| | |
|---|---|
| **United States Bankruptcy Court/Southern District of New York**<br>Lehman Brothers Holdings Claims Processing Center<br>c/o Epiq Bankruptcy Solutions, LLC<br>FDR Station, P.O. Box 5076<br>New York, NY 10150-5076 | **PROOF OF CLAIM** |

| In Re:<br>Lehman Brothers Holdings Inc., et al.,<br>Debtors. | Chapter 11<br>Case No. 08-13555 (JMP)<br>(Jointly Administered) | |
|---|---|---|
| Name of Debtor Against Which Claim is Held<br>**Lehman Brothers<br>Holdings Inc.** | Case No of Debtor<br>**80-13555** | |

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503. Additionally, this form should not be used to make a claim for Lehman Programs Securities (See definition on reverse side.)

THIS SPACE IS FOR COURT USE ONLY

Name and address of Creditor: (and name and address where notices should be sent if different from Creditor)

Mark Richard Imowitz
418 E. 59th Street
New York, NY 10022-2309

mimowitz@
Telephone number: 212-755-1668  Email Address: imowitz.com

☑ Check this box to indicate that this claim amends a previously filed claim.

Court Claim Number: 2918
(If known)

Filed on: 1/30/09

Name and address where payment should be sent (if different from above)

Telephone number:       Email Address:

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check this box if you are the debtor or trustee in this case.

1. **Amount of Claim as of Date Case Filed: $ 98,382.65**

If all or part of your claim is secured, complete Item 4 below; however, if all of your claim is unsecured, do not complete item 4.
If all or part of your claim is entitled to priority, complete Item 5.
If all or part of your claim qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9), complete Item 6.

☐ Check this box if all or part of your claim is based on a Derivative Contract.*
☐ Check this box if all or part of your claim is based on a Guarantee.*

*IF YOUR CLAIM IS BASED ON AMOUNTS OWED PURSUANT TO EITHER A DERIVATIVE CONTRACT OR A GUARANTEE OF A DEBTOR, YOU MUST ALSO LOG ON TO http://www.lehman-claims.com AND FOLLOW THE DIRECTIONS TO COMPLETE THE APPLICABLE QUESTIONNAIRE AND UPLOAD SUPPORTING DOCUMENTATION OR YOUR CLAIM WILL BE DISALLOWED.

☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of interest or additional charges. Attach itemized statement of interest or charges to this form or on http://www.lehman-claims.com if claim is a based on a Derivative Contract or Guarantee.

2. **Basis for Claim: Securities Purchased**
(See instruction #2 on reverse side.)

3. Last four digits of any number by which creditor identifies debtor: 4836
  3a. Debtor may have scheduled account as: _____
  (See instruction #3a on reverse side.)

4. **Secured Claim** (See instruction #4 on reverse side.)
Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.
Nature of property or right of setoff: ☐ Real Estate   ☐ Motor Vehicle   ☐ Other
Describe: _____
Value of Property: $_____ Annual Interest Rate _____%
Amount of arrearage and other charges as of time case filed included in secured claim, if any:
$_____ Basis for perfection: _____
Amount of Secured Claim: $_____ Amount Unsecured: $_____

6. **Amount of Claim that qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9): $_____**
(See instruction #6 on reverse side.)

5. **Amount of Claim Entitled to Priority under 11 U.S.C. §507(a).** If any portion of your claim falls in one of the following categories, check the box and state the amount.

Specify the priority of the claim:

☐ Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).
☐ Wages, salaries or commissions (up to $10,950), earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(4).
☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(5).
☐ Up to $2,425 of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(7).
☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).
☐ Other – Specify applicable paragraph of 11 U.S.C. § 507(a)(____).

Amount entitled to priority:

$_____

7. **Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim.
8. **Documents:** Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages and security agreements. Attach redacted copies of documents providing evidence of perfection of a security interest. (See definition of "redacted" on reverse side.) If the documents are voluminous, attach a summary.
DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.
If the documents are not available, please explain:

FOR COURT USE ONLY

**FILED / RECEIVED**

**DEC 30 2013**

**EPIQ BANKRUPTCY SOLUTIONS, LLC**

Date:
12/26/13

Signature: The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any.

Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

| Substitute Form **W-9** | **Request for Taxpayer**<br>**Identification Number and Certification** | Return form to Epiq Bankruptcy Solutions, LLC **Do not send to the IRS.** |
|---|---|---|

**Print or type**
**See Specific Instructions**

Name (as shown on your income tax return)

MARK R. IHOWITZ

Business name/disregarded entity name, if different from above

Check appropriate box for federal tax classification (required): ☑ Individual/ Sole proprietor  ☐ Corporation  ☐ S Corporation  ☐ Partnership  ☐ Trust/estate

☐ Limited liability company. Enter the tax classification (C=C corporation, S=S corporation, P=partnership) - - - - - -

☐ Other (see instructions)

☐ Exempt payee

Address (number, street, and apt. or suite no.)

418 E, 59th Street

City, state and ZIP code

New York, NY 10022-2309

List account number(s) here (optional)

Requester's name and address (optional)

Epiq Bankruptcy Solutions, LLC
As Agent for Lehman Brothers Holdings, Inc.
757 Third Avenue, 3rd Floor
New York, NY 10017

---

**Part I    Taxpayer Identification Number (TIN)**

Enter your TIN in the appropriate box. The TIN provided must match the name given on the "Name" line to avoid backup withholding. For individuals, this is your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the Part I instructions. For other entities, it is your employer identification number (EIN). If you do not have a number, see *How to get a TIN*.

**Note:** If the account is in more than one name, see the chart in the instructions for guidelines on whose number to enter.

**Social Security Number**

089 - 38 - 3559

or

**Employer identification number**

___ ___ - ___ ___ ___ ___ ___ ___ ___

---

**Part II    Certification**

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me), and

2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding, and

3. I am a U.S. citizen or other U.S. person (defined below).

**Certification Instructions.** You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the certification, but you must provide your correct TIN. (See the instructions)

| Sign Here | Signature of U.S. person | *Mark R. Imowitz* | Date | 12/26/13 |
|---|---|---|---|---|

## CERTIFICATION REGARDING STATUS

Creditor Name: Mark Richard Imowitz

Claim Number(s):

I, the undersigned, am the above-referenced creditor, or an authorized signatory for the above-referenced creditor (the "Creditor"), and hereby certify that neither the Creditor nor, to the best of the Creditor's knowledge, any person or entity for whom the Creditor may be acting or who may be the beneficial owner of the applicable claim(s), security/(ies), or interest(s) is a person or entity with whom it is illegal for a U.S. person to transact under the OFAC sanctions regulations and the list of Specially Designated Nationals and Blocked Persons.

Dated: 1/26/13

_____
Signature

Mark Richard Imowitz
Print Name

_____
Title (if applicable)

FOR IMMEDIATE RELEASE

**FOURTH DISTRIBUTION PERCENTAGES ANNOUNCED FOR LEHMAN BROTHERS
HOLDINGS INC. AND ITS DEBTOR AFFILIATES**

New York, September 26, 2013 – Lehman Brothers Holdings Inc. announced today in a
court filing the percentage recovery that will be distributed on October 3, 2013 to
holders of allowed claims against various former Lehman Debtors.

Lehman's fourth distribution to creditors pursuant to its confirmed chapter 11 plan will
total approximately $15.6 billion. This distribution includes (1) approximately $11.1
billion of payments to third-party creditors and non-controlled affiliates, (2) $4.1 billion of
payments among the Lehman Debtors and their controlled affiliates, (3) $276 million of
payments to recently allowed claims of amounts those claimants would have received
had those claims been allowed at the time of the previous distributions, and (4) $60.7
million of post-petition interest to holders of allowed claims that have been satisfied in
full (see Exhibit B to the court filing, Docket # 40225, for further detail).

In accordance with the chapter 11 plan, which was confirmed on December 6, 2011,
and subject to available funds, the Lehman Debtors' fifth distribution to creditors is
anticipated to be made within 5 business days of March 30, 2014.

The chapter 11 plan, related disclosure statement and other filings, including the filing
referred to above, can be found at www.lehman-docket.com in the "Key Documents"
section. Questions relating to the distribution can be directed to the Debtors' claims
agent, Epiq Systems, Inc., at 1-866-879-0688 (U.S.) and 1-503-597-7691 (Non-U.S.).

Media Contact:
Lehman Brothers Holdings Inc.
Kimberly Macleod
646-285-9215
kmacleod@lehmanholdings.com
# # #

**Epiq Bankruptcy Solutions, LLC**
**757 Third Avenue, 3rd Floor**
**New York, NY  10017**

Legal Documents Enclosed –
Please direct to the attention
of the Addressee,
Legal Department or President.

**Address Service Requested**

LBI OMNI 162 NTC 11-14-2013 (MERGE2,TXNUM2) 4000002674 BAR(23) MAIL ID *** 000073262535 ***
IMOWITZ, MARK RICHARD
418 E 59TH STREET
NEW YORK, NY 10022-2309

# THIS PAGE INTENTIONALLY LEFT BLANK

**THIS IS A NOTICE REGARDING YOUR CLAIM. YOU MUST READ IT
AND TAKE ACTION IF YOU DISAGREE WITH THE OBJECTION.**

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | |
| **LEHMAN BROTHERS INC.,** | **Case No. 08-01420 (JMP) SIPA** |
| Debtor. | |

**NOTICE OF HEARING ON TRUSTEE'S ONE HUNDRED SIXTY-SECOND
OMNIBUS OBJECTION TO GENERAL CREDITOR CLAIMS
(NO LIABILITY CLAIMS)**

**CLAIM(S) TO BE DISALLOWED & EXPUNGED**

**IMOWITZ, MARK RICHARD**

| Name/Address of Claimant | Claim Number | Date Filed | Total Amount Claimed | Basis for Objection & Reason for Proposed Disallowance |
|---|---|---|---|---|
| IMOWITZ, MARK RICHARD<br>418 E 59TH STREET<br>NEW YORK, NY 10022-2309 | 2918 | 1/30/2009 | $198,386.50 | No legal or factual justification for asserting a claim against LBI. The claimed securities were not issued or guaranteed by LBI. |

PLEASE TAKE NOTICE that, on November 14, 2013, James W. Giddens, as Trustee (the "Trustee") for the liquidation of the business of Lehman Brothers Inc. ("Debtor" or "LBI") filed his One Hundred Sixty-Second Omnibus Objection to General Creditor Claims (No Liability Claims) (the "Objection") with the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"). The category of claim objection applicable to you is identified in the table above in the column entitled "Basis for Objection & Reason for Proposed Disallowance."

The Objection requests that the Bankruptcy Court expunge, reduce, reclassify, and/or disallow one or more of your claims listed above under CLAIM(S) TO BE DISALLOWED & EXPUNGED on the ground that the LBI estate has no liability for the claim asserted. **Any claim that the Bankruptcy Court expunges and disallows will be treated as if it had not been filed and you will not be entitled to any distribution on account thereof.**

If you do NOT oppose the disallowance, expungement, reduction or reclassification of your claim(s) listed above under CLAIM(S) TO BE DISALLOWED & EXPUNGED, then you do NOT need to file a written response to the Objection and you do NOT need to appear at the hearing.

If you DO oppose the disallowance, expungement, reduction or reclassification of your claim(s) listed above under CLAIM(S) TO BE DISALLOWED & EXPUNGED, then you MUST file with the Court and serve on the parties listed below a written response to the Objection that is received on or before 4:00 p.m. Prevailing Eastern Time on December 5, 2013 (the "Response Deadline").

Your response, if any, must contain at a minimum the following: (i) a caption setting forth the name of the Bankruptcy Court, the name of the Debtor, the case number and the title of the Objection to which the response is directed; (ii) the name of the claimant and description of the basis for the amount of the claim; (iii) a concise statement setting forth the reasons why the claim should not be disallowed, expunged, reduced, or reclassified for the reasons set forth in the Objection, including, but not limited to, the specific factual and legal bases upon which you will rely in opposing the Objection; (iv) all documentation or other evidence of the claim, to the extent not included with the proof of claim previously filed with the Bankruptcy Court, upon which you will rely

in opposing the Objection; (v) the address(es) to which the Trustee must return any reply to your response, if different from that presented in the proof of claim; and (vi) the name, address, and telephone number of the person (which may be you or your legal representative) possessing ultimate authority to reconcile, settle, or otherwise resolve the claim on your behalf.

The Bankruptcy Court will consider a response only if the response is timely filed, served, and received. A response will be deemed timely filed, served, and received only if the original response is actually received on or before the Response Deadline by: (i) the chambers of the Honorable James M. Peck, One Bowling Green, New York, New York 10004, Courtroom 601; (ii) Hughes Hubbard & Reed LLP, One Battery Park Plaza, New York, New York, 10004, Attn: Meaghan C. Gragg, Esq.; (iii) Securities Investor Protection Corporation, 805 Fifteenth Street, N.W., Suite 800, Washington, DC 20005, Attn: Kenneth J. Caputo, Esq.; and (iv) Weil Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153, Attn: Maurice Horwitz, Esq. and Lori R. Fife, Esq.

A hearing will be held on December 19, 2013 to consider the Objection. The hearing will be held at 10:00 a.m. Prevailing Eastern Time in the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, New York 10004, Courtroom 601. If you file a written response to the Objection, you should plan to appear at the hearing. The Trustee reserves the right, however, to continue the hearing on the Objection with respect to your claim(s). If the Trustee does continue the hearing with respect to your claim(s), then the hearing will be held at a later date. If the Trustee does not continue the hearing with respect to your claim(s), then a hearing on the Objection will be conducted on the above date.

If the Bankruptcy Court does NOT disallow, expunge, reduce or reclassify your claim(s) listed above under CLAIM(S) TO BE DISALLOWED & EXPUNGED, then the Trustee has the right to object on other grounds to the claim(s) (or to any other claims you may have filed) at a later date. You will receive a separate notice of any such objections.

You may participate in a hearing telephonically provided that you comply with the Court's instructions (including, without limitation, providing prior written notice to counsel for the Trustee and any statutory committees), which can be found on the Court's website at www.nysb.uscourts.gov.

If you wish to view the complete Objection, you can do so on the Court's electronic docket for LBI's case, which is posted on the internet (i) at www.nysb.uscourts.gov (a PACER login and password are required and can be obtained through the PACER Service Center at www.pacer.psc.uscourts.gov), and (ii) for free at www.lehmantrustee.com, the Trustee's dedicated website. If you have any questions about this notice or the Motion, or if you would like to request a complete copy of the Motion at the Trustee's expense, please contact the Trustee's approved claims agent Epiq Bankruptcy Solutions, LLC at (866) 841-7868. CLAIMANTS SHOULD NOT CONTACT THE CLERK OF THE BANKRUPTCY COURT TO DISCUSS THE MERITS OF THEIR CLAIMS.

DATED:  November 14, 2013
        New York, New York

Meaghan C. Gragg
HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, New York 10004
(212) 837-6000

ATTORNEYS FOR JAMES W. GIDDENS,
TRUSTEE FOR THE SIPA LIQUIDATION OF
LEHMAN BROTHERS INC.

# LEHMAN BROTHERS

LEHMAN BROTHERS INC.
399 PARK AVENUE
6TH FLOOR
NEW YORK, NY  10022
MITCHELL, STEVEN

**Confirmation**                                    Page 1 of 2

**Account information**

**Your investment representative
for this activity**
IR #: 306191
MITCHELL, STEVEN
800-392-5000

MARK RICHARD IMOWITZ
418 E. 59TH STREET
NEW YORK NY  10022-2309

**Account number**
831-34836

This document confirms the transaction(s) described below. The transaction(s) are
USD denominated unless otherwise reflected. Please review the details provided.
Notify the branch manager immediately if you disagree with any information
provided here.

## Transaction summary for April 28, 2008

|  | Total number |
|---|---|
| Buys | 1 |
| Sells | 0 |

# You bought

| Description (Symbol) | Trade date | Settlement date | Market | Capacity | Account type |
|---|---|---|---|---|---|
| CUSIP #:  524935111000 | 25 Apr 08 | 28 Apr 08 | 7 | 7 | Cash |
| Trade #:  TMS04/28/08 - 0054046 | | | | | |

| WTS LEHMAN BROS HLDGS INC (L008788) | Quantity bought | Price | | | Amount |
|---|---|---|---|---|---|
| PROSPECTUS UNDER SEPARATE MAIL | 390 | 252.25000 | Principal | | 98,377.50 |
| UNSOLICITED | | | Processing fee | | 5.15 |
| AS OF 04/25/08 | | | Net amount | | 98,382.65 |
| Reference #:  372665 | | | | | |

 **BARCLAYS**

| **Premier client account**
| **831-34836**

MARK RICHARD IMOWITZ
October 1 - October 31, 2008

page    1 of    10

**Your investment**
**representative:**
S MITCHELL
BARCLAYS CAPITAL INC
399 PARK AVENUE
6TH FLOOR
NEW YORK NY. 10022
TEL: 800-392-5000

| | |
|---|---|
| **Portfolio summary** | |
| 3 | Account asset allocation |
| | Change in account value |
| 4 | Tax spotlight |
| | Bulletin board |
| 5 | Fixed income summary |
| 6 | Holdings |
| 8 | Activity |
| 9 | Cash investment summary |
| 10 | Tax lots |

**Valuation summary: USD**

Last period account value
1,155,848.96
This period account value
996,151.47

*All transaction dates*
*appearing on this statement*
*are settlement dates, unless*
*otherwise labeled.*

000067  03 AV   0.704 00001 LHDTG001
MARK RICHARD IMOWITZ
418 E. 59TH STREET
NEW YORK  NY  10022-2309



## Bulletin board (continued on pg.4)

(continued on pg.4)

As you are aware, following the bankruptcy of Lehman Brothers Inc.
("LBI") in September 2008, the business of Lehman Brothers Private
Investment Management ("PIM") was transferred to Barclays Wealth, the
wealth management division of Barclays Bank PLC, operating in the United
States through Barclays Capital Inc. As a former client of PIM, your
account relationship was transferred from LBI to Barclays Capital Inc.

You will notice several differences and enhancements over the coming
months to our communications including literature, a website, research
papers and a new look. We would like to take this opportunity again to
thank you for your patience and loyalty in this unprecedented market
environment and look forward to working with you and together building
on our successful relationship. If you have any questions, please
contact your investment Representative.

**GO PAPERLESS**

Sign up for electronic delivery of account
statements and trade confirmations and
we will plant a tree on your behalf.

Visit www.lehmanlive.com for details. If you currently
do not have online access, please contact your
investment Representative.

Member SIPC

The Multi-tone area of this document changes gradually from light to dark. Heat sensitive "SECURITY MARK" on front of the document turns from Grey to Clear when heat is applied.



| Premier client account | MARK RICHARD IMOWITZ |
| 831-34836 | October 1 - October 31, 2008 |

## Understanding your portfolio statement

**Client Services Department** Within the U.S. 800-253-4626
International 212-526-5600
Please contact us immediately to report any errors, omissions or discrepancies you find in your statement. Any oral communications should be re-confirmed in writing. Please send written inquiries to:

Barclays
Compliance Division
399 Park Avenue, 6th Floor
New York, NY 10022-3763

If you have any questions about your statement or you have a material change in your investment objectives or financial situation, please call us. A financial statement of Barclays is available for your personal inspection at our offices, or a copy of it will be mailed upon your written request.

**Transaction charges** Details of transaction charges and commissions are displayed on transaction confirmations, which have been mailed separately to you. We will also send you this information upon request.

**Client order policy** We route client orders to the market where we believe clients receive the best execution, taking into account price, reliability, market depth, quality of service, speed and efficiency. Ordinarily, we will route orders only to markets where there is an opportunity for them to be executed at better prices than the quoted bid or offer. Barclays does not accept hard-dollar payment for directing customer orders to particular broker/dealers or market centers. However, we may receive discounts, rebates, reductions of fees or credits as a result of the overall volume of our trading activity or directing certain orders. But these benefits will generally not be sufficient to offset the cost of directing orders to such broker/dealers or market centers. If your statement indicates that a security was delivered to you or your designated representative, and you have not received it within three weeks, you must notify your branch office immediately. If you do not notify your branch office within 5 months of the statement delivery date, Barclays will not be responsible for the cost of posting a replacement bond.

**Pricing and foreign exchange rates** We obtain pricing and foreign exchange rates from various outside sources and do not guarantee the accuracy, reliability, completeness or attainability of this information. The prices of the securities appearing herein have not been adjusted from the closing market prices to reflect any adjustment (such as an illiquidity discount) that may apply or be appropriate to a particular security or position that is a restricted security, a control security or a similar type of security that is not freely tradable in the hands of the client. You or your service providers should make the necessary adjustments that you believe are appropriate for the security, the client's status and the prevailing market conditions. The prices and rates in this statement indicate values as of the close of business on the last business day of the month only.

**Cost basis** The unit cost for securities have been obtained from various outside sources including, where applicable, supplied by you. We do not guarantee the accuracy, reliability or completeness of this information. Cost basis and associated realized gain and loss information has been provided to you as a courtesy. Such information may not reflect all adjustments necessary for tax

reporting purposes. You should verify cost basis and corresponding gain/loss information against your own records when calculating reportable gain or loss resulting from a sale. You are solely responsible for the accuracy of cost basis and gain/loss information reported to federal, state and other taxing authorities.

**Funds and securities** Clients funds and securities are held at Barclays. We will pay you a free credit balance in any account, except for segregated commodity accounts, on demand. These funds may be used for our business purposes and are properly accounted for on our record book.

**Guide to Barclays Capital Inc. Equity Research Rating System:** Our coverage analysts use a relative rating system in which they rate stocks as 1-Overweight, 2-Equal weight or 3-Underweight (see definitions below) relative to other companies covered by the analyst or a team of analysts that are deemed to be in the same industry sector ("the sector coverage universe").

In addition to the stock rating, we provide sector views which rate the outlook for the sector coverage universe as 1-Positive, 2-Neutral or 3-Negative (see definitions below). A rating system using terms such as buy, hold and sell is not the equivalent of our rating system. Investors should carefully read the entire research report including the definitions of all ratings and not infer its contents from ratings alone.

| Stock Rating | |
|---|---|
| 1 - Overweight: | The stock is expected to outperform the unweighted expected total return of the sector coverage universe over a 12-month investment horizon. |
| 2 - Equal weight: | The stock is expected to perform in line with the unweighted expected total return of the sector coverage universe over a 12-month investment horizon. |
| 3 - Underweight: | The stock is expected to underperform the unweighted expected total return of the sector coverage universe over a 12-month investment horizon. |
| RS Rating Suspended: | The rating and target price have been suspended temporarily to comply with applicable regulations and/or firm policies in certain circumstances including when Barclays Capital Inc. is acting in an advisory capacity in a merger or strategic transaction involving the company. |
| Sector View | |
| 1 - Pos / Positive: | "sector coverage universe" fundamentals/valuations are improving. |
| 2 - Neu / Neutral: | sector coverage universe fundamentals/valuations are steady, neither improving nor deteriorating. |
| 3 - Neg / Negative: | sector coverage universe fundamentals/valuations are deteriorating. |

**Independent Research:** We provide ratings from Independent Research Providers ("IRPs") for certain companies. BNY Jaywalk Inc., an intermediary, maps individual IRP ratings to standard ratings (1-Buy, 2-Hold, 3-Sell) which are referenced on your statement.

**Taxes** For tax reporting purposes, you should rely on the official tax forms we send you after the end of the year.

**Late charges** If you purchase securities in your cash account and do not make payment by the settlement day, you may have to pay a late charge.

**Interest charges** Any interest you are charged is generally calculated from the 21st day of each month through the 20th day of the following month. When the 20th day falls on a weekend or holiday, the interest is calculated through that weekend or holiday, and the next business day is the start of the next interest period.

*To calculate interest charges, we do the following:*
Net average debit balance x interest rate x number of days the debit was outstanding x 1/360

We charge you interest on the debit balance in your account. Interest charges that are not paid will be added to the opening balance debit balance in your account for the next interest period.

**Credit balances** In accordance w/ Financial Industry Regulatory Authority Rule 436, it is our understanding that any free credit balances in your account are being maintained for the purpose of investing those amounts through us.

**General Information** All transactions are subject to the constitutions, rules, regulations, customs, usages, rulings and interpretations of the pertinent exchanges, markets, self-regulatory organizations and clearing houses, as well as the terms and conditions set forth on the reverse side of the Barclays trade confirmation. All balances are subject to verification. Post-settlement and other differences may appear on subsequent statements. We and our affiliates trade for our own accounts, including as odd lot dealers, block positioners or arbitrageurs. At the time of any transaction in your account, we or our affiliates may have a long or short position in the same security and our positions may be completely or partially hedged. This statement should be preserved, as it may be necessary for the preparation and subsequent examination of your income tax return and to verify interest charges that may appear on your next statement.

We are required by law to report to the Internal Revenue Services certain dividends, bond interest and the net proceeds of certain transactions. For tax reporting purpose, you should rely on the 1099 forms that you will receive from us after the end of the year.

**Member of SIPC** Barclays Capital Inc. is a member of the Securities Investor Protection Corporation (SIPC). SIPC provides protection for the securities and cash held in client accounts up to $500,000 per client (including up to $100,000 for claims for cash). In addition to the coverage required by SIPC, Barclays Capital Inc. carries excess coverage protection from Lloyd's of London. Thus, the securities and cash held for clients by Barclays Capital Inc. are protected up to $500 million for any one client loss ($1.2 million for cash) with an aggregate loss limit of $500 million for all claims. This coverage does not protect against changes in market value. Securities lending, borrowing transactions (including repurchase and reverse repurchase agreements) and private equity may not be protected by SIPC. You may obtain information about SIPC, including the SIPC brochure, at www.sipc.org or by calling 202-371-8300.



**Premier client account**
**831-34836**

MARK RICHARD IMOWITZ
October 1 - October 31, 2008

## Account asset allocation

*Asset allocation includes derivative instruments classified based upon the corresponding underlying security and does not represent a comprehensive risk assessment of your account.*

| | Last period | This period | % change | Asset allocation Oct. 31 | |
|---|---|---|---|---|---|
| Equities | $ 95,316.00 | $ 3,510.00 | - 96.3% | ■ | 0.4 % |
| Fixed income | 77,030.00 | 9,000.00 | - 88.3 | ■ | 0.9 |
| Cash, cash equivalents & other | 983,502.96 | 983,641.47 | | ▓ | 98.7 |
| Total account value | $ 1,155,848.96 | $ 996,151.47 | - 13.8% | | |

## Change in account value

*Interest and dividends for this year include all income received in 2008. Please see the Tax Spotlight section for a summary of income that may be reportable in 2008.*

| | This period | This year |
|---|---|---|
| Opening portfolio value | $ 1,155,848.96 | $ 918,509.39 |
| Deposits | 0.00 | 300,000.00 |
| Withdrawals | 0.00 | - 50,000.00 |
| Interest | 0.00 | 8,808.62 |
| Dividends | 138.51 | 5,572.22 |
| Change in value* | - 159,836.00 | - 186,738.76 |
| Closing portfolio value | $ 996,151.47 | |

\* *May include changes in market value, changes in accrued interest or securities transferred in or out of your account.*

COPY COPY COPY COPY COPY

LBF 8155D2W (11-08)



 **BARCLAYS**

| | |
|---|---|
| **Premier client account** | MARK RICHARD IMOWITZ |
| **831-34836** | October 1 – October 31, 2008 |

page   4 of   10

## Tax spotlight

**This is not a tax document.** *This information is being provided for your convenience and is for informational purposes only. Information on hedge funds, limited partnerships, private equity, and private offerings are excluded from this section. For tax reporting, you should rely on your official tax documents. Transactions requiring tax consideration should be reviewed with your accountant or tax advisor*

*Your positions were held at Lehman Brothers Inc. through on or about September 25, 2008. Income and realized gains and losses on your positions through the date they were moved are based on information obtained from Lehman Brothers Inc. Barclays Capital Inc. has not verified such information and assumes no responsibility or liability for the accuracy of such information.*

| Reportable income | This period | This year |
|---|---|---|
| Dividends | $ 138.51 | $ 5,572.22 |
| Interest | 0.00 | 948.95 |
| **Total** | **$ 138.51** | **$ 6,521.17** |

| Non-reportable income | | |
|---|---|---|
| Non-taxable interest earned | $ 0.00 | $ 7,859.67 |

| Unrealized capital gains and losses | | To date |
|---|---|---|
| Short-term gains and losses | | -$ 94,872.65 |

*Cash In Lieu ( C-I-L) proceeds from fractional shares are not included in this section. The IRS does not require reporting on C-I-L under $20. Higher amounts will appear on your year end tax form based on your tax reporting status.*

*Gain/Loss information excludes cash, cash equivalents, and other, alternative investments, and commodity & commodities equivalents - private offerings.*

## Bulletin board *(continued from pg. 1)*

Structured Products issued by Lehman Brothers Holdings Inc. will be priced at $0.09 on the dollar for the October 2008 statement. This valuation will be provided in the market value column, and reflects indicative pricing which is based upon expectations related to Lehman Brothers bankruptcy and the illiquid nature of the underlying securities. There are no assurances that an investor could sell these structured products at this price

Barclays Capital Inc. (*BCI*) is committed to complying with various customer identification and verification obligations. We may ask you to

## Bulletin board *(continued from pg. 1)*

provide documentation or additional information, as necessary, to enable BCI to comply with these requirements. We may also screen your name against various databases to verify your identity. This verification applies to both new accounts and when changes are made to existing accounts. Please be assured that this information and documentation will be treated with the highest regard to your personal privacy.

Business Continuity at Barclays Capital Inc. (*BCI*): For a summary of how BCI would respond to a significant business disruption, please go to www.lehman.com/bcp.htm.

Additional information about your Investment Representative or your Representative's brokerage firm may be available by accessing FINRA's BrokerCheck program. Please visit www.nasdbrokercheck.com or call 1-800-289-9999 for more information.

Barclays Capital Inc. (*BCI*) provides 24 hour online access to your account information. You will have access to your account summary, holdings, activity, statements, trade confirmations and year-end tax reports. In the coming weeks, you'll also notice a new look, as we introduce an improved, user-friendly design. Contact your Investment Representative if you do not currently have online access or need assistance in accessing your account information at www.LehmanLive.com.

COPY COPY COPY COPY COPY

# BARCLAYS

## Fixed income

### Maturity (exclusive of calls)

| Type | % of total portfolio % | Market value | % of bonds Oct. 31 % |
|---|---|---|---|
| 0 - 3 months | | | 100.0 |
| 3 - 12 months | 0.9 | 9,000.00 | |
| 1 - 2 years | | | |
| 2 - 5 years | | | |
| 5 - 10 years | | | |
| Over 10 years | | | |
| **Total** | **0.9 %** | **$ 9,000.00** | |

### Type

| Type | % of total portfolio | Market value | % of fixed income Oct. 31 |
|---|---|---|---|
| CORPORATE | 0.9% | $ 9,000.00 | 100.0% |
| GOVERNMENTS AND AGENCIES | | | |
| MUNICIPAL | | | |
| INTERNATIONAL | | | |
| MORTGAGE AND ASSET-BACKED | | | |
| MUTUAL FUND | | | |
| OTHER | | | |
| **Total** | **0.9%** | **$ 9,000.00** | |

### Coupon rate

| Coupon rate | % of total portfolio | Market value | % of bonds Oct. 31 |
|---|---|---|---|
| Under 2% | 0.9% | $ 9,000.00 | 100.0% |
| 2 - 4% | | | |
| 4 - 6% | | | |
| 6 - 8% | | | |
| 8 - 10% | | | |
| Over 10% | | | |
| **Total** | **0.9 %** | **$ 9,000.00** | |

### Credit Quality

| | % of total portfolio | Market value |
|---|---|---|
| Moody's B3 | 0.9% | $ 9,000.00 |

## Barclays Capital Bond Indices

### U.S. Aggregate Bond Index

| Oct. 31 | 1,257.60 |
|---|---|
| % change | - 2.36 |

1311.00
1300.00
1289.00
1278.00
1267.00
1256.00

09/30                    10/31

### Municipal Bond Index

| Oct. 31 | 623.40 |
|---|---|
| % change | - 1.02 |

634.00
624.40
614.80
605.20
595.60
586.00

09/30                    10/31

LBIF 8155D23W (11-08)

000644   000000   000067

 **BARCLAYS**

| Premier client account **831-34836** | MARK RICHARD IMOWITZ |
|---|---|
| | October 1 - October 31, 2008 |

page  6 of  10

## HOLDINGS

*In instances where prices of securities are not readily available, securities have no values, securities may not have been actively traded or where other factors prevent the pricing of securities, \*\* appears in the market price column, the market value for the security is not computed and the total equity in your account does not reflect the long or short market value (if any) of those securities. Please also note that totals may differ from the sum on individual components due to rounding.*
*Unrealized gain/loss total reflects all positions for which a cost basis is available. Please review the Tax Lot section for details regarding cost basis.*

## Equities

*Your statement contains research ratings for companies covered by Barclays Capital Equity Research. The ratings reflect both the Barclays Capital rating and, where applicable, the ratings of an independent, third party research provider. You may obtain a copy of any independent research report, at no cost to you, where such research is available. Clients may access Barclays Capital or independent research at www.LehmanLive.com or by calling 1-800-253-4626. A complete description of Barclays Capital and independent research providers and ratings may be found on Page 2 of your statement.*

| Rights and warrants | Quantity | Unit cost | Total cost | Market price | Market value | Unrealized gain/loss | Comment |
|---|---|---|---|---|---|---|---|
| WTS LEHMAN BROS HLDGS INC CALL WT LKD MILLENNIUM | 390 | $252.26 | $98,382.65 | $9.00 | $3,510.00 | -$94,872.65 | In cash account Indicative bid, as of 10/1/08. |
| **Total Equities** | | | | | ▨▨▨▨ | -$94,872.65 | |

COPY COPY COPY COPY COPY COPY

# BARCLAYS

**Premier client account**
**831-34836**

MARK RICHARD IMOWITZ
October 1 - October 31, 2008

## Fixed income

*Yield information is provided for informational purposes only. Barclays makes reasonable efforts to ensure its accuracy but should not be held responsible for errors or omissions.*

| Corporate bonds | Par | Unit cost Adj. unit cost | Total cost Adj. total cost | Market price | Market value Accrued interest | Unrealized gain/loss | Yield-to-maturity(%) | Comment |
|---|---|---|---|---|---|---|---|---|
| LEHMAN BROS HOLDINGS INC | 100,000 | $ 100.004 | $ 100,003.85 | 9.00 | $ 9,000.00 | N/A | | In cash account |
| XLF ANN REV NTS | | 100.004 | 100,003.85 | | | | | Moody's B3 |
| DUE 02/20/2009 | | | | | | | | |
| DUE 20 FEB 2009 | | | | | | | | |
| ISIN: US5252M0DT14 | | | | | | | | |
| DATED DATE 19 FEB 2008 | | | | | | | | |

|  | Market value (USD) |
|---|---|
|  | Accrued int. (USD) |
| Total Fixed income | $ 9,000.00 |
|  | $ 0.00 |
|  | $ 9,000.00 |

## Cash, cash equivalents & other

*Money Market Preferred, SAVRs and other Auction Rate Securities are included in the Cash, Cash Equivalents and Other category. The interest rate on these securities generally is reset on a periodic basis in an auction process. Investors should be aware that these securities may have a final legal maturity date that is of a long-term nature and that under certain circumstances the rate paid or the mechanism for setting the rate paid on these securities could change. Please consult your investment representative with any questions.*

*Gain/Loss information also excludes cash, cash equivalents, and other.*

| Cash investments | Quantity | Market value Accrued income | Comment |
|---|---|---|---|
| LEHMAN INSTL LIQUIDITY FDS | 983,093.85 | $ 983,093.85 | |
| GOV'T RESV PORT PREMIER CL | | | |
| MONEY MARKET OBLIGATIONS TRUST | 547.62 | 547.62 | |
| PRIME OBLIGATION FUND | | | |
| Total USD Cash investments | | $ 983,641.47 | |

|  | Market value (USD) |
|---|---|
|  | Accrued income (USD) |
| Total Cash, cash equivalents & other | $ 983,641.47 |
|  | $ 0.00 |
|  | $ 983,641.47 |

LBE 8155D2W (11-08)



# BARCLAYS

| Premier client account
831-34836

MARK RICHARD IMOWITZ
October 1 - October 31, 2008

page    8 of    10

## ACTIVITY

**Dividends**

| | Date | Taxable amt. | Non-taxable amt. | Amount | Comment |
|---|---|---|---|---|---|
| LEHMAN INSTL LIQUIDITY FDS | 01 Oct 2008 | $78.08 | | $78.08 | div pay 9/1 to 9/25 |
| GOVT RESV PORT PREMIER CL | | | | | |
| LEHMAN INSTL LIQUIDITY FDS | 01 Oct 2008 | 60.43 | | 60.43 | MONTHLY DIVIDEND  9/26-9/30 |
| GOVT RESV PORT PREMIER CL | | | | | |
| Total USD dividends | | $ 138.51 | | $ 138.51 | |
| Total USD dividends - 2008 | | $ 138.51 | | $ 138.51 | |

The taxable and non-taxable designations provided above refer to the US income tax treatment of distributions from your securities. The designations are
accurate to the best of our knowledge. Clients should consult with a tax advisor regarding the tax treatment of their investments.



# BARCLAYS

**Premier client account**
**831-34836**

MARK RICHARD IMOWITZ
October 1 - October 31, 2008

page    9 of    10

## Cash investment summary

| | Type | Date | Amount | Comment |
|---|---|---|---|---|
| Opening balance | | | $ 982,955.34 | |
| LEHMAN INSTL LIQUIDITY FDS | Investment | 01 Oct 2008 | 78.08 | reinvest |
| GOVT RESV PORT PREMIER CL | | | | |
| LEHMAN INSTL LIQUIDITY FDS | Investment | 01 Oct 2008 | 60.43 | |
| GOVT RESV PORT PREMIER CL | | | | |
| MONEY MARKET OBLIGATIONS TRUST | Investment | 03 Oct 2008 | 547.62 | MONTHLY DIVIDEND REINVESTED |
| PRIME OBLIGATION FUND | | | | |
| Closing balance | | | $ 983,641.47 | |

LRF R1 (5D2W (1L.08))

 **BARCLAYS**

| Premier client account | MARK RICHARD IMOWITZ |
| 831-34836 | October 1 - October 31, 2008 |

## TAX LOTS

** Days Held: Either # of days if held one year or less or  L if held for more than one year or S/L for Index Options.

## Equities

| Rights and warrants - long | Quantity or Par | Settle date | Unit cost | Total cost | Market price | Market value | Unrealized gain/loss | Days held ** |
|---|---|---|---|---|---|---|---|---|
| WTS LEHMAN BROS HLDGS INC<br>CALL WT LKD MILLENNIUM | 390 | 28 Apr 2008 | $ 252.26 | $ 98,382.65 | $ 9.00 | $ 3,510.00 | -$ 94,872.65 | 194 |

## Fixed income

Unrealized gain/loss is calculated using adjusted unit cost.  Please consult your tax advisor to determine if your situation requires that you use unit cost for your unrealized gain/loss.

| Corporate bonds - long | Quantity or Par | Settle date | Unit cost<br>Adj. Unit cost | Total cost<br>Adj. total cost | Market price | Market value | Unrealized gain/loss | Days held ** |
|---|---|---|---|---|---|---|---|---|
| LEHMAN BROS HOLDINGS INC<br>XLF ANN REV NTS | 100,000 | 19 Feb 2008 | $ 100.00 | $ 100,003.85 | $ 9.00 | $ 9,000.00 | N/A | |
| DUE 02/20/2009<br>R/MD0000          02/20/2009 | | | 100.00 | 100,003.85 | | | | |

COPY COPY COPY COPY COPY COPY
COPY COPY COPY COPY COPY COPY

# LEHMAN BROTHERS

**Premier client account
831-34836**

MARK RICHARD IMOWITZ
September 1 - September 30, 2008

page   1 of   11

**Your investment representative:**
S MITCHELL
BARCLAYS CAPITAL INC
399 PARK AVENUE
6TH FLOOR
NEW YORK NY 10022
TEL: 800-392-5000

**Portfolio summary**

| | |
|---|---|
| 3 | Account asset allocation |
| | Change in account value |
| 4 | Tax spotlight |
| | Bulletin board |
| 6 | Fixed income summary |
| 7 | Holdings |
| 9 | Activity |
| 10 | Cash investment summary |
| 11 | Tax lots |

**Valuation summary: USD**

Last period account value
1,212,608.34
This period account value
1,155,848.96

*All transaction dates appearing on this statement are settlement dates, unless otherwise labeled.*

000365 03 AV  0.704 00004 LHDTG001
MARK RICHARD IMOWITZ
418 E. 59TH STREET
NEW YORK  NY  10022-2309



## Bulletin board (continued on pg.4)

(continued on pg.4)

As you are aware, the business of Lehman Brothers Private Investment Management ("PIM") is now part of Barclays Wealth, the wealth management division of Barclays Bank PLC, which operates in the United States as Barclays Capital Inc. As a client of PIM your account has been moved to Barclays Capital Inc. and remains safe and secure.

The September statement reflects the mid-month transfer. Additionally, as a new client of Barclays Wealth you will notice several differences from a branding perspective and you will see more of our new name and look in the upcoming months.

We want to thank you for your patience and loyalty in this unprecedented market environment. We look forward to continuing to work with you as we build on our success with our new partner. If you have any questions, please contact your Investment Representative.



### GO PAPERLESS

Sign up for electronic delivery of account statements and trade confirmations and we will plant a tree on your behalf.

Visit www.lehmanlive.com for details. If you currently do not have online access, please contact your Investment Representative.

Member SIPC

003885  000000  000365

The Multi-tone area of this document changes gradually from light to dark. Heat sensitive "SECURITY MARK" on front of the document turns from Grey to Clear when heat is applied.

LBF 8155D2W (10-06)

# LEHMAN BROTHERS

### Premier client account
### 831-34836

MARK RICHARD IMOWITZ
September 1 - September 30, 2008

## Understanding your portfolio statement

**Client Services Department** Please contact us immediately to report any errors, omissions or discrepancies you find in your statement. Any oral communications should be re-confirmed in writing. Please send written inquiries to:

Lehman Brothers
Compliance Division
745 7th Avenue, 19th Floor
New York, NY 10019

If you have any questions about your statement or you have a material change in your investment objectives or financial situation, please call us.

**Transaction charges** Details of transaction charges and commissions are displayed on transaction confirmations, which have been sent separately to you. We will also send you this information upon request.

**Client order policy** If your statement indicates that a security was delivered to you or your designated representative, and you have not received it within three weeks, you must notify your branch office immediately. If you do not notify your branch office within 5 months of the statement delivery date, Lehman Brothers will not be responsible for the cost of posting a replacement bond.

**Pricing and foreign exchange rates** We obtain pricing and foreign exchange rates from various outside sources and do not guarantee the accuracy, reliability, completeness or attainability of this information. The prices of the securities appearing herein have not been adjusted from the closing market prices to reflect any adjustment (such as an illiquidity discount) that may apply or be appropriate to a particular security or position that is a restricted security, a control security or a similar type of security that is not freely tradable in the hands of the client. You or your service providers should make the necessary adjustments that you believe are appropriate for the security, the client's status and the prevailing market conditions. The prices and rates in this statement indicate values as of the close of business on the last business day of the month only.

**Cost basis** The unit cost for securities have been obtained from various outside sources, including, where applicable, supplied by you. We do not guarantee the accuracy, reliability or completeness of this information. Cost basis and associated realized gain and loss information has been provided to you as a courtesy. Such information may not reflect all adjustments necessary for tax reporting purposes. You should verify cost basis and corresponding gain/loss information against your own records when calculating reportable gain or loss resulting from a sale. You are solely responsible for the accuracy of cost basis and gain/loss information reported to federal, state and other taxing authorities.

**Guide to Lehman Brothers Equity Research Rating System:** Our coverage analysts use a relative rating system in which they rate stocks as 1-Overweight, 2-Equal weight or 3-Underweight (see definitions below) relative to other companies covered by the analyst or a team of analysts that are deemed to be in the same industry sector ("the sector coverage universe").

In addition to the stock rating, we provide sector views which rate the outlook for the sector coverage universe as 1-Positive, 2-Neutral or 3-Negative (see definitions below). A rating system using terms such as buy, hold and sell is not the equivalent of our rating system. Investors should carefully read the entire research report including the definitions of all ratings and not infer its contents from ratings alone.

| Stock Rating | |
|---|---|
| 1 - Overweight: | The stock is expected to outperform the unweighted expected total return of the sector coverage universe over a 12-month investment horizon. |
| 2 - Equal weight: | The stock is expected to perform in line with the unweighted expected total return of the sector coverage universe over a 12-month investment horizon. |
| 3 - Underweight: | The stock is expected to underperform the unweighted expected total return of the sector coverage universe over a 12-month investment horizon. |
| RS Rating Suspended: | The rating and target price have been suspended temporarily to comply with applicable regulations and/or firm policies in certain circumstances including when Lehman Brothers is acting in an advisory capacity in a merger or strategic transaction involving the company. |
| Sector View | |
| 1 - Pos / Positive: | "sector coverage universe" fundamentals/valuations are improving. |
| 2 - Neu / Neutral: | sector coverage universe fundamentals/valuations are steady, neither improving nor deteriorating. |
| 3 - Neg / Negative: | sector coverage universe fundamentals/valuations are deteriorating. |

**Independent Research:** We provide ratings from Independent Research Providers ("IRPs") for certain companies. BNY Jaywalk Inc., an intermediary, maps individual IRP ratings to standard ratings (1-Buy, 2-Hold, 3-Sell) which are referenced on your statement.

**Late charges** If you purchase securities in your cash account and do not make payment by the settlement day, you may have to pay a late charge.

**Interest charges** Any interest you are charged is generally calculated from the 21st day of each month through the 20th day of the following month. When the 20th day falls on a weekend or holiday, the interest is calculated through that weekend or holiday, and the next business day is the start of the next interest period.

*To calculate interest charges, we do the following:*

Net average debit balance x interest rate x number of days the debit was outstanding x 1/360

We charge you interest on the debit balance in your account. Interest charges that are not paid will be added to the opening balance debit balance in your account for the next interest period.

**General Information** All transactions are subject to the constitutions, rules, regulations, customs, usages, rulings and interpretations of the pertinent exchanges, markets, self-regulatory organizations and clearing houses, as well as the terms and conditions set forth in Lehman Brothers' trade confirmation. All balances are subject to verification. Post-settlement and other differences may appear on subsequent statements. We and our affiliates trade for our own accounts, including as odd lot dealers, block positioners or arbitrageurs. At the time of any transaction in your account, we or our affiliates may have a long or short position in the same security and our positions may be completely or partially hedged. This statement should be preserved, as it may be necessary for the preparation and subsequent examination of your income tax return and to verify interest charges that may appear on your next statement.

COPY COPY COPY COPY COPY

# LEHMAN BROTHERS

**Premier client account**
**831-34836**

MARK RICHARD IMOWITZ
September 1 - September 30, 2008

## Account asset allocation

*Asset allocation includes derivative instruments classified based upon the corresponding underlying security and does not represent a comprehensive risk assessment of your account.*

| | Last period | This period | % change | Asset allocation Sep. 30 |
|---|---|---|---|---|
| Equities | $ 100,113.00 | $ 95,316.00 | - 4.7% | 8.2 % |
| Fixed income | 79,540.00 | 77,030.00 | - 3.1 | 6.7 |
| Cash, cash equivalents & other | 1,032,955.34 | 983,502.96 | - 4.7 | 85.1 |
| **Total account value** | **$ 1,212,608.34** | **$ 1,155,848.96** | **- 4.6%** | |

## Change in account value

*Interest and dividends for this year include all income received in 2008. Please see the Tax Spotlight section for a summary of income that may be reportable in 2008.*

| | This period | This year |
|---|---|---|
| Opening portfolio value | $ 1,212,608.34 | $ 918,509.39 |
| Deposits | 0.00 | 300,000.00 |
| Withdrawals | - 50,000.00 | - 50,000.00 |
| Interest | 0.00 | 8,808.62 |
| Dividends | 1,768.87 | 5,433.71 |
| Change in value* | - 8,528.25 | - 26,902.76 |
| Closing portfolio value | $ 1,155,848.96 | |

\* *May include changes in market value, changes in accrued interest or securities transferred in or out of your account.*

LBF 8155D2W (10-06)

# LEHMAN BROTHERS

**Premier client account
831-34836**

MARK RICHARD IMOWITZ
September 1 - September 30, 2008

## Tax spotlight

**This is not a tax document.** *This information is being provided for your convenience and is for informational purposes only. Information on hedge funds, limited partnerships, private equity, and private offerings are excluded from this section. For tax reporting, you should rely on your official tax documents. Transactions requiring tax consideration should be reviewed with your accountant or tax advisor*

| Reportable income | This period | This year |
|---|---|---|
| Dividends | $ 1,768.87 | $ 5,433.71 |
| Interest | 0.00 | 948.95 |
| Total | $ 1,768.87 | $ 6,382.66 |

| Non-reportable income | | |
|---|---|---|
| Non-taxable interest earned | $ 0.00 | $ 7,859.67 |

| Unrealized capital gains and losses | | To date |
|---|---|---|
| Short-term gains and losses | | -$ 3,066.65 |

*Cash In Lieu ( C-I-L) proceeds from fractional shares are not included in this section. The IRS does not require reporting on C-I-L under $20. Higher amounts will appear on your year end tax form based on your tax reporting status.*

*Gain/Loss information excludes cash, cash equivalents, and other, alternative investments, and commodity & commodities equivalents - private offerings.*

## Bulletin board *(continued from pg. 1)*

Barclays Capital Inc. (BCI) is committed to complying with various customer identification and verification obligations. We may ask you to provide documentation or additional information, as necessary, to enable BCI to comply with these requirements. We may also screen your name against various databases to verify your identity. This verification applies to both new accounts and when changes are made to existing accounts. Please be assured that this information and documentation will be treated with the highest regard to your personal privacy.

Business Continuity at Barclays Capital Inc: For a summary of how Barcalys Capital would respond to a significant business disruption, please go to www.lehman.com/bcp.htm.

## Bulletin board *(continued from pg. 1)*

Additional information about your investment representative or your representative's brokerage firm may be available by accessing FINRA's BrokerCheck program. Please visit www.nasdbrokercheck.com or call 1-800-289-9999 for more information.

Barclays Capital provides 24 hour online access to your account information. You will have access to your account summary, holdings, activity, statements, trade confirmations and year-end tax reports. Contact your Investment Representative if you do not currently have online access or need assistance in accessing your account information at www.LehmanLive.com.

As a registered broker-dealer and futures commission merchant, Barclays Capital Inc. (BCI) is subject to the Securities and Exchange Commission's Uniform Net Capital Rule 15c3-1 and Rule 1.17 of the Commodity Futures Trading Commission. Under these rules, BCI is required to maintain minimum net capital, as defined, of not less than the greatest of 2% of aggregate debit items arising from client transactions, 8% of customer risk maintenance margin requirements plus 4% of non-customer risk maintenance margin requirements, or $500 million. As of December 31, 2007, BCI had net capital, as defined, of approximately $1.5 billion, which exceeded the minimum net capital requirement by approximately $1.1 billion.

For additional information, Barclays PLC Consolidated Statement of Financial Condition, as of December 31, 2007, is available at no cost by accessing the Barclays Website at http://www.investor.barclays.com/results/index.html.

Barclays Capital would like to remind you about the importance of diversifying your portfolio. Diversification is an investment strategy for spreading your principal among different markets, sectors, industries, and securities. The goal is to protect the value of your overall portfolio in case a single security or market sector is adversely affected and drops in value. Maintaining concentrated

# LEHMAN BROTHERS

**Premier client account**
**831-34836**

MARK RICHARD IMOWITZ
September 1 - September 30, 2008

page    5 of    11

## Bulletin board *(continued from pg. 1)*

positions in your portfolio may present a higher degree of risk.
Please consult your Investment Representative to discuss ways of
ensuring your portfolio is sufficiently diversified.

LBF 8155D2W (10-06)

# LEHMAN BROTHERS

**Premier client account**
**831-34836**

MARK RICHARD IMOWITZ
September 1 - September 30, 2008

## Fixed income

| Maturity (exclusive of calls) | % of total portfolio % | Market value | % of bonds Sep. 30 % |
|---|---|---|---|
| 0 - 3 months | | | |
| 3 - 12 months | 6.7 | 77,030.00 | 100.0 |
| 1 - 2 years | | | |
| 2 - 5 years | | | |
| 5 - 10 years | | | |
| Over 10 years | | | |
| Total | 6.7 % | $ 77,030.00 | |

| Coupon rate | % of total portfolio | Market value | % of bonds Sep. 30 |
|---|---|---|---|
| Under 2% | 6.7 % | $ 77,030.00 | 100.0 % |
| 2 - 4% | | | |
| 4 - 6% | | | |
| 6 - 8% | | | |
| 8 - 10% | | | |
| Over 10% | | | |
| Total | 6.7 % | $ 77,030.00 | |

| Type | % of total portfolio | Market value | % of fixed income Sep. 30 |
|---|---|---|---|
| CORPORATE | 6.7 % | $ 77,030.00 | 100.0 % |
| GOVERNMENTS AND AGENCIES | | | |
| MUNICIPAL | | | |
| INTERNATIONAL | | | |
| MORTGAGE AND ASSET-BACKED | | | |
| MUTUAL FUND | | | |
| OTHER | | | |
| Total | 6.7 % | $ 77,030.00 | |

| Credit Quality | % of total portfolio | Market value |
|---|---|---|
| Moody's B3 | 6.7 % | $ 77,030.00 |

### Bond indices

**Lehman U.S. Aggregate Bond Index**

*Sep. 30*
1,290.43

*% change*
- 1.34

1331.00
1322.60
1314.20
1305.80
1297.40
1289.00

08/29    09/30

**Lehman Municipal Bond Index**

*Sep. 30*
630.85

*% change*
- 4.69

675.00
665.80
656.60
647.40
638.20
629.00

08/29    09/30

COPY COPY COPY COPY COPY

# LEHMAN BROTHERS

| Premier client account
| 831-34836

MARK RICHARD IMOWITZ
September 1 - September 30, 2008

## HOLDINGS

*In instances where prices of securities are not readily available, securities have no values, securities have not been actively traded or where other factors prevent the pricing of securities,*
*\*\*\* appears in the market price column, the market value for the security is not computed and the total equity in your account does not reflect the long or short market value (if any)*
*of those securities. Please also note that totals may differ from the sum on individual components due to rounding.*
*Unrealized gain/loss total reflects all positions for which a cost basis is available. Please review the Tax Lot section for details regarding cost basis.*

## Equities

*Your statement contains research ratings for companies covered by Lehman Brothers Equity Research. The ratings reflect both the Lehman Brothers rating and, where applicable, the ratings of an independent, third party research provider. You may obtain a copy of any independent research report, at no cost to you, where such research is available. Clients may access Lehman Brothers or independent research at www.LehmanLive.com or by calling 1-800-2-LEHMAN. A complete description of Lehman Brothers and independent research providers and ratings may be found on Page 2 of your statement.*

| Rights and warrants | Quantity | Unit cost | Total cost | Market price | Market value | Unrealized gain/loss | Comment |
|---|---|---|---|---|---|---|---|
| WTS LEHMAN BROS HLDGS INC | 390 | $ 252.26 | $ 98,382.65 | $ 244.40 | $ 95,316.00 | -$ 3,066.65 | In cash account |
| CALL WT LKD MILLENNIUM | | | | | | | Indicative bid, as of 9/1/08. |

| **Total Equities** | | | | | $95,316.00 | -$ 3,066.65 | |

COPY COPY COPY COPY COPY



# LEHMAN BROTHERS

**Premier client account**
**831-34836**

MARK RICHARD IMOWITZ
September 1 - September 30, 2008

## Fixed income

*Yield information is provided for informational purposes only. Lehman Brothers makes reasonable efforts to ensure its accuracy but should not be held responsible for errors or omissions.*

| Corporate bonds | Par | Unit cost<br>Adj. unit cost | Total cost<br>Adj. total cost | Market price | Market value<br>Accrued interest | Unrealized<br>gain/loss | Yield-to-<br>maturity(%) | Comment |
|---|---|---|---|---|---|---|---|---|
| LEHMAN BROS HOLDINGS INC | 100,000 | $ 100.004 | $ 100,003.85 | 77.03 | $ 77,030.00 | N/A | | In cash account |
| XLF ANN REV NTS | | 100.004 | 100,003.85 | | | | | Moody's B3 |
| DUE 02/20/2009 | | | | | | | | S&P D |
| DUE 20 FEB 2009 | | | | | | | | |
| ISIN: US5252M0DT14 | | | | | | | | |
| DATED DATE 19 FEB 2008 | | | | | | | | |

|  | Market value (USD)<br>Accrued int. (USD) |
|---|---|
| **Total Fixed income** | $ 77,030.00 |
| | $ 0.00 |
| | $ 77,030.00 |

## Cash, cash equivalents & other

*Money Market Preferred, SAVRs and other Auction Rate Securities are included in the Cash, Cash Equivalents and Other category. The interest rate on these securities generally is reset on a periodic basis in an auction process. Investors should be aware that these securities may have a final legal maturity date that is of a long-term nature and that under certain circumstances the rate paid or the mechanism for setting the rate paid on these securities could change. Please consult your investment representative with any questions.*

*Gain/Loss information also excludes cash, cash equivalents, and other.*

| Cash balance | Value |
|---|---|
| CASH ACCOUNT | $ 547.62 |

| Cash investments | Quantity | Market value<br>Accrued income | Comment |
|---|---|---|---|
| LEHMAN INSTL LIQUIDITY FDS | 982,955.34 | $ 982,955.34 | |
| GOVT RESV PORT PREMIER CL | | | |

|  | Market value (USD)<br>Accrued income (USD) |
|---|---|
| **Total Cash, cash equivalents & other** | $ 983,502.96 |
| | $ 0.00 |
| | $ 983,502.96 |

# LEHMAN BROTHERS

**Premier client account
831-34836**

MARK RICHARD IMOWITZ
September 1 - September 30, 2008

## ACTIVITY

| Withdrawals | Date | Tracking code | Reference No. | Amount | Comment |
|---|---|---|---|---|---|
| CK # 74177136 | 08 Sep 2008 | | | -$ 50,000.00 | |
| CHECK PAID | | | | | |

| Dividends | Date | Taxable amt. | Non-taxable amt. | Amount | Comment |
|---|---|---|---|---|---|
| LEHMAN INSTL LIQUIDITY FDS TREASURY PORT PREMIER CL | 02 Sep 2008 | $ 1,221.25 | | $ 1,221.25 | MONTHLY DIVIDEND FOR PERIOD 08/01/08 - 09/01/08 32 DAYS 7 DAY YIELD 1.34% |
| LEHMAN INSTL LIQUIDITY FDS TREASURY PORT PREMIER CL | 19 Sep 2008 | 547.62 | | 547.62 | RESIDUAL DIVIDEND |
| Total USD dividends | | $ 1,768.87 | | $ 1,768.87 | |
| Total USD dividends - 2008 | | $ 1,768.87 | | | |

The taxable and non-taxable designations provided above refer to the US income tax treatment of distributions from your securities. The designations are accurate to the best of our knowledge. Clients should consult with a tax advisor regarding the tax treatment of their investments.

003889  000000  000365

# LEHMAN BROTHERS

**Premier client account
831-34836**

MARK RICHARD IMOWITZ
September 1 - September 30, 2008

page   10 of   11

## Cash investment summary

| | Type | Date | Amount | Comment |
|---|---|---|---|---|
| Opening balance | | | $ 1,031,734.09 | |
| LEHMAN INSTL LIQUIDITY FDS TREASURY PORT PREMIER CL | Investment | 02 Sep 2008 | 1,221.25 | REINVEST |
| LEHMAN INSTL LIQUIDITY FDS TREASURY PORT PREMIER CL | Redemption | 09 Sep 2008 | - 49,991.78 | |
| LEHMAN BANK CASH DEPOSIT ACCT | Transfer-out | 09 Sep 2008 | - 8.22 | |
| LEHMAN INSTL LIQUIDITY FDS TREASURY PORT PREMIER CL | Sold | 18 Sep 2008 | - 982,955.34 | |
| LEHMAN INSTL LIQUIDITY FDS GOVT RESV PORT PREMIER CL | Bought | 18 Sep 2008 | 982,955.34 | |
| Closing balance | | | $ 982,955.34 | |

COPY COPY COPY COPY COPY

# LEHMAN BROTHERS

**Premier client account
831-34836**

MARK RICHARD IMOWITZ
September 1 - September 30, 2008

## TAX LOTS

** Days Held: Either # of days if held one year or less or  L if held for more than one year or S/L for Index Options.

## Equities

| Rights and warrants - long | Quantity or Par | Settle date | Unit cost | Total cost | Market price | Market value | Unrealized gain/loss | Days held ** |
|---|---|---|---|---|---|---|---|---|
| WTS LEHMAN BROS HLDGS INC | 390 | 28 Apr 2008 | $ 252.26 | $ 98,382.65 | $ 244.40 | $ 95,316.00 | -$ 3,066.65 | 158 |
| CALL WT LKD MILLENNIUM | | | | | | | | |

## Fixed income

Unrealized gain/loss is calculated using adjusted unit cost.  Please consult your tax advisor to determine if your situation requires that you use unit cost for your unrealized gain/loss.

| Corporate bonds - long | Quantity or Par | Settle date | Unit cost Adj. Unit cost | Total cost Adj. total cost | Market price | Market value | Unrealized gain/loss | Days held ** |
|---|---|---|---|---|---|---|---|---|
| LEHMAN BROS HOLDINGS INC | 100,000 | 19 Feb 2008 | $ 100.00 | $ 100,003.85 | $ 77.03 | $ 77,030.00 | N/A | |
| XLF ANN REV NTS | | | 100.00 | 100,003.85 | | | | |
| DUE 02/20/2009 | | | | | | | | |
| R/MD0000          02/20/2009 | | | | | | | | |

COPY COPY COPY COPY COPY

003890  000000  000365

# LEHMAN BROTHERS

**PAUL A. FEIDELSON**
**MANAGING DIRECTOR**

April 10, 2008

Mr. Mark Imowitz
622 Third Avenue, 33rd Floor
New York, New York 10017

Dear Mr. Imowitz,

Enclosed please find the Preliminary Private Placement Memorandum for the [4-Year, 2-Month] Cash-Settled Call Warrants Linked to the Performance of Millennium USA LP (the "Warrants"). The Warrants will provide investors with an opportunity to gain levered exposure to the performance of a hedge fund with an experienced management team and an established track record.

The Warrants are structured as European-style cash-settled options and are issued by Lehman Brothers Holdings Inc. Each Warrant is anticipated to be priced at [$245-$255], and will offer investors with $1,000 of exposure to Millennium USA LP (the "Reference Fund"). It is expected that the Warrants will be issued on or about May 1, 2008.

Millennium USA LP is a partnership designed to achieve above-average capital appreciation by opportunistically trading and investing in a wide variety of securities, instruments, and other investment opportunities and engaging in a broad array of trading and investment strategies. The Reference Fund is a commodity pool that invests predominantly in Millennium Partners, L.P. (the "Master Fund"). There are no substantive limits on the investment strategies that may be pursued by the Reference Fund.

Israel A. Englander founded both the Reference Fund and the Master Fund. Mr. Englander has a substantial interest in the funds, and controls Millennium Management LLC which is the General Partner of the Reference Fund and the Master Fund. Mr. Englander has over 35 years of experience trading various securities and derivatives.

The enclosed document should be reviewed in its entirety in connection with an investment in the Warrants. Please note that past performance is not necessarily indicative of future results.

Thank you for your consideration. Should you desire to discuss this product further, please contact Steven Mitchell at 2125267344 with questions or to schedule a meeting. We look forward to discussing this opportunity with you in further detail.

Sincerely,                                                            PPM#: MUSAF316

*[signature]*

Paul A. Feidelson

Confidential. You must read the Private Placement Memorandum for Fund II before making an investment in Fund II. This letter does not constitute an offer to sell or a solicitation of an offer to purchase any security. This letter is qualified by the PPM, and does not constitute a part of the PPM. Lehman Brothers Inc. Member SIPC.

LEHMAN BROTHERS INC.
399 PARK AVENUE
NEW YORK, NEW YORK 10022
TEL 212 526- 0411

MUSAF316



LEHMAN BROTHERS

Structured Investments Americas

# [4-Year, 2-Month] Cash-Settled Call Warrants Linked to the Performance of Millennium USA LP

By accepting this document, you acknowledge and agree that
all of the information contained in this document shall be kept
strictly confidential by you.

# [4-Year, 2-Month] Cash-Settled Call Warrants Linked to the Performance of Millennium USA LP (the "Warrants")

The information in this preliminary private placement memorandum supplement is not complete and may be changed. We may not sell these Warrants until the preliminary private placement memorandum is delivered in final form. This preliminary private placement memorandum supplement is not an offer to sell these securities and it is not soliciting an offer to buy these securities in any jurisdiction where the offer or sale is not permitted.

This preliminary private placement memorandum supplement is not to be shown or given to any person other than the person who directly received it from the Placement Agent (as defined below) and is not to be copied or otherwise reproduced in any manner whatsoever. If the language along the left margin does not appear in red, there is a presumption that this preliminary private placement memorandum supplement has been improperly reproduced and circulated, in which case Lehman Brothers Inc. disclaims any responsibility for its content and use. Failure to comply with this directive can result in a violation of the Securities Act of 1933, as amended (the "Securities Act").

The Warrants have not been and will not be registered under the Securities Act, or any state securities law. The Warrants are exempt from registration under Section 4(2) of the Securities Act and similar exemptions from registration provided by certain state securities laws. The Warrants may be offered, sold and otherwise transferred only to (i) persons who are "accredited investors" as defined in Rule 501 of the Securities Act who are also "qualified purchasers" as defined in Section 2(a)(51) of the Investment Company Act of 1940 (the "Investment Company Act"), or (ii) non-U.S. Persons in offshore transactions in accordance with Rule 903 or Rule 904 of Regulation S under the Securities Act ("Regulation S") who are also qualified purchasers, in each case, who have no need for liquidity of investment and understand and can afford the financial and other risks of an investment in a Warrant.

The Warrants are being offered by the Issuer through Lehman Brothers Inc. as placement agent (the "Placement Agent"). The Issuer (as defined below) reserves the right to withdraw, cancel or modify such offers and to reject orders in whole or in part. The Placement Agent will have the right to reject in whole or in part any offer to purchase Warrants.

For more information about Millennium USA LP (the "Reference Fund"), Millennium Partners, L.P. (the "Master Fund") as well as about Millennium Management LLC (the "General Partner"), which acts as the general partner to the Reference Fund, prospective investors are encouraged to review the Confidential Memorandum of the Reference Fund, attached as Exhibit [V] to the preliminary private placement memorandum. Neither the Issuer nor its affiliates or agents (collectively, "Lehman Brothers") have participated in the preparation of any offering or subscription documents for interests in the Reference Fund. Accordingly, neither the Issuer nor its agents makes any representation or warranty with respect to the accuracy, validity or completeness of any such information. Investors should conduct their own diligence of the Reference Fund as they would if investing directly in the Reference Fund. None of the General Partner, the Master Fund, the Reference Fund, or any affiliate of the foregoing, sponsors or endorses the Issuer or the Warrants.

The Warrants are issued by Lehman Brothers Holdings Inc. (the "Issuer") and represent an investment that is separate and distinct from an investment in the Reference Fund. Neither the Issuer nor its affiliates or agents is offering any interest in the Reference Fund. An investment in the Warrants confers no indicia of ownership in the Reference Fund and neither creates nor implies any rights or remedies with respect to the Reference Fund, the Master Fund, or the General Partner or affiliates of the foregoing.

© 2008 Lehman Brothers Inc. All rights reserved. Member SIPC.

THIS DOCUMENT IS NOT AN OFFER OR SOLICITATION WITH RESPECT TO THE PURCHASE OR SALE OF ANY SECURITY. ANY SUCH OFFER OR SOLICITATION WILL BE MADE ONLY PURSUANT TO A COMPLETED PRIVATE PLACEMENT MEMORANDUM. THIS DOCUMENT SHOULD BE READ IN CONJUNCTION WITH THE PRIVATE PLACEMENT MEMORANDUM FOR THE WARRANTS.

Dated as of [TBD, 2008]

# Warrant Sales Restrictions for Certain Jurisdictions

## MEXICO

The Warrants have not and will not be registered in the Mexican National Registry of Securities (Registro Nacional de Valores). The Warrants may not be offered or sold in the United Mexican States ("Mexico") by any means except in circumstances which do not constitute an offer to the public within the meaning of the Mexican Securities Market Law (Ley del Mercado de Valores) and its regulations. No Mexican regulatory authority has approved or disapproved the Warrants. All applicable provisions of the Mexican Securities Market Law must be complied with in respect of any sale, offer or distribution of, or intermediation with, the Warrants in, from or otherwise involving Mexico, and any resale of the Warrants must be made in a manner that will not constitute a public offering in Mexico.

## THE BAHAMAS

The Warrants have not been and shall not be offered or sold in or into The Bahamas except in circumstances that do not constitute a 'public offering' according to the Securities Industry Act, 1999 and Securities Industry Regulations, 1999. Any private offer of the Warrants, directly or indirectly, in or from within The Bahamas may only be made by an entity or person who is licensed as a Broker Dealer or Securities Investment Advisor by the Securities Commission of The Bahamas. No person deemed "resident" in The Bahamas for exchange control purposes pursuant to the Exchange Control Regulations, 1956 may purchase the Warrants unless the prior written approval of the Central Bank of The Bahamas has been obtained by or on behalf of such person. The Warrants are subject to significant restrictions on transfer.

## CHILE

Neither the issuer nor the warrants have been registered with the Superintendencia de Valores y Seguros pursuant to law no. 18.045, the Ley de Mercado de Valores, and regulations thereunder. This document does not constitute an offer of, or an invitation to subscribe for or purchase, the warrants in the republic of Chile, other than to individually identified buyers pursuant to a private offering within the meaning of article 4 of the Ley de Mercado de Valores (an offer that is not "addressed to the public at large or to a certain sector or specific group of the public.")

CONFIDENTIAL

# Introduction

Lehman Brothers has developed [4-Year, 2-Month] Cash-Settled Call Warrants (the "Warrants") linked to the performance of Millennium USA LP (the "Reference Fund"). The Warrants have a strike price that is at-the-money as of the Trade Date[1].

Warrant investors can achieve a higher percentage return from favourable moves in the Reference Fund compared to a direct investment since less upfront capital (premium) is required for similar exposure. Additionally, the downside is limited to the initial premium paid for the Warrants. However, similar to other at-the-money warrants, the Reference Fund must appreciate by a sufficient amount in order for investors to achieve any gain.

The payout for each Warrant is the greater of zero and the difference obtained by subtracting the "Strike Price" from the "Final NAV" (as defined in the Summary of Indicative Terms).

The Warrants will constitute senior unsecured obligations of the Issuer, Lehman Brothers Holdings Inc.

## EXPOSURE TO THE PERFORMANCE OF A HEDGE FUND

The Warrants provide investors with an opportunity to gain levered exposure to the performance of a hedge fund with an experienced management team and an established track record.

The Warrants are issued by Lehman Brothers Holdings Inc. and represent an investment that is separate and distinct from an investment in the Reference Fund. Neither the Issuer nor its affiliates or agents is offering any interest in the Reference Fund. An investment in the Warrants confers no indicia of ownership in the Reference Fund and neither creates nor implies any

rights or remedies with respect to the Reference Fund or its affiliates.

## LOWER MINIMUMS

The Warrants require a lower minimum capital commitment compared to the minimum requirement for a direct investment in the Reference Fund. The minimum capital commitment requirement for a direct investment in the Reference Fund is $5,000,000, compared to [$100,000] for a Warrant investment.

## TAX CONSIDERATIONS

While other treatments of the Warrants could be asserted by the Internal Revenue Service in respect of the Warrants, the Warrants should be treated as call options with respect to the Reference Fund.

Please refer to the section entitled "Certain U.S. Federal Income Tax Considerations" of the Preliminary Private Placement Memorandum (the "**Memorandum**") for details regarding the tax treatment of the Warrants.

THIS DOCUMENT WAS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, FOR THE PURPOSE OF AVOIDING UNITED STATES FEDERAL, STATE, OR LOCAL TAX PENALTIES. THIS DOCUMENT WAS WRITTEN AND PROVIDED BY THE ISSUER IN CONNECTION WITH THE PROMOTION OR MARKETING BY THE ISSUER AND/OR PLACEMENT AGENT OF THE WARRANTS. EACH HOLDER SHOULD SEEK ADVICE BASED ON ITS PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

---

[1] Investors should consider the inherent risks of options before investing. Options are not suitable for all investors. Please refer to the "Risk Factors" herein and in the Private Placement Memorandum for a discussion of these risks.

**CONFIDENTIAL**

# The Reference Fund - Millennium USA LP[2]

The Reference Fund is a partnership designed to achieve above-average capital appreciation by opportunistically trading and investing in a wide variety of securities, instruments, and other investment opportunities and engaging in a broad array of trading and investment strategies. The Reference Fund is a commodity pool that invests predominantly in Millennium Partners, L.P. (the "Master Fund"). There are no substantive limits on the investment strategies that may be pursued by the Reference Fund.

Israel A. Englander founded both the Reference Fund and the Master Fund. Mr. Englander has a substantial interest in the funds, and controls Millennium Management LLC which is the General Partner of the Reference Fund and the Master Fund. Mr. Englander has over 35 years of experience trading various securities and derivatives.

## Related Performance[2]

The past performance of the Reference Fund, the Master Fund, or of any investment fund or account advised or managed by the General Partner is not indicative of the future performance of the Reference Fund and has no bearing on the future performance of the Reference Fund.

### REFERENCE FUND AT A GLANCE[2]

| | |
|---|---|
| Cumulative Total Return since January 1, 1990 | 1,571.62% |
| Average Annual Return since January 1, 1990 | 16.69% |
| Percentage of Up Months | 90.41% |
| Percentage of Down Months | 9.59% |
| Best Monthly Return | 5.14% |
| Worst Monthly Return | -3.61% |
| Standard Deviation (S&P 500 Index = 13.76%) | 4.45% |
| Sharpe Ratio (S&P 500 Index = 0.40) | 2.79 |
| Largest Net Consecutive Gain (9/98–5/01) | 127.90% |
| 2nd Largest Net Consecutive Gain (11/95–5/98) | 83.85% |
| Largest Net Consecutive Decline (6/98-8/98) | -6.93% |
| 2nd Largest Net Consecutive Decline (9/92-11/92) | -4.93% |
| Minimum Investment | $5,000,000 |
| New Capital Accepted | Monthly |
| Incentive Allocation | 20% |
| Reference Fund Assets Under Management | $2.425bn |

### FREQUENCY COMPARISON OF NET MONTHLY RETURNS[2]

| | Reference Fund | S&P 500 Index |
|---|---|---|
| < -3% | 1 Month | 32 Months |
| -3% to -1.5% | 4 | 29 |
| -1.5% to 0% | 16 | 18 |
| 0% to 1.5% | 114 | 44 |
| 1.5% to 3% | 65 | 34 |
| > 3% | 19 | 62 |

### GROWTH OF HYPOTHETICAL $100[3]



[2] Source: Millennium Management LLC. None of the Issuer or any of its affiliates has verified the validity or accuracy of this data. All return information is presented net of expenses. All data is from January 1, 1990 through March 31, 2008. The Reference Fund reports Estimates with the express disclaimer that such Estimates are prepared in good faith, but are subject to high levels of uncertainty and actual returns or information may vary significantly from such Estimates. The Reference Fund and, consequently, the Issuer makes no representation as to the accuracy, completeness, fitness for a particular purpose or timeliness of any Estimates, and accepts no liability for any loss suffered as a result of reliance upon any such Estimate.

[3] Chart constructed from data received from the Millennium Management LLC and Bloomberg. All data is from January 1, 1990 through March 31, 2008. None of the Issuer or any of its affiliates has verified the validity or accuracy of this data. Past performance is not indicative of future results.

4

CONFIDENTIAL

REFERENCE FUND HISTORICAL PERFORMANCE[4]

| | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | YTD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1990 | -0.35% | 0.91% | 1.28% | 0.40% | 0.80% | 0.40% | 1.88% | 3.16% | -0.51% | 1.89% | 0.07% | 0.59% | 11.18% |
| 1991 | 1.14 | 1.13 | 2.24 | 2.53 | 1.36 | 1.60 | -0.54 | 0.71 | -0.17 | -0.63 | 1.03 | 1.72 | 12.91 |
| 1992 | 2.59 | 1.67 | 1.24 | 1.21 | 1.12 | 2.26 | 1.41 | 0.07 | -2.35 | -1.88 | -0.66 | 0.43 | 7.24 |
| 1993 | 0.54 | 0.58 | 1.15 | 1.44 | 3.01 | 0.75 | 0.90 | 2.75 | 1.11 | 0.93 | 0.98 | 2.27 | 18.00 |
| 1994 | 2.15 | 1.36 | 1.82 | 0.20 | -1.17 | 0.16 | 1.32 | -1.74 | 0.09 | -0.09 | 0.66 | 3.05 | 8.03 |
| 1995 | 2.64 | 1.95 | 2.17 | 1.23 | 1.92 | 1.43 | 2.25 | 0.55 | 2.04 | -0.64 | 1.11 | 2.48 | 21.29 |
| 1996 | 4.20 | 1.63 | 2.56 | 3.35 | 3.12 | 0.04 | 1.42 | 2.27 | 2.14 | 0.23 | 0.69 | 1.17 | 25.90 |
| 1997 | 2.33 | 1.83 | 0.70 | 1.19 | 4.05 | 1.66 | 3.22 | 0.35 | 1.51 | 2.18 | 1.31 | 2.93 | 26.53 |
| 1998 | 3.79 | 2.77 | 0.74 | 2.03 | 1.36 | -1.30 | -2.03 | -3.61 | 0.81 | 5.14 | 4.35 | 2.11 | 17.18 |
| 1999 | 0.96 | 2.42 | 1.29 | 4.72 | 2.73 | 2.95 | 2.71 | 0.74 | 0.65 | 2.23 | 3.38 | 3.56 | 33.25 |
| 2000 | 4.13 | 4.45 | 2.61 | 2.68 | 2.27 | 3.19 | 2.89 | 1.99 | 0.18 | 2.30 | 0.58 | 3.17 | 36.22 |
| 2001 | 4.84 | 1.12 | 1.14 | 2.52 | 0.82 | -0.57 | 0.07 | 1.13 | -1.29 | 2.01 | 1.48 | 1.07 | 15.38 |
| 2002 | -0.15 | 0.19 | 1.96 | 0.60 | 0.96 | 0.67 | 1.72 | 0.54 | 0.11 | 0.11 | 0.61 | 1.19 | 8.91 |
| 2003 | 0.54 | 0.54 | 0.50 | 1.16 | 1.24 | 1.54 | 1.02 | 1.34 | 0.59 | 0.44 | 0.48 | 1.09 | 11.11 |
| 2004 | 2.02 | 2.32 | 0.41 | 1.69 | 0.98 | 0.29 | 0.66 | 0.19 | 1.27 | 0.86 | 1.92 | 2.42 | 16.32 |
| 2005 | 0.94 | 1.28 | 0.95 | 0.19 | 0.61 | 1.37 | 1.68 | 0.93 | 1.04 | 0.04 | -0.26 | 1.93 | 11.35 |
| 2006 | 2.84 | 1.39 | 1.62 | 1.70 | 0.20 | 0.66 | 0.92 | 0.85 | 0.16 | 1.90 | 1.77 | 1.66 | 17.13 |
| 2007 | 1.63 | 1.11 | 1.07 | 0.96 | 1.18 | 0.86 | 0.08 | -0.86 | 0.93 | 2.26 | 0.27 | 0.84 | 10.94 |
| 2008 | 0.33 | 1.60 | -1.05* | | | | | | | | | | 0.87* |

* Estimated[4]

Return information reflects the actual historical returns for the Reference Fund, after deduction of expenses and the incentive-based allocation (equal to 20% of annual net profits, where applicable).

The past performance of the Reference Fund or any other investment fund or account managed by the General Partner is not indicative of the future performance of the Reference Fund and has no bearing on the future performance of the Reference Fund.

**Potential investors should not expect or rely on similar performance in the future.**

---

4 Source: Millennium Management LLC. None of the Issuer or any of its affiliates has verified the validity or accuracy of this data. All information is presented net of expenses. The Reference Fund reports Estimates with the express disclaimer that such Estimates are prepared in good faith, but are subject to high levels of uncertainty and actual returns or information may vary significantly from such Estimates. The Reference Fund and, consequently, the Issuer makes no representation as to the accuracy, completeness, fitness for a particular purpose or timeliness of any Estimates, and accepts no liability for any loss suffered as a result of reliance upon any such Estimate.

5

**CONFIDENTIAL**

# The Warrants

The Warrants are structured as European-style cash-settled call options and are issued by Lehman Brothers Holdings, Inc. The following is a brief summary of the Warrants. Please refer to the Memorandum for a more detailed description of the structure and the risks associated with an investment in the Warrants.

## WARRANT PAYMENT AMOUNT AT MATURITY[5]

The return on the Warrants is linked to the Final NAV of the Reference Fund as measured on the Valuation Date.

1.  The Strike Price for the Warrants will be equal to the Initial NAV.

2.  The payout of the Warrant at maturity may be described as follows: Max [Final NAV – Strike Price, zero].



The hypothetical analysis above assumes the Warrants are issued at a price of [$250] per Warrant for a notional exposure of $1,000 and that the Warrants remain outstanding until maturity. A Final NAV of [$1,250] represents an annualized return of [5.50%] for the Reference Fund.

IF THE INVESTOR HOLDS THE WARRANTS UNTIL EXPIRATION, THE INVESTOR CAN EXPECT EITHER OF THESE TWO SCENARIOS:

1.  At expiration, the Warrants will be automatically exercised and, if the Final NAV is greater than the Initial NAV, investors will receive the Warrant Payment Amount calculated as the Final NAV minus the Strike Price. Investors should note, however, that the Warrants will not necessarily generate a profit simply because the Final NAV is higher than the Initial NAV. In the above example, the break-even point of [$1,250] represents a scenario in which the Reference Fund has an annualized fund growth of [5.50]% whereas the Warrants generate 0% return on investment.

2.  If, at expiration, the Final NAV is lower than or equal to the Initial NAV, the Warrants will expire worthless and the investors will not receive any payment.

The Warrants may be terminated by the Issuer prior to maturity if certain Early Termination Events have occurred. Please refer to the summary of Early Termination Events contained herein, as well as the Memorandum for details on Early Termination Events.

---

5 Simulated, modelled, or hypothetical performance results have certain inherent limitations. No representation is being made that any client will or is likely to achieve the hypothetical returns represented above.

CONFIDENTIAL

6

# Hypothetical Pre- and Post-Tax Scenarios

The following analysis compares an investment in the Warrant with a hypothetical direct investment in the Reference Fund over the same period, assuming such hypothetical investment were sold or redeemed for a value equal to the Final NAV.

The analysis compares the performance of the Warrant and the hypothetical direct investment under various return scenarios for the Reference Fund. In order to describe such scenarios in terms of annual returns for the Reference Fund, this analysis assumes the Reference Fund appreciates or depreciates at a constant rate compounded annually from the Issue Date to the Valuation Date. A constant rate is a simplifying assumption representing one path of the infinite number of potential paths an actual investment in the Reference Fund might display over such a term. We make no claims or representations regarding the potential path for an actual investment in the Reference Fund. The examples provided below are for illustrative purposes only.

PRE-TAX COMPARISON OF WARRANT VS. HYPOTHETICAL DIRECT INVESTMENT[6]

| Reference Fund | | | Warrant | | | Hypothetical Direct Investment | | |
|---|---|---|---|---|---|---|---|---|
| Fund Net Annual Return | Initial NAV | Final NAV | Initial Warrant Premium | Payoff at Maturity | Annualized Warrant Return[7] | Initial Investment Value | Final Investment Value | Annualized Investment Return[8] |
| -6% | $1,000 | $773 | $250 | $0 | -100% | $1,000 | $773 | -6% |
| -4% | $1,000 | $844 | $250 | $0 | -100% | $1,000 | $844 | -4% |
| -2% | $1,000 | $919 | $250 | $0 | -100% | $1,000 | $919 | -2% |
| 0% | $1,000 | $1,000 | $250 | $0 | -100% | $1,000 | $1,000 | 0% |
| 2% | $1,000 | $1,086 | $250 | $86 | -23% | $1,000 | $1,086 | 2% |
| 4% | $1,000 | $1,178 | $250 | $178 | -8% | $1,000 | $1,178 | 4% |
| 5.50% | $1,000 | $1,250 | $250 | $250 | 0.00% | $1,000 | $1,250 | 5.50% |
| 6% | $1,000 | $1,275 | $250 | $275 | 2% | $1,000 | $1,275 | 6% |
| 7.15% | $1,000 | $1,333 | $250 | $333 | 7.15% | $1,000 | $1,333 | 7.15% |
| 8% | $1,000 | $1,378 | $250 | $378 | 10% | $1,000 | $1,378 | 8% |
| 10% | $1,000 | $1,488 | $250 | $488 | 17% | $1,000 | $1,488 | 10% |
| 12% | $1,000 | $1,604 | $250 | $604 | 24% | $1,000 | $1,604 | 12% |
| 14% | $1,000 | $1,726 | $250 | $726 | 29% | $1,000 | $1,726 | 14% |
| 16% | $1,000 | $1,856 | $250 | $856 | 34% | $1,000 | $1,856 | 16% |
| 18% | $1,000 | $1,993 | $250 | $993 | 39% | $1,000 | $1,993 | 18% |
| 20% | $1,000 | $2,138 | $250 | $1,138 | 44% | $1,000 | $2,138 | 20% |

 Represents the scenario under which the Payoff at Maturity Amount equals the Initial Warrant Premium of the Warrant.

Represents the scenario under which the Annualized Pre-Tax Warrant Return equals the Annualized Pre-Tax Investment Return of the Hypothetical Direct Investment.

A hypothetical illustration is not meant to forecast, imply or guarantee future performance.

---

[6] Simulated, modeled, or hypothetical performance results have certain inherent limitations. No representation is being made that any client will or is likely to achieve any of the hypothetical returns represented above.

[7] The constant rate at which the applicable Warrant Premium must grow to equal the Payoff at Maturity, if compounded annually over [4 years and 2 months]. Note this calculation gives no consideration to the time from the Valuation Date to the Warrant Payment Date.

[8] The constant rate at which the applicable Initial Investment Value must grow to equal the applicable Final Investment Value, if compounded annually over [4 years and 2 months].

CONFIDENTIAL

POST-TAX COMPARISON OF WARRANT VS. HYPOTHETICAL DIRECT INVESTMENT[9]

| Reference Fund | | | Warrant | | | | Hypothetical Direct Investment | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Fund Net Annual Return[10] | Initial NAV | Final NAV | Initial Warrant Premium | Payoff at Maturity | Post-Tax Payoff at Maturity[11] | Annualized Post-Tax Return[12] | Initial Investment Value | Final Investment Value | Final Post-Tax Value[13] | Annualized Post-Tax Return[14] |
| -6% | $1,000 | $773 | $250 | $0 | $0 | -100% | $1,000 | $773 | $773 | -6% |
| -4% | $1,000 | $844 | $250 | $0 | $0 | -100% | $1,000 | $844 | $844 | -4% |
| -2% | $1,000 | $919 | $250 | $0 | $0 | -100% | $1,000 | $919 | $919 | -2% |
| 0% | $1,000 | $1,000 | $250 | $0 | $0 | -100% | $1,000 | $1,000 | $1,000 | 0% |
| 2% | $1,000 | $1,086 | $250 | $86 | $86 | -23% | $1,000 | $1,086 | $1,056 | 1% |
| 4% | $1,000 | $1,178 | $250 | $178 | $178 | -8% | $1,000 | $1,178 | $1,115 | 3% |
| 6% | $1,000 | $1,275 | $250 | $275 | $271 | 2% | $1,000 | $1,275 | $1,179 | 4% |
| 6.68% | $1,000 | $1,309 | $250 | $309 | $300 | 4.49% | $1,000 | $1,309 | $1,201 | 4.49% |
| 8% | $1,000 | $1,378 | $250 | $378 | $359 | 9% | $1,000 | $1,378 | $1,246 | 5% |
| 10% | $1,000 | $1,488 | $250 | $488 | $452 | 15% | $1,000 | $1,488 | $1,317 | 7% |
| 12% | $1,000 | $1,604 | $250 | $604 | $550 | 21% | $1,000 | $1,604 | $1,392 | 8% |
| 14% | $1,000 | $1,726 | $250 | $726 | $655 | 26% | $1,000 | $1,726 | $1,472 | 10% |
| 16% | $1,000 | $1,856 | $250 | $856 | $765 | 31% | $1,000 | $1,856 | $1,556 | 11% |
| 18% | $1,000 | $1,993 | $250 | $993 | $882 | 35% | $1,000 | $1,993 | $1,645 | 13% |
| 20% | $1,000 | $2,138 | $250 | $1,138 | $1,004 | 40% | $1,000 | $2,138 | $1,739 | 14% |

Represents the scenario under which the Annualized Post-Tax Warrant Return equals the Annualized Post-Tax Investment Return of the Hypothetical Direct Investment.

A hypothetical illustration is not meant to forecast, imply or guarantee future performance.

Lehman Brothers does not provide tax advice. These numbers assume that the Warrant is respected as an option for U.S. federal income tax purposes, as explained in greater detail in the Memorandum. Alternative characterizations are possible that could affect the amount, timing and character of income, gain or loss recognized by you. These tax issues are complex. For more information, please consult the section in the Memorandum entitled "Certain U.S. Federal Income Tax Considerations." In addition, you are urged to consult your own tax advisor as to the proper tax treatment of the Warrant for U.S. federal, state and local income tax purposes.

---

[9] Simulated, modelled, or hypothetical performance results have certain inherent limitations. No representation is being made that any client will or is likely to achieve the hypothetical returns represented above.

[10] As mentioned above, this analysis assumes appreciation or depreciation of the Reference Fund at a constant rate with annual compounding.

[11] Assumes that gains (i.e., the excess of the applicable Warrant Payment Amounts over the applicable Warrant Premiums) as of the Warrant Payment Date are taxed at the maximum long term capital gain rate currently in effect (15%). Note that this analysis gives no consideration to the effect of losses for U.S. federal income tax purposes.

[12] The constant rate at which the applicable Warrant Premium must grow to equal the applicable Post-Tax Warrant Payment Amount, if compounded annually over [4 years and 2 months].

[13] Assumes that cumulative gains (i.e., the excess of the applicable Final Investment Value over the applicable Initial Investment Value) as of the Valuation Date are taxed at a [35%] rate. An actual investment in the Reference Fund may be taxed at a different rates and would likely realize taxes on an annual basis. Note that this calculation gives no consideration to the effect of losses for U.S. federal income tax purposes.

[14] The constant rate at which the applicable Initial Investment Value must grow to equal the applicable Post-Tax Final Investment Value, if compounded annually over [4 years and 2 months].

CONFIDENTIAL

# Summary of Indicative Terms[15]

| | |
|---|---|
| Warrant Type: | Call Warrant |
| Warrant Style: | European |
| Issuer: | Lehman Brothers Holdings Inc. |
| Reference Fund: | Millennium USA LP |
| Reference Performance: | Performance of the Class PP interests of the Reference Fund (the "**Interests**"). |
| Deemed Quantity of Interests: | A hypothetical quantity of Interests of the Reference Fund with an aggregate value as of the Issue Date equal to the Initial NAV. |
| Total Cost (Issue Price): | [$245-$255] per Warrant |
| Fees and Commissions: | Lehman Brothers (as defined below) will earn selling commissions of 2% of the Notional Amount Per Warrant (i.e., $20 per Warrant) in connection with the sale of each Warrant as well as fees related to risk-management of products of this type. |
| Initial NAV: | $1,000 |
| Notional Amount Per Warrant (Reference Fund Exposure Amount): | $1,000 |
| Final NAV: | As of the Valuation Date, the aggregate redemption proceeds that would be received by a Reference Holder on or prior to the date that is thirty (30) days after the Audit Date, assuming timely submission of a request for redemption of the Deemed Quantity of Interests effective as of the Valuation Date, as determined by the Calculation Agent. The Final NAV shall be calculated by deducting from such amount any redemption, management, incentive or administrator fees or other costs (including any applicable withdrawal fee) payable by a Reference Holder in respect of such Deemed Quantity of Interests, to the extent such amounts have not already been deducted by the Reference Fund in calculating the amount of redemption proceeds payable to the Reference Holder, as determined by the Calculation Agent. For the avoidance of doubt, if the Calculation Agent determines that a Reference Holder, assuming timely submission of a request for redemption of the Deemed Quantity of Interests effective as of the Valuation Date, would not have received any of the redemption proceeds on or prior to the date that is thirty (30) days after the Audit Date, the Calculation Agent shall determine the Final NAV, which Final NAV may be equal to zero. |
| Audit Date: | With respect to any date of determination, the date on which the Reference Fund's independent auditors have completed their examination of the Reference Fund's financial statements for the period including such date of |

---

[15] For complete terms and conditions, please refer to the Private Placement Memorandum.

**CONFIDENTIAL**

|  | determination. |
|---|---|
| Reference Holder: | A hypothetical limited partner of the Reference Fund that is deemed to have the benefits and obligations of an investor owning, during the term of the Warrants, Interests in the Reference Fund, as determined by the Calculation Agent. The Reference Holder will have a tax situs in Delaware. The Reference Holder does not represent an actual investment in or an Interest in the Reference Fund. |
| Strike Price: | 100% of the Initial NAV, $1,000 |
| Currency: | USD |
| Issue Date: | On or about [May 1, 2008] |
| Warrant Payment Amount: | On the Warrant Payment Date, each Warrant holder (a "**Holder**") will receive, per Warrant, the greater of:<br><br>1) Final NAV – Strike Price<br><br>and<br><br>2) Zero |
| Valuation Date: | [June 30, 2012] |
| Warrant Payment Date: | [August 3, 2012]; provided that if the Calculation Agent determines that a Reference Holder would not have received all redemption proceeds by the end of the day on [July 30, 2012], based on a timely request for redemption by such Reference Holder of the Deemed Quantity of Interests effective as of the Valuation Date, the Warrant Payment Date shall be the earlier of (i) [five] Business Days after the date that a Reference Holder would have received all such redemption proceeds, as determined by the Calculation Agent and (ii) thirty-five (35) Business Days after the Audit Date. |
| Client Suitability: | Each Holder must be (i) an "accredited investor" as such term is defined in Rule 501 of the Securities Act and (ii) a "qualified purchaser" as such term is defined in the Investment Company Act. |
| Minimum Initial Purchase: | USD 100,000 ([393–409] Warrants), unless the Placement Agent permits the purchase of a smaller number of Warrants. |
| Warrant Maturity Date: | The Warrant Payment Date |
| Settlement Method: | Cash Settlement |
| Automatic Exercise: | Each Warrant will be deemed to be automatically exercised on the Expiration Date. |
| Expiration Date: | The Valuation Date, scheduled to be the date that is approximately [4 years and 2 months] following the Issue Date. |
| Calculation Agent: | Lehman Brothers Inc. |
| Placement Agent: | Lehman Brothers Inc. |
| Transfer Agent: | Citibank, N.A. |
| Business Day: | A day, other than a Saturday or Sunday, which is neither a legal holiday nor a day on which banking institutions in |

CONFIDENTIAL

10

New York are authorized or obligated by law or executive order to close.

| | |
|---|---|
| Early Termination Events: | The Issuer reserves the right to terminate the Warrants at any time prior to the Warrant Payment Date if at any time before that date, the Calculation Agent determines that an Early Termination Event (as defined below) has occurred. The occurrence of any of the following events, as described more fully in the section entitled "Early Termination" starting on page [4] of the Memorandum, may be deemed an "**Early Termination Event**" by the Calculation Agent: |

(1)  A Reference Fund NAV Decrease Event. The Reference Fund net asset value per share decreases by (i) 10% or more during any month or (ii) 25% or more during any quarter;

(2)  A Reference Fund Volatility Event. As of any date of determination, the annualized standard deviation of the daily percentage returns of the Reference Fund over the most recent 90 days exceeds 15%;

(3)  A Reference Fund Net Capital Event. The net capital of the Reference Fund for any calendar month drops by 15% or more inclusive of all redemptions and subscriptions but exclusive of any other gains or loss;

(4)  A Master Fund Strategy Event. The percentage of the Master Fund's risk capital allocated to a Permitted Strategy exceeds the Percentage Limit for such Permitted Strategy as set forth below:

| | Permitted Strategy | Percentage Limit |
|---|---|---|
| 1 | Relative Value Sector Arbitrage | 55% |
| 2 | Statistical Arbitrage | 45% |
| 3 | Merger Arbitrage | 20% |
| 4 | Fixed Income Arbitrage | 25% |
| 5 | Distressed | 15% |
| 6 | Futures/Currency Arbitrage | 15% |
| 7 | Closed End/Asset Arbitrage | 18% |
| 8 | Convertibles | 10% |
| 9 | Options Arbitrage | 15% |
| 10 | Other | 10% |

(5)  A Reference Fund Diversion Event. Less than 80% of the assets of the Reference Fund is invested (directly or indirectly) in the Master Fund;

(6)  A Master Fund AUM Decrease Event. At any time the Master Fund's total assets under management (i) are less than USD 5,000,000,000 or (ii) decrease by 50% or more within any calendar year when compared to the Master Fund's total assets under management on January 1st of such calendar year;

(7)  A Key Person Event;

(8)  A Fund Liquidity Event;

(9)  A Material Adverse Change Event;

CONFIDENTIAL

11

(10)  A Master Fund Concentration Event;

(11)  A General Partner Event;

(12)  A Bankruptcy Event;

(13)  A Reference Fund Restatement Event;

(14)  A Reporting Failure Event;

(15)  A Misconduct Event;

(16)  A Change in Law Event;

(17)  A Reference Fund Modification Event;

(18)  A Merger Event;

(19)  A Reference Fund Asset Allocation Event;

(20)  The occurrence of a Hedging Disruption Event

(21)  The occurrence of an Increased Cost of Hedging Event;

(22)  A Material Contract Event;

(23)  A Nationalization Event;

Upon the occurrence of any of the foregoing events, the Calculation Agent shall determine whether the occurrence of such event constitutes an Early Termination Event. If the Calculation Agent deems the occurrence of such event to be an Early Termination Event and the Issuer determines to terminate the Warrants, the Issuer will notify the Transfer Agent of its intent to terminate the Warrants. Holders will receive the Early Termination Amount (as defined below) on the Early Termination Date.

The "**Early Termination Date**" shall be determined by the Calculation Agent and shall be [five] Business Days following the date on which all redemption proceeds would have been received by a Reference Holder of Interests based on a timely request for redemption by such Reference Holder to be effective as of the Early Termination Valuation Date (as defined below). Notwithstanding the foregoing, in no event will the Early Termination Date occur more than five Business Days after the thirtieth day following the Audit Date in respect of the Early Termination Valuation Date. Upon receipt of notice from the Issuer of its intent to terminate the Warrants following the Early Termination Event, the Transfer Agent will notify each Holder of the Issuer's election to terminate the Warrants in accordance with the Issuing, Paying and Transfer Agency Agreement (as defined in the Memorandum).

"**Early Termination Amount**" means the amount determined by the Calculation Agent equal to the market value of the Warrant as of the Early Termination Valuation Date, reduced by any losses or costs of the Issuer or its affiliates that are or would be incurred under then prevailing circumstances in closing its or its affiliates' hedge position(s) (including the effect of any withdrawal fees) arising from the occurrence of such Early Termination Event (as more fully described in the Memorandum). The "**Early Termination Valuation Date**"

**CONFIDENTIAL**

12

|                      | shall be determined by the Calculation Agent and shall be the date as of which a Reference Holder, which properly submitted a redemption notice to the Reference Fund promptly after such Early Termination Event, would have been able to redeem its Interests. If the Calculation Agent determines that a Reference Holder would not have received all of the redemption proceeds by the thirtieth (30th) day after the relevant Audit Date, the Early Termination Amount may be equal to zero. |
|----------------------|----------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
| Potential Adjustment | A "Potential Adjustment Event" means the occurrence of any of the following events: |

(1) a subdivision, reclassification, reorganization, consolidation, increase, reduction by cancellation of the Interests of a Reference Holder, or, a free distribution or dividend of any such Interests to existing holders by way of bonus, capitalization or similar issue;

(2) a distribution or dividend to existing holders of (a) Interests, or (b) any other interest capital or securities granting the right to payment of dividends and/or the proceeds of liquidation of the Reference Fund equally or proportionately with such payments to holders of such interests, or (c) any other type of securities, rights or warrants or other assets, in any case for payment (cash or other) at less than the prevailing market price as determined by the Calculation Agent;

(3) an extraordinary dividend;

(4) a call by the Reference Fund of such Interests in respect of Interests that are not fully paid;

(5) a repurchase by the Reference Fund of Interests whether out of profits or capital and whether the consideration for such repurchase is cash, securities or otherwise; or

(6) any other similar event.

Upon the occurrence of a Potential Adjustment Event, the Calculation Agent will make such adjustment to the exercise, settlement, payment or any other terms of the Warrants as the Calculation Agent determines appropriate, and determine the effective times thereof, to account for the economic effect on the Warrants of such Potential Adjustment Event.

| Governing Law: | The Warrants shall be governed by the laws of the State of New York, without reference to the choice of law doctrine. |
|----------------|----------------------------------------------------------------------------------------------------------------------|
| Secondary Markets: | The Warrants will not be listed on any securities exchange or quotation system. No secondary market in the Warrants is expected to develop. The only market, if any, for the Warrants will be the repurchase of the Warrants by the Issuer or the purchase of Warrants by the Placement Agent. The Issuer, the Placement Agent and their affiliates have no obligation to make a market for the Warrants, and may cease or alter market-making activities if commenced at any time. To the extent the Placement Agent does effect market-making transactions, the Placement Agent will determine market-making prices, based largely, on the factors set in the |

CONFIDENTIAL

Memorandum forth under "*Risk Factors— Secondary Trading of the Warrants is Limited and They are Subject to Substantial Restrictions on Transferability.*"

The Placement Agent intends, but is not obligated, to provide an opportunity for Holders to sell their Warrants to the Placement Agent. To request a market making transaction, a Holder must provide a signed copy of the form of Market Making Request attached as Exhibit VI to the Memorandum. The Market Making Request must be received by the Placement Agent no later than [105] calendar days in advance of the last Business Day of a calendar quarter. The Placement Agent will determine the market making price as of that quarter end. For the avoidance of doubt, until the parties agree to the final terms of any such transaction, the submission of a Market Making Request shall not obligate the Placement Agent or the requesting Holder to enter into a market making transaction.

If the Placement Agent agrees to buy a Warrant from a Holder, there will likely be significant delays between the time it agrees to such purchase and the pricing and settlement of such purchase. The Placement Agent may be the only source of price quotes for the Warrants. Any secondary market price quoted by the Placement Agent would reflect any changes in market conditions and other relevant factors, and the quoted price could be higher or lower than the initial purchase price.

In addition, any secondary market purchase of the Warrants by the Placement Agent or any of its affiliates prior to maturity will be at a price that is net of the commissions paid to the Placement Agent as described in the Memorandum under "*Plan of Distribution.*" Also, likely to be excluded from the secondary market price quote are the projected profits included in the cost of hedging the Issuer's obligations under the Warrants. In addition, any such prices may differ from values determined by pricing models used by the Calculation Agent, due to dealer discounts, mark-ups, hedge unwinds or other transaction costs (including any applicable withdrawal fee). Further, to the extent a Holder submits a Market Making Request to be effective prior to [   ], 2009, the secondary market price may be determined as if the net asset value of the Reference Fund were 4% less than its then current value, and to the extent a Holder submits a Market Making Request to be effective prior to [   ], 2010, the secondary market price may be determined as if the net asset value of the Reference Fund were 2% less than its then current value.  Such 4% and 2% reductions of the net asset value of the Fund corresponds to a 4% and 2% fee that may be paid by a Reference Holder to the Reference Fund in connection with a redemption of its Interests at a similar point in time. As a result, the price at which Holders may sell their Warrants to the Placement Agent or any of its affiliates may be less than the Holders' original cost.

CONFIDENTIAL

# Risk Factors

The following highlights some, but not all, of the risk considerations relevant to investing in the Warrants. The following must be read in conjunction with the section "Risk Factors" beginning on page [12] of the attached Memorandum. Defined terms not defined herein shall have the same meaning as in the attached Memorandum.

## HOLDERS MAY LOSE THEIR ENTIRE INVESTMENT

The Warrants are leveraged investments that involve a high degree of risk that may result in the Warrants maturing worthless. A Holder will lose its entire investment if the Final NAV is less than or equal to the Strike Price. A Holder will lose a portion of its investment if the net asset value of the Reference Fund does not increase such that the Final NAV is at least [24.5 - 25.5]% greater than the Strike Price. This means that if the net asset value of the Reference Fund increases such that the Final NAV is exactly [24.5 - 25.5]% greater than the Strike Price, each Holder will receive an amount equal to the Total Cost in respect of each of its Warrants.

## LIMITED TRADING HISTORY ON THE PERFORMANCE OF THE REFERENCE FUND

The Reference Fund has a limited trading history. Historical levels of the Reference Fund or any investment fund or account managed by the General Partner are not indicative of and have no bearing on future performance of the Reference Fund.

## HOLDERS SHOULD INVESTIGATE THE REFERENCE FUND AS IF INVESTING DIRECTLY

Holders should conduct their own diligence of the Reference Fund as they would if they were directly investing in the Reference Fund. Holders should not conclude that the sale by the Issuer of the Warrants is any form of investment recommendation by the Issuer to invest in the Reference Fund.

## THE ISSUER IS NOT RESPONSIBLE FOR DISCLOSURE OF INFORMATION BY THE REFERENCE FUND

Neither the Issuer nor any of its affiliates or agents has participated in the preparation of the Confidential Memorandum of the Reference Fund. Accordingly, the Issuer makes no representation or warranty with respect to the accuracy, validity or completeness of any such information.

The Issuer is not affiliated with the Reference Fund, the General Partner or the Reference Fund's asset managers in any way and the Issuer has no ability to control or predict their actions or the public disclosure of any events or circumstance affecting them. Therefore, the Issuer has no responsibility to monitor, verify, or disseminate current or future public disclosure of information by the Reference Fund in its fund documents or otherwise.

## SPECIFIC INVESTMENT AND TRADING RISKS RELATING TO THE REFERENCE FUND

The Warrants are subject to the risks of an investment in the Reference Fund. Investors should review the risks set forth in the Confidential Memorandum of the Reference Fund, which is attached as Exhibit V of the Memorandum.

## RISKS RELATING TO HEDGE FUNDS AND THE REFERENCE FUND

The Warrants are subject to many of the risks of direct investments in hedge funds. Investments in hedge funds can be speculative and involve a high degree of risk. The following is a list of some of the significant risks associated with hedge funds and the performance of the Warrants.

• The Reference Fund is not registered or regulated under the Investment Company Act. Investor protections similar to those afforded by the Investment Company Act relating to, among other matters, publication of net asset values, rights of redemption and controls over changes to an investment company's investment adviser, investment

15

CONFIDENTIAL

policies, and fees payable to an investment company's service providers, may not be available.

• The unregulated nature of investments made by the Reference Fund, such as the employment of different types of trading strategies (including leverage) and the investment in certain types of instruments that are typically prohibited for funds registered under the Investment Company Act.

• The asset manager for a hedge fund, on behalf of such hedge fund, may invest in and trade in a variety of financial instruments using sophisticated investment techniques for hedging and non-hedging purposes. Such financial instruments and investment techniques include but are not limited to the use of leverage (i.e., borrowing money for investment purposes), transactions that use derivatives such as swaps, options, index options, futures contracts and options on futures. While these investment strategies and financial instruments allow the asset manager the flexibility to generate positive returns, they also allow for greater volatility and the opportunity for significant losses that may adversely affect the value of a hedge fund and thus the return on the Warrants.

• The asset manager may invest in securities listed or traded on foreign exchanges. The execution of transactions on foreign exchanges might involve particular risks including but not limited to higher volatility, government intervention, lack of transparency, lack of regulation, currency risk, political risk and economic social instability.

• The asset manager for a hedge fund has total trading authority over the Hedge fund. The use of a single adviser applying generally similar trading programs could mean lack of diversification and, consequently, higher risk.

• Certain inherent and potential conflicts of interest may exist with respect to the operation of a hedge fund.

• The use of the above investment strategies, investment in the above instruments and the general characteristics of hedge funds may cause the hedge funds to be volatile.

• Hedge funds may involve complex tax structures and delays in distributing important tax information.

• Hedge funds may have high fees and expenses that may offset the hedge fund's trading profits.

• There is no secondary market for investors' interests in hedge funds (and none is expected to develop), there may be restrictions on transferring interests in hedge funds, and hedge funds may suspend or limit the right of redemption under certain circumstances. Thus, an investment in hedge funds should generally be regarded as illiquid.

• While hedge funds generally may provide periodic performance reports and annual audited financial statements, they are not otherwise required to provide periodic pricing or valuation information to investors.

• Legal, tax and regulatory changes could occur during the term of this Warrant that may adversely affect the Reference Fund. The regulatory environment for hedge funds is evolving, and changes in the regulation of hedge funds may adversely affect the value of investments held by the Reference Fund.

## YOUR WARRANTS COULD BE TERMINATED EARLY

If the Calculation Agent determines that an Early Termination Event has occurred during the term of the Warrants, your Warrants will be terminated as of the date selected by the Calculation Agent as the Early Termination Date. Upon termination of the Warrants pursuant to an Early Termination Event, the Calculation Agent will determine the Early Termination Amount, which will be an amount equal to the market value of the Warrants as of the relevant measurement date, and which will be reduced by any losses or costs of the Issuer or its affiliates that are or would be incurred in closing its or its affiliates' hedge position(s) (including the effect of any withdrawal fees) arising from the occurrence of such Early Termination Event. In determining the Early Termination

**CONFIDENTIAL**

Amount, the Calculation Agent may consider any relevant information it deems appropriate.

## RELIANCE ON MILLENNIUM MANAGEMENT LLC

The value of Interests in the Reference Fund is dependent on the ability of Millennium Management LLC to choose investments that appreciate in value, as well as other factors not within Millennium Management LLC's control. There can be no assurance that Millennium Management LLC will succeed in choosing investments that appreciate in value.

## SECONDARY TRADING OF THE WARRANTS IS LIMITED AND THEY ARE SUBJECT TO SUBSTANTIAL RESTRICTIONS ON TRANSFER-ABILITY

The Warrants will not be listed on an organized securities exchange in the United States or abroad. There is currently no secondary market for the Warrants. Even if there is a secondary market, it is not likely to provide significant liquidity.

The Warrants are subject to substantial restrictions on transferability. The Warrants will not be registered under the Securities Act or the securities laws of any state or any other jurisdictions and cannot, therefore, be resold unless they are subsequently registered under these laws or an exemption from registration is found. The Warrants may be sold only to Accredited Investors who are also Qualified Purchasers. Investors must thus be prepared to bear the risk of owning Warrants for an extended period of time.

## WARRANTS ARE NOT REGISTERED

The Warrants are not registered, and the Issuer does not intend to register the Warrants, under the Securities Act or under any state securities laws. Neither the Securities and Exchange Commission nor any state securities commission or regulatory authority has recommended or approved the Warrants, nor has any such commission or regulatory authority reviewed or passed upon the accuracy or adequacy of this Memorandum.

## THE WARRANTS DO NOT CONFER BENEFICIAL OWNERSHIP IN THE REFERENCE FUND OR ITS AFFILIATES

The Reference Fund is merely a reference used to calculate the value of the Warrants. The Warrants are issued by Lehman Brothers Holdings Inc. and represent an investment that is separate and distinct from an investment in the Reference Fund or the Master Fund Neither the Issuer nor its affiliates or agents is offering any Interest in the Reference Fund. An investment in the Warrants confers no indicia of ownership in the Reference Fund or the Master Fund, and neither creates nor implies any rights or remedies with respect to the Reference Fund, the Master Fund or the General Partner or affiliates of the foregoing.

## YOUR INVESTMENT WILL BE "NEW ISSUES" RESTRICTED

Investments in the Warrants will be "new issues" restricted. In calculating the Warrant Payment Amount, returns will exclude any amount (whether positive or negative) attributable to "new issues," as defined in Rule 2790 (or any successor rule) of the National Association of Securities Dealers, Inc. (the 'NASD'). Rule 2790 prohibits certain persons from receiving the economic benefit of new issues. Each of the Issuer and any affiliate that may be entering into transactions to hedge the Issuer's exposure under the Warrants is a Restricted Person under Rule 2790 and, accordingly, any investment by any of them in limited partnership interests of the Reference Fund will be treated as though it had been made by a Restricted Person. A 'Restricted Person' includes most associated persons of a U.S. broker-dealer, most owners and affiliates of a broker-dealer and certain other classes of persons. The Class PP Shares of the Reference Fund do not currently participate in new issues.

## ERISA LIMITATIONS

The Warrants may not be acquired by, on behalf of, or with the assets of, an employee benefit plan subject to Title I of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), a plan subject to Section 4975 of the Internal

17

Revenue Code of 1986, as amended (the "**Code**"), a plan subject to any federal, state, local or other law, rule or regulation which is substantially similar to Title I of ERISA or Section 4975 of the Code ("**Similar Law**") or any entity deemed to hold the assets of such an employee benefit plan or plan for purposes of ERISA, Section 4975 of the Code or Similar Law. Any investor or transferee shall further be deemed to represent and covenant that throughout the period it holds Warrants, the foregoing representations shall be true.

## INCOME TAX RULES RELATED TO THE WARRANTS ARE COMPLEX

The income tax rules relevant to the Warrant are quite complex and may result in significant and possibly adverse tax consequences. An investor should consult with its own tax adviser in order to understand fully the federal, state and local income tax consequences of an investment in this Warrant.

18

**CONFIDENTIAL**

The information in this preliminary private placement memorandum is not complete and may be changed. We may not sell these warrants until the preliminary private placement memorandum is delivered in final form. This preliminary private placement memorandum is not an offer to sell these securities and it is not soliciting an offer to buy these securities in any jurisdiction where the offer or sale is not permitted.

**[•]**

## [4-YEAR, 2-MONTH] CASH-SETTLED CALL WARRANTS

### linked to the

### PERFORMANCE OF

### MILLENNIUM USA LP

### ISSUED BY LEHMAN BROTHERS HOLDINGS INC.

### CONFIDENTIAL

### PRELIMINARY PRIVATE PLACEMENT MEMORANDUM

This preliminary private placement memorandum is not to be shown or given to any person other than the person who directly received it from the Placement Agent (as defined below) and is not to be copied or otherwise reproduced in any manner whatsoever. Failure to comply with this directive can result in a violation of the Securities Act of 1933, as amended (the "Securities Act").

The warrants have not been and will not be registered under the Securities Act, or any state securities law. The warrants are exempt from registration under Section 4(2) of the Securities Act and similar exemptions from registration provided by certain state securities laws. The warrants may be offered, sold and otherwise transferred only to (i) persons who are "accredited investors" as defined in Rule 501 of the Securities Act who are also "qualified purchasers" as defined in Section 2(a)(51) of the Investment Company Act of 1940 (the "Investment Company Act") or (ii) non-U.S. Persons in offshore transactions in accordance with Rule 903 or Rule 904 of Regulation S under the Securities Act ("Regulation S") who are also qualified purchasers, in each case, who have no need for liquidity of investment and understand and can afford the financial and other risks of an investment in a warrant.

The warrants are being offered by Lehman Brothers Holdings Inc. (the "Issuer") through Lehman Brothers Inc. as placement agent (the "Placement Agent"). The Issuer reserves the right to withdraw, cancel or modify such offers and to reject orders in whole or in part. The Placement Agent will have the right to reject in whole or in part any offer to purchase warrants.

For more information about Millennium USA LP (the "Reference Fund"), Millennium Partners, L.P. (the "Master Fund") as well as about Millennium Management LLC (the "General Partner"), which acts as the general partner to the Reference Fund, prospective investors are encouraged to review the Confidential Memorandum of the Reference Fund, attached as Exhibit V hereto. Neither the Issuer nor its affiliates or agents have participated in the preparation of any offering or subscription documents for interests in the Reference Fund. Accordingly, neither the Issuer nor its affiliates or agents makes any representation or warranty with respect to the accuracy, validity or completeness of any such information. Investors should conduct their own diligence of the Reference Fund as they would if investing directly in the Reference Fund. None of the General Partner, the Master Fund, the Reference Fund, or any affiliate of the foregoing sponsors or endorses the Issuer or the Warrants.

The Warrants are issued by Lehman Brothers Holdings Inc. and represent an investment that is separate and distinct from an investment in the Reference Fund. Neither the Issuer nor its affiliates or agents is offering any interest in the Reference Fund. An investment in the Warrants confers no indicia of ownership in the Reference Fund and neither creates nor implies any rights or remedies with respect to the Reference Fund, the Master Fund, or the General Partner or affiliates of the foregoing.

# LEHMAN BROTHERS INC.

Dated as of [•], 2008

## TABLE OF CONTENTS

**Page**

SUMMARY OF PRINCIPAL TERMS ............................................................................. 1
    Issuance ...................................................................................................................... 1
    Exercise and Maturity ............................................................................................... 2
    Warrant Payment Amount ......................................................................................... 2
    Liquidity ..................................................................................................................... 3
    In-Kind Distributions ................................................................................................ 4
    Restrictions On "New Issues" ................................................................................... 4
    Early Termination ...................................................................................................... 4
    Potential Adjustment Event ....................................................................................... 9
    Transfer Agent ........................................................................................................... 9
    Calculation Agent .................................................................................................... 10
    Calculations .............................................................................................................. 10
    Form and Transfer .................................................................................................... 10
    Ratings ...................................................................................................................... 11
RISK FACTORS .................................................................................................................. 12
    Holders May Lose Their Entire Investment ............................................................ 12
    Limited Trading History on the Performance of the Reference Fund ..................... 12
    Holders Should Investigate the Reference Fund as if Investing Directly ............... 13
    Risks Relating to the Reference Fund, the General Partner or the Master Fund ..... 13
    Lack of Affiliation Among the Issuer and the Reference Fund .............................. 13
    The Issuer is Not Responsible for Disclosure of Information by the Reference Fund
        and Has No Obligation to Disclose Information About the Reference Fund After
        the Date of this Memorandum ............................................................................ 13
    Value of Warrants Influenced by Many Unpredictable Factors .............................. 14
    Specific Investment and Trading Risks Relating to the Reference Fund ................. 15
    Risks Relating to Hedge Funds and the Reference Fund ........................................ 15
    Your Warrants Could Be Terminated Early ............................................................ 18
    Reliance on Millennium Management LLC ............................................................ 19
    Secondary Trading of the Warrants is Limited and They are Subject to Substantial
        Restrictions on Transferability ........................................................................... 19
    Warrants are not Registered ..................................................................................... 20
    Secondary Trading of Warrants Held Less than 24 Months is Subject to a Penalty ... 20
    Investors in Warrants will be Exposed to the Issuer's Credit Risk ......................... 21
    The Warrants do not Confer Beneficial Ownership in the Reference Fund or its
        Affiliates ............................................................................................................. 21
    Your Investment Will Be "New Issues" Restricted ................................................ 22
    ERISA Limitations ................................................................................................... 22
    Hedging Transactions by the Issuer ........................................................................ 22
    Adverse Economic Interests to Holders .................................................................. 22
    Certain Business Activities May Create Conflicts of Interest with Holders ........... 23
    Investment Suitability .............................................................................................. 24
    Transfer Restrictions ................................................................................................ 24

    Income Tax Rules Related to the Warrants are Complex ....................................24
PLAN OF DISTRIBUTION ...........................................................................................25
SUITABILITY REQUIREMENTS AND TRANSFER RESTRICTIONS ...................26
CERTAIN U.S. FEDERAL INCOME TAX CONSIDERATIONS ............................28
    Tax Treatment of Warrants...........................................................................29
    Taxation of U.S. Holders .............................................................................30
    Possible Alternative Tax Treatments of an Investment in Warrants .........31
    IRS Revenue Ruling 2008-1 and IRS Notice 2008-2 ................................31
    Tax Treatment of Non-U.S. Holders............................................................32
    Backup Withholding and Information Reporting .........................................32
CERTAIN BENEFIT PLAN CONSIDERATIONS.......................................................32
USE OF PROCEEDS .....................................................................................................33
LEHMAN BROTHERS HOLDINGS INC. ..................................................................33
THE REFERENCE FUND .............................................................................................35

## EXHIBITS

I:      Form of Investor Representation Letter.........................................................I-1

II:    Form of Transferee Representation Letter.................................................... II-1

III:   Form of Issuing, Paying and Transfer Agency Agreement ......................... III-1

IV:   Form of Calculation Agency Agreement .....................................................IV-1

V:    Confidential Private Offering Memorandum of Millennium USA LP ........... V-1

VI:   Form of Market Making Request...................................................................VI-1

This Preliminary Private Placement Memorandum (the "Memorandum") relates to the offer and sale by Lehman Brothers Holdings Inc. ("LBH" or the "Issuer"), in a transaction not involving a public offering, of [4-Year, 2-Month] Cash-Settled Call Warrants Linked to the Performance of Millennium USA LP (the "Warrants") as more fully described herein.

The obligations of the parties to the transaction contemplated herein are set forth in and will be governed by certain documents described herein; all of the statements and information contained herein are qualified in their entirety by reference to such documents. This Memorandum contains summaries of certain of these documents which LBH believes to be accurate, but for a complete description of the rights and obligations of the parties thereto, reference is hereby made to the actual documents, copies of which are attached hereto, and all such summaries are qualified in their entirety by this reference.

LBH will afford to prospective investors the opportunity to ask questions of, and receive answers from, LBH concerning the offering of the Warrants and to obtain additional relevant information which LBH possesses or can acquire without unreasonable effort or expense.

This Memorandum is based on information supplied by LBH and other sources identified herein and is being furnished on a confidential basis solely for the use of prospective investors in connection with the non-public offering of the Warrants.

The Warrants are being offered in negotiated transactions or otherwise and are offered when, as, and if issued, subject to prior sale or withdrawal, cancellation, or modification of any matters by counsel and certain other conditions. LBH may from time to time offer and sell other, similar Warrants with different terms to purchasers other than the offerees hereunder.

Subject to the provisions contained herein, the Warrants are being sold on behalf of LBH to persons described in the paragraph below by Lehman Brothers Inc. (the "Placement Agent").

The purchase of a Warrant offered hereby is suitable only for, and should be made only by, investors who are (i) "accredited investors," as defined in Rule 501 of Regulation D under the Securities Act ("Accredited Investors") who are also "qualified purchasers," as defined in Section 2(a)(51) of the Investment Company Act ("Qualified Purchasers") or (ii) "non-U.S. Persons" purchasing in "offshore transactions" (each as defined in Regulation S under the Securities Act, "Non-U.S. Persons" and "Offshore Transactions", respectively) who are also Qualified Purchasers, in each case, who have no need for liquidity of investment and understand and can afford the financial and other risks of an investment in a Warrant.

THE INITIAL INVESTOR AND EACH TRANSFEREE SHALL REPRESENT AND WARRANT THAT IT IS NOT, AND IT IS NOT ACQUIRING WARRANTS WITH THE ASSETS OF, AN EMPLOYEE BENEFIT PLAN SUBJECT TO TITLE I OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED ("ERISA"), A PLAN SUBJECT TO SECTION 4975 OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "CODE"), A PLAN SUBJECT TO ANY FEDERAL, STATE, LOCAL OR OTHER LAW, RULE OR REGULATION WHICH IS SUBSTANTIALLY SIMILAR TO TITLE I OF ERISA OR SECTION 4975 OF THE CODE ("SIMILAR LAW") OR ANY ENTITY DEEMED TO HOLD THE ASSETS OF ANY SUCH EMPLOYEE BENEFIT PLAN OR PLAN FOR PURPOSES OF ERISA, SECTION 4975 OF THE CODE OR SIMILAR LAW.

ANY INVESTOR OR TRANSFEREE SHALL FURTHER BE DEEMED TO REPRESENT AND COVENANT THAT THROUGHOUT THE PERIOD IT HOLDS WARRANTS, THE FOREGOING REPRESENTATIONS AND WARRANTIES SHALL BE TRUE.

AN INVESTMENT IN THE WARRANTS INVOLVES CERTAIN SUBSTANTIAL RISKS, INCLUDING THE RISK THAT INVESTORS MAY LOSE THE ENTIRE VALUE OF THEIR INVESTMENTS IN CERTAIN CIRCUMSTANCES. See *"Risk Factors"* for a discussion of certain factors that prospective investors should carefully consider before they invest in the Warrants.

The Warrants are being offered to a limited number of (i) Accredited Investors who are also Qualified Purchasers and (ii) Non-U.S. Persons who are also Qualified Purchasers. The offering of the Warrants will not be registered under the Securities Act in reliance upon an exemption provided in the Securities Act. There is no market for the Warrants being offered hereby and, as a result, a purchaser of a Warrant must be prepared to hold it for an indefinite period of time. Transfers of the Warrants may be made only in accordance with the transfer restrictions set forth herein.

## IRS CIRCULAR 230 NOTICE

**THIS MEMORANDUM WAS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, FOR THE PURPOSE OF AVOIDING UNITED STATES FEDERAL, STATE, OR LOCAL TAX PENALTIES. THIS MEMORANDUM WAS WRITTEN AND PROVIDED BY THE ISSUER IN CONNECTION WITH THE PROMOTION OR MARKETING BY THE ISSUER AND/OR PLACEMENT AGENT OF THE WARRANTS. EACH HOLDER SHOULD SEEK ADVICE BASED ON ITS PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

Notwithstanding anything to the contrary contained herein, all persons may disclose to any and all persons, without limitation of any kind, the federal, state and local tax treatment of the Warrants, any fact relevant to understanding the federal, state and local tax treatment of the Warrants and all materials of any kind (including opinions or other tax analyses) relating to such tax treatment and that may be relevant to understanding such tax treatment. However, no person may disclose the name of or identifying information with respect to any party identified herein or any pricing terms or other nonpublic business or financial information that is unrelated to the purported or claimed federal, state or local tax treatment of the Warrants and is not relevant to understanding the purported or claimed federal, state and local tax treatment of the Warrants.

No person has been authorized to give any information or to make any representations other than those contained in this Memorandum and, if given or made, such information or representations must not be relied upon. This Memorandum does not constitute an offer to sell or a solicitation of an offer to buy any securities other than the Warrants nor does it constitute an offer of the Warrants to any person in any state or other jurisdiction in which such offer would be unlawful. This Memorandum does not include information relating to events occurring subsequent to its date, except as specifically indicated. The delivery of this Memorandum at any time does not imply that information herein is correct as of any time subsequent to its date. The Warrants may not be sold to any person without delivery of this Memorandum and the Exhibits attached hereto.

## WARRANT SALES RESTRICTIONS FOR CERTAIN JURISDICTIONS

### *Mexico*

The Warrants have not and will not be registered in the Mexican National Registry of Securities (Registro Nacional de Valores). The Warrants may not be offered or sold in the United Mexican States ("Mexico") by any means except in circumstances which do not constitute an offer to the public within the meaning of the Mexican Securities Market Law (Ley del Mercado de Valores) and its regulations. No Mexican regulatory authority has approved or disapproved the Warrants. All applicable provisions of the Mexican Securities Market Law must be complied with in respect of any sale, offer or distribution of, or intermediation with, the Warrants in, from or otherwise involving Mexico, and any resale of the Warrants must be made in a manner that will not constitute a public offering in Mexico.

### *The Bahamas*

The Warrants have not been and shall not be offered or sold in or into The Bahamas except in circumstances that do not constitute a 'public offering' according to the Securities Industry Act, 1999 and Securities Industry Regulations, 1999. Any private offer of the Warrants, directly or indirectly, in or from within The Bahamas may only be made by an entity or person who is licensed as a Broker Dealer or Securities Investment Advisor by the Securities Commission of The Bahamas. No person deemed "resident" in The Bahamas for exchange control purposes pursuant to the Exchange Control Regulations, 1956 may purchase the Warrants unless the prior written approval of the Central Bank of The Bahamas has been obtained by or on behalf of such person. The Warrants are subject to significant restrictions on transfer.

### *Chile*

NEITHER THE ISSUER NOR THE WARRANTS HAVE BEEN REGISTERED WITH THE SUPERINTENDENCIA DE VALORES Y SEGUROS PURSUANT TO LAW NO. 18.045, THE LEY DE MERCADO DE VALORES, AND REGULATIONS THEREUNDER. THIS DOCUMENT DOES NOT CONSTITUTE AN OFFER OF, OR AN INVITATION TO SUBSCRIBE FOR OR PURCHASE, THE WARRANTS IN THE REPUBLIC OF CHILE, OTHER THAN TO INDIVIDUALLY IDENTIFIED BUYERS PURSUANT TO A PRIVATE OFFERING WITHIN THE MEANING OF ARTICLE 4 OF THE LEY DE MERCADO DE VALORES (AN OFFER THAT IS NOT "ADDRESSED TO THE PUBLIC AT LARGE OR TO A CERTAIN SECTOR OR SPECIFIC GROUP OF THE PUBLIC.")

## SUMMARY OF PRINCIPAL TERMS

*The information set forth below is qualified in its entirety by reference to the Form of Issuing, Paying and Transfer Agency Agreement attached hereto as Exhibit III. Each prospective investor should review Exhibit III, and no purchase of a Warrant should be made until such review is completed.*

### Issuance

The Issuer will issue [●] U.S. dollar Warrants for a total cost, including selling compensation, that is currently expected to be as high as $[245-255] per Warrant (the "Total Cost"). The Total Cost has been priced to include the selling compensation payable to Lehman Brothers Inc. (the "Placement Agent"). For an explanation of the components of the Total Cost and the plan of distribution, see *"Plan of Distribution."*

The Issuer expects to issue the Warrants on or about [May 1], 2008 (the "Issue Date"). The minimum initial investment is [393-409] Warrants per investor, subject to waiver at the discretion of the Placement Agent, with additional investments permitted in denominations of one Warrant or multiples thereof. The closing and settlement date for the Warrants will be the Issue Date.

Each Warrant is linked to the performance of the Class PP interests (the "Interests") of Millennium USA LP (the "Reference Fund"). Each Warrant will entitle you to receive from the Issuer an amount, if any, on the Warrant Payment Date (as defined below) in U.S. dollars based on the value of the Reference Fund, as determined by the Calculation Agent, on the Valuation Date (as defined below).

The Warrants represent an investment that is separate and distinct from an investment in the Reference Fund. Neither the Issuer nor its affiliates or agents is offering any Interest in the Reference Fund. An investment in the Warrants confers no indicia of ownership in the Reference Fund and neither creates nor implies any rights or remedies with respect to the Reference Fund or its affiliates.

The Reference Fund invests in Millennium Partners, L.P. (the "Master Fund"). For purposes of the discussion herein, any reference to the Reference Fund's assets or investments shall include the assets and investments of the Master Fund that are attributable to interests of the Master Fund held by the Reference Fund.

For more information about the Reference Fund, prospective investors are encouraged to review the Confidential Memorandum of the Reference Fund, attached hereto as Exhibit V. Neither the Issuer nor its affiliates or agents have participated in the preparation of any offering or subscription documents for interests of the Reference Fund. Accordingly, neither the Issuer nor its affiliates or agents makes any representation or warranty with respect to the accuracy, validity or completeness of any such information. Investors should conduct their own diligence of the Reference Fund as they would if investing directly in the Reference Fund. None of Millennium Management LLC. (the "General Partner"), which acts as the general partner to the

Reference Fund, the Master Fund, the Reference Fund, or any affiliate of the foregoing sponsors or endorses the Issuer or the Warrants.

The Warrants will be governed by, and construed in accordance with, the laws of the State of New York.

## Exercise and Maturity

The Warrants will be exercised automatically on the Valuation Date. The Warrants are scheduled to mature on [August 3], 2012 (the "Warrant Payment Date"); provided that if the Calculation Agent determines that a Reference Holder (as defined below) would not have received all redemption proceeds by the end of the day on [July 30], 2012, assuming a timely request for redemption by such Reference Holder of the Deemed Quantity of Interests (as defined below) effective as of the Valuation Date, the Warrant Payment Date shall be the earlier of (i) five Business Days after the date that a Reference Holder would have received all such redemption proceeds, as determined by the Calculation Agent and (ii) five Business Days after the thirtieth day following the Audit Date. Each Warrant entitles each holder thereof (a "Holder") to payment of the Warrant Payment Amount (as defined below) on the Warrant Payment Date. The Warrants may only be exercised for cash (U.S. dollars) and Holders will not be entitled to receive any Interests of the Reference Fund.

## Warrant Payment Amount

On the Warrant Payment Date (or if such day is not a Business Day then the immediately succeeding Business Day), Holders will receive, with respect to each Warrant, an amount (the "Warrant Payment Amount") which is the greater of (i) zero and (ii) an amount equal to the Final NAV minus the Strike Price. If the calculation of the Warrant Payment Amount yields an amount less than zero, Holders will not receive a payment from the Issuer, nor will Holders be required to make any payment to the Issuer. A Holder's loss will be limited to the Total Cost paid by such Holder for each Warrant.

"Final NAV" means, as of the Valuation Date, the aggregate redemption proceeds that would be received by a Reference Holder on or prior to the date that is thirty days after the Audit Date, assuming timely submission of a request for redemption of the Deemed Quantity of Interests (as defined below) to be effective as of the Valuation Date, as determined by the Calculation Agent. The Final NAV shall be calculated by deducting from such amount any redemption, management, incentive or administrator fees or other costs (including, without limitation, any applicable withdrawal fee) payable by a Reference Holder in respect of such Deemed Quantity of Interests, to the extent such amounts have not already been deducted by the Reference Fund in calculating the amount of redemption proceeds payable to the Reference Holder, as determined by the Calculation Agent. For the avoidance of doubt, if the Calculation Agent determines that a Reference Holder, assuming timely submission of a request for redemption of the Deemed Quantity of Interests to be effective as of the Valuation Date, would not have received any of the redemption proceeds on or prior to the date that is thirty days after the Audit Date, the Calculation Agent shall determine the Final NAV, which Final NAV may be equal to zero.

"Valuation Date" means [June 30], 2012.

"Audit Date" means, with respect to a date of determination, the Business Day on which the audit of the Reference Fund for the fiscal year in which such date of determination occurs is completed by the Reference Fund's independent auditor.

"Reference Holder" means a hypothetical limited partner of the Reference Fund that is deemed to have the benefits and obligations of an investor owning, during the term of the Warrants, Interests in the Reference Fund, as determined by the Calculation Agent. The Reference Holder will have a tax situs in Delaware. The Reference Holder does not represent an investment in or an Interest in the Reference Fund.

"Strike Price" means 100% of the Initial NAV.

"Initial NAV" means $1,000.

"Deemed Quantity of Interests" means a hypothetical quantity of Interests of the Reference Fund with an aggregate value as of the Issue Date equal to the Initial NAV.

"Business Day" means a day, other than a Saturday or a Sunday, that is neither a legal holiday nor a day on which banking institutions in New York are authorized or obligated by law or executive order to close.

The Warrants are linked the performance of Interests of the Reference Fund that are restricted from participating in gains or losses attributable to "new issues" investments by the Reference Fund to the extent deemed necessary or advisable by the Reference Fund to comply with Rule 2790 as adopted by the NASD on December 23, 2003, and as may subsequently be modified.

**Liquidity**

The Warrants will not be listed on any securities exchange or quotation system and there is no guarantee that a secondary market in the Warrants will develop. The Issuer, the Placement Agent and their affiliates have no obligation to make a market for the Warrants and may cease or alter market-making activities if commenced at any time. To the extent the Placement Agent does effect market-making transactions, the Placement Agent will determine market-making prices, based largely on the factors set forth under *"Risk Factors— Secondary Trading of the Warrants is Limited and They are Subject to Substantial Restrictions on Transferability."*

The Placement Agent intends, but is not obligated, to buy and sell the Warrants. To request a market making transaction, a Holder must provide a signed copy of the form of Market Making Request attached hereto as Exhibit VI. The Market Making Request must be received by the Placement Agent no later than 105 calendar days in advance of the last Business Day of a calendar quarter. The Placement Agent will determine the market making price as of that quarter end. For the avoidance of doubt, until the parties agree to the final terms of any such transaction, the submission of a Market Making Request shall not obligate the Placement Agent or the requesting Holder to enter into a market making transaction. The Placement Agent and its affiliates are not obligated to create a secondary market or to continue such activity once it has begun.

If the Placement Agent agrees to buy a Warrant from a Holder, there will likely be significant delays between the time it agrees to such purchase and the pricing and settlement of such purchase. The Placement Agent may be the only source of price quotes for the Warrants. Any secondary market price quoted by the Placement Agent would reflect any changes in market conditions and other relevant factors, and the quoted price could be higher or lower than the initial purchase price.

In addition, any secondary market purchase of the Warrants by the Placement Agent or any of its affiliates prior to maturity will be at a price that is net of the commissions paid to the Placement Agent as described under "*Plan of Distribution.*" Also, likely to be excluded from the secondary market price quote are the projected profits included in the cost of hedging the Issuer's obligations under the Warrants. In addition, any such prices may differ from values determined by pricing models used by the Calculation Agent, due to dealer discounts, mark-ups, hedge unwinds or other transaction costs. Further, to the extent a Holder submits a Market Making Request to be effective prior to [●], 2009, the secondary market price may be determined as if the net asset value of the Reference Fund were 4% less than its then current value, and to the extent a Holder submits a Market Making Request to be effective prior to [●], 2010, the secondary market price may be determined as if the net asset value of the Reference Fund were 2% less than its then current value. Such 4% and 2% reductions of the net asset value of the Fund corresponds to a 4% and 2% fee that may be paid by a Reference Holder to the Reference Fund in connection with a redemption of its Interests at a similar point in time. As a result, the price at which Holders may sell their Warrants to the Placement Agent or any of its affiliates may be less than Holders' original cost.

**In-Kind Distributions**

If the Reference Fund makes an in-kind payment to its Reference Holders, the Calculation Agent, when it determines the Valuation NAV, will determine the value of such distribution (including, without limitation, illiquidity discounts, the time remaining until the Warrants are unwound early or exercised, fees, transactions costs and other factors), for the purpose of calculating any related cash settlement amounts due to each Holder.

**Restrictions On "New Issues"**

The Warrants are linked to Interests that are restricted from participating in gains or losses attributable to "new issues" investments by the Reference Fund to the extent deemed necessary or advisable by the Reference Fund to comply with Rule 2790 as adopted by the NASD on December 23, 2003, and as may subsequently be modified.

**Early Termination**

The Issuer reserves the right to terminate the Warrants at any time prior to the Warrant Payment Date if at any time before that date, the Calculation Agent determines that an Early Termination Event (as defined below) has occurred. The occurrence of any of the following events may be deemed an "Early Termination Event" by the Calculation Agent:

(1)    Reference Fund NAV Decrease Event. The Reference Fund net asset value per share decreases by (i) 10% or more during any month or (ii) 25% or more during any quarter;

-4-

(2)    Reference Fund Volatility Event. As of any date of determination, the annualized standard deviation of the daily percentage returns of the Reference Fund over the most recent 90 days exceeds 15%;

(3)    Reference Fund Net Capital Event. The net capital of the Reference Fund for any calendar month drops by 15% or more inclusive of all redemptions and subscriptions but exclusive of any other gains or loss;

(4)    Master Fund Strategy Event. The percentage of the Master Fund's risk capital allocated to a Permitted Strategy exceeds the Percentage Limit for such Permitted Strategy as set forth below:

|    | Permitted Strategy | Percentage Limit |
|----|--------------------|--------------------|
| 1  | Relative Value Sector Arbitrage | 55% |
| 2  | Statistical Arbitrage | 45% |
| 3  | Merger Arbitrage | 20% |
| 4  | Fixed Income Arbitrage | 25% |
| 5  | Distressed | 15% |
| 6  | Futures/Currency Arbitrage | 15% |
| 7  | Closed End/Asset Arbitrage | 18% |
| 8  | Convertibles | 10% |
| 9  | Options Arbitrage | 15% |
| 10 | Other | 10% |

(5)    Reference Fund Diversion Event. Less than 80% of the assets of the Reference Fund is invested (directly or indirectly) in the Master Fund (each a "Reference Fund Diversion Event");

(6)    Master Fund AUM Decrease Event. At any time the Master Fund's total assets under management (i) are less than USD 5,000,000,000 or (ii) decrease by 50% or more within any calendar year when compared to the Master Fund's total assets under management on January 1st of such calendar year;

(7)    Key Person Event. Any two of Israel Englander, David Nolan or Terry Feeney cease to be involved in running the day-to-day operations and management of the General Partner (each a "Key Person Event");

(8)    Fund Liquidity Event. The Reference Fund, with respect to its Class PP shares (i) provides liquidity information less frequently than quarterly, (ii) requires more than 90 days' notice to effect redemptions, (iii) suspends redemptions in whole or in part or (iv) imposes any whole or partial restriction in respect of a redemption or subscription by a Reference Holder (exclusive of the 4% and 2% early withdrawal fee) (each a "Fund Liquidity Event");

(9)    Material Adverse Change Event. The occurrence of a material adverse change in the business, properties, operations, assets or liabilities (actual or contingent), or condition (financial or otherwise) of the Reference Fund (each a "Material Adverse Change Event");

(10)  Master Fund Concentration Event.  The Master Fund allocates more than 10% of its assets to a single underlying investment (each a "Master Fund Concentration Event");

(11)  General Partner Event.  Millennium Management LLC ceases to act as General Partner of the Reference Fund, or such party otherwise ceases to act for the Reference Fund as General Partner for any reason (each a "General Partner Event");

(12)  Bankruptcy Event.  The Reference Fund (a) is dissolved or has a resolution passed for its dissolution, winding up, or official liquidation; (b) makes a general assignment or arrangement with or for the benefit of its creditors; (c) becomes insolvent or is unable to pay its debts or fails or admits its inability generally to pay its debts as they become due; (d)(i) institutes or has instituted against it, by a regulator, supervisor or any similar official with primary insolvency, rehabilitative or regulatory jurisdiction over it in the jurisdiction of its incorporation or organization or the jurisdiction of its head or home office, a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation by it or such regulator, supervisor or similar official, or (ii) has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and such proceeding or petition is instituted or presented by a person or entity not described in clause (i) above and either (x) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (y) is not dismissed, discharged, stayed or restrained in each case within [15] days of the institution or presentation thereof; (e) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, or custodian or other similar official for it or for all or substantially all its assets in a proceeding of the type described herein; (f) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within [15] days thereafter; (g) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (a) through (f) above (inclusive); or (h) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts (each a "Bankruptcy Event");

(13)  Reference Fund Restatement Event.  The Reference Fund NAV is restated by more than +/- 2% for any month (each a "Reference Fund Restatement Event");

(14)  Reporting Failure Event.  The Reference Fund or the Master Fund fails to deliver information that it had previously agreed to deliver or that it had been previously delivering to investors in normal practice that the Calculation Agent deems necessary to determine compliance with the investment guidelines, asset allocation methodologies or any other similar policies of the Reference Fund in a timely manner (each a "Reporting Failure Event");

(15)  Misconduct Event.  (a) The Reference Fund, the Master Fund or the General Partner or any of their respective affiliates, employees, officers or agents, breaches any applicable law or regulation, (b) any governmental, legal or regulatory authority or other person brings or threatens to bring an administrative or judicial proceeding, investigation or litigation against any such

-6-

person (including, in the case of the General Partner, against any other fund managed by the General Partner) or makes or threatens to make any claim, demand, charge or complaint against such person alleging any misconduct, impropriety, illegality, negligence, contractual or fiduciary breach or other wrongdoing; or (c) the cancellation, suspension, revocation, termination, limitation or qualification of the registration, authorization, licenses, membership or approval of any such person by any governmental, legal or regulatory entity with authority over such person (each a "Misconduct Event");

(16) Change in Law Event. (a) There is a change in any law, regulations, practice or the interpretation of any law, regulations or practice by any court, tribunal or regulatory authority which causes it to become unlawful or inadvisable for the Issuer or any of its affiliates to perform any obligations hereunder or otherwise has material adverse consequences for the Issuer or any of their affiliates including, for greater certainty, with any hedging activity; or (b) there is a change in the legal, tax, accounting or regulatory treatments of the Interests, the Reference Fund or the General Partner that is reasonably likely to have a material adverse consequence for the Reference Fund or the Interests (each a "Change in Law Event");    -

(17) Reference Fund Modification Event. (a) The modification of the Reference Fund (such as, but not limited to, modification of the organizational documents or any prospectus, offering memorandum, information memorandum or other similar offering document related thereto) in a way that could reasonably be expected to have a material adverse effect on the Final NAV or the rights and remedies of a Reference Holder from those prevailing on the Issue Date (including, without limitations rights of liquidation, transfer or redemption of the Interests), or (b) any event or any change affecting the Reference Fund and/or an Interest thereof (such as, but not limited to, interruption, breakdown, suspension or deferral of the calculation or the publication of the level or value of such Interest, or the disappearance of the level or value of such Interest resulting more particularly from, but not limited to, the winding-up or the termination of such Fund or the cancellation of the registration or of the approval by any relevant authority of the Fund) and that, in the opinion of the Calculation Agent, is likely to have a material effect on the Interests of a Reference Holder (each a "Reference Fund Modification Event");

(18) Merger Event. The conversion of an Interest of the Reference Fund into another series of interests or securities with materially different benefits, rights or obligations, or the split of the Reference Fund, or its consolidation or its merger with or its sale or its conveyance of all or substantially all of its Interests or assets to a third party (each a "Merger Event"); .

(19) Reference Fund Asset Allocation Event. The announcement or implementation of a material change in the formula for or method of asset allocation or an other material modification, breach or violation of any strategy or investment guidelines of the Reference Fund that is reasonably likely to materially affect any Interests of a Reference Holder, as determined by the Calculation Agent (each a "Reference Fund Asset Allocation Event");

(20) Hedging Disruption Event. (1) The Issuer and/or any of its affiliates is unable, after using commercially reasonable efforts, or it is deemed inadvisable for the Issuer and/or any of its affiliates, to (A) acquire, establish, re-establish, substitute, maintain, unwind or dispose of any transaction(s) or asset(s) it deems necessary to hedge the price risk of the Issuer issuing and performing its obligations with respect to the Warrants, or (B) realize, recover or remit the

proceeds of any such transaction(s) or asset(s), including, without limitation, where such in bility or impracticability has arisen by reason of (i) any restrictions or increase in charges or ₰ es imposed by the relevant Reference Fund on any investor's ability to redeem such Interest, in whole or in part, or any existing or new investor's ability to make new or additional investments in such Interest, or (ii) any mandatory redemption, in whole or in part, of such Interest imposed by the relevant Reference Fund (in each case other than any restriction in existence on the date on which such Interest was first included in such a Reference Fund derivative transaction) or (2) the Issuer and/or any of its affiliates is unable, after using commercially reasonable efforts, to determine the value of any hedging position in the Reference Fund for any reason (each, a "Hedging Disruption Event").

(21) <u>Increased Cost of Hedging Event.</u> The Issuer and/or any of its affiliates would incur a materially increased (as compared with circumstances existing as of the Issue Date) amount of tax, duty, expense or fee (other than brokerage commissions) to (1) acquire, establish, re-establish, substitute, maintain, unwind or dispose of any transaction(s) or asset(s) it deems necessary to hedge the price risk of the Issuer issuing and performing its obligations with respect to the Warrants, or (2) realize, recover or remit the proceeds of any such transaction(s) or asset(s) (each, an "<u>Increased Cost of Hedging Event</u>").

(22) <u>Material Contract Event.</u> An event of default or a termination event, however defined, occurs with respect to the Reference Fund under any prime brokerage agreement, any ISDA Master Agreement or other similar derivatives agreement or any other agreement for borrowed money (including, without limitation, any loan agreement or repurchase agreement) (each a "<u>Material Contract Event</u>"); or

(23) <u>Nationalization Event.</u> All the Interests or substantially all the assets of the Reference Fund are nationalized, expropriated or are otherwise required to be transferred to any governmental agency, authority, entity or instrumentality thereof (each a "<u>Nationalization Event</u>").

Upon the occurrence of any of the foregoing events, the Calculation Agent shall determine whether the occurrence of such event constitutes an Early Termination Event. If the Calculation Agent deems the occurrence of such event to be an Early Termination Event and the Issuer determines to terminate the Warrants, the Issuer will notify the Transfer Agent of its intent to terminate the Warrants. Holders will receive the Early Termination Amount (as defined below) on the Early Termination Date. The "Early Termination Date" shall be determined by the Calculation Agent and shall be [five] Business Days following the date on which all redemption proceeds would have been received by a Reference Holder of Interests based on a timely request for redemption by such Reference Holder to be effective as of the Early Termination Valuation Date (as defined below). Notwithstanding the foregoing, in no event will the Early Termination Date occur more than five Business Days after the thirtieth day following the Audit Date in respect of the Early Termination Valuation Date. Upon receipt of notice from the Issuer of its intent to terminate the Warrants following the Early Termination Event, the Transfer Agent will notify each Holder of the Issuer's election to terminate the Warrants in accordance with the Issuing, Paying and Transfer Agency Agreement (as defined below).

"<u>Early Termination Amount</u>" means the amount determined by the Calculation Agent equal to the market value of the Warrant as of the Early Termination Valuation Date, reduced by any

losses or costs of the Issuer or its affiliates that are or would be incurred under then prevailing circumstances in closing its or its affiliates' hedge position(s) (including the effect of any withdrawal fees) arising from the occurrence of such Early Termination Event. The "Early Termination Valuation Date" shall be determined by the Calculation Agent and shall be the date as of which a Reference Holder, which properly submitted a redemption notice to the Reference Fund promptly after such Early Termination Event, would have been able to redeem its Interests. If the Calculation Agent determines that a Reference Holder would not have received all of the redemption proceeds by the thirtieth day after the relevant Audit Date, the Early Termination Amount may be equal to zero. In determining the Early Termination Amount, the Calculation Agent may, but need not, consider any relevant information, including, without limitation, information consisting of relevant market data in the relevant market including, without limitation, relevant rates, prices, yields, volatilities, spreads, correlations or other relevant market data from external or internal sources (including any affiliates of the Calculation Agent) or otherwise.

**Potential Adjustment Event**

Upon the occurrence of a Potential Adjustment Event (as defined below), the Calculation Agent shall make such adjustment to the exercise, settlement, payment or any other terms of the Warrants as the Calculation Agent determines appropriate, and determine the effective times thereof, to account for the economic effect on the Warrants of such Potential Adjustment Event. "Potential Adjustment Event" means any of the following:

(i)    a subdivision, reclassification, reorganization, consolidation, increase, reduction by cancellation of the Interests of a Reference Holder, or, a free distribution or dividend of any such Interests to existing holders by way of bonus, capitalization or similar issue;

(ii)   a distribution or dividend to existing holders of (a) Interests, or (b) any other interest capital or securities granting the right to payment of dividends and/or the proceeds of liquidation of the Reference Fund equally or proportionately with such payments to holders of such interests, or (c) any other type of securities, rights or warrants or other assets, in any case for payment (cash or other) at less than the prevailing market price as determined by the Calculation Agent;

(iii)  an extraordinary dividend;

(iv)   a call by the Reference Fund of such Interests in respect of Interests that are not fully paid;

(v)    a repurchase by the Reference Fund of Interests whether out of profits or capital and whether the consideration for such repurchase is cash, securities or otherwise; or

(vi)   any other similar event.

**Transfer Agent**

Citibank N.A. will act as registrar and Transfer Agent (the "Transfer Agent") for the Warrants pursuant to the terms of an issuing, paying and transfer agency agreement (the "Issuing, Paying and Transfer Agency Agreement"), dated on or about [●], 2008 by and between

the Issuer and the Transfer Agent. The Transfer Agent's corporate offices are located at 111 Wall Street, New York, New York 10043. Pursuant to the terms of the Issuing, Paying and Transfer Agency Agreement, the Transfer Agent has agreed to make payments on behalf of the Issuer and register the transfer or exchange of Warrants. Fees and expenses of the Transfer Agent will be paid by the Issuer. The Transfer Agent will not be liable for any loss, liability, cost, claim, action, demand or expense (including, without limitation, all costs, charges and expenses paid or incurred in disputing or defending any of the foregoing) arising out of or in relation to or in connection with its appointment or the exercise of its functions, except such as may result from its own willful default or gross negligence or that of its officers or agents. Nothing shall prevent the Transfer Agent or any of its affiliates from dealing in the Warrants or from entering into any related transactions, including any swap or hedging transactions, with the Issuer or any holder of Warrants. The Transfer Agent may resign at any time upon three months written notice, and the Issuer may remove the Transfer Agent at any time upon 30 days written notice. Neither resignation or removal of the Transfer Agent will take effect until a successor Transfer Agent has been appointed.

**Calculation Agent**

Lehman Brothers Inc. will initially serve as calculation agent (the "Calculation Agent") for the Warrants pursuant to the terms of a Calculation Agency Agreement (the "Calculation Agency Agreement"), dated on or about [●], 2008, by and between the Issuer and the Calculation Agent, attached hereto as Exhibit IV. Except as otherwise provided in the Warrants, all determinations, calculations or valuations made by the Calculation Agent shall be at the sole discretion of the Calculation Agent and, in the absence of manifest error, shall be conclusive for all purposes and binding on the Issuer, the Transfer Agent and each Holder. The Calculation Agent will not be liable for any loss, liability, cost, claim, action, demand or expense (including, without limitation, all costs, charges and expenses paid or incurred in disputing or defending any of the foregoing) arising out of or in relation to or in connection with its appointment or the exercise of its functions, except such as may result from its own willful default or gross negligence or that of its officers or agents. Nothing shall prevent the Calculation Agent or any of its affiliates from dealing in the Warrants or from entering into any related transactions, including any swap or hedging transactions, with the Issuer or any holder of Warrants. The Calculation Agent may resign at any time upon written notice to the Issuer, and the Issuer may remove the Calculation Agent at any time upon written notice to the Transfer Agent. Neither resignation nor removal of the Calculation Agent will take effect until a successor Calculation Agent has been appointed.

**Calculations**

Except as otherwise set forth herein, all calculations made with respect to a Warrant by the Calculation Agent will be calculated to the nearest one hundredth (i.e., to the nearest 0.01), with five one thousandths and greater rounded upwards.

**Form and Transfer**

The Warrants will at all times be represented by definitive warrant certificates representing each Holder's interest, in denominations of one Warrant or multiples thereof. All Warrants owned by customers of Lehman Brothers Inc. shall, absent contrary instructions from a customer, initially be evidenced by one or more Warrants held by, and registered in the name of,

Lehman Brothers Inc. Lehman Brothers Inc. will, upon the written request of the beneficial owner of any Warrants so held, deliver to such owner without charge Warrants registered in the name of the owner. Transfers of the Warrants, to the extent effected only on the books of the Placement Agent, shall require the consent of the Placement Agent.

The Warrants will not be registered under the Securities Act or under the securities laws of any other jurisdiction. The Warrants will be offered and sold only to (i) Accredited Investors who are also Qualified Purchasers or (ii) Non-U.S. Persons, who are also Qualified Purchasers, for purchase in Offshore Transactions. The minimum transfer amount is [393-409] Warrants or a smaller number of Warrants if such number represents the entire number of Warrants held by such transferor and no transfers of Warrants will be effected by the Transfer Agent within five Business Days of the Valuation Date. In addition, no transfer will be permitted unless the transferee has delivered to the Placement Agent or to the Issuer and the Transfer Agent the transfer certificate on the reverse of the Warrants, if applicable, and a transferee representation letter in the form of Exhibit II attached hereto and such transfer is otherwise made pursuant to, or in a manner exempt from, the registration requirements of the Securities Act.

**Ratings**

The Warrants will not be rated by any rating agency.

## RISK FACTORS

*Prior to making an investment decision in respect of the Warrants, prospective purchasers should carefully consider all the information set out in this Memorandum, the Issuing, Paying and Transfer Agency Agreement and the other related documents. The risk factors set out herein are not and do not purport to be exhaustive. There may be other risks that a prospective purchaser should consider that are relevant to an investor's particular circumstances or generally.*

*The Warrant Payment Amount for the Warrants will depend solely on the performance of the Reference Fund. An instrument linked to the Reference Fund carries with it substantial risks including, but not limited to, the risks referred to below. There can be no assurance that at maturity holders will receive at least or more than the Total Cost per Warrant. The Warrant Payment Amount could be zero.*

*The Issuer disclaims any responsibility to advise prospective purchasers of such risks as they exist at the date of this document or as they change from time to time. Prospective purchasers should consult their own financial, tax and legal advisors about risks associated with an investment in the Warrants and the suitability of investing in the Warrants in light of their particular circumstances.*

***Potential investors in the Warrants should review the risks stated in the Confidential Private Offering Memorandum of Millennium USA LP, a copy of which is attached hereto as Exhibit V.***

### Holders May Lose Their Entire Investment

The Warrants are leveraged investments that involve a high degree of risk that may result in the Warrants maturing worthless. A Holder will lose its entire investment if the Final NAV is less than or equal to the Strike Price. A Holders will lose a portion of its investment if the net asset value of the Reference Fund does not increase such that the Final NAV is at least [24.5-25.5]% greater than the Strike Price. This means that if the net asset value of the Reference Fund increases such that the Final NAV is exactly [24.5-25.5]% greater than the Strike Price, each Holder will receive an amount equal to the Total Cost in respect of each of its Warrants.

### Limited Trading History on the Performance of the Reference Fund

The Reference Fund has a limited trading history. As a consequence, each prospective investor should understand that very limited historical performance is available, by which it may be able to evaluate the Reference Fund's performance. **You are cautioned that the historical levels of the Reference Fund or any investment fund or account managed by the General Partner are not indicative of and have no bearing on future performance of the Reference Fund. The Reference Fund may outperform or under-perform the historical levels. No assurance can be given that the net asset value of the Reference Fund will increase in value which may result in the Warrants maturing worthless.**

**Holders Should Investigate the Reference Fund as if Investing Directly**

*Holders should conduct their own diligence of the Reference Fund as they would if they were directly investing in the Reference Fund. Holders should not conclude that the sale by the Issuer of the Warrants is any form of investment recommendation by the Issuer or the Placement Agent to invest in the Reference Fund.*

**Risks Relating to the Reference Fund, the General Partner or the Master Fund**

The performance of the Warrants could be adversely affected by the occurrence of negligence, fraud, misconduct or other acts of the Reference Fund, the General Partner or the Master Fund. For example, any such acts may lead to a material modification or breach of the Reference Fund's strategy or investment guidelines and thus an Early Termination Event. As described above, an Early Termination Event will cause the termination of the Warrants and thus a Holder will lose the opportunity to participate further in the performance of the Reference Fund and may receive less than the Total Cost of the Warrants. Investors should further understand that they will have no recourse against the Reference Fund, the General Partner or the Master Fund in connection with their Warrants.

Additionally, Holders will have very limited information regarding the Reference Fund, the General Partner or the Master Fund and will have no information regarding the underlying investments in the Reference Fund.

**Lack of Affiliation Among the Issuer and the Reference Fund**

The Issuer is not affiliated with the Reference Fund. However, the Issuer and its affiliates may be party to various financial contracts with, or provide services to, the Reference Fund. See "*–Certain Business Activities May Create Conflicts of Interest with Holders*" herein for a further discussion. The Issuer has no ability to control or predict the actions of the Reference Fund. This Memorandum does not and is not intended to provide information with respect to an investment in the Reference Fund. Neither the Issuer nor its affiliates make any representation as to the financial condition or creditworthiness of the Reference Fund in connection with the issuance of the Warrants.

**The Issuer is Not Responsible for Disclosure of Information by the Reference Fund and Has No Obligation to Disclose Information About the Reference Fund After the Date of this Memorandum**

Neither the Issuer nor any of its affiliates or agents has participated in the preparation of the Confidential Private Offering Memorandum of the Reference Fund. Accordingly, neither the Issuer nor its affiliates or agents makes any representation or warranty with respect to the accuracy, validity or completeness of any such information. Furthermore, the Issuer cannot give any assurance that all events occurring prior to the date hereof (including events that would affect the accuracy or completeness of the Confidential Private Offering Memorandum of the Reference Fund) have been properly disclosed. Subsequent disclosure of any such events or the disclosure of or failure to disclose material future events concerning the Reference Fund could affect any Warrant Payment Amount received by you with respect to the Warrants.

The Issuer is not affiliated with the Reference Fund, the General Partner or the Reference Fund's asset managers in any way and the Issuer has no ability to control or predict their actions or the public disclosure of any events or circumstance affecting them. Therefore, the Issuer has no responsibility to monitor, verify, or disseminate current or future public disclosure of information by the Reference Fund in its fund documents or otherwise. In the course of the Issuer's dealings with the Reference Fund, the Issuer or any of its affiliates may acquire non-public information about the Reference Fund. If the Issuer or its affiliates do acquire non-public information about the Reference Fund, they are not obligated to disclose such non-public information to you.

Neither the Issuer nor its affiliates or agents makes any representation or warranty to you as to the performance of the Warrants or the Reference Fund. Historical data or other performance data is not a prediction of future results.

**Value of Warrants Influenced by Many Unpredictable Factors**

An investment in the Warrants entails certain risks which are different from those associated with an investment in a conventional debt security issued by the Issuer. The value of the Warrants may increase and decrease between the Issue Date and the Warrant Payment Date. Several factors, many of which are beyond the control of the Issuer, will influence the value of the Warrants, including:

- the value of the Reference Fund;

- the volatility (frequency and magnitude of changes) in the value of the Reference Fund;

- interest and yield rates in the market;

- the market price of securities, derivative products or other investment instruments purchased by the Reference Fund;

- economic, financial, political and regulatory or judicial events that affect the financial markets generally and which may affect the level of the Reference Fund and/or the Warrants;

- the time remaining to the maturity of the Warrants;

- the amount of fees or other charges payable to the Issuer or its affiliates in connection with its activities relating to the Warrants, including hedging of the Issuer's obligations under the Warrants; and

- the creditworthiness of the Issuer. Any person who purchases the Warrants is relying upon the creditworthiness of the Issuer and has no rights against any other person. The Warrants constitute the general, unsecured and unsubordinated contractual obligations of the Issuer.

Some or all of these factors will influence the price that an investor will receive if an investor sells its Warrants in the secondary market, if any, prior to maturity. For example, an investor may have to sell its Warrants at a substantial discount from the Total Cost if at the time of sale the value of the Reference Fund is at, below, or not sufficiently above the Initial NAV.

## Specific Investment and Trading Risks Relating to the Reference Fund

The Warrants are subject to some of the risks of an investment in the Reference Fund. Investors should review the risks set forth in the "Risk Factors" section beginning on page [1-12] of the Confidential Memorandum of the Reference Fund, which is attached hereto as Exhibit V. Each of these risks impacts the value of the Interests in the Reference Fund and will, in turn, have a corresponding impact on the value of the Warrants.

## Risks Relating to Hedge Funds and the Reference Fund

The Warrants are subject to many of the risks of direct investments in hedge funds. Investments in hedge funds can be speculative and involve a high degree of risk. Many hedge funds (including the Reference Fund) are not subject to the same reporting requirements or investment restrictions as funds that are registered under the Investment Company Act of 1940, as amended (the "Investment Company Act"). The following is a list of some of the significant risks associated with hedge funds and the Reference Fund. Some of these factors are interrelated in complex ways. As a result, the effect of any one factor may be offset or magnified by the effect of another factor. Each of these risks may adversely impact the value of the Interests in the Reference Fund and may, in turn, have a corresponding adverse impact on the value of the Warrants.

- Many hedge funds are not registered or regulated under the Investment Company Act. Investor protections similar to those afforded by the Investment Company Act relating to, among other matters, publication of net asset values, rights of redemption and controls over changes to an investment company's investment advisor, investment policies, and fees payable to an investment company's service providers, may not be available. Furthermore, pursuant to exemptions available under rules of the United States Commodity Futures Trading Commission ("CFTC"), the asset manager for a hedge fund may not be required to comply with certain regulations promulgated by the CFTC.

- The unregulated nature of investments made by the Reference Fund, such as the employment of different types of trading strategies (including leverage) and the investment in certain types of instruments that are typically prohibited for funds registered under the Investment Company Act.

- There is no secondary market for investors' interest in hedge funds (and none is expected to develop), there may be restrictions on transferring interests in hedge funds, and hedge fund may suspend the right of redemption under certain circumstances. Thus, an investment in hedge funds should generally be regarded as illiquid.

- While hedge funds generally may provide periodic performance reports and annual audited financial statements, they are not otherwise required to provide periodic pricing or valuation information to investors.

- Generally, hedge funds are not registered under the Investment Company Act and therefore provide less transparency than those that are registered. For example, investors in unregistered hedge funds may not easily be able to ascertain all the risk characteristics of the investment vehicle or investment strategies employed by the investment managers of unregistered investment vehicles, as a result, investors in unregistered investment vehicles

may have to strictly rely on the portfolio position disclosure to evaluate the investments and risks of the related investment vehicle.

- The asset manager for a hedge fund, on behalf of such hedge fund, may invest in and trade in a variety of financial instruments using sophisticated investment techniques for hedging and non-hedging purposes. Such financial instruments and investment techniques include but are not limited to the use of leverage (i.e., borrowing money for investment purposes), transactions that use derivatives such as swaps, options, index options, futures contracts and options on futures. While these investment strategies and financial instruments allow the asset manager the flexibility to generate positive returns for the hedge fund, they also allow for greater volatility and the opportunity for significant losses that may adversely affect the value of the hedge fund and thus the return on the Warrants.

- The constitutional documents of hedge funds often provide that any securities or investments which are illiquid, not traded on an exchange or in an established market or for which no value can be readily determined, may be assigned such fair value as an investment manager, administrator (or other applicable third party valuation agent) may determine in its judgment based on various factors. Such valuations may not be indicative of what actual fair market value would be in an active, liquid or established market.

- Hedge funds may make investments which are subject to legal or other restrictions on transfer or for which no liquid market exists, thereby making the assets concerned difficult to sell or redeem. The market prices, if any, of such investments tend to be more volatile and it may be impossible to sell such investments when desired or to realize their fair value in the event of a sale. Furthermore, companies whose securities are not registered or publicly traded are not subject to the disclosure and other investor protection requirements which would be applicable if their securities were registered or publicly traded. As a result it may take some time for a hedge fund to sell or redeem all or part of these assets when an investor wishes to redeem its investment in the hedge fund. The hedge fund may delay redemptions or take other action to address this issue. In a situation where a large number of investors wish to withdraw their investments in a hedge fund (e.g. in a market downturn), the hedge fund may be forced to sell or redeem its investments on unfavorable terms, which will have an adverse effect on the returns to hedge fund investors and, in turn, upon the value of warrants linked to such a hedge fund.

- Hedge funds may make investments that are similar to investments made by other hedge funds. In the event that, during the same time period, many hedge funds act to unwind substantial positions in the same or similar investments, the price of the investment and, in turn, the proceeds resulting from such a sale may be adversely impacted, which will in turn have an adverse effect on the returns to hedge fund investors, and the value of warrants linked to such hedge funds.

- The investment strategies that hedge funds use may involve significant leverage. Hedge funds may use leverage through financial arrangements provided by banks, broker-dealers or others. The amount of leverage a hedge fund may have outstanding at any time may be large in relation to its capital. The use of leverage by a hedge fund in a market that moves adversely to the hedge fund's investments could result in a loss to the hedge fund that would be greater than if leverage were not employed by the hedge fund. In addition, the costs of

-16-

leverage (including interest on borrowings and other expenses that may be associated with borrowings) may be substantial and will affect the operating results of such a hedge fund.

• A hedge fund could be subject to changes in the value that a lender assigns to a given position, the amount of margin required to support such position, the borrowing rate to finance such position and such lender's willingness to continue to provide any such credit to the hedge fund. In the event the hedge fund has no alternative credit facility that could be used to finance its positions in the absence of financing from lenders, it could be forced to liquidate a substantial portion of its portfolio to meet its financing obligations. The forced liquidation of all or a portion of a hedge fund's investments at distressed prices could result in significant losses to the hedge fund, and the value of warrants linked to such hedge fund.

• In general, a hedge fund's use of short-term margin borrowings will result in certain risks to the hedge fund. For example, if lenders from whom the hedge fund has borrowed increase their maintenance margin requirements (i.e., reduce the percentage of a position that can be financed), the hedge fund could be subject to margin calls, pursuant to which the hedge fund would be required either to deposit additional funds with the lender or to liquidate positions. In the event of a sudden drop in the value of hedge fund assets, the hedge fund might incur losses as a result of mandatory liquidation of positions in a declining market at relatively low prices. Selling positions could cause the price of the positions to decline further, thereby exacerbating the loss.

• The asset manager for a hedge fund, on behalf of such hedge fund, may invest in securities listed or traded on foreign exchanges. The execution of transactions on foreign exchanges might involve particular risks including but not limited to higher volatility, government intervention, lack of transparency, lack of regulation, currency risk, political risk and economic social instability.

• The asset manager for a hedge fund will often receive an incentive fee from the hedge fund (the "Incentive Fee"), based upon the appreciation, if any, in the assets of that hedge fund. The Incentive Fee may create an incentive for the asset manager to make investments that are riskier or more speculative than would be the case if such arrangement were not in effect. Such risky investments may increase the opportunity for significant losses. In addition, because the Incentive Fee is often calculated on a basis that includes unrealized appreciation of the hedge fund's assets, it may be greater than if such compensation were based solely on realized gains. Certain management fees and administrative fees charged by the asset manager (as well as expenses of the hedge fund) will also reduce the performance of the hedge fund and the value of warrants linked to such a hedge fund.

• The asset manager for a hedge fund often has total trading authority over such hedge fund. The use of a single advisor applying generally similar trading programs could mean lack of diversification and, consequently, higher risk.

• Substantial redemptions of a hedge fund on a particular redemption day could require the asset manager of such hedge fund to liquidate positions more rapidly than would be otherwise desirable, which could have a negative impact on the performance of the hedge fund.

-17-

- Certain inherent and potential conflicts of interest may exist with respect to the operation of a hedge fund. The asset manager for a hedge fund may also serve as the trading manager for other clients. In performing its obligations for such other clients, the asset manager may be in possession of certain material non-public information and the asset manager will have no obligation to disclose such information or use such information for the benefit of the hedge fund. The asset manager may not be obligated to devote any specific amount of time to and the management of a particular hedge fund and often there can be no assurance that the performance by the asset manager of services for its other clients may not operate to the detriment of such hedge fund.

- The lack of oversight and regulation associated with hedge funds may increase the likelihood of fraud and negligence by the hedge funds, general partners, asset managers, or administrators of such hedge funds, or their respective brokerage firms or banks.

- The use of the above investment strategies, investment in the above instruments and the general characteristics of hedge funds may cause the hedge funds to be volatile.

- Hedge funds may involve complex tax structures and delays in distributing important tax information.

- Hedge funds may have high fees and expenses that may offset the hedge fund's trading profits.

- Legal, tax and regulatory changes could occur during the term of this Warrant that may adversely affect hedge funds. The regulatory environment for hedge funds is evolving, and changes in the regulation of hedge funds may adversely affect the value of investments held by hedge funds. In addition, the securities and futures markets are subject to comprehensive statutes, regulations and margin requirements. The Securities and Exchange Commission, other regulators and self-regulatory organizations and exchanges are authorized to take extraordinary actions in the event of market emergencies. The regulation of derivatives transactions and funds that engage in such transactions is an evolving area of law and is subject to modification by government and judicial action. The effect of any future regulatory change on hedge funds could be substantial and adverse and consequently adversely effect the value of an investment in, or linked to, hedge funds.

## Your Warrants Could Be Terminated Early

If the Calculation Agent determines that an Early Termination Event has occurred during the term of the Warrants, your Warrants will be terminated as of the date selected by the Calculation Agent as the Early Termination Date. Upon termination of the Warrants pursuant to an Early Termination Event, the Calculation Agent will determine the Early Termination Amount, which will be an amount equal to the market value of the Warrants as of the relevant measurement date, and which will be reduced by any losses or costs of the Issuer or its affiliates that are or would be incurred in closing its or its affiliates' hedge position(s) (including the effect of any withdrawal fees) arising from the occurrence of such Early Termination Event. In determining the Early Termination Amount, the Calculation Agent may, but need not, consider any relevant information it deems necessary, including, without limitation, information consisting of relevant market data in the relevant market including, without limitation, relevant rates, prices, yields,

-18-

volatilities, spreads, correlations or other relevant market data from external or internal sources (including any affiliates of the Calculation Agent) or otherwise. See *"Summary of Principal Terms - Early Termination."*

### Reliance on Millennium Management LLC

The Warrant Payment Amount is based on changes in the value of an Interest of the Reference Fund, which fluctuates. Changes in the value of the Reference Fund cannot be predicted, and is dependent on the ability of Millennium Management LLC as the General Partner to choose investments that appreciate in value, as well as other factors not within the General Partner's control. There can be no assurance that the General Partner will succeed in choosing investments that appreciate in value. Furthermore, the General Partner is dependent on the services of its key personnel. If the services of any such person were to become unavailable, the Reference Fund's performance could be negatively affected.

The Issuer and its affiliates are not in a position to protect the Holders against negligence, fraud and misrepresentation by the General Partner. Holders do not have and are not entitled to any beneficial Interests in the Reference Fund or its components and as such, have no recourse against the General Partner, either contractually or statutorily. Furthermore, as a practical matter, it may be difficult to bring an action, or to seek to enforce a judgment obtained in an action, against any of the aforementioned entities.

### Secondary Trading of the Warrants is Limited and They are Subject to Substantial Restrictions on Transferability

The Warrants will not be listed on an organized securities exchange in the United States or abroad. There is currently no secondary market for the Warrants. Even if there is a secondary market, it is not likely to provide significant liquidity. Accordingly, it will be difficult to obtain reliable information about the value of the Warrants at any given time as such value will reflect many factors and cannot be predicted.

The Placement Agent intends, but is not obligated, to buy and sell the Warrants. To request a market making transaction, a Holder must provide a signed copy of the form of Market Making Request attached hereto as Exhibit VI. The Market Making Request must be received by the Placement Agent no later than 105 calendar days in advance of the last Business Day of a calendar quarter. The Placement Agent will determine the market making price as of that quarter end. For the avoidance of doubt, until the parties agree to the final terms of any such transaction, the submission of a Market Making Request shall not obligate the Placement Agent or the requesting Holder to enter into a market making transaction. The Placement Agent and its affiliates are not obligated to create a secondary market or to continue such activity once it has begun. If the Placement Agent agrees to buy a Warrant from a Holder, there will likely be significant delays between the time it agrees to such purchase and the pricing and settlement of such purchase. The Placement Agent may be the only source of price quotes for the Warrants. Any secondary market price quoted by the Placement Agent would reflect any changes in market conditions and other relevant factors, and the quoted price could be higher or lower than the initial purchase price.

The original cost of the Warrants includes the cost of hedging the Issuer's obligations under the Warrants through one or more of its affiliates. Such cost includes the affiliates' expected cost of providing such hedge, as well as the profit such affiliates expect to realize in consideration for assuming the risks inherent in providing such hedge. As a result, assuming no change in market conditions or any other relevant factors, the price, if any, at which the Placement Agent would be willing to purchase Warrants in secondary market transactions, if at all, would likely be lower than the original cost of the Warrants.

In addition, any such prices may differ from values determined by pricing models used by the Calculation Agent, due to dealer discounts, mark-ups, hedge unwinds or other transaction costs. Further, to the extent a Holder submits a Market Making Request to be effective prior to [●], 2009, the secondary market price may be determined as if the net asset value of the Reference Fund were 4% less than its then current value, and to the extent a Holder submits a Market Making Request to be effective prior to [●], 2010, the secondary market price may be determined as if the net asset value of the Reference Fund were 2% less than its then current value. Such 4% and 2% reductions of the net asset value of the Fund corresponds to a 4% and 2% fee that may be paid by a Reference Holder to the Reference Fund in connection with a redemption of its Interests at a similar point in time. As a result, the price at which Holders may sell their Warrants to the Placement Agent or any of its affiliates may be less than the Holders' original offering price.

The Warrants are subject to substantial restrictions on transferability. The Warrants will not be registered under the Securities Act or the securities laws of any state or any other jurisdictions and cannot, therefore, be resold unless they are subsequently registered under these laws or an exemption from registration is found. The Warrants may be sold only to (i) Accredited Investors who are also Qualified Purchasers or (ii) Non-U.S. Persons who are also Qualified Purchasers for purchase in Offshore Transactions. In addition, no transfer will be permitted unless the transferee has delivered to the Placement Agent or to the Issuer and the Transfer Agent the transfer certificate on the reverse of the Warrants, if applicable, and a transferee representation letter in the form of Exhibit II attached hereto and such transfer is otherwise made pursuant to, or in a manner exempt from, the registration requirements of the Securities Act. Investors must thus be prepared to bear the risk of owning Warrants for an extended period of time.

**Warrants are not Registered**

The Warrants are not registered, and the Issuer does not intend to register the Warrants, under the Securities Act or under any state securities laws. Neither the Securities and Exchange Commission (the "SEC") nor any state securities commission or regulatory authority has recommended or approved the Warrants, nor has any such commission or regulatory authority reviewed or passed upon the accuracy or adequacy of this Memorandum.

**Secondary Trading of Warrants Held Less than 24 Months is Subject to a Penalty**

Pursuant to the terms of the Confidential Memorandum of the Reference Fund, withdrawals by Reference Holders of Interests held for less than 12 months may be subject to a withdrawal fee equal to 4% of the amount withdrawn. Withdrawals by Reference Holders of Interests held for less than 24 months, but more than 12 months, may be subject to a withdrawal fee equal to 2% of the amount withdrawn. To the extent a Holder submits a Market Making Request to be

effective prior to [●], 2009, the secondary market price may be determined as if the net asset value of the Reference Fund were 4% less than its then current value, and to the extent a Holder submits a Market Making Request to be effective prior to [●], 2010, the secondary market price may be determined as if the net asset value of the Reference Fund were 2% less than its then current value. Such 4% or 2% reduction of the net asset value of the Fund corresponds to a 4% or 2% fee that may be paid by a Reference Holder to the Reference Fund in connection with redemption of its Interests at a similar point in time.

**Investors in Warrants will be Exposed to the Issuer's Credit Risk**

The Warrants will constitute general unsecured obligations of the Issuer, Lehman Brothers Holdings Inc. If the Issuer is unable to meet its obligations as they come due, a Holder could suffer a complete loss of its investment. Payment of any amounts due under the Warrants will not be guaranteed by any corporate or governmental entity. The claims of Holders, if any, will not be secured by Interests in the Reference Fund or otherwise, and no amount will have been placed or will be placed in escrow to satisfy any such claims. Moreover, in the event the Issuer becomes the subject of voluntary or involuntary bankruptcy proceedings, investors may lose the whole of their investment, whether a cash settlement amount is or becomes due upon maturity or termination, or otherwise, and will not have a claim for any Interests in the Reference Fund.

Actual or anticipated changes in the Issuer's credit ratings, financial condition or results may affect the market value of the Warrants.

**The Warrants do not Confer Beneficial Ownership in the Reference Fund or its Affiliates**

A Warrant represents a notional investment in the Reference Fund. The term "notional" is used because there is no actual pool of Reference Fund Interests to which the Holder has recourse. The Reference Fund is merely a reference used to calculate the value of the Warrants. The Warrants are issued by Lehman Brothers Holdings Inc. and represent an investment that is separate and distinct from an investment in the Reference Fund or the Master Fund. Neither the Issuer nor its affiliates or agents is offering any Interest in the Reference Fund or the Master Fund. An investment in the Warrants confers no indicia of ownership in the Reference Fund or the Master Fund and neither creates nor implies any rights or remedies with respect to the Reference Fund, the Master Fund, the General Partner or any affiliates of the foregoing.

There are no actual investments in the Reference Fund underlying the Warrants or to which a Holder would have recourse. The Issuer, or an affiliate, may, in order to hedge its obligations under the Warrants, purchase Interests in the Reference Fund but it is under no obligation to do so. Such Interests, if any, are the separate property of the Issuer and do not secure or otherwise underlie the Warrants. For example, in the event of a failure to pay the Warrant Payment Amount by the Issuer under the Warrants, Holders will have no beneficial interest in or claim to any such Interests. Accordingly, any claims of Holders pursuant to the terms and conditions of such Warrants will be pari passu with all other unsecured, unsubordinated, unconditional creditors of the Issuer.

**Your Investment Will Be "New Issues" Restricted**

Your investment in the Warrants will be "new issues" restricted. The Warrants are linked the performance of Interests of the Reference Fund that are restricted from participating in gains or losses attributable to "new issues" investments by the Reference Fund to the extent deemed necessary or advisable by the Reference Fund to comply with Rule 2790 as adopted by the NASD on December 23, 2003, and as may subsequently be modified. Rule 2790 prohibits certain persons from receiving the economic benefit of new issues. Each of the Issuer and any affiliate that may be entering into transactions to hedge the Issuer's exposure under the Warrants is a Restricted Person under Rule 2790 and, accordingly, any investment by any of them in limited partnership interests of the Reference Fund will be treated as though it had been made by a Restricted Person. A 'Restricted Person' includes most associated persons of a U.S. broker-dealer, most owners and affiliates of a broker-dealer and certain other classes of persons.

**ERISA Limitations**

The Warrants may not be acquired by, on behalf of, or with the assets of, an employee benefit plan subject to Title I of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), a plan subject to Section 4975 of the Internal Revenue Code of 1986, as amended (the "Code"), a plan subject to any federal, state, local or other law, rule or regulation which is substantially similar to Title I of ERISA or Section 4975 of the Code ("Similar Law") or any entity deemed to hold the assets of such an employee benefit plan or plan for purposes of ERISA, Section 4975 of the Code or Similar Law. Any investor or transferee shall further be deemed to represent and covenant that throughout the period it holds Warrants, the foregoing representations shall be true.

**Hedging Transactions by the Issuer**

The Issuer and its affiliates, including Lehman Brothers Inc., may from time to time buy or sell Interests in the Reference Fund or enter into derivative instruments or other instruments which track or are related to the Reference Fund for their own accounts in connection with their normal business practices or in connection with hedging of the Issuer's obligations under the Warrants, including on the Valuation Date. Although the Issuer has no reason to believe that such activities had or will have a material impact on the value of the Reference Fund, the Issuer cannot give any assurance that it did not, or in the future will not, affect such value as a result of such activities.

**Adverse Economic Interests to Holders**

As described herein, the Issuer has appointed Lehman Brothers Inc. as the Calculation Agent for the Warrants. The Calculation Agent will be solely responsible for the determination and calculation of the Warrant Payment Amount (including the components thereof) or the Early Termination Amount and any other determinations and calculations in connection with the Warrants. Because the Calculation Agent is an affiliate of the Issuer, the Calculation Agent may have economic interests adverse to those of the Holders, including with respect to certain determinations and judgments that the Calculation Agent must make in determining the Warrant Payment Amount or the Early Termination Amount or whether an Early Termination Event,

THE FOREGOING LIST OF RISK FACTORS DOES NOT PURPORT TO BE A COMPLETE ENUMERATION OR EXPLANATION OF THE RISKS INVOLVED IN AN INVESTMENT IN THIS TRANSACTION. ANY PROSPECTIVE PURCHASER SHOULD CONSULT WITH ITS OWN LEGAL, TAX AND FINANCIAL ADVISERS BEFORE DECIDING TO INVEST IN THIS TRANSACTION.

## PLAN OF DISTRIBUTION

In order to purchase Warrants, investors will be required to execute and deliver to the Placement Agent a representation letter (available at the offices of Lehman Brothers Inc. at 745 Seventh Avenue, New York, New York, 10019, Attn: Structured Equity Products, the form of which is attached hereto as Exhibit I); the Warrants will be subject to transfer restrictions. Please refer to *"Suitability Requirements and Transfer Restrictions"* below.

The Issuer will issue [●] U.S. dollar Warrants for a Total Cost, including selling compensation, that is currently expected to be as high as $[245.00—255.00] per Warrant. The Issuer will receive $[225.00—235.00] of the Total Cost as compensation for issuing the Warrants. The balance of the Total Cost, or $[20.00] per Warrant, is payable to the Placement Agent as selling compensation. The Issuer and its affiliates will earn the standard fees related to risk-management of products of this type.

The Placement Agent and/or certain other placement agents will distribute the Warrants from time to time in one or more transactions at a fixed price or prices, which may be changed, or at market prices prevailing at the time of sale, at prices related to such prevailing market prices or at negotiated prices, subject to withdrawal, cancellation or modification of the offer by the Issuer, the Placement Agent and/or certain other placement agents.

The Warrants will only be sold in accordance with local sale restrictions.

Prior to the offering, there has been no market for the Warrants. No assurance can be given as to the development of any market, or the liquidity of any market that may develop, for the Warrants. The Placement Agent intends to make a market in the Warrants, but it is under no obligation to do so and such market-making could be discontinued at any time without notice, at its sole discretion. If the Warrants are traded, they may trade at a discount from their initial offering prices, depending on prevailing interest rates, the market for similar securities, the Issuer's performance and other factors.

The original cost of the Warrants includes the cost of hedging the Issuer's obligations under the Warrants through one or more of its affiliates. Such cost includes the affiliates' expected cost of providing such hedge, as well as the profit such affiliates expect to realize in consideration for assuming the risks inherent in providing such hedge. As a result, assuming no change in market conditions or any other relevant factors, the price, if any, at which the Placement Agent would be willing to purchase Warrants in secondary market transactions, if at all, would likely be lower than the original cost.

The Issuer and certain of its affiliates currently perform, and will in the future perform, various investment and commercial banking services from time to time for the Reference Fund,

the Master Fund, the General Partner and their affiliates. See "*Risk Factors – Certain Business Activities May Create Conflicts of Interest with Holders.*"

## SUITABILITY REQUIREMENTS AND TRANSFER RESTRICTIONS

The Warrants have not been registered, and the Issuer has no intention of registering any sales of the Warrants, under the Securities Act or any other applicable securities laws. Thus, the Warrants may not be offered or sold within the United States or to, or for the account or benefit of, United States persons except in compliance with the registration requirements of the Securities Act and any other applicable securities laws, or pursuant to an exemption from registration under the Securities Act and any other applicable securities laws, or in a transaction not subject to such laws. Accordingly, the Warrants are being offered and sold only to (i) Accredited Investors who are also Qualified Purchasers or (ii) Non-U.S. Persons for purchase in Offshore Transactions who are also Qualified Purchasers.

Any sales or transfers of Warrants in violation of the transfer restrictions set forth herein are prohibited and will be treated by the Issuer and the Transfer Agent as having no legal effect. The Issuer will not honor such sale or transfer and will have the right, at any time, at the expense and risk of the Holder of any Warrants held by or on behalf of a person who is not an Accredited Investor who is also a Qualified Purchaser at the time it purchases such Warrants, to (1) redeem such Warrants, in whole or in part, at the then-current value per Warrant as determined by the Calculation Agent or (2) require such holder to sell such Warrants to a qualifying transferee who satisfies all of the requirements set forth in these transfer restrictions.

Transfers of Warrants may be made by delivery of the relevant certificate or certificates evidencing ownership of the Warrants to the Transfer Agent together with the form of transfer in writing endorsed thereon and the transferee representation letter duly completed and executed by the transferee.

Each initial purchaser and each transferee will represent, warrant and agree as follows:

(i) It is either (i) an Accredited Investor who is also Qualified Purchasers or (ii) a Non-U.S. Persons purchasing the Warrants in Offshore Transactions who is also Qualified Purchasers.

(ii) If it is a Non-U.S. Person, that prior to the expiration of the Distribution Compliance Period, it will not offer, sell, pledge or otherwise transfer such Warrants except (1) in an Offshore Transaction in accordance with the provisions of Rule 903 or Rule 904 of Regulation S or (2) pursuant to any available exemption from registration under the Securities Act, in each case in accordance with any applicable securities law of any State of the United States or any other jurisdiction. "Distribution Compliance Period" means the 40-day period commencing on the later of the commencement of the offering or the date the Warrants were originally issued.

(iii) It is purchasing at least the minimum initial investment of Warrants specified herein, unless the Placement Agent permits the purchase of a smaller number of Warrants.

(iv) In connection with the purchase of such Warrants: (A) it has received a copy of this Memorandum, the Confidential Memorandum of the Reference Fund and any other information it deems necessary to make an investment decision; (B) neither the Issuer nor its affiliates make

any representations or warranties with respect to the accuracy, validity or completeness of the information contained in the Confidential Memorandum of the Reference Fund, (C) it has such knowledge and experience in financial and business matters so as to be able to evaluate the merits and risks of an investment in the Warrants and have sufficient net worth and/or annual income to hold the Warrants for an indefinite period of time and to bear the risk of losing its entire investment; and (D) it is acquiring the Warrants as principal solely for its own account, or for the accounts of its discretionary advisory clients, in each case for investment and not with a view to the resale, distribution or other disposition thereof in violation of the Securities Act.

(v) On each date from the date on which the investor acquires such Warrants through and including the date on which it disposes of its interests in such Warrants that it is not, and it is not acquiring Warrants with the assets of, an employee benefit plan subject to Title I of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), a plan subject to Section 4975 of the Internal Revenue Code of 1986, as amended (the "Code"), a plan subject to any federal, state, local or other law, rule or regulation which is substantially similar to Title I of ERISA or Section 4975 of the Code ("Similar Law") or any entity deemed to hold the assets of any such employee benefit plan or plan for purposes of ERISA, Section 4975 of the Code or Similar Law. Any investor or transferee shall further be deemed to represent and covenant that throughout the period it holds Warrants, the foregoing representations shall be true.

(vi) It acknowledges that (A) the Warrants have not been, nor will be, registered under the Securities Act or any state securities or blue sky laws or the laws of any other jurisdiction, and the Warrants will bear a legend to such effect and (B) none of the Warrants nor any interest or rights therein may be transferred in the absence of such registration under the Securities Act or an exemption from the registration requirements thereof or such other applicable laws, and the purchaser has informed itself about and will observe all restrictions on transfer of the Warrants under such laws that may be applicable to it.

(vii)    If it is a Non-U.S. Person, it understands that prior to the expiration of the Distribution Compliance Period, before any Warrants may be offered, sold, pledged or otherwise transferred, it may be required to provide the Transfer Agent, on behalf of the Issuer, with a written certification as to compliance with applicable securities laws.

(viii) The Purchaser agrees to treat the Warrants in accordance with the treatment described in "*Certain U.S. Federal Income Tax Considerations*" section of this Memorandum, unless otherwise required by law, for federal income tax purposes.

Prior to any purchase of Warrants on the Issue Date, each purchaser of Warrants must represent in writing, by completing, signing and delivering to the Placement Agent in the form of investor representation letter attached hereto as Exhibit I, that the Warrants are being acquired for its own account, for investment purposes and not with a view for resale and that such investor otherwise meets the suitability standards referred to above. In connection with any subsequent sale or transfer of a Warrant, each prospective transferee will be required to complete, sign and deliver to the Placement Agent or the Issuer and the Transfer Agent, as applicable, the form of transferee representation letter attached hereto as Exhibit II. Before any Warrants may be offered, sold, pledged or otherwise transferred, an initial investor or a subsequent transferee may be required to provide the Transfer Agent with a written certification as to compliance with applicable securities laws.

The Issuer has the right to reject a subscription for the purchase of Warrants for any reason or for no reason.

The Warrants are being offered to qualified investors only in such jurisdictions where offers and sales of Warrants are permitted and only in compliance with all applicable laws and regulations.

## CERTAIN U.S. FEDERAL INCOME TAX CONSIDERATIONS

This disclosure is limited to the U.S. federal income tax issues addressed herein. Additional issues may exist that are not addressed in this disclosure and that could affect the U.S. federal income tax treatment of the Warrants. This tax disclosure was written in connection with the promotion or marketing by the Issuer of the Warrants, and it cannot be used by you for the purpose of avoiding penalties that may be asserted against you under the Internal Revenue Code or any state or local tax laws. You should seek advice based on your particular circumstances from an independent tax adviser.

In the opinion of Cadwalader, Wickersham & Taft LLP, our special tax counsel, the following are the material U.S. federal income tax consequences of the purchase, ownership and disposition of the Warrants. This discussion applies to you only if you are an initial holder of a Warrant and you hold such Warrant as a capital asset within the meaning of Section 1221 of the Internal Revenue Code of 1986, as amended (the "Code").

This summary does not address all aspects of the U.S. federal income taxation of the Warrants that may be relevant to you in light of your particular circumstances, nor does it address all of your tax consequences if you are a taxpayer that is subject to special treatment under the U.S. federal income tax laws, such as:

- a financial institution;

- a tax exempt organization;

- a dealer in securities or foreign currencies;

- a person that does not write, sell, or grant (directly or indirectly) any put option with respect to the Reference Fund or any interest therein or asset thereof or holds the Warrants as part of a hedging transaction, straddle, synthetic security, conversion transaction, or other integrated transaction, or enters into a "constructive sale" with respect to the Warrants or a "wash sale" with respect to your Warrants or any Reference Fund Interests;

- a U.S. Holder (as defined below) whose functional currency is not the U.S. dollar;

- a trader in securities who elects to apply a mark to market method of tax accounting;

- a partnership or other entity classified as a partnership for United States federal income tax purposes; or

- a person that is not a U.S. Holder, as defined below.

This summary is based on the Code, administrative pronouncements, judicial decisions and final, temporary and proposed Treasury regulations as of the date of this Memorandum, changes to any of which subsequent to the date of this Memorandum may affect the tax consequences described herein. If you are considering the purchase of a Warrant, you should consult your own tax adviser concerning the application of the United States federal income tax laws to your particular situation, as well as any tax consequences arising under the laws of any state, local or foreign jurisdictions.

If an entity that is classified as a partnership for U.S. federal income tax purposes holds a Warrant, the U.S. federal income tax treatment of a partner will generally depend on the status of the partner and upon the activities of the partnership. Partners of partnerships holding Warrants should consult their own tax advisers.

A "U.S. Holder" is a beneficial owner of a Warrant that, for United States federal income tax purposes, is:

- a citizen or resident of the United States;

- a corporation, or other entity taxable as a corporation, created or organized in or under the laws of the United States or any political subdivision thereof;

- an estate the income of which is subject to U.S. federal income taxation regardless of its source; or

- a trust if a court within the United States is able to exercise primary supervision over its administration, and one or more United States persons have the authority to control all of its substantial decisions.

A "Non-U.S. Holder" is a beneficial owner of the Warrants that is not a U.S. Holder.

An individual may, subject to certain exceptions, be deemed to be a resident of the United States by reason of being present in the United States for at least 31 days in the calendar year and for an aggregate of at least 183 days during a three-year period ending in the current calendar year (counting for such purposes all of the days present in the current year, one-third of the days present in the immediately preceding year, and one-sixth of the days present in the second preceding year).

Further, this summary does not address any investor that is related to, employed by, or affiliated with, the Reference Fund, the Master Fund or the General Partner or to any employee of the Issuer or its affiliates that is involved in management of assets of, or in supervising or administrating, the Reference Fund. In addition, this discussion applies only to U.S. Holders that do not have any prearrangement with the Reference Fund regarding the purchase of an interest in the Reference Fund upon lapse, settlement or other termination of the Warrants.

**Tax Treatment of Warrants**

Based on certain factual representations provided to Cadwalader, Wickersham & Taft LLP by us, Cadwalader, Wickersham & Taft LLP is of the view that each Warrant should be treated for U.S. federal income tax purposes as a call option with respect to the Reference Fund. While

other treatments of the Warrants could be asserted by the Internal Revenue Service (the "IRS") in respect of the Warrants, as discussed below, the Issuer intends and, pursuant to the terms of the Warrants each U.S. Holder agrees, in the absence of an administrative determination or judicial ruling to the contrary, to characterize the Warrants as call options with respect to the Reference Fund, for U.S. federal income tax purposes and the following discussion assumes that this treatment of the Warrants is respected.

## Taxation of U.S. Holders

*Tax Treatment Prior to Expiration.* Under existing law, you should not be required to recognize taxable income over the term of your Warrants prior to the sale, exchange, redemption, settlement, lapse, exercise, maturity or other taxable disposition thereof.

*Sale, Exchange, Redemption, Exercise or Lapse of the Warrants.* Upon the sale, exchange, redemption, exercise, lapse or other taxable disposition of a Warrant (including the settlement of a Warrant at maturity), you should recognize gain or loss in an amount equal to the difference between the amount realized and your tax basis in the Warrant, which should equal the amount you paid to acquire the Warrant. In general, subject to the PFIC rules discussed below, such gain or loss should be long term capital gain or loss if you held the Warrant for more than one year at such time. Additionally, the deductibility of capital losses is subject to further limitations under the Code and U.S. Holders are encouraged to consult their own tax advisors regarding their ability to use any capital losses arising from ownership of the Warrants in light of their particular circumstances.

*Possible Treatment of the Warrants as Interests in One or More PFICs.* In general, a U.S. taxpayer that holds an option to acquire stock in a "passive foreign investment company" (a "PFIC") is required to report any gain on the disposition of the option as ordinary income, rather than capital gain, as if the gain had been earned ratably over each day in the taxpayer's holding period (or certain portion thereof), and the taxpayer is subject to tax on such gain at the highest ordinary income tax rate for each taxable year of the taxpayer's holding period for the option, other than the current year, regardless of the rate otherwise applicable to the taxpayer. The taxpayer is also liable for a non-deductible interest charge at the federal underpayment rate as if such tax liabilities had been due with respect to each prior year of the taxpayer's holding period. For purposes of these rules, gifts, exchanges pursuant to corporate reorganizations and use of a PFIC option as security for a loan may be treated as a taxable disposition of a PFIC option. In addition, a stepped-up basis in a PFIC option will not be available upon the death of an individual investor.

While the Reference Fund will not be classified as a PFIC, a U.S. Holder may be subject to the PFIC rules with respect to the Warrants to the extent that the Reference Fund directly or indirectly invests in PFICs or any investments of the Reference Fund are treated as PFICs. However, even if the Reference Fund were to acquire an interest in a PFIC, certain elections made by the Reference Fund for U.S. federal income tax purposes may eliminate any PFIC related exposure in respect of the Warrants. More specifically, even if the Reference Fund were to own an interest in a PFIC, such interest should not cause the Warrant to be treated as a PFIC option if the Reference Fund makes a timely "qualified electing fund" election with respect to such PFIC interest or elects to mark to market all of its trading activity under section 475 of the Code. We understand from the Confidential Memorandum of the Reference Fund that the

Master Fund has made such an election under section 475, although we have not verified the existence or validity of such election. Nevertheless, if the Reference Fund were to acquire a non-qualified electing fund PFIC interest directly or if the Master Fund were to acquire such an interest and identify it for U.S. federal income tax purposes as outside of its trading activity (or alternatively the IRS were to treat it as outside of such trading activity or otherwise treat the Master Fund's election under section 475 as invalid), then the application of the PFIC rules to the Warrants would be unclear and the IRS might assert that the Warrants constitute a PFIC option subject to the above described rules. Prospective U.S. Holders should consult their own tax advisors regarding the potential application of the PFIC rules to their ownership and disposition of the Warrants.

**Possible Alternative Tax Treatments of an Investment in Warrants**

Due to the absence of authorities that directly address the proper treatment of the Warrants, no assurance can be given that the IRS will accept, or that a court will uphold, the treatment of the Warrants described above. If the IRS were successful in asserting an alternative treatment of the Warrants, the amount, timing and character of income, gain or loss on your Warrants could differ materially from our description herein. For example, one alternative U.S. federal income tax treatment of the Warrants might require you to include amounts in income during the term of the Warrants on the theory that you own an equity interest in the Reference Fund, either directly or through a partnership with the Issuer. Other treatments could result in the recharacterization of some or all of any long term capital gain you realize as ordinary income, together with the imposition of an interest charge. Other tax treatments are also possible. Accordingly, you should consult your tax adviser regarding the existence, probability and consequences of potential IRS recharacterizations of the Warrants.

**IRS Revenue Ruling 2008-1 and IRS Notice 2008-2**

The IRS recently ruled in Revenue Ruling 2008-1 that an exchange-traded note that was linked to foreign currency is debt for U.S. federal income tax purposes, even though the holder's initial investment and repayment are made in US dollars and the holder might get back fewer dollars that it invested. Treatment of the exchange-traded notes resulted in current accrual of interest on the notes. At the same time the IRS announced that it and the Treasury Department are considering whether holders of prepaid forward or financial contracts should be required to accrue income on a current basis over the term of the transaction, regardless of whether any payments are made prior to maturity, even if such contracts are not otherwise treated as indebtedness for U.S. federal income tax purposes. In addition, the Notice indicates that the IRS and Treasury Department are considering related issues, including, among others, whether gain or loss from such instruments should be treated as ordinary or capital, whether foreign holders of such instruments should be subject to withholding tax, whether the tax treatment of such instruments should vary depending on the nature of the underlying asset, and whether such instruments should be subject to special "constructive ownership rules" contained in Section 1260 of the Code. Legislation has also been proposed that would require holders of certain prepaid forward contracts to accrue income during the term of the transaction. It is not possible to predict what changes, if any, will be adopted, or when they will take effect. In the event that any such treatment is adopted and extended to call options such as the Warrants, a U.S. Holder may be required to accrue ordinary income over the term of the Warrants and the amount, timing

-31-

and character of income, gain or loss with respect to the Warrants may otherwise be affected, possibly with retroactive effect. Prospective investors in the Warrants are urged to consult with their tax advisors concerning the impact of Revenue Ruling 2008-1 and the Notice on any investment in the Warrants.

## Tax Treatment of Non-U.S. Holders

Subject to the discussion below of backup withholding, in general, a Non-U.S. Holder will not be subject to U.S. federal withholding tax with respect to amounts received, if any, with respect to a Warrant, assuming that: (i) the Warrant is not held in connection with a U.S. trade or business or, in the case of a resident of a country that has an income tax treaty with the United States, such Warrant is not attributable to a permanent establishment (or in the case of an individual, a fixed place of business) in the United States; (ii) in the case of an individual, the Non-U.S. Holder is not present in the United States for 183 days during the taxable year and certain other conditions are met; and (iii) such Non-U.S. Holder is not subject to the rules applicable to certain former citizens and residents of the United States. However, it is possible that future guidance or legislation, such as discussed above regarding IRS Notice 2008-2, could subject Non-U.S. Holders to U.S. federal withholding tax on any deemed income accrual from the Warrants.

## Backup Withholding and Information Reporting

In general, information returns may be filed with the IRS in connection with payments of proceeds from a sale, exchange or settlement of a Warrant. In addition, a U.S. Holder who is not a corporation may be subject to U.S. backup withholding tax on these payments unless it provides its taxpayer identification number to the paying agent or otherwise establishes an exemption from backup withholding. If you are a Non-U.S. Holder, you will not be subject to backup withholding if you comply with certain certification procedures to establish that you are not a United States person or otherwise establish an exemption. The amount of any backup withholding imposed on a payment to a U.S. Holder may be allowed as a credit against its U.S. federal income tax liability and may entitle it to a refund, provided the required information is furnished to the IRS.

The tax consequences of owning a Warrant are unclear. You should consult your own tax adviser regarding the tax consequences of purchasing, owning and disposing of a Warrant, including the tax consequences under state, local, foreign and other tax laws and the possible effects of changes in United States federal or other tax laws.

## CERTAIN BENEFIT PLAN CONSIDERATIONS

The Warrants may not be acquired by, on behalf of, or with the assets of, an employee benefit plan subject to Title I of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), a plan subject to Section 4975 of the Internal Revenue Code of 1986, as amended (the "Code"), a plan subject to any federal, state, local or other law, rule or regulation which is substantially similar to Title I of ERISA or Section 4975 of the Code ("Similar Law") or any entity deemed to hold the assets of such an employee benefit plan or plan for purposes of ERISA, Section 4975 of the Code or Similar Law. Any investor or transferee shall further be

deemed to represent and covenant that throughout the period it holds Warrants, the foregoing representations shall be true.

## USE OF PROCEEDS

The Issuer estimates that it will receive net proceeds from this offering of approximately $[●], after deducting estimated offering expenses. The Issuer plans to use some of the net proceeds to effect purchases (in each case through an affiliate or affiliates of the Issuer) of Interests in the Reference Fund in order to hedge its obligations under the Warrants. However, it is not required to hedge those obligations.

Such Interests purchased, if any, will be the separate property of the Issuer, or such affiliate or affiliates of the Issuer, and do not secure or otherwise underlie the Warrants; and holders of Warrants have no beneficial interest in or claim over such assets.   .

The remainder of the proceeds will be used for general corporate purposes.

## LEHMAN BROTHERS HOLDINGS INC.

Lehman Brothers Holdings Inc. (together with its consolidated subsidiaries hereinafter referred to as the "Company" unless the context otherwise requires), an innovator in global finance and one of the leading global investment banks, serves the financial needs of corporations, governments and municipalities, institutional clients and individuals worldwide. The Company provides a full array of equities and fixed income sales, trading and research, investment banking services and investment management and advisory services.   The Company's global headquarters in New York and regional headquarters in London and Tokyo are complemented by offices in additional locations in North America, Europe, the Middle East, Latin America and the Asia Pacific region.

Through the Company's subsidiaries, it is a global market-maker in all major equity and fixed income products. To facilitate its market-making activities, the Company is a member of all principal securities and commodities exchanges in the United States, as well as NASD, Inc., and it holds memberships or associate memberships on several principal international securities and commodities exchanges, including the London, Tokyo, Hong Kong, Frankfurt, Paris, Milan and Australian stock exchanges.

The Company's principal business activities are investment banking, capital markets and investment management which, by their nature, are subject to volatility primarily due to changes in interest and foreign exchange rates, valuation of financial instruments and real estate, global economic and political trends and industry competition. Through its investment banking, trading, research, structuring and distribution capabilities in equity and fixed income products, the Company continues to build on its customer flow business model, which is based on its principal focus of facilitating client transactions in all major global capital markets products and services.   The Company generates customer flow revenues from institutional, corporate, government and high-net-worth customers by (i) advising on and structuring transactions specifically suited to meet client needs; (ii) serving as a market maker and/or intermediary in the global marketplace, including having securities and other financial instrument products available to allow clients to rebalance their portfolios and diversify risks across different market cycles;

(iii) originating loans for distribution to clients in the securitization or principal market; (iv) providing investment management and advisory services; and (v) acting as an underwriter to clients. As part of the Company's customer flow activities, it maintains inventory positions of varying amounts across a broad range of financial instruments. In addition, it also takes proprietary investment positions, the success of which is dependent on its ability to anticipate economic and market trends. The financial services industry is significantly influenced by worldwide economic conditions as well as other factors inherent in the global financial markets. As a result, revenues and earnings may vary from quarter to quarter and from year to year. The Company believes its customer flow orientation helps to mitigate overall revenue volatility.

LBH was incorporated in Delaware on December 29, 1983. LBH's principal executive offices are located at 745 Seventh Ave., New York, NY 10019. LBH is subject to the informational requirements of the Exchange Act and in accordance therewith files reports and other information with the SEC. Such reports and other information may be inspected and copied at the public reference facilities maintained by the SEC at 450 Fifth Street, N.W., Washington, D.C. 20549, and copies of such material can be obtained from the Public Reference Section of the SEC at prescribed rates. In addition, information provided to or filed with the SEC electronically can be accessed through a website maintained by the SEC. The address of the SEC's website is http://www.sec.gov. Information provided to or filed with the SEC by LBH pursuant to the Exchange Act can be located by reference to Commission file number 1-9466. Such reports and other information may also be inspected at the Information Center of the New York Stock Exchange Inc., 20 Broad Street, New York, New York 10005 and at the American Stock Exchange, 86 Trinity Place, New York, New York 10006.

The annual report of LBH on Form 10-K for the year ended November 30, 2007, the quarterly reports on Form 10-Q dated October 10, 2007, and the current reports of LBH on Form 8-K dated December 3, 2007, December 4, 2007 (two filings), December 5, 2007, December 6, 2007, December 7, 2007, December 10, 2007, December 11, 2007, December 13, 2007 (three filings), December 17, 2007 (two filings), December 20, 2007, December 21, 2007, December 28, 2007, January 4, 2008 (two filings), January 15, 2008 (two filings), January 16, 2008, January 17, 2008 (two filings), January 23, 2008, January 29, 2008 (two filings), February 4, 2008 (three filings), February 5, 2008, February 6, 2008 (two filings), February 8, 2008, February 11, 2008, February 12, 2008 (three filings), February 13, 2008, February 15, 2008, February 19, 2008 (two filings), February 20, 2008, February 22, 2008 (two filings), February 25, 2008, February 26, 2008, February 27, 2008, February 28, 2008, March 3, 2008, March 4, 2008, March 5, 2008, March 11, 2008 (two filings), March 12, 2008, March 13, 2008, March 18, 2008, March 21, 2008, March 24, 2008, and March 26, 2008 (two filings), which contain financial information concerning LBH and its subsidiaries on a consolidated basis and other information, have been filed with the SEC and otherwise publicly distributed. Such reports of LBH and subsequent reports of LBH filed with the SEC pursuant to Sections 13(a), 13(c), 14 or 15(d) of the Exchange Act after the date hereof are incorporated herein by reference.

The Company operates in three business segments: Investment Banking, Capital Markets and Client Services. Financial information concerning the Company for the fiscal years ended November 30, 2007, November 30, 2006, and November 30, 2005, including the amount of net revenue contributed by each segment in such periods, is set forth in the Company's Consolidated Financial Statements and the Notes thereto in its 2007 annual report on Form 10-K, which is

-34-

incorporated by reference herein. Information with respect to operations by segment and net revenues by geographic area is set forth under the captions "*Management's Discussion and Analysis of Financial Condition and Results of Operation—Business Segments*" and "*— Geographic Diversification*" and in Note 19 of the Notes to Consolidated Financial Statements contained in the annual report on Form 10-K, which, as noted above, is incorporated by reference herein.

Some of the statements contained in this Memorandum and the documents incorporated herein by reference, including those relating to LBH's strategy and other statements that are predictive in nature, that depend upon or refer to future events or conditions or that include words such as "expects," "anticipates," "intends," "plans," "believes," "estimates" and similar expressions are forward-looking statements within the meaning of Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934. These statements are not historical facts but instead represent only LBH's expectations, estimates and projections regarding future events. These statements are not guarantees of future performance and involve certain risks and uncertainties that are difficult to predict, which may include market, credit or counterparty, liquidity, legal and operational risks. Market risks include changes in interest and foreign exchange rates and securities valuations, global economic and political trends and industry competition. LBH's actual results and financial condition may differ, perhaps materially, from the anticipated results and financial condition in any such forward-looking statements. LBH undertakes no obligation to update any forward-looking statements, whether as a result of new information, future events or otherwise.

**Each prospective investor is encouraged to obtain and review the information referred to above, and it is recommended that no prospective investor make a decision to purchase a Warrant until such review is completed.**

### THE REFERENCE FUND

*This Memorandum is not an offer to sell and it is not an offer to buy interests of the Reference Fund. All disclosures contained in this Memorandum regarding the Reference Fund have been provided by Millennium USA LP. Substantially all of the capital of the Reference Fund generally is invested through a "master-feeder" structure in Millennium Partners, L.P., a Cayman Islands exempted limited partnership (the "Master Fund"). None of the Issuer, or any of its affiliates take any responsibility for the accuracy or completeness of such information.*

*Attached as Exhibit V is the Confidential Memorandum of Millennium USA LP.*

I

**EXHIBIT I**

**FORM OF INVESTOR REPRESENTATION LETTER**

Lehman Brothers Inc.
745 Seventh Avenue
New York, NY 10019
Attn: [●]

Re:    [4-Year, 2-Month] Cash-Settled Call Warrants Linked to the Performance
of Millennium USA LP Issued by Lehman Brothers Holdings Inc.

Ladies and Gentlemen:

In connection with the proposed issuance by Lehman Brothers Holdings Inc. (the "Issuer") of U.S. $[●] in principal amount of [4-Year, 2-Month] Cash-Settled Call Warrants Linked to the Performance of Millennium USA LP (the "Warrants"), the undersigned (the "Investor") who is acquiring the Warrants for its own behalf or for the account of its customers (each, a "Customer") hereby agrees with Lehman Brothers Inc. as follows (defined terms used but not defined herein shall have the meanings given to such terms in the Private Placement Memorandum for the Warrants, dated on or about [●], 2008 (the "PPM")):

On the basis of the representations, warranties and agreements contained herein, Lehman Brothers Inc., as agent of the Issuer for the purpose of soliciting and receiving offers to purchase the Warrants from the Issuer, agrees to sell to the Investor for its own behalf or for the account of its Customer, and the Investor, on its own behalf or on behalf of each Customer agrees to purchase from Lehman Brothers Inc., on [●], 2008 or on such other date as shall be mutually agreed upon by the Investor and Lehman Brothers Inc. (the "Closing Date"), up to $_____ worth of Warrants at a purchase price of $[245-255] per Warrant (the "Warrant Price"); provided that to the extent the issuance of the Warrants is oversubscribed, the subscription of the Investor may be reduced by the Issuer. No fractional Warrants will be issued. The "Purchase Price" is equal to the number of Warrants you are allocated by the Issuer on the Closing Date multiplied by the Warrant Price. The Purchase Price consists of $[225-235] per Warrant payable to the Issuer as compensation for issuing the Warrants. The balance of the Purchase Price is payable to the Placement Agent as selling compensation. The Purchase Price shall be paid by the Investor as set forth herein.

The undersigned, for itself and on behalf of the Customers, represents, warrants and covenants as of the date hereof and as of the Closing Date that:

1.    <u>Private Placement Memorandum.</u>  The Investor and each Customer (or an investment advisor acting on its behalf) has been furnished, and has received and reviewed, a copy of the PPM and has made such investigation as it deems necessary to evaluate the merits and risks involved in an investment in the Warrants.

2.    <u>Reference Fund Documents.</u>  The Investor hereby acknowledges, and hereby represents that each Customer acknowledges and understands, that neither the Issuer nor its

I-1

affiliates makes any representations or warranties with respect to the accuracy, validity, or completeness of the information contained in the Confidential Memorandum of Millennium USA LP, attached as Exhibit V to the PPM (the "Confidential Memorandum").

    3.    No Registration. The Investor hereby acknowledges, and hereby represents that each Customer acknowledges and understands, that the Warrants have not been, nor will be, registered under the Securities Act of 1933 (the "Securities Act") or any state securities or blue sky laws or the laws of any other jurisdiction, and the Warrants will bear a legend to such effect. The Warrants are being offered only to (i) "accredited investors" as defined in Rule 501 of Regulation D under the Securities Act ("Accredited Investors") who are also "qualified purchasers" as defined in Section 2(a)(51) of the Investment Company Act of 1940 ("Qualified Purchasers") or (ii) "non-U.S. Persons" purchasing in "offshore transactions" (each as defined in Regulation S under the Securities Act, "Non U.S. Persons" and "Offshore Transactions", respectively) who are also Qualified Purchasers.

    4.    Non-U.S. Person. If the Investor or any Customer is a Non-U.S. Person, that prior to the expiration of the Distribution Compliance Period, it will not offer, sell, pledge or otherwise transfer such Warrants except (1) in an Offshore Transaction in accordance with the provisions of Rule 903 or Rule 904 of Regulation S or (2) pursuant to any available exemption from registration under the Securities Act, in each case in accordance with any applicable securities law of any State of the United States or any other jurisdiction. It understands that prior to the expiration of the Distribution Compliance Period, before any Warrants may be offered, sold, pledged or otherwise transferred, it may be required to provide the Transfer Agent, on behalf of the Issuer, with a written certification as to compliance with applicable securities laws. "Distribution Compliance Period" means the 40-day period commencing on the later of the commencement of the offering or the date the Warrants were originally issued.

    5.    Restricted Transfer. None of the Warrants nor any interest or rights therein may be transferred in the absence of registration under the Securities Act or an exemption from the registration requirements thereof or such other applicable laws, and the Investor and each Customer has informed itself about and will observe all restrictions on transfer of the Warrants under such laws that may be applicable to it. The Investor and each Customer will not offer, sell, or deliver at any time, directly or indirectly, the Warrants unless Lehman Brothers Inc. receives a letter in the form hereof from each proposed transferee prior to such sale or transfer. Furthermore, before any Warrants may be offered, sold, pledged or otherwise transferred, it may be required to provide Lehman Brothers Inc. or the Transfer Agent, on behalf of the Issuer, with a written certification as to compliance with applicable securities laws.

    6.    Notice to Subsequent Holder. The Investor and each Customer will, and will require each Customer and subsequent Holder to, notify any purchaser of the Warrants from it of the resale and transfer restrictions referred to herein.

    7.    Accredited Investor or Non-U.S. Person/Offshore Transaction. The Investor and each Customer is either (a) an Accredited Investor or (b) a Non-U.S. Person and is purchasing the Warrants in an Offshore Transaction.

    8.    Experience and Financial Suitability. By reason of its business and financial experience the Investor and each Customer has such knowledge, sophistication, and experience

in business and financial matters that the Investor and each Customer is capable of evaluating the merits and risks of the prospective investment in the Warrants. The Investor and each Customer has sufficient net worth and/or annual income to hold the Warrants for an indefinite period and can afford to suffer the complete loss of its investment in the Warrants. The Investor and each Customer has a non-tax business or financial reason for acquiring the Warrants.

9.    Qualified Purchaser. The Investor and each Customer is a "qualified purchaser" within the meaning of Section 2(a)(51) of the Investment Company Act of 1940, as amended (the "Investment Company Act") because it is either:

(a)    a person acting for its own account or the accounts of other qualified purchasers, who in the aggregate owns and invests on a discretionary basis, not less than $25,000,000 in "investments" as defined in Rule 2a51-1 under the Investment Company Act ("Investments");

(b)    a natural person (including any person who holds a joint, community property, or other similar shared ownership interest in an issuer that is excepted under Section 3(c)(7) of the Investment Company Act with that person's spouse, who also meets the definition of "qualified purchaser") who owns not less than $5,000,000 in Investments;

(c)    a company that owns not less than $5,000,000 in Investments, was not formed or recapitalized for the specific purpose of making an investment in the Warrants and is owned directly or indirectly by or for two or more natural persons who are related as siblings or spouse (including former spouses), or direct lineal descendants by birth or adoption, spouses of such persons, the estates of such persons, or foundations, charitable organizations, or trusts established by or for the benefit of such persons;

(d)    a trust that is not covered by paragraph c. above and that was not formed or recapitalized for the specific purpose of making an investment in the Warrants, as to which the trustee or other person authorized to make decisions with respect to the trust, and each settlor or other person who has contributed assets to the trust, is otherwise a qualified purchaser; or

(e)    an entity in which each of the beneficial owners of its securities is a qualified purchaser.

10.    Minimum Requirement. The Investor is purchasing at least [393-409] Warrants.

11.    ERISA. The Investor represents and warrants on each date from the date on which the undersigned acquires Warrants that it and each Customer is not, and it and each Customer is not acquiring Warrants with the assets of, an employee benefit plan subject to Title I of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), a plan subject to Section 4975 of the Internal Revenue Code of 1986, as amended (the "Code"), a plan subject to any federal, state, local or other law, rule or regulation which is substantially similar to Title I of ERISA or Section 4975 of the Code ("Similar Law") or any entity deemed to hold the assets of any such employee benefit plan or plan for purposes of ERISA, Section 4975 of the Code or Similar Law. Such Investor and each Customer or transferee shall further be deemed to

I-3

represent and covenant that throughout the period it holds Warrants, the foregoing representations shall be true.

12.   Own Account.   The Investor is purchasing the Warrants as principal for its own account, or for the accounts of the Customers, in each case for investment purposes, and not with a view to the resale, distribution or other disposition thereof in violation of the Securities Act. Neither the Investor nor any Customer will purchase or hold additional Warrants under a different name.

13.   No General Solicitation.   The Warrants were not offered or sold to the Investor or any Customer by any form of general solicitation or advertising or directed selling efforts, including but not limited to:

(a)   any advertisement, article, notice or other communication published in any newspaper, magazine or similar media or broadcast over television or radio; or

(b)   any seminar or meeting whose attendees were invited by any general solicitation or general advertising.

14.   Information and Independent Investigation.   Prior to its purchase of the Warrants the Investor, on behalf of its self and on behalf of each Customer, was given the opportunity (i) to ask questions of, and receive answers from the Issuer or Lehman Brothers Inc. concerning the terms and conditions of the offering and (ii) to obtain any additional information requested concerning the Warrants, to the extent the Issuer or Lehman Brothers Inc. possessed such information or could acquire it without unreasonable effort or expense. In deciding whether to purchase the Warrants, the Investor and each Customer has relied upon its own independent appraisal and investigation, and the advice of its own counsel and other advisers, regarding the investment risks and all related matters of law, and has not relied upon any representation or warranty, express or implied, made by the Issuer or Lehman Brothers Inc., and the Investor and each Customer will continue to be solely responsible for making its own independent appraisal of the investment risks and all such related matters in the future, and will not hereafter rely on the Issuer or Lehman Brothers Inc. to provide any information concerning such matters.

15.   No Representations.   The Investor and acknowledges, understands and agrees, and hereby represents that each Customer acknowledges, understands and agrees, that the Issuer has not provided to it any representation or any assurance regarding the legal, tax, credit or accounting consequences to it of investing in the Warrants. The Investor further represents to the Issuer that the Investor and each Customer has made its own assessment and has not relied on any representation of the Issuer with respect to the legal, tax, credit or accounting consequences to it of investing in the Warrants.

16.   Customer Due Diligence.   The Investor has investigated the Customers and conducted sufficient and appropriate due diligence to make the representations and warranties hereunder on behalf of the Customers.

17.   Clawback.   If the Calculation Agent determines that a Reference Holder is required to repay (for any reason) any portion of the redemption proceeds received from the Reference Fund on or after the Warrant Payment Date, the Investor will be required to pay to the

Issuer an amount equal to the portion of the Warrant Payment Amount for each Warrant equal to the repayment amount for the Deemed Quantity of Interests.

18.    <u>Tax Treatment</u>.  The Investor and each Customer agrees to treat the Warrants in accordance with the treatment described in "*Certain U.S. Federal Income Tax Considerations*" section of the PPM, unless otherwise required by law, for federal income tax purposes.

19.    <u>No Investment or Control</u>.  The Investor represents, and hereby represents that each Customer represents, that it has not disposed of any direct or indirect interest in the Reference Fund immediately prior to acquiring the Warrants.  The Investor further represents, and hereby represents that each Customer represents, that it does not have any control or influence over the Reference Fund that could cause the Reference Fund to alter, or refrain from altering, the composition of its investments or its investment decisions.

20.    The Investor and each Customer, if not a "United States person" (as defined in Section 7701(a)(30) of the Code), either (A) is not a bank (within the meaning of Section 881(c)(3)(A) of the Code) or an Affiliate of a bank or (B) is a Person (or a wholly owned Affiliate of a Person) that is eligible for benefits under an income tax treaty with the United States that eliminates U.S. federal income taxation of U.S. source interest not attributable to a permanent establishment in the United States.

You are entitled to rely upon this letter and are irrevocably authorized to produce this letter or a copy hereof to any interested party in any administrative or legal proceeding or official inquiry with respect to the matters covered hereby.

IN WITNESS WHEREOF, the undersigned has executed this Investor Representation Letter this _____ day of _____, 20__.

Very truly yours,


By:_____

Print Name: _____


_____
Maximum Premium

# II

**EXHIBIT II**

**FORM OF TRANSFEREE REPRESENTATION LETTER**

Lehman Brothers Inc.
745 Seventh Avenue
New York, NY 10019
Attn: Equity Sales Derivatives

Citibank, N.A.
388 Greenwich Street, 14th Floor
New York, New York 10013
Attention: Citibank Agency & Trust

Re:     [4-Year, 2-Month] Cash-Settled Call Warrants Linked to the Performance
         of Millennium USA LP Issued by Lehman Brothers Holdings Inc.

Ladies and Gentlemen:

In connection with the purchase of U.S. $[●] in principal amount of [4-Year, 2-Month] Cash-Settled Call Warrants Linked to the Performance of Millennium USA LP issued by Lehman Brothers Holdings Inc. (the "Issuer"), the undersigned (the "Transferee") hereby agrees with [_____] (the "Transferor") and Lehman Brothers Inc. as follows (defined terms used but not defined herein shall have the meanings given to such terms in the Private Placement Memorandum for the Warrants, dated on or about [●], 2008 (the "PPM")):

On the basis of the representations, warranties and agreements contained herein the Transferor agrees to sell to the Transferee, and the Transferee agrees to purchase from the Transferor, on [●] or on such other date as shall be mutually agreed upon by the Transferor and the Transferee (the "Closing Date"), [●] Warrants at a purchase price of $[●] per Warrant and a total purchase price of $[●] (the "Purchase Price"). The Purchase Price shall be paid by the Transferee on the Closing Date by wire transfer in immediately available funds to account [_____].

The Transferee represents, warrants and covenants to the Transferor and Lehman Brothers Inc. as of the date hereof and as of the Closing Date that:

1.     Private Placement Memorandum. It has been furnished, and has received and reviewed, a copy of the PPM and has made such investigation as it deems necessary to evaluate the merits and risks involved in an investment in the Warrants.

2.     Reference Fund Documents. It acknowledges that neither Lehman Brothers Inc. or its affiliates makes any representations or warranties with respect to the accuracy, validity, or completeness of the information contained in the Confidential Memorandum of Millennium USA LP, attached as Exhibit V to the PPM.

Securities Act. The undersigned will not purchase or hold additional Warrants under a different name.

13.    No General Solicitation. The Warrants were not offered or sold to the Transferee by any form of general solicitation or advertising or directed selling efforts, including but not limited to:

(a)    any advertisement, article, notice or other communication published in any newspaper, magazine or similar media or broadcast over television or radio; or

(b)    any seminar or meeting whose attendees were invited by any general solicitation or general advertising.

14.    Information and Independent Investigation. Prior to its purchase of the Warrants the Transferee was given the opportunity (i) to ask questions of, and receive answers from Lehman Brothers Inc. concerning the terms and conditions of the offering and (ii) to obtain any additional information requested concerning the Warrants, to the extent Lehman Brothers Inc. possessed such information or could acquire it without unreasonable effort or expense. In deciding whether to purchase the Warrants, the Transferee has relied upon its own independent appraisal and investigation, and the advice of its own counsel and other advisers, regarding the investment risks and all related matters of law, and has not relied upon any representation or warranty, express or implied, made to it by Lehman Brothers Inc., and the Transferee will continue to be solely responsible for making its own independent appraisal of the investment risks and all such related matters in the future, and will not hereafter rely on Lehman Brothers Inc. to provide any information concerning such matters.

15.    No Representations. The Transferee acknowledges, understands and agrees that the Issuer and Lehman Brothers Inc. have not provided to it any representation or any assurance regarding the legal, tax, credit or accounting consequences to it of investing in the Warrants. The Transferee further represents to Lehman Brothers Inc. that the Transferee has made its own assessment and has not relied on any representation of Lehman Brothers Inc. with respect to the legal, tax, credit or accounting consequences to it of investing in the Warrants.

16.    Tax Treatment. The Transferee agrees to treat the Warrants in accordance with the treatment described in "Certain U.S. Federal Income Tax Considerations" section of the PPM, unless otherwise required by law, for federal income tax purposes.

17.    No Investment or Control. The undersigned represents that it has not disposed of any direct or indirect interest in the Reference Fund immediately prior to acquiring the Warrants. The undersigned further represents that it does not have any control or influence over the Reference Fund that could cause the Reference Fund to alter, or refrain from altering, the composition of its investments or its investment decisions.

18.    Clawback. If the Calculation Agent determines that a Reference Holder is required to repay (for any reason) any portion of the redemption proceeds received from the Reference Fund on or after the Warrant Payment Date, the Investor will be required to pay to the Issuer an amount equal to the portion of the Warrant Payment Amount for each Warrant equal to the repayment amount for the Deemed Quantity of Interests.

19.    The Transferee, if not a "United States person" (as defined in Section 7701(a)(30) of the Code), either (A) is not a bank (within the meaning of Section 881(c)(3)(A) of the Code) or an Affiliate of a bank or (B) is a Person (or a wholly owned Affiliate of a Person) that is eligible for benefits under an income tax treaty with the United States that eliminates U.S. federal income taxation of U.S. source interest not attributable to a permanent establishment in the United States.

You are entitled to rely upon this letter and are irrevocably authorized to produce this letter or a copy hereof to any interested party in any administrative or legal proceeding or official inquiry with respect to the matters covered hereby.

IN WITNESS WHEREOF, the Transferee has executed this Transferee Representation Letter this _____ day of _____, 20__.

Very truly yours,

By:_____
　　　　　　　Name of Transferee

Print Name:_____

_____
　　　　　　　Number of Warrants

II-6

## REQUIRED ACCOUNT INFORMATION

1.   Full legal name: _____

2.   If different, full legal
     name in which Warrants
     to be registered: _____

3.   Taxpayer number: _____

4.   Address for Notices: _____

     _____

     _____

5.   Address for delivery of Warrants (if
     to address or financial custodian other
     than Lehman Brothers Inc.):

     Name of financial institution: _____

     Address: _____

     _____

     _____

     Account #: _____

     Telephone: _____

6.   Account details for payments to the investor:

     Bank Name: _____

     ABA #: _____

     Account #: _____

     For further credit to: _____

     Reference: _____

# III

**EXHIBIT III**

**FORM OF ISSUING, PAYING AND TRANSFER AGENCY AGREEMENT**

This agreement, dated as of [●], 2008 (the "Agreement"), is by and between Lehman Brothers Holdings Inc., a corporation organized under the laws of the State of Delaware (the "Issuer") and Citibank, N.A., a national banking association duly organized and existing under the laws of the United States of America, as issuing, paying and transfer agent (the "Agent"). Capitalized terms used and not defined herein have the meanings assigned to them in the Warrants (as defined below).

Section 1.    Appointment of Agent

The Issuer proposes to issue U.S. $[●] in principal amount of [4-Year, 2-Month] Cash-Settled Call Warrants Linked to the Performance of Millennium USA LP (the "Warrants"). The Issuer has appointed Lehman Brothers Inc. as placement agent (the "Placement Agent") for the Warrants. The Issuer hereby appoints the Agent to act, on the terms and conditions specified herein, as issuing, paying and transfer agent for the Warrants.

Section 2.    Warrant Form; Terms; Execution

(a)    Each Warrant will at all times be represented by a warrant certificate in definitive form, substantially in the form of Exhibit A-1 hereto. The Warrants shall be in minimum denominations of $1,000 and in integral multiples of $1,000 in excess thereof. The minimum investment amount in the Warrants is $100,000 ([393-409] Warrants), subject to waiver at the discretion of the Placement Agent. The Warrants shall not be exercisable by the Registered Holder prior to maturity.

(b)    Upon request, the Issuer will furnish the Agent with an adequate supply of Warrants bearing consecutive control numbers, which will have, as applicable, the name of the Registered Holder (as defined in Section 4 hereof) and principal amount left blank. Each Warrant will have been executed by the manual signature of an Authorized Representative (as defined in Section 3 hereof) of the Issuer. The Agent will hold such blank Warrants in safekeeping in accordance with its customary practice and shall issue such Warrants in the order of the control numbers imprinted thereon.

Section 3.    Authorized Representatives

From time to time, the Issuer will furnish the Agent with a certificate of the Issuer certifying the incumbency and specimen signatures of the Issuer's officers authorized to execute Warrants on behalf of the Issuer by manual or facsimile signature (an "Authorized Representative"). Until the Agent receives a subsequent incumbency certificate of the Issuer, the Agent shall be entitled to conclusively rely on the last such certificate delivered to it for purposes of determining the Authorized Representatives. The Agent shall have no responsibility to the Issuer to determine whether any manual signature is genuine, if such manual signature resembles the specimen signatures filed with the Agent by a duly authorized officer of the Issuer. Any Warrant bearing the manual signature of a person who is an Authorized Representative on the

date such signature is affixed shall bind the Issuer after the completion and countersigning thereof by the Agent, notwithstanding that such person shall have ceased to hold office on the date such Warrant is completed, countersigned and delivered by the Agent.

Section 4.    Issuance Instructions; Completion, Countersignature and Delivery of Warrants

(a)    An Authorized Representative shall give all Warrant issuance instructions (the "*Issuance Instructions*") with respect to the Warrants to be issued hereunder to the Agent by facsimile transmission, or in writing by an Authorized Representative or by any person, including any employee or partner of the Placement Agent, who has been designated by an Authorized Representative in writing to the Agent as a person authorized to give such instructions hereunder.    The Agent shall have no duty to act in the absence of written instructions.    Such instructions shall include the: (i) name and address of the person in whose name the Warrant shall be registered (the "*Registered Holder*"), and (ii) taxpayer identification number of the Registered Holder.

(b)    Upon receipt of the instruction described above, the Agent shall withdraw the necessary Warrants from safekeeping and, in accordance with such instructions, shall: (i) complete each Warrant with the date, as applicable, enumerated in subparagraph (a) above; (ii) record each Warrant in the Warrant Register (as defined in Section 10 hereof); (iii) cause each Warrant to be manually countersigned by any one of the officers or employees of the Agent duly authorized and designed by it for such purpose; (iv) deliver each Warrant to the Placement Agent or its designed consignee, if any, which delivery shall be against payment or receipt for payment in immediately available funds, and (v) retain one copy of each Warrant for its own records and send a copy of each such Warrant to the Issuer.

(c)    All instructions, whether delivered by facsimile transmission, or in writing must be received by the Agent not later than 3:00 p.m. New York City time on the Business Day immediately preceding the date of issuance of Warrants.

Section 5.    Reliance on Instructions

The Agent shall incur no liability to the Issuer in acting hereunder upon instructions contemplated hereby which the Agent reasonably believed in good faith to have been given by an Authorized Representative (or its authorized designee).

Section 6.    Issuer's Representations and Warranties

Each Issuance Instruction given to the Agent shall constitute the Issuer's continuing representation and warranty to the Agent that the issuance and delivery of the Warrants have been duly and validly authorized by the Issuer and that the Warrants, when completed, countersigned and delivered pursuant hereto, will constitute the legal, valid and binding obligations of the Issuer.

Section 7.    Proceeds of Sale of Warrants

Proceeds received in payment for the Warrants shall be in immediately available funds and shall be transmitted in immediately available funds to the Issuer by wire transfer to

such bank account as may be designated by the Issuer to the Registered Holder at least one Business Day prior thereto.

Section 8.    Payment at Maturity

The Issuer will pay to the Registered Holders in immediately available funds the amount payable on each Warrant at maturity only upon presentation and surrender of such Warrant on or after the Warrant Payment Date, at the offices of the Agent located at the address set forth in Section 16 below. The Agent will forthwith cancel each such Warrant and promptly forward the same in due course to the Issuer. In the event the Warrant Payment Date is postponed as provided in the Warrants, the Warrant Payment Date shall be the earlier of (i) five Business Days after the date that a Reference Holder would have received all such redemption proceeds, as determined by the Calculation Agent and (ii) five Business Days after the thirtieth day following the Audit Date with respect to the final Valuation Date. The Warrants will be exercised automatically on the final Valuation Date. If required by law, the Issuer will withhold any taxes or other governmental charges on any payment made in connection with the Warrants.

Section 9.    Calculation Agent; Information Regarding Amounts Due

Lehman Brothers Inc. shall serve as calculation agent (the "Calculation Agent") in respect of the Warrants for, inter alia, purposes of determining the amount payable at maturity and the Agent shall be entitled conclusively to rely upon any determinations made by such Calculation Agent. Promptly following the final Valuation Date, the Issuer will confirm with the Calculation Agent the amount payable at maturity.

Section 10.    Warrant Register; Registration, Transfer, Exchange; Persons Deemed Owners

(a)    It is understood that the Warrant Register shall be maintained by the Agent by such method as the Issuer and the Agent shall mutually agree. "*Warrant Register*" means the definitive record in which shall be recorded the names, addresses, payment account information and taxpayer identification numbers of the Registered Holders, the Warrant numbers and details with respect to the issuance, transfer and exchange of such Warrants by such holders, as appropriate.

(b)    Upon presentation by a Registered Holder of a Warrant for registration of transfer, the Agent shall register the transfer of such Warrant if such Warrant is to be transferred to an Accredited Investor who is also a Qualified Purchaser.

(c)    Any sales or transfers of Warrants in violation of the transfer restrictions set forth in the Private Placement Memorandum are prohibited and will be treated by the Issuer and the Transfer Agent as having no legal effect. The Issuer will not honor such sale or transfer and will have the right, at any time, at the expense and risk of the Registered Holder of any Warrants held by or on behalf of a person who is not an Accredited Investor who is also a Qualified Purchaser at the time it purchases such Warrants, to (1) redeem such Warrants, in whole or in part, at the then-current value per Warrant as determined by the Calculation Agent or (2) require such holder to sell such Warrants to a qualifying transferee who satisfies all of the requirements set forth in the transfer restrictions.

(d)      To effectuate the restrictions on resales and other transfers of Warrants, if any resale or other transfer of such Warrants is proposed to be made, the Registered Holder and the proposed transferee shall be required to complete and deliver to the Agent, prior to the registration of such transfer, the transfer certificate on the reverse of the Warrants, if applicable, and a representation letter in favor of the Issuer (substantially in the form of Exhibit A-2 to the Warrant). In registering the transfer of any Warrants pursuant to this Section, the Agent shall be entitled to rely without further investigation on a duly completed transfer certificate, if applicable, and representation letter or such other certificate or instruments of transfer that the Issuer has advised the Agent is acceptable to the Issuer. The Agent shall not register any transfer of Warrants unless the Agent has received an executed transfer certificate, if applicable, and representation letter from the Registered Holder and proposed transferee, each in form and substance acceptable to the Issuer. Notwithstanding any provisions herein to the contrary, transfer of a Warrant may only be made in accordance with the restrictions on transfer set forth in the Warrants.

(e)      The Warrants are subject to restrictions on transferability and resale and will not be registered under the Securities Act of 1933 ("*Securities Act*") or under the securities laws of any other jurisdiction. The Warrants may only be sold to Accredited Investors who are also Qualified Purchasers.

(f)      In connection with the registration of transfer of the Warrants, the Agent (on behalf of the Issuer) may require payment from the Registered Holder of a sum sufficient to cover any applicable tax or other governmental charge.

(g)      Prior to due presentment of a Warrant for registration of transfer, the Issuer and the Agent may deem and treat the Registered Holder of any Warrant as the absolute owner of such Warrant for the purpose of receiving payment at maturity and for all other purposes whatsoever, whether or not such Warrant shall be overdue, and neither the Issuer nor the Agent, except as provided in this Section, shall be affected by notice to the contrary.

(h)      Any resales or other transfers of the Warrants in violation of the transfer restrictions are prohibited, will be treated by the Issuer and the Agent as having no legal effect and the Agent will not reflect any resale or transfer on the Warrant Register. Neither the Issuer nor the Agent will honor or recognize such resale or transfer and the Issuer and the Agent shall deem and treat the Registered Holder of record listed on the Warrant Register as the absolute owner of such Warrant for the purpose of receiving payment at maturity and for all other purposes whatsoever.

(i)      Each Warrant presented for registration of transfer shall be duly endorsed and accompanied by an appropriate written instrument for transfer and a representation letter in favor of the Transferor and the Issuer.

(j)      Upon surrender for registration of transfer of any Warrant and satisfaction of the requirements of this Section, including, without limitation, the receipt of the transfer certificate, if applicable, and representation letter, the Agent shall countersign and deliver, in the name of the designated transferee, one or more new registered Warrants of any authorized denominations, of a like aggregate principal amount, bearing a control number not

contemporaneously outstanding and containing identical terms and conditions and shall record the same in the Warrant Register.

(k)     At the option of any Registered Holder, Warrants may be exchanged for other Warrants containing identical terms and provisions, in any authorized denominations, and of a like aggregate principal amount, upon surrender of the Warrants to be exchanged to the Agent. Whenever any Warrants are so surrendered for exchange, the Agent shall countersign and deliver the new Warrants that the Registered Holder making the exchange is entitled to receive.

(l)     With respect to the sale of Warrants, the Issuer and the Agent agree to perform their respective duties and obligations in any administrative procedures approved from time to time by the Issuer and the Agent.

Section 11.    Mutilated, Destroyed, Lost or Stolen Warrants

If (a) any mutilated Warrant is surrendered to the Agent or the Agent receives evidence to the satisfaction of the Agent of the destruction, loss or theft of any Warrant and (b) there is delivered to the Agent by the Registered Holder of such Warrant such security or indemnity as may be required by the Agent to save it and the Issuer harmless, then, in the absence of actual notice to the Agent that such Warrant has been acquired by a bona fide purchaser, the Agent shall countersign and deliver, in exchange for or in lieu of any such mutilated, destroyed, lost or stolen Warrant, a new Warrant or Warrants of like tenor and terms. In connection with the issuance of any new Warrant under this Section 11, the Agent may require the payment by the Registered Holder of such Warrant of a sum sufficient to cover any expenses (including the fees and expenses of the Issuer) connected therewith. Any replacement Warrant issued shall constitute complete and indefeasible evidence of ownership of such Warrant as if originally issued, whether or not the lost, stolen or destroyed Warrant shall be found at any time.

Section 12.    Liability

Neither the Agent nor its officers or employees shall be liable to the Issuer for any act or omission hereunder except in the case of the Agent's gross negligence or willful misconduct. The duties and obligations of the Agent, its officers and employees shall be determined by the express provisions of this Agreement and they shall not be liable except for the performance of such duties and obligations as are specifically set forth herein and no implied covenants shall be read into this Agreement against them. The Agent may consult with counsel of its selection and shall be fully protected in any action taken in good faith in accordance with the advice of counsel. Neither the Agent nor its officers or employees shall be required to ascertain whether any transfer or sale of Warrants (or any amendment or termination of this Agreement) has been duly authorized or is in compliance with any other agreement to which the Issuer is a party (whether or not the Agent is also a party to such other agreement). The Agent shall not be required to, and shall not, expend or risk any of its own funds or otherwise incur any financial liability in the performance of any of its duties hereunder.

Section 13.    Indemnification

The Issuer agrees to indemnify and hold harmless the Agent, its directors, officers, employees and agents from and against any and all liabilities (including liability for penalties), losses, claims, damages, actions, suits, judgments, demands, cost and expenses (including reasonable legal fees and expenses) relating to or arising out of or in connection with its or their acceptance of or performance under this Agreement, except to the extent that they are caused by the gross negligence or willful misconduct of the Agent, its directors, officers, employees or agents; *provided, however,* that if any such action or suit shall be commenced against, or any such claim or demand be assessed against the Agent in respect to which the Agent or any of its directors, officers, employees or agents proposes to demand indemnification, the Issuer shall be notified to that effect with reasonable promptness. The foregoing indemnity includes, but is not limited to, any action taken or omitted in good faith within the scope of this Agreement upon telephonic, telecopier or other electronically transmitted instructions, if authorized herein, received from, or reasonably believed by the Agent in good faith to have been given by, an authorized representative of the Issuer. This indemnity shall survive the resignation or removal of the Agent and the satisfaction or termination of this Agreement.

Section 14.    Compensation of the Agent

The Issuer agrees to pay the compensation of the Agent at such rates as shall be agreed upon from time to time and to reimburse the Agent for its out-of-pocket expenses (including reasonable legal fees and expenses), disbursements and advances incurred or made in connection with the Agent's execution and performance of the Agreement. The obligation of the Issuer to the Agent pursuant to this Section shall survive the resignation or removal of the Agent and the satisfaction or termination of this Agreement.

Section 15.    Amendments

(a)    This Agreement may be amended by any written instrument signed by the parties, so long as such amendment does not adversely affect the rights of the Registered Holders of Warrants, as certified in writing by the Issuer to the Agent.

(b)    The Issuer and the Agent agree to cooperate to adopt amendments or supplements to this Agreement from time to time to modify the restrictions and procedures for resales and other transfers of the Warrants to reflect any change in applicable law or regulation (or the interpretation thereof) or in practices relating to the resale or transfer of restricted securities generally.

Section 16.    Notices

(a)    All communications by or on behalf of the Issuer relating to the transfer, exchange or payment of the Warrants shall be directed to the Agent at its address set forth in subsection (b) (ii) hereof, and the Issuer will send all Warrants to be completed and delivered by the Agent to such address (or such other address as the Agent shall specify in writing to the Issuer).

III-6

(b)    Notices and other communications hereunder shall (except to the extent otherwise expressly provided) be in writing, shall be deemed effective when received and shall be addressed as follows, or to such other addresses as the parties hereto shall specify from time to time:

(i)    if to the Issuer:

Lehman Brothers Holdings Inc.
745 Seventh Avenue.
New York, New York  10019
Attention:  Treasurer
Facsimile:  (646) 758-3204

With a copy to the Calculation Agent:

Lehman Brothers Inc.
745 Seventh Avenue
New York, New York  10019
Attention:  Structured Equity Products
Telephone:  (212) 526-0905
Facsimile:  (646) 885-9292

(ii)    if to the Agent:

For Notices:

Citibank, N.A.
388 Greenwich Street, 14th Floor
New York, New York  10013
Attention:  Agency & Trust
Telefax:  (212) 657-4024

For presentation and surrender of securities:

Citibank, N.A.
111 Wall Street, 15th Floor
New York, New York  10043
Attention:  Agency and Trust

Notwithstanding anything to the contrary herein, any and all communications (both text and attachments) by or from the Agent that the Agent in its sole discretion deems to contain confidential, proprietary, and/or sensitive information and sent by electronic mail will be encrypted.  The recipient of the email communication will be required to complete a one-time registration process.  Information and assistance on registering and using the email encryption technology can be found at Citibank, N.A.'s secure website at www.citigroup.com/citigroup/citizen/privacy/email.htm or by calling (866) 535-2504 (in the U.S.) or (904) 954-6181 at any time

Section 17.    Resignation or Removal of Agent

The Agent may at any time resign as such agent by giving written notice to the Issuer of such intention on its part, specifying the date on which its desired resignation shall become effective; provided, however, that such date shall be not less than 90 days after the giving of such notice by the Agent to the Issuer. The Agent may be removed at any time by the filing with it of an instrument in writing signed by a duly authorized officer of the Issuer and specifying such removal and the date upon which it is intended to become effective, which date shall not be less than 30 days from the date that notice is received. Such resignation or removal shall take effect on the date of the appointment by the Issuer of a successor Agent and the acceptance of such appointment by such successor Agent. In the event of resignation by the Agent, if a successor agent has not been appointed by the date as of which the resignation of the Agent is to be effective, as set forth in the resignation notice of the Agent referred to above, the Agent may, at the expense of the Issuer, petition any court of competent jurisdiction for appointment of a successor Agent.

Section 18.    Cancellation of Unissued Warrants

Upon the written request of the Issuer, the Agent shall cancel and return to the Issuer all unissued Warrants in its possession at the time of such request; provided, however, that the Agent shall not be required to destroy cancelled Warrants.

Section 19.    Cancellation of Warrants

The Issuer may at any time deliver to the Transfer Agent for cancellation any Warrants previously authenticated and delivered under this Agreement that the Issuer may have acquired in any manner whatsoever, and all Warrants so delivered shall be promptly cancelled by the Transfer Agent. No Warrants shall be authenticated instead of or in exchange for any Warrants cancelled as provided in this Section, except as expressly permitted by this Agreement. All cancelled Warrants may be held or disposed of by the Transfer Agent in accordance with its standard retention or disposal policy as in effect at the time unless before their disposal the Issuer directs by a written order or request signed in the name of the Issuer and delivered to the Transfer Agent that they be returned to it.

Section 20.    Application of Funds: Return of Unclaimed Funds

Until used or applied as herein provided, all funds received by the Issuer hereunder shall be held for the purposes for which they were received but need not be segregated from other funds except to the extent required by law. The Issuer shall be under no liability for interest on any funds received by it hereunder.

Section 21.    Benefit of Agreement

This Agreement is solely for the benefit of the parties hereto, their successor and assigns and the Registered Holders of Warrants and no other person shall acquire or have any right under or by virtue of this Agreement.

Section 22.     Warrants Held by the Agent

The Agent, in its individual or other capacity, may become the owner or pledgee of the Warrants with the same rights it would have if it were not acting as issuing, paying and transfer agent for the Registered Holders hereunder.

Section 23.     Governing Law

This Agreement is to be construed and enforced in accordance with, and the rights of the parties shall be governed by, the laws of the State of New York, without regard to conflicts of laws principles thereof.

Section 24.     Counterparts

This Agreement may be executed by the parties hereto in any number of counterparts, and by each of the parties hereto in separate counterparts, each such counterpart, when so executed and delivered, shall be deemed to be an original, but all such counterparts shall together constitute but one and the same instrument.

Section 25.     Force Majeure

The Agent will not incur any liability for not performing any act or fulfilling any duty, obligation or responsibility hereunder by reason of any occurrence beyond the control of the Agent (including but not limited to any act or provision of any present or future law or regulation or governmental authority, any act of God, war, or terrorism, or the unavailability of the Federal Reserve Bank wire or facsimile or other wire or communication facility).

Section 26.     Important Information About Procedures For Opening A New Account

To help the government fight the funding of terrorism and money laundering activities, federal law requires all financial institutions to obtain, verify, and record information that identifies each person who opens an account. When an account is opened, the Agent will ask for information that will allow it to identify relevant parties.

III-9

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed on their behalf by their officers thereunto duly authorized, all as of the day and year first above written.

LEHMAN BROTHERS HOLDINGS INC.

By:_____
    Name:
    Title:

CITIBANK, N.A.

By:_____
    Name:
    Title:

EXHIBIT A-1

### FORM OF WARRANT

THIS WARRANT HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") OR THE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES OR ANY OTHER JURISDICTION.

THE HOLDER HEREOF REPRESENTS THAT IT IS (I) A PERSON WHO IS AN "ACCREDITED INVESTOR" WITHIN THE MEANING OF RULE 501(A) UNDER THE SECURITIES ACT ("ACCREDITED INVESTOR") WHO IS ALSO A "QUALIFIED PURCHASER" AS DEFINED IN SECTION 2(A)(51) OF THE INVESTMENT COMPANY ACT OF 1940 ("QUALIFIED PURCHASER") OR (II) A NON-U.S. PERSONS IN OFFSHORE TRANSACTIONS IN ACCORDANCE WITH RULE 903 OR RULE 904 OF REGULATION S UNDER THE SECURITIES ACT ("REGULATION S") WHO ARE ALSO QUALIFIED PURCHASERS, IN EACH CASE, PURCHASING WARRANTS IN AN AGGREGATE NOMINAL AMOUNT OF AT LEAST THE MINIMUM INITIAL INVESTMENT, AS SET FORTH IN THE PRIVATE PLACEMENT MEMORANDUM FOR THE WARRANTS, WHO HAS NO NEED FOR LIQUIDITY OF INVESTMENT AND UNDERSTANDS AND CAN AFFORD THE FINANCIAL AND OTHER RISKS OF AN INVESTMENT IN A WARRANT, AND WHO MEETS THE OTHER REQUIREMENTS AS PROVIDED IN THE REPRESENTATIONS, WARRANTIES AND COVENANTS CONTAINED IN THE FORM OF REPRESENTATION LETTER (EACH SUCH PERSON, AN "ELIGIBLE INVESTOR").

THE HOLDER HEREOF, BY PURCHASING OR OTHERWISE ACQUIRING THIS WARRANT, ACKNOWLEDGES THAT THIS WARRANT IS A "RESTRICTED SECURITY" THAT HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT AND AGREES FOR THE BENEFIT OF THE ISSUER THAT THIS WARRANT MAY BE OFFERED, RESOLD OR OTHERWISE TRANSFERRED ONLY IN COMPLIANCE WITH THE SECURITIES ACT AND OTHER APPLICABLE LAWS OF THE STATES, TERRITORIES AND POSSESSIONS OF THE UNITED STATES GOVERNING THE OFFER AND SALE OF SECURITIES AND ONLY (1) TO THE ISSUER OR AN AFFILIATE OF THE ISSUER OR (2) TO AN ELIGIBLE INVESTOR.

THE HOLDER REPRESENTS AND WARRANTS THAT IT IS NOT, AND IT DID NOT ACQUIRED WARRANTS WITH THE ASSETS OF, AN EMPLOYEE BENEFIT PLAN SUBJECT TO TITLE I OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED ("ERISA"), A PLAN SUBJECT TO SECTION 4975 OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "CODE"), INCLUDING AN IRA ACCOUNT, A PLAN SUBJECT TO ANY FEDERAL, STATE, LOCAL OR OTHER LAW, RULE OR REGULATION WHICH IS SUBSTANTIALLY SIMILAR TO TITLE I OF ERISA OR SECTION 4975 OF THE

CODE ("SIMILAR LAW") OR ANY ENTITY DEEMED TO HOLD THE ASSETS OF ANY SUCH EMPLOYEE BENEFIT PLAN OR PLAN FOR PURPOSES OF ERISA, SECTION 4975 OF THE CODE OR SIMILAR LAW.   ANY INVESTOR OR TRANSFEREE SHALL FURTHER BE DEEMED TO REPRESENT AND COVENANT THAT THROUGHOUT THE PERIOD IT HOLDS WARRANTS, THE FOREGOING REPRESENTATIONS AND WARRANTIES SHALL BE TRUE.

THE HOLDER HEREOF AGREES THAT IT WILL DELIVER TO EACH PERSON TO WHOM THE SECURITY EVIDENCED HEREBY IS TRANSFERRED A NOTICE SUBSTANTIALLY TO THE EFFECT OF THIS LEGEND.

IF THIS SECURITY IS HELD IN VIOLATION OF THE APPLICABLE TRANSFER RESTRICTIONS, THE ISSUER SHALL HAVE THE RIGHT AT ANY TIME, AT THE EXPENSE AND RISK OF THE HOLDER OF ANY WARRANTS HELD BY OR ON BEHALF OF A PERSON WHO IS NOT AN ELIGIBLE INVESTOR AT THE TIME IT PURCHASES SUCH WARRANTS TO (1) REDEEM SUCH WARRANTS, IN WHOLE OR IN PART, AT THE THEN-CURRENT VALUE OR (2) REQUIRE SUCH HOLDER TO SELL ITS HOLDING TO AN ELIGIBLE INVESTOR.   ANY TRANSFER OF THE WARRANTS REPRESENTED BY THIS SECURITY TO A PERSON WHO IS NOT AN ELIGIBLE INVESTOR AT THE TIME OF SUCH TRANSFER SHALL BE DEEMED VOID AB INITIO AND OF NO LEGAL EFFECT, ANY SUCH TRANSFEREE SHALL BE DEEMED NOT TO BE THE HOLDER OF SUCH WARRANTS FOR ANY PURPOSE, AND SUCH TRANSFEREE SHALL BE DEEMED TO HAVE NO INTEREST WHATSOEVER IN THE WARRANTS.

IF THIS SECURITY IS HELD BY OR ON BEHALF OF AN EMPLOYEE BENEFIT PLAN IN VIOLATION OF THIS LEGEND, IT MAY BE REDEEMED AT THE OPTION OF THE ISSUER AT THE EXPENSE AND RISK OF THE HOLDER, IN WHOLE OR IN PART, OR THE ISSUER MAY REQUIRE THE HOLDER OF THIS SECURITY HELD BY OR ON BEHALF OF AN EMPLOYEE BENEFIT PLAN IN VIOLATION OF THIS LEGEND, AT THE EXPENSE AND RISK OF THE HOLDER, TO SELL ITS HOLDING TO AN ELIGIBLE INVESTOR.   ANY TRANSFER OF THE WARRANTS REPRESENTED BY THIS SECURITY TO AN EMPLOYEE BENEFIT PLAN IN VIOLATION OF THIS LEGEND SHALL BE DEEMED VOID AB INITIO AND OF NO LEGAL EFFECT, ANY SUCH TRANSFEREE SHALL BE DEEMED NOT TO BE THE HOLDER OF SUCH WARRANTS FOR ANY PURPOSE, AND SUCH TRANSFEREE SHALL BE DEEMED TO HAVE NO INTEREST WHATSOEVER IN THE WARRANTS.

EACH HOLDER OF THIS SECURITY ACKNOWLEDGES THAT ITS INVESTMENT IN SUCH WARRANTS IS CONSISTENT WITH ITS OVERALL INVESTMENT STRATEGY.

PRINCIPAL AMOUNT: $[●]
No.: 1 of 1

### Lehman Brothers Holdings Inc.

### [4-Year, 2-Month] Cash-Settled Call Warrants Linked to the Performance of Millennium USA LP

Lehman Brothers Holdings Inc. (the "Issuer"), a corporation organized under the laws of the State of Delaware, promises to pay to Lehman Brothers Inc., as holder hereof, per $1,000 [4-Year, 2-Month] Cash-Settled Call Warrants Linked to the Performance of Millennium USA LP (each, a "Warrant"), the Warrant Payment Amount (as defined herein) on [August 3], 2012, or such later date pursuant to the terms hereof (the "Warrant Payment Date"). Reference is hereby made to the further provisions of this Warrant as set forth on the reverse hereof, which provisions shall for all purposes have the same effect as if set forth at this place.

IN WITNESS WHEREOF, the Issuer has caused this warrant certificate to be executed on its behalf by a duly authorized signatory.

LEHMAN BROTHERS HOLDINGS INC.

By:_____
       Name:
       Title:

Issuing Agent's Validation
pursuant to the Issuing, Paying
and Transfer Agency Agreement, dated as of [●], 2008

Citibank N.A., as issuing, paying and transfer agent

By:_____
    Name:
    Title:

    Date:

[REVERSE SIDE OF WARRANT]

### Lehman Brothers Holdings Inc.

### [4-Year, 2-Month] Cash-Settled Call Warrants Linked to the Performance of Millennium USA LP

**Issuance**

The Issuer will issue [●] U.S. dollar Warrants for a total cost, including selling compensation, that is currently expected to be as high as $[245-255] per Warrant (the "Total Cost"). The Total Cost has been priced to include the selling compensation payable to Lehman Brothers Inc. (the "Placement Agent"). For an explanation of the components of the Total Cost and the plan of distribution, see "*Plan of Distribution*" in the Private Placement Memorandum for the Warrants dated on or about [●], 2008 (the "PPM").

The Issuer expects to issue the Warrants on or about [May 1], 2008 (the "Issue Date"). The minimum initial investment is [393-409] Warrants per investor, subject to waiver at the discretion of the Placement Agent, with additional investments permitted in denominations of one Warrant or multiples thereof. The closing and settlement date for the Warrants will be the Issue Date.

Each Warrant is linked to the performance of the Class PP interests (the "Interests") of Millennium USA LP (the "Reference Fund"). Each Warrant will entitle you to receive from the Issuer an amount, if any, on the Warrant Payment Date (as defined below) in U.S. dollars based on the value of the Reference Fund, as determined by the Calculation Agent, on the Valuation Date (as defined below).

The Warrants represent an investment that is separate and distinct from an investment in the Reference Fund. Neither the Issuer nor its affiliates or agents is offering any Interest in the Reference Fund. An investment in the Warrants confers no indicia of ownership in the Reference Fund and neither creates nor implies any rights or remedies with respect to the Reference Fund or its affiliates.

The Reference Fund invests in Millennium Partners, L.P. (the "Master Fund"). For purposes of the discussion herein, any reference to the Reference Fund's assets or investments shall include the assets and investments of the Master Fund that are attributable to interests of the Master Fund held by the Reference Fund.

For more information about the Reference Fund, prospective investors are encouraged to review the Confidential Memorandum of the Reference Fund, attached hereto as Exhibit V. Neither the Issuer nor its affiliates or agents has participated in the preparation of any offering or subscription documents for interests of the Reference Fund. Accordingly, neither the Issuer nor its affiliates or agents makes any representation or warranty with respect to the accuracy, validity or completeness of any such information. Investors should conduct their own diligence of the Reference Fund as they would if investing directly in the Reference Fund. None of Millennium Management LLC (the "General Partner"), which acts as the general partner to the

III-14

Reference Fund, the Master Fund, the Reference Fund, or any affiliate of the foregoing sponsors or endorses the Issuer or the Warrants.

The Warrants will be governed by, and construed in accordance with, the laws of the State of New York.

## Exercise and Maturity

The Warrants will be exercised automatically on the Valuation Date. The Warrants are scheduled to mature on [August 3], 2012 (the "Warrant Payment Date"); provided that if the Calculation Agent determines that a Reference Holder (as defined below) would not have received all redemption proceeds by the end of the day on [July 30], 2012, assuming a timely request for redemption by such Reference Holder of the Deemed Quantity of Interests (as defined below) effective as of the Valuation Date, the Warrant Payment Date shall be the earlier of (i) five Business Days after the date that a Reference Holder would have received all such redemption proceeds, as determined by the Calculation Agent and (ii) five Business Days after the thirtieth day following the Audit Date. Each Warrant entitles each holder thereof (a "Holder") to payment of the Warrant Payment Amount (as defined below) on the Warrant Payment Date. The Warrants may only be exercised for cash (U.S. dollars) and Holders will not be entitled to receive any Interests of the Reference Fund.

## Warrant Payment Amount

On the Warrant Payment Date (or if such day is not a Business Day then the immediately succeeding Business Day), Holders will receive, with respect to each Warrant, an amount (the "Warrant Payment Amount") which is the greater of (i) zero and (ii) an amount equal to the Final NAV minus the Strike Price. If the calculation of the Warrant Payment Amount yields an amount less than zero, Holders will not receive a payment from the Issuer, nor will Holders be required to make any payment to the Issuer. A Holder's loss will be limited to the Total Cost paid by such Holder for each Warrant.

"Final NAV" means, as of the Valuation Date, the aggregate redemption proceeds that would be received by a Reference Holder on or prior to the date that is thirty days after the Audit Date, assuming timely submission of a request for redemption of the Deemed Quantity of Interests (as defined below) to be effective as of the Valuation Date, as determined by the Calculation Agent. The Final NAV shall be calculated by deducting from such amount any redemption, management, incentive or administrator fees or other costs (including, without limitation, any applicable withdrawal fee) payable by a Reference Holder in respect of such Deemed Quantity of Interests, to the extent such amounts have not already been deducted by the Reference Fund in calculating the amount of redemption proceeds payable to the Reference Holder, as determined by the Calculation Agent. For the avoidance of doubt, if the Calculation Agent determines that a Reference Holder, assuming timely submission of a request for redemption of the Deemed Quantity of Interests to be effective as of the Valuation Date, would not have received any of the redemption proceeds on or prior to the date that is thirty days after the Audit Date, the Calculation Agent shall determine the Final NAV, which Final NAV may be equal to zero.

"Valuation Date" means [June 30], 2012.

"Audit Date" means, with respect to a date of determination, the Business Day on which the audit of the Reference Fund for the fiscal year in which such date of determination occurs is completed by the Reference Fund's independent auditor.

"Reference Holder" means a hypothetical limited partner of the Reference Fund that is deemed to have the benefits and obligations of an investor owning, during the term of the Warrants, Interests in the Reference Fund, as determined by the Calculation Agent. The Reference Holder will have a tax situs in Delaware. The Reference Holder does not represent an investment in or an Interest in the Reference Fund.

"Strike Price" means 100% of the Initial NAV.

"Initial NAV" means $1,000.

"Deemed Quantity of Interests" means a hypothetical quantity of Interests of the Reference Fund with an aggregate value as of the Issue Date equal to the Initial NAV.

"Business Day" means a day, other than a Saturday or a Sunday, that is neither a legal holiday nor a day on which banking institutions in New York are authorized or obligated by law or executive order to close.

## Liquidity

The Warrants will not be listed on any securities exchange or quotation system and there is no guarantee that a secondary market in the Warrants will develop. The Issuer, the Placement Agent and their affiliates have no obligation to make a market for the Warrants and may cease or alter market-making activities if commenced at any time. To the extent the Placement Agent does effect market-making transactions, the Placement Agent will determine market-making prices, based largely on the factors set forth under *"Risk Factors— Secondary Trading of the Warrants is Limited and They are Subject to Substantial Restrictions on Transferability."*

The Placement Agent intends, but is not obligated, to buy and sell the Warrants. To request a market making transaction, a Holder must provide a signed copy of the form of Market Making Request attached hereto as Exhibit VI. The Market Making Request must be received by the Placement Agent no later than 105 calendar days in advance of the last Business Day of a calendar quarter. The Placement Agent will determine the market making price as of that quarter end. For the avoidance of doubt, until the parties agree to the final terms of any such transaction, the submission of a Market Making Request shall not obligate the Placement Agent or the requesting Holder to enter into a market making transaction. The Placement Agent and its affiliates are not obligated to create a secondary market or to continue such activity once it has begun.

If the Placement Agent agrees to buy a Warrant from a Holder, there will likely be significant delays between the time it agrees to such purchase and the pricing and settlement of such purchase. The Placement Agent may be the only source of price quotes for the Warrants. Any secondary market price quoted by the Placement Agent would reflect any changes in market conditions and other relevant factors, and the quoted price could be higher or lower than the initial purchase price.

In addition, any secondary market purchase of the Warrants by the Placement Agent or any of its affiliates prior to maturity will be at a price that is net of the commissions paid to the Placement Agent as described under "*Plan of Distribution.*" Also, likely to be excluded from the secondary market price quote are the projected profits included in the cost of hedging the Issuer's obligations under the Warrants. In addition, any such prices may differ from values determined by pricing models used by the Calculation Agent, due to dealer discounts, mark-ups, hedge unwinds or other transaction costs. Further, to the extent a Holder submits a Market Making Request to be effective prior to [●], 2009, the secondary market price may be determined as if the net asset value of the Reference Fund were 4% less than its then current value, and to the extent a Holder submits a Market Making Request to be effective prior to [●], 2010, the secondary market price may be determined as if the net asset value of the Reference Fund were 2% less than its then current value. Such 4% and 2% reductions of the net asset value of the Fund corresponds to a 4% and 2% fee that may be paid by a Reference Holder to the Reference Fund in connection with a redemption of its Interests at a similar point in time. As a result, the price at which Holders may sell their Warrants to the Placement Agent or any of its affiliates may be less than Holders' original cost.

**In-Kind Distributions**

If the Reference Fund makes an in-kind payment to its Reference Holders, the Calculation Agent, when it determines the Final NAV, will determine the value of such distribution (including, without limitation, illiquidity discounts, the time remaining until the Warrants are unwound early or exercised, fees, transactions costs and other factors), for the purpose of calculating any related cash settlement amounts due to each Holder.

**Restrictions on "New Issues"**

The Warrants are linked the performance of Interests of the Reference Fund that are restricted from participating in gains or losses attributable to "new issues" investments by the Reference Fund to the extent deemed necessary or advisable by the Reference Fund to comply with Rule 2790 as adopted by the NASD on December 23, 2003, and as may subsequently be modified.

**Early Termination**

The Issuer reserves the right to terminate the Warrants at any time prior to the Warrant Payment Date if at any time before that date, the Calculation Agent determines that an Early Termination Event (as defined below) has occurred. The occurrence of any of the following events may be deemed an "Early Termination Event" by the Calculation Agent:

(1) Reference Fund NAV Decrease Event. The Reference Fund net asset value per share decreases by (i) 10% or more during any month or (ii) 25% or more during any quarter;

(2) Reference Fund Volatility Event. As of any date of determination, the annualized standard deviation of the daily percentage returns of the Reference Fund over the most recent 90 days exceeds 15% (each a "Reference Fund Volatility Event");

(3) <u>Reference Fund Net Capital Event.</u>  The net capital of the Reference Fund for any calendar month drops by 15% or more inclusive of all redemptions and subscriptions but exclusive of any other gains or loss (each a "<u>Reference Fund Net Capital Event</u>");

(4) <u>Master Fund Strategy Event.</u>  The percentage of the Master Fund's risk capital allocated to a Permitted Strategy exceeds the Percentage Limit for such Permitted Strategy as set forth below (each a "<u>Master Fund Strategy Event</u>"):

|   | Permitted Strategy | Percentage Limit |
|---|---|---|
| 1 | Relative Value Sector Arbitrage | 55% |
| 2 | Statistical Arbitrage | 45% |
| 3 | Merger Arbitrage | 20% |
| 4 | Fixed Income Arbitrage | 25% |
| 5 | Distressed | 15% |
| 6 | Futures/Currency Arbitrage | 15% |
| 7 | Closed End/Asset Arbitrage | 18% |
| 8 | Convertibles | 10% |
| 9 | Options Arbitrage | 15% |
| 10 | Other | 10% |

(5) <u>Reference Fund Diversion Event.</u>  Less than 80% of the assets of the Reference Fund is invested (directly or indirectly) in the Master Fund (each a "<u>Reference Fund Diversion Event</u>");

(6) <u>Master Fund AUM Decrease Event.</u>  At any time the Master Fund's total assets under management (i) are less than USD 5,000,000,000 or (ii) decrease by 50% or more within any calendar year when compared to the Master Fund's total assets under management on January 1st of such calendar year (each a "<u>Master Fund AUM Decrease Event</u>");

(7) <u>Key Person Event.</u>  Any two of Israel Englander, David Nolan or Terry Feeney cease to be involved in running the day-to-day operations and management of the General Partner (each a "<u>Key Person Event</u>");

(8) <u>Fund Liquidity Event.</u>  The Reference Fund, with respect to its Class PP shares (i) provides liquidity information less frequently than quarterly, (ii) requires more than 90 days' notice to effect redemptions, (iii) suspends redemptions in whole or in part or (iv) imposes any whole or partial restriction in respect of a redemption or subscription by a Reference Holder (exclusive of the 4% and 2% early withdrawal fee) (each a "<u>Fund Liquidity Event</u>");

(9) <u>Material Adverse Change Event.</u>  The occurrence of a [material adverse change] in the business, properties, operations, assets or liabilities (actual or contingent), or condition (financial or otherwise) of the Reference Fund (each a "<u>Material Adverse Change Event</u>");

(10) <u>Master Fund Concentration Event.</u>  The Master Fund allocates more than 10% of its assets to a single underlying investment (each a "<u>Master Fund Concentration Event</u>");

(11) <u>General Partner Event.</u>  Millennium Management LLC ceases to act as General Partner of the Reference Fund, or such party otherwise ceases to act for the Reference Fund as General Partner for any reason (each a "<u>General Partner Event</u>");

(12) <u>Bankruptcy Event.</u>  The Reference Fund (a) is dissolved or has a resolution passed for its dissolution, winding up, or official liquidation; (b) makes a general assignment or arrangement with or for the benefit of its creditors; (c) becomes insolvent or is unable to pay its debts or fails or admits its inability generally to pay its debts as they become due; (d)(i) institutes or has instituted against it, by a regulator, supervisor or any similar official with primary insolvency, rehabilitative or regulatory jurisdiction over it in the jurisdiction of its incorporation or organization or the jurisdiction of its head or home office, a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation by it or such regulator, supervisor or similar official, or (ii) has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and such proceeding or petition is instituted or presented by a person or entity not described in clause (i) above and either (x) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (y) is not dismissed, discharged, stayed or restrained in each case within [15] days of the institution or presentation thereof; (e) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, or custodian or other similar official for it or for all or substantially all its assets in a proceeding of the type described herein; (f) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within [15] days thereafter; (g) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (a) through (f) above (inclusive); or (h) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts (each a "<u>Bankruptcy Event</u>");

(13) <u>Reference Fund Restatement Event.</u>  The Reference Fund NAV is restated by more than +/- 2% for any month (each a "<u>Reference Fund Restatement Event</u>");

(14) <u>Reporting Failure Event.</u>  The Reference Fund or the Master Fund fails to deliver information that it had previously agreed to deliver or that it had been previously delivering to investors in normal practice that the Calculation Agent deems necessary to determine compliance with the investment guidelines, asset allocation methodologies or any other similar policies of the Reference Fund in a timely manner (each a "<u>Reporting Failure Event</u>");

(15) <u>Misconduct Event.</u>  (a) The Reference Fund, the Master Fund or the General Partner or any of their respective affiliates, employees, officers or agents, breaches any applicable law or regulation, (b) any governmental, legal or regulatory authority or other person brings or threatens to bring an administrative or judicial proceeding, investigation or litigation against any such person (including, in the case of the General Partner, against any other fund managed by the General Partner) or makes or threatens to make any claim, demand, charge or complaint against such person alleging any misconduct, impropriety, illegality, negligence, contractual or fiduciary

breach or other wrongdoing; or (c) the cancellation, suspension, revocation, termination, limitation or qualification of the registration, authorization, licenses, membership or approval of any such person by any governmental, legal or regulatory entity with authority over such person (each a "Misconduct Event");

(16) Change in Law Event. (a) There is a change in any law, regulations, practice or the interpretation of any law, regulations or practice by any court, tribunal or regulatory authority which causes it to become unlawful or inadvisable for the Issuer or any of its affiliates to perform any obligations hereunder or otherwise has material adverse consequences for the Issuer or any of their affiliates including, for greater certainty, with any hedging activity; or (b) there is a change in the legal, tax, accounting or regulatory treatments of the Interests, the Reference Fund or the General Partner that is reasonably likely to have a material adverse consequence for the Reference Fund or the Interests (each a "Change in Law Event");

(17) Reference Fund Modification Event. (a) The modification of the Reference Fund (such as, but not limited to, modification of the organizational documents or any prospectus, offering memorandum, information memorandum or other similar offering document related thereto) in a way that could reasonably be expected to have a material adverse effect on the Final NAV or the rights and remedies of a Reference Holder from those prevailing on the Issue Date (including, without limitations rights of liquidation, transfer or redemption of the Interests), or (b) any event or any change affecting the Reference Fund and/or an Interest thereof (such as, but not limited to, interruption, breakdown, suspension or deferral of the calculation or the publication of the level or value of such Interest, or the disappearance of the level or value of such Interest resulting more particularly from, but not limited to, the winding-up or the termination of such Fund or the cancellation of the registration or of the approval by any relevant authority of the Fund) and that, in the opinion of the Calculation Agent, is likely to have a material effect on the Interests of a Reference Holder (each a "Reference Fund Modification Event");

(18) Merger Event. The conversion of an Interest of the Reference Fund into another series of interests or securities with materially different benefits, rights or obligations, or the split of the Reference Fund, or its consolidation or its merger with or its sale or its conveyance of all or substantially all of its Interests or assets to a third party (each a "Merger Event");

(19) Reference Fund Asset Allocation Event. The announcement or implementation of a material change in the formula for or method of asset allocation or an other material modification, breach or violation of any strategy or investment guidelines of the Reference Fund that is reasonably likely to materially affect any Interests of a Reference Holder, as determined by the Calculation Agent (each a "Reference Fund Asset Allocation Event");

(20) Hedging Disruption Event. (1) The Issuer and/or any of its affiliates is unable, after using commercially reasonable efforts, or it is deemed inadvisable for the Issuer and/or any of its affiliates, to (A) acquire, establish, re-establish, substitute, maintain, unwind or dispose of any transaction(s) or asset(s) it deems necessary to hedge the price risk of the Issuer issuing and performing its obligations with respect to the Warrants, or (B) realize, recover or remit the proceeds of any such transaction(s) or asset(s), including, without limitation, where such inability or impracticability has arisen by reason of (i) any restrictions or increase in charges or fees imposed by the relevant Reference Fund on any investor's ability to redeem such Interest, in whole or in part, or any existing or new investor's ability to make new or additional investments

in such Interest, or (ii) any mandatory redemption, in whole or in part, of such Interest imposed by the relevant Reference Fund (in each case other than any restriction in existence on the date on which such Interest was first included in such a Reference Fund derivative transaction) or (2) the Issuer and/or any of its affiliates is unable, after using commercially reasonable efforts, to determine the value of any hedging position in the Reference Fund for any reason (each, a "Hedging Disruption Event").

(21) Increased Cost of Hedging Event. The Issuer and/or any of its affiliates would incur a materially increased (as compared with circumstances existing as of the Issue Date) amount of tax, duty, expense or fee (other than brokerage commissions) to (1) acquire, establish, re-establish, substitute, maintain, unwind or dispose of any transaction(s) or asset(s) it deems necessary to hedge the price risk of the Issuer issuing and performing its obligations with respect to the Warrants, or (2) realize, recover or remit the proceeds of any such transaction(s) or asset(s) (each, an "Increased Cost of Hedging Event").

(22) Material Contract Event. An event of default or a termination event, however defined, occurs with respect to the Reference Fund under any prime brokerage agreement, any ISDA Master Agreement or other similar derivatives agreement or any other agreement for borrowed money (including, without limitation, any loan agreement or repurchase agreement) (each a "Material Contract Event"); or

(23) Nationalization Event. All the Interests or substantially all the assets of the Reference Fund are nationalized, expropriated or are otherwise required to be transferred to any governmental agency, authority, entity or instrumentality thereof (each a "Nationalization Event").

Upon the occurrence of any of the foregoing events, the Calculation Agent shall determine whether the occurrence of such event constitutes an Early Termination Event. If the Calculation Agent deems the occurrence of such event to be an Early Termination Event and the Issuer determines to terminate the Warrants, the Issuer will notify the Transfer Agent of its intent to terminate the Warrants. Holders will receive the Early Termination Amount (as defined below) on the Early Termination Date. The "Early Termination Date" shall be determined by the Calculation Agent and shall be [five] Business Days following the date on which all redemption proceeds would have been received by a Reference Holder of Interests based on a timely request for redemption by such Reference Holder to be effective as of the Early Termination Valuation Date (as defined below). Notwithstanding the foregoing, in no event will the Early Termination Date occur more than five Business Days after the thirtieth day following the Audit Date in respect of the Early Termination Valuation Date. Upon receipt of notice from the Issuer of its intent to terminate the Warrants following the Early Termination Event, the Transfer Agent will notify each Holder of the Issuer's election to terminate the Warrants in accordance with the Issuing, Paying and Transfer Agency Agreement (as defined below).

"Early Termination Amount" means the amount determined by the Calculation Agent equal to the market value of the Warrant as of the Early Termination Valuation Date, reduced by any losses or costs of the Issuer or its affiliates that are or would be incurred under then prevailing circumstances in closing its or its affiliates' hedge position(s) (including the effect of any withdrawal fees) arising from the occurrence of such Early Termination Event. The "Early Termination Valuation Date" shall be determined by the Calculation Agent and shall be the date

as of which a Reference Holder, which properly submitted a redemption notice to the Reference Fund promptly after such Early Termination Event, would have been able to redeem its Interests. If the Calculation Agent determines that a Reference Holder would not have received all of the redemption proceeds by the thirtieth day after the relevant Audit Date, the Early Termination Amount may be equal to zero. In determining the Early Termination Amount, the Calculation Agent may, but need not, consider any relevant information, including, without limitation, information consisting of relevant market data in the relevant market including, without limitation, relevant rates, prices, yields, volatilities, spreads, correlations or other relevant market data from external or internal sources (including any affiliates of the Calculation Agent) or otherwise.

**Potential Adjustment Event**

Upon the occurrence of a Potential Adjustment Event (as defined below), the Calculation Agent shall make such adjustment to the exercise, settlement, payment or any other terms of the Warrants as the Calculation Agent determines appropriate, and determine the effective times thereof, to account for the economic effect on the Warrants of such Potential Adjustment Event. "Potential Adjustment Event" means any of the following:

(i) a subdivision, reclassification, reorganization, consolidation, increase, reduction by cancellation of the Interests of a Reference Holder, or, a free distribution or dividend of any such Interests to existing holders by way of bonus, capitalization or similar issue;

(ii) a distribution or dividend to existing holders of (a) Interests, or (b) any other interest capital or securities granting the right to payment of dividends and/or the proceeds of liquidation of the Reference Fund equally or proportionately with such payments to holders of such interests, or (c) any other type of securities, rights or warrants or other assets, in any case for payment (cash or other) at less than the prevailing market price as determined by the Calculation Agent;

(iii) an extraordinary dividend;

(iv) a call by the Reference Fund of such Interests in respect of Interests that are not fully paid;

(v) a repurchase by the Reference Fund of Interests whether out of profits or capital and whether the consideration for such repurchase is cash, securities or otherwise; or

(vi) any other similar event.

**Transfer Agent**

Citibank N.A. will act as registrar and Transfer Agent (the "Transfer Agent") for the Warrants pursuant to the terms of an issuing, paying and transfer agency agreement (the "Issuing, Paying and Transfer Agency Agreement"), dated as of [●], 2008 by and between the Issuer and the Transfer Agent. The Transfer Agent's corporate offices are located at 388 Greenwich Street, New York, New York 10013. Pursuant to the terms of the Issuing, Paying and Transfer Agency Agreement, the Transfer Agent has agreed to make payments on behalf of the Issuer and register the transfer or exchange of Warrants. Fees and expenses of the Transfer

Agent will be paid by the Issuer. The Transfer Agent will not be liable for any loss, liability, cost, claim, action, demand or expense (including, without limitation, all costs, charges and expenses paid or incurred in disputing or defending any of the foregoing) arising out of or in relation to or in connection with its appointment or the exercise of its functions, except such as may result from its own willful default or gross negligence or that of its officers or agents. Nothing shall prevent the Transfer Agent or any of its affiliates from dealing in the Warrants or from entering into any related transactions, including any swap or hedging transactions, with the Issuer or any holder of Warrants. The Transfer Agent may resign at any time upon three months written notice, and the Issuer may remove the Transfer Agent at any time upon 30 days written notice. Neither resignation or removal of the Transfer Agent will take effect until a successor Transfer Agent has been appointed.

**Calculation Agent**

Lehman Brothers Inc. will initially serve as calculation agent (the "Calculation Agent") for the Warrants pursuant to the terms of a Calculation Agency Agreement (the "Calculation Agency Agreement"), dated as of [●], 2008, by and between the Issuer and the Calculation Agent, attached to the PPM as Exhibit IV. Except as otherwise provided in the Warrants, all determinations, calculations or valuations made by the Calculation Agent shall be at the sole discretion of the Calculation Agent and, in the absence of manifest error, shall be conclusive for all purposes and binding on the Issuer, the Transfer Agent and each Holder. The Calculation Agent will not be liable for any loss, liability, cost, claim, action, demand or expense (including, without limitation, all costs, charges and expenses paid or incurred in disputing or defending any of the foregoing) arising out of or in relation to or in connection with its appointment or the exercise of its functions, except such as may result from its own willful default or gross negligence or that of its officers or agents. Nothing shall prevent the Calculation Agent or any of its affiliates from dealing in the Warrants or from entering into any related transactions, including any swap or hedging transactions, with the Issuer or any holder of Warrants. The Calculation Agent may resign at any time upon written notice to the Issuer, and the Issuer may remove the Calculation Agent at any time upon written notice to the Transfer Agent. Neither resignation nor removal of the Calculation Agent will take effect until a successor Calculation Agent has been appointed.

**Calculations**

Except as otherwise set forth herein, all calculations made with respect to a Warrant by the Calculation Agent will be calculated to the nearest one hundredth (i.e., to the nearest 0.01), with five one thousandths and greater rounded upwards.

**Form and Transfer**

The Warrants will at all times be represented by definitive warrant certificates representing each Holder's interest, in denominations of one Warrant or multiples thereof. All Warrants owned by customers of Lehman Brothers Inc. shall, absent contrary instructions from a customer, initially be evidenced by one or more Warrants held by, and registered in the name of, Lehman Brothers Inc. Lehman Brothers Inc. will, upon the written request of the beneficial owner of any Warrants so held, deliver to such owner without charge Warrants registered in the

name of the owner. Transfers of the Warrants, to the extent effected only on the books of the Lehman Brothers Inc., shall require the consent of Lehman Brothers Inc.

The Warrants will not be registered under the Securities Act or under the securities laws of any other jurisdiction. The Warrants will be offered and sold only to (i) Accredited Investors who are also Qualified Purchasers or (ii) Non-U.S. Persons, who are also Qualified Purchasers, for purchase in Offshore Transactions. The minimum transfer amount is [393-409] Warrants or a smaller number of Warrants if such number represents the entire number of Warrants held by such transferor and no transfers of Warrants will be effected by the Transfer Agent within five Business Days of the Valuation Date. In addition, no transfer will be permitted unless the transferee has delivered to the Placement Agent or to the Issuer and the Transfer Agent the transfer certificate on the reverse of the Warrants, if applicable, and a transferee representation letter attached to the PPM as Exhibit II and such transfer is otherwise made pursuant to, or in a manner exempt from, the registration requirements of the Securities Act.

**Ratings**

The Warrants will not be rated by any rating agency.

ASSIGNMENT FORM

FOR VALUE RECEIVED, the undersigned hereby sell(s), assign(s) and transfer(s) this Warrant to

(Print or type transferee's name, address and zip code)

(Insert transferee's Social Security or Tax I.D. Number)

and irrevocably appoint _____ to transfer this Warrant on the register of the Issuer or Lehman Brothers Inc., as applicable, with full power of substitution in the premises.

Signature:

Dated: _____

_____

NOTICE: The signature to this assignment must correspond with the name as written upon the face of this Warrant in every particular without alteration or enlargement or any change whatsoever.

III-24

EXHIBIT A-2

## FORM OF TRANSFEREE REPRESENTATION LETTER

Lehman Brothers Inc.
745 Seventh Avenue
New York, NY 10019
Attn: Equity Sales Derivatives

Citibank, N.A.
388 Greenwich Street, 14th Floor
New York, New York 10013
Attention: Citibank Agency & Trust

Re:   [4-Year, 2-Month] Cash-Settled Call Warrants Linked to the Performance
of Millennium USA LP Issued by Lehman Brothers Holdings Inc.

Ladies and Gentlemen:

In connection with the purchase of U.S. $[●] in principal amount of [4-Year, 2-Month] Cash-Settled Call Warrants Linked to the Performance of Millennium USA LP issued by Lehman Brothers Holdings Inc. (the "Issuer"), the undersigned (the "Transferee") hereby agrees with [_____] (the "Transferor") and Lehman Brothers Inc. as follows (defined terms used but not defined herein shall have the meanings given to such terms in the Private Placement Memorandum for the Warrants, dated on or about [●], 2008 (the "PPM")):

On the basis of the representations, warranties and agreements contained herein the Transferor agrees to sell to the Transferee, and the Transferee agrees to purchase from the Transferor, on [●] or on such other date as shall be mutually agreed upon by the Transferor and the Transferee (the "Closing Date"), [●] Warrants at a purchase price of $[●] per Warrant and a total purchase price of $[●] (the "Purchase Price"). The Purchase Price shall be paid by the Transferee on the Closing Date by wire transfer in immediately available funds to account [_____].

The Transferee represents, warrants and covenants to the Transferor and Lehman Brothers Inc. as of the date hereof and as of the Closing Date that:

1.   Private Placement Memorandum. It has been furnished, and has received and reviewed, a copy of the PPM and has made such investigation as it deems necessary to evaluate the merits and risks involved in an investment in the Warrants.

2.   Reference Fund Documents. It acknowledges that neither Lehman Brothers Inc. or its affiliates makes any representations or warranties with respect to the accuracy, validity, or completeness of the information contained in the Confidential Memorandum of Millennium USA LP, attached as Exhibit V to the PPM.

3.    No Registration.  It acknowledges that the Warrants have not been, nor will be, registered under the Securities Act of 1933 (the "Securities Act") or any state securities or blue sky laws or the laws of any other jurisdiction, and the Warrants will bear a legend to such effect. The Warrants are being offered only to (i) "accredited investors" as defined in Rule 501 of Regulation D under the Securities Act who are also "qualified purchasers" as defined in Section 2(a)(51) of the Investment Company Act of 1940 or (ii) "non-U.S. Persons" purchasing in "offshore transactions" (each as defined in Regulation S under the Securities Act, "Non U.S. Persons" and "Offshore Transactions", respectively) who are also Qualified Purchasers.

4.    Non-U.S. Persons.  If the undersigned is a Non-U.S. Person, that prior to the expiration of the Distribution Compliance Period, it will not offer, sell, pledge or otherwise transfer such Warrants except (1) in an Offshore Transaction in accordance with the provisions of Rule 903 or Rule 904 of Regulation S or (2) pursuant to any available exemption from registration under the Securities Act, in each case in accordance with any applicable securities law of any State of the United States or any other jurisdiction.  It understands that prior to the expiration of the Distribution Compliance Period, before any Warrants may be offered, sold, pledged or otherwise transferred, it may be required to provide the Transfer Agent, on behalf of the Issuer, with a written certification as to compliance with applicable securities laws. "Distribution Compliance Period" means the 40-day period commencing on the later of the commencement of the offering or the date the Warrants were originally issued.

5.    Restricted Transfer.  None of the Warrants nor any interest or rights therein may be transferred in the absence of registration under the Securities Act or an exemption from the registration requirements thereof or such other applicable laws, and the Transferee has informed itself about and will observe all restrictions on transfer of the Warrants under such laws that may be applicable to it.  The Transferee will not offer, sell, or deliver at any time, directly or indirectly, the Warrants unless Lehman Brothers Inc. receives a letter in the form hereof from each proposed transferee prior to such sale or transfer.  Furthermore, before any Warrants may be offered, sold, pledged or otherwise transferred, it may be required to provide the Transfer Agent, on behalf of the Issuer, with a written certification as to compliance with applicable securities laws.

6.    Accredited Investor or Non-U.S. Person/Offshore Transaction.  The Transferee is either (a) an Accredited Investor or (b) a Non-U.S. Person and is purchasing the Warrants in an Offshore Transaction.

7.    Experience.  By reason of its business and financial experience the Transferee has such knowledge, sophistication, and experience in business and financial matters that the Transferee is capable of evaluating the merits and risks of the prospective investment in the Warrants. The Transferee has sufficient net worth and/or annual income to hold the Warrants for an indefinite period and can afford to suffer the complete loss of its investment in the Warrants. The undersigned has a non-tax business or financial reason for acquiring the Warrants.

8.    Qualified Purchaser.  The Transferee is a "qualified purchaser" within the meaning of Section 2(a)(51) of the Investment Company Act of 1940, as amended (the "Investment Company Act") because it is either:

III-26

(a)    a person acting for its own account or the accounts of other qualified purchasers, who in the aggregate owns and invests on a discretionary basis, not less than $25,000,000 in "investments" as defined in Rule 2a51-1 under the Investment Company Act ("Investments");

(b)    a natural person (including any person who holds a joint, community property, or other similar shared ownership interest in an issuer that is excepted under Section 3(c)(7) of the Investment Company Act with that person's spouse, who also meets the definition of "qualified purchaser") who owns not less than $5,000,000 in Investments;

(c)    a company that owns not less than $5,000,000 in Investments, was not formed or recapitalized for the specific purpose of making an investment in the Warrants and is owned directly or indirectly by or for two or more natural persons who are related as siblings or spouse (including former spouses), or direct lineal descendants by birth or adoption, spouses of such persons, the estates of such persons, or foundations, charitable organizations, or trusts established by or for the benefit of such persons;

(d)    a trust that is not covered by paragraph c. above and that was not formed or recapitalized for the specific purpose of making an investment in the Warrants, as to which the trustee or other person authorized to make decisions with respect to the trust, and each settlor or other person who has contributed assets to the trust, is otherwise a qualified purchaser; or

(e)    an entity in which each of the beneficial owners of its securities is a qualified purchaser.

9.    <u>Minimum Requirement</u>.  The Transferee is purchasing at least the minimum number of Warrants specified in the PPM.

10.    <u>ERISA</u>.  The Transferee represents and warrants on each date from the date on which the Transferee acquires Warrants that it is not, and it is not acquiring Warrants with the assets of, an employee benefit plan subject to Title I of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), a plan subject to Section 4975 of the Internal Revenue Code of 1986, as amended (the "Code"), a plan subject to any federal, state, local or other law, rule or regulation which is substantially similar to Title I of ERISA or Section 4975 of the Code ("Similar Law") or any entity deemed to hold the assets of any such employee benefit plan or plan for purposes of ERISA, Section 4975 of the Code or Similar Law. Such investor or transferee shall further be deemed to represent and covenant that throughout the period it holds Warrants, the foregoing representations shall be true.

11.    <u>Own Account</u>.  The Transferee is purchasing the Warrants for its own account, or for the accounts of its discretionary advisory clients, in each case for investment purposes, and not with a view to the resale, distribution or other disposition thereof in violation of the Securities Act. The undersigned will not purchase or hold additional Warrants under a different name.

12.    No General Solicitation. The Warrants were not offered or sold to the Transferee by any form of general solicitation or advertising or directed selling efforts, including but not limited to:

(a)    any advertisement, article, notice or other communication published in any newspaper, magazine or similar media or broadcast over television or radio; or

(b)    any seminar or meeting whose attendees were invited by any general solicitation or general advertising.

13.    Information and Independent Investigation. Prior to its purchase of the Warrants the Transferee was given the opportunity (i) to ask questions of, and receive answers from Lehman Brothers Inc. concerning the terms and conditions of the offering and (ii) to obtain any additional information requested concerning the Warrants, to the extent Lehman Brothers Inc. possessed such information or could acquire it without unreasonable effort or expense. In deciding whether to purchase the Warrants, the Transferee has relied upon its own independent appraisal and investigation, and the advice of its own counsel and other advisers, regarding the investment risks and all related matters of law, and has not relied upon any representation or warranty, express or implied, made to it by Lehman Brothers Inc., and the Transferee will continue to be solely responsible for making its own independent appraisal of the investment risks and all such related matters in the future, and will not hereafter rely on Lehman Brothers Inc. to provide any information concerning such matters.

14.    No Representations. The Transferee acknowledges, understands and agrees that the Issuer and Lehman Brothers Inc. have not provided to it any representation or any assurance regarding the legal, tax, credit or accounting consequences to it of investing in the Warrants. The Transferee further represents to Lehman Brothers Inc. that the Transferee has made its own assessment and has not relied on any representation of Lehman Brothers Inc. with respect to the legal, tax, credit or accounting consequences to it of investing in the Warrants.

15.    Tax Treatment. The Transferee agrees to treat the Warrants in accordance with the treatment described in "Certain U.S. Federal Income Tax Considerations" section of the PPM, unless otherwise required by law, for federal income tax purposes.

16.    No Investment or Control. The undersigned represents that it has not disposed of any direct or indirect interest in the Reference Fund immediately prior to acquiring the Warrants. The undersigned further represents that it does not have any control or influence over the Reference Fund that could cause the Reference Fund to alter, or refrain from altering, the composition of its investments or its investment decisions.

17.    [The Transferee, if not a "United States person" (as defined in Section 7701(a)(30) of the Code), either (A) is not a bank (within the meaning of Section 881(c)(3)(A) of the Code) or an Affiliate of a bank or (B) is a Person (or a wholly owned Affiliate of a Person) that is eligible for benefits under an income tax treaty with the United States that eliminates U.S. federal income taxation of U.S. source interest not attributable to a permanent establishment in the United States.]

You are entitled to rely upon this letter and are irrevocably authorized to produce this letter or a copy hereof to any interested party in any administrative or legal proceeding or official inquiry with respect to the matters covered hereby.

IN WITNESS WHEREOF, the Transferee has executed this Transferee Representation Letter this _____ day of _____, 20__.

Very truly yours,

By:_____
　　　　　　　Name of Transferee

Print Name:_____

_____
　　　　　　Number of Warrants

## REQUIRED ACCOUNT INFORMATION

1.   Full legal name: _____

2.   If different, full legal
     name in which Warrants
     to be registered: _____

3.   Taxpayer number: _____

4.   Address for Notices: _____

     _____

     _____

5.   Address for delivery of Warrants (if
     to address or financial custodian other
     than Lehman Brothers Inc.):

     Name of financial institution: _____

     Address: _____

     _____

     _____

     Account #: _____

     Telephone: _____

6.   Account details for payments to the investor:

     Bank Name: _____

     ABA #: _____

     Account #: _____

     For further credit to: _____

     **Reference:** _____

# IV

**EXHIBIT IV**

**FORM OF CALCULATION AGENCY AGREEMENT**

CALCULATION AGENCY AGREEMENT, dated as of [●], 2008 (the "Agreement"), between Lehman Brothers Holdings Inc. (the "Issuer") and Lehman Brothers Inc., as Calculation Agent (the "Calculation Agent").

WHEREAS, the Issuer proposes to issue [4-Year, 2-Month] Cash-Settled Call Warrants Linked to the Performance of Millennium USA LP (each a "Warrant" and collectively "Warrants") in an aggregate amount of $[●]. Each Warrant is a senior, unsecured debt security of the Issuer whose value is linked to the Class PP interests of Millennium USA LP;

WHEREAS, the Warrants will be issued under a Issuing, Paying and Transfer Agency Agreement (the "Transfer Agreement"), dated as of [●], 2008, between the Issuer and Citibank, N.A., as Transfer Agent (the "Transfer Agent"); and

WHEREAS, the Issuer requests the Calculation Agent to perform certain services described herein in connection with the Warrants;

NOW THEREFORE, the Issuer and the Calculation Agent agree as follows:

1.   Certain Definitions.   Terms not otherwise defined herein are used herein as defined in the Transfer Agreement.

2.   Appointment of Agent.   The Issuer hereby appoints Lehman Brothers Inc. as Calculation Agent and Lehman Brothers Inc. hereby accepts such appointment as the Issuer's agent for the purpose of performing the services hereinafter described upon the terms and subject to the conditions hereinafter mentioned.

3.   Calculations and Information Provided.   In response to a request made by the Transfer Agent or the Issuer for a determination of the amount to be paid at the Warrant Payment Date of the Warrants following an acceleration, redemption by a Holder, redemption by the Issuer, or the maturity thereof, the Calculation Agent shall determine such amount, and any other determination or calculation that it is required to make as specified in the Private Placement Memorandum of the Warrants, and notify the Transfer Agent of its determination.

4.   Calculations.   Any calculation or determination by the Calculation Agent pursuant hereto shall (in the absence of manifest error) be final and binding.   Any calculation made by the Calculation Agent hereunder shall, at the Transfer Agent's request, be made available at the Transfer Agent's corporate trust office as set forth in the Transfer Agreement.

5. <u>Fees and Expenses</u>.  The Calculation Agent shall be entitled to reasonable compensation for all services rendered by it as agreed to between the Calculation Agent and the Issuer.

6. <u>Terms and Conditions</u>.  The Calculation Agent accepts its obligations herein set out upon the terms and conditions hereof, including the following, to all of which the Issuer agrees:

   i.  in acting under this Agreement, the Calculation Agent is acting solely as an independent expert on behalf of the Issuer and does not assume any obligation toward, or any relationship of agency or trust for or with, any of the holders of the Warrants;

   ii.  unless otherwise specifically provided herein, any order, certificate, notice, request, direction or other communication from the Issuer or the Transfer Agent made or given under any provision of this Agreement shall be sufficient if signed by any person who the Calculation Agent reasonably believes to be a duly authorized officer or attorney in fact of the Issuer or the Transfer Agent, as the case may be;

   iii.  the Calculation Agent shall be obliged to perform only such duties as are set out specifically herein and any duties necessarily incidental thereto;

   iv.  the Calculation Agent, whether acting for itself or in any other capacity, may become the owner or pledgee of Warrants with the same rights as it would have had if it were not acting hereunder as Calculation Agent; and

   v.  the Calculation Agent shall incur no liability hereunder except for loss sustained by reason of its gross negligence or willful misconduct.

7. <u>Resignation; Removal; Successor</u>.  (a) The Calculation Agent may at any time resign by giving written notice to the Issuer of such intention on its part, specifying the date on which its desired resignation shall become effective, subject to the appointment of a successor Calculation Agent and acceptance of such appointment by such successor Calculation Agent, as hereinafter provided. The Calculation Agent hereunder may be removed at any time by the filing with it of an instrument in writing signed by or on behalf of the Issuer and specifying such removal and the date when it shall become effective. Such resignation or removal shall take effect upon the appointment by the Issuer, as hereinafter provided, of a successor Calculation Agent and the acceptance of such appointment by such successor Calculation Agent. In the event a successor Calculation Agent has not been appointed and has not accepted its duties within 90 days of the Calculation Agent's notice of resignation, the Calculation Agent may apply to any court of competent jurisdiction for the designation of a successor Calculation Agent.

   In case at any time the Calculation Agent shall resign, or shall be removed, or shall become incapable of acting, or shall be adjudged bankrupt or

insolvent, or make an assignment for the benefit of its creditors or consent to the appointment of a receiver or custodian of all or any substantial part of its property, or shall admit in writing its inability to pay or meet its debts as they mature, or if a receiver or custodian of it or all or any substantial part of its property shall be appointed, or if any public officer shall have taken charge or control of the Calculation Agent or of its property or affairs, for the purpose of rehabilitation, conservation or liquidation, a successor Calculation Agent shall be appointed by the Issuer by an instrument in writing, filed with the successor Calculation Agent. Upon the appointment as aforesaid of a successor Calculation Agent and acceptance by the latter of such appointment, the Calculation Agent so superseded shall cease to be Calculation Agent hereunder.

Any successor Calculation Agent appointed hereunder shall execute, acknowledge and deliver to its predecessor, to the Issuer and to the Transfer Agent an instrument accepting such appointment hereunder and agreeing to be bound by the terms hereof, and thereupon such successor Calculation Agent, without any further act, deed or conveyance, shall become vested with all the authority, rights, powers, trusts, immunities, duties and obligations of such predecessor with like effect as if originally named as Calculation Agent hereunder, and such predecessor, upon payment of its charges and disbursements then unpaid, shall thereupon become obligated to transfer, deliver and pay over, and such successor Calculation Agent shall be entitled to receive, all moneys, securities and other property on deposit with or held by such predecessor, as Calculation Agent hereunder.

Any corporation into which the Calculation Agent hereunder may be merged or converted or any corporation with which the Calculation Agent may be consolidated, or any corporation resulting from any merger, conversion or consolidation to which the Calculation Agent shall be a party, or any corporation to which the Calculation Agent shall sell or otherwise transfer all or substantially all of the assets and business of the Calculation Agent shall be the successor Calculation Agent under this Agreement without the execution or filing of any paper or any further act on the part of any of the parties hereto.

8. Indemnification. The Issuer will indemnify the Calculation Agent against any losses or liability which it may incur or sustain in connection with its appointment or the exercise of its powers and duties hereunder except such as may result from the gross negligence or willful misconduct of the Calculation Agent or any of its agents or employees. The Calculation Agent shall incur no liability and shall be indemnified and held harmless by the Issuer for or in respect of any action taken or suffered to be taken in good faith by the Calculation Agent in reliance upon written instructions from the Issuer.

9. Notices. Any notice required to be given hereunder shall be delivered in person, sent (unless otherwise specified in this Agreement) by letter, telex or facsimile transmission or communicated by telephone (confirmed in a writing dispatched within two Business Days), (a) in the case of the Issuer, to it at 745 Seventh

IV-3

Avenue, New York, New York 10019 (facsimile: (646) 758-3204) (telephone: (212) 526-7000), Attention: Treasurer, with a copy to 399 Park Avenue, New York, New York 10022 (facsimile: (212) 526-0357) (telephone: (212) 526-7000), Attention: Corporate Secretary, (b) in the case of the Calculation Agent, to it at 745 Seventh Avenue, New York, New York 10019 (facsimile: (646) 885 9292) (telephone: (212) 526-0905), Attention: Structured Equity Products, (c) in the case of notices to the Transfer Agent, to it at 388 Greenwich Street, New York, New York 10013 (telefax: (212) 657 4024), Attention: Agency and Trust, (d) in the case of presentation and surrender of securities to the Transfer Agent, to it at 111 Wall Street, New York, New York 10043, Attention: Agency and Trust, or, in any case, to any other address or number of which the party receiving notice shall have notified the party giving such notice in writing. Any notice hereunder given by telex, facsimile or letter shall be deemed to be served when in the ordinary course of transmission or post, as the case may be, it would be received.

10.  <u>Governing Law</u>.  This Agreement shall be governed by and continued in accordance with the laws of the State of New York.

11.  <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.

12.  <u>Benefit of Agreement</u>.  This Agreement is solely for the benefit of the parties hereto and their successors and assigns, and no other person shall acquire or have any rights under or by virtue hereof.

IN WITNESS WHEREOF, this Agreement has been entered into as of the day and year first above written.

LEHMAN BROTHERS HOLDINGS INC.
as Issuer


By:_____
    Name:
    Title:


LEHMAN BROTHERS INC.
as Calculation Agent


By:_____
    Name:
    Title:

V

**EXHIBIT V**

**CONFIDENTIAL MEMORANDUM OF
MILLENNIUM USA LP**

**AND**

**SUPPLEMENT TO APPENDIX 1 TO PART ONE OF THE CONFIDENTIAL
MEMORANDUM OR MILLENNIUM USA LP**

*This Confidential Memorandum of Millennium USA LP is provided to you solely in connection with the issuance of [4-Year, 2-Month] Cash-Settled Call Warrants Linked to the Performance of Millennium USA LP (the "Warrants"), issued by Lehman Brothers Inc. (the "Issuer"). This Confidential Memorandum is supplemental to the Private Placement Memorandum for the Warrants, dated on or about [●], 2008 and does not constitute an offer of interests in Millennium USA LP.*

*Neither the Issuer nor its affiliates or agents have participated in the preparation of any offering or subscription documents for interests Millennium USA LP. Accordingly, neither the Issuer nor its affiliates or agents makes any representation or warranty with respect to the accuracy, validity or completeness of any such information. Investors should conduct their own diligence of the Reference Fund as they would if investing directly in the Reference Fund.*

US0109 (Lehman)

# CONFIDENTIAL MEMORANDUM

### Relating to

### Class OO and Class PP Interests

of

# MILLENNIUM USA, L.P.

---

THIS CONFIDENTIAL MEMORANDUM IS COMPRISED OF TWO PARTS, WHICH MUST BE READ TOGETHER. THIS PART ONE CONTAINS INFORMATION SPECIFIC TO MILLENNIUM USA, L.P. AND PART TWO CONTAINS INFORMATION SPECIFIC TO MILLENNIUM PARTNERS, L.P., IN WHICH THE MAJORITY OF THE ASSETS OF MILLENNIUM USA, L.P. ARE INVESTED.

---

*General Partner:*
Millennium Management, L.L.C.
666 Fifth Avenue, 8th Floor
New York, New York 10103-0899
Telephone: (212) 841-4100

June 1, 2007

US0109 (Lehman)

PURSUANT TO AN EXEMPTION FROM THE COMMODITY FUTURES TRADING COMMISSION IN CONNECTION WITH POOLS WHOSE PARTICIPANTS ARE LIMITED TO QUALIFIED ELIGIBLE PERSONS, AN OFFERING MEMORANDUM FOR THIS POOL IS NOT REQUIRED TO BE, AND HAS NOT BEEN, FILED WITH THE COMMISSION. THE COMMODITY FUTURES TRADING COMMISSION DOES NOT PASS UPON THE MERITS OF PARTICIPATING IN A POOL OR UPON THE ADEQUACY OR ACCURACY OF AN OFFERING MEMORANDUM. CONSEQUENTLY, THE COMMODITY FUTURES TRADING COMMISSION HAS NOT REVIEWED OR APPROVED THIS OFFERING OR ANY OFFERING MEMORANDUM FOR THIS POOL.

YOU SHOULD ALSO BE AWARE THAT THIS COMMODITY POOL MAY TRADE FOREIGN FUTURES OR OPTIONS CONTRACTS, EITHER DIRECTLY OR INDIRECTLY, THROUGH ITS INVESTMENT IN MILLENNIUM PARTNERS, L.P. TRANSACTIONS ON MARKETS LOCATED OUTSIDE THE UNITED STATES, INCLUDING MARKETS FORMALLY LINKED TO A UNITED STATES MARKET, MAY BE SUBJECT TO REGULATIONS WHICH OFFER DIFFERENT OR DIMINISHED PROTECTION TO THE POOL AND ITS PARTICIPANTS. FURTHER, UNITED STATES REGULATORY AUTHORITIES MAY BE UNABLE TO COMPEL THE ENFORCEMENT OF THE RULES OF REGULATORY AUTHORITIES OR MARKETS IN NON-UNITED STATES JURISDICTIONS WHERE TRANSACTIONS FOR THE POOL MAY BE EFFECTED.

This Confidential Memorandum relates to an offering of Class OO interests (the "Class OO Offered Interests") and Class PP interests (the "Class PP Offered Interests," and together with the Class OO Offered Interests, the "Offered Interests") of Millennium USA, L.P. ("Millennium USA"). The Offered Interests generally have the same rights and characteristics, except that the Class PP Offered Interests do not participate in transactions involving "new issues" (as such term is defined by the National Association of Securities Dealers, Inc.).

The Class OO and Class PP Offered Interests permit withdrawal, in whole or in part, as of the last day of each calendar quarter, subject to the timely receipt of a notice of withdrawal. However, it should be noted that: (a) all withdrawals of Class OO and Class PP Offered Interests will be subject to a gate (as described under "Millennium USA's Organization, Management, Structure, and Operations – Withdrawal Rights – Gates") that may limit the amount any single investor may withdraw on a single withdrawal date, (b) withdrawals of Offered Interests occurring before the last day of the fourth full calendar quarter after purchase of such Offered Interests will be subject to a charge equal to 4% of the withdrawal amount, and (c) withdrawals of Offered Interests occurring on or after the last day of the fourth full calendar quarter after purchase of such Offered Interests but before the last day of the eighth full calendar quarter after purchase of such Offered Interests will be subject to a charge equal to 2% of the withdrawal amount. The charges described above will be allocated to Millennium USA for the benefit of the non-withdrawing investors (which includes Millennium Management).

The Offered Interests are suitable only for sophisticated investors (i) that do not require immediate liquidity for their investments, (ii) for which an investment in Millennium USA does not constitute a complete investment program, and (iii) that fully understand and are willing to assume the risks involved in Millennium USA's investment program. Millennium USA's investment practices, by their nature, may be considered to involve a substantial degree of risk. (See "Certain Risk Factors Relating to Millennium USA" and "Millennium USA's Investment Program and Strategy"). Millennium USA carries out its investment and trading activities primarily by investing in Millennium Partners, L.P. (the "Master Partnership"), a Cayman Islands exempted limited partnership initially organized in 1989 as a Delaware limited partnership, but it may also trade and invest part of its capital for its own account.

Prospective purchasers should carefully read this Confidential Memorandum in its entirety (including both Part One, which discusses Millennium USA, and Part Two, which discusses the Master Partnership). The contents of

US0109 (Lehman)

this Confidential Memorandum, however, should not be considered legal or tax advice and each prospective purchaser should consult with its own counsel and advisers as to all matters concerning an investment in Millennium USA.

There will be no public offering of the Offered Interests. No offer to sell (or solicitation of an offer to buy) will be made in any jurisdiction in which such offer or solicitation would be unlawful.

This Confidential Memorandum has been prepared solely for the information of the prospective purchaser to whom it has been delivered on behalf of Millennium USA and may not be reproduced or used for any other purpose. Notwithstanding anything herein to the contrary, the prospective purchaser (and each employee, representative, or other agent of such prospective purchaser) may disclose to any and all persons, without limitation of any kind, the tax treatment and structure of (i) Millennium USA, (ii) any of its transactions, and (iii) all materials of any kind (including opinions or other tax analyses) that are provided to the investor relating to such tax treatment and tax structure. For this purpose, "tax treatment and structure" is limited to facts relevant to the U.S. federal and state income tax treatment of the transactions of Millennium USA and does not include information relating to the identity of any partner (other than Millennium Management, L.L.C.), its affiliates, agents or advisors. Each person accepting this Confidential Memorandum agrees to return it to Millennium USA promptly upon request by Millennium Management. This Confidential Memorandum is accurate as of its date, and no representation or warranty is made as to its continued accuracy after such date.

As part of its responsibility for the prevention of money laundering, Millennium USA (and any person acting on its behalf) reserves the right to require such information as is necessary to verify the identity of a prospective purchaser, limited partner, or any beneficial owner underlying the account of a prospective purchaser or a limited partner, and the source of any payment by or on behalf of a prospective purchaser or a limited partner. In the event of delay or failure by the prospective purchaser or limited partner to produce any information required for verification purposes, Millennium USA may refuse to accept a subscription or may cause the withdrawal of any such limited partner from Millennium USA.

---

NO OFFERING LITERATURE OR ADVERTISING IN WHATEVER FORM WILL BE EMPLOYED IN THE OFFERING OF THE OFFERED INTERESTS EXCEPT FOR THIS CONFIDENTIAL MEMORANDUM, STATEMENTS CONTAINED HEREIN AND WRITTEN MATERIALS SPECIFICALLY APPROVED BY MILLENNIUM MANAGEMENT. NO PERSON HAS BEEN AUTHORIZED TO MAKE ANY REPRESENTATION OR GIVE ANY INFORMATION WITH RESPECT TO THE OFFERED INTERESTS, EXCEPT THE INFORMATION CONTAINED HEREIN.

---

IN MAKING AN INVESTMENT DECISION, PROSPECTIVE PURCHASERS MUST RELY UPON THEIR OWN EXAMINATION OF MILLENNIUM USA AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED.

---

THE OFFERED INTERESTS ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM, AND IN COMPLIANCE WITH THE TERMS OF THE ORGANIZATIONAL DOCUMENTS OF MILLENNIUM USA. PROSPECTIVE PURCHASERS SHOULD BE AWARE THAT THEY MAY BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME. PROSPECTIVE PURCHASERS MUST REPRESENT THAT THEY ARE ACQUIRING THE OFFERED INTERESTS FOR INVESTMENT.

10424212.4

US0109 (Lehman)

EACH PROSPECTIVE PURCHASER IS INVITED TO MEET WITH REPRESENTATIVES OF MILLENNIUM MANAGEMENT TO DISCUSS WITH, ASK QUESTIONS OF, AND RECEIVE ANSWERS FROM SUCH PERSONS CONCERNING THE TERMS AND CONDITIONS OF THIS OFFERING OF THE OFFERED INTERESTS, AND TO OBTAIN ANY ADDITIONAL INFORMATION, TO THE EXTENT NECESSARY FOR A PROSPECTIVE PURCHASER TO MAKE AN INFORMED INVESTMENT DECISION.

*    *    *    *

10424212.4

US0109 (Lehman)

# TABLE OF CONTENTS

### PART ONE:
### INFORMATION RELATING TO THE OFFERING AND MILLENNIUM USA, L.P.

Summary of Part One of the Confidential Memorandum ............................................................... I-1
The Partnership ............................................................................................................................... I-10
Interests Offered; Terms of the Offering ...................................................................................... I-10
Certain Risk Factors Relating to Millennium USA ...................................................................... I-12
Suitability Requirements; Limitations on Transferability of Interests of Millennium USA ....... I-15
Millennium USA's Investment Program and Strategy .................................................................. I-16
Use of Proceeds by Millennium USA ........................................................................................... I-17
Millennium USA's Organization, Management, Structure, and Operations ................................ I-17
Management of Millennium USA ................................................................................................... I-24
Fees and Expenses Relating to Millennium USA ......................................................................... I-24
Allocation of Gains and Losses ..................................................................................................... I-25
Outline of the Partnership Agreement ........................................................................................... I-27
Certain Tax Matters Relating to an Investment in Millennium USA ........................................... I-32
ERISA Considerations Relating to an Investment in Millennium USA ....................................... I-48
Millennium USA's Fiscal Year ...................................................................................................... I-51
Millennium USA's Legal Counsel ................................................................................................. I-52
Millennium USA's Independent Public Accountants .................................................................... I-52
Appendix I to Part One: Five Year Performance History

### PART TWO:
### INFORMATION RELATING TO MILLENNIUM PARTNERS, L.P.

Summary of Part Two of the Confidential Memorandum ........................................................ II-1
The Master Partnership's Investment Program and Strategy ................................................... II-7
The Master Partnership's Organization ................................................................................... II-7
Certain Risk Factors Relating to an Investment in the Master Partnership ............................. II-11
The Master Partnership's Management, Structure and Operations .......................................... II-30
The Master Partnership's Investment Program and Description: Eligible Investments .......... II-35
The Master Partnership's Investment Program and Description: Investment Strategies ........ II-36
The Master Partnership's Investment Program and Description: Brokerage Issues ................ II-41
The Master Partnership's Investment Program and Description: Leverage and Loans ........... II-42
The Master Partnership's Risk Management Program .............................................................. II-43
The Master Partnership's Fees and Expenses ........................................................................... II-45
Related-Party Transactions; Conflicts ..................................................................................... II-45
Certain Tax Matters Relating to the Master Partnership .......................................................... II-48
Certain Legal and Regulatory Matters Relating to the Master Partnership .............................. II-49
Litigation ................................................................................................................................. II-51
The Master Partnership's Fiscal Year ...................................................................................... II-52
The Master Partnership's Independent Public Accountants ..................................................... II-52

US0109 (Lehman)

### Summary of Part One of the Confidential Memorandum
### (Information Relating to Millennium USA, L.P.)

The following is a summary of certain information set forth more fully elsewhere in this Confidential Memorandum and the Sixth Amended and Restated Limited Partnership Agreement (the "Partnership Agreement") of Millennium USA, L.P. ("Millennium USA"). This summary should be read in conjunction with, and is qualified in its entirety by, such detailed information.

**The Partnership:**  Millennium USA is a Delaware limited partnership formed in November 1997. Millennium USA primarily invests its capital in Millennium Partners, L.P. (the "Master Partnership"). For a more detailed description of Millennium USA and its investment strategy, see "The Partnership" and "Millennium USA's Investment Program and Strategy," below. For a description of the Master Partnership, see Part Two of this Confidential Memorandum. Investors in Millennium USA are referred to herein as the "Limited Partners."

**Interests Offered:**  This Confidential Memorandum relates to an offering of Class OO and Class PP interests (collectively, the "Offered Interests") of Millennium USA.

The minimum initial subscription for an investment in Millennium USA is $5,000,000 and subsequent subscriptions may be made in $500,000 increments. Millennium Management, L.L.C. ("Millennium Management"), the general partner of Millennium USA and the general partner of the Master Partnership, may permit Millennium USA to accept subscriptions of a lesser amount or establish different minimums in the future. Millennium Management reserves the right to reject a subscription in its sole and absolute discretion.

Offered Interests are generally sold only as of the first business day of a calendar month; monies received prior to the first business day of the month will be held by Millennium USA or its agent and will not earn any return based on Millennium USA's performance during that period. In the sole and absolute discretion of Millennium Management, subscriptions may be accepted after the first business day of a calendar month, but (i) under no circumstances may subscriptions for a given month be accepted after the fifteenth calendar day of that month and (ii) any such subscription, if accepted, will be deemed to have been invested on the first business day of such calendar month and will be assessed an interest charge at a daily rate determined by Millennium USA for the portion of the month preceding the date of acceptance. See "Interests Offered; Terms of the Offering – Interests Offered." A

US0109 (Lehman)

business day is any day on which banks in New York City are open for business.

**Purchaser Qualifications:**

The Offered Interests are intended for prospective purchasers that are "qualified purchasers" (as such term is defined in Section 2(a)(51) of the Investment Company Act of 1940, as amended), are U.S. taxable investors, and are persons for which such an investment is otherwise appropriate.

As a condition to the acceptance of any subscription for Offered Interests, each prospective purchaser will be required to complete (to the satisfaction of Millennium Management) and sign a subscription agreement certifying certain matters in a form to be provided by Millennium Management.

Millennium Management may require such certifications, representations, and undertakings as it deems reasonable, including representations as to the net worth of a prospective purchaser.

Millennium Management reserves the right to reject a subscription in its sole and absolute discretion. If a subscription is rejected, the unused subscription monies will be returned, without interest, and at the risk and cost of the applicant, to the applicant's account from which the monies were originally remitted.

**Millennium USA's Investment Program and Strategy:**

The investment objective of Millennium USA is to achieve above-average capital appreciation by opportunistically trading and investing in an extremely wide variety of securities, instruments, and other investment opportunities and engaging in a broad array of trading and investment strategies. THERE ARE NO SUBSTANTIVE LIMITS ON THE INVESTMENT STRATEGIES THAT MAY BE PURSUED BY MILLENNIUM USA. See "Millennium USA's Investment Program and Strategy" and the entirety of Part Two of this Confidential Memorandum.

As discussed in "Millennium USA's Investment Program and Strategy," Millennium USA carries out its investment and trading activities primarily by investing in the Master Partnership, but it will also trade and invest part of its capital for its own account, when presented with investment opportunities that are appropriate for it and its investors but that may be inappropriate (for tax or other reasons) for other direct or indirect investors in the Master Partnership. Similarly, such other investors may have the benefit of investments not appropriate for Millennium USA; therefore, returns among the Affiliated Funds (as defined in Part Two of

US0109 (Lehman)

|   |   |
|---|---|
| | this Confidential Memorandum) may differ. |
| **Certain Risk Factors:** | The investment program of the Master Partnership, and therefore of Millennium USA, involves significant risks, including the Master Partnership's reliance upon Millennium Management (and portfolio managers selected by Millennium Management), limitations on withdrawals, the use of leverage, trading in derivative instruments, and conflicts of interest related to investment opportunities and business activities among the Master Partnership's affiliates and their management. Prospective purchasers are urged to carefully review the sections titled "Certain Risk Factors Relating to Millennium USA" below and "Certain Risk Factors Relating to an Investment in the Master Partnership" in Part Two of this Confidential Memorandum. |
| **"New Issues":** | The Class PP Offered Interests (as well as certain other previously issued and outstanding classes) will not participate in gains and losses from "new issues" (as such term is defined by the National Association of Securities Dealers, Inc.). As a matter of fairness, a use of funds charge at a rate determined by Millennium Management may be debited from the capital accounts of the holders of the classes of Millennium USA interests participating in profits and losses from new issues and credited to the capital accounts of the holders of all interests of Millennium USA. This process is described in greater detail under "Interests Offered; Terms of the Offering – Interests Offered – Treatment of New Issues." Policies with respect to the allocation of new issues (and related charges) may be revised at any time. |
| **Sales Charges:** | Unless otherwise disclosed to an investor, there will be no sales charges payable to Millennium USA or Millennium Management in connection with the offering of Offered Interests. To the extent any such charges are paid from an investor's funds, the investor's actual investment in the Offered Interests will be reduced. |
| **Limitations on Transferability:** | As described below under "Suitability Requirements; Limitations on Transferability of Interests of Millennium USA," each investor will be required to agree (i) that no Offered Interests, nor any interest therein, may be pledged, transferred or assigned without the prior consent of Millennium Management (except by operation of law), which consent may be withheld in the discretion of Millennium Management, and (ii) that, prior to considering any request to permit a transfer of Offered Interests, Millennium Management may require the submission of a certification by |

US0109 (Lehman)

the proposed transferee as to the matters discussed in that section under "– Suitability Requirements" as well as such other documents, representations or undertakings as Millennium Management considers appropriate.

**Use of Proceeds by Millennium USA:**

Net proceeds received by Millennium USA from the sale of Offered Interests will be employed by Millennium USA in accordance with its investment program. See "Use of Proceeds by Millennium USA."

**Withdrawal Rights:**

As described under "Millennium USA's Organization, Management, Structure, and Operations – Withdrawal Rights," withdrawals from capital accounts relating to Offered Interests generally may be made, in whole or in part, upon 90 days' prior written notice, as of the last day of each calendar quarter, subject to the Gate and any applicable Early Withdrawal Charge, described below.

The "Gate" for Class OO and Class PP Offered Interests being withdrawn at any withdrawal date, taken together, is equal to the greater of:

(x) US$20 million, and
(y) 8% of the aggregate of:
  (i)   the net asset value reflected in the capital accounts relating to all outstanding Class OO interests,
  (ii)  the net asset value reflected in the capital accounts relating to all outstanding Class PP interests, and
  (iii) the net asset value of the corresponding shares of Millennium International, Ltd. ("Millennium International")

all as of the applicable quarterly withdrawal date.

In the event the aggregate net asset value of the Class OO and Class PP interests (and the corresponding classes of shares of Millennium International) that investors request be withdrawn or redeemed as of a quarterly withdrawal date (prior to giving effect to any Early Withdrawal Charges) exceeds the Gate, all such requests may be reduced, *pro rata*, to the maximum amount allowable under the Gate.

It should be noted that holders of Class U, V, W, and X Interests will have the opportunity to exchange their interests for Class OO and Class PP Offered Interests, and such interests received in exchange will be subject to the above-described Gate.

Millennium Management may in its sole and absolute

US0109 (Lehman)

discretion permit a withdrawal at intervals other than those set forth above, waive the application of the Gate or convert Offered Interests into interests of another class with substantially the same rights and characteristics if it determines that such a withdrawal or conversion would be permitted by the Partnership Agreement and by applicable law.

As described below under "Millennium USA's Organization, Management, Structure, and Operations," withdrawals are generally calculated net of any applicable incentive allocation, the Early Withdrawal Charge, and subject to any reserves and holdbacks. In general, approximately 90% of the aggregate withdrawal amount is paid within 30 days following the applicable withdrawal date and the remainder is paid within 30 days after completion of the audit of Millennium USA's books for the applicable fiscal year.

**Limitation on Withdrawals; Compulsory Withdrawal:**

Millennium Management may, in its discretion, hold back a portion of the withdrawal proceeds payable to a Limited Partner in respect of Offered Interests being withdrawn (whether such withdrawal is voluntary or compulsory) to satisfy contingent or expected liabilities. In addition, withdrawals may be suspended if required to ensure compliance with applicable law. Withdrawals may also be suspended if Millennium Management reasonably deems it appropriate to do so to ensure compliance with applicable anti-money laundering regulations. See "Millennium USA's Organization, Management, Structure and Operations – Withdrawal Rights" and "- Suspension for Anti-Money Laundering Purposes." A breach of a covenant under an agreement relating to indebtedness of the Master Partnership, could trigger an acceleration of debt thereunder, reducing or eliminating equity withdrawals from the Master Partnership by Millennium USA. See "Certain Risk Factors Relating to Millennium USA – Limitation on Withdrawals" herein and "Certain Risk Factors Relating to an Investment in the Master Partnership - Certain Market and Investment Risks - Indebtedness" in Part Two of this Confidential Memorandum.

Millennium Management reserves the right, subject to applicable laws, upon not less than five days' prior written notice, to require any investor to withdraw all or any portion of its interests at any time for any reason or no reason. See "Millennium USA's Organization, Management, Structure, and Operations – Compulsory Withdrawal."

**Early Withdrawal Charges:**

Withdrawals of Class OO or PP Offered Interests occurring before the last day of the fourth full calendar quarter after

US0109 (Lehman)

purchase of such Offered Interests (other than due to the occurrence of a Trigger Event, described below) will be subject to a charge equal to 4% of the withdrawal amount. Withdrawals of Class OO or PP Offered Interests occurring on or after the last day of the fourth full calendar quarter after purchase of such Offered Interests but before the last day of the eighth full calendar quarter after purchase of such Offered Interests will be subject to a charge equal to 2% of the withdrawal amount. The charges described above will be allocated to Millennium USA for the benefit of the non-withdrawing investors (including Millennium Management).

For purposes of determining whether Class OO or Class PP Offered Interests that were received by a Limited Partner in exchange for other classes of interests of Millennium USA will be subject to an Early Withdrawal Charge, the Class OO or PP Offered Interests being withdrawn will be deemed to have been owned for the amount of time such exchanged classes of interests were owned, plus the amount of time the Class OO or Class PP Offered Interests (as the case may be) have been owned.

For example:

- If an investor in Millennium USA owns a Class W interest for four full calendar quarters and subsequently exchanges such Class W interest for a Class OO Offered Interest, which that investor holds for one calendar quarter, and then submits a withdrawal request for that Class OO Offered Interest, the withdrawal amount would be subject to a 2% Early Withdrawal Charge.

- If an investor in Millennium USA owns a Class W interest for four full calendar quarters and subsequently exchanges such Class W interest for a Class OO Offered Interest, which that investor holds for four calendar quarters, and then submits a withdrawal request for that Class OO Offered Interest, the withdrawal amount would not be subject to an Early Withdrawal Charge.

**Special Withdrawal Right upon a Trigger Event:** Millennium Management will promptly notify the investors in the event of the death, disability, adjudication of incompetency, bankruptcy, insolvency or withdrawal from the general partner of the Master Partnership of Israel A. Englander (a "Trigger Event"). Following such an event, each

US0109 (Lehman)

Limited Partner will be given a special right to withdraw any amount from its capital accounts. Special provision is also made for "Possible Trigger Events" when an event occurs, but it cannot be quickly determined whether it resulted in a disability that rises to the level of a Trigger Event. (See "Millennium USA's Organization, Management, Structure, and Operations – Withdrawal Rights – Special Withdrawal Right upon a Trigger Event.")

**General Partner; Incentive Allocation:**

The general partner of Millennium USA is Millennium Management. Israel A. Englander is the managing member of Millennium Management. Millennium Management also serves as the general partner of the Master Partnership. See "The Master Partnership's Management, Structure and Operations – Management" in Part Two of this Confidential Memorandum for a description of certain control relationships.

As described below under "Allocation of Gains and Losses," at the end of each fiscal year of Millennium USA, or at such other date during a fiscal year as of which the following reallocation is required, 20% of the aggregate net capital appreciation of Millennium USA for the year will be reallocated to Millennium Management as its incentive allocation.

**Dissolution of Millennium USA:**

Millennium Management has the right to compulsorily effect a withdrawal of all issued interests of Millennium USA and dissolve Millennium Management at any time (including during a fiscal year) and for any reason. See "Outline of the Partnership Agreement – Term; Dissolution."

**Fees and Expenses Relating to Millennium USA:**

As described below under "Fees and Expenses Relating to Millennium USA," Millennium USA is responsible for:

- all fees and expenses incurred by it acting on its own behalf;

- a fee equal to a *pro rata* portion of the expenses of a payroll company, MPG Operations, L.L.C. and its affiliates (which expenses include compensation paid to portfolio managers and other employees, subcontractors and agents that directly or indirectly provide services to the Master Partnership and its affiliates); and

- a *pro rata* portion of any other expenses of the Master Partnership, including fees paid to investment advisers engaged directly by the Master Partnership and its subsidiaries.

**Taxation:**

Schulte, Roth & Zabel, LLP, counsel to Millennium USA,

US0109 (Lehman)

have rendered an opinion that Millennium USA and the Master Partnership each will be classified as a partnership and not as an association taxable as a corporation for federal tax purposes. Such counsel also has rendered its opinion, based upon the nature of the income that Millennium USA and the Master Partnership expect to realize or the number of partners in Millennium USA and the Master Partnership, that neither Millennium USA nor the Master Partnership will be treated as a "publicly traded partnership" taxable as a corporation. Accordingly, neither Millennium USA nor the Master Partnership should be subject to federal income tax, and each Limited Partner will be required to report on its own annual tax return such Limited Partner's distributive share of Millennium USA's taxable income or loss.  (See "Certain Tax Matters Relating to an Investment in Millennium USA.")

**ERISA and Other Tax-Exempt Entities:**

Tax-exempt entities subject to the U.S. Employee Retirement Income Security Act of 1974, as amended ("ERISA"), and other tax-exempt entities may purchase Offered Interests. Millennium USA does not intend to permit investments by "benefit plan investors" (as defined in Section 3(42) of ERISA and any regulations promulgated thereunder) to equal or exceed 25% of the value of any class of Offered Interests (or such greater percentage as may be purchased that would not, in the judgment of Millennium Management, adversely affect the structure and operations of Millennium USA or Millennium Management).  Investment in Millennium USA by tax-exempt entities subject to ERISA and other tax-exempt entities requires special consideration.  In particular, Millennium USA may utilize leverage in connection with its trading activities, which could give rise to "unrelated business taxable income." Accordingly, tax-exempt entities should consider making an investment in Millennium International.   Trustees or administrators of such tax-exempt entities are urged carefully to review the matters discussed in this Confidential Memorandum, including the discussion under "ERISA Considerations Relating to an Investment in Millennium USA."

**Litigation:**

Withdrawals with respect to certain classes of interests issued prior to January 1, 2004 (and the corresponding classes of shares and interests of the other funds investing in the Master Partnership) are subject to holdbacks in respect of liabilities related to the mutual fund trading matters discussed in "Litigation" in Part Two of this Confidential Memorandum. The Offered Interests will not be allocated expenses relating to

US0109 (Lehman)

such litigation.

**Anti-Money Laundering Considerations:**    As part of Millennium USA's responsibility for the prevention of money laundering, Millennium USA and its agents will require a detailed verification of the identity of a prospective purchaser of record and the source of payment. In the event of delay or failure by the applicant to produce any information required for verification purposes, Millennium USA and its agents may refuse to accept the application and the subscription monies relating thereto.    See "Anti-Money Laundering Considerations."

US0109 (Lehman)

PART ONE: INFORMATION SPECIFIC TO THE OFFERING AND MILLENNIUM USA

### The Partnership

This Confidential Memorandum relates to an offering of Class OO interests (the "Class OO Offered Interests") and Class PP interests (the "Class PP Offered Interests," and together with the Class OO Offered Interests, the "Offered Interests") of Millennium USA, L.P. ("Millennium USA"). The Offered Interests are intended for prospective purchasers that are U.S. taxable investors and are persons for which such an investment is otherwise appropriate. Investors in Millennium USA are referred to herein as the "Limited Partners." The Limited Partners, together with Millennium Management, L.L.C. ("Millennium Management"), are referred to herein as the "Partners." The Offered Interests, together with all other interests in Millennium USA, are referred to herein as the "Interests."

Millennium USA, along with Millennium International, Ltd. ("Millennium International"), accepts investments from outside investors and primarily invests its capital in Millennium Partners, L.P. (the "Master Partnership"), although it will make separate investments from time to time as discussed below under "Millennium USA's Investment Program and Strategy." A third fund, Millennium Global Estate, LP ("Millennium Global Estate"), also invests in the Master Partnership as part of a broader investment strategy. The Master Partnership and its investment program are described in detail in Part Two of this Confidential Memorandum.

### Interests Offered; Terms of the Offering

*Interests Offered*

Certain Characteristics of the Offered Interests. All offers are made subject to the approval of Millennium Management, the general partner of Millennium USA and the general partner of the Master Partnership. Millennium Management reserves the right to reject a subscription in its sole and absolute discretion.

Offered Interests are generally sold only as of the first business day of a calendar month. Monies received prior to the first business day of the month will not earn any return based on Millennium USA's performance during this period. In the sole and absolute discretion of Millennium Management, subscriptions may be accepted after the first business day of a calendar month. A prospective purchaser whose subscription is accepted by Millennium Management on a day subsequent to the first business day of the month, for whatever reason (including, without limitation, because the prospective purchaser's subscription agreement and supporting documentation were not deemed to be complete on such first business day) will be deemed to have been invested on the first business day of such calendar month and an interest charge at a daily rate determined by Millennium Management for the portion of the month preceding the date of acceptance will be assessed against the capital account of the *applicable* Limited Partner. A business day is any day on which banks in New York City are open for business.

There will be no public market for the Offered Interests, and they will not be transferable except under certain limited exceptions. (See "Suitability Requirements; Limitations on

US0109 (Lehman)

Transferability of Interests of Millennium USA.") Holders of other direct or indirect interests in Millennium USA or the Master Partnership may have the right to withdraw their interests pursuant to different and more favorable terms than are applicable to holders of the Offered Interests.

As a condition to the acceptance of any subscription for Offered Interests, each prospective purchaser will be required to complete and sign a subscription agreement (the "Subscription Agreement") in a form to be provided by Millennium Management. Under the terms of the Subscription Agreement, each Limited Partner agrees to notify Millennium Management promptly if there is any change with respect to (i) any information or representation made by or on behalf of such Limited Partner in a Subscription Agreement or (ii) any other information provided to or reasonably requested by Millennium USA. Millennium USA may also require such additional certifications, representations, and undertakings as it deems reasonable, including representations as to the net worth of a prospective purchaser.

Minimum Subscription. The minimum initial subscription for an investment in Millennium USA is $5,000,000 and additional subscriptions following an initial investment may be made in $500,000 increments. Millennium Management may accept subscriptions of a lesser amount or establish different minimums in the future. Millennium Management reserves the right to reject a subscription in its sole and absolute discretion.

Sales Charges and Commissions. Unless otherwise disclosed to an investor, there will be no sales charges payable to Millennium USA or Millennium Management in connection with the offering of Offered Interests. To the extent any such charges are paid from an investor's funds, the investor's actual investment in the Offered Interests will be reduced.

Withdrawals. As described under "Millennium USA's Organization, Management, Structure, and Operations – Withdrawal Rights," withdrawals from the capital accounts relating to the Offered Interests generally may be made, in whole or in part, upon 90 days' prior written notice as of the last day of each calendar quarter (subject to the Gate and any applicable Early Withdrawal Charge). Withdrawals of Offered Interests occurring before the last day of the eighth full calendar quarter after purchase of such Offered Interests will be subject to an Early Withdrawal Charge as described in greater detail below. The "Gate" for Class OO and Class PP Offered Interests being withdrawn at any Withdrawal Date (as defined below), taken together, is equal to the greater of (x) US$20 million and (y) 8% of the aggregate of:

(i)     the net asset value reflected in the capital accounts relating to all outstanding Class OO interests,

(ii)    the net asset value reflected in the capital accounts relating to all outstanding Class PP interests, and

(iii)   the net asset value of the corresponding shares of Millennium International as of the applicable quarterly Withdrawal Date.

In the event the aggregate net asset value of the Class OO and Class PP interests (and the corresponding classes of shares of Millennium International) that investors request be withdrawn or redeemed as of a quarterly Withdrawal Date (prior to giving effect to any Early Withdrawal Charge) exceeds the Gate, all such requests may be reduced, *pro rata*, to the maximum amount allowable under the Gate.

US0109 (Lehman)

It should be noted that holders of Class U, V, W, and X Interests will have the opportunity to exchange their interests for Class OO and Class PP Offered Interests, and such interests received in exchange will be subject to the above-described Gate.

Withdrawals of Class OO or PP Offered Interests occurring before the last day of the fourth full calendar quarter after purchase of such Offered Interests (other than due to the occurrence of a Trigger Event, described below) will be subject to a charge equal to 4% of the withdrawal amount. Withdrawals of Class OO or PP Offered Interests occurring on or after the last day of the fourth full calendar quarter after purchase of such Offered Interests but before the last day of the eighth full calendar quarter after purchase of such Offered Interests will be subject to a charge equal to 2% of the withdrawal amount. The charges described above will be allocated to Millennium USA for the benefit of the non-withdrawing investors (including Millennium Management).

For purposes of determining whether Class OO or Class PP Offered Interests that were received by a limited partner, in exchange for other classes of interests of Millennium USA will be subject to an Early Withdrawal Charge, the Class OO or PP Offered Interests being withdrawn will be deemed to have been owned for the amount of time such exchanged classes of interests were owned, plus the amount of time the Class OO or Class PP Offered Interests (as the case may be) have been owned.

Treatment of New Issues. The Class PP Offered Interests (as well as the previously issued and outstanding Class B, Class D, Class N, Class P, Class R, Class T, Class V, and Class X interests (collectively with the Class PP Offered Interests, the "Restricted Classes")) will not participate in gains and losses from "new issues" (as such term is defined by the National Association of Securities Dealers, Inc. (the "NASD")).

As a matter of fairness, a use of funds charge at a rate determined by Millennium Management may (but is not required to) be debited from the capital accounts of all Partners holding Class OO Offered Interests and other classes of Interests participating in profits and losses from new issues (each, an "Unrestricted Class") and credited to the capital accounts of all Partners *pro rata* in accordance with their opening capital accounts for the applicable accounting period.

If a Partner in an Unrestricted Class subsequently becomes restricted from the purchase of new issues, the interest in the Unrestricted Class held by such Partner may be converted, in the sole discretion of Millennium Management, into an interest in the corresponding Restricted Class.

Millennium Management reserves the right to vary its policy with respect to the allocation of new issues (and related charges) as it deems appropriate for Millennium USA as a whole, in light of, among other things, existing interpretations of, and amendments to, the NASD's rules and practical considerations, including administrative burdens and principles of fairness and equity.

### Certain Risk Factors Relating to Millennium USA

Risk Factors Relevant to the Master Partnership. Part Two of this Confidential Memorandum contains a description of risk factors relevant to an investment in the Master

US0109 (Lehman)

Partnership. As Millennium USA primarily invests its assets in the Master Partnership, the risk factors described in Part Two of this Confidential Memorandum likewise apply to an investment in Millennium USA and should be carefully reviewed before any investment is made.

Limitation on Withdrawals. Millennium Management may, in its discretion, hold back a portion of the withdrawal proceeds payable to a Limited Partner in respect of Offered Interests being withdrawn (whether such withdrawal is voluntary or compulsory) to satisfy contingent or expected liabilities. In addition, withdrawals may be suspended if required to ensure compliance with applicable law.    Withdrawals may also be suspended if Millennium Management reasonably deems it appropriate to do so to ensure compliance with applicable anti-money laundering regulations.    See "Millennium USA's Organization, Management, Structure and Operations – Withdrawal Rights" and "- Suspension for Anti-Money Laundering Purposes." A breach of a covenant under an agreement relating to indebtedness of the Master Partnership could trigger an acceleration of debt thereunder, reducing or eliminating equity withdrawals from the Master Partnership by Millennium USA.    See "Certain Risk Factors Relating to an Investment in the Master Partnership - Certain Market and Investment Risks - Indebtedness" in Part Two of this Confidential Memorandum.

Limitations on Transferability. As discussed below under "Suitability Requirements; Limitations on Transferability of Interests of Millennium USA," the Offered Interests may not be pledged, transferred, or assigned without the prior written consent of Millennium Management (except by operation of law). Any attempted pledge, transfer, or assignment without such consent may be treated as void or may subject such Offered Interests to a compulsory withdrawal. Prospective purchasers and prospective transferees must represent that they are purchasing the Offered Interests for investment and meet other suitability requirements established by Millennium Management. There is no independent market for the purchase or sale of Offered Interests, and none is expected to develop. All of these factors increase the risk that an investor will not be able to liquidate or monetize its investment in the Offered Interests quickly or at a price that approximates the fair market value of the Offered Interests.

Compensation of Millennium Management. The Incentive Allocation (defined below under "Allocation of Gains and Losses") – which arrangement was arrived at without negotiation with any third party – may, under some circumstances, create an incentive to cause Millennium Management and the Master Partnership to make investments that are riskier or more speculative than would be the case if such compensation were not performance-based, particularly in any period after losses have been suffered. Further, individual Portfolio Managers (as defined in Part Two of this Confidential Memorandum), who are generally compensated based on their performance, may have similar incentives to engage in more speculative activities than would be the case if such compensation were not performance-based.

In addition, because Millennium Management's Incentive Allocation is calculated on a basis that includes unrealized appreciation of Millennium USA's assets, it may be greater than if such allocation was based solely on realized gains.

As discussed below under "Fees and Expenses Relating to Millennium USA," Millennium USA indirectly will be responsible for a (generally *pro rata*) portion of the expenses, salaries, fringe benefits, bonuses, fees and incentive compensation (collectively "Compensation") paid to the Portfolio Managers and other employees and consultants.

US0109 (Lehman)

Compensation expenses may also include management or "base" fees that may be charged by certain Portfolio Managers or third party funds. This obligation is satisfied, in most cases, either by a direct payment by Millennium USA to MPG Operations, L.L.C. ("MPG Operations"), a limited liability company formed for the purpose of employing and engaging personnel to service the Millennium entities, by payment to other entities performing similar functions, or by a reduction in Millennium USA's capital account by the Master Partnership. This obligation in respect of Portfolio Manager Compensation is separate from and in addition to the Incentive Allocation.

Pass-Through of Expenses. Partners of Millennium USA bear their respective allocable portions of (i) Millennium USA's *pro rata* portion of the Master Partnership's costs and expenses as well as (ii) all of Millennium USA's costs and expenses (including the amounts payable to MPG Operations and its affiliates). This structure may create less of an incentive for Millennium Management to reduce operating and Compensation expenses than an alternative structure (such as a fixed management fee based on the amount of assets under management) would if the same personnel and opportunities were available under both structures. (See "Fees and Expenses Relating to Millennium USA.")

Distributions in Kind. Millennium Management does not currently intend to, but may, in its discretion, distribute securities or other property of Millennium USA in lieu of cash upon any withdrawal.

Contingency Reserves and Holdbacks. Millennium Management may, at any time or times, establish reserves (whether or not in accordance with U.S. generally accepted accounting principles ("GAAP")) for estimated or accrued expenses, liabilities or contingencies, including in connection with the dissolution of Millennium USA or any downsizing of Millennium USA following a Trigger Event (as defined below). If reserves are established that are not in accordance with GAAP, they will be treated in the same manner as reserves that are in accordance with GAAP, *i.e.*, in the period in which they are taken they shall be treated as an expense of Millennium USA (and will reduce the net assets of Millennium USA), and, if and to the extent that they are subsequently reversed they will be taken into income in the period of such reversal (and will to that extent increase the net assets of Millennium USA). The establishment of such reserves will not insulate any portion of Millennium USA's assets from being at risk, and such assets may still be traded by the Master Partnership.

In addition to the power to establish reserves, Millennium Management, in its discretion, may hold back a portion of the amount payable to a Limited Partner in respect of a withdrawal (whether such withdrawal is voluntary or compulsory) to satisfy contingent or expected liabilities. The amount of the withdrawal proceeds held back will be determined by Millennium Management, in its sole discretion, taking into account such factors as it considers relevant with respect to any contingent or expected liability. Such holdbacks will reduce the amount paid to a withdrawing Limited Partner. The unused portion of any holdback will be distributed to the Limited Partner to which the holdback applied after Millennium Management has determined that the need therefor has ceased.

Deferred Compensation. An affiliate of Millennium Management, Millennium International Management, L.P. ("Millennium International Management"), serves as the investment manager of Millennium International. Millennium International also invests

US0109 (Lehman)

primarily in the Master Partnership. Millennium International Management has a deferred incentive fee agreement with Millennium International pursuant to which it may defer compensation otherwise payable to it by Millennium International, which compensation may earn a return indexed to the performance of Millennium International. In addition, personnel retained by MPG Operations and its affiliates participate in compensation deferral programs that earn returns indexed to the performance of Millennium International or of certain of the trading groups trading for the Master Partnership and/or its subsidiaries. These deferred amounts may be (and in some cases are) leveraged through borrowings that are non-recourse to Millennium International's assets and may enjoy more favorable liquidity rights than are generally available to direct or indirect investors in the Master Partnership.

_Internal Valuations._   Millennium Management, and not an independent third party, performs the net asset value calculations for the Master Partnership (which directly affects the valuation of interests in Millennium USA). While Millennium Management may seek and rely upon independent sources of data (and, where appropriate, multiple sources of data) in computing a valuation, the lack of a third party performing the calculation may be a risk to investors and should be considered by any prospective purchasers of the Offered Interests.

_Tax-Exempt Investors._   Certain prospective purchasers may be subject to federal and state laws, rules and regulations which may regulate their participation in Millennium USA, or their engaging directly, or indirectly through an investment in Millennium USA, in investment strategies of the types which the Master Partnership or Portfolio Managers may utilize from time-to-time (_e.g._, leverage, the purchase and sale of options and limited diversification). While Millennium USA believes the Master Partnership's investment program is generally appropriate for tax-exempt organizations for which an investment in Millennium USA would otherwise be suitable, each type of exempt organization may be subject to different laws, rules and regulations, and prospective investors should consult with their own advisers as to the advisability and tax consequences of an investment in Millennium USA (and consider the alternative of investing in Millennium International). Since the Master Partnership is permitted to borrow, tax-exempt Limited Partners may incur income tax liability to the extent of their share of Millennium USA's share of the Master Partnership's "unrelated business taxable income." Trustees or administrators of entities subject to ERISA and other tax-exempt entities should consult their own legal and tax advisers.

## Suitability Requirements; Limitations on Transferability of Interests of Millennium USA

_Suitability Requirements_

Each investor is required to represent that the Offered Interests are being acquired for its own account, for investment, and not with a view to resale or distribution. The Offered Interests are suitable investments only for sophisticated investors for which an investment in Millennium USA does not constitute a complete investment program, and that fully understand, are willing to assume, and have the financial resources necessary to withstand the risks involved in Millennium USA's investment program and to bear the potential loss of their entire investment in the Offered Interests.

US0109 (Lehman)

Investors in Millennium USA must be "accredited investors" as defined in Rule 501 under the Securities Act of 1933, as amended (the "Securities Act") and "qualified purchasers" as such term is defined in Section 2(a)(51) of the Investment Company Act of 1940, as amended (the "Investment Company Act"), and must meet other suitability requirements.

Each prospective purchaser is urged to consult with its own advisors to determine the suitability of an investment in the Offered Interests, and the relationship of such an investment to the prospective purchaser's overall investment program and financial and tax position. Each purchaser of an Offered Interest is further required to represent that, after all necessary advice and analysis, its investment in Millennium USA is suitable and appropriate in light of the foregoing considerations. Prior to any subscription for Offered Interest, each prospective purchaser must represent in writing, by completing and signing the subscription documents, that it meets the suitability standards referred to in this Confidential Memorandum. Millennium Management has the right to reject a subscription for any reason or for no reason, even if the prospective purchaser satisfies Millennium USA's suitability requirements.

*Limitations on Transfer; Restrictions on Pledging Offered Interests*

Each investor must bear the economic risk of the investment for an extended period of time (subject to the limited rights of withdrawal described herein).

Each investor will be required to agree (i) that no Offered Interests, nor any interest therein, may be pledged, transferred, or assigned without the prior written consent of Millennium Management (except by operation of law), which consent may be withheld in the discretion of Millennium Management, and (ii) that, prior to considering any request to permit transfer of Offered Interests, Millennium Management may require the submission by the proposed transferee of a certification as to the matters referred to in the preceding paragraphs as well as such other documents, representations or undertakings as Millennium Management considers appropriate. Millennium Management may refuse to issue, register or permit the transfer of Offered Interests if it is not satisfied that such issuance, registration or transfer is consistent with the best interests of Millennium USA. In addition, no Offered Interests may be issued, registered or transferred to any non-U.S. Person, directly or indirectly.

Purchasers of Offered Interests that desire to pledge, transfer, assign, or otherwise dispose of Offered Interests should assume that they will not receive any help or assistance from Millennium Management in that regard.

Each purchaser of Offered Interests will be required to agree that any attempted pledge, transfer or assignment of Offered Interests in violation of the foregoing restrictions shall be invalid.

## Millennium USA's Investment Program and Strategy

The investment objective of Millennium USA is to achieve above-average capital appreciation by opportunistically trading and investing in an extremely wide variety of securities, instruments, and other investment opportunities and engaging in a broad array of trading and investment strategies. THERE ARE NO SUBSTANTIVE LIMITS ON THE INVESTMENT STRATEGIES THAT MAY BE PURSUED BY MILLENNIUM USA.

US0109 (Lehman)

Millennium USA carries out its investment and trading activities primarily by investing in the Master Partnership, but it will also to some degree trade and invest part of its capital for its own account, primarily when investment opportunities are appropriate for it and its investors for tax or other reasons, but are not appropriate for other (direct or indirect) investors in the Master Partnership. Similarly, such other investors may have the benefit of investments not appropriate for Millennium USA; therefore, returns among the Affiliated Funds (as defined in Part Two of this Confidential Memorandum) may differ. (See "Related Party Transactions: Conflicts - Allocation of Investments to Affiliated Funds" in Part Two of this Confidential Memorandum.)

The Master Partnership's investment program and the strategies it employs are described in Part Two of this Confidential Memorandum and, except as otherwise indicated in this Part One of the Confidential Memorandum, should be construed as also being the investment program and strategies of Millennium USA insofar as Millennium USA invests through the Master Partnership.

### Use of Proceeds by Millennium USA

Net proceeds received by Millennium USA from the sale of Offered Interests will be employed by Millennium USA in accordance with its investment program. This means that the net proceeds will be invested primarily in the Master Partnership and used by the Master Partnership in its investment program, although a portion of the net proceeds received by Millennium USA may be employed in direct investments made by Millennium USA. (See "Millennium USA's Investment Program and Strategy.")

### Millennium USA's Organization, Management, Structure, and Operations

*Organization*

Millennium USA is a Delaware limited partnership formed in November 1997. Millennium USA's principal office is located at 666 Fifth Avenue, 8th Floor, New York, New York 10103-0899.

*Master-Feeder Relationship*

As discussed in Part Two of this Confidential Memorandum under "The Master Partnership's Organization – Organization," the master-feeder relationship between the Master Partnership and Millennium USA has been structured, among other reasons, to give U.S. taxpayers an opportunity to invest in the Master Partnership indirectly.

US0109 (Lehman)

*Capital Structure*

Millennium USA's interests outstanding as of the date hereof are as follows:

| Class Designation | Withdrawal Rights | New Issue Eligibility |
|---|---|---|
| Class A | Each December 31[1] | Eligible |
| Class B | Each December 31[1] | Not Eligible |
| Class C | Quarterly, with a gate[1] | Eligible |
| Class D | Quarterly, with a gate[1] | Not Eligible |
| Class M | Annual | Eligible |
| Class N | Annual | Not Eligible |
| Class O | Quarterly, with a gate | Eligible |
| Class P | Quarterly, with a gate | Not Eligible |
| Class OO[2] | Quarterly, with a gate | Eligible |
| Class PP[2] | Quarterly, with a gate | Not Eligible |
| Class Q | Annual | Eligible |
| Class R | Annual | Not Eligible |
| Class S | Quarterly, with a gate | Eligible |
| Class T | Quarterly, with a gate | Not Eligible |
| Class U[3] | Annual | Eligible |
| Class V[3] | Annual | Not Eligible |
| Class W[3] | Quarterly, with a gate | Eligible |
| Class X[3] | Quarterly, with a gate | Not Eligible |

[1] *Holders of Class A, Class B, Class C, and Class D interests have certain rights to exchange interests with quarterly withdrawal rights (but that are subject to a gate) for interests with annual withdrawal rights, and vice versa.*
[2] *Class OO and PP interests are subject to Early Withdrawal Charges as described in this Memorandum.*
[3] *Classes U, V, W, and X interests may not be withdrawn until the end of the eighth full calendar quarter following purchase; they are exchangeable for Class OO or PP Offered Interests.*

Interests of each class of Millennium USA participate equally in the profits and losses of Millennium USA, except that interests that are offered and sold solely to persons that are restricted from participating in new issues will not directly or indirectly participate in the gains and losses from new issues (see "Interests Offered; Terms of the Offering – Interests Offered – Treatment of New Issues"). In addition, it is intended that the expenses incurred in defending and settling investigations and actions relating to certain practices that have been characterized as "market timing" and "late trading" in shares of mutual funds shall be borne by certain classes of interests issued prior to January 1, 2004. The Offered Interests will not be allocated expenses relating to such litigation. (See "Litigation – Settlement Relating to Mutual Fund Trading" in Part Two of this Confidential Memorandum.)

Millennium International and Millennium USA have a variety of classes of shares and interests, respectively, outstanding and, in some instances, have additional contractual (or "side letter") agreements with particular investors. The provisions of the different classes of outstanding shares or interests, and of such contractual undertakings, are not uniform, with the

US0109 (Lehman)

effect that some investors in the funds to some degree have different rights and entitlements from those of other investors, which may be true even though the fundamental economic terms of the investments are otherwise identical. Such differing provisions relate primarily to redemption rights (the frequency of permissible redemptions, the notice period required for redemption, and the circumstances under which accelerated redemption is permissible) and the detail and frequency with which information is provided regarding returns or broad portfolio segment information. With respect to the outstanding classes of interests in Millennium USA, the principal such differences are described under the caption "Millennium USA's Organization, Management, Structure, and Operations – Capital Structure." With respect to contractual arrangements or undertakings, Millennium International and Millennium USA have had a policy of entering into such agreements rarely and in limited circumstances, such as in connection with employee deferred compensation arrangements, and give careful consideration to relevant legal and fiduciary obligations in connection with any such agreements. With the exception of agreements related to such deferred compensation arrangements, Millennium USA and Millennium International no longer enter into any such side letter agreements. In the sole discretion of Millennium Management, (i) Millennium USA may issue other classes of interests in the future that may differ in terms of, among other things, denomination of currency, the fees charged, minimum commitment amounts, withdrawal rights and other rights, (ii) Millennium Management may establish and designate such new classes of interests without the approval of the Limited Partners, (iii) Millennium Management will determine the terms of such classes and (iv) Millennium Management may combine classes of interests or convert one class into another class, in each case, so long as such action does not adversely affect the terms of the other classes of interests in any material respect.

*Withdrawal Rights*

Capital accounts with respect to the Class OO and Class PP Offered Interests may be withdrawn, in whole or in part, upon 90 days' prior written notice, as of the last day of each calendar quarter, subject to the Gate and any applicable Early Withdrawal Charge, described below.

Millennium Management may in its sole and absolute discretion permit a withdrawal at a date earlier than that set forth above (and may enter into written agreements with individual investors providing for different withdrawal rights) if it determines that such a withdrawal (or such different withdrawal rights) would be permitted by the limited partnership agreement of Millennium USA (the "Partnership Agreement") and by applicable law.

Gates. The "Gate" for the Class OO and Class PP Offered Interests is equal to the greater of (x) US$20 million and (y) 8% of the aggregate net asset value of (i) the net asset value reflected in the capital accounts relating to all outstanding Class OO interests, (ii) the net asset value reflected in the capital accounts relating to all outstanding Class PP interests, and (iii) the net asset value of the corresponding shares of Millennium International, all as of the applicable quarterly Withdrawal Date. In the event the aggregate net asset value of the Class OO and Class PP interests (and the corresponding classes of shares of Millennium International) that investors request be withdrawn or redeemed as of a quarterly Withdrawal date (prior to giving effect to any Early Withdrawal Charges) exceeds the Gate, all such requests may be reduced, *pro rata*, to the maximum amount allowable under the Gate. An investor will be required to submit an

US0109 (Lehman)

additional withdrawal notice to the extent such investor seeks to withdraw any remaining balance of its withdrawal request on a subsequent quarterly Withdrawal Date. This gate does not take into account any other classes of interests of Millennium USA, any other classes of shares in Millennium International, or any interests in Millennium Global Estate.

It should be noted that holders of Class U, V, W, and X Interests will have the opportunity to exchange their interests for Class OO and Class PP Offered Interests, and such interests received in exchange will be subject to the above-described Gate.

The outstanding Class W and Class X interests of Millennium USA have quarterly withdrawal rights and are subject to a gate that limits withdrawal in respect of those classes (and the corresponding classes of shares of Millennium International) to the greater of (x) US$20 million and (y) 10% of the aggregate net asset value of (i) all outstanding Class W and Class X interests that are no longer in their initial two-year lock-up period and (ii) the net asset value of the capital accounts relating to the corresponding interests in Millennium International (if any), all as of the applicable withdrawal date. This gate does not take into account any other classes of interests of Millennium USA, any other classes of shares in Millennium International, or any interests in Millennium Global Estate.

The outstanding Class O, Class P, Class S and Class T interests of Millennium USA have quarterly withdrawal rights and are subject to a gate that limits withdrawal of those classes (and the corresponding classes of shares of Millennium International), to the greater of (x) $20 million and (y) 10% of the aggregate capital accounts of those four classes and the corresponding shares of Millennium International, as of that quarterly Withdrawal Date. This gate does not take into account any other classes of interests of Millennium USA, any other classes of shares in Millennium International, or any interests in Millennium Global Estate.

The outstanding Class C and Class D interests of Millennium USA have quarterly withdrawal rights and are subject to a gate that limits withdrawal of those classes (and the corresponding classes of shares of Millennium International), to the greater of (x) $24 million and (y) 12% of the aggregate capital accounts of those two classes and the corresponding shares of Millennium International, as of that quarterly Withdrawal Date. This gate does not take into account any other classes of interests of Millennium USA, any other classes of shares in Millennium International, or any interests in Millennium Global Estate.

In its sole discretion, Millennium USA may (but is not required to), waive the application of the Gate in any single instance or as a generally applicable matter.

Early Withdrawal Charge. Withdrawals of Class OO and Class PP Offered Interests occurring before the last day of the fourth full calendar quarter after purchase of such Offered Interests (unless due to the occurrence of a Trigger Event described below) are subject to a charge equal to 4% of the withdrawal amount, and withdrawals of Offered Interests occurring on or after the last day of the fourth full calendar quarter after purchase of such Offered Interests but before the last day of the eighth full calendar quarter after purchase of such Offered Interests (unless due to the occurrence of a Trigger Event described below) are subject to a charge equal to 2% of the withdrawal amount (the "Early Withdrawal Charge"). The charges described above will be allocated to Millennium USA for the benefit of the non-withdrawing investors (including Millennium Management).

US0109 (Lehman)

For purposes of determining whether Class OO or Class PP Offered Interests that were received by a limited partner in exchange for other classes of interests of Millennium USA will be subject to an Early Withdrawal Charge, the Class OO or PP Offered Interests being withdrawn will be deemed to have been owned for the amount of time such exchanged classes of interests were owned, plus the amount of time the Class OO or Class PP Offered Interests (as the case may be) have been owned.  For example:

- If an investor in Millennium USA owns a Class W interest for four full calendar quarters and subsequently exchanges such Class W interest for a Class OO Offered Interest, which that investor holds for one calendar quarter, and then submits a withdrawal request for that Class OO Offered Interest, the withdrawal amount would be subject to a 2% Early Withdrawal Charge.

- If an investor in Millennium USA owns a Class W interest for four full calendar quarters and subsequently exchanges such Class W interest for a Class OO Offered Interest, which that investor holds for four calendar quarters, and then submits a withdrawal request for that Class OO Offered Interest, the withdrawal amount would not be subject to an Early Withdrawal Charge.

Withdrawal Price; Payments.  Each date as of which capital accounts with respect to Offered Interests are withdrawn is referred to herein as a "Withdrawal Date."  Generally, payment of approximately 90% of the withdrawal request (calculated on the basis of unaudited data as of the Withdrawal Date, subject to reserves for contingencies (including general reserves for unspecified potential contingencies) and holdbacks), net of any applicable Incentive Allocation as of the close of business at the end of the applicable fiscal quarter and net of any applicable Early Withdrawal Charge, will be made within 30 days following the applicable Withdrawal Date.  Millennium USA will pay interest on the balance of such withdrawal request at the average (calculated weekly) per annum short-term (13-week) U.S. Treasury Bill rate, and such balance (together with all interest) will be paid, subject to audit adjustments, within 30 days after completion of the next audit of Millennium USA.

Withdrawals by an investor that has made more than one capital contribution with respect to a purchase of Offered Interests will be deemed to be made on a first-in first-out basis absent specific instructions to the contrary from the investor.

Special Withdrawal Right upon a Trigger Event.  Millennium Management will notify the Limited Partners within 10 days of the occurrence of the death, disability, adjudication of incompetency, bankruptcy, insolvency or withdrawal from the general partner of the Master Partnership of Israel A. Englander (each, a "Trigger Event").  During the period beginning on the date as of which a Trigger Event has occurred (as determined by Millennium Management) and ending on the last day of the third full month following the date on which notice of the Trigger Event is given (the "Transition Period"), and thereafter until the Special Withdrawal Date (as defined below), withdrawals may not be made, and (subject to the next sentence) withdrawal notices shall be of no effect.  During the last month of the Transition Period, Limited Partners may provide a written withdrawal request to Millennium Management to withdraw all or a portion of their respective capital accounts, which withdrawal will be effective as of the last day

US0109 (Lehman)

of the third full month after the expiration of the Transition Period (the "Special Withdrawal Date") without being subject to any withdrawal limitation or withdrawal charge, if applicable. A withdrawal request in respect of a Trigger Event may not be rescinded by the Limited Partner (absent the consent of Millennium Management) following its receipt by Millennium Management. Distributions of withdrawal proceeds due in respect of Withdrawal Dates that occurred prior to the occurrence of the Trigger Event will be paid during the Transition Period.

In the event of the death of Mr. Englander, the death benefits distributable to Millennium USA or the Master Partnership from "keyman" life insurance upon Mr. Englander's life will be deemed to be assets of Millennium USA or the Master Partnership, as the case may be, as of the date immediately prior to the Trigger Date and therefore will be included in Net Capital Appreciation or Net Capital Depreciation.

Following the occurrence of an event that Millennium Management in good faith determines may result in, or may have been, a Trigger Event (a "Possible Trigger Event"), Millennium Management may report such event to the Limited Partners (a "Possible Trigger Event Notice"). A Possible Trigger Event Notice will not commence a Transition Period, but any withdrawal request given on or after the date of the Possible Trigger Event identified in a Possible Trigger Event Notice will be suspended and held in abeyance for such period as may reasonably be necessary under the circumstances for Millennium Management to determine whether the Possible Trigger Event did in fact constitute a Trigger Event. Millennium Management will make such determination as soon as shall reasonably be practicable under the circumstances. Promptly upon making such determination, Millennium Management will notify the Limited Partners of that determination. If the determination is that there was not a Trigger Event, then all withdrawal requests held in abeyance pursuant to the foregoing will be given effect. If and to the extent that Withdrawal Dates specified in withdrawal notices have already occurred, the withdrawals will be given effect as of the last day of the first full calendar month following the date Millennium Management determines that there was not a Trigger Event. If the determination is that there was a Trigger Event, a Trigger Event Notice will promptly be given, and any withdrawal requests that were received and held in abeyance will be cancelled, and Limited Partners will be permitted to withdraw as described above.

A Limited Partner exercising its special withdrawal right will be paid approximately 90% of its estimated withdrawal request (computed on the basis of unaudited data as of the Special Withdrawal Date), subject to reserves for contingencies (including general reserves for unspecified potential contingencies) and holdbacks, within 30 days following the Special Withdrawal Date. The balance of such Limited Partner's withdrawal request will be paid (subject to audit adjustments) to such Limited Partner within 30 days after completion of the next audit of Millennium USA, with interest from the Special Withdrawal Date at the average (calculated weekly) per annum short term (13 weeks) Treasury Bill rate.

Notwithstanding the foregoing and subject to applicable law, Millennium Management may determine at any time, including following a Trigger Event, to dissolve Millennium USA. If Millennium Management makes a determination to dissolve Millennium USA during a Transition Period, distributions in respect of pending withdrawals pursuant to withdrawal requests given during that Transition Period will not be made and any further withdrawal requests will not be honored. Rather, distributions will be made in connection with the liquidation of Millennium USA.

US0109 (Lehman)

Following a Trigger Event and a Special Withdrawal Date, withdrawals may thereafter be made by Limited Partners in accordance with their rights to withdraw as specified herein, but no consideration will be given to withdrawal dates or relevant periods (for notice or otherwise) that occurred between the Trigger Event and the Special Withdrawal Date, so that the first occasion for a Limited Partner to withdraw after a Special Withdrawal Date will be the first regular Withdrawal Date as to which the time available after the Special Withdrawal Date for giving notice is sufficient in accordance with the requirements specified above.

Other Withdrawal Rights.    In addition, investors in other classes of interests of Millennium USA may withdraw all of their capital accounts at such other time and upon such terms as may be permitted by Millennium Management in accordance with the Partnership Agreement.

Limitation on Withdrawals.   Millennium Management, in its discretion, may hold back a portion of the amount payable to a Limited Partner in respect of a withdrawal (whether such withdrawal is voluntary or compulsory) to satisfy contingent or expected liabilities.  The amount of the withdrawal proceeds held back will be determined by Millennium Management in its sole discretion taking into account such factors as it considers relevant with respect to any contingent or expected liability.   Such holdbacks will reduce the amount paid to a withdrawing Limited Partner.  The unused portion of any holdback will be distributed to the Limited Partner to which the holdback applied after Millennium Management has determined that the need therefor has ceased.

In the event that an investor makes a complete or partial withdrawal on a date other than the regular Withdrawal Dates applicable to the particular class of interests of Millennium USA, Millennium USA has the right to charge such withdrawing investor any legal, accounting and administrative, registrar and transfer costs associated with such withdrawal of all or a portion of its interests, and in that connection may establish reserves for contingencies, including general reserves for unspecified contingencies.

Deferral of Withdrawal Payments.  Payments of withdrawal proceeds may be suspended if Millennium Management determines that such payments will violate applicable law, including any applicable rules or regulations of any regulatory agency or exchange, or any contract or agreement to which Millennium USA or any affiliate is then a party.

*Conversion of Offered Interests*

Millennium Management from time to time may, for administrative convenience or any other reason, redesignate and convert all or any portion of the outstanding Offered Interests into another class of interests of Millennium USA with substantially the same rights and characteristics.

*Suspension for Anti-Money Laundering Purposes*

Withdrawals by any investor purchasing Offered Interests hereunder may be suspended if Millennium Management reasonably deems it appropriate to do so to ensure compliance with anti-money laundering regulations applicable to Millennium USA, Millennium Management or any of Millennium USA's service providers.

US0109 (Lehman)

*Compulsory Withdrawal*

Millennium Management reserves the right, upon not less than five days' prior written notice, to require any investor to withdraw all or any portion of its capital account at any time for any reason or no reason. Any such compulsory withdrawal will be effective as of the date specified in the notice.

## Management of Millennium USA

The general partner of Millennium USA and the general partner of the Master Partnership is Millennium Management. L.L.C., a Delaware limited liability company. As discussed under "Certain Legal and Regulatory Matters Relating to the Master Partnership" in Part Two of this Confidential Memorandum, Millennium Management is the commodity pool operator of Millennium USA and the Master Partnership and has general responsibility and authority for supervising all aspects of Millennium USA's and the Master Partnership's business and operations. The Limited Partners have no right to act on behalf of Millennium USA or the Master Partnership in connection with any matter.

Millennium Management has the right to dissolve Millennium USA at any time (including during a fiscal year) and for any reason. In the case of such termination, Millennium USA's net assets (less reserves) will be distributed to the Limited Partners within 30 days after the completion of a final audit of Millennium USA's books (which must be performed within 90 days of the date of dissolution).

Biographies of the principals and senior management of Millennium Management can be found under "The Master Partnership's Management, Structure and Operations – Management – Principals and Key Managers" in Part Two of this Confidential Memorandum.

## Fees and Expenses Relating to Millennium USA

Millennium USA is responsible for:

- all fees and expenses incurred in connection with any transactions, engagements, and other agreements that it enters into on its own behalf, including, among other things, the costs and expenses incurred in connection with the private placement of interests in Millennium USA;

- a *pro rata* portion of MPG Operations' and its affiliates' fees and expenses incurred with respect to the Master Partnership and its affiliates (which cover, among other things, Compensation paid to Portfolio Managers, other employees, and consultants); and

- a *pro rata* portion of any other expenses of the Master Partnership, including fees paid for the investment advisory services of Millennium Capital Partners LLP (see "The Master Partnership's Organization – Portfolio Managers, Outside Investments and Firm Trading" in Part Two of this Confidential Memorandum).

US0109 (Lehman)

This means that the Limited Partners of Millennium USA will each bear their respective *pro rata* portions of Millennium USA's costs, fees, and expenses through reductions in their capital accounts.

As described above under "Interests Offered; Terms of the Offering – Allocations of Gains and Losses," at the end of each fiscal year of Millennium USA, or at such other date during a fiscal year as of which the following reallocation is required, 20% of the aggregate Net Capital Appreciation of Millennium USA for the year will be reallocated to Millennium Management as its Incentive Allocation. The Incentive Allocation is calculated on the basis of realized and unrealized gains and losses and after all expenses, including a *pro rata* portion of the Master Partnership's expenses, as described above, are paid or accrued (See "Interests Offered; Terms of the Offering – Allocations of Gains and Losses" and "Certain Risk Factors Relating to Millennium USA – Incentive Allocation") Millennium USA may share office space, services, and personnel with other businesses conducted by affiliates of Millennium USA or Millennium Management, and will bear a proportionate share of the associated costs. Millennium USA also bears the offering fees and expenses in connection with the private placement of interests of Millennium USA.

### Allocation of Gains and Losses

A separate capital account will be created on the books of Millennium USA for, and in the amount of, each capital contribution of a Partner. At the end of each Accounting Period[1] of Millennium USA, any Net Capital Appreciation[2] or Net Capital Depreciation[3] of Millennium USA, after payment of expenses (see "Certain Risk Factors Relating to Millennium USA – Compensation of Millennium Management" and "Fees and Expenses Relating to Millennium USA"), will be tentatively credited or debited to each Partner (including Millennium Management) in proportion to the opening balances of that Partner's capital account for such period (the Partner's "Partnership Percentage"). At the end of each fiscal year of Millennium USA, or at such other date during a fiscal year as of which the following reallocation is required, 20% of the aggregate Net Capital Appreciation of Millennium USA tentatively credited to each Limited Partner's capital accounts (excluding, in Millennium Management's discretion, capital accounts of Special Limited Partners[4] but including the proceeds of any Early Withdrawal Fee

---

[1]   "Accounting Period" means the following periods: each Accounting Period shall commence immediately after the close of the immediately preceding Accounting Period; each Accounting Period shall close at the close of business on the first to occur of (i) the last day of Millennium USA's fiscal quarter (which shall be the calendar quarter), (ii) the date immediately prior to the effective date of the admission of a new Partner pursuant to the Partnership Agreement, (iii) the date immediately prior to the effective date of a Partner's capital contribution pursuant to the Partnership Agreement, (iv) the effective date of any withdrawal by a Partner of capital pursuant to the Partnership Agreement, (v) the date when the Partnership shall dissolve or (iv) such other date prior to dissolution as Millennium Management may from time to time determine in its discretion pursuant to the Partnership Agreement.

[2]   "Net Capital Appreciation" means the increase in the value of Millennium USA's net assets, including unrealized gains, from the beginning of each Accounting Period to the end of such Accounting Period.

[3]   "Net Capital Depreciation" means the decrease in the value of Millennium USA's net assets, including unrealized losses, from the beginning of each Accounting Period to the end of such Accounting Period.

[4]   "Special Limited Partner" is defined as any Limited Partner who is a member, officer, director or employee of Millennium USA or the Master Partnership; any other Limited Partner, as determined in the sole discretion of Millennium Management; Millennium Management or any person controlling, controlled by or under common control with it or any member, officer, director or employee of such person (collectively, the foregoing, "Affiliates"); immediate family of Israel A. Englander, the managing member of Millennium Management, or trusts

US0109 (Lehman)

paid to non-Withdrawing investors) for the year will be reallocated to the capital accounts of Millennium Management as its "Incentive Allocation."

Due to investor qualification requirements, adverse tax effects, or other reasons, Millennium USA may be offered – but be unable or unwilling to accept – the opportunity to invest in the management company of an independent Portfolio Manager or third-party fund. In this case, Millennium Management or an affiliate may make that investment for its own account. Under such circumstances, Millennium USA and Millennium Management may (but are not required to) agree to reduce the Incentive Allocation or reduce the expenses payable by Millennium USA (as described below under "Fees and Expenses Relating to Millennium USA") to the extent Millennium Management is entitled to an Incentive Allocation. To the extent that a Partner withdraws all or a portion of its capital accounts prior to enjoying the full benefit of such Incentive Allocation adjustment, that Partner will forego some or all of remaining benefits of the adjustment. In addition, if Millennium USA fails to generate an Incentive Allocation in an amount sufficient to permit the adjustment, all or a part of the adjustment may not be made. The value of an investment by Millennium Management or its affiliate in such a management company will not be included in the calculation of net asset value of Millennium Management.

The Net Capital Appreciation upon which the calculation of an Incentive Allocation is based is deemed reduced by the unrecovered balance, if any, in a Limited Partner's "Loss Recovery Account." A Loss Recovery Account is a memorandum account, established for each capital account of a Limited Partner upon its creation, the opening balance of which is zero. At each date that an Incentive Allocation is to be determined, the balance in each Loss Recovery Account is debited with aggregate Net Capital Depreciation since the last date on which a calculation of the Incentive Allocation was made, and credited, but not beyond zero, by aggregate Net Capital Appreciation since such date. In the event that a Limited Partner with an unrecovered balance in any of its Loss Recovery Accounts withdraws all or a portion of its related capital accounts, the unrecovered balance in such Loss Recovery Accounts will be proportionately reduced.

In connection with the (i) downsizing of Millennium USA following a Trigger Event, or (ii) dissolution of Millennium USA, reserves for liabilities will be established for the estimated costs of downsizing or liquidating assets and liabilities, such as (without limitation) payments required as severance for personnel, or for termination of advisory or other agreements or contracts or leases, and the like. However, such reserves, and all other related costs and expenses, will be disregarded for the purpose of calculating Net Capital Appreciation or Net Capital Depreciation in determining the amount of the Incentive Allocation. Reserves, and related costs and expenses, taken by the Master Partnership will also be reflected on the books of Millennium USA, and treated similarly in calculating the Incentive Allocation. Any unused portion of a reserve established in anticipation of possible downsizing or dissolution of Millennium USA that is not expected to be used will be reversed after Millennium Management, in its sole discretion, has determined that the need therefor has ceased.

If a Limited Partner withdraws all or a portion of any of its capital accounts other than at the end of a fiscal year, an Incentive Allocation (the "Interim Year Incentive Allocation") with

---

for the benefit of any member thereof; and any Limited Partner that is an entity directly or indirectly controlled by Millennium Management or Affiliates.

US0109 (Lehman)

respect to such capital accounts will be determined on the effective distribution date for the period from the commencement of Millennium USA's fiscal year through the effective date of distribution; provided, however, that such Interim Year Incentive Allocation will be based upon the Net Capital Appreciation allocated to such capital account for the applicable period, pro rated for the portion of the capital accounts being withdrawn. The next Incentive Allocation from the capital accounts of such Limited Partner (assuming that such Incentive Allocation is not an additional Interim Year Incentive Allocation) will be allocated to the capital account of Millennium Management as of the end of the fiscal year in which the Interim Year Incentive Allocation occurs and will be calculated as follows: an amount equal to 20% of the aggregate Net Capital Appreciation credited to the capital accounts of such Limited Partner from the commencement of the fiscal year during which the Interim Year Incentive Allocation occurred through the end of such fiscal year (disregarding the Interim Year Incentive Allocation to Millennium Management). The amount of any Incentive Allocation from the capital accounts of a Limited Partner determined under the preceding sentence will be reduced by any Interim Year Incentive Allocation; provided, however, that in no event shall any portion of the Interim Year Incentive Allocation made to Millennium Management be returned to the Limited Partner. Appropriate fiscal year-end adjustments, if required, will be made to the Limited Partner's Loss Recovery Accounts.

After an Incentive Allocation has been made from a Limited Partner's capital accounts, such capital accounts that are part of the same class and are subject to the same withdrawal period (other than the capital account established with respect to the initial capital contribution for such class and such withdrawal period of such Limited Partner (the "Initial Capital Account")) will be combined with the Initial Capital Account of such Limited Partner. A capital account of a Limited Partner will not be combined with another capital account to the extent that there is a Loss Recovery Account attributable to it.

The Partnership Agreement provides that Millennium Management may amend the provisions of the Partnership Agreement relating to the Incentive Allocation so that it conforms to any applicable requirements of the Securities and Exchange Commission and other regulatory authorities, so long as such amendment does not increase the Incentive Allocation to more than 20% of aggregate Net Capital Appreciation for any fiscal year.

In the event that Millennium Management determines that, for tax or regulatory reasons, or any other reasons as to which Millennium Management and any Partner agree, such Partner should not participate in the Net Capital Appreciation or Net Capital Depreciation attributable to trading in any security or type of security or to any other transaction, Millennium Management may allocate such Net Capital Appreciation or Net Capital Depreciation only to the capital accounts of Partners to whom such reasons do not apply, and if appropriate, may establish a separate memorandum account in which only the Partners having an interest in such security, type of security or transaction shall have an interest and Net Capital Appreciation and Net Capital Depreciation for such separate memorandum account shall be separately calculated.

### Outline of the Partnership Agreement

The following outline summarizes the material provisions of the Partnership Agreement which are not discussed elsewhere in this Confidential Memorandum. This outline is not

US0109 (Lehman)

definitive, and each prospective investor should carefully read the Partnership Agreement in its entirety.

Limited Liability. A Limited Partner is liable for debts and obligations of Millennium USA only to the extent of its interest in Millennium USA in the fiscal year (or portion thereof) to which such debts and obligations are attributable. In order to meet a particular debt or obligation, a Limited Partner or former Limited Partner shall, in the discretion of Millennium Management, be required to make additional contributions or payments up to, but in no event in excess of, the aggregate amount of returns of capital and other amounts actually received by it from Millennium USA during or after the fiscal year to which such debt or obligation is attributable.

Term; Dissolution. Millennium USA will continue until the earlier of (i) an event of withdrawal (as defined in the Delaware Revised Uniform Limited Partnership Act, as amended (the "Act")) of Millennium Management; provided that Millennium USA will not be dissolved nor required to be wound up in connection with any such event if (A) at the time of the occurrence of such event there is at least one remaining general partner of Millennium USA who is authorized to and does carry on the business of Millennium USA, or (B) within 30 days after the occurrence of such event, Limited Partners having in excess of 50% of the Partnership Percentages of the Limited Partners agree in writing to continue the business of Millennium USA in which case the Limited Partners shall appoint, effective as of the date of such event, one or more additional general partners of Millennium USA; (ii) such time as Millennium Management, in its sole discretion, determines in writing to dissolve Millennium USA; (iii) the entry of a decree of judicial dissolution under Section 17-802 of the Act; or (iv) at any time there are no Limited Partners, unless Millennium USA is continued without dissolution pursuant to the Act.

On dissolution of Millennium USA, withdrawals will be terminated and no further business will be done except the completion of incomplete transactions and the taking of such action as will be necessary for the winding up of the affairs of Millennium USA and the distribution of its assets. In connection with the dissolution of Millennium USA, reserves for liabilities will be established for the estimated costs of liquidating assets and liabilities, such as (without limitation) payments required as severance for personnel, or for termination of advisory or other agreements or contracts or leases, and the like. However, such reserves, and all other related costs and expenses, will be disregarded for the purpose of calculating Net Capital Appreciation or Net Capital Depreciation in determining the amount of the Incentive Allocation. Reserves, and related costs and expenses, taken by the Master Partnership will also be reflected on the books of Millennium USA, and treated similarly in calculating the Incentive Allocation. Any unused portion of a reserve established in anticipation of dissolution of Millennium USA that is not expected to be used will be reversed after Millennium Management, in its sole discretion, has determined that the need therefor has ceased.

Capital Accounts. A separate capital account will be established on the books of Millennium USA for, and in the amount of, each capital contribution made by each Partner. A Partnership Percentage is determined for each Partner for each Accounting Period by dividing its capital accounts as of the beginning of such Accounting Period by the aggregate capital accounts of all Partners as of the beginning of such Accounting Period.

US0109 (Lehman)

Each Limited Partner's capital account is increased to reflect its share of Net Capital Appreciation, and is decreased to reflect withdrawals of capital, distributions and such Partner's share of Net Capital Depreciation.

*Additional Capital Contributions*. With the prior approval of Millennium Management (which approval may be withheld for any reason or no reason), a Limited Partner may make additional capital contributions to Millennium USA at such time as Millennium Management may permit.

Additional contributions by an existing Limited Partner will be subject to a new withdrawal period based on the class of Interest purchased and will be placed in a separate capital account. The Net Capital Appreciation and Net Capital Depreciation attributable to a Limited Partner's capital account for one class of Interest will not be aggregated with, or offset by, the Net Capital Appreciation and Net Capital Depreciation attributable to any other capital account held by the Limited Partner with respect to a different class of Interest.

*Management*. The management of Millennium USA is vested exclusively in Millennium Management.

*Valuation of Partnership Assets*. Millennium USA's assets are valued by Millennium Management in accordance with the terms of the Partnership Agreement.

*Liabilities; Reserves*. The liabilities of Millennium USA will be determined in accordance with GAAP, applied on a consistent basis, except as described below. Millennium Management may also at any time or times establish reserves (whether or not in accordance with GAAP) for estimated or accrued expenses, liabilities or contingencies, including in connection with the dissolution of Millennium USA or any downsizing of Millennium USA following a Trigger Event. If reserves are established that are not in accordance with GAAP, they will be treated in the same manner as reserves that are in accordance with GAAP, *i.e.*, in the period in which they are taken they will be treated as an expense of Millennium USA (and will reduce the net assets of Millennium USA), and, if and to the extent that they are subsequently reversed they will be taken into income in the period of such reversal (and will to that extent increase the net assets of Millennium USA).

*Death, Disability, etc. of a Limited Partner*. In the event of the death, disability, adjudication of incompetency, bankruptcy, termination or dissolution of a Limited Partner, such Limited Partner or its personal representative (as defined in the Act) will be permitted to withdraw from Millennium USA as of the next occurring date on which the Limited Partner could have withdrawn without regard to such death, disability, adjudication of incompetency, bankruptcy, termination or dissolution. Unless and until notice of withdrawal is properly given and such withdrawal occurs, the capital accounts of such Limited Partner will continue at the risk of Millennium USA's business until the effective date of the withdrawal or the earlier termination of Millennium USA.

*Assignability of Partner's Interest*. Without the prior written consent of Millennium Management, which may be withheld in its sole discretion, a Partner may not (i) pledge, transfer

US0109 (Lehman)

or assign its interest in Millennium USA in whole or in part to any person except by operation of law or (ii) substitute for itself as a Partner any other person.

> Admission of New Partners. Additional general partners and Limited Partners may, with the consent of Millennium Management, be admitted to Millennium USA at any time. Each new Partner is required to execute an agreement pursuant to which it becomes bound by the terms of the Partnership Agreement.

> Variation of Terms. Millennium Management may enter into a written agreement with a Limited Partner governing the following terms: (i) the payment by such Limited Partner of a fee to Millennium Management in connection with the admission or the withdrawal from Millennium USA of such Limited Partner (which fee may, in Millennium Management's sole discretion, be paid to Millennium Management or such other persons as Millennium Management determines); (ii) the application of a lower or a higher performance-based percentage allocation than the Incentive Allocation and different performance compensation arrangements to the capital accounts of such Limited Partner; (iii) the application of withdrawal and distribution arrangements that vary from those applicable to other Limited Partners; and (iv) the application of death, disability, bankruptcy or withdrawal arrangements that vary from those applicable to other Limited Partners.

> Millennium International and Millennium USA have a variety of classes of shares and interests outstanding and, in some instances, have additional contractual (or "side letter") agreements with particular investors. The provisions of the different classes of outstanding shares and interests, and of such contractual undertakings, are not uniform, with the effect that some investors in the funds to some degree have different rights and entitlements from those of other investors, which may be true even though the fundamental economic terms of the investments are otherwise identical. Such differing provisions relate primarily to redemption rights (the frequency of permissible redemptions, the notice period required for redemption, and the circumstances under which accelerated redemption is permissible) and the detail and frequency with which information is provided regarding returns or broad portfolio segment information. With respect to the outstanding classes of interests in Millennium USA, the principal such differences are described under the caption "Millennium USA's Organization, Management, Structure, and Operations – Capital Structure." With respect to contractual arrangements or undertakings, Millennium International and Millennium USA has had a policy of entering into such agreements rarely and in limited circumstances, such as in connection with employee deferred compensation arrangements, and to give careful consideration to relevant legal and fiduciary obligations in connection with any such agreements. With the exception of agreements related to such deferred compensation arrangements, Millennium USA and Millennium International no longer enter into any such side letter agreements.

> Amendments to Partnership Agreement. The Partnership Agreement may be modified or amended at any time by the written approval of Partners having in excess of 50% of the Partnership Percentages of the Limited Partners and the written approval of Millennium Management. Without the approval of the other Partners, however, Millennium Management may amend the Partnership Agreement to (i) reflect changes validly made in the membership of Millennium USA and the capital contributions and Partnership Percentages of the Partners; (ii) change the provisions relating to the Incentive Allocation so that such provisions conform to any

US0109 (Lehman)

applicable requirements of the SEC and other regulatory authorities, so long as such amendment does not increase the Incentive Allocation to more than 20% of aggregate Net Capital Appreciation for any fiscal year; (iii) reflect a change in the name of Millennium USA; (iv) make a change that is necessary or, in the opinion of Millennium Management, advisable to qualify Millennium USA as a limited partnership or a partnership in which the Limited Partners have limited liability under the laws of any state, or ensure that Millennium USA is not classified as an association taxable as a corporation or treated as a publicly traded partnership taxable as a corporation for Federal tax purposes; (v) make a change that does not adversely affect the Limited Partners in any material respect; (vi) make a change that is necessary or desirable to cure any ambiguity, to correct or supplement any provision in the Partnership Agreement that is inconsistent with any other provision in the Partnership Agreement, or to change any other provision with respect to matters or questions arising under the Partnership Agreement that is not inconsistent with the provisions of the Partnership Agreement, in each case so long as such change does not adversely affect the Limited Partners; (vii) make a change that is necessary or desirable to satisfy any requirements, conditions or guidelines contained in any opinion, directive, order, ruling or regulation of any federal or state statute, so long as such change is made in a manner which minimizes any adverse effect on the Limited Partners; or (viii) make a change that is required or contemplated by the Partnership Agreement; (ix) make a change in any provision of the Partnership Agreement that requires any action to be taken by or on behalf of Millennium Management or Millennium USA pursuant to the requirements of applicable Delaware law if the provisions of applicable Delaware law are amended, modified or revoked so that the taking of such action is no longer required; (x) prevent Millennium USA or Millennium Management from being deemed in any manner an "Investment Company" subject to the provisions of the Investment Company Act; (xi) reflect the terms of the issuance of new classes (or combination of classes or conversion of one class into another class) of interests so long as such amendment does not adversely affect the terms of the other classes of interests in any material respect; or (xii) make any other amendments similar to the foregoing. Each Partner, however, must consent to any amendment which would (a) reduce its capital accounts or rights of contribution or withdrawal; or (b) amend the provisions of the Partnership Agreement relating to amendments.

Reports to Partners.  Millennium Management will furnish each Limited Partner with quarterly statements that will include an unaudited balance sheet and statement of operations of the Partnership and a statement of the Net Capital Appreciation or Net Capital Depreciation from the end of the previous quarter for such Limited Partner.  Millennium Management will also provide an unaudited statement of changes in net asset value of Millennium USA, and a statement of each Partner's capital accounts and annual audited financial statements of Millennium USA.

Exculpation.  The Partnership Agreement provides that none of Millennium Management or its affiliates will be liable to any Limited Partner or Millennium USA for mistakes of judgment or for action or inaction which said person reasonably believed to be legally permissible and not contrary to the best interests of Millennium USA, or for losses due to such mistakes, action or inaction or to the negligence, dishonesty or bad faith of any employee, broker or other agent of Millennium USA; provided that such employee, broker or agent was selected, engaged or retained by Millennium USA with reasonable care.  Millennium Management and its affiliates may consult with counsel, accountants and/or other experts in respect of Millennium USA's affairs and be fully protected and justified in any action or inaction which is taken in good faith in accordance with the

US0109 (Lehman)

advice or opinion of such counsel, accountants and/or other experts; provided that they were selected with reasonable care.

The exculpation provisions of the Partnership Agreement will not be construed so as to provide for the exculpation of Millennium Management or its affiliates for any liability (including liability under Federal securities laws which, under certain circumstances, impose liability even on persons that act in good faith), to the extent (but only to the extent) that such exculpation would be in violation of applicable law, but will be construed so as to effectuate such provisions to the fullest extent permitted by law.

Indemnification of General Partners. The Partnership Agreement provides that Millennium USA will indemnify and hold harmless Millennium Management, its affiliates and its and their respective personal representatives (as defined in the Act) (each an "Indemnified Party"), to the fullest extent permitted by law, from and against any loss or expense suffered or sustained by an Indemnified Party by reason of the fact that it is or was an Indemnified Party, including, without limitation any judgment, settlement, reasonable attorney's fees and other costs or expenses incurred in connection with the defense of any actual or threatened action or proceeding; provided that such loss or expense resulted from a mistake of judgment on the part of an Indemnified Party, or from action or inaction that said Indemnified Party reasonably believed to be legally permissible and not contrary to the best interests of Millennium USA. Millennium USA will, in the sole discretion of Millennium Management, advance to any Indemnified Party, reasonable attorney's fees and other costs and expenses incurred in connection with the defense of any action or proceeding that arises out of such conduct. The Indemnified Parties will agree that in the event an Indemnified Party receives any such advance, such Indemnified Party will reimburse Millennium USA for such fees, costs and expenses to the extent it is determined that it was not entitled to indemnification.

The indemnification provisions of the Partnership Agreement will not be construed so as to provide for the indemnification of an Indemnified Party for any liability (including liability under Federal securities laws which, under certain circumstances, impose liability even on persons that act in good faith), to the extent (but only to the extent) that such indemnification would be in violation of applicable law, but shall be construed so as to effectuate such provisions to the fullest extent permitted by law.

Required Notifications. Under the terms of the Partnership Agreement, each Limited Partner agrees to notify Millennium Management promptly if there is any change with respect to any information or representations made by such Limited Partner in the subscription documents submitted by or on behalf of such Limited Partner in connection with (i) its acquisition of an Interest or (ii) any additional capital contributions made by such Limited Partner.

**Certain Tax Matters Relating to an Investment in Millennium USA**

**CIRCULAR 230 NOTICE. THE FOLLOWING NOTICE IS BASED ON U.S. TREASURY REGULATIONS GOVERNING PRACTICE BEFORE THE U.S. INTERNAL REVENUE SERVICE: (1) ANY U.S. FEDERAL TAX ADVICE CONTAINED HEREIN, INCLUDING ANY OPINION OF COUNSEL REFERRED TO**

US0109 (Lehman)

HEREIN, IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING U.S. FEDERAL TAX PENALTIES THAT MAY BE IMPOSED ON THE TAXPAYER; (2) ANY SUCH ADVICE IS WRITTEN TO SUPPORT THE PROMOTION OR MARKETING OF THE TRANSACTIONS DESCRIBED HEREIN (OR IN ANY SUCH OPINION OF COUNSEL); AND (3) EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

The following is a summary of certain aspects of the income taxation of Millennium USA and its Partners which should be considered by a Limited Partner. Millennium USA has not sought a ruling from the Internal Revenue Service (the "Service") or any other federal, state or local agency with respect to any of the tax issues affecting Millennium USA, nor has it obtained an opinion of counsel with respect to any federal tax issues other than the characterization of Millennium USA and the Master Partnership as partnerships for federal tax purposes.

This summary of certain aspects of the federal income tax treatment of Millennium USA is based upon the Internal Revenue Code of 1986, as amended (the "Code"), judicial decisions, Treasury Regulations (the "Regulations") and rulings in existence on the date hereof, all of which are subject to change. This summary does not discuss the impact of various proposals to amend the Code which could change certain of the tax consequences of an investment in Millennium USA. This summary also does not discuss all of the tax consequences that may be relevant to a particular investor or to certain investors subject to special treatment under the federal income tax laws, such as insurance companies.

EACH PROSPECTIVE LIMITED PARTNER SHOULD CONSULT WITH ITS OWN TAX ADVISOR IN ORDER TO FULLY UNDERSTAND THE FEDERAL, STATE, LOCAL AND FOREIGN INCOME TAX CONSEQUENCES OF AN INVESTMENT IN MILLENNIUM USA.

In addition to the particular matters set forth in this section, tax-exempt organizations should review carefully those sections of this Confidential Memorandum regarding liquidity and other financial matters to ascertain whether the investment objectives of Millennium USA are consistent with their overall investment plans. Each prospective tax-exempt Limited Partner is urged to consult its own counsel regarding the acquisition of Interests.

*Tax Treatment of Partnership Operations*

Classification of Millennium USA and the Master Partnership. Millennium USA has received an opinion of Schulte Roth & Zabel LLP, counsel to Millennium USA, that under the provisions of the Code and the Regulations, as in effect on the date of the opinion, as well as under the relevant authority interpreting the Code and the Regulations, and based upon certain representations of Millennium Management, each of Millennium USA and the Master Partnership will be classified as a partnership for federal tax purposes and not as an association

US0109 (Lehman)

taxable as a corporation. Schulte Roth & Zabel LLP also has rendered its opinion, based upon the anticipated operations of Millennium USA and the Master Partnership as well as certain representations of Millennium Management (including representations regarding the income of Millennium USA and the Master Partnership), that neither Millennium USA nor the Master Partnership will be treated as a publicly traded partnership taxable as a corporation, pursuant to either the passive income exemption of Section 7704(c) of the Code, or the "private placement" safe harbor of Treasury Regulation Section 1.7704-1(h).

Unless otherwise indicated, references in the following discussion to the tax consequences of Millennium USA investments, activities, income, gain and loss, include the direct investments, activities, income, gain and loss of Millennium USA, and those indirectly attributable to Millennium USA as a result of it being a member of the Master Partnership.

As a partnership, Millennium USA is not itself subject to federal income tax. Millennium USA files an annual partnership information return with the Service which reports the results of operations. Each Partner is required to report separately on its income tax return its distributive share of Millennium USA's net long-term capital gain or loss, net short-term capital gain or loss and all other items of ordinary income or loss. Each Partner is taxed on its distributive share of Millennium USA's taxable income and gain regardless of whether it has received or will receive a distribution from Millennium USA.

Allocation of Profits and Losses. Under the Partnership Agreement, Millennium USA's net capital appreciation or net capital depreciation for each accounting period is allocated among the Partners and is debited or credited to their capital accounts. The Partnership Agreement provides that items of income, deduction, gain, loss or credit for each fiscal year generally are to be allocated for income tax purposes among the Partners pursuant to the principles of Regulations issued under Sections 704(b) and 704(c) of the Code, based upon amounts of Millennium USA's net capital appreciation or net capital depreciation allocated to each Partner's capital account.

Under the Partnership Agreement, Millennium Management has the discretion to allocate specially an amount of Millennium USA's ordinary income and/or capital gain (including short-term capital gain) and deductions, ordinary loss and/or capital loss (including long-term capital loss) for federal income tax purposes to a withdrawing Partner to the extent that the Partner's capital account exceeds, or is less than, as the case may be, its federal income tax basis in its Interest. There can be no assurance that, if Millennium Management makes any such special allocations, the Service will accept such allocations. If such allocations are successfully challenged by the Service, Millennium USA's tax items allocable to the remaining Partners would be affected.

Tax Elections; Returns; Tax Audits. The Code generally provides for optional adjustments to the basis of partnership property upon distributions of partnership property to a partner and transfers of partnership interests (including by reason of death) provided that a partnership election has been made pursuant to Section 754. Under the Partnership Agreement, Millennium Management, in its sole discretion, may cause Millennium USA to make such an election. Any such election, once made, cannot be revoked without the Service's consent. The actual effect of any such election may depend upon whether the Master Partnership also makes

US0109 (Lehman)

such an election. As a result of the complexity and added expense of the tax accounting required to implement such an election, Millennium Management presently does not intend to make such election.

Millennium Management decides how to report the partnership items on Millennium USA's tax returns, and all Partners are required under the Code to treat the items consistently on their own returns, unless they file a statement with the Service disclosing the inconsistency. Given the uncertainty and complexity of the tax laws, it is possible that the Service may not agree with the manner in which Millennium USA's items have been reported. In the event the income tax returns of Millennium USA are audited by the Service, the tax treatment of Millennium USA's income and deductions generally is determined at the limited partnership level in a single proceeding rather than by individual audits of the Partners. Millennium Management, designated as the "Tax Matters Partner," has considerable authority to make decisions affecting the tax treatment and procedural rights of all Partners. In addition, the Tax Matters Partner has the authority to bind certain Partners to settlement agreements and the right on behalf of all Partners to extend the statute of limitations relating to the Partners' tax liabilities with respect to Millennium USA items.

Mandatory Basis Adjustments. Under new legislation, Millennium USA and the Master Partnership are generally required to adjust their tax basis in their assets in respect of all Partners in cases of partnership distributions that result in a "substantial basis reduction" (i.e., in excess of $250,000) in respect of the relevant partnership's property. Millennium USA and the Master Partnership also are required to adjust their tax basis in their assets in respect of a transferee, in the case of a sale or exchange of an Interest, or a transfer upon death, when there exists a "substantial built-in loss" (i.e., in excess of $250,000) in respect of partnership property immediately after the transfer. For this reason, Millennium USA will require (i) a Partner who receives a distribution from Millennium USA in connection with a complete withdrawal, (ii) a transferee of an Interest (including a transferee in case of death) and (iii) any other Partner in appropriate circumstances to provide Millennium USA with information regarding its adjusted tax basis in its Interest.

*Tax Consequences to a Withdrawing Limited Partner*

A Limited Partner receiving a cash liquidating distribution from Millennium USA, in connection with a complete withdrawal from Millennium USA, generally will recognize capital gain or loss to the extent of the difference between the proceeds received by such Limited Partner and such Limited Partner's adjusted tax basis in its partnership interest. Such capital gain or loss will be short-term, long-term or some combination of both, depending upon the timing of the Limited Partner's contributions to Millennium USA. However, a withdrawing Limited Partner will recognize ordinary income to the extent such Limited Partner's allocable share of Millennium USA's "unrealized receivables" exceeds the Limited Partner's basis in such unrealized receivables (as determined pursuant to the Regulations). For these purposes, accrued but untaxed market discount, if any, on securities held by Millennium USA will be treated as an unrealized receivable, with respect to which a withdrawing Limited Partner would recognize ordinary income. A Limited Partner receiving a cash nonliquidating distribution will recognize income in a similar manner only to the extent that the amount of the distribution exceeds such Limited Partner's adjusted tax basis in its partnership interest.

US0109 (Lehman)

As discussed above, the Partnership Agreement provides that Millennium Management may specially allocate items of Millennium USA ordinary income and/or capital gain (including short-term capital gain) and deductions, ordinary loss and/or capital loss (including long-term capital loss) to a withdrawing Partner to the extent its capital account would otherwise exceed or be less than, as the case may be, its adjusted tax basis in its partnership interest. Such a special allocation of income or gain may result in the withdrawing Partner recognizing ordinary income and/or capital gain, which may include short-term capital gain, in the Partner's last taxable year in Millennium USA, thereby reducing the amount of long-term capital gain recognized during the tax year in which it receives its liquidating distribution upon withdrawal. Such a special allocation of deduction or loss may result in the withdrawing Partner recognizing ordinary loss and/or capital loss, which may include long-term capital loss, in the Partner's last taxable year in Millennium USA, thereby reducing the amount of short-term capital loss recognized during the tax year in which it receives its liquidating distribution upon withdrawal.

Distributions of Property. A partner's receipt of a distribution of property from a partnership is generally not taxable. However, under Section 731 of the Code, a distribution consisting of marketable securities generally is treated as a distribution of cash (rather than property) unless the distributing partnership is an "investment partnership" within the meaning of Section 731(c)(3)(C)(i) and the recipient is an "eligible partner" within the meaning of Section 731(c)(3)(C)(iii). Millennium USA will determine at the appropriate time whether it qualifies as an "investment partnership." Assuming it so qualifies, if a Limited Partner is an "eligible partner," which term should include a Limited Partner whose contributions to Millennium USA consisted solely of cash, the rule treating a distribution of property as a distribution of cash would not apply.

*Tax Treatment of Millennium USA Investments*

In General. Millennium USA is engaged in a trade or business as a trader in securities and commodities. Millennium USA and the Master Partnership have elected to report their income from sales of securities and commodities held in connection with such trade or business on a "mark-to-market" basis for federal income tax purposes. Under this accounting method, (i) gains or losses recognized by Millennium USA upon an actual disposition of securities and commodities held in connection with such trade or business are treated as ordinary income or loss and (ii) any such securities and commodities held by Millennium USA on the last day of each taxable year are treated as if they were sold by Millennium USA for their fair market value on that day, and gains or losses recognized on this deemed sale will be treated as ordinary income or loss. For purposes of measuring gain or loss with respect to any such security or commodity in any subsequent year, the amount of any gain or loss previously recognized under the mark-to-market rules is taken into account in determining the tax basis for the security or commodity. Millennium USA is required to identify any securities and commodities that are not held in connection with such trade or business on the day such securities are acquired. If Millennium USA fails to properly identify a security or commodity that is not held in connection with such trade or business, the Service may require Millennium USA to recognize "mark-to-market" gains on such security or commodity as ordinary income at the end of each taxable year, but defer recognition of any "mark-to-market" losses, to the extent they exceed gains previously recognized with respect to such security or commodity, until the security or commodity is sold. Moreover, there can be no assurance that the Service will agree that Millennium USA's

US0109 (Lehman)

securities and commodities activities will constitute trading rather than investing, in which case Millennium USA may not be able to mark-to-market its positions.

Millennium USA may realize ordinary income from dividends and accruals of interest on securities. Income or loss from transactions involving certain derivative instruments, such as swap transactions, will also generally constitute ordinary income or loss. As described below, gain or loss from certain "Section 1256 Contracts" (defined below) held in connection with the securities trading activities will be treated as capital gain or loss.

The maximum ordinary income tax rate for individuals is 35%[5] and, in general, the maximum individual income tax rate for "Qualified Dividends"[6] and long-term capital gains is 15%[7] (unless the taxpayer elects to be taxed at ordinary rates – see "Limitation on Deductibility of Interest and Short Sale Expenses" below), although in all cases the actual rates may be higher due to the phase out of certain tax deductions, exemptions and credits. The excess of capital losses over capital gains may be offset against the ordinary income of an individual taxpayer, subject to an annual deduction limitation of $3,000. Capital losses of an individual taxpayer may generally be carried forward to succeeding tax years to offset capital gains and then ordinary income (subject to the $3,000 annual limitation). For corporate taxpayers, the maximum income tax rate is 35%. Capital losses of a corporate taxpayer may be offset only against capital gains, but unused capital losses may be carried back three years (subject to certain limitations) and carried forward five years.

Section 1256 Contracts. A Section 1256 Contract includes certain futures contracts, and certain other contracts. Gains and losses from such Section 1256 Contracts are marked to market annually, and generally are characterized as short-term capital gains or losses to the extent of 40% thereof and as long-term capital gains or losses to the extent of 60% thereof. Gains and losses from Section 1256 Contracts will be treated as ordinary income and losses, if such Section 1256 Contracts are held to hedge property which would generate ordinary loss if sold at a loss or if such Section 1256 Contracts are held in connection with the commodities trading activities. If an individual taxpayer incurs a net capital loss for a year, the portion thereof, if any, which consists of a net loss on Section 1256 Contracts may, at the election of the taxpayer, be carried back three years. Losses so carried back may be deducted only against net capital gain to the extent that such gain includes gains on Section 1256 Contracts. A Section 1256 Contract does not include a "securities futures contract" or any option on such a contract, other than a "dealer securities futures contract."

Generally, a "securities futures contract" is a contract of sale for future delivery of a single security or a narrow-based security index. A "dealer futures contract" is treated as a Section 1256 Contract. A "dealer securities futures contract" is a securities futures contract, or

---

[5]   This rate is scheduled to increase to 39.6% in 2011.
[6]   A "Qualified Dividend" is generally a dividend from certain domestic corporations, and from certain foreign corporations that are either eligible for the benefits of a comprehensive income tax treaty with the United States or are readily tradable on an established securities market in the United States. Shares must be held for certain holding periods in order for a dividend thereon to be a Qualified Dividend.
[7]   The maximum individual long-term capital gains tax rate is 20% for sales or exchanges on or after January 1, 2009. The 15% maximum individual tax rate on Qualified Dividends is scheduled to expire on December 31, 2008.

US0109 (Lehman)

an option to enter into such a contract, that (1) is entered into by a dealer (or, in the case of an option, is purchased or granted by the dealer) in the normal course of its trade or business activity of dealing in the contracts and (2) is traded on a qualified board of trade or exchange.

Mixed Straddle Election. The Code allows a taxpayer to elect to offset gains and losses from positions which are part of a "mixed straddle." A "mixed straddle" is any straddle in which one or more but not all positions are Section 1256 Contracts. Pursuant to Temporary Regulations, Millennium USA may be eligible to elect to establish one or more mixed straddle accounts for certain of its mixed straddle trading positions. The mixed straddle account rules require a daily "marking to market" of all open positions in the account and a daily netting of gains and losses from positions in the account. At the end of a taxable year, the annual net gains or losses from the mixed straddle account are recognized for tax purposes. The application of the Temporary Regulations' mixed straddle account rules is not entirely clear. Therefore, there is no assurance that a mixed straddle account election by Millennium USA will be accepted by the Service.

Effect of Straddle Rules on Limited Partners' Securities Positions. The Service may treat certain positions in securities held (directly or indirectly) by a Partner and its indirect interest in similar securities held by Millennium USA as "straddles" for federal income tax purposes. Investors should consult their tax advisors regarding the application of the "straddle" rules to their investment in Millennium USA.

Limitation on Deductibility of Interest and Short Sale Expenses. For noncorporate taxpayers, Section 163(d) of the Code limits the deduction for "investment interest" (*i.e.*, interest or short sale expenses for "indebtedness properly allocable to property held for investment"). Investment interest is not deductible in the current year to the extent that it exceeds the taxpayer's "net investment income," consisting of net gain and ordinary income derived from investments in the current year less certain directly connected expenses (other than interest or short sale expenses). For this purpose, Qualified Dividends and long-term capital gains are excluded from net investment income unless the taxpayer elects to pay tax on such amounts at ordinary income tax rates.

For purposes of this provision, Millennium USA's activities (other than certain activities that are treated as "passive activities" under Section 469 of the Code) will be treated as giving rise to investment income for a Limited Partner, and the investment interest limitation would apply to a noncorporate Limited Partner's share of the interest and short sale expenses attributable to Millennium USA's operation. In such case, a noncorporate Limited Partner would be denied a deduction for all or part of that portion of its distributive share of Millennium USA's ordinary losses attributable to interest and short sale expenses unless it had sufficient investment income from all sources including Millennium USA. A Limited Partner that could not deduct losses currently as a result of the application of Section 163(d) would be entitled to carry forward such losses to future years, subject to the same limitation. The investment interest limitation would also apply to interest paid by a noncorporate Limited Partner on money borrowed to finance its investment in Millennium USA. Potential investors are advised to consult with their own tax advisors with respect to the application of the investment interest limitation in their particular tax situations.

US0109 (Lehman)

Deductibility of Millennium USA Investment Expenditures and Certain Other Expenditures. Investment expenses (e.g., investment advisory fees) of an individual, trust or estate are deductible only to the extent they exceed 2% of adjusted gross income.[8]  In addition, the Code further restricts the ability of an individual with an adjusted gross income in excess of a specified amount (for 2006, $150,500 or $75,250 for a married person filing a separate return) to deduct such investment expenses. Under such provision, there is a limitation on the deductibility of investment expenses in excess of 2% of adjusted gross income to the extent such excess expenses (along with certain other itemized deductions) exceed the lesser of (i) 3% of the excess of the individual's adjusted gross income over the specified amount or (ii) 80% of the amount of certain itemized deductions otherwise allowable for the taxable year.[9]  Moreover, such investment expenses are miscellaneous itemized deductions which are not deductible by a noncorporate taxpayer in calculating its alternative minimum tax liability.

Pursuant to Temporary Regulations issued by the Treasury Department, these limitations on deductibility should not apply to a noncorporate Limited Partner's share of the expenses of Millennium USA to the extent that Millennium USA is engaged, as it expects to be, in a trade or business within the meaning of the Code.  Although Millennium USA intends to treat its expenses as not being subject to the foregoing limitations on deductibility, there can be no assurance that the Service may not treat such expenses as investment expenses which are subject to the limitations.

The consequences of these limitations will vary depending upon the particular tax situation of each taxpayer.  Accordingly, noncorporate Limited Partners should consult their tax advisors with respect to the application of these limitations

A Limited Partner will not be allowed to deduct syndication expenses attributable to the acquisition of an Interest, including placement fees, paid by such Limited Partner or Millennium USA.  Any such amounts will be included in the Limited Partner's adjusted tax basis for its Interest.

Application of Rules for Income and Losses from Passive Activities.  The Code restricts the deductibility of losses from a "passive activity" against certain income which is not derived from a passive activity.  This restriction applies to individuals, personal service corporations and certain closely held corporations.  Pursuant to Temporary Regulations issued by the Treasury Department, income or loss from Millennium USA's securities investment and trading activity generally will not constitute income or loss from a passive activity.  Therefore, passive losses from other sources generally could not be deducted against a Limited Partner's share of such

---

[8]    However, Section 67(e) of the Code provides that, in the case of a trust or an estate, such limitation does not apply to deductions or costs which are paid or incurred in connection with the administration of the estate or trust and would not have been incurred if the property were not held in such trust or estate. There is a disagreement among three Federal Courts of Appeals on the question of whether the investment advisory fees incurred by a trust are exempt (under Section 67(e)) from the 2% of adjusted gross income floor on deductibility. Limited Partners that are trusts or estates should consult their tax advisors as to the applicability of these cases to the investment expenses that are allocated to them.

[9]    Under recently enacted legislation, the latter limitation on itemized deductions will be reduced starting in calendar year 2006, will be further reduced starting in 2008, and will be completely eliminated by 2010.  However, this legislation contains a "sunset" provision that will result in the limitation on itemized deductions being restored in 2011.

US0109 (Lehman)

income and gain from Millennium USA.  Income or loss attributable to certain activities of Millennium USA, including investments in partnerships engaged in certain trades or businesses may constitute passive activity income or loss.

Application of Basis and "At Risk" Limitations on Deductions.  The amount of any loss of Millennium USA that a Limited Partner is entitled to include in its income tax return is limited to its adjusted tax basis in its Interest as of the end of Millennium USA's taxable year in which such loss occurred.  Generally, a Limited Partner's adjusted tax basis for its Interest is equal to the amount paid for such Interest, increased by the sum of (i) its share of Millennium USA's liabilities, as determined for federal income tax purposes, and (ii) its distributive share of Millennium USA's realized income and gains, and decreased (but not below zero) by the sum of (i) distributions (including decreases in its share of Millennium USA liabilities) made by Millennium USA to such Limited Partner and (ii) such Limited Partner's distributive share of Millennium USA's realized losses and expenses.

Similarly, a Limited Partner that is subject to the "at risk" limitations (generally, noncorporate taxpayers and closely held corporations) may not deduct losses of Millennium USA to the extent that they exceed the amount such Limited Partner has "at risk" with respect to its Interest at the end of the year.  The amount that a Limited Partner has "at risk" will generally be the same as its adjusted basis as described above, except that it will generally not include any amount attributable to liabilities of Millennium USA or any amount borrowed by the Limited Partner on a non-recourse basis.

Losses denied under the basis or "at risk" limitations are suspended and may be carried forward in subsequent taxable years, subject to these and other applicable limitations.

"Phantom Income" From Millennium USA Investments.  Pursuant to various "anti-deferral" provisions of the Code (the "Subpart F" and "passive foreign investment company" provisions), investments (if any) by Millennium USA in certain foreign corporations may cause a Limited Partner to recognize taxable income prior to Millennium USA's receipt of distributable proceeds.

*U.S. Withholding Taxes*

Certain interest and dividends received by the Master Partnership from sources within the United States may be subject to withholding taxes imposed by the United States.  The Limited Partners will be informed by Millennium USA as to their proportionate share of the U.S. taxes paid by the Master Partnership, if any, which they will be required to include in their income.  The Limited Partners should be entitled to claim an unrestricted credit or refund for their share of such U.S. taxes in computing their own federal income tax liability.

*Reporting Requirements*

Regulations generally impose an information reporting requirement on a U.S. person's direct and indirect contributions of cash or property to a foreign partnership such as the Master Partnership (i) where, immediately after the contribution, the U.S. person owns (directly, indirectly or by attribution) at least a 10% interest in the foreign partnership or (ii) the value of the cash and/or property transferred during the twelve-month period ending on the date of the

US0109 (Lehman)

contribution by the transferor (or any related person) exceeds $100,000. Under these rules, a Limited Partner will be deemed to have transferred a proportionate share of the cash and property contributed by Millennium USA to the Master Partnership. Furthermore, if a U.S. person was required to report a transfer to a foreign partnership of appreciated property under the first sentence of this paragraph, and the foreign partnership disposes of the property while such U.S. person remains a direct or indirect partner, that U.S. person must report the disposition by the partnership. However, a Limited Partner will not be required to file information returns with respect to the events described in this paragraph if Millennium USA complies with the reporting requirements. Millennium USA intends to file the required reports with the Service so as to relieve the Limited Partners of these reporting obligations.

Regulations also generally impose a reporting requirement on any U.S. Limited Partner which, at any time during the taxable year of the Master Partnership, owns (indirectly or by attribution) more than 50% of the capital or profits of the Master Partnership. Millennium Management will notify any Limited Partner who owns the requisite indirect interest in the Master Partnership and will assist such person in meeting their reporting obligations.

**The foregoing discussion is only a brief summary of certain information reporting requirements. Substantial penalties may apply if the required reports are not made on time. Partners are strongly urged to consult their own tax advisors concerning these reporting requirements as they relate to their investment in Millennium USA.**

*Foreign Taxes*

It is possible that certain dividends and interest directly or indirectly received by Millennium USA from sources within foreign countries will be subject to withholding taxes imposed by such countries. In addition, Millennium USA or the Master Partnership may also be subject to capital gains taxes in some of the foreign countries where they purchase and sell securities. Tax treaties between certain countries and the United States may reduce or eliminate such taxes. It is impossible to predict in advance the rate of foreign tax Millennium USA will directly or indirectly pay since the amount of Millennium USA's assets to be invested in various countries is not known.

The Limited Partners will be informed by Millennium USA as to their proportionate share of the foreign taxes paid by Millennium USA or the Master Partnership , which they will be required to include in their income. The Limited Partners generally will be entitled to claim either a credit (subject, however, to various limitations on foreign tax credits) or, if they itemize their deductions, a deduction (subject to the limitations generally applicable to deductions) for their share of such foreign taxes in computing their federal income taxes. A Limited Partner that is tax-exempt will not ordinarily benefit from such credit or deduction.

*United Kingdom Taxation*

*The following is a summary of the expected U.K. taxation treatment of participation by non-U.K. resident Limited Partners in Millennium USA based upon current law and practice (which, in either case, may change). This summary is of a general nature only, and should not be construed as tax advice to any particular investor. Prospective Limited Partners should*

US0109 (Lehman)

*consult their own professional advisers on the taxation implications of their investment in Millennium USA.*

Because Millennium USA and the Master Partnership are partnerships, and except for withholding tax on certain interest and other income received by Millennium USA or the Master Partnership which has a U.K. source, a non-U.K. resident Limited Partner will be liable to U.K. tax on his share of the profits of Millennium USA only to the extent that those profits arise from a trade carried on by Millennium USA or the Master Partnership in the U.K. Since it is intended that Millennium USA will primarily invest its capital in the Master Partnership, it is not believed that Millennium USA will in the normal course of its activities be carrying on a trade for U.K. taxation purposes. To the extent that the Master Partnership (or Millennium USA) is regarded for U.K. taxation purposes as carrying on activities which constitute a trade carried on by it in the U.K. through a U.K. "permanent establishment" (in the case of a non-U.K. resident Limited Partner which is a company) or through a branch or agency which constitutes an assessable "U.K. representative" (in the case of a non-U.K. resident Limited Partner which is not a company), the non-U.K. resident Limited Partner will be subject to U.K. tax on his share of the profits of that trade. However, it is intended that the respective affairs of Millennium USA, the Master Partnership, Millennium Management and MCP UK will be conducted in such a way that no such U.K. "permanent establishment" or assessable "U.K. representative" will arise. In particular, it is intended that Millennium USA, the Master Partnership, Millennium Management and MCP UK will operate in accordance with the conditions of a particular statutory exemption (the "investment manager exemption") so that, in the event that any of the activities of the Master Partnership (or Millennium USA) are regarded as constituting a trade carried on by the Master Partnership (or Millennium USA) in the U.K. through the agency of MCP UK, MCP UK will not be a U.K. "permanent establishment" or an assessable "U.K. representative" of a non-U.K. resident Limited Partner and hence such a Limited Partner will not be subject to U.K. tax on his share of the profits and gains of the Master Partnership (or Millennium USA) arising through the agency of MCP UK. However, it cannot be guaranteed that the conditions of the availability of the investment manager exemption will at all times be satisfied, or that any U.K. based third-party Portfolio Managers who may be engaged to manage a portion of the Master Partnership's (or Millennium USA's) assets will comply with the investment manager exemption.

Further, HM Revenue and Customs ("HMRC") have recently initiated a consultation process on the application of the investment manager exemption (contained in section 127 and Schedule 23 of the Finance Act 1995, and section 148 and Schedule 26 of the Finance Act 2003). The primary focus of the consultation process is Statement of Practice 1/01 ("SP1/01") which explains the application of the legislation. HMRC intend to revise SP1/01 to meet developments in the investment management industry and to further clarify the legislation. Although not anticipated, it is possible that such revised practice will significantly alter the application of the investment manager exemption.

*Unrelated Business Taxable Income*

Generally, an exempt organization is exempt from federal income tax on its passive investment income, such as dividends, interest and capital gains, whether realized by the

US0109 (Lehman)

organization directly or indirectly through a partnership in which it is a partner.[10] This type of income is exempt even if it is realized from securities trading activity which constitutes a trade or business.

This general exemption from tax does not apply to the "unrelated business taxable income" ("UBTI") of an exempt organization. Generally, except as noted above with respect to certain categories of exempt trading activity, UBTI includes income or gain derived (either directly or through partnerships) from a trade or business, the conduct of which is substantially unrelated to the exercise or performance of the organization's exempt purpose or function. UBTI also includes "unrelated debt-financed income," which generally consists of (i) income derived by an exempt organization (directly or through a partnership) from income-producing property with respect to which there is "acquisition indebtedness" at any time during the taxable year, and (ii) gains derived by an exempt organization (directly or through a partnership) from the disposition of property with respect to which there is "acquisition indebtedness" at any time during the twelve-month period ending with the date of such disposition. With respect to its investments in partnerships engaged in a trade or business, Millennium USA's income (or loss) from these investments may constitute UBTI.

Millennium USA may incur "acquisition indebtedness" with respect to certain of its transactions, such as the purchase of securities on margin. Based upon a published ruling issued by the Service which generally holds that income and gain with respect to short sales of publicly traded stock does not constitute income from debt financed property for purposes of computing UBTI, Millennium USA will treat its short sales of securities as not involving "acquisition indebtedness" and therefore not resulting in UBTI.[11] To the extent Millennium USA recognizes income (i.e., dividends and interest) from securities with respect to which there is "acquisition indebtedness" during a taxable year, the percentage of such income which will be treated as UBTI generally will be based on the percentage which the "average acquisition indebtedness" incurred with respect to such securities is of the "average amount of the adjusted basis" of such securities during the taxable year.

To the extent Millennium USA recognizes gain from securities with respect to which there is "acquisition indebtedness" at any time during the twelve-month period ending with the date of their disposition, the percentage of such gain which will be treated as UBTI will be based on the percentage which the highest amount of such "acquisition indebtedness" is of the "average amount of the adjusted basis" of such securities during the taxable year. In determining the unrelated debt-financed income of Millennium USA, an allocable portion of deductions directly connected with Millennium USA's debt-financed property is taken into account. Thus, for instance, a percentage of losses from debt-financed securities (based on the debt/basis percentage calculation described above) would offset gains treated as UBTI.

---

[10]    With certain exceptions, tax-exempt organizations which are private foundations are subject to a 2% federal excise tax on their "net investment income." The rate of the excise tax for any taxable year may be reduced to 1% if the private foundation meets certain distribution requirements for the taxable year. A private foundation will be required to make payments of estimated tax with respect to this excise tax.

[11]    Moreover, income realized from option writing and futures contract transactions generally would not constitute UBTI.

US0109 (Lehman)

Since the calculation of Millennium USA's "unrelated debt-financed income" is complex and will depend in large part on the amount of leverage, if any, used by Millennium USA from time to time,[12] it is impossible to predict what percentage of Millennium USA's income and gains will be treated as UBTI for a Limited Partner which is an exempt organization. An exempt organization's share of the income or gains of Millennium USA which is treated as UBTI may not be offset by losses of the exempt organization either from Millennium USA or otherwise, unless such losses are treated as attributable to an unrelated trade or business (*e.g.*, losses from securities for which there is acquisition indebtedness).

To the extent that Millennium USA generates UBTI, the applicable federal tax rate for such a Limited Partner generally would be either the corporate or trust tax rate depending upon the nature of the particular exempt organization. An exempt organization may be required to support, to the satisfaction of the Service, the method used to calculate its UBTI. Millennium USA will be required to report to a Partner which is an exempt organization information as to the portion, if any, of its income and gains from Millennium USA for each year which will be treated as UBTI. The calculation of such amount with respect to transactions entered into by Millennium USA is highly complex, and there is no assurance that Millennium USA's calculation of UBTI will be accepted by the Service.

In general, if UBTI is allocated to an exempt organization such as a qualified retirement plan or a private foundation, the portion of Millennium USA's income and gains which is not treated as UBTI will continue to be exempt from tax, as will the organization's income and gains from other investments which are not treated as UBTI. Therefore, the possibility of realizing UBTI from its investment in Millennium USA generally should not affect the tax-exempt status of such an exempt organization.[13] However, a charitable remainder trust will not be exempt from federal income tax under Section 664(c) of the Code for any year in which it has UBTI. A title-holding company will not be exempt from tax if it has certain types of UBTI. Moreover, the charitable contribution deduction for a trust under Section 642(c) of the Code may be limited for any year in which the trust has UBTI. A prospective investor should consult its tax advisor with respect to the tax consequences of receiving UBTI from Millennium USA. (See "ERISA Considerations.")

*Certain Issues Pertaining to Specific Exempt Organizations*

Private Foundations. Private foundations and their managers are subject to excise taxes if they invest "any amount in such a manner as to jeopardize the carrying out of any of the foundation's exempt purposes." This rule requires a foundation manager, in making an investment, to exercise "ordinary business care and prudence" under the facts and circumstances prevailing at the time of making the investment, in providing for the short-term and long-term needs of the foundation to carry out its exempt purposes. The factors which a foundation

---

[12]    The calculation of a particular exempt organization's UBTI would also be affected if it incurs indebtedness to finance its investment in Millennium USA. An exempt organization is required to make estimated tax payments with respect to its UBTI.

[13]    Certain exempt organizations which realize UBTI in a taxable year will not constitute "qualified organizations" for purposes of Section 514(c)(9)(B)(vi)(I) of the Code, pursuant to which, in limited circumstances, income from certain real estate partnerships in which such organizations invest might be treated as exempt from UBTI. A prospective tax-exempt Limited Partner should consult its tax advisor in this regard.

US0109 (Lehman)

manager may take into account in assessing an investment include the expected rate of return (both income and capital appreciation), the risks of rising and falling price levels, and the need for diversification within the foundation's portfolio.

In order to avoid the imposition of an excise tax, a private foundation may be required to distribute on an annual basis its "distributable amount," which includes, among other things, the private foundation's "minimum investment return," defined as 5% of the excess of the fair market value of its nonfunctionally related assets (assets not used or held for use in carrying out the foundation's exempt purposes), over certain indebtedness incurred by the foundation in connection with such assets. It appears that a foundation's investment in Millennium USA would most probably be classified as a nonfunctionally related asset. A determination that an interest in Millennium USA is a nonfunctionally related asset could conceivably cause cash flow problems for a prospective Limited Partner which is a private foundation. Such an organization could be required to make distributions in an amount determined by reference to unrealized appreciation in the value of its interest in Millennium USA. Of course, this factor would create less of a problem to the extent that the value of the investment in Millennium USA is not significant in relation to the value of other assets held by a foundation.

In some instances, an investment in Millennium USA by a private foundation may be prohibited by the "excess business holdings" provisions of the Code. For example, if a private foundation (either directly or together with a "disqualified person") acquires more than 20% of the capital interest or profits interest of Millennium USA, the private foundation may be considered to have "excess business holdings." If this occurs, such foundation may be required to divest itself of its interest in Millennium USA in order to avoid the imposition of an excise tax. However, the excise tax will not apply if at least 95% of the gross income from Millennium USA is "passive" within the applicable provisions of the Code and Regulations. There can be no assurance that Millennium USA will meet such 95% gross income test.

A substantial percentage of investments of certain "private operating foundations" may be restricted to assets directly devoted to their tax-exempt purposes. Otherwise, generally, rules similar to those discussed above govern their operations.

Qualified Retirement Plans. Employee benefit plans subject to the provisions of ERISA, Individual Retirement Accounts and Keogh Plans should consult their counsel as to the implications of such an investment under ERISA. (See "ERISA Considerations.")

Endowment Funds. Investment managers of endowment funds should consider whether the acquisition of an Interest is legally permissible. This is not a matter of federal law, but is determined under state statutes. It should be noted, however, that under the Uniform Management of Institutional Funds Act, which has been adopted, in various forms, by a large number of states, participation in investment partnerships or similar organizations in which funds are commingled and investment determinations are made by persons other than the governing board of the endowment fund is allowed.

Excise Tax on Certain Reportable Transactions. Under new legislation, a tax-exempt entity (including a state or local government or its political subdivision) may be subject to an excise tax equal to the greater of (i) 100% of the net income or (ii) 75% of the proceeds,

attributable to certain "reportable transactions," including "listed transactions," if any, in which it participates. The scope of this legislation, and the manner in which it may apply to a tax-exempt investor in Millennium USA, is not entirely clear. Tax-exempt investors should discuss with their own advisors the applicability of these rules to their investment in Millennium USA. (See "Tax Shelter Reporting Requirements" below.)

*Tax Shelter Reporting Requirements*

The Regulations require Millennium USA to complete and file Form 8886 ("Reportable Transaction Disclosure Statement") with its tax return for any taxable year in which Millennium USA participates in a "reportable transaction." Additionally, each Partner treated as participating in a reportable transaction of Millennium USA is required to file Form 8886 with its tax return. Millennium USA and any such Partner, respectively, must also submit a copy of the completed form with the Service's Office of Tax Shelter Analysis. Millennium USA intends to notify the Partners that it believes (based on information available to Millennium USA) are required to report a transaction of Millennium USA, and intends to provide such Limited Partners with any available information needed to complete and submit Form 8886 with respect to Millennium USA's transactions. In certain situations, there may also be a requirement that a list be maintained of persons participating in such reportable transactions, which could be made available to the Service at its request.

A Partner's recognition of a loss upon its disposition of an interest in Millennium USA could also constitute a "reportable transaction" for such Partner, requiring such Partner to file Form 8886.

Under new legislation, a significant penalty is imposed on taxpayers who participate in a "reportable transaction" and fail to make the required disclosure. The penalty is generally $10,000 for natural persons and $50,000 for other persons (increased to $100,000 and $200,000, respectively, if the reportable transaction is a "listed" transaction). Investors should consult with their own advisors concerning the application of these reporting obligations to their specific situations.

*State and Local Taxation*

In addition to the federal income tax consequences described above, prospective investors should consider potential state and local tax consequences of an investment in Millennium USA. State and local laws often differ from federal income tax laws with respect to the treatment of specific items of income, gain, loss, deduction and credit. A Partner's distributive share of the taxable income or loss of Millennium USA generally will be required to be included in determining its reportable income for state and local tax purposes in the jurisdiction in which it is a resident. A partnership in which Millennium USA acquires an interest may conduct business in a jurisdiction which will subject to tax a Partner's share of the partnership's income from that business and may cause Partners to file tax returns in those jurisdictions. Prospective investors should consult their tax advisors with respect to the availability of a credit for such tax in the jurisdiction in which that Partner is a resident.

One or more states may impose reporting requirements on Millennium USA and/or its Partners in a manner similar to that described above in "Tax Shelter Reporting Requirements."

Investors should consult with their own advisors as to the applicability of such rules in jurisdictions which may require or impose a filing requirement.

Millennium USA should not be subject to the New York City unincorporated business tax, which is not imposed on a partnership which purchases and sells securities for its "own account." (This exemption may not be applicable to the extent a partnership in which Millennium USA invests conducts a business in New York City.) By reason of a similar "own account" exemption, it is also expected that a nonresident individual Partner should not be subject to New York State personal income tax with respect to his share of income or gain realized directly by Millennium USA.

Individual Limited Partners who are residents of New York State and New York City should be aware that the New York State and New York City personal income tax laws limit the deductibility of itemized deductions and interest expense for individual taxpayers at certain income levels. As described above, Millennium USA expects to be in a trade or business within the meaning of the Code. Accordingly, Millennium USA intends to treat its expenses as not being subject to the foregoing limitations on deductibility. However, there can be no assurance that New York State and New York City will not treat such expenses as investment expenses which are subject to such limitations. Prospective Limited Partners are urged to consult their tax advisors with respect to the impact of these provisions and the Federal limitations on the deductibility of certain itemized deductions and investment expenses on their New York State and New York City tax liability.

For purposes of the New York State corporate franchise tax and the New York City general corporation tax, a corporation generally is treated as doing business in New York State and New York City, respectively, and is subject to such corporate taxes as a result of the ownership of a partnership interest in a partnership which does business in New York State and New York City, respectively.[14] Each of the New York State and New York City corporate taxes are imposed, in part, on the corporation's taxable income or capital allocable to the relevant jurisdiction by application of the appropriate allocation percentages. Moreover, a non-New York corporation which does business in New York State may be subject to a New York State license fee. A corporation which is subject to New York State corporate franchise tax solely as a result of being a limited partner in a New York partnership may, under certain circumstances, elect to compute its New York State corporate franchise tax by taking into account only its distributive share of such partnership's income and loss. There is currently no similar provision in effect for purposes of the New York City general corporation tax.

Regulations under both the New York State corporate franchise tax and the New York City general corporation tax, however, provide an exception to this general rule in the case of a "portfolio investment partnership," which is defined, generally, as a partnership which meets the gross income requirements of Section 851(b)(2) of the Code. New York State (but not New York City) has adopted regulations that also include income and gains from commodity transactions described in Section 864(b)(2)(B)(iii) as qualifying gross income for this purpose.

---

[14]    New York State (but not New York City) generally exempts from corporate franchise tax a non-New York corporation which (i) does not actually or constructively own a 1% or greater limited partnership interest in a partnership doing business in New York and (ii) has a tax basis in such limited partnership interest not greater than $1 million.

US0109 (Lehman)

Millennium USA's qualification as such a portfolio investment partnership must be determined on an annual basis and, with respect to a taxable year, Millennium USA may not qualify as a portfolio investment partnership.

New York State has enacted legislation that imposes a quarterly withholding obligation on certain partnerships with respect to partners that are individual non-New York residents or corporations (other than "S" corporations). Accordingly, Millennium USA may be required to withhold on the distributive shares of New York source partnership income allocable to such partners to the extent such income is not derived from trading in securities for Millennium USA's own account.

A trust or other unincorporated organization which by reason of its purposes or activities is exempt from federal income tax is also exempt from New York State and New York City personal income tax. A nonstock corporation which is exempt from federal income tax is generally presumed to be exempt from New York State corporate franchise tax and New York City general corporation tax. New York State imposes a tax with respect to such exempt entities on UBTI (including unrelated debt-financed income) at a rate which is currently equal to the New York State corporate franchise tax rate (plus the corporate surtax). There is no New York City tax on the UBTI of an otherwise exempt entity.

Each prospective Partner should consult its tax advisor with regard to the New York State and New York City tax consequences of an investment in Millennium USA.

### ERISA Considerations Relating to an Investment in Millennium USA

**CIRCULAR 230 NOTICE.** THE FOLLOWING NOTICE IS BASED ON U.S. TREASURY REGULATIONS GOVERNING PRACTICE BEFORE THE U.S. INTERNAL REVENUE SERVICE: (1) ANY U.S. FEDERAL TAX ADVICE CONTAINED HEREIN, INCLUDING ANY OPINION OF COUNSEL REFERRED TO HEREIN, IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING U.S. FEDERAL TAX PENALTIES THAT MAY BE IMPOSED ON THE TAXPAYER; (2) ANY SUCH ADVICE IS WRITTEN TO SUPPORT THE PROMOTION OR MARKETING OF THE TRANSACTIONS DESCRIBED HEREIN (OR IN ANY SUCH OPINION OF COUNSEL); AND (3) EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

THE FOLLOWING SUMMARY OF CERTAIN ASPECTS OF ERISA IS BASED UPON ERISA, JUDICIAL DECISIONS, DEPARTMENT OF LABOR REGULATIONS AND RULINGS IN EXISTENCE ON THE DATE HEREOF. THIS SUMMARY IS GENERAL IN NATURE AND DOES NOT ADDRESS EVERY ERISA ISSUE THAT MAY BE APPLICABLE TO MILLENNIUM USA, THE MASTER PARTNERSHIP, OR A PARTICULAR INVESTOR. ACCORDINGLY, EACH PROSPECTIVE PURCHASER SHOULD CONSULT WITH ITS OWN COUNSEL IN ORDER TO UNDERSTAND THE ERISA ISSUES AFFECTING MILLENNIUM USA, THE MASTER PARTNERSHIP, AND THE PROSPECTIVE PURCHASER.

US0109 (Lehman)

*General*

Persons who are fiduciaries with respect to a U.S. employee benefit plan or trust within the meaning of and subject to the provisions of ERISA (an "ERISA Plan"), an individual retirement account or a Keogh plan subject solely to the provisions of the Code (an "Individual Retirement Fund") should consider, among other things, the matters described below before determining whether to invest in Millennium USA.

ERISA imposes certain general and specific responsibilities on persons who are Fiduciaries with respect to an ERISA Plan, including prudence, diversification, avoidance of prohibited transactions and compliance with other standards. In determining whether a particular investment is appropriate for an ERISA Plan, U.S. Department of Labor ("DOL") regulations provide that a fiduciary of an ERISA Plan must give appropriate consideration to, among other things, the role that the investment plays in the ERISA Plan's portfolio, taking into consideration whether the investment is designed reasonably to further the ERISA Plan's purposes, the risk and return factors of the potential investment, including the fact that the returns may be subject to federal tax as unrelated business taxable income, the portfolio's composition with regard to diversification, the liquidity and current return of the total portfolio relative to the anticipated cash flow needs of the ERISA Plan, the projected return of the total portfolio relative to the ERISA Plan's funding objectives, and the limitation on the rights of Limited Partners to withdraw all or any part of their Interests or to transfer their Interests. Before investing the assets of an ERISA Plan in Millennium USA (and thus the Master Partnership), a fiduciary should determine whether such an investment is consistent with its fiduciary responsibilities and the foregoing regulations. For example, a fiduciary should consider whether an investment in Millennium USA (and thus the Master Partnership) may be too illiquid or too speculative for a particular ERISA Plan and whether the assets of the ERISA Plan would be sufficiently diversified. If a fiduciary with respect to any such ERISA Plan breaches its responsibilities with regard to selecting an investment or an investment course of action for such ERISA Plan, the fiduciary may be held personally liable for losses incurred by the ERISA Plan as a result of such breach.

*Plan Assets Defined*

ERISA and applicable DOL regulations describe when the underlying assets of an entity in which benefit plan investors ("Benefit Plan Investors") invest are treated as "plan assets" for purposes of ERISA. Under ERISA, Benefit Plan Investors are defined to include an "employee benefit plan" that is subject to the provisions of Title I of ERISA, a "plan" that is subject to the prohibited transaction provisions of Section 4975 of the IRC, and entities the assets of which are treated as "plan assets" by reason of investment therein by Benefit Plan Investors.

Under ERISA, as a general rule, when an ERISA Plan invests assets in another entity, the ERISA Plan's assets include its investment, but do not, solely by reason of such investment, include any of the underlying assets of the entity. However, when an ERISA Plan acquires an "equity interest" in an entity that is neither: (a) a "publicly offered security;" nor (b) a security issued by an investment Partnership registered under the Investment Company Act, then the ERISA Plan's assets include both the equity interest and an undivided interest in each of the

US0109 (Lehman)

underlying assets of the entity, unless it is established that: (i) the entity is an "operating company;" or (ii) the equity participation in the entity by Benefit Plan Investors is limited.

Under ERISA, the assets of an entity will not be treated as "plan assets" if Benefit Plan Investors hold less than 25% (or such higher percentage as may be specified in regulations promulgated by the DOL) of the value of any class of equity interests in the entity. Equity interests held by a person with discretionary authority or control with respect to the assets of the entity and equity interests held by a person who provides investment advice for a fee (direct or indirect) with respect to such assets or any affiliate of any such person (other than a Benefit Plan Investor) are not considered for purposes of determining whether the assets of an entity will be treated as "plan assets" for purposes of ERISA. The Benefit Plan Investor percentage of ownership test applies at the time of an acquisition by any person of the equity interests. In addition, an advisory opinion of the DOL takes the position that a redemption of an equity interest by an investor constitutes the acquisition of an equity interest by the remaining investors (through an increase in their percentage ownership of the remaining equity interests), thus triggering an application of the Benefit Plan Investor percentage of ownership test at the time of the redemption.

*Limitation on Investments by Benefit Plan Investors*

Millennium Management currently intends to monitor the investments in Millennium USA and the Master Partnership to ensure that the aggregate investment by Benefit Plan Investors does not equal or exceed 25% of the value of any class of the interests in each of Millennium USA and the Master Partnership (or such higher percentage as may be specified in regulations promulgated by the DOL) so that assets of neither Millennium USA nor the Master Partnership will be treated as "plan assets" under ERISA. Interests held by Millennium Management and its affiliates are not considered for purposes of determining whether the assets of Millennium USA will be treated as "plan assets" for the purpose of ERISA. If the assets of Millennium USA were treated as "plan assets" of a Benefit Plan Investor, Millennium Management would be a "fiduciary" (as defined in ERISA and the IRC) with respect to each such Benefit Plan Investor, and would be subject to the obligations and liabilities imposed on fiduciaries by ERISA. Similarly if the assets of the Master Partnership were treated as "plan assets" of a Benefit Plan Investor, Millennium Management would be a "fiduciary" (as defined in ERISA and the IRC) with respect to each such Benefit Plan Investor, and would be subject to the obligations and liabilities imposed on fiduciaries by ERISA. In such circumstances, Millennium USA (and/or the Master Partnership, as appropriate) would be subject to various other requirements of ERISA and the IRC. In particular, Millennium USA (and/or the Master Partnership, as appropriate) would be subject to rules restricting transactions with "parties in interest" and prohibiting transactions involving conflicts of interest on the part of fiduciaries which might result in a violation of ERISA and the IRC unless Millennium USA (and/or the Master Partnership, as appropriate) obtained appropriate exemptions from the DOL allowing Millennium USA (and/or the Master Partnership, as appropriate) to conduct its operations as described herein. As described above under "Millennium USA's Organization, Management, Structure and Operations – Compulsory Withdrawal," Millennium Management reserves the right to redeem all or part of the interests held by any limited partner, including, without limitation, to ensure compliance with the percentage limitation on investment in Millennium USA by Benefit Plan Investors as set forth above and similar rules apply to the Master

US0109 (Lehman)

Partnership. Millennium Management reserves the right, however, to waive the Benefit Plan Investor percentage of ownership limitation and thereafter to comply with ERISA.

*Representations by Plans*

An ERISA Plan proposing to invest in Millennium USA (and thus the Master Partnership) will be required to represent that it is, and any fiduciaries responsible for the ERISA Plan's investments are, aware of and understand Millennium USA's and the Master Partnership's investment objectives, policies and strategies, and that the decision to invest plan assets in Millennium USA (and thus the Master Partnership) was made with appropriate consideration of relevant investment factors with regard to the ERISA Plan and is consistent with the duties and responsibilities imposed upon fiduciaries with regard to their investment decisions under ERISA.

WHETHER OR NOT THE UNDERLYING ASSETS OF MILLENNIUM USA (OR THE MASTER PARTNERSHIP) ARE TREATED AS "PLAN ASSETS" UNDER ERISA, AN INVESTMENT IN MILLENNIUM USA (AND THUS THE MASTER PARTNERSHIP) BY AN ERISA PLAN IS SUBJECT TO ERISA. ACCORDINGLY, FIDUCIARIES OF ERISA PLANS SHOULD CONSULT WITH THEIR OWN COUNSEL AS TO THE CONSEQUENCES UNDER ERISA OF AN INVESTMENT IN MILLENNIUM USA (AND THUS THE MASTER PARTNERSHIP).

*ERISA Plans and Individual Retirement Funds Having Prior Relationships with Millennium Management or its Affiliates*

Certain prospective ERISA Plan and Individual Retirement Funds investors may currently maintain relationships with Millennium Management or other entities which are affiliated with Millennium Management. Each of such entities may be deemed to be a party in interest to and/or a fiduciary of any ERISA Plan or Individual Retirement Fund to which any of Millennium Management or its affiliates provides investment management, investment advisory or other services. ERISA prohibits ERISA Plan assets to be used for the benefit of a party in interest and also prohibits an ERISA Plan fiduciary from using its position to cause the ERISA Plan to make an investment from which it or certain third parties in which such fiduciary has an interest would receive a fee or other consideration. Similar provisions are imposed by the Code with respect to Individual Retirement Funds. ERISA Plan and Individual Retirement Fund investors should consult with counsel to determine if participation in Millennium USA is a transaction which is prohibited by ERISA or the Code.

The provisions of ERISA are subject to extensive and continuing administrative and judicial interpretation and review. The discussion of ERISA contained herein is, of necessity, general and may be affected by future publication of regulations and rulings. Prospective investors should consult with their legal advisers regarding the consequences under ERISA of the acquisition and ownership of Interests.

### Millennium USA's Fiscal Year

The fiscal year-end of Millennium USA is December 31.

US0109 (Lehman)

## Millennium USA's Legal Counsel

Schulte Roth & Zabel LLP, 919 Third Avenue, New York, New York 10022, has acted as counsel to Millennium USA in connection with the offering of the Offered Interests. Schulte Roth & Zabel LLP also acts as counsel to Millennium Management and its affiliates (including the Master Partnership). In connection with this offering of Offered Interests and subsequent advice to Millennium USA, Millennium Management and its affiliates, Schulte Roth & Zabel LLP will not be representing Limited Partners. No independent counsel has been engaged to represent the Limited Partners. An employee benefit plan of Schulte Roth & Zabel LLP, which is advised by an independent third party, may invest in Millennium International.

## Millennium USA's Independent Public Accountants

Millennium USA has retained Ernst & Young LLP, 5 Times Square, New York, New York 10036, certified public accountants, as its auditor.

## APPENDIX I TO PART ONE:  FIVE YEAR PERFORMANCE HISTORY[1]

## PAST PERFORMANCE IS NOT NECESSARILY INDICATIVE OF FUTURE RESULTS

**MILLENNIUM USA L.P.**
**PERFORMANCE HISTORY[1]**
**NET MONTHLY RETURNS FOR CLASSES A THRU D AND Q THRU T[2]**

| | Net Rate of Return | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **Jan** | **Feb** | **Mar** | **Apr** | **May** | **Jun** | **Jul** | **Aug** | **Sep** | **Oct** | **Nov** | **Dec** | **Year** |
| 2002 | -0.15% | 0.19% | 1.96% | 0.60% | 0.96% | 0.67% | 1.72% | 0.54% | 0.11% | 0.11% | 0.61% | 1.19% | 8.91% |
| 2003 | 0.54% | 0.54% | 0.50% | 1.16% | 1.24% | 1.54% | 1.02% | 1.34% | 0.59% | 0.44% | 0.48% | 1.09% | 11.11% |
| 2004 | 2.02% | 2.32% | 0.41% | 1.69% | 0.98% | 0.29% | 0.66% | 0.19% | 1.27% | 0.86% | 1.92% | 2.42% | 16.32% |
| 2005 | 0.94% | 1.28% | 0.95% | 0.19% | 0.61% | 1.37% | 1.68% | 0.93% | 1.04% | 0.04% | -0.26% | 1.93% | 11.35% |
| 2006 | 2.84% | 1.39% | 1.62% | 1.70% | 0.20% | 0.66% | 0.92% | 0.85% | 0.16% | 1.90% | 1.77% | 1.66% | 17.13% |
| 2007 | 1.63% | 1.11% | 1.07% | 0.96% | 1.08%[3] | | | | | | | | 6.03%[4] |

### NET MONTHLY RETURNS FOR SHARE CLASSES M THRU P,  U THRU X, OO and PP[2]

| | Net Rate of Return | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **Jan** | **Feb** | **Mar** | **Apr** | **May** | **Jun** | **Jul** | **Aug** | **Sep** | **Oct** | **Nov** | **Dec** | **Year** |
| 2004 | 2.02% | 2.32% | 0.41% | 1.69% | 0.98% | 0.29% | 0.66% | 0.25% | 1.27% | 0.86% | 1.92% | 2.42% | 16.40% |
| 2005 | 0.94% | 1.28% | 0.95% | 0.19% | 0.66% | 1.37% | 1.68% | 0.93% | 1.04% | 0.04% | 1.56% | 1.93% | 13.48% |
| 2006 | 2.84% | 1.39% | 1.62% | 1.70% | 0.20% | 0.66% | 0.92% | 0.85% | 0.16% | 1.90% | 1.77% | 1.66% | 17.13% |
| 2007 | 1.63% | 1.11% | 1.07% | 0.96% | 1.08%[3] | | | | | | | | 6.03%[4] |

[1] The first return table reflects a net charge of 1.82% in November 2005 relating to the Mutual Funds Investigation. Generally accepted accounting principles require that this settlement be treated as a 2005 event even though it was borne entirely by pre-2004 investors. The second return table reflects the returns of Millennium USA for those investors who invested in Millennium USA subsequent to December 31, 2003 and therefore do not reflect any charges relating to the Mutual Funds Investigation.
[2] Returns include net gains from "hot issues" or "new issues". See Note 7 below.
[3] May 2007 numbers are estimates.
[4] 2007 data is through May, with May 2007 numbers estimated.
10424212.4

US0109 (Lehman)

**PAST PERFORMANCE IS NOT NECESSARILY INDICATIVE OF FUTURE RESULTS**

### MILLENNIUM USA, L.P.
### NOTES TO PERFORMANCE HISTORY TABLE AND
### CAPITAL UNDER MANAGEMENT TABLE
### (in thousands)

|  | Beginning | Contributions | (Withdrawals) | Gross Performance | Ending | Average Capital |
|---|---|---|---|---|---|---|
| 2001 | 777,460 | 137,308 | (133,248) | 158,183 | 939,703 | 929,145 |
| 2002 | 939,703 | 146,589 | (158,256) | 102,158 | 1,030,194 | 958,602 |
| 2003 | 1,030,194 | 86,309 | (220,060) | 128,618 | 1,025,060 | 983,960 |
| 2004 | 1,025,060 | 149,319 | (489,132) | 150,569 | 835,816 | 799,478 |
| 2005 | 835,816 | 424,662 | (153,859) | 156,033 | 1,262,652 | 1,181,594 |
| 2006 | 1,262,652 | 336,316 | (185,028) | 303,326 | 1,717,266 | 1,572,091 |
| 2007[5] | 1,717,266 | 313,013 | (47,687) | 142,610 | 2,125,202 | 1,975,169 |

[5] 2007 data is through May, with May 2007 numbers estimated.

US0109 (Lehman)

**MILLENNIUM USA, L.P.**
**NOTES TO PERFORMANCE HISTORY TABLE AND**
**CAPITAL UNDER MANAGEMENT TABLE**

1. The first performance table represents returns of Millennium USA for those contributions made prior to January 1, 2004. The second performance table reflects the net returns of Millennium USA for those contributions made subsequent to December 31, 2003 and do not reflect any charges related to the Mutual Fund Investigation.

2. Net Rate of Return for a month is calculated by dividing Net Monthly Performance (Refer to Note 3) by the Ending Net Asset Value from the previous month, plus contributions and less withdrawals.

3. Gross Performance represents the profit (loss) net of expenses but before the Incentive Allocation. Millennium Management is entitled to an Incentive Allocation, equal to 20% of the Net Capital Appreciation. No Incentive Allocation is made to the extent of the value of any Loss Recovery Accounts maintained with respect to a Limited Partner's Capital Accounts. The Incentive Allocation generally is reallocated to Millennium Management at the end of the fiscal year. However, to calculate Net Monthly Performance, which is used to compute the Net Monthly Rate of Return, the Incentive Allocation has been included as a monthly expense. Yearly rates of return are based on money invested as of the first of January and reflect the Incentive Allocation being charged at the end of the year. Net Rate of Return figures will be net of the Incentive Allocation, expenses of Millennium USA and Millennium USA's *pro rata* share of expenses incurred by the Master Partnership.

4. Average Capital is the sum of each month's capital divided by the number of months in each fiscal year. Each month's capital is calculated by taking the prior month end capital and adding the current month's additions less withdrawals.

5. The monthly performance set forth herein has not been audited but is believed by Millennium USA to be accurate. Financial statements of Millennium USA, along with annual percentage returns of Millennium USA have been audited by Ernst & Young LLP and are available upon request.

6. Millennium USA invests primarily in the Master Partnership.

7. Included in the returns is income from "hot issues" or "new issues" which is allocated to investors who are eligible to participate. "Hot issues" and/or "new issue" income increased the year to date returns as follows:

10424212.4

US0109 (Lehman)

| Year | Increase |
|------|----------|
| 2001 | 0.04% |
| 2002 | 0.02% |
| 2003 | 0.01% |
| 2004 | 0.22% |
| 2005 | 0.30% |
| 2006 | 0.24% |
| 2007* | 0.12% |

\* 2007 data is through April 30, 2007

THERE CAN BE NO ASSURANCE THAT THE INVESTMENT OBJECTIVE OF MILLENNIUM USA WILL BE ACHIEVED OR THAT THE HISTORICAL INVESTMENT PERFORMANCE OF MILLENNIUM USA IS INDICATIVE OF THE INVESTMENT PERFORMANCE WHICH WILL BE ACHIEVED BY MILLENNIUM USA IN THE FUTURE. IN FACT, THE PRACTICES OF SHORT SELLING AND LEVERAGE CAN, IN CERTAIN CIRCUMSTANCES, MAXIMIZE THE ADVERSE IMPACT TO WHICH MILLENNIUM USA'S INVESTMENT PORTFOLIO MAY BE SUBJECT. (SEE "CERTAIN RISK FACTORS RELATING TO AN INVESTMENT IN THE MASTER PARTNERSHIP" IN PART TWO OF THIS CONFIDENTIAL MEMORANDUM.)

FURTHERMORE, IF MILLENNIUM MANAGEMENT AND ITS AFFILIATES DETERMINE THAT A PARTICULAR INVESTMENT IS NOT APPROPRIATE (FOR TAX OR OTHER REASONS) FOR AN AFFILIATED FUND, SUCH INVESTMENT MAY BE MADE DIRECTLY BY (OR THE INCOME OR LOSS FROM SUCH INVESTMENT MAY BE ALLOCATED AT THE MASTER PARTNERSHIP LEVEL SOLELY TO) THE AFFILIATED FUND FOR WHICH THE INVESTMENT IS DEEMED APPROPRIATE. (SEE "RELATED PARTY TRANSACTIONS; CONFLICTS - ALLOCATION OF INVESTMENTS TO AFFILIATED FUNDS" IN PART TWO OF THIS CONFIDENTIAL MEMORANDUM.)

APRIL 2008

## SUPPLEMENT[1] TO APPENDIX I TO PART ONE: FIVE YEAR PERFORMANCE HISTORY[2]

## PAST PERFORMANCE IS NOT NECESSARILY INDICATIVE OF FUTURE RESULTS

MILLENNIUM USA LP
PERFORMANCE HISTORY[1]
NET MONTHLY RETURNS FOR CLASSES A THRU D AND Q THRU T[3]

| | Net Rate of Return | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Year |
| 2003 | 0.54% | 0.54% | 0.50% | 1.16% | 1.24% | 1.54% | 1.02% | 1.34% | 0.59% | 0.44% | 0.48% | 1.09% | 11.11% |
| 2004 | 2.02% | 2.32% | 0.41% | 1.69% | 0.98% | 0.29% | 0.66% | 0.19% | 1.27% | 0.86% | 1.92% | 2.42% | 16.32% |
| 2005 | 0.94% | 1.28% | 0.95% | 0.19% | 0.61% | 1.37% | 1.68% | 0.93% | 1.04% | 0.04% | -0.26% | 1.93% | 11.35% |
| 2006 | 2.84% | 1.39% | 1.62% | 1.70% | 0.20% | 0.66% | 0.92% | 0.85% | 0.16% | 1.90% | 1.77% | 1.66% | 17.13% |
| 2007 | 1.63% | 1.11% | 1.07% | 0.96% | 1.18% | 0.86% | 0.08% | -0.86% | 0.93% | 2.26% | 0.27% | 0.84% | 10.94% |
| 2008 | 0.33% | 1.60% | -1.05%[3] | | | | | | | | | | 0.87%[4] |

### NET MONTHLY RETURNS FOR SHARE CLASSES M THRU P, U THRU X, OO and PP[2]

| | Net Rate of Return | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Year |
| 2004 | 2.02% | 2.32% | 0.41% | 1.69% | 0.98% | 0.29% | 0.66% | 0.25% | 1.27% | 0.86% | 1.92% | 2.42% | 16.40% |
| 2005 | 0.94% | 1.28% | 0.95% | 0.19% | 0.66% | 1.37% | 1.68% | 0.93% | 1.04% | 0.04% | 1.56% | 1.93% | 13.48% |
| 2006 | 2.84% | 1.39% | 1.62% | 1.70% | 0.20% | 0.66% | 0.92% | 0.85% | 0.16% | 1.90% | 1.77% | 1.66% | 17.13% |
| 2007 | 1.63% | 1.11% | 1.07% | 0.96% | 1.08%[3] | 0.86% | 0.08% | -0.86% | 0.93% | 2.26% | 0.27% | 0.84% | 10.94% |
| 2008 | 0.33% | 1.60% | -1.05%[3] | | | | | | | | | | 0.87%[4] |

[1] This Supplement replaces and supersedes the Appendix I to Part One attached to the Confidential Memorandum for Millennium USA LP dated June 1, 2007.
[2] The first return table reflects a net charge of 1.82% in November 2005 relating to the Mutual Funds Investigation. Generally accepted accounting principles require that this settlement be treated as a 2005 event even though it was borne entirely by pre-2004 investors. The second return table reflects the returns of Millennium USA for those investors who invested in Millennium USA subsequent to December 31, 2003 and therefore do not reflect any charges relating to the Mutual Funds Investigation.
[3] Returns include net gains from "hot issues" or "new issues". See Note 7 below.
[3] March 2008 numbers are estimates.
[4] 2008 data is through March, with March 2008 numbers estimated.

**PAST PERFORMANCE IS NOT NECESSARILY INDICATIVE OF FUTURE RESULTS**

**MILLENNIUM USA LP**
**NOTES TO PERFORMANCE HISTORY TABLE AND**
**CAPITAL UNDER MANAGEMENT TABLE**
**(in thousands)**

|  | Beginning | Contributions | (Withdrawals) | Gross Performance | Ending | Average Capital |
|---|---|---|---|---|---|---|
| 2001 | 777,460 | 137,308 | (133,248) | 158,183 | 939,703 | 929,145 |
| 2002 | 939,703 | 146,589 | (158,256) | 102,158 | 1,030,194 | 958,602 |
| 2003 | 1,030,194 | 86,309 | (220,060) | 128,618 | 1,025,060 | 983,960 |
| 2004 | 1,025,060 | 149,319 | (489,132) | 150,569 | 835,816 | 799,478 |
| 2005 | 835,816 | 424,662 | (153,859) | 156,033 | 1,262,652 | 1,181,594 |
| 2006 | 1,262,652 | 336,316 | (185,028) | 303,326 | 1,717,266 | 1,572,091 |
| 2007[5] | 1,717,266 | 313,013 | (47,687) | 142,610 | 2,125,202 | 1,975,169 |

[5] 2007 data is through May, with May 2007 numbers estimated.

**MILLENNIUM USA, L.P.**
**NOTES TO PERFORMANCE HISTORY TABLE AND**
**CAPITAL UNDER MANAGEMENT TABLE**

1. The first performance table represents returns of Millennium USA for those contributions made prior to January 1, 2004. The second performance table reflects the net returns of Millennium USA for those contributions made subsequent to December 31, 2003 and do not reflect any charges related to the Mutual Fund Investigation.

2. Net Rate of Return for a month is calculated by dividing Net Monthly Performance (Refer to Note 3) by the Ending Net Asset Value from the previous month, plus contributions and less withdrawals.

3. Gross Performance represents the profit (loss) net of expenses but before the Incentive Allocation. Millennium Management is entitled to an Incentive Allocation, equal to 20% of the Net Capital Appreciation. No Incentive Allocation is made to the extent of the value of any Loss Recovery Accounts maintained with respect to a Limited Partner's Capital Accounts. The Incentive Allocation generally is reallocated to Millennium Management at the end of the fiscal year. However, to calculate Net Monthly Performance, which is used to compute the Net Monthly Rate of Return, the Incentive Allocation has been included as a monthly expense. Yearly rates of return are based on money invested as of the first of January and reflect the Incentive Allocation being charged at the end of the year. Net Rate of Return figures will be net of the Incentive Allocation, expenses of Millennium USA and Millennium USA's *pro rata* share of expenses incurred by the Master Partnership.

4. Average Capital is the sum of each month's capital divided by the number of months in each fiscal year. Each month's capital is calculated by taking the prior month end capital and adding the current month's additions less withdrawals.

5. The monthly performance set forth herein has not been audited but is believed by Millennium USA to be accurate. Financial statements of Millennium USA, along with annual percentage returns of Millennium USA have been audited by Ernst & Young LLP and are available upon request.

6. Millennium USA invests primarily in the Master Partnership.

7. Included in the returns is income from "hot issues" or "new issues" which is allocated to investors who are eligible to participate. "Hot issues" and/or "new issue" income increased the year to date returns as follows:

| Year | Increase |
|------|----------|
| 2001 | 0.04% |
| 2002 | 0.02% |
| 2003 | 0.01% |
| 2004 | 0.22% |
| 2005 | 0.30% |
| 2006 | 0.24% |
| 2007 | 0.37% |
| 2008* | 0.00% |

* 2008 data is through February 29, 2008

THERE CAN BE NO ASSURANCE THAT THE INVESTMENT OBJECTIVE OF MILLENNIUM USA WILL BE ACHIEVED OR THAT THE HISTORICAL INVESTMENT PERFORMANCE OF MILLENNIUM USA IS INDICATIVE OF THE INVESTMENT PERFORMANCE WHICH WILL BE ACHIEVED BY MILLENNIUM USA IN THE FUTURE. IN FACT, THE PRACTICES OF SHORT SELLING AND LEVERAGE CAN, IN CERTAIN CIRCUMSTANCES, MAXIMIZE THE ADVERSE IMPACT TO WHICH MILLENNIUM USA'S INVESTMENT PORTFOLIO MAY BE SUBJECT. (SEE "CERTAIN RISK FACTORS RELATING TO AN INVESTMENT IN THE MASTER PARTNERSHIP" IN PART TWO OF THIS CONFIDENTIAL MEMORANDUM.)

FURTHERMORE, IF MILLENNIUM MANAGEMENT AND ITS AFFILIATES DETERMINE THAT A PARTICULAR INVESTMENT IS NOT APPROPRIATE (FOR TAX OR OTHER REASONS) FOR AN AFFILIATED FUND, SUCH INVESTMENT MAY BE MADE DIRECTLY BY (OR THE INCOME OR LOSS FROM SUCH INVESTMENT MAY BE ALLOCATED AT THE MASTER PARTNERSHIP LEVEL SOLELY TO) THE AFFILIATED FUND FOR WHICH THE INVESTMENT IS DEEMED APPROPRIATE. (SEE "RELATED PARTY TRANSACTIONS; CONFLICTS - ALLOCATION OF INVESTMENTS TO AFFILIATED FUNDS" IN PART TWO OF THIS CONFIDENTIAL MEMORANDUM.)

US0109 (Lehman)

# CONFIDENTIAL MEMORANDUM
# (Part Two)

## INFORMATION RELATING TO
# MILLENNIUM PARTNERS, L.P.

THIS CONFIDENTIAL MEMORANDUM IS COMPRISED OF TWO
PARTS, WHICH MUST BE READ TOGETHER. PART ONE CONTAINS
INFORMATION SPECIFIC TO MILLENNIUM USA, L.P.,
MILLENNIUM INTERNATIONAL, LTD. OR MILLENNIUM GLOBAL
ESTATE, LP AND THIS PART TWO CONTAINS INFORMATION
SPECIFIC TO MILLENNIUM PARTNERS, L.P.

INTERESTS IN MILLENNIUM PARTNERS, L.P. ARE NOT BEING
OFFERED FOR SALE.

June 1, 2007

10447442.1

US0109 (Lehman)

## Summary of Part Two of the Confidential Memorandum
## (Information Relating to Millennium Partners, L.P.)

The following is a summary of certain information set forth more fully elsewhere in this Confidential Memorandum and the Limited Partnership Agreement (the "Partnership Agreement") of Millennium Partners, L.P. (the "Master Partnership", and, collectively with its affiliates where applicable, "Millennium"). This summary should be read in conjunction with, and is qualified in its entirety by, such detailed information.

| | |
|---|---|
| **The Master Partnership:** | The Master Partnership is an exempted limited partnership registered under the laws of the Cayman Islands. |
| | The Master Partnership has four limited partners, three of which – Millennium USA, L.P. ("Millennium USA"), Millennium International, Ltd. ("Millennium International"), and Millennium Global Estate, LP ("Millennium Global Estate", and, together with the foregoing, the "Affiliated Funds") – accept investments from outside investors. |
| | Millennium Management, L.L.C., a Delaware limited liability company registered in the Cayman Islands, is the sole general partner of the Master Partnership (the "Managing Partner"). The Partnership Agreement grants substantially all of the power to control the affairs and operations of the Master Partnership to the Managing Partner. Israel Englander is the managing member of the Managing Partner. |
| | The Master Partnership has a broker-dealer subsidiary, Millenco, L.L.C. ("Millenco"). See "The Master Partnership's Organization" and "The Master Partnership's Investment Program and Description: Leverage and Loans – Broker-Dealer Affiliates and Leverage". |
| **Certain Risk Factors:** | As described under "Certain Risk Factors Relating to an Investment in the Master Partnership" and "Related-Party Transactions; Conflicts," the investment program of the Master Partnership involves significant risks, including the Master Partnership's reliance upon the Managing Partner and a large number of internal and third-party (both exclusive and non-exclusive) portfolio managers (the "Portfolio Managers") selected by the Managing Partner, the use of leverage, trading in derivative instruments, and conflicts of interest related to investment opportunities and business activities among the Master Partnership's affiliates and their management. |
| **The Master Partnership's Investment Program and** | The investment objective of the Master Partnership is to achieve above-average capital appreciation by |

US0109 (Lehman)

**Strategy:**

opportunistically trading and investing in an extremely wide variety of securities, instruments, and other investment opportunities and engaging in a broad array of trading and investment strategies. THERE ARE NO SUBSTANTIVE LIMITS ON THE INVESTMENT STRATEGIES THAT MAY BE PURSUED BY THE MASTER PARTNERSHIP. See "The Master Partnership's Investment Program and Description: Investment Strategies."

The Master Partnership's capital is allocated among a large number of Portfolio Managers and investments are made using the capital of the Master Partnership itself and subsidiaries and affiliates of the Master Partnership.

As a general matter, rather than making primary investment and trading decisions itself, the Managing Partner grants trading authority over portions of the capital of the Master Partnership and its subsidiaries to Portfolio Managers and monitors and evaluates their performance. See "The Master Partnership's Organization – Portfolio Managers, Outside Investments and Firm Trading."

As discussed under "The Master Partnership's Investment Program and Description: Eligible Investments," the Managing Partner does not establish fixed guidelines regarding diversification of investments to be followed by the Master Partnership; the Master Partnership is authorized to invest in all types of securities and other financial instruments of United States and non-U.S. issuers, and to sell securities short.

The Master Partnership invests opportunistically and the universe of eligible investments is not materially limited by any firm policies; however, as is disclosed under "The Master Partnership's Investment Program and Description: Investment Strategies," the investment strategies that the Master Partnership employs may be expected to include, among others, some or all of the following nine core strategies:

- Relative Value Sector Arbitrage;
- Statistical Arbitrage;
- Fixed-Income Strategies;
- Merger Arbitrage and Event-Driven Strategies;
- Distressed;
- Futures/Currency Arbitrage;
- Closed-End Fund/Asset Arbitrage;
- Convertible Arbitrage; and
- Options Arbitrage.

US0109 (Lehman)

The Master Partnership may concentrate in a select few strategies while not employing others.

**Leverage:**

The Master Partnership and its affiliates have the power to borrow on a secured or unsecured basis and may do so when deemed appropriate by the Managing Partner, including to enhance the Master Partnership's returns and meet withdrawal obligations that would otherwise result in the premature liquidation of investments. Additionally, certain exchange-traded and non-exchange-traded derivative securities that may be traded will themselves have embedded leverage. The use of leverage can substantially increase the risk of losses to which the Master Partnership's investment portfolios may be subject. See "The Master Partnership's Investment Program and Description: Leverage and Loans."

**Risk Management:**

The Managing Partner's risk management personnel engage in regular monitoring of the Master Partnership's portfolio and of the Portfolio Managers' trading activity. The results of this monitoring program are used to assess the risk-adjusted profitability of the Portfolio Managers (using a number of metrics), to make capital allocation decisions, and to quantify and manage the risks inherent in the Master Partnership's portfolio. See "The Master Partnership's Management, Structure and Operations."

**The Master Partnership's Fees and Expenses:**

All expenses of the Master Partnership are assessed against the interests of the partners of the Master Partnership. These expenses include brokerage commissions, interest expense, accounting expenses, audit and tax (including withholding tax) expenses, certain compensation expenses, legal expenses, administrator, registrar and transfer agent expenses, premiums for general partner liability insurance, risk-specific insurance, and "key-man" life insurance on certain personnel (including Mr. Englander), and other administrative and operating expenses. The Master Partnership does not charge a management fee. See "The Master Partnership's Fees and Expenses."

US0109 (Lehman)

**Brokerage Issues:**

As discussed below under "The Master Partnership's Investment Program and Description: Brokerage Issues," the Master Partnership executes and clears transactions through a number of brokerage firms (and the Managing Partner may unbundle the execution and clearing functions). Brokers may also act as custodians for the Master Partnership's securities. To the extent that securities are purchased in non-U.S. markets, non-U.S. brokers may be used and may maintain custody of the securities until such time as they are sold.

Transactions for the Master Partnership will be allocated to brokers in consideration of such factors as price, transaction costs, a broker's ability to effect the transactions, its facilities, reliability and financial responsibility, commitment of capital, access to company management, and the provision of research and research-related services that are of benefit to the Master Partnership or its affiliates, as well as other factors that are deemed appropriate to consider under the circumstances. Accordingly, the commission rates (or dealer markups and markdowns arising in connection with principal transactions) charged to the account of the Master Partnership by brokers in the foregoing circumstances may be higher than those charged by other brokers who may not offer such services.

The use of commission or "soft" dollars for research and research-related services will come within the safe harbor for the use of soft dollars provided under Section 28(e) of the U.S. Securities Exchange Act of 1934, as amended (the "Exchange Act").

In view of the fact that the Master Partnership's investment program includes trading as well as investments, short-term market considerations are frequently involved. Turnover of portions of the Master Partnership's portfolio will be substantially greater than the turnover rates of other types of investment vehicles.

**Related-Party
Transactions; Conflicts:**

Significant conflicts of interest among the Master Partnership, each of the Affiliated Funds (and their respective investors), Millennium management entities, and Millennium principals may and do exist. These conflicts include, but are not limited to, conflicts arising from management's multiple roles, pre-existing and outside businesses, "corporate opportunity" scenarios, engaging in investment businesses that may be competitive with the businesses of the Master Partnership and the Affiliated Funds, personal trading, leveraged investments, conflicts specific to the UK-based management structure,

US0109 (Lehman)

conflicts related to third party fund investments, and the allocation of certain investments directly to affiliates, including the Affiliated Funds. See "Related-Party Transactions; Conflicts."

**Certain Tax Matters Relating to the Master Partnership:**

As discussed under "Certain Tax Matters Relating to the Master Partnership," the Master Partnership is an exempted limited partnership under Cayman Islands law. The Master Partnership has received an undertaking as to tax concessions pursuant to Section 17 of the Exempted Limited Partnership Law (as amended) from the Governor in Council of the Cayman Islands dated January 6, 1998, which provides that, for a period of 50 years from the date thereof, no law thereafter enacted in the Cayman Islands imposing any taxes to be levied on income or capital assets, gains or appreciation will apply to any income or property of the Master Partnership.

There can be no assurance that the U.S. or Cayman Islands tax laws will not be changed adversely with respect to the Master Partnership, the Affiliated Funds, or their respective investors or that their income tax status will not be successfully challenged by such authorities.

Prospective investors should consult their own advisers regarding tax treatment by the jurisdiction applicable to them. Shareholders should rely only upon advice received from their own tax advisers based upon their own individual circumstances and the laws applicable to them.

**Certain Regulatory Matters:**

Each of the Affiliated Funds and the Master Partnership is excluded from the definition of "investment company" under the Investment Company Act of 1940, as amended (the "Investment Company Act"), pursuant to Section 3(c)(7) of that act, and they therefore are not subject to registration thereunder.

The Master Partnership's management and advisory affiliates are exempt from registration under the Investment Advisers Act of 1940, as amended (the "Advisers Act") because each of them "advises" fewer than fifteen "clients" (as such terms are used in the Advisers Act). Notwithstanding the fact that such affiliates are not subject to most of the provisions of the Advisers Act, each of these affiliates intends, when it deems such an action to be practicable and in the best interests of its investors, voluntarily to adopt policies and procedures that provide substantially similar protections to its investors as would be afforded to them if the relevant affiliate were registered under the Advisers Act. See "Certain Legal and

US0109 (Lehman)

Regulatory Matters Relating to the Master Partnership."

Also, as discussed under "Certain Legal and Regulatory Matters Relating to the Master Partnership," one subsidiary of the Master Partnership is a registered broker-dealer in the United States, the Master Partnership's London-based investment manager is registered with the UK Financial Services Authority ("FSA"), and a number of other affiliated individuals and entities are registered under the U.S. Commodities Exchange Act, as amended (the "CEA").

**Litigation:** On December 1, 2005, the Master Partnership and certain of its affiliates entered into settlements with the Office of the Attorney General of the State of New York (the "NYAG") and the U.S. Securities and Exchange Commission (the "SEC") relating to mutual fund trading in 2003 and prior years. These settlements included, among other things, a disgorgement of approximately $148 million of profits, civil fines aggregating approximately $32 million (which were paid by individuals affiliated with Millennium and not by the Master Partnership or Affiliated Funds), and a "cease and desist" order. See "Litigation" for a more detailed description of the settlements.

**Fiscal Year:** The fiscal year-end of the Master Partnership is December 31.

**The Master Partnership's Independent Public Accountants:** The Master Partnership has retained Ernst & Young LLP, 5 Times Square, New York, New York 10036, certified public accountants, as its auditor.

US0109 (Lehman)

### PART TWO: INFORMATION SPECIFIC TO THE MASTER PARTNERSHIP

### The Master Partnership's Investment Program and Strategy

The investment objective of Millennium Partners, L.P., an exempted limited partnership registered under the laws of the Cayman Islands (the "Master Partnership" and, collectively with its affiliates where applicable, "Millennium"), is to achieve above-average capital appreciation by opportunistically trading and investing in an extremely wide variety of securities, instruments, and other investment opportunities and engaging in a broad array of trading and investment strategies. There are no substantive limits on the investment strategy that may be pursued by the Master Partnership.

As is described in greater detail below, in carrying out its investment program and strategy, the Master Partnership may, directly or indirectly, trade, invest in, or otherwise obtain exposure to U.S. and non-U.S. equity and debt securities (both public and non-public), mortgage-backed and asset-backed securities, currencies, futures and forward contracts, options and other derivative instruments, loan participations and other means of obtaining credit exposure to selected borrowers, and a variety of other investment opportunities.

As described below under "The Master Partnership's Organization - Portfolio Managers, Outside Investments and Firm Trading," the Master Partnership's capital is allocated among a large number of internal and third-party (both exclusive and non-exclusive) portfolio managers (collectively, the "Portfolio Managers") and investments are made using the capital of the Master Partnership itself and subsidiaries and affiliates of the Master Partnership. As a general matter, rather than making primary investment and trading decisions itself, Millennium Management, L.L.C., a Delaware limited liability company (the "Managing Partner"), grants trading authority to, monitors, and evaluates these Portfolio Managers. (See "The Master Partnership's Management, Structure and Operations – Ongoing Evaluation of Trading Groups".)

### The Master Partnership's Organization

*Organization*

Organization of the Master Partnership; Master-Feeder Relationship.  The Master Partnership was initially organized in 1989 as a Delaware limited partnership and was redomiciled in the Cayman Islands as of January 1, 2000. The Master Partnership is registered as an exempted limited partnership in the Cayman Islands and therefore, as described below under "Certain Tax Matters Relating to the Master Partnership – Certain Cayman Islands Tax Matters," general and limited partners in the Master Partnership are not currently subject to income, corporation, capital gains or other taxes in the Cayman Islands. The Managing Partner is also registered as a foreign company in the Cayman Islands as required by Cayman Islands law for the general partner of an exempted limited partnership.

The Managing Partner is the sole general partner of the Master Partnership, with substantially all of the power to control its affairs and operations. The Master Partnership has four limited partners, three of which – Millennium USA, L.P., Millennium International, Ltd., and Millennium Global Estate, LP (the "Affiliated Funds") – accept investments from outside investors.  (The fourth limited partner, Edina, LLC, which is not reflected on the chart below, is

US0109 (Lehman)

a Delaware limited liability company that is wholly-owned by Millennium USA, L.P. and Millennium Global Estate, LP.)

A simplified chart showing the master-feeder relationship is set forth below:



While the particular characteristics of each Affiliated Fund are described in the applicable Part One of the Confidential Memorandum for such fund, as a general matter, the Affiliated Funds have the following investor criteria:

- Millennium USA, L.P. ("Millennium USA"), a Delaware limited partnership formed in November 1997, was organized to accept investments from U.S. taxable investors that qualify as "accredited investors" and "qualified purchasers" under the U.S. federal securities laws. Millennium USA primarily invests its capital in the Master Partnership.

- Millennium International, Ltd. ("Millennium International"), an exempted company incorporated in December 1997 under the laws of the Cayman Islands, was organized to accept investments from persons who are not "U.S. Persons" and from tax-exempt U.S. Persons (e.g., 501(c)(3) non-profit organizations and individual retirement accounts) that qualify as "accredited investors" and "qualified purchasers" under the U.S. federal securities laws. Millennium International primarily invests its capital in the Master Partnership.

- Millennium Global Estate, LP ("Millennium Global Estate"), a Delaware limited partnership formed in May 2000, was organized to accept outside investments only from insurance company segregated asset accounts, insurance company qualified general accounts and insurance dedicated partnerships that qualify as "accredited investors" and "qualified purchasers" under the U.S. federal securities laws. In accordance with the investment requirements imposed by applicable insurance laws and regulations, Millennium Global Estate invests a portion of its assets in the Master Partnership only as part of a broader investment strategy.

US0109 (Lehman)

*Subsidiaries*

The Master Partnership owns or controls a number of subsidiaries that may trade in their own names and are generally consolidated into the financial reports of the Master Partnership. One of these subsidiaries, Millenco, L.L.C. ("Millenco") is a broker-dealer registered with the U.S. Securities and Exchange Commission (the "SEC"). It is a member of the NASDAQ Stock Market, the American Stock Exchange and other U.S. exchanges. The Master Partnership indirectly owns 99% of the equity of Millenco, which conducts trading activities on a proprietary basis. The Managing Partner is the manager of Millenco. The financial reports of Millenco are consolidated into the financial reports of the Master Partnership. At any time a decision may be made not to utilize Millenco and for such trading to be conducted on a proprietary basis by an unregulated entity.

*Capital Structure*

The equity ownership of the Master Partnership is divided into general partner interests and limited partner interests. The interests differ in the amount of liability that they impose on their holders and in the ability to control the Master Partnership. The liability of limited partners is generally limited to the amount of invested capital at risk, while the liability of general partners can exceed invested capital. The limited partnership agreement of the Master Partnership (the "Partnership Agreement") grants the power to control the Master Partnership to the Managing Partner. The general partner interests and the limited partner interests both participate in the net capital appreciation and net capital depreciation of the Master Partnership, with the capital account of each partner being adjusted on a monthly basis to reflect changes in the Master Partnership's net asset value.

*Portfolio Managers, Outside Investments and Firm Trading*

The Managing Partner is primarily responsible for managing the Master Partnership's capital. The Managing Partner may also delegate this responsibility to other investment managers. The principal investment managers, in addition to the Managing Partner, that manage such capital are Millennium International Management, L.P. ("Millennium International Management"), Millennium Capital Management (Singapore) Pte. Ltd. ("MCM Singapore") and Millennium Capital Partners LLP ("MCP UK"). MCP UK is a United Kingdom limited liability partnership registered with the United Kingdom Financial Services Authority ("FSA") as an investment manager. David Nolan, co-President of the Managing Partner, is MCP UK's ultimate majority owner. Millennium Capital Management, Ltd. ("MCM Ltd.") acts as the "payroll company" for MCP UK. (See "The Master Partnership's Management, Structure and Operations – Management," "Certain Legal and Regulatory Matters Relating to the Master Partnership," and "Related-Party Transactions; Conflicts".) The Managing Partner, Millennium International Management, MCM Singapore and MCP UK are collectively referred to herein as the "Investment Management Entities."

The Investment Management Entities generally allocate the Master Partnership's capital among a large number of internal and external Portfolio Managers. Thus, subject to the oversight of the Investment Management Entities, and the ultimate oversight of the Managing Partner, the Portfolio Managers generally make day-to-day investment and trading decisions for the Master Partnership and its trading subsidiaries.

US0109 (Lehman)

In addition to employing the Portfolio Managers, the Managing Partner also may invest a portion of the Master Partnership's capital in third-party investment vehicles or in "contra" trades that establish a firm-wide hedge or profit-seeking investments. The Master Partnership also may enter into relationships that encompass elements of more than one of these categories, as well as new structures that may be introduced or become accepted within the asset-management business.

### Portfolio Managers

The Managing Partner is primarily responsible for the selection, monitoring and evaluation of the Portfolio Managers. Portfolio Managers generally fall into the following three categories, each of which is described below: internal Portfolio Managers; exclusive third-party Portfolio Managers; and non-exclusive third-party Portfolio Managers. The Managing Partner and/or the other Investment Management Entities currently allocate trading authority over a majority of the Master Partnership's capital to internal Portfolio Managers and exclusive third-party Portfolio Managers. Portfolio Managers are generally subject to confidentiality and two-year non-solicitation agreements and must execute trading agreements which outline their responsibilities and compensation arrangements (including performance-based compensation arrangements, which typically comprise a portion of compensation). Internal Portfolio Managers and exclusive third-party Portfolio Managers are generally provided the opportunity to invest in the portfolios they manage for Millennium through one of two co-investment entities. These investment arrangements serve to further align the interests of Portfolio Managers with those of the investors in the Affiliated Funds and serve as an important retention tool.

Millennium requires all Portfolio Managers to trade through Millennium accounts, which are controlled by the Managing Partner and subject to the Managing Partner's risk management oversight. Millennium can view all Portfolio Manager positions at any time and all Portfolio Manager trades clear through and are financed by Millennium's brokers. The Portfolio Managers, when they consider it appropriate and subject to applicable regulations and firm policies, may utilize repurchase and reverse repurchase agreements, short sales, and leverage in their investment programs.

Internal Portfolio Managers. Internal Portfolio Managers are traders whose services are exclusive to Millennium and who generally are employed by MPG Operations, L.L.C. ("MPG Operations") if based in the United States. These Portfolio Managers operate their respective trading groups as distinct business units and are primarily responsible for their group's respective trading, personnel, and similar decisions, which decisions are made independently from other trading groups, in each case subject to the oversight of the Managing Partner.

Exclusive Third-Party Portfolio Managers. The Managing Partner also engages third parties to manage a portion of Millennium's capital on an exclusive basis. These exclusive third-party Portfolio Managers are not employed by Millennium, but are risk managed in an identical fashion to internal Portfolio Managers and, like internal Portfolio Managers, are subject to the oversight of the Managing Partner. In addition, the Managing Partner generally retains control over the positions managed by exclusive third-party Portfolio Managers.

US0109 (Lehman)

Non-Exclusive Third-Party Portfolio Managers. The Managing Partner also engages third parties to manage a portion of the Master Partnership's capital on a non-exclusive basis. These third parties also generally manage money for a number of other clients. These non-exclusive third-party Portfolio Managers are responsible for their own operations (e.g., hiring of personnel and information technology), although the Managing Partner retains ultimate control over the positions as well as risk management oversight of the portfolio. The Managing Partner also may provide financial assistance or technical expertise. As a general matter, and subject to certain limited exceptions, trading decisions of non-exclusive third-party Portfolio Managers are generally subject to the oversight of the Managing Partner.

*Outside Investments and Firm Trading*

Outside Investments. In some cases, the Master Partnership's capital is invested in investment vehicles managed by third-party asset managers. In making investments of this nature, the goal of the Managing Partner often is to have the economic benefits of the investment approximate the benefits that would have accrued had the relationship been structured as the engagement of a third-party Portfolio Manager. In addition, the Master Partnership may also take an equity stake in the third-party management company. See "Related Party Transactions; Conflicts."

Firm Trading. In addition to the capital allocation options discussed above, the Managing Partner will also from time to time make direct investments of the Master Partnership's capital, either as as a profit-seeking investment or a "contra" trade that establishes a firm-wide hedge (typically against a portion of the total exposure resulting from the aggregate positions of the Portfolio Managers).

## Certain Risk Factors Relating to an Investment in the Master Partnership

Prospective investors should consider the following factors in determining whether an investment in an Affiliated Fund is a suitable investment:

### General

The performance of the Master Partnership and the Affiliated Funds can be highly volatile. The Master Partnership may lose capital through (i) investment losses, (ii) withdrawals of capital by the Affiliated Funds to fund their expenses or in connection with equity withdrawals and redemptions by their investors or (iii) a combination of investment losses and such withdrawals of capital. Investment losses may give rise to requests for equity withdrawals and redemptions, but withdrawals and redemptions may occur irrespective of performance (and perhaps for reasons wholly unrelated to the Master Partnership or the Affiliated Funds).

### Business and Structural Risks

*Possible Effect of Withdrawals and Redemptions*

Substantial withdrawals of capital by an Affiliated Fund from the Master Partnership in connection with investor withdrawals or redemptions could require the Master Partnership to

US0109 (Lehman)

liquidate investments more rapidly than otherwise desirable to raise the necessary cash to fund the withdrawals and to achieve a market position appropriately reflecting a smaller equity base. While the chances of an adverse impact on the Master Partnership are mitigated by (i) the fact that the majority of the Master Partnership's assets are in exchange-traded securities in which the Master Partnership does not hold an overly large position, (ii) the requirement that withdrawing or redeeming investors provide a substantial amount of notice to the applicable Affiliated Fund, (iii) "gates" limiting the amounts that some investors may withdraw or redeem at any one time, and (iv) early withdrawal or redemption charges imposed on certain classes of investors, there remains a risk that substantial withdrawals could be targeted for a single date or occur during a short period of time; moreover, the gates and early withdrawal or redemption charges may be waived and will not apply upon the occurrence of a Trigger Event (as defined below) or in other circumstances relating to Millennium International summarized immediately below. As a result, the ability of the Master Partnership and the Affiliated Funds to plan for and anticipate the volume of withdrawals (other than the advance written notice requirements imposed by the Affiliated Funds' organizational documents) can be limited.

In connection with deferred compensation arrangements, Millennium International enters into swap and option contracts with respect to which counterparties subscribe for certain classes of Millennium International's equity capital in order to hedge their exposure under such contracts. Upon the occurrence of certain events, including declines in the capital of the Master Partnership or Millennium International below pre-determined thresholds and changes in senior management, these contracts can be terminated by the counterparties and such equity capital can be withdrawn from Millennium International, without the imposition of "gates" or early withdrawal charges, on either a monthly or quarterly basis.

In the event that there are substantial withdrawals, the Master Partnership may find it difficult to adjust its asset allocation and investment strategies to the suddenly reduced amounts of assets. In addition, in order to provide sufficient funds to pay the amounts withdrawn, the Master Partnership might be required to close out positions at an inappropriate time or on unfavorable terms, and events of default and increased collateral requirements could be triggered under certain of the Master Partnership's borrowing facilities and counterparty relationships. In the event of a high volume of withdrawals, such liquidation of positions could adversely affect the value of an investor's interests. Finally, to the extent that an Affiliated Fund reduces the restrictions on redemptions that are applicable to its investors, the Master Partnership may be in a position where it is attempting to liquidate less liquid positions to satisfy redemption requests from the other Affiliated Funds' investors.

*Special Withdrawal or Redemption Right Upon a Trigger Event*

The death, disability, adjudication of incompetency, bankruptcy, insolvency or withdrawal from Millennium Management of Israel A. Englander constitutes a "Trigger Event." The date of a Trigger Event is referred to herein as the "Trigger Date." Notice of a Trigger Event is required to be given to equity investors in the Affiliated Funds within 10 days of the occurrence of a Trigger Event. The occurrence of a Trigger Event will not be a cause for dissolution of any of the Affiliated Funds.

In connection with the occurrence of a Trigger Event, each equity investor in an Affiliated Fund will be given a special right to withdraw or redeem any portion of its capital or

US0109 (Lehman)

withdraw from the applicable Affiliated Fund (without incurring any otherwise applicable early withdrawal or redemption charge) by delivering notice of such withdrawal or redemption to the Managing Partner, Millennium International Management or Millennium Global Estate GP, LLC (Millennium Global Estate's general partner, "Millennium Global Estate GP"), as the case may be, as described below. During the period beginning on the Trigger Date and ending on the last day of the third full month following the date on which notice of the Trigger Event is given (such period, the "Transition Period"), and thereafter until the Special Redemption Date (as defined below), notices of withdrawals or redemptions will be of no effect with the exception of the last month of the Transition Period, in which equity investors may deliver notices of withdrawals or redemptions to Millennium Management, Millennium International Management or Millennium Global Estate GP, as the case may be, and such withdrawals or redemptions will be effective as of the last day of the third full month after the expiration of the Transition Period (the "Special Redemption Date"). Unless the decision is made to liquidate the Affiliated Fund (in which case all interest holders will be paid pursuant to such liquidation), each equity investor will be paid approximately 90% of the amount due upon such withdrawal or redemption within 30 days after the Special Redemption Date, subject to reserves for contingencies and holdbacks, and the balance will be paid (subject to audit adjustments) within 30 days after completion of the next audit of the applicable Affiliated Fund, with interest from the Special Redemption Date at the average (calculated weekly) per annum short term (13 weeks) Treasury Bill rate (or its equivalent at the time).

Following the occurrence of an event that Millennium Management, Millennium International Management or Millennium Global Estate GP, as the case may be, in good faith determines may result in, or may have been, a Trigger Event (a "Possible Trigger Event"), notice of such event may be given to equity investors (a "Possible Trigger Event Notice"). A Possible Trigger Event Notice will not commence a Transition Period, but any notice of withdrawal or redemption given on or after the date of the Possible Trigger Event identified in a Possible Trigger Event Notice will be suspended and held in abeyance for such period as may reasonably be necessary under the circumstances to determine whether the Possible Trigger Event did in fact constitute a Trigger Event. If Millennium Management, Millennium International Management or Millennium Global Estate GP, as the case may be, determines that a Trigger Event did occur, notice will be given promptly to equity investors, the Transition Period will commence as described above, and notices of withdrawals or redemptions received after the date of the Possible Trigger Event will be cancelled. Equity investors will then be permitted to submit notices of withdrawals or redemptions as described above. If Millennium Management, Millennium International Management or Millennium Global Estate GP, as the case may be, determines that a Trigger Event did not occur, notices of withdrawals or redemptions that have been received will be given effect (subject to the normal process) as of the dates specified in the notices of withdrawals or redemptions. If any such date has passed, the withdrawal or redemption will be effected as of the last day of the next full calendar month. Thereafter, such notices will be subject to the normal process.

A withdrawal or redemption notice in respect of a Trigger Event may not be rescinded by the investor (absent the consent of Millennium Management, Millennium International or Millennium Global Estate GP, as the case may be, which in each case may be withheld in its sole discretion) following its receipt by the applicable Affiliated Fund. In addition, so long as the Master Partnership has certain debt securities outstanding, no withdrawal or redemption which

US0109 (Lehman)

would trigger a "Repurchase Event" under the terms of such financing may be paid out on an accelerated basis prior to the time for such payment prescribed in the Partnership Agreement of the Master Partnership or the respective organizational documents of the Affiliated Funds, as applicable. See "- Certain Market and Investment Risks; Indebtedness".

### *Business Dependent on Key Individuals; Reliance on Portfolio Managers*

The success of the Master Partnership (and, therefore, of the Affiliated Funds) is significantly dependent upon the expertise of Israel A. Englander (the Chairman and Chief Executive Officer of the Managing Partner), Terry Feeney (Co-President and Chief Operating Officer of the Managing Partner) and David Nolan (Co-President and Chief Risk Officer of the Managing Partner). If two of these three individuals and, in some cases, Mr. Englander solely, cease to be involved in the ongoing operation of the Managing Partner for any reason, the Master Partnership may be exposed to the risk of termination of critical agreements containing "key man" clauses and, in the case of the death, disability, adjudication of incompetency, bankruptcy, insolvency or withdrawal of Israel A. Englander, to the withdrawal, without the imposition of "gates" or early withdrawal or redemption charges, of all of the equity capital of the Master Partnership. See "- Special Withdrawal or Redemption Right Upon a Trigger Event."

The Managing Partner grants trading authority to a large number of Portfolio Managers. The success of the Master Partnership's investment program (and the return on investments in the Affiliated Funds) depends generally on the performance of these Portfolio Managers, rather than on the trading and investing skills of the Managing Partner itself. To the extent that the Managing Partner is unable to select, manage, allocate appropriate levels of capital to, and retain Portfolio Managers that, in the aggregate, are able to produce consistent positive returns for the Master Partnership (particularly, outperforming Portfolio Managers) or, conversely, to the extent that the Managing Partner does not adequately monitor, supervise, and allocate capital away from Portfolio Managers that are underperforming, the performance of the Master Partnership (and the return on investment for interests in the Affiliated Funds) will be impaired. (See "The Master Partnership's Organization – Portfolio Managers, Outside Investments and Firm Trading".) Moreover, Portfolio Managers who are successful may be able to negotiate agreements providing for additional compensation to them, which will reduce the profits available to the Affiliated Funds and their investors.

### *Competition; Low Barriers to Entry*

The Managing Partner faces intense competition in attracting Portfolio Managers. The Managing Partner's ability to continue to compete effectively will depend upon its ability to attract new successful Portfolio Managers and retain and motivate existing successful Portfolio Managers. In addition, at any given time, a relatively small number of Portfolio Managers may be responsible for a significant majority of the Master Partnership's positive performance. The investment management field is intensively competitive and there are few barriers to entry. As a result, the Master Partnership's Portfolio Managers are constantly facing new competition for profitable transactions, and successful portfolio managers from existing firms, including the Master Partnership, may form new firms engaged in strategies similar to those employed by the Master Partnership. To the extent any such competitors are successful, the opportunities available to the Master Partnership, and its potential profitability, may be reduced.

US0109 (Lehman)

### Role of Technology

The Master Partnership is heavily dependent on its technology and communications links. On the trading side, the ability to gather large amounts of current and historical data, process that data against a static or dynamic trading model, and execute trades before a window of opportunity (which can be open for as little as a few milliseconds) closes is of critical importance to some of the Master Partnership's Portfolio Managers. The Master Partnership's operations function relies heavily on technology for processing and settling trades. For compliance purposes the availability of highly accurate, auditable data is important for monitoring compliance with applicable regulations. While the Managing Partner devotes significant resources to the firm's technology and communications needs, the Master Partnership may experience disruptive or gradual technological or communications failures that could result in substantial economic damages (including missed opportunities for profit) to the Master Partnership.

In addition, there can be no assurance that the Master Partnership's technology and communications links will continue to be able to accommodate its growth, or that the cost or maintaining such systems will not increase from its current level. Such a failure to accommodate growth or such an increase in costs could have a material adverse effect on the Master Partnership.

### Business Continuity

The Managing Partner's headquarters, located in New York, are important to the continued business of the Master Partnership. A disaster or a disruption in the infrastructure that supports the Master Partnership's businesses, including a disruption involving electronic communications or other services used by the Master Partnership or third parties with whom it conducts business, or directly affecting the Managing Partner's headquarters, may have a material adverse impact on the Master Partnership's ability to continue to operate its businesses without interruption. Although the Master Partnership provides redundancy and diversity for communications and related systems wherever possible and although it has a business continuity plan, which includes replication of data to geographically diverse locations, replication of communications links and a business continuity office facility, there can be no assurance that these measures will be sufficient to mitigate the harm that may result from such a disaster or infrastructure disruption.

### Portfolio Manager Compensation Structure Risk

Each Portfolio Manager is entitled to receive performance-based compensation (which generally is paid by the Affiliated Funds) based on such Portfolio Manager's performance without taking into account the performance of the other Portfolio Managers or the Master Partnership generally. Therefore, individual Portfolio Managers may have incentives to engage in more speculative activities than would be the case if such compensation were not performance-based, particularly after any period of losses by the Portfolio Manager. In addition, Portfolio Managers with positive performance will receive performance-based compensation even if the Master Partnership's overall returns are negative.

### Incentive Allocation and Incentive Fee

US0109 (Lehman)

The performance-based compensation (*i.e.*, the incentive allocation or incentive fee) earned by the general partners (and their affiliates) of the Affiliated Funds organized in the United States (*i.e.*, the Managing Partner and Millennium Global Estate GP) and the investment adviser to Millennium International (*i.e.*, Millennium International Management) may under some circumstances create an incentive for the Managing Partner to cause the Master Partnership to make investments that are riskier or more speculative than would be the case if such compensation were not performance-based, particularly in any period after losses have been suffered. In addition, because such compensation is calculated on a basis that includes unrealized appreciation of the Master Partnership's assets, the total compensation paid will be different from (and may be greater than) the result that would have been obtained if such compensation was based solely on realized gains. (See also "Certain Market and Investment Risks – Valuation Risk.")

### Transaction Fees Resulting From Uncoordinated Trading; Asymmetric Performance

Investment decisions of the Master Partnership are made by the Portfolio Managers independently of each other so that, at any particular time, one Portfolio Manager may be purchasing shares of an issuer whose shares are being sold at the same time by another Portfolio Manager. Risk management decisions to take positions that offset the aggregate positions of the various portfolio managers may lead to a similar result. Transactions of this sort will inevitably result in the Master Partnership directly or indirectly incurring certain transaction costs without accomplishing any net investment result for the Master Partnership as a whole.

As discussed herein, the Master Partnership's capital is allocated among a relatively large number of Portfolio Managers. However, at any given time, a small number of Portfolio Managers may be responsible for a significant majority of the Master Partnership's positive performance and the persons responsible for such positive performance may change from time to time. To the extent that the Managing Partner is, at any given time, unable to engage and retain the services of these outperforming Portfolio Managers, the returns of investors in the Affiliated Funds will suffer.

### Certain Market and Investment Risks

### Investment and Trading Risks in General

Inherent in any investment in securities is the risk of losing the invested capital. Millennium International Management, the Managing Partner, and Millennium Global Estate GP (collectively, the "Advisers") each believes that the Master Partnership's investment program and the Portfolio Managers' research techniques moderate this risk through a careful selection of securities and investment opportunities, as well as through the application of the Managing Partner's ongoing qualitative and quantitative risk assessment and management program. However, no guarantee or representation is made that the Master Partnership's investment program will be successful or profitable, and investment results may vary substantially over time. The Master Partnership's investment program will utilize investment techniques such as option and derivative transactions, limited diversification, margin transactions, short sales, and futures and forward contracts, which can, in certain circumstances, maximize the adverse impact of any loss or adverse event to which the Master Partnership may be subject. (See "The Master

US0109 (Lehman)

Partnership's Investment Program and Description:  Eligible Investments" and "The Master Partnership's Investment Program and Description:  Investment Strategies".)

The Managing Partner does not, in general, attempt to measure or hedge all market or other risks inherent in the Master Partnership's portfolio, and measures and hedges certain risks, if at all, only partially.  Specifically, the Managing Partner may choose not, or may determine that it is economically unattractive, to hedge certain risks, instead relying on diversification in an attempt to mitigate such risks.  As discussed below, the Master Partnership is not limited to any specific policies or requirements for diversification or risk mitigation.

### Limited Diversification

In the normal course of making investments, the Master Partnership will attempt to diversify its investments.  However, the Managing Partner does not establish fixed limits and guidelines regarding diversification of investments to be followed by the Master Partnership as a whole.  As a result, the Master Partnership's portfolio could to a certain degree become concentrated in a single issuer, industry, market or sector.  Such concentration of risk may increase the losses suffered by the Master Partnership.  It is also possible that the Master Partnership could become significantly concentrated in any one strategy, and the investments of such strategy may be more illiquid than the investments in another strategy.  In addition, it is possible that the Managing Partner may select Portfolio Managers who make investments that are concentrated in a limited number of types of financial instruments.  This limited diversity may lead to greater volatility and could expose the Master Partnership to losses disproportionate to market movements in general.  The Master Partnership's investments are relatively concentrated in equity positions in the United States financial markets, although there has been increasing global diversification within the Master Partnership in recent periods. The Managing Partner currently maintains a diversified portfolio and has no current plans to materially change the portfolio make-up in the future.

### Borrowing and Lending Activities

The Master Partnership may borrow, pledge, loan and otherwise finance assets on both a secured and an unsecured basis and may issue notes or enter into credit agreements, indentures or other financing arrangements in order to achieve efficient financing structures.

At any given time, the outstanding contractual obligations of the Master Partnership may total well in excess of its equity.  There are no limitations on the ability of the Master Partnership to borrow or enter into such contractual obligations. The brokers and market counterparties with which the Master Partnership transacts will have a secured claim against the assets of the Master Partnership that are on deposit with such brokers or counterparties, senior to the claim of the notes.  Significant losses from investment activities or changes in market conditions that affect such assets could result in such brokers or counterparties foreclosing on such assets.

While the Master Partnership has entered into "lockup" agreements with many of its key counterparties limiting the ability of those counterparties to change financing or margin terms, recall loans or refuse to execute trades for a period of time after notice is given absent an event of default or other termination event under such agreements, creditors that provide financing to the Master Partnership may, in certain circumstances, accelerate a loan and require repayment in

US0109 (Lehman)

full upon the occurrence of certain events, including: (i) changes in key management; (ii) suspension of redemptions; (iii) violations of minimum capital levels; and (iv) the imposition of regulatory sanctions on the Master Partnership or its key personnel that would materially and adversely affect the Master Partnership's ability to conduct its business or perform under such agreements. In many cases, when such lockup agreements are not in place, the banks and dealers that provide financing to the Master Partnership can apply essentially discretionary margin, "haircut" financing, security and collateral valuation policies. Changes by banks and dealers in such policies, or the imposition of other credit limitations or restrictions, whether due to market circumstances or governmental, regulatory or judicial action, may result in large margin calls, requirements to post additional collateral, loss of financing, forced liquidation of assets at disadvantageous prices, termination of swap and repurchase agreements and cross defaults to agreements with the same or other counterparties. Any such adverse effects may be exacerbated in the event that such limitations or restrictions are imposed suddenly and/or by multiple market participants at or about the same time. The imposition of such limitations or restrictions could compel the Master Partnership to liquidate all or part of its portfolio at disadvantageous prices.

Assets lent by the Master Partnership to third parties may not be required to be kept segregated by such third parties, and may be subject to the claims of other creditors of such third parties. Such third parties which enter into financing transactions with the Master Partnership may default on their obligations to return the Master Partnership's assets or pay amounts owed to the Master Partnership.

*Liquidity; Availability of Credit*

The Master Partnership's investment strategies depend on the availability of credit in order to permit the financing of its portfolio. The Master Partnership's liquidity could be impaired by an inability to access debt markets, an inability to sell assets or unforeseen outflows of cash or collateral. Any or all of these situations could arise due to circumstances that the Master Partnership may be unable to control, such as a general market disruption or an operational problem that affects third parties. A lack of liquidity has historically been the cause of substantial losses in the hedge fund industry. Liquidity risk will be increased if the Master Partnership is required to liquidate positions to meet margin requirements, margin calls or other funding requirements on such positions or otherwise. The ability of counterparties to take actions following declines in investment values which result in the forced liquidation of highly leveraged positions in declining markets, including as a result of the Master Partnership having insufficient liquidity to meet margin calls, could subject it to substantial losses. The Managing Partner may fail to adequately predict the liquidity that the Master Partnership requires to address counterparty requirements relating to falling values of investments being financed by such counterparties, which could result not only in losses related to such investments, but also in losses related to the need to liquidate unrelated investments in order to meet the Master Partnership's obligations. The Master Partnership's losses may be magnified in the event that significant capital is invested in highly leveraged investments or investment strategies. Such losses would result in a decline in assets, may lead to requests from investors in the Affiliated Funds to redeem or withdraw remaining assets, and may in certain circumstances damage the Master Partnership's reputation.

US0109 (Lehman)

*Indebtedness*

The Master Partnership may borrow funds on a secured or unsecured basis, and may do so through the issuance of notes. In the event that the funds available to the Master Partnership were insufficient to meet principal or interest obligations on such indebtedness (by reason of acceleration of the indebtedness or otherwise), then funds would not be available to the Affiliated Funds for equity redemptions or withdrawals or for other purposes. Additionally, the terms of any such indebtedness or related agreements could include covenants restricting the ability of the Master Partnership to take actions, or waive conditions, that might otherwise have been taken for the benefit of the Affiliated Funds and ultimately their investors. One such covenant might include a limitation on the Master Partnership's ability to pay equity distributions to the Affiliated Funds, if, for example, its Net Asset Value would drop below a specified threshold as a result of such payment. There is no limitation on the right or ability of the Master Partnership to enter into any such borrowing arrangements or related agreements.

*Valuation Risk*

The Managing Partner, and not an independent third party, performs the net asset value calculations for the Master Partnership. While the Managing Partner may seek and rely upon independent sources of data (and, where appropriate, multiple sources of data), to the extent that they are readily available, in computing fair value for most of the Master Partnership's positions, the lack of a third party performing the calculation is a risk to investors in the Affiliated Funds. To the extent that the Master Partnership's portfolio contains unregistered/privately-placed or complex instruments or strategies for which adequate third party pricing is not available, this risk is compounded.

The processes for determining the fair value of the Master Partnership's investment positions are formulated and administered by a valuation committee of the Managing Partner, which is comprised of persons independent from specific portfolio management decisions. The fair value of investment positions is determined using a number of methodologies described in the Managing Partner's valuation guidelines and policies, which may, in some cases, involve the exercise of a significant degree of market judgment by the Managing Partner. The methodologies it uses in valuing individual investments are based on a variety of estimates and assumptions specific to the particular investment, and actual results related to the investment therefore may vary materially as a result of the inaccuracy of such assumptions or estimates. In addition, because certain of the illiquid investments held by the Master Partnership and its trading subsidiaries are in industries or sectors which are unstable, in distress or undergoing some uncertainty, such investments are subject to rapid changes in value caused by sudden company-specific or industry-wide developments. Because there is significant uncertainty in the valuation of, or in the stability of the value of, illiquid investments, the fair values of such investments as reflected in the net asset value of the Master Partnership may not reflect the prices that would actually be obtained by the Managing Partner on behalf of the Master Partnership if such investments were liquidated.

*General Market and Economic Risk*

Most trading strategies utilized by the Master Partnership involve some, and occasionally a significant degree of, market risk. The profitability of the Master Partnership, and,

US0109 (Lehman)

consequently, each Affiliated Fund, depends, in significant part, upon the Managing Partner and the Portfolio Managers correctly assessing future price movements of securities and other financial instruments. An Affiliated Fund cannot assure any investor in an Affiliated Fund that the Managing Partner or the Portfolio Managers will accurately predict these price movements. Additionally, unanticipated illiquidity in a market could lead to substantial losses or mean that the Master Partnership is unable to close out certain positions when it wishes.

The success of the Master Partnership's activities will also be affected by general economic and market conditions, such as interest rates, availability of credit, inflation rates, economic uncertainty, changes in laws (including laws relating to taxation of the Master Partnership's investments) or regulations (or their interpretation), trade barriers, currency exchange controls, and national and international political circumstances (including wars, terrorist acts or security operations). These factors will affect the level and volatility of the prices of securities, commodities and other financial instruments and the liquidity of the Master Partnership's investments. Illiquidity or significant changes in volatility could impair the Master Partnership's profitability or result in losses.

The economies of non-U.S. countries may differ favorably or unfavorably from the U.S. economy in such respects as growth of gross domestic product, rate of inflation, relative currency appreciation or depreciation, asset reinvestment opportunities, resource self-sufficiency and balance of payments position. Further, certain economies are heavily dependent upon international trade and, accordingly, have been and may continue to be adversely affected by trade barriers, exchange controls, managed adjustments in relative currency values and other protectionist measures imposed or negotiated by the countries with which they trade. The economies of certain non-U.S. countries may be based, predominantly, on only a few industries and may be vulnerable to changes in trade conditions and may have higher levels of debt or inflation.

*Trade Execution Risk*

Many of the investment techniques used by the Portfolio Managers require the rapid and efficient execution of transactions, or the ability of the Portfolio Managers to accumulate or liquidate large positions. Inefficient execution can impair realization of the market opportunities sought with such techniques.

Occasionally, transactions may be executed erroneously on terms other than those intended by the Master Partnership or a Portfolio Manager. For example, a transaction may be executed in the wrong asset, for the wrong quantity or price, to buy when the Master Partnership or a Portfolio Manager meant to sell, or to sell when the Master Partnership or a Portfolio Manager meant to buy. The Master Partnership will bear the losses or costs of any such errors, unless the error occurred due to fraud, gross negligence or reckless or intentional misconduct by the Managing Partner.

US0109 (Lehman)

### Risks of Certain Trading Strategies

*Models*

Certain of the Master Partnership's investment strategies are based on proprietary models. These models are developed by Portfolio Managers or third parties. Models generally must be updated in order to remain effective. There can be no assurance that The Master Partnership's Portfolio Managers will be able to continue to develop and update effective models and any changes that are made in an attempt to respond to perceived changes in market conditions may be unsuccessful.

*Statistical Arbitrage*

The success of the Master Partnership's statistical arbitrage strategies depends on market values converging towards the theoretical values determined by models. In the event of market disruptions, significant losses can be incurred which may force the Master Partnership to close out one or more positions. Such disruptions have in the past resulted in losses for funds employing statistical arbitrage strategies.

*Merger Arbitrage and Other Event-Driven Strategies*

Merger arbitrage and other event-driven investment strategies generally incur significant losses when proposed transactions are not consummated or expected events do not occur. The consummation of mergers, tender offers, exchange offers and other significant corporate events can be prevented or delayed by a variety of factors, including: (i) regulatory intervention; (ii) efforts by the target company to pursue a defensive strategy; (iii) failure to obtain the necessary shareholder approvals; (iv) adverse market or business conditions resulting in a material change or termination of the pending transaction; (v) additional requirements imposed by law; and (vi) inability to obtain adequate financing.

*Activist Strategies*

In an activist sub-strategy, a Portfolio Manager will take a sizable equity position in an issuer and privately or publicly attempt to improve a company's management, strategy and operations. This can involve attempts to persuade a company's management to adopt new policies, proxy contests intended to replace a board of directors with a new slate of individuals in whom the Portfolio Manager has confidence, and tender offers for other shareholders' equity interests in the company. Accordingly, there exists the risk that the changes or transactions in which such business enterprise is involved either will be unsuccessful, take considerable time or will result in a distribution of cash or a new security the value of which will be less than the purchase price of the security or other financial instrument in respect of which such distribution is received. Similarly, if an anticipated transaction does not in fact occur, the investment may be required to be sold at a loss. Because there is substantial uncertainty concerning the outcome of shareholder activism, there is a potential risk of loss by the Master Partnership of its investment in such companies. Activist sub-strategies also subject the Master Partnership to an increased risk of litigation.

US0109 (Lehman)

*Convertible Arbitrage*

Convertible arbitrage strategists identify convertible bonds, convertible preferred stocks or warrants that appear mispriced or undervalued, yet offer a favorable rate of return. By establishing a long position in a convertible security (usually preferred stock or bonds) and a partially offsetting short position in the underlying security into which the convertible security is convertible (usually common stock of the issuer), a Portfolio Manager invests with the expectation of capturing price or yield differences or to seek to profit from cash flow (e.g., coupon income and stock borrowed rebate). Changes in interest rates influence the investment value of a convertible security, with investment value declining as interest rates increase and increasing as interest rates decline. The credit standing of the issuer, the value of the underlying stock and other factors may also have an effect on the convertible security's investment value. A convertible security may be subject to redemption at the option of the issuer at a price established in the convertible security's governing instrument. If a convertible security held by a Portfolio Manager is called for redemption, the Portfolio Manager will be required to permit the issuer to redeem the security, convert it into the underlying common stock or sell it to a third party. Any of these actions could have an adverse effect on a Portfolio Manager's ability to achieve its investment objective, which, in turn, could result in losses to the Master Partnership.

*Loan Participations*

The Master Partnership or certain of its affiliates may buy and sell loan participations (i.e., interests in a loan, generally governed by a credit agreement between the original lending syndicate and the borrower) in the secondary market. These investments involve certain risks additional to those associated with direct loans. A loan participant has no contractual relationship with the borrower of the underlying loan. As a result, the participant is generally dependent upon the lender from which the participation is purchased to enforce its rights and obligations under the credit agreement in the event of a default, and may not have the right to object to amendments to or modifications of the terms of the credit agreement in which it participates. A participant in a syndicated loan generally does not have voting rights, which are retained by the lender from which the participation is purchased. In addition, a loan participant is subject to the credit risk of the lender from which the participation is purchased as well as the borrower, since a loan participant is dependent upon the lender from which the participation is purchased to furnish to the participant its share of payments of principal and interest received on the underlying loan.

*Short Positions*

Portfolio Managers routinely take short positions in a wide range of assets. A short sale of an asset exposes the seller to the risk of an increase in the market price of that asset with a theoretically unlimited risk of loss. Purchasing assets to close out a short position can itself cause their market price to rise further, increasing losses. Furthermore, such Portfolio Managers may prematurely be forced to close out a short position if a lender demands the return of the asset sold short and an alternative source of that asset is not available.

US0109 (Lehman)

### *Portfolio Turnover*

Certain Portfolio Managers often invest on the basis of short-term market considerations. The turnover rate of such Portfolio Managers' positions may be significant, potentially involving substantial brokerage commissions and fees to unaffiliated third parties.

The Master Partnership is also subject to the risk that a counterparty will not settle a transaction in accordance with its terms and conditions, thereby causing the Master Partnership to suffer a loss.

### *Equity Securities*

The Portfolio Managers invest significantly in equity securities (including derivatives on equity securities, such as options), the cost and value of which vary with an issuer's performance and movements in the broader equity markets, which can be influenced by numerous economic factors as well as market sentiment and political and other factors. · As a result, the Master Partnership may suffer losses if the Portfolio Managers invest in equity securities of issuers whose performance diverges from the Portfolio Managers' expectations or if equity markets generally move in a single direction and the Portfolio Managers have not hedged against such a general move. At any given time, the Portfolio Managers may have significant investments in companies with smaller market capitalizations. These securities often involve greater risks than the securities of larger, better-known companies, including less liquidity and greater volatility.

### *Debt Securities*

Debt securities may be subject to price volatility due to various factors, including changes in interest rates, market perception of the creditworthiness of the issuer and general market liquidity. In addition to the sensitivity of debt securities to overall interest-rate movements, debt securities involve a fundamental credit risk based on an issuer's ability to make principal and interest payments on the debt it issues.

The Portfolio Managers invest in both investment grade debt securities and non-investment grade debt securities (commonly referred to as "junk bonds"). Non-investment grade debt securities in the lowest rating categories may involve a substantial risk of default or may be in default. Debt securities may pay fixed, variable or floating rates of interest, may include zero coupon obligations and may be subordinated (and thus exposed to the first level of default risk) or otherwise subject to substantial credit risks.

The Portfolio Managers invest in synthetic debt instruments, such as credit derivatives, which are often subject to more categories of risk than conventional debt; for example, the credit risk of the derivatives counterparty as well as of the issuer of the underlying debt, the absence of direct rights against the issuer of the underlying debt and added leverage. In addition, in certain cases the credit derivatives market is significantly less liquid than the market in the underlying debt obligations.

US0109 (Lehman)

### Distressed and High-Yield Securities

The Portfolio Managers may invest in securities issued by companies in weak and/or deteriorating financial condition, experiencing poor operating results, needing substantial capital investment, perhaps having negative net worth, facing special competitive or product obsolescence problems or involved in bankruptcy or reorganization proceedings. Investments of this type may involve substantial financial and business risks, which are often heightened by an inability to obtain reliable information about the issuers. Such investments can result in significant or even total losses. In addition, the markets for distressed and high-yield securities are frequently illiquid.

The market prices of distressed and high-yield assets are subject to abrupt and erratic market movements and above-average price volatility, and the spreads between the bid and asked prices of such assets may be greater than those prevailing in other markets. It may take a number of years for the market price of such assets to reflect their intrinsic value. In liquidation (both in and out of bankruptcy) and other forms of corporate reorganization, there exists the risk that the reorganization either will be unsuccessful (for example, due to failure to obtain requisite approvals), will be delayed (for example, until various liabilities, actual or contingent, have been satisfied), or will result in a distribution of cash or a new asset the value of which will be less than the purchase price to the Master Partnership of the asset in respect to which such distribution was made. Distressed assets also may be adversely affected by U.S. state and federal laws relating to, among other things, fraudulent transfers and other voidable transfers or payments and lender liability, as well as the U.S. Bankruptcy Court's power to disallow, reduce, subordinate or disenfranchise particular claims.

### Differential Cash Flows on Related Positions

Certain of the Master Partnership's strategies involve taking positions that are subject to unilateral margin in favor of the counterparty. These positions may be related or hedged with other positions margined on a bilateral marked-to-market basis, which may require the Master Partnership to supply margin on a position while a counterparty would not be required to supply margin on the related position. Due to the cash flow imbalances between such assets, in certain market scenarios, The Master Partnership may be forced to close out such positions, perhaps at disadvantageous prices.

### Structured Investment Products

Certain Portfolio Managers may issue, invest in, or otherwise participate in a variety of different structured investment products; for example, total return swaps, participating notes, options and collateralized debt obligations. These structured products involve not only the risks of the underlying "reference asset," but also the risks (including acceleration of the financing embedded in the structure and/or restrictions imposed on the management and nature of the permissible reference assets) and costs of creating the structured products.

### Interest-Rate and Foreign Exchange-Rate Risks

The prices of assets held by the Master Partnership may be sensitive to interest-rate and foreign exchange-rate fluctuations; such fluctuations could cause the U.S. dollar value of long

US0109 (Lehman)

and short positions to move in unanticipated directions. To the extent that interest-rate and foreign exchange-rate assumptions underpin the hedging of a particular position, fluctuations in such rates could invalidate those underlying assumptions and expose the Master Partnership to losses.

### Illiquid and Restricted Securities

Certain investment positions of the Master Partnership may be illiquid. The Portfolio Managers may invest a portion of the value of the Master Partnership's assets in illiquid over-the-counter securities, securities of young, development-stage companies (whether publicly traded or issued in a private placement) and financially troubled companies, non-publicly traded securities, mortgage-backed securities and securities traded on non-U.S. exchanges, and may make other investments that are illiquid or that subsequently become illiquid. In general, securities and other investments are classified as illiquid because they are characterized as "restricted" securities due to legally-imposed restrictions on resale or liquidation, because the market for the particular security or the volume of trading is so small as to effectively impose limits on the speed or price at which the resale or liquidation of a given position can be effected, or due to a combination of the foregoing factors. Portfolio Managers may be unable to sell restricted securities and other illiquid securities and investments at the most opportune times or at prices approximating the value at which they purchased the securities or investments.

In the United States, "restricted" securities are securities that may not be sold to the public without an effective registration statement under the U.S. Securities Act of 1933, as amended (the "Securities Act") or, if they are unregistered, may be sold only in a privately negotiated transaction or pursuant to an exemption from registration; similar restrictions apply in other countries. When registration is required to sell a security, it is common that a considerable period may elapse between the decision to sell and the time the Portfolio Manager may be permitted to sell a security under an effective registration statement; although this is less common, in some cases the Master Partnership may be obligated to pay part or all of the registration expenses. If adverse market conditions developed during this period, the Master Partnership might obtain a less favorable transaction price.

### Certain Risks Relating to Aggressive Trading and Financing Strategies

### Hedging Transactions

Hedging against a decline in the value of a portfolio position does not always eliminate fluctuations in the values of portfolio positions or prevent losses. Such hedging transactions typically limit the opportunity for gain if the value of a portfolio position should increase. Moreover, it should be noted that (i) a Portfolio Manager may determine not to hedge against, or may not anticipate, certain risks, (ii) the portfolio will always be exposed to certain risks that cannot be hedged, and (iii) there is no guarantee that a hedge will be properly implemented or will function in the manner anticipated.

The success of the Master Partnership's hedging transactions to a significant degree will be subject to the ability of each Portfolio Manager correctly to assess the relationships between groupings of securities within the Portfolio Manager's portfolio. In addition, the degree of

correlation between price movements of the instruments used in a hedging strategy and price movements in the portfolio position being hedged may vary.

*Trading in Commodities and Derivatives*

A Portfolio Manager may engage in short sales and utilize derivative instruments such as options, futures, forward contracts, mortgage-backed securities and interest rate swaps, caps and floors, both for investment purposes and to hedge against fluctuations in the relative values of that Portfolio Manager's portfolio positions. These are instruments whose values are based upon underlying assets, indices or reference rates or a combination of these factors, and generally represent future commitments to exchange cash flows or to purchase or sell other financial instruments at specified future dates. The use of derivatives involves a variety of material risks, including the possibility of counterparty non-performance as well as of deviations between the actual and theoretical value of such derivatives. In addition, the markets for certain derivatives may be illiquid.

Derivatives are typically intrinsically leveraged investments that entail investment exposures that are greater than the amount of the investment, meaning that a small investment in derivatives could have a large potential effect on the performance of the Master Partnership. The Master Partnership could also experience losses if the derivatives that are acquired or sold as a hedge are poorly correlated with the investment to be hedged, or if a Portfolio Manager is unable to liquidate a position because of an illiquid secondary market. Changes in liquidity may result in significant, rapid and unpredictable changes in the prices for derivatives.

The Portfolio Managers may trade commodities, futures and options, and may enter into swap agreements, in the United States and on commodity exchanges and markets located outside the United States where U.S. Commodity Futures Trading Commission (the "CFTC") and other U.S. futures regulations do not apply. The prices of commodities contracts and all derivative instruments, including futures and options, depend upon a number of factors, including the prices of the underlying assets and may be highly volatile. Price movements of commodities, futures and options contracts and payments pursuant to swap agreements are influenced by, among other things, interest rates, changing supply and demand relationships, trade, fiscal, monetary and exchange control programs and policies of governments, and national and international political and economic events and policies. In addition, each of the Master Partnership and its trading subsidiaries is subject to the risk of failure of any of the exchanges on which they trade, their clearinghouses or the clearing brokers through which their trades clear. In the case of commodity contracts traded on non-U.S. exchanges and certain derivative instruments, the Master Partnership will be subject to the risk of the inability of, or refusal by, the counterparty to perform. In addition, profits realized in non-U.S. markets could be eliminated by adverse changes in the applicable currency exchange-rate, or the Master Partnership could incur losses as a result of those changes.

*Possible Effects of Speculative Positions Limits on the Master Partnership's Investments in Commodities, Futures and Options Contracts*

The CFTC and certain commodity exchanges have established limits referred to as "speculative position limits" or "position limits" on the maximum net long or net short position

US0109 (Lehman)

which any person or group of persons may hold or control in particular futures and options contracts. Limits on trading in options contracts also have been established by the various options exchanges. The Managing Partner believes that established position limits will not adversely affect the Master Partnership's contemplated trading. However, it is possible that the trading decisions of the Master Partnership may have to be modified and that positions held by it may have to be liquidated in order to avoid exceeding such limits. Such modification or liquidation, if required, could adversely affect the operations and profitability of the Master Partnership.

### Leverage; Interest Rates; Margin

The Managing Partner intends to cause the Master Partnership to borrow funds (including through the issuance of debt securities), and leverage its investment portfolio in order to be able to increase the amount of capital available for marketable securities investments. In addition, there is a significant degree of leverage typically embedded in certain derivative instruments in the Master Partnership's investment portfolio. Consequently, the level of interest rates, generally, and the rates at which the Master Partnership can borrow, in particular, will affect its operating results. Although leverage will increase investment return if a given Portfolio Manager earns a greater return on the investments purchased with borrowed funds than it pays for the use of those funds, the use of leverage will decrease the return of the Master Partnership if the Portfolio Manager fails to earn as much on investments purchased with borrowed funds as it pays for the use of those funds. The use of leverage will in this way magnify the volatility of changes in the value of an interest in the Master Partnership. In the event of a sudden, precipitous drop in value of the Master Partnership's assets, the Portfolio Managers might not be able to liquidate assets quickly enough to pay back the Master Partnership's borrowings. (See "The Master Partnership's Investment Program and Description: Leverage and Loans".)

### Counterparty Risks

A Portfolio Manager may enter into many transactions, including derivatives and over-the-counter transactions, with or through third parties in which the failure of the third party to perform its obligations could have a material adverse effect on the Master Partnership. Such counterparty risk is accentuated for contracts with longer maturities where events may intervene to prevent settlement, or where the Master Partnership has concentrated its transactions with a single or small group of counterparties. The Master Partnership will also face counterparty risks in connection with its securities lending business.

The assets of the Master Partnership and its trading affiliates are generally held in accounts maintained for them by their prime brokers or in accounts with other market participants. Such accounts are generally not segregated, bankruptcy-remote accounts titled in the owner's name and, therefore, a failure of any such broker or market participant is likely to have a greater adverse impact than if such assets, or the accounts in which they are held, were registered in the name of the Master Partnership or its affiliate. In addition, because the Master Partnership and its affiliates' securities are generally held in margin accounts, and the prime brokers have the ability to loan those securities to other persons, the Master Partnership's or an affiliate's ability to recover all of its assets in the context of a bankruptcy or other failure of a prime broker will be further limited. Although the prime brokers, as brokerage firms or

US0109 (Lehman)

commercial banks, are subject to various laws and regulations in various jurisdictions that are designed to protect their customers in the event of their insolvency, the practical effect of these laws and their application to the Master Partnership's and its affiliates' assets are subject to substantial limitations and uncertainties because of the large number of entities and jurisdictions involved and the range of possible factual scenarios involving the insolvency of a prime broker or any of its sub-custodians, agents or affiliates. Investors in the Affiliated Funds should take into account that the insolvency of any of the Master Partnership's or its affiliates' prime brokers or other service providers could result in the loss of all or a substantial portion of the Master Partnership's assets held by or through such prime brokers.

In addition, a portion of the Master Partnership's capital is invested in non-exchange traded instruments, such as swap transactions and over-the-counter options in which the Master Partnership or its subsidiary "faces off" directly against a counterparty, often over an extended period of time. To the extent that a counterparty suffers a bankruptcy event or otherwise becomes distressed, the performance of the Master Partnership could be impaired.

### Certain Regulatory Risks

*Absence of Regulatory Oversight*

Each of the Master Partnership and the Affiliated Funds is exempt from registration under the U.S. Investment Company Act of 1940 (the "Investment Company Act") in reliance upon an exemption available to privately offered investment companies. Accordingly, many of the provisions of the Investment Company Act (provisions which, among other matters, require investment companies to have a majority of disinterested directors, require securities held in custody to at all times be individually segregated from the securities of any other person and marked to clearly identify such securities as the property of such investment company, and regulate the relationship between the adviser and the investment company) are not applicable to the Master Partnership or the Affiliated Funds, and therefore the investors in the Affiliated Funds will not be afforded those protections. Furthermore, neither the Managing Partner nor any affiilated entity is registered or intends to register under the Investment Advisers Act of 1940, as amended (the "Investment Advisers Act"). Accordingly, the protections offered to investors by the Advisers Act – such as periodic inspections by agents of the United States Securities and Exchange Commission (the "SEC") – will not be available to investors in the Affiliated Funds.

*Potential for Increased Regulatory Scrutiny*

There has recently been increased regulatory scrutiny of private investment funds, such as the Master Partnership and the Affiliated Funds. Legislation proposing greater regulation of the "alternative investment" industry periodically is considered by Congress, the states and the governing bodies of non-U.S. jurisdictions, which could have substantial and adverse consequences for private investment funds such as the Master Partnership and the Affiliated Funds.

It is impossible to predict what, if any, changes in the regulations applicable to the Master Partnership, the Portfolio Managers, the markets in which they invest or the counterparties with which they do business may be instituted in the future. Any such change could have a material adverse impact on the profit potential of the Master Partnership, as well as require increased

US0109 (Lehman)

transparency as to the Master Partnership's portfolios or the identity of its investors. Further, such regulation could place limitations on the type of investor that can invest in the Affiliated Funds, or on the conditions under which such investors may invest. Such regulation may also limit the scope of investing activities that may be undertaken by the Portfolio Managers, impose significant administrative burdens on the Master Partnership and the Managing Partner and divert time and attention from core business activities.

### Absence of Regulation Under the Laws of the Cayman Islands

The Master Partnership falls within the definition of a "mutual fund" in terms of the Mutual Funds Law (2003 revision) of the Cayman Islands, but is not regulated in terms of that law for so long as there are 15 or fewer partners, the majority of whom in number are capable of terminating the appointment of the Managing Partner.

### Regulatory Actions

From time to time, in the ordinary course of operations, certain of the Master Partnership's businesses are subject to regulatory inquiries, investigations and enforcement proceedings from U.S. and non-U.S. governmental agencies, regulatory bodies and securities commissions, which can be costly and occupy significant staff time and resources. Any such inquiry, investigation or enforcement proceeding could include civil or criminal proceedings resulting in a censure, fine, penalty and/or other sanction, including asset freezes, the issuance of a cease and desist order or the suspension or expulsion of an individual. Any such inquiry, investigation or enforcement proceeding could have a material adverse impact on the Master Partnership.

### Securities Law Compliance Risks

The domestic and foreign laws and regulations governing trading in the securities markets (and governing investing in other kinds of markets) are often complex and difficult to implement and monitor, especially in the context of a fund structured like the Master Partnership, and are subject to re-interpretation, which could expose the Master Partnership, the Managing Partner and their respective affiliates to liability. See, for example, "Litigation", below.

### Investments in Foreign Markets and Jurisdictions

The Master Partnership invests its capital in large, liquid, and internationalized markets (such as the United States, the United Kingdom, and Japan) as well as lesser-developed emerging markets. The evolving laws and regulations applicable to the securities and financial services industries of certain countries subject such markets to uncertainty. By investing in such markets, the Master Partnership risks misinterpreting or possibly violating the local laws or the securities regulations of these jurisdictions and is subject to, among other risks: (i) currency exchange-rate risk; (ii) inefficient clearing systems; (iii) the possible imposition of withholding, income or excise taxes; (iv) the absence of uniform accounting, auditing and financial reporting standards and practices, less rigorous disclosure requirements and little or potentially biased government supervision and regulation; (v) the risk of terrorism and acts of war; and (vi) economic and political risks, including expropriation, exchange controls and restrictions on foreign investment and repatriation of capital. Emerging markets are also generally more vulnerable to periods of

illiquidity and extreme volatility than the more developed markets. In addition, when periods of stress occur in the developed financial markets, the emerging markets as a group may suffer major price declines and illiquidity.

*Membership on Exchanges and/or in Clearing or Self-Regulatory Organizations*

In an effort to facilitate certain investment strategies, the Master Partnership and certain of its subsidiaries and affiliates have become, and/or may become, members of exchanges, clearing houses and other self-regulatory organizations and have obtained or will obtain a variety of governmental licenses or authorizations. Such memberships, licenses or authorizations subject these persons to a wide range of regulation and other obligations, including net capital requirements, as well as to audits and other restrictions—in each case, together with the associated costs.

*          *          *

The foregoing list of risk factors does not purport to be a complete enumeration or explanation of the risks involved in an investment in an Affiliated Fund. Prospective investors should read Part One and Part Two of this Confidential Memorandum in their entirety and the Partnership Agreement of the Master Partnership, as well as the organizational documents of the Affiliated Fund in which they intend to invest and consult with their own advisers before deciding whether to invest in an Affiliated Fund.

### The Master Partnership's Management, Structure and Operations

*Management*

Managing Partner. The Partnership Agreement grants substantially all of the power to control the affairs and operations of the Partnership to the Managing Partner. The Managing Partner is a Delaware limited liability company that was formed in 1994.

The Managing Partner also serves as the sole general partner of Millennium USA, a limited partnership organized in November 1997 under the laws of the State of Delaware, United States, which invests primarily in the Master Partnership. The Advisers are all considered to be under the control of Israel Englander. The business address and telephone number of each of the Advisers is 666 Fifth Avenue, New York, New York 10103-0899 (+1 (212) 841-4100).

MCP UK and MCM Singapore. As discussed above under "The Master Partnership's Organization – Portfolio Managers, Outside Investments and Firm Trading," a portion of the Master Partnership's capital is also managed by MCP UK, which is registered with the Financial Services Authority as an investment manager. David Nolan, a Vice-Chairman of the Managing Partner, is MCP UK's ultimate majority owner. The business address and telephone number of MCP UK is 50 Berkeley Street, London W1J 8HD, United Kingdom (+44 (0) 20-7107-8400). Another portion of the Master Partnership's capital is managed by MCM Singapore, an exempt fund manager organized under the laws of Singapore and which is wholly-owned by Millennium International Management. Principals and Key Managers. The key members of the Managing Partner's management team include the following individuals:

US0109 (Lehman)

- *Israel A. Englander, 58,* is the founder and managing member of the Managing Partner and Millennium International Management GP, L.L.C. (which is the general partner of Millennium International Management). Mr. Englander is also the Managing Partner's Chairman and Chief Executive Officer. Mr. Englander has over 35 years of experience in securities and derivatives across a broad range of instruments and strategies. He worked as a floor broker and trader on the American Stock Exchange, has owned a specialist operation since 1982, is former chairman of the Specialist Association and has served on numerous Exchange committees, including Allocations, Allocation Procedures, Emerging Company Marketplace, Options and Special Allocations. He founded the firm in 1989 with a total of approximately $35 million under management. Mr. Englander graduated from New York University with a BS in Finance, and attended New York University Graduate School of Business Administration. Mr. Englander is a member of the Executive Committee and Investment Risk Committee of the Managing Partner.

- *Terry Feeney, 49,* is the Managing Partner's Co-President and Chief Operating Officer. Mr. Feeney has over 25 years of experience in the financial services industry. Mr. Feeney previously worked as an audit partner with Ernst & Young's New York Financial Services Office, specializing in broker-dealers and hedge funds, an experience that involved various operational, back office and regulatory projects, along with financial audits. Mr. Feeney oversees the administrative areas of the Master Partnership, including finance, technology and investor relations, which collectively employ more than 200 people. Mr. Feeney graduated summa cum laude from Fordham University with a BS in Accounting. Mr. Feeney is a member of the Executive Committee, Investment Risk Committee and Valuation Committee of the Managing Partner.

- *David Nolan, 58,* is the Managing Partner's Co-President and Chief Risk Officer. Mr. Nolan is responsible for the Master Partnership's risk management function, which monitors the Master Partnership's overall portfolio and risk exposure. He is also closely involved with the mentoring and development of the Portfolio Managers. Mr. Nolan started his career at Merrill Lynch in 1971 and rose to Vice President, Head of Institutional Convertible Securities. In 1981, he joined Spear Leeds & Kellogg in their newly formed Upstairs Trading Department. In 1984 he was admitted as a Partner and joined the Executive Committee, a position he held until 1990. In 1992, Mr. Nolan started a hedge fund, Davos Partners, which he ran until joining the Managing Partner. Mr. Nolan graduated from Johns Hopkins University with a BA in Humanities, and attended New York University Graduate School of Business Administration. Mr. Nolan is a member of the Executive Committee, Investment Risk Committee and Valuation Committee of the Managing Partner.

- *Simon M. Lorne, 61,* is the Managing Partner's Vice Chairman and Chief Legal Officer. Mr. Lorne oversees compliance, legal, and regulatory functions, along with internal audit. Mr. Lorne had been a partner in the law firm of Munger, Tolles & Olson LLP, which he rejoined in 1999 after originally becoming a partner in 1972. In 1996, he became a Managing Director at Salomon Brothers where he served as Global Head of Internal Audit. Following the merger of Salomon Brothers into Travelers

US0109 (Lehman)

Group Inc., he continued as Managing Director and as a senior member of the General Counsel's office. With the merger of Travelers Group and Citicorp Inc., he organized and coordinated the global compliance function of Citigroup. From 1993 to 1996, Mr. Lorne was General Counsel of the SEC. Mr. Lorne graduated cum laude with an AB from Occidental College and received his JD, magna cum laude, from the University of Michigan Law School. Mr. Lorne is a member of the Executive Committee and Compliance Legal and Ethics Oversight Committee ("CLEO Committee") of the Managing Partner.

- *Mark Meskin, 39*, is a Senior Managing Director and the Chief Trading Officer of the Managing Partner. Mr. Meskin has oversight of Millennium's day-to-day trading activities and works with the Portfolio Managers to ensure they have the optimal platform to operate their trading strategies. In this role, he is involved in Portfolio Manager evaluation, recruitment and monitoring as well as coordinating with the various departments to support the needs of the Master Partnership's trading strategies. Prior to joining the Managing Partner, Mr. Meskin spent nine years as Managing Director/Principal for Helfant Group, Inc., a NYSE member firm, where he was responsible for the upstairs trading, operations and technology areas. Mr. Meskin has an MBA in Finance from New York University and a Master's in Information Systems from the University of Cape Town, South Africa. Mr. Meskin is a member of the Executive Committee, Investment Risk Committee, Valuation Committee and the CLEO Committee of the Managing Partner.

- *Larry Statsky, 53*, is a Senior Managing Director and the Chief Administrative Officer of the Managing Partner. Mr. Statsky has responsibility for the Master Partnership's accounting, tax and operations areas. Prior to joining the Managing Partner, Mr. Statsky had been at Ernst & Young for over 17 years in their hedge fund practice, most recently as a partner and co-head of the Hedge Fund Group within the New York Financial Services Office. Mr. Statsky worked at Spicer & Oppenheim for seven years and joined Ernst & Young in 1990. Mr. Statsky has over 25 years of financial services industry experience providing audit and advisory services to broker-dealers and hedge funds. Mr. Statsky graduated from Queens College of the City University of New York. Mr. Statsky is a member of the Executive Committee and the Valuation Committee of the Managing Partner.

- *Martin Schwartz, 34*, is the Managing Partner's Chief Compliance Officer. Mr Schwartz has primary responsibility for the day-to-day development and administration of Millennium's regulatory compliance program. Prior to joining the Managing Partner, Mr. Schwartz practiced law with the law firm Fried Frank Harris Shriver & Jacobson. At Fried Frank, Mr. Schwartz's practice was focused on the regulation of financial institutions under the federal securities laws. Mr. Schwartz counseled clients on a full range of securities law requirements, and represented clients in connection with SEC and SRO examinations and enforcement actions. Before entering private practice, Mr. Schwartz was on the staff of the SEC's Division of Market Regulation at the Office of Financial Responsibility Risk Management and Control. As an SEC staff member, Mr. Schwartz administered the financial responsibility rules relating to broker-dealers. Mr. Schwartz received a JD from the

US0109 (Lehman)

University of Maryland School of Law, where he was an Articles Editor of the ABA journal *The Business Lawyer*. Mr. Schwartz is also a Certified Public Accountant. Mr. Schwartz is a member of the Valuation Committee and the CLEO Committee of the Managing Partner.

As a result of the resolution of the Mutual Funds Investigation (discussed under "Litigation – Settlement Relating to Mutual Fund Trading"), Messrs. Englander and Feeney agreed to pay civil fines aggregating approximately $32 million; were ordered to cease and desist from committing or causing any violations of Section 17(a) of the Securities Act and Section 10(b) of the U.S. Securities Exchange Act of 1934, as amended (the "Exchange Act") and Rule 10b-5 thereunder; and were barred from acting in certain capacities with respect to U.S. open-end mutual funds (including, with limited exceptions, trading in them). (None of these limitations affects in any way the services that any of the individuals has historically performed, or contemplates performing, for or with respect to the Master Partnership, the Affiliated Funds, or any of their related entities.) There have been no other material administrative, civil or criminal proceedings against Mr. Englander or Mr. Feeney in the five years preceding the date of this Confidential Memorandum.

There have been no material administrative, civil or criminal proceedings against Mr. Nolan, Mr. Lorne, Mr. Meskin, Mr. Statsky or Mr. Schwartz in the five years preceding the date of this Confidential Memorandum.

US0109 (Lehman)

*Office Locations*

Millennium has U.S. office locations in New York City and White Plains, New York; Greenwich, Connecticut; and Dallas, Texas. Millennium has international office locations in Beijing; Hong Kong; London; Paris; Luxembourg; and Singapore. The addresses of those offices are:

666 Fifth Avenue, 8th Floor
New York, NY 10103

ChengJian Plaza, Unit Number A405,
Number 18 Beitaipingzhuanglu
Haidian District
Beijing, China

650 Fifth Avenue, 32nd Floor
New York, NY 10019

50 Berkeley Street
London WC1J 8HD
United Kingdom

44 S. Broadway
White Plains, NY 10601

49/51, avenue George V, 3ème étage
Paris (75008) France

1700 East Putnam Avenue
Old Greenwich, CT 06870

25 B, Boulevard Royal
L-2449 Luxembourg

2828 N. Harwood St., Suite 1240
Dallas, TX 75201

The Executive Centre Singapore Pte. Ltd.
Level 25 One Raffles Quay
Singapore 048583

*Corporate Services*

Pursuant to the Partnership Agreement and the Cayman Islands Exempted Limited Partnership Law, the Managing Partner is responsible for and performs all recordkeeping and causes the register of the Master Partnership to be maintained under the auspices of Walkers, the Master Partnership's Cayman Islands counsel, at the company's registered address in the Cayman Islands. The Master Partnership is not required to, and does not, employ a third-party corporate services agent, administrator, registrar, or transfer agent.

*Ongoing Evaluation of Trading Groups*

As discussed below under "The Master Partnership's Risk Management Program," the Managing Partner engages in daily monitoring of all trading activity of the Master Partnership and its affiliates, which allows the Managing Partner to constantly review and evaluate the Portfolio Managers and their performance. This ongoing performance review assesses a Portfolio Managers' profitability on the basis of, among others, the following metrics:

- absolute returns;
- risk-adjusted returns;
- volatility;
- relative performance to market indices and other objective benchmarks; and

US0109 (Lehman)

- anticipated internal performance expectations.

The Managing Partner's risk management personnel review the Portfolio Managers' positions. Based on the results of these reviews and on other factors deemed by the Managing Partner to be relevant, decisions on increases or decreases of allocated capital (including the continued engagement of Portfolio Managers) are made and reviewed.

### The Master Partnership's Investment Program and Description: Eligible Investments

The Master Partnership, in managing the Master Partnership's assets, follows an investment strategy that is opportunistic with respect to investments and strategies and that is global in scope. Consistent with the Managing Partner's opportunistic approach (and unlike many investment companies that as a matter of investment policy diversify portfolio holdings so that no more than a fixed percentage of their assets are invested in any one industry or group of industries), the Managing Partner does not establish fixed guidelines regarding diversification of investments to be followed by the Master Partnership. At any given time, the Master Partnership's assets may be highly concentrated in securities or asset classes that the Managing Partner or a Portfolio Manager believes offer an optimal opportunity for capital appreciation or may be employed in a broadly diversified strategy of opportunistic investing.

*Universe of Eligible Investments*

The Master Partnership is authorized, under the Partnership Agreement, to invest in all types of securities and instruments of United States and non-U.S. issuers and to participate in other potentially profitable opportunities, including without limitation the short selling of securities. Examples of securities traded and other investments made by the Master Partnership include, but are not limited to capital stock; shares of beneficial interest; partnership interests and similar financial instruments; mortgage-backed securities; interests in real estate and real estate related assets; bonds, notes, debentures (whether subordinated, convertible, secured, unsecured or otherwise); currencies; commodities; interest rate, currency, commodity, equity and other derivative products, including, without limitation, (i) futures contracts (and options thereon) relating to stock indices, currencies, United States government securities and securities of non-U.S. governments, other financial instruments and all other commodities, (ii) swaps, options, contracts for difference, warrants, caps, collars, floors and forward rate agreements, (iii) spot and forward currency transactions and (iv) agreements relating to or securing such transactions; equipment lease certificates; equipment trust certificates; loans, loan participations, and other obligations and instruments or evidences of indebtedness of whatever kind or nature; accounts and notes receivable and payable held by trade or other creditors; trade acceptances; contract and other claims; executory contracts; participations; assignments of rights under financial and derivative contracts; viatical settlements; insurance policies; pollution credits; money market funds; obligations of the United States or any state thereof, non-U.S. governments and instrumentalities of any of them; commercial paper; certificates of deposit; bankers' acceptances; trust receipts; and annuities, structured settlements and similar payment rights.

The Portfolio Managers, when they consider it appropriate and subject to applicable regulations and firm policies, may utilize repurchase and reverse repurchase agreements, short sales, and leverage in their investment programs.

US0109 (Lehman)

### The Master Partnership's Investment Program and Description: Investment Strategies

The Master Partnership pursues an opportunistic investment policy. The Managing Partner does not establish fixed guidelines regarding diversification of strategies. The strategies that the Master Partnership may employ may be concentrated in the strategies that the Managing Partner or a Portfolio Manager believes offer the optimal opportunity for capital appreciation.

The Partnership Agreement imposes no material restrictions on the particular types of investing or on the particular markets in which the Master Partnership may invest. The Managing Partner reviews and evaluates the trading strategies in which the Master Partnership's assets are invested, as well as new potential strategies and investments.

THERE ARE NO SUBSTANTIVE LIMITS ON THE INVESTMENT STRATEGIES THAT MAY BE PURSUED BY THE MASTER PARTNERSHIP OR ON THE PARTICULAR MARKETS IN WHICH IT MAY INVEST. THERE CAN BE NO ASSURANCE THAT THE INVESTMENT OBJECTIVE OF THE MASTER PARTNERSHIP WILL BE ACHIEVED. THE PRACTICES OF SHORT SELLING, LEVERAGE AND LIMITED DIVERSIFICATION MIGHT, IN CERTAIN CIRCUMSTANCES, EXACERBATE ADVERSE PERFORMANCE OF THE MASTER PARTNERSHIP'S PORTFOLIO. (See "Certain Risk Factors Relating to an Investment in the Master Partnership").

As discussed above, the Master Partnership invests opportunistically and the universe of eligible investments is not materially limited by any firm policies; however, the investment strategies that the Master Partnership employs may be expected to include, among others, some or all of the following strategies, and the Master Partnership may concentrate in a select few strategies while not employing others.

*Investment Strategies*

The following are the Master Partnership's nine core strategies:

Relative Value Sector Arbitrage. Portfolio Managers employing a relative value sector arbitrage strategy perform detailed fundamental research on companies, usually within a particular industry group (e.g., financial services) or subgroup (e.g., securities brokers). These Portfolio Managers make use of research, company visits, industry conferences, third-party consultants, and their own expert knowledge in making investment decisions. Fundamental change at these companies drives changes in investor perception, which impacts the valuation of their securities.

- Fundamental-Long/Short. Under this sub-strategy, a Portfolio Manager will attempt to: spot changes in fundamentals; identify where comparable companies are mispriced in relation to each other and buy the undervalued companies and short sell the overvalued ones; and capture the excess return as a perceived mispricing narrows, while minimizing overall net market risk.

- Fundamental-Long. A fundamental-long sub-strategy involves a Portfolio Manager identifying a company, based on its review of such company's

US0109 (Lehman)

performance, management, and industry, that has significant growth prospects and acquiring a long position in such company's equity (by buying the company's stock outright, or by buying derivative securities that increase in value as the company's stock rises). The Portfolio Manager may also employ short sales or derivatives to limit the downside risk of deterioration in the stock price of a company.

- **Fundamental-Short.** A fundamental-short sub-strategy is employed by a Portfolio Manager who has identified a company that it believes is overvalued, or that the Portfolio Manager believes will decline in value in the future. In this case, the Portfolio Manager establishes a short position (through short sales of equity or the use of derivatives) which will increase in value if the company's stock price drops. The Portfolio Manager may also employ long purchases or derivatives to limit the downside risk of an increase in the stock price of a company.

- **Activist Strategies.** In an activist sub-strategy, a Portfolio Manager will take a sizable equity position in an issuer and privately or publicly attempt to improve a company's management, strategy and operations. This can involve attempts to persuade a company's management to adopt new policies, proxy contests intended to replace a board of directors with a new slate of individuals in whom the Portfolio Manager has confidence, and tender offers for other shareholders' equity interests in the company. While activist strategies may constitute a relatively small portion of the Master Partnership's allocated capital, they are among the most visible.

- **Private Equity/Restricted Stock.** Some Portfolio Managers invest the Master Partnership's capital in private companies. These investments can be made on a private equity basis, where the investment is made with the expectation that the company will not become publicly traded and will generate sufficient earnings to provide sufficient cash flow to justify the return threshold, or on a venture capital or private equity basis, where the expectation is that the company will become publicly traded and that the investor will have an opportunity to sell its shares into the market at a higher valuation than that at which the original investment was made.

**Statistical Arbitrage.** The Master Partnership's statistical arbitrage strategies are quantitatively driven and are employed across the global equity markets. The Portfolio Managers seek to identify over- or under-valued stocks and create unique compositions of long and short equity positions to execute "relative value" trades. Investments made by Portfolio Managers employing this strategy are primarily in medium- to large-cap stocks and focus on geographical regions, industry sectors or securities with similar trading characteristics.

To help identify stocks and outline market and non-market risks, the Portfolio Managers build proprietary models (which may remain the property of the Portfolio Manager) that consider historical, as well as forward-looking factors; these models are dependent upon, among other things, the collection, verification and maintenance of historical and/or real time market data. Qualitative analysis of current business information may also be employed to determine value,

US0109 (Lehman)

potential return, and relevant risk factors. Models and tools are monitored and updated as paradigm shifts occur in the market.

Statistical arbitrage managers often trade by constructing computer code that runs in real time, interfaces with an executing broker's electronic order management system, and executes trades electronically. Statistical arbitrage strategies depend on computing power and high speed connections to an exchange, as they seek to identify and exploit perceived pricing anomalies that may only exist for a few milliseconds. The turnover of these strategies also tends to be high and marked by very short holding periods and, as a result, profitability is highly dependent on minimizing transaction costs.

Fixed-Income Strategies. The Portfolio Managers employ a number of fixed-income strategies, including the following:

- Fixed–Income Arbitrage. Fixed-income arbitrage is typically a leveraged strategy that seeks to profit from inefficient pricing of fixed-income securities. The securities to which a Portfolio Manager will apply this strategy typically trade at a discount or premium to instruments that are otherwise similar in maturity, yield and creditworthiness. Fixed-income arbitrage trading is performed using sovereign debt, agency debt, corporate debt, asset backed securities, related futures contracts, over-the-counter swaps and credit default swaps, as well as derivatives on these instruments. The strategy typically involves buying these fixed-income instruments and using various hedges (including derivatives) to reduce interest rate risk, market risk, credit risk, call and redemption risk along with other risks related to fixed–income instruments. The evaluation and trading process can be complicated, highly technical, and heavily dependent on computer processing power. Portfolio Managers utilizing fixed–income arbitrage strategies may attempt to capture changes in the shape of the yield curve of a given country's debt (the difference in yield between different maturities of an issuer, for example, two-year U.S. Treasury notes versus five-year U.S. Treasury notes) or the relationship spreads between the fixed-income securities of two different countries (e.g., yield curves on five-year German bonds versus five-year U.S. Treasury notes). Many dealer-supplied and private vendor-supplied historical databases are used to assist in making trading decisions.

- Swap Strategies. Strategies that focus in whole or in part on swap transactions involve the use of bilateral contracts under a master swap or netting agreement. Swap agreements allow parties to assume exposure to risks in ways that generally are not available in existing securities. Often-used swap instruments include interest rate swaps and credit default swaps. In the classic interest rate swap, two counterparties will enter into an agreement to exchange, or "swap," two or more interest rate payment obligations, generally with one side holding a fixed rate obligation and the other holding a floating rate obligation.

Credit default swaps involve the buying or selling of "protection" with respect to a referenced debt obligation or basket of obligations. The party that "sells the protection" will incur a payment obligation to the counterparty if there is a default

US0109 (Lehman)

under the referenced obligation. The party that "buys the protection" has a periodic payment obligation unless and until such a default occurs or the swap terminates or expires. Credit default swaps can be entered into as a distinct asset class (i.e., as a means of synthetically "going long" or "going short" exposure to the referenced debt obligation or basket of obligations), or as a hedge to a position in the referenced debt obligation. See "Risk Factors—Certain Risks Relating to Aggressive Trading and Financing Strategies."

- Capital Structure Arbitrage. Capital structure arbitrage aims to exploit a perceived pricing inefficiency that exists within the capital structure of a single firm. Portfolio Managers engaging in this strategy seek to find arbitrage opportunities between (or among) the equity and debt securities of a single issuer. A Portfolio Manager might, for example, take a long position in a high yield bond and simultaneously short the common stock of the bond issuer in order to profit from what the Portfolio Manager believes to be an overly large discount on the bond vis-à-vis the stock.

- Credit Strategies. The Master Partnership may be involved in various strategies that involve being long and short different corporate and asset backed securities and derivatives, including loan participations and allocations (i.e., interests in a loan, generally governed by a credit agreement between the original lending syndicate and the borrower) in the secondary market. The credits involved will range from high grade to high yield and distressed debt.

- Cat Bonds. The Master Partnership may buy and sell catastrophe bonds (also known as "cat bonds"). Cat bonds are high-yield debt instruments containing special conditions that generally provide that if the issuing insurance company suffers a pre-defined loss from a particular pre-defined catastrophe, then the issuing insurance company's obligation to pay interest and/or repay the principal is either deferred or completely forgiven.

Merger Arbitrage and Other Event-Driven Strategies. Merger arbitrage and other event-driven investment strategies (also called risk arbitrage) are based on announcements of mergers, acquisitions, tender offers, liquidations, spin-offs and other corporate reorganizations and restructurings. A Portfolio Manager employing such a strategy will gain exposure to the stock of the company or companies involved in the reorganization or restructuring, depending upon the transactions and details, typically purchasing the stock of the target company and selling short the stock of the acquiring company, or will employ derivative instruments to achieve a similar economic result. The value of such an investment is driven by the ability to correctly estimate the spread between the security's then-current price and its value at the transaction's completion, and to gauge the chances of timely completion of the transaction. Success requires in-depth knowledge of merger and acquisition processes, as well as legal and financial requirements. In some cases this strategy may be combined with an activist strategy as described above.

Distressed. Distressed strategies involve purchases and sales of debt and quasi-debt securities and obligations of companies with what the market perceives to be a declining creditworthiness. Portfolio Managers engaging in this strategy will often purchase obligations of

US0109 (Lehman)

declining or low-credit quality borrowers at a discount, with the hope or expectation that the
company will either improve its performance without the need to enter into bankruptcy or
insolvency proceedings, or that the company will seek the protection of bankruptcy and
insolvency laws and that its previously outstanding debt obligations will be converted into
obligations of or equity in a healthier, restructured company.

Futures/Currency Arbitrage. After analysis of financial data, recurring patterns are found
in both domestic and international markets. These patterns are exploited in computer-based
models. The strategy can take outright long/short positions or invest in assets that are perceived
to be undervalued relative to similar assets. Portfolio Managers may trade diversified portfolios
of futures in U.S. and non-U.S. markets in an effort to capture risk premiums and profit from
anticipated trends in market prices. Portfolio Managers may attempt to structure a diversified
portfolio of liquid futures contracts including stock index, global currency, interest rate, metals,
energy and agricultural futures. The nature of futures and currency arbitrage is such that turnover
tends to be high and may be dependent on high speed connectivity to the global futures
exchanges and currency marketplaces.

Closed-End Fund/Asset Arbitrage. This Strategy involves identifying discounted or high
premium closed-end funds, companies with shares priced below net asset value, or mispriced
parent-subsidiary situations. This strategy can be combined with short sales and derivative
positions to create a hedge, or with an activist strategy designed to cause the management to take
actions that would cause the closed end fund's stock price to converge with its portfolio's net
asset value.

Convertible Arbitrage. Convertible arbitrage strategists identify convertible bonds,
convertible preferred stocks or warrants that appear mispriced and offer a favorable rate of
return. By establishing a long position in a convertible security (usually preferred stock or bonds)
and a partially offsetting short position in the underlying security into which the convertible
security is convertible (usually common stock of the issuer), a Portfolio Manager invests with the
expectation of capturing price or yield differences or to seek to profit from cash flow (e.g.,
coupon income and stock borrowed rebate). By hedging, the Portfolio Manager may relinquish
some of the upside potential of the long position in order to (a) protect the long position in the
event of a price decline, and (b) profit from a possible convergence of prices between long and
short sides of the position. A variant of the convertible arbitrage strategy is the purchase of
publicly traded, SEC-registered securities of special purpose acquisition companies (so-called
SPACs), companies that have no operations but that go public with the intention of merging with
or acquiring a private company within a specified period of time. Most of the money raised from
a SPAC's initial public offering of securities is placed in a trust until the merger or acquisition is
consummated. A SPAC's publicly offered securities typically consist of units comprised of
common shares and warrants.

Options Arbitrage. Options arbitrage (also known as option-volatility trading) is a
derivatives-based strategy that seeks to profit from market turbulence (or the lack thereof), as
reflected in movements in option prices that result either from market volatility or market
fluctuations. The goal of a Portfolio Manager employing this strategy is to buy inexpensively
priced (i.e., low implied volatility) options whose underlying instruments are historically more
volatile, and sell expensively priced (i.e., high implied volatility) options whose underlying

US0109 (Lehman)

instruments are historically less volatile. The strategy may be implemented through options on equities and equity indices. Such option combinations include spreads (buying an option to buy or sell an asset while simultaneously selling an option to buy or sell the same asset with a different expiration date or strike price) or straddles (option combinations that will profit from movement in the level of the value of an asset outside of certain bands, or the lack of such movement, without regard to whether the movement is upward or downward). Option-volatility trading may also involve trades in which futures (or other derivatives) are used to create a position that synthetically resembles an option or option combination, or in which options are purchased or sold versus an offsetting position in the underlying market (such as a basket of stocks). The decision process is dependent on fundamental and technical analysis of the underlying instruments. Computer models are often used to enhance the execution of various hedges.

### Strategy Development

There are no substantive limits on the investment strategies that may be pursued by the Master Partnership. The Master Partnership's assets may be invested in strategies other than those listed above, and in strategies that may differ from those described above. In addition, as noted above, the Managing Partner employs an opportunistic investment strategy in allocating the Master Partnership's capital with an emphasis on consistency of returns rather than consistency of strategies, so the amount of capital invested in each strategy generally will vary and new trading and investment strategies which are different from (or are not included in) those described above may (a) receive allocations of the Master Partnership's capital or (b) receive increased allocations of the Master Partnership's capital.

### Eligible Investments

There are no limits on the investments the Master Partnership may make.

### The Master Partnership's Investment Program and Description:  Brokerage Issues

Portfolio transactions for the Master Partnership will be allocated to brokers in consideration of such factors as price, transaction costs, a broker's ability to effect the transactions, its facilities, reliability and financial responsibility, commitment of capital, access to company management, and the provision of research and research-related services that are of benefit to the Master Partnership, the Managing Partner or related funds and accounts, as well as other factors that are deemed appropriate to consider under the circumstances. Accordingly, the commission rates (or dealer markups and markdowns arising in connection with principal transactions) charged to the Master Partnership by brokers in the foregoing circumstances may be higher than those charged by other brokers who may not offer such services. The use of commission or "soft" dollars (or dealer markups and markdowns arising in connection with riskless principal transactions) for research and research-related services will come within the safe harbor for the use of soft dollars provided under Section 28(e) of the Exchange Act.

The Master Partnership has arrangements with a number of brokers and clears certain of the Master Partnership's transactions for securities, equities, bonds, options and futures through a

US0109 (Lehman)

number of brokerage firms. Brokers may also act as custodians for the Master Partnership's securities. To the extent that securities are purchased in non-U.S. markets, non-U.S. brokers may be used and may maintain custody of the securities until such time as they are sold.

In view of the fact that the Master Partnership's investment program includes trading as well as investments, short-term market considerations are frequently involved. Turnover of portions of the Master Partnership's portfolio will be substantially greater than the turnover rates of other types of investment vehicles.

### The Master Partnership's Investment Program and Description: Leverage and Loans

The Master Partnership's investment portfolio will be leveraged in order to increase the amount of securities that can be purchased and other investments that may be made with invested capital on hand.

#### Derivative Instruments and Leverage

The Managing Partner intends also to cause the Master Partnership to leverage its investment return with borrowings, options, contracts for difference, portfolio swaps, commodity futures contracts, short sales, swaps, repurchase agreements, forwards and other derivative instruments. Certain over-the-counter securities require no margin to be deposited. In addition, in some cases, variation margin is not bilateral (e.g., the Master Partnership may, in a leveraged transaction, be required to pay variation margin to one party but receive no variation margin from the other party). The amount of borrowings which the Master Partnership may have outstanding at any time may be large in relation to its capital.

#### Broker-Dealer Subsidiary and Leverage

As discussed above, applicable laws and regulations in the United States and in other countries restrict the amount of credit that can be extended to fund the purchase of securities. In the United States, certain categories of registered broker dealers are permitted to borrow at leverage levels higher than those available to retail investors. The Master Partnership has one subsidiary that is a U.S.-registered broker-dealer, Millenco. By allowing the Portfolio Managers to trade for the account of Millenco (on a proprietary basis) and to cause their U.S. equities positions to be booked in Millenco accounts held at a prime broker, the Master Partnership, on a consolidated basis, is able to leverage its investments in U.S. equities at more favorable levels than are available to retail investors.

Millenco engages exclusively in proprietary trading for its own account and does not carry any customer accounts or otherwise act as executing brokers for third parties or affiliates. Millenco also does not provide any broker-dealer or other services to third parties or affiliates and do not charge any commissions, execution fees or any other fees to the Master Partnership or any of the Affiliated Funds. All such charges and fees are incurred by the Master Partnership and Affiliated Funds from third party execution vendors, clearing firms and other service providers.

US0109 (Lehman)

*Leverage of Specific Investments*

From time to time, Millennium may have the opportunity to achieve leverage from sources other than their prime brokers. For example, in some cases a third-party financial institution may agree to leverage a specific investment in an outside fund, in which case the lender will take a security interest in the investment and may also take nominal title to the investment. A variation of this kind of financing is for a third-party financial institution to take a position in an outside fund or investment, and to enter into a leveraged total return swap or purchase option with the Master Partnership or one of its affiliates.

*Stock Loan and Borrowing Activities*

Millennium actively engages in stock loan activities as a mechanism for increasing returns to its ultimate investors. In engaging in stock loan activities, the Master Partnership or one of its subsidiaries enters into agreements with counterparties (acting as principals) and pursuant to these stock loan agreements may from time to time lend securities that it beneficially owns to these counterparties. In exchange for lending out its securities, the Master Partnership will earn interest on the value of the loaned securities. Millennium also engages in stock borrowing activities to reduce borrowing costs. Pursuant to the same agreements that govern stock loan activities, the Master Partnership or one of its subsidiaries may borrow securities to cover short positions on behalf of the Portfolio Managers.

*Additional Leverage Opportunities*

As the number of financial products that relate to investment in investment funds increases, Millennium will continually evaluate new sources of financing and leverage.

### The Master Partnership's Risk Management Program

The Managing Partner maintains an investment risk assessment and management program designed to identify, measure, monitor, manage and report on the associated risks of the portfolios of the Master Partnership, its subsidiaries, and the Affiliated Funds. Automated and manual risk monitoring is performed at a firm-wide level, at a Portfolio Manager level, and at an instrument or asset-class level. The investment risk assessment and management program is coordinated through the Managing Partner's investment risk management personnel, subject to the oversight of the Chief Risk Officer, David Nolan.

In particular, risk assessment and management activities include the following:

| | |
|---|---|
| *Measuring and Monitoring Risk* | The Investment Risk Management department measures, monitors, and reports on the risk profile of individual Portfolio Managers, strategy groups, and the firm as a whole. Market risk is measured in objective terms using a variety of industry and proprietary calculations, standards, and benchmarks; for example, equity price risk, interest-rate risk, credit spread risk, foreign exchange rate risk and commodity price risk (as well as concentration risk by, for example, industry sector, market capital, value/growth, issuer name and |

US0109 (Lehman)

geographic region). Scenario analyses and stress tests (including large market movements of rates, spreads and prices) are performed to estimate the exposure of a portfolio to extreme market moves either historically or prospectively. Value at Risk (VaR) and Conditional Value at Risk (CVaR) are additional measures used, where appropriate, to estimate the risk of loss at a particular confidence level and for a given time horizon. Liquidity risk is measured in terms of liquidation horizon analysis (i.e., days to liquidate), cost to liquidate estimates, and liquidation cost during market stress (for markets in which volatility and liquidity data is available).

*Setting Risk Limits*

The Investment Risk Management department establishes a variety of risk limits (e.g., net exposure, gross book, issuer name, asset class, industry/sector, country, currency and VAR) on an individual Portfolio Manager basis and actively monitors exposures against these limits. The trading risk limits are tailored to be consistent with the investment objectives of the proposed strategy as well as the Master Partnership's risk tolerance.

*Performance Monitoring*

The Investment Risk Management department tracks and analyzes profitability and performance of the firm and by Portfolio Manager and strategy. Profits and losses are the main criteria, along with volatility of the returns, risk-adjusted return ratios (Sharpe and Sortino), and drawdowns.

*Reporting*

The Investment Risk Management department produces and distributes daily, weekly and monthly internal reports to senior management, the Investment Risk Committee and where appropriate, Portfolio Managers.

Based in part on the results of these performance and risk management reports, the Managing Partner increases or reduces (and may sometimes terminate entirely) its allocations of capital to individual Portfolio Managers. The Managing Partner also employs these risk management analyses in determining whether a given Portfolio Manager or strategy poses an unacceptable risk to the Master Partnership, and may take a variety of actions to attempt to manage, reduce, or eliminate that risk.

US0109 (Lehman)

### The Master Partnership's Fees and Expenses

All of the Master Partnership's fees and expenses are assessed against the interests of the partners of the Master Partnership. "Investment expenses" include all expenses that the Managing Partner reasonably determines to be directly or indirectly related to the Master Partnership's investment activities, including, without limitation, brokerage commissions and interest expense, internal and external accounting expenses, audit and tax (including withholding tax) expenses, certain compensation expenses (including management or "base" fees that may be charged by certain Portfolio Managers or third party funds), legal expenses, administrator, registrar and transfer agent expenses, premiums for general partner liability insurance and risk-specific insurance  and "key-man" life insurance on certain personnel (including, without limitation, Mr. Englander, the managing member of the Master Partnership's Managing Partner), and other administrative and operating expenses.

The expenses of the Affiliated Funds are passed through to their investors.  Each Affiliated Fund bears its pro rata portion of the Master Partnership's expenses.

### Related-Party Transactions; Conflicts

Conflicts of interest among the Master Partnership, each of the Affiliated Funds (and their respective investors), the Advisers and Millennium's principals may and do exist, which conflicts include, but are not limited to, those described herein.

#### *Allocation of Investments to Affiliated Funds*

As discussed in Part One of this Confidential Memorandum, specific investment opportunities may be allocated, at times, to the Master Partnership and/or to one or more of the Affiliated Funds.

If a particular investment is not appropriate (for tax or other reasons) for one or more of the Affiliated Funds, such investment may be made directly by (or the income or loss from such investment may be allocated at the Master Partnership level solely to) other Affiliated Funds.  In such cases, it is intended that participation in such opportunities will be allocated on an equitable basis, taking into account such factors as the relative amounts of capital available for new investments, relative exposure to short-term market trends and the investment programs and portfolio positions of the Master Partnership and the affiliated entities for which participation is appropriate; however, the Managing Partner is not required to make any such equitable determination, and in many cases where an opportunity is allocated away from the Master Partnership, the net result will be to provide the investors in a single Affiliated Fund with all of the benefits of that opportunity and to cause the performance of one Affiliated Fund to differ from that of another.

The use of a master-feeder structure may also create a conflict of interest in that different tax considerations for the Master Partnership and other Affiliated Funds may cause the Master Partnership to structure or dispose of an investment in a manner that is more advantageous to one Affiliated Fund than to the other Affiliated Funds.

US0109 (Lehman)

*Management's Multiple Roles*

Investors do not hold interests directly in the Master Partnership; rather, they hold ownership interests in one of the three Affiliated Funds: Millennium International, Millennium USA, or Millennium Global Estate; Millennium International and Millennium USA invest the majority of their capital in the Master Partnership and Millennium Global Estate invests in the Master Partnership as part of a broader investment strategy. The investment manager or general partner of each of the Affiliated Funds is directly or indirectly controlled by Israel A. Englander. As a result, to the extent that any investment opportunities are allocated directly to one or more of the Affiliated Funds, Mr. Englander and the other principals of the Advisers will have a conflict of interest. This inherent conflict of interest may be exacerbated by the fact that Mr. Englander may hold disproportionate direct or indirect investments in some or all of the Affiliated Funds.

*Pre-Existing and Outside Businesses*

Mr. Englander is involved or invested in a number of entities engaged in the securities business, including four non-Millennium broker-dealers (one of which – Israel A. Englander & Co., Inc. – bears his name and the other three of which are specialist firms). To the extent that the Master Partnership, an Affiliated Fund, or a Portfolio Manager employ the services of one of these entities, this transaction could constitute a conflict of interest for Mr. Englander. However, the amount of business that these brokers receive from the Master Partnership and its affiliates is relatively small; from January 1, 2006 to December 31, 2006, the brokerage commissions paid to Israel A. Englander & Co., Inc. by all Millennium entities were approximately $54,000.

Mr. Englander and the other principals of the Advisers devote to the Master Partnership and to the Affiliated Funds so much of their time as, in their respective judgments, is necessary or appropriate in connection with the Master Partnership's and the Affiliated Funds' activities.

The Master Partnership may share office space, services and personnel with other businesses conducted by affiliates of the Managing Partner and, in such event, will bear a proportionate share of the associated costs. The Managing Partner may elect to have certain costs or expenses of the Master Partnership charged solely to its capital account in the Master Partnership.

*Ownership Influence*

Persons related to or affiliated with the Managing Partner (including Mr. Englander, the key managers identified above, various Portfolio Managers, and other Millennium employees and consultants) held, as of March 31, 2007, through a variety of direct and indirect investment channels, the economic equivalent of owning approximately 19% of the equity of the Affiliated Funds.

*Conflicting Investment Opportunities*

The Managing Partner or its affiliates may form other or additional investment partnerships or funds and may make investments with their own funds and/or the funds of outside investors. In some instances, investment opportunities that might have been available to and suitable for the Master Partnership may instead be placed with such other partnerships or

US0109 (Lehman)

funds or may be made by the Managing Partner or its affiliates. **THERE IS NO REQUIREMENT THAT THE MASTER PARTNERSHIP OR ANY OF THE AFFILIATED FUNDS RECEIVE ANY PREFERENCE OR PRIORITY WITH RESPECT TO INVESTMENT OPPORTUNITIES.**

*Personal Accounts*

The Master Partnership's policies place a number of limitations on the ability of Portfolio Managers to trade for their own accounts; however, these limitations are not absolute and certain (and can, in many cases, be waived by the Managing Partner) and Portfolio Managers may maintain personal trading accounts that hold positions that are substantially similar to the positions held in the portfolios they manage for the Master Partnership. In certain circumstances, such a situation could provide an incentive for a Portfolio Manager to trade in a way that would be advantageous to him or her personally but that would not be expected to have a positive effect on (and could even be adverse to) the Master Partnership.

In addition, members of Millennium's management may trade for their own accounts and may manage assets for other persons or entities. It is possible that from time to time these activities may come into conflict with Millennium's business; if such a conflict arises, Millennium's management personnel are not required to subordinate the interests of any other parties (or their own interests) to those of the direct or indirect investors in the Master Partnership, but they will endeavor to resolve any conflicts in a manner that is fair and reasonable.

*Leveraged Investments*

The principals and senior officers of the Managing Partner indirectly invest in the Master Partnership through a number of channels. Some of these investments may be leveraged through the extension of credit by a third party (structured in a manner that is non-recourse to the Master Partnership and to each Affiliated Fund) and may enjoy more favorable liquidation and other rights. While the Managing Partner believes that in substantially all situations these kinds of relationships are useful in aligning the interests of management with those of investors, they can lead to situations where the interests of management diverge from those of other investors.

*UK Structure*

MCP UK is indirectly majority-owned by David Nolan, Millennium's Vice-Chairman. The capital to organize this entity was loaned to Mr. Nolan by the Master Partnership, and that receivable remains outstanding to the Master Partnership. Mr. Nolan operates MCP UK with the intention of providing a valuable service to the direct and indirect investors in the Master Partnership, and not with the intention of making a personal profit.

*Conflicts Related to Third Party Fund Investments*

From time to time, the Managing Partner may negotiate for an economic interest in an independent Portfolio Manager with which the Master Partnership invests. Such interest may take various forms, such as shares or partnership interests in the Portfolio Manager's management company.

US0109 (Lehman)

### *Commingling of Property*

The Managing Partner will not commingle the investment assets of the Master Partnership with the property of any other person, although (i) specified assets may be pooled in a side-by-side co-investment with another entity and (ii) the investment assets of the Master Partnership may be commingled by those firms which act as brokers, futures commission merchants and custodians for the Master Partnership or the Master Partnership's Portfolio Managers.

### *Related-Party Charitable Foundation*

In 2006, the Managing Partner established the "Millennium Management and Employees Foundation" as a tax-exempt IRS §501(c)(3) organization for the purpose of providing support for educational, social, community service and other similar tax-exempt organizations in the communities in which Millennium is involved. Funds provided to the foundation come from the Managing Partner, Millennium International Management and officers and employees of those Advisers and their affiliates. No funds from the Master Partnership or the Affiliated Funds are contributed to this foundation, and no funds of investors are used to support the foundation.

## Certain Tax Matters Relating to the Master Partnership

### *Certain Cayman Islands Tax Matters*

THE FOLLOWING IS A SUMMARY OF CERTAIN CAYMAN ISLANDS TAX CONSEQUENCES TO PERSONS WHO PURCHASE INTERESTS IN THE OFFERING. THE DISCUSSION IS BASED UPON APPLICABLE LAW OF THE CAYMAN ISLANDS AND ON THE ADVICE OF WALKERS, CAYMAN ISLANDS COUNSEL. THE DISCUSSION DOES NOT ADDRESS ALL OF THE TAX CONSEQUENCES THAT MAY BE RELEVANT TO A PARTICULAR INVESTOR. PROSPECTIVE INVESTORS MUST CONSULT THEIR OWN TAX ADVISERS AS TO THE CAYMAN ISLANDS TAX CONSEQUENCES OF ACQUIRING, HOLDING AND DISPOSING OF INTERESTS, AS WELL AS THE EFFECTS OF TAX LAWS OF THE JURISDICTIONS OF WHICH THEY ARE CITIZENS, RESIDENTS OR DOMICILIARIES OR IN WHICH THEY CONDUCT BUSINESS.

There is, at present, no direct taxation in the Cayman Islands and interest, dividends and gains payable to the Master Partnership will be received free of all Cayman Islands taxes. The Master Partnership is registered as an "exempted limited partnership" pursuant to the Exempted Limited Partnership Law (as amended). The Master Partnership has received an undertaking from the Governor in Cabinet of the Cayman Islands to the effect that, for a period of fifty years from such date, no law that thereafter is enacted in the Cayman Islands imposing any tax or duty to be levied on profits, income or on gains or appreciation, or any tax in the nature of estate duty or inheritance tax, will apply to any property comprised in or any income arising under the Master Partnership, or to the Investors thereof, in respect of any such property or income.

### *Other Jurisdictions*

Tax disclosures relevant to an investment in a particular Affiliated Fund have been included in Part One of this Confidential Memorandum.

US0109 (Lehman)

**Certain Legal and Regulatory Matters Relating to the Master Partnership**

*United States Investment Company Act*

As entities that are engaged primarily in the business of "investing, reinvesting, or trading in securities," the Affiliated Funds and the Master Partnership would likely fall within the definition of "investment company" found in the Investment Company Act. The Investment Company Act imposes technical, complex, and extensive substantive regulations of the activities of an investment company (including obligations and restrictions relating to organization, corporate governance, disclosure, asset allocation, and investment diversification) and prohibits an investment company from offering or selling securities in the United States unless it is registered under the Investment Company Act. However, each of the Affiliated Funds and the Master Partnership is excluded from the definition of "investment company" under the Investment Company Act pursuant to Section 3(c)(7) of that act, and they therefore are not subject to its provisions.

*United States Investment Advisers Act*

The activities of the Advisers with respect to the assets of the Affiliated Funds and/or to the assets of the Master Partnership would likely cause the Advisers to be classified as "investment advisers" under the Advisers Act. Such a classification would require the Advisers, among other things, to adhere to the Advisers Act's disclosure obligations, to publicly file periodic reports with the SEC, and to adopt a number of policies and procedures required by the Advisers Act and by the rules and regulations promulgated thereunder by the SEC.

However, the Advisers are exempt from registration under the Advisers Act because each of them "advises" fewer than fifteen "clients" (as such terms are used in the Advisers Act). Notwithstanding the fact that the Advisers are not subject to most of the provisions of the Advisers Act, each Adviser intends, when it deems such an action to be practicable and in the best interests of its investors, to voluntarily adopt policies and procedures that provide substantially similar protections to its investors as would be afforded to them if the relevant Adviser was registered under the Advisers Act.

*United States Commodity Exchange Act*

The Master Partnership and each of the Affiliated Funds is classified as a "commodity pool" under the U.S. Commodity Exchange Act, as amended (the "CEA"), and each of the Advisers is registered with the CFTC as a commodity pool operator ("CPO") and is a member of the U.S. National Futures Association. In addition, Israel Englander, the managing member or control person of each of the Advisers, is registered under the CEA as an associated person and a principal of each of the Advisers. However, because interests in each Affiliated Fund and in the Master Partnership are offered and sold only to "qualified eligible persons" (as defined in the CEA) in offerings exempt from registration under the Securities Act pursuant to Section 4(2) or Regulation S thereunder, the Advisers are not required to provide any disclosure document to investors and are granted significant relief from the periodic reporting and recordkeeping requirements of the CEA. In addition, one or more of the Advisers may be exempt from registration as a CPO under the so-called "limited trading exemption" created by a 2003

US0109 (Lehman)

amendment to the rules and regulations promulgated under the CEA, although none of the Advisers presently intends to avail itself of this possible exemption.

The Master Partnership fulfills its initial margin requirements with respect to commodity interests subject to CFTC jurisdiction by delivering cash, or to the extent permitted by the rules of the exchange on which a position is being maintained, by delivering securities. Any income generated from Master Partnership securities posted as margin will be received by the Master Partnership and allocated among the partners in the Master Partnership (including the Affiliated Funds) in the same manner as is provided in the Partnership Agreement for items of income. Any variation margin required to be furnished by the Master Partnership from time to time will be satisfied solely through the delivery of cash or other acceptable collateral.

### United States Securities Exchange Act

<u>Institutional Investment Adviser</u>. The Master Partnership and a number of its affiliates qualify as "institutional investment managers" under Section 13(f) of the Exchange Act and, accordingly, are required to file quarterly "Form 13F" position reports with the SEC. These reports are available through the SEC's EDGAR database, which can be accessed through the SEC's web site (www.sec.gov).

<u>Broker-Dealer Registration</u>. Millenco is registered as a broker-dealer under the Exchange Act. Its financial reports are prepared as stand-alone financial statements and FOCUS reports, which are filed with the SEC, and are also consolidated into the financial reports of the Master Partnership.

### United Kingdom Financial Services Authority

MCP UK, which is indirectly majority owned by one of the senior officers of the Managing Partner, serves as an investment adviser to the Master Partnership and certain of its subsidiaries. It is authorized and regulated by the FSA in the United Kingdom and as such its conduct of regulated activities is regulated by the FSA.

### Ontario Securities Commission

In October, 2005, the Ontario Securities Commission, pursuant to section 80 of the Commodity Futures Act (Ontario), granted exemptive relief to the Managing Partner's and to Millennium International Management's members, directors, partners, officers, principals and employees from the registration requirements of paragraph 22(1)(b) of the act. The exemption will have a duration of three years, and is limited in scope to advisory services provided to the Master Partnership and the Affiliated Funds.

### Stock Exchanges/Self-Regulatory Organizations

By virtue of their exchange memberships, a number of Millennium entities are also subject to oversight by, among others, the American Stock Exchange (whose inspection and examination function is currently administered by the NASD), NYSE/ARCA, the International Securities Exchange, the Chicago Board of Trade and the Chicago Mercantile Exchange. In general, such oversight is intended to protect the markets themselves and a firm's public customers, rather than investors in the Master Partnership or in the Affiliated Funds.

US0109 (Lehman)

*Anti-Money Laundering Regulations*

The Master Partnership accepts investments only from (i) the Affiliated Funds, (ii) Edina, LLC, a special purpose subsidiary of Millennium USA and Millennium Global Estate and (iii) the Managing Partner. Accordingly, the Master Partnership relies upon the Affiliated Funds' "know your investor" and similar anti-money-laundering policies and procedures, described in Part One of the applicable version of this Confidential Memorandum.

## Litigation

*Settlement Relating to Mutual Fund Trading*

In 2003, the Office of the Attorney General of the State of New York (the "NYAG") initiated a broad scale investigation into trading in mutual funds generally. This investigation related primarily to certain practices that have been characterized as "market timing" and "late trading" in shares of mutual funds. The NYAG issued a subpoena to numerous market participants, including the Master Partnership, each of the Affiliated Funds, the Managing Partner, Millennium International Management and certain of their officers and affiliates (collectively, the "Millennium Group"). The Millennium Group cooperated with that investigation and a companion investigation conducted by the SEC (together, the "Mutual Funds Investigation").

In October, 2003, a Millennium trader, Steven Markovitz, pled guilty to a Class E felony under New York's Martin Act (which prohibits schemes to defraud in connection with the purchase or sale of securities). The SEC also issued an order finding that he willfully violated several provisions of the federal securities laws by engaging in late trading of mutual fund shares while employed at Millennium.

On December 1, 2005, the Millennium Group entered into settlements with the NYAG and the SEC. Pursuant to those settlements, the Master Partnership, the Managing Partner, Millennium International Management (together, the "Millennium Respondents"), Israel Englander, Terence Feeney (the Millennium Group's Chief Operating Officer), and Fred Stone (the Millennium Group's General Counsel at the time) (collectively, the "Individual Respondents"), a Millennium trader, and certain affiliates entered into agreements with the SEC. Under these agreements, the Millennium Group respondents consented to the entry of findings without admitting or denying those findings (except as to jurisdiction) and, among other things, agreed to the following:

disgorgement of approximately $148 million of profits earned from mutual fund trading (of which approximately $26.6 million reflected incentive amounts earned on the disgorged profits);

payment of civil fines by the Individual Respondents aggregating approximately $32 million; and

the entry of an order against the Millennium Group respondents to "cease and desist from committing or causing any violations and any future violations of Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder."

US0109 (Lehman)

*Other Matters Related to Mutual Fund Trading*

Certain Millennium entities entered into an agreement with a mutual fund family that effectively tolled the running of the statute of limitations for the period during which the affected funds could bring an action against Millennium for damages or losses resulting from the circumstances underlying the settlement described above. The mutual fund family did not articulate any specific potential claim, and has not brought any action to date.

In addition, a class action was filed against Millennium International and a number of financial institutions and market entities seeking damages for the alleged "market timing" and "late trading" activities. Millennium International was dismissed as a defendant, although the case remains subject to potential appeal.

*Renaissance Technologies Corporation v. Millennium Partners, LP, et al.*

In December 2003, Renaissance Technologies Corporation ("Renaissance") commenced an action in New York Supreme Court against the Master Partnership, the Managing Partner and two Millennium traders, seeking injunctive relief and money damages for breach of trade secrets and confidentiality agreements. The case was settled for an immaterial amount in 2007, and the employment of the traders was terminated.

### The Master Partnership's Fiscal Year

The fiscal year-end of the Master Partnership is December 31.

### The Master Partnership's Independent Public Accountants

The Master Partnership has retained Ernst & Young LLP, 5 Times Square, New York, New York 10036, certified public accountants, as its auditor.

# VI

**EXHIBIT VI**

**FORM OF MARKET MAKING REQUEST**

Lehman Brothers Inc.
745 Seventh Avenue
New York, NY 10019
Attn:  Equity Sales Derivatives]

Re:   [4-Year, 2-Month] Cash-Settled Call Warrants Linked to the Performance
of Millennium USA LP Issued by Lehman Brothers Holdings Inc.

Ladies and Gentlemen:

(1)    In connection with the [4-Year, 2-Month] Cash-Settled Call Warrants Linked to the
Performance of Millennium USA LP (the "Warrants") issued by Lehman Brothers
Holdings Inc. (the "Issuer"), the undersigned holder of Warrants (the "Holder") hereby
submits to Lehman Brothers Inc. this market making request (the "Market Making
Request") for the number of Warrants set forth below.  Defined terms used but not
defined herein shall have the meanings given to such terms in the Private Placement
Memorandum for the Warrants, dated on or about [●], 2008 (the "PPM").

(2)    The Holder represents that this Market Making Request has been delivered to Lehman
Brothers Inc. no later than 105 calendar days in advance of the last Business Day of a
calendar quarter.

(3)    The Holder acknowledges and agrees that neither Lehman Brothers Inc. nor its affiliates
are obligated to create a secondary market or to continue such activity once it has begun.

(4)    The Holder further acknowledges and agrees that:

(a)    Lehman Brothers Inc. or its affiliate will determine the market making
price as of that quarter end;

(b)    In the event that Lehman Brothers Inc. or its affiliate agrees to buy a
Warrant(s) from the Holder, there will likely be significant delays between the time it
agrees to such purchase and the pricing and settlement of such purchase.

(c)  .  In the event that Lehman Brothers Inc. or is affiliate agrees to buy a
Warrant(s) from the Holder, any secondary market price quoted by Lehman Brothers Inc.
or its affiliate (i) will reflect any changes in market conditions and other relevant factors,
and the quoted price could be higher or lower than the initial purchase price, (ii) will be at
a price that is net of the commissions paid to the Placement Agent as described under
"*Plan of Distribution*" in the PPM, (iii) will likely exclude the projected profits included
in the cost of hedging the Issuer's obligations under the Warrants (iv) may differ from
values determined by pricing models used by the Calculation Agent, due to dealer
discounts, mark-ups, hedge unwinds or other transaction costs.

IN WITNESS WHEREOF, the undersigned has executed this Market Making Request this _____ day of _____, 20__.

Very truly yours,

By:_____
Name of Holder


_____
Number of Warrants

VI-1

Mark R. Imowitz

418 E. 59th Street

New York, NY 10022

212-755-1668



FILED / RECEIVED

DEC 3 0 2013

EPIQ BANKRUPTCY SOLUTIONS, LLC

December 19, 2013

Epic Bankruptcy Solutions, LLC
757 Third Avenue, 3rd Floor
New York, NY 10017

Re: Lehman Brothers Holdings Inc.
Case No. 08-13555(JMP)

Dear Sirs:

Attached is Proof of Claim in the Chapter 11 bankruptcy proceeding of Lehman Brothers Holdings Inc.,
Case No. 08-13555 (JMP), together with Substitute Form W-9 and Certification Regarding Status.

The undersigned timely filed a Proof of Claim on January 30, 2009 in the Chapter 11 bankruptcy
proceeding of Lehman Brothers Inc., Case No. 08-01420 (JMP), Claim Number 2918. By Notice dated
November 14, 2013, the undersigned was advised that its claim was being denied for the reason that the
claim was filed against the wrong party, and that the correct party was Lehman Brothers Holdings Inc. A
copy of the denial of the claim is attached. The undersigned was not aware of its error at the time of
the filing of its Proof of Claim in that proceeding, which filing was made in good faith.

Accordingly, the undersigned Claimant respectfully requests that the filing of its Proof of Claim in the
Chapter 11 bankruptcy proceeding of Lehman Brothers Holdings Inc., Case No. 08-13555 (JMP) be
accepted and that the Bankruptcy Court exercise its discretion to allow Claimant's Proof of Claim in such
proceeding. It is noted that in connection with the Fourth Distribution on October 3, 2013, said
distribution included $276 million of payments to recently allowed claims of amounts those claimants
would have received had those payments been allowed at the time of the previous distributions.

Thank you for your consideration.

Very truly yours,

Mark R. Imowitz





USPS TRACKING #

9114 9011 5981 8218 1660 63



First Class Mail

Confidential

*Imowitz, Koenig & Co., LLP*
*Certified Public Accountants*
*622 Third Avenue*
*New York, New York 10017*

*Lehman Brothers Holdings Claims Processing*
*c/o Epiq Bankruptcy Solutions, LLC*
*FDR Station, PO Box 5076*
*New York, NY 10150-5076*



PRIORITY MAIL

TRACKED
INSURED

UNITED STATES POSTAL SERVICE®
For Domestic Use Only