UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
In re

LEHMAN BROTHERS HOLDINGS INC., *et al.*,

                             Debtors.
-------------------------------------------------------------------x

Chapter 11 Case No.

08-13555 (JMP)

Jointly Administered

## MEMORANDUM IN OPPOSITION TO DEBTORS' FOURTEEN OMNIBUS OBJECTIONS SEEKING TO RECLASSIFY COMPENSATION CLAIMS AS EQUITY, OR ALTERNATIVELY, TO SUBORDINATE CLAIMS PURSUANT TO SECTION 510(b) OF THE BANKRUPTCY CODE

STAMELL & SCHAGER, LLP
  Richard J. Schager, Jr., Esq.
  Andrew R. Goldenberg, Esq.
One Liberty Plaza, 23rd Floor
New York, NY 10006-1404
Telephone: (212) 566-4047
Facsimile: (212) 566-4061
Email: schager@ssnyc.com
Email: agoldenberg@ssnyc.com

LAW OFFICES OF LISA M. SOLOMON
  Lisa M. Solomon, Esq.
One Grand Central Place
305 Madison Avenue
Suite 4700
New York, NY 10165
Telephone: (212) 471-0067
Facsimile: (212) 980-6965
Email: lisa.solomon@att.net

RICH MICHAELSON MAGALIFF
 MOSER LLP
  Howard P. Magaliff, Esq.
  Robert N. Michaelson, Esq.
340 Madison Avenue - 19th Floor
New York, NY 10173
Telephone: (212) 220-9402
Email: HMagaliff@R3MLaw.Com
Email: RMichaelson@R3MLaw.Com

LAW OFFICE OF A. JAMES
BOYAJIAN
  A. James Boyajian, Esq.
355 S. Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (424) 258-0777
Facsimile: (424) 298-4377
Email: jamesboyajian@gmail.com

*Attorneys for Compensation Claimants*

# TABLE OF CONTENTS

**Description**                                                                                                                    **Page**

PRELIMINARY STATEMENT ..................................................................... 1

STATEMENT OF FACTS ........................................................................... 3

Lehman's Promise of Compensation .............................................................. 3

The RSU/CSA Compensation Plan .............................................................. 5

RSUs and CSAs Were A Contract Promise, Not An Equity Award .............................. 7

LBHI Removed Purported Subordination Language from the RSU/CSA Agreements .. 8

LEGAL ARGUMENT.................................................................................. 10

I.      COMPENSATION CLAIMS ARE NOT BASED UPON AN EQUITY
        INTEREST................................................................................... 10

II.     LEHMAN FAILS TO SHOW ANY BASIS FOR SUBORDINATION UNDER
        SECTION 510(b) OF THE CODE ................................................... 12

A.      The Compensation Claims Do Not Arise from the Purchase or Sale of a "Security"    13

        1.   RSUs and CSAs Are Not Investment Contracts under § 101(49)(A)(xii)..... 14

        2.   RSUs and CSAs Are Not Commonly Known as a Security Under
             § 101(49)(A)(xvi)........................................................... 22

        3.   RSUs and CSAs Are Not a Security As a  Right to Purchase Under
             § 101(49)(A)(xv)........................................................... 23

B.      There Was No "Purchase or Sale" of a Security.................................. 25

C.      The Compensation Claims Are Not For "Damages" Under Section 510(b) ....... 27

D.      The Compensation Claims Based Upon Lehman's Alternative Performance
        Obligations Are Not Claims "Arising" From the Purchase of a Security........... 32

E.      The Compensation Claims Are Not For "Damages"; Rather, They Are Claims
        Arising From Statutory Rights To "Wages" For Services Rendered .................. 33

        1.   Applicable Wage Laws................................................... 34

        2.   Amounts Withheld from Fixed Commissions and  Bonuses are Unpaid "Wages"    35

a. Commissions are "Wages" ...................................................................... 35

b. Bonuses are "Wages" ........................................................................... 35

3. Lehman's RSU/CSA Plans Violate Wage Laws Requiring Voluntary Written Authorization from the Employee .................................................. 37

4. Lehman's RSU/CSA Plan Violates Wage Laws Requiring Deductions or Withholdings be For the Employee's Benefit ................................................. 38

III. THE SUBORDINATION PROVISIONS IN THE RSU AND CSA AGREEMENTS ARE UNENFORCEABLE ....................................................... 39

IV. THE LEGISLATIVE HISTORY OF SECTION 510(b) DOES NOT SUPPORT SUBORDINATION ............................................................................. 41

V. APPLICATION OF SECTION 510(b) WILL NOT FURTHER THE POLICIES OF THE STATUTE. COMPENSATION CLAIMANTS DID NOT ASSUME THE RISKS AND BENEFITS OF SHAREHOLDERS .................... 42

CONCLUSION ........................................................................................... 48

## TABLE OF AUTHORITIES

### Cases

*Arrez v. Kelly Servcs., Inc.*, 522 F. Supp. 2d 997 (N.D. Ill. 2007) ................................................ 36

*Ashland Oil & Refining Co. v. Cities Serv. Gas Co.*, 462 F.2d 204 (10th Cir. 1972) .................. 29

*Bader v. Wells Fargo Home Mortg. Inc.*, 773 F. Supp. 2d 397 (S.D.N.Y. 2011) ....................... 36

*Bauman v. Bish*, 571 F. Supp. 1054 (N.D. W.Va. 1983) ....................................................... 17, 25

*Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723 (1975) ..................................................... 13

*Brandon v. Anesthesia & Pain Mgmt Associates, Ltd.,* 419 F.3d 594 (7th Cir. 2005) ................ 36

*Camillo v. Wal-Mart Stores, Inc.*, 221 Ill.App.3d 614 (Ill. App. Ct. 1991) .................................. 36

*Carlson v. Katonah Capital, L.L.C.*, 2006 WL 273548 (N.Y. Sup. Ct. Jan. 27, 2006) ............... 36

*Childers v. Northwest Airlines, Inc.*, 688 F. Supp. 1357 (D. Minn. 1988) ............................ 16, 25

*Chock Full O'Nuts Corp. v. United States*, 453 F.2d 300 (2d Cir. 1971) ...................................... 32

*DeGeer v. Gillis*, 707 F.Supp.2d 784 (N.D. Ill. 2010) ................................................................... 36

*Devlin v. United States*, 352 F.3d 525 (2d Cir. 2003) ................................................................... 14

*Diamond v. Davis*, 38 N.Y.S.2d 103 (N.Y. Sup. Ct. 1942) .......................................................... 36

*Draken Group, Inc. v. Avondale Resources, Inc.*, 2008 WL 151901 (N. D. Okla. Jan 14, 2008) 29

*Dubin v. E.F. Hutton Group, Inc.*, 695 F. Supp. 138 (S.D.N.Y. 1988) ........................... 14, 16, 18

*Farrell Matthews & Weir v. Hansen*, [2005] I.R.L.R. 160 ........................................................... 36

*Fishoff v. Coty Inc.*, 2009 WL 1585769 (S.D.N.Y. June 8, 2009) ................................................ 16

*FleetBoston Fin. Corp. v. Alt*, 668 F. Supp. 2d 277, 279-80 (D. Mass. 2009) ............................ 12

*Fraser v. Fiduciary Trust Co., Int'l*, 2005 WL 6328596 (S.D.N.Y. June 23, 2005) ................... 26

*Gennes v. Yellow Book of New York, Inc.*, 23 A.D.3d 520 (2d Dep't. 2005) .............................. 35

*Glidden Co. v. Hellenic Lines, Ltd.*, 275 F.2d 253 (2d Cir. 1960) ............................................... 29

*Heyen v. Safeway Inc.*, 157 Cal.Rptr.3d 280 (Cal. Ct. App. 2013) .............................................. 34

*In re American Wagering, Inc.*, 493 F.3d 1067 (9th Cir. 2007) ................................................... 46

*In re Blondheim Real Estate, Inc.*, 91 B.R. 639 (Bankr. D. N.H. 1988) ...................................... 28

*In re Calpine Corp.*, 2007 WL 4326738 (S.D.N.Y. Nov. 21, 2007) ............................................ 32

*In re Cendant Securities Litig.*, 81 F. Supp. 2d 550 (D. N.J. 2000) .............................................. 25

*In re DirecTV Latin Am., LLC*, 2004 WL 302303 (D. Del. Feb. 4, 2004) .............................. 46, 47

*In re Erickson Retirement Communities, LLC*, 425 B.R. 309 (Bankr. N.D. Tex. 2010) ............. 40

*In re Granite Partners, L.P.*, 208 B.R. 332 (Bankr. S.D.N.Y. 1997) ........................................... 42

*In re III Enterprises, Inc. V*, 163 B.R. 453 (Bankr. E.D.Pa.)........................................................ 24

*In re Lawsam Elec. Co.*, 300 F. 736 (S.D.N.Y. 1924) .................................................................. 35

*In re MarketXT Holdings Corp.*, 2008 WL 2164572 (Bankr. S.D.N.Y. May 22, 2008)........ 42, 43

*In re Med Diversified, Inc.,* 461 F.3d 251 (2d Cir. 2006)..................................................... passim

*In re Mobile Tool Int'l Inc.*, 306 B.R. 778 (Bankr. Del. 2004)..................................................... 28

*In re Montgomery Ward Holding Corp.*, 272 B.R. 836 (Bankr. Del. 2001)................................. 27

*In re NationsRent, Inc.*, 381 B.R. 83 (Bankr. D. Del. 2008)........................................................ 30

*In re Riodizio, Inc.*, 204 B.R. 417, 422 (Bankr. S.D.N.Y. 1997).................................................. 24

*In re Satyam Computer Servs. Ltd. Sec. Litig.*, 915 F. Supp. 2d 450 (S.D.N.Y. 2013).......... 14, 16

*In re Touch America Holdings, Inc.*, 381 B.R. 95 (Bankr. D. Del. 2008) .................................... 26

*In re U.S. Wireless Corp.*, 384 B.R. 713 (Bankr. D. Del. 2008).................................................. 26

*In re Washington Bancorporation*, 1996 WL 148533 (D. D.C. Mar. 19, 1996) ......................... 27

*In re Wyeth Co.*, 134 B.R. 920 (Bankr. W.D. Miss. 1991) .......................................................... 27

*International Wireless Comm. Holdings Inc.*, 279 B.R. 463 (D. Del. 2002)................................ 26

*Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am. v. Daniel*, 439 U.S. 551,
    (1979) ......................................................................................................................... passim

*Kim v. Citigroup, Inc.*, 305 Ill.Dec. 834 (Ill. App. Ct. 2006)..................................................... 37

*Klig v. Deloitte LLP*, 36 A.3d 785 (Del. Ch. 2011) ................................................................... 34

*Koehl v. Verio, Inc.*, 142 Cal.App.4th 1313 (Cal. Ct. App. 2006).......................................... 35, 37

*Landreth Timber Co. v. Landreth*, 471 U.S. 681 (1985) ........................................................ 15, 22

*Levion v. Societe Generale*, 822 F.Supp.2d 390 (S.D.N.Y. 2011) ............................................. 36

*Marsh v. Prudential Sec. Inc.*, 1 N.Y.3d 146 (N.Y. Ct. App. 2003)............................................ 37

*Neisendorf v. Levi Strauss & Co.*, 143 Cal. App. 4th 509 (Cal. Ct. App. 2006) ......................... 36

*Northcross v. Board of Educ. of Memphis City Schools*, 412 U.S. 427 (1973)............................ 16

*Padilla v. Manlapaz*, 643 F.Supp.2d 302 (E.D.N.Y. 2009)........................................................ 37

*Reilly v. Natwest Markets Group Inc.*, 181 F.3d 253 (2d Cir. 1999)........................................... 36

*Rosen v. Smith Barney, Inc.*, 393 N.J.Super. 578 (N.J. Super. Ct. 2007) .............................. 34, 37

*Schachter v. Citigroup, Inc.*, 47 Cal.4th 610 (Cal. Super. Ct. 2009) ......................................... 36

*Schunkewitz v. Prudential Sec., Inc.*, 99 F. Appx. 353 (3d Cir. 2004) ....................................... 37

*SEC v. Lauer*, 52 F.3d 667 (7th Cir. 1995) ............................................................................... 14

*SEC v. W. J. Howey Co.*, 328 U.S. 293 (1946)........................................................... 15, 17, 19, 20

*United Housing Found., Inc. v. Forman*, 421 U.S. 837 (1975) ........................................ 15, 19, 22

*Ury v. Fruit Belt Service Co.,* 64 Ill.Dec. 613 (Ill. App. Ct. 1982)............................................. 37

*Yankton Sioux Tribe of Indians v. U.S.*, 272 U.S. 351 (1926) ...................................................... 29

*Zabinsky v. Gelber Group, Inc.,* 347 Ill. App. 3d 243 (Ill. App. Ct. 2004) ................................. 36

**Statutes**

11 U.S.C. § 101(49)(A)................................................................................................. passim

11 U.S.C. § 101(16) ............................................................................................................ 10

11 U.S.C. § 510(a) .............................................................................................................. 40

11 U.S.C. § 510(b) ....................................................................................................... passim

26 U.S.C. § 83(b) ................................................................................................................ 11

Cal. Lab. Code § 222 .......................................................................................................... 37

Cal. Lab. Code § 224 .......................................................................................................... 37

Cal. Lab. Code § 407 .......................................................................................................... 34

Cal. Lab. Code § 408 .......................................................................................................... 34

Cal. Lab. Code § 225 .......................................................................................................... 34

Col. Rev. Stat. § 8-4-105 .................................................................................................... 37

Ill. 820 ILCS § 115/9 ......................................................................................................... 37

N.Y. Lab. Law § 193 ..................................................................................................... 37, 38

N.Y. Lab. Law § 197 .......................................................................................................... 34

N.Y. Lab. Law § 198 .......................................................................................................... 34

N.Y. Stat. Law § 321 .......................................................................................................... 34

**Other Authorities**

2B George Sutherland, *Statutes & Statutory Construction*, § 53.03 at 233 (5th ed. 1992) .......... 16

C. Edgar Adkins, Jr. & Jeffrey A. Martin, *Restricted Stock: The Tax Impact on Employers and Employees*, 107 J. Tax. 224 (2007) ("Adkins & Martin") ...................................................... 11

Cal. Op. Att'y Gen. (Nov. 5, 1981) .................................................................................... 38

H.R. Doc. No. 93-137 ......................................................................................................... 42

H.R. REP. 95-595, 1978 U.S.C.C.A.N., 6268 ...................................................................... 10, 45

John J. Slain and Homer Kripke, *The Interface Between Securities Regulation and Bankruptcy – Allocating the Risk of Illegal Securities Issuance Between Securityholders and the Issuer's Creditors*, 48 N.Y.U. L. Rev. 261 (1973) ............................................................................ passim

L. Loss et al., 2 *Securities Regulation*, 863 (4th ed. 2007) .......................................................... 22

Max J. Schwarz, *A Primer on Stock-Based Compensation and Selected Recent Developments,*
*contained in Hot Issues in Executive Compensation 2004*, PLI Tax Law & Estate Planning
Course Handbook Series, 642 PLI/Tax 57 (September 2004) .................................................. 11

S. REP. 95-989, 1978 U.S.C.C.A.N. 5787 .................................................................................. 10

Weil, Gotshal & Manges LLP, Bankruptcy Blog, *Tightening the Golden Handcuffs: Forfeiture*
*Provision in Stock; Voluntary Plans*, April 5, 2004 ................................................................. 37

## PRELIMINARY STATEMENT

Prior to this bankruptcy, Compensation Claimants (as defined below) were given a promise of compensation for services rendered that gave rise to contractual obligations and statutory obligations under the wage laws. According to Lehman Brothers Holdings Inc. and its affiliated debtors (collectively, "Lehman"), notwithstanding these contractual and statutory claims for a fixed amount, the bankruptcy filing of Lehman transforms Compensation Claimants into holders of equity with no right to any distribution of any kind under Lehman's plan.

