**KAPLAN LANDAU LLP**
1065 Avenue of the Americas
27th Floor
New York, New York 10018
(212) 593-1700

**JULIEN & SCHLESINGER, P.C.**
One Whitehall Street
17th Floor
New York, NY 10004
(212) 962-8020

*Attorneys for Claimants: Richard J. Glasebrook II (Claim No. 9682), Judith Ann Kenney (Claim No. 13929), Richard Nackenson (Claim No. 13968), Henry Ramallo (Claim No. 17607), Christian Reynolds (28442), Marvin C. Schwartz (Claim No. 20244), Stephanie Stiefel (Claim No. 21711), and David I. Weiner (Claim No. 18314), Seth Finkel (Claim No. 18067) and Richard Levine (Claim No. 31657).*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------------x

In re

LEHMAN BROTHERS HOLDINGS INC., et al.

                                        Debtors.
----------------------------------------------------------------------x

Chapter 11 Case No.

08-13555 (JMP)

(Jointly Administered)


**NEUBERGER BERMAN CLAIMANTS' OPENING MEMORANDUM OF LAW**

## **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ...................................................................................................ii-iii

PRELIMINARY STATEMENT ...............................................................................................1

FACTS .......................................................................................................................................4

ARGUMENT ...........................................................................................................................11

CONCLUSION ........................................................................................................................19

## TABLE OF AUTHORITIES

**Page**

### CASES

*767 Third Ave. LLC v. Orix Capital Markets, LLC,*
  26 A.D.3d 216, 812 N.Y.S.2d 8 (1st Dept. 2006) ....................................................17

*Bessemer Trust Co., N.A. v. Branin,*
  16 N.Y.3d 549 (2011) .......................................................................................... 11-12

*Brennan v. Bally Total Fitness,*
  198 F.Supp.2d 382 (S.D.N.Y. 2002) ...................................................................16

*Caruso v. Allnet Communications Servs. Inc.,* 242 A.D.2d 484,
  662 N.Y.S.2d 468 (1st Dept. 1997) .....................................................................15

*First Nat. Bank of Cincinnati v. Pepper,*
  454 F.2d 626 (2d Cir. 1972) ................................................................................18

*Frank v. Wesco Distributors, Inc.,*
  68 A.D.3d 641, 892 N.Y.S.2d 348 (1st Dept. 2009) ...........................................12

*In re Enron,*
  341 B.R. 141 (S.D.N.Y. 2006) ...................................................................3, 12, 13

*In re Market Square Assoc. Ltd.,*
  56 B.R. 566 (S.D.N.Y. 1986) ..............................................................................17

*In re Med Diversified,*
  461 F.3d 251 (2d Cir. 2006) ................................................................................14

*In re Touch America Holdings Inc.,*
  381 B.R. 95 (D. Del. 2008)..................................................................................13

*In re U.S. Wireless Corp.,*
  384 B.R. 713 (D. Del. 2008).................................................................................13

*Korn v. Franchard Corp.,*
  388 F. Supp. 1326 (S.D.N.Y. 1975) .....................................................................18

*Markby v PaineWebber, Inc.,*
  169 Misc.2d 173, 650 N.Y.S.2d 950 (Sup. Ct., N.Y. Co. 1996), *aff'd,* 243 A.D.2d 311,
  664 N.Y.S.2d 520 (1st Dept. 1997) ......................................................................15

## TABLE OF AUTHORITIES (CONT'D)

**Page**

*Medimmune, Inc. v. Genentech, Inc.,*
   549 U.S. 118 (2007)..............................................................................................18

*Mirchel v. RMJ Securities Corp.,*
   205 A.D.2d 388, 613 N.Y.S.2d 876 (1st Dept. 1994) ...................................15

*Rangone v. Atlantic Video at Manhattan Center,*
   595 F.3d 115 (2d Cir. 2010) ...............................................................................17

*Reilly v. Natwest Markets Group Inc.,*
   181 F.3d 253 (2nd Cir. 1999) ............................................................................15

*Sosnoff v. Carter,*
   165 A.D.2d 486, 568 N.Y.S.2d 43 (1st Dept. 1991) .......................................17

*Stewart M. Muller Constr. Co. v. New York Tel. Co.,*
   40 N.Y.2d 955 (1976)...........................................................................................17

*Union Pac R.R. Co. v. Public Service Comm.,*
   248 U.S. 67 (1918)................................................................................................18

*VVK Corp. v. National Football League,*
   244 F.3d 114 (2d Cir. 2001) ...............................................................................17

*Weiner v. Diebold Group,*
   173 A.D.2d 166, 568 N.Y.S.2d 959 (1st Dept. 1991) ...................................15

*Yuk Fung Ma v. J.C. Sake Inc.,*
   2011 N.Y. Slip. Op. 50999 (Sup. Ct. 2011)......................................................17

