WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ralph I. Miller
Robert J. Lemons

Attorneys for Lehman Brothers Holdings Inc.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------------x
| | | |
|---|---|---|
| **In re** | : | **Chapter 11 Case No.** |
| | : | |
| | : | |
| **LEHMAN BROTHERS HOLDINGS INC.,** *et al.*, | : | **08-13555 (JMP)** |
| | : | |
| | : | **(Jointly Administered)** |
| **Debtors.** | : | |
| | : | |

-----------------------------------------------------------------------x

**MEMORANDUM OF LAW IN SUPPORT OF DEBTORS'
SEVENTY-THIRD, ONE HUNDRED EIGHTEENTH, ONE HUNDRED
THIRTIETH, ONE HUNDRED THIRTY-FIRST, ONE HUNDRED THIRTY-THIRD,
ONE HUNDRED THIRTY-FOURTH, ONE HUNDRED THIRTY-FIFTH,
ONE HUNDRED SEVENTY-SIXTH, AND TWO HUNDRED
SEVENTH OMNIBUS OBJECTIONS TO CLAIMS (TO RECLASSIFY
<u>PROOFS OF CLAIM AS EQUITY INTERESTS)</u>**

# TABLE OF CONTENTS

**Page**

Preliminary Statement ................................................................................................. 1

Procedural History .................................................................................................... 3

Factual Background ................................................................................................... 7

ARGUMENT .............................................................................................................. 9

I.   To Overcome the Omnibus Objections, Claimants Must Show that the Claims
     Should Not Be Classified as Equity ................................................................... 9

II.  The Claims of the RSU Holders Must Be Subordinated Pursuant to Section 510(b)
     of the Bankruptcy Code ................................................................................... 11

     A.   An RSU Is a "Security" as Defined by Section 101(49) of the Bankruptcy Code ................ 12

     B.   The Claimants Purchased the RSUs at Issue ........................................................... 19

     C.   The Claims of the RSU Holders All "Arise From" the Purchase or Sale of a Security ......... 22

III. The RSUs Also Constitute "Equity Securities" Under Section 101(16) of the
     Bankruptcy Code ............................................................................................. 27

IV.  The Claimants Do Not Have a Claim under Delaware or New York Labor Law ............. 30

     A.   The Delaware Wage Act Does Not Apply to the RSU Claims ........................................ 30

     B.   The Majority of Claimants' Delaware Wage Act Claims Are Untimely .............................. 31

     C.   The RSU Claims Are Not Claims for "Wages" Under New York Labor Law Because
          Claimants Merely Have a Contingent Claim to Equity-Based Compensation .................... 32

V.   LBHI Reserves Its Right to Seek to Reclassify the RSU Claims as Claims  Against
     LBI ................................................................................................................ 34

CONCLUSION ......................................................................................................... 35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Adelphia Commc'ns Corp.*,
No. 02–41729 (REG), 2007 WL 601452 (Bankr. S.D.N.Y. Feb. 20, 2007) ............................9

*In re Am. Hous. Found.*,
No. 09-20232-RLJ-11, 2013 WL 1316723 (Bankr. N.D. Tex. March 30, 2013)..............13, 14

*Aristeia Capital v. Calpine Corp. (In re Calpine Corp.)*,
No. 05-60200 (BRL), 2007 WL 4326738 (S.D.N.Y. Nov. 21, 2007) .....................................14

*In the Matter of Baldwin-United Corp.*,
52 B.R. 549 (Bankr. S.D. Ohio 1985)....................................................................................28

*Bar-Tur v. Arience Capital Mgt., L.P.*,
No. 11-864-CV, 2012 WL 3140421 (2d Cir. Aug. 3, 2012).....................................................34

*Baroda Hill Invs., Ltd. v. Telegroup, Inc. (In re Telegroup, Inc.)*,
281 F.3d 133 (3rd Cir. 2002) .................................................................................................23

*Begum v. Singh*,
C.A. N11C-10-220 PRW, 2013 WL 5274408 (Del. Super. Ct. Sept. 18, 2013) ....................32

*In re Betacom of Phoenix, Inc.*,
240 F.3d 823 (9th Cir. 2001) .................................................................................................27

*Carrier v. Jobs.com, Inc.*,
393 F.3d 508 (5th Cir. 2004) .............................................................................................29, 30

*In re CIT Group, Inc.*,
460 B.R. 633 (Bankr. S.D.N.Y. 2011), *aff'd,* 479 Fed. Appx. 393 (2d Cir. 2012)................18

*In re Club Ventures Investment LLC*,
No. 11-10891 (ALG), 2012 WL 6139082 (Bankr. S.D.N.Y. Dec. 11, 2012) .................18, 27

*Econn v. Barclays Bank PLC*,
No. 07 Civ. 2440 (BSJ), 2010 WL 9008868 (S.D.N.Y. May 10, 2010)..........................33, 34

*In re Einstein/Noah Bagel Corp.*,
257 B.R. 499 (Bankr. D. Ariz. 2000)......................................................................................29

*In re Enron Corp.*,
341 B.R. 141 (Bankr. S.D.N.Y. 2006) ........................................................................... *passim*

*Frankum v. Int'l Wireless Commc'ns Holdings, Inc. (In re Int'l Wireless Commc'ns Holdings, Inc.)*,
    279 B.R. 463 (D. Del. 2002), *aff'd*, 68 Fed. Appx. 275 (3d Cir. 2003)...................20

*In re Granite Partners L.P.*,
    208 B.R. 332 (Bankr. S.D.N.Y. 1997).................................................................23

*Guiry v. Goldman, Sachs & Co.*,
    31 A.D.3d 70 (1st Dept. 2006)..........................................................................33

*KIT digital, Inc. v. Invigor Group Ltd.*,
    497 B.R. 170 (Bankr. S.D.N.Y. 2013).........................................................18, 26

*Int'l. Bus. Machs. Corp. v. Martson*,
    37 F. Supp. 2d 613 (S.D.N.Y. 1999).................................................................34

*Klig v. Deloitte LLP*,
    36 A.3d 785 (Del. Chanc. Ct. 2011) ..................................................................31

*In re Lehman Brothers Inc.*,
    No. 08-01420 (JMP), 2014 WL 288571 (Bankr. S.D.N.Y. Jan. 27, 2014) ....................*passim*

*Liquidating Trust of U.S. Wireless Corp. v. Wax (In re U.S. Wireless Corp.)*,
    384 B.R. 713 (Bankr. D. Del. 2008) .........................................................15, 19, 30

*In re Med Diversified, Inc.*,
    461 F.3d 251 (2d Cir. 2006)................................................................... *passim*

*Meli v. Rembrandt IP Mgmt., LLC*,
    C.A. No. 09C-09-108 WCC, 2010 WL 2681853 (Del. Super. June 28, 2010) .....................31

*In re Motor Liquidation Co.*,
    No. 11 Civ. 7893 (DLC), 2012 WL 398640 (S.D.N.Y. Feb. 7, 2012) .............................19, 36

*Nantahala Capital Partners, LP v. Wash. Mut., Inc. (In re Wash. Mut., Inc.)*,
    464 B.R. 656 (Bankr. D. Del. Jan. 3, 2012)...........................................................28

*Nikolouzakis v. Exinda Corp.*,
    No. 11-1261-LPS-MPT, 2012 WL 3239853 (D. Del. Aug. 7, 2012) ...................................31

*O'Donnell v. Tristar Esperanza Props., LLC (In re Tristar Esperanza Props., LLC)*,
    488 B.R. 394 (9th Cir. 2013) ................................................................13, 14, 17

*In re Oneida Ltd.*,
    400 B.R. 384 (Bankr. S.D.N.Y. 2009)..............................................................9, 10

*In re PT-1 Commc'ns, Inc.*,
    304 B.R. 601 (Bankr. E.D.N.Y. 2004)................................................................24

*Queen v. Official Comm. Of Unsecured Creditors (In re Response U.S.A., Inc.)*,
    288 B.R. 88 (D.N.J. 2003) ...................................................................................................24

*In re Rockefeller Ctr. Props.*,
    272 B.R. 524 (Bankr. S.D.N.Y. 2000) ...............................................................................9, 10

*In re SeaQuest Diving, LP*,
    579 F.3d 411 (5th Cir. 2009) ..............................................................................................13

*In the Matter of Standard Oil & Exploration of Del., Inc.*,
    136 B.R. 141 (Bankr. W.D. Mich. 1992)............................................................................30

*In re Touch America Holdings, Inc.*,
    381 B.R. 95 (Bankr. D. Del. 2008) .....................................................................................20

*Truelove v. Ne. Capital Advisory*,
    95 N.Y.2d 220 (2000) .........................................................................................................33

*In re Worldcom, Inc.*,
    329 B.R. 10 (Bankr. S.D.N.Y. 2005) .................................................................................23

**Statutes**

10 Del. C. § 8111 ......................................................................................................................32

19 Del. C. § 1101 .................................................................................................................30, 31

11 U.S.C. § 101 ................................................................................................................. *passim*

11 U.S.C. § 502...........................................................................................................................9

11 U.S.C. § 510 ................................................................................................................. *passim*

TO THE HONORABLE SHELLEY CHAPMAN
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Holdings Inc. ("LBHI"), in its capacity as Plan Administrator (in this capacity, the "Plan Administrator") under the *Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors* (the "Plan"), by its undersigned attorneys, files this memorandum of law (the "LBHI Memorandum") in further support of certain omnibus claim objections, and respectfully represents:

### Preliminary Statement

Restricted stock units and contingent stock awards (collectively, the "RSUs"), paid to Lehman employees under Lehman's Equity Award Program, should be treated and classified as equity under the Plan.  As explained in the pages that follow, since 1994, Lehman employees have been compensated for their services in both cash and equity.  The Claimants in particular were paid – whether salaried or commissioned – partially in cash and partially in RSUs.  These RSUs gave them a contingent right to own LBHI common stock, which would be issued to the RSU holders five years after the grant of the RSUs (*i.e.*, the hold period) upon the fulfillment of certain employment-related conditions.  Until the recession of 2008, Lehman employees benefited from the program as the value of their stock awards increased with the success of the firm.  Indeed, the primary purpose of Lehman's Equity Award Program was to encourage employees "to think and act like an owner every day … and to share in the Firm's financial success over time"[1] and thus to attract, motivate, and retain talented individuals.  Under this

---

[1] *See, e.g.,* Stipulation, Exh. 3 (2003 Senior Vice President Equity Award Program) at 2.  The "Stipulation" refers to the Order Approving Stipulation of Facts Regarding RSUs and CSAs, Including the Tax and Accounting Treatment of RSUs and CSAs, dated October 2, 2013 [ECF No. 40263], which is attached as Exhibit A to the Declaration of Ralph I. Miller in Support of Memorandum of Law in Support of Debtors' Seventy-Third, One Hundred Eighteenth, One Hundred Thirtieth, One Hundred Thirty-First, One Hundred Thirty-Third, One Hundred Thirty-Fourth, One Hundred Thirty-Fifth, One Hundred Seventy-Sixth and Two Hundred Seventh Omnibus Objections to Claims (To Reclassify Proofs of Claim As Equity Interests), dated January 28, 2014 (the "Miller Declaration").

system, Lehman thrived for more than a decade, aligning the interests of employees with those of all shareholders and promoting growth in the value of the enterprise.

