DAY PITNEY LLP
ONE JEFFERSON ROAD
PARSIPPANY, NJ 07054
T: (973) 966-6300
F: (973) 966-1015
MARGARITA Y. GINZBURG (MG-6240)

ONE INTERNATIONAL PLACE
BOSTON, MA 02110
T: (617) 345-4600
F: (617) 345-4745
DANIEL J. CARRAGHER (DC-0328)

Attorneys for Fabio Liotti

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| In re: | Chapter 11 |
|---|---|
| LEHMAN BROTHERS HOLDINGS INC., et al, | Case No. 08-13555 (SC) |
| Debtor. | (Jointly Administered) |

**SUPPLEMENTAL OPENING MEMORANDUM ON BEHALF OF FABIO LIOTTI**

This supplemental memorandum of law is submitted by Fabio Liotti pursuant to paragraph 9(b) of the Stipulation & Order Establishing Procedures for an Evidentiary Hearing in Connection with Omnibus Objections to Reclassify Proofs of Claim as Equity Interests dated January 24, 2014 (the "Procedural Order") (Doc. 42176). Mr. Liotti submitted multiple claims in this proceeding on the basis of unpaid production payments and Contingent Stock Awards ("CSAs") issued to him by the Debtor between 2004 and 2008. As a result of the elimination or withdrawal of certain proofs of claim and the partial settlement of certain of his claims, Mr. Liotti's surviving claim is Claim 15120, and is based on the issuance date values of 70,490.68 CSAs awarded to him, principally between November 30, 2005 and July 1, 2008, including

72205494.3

1,628.09 CSAs issued as dividend equivalents on CSA previously awarded to him.[1]  Mr. Liotti previously submitted responses to the 118th Omnibus Objection (Doc. 16934) on May 18, 2011 and the 176th Omnibus Objection (Doc. 20084) on September 16, 2011.  Mr. Liotti did not elect to participate in the voluntary discovery process and is thus not one of the "Represented Participants" as defined in the Procedural Order.

Claimant was employed by Lehman Brothers Limited, an indirect United Kingdom subsidiary of the Debtor.  He received no base salary and was compensated solely for his production of business for Lehman though production payments – commissions.  As with all other senior level production employees, he was required to accept the deferral of a significant portion of his production payments and to accept, in lieu of cash, the award of CSAs that would only convert into LBHI common stock years in the future.  In Mr. Liotti's case, 54 percent of his commission income over $250,000 (subject to an overall cap of 36% of annual compensation) was paid in the form of CSAs rather than in cash.  Due to the significant size and volume of transactions Mr. Liotti arranged for Lehman, the deferral of compensation between 2005 and 2008 was over $3.5 million.  Under his employment agreement, Lehman reserved the right to discontinue any equity award plans on four months' notice.

## ARGUMENT

**I.    MR. LIOTTI HAS A DEFERRED COMPENSATION CLAIM, NOT A CLAIM BASED ON A SECURITY OR FOR DAMAGES ARISING FROM THE PURCHASE OR SALE OF A SECURITY.**

**A.    The CSAs were not securities or equity securities as defined in the Bankruptcy Code because they are not covered by any of the enumerated classes of instruments.**

---

[1] Pursuant to a Settlement Agreement dated as of December 31, 2013, the maximum allowable amount of Mr. Liotti's "Remaining RSU Claim" is capped at $2,548,421.52.

The CSAs awarded to Mr. Liotti entitled him to the future delivery of shares of LBHI common stock three to five years, depending on the year and the program under which the CSAs were awarded.  Ultimate conversion to shares of LBHI common stock was subject to various conditions, including continued employment.  The CSAs were not assignable by claimant and could not be sold, traded or pledged.  Claimant did not receive or hold any common stock certificates, book entry certificates, options, warrants or any other form of security.

Mr. Liotti specifically adopts and endorses the arguments include in Part I and Part II, Sections A through D, of the Memorandum in Opposition to Debtors' Fourteen Omnibus Objections Seeking to Reclassify Compensation Claims as Equity filed herein by the Represented Participants on January 29, 2014 (Doc. 42348).  Claimant offers the following additional arguments to supplement the Represented Participants' opening memorandum.

B.  **The decisions of the Second Circuit and the bankruptcy courts in this district are consistent with and support treatment of CSA claims as creditor claims not subject to subordination under section 510(b).**

The Plan Administrator frames the legal issue as requiring the RSU and CSA claimants to demonstrate why the decisions in *In re Enron Corp.*, 341 B.R. 141 (Bankr. S.D.N.Y. 2006) and other decisions in this Circuit do not mandate subordination.  Far from requiring subordination of claims, those decisions are entirely consistent with and support treating the RSU and CSA claims as general unsecured claims.  In *Enron*, the employee claimants held stock options or phantom stock and asserted damage claims based on their securities ownership.  Specifically, the employees asserted claims related to their election to receive their stock options and claims that they were fraudulently induced to retain their stock options by the debtor's misconduct and bad acts.  Viewed in that light, their claims were no different than common stockholders or outside investors speculating in options or other derivative securities of Enron.  The court concluded that their damage claims arose in connection with a purchase of securities for purposes of section

72205494.3

-3-

510(b) of the Bankruptcy Code. It was critical to the court's ruling, though, that the employee claimants held actual securities in the form of stock options. The one employee claimant whose claim was based on phantom stock rather than stock options already had a contractual entitlement to the delivery of the shares prior to the petition date. *Id.* at 162-63. Here, by contrast, no stock option or other security was issued to Mr. Liotti or other RSU or CSA claimants, and the time for delivery of shares of LBHI stock to Mr. Liotti was still years in the future when the Chapter 11 case was filed.

