# EXHIBIT A

Draft 4/5/04

## RESERVE FUND AGREEMENT

This Reserve Fund Agreement (this "Agreement") dated as of ~~March 25, 2004~~April 7, 2004 by and among COVENANT MEDICAL CENTER, INC., a Michigan not-for-profit corporation (the "Corporation"), U.S. BANK NATIONAL ASSOCIATION, a national banking association (the "Trustee"), and LEHMAN BROTHERS SPECIAL FINANCING INC., a Delaware corporation ("Lehman").

SECTION I.            DEFINITIONS

For purposes of this Agreement, unless the context clearly indicates otherwise, the words and terms defined in this Section I have the respective meanings given to them herein:

"Bond Payment Date" means, with respect to each Deposit Date, each date identified as a "Bond Payment Date" on Exhibit A unless such date is not a Business Day, in which case "Bond Payment Date" means the immediately succeeding Business Day; provided that in determining whether any such date is a Business Day no effect shall be given to clause (c) or (d) of the definition of Business Day.

"Bonds" means $40,060,000 City of Saginaw Hospital Finance Authority Hospital Revenue Refunding Bonds (Covenant Medical Center, Inc.) Series 2004G.

"Burdened Party" means, (i) in the case of (A) a Corporation Event of Default or a Trustee Event of Default or (B) a termination of this Agreement by the Corporation pursuant to Section 3.1 following a redemption, defeasance or refunding of the Bonds, Lehman and (ii) in the case of a Lehman Event of Default, the Corporation.

"Business Day" means any day other than (a) a Saturday or Sunday, (b) a day on which the principal corporate trust office of the Trustee is authorized or required by law to close, (c) a day on which banking institutions in the City of New York are authorized or required by law to close, or (d) a day on which any Qualified Securities which may be delivered hereunder are not subject to delivery in the City of New York.

"Closing Date" means April 7, 2004.

"Corporation Event of Default" means the occurrence of an event specified in Section 7.2 hereof.

"Coupon Payment" means, for any Qualified Security, a payment of interest which is due to be paid thereon prior to the scheduled maturity of such Qualified Security.

RFA:

1

Draft 4/5/04

"Dealer" means a leading dealer in the relevant markets selected by Lehman in good faith (a) from among dealers of the highest credit standing which satisfy all the criteria that Lehman applies generally at the time in deciding whether to offer or to make an extension of credit and (b) to the extent practicable, from such dealers having an office in the same city.

"Debt Service Payment" means (i) a scheduled payment of principal of or interest on the Bonds, including any such payment in connection with a scheduled mandatory sinking fund redemption of the Bonds from sinking fund installments but excluding any such payment in connection with any other redemption of the Bonds and excluding any payment required to make a regularly scheduled deposit to the principal account or interest account for the Bonds or (ii) a payment of principal of or interest on the Bonds upon an acceleration of the Bonds following an event of default under the Indenture.

"Default Rate" means a per annum rate equal to the lesser of (a) Three Month LIBOR plus 1% per annum, or (b) the maximum rate permitted by law.

"Delivery Notice" means a notice substantially in the form of Exhibit E or in such other form as provided by the Qualified Dealer and is reasonably acceptable to the Trustee.

"Deposit Date" means each date identified as a "Deposit Date" on Exhibit A unless such date is not a Business Day, in which case "Deposit Date" means the immediately succeeding Business Day.

"Differential" means the amount, if any, by which the Purchase Price of any Qualified Security delivered hereunder exceeds the Market Value thereof.

"Eligible Securities" means direct, full faith and credit, non-callable obligations of the United States of America.

"Financing Documents" means the Indenture and the Loan Agreement.

"Guaranteed Rate" means a rate per annum equal to 4.022% assuming that the interest on the applicable security was compounded semi-annually on the basis of a year of 360 days with twelve thirty day months.

"Illegality" means any event due to the adoption of, or any change in, any applicable law after the date on which this Agreement is entered into, or due to the promulgation of, or any change in, the interpretation by any court, tribunal or regulatory authority with competent jurisdiction of any applicable law after such date, which causes it to becomes unlawful to perform any absolute or contingent obligation to make a payment or delivery or to receive a payment or delivery in respect of this Agreement or to comply with any other material provision of this Agreement.

"Incipient Illegality" means (a) the enactment by any legislative body with competent jurisdiction over the Corporation of legislation which, if adopted as law, would render unlawful (i) the performance by the Corporation of any absolute or contingent obligation to make a payment or delivery or to receive

RFA:

2

Draft 4/5/04

a payment or delivery in respect of this Agreement or the compliance by the Corporation with any other material provision of this Agreement or (ii) the performance by the Corporation of any contingent or other obligation which the Corporation relating to this Agreement, (b) any assertion in any proceeding, forum or action by the, in respect of the Corporation or in respect of any entity located or organized under the laws of the state in which the Corporation is located to the effect that performance under this Agreement or similar agreements is unlawful or (c) the occurrence with respect to the Corporation of any event that constitutes an Illegality.

"Indenture" means the Trust Indenture dated as of April 1, 2004 by and between the Issuer and the Trustee.

"Insolvent" means (i) either the Trustee or Lehman as the case may be, shall (1) commence a voluntary case under the federal bankruptcy laws (as in effect on the date of this Agreement or hereafter), (2) file a petition seeking to take advantage of any other law relating to bankruptcy, insolvency, reorganization, winding up or composition or adjustment of debts, (3) consent to any petition filed against it in an involuntary case under such bankruptcy or insolvency or other laws, (4) apply for or consent to the appointment of, or the taking of possession by, a trustee, receiver, custodian, liquidator or the like for itself or for all or a substantial part of its property, (5) admit in writing its inability to pay, or generally not be paying, its debts as they come due, (6) make a general assignment for the benefit of creditors, or (7) take any official action for the purpose of effecting any of the foregoing; or (ii) a case or other proceeding shall be commenced against either the Trustee or Lehman, as the case may be, in any court of competent jurisdiction seeking (1) relief under the federal bankruptcy laws (as in effect on the date of this Agreement or hereafter) or under any other law relating to bankruptcy, insolvency, reorganization, winding up or composition or adjustment of debts, or (2) the appointment of a trustee, receiver, custodian, liquidator or the like for the Trustee or Lehman, as the case may be, or for all or a substantial part of its property, and any such case or proceeding shall continue undismissed and unstayed for a period of 60 consecutive calendar days, or an order granting the relief requested in any such case or proceeding against such party shall be entered and shall remain in effect and unstayed for a period of 60 consecutive days.

"Issuer" means the City of Saginaw Hospital Finance Authority, a public body corporate created under the laws of the State of Michigan.

"LBH" means Lehman Brothers Holdings Inc., which wholly owns and unconditionally guarantees the obligations of Lehman.

"Lehman Cure Period" has the meaning specified in Section 7.3(a) hereof.

"Lehman Event of Default" means the occurrence of an event specified in Section 7.3 hereof.

"Loan Agreement" means the Loan Agreement dated as of April 1, 2004 by and between the Issuer and the Corporation.

RFA:

3

Draft 4/5/04

"Market Value" means with respect to any Qualified Security, the market value thereof (including accrued interest thereon) as specified by the Qualified Dealer delivering that security, provided that the Market Value of any Qualified Security shall in no event exceed the Maturity Amount thereof.

"Maturity Amount" means, with respect to any Qualified Security, the amount, payable in cash, representing the principal and interest (including any Coupon Payments) due thereon on or prior to its maturity date.

"Purchase Price" means, (i) for any Eligible Security delivered hereunder under Section 2.1 hereof, that price for such security, as set forth in the Delivery Notice, which will produce a rate of return on such security for the period from (and including) the date of its delivery to (but excluding) its maturity date equal to the Guaranteed Rate or (ii) for any Eligible Security delivered under Section 2.3 hereof, the Maturity Amount thereof.

"Qualified Dealer" means Lehman Brothers Inc., its successors or assigns, or any other dealer in Eligible Securities selected by Lehman.

"Qualified Securities" means, for any Deposit Date or subsequent deposit date pursuant to Section 2.3 or 2.4, Eligible Securities which, to the extent available on the open market, (i) mature on or prior to the related Bond Payment Date and (ii) have an aggregate Purchase Price which is as close as possible to but does not exceed the related Scheduled Reserve Amount.

