Page 1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   Case No. 08-13555-scc

4   - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5   In the Matter of:

6   LEHMAN BROTHERS HOLDINGS, INC.,

7        Debtors.

8   - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

9   ADV. CASE NO.: 13-01341-scc

10   In the Matter of:

11   LEHMAN BROTHERS HOLDINGS, INC.,

12        Plaintiff,

13   v.

14   SYNCORA GUARANTEE, INC.

15        Defendant.

16   - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

17            United States Bankruptcy Court

18            One Bowling Green

19            New York, New York

20

21            February 19, 2014

22            10:06 a.m.

23   B E F O R E :

24   HON SHELLEY C. CHAPMAN

25   U.S. BANKRUPTCY JUDGE

Page 2

1    Status Conference

2

3    Doc. #42754 Motion of Lehman Brothers Holdings, Inc.

4    Pursuant to Bankruptcy Rule 9019 for Approval of Settlement

5    Agreement Regarding Claims of Federal Home Loan Mortgage

6    Corporation Filed by Alfredo R. Perez on behalf of Lehman

7    Brothers Holdings, Inc.

8

9    Adversary Proceeding:  13-01341-scc Lehman Brothers

10   Holdings, Inc. v Syncora Guarantee, Inc.  Doc. #16 Lehman

11   Brothers Holdings, Inc.'s Notice of Motion and Motion for

12   Summary Judgment of Its Adversary Complaint Against Syncora

13   Guarantee, Inc. filed by Glenn E. Siegel on behalf of Lehman

14   Brothers Holdings, Inc.

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Sherri L. Breach, CERT*D-397

1    A P P E A R A N C E S :

2    WEIL, GOTSHAL & MANGES, LLP

3        Attorneys for Debtors

4        700 Louisiana, Suite 1600

5        Houston, Texas 77002

6

7    BY:  ALFREDO R. PEREZ, ESQ.

8

9    WEIL, GOTSHAL & MANGES, LLP

10       Attorneys for Debtors

11       767 Fifth Avenue

12       New York, New York 10153

13

14   BY:  GARRETT A. FAIL, ESQ.

15       JACQUELINE MARCUS, ESQ.

16

17   MORGAN LEWIS & BROCKIUS, LLP

18       Attorneys for Debtors

19       101 Park Avenue

20       New York, New York 10178

21

22   BY:  GLENN E. SIEGEL, ESQ.

23       PATRICK D. FLEMING, ESQ.

24

25

Page 4

1    ALLEGAERT BERGER & VOGEL, LLP

2        Attorneys for Syncora

3        111 Broadway, 20th Floor

4        New York, New York 10006

5

6    BY:  JOHN S. CRAIG, ESQ.

7        MICHAEL S. VOGEL, ESQ.

8

9    ALSO APPEARING:

10   MATTHEW CANTOR

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 5

1                    P R O C E E D I N G S

2              THE COURT:  How are you?

3              MR. CANTOR:  Good morning

4              MR. PEREZ:  Good morning, Your Honor.

5              THE COURT:  Good morning.

6              MR. PEREZ:  Alfredo Perez on behalf of the LBHI,

7      the plan administrator.

8              Your Honor, there are two matters on the agenda,

9      the state of the estate and then the motion -- the 9019

10     motion with Freddie Mac.

11             THE COURT:  Right.

12             MR. PEREZ:  If I could flip the order --

13             THE COURT:  Sure.

14             MR. PEREZ:  -- and let a lot of people go.

15             So, Your Honor, I'm happy to be here to report on

16     this 9019.  As the Court is aware, even from its short

17     tenure in this case --

18             THE COURT:  Right.

19             MR. PEREZ:  -- this has had a very long history.

20             Your Honor, in essence, we're resolving two

21     claims.  One is what we call the loan claim, which is a $1.2

22     billion, approximately, claim, in which we had a dispute as

23     to its classification.  Freddie Mac taking the position that

24     it was subject to here a priority and we took the position

25     that it was just a borrowed money claim.

1        Additionally, Your Honor, we have almost a billion

2    dollars worth of servicing related claims.  We have a

3    declaration from Mr. Zach Trump (ph) who is in the courtroom

4    talking about the merits of that.

5        THE COURT:  Uh-huh.

6        MR. PEREZ:  But, in essence, we bought whole --

7    Freddie bought whole loans from LBHI, made reps and

8    warranties.  So approximately $934 million of that is as a

9    result of reps and warrants.  An additional 27 million is on

10   so-called servicing claims.  Freddie takes the position that

11   those are post-petition admin claims that would be payable

12   100 cents on the dollars.  Obviously, we dispute that, but

13   that was another dispute.

14       So as a result of the motion that we filed that

15   went up to the District Court, it -- the reference that came

16   back down, et cetera, we had to find, in essence, a creative

17   way to settle this otherwise we would be litigating for a

18   long time, and we do have a $1.2 billion cash escrow in

19   addition to a $900 million claim escrow.  So we've got the

20   two escrows totaling in excessive of $2 billion.

21       So by the payment of the $767 million, we

22   purchased the claims.  Those claims are now -- would now be

23   owned by LBHI.

24       In addition, Your Honor, and very important, we

25   get, in essence, the back of the loan file so that we can

Page 7

1   make claims against the people who we purchased who made

2   reps and warranties to us who we purchased.  Similar to what

3   we did with Fannie.  I do have an amended order.  There were

4   some numbers --

5           THE COURT:  Okay.

6           MR. PEREZ:  -- that were missing.  So I want to --

7   or that are actually not correct, just a few.  But I have an

8   amended order which actually attaches the loan that the --

9   the correct loan numbers.

10          But other than that, I --

11          THE COURT:  All right.  That's the -- that was

12   filed at Docket 42907?

13          MR. PEREZ:  Exactly, Your Honor.

14          THE COURT:  Okay.

15          MR. PEREZ:  But -- but it -- because we have these

16   two competing charts, what I would like to do is the order

17   that the Court enters actually have --

18          THE COURT:  Sure.

19          MR. PEREZ:  -- it attached so there's no --

20          THE COURT:  Okay.

21          MR. PEREZ:  -- question as to which is the correct

22   one.

23          THE COURT:  All right.

24          MR. PEREZ:  And with that, Your Honor, I would

25   request entry of the -- of the motion.

1        THE COURT:  Okay.  And you said that it -- we have

2    the supporting declaration, correct?

3        MR. PEREZ:  We have a supporting declaration from

4    Mr. Trump with respect to the rep and warrant.  I think with

5    respect to the issue of the HIRA (ph) priority, that's been

6    the subject of extensive briefing.  I think it's really a

7    legal question at --

8        THE COURT:  Right.

9        MR. PEREZ:  -- this point.  The Court would have,

10   you know, decided, had we gone forward.

11       THE COURT:  Right.

12       MR. PEREZ:  I don't know that we have any -- the

13   facts are not disputed.  We got --

14       THE COURT:  Right.

15       MR. PEREZ:  -- a billion-two was payable the day

16   of the bankruptcy and it's how you characterize those facts.

17       THE COURT:  Okay.  Does anyone else wish to be

18   heard with respect to the motion of LBHI for approval of the

19   settlement of the claims of the Federal Home of Loan

20   Mortgage Corporation?

21       All right.  Very good.  I'm very happy --

22       MR. PEREZ:  Thank you, Your Honor.  I do have --

23       THE COURT:  -- to approve the settlement.

24       MR. PEREZ:  -- a copy of the redline of the order

25   and as well as the actual --

Page 9

1          THE COURT:  Okay.

2          MR. PEREZ:  -- order.  Do you want -- would you

3     like to look at that?

4          THE COURT:  Yes.  If you would hand that up, that

5     would be great.

6          Okay.  All right.  So we'll get that entered

7     shortly later this morning.

8          So that -- other than the status, that's all that

9     was on -- is on for this morning, right?  The adversary --

10          MR. PEREZ:  Correct, Your Honor.

11          THE COURT:  -- proceeding apparently was adjourned

12     to this afternoon --

13          MR. PEREZ:  Correct.

14          THE COURT:  -- rescheduled for this afternoon?

15          MR. PEREZ:  Yes.

16          THE COURT:  Okay.  All right.

17          MR. PEREZ:  So, Your Honor, Matthew Cantor who is

18     the EVP and -- of legal affairs and the chief general

19     counsel is going to be the one presenting the state of the

20     estate.

21          THE COURT:  Okay.  Excellent.

22          MR. PEREZ:  Thank you, Your Honor.

23          THE COURT:  Thank you, Mr. Perez.

24      (Pause)

25          THE COURT:  Good morning, Mr. Cantor.  How are

1    you?

2          MR. CANTOR:  I'm okay, Your Honor.  I apologize

3    for the delay this morning.  It was --

4          THE COURT:  No problem.

5          MR. CANTOR:  Thank you.

6          We just thought it would be worthwhile, and

7    appreciate you giving us a little bit of time, to give you a

8    state of the estate, introduce who we are, who Lehman is,

9    who you'll be seeing before you over the next --

10         THE COURT:  Okay.

11         MR. CANTOR:  -- couple of years, I suspect.  I

12   have folks from Weil Gotshal here who can answer probably a

13   lot more questions than I can.  I'm basically the chief

14   legal officer at Lehman.

