WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ralph I. Miller
Robert J. Lemons

Attorneys for Lehman Brothers Holdings Inc.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------------------------------x

| | | |
|---|---|---|
| **In re** | : | **Chapter 11 Case No.** |
| | : | |
| | : | |
| **LEHMAN BROTHERS HOLDINGS INC.**, *et al.*, | : | **08-13555 (SCC)** |
| | : | |
| | : | **(Jointly Administered)** |
| **Debtors.** | : | |
| | : | |

----------------------------------------------------------------------x

**MEMORANDUM OF LAW IN OPPOSITION TO CLAIMANTS' OPENING
MEMORANDA REGARDING DEBTORS' SEVENTY-THIRD, ONE HUNDRED
EIGHTEENTH, ONE HUNDRED THIRTIETH, ONE HUNDRED THIRTY-FIRST, ONE
HUNDRED THIRTY-THIRD, ONE HUNDRED THIRTY-FOURTH, ONE HUNDRED
THIRTY-FIFTH, ONE HUNDRED SEVENTY-SIXTH, AND TWO HUNDRED
SEVENTH OMNIBUS OBJECTIONS TO CLAIMS
<u>(TO RECLASSIFY PROOFS OF CLAIM AS EQUITY INTERESTS)</u>**

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................. 1

ARGUMENT ....................................................................................... 3

I.  The Broad Applicability of Section 510(b) is Well-Settled, Rendering Detailed
    Analysis of its Legislative History and Textual Comparisons to Federal Securities
    Fraud Statutes Unnecessary ........................................................... 3

II. The RSU Claims Must Be Subordinated Pursuant to Section 510(b) of the
    Bankruptcy Code .......................................................................... 6

    A.  An RSU Is a "Security" as Defined by Section 101(49) of the Bankruptcy
        Code ...................................................................................... 7

        1.  *The Value of the RSUs Varied with the Price of LBHI Stock* ................... 9

        2.  *Claimants Expected to Share in any Increases in Value in the
            Enterprise to the Exclusion of General Unsecured Creditors* ................. 11

        3.  *The RSUs Bear the Commonly Known Hallmark Characteristics
            of a Security* ....................................................................... 14

    B.  The Claimants Purchased the RSUs at Issue ..................................... 16

        1.  *The Claimants Made the Voluntary Choice to Become Equity Holders* ... 16

        2.  *The Neuberger Berman Claimants Also Chose to Accept Equity
            in Lehman* ......................................................................... 20

    C.  The RSU Claims Seek Damages Arising from the Purchase of the RSUs .......... 26

    D.  The Claimants Do Not Have a "Wage" Claim Under Any Labor Law ............... 30

        1.  *The RSU Claims Are Not Claims for "Wages" Under New York Law* .... 30

        2.  *The RSU Claims Fail under Other Jurisdictions' Labor Laws* ............... 32

            a)  Claimants' "Wage" Claims under New Jersey and California
                Law Are Untimely ............................................................ 32

            b)  Claimants' "Wage" Claims Fail on the Merits of New Jersey,
                California, Illinois, and United Kingdom Law ............................ 33

III. The RSUs Are Also "Equity Securities" Under Section 101(16) of the Bankruptcy
     Code ......................................................................................... 38

IV.  The Subordination Provisions in the RSU Grant Agreements Are Enforceable ............. 39

CONCLUSION ..................................................................................... 42

i

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Am. Broad. Sys. Inc. v. Nugent (In re Betacom of Phoenix, Inc.)*,
   240 F.3d 823 (9th Cir. 2001) ............................................................5, 20

*Andrews & Kurth LLP v. Family Snacks (In re Pro-Snax Distribs.)*,
   157 F.3d 414 (5th Cir. 1998) ...................................................................4

*Aristeia Capital v. Calpine Corp. (In re Calpine Corp.)*,
   No. 05-60200 (BRL), 2007 WL 4326738 (S.D.N.Y. Nov. 21, 2007) .......................8

*Bader v. Wells Fargo Home Mortg. Inc.*,
   773 F. Supp. 2d 397 (S.D.N.Y. 2011)...........................................................31

*Baroda Hill Invs., Inc. v. Telegroup, Ltd. (In re Telegroup, Inc.)*,
   281 F.3d 133 (3d Cir. 2002).................................................................6, 19

*Bauman v. Bish*,
   571 F. Supp. 1054 (N.D.W. Va. 1983) .........................................................17

*Bintliff-Ritchie v. Am. Reinsurance Co.*,
   No. 05-3802 (GEB), 2007 WL 556895 (D.N.J. Feb. 15, 2007) ............................34

*Brennan v. Bally Total Fitness*,
   198 F. Supp. 2d 377 (S.D.N.Y. 2002)...........................................................26

*Callan v. Merrill Lynch & Co. Inc.*,
   No. 09 CV 0566 BEN (BGS), 2010 WL 3452371 (S.D. Cal. Aug. 30, 2010) .................34, 35

*Cardwell v. Thermo Fischer Scientific*,
   No. 09 Civ. 7809 (DAB), 2010 WL 3825711 (S.D.N.Y. Sept. 23, 2010)............................23

*Carlson v. Katonah Capital, L.L.C.*,
   10 Misc. 3d 1076(A), (N.Y. Sup. Ct. 2006)....................................................31

*Chase Manhattan Bank v. State of New York*,
   13 A.D. 3d 873 (3d Dept. 2004) ..............................................................21

*Childers v. Northwest Airlines, Inc.*,
   688 F. Supp. 1357 (D. Minn. 1988)............................................................17

*Coors Brewers Ltd v. Adcock and Ors*,
   [2007] I.C.R. 983 (C.A.) ....................................................................37

*Crown IT Servs., Inc. v. Koval-Olsen*,
   11 A.D.3d 263 (1st Dept. 2004)..............................................................24

ii

*Delaney v. Staples (t/a De Montfort Recruitment)*,
    [1992] I.C.R. 483 (H.L.) ................................................................................37

*Duvall v. Galt Med. Corp.*,
    No. C-07-03714 JCS, 2007 WL 4207792 (N.D. Cal. Nov. 27, 2007)....................35

*Econn v. Barclays Bank PLC*,
    No. 07 Civ. 2440 (BSJ), 2010 WL 9008868 (S.D.N.Y. June 10, 2010)................30

*Fraser v. Fiduciary Trust Co., Int.*,
    No. 04 CIV 6958(RMB)(GWG), 2005 WL 6328596 (S.D.N.Y. June 23, 2005)..................17

*Garcia v. Tenafly Gourmet Farms, Inc.*,
    No. 11–6828 (SRC), 2012 WL 715316 (D.N.J. Mar. 5, 2012)................................33

*Guiry v. Goldman, Sachs & Co.*,
    31 A.D.3d 70 (1st Dept. 2006)........................................................................30, 35

*In re Am. Hous. Found.*,
    No. 09-20232-RLJ-11, 2013 WL 1316723 (Bankr. N.D. Tex. March 30, 2013)....................7

*In re American Wagering, Inc.*,
    493 F.3d 1067 (9th Cir. 2007) ......................................................................12, 13

*In re Cendant Corp. Sec. Litig.*,
    81 F. Supp. 2d 550 (D.N.J. 2000) ........................................................................17

*In re Club Ventures*,
    No. 11-10891 ALG, 2012 WL 6139082 (Bankr. S.D.N.Y. Dec. 11, 2012) ....................16, 27

*In re DirecTV Latin America, LLC*,
    No. 03-10805 (PJW), Civ. 03-981-SLR, 2004 WL 302303 (D. Del. Feb. 4, 2004)..........12, 13

*In re Enron Corp.*,
    341 B.R. 141 (Bankr. S.D.N.Y. 2006) ......................................................... *passim*

*In re KIT digital, Inc.*,
    497 B.R. 170, 181 (Bankr. S.D.N.Y. 2013)................................................3, 16, 28

*In re Lehman Brothers Inc.*,
    Case No. 08-01420 (JMP) (Bankr. S.D.N.Y. Jan. 27, 2014)................................29

*In re Med Diversified, Inc.*,
    461 F.3d 251 (2d Cir. 2006)........................................................................ *passim*

*In re Motor Liquidation Co.*,
    No. 11 Civ. 7893 (DLC), 2012 WL 398640 (S.D.N.Y. Feb. 7, 2012) ....................19

*In re NationsRent, Inc.*,
    381 B.R. 83 (Bankr. Del. 2008) ........................................................................28

*In re PT-1 Commc'ns*,
    304 B.R. 601 (Bankr. E.D.N.Y. 2004)........................................................16, 20

US_ACTIVE:\44426990\12\58399.0011

*In re U.S. Wireless Corp., Inc.*,
    384 B.R. 713 (Bankr. Del. 2008) ...................................................................................17, 30

*Int'l Bhd. Of Teamsters, Chauffeurs, Warehousemen & Helpers of America v. Daniel*,
    439 U.S. 551 (1979)..............................................................................................................18

*Int'l Bus. Machs. Corp. v. Bajorek*,
    191 F.3d 1033 (9th Cir. 1999) ............................................................................................35

*Jurgensen v. Chalmers*,
    248 B.R. 94 (W.D. Mich. 2000) ...........................................................................................4

*Kim v. Citigroup Inc.*,
    368 Ill. App. 3d 298 (Ill. App. Ct. 1st Dist. 2006) ..............................................................36

*Levion v. Societe Generale*,
    822 F. Supp. 2d 390 (S.D.N.Y. 2011)..................................................................................31

*London v. Sears, Roebuck & Co.*,
    619 F. Supp. 2d 854 (N.D. Cal. 2009) .................................................................................33

*Markby v. PaineWebber, Inc.*,
    169 Misc.2d 173 (N.Y. Sup. Ct. 1996) ...............................................................................31

*Mirchel v. RMJ Securities Corp.*,
    205 A.D.2d 388 (1st Dept. 1994)........................................................................................31

*Neisendorf v. Levi Strauss & Co.*,
    143 Cal. App. 4th 509 (Cal. Ct. of App. 1st Dist. 2006) ....................................................36

*O'Donnell v. Tristar Esperanza Props., LLC (In re Tristar Esperanza Props., LLC)*,
    488 B.R. 394 (9th Cir. 2013) ............................................................................................7, 8

*Ragone v. Atl. Video at the Manhattan Ctr.*,
    595 F.3d 115 (2d Cir. 2010).................................................................................................25

*Reilly v. Natwest Mkts Grp. Inc.*,
    181 F.3d 253 (2d Cir. 1999) ................................................................................................31

*Rosen v. Smith Barney, Inc.*,
    393 N.J. Super. 578 (N.J. Super. Ct. 2007).........................................................................34

*Schachter v. Citigroup*,
    47 Cal. 4th 610 (Sup. Ct. Cal. 2009)...................................................................................36

*Sluka v. Landau Uniforms, Inc.*,
    383 F. Supp. 2d 649 (D.N.J. 2005) .....................................................................................33

*Union Pac. R.R. Co. v. Pub. Serv. Comm'n*,
    248 U.S. 67 (1918)..............................................................................................................22

*VKK Corp. v. NFL*,
    244 F.3d 114 (2d Cir. 2001)....................................................................................21, 22, 24

US_ACTIVE:\44426990\12\58399.0011

*Weiner v. Diebold Group, Inc.*,
  173 A.D.2d 166 (1st Dept. 1991).............................................................................31

*Yuk Fung Ma v. J.C. Sake Inc.*,
  No. 23704/08, 31 Misc.3d 1234(A), 2011 N.Y. Slip Op. 50999(U)
  (Kings Co. June 3, 2011) ......................................................................................22

**Statutes**

11 U.S.C. § 101 ........................................................................................... *passim*

11 U.S.C. § 510 ........................................................................................... *passim*

Cal. Civ. Proc. Code § 338 ......................................................................................33

Employment Rights Act, 1996, § 13(3) ERA (U.K.)....................................................37

Employment Rights Act, 1996, § 27(1) ERA (U.K.)....................................................37

N.J. Stat. Ann. § 34:11 ......................................................................................32, 33

**Other Authorities**

Max J. Schwarz, *A Primer on Stock-Based Compensation and Selected Recent Developments,
  Hot Issues in Executive Compensation 2004*, PLI Tax Law & Estate Planning Course
  Handbook Series, 642 PLI/Tax 57 ........................................................................12

US_ACTIVE:\44426990\12\58399.0011

TO THE HONORABLE SHELLEY CHAPMAN
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Holdings Inc. ("LBHI"), in its capacity as Plan Administrator (in this capacity, the "Plan Administrator") under the *Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors* (the "Plan"), by its undersigned attorneys, files this opposition memorandum of law (the "LBHI Opposition Memorandum") in further support of certain omnibus claim objections, and respectfully represents:

## PRELIMINARY STATEMENT

In its opening memorandum, LBHI demonstrated that the RSU Claims[1] must be treated the same as the claims of all non-employee shareholders – they must be subordinated to the claims of those with senior or equal interests under section 510(b) of the Bankruptcy Code because they are claims for damages arising from the purchase or sale of a security. LBHI also demonstrated that the RSUs are "equity securities" as that term is defined in section 101(16) of the Bankruptcy Code, and thus, that Claimants do not have a claim under section 101(5) of the Bankruptcy Code.

