WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ralph I. Miller
Robert J. Lemons

Attorneys for Lehman Brothers Holdings Inc.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x

| | | |
|---|---|---|
| **In re** | : | **Chapter 11 Case No.** |
| | : | |
| **LEHMAN BROTHERS HOLDINGS INC.,** *et al.*, | : | **08-13555 (SCC)** |
| | : | |
| **Debtors.** | : | **(Jointly Administered)** |

------------------------------------------------------------x

## SUPPLEMENTAL DECLARATION OF RALPH I. MILLER IN SUPPORT OF LBHI'S OPPOSITION TO CLAIMANTS' OPENING MEMORANDA REGARDING DEBTORS' SEVENTY-THIRD, ONE HUNDRED EIGHTEENTH, ONE HUNDRED THIRTIETH, ONE HUNDRED THIRTY-FIRST, ONE HUNDRED THIRTY-THIRD, ONE HUNDRED THIRTY-FOURTH, ONE HUNDRED THIRTY-FIFTH, ONE HUNDRED SEVENTY-SIXTH AND TWO HUNDRED SEVENTH OMNIBUS OBJECTIONS TO CLAIMS (TO RECLASSIFY PROOFS OF CLAIM AS EQUITY INTERESTS)

I, Ralph I. Miller, under penalty of perjury, declare that the following is true and correct to the best of my knowledge, information, and belief:

1.      I am an attorney admitted to practice before this Court and a partner of Weil, Gotshal & Manges LLP, attorneys for Lehman Brothers Holdings Inc. ("LBHI"), as Plan Administrator for LBHI and certain of its affiliates under the *Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors* (the "Plan").[1]

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

2.    I submit this supplemental declaration in support of *LBHI's Opposition to Claimants' Opening Memoranda Regarding Debtors' Seventy-Third, One Hundred Eighteenth, One Hundred Thirtieth, One Hundred Thirty-First, One Hundred Thirty-Third, One Hundred Thirty-Fourth, One Hundred Thirty-Fifth, One Hundred Seventy-Sixth, and Two Hundred Seventh Omnibus Objections to Claims (To Reclassify Proofs of Claim as Equity Interests)* dated March 4, 2014 (the "Opposition") and to provide the Court with true and correct copies of certain documents filed with the Court in support of the Opposition.

3.    LBHI produced minutes from the meetings of the Compensation and Benefits Committee of LBHI's Board of Directors, dated October 3, 2006 (bearing Bates numbers LEH-RSU 0000588-0000609) and November 14, 2006 (bearing Bates numbers LEH-RSU 0000714-0000735) in redacted form. A paragraph was redacted with the heading "Update on New Disclosure Requirements" in the minutes dated October 3, 2006, and a paragraph was redacted with the heading "New Compensation Disclosure Requirements" in the minutes dated November 14, 2006. These redacted paragraphs both discussed only the implementation of new SEC compensation disclosure requirements. Neither paragraph mentioned RSUs or the Equity Award Program. A table at the end of each set of minutes was also redacted that listed information about specific equity awards for new hires. Each line in these tables listed the name, position or function, date of hire, award value, number of RSUs, and a summary of the vesting schedule for that employee's award. These tables were redacted to protect personal and confidential information of the individuals listed.

4.    Attached hereto are true and correct copies of the following documents:

Exhibit A:    Excerpts from Enron Corporation's 1995 Form S-8, dated June 30, 1995;

2

Exhibit B:  A Lehman Brothers brochure entitled "2004 Stock Option Award Agreement Evidencing A Grant of Nonqualified Stock Option - Managing Directors," bearing Bates numbers LEH-RSU 0002313 – 0002316;

Exhibit C:  A Lehman Brothers brochure entitled "2005 Stock Option Award Agreement Evidencing A Grant of Nonqualified Stock Option - Senior Vice-Presidents," bearing Bates numbers LEH-RSU 0002403 – 0002406;

Exhibit D:  Motion for Leave to File A Response Out of Time with an attached Objection to Disallowing and Expunging Claim Number 1773500 filed by Thomas C. McBarron in *In re Enron Corp., et al.,* No. 0116034 (AJG) (Bankr. S.D.N.Y. Jan. 5, 2004), [ECF Doc 15647]; and

Exhibit E:  Summons and Verified Complaint for Breach of Contract and Other Claims Against Defendants in *Berkowitz v. Club Ventures Investments LLC, et al.,* No. 07-602824 (N.Y.S. Aug. 21, 2007), [NYSCEF DOC. NO. 2].

Executed On:  March 3, 2014

Ralph I. Miller

3

**EXHIBIT A**

**EXHIBIT A**

1

AS FILED WITH THE SECURITIES AND EXCHANGE COMMISSION ON JUNE 30, 1995

Registration No. 33-
==============================================================================

SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

-----------------

FORM S-8

REGISTRATION STATEMENT

UNDER

THE SECURITIES ACT OF 1933

-----------------

ENRON CORP.
(Exact name of registrant as specified in its charter)

DELAWARE                                      47-0255140
(State or other jurisdiction of             (I.R.S. Employer
incorporation or organization)              Identification No.)

1400 SMITH STREET
HOUSTON, TEXAS 77002
(Address of principal executive offices, including zip code)

-----------------

ENRON CORP. 1994 STOCK PLAN
(Full title of the plan)

PEGGY B. MENCHACA
VICE PRESIDENT AND SECRETARY
ENRON CORP.
1400 SMITH STREET
HOUSTON, TEXAS 77002
(Name and address of agent for service)

(713) 853-6161
(Telephone number, including area code, of agent for service)

Copy to:
Rex R. Rogers, Esq.
Assistant General Counsel
Enron Corp.
1400 Smith Street
Houston, Texas 77002

CALCULATION OF REGISTRATION FEE

| Title of securities to be registered | Amount to be registered | Proposed maximum offering price per share(1) | Proposed maximum aggregate offering price(1) | Amount of registration fee |
|---|---|---|---|---|
| Common Stock, $.10 par value | 11,000,000 Shares (2) | $34.50 | $379,500,000 | $130,863 |

(1) Estimated, solely for purpose of calculating the registration fee, in
    accordance with Rule 457(h) on the basis of the price of securities of the
    same class, as determined in accordance with Rule 457(c), using the average

of the high and low prices of the Common Stock on the New York Stock
Exchange composite transactions reporting system on June 28, 1995.


(2)    This Registration Statement also includes an indeterminable number of
additional shares of Common Stock that may become issuable pursuant to the
antidilution adjustment provisions of the Plan.

8

## EXHIBIT INDEX

| Exhibit | Description of Exhibit |
| ------- | --------------------- |
| * 4.1 -- | Restated Certificate of Incorporation of Enron Corp., as amended (Exhibit 3.01 to the Company's Form 10-K Annual Report for the year ended December 31, 1994). |
| * 4.2 -- | Bylaws of Enron Corp. (Exhibit 3.02 to the Company's Annual Report on Form 10-K for the year ended December 31, 1990). |
| 4.3 -- | Enron Corp. 1994 Stock Plan, as amended. |
| 5 -- | Opinion of James V. Derrick, Jr., Esq., Senior Vice President and General Counsel of Enron Corp., as to the validity of the Common Stock. |
| 23.1 -- | Consent of Arthur Andersen LLP regarding reports included in Form 10-K. |
| 23.2 -- | Consent of DeGolyer and MacNaughton. |
| 23.3 -- | The consent of James V. Derrick, Jr., Esq., is contained in his opinion filed as Exhibit 5 hereto. |
| 24 -- | Powers of Attorney of certain directors of the Company. |

-  ------------------

* Incorporated by reference as indicated

1

EXHIBIT 4.3

ENRON CORP. 1994 STOCK PLAN

SECTION 1.  PURPOSE

The purposes of this Enron Corp. 1994 Stock Plan (the "Plan") are to enable all employees employed by Enron Corp. (together with any successor thereto, the "Company") and its Affiliates and other eligible persons to develop a proprietary interest in the growth and performance of the Company, to generate an increased incentive to contribute to the Company's future success and prosperity, thus enhancing the value of the Company for the benefit of its stockholders, and to enhance the ability of the Company and its Affiliates to attract and retain employees who are essential to the progress, growth and profitability of the Company.

SECTION 2.  ADMINISTRATION

2.1   The Plan shall be administered by the Committee. A majority of the Committee shall constitute a quorum, and the acts of a majority of the members present at any meeting at which a quorum is present, or acts approved in writing by all members of the Committee, shall be deemed the acts of the Committee.

2.2   Subject to the terms of the Plan and applicable law, the Committee shall have sole power, authority and discretion to: (i) designate Participants; (ii) determine the types of Awards to be granted to a Participant under the Plan; (iii) determine the number of Shares to be covered by or with respect to which payments, rights, or other matters are to be calculated in connection with Awards; (iv) determine the terms and conditions of any Award; (v) determine whether, to what extent, under what circumstances and how Awards may be settled or exercised in cash, Shares, other securities, other Awards, or other property, or may be canceled, forfeited, or suspended; (vi) determine whether, to what extent, and under what circumstances cash, Shares, other securities, other Awards, other property, and other amounts payable with respect to an Award under the Plan shall be deferred either automatically or at the election of the holder thereof or of the Committee; (vii) interpret, construe and administer the Plan and any instrument or agreement relating to an Award made under the Plan; (viii) establish, amend, suspend, or waive such rules and regulations and appoint such agents as it shall deem appropriate for the proper administration of the Plan; (ix) make a determination as to the right of any person to receive payment of an Award or other benefit; and (x) make any other determination and take any other action that the Committee deems necessary or desirable for the administration of the Plan.

2.3   Unless otherwise expressly provided in the Plan, all designations, determinations, interpretations, and other decisions with respect to the Plan or any Award shall be within the sole discretion of the Committee, may be made at any time, and shall be final, conclusive, and binding upon all Persons, including the Company, any Affiliate, any Participant, any holder or beneficiary of any Award, any stockholder, and any employee of the Company or of any Affiliate.

SECTION 3.  SHARES AVAILABLE FOR AWARDS

3.1    SHARES AVAILABLE.

(i)      Calculation of Number of Shares Available. The number of Shares available for granting Awards under the Plan for 1994 shall be 3,000,000 Shares, subject to adjustment as provided in Section 3.2.

Further, if after the effective date of the Plan, any Shares covered by an Award granted under the Plan, or to which an Award relates, are

forfeited, or if an Award otherwise terminates without the delivery of
Shares or of other consideration, then the Shares covered by such Award
(or to which such Award relates, or the number of Shares otherwise
counted against the aggregate number of Shares available under the Plan
with respect to such Award, to the extent of any such forfeiture or
termination) shall again be available for granting Awards under the Plan.

1

2

(ii)    Accounting for Awards. For purposes of this Section 3, if an Award is denominated in Shares, the number of Shares covered by such Award, or to which such Award relates, shall be counted on the date of grant of such Award against the aggregate number of Shares available for granting Awards under the Plan; provided, however, that Awards that operate in tandem with (whether granted simultaneously with or at a different time from) other Awards may be counted or not counted under procedures adopted by the Committee in order to avoid double counting.

(iii)    Sources of Shares Deliverable Under Awards. Any shares delivered pursuant to an Award may consist, in whole or in part, of authorized and unissued Shares or of treasury Shares.

3.2    ADJUSTMENTS.

(i)    In the event that the Committee shall determine that any dividend  or other distribution (whether in the form of cash, Shares, other securities or other property), recapitalization, stock split, reverse stock split, reorganization, merger, consolidation, split-up, spin-off, combination, repurchase or exchange of Shares or other securities of the Company, issuance of warrants or other rights to purchase Shares or other securities of the Company (or other similar corporate transaction or event) affects the Shares such that an adjustment is determined by the Committee to be appropriate in order to prevent dilution or enlargement of the benefits or potential benefits intended to be made available under the Plan, then the Committee may, subject to Section 3.2 (ii), in such manner as it may deem equitable, adjust any or all of (a) the number and type of Shares (or other securities or property) which thereafter may be made the subject of Awards, (b) the number and type of Shares (or other securities or property) subject to outstanding Awards, and (c) the grant, purchase, or exercise price with respect to any Award, or, if deemed appropriate, make provision for a cash payment to the holder of an outstanding Award; provided, however, that the number of Shares subject to any Award denominated in Shares shall always be a whole number.

(ii)    If, and whenever, prior to the expiration of a grant theretofore made, the Company shall effect a subdivision or consolidation of Shares or the payment of a stock dividend on Shares without receipt of consideration by the Company, the number of Shares with respect to which such grant may thereafter be vested or exercised (a) in the event of an increase in the number of outstanding Shares shall be proportionately increased, and if the grant is an Option the purchase price per Share shall be proportionately reduced, and (b) in the event of a reduction in the number of outstanding Shares shall be proportionately reduced, and if the grant is an Option the purchase price per Share shall be proportionately increased.

SECTION 4.  ELIGIBILITY

4.1    Any Employee of the Company or of an Affiliate, any individual who is a member of the board of directors of an Affiliate, who is not an Employee at the time the grant is made, or any individual performing services for the Company or any Affiliate as a Non-employee Contractor shall be eligible to be designated a Participant. Notwithstanding the foregoing, any person who is subject to Section 16(b) of the Securities Exchange Act of 1934 or any officer or director of the Company covered by the New York Stock Exchange listing requirements shall not be eligible to be designated a Participant. Further, no grants of Incentive Stock Options shall be made under the Plan. Grants may be made to the same individual on more than one occasion.

4.2    No individual who is subject to any written agreement with the company that generally restricts the acquisition of Shares shall be eligible for any

grant of an Award while such agreement is in effect.

2

3

SECTION 5.   AWARDS

5.1    Options. The Committee is hereby authorized to grant Options to
Participants with the following terms and conditions and with such additional
terms and conditions, which are not inconsistent with the provisions of the
Plan, as the Committee shall determine:

    (i)    Exercise Price. The per Share purchase price of an Option shall not
be less than the Fair Market Value of a Share on the date of grant of
such Option and in no event less than the par value of a Share.

    (ii)   Time and Method of Exercise. Subject to the provisions contained in
the Plan and in a Participant's Award Agreement, unexercised vested
Shares under an Option may be exercised in whole or in part from time to
time by request to the Company. Payment of the exercise price and any
applicable tax withholding amounts must be made at the time of exercise,
in whole or in part, by delivery of a cashier's check, Shares of Stock,
other awards, other property or any combination thereof having a fair
market value equal to such amount or part thereof provided that the fair
market value of Stock so delivered shall be equal to the closing price of
the Stock as reported in the "NYSE -- Composite Transactions" section of
the Midwest Edition of the Wall Street Journal on the date of actual
receipt by the Company of the notice exercising the Option or, if no
prices are so reported on such day, on the last preceding day on which
such prices of Stock are so reported. An Option may be exercised through
a broker financed exercise pursuant to the provisions of Regulation T of
the Federal Reserve Board. If the Company receives payment of the
purchase price for the exercise of the Option through a broker financed
exercise before the end of the next business day following the broker's
execution of the sale of Stock for the financed exercise, the exercise
shall be effective at the time of such sale. Otherwise, the exercise
shall be effective when the Company receives payment of the purchase
price.

