UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x

In re

LEHMAN BROTHERS HOLDINGS INC., *et al.*,


                              Debtors.

-------------------------------------------------------------------x

Chapter 11 Case No.

08-13555 (SCC)



Jointly Administered


## MEMORANDUM IN FURTHER OPPOSITION TO DEBTORS' FOURTEEN OMNIBUS OBJECTIONS SEEKING TO RECLASSIFY COMPENSATION CLAIMS AS EQUITY, OR ALTERNATIVELY TO SUBORDINATE CLAIMS PURSUANT TO § 510(b) OF THE BANKRUPTCY CODE

STAMELL & SCHAGER, LLP
  Richard J. Schager, Jr.
  Andrew R. Goldenberg
One Liberty Plaza, 23rd Floor
New York, NY 10006-1404
Telephone: (212) 566-4047
Facsimile: (212) 566-4061
Email: schager@ssnyc.com
Email: goldenberg@ssnyc.com

LAW OFFICES OF LISA M. SOLOMON
  Lisa M. Solomon
One Grand Central Place
305 Madison Avenue
Suite 4700
New York, NY 10165
Telephone: (212) 471-0067
Facsimile: (212) 980-6965
Email: lisa.solomon@att.net

RICH MICHAELSON MAGALIFF
 MOSER LLP
  Howard P. Magaliff
  Robert N. Michaelson
340 Madison Avenue - 19th Floor
New York, NY 10173
Telephone: (212) 220-9402
Email: HMagaliff@R3MLaw.Com
Email: RMichaelson@R3MLaw.Com

LAW OFFICE OF A. JAMES BOYAJIAN
  A. James Boyajian
355 S. Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (424) 258-0777
Facsimile: (424) 298-4377
Email: jamesboyajian@gmail.com


*Attorneys for Compensation Claimants*

Dated: March 4, 2014

# TABLE OF CONTENTS

**Description**                                                              **Page**

TABLE OF AUTHORITIES.................................................................................iii-vi

PRELIMINARY STATEMENT..............................................................................1

PROCEDURAL HISTORY....................................................................................2

REPLY TO LEHMAN'S FACTUAL ASSERTIONS................................................3

ARGUMENT.......................................................................................................6

I.   LEHMAN HAS NOT OFFERED EVIDENCE SUFFICIENT TO SHIFT THE
     BURDEN OF PROOF.................................................................................6

II.  COMPENSATION CLAIMS ARE NOT BASED UPON AN EQUITY
     SECURITY..............................................................................................8

III. LEHMAN FAILS TO MEET EACH ELEMENT OF SECTION 510(b) IN
     ORDER TO SHOW ANY BASIS FOR SUBORDINATION.............................10

     A. Lehman Has Failed to Demonstrate the Compensation Claims Arise from the
        Purchase or Sale of a "Security"..........................................................11

        1. RSUs and CSAs Are Not Investment Contracts under § 101(49)(A)(xii)...11

        2. RSUs and CSAs Are Not a Right to Purchase Under § 101(49)(A)(xv)......14

     B. Lehman Fails to Demonstrate there Was a "Purchase or Sale" of a Security.........16

     C. Lehman Fails to Demonstrate the Compensation Claims Are For "Damages
        Arising from the Purchase or Sale" of a Security......................................18

        1. Compensation Claims for Lehman's Alternative Performance Obligations
           are Not Damage Claims...................................................................19

        2. Compensation Claims based on Statutory Wage Law Causes of Action
           are Not "Damages" Claims...............................................................21

IV.  SUBORDINATION OF THE COMPENSATION CLAIMS VIOLATES THE
     POLICIES OF SECTION 510(b)................................................................23

V.   LBHI'S LATE RESERVATION OF RIGHTS TO THE COMPENSATION CLAIMS
     AS CLAIMS AGAINST SUBSIDIARY 'LBI' ARE PRECLUDED ON BASIS OF
     WAIVER, ESTOPPEL, AND JUDICIAL ESTOPPEL......................................25

i

A. Lehman has Waived and/or is Estopped From Asserting any Rights to Reclassify the Claims as against LBI in its Separate SIPA Proceeding...........................26

B. Lehman is Judicially Estopped from Seeking to Reclassify Claims...................27

CONCLUSION....................................................................................................30

# TABLE OF AUTHORITIES

**Cases**                                                                                      **Page**

*Carrieri v. Jobs.com Inc.,*
393 F.3d 508 (5th Cir. 2004)……………………………………...…………………………10

*Denty v. SmithKline Beecham Corp.,*
907 F. Supp. 879 (E.D. Pa. 1995), *aff'd,* 109 F.3d 147 (3d Cir. 1997)……………………....27

*Giuntoli v. Garvin Guybutler Corp.,*
726 F. Supp. 494 (S.D.N.Y.1989)……………………………………………………………22

*Guiry v. Goldman, Sachs & Co.,*
31 A.D.3d 70, 814 N.YS.2d 617 (1st Dep't 2006)……...………………………………....21, 22

*Harris Corp. v. McBride & Associates, Inc.,*
2002 WL 1677695 (W.D.N.Y. July 19, 2002)………………………………………………26, 27

*In re Allegheny Int'l, Inc.,*
954 F.2d 167 (3d Cir. 1992)……………………………………………………………………7

*In re Am. Hous. Found.,*
2013 WL 1316723 (Bankr. N.D. Tex. Mar. 30, 2013)………………………………………13

*In re Audre, Inc.,*
210 B.R. 360 (Bankr. S.D. Cal. 1997)………………………………………………………....7

*In re Bristol-Myers Squibb Sec. Litig.,*
228 F.R.D. 221 (D.N.J. 2005)………………………………………….....................................27

*In re CIT Grp. Inc.,*
460 B.R. 633 (Bankr. S.D.N.Y. 2011), *aff'd,* 479 F. App'x 393 (2d Cir. 2012)………………..18

*In re Einstein/Noah Bagel,*
257 B.R. 499 (Bankr. D. Ariz. 2000)…………………………………………………………10

*In re Enron Corp.,*
341 B.R. 141 (Bankr. S.D.N.Y. 2006)………………......................................................passim

*In re Giordano,*
234 B.R. 645 (Bankr. E.D. Pa. 1999)………………………………………………....…..….7

*In re Lehman Bros. Inc.,*
462 B.R. 53 (Bankr. S.D.N.Y. 2011)…………………………………………………......13, 15

*In re Med Diversified, Inc.,*
461 F.3d 251 (2d Cir. 2006)………………………………………………...16, 17, 18

*In re NationsRent, Inc.,*
381 B.R. 83 (Bankr. D. Del. 2008)………………......…………………………………...20

*In re Oneida Ltd.,*
400 B.R. 384 (Bankr. S.D.N.Y. 2009), *aff'd sub nom. Peter J. Solomon*
*Co, L.P. v. Oneida Ltd.,* 2010 WL 234827 (S.D.N.Y. Jan. 22, 2010)……....................................7

*In re S. St. Tavern & Grill, Inc.,*
2006 WL 1687781 (Bankr. M.D. Fla. Mar. 28, 2006)………………………………….......27

*In re Sabre Shipping Corp.,*
299 F. Supp. 97 (S.D.N.Y. 1969)………………………….......………………………..7

*In re Satyam Computer Servs. Ltd. Sec. Litig.,*
915 F. Supp. 2d 450 (S.D.N.Y. 2013)………………………………………………….13

*In re SeaQuest Diving, LP,*
579 F.3d 411 (5th Cir. 2009)………………………………………………………….13

*In re SemCrude, L.P.,*
436 B.R. 317 (Bankr. D. Del. 2010)…………………………………...........……..7

*In re Tristar Esperanza Properties, LLC,*
488 B.R. 394 (B.A.P. 9th Cir. 2013)…………………………………………………….13

*In re U.S. Wireless Corp.,*
384 B.R. 713 (Bankr. D. Del. 2008)……………………………………………………..15

*Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am. v. Daniel,*
439 U.S. 551 (1979)……………………………………………………………….11, 12

*Landreth Timber Co. v. Landreth,*
471 U.S. 681 (1985)………………………………………………………………….12, 13

*Larson v. Groos Bank, N.A.,*
204 B.R. 500 (W.D. Tex. 1996)………………………………….......…………….27

*Matter of Baldwin-United Corp.,*
52 B.R. 549 (Bankr. S.D. Ohio 1985)……………………………….......…………...10

*Matter of N. Am. Cattle Co.,*
51 B.R. 822 (Bankr. W.D. Mich. 1985)……………………………………………….11

*Matter of Standard Oil & Exploration of Delaware, Inc.,*
136 B.R. 141 (Bankr. W.D. Mich. 1992)……………………………………………………...10

*Nantahala Capital Partners v. Wash. Mut. (In re Wash. Mut., Inc.),*
464 B.R. 656 (Bankr. D. Del. 2012)……………………………………………………..10

