UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x
                                    :
In re                               :    Chapter 11 Case No.
                                    :
LEHMAN BROTHERS HOLDINGS INC., et al.,  :  08-13555 (SCC)
                                    :
                    Debtors.        :    (Jointly Administered)
                                    :
-------------------------------------------------------------x

**DECLARATION OF CLAIMANT NESTOR DE JESUS IN OPPOSITION
TO DEBTORS' FOURTEEN OMNIBUS OBJECTIONS SEEKING
TO RECLASSIFY COMPENSATION CLAIMS AS EQUITY, OR
ALTERNATIVELY TO SUBORDINATE CLAIMS PURSUANT
TO § 510(b) OF THE BANKRUPTCY CODE**

Nestor de Jesus, declares under penalty of perjury, pursuant to 28 U.S.C. § 1746, as follows:

1.  I make this Declaration based on my personal knowledge and the documents available to me, and would testify to the following if called upon. I authorize the filing of this objection in opposition to Lehman's Fourteenth Omnibus Objection.

2.  I was employed by Lehman Brothers from January 9, 1984 to September 15, 2008.

3.  My employment with Lehman Brothers ended upon Lehman Brothers' filing for bankruptcy protection on September 15, 2008. I actually never received a formal termination notice from Lehman Brothers. I attach a copy of the Corporate Communication received on September 22, 2008 regarding the announcement of an offer of employment with Barclays Capital pursuant to the Court's approval of the purchase by Barclays of certain of Lehman's businesses; this included the business of which I was a part. The employment offer from

Barclays was made (via an e-mail which I marked and returned as "accepted") and accepted by me on September 22, 2008. Due to the circumstances of the termination of my employment with Lehman Brothers, my termination was an "involuntary termination without cause" as that phrase is defined in the "RSU Agreements" between Lehman Brothers and employees.

4. Lehman compensated me on what it called a Total Compensation basis, by payment of an annual salary (paid in bi-weekly installments) plus a bonus. My bonus was an integral part of my compensation – my annual salary during the years at issue here was generally approximately only 25 to 50 percent of my total compensation.

5. For each year between 2003 and 2008, Lehman told me in writing, shortly after the end of each fiscal year (November 30), the amount of my bonus for that year and that my bonus was being divided into two portions, one designated Restricted Stock Awards (or "RSUs") and one designated as the "Total Cash Payment." For each of those years, approximately between 20 percent and 35 percent of my bonus was designated as RSUs.

6. When Lehman paid me the "Total Cash Payment" portion of my bonus, Lehman reported it to the tax authorities as compensation income and I paid income tax on it through customary withholding and estimated income tax payments. While the RSU-designated portion was declared as part of my bonus at the same time, it was not reported to the tax authorities as my compensation income.

7. At no time could I decline to accept Lehman's designation of a portion of my compensation in the form of RSUs. My participation in this compensation plan was automatic and mandatory -- there were no election or enrollment forms to complete, I could not choose whether or not to participate or to limit the portion amount of my bonus that was designated as RSUs, and I had no ability to direct how the amounts that Lehman withheld would be used. Since what I received was Lehman's contract promise to pay in the future, I paid no tax on the

2

RSU-designated portion of my compensation. While Lehman described it as part of my "Total Compensation" for that fiscal year, on a form Lehman called "200__ Total Compensation Statement," this RSU-designated portion of my bonus was essentially a part of my earned and declared compensation that Lehman forced me to wait five years to receive.

8.  When I was first hired by Lehman I was not told that I was required to take a minimum portion of my Total Compensation in the form of RSUs. Nor was I told at the outset of each fiscal year the portion of my Total Compensation for that year that I would be required to accept in the form of RSUs, or even that I would be required to accept any portion as RSUs. Whether any portion of my Total Compensation would be paid in RSUs, or in equity awards such as stock options or restricted stock, was completely within Lehman's discretion, and Lehman simply dictated its decision to me at year-end.

