UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------- x
                           :

In re                           :        Chapter 11 Case No.
                           :

LEHMAN BROTHERS HOLDINGS INC., et al.,   :        08-13555 (SCC)
                           :

                     Debtors.     :        (Jointly Administered)
                           :
----------------------------------------------------------- x

**DECLARATION OF CLAIMANT DARIAN J. COHEN IN OPPOSITION
TO DEBTORS' FOURTEEN OMNIBUS OBJECTIONS SEEKING
TO RECLASSIFY OR SUBORDINATE COMPENSATION CLAIMS AS EQUITY**

     I, Darian J. Cohen, a claimant in the above captioned matter, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

1. I make this Declaration based on my personal knowledge and the documents available to me, and would testify to the best of my recollection about the following if called upon.  I submit this declaration in opposition to Lehman's One Hundred Seventy-Sixth Omnibus Objection.

2. I was employed by Lehman Brothers in the State of California, County of Los Angeles, between 1983 and 1994 as well as between November 1997 and Lehman's chapter 11 filing of bankruptcy petition on September 15, 2008.

3. I was paid a percentage (based on the "production grid") of my gross commissions in cash at the end of each month. However, Lehman deducted an amount based on annualized production and title to be withheld in the form of RSUs.

4. My participation in the unfunded RSU deferred compensation program was automatic and mandatory -- there were no election or enrollment forms to complete, I could not choose whether or not to participate or to limit the portion amount of my commissions designated as RSUs, and I had no ability to direct how the amounts that Lehman withheld would be used.

This RSU-designated portion was essentially a part of my earned compensation that Lehman forced me to wait five (5) years to *possibly* receive any value from.

5. At the end of each fiscal year, except 2008, Lehman kept that portion of my Total Sales Compensation that it had deducted/withheld on a monthly basis, denominated Equity Accrual Calculated, and instead gave me a deferred compensation credit in the form of restricted stock units ("RSUs") pursuant to its mandatory Equity Awards Program.

6. Lehman never obtained my express written authorization to deduct and withhold *specified* amounts of commissions from my payroll checks.

7. A portion of my earned commissions were nevertheless deducted from my monthly paychecks each month and withheld for the general benefit of Lehman, in an amount pre-determined by Lehman, and with the promise of granting RSUs at year-end (at Lehman's sole discretion) that would not convert to a true equity stake until five (5) years thereafter. Employees like me had no choice as to our participation.

8. Even after the vesting of the RSUs, there was no present right to the common stock, and I did not receive and was not permitted to sell the shares until (if at all) at least five (5) years after the RSU grant date.

9. When Lehman paid me the cash portion of my due commissions, Lehman reported it to the tax authorities as compensation income and I paid income tax on it through customary withholding.  While the RSU-designated portion of my commissions was earned simultaneously as part of the agreed-upon commissions, it was not reported to the tax authorities as my compensation income. With RSUs, I would have to pay tax at ordinary income rates on the market value of the shares Lehman issued to me upon their conversion five-years after being granted the RSUs.

2

10. Whether any portion of my Total Compensation would be paid in RSUs was completely within Lehman's discretion.

11. Pursuant to the terms of the RSU program, I recognized that I was contractually obligated to avoid engaging in any "Detrimental Activity" and that I had other ongoing contract obligations. As Lehman cautioned me in the program documents it provided, I had no rights as a stockholder until I became the record holder of stock, and as grantee of these deferred compensation devices called RSUs I had no better rights than those of a general creditor. Further, I had no ability to sell, assign, hedge, pledge or otherwise dispose of the RSUs. I had no rights but the contract rights of an employee whose compensation had been withheld.

12. Lehman objects that the RSUs gave employees a financial stake in the company. However, until the waiting period ended, the RSU plan documents made it clear that employees had only the rights of a general unsecured creditors and no rights as an equity-holder or stockholder.

13. What Lehman describes as a financial incentive to remain with the company was really Lehman's arbitrary assertion of financial control by withholding a large portion of my earned commissions and forcing me to forfeit my wages if we breached certain employment-related conditions Lehman had unilaterally imposed. I did not view the Lehman RSU as being designed for my benefit; it was simply Lehman's way of handcuffing employees to the firm. In other words, RSUs were designed to allow Lehman to penalize me if I left the firm in certain circumstances by forcing me to forfeit a portion of my earned commissions after not having given me any real equity in the company for at least the five (5) year-holding period. It goes without saying that RSUs were never a form of compensation I would have freely elected if given any choice in the matter.

3

14. I did not intend to be an investor in Lehman, or to take on the risk of losses or gains of owning Lehman equity, by seeking and continuing employment with Lehman. I did not join Lehman so that I could make a profit on its stock. My sole intention in taking and keeping my job was to provide labor and services in order to secure a good career and livelihood. Lehman's claim that I "originally intended" to treat the RSUs as equity in the firm is unsupported by any evidence and is simply not true. Lehman also told me I had no rights as a stockholder until I became the record holder of stock. I never had the intent to put my compensation at risk in a pseudo-investment instrument over which I had no control.

15. Lehman's representation that RSU holders had shareholder voting rights even before the stock was issued is incomplete and misleading. I do not recall being given the opportunity to vote related to any RSUs and was not advised about any documents relating to the shares reserved in trust. The Lehman Brief cites to a description of a trust established to hold an unspecified number of shares that would be voted "in proportion" to the number of RSUs the holder held. But Lehman never tells the Court here what it also never told the employees: What was the proportion of shares held by the Trust relative to the total outstanding RSUs (determining what fraction of a vote the purported RSU vote had, if any), when did an RSU come to have this purported voting right (*i.e.*, upon grant, upon vesting, or as amortized), and how was the RSU holder's vote solicited? Lehman's statement that holders of RSUs had voting rights is not supported by any explanation of how holders exercised these purported voting rights, if indeed they were exercised at all.

16. Lehman's claims that it "equated RSUs to common stock" and that if it had avoided bankruptcy "Claimants would have reaped the benefit" of any increase in the stock price is simply meaningless and disingenuous. What matters is what I had before the end of five-year waiting period. Lehman told me I had no rights as a stockholder and equated my rights

with those of a general creditor. When Lehman failed to "avoid bankruptcy," what I was left with was my contract right to the full commission value that Lehman had declared due to me.

17. Lehman recognized my rights as those of a contract creditor in its petition and schedules, where RSU agreements were listed as Executory Contracts under Schedule G. My claim was assigned Claim No. <u>16153</u> and corresponds to Schedule No. <u>555080090</u> according to the Epiq docket site "www.Lehman-Docket.com." A true and correct copy of the Proof of Claim that I filed in connection with my contract rights under the RSU Agreements is attached hereto as <u>Exhibit A</u>. Along with its bar date notice, Lehman provided me with this Proof of Claim form which it had largely pre-completed, including inserting the caption, supplying my name and address, and notifying me that I had a "Schedule G" claim for an "Executory Contract or Unexpired Lease." Lehman also stated on the form that the scheduled claim related to the "Restricted Stock Unit Agreement." I completed and filed the rest of the blanks on the form Lehman had sent and attached relevant employment records showing the amounts withheld from my commissions. Lehman acknowledged receipt of my Proof of Claim form upon my delivery to its claims agent. Lehman still owes me unpaid wages for services I rendered in the amount stated on this form. The amount claimed is supported by the compensation statements attached to the proof of claim form for the relevant period of my employment, based on the amounts withheld.

18. Stock options that Lehman issued to me worked in a completely different way than RSUs. At the time of the grant, I received what is recognized as a security in the form of the stock option. The option provided me with the choice whether to buy LBH shares at a fixed price, the exercise price. The time for exercise was not a fixed date, but a period of time between exercise and lapse during which I would make an investment decision to pay the exercise price, and I then would receive LBH shares. The timing of any exercise, and even the

decision *whether* to hold the option or exercise it, was solely my investment decision.  No comparable security was issued to me under the RSU Agreement.  With an RSU, there was a conversion and Lehman stock was simply issued to me at the end of the waiting period Lehman imposed, with no action on my part.  At no time did I exercise any choice or make any investment decision regarding the RSUs or the delivery, the timing of delivery, or the form of the underlying compensation. Upon exercise of stock options I also paid tax at ordinary income rates, but only on the difference between the current market value of the LBH shares at the time of exercise and the exercise price.

19. Lehman does not dispute that it retained me to perform services as an employee and that it received the benefit of my services.  Although I continued to work for Lehman in reliance on its promise to pay me the compensation it declared that I had earned, subsequent to the bankruptcy Lehman claims the unpaid withheld amount is somehow "equity," even though no true equity (like common stock) was ever issued and I had no rights as a holder of real equity in Lehman.

20. Lehman also never told me, either in its employment offer, equity awards plan, or any of its descriptions of the mandatory RSU program that if Lehman filed for bankruptcy, it could try to prevent me from at least receiving full payment of the earned commissions it had deducted and withheld from my paychecks.

21. Lehman and I entered into a settlement agreement in December 2013, in which they agreed to allow in part the 2008 portion my claim for which amounts were withheld but no RSUs were ever issued. The amount settled as an allowed claim is to be paid in the following amounts: $ 8,212.50 as a priority claim and $21,916.74 as a general unsecured claim. A true and correct copy of a screenshot of the settled and remaining balance of my claim, taken from the public Epiq docket site, is attached hereto as <u>Exhibit B.</u>

22. Because the RSUs remained a debt obligation to pay withheld wages until they actually converted to real equity like Lehman stock, and the fact that the remaining amount of my claim is for amounts withheld as RSUs that never did convert to Lehman stock, I believe the remaining balance remains a general unsecured claim. I maintain my rights to be paid as a general unsecured creditor under the wage laws of the State of California.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: March 4, 2014

_____
Signature

_____
Printed Name

7

# Exhibit A

**United States Bankruptcy Court/Southern District of New York**

Lehman Brothers Holdings Claims Processing Center
c/o Epiq Bankruptcy Solutions, LLC
FDR Station, P.O. Box 5076
New York, NY 10150-5076

# PROOF OF CLAIM

| In Re: | Chapter 11 |
|---|---|
| Lehman Brothers Holdings Inc., et al.<br>Debtors. | Case No. 08-13555 (JMP)<br>(Jointly Administered) |
| Name of Debtor Against Which Claim is Held<br>LEHMAN BROTHERS HOLDINGS, INC. | Case No. of Debtor<br>08-13555 (JMP) |

UNIQUE IDENTIFICATION NUMBER: 555080090

Filed: USBC - Southern District of New York
Lehman Brothers Holdings Inc., Et Al.
08-13555 (JMP)        0000016153

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503. Additionally, this form should not be used to make a claim for Lehman Programs Securities (See definition on reverse side.)

Name and address of Creditor: (and name and address where notices should be sent if different from Creditor)

LBH (MERGE2.DBF,SCHED_NO) SCHEDULE #: 555080090*****
DARIAN J., COHEN
5035 WAGNER WAY
OAK PARK, CA 91377

Telephone number: 818-632-4123  Email Address: sbcglobal.net
*Dariane*

☐ Check this box to indicate that this claim amends a previously filed claim.

