UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------- x

In re                                                    :          Chapter 11 Case No.

                                                         :

LEHMAN BROTHERS HOLDINGS INC., et al.,    :          08-13555 (SCC)

                                                         :

                                        Debtors.        :          (Jointly Administered)

                                                         :

-------------------------------------------------------------- x


**DECLARATION OF CLAIMANT WENDY M. UVINO IN OPPOSITION
TO DEBTORS' FOURTEEN OMNIBUS OBJECTIONS SEEKING
TO RECLASSIFY COMPENSATION CLAIMS AS EQUITY, OR
ALTERNATIVELY TO SUBORDINATE CLAIMS PURSUANT
TO § 510(b) OF THE BANKRUPTCY CODE**


Wendy M. Uvino, declares under penalty of perjury, pursuant to 28 U.S.C. § 1746, as

follows:

1.       I make this Declaration based on my personal knowledge and the documents

available to me, and would testify to the following if called upon.  I authorize the filing of this

objection in opposition to Lehman's 14th Omnibus Objection.

2.       I was employed by Lehman Brothers Inc. from September 20, 1994 through

October 16, 2008.  Lehman Brothers gave me notice of termination in early September 2008,

indicating that I would remain employed through the end of the calendar year and then would be

entitled to a separation package, consisting of severance and notice pay.  No Separation

Agreement was given to me, however, as the Bankruptcy then occurred in the following week

and the administrative functions within Human Resources were in disarray.

3.       Upon the notice of my termination of my employment, Lehman Brothers assured

me that my termination was an "involuntary termination without cause" as that phrase is defined

in the "RSU Agreements" between Lehman Brothers and employees.  Upon my execution of a

Separation Agreement and Release, I would satisfy the "Release Requirement" set forth in the RSU Agreements.

4.      Lehman compensated me on what it called a Total Compensation basis, by payment of an annual salary (paid in bi-weekly installments) plus an annual bonus.  My bonus was an integral part of my compensation – in fact, my annual base salary during the years at issue here was generally about 33 percent of my Total Compensation.

5.      For each year between 2003 and 2007, Lehman told me in writing, shortly after the end of each fiscal year (November 30), the amount of my bonus for that year and that my bonus was being divided into two portions, one designated Restricted Stock Units (or "RSUs"), or the deferred portion of my bonus, and the other designated as the "Total Cash Payment", which was generally paid on the last business day of January in the following calendar year. For each of those years, between 25 and 40 percent of my bonus was designated as RSU Awards depending on the level of my Total Compensation.  The number of RSUs awarded was determined by dividing the dollar value of the deferred portion of my bonus by the closing price of LEH shares on a certain day established in December by the Board of Directors of Lehman.

6.      When Lehman paid me the "Total Cash Payment" portion of my bonus, Lehman reported it to the tax authorities as taxable W-2 income and I paid income tax on it through customary withholding.  While the RSU-designated portion was declared as part of my bonus at the same time, it was not reported to the tax authorities as my taxable income in the year of the Award.

7.      At no time could I decline to accept Lehman's designation of a portion of my compensation in the form of RSU Awards. My participation in this deferred compensation plan was automatic and mandatory -- there were no election or enrollment forms to complete, I could not choose whether or not to participate or to limit the portion of the amount of my bonus that

2

was designated as RSU Awards, and I had no ability to direct how the amounts that Lehman withheld would be used. Since what I received was Lehman's contract promise to pay in the future, I paid no tax on the RSU-designated portion of my Total Compensation. While Lehman described it as part of my "Total Compensation" for that fiscal year, on a form Lehman called "2007 Total Compensation Statement," (and each fiscal year in question) this RSU-designated portion of my bonus was essentially a part of my earned and declared compensation that Lehman forced me to wait five years to receive.

