UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ x
                                 :

In re                               :        Chapter 11 Case No.
                                 :

LEHMAN BROTHERS HOLDINGS INC., et al.,  :        08-13555 (SCC)
                                 :

                      Debtors.     :       (Jointly Administered)
                                 :

------------------------------------------------------------ x

### DECLARATION OF CLAIMANT CHRISTIAN STEVENS IN OPPOSITION TO DEBTORS' FOURTEEN OMNIBUS OBJECTIONS SEEKING TO RECLASSIFY OR SUBORDINATE COMPENSATION CLAIMS AS EQUITY

I, Christian Stevens, a claimant in the above captioned matter, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

1. I make this Declaration based on my personal knowledge and the documents available to me, and would testify to the best of my recollection about the following if called upon. I submit this declaration in opposition to Lehman's Two Hundred and Seventh Omnibus Objection.

2. I was employed by Lehman Brothers in the State of Colorado at its subsidiary Aurora Loan Services LLC from 12/2002 through 02/2008. Prior to its Chapter 11 bankruptcy petition filing, I was "involuntarily terminated" without cause as a result of Lehman announcing that my division of Aurora Loan Services LLC would be closed down. Lehman assured me this was an involuntary termination without cause and had me execute a Separation Agreement on or around 01/18/2008. After searching my records, I cannot locate a copy of that Separation Agreement. I stopped working for Lehman about five (5) weeks later, after being asked to stay on to help wind down the loan-servicing division.

3. Lehman compensated me on what it called a Total Compensation basis by agreeing to pay commissions on the products I sold. The commission varied depending on the product, but Lehman agreed to pay me a specific commission for each product. On a monthly basis after

my Gross Production was determined, Lehman told me what my "Total Sales Compensation"
was, and then told me what portion of my Total Sales Compensation would be paid as "Cash
Commissions." Lehman then deducted and withheld the balance from my monthly paycheck.

4.  After I was promoted in 2005 to V.P. Regional Sales Manager, my participation in the RSU

compensation program became automatic and mandatory -- there were no election or

enrollment forms to complete, I could not choose whether or not to participate or to limit the

portion amount of my commissions designated as RSUs, and I had no ability to direct how

the amounts that Lehman withheld would be used. This RSU-designated portion was

essentially a part of my earned compensation that Lehman forced me to wait five (5) years to

*possibly* receive any value from.

5.  At the end of each fiscal year, Lehman took that portion of my Total Sales Compensation

that it had deducted/withheld on a monthly basis, denominated Equity Accrual Calculated,

and gave me a deferred compensation credit in the form of restricted stock units ("RSUs"). A

true and correct copy of the "LEHMAN BROTHERS EQUITY AWARD PROGRAM

QUESTIONS AND ANSWERS FOR AURORA SALES MANAGERS" (July 2004) that

governed the terms of grant, vesting, and conversion of RSUs is attached hereto as <u>Exhibit A</u>.

I do not recall ever being provided any amended version of this document.

6.  Nothing in this Equity Award Program document described what could happen to my

withheld wages if there was a bankruptcy event before the RSUs become convertible (at

Lehman's discretion) to common stock five (5) years after grant date, and there is no

subordination clause or warning regarding subordination in a bankruptcy.

7.  Lehman also never obtained my express written authorization to deduct and withhold

*specified* amounts of commissions from my payroll checks. While the 2005 offer letter

included a "Payout Plan," it was not clear what specific amounts would be withheld or whether my authorization was revocable if I ever objected to the amounts withheld.

8.  A portion of my earned commissions were nevertheless deducted from my monthly paychecks each month and withheld for the general benefit of Lehman, in an amount determined by Lehman, and with the promise of granting RSUs at year-end (at Lehman's discretion) that would not convert to a true equity stake until five (5) years thereafter.

9.  Even after vesting of the RSUs, there was no right to the common stock, and I did not receive and was not permitted to sell the shares until five (5) years after the RSU grant date. And even after I was terminated without cause, my right to ultimately receive the full consideration due for my services rendered in prior years depended upon my continued observance of certain contract obligations.

10. When Lehman paid me my "Cash Commissions," Lehman reported it to the tax authorities as compensation income and I paid income tax on it through customary withholding. While the RSU-designated portion of my commissions was earned simultaneously as part of the agreed-upon commissions, it was not reported to the tax authorities as my compensation income. With RSUs, I would have to pay tax at ordinary income rates on the market value of the shares Lehman issued to me upon their conversion five-years after being granted RSUs.

11. At the outset when I was first hired in 2002, I was *not* told that I was required to take a minimum portion of my Total Compensation in the form of RSUs or that I would have to wait 5 years to receive the full value of my due commissions. Nor was I told at the outset of each fiscal year the portion of my Total Compensation for that year that I would be required to accept in the form of RSUs, or even that I would be required to accept any portion as RSUs. Whether any portion of my Total Compensation would be paid in RSUs was completely within Lehman's discretion, and Lehman simply dictated its decision on how

much of my commissions, if any, it would pay me at year end. It was solely at the Firm's

option whether a portion of my total compensation *may* be payable in the form of RSUs.

12. Pursuant to the terms of the RSU program, I recognized that I was contractually obligated to

avoid engaging in any "Detrimental Activity" and that I had other ongoing contract

obligations. As Lehman cautioned me in the program documents it provided, I had no rights

as a stockholder until I became the record holder of stock, and as grantee of these deferred

compensation devices called RSUs I had no better rights than those of a general creditor.

Further, I had no ability to sell, assign, pledge or otherwise dispose of the RSUs.  I had no

rights but the contract rights of an employee whose compensation had been withheld.

13. Just before my involuntary termination, I wrote Lehman Brothers' Human Resources

compensation department an email and a Lehman representative responded accordingly to

confirm that for "involuntary termination" situations like mine, the RSUs would remain

convertible to common stock five (5) years after their grant date. A true and correct copy of

that email correspondence is attached hereto as Exhibit B.

14. I have reviewed the "Factual Background" included in Lehman's Memorandum in Support.

It is self-serving, unsupported by the facts, and imputes an intent to me that I did not have.

The Background concedes that the RSU-designated portion was withheld from each

employee's earned and declared "Total Compensation."  The Background claims that the

RSUs gave employees a financial stake in the company. However, until the waiting period

ended, employees had no rights as a stockholder and had nothing but Lehman's contract

promise to pay us, someday, the balance of the due monthly-commissions Lehman had

previously declared.  Employees like me had no choice as to our participation.

15. What Lehman describes as a financial incentive to remain with the company was really

Lehman's arbitrary assertion of financial control by withholding a large portion of my earned

commissions and threatening not to pay me those wages if we breached certain employment-related conditions Lehman unilaterally imposed. There was nothing in this practice that attracted me to work at Lehman. I did not view the Lehman RSU as being designed for my benefit; it was simply Lehman's way of handcuffing employees to the firm. In other words, RSUs were designed to allow Lehman to penalize me if I left the firm in certain circumstances by forcing me to forfeit a portion of my earned commissions after not having given me any real equity in the company for at least the five (5) year-holding period. It goes without saying that RSUs were never a form of compensation I would have freely elected if given any choice in the matter.

16. I did not intend to be an investor in Lehman, or to take on the risk of potential costs and benefits of owning Lehman equity, by seeking and continuing employment with Lehman. I did not join Lehman so that I could make a profit on its stock. My sole intention in taking and keeping my job was to provide labor and services in order to secure a good career and livelihood. Lehman's claim that I "originally intended" to treat the RSUs as equity in the firm is unsupported by any evidence and is simply not true. In fact, RSUs were not even initially offered to me when I first took the job. Lehman also told me I had no rights as a stockholder until I became the record holder of stock. I never had the intent to put my compensation at risk in a pseudo-investment instrument over which I had no control. I did not intend, and I had no reason to believe that Lehman intended, for me to be an actual equity holder before real common stock was issued, after the five-year waiting period.

17. Lehman's representation that RSU holders had shareholder voting rights even before the stock was issued is incomplete and misleading. The Lehman Brief cites to a description of a trust established to hold an unspecified number of shares that would be voted "in proportion" to the number of RSUs the holder held. But Lehman never tells the Court here what it also

5

never told the employees:  What was the proportion of shares held by the Trust relative to the total outstanding RSUs (determining what fraction of a vote the purported RSU vote had, if any), when did an RSU come to have this purported voting right (*i.e.*, upon grant, upon vesting, or as amortized), and how was the RSU holder's vote solicited?  Lehman's statement that holders of RSUs had voting rights is not supported by any explanation of how holders exercised these purported voting rights, if indeed they were exercised at all.

18. Lehman's claims that it "equated RSUs to common stock" and that if it had avoided bankruptcy "Claimants would have reaped the benefit" of any increase in the stock price is simply meaningless and disingenuous.  What matters is what I had before the end of five-year waiting period.  Lehman told me I had no rights as a stockholder and equated my rights with those of a general creditor. When Lehman failed to "avoid bankruptcy," what I was left with was my contract right to the full commission value that Lehman had declared due to me.

