**Opposition Due: May 2, 2014**
**Hearing Date: TBD**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------- x
                                        :
In re                                   :        Chapter 11
                                        :
LEHMAN BROTHERS HOLDINGS INC. *et al.*, :        Case No. 08-13555 (SCC)
                                        :
                  Debtors.              :        Jointly Administered
                                        :
------------------------------------------------------------------- x

### THE CANARY WHARF CLAIMANTS' MEMORANDUM IN
### SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT ON LIABILITY

David B. Tulchin
Marc De Leeuw
John J. Jerome
Andrew E. Gelfand
John G. McCarthy
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Tel:  (212) 558-4000
Fax:  (212) 558-3588

*Attorneys for Canary Wharf Management*
*Ltd., Heron Quays (HQ2) T1 Limited and*
*Heron Quays (HQ2) T2 Limited*

March 14, 2014

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ...............................................................................................1

THE UNDISPUTED FACTS ...................................................................................................4

    A.    The Parties ..................................................................................................4

    B.    Background to the Lease ...............................................................................5

    C.    The Lease ...................................................................................................6

    D.    Lehman's U.S. Bankruptcy, Lehman Sub's U.K.
           Administration, and Canary Wharf's Claims ..................................................9

    E.    Lehman Sub Vacated the Property and Canary Wharf
           Mitigated Its Losses ..................................................................................10

    F.    Procedural History.....................................................................................12

ARGUMENT ......................................................................................................................12

    I.    The Standard on This Motion ......................................................................12

    II.    Lehman Is Obligated Under Paragraph 1 of Schedule 4 to Indemnify
           Canary Wharf for Its Losses Caused by Lehman Sub's Default ......................13

           A.    Under English Law, an Indemnitor's Obligations Are More
                 Extensive Than Those of a Guarantor ............................................13

           B.    Schedule 4 to the Lease Is an Indemnity ......................................15

    III.    Lehman Is Also Liable Under Paragraph 1 of Schedule 4 for
           Canary Wharf's Losses From Lehman Sub's Repudiatory
           Breach of the Lease ...................................................................................19

CONCLUSION....................................................................................................................23

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Celotex Corp.* v. *Catrett,*
    477 U.S. 317 (1986) ..................................................................................................13

*D'Amico* v. *City of New York,*
    132 F.3d 145 (2d Cir. 1998) ......................................................................................12

*Deutsche Zentral-Genossenchaftsbank AG* v. *HSBC N. Am. Holdings, Inc.,*
    No. 12 Civ. 4025, 2013 WL 6667601 (S.D.N.Y. Dec. 17, 2013) ..............................13

*In re Quebecor World (USA), Inc.,*
    491 B.R. 363 (Bankr. S.D.N.Y. 2013) ......................................................................13

*Martinez* v. *Bloomberg LP,*
    883 F. Supp. 2d 511 (S.D.N.Y. 2012) .......................................................................13

*MBIA Inc.* v. *Federal Ins. Co.,*
    652 F.3d 152 (2d Cir. 2011) ......................................................................................13

*Rainey Brothers Ltd.* v. *Kearney,*
    1990 N.I. 18 (Court of Appeal) .............................................................................21, 22

*Reichman* v. *Beveridge,*
    [2006] EWCA Civ 1659 ..........................................................................................20, 21

## RULES

Fed. R. Bankr. P. 7056 .....................................................................................................12

Fed. R. Bankr. P. 9014 .....................................................................................................12

Fed. R. Bankr. P. 9017 .....................................................................................................13

Fed. R. Civ. P. 44.1 .....................................................................................................13, 18

Fed. R. Civ. P. 56 .............................................................................................................12

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------------------- x
                                            :
In re                                       :        Chapter 11
                                            :
LEHMAN BROTHERS HOLDINGS INC. *et al.*,     :        Case No. 08-13555 (SCC)
                                            :
                        Debtors.            :        Jointly Administered
                                            :
                                            :
--------------------------------------------------------------------- x

### THE CANARY WHARF CLAIMANTS' MEMORANDUM IN
### SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT ON LIABILITY

### PRELIMINARY STATEMENT

In 2005, Lehman Brothers Holdings Inc. ("Lehman") as Surety, Lehman subsidiary Lehman Brothers Limited ("Lehman Sub") as Tenant, and Canary Wharf as Landlord and Management Company entered into a 30-year lease for a large office building at 25 Bank Street in London, England (the "Lease").[1]  The Lease, which is governed by English law, clearly provides in Paragraph 1 of Schedule 4, entitled "Indemnity by Surety," that Lehman will "indemnify" Canary Wharf for any losses "arising directly or indirectly out of any default by the Tenant."  Despite that, Lehman contends that Schedule 4 is not an indemnity, but rather a "guarantee," and that under English law a guarantor's obligations (unlike those of an indemnitor) are co-extensive with those of the underlying obligor (here, Lehman Sub), which Lehman contends were discharged.  The Lease plainly provides otherwise, and summary judgment should be entered for Canary Wharf on the issue of Lehman's liability pursuant to the indemnity.

---

[1]  In this motion, "Canary Wharf," a group of companies that develops, invests in and manages properties, includes Claimants Canary Wharf Management Ltd., Heron Quays (HQ2) T1 Limited and Heron Quays (HQ2) T2 Limited, as well as certain affiliates of Claimants that entered into the other transactions described herein concerning the property subject to the Lease.

The undisputed background facts, briefly stated, are these:  Canary Wharf agreed to build expressly for Lehman a 30-story office building of more than one million square feet in London.  The Lease for the building provided for rental payments -- by Lehman Sub as "Tenant" and by Lehman as "Surety" -- of more than £1.5 billion (the equivalent of approximately US $2.5 billion)[2] plus other payments over a 30-year term.  After Lehman and Lehman Sub failed in 2008, Lehman Sub defaulted on the Lease and vacated the building in 2010.  Canary Wharf took steps to mitigate its losses by retaking possession of the building and terminating Lehman Sub's tenancy (a "forfeiture" under English law), thereby enabling it to sell the building by way of a 999-year lease with JPMorgan Chase, N.A. ("JPMorgan").  Although the sale was made at a time when the market for commercial office space in London had declined substantially in the wake of the global financial crisis, the value of the JPMorgan transaction nevertheless substantially reduced the amount of Canary Wharf's damages.  It is the remaining amount (approximately $780 million in present value) that is sought by Canary Wharf in Claims Nos. 14824 and 14826 (the "Claims").

