# Exhibit 15

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

| | |
|---|---|
| **IN RE LEHMAN BROTHERS HOLDINGS INC.,** *et al.,* **Debtors.** | **Chapter 11 Case No. 08-13555 (JMP)** |
| | **(Jointly Administered)** |

---

### REPORT OF LAURENCE RABINOWITZ, Q.C.

**A.    INTRODUCTION**

1.    Canary Wharf Management Limited (the "Management Company") and Heron Quays (HQ2) T1 Limited and Heron Quays (HQ2) T2 Limited ("the Landlord", and together with the Management Company, the "Claimants") have filed proofs of claim against Lehman Brothers Holdings Inc ("LBHI"). On 15 August 2012, LBHI filed objections to the proofs of claim ("the Objections"). I was asked by counsel for the Claimants, Sullivan & Cromwell LLP, to set out my opinions on matters of English law arising out of the Objections, which I did in a declaration dated October 11, 2012, that I understand was filed in the above-captioned matter. In this report, I set out again my opinions on those matters, which have not changed since I wrote that declaration but are now supplemented with reference to additional material and refers to a declaration of Richard Millett, Q.C. who is acting for LBHI in this matter.

2.    The structure of my report is as follows:

    (1)    Personal Background (Section B);

    (2)    Factual Background (Section C);

    (3)    The Issues (Section D);



(4)     Executive Summary of Conclusions (Section E);

(5)     Principles of Contractual Construction (Section F);

(6)     The Effect of a Material Variation (Section G);

(7)     The Meaning of the Forfeiture Letter (Section H);

(8)     The Effect of Forfeiture on LBHI's Obligations (Section I);

(9)     The Meaning of Para 7(a) (Section J);

(10)    Anticipatory Breach of Para 7(a) (Section K); and

(11)    Conclusions (Section L).

## B.      PERSONAL BACKGROUND

### (1)     Current Occupation

3.      I am a practising barrister at the Commercial Bar in London at the Chambers of Lord
Grabiner QC, One Essex Court. I was called to the Bar by Middle Temple in 1987, and
was made a Queen's Counsel in 2002 and have been a Bencher of Middle Temple (i.e. a
member of its governing body) since 2008. My practice covers many areas and often
involves disputes between international and multi-national companies, both English and
foreign. I am recommended in the latest editions of *Chambers UK Bar* and *Legal 500*
(industry guides to the profession) as a "*star individual*" in the fields of Commercial
Dispute Resolution, Banking & Finance and Energy & Natural Resources and also as a
leading barrister in Civil Fraud, International Arbitration and Tax.

4.      I appear regularly as counsel in the High Court in London, as well as in the Court of
Appeal and Supreme Court (having appeared as an advocate on a number of occasions in
the House of Lords, which was England's highest court until its replacement by the
Supreme Court in October 2009).

2

5.    Because commercial disputes usually arise out of a contractual framework, questions of contractual interpretation (also referred to by English lawyers as "contractual construction") arise in virtually all the work I do.

6.    I am being compensated at a rate of £1,000 per hour for my work on this case.

**(2)    Educational Background and Qualifications**

7.    I have a Bachelor of Arts degree and a Bachelor of Laws degree (first class, cum laude) from the University of Witwatersrand, Johannesburg, South Africa. I also have a degree in Jurisprudence (first class) and a Bachelor of Civil Law degree (first class) from the University of Oxford.

8.    I was awarded the Juta Prize for best non-graduating law student of the University of Witwatersrand (1982) and the Advocate's Prize for best graduating law student of the same university (1983).

9.    I was awarded a Rhodes Scholarship to study at the University of Oxford in 1983. After completing my degrees there, I was made the Eldon Scholar in 1986.

10.    Prior to my call to the Bar, the Honourable Society of the Middle Temple awarded me a Harmsworth Major Scholarship together with a Queen Mother's Scholarship.

11.    I am the current editor of *Weinberg & Blank on Take-overs and Mergers* (5th edition), the leading text on this subject.

12.    I have been appointed to the Advisory Group which is assisting Professor Andrew Burrows, Professor of the Law of England at the University of Oxford, to publish *A Restatement of the English Law of Contract*. I was previously a member of the Advisory Group for Professor Burrows' *A Restatement of the English Law of Restitution* (OUP, 2012). I have recently been elected Vice-Chair of the Commercial Bar Association

3

(COMBAR), which represents barristers who practise in the field of international and commercial law.

13. Since 2010, I have served on the awarding committee for the Eldon Scholarship by the University of Oxford.

14. My full CV, including all publications authored by me in the past 10 years, is included as Appendix A. I have not testified as an expert at trial or by deposition in the last four years.

## C.    FACTUAL BACKGROUND

15. My understanding of the factual background is based upon the documents referred to below, the documents and deposition testimony listed in Appendix B, and on information provided to me by Sullivan & Cromwell LLP, the attorneys for the Claimants.

16. By a lease dated 16 March 2005 ("the Lease"), the Landlord granted a lease for a term of 30 years (from 3 July 2003) to an English company, Lehman Brothers Limited ("the Tenant"), of certain commercial premises, including the building at 25 Bank Street, Canary Wharf, London. The building was constructed specifically at the request of LBHI and on the footing that it would be occupied by the Tenant for the duration of the Lease.

17. LBHI was a party to the Lease as "Surety". Schedule 4 of the Lease is entitled, "Covenants by the Surety". Under English law, as I will explain below, Schedule 4 is considered to be a contract of indemnity.

18. On 15 September 2008 joint administrators were appointed in England in the administrative insolvency proceedings of the Tenant. On the same date, LBHI commenced proceedings under title 11 of the US Bankruptcy Code.[1]

19. On 17 September 2009, the Claimants filed proofs of claim in the bankruptcy of LBHI.

---

[1]    Objections, paras 5 and 7.

20.  From April 2010 onwards, the Tenant failed to make payments in rent. On this basis, pursuant to clause 8.1 of the Lease, the Landlord had a lawful right to forfeit the Lease by peaceable re-entry. Forfeiture is the label given by English law to the right of a landlord under a lease, upon the occurrence of a specified event, to bring the lease to an end and re-enter the premises.

21.  On 3 December 2010, the Claimants entered into an agreement with the Tenant (in administration) ("the Forfeiture Letter"). By para 1.1 of the Forfeiture Letter, the administrators of the Tenant consented to the Claimants forfeiting the Lease by means of peaceable re-entry, so that it would not be necessary to obtain the leave of the Court.[2]

22.  On 20 December 2010, the Claimants' assignee granted a Lease of the premises to JPMorgan Chase Bank, NA ("JPMorgan").[3] The rent payable under the JPMorgan lease is substantially lower than that which would have been payable under the Lease.

23.  Prior to the execution of the lease with JPMorgan, LBHI had informed the Claimants that it would not elect to enter a new lease of the premises on the same rents and other terms as the Lease.

24.  I understand that on 15 August 2012 LBHI filed its Objections to the Claimants' proofs of claim, on 12 October 2012 the Claimants filed a response to LBHI's Objections (with my supporting declaration), and on 10 January 2013 LBHI filed a reply to the response, including a supporting declaration by Richard Millett Q.C. ("Millett Declaration" or "Millett Decl."). As I understand it, LBHI and Mr Millett contend, in summary, that LBHI's obligations under Schedule 4 were discharged by a material variation of the

---

[2]    Because the Tenant was in administration, the leave of the Court would otherwise have been required to exercise a right of forfeiture under the Lease: para 43(4) of Schedule B1 of the Insolvency Act 1986.

[3]    Objections, para 14.

Lease which LBHI contends was effected by clause 4 of the Forfeiture Letter. In the alternative, LBHI and Mr Millett contend that LBHI's liability ceased upon forfeiture when the Tenant's obligations under the Lease ceased. In the further alternative, LBHI and Mr Millett contend that, pursuant to para 7 of Schedule 4, LBHI's liability continues only until the expiration of 180 days after forfeiture or until the grant of the lease to JPMorgan, whichever is sooner and, accordingly, that LBHI is released from any liability accruing after 20 December 2010 (the date of the JPMorgan lease).[4]

**D.    ISSUES**

25.    The following issues of English law arise out of LBHI's Objections:

(1)    Would a material variation of the Lease result in the discharge of LBHI's obligations under Schedule 4? (see Section G)

(2)    Did the releases of LBL in clause 4 of the Forfeiture Letter in fact constitute a material variation of the terms of the Lease? (see Section H)

(3)    Did the forfeiture of the Lease mean that LBHI's liability under Schedule 4 ceased? (see Section I)

(4)    Is LBHI's liability under Schedule 4 limited to the payment of rent and other amounts due up to 20 December 2010 pursuant to para 7(b) of Schedule 4? (see Section J)

---

[4]    Mr Millett raises the possibility that the transactions leading up to the grant of the JPMorgan lease may "*affect the claims of the original landlords against LBHI for post forfeiture rent*" on the basis that the transactions may have had the "*consequence of breaking the nexus between the original landlords and LBL as to future liabilities*". I do not understand on what basis it might be suggested that those transactions could have that consequence and I note that Mr Millett declines to express any firm view pending review of the full documentation. (Millett Decl., paras 11-15.)

6

(5)     Did LBHI's statement that it would not elect to execute a replacement lease on the same terms as the Lease constitute an anticipatory breach of para 7(a) of Schedule 4? (see Section K)

## E.     EXECUTIVE SUMMARY OF CONCLUSIONS

26.     My conclusions on the issues identified in para 25 above may be summarised as follows (adopting the same numbering):

(1)     Because Schedule 4 is a contract of indemnity and not a contract of guarantee, LBHI's obligations would not be discharged by a material variation of the Lease. Even if (contrary to my view) Schedule 4 is a contract of guarantee, a material variation of the Lease would not discharge LBHI's obligations because paras 6(d) and/or (g) of Schedule 4 provide that a variation of the Lease will not discharge or exonerate LBHI.

(2)     In any event, clause 4 of the Forfeiture Letter does not effect a variation of the Lease because the releases are confined to claims for rent as an administration expense (which do not arise from the terms of the Lease) while the Landlord's ability to claim for unpaid rent in the administration of the Tenant as an unsecured creditor is expressly preserved.

(3)     The Claimants are entitled to an indemnity in respect of losses flowing from the Tenant's default under the second part of para 1 of Schedule 4, even though, following the forfeiture, the Tenant is no longer bound by the covenants in the Lease, because such losses arise from the Tenant's pre-forfeiture default. Even if (contrary to my view) Schedule 4 were limited to a guarantee of the Tenant's obligations under the Lease, forfeiture of the Lease resulting from the Tenant's repudiatory breach would trigger a liability on the part of the Tenant to pay

7

damages for the loss of future rent, which the Claimants would be entitled to recover from LBHI. The assertion in the Objections and by Mr Millett that forfeiture releases LBHI from liability under Schedule 4 is not correct.

(4)     Para 7 of Schedule 4 confers an additional remedy on the Claimants and does not detract from their right to be indemnified in respect of damages pursuant to para 1.

(5)     LBHI's decision not to execute a new lease in accordance with para 7(a) of Schedule 4 would constitute an anticipatory breach of contract. The damages recoverable by the Claimants include the difference between the rent and other charges payable for the remainder of the Lease and the sums payable under the lease with JPMorgan.

27.     After reaching my opinions in this case (which are as stated above) and submitting my declaration, I understand that the parties exchanged, and obtained from others, a substantial number of documents and took depositions of nine witnesses.   I have reviewed the transcripts of the depositions and the exhibits marked at those depositions. None of those materials have changed my opinions on these matters.

## F.     PRINCIPLES OF CONTRACTUAL CONSTRUCTION

28.     Under English law, the modern approach to the interpretation of contracts of suretyship and leases is to apply the same general principles as apply to the interpretation of any other contract. It may therefore be helpful to identify at the outset what those general principles are. They have been authoritatively stated in a series of recent decisions of the House of Lords and Supreme Court: *Investors Compensation Scheme* v *West Bromwich Building Society* [1998] 1 W.L.R. 896 at 912-3; *Chartbrook Ltd* v *Persimmon Homes Ltd*

8

[2009] UKHL 38, [2009] 1 AC 1101; *Re Sigma Finance Corp* [2009] UKSC 2, [2010] 1
All ER 571; and *Kookmin Bank* v *Rainy Sky SA* [2011] UKSC 50, [2012] 1 All ER 1137.

29.    I note that there is no dispute concerning these points or the general principles of
contractual construction that follow. In my October declaration, I set forth the same key
principles and Mr Millett explicitly agreed: *"I agree with Mr Rabinowitz's statement of
the basic principles of English law as to the interpretation of commercial contracts. I
also agree that those principles apply for the most part generally to leases, guarantees
and indemnities."*[5]

30.    The key principles may be summarised as follows:

    (1)    Interpretation of a contract involves the ascertainment of the meaning which the
document would convey to a reasonable person having all the background
knowledge which would reasonably have been available to the parties in the
situation in which they were at the time of the contract: *Investors* at page 912H;
*Kookmin* at para 14.

    (2)    Subject to the exception in (3) below, this background knowledge includes
anything which would have affected the way in which the language of the
document would have been understood by a reasonable man: *Investors* at
page 913A.

    (3)    The law excludes from the admissible background the previous negotiations of
the parties and their declarations of subjective intent: *Investors* at 913B;
*Chartbrook* at para 41.

---

[5]    Millett Decl., para 20.

9

(4)     The background referred to in (2) above may enable one to choose between the possible meanings of words which are ambiguous or even to conclude that the parties must, for whatever reason, have used the wrong words or syntax: *Investors* at page 913C-D; *Chartbrook* at para 41.

(5)     The resolution of an issue of interpretation of a contract is an iterative process, which involves checking each of the rival meanings against other provisions of the document and investigating its commercial consequences: *Sigma* at para 12. If there are two or more possible constructions, it is generally more appropriate to adopt the construction which is most consistent with business common sense and to reject the other: *Kookmin* at paras 21 and 30.

(6)     If a detailed semantic and syntactical analysis of words in a commercial contract is going to lead to a conclusion that flouts business common sense, it must be made to yield to business common sense: *The Antaios* [1985] AC 191 at 201; *Investors* at 913 D-F.