Lehman seeks a holding of unprecedented breadth that would sweep Compensation Claimants, whom Lehman scheduled as counterparties to existing executory contracts, into the mandatory provisions of § 510(b) of title 11 of the United States Code (the "Code"). By the relief Lehman seeks in its Fourteen Omnibus Objections (*see* Exhibit "A"), creditors other than Compensation Claimants, who had no priority over Compensation Claimants, would now be gifted a preference.

This is not a fact pattern that exists in any of the cases Lehman has cited and it is not a fact pattern that fits within the terms of § 510(b) of the Code. Lehman does not address the requirements of § 510(b) of the Code, that a claim must be one for damages that arise from the sale or purchase of a security in order to qualify for subordination. The Court should reject the relief Lehman seeks because:

- The RSUs and CSAs at issue here are not "securities" as defined in the Code. They were mandatorily imposed upon the Compensation Claimants and did not allow these Claimants to make independent decisions to purchase or sell Lehman stock.

- There was no "purchase" of RSUs and CSAs by employees as that term is used in the Code. There was no bargained for exchange to become a shareholder but instead a transaction calling for the possible delivery of RSUs or CSAs as one mode of alternative performance for payment of promised compensation.

- The Claims are not for "damages" that arise from the purchase or sale of a security. The Claims are for enforcement of Lehman's contract obligations for alternative performance and for payments due Claimants under the wage laws that are not measured by or dependent in any way on diminution in the value of Lehman stock. Where a promise of compensation is made in one of two alternate modes, the promisor is not relieved of the compensation obligation when one mode becomes impossible to perform.

- Subordination also conflicts with § 510(b)'s purpose, which was to subordinate securities fraud claims to the level of equity because "the reliance interests of *laborers,* lenders and trade creditors" deserve greater protection.  Reclassification of these compensation claims as equity, where the compensation Claimants seek only involuntarily withheld wages, not fraud damages, completely up-ends the statute's purpose.[1]

The Second Circuit has cautioned courts to "guard[ ] against attempts by a bankruptcy debtor to clothe a general creditor in the garb of a shareholder."  *In re Med Diversified,* 461 F.3d 251, 258 (2d Cir. 2006).  The policies underlying § 510(b), consistent with the Second Circuit's concern, support a finding that compensation claims fall outside the ambit of § 510(b).

Finally, Lehman's own action pre-bankruptcy, permanently removing from post-2004 RSU/CSA documents the purported subordination clause it has quoted to the Court in prior filings, demonstrates and concedes that these compensation claims warrant treatment on parity with other general creditors.

Subordination of these compensation claims would be inconsistent with the statutory language and in direct conflict with the policies that lead to its enactment.  Lehman's efforts to

---

[1]   J. Slain & H. Kripke, *The Interface between Securities Regulation and Bankruptcy - Allocating the Risk of Illegal Securities Issuance between Securityholders and the Issuer's Creditors,* 48 N.Y.U. L. Rev. 261, 299 (1973) (emphasis added) ("Slain & Kripke").  In *In re Enron Corp.*, 341 B.R. 141, 163-64 (S.D.N.Y. Bankr. 2006), Judge Gonzales recognized the Slain & Kripke article as "the journal article that motivated the promulgation of" § 510(b), and noted that Congress had "broadly adopted the legal principles articulated by Slain and Kripke" in drafting the statute.  *Enron*, 341 B.R. at 163.  On the Appellate level, the Second and Third Circuits both have noted the influence of the Slain & Kripke article.  *In re Med Diversified, Inc.*, 461 F.3d 251, 255-56 (2d Cir. 2006));  *In re Telegroup, Inc.*, 281 F.3d 133, 139 (3d Cir. 2002).

"clothe" its former employees in "the garb of a shareholder" should be rejected and the Omnibus

Objections overruled.

## STATEMENT OF FACTS

**Lehman's Promise of Compensation**

At the outset of their employment arrangement, Lehman employees were given a promise

of compensation. They were told : "[T]he Firm pays you on a 'total compensation' basis." Total

compensation included commissions and bonuses, a portion of which could be paid in one of two

alternative forms, cash or grants of Restricted Stock Units (for U.S. employees) and Contingent

Stock Awards (for non-U.S. employees). LEH-RSU 0000292, 299, Guide to Working at

Lehman Brothers.[2] Fact Stip. ¶ 2.[3]

At or near year-end Lehman awarded its U.S.-based salaried employees their year-end

bonuses with a standard form document prepared by Lehman entitled "200_ Total Compensation

Statement." These statements set forth the employee's total compensation for that year,

including both the fixed salary and bonus amount. The statements also identified any portion of

the bonus Lehman determined would be paid in Restricted Stock Units. A Total Compensation

Statement issued for this U.S.-based employee would show three line items listed under

"Compensation Type":

| | |
|---|---|
| Annualized Salary | $200,000 |
| Bonus | $900,000 |
| TOTAL COMPENSATION | $1,100,000 |

---

[2] Documents produced by LBHI are Bates-Stamped "LEH-RSU ___."

[3] "Fact Stip." refers to a Stipulation of Facts Regarding RSUs and CSAs, Including the Tax and Accounting Treatment of RSUs and CSAs, which was entered into on September 13, 2013 by LBHI and certain Claimants and approved by the Court on October 2, 2013 (ECF 40263 & 40263-1).

The Total Compensation Statement Included a "Payment Schedule" showing the breakdown of the total bonus to be paid as a "Cash Payment" portion and an RSU portion:

| | |
|---|---|
| Bonus | $900,000 |
| Less RSUs | ($235,000) |
| Total Cash Payment (Before Taxes) | $665,000 |

Fact Stip. ¶ 15, Exhibit 16 (p. 138 of 148).[4]

Overseas salaried employees during the years 2003 through 2008 were provided similar information at year-end meetings and a "Total Compensation Statement," but in a slightly different format. Those compensation statements contained a "Total Compensation Summary" that described the employee's Total Compensation as including Salary and a "Total Bonus," with a portion of the Total Bonus including the Contingent Stock Award. *Id.*, ¶ 16, Exhibit 17 (p. 140 of 148).

Production-based employees during these years had a portion of his/her monthly Total Sales Compensation (i.e., the employee's gross commissions) withheld for a future grant of RSUs. As illustrated by the attached Exhibits 18 and 19 of the Fact Stip.; the term Total Sales Compensation (fifth line from the bottom) was used to describe the total of Cash Commissions plus Equity Accrual Calculated. Near the end of each fiscal year through and including 2007 (but excluding fiscal year 2008), the total amount of the Equity Accrual Calculated for each of the pay periods in that fiscal year was typically awarded to the employee in the form of RSUs, with the number of RSUs based on the total Equity Accrual Calculated divided by the price of the RSUs on the Grant Date. *Id.*, ¶ 18, Exhibit 3 (p. 40 of 148).

---

[4] Page references cite to ECF-stamped page numbers.

**The RSU/CSA Compensation Plan**

During the years at issue here, 2003 through 2008, Lehman Brothers' bonuses for its employees consisted of two elements, cash and grants of Restricted Stock Units ("RSUs") and, for overseas employees, Contingent Stock Awards ("CSAs"). This RSU and CSA compensation plan was mandatorily imposed upon employees firm-wide at the discretion of Lehman. Lehman employees had no decisions to make under the RSU and CSA compensation plan. There were no election or enrollment forms for them to complete. They could not choose or elect to participate, they had no say in the percentage of any compensation paid in RSUs or CSAs, and they could not negotiate or vary the terms. The amount of compensation paid in RSUs and CSAs varied from year to year as determined solely by Lehman. *Id.*, ¶ 13.

The terms of the awards under the RSU and CSA compensation plan provided that, at a date five years after the grant (the "Grant Date"), the RSUs and CSAs would "convert" to stock that would be issued by LBHI, Lehman's publicly-traded holding company parent. Before conversion, the RSUs and CSAs could not be "sold, assigned, transferred, pledged, hypothecated or otherwise disposed of" except to heirs upon death. Fact Stip., Exhibit 4 (p. 50 of 148). Unlike stock options, there was no exercise price under the RSUs and CSAs, and no payment upon exercise -- "conversion" meant simply that the compensation obligation was fulfilled by the issuance of shares. *Id.*, ¶ 5.

Grantees of the RSUs and CSAs had "no rights as a stockholder with respect to any Share . . . until he shall have become the holder of record of such Share." *Id.*, Exhibit 13 (p. 100 of 148.) Lehman's Incentive Compensation Plan advised employees that as grantees of RSUs and CSAs they had no better rights than those of a general creditor. LEH-RSU 0000003 (Lehman Brothers Holdings Inc. Employee Incentive Plan, as amended through Feb. 19, 2003, (the "Lehman Employee Incentive Plan")).

-5-

The amount of an employee's bonus was a function of the profitability of Lehman Brothers that year.  Late in each fiscal year (which ended November 30), the Compensation and Benefits Committee (the "Compensation Committee") of Lehman's Board of Directors (the "Board of Directors") received reports on Lehman Brothers' profitability that year, and determined a percentage, generally within a range of 48-52% of that year's profit, that would be allocated among employees.  The allocation among employees was largely a function of position.  *Id.*, ¶ 14.

In its petition, LBHI listed on Schedule G over 22,000 executory contracts related to the issuance of RSUs and CSAs, including those between Lehman and the Compensation Claimants. Other executory contracts included guarantees, open trade contracts, proprietary trading agreements, severance payment, sublease agreements, tax allocation agreements and vendor contracts.

The bonus compensation that was to be paid in RSUs and CSAs was communicated to employees in person, and the general terms for grants of such RSU/CSA Awards were meetings, communicated to employees firm-wide via face-to-face meetings, conference calls, the online bonus system "LehmanLive" (the Firm's internal computer network), and/or electronic mail.  *Id.*, ¶ 13.  During each of these years, preprinted packets of information containing a "Dear Colleague" letter, a summary of the material terms, and a brochure were distributed to employees.  *Id.*

Near the end of each fiscal year 2003 through 2008, bonus-eligible (salaried) and production-based (commissioned) employees typically received a brochure with a schedule attached identifying any percentage and/or amount of an employee's bonus or commissions that would be paid in RSUs and CSAs for those years, which was based on the level of compensation

and corporate title held by the employee (the "Grid").  *Id.*, ¶ 14, Exhibit 14 (p. 104-119 of 148)

(Brochure entitled "Questions and Answers for Bonus-Eligible and Production-Based

Employees," dated July 1, 2008, which was distributed to employees in the United States (the

"2008 RSU Q&A") and Exhibit B and C (p. 115-116 of 148) are examples of the Grid used for

bonus-eligible and production-based employees, respectively).  Overseas employees granted

CSAs typically received a similar brochure, also attaching a Grid for salaried and production-

based employees.  *Id.*, ¶ 14, Exhibit 15 (p. 120-136 of 148) (Brochure entitled, "Questions and

Answers for Bonus-Eligible and Production-Based Employees," dated July 1, 2008, which was

distributed to employees overseas (the "2008 CSA Q&A") and Exhibits B and C (p. 132-133 of

148) are examples for bonus-eligible and production-based employees).

Because a grant of RSUs involved only a contract promise to deliver shares in the future,

no tax was imposed on the date of the grant or at any time before the Conversion/Issuance date.

*Id.*, ¶ 20.  Grants of CSAs received the same tax-fee treatment.  *Id.*, ¶ 21.  No amount of the

RSU/CSA Awards for the year 2003-2008 was ever held by LBHI in any reserve, escrow or

similar account for the benefit of any employee who received a grant, and there was never any

common stock reserved for or attributed to a particular employee.  *Id.*, ¶¶ 31-32.

**RSUs and CSAs Were A Contract Promise, Not An Equity Award**

In their Omnibus Objections Lehman demands that the Court ignore the critical facts of

the RSU and CSA agreements.  In their eagerness to characterize every one of a variety of

deferred compensation plans as "equity based compensation," Lehman glosses over critical

difference in the plans.  Pre-petition Lehman could, and did, issue equity awards, the most

common of which were stock options.  Several years of Stock Option Plans pursuant to which

stock options were issued are part of the record in this case, and these repeatedly state that the

issuance of options was a *present* issue of securities:

> [Y]ou are hereby granted . . . a non-qualified stock option to
> purchase the number of common shares . . . set forth on the award
> statement . . . with an exercise price of . . . $63.40 per share . . . .