## STATUTES

11 U.S.C. §510(b)....................................................................................... passim

*New York Labor Law § 190(1)* .............................................................................15

**KAPLAN LANDAU LLP**
1065 Avenue of the Americas
27th Floor
New York, New York 10018
(212) 593-1700

**JULIEN & SCHLESINGER, P.C.**
One Whitehall Street
17th Floor
New York, NY 10004
(212) 962-8020

*Attorneys for Claimants: Richard J. Glasebrook II (Claim No. 9682), Judith Ann Kenney (Claim No. 13929), Richard Nackenson (Claim No. 13968), Henry Ramallo (Claim No. 17607), Christian Reynolds (28442), Marvin C. Schwartz (Claim No. 20244), Stephanie Stiefel (Claim No. 21711), and David I. Weiner (Claim No. 18314), Seth Finkel (Claim No. 18067) and Richard Levine (Claim No. 31657).*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------x
In re

LEHMAN BROTHERS HOLDINGS INC., et al.

                              Debtors.
--------------------------------------------------------------------x

Chapter 11 Case No.

08-13555 (JMP)

(Jointly Administered)

## NEUBERGER BERMAN CLAIMANTS' OPENING MEMORANDUM OF LAW

### PRELIMINARY STATEMENT

The Neuberger Berman Claimants[1] respectfully submit this memorandum of law

in advance of the April 1-3, 2014 hearing on, and in opposition to, the application of Lehman

Brothers Holdings Inc. ("LBHI" or "Lehman") to reclassify their claims as equity interests under

---

[1] Marvin C. Schwartz (Claim No. 20244), Stephanie Stiefel (Claim No. 21711), Richard J. Glasebrook II (Claim No. 9682), Judith Ann Kenney (Claim No. 13929), Richard Nackenson (Claim No. 13968), Henry Ramallo (Claim No. 17607), Christian Reynolds (28442), David I. Weiner (Claim No. 18314), Richard Levine (Claim No. 31657) and Seth Finkel (Claim No. 18067) (collectively the "NB Claimants" or the "Neuberger Claimants").

1

11 U.S.C. §510(b) and in support of general creditor status for their unpaid commission claims that collectively exceed $100 million.

The NB Claimants join in, and by this reference, adopt all applicable arguments made and advanced by the other Represented Participants in their Memorandum In Opposition To Debtors' Fourteen Omnibus Objections Seeking To Reclassify Compensation Claims As Equity of today's date. The NB Claimants submit this additional Memorandum of Law to advance facts and arguments that arise from and out of the merger of Neuberger Berman ("NB" or "Neuberger") into LBHI in October 2003.[2]

As demonstrated in detail below, the NB Claimants' claims cannot be reclassified as equity interests. The NB Claimants never had an opportunity to negotiate their employment compensation contracts with LBHI, when their original employer, Neuberger, was acquired by LBHI. Instead, under duress and threats against their very livelihoods, the NB Claimants were presented with a Hobson's choice: starting employment at LBHI and, therefore, becoming subject to the LBHI compensation system, which required that a significant portion of their currently earned production based compensation -- commissions -- be withheld from the Neuberger Claimants for at least five years, in the form of unvested restricted stock units ("RSUs"), in order for them to maintain the billions of dollars of assets under their management and continue the client relationships -- books of business -- they had cultivated over the course of decades, and, perhaps more importantly, to benefit from the future revenue stream from their significant books of business **or,** because of the draconian restrictive covenants to which each

---

[2]  To the extent not reiterated here, the Neuberger Claimants also repeat, adopt and incorporate herein all of their prior arguments made in Claimants' Opposition To Debtors' One Hundred Eighteenth Omnibus Objection To Claims, dated August 16, 2011 (ECF No. 20996); and Claimants' Sur-Reply In Further Opposition To Debtors' Seventy Third, One Hundred Eighteenth and Two Hundred Seventh Omnibus Objection To Claims, dated February 13, 2012 (ECF No. 25715).

2

was subject, forfeit their client lists and entire books of business and seek employment outside the securities and investment management industries.

The Neuberger Claimants participation in the Lehman RSUs -- essentially IOUs -- for earned commissions' compensation scheme thus was entirely an involuntary product of the 2003 merger. It was required by the need to preserve their careers, livelihoods and substantial books of business, all of which would have been forfeited unless they continued employment at LBHI because of the multiple restrictive covenants imposed on them and as a matter of law. Indeed, unlike others in the securities industry -- including at LBHI -- that received bonuses based on trailing 12 months' revenue, the Neuberger Claimants' compensation was based on the net present value of future cash flows from their substantial books of business and this future multi-million dollar revenue stream simply would have been lost if the Neuberger Claimants had not joined LBHI.