As the Court is well aware, LBHI was forced to file for chapter 11 protection on September 15, 2008.  At that time, hundreds of Lehman employees were holding RSUs that had been granted to them for services performed from 2003 through 2008.  Due to the five year hold period, those RSUs had not yet led to the issuance of common stock.  Many of those employees filed proofs of claim against LBHI seeking payment, *in cash*, of the amounts allocated in their employment records to RSUs.  As explained in the Procedural History below, LBHI filed several Omnibus Objections seeking to reclassify such claims as equity and subordinating them to the claims of general creditors.  By those Omnibus Objections, LBHI seeks to ensure that the RSUs granted to the Claimants are treated as originally intended by Lehman and the Claimants – as equity of the firm.  As fully explained below, *nothing* – not in the Equity Award Program, the RSU grant agreements, employment contracts, or employee handbooks – gave Lehman employees the right to be paid the equity portion of their compensation *in cash*.  Indeed, entitlements to cash payments would have eroded the primary goal of the Equity Award Program – to incentivize employees to think and act as owners of Lehman Brothers.  It is unfortunate, of course, that LBHI became insolvent, leaving so many RSU holders, as well as non-employee shareholders, without the value in the common stock from which they hoped to reap a substantial profit.  None of the arguments raised by Claimants nor facts uncovered in discovery, however, supports the radical conclusion that the Claimants urge this Court to accept – that Claimants should somehow be preferred over non-employee shareholders.

Two bankruptcy doctrines independently compel the treatment of RSUs as equity:
(1) the RSU Claims must be subordinated to the claims of those with senior or equal interests

under section 510(b) of the Bankruptcy Code because they are claims for damages arising from the purchase or sale of a security, as interpreted by the Court in *In re Enron Corp.,* 341 B.R. 141 (Bankr. S.D.N.Y. 2006), and (2) the RSUs are "equity securities" as that term is defined in section 101(16) of the Bankruptcy Code, and thus, Claimants do not have a claim under section 101(5) of the Bankruptcy Code. Accordingly, LBHI respectfully requests that the Court grant the relief sought in the Omnibus Objections, thereby treating RSUs in bankruptcy the way they were consistently treated in the workplace – as equity.

### Procedural History

Between December 7, 2010 and August 24, 2012, LBHI and certain of its affiliated Debtors (collectively, the "Debtors" or "Lehman") filed fourteen omnibus objections to Proofs of Claim (the "Omnibus Objections") for bonus or commission compensation during the years 2003 through 2008 for which many claimants received restricted stock units or contingent stock awards (collectively, the "RSU Claims"). The Omnibus Objections sought to reclassify 3,279 such claims as equity interests and/or subordinate them to the claims of general unsecured creditors.

In a series of orders entered between January 20, 2011 and October 27, 2011 (collectively, the "Orders"),[2] the Court granted the requested relief, and reclassified as equity,

---

[2]  The Orders are the: Order Granting Debtors Seventy-Third Omnibus Objection to Claims (To Reclassify Proofs of Claim as Equity Interests) [ECF No. 14025]; Supplemental Order Granting Debtors Seventy-Third Omnibus Objection to Claims (To Reclassify Proofs of Claim as Equity Interests) [ECF No. 14776]; Order Granting Debtors' One Hundred Eighteenth Omnibus Objection to Claims (To Reclassify Proofs of Claim as Equity Interests) [ECF No. 17349]; Supplemental Order Granting Debtors' One Hundred Eighteenth Omnibus Objection to Claims (To Reclassify Proofs of Claim as Equity Interests) [ECF No. 19527]; Second Supplemental Order Granting Debtors' One Hundred Eighteenth Omnibus Objection to Claims (To Reclassify Proofs of Claim as Equity Interests) [ECF No. 21346]; Order Granting Debtors' One Hundred Thirtieth Omnibus Objection to Claims (To Reclassify Proofs of Claim as Equity Interests) [ECF No. 17369]; Order Granting Debtors' One Hundred Thirty-First Omnibus Objection to Claims (To Reclassify Proofs of Claim as Equity Interests) [ECF No. 17353]; Order Granting Debtors' One Hundred Thirty-Third Omnibus Objection to Claims (To Reclassify Proofs of Claim as Equity Interests) [ECF No. 18177]; Order Granting Debtors' One Hundred Thirty-Fourth Omnibus Objection to Claims (To Reclassify Proofs of Claim as Equity Interests) [ECF No. 18187]; Order Granting Debtors' One Hundred Thirty-Fifth Omnibus

nearly 3,500 RSU Claims asserting a total of approximately $2.46 billion in claims, ordering that

such claims have the same priority as, and no greater priority than, common stock interests in

LBHI, and thus resulting in the reclassification to equity of more than 93% of all asserted RSU

Claims.

      Between December 2010 and December 2011, certain holders of RSU Claims filed

responses (together with all subsequent responses, the "Responses") in opposition to the

Omnibus Objections (such responding holders, the "Claimants").  Though thousands of RSU

Claims had been reclassified as equity, the majority of those that were the subject of the

Responses (each, an "Outstanding Claim" and, collectively, the "Outstanding Claims") have not

yet been reclassified as equity.[3]  On March 28, 2011 and December 15, 2011, the Debtors filed

"Omnibus Replies"[4] to the Responses.

      On December 21, 2011, Judge Peck held a hearing to consider the approximately 236

RSU Claims (filed by 222 claimants) as to which the Claimants opposed the Omnibus Objections

(the "2011 Hearing").  A copy of the transcript of the 2011 Hearing, *In re Lehman Brothers*

---

Objection to Claims (To Reclassify Proofs of Claim as Equity Interests) [ECF No. 18178]; Order Granting Debtors'
One Hundred Seventy-Sixth Omnibus Objection to Claims (To Reclassify Proofs of Claim as Equity Interests) [ECF
No. 20610]; Supplemental Order Granting Debtors One Hundred Seventy-Fourth Omnibus Objection to Claims (To
Reclassify Proofs of Claim as Equity Interests) [ECF No. 27092]; Order Granting Debtors Two Hundred Fifty-
Eighth Omnibus Objection to Claims (to Reclassify Proofs of Claim as Equity Interests) [ECF No. 27101]; Order
Granting Two Hundred Seventy-Second Omnibus Objection to Claims (To Reclassify Proofs of Claim as Equity
Interests) [ECF No. 27637]; Order Granting Debtors Two Hundred Eighty-Fourth Omnibus Objection to Claims (to
Reclassify Proofs of Claim as Equity Interests) [ECF No. 28378]; Order Granting Three Hundred Thirteenth
Omnibus Objection to Claims (To Reclassify Proofs of Claim as Equity Interests) [ECF No. 30368]; and Order
Granting Three Hundred Nineteenth Omnibus Objection to Claims (To Reclassify Proofs of Claim as Equity
Interests) [ECF No. 30370].

[3] Certain RSU Claims have been reclassified as equity or disallowed as a result of settlements entered into with
LBHI.  Those RSU Claims are not included in the definition of "Outstanding Claims."

[4]  The Omnibus Replies are the:  Omnibus Reply to Responses to Debtors' Seventy-Third Omnibus Objection to
Claims (To Reclassify Proofs of Claim as Equity Interests) [ECF No. 15406]; and Omnibus Reply to Responses to
Debtors' One Hundred Eighteenth, One Hundred Thirtieth, One Hundred Thirty-First, One Hundred Thirty-Third,
One Hundred Thirty-Fourth, One Hundred Thirty-Fifth, One Hundred Seventy-Sixth, and Two Hundred and
Seventh Omnibus Objections to Claims (To Reclassify Proofs of Claim as Equity Interests) [ECF No. 23470].

*Holdings, Inc.,* No. 08-13555-jmp (Bankr. S.D.N.Y. Dec. 21, 2011) [ECF No. 23741] (the

"Transcript"), is attached as Exhibit B to the Miller Declaration.  At the 2011 Hearing, Judge

Peck noted that he "intended to follow" Judge Gonzalez's reasoning in *Enron*, 341 B.R. at 144,

wherein the Court ruled that "claims for damages that arise from the ownership of employee

stock options . . . should be subordinated pursuant to section 510(b) [of the Bankruptcy Code]."

*See* Miller Decl., Exh. B (Transcript) at 58:15-59:16 (asking Claimants to explain "what it is

about [each Claim] that takes it outside of the reasoning [in *Enron*] that I've reviewed and that I

intend to follow"); *see also infra* at Section I.  The Court further recognized that there were

potential issues of fact being raised "by individuals who are not under oath, who are not subject

to cross-examination and who are in a position to influence the Court."  Miller Decl., Exh. B

(Transcript) at 103:25-104:4.  Because the Claimants alleged that there were distinguishing

characteristics among the different "subclasses" of Claimants, Judge Peck acknowledged that

there were "some questions as to what the facts actually are." *Id.* at 104:5-105:11.  Accordingly,

after five hours of argument, the vast majority of which was devoted to hearing the various

Claimants' arguments in opposition to the Omnibus Objections (including arguments from a

number of *pro se* claimants), Judge Peck directed the parties to develop a factual record in order

to afford each of the Claimants an opportunity to distinguish *Enron* and to demonstrate the

unique nature of his/her claim and why it should not be classified as equity.  *Id.* at 127:7-128:21.

After the 2011 Hearing, and at the Court's direction, the Debtors filed their Supplemental

Annotated Omnibus Reply to Responses to Debtors' Seventy-Third, One Hundred Eighteenth,

One Hundred Thirtieth, One Hundred Thirty-First, One Hundred Thirty-Third, One Hundred

Thirty-Fourth, One Hundred Thirty-Fifth, One Hundred Seventy-Sixth, and Two Hundred and

Seventh Omnibus Objection to Claims (To Reclassify Proofs of Claim as Equity Interests), dated

January 24, 2012  [ECF No. 24591] (the "Annotated Reply"), in which the Debtors specifically

identified the Claimants to whom their various arguments and replies applied.  In the months

following the hearing, Claimants filed (or otherwise registered)[5] a multitude of additional formal

and informal responses regarding the Omnibus Objections.