In *Rombro v. Dufrayne (In re Med Diversified, Inc.)*, 461 F.3d 251 (2d Cir. 2006), Rombro, a former executive employee of the debtor alleged that the debtor had breached a termination agreement by failing to issue its common stock to Rombro by January 2, 2002 in exchange for an equal number of his shares in PrimeRX. The debtor failed to issue the shares and was sued by Rombro for breach of contract. Med Diversified filed for bankruptcy protection on November 27, 2002, well after the stipulated date for issuance of the shares to Rombro. *Id.* at 253. The courts at trial and on appeal were required to construe section 510(b) because Rombro never received shares in the debtor, and interpretation of the "arising from" clause under the third alternative provision in section 510(b) was needed. *Med Diversified* would only apply to Mr. Liotti if, for example, the time for the conversion of particular CSAs had occurred before the Chapter 11 petition and LBHI had failed to issue them. Since Mr. Liotti had no present right to the conversion of his CSAs to LBHI common stock, and there were material contingencies still to be satisfied before the conversion could occur, his claims under the CSAs cannot be said to arise from the purchase or sale of a security.

As with *Med Diversified*, the claimants in *In re PT-1 Commc'ns, Inc.*, 304 B.R. 601 (Bankr. S.D.N.Y. 2004), claimed that they should have received shares of the debtor's stock

years before the petition date. There, the petition was filed on March 9, 2001, and the alleged fraudulent conduct that the claimants alleged gave rise to their claim for issuance of shares equal to 60 percent of the debtor dated back to 1995. *Id.* at 607-08.

*KIT Digital, Inc. v. Invigor Group Ltd. (In re KIT Digital, Inc.)*, 497 B.R. 170 (Bankr. S.D.N.Y. 2013) similarly does not support the Plan Administrator's position. The debtor had acquired certain of Invigor's subsidiaries under a Securities Purchase Agreement (the "Agreement") signed in April 2012 through a prepetition purchase of the stock of those subsidiaries for cash plus shares of the debtor's common stock, including a potential "top-up" of additional shares based on a comparison of future values of the debtor's shares upon reaching an unrestricted date. The parties disputed whether the time for delivery had come or not, but the court ruled that the timing was not material because the claim unambiguously was one that arose "under the Agreement [the Securities Purchase Agreement], which of course was an agreement for the sale of securities." *Id.* at 183. Thus, the claim fell squarely within section 510(b). The *International Wireless* decision by the Third Circuit, cited in *Enron* and *KIT Digital*, is to the same effect since the claimant there already held shares of common stock in the debtor pursuant to a prepetition Share Purchase Agreement, and its claims were based on alleged wrongful conduct by the debtor in failing to complete an initial public offering. *Frankun v. Int'l Wireless Commc'ns Holdings, Inc. (In re Int'l Wireless Commc'ns Holdings, Inc.)*, 68 Fed. Appx. 275, 277 (3d Cir. Del. 2003).

Finally, the recently decided case of *In re Lehman Bros., Inc.*, No. 08-01420, 2014 WL 288571 (Bankr. S.D.N.Y., Jan. 27, 2014) supports the position of the CSA claimants and not the Plan Administrator in this case. The claims by Claren Road Master Fund, Ltd. in the LBI proceeding were that LBI had failed to execute an order placed days before the bankruptcy and

SIPA proceedings began to purchase certain Euro Medium Term Notes (so-called Program Securities) issued by LBHI. The court easily concluded that the underlying Euro Medium Term Notes were "securities" because they were "bonds" as expressly included in the definition of "security" in 11 U.S.C. § 101(49)(a)(4) and section 78lll of SIPA. Since the claim was for damages arising directly from the failed purchase or sale of securities of an affiliate of LBI, it fell squarely within section 510(b). *Slip op.* at 8-9.

C. **Mr. Liotti's claim should not be subordinated because it is not a claim for damages arising from the purchase or sale of a security of the Debtor.**

Mr. Liotti's CSA claims arose under an ongoing employment relationship and not an agreement for the purchase or sale of securities. Accordingly, there is no basis to subordinate his claims under section 510(b). CSAs and RSUs were awarded under plans with uniform and universal application to thousands of Lehman employees worldwide, as evidenced by the nearly 3,500 RSU and CSA claims filed in this case. There was no meaningful opportunity for bargaining by any individual employee as to the terms of the equity award programs, and there certainly was no bargaining by Mr. Liotti for the opportunity to reap a shareholder's benefits, *c.f. In re PT-1 Commc'ns,* 304 B.R. at 609. Mr. Liotti received no base salary and was only entitled to commissions on his production, so LBHI's equity award programs operated solely as mandatory deferred compensation program for the benefit of LBHI and not as an incentive or bonus plan to reward him. Under those circumstances, there is no reason to conclude that the CSAs were issued as part of an agreement for the purchase or sale of securities.

-7-

    Respectfully submitted,

                      DAY PITNEY LLP
                      Attorneys for Fabio Liotti,

                      By: */s/ Margarita Y. Ginzburg*
                            Margarita Y. Ginzburg (MG-6240)

Dated: February 4, 2014
       Parsippany, NJ

72205494.3
.