"Reserve Fund" means the account created pursuant to the Indenture and designated thereunder as the Reserve Account.

"Scheduled Reserve Amount" means, for each Deposit Date, the amounts shown on Exhibit A which, under the terms of the Indenture, will be the Reserve Fund Requirement on such date, assuming that (i) no withdrawals from the Reserve Fund have been made to make a Debt Service Payment and (ii) no Bonds will have been defeased or redeemed on or prior to such date except in connection with a scheduled sinking fund redemption.

"Specified Indebtedness" means any obligation of the Corporation (whether present or future, contingent or otherwise, as principal or surety or otherwise) in respect of borrowed money in a principal amount of $1,000,000 or more.

"Termination Amount" means an amount, as determined by Lehman reasonably and in good faith on the basis of the arithmetic mean of quotations from at least three Dealers of the amount, if any, that each such Dealer would require the Burdened Party to pay to the Dealer (expressed as a positive number if the Burdened Party is Lehman and a negative number if the Burdened Party is the Corporation) or would pay to the Burdened Party (expressed as a negative number if the Burdened Party is Lehman and a positive number if the Burdened Party is the Corporation) in consideration of such Dealer entering into an agreement with the Burdened Party (with such documentation as Lehman

RFA:                                                    4

Draft 4/5/04

and the Dealer may in good faith agree) which would have the effect of preserving for the Burdened Party the economic equivalent of its rights under this Agreement for the period commencing on the termination date of this Agreement and terminating on the last Bond Payment Date set forth in Exhibit A (assuming for these purposes that this Agreement were not terminating on the termination date and continued in full force through such last Bond Payment Date); provided, however, that:

(i)    if more than three quotations are provided, the Termination Amount will be the arithmetic mean of such quotations, without regard to the quotations having the highest and lowest values,

(ii)    if exactly three quotations are provided, the Termination Amount will be the quotation remaining after disregarding the highest and lowest quotations,

for purposes of clauses (i) and (ii), if more than one quotation has the same highest value or lowest value, then one of such quotations shall be disregarded, and

(iii)    if Lehman is unable to obtain three such quotations, the Termination Amount shall be the amount, as reasonably determined in good faith by Lehman, to be the Burdened Party's total losses and costs (expressed as a positive number if the Burdened Party is Lehman and a negative number if the Burdened Party is the Corporation), or gains (expressed as a negative number if the Burdened Party is Lehman and a positive number if the Burdened Party is the Corporation) in connection with a termination of this Agreement, including any loss of bargain, cost of funding or, at the election of Lehman but without duplication, any loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position, and;

provided further, however, that in any event the Termination Amount shall also include (A) any unpaid amounts due as of the date of termination of this Agreement (including any amounts due under Section 7.7 hereof) and (B) if such Termination Amount is being paid in connection with a termination of this Agreement following an Event of Default or if any Termination Amount otherwise due hereunder is not paid when due, the Termination Amount shall also include any incidental costs and expenses incurred by the Burdened Party in connection with such termination and the enforcement of its rights hereunder (including costs of collection and reasonable attorneys' fees). Any determination of the Termination Amount by Lehman shall be conclusive and binding on the parties hereto absent manifest error.

"Three Month LIBOR" as of any date of determination means the rate for deposits in US dollars for a period of three months which appears on the Telerate Page 3750 as of 11:00 a.m., London time, on the day that is two Business Days before the day for which such determination is being made. If no such rate appears on the Telerate Page 3750 as of such date, Lehman may select another nationally recognized published source to determine Three Month LIBOR.

"Trustee Event of Default" means the occurrence of an event specified in Section 7.1 hereof.

RFA:

5

Draft 4/5/04

SECTION II.        PURCHASE AGREEMENT

   Section 2.1    <u>Purchase and Sale of Qualified Securities</u>.

   (a)    Lehman shall cause a Qualified Dealer to deliver to the Trustee, on any Deposit Date, in accordance with the delivery requirements of Section 2.2 hereof, to the extent such securities are available on the open market, Qualified Securities selected by Lehman or the Qualified Dealer.

   (b)    If Lehman causes a Qualified Dealer to deliver Qualified Securities, the Trustee shall, out of funds available under the Indenture for such purpose or as otherwise provided by the Corporation, at the time of the delivery of such Qualified Securities, purchase such Qualified Securities and pay to the Qualified Dealer or Lehman, as applicable, in accordance with Section 2.2(b) hereof, an amount equal to the Purchase Price thereof.

   Section 2.2    <u>Delivery; Payment</u>.

   (a)    All Qualified Securities delivered hereunder shall be delivered to the Trustee to the account specified in Section 9.1 hereof, in such manner as at the time is generally acceptable for delivery of Qualified Securities. All Qualified Securities delivered hereunder shall be delivered to the Trustee on a "delivery versus payment" basis.

   (b)    (i)    Lehman shall cause the Qualified Dealer to send a Delivery Notice to the Trustee at least one Business Day prior to the delivery of any Qualified Securities which are in book-entry form and at least two Business Days prior to the delivery of any Qualified Securities which are being delivered in certificated form. The Trustee may conclusively rely on the Qualified Dealer's specification in the Delivery Notice of the Market Value, the Maturity Amount and the Purchase Price of a Qualified Security.

        (ii)    Concurrently with the delivery of any Qualified Securities, unless otherwise directed by Lehman in writing, the Trustee shall, subject to clause (iii) below, pay the Qualified Dealer delivering such Qualified Securities, in its individual capacity, the Market Value thereof, and to the Qualified Dealer as agent for Lehman, the Differential, if any.

        (iii)    Lehman may in the Delivery Notice, direct the Trustee to pay (A) to the Qualified Dealer, the Market Value of any Qualified Securities delivered to the Trustee hereunder, and (B) to Lehman, the Differential, if any. Any such payment to Lehman shall be at Lehman's account as set forth in the Delivery Notice.

        (iv)    All payments to be made hereunder shall be made in immediately available funds by means of a bank or Federal funds wire.

   Section 2.3    <u>Subsequent Deliveries</u>. If any Qualified Securities delivered by a Qualified Dealer pursuant to Section 2.1 hereof (a) mature prior to the Bond Payment Date for which such

RFA:

Draft 4/5/04

Qualified Securities were delivered, or (b) have a Coupon Payment, Lehman shall have the right, upon at least one Business Day's prior written notice to the Trustee in the form of the Delivery Notice, to cause a Qualified Dealer to deliver to the Trustee, at any time on or after the maturity date of such Qualified Securities (or, as applicable, on or after the interest payment date of such Coupon Payment) but prior to the date which is one Business Day before such Bond Payment Date, other Qualified Securities, provided that the Maturity Amount thereof does not exceed the Maturity Amount of the securities which have so matured (or as applicable, the amount of the Coupon Payment). Any such deliveries by the Qualified Dealer shall conform to the requirements of Section 2.2(a) and (b) hereof. Upon the delivery by the Qualified Dealer of such Qualified Securities, the Trustee shall pay the Purchase Price thereof in the manner required by Section 2.2(b)(ii) hereof.

Section 2.4    Late Delivery; Failure to Deliver.

(a)    If Lehman fails to cause a Qualified Dealer to deliver Qualified Securities as required hereunder by 4:30 p.m. New York City time on any Deposit Date or during the Lehman Cure Period, the Trustee shall, on each such date, invest the related Deposit Amount on an overnight basis, in Permitted Investments (as defined in the Indenture)to the extent permitted by law and if Lehman's failure continues beyond the Lehman Cure Period, the Trustee shall invest the related Deposit Amount in Permitted Investments with the longest possible maturities, provided such maturities are not later than the related Bond Payment Date.

(b)    No failure on Lehman's part to cause a Qualified Dealer to deliver Qualified Securities hereunder shall terminate or affect Lehman's right to cause future sales of Qualified Securities in accordance with this Agreement.

Section 2.5    Notice of Withdrawal from Reserve Fund; Replenishment.