15         You know, it the largest chapter 11 case in

16   history.  There was $639 billion of assets when it filed.

17   There were $613 billion of liabilities.  It was a legendary

18   bankruptcy case.  The company emerged from bankruptcy on

19   March 6th, 2012 and it basically emerged as a corporation

20   engaged in the business of liquidating itself and the 22

21   other debtor subsidiaries and the thousands of entities.

22   It's an amazing place to have gotten to see.   There's

23   thousands of entities.  And we're in the business of

24   dissolving many, many, many companies that we pay.

25         We basically operate as 23 different debtors.

Page 11

1    LBHI, which was the ultimate holding company, was authorized

2    to be the plan administrator for all these post-emergence

3    debtors.  The plan administrator was granted broad authority

4    to wind down the business exercising its business judgment

5    as a fiduciary, as a trustee for all these debtors.

6         Virtually everything that gets done gets done

7    without court approval.  Large settlements, like the one we

8    just brought to you, will need court approval pursuant to

9    the plan.

10        THE COURT:  My understanding is that the threshold

11   of most instances is $200 million?

12        MR. CANTOR:  Yes.  Matters of 200 million or more

13   we bring to the Court for a 9019 motion.

14        THE COURT:  Then the 200 million refers to the

15   amount that's at issue or the amount of the settlement?

16        MR. CANTOR:  I believe it's the amount of the

17   claim, but those --

18        THE COURT:  Of the claim.

19        MR. CANTOR:  It's the --

20        MR. PEREZ:  Right.

21        MR. CANTOR:  Yeah.  They told me that.  The claim

22   amount.

23        THE COURT:  Right.  Okay.

24        MR. CANTOR:  So LBHI is effectively run by seven

25   directors.  They're highly experienced, you know, business

Page 12

```
 1   professionals.  They're very active in their oversight of --
 2   and management of the liquidation.  I think of them as
 3   effectively trustees as you would think of a Chapter 7
 4   trustee.
 5        It's a very active board model.  The directors
 6   have organized themselves on different subcommittees and
 7   with their specialties focusing on different types of assets
 8   and different types of disputes.  And, you know, there's
 9   weekly reporting from the -- at the management team into the
10   committees and it's very collaborative.  And they're working
11   real hard and they'll create a lot of value, I think, from
12   what I've seen.
13        The post-emergence governance was a hotly
14   negotiated topic during the bankruptcy case.  These seven
15   directors were chosen by consensus of a committee that
16   represented all the major creditor constituencies in the
17   case.  The general unsecured committee was represented.  The
18   foreign affiliate representatives were represented; holding
19   company creditors were represented; operating company
20   creditors.  There was -- and management was represented to
21   ensure that we had a group of folks managing the post-
22   emergence debtors in a way that was different to any
23   individual creditor group, but looking to, you know, achieve
24   its goal.
25        THE COURT:  It -- in light of that comment -- you
```

Page 13

1    may be getting to this -- but could you include an

2    explanation of their compensation structure?

3         MR. CANTOR:  The -- I couldn't give you great

4    detail on the compensation structure.  I read it about a

5    year ago, but it's very complicated.  But it is -- there is

6    some discretionary portion -- not discretionary.  There's

7    some --

8         THE COURT:  Incentive compensation.

9         MR. CANTOR:  -- incentive compensation --

10         THE COURT:  Okay.

11         MR. CANTOR:  -- based upon whether the credit --

12    whether the recoveries exceed some estimates that were --

13         THE COURT:  Okay.

14         MR. CANTOR:  -- in the disclosure statement.

15         THE COURT:  So there's -- there's baseline

16    compensation in terms of a monthly or hourly or yearly rate,

17    and then there's additional incentive compensation?

18         MR. CANTOR:  Right.  There's a baseline comp with

19    a incentive piece.  It's driven primarily by increase

20    percentage distributions to creditors.  There is some -- I

21    think it's a very small factor -- acceleration in terms of

22    speed.

23         But I would tell you that as we, you know, engage

24    in the liquidation, both at the management level and I know

25    at the board level, it's interesting to be -- we have no, as

Page 14

1   we say, no one has an ax in -- where it comes out.  What

2   we're trying to do is make sure we get to the right place.

3        I thought the way we wrote it in the last balance

4   sheet, what the objective is is that the company continues

5   to pursue the objective of asset value maximization and

6   timely distributions to creditors with available cash trough

7   the optimal execution and orderly wind down process, and the

8   judicious and timely resolution of claims.

9        The messaging is that while we're doing this as

10  fast as reasonably possible, we're doing it with an eye

11  towards maximizing value and balancing the speed of that.

12  And, likewise, on the claims side we're working real hard to

13  get the claims down and resolve as many disputes as we can,

14  and balancing that with the cost of doing that in the

15  fairest and most judicious way.  And, also, being mindful of

16  the Court's time, too.

17        So far the estate has made distributions of about

18  $60 billion.  That includes distributions, when you think

19  about the -- it's a plan with a waterfall.  There's

20  distributions among debtors.  So 40 million of that 60 has

21  been distributed out, but we -- you may see a headline of

22  $60 billion or so of distributions.  That includes amounts

23  re-circulated --

24        THE COURT:  Out of the Lehman family, in other

25  words?

```
 1        MR. CANTOR:  Yes.  Forty million out of the Lehman

 2   family.

 3        And, again, just to reiterate, the goals are --

 4   the boards goals and our goals are to market the assets and

 5   to obtain maximum value.

 6        Obviously, we're also looking to resolve disputed

 7   claims in a judicious way, but do it as timely as we can

 8   because there is a cost to having disputed claims and we

 9   reserve against those claims.

10        And, of course, we have a pragmatic view of the

11   Court's time and we're very mindful of maximizing the

12   Court's resources here.  And I'll get into the -- so -- I

13   mean, the case has been, you know, a great success in so

14   many ways.  The alternative dispute resolution process and

15   the sheer number of dollars of claims and disputes that have

16   been resolved by the Weil Gotshal folks outside the court

17   has been extraordinary.

18        Thinking about the left side of the balance sheet,

19   the assets remaining, there is about $9.3 billion of assets

20   remaining to be monetized from operations.  That includes

21   recoveries from affiliates -- we have a lot of foreign

22   affiliates that we're expecting recoveries from -- and

23   litigation recoveries, which I'll briefly talk about.

24        There are a few other significant assets to sell,

25   private equity investments, not a lot of real estate left to
```

Page 16

1   sell.  And, like I said, we have receivables from foreign

2   affiliates, non-controlled affiliates really represents the

3   greatest number of dollars left to be received.

4        One affiliate that I would point is the Lehman

5   Brothers Finance, A.G., which is the Swiss affiliate which

6   was in a Swiss receivership, is a very large portion of the

7   dollars remaining from foreign affiliates.  Judge Peck was

8   instrumental in helping us get a settlement done about a

9   year ago that resolved huge disputes, you know, $10 billion

10  of claims on the Swiss side, $6 billion of claims on the

11  U.S. side, and it was -- enabled -- will enable the estate

12  to unlock a tremendous amount of value.

13       That deal had been approved recently by the Swiss

14  Financial Market Supervisory Authority, which we call FIMA

15  (sic), and we're hoping to get that soon.  The effectiveness

16  of the settlement has been delayed.  A Swiss -- purported

17  Swiss creditor, we -- the name is very hard for me to

18  pronounce in German, but we refer to him as Klaus Teshira

19  (ph) is a Swiss creditor who has objected to the settlement

20  over there and proposed additional claims.  We've been

21  trying to find a way to move a resolution with him along.

22  He had claims here in the states, withdrew those claims to

23  get out of sort of having to deal with us here.

24       We've initiated an avoidance action against Klaus

25  Teshira.  We're in the middle of discovery on that.  We

Page 17

1   think it's -- they've resisted the discovery.  We think it's

2   really important that we keep that moving forward.  I think

3   that will help break the log jam if we can move the

4   litigation along here.  That's one of the things -- some of

5   the things I'm going to identify for you is what are the

6   things you may see coming to the court that you need to be

7   ready for, and that's certainly one of them.  We're working

8   hard on getting it resolved, but that's a hot litigation

9   here.

10       THE COURT:  Okay.  I meant to ask, Mr. Perez, the

11  claims that are being acquired by LBHI as a result of this

12  settlement --

13       MR. PEREZ:  Right.

14       THE COURT:  -- are those claims that will be

15  brought here or in other courts, assuming that --

16       MR. PEREZ:  Well --

17       THE COURT:  -- that they are eventually claims

18  that would be lodged.

19       MR. PEREZ:  So there's really three types of

20  claims.  There's -- there is a claim that will be an LBHI

21  class 3 claim, which is the 1.2 billion.  There is a claim

22  which will be a class 7 claim, and then there are hundreds

23  of the smaller claims --

24       THE COURT:  Those are --

25       MR. PEREZ:  -- which will be brought wherever we

Page 18

1    can find who gave -- made the reps and warrants.