In their opening memoranda, Claimants put forth a host of irrelevant facts and legal arguments, transforming what is a straightforward analysis into a complicated legal morass. Claimants make arguments under the Securities Act of 1933, the Securities Exchange Act, the Wage Act laws of five different jurisdictions, and even go as far as to claim economic duress, all laws and concepts irrelevant to the section 510(b) analysis. Claimants also point to immaterial distinctions between the stock options at issue in *In re Enron Corp.,* 341 B.R. 141 (Bankr. S.D.N.Y. 2006) and the RSUs at issue here, in an apparent attempt to distance their

---

[1] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in LBHI's opening memorandum.

claims from the claims in *Enron* and the long line of well-settled case law establishing that

claims for stock-based awards – such as RSUs – *must be* subordinated pursuant to section 510(b)

of the Bankruptcy Code.  Whether this is the result of drafting by committee or a genuine

confusion over the issues, Claimants fail to do what Judge Peck directed them to do over two

years ago: Judge Peck placed the burden on Claimants to show what it is about their RSU Claims

that meaningfully distinguishes them from the claims in *Enron*.[2]  If Claimants had undertaken

this assigned analysis in a concise way, it would have revealed that the RSU Claims are nothing

more than claims for damages arising from the purchase or sale of a security, as were the claims

for stock option-based compensation asserted in *Enron*.  Indeed, Claimants' repeated digressions

into irrelevant issues and arguments merely confirm that Judge Peck's "intent[ion] to follow"

*Enron* was the appropriate course of action and that more than a year's worth of discovery has

uncovered nothing that should alter that conclusion.

Rather than support Claimants' arguments, the evidence revealed in discovery

demonstrates that:  (1) RSUs, like the stock options at issue in *Enron*, constitute "securities" as

defined by section 101(49) of the Bankruptcy Code because (a) their value varied with the value

of LBHI common stock; (b) RSU holders enjoyed the benefits of any increases in the value of

the overall Lehman enterprise to the exclusion of creditors; and (c) the RSUs bear the commonly

known characteristics of a security, including allowing RSU holders to enjoy dividend

distributions and limited voting rights; (2) Claimants, including the NB Employees, purchased

the RSUs with their labor by choosing to accept employment with Lehman and exchanging their

labor for compensation paid partially in cash and partially in RSUs; and (3) the amounts sought

by Claimants are damages arising from Claimants' purchase of the RSUs because, no matter how

---

[2] *See* Miller Decl., Exh. B (Transcript) at 58:15-59:16 (Judge Peck asking Claimants to explain "what it is about [each Claim] that takes it outside of the reasoning [in *Enron*] that I've reviewed and that I intend to follow").

US_ACTIVE:\44426990\12\58399.0011

the Claimants choose to characterize their claims, each of them relates to LBHI's issuance or non-issuance of RSUs, which upon fulfillment of the necessary conditions, could only have resulted in the issuance of LBHI common stock, not cash. Each of the above is entirely consistent with the primary purpose of Lehman's Equity Award Program – to encourage employees to think and act as owners of Lehman Brothers (*i.e.,* shareholders).

Despite the numerous arguments made by Claimants, they have been unable to provide the Court with support for the radical conclusion they seek – to have their claims (225 RSU Claims filed by 213 Claimants seeking $348 million plus unliquidated amounts) preferred over the claims of all non-employee shareholders. To the contrary, the evidence uncovered in discovery confirms that RSU holders stand in the same position as stock option holders as well as shareholders – they all expected to share in the financial success of Lehman Brothers to the exclusion of general creditors, and thus, also bear the unfortunate consequences of Lehman's bankruptcy. Accordingly, the Court should treat the RSUs as they were commonly known – as potential equity in LBHI – and classify them as such under the Plan.[3]

## ARGUMENT

### I. The Broad Applicability of Section 510(b) is Well-Settled, Rendering Detailed Analysis of its Legislative History and Textual Comparisons to Federal Securities Fraud Statutes Unnecessary

The Court in *Enron* held that with the "accumulation of precedents," "the broad applicability of section 510(b) is . . . quite settled." 341 B.R. at 163; *see also In re KIT digital, Inc.*, 497 B.R. 170, 181 (Bankr. S.D.N.Y. 2013) (stating that the Second Circuit, along with bankruptcy and district court judges in the Second Circuit, have construed section 510(b)

---

[3] Indeed, approximately 3,500 of 3,800 claimants who filed RSU Claims stopped pursuing them after LBHI filed the Omnibus Objections demonstrating that such claims entitled them to nothing more than equity, resulting in the reclassification to equity of approximately 93% of all RSU Claims.

broadly).  As such it is "no longer necessary" to consider in detail the history and background of

section 510(b), nor is it necessary to harmonize section 510(b) with the federal securities fraud

statutes.  *Enron*, at 158-159 and 163; *see also Andrews & Kurth LLP v. Family Snacks (In re

Pro-Snax Distribs.),* 157 F.3d 414, 425 (5th Cir. 1998) ("'In the absence of any ambiguity, our

examination is confined to the words of the statute, which are assumed to carry their ordinary

meaning.' Recourse to the legislative history is unnecessary in light of the plain meaning of [the

statute].") (internal citations omitted); *Jurgensen v. Chalmers,* 248 B.R. 94 (W.D. Mich. 2000)

(finding that because the statute in question was unambiguous, a comparison to other statutes

was unnecessary and that when presented with text that is clear and unambiguous, a court will

not look to legislative history to contravene the plain language of the statute).

Despite this well-settled law, Claimants devote nearly 20 pages of their opening

memoranda to (1) detailed and irrelevant comparisons of the terms in section 510(b) of the

Bankruptcy Code to terms found in the Securities Act of 1933 and the Securities Exchange Act

of 1934 and (2) a detailed analysis of the legislative history of section 510(b) and its policies.

Rep. Part. Open. Mem. at 14-27, 41-48.  The Court should disregard each of these arguments in

its entirety.[4]

---

[4] Approximately 100 Claimants participated in discovery in this matter in connection with the RSU Claims (the "Participants").  LBHI and a subset of Participants who retained counsel (the "Represented Participants") entered into a Stipulation and Order Establishing Procedures for an Evidentiary Hearing in Connection With Omnibus Objections to Reclassify Proofs of Claim as Equity Interests, which was so-ordered on January 24, 2014 [ECF. No. 42176] (the "Stipulation and Order").  Pursuant to the Stipulation and Order, LBHI and the Represented Participants served opening pre-hearing memoranda of law on January 28, 2014  [ECF Nos. 42404 and 42348] (the "LBHI Open. Mem." and "Rep. Part. Open. Mem.", respectively).  The Represented Participants who became employees of Lehman as a result of the merger of Neuberger Berman ("Neuberger") and LBHI (the "NB Employees") served a separate opening pre-hearing memorandum of law on January 28, 2014 [ECF No. 42385] (the "NB Cl. Open. Mem.").  Pursuant to the Stipulation and Order, a few Claimants who are not Represented Participants filed additional opening pre-hearing memoranda of law on February 4, 2014.  Specifically, opening pre-hearing memoranda of law were served by Claimants Andrea T. Jao [ECF No. 42482] (the "Jao Open. Mem."), Arthur J. Kenney [ECF No. 42531] (the "Kenney Open. Mem.") and Fabio Liotti [ECF No. 42501] (the "Liotti Open. Mem.").  In addition, Claimants Alexandre Catalao Maia, Jennifer Becker, Guillemette Callies, Gregg W. Hawes, Christiane Schuster and Colin S.A. Welch adopted and joined the opening pre-hearing memorandum of law served by the Represented Participants [ECF Nos. 42707 and 42500, respectively].

4

Indeed, the claimants in *Enron* similarly argued that section 510(b) should be read in light of similar federal statutes concerning securities fraud, specifically the Securities Act of 1933 and the Securities Exchange Act of 1934 invoked by Claimants here. *Enron*, 341 B.R. at 152. The Court rejected those attempts to subject section 510(b) to a "detailed and rigorous textual analysis," holding that given the "clear trend in the case law is to interpret section 510(b) broadly," "a comparative analysis of Rule 10(b)-5 and the Securities Act does not appear fruitful here." *Id*. at 158-159. The Court further held that there is no evidence to indicate that section 510(b) and the federal securities fraud statutes must be interpreted in harmony: "[T]here is nothing to suggest that the Securities Acts and section 510(b) were intended to constitute a complementary whole . . .: the Bankruptcy Code and the Securities Acts create two distinct regulatory schemes." *Id*. at 159. Therefore, this Court should similarly reject any attempted analogies to the federal securities fraud statutes, and Claimants' references to the legislative history or policies of section 510(b) should not be given any deference.

Given, however, that certain of Claimants' assertions regarding the legislative history of section 510(b) are plain wrong, LBHI addresses some of them here. First, Claimants' assertion that the legislative history of section 510(b) indicates that the statute was only intended to apply to fraud claims is incorrect. Rep. Part. Open. Mem. at 41-42. The Ninth Circuit considered and rejected this precise argument in *American Broadcasting Systems v. Nugent (In re Betacom of Phoenix, Inc.)*, holding that cases that have interpreted section 510(b) have persuasively concluded that Congress did not intend to tie mandatory subordination under the statute exclusively to securities fraud claims. 240 F.3d 823 (9th Cir. 2001).

Similarly, there is no basis to support Claimants' argument that they did not assume the risks and benefits of shareholders, and therefore applying section 510(b) to the RSU Claims will

not further the policies of the statute.  Rep. Part. Open. Mem. at 42-47.  The policy reason for

enacting section 510(b) was specifically to prevent parties like Claimants from bootstrapping

their way to parity with general creditors in bankruptcy proceedings.  *Enron*, 341 B.R at 158

("[T]he policy judgment behind section 510(b) is clear: 'Congress enacted § 510(b) to prevent

disappointed shareholders from recovering their investment loss by using fraud and other

securities claims to bootstrap their way to parity with general unsecured creditors in a bankruptcy

proceeding.'"), *citing to Baroda Hill Invs., Inc. v. Telegroup, Ltd. (In re Telegroup, Inc.)*, 281

F.3d 133, 142 (3d Cir. 2002).  The evidence in this case, as well as the legal analysis below and

in LBHI's opening memorandum, clearly demonstrates that each and every one of the Claimants

voluntarily chose to exchange labor for contingent rights to become a shareholder and to assume

the risk and return expectations of a shareholder.  Consequently, section 510(b) is intended to

apply to claims arising from restricted stock units, such as those at issue here.

## II.    The RSU Claims Must Be Subordinated Pursuant to Section 510(b) of the Bankruptcy Code

In its opening memorandum, LBHI demonstrated that the RSU Claims fall squarely

within *Enron's* reasoning and section 510(b)'s reach because (1) an RSU is a "security" as

defined in section 101(49) of the Bankruptcy Code, (2) the Claimants acquired the RSUs in a

purchase by voluntarily exchanging their labor for the contingent right to receive stock, and (3)

the damages sought by Claimants "arise from" this purchase of a security.