    (iii) Option Agreement. Each Option shall be evidenced by an Award
Agreement which shall specify the term of the Option as well as vesting
and termination provisions.

    (iv)  Status as Stockholder. Unless and until a certificate or
certificates representing such Shares shall have been issued by the
Company to the Participant, the Participant (or the person permitted to
exercise an Option in the event of the Participant's death or incapacity)
shall not be or have any of the rights or privileges of a Stockholder of
the Company with respect to the Shares acquirable upon an exercise of an
Option.

5.2    RESTRICTED STOCK

    (i)    Issuance. The Committee is hereby authorized to grant Awards of
Restricted Stock to Participants, which Awards shall be evidenced by
Award Agreements, which shall specify vesting provisions. Notwithstanding
the foregoing, the number of Shares of Restricted Stock which may be
granted shall be limited to not more than twenty-five percent (25%) of
the total number of Shares available for grant under the Plan.

    (ii)   Restrictions. Shares of Restricted Stock shall be subject to such
restrictions as the Committee may impose (including without limitation,
any limitation on the right to vote a Share of Restricted Stock), which
restrictions may lapse separately or in combination at such time or
times, in such installments or otherwise as the Committee may deem
appropriate.

    (iii) Certificates and Dividends. All dividends and distributions, or

cash equivalent thereof (whether cash, stock or otherwise), on non-vested Shares of Restricted Stock shall be withheld from the respective Participant and credited by the Company for the Participant's account. At such time as a Participant becomes vested in a portion of the Award of Restricted Stock Shares, the restrictions thereon imposed by this Section 5.2 (iii) shall lapse and certificates representing such

3

4

vested shares shall be delivered to the Participant along with all
accumulated credits for dividends and distributions, or cash equivalent
thereof attributable to such vested shares. Interest shall not be paid on
any dividends or distributions or cash equivalent thereof, credited by
the Company for the account of a Participant. The Company shall have the
option of paying such credits for accumulated dividends or distributions
or cash equivalent thereof, in Shares of the Company rather than in cash
or other medium. (If payment is made in Shares, the conversion to Shares
shall be at the average Fair Market Value for the five trading days
preceding the date of payment.) Dividends and distributions, or cash
equivalent thereof credited on non-vested Restricted Stock shall be
forfeited in the same manner and at the same time as the respective
shares of Restricted Stock to which they are attributable are forfeited,
except that such forfeited credits for dividends and distributions or
cash equivalent thereof shall be canceled and shall not be available for
future distribution under this Plan.

(iv) Payment. A Participant shall not be required to make any payment for
Awards of Restricted Stock, except to the extent otherwise required by
law.

(v) Vesting. Shares of non-vested Restricted Stock awarded to a
Participant will be forfeited if the Participant terminates employment or
service for any reason other than death, Disability, Retirement or
Involuntary Termination. At the time and on the date of a Participant's
death, Disability, Retirement or Involuntary Termination during the
Participant's employment or service, prior to the date the Participant
otherwise becomes fully vested in all the Restricted Stock awarded to the
Participant, all restrictions placed on each share of Restricted Stock
awarded to the Participant shall lapse and the non-vested Restricted
Stock will become fully vested Released Securities. From and after such
date the Participant or the Participant's estate, personal representative
or beneficiary, as the case may be, shall have full rights of transfer or
resale with respect to such Restricted Stock subject to applicable state
and federal regulations.

(vi) Exchange of Restricted Stock for Options. In advance of accepting
delivery of a stock certificate for vested Shares of Restricted Stock,
subject to approval of the Committee which need not be given, a
Participant may request that such Shares of Restricted Stock be traded
for a grant of Stock Options under the Plan, for an amount of Shares of
Enron Corp. common stock ("Stock") and subject to such terms and
conditions as the Committee may elect.

5.3   GENERAL

(i)   No Cash Consideration for Awards. Except as otherwise provided in
the Plan, awards shall be granted for no cash consideration or for such
minimal cash consideration as may be required by applicable law.

(ii)  Awards May Be Granted Separately or Together. Awards, in the
discretion of the Committee, may be granted either alone or in addition
to, or in tandem with any other Award or any award granted under any
other plan of the Company or an Affiliate. Awards granted in addition to
or in tandem with other Awards, or in addition to or in tandem with
awards granted under any other plan of the Company or any Affiliate, may
be granted either at the same time as or at a different time from the
grant of such other Awards or awards.

(iii) Limits on Transfer of Awards. No Award (other than Released
Securities) and no right under any such Award, shall be assignable,
alienable, saleable or transferable by a Participant otherwise than by
will or by the laws of descent and distribution or, in the case of an

Award of Restricted Stock by assignment to the Company; provided however, if so determined by the Committee, a Participant may, in the manner established by the Committee, designate a beneficiary or beneficiaries to exercise the rights of the Participant and to receive any property distributable with respect to any Award upon the death of the Participant. Each Award and each right under any Award shall be exercisable during the Participant's lifetime only by the Participant or, if

4

5

permissible under applicable law, by the Participant's guardian or legal representative. No Award (other than Released Securities) and no right under any such Award may be pledged, alienated, attached or otherwise encumbered, and any purported pledge, alienation, attachment or encumbrance thereof shall be void and unenforceable against the Company or any Affiliate.

(iv)  Term of Awards. The term of each Award shall be for such period as may be determined by the Committee; provided however, that in no event shall the term of any Option exceed a period of ten (10) years from the date of its grant.

(v)  Status of Stock. The Company intends to register for issue under the Securities Act of 1933, as amended ("The Act"), the Shares of Stock acquirable pursuant to Awards under the Plan, and to keep such registration effective throughout the period any Awards are in effect. In the absence of such effective registration or an available exemption from registration under the Act, delivery of Shares of Stock acquirable pursuant to Awards under the Plan shall be delayed until registration of such Shares is effective or an exemption from registration under the Act is available. The Company intends to use its best efforts to ensure that no such delay will occur. In the event exemption from registration under the Act is available, Participant (or Participant's estate or personal representative in the event of the Participant's death or incapacity), if requested by the Company to do so, will execute and deliver to the Company in writing an agreement containing such provisions as the Company may require to assure compliance with applicable securities laws. No sale or disposition of Shares of Stock acquired pursuant to an Award under the Plan by a Participant shall be made in the absence of an effective registration statement with respect to such shares under the Act unless an opinion of counsel satisfactory to the Company that such sale or disposition will not constitute a violation of the Act or any other applicable securities laws is first obtained. In the event that a Participant proposes to sell or otherwise dispose of Shares of Stock in such a manner that an exception from the registration requirements of the Act is unavailable for such sale or disposition, and upon request to the Company by the Participant, the Company, at its sole cost and expense, shall cause a registration statement to be prepared and filed with respect to such sale or disposition by the Participant and shall use its best efforts to have such registration statement declared effective, and, in connection therewith, shall execute and deliver such documents as shall be necessary, including without limitation, agreements providing for the indemnification of underwriters for any loss or damage incurred in connection with such sale or disposition.

(vi)  Share Certificates. All certificates for Shares or other securities delivered under the Plan pursuant to any Award or the exercise thereof shall be subject to such stop transfer orders and other restrictions as the Committee may deem advisable under the Plan or the rules, regulations and other requirements of the Securities and Exchange Commission, any stock exchange upon which such Shares or other securities are then listed and any applicable Federal or state securities laws, and the Committee may cause a legend or legends to be put on any such certificates to make appropriate reference to such restrictions, including, but not limited to, the provisions of Subsection 5.3(v).

SECTION 6.  AMENDMENT AND TERMINATION

Except to the extent prohibited by applicable law and unless otherwise expressly provided in an Award Agreement or in the Plan:

6.1 AMENDMENTS TO THE PLAN. The Board of Directors in its discretion may terminate the Plan at any time with respect to any Shares for which a grant has

not theretofore been made. The Board of Directors shall have the right to alter
or amend the Plan or any part thereof from time to time, including amending the
Plan for the purpose of making additional Shares available for Awards under the
Plan, provided, that no change in any grant theretofore made may be made which
would impair the rights of the recipient of a grant without the consent of such
recipient.

5

6

## 6.2 ADJUSTMENTS OF AWARDS UPON THE OCCURRENCE OF CERTAIN UNUSUAL OR NONRECURRING EVENTS

A. Subject to the provisions of Section 6.2B and 6.2C below, if a transaction occurs which is not approved or recommended by a majority of the Board of Directors of the Company in Actions taken prior to, and with respect to, such transaction in which either (i) the Company merges or consolidates with any other corporation (other than one of the Company's wholly-owned subsidiaries) and is not the surviving corporation (or survives only as the subsidiary of another corporation), (ii) the Company sells all or substantially all of its assets to any other person or entity, or (iii) the Company is dissolved, or if (iv) any third person or entity (other than the trustee or committee of any qualified employee benefit plan of the Company), together with its Affiliates and Associates shall be, directly or indirectly, the Beneficial Owner of at least thirty percent (30%) of the Voting Stock of the Company, or (v) the individuals who constitute the members of Company's Board of Directors on the date hereof (the "Incumbent Board") cease for any reason to constitute at least a majority thereof, provided that any person becoming a Director subsequent to the date hereof whose election or nomination for election by the Company's stockholders was approved by a vote of at least eighty percent (80%) of the Directors comprising the Incumbent Board (either by a specific vote or by approval of the proxy statement of the Company in which such person is named as a nominee for Director, without objection to such nomination) shall be, for purposes of this clause (v), considered as though such person were a member of the Incumbent Board, then within (a) ten days of the approval by the stockholders of the Company of such merger, consolidation, sale of assets or dissolution as described in clause (i), (ii) or (iii) of this Section 6.2A, or (b) thirty (30) days of the occurrence of such change of Beneficial Ownership or Directors as described in clause (iv) or (v) of this Section 6.2A, then with respect to outstanding grants of Restricted Stock made under Section 5.2, each recipient thereof shall have a fully vested right in all Restricted Stock granted to the recipient and then outstanding, and with respect to outstanding grants of Options made under Section 5.1, all such outstanding Options irrespective of whether they are then exercisable, shall be surrendered to the Company by each grantee thereof and such Options shall thereupon be cancelled by the Company, and the grantee shall receive a cash payment by the Company in an amount equal to the number of Shares subject to the Options held by such grantee multiplied by the difference between (x) and (y) where (y) equals, for Options, the purchase price per Share covered by the Option and (x) equals (1) the per share price offered to stockholders of the Company in any such merger, consolidation, sale of assets or dissolution transaction, (2) the per share price offered to stockholders of the Company in any tender offer or exchange offer whereby any such change of Beneficial Ownership or Directors takes place, or (3) the Fair Market Value of a Share on the date determined by the Committee (as constituted prior to any change described in clause (iv) or (v)) to be the date of cancellation and surrender of such Options if any such change of Beneficial Ownership or Directors occurs other than pursuant to a tender or exchange offer, whichever is appropriate. In the event that the consideration offered to stockholders of the Company in any transaction described in this Section 6.2A consists of anything other than cash, the Committee (as constituted prior to such transaction) shall determine the fair cash equivalent of the portion of the consideration offered which is other than cash.

B. Except as otherwise expressly provided herein, the issuance by the Company of shares of stock of any class or securities convertible into shares of stock of any class, for cash, property, labor or services, upon direct sale, upon the exercise of rights or warrants to subscribe therefor, or upon conversion of shares or obligations of the Company convertible into such shares or other securities, and in any case whether or not for fair value, shall not affect, and no adjustment by reason thereof shall be made with respect to, the number of Shares subject to Restricted Stock or Options theretofore granted or the purchase price or grant price per share, if applicable.

C. Any adjustment provided for in Section 3.2 or Section 6.2 shall be subject to
any required stockholder action.


6.3 CORRECTION OF DEFECTS, OMISSIONS AND INCONSISTENCIES. The Committee may
correct any defect, supply any omission, or reconcile any inconsistency in the
Plan or any Award in the manner and to the extent it shall deem desirable in the
establishment or administration of the Plan.


6

7

## SECTION 7. GENERAL PROVISIONS

**7.1 NO RIGHTS TO AWARDS.** No Employee, Participant or other Person shall have any claim to be granted any Award under the Plan, and there is no obligation for uniformity of treatment of Employees, Participants, or holders or beneficiaries of Awards under the Plan. The terms and conditions of Awards need not be the same with respect to each Participant.

**7.2 WITHHOLDING.** The Company or any Affiliate is authorized (i) to withhold from any Award granted or any payment due or any transfer made under any Award or under the Plan the amount (in cash, Shares, other securities, other Awards, or other property) of withholding taxes due in respect of an Award, its exercise, or any payment or transfer under such Award or under the Plan, and (ii) to take such other action as may be necessary in the opinion of the Company or Affiliate to satisfy all obligations for the payment of such taxes. In the case of Restricted Stock, the Participant is required to pay to the Company or any Affiliate an amount (in cash, Shares, other securities, other Awards, or other property) necessary to satisfy applicable taxes required to be withhold by the Company or any Affiliate, before stock certificates representing the number of Shares of vested Restricted Stock shall be delivered.

**7.3 NO LIMIT ON OTHER COMPENSATION ARRANGEMENTS.** Nothing contained in the Plan shall prevent the Company or any Affiliate from adopting or continuing in effect other or additional compensation arrangements and such arrangements may be either generally applicable or applicable only in specific cases.

**7.4 NO RIGHT TO EMPLOYMENT.** The grant of an Award shall not be construed as giving a Participant the right to be retained in the employ of the Company or any Affiliate. Further, the Company or an Affiliate may at any time dismiss a Participant from employment, free from any liability or any claim under the Plan unless otherwise expressly provided in the Plan or in any Award Agreement.

**7.5 GOVERNING LAW.** The validity, construction and effect of the Plan and any rules and regulations relating to the Plan shall be determined in accordance with applicable Federal law, and to the extent not preempted thereby, with the laws of the State of Texas.

**7.6 SEVERABILITY.** If any provision of the Plan or any Award is or becomes or is deemed to be invalid, illegal or unenforceable in any jurisdiction, or as to any person or Award, or would disqualify the Plan or any Award under any law deemed applicable by the Committee, such provision shall be construed or deemed amended to conform to applicable laws. If it cannot be so construed or deemed amended without, in the determination of the Committee, materially altering the intent of the Plan or the Award, such provision shall be stricken as to such jurisdiction, Person or Award and the remainder of the Plan and any such Award shall remain in full force and effect.

**7.7 NO TRUST OR FUND CREATED.** Neither the Plan nor any Award shall create or be construed to create a trust or separate fund of any kind or a fiduciary relationship between the Company or any Affiliate and a Participant or any other Person. To the extent that any Person acquires a right to receive payments from the Company or any Affiliate pursuant to an Award, such right shall be no greater than the right of any unsecured general creditor of the Company or any Affiliate.

**7.8 NO FRACTIONAL SHARES.** No fractional Shares shall be issued or delivered pursuant to the Plan or any Award, and the Committee shall determine whether cash, other securities, or other property shall be paid or transferred in lieu of any fractional Shares, or whether such fractional Shares or any rights thereto shall be canceled, terminated or otherwise eliminated. In addition, no fractional Shares shall be accepted by the Company in payment of the exercise price of an Option.