*Norritech v. Geonex Corp.,*
204 B.R. 684 (D. Md.), *aff'd sub nom. In re Geonex Corp. v. Norritech,* 120 F.3d 261
(4th Cir. 1997)……………………………………………………………………………27

*Northcross v. Bd. of Educ. of Memphis City Sch.,*
412 U.S. 427 (1973)……………………………..……………………………………….14

*Paducah River Painting, Inc. v. McNational Inc.,*
2011 WL 5525938 (W.D. Ky. Nov. 14, 2011)………………..………………………….26

*Ryan v. Kellogg Partners Institutional Servs.,*
19 N.Y.3d 1, 968 N.E.2d 947 (2012)……………………………………………………22

*S.E.C v. W.J. Howey Co.,*
328 U.S. 293 (1946)………………………………………………………11, 12, 13

*Sherman v. Novak (In re Reilly),*
245 B.R. 768 (B.A.P. 2d Cir.), *aff'd,* 242 F.3d 367 (2d Cir. 2000)…………………………7, 26

*Spirnak v. Motor Liquidation (In re Motor Liquidation Co.),*
2012 WL 398640 (S.D.N.Y. Feb. 7, 2012)………………..…………………………….18

*Truelove v Ne. Capital & Advisory, Inc.,*
95 N.Y.2d 220, 738 N.E.2d 770 (2000)…………………………………………………22

## Statutes

11 U.S.C. § 101(16)…………………………………………..……………………8, 9, 10

11 U.S.C. § 101(49)……………………………………………………….....……11, 12, 13, 14

11 U.S.C. § 101(49)(A)(xii)…………………………………………..……………11, 12, 13

11 U.S.C. § 101(49)(A)(xiv)………………………………………………………..12, 13

11 U.S.C. § 101(49)(A)(xv)……………………………………….…………….....……12, 13, 14

11 U.S.C. § 502(a)……………………………………………………………………….6

11 U.S.C. § 507(a)(4)……………………………………………………………………….29

11 U.S.C. § 510(b)……………………………………………………………………….passim

15 U.S.C.A. § 78lll……………………………………………………………………...13

Fed. R. Bankr. P. 3001(f)……………………………………………………...…......7

Fed. R. Evid. 803(6)(D)……………………………………………………...……...8

Fed. R. Evid. 901………………………………………………........................8

**Other Authorities**

4 L. King, et al., *Collier on Bankruptcy* ¶ 502.03[3][f] (rev. ed. 2007)…………………….7

S. REP. 95-989, 1978 U.S.C.C.A.N. 5787……………………........................9

Steinberg, *Bankruptcy Litigation*, § 8:56 (2d Ed. 2007)……………….......................7

## PRELIMINARY STATEMENT

Long before Lehman filed for bankruptcy, Claimants had fully liquidated claims for services rendered. Before the bankruptcy, Lehman promised Claimants compensation that gave rise to contractual and statutory obligations under various wage laws. As of the bankruptcy filing, they were general unsecured creditors and not equity holders.

Now, Lehman contends that its bankruptcy has transformed Claimants into equity holders of equity they never had or sought to own, the risk of which they never sought to undertake, and any conceivable rewards they never sought to reap. By its arguments, Lehman proves too much. If one were to accept Lehman's arguments, then any claim asserted by an employee in an employer's bankruptcy who at some time in the future might receive their employer's stock as one alternative means of compensation, where there was no bargained for exchange for the stock of the employer, would have to be subordinated. Clearly, that is not the law.

Lehman has repeatedly imputed intent to Claimants for which there is no evidentiary basis, withheld from the Court plain language it used in its own documents, and glossed over material differences in the features of different compensation instruments.

While Lehman has cited *In re Enron Corp.*, 341 B.R. 141 (Bankr. S.D.N.Y. 2006) and other cases for a number of inapplicable propositions involving different fact patterns, it has failed to provide any logical reason why this Court should:

(a) ignore the words of the statute,

(b) ignore the legislative history of the statute,

(c) depart from the settled construction of almost identical terms as used in another federal statute, and

(d) import into the statute words and concepts not used by Congress.

## PROCEDURAL HISTORY

While Lehman takes credit for having had "thousands of RSU Claims . . . reclassified as equity" (L Br. at 4), there have been no merits determination on any of Lehman's Fourteen Omnibus Objections now before the Court.[1] Nor did Judge Peck make any finding that the unauthenticated documents submitted with the original Objections and the succeeding Omnibus Replies were admissible.[2] The Court granted Lehman's requested relief *only* as to those "claimants [who] simply allowed the Omnibus Objection to be presented and, in effect, for defaults to be entered." Hearing Tr., May 31, 2012, 40:25-41:3.

Judge Peck expressed concern from the first hearing about how Lehman has proceeded with these Omnibus Objections. The first hearing was held on December 21, 2011, when only nine of the Objections had been filed. Hearing Tr., Dec. 21, 2011, at 46:3-46:8. Ten law firms representing claimants and ten claimants appearing *pro se* spoke at the hearing. *Id.* at 16-25. After several hours of argument Judge Peck noted that:

> there are issues of fact that are being referenced in a very credible
> way by individuals who are not under oath, who are not subject to
> cross-examination and who are in a position to influence the Court.

*Id.* at 103:13-104:4. Judge Peck added that in the absence of such an evidentiary record "I'm troubled by where we are right now in this proceeding just as a pure matter of case management and administration. . . ." *Id.* at 104:5-104:7.

---

[1] All terms used and not defined herein shall have the meanings assigned in Claimants' Memorandum of Law in Opposition to Debtors' Fourteen Omnibus Objections dated January 28, 2014 ("Claimants' Opening Brief").

[2] As noted in Argument I below, Lehman claims that it has offered sufficient evidence to overcome the *prima facie* validity of the RSU and CSA claims, but the only evidence admitted to date is a joint Stipulation of Facts. *See* Order, Oct. 2, 2013, ECF 40263.

> I think, as a result, that we need to do a better job managing this
> process so that I can make some judgments about particular
> claimants.

*Id.* at 104:10-104:13.

At the subsequent hearing on May 31, 2012, after submission of the Omnibus Replies and

Claimants' sur-replies, Judge Peck commented:

> We're not determining anything today.  The only thing we're
> doing today is identifying the fact that we still have a lot of work to
> do.

Hearing Tr., May 31, 2012 at 44:20-44:22.  Judge Peck requested the parties "to come up with a

set of procedures that work for those who are in litigation so that we can get to the finish line."

*Id.* at 41:21-41:25.

The parties thereafter negotiated a Discovery Procedures Order and both Claimants and

Lehman prepared document requests and produced responsive documents.  At Claimants'

request (and after writing to Judge Peck requesting a conference), Lehman agreed to negotiate a

Stipulation of Facts, which was approved by order entered October 2, 2013 (ECF 40263).

## REPLY TO LEHMAN'S FACTUAL ASSERTIONS

As noted above, Judge Peck cautioned Lehman that statements not made under oath or

not subject to cross-examination did not form part of an evidentiary record on which he could

rely for purposes of decision-making.  Hearing Tr., Dec. 21, 2011, at 103:13-104:4.

Notwithstanding this warning, in its cryptic Factual Background Lehman asks the Court to

accept many allegations of purported fact for which there is no evidentiary support.

As a reply to the unsupported factual assertions in Lehman's brief, the Represented

Claimants are submitting more than forty declarations from Claimants providing support for their

Opposition to Lehman's Omnibus Objections.  Each of the following paragraphs summarize the

3

most egregious and erroneous statements and implications of Lehman's purported assertions of fact, discuss evidentiary deficiencies, and refer to the responsive paragraphs of Claimants' affidavits that address the assertions.

1.    "Equity in the Firm."  Lehman claims that both Lehman and Claimants "originally intended" to treat RSUs and CSAs "as equity of the firm" (L Br. at 2), but Lehman offers no evidentiary support for this proposition.  There is no evidence that either Lehman or Claimants believed that the RSUs and CSAs constituted equity.  Lehman in fact cautioned employees that they had no rights as stockholders until they became record holders of stock, and that their rights as grantees of RSUs and CSAs were no better than those of a general creditor. *See e.g.* Charles Spero Aff., ¶9.  Claimants also assert that did not consider themselves as stockholders based upon their grants of RSUs.  *See e.g.*, Virgilio Casuple Decl. §§9-11.