9.  Pursuant to the RSU Agreements, I recognized that I was contractually obligated to avoid engaging in any "Detrimental Activity" and that I had other ongoing contract obligations under these Agreements. As Lehman cautioned me in the program documents it provided, I had no rights as a stockholder until I became the record holder of stock, and as grantee of these deferred compensation devices called RSUs I had no better rights than those of a general creditor. Further, I had no ability to sell, assign, pledge or otherwise dispose of the RSUs. I had no rights but the contract rights of an employee whose compensation had been withheld.

10. I understand that Lehman now has taken the position that I was issued "equity securities" for the RSU-designated portion of my bonus in each of the years at issue. For prior years, not at issue here, after the five-year waiting period ended and I was issued as shares the RSU-designated portion of my bonus, Lehman withheld from this compensation a sufficient amount of cash to pay the applicable withholding tax paid on ordinary income, and then provided

3

me with Lehman shares for the balance. The entire amount of the bonus was taxed as ordinary income to me, the same way as a salary. <u>And if the RSUs had appreciated in value between the date of the grant and the date of release (five years later), the appreciation was also reported to the tax authorities as regular salary compensation, not as an equity capital gain.</u> This is proof that Lehman and the tax authorities considered the value of the RSUs as ordinary income subject to regular payroll taxes, not an equity grant subject to a capital gains tax treatment. Also, there was never any sale of securities to raise cash for the withholding tax, which would have been necessary if "equity securities" had been issued to me at the time of the declaration of the bonus.

11.     I have reviewed the "Factual Background" included in Lehman's Memorandum in Support. It is self-serving, unsupported by the facts, and imputes an intent to me that wasn't there. The Background concedes that the RSU-designated portion was withheld from each employee's earned and declared "Total Compensation." The Background claims that the RSUs gave employees a financial stake in the company, but until the end of the waiting period employees had no rights as a stockholder and had nothing but Lehman's contract promise to pay us after five years the balance of the bonus Lehman had previously declared. Employees had no choice as to our participation. What Lehman describes as a financial incentive to remain with Lehman was really Lehman's arbitrary assertion of financial control by withholding approximately 20 percent to 35 percent of our declared bonuses and threatening not to pay it if we breached certain employment-related conditions Lehman unilaterally imposed. There was nothing in this practice that attracted me to work at Lehman – it was just withholding my earnings as a means of making it costly for me to leave the firm. The RSUs were never a form of compensation I elected to take; it was Lehman's way of handcuffing employees to the firm.

12.     Lehman's claim that it "originally intended" to treat the RSUs as equity in the firm is unsupported by any evidence and is simply not true. It expected to treat shares as equity

4

only once the share had been issued, and that was after the five year waiting period Lehman unilaterally imposed. In fact, Lehman specifically represented that I had no rights as a stockholder until I became the record holder of stock. Further, I did not join Lehman so I could make a profit on its stock or to be compensated with equity. I joined Lehman to have a job and to further my career. I did not join to have the opportunity to invest in Lehman stock - that I could have done, as a private investor in a publicly traded entity, without having to join Lehman. I never desired to put my bonus at risk in an investment over which I had no control. I did not intend, and I had no reason to believe that Lehman intended, for me to be an equity holder before equity was issued, after the five-year waiting period.

13.     Lehman's representation to the Court that RSU holders had shareholder voting rights even before the stock was issued is incomplete and misleading. The Lehman Brief cites to a description of a trust established to hold an unspecified number of shares that would be voted "in proportion" to the number of RSUs the holder held. But Lehman never tells the Court what it also never told the employees: What was the proportion of shares held by the Trust relative to the total outstanding RSUs (determining what fraction of a vote the purported RSU vote had, if any), when did the RSU come to have this purported voting right (*i.e.*, upon grant, upon vesting, or as amortized), and how was the RSU holder's vote solicited? It wasn't. Lehman's statement that holders of RSU had voting rights is not supported by any explanation of how holders exercised these purported voting rights, if indeed they were exercised at all.