Court Claim Number: _____
*(If known)*

Filed on: _____

**NOTICE OF SCHEDULED CLAIM:**
Your Claim is scheduled by the indicated Debtor as:

SCHEDULE G - EXECUTORY CONTRACT OR UNEXPIRED LEASE

DESCRIPTION:
RESTRICTED STOCK UNIT AGREEMENT

Name and address where payment should be sent (if different from above)

Telephone number: _____  Email Address: _____

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check this box if you are the debtor or trustee in this case.

1. **Amount of Claim as of Date Case Filed:** $ 428,550

If all or part of your claim is secured, complete item 4 below; however, if all of your claim is unsecured, do not complete item 4.
If all or part of your claim is entitled to priority, complete item 5.
If all or part of your claim qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9), complete item 6.

☐ Check this box if all or part of your claim is based on a Derivative Contract.*
☐ Check this box if all or part of your claim is based on a Guarantee.*

*IF YOUR CLAIM IS BASED ON AMOUNTS OWED PURSUANT TO EITHER A DERIVATIVE CONTRACT OR A GUARANTEE OF A DEBTOR, YOU MUST ALSO LOG ON TO http://www.lehman-claims.com AND FOLLOW THE DIRECTIONS TO COMPLETE THE APPLICABLE QUESTIONNAIRE AND UPLOAD SUPPORTING DOCUMENTATION OR YOUR CLAIM WILL BE DISALLOWED.

☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of interest or additional charges. Attach itemized statement of interest or charges to this form or on http://www.lehman-claims.com if claim is a based on a Derivative Contract or Guarantee.

2. **Basis for Claim:** Services performed / sales comp
(See instruction #2 on reverse side.)

3. **Last four digits of any number by which creditor identifies debtor:** 0282
3a. **Debtor may have scheduled account as:** _____
(See instruction #3a on reverse side.)

4. **Secured Claim** (See instruction #4 on reverse side.)
Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.
Nature of property or right of setoff: ☐ Real Estate  ☐ Motor Vehicle  ☐ Other
Describe: _____
Value of Property: $_____  Annual Interest Rate _____%
Amount of arrearage and other charges as of time case filed included in secured claim, if any:
$_____  Basis for perfection: _____
**Amount of Secured Claim:** $_____  **Amount Unsecured:** $_____

6. **Amount of Claim that qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9):** $_____
(See instruction #6 on reverse side.)

5. **Amount of Claim Entitled to Priority under 11 U.S.C. §507(a). If any portion of your claim falls in one of the following categories, check the box and state the amount.**

Specify the priority of the claim:

☐ Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries or commissions (up to $10,950), earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(4).

☑ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(5).

☐ Up to $2,425 of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(7).

☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).

☐ Other – Specify applicable paragraph of 11 U.S.C. § 507(a)(___).

**Amount entitled to priority:**

$_____

7. **Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim.
8. **Documents:** Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages and security agreements. Attach redacted copies of documents providing evidence of perfection of a security interest. (See definition of "redacted" on reverse side.) If the documents are voluminous, attach a summary.
DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.
If the documents are not available, please explain:

FOR COURT USE ONLY

**FILED / RECEIVED**

SEP 18 2009

EPIQ BANKRUPTCY SOLUTIONS, LLC

| Date:<br>9/17/09 | Signature: The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any.<br>*Darian Coh* |
|---|---|

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

To Whom It May Concern:                                    Sept. 17, 2009

Enclosed is documentation supporting my claim of $428,550.00 as an unsecured general creditor of Lehman Brothers Holding. This amount is derived from the attached documents as follows:

- $336,927 "grant value" of award units from 12/10/2003 to 7/28/2008.
- $51,451 "grant value" of stock options from 12/3/2001 to 12/10/2003.
- $40,172 withheld from my compensation in 2008 yet to be contributed to the Plan. ($58,311 total less $18,139 granted on 7/1/2008).

 The above amount was withheld from my compensation for purposes of contributing to the Lehman Brothers Holdings Stock Incentive Plan, a non-qualified deferred compensation plan. (see enclosures). The plan documents make it clear that the plan is "unfunded" and that participants have no rights other than those of "a general creditor". (page 11, section 8).

Since the plan was unfunded and non-qualified, participants are unsecured general creditors of Lehman Brothers Holdings.

Regards,

Darian Cohen
5035 Wagner Way
Oak Park, CA. 91377
818-631-4123

LEHMAN BROTHERS | LehmanLive

## Personal Award Summary

Equity Award Program  RSUs  CSAs  CEAs  Stock Options  Award Documents  Glossary  Personal Award Summary

### LEHMAN BROTHERS | LehmanLive

**Data as of July 10, 2008**

### AWARD UNITS[1] OUTSTANDING

| Grant Date | Description | Grant Price | Grant Value[2] | Restriction Ends | Units Granted | Dividend Equivalents | Units Delivered |
|---|---|---|---|---|---|---|---|
| 07/01/2008 | July 2008 IR RSU | $20.9600 | $18,139 | 11/30/2011 | 865.39 | 0.00 | 0.00 |
| 12/07/2007 | 2007 IR SVP Principal | $47.6000 | $76,874 | 11/30/2012 | 1,614.99 | 12.69 | 0.00 |
| 12/07/2007 | 2007 IR SVP Discount | $47.6000 | $25,625 | 11/30/2012 | 538.33 | 4.25 | 0.00 |
| 12/08/2006 | 2006 IR SVP Principal | $57.7700 | $59,067 | 11/30/2011 | 1,022.45 | 17.12 | 0.00 |
| 12/08/2006 | 2006 IR SVP Discount | $57.7700 | $19,689 | 11/30/2011 | 340.82 | 5.70 | 0.00 |
| 11/30/2005 | 2005 IR SVP Principal | $47.2500 | $37,891 | 11/30/2010 | 801.92 | 19.05 | 0.00 |
| 11/30/2005 | 2005 IR SVP Discount | $47.2500 | $12,630 | 11/30/2010 | 267.30 | 6.30 | 0.00 |
| 12/09/2004 | 2004 IR SVP Principal | $32.1750 | $40,592 | 11/30/2009 | 1,261.60 | 40.22 | 0.00 |
| 12/09/2004 | 2004 IR SVP Discount | $32.1750 | $13,530 | 11/30/2009 | 420.52 | 13.50 | 0.00 |
| 12/10/2003 | 2003 IR SVP Principal | $26.7700 | $24,667 | 11/30/2008 | 921.46 | 37.04 | 0.00 |
| 12/10/2003 | 2003 IR SVP Discount | $26.7700 | $8,223 | 11/30/2008 | 307.16 | 12.60 | 0.00 |
| | **Total** | | **$336,927** | | **8,361.94** | **168.47** | **0.00** |

### STOCK OPTIONS OUTSTANDING

| Grant Date | Description | Exercise Price | Black-Scholes Grant Price | Expiration Date | Black-Scholes Grant Value | Options Granted | Options Exercised | E |
|---|---|---|---|---|---|---|---|---|
| 12/10/2003 | 2003 IR SVP Options | $35.6950 | $10.4200 | 11/29/2013 | $10,941 | 1,050 | 0 | |
| 12/11/2002 | 2002 IR SVP Options | $27.2100 | $9.1250 | 11/29/2012 | $25,586 | 2,804 | 0 | |
| 12/03/2001 | December 2001 SVP Options | $31.7000 | $10.5100 | 11/29/2011 | $14,924 | 1,420 | 0 | |
| | **Total** | | | | **$51,451** | **5,274** | **0** | |
| **Total Equity** | | | | | | | | |

* Market value refers to the value of the underlying Lehman Brothers Holdings Inc. shares at the indicated stock price. The intrinsic value of sto
number of options outstanding by the difference between the indicated stock price and the option exercise price. Please note that the current m
minutes feed from Reuters. (04:02 PM EDT on July 28 2008)

[1] Award Units are those equity-based awards other than stock options, i.e. Restricted Stock Units, Conditional Equity Awards or Contingent Sto
[2] Grant Value refers to the value of the underlying Lehman Brothers Holdings Inc. shares at the indicated grant price.
[3] Units Vested refers to that portion of the award that has become vested and/or subject to limited conditions, as determined under the applicat

http://my.lehman.com/HRS/equityaward/vestinghouse.do

Personal Award Summary

# LEHMAN BROTHERS | LehmanLive

Data as of July 10, 2008

10068365 Darian J. Cohen

## AWARD UNITS¹ OUTSTANDING

| Grant Date | Description | Grant Price | Grant Value² | Restriction Ends | Units Granted | Dividend Equivalents | Units Delivered | Units Vested³ | Units Outstanding | Market Value at $17.62⁴ |
|---|---|---|---|---|---|---|---|---|---|---|
| 07/01/2008 | July 2008 IR RSU | $20.9600 | $18,139 | 11/30/2011 | 865.39 | 0.00 | 0.00 | 0.00 | 865.39 | $15,248 |
| 12/07/2007 | 2007 IR SVP Principal | $47.6000 | $76,874 | 11/30/2012 | 1,614.99 | 12.69 | 0.00 | 0.00 | 1,627.68 | $28,680 |
| 12/07/2007 | 2007 IR SVP Discount | $47.6000 | $25,625 | 11/30/2012 | 538.33 | 4.25 | 0.00 | 0.00 | 542.58 | $9,560 |
| 12/08/2006 | 2006 IR SVP Principal | $57.7700 | $59,067 | 11/30/2011 | 1,022.45 | 17.12 | 0.00 | 0.00 | 1,039.57 | $18,317 |
| 12/08/2006 | 2006 IR SVP Discount | $57.7700 | $19,689 | 11/30/2011 | 340.82 | 5.70 | 0.00 | 0.00 | 346.52 | $6,106 |
| 11/30/2005 | 2005 IR SVP Principal | $47.2500 | $37,891 | 11/30/2010 | 801.92 | 19.05 | 0.00 | 0.00 | 820.97 | $14,465 |
| 11/30/2005 | 2005 IR SVP Discount | $47.2500 | $12,630 | 11/30/2010 | 267.30 | 6.30 | 0.00 | 0.00 | 273.60 | $4,821 |
| 12/09/2004 | 2004 IR SVP Principal | $32.1750 | $40,592 | 11/30/2009 | 1,261.60 | 40.22 | 0.00 | 1,301.82 | 1,301.82 | $22,938 |
| 12/09/2004 | 2004 IR SVP Discount | $32.1750 | $13,530 | 11/30/2009 | 420.52 | 13.50 | 0.00 | 434.02 | 434.02 | $7,647 |
| 12/10/2003 | 2003 IR SVP Principal | $26.7700 | $24,667 | 11/30/2008 | 921.46 | 37.04 | 0.00 | 958.50 | 958.50 | $16,889 |
| 12/10/2003 | 2003 IR SVP Discount | $26.7700 | $8,223 | 11/30/2008 | 307.16 | 12.60 | 0.00 | 319.76 | 319.76 | $5,634 |
| **Total** | | | **$336,927** | | **8,361.94** | **168.47** | **0.00** | **3,081.29** | **8,530.41** | **$150,305** |

## STOCK OPTIONS OUTSTANDING

| Grant Date | Description | Exercise Price | Black-Scholes Grant Price | Expiration Date | Black-Scholes Grant Value | Options Granted | Options Exercised | Options Exercisable | Options Outstanding | Intrinsic Value at $17.62⁴ |
|---|---|---|---|---|---|---|---|---|---|---|
| 12/10/2003 | 2003 IR SVP Options | $35.6950 | $10.4200 | 11/29/2013 | $10,941 | 1,050 | 0 | 788 | 1,050 | $0 |
| 12/11/2002 | 2002 IR SVP Options | $27.2100 | $9.1250 | 11/29/2012 | $25,586 | 2,804 | 0 | 2,804 | 2,804 | $0 |
| 12/03/2001 | December 2001 SVP Options | $31.7000 | $10.5100 | 11/29/2011 | $14,924 | 1,420 | 0 | 1,420 | 1,420 | $0 |
| **Total** | | | | | **$51,451** | **5,274** | **0** | **5,012** | **5,274** | **$0** |

**Total Equity** $150,305

¹Award Units are those equity-based awards other than stock options, i.e. Restricted Stock Units, Conditional Equity Awards or Contingent Stock Awards, as applicable.