8.      When I was first hired by Lehman, RSUs were not part of Total Compensation and I was not told that I was required to take a minimum portion of my Total Compensation in the form of RSUs. Nor was I told at the outset of each fiscal year the portion of my Total Compensation for that year that I would be required to accept in the form of RSU Awards, or even that I would be required to accept any portion as RSU Awards. Whether any portion of my Total Compensation would be paid in RSU Awards, or in equity awards such as stock options or restricted stock, was completely within Lehman's discretion, and Lehman simply dictated its decision to me at year-end.

9.      Pursuant to the RSU Agreements, I recognized that I was contractually obligated to avoid engaging in any "Detrimental Activity" and that I had other ongoing contract obligations under these Agreements. As Lehman cautioned me in the Award documents it provided, I had no rights as a shareholder until I became the record holder of the LEH common stock, and as grantee of these deferred compensation devices called RSUs I had no better rights than those of a general creditor. Further, I had no ability to sell, assign, pledge or otherwise dispose of the RSUs. I had no rights but the contract rights of an employee whose compensation had been deferred.

3

10.     I understand that Lehman now has taken the position that I was issued "equity securities" for the RSU-designated portion of my bonus in each of the years at issue. For prior years, not at issue here, after the five-year waiting period expired and I was issued the RSU-designated portion of my bonus, Lehman withheld from this compensation a sufficient amount of cash to pay the federal and state withholding taxes, and then provided me with LEH common shares for the balance. These shares of LEH common stock were then deposited into my Lehman brokerage account shortly thereafter. The entire amount of the value of the RSU Award at the time the restriction lapsed (November 30th of the fifth year) was taxed as ordinary income to me. There was never any sale of securities to raise cash for the withholding tax, which would have been necessary if "equity securities" had been issued to me at the time of the declaration of the bonus.

11.     I have reviewed the "Factual Background" included in Lehman's Memorandum in Support. It is self-serving, unsupported by the facts, and imputes an intent to me that wasn't there. The Background concedes that the RSU-designated portion was withheld from each employee's earned and declared "Total Compensation." The Background claims that the RSUs gave employees a financial stake in the company, but until the end of the five-year restriction period employees had no rights as a stockholder and had nothing but Lehman's contract promise to pay us, someday, the value of the RSU Awards Lehman had previously granted. Employees like me had no choice as to our participation. What Lehman describes as a financial incentive to remain with Lehman was really Lehman's arbitrary assertion of financial control by withholding 25 percent to 40 percent of our declared bonuses and threatening not to pay it if we breached certain employment-related conditions Lehman unilaterally imposed. There was nothing in this practice that retained me to work at Lehman – it was just withholding my earnings as a means of

4

making it costly for me to leave the firm. The RSU Awards were never a form of compensation I elected to take; it was Lehman's way of handcuffing employees to the Firm.

12.     Lehman's claim that it "originally intended" to treat the RSUs as equity in the Firm is unsupported by any evidence and is simply not true. I expected to treat shares as equity when I was issued shares, and that was after the five-year waiting period Lehman unilaterally imposed. In fact, Lehman specifically told me I had no rights as a stockholder until I became the record holder of the LEH shares. Further, I did not join Lehman so I could make a profit on its stock or to be compensated with equity. I joined Lehman to have a job and to further my career, and not to have an opportunity to invest in Lehman stock. I never had the intent to put my bonus at risk in an investment over which I had no control. I did not intend, and I had no reason to believe that Lehman intended, for me to be an equity holder before shares were issued following the five-year restriction period.

13.     Lehman's representation to the Court that RSU holders had shareholder voting rights even before the stock was issued is incomplete and misleading. The Lehman Brief cites a description of a trust established to hold an unspecified number of shares that would be voted "in proportion" to the number of RSUs the shareholder held. But Lehman never tells the Court here what it also never told the employees: what was the proportion of shares held by the Trust relative to the total outstanding RSUs (determining what fraction of a vote the purported RSU vote had, if any), when did the RSU come to have this purported voting right (*i.e.*, upon grant, upon vesting, or as amortized), and how was the RSU holder's vote solicited. Lehman's Statement that holders of RSUs had voting rights is not supported by any explanation of how holders exercised these purported voting rights, if indeed they were exercised at all.