19. Lehman recognized my rights as those of a contract creditor in its petition and schedules, where RSU agreements were listed as Executory Contracts under Schedule G. My initial Claim was assigned Claim No. <u>25431</u> and corresponds to <u>555056270</u> according to the Epiq docket site "www.Lehman-Docket.com." A true and correct copy of the Proof of Claim that I filed in connection with my contract rights under the RSU Agreements is attached hereto as <u>Exhibit C</u>. Along with its bar date notice, Lehman provided me with this Proof of Claim form which it had largely pre-completed, including inserting the caption, supplying my name and address, and notifying me that I had a "Schedule G" claim for an "Executory Contract or Unexpired Lease." Lehman also stated on the form that the scheduled claim related to the "Restricted Stock Unit Agreement." I hired an attorney to add only my phone number, email address, the amount of the claim, and my signature and date along with relevant attachments from my records showing the amounts withheld from my commissions. Lehman

acknowledged receipt of my Proof of Claim form upon my delivery to its claims agent. Lehman still owes me unpaid wages for services I rendered in the amount stated on this form. The amount claimed is supported by the compensation statements attached to the proof of claim form for the relevant period of my employment, based on the amounts withheld.

20. Lehman does not dispute that it retained me to perform services as an employee and that it received the benefit of my services, for which at the end of each fiscal year it declared my Total Compensation. Although I continued to work for Lehman in reliance on its promise to pay me the compensation it declared that I had earned, subsequent to the bankruptcy Lehman claims the unpaid withheld amount is somehow "equity," even though no true equity (like common stock) was ever issued and I had no rights as a holder of real equity in Lehman.

21. Lehman also never told me, either in its employment offer, equity awards plan, or any of its descriptions of the mandatory RSU program that if Lehman filed for bankruptcy, it would try to prevent me from at least receiving full payment of the earned commissions it had deducted and withheld from my paychecks. I maintain my rights to be paid as a general unsecured creditor under the wage laws of the State of Colorado.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: March 1, 2014

Signature

Printed Name

7

# Exhibit A

# LEHMAN BROTHERS EQUITY AWARD PROGRAM
## QUESTIONS AND ANSWERS FOR AURORA SALES MANAGERS

### JULY 2004

*THIS DOCUMENT IS PROVIDED FOR INFORMATIONAL PURPOSES ONLY. These Questions and Answers are intended to provide a general overview of the 2004 Equity Award Program. All terms and conditions of the 2004 Equity Award Program are subject to the applicable controlling plan documents, including but not limited to the Restricted Stock Unit Award Agreement, the Stock Option Award Agreement, the Employee Incentive Plan and the Employee Incentive Plan Prospectus. In the event of any conflict between the plan documents and the information in this document, the plan documents will govern.*

# TABLE OF CONTENTS

**EQUITY AWARD ELIGIBILITY**

Which Aurora sales managers are eligible to receive an equity award? ................ 1

**COMPONENTS OF THE EQUITY AWARD**

What are the components of the equity award? .................................................... 2

How will my equity award be calculated? ............................................................. 2

How much of my 2004 compensation will be awarded in equity? ......................... 4

When and at what price will my equity award be determined? ............................. 4

    Firm-provided Discount.................................................................................4

**EQUITY AWARD VESTING**

When will my RSUs vest? .................................................................................... 5

When will my RSUs convert to Lehman Brothers common stock? ....................... 5

When will my stock options become exercisable? ............................................... 6

**DIVIDEND EQUIVALENTS** ........................................................................................... 6

**VOTING RIGHTS** ......................................................................................................... 6

**TERMINATION PROVISIONS**

What will happen to my equity award if I leave Lehman Brothers? ..................... 7

    RSU Termination Provisions ......................................................................... 7

    Stock Option Termination Provisions ............................................................ 8

**TAX CONSIDERATIONS** ........................................................................................... 10

**GENERAL INFORMATION**

When will I receive details regarding my equity award? ..................................... 11

Who do I contact if I have questions regarding
the Equity Award Program? ............................................................................... 11

# EXHIBITS

EXHIBIT A:    2004 EQUITY AWARD SCHEDULE
FOR AURORA SALES MANAGERS..........................................................12

EXHIBIT B:    2004 EQUITY AWARD CALCULATION
FOR AURORA SALES MANAGERS..........................................................13

EXHIBIT C:    2004 MONTHLY EQUITY ACCRUAL CALCULATION
FOR AURORA SALES MANAGERS..........................................................14

EXHIBIT D:    GLOSSARY OF COMMON TERMS ........................................................15

The Equity Award Program provides employees of Lehman Brothers (the "Firm") and certain subsidiaries with a direct ownership interest in the Firm, and requires us to hold that stake for at least five years. In doing so, the Program gives each of us an incentive to think and act like an owner every day, and allows us to share in the Firm's financial success over time. The purpose of these Questions and Answers ("Q&A") is to acquaint Aurora sales managers with the Firm's Equity Award Program, and to explain their participation in the Program for the 2004 performance year (ending, with the Firm's fiscal year, on November 30, 2004).

## EQUITY AWARD ELIGIBILITY

**Which Aurora sales managers are eligible to receive an equity award?**

All active employees other than those who are on long-term disability or who are classified as part-time hourly are eligible to receive an equity award for 2004, including employees on an approved leave of absence.

Any sales managers whose employment terminates prior to the time year-end 2004 bonuses are paid will remain eligible for an award based on their equity award accrual through the date of termination. As more fully explained below, the ultimate disposition of any such award will be determined in accordance with applicable Plan provisions relating to the treatment (and potential forfeiture) of equity awards on or after the termination of employment.

In addition, note that your corporate title with Lehman Brothers (and not your title with Aurora Loan Services) will determine your eligibility to participate, your participation level, and all other terms and conditions of your participation in the Equity Award Program.

The chart below provides a comparision of Aurora titles and equivalent Lehman Brothers titles for purposes of the Firm's Equity Award Program:

| AURORA CORPORATE TITLE | EQUIVALENT LEHMAN BROTHERS CORPORATE TITLE |
|---|---|
| Managing Director | Managing Director ("MD") |
| Executive Vice President | Senior Vice President ("SVP") |
| Senior Vice President | Vice President ("VP") |
| Vice President & Other | Other |

**Note that, hereafter, all references to corporate titles are to the Lehman Brothers corporate title.**

# COMPONENTS OF THE EQUITY AWARD

**What are the components of the equity award?**

For performance year 2004, we expect that **employees up through and including the VP (Aurora SVP) level,** will receive a portion of total compensation in the form of Restricted Stock Units ("RSUs"). For SVPs **(Aurora EVPs)** and **MDs,** we expect that a portion of total compensation will be awarded in a combination of RSUs and stock options. We anticipate that the allocation of RSUs and stock options will be according to the schedule below:

| | RSU and Option Mix | | |
| Equity Component | Employees Through VP (Aurora SVP) Level | SVPs (Aurora EVPs) | MDs |
| --- | --- | --- | --- |
| RSUs | 100% | 75% | 75% |
| Stock Options | N/A | 25% | 25% |

Note: The actual mix of RSUs and options for employees at all levels will be determined and communicated on or about the end of the 2004 performance year.

Each RSU represents the right to receive one share of Lehman Brothers common stock five years after the grant date. You can consider the RSUs as shares of Lehman Brothers common stock that the Firm holds on your behalf for five years. The RSUs cannot be sold, traded, pledged or assigned for the five-year period.

Stock options awarded will have a 10-year term and an exercise price equal to the market price on the date of grant. Stock options cannot be sold, traded, pledged or assigned.

**How will my 2004 equity award be calculated?**

During performance year 2004, the portion of total compensation awarded in equity will be calculated in the same way as other Lehman Brothers employees with comparable corporate titles and compensation levels, *except on the basis that your participation is for part of the year only*. Beginning in performance year 2005, the amount of total compensation awarded in equity will be at 100% of the levels then applicable to other similarly situated Lehman Brothers employees.

The amount of your award will be determined according to a schedule that specifies the awards granted at each level of compensation. This schedule is included as Exhibit A. Under this schedule, the amount of compensation awarded in the form of equity (RSUs and options) increases as total compensation rises.

Starting with the August 2004 production month, sales managers will earn total compensation part in cash and part in conditional equity awards, as more fully described below. Each sales manager's regular monthly production payout, beginning with the September payout for the August production month, will be payable part in cash and part as an accrual toward a year-end conditional equity award. For this year's award, the amount of total compensation payable in equity will be calculated based on one-third (33.33%) of the 2004 Equity Award Schedule shown on Exhibit A, and will be accrued on a monthly basis as more fully described in Exhibit C.