Lehman is liable for the Claims as a matter of law for two independent, alternative reasons.  *First*, Lehman is an indemnitor, having agreed to pay Canary Wharf's losses under Paragraph 1 of Schedule 4 of the Lease.  There is no dispute that under English law, an indemnitor has a primary obligation to perform and that an indemnitor will be liable even when the underlying obligor is not.  (This is in contrast to a guarantor, which has obligations that are ordinarily co-extensive with those of the underlying obligor.)  The parties' English-law experts, both of whom are Queen's Counsel ("Q.C.")[3] -- Laurence Rabinowitz, Q.C. (for Canary Wharf)

---

[2]  The current exchange rate as of March 12, 2014 is about US $1.66 per U.K. pound sterling.  Currencies, THE WALL STREET JOURNAL, March 13, 2014, at C5.

[3]  Queen's Counsel is a distinction awarded by the Queen to senior English barristers of outstanding ability.

and Richard Millett, Q.C. (for Lehman) -- agree on these points.  Thus, the Court here need only interpret the plain language of the Lease.

Paragraph 1 of Schedule 4 is entitled "Indemnity by Surety" and provides that Lehman has "a primary obligation" to "indemnify and keep indemnified" Canary Wharf for "all claims demands losses damages liability costs fees and expenses whatsoever sustained by [Canary Wharf] by reason of or arising directly or indirectly out of any default by the Tenant . . . ."  Lehman contends that this is merely a guarantee, not an indemnity, but the plain terms of the provision say otherwise.  This is further confirmed by (a) the other terms of Schedule 4 and Sections 10 and 14 of the Lease, and (b) the uncontroverted evidence concerning the commercial background of the Lease, which evidence an English court may consider in interpreting a contract.  Canary Wharf's Chairman and CEO testified that Canary Wharf would not have entered into the Lease without an ironclad promise from Lehman to "indemnify" Canary Wharf, and there is no evidence to the contrary.

*Second*, and alternatively, even if Schedule 4 were a guarantee, Lehman is liable for the independent reason that Lehman Sub committed a "repudiatory breach" of the Lease in 2010 when it stopped making the payments due thereunder, giving rise to its own and Lehman's liability.  Under English law, a party to a contract commits a repudiatory breach when it repudiates its remaining obligations under the contract (*e.g*., ceases making payments due).  The other party may accept that breach and seek damages for the remaining value of the contract (*e.g*., future payments).  Accordingly, under a separate Lehman obligation in Paragraph 1 of Schedule 4 -- a promise to "perform and observe all the covenants on the part of the Tenant contained in this Lease including the payment of the rents hereby reserved and all other sums

- 3 -

payable under this Lease" -- Lehman is responsible for the rent and other payments under the Lease even if Schedule 4 is not an indemnity.

The terms of the Lease are clear, and there are no material issues of fact in dispute relating to its interpretation. The Court should grant summary judgment in favor of Canary Wharf on the issue of liability.[4]

## THE UNDISPUTED FACTS

The facts that are material to this motion are undisputed and set forth in Canary Wharf's accompanying Statement of Undisputed Material Facts Pursuant to Local Bankruptcy Rule 7056-1. Lehman stipulated to many of these facts in the parties' Stipulation of Undisputed Facts, executed June 13, 2013 ("Facts Stipulation") (Ex. 1).[5] Those facts, and others provided here as background to the dispute, are set forth below.

### A.    The Parties

Lehman was one of the largest investment banks in the United States before its collapse in 2008. (Lehman Form 8-K, filed with the United States Securities and Exchange Commission ("SEC") on April 16, 2010 (Ex. 2) at Exhibit 99.1 pp. 2, 32.) Lehman Sub was a subsidiary of Lehman with operations in England. (Lehman Form 8-K, filed with the SEC on Sept. 19, 2008 (Ex. 3) at 2, Exhibit 99.2 p. 2.)

---

[4]  Lehman is also liable for a third independent reason that is not addressed in this motion: it anticipatorily breached an obligation in Paragraph 7 of Schedule 4 of the Lease that required it to enter a new lease on the same terms as the Lease. *See* p. 9 n.9 & p. 11 n.11, *infra*. Because Lehman contends that there are issues of fact with respect to this ground for Lehman's liability, Canary Wharf does not now seek summary judgment on this basis.

[5]  References herein to "Ex. __" are to exhibits attached to the Declaration of Marc De Leeuw, executed March 14, 2014, being filed herewith. In the Facts Stipulation, the parties agreed that the facts contained therein "are uncontested for purposes of" the Claims. (Facts Stipulation (Ex. 1) at 1.)

Canary Wharf is in the business of property development, investment and management.  (2011 Canary Wharf Group plc Annual Report (Ex. 4) at 8-11.)  In the late 1980s, Canary Wharf began to develop the Canary Wharf area of London.  (Transcript of Deposition of Sir George Iacobescu, Canary Wharf's Chairman and CEO, taken June 18, 2013 ("Iacobescu Tr.") (Ex. 5) 17:23-25.)  Since that time, Canary Wharf has continued to develop and manage the area into one of the world's preeminent business districts.  (Ex. 4 at 6.)

### B.    Background to the Lease

On March 30, 2001, Canary Wharf, Lehman, and Lehman Sub entered into an "Agreement for Lease," pursuant to which Canary Wharf agreed to build a customized office building in Canary Wharf.  (Agreement for Lease (Ex. 6) at CW-8625, CW-8634.)  The contract provided that the building would be designed and constructed according to Lehman Sub's specifications and at the expense of Canary Wharf.  (*Id.* at CW-8636 (§ 1.11), CW-8663 (§ 4.3), CW-8667-70 (§§ 6.1, 7).)  Once completed, the parties would enter into a 30-year lease for the 25 Bank Street property.  (*Id.* at CW-8634, CW-8640 (§ 1.43), CW-8646 (§ 1.92), CW-8705 (§ 22.1).)  Lehman Sub would become the "Tenant" of the building, and Lehman agreed that it would execute the lease as "Surety."  (*Id.* at CW-8705 (§ 22.1).)  A draft of the lease was attached to the Agreement for Lease.  (*Id.* at CW-8750-862 (Annexure 8).)