31.     There are suggestions in some, particularly older, cases, that a special approach must be taken to the construction of contracts of suretyship, i.e. contracts of indemnity or guarantee (a distinction I explain further below), namely that in the event of ambiguity such contracts must be construed strictly in favour of the surety and that no liability is to be imposed on him which is not clearly and distinctly covered by the contract: e.g. *Blest* v *Brown* (1862) 3 De GF&J 367, 376. There is a divergence of views among treatise authors as to the extent to which this special approach has been overtaken by the modern case-law on the construction of contracts generally: O'Donovan and Phillips suggest that

10

there is no need to preserve the older approach even as a rule of last resort[6]; by contrast, Andrews and Millett argue that the modern approach to construction is not inconsistent with the retention of a requirement that the courts should in general require evidence of clear intention in a case of suretyship.[7]

32.     The Millett Declaration argues for the older approach.[8]  In concluding that rules of strict construction should be applied to contracts of suretyship, however, Mr Millett substantially overstates the effect of the cases referred to.  For example, the Court of Appeal's view in *Estates Gazette* is that the old rules of construction are "*very much a matter of last resort*".  Similarly, the reference by Mr Millett to *Cattles* is somewhat misleading because although Lloyd LJ does recognise that the *contra proferentem* rule has a legitimate role in an appropriate case, he says that it "*only*" applies if the document, properly construed, is unclear, "*So the court's first task is to construe the document properly on ordinary principles.*"  This is consistent with the views expressed in a leading treatise on contractual interpretation by Sir Kim Lewison (a judge of the English Court of Appeal), *The Interpretation of Contracts* (5th ed, 2011), which is regularly cited with approval by the English Courts.  The treatise states (at section 7.08) that it is "*doubtful*" whether the mere fact that a contract is one of guarantee is enough to bring the *contra proferentem* principle into play.  The treatise cites the observations of Millett J (later Lord Millett) to the effect that the words have to be fairly construed in their context and in accordance with their proper meaning, without in any way favouring the guarantor, who is not placed in any more favourable position in this regard than any other

---

[6]     *The Modern Contract of Guarantee* (2nd ed, 2010), para 5-07.
[7]     *Law of Guarantees* (6th ed, 2012), para 4-002 on page 119.
[8]     Millett Decl., paras 21-28.

11

contracting party, and that the "*so-called rule of construction is very much a matter of last resort*".

33.    On a separate point, I note that at the deposition of Sir George Iacobescu (pages 18-21), counsel for LBHI seemed to suggest that LBHI might argue that Schedule 4 should be interpreted against the Claimants because that document was similar in form to that used in other leases granted by the Claimants.    Such an argument would be based on the premise that the *contra proferentem* principle applies as against the party that drafted the contract or instrument.    Sir Kim's treatise notes (at section 7.08) that there are differing and potentially conflicting views about whether the *contra proferentem* rule is engaged at all by the fact that one side or another drafted the contract, as distinct from the principle applying as against the party invoking or benefiting from a particular clause.    Two further points of note are made in the treatise.    First, Sir Kim explains that the principle applies only where there is genuine doubt or ambiguity, and that the principle cannot be used for the purpose of creating a doubt or magnifying an ambiguity, where none would otherwise exist.    Second, the clear trend of the modern authorities is to "*struggle with the words actually used as applied to the unique circumstances of the case*" rather than rely on a principle which is now regarded as one of "*last resort*".    Moreover, as Gloster J (now Gloster LJ) stated in *CDV Software Entertainment AG v Gamecock Media Europe Ltd* [2009] EWHC 2965, the principle is "*of uncertain application and little utility in the context of commercially negotiated agreements*".

34.    Mr Millett suggests that what he calls the "*strict rule of construction*" may remain applicable in the interpretation of provisions which are designed to preserve the liability of a guarantor, in circumstances where a guarantor would otherwise be discharged under

the general law.[9]  This appears to be a separate point from Mr Millett's later contention (with which I would not disagree) that, where parties are minded to exclude one or more of the normal incidents of suretyship, clear and unambiguous language must be used.[10]

35.   However, the only judicial authority which he cites for a "*strict rule*" approach to construction, namely *Liberty Mutual*, was not a case about a provision preserving the liability of a guarantor at all, but rather concerned whether a clause in a surety bond excluded rights of subrogation. Moreover, Rix LJ accepted that modern authority had moved away from "*technical or hostile attitudes to exclusion clauses*" and merely observed that the reasonable reader does not expect "*fundamental principles of law, equity and justice, such as rights of set-off or of subrogation to be excluded unless the contract clearly says so.*" Mr Millett suggests that these observations call into question the correctness of the view of Stanley Burnton J (who later became a judge of the Court of Appeal) in *Barclays Bank plc* v *Kingston* at paras 28-29 to the effect that clauses preserving the guarantor's liability should not be interpreted "*with the hostility traditionally shown to guarantees*" but should rather be interpreted "*as a commercial document and to give it a sensible meaning*". I disagree with Mr Millett: in my view, Stanley Burnton J's view is entirely consistent with *Liberty Mutual*, and with the subsequent cases.

36.   In any event, I am not persuaded that, for any practical purposes, there is any material distinction between the two approaches. For my part, I consider that the modern principles of contractual construction, since they rely on the concept of the "*reasonable reader*", are sufficiently flexible to take account of the fact that the document being

---

[9]    Millett Decl., para 25.
[10]   Millett Decl., paras 26-27.

13

construed is a contract of suretyship (insofar as this would make any difference to the meaning that the document would otherwise convey to the reasonable reader). In any event, the views I express below about the meaning of Schedule 4 would be the same, regardless of whether there is a rule that a contract of suretyship must be construed strictly in favour of the surety or not.

**G.      THE EFFECT OF A MATERIAL VARIATION**

37.      LBHI and Mr Millett contend that there is a rule of English law that a guarantee is discharged if there is a material variation of the underlying contract to which the guarantor does not consent ("the material variation rule").[11]

38.      I agree that there is such a rule: *Holme v Brunskill* [1877] 3 QBD 495.[12] I also agree that, as set out in the authorities invoked by LBHI,[13] a variation is deemed to be material unless it is self-evident that it is unsubstantial or will not prejudice the guarantor by affecting the risk of default by the principal.

39.      Proceeding from this basis, LBHI and Mr Millett further contend that clause 4 of the Forfeiture Letter effected a material variation to the Lease to which LBHI did not consent, and that, as a result, LBHI's obligations under Schedule 4 are enforceable.[14]

40.      As a matter of English law, this further contention is not correct for a number of reasons. I set out these reasons below.

41.      In this section, I will assume for the sake of the discussion that the Forfeiture Letter effected a variation of the Lease that was material (an assumption I revisit and conclude to be mistaken in Section H below), and that LBHI did not consent to such variation. At

---

[11]    Objections, para 17; Millett Decl., paras 19(iv), 40.
[12]    Cited by LBHI at Objections, para 17; Millett Decl., paras 19(iv), 40.
[13]    Objections, para 18.
[14]    Objections, paras 19 to 20; Millett Decl., paras 19(iv), 49, 53-55.

this stage, the question is whether, on these assumptions, the material variation rule would apply so as to discharge LBHI.

42. In summary, under English law, even on these assumptions, LBHI would not, by reason of that variation, have been discharged from liability under Schedule 4. This is because, as Mr Millett states in his declaration: *"The principle in Holme v Brunskill does not apply to a contract of indemnity."*[15] Schedule 4 is a contract of indemnity, and consequently the material variation rule does not apply to it.

43. It is convenient to explain the distinction between a guarantee and an indemnity by reference to the decision, in 2010, of Sir William Blackburne, sitting in the High Court of England, in *Vossloh Aktiengesellschaft* v *Alpha Trains (UK) Ltd* [2010] EWHC 2443 (Ch), [2011] 2 All ER (Comm) 307, which provides one of the most comprehensive recent judicial analyses of the nature of a contract of suretyship. Mr Millett agrees in his declaration, stating that *Vossloh* summarizes the principles of suretyship *"accurately."*[16] As the judge in *Vossloh* acknowledges (para 19), the analysis in *Vossloh* is drawn from some of the leading treatises but also accords with his own experience of the law in this area. I would add that the guarantee/indemnity distinction is so fundamental to the law in this area that it is generally addressed in the very first chapter of the relevant treatises (including Mr Millett's).[17]

44. The starting point is that a contract of suretyship is a contract by which one person (the surety) agrees to answer for the liability of another (the principal) to a third party (the creditor), under which the surety's liability is in addition to, and not in substitution for,

---

[15]    Millett Decl., para 29 & note 8.
[16]    Millett Decl., para 30.
[17]    *Law of Guarantees*, para 1-003; *The Modern Contract of Guarantee*, para 1-91.

the liability of the principal: *Vossloh*, para 21. There are two categories of suretyship: contracts of guarantee and contracts of indemnity.

45.     As Mr Millett explains in his declaration: *"the basic touchstone of whether the contract is one of guarantee or of indemnity is whether the surety assumes an original liability to the creditor or whether his liability is contingent on the default of the principal debtor."*[18]

46.     *Vossloh*, as Mr Millett notes approvingly at para 30 of his declaration, explains that an essential feature of a true contract of guarantee is that the liability of the guarantor is always secondary to that of the principal. Under the principle of *"co-extensiveness"*, the guarantor is generally liable to the creditor only to the same extent as the principal is liable to the creditor: *Vossloh*, para 24. By contrast, the essential feature of a contract of indemnity is that a primary (rather than secondary) liability falls upon the giver of the indemnity and (unless given only jointly with the principal) this obligation is wholly independent of any liability that may arise as between the creditor and the principal: *Vossloh*, para 25. Because the obligation under an indemnity is primary and independent, the principle of co-extensiveness does not apply: *Vossloh*, para 26.

47.     The above distinctions between a guarantee and an indemnity are significant when it comes to the application of the material variation rule.[19] It is precisely because liability under a guarantee is co-extensive with the liability of the principal that a guarantee must be discharged in the event of a material variation of the principal contract. Conversely, since liability under an indemnity is primary and not co-extensive with that of the principal, there is no automatic rule that a material variation of the principal contract discharges the giver of the indemnity. As stated in *Vossloh* (para 27), the fact that the

---

[18]     Millett Decl., para 30.
[19]     Millett agrees.  Millett Decl., para 29 & note 8.

indemnity is primary and independent *"prevents the discharge of the principal or any variation or compromise of the creditor's claims against the principal from necessarily affecting the liability of the indemnifier under his contract with the creditor."* This proposition is supported by the treatises (including Mr Millett's).[20]

48.    As a matter of English law, it is clear that LBHI's obligations under Schedule 4 constitute an indemnity and not a guarantee. I reach this conclusion for the following reasons:

   (1)    I note that para 1 of Schedule 4 is headed *"Indemnity by Surety"*. Although the label used is not conclusive (particularly because clause 2.7 of the Lease says that headings are for reference only), this indicates that the parties intended it to take effect as an indemnity rather than a guarantee.

   (2)    More importantly, para 1 is expressed to be a *"primary obligation"*. And section 10 of the Lease – *"The Surety's Covenants"* – is also stated to be a *"primary obligation"*: *"[T]he Surety HEREBY COVENANTS with the Landlord and as a separate covenant with the Management Company as a primary obligation in the terms contained in Schedule 4."* As already noted, an essential feature of a guarantee is its secondary nature. A primary obligation in a contract of suretyship must therefore be in the nature of an indemnity.

   (3)    Moreover, it is not merely that section 10 and Schedule 4 describe the obligation as a *"primary"* one: the obligations assumed by the Surety are, by their nature, properly to be regarded as primary in nature and not merely as dependent on a default by the Tenant. The primary obligation in para 1 is a covenant that *either* the Tenant or the Surety will perform the covenants in the Lease: *"the Tenant or*

---

[20]    *Chitty on Contracts*, para 44-007; *Law of Guarantees*, para 1-013; *The Modern Contract of Guarantee*, para 7-70.

*the Surety shall at all times until the Tenant shall cease to be bound by the Tenant's covenants in the Lease during the Term duly perform and observe all the covenants on the part of the Tenant contained in this Lease ... .*" Thus, in contrast with a guarantee, which involves only a promise to see to it that someone else will perform his obligations or a promise to perform if someone else fails to do so, para 1 includes a promise that LBHI will itself perform the covenants in the Lease that is not contingent on a failure to perform by the Tenant. The obligations to perform are concurrent on the part of LBHI and the Tenant: contrary to what Mr Millett suggests at Millett Decl., para 37(i)(b), LBHI's obligation under para 1 of Schedule 4 is not merely to "*see to it*" that the Tenant performs and to "*do it*" if the Tenant fails to perform; LBHI is itself under an obligation from the outset to perform the covenants in the Lease, regardless of any default on the part of the Tenant. This reinforces the primary nature of LBHI's obligation under para 1 of Schedule 4.

(4)    The second part of para 1 expressly provides that LBHI will "*indemnify and keep indemnified*" the Claimants against losses etc flowing from the Tenant's default. In its terms, therefore, this imports an obligation on the part of LBHI to indemnify the Claimants. It is difficult to conceive of a clearer indication that LBHI's obligations under Schedule 4 are in the nature of an indemnity. Mr Millett seems to suggest (somewhat paradoxically) that the existence of this indemnity supports his conclusion that Schedule 4 is in the nature of a guarantee, on the basis that the subject matter of the indemnity is loss resulting from a default on the part of the Tenant (Millett Decl., paras 37(i)(c) and 38(1)). This is incorrect. As a form of

18

suretyship, a contract of indemnity necessarily involves answering "*for some existing or future liability of another, the principal ...*" (*Vossloh*, para 21) and the indemnity obligation is given "*by way of security for the performance of an obligation by another*". Accordingly, the fact that Schedule 4 rendered LBHI liable for the default of the Tenant offers no support for the contention that Schedule 4 is in the nature of a guarantee rather than an indemnity. On the contrary, as already noted, the second part of para 1 is plainly an indemnity.

(5)    Para 2 expressly provides that the Surety is jointly and severally liable with the Tenant for the obligations in the Lease and that the Claimants may proceed against the Surety "*as if the Surety was named as the Tenant in this Lease*". Again, this treats the Surety as undertaking a primary liability in respect of the obligations in the Lease, equivalent to the obligations undertaken by the Tenant. Mr Millett says that this language "*serves to emphasise that LBHI is not the Tenant*" (Millett Decl., para 38(5)). This misses the point: LBHI could never have been (and was not intended to be) the Tenant, because the whole point of a surety is that it is a separate entity to the principal (i.e. the Tenant) that is willing to agree to be liable. Para 2 cannot have been intended to "*emphasise*" the self-evident and inevitable fact that LBHI was not the Tenant: its true function is to reinforce the primary nature of LBHI's obligation.