*See* Debtors' Omnibus Reply dated December 15, 2011, ECF 23470 (p. 23 of 126) (2001 Stock

Option Plan ¶ 1); (*id.* at 27) (Second 2001 Stock Option Plan ¶ 1); (*id.* at p. 31) (2002 Stock

Option Plan ¶ 1); (*id.* at p. 35) 2003 Stock Option Plan ¶ 1; (*id.* at p. 39) (Second 2003 Stock

Option Plan ¶ 1) (all with the same language).

    Unlike the stock options, the RSU/CSA Agreements did not provide for the present issue

of a security, but only a contract promise to issue a security in the future -- "the *conditional right*

to receive one share of Lehman Brothers common stock five years after the RSU [or CSA] is

granted, assuming continued employment with the firm." *See, e.g.,* Fact Stip. ¶ 5, Exhibit 3 at

(p. 34 of 148) (emphasis added).  While the RSUs and CSAs were one of the alternate means of

performance of Lehman's promise to pay employees their compensation, the RSUs and CSAs

did not represent a current entitlement but rather shares "which you will be entitled to receive at

that time [five years hence] provided you meet certain terms and conditions." *Id.* (p. 35 of 148).

In contrast, immediately after this proviso making the contract obligation conditional, LBH

described the stock options that would be issued under the same program: The stock option

language does not contain the same proviso making the stock option grant conditional. *Id.*  This

document is unambiguous in describing the RSU and CSA Agreement as having ongoing

contract obligations and conditions that stock options did not have. The stock options constituted

a present equity award; the RSU/CSA Agreement was a conditional contract undertaking to

provide compensation in the future.

**LBHI Removed Purported Subordination Language from the RSU/CSA Agreements**

    LBHI has represented to the Court that "certain" of the agreements governing the Equity

Awards provided that, in the event of a bankruptcy of Lehman, claims arising from unconverted

RSUs and CSAs would have the same priority as common stock interests in Lehman.  *See, e.g.,*
Fact Stip., ¶ 10, Exhibit 4 (p. 50 of 148) and Exhibit 5 (p. 55 of 148).  Lehman withheld from
this representation, however, that this subordination language was uniformly removed from all
the RSU/CSA documents for the 2005, 2006, 2007 and 2008 fiscal years.

Lehman was misleading the Court in stating that "certain" agreements contained the
language without clarifying that, starting in 2005, the quoted language was removed from all
RSU and CSA Agreements and never restored.[5]  For language that Lehman quotes at length, and
on which it relies for more years than it covered, the removal of that language from RSU
documents for 2005, 2006, 2007 and 2008 is of sufficient importance to have been covered in
meetings of the Compensation Committee, very likely in meetings discussing an "Update on
Disclosure Requirements" as described in the footnote above.  The removal of the subordination
language both warrants the conclusion that (i) the subordination language quoted above was
unenforceable, and (ii) the intention that employees' compensation claims not be viewed as
damage claims arising from the purchase or sale of a securities, but as general creditor claims.

There was never any mention or disclosure to employees in any of the brochures or
descriptions of select material terms provided to employees of the possible ramifications that
participation in the RSU/CSA plan may have upon employees' claims for unpaid compensation
in the event Lehman filed for bankruptcy, and specifically no mention of § 510(b), although
employees' claims constituted statutory wage claims.  Acceptance and continuation of

---

[5]  Lehman has not disclosed any document explaining the removal.  What appears to have been an explanation was
redacted from two documents.  In two meetings in late 2006 the Compensation and Benefits Committee met and
discussed an "Update on New Disclosure Requirements."  The Minutes of these two meetings, held on October 3
and November 14, 2006, contain the only references in minutes of 2005 and 2006 to changes in the documents
governing the issuance of RSUs and CSAs.  LEH-RSU 0000588, at 591; LEH-RSU 0000718.  The minutes do not
show the attendance of counsel, and do not discuss the circulation of legal advice.  Yet in these minutes this "Update
on Disclosure" is redacted.  No privilege log explaining the redaction has been provided.

employment with Lehman subject to the terms of the RSU/CSA plan was not done with

knowledge of the risks and rewards attendant to employees' participation in the plan and with

respect to employees' unpaid commissions and bonuses that were statutory wages, including

subordination under § 510(b).

## LEGAL ARGUMENT

## I.    COMPENSATION CLAIMS ARE NOT BASED UPON AN EQUITY INTEREST

In the past LBHI has argued that RSUs and CSAs were equity interests because they are

within the definition of "equity security" found in 11 U.S.C. § 101(16) of the Code.  The statute

is clear, however, that the definition does not include convertible instruments such as RSUs and

CSAs.

What subsection (C) states is that a "right" to "purchase, sell, or subscribe to a share,

security, or interest" is included in the definition of an "equity security," but only if it is "other

than a right to convert . . . ."   There is no ambiguity to this clause, but the clear statutory

language is explained by equally clear legislative history:

> The term ["equity security"] includes a share or stock in a
> corporation, a limited partner's interest in a limited partnership,
> and a warrant or right to subscribe in an equity security.  The term
> does not include a security, such as a convertible debenture, that is
> convertible into equity security, but has not been converted.

*See* H.R. REP. 95-595, 311, 1978 U.S.C.C.A.N., 5963, 6268; S. REP. 95-989, 24, 1978

U.S.C.C.A.N. 5787, 5810.  (The Reports were the final House and Senate Reports that

accompanied H.R. 8200 and H.R.S. 2266, the bills that became the Bankruptcy Code.)  Congress

was careful to exclude convertible instruments like RSUs and CSAs from the definition of equity

securities, and the statute of course governs.  LBHI's argument that RSUs and CSAs are equity

securities simply misconstrues the statute.

-10-

What distinguishes RSUs and CSAs from restricted stock and other equity awards is that "with restricted stock the stock itself is transferred," while an RSU or CSA is only "a promise from the employer to transfer the stock "at a future date." C. Edgar Adkins, Jr. & Jeffrey A. Martin, *Restricted Stock: The Tax Impact on Employers and Employees*, 107 J. Tax. 224 (2007) ("Adkins & Martin"). RSUs/CSAs are contract obligations, not equity securities, and the person receiving a grant of RSUs or CSAs is "merely an unsecured creditor of the company." *E.g.*, Max J. Schwarz, *A Primer on Stock-Based Compensation and Selected Recent Developments, contained in Hot Issues in Executive Compensation 2004*, PLI Tax Law & Estate Planning Course Handbook Series, 642 PLI/Tax 57, at *81 (September 2004).[6]

LBHI's Employee Incentive Plan cautioned grantees that an award of RSUs and CSAs did not make them stockholders "unless shares of stock have been issued to Participants pursuant to the Awards hereunder." LEH-RSU 0000003. Similarly, eight months after its Petition Date, LBHI declared in its Petition and in notices of bar date sent to Compensation Claimants that the RSUs and CSAs were executory contracts and not securities. *See* Debtors' Petition, Amended Schedules of Assets and Liabilities for Lehman Brothers Holdings Inc., Schedule G, at pp. 453-866 (June 14, 2009).

---

[6] Because stock is not transferred to the employee until the end of the waiting period (here, five years), an RSU/CSA grantee did not have an important right the grantee of restricted stock would have under 26 U.S.C. § 83(b) of the Internal Revenue Code. Under § 83(b), the grantee of Restricted Stock can elect to pay tax on the value of the shares granted, *even if they are subject to the same restrictions and forfeiture risks as the grantee of RSUs.* The benefit to that employee is that the post-grant increase in value is taxed at capital gain rates, not ordinary income rates. As Adkins and Martin note:

> An employee can report the gross income associated with restricted stock in the year the stock is granted (i.e., transferred), rather than waiting until the year in which the stock vests. This "Section 83(b) election" is *available for restricted stock but not for restricted stock units*, because typically the stock is not transferred until it vests.

Adkins & Martin at *226-27 (emphasis added). No right of election is available for RSU/CSAs under § 83(b) of the Internal Revenue Code because no property was transferred to the employee, only a promise to transfer the stock in the future.

The Court should be vigilant of Lehman's attempts, from the outset, to re-characterize these instruments by consistently using a generalized and misleading label – equity awards – to gloss over the differences between these compensation plans and to make arguments about RSUs and CSAs drawn largely from stock option cases that address materially different instruments. Compensation Claimants here are claiming for payments due under contract or statutory causes of action under wage laws; they were never equity-holders, in contrast with the defrauded stockholders,[7] holders of stock options,[8] or 401(k) investors[9] in the cases Lehman has equivocally cited. The case law also indicates that RSU holders do not have the rights of equity-holders and no standing under corporate law, because RSUs were not corporate stock and holders of RSUs "never acquired stockholder status." *FleetBoston Fin. Corp. v. Alt*, 668 F. Supp. 2d 277, 279-80 (D. Mass. 2009), *aff'd*, 638 F.3d 70 (1st Cir. 2011)[10].

## II.    LEHMAN FAILS TO SHOW ANY BASIS FOR SUBORDINATION UNDER SECTION 510(b) OF THE CODE

In order to accomplish subordination under 11 U.S.C. § 510(b), Lehman bears the burden of proving each one of the following three underlined elements:

> For the purpose of distribution under this title, a claim  arising from rescission of a purchase or sale of a security of the debtor or of an affiliate of the debtor, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under section 502 on account of such a claim, shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security, except that if such security is common stock, such claim has the same priority as common stock.

---

[7]    See *In re Stirling Homex Corp.*, 579 F.2d 206, 210, 213-14 (2d Cir. 1978).

[8]    See *In re Enron Corp.*, 341 B.R. 146, 158, 160 (Bankr. S.D.N.Y. 2006).

[9]    See *In re Motor Liq'n Co.* 2012 W.L. 398640 (S.D.N.Y. 2012).

[10] Even the fact that the issuer recorded the RSU holders as putative stockholders did not give them standing as stockholders. *Id.* at 281. The court also rejected the argument that the plaintiffs were "equitable stockholders." *Id.* at 282.

11 U.S.C. § 510(b).

A.    **The Compensation Claims Do Not Arise from the Purchase or Sale of a "Security"**

In order for the RSU and CSA Claimants' compensation claims of these former Lehman employees to be subordinated under § 510(b), the employees must have purchased a "security" and their claims must arise from that purchase. Section 101(49)(A) of the Code defines a "security" to include a list of items, but does not refer to instruments comparable to RSUs or CSAs.[11]

"The starting point in every case involving construction of a statute is the language itself." *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 756 (1975) (Powell, J., concurring). In the past LBHI has argued that "a range of stock-based transactions, including transactions based on a *right to acquire* stock," are within the definition of "security" at § 101(49)(A). *See, e.g.,* Debtors' 313th Omnibus Objection to Claims, ECF 28433, ¶¶ 12-13 ("313th Omni Obj.") (emphasis added). The generalized term "right to acquire," however, *appears nowhere in the statute*. The only paragraphs that could conceivably here apply are an

---

[11]   Section 101(49)(A) provides that the term "security" includes:

(i) note: (ii) stock: (iii) treasury stock; (iv) bond; (v) debenture; (vi) collateral trust certificate: (vii) pre-organization certificate or subscription; (vii) transferable share; (ix) voting-trust certificate; (x) certificate of deposit; (xi) certificate of deposit for security; (xii) investment contract or certificate of interest or participation in a profit sharing agreement or in an oil, gas or mineral royalty or lease, if such contract or interest is required to be the subject of a registration statement filed with the Securities and Exchange Commission under the provisions of the Securities Act of 1933, or is exempt under section 3(b) of such Act from the requirement to file such a statement; (xiii) interest of a limited partner in a limited partnership; (xiv) other claim or interest commonly known as "security"; and (xv) certificate of interest or participation in, temporary or interim certificate for, receipt for, or warrant or right to subscribe to or purchase or sell, a security . . . .

Section 101(49)(B) provides a number of specific exclusion from the definition of security, none of which are relevant here except subsection 101(B)(49)(vi), which mirrors subsection 101(49)(A)(xii) on investment contracts by stating that the term "security" does not include a:

contract or certificate of a kind specified in subparagraph A(xii) of this paragraph that is not required to be the subject of a registration statement filed with the Securities and Exchange Commission and is not exempt under section 3(b) of the Securities Act of 1933 from the requirement to file such a statement . . . .

"investment contract" (§ 101(49)(A)(xii)), an instrument "commonly known as a security" (§ 101(49)(A)(xiv)), and right to purchase" (§ 101(49)(A)(xv)).  As demonstrated below, RSUs and CSAs are not within the statutory definition.

### 1.  RSUs and CSAs Are Not Investment Contracts under § 101(49)(A)(xii)

Paragraph (xii) of Code § 101(49) includes in the definition of "security" an "investment contract if such contract is required to be the subject of a registration statement filed with the Securities and Exchange Commission [the "SEC"] under the . . . Securities Act of 1933, or is exempt under section 3(b) of such Act from the requirement to file such a statement." 11 U.S.C. § 101(49)(A)(xii).  As discussed below, an employee's interest in an employee benefit plan such as the RSU/CSA compensation plan here constitutes a "security" within the meaning of §§101(49) and § 510(b) only where the plan is a *voluntary* investment contract.

"Investment contract" is not defined in the Code; however, since the Code's definition of security is nearly identical to the definitions provided in the Securities Act of 1933 and Securities Exchange Act of 1934, the relevant federal securities' law definitions apply.[12]  Under federal securities law, an employee's contract with an employer for an interest in a company's employee benefit plan built around the employer's stock has been brought within the scope of the term security generally *only* where it qualifies as an "investment contract."  *See e.g.*, *In re Satyam Computer Servs. Ltd. Sec. Litig.*, 915 F. Supp. 2d 450, 470-71 (S.D.N.Y. 2013); *Dubin v. E.F. Hutton Group, Inc.*, 695 F. Supp. 138, 143 (S.D.N.Y. 1988).  Accordingly, the Court's analysis of whether there is a security with regard to the RSUs and CSAs – which are based on the

---

[12] *See, e.g., SEC v. Lauer*, 52 F.3d 667, 670 (7th Cir. 1995) (Posner, C.J.) (Investment contract is not defined by the Code but is a term of art under the securities laws, intended to cover "an interest that is not a conventional security like a bond or a share of common stock but that, having the essential properties of a security . . . is treated as one for purposes of these [securities] laws."); *Devlin v. United States*, 352 F.3d 525 (2d Cir. 2003) (When Congress uses a term of art with an established meaning within a statute, it presumably incorporates that meaning in using that term).