The amounts withheld from the NB Claimants by LBHI for RSUs -- representing the formulaic, production based compensation or, more colloquially, commissions -- *were not at all* "a condition of employment that the Claimants willingly accepted in return for their labor . . . [and] thus 'purchased' . . . with their labor." *In re Enron,* 341 B.R. 141, 151 (S.D.N.Y. 2006). To the contrary, unlike *Enron* -- the case relied on almost exclusively by LBHI in its motions for reclassification -- here the RSUs were thrust on the Neuberger Claimants involuntarily and without their having any choice or viable alternative to employment at LBHI and the attendant pay Lehman scheme. The sums owed to the NB Claimants make them general creditors of LBHI and their claims for unpaid compensation are not appropriate for subordination under Section 510(b) of the Bankruptcy Code.

3

## FACTS

Neuberger is an investment management firm that has provided financial services to high net worth individuals and institutional investors since it was founded in 1939. The NB Claimants currently are all Managing Directors who joined Neuberger Berman between 1961 and 2002. Managing Directors at Neuberger are charged with managing the growth of each client's assets within different asset management groups. Neuberger has a long standing history of attracting and retaining superior portfolio management talents who have a singular objective to deliver excellent performance results to clients. All of the NB Claimants maintain the portfolios of high net worth and institutional clients that chose Neuberger and its Managing Directors to provide investment management, financial planning, fiduciary and trust services. These high net worth and institutional clients chose to invest with Neuberger based on the management's reputation for trust and Neuberger's mission where "clients come first" and "the singular investment focus is to deliver long-term performance."[3] The reputation of Neuberger and the success of its Managing Directors are reflected in the high retention rate of Neuberger clients, which is estimated at nearly 95%. Not only do the Managing Directors play a vital role in the retention of Neuberger's clients, but their production based compensation -- commissions -- is locked into the growth of the clients' portfolios.

From its founding in 1939 and for the next 60 years, NB was a partnership (or LLC). In 1999, NB became a public corporation. At the time of the Neuberger IPO, four of the NB Claimants -- Messrs. Schwartz, Levine and Weiner and Ms. Stiefel -- were NB partners. In return for their partnership interests, to the extent relevant here, these four claimants received Founder Shares in the publicly traded Neuberger, which were restricted and could only be sold at a rate of 10% a year and for only so long as such Founder Stockholder did not engage in any

---

[3] See Neuberger Berman website, www.nb.com/our_mission

"Harmful Activity" within three years of the termination of such shareholders' employment with

NB. The NB Founder Stockholders' Agreement, in turn, imposed harsh restrictive covenants on

the former partners by defining "Harmful Activity" as follows:

> "Harmful Activity" by a [Founder Stockholder] means such [Founder Stockholder], directly or indirectly, either individually or as owner, partner, agent, employee, consultant or otherwise:

>> (a)    solicits or accepts business from (i) any Person who was a client of the [NB] during the one year period prior to such [Founder Stockholder's] Employment Termination Date or, in the case of an action taken during such [shareholder's] employment with [NB], during the one-year period immediately prior to such action) or (ii) any prospective client of [NB] who, within the one year period prior to such Employment Termination Date (or, in the case of an action taken during such [shareholder's] employment with [NB], within the one-year period immediately prior to such action), had been directly solicited by such [shareholder] or where, directly or indirectly, in whole or in part, such [shareholder] supervised or participated in [NB's] solicitation activities related to such prospective client;

>> (b)    solicits or accepts business from or through, or engages in any sales or marketing activities with, any financial intermediary (including, without limitation, any broker-dealer, bank, insurance company, financial planner or other financial institution), or any person employed by or associated with a financial intermediary, with whom such [shareholder] had business contact during the one year period prior to such [shareholder's] Employment Termination Date;

>> (c)    (i) employs any current or former employee or consultant of [NB] (other than clerical, secretarial and other similar support personnel) or (ii) recruits, solicits or induces (or in any way assists another in recruiting, soliciting or inducing) any such Person to terminate his or her employment or consultantship with [NB]. . . .

5

(d)    Markets, promotes or otherwise trades on or (other than solely in connection with seeking new employment) claims (or in any way, other than in connection with the business of [NB], assists any Person in marketing, promoting or otherwise trading on or claiming as such [shareholder's] (or such other Person's), the investment performance record (including without limitation performance ratings or rankings provided by any rating or ranking service) of any mutual fund, client account or group of mutual funds or client accounts with which such Principal was associated while employed with [NB];

(e)    discloses to any person, firm or corporation any Confidential Information that is known to the [shareholder] as a result of his or her employment or professional association with [NB] or uses the same in any way other than in connection with the business of [NB] or;

(f)    publicly makes disparaging or derogatory comments regarding (i) [NB] or any member of [NB] or (ii) any current or former Principal, employee or consultant of [NB] in their capacity as a Principal, employee or consultant or with the effect of damaging the business or reputation of [NB].