On August 27, 2012, the Court entered an Order Establishing Discovery Procedures in

Connection With Omnibus Objections to Reclassify Proofs of Claim as Equity Interests [ECF

No. 30421] (as amended, the "Discovery Procedures Order"), which was the product of

significant negotiations by LBHI and counsel for numerous Claimants.[6]  Pursuant to the

Discovery Procedures Order, LBHI provided the Claimants who participated in discovery

(collectively, the "Participants") with initial disclosures of key documents, including program

documents setting forth the terms of the RSU awards, minutes of the LBHI Compensation &

Benefit Committee meetings for the years 2003 through 2008, employee handbooks, financial

statements, as well as confidential reports to each Participant identifying the plans in which he or

she had an unvested interest in RSUs from 2003 through 2008, and the RSUs accrued by

commissioned employees in 2008.  LBHI thereafter responded to over 80 document requests and

interrogatories, and produced over 30,000 pages of documents.  On October 24, 2013, a

representative of LBHI also sat for a full-day Rule 30(b)(6) deposition primarily concerning the

accounting treatment of RSUs.  In addition, LBHI negotiated and executed a stipulation of facts

with the Participants, dated September 13, 2013, detailing the inner workings of the Lehman

Brothers Equity Award Program, including the tax and accounting treatment of RSUs.  The

stipulation sets forth the parties' agreed and undisputed facts, further establishing an evidentiary

---

[5] For example, several *pro se* Claimants submitted statements to LBSF setting forth their positions.

[6] The initial Discovery Procedures Order was amended on November 28, 2012 [ECF No. 32386], February 13, 2013 [ECF No. 34583], October 8, 2013 [ECF No. 40334], and October 17, 2013 [ECF No. 40542].

record for the Court, which gives the Claimants every opportunity to attempt to demonstrate why

the Claims differ from those that were before Judge Gonzalez in the *Enron* bankruptcy cases.

On October 2, 2013, Judge Peck entered an order approving the Stipulation of Facts, thereby

rendering it part of the Court's factual record.  *See* Miller Decl., Exh. A.

### **Factual Background**

Since the implementation of the Lehman Brothers Equity Award Program in 1994,

Lehman employees have been compensated in both cash and equity.  Documents provided by

Lehman before and/or shortly after retention advised all employees of this practice.  From at

least 2003 through 2008, a portion of compensation to Lehman employees was paid in the form

of RSUs, all of which provided the holders with a right to acquire common stock in LBHI – an

equity interest in the firm.  In the five years before the commencement of the Debtors' chapter 11

cases, tens of thousands of domestic and overseas Lehman employees were granted restricted

stock units and contingent stock awards, respectively, in exchange for their service as Lehman

employees.  *See* Omnibus Objections; Stipulation at ¶ 1.

RSUs were awarded to Lehman employees as a portion of their "total compensation"

packages.  *See* Stipulation at ¶¶ 1-3, 15.  Restricted stock units were granted to employees based

in the United States, and contingent stock awards were granted to employees located overseas.

*Id.* at ¶ 1.  These awards were granted to salaried employees pursuant to a discretionary bonus

award program and to commissioned-employees as the equity portion of the commissions paid to

them in each paycheck.  *Id.* at ¶¶ 15-18.  In practice, both restricted stock units and the

contingent stock awards operated the same way – they were granted to both salaried and

commissioned employees near the end of each calendar year (the "<u>Grant Date</u>"), and five years

after the Grant Date, they resulted in the issuance of unrestricted LBHI common stock upon the

fulfillment of certain employment-related conditions.  After receiving these shares of LBHI

common stock, the employees would dispose of the stock as they saw fit.  *Id*. at ¶¶ 3, 5-6.

Lehman fully informed its employees that a portion of their compensation would be paid

in equity.  The employee handbooks distributed in the United States and the United Kingdom

provide that "[a]t the Firm's option, a portion of [an employee's] total compensation . . . may be

payable in the form of conditional equity awards (restricted stock units ('RSUs'), stock options,

or other equity awards) pursuant to the Firm's equity award program."  Stipulation at ¶ 2.  In

addition, in each case where Lehman had an employment contract with a Claimant, that contract

provided (with some varying language), that "[a]t the Firm's discretion, a portion of your total

. . . compensation . . . will be [or may be] payable in conditional equity awards (restricted stock

units and/or other equity awards) pursuant to the Firm's employee equity award program . . . ."

*Id.*

In effect, the RSUs (i) gave Lehman employees a financial stake in the company, thus

giving them a sense of ownership in the firm and motivating them to secure the firm's success;

and (ii) provided Lehman employees with a financial incentive to remain with Lehman until the

shares were issued.  *See, e.g.*, Stipulation, Exh. 3 (2003 Senior Vice-President Equity Award

Program) at 2.  Indeed, the Equity Award Program Brochure distributed to employees on a

yearly basis reminded them of their personal stake in the company:  "Given the key role you play

in Lehman Brothers' success, it is important for you to have a significant stake in the firm . . .

The Program provides you with an incentive to think and act like an owner every day, and allows

you to share in the Firm's financial success over time."  *Id.; see also* Stipulation, Exh. 15 (2008

Equity Award Program Questions and Answers) at 4 ("[A]s in the past, the overall objective of

the Firm's Equity Award Program is to ensure multi-year alignment with shareholders through

significant ownership stakes for employees.")

For many years, Lehman employees' fortunes rose with Lehman's success.  When their

RSUs vested, Lehman employees were issued common stock – often worth millions of dollars to

certain employees.  Had Lehman avoided bankruptcy, all of the RSUs that form the basis of the

RSU Claims would have vested by now, and the Claimants would have reaped the benefit of any

increase in LBHI's common stock price.  Unfortunately, and to the detriment of all its creditors

and shareholders, LBHI filed a chapter 11 petition on September 15, 2008.

## ARGUMENT

### I.    To Overcome the Omnibus Objections, Claimants Must Show that the Claims Should Not Be Classified as Equity

A filed proof of claim is "deemed allowed, unless a party in interest . . . objects."  11

U.S.C. § 502(a).  If an objection refuting at least one of the claim's essential allegations is

asserted, the burden shifts back to the claimant to demonstrate the validity of the claim.  *See In re*

*Oneida Ltd.*, 400 B.R. 384, 389 (Bankr. S.D.N.Y. 2009); *In re Adelphia Commc'ns Corp.*, No.

02–41729 (REG), 2007 WL 601452, *5 (Bankr. S.D.N.Y. Feb. 20, 2007); *In re Rockefeller Ctr.*

*Props.*, 272 B.R. 524, 539 (Bankr. S.D.N.Y. 2000).

Here, LBHI – in the Omnibus Objections, Omnibus Replies, Annotated Reply and during

the 2011 Hearing  – has offered sufficient evidence to refute and overcome the *prima facie*

validity of the RSU Claims.  *See In re Oneida Ltd.*, 400 B.R. at 389.  As demonstrated in those

submissions and as will be demonstrated at the evidentiary hearing, the RSU Claims, all of

which arise from the voluntary exchange of labor for the right to receive stock, should be

classified as equity under the Plan because:  (1) section 510(b) of the Bankruptcy Code mandates

that the RSU Claims have the same priority as common equity of LBHI; and (2) RSUs fall

within the Bankruptcy Code definition of "equity security" under section 101(16) of the

Bankruptcy Code.   This result is entirely consistent with – and in fact required by – the Court's

decision in *Enron* (and its progeny)*,* where Judge Gonzalez concluded that claims for damages

arising from the issuance of stock option compensation must be subordinated pursuant to section

510(b) of the Bankruptcy Code.  341 B.R. 141.

     The burden thus has shifted to Claimants to prove by a preponderance of the evidence

that under applicable law the RSU Claims should be allowed.  *See In re Oneida Ltd.*, 400 B.R. at

389 ("When the burden is shifted back to the claimant, it must then prove by a preponderance of

the evidence that under applicable law the claim should be allowed.") (citing *Raleigh v. Ill. Dep't*

*of Revenue*, 530 U.S. 15, 20 (2000) and *In re Holm*, 931 F.2d 620, 623 (9th Cir. 1991));

*Rockefeller Ctr.*, 272 B.R. at 539.   Indeed, Judge Peck asked the Claimants to demonstrate why

the RSU Claims should not be subordinated pursuant to section 510(b):

> The [*Enron*] decision treated all of the employee claims with
> sympathy as part of the same class of claimants and focused on
> Section 510(b) of the Bankruptcy Code . . . . And without re-
> characterizing what the Court said in *Enron*, in effect, Judge
> Gonzalez concluded that regardless of how these rights to receive
> stock may be characterized, that they are really governed by
> Section 510(b), which leads to subordination of the contract right
> to receive stock to the same level as an equity holder. . . . *what I'm*
> *really looking for, if you can tell me, is what it is about your claim*
> *that takes it outside of the reasoning [of Enron] that I've reviewed*
> *and that I intend to follow.*

Miller Decl., Exh. B (Transcript) at 58: 7-9, 19-24; 59: 14-16 (emphasis added).  Thus, in the

pages that follow, LBHI primarily addresses the Bankruptcy Court's specific interest in the

applicability of *Enron* to the facts at hand, but reserves and reasserts the remaining arguments

made in the Omnibus Objections, Omnibus Replies, Annotated Reply and 2011 Hearing.

     As set forth in detail below, Claimants cannot do as Judge Peck directed – they cannot

show that the RSU Claims are "outside of the reasoning" of *Enron.*  In fact, the relevant facts

lead to the opposite conclusion: the RSU Claims fall squarely within the reasoning of *Enron*

section 510(b)'s reach.  Thus, they must be subordinated and treated the same as claims arising

from the issuance of common stock.  In fact, as also demonstrated below, any meaningful

difference between the stock options at issue in *Enron* and the RSUs at issue in this case only

reinforces that RSUs are a form of equity compensation with the same benefits and risks as

common stock, and accordingly, the RSU Claims must be subordinated pursuant to section

510(b) of the Bankruptcy Code.