(a)    If at any time the Trustee is required under the Indenture to withdraw any investments or other amounts from the Reserve Fund (including any Qualified Securities), or to otherwise liquidate any investments, to make a Debt Service Payment, the Trustee shall promptly give oral and written notice thereof to Lehman and shall in such notice specify (i) the amount or investments which are to be withdrawn and (ii) the amount which will be in the Reserve Fund after giving effect to such withdrawal.

(b)    If, following the Trustee's withdrawal of funds from the Reserve Fund pursuant to Section 2.5(a), within twelve (12) months of such withdrawal, (i) sufficient funds are deposited into the related Reserve Fund to permit the purchase of Qualified Securities hereunder or (ii) the Corporation has notified the Trustee in writing (with a copy to Lehman) that it intends, in compliance with the Indenture, to deposit sufficient funds in the Reserve Fund within twelve (12) months after such withdrawal from the Reserve Fund pursuant to Section 2.5(a), then the Trustee shall, within two Business Days of such replenishment of the Reserve Fund, give oral and written notice (a "Reserve Fund Replenishment Notice") to Lehman stating (A) the amount of funds which have been or will be deposited into the Reserve Fund (the "Replenishment Amount") and (B) the date(s) or expected date(s) of such deposit(s). If the Trustee has so delivered a Reserve Fund Replenishment Notice to Lehman,

Draft 4/5/04

then by no later than the second Business Day after delivery thereof, the Trustee shall purchase any Qualified Securities duly tendered by the Qualified Dealer in accordance with Section 2.2 hereof.

(c)    If the Reserve Fund is not replenished within twelve (12) months of a withdrawal, Lehman shall not be required or obligated under this Agreement to cause the Qualified Dealer to make any delivery of Qualified Securities with respect to the Replenishment Amount upon the replenishment of the Reserve Fund.

Section 2.6    Direction by Corporation to Trustee.  The Corporation hereby irrevocably instructs the Trustee to enter into this Agreement and the Trustee agrees to take the actions and to make the purchases required hereby.

Section 2.7    Lehman Downgrade.

(a)    If during the term of this Agreement the long-term senior unsecured debt ratings of LBH are suspended, withdrawn or fall below "A3" by Moody's or "A-" by Standard & Poor's (in any such case, a "Lehman Downgrade"), Lehman shall provide written notice to the Corporation and the Trustee within five Business Days of such Lehman Downgrade.

(b)    Upon receipt of the written notice from Lehman of such Lehman Downgrade, Lehman shall, within ten Business Days of such Lehman Downgrade:

(i)    assign and transfer all of this Agreement and its interests hereunder to a transferee which shall meet the requirements of a provider of an investment agreement under the Indenture an entity rated at least "A2" by Moody's or "A" by Standard & Poor's and with the consent of the Corporation (such consent not to be unreasonably withheld or delayed), provided that in all such instances of transfer the transferee shall assume all of the rights and obligations of Lehman hereunder;

(ii)    have obligations of Lehman hereunder guaranteed by an entity which meets the requirements of the Indenture and with the consent of the Corporation (such consent not to be unreasonably withheld or delayed); or

(iii)    deliver collateral to the Trustee comprised of Qualified Securities such that the market value of the collateral must be maintained at levels and upon such conditions that would be acceptable to Moody's and Standard & Poor's to maintain an "A" rating in an "A" rated structured financing (with a market value approach). Lehman shall be responsible for all reasonable fees of the Trustee relating to the collateral.

(c)    If Lehman fails to take any of the aforesaid actions to remedy a Lehman Downgrade within ten Business Days, the Corporation shall have the right, but not the obligation, to terminate this Agreement by giving written notice thereof to Lehman with a copy to the Trustee, whereupon Lehman shall determine the Termination Amount and (i) if the Termination Amount is a negative number, Lehman shall promptly, but no later than one Business Day after written notice that such amount is due, pay the

RFA:

8

Draft 4/5/04

absolute value of such amount in immediately available funds to the Corporation and (ii) if the Termination Amount is a positive number, Lehman may demand payment by the Corporation of the Termination Amount in which case the Corporation shall promptly, but no later than one Business Day after written notice that such amount is due, pay the Termination Amount in immediately available funds to Lehman. If any such amount is not paid when due, the party owing such amount shall pay interest on such amount for each date such amount is due but not paid at the Default Rate.

SECTION III.        DEFEASANCE OR REFUNDING

Section 3.1    Defeasance or Refunding.

(a)    The Corporation may, by giving Lehman at least fifteen Business Days prior notice, but without the consent of Lehman, cause the Issuer to redeem, defease, repurchase, or refund the Bonds as provided in the Indenture, provided that if the Corporation takes any such action (i) if the Termination Amount is a positive number, the Corporation shall pay or cause the Trustee to pay to Lehman in immediately available funds the Termination Amount and (ii) if the Termination Amount is a negative number, Lehman shall pay the absolute value of such amount to the Trustee. If the Termination Amount is payable pursuant to this Section 3.1, the party owing such amount shall pay such amount promptly but by no later than the later of (A) one Business Day after receipt of notice of the Termination Amount from Lehman or (B) the date of such redemption, defeasance or refunding. Such payment shall be made in immediately available funds, to or at the direction of the party to whom such Termination Amount is due.

(b)    Immediately upon payment of the Termination Amount in accordance with this Section 3.1 this Agreement shall terminate. The Corporation agrees that it shall not cause the Issuer to redeem, defease, refund or repurchase the Bonds unless it shall have sufficient funds to pay any Termination Amount which may be due as provided herein.

(c)    If pursuant to clause (a) above this Agreement would be terminated in connection with the issuance of bonds to refund the Bonds (the "Refunding Bonds") and a Termination Amount would be payable to Lehman, the Corporation may, by written notice to Lehman, request that Lehman continue this Agreement and have such Agreement apply to the Refunding Bonds. Lehman agrees that if it receives such a request it shall agree to so continue this Agreement with respect to the Refunding Bonds and the Bonds remaining outstanding after such refunding, provided that:

(i)    Lehman receives such request (together with all relevant details relating thereto) at least 30 days in advance of the issuance of the Refunding Bonds;

(ii)    on or prior to the date the Bonds are to be refunded (the "Refunding Date") the Corporation and the trustee of the Refunding Bonds enter into such amendments of this Agreement with Lehman (the "Amended Agreement") as are necessary to have this Agreement pertain to the scheduled

RFA:

9

Draft 4/5/04

reserve amounts, deposit dates and bond payment dates applicable to the Refunding Bonds and to any Bonds which remain outstanding after giving effect to such refunding (the "Amended Cash Flows");

        (iii)    if as determined on the Refunding Date, the Termination Amount payable to Lehman with respect to the Scheduled Reserve Amounts, Deposit Dates and Bond Payment Dates which would be remaining hereunder on such date, assuming that the Bonds were not then refunded (the "Original Cash Flows") would be greater than the Termination Amount to Lehman which would be payable to Lehman for its investment rights with respect to the Amended Cash Flows, the Corporation shall on or before the Refunding Date pay to Lehman the amount of such difference;

        (iv)    the last deposit date under the Amended Agreement is no later than the last Deposit Date hereunder;

        (v)    the Refunding Bonds have a credit rating at least equivalent to the credit rating of the Bonds without giving effect to any bond insurance and are secured by revenues at least equivalent to the assets securing the Bonds; and

        (vi)    Lehman receives any opinions and other assurances it may reasonably request to assure that the protections afforded it hereunder will continue under the Amended Agreement.

If the conditions described in paragraphs (i) through (vi) are satisfied but the Termination Amount which would be payable to Lehman for its investment rights with respect to the Amended Cash Flows would be greater than the Termination Amount which would be payable to Lehman for its investment rights with respect to the Original Cash Flows, Lehman may, at its option, pay the Corporation the amount of such difference or retain investment rights only with respect to such portion of the Amended Cash Flows as would have a Termination Amount equal to the Termination Amount of the Original Cash Flows.