2         THE COURT:  Okay.  But not necessarily here?

3         MR. PEREZ:  Not necessarily here.

4         THE COURT:  Okay.  Thank you.

5         MR. CANTOR:  And I just -- just as an aside there,

6    we did a -- we had a very, I think, favorable resolution

7    with Fannie May.  I think this resolution with Freddie Mac

8    was very favorable.  Part of that, because we were giving up

9    claims or value on account of mortgages that they claimed we

10   sold to them -- they would have violations and breaches in

11   the reps and warranties -- we bought many of those.

12         Now Mr. Trump, who you'll probably see again, and

13   our folks out in Denver have been in the business over the

14   past couple of years pursuing count -- downstream

15   counterparties on account of claims we have.  These

16   mortgages that we're going to get back or mortgage files

17   we're going to get back from Fannie and Freddie are going to

18   go into that where we can continue monetizing those assets

19   for the estate.

20         THE COURT:  Okay.

21         MR. CANTOR:  I would say there -- the value is

22   speculative, not to suggest there isn't any, but it's very

23   hard to get an idea of what it's worth because --

24         THE COURT:  All right.

25         MR. CANTOR:  -- so many of those counterparties

Page 19

1    aren't in business anymore.

2         And we've brought claims all over the country in

3    state courts and federal courts looking for the most

4    appropriate jurisdiction to do that.  We have not yet

5    brought those here.

6         THE COURT:  Okay.

7         MR. CANTOR:  The second big piece of litigation or

8    litigations is during the bankruptcy case the estate reached

9    a resolution with all of its major banks, all of its major

10   counterparties save three: JPMorgan, Citi and Credit Suisse.

11   Those litigations particularly -- well, all three of them

12   derived -- claims derive in part from termination of

13   business and all the underlying -- hundreds of underlying

14   transactions.  And there's disputes over the value of those

15   claims and what the value of the underlying collateral was.

16        With Citi and JPM there's disputes as to the

17   validity of their collateral security arrangements.  So

18   there will be challenges to their liens.

19        With JPM there's a major challenge as to how JPM

20   liquidated the collateral securities that they had.  They

21   proposed a deficiency claim against us for a shortfall in

22   the collateral securities.  So we've challenged that.

23        Those are the types of litigation you're going to

24   see here.  We have additional litigation -- and right now

25   we're in -- we're steep in discovery.  Document -- documents

Page 20

1    are being shared and we're beginning to set up depositions

2    on experts in the JPM case and the custodians in the Citi

3    case.  We haven't gotten that far in the Credit Suisse case.

4         Also, in the JPM case the estate has affirmative

5    claims against JPM.  JPM requested -- demanded a jury trial.

6    I -- so that case is pending before Judge Sullivan.  We call

7    it the collateral case.  So --

8         It's with Judge Sullivan, right, Judge Sullivan?

9         And so that's an affirmative case we have raising

10   a bunch of issues.  Judge Peck dismissed many of our claims

11   under the safe harbor provisions and 546(g), but I think 24

12   claims remain.  Claims like an actual -- actual fraudulent

13   conveyances, violations of the automatic stay, things that

14   weren't protected by 546.

15        And we're moving forward.  We are in mediation

16   with JPM.  We've chosen a mediator.  We've had some sessions

17   and we continue to work at that, the parallel track with the

18   litigation.

19        But needless to say that's after the affiliate

20   recoveries, the foreign affiliate recoveries, that's --

21   those are the largest recoveries.  You know, if we're

22   successful in getting those claims to a -- where we think

23   they should be, that will bring collateral security back

24   into the estate which we can distribute to creditors.

25        You may see some issues of post-petition interest.

Page 21

1   You have a secured creditor holding cash collateral on a

2   claim we think is too big and it's taking a long time to

3   work that out.  So you may see some questions about interest

4   accruals.

5        The other large litigation that you're going to be

6   seeing is litigation around special purpose vehicles.  All

7   right.  Lehman had set up a bunch of SPVs.  In many of these

8   deals, there were -- when the case commenced, the rights of

9   the noteholders versus Lehman as the residual were altered

10  by the commencing of the case and the termination of certain

11  rights.  We've challenged that.

12       These particular vehicles we're talking about are

13  vehicles where the assets in the trust, in the SPV, got

14  distributed out to noteholders.  And we've gone out and

15  looked for them and sued them.  We've initiated avoidance

16  actions.  We're trying to recover that property.  We have

17  all of that -- all those disputes in an alternative dispute

18  resolution regime and we're trying to work that out.  All

19  the litigation was stayed and Judge Peck, his last order

20  that he entered was an order staying that litigation through

21  May --

22       THE COURT:  Through May.

23       MR. CANTOR:  Through May.  Great.  Thanks.

24   (Laughter)

25       THE COURT:  Right.

Page 22

```
 1        MR. CANTOR:  So we're presenting a protocol.

 2   We're work -- trying to work out a protocol to manage that

 3   litigation.  But I suspect that's going to -- that could

 4   take a fair bit of judicial resources --

 5        THE COURT:  Okay.

 6        MR. CANTOR:  -- to manage.  And Ms. Marcus is

 7   going to -- she'll know more about that.

 8        Last huge asset of the estate is the distributed

 9   claims reserve.  There's 12.8 billion of cash in that

10   reserve.  All the investors on the street, now after looking

11   to see what we get in from the foreign affiliates, watch

12   that distributed claims reserve very carefully.  They want

13   to see what's coming out and when it's coming out.  And

14   we're mindful of that.  And we do -- we know -- our

15   creditors, you know, those who put in claims, are mindful of

16   that.  They know there's some tension there.  We're maybe

17   looking to get that done faster.  But we -- one of our

18   biggest challenges is balancing the time versus trying to do

19   what's right.  And so there --

20        THE COURT:  How -- I assume that the $12 million

21   is held in something that there is a phenomenal interest

22   rate of something like .01 percent of something like that.

23     (Laughter)

24        MR. CANTOR:  Yeah.  It actually has been shocking

25   at how little you can make on your money when you have to,
```

Page 23

1    but we're doing our best, and I can get you an answer on

2    what the real rate is --

3              THE COURT:  I'm assuming that it's something

4    virtually trivial.

5              MR. CANTOR:  Well, we actually --

6              THE COURT:  Very trivial.

7              MR. CANTOR:  The board has actually come up with a

8    -- I think a very smart, but safe way.  I was in -- sort of

9    involved in the meetings where they found -- I'm trying to

10   think about what we've disclosed, but we have it invested in

11   the most aggressive and high-yielding stuff that we could do

12   within the context of the risk we're allowed to take.

13             THE COURT:  Okay.

14             MR. CANTOR:  And I know it's been a hot topic and

15   the folks doing it are the best guys in the world doing it.

16             So there's about 4,000 claims remaining to be

17   resolved.  And it started out as 69,000, so we're down to

18   sort of the creaky last eight or nine percent.  And those

19   are the folks -- you know, we resolved most of these claims

20   either because, you know, they're an omnibus, you know,

21   objection or most of it's been resolved consensually.  You

22   know, the estate is pretty much taking down the middle views

23   on what claim amounts should be and we generally the folks

24   there.  The mediators have been great helping us get there.

25             So the -- a lot of the folks we're left with are

Page 24

1   the ones we're not really able to -- where we're going to

2   need some judicial help to get to the right place.

3       So of that 4,000, it's about $124 billion worth of

4   claims in that 4,000.  The estate started with $1.3 trillion

5   of claims, so, obviously, I mean, they've made tremendous

6   progress.

7       Of the 4,000, 1,000 are likely to be subject to an

8   omnibus type objection, meaning they're not -- so claims

9   you're going to see is one-offs.  And many of those are

10  grouped in claims.  What you'll hear about next, I'll talk

11  about our large remaining claims.  The largest -- some of

12  the largest are our R&BS type claims.  We had the claims in

13  from Fannie and big claims in from Freddie, and we worked

14  real hard and we just got those done.

15      What remains in terms of large claims is we have

16  all the private label trustees, all the securitizations that

17  weren't sold to the GSCs, but were sold to the street.

18  There's about three to 400 claims of the 4,000 claim numbers

19  picked up in that.  So if and when we get the private label

20  trustee -- you know, claims next, we can take out three or

21  400 of those.

22      So there will be -- there will be types of claims

23  that we'll be able to knock out large blocks of that number.

24      The plan was to get a deal done with Fannie and a

25  deal done with Freddie, and then go work and try

Page 25

1   (indiscernible).  That's what we're focusing on next.

2        So the aggregate amount of claims in the R&BS area

3   was 58 billion.  Freddie was a couple of billion and Fannie

4   was a couple of billion.  So most of that is in the private

5   label.  That's to come.