Claimants' briefing has muddied what should be a straightforward analysis by

introducing irrelevant arguments, inaccurate factual allegations, and analogies to inapposite law

(including a detailed analysis of the Securities Act of 1933 and the Securities Exchange Act of

1934, as discussed above), in futile attempts to distinguish their RSU Claims from the reasoning

in *Enron* and from the myriad of attributes that RSU recipients share with traditional equity

holders.  However, after navigating through Claimants' opening memoranda, it becomes evident

that they have not made a single argument nor uncovered any fact in the year-long discovery

process that transforms the RSU Claims into something other than claims for damages arising

out of the purchase of securities that are subject to subordination pursuant to section 510(b) of

the Bankruptcy Code.

> A.    An RSU Is a "Security" as Defined by Section 101(49) of the Bankruptcy Code

Claimants maintain that an RSU is not a "security" for purposes of section 510(b)

because (1) RSUs are not specifically enumerated in section 101(49)(A) of the Bankruptcy Code,

which defines "security"; (2) the only paragraphs in the Bankruptcy Code's definition of

"security" that could conceivably apply to RSUs are "investment contract" (section

101(49)(A)(xii)), an instrument "commonly known as 'security'" (section 101(49)(A)(xiv)); and

a "right to . . . purchase" (section 101(49)(A)(xv)); and (3) RSUs are not any of these.  Rep. Part.

Open. Mem., at 13-25; *see also* Liotti Open. Mem. at 2-3.  None of these arguments has any

merit.

As set forth in more detail in LBHI's opening memorandum, courts have repeatedly held

that the fifteen examples identified in section 101(49)(A) of the Bankruptcy Code are merely

illustrative rather than an exhaustive or exclusive list of every instrument that constitutes a

"security."  LBHI Open. Mem., at 13, *citing O'Donnell v. Tristar Esperanza Props., LLC (In re

Tristar Esperanza Props., LLC)*, 488 B.R. 394, 399 (9th Cir. 2013) and *In re Am. Hous. Found.*,

No. 09-20232-RLJ-11, 2013 WL 1316723, at *18 (Bankr. N.D. Tex. March 30, 2013).

Numerous courts have found that various interests not specifically identified in section

101(49)(A) of the Bankruptcy Code are "securities" within the meaning of that provision,

including the stock options at issue in *Enron*.  *Enron*, 341 B.R. 141.  Not only have Claimants

US_ACTIVE:\44426990\12\58399.0011

failed to address these holdings, they have completely ignored that *Enron,* which Judge Peck

expressly stated he "intend[ed] to follow," involved a "security" not specifically enumerated in

section 101(49)(A) – stock options.  Miller Decl., Exh. B (Transcript) at 58:7 - 59:16.

Thus, to constitute a "security" under section 101(49)(A) of the Code, the RSUs need not

fall within the definition of an "investment contract," an instrument "commonly known as a

security," or a "right to purchase."  Nor is it necessary that the RSU holders share *all* of the same

characteristics as actual shareholders to be subject to mandatory subordination under section

510(b) of the Bankruptcy Code, as some Claimants have erroneously argued.  *See* Jao Open.

Mem. at ¶¶ 1-4.  Rather, section 510(b) governs if an RSU is a "security" under section

101(49)(A) of the Bankruptcy Code, and an interest may fall within the definition of a security if,

among other things, the interest owner expects to share in any increases in value in the enterprise

to the exclusion of ordinary creditors, or the value of the interest varies with the value of the

stock of the enterprise.  *See Tristar*, 488 B.R. at 399 (holding that a membership interest in an

LLC is a "security" because it shares in net revenues and increases in value); *Aristeia Capital v.*

*Calpine Corp. (In re Calpine Corp.),* No. 05-60200 (BRL), 2007 WL 4326738, at *13 (S.D.N.Y.

Nov. 21, 2007) ("The value of the [convertible notes] vary with the value of the common stock

of [the debtor], and therefore resemble an equity interest to which section 510(b) is applicable.")[5]

As demonstrated in LBHI's opening memorandum, both conditions are easily met.

---

[5] Claimants' attempt to distinguish *In re Calpine Corp.* is at best, based on a misreading of the facts and holding in
that case. Rep. Part. Open. Mem. at 32, n.14.  The court in *Calpine* held that because the securities at issue –
indentures allowing holders the right to convert their notes into cash and stock upon the occurrence of a number of
conditions precedent – were not yet exercisable on the petition date, the conversion rights expired and the claimant
indenture holders did not have a cognizable claim for damages.  2007 WL 4326738, at *12.  The Court continued,
holding that even if the conversion rights were allowable, the claims would nonetheless be subordinated under
section 510(b).  *Id.* at *13.  The indentures, like RSUs, represented a *right to receive* stock and the *opportunity* to
capture the benefits of increases in the stock price in the future.  *Id.*  The indenture holders, like RSU holders, took
on the risk that the right to receive stock "would never ripen in order to obtain 'the upside potential of shareholder
status.'"  *Id.*  The value of the indentures at issue in *Calpine*, like RSUs, varied with the value of the common stock
which holders had the right to receive.  *Id.*  For these reasons, the Court in *Calpine* held that the indentures

8

1.    *The Value of the RSUs Varied with the Price of LBHI Stock*

A grant of RSUs entitled Lehman employees to nothing more than LBHI common stock at the end of a five year period upon the fulfillment of certain conditions. Claimants, however, assert that RSUs had both a fixed monetary value and no value at all. *See* Rep. Part. Open. Mem. at 46 ("Claimants also had contractual rights . . . as well as their statutory rights . . . for fixed and liquidated amounts") and 22 ("Before and after they vested RSUs and CSAs had no value").

Claimants first argue that RSUs are not securities because their value was not based upon the price of Lehman stock but rather had a fixed value equal to the value of the RSUs on the Grant Date, *i.e.*, the amount attributed to RSUs on the year-end Total Compensation Statements, and that the RSUs therefore are not securities. Rep. Part. Open. Mem., at 3-4 and 45-46. Following Claimants' argument to its logical end would mean that RSUs were intended to have the same fixed monetary value on the Grant Date and five years later when the stock was issued. That clearly was not Lehman's or Claimants' intention. *See* Stipulation, Exh. 3 at 11 ("As a result, your RSUs appreciate on a pre-tax basis for the five-year restriction period . . . . Upon conversion to common stock, the fair market value of the shares will be taxed as employment income *based on the closing price of Lehman Brothers common stock on the conversion date*.") (emphasis added). Rather, Claimants and Lehman intended that Claimants would enjoy the upside (and obviously, downside) of any increase (or decrease) in value of the stock price. However, it appears that Claimants' implicit argument is that the value of the RSUs could vary with the value of Lehman's common stock but only in one direction – upward – such that the RSUs had a minimum value of the amount attributed to the RSUs on the Total Compensation Statements. Claimants do not – and cannot – point to a single document or shred of evidence in

---

resembled equity interests to which section 510(b) was applicable. *Id.* For the same reasons, RSUs resemble equity interests subject to mandatory subordination under section 510(b).

9

support of such an unreasonable contention.  As explained in LBHI's opening memorandum, the value of RSUs was not fixed like cash or a debt.  Rather, during the five-year hold period, the value of RSUs varied with the value of LBHI's common stock, which, of course, is synonymous with an equity interest.  LBHI Open. Mem. at 14.

In the same breath, Claimants simultaneously argue that the RSUs had no value at all. Rep. Part. Open. Mem. at 21-22 ("Before and after they vested RSUs and CSAs had no value."). Claimants argue that the RSUs themselves did not have monetary value but rather served as a retention tool by representing a promise to deliver shares with value upon completion of vesting and other conditions.  *Id*.  In contrast, Claimants argue, stock options are a present and unconditional issue of a security that have value when exercised.  *Id*. at 7-8 and 21-22.  Not only are the Claimants factually wrong, their comparison of vested equity awards to awards that are still vesting is misguided at best.

The facts demonstrate that employee stock options, like RSUs, are subject to a hold period and employment-related conditions.  *See Enron* at 145 ("Enron's stock options granted employees the right to purchase a specified number of shares at a specified future time (the vesting point)"); Supp. Miller Decl.,[6] Exh. A (the 1994 Enron Stock Plan) at section 5.1 (stating that each option grant will be covered by an option agreement evidencing the terms of the options, and the vesting and termination provisions), and Exhs. B and C (Lehman Stock Option Program Documents) at ¶¶3-4 (requiring, *inter alia* that stock options be issued in parts with varying hold periods before becoming exercisable; that recipients must have either (a) been

---

[6] "Supp. Miller Decl." shall refer to the Supplemental Declaration of Ralph I. Miller in Support of LBHI's Opposition to Claimants' Opening Memoranda Regarding Debtors' Seventy-Third, One Hundred Eighteenth, One Hundred Thirtieth, One Hundred Thirty-First, One Hundred Thirty-Third, One Hundred Thirty-Fourth, One Hundred Thirty-Fifth, One Hundred Seventy-Sixth and Two Hundred Seventh Omnibus Objections to Claims (To Reclassify Proofs of Claim As Equity Interests), dated March 4, 2014.

employed by LBHI or a subsidiary at all times from the grant date to the exercise date or (b) not

have engaged in Detrimental Activity; and providing for forfeiture of options if the participant

leaves before expiration options became exercisable, under certain circumstances).  Stock

options, like RSUs, are not a grant of stock but, rather, a grant of a *right to* stock at a specified

future time upon the satisfaction of the aforementioned conditions.  LBHI Open. Mem. at 15.

Further, as LBHI demonstrated in its opening memorandum, the differences that do exist

between employee stock options and RSUs show that if stock options are "security[ies]" under

*Enron* and the Bankruptcy Code, then the RSUs at issue also must be "securit[ies]" subject to

mandatory subordination under the Bankruptcy Code.  Moreover, to the extent a stock option is a

"security" under section 101(49)(A)(xv) because it is a "right to . . . purchase" a security, that

right only matures after the hold period.  In the same way, an RSU constitutes a "right to sell" a

security after the five year hold period under section 101(49)(A)(xv) since at that time, the RSU

automatically becomes a stock without any further action on the part of the RSU holder.  Neither

stock option holders nor RSU holders could sell, assign, transfer, pledge or otherwise dispose of

the equity awards until the end of the hold period.  *See* LBHI Open. Mem. at 12-13.  However, at

the end of the hold period, RSU holders could elect to sell the stock or continue to hold the stock,

just as stock option holders at the end of the hold period could elect to exercise the option or

continue to hold the option.

2.    *Claimants Expected to Share in any Increases in Value in the Enterprise*
      *to the Exclusion of General Unsecured Creditors*

There also is no dispute that the RSU recipients were repeatedly reminded that one of the

key purposes of the RSU awards was to allow employees to share in the financial success of

Lehman Brothers over time.  *See* Stipulation, Exh. 3 (2003 Senior Vice-President Equity Award

Program) at 2 ("Given the key role you play in Lehman Brothers' success, it is important for you

11

to have a significant stake in the Firm . . . . The Program provides you with an incentive to think and act like an owner every day, and allows you to share in the Firm's financial success over time."). This opportunity to potentially benefit from the success of the company distinguishes the Claimants from ordinary creditors. *See In re Med Diversified, Inc.*, 461 F.3d 251, 257 (2d Cir. 2006) ("The creditor can only recoup her investment; the investor expects to participate in firm profits.") (internal citations omitted).[7]  Claimants could not have realistically expected to enjoy all of the upside of LBHI stock and none of the downside.