7.9 HEADINGS. Headings are given to the Sections and Subsections of the Plan solely as a convenience to facilitate reference. Such headings shall not be deemed in any way material or relevant to the construction or interpretation of the Plan or any provision thereof.

7

8

7.10 NO LIMITATION. The existence of the Plan and the grants of Awards made hereunder shall not affect in any way the right or power of the Board of Directors or the stockholders of the Company (or stockholders of any Affiliate, as applicable) to make or authorize any adjustment, recapitalization, reorganization or other change in the capital structure or business of the Company or any Affiliate, any merger or consolidation of the Company or any Affiliate, any issue of debt or equity securities ahead of or affecting Shares or the rights thereof or pertaining thereto, the dissolution or liquidation of the Company or any Affiliate or any sale or transfer of all or any part of Company or any Affiliate's assets or business, or any other corporate act or proceeding.

7.11 NO RIGHT TO RETENTION. Neither the Plan, nor any Award granted pursuant to the Plan, is a contract or agreement that the Company will retain the services of a Non-employee Contractor for any period of time, or at any particular rate of compensation.

7.12 SECURITIES LAWS. Each Award granted under the Plan shall be subject to the requirement that if at any time the Board of Directors shall determine, in its discretion, that the listing, registration or qualification of the shares subject to such grant upon any securities exchange or under any state or federal law, or that the consent or approval of any government regulatory body, is necessary or desirable as a condition of, or in connection with, such grant or the issue or purchase of shares thereunder, such grant shall be subject to the condition that such listing, registration, qualification, consent or approval shall have been effected or obtained free of any conditions not acceptable to the Board of Directors.

7.13 DELEGATION. Subject to the terms of the Plan, the Committee may delegate to other Persons the authority and responsibility of designating the recipients of Awards under the Plan (which recipients may not be any Person to whom the Committee has so delegated such authority and responsibility).

SECTION 8.  TERM OF THE PLAN

The Plan is effective as of the date of its approval by the Board of Directors of the Company. No Award shall be granted under the Plan after the earlier of (i) ten (10) years from the date of approval of the Plan or (ii) termination of the Plan pursuant to Section 6.1. However, unless otherwise expressly provided in the Plan or in an applicable Award Agreement, any Award theretofore granted may extend beyond such date, and any authority of the Committee to amend, after, suspend, discontinue or terminate any such Award, or to waive any conditions or rights under any such Award, and the authority of the Board of Directors of the Company to amend the Plan, shall extend beyond such date.

SECTION 9.  DEFINITIONS

As used in the Plan, the following terms shall have the meanings set forth below:

        (a) "Affiliate" shall mean (i) any entity that directly or through one or more intermediaries is controlled by the Company, (ii) any entity in which the Company has a significant equity interest as determined by the Committee, and (iii) as used in Section 6.2 and in the term "Associate", as the term "affiliate" is defined in Rule 12b-2 under the Securities Exchange Act of 1934, as amended, or any successor rule or regulation.

        (b) "Associate" is used to indicate a relationship with a specified person and shall mean (i) any corporation, partnership or other organization to which such specified person is an officer or partner or is, directly or indirectly, the Beneficial Owner of ten percent (10%) or more of any class of equity securities, (ii) any trust or other estate in which such specified person has a substantial beneficial interest or as

to which such specified person serves as trustee or in a similar
fiduciary capacity, (iii) any relative or spouse of such specified
person, or any relative of such spouse, who has the same home as such
specified person or who is a Director or officer of the Company or any of
its parents or Affiliates, and (iv) any person who is a director or
officer of such specified person

8

9

or any of its parents or Affiliates (other than the Company or any wholly-owned subsidiary of the Company).

(c) "Award" shall mean any Option or Restricted Stock granted under the Plan.

(d) "Award Agreement" shall mean any written agreement, contract or other instrument or document evidencing any Award granted under the Plan.

(e) "Beneficial Owner" shall be defined by reference to Rule 13d-3 under the Securities Exchange Act of 1934, as amended, or any successor rule or regulation; provided, however, and without limitation, any individual, corporation, partnership, group, association or other person or entity which has the right to acquire any Voting Stock at any time in the future, whether such right is contingent or absolute, pursuant to any agreement, arrangement or understanding or upon exercise of conversion rights, warrants or options, or otherwise, shall be the Beneficial Owner of such Voting Stock.

(f) "Code" shall mean the Internal Revenue Code of 1986, as amended from time to time.

(g) "Committee" shall mean a committee of the Board of Directors of the Company designated by such Board to administer the Plan and composed of not less than two outside directors.

(h) "Disability" shall mean, with respect to an Employee of the Company or one of its Affiliates, such total and permanent disability as qualifies the Employee for benefits under the long-term or extended disability plan of the Company or Affiliate covering the Employee at the time. With respect to a Non-employee Contractor, Disability shall mean inability to perform duties and services for the Company or an Affiliate by reason of a medically determinable physical or mental impairment supported by medical evidence which in the opinion of the Committee can be expected to result in death or which can be expected to last for a continuous period of not less than twelve (12) months.

(i) "Employee" shall mean any person employed by the Company or any Affiliate.

(j) "Fair Market Value" shall mean, with respect to any property (including, without limitation, any Shares or other securities), the value of such property determined by such methods or procedures as shall be established from time to time by the Committee; provided, that so long as the closing price of Shares as reported in the "NYSE-Composite Transactions" section of the Midwest edition of The Wall Street Journal is reported, Fair Market Value with respect to Shares on a particular date shall mean such closing price of Shares as so reported for such date (or, if no prices are quoted for that date, as so quoted for the last preceding date for which such prices were so quoted).

(k) "Incentive Stock Option" shall mean an option that is intended to meet the requirements of Section 422 of the Code, or any successor provision thereto.

(l) "Involuntary Termination" shall mean termination of a Participant's employment as an Employee or service as a Non-employee Contractor with the Company or an Affiliate at the election of the Company or Affiliate, provided that such termination is not Termination for Cause, and provided further, that in the case of a Non-employee Contractor, such termination is not due to the election of the Company or an Affiliate not to renew the Non-employee Contractor's contract upon its expiration. Involuntary Termination shall not include a transfer of assignment or location of a

Participant where the Participant is employed by or in the service of the
Company or an Affiliate both before and after the transfer.

(m) "1934 Act" shall mean the Securities Exchange Act of 1934, as
amended.

9

10

(n) "Non-employee Contractor" shall mean a person who is not an Employee as defined in this Section 9, who is performing services for the Company or an Affiliate under a contractual arrangement either directly or through a third party agency.

(o) "Non-Qualified Stock Option" shall mean an option granted under Section 5.1 or the Plan that is not intended to be an Incentive Stock Option.

(p) "Option" shall mean a Non-Qualified Stock Option.

(q) "Participant" shall mean an Employee or other individual described in Sections 4.1 designated to be granted an Award under the Plan.

(r) "Person" shall mean any individual, corporation, partnership, association, joint-stock company, trust, unincorporated organization or government or political subdivision thereof.

(s) "Released Securities" shall mean securities that were Restricted Stock with respect to which all applicable restrictions have expired, lapsed or been waived.

(t) "Restricted Stock" shall mean any Shares granted under Section 5.2 of the Plan.

(u) "Retirement" shall mean the commencement of retirement benefits to an Employee of the Company or an Affiliate under the Enron Retirement Plan.

(v) "Shares" shall mean the shares of Common Stock of the Company, $.10 par value, and such other securities or property as may become the subject of Awards pursuant to an adjustment made under Section 3.2 of the Plan.

(w) "Termination for Cause: shall mean termination of employment or service at the election of the Company or an Affiliate because of the Participant's (i) conviction of a felony relating to or in connection with Enron or Enron's business (which, through lapse of time or otherwise, is not subject to appeal); or (ii) willful refusal without proper legal cause to perform the Participant's duties and responsibilities; or (iii) willfully engaging in conduct which the Participant has, or in the opinion of the Committee should have, reason to know is materially injurious to the Company or an Affiliate. Such termination of employment or service shall be effected by notice thereof delivered by the Company or an Affiliate to the Participant and shall be effective as of the date stated in such notice; provided, however, that if (a) such termination of employment or service is because of the Participant's willful refusal without proper cause to perform any one or more duties and responsibilities and (b) within seven (7) days following the date of such notice the Participant shall cease such refusal and shall use all reasonable efforts to perform such obligations, the termination of employment or service, if made, shall not be for cause.

(x) "Voting Stock" shall mean all outstanding shares of capital stock of the Company entitled to vote generally in elections for directors, considered as one class; provided, however, that if the Company has shares of Voting Stock entitled to more or less than one vote for any such share, each reference to a proportion of shares of Voting Stock shall be deemed to refer to such proportion of the votes entitled to be cast by such shares.

(y) Any terms or provisions used herein which are defined in Sections 83, 421, 422 or 424 of the Code or the regulations thereunder shall have the meanings as therein defined.

10

11

Adopted pursuant to resolution of the Board of Directors this 8th day of
February, 1994.

By:  KENNETH L. LAY                    Date:  February 16, 1994
     --------------------------------
     Chairman of the Board and
     Chief Executive Officer


By:  PEGGY B. MENCHACA                 Date:  February 16, 1994
     --------------------------------
     Secretary

11

12

## FIRST AMENDMENT TO
## ENRON CORP. 1994 STOCK PLAN

WHEREAS, the Company has heretofore approved and adopted the Enron Corp. 1994 Stock Plan (the "Plan"); and

WHEREAS, the Company desires to amend the Plan to permit the issuance of a total number of 11,000,000 shares of Enron Corp. common stock under the Plan;

NOW, THEREFORE, the Plan is amended as follows:

1. The first paragraph of Section 3.1(i) is deleted and the following is substituted therefor:

"The number of Shares available for granting Awards under the Plan shall be 11,000,000 Shares, subject to adjustment as provided in Section 3.2."

AS AMENDED HEREBY, the Plan is specifically ratified and reaffirmed.

Date: May 3, 1994                    ENRON CORP.

                                     By: PHILIP J. BAZELIDES
                                         ------------------------
                                         Title: Vice President,
                                         Corporate Human Resources


ATTEST:

PEGGY B. MENCHACA
- ----------------------------------
Title: Vice President & Secretary

13

SECOND AMENDMENT TO
ENRON CORP. 1994 STOCK PLAN

WHEREAS, ENRON CORP. (the "Company") has heretofore adopted and maintains the
Enron Corp. 1994 Stock Plan (the "Plan"); and

WHEREAS, the Company desires to amend the Plan to extend the time payment may be
made for a cashless exercise of options through a broker financed exercise
pursuant to the provisions of Regulation T of the Federal Reserve Board;

NOW, THEREFORE, the Plan is amended as follows:

1.    Subparagraph (ii) of Section 5.1 is rescinded and the following new
subparagraph (ii) is inserted in its place as of the effective date of the Plan:

"(ii) Time and Method of Exercise. Subject to the provisions contained in
the Plan and in a Participant's Award Agreement, unexercised vested Shares
under an Option may be exercised in whole or in part from time to time by
request to the Company. Payment of the exercise price and any applicable
tax withholding amounts must be made at the time of exercise, in whole or
in part, by delivery of a cashier's check, Shares of Stock, other awards,
other property or any combination thereof having a fair market value equal
to such amount or part thereof provided that the fair market value of
Stock so delivered shall be equal to the closing price of the Stock as
reported in the "NYSE -- Composite Transactions" section of the Midwest
Edition of the Wall Street Journal on the date of actual receipt by the
Company of the notice exercising the Option or, if no prices are so
reported on such day, on the last preceding day on which such prices of
Stock are so reported. An Option may be exercised through a broker
financed exercise pursuant to the provisions of Regulation T of the
Federal Reserve Board. If the Company receives payment of the purchase
price for the exercise of the Option through a broker financed exercise
before the end of the fifth business day following the broker's execution
of the sale of Stock for the financed exercise, the exercise shall be
effective at the time of such sale. Otherwise, the exercise shall be
effective when the Company receives payment of the purchase price."

14

AS AMENDED HEREBY, the Plan is specifically ratified and reaffirmed.

Date: December 13, 1994

ENRON CORP.

By: PHILIP J. BAZELIDES
    ---------------------
Title: Vice President,
Corporate Human Resources

ATTEST:

PEGGY B. MENCHACA
- --------------------------------
Title: Vice President & Secretary

E
X
H
I
B
I
T

B

**EXHIBIT B**

2004 STOCK OPTION AWARD

# AGREEMENT EVIDENCING A GRANT OF NONQUALIFIED STOCK OPTION

*Managing Directors*



LEHMAN BROTHERS

LEH-RSU 0002313

**1. GRANT OF UNITS.** Pursuant to the Lehman Brothers Holdings Inc. ("Holdings") Employee Incentive Plan (the "Plan"), you are hereby granted, as of December 9, 2004, a nonqualified stock option to purchase the number of common shares (par value $0.10 per share) of Holdings ("Shares") set forth on the award statement with your name on it delivered to you herewith (the "Award Statement") (which number of Shares may be adjusted pursuant to Paragraph 6 below) with an exercise price of $85.80 per share as specified in the Award Statement (the "Option Exercise Price")

**2. ADDITIONAL DOCUMENTS; DEFINITIONS.** You have been provided with a copy of the Plan, which is incorporated in this instrument by reference and made a part hereof, and a copy of the Plan prospectus. The Plan and the prospectus then in effect should be carefully examined before any decision is made to exercise the option. In the event of any conflict or ambiguity between this instrument and the Plan, the terms of the Plan shall govern. All capitalized terms not defined herein or in Annex A attached hereto shall have the meaning ascribed to such terms under the Plan.

**3. EXERCISABILITY.** Subject to the provisions of this Agreement and the applicable provisions of the Plan, you may exercise this option as follows:

**(a)** No part of this option may be exercised after November 29, 2014 (the "Final Expiration Date").

**(b)** Beginning as of November 30, 2007, you may exercise this option as to no more than one-half of the Principal Option Shares (thirty-five percent of Shares subject to option pursuant to this Agreement); and

**(c)** As of November 30, 2009, you may exercise this option as to all Principal Option Shares and Discount Option Shares.

This option may not be exercised for a fraction of a Share.

**4. Conditions to Exercise.** This option may not be exercised unless all of the following conditions are met:

**(a)** Legal counsel for Holdings must be satisfied at the time of exercise that the issuance of Shares upon exercise will be in compliance with the Securities Act of 1933, as amended, and applicable U.S. federal, state, local and foreign laws;

**(b)** You (or in the event of your death, your estate or any person who acquires the right to exercise this option by bequest or inheritance or otherwise by reason of your death) must pay at the time of exercise the full option price for the Shares being acquired hereunder, by (i) paying in United States dollars by cash (which may be in the form of a certified check), (ii) subject to Holdings' prior consent, tendering Shares owned by you which have a Fair Market Value on the day of exercise equal to the full purchase price for the Shares being acquired, (iii) subject to Holdings' prior consent, by delivery of a properly executed exercise notice together with irrevocable instructions to a securities broker (or, in the case of pledges, lender) approved by Holdings to (a) sell shares of Common Stock subject to the option and to deliver promptly to Holdings a portion of the proceeds of such sale transaction on behalf of the exercising Participant to pay the option price, or (b) pledge shares of Common Stock subject to the option to a margin account maintained with such broker or lender, as security for a loan, and such broker or lender, pursuant to irrevocable instructions, delivers to Holdings loan proceeds, at the time of exercise to pay the option price, or (iv) by any combination of (i), (ii) or (iii) above; and

**(c)** You must, unless otherwise provided below, at all times during the period beginning with January 31, 2005 and ending on the date of such exercise, (x) have been employed by Holdings or a subsidiary thereof or (y) not have engaged in Detrimental Activity.