Further, Lehman's statement of its own "original intent" that the RSUs and CSAs would be treated as equity is impeached by its own conduct in removing the Subordination Clause from the RSU/CSA Agreements and its bankruptcy schedules, in which it listed over 22,000 RSU and CSA agreements and Claimants as parties to executory contracts (RSU/CSA agreements) on Schedule "G."  In many cases LBHI provided employees with pre-populated proof of claim forms in which it showed Claimants as holders of scheduled claims with respect to their RSU Agreements listed as executory contracts. *See e.g.*, Darian J. Cohen Decl. ¶17, Exhibit "A." Lehman's statement is further impeached by another of its documents, the RSU Trust, in which Lehman recognized Claimants and other employees as "general creditors" with "unsecured contractual rights" against Lehman for its "payment obligations" under the RSU compensation plan. RSU Trust, §§1(b), (e), 3(b)(3).

4

2.    <u>Voting Rights.</u> Lehman claims that a trust funded with shares of Lehman stock "gave RSU holders the ability to direct voting on those shares based on the proportion of the number of RSUs held by the employees." L Br. at 14. However, the RSU Trust that Lehman refers to specifically provides: "Nothing in this Agreement shall in any way diminish any rights of Participants to pursue their rights as general creditors of the Company with respect to benefits due under the Plans or otherwise." RSU Trust, § 3(b)(3), LEH-RSU 0002282. Thus, notwithstanding Lehman's reliance upon the Trust, any voting rights conferred under the Trust do not diminish Claimants' rights as general creditors in this proceeding. Further, as discussed below, the so-called voting rights granted to certain holders of RSUs in certain circumstances were not the type or quality of voting rights accorded shareholders. Nor does Lehman provide any evidence that holders of RSUs and CSAs were actually given the opportunity to exercise voting rights, either by documentary evidence of instructions or by an affidavit explaining how the voting rights were administered. *See e.g.*, Cohen Decl., ¶15.

3.    <u>Financial Stake & Incentive.</u> While Lehman claims that RSUs gave employees "a financial stake in the company, thus giving them a sense of ownership" (L Br. at 8), Lehman cites only to documents containing its own self-serving statements, and no evidence that the employees shared with Lehman this purported understanding of a financial stake other than the financial stake any employee has in his or her employer, or how a sense of ownership might be imputed. Claimants reject Lehman's effort to impute this intent to them. *See e.g.*, Cohen Decl., ¶14. They report Lehman's prior statements that they had no rights as a stockholder before stock was actually issued, and state that they viewed the RSUs and CSAs as providing "nothing but Lehman's contract promise to pay us the balance of the bonus Lehman had previously declared. . . ." *See e.g.*, Charles Spero Aff., ¶8.

5

In addition, while Lehman characterizes the RSUs as having "provided Lehman employees with a financial incentive to remain with Lehman until the shares were issued" (L Br. at 8), Lehman once again cites only to the documents containing its own self-serving statements, and not to any evidence that employees were so incentivized. Employees in fact viewed the RSUs and CSAs as "Lehman's arbitrary assertion of financial control" by withholding a substantial portion of the bonus it declared "as earned in the prior year." *See e.g.*, Cohen Decl., ¶13.

4.    Full Information. Lehman claims it "fully informed its employees that a portion of their compensation *would* be paid in equity" (L Br. at 8). Lehman cites as support, however, only documents pointing to its own discretion in deciding whether to issue RSUs and CSAs. Fact Stip. ¶ 2 (quoting four documents all using the phrase "At the Firm's option" or "discretion"). Claimants were not told at the beginning of each fiscal year what portion of their total compensation they were required to take as RSUs or CSAs, or even whether any portion of their compensation would be paid in RSUs or CSAs. *See e.g.*, Nahiketa Das Aff., ¶7. Any such determination was solely in Lehman's discretion, which was not exercised until after the end of the fiscal year. Lehman's assertion that Claimants were "paid in equity" is also misleading because the RSUs and CSAs did not represent "payment in equity."

## ARGUMENT

## I.    LEHMAN HAS NOT OFFERED EVIDENCE SUFFICIENT TO SHIFT THE BURDEN OF PROOF

Section 502(a) of the Code provides that a claim "is deemed allowed, unless a party in interest . . . objects." 11 U.S.C. § 502(a). "A proof of claim executed in accordance with [the Bankruptcy Rules] shall constitute *prima facie* evidence of the validity and amount of the claim." Fed. R. Bankr. P. 3001(f). "To overcome this *prima facie* evidence, the objecting party must

come forth with evidence which, if believed, would refute at least one of the allegations essential to the claim." *Sherman v. Novak (In re Reilly),* 245 B.R. 768, 773 (B.A.P. 2d Cir.), *aff'd,* 242 F.3d 367 (2d Cir. 2000), *citing In re Allegheny Int'l, Inc.,* 954 F.2d 167 (3d Cir. 1992) and *In re Giordano,* 234 B.R. 645, 650 (Bankr. E.D. Pa. 1999). A bankruptcy claim "cannot be defeated by mere formal objection." *In re Sabre Shipping Corp.,* 299 F. Supp. 97, 99 (S.D.N.Y. 1969).

If Lehman, as the objector, does not "introduce[] evidence as to the invalidity of the claim or the excessiveness of its amount, the Claimant need offer no further proof of the merits of the validity and the amount of the claim." 4 L. King, et al., *Collier on Bankruptcy* ¶502.03[3][f] (rev. ed. 2007). The objector must produce "evidence equal in force to the *prima facie* case" in order to succeed in its objection. *In re Oneida Ltd.,* 400 B.R. 384, 389 (Bankr. S.D.N.Y. 2009), *aff'd sub nom. Peter J. Solomon, L.P. v. Oneida Ltd.,* 2010 WL 234827 (S.D.N.Y. Jan. 22, 2010).

Lehman also has the burden under § 510(b) to prove that the Compensation Claims should be subordinated. *See In re Audre, Inc.,* 210 B.R. 360, 367-68 (Bankr. S.D. Cal. 1997) ("The burden of proving all elements of subordination is on the objectant."); *In re SemCrude, L.P.,* 436 B.R. 317, 322 (Bankr. D. Del. 2010) ("The Debtors have not carried their burden of demonstrating that Harvest's claims should be subordinated pursuant to section 510(b). Accordingly, the Debtors' Objection will be overruled."); Steinberg, *Bankruptcy Litigation,* § 8:56 (2d Ed. 2007) ("The debtors bears the burden of proof to establish that a claim falls within § 510(b).").

Lehman has failed to satisfy its burden of presenting sufficient evidence to overcome the *prima facie* validity of Claimants' proofs of claim or to prove that the compensation Claims should be subordinated.

7

*First*, Lehman claims that it has "offered sufficient evidence" in its fourteen Omnibus

Objections, its Omnibus Replies, in its Annotated Reply, and at the hearing on December 21,

2011.[3] These submissions and comments at a preliminary hearing are not evidence. While the

documents attached to the briefs on their face appear to be business records, Lehman made no

attempt to authenticate these documents, *see* Fed. R. Evid. 803(6)(D) & 901, and there is no

basis yet for the Court to consider them evidence.

*Second*, Judge Peck did not rule on the sufficiency of these documents to overcome the

*prima facie* validity of the filed proofs of claim; nor did he rule on the admissibility of the

unauthenticated attachments. The granting of the relief Lehman requested in the Omnibus

Objections was done only as to "claimants [who] simply allowed . . . for defaults to be entered."

Hearing Tr., May 31, 2012, at 40:25-41:3. Lehman's claim that it already "has offered sufficient

evidence to refute and overcome the *prima facie* validity of the [Compensation] Claims" (L Br.

at 9) is simply not true.

## II.    COMPENSATION CLAIMS ARE NOT BASED UPON AN EQUITY SECURITY

In the Represented Claimants' opening memorandum (ECF 42348)(hereafter,

"Claimants' Opening Brief"), Claimants called to the Court's attention the key phrase in §

101(16)(C) of the Code that excludes convertible instruments like RSUs and CSAs from the

definition of Equity Securities. Section 101(16)(C) reads (with emphasis added):

> The term 'equity security' means –
>
> (C)   warrant or right, *other than a right to convert*, to purchase, sell, or subscribe
> to a share, security, or interest of a kind specified in subparagraph (A) [shares of
> stock] or (B) [limited partnership interests] of this paragraph.

---

[3]   By "Omnibus Replies" Lehman is referring to its Omnibus Reply to Responses to Debtors' 73rd Omnibus Objection to Claims, Mar. 28, 2011 [ECF 15406], and its Omnibus Reply to Responses to Debtors 118th, 130th, 131st, 133rd, 134th, 135th, 170th, and 207th Omnibus Objections to Claims, Dec. 15, 2011 [ECF 23470]. By Annotated Reply Lehman is referring to its Supplemental Annotated Omnibus Reply to Debtors 73rd, 118th, 130th, 131st, 13rd, 134th, 135th, 176th and 207th Omnibus Objections to Claims, Jan. 12, 2012 [ECF 24591]. Lehman Br. at 4, 6.