14.     Lehman's claims that it "equated" RSUs to common stock and that if it had avoided bankruptcy "Claimants would have reaped the benefit" of any increase in the stock price is simply meaningless. What has meaning is what I had before the end of five-year waiting period. As noted above, Lehman told me I had no rights as a stockholder and equated my rights with those of a general creditor. In each of the years at issue here Lehman declared what I

5

earned as my bonus, promised payment of my bonus, and as one means of performing that promise contracted with me to pay a portion of my bonus in five years using its own stock as currency when that time came. I had no rights to any stock during this five-year waiting period; what I had was a contract promise from Lehman to pay the bonus Lehman previously declared I had earned. When Lehman failed to "avoid bankruptcy," what I was left with was my contract right to the bonus Lehman had declared and promised would be paid. <u>The RSUs converted to equity and were issued as shares only upon the expiration of the five year period, but were not equity shares during the restricted five year period.</u>

15. Lehman recognized my rights as those of a contract creditor in its petition and schedules, where RSU agreements were listed as Executory Contracts under Schedule G.

16. In addition, I have attached hereto as Exhibit 1 the Proof of Claim that I filed in connection with my contract rights under the RSU Agreements. My initial Claim was assigned Claim No. 34492 (see attached acknowledgement of receipt of proof of claim from Epiq Systems).

17. Along with its bar date notice, Lehman provided me with this Proof of Claim form. In the form provided, Lehman had largely completed the form, including inserting the caption, supplying my name and address, and notifying me that I had a Claim scheduled as a "Schedule G" claim, for an "Executory Contract." Lehman also stated on the form that the scheduled claim related to the "Restricted Stock Unit Agreement."

18. All of this information was contained in the Proof of Claim form when Lehman provided it to me. I added only my phone number, email address, the amount of the claim, and my signature and date. Lehman acknowledged receipt of my Proof of Claim form upon my delivery to its claims agent.

19. The economic substance of the RSU Agreements to me was that a portion of my annual bonus, the bonus that had been declared and earned as part of my Total Compensation for each of the years at issue, was held back, and would be paid to me only after passage of five years. Lehman withheld this compensation unilaterally, and imposed on me certain terms before it would pay the declared and earned bonus. Thus, while the value of the RSUs was directly tied to the price of Lehman stock on the date the shares were to be issued, the RSUs were not Lehman shares until the date when they were issued (after five years). The RSUs "converted" to Lehman shares on that date, meaning they had not been Lehman shares until such date. During the five year period, the value of the RSUs was the value given on the date they were granted.

20. During the five year period, and even after vesting of the RSUs, there was no right to the common stock, and I did not receive and was not permitted to sell the shares until five years after the date of the RSU Agreement. Even after I was terminated without cause, my right to have the shares issued to me depended upon my continued observance of certain contract obligations.

21. Stock options that Lehman issued to me worked in a completely different way than RSUs. At the time of the grant, I received what is recognized as a security in the form of the stock option. The option provided me with the choice whether to buy LBH shares at a fixed price, the exercise price. The time for exercise was not a fixed date, but a period of time between exercise and lapse during which I would make an investment decision to pay the exercise price, and I then would receive Lehman Brothers shares. The timing of any exercise, and even the decision whether to hold the option or exercise it, was solely my investment decision. No comparable security was issued to me under the RSU Agreement. With an RSU, there was a conversion and Lehman stock was simply issued to me at the end of the waiting period Lehman imposed, with no action on my part. At no time did I exercise any choice or make any

investment decision regarding the RSUs or the delivery, the timing of delivery, or the form of the underlying compensation. NB: While the Proof of Claim prepared by me on September 21, 2009 incorrectly included the value of the Stock Options on the Grant Date, I have recognized my error and make my claim amount only for the value of the RSUs on the Grant Date, $655,112.