²Grant Value refers to the value of the underlying Lehman Brothers Holdings Inc. shares at the indicated grant price.

³Units Vested refers to that portion of the award that has become vested and/or subject to limited conditions, as determined under the applicable plan documents.

⁴Market Value refers to the value of the underlying Lehman Brothers Holdings Inc. shares at the indicated stock price. The intrinsic value of stock options is calculated by multiplying the number of options outstanding by the difference between the indicated stock price and the option exercise price. Please note that the current market price is based on a delayed 20 minutes feed from Reuters. (09:55 AM EDT on July 30 2008)

- Main Menu
- Branch Reports
- Sales Person Explorer
- Revenue and Summary Reports
- Compensation Statements
- Customer Reports
- Trade Search
- Product Summary
- Pay Grid Summary
- Net Adjustment Reports
- KMMM History
- Client Tier Analysis
- Master File Explorer
- Tutorial
- About
- Logout

## Compensation Statement

Name: 10068365 - DARIAN J COHEN
From: 12/1/2007 To: 11/30/08
Future payout trades

Find: GSID ▾ | 10068365 | Get | Get in Excel
Fiscal year: 2008 | ☐ Show as of before EOM

Sales Org: -----10068365 DARIAN J COHEN

Select Report : | ---Select An Action--- ▾ | Go!

| Year Total | | 9/2008 | 8/2008 | 7/2008 | 6/2008 | 5/2008 | 4/2008 | 3/2008 | 2/2008 | 1/2 |
|---|---|---|---|---|---|---|---|---|---|---|
| 1,129,0294 | Gross Production | 42,439.52 | 27,191.13 | 147,679.36 | 56,540.91 | 152,680.60 | 151,090.70 | 181,685.40 | 28,401.95 | 152,1 |
| 435,673.14 | Net Production | 14,318.46 | 27,382.46 | 59,247.52 | 48,638.13 | 60,354.02 | 58,472.01 | 40,572.32 | 60.92 | |
| 20.66 | Retro Net Production | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 35.25 | Average Rate (%) | 33.74 | 35.47 | 40.12 | 31.81 | 32.06 | 39.95 | 32.18 | 31.60 | |
| | Prior Months Deficit/Overage | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | 4 |
| -7,234.45 | Adj to Net Production | 0.00 | 0.00 | -1,371.85 | 0.00 | 0.00 | 925.15 | -3,172.17 | 0.00 | -1.51 |
| 0.00 | Monthly Payout Balance | 14,318.46 | 27,382.46 | 57,875.67 | 48,929.51 | 61,279.07 | 55,299.84 | 40,572.32 | 59.40 |
| 0.00 | Draw Amount | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 408,469.35 | Total Sales Compensation | 14,318.46 | 27,382.46 | 57,875.67 | 48,929.51 | 61,279.07 | 55,299.84 | 40,572.32 | 50.03 |
| 335,839.94 | Cash Commissions | 24,678.25 | 48,158.02 | 17,441.21 | 50,778.71 | 46,174.62 | 34,834.44 | 50.03 | |
| | Equity Accrual Calculated | 0.00 | 9,717.65 | 542.50 | 10,500.46 | 9,125.21 | 5,737.88 | | |
| 394,150.89 | Recorded Total Sales Compensation | 27,382.47 | 2,704.22 | 57,983.71 | 48,929.51 | 61,279.17 | 55,299.83 | 40,572.32 | 59.40 |
| 58,310.96 | Deficit/Overage | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 59.40 | 9.36 |

# ALL TERMS REMAIN SUBJECT TO THE RULING OF THE U.S. BANKRUPTCY COURT***

## LEHMAN BROTHERS

### Executive Compensation Summary

### Darian J. Cohen

Employee ID:    10068365

### AWARD UNITS*

| Grant Date | Plan Description | Units Granted | Dividend Equivalents | Units Vested** | Units Unvested | Units Outstanding | Units Forfeited | Units Not Forfeited |
|---|---|---|---|---|---|---|---|---|
| December 10, 2003 | 2003 IR SVP Principal | 921.46 | 49.16 | 970.62 | 0.00 | 970.62 | 0.00 | 970.62 |
| December 10, 2003 | 2003 IR SVP Discount | 307.16 | 16.65 | 0.00 | 323.81 | 323.81 | 0.00 | 323.81 |
| December 09, 2004 | 2004 IR SVP Principal | 1,261.60 | 56.67 | 1,318.27 | 0.00 | 1,318.27 | 0.00 | 1,318.27 |
| December 09, 2004 | 2004 IR SVP Discount | 420.52 | 19.00 | 0.00 | 439.52 | 439.52 | 0.00 | 439.52 |
| November 30, 2005 | 2005 IR SVP Principal | 801.92 | 29.43 | 831.35 | 0.00 | 831.35 | 0.00 | 831.35 |
| November 30, 2005 | 2005 IR SVP Discount | 267.30 | 9.75 | 0.00 | 277.05 | 277.05 | 0.00 | 277.05 |
| December 08, 2006 | 2006 IR SVP Principal | 1,022.45 | 30.26 | 1,052.71 | 0.00 | 1,052.71 | 0.00 | 1,052.71 |
| December 08, 2006 | 2006 IR SVP Discount | 340.82 | 10.10 | 0.00 | 350.92 | 350.92 | 0.00 | 350.92 |
| December 07, 2007 | 2007 IR SVP Principal | 1,614.99 | 33.26 | 0.00 | 1,648.25 | 1,648.25 | 0.00 | 1,648.25 |
| December 07, 2007 | 2007 IR SVP Discount | 538.33 | 11.10 | 0.00 | 549.43 | 549.43 | 0.00 | 549.43 |
| July 01, 2008 | July 2008 IR RSU | 865.39 | 10.95 | 0.00 | 876.34 | 876.34 | 0.00 | 876.34 |
| | | | | | | 8,638.27 | 0.00 | 8,638.27 |

### STOCK OPTIONS

| Grant Date | Description | Exercise Price | Options Granted | Options Outstanding | Options Exercisable | Current Expiration Date | Options Cancelled | Options Not Cancelled |
|---|---|---|---|---|---|---|---|---|
| December 03, 2001 | December 2001 IR SVP Options | $31.7000 | 1,420 | 1,420 | 1,420 | November 29, 2011 | 0 | 1,420 |
| December 11, 2002 | 2002 IR SVP Options | $27.2100 | 2,804 | 2,804 | 2,804 | November 29, 2012 | 0 | 2,804 |
| December 10, 2003 | 2003 IR SVP Options | $35.6950 | 1,050 | 1,050 | 788 | November 29, 2013 | 0 | 1,050 |
| | | | 5,274 | 5,012 | | | 0 | 5,274 |

*Award Units are those equity-based awards other than stock options, i.e. Restricted Stock Units, Conditional Equity Awards or Contingent Stock Awards, as applicable.

**Units Vested refers to that portion of the award that has become vested and/or subject to limited conditions, as determined under the applicable plan documents.

***AS A RESULT OF LEHMAN BROTHERS HOLDINGS INC.'S BANKRUPTCY FILING, THE TREATMENT OF ALL OUTSTANDING EQUITY AWARDS REMAIN SUBJECT TO SUCH PROCEEDING IN THE U.S. BANKRUPTCY COURT.

Data as of September 12, 2008

Prepared on September 15, 2009

*As amended November 8, 2007*

### LEHMAN BROTHERS HOLDINGS INC.

### 2005 STOCK INCENTIVE PLAN

1) **Purpose of the Plan**

The purpose of the Plan is to aid the Company and its Affiliates in recruiting and retaining employees, directors and consultants and to motivate such employees, directors and consultants to exert their best efforts on behalf of the Company and its Affiliates by providing incentives through the granting of Awards. The Company expects that it will benefit from the added interest which such employees, directors and consultants will have in the welfare of the Company as a result of their proprietary interest in the Company's success.

2) **Definitions**

The following capitalized terms used in the Plan have the respective meanings set forth in this Section:

(a) *"Act"* means The Securities Exchange Act of 1934, as amended, or any successor thereto.

(b) *"Affiliate"* means any entity that is consolidated with the Company for financial reporting purposes or any other entity designated by the Board in which the Company or an Affiliate has a direct or indirect interest of at least twenty-five percent (25%).

(c) *"Award"* means an Option, Stock Appreciation Right or Other Stock-Based Award granted pursuant to the Plan.

(d) *"Award Agreement"* means the written document or documents by which each Award is evidenced.

(e) *"Board"* means the Board of Directors of the Company.