14.     As with most common stock, Lehman was required to get approval from its shareholders to issue more shares of common stock. Each year, the Firm evaluated whether or

5

not there was enough shares "on the shelf" to allow it to issue shares of common stock in

exchange for the RSUs effective with the expiration of the five-year waiting period in

November.  To the extent, there were not enough shares on the shelf for the projected conversion

in November, Lehman sought the approval of its shareholders during the annual proxy voting in

the previous April.  This clearly shows that the RSUs were not counted in the "outstanding

equity" of the Firm until after the RSU Awards were converted to shares of common stock each

November.

14.    Lehman's claims that it "equated RSUs to common stock" and that if it had

avoided bankruptcy "Claimants would have reaped the benefit" of any increase in the stock price

is simply meaningless.  What has meaning is what I had before the end of five-year waiting

period.  As noted above, Lehman told me I had no rights as a stockholder and equated my rights

with those of a general creditor.  In each of the years at issue here Lehman declared what I

earned as my bonus, promised payment of some future amount, and as one means of performing

that promise contracted with me to pay a portion of my bonus five years hence,  using its own

stock as currency when that time came.  I had no rights to any stock during this five-year waiting

period; what I had was a contract promise from Lehman to pay the value of the RSU Awards that

Lehman previously granted. When Lehman failed to "avoid bankruptcy," what I was left with

was my contract right to the value of the RSU Awards Lehman had promised would be paid.

15.    The economic substance of the RSU Agreements to me was that a portion of my

annual bonus, the bonus that had been declared as part of my Total Compensation for each of the

years at issue, was deferred, and would be paid to me only after passage of five years.  Lehman

withheld this compensation unilaterally, and imposed on me certain terms before it would pay

the declared bonus.

16.     Stock options that Lehman issued to me worked in a different way than RSUs. At the time of the grant, I received what is recognized as a security in the form of the stock option. The option provided me with the choice whether to buy LEH shares of common stock at a fixed price, the strike price. The time for exercise was not a fixed date, but a period of time between exercise and lapse during which I could make an investment decision to pay the exercise price, and I then would receive LEH shares. The timing of any exercise, and even the decision *whether* to hold the option or exercise it, was solely my investment decision. No comparable security was issued to me under the RSU Agreement. With an RSU Award, there was a conversion and Lehman common stock was simply issued to me at the end of the waiting period Lehman imposed, with no action on my part. At no time did I exercise any choice or make any investment decision regarding the RSUs or the delivery, the timing of delivery, or the form of the underlying compensation

17.     Finally, with RSUs I paid tax at ordinary income rates based on the value of the RSU Awards on the date of expiration of the five-year waiting period. Upon exercise of stock options I also paid tax at ordinary income rates, but only on the difference between the current market value of the LEH shares at the time of exercise and the strike price.

18.     Lehman does not dispute that it retained me to perform services as an employee and that it received my services, for which at the end of each fiscal year it declared the bonus portion of my Total Compensation. While I continued to work for Lehman in reliance on its promise to pay me the compensation it declared that I earned, Lehman now claims that the unpaid compensation is in fact equity in the Firm, even though no equity was ever issued and I had no normal rights as a holder of equity.

19.     Lehman never told me in its annual brochures or its description of the RSU Awards, and I did not understand, that if Lehman filed for bankruptcy there was a risk I would

7

not receive any of the compensation that it declared and withheld, or that I would not have the

same standing as other unpaid creditors because my deferred compensation had been converted

into RSU Awards.  Lehman did not ask for, and I never provided, a written authorization for

deductions or withholdings from my wages for the RSU Awards. I respectfully maintain and

reassert my rights to be paid as a general unsecured creditor under the wage laws of the State of

New York.

      I declare under penalty of perjury that the foregoing is true and correct.

Dated: March 4, 2014

                                            /s/ Wendy Uvino____
                                            Wendy Uvino