Total compensation for sales managers includes production compensation, plus any additional compensation for your performance in 2004, even if some of these payments are deferred or paid in 2005. Such compensation may include earned salary and other compensation, e.g., car allowances, overrides, etc.

Your 2004 equity award will be calculated based on one-third (33.33%) of the 2004 Equity Award schedule shown on Exhibit A. The portion of your 2004 total compensation delivered as an equity award will be determined based on your **annualized** total compensation earned during the production months from August 2004 through November 2004 (paid from September to December 2004), after all adjustments. Exhibit B & Exhibit C illustrate how the 2004 equity award will be calculated for Aurora sales managers.

During any period you receive a draw, however, equity will not be awarded with respect to production compensation up to the level of the draw, and the equity component of compensation will be calculated by applying one-third (33.33%) of the Equity Award schedule solely to actual paid overage (in the year in which overage is paid).

Beginning in fiscal year 2005 with the December 2004 production month (relating to the January 2005 pay period), a different schedule may apply. In fiscal years 2005 and beyond, you will receive notice of any changes to the equity award schedule in advance of its implementation.

**How much of my 2004 compensation will be awarded in equity?**

As an introduction to the Lehman Brothers Equity Award Program, your 2004 equity award will be calculated in the same way as for other Lehman Brothers employees with comparable corporate titles and compensation levels, *except on the basis that your participation is for part of the year only*.

The schedule below details the actual level of the equity award as a portion of 2004 annualized total compensation (at selected compensation levels). Please refer to Exhibit B and Exhibit C for an illustration of the calculation of your 2004 equity award.

PERCENTAGE OF TOTAL COMPENSATION AWARDED IN EQUITY
AT SAMPLE COMPENSATION LEVELS
(BASED ON 33.33% OF EQUITY AWARD SCHEDULE)

| ANNUALIZED COMPENSATION LEVEL[1] | EMPLOYEES THROUGH THE VICE PRESIDENT (AURORA SVP) LEVEL | SENIOR VICE PRESIDENTS (AURORA SVPS) | MANAGING DIRECTORS |
|---|---|---|---|
| $100,000 | 2.0% | 2.0% | 2.0% |
| $250,000 | 5.2% | 5.2% | 5.2% |
| $500,000 | 9.6% | 12.5% | 12.5% |
| $750,000 | 13.1% | 15.0% | 15.0% |
| $1,000,000 | 16.1% | 20.0% | 20.0% |
| $1,500,000 | 20.7% | 25.0% | 28.0% |
| $2,000,000 | 24.3% | 30.0% | 35.0% |
| $2,500,000 | 27.4% | 35.0% | 40.0% |

**When and at what price will my equity award be determined?**

Awards are generally granted at the end of the Lehman Brothers fiscal year (on or about November 30, 2004). Your equity award will be based on the closing price of Lehman Brothers common stock on the New York Stock Exchange on the date of grant.

**Firm-Provided Discount**
The Firm provides equity awards to employees at a "discount" to the market price. The number of RSUs awarded to eligible employees will be based on the closing price of Lehman Brothers common stock on the date of grant less the appropriate discount. The number of stock options

---

[1] The equity award will be calculated based on annualized total compensation earned from August through November 2004 (paid September to December 2004). For purposes of the above illustration, this amount is also assumed to be actual total compensation for the full performance year. Actual total compensation may differ from the annualized amounts used for equity award calculation purposes.

4

awarded will be based on the Black-Scholes value of a 10-year Lehman Brothers option on the date of grant less the appropriate discount.

For 2004, we expect that the discount for each employee level will be as follows:

|  | RSU Discount | Stock Option Discount |
|---|---|---|
| Employees through VP (Aurora SVP) Level | 25% | N/A |
| SVPs (Aurora EVPs) | 25% | 25% |
| MDs | 30% | 30% |

For example, with a 25% discount, every $100 in RSUs gives you $133 in value. A 25% discount really means that the Firm "grosses up" your contribution by 33% at the outset. Likewise, a 30% discount provides MDs with $143 in value for every $100 in RSUs.

Note: The actual discount with respect to RSU and/or option awards for employees at all levels will be determined and communicated on or about the end of the 2004 performance year.

## EQUITY AWARD VESTING

**When will my RSUs vest?**
For purposes of discussing the vesting schedule, you should consider your RSU award as having two components: the **principal portion** and the **discount portion.** The principal portion represents the number of RSUs awarded as part of your compensation before the discount. The discount portion represents the number of RSUs awarded as a result of the discount that the Firm provides.

**Employees up to and including SVP (Aurora EVP)**
Your RSUs will vest in two stages:

| | | |
|---|---|---|
| 2 Years (on November 30, 2006): | 75% | (Entire principal portion) |
| 5 Years (on November 30, 2009): | 25% | (Entire discount portion) |

**MD**
Your RSUs will vest in two stages:

| | | |
|---|---|---|
| 3 Years (on November 30, 2007): | 35% | (Half of the principal portion) |
| 5 Years (on November 30, 2009): | 65% | (Half of the principal portion plus the entire discount portion) |

## When will my RSUs convert to Lehman Brothers common stock?

For employees who remain actively employed with the Firm for the full five years, your RSUs will convert to freely tradable shares of Lehman Brothers common stock five years after the grant date.

**When will my stock options become exercisable?**

**SVP (Aurora EVP)**
Stock options become exercisable in two stages:

| | | |
|---|---|---|
| 2 Years (on November 30, 2006): | 75% | (Entire principal portion) |
| 5 Years (on November 30, 2009): | 25% | (Entire discount portion) |

**MD**
Stock options become exercisable on the same schedule as the RSUs:

| | | |
|---|---|---|
| 3 Years (on November 30, 2007): | 35% | (Half of the principal portion) |
| 5 Years (on November 30, 2009): | 65% | (Half of the principal portion plus the entire discount portion) |

Note: The vesting and exercise schedules described above reflect the provisions of the 2003 Lehman Brothers Equity Award Program. While we expect these provisions to be materially the same for 2004 equity awards, the Firm reserves the right to amend the terms and conditions of the Equity Award Program from time to time.

Refer to the *Termination Provisions* on page 8 for an explanation of how your RSUs and stock options may be affected if you leave Lehman Brothers, including circumstances under which you may forfeit your rights to your RSUs and stock options.


## DIVIDEND EQUIVALENTS

**Will I be entitled to receive dividends on my equity award?**

Dividends may be declared from time to time at the discretion of the Board of Directors. Until your RSUs convert to shares of Lehman Brothers common stock, if dividends are declared, you will receive dividend equivalents. Dividend equivalents accrue quarterly on your RSUs and are reinvested as additional RSUs without a discount. Dividend reinvestment RSUs are subject to the same vesting and forfeiture provisions as the underlying RSUs to which they relate. The Firm retains the discretion to change this dividend policy at any time to pay in cash rather than in RSUs. Dividends will not be paid on stock option awards.


## VOTING RIGHTS

**Do my RSUs entitle me to voting rights?**

Lehman Brothers established a trust and funded it with shares for your benefit to provide you with voting rights related to your RSU awards. You will be able to direct the voting related to shares held in the trust in proportion to the number of RSUs you hold. You will continue to have these voting rights as long as you remain employed by the Firm.

# TERMINATION PROVISIONS

**What will happen to my equity award if I leave Lehman Brothers?**

Your entitlement to your equity award upon a separation from the Firm will be determined based on your conduct with respect to Lehman Brothers after you leave. The following information is intended to provide you with a general description of the RSU and option termination provisions. Your award agreement and other applicable controlling plan documents will provide a more detailed description of the award provisions.