Canary Wharf's Chairman and CEO, Sir George Iacobescu, testified that at the time of the negotiations of the Lease, it was the practice of Canary Wharf to "always ask for an indemnity" from "the top company in any transaction" because Canary Wharf's "need is to have an uninterrupted cash flow regardless of anything that goes wrong with the tenant."  (Iacobescu Tr. (Ex. 5) 239:25-240:11.)  Canary Wharf thus insisted "from day one" on an obligation from Lehman to pay "come hell or high water."  (*Id.* 239:16-25.)  Indeed, Canary Wharf "would not have entered into any . . . lease agreement unless we had the parent company indemnity . . . ."

- 5 -

(*Id*. 240:20-22.)  The certainty of an uninterrupted cash flow provided by an indemnity from the parent was key to Canary Wharf, given that the rental income would be securitized in the form of bonds.  (*Id*. 241:8-17.)  All of this testimony is undisputed.[6]

Construction of the office building at 25 Bank Street was completed in August 2003.  (Songbird Estates plc Admission Document, published pursuant to the Rules of the Alternative Investment Market (a submarket of the London Stock Exchange, based in London, England), dated April 23, 2004 (Ex. 8) at 70.)[7]  The building has 30 stories and more than one million square feet (*id*.), making it one of the largest buildings in London (Iacobescu Tr. (Ex. 5) 125:19-25 (explaining that, unlike New York, London has only a few buildings of one million square feet or larger)).  Lehman, Lehman Sub and Canary Wharf then executed the Lease, dated March 16, 2005.  (Facts Stipulation (Ex. 1) ¶ 1.)  The Lease contained terms nearly identical to the draft in the Agreement for Lease.  (*Compare* Ex. 6 at CW-8750-862 (Annexure 8) *with* Ex. 9.)  The 25 Bank Street building served thereafter as Lehman's European headquarters. (Lehman Form 10-K, filed with the SEC on February 13, 2006 (Ex. 10) at 16.)

C.    **The Lease**

The Lease is for a term of 30 years commencing July 3, 2003.  (Facts Stipulation (Ex. 1) ¶ 3; Lease (Ex. 9) at LBHI_CW-10 (Lease Particulars ¶ 6).)  The Lease, which states that it "shall be governed by and construed in all respects in accordance with the Laws of England

---

[6]  When Canary Wharf asked Lehman for a Rule 30(b)(6) deponent to testify about the negotiation of the Lease, Lehman designated Richard Krasnow, one of its lawyers at Weil, Gotshal & Manges LLP ("Weil").  Krasnow had no knowledge of the subject.  (Transcript of Deposition of Richard Krasnow, taken June 25, 2013 (Ex. 7) 29:7-34:3, 39:16-40:4.)

[7]  Songbird Estates plc was incorporated in April 2004 for the purpose of acquiring Canary Wharf Group plc.  That acquisition was completed in July 2004, and Songbird Estates plc has been the ultimate parent company of Canary Wharf Group plc since that time.

. . .” (Lease (Ex. 9) at LBHI_CW-67 (§ 8.16); Facts Stipulation (Ex. 1) ¶ 2), provides for rental

payments of more than £1.5 billion as well as other payments, such as building and estate service

charges and insurance, over its 30-year term (Lease (Ex. 9) at LBHI_CW-10 (Lease Particulars

¶¶ 7-12), LBHI_CW-17 (§ 1.24), LBHI_CW-22-26 (§§ 3, 4.1, 4.3, 4.4, 4.5), LBHI_CW-69-73

(§§ 9.1, 9.2), LBHI_CW-106-09 (Schedule 6 Part A)).

Lehman is defined in the Lease as the "Surety," and its obligations are set out in

Section 10 of the Lease, entitled "THE SURETY'S COVENANTS."  (Lease (Ex. 9) at

LBHI_CW-9 (Lease Particulars ¶ 3), LBHI_CW-77 (§ 10).)  That section provides that "IN

consideration of this demise having been made at its request the Surety HEREBY COVENANTS

with the Landlord and as a separate covenant with the Management Company as a primary

obligation in the terms contained in Schedule 4."  (Lease (Ex. 9) at LBHI_CW-77 (§ 10).)

Schedule 4 is clearly an indemnity.  Paragraph 1 of Schedule 4, entitled

"Indemnity by Surety," provides as follows:

1. **Indemnity by Surety**

The Surety hereby covenants with the Landlord and as a separate covenant with the
Management Company as a primary obligation that the Tenant or the Surety shall at all
times until the Tenant shall cease to be bound by the Tenant's covenants in the Lease
during the Term duly perform and observe all the covenants on the part of the Tenant
contained in this Lease including the payment of the rents hereby reserved and all other
sums payable under this Lease in the manner and at the times herein specified and the
Surety shall indemnify and keep indemnified the Landlord and the Management
Company against all claims demands losses damages liability costs fees and expenses
whatsoever sustained by the Landlord or the Management Company by reason of or
arising directly or indirectly out of any default by the Tenant in the performance and
observance of any of its obligations or the payment of any rents and other sums
Provided That the Landlord and the Management Company shall notify the Tenant of
any such actions or other matters and take all reasonable steps to mitigate such losses
having regard to the nature of the breach

(Lease (Ex. 9) at LBHI_CW-101 (Schedule 4 ¶ 1); *see also* Appendix A (highlighted copy of the

provision).)

By contrast, Paragraph 1 of Section 14 of the Lease, entitled "Covenant by Landlord's Guarantor,"[8] does not contain any indemnification "against all claims demands losses damages . . . ."  Instead, that Paragraph states in full:

> The Landlord's Guarantor hereby covenants with the Tenant as a primary obligation that the Landlord shall at all times until the Landlord shall cease to be bound by the Landlord's covenant in the Lease duly perform and observe the covenants on the part of the Landlord contained in this Lease

(Lease (Ex. 9) at LBHI_CW-79 (§ 14.1).)  Thus, Paragraph 1 of Section 14 provides that Canary Wharf's "Guarantor" (a Canary Wharf affiliate) extends a guarantee to Lehman Sub in terms similar to the <u>first</u> obligation of the Surety (Lehman) in Paragraph 1 of Schedule 4, but without an obligation that the Landlord's Guarantor "duly perform and observe the covenants" in the Lease (as the Surety is obligated in Schedule 4).  The <u>second</u> obligation in Paragraph 1 of Schedule 4 -- that "the Surety shall indemnify and keep indemnified the Landlord and the Management Company against all claims demands losses damages liability costs fees and expenses whatsoever . . ." -- is not included among the obligations of the "Landlord's Guarantor" at all.  (*Compare* Lease (Ex. 9) at LBHI_CW-101 (Schedule 4 ¶ 1) *with id.* at LBHI_CW-79 (§ 14.1).)  Clearly, the drafters understood the difference between a guarantee and an indemnity, and Paragraph 1 of Schedule 4 provided for (and is entitled as) an indemnity.