(6)    Para 6 of Schedule 4 specifies that the occurrence of certain events will not "*release discharge or in any way lessen or affect the liability of the Surety*". These events include, by para 6(d), "*any variation of the terms of this Lease*" and, by para 6(g), "*any other act omission matter or thing whatsoever whereby but for*"

19

*this provision the Surety would be exonerated*". It is sometimes said that a contract which contains a provision preserving liability in circumstances in which a guarantor would otherwise be discharged (e.g. a material variation) should be construed as a guarantee, because such a provision would be unnecessary if the contract was an indemnity.[21] But such provisions may instead point to the opposite conclusion, namely that the contract is one of indemnity, because they show the parties' intention that the liability of the surety should continue regardless of what might happen to the principal debtor.[22] In my opinion, read in the context of Schedule 4 as a whole, it is clear that para 6 was included to serve the latter purpose and to confirm "for the avoidance of doubt" that dealings between the Claimants and the Tenant would not impact on LBHI's liability under the indemnity. Para 6(g) is especially noteworthy and has the effect that nothing short of a release under seal will discharge LBHI. This opens up a very real prospect of LBHI remaining liable in circumstances where the Tenant is not liable (e.g. where the Tenant has been released but there has been no release under seal of LBHI), thus confirming the primary and independent nature of LBHI's liability under Schedule 4.[23]

(7)      Although para 8 of Schedule 4 uses the expression "*guarantee and indemnity*", it does so in the context of an ancillary provision which provides that the benefit of Schedule 4 will enure for the benefit of the Claimants' successors and assigns. I

---

[21]    *Law of Guarantees*, para 1-013.
[22]    *Ibid.*
[23]    Para 6(d) of Schedule 4 is expressed to be subject to section 18 of the Landlord and Tenant (Covenants) Act 1995. Section 18 deals with the assignment of a lease and consequently has no application in the present case.

am unable to identify any substantive provision of Schedule 4 to which the word "*guarantee*" in para 8 could cross-refer. Mr Millett suggests that I say this only because I have already concluded that para 1 is not a guarantee, with the result that my analysis "*pulls itself up by its own bootstraps*" (Millett Decl., para 38(7)). However, Mr Millett has misunderstood my point, which is a rather simpler one and focuses purely on the language rather than the correct legal characterization of the earlier provisions of Schedule 4. The fact is that none of the preceding provisions of Schedule 4 uses the word "*guarantee*" (or any variant thereof) at any stage and, furthermore, para 1 is specifically entitled "*indemnity*" rather than "*guarantee and indemnity*". It is for this reason, purely as a matter of language, that I am driven to infer that the expression "*guarantee and indemnity*", when it crops up for the first time in para 8, may simply have been carried across in error from an earlier precedent. In any event, this expression would indicate that the contract contained *both* a guarantee *and* an indemnity. In that event, and assuming a complete overlap between the guarantee and the indemnity, the guarantee part would be redundant because, as Mr Millett states in his treatise, "*the creditor is almost invariably going to be better off enforcing the primary obligation undertaken in an indemnity.*"[24]

(8)    The heading to para 10 refers to "*Guarantor*" rather than "*Surety*". I regard this as an obvious error which may have been carried over from an earlier precedent: it is to be noted in this regard that the text correctly refers to LBHI as "*the Surety*". Para 10 concerns an "*Authorised Guarantee Agreement*". This is a type of

---

[24]    *Law of Guarantees*, op cit, para 1-014 at page 16.

agreement created by statute[25] to cater for the assignment of a tenancy: an authorised guarantee agreement is one whereby the former tenant (the assignor) guarantees the performance of covenants in the Lease by the new tenant (the assignee). I do not, therefore, consider that para 10 sheds any real light on the nature of the substantive obligations created by Schedule 4.

(9)    Also supporting my conclusion that Schedule 4 is an indemnity are the obligations of a company affiliated with the Claimants (Canary Wharf Holdings Limited) which executed the Lease as *"Landlord's Guarantor."* The Landlord's Guarantor's obligations are set forth in Section 14 of the Lease and are extremely similar to those found in Schedule 4, but with the following notable differences: (a) LBHI is named the *"Surety"* rather than the *"Guarantor"*; (b) the title of para 1 in Schedule 4 was changed to *"Indemnity by Surety"* from Section 14's *"Covenant by Landlord's Guarantor"*; (c) the second part of para 1, which I describe above as a separate indemnification obligation of LBHI's, is absent from the similar provision in Section 14; and (d) *"and indemnity"* has been added twice to para 8 of Schedule 4 as compared with Section 14.7.

49.    For completeness, I also note that an English Court would be prepared, when considering the meaning of Schedule 4, to take into account, as part of the background knowledge known or reasonably available to the parties, the fact that the Lease had been entered into with an English subsidiary of a major New York investment bank as Tenant,[26] and that the Landlord might be expected to seek the strongest possible security from the New York parent in respect of the liabilities under the Lease.

---

[25]    Landlord and Tenant (Covenants) Act 1995, section 16.
[26]    Transcript of Deposition of Sir George Iacobescu, taken June 18, 2013 at 19 and 239-41.

50.    Once it is recognised that Schedule 4 is a contract of indemnity rather than guarantee, it follows that the material variation rule does not apply to discharge LBHI's obligations thereunder.

51.    However, even if (contrary to my view) Schedule 4 constitutes a contract of guarantee, it remains the case that the material variation rule would not apply. This is because, as foreshadowed above, para 6(d) of Schedule 4 expressly disapplies the rule, by stipulating that a variation of the Lease will not discharge LBHI. For good measure, para 6(g) of Schedule 4 provides in broad terms that nothing that would otherwise exonerate the Surety shall be effective to do so. Accordingly, on LBHI's assumption (which I regard as mistaken) that Schedule 4 constitutes a contract of guarantee, with the result that a material variation of the Lease would in principle lead to its discharge, the effect of para 6(d) and/or 6(g) is that LBHI remains liable.

52.    There is nothing unusual about provisions like paras 6(d) and 6(g). On the contrary, as stated in one treatise:[27]

> "... in practice any well-drawn contract of suretyship will nowadays expressly permit variation of the obligations or the giving of time, without discharging the surety. At common law, such an agreement takes effect according to its terms, but in cases of doubt or uncertainty will be construed in favour of the surety."

53.    In his declaration, Mr Millett argues that para 6(d) is too narrow and para 6(g) is too broad to apply here.   This is both an illogical and uncommercial reading of these provisions with which I do not agree.

54.    With respect to para 6(d), Mr Millett argues that there are situations which fall within the rule in *Holme* v *Brunskill* (the material variation rule) but which are not strictly speaking variations and thus fall outside the scope of what he considers to be a narrowly limited

---

[27]    *Chitty on Contracts*, para 44-099.

para 6(d).[28]  Para 6(d), however, is plainly intended to contract out of common law rules that would permit discharge of a guarantor.  It is therefore to be construed to be consistent with that common law definition of "*variation*".  This point emerges from *Bank of Baroda* v *Patel*, the very case cited by Mr Millett.[29]

55.    Put another way, it is wholly illogical and uncommercial to give a narrow meaning to the word "*variation*" in the Lease (Mr Millett's suggestion in para 61 of his declaration seems to be that it should be read as meaning "*formal variation*") when the background common law of guarantees (to which para 6(d) is plainly directed) takes a broad view of that term.

56.    Mr Millett's argument about para 6(g) is unexplained and illogical.[30]  Even if para 6(g) may not give a "*complete carte blanche*" as Mr Millett argues, that does not prevent para 6(g) from applying in the present situation.  Mr Millett does not explain his view that it should not apply, and in my view it does.  By its plain terms, para 6(g) covers the variation claimed by LBHI and would be enforced.

57.    I consider that the broad terms of paras 6(d) and 6(g) leave no real room for doubt as to what was intended. They make clear that the material variation rule does not apply so as to discharge LBHI's obligations under Schedule 4.

## H.    THE MEANING OF THE FORFEITURE LETTER

58.    I now turn to consider whether, on its true construction, clause 4 of the Forfeiture Letter did in fact effect a material variation of the Lease. Clause 4 provides, so far as material:

---

[28]    Millett Decl., paras. 60-61.
[29]    Millett Decl., para. 60.
[30]    Millett Decl., para 62.

"We, [the Claimants] agree that:

(a)    in consideration of [the Tenant] agreeing to pay to the Landlord £1.5m on the date of forfeiture as notified by the Landlord to [the Tenant] in writing ..., [the Tenant] is unconditionally and irrevocably released and discharged from any claims as an administration expense for unpaid rent that fell due and was payable under the Lease before the date of forfeiture,

...

(c)    [the Tenant] is unconditionally and irrevocably released and discharged from any claims as an administration expense for any estate service charge and other sums that fell due and were payable under the Lease and Car Parking Agreement before the date of forfeiture;

provided that [the Tenant] agrees that [the Claimants] may claim against [the Tenant] as an unsecured creditor for any unpaid rent and estate charge and any other sums falling due under the Lease up to the date of forfeiture."

59.    An administrative expense is an expense which is payable from the assets of the company in administration in priority to the claims of other creditors. English insolvency legislation[31] identifies the expenses that qualify as administration expenses and their order of priority *inter se*. They include, for example, expenses properly incurred by the administrator in performing his functions in the administration of the company. It has been held that rent which becomes due during a period when the administrator is retaining the property for the purposes of the administration may qualify as an administration expense: *Goldacre (Offices) Ltd* v *Nortel Networks UK Ltd (in administration)* [2009] EWHC 3389 (Ch); *Leisure (Norwich) II Ltd* v *Luminar Lava Ignite Lid (in administration)* [2012] EWHC 951 (Ch) at para 26. For rent due after the administrator has stopped retaining the property for the purposes of the administration, *Goldacre* implies that the rent due will not qualify as an administration expense.

---

31        In particular, rule 2.67 of the Insolvency Rules 1986.

60.    The meaning of clause 4(a) is that, in return for a payment of £1.5m, the Claimants gave up any further entitlement to recover pre-forfeiture rent *as an administrative expense* but not otherwise. Clause 4(c) similarly releases only claims as an administrative expense. The proviso at the end of clause 4 ("*provided that ...*") expressly preserves the Claimants' ability to claim for pre-forfeiture rent (and other sums) as an unsecured creditor in the Tenant's administration. Under the English insolvency legislation, a landlord is able to prove as a creditor in an administration for rent up to the date of the administration, as well as rent due in future: *Leisure (Norwich)* at para 17(a).

61.    The terms of the Lease do not confer any right on the Claimants to have rent treated as an administration expense in any administration of the Tenant. Any such right would arise, not from the terms of the Lease, but under the insolvency legislation in the event of a later decision by the administrators to retain possession of the premises for the purpose of discharging their duties in the administration. Moreover, the administrators here vacated the property in March 2010, thus raising the question of whether the Claimants could claim the unpaid rent thereafter as an administrative expense at all.[32]

62.    It follows that clause 4 of the Forfeiture Letter does not constitute a variation of the Lease. Claims for unpaid rent or estate service charges as an administrative expense do not arise from the terms of the Lease and may not have been recoverable as an administrative expense at all given the administrators' vacating the property in March 2010. Consequently, the release of such claims (as an administrative expense) in return for £1.5m cannot constitute a variation of the terms of the Lease. Conversely, the proviso to clause 4 preserves the Claimants' claims (as an unsecured creditor) in respect of

---

[32]    The Tenant and the Claimants themselves debated this at the time in letters sent to each other in 2010 with each relying on different readings of *Goldacre*.

unpaid rent and estate charges under the Lease, and, accordingly, there is no variation of the Claimant's rights under the Lease in that regard.

63.    The Millett Declaration asserts to the contrary that there is a material variation. Mr Millett first contends (on the basis of two Nineteenth Century cases which do not appear to have been subsequently cited) that a variation to the principal contract imposed by statute will discharge the guarantor (Millett Decl., para 51). However, any such principle does not appear to arise on the facts of this case, since Mr Millett does not suggest that Schedule 4 may have been discharged as a result of a variation imposed by statute.

64.    Secondly, he suggests that the courts will not always insist on a variation in the strict contractual sense and he asserts that the operation of the relationship in a way which is different from that envisaged by the contract "*will suffice*". In my view, this is too absolute. In *Baroda* (the sole case relied on by Mr Millett), Potter J accepted that the actions of the bank might, in other contexts, "*properly be dubbed a waiver rather than a variation*", but he nevertheless took the view that it amounted in broad steps to an agreement to operate the loan facility in a different manner and "*in effect as a variation of the terms of the facility*". It does not follow that conduct falling short of a variation in the strict contractual sense will always, or even usually, be regarded as falling within the material variation rule. Again, however, in the context of this case, nothing seems to turn on the distinction between a contractual variation and something falling short of one.

65.    Thirdly, Mr Millett refers to a view that the guarantor will be discharged under the material variation rule "*by any conduct by the creditor which is prejudicial to the guarantor.*" Mr Millett then asserts that "*LBHI, as guarantor, incurred no risk in respect*

27

*of LBL's liability for rent in respect of periods of occupation of the Premises because it*
*would fall as a matter of law to be paid in priority as an administration expense and*
*always be timely paid by LBL 100%*" and thus the release of claims as an administration
expense in the Forfeiture Letter increased LBHI's "*commercial risk.*" He thus concludes
that there has been a material variation and that LBHI should be discharged.[33]

66.    I disagree with Mr Millett's analysis for the following reasons:

(1)    First, the legal principle relied on by Mr Millett is not just "*controversial*" -- as
Mr Millett freely admits in para. 52 of his Declaration -- but is misstated.  In the
treatise which Mr Millett co-authored,[34] the same principle he purports to rely on
in his declaration is explained as follows: "*A variation is material so as to entitle*
*a surety to full discharge, however, only if it is an act by the creditor which affects*
*the risk of default by the principal, and consequently the risk of the surety being*
*called upon to honour the guarantee.*" In contrast to Mr Millett's Declaration, the
treatise states that "*a variation which merely affects the amount of the surety's*
*ultimate liability, but which leaves the risk of default by the principal unchanged*
*. . . will not be material.*"

(2)    The principle as described in Mr Millett's treatise makes plain that the release in
the Forfeiture Letter is not a material variation that operates to discharge LBHI's
obligations under Schedule 4.   Mr Millett argues that the Forfeiture Letter
increased LBHI's risk that the landlord would no longer recover the rent that fell
due during LBL's occupation as an administration expense.  But this is a misuse
of the concept of "*risk*" in this context. As Mr Millett's treatise makes clear, what

---

[33]    Millett Decl., paras 50-56.
[34]    *Law of Guarantees*, para 9-024 at page 407.

matters is whether there is a change in the "*risk of default by the principal*". The provisions in the Forfeiture Letter about the recoverability of rent as an administrative expense have no impact on the risk of default by the principal, as the principal (LBL) had already defaulted. Thus, according to Mr Millett's own treatise, there was no material variation of the Lease that would discharge LBHI's obligations.

(3)     Second, as discussed above, the agreed payment of £1.5m in the Forfeiture Letter is not a cap on the liability for rent, but merely a cap on the liability for rent *as an administrative expense*; the whole of the rent continues to be payable as a provable debt. In circumstances where the whole of the rent remains payable, and where the surety had no right to assume that (in the event of insolvency) any of it would necessarily end up being paid as a priority expense, it is difficult to see that LBHI could be said to have been prejudiced in any way. There has been no variation of the liability under the Lease to pay rent.

(4)     Third, in agreeing to Schedule 4, LBHI took the risk that it would have to pay the rent if LBL were to enter into administration. If the administrators were not in occupation of the premises but refused to consent to forfeiture, there might be a significant period of time while the Landlord sought the court's permission for forfeiture but during which the Landlord would have no right to payment of rent as an administration expense but merely the right to prove for the continuing rent in the administration.[35] In comparison with this situation, the Forfeiture Letter

---

[35]     Mr Millett seems to assume that the statutory bar on forfeiture of the Lease will always be "*balanced*" by the advantage of the rent being paid in priority as an administration expense (Millett Decl., para 53(ii)). This is incorrect. The bar on forfeiture applies

has left LBHI *better* off, in that £1.5m has been paid by the administrators of LBL, so reducing the sums for which LBHI is liable as surety.