RSU/CSA plan contract - should start and end with a determination of whether there is an

"investment contract" that is the subject of a registration statement to be filed with the SEC.

The starting point under federal securities law, and virtually identical definition of

"security" in the Code by analogy, for the judicial inquiry of whether there is an investment

contract is the *Howey* test. An offering is an "investment contract" and therefore a security if it

"involves an investment of money in a common enterprise with profits to come solely from the

efforts of others." *SEC v. W. J. Howey Co.,* 328 U.S. 293, 301 (1946). In *United Housing*

*Found., Inc. v. Forman*, 421 U.S. 837 (1975), the U.S. Supreme Court again confirmed that

*Howey* is the baseline catchall test for what is a "security."

> We perceive no distinction, for present purposes, between an
> 'investment contract' and an 'instrument commonly known as a
> 'security.'' In either case, the basic test for distinguishing the
> transaction from other commercial dealings is [the *Howey* test].
> This test, in shorthand form, embodies the essential attributes that
> run through all of the Court's decisions defining a security.

421 U.S. at 852. In determining whether or not there is a security, unless the instrument is

labeled "stock" and possesses all of the traditional characteristics of stock, the Court "must

examine the substance – the economic realities of the transaction – rather than the names that

may have been employed by the parties". *Landreth Timber Co. v. Landreth*, 471 U.S. 681, 682

(1985); *Forman*, 421 U.S. at 851-852. It is the terms of the instruments (the RSUs and CSAs),

as well as the circumstances under which they were granted that determines whether they are

"investment contracts" and thereby a security. For example, the District Court in the Southern

District of New York has found in a fact-intensive analysis:

> Although the federal securities laws generally consider an option
> to purchase a security to be the equivalent of a security, employee
> stock options are acquired as part of a contract between employer
> and employee, and must be considered an 'investment contract' in
> order to constitute a security.

*Satyam*, 915 F. Supp. 2d at 470 (internal citations omitted); *see also Dubin*, 695 F. Supp. at 143

(analyzing whether there was a security with respect to restricted stock unit plan).  Similarly, the

RSUs and CSAs here were granted as part of a contract between Lehman and its employees, and

should be considered a "security" only if they qualify as an "investment contract," an expansive

term under the securities laws but one that has been crystallized through judicial interpretation.

In searching for Congress' intent, a court may look to similar language in unrelated statutes that

apply to similar person, things or relationships. 2B George Sutherland, *Statutes & Statutory

Construction*, § 53.03 at 233 (5th ed. 1992).  The use of similar language strongly indicates that

the two statutes should be interpreted *pari passu.  Northcross v. Board of Educ. of Memphis City

Schools*, 412 U.S. 427, 428 (1973).  The statutory analogy to the securities laws and the case law

thereunder should provide guidance on this issue here.

Additionally, under federal securities law, specifically, under § 2(1) of the Securities Act

of 1933 and rules 10(b) and 10b-5 of the Securities Exchange Act of 1934, in order for the

interest of an employee in an employee benefit plan to qualify as an "investment contract," the

employee's participation in the plan must be both voluntary and contributory.  *See, e.g.*, *Fishoff

v. Coty Inc.*, 2009 WL 1585769, at *5 (S.D.N.Y. June 8, 2009) (only voluntary, contributory

plans have investment characteristics that render them securities).  Conversely, where a plan is

either involuntary or noncontributory, participation in the plan is not considered an investment

contract and not a security.  *Childers v. Northwest Airlines, Inc.*, 688 F. Supp. 1357, 1363 (D.

Minn. 1988) (participation in the ESOP was compulsory and not an individual affirmative

decision where modifications in the collective bargaining agreements bound all union members

regardless of whether they supported modifications); *Fishoff*, 2009 WL 1585769 at *5 (long-

-16-

term incentive plan not investment contract and thus could not be deemed a security where it was

voluntary but non-contributory).

The first prong of the *Howey* test – "an investment of money" – necessarily requires there

be a decision to invest.  *Howey,* 328 U.S. at 301.  The Supreme Court emphasized that in the

employment context the employee must have made an investment decision to be deemed a

purchaser of securities.

> In order to determine whether respondent invested in the Fund by
> accepting and remaining in covered employment, it is necessary to
> look at the entire transaction through which he obtained a chance
> to receive pension benefits. In every decision of this Court
> recognizing the presence of a 'security' under the Securities Acts,
> the person found to have been an investor *chose* to give up a
> specific consideration in return for a separable financial interest
> with the characteristics of a security. [citations omitted].

*Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am. v. Daniel*, 439 U.S. 551,

559 (1979).

Courts have reasoned, relying upon the Supreme Court's decision in *Daniel*, that there is

no "investment decision" – that is, for the "investment of money" element of the *Howey* test –

where participation is compulsory rather than voluntary, as it was here.  Fact Stip. ¶ 13; s*ee also*

*Bauman v. Bish*, 571 F. Supp. 1054 (N.D. W.Va. 1983).  In *Daniel*, where an employee made a

claim under the securities laws based on his employer's denial of benefits due to a requirement

of continuous service under the employer's mandatory plan, the Supreme Court determined that

only voluntary contributory pension plans can be "investment contracts."  *Daniel,* 439 U.S. at

556.  *Daniel* found the claim had only an "attenuated relationship," if any, to perceived

investment   possibilities, and that the employee did not "choose" to make an investment but

instead sought to obtain a livelihood.  *Id*. at 560.

> Only in the most abstract sense may it be said that an employee "exchanges" some portion of his labor in return for these possible benefits [footnote omitted]. He surrenders his labor as a whole, and in return receives a compensation package that is substantially devoid of aspects resembling a security. His decision to accept and retain covered employment may have only an attenuated relationship, if any, to perceived investment possibilities of a future pension. Looking at the economic realities, it seems clear that an employee is selling his labor primarily to obtain a livelihood, not making an investment.

*Id.* at 560. *Daniel* was applied in *Dubin* to an employee incentive plan offered to employees of E.F. Hutton Group, a predecessor of Lehman. *Dubin*, 695 F. Supp. at 138. There, similar to here, an employee did not receive stock but an interest in an employee incentive plan. *Id.* at 140. Preliminarily, the court found the interests in the employer's company plan "*appear[ed] more like interests in [the] pension plan [in Daniel] than in a stock or a stock option*" (emphasis added). *Id.* at 145. However, upon further examination, that court found the plaintiff's interest distinguished from *Daniel*. *Id.* Specifically, unlike the facts here, participation in the plan in *Dubin* was not mandatory. *Id.* The plaintiff had alleged the stock option plan in that case had a direct bearing upon his willingness to accept employment. *Id.* That plaintiff had also alleged, as a result of pre-employment negotiations, substantial vesting preconditions were adjusted in order to induce plaintiff to accept the employment offer. *Id.* at 146.

Here, employee participation in LBHI's RSU and CSA Compensation Plan was not voluntary; it was compulsory. Fact Stip. ¶¶ 10, 13. The RSUs and CSAs which Lehman employees were forced to take cannot be appropriately characterized as an "investment contract." Employees' interests in the RSU/CSA compensation plan were similar to the interest of the employee in the pension plan in *Daniel* in that they were merely seeking employment or continued employment, not risks with their wages in the profits and losses of Lehman. *Daniel*, 439 U.S. at 560. Lehman employees did not receive an outright grant of stock, and any grants of

RSUs/CSAs they did receive were pursuant to Lehman's policies that were imposed firm-wide at the sole discretion of Lehman's Compensation and Benefits Committee.  Fact Stip. ¶ 10.

Lehman employees had no decisions to make.  Compensation Claimants could not choose or elect to not to participate; nor was their informed written consent to the plan even requested by Lehman.  *Id.*  ¶¶ 10, 13.  Compensation Claimants also had no say in the percentage of any compensation paid in RSUs/CSAs.  *Id.*  From 2003 through 2008 as in earlier years, the amount of compensation paid in RSUs/CSAs varied from year to year as determined annually by Lehman.  *Id.* ¶ 10.  Quite simply, employees did not choose to make an investment in Lehman by accepting employment and agreeing to Lehman's mandated employment terms (other than the same manner in which any employee makes an investment in a company from which it accepts employment).  Like the employees in *Daniel,* they only sought to make a livelihood.

Since employees had no investment decision, the "investment of money" prong of the *Howey* test necessarily fails.  Lehman also does not show another prong of that seminal test: that the employees were expecting to profit "solely from the efforts of others."

> [W]here a plan has substantial preconditions to vesting, the principal barrier to an individual employee's realization of pension benefits is not the financial health of the fund. Rather, it is his own ability to meet the fund's eligibility requirements. Thus, even if it were proper to describe the benefits as a "profit" returned on some hypothetical investment by the employee, this profit would depend primarily on the employee's efforts to meet the vesting requirements, rather than the fund's investment success. When viewed in light of the total compensation package an employee must receive in order to be eligible for pension benefits, it becomes clear that the possibility of participating in a plan's asset earnings "is far too speculative and insubstantial to bring the entire transaction within the Securities Acts."

*Daniel*, 439 U.S. at 562 (quoting *Forman*, 421 U.S. at 856).  Here, Lehman employees were subject to many forfeiture provisions in the RSU/CSA plan documents.  Any profits they may

have expected from this compulsory scheme would only be available to them after several years

of hard work until the RSUs or CSAs vested and only if the employee met several eligibility

requirements to avoid the forfeiture clauses of the RSU/CSA plan.  Accordingly, Lehman fails to

establish the "solely from the efforts of others" prong of the *Howey* test.  Having failed to meet

the elements of the *Howey* test, Lehman cannot show a security under the catchall "investment

contract" definition.

    The decision in *In re Enron Corp.*, 341 B.R. 146, 158, 160 (Bankr. S.D.N.Y. 2006) does

not require a different conclusion.  In *Enron*, the bankruptcy court held that fraud based claims of

former employees with respect to stock options received as part of their compensation package

were subject to subordination under § 510(b).  *Id.* at 159.  Prior to bankruptcy, the stock options

had vested and were fully exercisable.  *Id.* at 145-46.  The court recognized that the requirement

of a "security" was the preliminary issue under § 510(b), but focused only upon the particular

instrument and not the underlying circumstances through which the employees obtained their

stock options.  *Id.* at 149-50.  The court found the stock options were a security under

§101(49(A)(xv), which includes a "right to subscribe to or purchase or sell, a security."  *Id.* at

150.  In footnote 3, the court limited its holding to stock options similar to those presented there.

The Hon. Arthur J. Gonzalez stated:

> The Court notes that its conclusions *apply only to stock options
> similar to those presented here*. The Court issues no opinion as to
> whether *stock options* might be designed in such a fashion that
> would result in different treatment under section 510(b).

*Id.* at 144 n. 3 (emphasis added).  In *Enron,* RSUs and CSAs were not at issue; in the case at bar,

stock options are not at issue.  Thus, *Enron's* limited holding does not apply to RSUs and CSAs.

Lehman is asking the Court to extend the holding of that case to cover the instruments at issue

here.  Moreover, the Supreme Court's decision in *Daniel* was not raised and the court in *Enron*

did not have the opportunity to consider whether the interests of the employees obtained through

Enron's company sponsored plan qualified as an investment contract under § 101(49)(A)(xii),

nor whether such a finding would require a different result.

In any event, the RSUs/CSAs themselves are fundamentally different from the stock

options in *Enron* and the other enumerated types of instruments listed as securities under §

101(49)(A).  The RSUs/CSAs, unlike the stock options in *Enron*, do not have the significant

characteristics of a security that allow the holder to make independent decisions concerning the

purchase or sale of stock, as demonstrated by the chart below.

| Stock Options in *Enron* | RSUs and CSAs in *Lehman* |
| --- | --- |
| The stock options were vested and allowed employees to make investment decisions. They granted employees the right to purchase a specified number of shares at an unspecified future time beginning upon the vesting date. *Enron*, 341 B.R. at 146-46. | RSUs and CSAs involved no investment decision on the part of Lehman employees before or after they vested.  Fact Stip. ¶¶ 10, 13.  Subject to satisfaction of the employment related conditions, the RSUs and CSAs converted to stock on a date certain in the future without any action on the part of the employee.  *Id.*, ¶¶ 3, 5.  Until the date the RSUs and CSAs converted to LBHI stock, employees were locked into their RSUs and CSAs subject to the performance of the employment related conditions.  Employees could not sell, assign, transfer, pledge or otherwise dispose of the RSUs/CSAs.  *Id.*, ¶¶ 5-7. |
| The stock options had a significant value separate from the employment relationship. The proceeds received from the exercise of the stock options and the sale of the stock depended on the investment decisions employees made once the stock options vested.  Participation in profits following vesting depended upon the difference | RSUs and CSAs were inextricably linked to the employment relationship and had no independent value.  *Id.*  RSUs and CSAs were subject to many conditions and prolonged periods of vesting and delivery. *Id.*  Conversion to LBHI stock depended upon remaining employed and not the price |

| | |
|---|---|
| between the trading price and the option price determined by the date employees exercised their options to purchase the stock.  *Id.* | of the stock.  *Id.* |
| Once the stock options vested they had ability to appreciate in value.  At the same time, they were not an effective retention tool if the option price was below the current trading price since they had no value in that scenario.  *Id.* | Before and after they vested RSUs and CSAs had no value.  *Id.,* ¶ 3.  They were merely used in the employment context to serve as a retention tool.  They were awarded as a form of compensation.  *Id.,* ¶ 2. |
| If the trading price was less than the option price, the stock option was practically valueless.  As the share price declined, so did the likelihood that the claimants would exercise their options.  *Id.* | RSUs and CSAs on the other hand embodied a promise to deliver a set number of shares on completion of vesting and other conditions.  *Id.*, ¶¶ 5-6.  Employees' compensation in the form of RSUs or CSAs was received irrespective of the share price.  *Id.*, ¶ 5. |

## 2.    RSUs and CSAs Are Not Commonly Known as a Security Under § 101(49)(A)(xvi)

Paragraph (xiv) of § 101(49)(A) includes in the definition of a "security" a claim or interest "commonly known as" a security.  The Supreme Court has indicated that the term any interest or instrument "commonly known as" a security covers the same financial instruments as referred to by the term "investment contract."  *Forman,* 421 U.S. at 852 ("[w]e perceive no distinction, for present purposes, between an 'investment contract' and an 'instrument' commonly known as a 'security.' In either case, the basic test for distinguishing the transaction from other commercial dealings is 'whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others.'"); *see also Landreth,* 471 U.S. at 691 n. 5 (same); L. Loss et al., 2 *Securities Regulation*, 863 n.19 (4th ed. 2007) ("…every statute's definition of *security* closes with the broad phrase, 'or any interest or instrument commonly known as a 'security'…There has been surprisingly little judicial or

-22-

administrative construction of the phrase, perhaps because other phrases, especially *investment contract*, normally satisfy any reasonable plaintiff.) (emphasis in original).