*See* Declaration of Stephanie Stiefel, dated January 27, 2014 ("Stiefel Dec."), at Ex. A, pp. 12-14. *See also id.* at pp. 11.

The other NB Claimants -- Messrs. Glasebrook, Nackenson, Ramallo, Finkel and Ms. Kenney -- all were employees of NB at the time of the IPO or joined NB thereafter. They too were subject to contractually imposed restrictive covenants under their respective employment contracts of at least one year post-employment. For example, in connection with, and in consideration of, Ms. Kenney's June 2001 promotion to Senior Vice President, that included an award of 2,000 shares of Neuberger Restricted Stock, Ms. Kenney was required to

sign explicit restrictive covenants that continued throughout her employment at Neuberger and

for one year thereafter, regardless of whether her employment termination was voluntary or

involuntary or with or without her cause:

(a)     You will not, directly or indirectly . . . solicit, recruit, hire or otherwise encourage the resignation of any executive, employee, agent, consultant or independent contractor of NB or induce or attempt to induce any executive, employee, agent, consultant, or independent contractor of NB or any of its parents, subsidiaries or affiliates to terminate their association with NB or any of its parents, subsidiaries or affiliates.

(b)     You will not, directly or indirectly . . . solicit the business of or provide or perform any services to any client or prospective client to whom you provided or performed services while employed by NB or as to whom you learned confidential information while at NB. You also agree not to assist any person or entity in competition with NB to solicit or service any such client to reduce its business with NB. . . . The term "prospective client" applies to any person or entity who has been solicited or identified for solicitation by NB, its parents, subsidiaries or affiliates during the twelve (12) month period prior to the date you cease to be an employee of NB.

(c)     You further agree and acknowledge that any knowledge or information of any type whatsoever of a confidential nature relating to the business of NB or any of its parents, subsidiaries or affiliates, including, without limitation, all types of trade secrets, concepts, techniques, methods, client lists and client information of any kind, employee lists or information, information regarding product development, prospective investment products and strategies, marketing plans, management organization information, opening policies or manuals, performance results, business plans, financial records, or other financial commercial, business or technical information (collectively, "Confidential Information"), must be protected as confidential, not copied, disclosed or used, directly or indirectly, other than for NB's benefit at any time, unless and until such knowledge or information is in the public domain through no wrongful act by you. You agree that you will not, directly or indirectly, divulge or disclose to anyone (other

than NB or any of its affiliates or any person employed or designated by such entities), publish or make use of any such Confidential Information without NB's prior written consent, except pursuant to an order or a court having competent jurisdiction or under subpoena from an appropriate government or regulatory agency.

(d)    You further agree that following the termination of your employment, you shall deliver to NB all documents or other tangible and intangible materials in your possession, including all copies thereof, which contain or are derived from Confidential Information, and that you shall not misappropriate, utilize, disclose or infringe upon the Confidential Information of NB or any of its affiliates (including the recreation or reconstruction of Confidential Information from memory).

*See* Declaration of Judith Kenney, dated January 27, 2014 at ¶ 4 and Ex. A at pp. 1-3.

LBHI acquired Neuberger on October 31, 2003 for approximately $2.6 billion in cash and securities. Through the acquisition of Neuberger and its high net worth clients, Lehman added $67 billion of assets under its management. This helps explain why Neuberger was considered to be the "Crown Jewel" of Lehman.[4] At that time, the Neuberger Claimants had been working for Neuberger for an aggregate of over 100 years, and had developed and managed substantial books of high net worth and institutional clients and asset management groups for Neuberger, all of which came under the umbrella of LBHI's new assets under management.

On the merger, the Founder Stockholders -- Schwartz, Weiner, Levine and Stiefel -- exchanged their NB shares for an equivalent amount of LBHI shares, which were subject to the same sales limitations, forfeiture provisions and restrictive covenants, which, as the Amended and Restated Stockholders Agreement, dated as of October 31, 2003, made clear were

---

[4] *See e.g.* The Nine Lives of Neuberger Berman Management, Wall Street Journal, December 4, 2008.

8

intended "to limit such [shareholder's] ability to earn a livelihood in a business similar to the business of [LBHI or NB]". *See* Stiefel Dec. at Ex. B, p. 5; *see also id.* pp. 4-6, 8-10.