## II.     The Claims of the RSU Holders Must Be Subordinated Pursuant to Section 510(b) of the Bankruptcy Code.

The RSU Claims – which all arise from the voluntary exchange of labor for the right to

receive stock – must be subordinated pursuant to 11 U.S.C. § 510(b) as claims "for damages

arising from the purchase or sale of . . . a security."  *See In re Lehman Brothers Inc.,* No. 08-

01420 (JMP) (SIPA), 2014 WL 288571 (Bankr. S.D.N.Y. Jan. 27, 2014) (holding "subordination

for claims meeting the criteria set forth in [section 510(b)]" is mandatory).

Section 510(b) of the Bankruptcy Code states:

> For the purpose of distribution under this title, a claim arising from
> rescission of a purchase or sale of a security of the debtor or of an
> affiliate of the debtor, *for damages arising from the purchase or
> sale of such a security*, or for reimbursement or contribution
> allowed under 502 on account of such a claim, *shall be
> subordinated to all claims or interests that are senior to or equal
> the claim or interest represented by such security*, except that if
> such security is common stock, such claim has the same priority as
> common stock.

11. U.S.C. § 510(b) (emphasis added).  It is well-established in the Second Circuit that section

510(b) is to be interpreted broadly.  *See In re Lehman Brothers Inc.,* 2014 WL 288571 (quoting

*In re Med Diversified, Inc.,* 461 F.3d 251, 255 (2d Cir. 2006)).  Therefore, three questions must

be answered to assess whether a claim based on RSUs must be subordinated under § 510(b):

-11-

(1) Is an RSU a "security"?

(2) Did the Claimants acquire the RSUs in a "purchase"?

(3) Do the damages sought by Claimants "aris[e] from" the purchase of a security?

As explained in detail below, Judge Gonzalez specifically addressed each of these questions in *Enron*, and the answer to each was firmly, "Yes." Despite Claimants' best efforts to distinguish their claims from the employee claims in *Enron*, they have failed to identify a single characteristic that would take them out from under the reasoning in *Enron*. Accordingly, the RSU Claims, regardless of how Claimants choose to characterize them, are subject to section 510(b) and must be subordinated to the claims of general unsecured creditors.[7]

A.    An RSU Is a "Security" as Defined by Section 101(49) of the Bankruptcy Code

Section 101(49)(A)(xv) defines "security" to include a "certificate of interest or participation in, temporary or interim certificate for, receipt for, or warrant or right to subscribe to or purchase or sell, a security," and as section 101(49)(A)(ii) makes plain, a stock is a security. As stated in Lehman Brothers Equity Award Program brochures distributed to employees, an RSU "represents the conditional right to receive one share of Lehman Brothers common stock" once certain employment-related conditions have been satisfied. *See, e.g.*, Stipulation, Exh. 3 (2003 Senior Vice-President Equity Award Program) at 1; Miller Decl., Exh. C (2005 Equity

---

[7] The fact that the 2003 and 2004 Equity Program Grant Agreements for restricted stock units and contingent stock awards contain express subordination provisions does not alter this conclusion. Those grant agreements state that, "[A]ll claims arising from, in connection with, or in any way, relating to the failure of [LBHI] to deliver to you, shares of Common Stock on the date when such shares are due to be delivered under this Agreement in satisfaction of each Unit granted to you shall be deemed, in the event of a bankruptcy of [LBHI], to be claims for damages arising from the purchase or sale of Common Stock of [LBHI], within the meaning of section 510(b) of the Bankruptcy Code and shall have in such bankruptcy the same priority as, and no greater priority than, common stock interests in [LBHI]." *See, e.g.*, Stipulation, Exh. 4 (2003 Managing Director Equity Award Program Agreement Evidencing a Grant of Restricted Stock Units) at ¶10 and Exh. 5 (2004 Equity Award Program Agreement Evidencing a Grant of Restricted Stock Units – Investment Representatives) at ¶10. Indeed, such provisions provide an additional ground for subordination because they are enforceable subordination agreements under section 510(a) of the Bankruptcy Code and do nothing to alter the mandated subordination required by section 510(b) of the Bankruptcy Code.

Award Program For Bonus-Eligible and Production-Based Employees) at 2. Thus, a grant of an RSU constitutes a contingent right to participate in, receive and/or purchase common stock of LBHI, consistent with section 101(49) of the Bankruptcy Code. As such, each of the RSUs must be treated as a "security" as that term is defined by the Bankruptcy Code.

Even when interests do not precisely match the specific labels enumerated in section 101(49) of the Bankruptcy Code, courts have repeatedly held that the fifteen-item list of examples of securities in section 101(49) is not exhaustive and that an interest may fall within the definition of a security if, among other things, the interest owner expects to share in any increases in value in the enterprise to the exclusion of ordinary creditors. *See O'Donnell v. Tristar Esperanza Props., LLC (In re Tristar Esperanza Props., LLC)*, 488 B.R. 394, 399 (9th Cir. 2013) (finding that the fifteen-item list of what constitutes a "security" in section 101(49) is non-exclusive and holding that a membership interest in an LLC is a "security"); *In re Am. Hous. Found.*, No. 09-20232-RLJ-11, 2013 WL 1316723, *18 (Bankr. N.D. Tex. March 30, 2013) (finding that the list in section 101(49) is not exhaustive and that securities are not limited to the items specifically identified). Similarly, the Fifth Circuit concluded that section 101(49)(A)(xiv), which includes in the definition of security "other claim[s] or interest[s] commonly known as 'security,'" is a "broad residual category." *In re Am. Hous. Found.*, 2013 WL 1316723, *18, citing to *In re SeaQuest Diving, LP*, 579 F.3d 411 (5th Cir. 2009). Courts have held that various interests not specifically identified in section 101(49) of the Bankruptcy Code, such as membership interests in limited liability companies and investments in a limited partnership with guarantees of repayment of the amount of the investment, are "securities" within the meaning of that provision. *In re Tristar Esperanza Props., LLC*, 488 B.R. at 399; *In re Am. Hous. Found.*, 2013 WL 1316723, *18.

-13-

It is indisputable that the RSUs at issue in this case bear the hallmarks of a security and should be treated as such.  Indeed, Lehman equated RSUs to common stock and expressly informed its employees that they should "consider the RSUs as *shares of Lehman Brothers common stock* that the Firm holds on your behalf for five years . . . ."  *See, e.g.*, Stipulation, Exh. 3 (2003 Senior Vice-President Equity Award Program) at 2 (emphasis added); Miller Decl., Exh. C (2005 Equity Award Program For Bonus-Eligible and Production-Based Employees) at 2 (emphasis added).  The RSUs automatically resulted in the issuance of freely tradable LBHI common stock, once conditions were met without any further action on the part of the employee.  Moreover, the RSUs did not have a fixed value as cash or a debt does.  Rather, during the five-year hold period, the value of the RSUs varied with the value of LBHI's common stock, which is synonymous with an equity interest.  *See Aristeia Capital v. Calpine Corp. (In re Calpine Corp.)*, No. 05-60200 (BRL), 2007 WL 4326738, *13 (S.D.N.Y. Nov. 21, 2007) ("The value of the [convertible notes] vary with the value of the common stock of [the debtor], and therefore resemble an equity interest to which Section 510(b) is applicable.").  In addition, RSU holders had shareholder voting rights even before the stock was issued.  Specifically, Lehman established a trust and funded it with shares to be issued upon the conversion of RSUs to common stock.  That trust gave RSU holders the ability to direct voting on those shares based on the proportion of the number of RSUs held by the employees.  *See, e.g.*, Stipulation, Exh. 3 (2003 Senior Vice-President Equity Award Program) at 13; Miller Decl., Exh. C (2005 Equity Award Program For Bonus-Eligible and Production-Based Employees) at 12.  Finally, RSU holders, like shareholders, benefited from any dividends that were paid during the five-year hold period.  Dividend equivalents accrued quarterly on RSUs and were reinvested as additional RSUs during that time.  *Id.*; Stipulation at ¶ 29.  If the necessary conditions were satisfied, when

-14-

the RSU holders were issued tradable Lehman Brothers common stock, the RSU holder received additional common stock in proportion to the dividend equivalents that had accrued during the five-year period. Stipulation at ¶ 29. Any additional RSUs awarded for dividend equivalents were not treated as income by LBHI or accounted for as a compensation expense of LBHI. Stipulation at ¶¶ 29, 30.

Comparing RSUs to employee stock options, which courts have held are securities within the meaning of section 101(49) and subject to subordination under section 510(b), further demonstrates that RSUs are equity security interests and should receive the same treatment. *See Enron*, 341 B.R. 141; *Liquidating Trust of U.S. Wireless Corp. v. Wax (In re U.S. Wireless Corp.)*, 384 B.R. 713, 718 (Bankr. D. Del. 2008). Employee stock options, like RSUs, are not a grant of stock but, rather, a grant of a *right to stock* at a specified future time upon the satisfaction of certain employment-related conditions. Employee stock options issued under the Equity Award Program, like RSUs, may not be sold, traded or pledged. *See, e.g.*, Stipulation, Exh. 3 (2003 Senior Vice-President Equity Award Program) at 2; Miller Decl., Exh. C (2005 Equity Award Program For Bonus-Eligible and Production-Based Employees) at 2. Employee stock options, like RSUs, are not taxed on the award date; the instruments are both taxed on the exercise date and issuance date, respectively. *See, e.g.*, Stipulation, Exh. 3 (2003 Senior Vice-President Equity Award Program) at 11; Miller Decl., Exh. C (2005 Equity Award Program For Bonus-Eligible and Production-Based Employees) at 10 (comparing taxation of RSUs to stock options). And, both instruments are expensed over the requisite service period for accounting purposes. *See* Stipulation at ¶¶ 34-38; Miller Decl., Exh. D (LBHI's 2005 Form 10-K) at 82.

In an attempt to distinguish the RSU Claims from the compensation claims in *Enron,* some Claimants rely on a footnote in *Enron*, stating that the Court's "conclusions apply only to

stock options similar to those presented [*in Enron*]" and thus that the Court "issue[d] no opinion

as to whether stock options might be designed in such a fashion that would result in different

treatment under section 510(b)."[8]  First, Claimants ignore that the Court also stated in *Enron* that

"to the extent that stock options necessarily implicate the purchase or sale of a security, *it is

doubtful that any stock options can be so designed.*"  *Enron*, 341 B.R. at 144 n.3 (emphasis

added).  Second, Claimants cannot escape the fact that RSUs bear *even more* traditional

characteristics of a security than employee stock options.  Unlike RSUs, such stock options do

not automatically result in the issuance of common stock without any further action on the part

of the stock option holder.  Rather, once the necessary conditions are satisfied, a stock option

holder must actively exercise the option and purchase shares to become a stock holder.  Also,

unlike Lehman RSU holders, holders of employee stock options do not enjoy any voting rights.