SECTION IV        REPRESENTATIONS AND WARRANTIES

    Section 4.1    <u>Representations and Warranties</u>.  Each party hereto represents and warrants to the other parties hereto at all times during the term of this Agreement that:

    (a)    it is duly organized and validly existing under the laws of its jurisdiction, incorporation or establishment;

    (b)    it has the power to enter into and perform its obligations under this Agreement (including, in the case of the Corporation, to pay the Termination Amount in accordance herewith and, including, in the case of the Corporation or the Trustee, to enter into and perform its obligations under the Indenture and any other Financing Documents to which it is a party);

    (c)    this Agreement has been duly authorized, executed and delivered by it and, assuming the due authorization, execution and delivery hereof by the other parties hereto, constitutes a legal, valid

RFA:

10

Draft 4/5/04

and binding obligation of it enforceable against it in accordance with the terms hereof, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally, and subject, as to enforceability, to general principles of equity regardless of whether enforcement is sought in a proceeding in equity or at law;

(d)     its execution and delivery of this Agreement and its performance of its obligations hereunder do not and will not constitute or result in a default under, a breach or violation of, or the creation of any lien or encumbrance on any of its property under, its charter or by-laws (or equivalent organizational documents), or any other agreement (including in the case of the Corporation and the Trustee, the Indenture or other Financing Documents to which it is a party), instrument, law, ordinance, regulation, judgment, injunction or order applicable to it or any of its property;

(e)     there is no proceeding pending or threatened against it at law or in equity, or before any governmental instrumentality or in any arbitration, which would materially impair its ability to perform its obligations under this Agreement, and there is no such proceeding pending against it which purports or is likely to affect the legality, validity or enforceability of the Agreement; and

(f)     in the case of the Corporation,

(i)     all Deposit Dates, Bond Payment Dates and Deposit Amounts as indicated on Exhibit A of this Agreement are true and correct in all respects;

(ii)     it is not entitled to claim, and shall not assert any claim, with respect to itself or its revenues, assets or property (irrespective of the use or intended use thereof), of immunity on the grounds of sovereignty or similar grounds from suit, jurisdiction of any court, relief by way of injunction, order for specific performance or for recovery of property, attachment of its assets (whether before or after judgment, in aid of execution, or otherwise) and execution or enforcement of any judgment to which it or its revenues or assets or property might otherwise be entitled in any suit, action or proceeding relating to this Agreement in the courts of any jurisdiction, nor may there be attributed to the Corporation or its revenues, assets or property any such immunity (nor shall such attribution be claimed by the Corporation);

(iii)     it has delivered to Lehman its most recent annual audited statement of financial condition and its most recent quarterly unaudited statement of financial condition and the Corporation has not experienced since the date of its last published financial statement any material adverse change in its business, assets, operations or financial condition;

(iv)     it has not nor does it anticipate that there shall be any occurrence or existence of (1) a default, event of default or other similar condition or event (however described and including any such conditions or events which will become events of default with the passing of time or the giving of notice) in respect of the Corporation under one or more agreements or instruments relating to any Specified Indebtedness of the Corporation which has resulted in any Specified Indebtedness becoming, or becoming capable at such time of being declared, due and payable under such agreements or

RFA:

11

Draft 4/5/04

instruments, before it would otherwise have been due and payable or (2) a default by the Corporation in making one or more payments on the due date thereof under such agreements or instruments (after giving effect to any applicable notice requirement or grace period);

(v)     it is solvent and has, and will have after giving effect to this Agreement, sufficient capital to conduct its business and to pay its debts as they become due;

(vi)    it has not experienced any Incipient Illegality with respect to this Agreement; and

(vii)   it is not subject to any administrative, governmental or other investigation, special review or order, or pending order or similar event.

SECTION V.          COVENANTS AND ACKNOWLEDGMENTS

Section 5.1    Covenants.  Each of Lehman, the Corporation and the Trustee covenants to the other parties to this Agreement that so long as it shall have any obligations under this Agreement it shall:

(a)     maintain in full force and effect all authorizations and agreements of and exemptions, consents, licenses, actions or approvals by, and all filings with or notices to, any governmental or other authority that are required to be obtained or made by such party with respect to this Agreement and will use all reasonable efforts to obtain or make any that may become necessary in the future;

(b)     comply in all material respects with all applicable laws, rules, regulations and orders to which it may be subject if failure so to comply could materially impair its ability to perform its obligations under this Agreement;

(c)     if it is the Corporation or the Trustee, not enter into any amendment or modification of the Indenture or other Financing Documents to which it is a party which could impair its ability to perform its obligations to Lehman hereunder except nothing contained hereunder shall restrict the Corporation's ability to issue additional bonds under the Indenture;

(d)     if it is the Corporation, the Corporation agrees that, during the term of this Agreement, it shall deliver to Lehman its most recently available statement of financial condition (both audited and unaudited) as such are issued; and

(e)     if it is the Corporation, it shall not replace this Agreement or withdraw any amounts held in the Debt Service Reserve Fund for purposes of purchasing a surety bond or any similar financial instrument.

Section 5.2    Role of Lehman; Independent Judgment.  The Corporation acknowledges and agrees that in connection with its decision to enter into this Agreement and its subsequent negotiation

RFA:

12

Draft 4/5/04

and execution of this Agreement, (i) neither Lehman, nor any of its directors, officers, employees, agents or affiliates (each of the foregoing, including Lehman, a "Lehman Party") has acted as a fiduciary or financial or investment advisor to or agent or other representative of the Corporation, (ii) the Corporation has, to the extent it has deemed necessary, consulted with its own legal, tax, regulatory, accounting, financial and investment advisors in determining the suitability and appropriateness of this Agreement as well as in negotiating the specific terms hereof and has not relied upon any advice from any Lehman Party, with respect to such matters; the Corporation understands the terms, conditions and risks of this Agreement and is capable of assuming such risks; and (iii) the terms and conditions of this Agreement have been individually negotiated by it and the Trustee and are the result of arms-length negotiations among Lehman, the Trustee and the Corporation.

Section 5.3    No Liability.    Each of the Corporation and the Trustee agrees that no Lehman Party shall be liable or responsible for: (i) the payment of any amounts owing on or with respect to the Bonds; (ii) the Trustee's use or application of any moneys payable to the Trustee hereunder; (iii) any acts or omissions of the Corporation or the Trustee under, or with respect to, the Bonds or the Indenture or any related document; or (iv) determining whether the Corporation or the Trustee is in compliance with any applicable statute, regulation or law, the Bonds, the Indenture or any other related document.

Section 5.4    Fixed Rate of Return.    The Corporation has entered into this Agreement for purposes of managing its borrowings or investments by increasing the predictability of its cash flow from earnings on its investments and not for purposes of speculation. The Corporation understands that in consideration of its purchasing Qualified Securities at the Purchase Price on each Deposit Date, the Corporation has minimized the risks resulting from fluctuations in interest rates during the term of this Agreement on the Scheduled Reserve Amounts in the Reserve Fund but has also foregone the possibility of receiving greater returns on the Scheduled Reserve Amounts in the future from such fluctuations.

Section 5.5    Termination Amount.    Each of the Corporation and the Trustee understands that if under any of the circumstances provided herein (including upon the occurrence of a redemption or a defeasance of the Bonds on or prior to the last Deposit Date), a Termination Amount would be due Lehman, the size of such Termination Amount will vary depending, in large part, on prevailing interest rates at the time such Termination Amount is calculated. In certain market conditions the amount of the Termination Amount owed to Lehman by, as applicable, the Trustee or the Corporation could be substantial.

Section 5.6    Fees and Commissions.    The Corporation acknowledges that Lehman shall pay $30,000 to UBS Financial Services Inc., on behalf of the Corporation, as a bidding agent's fee for services provided by UBS Financial Services Inc. to the Corporation.

SECTION VI        CLOSING CONDITIONS

RFA:

13

Draft 4/5/04

Section 6.1    <u>Closing Conditions</u>

On or prior to the Closing Date the following shall occur:

(a)    delivery to Lehman and Corporation of an opinion of counsel to the Trustee, in the form of <u>Exhibit B</u>;

(b)    delivery to Lehman and Trustee of an opinion of counsel to the Corporation, in the form of <u>Exhibit D</u>;

(c)    delivery to Lehman by the Corporation of a copy of the official statement for the Bonds;

(d)    delivery to Lehman by the Corporation of a true and correct copy of the Financing Documents as in full force and effect on the date hereof;

(e)    delivery to Lehman of a copy of any consent received by the Corporation to enter into this Agreement;

(f)    delivery to the Trustee and Corporation of an opinion of inside counsel to <u>Lehman and LBH</u>, in the form of <u>Exhibit C</u>; and

(g)    delivery to Lehman of a copy of the statutory or regulatory authority, if any, pursuant to which the Corporation is authorized to enter into this Agreement and a certified copy of any resolution or resolutions of the Corporation pursuant to which the Corporation is authorized to enter into this Agreement.