6        The next large claim that we've been unable to

7   resolve in sort of a dispute, alternative dispute resolution

8   context is the -- you know, Lehman -- LBL, Lehman Brothers

9   in London had some space at the Canary Warf and there's a --

10  an allegation of a guarantee by the holding company of the

11  lease.  There's a lot of noise around this one, but it's a

12  $780 million claim the estate thinks it's left.  Briefing,

13  if it hasn't been completed already, it will be shortly.

14  Discovery's done.  We tried to mediate it.  It has been

15  unsuccessful.  That's going to get teed up for Your Honor.

16       The next, which you have on your calendar for a

17  trial in April --

18       THE COURT:  Uh-huh.

19       MR. CANTOR:  -- is our objections to reclassify

20  these RSU, restricted stock unit claims of former employees.

21  So that's going to hit your calendar and it's something

22  we're going to need your time on.

23       So as I said before we -- the estate has a good

24  track record and has an amazing amount of information that

25  we generate -- that Peter (sic) generates every month in

Page 26

1    terms of how many claims are being resolved by the

2    alternative dispute resolution process.  And Your Honor will

3    see those reports every month, and we hope to be able to

4    continue in the same type of resolution paradigm that we had

5    before.

6        There are, let me see, 302 settlements that were

7    achieved pursuant to the ADR procedures on -- and these were

8    due to the estate type claims.  We brought in $2.1 billion

9    that way.  We were 91 percent effective; 91 percent of all

10   the collection matters that went to dispute resolution were

11   successful.

12       So we -- you know, we look forward to working with

13   your chambers the way we did with Judge Peck's chambers and

14   managing the calendar, and everything -- we have everything

15   -- because we have lots of different attorneys.

16       THE COURT:  I've noticed.

17       MR. CANTOR:  But everything -- the calendar is

18   managed through Moe (sic) and the people at Weil Gotshal and

19   we help -- we help to keep it a little organized for you and

20   a little less helter skelter.

21       So the things that ended up coming to you are

22   obviously the things we've reached an impasse on.

23       THE COURT:  Okay.

24       MR. CANTOR:  Our rate of reaching impasse is

25   higher because we're down to that creaky --

1          THE COURT:  I understand.

2          MR. CANTOR:  -- five to eight percent.  And

3     sometimes we come across a legal issue, you know, and, you

4     know, we're trying to resolve something with a creditor.

5     You may see something very shortly if we have that type of

6     issue where we just can't get there -- anywhere close on a

7     legal issue and everyone thinks they're right on a legal

8     issue, or at least we can't get the other side to agree

9     there's some riff there.

10         THE COURT:  Right.

11         MR. CANTOR:  And then we -- we sort of tear the

12    Band-Aid off and present it to Your Honor --

13         THE COURT:  Right.

14         MR. CANTOR:  -- for resolution.

15         THE COURT:  And I assume that when you get to an

16    issue like that, if there are other similarly situated

17    issues, that you would bring that to my attention.  In other

18    words, if the resolution of a particular dispute is going to

19    have an impact or be law of the case with respect to a

20    similar issue between other parties that you would bring

21    that to my attention.

22         MR. CANTOR:  Absolutely, Your Honor.  We -- we've

23    had that in the past and we've very clear we don't want to

24    sort of pull a fast one with the little guy and get

25    everybody swept into that.

1        And we try real hard to make sure we know who is

2   litigating what in the estate.

3        THE COURT:  Right.  Okay.

4        MR. CANTOR:  So in terms of numbers -- so,

5   currently, there's 46 adversary proceedings pending;  41 of

6   them have been commenced by us, the remainder commenced by

7   the other side.

8        And so far as I can tell now that's what I would

9   expect you should be seeing coming down the pipe for Your

10  Honor to be -- the litigation with -- on LBF, we have some

11  litigation this afternoon with Syncora which was a mono-line

12  that insured some of our private label R&BS.

13       And then I'm happy to answer any questions and for

14  every other one that I can't answer, that's why I've made

15  sure we had everyone here.

16       THE COURT:  Okay.  That was very helpful.  From my

17  perspective these are big shoes to fill.  I said that at the

18  first hearing, but we're going to do our best.  We're going

19  to do our best also to continue with some continuity in

20  terms of the way you folks grew accustom to doing things

21  with Judge Peck over the last four to five years.

22  Invariably, there might be some differences, but you should

23  never hesitate to contact chambers and let us know your

24  druthers.

25       I mean, my perspective is that we're here to serve

Page 29

1    you and continue to get this done, and we'll give you as

2    much of our time as you -- as you would like.

3           So I look -- very much look forward to working

4    with all you and I --

5           MR. CANTOR:  Likewise.

6           THE COURT:  -- appreciate the overview.

7           MR. CANTOR:  Thanks.

8           THE COURT:  If I could ask, it would be very

9    useful to me, actually, to have a transcript of your

10   remarks, Mr. Cantor.  So if somebody --

11          MR. PEREZ:  we'll get that --

12          THE COURT:  -- could send that to us, that would

13   be --

14          MR. PEREZ:  We'll get that for you.

15          THE COURT:  -- that would be very helpful.

16          MR. PEREZ:  Yes.

17          THE COURT:  All right.

18          MR. CANTOR:  Okay.

19          THE COURT:  Thank you.

20          MR. CANTOR:  Thank you, Your Honor.

21          THE COURT:  Thank you.

22          MR. CANTOR:  See you this afternoon.

23          THE COURT:  I think that's it.

24          MR. PEREZ:  That's it for this morning.

25          THE COURT:  This morning and then we're --

Page 30

1          MR. PEREZ:  And then --

2          THE COURT:  -- going to reconvene at 2:00.

3          MR. PEREZ:  Right.

4          THE COURT:  Okay.  Thank you all very much.

5          MR. PEREZ:  Thank you.  May we be excused?

6          THE COURT:  Yes.

7       (Recess taken at 10:36 a.m.; reconvened at 2:09 p.m.)

8          THE COURT:  Please have a seat.

9          How is everyone today?

10         MR. SIEGEL:  Very good.

11         MR. CRAIG:  Good.  Thank you, Your Honor.

12         THE COURT:  All right.  Who would like to start,

13    Mr. Siegel?

14         Ready when you are.

15         MR. SIEGEL:  Good afternoon, Your Honor.  Glenn

16    Siegel from Morgan Lewis, here on behalf of Lehman.  This is

17    a -- these are actually, I guess, cross-motions for summary

18    judgment in connection with Lehman's adversary proceeding

19    seeking to disallow and subordinate a claim filed by Syncora

20    in connection with a trust that they insured, the trust

21    called the Green Point Mortgage Funding Trust 2006-HE1; that

22    they had filed a claim in connection with the insurance that

23    they provided to that trust, and the debtor takes the

24    position that that claim is subject to disallowance and

25    subordination essentially because it is duplicative of the

Page 31

```
 1    U.S. Bank claim, which also seeks recovery for the same

 2    losses.

 3          There's actually two components to this which --

 4          THE COURT:  Right.

 5          MR. SIEGEL:  -- have to do with the --

 6          THE COURT:  So --

 7          MR. SIEGEL:  -- intra --

 8          THE COURT:  So let me --

 9          MR. SIEGEL:  Sure.

10          THE COURT:  -- let me jump in --

11          MR. SIEGEL:  Sure.

12          THE COURT:  -- and see if I can translate this

13    into some common language --

14          MR. SIEGEL:  Okay.

15          THE COURT:  -- okay because I'm going to want to

16    -- as you know, I like to ask a lot of questions.

17          MR. SIEGEL:  Not a problem.

18          THE COURT:  Okay.

19          So there's something in the papers called the

20    Syncora claim, right, and the Syncora claim, I take it,

21    includes at least a claim against LBHI for $527 million.  Is

22    that at least partially correct?

23          In other words, Syncora has paid out $527 million

24    --

25          MR. SIEGEL:  That's correct.
```

     1          THE COURT:  -- to its insureds, to the

     2     noteholders.

     3          MR. SIEGEL:  That's correct.

     4          THE COURT:  Correct?  And Syncora says that

     5     they've paid out that money because -- and I'm going to use

     6     shorthand -- shortfalls in the collateral.

     7          MR. SIEGEL:  Okay.

     8          THE COURT:  Right?  I mean --

     9          MR. SIEGEL:  Essentially.

    10          THE COURT:  Essentially.  Right.  And Syncora also

    11     says that that claim would exist even if the mortgages --

    12     the mortgage documentation had been perfect and there were

    13     no repurchase -- there were no claims relating to the

    14     repurchase.

    15          In other words, LBHI, in Syncora's view, could

    16     have absolutely done nothing wrong and yet there would have

    17     been -- there could have been a shortfall and Syncora would

    18     have been liable to the noteholders.

    19          MR. SIEGEL:  It is correct that the insurance

    20     obligation they have to the noteholders exists regardless of

    21     what claims they might assert against LBHI, if that's what

    22     you're saying.

    23          THE COURT:  With respect to the adequacy of the

    24     documentation so to speak, the reps and warranties claims.

    25          MR. SIEGEL:  The reps and warranties that they

Page 33

1    assert were made to them in connection with them providing

2    the insurance.