Against the weight of the evidence, Claimants rely on two cases, *In re DirecTV Latin America, LLC*, No. 03-10805 (PJW), Civ. 03-981-SLR, 2004 WL 302303 (D. Del. Feb. 4, 2004) and *In re American Wagering, Inc.*, 493 F.3d 1067 (9th Cir. 2007), to argue that they did not take on the risk and reward expectations of a shareholder.  Rep. Part. Open. Mem. at 45-47.  But each of these cases is easily distinguishable.  The claim at issue in *In re DirecTV* arose not out of the agreement for the purchase of the security, but from a side put agreement separate and apart from the stock purchase agreement.  Moreover, pursuant to the put agreement, Raven, as the holder of the claim and put option, had the right to either hold the put option or to exercise it.  If Raven exercised the put option, Raven was required to sell its equity interest back to the counterparty, DirecTV Latin America ("DTVLA") and forego participation in DTVLA's profits, and DTVLA

---

[7] Claimants rely upon a single article written by Max J. Schwarz in 2004 for a PLI Tax Law & Estate Planning Course Handbook Series for the proposition that an RSU holder is merely an unsecured creditor of the company. Rep. Part. Open. Mem. at 11; Max J. Schwarz, *A Primer on Stock-Based Compensation and Selected Recent Developments,* contained in *Hot Issues in Executive Compensation 2004*, PLI Tax Law & Estate Planning Course Handbook Series, 642 PLI/Tax 57, at 81.  The article does not discuss RSUs in the context of the Bankruptcy Code, nor does there appear to be a single court or legislative body that has considered Mr. Schwarz's article in the context of section 510(b) of the Bankruptcy Code.  Mr. Schwarz also fails to cite to any authorities in support of his contention that an RSU holder is an unsecured creditor of the company.  Moreover, Mr. Schwarz states that RSUs are sometimes called "phantom stock" and it is undisputed that phantom stock issued to employees were considered in *Enron* and determined to be subject to mandatory subordination under section 510(b). 341 B.R. at 162-163.  In any event, Mr. Schwarz's article considers RSU holders that have none of the rights of a shareholder.  As demonstrated in LBHI's opening memorandum at pages 14-16, recipients of Lehman RSUs did enjoy many of the same rights held by Lehman stock holders, whereas Lehman stock options holders did not.  Thus Mr. Schwarz's analysis is inapplicable to the RSUs at issue in this case.

12

was required under the put agreement to pay a fixed amount equal to the purchase price plus interest. The court found that Raven had the right to not exercise the option and therefore participate in any profits of the company, but that the put agreement and option were intended to protect Raven against the risk of any loss, including illiquidity or insolvency. *Id*. at *4. As such, Raven did not take on any risk of loss because at a minimum Raven was entitled to payment of the purchase price plus interest. *Id*. Here, the claim arises directly from Claimants' employment, meaning that Claimants purchased the RSUs with their labor. In addition, despite Claimants' best efforts to argue the contrary, the RSUs provided no protection from loss, including Lehman's illiquidity or insolvency. Claimants took on the benefits *and* risks of a shareholder. As such, *In re DirectTV* is inapposite to the analysis at issue here.

Claimants' analogy to *In re American Wagering, Inc.* is equally unpersuasive. The claimant in *American Wagering* was the holder of a pre-petition money judgment, not a right to a security. 493 F.3d at 1070, 1073. Moreover, that court found that the contract under which the dispute arose only promised to the claimant "the monetary value of the shares of stock, not the stock itself." *Id*. at 1071. Here, the documentary evidence is clear that at all times RSU holders, including the Claimants, only had a contingent right to stock, not cash. *See* Miller Decl., Exh.E (LBHI Employee Incentive Plan as amended through Nov. 8, 2007) at Paragraph 8(b) ("[w]ith respect to [RSUs] granted under the Plan, the obligations of the Company or any Subsidiary are *limited solely to the delivery of shares of Common Stock . . . and in no event shall the Company or any Subsidiary become obligated to pay cash in respect of such obligation . . . ."* (emphasis added). No Claimant even tries to contend that he or she has a claim arising out of a pre-petition money judgment. As such, the holding in *American Wagering* is irrelevant to the analysis here.

13

Claimants' allegation that Lehman advised the RSU recipients that they were general unsecured creditors also fails. *See* Rep. Part. Open. Mem. at 5. In describing Paragraph 16 of Lehman's Employee Incentive Plan, Claimants incorrectly contend that "Lehman's Incentive Compensation Plan advised employees that as grantees of *RSUs and CSAs* they had no better rights than those of a general creditor." *Id.* (emphasis added); *see also* Jao Open. Mem. at ¶5 ("[I]f I am not mistaken, the RSU agreement does state that holders of RSUs do not have the rights of shareholders."). The Program did no such thing. The Employee Incentive Plan cited by Claimants applied to various types of stock-based awards, not only RSUs. Moreover, paragraph 16 of the Employee Incentive Plan refers to "payments not yet made" to any participant. Here, Claimants already received payment *in the form of RSUs.*[8] As such, paragraph 16 of the Employee Incentive Plan is inapplicable. Instead, what is at issue are RSUs that have been granted, and the program documents are clear that Claimants only have claims to stock, not cash. *See* Miller Decl., Exh. E (LBHI Employee Incentive Plan as amended through Nov. 8, 2007) at ¶8(b). Further, paragraph 16 states that "nothing herein shall give any Participant any rights *that are greater* than those of a general creditor of the Company." *Id.* ¶16. Nowhere does it state that participants shall be given the *same* rights of a general creditor. Thus, Claimants have nothing more than claims for securities.

3.      *The RSUs Bear the Commonly Known Hallmark Characteristics of a Security*

In its opening memorandum, LBHI demonstrated the many ways in which RSUs, like the stock options at issue in *Enron*, bear the hallmarks of a security and should be treated as such.

---

[8] Paragraph 16 of the Employee Incentive Plan does not require a different outcome with respect to the few remaining Claimants whose claims are based, at least in part, on unissued RSUs. *See* Kenney Open. Mem. at 2. For the reasons stated in section II(C) at note 12 *infra* and in LBHI's opening memorandum at 26-27, claims for unissued RSUs are also subject to mandatory subordination pursuant to section 510(b) of the Bankruptcy Code, and the Claimants seeking unissued RSUs do not have any rights greater than those of a general creditor of the company.

14

LBHI Open. Mem. at 14-18. Claimants, however, assert that the RSUs are fundamentally different from the stock options in *Enron* and from the stock options issued by LBHI. Rep. Part. Open. Mem. at 21-22. As set forth in LBHI's opening memorandum, and for the additional reasons stated below, the differences raised by Claimants do not take RSUs out from under the reach of *Enron* and section 101(49) and only demonstrate that RSUs bear even more traditional characteristics of a security than do employee stock options. LBHI Open. Mem. at 16.

Claimants rely on the inaccurate and irrelevant contention that all of the stock options at issue in *Enron* "had vested and were fully exercisable" whereas here the RSUs had been granted but no stock had yet been issued. Rep. Part. Open. Mem. at 20-21; Liotti Supp. Open. Mem. at 3-4. As an initial matter, while some of the claims in *Enron*, such as those for fraudulent retention, involved stock options that were exercisable, it appears that not *all* of the stock options at issue in *Enron* were fully exercisable.[9]

In any event, the analysis and decision in *Enron* did not turn on whether or not the stock options at issue had vested or were fully exercisable; rather the issue that the Court addressed was whether claims relating to employee stock options were subject to subordination under section 510(b), regardless of any factual differences among the stock options at issue:

> The Stock Option Claims collectively present shared issues of law despite any factual differences . . . . Though, in reaching its conclusion, the Court will address the Stock Option Claims in discrete sets, *there is an essential question of first impression that the Court must resolve: namely, whether claims for damages related to employee stock options are subject to subordination under section 510(b)*.

---

[9] For example, *Enron* claimant Thomas C. McBarron's claim was for Stock Option Shares "representing total compensation for awards earned but not received," including stock options granted to him on August 21, 2001, less than 4 months before the firm filed for Chapter 11 on December 2, 2001, and it is clear that stock options granted to Enron employees all had minimum vesting periods. Supp. Miller Decl., Exh. D, (Motion of Claimant Thomas C. McBarron to File a Response to Debtor Enron Corp.'s Omnibus Objection to Disallow and Expunge or Reclassify and Subordinate Claim No. 1773500) at 7 and *Enron*, at 145 ("Enron's stock options granted employees the right to purchase a specified number of shares at a specified future time (the vesting point)). *See also Enron*, at 144 at fn. 2 ("The following claims will be addressed in this Opinion . . . . Claim # 1773500 filed by Thomas C. McBarron.").

15

*Enron*, 341 B.R. at 144 (emphasis added).  The *Enron* Court's conclusion that an employee stock option is a security was similarly reached without regard to whether the option had vested or was exercisable.  *Id*. at 150 ("At this point, however, the issue can be simply framed as whether a stock option constitutes a 'security of the debtor,' and to this question the Bankruptcy Code provides an immediate answer.").  Finally, the Court's express ruling in *Enron* was in no way limited to vested stock options.  *Id*. at 144 ("Having reviewed the parties' pleadings, the statutory text, and the relevant case law, the Court finds that *claims for damages that arise from the ownership of employee stock options* – as such claims and options are presented here – should be subordinated pursuant to section 510(b).") (emphasis added).  In the same way, the Court in *In re Club Ventures* subordinated membership interests in an LLC pursuant to section 510(b) without regard to whether the interests were exercisable, where the hold period on the interests had not expired and the parties disputed whether the conditions accelerating the interests to exercisability had been met.  No. 11-10891 ALG, 2012 WL 6139082 (Bankr. S.D.N.Y. Dec. 11, 2012); *see* Supp. Miller Decl., Exh. E (Verified Complaint for Breach of Contract and Other Claims Against Defendants filed by Mark Berkowitz against Club Ventures LLC et al.) at ¶¶ 23-26 and 55. Therefore, whether or not a stock option is exercisable or the stock for an RSU award is issuable has no bearing on the section 510(b) analysis.[10]

> B.    The Claimants Purchased the RSUs at Issue

>> 1.    *The Claimants Made the Voluntary Choice to Become Equity Holders*

Claimants also deny that there was a "purchase" or "sale" of a security as required by section 510(b), asserting that RSUs were mandatorily imposed upon employees, and thus, they

---

[10] For the same reasons, Mr. Liotti's attempts to distinguish *In re Med Diversified, Inc.*, *In re PT-1 Commc'ns, Inc., KIT digital, Inc,*. and *International Wireless* on the grounds that these cases involved securities that should have been delivered pre-petition, must fail.  *See* Liotti Supp. Open. Mem. at 4-5.

US_ACTIVE:\44426990\12\58399.0011

did not make a choice to invest in or bargain for LBHI stock.  *See* Rep. Part. Open. Mem. at 25-27 and Liotti Open. Mem. at 6.  In support of their position, Claimants again attempt to analogize themselves to plaintiffs pursuing fraud actions under federal securities law (and in one instance, Minnesota state law) rather than relying on any decisions applying section 510(b) of the Bankruptcy Code.  *See* Rep. Part. Open. Mem. at 25-27, *citing Fraser v. Fiduciary Trust Co., Int.*, No. 04 CIV 6958(RMB)(GWG), 2005 WL 6328596 (S.D.N.Y. June 23, 2005) (federal securities fraud statutes and the Sarbanes-Oxley Act of 2002); *In re Cendant Corp. Sec. Litig.*, 81 F. Supp. 2d 550 (D.N.J. 2000) (federal securities fraud statutes);  *Childers v. Northwest Airlines, Inc.*, 688 F. Supp. 1357 (D. Minn. 1988) (Federal and Minnesota state securities fraud statutes); *Bauman v. Bish*, 571 F. Supp. 1054 (N.D.W. Va. 1983) (federal securities fraud statutes).

In contrast, courts that have considered the term "purchase" as used in section 510(b) have consistently held that participation in an employee equity award plan, like the RSU program here, is sufficient to constitute the purchase of a security.  *See Enron*, 341 B.R. at 151 ("While it is true that the Claimants did not purchase the stock options on the open market, they nonetheless exchanged value for the options: here, their labor.  Such exchange falls under a broad reading of the term 'purchase'"); *In re U.S. Wireless Corp., Inc.*, 384 B.R. 713, 718-719 (Bankr. Del. 2008) ("[C]ourts interpreting section 510(b) have read the term 'purchase' broadly and have included within its scope grants of stock and stock options as compensation. Therefore, under established law, the Equity Package Wax received as a portion of his compensation, i.e., in exchange for his labor, constitutes a purchase and sale of a security for the purpose of section 510(b) of the Bankruptcy Code."); LBHI Open. Mem. at 19-22.