**(i) Effect of Termination before January 31, 2005.** In the event of your Termination for any reason or notification of Termination prior to January 31, 2005, this option shall be forfeited and cancelled.

**(ii) Voluntary Termination with Competitive Activity.** In the event of your voluntary Termination with Competitive Activity, this option shall be forfeited and canceled.

**(iii) Voluntary Termination without Competitive Activity.** In the event of your voluntary Termination without Competitive Activity, you will be permitted to exercise this option, to the extent not previously exercised, six months after your Termination (or on the scheduled date if sooner than six months) but not later than the Termination Expiration Date, provided you do not engage in Competitive Activity or Detrimental Activity during that period of time. However, if your Termination is a Full Career Termination, you will be permitted to exercise this option as to the number of Shares determined under this Subparagraph until November 29, 2014, the Final Expiration Date, provided you do not engage in Competitive Activity or Detrimental Activity through that date.

**(iv) Involuntary Termination with Cause.** In the event of your involuntary Termination with Cause, this option, to the extent not previously exercised, shall be forfeited and canceled immediately.

**(v) Involuntary Termination without Cause.** In the event of your involuntary Termination without Cause, you will be permitted to exercise this option as to all of the Principal Option Shares and Discount Option Shares, beginning as of the day after your Termination and continuing until the Termination Expiration Date, provided you do not engage in Detrimental Activity during that period of time. However, if your Termination is a Full Career Termination, you will be permitted to exercise all of the Principal Option Shares and all of the Discount Option Shares until November 29, 2014, provided you do not engage in Detrimental Activity through that date.

**(vi) Retirement.** Notwithstanding the foregoing provisions of Paragraph 4c(ii), (iii), (iv), and (v), in the event of your Retirement, you will be permitted to exercise this option in full, beginning as of the day after your Retirement and continuing until November 29, 2014, provided you do not engage in Competitive Activity or Detrimental Activity. If you engage in Competitive Activity or Detrimental Activity, this option shall expire immediately.

**(vii) Occurrence of a Bankruptcy Distribution Event, Death, or Disability.** Notwithstanding the foregoing provisions of Paragraph 4c(ii), (iii), (iv) and (v), in the event of the occurrence of a Bankruptcy Distribution Event or your death or Disability following a Termination described in Paragraph 4(c)(iii) and (v) hereof on or after January 31, 2005, you (or in the event of your death, your estate or any person who acquires the right to exercise this option by bequest or inheritance or otherwise by reason of your death) will be permitted to exercise this option in full, beginning as of the day after your Termination and continuing until November 29, 2014, provided you do not engage in Competitive Activity or Detrimental Activity. If you engage in Competitive Activity or Detrimental Activity, this option shall expire immediately.

Any remaining portion of this option, which is not exercisable pursuant to the provisions of this subparagraph 4(c), shall be canceled by Holdings.

**(d)** You may be requested, from time to time, to complete and sign an affidavit with respect to Competitive Activity or Detrimental Activities, which includes representations and authorizes

Holdings to verify the representations. Any failure on your part to complete, sign and return the affidavit may cause this option to be forfeited and canceled at that time.

**5. NON-ASSIGNMENT.** This option may not be sold, assigned, transferred, pledged, hypothecated or otherwise disposed of by you, except by will or the laws of descent and distribution and is exercisable during your lifetime only by you. If you or anyone claiming under or through you attempts to violate this Paragraph 5, such attempted violation shall be null and void and without effect, and Holdings' obligations hereunder shall terminate.

**6. EQUITABLE ADJUSTMENT.** In the event of a Change in Capitalization occurring after the date of grant of this option and prior to the exercise of the option in full, the number and kind of shares of Common Stock for which this option may then be exercised and the option price shall be adjusted so as to reflect such change.

**7. CHANGE IN CONTROL.** Except as set forth below, upon the occurrence of a Change in Control without the prior approval of the majority of the independent members of the Incumbent Board, all options awarded hereunder will be exercisable in full and all such options are entitled to Limited Rights described in Section 6(d) of the Plan which have been granted by the Committee. Except as set forth below, upon the occurrence of a Change in Control with the prior approval of a majority of the independent members of the Incumbent Board, one-half of the options awarded hereunder, which are then not exercisable shall become immediately exercisable and remain exercisable through November 29, 2014, and the remaining one-half of such options, or the difference in value between the exercise price and the highest price paid by the acquiring entity in such Change in Control (in such form of consideration as is received by shareholders generally) for the remaining one-half of such options, shall become exercisable or be paid, as appropriate, upon the earlier to occur of (a) two years following such Change in Control or (b) the date such options would become exercisable by their terms, provided however, that if such Change in Control occurs within one year of this grant date, and such Change in Control will be effected by a merger involving the issuance of equity shares to Holdings' stockholders, then the foregoing provisions of this paragraph will not apply and the Committee shall have total discretion as to the impact of such an event on options granted hereunder which are not then exercisable.

**8. AMENDMENT.** The terms of this Agreement may be amended from time to time by the Committee in its sole discretion in any manner that it deems appropriate (including, but not limited to, the acceleration provisions).

**9. BINDING ACTIONS.** Any action taken or decision made by the Committee or its delegates arising out of or in connection with the construction, administration, interpretation or effect of the Plan or this Agreement shall lie within its sole and absolute discretion, as the case may be, and shall be final, conclusive and binding on you and all persons claiming under or through you. By accepting this grant or other benefit under the Plan, you and each person claiming under or through you shall be conclusively deemed to have indicated acceptance and ratification of, and consent to, any action taken under the Plan by the Committee or its designees.

**10. NO RIGHT TO CONTINUED EMPLOYMENT.** Neither the grant nor the exercise of the option shall confer on you any right to be retained in the employ of Holdings or its Subsidiaries, or to receive subsequent options or other awards under the Plan. The right of Holdings or any Subsidiary to terminate your employment with it at any time or as otherwise provided by any agreement between Holdings or any Subsidiary and you is specifically reserved.

**11. NO RIGHTS OF A STOCKHOLDER.** Neither you (nor, in the event of your death, your estate or any person who acquires the right to exercise this option by bequest or inheritance or otherwise by reason of your death) shall have any of the rights of a stockholder with respect to Shares subject to the option except to the extent that such Shares of Common Stock shall have been issued to you (or, in the event of your death, your estate or any person who acquires the right to exercise this option by bequest or inheritance or otherwise by reason of your death) upon the exercise of the option.

**12. APPLICABLE LAW.** The validity, construction, interpretation, administration, and effect of the Plan, and of its rules and regulations, and rights relating to the Plan and to this Agreement, shall be governed by the substantive laws, but not the choice of law rules, of the State of Delaware.

**13. WITHHOLDING.** Holdings shall have the right to deduct applicable taxes from all amounts payable to you. It shall be a condition to the obligation of Holdings to issue Shares upon exercise of an option hereunder (a) that you (or in the event of your death, your estate or any person who acquires the right to exercise this option by bequest or inheritance or otherwise by reason of your death) pay to Holdings or its designee, upon its demand, in accordance with the Plan, such amount as may be required for the purpose of satisfying its obligation or the obligation of any other person to withhold any taxes required by law which are incurred by reason of the exercise of the option and (b) that you (or in the event of your death, your estate or any person who acquires the right to exercise this option by bequest or inheritance or otherwise by reason of your death) provide Holdings with any forms, documents or other information reasonably required in connection with the grant. If the amount requested for the purpose of satisfying the withholding obligation is not paid, Holdings may refuse to furnish Shares upon exercise of the option. Holdings shall further have the right to deduct from all amounts remaining payable to you after satisfaction of the withholding obligations described above, the amount of any deficit, debt, tax obligation or other liability or obligation of any kind which you may at that time have with respect to Holdings or any Subsidiary.

**Annex A: Definitions**

**"Appropriate Officer"** means the Chief Executive Officer or Chief Operating Officer of Holdings (or their respective designees).

**"Bankruptcy Distribution Event"** means the earlier to occur of (i) the date of, but immediately prior to, distribution to holders of claims and interests upon the substantial consummation of a confirmed plan of reorganization of Holdings in a Chapter 11 case under Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"), or (ii) the date of, but immediately prior to, distribution to holders of claims and interests upon the liquidation of Holdings in a Chapter 7 case under the Bankruptcy Code.

**"Cause"** means a material breach by a person of an employment contract between the person and Holdings or any Subsidiary, failure by a person to devote substantially all business time exclusively to the performance of his or her duties for Holdings or any Subsidiary, willful misconduct, dishonesty related to the business and affairs of Holdings or any Subsidiary, conviction of a felony or of a misdemeanor constituting a statutory disqualification under U.S. securities laws (or failure to contest prosecution for a felony or such misdemeanor), habitual or gross negligence in the performance of the person's duties, solicitation of employees of Holdings or any Subsidiary to work at another company, improper use or disclosure of confidential information, the violation of policies and procedures adopted by Holdings or any Subsidiary including but not limited to the Code of Conduct, a material violation of the conflict of interest, proprietary information or business ethics policies of Holdings or any Subsidiary, or such other circumstances as may be determined in the sole discretion of an Appropriate Officer.

**"Change in Capitalization"** means the occurrence of a circumstance described in Section 14 of the Plan.

**"Committee"** means the Compensation and Benefits Committee of the Incumbent Board (see definition of Change in Control in the Plan).

**"Competitive Activity"** means involvement (whether as an employee, proprietor, consultant or otherwise) with any person or entity (including any company and its affiliates) engaged in any business activity which is materially competitive with any business carried on by Holdings or any of its Subsidiaries or affiliates on the date of termination of a person's employment with Holdings or any of its Subsidiaries, as determined in the sole discretion of an Appropriate Officer.

**"Detrimental Activity"** means (i) using information received during a person's employment with Holdings or any of its Subsidiaries relating to the business affairs of Holdings or any of its Subsidiaries, affiliates or clients, in breach of such person's undertaking to keep such information confidential; (ii) directly or indirectly persuading or attempting to persuade, by any means, any employee of Holdings or any of its Subsidiaries or affiliates to terminate employment with any of the foregoing or to breach any of the terms of his or her employment with the foregoing; (iii) directly or indirectly making any statement that is, or could be, disparaging of Holdings, its Subsidiaries or affiliates, or any of their affiliates (except as necessary to respond truthfully to any inquiry from applicable regulatory authorities or to provide information pursuant to legal process); or (iv) directly or indirectly engaging in any activity that is, or could be, substantially injurious to the financial condition, reputation, or goodwill of Holdings or its Subsidiaries or affiliates, in each case as determined in the sole discretion of an Appropriate Officer.

**"Disability"** means a disability under both the Long-Term Disability Insurance Plan and Social Security Act.

**"Discount Option Shares"** means the number of Shares subject to option hereunder related to the 30% discount upon issuance of the award.

**"Full Career Termination"** means a Termination when (i) a person has at least 20 years of service or (ii) a person meets all of the following criteria: (x) the person's age plus years of service with Holdings or any Subsidiary equals at least 65, (y) the person is at least 45 years old, and (z) the person has at least 10 years of service with Holdings or any Subsidiary.

**"Principal Option Shares"** shall mean the number of Shares subject to option hereunder related to the undiscounted base portion of the award (70% of the total number of Shares subject to option hereunder).

**"Retirement"** means a Termination of employment with Holdings or any Subsidiary which meets the criteria for retirement under Holdings' qualified defined benefit pension plan, provided that the person has signed an agreement not to engage in Competitive Activity or Detrimental Activity, in a form prescribed in the sole discretion of an Appropriate Officer.

**"Termination"** means the end of employment with Holdings or any Subsidiary. The date of Termination and the reason for Termination are as determined in the sole discretion of an Appropriate Officer.

**"Termination Expiration Date"** means the later to occur of (i) November 30, 2009 or (ii) six months following your Termination, but in no event after November 29, 2014.

©2004 Lehman Brothers.  All Rights Reserved.

4

E

X

H

I

B

I

T

C

**EXHIBIT C**

2005 STOCK OPTION AWARD

# AGREEMENT EVIDENCING A GRANT OF NONQUALIFIED STOCK OPTION

*Senior Vice Presidents*



# LEHMAN BROTHERS

LEH-RSU 0002403

**1. GRANT OF OPTIONS.** Pursuant to the Lehman Brothers Holdings Inc. ("Holdings") Employee Incentive Plan (the "Plan"), you are hereby granted, as of November 30, 2005, a nonqualified stock option to purchase the number of common shares (par value $0.10 per share) of Holdings ("Shares") set forth on the award statement with your name on it delivered to you herewith (the "Award Statement") (which number of Shares may be adjusted pursuant to Paragraph 6 below) with an exercise price of $126.00 per Share as specified in the Award Statement (the "Option Exercise Price")

**2. ADDITIONAL DOCUMENTS; DEFINITIONS.** You have been provided with a copy of the Plan, which is incorporated in this instrument by reference and made a part hereof, and a copy of the Plan prospectus. The Plan and the prospectus then in effect should be carefully examined before any decision is made to exercise the option. In the event of any conflict or ambiguity between this instrument and the Plan, the terms of the Plan shall govern. All capitalized terms not defined herein or in Annex A attached hereto shall have the meaning ascribed to such terms under the Plan.

**3. EXERCISABILITY.** Subject to the provisions of this Agreement and the applicable provisions of the Plan, you may exercise this option as follows:

**(a)** No part of this option may be exercised after November 29, 2015 (the "Final Expiration Date").

**(b)** Beginning as of November 30, 2007, you may exercise this option as to all of the Principal Option Shares (seventy-five percent of Shares subject to option pursuant to this Agreement); and

**(c)** As of November 30, 2010, you may exercise this option as to all Principal Option Shares and Discount Option Shares.

This option may not be exercised for a fraction of a Share.