The paragraph states clearly that a right to purchase, sell, or subscribe to an equity security is not

an equity security if it is only "a right to convert." CC Br. at 10. (The italicized clause is

accordingly referred to herein as "the exclusion for a right to convert.") Claimants discussed the

statutory language and the legislative history in their Opening Brief at pp. 10-12.

In negotiating the Stipulation of Facts, Lehman conceded that the Represented Claimants

"receive[d] RSUs as a portion of their total compensation," that there was "no further cost to

employees associated with the RSU awards," and that "the awards *convert*" to common stock

five years after the grant date. Fact Stip. ¶ 3 (emphasis added). Lehman's Financial Statements

state the same. *Id.* The date that was five years after the grant of the RSUs was referred to as the

"Conversion/Issuance Date." *Id.* at ¶ 5. There is no question that RSUs and CSAs at issue here

were convertible instruments that had not converted as of the date of Lehman's bankruptcy

petition, and are squarely within the "exclusion for a right to convert," and accordingly outside

the definition of equity security in § 101(16).

Buried away in a footnote Lehman argues that the exclusion of convertible instruments

was only "intended to exclude . . . bonds or similar debt instruments," but there is nothing in the

statute or the legislative history to support this reconstruction of Congressional intent. The

statute refers to a "warrant or right, other than a right to convert" (§ 101(16)(C)), and the

legislative history refers to "*a security* . . . that is convertible" (S. REP. 95-989 at 24, 1978

U.S.C.C.A.N. 5787, 5810; see CC Br. at 10). Neither hints that only convertible bonds are

excluded.

Lehman cites to *Matter of Standard Oil & Exploration of Delaware, Inc.*, 136 B.R. 141

(Bankr. W.D. Mich. 1992), but the holding there is perfectly consistent: "Even though a note

may be later converted to stock, such right to convert does not transform the note into an equity

security." *Id.* at 150. Lehman's other authorities either fail to take into account this exclusion

for a right to convert or deal with instruments that are completely different. *Carrieri v. Jobs.com*

*Inc.*, 393 F.3d 508 (5th Cir. 2004) (instruments called warrants, which provided that the holder

"may demand repurchase of the warrant" after a specified date, were not "rights" under §

101(16)(C) subject to the exclusion for the right to convert); *Nantahala Capital Partners v.*

*Wash. Mut. (In re Wash. Mut., Inc.)*, 464 B.R. 656, 659, 665-66 (Bankr. D. Del. 2012)(warrants

called "litigation tracking warrants" were issued to existing shareholders because new investors

discounted the value of a pending litigation; warrants were "*a right to buy stock*" if the litigation

was successful, not a conversion right); *In re Einstein/Noah Bagel*, 257 B.R. 499, 506 (Bankr. D.

Ariz. 2000)("Put Right" provided a holder of equity with the right "to require that its equity

interest be repurchased," not a conversion right); *Matter of Baldwin-United Corp.*, 52 B.R. 549,

552 (Bankr. S.D. Ohio 1985)(options provided rights to purchase shares, once again not

conversion right).

## III.    LEHMAN FAILS TO MEET EACH ELEMENT OF SECTION 510(b) IN ORDER TO SHOW ANY BASIS FOR SUBORDINATION

In order to accomplish subordination under 11 U.S.C. § 510(b), Lehman bears the burden

of proving the Claims are (i) for "damages," (ii) "arising" from the, (iii) "purchase" or "sale,"

(iv) of a "security."   11 U.S.C. § 510(b).   In *Enron,* the court explained "[W]here the claim is or

a fixed amount and does not arise in parallel with the fortunes of the share price," as here, "the

courts are inclined to read section 510(b) narrowly." *In re Enron Corp.*, 341 B.R. 141, 157

(Bankr. S.D.N.Y. 2006).

### A. Lehman Has Failed to Demonstrate the Compensation Claims Arise from the Purchase or Sale of a "Security"

#### 1. RSUs and CSAs Are Not Investment Contracts under § 101(49)(A)(xii)

Claimants' Opening Brief demonstrates that RSUs and CSAs, granted as part of a contract between Lehman and its employees, should be considered a security *only* if they qualify as an "investment contract" under subsection (xii) of §101(49).[4] The caselaw discussed in Claimants' Opening Brief demonstrates that whether an employee's interest in an employee benefit plan such as the RSU compensation plan constitutes an investment contract, and thus a "security," depends upon whether the plan was a voluntary plan involving an investment decision and the employee expected to profit solely from the efforts of others. *S.E.C v. W. J. Howey Co.,* 328 U.S. 293, 301 (1946)("Howey"); *Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am. v. Daniel,* 439 U.S. 551, 559 (1979)("Daniel").[5]

The evidence indisputably shows that participation in the RSU plan for Claimants was mandatory and compulsory, if and when Lehman determined to pay part of employees' compensation in RSUs/CSAs, and did not involve an investment decision. The decision whether to receive part of their Total Compensation in RSUs or CSAs was not left to any individual employee. *See e.g.,* Timothy A. Burke Aff., ¶6.

Lehman's brief is bereft of any discussion of *Daniel* or *Howey.* Nonetheless, Lehman argues factually that Claimants "had a bargaining position" and "a choice as to whether or not to

---

[4] For a further discussion of this point, *see* pp.14-20 *infra.*

[5] As discussed in Claimants' Opening Brief, investment contract, a term of art not defined in the Code, is an expansive term under the securities laws that has been crystallized through judicial interpretation. The *Howey* test has not been limited to federal securities law cases, and has been applied by bankruptcy courts (*see e.g., Matter of N. Am. Cattle Co.,* 51 B.R. 822 (Bankr. W.D. Mich. 1985) (claimants were not shareholders; in analyzing investment contract court noted if security existed it was relationship under contract between issuer and purchaser created by transaction and not subject of contract), specifically concerning issues of subordination under §510(b). *Id.* (court denied subordination due to absence of claim arising from purchase or sale of a security).

accept and continue employment at Lehman." L Br. at 20. Lehman's argument to support a securities transaction misses the point.[6] In *Daniel*, the Supreme Court rejected the argument that an employee engages in a securities transaction or makes an investment decisions solely through the act of accepting or remaining in employment where there is only an "attenuated relationship," if any, to perceived investment possibilities. *Id.* at 560. *Daniel* refutes Lehman's argument that employees' so-called choice to accept or continue in employment with Lehman is sufficient to qualify them as investors. The issue is not the acceptance or remaining in employment but whether employees had a choice to participate in Lehman's RSU plan. There is no dispute here and Lehman has stipulated that employees "could not choose whether or not to participate." Stevens Decl., ¶14; *see also* Fact Stip. ¶ 13.

Lehman also does not address the second prong of the *Howey* test, which is not satisfied here, that Lehman employees were expecting to profit "solely from the efforts of others." Lehman thus does not satisfy the requirements for an investment contract as used in subsection (xii) of the Code. Lehman does rely on other subsections of §101(49) of the Code, subsection (xiv) and (xv) pertaining to "other claim[s] or interest[s] commonly known as 'security'" and "right to…purchase or sell, a security", respectively. Investment contracts, interests commonly known as securities and the right to purchase or sell a security, however, are all general categories in the definition of a security. *Landreth Timber Co. v. Landreth*, 471 U.S. 681, 682 (1985) (discussing "investment contract" as a "general category" under the federal securities laws); *In re Lehman Bros. Inc.*, 462 B.R. 53 (Bankr. S.D.N.Y. 2011) (discussing a right to purchase or sell a security under SIPA §78lll(14) as a "catchall" and finding unregistered TBA

---

[6] Lehman's argument is also misleading because there was no "bargain" made for RSUs or CSAs where, as here, under the RSU plan, all terms were dictated by Lehman and the decision to pay any part of Claimants' year-end Total Compensation was in Lehman's discretion. This issue is discussed in more detail in Point I(B) below.

contracts were not "investment contracts") (Peck, J.).  Lehman's reliance upon other general

categories, subsections (xiv) and (xv), when it cannot satisfy the requirements of the general

category investment contract under (xii) departs from the construction of the very similar statutes

under the securities laws, which as discussed below, should provide guidance here.