22. Finally, with RSUs I paid tax at ordinary income rates on the market value of the shares Lehman issued to me upon conversion. Again, had the RSUs been equity shares, the tax treatment would have been a capital gains tax rather than what is was, a tax on ordinary payroll income. Upon exercise of stock options I also would have paid tax at ordinary income rates, but only on the difference between the current market value of the Lehman Brothers shares at the time of exercise and the exercise price.

23. Lehman does not dispute that it hired and retained me to perform services as an employee and that it received value from my services, for which at the end of each fiscal year it declared and granted the bonus portion of my Total Compensation. While I continued to work for Lehman in reliance on its promise to pay to me the compensation it declared that I earned, Lehman now claims for the unpaid amount the classification of equity, even though no equity was ever issued and I had no rights as a holder of equity.

24. Lehman never told me in its annual brochures or its description of the RSUs, and I did not understand, that if Lehman filed for bankruptcy there was a risk I would not receive any of the compensation that it declared, granted and withheld, or that I would not have the same standing as other unpaid creditors because I had been compensated with RSUs. Lehman did not ask for, and I never provided, a written authorization for deductions or withholdings from my wages. I respectfully maintain and reassert my rights to be paid as a general unsecured creditor under the wage laws of the Commonwealth of Puerto Rico.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: March 3, 2014

_____
Signature

Néstor de Jesús
Printed Name

## EXHIBIT I

08-13555-mg    Doc 43451    Filed 03/06/14    Entered 03/06/14 14:20:09    Main Document
Pg 10 of 14

**United States Bankruptcy Court/Southern District of New York**
Lehman Brothers Holdings Claims Processing Center
c/o Epiq Bankruptcy Solutions, LLC
FDR Station, P.O. Box 5076
New York, NY 10150-5076

**PROOF OF CLAIM**

| In Re: | Chapter 11 | UNIQUE IDENTIFICATION NUMBER: 555247370 |
|---|---|---|
| Lehman Brothers Holdings Inc., et al. Debtors. | Case No. 08-13555 (JMP) (Jointly Administered) | |
| Name of Debtor Against Which Claim is Held | Case No. of Debtor | |
| LEHMAN BROTHERS HOLDINGS, INC. | 08-13555 (JMP) | |

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503. Additionally, this form should not be used to make a claim for Lehman Programs Securities (See definition on reverse side.)

**THIS SPACE IS FOR COURT USE ONLY**

Name and address of Creditor: (and name and address where notices should be sent if different from Creditor)
LBH (MERGE2.DBF,SCHED_NO) SCHEDULE #: 555247370*****
NESTOR E. DE JESUS
LA VILLA DE TORRIMAR
REINA ANA STREET #163
GUAYNABO 969~ 00969
PUERTO RICO

Telephone number: 787-759-8907
Email Address: ndejesus@barcap.com

☐ Check this box to indicate that this claim amends a previously filed claim.

Court Claim Number: _____ (If known)

Filed on: _____

NOTICE OF SCHEDULED CLAIM:
Your Claim is scheduled by the indicated Debtor as:
SCHEDULE G - EXECUTORY CONTRACT OR UNEXPIRED LEASE
DESCRIPTION: RESTRICTED STOCK UNIT AGREEMENT

Name and address where payment should be sent (if different from above)

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.
☐ Check this box if you are the debtor or trustee in this case.

1. Amount of Claim as of Date Case Filed: $ 750,555.-
If all or part of your claim is secured, complete Item 4 below; however, if all of your claim is unsecured, do not complete item 4.
If all or part of your claim is entitled to priority, complete Item 5.
If all or part of your claim qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9), complete Item 6.
☐ Check this box if all or part of your claim is based on a Derivative Contract.*
☐ Check this box if all or part of your claim is based on a Guarantee.*
*IF YOUR CLAIM IS BASED ON AMOUNTS OWED PURSUANT TO EITHER A DERIVATIVE CONTRACT OR A GUARANTEE OF A DEBTOR, YOU MUST ALSO LOG ON TO http://www.lehman-claims.com AND FOLLOW THE DIRECTIONS TO COMPLETE THE APPLICABLE QUESTIONNAIRE AND UPLOAD SUPPORTING DOCUMENTATION OR YOUR CLAIM WILL BE DISALLOWED.
☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of interest or additional charges. Attach itemized statement of interest or charges to this form or on http://www.lehman-claims.com if claim is a based on a Derivative Contract or Guarantee.