(f) *"Change in Control"* means, with respect to any Award granted on or prior to November 8, 2007, the occurrence of any of the following events:

(i) The occurrence of an event described in paragraph (ii), (iii), (iv), (v) or (vi) below involving any entity (or an affiliate thereof) which had previously commenced (within the meaning of Rule 14d-2 under the Act), without the approval of the Board, a tender offer for shares having more than 20% of the combined voting power of the Company's outstanding shares of capital stock having ordinary voting power in the election of directors of the Company (the "Voting Securities");

(ii) An acquisition (other than directly from the Company) of any Voting Securities by any "Person" (as the term "person" is used for purposes of Section 13(d) or 14(d) of the Act) immediately after which such Person has "Beneficial Ownership" (within the meaning of Rule 13d-3 promulgated under the Act) of 20% or more of the combined voting power of the Company's then outstanding Voting Securities; provided, however, in determining whether a Change in Control has occurred, Voting Securities which are acquired in a "Non-Control Acquisition" (as hereinafter defined) shall not constitute an acquisition which would cause a Change in Control. A "Non-Control Acquisition" shall mean an acquisition by (A) an employee benefit plan (or a trust forming a part thereof or a trustee thereof acting solely in its capacity as trustee) maintained by (I) the Company or (II) any corporation or other Person of which a majority of its voting power or its voting equity securities or equity interest is owned, directly or indirectly, by the Company (for purposes of this definition, a "Subsidiary Entity"), (B) the Company or any of its Subsidiary Entities, or (C) any Person who files in connection with such acquisition a Schedule 13D which expressly disclaims any intention to seek control of the Company and does not expressly reserve the right to seek such control; provided,

however, that any amendment to such statement of intent which either indicates an intention or reserves the right to seek control shall be deemed an "acquisition" of the securities of the Company reported in such filing as beneficially owned by such Person for purposes of this paragraph (ii);

(iii) The individuals who, as of the Effective Date, are members of the Board (the "Incumbent Board"), ceasing for any reason to constitute at least a majority of the members of the Board; provided, however, that if the election, or nomination for election by the Company's common stockholders, of any new director was approved by a vote of at least two-thirds of the Incumbent Board, such new director shall, for purposes of this Plan, be considered as a member of the Incumbent Board; provided further, however, that no individual shall be considered a member of the Incumbent Board if such individual initially assumed office as a result of either an actual or threatened election contest or other actual or threatened solicitation of proxies or consents by oro n behalf of a Person other than the Board (in each case, a "Proxy Contest") including by reason of any agreement intended to avoid or settle any Proxy Contest;

(iv) A merger, consolidation, recapitalization or reorganization involving the Company, unless such merger, consolidation or reorganization is a "Non-Control Transaction"; i.e., meets each of the requirements described in subparagraphs (A), (B) and (C) below:

(A) the stockholders of the Company, immediately before such merger, consolidation, recapitalization or reorganization, own, directly or indirectly, immediately following such merger, consolidation, recapitalization or reorganization, at least 50% of the combined voting power of the outstanding voting securities of the Company, the corporation resulting from such merger or consolidation, recapitalization or reorganization, or any parent thereof (the "Surviving Corporation") in substantially the same proportion as their ownership of the Voting Securities immediately before such merger, consolidation, recapitalization or reorganization;

(B) the individuals who were members of the Incumbent Board immediately prior to the execution of the agreement providing for such merger, consolidation, recapitalization or reorganization constitute at least 50% of the members of the board of directors of the Surviving Corporation immediately following the consummation of such merger, consolidation, recapitalization or reorganization; and

(C) no Person other than the Company, any Subsidiary Entity, any employee benefit plan (or any trust forming a part thereof or a trustee thereof acting solely in its capacity as trustee) maintained by the Company, the Surviving Corporation, or any Subsidiary Entity, or any Person who, immediately prior to such merger, consolidation, recapitalization or reorganization had Beneficial Ownership of 20% or more of the then outstanding Voting Securities has Beneficial Ownership of 20% or more of the combined voting power of the Surviving Corporation's then outstanding voting securities immediately following the consummation of such merger, consolidation, recapitalization or reorganization;

(v) A complete liquidation or dissolution of the Company;

(vi) Sale or other disposition of all or substantially all of the assets of the Company to any Person (other than a transfer to a Subsidiary Entity); or

(vii) An event that would constitute a "Change in Control" within the meaning of Section 2(g).

Notwithstanding the foregoing, a Change in Control shall not be deemed to occur solely because any Person (the "Subject Person") acquired Beneficial Ownership of more than the permitted percentage set forth in paragraph (ii) or subparagraph (iv)(A) or (C) above, as applicable, of the outstanding Voting Securities as a result of the acquisition of Voting Securities by the Company which, by reducing the number of Voting Securities outstanding, increases the proportional number of shares Beneficially Owned by the Subject Persons, provided that if a Change in Control would occur (but for the operation of this sentence) as a result of the acquisition of Voting

2

Securities by the Company, and thereafter such Beneficial Owner acquires any additional Voting Securities which increases the percentage of the then outstanding Voting Securities Beneficially Owned by the Subject Person, then a Change in Control shall occur.

A "Hostile Change in Control" shall mean the occurrence of an event as contemplated in paragraph (i) above. A "Friendly Change in Control" shall mean any Change in Control that is not a Hostile Change in Control.

(g) *"Change in Control"* means, with respect to any Award granted after November 8, 2007, the occurrence of any of the following events:

  (i) An acquisition (other than directly from the Company, but includingan y acquisition in connection with any merger, consolidation, recapitalization or reorganization involving the Company) of the Company's outstanding shares of capital stock having ordinary voting power in the election of directors ("Voting Securities") by any "Person" (as the term "person" is used for purposes of Section 13(d) or 14(d) of the Exchange Act) immediately after which such Person has "Beneficial Ownership"(wi thin the meaning of Rule 13d-3 promulgated under the Exchange Act) of 70% or more of the combined voting power of the Company's then outstanding Voting Securities; provided, however, in determining whether a Change in Control has occurred, Voting Securities that are acquired in a "Non-Control Acquisition" (as hereinafter defined) shall not constitute an acquisition that would cause a Change in Control. A "Non-Control Acquisition" shall mean an acquisition by (A) an employee benefit plan (or a trust forminga part thereof or a trustee thereof acting solely in its capacity as trustee) maintained by (I) the Company or (II) any corporation or other Person of which a majority of its voting power or its voting equity securities or equity interest is owned, directly or indirectly, by the Company (for purposes of this definition, a "Subsidiary Entity"), (B) the Company or any of its Subsidiary Entities, or (C) any Person who files in connection with such acquisition a Schedule 13D that expressly disclaims any intention to seek control of the Company and does not expressly reserve the right to seek such control; provided, however, that any amendment to such statement of intent that either indicates an intention orres erves the right to seek control shall be deemed an "acquisition" of the securities of the Company reported in such filing as beneficially owned by such Person for purposes of this paragraph (i);

  (ii) Any merger, consolidation, recapitalization or reorganization involving the Company, unless such merger, consolidation, recapitalization or reorganization is a "Non-Control Transaction"; i.e., meets each of the requirements described in subparagraphs (A), (B) and (C) below:

    (A) the stockholders of the Company, immediately before such merger, consolidation, recapitalization or reorganization, own, directly or indirectly, immediately following such merger, consolidation, recapitalization or reorganization, at least 30% of the combined voting power of the outstanding voting securities of the Company, the corporation resulting from such merger, consolidation, recapitalization or reorganization, or any parent thereof (the "Surviving Corporation") in substantially the same proportion as their ownership of the Voting Securities immediately before such merger, consolidation, recapitalization or reorganization;

    (B) the individuals who were members of the Board immediately prior to the execution of the agreement providing for such merger, consolidation, recapitalization or reorganization constitute at least 50% of the members of the board of directors of the Surviving Corporation immediately following the consummation of such merger, consolidation, recapitalization or reorganization; and

    (C) no Person other than the Company, any Subsidiary Entity, any employee benefit plan (or any trust forming a part thereof or a trustee thereof acting solely in its capacity as trustee) maintained by the Company, the Surviving Corporation, or any Subsidiary Entity, or any Person who, immediately prior to such merger, consolidation, recapitalization or

3

reorganization had Beneficial Ownership of 70% or more of the then outstanding Voting Securities has Beneficial Ownership of 70% or more of the combined voting power of the Surviving Corporation's then outstanding voting securities immediately following the consummation of such merger, consolidation, recapitalization or reorganization;

(iii)  Replacement within a consecutive twelve month period of a majority of the individuals who are members of the Board with individuals ("Replacement Board Members") who do not receive endorsement by a majority of the Board before the date of the appointment or election of such Replacement Board Member; or

(iv)  Sale or other disposition (other than a transfer to a Subsidiary Entity) of all or substantially all of the assets of the Company to any Person, or any Person acquires such amount of assets in any consecutive twelve-month period ending on the most recent acquisition by such Person.

Notwithstanding the foregoing, a Change in Control shall not be deemed to occur solely because any Person (the "Subject Person") acquired Beneficial Ownership of more than the permitted percentage set forth in paragraph (i) of the outstanding Voting Securities as a result of the acquisition of Voting Securities by the Company that, by reducing the number of Voting Securities outstanding, increases the proportional number of shares Beneficially Owned by the Subject Person, provided that if a Change in Control would occur (but for the operation of this sentence) as a result of the acquisition of Voting Securities by the Company, and thereafter such Subject Person acquires any additional Voting Securities which increases the percentage of the then outstanding Voting Securities Beneficially Owned by the Subject Person, then a Change in Control shall occur.  In addition, notwithstanding the foregoing a Change in Control shall not be deemed to occur unless such transaction or occurrence constitutes a change in ownership or effective control within the meaning of Section 409A(a)(2)(A)(v) of the Code.

(h)  *"Code"* means the Internal Revenue Code of 1986, as amended, or any successor thereto.

(i)  *"Committee"* means the Compensation and Benefits Committee of the Board.

(j)  *"Company"* means Lehman Brothers Holdings Inc.

(k)  *"Dividend Equivalent Right"* means a dividend equivalent right granted under the Plan, which represents an unfunded and unsecured promise to pay to the Participant amounts equal to all or any portion of the regular cash dividends that would be paid on Shares covered by an Award if such shares were delivered pursuant to an Award.

(l)  *"Effective Date"* means May 1, 2005.

(m)  *"Employment"* means (i) a Participant's employment if the Participant is an employee of the Company or any of its Affiliates, (ii) a Participant's services as a consultant, if the Participant is consultant to the Company or any of its Affiliates and (iii) a Participant's services as a Non-Employee Director, if the Participant is a non-employee member of the Board; provided however that unless otherwise determined by the Committee, a change in a Participant's status from employee to non-employee (other than a director of the Company or an Affiliate) shall constitute a termination of employment hereunder. For purposes of the Plan, unless the Committee determines otherwise: (a) a transfer of a Participant's employment, without an intervening period of separation, between the Company and any Affiliate shall not be deemed a termination of employment, and (b) a Participant who is granted in writing a leave of absence shall be deemed to have remained in the employ of the Company during such leave of absence.

(n)  *"Fair Market Value"* means, on a given date, (i) if there should be a public market for the Shares on such date, the closing price of the Shares on the New York Stock Exchange, or, if the Shares are not listed or admitted on any national securities exchange, the arithmetic mean of the per Share closing bid price and per Share closing asked price on such date as quoted on the National Association of Securities Dealers Automated Quotation System (or such market in which such

4

prices are regularly quoted) (the "NASDAQ"), or, if no sale of Shares shall have been reported on the New York Stock Exchange or quoted on the NASDAQ on such date, then the immediately preceding date on which sales of the Shares have been so reported or quoted shall be used, and (ii) if there should not be a public market for the Shares on such date, the Fair Market Value shall be the value established by the Committee in good faith and, in the case of an ISO, in accordance with Section 422 of the Code.

(o)  *"ISO"* means an Option that is also an incentive stock option granted pursuant to Section 5(d).

(p)  *"Non-Employee Director"* means a director of the Company who is not an employee of the Company or a Subsidiary.

(q)  *"Option"* means (i) a non-qualified stock option or (ii) an ISO, as applicable, granted pursuant to Section 5.

(r)  *"Option Price"* means the purchase price per Share of an Option, as determined pursuant to Section 5(a).

(s)  *"Other Stock-Based Award"* means an award granted pursuant to Section 7.

(t)  *"Participant"* means an employee, prospective employee, director or consultant of the Company or an Affiliate who is selected by the Committee to participate in the Plan.

(u)  *"Performance-Based Award"* means an Other Stock-Based Award granted pursuant to Section 7(c).