## RSU TERMINATION PROVISIONS

| | |
|---|---|
| Voluntary Termination | • Provided you do not engage in Competitive Activity or Detrimental Activity. you will be entitled to the principal portion of the award (70% for MDs. 75% for all others) plus a pro-rata portion of the discount (for each full year of service after November 30). RSUs convert to shares and are issued at the end of the fiscal quarter one year after termination date. |
| | • If you engage in Competitive Activity. the unvested portion of RSUs will be forfeited. |
| |    - For MDs. forfeit 100% of RSUs if termination occurs prior to 3 years; forfeit 65% of RSUs if termination occurs after 3 years but before 5 years. |
| |    - For all others. forfeit 100% of RSUs if termination occurs prior to 2 years; forfeit 25% of RSUs if termination occurs after 2 years but before 5 years. |
| |    - Any vested RSUs convert to shares and are issued at the end of the fiscal quarter one year after termination, provided no Detrimental Activity. |
| | • Participants who meet the requirements for Full Career termination and do not engage in Competitive Activity or Detrimental Activity will be entitled to the entire RSU discount, rather than a pro-rata portion. |
| Involuntary Termination without Cause | • You will be entitled to principal portion of award (70% for MDs, 75% for all others) plus pro-rata portion of discount (for each full year of service after November 30). Shares issued at the end of the fiscal quarter one year after termination date, provided you do not engage in Detrimental Activity. |
| | • Participants who meet the requirements for Full Career termination will be entitled to the entire RSU discount, rather than a pro-rata portion. |
| Involuntary Termination With Cause | • Forfeit entire award. |
| Death, Retirement, Disability | • Entire award immediately vests and becomes payable. |

## TERMINATION PROVISIONS (CONTINUED)

### STOCK OPTION TERMINATION PROVISIONS

| | |
|---|---|
| Voluntary Termination | • Provided you do not engage in Competitive Activity or Detrimental Activity, 100% of options become exercisable six months after termination. Options may be exercised at any time until the later of a) 5 years after the grant date or b) six months after termination of employment. |
| | • If you engage in Competitive Activity, any options that are not exercisable will be forfeited. |
| |    − For MDs. forfeit 100% of options if termination occurs prior to 3 years; forfeit 65% of options if termination occurs after 3 years but before 5 years. |
| |    − For SVPs (Aurora EVPs), forfeit 100% of options if termination occurs prior to 2 years; forfeit 25% of options if termination occurs after 2 years but before 5 years. |
| | • For participants who meet the requirements for Full Career termination and do not engage in Competitive Activity or Detrimental Activity, options remain exercisable for the remainder of their full 10-year term. |
| Involuntary Termination without Cause | • All outstanding options become exercisable immediately upon termination. Options may be exercised at any time until the later of a) 5 years after the grant date or b) six months after termination of employment. |
| | • For participants who meet the requirements for Full Career termination and do not engage in Detrimental Activity, options remain exercisable for the remainder of their full 10-year term. |
| Involuntary Termination With Cause | • Forfeit entire award. |
| Death, Retirement, Disability | • All options become immediately exercisable. |

## TERMINATION PROVISIONS (CONTINUED)

### Competitive Activity

Competitive Activity means involvement (whether as an employee, proprietor, consultant or otherwise) with any person or entity (including any company and its affiliates) engaged in any business activity which is materially competitive with any business carried on by Lehman Brothers Holdings Inc. ("Holdings") or any of its subsidiaries or affiliates on the date of termination of a person's employment with Holdings or any of its subsidiaries, as determined in the sole discretion of the Chief Executive Officer or the Chief Administrative Officer of the Firm (or their respective designees).

Please note that the determination of competitive activity is not based on the function that an individual performs in a company but rather the nature of the company's businesses. Most financial services companies, including but not limited to, all the "bulge bracket" investment banks, many commercial banks and even small boutique-type firms are considered *competitors* of the Firm for purposes of the Equity Award Program. While the Firm values its client relationships with financial institutions. these relations will not preclude companies being deemed competitors when any of their business activities may be considered competitive with the Firm.

### Detrimental Activity

Detrimental Activity means at any time (i) using information received during a person's employment with Holdings or any subsidiary. their affiliates or clients. in breach of such person's undertakings to keep such information confidential; (ii) directly or indirectly persuading or attempting to persuade, by any means. any employee of Holdings or any subsidiary to terminate employment with any of the foregoing or to breach any of the terms of his or her employment with the foregoing; or (iii) directly or indirectly making any statement that is. or could be. disparaging of Holdings, its subsidiaries or affiliates, or any of their employees (except as necessary to respond truthfully to any inquiry from applicable regulatory authorities or to provide information pursuant to legal process); or (iv) directly or indirectly engaging in any activity that is substantially injurious to the financial condition, reputation, or goodwill of Holdings or its subsidiaries or affiliates, in each case as determined in the sole discretion of the Chief Executive Officer or the Chief Administrative Officer of the Firm (or their respective designees).

### Full Career Termination

Provided you meet certain criteria, you will now be eligible to receive the full RSU discount, rather than a pro-rata portion. These requirements are: a) you have at least 20 years of service or b) your age and years of service with the Firm add up to 65 **and** you are at least 45 years old **and** your tenure with the Firm is at least 10 years. Your entitlement to your RSU and stock option awards is contingent on your not engaging in Competitive Activity or Detrimental Activity. This change will apply to stock awards beginning in 2001; it will not be retroactive to earlier award years.

Refer to Exhibit D for a more detailed explanation of the definition of terms.

## TAX CONSIDERATIONS

Under current US tax regulations, you will not be taxed on the value of your RSUs until they convert to common stock. As a result, your RSUs appreciate on a pre-tax basis for the five-year restriction period.

You will not be taxed on the value of your stock option award on the date of grant. When you exercise your options, the gain will be considered ordinary income subject to applicable US tax withholding.

Provided below is a summary of the taxes related to RSUs and stock options that are ultimately due under current law.

| RSUs | Stock Options |
|---|---|
| • No taxation on the award date. | • No taxation on the award date. |
| • Upon conversion to common stock, the full market value of the shares will be taxed as employment income based on the closing price of Lehman Brothers common stock on the conversion date. | • When options are exercised, the difference between the Fair Market Value on the exercise date and the option exercise price will be taxed as employment income. Fair Market Value is defined as a) the average of the sales prices (for a "same-day-sale" transaction) or b) the closing price of Lehman Brothers common stock on the exercise date (for a cash exercise). |
| • This income will be subject to applicable withholding tax. | • This income will be subject to applicable withholding tax. |
| • Special provisions dealing with capital gains will not apply upon conversion to common stock. | • Special provisions dealing with capital gains will not apply upon conversion to common stock. |
| • If you retain your shares after RSUs convert to common stock, the basis for capital gains is the closing price on the conversion date. | • If you retain your shares upon exercise, the basis for capital gains is the Fair Market Value on the date of exercise. |

Consult your personal tax advisor concerning the application of all US federal/state/local tax laws on your RSUs and stock options.

## GENERAL INFORMATION

**When will I receive details regarding my equity award?**

You will receive details of your 2004 equity award during the Firm's second quarter of 2005.

All employees will be able to obtain documents relating to the 2004 Equity Award Program (including applicable award agreements and other plan documents), along with updated information on all of their equity awards, on the Firm's Equity Award site on LehmanLive (keyword: EquityAward) during the Firm's second quarter of 2005.

**Who do I contact if I have questions regarding the Equity Award Program?**

COMPENSATION DEPARTMENT
LEHMAN BROTHERS
Tel: (212) 526-8346
Fax: (212) 526-8309

*In the event of any conflict between the plan documents (including but not limited to the Restricted Stock Unit Award Agreement, the Stock Option Award Agreement, the Employee Incentive Plan, and the Employee Incentive Plan Prospectus) and the information in this Questions and Answers (Q&A), the plan documents will govern.*

*Nothing in this Q&A shall be construed to create or imply any contract of employment between you and Neuberger Berman or Lehman Brothers. All references to taxation refer to U.S. taxes and current tax law. You should consult your local tax authorities or personal tax consultant for details on the impact of tax laws in effect at the time your RSUs and stock options become taxable.*

*FOR AURORA SALES MANAGERS ONLY*

## EXHIBIT A:  2004 EQUITY AWARD SCHEDULE

If you are an **Aurora sales manager**, the portion of your 2004 total compensation ("TC") delivered as an equity award, for the full year, will be calculated according to **33.33% of the** schedule below, based on *annualized* total compensation earned during the four production months from August 2004 through November 2004 (paid from September to December 2004). Examples of the calculation follow in Exhibits B & C.

### 2004 EQUITY AWARD SCHEDULE FOR AURORA SALES MANAGERS

| Annualized Total Compensation Range | AMOUNT OF TOTAL COMPENSATION IN EQUITY-BASED AWARDS | | |
|---|---|---|---|
| | *Employees Through the Vice President (Aurora SVP) Level* | *Senior Vice Presidents (Aurora EVPs)* | *Managing Directors* |
| $0 - $74,999 | 1% of 2004 TC | 2% of 2004 TC | 2% of 2004 TC |
| $75,000 - $99,999 | 2% of 2004 TC | 2% of 2004 TC | 2% of 2004 TC |
| $100,000 - $199,999 | $2,000 plus 6% of 2004 TC over $100,000 | $2,000 plus 6% of 2004 TC over $100,000 | $2,000 plus 6% of 2004 TC over $100,000 |
| $200,000 - $299,999 | $8,000 plus 10% of 2004 TC over $200,000 | $8,000 plus 10% of 2004 TC over $200,000 | $8,000 plus 10% of 2004 TC over $200,000 |
| $300,000 - $499,999 | $18,000 plus 15% of 2004 TC over $300,000 | $30,000 plus 16.25% of 2004 TC over $300,000 | $30,000 plus 16.25% of 2004 TC over $300,000 |
| $500,000 - $749,999 | $48,000 plus 20% of 2004 TC over $500,000 | $62,500 plus 20% of 2004 TC over $500,000 | $62,500 plus 20% of 2004 TC over $500,000 |
| $750,000 - $999,999 | $98,000 plus 25% of 2004 TC over $750,000 | $112,500 plus 35% of 2004 TC over $750,000 | $112,500 plus 35% of 2004 TC over $750,000 |
| $1,000,000 - $1,499,999 | $160,500 plus 30% of 2004 TC over $1.0 million | $200,000 plus 35% of 2004 TC over $1.0 million | $200,000 plus 44% of 2004 TC over $1.0 million |
| $1,500,000 - $1,999,999 | $310,500 plus 35% of 2004 TC over $1.5 million | $375,000 plus 45% of 2004 TC over $1.5 million | $420,000 plus 56% of 2004 TC over $1.5 million |
| $2,000,000 - $2,499,999 | $485,500 plus 40% of 2004 TC over $2.0 million | $600,000 plus 55% of 2004 TC over $2.0 million | $700,000 plus 60% of 2004 TC over $2.0 million |
| $2,500,000 and up | $685,500 plus 45% of 2004 TC over $2.5 million up to a max of 30% of 2004 TC | 35% of 2004 TC | 40% of 2004 TC |