Further, under Paragraph 2 of Schedule 4, Lehman is "jointly and severally liable with the Tenant (whether before or after any disclaimer by a liquidator or trustee in bankruptcy) for the fulfilment of all the obligations of the Tenant under this Lease" and Canary Wharf "may proceed against the Surety as if the Surety was named as the Tenant in this Lease."  (Lease (Ex. 9) at LBHI_CW-101 (Schedule 4 ¶ 2).)

---

[8]  The "Landlord's Guarantor" is Canary Wharf Holdings Limited, an affiliate of Canary Wharf. (Lease (Ex. 9) at LBHI_CW-9 (Lease Particulars ¶ 3).)

In Paragraph 6 of Schedule 4, consistent with the principle that Lehman's obligations are broader than (*i.e.*, not co-extensive with) the Tenant's, Lehman agreed that "[n]one of the following or any combination thereof shall release discharge or in any way lessen or affect the liability of the Surety under this Lease":

- "any variation of the terms of this Lease," subject to a statute not relevant here; and

- "any other act omission matter or thing whatsoever whereby but for this provision the Surety would be exonerated either wholly or in part (other than a release under seal given by the Landlord and/or the Management Company as the case may be)."

(Lease (Ex. 9) at LBHI_CW-102 (Schedule 4 ¶¶ 6(d), (g)).)[9]

In sum, Lehman as Surety has an obligation to perform all of the Tenant's covenants in the Lease and to "indemnify" Canary Wharf against its losses "arising directly or indirectly out of any default by the Tenant," and Lehman's obligations are not discharged or diminished by any "variation" of the Lease or any act or omission by Canary Wharf.  (Lease (Ex. 9) at LBHI_CW-101-02 (Schedule 4 ¶¶ 1, 6).)

### D.   Lehman's U.S. Bankruptcy, Lehman Sub's U.K. Administration, and Canary Wharf's Claims

On September 15, 2008, Lehman filed for bankruptcy in the United States Bankruptcy Court for the Southern District of New York under chapter 11 of the Bankruptcy Code, and on that same day, Lehman Sub was placed into administration in the United Kingdom. (Facts Stipulation (Ex. 1) ¶ 4.)

On September 17, 2009, Canary Wharf filed the Claims against Lehman.  (Facts Stipulation (Ex. 1) ¶ 5.)  The first Claim (No. 14826) sought $4.28 billion in damages for rent,

---

[9]  Paragraph 7 of Schedule 4 provides an additional remedy.  It provides that Lehman "further covenants" that should the Lease be disclaimed or forfeited, Canary Wharf may in its discretion require Lehman to fulfill one of several obligations, including having Lehman enter a new lease "at the same rents and subject to the same covenants conditions and provisions as are contained in this Lease."  (Lease (Ex. 9) at LBHI_CW-103 (Schedule 4 ¶ 7(a)).)  *See* p. 4, n.4, *supra*.

insurance, taxes and certain other amounts due under the Lease if Lehman Sub defaulted and

Canary Wharf was unable to mitigate. (Heron Quays Proof of Claim (Ex. 11) at Addendum ¶ 2.)

The second Claim (No. 14824) sought $195,550,000 in damages for estate service charges due

under the Lease if Lehman Sub defaulted and Canary Wharf was unable to mitigate. (Canary

Wharf Management Proof of Claim (Ex. 12) at Addendum ¶ 2.)

### E.    Lehman Sub Vacated the Property and Canary Wharf Mitigated Its Losses.

In March 2010, Lehman Sub vacated the 25 Bank Street building and stopped

paying rent or any of the other amounts due under the Lease. (Joint Administrators' Progress

Report, dated April 13, 2010 (Ex. 13) at 1, 4, 14; Iacobescu Tr. (Ex. 5) 49:20-50:2, 246:5-12;

Transcript of Deposition of Pamela Kendall, Canary Wharf Counsel, taken June 20, 2013

("Kendall Tr.") (Ex. 14) 99:21-100:8.) In an effort to mitigate the substantial losses that would

have resulted if the building were vacant and no rent was paid, and in accordance with its

obligations to mitigate under Paragraph 1 of Schedule 4, Canary Wharf sought a new tenant for

the 25 Bank Street property. (Iacobescu Tr. (Ex. 5) 32:19-25.) In order to enter into a deal to

mitigate its damages, Canary Wharf was required to terminate the Lease and retake possession of

the property. Under English law, "forfeiture" allows a landlord to bring a lease to an end and re-

enter the property under certain circumstances. (Report of Laurence Rabinowitz, Q.C., dated

July 17, 2013 ("Rabinowitz Report") (Ex. 15) ¶ 20.)[10]

---

[10]  Pursuant to Section 8.1 of the Lease, entitled "Forfeiture," if any rent or estate service charges (among other amounts) is "unpaid for twenty one (21) days after becoming payable (whether formally demanded or not)," then Canary Wharf may re-enter the property and terminate the lease "without prejudice to any rights or remedies which may then have accrued to the Landlord or the Management Company against the Tenant in respect of any antecedent breach of any of the covenants contained in this Lease." (Lease (Ex. 9) at LBHI_CW-60-62 (§ 8.1).)

Accordingly, in a letter agreement between Lehman Sub, its administrators and Canary Wharf, dated December 3, 2010 (the "Forfeiture Letter"), Canary Wharf agreed to exercise its "right to forfeit the Lease by peaceable re-entry" before 11:59 p.m. on December 10, 2010. (Facts Stipulation (Ex. 1) ¶ 6; Forfeiture Letter (Ex. 16) § 2.)[11]  On December 10, Canary Wharf forfeited the Lease and took possession of the 25 Bank Street property. (Iacobescu Tr. (Ex. 5) 37:7-11; Lehman's Reply to Canary Wharf's Response and in Further Support of Objection, filed Jan. 10, 2013 ("Reply") (ECF# 33774) ¶ 6.)  Canary Wharf then entered into an agreement with JPMorgan and certain of its affiliates to purchase the 25 Bank Street property for approximately £470 million by way of a 999-year lease (the "JPM Lease"). (JPM Lease, dated Dec. 20, 2010 (Ex. 19) at Prescribed Clauses LR1, LR3, LR6 & LR7, p. 9, § 2.3.)[12]