(5)     Fourth, even if the Forfeiture Letter had involved a release of the Tenant's liability to rent under the Lease *per se* (as distinct from a release of the administrator's liability to pay more than £1.5m in rent as an administrative expense), a partial release of that kind would only have released LBHI to the same extent and would not have effected a complete release of LBHI's liabilities under Schedule 4. As explained in the O'Donovan treatise (at para 6-88):

> "The creditor, instead of releasing the principal debtor absolutely, may release the principal debtor from only a portion of the debt, making it clear that liability remains for the balance. In this situation, it is considered that the guarantor will only be partially released by an amount corresponding to the extent of the release of the principal. Although the agreement of release constitutes a variation of the principal contract, such a variation does not lead to an absolute discharge of the guarantor because it is a variation which is obviously for the benefit of the guarantor, as it reduces the extent of the guarantor's liability."

But here, there is not even a partial release because, as already explained, the Forfeiture Letter does not affect the Tenant's liabilities but merely sets a cap on the sums payable by the administrators as an administration expense.

(6)     Fifth, even if there were a variation resulting in alleged prejudice to LBHI, Potter J in *Baroda* stated that the material variation rule does not apply where "the contract of suretyship provides to the contrary." It is obvious that if, in *Baroda* (the principle case relied on by Mr Millett for his prejudice argument), there had

---

whether or not the administrators remain in occupation. By contrast, the right to payment of rent as a priority expense is critically dependent on the administrators remaining in occupation. Thus, as just explained, there is a very real prospect of the landlord being precluded from exercising the right of forfeiture in the lease, without any balancing entitlement to be paid rent as a priority expense.

been a provision of the contract of suretyship which precluded a variation of the terms from discharging the surety, such a provision would have governed and the guarantor would not have been discharged. As Mr Millett states in his treatise: "*Where the guarantee expressly provides for the surety's continuing liability following release of the principal (as all properly drafted modern bank guarantees should), there is no room for the operation of the rule as to release of the surety ...*": *Law of Guarantees*, para 9-016; see also O'Donovan, paras 6-76 ff. As discussed above, here, paras 6(d) and 6(g) of Schedule 4 preserves LBHI's liability even if there is a variation of the Lease.

67.   The Millett Declaration also asserts that even if the Forfeiture Letter does not constitute a variation of the Lease, the application of the "*purview*" principle would dictate the same result as a material variation.[36] Specifically, Mr Millett asserts that "*LBHI never agreed to guarantee the payment of rent accruing due during the period after LBL had entered administration and for which the landlord only had a proof in the administration*" and thus that the Claimants do not have a claim against LBHI.[37]

68.   I disagree. The doctrine of the "*purview*" of a guarantee has recently been subjected to scrutiny by the Court of Appeal in *CIMC Raffles Offshore (Singapore) Limited* v *Schahin Holding SA* [2013] EWCA Civ 644 (decision of 7 June 2013). Rix LJ (who gave the leading judgment) analysed the earlier case-law, including *Triodos Bank* v *Dobbs* [2005] EWCA Civ 630 (cited in the Millett Declaration at para 46). Rix LJ noted (at para 51) that the doctrine has been applied in two situations: first, simply to determine the scope of

---

36   Millett Decl., paras 45-46, 57 (discussing *Triodos Bank NV* v *Dobbs* [2005] 2 LI Rep 588).
37   Millett Decl., para 57.

the guarantee, and whether it does or does not apply to a new arrangement; and secondly, to determine the scope of an "anti-discharge" provision, which seeks expressly to throw the cloak of present consent over future events so as to prevent those events subverting the guarantee.

69.     It is not at all clear to me which of these two categories Mr Millett's argument (Millett Decl., para 57) falls into. He begins by contending that LBHI *"never agreed to guarantee the payment of rent accruing due during the period after LBL had entered administration and for which the landlord only had a proof in the administration."* Thus far, Mr Millett appears to be relying on the first category of *"purview"* cases: he seems to be making a point simply about the scope of the guarantee, namely that it never covered any liability accruing due after LBL had entered administration. On this basis, it would appear that Mr Millett's point is separate from and not dependent on the terms of the Forfeiture Letter: the logic of his position is that the Landlord would have no claim against LBHI in respect of the period post-administration, even if the Forfeiture Letter had not set a cap on the rent recoverable as an administrative expense and indeed if there had been no Forfeiture Letter at all.

70.     As a matter of construction of Schedule 4, I would regard it as a very weak contention to argue that it was not intended to cover the situation where the Tenant enters administration. On the contrary, that is the kind of situation (the Tenant being unable to pay the rent) where an indemnity or guarantee is of greatest value and importance.

71.     Mr Millett's view seems to be based on the premise that the bar against forfeiture that arises upon a tenant going into administration comes at a *"price designed to give equal and opposite protection to the landlord, namely that the rent and other outgoings would*

*be treated as an expense of the administration.*" However, as pointed out above (fn. 35),
Mr Millett appears to have overlooked the fact that the right to payment of rent as an
administrative expense is contingent on the administrators remaining in occupation,
which may not occur. In that scenario, the only right that would accrue due, pending a
court order for forfeiture or the administrators' agreement to forfeiture, would be a right
to prove for rent in the administration.

72.     Allied to this point is Mr Millett's view that, but for the statutory bar, the landlord "*would
        legitimately be expected by all parties*" to exercise the right of forfeiture. Again,
        however, I cannot agree. The very issue in *Reichman* v *Beveridge* [2006] EWCA Civ
        1659 (discussed in more detail below) was whether there was a duty on a landlord (in
        order to mitigate his loss) to exercise a right of forfeiture as soon as it accrued. The
        Court of Appeal held that there was not, and that it may be perfectly reasonable for a
        landlord to keep the lease on foot and to continue claiming rent as it falls due. While a
        landlord may not always or even usually wish to adopt this stance where the tenant is in
        administration and the administrators are not in occupation of the property, one can
        readily envisage a situation where the state of the property market, and the likely
        recoveries from the administration, might render this an attractive course of action.

73.     Accordingly, if Mr Millett is suggesting that (regardless of the terms of the Forfeiture
        Letter) Schedule 4 never covered liabilities resulting from the Tenant going into
        administration, I do not agree.

74.     On the other hand, it is possible that Mr Millett may be saying that the effect of the
        Forfeiture Letter is a variation of the Lease, but not one that is insulated against by paras
        6(d) and (g) of Schedule 4, and thus that he is relying on the second category of

33

"*purview*" cases. I have great difficulty in seeing how such an argument could be advanced. The review of the earlier case-law in *CIMC* is instructive. The starting point is a dictum of Lord Atkin in *Trade Indemnity Company Limited* v *Workington Harbour and Dock Board* [1937] AC 1, where an anti-discharge clause in a guarantee of certain construction works provided that the guarantor would not be discharged by any agreement for the alteration for the works. Lord Atkin said that those words would probably have to be cut down so as not to include such changes as "*substituting a cathedral for a dock, or the construction of a dock elsewhere, or possibly such an enlargement of the works as would double the financial liability.*" In *Triodos Bank* v *Dobbs* [2005] EWCA Civ 630, the anti-discharge clause referred to any amendment, waiver or release of the obligations under a loan agreement. Longmore LJ (cited in *CIMC* at para 47) said that the anti-discharge provision would not apply to a replacement loan facility that was "*so different from the original agreement*" that it cannot be an "'*amendment or variation' of the initial contract*" at all. Chadwick LJ (cited in *CIMC* at para 48) said that the anti-discharge provision exposed the guarantor to the risk that his liability in respect of the obligations of the principal under the loan agreement "*might be made more onerous by an amendment or variation of those obligations*" (original emphasis) but not to the risk of additional obligations of the principal "*which were not properly to be regarded as an amendment or variation of existing obligations.*"

75.    Adopting the same approach, the question here would be whether the effect of the £1.5m cap in the Forfeiture Letter was to make LBHI's liability more onerous by an amendment or variation of the Tenant's obligations, or whether that cap could not properly be regarded as an amendment or variation of the Tenant's existing obligations. Of course, as

34

I have already explained, I do not accept the premise of this question, because I consider that the Tenant's obligations remained intact notwithstanding the Forfeiture Letter and I also do not consider that LBHI's liability became more onerous as a result of the Forfeiture Letter (if anything, the reverse). However, on the assumption that the question does arise, the answer is obvious: the Forfeiture Letter amounts, at most, to an amendment or variation of the Tenant's existing obligations; it cannot be regarded as creating additional obligations which are so new and different from what was there before that they cannot properly be regarded as an amendment or variation of existing obligations at all.

76.    I should add that *CIMC* went on to consider a further question, namely whether it is possible, through appropriate contractual language, to exclude the "*purview*" doctrine altogether. As Rix LJ observed (at para 60), there is no authority which provides any guidance on that issue, and I have not sought to consider it in this report.

## I.    THE EFFECT OF FORFEITURE ON LBHI'S OBLIGATIONS

77.    Para 1 of Schedule 4 (with bracketed text added) provides:

> "The Surety hereby covenants with the Landlord and as a separate covenant with the Management Company as a primary obligation that [i] the Tenant or the Surety shall at all times until the Tenant shall cease to be bound by the Tenant's covenants in the Lease during the Term duly perform and observe all the covenants on the part of the Tenant contained in this Lease including the payment of the rents hereby reserved and all other sums payable under this Lease in the manner and at the times herein specified and [ii] the Surety shall indemnify and keep indemnified the Landlord and the Management Company against all claims demands losses damages liability costs fees and expenses whatsoever sustained by the Landlord or the Management Company by reason of or arising directly or indirectly out of any default by the Tenant in the performance and observance of any of its obligations or the payment of any rents and other sums Provided That the Landlord and the Management Company shall notify the Tenant of any such actions or other matters and take all reasonable steps to mitigate such losses having regard to the nature of the breach"

35

78.     LBHI and Mr Millett contend that, by virtue of the words, *"until the Tenant shall cease to be bound by the Tenant's covenants"*, LBHI's obligations under Schedule 4 ceased when the Tenant's obligations under the Lease ceased, and that this happened upon forfeiture of the Lease. LBHI contends it is *"released of any and all liability that accrued post-forfeiture"*.[38]

79.     In my view, this is not correct.

80.     It is important to appreciate that para 1 of Schedule 4 falls into two parts, as I have sought to indicate by inserting "[i]" and "[ii]" in the quotation above. Part [i] entails a covenant that the Tenant (or LBHI) will perform the Tenant's covenants in the Lease. I agree that this part of para 1 is circumscribed by the words *"until the Tenant shall cease to be bound by the Tenant's covenants"*. Following forfeiture, LBHI was no longer obliged to procure that the Tenant (or LBHI itself) perform the covenants in the Lease.

81.     However, it is important to note that part [ii] of para 1 is not circumscribed in that way. It involves a promise by LBHI to indemnify the Claimants against all losses sustained *"by reason of or arising directly or indirectly out of any default by the Tenant"*. These words import the widest conceivable causal nexus between the default of the Tenant and the losses sustained by the Claimants.

82.     LBHI and Mr Millett argue that the language *"until the Tenant shall cease to be bound by the Tenant's covenants in the Lease during the Term"* modifies both portions of Paragraph 1 separated by the word *"and"*.[39] In other words, LBHI and Mr Millett would place a [i] and [ii] in para 1 as follows:

---

38      Objections, para 21.
39      Reply, para 28; Millett Decl., paras 68-71.

"The Surety hereby covenants with the Landlord and as a separate covenant with the Management Company as a primary obligation that the Tenant or the Surety shall at all times until the Tenant shall cease to be bound by the Tenant's covenants in the Lease during the Term [i] duly perform and observe all the covenants on the part of the Tenant contained in this Lease including the payment of the rents hereby reserved and all other sums payable under this Lease in the manner and at the times herein specified and [ii] the Surety shall indemnify and keep indemnified the Landlord and the Management Company against all claims demands losses damages liability costs fees and expenses whatsoever sustained by the Landlord or the Management Company by reason of or arising directly or indirectly out of any default by the Tenant in the performance and observance of any of its obligations or the payment of any rents and other sums Provided That the Landlord and the Management Company shall notify the Tenant of any such actions or other matters and take all reasonable steps to mitigate such losses having regard to the nature of the breach"

83.    The reading advocated by LBHI and Mr Millett does not make grammatical sense. If the language *"until the Tenant shall cease to be bound by the Tenant's covenants in the Lease during the Term"* applied to both portions of para 1 separated by the word *"and"*, that paragraph should make sense if the first phrase (and the word *"and"*) is deleted. It does not:

"The Surety hereby covenants with the Landlord and as a separate covenant with the Management Company as a primary obligation that the Tenant or the Surety shall at all times until the Tenant shall cease to be bound by the Tenant's covenants in the Lease during the Term ~~[i] duly perform and observe all the covenants on the part of the Tenant contained in this Lease including the payment of the rents hereby reserved and all other sums payable under this Lease in the manner and at the times herein specified and~~ [ii] the Surety shall indemnify and keep indemnified the Landlord and the Management Company against all claims demands losses damages liability costs fees and expenses whatsoever sustained by the Landlord or the Management Company by reason of or arising directly or indirectly out of any default by the Tenant in the performance and observance of any of its obligations or the payment of any rents and other sums . . ."

This language – *"the Tenant or the Surety shall at all times . . . the Surety shall . . ."* – makes no sense as written.

37

84.  The logical construction of Paragraph 1 is that the word "*and*" separates the two phrases

that follow the word "*that*," so that either could be deleted and the remaining language

would make sense:

> "The Surety hereby covenants with the Landlord and as a separate
> covenant with the Management Company as a primary obligation that ~~the~~
> ~~Tenant or the Surety shall at all times until the Tenant shall cease to be~~
> ~~bound by the Tenant's covenants in the Lease during the Term duly~~
> ~~perform and observe all the covenants on the part of the Tenant contained~~
> ~~in this Lease including the payment of the rents hereby reserved and all~~
> ~~other sums payable under this Lease in the manner and at the times herein~~
> ~~specified and~~ the Surety shall indemnify and keep indemnified the
> Landlord and the Management Company against all claims demands
> losses damages liability costs fees and expenses whatsoever sustained by
> the Landlord or the Management Company by reason of or arising directly
> or indirectly out of any default by the Tenant in the performance and
> observance of any of its obligations or the payment of any rents and other
> sums . . ."

This language – "*The Surety hereby covenants . . . that . . . the Surety shall . . .*" – is

logical and sensible as written.

85.  In addition to the language of the paragraph itself, reading para 1 of Schedule 4 as having

two subparts, as explained above, is supported by other sections in the Lease. First, the

second subpart of para 1 is absent from the Landlord's Guarantee in Section 14, thus

showing that the second subpart is not one and the same as the first subpart. Instead, the

second subpart must be read as a separate and independent obligation. Second, contrary

to Mr Millett's argument,[40] the use of "*a primary obligation*" (in the singular) rather than

"*primary obligations*" (plural) in para 1 does not tell us anything about whether para 1

should be read as having two subparts. Section 10 of the Lease also uses "*a primary*

*obligation*" to describe all the obligations in Schedule 4, and one could not contend that

all of Schedule 4 is a single obligation.

---

[40]    Millett Decl., para. 69.