RSUs and CSAs are not claims or interests commonly known as securities for the same reasons they are not investment contracts as discussed *supra*. Therefore, paragraph (xiv) of § 101(49)(A) does not apply.

### 3. RSUs and CSAs Are Not a Security As a Right to Purchase Under § 101(49)(A)(xv)

Federal securities law cited above holds that the investment contract analysis is the beginning and end of the analysis as to whether an employee benefit plan is a "security." However, if the Court for whatever reason finds that Lehman's RSU/CSA plan was not subject to that exclusive analysis, then Compensation Claimants submit the following additional argument. Section 101(49)(A)(xv) defines a "security" as including a "right to . . . purchase or sell, a security." Lehman previously argued this section applies since RSU and CSA grantees were given a "right to acquire" LBHI stock "similar to stock options or the right to exercise stock options." *See, e.g.,* 313th Omnibus Obj., ¶ 13. As already noted, the broad and inclusive term "right to acquire" does not appear in the statute. The statute refers only to the more limited to "purchase."

Lehman is asking this Court to improperly expand the holding of *Enron*, which did not address any instrument comparable to RSUs and CSAs. *Enron*, 341 B.R. at 144 n.3. Judge Gonzales in fact specifically limited his holding to "stock options similar to those presented here." *Id.* As discussed below (see section II(B)), a right to purchase a security requires that there be an "investment decision." Unlike the stock options in *Enron*, there was no investment decision relating to the RSUs and CSAs. *Enron* option holders were able to make decisions with regard to the purchase and sale of Enron stock by exercising the stock options and selling the

stock, or alternatively retaining them to exercise at a later time in the hope of an increase to their trading profits.  In contrast, RSU and CSA holders were not able to sell or hedge their interest in the RSUs or CSAs even after vesting.  With respect to the conversion to stock upon the expiration of the five-year term, the transaction did not involve an investment decision.  Fact Stip. ¶¶ 3, 5-7, 9.  It occurred automatically without any action or investment decision on the part of  Claimants.  Claimants' right to payment under the RSUs/CSAs was contingent on future events although none of those future events had to do with the price of the stock. Rather, conversion from RSUs or CSAs to Lehman stock simply involved Lehman fulfilling its compensation promise.  *Id.*, ¶¶ 3-5, Exhibit 3.

Moreover, Claimants did not have a right to purchase a security under the RSUs or CSAs, i.e., Lehman stock, because there was no guaranty that stock would be delivered to the RSU or CSA holder at the conversion date.  Under the RSU and CSA agreements, it was solely within Lehman's discretion to modify the terms in any manner it deemed appropriate.  Lehman maintained the discretion to pay RSU and CSA holders in cash rather than through stock.

An option is an enforceable promise to sell stock at a fixed exercise price.  *In re Riodizio, Inc.*, 204 B.R. 417, 422 (Bankr. S.D.N.Y. 1997) (citing *In re III Enterprises, Inc. V,* 163 B.R. 453, 460–61 (Bankr. E.D.Pa.)).  "It is a unilateral contract until exercised; upon exercise, it becomes a bilateral contract." *Id.* (citations omitted).  As noted in Exhibit 3 to the Fact Stip., to receive the benefit of Stock Options an "exercise" is required, with the payment at the time of exercise of "the option exercise price."  Fact Stip., Exhibit 3 (p. 44 of 148).  No such payment is required at the time of "conversion" of an RSU or CSA.  *Id.*  The RSUs and CSAs were simply "a portion of [the employee's] total compensation" for services rendered in the year of the grant and as a function of LBHI's profitability that year.  *Id.* (p. 34 of 148); *see also* Fact Stip. ¶¶ 1, 3,

15-17, 34.  Conversion from RSUs or CSAs to Lehman stock simply involved Lehman

performing its contract promise.  *Id.*, ¶¶ 3-5, Exhibit 3.  Unlike stock options providing a buyer

with a right to purchase at a fixed price, RSU and CSA grantees made no payment and make no

decision based on the price of the stock.  *Id.* ¶ 10.

* * * * * * *

In sum, RSUs and CSAs were not a security because they are not an "investment

contract" under § 101(49)(A)(xii) nor commonly known as a security under §101(49)(A)(xiv).

Moreover, the RSUs and CSAs are not a right "to purchase a security" under § 101(49)(A)(xv).

To the contrary, the foregoing authorities and analysis demonstrate that RSUs and CSAs were

simply Debtors' pre-petition contractual compensation undertakings that do not amount to a

"security" under the Code.

### B.     There Was No "Purchase or Sale" of a Security

Compensation Claimants deny there was a "purchase" or "sale" of a security as required

by § 510(b).  Caselaw holds that there is a purchase or sale of a security only where an employee

has bargained for the employer's security.  *See e.g.*, *In re Med Diversified, Inc.,* 461 F.3d 251 (2d

Cir. 2006) (damage claim for loss in value of shares based on debtor's failure to deliver stock

pursuant to negotiated employee termination agreement with release of claims).  No purchase or

sale occurs under broad-based employee benefit plans like the RSU/CSA program that involve

thousands of employees.  *Childers,* 688 F. Supp. at 1363 (plaintiffs' participation under broad-

based employee benefit plan was not a purchase of a security); *Bauman,* 571 F. Supp. at 1064

*supra* (same); *In re Cendant Securities Litig.*, 81 F. Supp. 2d 550, 557 (D. N.J. 2000) ("When a

group of employees is offered [a compensation package] an eligible employee does not make an

individual affirmative 'investment decision' if he or she chooses either to participate in the plan

or to reject it."); *Fraser v. Fiduciary Trust Co., Int'l*, 2005 WL 6328596, at *5 (S.D.N.Y. June

-25-

23, 2005) ("plaintiff does not allege that he specifically bargained with Fiduciary for their stock in exchange for his employment, or that his acquisition of Franklin stock through these plans resulted from a voluntary investment decision.").

Lehman relies primarily on *Enron* to argue that the grant of RSUs and CSAs constitute a purchase or sale of a security. However, *Enron* is inapposite along with the other caselaw Lehman cites. All of those cases involve either the privately negotiated sale of stock or stock options or voluntary investment decisions made by claimants to acquire stock.[13] In *Enron*, the court subordinated claims relating to stock options where the debtor's employees chose not to exercise their options when they vested. *Enron*, 341 B.R. at 145-46. The court's focus was on the relationship of the exercise price compared with the then current market value, "the trading price." *Id.* "[T]he situation faced by the stock option claimants" was whether to make an investment decision to exercise their options, a decision not presented to the holders of RSUs and CSAs. *Id.*; *see also* Fact Stip. ¶¶ 10, 13.

The court also did not address compensation plan cases such as the Supreme Court's decision in *Daniel* and its progeny that would have required a different result as discussed *supra*. In any case, it is clear that employees in *Enron* had made a choice and an investment decision once their stock options had vested.

Lehman also relies on *Med Diversified* in which the Second Circuit held that a claim based on failure to issue common stock in exchange for the claimant's stock in another company constituted a "purchase" of a security under § 510(b). *Med Diversified*, 461 F.3d at 258. In

---

[13] *See In re U.S. Wireless Corp.*, 384 B.R. 713 (Bankr. D. Del. 2008) (stock and stock options granted under employment agreement to chief technology officer a purchase); *In re Touch America Holdings, Inc.*, 381 B.R. 95 (Bankr. D. Del. 2008) (employees' acquisition of stock of debtor affiliate as matching contribution under voluntary 401(k) plan a purchase); *International Wireless Comm. Holdings Inc.*, 279 B.R. 463 (D. Del. 2002) (stock of subsidiary later exchanged for stock of parent company and warrants pursuant to negotiated share purchase agreement was a purchase).

reaching its decision, the Second Circuit highlighted the significant choice the *Enron* employees

had made in trading the relative safety of cash and "not . . . exercis[ing] stock options [once they

had vested] with hopes for future higher returns". *Id.* at 257. The Second Circuit then analyzed

the term "arising from" the purchase or sale of security under § 510(b) and looked to text outside

the statute to determine the intended meaning of the phrase. *Id.* at 255.

Here, employees did not bargain to receive RSUs or CSAs. Fact Stip. ¶¶ 10, 13. It was

within Lehman's sole discretion whether and to what extent employee compensation would be

paid in the form of RSU or CSA grants. *Id.* The consideration under the employment

arrangement with employees was not the grant of RSUs or CSAs but instead Lehman's promise

to pay their compensation. Lehman has and cannot demonstrate based upon the facts here that

Compensation Claimants decided to work for Lehman in reliance upon the nature and terms of

Lehman's compensation plan. Compensation Claimants' act of acceptance of employment with

Lehman does not translate into an investment decision.

## C.    The Compensation Claims Are Not For "Damages" Under Section 510(b)

The Compensation Claims are not for "damages" as required by § 510(b). Claims based

upon an unpaid debt are not for "damages" within the meaning of § 510(b). *See In re*

*Montgomery Ward Holding Corp.*, 272 B.R. 836, 842 (Bankr. Del. 2001) ("damages" in § 510(b)

"connotes a recovery broader than a simple claim on an unpaid debt."); *In re Washington*

*Bancorporation*, 1996 WL 148533, at *20 (D. D.C. Mar. 19, 1996) (subordination denied where

creditor sought to recover solely on debtor's debt obligations under commercial paper rather than

on tort claim).

"The use of the term 'damages' implies more than a simple debt, but at minimum, there

must be a claim for damages resulting from some defect with reference to such a purchase or

sale." *In re Wyeth Co.*, 134 B.R. 920, 921 (Bankr. W.D. Miss. 1991); *see also In re Blondheim*

-27-

*Real Estate, Inc.*, 91 B.R. 639, 642 (Bankr. D. N.H. 1988) (court refused to subordinate claims of creditors who invested in debtors' notes even though they constituted a security because debt was for a fixed amount). Consistent with the foregoing, a former shareholder can divest itself of a debtor's shares in exchange for a contractual payment obligation under a note without being subject to subordination under § 510(b) although the note transaction was derived from an equity interest. *In re Mobile Tool Int'l Inc.*, 306 B.R. 778, 782 (Bankr. Del. 2004) (stock redemption noteholder claims not subject to subordination).

As discussed below, the Claimants have claims for Lehman's alternative performance obligations and for payments due under the wage laws, which are not for damages. Neither of those claims arise from the purchase of a security, regardless of whether the RSUs and CSAs are found to constitute a security for purposes of § 510(b).

Lehman's contract with its employees recognized Lehman might pay part of employees' total compensation in one of two alternative forms, either cash or equity based awards. Lehman employees were told "At the Firm's option, a portion of your total compensation (combined base salary, bonus and other compensation) may be payable in the form of conditional equity awards (restricted stock units ("RSUs"), stock options or other equity awards) pursuant to the Firm's Equity Award Program." LEH-RSU 0000300. As of the Petition Date, Lehman had a contingent and liquidated liability to Claimants for their deferred compensation based upon the alternative promise it made to them for payment for their services in the form of cash. As of the Petition Date, Claimants' and Lehman's performance under outstanding RSUs/CSAs was rendered impossible by Lehman's bankruptcy filing and its firing its employees and the subsequent cancellation of LBHI stock under Lehman's plan. Under established contract law

principles, Lehman is required to render its alternative performance, to pay Claimants their compensation that arose and was a liquidated and certain amount as of the Petition Date.

Caselaw uniformly recognizes that where a contract provides for one of two alternative modes of performance and one mode of performance becomes impossible of performance, the promisor is not relieved from performing the other. *Yankton Sioux Tribe of Indians v. U.S.*, 272 U.S. 351, 358 (1926) (where "the undertaking of the Government is in the alternative" in default of one alternative Government must perform the other); *Ashland Oil & Refining Co. v. Cities Serv. Gas Co.*, 462 F.2d 204 (10th Cir. 1972) (alternative undertaking to pay for deficiency was activated where performance of other promise was impossible.). Impossibility of performing one of the promised alternative means of performance does not discharge the duty of the promisor if by the terms of the contract he had the privilege of choice but merely destroys the promisor's choice. *Glidden Co. v. Hellenic Lines, Ltd.*, 275 F.2d 253 (2d Cir. 1960) (where charter agreement provided for alternative routes at owner's option and Suez Canal was closed owner required to take alternative route).

In requiring alternative performance following the failure of an optional undertaking, courts have recognized they are enforcing the contractual obligations agreed to by the parties. For example, in *Draken Group, Inc. v. Avondale Resources, Inc.*, 2008 WL 151901 (N. D. Okla. Jan 14, 2008), at issue and similar to here was a contract providing "at the discretion of Avondale, this fee may be paid in cash or, in whole or in part, in the equivalent percentage of working interests in acquired oil and gas fields." *Id.* at *1. After execution of the contract, certain of the leases were forfeited or otherwise lost. *Id.* at *3. The court found defendant could not compensate plaintiff with a 5% working interest in a lease it no longer owned. *Id.* However, under the impossibility of alternative performance doctrine, the defendant was required to render

alternative performance through the remaining means of compensation called for under the contract, that of cash. *Id.*

Here, long before the Petition Date, Compensation Claimants were general creditors of Lehman based upon, *inter alia*, their contingent but liquidated claims for Lehman's alternative performance obligation for their compensation. They also held RSUs and CSAs for deferred compensation as to which payment was not yet due. Claimants did not agree to excuse Lehman's alternative performance (payment in cash) if Lehman could not perform under the RSUs or CSAs. In fact, in 2005, Lehman itself purposely and intentionally removed from the RSU agreements themselves the Subordination Clause and all references to bankruptcy, thereby demonstrating its intention that employees' claims for unpaid compensation that had or might receive RSUs should not be viewed as damage claims arising from the purchase or sale of a security, but as general creditor claims. *See, e.g.*, Fact Stip., Exhibit 6 (58-61 of 148).