The other NB Claimants also became subject to new and particularly harsh restrictive covenants that extended and further eviscerated their abilities to earn a living elsewhere in the securities/investment management industry. As demonstrated in the accompanying declaration of Henry Ramallo, these claimants were cajoled, coerced, pressured and, quite literally, threatened with their continued ability to earn a livelihood in their chosen professions into accepting retention bonuses -- payable in RSUs that vested at 20% a year for 5 years -- in return for continued employment by LBHI under restrictive covenants that provided as follows:

<u>Non-Solicitation; Company Information</u>

1.    In connection with the Merger, you will become entitled to receive distribution(s) from the retention bonus pool and you will exchange your shares of common stock of NB Inc. (*"NB Stock"*) for the Merger Consideration (as defined in the Merger Agreement), and you hereby acknowledge and agree that:

(a)    it is essential to the success of the Merger and the firm's enterprise in the future, and it is hereby so represented that your shares of NB Stock that are being transferred to Lehman upon consummation of the Merger be protected by covenants not to solicit clients or employees of the Firm; and

(b)    the Firm would suffer significant and irreparable harm, on and after the Effective Date, from your engaging in certain activities relating to the clients or employees of the Firm.

2.    Therefore, you agree that the covenants and restrictions contained in this Schedule B are reasonable and necessary for the Lehman and its affiliates to enjoy the full benefit of the business acquired in connection with the Merger and that the covenants and restrictions will not unreasonably restrict your professional opportunities should your employment with NB Inc. terminate. Accordingly, you agree that, you will not, directly or indirectly, either individually or as an owner, partner,

agent, employee, advisor, consultant or otherwise (other than on behalf of the Firm while employed by the Firm) during your employment with the Firm and for a period of twelve months after your Date of Termination (the "Restricted Period"):

> (a)    solicit or accept business from any individual or entity for whom any member of the firm provides services within the one-year period before or after the Date of Termination;

> (b)    solicit or accept business from any prospective client of the Firm who, within the one-year period prior to the Date of Termination, you had directly solicited or where, directly or indirectly, in whole or in part, you supervised or participated in the Firm's solicitation activities related to such prospective client;

> (c)    solicit or accept business from or through, or engage in any sales or marketing activities with, any broker-dealer, bank, insurance company, financial planner or other financial institution (or any person employed by or associated with any such entity), with whom you had business contact during the one-year period prior to the Date of Termination;

> (d)    employ any current or former employee or consultant of the Firm (other than clerical, secretarial and other support personnel); or

> (e)    solicit (or assist in soliciting) any such person described in (d) to terminate his or her employment or consulting services with the Firm. . . .

*    *    *    *

Company Information

3.     You acknowledge that, during the course of your employment with the Firm, you have had, and will continue to have, access to confidential and proprietary information of the Firm. In recognition of the foregoing, you agree, at all times during the term of the your employment with the Firm and thereafter, to hold in confidence, and not to use, except for the benefit of the Firm, or to disclose to any person, firm, corporation or other entity without written authorization of the Firm, any Confidential Information of the Firm. You further agree not to make copies of such Confidential Information except as authorized by the Firm.

*See*, Declaration of Henry Ramallo, dated January 27, 2014 at ¶¶ 5-8 and Ex. A., p. 2 and Schedule B.

As a result of the restrictive covenants that were reiterated or imposed at the time of the LBHI-NB merger, the NB Claimants had no choice but to continue employment with LBHI and participate in the LBHI compensation structure -- one that included the payment of approximately 50% of their earned, production based commission income in the form of RSUs that did not vest for five years[5] -- because the Managing Directors' books of business were transferred from NB to LBHI, and failure to accept LBHI's pay scheme would have resulted in the forfeiture of an aggregate of over 100 years of work, the growth of their clients' assets, the relationship of trust between clients and Claimants and their entire books of business. The Neuberger Claimants were required to work for Lehman because their books of business were transferred to LBHI as part of the merger, and also because these books of business were bound by their clients' desire to work with the Neuberger Claimants along with Neuberger, the institution. The NB Claimants could not leave LBHI without forsaking the basis of their entire livelihood.

## ARGUMENT

The Neuberger Claimants were required to remain in the employ of Lehman in order to retain their substantial books of business worth billions of dollars that they had spent decades cultivating and building. Apart from any restrictive covenants, it is unlikely that, as Managing Directors and substantial shareholders of NB that had sold NB's "good will" and client lists to Lehman, the Neuberger Claimants could lawfully seek to retain or solicit any of their existing clients if they decided to leave Lehman. *See, e.g., Bessemer Trust Co., N.A. v.*

---

[5]  The NB Claimants all were production-based (not salary plus bonus) employees at LBHI. Paragraphs 17-19 of the Stipulation of Facts explain how their RSUs were calculated.

*Branin,* 16 N.Y.3d 549 (2011); *compare, e.g., Frank v. Wesco Distributors, Inc.,* 68 A.D.3d 641, 892 N.Y.S.2d 348 (1st Dept. 2009).[6] Moreover, the fact that NB traditionally retained almost 95% of its business, would have made any such attempts virtually impossible, especially in light of NB joining forces with the then respected, and then apparently very solvent, Lehman.