*See, e.g.*, Miller Decl., Exh. C (2005 Equity Award Program For Bonus-Eligible and Production-

Based Employees) at 12 (describing voting rights of RSUs, but not stock options).  And no

dividends were paid on stock option awards.  *Id*. (describing dividend equivalents accrued on

RSUs and stating that "Dividends will not be paid on stock option awards").  The similarities and

differences between employee stock options and RSUs are significant and instructive.  It follows

that, if a stock option is a "security" under the Bankruptcy Code, then each of the RSUs at issue

in this case must also be a "security" subject to subordination under the Bankruptcy Code.  *See

In re Tristar Esperanza Props., LLC*, 488 B.R. at 399.

---

[8] *See, e.g.*, Joint Response of Compensation Claimants Riccardo Banchetti, Philippe Dufournier, Anke Parr,
Giancarlo Saronne and Harsh Shah to Debtors' Supplemental Annotated Omnibus Objection to Claims With
Respect to 118th and 130th Omnibus Objections Seeking To Reclassify Proofs of Claim as Equity Interests [ECF
No. 25550]  (the "Banchetti, Dufournier, Parr, Saronne, and Shah Joint Response") at ¶ 27 (*citing Enron,* 341 B.R.
at 144 n.3).

Finally, the very purpose of the RSU awards – (1) to provide employees "with a direct

ownership interest in the Firm", (2) to give each employee "an incentive to think and act like an

owner every day, and (3) to allow employees "to share in the Firm's financial success over time"

– cannot be overstated.  *See, e.g.*, Miller Decl., Exh. C (2005 Equity Award Program For Bonus-

Eligible and Production-Based Employees) at 2; *see also* Stipulation, Exh. 3 (2003 Senior Vice-

President Equity Award Program) at 2 ("Given the key role you play in Lehman Brothers'

success, it is important for you to have a significant stake in the Firm . . . . The Program provides

you with an incentive to think and act like an owner every day, and allows you to share in the

Firm's financial success over time.").  RSU recipients repeatedly were reminded that the awards,

whose ultimate value depended on the firm's overall financial success and not on the employee's

personal productivity, served the function of giving employees an incentive to stay with the firm

and to stay motivated to help maximize the value of the firm's business:

> The purpose of the Lehman Brothers Holdings Inc. Employee
> Incentive Plan (the "Plan") is to strengthen Lehman Brothers
> Holdings Inc. (the "Company") by providing selected employees
> of the Company with the *opportunity to acquire a proprietary and
> vested interest in the growth and performance of the Company*,
> *thus generating an increased incentive to contribute to the
> Company's future success and prosperity, enhancing the value of
> the Company for the benefit of stockholders,* and enhancing the
> Company's ability to attract and retain individuals of exceptional
> talent.  *The purposes of the Plan are to be achieved through the
> grant of various types of stock-based awards*.

Miller Decl., Exh. E (LBHI Employee Incentive Plan as amended through Nov. 8, 2007) at 1

(emphasis added).  RSUs thus gave employees a direct stake in the company and motivated them

to play a significant role in the success – or failure – of Lehman Brothers.  *See, e.g.*, Miller Decl.,

Exh. F (Mar. 29, 2013 Response of Karen M. Simon Kreiger to LBHI's Discovery Requests) at 2

(". . . I most certainly thought and acted like an owner during my eighteen years at Lehman

Brother [*sic*] every day. . . .").  Thus, the Claimants had "greater financial expectations than the

-17-

creditor.  The creditor can only recoup her investment; the [Claimants] expect[ed] to participate

in firm profits."  *In re Med Diversified, Inc.,* 461 F.3d at 257.  This direct financial interest in the

firm's overall success is the quintessential hallmark of a common stock holder.  *See KIT digital,*

*Inc. v. Invigor Group Ltd.*, 497 B.R. 170, 183 (Bankr. S.D.N.Y. 2013) (subordinating a claim

under section 510(b), holding that "by agreeing to accept stock instead of cash . . .[the claimant]

subjected itself to the greater risk that the price of the stock it would then receive might go

down" and that "[the claimant] would also get the benefits if the price of the stock went up."); *In*

*re Club Ventures Investment LLC*, No. 11-10891 (ALG), 2012 WL 6139082, *5 (Bankr.

S.D.N.Y. Dec. 11, 2012) (holding that unissued membership units that represented a future

interest in in an LLC after certain conditions were met were "securities" subject to section 510(b)

because the units "would have given [claimant] certain rights to share in the Debtor's profits, and

he would have had the risk and reward expectations of an equity holder.").  As such, the RSUs

are "securities" and must be subordinated under section 510(b) of the Bankruptcy Code.[9]

---

[9] Claimants previously have argued that RSUs are not securities because they do not form an equity cushion upon which a creditor could rely.  *See, e.g.*, Responses of Claimants Michael K. McCully, Michael J. Mullen and Other Claimants, in Opposition to Debtors' 313th Omnibus Objections to Claims (To Reclassify Proofs of Claim as Equity Interests) [ECF No. 29254] at pp. 10-14.  The claimants in *Enron* made the same argument and it was expressly rejected by the Court.  The *Enron* Court found that when optioned stock is ultimately issued, additional equity is invested in the enterprise, creating an equity cushion upon which creditors can rely. 341 B.R. at 165.  The same is true with respect to RSUs.  Most importantly, however, the Court in *Enron* concluded that "even assuming that the Claimants are correct regarding the equity cushion, this issue is only one part of the broader judgment regarding risk allocation" and that the absolute priority rule that creditors be given priority over security holders "does not rely on the [equity] cushion for logical support. "  *Id.*  The Second Circuit twice upheld the Court's reasoning in *Enron,* affirming the Court's conclusion that "the real question is whether the claimant bargained for the risks and rewards of a holder of equity rather than a holder of debt."  *In re CIT Group, Inc.,* 460 B.R. 633, 639 (Bankr. S.D.N.Y. 2011), *aff'd,* 479 Fed. Appx. 393  (2d Cir. 2012); *In re Med Diversified Inc.,* 461 F.3d at 256, 259 (affirming the subordination of a claim under section 510(b) even though the "equity-cushion rationale is not promoted here" because the "situation fits within the risk-allocation rationale for subordination").  As demonstrated in this memorandum, the Claimants here bargained for and took on the risk and return expectations of a shareholder by accepting payment of their compensation in RSUs, the value of which varied with the value of LBHI's common stock, thus resembling "a typical equity interest."  *See In re Med Diversified Inc.*, 461 F.3d at 257.

B.     The Claimants Purchased the RSUs at Issue

The law is well-settled that the grant of an equity award as a form of compensation is a
"purchase or sale" that brings section 510(b) into play.  Thus, by working for Lehman, Claimants
purchased the RSUs with their labor.  Indeed, the employee handbooks expressly provide that
"[a]t the Firm's option, a portion of [an employee's] total compensation . . . may be payable in
the form of conditional equity awards (restricted stock units ("RSUs"), stock options, or other
equity awards) pursuant to the Firm's equity award program."  Stipulation at ¶ 2.  And in cases
where Lehman had an employment contract with a Claimant, those contracts also provide that at
Lehman's option, a portion of the employee's compensation "will be" or "may be" payable in
conditional equity awards.  *Id.*  The courts in *Enron, Motor Liquidation*, and *U.S. Wireless* have
each held that employees who received equity awards as part of their compensation purchased
those securities with their labor, thus satisfying the purchase requirement of section of 510(b).
*See Enron*, 341 B.R. at 151 ("While it is true that the Claimants did not purchase the stock
options on the open market, they nonetheless exchanged value for the options: here, their labor.
Such exchange falls under broad reading of the term 'purchase.'"); *In re Motor Liquidation Co.*,
No. 11 Civ. 7893 (DLC), 2012 WL 398640, at *4 (S.D.N.Y. Feb. 7, 2012) ("Section 510(b)
mandates subordination when an individual receives equity securities in exchange for labor even
when there is 'no actual sale or purchase' of securities") (citing *In re Med Diversified*, 461 F.3d
at 258); *U.S. Wireless*, 384 B.R. at 719 ("Therefore, under established law, the Equity Package
Wax received as a portion of his compensation, *i.e.*, in exchange for his labor, constitutes a
purchase and sale of a security for the purpose of section 510(b) of the Bankruptcy Code.");
*Frankum v. Int'l Wireless Commc'ns Holdings, Inc. (In re Int'l Wireless Commc'ns Holdings,
Inc.)*, 279 B.R. 463, 467 (D. Del. 2002), *aff'd*, 68 Fed. Appx. 275 (3d Cir. 2003) ("That
Appellants received the Debtors' stock as part of a compensation package does not preclude the

transfer from being characterized as a purchase/sale of the Debtors' stock."); *In re Touch America Holdings, Inc.*, 381 B.R. 95, 104 (Bankr. D. Del. 2008) (adopting a broad reading of the term "purchase" and noting that "stock given to an employee as compensation nonetheless involves a 'bargain and exchange of value'").

Claimants argue that the grant of equity awards as a form of compensation cannot constitute a "purchase" for purposes of section 510(b) because they had no choice and did not elect to receive the RSUs.[10]  This is incorrect.  Claimants had a bargaining position and a choice as to whether or not to accept and continue employment at Lehman.  Here, Claimants understood they would be compensated both with cash and with rights to become shareholders of LBHI common stock.  By accepting employment for Lehman and going to work every day, Claimants voluntarily and continuously accepted as a condition of their employment that part of their total compensation was to be paid in RSUs, and they voluntarily and continuously accepted the attendant benefits and risks, since the value of the RSUs varied with the value of the LBHI common stock.  At all times, Claimants could essentially "vote with their feet" against the terms of the equity award program by leaving Lehman.  Instead, Claimants made the voluntary choice to stay in the business that they voluntarily entered as employees.

Indeed, the claimants in *Enron* similarly tried to maintain that they did not "purchase" the stock options issued as part of their compensation, arguing that there was no voluntary exchange of goods, services, or currency, but rather, that they were "required to take a minimum percentage of their annual bonus in stock option form."  341 B.R. at 150-151.  Judge Gonzalez rejected this very argument in *Enron* as flawed, reasoning that,

---

[10] *See, e.g.*, Opposition filed by Guillemette Callies [ECF No. 25708] at p. 1; Claimants' Opposition to Debtors' One Hundred Eighteenth Omnibus Objection to Claims (To Reclassify Proofs of Claim as Equity Interests) [ECF No. 20996] (the "Glasebrook Opposition") at pp. 11-15.