<u>(h)    delivery to the Trustee and the Corporation the Guarantee of Lehman Brothers Holdings.</u>


SECTION VII        DEFAULTS; TERMINATION

Section 7.1    <u>Trustee Events of Default</u>.  The occurrence of any of the following events shall constitute a Trustee Event of Default:

(a)    the Trustee shall fail for any reason (other than because such cash is not available because the Trustee withdrew funds from the Reserve Fund in order to make a Debt Service Payment for the Bonds on a Bond Payment Date) to apply any funds in the Reserve Fund to purchase, at the Purchase Price therefor, any Qualified Securities delivered by the Qualified Dealer in accordance with this Agreement;

RFA:

Draft 4/5/04

(b)    the Trustee shall default in the performance of any other covenant or obligation under this Agreement and such default is not cured within five Business Days of notice thereof from Lehman or the Corporation; or

(c)    any representation or warranty of the Trustee contained in this Agreement proves to have been incorrect, false or misleading in any material respect as of the date on which it was made.

Section 7.2    Corporation Events of Default.  The occurrence of any of the following events shall constitute a Corporation Event of Default:

(a)    the amount in the Reserve Fund available to purchase Qualified Securities on any Deposit Date is less than the Scheduled Reserve Amount (other than because such cash is not available because the Trustee withdrew funds from the Reserve Fund in order to make a Debt Service Payment for the Bonds on a Bond Payment Date);

(b)    the Corporation shall default in the performance of any covenant or obligation under, or incorporated by reference in, this Agreement, other than as described in clause (a) above and such default is not cured within five Business Days of notice thereof from Lehman or the Trustee;

(c)    [RESERVED]the Corporation has experienced or is experiencing a material adverse change, as determined by Lehman in Lehman's sole discretion, in its business, assets, operations or financial condition;

(d)    any representation or warranty of the Corporation contained in this Agreement proves to have been incorrect, false or misleading in any material respect;

(e)    the Corporation (1) is dissolved (other than pursuant to a consolidation, amalgamation or merger); (2) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due; (3) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (4) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition (A) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (B) is not dismissed, discharged, stayed or restrained in each case within 30 days of the institution or presentation thereof; (5) has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (6)(A) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets or (B)(I) there shall be appointed or designated with respect to it, an entity such as an organization, board, commission, authority, agency or body to monitor, review, oversee, recommend or declare a financial emergency or similar state of financial distress with respect to it or (II) there shall be declared or introduced or proposed for consideration by it or by any legislative

RFA:

Draft 4/5/04

or regulatory body with competent jurisdiction over it, the existence of a state of financial emergency or similar state of financial distress in respect of it; (7) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 30 days thereafter; (8) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (1) to (7) (inclusive); or (9) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts;

(f)      the Corporation consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity (or, without limiting the foregoing, if an entity such as an organization, board, commission authority, agency or body succeeds to the principal functions of, or powers and duties granted, to the Corporation) and, at the time of such consolidation, amalgamation, merger or transfer either (i) the resulting or surviving or transferee entity fails to assume all the obligations of the Corporation under this Agreement or by operation of law or pursuant to an agreement reasonably satisfactory to the other party to this Agreement or (ii) the creditworthiness of the resulting, surviving or transferee entity is materially weaker than that of the Corporation;

(g)      ~~the Corporation shall default~~ an Event of Default (as defined in the Indenture) with respect to the Bonds and/or ~~any~~ an event of default with respect to Specified Indebtedness.

Section 7.3      Lehman Events of Default.  The occurrence of any of the following events shall constitute a Lehman Event of Default:

(a)      Lehman shall fail, on any Deposit Date, to cause a Qualified Dealer to deliver Qualified Securities and such failure is not cured within five Business Days after written notice thereof to Lehman from the Trustee or the Corporation (the "Lehman Cure Period");

(b)      any representation or warranty of Lehman contained in this Agreement proves to have been incorrect, false or misleading in any material respect as of the date on which it was made; or

(c)      Lehman is at any time Insolvent.

Section 7.4      Remedies Upon Occurrence of a Trustee Event of Default.  Upon the occurrence of a Trustee Event of Default, Lehman shall have the right to:

(a)      cause a Qualified Dealer to redeliver to the Trustee or sell to any other purchaser the Qualified Securities which were to be delivered in connection with any Deposit Date and which have not theretofore been delivered to and purchased by the Trustee and, subject to Section 8.2 hereof, make demand for the payment of its losses (calculated in accordance with Section 7.7 hereof) arising out of the Trustee's failure to purchase such Qualified Securities; and/or

RFA:

16

Draft 4/5/04

(b)    immediately terminate this Agreement by giving notice thereof to the Trustee with a copy to the Corporation and, subject to Section 8.2 hereof, (i) if the Termination Amount is a positive number, make demand upon the Trustee for the payment of the Termination Amount, and (ii) if the Termination Amount is a negative number, pay such Termination Amount to the Trustee for deposit in the Reserve Fund.

If the Termination Amount is payable pursuant to this Section 7.4(b), subject again to Section 8.2, the party owing such amount shall promptly, but by no later than one Business Day after notice that such amount is due from the party to whom such Termination Amount is due, pay such amount, in immediately available funds, to the party to whom such Termination Amount is due. If any such amount is not paid when due, the party owing such amount shall pay interest on such amount for each date such amount is due and not paid at the Default Rate. Any amounts payable pursuant to Section 7.7 hereof shall be payable upon demand as provided therein.

Section 7.5    Remedies Upon Occurrence of Corporation Event of Default. Upon the occurrence of a Corporation Event of Default, Lehman shall have the right to:

(a)    cause a Qualified Dealer to redeliver to the Trustee or sell to any other purchaser the Qualified Securities which were to be delivered in connection with any Deposit Date and which have not theretofore been delivered to and purchased by the Trustee and make demand for the payment of its losses (calculated in accordance with Section 7.7 hereof) arising out of the Trustee's failure to purchase such Qualified Securities; and/or

(b)    immediately terminate this Agreement by giving notice thereof to the Corporation with a copy to the Trustee, and (i) if the Termination Amount is a positive number, make demand upon the Corporation for the payment of the Termination Amount and (ii) if the Termination Amount is a negative number, pay such amount to the Corporation.

If a Termination Amount is payable pursuant to clause (b) above, the party owing such amount shall promptly, but by no later than one Business Day after notice that such amount is due from the party to whom such Termination Amount is due, pay such amount, in immediately available funds, to or at the direction of the party to whom such Termination Amount is due. If any such amount is not paid when due, the party owing such amount shall pay interest on such amount for each date such amount is due but not paid at the Default Rate.

Section 7.6    Remedies Upon Occurrence of a Lehman Event of Default. Upon the occurrence of a Lehman Event of Default, the Corporation shall have the right to:

(a)    if such default is a default under Section 7.3(a), apply the Deposit Amount to purchase Permitted Investments in accordance with Section 2.4 hereof and make demand for the payment of its losses in connection therewith, calculated as provided in Section 7.7(b);

RFA:

17

Draft 4/5/04

(b)      if such default is a default under Section 7.3(a) and Lehman has failed to pay the Corporation's losses (as described in Section 7.7(b)) upon demand therefor, immediately terminate this Agreement by giving notice thereof to Lehman with a copy to the Trustee; and

(c)      if such default is a default under Sections 7.3(b) or (c) hereof immediately terminate this Agreement by giving notice thereof to Lehman with a copy to the Trustee, whereupon Lehman shall determine the Termination Amount and (i) if the Termination Amount is a negative number, Lehman shall promptly, but no later than one Business Day after notice that such amount is due, pay such amount, in immediately available funds, to the Corporation and (ii) if the Termination Amount is a positive number, Lehman may demand payment by the Corporation of the Termination Amount in which case the Corporation shall promptly, but no later than one Business Day after notice that such amount is due, pay, in immediately available funds, the Termination Amount to Lehman. If any such amount is not paid when due, the party owing such amount shall pay interest on such amount for each date such amount is due but not paid at the Default Rate. Notwithstanding anything to the contrary in this Agreement, if Lehman fails to determine the Termination Amount within three Business Days of notice from the Corporation or the Trustee of the occurrence of a Lehman Event of Default then the Corporation (or if so directed by the Corporation, the Trustee) shall make such determination as if it were Lehman and the amount as so determined by the Corporation (or the Trustee) shall for purposes of this Section 7.6 be deemed the Termination Amount.