3         THE COURT:  Yes.  Okay.  So Syncora also says

4    that, therefore, that $527 million is not contingent.

5         MR. SIEGEL:  Okay.

6         THE COURT:  Do you agree with that?

7         MR. SIEGEL:  I agree that to the extent they've

8    paid actual dollars --

9         THE COURT:  Okay.

10        MR. SIEGEL:  -- that the -- that 502 -- what is it

11   --

12        THE COURT:  502(e)(1)(B) --

13        MR. SIEGEL:  -- is inapplicable.

14        THE COURT:  -- is inapplicable.

15        MR. SIEGEL:  And that is the portion, to be clear,

16   that we assert is subordinatable (sic) under 509.

17        THE COURT:  Okay.  All right.  So then there is

18   the -- then there are the -- there's the aspect of the

19   Syncora claim vis-à-vis what it might pay the noteholders.

20   That is TBD.  In other words, for whatever reason, which I

21   don't fully understand, but maybe in the course of the

22   afternoon you can -- someone can explain it to me, claims

23   have not yet been made and, therefore, Syncora has not yet

24   paid to those noteholders.

25        MR. SIEGEL:  That's right.

Page 34

```
 1          THE COURT:  Correct?  And do the parties dispute,

 2    putting aside the 509 aspect, do the parties -- I would like

 3    to understand the parties' position with respect to the

 4    contingent portion of that claim.

 5          MR. SIEGEL:  Okay.  Let me start with one

 6    overriding important factor that the -- that I think you

 7    should understand.

 8          What the estate has determined is that because

 9    they believe in the strength of this disallowance and

10    subordination argument, for the purposes of this motion we

11    will say that they have -- that they and U.S. Bank are

12    asserting valid claims against the estate.

13          THE COURT:  Right.

14          MR. SIEGEL:  We are, in fact, contesting those

15    claims as to their validity, but that's going on or that

16    will go on to the extent to which this doesn't move that in.

17          THE COURT:  But -- okay.  But let me ask -- let me

18    stop you and ask a question about that.  So the -- break

19    that down into two components.

20          The Syncora claim I view as a -- but for the

21    massive complications regarding the -- how the documents got

22    into the trust, et cetera, it's a -- almost a garden variety

23    reimbursement claim of a financial -- of a guarantor.

24          MR. SIEGEL:  I agree.

25          THE COURT:  Right?
```

```
 1          MR. SIEGEL:  Yes.

 2          THE COURT:  I mean, that -- that's what it is.

 3          MR. SIEGEL:  That's what it is.

 4          THE COURT:  Okay.  So there's that.

 5          With respect to the trust claim, though, that's a

 6   damage claim.

 7          MR. SIEGEL:  That's right.  That's right.

 8          THE COURT:  Right?  That's a damage claim.

 9          MR. SIEGEL:  That's right.  It's for -- well, yes.

10   It is -- well, it's a damages claim that give rise -- that

11   is given rise to in connection with the sale of the

12   mortgages --

13          THE COURT:  Yes.

14          MR. SIEGEL:  -- into the trust --

15          THE COURT:  Into the trust.

16          MR. SIEGEL:  -- where they assert that there were

17   breaches of reps and warranties --

18          THE COURT:  Yes.

19          MR. SIEGEL:  -- there.

20          THE COURT:  Okay.

21          MR. SIEGEL:  The same mortgages that we're talking

22   about were the mortgages that Syncora provided insurance for

23   --

24          THE COURT:  Right.

25          MR. SIEGEL:  -- to assure that the cash flows
```

Page 36

1    generated --

2         THE COURT:  Right.

3         MR. SIEGEL:  -- by those mortgages would be --

4         THE COURT:  Okay.

5         MR. SIEGEL:  -- sufficient to pay the notes.

6         THE COURT:  Okay.  So that -- yes.  I totally

7    agree with that.

8         But when you say that LBHI is, forget about for

9    the purpose of this motion, disputing the validity of the

10   claim, are you disputing the validity of the reimbursement

11   obligation?  In other words, if the whole trust claim side

12   of it didn't exist, would LBHI be asserting that Syncora

13   does not have a valid claim for reimbursement?

14        MR. SIEGEL:  Yes.  That's correct.  Because their

15   claim -- this is not a classic guarantee claim.  This is not

16   a claim where someone made a guarantee and then they pay on

17   the guarantee and then there's several -- this is an

18   insurance claim.  They were paid a premium to risk -- to

19   compensate them against risk of loss and that premium was

20   their compensation for providing the guarantee like any

21   other insurance policy.

22        What they assert under their claim is that in

23   entering into the insurance agreement, that Lehman -- LBHI

24   made representations to them that turned out not to be true

25   that were material that give them a right to seek damages

Page 37

1    from the party that induced them into entering into this

2    insurance contract.

3         Our --

4         THE COURT:  How does that affect the validity,

5    though, of the guarantee -- of the insurance, if you will,

6    that Syncora issued?

7         MR. SIEGEL:  It has no effect on it.  They are

8    obligated to pay on this insurance to the beneficiaries come

9    hell or high water.

10         THE COURT:  Okay.  And on what basis would LBHI be

11   able to deny Syncora the right to request reimbursement?

12         MR. SIEGEL:  From LBHI?

13         THE COURT:  Yes.  In other words --

14         MR. SIEGEL:  It's not in the contract.  The

15   contract is an insurance contract.  It's an insurance

16   premium.  I -- you know, I have a life insurance policy.

17   And I have a beneficiary under the life insurance policy and

18   I pay my insurance company premiums.  When they pay out on

19   that, there's no obligate -- there's no right of the

20   insurance company, absent some misrepresentation, to go

21   against the party who procured the insurance.

22         Now --

23         THE COURT:  So it's -- so it's not -- because I

24   thought I read something to the contrary -- give me one

25   moment because I -- I thought I had read something directly

Page 38

```
 1   to the contrary.

 2          MR. SIEGEL:  Okay.

 3          THE COURT:  In other words, in the classic type of

 4   a guarantee there would be a provision that provides for a

 5   reimbursement obligation in the event of monies paid over.

 6   There is --

 7          MR. SIEGEL:  This is not --

 8          THE COURT:  -- nothing like that here?

 9          MR. SIEGEL:  This is not a guarantee.  This is an

10   insurance policy.

11          THE COURT:  Okay.  And it does not in -- there is

12   no right of reimbursement for monies paid over?

13          MR. SIEGEL:  I believe not, but now you have me

14   worried so I'm going to turn and make sure I'm not

15   misstating it.

16          Is that right?  Right?

17          UNIDENTIFIED SPEAKER:  Yes.

18          MR. SIEGEL:  That's right.  At least the three of

19   us all think it's right.

20          THE COURT:  All right.  Give me one minute because

21   I did make a lot of notes and I thought I had read something

22   to the contrary.

23       (Pause)

24          THE COURT:  Okay.  Why don't you keep going?

25          MR. SIEGEL:  Okay.  So --
```

```
1          THE COURT:  But -- oh, I'm sorry.  But one more

2     question.  But under no -- under other than via a -- an

3     action that says that LBHI did something wrong in failing to

4     repurchase the notes or in the representations and

5     warranties that accompanied the original placement of the

6     notes into the trust, the noteholders would have no right to

7     go against LBHI?

8          MR. SIEGEL:  That's correct.  They need the trust,

9     the -- what is it, the Green Point Mortgage Funding Trust

10    needs to demonstrate in order to prove their claim that

11    there were reps and warranties that were made by Lehman that

12    were breached that would give rise to what's called a put

13    back claim, put back claim meaning the mortgages that were

14    sold could be put back to the seller.

15         Lehman's belief is they did not make the reps and

16    warranties and are not responsible for the reps and

17    warranties that were made by the originator of the mortgage;

18    that Lehman was effectively a conduit; that the only thing

19    that Lehman did was they took the reps and warranties of the

20    originator, which was Green Point.  They packaged them.

21    They sold them to the trust, and the only rep they made, as

22    I understand it, was that they, in fact, owned those reps;

23    that they could transfer them on.

24         As I understand it, U.S. Bank is making an

25    assertion that the reps are -- go beyond that.
```

Page 40

```
 1          THE COURT:  Okay.  All right.  I interrupted you

 2     at the outset, so why don't I let you keep going.

 3          MR. SIEGEL:  Okay.  So I think, naturally, some of

 4     your questions have obviated the need for some of my

 5     argument.  So I -- what I would like to do is simply talk

 6     about the two claims we're talking about now.  There is the

 7     claim that the trustee filed and the claim the trustee

 8     filed, which we're talking about as of July 31st, 2009,

 9     asserts that they have repurchased claims for about 11,500

10     mortgage loans that equal $647,550,226.64.  That claim is

11     calculated based upon the trust's assumption as to what the

12     values of the existing mortgages are and it represents,

13     essentially, the shortfall in value.

14          Syncora -- I explain this to explain the disparity

15     between the Syncora claim and the trust claim.

16          What Syncora has done is they have asserted a

17     claim for the entire $1.3 billion in face amount.  They do

18     not calculate any mitigation of damages for the value of the

19     mortgages.  Even if the mortgages are underperforming, it

20     doesn't mean they're not generating revenue.  It just means

21     they're not generating as much revenue as one might have

22     expected.

23          THE COURT:  Okay.  So let's pause on this point.

24     So they've paid out $527 million.

25          MR. SIEGEL:  That's right.
```