Claimants' attempts to distinguish their claims from the equity award claims in *Enron* and *In re Med Diversified* are unavailing.  First, Claimants' assertion that the court in *Enron* did

not address compensation plans is wrong. *Enron*, 341 B.R. at 145. ("The Stock Option

Claimants are here seeking to recoup damages suffered in connection with the ownership of

employee stock options. Employee stock options were a component of Enron's compensation

programs."); *see* Rep. Part. Open. Mem. at 26. The *Enron* court considered and rejected the

argument that employees who were required to receive a portion of their compensation as stock

options did not "purchase" the options for purposes of section 510(b). *Id*. at 151 ("If these

Claimants were required to receive a portion of their compensation as options, that was a

condition of employment the Claimants willingly accepted in return for their labor. These

Claimants, thus, 'purchased' the stock options with their labor."). Second, it is of no import that

the *Enron* court did not address the compensation plan at issue in the Supreme Court's decision

in *International Brotherhood Of Teamsters, Chauffeurs, Warehousemen & Helpers of America v.

Daniel*, 439 U.S. 551, 559 (1979), which addressed the meaning of "investment contracts" in the

context of federal securities fraud statutes, because investment contracts were not implicated in

*Enron* or in the instant matter, and the *Enron* Court determined that it is not necessary to

harmonize section 510(b) with the federal securities fraud statutes. *Enron*, at 163. Finally,

Claimants fail in their attempt to distinguish the RSU Claims from the stock option claims in

*Enron* by arguing that an employee with an exercisable stock option has the option to decide and

choose to become a company equity holder by exercising the option and purchasing stock,

whereas a claimant with an RSU has no investment choice, automatically becoming a stock

holder at the end of the five year period without any additional action on the part of the

employee. Rep. Part. Open. Mem. at 21-22; Liotti Supp. Open. Mem. at 4. As discussed in

LBHI's opening memorandum at 19-22 and *infra* in Section II(B)(2), court after court, including

the *Enron* Court, have analyzed this very issue, and it is clear that the operative dates on which

employees such as the Claimants bargained for and made the voluntary investment choice to become equity holders are the dates on which they accepted employment and each and every day thereafter that they voluntarily came to work, continuously accepting as a condition of their employment that a portion of their compensation would be paid in equity.  Thus, Claimants' assertion that their "act of acceptance of employment with Lehman does not translate into an investment decision" directly contradicts the law.  *In re Motor Liquidation Co.*, No. 11 Civ. 7893 (DLC), 2012 WL 398640, at *4 (S.D.N.Y. Feb. 7, 2012) ("Section 510(b) mandates subordination when an individual receives equity securities in exchange for labor even when there is 'no actual sale or purchase' of securities") (citing *In re Med Diversified*, 461 F.3d at 258).  Although Claimants did not purchase RSUs in the open market, the voluntary choice they made to exchange their labor for compensation in the form of RSUs, and their daily choice to remain Lehman employees and accept payment in RSUs, are sufficient to fold their current claims into the subordination requirements of section 510(b).  *See Enron*, 341 B.R. at 150-151.

Claimants also attempt to distinguish themselves from the former employee in *In re Med Diversified* who elected "to trade the relative safety of cash compensation" to become a shareholder owning a specific number of common shares of the enterprise, arguing that here, Lehman had the discretion whether and to what extent employee compensation would be paid in the form of RSUs from year to year.  *See* Rep. Part. Open. Mem. at 26-27; NB Cl. Open. Mem. at 14; *In re Med Diversified*, 461 F. 3d at 256-258.  Claimants have failed to cite to a single authority upholding (or even recognizing) a distinction on these grounds.  Moreover, nothing in section 510(b), or the cases interpreting it, exclude from mandatory subordination claims arising from a bargain for the *potential* to become a bona fide shareholder.[11]  Indeed, Claimants need not

---

[11] *See Baroda Hill Invs., v. Telegroup, Inc. (In re Telegroup, Inc.)*, 281 F.3d 133, 136 (3d Cir. 2002) (subordinating under section 510(b) a claim arising from a breach of a contract to use "best efforts" to register stock and ensure that

be actual shareholders to be covered by section 510(b).  Rep. Part. Open. Mem. at 26-27.[12]

Instead, the section 510(b) analysis turns on the *expectation* of the parties when entering into the

bargain, and whether the claimant "entered into the investment with greater financial

expectations than the creditor."  *In re Med Diversified*, 461 F.3d at 257.  There is no question

that Claimants, even if they only bargained for the *potential* to become a shareholder, voluntarily

entered into the employment relationship with greater financial expectations than general

creditors, who at best could only expect repayment of a fixed debt.  To the contrary, Claimants

expected to participate in the firm's profits.  *See In re Betacom*, 240 F.3d at 830.[13]

> 2.    *The Neuberger Berman Claimants Also Chose to Accept Equity in Lehman*

The NB Employees argue that they are distinguishable from the other Claimants because

they allegedly never had the opportunity to negotiate their employment contracts, given that their

original employer, Neuberger Berman, was acquired by LBHI.  NB Cl. Open. Mem. at 2.  The

NB Employees therefore assert to never have "purchased" the RSUs at issue.  But the NB

Employees are no different from the other Claimants.  At all times, beginning with the merger

and every day after, the NB Employees and all Lehman employees had the choice to "vote with

their feet" against the terms of the equity award program by leaving Lehman.  LBHI Open.

---

shares were freely tradeable); *Am. Broad. Sys. Inc. v. Nugent (In re Betacom of Phoenix, Inc.)*, 240 F.3d 823 (9th Cir. 2001) (subordinating shareholder claims against acquiring company for breach of merger agreement that did not close).

[12] *See In re Med Diversified*, 461 F.3d at 258 ("Courts responding to similar arguments have concluded that a claimant need not be an actual shareholder for his claim to be covered by the statute"), *citing to In re PT-1 Commc'ns*, 304 B.R. 601, 609 (Bankr. E.D.N.Y. 2004) (same) and *Enron*, 341 B.R. at 162-163 (concluding that an employee's claim based on debtor's failure to deliver stock was subject to section 510(b) even though the claimant had not become a shareholder).

[13] For this reason, Claimants' contention that grantees of restricted stock, unlike grantees of RSUs, can elect to pay taxes upon grant of the restricted stock, even if true, is irrelevant.  Rep. Part. Open. Mem. at n.6.  The transfer of actual shares is unnecessary to bring the claim under the ambit of section 510(b).  An expectation to potentially participate in the firm's profits in the future is sufficient.

US_ACTIVE:\44426990\12\58399.0011

Mem. at 19-22.  Instead, each and every one of the Claimants, including the NB Employees, elected to remain Lehman employees subject to the equity award program.

The NB Employees argue, however, they did not have a real choice about whether to leave Neuberger or Lehman, or to vote with their feet against the terms of the equity award program.  They claim that leaving Lehman would have required them to forfeit their careers and livelihoods and to "seek employment outside the securities and investment management industries," which the NB Employees characterize as not a "viable alternative to employment at LBHI" due to their non-compete agreements with Neuberger Berman and Lehman.  NB Cl. Open. Mem. at 3.  The NB Employees argue that, as a result, their employment contracts were unconscionable and entered into under economic duress, and their claims should not be subordinated because their involuntary acquiescence into employment at Lehman is not a "purchase" for purposes of section 510(b).  *Id*. at 15-19.  The NB Employees confuse not having a choice with not having alternatives that were as desirable as working for Lehman.

Under New York law, parties who attempt to set aside a contract due to economic duress, here the NB Employees, face a heavy burden.  As the Second Circuit in *VKK Corp. v. NFL* explained, some element of economic duress is present when many contracts are formed because it is not unusual for one commercial party to have "a decided economic advantage over the other."  244 F.3d 114 at 123 (2d Cir. 2001).  As such, successful claims of duress are "reserved for extreme and extraordinary cases."  *Id*.  In order to prevail, a plaintiff claiming economic duress must show (1) threats of an *unlawful act* by one party which (2) compels performance by the other party of an act which it had a legal right to abstain from performing.  *Chase Manhattan Bank v. State of New York,* 13 A.D. 3d 873 (3d Dept. 2004).  In addition, the party claiming duress must act *promptly* or be deemed to have ratified the agreement; courts in New York have

21

found that delays as short as six months constituted waivers of claims for duress. *VKK Corp.*, 244 F.3d at 122-123 (holding that waiting 30 months before challenging a contract was too long and plaintiff forfeited any right to assert duress) and *citing to DiRose v. PK Mgmt. Corp.*, 691 F.2d 628, 633 (2d Cir. 1982) (collecting cases in which delays ranging from six months to two years constituted a forfeiture).

Notably, of the 10 cases cited by the NB Employees in support of their claim for economic duress, only two actually found economic duress, and both are easily distinguishable from the facts at hand. In *Yuk Fung Ma v. J.C. Sake Inc.*, the court found economic duress where the defendants changed the locks on the doors of the restaurant that they jointly owned with plaintiff and threatened to keep the establishment closed indefinitely without any compensation to plaintiff, thus coercing plaintiff to accept a buy-out offer that was even lower than the initial offer plaintiff had rejected as unfair. In that case, the plaintiff took prompt action to repudiate the agreement by commencing a lawsuit to seek to void the contract for economic duress. No. 23704/08, 31 Misc.3d 1234(A), 2011 N.Y. Slip Op. 50999(U) (Kings Co. June 3, 2011). In *Union Pacific Railroad Co. v. Public Service Commission,* the United States Supreme Court found that a high fee paid by the railroad company to a commission in the State of Missouri to obtain a certificate authorizing the issuance of bonds was paid under duress, where the fee was based on a valuation of the entire 3,500 mile track when only 6/10 of a mile of the track actually passed through Missouri, and the certificate was a "commercial necessity" for the issuance of the bonds given that Missouri statutes threatened to invalidate the bonds and impose grave penalties for failure to obtain the certificate. The railroad, after paying the fee, immediately sought a rehearing at the commission and then commenced an action to set aside the commission's judgment. 248 U.S. 67 (1918). In both *Yuk Fang Ma* and *Union Pacific Railroad Co.*, the

US_ACTIVE:\44426990\12\58399.0011

plaintiffs found themselves in extraordinarily impossible positions and promptly took legal action to repudiate the agreements they had entered into under economic duress.

Here, there are no facts to support the NB Employees' contention that they acquiesced to employment at Lehman under economic duress.  For the reasons set forth in LBHI's opening memorandum, all of the Claimants, including the NB Employees, made a meaningful and voluntary choice to become and remain Lehman employees subject to the terms of the equity award program.  *See* LBHI Open. Mem. at 21-22.  Though the NB Employees claim they were faced with a "Hobson's choice," their choice was anything but – there was nothing unconscionable about giving the NB Employees the choice between accepting employment at Lehman in exchange for millions of dollars in both cash and RSUs or seeking employment elsewhere.  It was an economic choice they made based on rational self-interest.  *See* Declaration of John Tuosto ("Tuosto Decl."), Exh. A (demonstrating that NB Employees were paid millions of dollars in cash and equity from 2003 through 2008).  In addition, the NB Employees have not demonstrated how the terms of their non-compete agreements with Lehman, which had a one year restriction period and were narrowly restricted to Lehman's market, were unlawful.  NB Cl. Open. Mem. at 9-10.[14]  Non-compete agreements of this very nature have been upheld by Courts as lawful.  *See Cardwell v. Thermo Fischer Scientific*, No. 09 Civ. 7809 (DAB), 2010 WL 3825711 (S.D.N.Y. Sept. 23, 2010) (holding that a one-year non-compete covenant was reasonable where plaintiff was a project manager and employed for over four years with the

---

[14] The non-compete agreements that the NB Employees entered into with Neuberger Berman prior to the 2003 merger with Lehman are irrelevant to the issue of whether Lehman unlawfully and mandatorily imposed terms of the equity award program on the NB Employees.  Similarly, the alleged actions taken and statements made by Heidi Steiger as a Neuberger Berman employee prior to the merger with Lehman, in addition to being inadmissible hearsay, should not be considered in weighing whether or not there was a bargain between Lehman and the NB Employees.  *See* Decl. of Henry Ramallo filed in support of the NB Cl. Open. Mem. at ¶¶ 5-8.  Similarly, any conversations that Claimants had as a Barclays employee with the Human Resources department at Barclays after the firm acquired Lehman in 2008 have no bearing on the issues in this matter.  *See* Kenney Open. Mem. at 5-6 and Exh. B.