**4. Conditions to Exercise.** This option may not be exercised unless all of the following conditions are met:

**(a)** Legal counsel for Holdings must be satisfied at the time of exercise that the issuance of Shares upon exercise will be in compliance with the Securities Act of 1933, as amended, and applicable U.S. federal, state, local and foreign laws;

**(b)** You (or in the event of your death, your estate or any person who acquires the right to exercise this option by bequest or inheritance or otherwise by reason of your death) must pay at the time of exercise the full option price for the Shares being acquired hereunder, by (i) paying in United States dollars by cash (which may be in the form of a certified check), (ii) subject to Holdings' prior consent, tendering Shares owned by you which have a Fair Market Value on the day of exercise equal to the full purchase price for the Shares being acquired, (iii) subject to Holdings' prior consent, by delivery of a properly executed exercise notice together with irrevocable instructions to a securities broker (or, in the case of pledges, lender) approved by Holdings to (a) sell shares of Common Stock subject to the option and to deliver promptly to Holdings a portion of the proceeds of such sale transaction on behalf of the exercising Participant to pay the option price, or (b) pledge shares of Common Stock subject to the option to a margin account maintained with such broker or lender, as security for a loan, and such broker or lender, pursuant to irrevocable instructions, delivers to Holdings loan proceeds, at the time of exercise to pay the option price, or (iv) by any combination of (i), (ii) or (iii) above; and

**(c)** You must, unless otherwise provided below, at all times during the period beginning with January 31, 2006 and ending on the date of such exercise, (x) have been employed by Holdings or a subsidiary thereof or (y) not have engaged in Detrimental Activity.

**(i) Effect of Termination before January 31, 2006.** In the event of your Termination for any reason or notification of Termination prior to January 31, 2006, this option shall be forfeited and cancelled. In the event of any Termination not described in the preceding sentence, the following rules shall apply:

**(ii) Voluntary Termination with Competitive Activity.** In the event of your voluntary Termination with Competitive Activity, this option shall be forfeited and canceled.

**(iii) Voluntary Termination without Competitive Activity.** In the event of your voluntary Termination without Competitive Activity, you will be permitted to exercise this option, to the extent not previously exercised, for a period beginning six months after your Termination (or on the scheduled date if sooner than six months) and continuing until the Termination Expiration Date, provided you do not engage in Competitive Activity or Detrimental Activity during that period of time. However, if your Termination is a Full Career Termination, you will be permitted to exercise this option as to the number of Shares determined under this Subparagraph until November 29, 2015, the Final Expiration Date, provided you do not engage in Competitive Activity or Detrimental Activity.

**(iv) Involuntary Termination with Cause.** In the event of your involuntary Termination with Cause, this option, to the extent not previously exercised, shall be forfeited and canceled immediately.

**(v) Involuntary Termination without Cause.** In the event of your involuntary Termination without Cause, you will be permitted to exercise this option as to all of the Principal Option Shares and Discount Option Shares, beginning as of the day after your Termination and continuing until the Termination Expiration Date, provided you do not engage in Detrimental Activity during that period of time. However, if your Termination is a Full Career Termination, you will be permitted to exercise all of the Principal Option Shares and all of the Discount Option Shares until November 29, 2015, provided you do not engage in Detrimental Activity.

**(vi) Retirement.** Notwithstanding the foregoing provisions of Paragraph 4(c)(ii), (iii), and (v), in the event of your Retirement, you will be permitted to exercise this option in full, beginning as of the day after your Retirement and continuing until November 29, 2015, provided you do not engage in Competitive Activity or Detrimental Activity. If you engage in Competitive Activity or Detrimental Activity, this option shall expire immediately.

**(vii) Occurrence of a Bankruptcy Distribution Event, Death, or Disability.** Notwithstanding the foregoing provisions of Paragraph 4(c)(ii), (iii), (iv) and (v), in the event of the occurrence of a Bankruptcy Distribution Event or your death or Disability following a Termination described in Paragraph 4(c)(iii) and (v) hereof on or after January 31, 2006, you (or in the event of your death, your estate or any person who acquires the right to exercise this option by bequest or inheritance or otherwise by reason of your death) will be permitted to exercise this option in full, beginning as of the day after your Termination and continuing until November 29, 2015, provided you do not engage in Competitive Activity or Detrimental Activity. If you engage in Competitive Activity or Detrimental Activity, this option shall expire immediately.

Any remaining portion of this option, which is not exercisable pursuant to the provisions of this subparagraph 4(c), shall be canceled by Holdings.

**(d)** You may be requested, from time to time, to complete and sign an affidavit with respect to Competitive Activity or Detrimental Activities, which includes representations and authorizes

Holdings to verify the representations. Any failure on your part to complete, sign and return the affidavit may cause this option to be forfeited and canceled at that time or, in the event of Retirement, to repay to Holdings the full gross amounts or shares you received under this Agreement.

**5.    NON-ASSIGNMENT.** This option may not be sold, assigned, transferred, pledged, hypothecated or otherwise disposed of by you, except by will or the laws of descent and distribution and is exercisable during your lifetime only by you. If you or anyone claiming under or through you attempts to violate this Paragraph 5, such attempted violation shall be null and void and without effect, and Holdings' obligations hereunder shall terminate.

**6.    EQUITABLE ADJUSTMENT.** In the event of a Change in Capitalization occurring after the date of grant of this option and prior to the exercise of the option in full, the number and kind of shares of Common Stock for which this option may then be exercised and the option price shall be adjusted so as to reflect such change.

**7.    CHANGE IN CONTROL.** Except as set forth below, upon the occurrence of a Change in Control without the prior approval of the majority of the independent members of the Incumbent Board, all options awarded hereunder will be exercisable in full and all such options are entitled to Limited Rights described in Section 6(d) of the Plan which have been granted by the Committee. Except as set forth below, upon the occurrence of a Change in Control with the prior approval of a majority of the independent members of the Incumbent Board, one-half of the options awarded hereunder, which are then not exercisable shall become immediately exercisable and remain exercisable through November 29, 2015, and the remaining one-half of such options, or the difference in value between the exercise price and the highest price paid by the acquiring entity in such Change in Control (in such form of consideration as is received by shareholders generally) for the remaining one-half of such options, shall become exercisable or be paid, as appropriate, upon the earlier to occur of (a) two years following such Change in Control or (b) the date such options would become exercisable by their terms, provided however, that if such Change in Control occurs within one year of this grant date, and such Change in Control will be effected by a merger involving the issuance of equity shares to Holdings' stockholders, then the foregoing provisions of this paragraph will not apply and the Committee shall have total discretion as to the impact of such an event on options granted hereunder which are not then exercisable.

**8.    AMENDMENT.** The terms of this Agreement may be amended from time to time by the Committee in its sole discretion in any manner that it deems appropriate (including, but not limited to, the acceleration provisions).

**9.    BINDING ACTIONS.** Any action taken or decision made by the Committee or its delegates arising out of or in connection with the construction, administration, interpretation or effect of the Plan or this Agreement shall lie within its sole and absolute discretion, as the case may be, and shall be final, conclusive and binding on you and all persons claiming under or through you. By accepting this grant or other benefit under the Plan, you and each person claiming under or through you shall be conclusively deemed to have indicated acceptance and ratification of, and consent to, any action taken under the Plan by the Committee or its designees.

**10.    NO RIGHT TO CONTINUED EMPLOYMENT.** Neither the grant nor the exercise of the option shall confer on you any right to be retained in the employ of Holdings or its Subsidiaries, or to receive subsequent options or other awards under the Plan. The right of Holdings or any Subsidiary to terminate your employment with it at any time or as otherwise provided by any agreement between Holdings or any Subsidiary and you is specifically reserved.

**11.    NO RIGHTS OF A STOCKHOLDER.** Neither you (nor, in the event of your death, your estate or any person who acquires the right to exercise this option by bequest or inheritance or otherwise by reason of your death) shall have any of the rights of a stockholder with respect to Shares subject to the option except to the extent that such Shares of Common Stock shall have been issued to you (or, in the event of your death, your estate or any person who acquires the right to exercise this option by bequest or inheritance or otherwise by reason of your death) upon the exercise of the option.

**12.    APPLICABLE LAW.** The validity, construction, interpretation, administration, and effect of the Plan, and of its rules and regulations, and rights relating to the Plan and to this Agreement, shall be governed by the substantive laws, but not the choice of law rules, of the State of Delaware.

**13.    WITHHOLDING.** Holdings shall have the right to deduct applicable taxes from all amounts payable to you. It shall be a condition to the obligation of Holdings to issue Shares upon exercise of an option hereunder (a) that you (or in the event of your death, your estate or any person who acquires the right to exercise this option by bequest or inheritance or otherwise by reason of your death) pay to Holdings or its designee, upon its demand, in accordance with the Plan, such amount as may be required for the purpose of satisfying its obligation or the obligation of any other person to withhold any taxes required by law which are incurred by reason of the exercise of the option and (b) that you (or in the event of your death, your estate or any person who acquires the right to exercise this option by bequest or inheritance or otherwise by reason of your death) provide Holdings with any forms, documents or other information reasonably required in connection with the grant. If the amount requested for the purpose of satisfying the withholding obligation is not paid, Holdings may refuse to furnish Shares upon exercise of the option. Holdings shall further have the right to deduct from all amounts remaining payable to you after satisfaction of the withholding obligations described above, the amount of any deficit, debt, tax obligation or other liability or obligation of any kind which you may at that time have with respect to Holdings or any Subsidiary.

## Annex A: Definitions

**"Appropriate Officer"** means the Chief Executive Officer or Chief Operating Officer of Holdings (or their respective designees).

**"Bankruptcy Distribution Event"** means the earlier to occur of (i) the date of, but immediately prior to, distribution to holders of claims and interests upon the substantial consummation of a confirmed plan of reorganization of Holdings in a Chapter 11 case under Title 11 of the United States Code, Title 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"), or (ii) the date of, but immediately prior to, distribution to holders of claims and interests upon the liquidation of Holdings in a Chapter 7 case under the Bankruptcy Code.

**"Cause"** means a material breach by a person of an employment contract between the person and Holdings or any Subsidiary, failure by a person to devote substantially all business time exclusively to the performance of his or her duties for Holdings or any Subsidiary, willful misconduct, dishonesty related to the business and affairs of Holdings or any Subsidiary, conviction of a felony or of a misdemeanor constituting a statutory disqualification under U.S. securities laws (or failure to contest prosecution for a felony or such a misdemeanor), habitual or gross negligence in the performance of the person's duties, solicitation of employees of Holdings or any Subsidiary to work at another company, improper use or disclosure of confidential information, the violation of policies and practices adopted by Holdings or any Subsidiary including but not limited to the Code of Conduct, a material violation of the conflict of interest, proprietary information or business ethics policies of Holdings or any Subsidiary, or such other circumstances as may be determined in the sole discretion of an Appropriate Officer.

**"Change in Capitalization"** means the occurrence of a circumstance described in Section 14 of the Plan.

**"Committee"** means the Compensation and Benefits Committee of the Incumbent Board (see definition of Change in Control in the Plan).

**"Competitive Activity"** means involvement (whether as an employee, proprietor, consultant or otherwise) with any person or entity (including any company and its affiliates) engaged in any business activity which is materially competitive with any business carried on by Holdings or any of its Subsidiaries or affiliates on the date of termination of a person's employment with Holdings or any of its Subsidiaries, as determined in the sole discretion of an Appropriate Officer.

**"Detrimental Activity"** means (i) using information received during a person's employment with Holdings or any of its Subsidiaries relating to the business affairs of Holdings or any of its Subsidiaries, affiliates or clients, in breach of such person's undertaking to keep such information confidential; (ii) directly or indirectly persuading or attempting to persuade, by any means, any employee of Holdings or any of its Subsidiaries or affiliates to terminate employment with any of the foregoing or to breach any of the terms of his or her employment with the foregoing; (iii) directly or indirectly making any statement that is, or could be, disparaging of Holdings, its Subsidiaries or affiliates, or any of their affiliates (except as necessary to respond truthfully to any inquiry from applicable regulatory authorities or to provide information pursuant to legal process); or (iv) directly or indirectly engaging in any activity that is, or could be, substantially injurious to the financial condition, reputation, or goodwill of Holdings or its Subsidiaries or affiliates, in each case as determined in the sole discretion of an Appropriate Officer.

**"Disability"** means a disability under both the Long-Term Disability Insurance Plan and Social Security Act.

**"Discount Option Shares"** means the number of Shares subject to option hereunder related to the 25% discount upon issuance of the award.

**"Full Career Termination"** means a Termination when (i) a person has at least 20 years of service or (ii) a person meets all of the following criteria: (x) the person's age plus years of service with Holdings or any Subsidiary equals at least 65, (y) the person is at least 45 years old, and (z) the person has at least 10 years of service with Holdings or any Subsidiary.

**"Principal Option Shares"** shall mean the number of Shares subject to option hereunder related to the undiscounted base portion of the award (75% of the total number of Shares subject to option hereunder).

**"Retirement"** means a Termination when the person's age plus years of service with Holdings or any Subsidiary equals at least 65, provided that (i) the person is at least 65 years old and has at least 5 years of service or (ii) the person is at least 55 years old and has at least 10 years of service.

**"Termination"** means the end of active employment with Holdings or any Subsidiary. The characterization of the circumstances of Termination is determined in the sole discretion of an Appropriate Officer.

**"Termination Expiration Date"** means the later to occur of (i) November 30, 2010 or (ii) six months following your Termination, but in no event after November 29, 2015.

©2005 Lehman Brothers.  All Rights Reserved.

LEH-RSU 0002406

EXHIBIT D

**EXHIBIT D**

THOMAS C. MCBARRON
Federal Medical Center
P.O. Box 15330
Fort Worth, Texas 76119-0330

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| ENRON CORP., et al., | : | Case No. 01-16034 (AJG) |
| | : | |
| | : | Jointly Administered |
| Debtors. | : | |

### MOTION FOR LEAVE TO FILE RESPONSE OUT OF TIME

Claimant, Thomas C. McBarron ("McBarron"), requests the Court to

authorize the filing of a response to the motion seeking an order

to disallow and expunge or reclassify and subordinate claim No.

1773500 beyond the stipulated December 10, 2003 deadline.



JAN - 5 2004

### I

### FACTS

Good and sufficient notice has not been provided as evidenced by

McBarron's receipt of Objection on December 11, 2003, one (1) day

after the established deadline (see Exhibit A). The Objection was

originally received by McBarron's Agent, James W. McBarron II, on

an unknown date, who then forwarded the Objection to McBarron in

an expeditious manner. The Objection was erroneously mailed to

"41334 Manorfield" instead of the correct address 4134 Manorfield

(see Exhibit B). McBarron has used the correct address in all

- 1 -

correspondence with the Court and the Enron Employee Claims Team
(see Exhibit C). Furthermore, a Certificate of Service did not
accompany the Objection attesting proper notice has been provided.

## II

### PRAYER

Therefore McBarron prays this Court grant the Motion For Leave To
File Response Out Of Time and authorize the filing of McBarron's
Objection To Disallowing And Expunging Claim Number 1773500 en-
closed with this motion.

*Thomas C. McBarron*
Thomas C. McBarron

EXHIBITS

## EXHIBITS TABLE OF CONTENTS

Exhibit No.          Description

A                    Copy of envelope received from Federal Medical
                     Center – Fort Worth mail room with date and
                     signature of McBarron's receipt witnessed by
                     Federal Bureau of PRisons staff.

B                    Copy of envelope (sized reduced) containing
                     Objection received by McBarron's Agent showing
                     Incorrect address. No postmark to specify date
                     of mailing is present.

C                    Copy of reply to Enron Employee Claims Team
                     dated June 10, 2003, detailing how claim was
                     computed. McBarron brings the return address to
                     Court's attention.