In *Landreth Timber Co. v. Landreth*, 471 U.S. 681, the United States Supreme Court

confirmed there was no reason to analyze a case differently whether an instrument was viewed as

an "investment contract" or "another similarly general category of the definition" of a security,

there an "instrument commonly known as a security." *Id.* at 691-92, n.5.  "Under either of these

general categories, the *Howey* test would apply." *Id.*  The Supreme Court further explained

"applying the *Howey* test to traditional stock and all other types of instruments listed in the

statutory definition would make the Acts' enumeration of many types of instruments

superfluous." *Id.* at 692.[7]

Here, whether the RSUs/CSAs are analyzed under subsections (xii), (xiv) or (xv) of

§101(49)(A) of the Code, the determination should be governed by *Howey*.[8]  The statutory

analysis applied in *Landreth* in connection with the *Howey* test also should apply here in this

bankruptcy proceeding to § 101(49)(A).  *Northcross v. Bd. of Educ. of Memphis City Sch.*, 412

U.S. 427, 428 (1973) (different statutes containing similar language should be interpreted *pari

passu*).  The respective definitions of a security under the securities and bankruptcy law include

---

[7] The cases Lehman cites on subsection (xiv) are inapposite. LB at 13. They only address voluntary investments in partnerships (*In re Am. Hous. Found.*, 2013 WL 1316723, at \*18 (Bankr. N.D. Tex. Mar. 30, 2013)) or membership interests in limited liability companies (*In re SeaQuest Diving, LP*, 579 F.3d 411 (5th Cir. 2009); *In re Tristar Esperanza Properties, LLC*, 488 B.R. 394 (B.A.P. 9th Cir. 2013)), which are not at issue here.

[8] Further support for Claimants' analysis here, that Lehman must satisfy the test for an investment contract as established in *Howey* in order to establish the RSUs/CSAs are a security, can be found in other federal securities caselaw in this district. *See e.g., In re Satyam Computer Servs. Ltd. Sec. Litig.*, 915 F. Supp. 2d 450, 470-71 (S.D.N.Y. 2013) and other cases cited in Claimants' Opening Brief at 14.

the same terms, referring to the general categories of investment contract, commonly known as securities and the right to purchase or sell a security. The catchall/general categories for a right to purchase or sell a security in the bankruptcy and securities laws are also located at the end of the statutes following a long list of enumerated items of a security, each of which involves a transaction predicated upon an investment decision.

This Court should reject any attempt by Lehman to argue for a broader interpretation of "security" under the Code. There is no justification for a broader interpretation to encompass the RSUs/CSA instruments that arose from a transaction that did not involve an investment decision. The overarching purpose of the statutes, both under the securities laws and bankruptcy law, that they should apply where one has made a choice to become an investor or an investment decision, and the other common elements under those statutory frameworks compel the same interpretation, particularly because the securities laws have been liberally construed.

2.  RSUs and CSAs Are Not a Right to Purchase Under § 101(49)(A)(xv)

Lehman argues that RSU/CSA grantees were given a "contingent right to participate in, receive and/or purchase common stock of LBHI", and therefore, the RSUs/CSAs should be treated as a security under § 101(49)(A)(xv). L Br. at 12-13. However, Lehman utterly fails to address the specific statutory requirements that there be a right to purchase a security. As discussed in the Opening Brief, a right to purchase a security requires that there be an investment decision and there was no investment decision relating to the RSUs/CSAs. CC Br. at 23-24. Moreover, there was no guarantee that Claimants that would employees would receive Lehman stock pursuant to their RSUs.

Lehman draws largely from stock option cases that address materially different facts. Lehman cites *In re Enron Corp.,* 341 B.R. 141, and *In re U.S. Wireless Corp.*, 384 B.R. 713

14

(Bankr. D. Del. 2008) (L Br. at 15) where employee-stock option holders were able to make decisions with regard to the purchase and sale of stock by exercising the stock options and selling the stock, or alternatively retaining them to exercise at a later time in the hope of an increase to their trading profits. Once the stock options vested, they had trading value to the stock option holders.

Unlike the holders of stock options in *Enron* and *U.S. Wireless*, as described in Claimants' Opening Brief, Claimants did not have a right to purchase a security under the RSUs or CSAs, were not able to sell or hedge their interest in the RSUs or CSAs even after vesting and were given no guarantee by Lehman that stock would be delivered to them at the conversion date. Moreover, fluctuations of the Lehman stock price during the RSU/CSA term period were not significant to the RSU/CSA holders because they had no rights to exercise. The RSU/CSA Agreements did not provide for the present issue of a security. Fact Stip. ¶ 5, Exhibit 3 at (p. 34 of 148). None of the employment related contingencies tied to the RSUs/CSAs were the kind that shareholders face and they did not depend on the price of Lehman stock.

Further, unlike a "right," which like an option involves a potential unilateral act, the RSUs are executory contracts, as Lehman has recognized, that involve no choice on the part of the Claimants. *See e.g., In re Lehman Bros. Inc.*, 462 B.R. at 64 (court found TBA contracts were not a right to purchase or sell a security for purposes of SIPA definition of security that did not involve a unilateral act but an executory contract).

Lehman also argues RSUs/CSAs should be considered securities because the purported "purpose" of the RSU/CSA plan was to give Lehman employees an "opportunity to acquire a proprietary and vested interest" in Lehman. L Br. at 17. However, as stated above, Lehman cites only to documents containing its own self-serving statements, and provides no evidence that

15

employees shared with Lehman this purported understanding of a financial stake or how a sense of ownership might be imputed.[9]

### B. Lehman Fails to Demonstrate there Was a "Purchase or Sale" of a Security

Compensation Claimants demonstrate in their Opening Brief there was no "purchase" or "sale" of RSUs or CSAs as required by § 510(b). A purchase or sale of a security requires that an employee bargains for the employer's security. *See e.g.*, *In re Med Diversified, Inc.*, 461 F.3d 251 (2d Cir. 2006).

Lehman relies upon inapposite caselaw holding that a grant of an equity award as a form of compensation can be a purchase or sale within §510(b), arguing Claimants "had a bargaining position" and "a choice as to whether or not to accept and continue employment at Lehman." L Br. at 20. According to Lehman, Claimants "understood they would be compensated both with cash and with rights to become shareholders of LBHI common stock." *Id*. Lehman argues employees could "vote with their feet" against the terms of the RSU compensation plan by leaving Lehman. *Id*. This argument is misleading to the Court and contrary to *Med Diversified* because the option to pay compensation in the form of RSUs was in Lehman's discretion. Fact Stip. ¶¶ 10, 13.

Contrary to Lehman's argument, Lehman did not "fully inform" or even advise Claimants at the outset of employment or at the beginning of any fiscal year that Lehman would exercise its discretion and pay Claimants' year–end Total Compensation in both cash and

---

[9] Lehman quotes Claimant Krieger's original Opposition to the 185th Omnibus Objection at p. 17 of its brief completely out of context. The point she made was that she had worked at other companies in the securities industry that had become bankrupt, and that she did not want equity in an organization she depended for her annual earnings, but she did not let that concern interfere with her performance at Lehman, where she was an enthusiastic, loyal and dedicated employee who approached working at Lehman as if it was her own personal business. (Krieger Decl. ¶18) Reference to her letter (Miller Aff., Ex. F., at p. 2) demonstrates that Lehman has twisted her expression of enthusiasm for the Company and her approach to working there into support for a program to which she expressly objected.

16

RSUs/CSAs. *See e.g.*, Gordon Sweely Aff., ¶6. Nor were Claimants advised at the beginning of

any fiscal year that they were "required to take a minimum portion of [their] Total Compensation

each fiscal year in the form of RSUs" or [CSAs]. *See e.g.*, Stevens Decl., ¶11. Claimants had no

legally enforceable right to RSUs/CSAs. Claimants did not in Lehman's words "bargain" nor

conclude a bargain to become a shareholder. L Br. at 20.

The arrangement Lehman had with its employees was thus different from the situation

before the Second Circuit in *Med Diversified*. There, the claimant individually negotiated and

bargained not for cash but to become a stockholder in the debtor. *Med Diversified*, 461 F.3d at

258. Lehman's arrangement with its employees was also different from *Enron* where there was

no indication that stock options were in the discretion of Enron; instead, employees were

"required to take a minimum percentage of their annual bonus in stock option form." *Enron*, 341

B.R. at 150-51. The other cases Lehman cites (*see* p. 26 of Claimants' Opening Brief) also are

distinguishable because they involved privately negotiated stock or stock option transactions.

This case is also different because the RSUs/CSAs granted to Claimants did not involve

an investment decision or an election to participate. In *Enron*, the stock option claimants were

left with two investment decisions: (i) *whether* to exercise (which could not be done if the

options were "under water" because the market price of the stock was below the exercise price),

and (ii) *when* to exercise. The holders of the RSUs and CSAs did not have either of these

investment decisions to make. The Second Circuit in *Med Diversified* highlighted the significant

choice the *Enron* employees had made in trading the relative safety of cash and "not . . .

exercis[ing] stock options [once they had vested] with hopes for future higher returns". *Id.* at

257. Similarly, in *Spirnak v. Motor Liquidation (In re Motor Liquidation Co.)*, 2012 WL

398640 (S.D.N.Y. Feb. 7, 2012), relied upon by Lehman, the court subordinated the claim of a

GM shareholder employee who had voluntarily elected to participate in a 401(k) plan of the company.