2. Basis for Claim: Employee Restricted Stock Unit Agreement
(See instruction #2 on reverse side.)

3. Last four digits of any number by which creditor identifies debtor: 9623
3a. Debtor may have scheduled account as: _____
(See instruction #3a on reverse side.)

4. Secured Claim (See instruction #4 on reverse side.)
Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.
Nature of property or right of setoff: ☐ Real Estate ☐ Motor Vehicle ☐ Other
Describe: _____
Value of Property: $_____ Annual Interest Rate _____%
Amount of arrearage and other charges as of time case filed included in secured claim, if any:
$_____ Basis for perfection: _____
Amount of Secured Claim: $_____ Amount Unsecured: $_____

6. Amount of Claim that qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9): $_____
(See instruction #6 on reverse side.)

7. Credits: The amount of all payments on this claim has been credited for the purpose of making this proof of claim.
8. Documents: Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages and security agreements. Attach redacted copies of documents providing evidence of perfection of a security interest. (See definition of "redacted" on reverse side.) If the documents are voluminous, attach a summary.
DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.
If the documents are not available, please explain:

Date: 9/21/09
Signature: [signed] Nestor E. de Jesus
The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any.

5. Amount of Claim Entitled to Priority under 11 U.S.C. §507(a). If any portion of your claim falls in one of the following categories, check the box and state the amount.

Specify the priority of the claim:
☐ Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).
☐ Wages, salaries or commissions (up to $10,950), earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(4).
☒ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(5).
☐ Up to $2,425 of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(7).
☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).
☐ Other - Specify applicable paragraph of 11 U.S.C. § 507(a)(___).

Amount entitled to priority:
$_____

FOR COURT USE ONLY

Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

Nestor E. de Jesus

# LEHMAN BROTHERS | LehmanLive

Data as of August 31, 2008

10062707 Nestor E de Jesu

## AWARD UNITS* OUTSTANDING

| Grant Date | Description | Grant Price | Grant Value² | Restriction Ends | Units Granted | Dividend Equivalents | Units Delivered | Units Vested³ | Units Outstanding | Market Value at $0.0( |
|---|---|---|---|---|---|---|---|---|---|---|
| 07/01/2008 | July 2008 RSU | $20.9600 | $18,975 | 11/30/2011 | 905.30 | 11.43 | 0.00 | 0.00 | 916.73 | $ |
| 12/07/2007 | 2007 SVP Principal | $47.6000 | $71,156 | 11/30/2012 | 1,494.88 | 30.79 | 0.00 | 0.00 | 1,525.67 | $ |
| 12/07/2007 | 2007 SVP Discount | $47.6000 | $23,719 | 11/30/2012 | 498.29 | 10.25 | 0.00 | 0.00 | 508.54 | $ |
| 12/08/2006 | 2006 SVP Principal | $57.7700 | $97,031 | 11/30/2011 | 1,679.61 | 49.70 | 0.00 | 0.00 | 1,729.31 | $ |
| 12/08/2006 | 2006 SVP Discount | $57.7700 | $32,344 | 11/30/2011 | 559.87 | 16.55 | 0.00 | 0.00 | 576.42 | $ |
| 11/30/2005 | 2005 SVP Principal | $47.2500 | $150,000 | 11/30/2010 | 3,174.60 | 116.52 | 0.00 | 3,291.12 | 3,291.12 | $ |
| 11/30/2005 | 2005 SVP Discount | $47.2500 | $50,000 | 11/30/2010 | 1,058.20 | 38.80 | 0.00 | 0.00 | 1,097.00 | $ |
| 12/09/2004 | 2004 SVP Principal | $32.1750 | $104,063 | 11/30/2009 | 3,234.28 | 145.26 | 0.00 | 3,379.54 | 3,379.54 | $ |
| 12/09/2004 | 2004 SVP Discount | $32.1750 | $34,687 | 11/30/2009 | 1,078.08 | 48.35 | 0.00 | 0.00 | 1,126.43 | $ |
| 12/10/2003 | 2003 SVP Principal | $26.7700 | $54,853 | 11/30/2008 | 2,049.06 | 109.36 | 0.00 | 2,158.42 | 2,158.42 | $ |
| 12/10/2003 | 2003 SVP Discount | $26.7700 | $18,284 | 11/30/2008 | 683.02 | 36.60 | 0.00 | 0.00 | 719.62 | $ |
| | Total | | $655,112 | | 16,415.19 | 613.61 | 0.00 | 8,829.08 | 17,028.80 | $ |