(v)  *"Plan"* means the Lehman Brothers Holdings Inc. 2005 Stock Incentive Plan, as amended from time to time.

(w)  *"Shares"* means shares of common stock of the Company.

(x)  *"Stock Appreciation Right"* means a stock appreciation right granted pursuant to Section 6.

(y)  *"Subsidiary"* means a subsidiary corporation, as defined in Section 424(f) of the Code (or any successor section thereto), of the Company.

3)  **Shares Subject to the Plan**

(a)  The total number of Shares that may be issued under the Plan is ninety-five (95) million, plus the number of Shares calculated as set forth in subsection (c) below, subject to adjustment as provided in Section 9. Shares of Common Stock issued under the Plan may be authorized but unissued shares or authorized and issued shares held in the Company's treasury, or any combination thereof. No participant may be granted Options, Stock Appreciation Rights or Other Stock-Based Awards covering in excess of four million Shares in any fiscal year of the Company, and the maximum number of Shares that may be subject to Awards that are ISOs is twenty (20) million, subject to adjustment as provided in Section 9.

(b)  In calculating the number of Shares remaining available for grants of Awards at any given time during the term of the Plan, the following rules shall apply:

(i)  the number of Shares remaining for issuance shall be reduced by the number of outstanding Awards that consist of, or that are payable in Shares;

(ii)  the number of Shares remaining for issuance shall be increased by the number of Shares withheld or tendered (by actual delivery or attestation) to pay the exercise price of an Option

5

and by the number of shares withheld from any grant of Awards to satisfy tax withholding obligations;

(iii) the number of Shares remaining for issuance shall be increased by the number of Shares that have been granted, or reserved for distribution in satisfaction of Awards, that are later forfeited, or that expire or terminate or, for any other reason, are not payable or distributable under the Plan; and

(iv) the number of Shares remaining for issuance shall be increased by the number of Shares that have been granted in respect of Awards that are settled in cash under the Plan.

(c) The following numbers of Shares shall be added to the ninety-five (95)m illion Shares expressly identified in subsection (a) above: the number of Shares that, on the date that is immediately prior to the applicable date of expiration of each of the Lehman Brothers Holdings Inc. Employee Incentive Plan and the Lehman Brothers Holdings Inc. 1996 Management Ownership Plan (each,a "Prior Plan"), are available for issuance and not otherwise subject to outstanding Awards granted under the Prior Plans, increased by the number of Shares that, as of each such applicable expiration date, were subject to Awards granted and outstanding under the Prior Plans (the "Prior Awards") but which are subsequently not payable or distributable under the PriorAwa rds under any of the circumstances described in paragraph (ii), (iii) or (iv) of subsection (b) above.

4) **Administration**

(a) The Plan shall be administered by the Committee, the members of which shall be "independent" in accordance with all applicable stock exchange or market listing requirements. The Committee may delegate its duties and powers in whole or in part to any subcommittee thereof consisting solely of at least two individuals who are intended to qualify as "non-employee directors" within the meaning of Rule 16b-3 under the Act (or any successor rule thereto) and, to the extent required by Section 162(m) of the Code (or any successor section thereto), "outside directors" within the meaning thereof. In addition, to the extent consistent with Rule 16b-3 under the Act, the Committee may delegate the authority to grantAw ards under the Plan to officers or employees of the Company.

(b) The Committee is authorized to construe, interpret, implement and administer the Plan and any Award, to establish, amend and rescind any rules and regulations relating to the Plan and each Award, and to make any other determinations that it deems necessary or desirable for the administration of the Plan or with respect to any Award. The Committee may correct any defect or supply any omission or reconcile any inconsistency in the Plan or in any Award in the manner and to the extent the Committee deems necessary or desirable. Any decision of the Committee in the construction, interpretation, implementation and administration of the Plan or any Award, as described herein, shall lie within its sole and absolute discretion and final, conclusive and binding on all parties concerned (including, butn ot limited to, Participants and their beneficiaries or successors). The Committee shall have the full and exclusive power and authority to make, and establish the terms and conditions of, any Award to any person eligible to be a Participant, consistent with the provisions of the Plan and to amend or waive any such terms and conditions at any time (including, without limitation, accelerating or waiving any conditions on vesting), provided, however, the Committee shall not have such power and authority to accelerate or otherwise provide for the times at which Shares with respect to any Award are delivered if any Award is subject to Section 409A of the Code in a manner that would result in the imposition upon any Participant of an additional tax under Section 409A of the Code, and provided further, in the event that it is reasonably determined by the Committee that, as a result of Section 409A of the Code, a Participant is deemed to be a "specified employee" (within the meaning of Section 409A(a)(2)(B)(i) of the Code), payments and/or deliveries of Shares in respect of any Award subject to Section 409A of the Code shall not be made prior to the date which is six (6) months after the date of such Participant's separation from service from the Company and all Subsidiaries, determined in accordance with Section 409A of the Code and the regulations promulgated

thereunder. None of Committee's determinations under the Plan and under any Award Agreement need be uniform and any such determinations may be made by it selectively among persons who receive, or are eligible to receive, Awards under the Plan (whether or not such persons are similarly situated). Without limiting the foregoing, the Committee shall be entitled, among other things, to make non-uniform and selective determinations under Award Agreements, and to enter into non-uniform and selective Award Agreements, as to (i) the persons to receive Awards, (ii) the terms and provisions of Awards, (iii) whether a Participant's Employment has been terminated for purposes of the Plan and (iv) any adjustments to be made to Awards pursuant to Section 9 or otherwise.

(c) The Committee shall require payment of any amount it may determine to be necessary to withhold for federal, state, local or other taxes or to otherwise satisfy any tax obligations due as a result of the exercise, grant, vesting of, or payment pursuant to, an Award. Unless the Committee specifies otherwise, the Participant may elect to pay a portion or all of such withholding or other taxes by (i) delivery, in cash or by check, (ii) delivery in Shares or (iii) having Shares withheld by the Company with a market value equal to the minimum statutory withholding rate from any Shares that would have otherwise been received by the Participant.

(d) Deliveries of Shares may be rounded to avoid fractional shares. In addition, the Company may pay cash in lieu of fractional shares.

## 5) Terms and Conditions of Options

Options granted under the Plan shall be, as determined by the Committee, non-qualified or ISOs for federal income tax purposes, as ev idenced by the related Award agreements, and shall be subject to the foregoing and the following terms and conditions and to such other terms and conditions, not inconsistent therewith, as the Committee shall determine:

(a) *Option Price.* The Option Price per Share shall be determined by the Committee, but shall not be less than 100% of the Fair Market Value of the Shares on the date an Option is granted.

(b) *Exercisability.* Options granted under the Plan shall be exercisable at such time and upon such terms and conditions as may be determined by the Committee, but in no event shall an Option be exercisable more than ten years after the date it is granted.

(c) *Exercise of Options.* Except as otherwise provided in the Plan or in an Award Agreement, an Option may be exercised for all, or from time to time any part, of the Shares for which it is then exercisable. For purposes of this Section 5, the exercise date of an Option shall be the date a notice of exercise is received by the Company, together with provision for payment of the full purchase price in accordance with this subsection (c). The Option Price for the Shares as to which an Option is exercised shall be paid to the Company, at the election of the Committee, pursuant to one or more of thef ollowing methods: (i) in cash; (ii) in Shares having a market value equal to the aggregate Option Price for the Shares being purchased and satisfying such other requirements as may be imposed by the Committee; provided, that such Shares have been held by the Participant for no less than six months (or such other period as established from time to time by the Committee in order to avoid adverse accounting treatment applying generally accepted accounting principles); (iii) partly in cash and partly in such Shares; (iv) if there is a public market for the Shares at such time, through the delivery of irrevocable instructions to a broker to sell Shares obtained upon the exercise of the Option and to deliver promptly to the Company an amount out of the proceeds of such Sale equal to the aggregate Option Price for the Shares being purchased or (v) by such other means as the Committee deems appropriate. No Participant shall have any rights to dividends or other rights of a stockholder with respect to Shares subject to an Option, and shall not otherwise be entitled to delivery of any Shares (or cash or other property in lieu thereof) underlying any such Option, until the Participant has given written notice of exercise of the Option, paid in full for such Shares and, if applicable, has satisfied any other conditions imposed by the Committee pursuant to the Plan, and such Shares have been issued hereunder.

7

(d) *ISOs.* The Committee may grant Options under the Plan that are intended to be ISOs. Such ISOs shall comply with the requirements of Section 422 of the Code (or any successor section thereto). No ISO may be granted to any Participant who, at the time of such grant, owns more than ten percent of the total combined voting power of all classes of stock of the Company or of any Subsidiary, unless (i) the Option Price for such ISO is at least 110% of the Fair Market Value of a Share on the date the ISO is granted and (ii) the date on which such ISO terminates is a date not later than the day preceding the fifth anniversary of the date on which the ISO is granted. Any Participant who disposes of Shares acquired upon the exercise of an ISO either (i) within two years after the date of grant of such ISO or (ii) within one year after the transfer of such Shares to the Participant, shall notify the Company immediately of such disposition and of the amount realized upon such disposition. All Options granted under the Plan are intended to be nonqualified stock options, unless the applicable Award Agreement expressly states that the Option is intended to be an ISO. If an Option is intended to be an ISO, and if for any reason such Option (or portion thereof) shall not qualify as an ISO, then, to the extent of such nonqualification, such Option (or portion thereof) shall be regarded as a nonqualified stock option granted under the Plan, provided that such Option (orp ortion thereof) otherwise complies with the Plan's requirements relating to nonqualified stock options. In no event shall any member of the Committee, the Company or any of its Affiliates (or their respective employees, officers or directors) have any liability to any Participant (or any other Person) due to the failure of an Option to qualify for any reason as an ISO.

(e) *Attestation.* Wherever in this Plan or any agreement evidencing an Award a Participant is permitted to pay the exercise price of an Option or withholding taxes relating to the exercise of an Option or delivery of Shares pursuant to an Award by delivering Shares, the Participant may, subject to procedures satisfactory to the Committee, satisfy such delivery requirement by presenting proof of beneficial ownership of such Shares, in which case the Company shall treat the Option as exercised without further payment and shall withhold such number of Shares from the Shares acquired by the exercise of the Option or pursuant to the other Award.

(f) *Section 409A Restrictions on Option Awards.* Options shall only be granted to employees, independent contractors or Non-Employee Directors providing direct services to any corporation in a chain of corporations or other entities in which each corporation or other entity, starting with the Company, has a controlling interest in another corporation or other entity in the chain, ending with the corporation or other entity for which the service provider provides direct services on the date of grant of the Option.F or this purpose, the term controlling interest has the same meaning as provided in Treas. Reg. Section 1.414(c)-2(b)(2)(i) of the Code, provided that the language "at least 50 percent" is used instead of "at least 80 percent" each place it appears in Treas. Reg. Section 1.414(c)-2(b)(2)(i). In addition, where the use of such stock with respect to the grant of an option to such service provider is based upon legitimate business criteria, the term controlling interest has the same meaning as provided in Treas. Reg. Section 1.414(c)-2(b)(2)(i),p rovided that the language "at least 20 percent" is used instead of "at least 80 percent" each place it appears in Treas. Reg. Section 1.414(c)-2(b)(2)(i). For purposes of determining ownership of an interest in an organization, the rules of Treas. Reg. Section 1.414(c)-3 and 1.414(c)-4 of the Code apply.