12

## EXHIBIT B:    2004 EQUITY AWARD CALCULATION FOR AURORA SALES MANAGERS

Your 2004 equity award will be calculated based on your 2004 total compensation ("TC") and **33.33%** of the 2004 Equity Award Schedule shown in Exhibit C. The examples below set out the calculation at illustrative total compensation levels.

| | Employees Through the Vice President (Aurora SVP) Level | Senior Vice Presidents (Aurora EVPs) | Managing Directors |
|---|---|---|---|
| 2004 Total Compensation earned from August through November 2004 | $100,000 | $166,667 | $250,000 |
| 2004 Annualized Total Compensation, subject to Equity Award Schedule in Exhibit A[1] | $300,000 | $500,000 | $750,000 |
| **Equity Grid Calculations** | | | |
| -- Equity Award per Schedule | $18,000 | $62,500 | $112,500 |
| -- Amount awarded in Equity (33.33%) | $6,000 | $20,833 | $37,500 |
| -- Equity Award as % of TC earned from August through November 2004 | 6.0% | 12.5% | 15.0% |
| **Equity Award Mix**[2] | | | |
| Stock Options | | | |
| -- % of Equity | 0% | 25% | 25% |
| -- $ Amount | $0 | $5,208 | $9,375 |
| RSUs | | | |
| -- % of Equity | 100% | 75% | 75% |
| -- $ Amount | $6,000 | $15,625 | $28,125 |

---

[1] The equity award will be calculated based on annualized total compensation earned from August through November 2004 (paid September to December 2004). For purposes of the above illustration, this amount is also assumed to be actual total compensation for the full performance year. Actual total compensation may differ from the annualized amounts used for equity award calculation purposes.

[2] Assumes that 2004 RSU/Option mix remains consistent with 2003 program.

# EXHIBIT C:   CALCULATION OF 2004 MONTHLY EQUITY ACCRUAL FOR AURORA SALES MANAGERS

As an example, we'll go through the monthly calculation for a VP (Aurora SVP) sales manager whose base salary is $48,000 and whose total compensation earned for production months August through November 2004 was $100,000.  For purposes of this analysis, year-to-date determinations are based only on the August through November production months.

| Step | Instructions | Sample Calculation | Sample Result |
|------|-------------|-------------------|---------------|
| Step 1 | Take YTD Total Compensation for first month, annualize (multiply by 12) and divide by production month number. | $20,000 x 12 ÷ 1 | $240,000 |
| Step 2 | Calculate the equity accrual from 2004 Award schedule in Exhibit A and multiply by 33.33%. | $12,000 x 33.33% | $4,000 |
| Step 3 | Multiply result by allocation %.  Subtract previous month's YTD equity accrual from result.  This is the monthly equity accrual. | ($4,000 x 25%) - $0 | $1,000 |
| Step 4 | Take YTD Total Compensation for second month, multiply by 12 and divide by production month number. | $55,000 x 12 ÷ 2 | $330,000 |
| Step 5 | Calculate the equity accrual from 2004 Award schedule in Exhibit A and multiply by 33.33%. | $22,500 x 33.33% | $7,500 |
| Step 6 | Multiply result by allocation %.  This is the YTD equity accrual.  Subtract previous month's YTD equity accrual from result.  This is the monthly equity accrual. | ($7,500 x 50%) - $1,000 | $2,750 |
| Step 7 | Repeat for next month. | | |

| # | Pay Month | Monthly Total Comp. | YTD Total Comp. | Annualized Total Comp. | Projected Equity Award (@ 33.33%) | Allocation % | YTD Equity Accrual | Monthly Equity Accrual |
|---|-----------|--------------------|-----------------|------------------------|-----------------------------------|--------------|--------------------|------------------------|
| 1 | September | 20,000 | 20,000 | 240,000 | 4,000 | 25% | 1,000 | 1,000 |
| 2 | October | 35,000 | 55,000 | 330,000 | 7,500 | 50% | 3,750 | 2,750 |
| 3 | November | 25,000 | 80,000 | 320,000 | 7,000 | 75% | 5,250 | 1,500 |
| 4 | December | 20,000 | 100,000 | 300,000 | 6,000 | 100% | 6,000 | 750 |
| Total | | | | | | | | $6,000 |

# EXHIBIT D:  GLOSSARY OF COMMON TERMS

**"Appropriate Officer"** means the Chief Executive Officer or Chief Operating Officer of Lehman Brothers Holdings Inc. ("Holdings") (or their respective designees).

**"Cause"** means a material breach by a person of an employment contract between the person and Holdings or any subsidiary, failure by a person to devote substantially all business time exclusively to the performance of his or her duties for Holdings or any subsidiary, willful misconduct, dishonesty related to the business and affairs of Holdings or any subsidiary, conviction of a felony or of a misdemeanor constituting a statutory disqualification under U.S. securities laws (or failure to contest prosecution for a felony or such a misdemeanor), habitual or gross negligence in the performance of a person's duties, solicitation of employees of Holdings or any subsidiary to work at another company, improper use or disclosure of confidential information, the violation of policies and practices adopted by Holdings or any subsidiary, including but not limited to the Code of Conduct, or a material violation of the conflict of interest, proprietary information or business ethics policies of Holdings or any subsidiary, or such other circumstances as may be determined in the sole discretion of an Appropriate Officer.

**"Competitive Activity"** means involvement (whether as an employee, proprietor, consultant or otherwise) with any person or entity (including any company and its affiliates) engaged in any business activity which is materially competitive with any business carried on by Holdings or any of its subsidiaries or affiliates on the date of termination of a person's employment with Holdings and any of its subsidiaries, as determined in the sole discretion of an Appropriate Officer.

**"Detrimental Activity"** means at any time (i) using information received during a person's employment with Holdings or any subsidiary, their affiliates or their clients, in breach of such person's undertakings to keep such information confidential; (ii) directly or indirectly persuading or attempting to persuade, by any means, any employee of Holdings or any subsidiary to terminate employment with any of the foregoing or to breach any of the terms of his or her employment with the foregoing; (iii) directly or indirectly making any statements that is, or could be, disparaging of Holdings, its subsidiaries or affiliates, or any of their employees (except as necessary to respond truthfully to any inquiry from applicable regulatory authorities or to provide information pursuant to legal process); or (iv) directly or indirectly engaging any activity that is substantially injurious to the financial condition, reputation, or goodwill of Holdings or any of its subsidiaries or affiliates, in each case as determined in the sole discretion of an Appropriate Officer.

**"Exercise Price"** also known as the strike price, this is the dollar amount that must be paid to the Firm to acquire the stock.  The strike price of the stock options under the program is set at the closing price of the Common Stock on the New York Stock Exchange on the date the award is made.

**"Full Career Termination"** means a Termination when (i) a person has at least 20 years of service or (ii) a person meets all of the following criteria: (x) the person's age plus years of service with Holdings or any subsidiary equals at least 65, (y) the person is at least 45 years old, and (z) the person has at least 10 years of service with Holdings or any subsidiary.

**"Restricted Stock Units (RSUs)"** An RSU represents the right to receive one share of Lehman Brothers common stock five year after the grant date (November 30).  You can consider the RSUs as shares of Lehman Brothers common stock that the Firm holds on your behalf.  The RSUs cannot be sold, traded, pledged or transferred for that five-year period.

**"Stock Options"** offer recipients the right to buy a given amount of shares of company stock at a stated price (the "strike price" or "exercise price") within a specified period of time. The options have a ten-year term and are subject to vesting restrictions before they become exercisable.

**"Termination"** means the end of employment with Holdings or a subsidiary.  The date of Termination and the reason for Termination are as determined in the sole discretion of an Appropriate Officer.