The JPM Lease partially mitigated Canary Wharf's damages. Thus, Canary Wharf entered into a Stipulation with Lehman, so ordered by this Court on September 1, 2011, agreeing to limit its $4.28 billion claim (No. 14826) to $770 million. (Stipulation, Agreement and Order, entered Sept. 1, 2011 (ECF# 19644) (Ex. 20) ¶ 2.)  For its other claim for estate service charges (No. 14824), Canary Wharf agreed to a limit of $9.15 million. (*Id.*)

---

[11]  Canary Wharf sent a copy of the Forfeiture Letter to Lehman's lawyers at Weil on December 7, 2010. (Ex. 17.) Canary Wharf also sought confirmation from Lehman that it would not enter a new lease on the same terms as the Lease as required by Paragraph 7 of Schedule 4. In response to multiple inquiries from Canary Wharf's counsel in early December 2010 about whether Lehman would honor this obligation, Lehman's counsel informed Canary Wharf's counsel on December 9, 2010, that "LBHI would not elect to enter into a lease for the premises on the same terms as the current CW/LBL lease." (Ex. 18.)

[12]  There is no dispute that the market for commercial office space in London was much lower in 2010 than it had been in 2005.

F.    **Procedural History**

On August 15, 2012, Lehman filed its Objection to the Claims pursuant to 11

U.S.C. § 502(b) and Rule 3007(d) of the Federal Rules of Bankruptcy Procedure, requesting that

the Court "disallow and expunge the Claim[s]."  (Objection ¶ 3 (ECF# 30055).)  On October 12,

2012, Canary Wharf filed a response to Lehman's objection (ECF# 31341), supported by a

declaration from Q.C. Rabinowitz on issues of English law (ECF# 31343; Ex. 21).  Rabinowitz

subsequently submitted an expert report, dated July 17, 2013, which is attached as Exhibit 15.

On January 10, 2013, Lehman filed a reply in further support of its objection (ECF# 33774),

along with a declaration from Q.C. Millett (Ex. 22).

In February 2013, the parties agreed to bifurcate proceedings into liability and

damages phases.  (*See* Stipulation and Order Governing the Scope and Schedule for Discovery,

entered March 11, 2013 (ECF# 35844).)  Fact and expert discovery on liability was completed in

September 2013.  Canary Wharf now moves for summary judgment on liability.

## ARGUMENT

**I.    The Standard on This Motion**

Pursuant to Rules 7056 and 9014 of the Federal Rules of Bankruptcy Procedure,

Federal Rule of Civil Procedure 56 governs Canary Wharf's motion for summary judgment.

Under Rule 56, the Court "shall grant summary judgment if the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law."  Fed. R. Civ. P. 56(a); *see also D'Amico* v. *City of New York*, 132 F.3d 145, 149 (2d Cir.

1998).  Once the movant satisfies its initial burden of demonstrating the absence of material

facts, the non-moving party must present its own evidence to show that there is a genuine issue

for trial.  *In re Quebecor World (USA), Inc*., 491 B.R. 363, 368 (Bankr. S.D.N.Y. 2013) (citing

*Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323-24 (1986)).

Summary judgment is appropriate because Canary Wharf's motion seeks to

resolve "a pure matter of contract interpretation, and no facts are in dispute."  *See, e.g.*, *MBIA*

*Inc.* v. *Federal Ins. Co*., 652 F.3d 152, 171 (2d Cir. 2011).  Here, the relevant law is that of

England.  (Facts Stipulation (Ex. 1) ¶ 2; Lease (Ex. 9) at LBHI_CW-67 (§ 8.16).)  Pursuant to

Federal Rule of Bankruptcy Procedure 9017 and Federal Rule of Civil Procedure 44.1, "[i]n

determining foreign law, the court may consider any relevant material or source, including

testimony, whether or not submitted by a party or admissible under the Federal Rules of

Evidence.  The court's determination must be treated as a ruling on a question of law."  *See, e.g.*,

*Martinez* v. *Bloomberg LP*, 883 F. Supp. 2d 511, 519 (S.D.N.Y. 2012) (relying in part on

declarations of parties' English-law experts to establish applicable principles of contract

interpretation under English law); *Deutsche Zentral-Genossenschaftsbank AG* v. *HSBC N. Am.*

*Holdings, Inc.*, No. 12 Civ. 4025, 2013 WL 6667601, at *7 (S.D.N.Y. Dec. 17, 2013)

(determining issues of German law based on parties' "dueling expert affidavits").

## II.    Lehman Is Obligated Under Paragraph 1 of Schedule 4 to Indemnify Canary Wharf for Its Losses Caused by Lehman Sub's Default.

### A.    Under English Law, an Indemnitor's Obligations Are More Extensive Than Those of a Guarantor.

Under English law, there are two types of contracts of suretyship:  contracts of

indemnity and contracts of guarantee.  (Rabinowitz Report (Ex. 15) ¶ 44; Millett Decl. (Ex. 22)

¶ 30.)  As both parties agree, a guarantor's liability is secondary to that of the principal such that,

under the principle of "co-extensiveness," the guarantor is generally liable only to the same extent

as the principal.  (Millett Decl. (Ex. 22) ¶ 30; Rabinowitz Report (Ex. 15) ¶ 46.)  In contrast, "the

essential feature of a contract of indemnity is that a primary (rather than secondary) liability falls

upon the giver of the indemnity and (unless given only jointly with the principal) this obligation

is wholly independent of any liability that may arise as between the creditor and the principal";

the principle of co-extensiveness does not apply to an indemnity.  (Rabinowitz Report (Ex. 15)

¶ 46; Millett Decl. (Ex. 22) ¶¶ 30-31, 36; Transcript of Deposition of Richard Millett, taken Sept.

12, 2013 ("Millett Tr.") (Ex. 23) 109:21-110:8.)  Both sides agree on these propositions.

As Lehman's expert states, whether a contract is an indemnity or a guarantee "is

always a question of construction of the terms of the instrument and the character of the

bargain."  (Millett Decl. (Ex. 22) ¶ 32.)  Both parties agree on the relevant principles of

"construction."  Mr. Millett states in his declaration that "I agree with Mr. Rabinowitz's

statement of the basic principles of English law as to the interpretation of commercial contracts."