86.     Further, the discharge of the contract, and the fact that the tenant is no longer bound by the obligations contained in it, is not inconsistent with the accrual of a liability in damages. On the contrary, under English contract law, as I explain in greater detail below, it is axiomatic that where a contract is discharged as a result of the repudiatory breach of one party, both parties are discharged from future performance but the defaulting party is liable to the innocent party for the lost value of that future performance: the termination of the contract, far from precluding the defaulting party's liability in damages, is entirely consistent with (and usually gives rise to) the accrual of a damages claim. The same is true for the Lease: Section 8.1 of the Lease provides that, in the event of certain specified Tenant defaults, "*the Landlord may at any time thereafter re-enter the Demised Premises . . . and thereupon the Term shall absolutely cease and determine but without prejudice to any rights or remedies which may then have accrued to the Landlord or the Management Company against the Tenant in respect of any antecedent breach of any of the covenants contained in the Lease.*" In other words, the Landlord can sue for its damages resulting from the breach even though the Tenant is no longer bound by the covenants in the Lease. Under the LBHI and Millett construction, it would appear that the Surety would not be liable for those damages, because (they contend) the Surety ceases to be liable once the Tenant has ceased to be bound by the covenants in the Lease. This construction makes no commercial sense.

87.     I understand that the losses claimed by the Claimants include the rent and other amounts that would have been paid under the Lease, had it run its full term, less sums received by way of mitigation from the lease with JPMorgan. Such losses plainly fall within the scope of the indemnity contained in part [ii] of para 1 of Schedule 4. Although LBHI seeks to

describe liability in respect of such losses as "*liability that accrued post-forfeiture*",[41] this

is not an accurate description because LBHI's liability is to provide indemnification in

respect of loss that arise as a result of the Tenant's antecedent (i.e. pre-forfeiture) default

under the Lease. The act of forfeiture on the part of the Landlord does not, in my view,

break the chain of causation between the Tenant's default and the loss of future rent. A

break in the chain would require some unwarrantable or unreasonable behaviour on the

part of the Landlord: *The Oropesa* [1943] P 32 at page 39. Far from being unreasonable,

however, it will usually be entirely reasonable for a landlord faced with a serious breach

of covenant to forfeit the lease, not least because (as in the present case) this will enable

the landlord to mitigate his losses by granting a new lease of the premises at the then

prevailing market rent.[42]

88.    There is nothing surprising about this conclusion, since an indemnity, being a primary

obligation, is "*independent of the continuing obligation of another*".[43] Thus, LBHI's

invocation of the principle of co-extensiveness[44] is misplaced here.

89.    Further, even if para 1 of Schedule 4 ended at the words "*times herein specified*" (so that

it was confined to part [i] and did not include part [ii]), and even if (contrary to my view)

Schedule 4 were a contract of guarantee rather than an indemnity, the Claimants would

---

41      Objections, para 21.

42      I note that, in *Reichman* v *Beveridge* [2006] EWCA Civ 1659, discussed below, the
        opposite argument was advanced, namely that a landlord who decided not to forfeit the
        lease and to continue claiming rent had acted unreasonably by failing to mitigate his
        losses. The argument did not succeed, but the case implicitly supports the proposition that
        where a landlord does forfeit the lease, it is all the more difficult to argue that he has
        acted unreasonably.

43      *The Modern Contract of Guarantee*, para 1-91.

44      Objections, para 21.

still be able to recover their losses (including loss of future rent) from LBHI pursuant to Schedule 4. This is, in summary, for the following reasons:

(1)     It is established at the highest authority that the termination of the principal contract on account of the debtor's breach does not discharge a guarantor: *Moschi* v *Lep Air Services Ltd* [1973] AC 331. As Millett and Andrews explain in their treatise: "*The general rule is that where the principal commits a breach of the principal contract, the surety will be liable to the creditor for the amount representing the damages payable by the principal in respect of the breach.* In *Moschi* v *Lep Air Services Ltd [1973] AC 331, where the performance of the principal contract to pay a sum of money by instalments was guaranteed by the surety, the House of Lords held that it was not open to a surety to say that he had only guaranteed performance of the contract, and not guaranteed to pay damages.*" *Law of Guarantees*, para 6-030.

(2)     *Moschi* concerned a guarantee in respect of a contract under which the principal debtor had to pay by instalments in respect of services previously rendered by the creditor. It was argued that, when the creditor terminated the underlying contract following the debtor's repeated failure to keep up with the instalments, the guarantor's obligations thereby came to an end. The House of Lords unanimously rejected the argument, observing that it would have the paradoxical effect of depriving the creditor of the benefit of the guarantee "*at the moment he most needs it – namely, on a repudiation by the principal promisor of his obligations under the contract*": *Moschi* at page 356H *per* Lord Simon of Glaisdale.

41

(3)     The reasoning of the House of Lords was that the guarantor's obligation is to "*see to it that the debtor performed his own obligations to the creditor*": *Moschi* at page 348D. Where the debtor fails to perform his obligations, the creditor can recover from the guarantor as damages for breach of the contract of guarantee whatever sum the creditor could have recovered from the debtor himself as a consequence of that failure. The debtor's liability to the creditor is thus also the measure of the guarantor's: *Moschi* at page 349A-B.

(4)     It is therefore necessary to examine the effect in English law of the principal debtor committing a serious ("*repudiatory*") breach of the principal contract. Faced with such a breach, the innocent party (here, the creditor) may elect to (a) "*affirm*" the contract, i.e. choose to keep it alive and insist on future performance, or (b) "*accept*" the breach and bring the contract to an end. The effect of termination is to discharge the unperformed (future) obligations under the contract (the "*primary obligations*") and to substitute by operation of law a "*secondary obligation*" on the part of the contract-breaker to pay damages to compensate the innocent party for the loss he has sustained as a result of the failure to perform the primary obligations: *Moschi* at page 350 C-E. Damages for breach of contract are assessed as the sum needed to place the innocent party into the position he would have been in, had the contract been performed in accordance with its terms: *Robinson* v *Harman* (1848) 1 Exch. 850, 855.

(5)     It follows that, where the principal contract is terminated for a repudiatory breach, the creditor is entitled to recover (as against the debtor, and therefore also against the guarantor) whatever sum would place him in the same position as if the

42

contract had been performed for its full term. In *Moschi*, damages were awarded for the present value of the unpaid instalments (subject to a monetary cap in the guarantee): *Moschi* at 345 C-E and 358 B-C.

(6)     Thus far, I have been dealing with the general law of contract. In the context of leases, forfeiture (sometimes called "*re-entry*") is the means by which a landlord puts an end to the lease.[45] In principle, and as a matter of logic, one would expect the consequences of a forfeiture on account of the tenant's breach to be the same as for the termination of a (non-lease) contract on account of a repudiatory breach, namely that the landlord would be entitled to recover from the tenant in breach the losses flowing from the forfeiture, such as any difference between the rent under the lease and the market rent at the date of forfeiture for the remainder of the term.

(7)     Surprisingly, there is no direct authority on this subject in English law and it is an open question whether a landlord can recover damages from a tenant for loss of future rent following a termination of the lease for repudiatory breach. In *Reichman*, the Court of Appeal observed that, although the landlord's ability to recover damages for loss of future rent was recognised in other common law jurisdictions, such as Canada and Australia, there was no case in English law establishing such a claim and one case (dating from 1826) which indicated that the landlord could not so claim. However, the Court expressly stated that the

---

[45]     E.g. *Reichman* at para 22.

43

question of whether such damages could be claimed was not "*directly in issue before us, and it would be wrong to decide it unnecessarily*".[46]

(8)    The Court in *Reichman* appears, regrettably, to have overlooked a decision of the Court of Appeal of Northern Ireland which in fact did decide that a landlord who forfeits the lease is entitled to recover damages for the loss of future rent: *Rainey Brothers Ltd* v *Kearney* [1990] NI 18.[47] Although decisions of the Northern Ireland Court of Appeal are not binding as a matter of English law, they are entitled to "*the greatest respect*": *Secretary of State for Work and Pensions* v *Amanda Deane* [2010] EWCA Civ 699. The decision in Rainey would command particularly great respect in an English court because the judge who gave the sole judgment, Lord Hutton (then Chief Justice of Northern Ireland), was subsequently elevated to the House of Lords, the final court of appeal for England and Wales as well as Northern Ireland. I also note that, although *Rainey* was a decision under the law of Northern Ireland, Lord Hutton's judgment is entirely founded on an analysis of earlier English (rather than Northern Irish) case-law. There is every reason to believe, therefore, that his analysis was intended to reflect the law of England as well as that of Northern Ireland.

---

[46]    The argument in *Reichman* was that a landlord, faced with repeated non-payment of rent by the tenant, had acted unreasonably and failed to mitigate his loss by electing to affirm the lease and continue to claim rent, rather than forfeit the lease and recover damages. The Court of Appeal held that, in the absence of any case demonstrating an entitlement to claim damages for the loss of future rent, the landlord's conduct was not unreasonable.

[47]    The oversight may have arisen because neither the landlord nor the tenant in *Reichman* was represented in the Court of Appeal by Counsel. Although an advocate to the Court was appointed, she appears to have missed the *Rainey* decision. From all that appears in the judgments, the Court of Appeal was unaware of it.

44

(9)     I would therefore expect an English court, in a case where the point was necessary to the decision, to follow *Rainey* by holding that a landlord is entitled to recover damages for loss of future rent where the lease is forfeited for a repudiatory breach by the tenant. This would maintain consistency between the law of England and the law in other common law jurisdictions such as Northern Ireland, Australia and Canada. From a policy point of view, this would also serve to uphold the promises made by the parties to a lease by compensating the landlord for his loss of bargain when a lease is prematurely terminated by reason of the tenant's default.

(10)    A combination of the principles established in *Rainey* and *Moschi* leads to the conclusion that the forfeiture of the Lease for the Tenant's failure to pay rent gives the Claimants the right to recover from LBHI such damages as would place the Claimants in the same position as if the Lease had been performed for its full term, including damages for any loss of future rent.[48]

(11)    Much of Mr Millett's analysis in his declaration is directed at the proposition that rent does not accrue after forfeiture of a lease and indeed that a tenant has no present liability for future rent. This is not in dispute. I agree that the Claimants

---

[48]    This is precisely the conclusion reached by the Supreme Court of Victoria in *Nangus Pty Ltd* v *Charles Donovan Ptd Ltd (in liq)* [1989] VR 184, a case cited in *The Modern Contract of Guarantee* at fn 321. Decisions of the Australian federal and state courts are not binding on the English courts, but they are regularly cited (as in *Reichman*) and treated as persuasive. In *AG* v *Clough* [1963] 1 QB 713 at page 792, described a decision of the Australian (federal) High Court as "*most persuasive authority*" and said he would "*hesitate very long if in a matter which pertained to the common law of England, this country should differ, unless it had to, with another Commonwealth country.*" In *Hymn* v *DPP* [1975] AC 55 at page 76, the House of Lords referred to a decision of the Supreme Court of Victoria as "*persuasive authority*" for a particular proposition on which there was no direct English authority.

cannot seek rent post-forfeiture as a claim in debt: no such debt will accrue. But the question is whether the Claimants can nevertheless seek compensation by way of damages for the fact that the agreed rent will no longer be paid in the future as a result of the forfeiture. As to this, Mr Millett's analysis boils down to the assertion that, when the obligation to pay rent comes to an end upon forfeiture, "*unlike ordinary commercial contracts it is not replaced with an implied secondary obligation to pay damages sustained in consequence of the non-performance of that primary obligation*" (Millett Decl., para 80). However, the only reason given for this assertion is that forfeiture involves regaining possession of the land and thus removing the juridical basis for the prospective liability of the tenant for rent. This does not, in my view, support the conclusion. It could just as easily be said, in the case of a commercial contract, that termination of such a contract brings to an end the juridical basis for claiming future performance, including payment of any instalments which have not yet fallen due at the date of termination. Yet it is trite law, as Mr Millett accepts, that with ordinary commercial contracts an entitlement to damages does accrue. It follows that Mr Millett is unable to offer any satisfactory explanation as to why there should be a different rule for leases from that which applies to ordinary commercial contracts. Moreover, Mr Millett is wrong to suggest that Lord Hutton's conclusion in *Rainey* would "*require the overruling of two hundred years of settled law, at the highest level, as to the particular characteristics of rent . . .* "[49]

While the case law makes clear that a claim for future rent as such cannot accrue

---

[49]     Millett Decl., para 81.

due after forfeiture, the question of whether a damages claim accrues is the question explicitly left open by *Reichman* and decided affirmatively in *Rainey*.

(12)    I would add that Mr Millett seeks to infer from certain observations of the House of Lords in *Re Park Air Services*, which were concerned with the statutory right to compensation upon the disclaimer of a lease introduced in 1929, that no right existed prior to the 1929 enactment to claim damages for the loss of future rent upon the early termination of a lease of an insolvent tenant.   However, the reference to the historical position in the speeches in the House of Lords is very compressed.   A much fuller account is found in the judgment of Mummery LJ in the Court of Appeal [1997] 3 All ER 193.   Mummery LJ said (at page 202) that, absent a surrender of the lease, "*the lease may be regarded as determined, for example, in the case of the acceptance by the landlord of a repudiation of the lease by the tenant company.   In those cases the landlord is entitled to prove for the rent for the remainder of the term on the basis that the lease has been determined*", giving credit for the value of the lease.   He went on to say that the effect of the authorities was that, if a lease was determined in a winding up or bankruptcy, the landlord was entitled "*to claim for the difference between what he would have recovered from the tenant, if the lease had continued, and the amount which he will in fact recover from a new tenant of the premises.*"   This suggests that, contrary to the Millett Declaration, the tenant's proof, prior to 1929, would have been calculated on the same basis as the loss claimed by the Claimants in these proceedings.

47

90. Put shortly, therefore, although the Tenant's obligations under the Lease ceased upon forfeiture, I do not agree that this exempts LBHI from liability to compensate the Claimants for losses flowing from the Tenant's repudiatory breach of the Lease. The Claimants are entitled to be indemnified pursuant to part [ii] of para 1 or alternatively to claim damages for the Tenant's repudiatory breach pursuant to part [i] of para 1.

## J.    THE MEANING OF PARA 7 OF SCHEDULE 4

91. Para 7 of Schedule 4 provides:

"(a)    The Surety hereby further covenants with the Landlord and the Management Company that:-

(i)    if the Crown or a liquidator or trustee in bankruptcy shall disclaim or surrender this Lease or

(ii)    if this Lease shall be forfeited or

(iii)    if the Tenant shall cease to exist unless the same occurs as part of an amalgamation merger or reconstruction resulting in a solvent corporation

THEN the Surety shall if the Landlord by notice in writing given to the Surety within one hundred and eighty (180) days after such disclaimer or other event so requires accept from and execute and deliver to the Landlord a counterpart of a new lease of the Demised Premises (duly stamped at the Surety's expense) for a term commencing on the date of the disclaimer or other event and continuing for the residue then remaining unexpired of the Term such new lease to be at the cost of the Surety and to be at the same rents and subject to the same covenants conditions and provisions as are contained in this Lease

(b)    If the Landlord shall not require the Surety to take a new lease the Surety shall nevertheless upon demand pay to the Landlord a sum equal to the Rent and other sums that would have been payable under this Lease but for the disclaimer or other event in respect of the period from and including the date of such disclaimer or other event until the expiration of one hundred and eighty (180) days therefrom or until the Landlord shall have granted a lease of the Demised Premises to a third party (whichever shall first occur)"

48

92.   LBHI contends that, by virtue of para 7(b) of Schedule 4, its liability (if any) under Schedule 4 ceased on 20 December 2010 with the grant of the lease to JPMorgan. The implicit premise for this contention must be that para 7(b) represents the exclusive remedy of the Claimants in a case where the Lease is forfeited and the option to require LBHI to execute a new lease is not exercised.