In *In re NationsRent, Inc.*, 381 B.R. 83 (Bankr. D. Del. 2008), the court rejected an attack under § 510(b) to claims of those who, in exchange for stock, cash, promissory notes, and other deferred consideration, transferred to the debtors their interests in companies the debtors acquired through pre-petition mergers. *Id.* at 92. The court reasoned the claims were not for "damages" arising from fraud, securities violations, or from a breach of contract beyond the agreed to amount. *Id.* The court found the claimants were seeking to recover payments due under the agreements for the sale of the businesses, and that the transferors merely sought to obtain their agreed upon sales price. *Id.*

Similar to *Nationsrent*, the Claims here are based upon Claimants' attempt to enforce the promise made to them for their compensation which as of the Petition Date was a fixed and liquidated amount. As of the Petition Date, payment under the RSUs and CSAs representing

Claimants' deferred compensation was not yet due.  Lehman did not breach or default in its

obligation to Claimants prior to performance under its optional undertaking pursuant to the RSUs

or CSAs being rendered impossible. The Claims are not damage claims. The Claims involve

neither loss nor injury based upon a wrongful act of Lehman, a fraud committed by Lehman nor

a tort or breach of contract.

Lehman argues that the analysis under § 510(b) here does not depend on whether

Respondents were actual shareholders, but rather on the nature of their underlying claim.  The

cases holding shareholder status is not necessary for subordination, however, upon which

Lehman relies, are grounded on the wrongful deprivation of the opportunity to become a

shareholder and the resulting loss in profits derived from the stock.  *See e.g., In re Med*

*Diversified, Inc.*, 461 F.3d at 254 (claim for damages based on debtor's failure to issue shares of

common stock pursuant to employee termination agreement); *In re Betacom of Phoenix, Inc.*,

240 F.3d 823 (9th Cir. 2001) (claim for damages based upon debtor's pre-bankruptcy failure to

deliver promised shares).

In *Enron*, the employees' damage claims were based upon Enron's fraud and breach of

contract arising from its bloated financials that failed to recognize its stock option compensation.

The claims sought recovery for the misrepresentations and decline in the value of Enron's stock.

*Enron*, 341 B.R. at 143-44.  Here, the deferred compensation represented by the RSUs/CSAs

was recognized in Lehman's financials through Lehman's expensing of the compensation in its

income statements.  Fact Stip. ¶¶ 34-38.  Here, the Claims are not based upon a lost opportunity

to acquire Lehman stock nor the loss in the value of the stock.

The cases cited above show that enforcement of a claim based upon a debt is not subject

to mandatory subordination.  Claimants like noteholders are entitled to rely upon Lehman's

-31-

contractual payment obligations without being subject to subordination under § 510(b).

### D. The Compensation Claims Based Upon Lehman's Alternative Performance Obligations Are Not Claims "Arising" From the Purchase of a Security

Claimants were general creditors long before the Petition Date based upon, inter alia, Lehman's alternative performance obligation that gave rise to a contingent but liquidated claim.[14] The Claims for alternative performance arise out of Lehman's promise to pay Claimants their compensation. Lehman's post-petition cancellation of its stock did not give rise to the claim for alternative performance. Such a reading would fly in the face of Code §§ 101(5) and 502(e)(1)(B), which defines the term claim to include claims that are contingent. *See e.g., U.S. Through Agr. Stabilization & Conservation Serv. v. Gerth*, 991 F.2d 1428, 1433-34 (8th Cir. 1993) (observing how "dependency on a postpetition event does not prevent a debt from arising prepetition," since "debt can be absolutely owing prepetition even though that debt would never have come into existence except for postpetition event").

Moreover, as has been recognized, "The existence of a mere 'connection' between the claim and the purchase or sale of a security is not enough to support a finding that the claim "arises from the purchase or the sale." *In re CIT Group Inc.*, 460 B.R. 633, 639 (Bankr. S.D.N.Y. 2011) (internal quotation and citation omitted). In *Med Diversified*, claimant argued

---

[14] The Claims here are not for the loss of the RSU/CSA conversion privilege. Similar to a convertible debenture holder seeking to recover principal and interest on the underlying unsecured indebtedness, here, Claimants are not seeking recovery for the loss of the RSU/CSA conversion right but only for the "principal" (and not interest) due Claimants. *See e.g., Chock Full O'Nuts Corp. v. United States*, 453 F.2d 300 (2d Cir. 1971) (court referred to alternative performance rights existing under convertible debentures). For this reason, the decision in *In re Calpine Corp.*, 2007 WL 4326738 (S.D.N.Y. Nov. 21, 2007), upon which Lehman relies, is distinguishable. There, convertible debentureholders sought to amend their claims to include a claim for the elimination of their conversion rights under the plan of reorganization after receiving payment on the underlying indebtedness on their debentures as a general unsecured claim. *Id.* at *1. Claimants argued the proposed amended claim was not subject to subordination under § 510(b) on the basis that their conversion rights were only permissive and not obligatory. *Id.* at *8. The court rejected their argument, emphasizing that the claim sought a double recovery and damages that arose out of a breach of the claimants' prospective right to purchase common stock through conversion. *Id.* at *12.

that there was no difference between the debtor's promise to purchase his PrimeRX stock with debtor's own stock and the promise to make a cash severance payment to him. *Med Diversified*, 461 F.3d at 256. The Second Circuit rejected this argument, stating "There is an important difference however on which our decision depends. Rombro bargained not for cash but to become a stockholder in the debtor." *Id.* Here, Claimants did not bargain for the status of shareholders. Claimants had alternative rights to those of shareholders. The alternative performance rights here exist to provide Claimants with their bargained for compensation.

### E. The Compensation Claims Are Not For "Damages"; Rather, They Are Claims Arising From Statutory Rights To "Wages" For Services Rendered

Section 510(b) of the Code is inapplicable for the further reason that Compensation Claimants are creditors who seek to enforce their right to payments under wage law statutes; not "damages" based on breach of contract, fraud, or any other tort, loss, or injury. These claims are based on a fixed-amount of unpaid "wages" for rendered services and unlawful wage deductions and withholdings effectuated under Lehman's RSU and CSA plans.[15]

Prior to Lehman's Chapter 11 petition, Compensation Claimants were production-based or salary-plus-bonus employees who were respectively paid either through sales commissions or bonuses. In the case of salaried employees, the vast majority of their pay came through a year-end bonus that was directly tied to their performance. Lehman set Compensation Claimants' wages for each of the years 2003 through 2007, withheld varying portions from each employee's paycheck, and generally granted RSUs/CSAs at year-end. Portions withheld were at Lehman's sole discretion and lacked prior informed, written authorization by the former employees. Acceptance and continuation of employment with Lehman subject to the terms of the RSU/CSA plan was not done

---

[15] To be clear, Compensation Claimants do not argue that the RSUs/CSAs themselves are wages, or that the incentive compensation plan itself gives them a right to wages. These are statutory claims for unpaid wages in fixed amounts.

with knowledge of the risks and rewards attendant to their participation in the plan and with respect to employees' unpaid commissions and bonuses that were statutory wages, including subordination under § 510(b).

### 1. Applicable Wage Laws

Lehman had offices world-wide. The Compensation Claimants worked for Lehman primarily at its New York, New Jersey, California, Illinois, and United Kingdom offices.[16] Wage laws of the jurisdiction where an employee worked generally apply despite any choice of law contractual provision to the contrary when there is a strong public policy to protect employees.[17]

Wages are not ordinary debts; they are required to be paid by statute. The wage statutes do not involve causes of action which generate unliquidated and uncertain damages; nor even use the term "damages." Rather, they provide their own statutory causes of actions and remedies. *See, e.g.,* N.Y. Lab. Law § 198(3). Violations of laws prohibiting unlawful "deductions" or "withholdings" from wages are subject to civil and criminal penalties.[18] Some jurisdictions such as California even prohibit employers from conditioning employment on taking an interest in the business as part of their compensation. Cal. Lab. Code §§ 407, 408.

As remedial legislation intended to ensure employees receive the fruits of their labor, these wage laws must be construed liberally.[19] This is consistent with Congress' longstanding intent to

---

[16] Compensation Claimants reserve rights to supplemental arguments under the laws of other jurisdictions.

[17] If there is no deprivation of rights in the actual state of employment, a choice of law provision could be applied with respect to a state's wage laws as long as the legislature of the chosen state had not expressed any restrictions on the applicability of the state wage laws is. Delaware wage law contains such a restriction: employees who do not actually work in Delaware cannot enforce its wage laws. *Klig v. Deloitte LLP*, 36 A.3d 785 (Del. Ch. 2011).

[18] *See, e.g.,* N.Y. Lab. Law § 197 (civil penalties) and § 198a (criminal penalties); Cal. Lab. Code § 225 (criminal misdemeanor) and 225.5 (civil penalties).

[19] *See* N.Y. Stat. Law § 321 ("Generally, remedial statutes are liberally construed to carry out the reforms intended and to promote justice"); *Rosen v. Smith Barney, Inc.*, 393 N.J.Super. 578, 586 (N.J. Super. Ct. 2007) (Intent of the wage law is to protect employees and to guarantee receipt of the fruits of their labor by prohibiting employers from withholding or diverting any portion of the employee's wages unless expressly provided by the wage law.); *Heyen v.*

protect employees under the Code itself by giving them fourth level priority for "wages, salaries, or commissions . . . earned by an individual." 11 U.S.C. § 507(a)(4)(A).[20]

### 2. Amounts Withheld from Fixed Commissions and Bonuses are Unpaid "Wages"

Wages are defined broadly to include salaries, bonuses, and commissions in applicable states' and countries' wage laws. New York Labor Law § 190 defines "wages" as "the earnings of an employee for labor or services rendered, whether the amount of earnings is determined on a time, task, piece, commission or other basis." *Compare* Illinois (820 ILCS § 115/1 et. seq.), California (Cal. Lab. Code § 200 et. seq.), Colorado (Colo. Rev. Stat. § 8-4-101 et. seq.), and United Kingdom (Employment Rights Act 1996), § 27(1)(a)), wage laws.

#### a.    Commissions are "Wages"

Commissions are protected as "wages" under any jurisdiction.[21]  All of the commissions claimed by Commissioned Claimants were "wages" that were already declared in fixed amounts reflected as deducted and withheld on their "Lehman-Live" online accounts at the time of monthly withholdings by Lehman.

#### b.    Bonuses are "Wages"

Bonuses are wages if they are either guaranteed or, in the case of so-called discretionary bonuses labeled, declared earned in a fixed amount; thus making the employee the holder of a fixed

---

*Safeway Inc.*, 157 Cal.Rptr.3d 280 (Cal. Ct. App. 2013) (Statutory provisions regulating wages that are enacted to protect employees are liberally construed with an eye to promoting such protection, while exemptions are narrowly construed and, as affirmative defenses, must be proved by the employer.).

[20] Judge Learned Hand observed, in a case under the Bankruptcy Act, "The statute was intended to favor those who could not be expected to know anything of the credit of their employer, but must accept a job as it comes, to whom the personal factor in employment is not a practicable consideration."  *In re Lawsam Elec. Co.*, 300 F. 736 (S.D.N.Y. 1924).

[21] *Gennes v. Yellow Book of New York, Inc*., 23 A.D.3d 520 (2d Dep't. 2005) (Commissions were "wages," within meaning of Labor Law provision proscribing unauthorized deductions from wages).  Commissions are wages under the Cal. Labor Code.  *Koehl v. Verio, Inc.*, 142 Cal.App.4th 1313 (Cal. Ct. App. 2006).

wage claim when those declared amounts are not paid.[22]  Under New York law, "bonuses and similar incentive compensation become vested either by contract or when an employer otherwise awards a specified amount of compensation to the employee."[23]  Under Illinois law, bonuses have to be guaranteed or earned to be a "wage," and earned bonuses are earned pro rata.[24]  In the U.K., once a bonus is declared it becomes the legal obligation of employer that cannot be withdrawn, and falls within meaning of wages.[25]  California law broadly considers incentive compensation like bonuses to be "wages."[26]

Bonuses claimed by the Compensation Claimants were either guaranteed, and automatically "wages" under any law, or labeled as discretionary. All so-called discretionary bonuses became "wages" when Lehman's bonus pool was determined and the amounts of bonuses were awarded to specific employees; these are wages in the liquidated amounts deducted, withheld, and appearing on their respective "Lehman-Live" reports.  *See* Fact Stip. ¶ 13.

---

[22] *See, e.g., Diamond v. Davis*, 38 N.Y.S.2d 103 (N.Y. Sup. Ct. 1942) (every benefit firmly offered or authoritatively fixed for an employee, which in the course of fair dealing and reasonable conduct should rightfully be expected, may be regarded as part of a just increment to the compensation payable for the work).

[23] *Carlson v. Katonah Capital, L.L.C.*, 2006 WL 273548 (N.Y. Sup. Ct. Jan. 27, 2006); *See, also, Levion v. Societe Generale*, 822 F.Supp.2d 390 (S.D.N.Y. 2011) (guaranteed bonuses would be considered "wages" under NY Labor Law"); *Reilly v. Natwest Markets Group Inc.*, 181 F.3d 253, 264-65 (2d Cir. 1999) (employee's bonus constituted wages where it was guaranteed to be a percentage of employee's revenues); *Bader v. Wells Fargo Home Mortg. Inc.*, 773 F. Supp. 2d 397 (S.D.N.Y. 2011) ("Wages" does not include bonus, profit-sharing, and other forms of incentive compensation unless the incentive compensation is already earned by the employee; a bonus is earned when the employee acquires a vested interest in the award and its payment is not conditioned upon some occurrence or left to the discretion of the employer.).