Following the merger, and in order to keep their respective books of business, client relationships and stock interests, the Neuberger Claimants became subject to the Lehman compensation scheme for Managing Directors that required that as much as 50% of their annual compensation be paid in RSUs that would not vest for 5 years and would not vest at all if the Neuberger Claimants ceased employment at Lehman. From 2003 through 2008, the Neuberger Claimants earned collectively over $100 million in production based compensation -- commissions -- for which they essentially received IOUs from LBHI that took the form of RSUs, none of which was ever paid as a result of the bankruptcy of LBHI before the vesting period had elapsed.

In this proceeding, LBHI erroneously seeks to reclassify the employment contract and commission claims of the NB Claimants that were unilaterally diverted by Lehman into unvested RSUs as equity claims and subordinate such claims pursuant to Section 510(b). In doing so, LBHI principally relies on a line of cases flowing from *In re Enron Corp.,* 341 B.R. 141 (S.D.N.Y. 2006).

*Enron* and its progeny, however, clearly do not apply to the facts here and cannot serve as basis for subordination. The *Enron* rationale is that "a claim will be subordinated under Section 510(b) if the claim is for damages and if those damages 'arise from' the purchase or sale

---

[6] For example, Claimant Marvin Schwartz, NB's most powerful and profitable Managing Director, exchanged 4.3 million shares, mostly Founder Shares, of NB for an equivalent amount of LBHI stock upon the merger of the two firms. Even apart from the restrictive covenants contained in the Shareholder Agreements, he hardly could solicit or retain a NB client if he subsequently chose to work somewhere other than at LBHI.

of a security." *Enron,* 341 B.R. at 148-149.  In concluding that the *Enron* employees stock

option claims arose from the purchase of a security, Judge Gonzalez found that the employees

had "exchanged value for the options: here, their labor.  Such exchange falls under a broad

reading of the term 'purchase'." *Id.* at 151.  The *Enron* court continued:

> Some of the Claimants . . . argue that they never elected to receive
> stock options, but rather were required to take a minimum
> percentage of their annul bonus in stock option form.  This factual
> distinction, these Claimants argue, demonstrates clearly that they
> did not "purchase" stock options, as there was no voluntary
> exchange of goods, services, or currency for the options.  While
> this argument might appear at first blush intuitively reasonable, the
> distinction is flawed.  Although implicit, there is nonetheless a
> bargain and exchange of value.  Here, the employment.  If these
> Claimants were required to receive a portion of their compensation
> as options, that was a condition of employment the Claimants
> willingly accepted in return for their labor.  These Claimants, thus,
> "purchased" the stock options with their labor.

*Id.  See also, e.g., In re Touch America Holdings Inc.,* 381 B.R. 95, 104 (D. Del. 2008) (same);

*In re U.S. Wireless Corp.,* 384 B.R. 713, 718 (D. Del. 2008) (same).

Here, unlike the *Enron* employees, the requirement that the Neuberger Claimants

accept up to 50% of their annual production based compensation in RSUs *was not at all* "a

condition of employment the Claimants willingly accepted in return for their labor . . . . [and]

thus 'purchased' the [RSUs and] stock options with their labor", but rather a condition that was

thrust on them by the merger and their only manner to retain control of their billions of dollars

worth of business and client relationships developed over decades.  The Neuberger Claimants

had no choice.  They were held hostage to the LBHI compensation scheme, since if they did not

accept RSUs as part of their compensation they would lose their jobs and forfeit their books of

business, client relationships and, *e.g.* Founder Shares, if they sought to work elsewhere.  There

simply was no alternative to LBHI employment and the compensation scheme that went with it.

13

The Neuberger Claimants had chosen to work at NB and to accept its cash-based compensation system. The Neuberger Claimants, however, were required to work at Lehman -- and participate in the RSU/IOU for earned commissions scheme -- under the terms of far reaching restrictive covenants against "Harmful Activity" in order to preserve what they previously had built, earned and negotiated. As a result, this compelled participation does not give rise to "damages arising from" a voluntary purchase of a Lehman security -- if RSUs were a security at all -- and cannot be subordinated under 510(b).

Likewise, the Second Circuit's decision in *In re Med Diversified*, 461 F.3d 251 (2d Cir. 2006), also relied on by LBHI, does not apply to the facts presented here. In *Med Diversified*, the court found 510(b) subordination applied because claimant "took on the risk and return expectations of a shareholder when *he agreed* to exchange . . . employment claims for shares of the debtor. . . ." 461 F.3d at 256 (emphasis added). Once the *Med Diversified* claimant "bargained not for cash but to become a stockholder . . . he became bound by the choice he made to trade the relative safety of cash compensation for the upside potential of shareholder status . . . ." *Id.*

Here, again, the Neuberger Claimants *did not bargain* to become LBHI shareholders; the compensation scheme was a mandatory condition of the acquisition which was required in order for the Neuberger Claimants to retain their clients and their business. The Neuberger Claimants had no "choice" and made no "trade."