> [a]lthough implicit, there is nonetheless a bargain and exchange of value. Here, the exchange is made not at the time of payment but prior to employment. If these Claimants were required to receive a portion of their compensation as options, *that was a condition of employment the Claimants willingly accepted in return for their labor*. These Claimants, thus, "purchased" the stock options with their labor.

341 B.R. at 151 (emphasis added).

This analysis is equally true of all Claimants, regardless of the specific terms of their employment agreements, including the former Neuberger Berman employees ("NB Employees"). The NB Employees argue that they are distinguishable because they "truly" had no choice but to accept the terms of Lehman's Equity Award Program when their employer, Neuberger Berman, elected to merge with Lehman.[11] The NB Employees argue that their hands were tied and they had to accept and continue employment with Lehman or risk throwing away their careers because of the conditions of their non-compete agreements with Neuberger Berman. *See* Neuberger Sur-Reply, at 2-3, 6-7. These arguments are unavailing.

As an initial matter, it must be noted that the effects of any pre-merger non-compete agreements with Neuberger Berman were in place before the merger with Lehman. *See id.* at 7.[12] Second, as equity holders of Neuberger Berman, the NB Employees certainly had a choice when it came to voting in favor of or against the merger with Lehman. Finally, like every other Claimant, the NB Employees had bargaining power and nevertheless voluntarily elected to

---

[11] *See* Claimants' Sur-Reply in Further Opposition to Debtors' Seventy Third, One Hundred Eighteenth, and Two Hundred Seventh Omnibus Objections to Claims (To Reclassify Proofs of Claim as Equity Interests) [ECF No. 25715] (the "Neuberger Sur-Reply") at 2, 6-7.

[12] *See also* Response of Nikki Marshall to Debtors' Supplemental Annotated Omnibus Reply to Responses to Debtors' Seventy Third, One Hundred Eighteenth, One Hundred Thirtieth, One Hundred Thirty-First, One Hundred Thirty-Third, One Hundred Thirty-Fourth, One Hundred Thirty-Fifth, One Hundred Seventy-Sixth, and Two Hundred and Seventh Omnibus Objections to Claims (To Reclassify Proofs of Claim as Equity Interests) [ECF No. 25716] (the "N. Marshall Response") at 2; Glasebrook Opposition, at 4-5.

-21-

become a Lehman employee and remain a Lehman employee thereby continuously accepting as

a condition of their employment that part of the total compensation would be paid in RSUs.  A

"Hobson's choice," as the NB Employees characterize their position,  *see* Neuberger Sur-Reply

at 2, is still a choice because the NB Employees at all times could refuse the offer to become a

Lehman employee.  In essence, the NB Employees argue that the very high compensation levels

available to them after the merger reduced their leverage because they would have great

difficulty finding any other employer who would pay them as much as they could receive by

remaining with Lehman.  Their decision to remain as NB Employees after the merger was an

economic choice based on rational self-interest.  *See* Glasebrook Opposition at 4 ("The

Neuberger Berman Managing Directors, including the Neuberger Claimants, were also entitled

to receive the [Long Term Incentive Plan] Retention Award.  The LTIP Retention Award was a

bonus given to Managing Directors who 'chose' to remain employed at Lehman").

> C.     The Claims of the RSU Holders All "Arise From" the Purchase or Sale of a
> Security

The Courts in *Enron* and *Worldcom* and the Second Circuit in *In re Med Diversified*,

among other courts, have embraced the broad interpretation of "arising from" in section 510(b)

and have subordinated claims if there is any nexus or causal relationship between the purchase of

the securities and the damages that are being claimed.

Here, Claimants assert a variety of theories for the liability of LBHI relating to the RSUs,

ranging from the diminution in value of the RSUs to allegedly fraudulent statements that were

made by LBHI in financial statements prior to or in connection with the issuance of the RSUs.[13]

---

[13] *See, e.g.,* Objection to Debtors One Hundred Eighteenth Omnibus Objection to Claims (To Reclassify Proofs of Claim as Equity Interests) filed by Madelyn Antoncic [ECF No. 16921]; Chris Reynolds' Objection to Debtors One Hundred Eighteenth Omnibus Objection to Claims (To Reclassify Proofs of Claim as Equity Interests) [ECF No. 17153] at ¶ 2.

Other Claimants have asserted that Lehman breached their employment agreements by actually issuing these RSUs as opposed to paying them in cash, *although no creditor has produced an employment agreement indicating that this portion of their compensation would be paid in cash. See, e.g.,* Glasebrook Opposition at 15-16. Still others have asserted claims for unpaid wages allegedly arising under Delaware law and the Bankruptcy Code.[14]

Regardless of how Claimants' rights to receive stock may be characterized, they are still governed by section 510(b) because the alleged damages to each Claimant relate to Lehman's issuance or non-issuance of RSUs, and would not have been incurred but for Claimants' purchase of the RSUs in the first place. *See Baroda Hill Invs., Ltd. v. Telegroup, Inc. (In re Telegroup, Inc.)*, 281 F.3d 133, 135 (3rd Cir. 2002), citing to *In re Granite Partners L.P.*, 208 B.R. 332 (Bankr. S.D.N.Y. 1997) (holding that section 510(b) should be read broadly so that claims which would not have arisen but for the purchase of the securities, may arise from that purchase, even though the actionable conduct occurred after the transaction was completed.) At the core, each claim seeks to recover damages arising from the purchase of the RSUs and as such, is squarely within the scope of section 510(b). *See In re Worldcom, Inc.*, 329 B.R. 10, 14 (Bankr. S.D.N.Y. 2005) ("So long as the nature of the damage or harm complained of by a shareholder can be said to result as a consequence of his having purchased or sold shares of stock or other securities of the debtor, the claimant falls within the scope of Section 510(b) . . . ."); *Queen v. Official Comm. Of Unsecured Creditors (In re Response U.S.A., Inc.)*, 288 B.R. 88, 94 (D.N.J. 2003) (affirming the bankruptcy court's holding that claims seeking cash compensation under the terms of a stock purchase agreement for the decline in value of stock were damage claims that fit within the scope of section 510(b) rather than claims for a contractual right to

---

[14] *See, e.g.*, Response of Riccardo Banchetti to Debtors' 118th Omnibus Objection to Claims [ECF No. 20664] at ¶ ¶ 19-20.

payment); *In re PT-1 Commc'ns, Inc.*, 304 B.R. 601, 608 (Bankr. E.D.N.Y. 2004) (holding that "the claim need not flow directly from the securities transaction, but can be viewed as 'arising from' the transaction if the transaction is part of the causal link leading to the injury").[15]   Indeed, the Court in *Enron* explicitly considered claims for fraudulent inducement, fraudulent retention, and breach of contract and determined that all still "arise from the purchase of a security" and should be subordinated pursuant to section 510(b).   341 B.R. at 170; *see also In re Lehman Brothers Inc.,* 2014 WL 288571 (holding that a claim against LBI for breach of a contract to purchase securities "fits comfortably within that portion of section 510(b) which mandates subordination because it is a claim 'for damages arising from the purchase or sale' 'of a security of the debtor or of an affiliate. . . ..'")

Claimants have argued that their claims are not subject to section 510(b) because they do not arise out of a purchase of a security but rather arise out of Lehman's failure to pay earned compensation for services provided to Lehman; as such, they contend to be creditors entitled to cash, not shareholders.  *See, e.g.*, N. Marshall Response at 2; Supplemental Response of Brian W. Monahan to Debtor's Omnibus Reply to Debtors' Response to One Hundred and Eighteenth and One Hundred Eighty Fifth Omnibus Objection to Claims (To Reclassify Proofs of Claim 20774 and 20775) [ECF No. 25308] at ¶ 22; Objection to Reclassification of Claim No. 25198 filed by Anthony T. Carango [ECF No. 17077]; Response of Philippe Dufournier to Debtors' 130th Omnibus Objection to Claims [ECF No. 20667] at ¶13.

There is absolutely no basis for Claimants' position that they are now entitled to cash or anything other than RSUs from Lehman as consideration for their labor.  As discussed more fully in *infra* Section III, the Claimants admit they "could not elect to receive cash instead of the

---

[15] LBHI does not concede liability on any of the RSU Claims.

awards." Stipulation at ¶ 10. In addition, at no point did Claimants bargain for the right to receive, and under no circumstances did LBHI have an obligation to deliver, cash in lieu of or in exchange for the Equity Awards.[16] LBHI's bankruptcy filing does not transform a claim for equity into a claim for cash.

By seeking cash, Claimants contend that they are entitled to something more than equity awards whose values vary with the value of LBHI's common stock. Claimants, however, did not bargain for cash, nor did they bargain for a promise that the RSUs would have any minimum value, or any value at all. Claimants bargained solely for compensation in the form of RSUs, and with the minor exception of certain RSU accruals in 2008 (discussed below), the Claimants were duly paid the RSUs promised to them. Although Claimants are disappointed that the RSUs that they were paid do not currently have value, that disappointment does not arise to a cognizable claim for cash to which they were never entitled. In any event, as with the other positions that Claimants have asserted, these breach of contract arguments were considered and rejected by the Court in *Enron,* where the Court held that even assuming the breach of contract claims were successful on the merits, the claims would nonetheless be subordinated under section 510(b). 341 B.R. at 62; *see also KIT digital,* 497 B.R. at 183 (holding a claim must be subordinated under section 510(b) in part because claimant "didn't bargain for the difference in value in cash"

---

[16] The only place in the program documents that refers to receiving cash in exchange for RSUs is the section discussing a friendly change of control. *See* Stipulation, Exh. 3 (2003 Senior Vice-President Equity Award Program) at 12 and Exh. 4 (2003 Managing Director Equity Award Program Agreement Evidencing a Grant of Restricted Stock Units) at ¶ 9; *see also* Joint Response of Compensation Claimants Vincent Primiano, Gordon Sweely, Charles Spero and Timothy A. Burke to Debtors' Supplemental Annotated Omnibus Objection to Claims with Respect to 118th, 135th, and 207th Omnibus Claims Objections Seeking to Reclassify Proofs of Claim as Equity Interests [ECF. No. 25551] at ¶ 15 ("In addition, the RSUs did give Claimants a right to payment in cash under certain conditions. According to the RSU program documents, amounts were payable in cash upon occurrence of a 'change in control' in certain circumstances."). But even in that circumstance, the program documents are clear that it is Lehman's option or discretion to pay cash or equity in exchange for those RSUs. Similarly, although some employment agreements and equity award letters stated that compensation "may" be paid in cash instead of RSUs, it ultimately was still in Lehman's discretion to pay Claimants in cash or RSUs.

but rather "for the right to receive more stock, and the gravamen of its claim is that it didn't get it. But all that [the claimant] was entitled to demand was more stock.")