Section 7.7      Loss Amount if Failed or Late Purchase.

(a)      Subject to Section 8.2 hereof, if  (a) the Trustee fails to apply any funds in the Reserve Fund to purchase any Qualified Securities delivered by a Qualified Dealer in accordance with this Agreement or (b) if on any Deposit Date the amount in the Reserve Fund available to purchase Qualified Securities is less than the Scheduled Reserve Amount, the Trustee, in the case of clause (a) or the Corporation in the case of clause (b), shall pay to Lehman, as liquidated damages for its losses and not as a penalty, on demand by Lehman, the sum of (w) interest on the Purchase Price of such Qualified Securities which the Qualified Dealer tendered for delivery to, but were not purchased by, the Trustee for each day from and including the delivery date thereof to but excluding the date on which such securities are resold to a third party or to the Trustee, (x) the excess, if any, of the Purchase Price of such Qualified Securities over the amount received by the Qualified Dealer upon such resale of the securities (the "Shortfall Amount"), (y) interest on the Shortfall Amount from and including the resale date to but excluding the date on which the Trustee or the Corporation, as applicable, compensates Lehman for its losses as described herein, and (z) any incidental costs and expenses incurred by Lehman in connection with the Trustee's failure to so purchase such Qualified Securities. Interest shall accrue at a rate per annum equal to the Default Rate for purposes of clauses (w) and (y). Notwithstanding the foregoing, if Lehman does not on any date cause the delivery of Qualified Securities because the amount in the Reserve Fund is less than the Scheduled Reserve Amount, the Loss Amount shall equal the sum of (y) the amount, if any, by which the aggregate Purchase Price of the Qualified Securities which Lehman could have caused to be delivered exceeds the market value thereof (as reasonably determined by Lehman as of the date such tender was to be made) and (z) interest on such

RFA:

Draft 4/5/04

amount at the Default Rate for each date from the date such securities could have been delivered to the next succeeding Bond Payment Date plus any amounts specified in clause (x) above.

(b)     If there is a Lehman Event of Default as described in Section 7.3(a) hereof, the amount of losses payable by Lehman upon demand therefor pursuant to Section 7.6(a) shall equal the excess, if any, of (i) interest the Trustee would have earned on the related Deposit Amount had the Deposit Amount been invested in Qualified Securities at the Guaranteed Rate (the "Guaranteed Interest") over (ii) the interest the Trustee actually earned by investing the related Deposit Amount ~~in Permitted Investments~~ in accordance with Section 2.4 hereof (or if the Trustee fails to invest such Deposit Amount ~~in Permitted Investments~~ in accordance with Section 2.4, the amount of interest the Trustee would have earned on such Deposit Amount had the Trustee complied with the requirements of Section 2.4 hereof).

Section 7.8     Application of Excess Funds.   The Corporation hereby directs the Trustee and the Trustee agrees that if at any time any amounts are due Lehman from the Corporation in connection with an Corporation Event of Default, the Trustee shall, upon demand from Lehman, and without further direction or instruction from the Corporation, apply any funds available under the Indenture which are not subject to the lien of the Indenture (including any funds which would otherwise be released to the Corporation) to the payment of such amounts.

Section 7.9     Limited Rights Against the Reserve Fund.   Neither Lehman nor any Qualified Dealer shall have any right to any amounts held in the Reserve Fund except as expressly provided herein upon the delivery of a Qualified Security in accordance with this Agreement.

Section 7.10     No Waiver; Remedies Cumulative.   No failure or delay on any party's part in exercising any right or remedy hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any such right or remedy preclude any other or further exercise thereof or the exercise of any other right or remedy.  Such party's rights and remedies hereunder are cumulative and not exclusive of any rights or remedies provided by law, this Agreement or otherwise.  None of the terms or provisions of this Agreement may be waived, modified or amended except in a writing duly signed by the Trustee, the Corporation and Lehman.


SECTION VIII       THE TRUSTEE

Section 8.1     Acceptance by Trustee.   By execution and delivery of this Agreement, the Trustee accepts its duties and obligations hereunder, as an addition to its duties and obligations as Trustee under the Indenture.

Section 8.2     Liability of the Trustee; Consultation with Legal Counsel.

(a)     The Trustee shall not be liable to any person for any action taken or neglected to be taken in performing or attempting to perform its obligations hereunder or preserving or seeking to preserve the funds it maintains under the Indenture or to purchase the Qualified Securities tendered

RFA:

Draft 4/5/04

pursuant to this Agreement, except for actions arising from its gross negligence or willful misconduct or for a breach of its representations or warranties or from a breach of its covenant under Section 5.1(c) hereof.

(b)     The Trustee may consult with counsel reasonably satisfactory to it with respect to any question relating to its duties or responsibilities hereunder or otherwise in connection herewith and, except as expressly provided herein, shall not be liable for any action taken, suffered, or omitted by the Trustee in good faith upon the advice of such counsel. The Trustee may act through its officers, employees, agents and attorneys.

Section 8.3     Payment of Trustee Fees. Lehman has no liability or responsibility for payment of the Trustee's fees or expenses for its services hereunder, including any such fees or expenses arising out of or in connection with the liquidation of the Qualified Securities as provided herein.

Section 8.4     Trustee Cooperation.

(a)     The Trustee shall not act in contravention of its obligations hereunder or invest amounts in the Reserve Fund other than pursuant to this Agreement.

(b)     The Trustee shall not make any payments or distributions from the Reserve Fund other than payments or distributions (i) required by this Agreement, (ii) to pay principal of, redemption premium and interest on the Bonds or (iii) to the extent not inconsistent with the terms of this Agreement, to make payments required by the Indenture.

Section 8.5     Successor Trustee. If the Trustee shall resign or be discharged from its duties and obligations under the Indenture, the Corporation shall appoint a successor Trustee pursuant to the terms of the Indenture; provided, however, the successor trustee shall be reasonably acceptable to Lehman. The Corporation agrees that if the Trustee fails for any reason to perform its duties to Lehman under this Agreement in accordance with the terms hereof, or is at any time Insolvent or breaches in any material respect its representations and warranties to Lehman hereunder, the Corporation, upon the request of Lehman, shall promptly in accordance with the Indenture, upon request of Lehman, cause request the Issuer to appoint a successor Trustee reasonably acceptable to Lehman.

SECTION IX     MISCELLANEOUS

Section 9.1     Notices and Delivery Instructions.     All notices, demands or other communications hereunder shall be given or made in writing and shall be delivered personally, or sent by certified or registered mail, postage prepaid, return receipt requested, or overnight delivery service, telex or telecopy to the party to whom they are directed at the following addresses, or at such other addresses as may be designated by notice from such party to all other parties:

To Lehman:

RFA:

20

Draft 4/5/04

Lehman Brothers Special Financing Inc.
745 Seventh Avenue, 5th Floor
New York, NY  10019
Attention:      Municipal Financial Products - Middle Office
Telephone:     212-526-2240
Fax:           646-758-2988

To the Trustee:

U.S. Bank National Association
535 Griswold Street, Suite 550
Detroit, MI 48226
Attention:      Corporate Trust Department - Jim Kowalski
Telephone:      313-234-4716
Fax:            313-963-9428

[DELIVERY INSTRUCTIONS FOR BOOK-ENTRY GOVERNMENT OBLIGATIONS]

ABA #
A/C:
A/C #
Further Credit


To the Corporation:

Covenant Medical Center, Inc.
515 North Michigan
Saginaw, Michigan 48602
Attention:      Chief Financial Officer
Telephone:      989-583-6007
Fax:            989-583-2712
Corporation Tax I.D. #


    Any notice, demand or other communication given in a manner prescribed in this Section shall
be deemed to have been delivered on receipt.