Page 41

```
 1        THE COURT:  And if somehow we could get to a
 2   mythical day called, the last day, right, and at the last
 3   day there's a shortfall of another $100 million that Syncora
 4   has to pay out --
 5        MR. SIEGEL:  That's correct.
 6        THE COURT:  -- but that otherwise the noteholders
 7   have been made whole.
 8        MR. SIEGEL:  That's correct.
 9        THE COURT:  Then Syncora's aggregate hypothetical
10   claim would be that $627 million.
11        MR. SIEGEL:  That would be their loss.
12        THE COURT:  That would be their loss.  And they
13   say LBHI has to compensate us for that loss because it's --
14   this is their position -- it's LBHI's fault.
15        MR. SIEGEL:  That's the way I understand it.
16        THE COURT:  Okay.
17        MR. SIEGEL:  Now what Your Honor should also
18   understand is that the indenture and what's called the
19   transfer and servicing agreement contemplate this.
20        And under the indenture what happens is to the
21   extent to which the insurer makes payment on claims as cash
22   flow comes in to the trust, they get their share of that
23   cash flow pursuant to a contract that they were part of
24   negotiating with the trust as to how those losses would be
25   reimbursed out of cash flow coming into the trust.
```

Page 42

```
 1          And the reason I make this point is because to the

 2     extent to which U.S. Bank proves a valid claim and

 3     distributions flow through the trust, they have

 4     contractually agreed in the waterfall as to how they get

 5     reimbursed for the payments they've made with respect to the

 6     insurance certificates.

 7          THE COURT:  So if not a penny more goes out other

 8     than the 527, monies that would come in would reduce the out

 9     of pocket down from the 527 under the waterfall?

10          MR. SIEGEL:  They should, although I can't tell

11     you I understand the complexities of the waterfall so

12     totally that I know how much they would be reduced by.

13          THE COURT:  Uh-huh.

14          MR. SIEGEL:  The other thing that the Court should

15     know is that Syncora has control rights over the trust.  So

16     that because they are the insurer, they are the control

17     party and they make determinations as to the decisions the

18     trust makes.  And I would suggest that that also

19     demonstrates everyone's understanding about who is really

20     the beneficiary of the cash flows under the trust because of

21     the insurance.

22          And this is all really designed to illustrate to

23     the Court how these are really just two paths to recover as

24     to the same loss, and which is why I've gone through that.

25          Now we talked about this a moment ago and I just
```

Page 43

1    want to talk about it again for a second, which is the two

2    parts of their claim.  There is the -- there are their

3    actual losses and then there are the hypothetical future

4    losses that may happen in the future.  You know, there's

5    been a lot of litigation over R&BS.  There's been a lot of

6    experience over R&BS, and as a consequence people think they

7    know what those losses will be.

8         But I don't believe that what people think they

9    know losses will be in the future makes that claim move from

10   being contingent to non-contingent.  They haven't actually

11   paid those amounts to the trust, and I think under

12   502(e)(1)(B) that means since they haven't actually paid

13   those claims can only be asserted by the party who has the

14   insurance, which would be U.S. Trust -- I'm sorry -- U.S.

15   Bank and not them.  So I think 502(e)(1)(B) disallows their

16   claim to the extent it exceeds their out of pocket costs.

17        THE COURT:  So disallows it to the extent that

18   they want to retain the ability to assert something in

19   excess of the 527.

20        MR. SIEGEL:  That's correct.

21        Now I will say that at least the way I read the

22   code if they incur future losses, they'll be able to assert

23   claims for that, but that, I think, effectively just reduces

24   the U.S. Bank claim and moves it over to their claim.

25        THE COURT:  Right.  I mean, that's the part of it

1   that I've been puzzling over because I think that that's

2   exact -- would exactly be the effect.  But the way you just

3   articulated the operation of 520(e)(1)(B), that part was

4   unclear to me.

5        In other words, the notion that -- I don't

6   understand the point of 502(e)(1)(B) if then they incur

7   later out of pockets.  If we all agree that they then get to

8   assert a claim in that amount, putting aside the subrogation

9   point, then we're not fighting over it.  What are we

10  fighting over?

11       MR. SIEGEL:  Well, I mean, one of the things we're

12  fighting over is the fact they filed a claim for over a

13  billion dollars and simultaneously there's a claim being

14  filed by the trust and they're with respect to the same

15  losses, and the estate has to make payments and they have to

16  make payments to people who have allowed claims at the time

17  they have allowed claims.

18       And if in the future things change, one would

19  think -- and this is, of course, assuming the validity of

20  everybody's claim.  One would think that all this is is a

21  bookkeeping maneuver, ultimately, which would  -- what would

22  happen would be U.S. Bank would agree to reduce its claim,

23  if everybody's claim is valid.  Syncora's claim would be

24  increased, and the only thing that the trustee would have to

25  do would be to just make an adjustment in the distribution

Page 45

1    schedule.

2        Now, by the way -- and that's really not for today

3    -- we don't even know, assuming the validity of the claims,

4    the fact that they'll be getting reimbursements out of the

5    waterfall how that might affect the numbers there in any

6    event.  I would suggest that because of 509(c) that they're

7    going to be subordinated in any event to the trust; that's

8    what essentially happens is all the payments are going to be

9    directed into the trust.  They will flow through the

10   waterfall, and if, at some point in time, the trust is made

11   whole as to whatever claim it has, then Syncora's

12   subordinated claim could get a dividend.

13       I mean, in this case that's unlikely, but that's

14   the way the statute is designed to work.  Does --

15       THE COURT:  No.  That makes complete sense to me.

16   But what I'm -- I'm still tripping over is no one should be

17   taking the position that there should be duplicative allowed

18   claims, right; that there should be double payment of any

19   kind?

20       MR. SIEGEL:  We agree.

21       THE COURT:  Right.  So I don't understand how we

22   have enough information at this moment in time to do much of

23   anything.  That's the part that I'm having a hard time

24   understanding.  I think that the -- we can clearly recognize

25   that there shouldn't be double counting for the 527.

Page 46

```
1          MR. SIEGEL:  Right.  Okay.

2          THE COURT:  But if as time rolls forward 527 turns

3     out to be the last penny that Syncora pays out, and Lehman

4     were to prevail in its defense that it did nothing wrong,

5     then -- and we'll talk to the Syncora folks about this when

6     it's their turn, but then it would seem to me that there is

7     no claim against LBHI.

8          MR. SIEGEL:  What I would say, Your Honor, is

9     there's a few things going on here.

10          So, first of all, if they are saying and they're

11     conceding that there's a claim for 527 right now and that

12     the rest of it may or may not mature into being a claim in

13     the future, that's fine.  In the meantime, we have a reserve

14     for their claim at, what is it, $1.3 billion.  We fully

15     reserved their claim, and we've also reserved based upon the

16     U.S. Bank claim.  So the estate is holding onto a lot of

17     funds based upon a claim that we don't think -- we think

18     it's one claim and we just have to whack it up between two

19     entities.

20          So, first of all, we think the reserve is grossly

21     too high and we want to get that taken care of.

22          THE COURT:  Right.

23          MR. SIEGEL:  The second thing is in the meantime

24     we need to know who to pay money to when we make

25     distributions.  So who do we pay money to?  We think that
```

Page 47

1   who we pay money to is we pay money to the trust and that

2   the 527 claim is simply subordinated and that the trust

3   takes the money, pays it out in accordance with its

4   waterfall, assuming that they prove their claim against the

5   estate.

6        And then at that point the losses that they will

7   have to pay will be dependent upon how much they get out of

8   the trust, and to the extent to which other funds flow

9   within the trust, the extent to which they are actually

10  required to go out of pocket to make future payments.  That

11  works however the waterfall requires it to work.

12       But in the meantime, we have a bunch of other

13  creditors who are entitled to receive distributions and we

14  want to be able to pay them fairly and move forward in a way

15  that makes sense and is fair.  What we don't think is that

16  the ultimate numbers, even if we assume the validity of all

17  of these claims, the claim can't exceed the aggregate of

18  losses that the trust has and would -- might ultimately

19  experience.

20       THE COURT:  Right.

21       MR. SIEGEL:  Right now we have two claims that are

22  asserting the same thing and, therefore, we've double

23  reserved.

24       THE COURT:  Right.

25       MR. SIEGEL:  And it's effecting our distributions.

1           One of the major --

2           THE COURT:  So you've reserved for the Syncora

3     claim --

4           MR. SIEGEL:  Yes.

5           MR. SIEGEL:  -- and you've reserved for the trust

6     claim?

7           MR. SIEGEL:  That's right.

8           And this is a basis upon which to alter the

9     reserves and free up a lot of cash.