US_ACTIVE:\44426990\12\58399.0011

defendant, and stating that "New York Court have held restrictions of up to five years to be reasonable depending on the circumstances"); *Crown IT Servs., Inc. v. Koval-Olsen*, 11 A.D.3d 263 (1st Dept. 2004) (finding a non-compete covenant to be reasonable in time and area where the clause prohibited a consultant from servicing the firm's former clients for one year). The law does not recognize a claim for economic duress where there was no unlawful conduct by LBHI compelling performance by the Claimants.

Nor is there one shred of evidence that any of the NB Employees *promptly* claimed that they entered into employment with Lehman under duress in 2003. The NB Employees first made this claim when they served their sur-reply in further opposition to Lehman's omnibus objection to reclassify the RSU claims as equity interests on February 14, 2012, nearly 10 years after they became Lehman employees. *See* Claimants' Sur-Reply in Further Opposition to Debtors' Seventy-Third, One Hundred Eighteenth and Two Hundred Seventh Omnibus Objections to Claims (To Reclassify Proofs of Claim as Equity Interests) [ECF No. 25715] at 6-8. The Second Circuit in *VKK Corp.*, which the NB Employees cited in support of their argument, cautioned against finding duress where parties like the NB Employees have employed a "wait and see" approach:

> The requirement that the party claiming duress disclaim the contract or release about which he is complaining promptly or be held to have forfeited his right to do so protects the stability and reliability of such agreements by denying the weaker party the "heads I win, tails you lose" option of waiting to see how the arrangement works out and then deciding whether to seek to undo it. . . . [T]he requirement of prompt disavowal after execution is fair to the disadvantaged party, who will ordinarily know at the time he executes the instrument that he is being economically coerced.

244 F.3d at 123-124. The NB Employees are all highly sophisticated individuals who have known for decades that they received more than fair value for their services from Neuberger, and then, Lehman, and certainly would have known had they been economically coerced into

24

employment at either institution.  NB Cl. Open. Mem. at 4 ("The NB Claimants currently are all Managing Directors who joined Neuberger Berman between 1961 and 2002.  Managing Directors at Neuberger are charged with managing the growth of each client's assets within different asset management groups").  Instead the NB Employees agreed that the terms of their non-compete agreements with Lehman were "reasonable and necessary for Lehman and its affiliates to enjoy the full benefit of the business acquired in connection with the Merger" and that covenants and restrictions therein would not unreasonably restrict the NB Employees' professional opportunities should they no longer be employed by NB or Lehman.  *Id.* at 9.  For decades, the NB Employees did not seek to repudiate the terms of their employment at Neuberger Berman or Lehman, but rather voluntarily accepted them, and were paid handsomely under these arrangements.  *See, e.g.* Tuosto Decl., Exh. A.  Now, more than 10 years after the merger, the NB Employees have forfeited the right to complain of economic duress.  Rather, by their behavior, the NB Employees ratified the terms of the Equity Award Program and confirmed their reasonableness.

Similarly, the NB Employees' conclusory and unsupported allegations that the terms of the equity award program "unreasonably favored Lehman by allowing it to benefit from the tax and accounting aspects of substituting paper RSUs . . . for cash compensation" are insufficient to support their claim that their mandatory participation in Lehman's Equity Award Program was akin to "an unconscionable employment contract of adhesion."  NB Cl. Open. Mem. at 16-17; *see also* Kenney Open. Mem. at 4.  The cases cited by the NB Employees in their opening memorandum make clear that New York courts deem a contract unconscionable only where "it is so grossly unreasonable or unconscionable in the light of the mores and business practices of the time and place as to be unenforceable according to its literal terms."  *Ragone v. Atl. Video at the*

25

*Manhattan Ctr.*, 595 F.3d 115, 121 (2d Cir. 2010) (holding that an arbitration agreement was not unconscionable) (internal citations omitted); *Brennan v. Bally Total Fitness*, 198 F. Supp. 2d 377, 381-82 (S.D.N.Y. 2002). The NB Employees have failed to make even a minimum showing that the terms of their employment were unconscionable by these standards. To the contrary, the equity award programs at issue in *Enron* and its progeny support the notion that such programs are in fact quite commonplace.

For these reasons, the Court should reject any assertion that the Claimants, including the NB Employees, did not voluntarily accept the terms of the equity award program and "purchase" the securities for purposes of section 510(b).

C.    The RSU Claims Seek Damages Arising from the Purchase of the RSUs

Claimants argue that their claims are not for damages but, rather, for unpaid debt for services rendered. *See, e.g.,* Kenney Open. Mem. at 2, 5. Claimants therefore allege that their claims are for payments due under various wage laws and for alternative performance obligations because Lehman recognized that it might pay part of their total compensation in one of two alternative forms, either cash or equity based awards. Rep. Part. Open. Mem. at 27-29.

Putting aside the fact that at all times it was within Lehman's sole discretion whether to pay part of employees' total compensation in either cash or equity based awards, Claimants continue to ignore that Lehman already paid them the compensation they were due in the form of RSUs. Once those RSUs were paid, as they were here, Claimants had no right whatsoever to other "modes" of performance in the form of cash or otherwise.[15] Rep. Part. Open. Mem. at 29.

---

[15] As further discussed in LBHI's opening memorandum at 34-35, the vast majority of Lehman employees, including Claimants, were not employed by LBHI. Thus, to the extent these Claimants seek cash payments for unpaid "compensation," such compensation would be due, if at all, from their actual employers (LBI, Neuberger Berman, LBIE, etc.), not LBHI. LBHI's only nexus to the Claimants is that the RSU Claims relate to unissued LBHI stock. Thus, LBHI reserves the right to seek to reclassify some or all of the RSU Claims as claims against their actual employers, rather than LBHI.

Claimants' rights were solely limited to the delivery of LBHI common stock.  *See* Miller Decl.,

Exh. E (LBHI Employee Incentive Plan as amended through Nov. 8, 2007) at Paragraph 8(b)

("[w]ith respect to [RSUs] granted under the Plan, the obligations of the Company or any

Subsidiary are *limited solely to the delivery of shares of Common Stock . . . and in no event shall*

*the Company or any Subsidiary become obligated to pay cash in respect of such obligation . . . .*"

(emphasis added).  Thus, Claimants do not have a claim for alternative performance in the form

of cash.[16]

Nor do Claimants have any claims arising under relevant wage laws, as further discussed

in LBHI's opening memorandum at 30-33 and *infra* in Section II(D).  Instead, the Claimants'

claims are more akin to the claim of Manuel Garcia considered by the Court in *Enron*: "'My

claim is not based on a security that lost value.  My claim is based on Enron['s failure] to fulfill

its commitment . . . to the bonuses to which I am entitled.'"  *Enron*, 341 B.R. at 159.  Judge

Gonzalez interpreted Garcia's claim as a claim for breach of contract:

> The Claimants' legal arguments are not detailed, but may be assumed to consist in
> essence of the following propositions: first, the Debtor was obliged by contract to
> the Claimants for a certain amount; second, the Debtor attempted to meet this
> obligation by granting the Claimants stock options, representing those options to
> have a certain value; third, the stock options either did not or would not have that
> value; and fourth, the contractual obligation was therefore not satisfied and was
> breached following the Debtor's attempt to perform.

*Id*.  After noting that the Court was "unsure whether the Claimants have even stated a cognizable

breach of contract claim," the Court went on to conclude that the claim "should nonetheless be

subordinated under section 510(b)."  *Id*. at 161.

---

[16] As further discussed in LBHI's opening memorandum at 26-27, the claims of commission-based employees who
did not receive RSUs in 2008 amount to claims for RSUs that were not issued.  *See, e.g.,* Kenney Open. Mem. at  2
Courts have extended section 510(b) to claims relating to a failure to issue equity.  *See In re Med Diversified Inc.*,
461 F.3d at 256 (holding that section 510(b) covers a claim based on a debtor's failure to issue common stock
pursuant to the terms of an agreement between the parties) and *In re Club Ventures*, 2012 WL 6139082 (holding that
claims for membership units were subject to section 510(b) even though the membership units were never issued).
As such, these Claimants should not be treated differently from their salaried counterparts.

Here, the RSU claims boil down to a complaint that the RSUs paid to Claimants as compensation for services rendered did not have the value that Claimants had hoped. This is clearly a claim for damages arising out of the purchase of a security akin to Garcia's claim in *Enron*, which the Court interpreted as a claim for breach of contract subject to subordination under section 510(b). *Id.*

Claimants, however, choose to compare themselves to claimants holding claims that had a fixed and liquidated amount on the date of LBHI's Chapter 11 filing, such as the claimant in *In re NationsRent, Inc.*, 381 B.R. 83 (Bankr. Del. 2008). But as discussed in section II(A)(1) *supra*, this position flies in the face of all the documentary evidence in this case that the value of the RSUs was not fixed and continuously varied with the value of LBHI common stock. Moreover, as with Claimants' other attempted analogies, *NationsRent* is easily distinguishable.

In *NationsRent*, the court declined to subordinate a "Make-Whole" payment under section 510(b). However, in that case, the "Make-Whole" payment did not arise from the purchase of the security but rather, from a side agreement "separate and apart from the stock purchase agreement." *KIT digital,* 497 B.R. at 185; *NationsRent*, 381 B.R. at 86. Moreover, the payment at issue in *NationsRent* was a payment for cash that was to be merely valued based on the price of the common stock on a particular date. *KIT digital*, 497 B.R. at 185 ("*NationsRent* didn't involve a bargain to acquire stock; stock value was merely the index by which the monetary obligation was measured."). Here, the payment at issue arose from the purchase of the security, *i.e.*, Claimants' voluntary exchange of labor for the potential to become shareholders, and Claimants never had a right to cash for the value of the RSUs; all Claimants had was a contingent right to common stock. The fact that Lehman had the right to compensate Claimants in cash and in RSUs does not change the analysis. *See id.* at 184 ("It is no answer for Invigor to

28

rely on the provision in the Agreement which gave KIT Digital the right to satisfy its obligations in cash, rather than stock . . . at KIT Digital's sole discretion. Invigor bargained to accept payment under the Agreement in stock . . . .").

Finally, as discussed in section II(A)(1) *supra*, Claimants' argument that RSUs represent merely a contractual promise to deliver a security in the future and are therefore distinguishable from stock options is baseless. However, even if Claimants' position is given some consideration, it becomes clear that the distinction that Claimants make is irrelevant because a claim for damages arising from a breach of a contractual promise to deliver a security is subject to mandatory subordination under section 510(b). This very issue has been decided by a number of courts, including the instant Court earlier this year in *In re Lehman Brothers Inc.*, Case No. 08-01420 (JMP) (Bankr. S.D.N.Y. Jan. 27, 2014). Claren Road and LBI had entered into an agreement in which LBI was to purchase at a future time two sets of LBHI bonds from Claren Road. LBI failed to perform its obligations, and Claren Road filed claims in the LBI SIPA proceeding for this breach by LBI of its contractual obligation. Judge Peck held that "the Claren Road Claim fits comfortably within that portion of section 510(b) which mandates subordination because it is a claim 'for damages arising from the purchase or sale' 'of a security of the debtor or of an affiliate . . . .' 11 U.S.C. § 510(b)." *Id.* at 10. Similarly, here, there is no causal ambiguity. Claimants' claims are for damages directly related to the purchase of a security – the RSUs – and as such must be subordinated under section 510(b).[17]

---

[17] Claimants attempt to distinguish the *LBI* decision on the grounds that the instrument at issue were bonds, which are specifically enumerated in section 101(49) of the Bankruptcy Code defining "security." *See* Liotti Open. Mem. at 5-6. This distinction is of no significance, since, as discussed *supra* in section II(A), courts have consistently held that the list in section 101(49) of the Bankruptcy Code defining what is a "security" is non-exhaustive.