SPECIAL LEGAL MAIL
DO NOT OPEN WITHOUT
PRESENCE OF INMATE

EXHIBIT A

Date/Time of receipt: 12/10/3 9²

Date/Time delivered to inmate: 12/11/3 730

Name of staff that delivered: _____



FIRST CLASS

*Law Offices of Charles G. Kingsbury*
16826 TITAN DRIVE
HOUSTON, TEXAS 77058
(281) 218-7801 Office
(281) 480-1190 Fax

Mr. Thomas McBarron 44999-079
FMC Fort Worth
P.O. Box 15330
Fort Worth, Texas 76119

PERSONAL AND CONFIDENTIAL



9261

Bankruptcy Services LLC
P.O. Box 6020
Ilmawr, NJ 08099-6020

ADDRESS SERVICE REQUESTED

ERR OBJ 019 (MERGE, TXNUM1) 3000123060
MCBARRON THOMAS C
41334 MANORFIELD
SEABROOK TX 77586-0000

EXHIBIT B

FIRST CLASS MAIL
U.S. POSTAGE
**PAID**
NEW YORK, NY
PERMIT #4427

4134 Manorfield Drive
Taylor Lake Village, TX
77586
June 10, 2003

Enron Employee Claims Team EB 1685
P.O. Box 1188
Houston, TX 77251-1188

To Whom It May Concern,

Reference your attached letter dated May 28, 2003 requesting information regarding
*"Enron Corp. et al., Debtors, Thomas C. McBarron, Creditor, Case No. 01-16034
(Chapter 11), Proof of Claim No. 17735."*

The $53,475.00 represents total compensation for awards earned but not received by
Thomas C. McBarron during employment with Enron. The total value was calculated as
the sum of issue prices for the following Stock Options:

    42 Stock Option Shares times the issue price of $84.88, granted 08/25/2000
    525 Stock Option Shares times the issue price of $83.13, granted 12/29/2000
    170 Stock Option Shares times the issue price of $36.88, granted 08/21/2001

Enron initiated "voluntary" employment termination of Thomas C. McBarron effective
September 20, 2001, which was protested with Enron Human Resources personnel at that
time. Enron employment termination was actually involuntary; resulting from his
_____ to Enron employment and related unfavorable publicity.

_____ not possible due to status of Enron's financial problems
_____ ne.

_____ ould you need any additional information.

_____ McBarron enclosed.



**U.S. Postal Service Delivery Confirmation Receipt**

Postage and Delivery Confirmation fees must be paid before mailing.
Article Sent To: (to be completed by mailer)

ENRON Employee CLAms Team
P.O. Box 1188        #EB185
HOUSTON, TX 77251-1188

**POSTAL CUSTOMER:**
Keep this receipt. For inquiries: Access
Internet web site at www.usps.com
or call 1-800-222-1811

DELIVERY CONFIRMATION NUMBER:
310 2990 0001 1066 4691

CHECK ONE (POSTAL USE ONLY):
☐ Priority Mail

EXHIBIT C

## CERTIFICATE OF SERVICE

I, Thomas C. McBarron, certifies, that on the ___19___ day of December, 2003,

placed in the inmate mail system first class postage pre-paid an exact copy

of the attached Motion For Leave To File Response Out Of Time to:

    Weil, Gotshal & Manges LLP
    767 Fifth Avenue
    New York, New York 10153

    The Office of the United States Trustee
    33 Whitehall Street
    21st Floor
    New York, New York 10004

    Davis, Polk & Wardell
    450 Lexington Avenue
    New York, New York 10017

    Shearman & Sterling
    599 Lexington Avenue
    New York, New York 10022

    Milbank, Tweed, Hadley & McCoy LLP
    One Chase Manhattan Plaza
    New York, New York 10005

    Kronish Lieb Weiner & Helmann LLP
    1114 Avenue of the Americas
    New York, New York 10036-7798


                                    Thomas C. McBarron
                                    Thomas C. McBarron

# EXHIBIT E

# EXHIBIT E

FILED: NEW YORK COUNTY CLERK 09/22/2010
INDEX NO. 602824/2007
NYSCEF DOC. NO. 2
RECEIVED NYSCEF: 09/22/2010
08-13555-mg    Doc 43421    Filed 03/05/14    Entered 03/05/14 11:17:38    Main Document
Pg 52 of 77

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

07602824

----------------------------------------------------------------X

MARK BERKOWITZ,

                         **Plaintiff,**

                       **vs.**

CLUB VENTURES INVESTMENTS LLC
d/b/a/ DAVID BARTON GYM, DAVID
BARTON and JOHN HOWARD,

                       **Defendants.**

----------------------------------------------------------------

Date Purchased: 8/21/07

Index No.

SUMMONS

Plaintiff designates New York
County as the place of trial

The basis of venue is CPLR 503,
based on Plaintiff's Residence

Plaintiff resides at:
56 West 56th Street, Apt. 24-D
New York, NY 10019

*FILED*
*AUG 21 2007*
*NEW YORK*
*COUNTY CLERK'S OFFICE*

To the above named Defendants.

      **YOU ARE HEREBY SUMMONED** and required to answer the annexed Verified Complaint in this action by serving a Verified Answer to the annexed Verified Complaint upon Plaintiff's attorneys, at the address stated below, within 20 days after service upon you, exclusive of the day of service, or within 30 days after service is complete if this summons is not personally delivered to you within the State of New York. In case of your failure to answer, judgment will be taken against you by default for the relief demanded in the Complaint, together with the costs of this action.

Dated: New York, New York
       August 21, 2007

                                SANFORD WITTELS & HEISLER, LLP
                                950 Third Avenue, 10th Floor
                                New York, NY  10022
                                (212) 723-2947

                                ATTORNEYS FOR PLAINTIFF

DEFENDANTS' ADDRESSES:

CLUB VENTURES INVESTMENTS LLC
DAVID BARTON
57 West 16th Street
3rd Floor
New York, New York 10011

JOHN HOWARD
c/o Bear Stearns & Co.
383 Madison Avenue
40th Floor
New York, New York 10179

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

------------------------------------------------------------X

MARK BERKOWITZ

                Plaintiff,

    - against -

CLUB VENTURES INVESTMENTS LLC
d/b/a/ DAVID BARTON GYM, DAVID
BARTON and JOHN HOWARD,

                Defendants.

------------------------------------------------------------X

Index No. 07-_____

0 7 6 0 2 8 2 4

**FILED**

AUG 2 1 2007

NEW YORK
COUNTY CLERKS OFFICE

## <u>VERIFIED COMPLAINT FOR BREACH OF CONTRACT AND OTHER CLAIMS</u><br><u>AGAINST DEFENDANTS</u>

    Plaintiff MARK BERKOWITZ ("Berkowitz" or "Plaintiff"), by his undersigned attorneys, alleges for his Verified Complaint against CLUB VENTURES INVESTMENTS LLC d/b/a/ DAVID BARTON GYM ("CVI"), DAVID BARTON ("Barton"), and JOHN HOWARD ("Howard") (collectively with CVI and Barton referred to as "Defendants"), upon personal knowledge as to his own acts and otherwise upon information and belief, as follows:

### INTRODUCTION

    1.    Defendant CVI, with the direct participation of, and/or aided and abetted by, defendants Barton and Howard, breached an employment agreement with Plaintiff, CVI's Chief Financial Officer ("CFO"), and retaliated against Plaintiff when he raised certain significant problems with the accounting records of CVI and with certain conduct by CVI and Barton affecting CVI's books and records and taxes that was inconsistent with the best interests of CVI and its ability to continue on its successful upward growth trajectory -- growth for which Plaintiff was principally responsible and is entitled to be compensated substantially.

Supreme Court Records OnLine Library - page 2 of 26

2.      Defendants materially and continuously breached Plaintiff's employment agreement, dated November 18, 2005 (hereafter "Employment Agreement" or "Agreement") (Exhibit 1 annexed hereto) throughout the period 2005-2007, *inter alia*, by failing to provide Berkowitz with the base salary, incentive bonuses and other benefits required under his Agreement. The outstanding and unpaid compensation and benefits totaled more than $170,000 prior to Plaintiff's election to terminate his employment for Good Reason on June 5, 2007.

3.      Beginning in late 2006 and continuing into 2007, while Plaintiff was still attempting to obtain from CVI the substantial amounts to which he was entitled under his Employment Agreement, Plaintiff discovered and then complained to CVI Managing Member Barton that the accounting records and reports of CVI failed to disclose a number of outstanding liabilities -- relating principally to amounts incurred by Barton with respect to various gym subsidiaries prior to Plaintiff's 2005 Start Date as CFO of CVI, and totaling in excess of $500,000. Plaintiff also discovered and raised with Barton issues regarding the payment of overtime and withholding taxes for employees of various wholly-owned subsidiaries of CVI that could imperil previously negotiated offers-in-compromise with the Internal Revenue Service and the State of New York and result in the revival of compromised tax liabilities, interest and penalties of approximately $3 million or more for Defendants CVI, Barton and Howard.

4.      During this time, it became clear to Berkowitz that unless these issues were handled correctly and proper disclosures made, the issues could, *inter alia*, imperil the ultimate success of the $50 million equity financing that Plaintiff had substantially structured and that was on schedule to go forward in mid-2007 -- and for which when completed Mr. Berkowitz would be entitled to receive an additional incentive bonus under his Employment Agreement of more than $500,000 (hereafter the "$50MM Equity Financing").

2

5.    The response of CVI and Barton to these accounting and tax issues was to try to conceal them from potential investors in CVI and other interested parties, and to threaten and engage in acts of retaliation against Berkowitz, including continuing breaches of his Employment Agreement that Defendants refused to mend, and the outright refusal to pay Plaintiff the substantial and material amounts of compensation and benefits he clearly was entitled to under the Agreement. Additionally, defendant Howard, who controls CVI, has failed and refused to take necessary action to make amends for these issues and the wrongful acts of CVI and Barton.

6.    Defendants' ongoing material breaches, acts of bad faith and retaliation, combined with Plaintiff's serious concerns about Defendants' failure to disclose and correct the accounting and tax problems he had discovered in connection with the $50MM Equity Financing Plaintiff had been primarily responsible for bringing to fruition (and Plaintiff's awareness that potential investors valued his relation to CVI and his reputation in connection with their decision whether to invest in CVI) left Plaintiff with only one reasonable avenue. On June 5, 2007, Plaintiff elected to tender his letter terminating his employment as CFO for Good Reason effective July 5, 2007 (30 days after tender), as was his right under his Employment Agreement in the event, *inter alia*, of a material breach by CVI of its obligations to Plaintiff in connection with his employment (Exhibit 2 annexed hereto).

7.    Under the terms of his Employment Agreement with CVI, Plaintiff's exercise of his right to terminate his employment as CFO for Good Reason caused an immediate vesting of the 2.9 CVI Membership Units that he had been issued by Defendants as an agreed condition on the formal commencement of his employment as CFO of CVI in November, 2005. The now substantial value of those units -- primarily as a result of Berkowitz's efforts and services as

3

CFO, and which were intended under his Employment Agreement to serve as a significant financial reward for the success of his efforts -- is conservatively estimated at $2.9 million.

8.    Despite the requirements of his Employment Agreement, Defendants to date have refused to provide Berkowitz with the unpaid compensation and benefits to which he was and is entitled under the Agreement, and have refused to compensate Mr. Berkowitz for all other amounts due and owing, as well as the value of his now-vested 2.9 Membership Units.   As further described below, Defendants' misconduct has caused Mr. Berkowitz more than $3.5 million in damages.

9.    Based on these events, which are set forth more fully below, Berkowitz alleges claims for breach of contract and violations of the implied covenant of good faith and fair dealing, retaliatory conduct which violates relevant public policy, tortious interference with contract and violation of relevant Delaware labor laws entitling Plaintiff to liquidated damages as a result of Defendants' failure to pay him the compensation to which he was entitled for the services he rendered.

## JURISDICTION AND VENUE

10.    This court has jurisdiction under CPLR 301, because Defendants maintain offices, reside and/or and transact business within the State of New York with a fair measure of permanence and continuity.

11.    Venue is appropriate in this court under CPLR 503, because Plaintiff resides in this county.

## THE PARTIES AND OTHER RELEVANT PERSONS

12.    (a)    Plaintiff Mark Berkowitz, a resident of the City and State of New York, was formally employed as Chief Financial Officer of CVI pursuant to the Employment

4

Agreement, dated November 18, 2005, with a start date of October 31, 2005 (Exhibit 1 hereto).

Plaintiff attended Wesleyan University and Stanford University Graduate School of Business.

Prior to becoming CFO of CVI in 2005, Plaintiff was, *inter alia*, an investment banker with

Morgan Stanley & Co. during 1992-94 and with The Blackstone Group L.P. during 2000-2002,

and was a management consultant with McKinsey & Co. during 2003-04.

(b)      Plaintiff's duties and responsibilities as CFO were not described or

prescribed in the Employment Agreement. However, Plaintiff's principal duties, responsibilities

and efforts were understood and intended by the parties to be directed to growing the company,

including overseeing strategy and development, and the financial structure of transactions

entered into in furtherance of strategy and development. Plaintiff was not responsible and did

not oversee the books and records or the accounting and tax matters of CVI or any of its

subsidiaries. Nor did Plaintiff have signing authority with respect to CVI or its subsidiaries, or

the bank accounts of CVI and its subsidiaries.

13.      Defendant Club Ventures Investments LLC d/b/a/ David Barton Gym ("CVI") is

a limited liability company organized under the laws of Delaware, with offices located at 57

West 16th Street, 3rd Floor, New York, New York, 10011. Defendant CVI, founded in 2004, is a

holding company for various wholly-owned subsidiaries that comprise the David Barton Gym

boutique gyms group, which operates branded upscale health clubs and provides personal

training services. CVI structures and finances various wholly-owned subsidiaries that lease real

estate and health club equipment, and that develop, design and build new health clubs. CVI also

wholly owns subsidiaries which, in aggregate, presently operate four health clubs with

approximately 8,000 club members and 2,000 physical fitness personal training clients, and

which employ approximately 300 employees in three cities – New York, Chicago and Miami

5

Supreme Court Records OnLine Library - page 6 of 26

Beach. Principally as a result of Plaintiff's efforts since 2004 and further described herein, CVI currently has 8 new clubs in development and 7 additional locations in discussion in some ten cities in six states, with plans to open as many as 22 new club locations in the next four years.

14.    Defendant David Barton, who founded David Barton Gym in 1992, is the Managing Member and co-owner of CVI. Barton resides in New York City, and his principal business address is the same as CVI, 57 West 16th Street, 3rd Floor, New York, New York, 10011. Barton was the president and co-owner of DB 85 Gym Corporation ("DB85"), which owned and operated the first David Barton Gym health clubs (including one of the current clubs) and which owns the trademarks for "David Barton Gym" and "Look Better Naked." DB85 became a wholly owned subsidiary of CVI in November, 2006. Barton signed Plaintiff's Employment Agreement on behalf of Defendants. As Managing Member, Barton has principal overall responsibility for the management of CVI and for the operations of its gym subsidiaries.