### C. Lehman Fails to Demonstrate the Compensation Claims Are For "Damages Arising from the Purchase or Sale" of a Security

The Claims are not subject to a broad interpretation of § 510(b) or a "but for analysis", as Lehman argues. If that were the case, then former equity holders seeking recovery on put and redemption agreements or notes payable for their former equity interests could not avoid subordination under § 510(b). That is not the law. (*see* Opening Brief at 27-28). As discussed herein, the Claims are for fixed dollar amounts. "[W]here the claim is for a fixed amount and does not arise in parallel with the fortunes of the share price, the courts are inclined to read section § 510(b) narrowly." *Enron*, 341 B.R. at 157.[10]

### 1. Compensation Claims for Lehman's Alternative Performance Obligations are Not Damage Claims

Lehman mischaracterizes Claimants' position and their words. Lehman argues Claimants assert a variety of theories for the liability of LBHI relating to the RSUs, "ranging from the diminution in value of the RSUs to allegedly fraudulent statements that were made by LBHI in financial statements prior to or in connection with the issuance of the RSUs." L Br. at 22. This is incorrect. The Claims are based, *inter alia*, upon Lehman's alternative performance obligations for the compensation promised and due Claimants pre-petition. Under the alternative

---

[10] The quoted language above from the *Enron* decision contradicts Lehman's position that the courts "in *Enron* . . . and the Second Circuit in *Med Diversified*, among other courts, have embraced the broad interpretation of 'arising from' in section 510(b) and have subordinated claims if there is any nexus or causal relationship between the purchase of the securities and the damages that are being claimed." LB at 22. In *Med Diversified*, the Second Circuit held the term "arising from" the purchase or sale of a security could be read broadly, as encompassing the transaction at issue there, or narrowly, as excluding the contract claim of the plaintiff. The Court held that based upon the facts before the Court the intent and purpose of the statute would have to be canvassed in order to construe the phrase "arising from." Other courts have limited the scope of § 510(b) subordination. *See e.g.*, *In re CIT Grp. Inc.*, 460 B.R. 633, 639 (Bankr. S.D.N.Y. 2011), *aff'd*, 479 Fed. App'x 393 (2d Cir. 2012) (court rejected "but for" analysis under § 510(b)).

performance doctrine, where a contract provides for one of two alternative modes of performance (i.e., payment of compensation in cash or RSUS/CSAs) and one mode of performance is rendered impossible, the promisor is not relieved from performing the other.

The Claims are not for damages but an attempt to enforce the promise Lehman made to Claimants pre-petition, for an unpaid debt.[11] Lehman's repeated mantra and references to fraud based claims is a transparent attempt to make *Enron* and other cases it relies upon relevant to the common law and statutory wage claims at issue here and to satisfy the statute's mandate that the claim be one for damages.

Lehman fails to address Claimants' rights based upon the promise Lehman made to them for their compensation that could be paid in cash or RSUs or CSAs. The most Lehman musters on this point is its erroneous argument that it was only at Lehman's "option or discretion [to] pay cash or equity" (L Br. at 25 n. 16), although the caselaw cited in the Opening Brief establishes that Lehman lost the option of choosing the mode of performance of its compensation obligation when performance under the RSUs/CSAs was rendered impossible. Lehman lost that option upon Lehman's bankruptcy filing, its terminating its employees and the subsequent cancellation of LBHI stock under Lehman's plan.

Lehman also similarly mischaracterizes Claimants as seeking a recovery for the "equity portion of [Claimants'] compensation *in cash*." L Br. at 2. Claimants at no time were awarded equity by Lehman, only RSUs and CSAs, which Lehman documents recognized Claimants as

---

[11] Lehman relies upon a single response filed by a Represented Claimant, Madelyn Antoncic (prior to engagement of counsel) (ECF 16921) in supporting its argument that the Claims are based upon fraud. Claimant argued not that Lehman had committed or sought recovery for fraud but that "*[i]f the deferred compensation was equity as the Debtor now claims,*" then the Debtor disadvantaged employees relative to equity holders. (emphasis added).

general creditors.[12]  Lehman submits no evidence that it was excused from its alternative

performance (payment in cash) obligation if Lehman could not perform pursuant to the RSUs or

CSAs.  Claimants are thus analogous to the claimant in *NationsRent* cited in the Opening Brief,

that sought recovery of its unpaid compensation and did not assert a claim for breach.  *In re*

*NationsRent, Inc.*, 381 B.R. 83 (Bankr. D. Del. 2008).

Lehman fails to offer any explanation of its own conduct in purposely and intentionally

removing from the RSU and CSA agreements the Subordination Clause and all references to

bankruptcy.  *See, e.g.*, Fact Stip., Exhibit 6 (p. 58-61 of 148).  Lehman meekly argues "The fact

that the 2003 and 2004 Equity Award Program Grant Agreements for restricted stock units and

contingent stock awards contain express subordination provisions [and were subsequently

removed] does not alter th[e] conclusion" [that the Claims are subject to subordination."  L Br. at

p. 12 n.7; *see also Id.* (the Subordination Clause "do[es] nothing to alter the mandated

subordination required by section § 510(b) of the Bankruptcy Code.").  At most, Lehman's

removal of the Subordination Clause creates an ambiguity that under well settled rules of

contract interpretation must be construed against Lehman as the drafter of the document. The

removal of the clause is evidence that Lehman no longer intended to subordinate such claims.

## 2. Compensation Claims based on Statutory Wage Law Causes of Action are Not "Damages" Claims

In the alternative, the Claims are based on the wage laws of the jurisdictions in which

each employee respectively worked, and not limited to the wage laws of New York and the

---

[12] *See e.g.*, RSU Trust Agreement, 2(b)(3) (if at any time the Trustee determines Lehman is insolvent, "Nothing in this Agreement shall in any way diminish any rights of Participants to pursue their rights as general creditors of the Company with respect to benefits due under the Plans or otherwise.")

United Kingdom.[13] Lehman does not provide sufficient legal arguments and evidentiary basis to overcome these claims under the wage laws of all applicable jurisdictions. Lehman's arguments are misleading because Claimants are not arguing the "RSUs" themselves are wages and because a statutory wage claim is not one for "damages" based on tort or breach of contract for purposes of § 510(b). The Claims are for the fixed wage amounts arising from Lehman's withholdings effectuated through the RSU plan wherein Lehman failed to disclose to Claimants the consequences of a bankruptcy filing upon their wages and also failed in many instances to obtain written signed authorizations for the deductions made. *See e.g.*, Burke Aff., ¶14.

Lehman argues, "[C]laimants do not have a claim under New York Labor Law because unvested and unexercised RSUs do not constitute 'wages.'" L Br. at 30. It then cites various irrelevant cases that addressed the issue of whether *stock options* and *restricted stock units* themselves were wages. For example, "[T]he question presented is whether these unvested rights to equity-based compensation constitute 'wages' within the meaning of article 6 of the Labor Law." *Guiry v. Goldman, Sachs & Co.*, 31 A.D.3d 70, 72, 814 N.Y.S.2d 617 (1st Dep't 2006). The majority opinion did not address the issue of whether improperly withheld amounts from earned wages without full disclosure of material terms and express written authorization give rise to a wage claim. Claimants do not argue that the RSUs are wages. Rather, the underlying withheld amounts which were unlawfully withheld in violation of various state wage laws are the claims asserted here. *Guiry* and all the other cases cited by Lehman also do not address whether the wage-withholdings were for the benefit of the employees.

*Truelove v Ne. Capital & Advisory, Inc.,* 95 N.Y.2d 220, 738 N.E.2d 770 (2000), relied

---

[13] Lehman exaggerates that "the vast majority (or all) of the work was to be performed in New York or the United Kingdom." LB at 31. It is well known and evident from the declarations of Claimants submitted herewith that Lehman employees performed work all over the world including California, Illinois, Colorado, and Germany; the wage laws of each of these jurisdictions applies to Lehman employees working in their applicable jurisdiction.

upon by Lehman (L Br. at 33), does not advance their position. There, payment of a bonus was based "*solely* upon his employer's overall financial success." *Id.* at 224. Also, the case did not involve a situation such as here where employees did not give informed consent to withholding of their wages. Moreover, *Truelove* was distinguished in *Ryan v. Kellogg Partners Institutional Servs.*, 19 N.Y.3d 1, 968 N.E.2d 947 (2012) (bonus constituted "wages" within meaning of Labor Law, so that employer's neglect to pay bonus violated Labor Law provision prohibiting an employer from making deductions from wages of employee); *see also, Giuntoli v. Garvin Guybutler Corp.*, 726 F. Supp. 494, 509 (S.D.N.Y. 1989) ("bonus payments, already due and vested . . . fall within the definition of wages in § 190").

Lehman's Opening Brief does not cite any precedent that a statutory wage claim is equivalent to a claim for "damages" based on tort or breach of contract for purposes of §510(b). Instead, Lehman improperly omits the word "damages" with ellipses from the language of §510(b) to fashion its own rule:

> First, a state law claim for payment in the form of RSUs for services provided to Lehman is still a claim "arising from the purchase or sale of a . . . security" and thus must be subordinated under section 510(b)."