## STOCK OPTIONS OUTSTANDING

| Grant Date | Description | Exercise Price | Black-Scholes Grant Price | Expiration Date | Black-Scholes Grant Value | Options Granted | Options Exercised | Options Exercisable | Options Outstanding | Intrinsic Value at $0.00 |
|---|---|---|---|---|---|---|---|---|---|---|
| 12/10/2003 | 2003 SVP Options | $35.6950 | $10.4200 | 11/29/2013 | $24,362 | 2,338 | 0 | 1,754 | 2,338 | $ |
| 12/11/2002 | 2002 SVP Options | $27.2100 | $9.1250 | 11/29/2012 | $56,630 | 6,206 | 0 | 6,206 | 6,206 | $ |
| 12/03/2001 | December 2001 SVP Options | $31.7000 | $10.5100 | 11/29/2011 | $14,441 | 1,374 | 0 | 1,374 | 1,374 | $ |
| | Total | | | | $95,433 | 9,918 | 0 | 9,334 | 9,918 | $ |
| | Total Equity | | | | | | | | | $ |

* Market value refers to the value of the underlying Lehman Brothers Holdings Inc. shares at the indicated stock price. The intrinsic value of stock options is calculated by multiplying the number of options outstanding by the difference between the indicated stock price and the option exercise price. Please note that the current market price is based on a delayed 20 minutes feed from Reuters. (null on null)

¹ Award Units are those equity-based awards other than stock options, i.e. Restricted Stock Units, Conditional Equity Awards or Contingent Stock Awards, as applicable.
² Grant Value refers to the value of the underlying Lehman Brothers Holdings Inc. shares at the indicated grant price.
³ Units Vested refers to that portion of the award that has become vested and/or subject to limited conditions, as determined under the applicable plan documents.

*[Handwritten:]*
$655,112
  95,433
$750,555  Amount of Claim

http://my.lehman.com/HRS/equityaward/westinghouse.do

9/23/2008

EPIQ SYSTEMS
757 THIRD AVENUE
THIRD FLOOR
NEW YORK, NY 10017

P 646 282 2500  F 646 282 2501
757 THIRD AVENUE, NEW YORK, NY 10017
WWW.EPIQSYSTEMS.COM

**epiq SYSTEMS**

MAILID *** 0004892746 ***

**** LBH CLMLTR (MERGE2.TXNUM2) 4000081200 ****

DE JESUS, NESTOR E
LA VILLA DE TORRIMAR
REINA ANA STREET #163
GUAYNABO, PR 00969

December 02, 2009

### ACKNOWLEDGEMENT OF RECEIPT OF PROOF OF CLAIM

This letter serves as acknowledgement that the claim identified below has been recorded by Epiq Bankruptcy Solutions, LLC, the court-approved claims agent, on the claims register in the LEHMAN BROTHERS HOLDINGS INC. case. It is also publically available at the following website address: http://chapter11.epiqsystems.com/LBH. To ensure that your claim has been recorded correctly, please review the following information:

| | |
|---|---|
| Debtor: | LEHMAN BROTHERS HOLDINGS, INC. |
| Case Number: | 08-13555 |
| Creditor: | DE JESUS, NESTOR E |
| Date Received: | 09/23/2009 |
| Claim Number: | 34492 |