6) **Terms and Conditions of Stock Appreciation Rights**

(a) *Grants.* The Committee may grant (i) a Stock Appreciation Right independent of an Option or (ii) a Stock Appreciation Right in connection with an Option, or a portion thereof. A Stock Appreciation Right granted pursuant to clause (ii) of the preceding sentence (A) may be granted at the time the related Option is granted or at any time prior to the exercise or cancellation of the related Option, (B) shall cover the same number of Shares covered by an Option (or such lesser number of Shares as the Committee may determine) and (C) shall be subject to the same terms and conditions as such Option except for such additional limitations as are contemplated by this Section 6 (or such additional limitations as may be included in an Award agreement).

(b) *Terms.* The exercise price per Share of a Stock Appreciation Right shall be an amountd etermined by the Committee but in no event shall such amount be less than the Fair Market Value of a Share on the date the Stock Appreciation Right is granted; provided, however, that notwithstanding the foregoing in the case of a Stock Appreciation Right granted in conjunction with an Option, or a portion thereof, the exercise price may not be less than the Option Price of the related Option. Each Stock Appreciation Right granted independent of an Option shall entitle a Participant upon exercise to an amount, in cash and/or Shares, equal to (i) the excess of (A) the market value on the exercise date of one Share over (B) the exercise price per Share, times (ii) the number of Shares covered by the Stock Appreciation Right. Each Stock Appreciation Right granted in conjunction with an Option, or a portion thereof, shall entitle a Participant to surrender to the Company the unexercised Option, or any portion thereof, and to receive from the Company in exchange therefor an amount equal to (i) the excess of (A) the market value on the exercise date of one Share over (B) the Option Price per Share, times (ii) the number of Shares covered by the Option, or portion thereof, which is surrendered. Payment shall be made in Shares or in cash, or partly in Shares and partly in cash (any such Shares valued at such market value), as shall be determined by the Committee. Stock Appreciation Rights may be exercised from time to time upon actual receipt by the Company of written notice of exercise stating the number of Shares with respect to which the Stock Appreciation Right is being exercised. The date a notice of exercise is received by the Company shall be the exercise date. No fractional Shares will be issued in payment for Stock Appreciation Rights, but instead cash will be paid for a fraction or, if the Committee should so determine, the number of Shares will be rounded downward to the next whole Share.

(c) *Limitations.* The Committee may impose, in its discretion, such conditions upon the exercisability or transferability of Stock Appreciation Rights as it may deem fit.

(d) *Section 409A Restrictions on Stock Appreciation Right Awards.* Stock Appreciation Rights shall only be granted to employees, independent contractors or Non-Employee Directors providing direct services to any corporation in a chain of corporations or other entities in which each corporation or other entity, startingwi th the Company, has a controlling interest in another corporation or other entity in the chain, ending with the corporation or other entity for which the service provider provides direct services on the date of grant of the Stock Appreciation Right. For this purpose, the term controlling interest has the same meaning as provided in Treas. Reg. Section 1.414(c)-2(b)(2)(i) of the Code, provided that the language "at least 50 percent" is used instead of "at least 80 percent" each place it appears in Treas. Reg. Section 1.414(c)-2(b)(2)(i). In addition, where the use of such stock with respect to the grant of a Stock Appreciation Right to such service provider is based upon legitimate business criteria, the term controlling interest has the same meaning as provided in Treas. Reg. Section 1.414(c)-2(b)(2)(i), provided that the language "at least 20 percent" is used instead of "at least 80 percent" each place it appears in Treas. Reg. Section 1.414(c)-2(b)(2)(i). For purposes of determining ownership of an interest in an organization, the rules of Treas. Reg. Section 1.414(c)-3 and 1.414(c)-4 of the Code apply.

7) **Other Stock-Based Awards**

(a) The Committee, in its sole discretion, may grant or sell Awards of Shares and Awards that are valued in whole or in part by reference to, or otherwise based on the Fair Market Value of, Shares (all such Awards being referred to herein as "Other Stock-Based Awards"). Other Stock-Based Awards shall be in such form, and be subject to such terms and conditions, as the Committee shall determine, including without limitation, the following forms: (i) the right to purchase Shares, (ii) Shares subject to restrictions on transfer until the completion of a specified period of service, the occurrence of an event or the attainment of performance objectives, each as specified by the Committee, and (iii) Shares issuable upon the completion of a specified period of service, the occurrence of an event or the attainment of performance objectives, each as specified by the Committee. Other Stock-Based Awards may be granted alone or in addition to any other Awards made under the Plan. All references in the preceding sentence to "specified period of service," in the case of Other Stock-Based Awards which (i) are not in lieu of cash compensation to employees generally, (ii) are not paid to recruit a new employee in an amount of less than 5% of the total

awards available for grant under the Plan or (iii) are not subject to the attainment of performance objectives, shall provide that vesting, restrictions on transfer or some other comparable restriction which incents continued performance of the Participant, will be for a period of not less than three years (although vesting or lapsing may occur in tranches over the three years), unless there is a Change in Control or the Participant retires, becomes disabled or dies. Subject to the provisions of the Plan, the Committee shall have sole and absolute discretion to determine to whom and when such Other Stock-Based Awards will be made, the number of shares of Common Stock to be awarded under (oro therwise related to) such Other Stock-Based Awards and all other terms and conditions of such Awards. The Committee shall determine whether Other Stock-Based Awards shall be settled in cash, Common Stock or a combination of cash and Common Stock.

(b) With respect to any restricted stock units granted under the Plan, the obligations of the Company or any Subsidiary are limited solely to the delivery of Shares (or, at the discretion of the Committee, cash in lieu thereof to the extent necessary to comply with applicable law, regulation or other local practice, as determined by the Committee) on the date when such Shares are due to be delivered under each Award Agreement. The Company or any Subsidiary may deliver cash to Participants for dividends paid to a holder of shares of Common Stock, for fractional shares or for any amounts payable in cash upon the occurrence of a Change in Control.

(c) The Committee may establish performance objectives that must be attained in order for the Company to make payments pursuant to Other Stock-Based Awards. The performance objectives for Awards will be based upon one or more of the following criteria: (i) before-tax income and/or net income; (ii) earnings per share; (iii) book value per share; (iv) stock price; (v) return on equity; (vi) expense management; (vii) return on investment; (viii) improvements in capitalization; (ix) profitability of an identifiable business unit or product; (x) profit margins; (xi) budget comparisons; (xii) total return to Stockholders; (xiii) net revenue; and (xiv) economic value added. The foregoing criteria may relate to the Company, one or more of its Subsidiaries or one or more of its divisions or units, or any combination of the foregoing, and may be applied on an absolute basis and/or be relative to one or more peer group companies or indices, or any combination thereof, as the Committee shall determine. In addition, to the degree consistent with Section 162(m) of the Code (or any successor section thereto), the performance goals may be calculated without regard to extraordinary items. The Committee shall determine whether, with respect to a performance period, the applicable performance goals have been met with respect to a given Participant and, if they have, shall so certify and ascertain the amount of the applicable Performance-Based Award. No Performance-Based Awards will be paid for such performance period until such certification is made by the Committee. The amount of the Performance-Based Award actually paid to a given Participant may be less than the amount determined by the applicable performance goal formula, at the discretion of the Committee. The amount of the Performance-Based Award determined by the Committee for a performance period shall be paid to the Participant at such time as determined by the Committee in its sole discretion after the end of such performance period; provided, however, that a Participant may, if and to the extent permitted by the Committee and consistent with the provisions of Sections 162(m) and 409A of the Code, elect to defer payment of a Performance-Based Award. The maximum amount of Other Stock-Based Awards that may be granted during a fiscal year of the Company to any Participant shall be (x) with respect to Other Stock-Based Awards that are denominated or payable in Shares, four million Shares, and (y) with respect to Other Stock-Based Awards that are not denominated or payable in Shares, $50 million.

(d) The Committee may grant Participants Dividend Equivalent Rights with respect to any Common Stock subject to any Award. The Committee shall specify at the time of grant of any Dividend Equivalent Right whether dividends shall be paid at the time dividends in respect of Common Stock are paid to other shareholders or accumulated and paid out at the time payment is called for under the Awards to which the Dividend Equivalent Right relates. Other Stock-Based Awards may, at the discretion of the Committee, provide the Participant with dividends or dividend equivalents and voting rights prior to either vesting or earnout.

10

8) **Unfunded Status of Plan; No Rights as a Shareholder.**

The Plan is intended to constitute an "unfunded" plan for long-term incentive compensation. With respect to any payments not yet made to a Participant, including any Participant-optionee, by the Company, nothing herein contained shall give any Participant any rights that are greater than those of a general creditor of the Company. In its sole discretion, the Committee may authorize the creation of trusts or other arrangements to meet the obligations created under the Plan to deliver Shares or payments in lieu thereof or with respect to Options, Stock Appreciation Rights and Other Stock-Based Awards under the Plan; provided, however, that the existence of such trusts or other arrangements is consistent with the unfunded status of the Plan. Except as otherwise provided in a Participant's Award Agreement, no Participant (or other person having rights pursuant to an Award) shall have any of the rights of a shareholder of the Company with respect to Shares subject to an Award until the delivery of such Shares. Except as otherwise provided in Section 9, no adjustments shall be made for dividends or distributions on (whether ordinary or extraordinary, and whether in cash, Shares, other securities or other property), or other events relating to, Shares subject to an Award for which the record date is prior to the date such Shares are delivered.

9) **Adjustments Upon Certain Events**

Notwithstanding any other provisions in the Plan to the contrary, the following provisions shall apply to all Awards granted under the Plan:

(a) *Generally.* In the event of any change in the outstanding Shares after the Effective Date by reason of any Share dividend or split, reorganization, recapitalization, merger, consolidation, spin-off, combination or transaction or exchange of Shares or other corporate exchange, or any distribution to shareholders of Shares other than regular cash dividends, or any transaction similar to the foregoing, the Committee in its sole discretion and without liability to any person may make such substitution or adjustment, if any, as it deems to be equitable, as to (i) the number or kind of Shares or other securities issued or reserved for issuance pursuant to the Plan or pursuant to outstanding Awards, (ii) the maximum number of Shares for which Awards may be granted during a fiscal year of the Company to any Participant, (iii) the Option Price or exercise price of any Stock Appreciation Right and/or (iv) any other affected terms of such Awards.