# Exhibit B

# FW: RSU's

From: **Stevens, Christian E** (cstevens@alservices.com)
Sent:  Wed 1/16/08 8:48 PM
To:    CHRISTIAN CHRISTIAN STEVENS (stevens_726@msn.com)

```
> _____
> From: Compensation
> Sent: Wednesday, January 16, 2008 1:45 PM
> To: Stevens, Christian E
> Subject: RE: RSU's
>
> Apologies! 2012, you are correct. It is the 2006 Award Grant that
will be distributed in 2011.
>
> Sorry for the inconvenience.
>
> Thank You.
>
> _____
> From: Stevens, Christian E
> Sent: Wednesday, January 16, 2008 3:44 PM
> To: Compensation
> Subject: RE: RSU's
>
> Ok, hopefully last question-
> Can't find this on the website...why is it 2011 when they were
granted in 2007 and it's 5 years from the grant date? Wouldn't that
be 2012?
>
> Thanks and sorry.
>
> _____
> From: Compensation
> Sent: Wednesday, January 16, 2008 1:27 PM
> To: Stevens, Christian E
> Subject: RE: RSU's
>
> The share payment date is 5 years from the grant date (i.e. shares
were granted in 2007 and would be deliverable November 30, 2011).
>
> Thanks,
> _____
> LEHMAN BROTHERS
> Human Resources | C o m p e n s a t i o n
```

> 212.526.8346 | PHONE
> 212.526.8309 | FAX
> compensation@lehman.com | E-MAIL
>
>
> _____
> From: Stevens, Christian E
> Sent: Wednesday, January 16, 2008 3:25 PM
> To: Compensation
> Subject: RE: RSU's
>
> Thanks, sorry for the confusion. Why 2011?
>
> _____
> From: Compensation
> Sent: Wednesday, January 16, 2008 1:21 PM
> To: Stevens, Christian E
> Subject: RE: RSU's
>
> Christian,
>
> In the case that an employee is involuntarily terminated from the
> Firm, they would be entitled to the Principal Portion of their 2007
> grant (provided no Detrimental Activity). The shares would be
> delivered to the employee on the share payment date, November 30,
> 2011, based on whatever the closing price Lehman Brothers stock is at
> on that day.
>
> There is documentation available via LehmanLive, keyword:
> 'equityaward', that explains the provisions of the Program. Let us
> know if you have any additional questions.
>
> Thanks,
>
> _____
> LEHMAN BROTHERS
> Human Resources | C o m p e n s a t i o n
> 212.526.8346 | PHONE
> 212.526.8309 | FAX
> compensation@lehman.com | E-MAIL
>
>
> _____
> From: Stevens, Christian E
> Sent: Wednesday, January 16, 2008 1:38 PM
> To: Compensation
> Subject: RE: RSU's
>
> Thanks so much. I do have one more question about Involuntary
Termination without Cause. The policy states that "participants will
become entitled to the Principal portion of their award, including
the unvested Principal portion."
>
> Does that mean that the 1,435.73 shares are mine, regardless? If so

at what price and when it is paid out?
>
> Thanks so much.
>
> _____
> From: Compensation
> Sent: Wednesday, January 16, 2008 11:26 AM
> To: Stevens, Christian E
> Subject: RE: RSU's
>
> Hello Christian,
>
> We are in the process of undergoing a large reconstruction of the
website, so are therefore not entirely sure when the 2007 grants will
be reflected through onto the website.
>
> For your reference, however, detailed below is your 2007 grant:
>
> Total Award: 1,914.30 Shares
> Principal Portion (75%): 1,435.73 Shares
> Discount Portion (25%): 478.57 Shares
>
> Hope this helps - please let us know if you have any additional
questions.
>
> Thanks!
>
> _____
> LEHMAN BROTHERS
> Human Resources | C o m p e n s a t i o n
> 212.526.8346 | PHONE
> 212.526.8309 | FAX
> compensation@lehman.com | E-MAIL
>
>
> _____
> From: Stevens, Christian E
> Sent: Wednesday, January 16, 2008 12:53 PM
> To: Compensation
> Subject: RSU's
>
> Hi, when will 2007's RSU's show up in the Equity Award section of
Lehman Live? Do you know what my 2007 "principal" portion is?>
>
> Thank you.
>
> Christian Stevens
> Vice President, Regional Sales Manager
> Aurora Loan Services, A Lehman Brothers Company
> 327 Inverness Drive South
> Englewood, CO 80112
> 720-945-5353-Phone
> 720-945-3911-Fax
>

>
- - - - - - - - - - - - - - - - - - - - - - - - - - - - -

This message is intended only for the personal and confidential use
of the designated recipient(s) named. If you are not the intended
recipient of this message, you are hereby notified that any review,
dissemination, distribution or copying of this message is strictly
prohibited. This communication is for information purposes only and
should not be regarded as an offer to sell or as a solicitation of an
offer to buy any financial product, an official confirmation of any
transaction, or as an official statement of Aurora Loan Services.
Email transmission cannot be guaranteed to be secure or error-free.
Therefore, we do not represent that this information is complete or
accurate and it should not be relied upon as such. All information is
subject to change without notice.

**Exhibit C**

**United States Bankruptcy Court/Southern District of New York**
Lehman Brothers Holdings Claims Processing Center
c/o Epiq Bankruptcy Solutions, LLC
FDR Station, P.O. Box 5076
New York, NY 10150-5076

# PROOF OF CLAIM

| In Re: | Chapter 11 | |
| Lehman Brothers Holdings Inc., et al. | Case No. 08-13555 (JMP) | UNIQUE IDENTIFICATION NUMBER: 555056270 |
| Debtors. | (Jointly Administered) | |
| Name of Debtor Against Which Claim is Held | Case No. of Debtor | |
| LEHMAN BROTHERS HOLDINGS, INC. | 08-13555 (JMP) | |

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503. Additionally, this form should not be used to make a claim for Lehman Programs Securities. (See definition on reverse side.)

## THIS SPACE IS FOR COURT USE ONLY

Name and address of Creditor: (and name and address where notices should be sent if different from Creditor)

LBH (MERGE2.DBF,SCHED_NO) SCHEDULE #: 555056270*****
CHRISTIAN E. STEVENS
2940 ROCKBRIDGE DRIVE
HIGHLANDS RANCH, CO 80129

☐ Check this box to indicate that this claim amends a previously filed claim.

Court Claim Number: _____
(If known)

Filed on: _____

**NOTICE OF SCHEDULED CLAIM:**
Your Claim is scheduled by the indicated Debtor as:

SCHEDULE G - EXECUTORY CONTRACT OR UNEXPIRED LEASE

DESCRIPTION:
RESTRICTED STOCK UNIT AGREEMENT

Telephone number: _____ Email Address: _____

Name and address where payment should be sent (if different from above)

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check this box if you are the debtor or trustee in this case.

Telephone number: _____ Email Address: _____

1. **Amount of Claim as of Date Case Filed:** $ 132,944.81 - see attached
If all or part of your claim is secured, complete Item 4 below; however, if all of your claim is unsecured, do not complete item 4.
If all or part of your claim is entitled to priority, complete Item 5.
If all or part of your claim qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9), complete Item 6.
☐ Check this box if all or part of your claim is based on a Derivative Contract.*
☐ Check this box if all or part of your claim is based on a Guarantee.*

*IF YOUR CLAIM IS BASED ON AMOUNTS OWED PURSUANT TO EITHER A DERIVATIVE CONTRACT OR A GUARANTEE OF A DEBTOR, YOU MUST ALSO LOG ON TO http://www.lehman-claims.com AND FOLLOW THE DIRECTIONS TO COMPLETE THE APPLICABLE QUESTIONNAIRE AND UPLOAD SUPPORTING DOCUMENTATION OR YOUR CLAIM WILL BE DISALLOWED.

☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of interest or additional charges. Attach itemized statement of interest or charges to this form or on http://www.lehman-claims.com if claim is a based on a Derivative Contract or Guarantee.

2. **Basis for Claim:** see attached
(See instruction #2 on reverse side.)

3. **Last four digits of any number by which creditor identifies debtor:** _____
3a. Debtor may have scheduled account as: _____
(See instruction #3a on reverse side.)

4. **Secured Claim** (See instruction #4 on reverse side.)
Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.
Nature of property or right of setoff: ☐ Real Estate   ☐ Motor Vehicle   ☐ Other
Describe: _____
Value of Property: $_____ Annual Interest Rate _____%
Amount of arrearage and other charges as of time case filed included in secured claim, if any:
$_____ Basis for perfection: _____
Amount of Secured Claim: $_____ Amount Unsecured: $_____

5. **Amount of Claim Entitled to Priority under 11 U.S.C. §507(a).** If any portion of your claim falls in one of the following categories, check the box and state the amount.

Specify the priority of the claim:

☐ Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries or commissions (up to $10,950), earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(4).

☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(5).

☐ Up to $2,425 of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(7).

☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).