(*Id.* ¶ 20; *see also* Rabinowitz Report (Ex. 15) ¶ 29.)  As Mr. Rabinowitz explains, under English

law, "[i]nterpretation of a contract involves the ascertainment of the meaning which the

document would convey to a reasonable person having all the background knowledge which

would reasonably have been available to the parties in the situation in which they were at the

time of the contract."  (Rabinowitz Report (Ex. 15) ¶ 30(1).)  Interpreting a contract "involves

checking each of the rival meanings against other provisions of the document and investigating

its commercial consequences"; if analyzing the "words in a commercial contract is going to lead

to a conclusion that flouts business common sense, it must be made to yield to business common

sense."  (*Id.* ¶ 30(5)-(6).)  Thus, this Court need only interpret the Lease's plain language as

understood in the context of the background knowledge available to the parties at the time the

Lease was entered into.

**B.      Schedule 4 to the Lease Is an Indemnity.**

Paragraph 1 of Schedule 4, which is set forth in full on page 7, *supra* (and also attached hereto as Appendix A), is entitled "Indemnity by Surety."[13]  It contains two independent obligations that are separated with the word "and," making clear that they are separate.  *First*, Lehman agreed to "perform and observe all the covenants on the part of the Tenant contained in this Lease including the payment of the rents hereby reserved and all other sums payable under this Lease" until "the Tenant shall cease to be bound by the Tenant's covenants in the Lease . . . ."  (*See* Appendix A (highlighted in blue).)  *Second*, Lehman agreed to "indemnify and keep indemnified" Canary Wharf "against all claims demands losses damages liability costs fees and expenses whatsoever sustained by [Canary Wharf] by reason of or arising directly or indirectly out of any default by the Tenant in the performance and observance of any of its obligations or the payment of any rents and other sums."  (*See* Appendix A (highlighted in green); Rabinowitz Report (Ex. 15) ¶¶ 77-85.)  There is no evidence that the drafters used the words "indemnify" or "keep indemnified" in error.

This second obligation in Paragraph 1 "involves a promise by Lehman to indemnify the Claimants against all losses sustained 'by reason of or arising directly or indirectly out of any default by the Tenant.'  These words import the widest conceivable causal nexus between the default of the Tenant and the losses sustained by the Claimants."  (Rabinowitz Report (Ex. 15) ¶ 81.)  The plain language requires Lehman to pay Canary Wharf's losses arising out of Lehman Sub's default.

---

[13] Rabinowitz explains that, although the label "is not conclusive," such a label "indicates that the parties intended it to take effect as an indemnity rather than a guarantee."  (Rabinowitz Report (Ex. 15) ¶ 48(1).)  Millett agrees that the "labels that the parties use can be a useful guide, particularly if they are repeated . . . ."  (Millett Decl. (Ex. 22) ¶ 32.)

Lehman's Objection depends entirely on an interpretation of Paragraph 1 that construes it to contain a single obligation so that the phrase "until the Tenant shall cease to be bound" applies to and modifies the obligation to indemnify in the second part of the sentence. (Objection ¶ 21; Reply ¶¶ 4, 25(i), 27-28; *see also* Millett Tr. (Ex. 23) 147:4-23.)[14]  Millett's explanation for Lehman's interpretation -- that "[w]hat's being connected is the assumption of obligation with the promise, as it were, as to the extent and manner of performance of that obligation" (Millett Tr. (Ex. 23) 155:20-156:6) -- is contrary to the paragraph's plain language. Indeed, Millett conceded at deposition that "[t]here are no express words in paragraph one or Schedule 4 or to the extent that I have reread it again, which is not much, the lease, which tells you that you have to read paragraph one in the way that I believe it should be read."  (*Id.* at 163:9-164:4.)

Lehman's interpretation of Paragraph 1 does not make grammatical sense and is illogical.  (*See* Rabinowitz Report (Ex. 15) ¶¶ 78-85.)  The second obligation in Paragraph 1 is segregated from the first by the conjunctive "and," meaning that it is not modified by the phrase "until the Tenant shall cease to be bound."  (Lease (Ex. 9) at LBHI_CW-101 (Schedule 4 ¶ 1).) Further, both parties' experts agree that an essential feature of an indemnity is that the indemnitor has a primary obligation (Millett Tr. (Ex. 23) 109:21-110:8; Rabinowitz Report (Ex. 15) ¶ 46), and not only does Paragraph 1 describe the obligations therein as "a primary

---

[14]  Lehman has also argued that Paragraph 7 of Schedule 4 contains Canary Wharf's exclusive remedies in the case of forfeiture (Objection ¶ 22; Reply ¶ 40), but the plain language of the Lease provides otherwise.  Nothing in Paragraph 7 limits or eliminates the rights of Canary Wharf to damages under other provisions of Schedule 4 (such as Paragraph 1).  Rather, Paragraph 7 begins by stating that LBHI "further covenants" before discussing the parties' rights and obligations thereunder.  (Lease (Ex. 9) at LBHI_CW-103 (Schedule 4 ¶ 7).)  And Paragraph 1 does not limit the rights and obligations provided therein, such as by providing that they are applicable "unless governed by Paragraph 7."  (*See id.* at LBHI_CW-101 (Schedule 4 ¶ 1).) Schedule 4 thus permits Canary Wharf to seek a remedy under either Paragraph 1 or Paragraph 7.  (Rabinowitz Report (Ex. 15) ¶¶ 92-100.)

obligation," but both the first and second obligations in Paragraph 1 are primary in nature:  the first obligation is a covenant that either "the Tenant or the Surety shall" perform the covenants in the Lease, and the second obligation is a covenant that "the Surety shall indemnify" Canary Wharf (Lease (Ex. 9) at LBHI_CW-101 (Schedule 4 ¶ 1); *see also* Rabinowitz Report ¶ 48(2)-(4)).  Millett conceded that the contract makes Lehman a "primary obligor" (Millett Decl. (Ex. 22) ¶ 38(5)) and that the use of the term "primary obligation" is relevant, explaining that "one has to assume that when the parties chose to use the words, they did so with some kind of purpose in mind" (Millett Tr. (Ex. 23) 116:19-117:2).[15]  He also conceded that "of course, you would look at all the words, and included in the words are the words 'shall indemnify and keep indemnified.'  I'm not going to pretend it's irrelevant."  (Millett Tr. (Ex. 23) 140:25-141:15.)  The plain words of Paragraph 1 provide for an indemnity.

There is other clear evidence that the parties intended for Lehman's obligations to be those of an indemnitor, not a guarantor.  *First*:

- Section 10 of the Lease refers to "Schedule 4" as "a primary obligation."