93.   Again, I do not agree.

94.   The starting point for any consideration of this issue, is that para 7(a) of Schedule 4, which is a put option, represents an *additional* remedy for the Landlord, which does not prejudice the Claimants in the exercise of any other rights which arise under Schedule 4. There are two reasons for this:

    (1)   First, para 7(a) is not expressed to be an exclusive remedy in a case where the Lease is forfeited (or any of the other events in para 7(a) occur).

    (2)   Secondly, the opening words, "*The Surety hereby further covenants ...*" (emphasis added), indicate an intention to confer an additional right.

95.   I am fortified in my conclusion that para 7(a) is to be regarded as an additional remedy and not an exclusive or exhaustive remedy, by recent judicial authority. In *Shaw v Doleman* [2009] EWCA Civ 279, [2009] 2 BCLC 123 Elias LJ, sitting in the English Court of Appeal, said (at para 61) that a similarly-worded put option in a guarantee of a lease "*provides an additional remedy for the landlord*", and that its existence did not affect the meaning to be given to the other covenants in the guarantee.

96.   Once it is accepted that para 7(a) is an additional, and not an exclusive or exhaustive, remedy, it is obvious that the same must be true of para 7(b). If the Landlord does not exercise the put option in para 7(a), para 7(b) gives him the right to receive a one-off sum

of money. The benefit of this remedy from the Landlord's point of view is that he can claim immediate payment "*upon demand*" of a liquidated and certain sum, without the need to prove any actionable damage flowing from the Tenant's default (or its amount) or to take any steps by way of mitigation (in contrast with para 1 which expressly requires the Claimants to take all reasonable steps to mitigate their losses).[50] This may be particularly advantageous for the Claimants in a situation where the market rent at the date of forfeiture is *higher* than the rent payable under the Lease. In that situation, para 7(b) would nevertheless enable the Claimants to continue to claim the rent under the Lease for 180 days (or until the execution of a replacement lease), regardless of the improvement in the market.

97.    Para 7(b) thus provides an additional benefit to a Landlord who does not exercise the put option, but (like para 7(a)) this is without prejudice to the Landlord's pre-existing rights under the other provisions of Schedule 4. One can test the position in this way:

    (1)    The effect of LBHI's argument, if correct, would be to deprive the Claimants of their express indemnity, under part [ii] of para 1, to recover damages flowing from the Tenant's default, in a case where such default led to the forfeiture of the Lease and the Claimants did not exercise the option in para 7(a).

    (2)    Clear words would be required to impose such a drastic restriction on the Landlord's ability to recover damages under para 1 (e.g. "*save in the case of forfeiture*"). Indeed, since a right of forfeiture arises only upon the occurrence of a serious breach (and thus one liable to result in the greatest losses), the suggested

---

[50]    The benefit of para 7(a) as compared with para 1 is that would allow the Landlord to bypass the process of seeking damages under para 1 and the complication of finding a new tenant (para 1 requires the Claimants to take all reasonable steps to mitigate their losses) by instead having the Surety take up a new lease on the same terms.

restriction on the ability to claim under the indemnity would tend to operate in the

very case where the indemnity was most needed.

(3)     In fact, there is nothing in the wording of para 1 to suggest that the indemnity

should cease to be available in a case of forfeiture occasioned by the Tenant's

default and, on a commercially sensible construction, this is unlikely to have been

the parties' intentions.

98.     Moreover, that para 7 was not intended to be an exclusive remedy in the event of a

disclaimer, is also apparent from para 2 of Schedule 4.  This provides:

> "The Surety hereby further covenants with the Landlord and as a separate
> covenant with the Management Company that the Surety is jointly and severally
> liable with the Tenant (whether before or after any disclaimer by a liquidator or
> trustee in bankruptcy) for the fulfilment of all the obligations of the Tenant under
> this Lease and agrees that the Landlord or the Management Company in the
> enforcement of its rights hereunder may proceed against the Surety as if the
> Surety was named as the Tenant in this Lease"

99.     As with para 7, the opening words of para 2 of Schedule 4, "*The Surety hereby further*

*covenants* ..." (emphasis added), indicate an intention to confer an additional right.

Para 2 then makes express provision as to a remedy which is to be available to the

Claimants "*before or after disclaimer*", namely that the Claimants will (also) have the

right to proceed against LBHI for breach of covenant as if named as the Tenant in the

Lease. It is accordingly impossible to conclude that the parties intended para 7 to deal

exhaustively with the Claimants rights after disclaimer: this would fail to give effect to

the express provision of para 2. The true construction of Schedule 4 must be, therefore,

that para 7 was intended to confer additional rights in the event of a disclaimer.

100.    Once it is accepted that, in a case of disclaimer, para 7 confers rights which are additional

rather than substitutive, the same conclusion must apply to forfeiture.  Para 7 draws no

51

distinction in its application as between cases of disclaimer, on the one hand, and forfeiture, on the other.

101.    For these reasons, I do not agree that para 7(b) imposes a limit on LBHI's liability following forfeiture of the Lease to indemnify the Claimants against damages suffered as a result of the Tenant's default.

**K.    ANTICIPATORY BREACH OF PARA 7(a)**

102.    By the time of the Forfeiture Letter, LBHI had itself been under chapter 11 protection for over 2 years.  Daniel Ehrmann testified at deposition as a corporate representative for LBHI that, as a bankrupt company winding up operations, LBHI had no use for a large office building in London in 2010 and did not expect to have any need for the building. He also did not think LBHI otherwise would want a new lease:  "*Q. Why would LBHI want a lease of the 25 Bank Street property, if not to use it for itself?  A.  I don't think it would want one.  Q.  I'm sorry?  A.  I don't think it would want one.  Let me elaborate. LBHI was going out of business. It's not in the rental businesses.*"[51]

103.    Further, even if LBHI were not bankrupt and had use for the building at 25 Bank Street, the market rental rates in Canary Wharf in 2010 were much lower than the rent that LBHI would have had to pay if it had taken a new lease on the same terms as the Lease.[52] Indeed, that market rental rates were much lower than the rent in the Lease is borne out by the amount JPMorgan was willing to pay in its arms' length transaction with the Claimants for the premises in December 2010.  JPMorgan paid approximately £470

---

[51]    Transcript of Deposition of Daniel Ehrmann, taken June 27, 2013 at 134-36.  See also Transcript of Deposition of Richard Krasnow, taken June 25, 2013 at 114-16.

[52]    Deposition Exs. 83, 91 and 93.

million, while the value of the Lease was more than £1 billion.[53]  Mr Ehrmann did not

provide any testimony to the contrary; rather, he testified he had no understanding of the

market in 2010 and did not know whether the rent in the Lease was above market, at

market or below market.[54]

104.    Mr Ehrmann testified that for LBHI to take a new lease it "*would have gone through
court in order to agree to get a lease*" and "*would have to have gone to our creditors'
committee saying that while we are dead, we are going back into business, and our new
business is a real estate business. Once we would have convinced them, we would have to
have gone to court, notify all our creditors, and then have the court approve whatever
transaction would have resulted in Lehman Brothers taking over the lease.*" He said that
he never was asked to consider going through this process for the premises at 25 Bank
Street.[55]

105.    If US insolvency law is similar to English law (and I am informed that it is in this
regard), then the effect of LBHI executing a new lease on the same terms as the Lease
following the forfeiture would have been to turn LBHI's obligation to pay rent for the
remaining term into an administration expense, thus giving the Claimants priority over all
of LBHI's other unsecured creditors.

106.    LBHI informed the Claimants, before the execution of the new lease with JPMorgan, that
it would not execute a new lease on the same rents and covenants as the Lease.  On
December 9, 2010, Mr Krasnow for LBHI sent an e-mail to Andrew Dietderich, a lawyer
for the Claimants, stating: "*We have consulted with our client and, on the assumption*

---

[53]    Transcript of Deposition of Sir George Iacobescu, taken June 18, 2013 at 32-33; see also
Deposition Exs. 15, 83.
[54]    Transcript of Deposition of Daniel Ehrmann, taken June 27, 2013 at 70-71 and 114-15.
[55]    Transcript of Deposition of Daniel Ehrmann, taken June 27, 2013 at 136.

*that the economic terms of the proposed transaction are as was described to us at the December 6, 2010 meeting, then LBHI would not elect to enter into a lease for the premises on the same terms as the current CW/LBL lease.*"[56]  Mr Krasnow testified at deposition that the "*economic terms that Mr Dietderich described were consistent with those provisions of the lease that refer to those economic terms.*"[57]  Mr Dietderich similarly testified that the economic terms of the JPMorgan transaction were the same as previously discussed with LBHI.[58]  In these circumstances, the Landlord did not serve a document on LBHI expressed to be a notice under para 7(a) requiring LBHI to execute a new lease.

107.    Under English law, if a promisor under a contract, even before the time for performance has arrived, evidences an intention not to perform it (an "*anticipatory breach*"), the promisee may treat this as an immediate breach of contract and bring his action accordingly: *Moschi* at page 356A.

108.    Mr Millett accepts in para 97 of his declaration that it is possible to commit an anticipatory breach of a contingent obligation. This is correct. In *Frost* v *Knight* (1871-72) L.R. 7 Ex. 111, the defendant promised to marry the plaintiff as soon as his (defendant's) father should die. During the father's lifetime the defendant refused to ever marry the plaintiff. The plaintiff sued for breach of the promise, while the defendant's father was still alive.  It was held that an anticipatory breach of contract had been committed, on which the plaintiff could sue.

---

[56]    Deposition Ex. 21.
[57]    Transcript of Deposition of Richard Krasnow, taken June 25, 2013 at 142-43.
[58]    Transcript of Deposition of Andrew Dietderich, taken June 11, 2013 at 72-74.

109.    Although it is true that LBHI's obligation under para 7(a) to execute a new lease is triggered by the receipt of notice from the Landlord, I consider that LBHI's express statement that it would not execute a new lease, if notice were given, would likely be regarded as an anticipatory breach of its obligations under para 7(a), particularly when LBHI's statement is seen in the context of LBHI's own longstanding insolvency and the detrimental effect on other creditors of LBHI executing an onerous new lease while under chapter 11 protection.

110.    That the contingency was within the control of the Landlord (a point emphasized in the Millett Decl., para 97), which could have given notice to exercise the para 7 option and thus brought into being a contractual obligation on the part of LBHI to execute a replacement lease, does not matter. *Byrne* v *Inntrepreneur Beer Supply Co Ltd* [1998] All ER (D) 634 is instructive. In *Byrne*, the plaintiff had a lease with an option to take a new lease of the premises, subject to certain pre-conditions including giving notice that he wanted to exercise the option. A representative of the defendant then told the plaintiff that plaintiff must take a new lease on different terms from those contained in the option or vacate the premises. The plaintiff never gave notice that he wanted to exercise the option. Instead, he took the new lease offered and brought suit, contending that the defendant "*was in anticipatory breach of its obligations under the option, and that the plaintiff accepted the repudiation*". Although the defendant sought to defend on the basis that the plaintiff had failed to satisfy some of the conditions precedent for the option, including failing to give notice to exercise the option, the defendant did not advance the argument which (on Mr Millett's analysis) would have been available as a complete defence, namely that, unless and until the plaintiff had given notice, there was no

55

obligation capable of being repudiated. Nor is there any suggestion in the judgment that this would have been a good point. It may be worth noting that the judge was Neuberger J who, as is correctly pointed out at note 40 of the Millett Declaration, is now President of the Supreme Court and was previously "*an eminent specialist practitioner in landlord and tenant law.*" On Mr Millett's approach, both Neuberger J and Counsel for the defendants must have missed this obvious and short defence to the claim.

111.    For completeness, I do not agree with Mr Millett's suggestion that, if para 7 is properly regarded as an option, it follows that "*no obligation under paragraph 7, executory or otherwise, ever came into existence at all*" (Millett Decl., para 100). An option imposes no obligation on the grantee, but it imposes an obligation on the grantor which is contingent on the exercise of the option: *Spiro* v *Agnew* at page 543 (cited in the Millett Decl., para 98). It follows, in my view, that it must be possible for the grantor to commit an anticipatory breach of that contingent obligation, regardless of whether the option has been exercised by the grantee.

112.    Since damages are awarded to put the Landlord into the position it would have been had LBHI performed its obligations under para 7(a), these would include the rent and other charges that the Claimants would have received under a new lease with LBHI (at the same rent and covenants as the Lease) less sums received by way of mitigation from the lease executed with JPMorgan.

## L.    CONCLUSIONS

113.    For the reasons set out above, my conclusions are, in summary, as follows:

(1)    Because Schedule 4 is a contract of indemnity and not a contract of guarantee, LBHI's obligations would not be discharged by a material variation of the Lease.

(2)     Even if (contrary to my view) Schedule 4 is a contract of guarantee, a material
        variation of the Lease would not discharge LBHI's obligations because paras 6(d)
        and/or 6(g) of Schedule 4 provide that a variation of the Lease will not discharge
        or exonerate LBHI.

(3)     In any event, on its true construction, the Forfeiture Letter does not effect a
        variation of the Lease because the releases are confined to claims for rent as an
        administration expense (which do not arise from the terms of the Lease) while the
        Landlord's ability to claim for unpaid rent in the administration of the Tenant as
        an unsecured creditor is expressly preserved. As Mr Millett's own treatise makes
        clear, the releases in the Forfeiture Letter are not a variation that discharges
        LBHI's obligations under Schedule 4.

(4)     The Claimants are entitled to an indemnity in respect of losses flowing from the
        Tenant's default under part [ii] of para 1 of Schedule 4, even though, following
        the forfeiture, the Tenant is no longer bound by the covenants in the Lease
        because such losses arise from the Tenant's pre-forfeiture default. Thus, the
        Claimants are entitled to the rents and other charges they would have received had
        the Lease run its full term, less sums received by way of mitigation from the
        JPMorgan lease.

(5)     Even if (contrary to my view) Schedule 4 were limited to a guarantee of the
        Tenant's obligations under the Lease, forfeiture of the Lease resulting from the
        Tenant's repudiatory breach would trigger a liability on the part of the Tenant to
        pay damages for the loss of future rent, which the Claimants would be entitled to
        recover from LBHI.

57

(6)     Para 7 of Schedule 4 confers an additional remedy on the Claimants and does not

limit their right to be indemnified in respect of damages pursuant to para 1.

(7)     LBHI's decision not to execute a new lease in accordance with para 7 of

Schedule 4 would likely be regarded as an anticipatory breach of contract. The

damages recoverable by the Claimants would include the rent and other charges

payable for the remainder of the Lease less sums received by way of mitigation

from the lease with JPMorgan.