[24] *DeGeer v. Gillis*, 707 F.Supp.2d 784 (N.D. Ill. 2010) (Bonuses are among the forms of compensation recoverable under the Illinois Wage Payment and Collection Act); *Arrez v. Kelly Servcs., Inc.*, 522 F. Supp. 2d 997 (N.D. Ill. 2007); *Camillo v. Wal-Mart Stores, Inc.*, 221 Ill.App.3d 614 (Ill. App. Ct. 1991); *Brandon v. Anesthesia & Pain Mgmt Associates, Ltd.*, 419 F.3d 594, 597 (7th Cir. 2005); *Zabinsky v. Gelber Group, Inc.*, 347 Ill. App. 3d 243 (Ill. App. Ct. 2004).

[25] *Farrell Matthews & Weir v. Hansen*, [2005] I.R.L.R. 160.

[26] *Schachter v. Citigroup, Inc.*, 47 Cal.4th 610 (Cal. Super. Ct. 2009); *Neisendorf v. Levi Strauss & Co.*, 143 Cal. App. 4th 509 (Cal. Ct. App. 2006).

### 3.    Lehman's RSU/CSA Plans Violate Wage Laws Requiring Voluntary Written Authorization from the Employee

Deductions or withholdings from wages are unlawful unless they are expressly authorized in writing by the employee with full notice of all terms and conditions of the payment and/or its benefits and the details of the manner in which deductions will be made. NY Lab. Law § 193.[27] *See also*, Cal. Lab. Code §§ 222 and 224;[28] Col. Rev. Stat. § 8-4-105; and Ill. 820 ILCS § 115/9.[29] An employee may not be forced to waive labor law protections. *Padilla v. Manlapaz*, 643 F.Supp.2d 302 (E.D.N.Y. 2009).

Compensation Claims are distinguishable from voluntary written authorization cases because the claimants here: (1) were given no choice but to participate in the RSU/CSA plan if they wanted to obtain or keep their job; (2) many employees did not sign written authorizations for deductions from their wages and where given they were not informed authorization; and (3) acceptance and continuation of employment with Lehman subject to the terms of the RSU/CSA

---

[27]    *Schunkewitz v. Prudential Sec., Inc*., 99 F. Appx. 353 (3d Cir. 2004) (terms of plan valid where contract was entered into on informed and voluntary basis); *Rosen v. Smith Barne*y, *Inc.,* 925 A.2d 205 (N.J. 2008) (Deductions from wages for deferred stock compensation plan was permissible given that the plan was in writing and fully disclosed all the terms prior to a participant enrolling, participation was optional and risk of forfeiture was unambiguously disclosed); *Schacter v. Citigroup, Inc.*, 126 Cal. App. 4th 726, 740 (Cal. App. Ct. 2005) (compensation plan upheld where all terms and conditions were disclosed to participants); *Marsh v. Prudential Sec. Inc*., 1 N.Y.3d 146 (N.Y. Ct. App. 2003) (deductions lawful where employee gave written and informed authorization to defer wages under plan ); *see also* Weil, Gotshal & Manges LLP, Bankruptcy Blog, *Tightening the Golden Handcuffs: Forfeiture Provision in Stock; Voluntary Plans*, April 5, 2004 ("*Marsh* provides that . . . plan participants should, as a condition to participation, sign a written authorization acknowledging that they were given notice of and understand the risks associated with participation in the plan."), www.weil.com/news/pubdetail.aspx?pub=3428.

[28] *See Koehl v. Verio, Inc.*, 142 Cal.App.4th 1313 (Cal. Ct. App. 2006) (Deductions lawful because the "[employees] all testified that they received and read the plans, had the opportunity to ask questions about them, understood them, and signed them."), *review denied*.

[29] *See also Kim v. Citigroup, Inc.*, 305 Ill.Dec. 834, 368 (Ill. App. Ct. 2006), *appeal denied* (wage deductions  not unlawful because voluntarily allowed with the express written consent of the employee); *Ury v. Fruit Belt Service Co.,* 64 Ill.Dec. 613 (Ill. App. Ct. 1982) (unlawful for employer to withhold a portion of employee's income and place it in reserve account for employer benefit.)

plan was not done with knowledge of the risks and rewards, specifically with respect to possible subordination under § 510(b).

There could be no informed and voluntary written authorization to Lehman's unilateral wage deductions because Lehman did not provide any disclosure with respect to the possible application of § 510(b) . In fact, Lehman *removed* the Subordination Clause in all RSU/CSA plan documents after 2004.  If this deletion does not evidence Lehman's intent that the claims be treated on par with other general creditors, then the risks of § 510(b) must have been disclosed in a notice to employees so that the employees could make informed written authorizations to the wage withholdings.  Lehman knowingly and purposely removed the subordination language and this should be construed strictly against the drafter.  Disclosure to employees of the risks attendant to a bankruptcy was imperative for the further reason that the contingency that could cause a loss of their wages, a possible bankruptcy, was an event wholly outside employees' control, as distinguished from the other conditions stated in the RSU/CSA plan that could cause a forfeiture of their wages.

### 4.    Lehman's RSU/CSA Plan Violates Wage Laws Requiring Deductions or Withholdings be For the Employee's Benefit

Wage withholdings in certain jurisdictions also must be for the benefit of the employee, not the employer.[30]  Here, Lehman devised a clever way of using employee wages to its own benefit. Lehman's implementation of the RSU/CSA plan allowed it to retain cash for itself by deducting and withholding earned compensation from thousands of its employees' paychecks. By doing so, Lehman was able to (1) retain top employee talent due to the risk of forfeiting wages, (2) avoid paying employees their wages if they left the company before RSUs or CSAs converted many years later to common stock, (3) keep more cash for its own use, and (4) inflate its financial value and

---

[30] *See, e.g.,* N.Y. Labor Law § 193; Cal. Op. Att'y Gen. (Nov. 5, 1981) (deduction must be for the benefit of the employee, not the benefit of the employer.).

present a healthier picture to its shareholders, rating agencies, clients, and potential target clients than was truly the case in the years leading up to the Chapter 11 petition.  That the RSU/CSA plan was not for the benefit of employees is further evidenced by Lehman's foreclosing employees from making the decision whether or not to participate in the RSU/CSA plan, and instead making the decision for them.  Lehman knew best what was good for it.

Lehman enjoyed the benefits of the retained cash at (what it now hopes will be) at the ultimate expense of employees.  It was a "win lose" situation for the employees because if an employee satisfied the employment-related conditions, the possible gain might materialize but it also may prove to be a mirage if Lehman is correct in its interpretation of §510 with respect to the Compensation Claims in the event of Lehman's bankruptcy filing.

Compensation Claimants have legal claims and right to payment for their improperly withheld "wages" under the applicable statutes here.

### III.    THE SUBORDINATION PROVISIONS IN THE RSU AND CSA AGREEMENTS ARE UNENFORCEABLE

Under 11 U.S.C. § 510(a) of the Code, "A subordination agreement is enforceable in a case under this title to the same extent that such agreement is enforceable under applicable nonbankruptcy law."  Lehman argues that for years 2003 and 2004, its employees agreed that RSUs and CSAs would have the same priority as common stock interest in LBHI.  *See* 313th Omnibus Obj., ¶¶ 14-16.  This argument fails for three reasons:

First, the 2003 and 2004 RSU and CSA agreements conflict with the terms of the Employee Incentive Plan, which governs in the event of any conflict.  *See* Fact Stip., Exhibit 4 (p. 49 of 148) ("In the event of any conflict or ambiguity between this [RSU Agreement] and the [Employee Incentive Plan], the terms of the [Employee Incentive Plan] shall govern.").  The Employee Incentive Plan provides "the grant of an Award shall *not* be construed as giving a

-39-

Participant the rights of a stockholder of Common Stock *unless shares of stock have been issued to Participants pursuant to Awards hereunder.*" LEH-RSU 0000003 (emphasis added).  Since no RSUs or CSAs were converted to stock for 2003 and 2004 and the Employee Incentive Plan confers rights of a shareholder only after shares are issued, the Subordination Clause is ineffective.

Second, the facts here do not demonstrate that the Compensation Claimants knowingly waived their rights as general creditors receiving RSUs or CSAs.  A subordination of rights, which effectuates a waiver of rights, will only be enforced where it has been knowingly and intelligently done with adequate awareness of the relevant circumstances and likely consequences.  *See In re Erickson Retirement Communities, LLC*, 425 B.R. 309, 314-16 (Bankr. N.D. Tex. 2010) (subordination agreements enforced based upon knowing and intelligent waiver of rights).  For years 2003 and 2004, as in all later years, Lehman distributed literature to its employees purporting to explain to them the express terms and conditions of the RSU and CSA plans.  Fact Stip. ¶ 13.[31]  However, LBHI has cited to no document, and Claimants' counsel have found no document, disclosing to employees the presence of the Subordination Clause in the grant agreements for those two years.  The grant agreements for those years were only first posted online on "LehmanLive" and made available to employees in January of the following

---

[31] Thus, during years 2003 and 2004 as well as later years, Lehman distributed to employees throughout the year preprinted packets of information containing a "Dear Colleague" letter, a summary of material terms, and separate brochures for employees based upon their corporate title, i.e., brochures for Vice-Presidents, Senior Vice-Presidents and Managing Directors, to summarize the compensation plan for those employees for those years.  Near year end of each year, employees also received total compensation statements setting forth their total compensation, including cash and RSU/CSA awarded bonus or commissions for the year.  Lehman posted on LehmanLive important tax information and a section with frequently asked questions covering common topics of general interest.  Not one of these documents mentioned the presence of a subordination provision in the RSU/CSA grant agreements.  Nor did the Employee Incentive Plan provide for the inclusion of such a clause.

year, 2004 and 2005, respectively, after the services that were the predicate for the RSUs/CSAs

had been fully performed.

Third, as outlined in the statement of fact, Lehman withheld from its disclosure any

explanation of the reasons why it removed from the RSU/CSA agreements the subordination

language, the language it told the court was in "certain" of the agreements without disclosing that

it had been uniformly removed from all agreements after 2004.  The removal of this language,

and Lehman's withholding of documents explaining why, warrants an inference that it was

removed because it was false.

## IV.    THE LEGISLATIVE HISTORY OF SECTION 510(b) DOES NOT SUPPORT SUBORDINATION

Courts have sought guidance from the legislative history of § 510(b) in examining the

intent and purpose of § 510(b).  *In re MarketXT Holdings Corp.*, 2008 WL 2164572, at *2

(Bankr. S.D.N.Y. May 22, 2008), *aff'd* 346 F. App'x 744, 746 (2d Cir.2009) (Circuit court

examined both the "plain meaning" of the statute and the "policy rationales cited . . . in *In re*

*Med Diversified*.")  One revealing piece of legislative history is the Report of the Commission on

Bankruptcy Laws of the United States (H.R. Doc. No. 93-137, Pts. I & II (1973) (Commission

Report)),which contained proposed language very similar to § 510(b)'s final language.  *See In re*

*Granite Partners, L.P.*, 208 B.R. 332, 336 n.8 (Bankr. S.D.N.Y. 1997).

According to the accompanying explanation, the proposed provision was "intended to

reach claims by holders of the debtor's securities that were based on 'federal and state securities

legislation, rule pursuant thereto, and similar laws,' *but would not affect any other claim (e.g., a*

*wage claim) which the investor also held*."  *Id.* (quoting Commission Report, pt. II, at 116)

(emphasis added).  If the same intent is attributed to the Congress that later adopted the same

statutory language, it is strong evidence that § 510(b) was not intended to apply to wage claims, such as those here.

Professors Slain and Kripke were completely consistent in the study cited by Congress in adopting § 510(b), stating that "the reliance interests of *laborers*, lenders and trade creditors" deserved greater protection than securities fraud claimants. John J. Slain and Homer Kripke, *The Interface Between Securities Regulation and Bankruptcy – Allocating the Risk of Illegal Securities Issuance Between Securityholders and the Issuer's Creditors*, 48 N.Y.U. L. Rev. 261, 299 (1973) ("Slain & Kripke") (emphasis added). Their focus was on *fraud* claims, which they viewed as an exception carved out from the absolute priority rule.

> The exception does not acknowledge the fact that the general creditor relies on the existence of an equity cushion in the case of his debtor's bankruptcy . . . . In sum, the exception [for securities fraud claims]gives full recognition to the interests of shareholders, but neglects the interests and expectations of *laborers*, lenders and trade creditors.

*Id.* at 298 (emphasis added). The purpose of § 510(b) was to remove the exception to the absolute priority rule for securities fraud claims, of which Slain and Kripke were critical because "purchasers of stock and subordinated debt have by their investments invited reliance by others who deal with the issuer." *Id.* at 299. To apply this analysis to these employees' compensation complete upends the Slain/Kripke analysis.

## V. APPLICATION OF SECTION 510(b) WILL NOT FURTHER THE POLICIES OF THE STATUTE. COMPENSATION CLAIMANTS DID NOT ASSUME THE RISKS AND BENEFITS OF SHAREHOLDERS

Compensation Claimants should prevail based upon the plain language of the statute and an examination of the policies of § 510(b). Section 510(b) is aimed at the situation of fraud in the issuance of securities. *See Med Diversified*, 461 F.3d at 256; *Enron*, 341 B.R. at 150 ("[T]his is a clear example of a typical claim by the defrauded purchase of a security to which section

-42-

510(b) unambiguously applies."); *see also In re MarketXT Holdings Corp.*, 2008 WL 2164572, at *2 (Bankr. S.D.N.Y. May 22, 2008), *aff'd* 346 F. App'x 744, 746 (2d Cir.2009) (summary order) (Circuit court examined both the "plain meaning" of the statute and "the policy rationales cited by this Court in *In re Med Diversified*" in concluding securities fraud claim should be subordinated).

The Claims do not resemble the type of securities fraud claims Congress addressed in § 510(b). Lehman mischaracterizes the Claims as veiled in fraud and/or breach of contract causes of action. But the Claims do not arise from a breach of Lehman's duties under the securities laws or from a breach of contract. Instead the Claims are premised upon Claimants' unsecured creditor rights to their deferred compensation, their contractual rights based upon Lehman's alternative performance obligation and Claimants' rights under the governing wage laws. Here, there were no damages, no purchase or sale of a security nor was the promise to pay compensation for their services a security. Claimants' rights based upon Lehman's alternative performance obligation and the governing wage laws do not arise from the purchase of a security, although under their employment arrangement part of Claimants' unpaid wages could be paid, at Lehman's discretion, through the vehicle of grants of RSUs/CSAs that in the future could effectuate the transfer of securities, the Debtors' stock.