The penalties for "Harmful Activities" imposed by the several restrictive covenants further illustrate that the NB Claimants did not take on the typical expectations of a stockholder. By virtue of these penalties, Lehman made sure that the NB Claimants did not compete with LBHI. Provided that the NB Claimants did not do so, and did not violate the

14

covenants, only then, after five years, would they receive the value of the commissions that they previously earned and were entitled to as part of their compensation. The restrictive covenants thus reinforce that Claimants did not willingly accept RSUs as a form of compensation in exchange for their labors or that they received RSUs in order to obtain the possible benefits of a typical equity holder.

Since the LBHI RSUs never vested, the Neuberger Claimants now are entitled to the production based compensation -- commissions -- that they earned while employed at LBHI, in the amounts that Lehman unilaterally allocated to RSUs each year. The Neuberger Claimants cannot be deprived of their justly earned compensation through the slight of hand tactics of Lehman and its attempt at subordination under 510(b). The longstanding public policy and the provisions of the New York Labor Law against forfeiture of earned compensation -- commissions and production based earnings -- commands nothing less. *See, e.g., Labor Law § 190(1); Reilly v. Natwest Markets Group Inc.,* 181 F.3d 253, 264-65 (2nd Cir. 1999) (the NB Claimants production based compensation "falls comfortably within the definition of 'commission' that is expressly included within the Labor Law's definition of 'wages'.").[7]

The cases relied on by LBHI for subordination all require "damages" flowing from a volitional act by the Neuberger Claimants to "purchase" RSUs. Here, far from being a voluntary purchase -- the volitional choice of stock over cash or other compensation or "a condition of employment that claimants willingly accepted" -- the Neuberger Claimants were compelled to join the LBHI compensation scheme by the acquisition and their respective restrictive covenants. When the merger occurred, the Neuberger Claimants were forced to

---

[7]  *Accord, e.g., Caruso v. Allnet Communications Servs. Inc.,* 242 A.D.2d 484, 662 N.Y.S.2d 468, 469 (1st Dept. 1997); *Mirchel v. RMJ Securities Corp.,* 205 A.D.2d 388, 389, 613 N.Y.S.2d 876, 878 (1st Dept. 1994); *Weiner v. Diebold Group,* 173 A.D.2d 166, 167, 568 N.Y.S.2d 959, 961 (1st Dept. 1991); *Markby v PaineWebber, Inc.,* 169 Misc.2d 173, 179, 650 N.Y.S.2d 950 (Sup. Ct., N.Y. Co. 1996), *aff'd,* 243 A.D.2D 311, 664 N.Y.S. 2d 520 (1st Dept. 1997).

choose between: continuing their career at LBHI with Lehman's requisite, involuntary pay scheme or finding another career in another line of work. The Neuberger Claimants, in order to preserve, service and build on their client relationships and their books of business, that otherwise would be forfeited to Lehman as part of its acquisition of NB's goodwill and assets, and to realize on their past NB partnership, labors and earnings, had no choice but to remain as LBHI employees and to participate in the Lehman mandated compensation scheme from which they could not escape without ruining their careers as investment professionals and losing substantial compensation and decades of client development. The Neuberger Claimants had no bargaining power and made no volitional election, but were ensnared into remaining in the employ of LBHI in order to continue to earn a livelihood. Such involuntary acquiescence hardly is a "purchase" that gives rise to "damages" under the plain meaning of § 510(b).

   The position of the Neuberger Claimants is further advanced by analyzing their mandated participation in the Lehman compensation scheme in terms akin to an unconscionable employment contract of adhesion: "a contract is unconscionable where there is 'an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other part.'" *Brennan v. Bally Total Fitness*, 198 F.Supp.2d 382 (S.D.N.Y. 2002). Here, the "employment" contracts of the Neuberger Claimants plainly are unconscionable. The Neuberger Claimants, in order to preserve their ability to earn a living in their chosen occupation and maintain the substantial books of business they had built over the course of their careers and the income stream flowing therefrom, had no choice but to participate in LBHI pay scheme, a compensation package that unreasonably favored Lehman by allowing it to benefit from the tax and accounting aspects of substituting paper RSUs payable after five years for the cash compensation that the Neuberger Claimants had earned and to which they

were entitled under the long-standing, pre-existing Neuberger formulaic, production based compensation system. *See, also, e.g. Rangone v. Atlantic Video at Manhattan Center,* 595 F.3d 115, 122 (2d Cir. 2010).