The claims of commission-based employees who did not receive RSUs in 2008 are no different. These employees argue that cash was set aside from their pay checks for the purchase of RSUs, for which no RSUs were granted in fiscal year 2008.[17] They assert that because they have not received anything in exchange for their labor, their claims for 2008 compensation amount to claims for payment under relevant labor laws. It is indisputable, however, that these employees did not have the ability to access the funds that were allocated from their paychecks to RSUs, and that the money that was set aside could only be used to acquire RSUs. As such, these Claimants are no different from their salaried counterparts, as they never had any right to receive payment in cash. At best, they have a claim for RSUs that were not issued, which is subject to section 510(b) of the Bankruptcy Code.

Indeed, courts have extended section 510(b) to claims relating to a failure to issue equity. *See In re Med Diversified Inc.,* 461 F. 3d at 256 (holding that section 510(b) covers a claim based on a debtor's failure to issue common stock pursuant to the terms of an agreement between the parties, where claimant made the choice "to trade the relative safety of cash compensation for the upside potential of shareholder status"); *In re Lehman Brothers Inc.,* 2014 WL 288571 (subordinating claim for unissued bonds under section 510(b))*; In re Club Ventures,* 2012 WL 6139082 (holding that claims for membership units, which are not specifically enumerated in

---

[17] *See, e.g.,* Response of Robert C. Dyer to Seventy-Third Omnibus Objection to Claims (to Reclassify Proofs of Claim as Equity Interests) [ECF No. 14058]. Although Lehman made a partial grant of RSUs in July 2008, there remained a portion for which no RSUs were granted. Stipulation, Exh. 14 (2008 Equity Award Program) at 5 ("Eligible employees' 2008 equity award will comprise two separate grants on **two dates** : a) a grant on July 1, 2008 . . . and b) a grant at a date to be determined by Compensation and Benefits Committee of the Board of Directors during the fourth quarter . . . ."). While the vast majority of Claimants whose claims were based, at least in part, on unissued RSUs have settled such claims with LBHI, approximately nine Claimants continue to pursue these claims.

section 101(49)(a), were subject to section 510(b) even though the membership units were never

issued, since the units would have given claimant certain rights to share in the debtor's profits,

and he would have had the risk and reward expectations of an equity holder).  The Ninth Circuit

has specifically held that "nothing in §510(b)'s text requires a subordinated claimant to be a

shareholder." *In re Betacom of Phoenix, Inc.*, 240 F.3d 823, 829 (9th Cir. 2001).  Rather, a

deciding factor for the court in *Betacom of Phoenix* was that the security holder decided to enter

into the transaction for a chance at greater earnings with the understanding that there was a risk

of failure and bankruptcy.  *See id.* at 830; *see also In re Med Diversified*, 461 F.3d at 257

(holding that section 510(b) includes claims predicated on the failure to issue stock because

claimants "'entered into the investment with greater financial expectations than the creditor.  The

creditor can only recoup her investment; the [Claimants] expect to participate in firm profits.'").

That is precisely what happened in this case with respect to all Claimants – they were

experienced businesspeople who accepted the tradeoff of the relative safety of cash

compensation for a chance at greater earnings, while understanding that they faced the risk that

they may not receive the equity portion of their bonus or commission compensation.  *In re Med

Diversified*, 461 F.3d at 256-57.  The few Claimants who are still seeking cash based on

commission withholdings for which RSUs were never issued in 2008, are, at most, entitled to

RSUs, which must, in turn then be subordinated – like all other RSUs – as equity interests.

Therefore, it is of no consequence for purposes of section 510(b) that the commission-based

Claimants did not receive some of their RSUs for fiscal year 2008.

## III.    The RSUs Also Constitute "Equity Securities" Under Section 101(16) of the Bankruptcy Code

The RSUs, which provided Claimants with a nontransferable, non-assignable right to

common stock in LBHI at a specified future time upon the satisfaction of certain conditions, fall

squarely within the definition of "equity security" under section 101(16) of the Bankruptcy

Code. This would provide an alternative basis for reclassification even if section 510(b) did not

exist. Section 101(16)(C) defines "equity security" as a "*warrant or right,* other than a right to

convert, *to purchase, sell, or subscribe to a share, security or interest of a kind specified in*

*subparagraph (A)* or (B) of this paragraph." 11 U.S.C. §101(16)(C) (emphasis added). The

"interest" referred to in subparagraph (A) is a "share in a corporation, whether or not

denominated as 'stock', or similar security." 11 U.S.C. § 101(16)(A). As demonstrated below,

the RSUs granted to the Claimants gave them a warrant or right to acquire common stock upon

the fulfillment of employment-related conditions, and thus, constitute "equity securities" within

the meaning of section 101(16).

Courts have interpreted the definition of equity security to include a range of stock-based

transactions. *See, e.g., Nantahala Capital Partners, LP v. Wash. Mut., Inc. (In re Wash. Mut.,*

*Inc.)*, 464 B.R. 656 (Bankr. D. Del. Jan. 3, 2012) (holding that litigation tracking warrants were

equity securities because such warrants entitled the holders only to common stock, not cash);

*Carrier v. Jobs.com, Inc.*, 393 F.3d 508 (5th Cir. 2004) (holding that claimant's right to redeem

stock was an equity security); *In re Einstein/Noah Bagel Corp.*, 257 B.R. 499, 506 (Bankr. D.

Ariz. 2000) (holding that a nontransferable, non-assignable put right "falls squarely within the

contours of section 101(16)" because such put right does not include a "right to payment" in

cash); *In the Matter of Baldwin-United Corp.*, 52 B.R. 549, 552 (Bankr. S.D. Ohio 1985)

(holding that claims to exercise the stock option portion of a stock option plan are properly

classified as equity security interests).

Here, it is undisputed that the RSUs provided Claimants with a nontransferable, non-

assignable right to common stock in LBHI, and nothing more. *See* Stipulation at ¶ 6 and Exh. 3

(2003 Senior Vice-President Equity Award Program) at 2 ("The RSUs cannot be sold, traded, pledged, or assigned before conversion").  At no time did any of the Claimants have any right to demand or receive cash in exchange for their RSUs.  Indeed, the Claimants admit they "could not elect to receive cash instead of the awards."  Stipulation at ¶ 10.  Moreover, at no point did Claimants bargain for the right to receive, and under no circumstances did LBHI have an obligation to deliver, cash in lieu of or in exchange for the Equity Awards.  Rather, the grant agreements for RSUs explicitly provided that:

> [LBHI] and any Subsidiary's obligation with respect to the [RSU] granted here under is limited solely to the delivery to you of shares of Common Stock on the date when such shares are due to be delivered hereunder, and in no way shall [LBHI] or any subsidiary become obligated to pay in cash in respect of such obligation.

*See, e.g.*, Stipulation, Exh. 4 (2003 Managing Director Equity Award Program Agreement Evidencing a Grant of Restricted Stock Units) at ¶ 6; *see also* Stipulation, Exh. 12 (2006 Equity Award Program Contingent Stock Award Letter) at ¶ 5 ("The obligations of each and every Group Company shall be limited to the delivery to the Participant of Shares and in no way shall any Group Company become obligated to pay cash to the Participant").  This language makes unambiguously clear that Claimants have no "right to payment" in cash on behalf of the RSUs as neither LBHI nor any subsidiary was obligated, or would in any way become obligated, to pay cash to Claimants in respect of the RSU obligations.  Thus, the RSUs fall squarely within the definition of "equity security" under section 101(16) and do not give rise to a "claim" within the meaning of section 101(5) of the Bankruptcy Code.[18]

---

[18] Certain Claimants assert that the language in section 101(16) of the Bankruptcy Code of "warrant or right, other than a right to convert" serves to exclude the RSUs from the definition.  *See, e.g.*  Banchetti, Dufourneir, Parr, Saronne, and Shah Joint Response at ¶ 10.  Contrary to such arguments, this language was intended to exclude, from the definition of equity security, bonds or similar debt instruments that contain a right to convert to equity.  *See In the Matter of Standard Oil & Exploration of Del., Inc.*, 136 B.R. 141, 150 (Bankr. W.D. Mich. 1992) (explaining that even though a note, which is a security, "may be later converted to stock, such right to convert itself does not

IV.    **The Claimants Do Not Have a Claim under Delaware or New York Labor Law**

Some of the Claimants argue that their claims should not be subordinated under section 510 because they allegedly are claims for unpaid "wages" under Delaware's Wage Payment and Collection Act (the "Delaware Wage Act").[19]  They are incorrect.  First, a state law claim for payment in the form of RSUs for services provided to Lehman is still a claim "arising from the purchase or sale of a . . . security" and thus must be subordinated under section 510(b).  *U.S. Wireless*, 384 B.R. at 719.  Second, Claimants do not have a claim under the Delaware Wage Act, and even if they did, the vast majority of the claims would be time-barred.  And third, Claimants do not have a claim under New York Labor Law because unvested and unexercised RSUs do not constitute "wages."

A.    The Delaware Wage Act Does Not Apply to the RSU Claims

"In order to invoke the [Delaware Wage Act], Claimants must meet the definitional requirements set forth under 19 Del. C. § 1101." *Meli v. Rembrandt IP Mgmt., LLC*, C.A. No. 09C-09-108 WCC, 2010 WL 2681853, *3 (Del. Super. June 28, 2010).  Section 1101(a)(5) of the Delaware Wage Act defines "wages" as "compensation for labor or services rendered by an employee, whether the amount is fixed or determined on a time, task, piece, commission or other basis of calculation." 19 Del. C. § 1101(a)(5).  An "Employee" is "any person suffered or permitted to work by an employer under a contract of employment *either made in Delaware or to be performed wholly or partly therein." Id.* § 1101(a)(3) (emphasis added); *see also Klig v. Deloitte LLP*, 36 A.3d 785, 797 (Del. Chanc. Ct. 2011) (limiting section 1101(a)(3) to persons

---

transform the note into an 'equity security'"); *see also Carrieri v. Jobs.com, Inc.*, 393 F.3d at 519 (holding that claimant's right to redeem stock was an equity security and "the phrase 'other than a right to convert' restricts only the word 'right' and not the rest of the section.").  This language, therefore, does not operate to exclude the RSUs from the definition of equity security under section 101(16).