    Section 9.2    Binding Effect; Transfer.  This Agreement shall be binding upon and inure to the
benefit of the Trustee, the Corporation and Lehman and upon their respective permitted successors and
transferees.  Lehman shall be entitled to transfer all or any portion of this Agreement and its interests
hereunder, to any subsidiary or affiliate of Lehman, or to any office, branch or subsidiary of any affiliate

RFA:

21

Draft 4/5/04

of Lehman (provided such transfer will not effect the validity of the Guarantee from LBH) upon notice to
the Corporation and the Trustee, and Lehman shall otherwise be able to transfer all or any portion of
this Agreement only with the consent of the Corporation (such consent not to be unreasonably withheld
or delayed) and notice to the Trustee; provided, however, that such consent shall not be required if such
transfer is to any entity rated at least an "A-", "A3", or "A-" by Standard & Poor's Ratings Service
("S&P"), Moody's Investors Service, Inc. ("Moody's") or Fitch, Inc. ("Fitch"), respectively, and
provided further that in all such instances of transfer the transferee shall assume all of the rights and
obligations of Lehman hereunder. Neither the Corporation nor the Trustee may transfer this Agreement
without the prior written consent of Lehman and the other party hereto.

Section 9.3    Limitation. Nothing expressed or implied herein is intended or shall be
construed to confer upon any person, firm or corporation other than the parties hereto, any right,
remedy or claim by reason of this Agreement or any term hereof, and all terms contained herein shall be
for the sole and exclusive benefit of the parties hereto, and their successors and permitted transferees.

Section 9.4    Severability. If one or more provisions of this Agreement or the applicability of
any such provisions to any set of circumstances shall be determined to be invalid or ineffective for any
reason, such determination shall not affect the validity and enforceability of the remaining provisions or
the applicability of the same provisions or any of the remaining provisions to other circumstances.

Section 9.5    Amendments, Changes and Modifications. This Agreement may be amended
or any of its terms modified only by a written document authorized, executed and delivered by each of
the parties hereto.

Section 9.6    Counterparts. This Agreement may be executed in one or more counterparts
and when each party hereto has executed at least one counterpart, this Agreement shall become binding
on all parties and such counterparts shall be deemed to be one and the same document.

Section 9.7    Termination. Unless earlier terminated pursuant to Sections 3.1, 7.4, 7.5 or 7.6
hereof, this Agreement shall terminate on the later of the last Bond Payment Date set forth in Exhibit A
and the date on which Lehman the Trustee and the Corporation have satisfied all of their obligations
hereunder.

Section 9.8    Entire Agreement. This Agreement constitutes the entire agreement and
understanding of the parties with respect to its subject matter and supersedes all oral communication
and prior writings with respect thereto.

Section 9.9    Governing Law. This Agreement shall be governed by and construed in
accordance with the laws of the State of New York, without regard to conflict of law principles.

RFA:

22

Draft 4/5/04

IN WITNESS WHEREOF, the Trustee, the Corporation and Lehman have caused this Reserve Fund Agreement to be executed by their respective duly authorized officers, all as of the date and year first above written.

COVENANT MEDICAL CENTER, INC.

By:_____
Name:
Title:


U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE


By:_____
Name:
Title:


LEHMAN BROTHERS SPECIAL FINANCING INC.


By:_____
Name:
Title:

RFA:

**EXHIBIT A**

| Deposit Date* | Bond Payment Date* | Scheduled Reserve Amount |
|---|---|---|
| 04/07/04 | 07/01/04 | $3,743,500 |
| 07/01/04 | 01/01/05 | $3,743,500 |
| 01/01/05 | 07/01/05 | $3,743,500 |
| 07/01/05 | 01/01/06 | $3,743,500 |
| 01/01/06 | 07/01/06 | $3,743,500 |
| 07/01/06 | 01/01/07 | $3,743,500 |
| 01/01/07 | 07/01/07 | $3,743,500 |
| 07/01/07 | 01/01/08 | $3,743,500 |
| 01/01/08 | 07/01/08 | $3,743,500 |
| 07/01/08 | 01/01/09 | $3,743,500 |
| 01/01/09 | 07/01/09 | $3,743,500 |
| 07/01/09 | 01/01/10 | $3,743,500 |
| 01/01/10 | 07/01/10 | $3,743,500 |
| 07/01/10 | 01/01/11 | $3,743,500 |
| 01/01/11 | 07/01/11 | $3,743,500 |
| 07/01/11 | 01/01/12 | $3,743,500 |
| 01/01/12 | 7/1/1012 | $3,743,500 |
| 7/1/1012 | 01/01/13 | $3,743,500 |
| 01/01/13 | 7/1/1013 | $3,743,500 |
| 7/1/1013 | 01/01/14 | $3,743,500 |
| 01/01/14 | 7/1/1014 | $3,743,500 |
| 7/1/1014 | 01/01/15 | $3,743,500 |
| 01/01/15 | 7/1/1015 | $3,743,500 |
| 7/1/1015 | 01/01/16 | $3,743,500 |
| 01/01/16 | 7/1/1016 | $3,743,500 |
| 7/1/1016 | 01/01/17 | $3,743,500 |
| 01/01/17 | 7/1/1017 | $3,743,500 |
| 7/1/1017 | 01/01/18 | $3,743,500 |
| 01/01/18 | 7/1/1018 | $3,743,500 |
| 7/1/1018 | 01/01/19 | $3,743,500 |
| 01/01/19 | 7/1/1019 | $3,743,500 |
| 7/1/1019 | 01/01/20 | $3,743,500 |
| 01/01/20 | 7/1/1020 | $3,743,500 |
| 7/1/1020 | 01/01/21 | $3,743,500 |
| 01/01/21 | 7/1/1021 | $3,743,500 |
| 7/1/1021 | 01/01/22 | $3,743,500 |
| 01/01/22 | 7/1/1022 | $3,743,500 |
| 7/1/1022 | 01/01/23 | $3,743,500 |
| 01/01/23 | 07/01/23 | $3,743,500 |

\*   If any Deposit Date or Bond Payment Date specified above is not a Business Day, such date will be the immediately succeeding Business Day; provided, however, that with respect to any date specified as a Bond Payment Date, the determination of whether such date is a Business Day shall be made without giving effect to clauses (c) and (d) of the definition of Business Day.

A-1

**EXHIBIT B**

[LETTERHEAD OF COUNSEL TO TRUSTEE]

[Date]

[Corporation]

Lehman Brothers Special Financing Inc.
New York, NY

Re:     [Name of Bonds]

Ladies and Gentlemen:

　　　　We have acted as counsel to _____ (the "Trustee") in connection with the execution and delivery by the Trustee of the Reserve Fund Agreement dated as of _____ (the "Agreement") by and among the Trustee, _____ (the "Corporation") and Lehman Brothers Special Financing Inc. ("Lehman"). Capitalized terms used herein and not defined herein have the respective meanings given to them in the Agreement.

　　　　In rendering this opinion, we have examined, among other things, copies of the Agreement and the Financing Documents.

　　　　In connection with the foregoing, we have also examined originals or copies satisfactory to us of all such corporate records, agreements, certificates and other documents as we have deemed relevant and necessary as a basis for the opinions hereinafter expressed. In such examination we have assumed the genuineness of all signatures, the authenticity of all documents submitted to us as originals, and the conformity with the original documents of all documents submitted to us as copies.

　　　　In giving the opinions expressed below we do not purport to be experts in or generally familiar with or qualified to express legal opinions based on the laws of any jurisdiction other than the federal laws of the United States of America and the laws of the State of [state of Trustee] (the "State").

　　　　Based upon the foregoing examination and review, we are of the opinion that:

　　　　(i)　　　　The Trustee has full legal right, power and authority to enter into the Agreement.

　　　　(ii)　　　　The Agreement has been duly authorized, executed and delivered by the Trustee.

B-1

(iii)    The stipulation of New York law as the governing law of the Agreement is enforceable under State law.