10          THE COURT:  But that's -- but that's not the

11    request that I have.  I mean, that seems to me that that

12    request is, frankly, a no-brainer --

13          MR. SIEGEL:  Uh-huh.

14          THE COURT:  -- because we're definitely not going

15    to pay twice.  But that's not -- at least I'm not reading

16    that into the papers.

17          MR. SIEGEL:  Well, the effect of our being

18    successful on this motion would be exactly what I described.

19    We could, if I'm understanding Your Honor, instead -- and I

20    would have to talk to my client about this.

21          THE COURT:  Right.

22          MR. SIEGEL:  Instead, simply agree to -- you know,

23    to defer this and instead just reduce the reserve to a one-

24    claim reserve while we litigate over everything else.

25          THE COURT:  Well, the one claim -- the outside

1    number is the billion-three, is it not?

2         MR. SIEGEL:  I don't think that's right because

3    the billion-three assumes no recovery at all with respect to

4    the mortgages.

5         THE COURT:  Right.  But that's why I mean it's the

6    outside number.  There could be no larger --

7         MR. SIEGEL:  No, because these mortgages have

8    already had recoveries.

9         THE COURT:  So you're saying that's too high a

10   number.

11        MR. SIEGEL:  Yes.  I mean, we would have to figure

12   out how much these mortgages actually have paid.  Even if

13   they're deficient, they've paid and there would be some

14   number, but I expect it would be less than a billion.

15        THE COURT:  I'm sorry.  But I -- I guess what I'm

16   trying to get at is right now we're holding a billon-three

17   because that's the face amount of the trust claim, right?

18        MR. SIEGEL:  No.  The trust claim is smaller.  The

19   trust claim -- remember, when I started I said the trust

20   claim was 647,550 because it includes some factor for

21   mitigation and for the value of the existing mortgages, as I

22   understand it.

23        THE COURT:  Okay.

24        MR. SIEGEL:  But the Syncora claim is for the

25   original face amount of the certificates, which is 1.3,

Page 50

 1    which doesn't taken into consideration that there have been

 2    recoveries with respect to some of these mortgages.

 3         THE COURT:  But --

 4         MR. SIEGEL:  Actually, it doesn't -- it's got two

 5    pieces to it and I think I now understand why I'm confusing

 6    you, at least in this instance.

 7         Okay.  The actual losses are 527.

 8         THE COURT:  The -- well, the --

 9         MR. SIEGEL:  The --

10         THE COURT:  -- Syncora's paid out 527.

11         MR. SIEGEL:  That's right.  Syncora's paid out

12    527.

13         THE COURT:  Right.

14         MR. SIEGEL:  The trust has asserted 647 which I

15    believe represent actual losses and their projected future

16    losses in connection with what they assert to be their rep

17    and warranties.

18         THE COURT:  And that 647 includes the 527 or no?

19         MR. SIEGEL:  I believe it -- it does or it should.

20    Yes.

21         The remainder of the Syncora claim is the

22    principal balance that is owed with respect to the insured

23    certificates.  The trust is not asserting that remainder

24    claim either because they calculate their projected future

25    losses differently or because they simply don't believe

Page 51

1    they're entitled to that claim.  But I believe the 527 has

2    to be subsumed within the 647 because they're both losses

3    with respect to the same mortgages.

4        But we're reserving the entire 1.3 on Syncora

5    because the reserve for Syncora on the 1.3 is the entire --

6    is the asserted amount of their claim which is essentially,

7    we're entitled to be paid the entire amount we insured

8    without respect to any credit for the value of the

9    recoveries that the trust -- the trust that we insured

10   receives.

11       So in some ways, I mean, I -- it suggests to me

12   that they're asserting that they insured -- they insured 1.3

13   billion in certificates.  If it turns out that the

14   certificate holders only suffered 700 million of losses --

15       THE COURT:  Right.

16       MR. SIEGEL:  -- that's all they would pay out, but

17   they're suggesting they still have a claim for 1.3 billion.

18   That's what it --

19       THE COURT:  Well, what --

20       MR. SIEGEL:  -- seems to me.

21       THE COURT:  -- that -- but that goes to the

22   question of hypothetically if they alleged a claim for the

23   breaches of the reps and warranties or the put back claim,

24   I'm trying to imagine how there could be damage beyond the

25   losses.

Page 52

```
1        MR. SIEGEL:  I agree with you, and what I'm saying
2    is --
3        THE COURT:  So there --
4        MR. SIEGEL:  -- from what I can see in front of me
5    --
6        THE COURT:  Right.
7        MR. SIEGEL:  -- the trust is asserting that their
8    losses all in, including projected future losses, would be
9    647.  They are asserting that they're not -- they didn't
10   make the calculation.  What they did was they simply put in
11   a claim for the entirety of their insured amount.
12       So the disparity on the unpaid amount is the
13   difference between the calculation the trustee made with
14   respect to what I would think are future losses they expect
15   to experience with respect to these certificates and Syncora
16   simply saying, I'm not making that calculation.  I'm just
17   asserting for the balance on the notes.  That's the
18   difference between the two there.
19       So I don't know -- and if it's worthwhile, because
20   I think I'm hearing Your Honor and the direction that you
21   think you might like this to take, if I could have a few
22   minutes we could talk and see if maybe there is some other
23   resolution we could work out.
24       THE COURT:  That might be a good idea.
25       MR. SIEGEL:  Okay.  Thank you.
```

Page 53

1          THE COURT:  All right.  You want to -- I mean, I -

2  - I -- I will hear from Syncora as much as you would like

3  either now or after you confer with -- with Mr. Siegel.  I'm

4  just -- I'm trying to figure out as a practical matter why

5  there isn't some sort of a threshold disposition that deals

6  with what clearly to me seems to be an over reserve

7  situation.  And if we can cut through that, then -- and not

8  prejudice anyone's rights, then that would be a good thing.

9          MR. CRAIG:  I think that makes a lot of sense,

10  Your Honor.  I think we should talk and come back to the

11  Court.

12          THE COURT:  Okay.  All right.  We'll go back

13  across the hall and someone can come and get us when --

14          MR. SIEGEL:  We'll do that.

15          THE COURT:  -- when you're done.

16          MR. SIEGEL:  Thank you.

17          THE COURT:  Okay.

18          MR. CRAIG:  Thank you, Your Honor.

19          THE COURT:  Very good.

20     (Recess taken at 2:39 p.m.; resumed at 3:24 p.m.)

21          THE COURT:  I will be very impressed, Mr. Siegel,

22  if you've worked this out.

23          MR. SIEGEL:  Well, we've accomplished what we

24  think we can accomplish today.

25          THE COURT:  Okay.

1        MR. SIEGEL:  And I will describe that to you.

2        THE COURT:  Okay.

3        MR. SIEGEL:  I will also tell you what we hope to

4    accomplish going forward.

5        THE COURT:  Okay.

6        MR. SIEGEL:  And let's go to what we think we can

7    accomplish today or what we have accomplished today.

8        THE COURT:  Okay.

9        MR. SIEGEL:  Syncora has agreed that with respect

10   to their claim that they will agree that their claim -- that

11   their reserve will be dropped to 600 million.

12       THE COURT:  Okay.

13       MR. SIEGEL:  The --

14       THE COURT:  So for the -- that will free up 700

15   million?

16       MR. SIEGEL:  That's right.

17       THE COURT:  Okay.

18       MR. SIEGEL:  That will free up $700 million.  That

19   translates into some pennies per dollar in terms of cash,

20   but that's correct.

21       MR. CANTOR:  Just (indiscernible).  We're talking

22   -- those are claim dollars.

23       THE COURT:  Yes.  Those are claim dollars.

24       MR. CANTOR:  That's right.  And --

25       MR. SIEGEL:  Yes.

1          MR. CANTOR:  -- that's a much smaller amount --

2          THE COURT:  Yes.

3          MR. CANTOR:  -- (indiscernible).

4          THE COURT:  And for the record, that was Mr.

5     Cantor speaking.

6          MR. CANTOR:  Sorry.

7          MR. SIEGEL:  My client.

8          THE COURT:  Yes.  I'm aware.

9          MR. CRAIG:  Claim dollars off the reserve.

10         MR. SIEGEL:  That's --

11         THE COURT:  Yes.  Okay.  So let's --

12         MR. SIEGEL:  I mean, it's not a final --

13         THE COURT:  -- let's --

14         MR. SIEGEL:  -- determination of the claim.

15         THE COURT:  -- let's state it very precisely.

16    There is currently a reserve of $1.3 billion for that -- for

17    the Syncora claim.

18         MR. SIEGEL:  That's right.

19         THE COURT:  We are reducing -- you are saying that

20    the proposal is to reduce the amount of that reserve to six-

21    hundred-plus-million-dollars, correct?