US_ACTIVE:\44426990\12\58399.0011

D.     The Claimants Do Not Have a "Wage" Claim Under Any Labor Law

As set forth below, Claimants allege that the RSU Claims are claims for withheld wages under the labor laws of various jurisdictions.  Regardless of which state's labor laws Claimants choose to rely upon, claims for compensation owed in the form of RSUs are still claims "arising from the purchase or sale of a . . . security" that must be subordinated under section 510(b) of the Bankruptcy Code.  *U.S. Wireless*, 384 B.R. at 719.  Moreover, no earned compensation (whether characterized as wages, or otherwise) remains unpaid in this matter:  (1) the RSUs, in most cases, were paid to the Claimants; and (2) whether or not RSUs were actually paid to a particular Claimant, such RSUs do not give him/her an unconditional right to any amount of cash or value. Indeed, the RSUs would have been worthless if paid because LBHI's equity is worthless.

1.     *The RSU Claims Are Not Claims for "Wages" Under New York Law*

As established in LBHI's opening memorandum, the RSU Claims are not claims for wages under New York law because "the ultimate value of the equity-based compensation [depends] on [the employer's] stock price after the rights vested, at the time of delivery." *See Econn v. Barclays Bank PLC*, No. 07 Civ. 2440 (BSJ), 2010 WL 9008868, at *5 (S.D.N.Y. June 10, 2010) (internal citations omitted).

In their opening memorandum, Claimants fail to refute this well-settled principle, and ignore the First Department's decision in *Guiry v. Goldman, Sachs & Co.*, 31 A.D.3d 70 (1st Dept. 2006).  In *Guiry*, a case closely analogous to the instant matter, the court held that a commission-based employee's equity-based compensation in the form of RSUs was not "wages" because as in this case, "it is always possible that a deferred award of stock or a stock option ultimately will turn out to have no value," and "wages" was not intended to include such "supplemental income that may prove worthless when ultimately received." *Id.* at 73.

US_ACTIVE:\44426990\12\58399.0011

The cases Claimants cite in their opening memorandum actually support LBHI's position, and/or are inapplicable to Claimants' facts. For example, in *Levion v. Societe Generale*, 822 F. Supp. 2d 390 (S.D.N.Y. 2011), *see* Rep. Part. Open. Mem. at n.23, the court held that the plaintiff's claims for "wages" failed because, like Claimants' RSUs, the supplemental bonus payments at issue in *Levion* were not guaranteed, but rather, were contingent and dependent upon the success of the group as a whole, outside of the plaintiff's own personal efforts. *Id.* at 403-04. Similarly, in *Markby v. PaineWebber, Inc.*, 169 Misc.2d 173 (N.Y. Sup. Ct. 1996), the court upheld an arbitration award finding that a bonus subject to the discretion of and terms imposed by the compensation committee of the employer's board of directors was not a "wage" under New York Labor law. Claimants' reliance on cases such as *Mirchel v. RMJ Securities Corp.*, 205 A.D.2d 388 (1st Dept. 1994) and *Weiner v. Diebold Group, Inc.*, 173 A.D.2d 166 (1st Dept. 1991) is also misplaced because neither of those cases addressed claims based upon equity-based compensation, the ultimate value of which depended on the company's financial success.

Moreover, numerous cases relied upon by Claimants expressly confirm "that incentive pay does not constitute a 'wage'" until an amount certain is determined after all appropriate adjustments have been made in accordance with the conditions set forth in the compensation plan at issue. *See, e.g.*, *Reilly v. Natwest Mkts Grp. Inc.*, 181 F.3d 253, 264 (2d Cir. 1999); *see also Bader v. Wells Fargo Home Mortg. Inc.*, 773 F. Supp. 2d 397, 417 (S.D.N.Y. 2011) (explaining that compensation whose ultimate value remains subject to factors outside of an employee's performance of services or left to the discretion of the employer is not "wages"); *Carlson v. Katonah Capital, L.L.C.*, 10 Misc. 3d 1076(A), at *2 (N.Y. Sup. Ct. 2006) (explaining that incentive compensation does not constitute earned wages until its value and payment are no longer "*conditioned upon some occurrence*" or left to the employer's discretion) (emphasis

31

added); Rep. Part. Open. Mem. at n.23; NB Cl. Open. Mem. at 15.  Because Claimants merely

had a contingent entitlement to an undetermined amount of LBHI common stock, and the value

of the RSUs ultimately depended on the value of LBHI common stock at the time of issuance,

such compensation falls outside the purview of "wages" under New York Labor Law.  Thus,

Claimants' allegations of improper deduction fail because they are premised on the faulty and

untenable position that the RSUs are "wages" under New York law.

> ## 2. *The RSU Claims Fail under Other Jurisdictions' Labor Laws*

Likely recognizing that they do not have a claim under either New York or Delaware

labor laws,[18] Claimants for the first time assert that their RSU Claims are also governed by New

Jersey, California, Illinois, and United Kingdom law.  Claimants fail, however, to specify which

of their claims are governed by the laws of each of these jurisdictions.  Even though some

unspecified subgroup of Claimants were employed in New Jersey, California and Illinois, the

vast majority of them were employed in New York and the United Kingdom.  In any event, the

RSU Claims likewise fail under New Jersey, California, Illinois and United Kingdom law.

> ### a) Claimants' "Wage" Claims under New Jersey and California Law Are Untimely

Claims for unpaid wages under the New Jersey Wage Payment Law must be commenced

no later than two years from the date the action has arisen, which is deemed to occur at the time

that the purported wages are allegedly withheld.  N.J. Stat. Ann. § 34:11-56a25.1 ("No claim for

unpaid minimum wages, unpaid overtime compensation, or other damages under this act shall be

valid with respect to any such claim which has arisen more than 2 years prior to the commencement

---

[18] Although Claimants previously asserted claims under the Delaware Wage Act, *see, e.g.*, Response of Harsh Shah to Debtors' 118th Omnibus Objection to Claims [ECF No. 20666] at ¶19, Response of Phillipe Dufournier to Debtors' 130th Omnibus Objection to Claims [ECF No. 20667] at ¶19, and Response of Vincent Primiano to Debtors' 118th Omnibus Objection to Claims [ECF No. 20662] at ¶19, they now concede that "employees who do not actually work in Delaware cannot enforce its wage laws."  Rep. Part. Open. Mem. at n. 17.

of an action for the recovery thereof"); *Garcia v. Tenafly Gourmet Farms, Inc.,* No. 11–6828 (SRC), 2012 WL 715316, at *3 (D.N.J. Mar. 5, 2012).    Similarly, under the California Labor Code, actions for unpaid wages must be filed within three years from the date that the employee was allegedly not paid his/her wages.  Cal. Civ. Proc. Code § 338; *London v. Sears, Roebuck & Co.*, 619 F. Supp. 2d 854, 863 (N.D. Cal. 2009) ("The statute of limitations for wage claims under § 201 is three years" from the date plaintiff "claims she was not paid").    Here, the purported "wages" that Claimants assert were withheld from their bonus or commission checks were allegedly withheld between 2003 and 2008.  Thus, the RSU Claims arising from paychecks issued prior to September 15, 2006 and September 15, 2005 (two and three years prior to LBHI's chapter 11 filing, which tolled the statute of limitations) are barred by New Jersey and California law, respectively.  Thus, such claims deserve no consideration under the New Jersey and California labor laws.

> b)    Claimants' "Wage" Claims Fail on the Merits of New Jersey, California, Illinois, and United Kingdom Law

The New Jersey Wage Payment Law defines "wages" as "the direct monetary compensation for labor or services rendered by an employee, where the amount is determined on a time, task, piece, or commission basis, *excluding any form of supplementary incentives and bonuses which are calculated independently of regular wages and paid in addition thereto.*" N.J. Stat. Ann. § 34:11-4.1(c) (emphasis added).  As demonstrated in LBHI's opening memorandum, the RSUs served to incentivize employees to stay with the firm and to ensure its success.  The RSUs also were calculated and paid independently of Claimants' regular wages because the ultimate value of the RSUs depended on Lehman's financial success.  Such "supplementary incentives" – whether paid as "bonuses" or "commissions" – "are the types of payments that, by definition, are not included under the [New Jersey Wage Payment Law]."  *See Sluka v. Landau*

33

*Uniforms, Inc.*, 383 F. Supp. 2d 649, 656 (D.N.J. 2005). Moreover, because Claimants had

merely a contingent right to equity-based compensation, Claimants' RSU Claims are not

protected under New Jersey law. *See Bintliff-Ritchie v. Am. Reinsurance Co.*, No. 05-3802

(GEB), 2007 WL 556895, at *5 (D.N.J. Feb. 15, 2007) (because the plaintiff had not met all the

requisite conditions to claim her anticipated inventive award, "the Plaintiff's interest . . . is not

protected. . . .").

Claimants' citation to *Rosen v. Smith Barney, Inc.*, 393 N.J. Super. 578 (N.J. Super. Ct.

2007) is unavailing. *See* Rep. Part. Open. Mem. at n.27. As an initial matter, the court in *Rosen*

never decided the threshold question of whether the amounts allocated to Smith Barney's Capital

Accumulation Plan ("CAP") were in fact "wages" under New Jersey law. In addition, the court

held that the plaintiffs' forfeiture of non-vested interests in the CAP did not violate the New

Jersey Wage Payment Law or public policy because "the contract [was] in writing and all terms

[were] fully disclosed prior to any participant enrolling." *Id.* at 593. The risk of forfeiture was

unambiguously disclosed, and the CAP investment provided immediate beneficial tax treatment

and some stock ownership benefits. *Id.* As in *Rosen*, the details of the Equity Award Program

were regularly communicated and disclosed to Claimants in their employment agreements,

employee handbooks, and various RSU program brochures. *See, e.g.*, Stipulation, Exh. 3 (2003

Senior Vice-President Equity Award Program) and Exh. 15 (2008 Equity Award Program

Questions and Answers); Miller Decl., Exh. C (2005 Equity Award Program for Bonus-Eligible

and Production-Based Employees) and Exh. E (LBHI Employee Incentive Plan as amended

through Nov. 8, 2007). For these reasons, Claimants do not have a claim under New Jersey law.

Under the California Labor Code, unvested, contingent incentive compensation also has

been found to fall outside the definition of "wages." In *Callan v. Merrill Lynch & Co. Inc.*, No.

34

09 CV 0566 BEN (BGS), 2010 WL 3452371 (S.D. Cal. Aug. 30, 2010), the court held that

equity awards made under a *mandatory* equity plan were not "wages," and upheld a forfeiture

provision under California law.  More specifically, in *Callan*, the plaintiffs were required to

accept part of their compensation in the form of "awards," which contained a cliff-vesting

schedule under which the awards were forfeited if employment terminated before vesting. *Id.* at

*4.  Notably, the *Callan* court explained that the compensation did not constitute "wages" unless

"all conditions agreed to in advance for earning those wages have been satisfied." *Id.*  Because

the plaintiff did not have a "wage" interest in contingent awards, the court found that there were

"no unpaid wages." *Id.* at *5.

Other courts in California have held specifically that stock options are not "wages" under

the California Labor Code.  In *International Business Machines Corp. v. Bajorek*, 191 F.3d 1033

(9th Cir. 1999), the Ninth Circuit concluded that because the "amount of money for which the

shares can be sold on the market varies unpredictably from time to time . . . [the stock option

award] is not 'fixed or ascertainable' by any method of calculation when the agreements are

made or exercised," and thus "ordinarily do not give rise to an expectation of a calculable sum of

money." *Id.* at 1039.  Similar to the First Department in *Guiry*, the *Bajorek* court recognized that

"[t]he value of the stock awarded in options may be as much affected by the fortuities of stock

market behavior as by the profitability of the company," so "unlike wages, the value that [the

plaintiff] obtained from them depended largely on the vagaries of stock market valuations" on

the vesting or award dates of the options. *Id.*; *see also Duvall v. Galt Med. Corp.*, No. C-07-

03714 JCS, 2007 WL 4207792, at *10 (N.D. Cal. Nov. 27, 2007) (rejecting the plaintiff's claim

that the defendant failed to pay him "wages" because his stock options for 100,000 shares did not

constitute "wages," citing to *Bajorek*).