15.    Defendant John Howard, a resident of New York City, was the majority owner and controlling shareholder of DB85 until its sale to CVI in November, 2006, and was the majority owner and controlling member of CVI before Plaintiff tendered his letter of termination for Good Reason on June 5, 2007. Howard also is the Chief Executive Officer of Bear Stearns Merchant Banking, and is a Senior Managing Director of Bear, Stearns & Co., with his principal place of business at 383 Madison Avenue, 40th Floor, New York, New York, 10179.

16.    Non-party Craig Harrington ("Harrington") is the Vice President of Finance and Controller of CVI. Harrington is principally responsible for overseeing the maintenance of CVI's accounts and books and records, and the completion and accuracy of all financial statements and tax returns. Harrington also oversees CVI's audit process and information technology systems. Harrington, along with Barton, has signing authority with respect to the

6

CVI bank accounts. Harrington also was the Controller and Vice President of Finance of DB85 prior to its sale to CVI, and was principally responsible for overseeing the maintenance of DB85's accounts and books and records and the completion and accuracy of all DB85's financial statements and tax returns, and for DB85's audit process and information technology systems. Harrington, along with Barton, had signing authority with respect to DB85's bank accounts.

## FACTS

**A.** **Plaintiff Provides Valuable Consulting Services to Defendants Before Joining CVI as CFO in November, 2005**

17. Plaintiff's business relationship with Defendants began in 1997, when he was initially retained by Barton as an independent consultant advising on enterprise level strategy, development and corporate finance for DB85. As a result of the quality of his services, Plaintiff was offered and accepted an employment position as Vice President of Planning for DB85, with the title/position of Chief Financial Officer added after Plaintiff successfully negotiated a critical loan restructuring with a DB85 lender. Throughout 1997 and 1998, Plaintiff continued in this role, helping DB85 to restructure and to return to operating profitability, and laying out a several-year plan to restore its growth prospects. Issues regarding the character of David Barton, however, forced Plaintiff to discontinue the relationship later in 1998.

18. In or about March 2002, Plaintiff again began providing independent strategic advisory consulting services to DB85, Barton and Howard, having been assured that Barton's character issues had been resolved. From 2002 through 2005, Plaintiff developed a strategic and financial plan for DB85 and CVI, raised and structured capital for CVI, identified and negotiated new CVI gym locations for which Plaintiff sourced potential real estate and capital, designed and laid out much of the physical plant for the new facilities in collaboration with CVI and its retained consultant architects, and negotiated potential investment deals with outside investors.

7

As the value of CVI continued to grow on the strategy Plaintiff had engineered, he repeatedly was promised an equity stake in CVI and a Chief Financial Officer or Chief Development Officer role to oversee strategy, development and corporate finance when an appropriate capital investment was secured for CVI.

19.    Plaintiff's consulting services for Defendants in 2004 and 2005 resulted, *inter alia*, in successfully finding an additional CVI investor, Praesidian Capital Investors, L.P. ("Praesidian"), a Delaware limited partnership.    As a result of Plaintiff's efforts, Praesidian agreed to invest much needed capital in CVI.    Beginning in August 2005, Praesidian invested approximately $10 million in debt and warrants to own approximately 5.6 Member Units of CVI. Importantly, a material condition of Praesidian's agreement to invest was that Berkowitz be brought on as Chief Financial Officer of CVI – a condition satisfied by entry into the Employment Agreement on November 18, 2005.    Indeed, Praesidian so valued CFO Berkowitz that he was asked to speak at the Praesidian 2006 Annual Partners' Meeting, rather than CEO/Managing Member Barton, even though the other invited presenters from companies in Praesidian's investment portfolio were CEO's.

**B.      The Material Terms of Plaintiff's Employment Agreement with Defendants**

20.     Under Plaintiff's Employment Agreement, Defendants contracted to employ Plaintiff as Chief Financial Officer of CVI, reporting to Managing Member Barton, with a start date of October 31, 2005.

21.     The Employment Agreement entitled Plaintiff to a base salary of (i) $200,000 per annum *pro rata* from October 31, 2005 to December 31, 2005, (ii) $225,000 per annum for 2006, and (iii) $250,000 per annum for 2007.

8

Supreme Court Records OnLine Library - page 9 of 26

22.    The Employment Agreement also provided Plaintiff with the entitlement to "incentive bonuses," including, *inter alia*:

(a)    For the period from October 31-December 31, 2005, a bonus equal to 3% of the amount by which CVI's EBITDA -- operating earnings before interest, taxes, depreciation and amortization (hereafter "EBITDA") -- for that period exceeded $166,667, with such bonus to be paid within 90 days after December 31, 2005;

(b)    For each full calendar year beginning in and after 2006, a bonus equal to 3% of the amount by which CVI's EBITDA for that period exceeds $1,000,000, with such bonus to be paid within 90 days after the end of the calendar year;

(c)    For any "Change of Control" transaction (generally involving the sale of more than 50% of the CVI equity or substantially all of the CVI assets), 2% of the amount by which the Enterprise Value (as defined in the Agreement) exceeds $24 million; and

(d)    For any "Non Change of Control" transaction (generally involving the sale of CVI interests with proceeds of at least $20 million and Enterprise Value of at least $24 million), 2% of the amount by which the total proceeds exceed $24 million.

23.    In addition, Plaintiff's Employment Agreement provided for the issuance to Plaintiff of 2.9 Membership Units ("Units"), representing 2.76% of the outstanding equity of CVI on a fully diluted basis.    These Units were intended under Plaintiff's Employment Agreement to serve as a significant financial reward for the success of his efforts as CFO of CVI.

24.    Under the Employment Agreement, the Units generally were subject to a four-year vesting schedule, with 25% vesting after two years, another 25% vesting after three years, and the remaining 50% vesting after four years.    Furthermore, the Units were subject to accelerated full vesting in certain prescribed circumstances:

9

Supreme Court Records OnLine Library - page 10 of 26

The [Units] shall accelerate and become fully-vested upon consummation of a Change of Control Transaction or upon your termination without Cause or for Good Reason, each as defined below.

25.    Paragraph 3(iii) of the Employment Agreement sets out the circumstances under which Plaintiff was entitled to terminate his employment "for Good Reason" and thereby accelerate the full vesting of his Units:

> At your option for Good Reason, on thirty (30) days prior written notice to [CVI], whereupon you shall be entitled to base salary and any accrued and unpaid vacation pay which may be owing in accordance with [CVI's] policies or applicable law, which shall be payable within five (5) business days after the date of termination *and immediate acceleration and full vesting of your [Units]*. "Good Reason" shall mean (a) a reduction in your base salary, Incentive Bonuses, [Units] or a material reduction or discontinuance of any material benefit plan other than pursuant to a reduction or discontinuance applicable to senior executives or employees generally; (b) a material diminution in your duties, title or responsibilities; . . . or (d) a material breach by [CVI] of its obligations to you in connection with your employment. (emphasis added)

26.    Paragraph 3(ii) of the Employment Agreement also provided for the immediate acceleration and vesting of Plaintiff's Units if he was terminated by CVI without Cause, and in addition entitled Plaintiff to a *pro rata* portion of the 3% EBITDA incentive bonus described in Complaint ¶ 22(b) above.

27.    The Employment Agreement also expressly provided for vacations and holidays, as follows:

> You are eligible for 3 weeks (15 calendar days) vacation per full year of employment. You will also be eligible to take all appropriate company holidays as defined by [CVI] (including appropriate Jewish holidays).

The reference to "appropriate Jewish holidays" was expressly requested by Plaintiff and agreed to by Defendants because, as Defendants were and are well aware, Plaintiff observes certain Jewish Sabbath and holiday work restrictions and dietary laws.

10

28.    As CFO with primary responsibility for growing CVI, it was anticipated and understood that Plaintiff would perform his services in many different places across the country. In fact, Plaintiff did not have a CVI office in New York, but in practice worked from hotel rooms, his cellphone and his laptop via the internet. As CVI was a Delaware LLC, and as its growth and expansion necessarily entailed the formation and oversight of numerous Delaware subsidiaries for the various new clubs and other new operational entities, it was known and understood by Plaintiff and Defendants that his Employment Agreement was to be performed at least in part in Delaware.

## C.    CVI Grows Substantially In Profits and Value As a Result of Plaintiff's Services Rendered and Successful Efforts As CFO

29.    Among other things, as CFO Plaintiff was the principal CVI employee responsible for the identification of new club sites and expansion strategies, the negotiation of the lease and finance terms on which the new real estate club sites were to be obtained, sourcing the funding to finance continuing CVI development of additional health club locations, maintaining investor relations with CVI's largest outside investor, Praesidian, and finding suitable investors to engage in "change of control" and "non change of control" investments providing the funding for CVI's growth and expansion.

30.    When Plaintiff renewed his consulting relationship with CVI in 2002, David Barton Gym had three clubs -- two in New York and one in Miami. Primarily as a result of Plaintiff's efforts beginning around 2004 and continuing as CFO, *inter alia,* (i) a flagship 21,000 square foot David Barton Gym club was opened on West 23rd Street in New York City to replace the 8,000 square foot David Barton Gym club on 15th Street, (ii) a premier 28,000 square foot David Barton Gym club was opened at an exclusive River North site in Chicago, (iii) a 6,000 square foot Miami David Barton Gym club was closed and a new 15,000 square foot

11

Supreme Court Records OnLine Library - page 12 of 26

replacement David Barton Gym club opened, (iv) a new 43,000 square foot David Barton Gym club in Miami is approaching completion and is scheduled to open later this year, (v) a 38,000 square foot site in the Chicago Loop neighborhood is under design/construction; and (vi) sites have been identified and negotiated by Plaintiff, *inter alia,* for three more clubs in Chicago, additional clubs in New York City, and a number of clubs in several cities in the western United States, including in the Los Angeles area.

31.     Not only did Plaintiff identify and develop these new sites and clubs, but he negotiated leases for many of the sites with very favorable and/or below-market lease terms *plus* cash contributions by lessors aggregating tens of millions of dollars to develop the new clubs – generating tens of millions of dollars of new, increased equity value for CVI's ownership.

32.     As part of Plaintiff's services overseeing strategy and development, he also caused the operations of CVI to be substantially professionalized, including through the retention of outside legal and construction advisors to ensure the proper implementation of the development plan, as well as assembling a management operating team to ensure the proper management of the clubs' operations.

33.     The success of Plaintiff's efforts on behalf of CVI speaks for itself. CVI revenues increased to $11.9 million in 2005, and to $17.7 million in 2006, and EBITDA increased to $1.1 million and $4.1 million during those same years, respectively.

34.     These substantial revenue and EBITDA increases have also translated into more valuable offers for investment by potential equity investors. Rather than sell such interests too cheaply, Plaintiff oversaw CVI's obtaining the $10 million debt and warrant investment of Praesidian in lieu of certain other substantial equity investment offers, in order to wait until CVI's expansion and development would support the $50MM Equity Financing that Plaintiff had

12

Supreme Court Records OnLine Library - page 13 of 26

developed, structured and overseen prior to June 5, 2007.

**D. Defendants Materially Breach Plaintiff's Employment Agreement, and Retaliate After Plaintiff Discovers Substantial Problems with CVI's Accounting Records and Conduct**

35. From the outset, Defendants failed and refused to meet their obligations with respect to Plaintiff's base compensation under his Employment Agreement.

36. First, Defendants never paid Plaintiff any of the required base compensation to which he was entitled under the Employment Agreement for the 62-day period from his October 31, 2005 Start Date through December 31, 2005. Based on the prescribed compensation of $200,000 per annum under the Employment Agreement for this period, Plaintiff was owed but never paid base salary of $33,972.60 for that period. Plaintiff was also owed a 3% EBITDA bonus of $481 when the *pro rata* 2005 EBITDA exceeded the agreed target. His total compensation of $34,472.60 had been past due for almost 18 months at the time of Plaintiff's June 5, 2007 election to terminate his employment for Good Reason.

37. Similarly, Defendants never paid Plaintiff the full amount of the required compensation for his services rendered for calendar year 2006. Although the prescribed compensation for 2006 under the Employment Agreement was $225,000 per annum, Plaintiff was paid only $195,611.23 for this period, a shortfall of $29,388.77 that had been past due for almost 6 months at the time of Plaintiff's June 5, 2007 election to terminate his employment for Good Reason.

38. Defendants also never paid Plaintiff the full amount of the required compensation for his services rendered for calendar year 2007. Although the prescribed compensation for 2007 under the Employment Agreement was $250,000 per annum, or $129,808 for the period from January 1, 2007 through the July 5, 2007 effective date of termination, Plaintiff was paid only

13

Supreme Court Records OnLine Library - page 14 of 26

$122,697 for this period, a total shortfall of $7,111 that is now past due for more than one month under the terms of the Employment Agreement.

39.     Defendants also breached their obligation to Plaintiff regarding vacation. Defendants repeatedly denied Plaintiff permission to schedule his allotted vacation days, and at other times cancelled his vacation days that already had been scheduled and approved.   For example, Defendants, at the last minute and for no good reason, cancelled a planned vacation to Montreal during the summer of 2006 for which Plaintiff already had purchased plane tickets, and another weeklong vacation to London in November 2006 for which Plaintiff also already had purchased plane tickets.   Instead, Defendants, in bad faith and without sufficient reason, caused Plaintiff economic loss with respect to vacations they previously had approved, and permitted Plaintiff to take only seven of the approximately 25 vacation days to which he was entitled during the period from the start of his employment until his election to terminate his employment for Good Reason effective July 5, 2007, despite Plaintiff's good faith attempts to use all of the vacations days to which he was entitled under the Employment Agreement.   These unused vacation days have a value of $17,307.69.

40.     In late 2006 and 2007, in connection with the structuring and development of the $50MM Equity Financing for which Plaintiff had primary responsibility as CFO, Plaintiff learned over a period of time that defendant Barton had incurred hundreds of thousands of dollars of expenses for professional services rendered to CVI and DB85 and Barton that had become the responsibility of CVI, but which had not been recorded or disclosed as liabilities of CVI on the financial statements and other documents that were to be incorporated into the information package used to attract and secure the $50MM Equity Financing investment.   These liabilities included hundreds of thousands of dollars of claims and/or unsatisfied judgments

14

Supreme Court Records OnLine Library  -  page 15 of 26

against David Barton and David Barton Gym by law firms and other service providers, including accountants, construction contractors, and others.    Information that Barton and Harrington provided to Plaintiff regarding these liabilities, before Plaintiff learned the truth in 2007, was false, misleading and/or incomplete.

41.    In or around the same time, Plaintiff also learned that defendant Barton had used CVI as his personal piggy bank to pay for numerous personal expenses not properly attributable to CVI operations, including personal tax accounting and legal services.