L Br. at 30. These are not damages claims; they are for statutory rights to withheld compensation.

## IV.    SUBORIDNATION OF THE COMPENSATION CLAIMS WOULD VIOLATE THE POLICIES OF SECTION 510(b)

Lehman gives short shrift to the significant policy considerations underlying § 510(b) addressed in Claimants' Opening Brief. What little Lehman says only reinforces the inapplicability of § 510(b) to the Claims.

*First*, Lehman argues RSUs/CSAs are securities because they "automatically resulted in the issuance of freely tradable LBHI common stock" and the value of the RSUs/CSAs varied

22

with the value of LBHI stock. *Id.* at 14. However, unlike stock, the RSUs/CSAs could not be

"sold, assigned, transferred, pledged, hypothecated or otherwise disposed of…." Fact Stip.,

Exhibit 4 (p. 50 of 148). Grantees of RSUs/CSAs had "no rights as a stockholder with respect to

any Share…" unless and until the RSUs/CSAs were converted to stock. *Id.*, Exhibit 13 (p. 100

of 148.). Prior to that time, Claimants' rights were defined by the wage laws and the common

law doctrine of alternative performance, providing Claimants with fixed dollar claims (consistent

with the number of RSUs granted to Claimants also based upon a fixed stock price), and not

claims that fluctuated with the price of LBHI stock, for services rendered.

*Second* is Lehman's description of the so-called "shareholder voting rights [Claimants

had] even before the stock was issued." L Br. at 14. However, the RSU Trust specifically

provides that "Nothing in this Agreement shall in any diminish any rights of Participants to

pursue their rights as general creditors of the Company with respect to benefits due under the

Plans or otherwise." RSU Trust, § 3(b)(3), LEH-RSU 0002282. Moreover, Claimants at no time

had the corporate governance rights of shareholders. For example, although Lehman lumps

together CSA and RSU holders as one (referring to them as generically as "RSU holders"), the

RSU trust provides for voting rights to CSA holders with respect to certain of their CSAs *only* if

they resided in certain locations. *See* RSU Trust, § 9(a), LEH-RSU 0002285; *see also* Lehman's

2007 brochure to CSA holders, LEH-RSU 0000277 ("Through the Trust, you *may be able to*

direct the exercise of voting rights related to your CSAs.")(emphasis added). Also, Lehman's

own documents produced during discovery show that as of 11/05, there were 60 million RSUs

outstanding but only 35 million shares in the RSU trust. LEH-RSU 000757. Lehman does not

inform the Court if any of the Claimants were entitled to and were actually offered the ability to

vote and if so, as to how many of their RSUs. In fact, many of the Claimants report through their

23

affidavits that they do not recall ever having been given the right to vote. *See e.g.*, Cohen Decl., ¶15.

Lehman inaccurately describes the voting rights as "the ability to direct voting on those shares based on the proportion of the number of RSUs held by the employees." L Br. at 14. The Trust procedures, contrary to what Lehman states, provide that any RSU holder who is given the ability to vote but *does not vote has his or her vote counted as voted by the Trustee*.[14] These are not the rights of a shareholder.

*Third*, Lehman argues RSU/CSA grantees are "like shareholders" because they received so-called "dividend equivalents." L Br. at 14-15. The "dividend equivalents", however, were simply additional RSUs/CSAs that were "subject to the same vesting and forfeiture provisions as the underlying RSUs." Fact Stip. ¶ 29, Exhibit 3 (p. 46 of 148). Moreover, Lehman retained the authority to "at any time" pay the dividend equivalents "in cash rather than RSUs." *Id.* This is another strawman established by Lehman. The dividends equivalents had no value to Claimants until and if the RSUs/CSAs converted to stock subject to the significant employment-related conditions, which did not occur.

*Fourth*, the absolute priority rule upon which Lehman relies (L Br. at 18, n.9), which provides that unsecured creditors stand ahead of equity investors, does not support Lehman. Claimants were not equity investors. Lehman's own documents, the program documents and the RSU Trust unequivocally recognized Claimants as having "unsecured contractual rights against [Lehman]" for Lehman's contractual "liability" to Claimants. RSU Trust, §§1(b), (e), 3(b)(3). The absolute priority rule does not provide that one unsecured creditor be paid before another

---

[14] Under the Trust, the Trustee voted all the shares held in the Trust, *including shares for which no direction was given,* in the ratio that directions to votes for and against the proportion received from employees bore to the total number of shares held in the Trust. *See* RSU Trust, § 9(c), LEH-RSU 0002286.

unsecured creditor but to the contrary demands unsecured creditors be treated on a parity. The absolute priority rule demands that Claimants be treated on parity with other unsecured creditors.

Fifth is the equity cushion to which Lehman only makes a passing reference and acknowledges is only "one part of the broader judgment regarding risk allocation." L Br. at 18, n.9. In fact, in *Enron* the court "questioned the utility of the equity cushion concept as a rationale for section § 510(b) subordination," recognizing that it is "less useful when applied to any particular claim for the simple reason that it is difficult in a mature and liquid market to link any particular equity investment to any particular credit extended in reliance thereon."

## V.    LBHI'S LATE RESERVATION OF RIGHTS TO THE COMPENSATION CLAIMS AS CLAIMS AGAINST SUBSIDIARY 'LBI' ARE PRECLUDED ON BASIS OF WAIVER, ESTOPPEL AND JUDICIAL ESTOPPEL

In anticipation of a possible adverse ruling, Lehman now seeks to "reserve the right" to reclassify "some or all" of the Compensation Claims as against *one* of its subsidiaries – Lehman Brothers Inc. ("LBI") – in LBI's separate proceeding administered under SIPA rather than LBHI. L Br. at 34. Lehman argues *for the first time* and *without any factual support* that the "vast majority" of Claimants "were employed by LBI" and that LBI is responsible for the Claims. To satisfy their burden of presenting evidence sufficient to overcome the *prima facie* validity of Claimants' Claims, LBHI would have to come forward with some documentary or testimonial evidence supporting the claim that the obligation Claimants seek to enforce is an obligation of subsidiary company, LBI. *In re Reilly*, 245 B.R. at 773, *aff'd* 242 F.3d 367 (2d. Cir. 2000). This it has not done.

### A. Lehman has Waived and/or is Estopped From Asserting any Rights to Reclassify the Claims as against LBI in its Separate SIPA Proceeding

Lehman says nothing about whether it has consulted with LBI on the Claims and whether, if reclassified to the LBI proceeding, LBI would consider the Claims as late-filed.[15] Lehman offers no reason why it is first raising an issue as to the proper debtor on the eve of trial when Lehman had knowledge of the nature of the claims from the start of the litigation and many opportunities to state this sort of defense earlier on.

To raise such a defense after several years of litigation is prejudicial to Claimants. Such a procedural ploy is barred by the common law doctrine of waiver. Lehman's omnibus objections are analogous to an answer, and Lehman was required to assert all affirmative defenses, including that the claims are against the wrong party, in its omnibus objections. *See e.g., Harris Corp. v. McBride & Associates, Inc.*, 2002 WL 1677695 (W.D.N.Y. July 19, 2002) (court denied amendment to assert affirmative defense plaintiff sued wrong party). Seeking to preserve unknown or unstated affirmative defenses is also improper under the rules and violative of Lehman's obligations for fair notice. *See e.g., Paducah River Painting, Inc. v. McNational Inc.*, 2011 WL 5525938 (W.D. Ky. Nov. 14, 2011).

Importantly, throughout these proceedings, Lehman never distinguished between the different Lehman entities but instead responded to the allegations as if LBHI were the correct party.[16] To permit Lehman to raise a new defense several years into this litigation would

---

[15] Lehman couches its request as an effort to avoid a "double recovery," pointing to four Compensation Claimants that also filed claims against LBI related to their RSUs. L Br. at 35. Lehman does not mention that the vast majority of Compensation Claimants did *not* file claims against LBI.