*Please note that nothing in this Acknowledgement should be construed to mean or imply that your claim is being allowed. The Debtor may elect to object to the identified claim on various grounds.*

We strongly encourage you to review your submitted proof of claim on our website at the address listed above. To find your imaged claim, click on the "Filed Claims & Schedules" link at the top of the page, type in your claim number in the "Claim #" field, and click "Search."

**WHEN REVIEWING YOUR CLAIM, PLEASE BE AWARE OF ANY PERSONALLY IDENTIFIABLE INFORMATION ("PII") SUBMITTED BY YOU.** PII can include information used to distinguish or trace an individual's identity, such as their social security number, biometric records, drivers license number, account number, credit or debit card number (including any passwords, acces codes or PIN numbers), etc., alone, or when combined with other personal or identifying information which is linked or linkable to a specific individual, such as date and place of birth, mother's maiden name,etc.

The Proof of Claim Form allows for redacted documents. If you identify any PII in your filed claim, please contact us immediately at (646) 282-2400 or via our contact form on our website at http://www.epiq11.com/contact.aspx so we may assist you in redacting this information. Please be sure to specify the client/debtor about which you are inquiring.

You may also contact by either of the methods listed above should you have any other questions.

**EPIQ BANKRUPTCY SOLUTIONS, LLC**

**de Jesus, Nestor E: Markets (NYK)**

| | |
|---|---|
| From: | Corporate Communications |
| Sent: | Monday, September 22, 2008 1:06 AM |
| Subject: | Lehman Brothers -- Update |
| Attachments: | FINAL_QA FOR LEHMAN EMPLOYEES.pdf |

## Corporate Communications | Lehman Brothers -- Update

*For internal use only. Do not redistribute.*

Early Saturday morning, the bankruptcy court approved Barclays Capital's proposed acquisition of Lehman Brothers Capital Markets, Investment Banking and Private Investment Management businesses in the U.S., Canada, Argentina and Uruguay. Both strategically and culturally, Barclays and Lehman Brothers are a great fit. The combined organization will offer tremendous opportunities across investment banking and capital markets.

As a result of court approval, employees in Fixed Income and Equities Sales, Trading and Research, Prime Services, Principal Investing, Investment Banking and Private Investment Management will be receiving offers to join Barclays Capital. Many of the employees in Corporate who support those businesses will also receive offers. These offers will be sent to employees' Lehman Brothers e-mail accounts shortly. Barclays Capital has committed to continue the support of Lehman Brothers Holdings Inc., including providing comprehensive access to those of you who can help maximize the value of Lehman Holdings' remaining assets.

All other employees will continue in their employment with Lehman Brothers and continue to receive ongoing salary, benefits and expense reimbursement. The corporate team will be invaluable to our creditors and other constituents as we work together to maximize value. For those who work in or support a number of our other operating businesses, including the Investment Management Division's Asset Management and Private Equity businesses, efforts continue to maximize the value of those businesses. We will be communicating further details in the coming days. You should continue to report to work as usual. No further action on your part is required to continue your employment with Lehman Brothers.

We understand that the past week has been extremely frustrating for many of you given your many questions and our inability to give prompt answers due to the court process for decisions related to the bankruptcy and the Barclays transaction. We look forward to answering your many questions in the coming days, and we commit to communicating with you as information becomes available. We appreciate your patience, professionalism, dedication and incredible efforts during this extremely challenging time.

Attached is a Q&A document designed to answer some of your immediate questions.

Visit the LehmanLive Global Homepage for an archive of significant announcements, news, Firm Fact Sheets and other Corporate Communications' materials.

6/25/2012