(b) *Change in Control.* If a Change in Control occurs after the Effective Date, at any time before such Change in Control the Committee may, but shall not be obligated to, (i) accelerate, vest or cause the restrictions to lapse with respect to, all or any portion of an Award, (ii) cancel Awards for fair value (as determined in the sole discretion ofth e Committee) which, in the case of Options and Stock Appreciation Rights, may equal the excess, if any, of value of the consideration to be paid in the Change in Control transaction to holders of the same number of Shares subject to such Options or Stock Appreciation Rights (or, if no consideration is paid in any such transaction, the Fair Market Value of the Shares subject to such Options or Stock Appreciation Rights) over the aggregate exercise price of such Options or Stock Appreciation Rights, (iii) provide for the issuance of substitute Awards that will substantially preserve the otherwise applicable terms of any affected Awards previously granted hereunder as determined by the Committee in its sole discretion or (iv) provide that for a period of at least 30 days prior to the Change in Control, such Options shall be exercisable as to all shares subject thereto and that upon the occurrence of the Change in Control, such Options shall terminate and be of no further force and effect, provided in any such case the Committee shall not have such power and authority to accelerate the times at which Shares with respect to any Award are delivered if any Award is subject to Section 409A of the Code in a manner that would result in the imposition upon any Participant of an additional tax under Section 409A of the Code.

10) **No Right to Employment or Awards**

The granting of an Award under the Plan shall impose no obligation on the Company or any Affiliate to continue the Employment of a Participant and shall not lessen or affect the Company's or

Subsidiary's right to terminate the Employment of such Participant. No Participant or other Person shall have any claim to be granted any Award, and there is no obligation for uniformity of treatment of Participants, or holders or beneficiaries of Awards. The terms and conditions of Awards and the Committee's determinations and interpretations with respect thereto need not be the same with respect to each Participant (whether or not such Participants are similarly situated).

11) **Successors and Assigns**

The Plan and any Award Agreement shall be binding on all successors and assigns of the Company and a Participant, including without limitation, the estate of such Participant and the executor, administrator or trustee of such estate, or any receiver or trustee in bankruptcy or representative of the Participant's creditors.

12) **Transferability of Awards**

Unless otherwise determined by the Committee or as otherwise set forth in any Award Agreement, an Award shall not be sold, transferred, assigned, pledged, hypothecated or otherwise disposed of by the Participant otherwise than by will or by the laws of descent and distribution. An Award exercisable after the death of a Participant may be exercised by the legatees, personal representatives or distributees of the Participant.    Any sale, transfer, assignment, pledge, hypothecation or other disposition in violation of the provisions of this Section 12 shall be void.

13) **Amendments or Termination**

The Board may amend or terminate the Plan, but no amendment or termination shall be made, (a) without the approval of the shareholders of the Company, if such action would (i) (except as is provided in Section 9), increase the total number of Shares reserved for the purposes of the Plan or increase the maximum number of Shares that may be issued hereunder, or the maximum number of Shares for which Awards may be granted to any Participant, (ii) change the class of persons eligible to be Participants; or (iii) extend the date after which Awards cannot be granted under the Plan; or (b) without the consent of a Participant, if such action would diminish any of the rights of the Participant under any Award theretofore granted to such Participant under the Plan; provided, however, that the Committee may amend the Plan and/or any outstanding Awards in such manner as it deems necessary to permit the Plan and/or any outstanding Awards to satisfy applicable requirements of the Code or other applicable laws.

14) **Treatment of Awards**

Absent express provisions to the contrary, an Award under this Plan shall not be deemed compensation for purposes of computing benefits or contributions under any retirement plan of the Company or its Affiliates and shall not affect any benefits under any other benefit plan of any kind now or subsequently in effect under which the availability or amount of benefits is related to level of compensation. This Plan is not a "Pension Plan" or "Welfare Plan" under the Employee Retirement Income Security Act of 1974, as amended.

15) **Choice of Law**

The Plan shall be governed by and construed in accordance with the laws of the State of Delaware without regard to conflicts of laws.

16) **Effectiveness of the Plan**

The Plan shall be effective as of the Effective Date and shall terminate immediately prior to the tenth anniversary of the Effective Date, subject to earlier termination by the Board pursuant to Section 13.

12

FROM: Willie Figueroa (310)788-6214
Deutsche Bank
2000 Avenue of the Stars
9
Los Angeles, CA 90067



TO: **LEHMAN BROTHHERS HOLDINGS CLAIMS PR (866)879-0688**
**EPIQ BANKRUPTCY SOLUTIONS, LLC**
**757 THIRD AVENUE**
**3RD FLOOR**
**NEW YORK, NY 10017**
Ref: 6420408054

CAD#: 5632825
SHIP DATE: 17SEP09
WEIGHT: 1 LB



DELIVERY ADDRESS (FedEx-EDR)

TRK # 7912 4068 6358       FORM
0201

10017   -NY-US

**STANDARD OVERNIGHT**

**EWR**

**FRI**
**A1**
Deliver by:
**18SEP09**

# XA OGSA



CLS0920090519

# Exhibit B

Claim Question? Call: 646 282 2400 Technical Support Question? Call: 800 794 4430

- Sign In



- Home
- Claims
- Docket
- Key Documents
- Cross-Case Search

debtorMatrix
Lehman Brothers Holdings Inc. (Chapter 11) (change...)

General Criteria

Select Scope Claims and Schedules
Claim No(s)
16153Remove
Schedule No(s)
Creditor Name  Cohen, Darian
Creditor Name and Address?
Debtor(s) Select
Docket No(s)

Amount

Select Classification Total Claim Value
Select Search Operator Equals

Date Range

Claim Filed Date
From

To

Results per page  25 ▼
Reset Search

| Claim # | Schedule # | Creditor Name | Filed Date | Total Claim Value |
|---------|-----------|---------------|-----------|-------------------|
| 16153 | 555080090 | COHEN, DARIAN J. | 09/18/2009 | $30,129.24 Image |

**Creditor Address:**

5035 WAGNER WAY

OAK PARK, CA 91377

**Debtor:**

08-13555 Lehman Brothers Holdings Inc.

**Amounts:**

| | |
|---|---|
| Allowed Priority: | $8,212.50 |
| Allowed Unsecured: | $21,916.74 |
| Claimed Priority: | $10,950.00 |
| Claimed Unsecured: | $28,179.24 |

**Remarks:**

THIS CLAIM IS ALLOWED

Related Dockets

| Docket No. | Docket Date | Docket Text | Related Documents |
|-----------|-------------|-------------|-------------------|
| 30339 | 08/23/2012 | Order Signed on 8/23/2012 Granting Three Hundred Twenty-Ninth Objection to Claims (Misclassified Claims). (Related Doc # [29324]) (Nulty, Lynda)<br><br>Case: Lehman Brothers Holdings Inc.<br><br>Related: 29324 | Documents<br>Main Document<br>Exhibit 1<br>Exhibit 2 |
| 29324 | 07/10/2012 | Motion for Omnibus Objection to Claim(s) : Three Hundred Twenty-Ninth Objection to Claims (Misclassified Claims) filed by Robert J. Lemons on behalf of Lehman Brothers Holdings Inc.. with hearing to be held on 8/23/2012 at 10:00 AM at Courtroom 601 (JMP) Responses due by 8/9/2012, (Lemons, Robert)<br><br>Case: Lehman Brothers Holdings Inc.<br><br>Related: none | Document |

Notice of Adjournment of Hearing of Adjournment of One Hundred Seventy-Sixth Omnibus Objection to Claims (To Reclassify Proofs Of Claim As Equity Interests) filed by Robert J. Lemons on behalf of Lehman Brothers Holdings Inc.. with hearing to be held on 5/31/2012 at 10:00 AM at Courtroom

| | | | |
|---|---|---|---|
| 26693 | 03/16/2012 | 601 (JMP) (Lemons, Robert) | Document |

Case: Lehman Brothers Holdings Inc.

Related: none

Response : Omnibus Reply to Responses to Debtors One Hundred Eighteenth, One Hundred Thirtieth, One Hundred Thirty-First, One Hundred Thirty-Third, One Hundred Thirty-Fourth, One Hundred Thirty-Fifth, One Hundred Seventy-Sixth, and Two Hundred and Seventh Omnibus Objections to Claims (To Reclassify Proofs of Claim as Equity Interests) filed by Robert J. Lemons on behalf of Lehman Brothers Holdings Inc.. (Lemons, Robert)

| | |
|---|---|
| 23470 | 12/15/2011 |

Document

Case: Lehman Brothers Holdings Inc.

Related: none

Notice of Hearing : Omnibus Notice of Hearing on Debtors Seventy-Third, One Hundred Eighteenth, One Hundred Thirtieth, One Hundred Thirty-First, One Hundred Thirty-Third, One Hundred Thirty-Fourth, One Hundred Thirty-Fifth, and One Hundred Seventy-Sixth Omnibus Objections to Claims (To Reclassify Proofs of Claim as Equity Interests) filed by Robert J. Lemons on behalf of Lehman Brothers Holdings Inc.. (Lemons, Robert)

| | |
|---|---|
| 23185 | 12/09/2011 |

Document

Case: Lehman Brothers Holdings Inc.

Related: none

Notice of Adjournment of Hearing of Debtors One Hundred Seventy-Sixth Omnibus Objection to Claims (To Reclassify Proofs of Claim as Equity Interests) Solely as to Certain Claims filed by Robert J. Lemons on behalf of Lehman Brothers Holdings Inc.. with hearing to be held on 12/21/2011 at 10:00 AM at Courtroom 601 (JMP) (Lemons, Robert)

| | |
|---|---|
| 21023 | 10/19/2011 |

Document

Case: Lehman Brothers Holdings Inc.

Related: none

Order Signed on 10/5/2011 Granting Debtors One Hundred Seventy-Sixth Omnibus Objection to Claims (To Reclassify Proofs of Claim as Equity Interests). (Related Doc # [19392]) (Nulty, Lynda)

| | |
|---|---|
| 20610 | 10/05/2011 |

Documents
Main Document
Exhibits

Case: Lehman Brothers Holdings Inc.

Related: 19392

| | | Notice of Adjournment of Hearing / Notice of Adjournment of Debtors One Hundred Seventy-Sixth Omnibus Objection to Claims (To Reclassify Proofs of Claim as Equity Interests) Solely as to Certain Claims filed by Robert J. Lemons on behalf of Lehman Brothers Holdings Inc.. with hearing to be held on 10/27/2011 at 10:00 AM at Courtroom 601 (JMP) (Lemons, Robert) | |
|---|---|---|---|
| 20364 | 09/28/2011 | | Document |

Case: Lehman Brothers Holdings Inc.

Related: none

| | | Motion for Omnibus Objection to Claim(s) / Debtors One Hundred Seventy-Sixth Omnibus Objection to Claims (To Reclassify Proofs of Claim as Equity Interests) filed by Robert J. Lemons on behalf of Lehman Brothers Holdings Inc.. with hearing to be held on 10/5/2011 at 10:00 AM at Courtroom 601 (JMP) Responses due by 9/20/2011, (Lemons, Robert) | |
|---|---|---|---|
| 19392 | 08/19/2011 | | Document |

Case: Lehman Brothers Holdings Inc.