☐ Other – Specify applicable paragraph of 11 U.S.C. § 507(a)(___).

Amount entitled to priority:

$_____

6. **Amount of Claim that qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9):** $_____
(See instruction #6 on reverse side.)

7. **Credits:** The amount of all payments on
8. **Documents:** Attach redacted copies of an
orders, invoices, itemized statements of runnin
Attach redacted copies of documents providin
on reverse side.) If the documents are volumin
DO NOT SEND ORIGINAL DOCUMENTS
SCANNING.
If the documents are not available, please expla

Filed: USBC - Southern District of New York
Lehman Brothers Holdings Inc., Et Al.
08-13555 (JMP)     0000025431

oof of claim.
s, purchase
ements.
of "redacted"

AFTER

## FOR COURT USE ONLY

**FILED / RECEIVED**

SEP 2 1 2009

EPIQ BANKRUPTCY SOLUTIONS, LLC

| Date: | Signature: The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any. |
| 09/18/09 | Marc C. Forsythe, Esq., Attorney for Claimant |
| | California State Bar #153854 |

Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

**CASE NO: 08-13555** (JMP)(Lehman Brothers Holdings, Inc.)

CHRISTIAN E. STEVENS
PROOF OF CLAIM

PART 1 (amount of claim):  $132,944.81 (lost wages)

      2005 ALS Stock Accrual:     $   1,930.74
      2006 ALS Stock Accrual:     $ 39,893.36
      2007 ALS Stock Accrual:     $ 91,120.71

The above represent Claimant's deferred compensation which Lehman Brothers
converted to "equity awards" beginning in 2005

See Exhibits:

      Compensation Analyses (2005-2006-2007)(Exhibit 1)

      Letter of Employment and Production Payout Plan (Exhibit 2)

      Position Letter of Claimant (Exhibit 3)

PART 2 (basis for claim)

    See Exhibits 1 through 3

    All amounts are classified as "general unsecured"

# <u>EXHIBIT 1</u>

## Lehman Brothers

### 2005 Compensation Analysis (ALS)

| Christian E. Stevens |
|---|
| SS# XXX-XX-5740 / Emplid 10218450 |

| | Description | Gross Earnings | Taxable Earnings |
|---|---|---|---|
| **Gross Compensation** | | | |
| AAA | Regular Salary | 34,846.20 | 34,846.20 |
| CL5 | 2005 ALS Stk Accrual-Reg | 1,930.74 | 0.00 |
| COA | ALS Commission Payment | 220,304.05 | 220,304.05 |
| TGN | TuitionReimburse-Grad | 2,495.00 | 0.00 |
| | **Gross** | **259,575.99** | **255,150.25** |
| **Adjustments to Taxable Wages** | | | |
| BASLFE | Basic Life Ins-MetLif | | 40.50 |
| DENTAL | Pre-Tax Dental | | (288.00) |
| FSADPW | FSA Dependent Care | | (2,500.00) |
| FSAHLW | FSA Healthcare | | (1,000.00) |
| MEDICL | Pre-Tax Medical | | (1,140.00) |
| TDSP | TDSP 401(k) | | (14,000.00) |
| VISION | Pre~Tax Vision | | (262.32) |
| | **Adjustments** | **0.00** | **(19,149.82)** |
| | **Taxable Earnings** | | **236,000.43** |
| **Taxes Withheld** | | | |
| OASDI/EE | $U  D Tax | | 5,580.00 |
| MED/EE | $U  F Tax | | 3,625.01 |
| Withholdng | $U  H Tax | | 60,637.35 |
| Withholdng | CO  H Tax | | 10,253.00 |

Printed: 11-SEP-2009_04:42:09_PM

## Lehman Brothers

### 2006 Compensation Analysis (ALS)

| Christian E. Stevens |
|---|
| SS# XXX-XX-5740 / Emplid 10218450 |

| | Description | Gross Earnings | Taxable Earnings |
|---|---|---|---|

### Gross Compensation

| | | | |
|---|---|---|---|
| AAA | Regular Salary | 47,999.90 | 47,999.90 |
| CL6 | 2006 ALS Stk Accrual-Reg | 39,893.36 | 0.00 |
| COA | ALS Commission Payment | 358,062.43 | 358,062.43 |
| | **Gross** | **445,955.69** | **406,062.33** |

### Adjustments to Taxable Wages

| | | | |
|---|---|---|---|
| BASLFE | Basic Life Ins-MetLif | | 13.50 |
| DENTAL | Pre-Tax Dental | | (288.00) |
| FSAHLW | FSA Healthcare | | (600.00) |
| GVLBTX | GVUL Basic/Taxable | | 47.88 |
| MEDICL | Pre-Tax Medical | | (2,988.00) |
| TDSP | TDSP 401(k) | | (15,000.00) |
| VISION | Pre-Tax Vision | | (262.32) |
| | **Adjustments** | **0.00** | **(19,076.94)** |

| | | | |
|---|---|---|---|
| | **Taxable Earnings** | | **386,985.39** |

### Taxes Withheld

| | | | |
|---|---|---|---|
| OASDI/EE | $U | D Tax | 5,840.40 |
| MED/EE | $U | F Tax | 5,828.79 |
| Withholdng $U | | H Tax | 109,626.75 |
| Withholdng CO | | H Tax | 16,992.00 |

Printed: 11-SEP-2009_04:46:27_PM

**Lehman Brothers**

**2007 Compensation Analysis (ALS)**

| Christian E. Stevens |
| --- |
| SS# XXX-XX-5740 / Emplid 10218450 |

| Description | Gross Earnings | Taxable Earnings |
| --- | --- | --- |
| **Gross Compensation** | | |
| AAA    Regular Salary | 47,999.90 | 47,999.90 |
| CL7    2007 ALS Stk Acc-Reg | 91,120.71 | 0.00 |
| COA    ALS Commission Payment | 517,056.21 | 517,056.21 |
| **Gross** | **656,176.82** | **565,056.11** |
| **Adjustments to Taxable Wages** | | |
| DENTAL    Pre-Tax Dental | | (288.00) |
| FSAHLW    FSA Healthcare | | (600.00) |
| GVLBTX    GVUL Basic/Taxable | | 64.04 |
| MEDICL    Pre-Tax Medical | | (3,144.00) |
| TDSP    TDSP 401(k) | | (15,500.00) |
| VISION    Pre-Tax Vision | | (262.32) |
| **Adjustments** | **0.00** | **(19,730.28)** |
| **Taxable Earnings** | | **545,325.83** |
| **Taxes Withheld** | | |
| OASDI/EE    $U  D Tax | | 6,045.00 |
| MED/EE    $U  F Tax | | 8,131.97 |
| Withholdng $U  H Tax | | 164,302.77 |
| Withholdng CO  H Tax | | 24,297.00 |

Printed: 11-SEP-2009_04:48:13_PM

# EXHIBIT 2

# AURORA LOAN SERVICES
*A Lehman Brothers Company*

September 29, 2005

Mr. Christian Stevens

Dear Christian,

It is our pleasure to confirm our offer to you for the position of Regional Sales Manager for Aurora Loan Services, *A Lehman Brothers Company.*

The following outlines the major components of your compensation and benefits package:

**Compensation:** Your bi-weekly rate will be $1,846.15 (equivalent to $48,000 annually)

***Production Payout Plan:*** *Production payouts will be paid at monthly intervals according to the published payroll schedule. A copy of your production payout plan has been included*

**Benefits:** You will be eligible for the standard health, dental (including orthodontia) and optical insurance that Aurora Loan Services provides its employees.   Please be advised that changes in our plans may occur in any or all part of the plans, including benefit coverage, deductibles, maximum, co-payments, exclusions, limitations, definitions, eligibility and the like.

**Vacation Time:** You will be entitled to 3 weeks of paid vacation per year (subject to proration).

**Scheduled Start Date:** 09/25/05 or such other date acceptable to Aurora Loan Services.

**Employee Representation:** You have represented to Aurora Loan Services, and by signing this offer letter and delivering it to Aurora Loan Services, you confirm your representation to us that you are not bound by (and will not become bound by) any agreement, whether written or oral, that would in any way limit your ability to fully perform your obligations as an employee of Aurora Loan Services—such as a covenant against competition or solicitation or other similar agreement.

**Other Terms:** As a condition of your employment you will agree to the following:

* Submit to a security check and background screening, including fingerprinting, in accordance with the criteria set forth by the Securities and Exchange Commission.
* Submit to a pre-employment drug test.  Your continued employment with Aurora Loan Services is expressly conditioned on your satisfactory completion of such test and screening.
* This offer of employment with Aurora Loan Services is also contingent upon your executing our "Confidentiality and Non-Solicitation" and "Intellectual Property" agreements.  Copies are enclosed with this letter.



LENDER    AURORA LOAN SERVICES LLC.