- Paragraph 2 of Schedule 4 provides that (i) Lehman is "jointly and severally liable" for Lehman Sub's obligations under the Lease (in other words, Lehman is a primary obligor), and (ii) Canary Wharf "may proceed against the Surety [*i.e.*, Lehman] as if the Surety was named as the Tenant in this Lease."

- Paragraph 6 of Schedule 4 provides that certain events will not "release discharge or in any way lessen or affect the liability of the Surety," consistent with the principle that Lehman's obligations are not co-extensive with the tenant's (as they would be in an ordinary guarantee).

---

[15]  Millett argues that Paragraph 1's use of the term "a primary obligation" supports that paragraph being read as a single obligation instead of two independent obligations.  (Millett Decl. (Ex. 22) ¶ 69.)  But that argument cannot be reconciled with the use of that exact same term in Section 10 of the Lease to refer to all of Schedule 4.  (Lease (Ex. 9) at LBHI_CW-77 (§ 10).)  Millett does not argue, nor could he, that Schedule 4 constitutes only a single obligation.  The phrase "as a primary obligation" simply describes the *nature* of the obligations, not the *number* of obligations.

(Ex. 9 at LBHI_CW-77 (§ 10), LBHI_CW-101-02 (Schedule 4 ¶¶ 2, 6); Rabinowitz Report (Ex. 15) ¶ 48.)  Section 14 of the Lease is also quite telling.  That section sets forth the obligations of the "Landlord's Guarantor."  (Lease (Ex. 9) at LBHI_CW-79-81 (§ 14); *id.* at LBHI_CW-9 (Lease Particulars ¶ 3).)  Those "Guarantor" obligations are similar to the Lehman obligations in the first part of Paragraph 1 (the part that includes the phrase "until the Tenant shall cease to be bound"), but the second obligation in Paragraph 1 of Schedule 4 -- *i.e.*, that Lehman "shall indemnify and keep indemnified" -- is entirely absent from Section 14.  (*Compare* Lease (Ex. 9) at LBHI_CW-79 (§ 14.1) *with id.* at LBHI_CW-101 (Schedule 4 ¶ 1.)  And Schedule 4 has the other following notable differences from Section 14 that also demonstrate that the parties intended Schedule 4 to be an indemnity:  (a) in Schedule 4, Lehman is named the "Surety" rather than the "Tenant's Guarantor" (as in Section 14); (b) the title of Paragraph 1 of Schedule 4 is "Indemnity by Surety,"  in contrast with Section 14.1's "Covenant by Landlord's Guarantor"; (c) Lehman agreed in the first part of Schedule 4 that "the Tenant *or the Surety* shall" perform the Tenant's covenants under the Lease, whereas the Landlord's Guarantor agreed in Section 14 only that "the Landlord shall" perform the Landlord's covenants; and (d) Paragraph 8 of Schedule 4 refers twice to its benefit being one of "guarantee and indemnity," while the analogous provision in Section 14.7 refers merely to a "guarantee."  (*Compare* Lease (Ex. 9) at LBHI_CW-79-81 (§ 14) *with id.* at LBHI_CW-101 (Schedule 4 ¶ 1) (emphasis added); Rabinowitz Report (Ex. 15) ¶¶ 48(3), 48(9), 85.)

  *Second*, as Rabinowitz explains, in interpreting Schedule 4, an English court would take into account the background facts known or reasonably available to the parties.  (Rabinowitz Report (Ex. 15) ¶ 49; *see also* Fed. R. Civ. P. 44.1.)  Here, that background knowledge includes "the fact that the Lease had been entered into with an English subsidiary of a

major New York investment bank as Tenant, and that the Landlord might be expected to seek the strongest possible security from the New York parent in respect of the liabilities under the Lease." (Rabinowitz Report (Ex. 15) ¶ 49.) As Sir George Iacobescu testified, Canary Wharf's regular practice at the time of the Lease's negotiation was to "always ask for an indemnity." (Ex. 5 at 239:25-240:11.) He further testified that Canary Wharf "would not have entered into any . . . lease agreement unless we had the parent company indemnity" and did not recall Lehman objecting at any time to this request. (*Id.* 240:20-241:2.) Indeed, the certainty of an uninterrupted cash flow provided by an indemnity was key to Canary Wharf, given that the rental income would be securitized in the form of bonds. (*Id.* 241:8-17.) That testimony is undisputed. *See* p. 6 n.6, *supra*.

In short, Lehman seeks to excise or overlook key terms from the Lease and to ignore the undisputed testimony about the negotiations of the Lease -- both of which clearly demonstrate that Lehman is an indemnitor -- but has no plausible rationale for doing either. There is no dispute that under English law an indemnitor may be liable regardless of whether the underlying obligor is liable. *See* pp. 13-14, *supra*. As Rabinowitz explains, the losses sought by Canary Wharf in the Claims (rent and other amounts that would have been paid under the Lease, less sums received by mitigation) plainly fall within the scope of the indemnity in Paragraph 1 of Schedule 4. (Rabinowitz Report (Ex. 15) ¶ 87.)

## III. Lehman Is Also Liable Under Paragraph 1 of Schedule 4 for Canary Wharf's Losses From Lehman Sub's Repudiatory Breach of the Lease.

Alternatively, even if Schedule 4 did not contain the second obligation in Paragraph 1 and even if Schedule 4 were a guarantee, Lehman is obligated under the first obligation in Paragraph 1 to pay Canary Wharf the unpaid rent and other amounts due under the Lease sought in the Claims. This is so because Lehman Sub's failure to pay any rent (and other

amounts due under the Lease) after March 2010 amounted to a repudiatory breach that gave rise to a damages claim for the entire unpaid value of the Lease.  (Rabinowitz Report (Ex. 15) ¶ 89.)[16]

Under English law, a serious breach of a contract, *e.g.*, a failure to pay installments in respect of service rendered, constitutes a repudiation of the breaching party's obligations under the contract.  (*Id.* ¶ 89(1)-(4).)  Such a "repudiatory breach" provides grounds for termination of that contract by the non-breaching party.  (*Id.* ¶ 89(4).)  Upon such termination, the non-breaching party may recover -- against both the breaching party and its surety -- for the remaining value of the unperformed portions of the contract.  (*Id.* ¶ 89(5).)