Dated 17 July, 2013

_____
            Laurence Rabinowitz Q.C.

58

# APPENDIX A TO THE REPORT OF LAURENCE RABINOWITZ QC

## CURRICULUM VITAE WITH DETAILS OF PUBLICATIONS IN LAST TEN YEARS

**Barrister**
**Date of call:** 1987
**QC:** 2002

Generally recognised as one of the leading silks at the Commercial Bar, Laurence Rabinowitz has a wide ranging commercial and company practice. He is recommended in both Chambers and Partners 2013 and the Legal 500 2012 as a leading silk in Banking, Commercial Dispute Resolution, Energy and Natural Resources, Civil Fraud, Tax and International Arbitration (General Commercial & Insurance).

*'Laurence Rabinowitz QC is one of the Bar's most successful advocates and "a real heavyweight," who "can make a real difference to the outcome of a case." Possessed of abundant "raw ability" and praised for his "nuanced" advocacy, he provides "devastating cross-examination" and "inestimable intellectual firepower." '* **Chambers & Partners 2013**

*'Laurence Rabinowitz QC has 'an unassuming and down-to-earth style which belies his fierce intellect', and 'masters the detail of cases incredibly quickly'.'* **Legal 500 2012**

Laurence Rabinowitz QC is 'about the best in the business' **Legal 500 2012**

"Laurence Rabinowitz QC is 'in the top handful of the most eminent advocates anywhere at the Bar'." **Chambers & Partners 2012**

'The 'absolutely phenomenal' Laurence Rabinowitz QC is 'a formidable legal talent who continues to be at the top of his game" **Legal 500 2011**

SCOPE OF PRACTICE

- Arbitration

- Banking & Financial Services

- City practice

- Civil fraud

- Commercial litigation

- Company & Insolvency

- Energy, oil & gas and utilities

- Professional negligence

- Tax litigation

EXAMPLES OF RECENT CASES

**Arbitration**

- **Jivraj v. Hashwani (Supreme Court 2011)**

  Appearing for the LCIA. By judgments given on 27 July 2011 in Jivraj v Hashwani [2011] UKSC 40 the Supreme Court reversed the decision of the Court of Appeal and held that UK discrimination law did not apply to the selection or appointment of arbitrators. In the judgments under appeal to the Supreme Court, the Court of Appeal had held that the stipulation of a religious qualification for an arbitrator was unlawful unless justified under the discrimination legislation. This decision caused consternation in the arbitration world because it implied that common provisions excluding arbitrators from appointment on the grounds that they shared a nationality with one of the parties might similarly fall foul of the discrimination legislation, casting doubt on the validity of many arbitration agreements and on the enforceability of awards made under them.

- **Acting for a major utilities company in a €1.4bn claim against a joint venturer.**

- **Acting for the respondent in arbitration proceedings in Singapore, concerning satellite and media disputes.**

- **Acting for the respondent in a dispute concerning a $7.5bn petroleum joint venture.**

- **Nominated as co-arbitrator in a dispute concerning a price review notice issued in respect of liquefied natural gas.**

**Banking & Financial Services**

Laurence advises regularly on all aspects of international and domestic banking and finance. His work includes banking regulation, credit-crunch litigation, guarantees, bank debt recovery, claims for and against banks, cheques and negotiable instruments, letters of credit and performance bonds, disputes arising out of CDOs, swaps and securitisation. In 2009 he was voted Banking & Finance Silk of the Year by Chambers & Partners.

*'Confidence in the prowess of Laurence Rabinowitz QC in this area is not in dispute given his engagement for RBS on the OFT bank charges matter. Clients laud his "almost perfect blend of real intelligence combined with pragmatism and the ability to facilitate commercial solutions to really tough disputes.'*
**Chambers & Partners 2010**

- **Dominion DX PCC Ltd -v- Prudential International Assurance Ltd & Prudential International Assurance PLC (Chancery Division)**

  Acting for Prudential Insurance Assurance plc and an Irish subsidiary of Prudential plc. The Client was involved in a dispute with fund management company called Dominion Fund Management Ltd, a Guernsey Company. The dispute concerned the application by Prudential of market value reductions (MVRs) on proposed surrenders by Dominion of Prudential with-profits bonds.

- The **Sisters of Charity of Jesus & Mary & Ors. –v- Morgan Stanley**

  This dispute concerns a group of Sisters and other investors who bought Saturn notes estimated to be worth €20m linked to Dresdner Bank bonds in 2005 and 2006. The matter concerned allegations that Morgan Stanley failed to redeem the debt when a mandatory redemption was triggered in early 2009 after the German bank's credit rating was cut below an agreed point.

2

- **JP Morgan -v- Berliner Verkehrsbetriebe**

  Currently acting for JP Morgan who are in dispute with Berliner Verkehrsbetriebe (the Berlin Transport Authority). The dispute relates to credit derivatives transactions under which there have been a series of defaults. We have issued proceedings for declaratory relief.

- **OFT -v- Abbey plc & Ors. 'Bank charges' [2009] UKSC 6**
  This appeal involved a relatively narrow issue. The Supreme Court had to decide not whether the banks' charges for unauthorised overdrafts were fair, but whether the OFT could launch an investigation into whether they were fair.

- **The Equitable Life Assurance Society v Ernst & Young, Roger Bowley & Ors [2005] EWHC 722 (Comm)**
  Acting for former non-executive directors of ELAS, in their successful defence to a claim brought by the Society.

- **Mahonia Ltd & JP Morgan Chase v. West LB AG & Anr**

**Civil fraud**

- **Trebuchet Finance Ltd -v- Merrill Lynch International Bank Ltd**

  Acting for Trebuchet, the Claimant. Representations were given to induce, and did induce, Trebuchet to enter into an agreement. Trebuchet relied on accuracy of representations in entering into the RPA. Had Trebuchet (or, it is to be inferred, MLIB) known the Representation was false, the RPA would not have been signed. In fact, the Representation was false because the Offering Circular and the Investor Presentation were materially inaccurate and contained material misstatements and omissions.

- **Enercon GmBH & Wobben Properties GmBH -v- Enercon**

  Acting for the Defendant (Enercon India Ltd) / EIL is a substantial Indian power company set up by Yogesh Mehra / German investors bought share of company from Mr Mehra / business became highly successful in the manufacture and sale of wind turbine generators / JV worked successfully between 1994 and 2006 / various disputes have subsequently arisen in relation to a 'technical know-how agreement' and an intellectual property licence agreement, as well as shareholders agreements.

- **Boris Berezovsky –v- Roman Abramovich**

  In 2011 Berezovsky brought a civil case against Roman Abramovich in the High Court of Justice in London, accusing Abramovich of blackmail, breach of trust and breach of contract, and seeking over £3 billion in damages. This became the largest civil court case in British legal history.

- Acting for a large car company in potential claims being brought by shareholders / flows from potential takeover of another large car comapny and the ensuing regulatory investigation in Germany.

**Commercial litigation**

*'One of the leading lawyers at this set is the "revered and hugely gifted" Laurence Rabinowitz QC. This innovative silk "manages to make clients feel like they are leaving the problem behind," say solicitors...'*
**Chambers & Partners 2010**

3

- **Mr Boris Berezovsky –v- Mr Roman Abramovich (Commercial Court)**

  In 2011 Berezovsky brought a civil case against Roman Abramovich in the High Court of Justice in London, accusing Abramovich of blackmail, breach of trust and breach of contract, and seeking over £3 billion in damages. This became the largest civil court case in British legal history

- **Colour Quest Ltd v Total Downstream UK Plc – 'Buncefield' [2009] EWHC 540 (Comm)**
  Acting for Shell UK in its £100m claim against Total and HOSL for loss and damages arising out of the Buncefield terminal fire and explosion.

- **Cooper Tire & Rubber Co v Shell Chemicals UK Ltd (Commercial Court), [2009] EWHC 2609 (Comm)**
  A challenge to the English Court's jurisdiction following proceedings subsequent to a finding of the European Commission that 13 companies were guilty of an infringement of the EC Treaty (Nice) Art. 81, in relation to the market for the supply of certain kinds of rubber used in car tyres.

- **Masri v Consolidated Contractors International Co SAL (House of Lords), 30 July 2009**
  The issues examined by the House of Lords, were (1) whether the language of CPR 71.2 purports to confer power to order examination of a foreign director of a foreign company, (2) whether it purports to confer power to order such examination in respect of foreign assets, (3) whether, if it does, it is ultra vires the rule-making power, (4) whether, if it does, there is any basis under CPR 6 for service upon Mr Khoury out of the jurisdiction in Greece, and (5) whether, if there is, the English courts should nonetheless give "primacy" or priority to use of the Evidence Regulation (EC) No 1206/2001 , before contemplating such domestic means.

- **JP Morgan Chase Bank NA v Berliner Verkehrsbetriebe (BVG) Anstalt Des Offentlichen Rechts [2009] EWHC 1627 (Comm)**
  Successfully resisting an application by a German public law institution, Berliner, which applied for an order pursuant to Regulation 44/2001 Art. 22(2) that the court had no jurisdiction to hear the claim brought against it by the respondent company JPM. JPM claimed from Berliner approximately $112 million said to be due under a commercial agreement pursuant to which Berliner sold to JPM protection against the credit risk of certain companies.

- **Alessandro Benedetti, M Finance SA v Naguib Onsi Naguib Sawiris, April Holding, OS Holding, Cylo Investments Limited [2009] EWHC 1330 (Ch)**
  Acting for the 1st and 4th Defendants in a claim for specific performance of an agreement entitling the Claimant to certain share capital, or alternatively claimed in equity for breaches of fiduciary duty or constructive trust, or claimed for a quantum meruit. A dispute arose as to the contribution that the Claimant had made to an acquisition and whether he was entitled to shares in a company used as an investment vehicle in the transactions, or to a further payment for his services beyond the €67 million he had already received under a brokerage agreement.

## Energy, oil & gas and utilities

Laurence Rabinowitz has a significant oil, gas and power practice.  He regularly advises many of the major oil and gas companies directly, on all aspects of JOAs, TPAs, field and pipeline contracts, exploration and exploitation agreements and 'take or pay' contracts.

*Laurence Rabinowitz QC is "amazing at everything he does." "Hugely in demand from energy companies," he "gives off a very calm and authoritative air and never seems flustered." Possessed of "clear analytical skills," he "gets to the heart of a problem with ease and has a rare elegance of delivery in court."*
**Chambers & Partners 2009**

- **UNCITRAL arbitration**

  Acting for one of the Largest Oil Companies. The dispute relates to an alleged breach of a shareholders agreement for an oil and gas joint venture in Russia. By way of relief, the claimants are seeking nominal damages ($1) and a number of declarations confirming the respondents' breach

- **ICC Arbitration**

  Acting for a large Energy provider , the Respondent in an ICC arbitration. The claimant is a Thai listed company which owns a portfolio of 12 electricity generating assets in Thailand and Laos. The dispute concerns attempted share disposal and claims that our client did not use 'best endeavours' to complete a transaction under best endeavours obligations in the contract and was in breach of exclusivity obligations.

- **British Gas Ltd v Amerada Hess Ltd (Court of Appeal), [2006] EWCA Civ 900**
  Contract terms; Oil and gas production; Termination notices.

- **Bocardo SA v Star Energy UK Onshore Ltd [2008] EWHC 1756 (Ch)**
  Trespass to land; Pipelines; Oil extraction under claimant's land; Basis of assessment of damages.

- **National Power Plc v. United Gas Co Ltd**

- **Total Gas Marketing Ltd v. ARCO British Ltd & Ors**

- **Conoco & Ors v. Philips**

- **Kuwait Oil Tanker Company SAK v. Abdul Fattah Khaled Al Bader & Ors**

- **Shell & Ors v. Enterprise Oil**

**Professional negligence**

*'....one of the leading barristers of his generation. His broad commercial practice takes in a substantial amount of negligence cases and he is particularly noted for his expertise in handling accountancy claims.'*
**Chambers & Partners 2010**

*'A robust and incisive silk with an outstanding reputation.'*
**Chambers & Partners 2009**

- **Colour Quest Ltd v Total Downstream UK Plc – 'Buncefield' [2009] EWHC 540 (Comm)**
  Acting for Shell UK in its £100m claim against Total and HOSL for loss and damages arising out of the Buncefield terminal fire and explosion.

- Steamship Mutual Underwriting Association Trustees (Bermuda) Ltd / Hamilton Investment Management Ltd v. Baring Asset Management

- Bank Austria v. Price Waterhouse

- Yeoman v. Warburgs & Linklaters

- Socpen v. UBS

- Atlantic Computers plc v. BZW & Ors

5

- G E Capital Corporate Finance Group v. Bankers Trust Company & Ors

**Tax litigation**

- **Franked Investment Income (FII) Group Litigation –v- HMRC**

  The purpose of the litigation was to determine various questions of law arising from the tax treatment of dividends received by UK-resident companies from non-resident subsidiaries, as compared with the treatment of dividends paid and received within wholly UK-resident groups of companies. The provisions giving rise to these questions related to the system of advance corporation tax ("ACT") and to the taxation of dividend income from non-resident sources under section 18 (Schedule D, Case V) of the Income and Corporation Taxes Act 1988 ("the ICTA") ("the DV provisions").

- **The Investment Trust Companies -v- HMRC**

  Acting for The Investment Trust Companies (ITC), closed end investment trusts who got investment management services from management companies, sued to recover overpaid VAT from the HMRC. The managers usually got paid by fees plus VAT. It was thought there was no exemption possible, and VAT was charged at a standard rate. But then the ECJ said in 2007 the services should have been exempt from VAT since 1 January 1990. The litigation had begun in 2004, and at that point the managers claimed VAT refunds from 2001 to 2004. The claims were not made for any earlier accounting periods because the Value Added Tax Act 1994 section 80(4) installed a three year limitation period. HMRC repaid net amounts (because s 80(2A) required a set off from deductions of input tax already made for supplying services). After Fleming (t/a Bodycraft) v Customs and Excise Commissioners [2008] UKHL 2, more refund claims were allowed going back to 4 December 1996. ITC claimed they had a remedy for restitution, that this claim was not excluded by the VATA 1994 section 80(7), and that EU law gave an effective right to reimbursement.

- **Littlewoods –v- HMRC**

  This case concerned the argument as to the type of interest due to the retailer on overpaid VAT. The company argues that it should be entitled to compound interest on the overpaid tax, which had been charged in breach of EU law on commission.

- **Lookers plc v The Commissioners for Her Majesty's Revenue and Customs Commissioners, [2009] UKUT 175 (TCC)**
  Acting for one of five appellant motor traders, in conjoined appeals, appealing against a decision of the respondent commissioners not to pay compound interest on repayments of overpaid tax. The appellants carried on business as motor dealers and had all paid excess output tax on bonus payments paid by motor manufacturers and on the sales of demonstrator vehicles they had used for the purposes of their businesses. The excess tax was paid as a result of the United Kingdom's failure to implement provisions of Directive 77/388 correctly.