In *Med Diversified*, the debtor allegedly breached the very provision of the very contract providing for the purchase of the debtor's stock, yet the Second Circuit still held that the claim did not stem directly from a purchase, sale or recission of the debtor's security and that a policy analysis was required. *Med Diversified*, 461 F.3d at 255.

The legislative history of § 510(b) makes clear that in enacting the statute Congress relied heavily upon a law review article written by Professor John J. Slain and Homer Kripke. Slain &

-43-

Kripke, 48 N.Y.U. L. Rev. 261; s*ee generally Med Diversified, Inc.*, 461 F.3d at 255-56.  As the

title of their article indicates, the law professors focused their attention on allocating risks and

expectations arising from the illegal issuance of securities, and argued that shareholders, rather

than general creditors, should bear the risk of illegal issuance of securities as well as the risk of

enterprise insolvency.  Slain & Kripke, *supra*, at 286-88.

        In their view, both risks are voluntarily assumed by shareholders, who hope to obtain

profits through an equity investment, and neither is assumed by creditors who assert a fixed

dollar claim.  *Id.*  The bill enacted by Congress "generally adopted the Slain/Kripke" policy

rationale for mandatory subordination.  H.R. REP. No. 95-595, 196, 1978 U.S.C.C.A.N. 5963,

6156.  Thus, when the courts are determining whether the subordination of a particular claim will

further the purposes of § 510(b), the main focus is whether the claimant took on the risk and

return expectations of a shareholder, rather than a creditor.  *Id.*[32]

        In analyzing whether subordination would further the risk-allocation rationale, courts

have examined whether the claim is based on the "value of the debtors' stock."  *Med Diversified*,

461 F.3d at 257.  In *Enron,* the court explained:

> Though the statutory language refers only to 'damages,' the courts
> reasonably read this to mean damages flowing from changes in the
> debtor's share price. Where the damages are connected to the
> declining value of the debtor's stock, the courts are inclined to read
> section 510(b) broadly …Conversely…where the claim is for a
> fixed amount and does not arise in parallel with the fortunes of the
> share price, the courts  are inclined to read section 510(b)
> narrowly.

---

[32] Although the courts will also consider whether the claimant seeks to recover a "contribution to the equity pool
presumably relied upon by creditors in deciding whether to extend credit to the debtor," it is the "risk-allocation
rationale which is more integral to any policy analyses of 510(b) . . . Congress and the courts have clearly elevated
the issue of risk (rather than creditor reliance) to the fore."  *Med Diversified*, 461 F.3d at 256, 259 (citing *Enron*, 341
B.R. at 166, n.21)).  Here, Lehman has not argued in support of subordination of the Claims that Lehman creditors
relied upon an equity cushion through the RSU/CSA compensation plan and the equity cushion argument is not
addressed herein.

-44-

*Enron*, 341 B.R. at 157.  In both *Enron* and *Med Diversified*, the courts reasoned that "the

asserted damages . . . are directly related to the decline in the value of [the debtor's] stock," and

therefore the policies of § 510(b) would be furthered by subordination.  *Id.*

Conversely, where the debtor's stock was neither the basis for the alleged claim nor the

measure of damages, the courts have found the claimant had not taken on the risk/reward

expectations of a shareholder.  *See In re American Wagering, Inc.*, 493 F.3d 1067, 1071 (9th Cir.

2007) (contract provided for compensation in form of 4% of initial evaluation); *In re DirecTV

Latin Am., LLC*, 2004 WL 302303, at *4-5 (D. Del. Feb. 4, 2004) (court reversed bankruptcy

court order subordinating claim pursuant to § 510(b) because "Raven asserts a claim neither

predicated upon misleading statements nor measured by diminished share value.").

In *DirecTV*, the district reversed the bankruptcy court's grant of subordination of a

contract claim asserted by an equity holder of the debtor under a put agreement in the amount of

$169 million that was not predicated on misleading statements or misconduct.  *Id.*  In so doing,

the court found significant the structure of the transaction by which the claimant had acquired its

interest in the debtor, including a fixed amount payable to the claimant under the put agreement

upon the occurrence of certain accelerating events, demonstrating "Raven did not seek to hold an

equity interest in [the debtor]."  *Id.*  The court rejected the debtor's argument that claimant's

participation in the profits required subordination, finding that Raven did not seek recovery on a

claim measured by diminished share value and its interest otherwise possessed few of the

conditions consistent with an equity investment.  *Id.*

Here, contrary to Lehman's argument, it is evident that the Claims are not measured by –

or dependent in any way –on diminution in value of the stock.  Instead, the Claims are calculated

based upon the value of the RSUs and CSAs as of the Grant Date representing the equivalent

monetary value of employees' total compensation for each of the performance years for which

Lehman held back compensation from Claimants' paychecks (2003 through 2008).  The level of

compensation Lehman allocated and held back in the form of RSUs and CSAs itself was not

based upon the price of the stock but resulted from Lehman's unilateral determinations made

without discussion with Claimants, and was a function of *inter alia*, Lehman's compensation and

benefits ratio and its cash flow needs that varied from year to year as enhanced through

Lehman's golden handcuffs RSU/CSA compensation plan.

As such, whether the share price rose or fell is irrelevant to the calculation of the Claims.

In *DirecTV*, the court denied subordination of the claim of an equity holder based upon its

finding that the equity holder's claim was rooted in a contract that allocated a specific contract

price in the event of breach.  Here, Claimants were never shareholders but creditors based upon

their rights to deferred compensation under the Incentive Plan.  Claimants also had contractual

rights with respect to Lehman's alternative performance obligation, as well as their statutory

rights to recover improper deductions taken from their wages under the governing wage laws, for

fixed and liquidated amounts.  Given the emphasis placed on this factor in cases such as *Med

Diversified* and *Enron*, the lack of any damages "flowing" from changes to Lehman's stock price

is a significant factor weighing against subordination under § 510(b).

In addition to the lack of any connection between the Claims and Lehman's share price,

Claimants here, similar to the claimant in *DirecTV,* are unlike a shareholder because Claimants

"did not seek to hold an equity investment in [Lehman]."  *See DirecTV*, 2004 WL 302303 at *4.

The RSUs and CSAs were a form of deferred compensation mandatorily imposed upon Lehman

employees for the benefit of Lehman and not its employees.  Claimants did not come to Lehman

as investors nor were their decisions to accept employment or remain with Lehman a choice to

invest with Lehman.  Instead, the decision was one to obtain a livelihood that did not turn on the structure of Lehman's employment arrangement.  It was not a choice to trade the relative safety of cash compensation for the upside potential of shareholder status, the choice highlighted by Slain and Kripke.

The "risk-allocation" rationale is premised on the notion that "those who conclude the bargain to become investors or shareholders should be treated as such."  *Med Diversified*, 461 F.3d at 257.  That Claimants did not bargain for the status of a shareholder nor conclude a bargain to become a shareholder is further evident from Lehman's compensation structure.  A bargained for exchange, i.e., to become a shareholder, cannot be premised upon a transaction, such as here where during each year of employment there was no obligation for Lehman to grant RSUs/CSAs  but only called for delivery of RSUs/CSAs as one mode of alternative performance that was wholly within Lehman's discretion.

Further, the RSUs and CSAs themselves upon the actual grant and through the maturity/conversion date did not allow Claimants to make independent investment decisions with regard to the purchase or sale of stock or provide RSU/CSA holders with unlimited profits like or the downside risk of a shareholder.  In that regard, the Compensation Claimants were unlike the stock option holders in *Enron* with their vested stock options.  There, the employee-stock option holders were able to make decisions with regard to the purchase and sale of Enron stock by exercising the stock options and selling the stock, or alternatively retaining them to exercise at a later time in the hope of an increase to their trading profits.  Once the stock options vested, they had trading value to the stock option holders.

Here, on the other hand, fluctuations of the Lehman stock price during the RSU/CSA terms were not significant to the RSU/CSA holders. They were not able to sell or hedge their

-47-

interest in their RSUs/CSAs even after vesting.  Prior to the Petition Date, the only "option" for

Claimants was to continue rendering services under the RSU/CSA contracts in accordance with

the employment related conditions.  Even with respect to the conversion to stock upon the

expiration of the five year term, subject to the employment related conditions, the transaction did

not involve an investment decision by Claimants. It occurred automatically without any action or

investment decision on the part of Claimants. Claimants' right to payment under the RSUs/CSAs

was contingent on future events although none of the employment related contingencies tied to

the RSUs/CSAs were the kind that shareholders face nor were they based upon the price of the

stock.

## **CONCLUSION**

For the foregoing reasons, the Omnibus Objections should be denied in their entirety.

Dated:  January 28, 2014
New York, New York

LAW OFFICES OF LISA M. SOLOMON

By:  _____/s/_____
    Lisa M. Solomon
One Grand Central Place
305 Madison Avenue, Suite 4700
New York, New York 10165
Tel: (212) 471-0067
Fax: (212) 980-6965

*Counsel to Claimants:  Madelyn Antoncic,
Peter Hornick, Vincent Primiano, Charles
Spero, Gordon Sweely, Timothy A. Burke,
Jonathan Sebiri, Riccardo Banchetti, Michele
Bareggi, Philippe Dufournier, Anke Parr,
Giancarlo Saronne, Harsh Shah, Richard
Noble, Michael Lawsky, Nikki Marshall*

STAMELL & SCHAGER, LLP

By:  _____/s/_____
    Richard J. Schager, Jr.
    Andrew R. Goldenberg
One Liberty Plaza - 23/F
New York, NY  10006-1404
Tel.:  (212) 566-4047
Fax:  (212) 566-4061

*Counsel to Claimants:  Jennifer Adler, Ian
Anderson, Craig Benson, Paola Biraschi,
Karen Brewer, William Broadbent, David
Brooks, Patrick Cremin, Michael Collier,
Joseph D'Amadeo, John Dmuchowski,
Nestor De Jesus, Steven Engel, Louise
Goldberg, Michael Gran, Anshuman Goyal
Adrian Graves, Sandra Hahn-Colbert,
Nicholas Howard, Julian Iragorri,
Harriet Chan King, Karen Krieger,*

*Tal Lev Ari, Yeruchim Levilev, Sarah Lewis, Patricia Luken, Lawrence McCarthy, Michael McCully, Hugh McGee, Estate of Michael Mullen, Ian Neville, Thomas, O'Sullivan, Helmut Olivier, Martin Patterson, Michael Petrucelli, Sandy Richman Fleischman, Barry Porter, Jack Rivkin, Alvaro Santodomingo, Brian Seward, Ross Shapiro, Margaret Smith, Stephen Snelling, Gregg Somma, Andrea Sullivan, Milan Veleba, Pierluigi Volini, Jeffrey Wecker, Peter Ward, Timothy Wilkinson, Judith Winchester*

RICH MICHAELSON MAGALIFF
 MOSER LLP
    Howard P. Magaliff, Esq.
    Robert N. Michaelson, Esq.
340 Madison Avenue - 19th Floor
New York, NY  10173
Tel.:  (212) 220-9402

*Counsel to Claimants:  Roger Saks, Donald Boughrum, Brian Monahan, Nicole Lawrence, H. Morgan Lawrence, III*

LAW OFFICE OF A. JAMES
BOYAJIAN
    A. James Boyajian, Esq.
355 S. Grand Avenue, Suite 2450
Los Angeles, CA 90071
Tel: (424) 258-0777
Fax: (424) 298-4377

*Counsel to Claimants: Virgilio Casuple, Darian J. Cohen, Lars P. Jacobson, Mary Langevin, Amit K., Sarkar, Christian E. Steven, Andrew Wideman*

# EXHIBIT A

### Omnibus Objections at Issue in this Hearing

1.  Debtors' Seventy-Third Omnibus Objection to Claims (to Reclassify Proofs of Claim as Equity Interests) [ECF No. 13295]

2.  Debtors' One Hundred Eighteenth Omnibus Objection to Claims (to Reclassify Proofs of Claim as Equity Interests) [ECF No. 15666]

3.  Debtors' One Hundred Thirtieth Omnibus Objection to Claims (to Reclassify Proofs of Claim as Equity Interests) [ECF No. 16115]

4.  Debtors' One Hundred Thirty-First Omnibus Objection to Claims (to Reclassify Proofs of Claim as Equity Interests) [ECF No. 16116]

5.  Debtors' One Hundred Thirty-Third Omnibus Objection to Claims (to Reclassify Proofs of Claim as Equity Interests) [ECF No. 16530]

6.  Debtors' One Hundred Thirty-Fourth Omnibus Objection to Claims (to Reclassify Proofs of Claim as Equity Interests) [ECF No. 16532]

7.  Debtors' One Hundred Thirty-Fifth Omnibus Objection to Claims (to Reclassify Proofs of Claim as Equity Interests) [ECF No. 16808]

8.  Debtors' One Hundred Seventy-Sixth Omnibus Objection to Claims (to Reclassify Proofs of Claim as Equity Interests) [ECF No. 19392]

9.  Debtors' One Hundred Eighty-Fifth Omnibus Objection to Claims (Compound Claims) [ECF No. 19714]

10. Debtors' Two Hundred Seventh Omnibus Objection to Claims (to Reclassify Proofs of Claim as Equity Interests) [ECF No. 20012]

11. Three Hundred Thirteenth Omnibus Objection to Claims (to Reclassify Proofs of Claim as Equity Interests) [ECF No. 28433]

12. Three Hundred Fourteenth Omnibus Objection to Claims (Late-Filed Claims) [ECF No. 28435]

13. Three Hundred Nineteenth Omnibus Objection to Claims (to Reclassify Proofs of Claim as Equity Interests) [ECF No. 28777]

14. Three Hundred Forty Seventh Omnibus Objection to Claims (to Reclassify Proofs of Claim as Equity Interests) [ECF No. 30357].