The facts also demonstrate clear economic duress and business compulsion arising from the restrictive covenants imposed on the Neuberger Claimants and when they were told by their superiors to "sign up with Lehman or leave" and forfeit their careers, substantial books of business and future earning capacities. "A contract may be voided on the ground of economic duress where the complaining party was compelled to agree to its terms by means of a wrongful threat which precluded the exercise of its free will." *Stewart M. Muller Constr. Co. v. New York Tel. Co.,* 40 N.Y.2d 955, 956 (1976); *767 Third Ave. LLC v. Orix Capital Markets, LLC,* 26 A.D.3d 216, 218, 812 N.Y.S.2d 8, 9 (1st Dept. 2006); *Sosnoff v. Carter,* 165 A.D.2d 486, 491, 568 N.Y.S.2d 43, 46 (1st Dept. 1991). Here, the threatened loss of their careers, substantial books of business and future revenue and earning streams, plainly depicts a lack of free will by the Neuberger Claimants. *See, e.g., Yuk Fung Ma v. J.C. Sake Inc.,* 2011 N.Y. Slip. Op. 50999 at *3 (Sup. Ct. 2011). As this Court made clear: "the doctrine of business compulsion provides that the making of a contract may be under such circumstances of business necessity as will render the same involuntary and excuse the allegedly coerced party from its performance, especially where undue advantage or a threat to do unlawful injury is shown." *In re Market Square Assoc. Ltd.,* 56 B.R. 566, 573-74 (S.D.N.Y. 1986).

"The doctrine of economic duress arises from the theory that 'the courts will not enforce an agreement in which one party has unjustly taken advantage of the economic necessities of another and thereby threatened to do an unlawful injury.'" *VVK Corp. v. National Football League,* 244 F.3d 114, 122 (2d Cir. 2001). "A crucial element of coercion or duress is

lack of free choice. The circumstances involved must be such that the party . . . had no practical alternative open to him." *Korn v. Franchard Corp.,* 388 F. Supp. 1326, 1333 (S.D.N.Y. 1975). In this regard, an "'actual or threatened serious injury to business or employment' by a private party can be as coercive as other forms of coercion . . . and that '[t]o imperil a man's livelihood, his business enterprises, or his solvency, [is] ordinary quite as coercive as, for example, detaining his property.'" *Medimmune, Inc. v. Genentech, Inc.,* 549 U.S. 118, 132 (2007). Indeed, as Justice Holmes long-ago aptly observed: "it always is for the interest of a party under duress to choose the lesser of two evils. But the fact that a choice was made according to interest does not exclude duress. It is the characteristic of duress properly so called." *Union Pac R.R. Co. v. Public Service Comm.,* 248 U.S. 67, 70 (1918). *See also, e.g., First Nat. Bank of Cincinnati v. Pepper,* 454 F.2d 626, 633 (2d Cir. 1972). Here, the NB Claimants had no free choice or, for that matter, any choice at all.

At the time of the merger, each of the Neuberger Claimants was presented with the a Hobson's choice of **either** leaving Neuberger Berman and forfeiting their longstanding client relationships and books of business valued at billions of dollars in assets **or** joining Lehman with its compensation structure that contractually mandated participation in the Equity Award -- RSUs -- Program. Each of the Neuberger Claimants was essentially required and coerced by their respective restrictive covenants to participate in the RSU Program, which withheld up to 50% of their yearly compensation for up to five years, in order to continue to cultivate their client relationships and books of business that they had worked for so many years to build and which made Neuberger such an attractive firm to acquire. All of the Neuberger Claimants' compensation withheld for RSUs never vested prior to LBHI's 2008 bankruptcy[8] and

---

[8] 80% of the RSUs granted to some of the NB Claimants as Retention Bonuses did, in fact, vest prior to the bankruptcy. No claim is made for same herein.

the Neuberger Claimants, therefore, were never compensated for their production based labors between 2003 and 2008, while Neuberger was under the umbrella of LBHI. The NB Claimants are general creditors of LBHI and are owed the commissions that they earned.

## CONCLUSION

For all of the foregoing reasons, the Neuberger Claimants' claims should not be reclassified as equity interests under Section 510(b); Lehman's various omnibus objections should be denied and the Neuberger Claimants general creditor and wage and compensation claims must be allowed.

Dated: New York, New York
     January 28, 2014

        **KAPLAN LANDAU LLP**

        By: _____
            Eugene Neal Kaplan (EK-4229)

        1065 Avenue of the Americas
        27th Floor
        New York, New York 10018
        (212) 593-1700

        Michael S. Schlesinger (MS-0399)
        **JULIEN & SCHLESINGER, P.C.**
        One Whitehall Street
        17th Floor
        New York, New York 10004
        (212) 962-8020

        *Attorneys for the Neuberger Claimants:*