[19] *See, e.g.*, Response of Giancarlo Saronne to Debtors' 118th Omnibus Objection to Claims, dated October 7, 2011 [ECF No. 20665].

"under a contract of employment either *made in Delaware* or to be *performed wholly or partly therein*") (emphasis in original).

Claimants cannot satisfy either requirement.  The Claimants do not – and cannot – allege that any of the RSU grant agreements were entered into in Delaware or that the work would be performed in Delaware.  Rather, the vast majority (or all) of the work was to be performed in New York or the United Kingdom.  Thus, as the court held in *Klig*, because Claimants cannot "satisfy the requisite Delaware nexus," their claims under the Delaware Wage Act have no merit.  *See Klig*, 36 A.D. at 797 (granting summary judgment for defendants on plaintiff's Delaware Wage Act claims because plaintiff worked out of defendant's New York office and the agreement was not made in Delaware).[20]

### B.    The Majority of Claimants' Delaware Wage Act Claims Are Untimely.

Even if Claimants were "employees" under the Delaware Wage Act – which they are not – the vast majority of their claims would be barred by Delaware's one-year statute of limitations.  Under the Delaware Wage Act, employment actions "for recovery upon a claim for wages, salary, or overtime for work, labor or personal services performed . . . or for any other benefits arising from such work, labor or personal services performed" may not be "brought after the expiration of one year from the accruing of the cause of action on which such action is based."  *See* 10 Del. C. § 8111.  The law is well-settled that an action for "wages" "accrues when an employee received his [or her] compensation in whatever form, and through the exercise of reasonable diligence, discovers that he or she has not been paid the agreed-upon amount."

---

[20] The fact that LBHI was incorporated in Delaware or the grant agreements provide that they shall be governed by Delaware law (*see* Stipulation at ¶ 10) does not alter this conclusion.  In fact, it is *Delaware law* that provides that Claimants are not "employees" under the Delaware Wage Act.  *See Nikolouzakis v. Exinda Corp.*, No. 11-1261-LPS-MPT, 2012 WL 3239853, *12 (D. Del. Aug. 7, 2012) (dismissing a Delaware Wage Act claim because "[i]t is not enough to merely allege [the defendant] was incorporated in Delaware, because incorporation in a particular state does not mean that all the corporation's contracts are made or performed in the incorporating state.").

*Begum v. Singh*, C.A. N11C-10-220 PRW, 2013 WL 5274408, *4 (Del. Super. Ct. Sept. 18, 2013) (citation omitted).

Here, the purported "wages" that were withheld from Claimants are those amounts that were withheld from their bonus or commission checks and allocated to RSUs. As such, the RSU Claims accrued the day Claimants received notice on their pay stubs that a portion of their "total compensation" was being attributed to RSUs. Given that the RSU Claims are for RSUs granted between 2003 and 2008, the most recent pay stubs related to these claims were received by Claimants in 2008. Thus, the vast majority of the RSU Claims – those arising from paychecks issued prior to September 15, 2007 (one year prior to LBHI's chapter 11 filing, which tolled the statute of limitations) – are time-barred under the Delaware Wage Act. *See Begum*, 2013 WL 5274408, at *5 n.47 (explaining that if a claim "based on the last such pay cycle is time-barred, any cause of action based on any preceding pay cycle is also time-barred").

C.    The RSU Claims Are Not Claims for "Wages" Under New York
Labor Law Because Claimants Merely Have a Contingent Claim
to Equity-Based Compensation.

The RSU Claims are not claims for "wages" under New York law. "'[U]nvested, contingent rights' to company stock" – such as RSUs – are not "wages" because "'the ultimate value of such equity-based compensation [depends] on [the employer's] stock price after the rights vested, at the time of delivery.'" *See Econn v. Barclays Bank PLC*, No. 07 Civ. 2440 (BSJ), 2010 WL 9008868, *5 (S.D.N.Y. May 10, 2010) (quoting *Guiry v. Goldman, Sachs & Co.*, 31 A.D.3d 70, 71-72 (1st Dept. 2006)). Moreover, it is well-settled law that "wages" exclude discretionary, equity-based incentive compensation that are "more in the nature of a profit-sharing arrangement and are both contingent and dependent, at least in part, on the financial success of the business" or other factors outside the employee's control. *See Truelove v. Ne. Capital Advisory*, 95 N.Y.2d 220, 223-24 (2000).

-32-

For example, in *Guiry v. Goldman, Sachs & Co.*, 31 A.D.3d 70 (1st Dept. 2006), the court concluded that a commission-based employee's equity-based compensation in the form of restricted stock units was not "wages" because the value of that compensation depended on the defendant's stock price after the restricted stock units vested, and not "simply on the employee's personal productivity." *Id.* at 72-73. The court reasoned that it was "always possible that a deferred award of stock or a stock option ultimately will turn out to have no value," and "wages" was not intended to include "supplemental income that may prove worthless when ultimately received." *Id* at 73. The court further explained that "[d]eferred awards of stock options, like those at issue here, constitute incentive compensation, since they plainly serve the function of giving employees an incentive to stay with the firm and to maximize the value of the firm's business." *Id.*

Here, the RSUs granted to Claimants are similar to the restricted stock units and stock options awarded in *Guiry* in that they did not give Claimants an unconditional right to a certain amount of cash or value. Rather, Claimants merely had a contingent entitlement to a discretionary, undetermined amount of common stock. The value of the RSUs ultimately depended on the value of a share of common stock at the time of issuance, and ultimately, on Lehman's financial success. RSUs therefore incentivized Claimants to stay with the firm and ensure its success. Such compensation falls outside the purview of "wages" under the Labor Law. *See id.* at 74; *see also Bar-Tur v. Arience Capital Mgt., L.P.*, No. 11-864-CV, 2012 WL 3140421, *1 (2d Cir. Aug. 3, 2012) (where incentive compensation was contingent and "tied to [the company's financial success]," the compensation was not "wages" covered by the New York Labor Law); *Econn*, 2010 WL 9008868, at *5 (equity compensation paid by Barclays in the form of unvested options did not constitute "wages" because "the value of the shares would

be based on the overall financial success" of the Barclays); *Int'l. Bus. Machs. Corp. v. Martson*, 37 F. Supp. 2d 613,  617-18 (S.D.N.Y. 1999) (concluding that stock options were not "wages" and could be forfeited, and that the plaintiff could be divested of the profits earned even on exercised options).

**V.     LBHI Reserves Its Right to Seek to Reclassify the RSU Claims as Claims Against LBI**

In the event that the Court does not grant the relief sought in the Omnibus Objections, LBHI reserves the right to seek to reclassify some or all of the RSU Claims as claims against Lehman Brothers Inc. ("LBI"), rather than against LBHI.  The vast majority of Lehman employees, including the Claimants, were employed by LBI – and not LBHI.  Thus, the Claimants' only nexus to LBHI is that they seek payments in connection with unvested LBHI stock.  To the extent that the Claimants are entitled to any unpaid "compensation," such compensation would be due from LBI as their employer.

Moreover, certain Claimants have asserted direct claims against LBI – claims which are based on the same RSUs as those at issue in the corresponding claims against LBHI.  In connection with those claims against LBI, those Claimants have argued that, to the extent that they hold claims for withheld compensation against any Lehman entity, they hold such claims against LBI – and not LBHI.  Claimants have represented, among other things, that

- "These are claims by former employees for unpaid compensation promised by LBI as their employer. . . .  they are employees' claims against their employer"

- "LBI Owed Claimants Bonus Compensation; the Obligation was Neither Assigned to its Corporate Parent Nor Converted to Equity"

- "A subsidiary's use of RSUs for compensation may involve an inter-company transaction with the publicly-traded parent -- it is only the publicly-traded shares that have any compensation value, and the parent generally is not (and was not here) the employing entity"

-34-

- "The [SIPA] Trustee has offered no evidence of a novation or any purported assignment from LBI to LBHI in connection with the RSUs; LBI was simply never relieved of its obligation to pay its employees for their services."

*See, e.g.*, *In re Lehman Brothers Inc.*, Case No. 08-1420 (SIPA), at ECF Nos. 6255, 7280, 7281 (Responses filed by Richard J. Schager of Stamell & Schager, LLP on behalf of  Michael K. McCully, Gregg Somma, David Brooks, and Karen M. Simon Krieger, respectively, all of whom are seeking the same relief from LBHI in the instant matter); *see also* ECF No. 6061 (response filed by Richard J. Schager of Stamell & Schager, LLP, on behalf of Paola Biraschi, who also is a Claimant seeking the same relief from LBHI in the instant matter).

As demonstrated above, the RSUs were, at best, only promises to provide shares of common stock at a later date.   However, in the unlikely event that the Court determines that the Claimants are entitled to unpaid compensation in the form of cash, that compensation is owed by LBI and <u>not LBHI</u>.  Of course, no Claimant should be afforded a double-recovery from both LBHI and LBI under the well-established "one recovery" rule.

## <u>CONCLUSION</u>

As demonstrated above, Claimants have utterly failed to comply with Judge Peck's directive that they identify characteristics that could distinguish their RSU Claims from the employee claims at issue in *Enron*.  Each and every one of the Claimants' arguments was considered and rejected by courts in cases such as *Enron*, *In re U.S. Wireless, In re Med Diversified* and *In re Motors Liquidation Co.*, among others.  Regardless of Claimants' characterization of the RSU Claims, and regardless of the merits of each, it is indisputable that (1) the RSUs are "securities;" (2) Claimants purchased the securities when they willingly engaged in the exchange of their labor for these awards; and (3) the damages that Claimants seek would not have been incurred had it not been for Claimants' agreement to exchange their labor

-35-

for RSUs, and therefore arise from the purchase of a security. The RSU Claims fall squarely

within the reasoning of *Enron* and section 510(b)'s reach and must be subordinated. In the

alternative, the factual record before this Court goes beyond the one in *Enron* by establishing that

the RSUs in issue here are squarely within the definition of "equity security" under section

101(16) of the Bankruptcy Code.

The Plan Administrator respectfully requests that the Court grant the relief requested

herein and such other and further relief as it deems just and proper.


Dated: New York, New York
       January 28, 2014

                                              /s/ Ralph I. Miller
                                              Ralph I. Miller
                                              Robert J. Lemons

                                              WEIL, GOTSHAL & MANGES LLP
                                              767 Fifth Avenue
                                              New York, New York 10153
                                              Telephone: (212) 310-8000
                                              Facsimile: (212) 310-8007

                                              *Attorneys for Lehman Brothers Holdings Inc.*
                                              *and Certain of Its Affiliates*