(iv)    Assuming for purposes of the opinion expressed in this paragraph (iv) that State law and New York law are the same, the Agreement is a legal, valid and binding obligation of the Trustee, enforceable against it in accordance with the terms thereof, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally, and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

(v)    The execution and delivery by the Trustee of the Agreement and the performance of its obligations thereunder do not and will not constitute or result in a default under, a breach or violation of, or the creation of any lien or encumbrance on any of its property under, its charter or by-laws, or the Indenture, the other Financing Documents or any other agreement, instrument, judgment, injunction or order applicable to it or any of its property.

(vi)    The Indenture and each of the Financing Documents are legal, valid and binding obligation of the Trustee, enforceable against it in accordance with the terms thereof, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally, and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

We are furnishing this opinion to you solely for your benefit and no other person is entitled to rely hereon. This opinion is not to be used, circulated, quoted or otherwise referred to for any other purpose.

Very truly yours,

B-2

**EXHIBIT C**

[LETTERHEAD OF COUNSEL TO LEHMAN]

[Date]

[Corporation]

[Trustee]

Re:

Ladies and Gentlemen:

I have acted as counsel to Lehman Brothers Special Financing Inc. ("Lehman") in connection with the execution and delivery by Lehman of the Reserve Fund Agreement dated as of _____ (the "Agreement") by and among Lehman _____, as Trustee (the "Trustee") and _____. (the 'Corporation"). Capitalized terms used herein and not defined herein have the respective meanings given to them in the Agreement.

In connection with the opinions expressed below, I have examined, or have had examined on my behalf, a copy of the Agreement executed by Lehman and such other agreements, instruments, documents and records of Lehman and certificates and statements by public officials and officers of Lehman as I have deemed necessary or appropriate as a basis for the opinions hereinafter expressed.

Based on the foregoing but subject to the assumptions, exceptions, qualifications and limitations hereinafter expressed, I am of the opinion that:

1.    Lehman is a corporation duly incorporated, validly existing and in good standing under the laws of the State of Delaware and has the corporate power and authority to execute and deliver the Agreement and to perform its obligations thereunder.

2.    The Agreement has been duly and validly authorized, executed and delivered by Lehman and constitutes the legal, valid and binding obligation of Lehman, enforceable against Lehman in accordance with its terms.

The foregoing opinions are subject to the following assumptions, exceptions, qualifications and limitations:

C-1

A.    My opinion in paragraph 2 above is subject to the effect of any bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally (including, without limitation, the effect of statutory or other laws regarding fraudulent or other similar transfers) and general principles of equity, regardless of whether enforceability is considered in a proceeding in equity or at law.

B.    I am a member of the Bar of the State of New York and render no opinion on the laws of any jurisdiction other than the State of New York, the United States of America and the General Corporation Law of the State of Delaware.

C.    My opinions are limited to the present laws and to the facts as they presently exist.  I assume no obligation to revise or supplement this opinion should the present laws of the jurisdictions referred to in paragraph B above be changed by legislative action, judicial decision or otherwise.

D.    This letter is rendered to you in connection with the Agreement and the transactions related thereto and may not be relied upon by any other person or by you in any other context or for any other purpose.  This letter may not be quoted in whole or in part, nor may copies thereof be furnished or delivered to any other person, without the prior written consent of Lehman, except that you many furnish copies hereof (i) to your independent auditors and attorneys, (ii) to any United States, state or local authority having jurisdiction over you or over Lehman, (iii) pursuant to the order or any legal process of any court of competent jurisdiction or any governmental agency, and (iv) in connection with any legal action arising out of the Agreement.

E.    I have assumed with your permission (i) the genuineness of all signatures by the Corporation and the Trustee, (ii) the authenticity of documents submitted to me as originals and the conformity with the original documents of all documents submitted to me as copies, and (iii) the due execution and delivery, pursuant to due authorization, of the Agreement by each party other than Lehman.

The foregoing opinions are given on the express understanding that the undersigned is an officer of Lehman Brothers Inc. and shall in no event incur any personal liability in connection with the said opinions.

Very truly yours,

**EXHIBIT D**

[LETTERHEAD OF COUNSEL TO CORPORATION]

[Date]

[Trustee]

Lehman Brothers Special Financing Inc.
New York, NY

Re:   [NAME OF BONDS]

Ladies and Gentlemen:

I have acted as counsel to _____ (the "Corporation") in connection with its execution and delivery of the Reserve Fund Agreement dated as of _____ (the "Agreement"), by and among Lehman Brothers Special Financing Inc. ("Lehman"), _____, as Trustee (the "Trustee") and the Corporation and its execution and delivery of the Indenture (as defined in the Agreement). Capitalized terms used herein and not defined herein have the respective meanings given to them in the Agreement.

In rendering this opinion, we have examined, among other things, copies of the Agreement and the Financing Documents.

In connection with the foregoing, we have also examined originals or copies satisfactory to us of all such corporate records, agreements, certificates and other documents as we have deemed relevant and necessary as a basis for the opinions hereinafter expressed. In such examination we have assumed the genuineness of all signatures, the authenticity of all documents submitted to us as originals, and the conformity with the original documents of all documents submitted to us as copies.

In giving the opinions expressed below we do not purport to be experts in or generally familiar with or qualified to express legal opinions based on the laws of any jurisdiction other than the laws of the State of [state of Corporation] (the "State").

Based upon the foregoing examination and review, we are of the opinion that:

(i)     The Corporation has full legal right, power and authority to enter into the Reserve Fund Agreement and the Financing Documents to which it is a party and to authorize and direct the Trustee, pursuant to the Reserve Fund Agreement, to make purchases of the Qualified Eligible Securities in accordance with the terms therein.

(ii)    The Agreement and the Financing Documents to which it is a party have been duly authorized, executed and delivered by the Corporation.

D-1

(iii)    The stipulation of New York law as the governing law of the Agreement is enforceable under the laws of the State.

(iv)    Assuming for purposes of the opinion expressed in this paragraph (iv) that State law and New York law are the same, the Agreement is a legal, valid and binding obligation of the Corporation, enforceable against it in accordance with the terms thereof, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally, and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

(v)    The Corporation's execution and delivery of the Agreement and the performance of its obligations thereunder do not and will not conflict with or constitute or result in a default under, a breach or violation of, or the creation of any lien or encumbrance on any of its property under the Indenture, the Financing Documents to which it is a party, or any other agreement, instrument, judgment, injunction or order applicable to it or any of its property.

(vi)    The Loan Agreement is a legal, valid and binding obligation of the Corporation, enforceable against it in accordance with the terms thereof, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally, and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

(vii)    All consents, authorizations and approvals requisite for its execution, delivery and performance of this Agreement have been obtained and remain in full force and effect and all conditions thereof have been duly complied with, and no other action by, and no notice to or filing with, any governmental authority, regulatory body or any other entity is required for such execution, delivery or performance.

I am furnishing this opinion to you solely for your benefit and no other person is entitled to rely hereon.  This opinion is not to be used, circulated, quoted or otherwise referred to for any other purpose.

Very truly yours,

D-2

**EXHIBIT E**

# Lehman Brothers Special Financing Inc.
## Notice of Tender
### Under the [ _____ ] Agreement
### Dated as of:  [ _____ ]

To:           _____, as [Escrow
              Agent/Trustee]
              Attention:     _____
              Fax:      _____
              Phone:    _____
From:         Lehman Brothers Inc. ("LBI")
              Attention:     _____
              Fax:      _____
              Phone:    _____
Date:         [_____]
Re:           [_____]

| Date and Price | |
|---|---|
| Purchase Date: | [_____] |
| Specified Purchase Price: | [_____] |

**Specific Government Obligations**

| Cusip | Type | Maturity | Coupon | Face Amount | Maturity Amount | Accrued Interest |
|---|---|---|---|---|---|---|
| [ _____ ] | [ _____ ] | [ _____ ] | [ _____ ] | [ _____ ] | [ _____ ] | [ _____ ] |

**Delivery vs. Payment (Book Entry Delivery)**

On the Purchase Date, LBI will deliver Face value      [ _____ ]        [BILLS/NOTES] maturing [ _____ ]
to:
              [_____]
              [_____]
              Re:
              [_____]
On the Purchase Date, LBI will receive [ _____ ]
       Chase NYC/Lehman
       ABA: 021000021
       A/C #066206677