22         MR. SIEGEL:  That's correct.

23         THE COURT:  Okay.

24         MR. SIEGEL:  We have also agreed -- and that

25    agreement is because that's as far as we think we can go

Page 56

```
 1    today based on the facts available --

 2         THE COURT:  Okay.

 3         MR. SIEGEL:  -- to us today.

 4         We've also agreed that the estate will not seek to

 5    further reduce the reserve for 60 days.  What we are going

 6    to do in that period of time is we are going to try to

 7    understand the other amounts that have been received by

 8    Syncora that mitigate its loss --

 9         THE COURT:  Okay.

10         MR. SIEGEL:  -- so that it can better reflect the

11    actual loss that they've experienced.

12         THE COURT:  Okay.

13         MR. SIEGEL:  Additionally, we expect that --

14         THE COURT:  So that's going to cabin the outside

15    -- the outside number or --

16         MR. SIEGEL:  Right.

17         THE COURT:  Right?

18         MR. SIEGEL:  That's right.

19         THE COURT:  Okay.

20         MR. SIEGEL:  That is -- the number will never --

21    the reserve number will never go above that.

22         THE COURT:  Okay.

23         MR. SIEGEL:  The reserve number can go down

24    further depending upon our further discussions and

25    understanding -- I'm sorry.  I'm told that we agreed to 90,
```

Page 57

1    not 60 days with respect to reconsidering --

2          THE COURT:  Okay.

3          MR. SIEGEL:  -- the reserve.

4          THE COURT:  All right.

5          MR. SIEGEL:  My natural aggressiveness took over,

6    apparently.

7          THE COURT:  Okay.

8      (Laughter)

9          THE COURT:  All right.  So as you keep going, Mr.

10   Siegel, I -- are you -- would it be the parties' preference

11   to submit an order reflecting what you're telling me or do

12   you want to have statements on the record and then have my

13   so order the record.  I'm --

14         MR. SIEGEL:  I think --

15         THE COURT:  -- indifferent.

16         MR. SIEGEL:  I think that we are satisfied so

17   ordering the record.

18         THE COURT:  Okay.  Then we're going to -- when all

19   is said and done, then I'm going to ask you to go back and

20   have a very precise statement of exactly what it is --

21         MR. SIEGEL:  Okay.

22         THE COURT:  -- because we've now had a couple of

23   backs and forths.

24         MR. SIEGEL:  Understood.

25         THE COURT:  Okay.  All right.  So let me let you

1    keep going.

2        MR. SIEGEL:  Okay.  So what we are going to do

3    after today is, as I said, we will due diligence with the

4    cooperation of Syncora figuring out what the actual out of

5    pocket losses are.  And, of course, they remind us that they

6    are paying out claims also as it goes forward, so this is a

7    moving target.  They are getting reimbursements, but they

8    are also paying out at the same time.  So some things,

9    stated a little differently, move from the 502 to the 509

10   category from our standpoint.  But that's an ongoing

11   process.

12       THE COURT:  Right.

13       MR. SIEGEL:  Additionally, we are going to talk to

14   -- all of us are going to talk to U.S. Bank about their

15   reserve and how to better reconcile their claims as we're

16   going through this process as well.  We have made no

17   commitment to U.S. Bank and we've not spoken to about when

18   we might move to reduce their reserve.  They're just not

19   here and they're not a party to any of this.

20       THE COURT:  Understood.  Okay.

21       MR. SIEGEL:  But we are going to get them involved

22   in the discussion so we can try and rationalize --

23       THE COURT:  Right.

24       MR. SIEGEL:  -- at least what the estate views as

25   two competing claims to find some fair way to deal with

1    distributions.

2        IN the meantime, we will withdraw the motion that

3    is in front of -- I guess everyone is going to withdraw the

4    motions that are before the Court on summary judgment and

5    the adversary proceeding without prejudice to re-file at

6    some point in the future if we can't work things out.  So

7    that will just get marked off the calendar.

8        THE COURT:  Okay.

9        MR. SIEGEL:  I believe, someone can tell me

10   otherwise, I believe that's the sum total of our agreement.

11       THE COURT:  Okay.  I think that makes -- that's a

12   very practical and finely tailored solution.

13       So I think it just remains for you to state with

14   precision the amount to which the reserve is going to be

15   reduced.

16       MR. SIEGEL:  Okay.  I just --

17       THE COURT:  All right.

18       MR. SIEGEL:  They're consulting --

19       MR. CANTOR:  We're just conferring briefly.

20       THE COURT:  Okay.

21       MR. SIEGEL:  Yeah.  Okay.  Just -- let's give

22   them an opportunity.

23       (Pause)

24       MR. CRAIG:  Your Honor, John Craig, Allegaert,

25   Berger & Vogel --

Page 60

```
 1          THE COURT:  Yes.

 2          MR. CRAIG:  -- for Syncora.

 3          That generally comports with our understanding,

 4     too.

 5          THE COURT:  Okay.

 6          MR. CRAIG:  The only thing that I would add is

 7     that, you know, obviously, our reasonable cooperation with

 8     information about Syncora's losses --

 9          THE COURT:  I'm sorry.

10          MR. CRAIG:  Of course.  Our reasonable cooperation

11     with information about Syncora's losses is not a blank check

12     to open Syncora's books and provide everything that they

13     might want.

14          MR. SIEGEL:  We're going to try and work this out

15     amicably.

16          THE COURT:  Right.

17          MR. SIEGEL:  If we're dissatisfied with our

18     ability to work it out amicably, there are other ways to

19     work it out.

20          THE COURT:  Right.

21          MR. SIEGEL:  It's that simple.

22          THE COURT:  Right.

23          So could we have an exact statement to the dollar

24     --

25          MR. SIEGEL:  Okay.
```

Page 61

1          THE COURT:  -- if not to the penny of the amount

2     of the reserve that will be outstanding.

3          MR. SIEGEL:  Okay.  I think the exact amount is

4     $600 million even.  Is that right?

5          MR. CRAIG:  That's correct.

6          MR. SIEGEL:  Okay.

7          THE COURT:  Okay.

8          MR. SIEGEL:  So -- and we agree that for 90 days

9     we will not seek to further reduce the reserve or change

10    their reserve.

11         THE COURT:  Okay.

12         MR. SIEGEL:  And we've withdrawn the motions

13    without prejudice on both sides.

14         THE COURT:  And this is the reserve for the

15    Syncora claim.

16         MR. SIEGEL:  Just for the Syncora claim.

17         THE COURT:  Just for the Syncora --

18         MR. SIEGEL:  We are advising the Court that we

19    intend to bring U.S. Bank into the process and that we and

20    Syncora both expect to speak to U.S. Bank about this --

21         THE COURT:  Very good.

22         MR. SIEGEL:  -- as well.  That's the entirety of

23    this motion.

24         THE COURT:  All right.  All right.

25         Does anyone else wish to add anything?

1        MR. CRAIG:  No, Your Honor.

2        THE COURT:  Okay.  All right.  Then I'm going to

3   so order the record with respect to all of those points.

4   And I very much appreciate your cooperation in getting to

5   this good practical result and we'll wait to hear from you

6   again.

7        MR. SIEGEL:  Thank you, Your Honor.

8        THE COURT:  All right.  Thanks for coming in.

9        MR. CRAIG:  Thank you, Your Honor.

10       THE COURT:  Thank you.

11     (Whereupon, these proceedings were concluded at 3:31

12   p.m.)

13

14                                  Formatted: Centered

15

16

17

18

19

20

21

22

23

24

25

Page 63

1

2        (Whereupon, these proceedings concluded at 3:31 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 64

```
 1                    I N D E X

 2

 3                    RULINGS

 4   DESCRIPTION                    PAGE     LINE

 5   Doc. #42754 Motion of Lehman Brothers

 6   Holdings, Inc. Pursuant to Bankruptcy

 7   Rule 9019 for Approval of Settlement

 8   Agreement Regarding Claims of Federal

 9   Home Loan Mortgage Corporation Filed

10   by Alfredo R. Perez on behalf of Lehman

11   Brothers Holdings, Inc.               8      21

12

13   Adversary Proceeding:  13-01341-scc

14   Lehman Brothers Holdings, Inc. v Syncora

15   Guarantee, Inc.  Doc. #16 Lehman Brothers

16   Holdings, Inc.'s Notice of Motion and

17   Motion for Summary Judgment of Its

18   Adversary Complaint Against Syncora

19   Guarantee, Inc. filed by Glenn E. Siegel

20   on behalf of Lehman Brothers Holdings,

21   Inc.                                 --     --

22

23

24

25
```

Page 65

1                C E R T I F I C A T I O N

2

3    I, Sherri L. Breach, CERT*D-397, certified that the

4    foregoing transcript is a true and accurate record of the

5    proceedings.

6    Sherri L          Digitally signed by Sherri L Breach
                        DN: cn=Sherri L Breach, o, ou,
7    Breach            email=digital1@veritext.com, c=US
                        Date: 2014.02.20 15:22:58 -05'00'
8

9    SHERRI L. BREACH

10   AAERT Certified Electronic Reporter & Transcriber

11   CERT*D-397

12

13   Veritext

14   330 Old Country Road

15   Suite 300

16   Mineola, New York 11501

17

18   Date: February 20, 2013

19

20

21

22

23

24

25