None of the California cases cited by Claimants supports their position.  *See* Rep. Part. Open. Mem. at n.26.  In *Neisendorf v. Levi Strauss & Co.*, 143 Cal. App. 4th 509 (Cal. Ct. of App. 1st Dist. 2006), the court rejected the plaintiff's position that a "contingent expectation of receiving bonuses" transforms into an entitlement to wages when all pre-conditions have not been met.  *Id.* at 522.  The court specifically found that the plaintiff was aware of all the terms and conditions of the plan, her performance signified acceptance, and thus, the defendant was not obligated to pay the plaintiff the bonus under the compensation plans.  *Id.* at 524.  In *Schachter v. Citigroup*, 47 Cal. 4th 610, 621 (Sup. Ct. Cal. 2009), the court similarly held that "[h]aving elected to receive some of his compensation in the form of restricted stock," the plaintiff could not assert that he should have been paid "in cash that portion of his compensation" that he "never 'earned'—fully vested [company] stock." *Id.* at 622.  Thus, the plaintiff had no claim under the California Labor Code because "no earned wages" remained unpaid.  *Id.*  Similarly, as explained above, no earned wages remain unpaid in this matter.

Likewise, Claimants' RSU claims fail under Illinois law because the Claimants were fully notified of the terms of the Equity Award Program through their employment agreements, employee handbooks, and program brochures, among other things – including the fact that they would be paid partially in RSUs – and they accepted such payment by voluntarily agreeing to be employed with (and remain employed by) Lehman.  Indeed, in *Kim v. Citigroup Inc.*, 368 Ill. App. 3d 298 (Ill. App. Ct. 1st Dist. 2006), cited by Claimants, *see* Rep. Part. Open. Mem. at n.29, the court held that the forfeiture provision in a compensation program which allowed employees to be paid partially in restricted stock was lawful in part because the deductions were made with the plaintiff's voluntary consent.  Here, Claimants also voluntarily accepted payment

of their compensation partially in cash and partially in RSUs.  Thus, Lehman's payment of compensation in RSUs did not violate Illinois Wage Law.

The Claimants' position also has no support under U.K. law.  Part II of the Employment Rights Act of 1996 ("ERA") addresses the protection of wages of U.K. employees.  Section 27(1) ERA defines "wages" as "any sums payable to the worker in connection with his employment . . ." including "any fee, bonus, commission, holiday pay or other emolument referable to his employment, whether payable under his contract or otherwise."  Wages must also be "properly payable" as provided for under Section 13(3) ERA, which states:

> [w]here the total amount of wages paid on any occasion by an employer to a worker employed by him is less than the total amount of the wages **properly payable** by him to the worker on that occasion (after deductions), the amount of the deficiency shall be treated for the purposes of this Part [II] as a deduction made by the employer from the worker's wages on that occasion.

§ 13(3) ERA (emphasis added).  The U.K. House of Lords held in the case of *Delaney v. Staples (t/a De Montfort Recruitment)*, [1992] I.C.R. 483 (H.L.), that in order to be "properly payable" as wages, the payment allegedly owed must be capable of quantification. This position was confirmed by the U.K. Court of Appeal in *Coors Brewers Ltd v. Adcock and Ors*, [2007] I.C.R. 983 (C.A.), where the court held that Part II ERA was designed for "straight forward claims where the employee can point to a quantified loss."  Thus, in order for any amount to be properly payable as "wages" (and subject to an unlawful deduction claim) under U.K. law, it must be quantifiable, which requires the claim to be of a straightforward nature.  Any contingent, equity-based incentive compensation awards, such as RSUs, are incapable of quantification, and therefore, would not be properly payable pursuant to Part II ERA.

US_ACTIVE:\44426990\12\58399.0011

Accordingly, Claimants cannot avoid the mandatory subordination required by section 510(b) of the Bankruptcy Code by asserting a wage claim under New York, New Jersey, California, Illinois or U.K. law.

### III.    The RSUs Are Also "Equity Securities" Under Section 101(16) of the Bankruptcy Code

In its opening memorandum, LBHI demonstrated that the RSU Claims must be reclassified as equity for the additional reason that RSUs fall squarely within the definition of "equity security" under section 101(16) of the Bankruptcy Code.  Numerous courts in various jurisdictions have interpreted the definition of equity security to include a range of stock-based transactions, including instruments which, like RSUs, entitle recipients to a nontransferable, non-assignable right to common stock but not cash.  LBHI Open. Mem. at 27-29.

Contrary to Claimants' bold representations, there is no evidence that Congress or any court interpreting section 101(16) intended to exclude RSUs from the definition of equity securities.  *See* Rep. Part. Open. Mem. at 10 ("Congress was careful to exclude convertible instruments like RSUs and CSAs from the definition of equity securities, and the statute of course governs.").  Notes, bonds or similar debt instruments that contain a right to convert to equity have been excluded from the purview of section 101(16) but a right to redeem stock, which RSUs are akin to, have not.  *Id.* at n.18.

In addition, Claimants' argument that RSUs are not securities because they are "executory contracts" is unavailing and, worse, disingenuous.  Although Debtors listed hundreds of claimants seeking payment based on RSUs among the thousands of counterparties to a host of different agreements (on over 500 pages of fine-print schedules), those schedules were filed on June 15, 2009, well before the Debtors had sufficient opportunity to assess whether all the contracts listed thereon were, in fact, executory contracts or unexpired leases.  In fact, Claimants

ignore that LBHI's schedules specifically and unequivocally state that "inclusion of a contract, lease or other agreement on Schedule G does not constitute an admission that such contract, lease or other agreement is an executory contract, was in effect on the applicable Petition Date, or is valid or enforceable." *See* Schedules of Assets and Liabilities of Lehman Brothers Holdings Inc., filed June 15, 2009, Note 18(i) [ECF No. 3918].[19]

## IV.    The Subordination Provisions in the RSU Grant Agreements Are Enforceable

Claimants rely on nothing but mere speculation to argue that the subordination provisions contained in the 2003 and 2004 grant agreements[20] are unenforceable and that their omission from subsequent grant agreements constitutes evidence that Lehman did not intend for claims for RSUs to be subordinated under section 510 of the Bankruptcy Code. *See* Rep. Part. Open. Mem. at 8-9, 39-40.  Claimants are incorrect for numerous reasons.  For starters, Claimants' assertion that the clauses in the 2003 and 2004 grant agreements are ineffective because they conflict with the Employee Incentive Plan is baseless.  *See* Rep. Part. Open. Mem. at 39-40 (arguing the grant agreements conflict with the Employee Incentive Plan because they give Claimants the rights of a stockholder).  The subordination provisions do not give RSU holders all of the same rights as

---

[19] Moreover, even if the RSUs were executory contracts (which LBHI does not concede), any claims for rejection damages would simply entitle Claimants to equity in LBHI – precisely the relief that LBHI is seeking in the Omnibus Objections.  In any event, the presence of an executory contract (if one existed) does not necessarily mean that Claimants have anything more than claims for equity and/or damages resulting from the purchase or sale of a security subject to mandatory subordination pursuant to section 510(b) of the Bankruptcy Code.  The mere fact that a contract is for the purchase or sale of a security means that it is subject to subordination pursuant to section 510(b), and Claimants have not articulated any reason why executory contracts are somehow exempt from this plain rule.

[20] The 2003 and 2004 grant agreements state that, "[A]ll claims arising from, in connection with, or in any way, relating to the failure of [LBHI] to deliver to you, shares of Common Stock on the date when such shares are due to be delivered under this Agreement in satisfaction of each Unit granted to you shall be deemed, in the event of a bankruptcy of [LBHI], to be claims for damages arising from the purchase or sale of Common Stock of [LBHI], within the meaning of section 510(b) of the Bankruptcy Code and shall have in such bankruptcy the same priority as, and no greater priority than, common stock interests in [LBHI]."  *See, e.g.,* Stipulation, Exh. 4 (2003 Managing Director Equity Award Program Agreement Evidencing a Grant of Restricted Stock Units) at ¶10 and Exh. 5 (2004 Equity Award Program Agreement Evidencing a Grant of Restricted Stock Units – Investment Representatives) at ¶10.

shareholders, but rather, provide that their claims in the event of bankruptcy shall be "claims for damages arising from the purchase or sale of Common Stock . . . within the meaning of section 510(b) of the Bankruptcy Code." *See, e.g.,* Stipulation, Exh. 4 (2003 Managing Director Equity Award Program Agreement Evidencing a Grant of Restricted Stock Units) at ¶10.  Nor do these provisions effectuate a waiver of rights.  *See* Rep. Part. Open. Mem. at 40.  There were no superior rights to be waived; the grant agreements simply clarify in writing that such claims are subject to subordination pursuant to section 510(b) of the Bankruptcy Code.  Further, Claimants cannot seriously contend that they had no notice of the terms of the grant agreements.  *See id.* As Claimants admit, these grant agreements were posted on "LehmanLive," which was regularly used by Lehman to communicate the terms of the Program and accessed by employees to view their compensation information, including the total compensation statements upon which the Claimants rely for their RSU Claims.  *See id.* at 40; Stipulation ¶¶ 13,17.

Grasping at straws, Claimants further speculate that the subordination provisions must be unenforceable because Lehman "has withheld from its disclosure any explanation" specifically addressing why they were removed, implying that Lehman has an interest in withholding such documents from the Claimants.  Rep. Part. Open. Mem. at 8-9, 39-40.  First, it should go without saying that LBHI does not seek to classify the RSU Claims as equity for its own financial interest, but rather, for the benefit and interest of the creditors of its estate.  Second, LBHI has not withheld any such documents from its production.  The two documents that Claimants claim "appear[] to have been an explanation" as to the removal of the provision, *id.* at n.5, were redacted because they concern the implementation of new SEC compensation disclosure requirements and disclosed confidential equity awards information for specific, newly-hired individuals.  Suppl. Miller Decl. ¶ 3.  LBHI has not been asked by any Claimant to produce these

US_ACTIVE:\44426990\12\58399.0011

documents in unredacted form, but LBHI will be happy to provide unredacted copies to the

Court for *in camera* inspection to confirm the subject matter of the redactions upon request from

the Court.  Thus far, LBHI has been unable to determine the historical reason for this change in

the format.  The elimination of a superfluous provision that merely restated applicable law

appears to be the most logical explanation, and the inferences that Claimants seek to draw from

the change are based on pure speculation.   In any event, there is certainly no evidence that this

change arose from any intent by LBHI that claims for RSUs, which were expressly subject to

subordination at that point in time, should cease for some reason to be subject to subordination

pursuant to section 510(b) if a Chapter 11 proceeding should ever arise in the future.

Most importantly, however, it is not necessary for the Court to determine whether the

subordination provisions in the 2003 and 2004 grant agreements are enforceable in order to

resolve the matter at hand.  As LBHI demonstrated in its opening memorandum, section 510(b)

of the Bankruptcy Code requires that the RSU Claims, which arise from the sale or purchase of a

security, be subordinated to general unsecured claims.  Accordingly, whether the subordination

provisions in the 2003 and 2004 grants agreements are enforceable is not dispositive and the

Claimants' reliance on these provisions (and the removal thereof) is a red herring.

US_ACTIVE:\44426990\12\58399.0011

## CONCLUSION

For the foregoing reasons, and the reasons set forth in LBHI's opening memorandum, the

Plan Administrator respectfully requests that the Court grant the relief requested herein and such

other and further relief as it deems just and proper.

Dated: New York, New York
March 4, 2014

/s/ Ralph I. Miller
Ralph I. Miller
Robert J. Lemons

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile:  (212) 310-8007

*Attorneys for Lehman Brothers Holdings Inc. and
Certain of Its Affiliates*

42