42.    These issues were in addition to several instances of highly erratic and unprofessional behavior publicly displayed by Barton during the same period. One instance occurred at an important meeting in Chicago among Plaintiff, CVI counsel, and representatives and counsel for a major potential lessor with respect to a new club site that Plaintiff had developed and which Plaintiff, after approximately one year of negotiations, was close to finalizing at very favorable and valuable lease terms for CVI, including payment by the potential lessor to CVI of approximately $7.2 million.  Although Barton generally had not attended these types of meetings, which were the principal responsibility of Plaintiff, Barton committed to attending this particular meeting, where review and negotiations with respect to an approximately 100-page real estate lease and construction financing contract were to be substantially completed.  However, Barton did not show up at the morning meeting until some 90 minutes after it had begun, providing those in attendance with an inaccurate and misleading excuse for his lateness.  Barton then proceeded to fall asleep during much of the day-long meeting and discussions, occasionally awaking to make a suggestion or comment that generally was inconsistent with Plaintiff's objectives in connection with the negotiations, and otherwise providing more distraction than meaningful contribution, and detracting from the

15

professionalism and importance that such negotiations mandate.  In another disturbingly similar incident in Florida, Barton showed up two hours late at a morning construction site meeting among Plaintiff and design consultants, and Barton then proceeded to pass out asleep in the dust on the construction site floor.

43.    Thus, it appeared to Plaintiff that the types of issues regarding the character of David Barton that had forced Plaintiff to discontinue his previous employment relationship with Defendants in 1998 were resurfacing.  Plaintiff understood, however, that these issues could seriously undermine CVI's $50MM Equity Financing that he had been working diligently to complete.   When Plaintiff asked Harrington about the undisclosed liabilities and other accounting issues, Harrington refused to provide answers and referred him to Barton.  Plaintiff, therefore, had no choice but to raise the accounting issues he had discovered with Barton, in order to facilitate corrective action.

44.    These accounting improprieties would obviously undermine Barton in the eyes of his principal equity partner, defendant Howard, and so, predictably, Barton refused to disclose or discuss them with Howard and directed Plaintiff not to raise them with Howard or anyone else to whom the information would be material.  Barton told Plaintiff that the issues raised by Plaintiff were "none of [Plaintiff's] [expletive deleted] business," and that the accounting records and financial statements were "not [Plaintiff's] [expletive deleted] job," but Harrington's.  Instead, CVI and Barton engaged in a pattern of retaliation against Plaintiff perpetuating and compounding the material breaches of the Employment Agreement that already had occurred.

45.    Under the Employment Agreement, Plaintiff was entitled to an Incentive Bonus equal to 3% of the amount that CVI's EBITDA for 2006 exceeded $1,000,000.  CVI's 2006 EBITDA of $4.1 million was evidenced in numerous company documents distributed to and

16

Supreme Court Records OnLine Library - page 17 of 26

reviewed by Plaintiff and others, including in the information memorandum prepared in connection with $50MM Equity Financing, and in internal CVI financial statements. Thus, under his Employment Agreement, Plaintiff was entitled to a 2006 EBITDA incentive bonus of $91,975.59, payable to Plaintiff on or before March 30, 2007. In fact, this $91,975.59 bonus obligation was reflected in internal company cash flow projections distributed among CVI executives and to debt and warrant investor Praesidian in April, 2007.

46.     Barton did not dispute that Plaintiff was entitled to be paid this 2006 EBITDA bonus, and in fact, repeatedly acknowledged to Plaintiff that this bonus payment was due, and promised Plaintiff that it would be paid. However, these concessions and promises were overshadowed by threats and acts of retaliation against Plaintiff because of Plaintiff's discovery of the undisclosed liabilities and improper personal expenditures Barton had incurred. These threats included that Plaintiff would never get his bonus or the other money he was owed by Defendants under his Employment Agreement unless he kept quiet about what he had discovered. Barton and the other Defendants continued to retaliate against Plaintiff by failing and refusing to pay him the amounts he was owed on an ongoing basis.

47.     Additionally, Plaintiff was subjected to religious threats and hostilities in retaliation for seeking to correct the accounting problems about which he had learned. For example, Barton told Plaintiff that Barton was unilaterally revoking Plaintiff's contractual right to observe Jewish holidays, and threatened to not pay Plaintiff the outstanding and unpaid compensation to which Plaintiff was entitled unless Plaintiff ceased to observe Jewish holiday work restrictions – despite Plaintiff's express right to do so under the Employment Agreement. Barton also threatened in bad faith to not pay Plaintiff's past due and future bonuses unless Plaintiff worked on Passover in 2007. Additionally, Barton repeatedly harassed Plaintiff about

17

observing work restrictions on Shavuot in May 2007 and Friday evening Sabbath restrictions –
even though Plaintiff had observed those restrictions in 2006 without comment.

48.      As part of Plaintiff's continuing efforts with respect to the $50MM Equity
Financing, Plaintiff also learned in 2007 (not long before he terminated his employment for
Good Reason) that one of the CVI subsidiaries had received a complaint from the New York
State Department of Labor to investigate the failure to pay overtime wages -- initially limited to a
single employee, but subsequently expanded into a broadening investigation.  When Plaintiff
raised these overtime issues with Barton and asked to have them addressed by CVI counsel,
Barton actually boasted that he had "never paid overtime wages" to numerous employees at
many of his companies.

49.      Plaintiff understood that this overtime wage problem could potentially also
implicate the related withholding taxes for these employees, as well as other employees for
whom Plaintiff learned employment taxes had been withheld but not paid by Harrington and
Barton.  Plaintiff further understood that these overtime and employment tax issues potentially
created another far more material problem for CVI, because the failure to be in compliance with
all federal and state employment tax obligations could imperil offers-in-compromise entered into
in 2006 with the Internal Revenue Service and the State of New York by Barton and Howard
with respect to approximately $5 million of previously unpaid withholding taxes and related
interest and penalties owed by DB85.  The offers-in-compromise had required the payment of
approximately $2.3 million by DB85 and by Barton personally, and the execution of a personal
guarantee by Howard.  However, the remaining liability of approximately $3 million could be
revived in light of these overtime and related withholding tax issues.

18

Supreme Court Records OnLine Library - page 19 of 26

50.    Plaintiff was forcefully directed by Barton to "stay out" of these types of problems.  Indeed, on at least three occasions in 2007, Barton physically threatened Plaintiff if he tried to correct or raise or disclose to Howard any of the accounting and tax improprieties Plaintiff had discovered.

**E.    Plaintiff Terminates His Employment for Good Reason, and Defendants Continue to Refuse to Honor Their Obligations Under the Employment Agreement**

51.    Defendants have never complied with their obligations regarding Plaintiffs' compensation under the Employment Agreement.  Defendants' conduct described herein constitutes a material reduction in Plaintiff's agreed compensation, and a material breach of Defendant's obligations to Plaintiff under the Employment Agreement.

52.    Furthermore, Defendants' conduct with respect to the financial issues and problems discovered by Plaintiff, including Defendants' refusal to disclose or correct these problems in connection with the "non change of control" $50MM Equity Financing structured by Plaintiff, materially interfered with and prohibited Plaintiff from performing his duties and responsibilities as CFO.  Barton even went so far in May 2007 as to set up, with Harrington, a corporate finance meeting regarding the $50MM Equity Financing with CVI's investment bankers at Jeffries without informing Plaintiff and then, when Plaintiff learned of the meeting, telling Plaintiff that he could not attend.  Barton's conduct at that meeting engendered substantial confusion and misdirection that Plaintiff was required and able to correct subsequently.

53.    Thus, by letter dated June 5, 2007 (Exhibit B hereto), Plaintiff terminated his employment with Defendants for Good Reason, thereby causing the immediate and full vesting of his Units.

54.    At the time he tendered his termination for Good Reason, Plaintiff was also owed tens of thousands of dollars of fees and expense reimbursements for services provided and

19

expenses incurred as consultant and then Chief Financial Officer. These fees and expenses, which all were subject to payment and/or reimbursement by Defendants in the ordinary course of business according to their agreement and pattern and practice of conduct with Plaintiff, included $22,873 of expenses incurred in the months of October, 2006 through June, 2007 as CFO, and $78,387 of fees incurred from January 1, 2005 through August 26, 2005 as a paid consultant to Defendants.

55.    Even after Plaintiff tendered his June 5, 2007 letter of termination for Good Reason, Defendants have continued to refuse and have failed to honor their obligations to Plaintiff under the Employment Agreement, thus requiring the commencement of the instant action. Among other things, Defendants have wrongfully denied that Plaintiff's termination was for Good Reason and have refused to provide him with his fully vested Units or the value thereof.

## FIRST CAUSE OF ACTION -- BREACH OF CONTRACT
### (against all Defendants)

56.    Plaintiff repeats and realleges the preceding paragraphs of this Complaint as if fully set forth herein.

57.    Defendants were obligated to pay Plaintiff the compensation and benefits prescribed in the Employment Agreement.

58.    Defendants have breached Plaintiff's Employment Agreement by failing to pay or provide him with the compensation and benefits to which he is entitled thereunder, including, *inter alia*: (i) $34,453.60 in unpaid base compensation for 2005; (ii) $29,388.77 in unpaid base compensation for 2006; (iii) $7,111 in unpaid base compensation for 2007; (iv) 2006 EBITDA incentive bonuses of $91,975.59; (v) $17,307.69 in accrued unused vacation time; (vi) $22,873 for unreimbursed expenses incurred as CFO; (vii) $78,387 of fees earned for consulting services

20

provided in 2005; and (viii) Plaintiff's 2.9 vested Units, or their value, equal to approximately $2.9 million.

59.    Additionally, Defendants have breached the implied covenant of good faith and fair dealing implied under every contract, including by affirmatively and in bad faith precluding Plaintiff from enjoying the fruits of his Employment Agreement that he would have received thereunder but for Defendants' bad faith, including, *inter alia*: (i) Plaintiff's 2% non change in control incentive bonus on account of the $50MM Equity Financing that was substantially completed by Plaintiff's services and efforts at the time of his June 5, 2007 termination for Good Reason, in an amount equal to $520,000; and (ii) Plaintiff's *pro rata* share of the 3% EBITDA incentive bonus for 2007, in an amount estimated to be equal to or greater than $100,000.

60.    As a result of Defendant's breaches of contract, Plaintiff has sustained damages in excess of $3.5 million.

## SECOND CAUSE OF ACTION – RETALIATORY DENIAL OF COMPENSATION AND OTHER EMOLUMENTS IN VIOLATION OF RELEVANT LAW (against all Defendants)

61.    Plaintiff repeats and realleges the preceding paragraphs of this Complaint as if fully set forth herein.

62.    Defendants were obligated to pay Plaintiff the compensation and benefits prescribed in the Employment Agreement.

63.    Defendants failed and refused to pay the amounts to which he was entitled in retaliation for Plaintiff's reporting of erroneous and wrongful accounting and tax activity, and other improper financial conduct.

64.    Delaware, under whose laws CVI and nearly all of CVI's subsidiaries are organized, and where it was understood that Plaintiff's Employment Agreement would be

21

Supreme Court Records OnLine Library - page 22 of 26

performed in part, recognizes a statutorily prescribed state interest in ensuring that employees can report illegal and unethical accounting and other financial conduct without fear of retaliation. This interest is a clear and sufficient mandate of public policy, and is set forth in Delaware Labor Law, Title 19, Chapter 17, §§ 1702-04.

65.      Similarly, the law of New York protects employees from retaliation for acts protected by public policy, or retaliation for proper conduct in response to acts in violation of public policy.

66.      Defendants violated the public policy against retaliation of Delaware and New York by their conduct described herein.

67.      As a result of Defendant's conduct, Plaintiff has sustained damages in excess of $3.5 million.

### THIRD CAUSE OF ACTION – TORTIOUS INTERFERENCE WITH CONTRACT
### (against all Defendants)

68.      Plaintiff repeats and realleges the preceding paragraphs of this Complaint as if fully set forth herein.

69.      Defendants all were aware of the existence of and were bound by Plaintiff's Employment Agreement.

70.      Defendants intentionally interfered with Plaintiff's Employment Agreement, and without justification, caused that Employment Agreement to be breached and the compensation and benefits owed to Plaintiff and to which Plaintiff was entitled to be withheld, and also caused a material diminution in Plaintiff's duties and responsibilities.

71.      As a result of Defendants' tortious interference with Plaintiff's Employment Agreement, Plaintiff has suffered damages in excess of $3.5 million.

22

Supreme Court Records OnLine Library - page 23 of 26

**FOURTH CAUSE OF ACTION – FAILURE TO TIMELY PAY COMPENSATION AND OTHER EMOLUMENTS IN VIOLATION OF DELAWARE LABOR LAW (against all Defendants)**

72.     Plaintiff repeats and realleges the preceding paragraphs of this Complaint as if fully set forth herein.

73.     Under Plaintiff's Employment Agreement, Plaintiff was entitled to the payment of his compensation on a timely basis and/or in accordance with the deadlines prescribed therein.

74.     Defendants failure to pay Plaintiff the amounts to which he was entitled on a timely basis and/or in accordance with the deadlines prescribed therein violates Delaware Labor Law, Title 19, Chapter 11, § 1102.

75.     Based on Defendants' violations as alleged herein, all of which involve delays in the payment of compensation equal to more than 10 days, Plaintiff is entitled to liquidated damages equal to the amount of unpaid compensation, in addition to the payment of that compensation.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff MARK BERKOWITZ demands judgment against Defendants, as follows:

A.     Awarding Plaintiff all compensatory damages allowed as a result of Defendants' breaches of contract, including Defendants' breach of the implied covenant of good faith and fair dealing – as set forth in Count I;

B.     Awarding Plaintiff all compensatory and punitive damages allowed as a result of Defendants' unlawful retaliatory conduct – as set forth in Count II;

C.     Awarding Plaintiff all compensatory and punitive damages allowed as a result of Defendants' tortious interference with contract – as set forth in Count III;

23

Supreme Court Records OnLine Library - page 24 of 26

D.      Awarding Plaintiff all liquidated damages allowed as a result of Defendants'

violations of Delaware Labor Law Title 19, Chapter 11 – as set forth in Count III;

E.      Awarding Plaintiff pre- and post-judgment interest, and the costs and

disbursements of this action, including attorneys' fees, experts' fees and other expenses; and

F.      Granting such other, further and different relief as the Court deems just and

proper.

Dated: New York, New York
       August 21, 2007

Respectfully submitted,

SANFORD WITTELS & HEISLER, LLP

By: _____
           William R. Weinstein
950 Third Avenue, 10th Floor
New York, NY 10022
(646) 723-2947

SANFORD WITTELS & HEISLER, LLP
David Sanford
1666 Connecticut Ave., N.W., Suite 310
Washington, D.C. 20009
(202) 742-7777

ATTORNEYS FOR PLAINTIFF
MARK BERKOWITZ

24

Supreme Court Records OnLine Library - page 25 of 26

## VERIFICATION

MARK BERKOWITZ, the plaintiff herein, hereby swears that the foregoing allegations of his Verified Complaint are true to the best of his knowledge, except as to those matters alleged on information and belief, which he believes to be true to the best of his belief.

Dated: August 21, 2007

_____
MARK BERKOWITZ

Sworn to before me this
21 day of August, 2007.

_____
Notary Public

William R. Weinstein
Attorney & Counselor at Law
No. 02WE6084890
Qualified in Westchester County
Commission Expires December 16, 20 10

25