[16] This is consistent with the presentation LBLHI made to employees prior to bankruptcy. Before the chapter 11, LBHI represented itself, LBI, and all other subsidiaries equivocally as one firm called "Lehman Brothers" or "Lehman." *See e.g.*, Debtors' Disclosure Statement at 13, citing to Examiner's Report vol. 5 [Docket No. 8307 at 1967-68. Many of Claimants' employment contracts refer to "Lehman Brothers" as the employer. *See. e.g*, Antoncic Aff. at ¶2. Lehman's Opening Brief even implies as much: "In the five years before the commencement of the Debtors' chapter 11 cases, tens of thousands of domestic and overseas Lehman employees were granted

significantly prejudice Claimants as the time for discovery has ended and Lehman's reversal on

such a key issue would require additional discovery that could result in years of further costly

litigation, and worse yet, possible denial of the claims on the basis they were late filed. *See e.g.,*

*Denty v. SmithKline Beecham Corp.*, 907 F. Supp. 879., 882 (E.D. Pa. 1995), *aff'd,* 109 F.3d 147

(3d. Cir. 1997) (court granted leave to amend pleading asserting wrong party on condition

plaintiff be granted leave to add proper party). Courts have not permitted amendments to

pleadings where there is significant prejudice, such as here. *See e.g., In re Bristol-Myers Squibb*

*Sec. Litig.*, 228 F.R.D. 221, 229 (D.N.J. 2005) (denial of "eleventh hour amendment" to pleading

where there was prejudice due to possible fresh rounds of motion practice and further delaying

the end of the case); *Harris Corp. v. McBride & Associates, Inc., supra* (denial of amendment to

answer to assert wrong party due to prejudice where there was no reason for delay).

## B. Lehman is Judicially Estopped from Seeking to Reclassify Claims

"Statements in bankruptcy schedules are executed under penalty of perjury and, when

offered against a debtor, are eligible for treatment as judicial admissions." *Larson v. Groos*

*Bank, N.A.*, 204 B.R. 500, 502 (W.D. Tex. 1996)(debtors' representation in schedules of no

contingent or unliquidated claims was judicial admission); *Norritech v. Geonex Corp.*, 204 B.R.

684, 688 (D. Md.), *aff'd sub nom,. In re Geonex Corp. v. Norritech*, 120 F.3d 261 (4th Cir.

1997)(debtor-tenant *"effectively admitted that the lease was unexpired when listed it in the*

*original Schedule G."* (emphasis added); *see also In re S. St. Tavern & Grill, Inc.*, 2006 WL

1687781, at *7 (Bankr. M.D. Fla. Mar. 28, 2006)(debtor judicially estopped from denying

existence of lease where included on Schedule G).

---

restricted stock units and contingent stock awards, respectively, in exchange for their service as Lehman
employees." L Br. at 7. (emphasis added).

LBHI, and not LBI, scheduled 413 pages of RSU agreements in its "Schedule G" listing
Claimants as counterparties to existing executory contracts and as creditors of LBHI for their
RSU compensation related claims. LBHI and not LBI sent Compensation Claimants preprinted
proof of claim forms advising them they had been scheduled as creditors of LBHI and
counterparties to executory contracts with LBHI – the RSU Agreements. LBHI filed
amendments to its schedules on a number of occasions but failed to remove the RSUs from its
schedules. Through the pre-populated proof of claim, LBHI directed the filing of the claims
against LBHI and not LBI. By filing Court schedules, failing to remove the RSUs from the
schedules, inviting proofs of claims to be filed, and directly objecting to thousands of RSU
claims as the responsible debtor in this matter, LBHI is now estopped from arguing that
Claimants are not creditors of LBHI or that the Claims should be more properly considered as
claims against another Debtor.

Moreover, in 2009 after the bankruptcy filing, LBHI acknowledge its obligations to
Claimants when it filed a series of claims seeking tens of billions of dollars from LBHI. One of
the claims filed by LBHI was for its RSU/CSA obligations to Claimants in the amount of
$626,325,235.36, although LBHI was already in bankruptcy. *See* LBHI Proof of Claim attached
as Exhibit T to James Emmert's Fed. R. Civ. P. 30(b)(6) Deposition dated October 24, 2013
("Emmert Dep."); *see also* Declaration of Christopher K. Kiplock in Support of Motion for Entry
of Order Approving LBHI-LBI Settlement at ¶¶ 4, 29 attached as Exhibit U to Emmert Dep.
LBHI's designated corporate representative, James Emmert, testified that the claim LBHI filed
against LBI represented the cost of the "[RSU/CSA] award that LBI could not issue because they
didn't have stock, that….LBHI would be issuing on LBI's behalf." Emmert Tr. at 183:16-20. In
February 2013, LBHI settled its RSU/CSA claim against LBI for an undisclosed amount. *See*

28

*generally* Motion for Entry of Order Approving LBHI-LBI attached as Exhibit V to Emmert

Dep.[17]

Lastly, LBHI settled many Claimants' RSU related claims – specifically the post-July

2008 RSU-related claims for which Lehman had withheld amounts from Claimants but failed to

grant any RSUs due to the filing of the bankruptcy petition. *See* L Br. at 4 fn. 3 and p. 26 fn. 17

Lehman's public docket site for these cases – "www.Lehman-Docket.com" – shows that

pursuant to and part of such settlements, LBHI agreed to and granted such claimants *in the full*

*priority wage amount of $10,950* pursuant to 507(a)(4). *See, e.g.*, Cohen Decl., ¶20, Exh. "B."

LBHI cannot at the same time argue that the claims should not be allowed as against it because

LBHI was not the employer or that it was not obligated for compensation due Claimants.

---

[17] Mr. Emmert testified that he did not review the settlement agreement between LBHI and LBI (Emmert Tr.
191:13-193:17,194:23-195:2), did not know how the claims were resolved (193:10-17) and relied on statements
made by LBHI's Counsel who allegedly told him "no value has been given to RSUs as part of the overall
settlement." 195:9-15. Although the noticed 30(b)(6) deposition required LBHI to designate a witness with
knowledge relating to "[a]ll facts and circumstances concerning the settlements between LBHI and Lehman
Brothers Inc. ("LBI")...that called for the settlement of inter-company claims...including RSUs and CSAs...", Mr.
Emmert was clearly unprepared to testify on this subject. *See* Notice of Deposition dated April 22, 2013 attached as
Exhibit A to Emmert Dep.

## CONCLUSION

For the foregoing reasons, the Omnibus Objections should be denied in their entirety.

Dated:  March 4, 2014
      New York, New York


LAW OFFICES OF LISA M. SOLOMON

By: ___/s/___Lisa M. Solomon____
      Lisa M. Solomon
One Grand Central Place
305 Madison Avenue, Suite 4700
New York, New York 10165
Tel: (212) 471-0067
Fax: (212) 980-6965

*Counsel to Claimants:  Madelyn Antoncic, Peter Hornick, Vincent Primiano, Charles Spero, Gordon Sweely, Timothy A. Burke, Jonathan Sebiri, Riccardo Banchetti, Michele Bareggi, Philippe Dufournier, Anke Parr, Giancarlo Saronne, Harsh Shah, Richard Noble, Michael Lawsky, Nikki Marshall, Nachiketa Das*


STAMELL & SCHAGER, LLP

By: __/s/_Richard J. Schager, Jr.___
      Richard J. Schager, Jr.
      Andrew R. Goldenberg
One Liberty Plaza - 23/F
New York, NY  10006-1404
Tel.:  (212) 566-4047
Fax:  (212) 566-4061

*Counsel to Claimants:  Jennifer Adler, Ian Anderson, Craig Benson, Paola Biraschi, Karen Brewer, William Broadbent, David Brooks, Patrick Cremin, Michael Collier, Joseph D'Amadeo, John Dmuchowski, Nestor De Jesus, Steven Engel, Louise Goldberg, Michael Gran, Anshuman Goyal Adrian Graves, Sandra Hahn-Colbert, Nicholas Howard, Julian Iragorri, Harriet Chan King, Karen Krieger, Tal Lev Ari, Yeruchim Levilev, Sarah Lewis, Patricia Luken, Lawrence McCarthy, Michael McCully, Hugh McGee, Michael Mullen, Ian Neville,* Thomas *O'Sullivan, Helmut Olivier, Martin Patterson, Michael Petrucelli, Sandy Richman Fleischman, Barry Porter, Jack Rivkin, Alvaro Santodomingo, Brian Seward, Ross Shapiro, Margaret Smith, Stephen Snelling, Gregg Somma, Andrea Sullivan, Milan Veleba, Pierluigi Volini, Jeffrey Wecker, Peter Ward, Timothy Wilkinson, Judith Winchester*

30

RICH MICHAELSON MAGALIFF
 MOSER LLP
    Howard P. Magaliff, Esq.
    Robert N. Michaelson, Esq.
340 Madison Avenue - 19th Floor
New York, NY  10173
Tel.:  (212) 220-9402
*Counsel to Claimants:  Roger Saks, Donald*
*Boughrum,Brian Monahan, Nicole Lawrence,*
*H. Morgan Lawrence, III*

LAW OFFICE OF A. JAMES BOYAJIAN
355 S. Grand Avenue, Suite 2450
Los Angeles, CA 90071
Tel: (424) 258-0777
Fax: (424) 298-4377
*Counsel to Claimants: Virgilio Casuple*
*Darian J. Cohen, Lars P. Jacobson*
*Mary Langevin, Amit K. Sarkar*
*Christian E. Steven, Andrew Wideman*