Related: none

| 16153 | 555080090 | COHEN, DARIAN J. | 09/18/2009 | $388,377.68 Image |
|---|---|---|---|---|

**Creditor Address:**
5035 WAGNER WAY
OAK PARK, CA 91377

**Debtor:**
08-13555 Lehman Brothers Holdings Inc.
**Amounts:**
Claimed Unsecured:                                                                                          $388,377.68

**Remarks:**

Related Dockets
 Docket No. Docket Date Docket Text                                                        Related Documents
                   Notice of Hearing : LBHIs Notice of Hearing as to Pending

| | | | |
|---|---|---|---|
| 41589 | 12/18/2013 | Claims Related to Restricted Stock Units and Contingent Stock Awards filed by Ralph I. Miller on behalf of Lehman Brothers Holdings Inc.. with hearing to be held on 4/1/2014 at 10:00 AM at Courtroom 621 (SCC) (Miller, Ralph)<br><br>Case: Lehman Brothers Holdings Inc.<br><br>Related: none | Document |
| 30339 | 08/23/2012 | Order Signed on 8/23/2012 Granting Three Hundred Twenty-Ninth Objection to Claims (Misclassified Claims). (Related Doc # [29324]) (Nulty, Lynda)<br><br>Case: Lehman Brothers Holdings Inc.<br><br>Related: 29324 | Documents<br>Main Document<br>Exhibit 1<br>Exhibit 2 |
| 29324 | 07/10/2012 | Motion for Omnibus Objection to Claim(s) : Three Hundred Twenty-Ninth Objection to Claims (Misclassified Claims) filed by Robert J. Lemons on behalf of Lehman Brothers Holdings Inc.. with hearing to be held on 8/23/2012 at 10:00 AM at Courtroom 601 (JMP) Responses due by 8/9/2012, (Lemons, Robert)<br><br>Case: Lehman Brothers Holdings Inc.<br><br>Related: none | Document |
| 26693 | 03/16/2012 | Notice of Adjournment of Hearing of Adjournment of One Hundred Seventy-Sixth Omnibus Objection to Claims (To Reclassify Proofs Of Claim As Equity Interests) filed by Robert J. Lemons on behalf of Lehman Brothers Holdings Inc.. with hearing to be held on 5/31/2012 at 10:00 AM at Courtroom 601 (JMP) (Lemons, Robert)<br><br>Case: Lehman Brothers Holdings Inc.<br><br>Related: none | Document |
| 23470 | 12/15/2011 | Response : Omnibus Reply to Responses to Debtors One Hundred Eighteenth, One Hundred Thirtieth, One Hundred Thirty-First, One Hundred Thirty-Third, One Hundred Thirty-Fourth, One Hundred Thirty-Fifth, One Hundred Seventy-Sixth, and Two Hundred and Seventh Omnibus Objections to Claims (To Reclassify Proofs of Claim as Equity Interests) filed by Robert J. Lemons on behalf of Lehman Brothers Holdings Inc.. (Lemons, Robert) | Document |

Case: Lehman Brothers Holdings Inc.

Related: none

Notice of Hearing : Omnibus Notice of Hearing on Debtors Seventy-Third, One Hundred Eighteenth, One Hundred Thirtieth, One Hundred Thirty-First, One Hundred Thirty-Third, One Hundred Thirty-Fourth, One Hundred Thirty-Fifth, and One Hundred Seventy-Sixth Omnibus Objections to Claims (To Reclassify Proofs of Claim as Equity Interests) filed by Robert J. Lemons on behalf of Lehman Brothers Holdings Inc.. (Lemons, Robert)

23185   12/09/2011   Document

Case: Lehman Brothers Holdings Inc.

Related: none

Notice of Adjournment of Hearing of Debtors One Hundred Seventy-Sixth Omnibus Objection to Claims (To Reclassify Proofs of Claim as Equity Interests) Solely as to Certain Claims filed by Robert J. Lemons on behalf of Lehman Brothers Holdings Inc.. with hearing to be held on 12/21/2011 at 10:00 AM at Courtroom 601 (JMP) (Lemons, Robert)

21023   10/19/2011   Document

Case: Lehman Brothers Holdings Inc.

Related: none

Order Signed on 10/5/2011 Granting Debtors One Hundred Seventy-Sixth Omnibus Objection to Claims (To Reclassify Proofs of Claim as Equity Interests). (Related Doc # [19392]) (Nulty, Lynda)

20610   10/05/2011

Documents
Main Document
Exhibits

Case: Lehman Brothers Holdings Inc.

Related: 19392

Notice of Adjournment of Hearing / Notice of Adjournment of Debtors One Hundred Seventy-Sixth Omnibus Objection to Claims (To Reclassify Proofs of Claim as Equity Interests) Solely as to Certain Claims filed by Robert J. Lemons on behalf of Lehman Brothers Holdings Inc.. with hearing to be held on 10/27/2011 at 10:00 AM at Courtroom 601 (JMP) (Lemons, Robert)

20364   09/28/2011   Document

Case: Lehman Brothers Holdings Inc.

Related: none

|  |  | Motion for Omnibus Objection to Claim(s) / Debtors One Hundred Seventy-Sixth Omnibus Objection to Claims (To Reclassify Proofs of Claim as Equity Interests) filed by Robert J. Lemons on behalf of Lehman Brothers Holdings Inc.. with hearing to be held on 10/5/2011 at 10:00 AM at Courtroom 601 (JMP) Responses due by 9/20/2011, (Lemons, Robert) | Document |
| 19392 | 08/19/2011 | | |
|  |  | Case: Lehman Brothers Holdings Inc. | |
|  |  | Related:  none | |

| 16153 | 555080090 | COHEN, DARIAN J. | 09/18/2009 | $0.00 Image |

**Creditor Address:**
5035 WAGNER WAY
OAK PARK, CA 91377

**Debtor:**
08-13555 Lehman Brothers Holdings Inc.
**Amounts:**
Claimed Unsecured:                                                                    $10,043.08

**Remarks:**
THIS CLAIM IS EXPUNGED\DISALLOWED

Related Dockets

| Docket No. | Docket Date | Docket Text | Related Documents |
| --- | --- | --- | --- |
| 30339 | 08/23/2012 | Order Signed on 8/23/2012 Granting Three Hundred Twenty-Ninth Objection to Claims (Misclassified Claims). (Related Doc # [29324]) (Nulty, Lynda)<br><br>Case: Lehman Brothers Holdings Inc.<br><br>Related: 29324 | Documents<br>Main Document<br>Exhibit 1<br>Exhibit 2 |
| 29324 | 07/10/2012 | Motion for Omnibus Objection to Claim(s) : Three Hundred Twenty-Ninth Objection to Claims (Misclassified Claims) filed by Robert J. Lemons on behalf of Lehman Brothers Holdings Inc.. with hearing to be held on 8/23/2012 at 10:00 AM at Courtroom 601 (JMP) Responses due by 8/9/2012, (Lemons, Robert) | Document |

Case: Lehman Brothers Holdings Inc.

Related: none

Notice of Adjournment of Hearing of Adjournment of One Hundred Seventy-Sixth Omnibus Objection to Claims (To Reclassify Proofs Of Claim As Equity Interests) filed by Robert J. Lemons on behalf of Lehman Brothers Holdings Inc.. with hearing to be held on 5/31/2012 at 10:00 AM at Courtroom 601 (JMP) (Lemons, Robert)

26693   03/16/2012   [Document]

Case: Lehman Brothers Holdings Inc.

Related: none

Response : Omnibus Reply to Responses to Debtors One Hundred Eighteenth, One Hundred Thirtieth, One Hundred Thirty-First, One Hundred Thirty-Third, One Hundred Thirty-Fourth, One Hundred Thirty-Fifth, One Hundred Seventy-Sixth, and Two Hundred and Seventh Omnibus Objections to Claims (To Reclassify Proofs of Claim as Equity Interests) filed by Robert J. Lemons on behalf of Lehman Brothers Holdings Inc.. (Lemons, Robert)

23470   12/15/2011   [Document]

Case: Lehman Brothers Holdings Inc.

Related: none

Notice of Hearing : Omnibus Notice of Hearing on Debtors Seventy-Third, One Hundred Eighteenth, One Hundred Thirtieth, One Hundred Thirty-First, One Hundred Thirty-Third, One Hundred Thirty-Fourth, One Hundred Thirty-Fifth, and One Hundred Seventy-Sixth Omnibus Objections to Claims (To Reclassify Proofs of Claim as Equity Interests) filed by Robert J. Lemons on behalf of Lehman Brothers Holdings Inc.. (Lemons, Robert)

23185   12/09/2011   [Document]

Case: Lehman Brothers Holdings Inc.

Related: none

Notice of Adjournment of Hearing of Debtors One Hundred Seventy-Sixth Omnibus Objection to Claims (To Reclassify Proofs of Claim as Equity Interests) Solely as to Certain Claims filed by Robert J. Lemons on behalf of Lehman Brothers Holdings Inc.. with hearing to be held on 12/21/2011 at 10:00 AM at Courtroom 601 (JMP) (Lemons, Robert)

21023   10/19/2011   [Document]

Case: Lehman Brothers Holdings Inc.

Related:  none

| | | | |
|---|---|---|---|
| 20610 | 10/05/2011 | Order Signed on 10/5/2011 Granting Debtors One Hundred Seventy-Sixth Omnibus Objection to Claims (To Reclassify Proofs of Claim as Equity Interests). (Related Doc # [19392]) (Nulty, Lynda)<br><br>Case: Lehman Brothers Holdings Inc.<br><br>Related:  19392 | Documents<br>Main Document<br>Exhibits |
| 20364 | 09/28/2011 | Notice of Adjournment of Hearing / Notice of Adjournment of Debtors One Hundred Seventy-Sixth Omnibus Objection to Claims (To Reclassify Proofs of Claim as Equity Interests) Solely as to Certain Claims filed by Robert J. Lemons on behalf of Lehman Brothers Holdings Inc.. with hearing to be held on 10/27/2011 at 10:00 AM at Courtroom 601 (JMP) (Lemons, Robert)<br><br>Case: Lehman Brothers Holdings Inc.<br><br>Related:  none | Document |
| 19392 | 08/19/2011 | Motion for Omnibus Objection to Claim(s) / Debtors One Hundred Seventy-Sixth Omnibus Objection to Claims (To Reclassify Proofs of Claim as Equity Interests) filed by Robert J. Lemons on behalf of Lehman Brothers Holdings Inc.. with hearing to be held on 10/5/2011 at 10:00 AM at Courtroom 601 (JMP) Responses due by 9/20/2011, (Lemons, Robert)<br><br>Case: Lehman Brothers Holdings Inc.<br><br>Related:  none | Document |

Page 1 of 1 (3 items)
<<<1>>>

- About Epiq »

- Epiq Difference »
- Offices »
- Leadership »

- Solutions »
- eDiscovery + Document Review »
- Bankruptcy »
- Class Action »

- Who We Serve »
- Law Firms »
- Corporations »
- Advisory Firms »
- Government Agencies »
- Trustees & Fiduciaries »

- Subscribe »
- Forms »

- Follow »
- Like »
- Connect »
- RSS Feeds »

  

- Sitemap|
- Disclaimer|
- Terms of Use|
- Privacy Statement|
- Safe Harbor
- © 2013 Epiq Systems, Inc. All Rights Reserved.

| Claim # | Schedule # | Creditor Name | Filed Date | Total Claim Value |
|---------|------------|---------------|------------|-------------------|
| No Results | | | | |