# AURORA LOAN SERVICES

*A Lehman Brothers Company*

Compensation Plan Code: 14

Christian, we are delighted that you are interested in joining the Aurora Loan Services' team. Please indicate your acceptance of the above terms and conditions by signing below and returning one copy of this letter and a signed copy of the "Confidentiality and Non-Solicitation" and "Intellectual Property" agreements on or before 09/25/05. Please contact Shaunda Van Wert at 720-945-5562 if you have any questions.

Sincerely,

*Shaunda Van Wert*

Shaunda Van Wert
Recruiter
Aurora Loan Services

Encl.

Accepted and Agreed:

_____          9/30/2005

Christian Stevens                                          Date

Please be advised that neither anything in this letter nor any other policy, procedure, practice or benefit of Aurora Loan Services constitutes an express or implied contract, guarantee, promise, or covenant of any type. Employment at Aurora Loan Services is "at-will". This means that either you or Aurora Loan Services may terminate the employment relationship at any time without notice, cause, or any specific disciplinary procedures. The terms contained in this letter are subject to modification from time to time.

LENDER          AURORA LOAN SERVICES LLC.

# AURORA LOAN SERVICES
*A Lehman Brothers Company*

Compensation Plan Code: 14

## AURORA LOAN SERVICES
### Correspondent Conduit Regional Sales Manager
### Production Payout Plan
### (April 1, 2005)

Nothing in this document or any other policy, practice, procedure or benefit of Aurora Loan Services constitutes an express or implied contract, guarantee, promise, or covenant of any type. Employment at Aurora Loan Services (Aurora) is at-will, meaning the employee or Aurora may terminate the employment relationship at any time without notice, cause, or any special procedures.

**Name:** Christian Stevens

**Title:** Regional Sales Manager

**Reports to:** Jim Jandrisevits, SVP - Sales Manager

**Participant Effective Date:** 09/25/05

**Compensation:**

Base Salary: $1,846.15 per bi-weekly pay period (equivalent to $48,000 per year)

Monthly Allowance Option
- Car--$400.00 (if applicable, Manager and Participant initial here _____)

Reimbursement Options
- Home Office – Up to $150.00 (if applicable, Manager and Participant initial here _____)
- Cell Phone - Up to $200.00 (if applicable, Manager and Participant initial here _CS_ ___)

Production Payouts:
Total Production Payouts will be calculated monthly on the following schedule. A portion of the Production Payout will be payable in cash, and a portion will be accrued toward a year-end conditional equity award pursuant and subject to terms and conditions of the Lehman Brothers Equity Award Program (as may be modified from time to time). The current percentage of the Production Payout payable in equity is set forth in Program materials that are being provided with this payout schedule.

| Channel | Client Medal Classification | Total Production Payout (bps) |
|---|---|---|
| Flow | Platinum | 3.0 |
| Flow | Gold | 3.0 |
| Flow | Silver | 4.0 |
| Flow | Bronze | 8.0 |
| | | |
| Bulk | n/a | 0.75 |
| Forwards | 12.5bps Payout | 1.25 |
| | 25bps Payout | 1.0 |
| | 37.5bps or > Payout | 0.75 |



AURORA LOAN SERVICES LLC.

<u>New Funding Incentive</u>:  $500 for each new Correspondent activation in the first month Aurora purchases a loan.

<u>Payment Schedule</u>
Calculated cash (non-equity) production payouts are paid, per Human Resources' annual published Payroll Processing Schedule, the month subsequent to the month in which production payouts were earned.

<u>Standard Practices & Definitions</u>
Refer to the attached version of the Aurora Loan Services Administrative Practices and Definitions Guide for commission calculation practices and definitions of key terms.  In the future, the most current version superseding all other versions will be posted on the internet.  When this option is available, location and login information will be communicated under separate cover.

<u>Termination</u>

In the event that a Plan Participant's employment terminates (irrespective of whether it is voluntary or involuntarily), the Plan Participant is eligible to receive Production Payouts on all loans from assigned accounts that: 1) are locked as of the date of termination; and 2) close and fund within 30 days following the termination date. The date that notice of resignation is given is the termination date, irrespective of the length of notice of resignation that the Plan Participant seeks to provide.  Any amounts accrued toward a year-end equity award will be subject to the terms and conditions of the Lehman Brothers Equity Award Program in effect at the time of the award. Final production payout checks will be paid per the Production Payout schedule. Any unearned draw will be deducted from the "payouts due."

Compensation amounts and structures can be modified at any time at the sole discretion of Senior Management.

Any Participant requiring clarification of, or having concerns about this Plan, is advised to discuss such matters with his/her Manager/Supervisor prior to executing this document.  Understanding of the Plan is evidenced by Participant's signature below:

_____    9/30/2005
Christian Stevens                                                      Date

_____
Jim Jandrisevits, SVP - Sales Manager                Date

# **EXHIBIT 3**

September 14, 2009


Christian Stevens
2940 Rockbridge Drive
Highlands Ranch, CO  80129
303.233.2440


To Whom It May Concern:

I am writing this letter regarding the compensation that I received while being an employee of Aurora Loan Services, A Lehman Brothers Company during the years of 2005, 2006 and 2007.

I have attached a copy of my Correspondent Conduit Regional Sales Manager Production Payout Plan which states in "Production Payouts" that "A portion of the Production Payout will be payable in cash, and a portion will be accrued toward a year-end conditional equity award..." Also attached are my 2005, 2006 and 2007 compensation analysis statements from Lehman Brothers payroll.  In 2005 Aurora Loan Services took out $1,930.74 in "ALS Stk Accrual, in 2006 they took out $39,893.36 and in 2007 they took out $91,120.71 for a grand total of $132,944.81 worth of earned income that was taken out of my paychecks and put into an equity award program.

As a result of Lehman Brothers Holdings, Inc Chapter 11 Bankruptcy the $132,944.81 worth of earned income contributed to the Lehman Brothers Equity Award Program has not been paid to me.

Based on the supporting documentation and the Proof of Claim I am requesting that the United States Bankruptcy Court for the Southern District of New York reimburse me for income totaling $132,944.81 earned during the years of 2005-2007 while working at Aurora Loan Services, A Lehman Brothers Company.

Thank you for your time and consideration.


Christian Stevens

# GOE & FORSYTHE, LLP

Marc C. Forsythe
California State Bar No.153854

18101 Von Karman Avenue, Suite 510
Irvine, CA 92612
(949) 798-2460

Direct Dial (949) 798-2467
Facsimile (949) 955-9437
mforsythe@goeforlaw.com

September 18, 2009

**VIA FEDERAL EXPRESS**

United States Bankruptcy Court
Southern District of New York

c/o Epiq Bankruptcy Solutions, LLC
Attn: Lehman Brothers Holdings Claims
        Processing
757 Third Avenue, Third Floor
New York, New York  10017

Re:    Proof of Claim
       CHRISTIAN E. STEVENS

Gentlemen:

Please accept for processing the enclosed Proof of Claim for CHRISTIAN E. STEVENS.

Also please conform the copy and return it in the enclosed postage pre-paid self-addressed envelope.

Very truly yours,

GOE & FORSYTHE, LLP

By: _____
        Marc C. Forsythe

MCF/gb

cc:  Client

From:    Origin ID: NZJA    (949) 798-2460
Kerry Murphy
Goe & Forsythe, LLP
18101 Von Karman Avenue
Suite 510
Irvine, CA 92612



Ship Date: 18SEP09
ActWgt: 1.0 LB
CAD: 8485051/INET9060
Account#: S *********


Delivery Address Bar Code

SHIP TO:    (646) 282-2500    BILL SENDER

**Lehman Brothers Holdings**
**Eqip Bankruptcy Solutions, LLC**
**Claims Processing Center**
**757 Third Ave., 3rd Fl**
**New York, NY 10017**

Ref #    Falce-Stevens
Invoice #
PO #
Dept #

SEP 21 2009



TRK#    7979 4578 1196    **MON - 21SEP    A1**
0201                      **STANDARD OVERNIGHT**

**10017**
NY-US
**SB OGSA**    EWR



**After printing this label:**
1. Use the 'Print' button on this page to print your label to your laser or inkjet printer.
2. Fold the printed page along the horizontal line.
3. Place label in shipping pouch and affix it to your shipment so that the barcode portion of the label can be read and scanned.

**Warning**: Use only the printed original label for shipping. Using a photocopy of this label for shipping purposes is fraudulent and could result in additional billing charges, along with the cancellation of your FedEx account number.

Use of this system constitutes your agreement to the service conditions in the current FedEx Service Guide, available on fedex.com.FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non -delivery,misdelivery,or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim.Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic valueof the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental,consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss.Maximum for items of extraordinary value is $500, e.g. jewelry, precious metals, negotiable instruments and other items listed in our ServiceGuide. Written claims must be filed within strict time limits, see current FedEx Service Guide.