With respect to a lease, as Mr. Rabinowitz explains, an English court would hold that a tenant's failure to pay rent constitutes a repudiatory breach of that lease.  (*Id.* ¶ 89(6).) There is no direct English law authority on the issue of whether a "landlord would be entitled to recover from a tenant in [repudiatory] breach the losses flowing from the forfeiture, such as any difference between the rent under the lease and market rent at the date of forfeiture for the remainder of the term."  (*Id.* ¶ 89(6)-(7).)  Mr. Millett argues that an English appellate court decision, *Reichman* v. *Beveridge*, [2006] EWCA Civ 1659 (Ex. 24), and a treatise citing *Reichman* stand for the proposition that when a tenant defaults, the landlord must elect either to continue to claim rent as it becomes due or to forfeit the lease and no longer claim future rent. (Millett Decl. (Ex. 22) ¶¶ 73-74.)  But the court in *Reichman* merely decided whether or not it was "unreasonable" for the landlord in that case not to forfeit the lease and instead continue to claim rent as it became due.  The discussion in *Reichman* of whether a tenant could repudiate a

---

[16]  The first obligation in Paragraph 1 of Schedule 4 is an indemnity.  Lehman agreed therein that "the Tenant *or the Surety* [*i.e.*, Lehman] shall" perform the Tenant's covenants under the Lease, which is a primary obligation by Lehman.  *See* pp. 16-17, *supra*.  The Court need not decide whether the first obligation in Paragraph 1 of Schedule 4 is an indemnity or guarantee, however, because Lehman is liable either way.

lease giving rise to a claim by the landlord for damages for lost future rent was "not directly in

issue," and the court explicitly stated that "it would be wrong to decide it unnecessarily."

(*Reichman* (Ex. 24) ¶ 42; *see also* Rabinowitz Report (Ex. 15) ¶ 89(7).)  Millett thus relies solely

on pure *dicta*.

        The Northern Ireland Court of Appeal in *Rainey Brothers Ltd.* v. *Kearney*, 1990

N.I. 18 (Court of Appeal) (Hutton, C.J.) (Ex. 25), has directly decided the issue.  Mr. Rabinowitz

explains that he would expect an English court to follow this decision because (i) English courts

typically give great deference to the courts of Northern Ireland, (ii) the decision is consistent

with the law in other common-law jurisdictions such as Australia and Canada, (iii) the jurist who

authored the *Rainey Brothers* decision (Lord Hutton) subsequently served in the House of Lords,

then England's highest court, and (iv) the opinion considers and expressly relies on decisions by

English courts (not those of Northern Ireland).  (Rabinowitz Report (Ex. 15) ¶ 89(8)-(9).)  Indeed,

Millett concedes that "Northern Irish decisions are to be afforded considerable respect in an

English court [and] that the decision [in *Rainey Brothers*] was founded entirely upon three earlier

English cases and so is not a decision on purely Northern Irish law."  (Millett Decl. (Ex. 22) ¶ 75.)

        In *Rainey Brothers*, a tenant signed a 20-year lease and stopped paying rent in the

fifth year.  In the sixth year, the landlord re-entered the premises for non-payment of rent and

terminated the lease.  *Rainey Brothers*, 1990 N.I. at 19 (Ex. 25).  The landlord subsequently relet

the premises at a rent lower than that agreed to by the original tenant.  *Id*.  The court held that "a

lessor who terminates a lease for non-payment of rent may recover damages to compensate him

for the loss of rent which would have been payable under the lease."  *Id*. at 19-20.  The court also

noted that the lease with the original tenant had a provision that upon re-entry "this demise

should be absolutely determined but without any prejudice to any claim by the Lessor in respect

of any antecedent breach of any covenant or provision herein contained." *Id.* at 19.  The court concluded that the landlord could recover damages for the loss of rent between termination and the granting of the new lease as well as the difference between the new and old leases' rent.  *Id.* at 19-21.

Here, Lehman Sub committed a repudiatory breach under English law when it stopped paying rent after March 2010, and thus Canary Wharf's claim for damages for the unpaid rent and other amounts due under the Lease (less mitigation) arose at that time. (Rabinowitz Report (Ex. 15) ¶ 89(10).)  The fact that Canary Wharf forfeited the Lease in December 2010 does not alter or eliminate Canary Wharf's damages claim (*see* Objection ¶¶ 21-22), just as termination of the lease by re-entry did not do so in *Rainey Brothers*.  Indeed, Section 8.1 of the Lease, similar to the lease in *Rainey Brothers*, confirms that Canary Wharf's damages claim is unaffected by forfeiture:  after forfeiture, Canary Wharf could re-enter the property and terminate the lease "without prejudice to any rights or remedies which may then have accrued" to Canary Wharf "against the Tenant in respect of any antecedent breach of any of the covenants contained in this Lease."  (Lease (Ex. 9) at LBHI_CW-60-62 (§ 8.1); *see also* Rabinowitz Report (Ex. 15) ¶ 86.)  Therefore, the first obligation in Paragraph 1 of Schedule 4 provides an alternative ground for granting Canary Wharf summary judgment on the issue of liability.

**CONCLUSION**

This Court should grant summary judgment to Canary Wharf with respect to

Lehman's liability for the Claims.

Dated:    March 14, 2014

Respectfully submitted,

/s/ David B. Tulchin
David B. Tulchin
Marc De Leeuw
John J. Jerome
Andrew E. Gelfand
John G. McCarthy
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Tel:  (212) 558-4000
Fax:  (212) 558-3588

*Attorneys for Canary Wharf Management Ltd.,
Heron Quays (HQ2) T1 Limited and Heron Quays
(HQ2) T2 Limited*

**APPENDIX A**

Paragraph 1 from Schedule 4 of the Lease

## 1.    Indemnity by Surety

The Surety hereby covenants with the Landlord and as a separate covenant with the Management Company as a primary obligation that the Tenant or the Surety shall at all times until the Tenant shall cease to be bound by the Tenant's covenants in the Lease during the Term duly perform and observe all the covenants on the part of the Tenant contained in this Lease including the payment of the rents hereby reserved and all other sums payable under this Lease in the manner and at the times herein specified *and* the Surety shall indemnify and keep indemnified the Landlord and the Management Company against all claims demands losses damages liability costs fees and expenses whatsoever sustained by the Landlord or the Management Company by reason of or arising directly or indirectly out of any default by the Tenant in the performance and observance of any of its obligations or the payment of any rents and other sums Provided That the Landlord and the Management Company shall notify the Tenant of any such actions or other matters and take all reasonable steps to mitigate such losses having regard to the nature of the breach