- **Sempra Metals v. Inland Revenue, [2007] UKHL 34**
  Successfully resisting an appeal by the IRC, against a decision ([2005] EWCA Civ 389, [2006] Q.B. 37) that the respondent company Sempra, was entitled to interest for the loss of use of money on a compound basis. Sempra had paid advance corporation tax in respect of certain dividends prematurely. The premature payment of such tax gave rise to a breach of Community law. Sempra's claim was in restitution, it being alleged that the money had been paid under a mistake.

**Rail industry disputes**

- GNER v. Strategic Rail Authority

- Crosscountry Train Limited, West Coast Trains Limited & Virgin Rail Group Limited

**Other notable cases**

- Kuwait Shipping v. UBS

- University of Keele v. Price Waterhouse

- Amicus Curiae in R v. Governor of Brockhill Prison: ex parte Evans (HL) and Turner v. Grovit (HL)

**Publications**

General Editor - Weinberg & Blank - *Takeovers and Mergers*

Member of Advisory Group, 2012 to *A Restatement of the English Law of Unjust Enrichment*

**Education**

1978-83: BA LLB (University of Witwatersrand), 1st Cum Laude, top graduating law student, Juta Prize, Advocates Prize for best graduating student.
1983: Rhodes Scholar, South-At-Large.
BA (Jurisprudence) Oxon, 1st.
BCL, 1st
Eldon Scholar

## APPENDIX B TO THE REPORT OF LAURENCE RABINOWITZ QC

## DOCUMENTS AND DEPOSITION TESTIMONY CONSIDERED

### Deposition Transcripts

1. Deposition of Andrew Dietderich, taken June 11, 2013

2. Deposition of Sir George Iacobescu, taken June 18, 2013

3. Deposition of Tony Briam, taken June 19, 2013

4. Deposition of Pamela Kendall, taken June 20, 2013

5. Deposition of Richard Krasnow, taken June 25, 2013

6. Deposition of William Viets, taken June 26, 2013

7. Deposition of Daniel Ehrmann, taken June 27, 2013

8. Deposition of Jeremy Clay, taken July 9, 2013

9. Deposition of Anita Jones, taken July 9, 2013

### Deposition Exhibits

| Ex. # | Date | Description | Bates |
|---|---|---|---|
| 1 | | Notice of Deposition of Canary Wharf | |
| 2 | 2010.11.30 | DeMarco email to Kendall and Henderson re LBHI / Canary Wharf | CW0016226 |
| 3 | 2005.02.16 | Schedule 4, entitled "Covenants by the Surety" | CW0011478 |
| 4 | 2010.11.26 | Iacobescu email to Anderson, Jacomb et al. re 25 Bank Street - draft agreement for surrender | CW0018402 |
| 5 | 2010.12.01 | Shenker email to Andersen re LBHI/ Canary Wharf Settlement Negotiations | CW0010419 |
| 6 | 2010.12.01 | Sansom and Briam email to Iacobescu et al. re 25 Bank Street | CW0022960 |
| 7 | 2010.12.05 | Shenker email to Andersen re 25 Bank Street | CW0010423 |
| 8 | 2010.12.05 | Shenker email to Andersen re 25 Bank Street | CW0010430 |
| 9 | 2010.12.06 | Kendall email to Iacobescu re Domus - LBHI | CW0029713 |
| 10 | 2010.12.06 | Dietderich email to Krasnow re Canary Wharf | CW0010435 |
| 11 | 2010.12.08 | Dietderich email to Krasnow, Jones and Del Nido re Canary Wharf Lease | CW0010463 |

| Ex. # | Date | Description | Bates |
|---|---|---|---|
| 12 | 2010.12.08 | Dietderich email to Krasnow re revised confidentiality agreement | CW0010464 |
| 13 | 2010.12.10 | Dietderich email to O'Connor, Del Nido, and Jones re Canary Wharf("CW") | CW0009711 |
| 14 | 2010.12.10 | Shenker email to Andersen re 25 Bank Street - Proposed Transaction with New Tenant | CW0010492 |
| 15 | 2010.12.20 | Agreement Relating to the Grant of a Lease of 25 Bank Street, Canary Wharf | CW0005282 |
| 16 | 2011.01.06 | Dietderich email to O'Connor re Canary Wharf("CW") | CW0016768 |
| 17 | 2011.01.27 | Dietderich letter to Krasnow dated January 27, 2011 | |
| 18 | 2010.12.20 | Agreement Relating to the Grant of a Lease of 25 Bank Street, Canary Wharf | LBHI_CW0013640 |
| 19 | 2010.12.06 | Briam email to Iacobescu, Anderson, and Henderson re 25 Bank Street | CW0022598 |
| 20 | 2010.12.07 | Shenker email to Andersen re Canary Wharf - Info Flow | CW0010440 |
| 21 | 2010.12.09 | Krasnow email to Dietderich re revised confidentiality agreement | CW00000001 |
| 22 | 2010.12.09 | Dietderich email to Krasnow and Del Nido re Execution Copy of Confidentiality Agreement | CW0014173 |
| 23 | 2010.03.05 | JPMorgan and Canary Wharf Group Letter Dated March 5, 2010 | CW0010412 |
| 24 | 2010.05.24 | Briam email to Kendall re 25 Bank Street | CW0019076 |
| 25 | | Handwritten Notes | CW0034681 |
| 26 | 2010.08.13 | Henderson letter to Clay re Lease Memorandum of Understanding | CW0001546 |
| 27 | 2010.09.14 | Iacobescu email to Kendall et al. re 25 Bank Street Surrender | CW0000493 |
| 28 | 2010.09.23 | Dawson email to Bradford re 25 Bank Street - Without Prejudice | CW0000480 |
| 29 | 2010.09.27 | Briam email to Bradford et al. re 25 Bank Street - Without Prejudice | CW0000587 |
| 30 | 2010.09.30 | Iacobescu email to Jervis re bank st - without prejudice | CW0000550 |
| 31 | 2010.09.30 | Iacobescu email to Jervis re bank st - without prejudice | CW0000546 |
| 32 | 2010.09.30 | Iacobescu email to Briam et al. re 25 Bank Street | CW0000539 |

-2-

| Ex. # | Date | Description | Bates |
|-------|------|-------------|-------|
| 33 | 2010.10.28 | Iacobescu email to Waugh, Lyons, Precious et al. | CW0019134 |
| 34 | 2010.11.12 | Kendall email to Reeves re 25 Bank Street | CW0000775 |
| 35 | 2010.11.15 | Kendall email to Henderson re Lehman Brothers Holdings Inc - Chapter 11 Proceedings | CW0011679 |
| 36 | 2010.11.24 | Kendall email to Iacobescu re 25 Bank Street | CW0016742 |
| 37 | 2010.11.25 | Iacobescu email to Kendall re 25 Bank Street | CW0000812 |
| 38 | 2010.11.26 | Iacobescu email to Kendall, Briam, Henderson re 25 Bank Street | CW0018395 |
| 39 | 2010.12.06 | Kendall email to Ehrmann re 25 Bank Street - URGENT | CW0016113 |
| 40 | 2010.12.06 | Kendall email to Turner re DOMUS | CW0020707 |
| 41 | 2010.12.06 | Henderson email to Kendall re JPM/CW/25 Bank Street - £10 million "contribution" | CW0011707 |
| 42 | 2010.11.24 | Financial Times Article "JPMorgan set to axe plans for £1.5bn HQ | |
| 43 | 2010.11.18 | Viets email to Jordan and Joyce re Project Domas - Treatment of Floors 18-21 in Spa | CW0002761 |
| 44 | 2010.11.25 | Sansom and Briam email to Bradford re 25 Bank Street | CW0014544 |
| 45 | 2010.11.26 | Sansom email to Henderson and Kendall re 25 Bank Street | CW0018393 |
| 46 | 2010.11.27 | Briam email to Henderson and Kendall re 25 Bank Street | CW0029649 |
| 47 | 2010.11.27 | Briam email to Henderson and Kendall re 25 Bank Street | CW0023237 |
| 48 | 2010.11.28 | Briam email to Iacobescu re 25 Bank Street | CW0034383 |
| 49 | 2010.11.30 | Briam email to Henderson re 25 Bank Street | CW0023091 |
| 50 | 2010.12.13 | Kendall email to Henderson re 25 Bank Street | CW0030796 |
| 51 | 2008.10.13 | DeMarco email to Krasnow and Del Nido re Canary Wharf Settlement Agreement | LBHI_CW0011136 |
| 52 | 2010.06.30 | Ridyard email to Taylor and Bradford re Underlease of 25 Bank Street | CW0000004 |
| 53 | 2010.08.11 | Kendall email to Ehrmann re Lehman Brothers Holdings Inc; Chapter 11 Claim | LBHI_CW0004291 |
| 54 | 2010.11.11 | Jervis email to Kendall re without prejudice and subject to contract | CW0000444 |
| 55 | 2010.11.02 | Henderson email to Viets re Lehman Lease | CW0014554 |

| Ex. # | Date | Description | Bates |
|-------|------|-------------|-------|
| 56 | 2010.11.02 | Cash email to Ehrmann and Zavo re Canary Wharf Settlement Stipulation | LBHI_CW0005810 |
| 57 | 2012.05.21 | Summary Sheet for Compensation and Reinbursment of Expenses | |
| 58 | 2013.01.31 | December 2012 Post-Effective Operating Report | |
| 59 | 2013.01.31 | Notice of Deposition of Lehman Brothers Holdings, Inc | |
| 60 | 2012.08.15 | Notice of Hearing on Objection to Proofs of Claim Number 14824 and 14826 | |
| 61 | 2010.09.17 | Business article JPMorgan eyes Lehman tower in potential snub to Government | |
| 62 | 2010.09.14 | Iacobescu letter re Surrender of 25 Bank Street | CW0011847 |
| 63 | 2010.11.02 | Cash email to Ehrmann and Zavo re Canary Wharf Settlement Stipulation | LBHI_CW0005810 |
| 64 | 2010.11.11 | DeMarco email to Kendall, Briam, and Brozman re Revised Canary Wharf Settlement Agreement | CW0016744 |
| 65 | 2010.11.22 | Krasnow email to DeMarco re Canary Wharf Stipulation | CW0006432 |
| 66 | 2010.11.24 | Krasnow email to DeMarco re Canary Wharf Stipulation | CW0006444 |
| 67 | 2010.11.24 | Krasnow email to DeMarco re Lehman/LBL Canary Wharf Lease | CW0006436 |
| 68 | 2010.12.01 | Krasnow email to Ehrmann, Cash, and Del Nido re 25 Bank Street | CW0006473 |
| 69 | 2010.12.01 | Krasnow email to DeMarco re LBHI/Canary Wharf Settlement Negotiations | CW0006467 |
| 70 | 2010.12.06 | Krasnow email to Briam re 25 Bank Street | CW0009831 |
| 71 | 2013.05.21 | Krasnow email to Dietderich re Canary Wharf | CW0010941 |
| 72 | 2010.12.08 | Dietderich email to Krasnow, Jones and Del Nido re Canary Wharf Lease | CW0006527 |
| 73 | 2010.12.07 | Dietderich email to Krasnow, Jones and Del Nido re Info Flow | CW0006528 |
| 74 | 2010.12.09 | Jones email to Krasnow re revised confidentiality agreement | CW0010178 |
| 75 | 2010.12.09 | Krasnow email to Dietderich re revised confidentiality agreement | CW00000001 |
| 76 | 2011.01.06 | Dietderich email to Kendall re Canary Wharf("CW") | CW0018454 |
| 77 | 2013.05.30 | April 2013 Post-Effective Operating Report | |

| Ex. # | Date | Description | Bates |
|-------|------|-------------|-------|
| 78 | 2013.02.20 | Blakemore email to Cash re Lehman: Canary Wharf | LBHI_CW0009237 |
| 79 | 2005.03.16 | Underlease of 25 Bank Street, Canary Wharf | LBHI_CW0000005 |
| 80 | 2010.04.07 | Cash email to Ehrmann re LBL Lease Analysis | LBHI_CW0004802 |
| 81 | 2010.06.23 | Ehrmann email to Oneill re: Lehman Brothers Holdings Inc ("LBHI"): Chapter 11 Claim Class 7H | LBHI_CW0002657 |
| 82 | 2010.06.30 | Ehrmann email to Suckow re Lehman Brothers Holdings Inc; Chapter 11 Claim | LBHI_CW0008495 |
| 83 | 2010.07.26 | Ehrmann letter re Lehman Brothers Holdings Inc. (LBHI) - Chapter 11 Claims | LBHI_CW0009313 |
| 84 | 2010.08.06 | Ehrmann email to Cash re LBL Lease | LBHI_CW0005874 |
| 85 | 2010.08.18 | Cash email to Kendall re LBHI Chapter II Claim - without prejudice | LBHI_CW0015426 |
| 86 | 2010.09.16 | Cash email to Zavo re 25 Bank St lease liabilities LBHI | LBHI_CW0005468 |
| 87 | 2010.09.29 | Ehrmann email to Cash re 25 Bank Street - Chapter 11 Claim | LBHI_CW0006007 |
| 88 | 2010.09.30 | Ehrmann email to Weeks re 25 Bank Street Chapter 11 Claim | CW0010983 |
| 89 | 2010.10.04 | Cash email to Kendall re 25 Bank Street: Chapter 11 Claim - Without Prejudice | CW0032393 |
| 90 | 2010.10.05 | Ehrmann email to Cash re Canary Wharf Claim | LBHI_CW0006333 |
| 91 | 2010.10.12 | Cash email to Fitts and Blakemore re Lehman: Canary Wharf | LBHI_CW0008662 |
| 92 | 2010.10.12 | Zavo email to Cash re HQ2 relevant pages from Canary Wharf OC | LBHI_CW0008933 |
| 93 | 2010.10.13 | Kendall email to Reeves re Canary Wharf | CW0032288 |
| 94 | 2010.10.27 | Kendall email to Cash re Chapter 11 Claim - 25 Bank Street | CW0001182 |
| 95 | 2010.11.13 | DeMarco email to Krasnow re Lehman Brothers Holdings Inc - Chapter 11 Proceedings | LBHI_CW0011132 |
| 96 | 2010.11.23 | Cash email to Kendall re 25 Bank Street | LBHI_CW0005818 |
| 97 | 2010.12.02 | Clay email to Briam re Domus | MB0001167 |
| 98 | 2010.12.15 | Briam email to Clay re Domus - Main SPA and Existing Lease SPA | MB0000654 |
| 99 | 2010.12.11 | Clay email to Briam | MB0003093 |
| 100 | 2010.12.12 | Clay email to Briam re Domus | JPM-25BankStreet 0000611 |

**Other Documents**

1. Objection to Proofs of Claim Number 14842 and 14846, filed August 15, 2012, with exhibits.

2. Reply to Canary Wharf Response and in Further Support of Objection to Proofs of Claim Number 14824 and 14826, filed January 10, 2013, with exhibits and appendices, including the Declaration of Richard Millett Q.C.

3. Overriding Lease between HQCB Investments Limited, JPMorgan Chase Bank, National Association, Heron Quays Properties Limited, Canary Wharf Management Limited, Canary Wharf Investments Limited, and Canary Wharf Limited, dated December 20, 2010 (CW0010007-161).