# Exhibit 19

**C L I F F O R D**
**C H A N C E**

CLIFFORD CHANCE LLP

10:22 AM

HQCB INVESTMENTS LIMITED

JPMORGAN CHASE BANK, NATIONAL ASSOCIATION

HERON QUAYS PROPERTIES LIMITED

CANARY WHARF MANAGEMENT LIMITED

CANARY WHARF INVESTMENTS LIMITED

CANARY WHARF LIMITED

---

COUNTERPART

OVERRIDING LEASE
of
premises known as
25 Bank Street, Canary Wharf
London E14 5LE

---

UK-2583741-v15

70-40394288

CONFIDENTIAL

CW0010007

Contents

| Clause | | Page |
|---|---|---|
| 1. | Definitions and interpretations | 1 |
| 2. | Demise and rents | 13 |
| 3. | Tenant's covenants | 14 |
| 4. | Landlord's covenants | 26 |
| 5. | Management | 38 |
| 6. | Provisos | 40 |
| 7. | Service charge | 57 |
| 8. | Mutual declaration as to rights of light and air | 67 |
| 9. | New tenancy | 67 |
| 10. | Third party rights | 67 |

Schedule 1 Tenant's Rights ... 68

Schedule 2 Exceptions And Reservations ... 79

Schedule 3 Matters To Which The Demised Premises Are Subject ... 87

Schedule 4 Estate Services ... 88

Part I General ... 88

Part II the Services ... 88

Part III the Costs and Expenses ... 91

Schedule 5 Estate Regulations ... 95

Part A ... 95

Part B ... 99

Schedule 6 Indexation Of Ground Rent ... 102

Schedule 7 Guarantor Provisions ... 104

CONFIDENTIAL                                                                  CW0010008

## PRESCRIBED CLAUSES

| LR1. | Date of lease | 20 December 2010 |
|---|---|---|
| LR2. | Title number(s) | |
| | LR2.1 Landlord's title number(s) | EGL436333 (as to part) and pending registration (as to the remainder) |
| | LR2.2 Other title numbers | EGL387040, EGL387043, EGL200721, EGL316757, EGL371036, EGL202810, EGL202850, EGL316758 |
| LR3. | Parties to this lease | |
| | Landlord | HQCB INVESTMENTS LIMITED whose registered office is at One Canada Square Canary Wharf London E14 5AB (Company registration number 04353135). |
| | Tenant | JPMORGAN CHASE BANK, NATIONAL ASSOCIATION, a national banking association organised under the laws of the United States with Company registration number FC004891 and branch number BR000746 with its main office located at 1111 Polaris Parkway Columbus Ohio 43240 and its branch office located at 125 London Wall, London EC2Y 5AJ. |
| | Estate Landlord | HERON QUAYS PROPERTIES LIMITED whose registered office is at One Canada Square Canary Wharf London E14 5AB (Company registration number 02276627). |
| | Management Company | CANARY WHARF MANAGEMENT COMPANY LIMITED whose registered office is at One Canada Square, Canary Wharf London E14 5AB (Company registration number 02067510). |
| | Estate Freeholder | CANARY WHARF INVESTMENTS LIMITED whose registered office is at One Canada Square Canary Wharf London E14 5AB (Company registration number 02127410). |
| | Canary Wharf Landlord | CANARY WHARF LIMITED whose registered office is at One Canada Square Canary Wharf London E14 5AB (Company registration number 01971312). |

CONFIDENTIAL    CW0010009

| | | |
|---|---|---|
| LR4. | **Property**<br><br>In the case of a conflict between this clause and the remainder of this lease then, for the purposes of registration, this clause shall prevail. | See clause 1 of this Lease for the definition of the Demised Premises which describes the land demised. |
| LR5. | **Prescribed statements etc.**<br><br>LR5.1 Statements prescribed under rules 179 (dispositions in favour of a charity), 180 (dispositions by a charity) or 196 (leases under the Leasehold Reform, Housing and Urban Development Act 1993) of the Land Registration Rules 2003.<br><br>LR5.2 This lease is made under, or by reference to, provisions of: | |
| LR6. | **Term for which the Property is leased** | The term is as follows: 999 years from and including 20 December 2010   ccup |
| LR7. | **Premium** | Four hundred and sixty nine million seven hundred and fifty thousand pounds sterling (£469,750,000.00) (inclusive of VAT, if any). |
| LR8. | **Prohibitions or restrictions on disposing of this lease** | This Lease contains a provision that prohibits or restricts dispositions. |
| LR9. | **Rights of acquisition etc.**<br><br>LR9.1 Tenant's contractual rights to renew this lease, to acquire the reversion or another lease of the Property, or to acquire an interest in other land<br><br>LR9.2 Tenant's covenant to (or offer to) surrender this lease<br><br>LR9.3 Landlord's contractual rights to acquire this lease | |
| LR10. | **Restrictive covenants given in this lease by the Landlord in respect of land other than the Property** | Refer to Clause 4. |

CONFIDENTIAL    CW0010010

| | | |
|---|---|---|
| LR11. | Easements | |
| | LR11.1 Easements granted by this lease for the benefit of the Property | See Schedule 1 and paragraph 8 and 9 of Schedule 2 of this Lease. |
| | LR11.2 Easements granted or reserved by this lease over the Property for the benefit of other property | See Schedule 2 of this Lease. |
| LR12. | Estate rent charge burdening the Property | None. |
| LR13. | Application for standard form of restriction | None. |
| LR14. | Declaration of trust where there is more than one person comprising the Tenant | None. |

CONFIDENTIAL                                                                                      CW0010011

| | | |
|---|---|---|
| LR11. | Easements | |
| | LR11.1 Easements granted by this lease for the benefit of the Property | See Schedule 1 and paragraph 8 and 9 of Schedule 2 of this Lease. |
| | LR11.2 Easements granted or reserved by this lease over the Property for the benefit of other property | See Schedule 2 of this Lease. |
| LR12. | Estate rent charge burdening the Property | None. |
| LR13. | Application for standard form of restriction | None. |
| LR14. | Declaration of trust where there is more than one person comprising the Tenant | None. |

CONFIDENTIAL    CW0010011

THIS LEASE is made on the date specified in Prescribed Clause LR1 BETWEEN:-

(1) the Landlord;

(2) the Tenant;

(3) the Estate Landlord;

(4) the Management Company;

(5) the Estate Freeholder; and

(6) the Canary Wharf Landlord.

**OPERATIVE PROVISIONS:**

1. **DEFINITIONS AND INTERPRETATIONS**

1.1 Unless the contrary intention appears, the following definitions apply:

"**Accountant**" means a Chartered Accountant or firm of Chartered Accountants appointed by the Management Company or a Group Company of the Management Company to perform the functions of the accountant under this Lease;

"**Adjoining Property**" means all parts of the Estate (other than the Demised Premises) and any land and/or buildings from time to time adjoining or neighbouring the Estate;

"**Base Rate**" means the base rate for the time being of Barclays Bank PLC or some other London clearing bank nominated from time to time by the Landlord or in the event of that base rate ceasing to exist such other reasonably comparable rate of interest as the Landlord and the Tenant shall agree or which shall be fixed in default of agreement by an independent expert (acting as an expert) appointed on the application of either party by the President for the time being of the Law Society;

"**Building**" means any building erected or to be erected on the Demised Premises (whether or not also on other land) and includes where the context so admits any building or buildings erected at any time during the Term on the whole or any part of the Demised Premises (whether or not also on other land) and each and every part thereof and the appurtenances belonging thereto and all additions, alterations and improvements thereto including for the avoidance of doubt the foundations and structure of the building and all appurtenances thereto;

"**Business Day**" means a day on which banks are generally open in the City of London for sterling transactions other than any Saturday or Sunday;

"**Car Park**" means the car parks within the Estate (other than the car parking area (if any) within the Building) capable of being used as such and designated from time to time in writing by the Landlord and notified in writing to the Tenant from time to time by the Landlord;

CONFIDENTIAL        CW0010012

"**Car Park Access**" means the vehicular access from the estate road at ground level of the Heron Quays Land to the entrance of the car park within the Demised Premises at level B2 which at the date of this Lease is provided through the building known as Jubilee Place Car Park and thereafter over such alternative route as the Landlord from time to time gives written notice of to the Tenant and which, shall be no less commodious or convenient (other than to an immaterial extent) than that existing at the date of this Lease;

"**Car Park Barrier**" means the car park barrier existing at the date of this Lease within the Car Park Barrier Location or such replacement barrier as may be located within that area from time to time with the approval of the Landlord (such approval not to be unreasonably withheld or delayed);

"**Car Park Barrier Location**" means the area shown hatched blue on Plan 39;

"**Canary Wharf Landlord**" means the party named as "**Canary Wharf Landlord**" in Prescribed Clause LR3 and includes the tenant from time to time under the 1987 Lease of the premises which comprise part of the Estate Common Parts;

"**Circulation Areas**" means the areas at ground level shown hatched blue on Plan 38;

"**Demised Premises**" means all that land and premises (including (if any) the quayside and the parts of the Dock Walls located therein) comprising part of the area (shown for identification purposes only) edged red on Plan 1 and shown more particularly delineated and edged red on Plans 2-9 (inclusive) and edged red on the Ordnance Survey Plans including the unlimited airspace above the unlimited subsoil below all such areas and shown, for identification purposes only, edged red on the Sections (and in the event of any inconsistencies between (i) Plans 2-9 (inclusive) and the Ordnance Survey Plans and (ii) Plan 1 and the Sections, Plans 2-9 (inclusive) and the Ordnance Survey Plans shall prevail) and known as 25 Bank Street, Canary Wharf, London E14 and including:-

(a) the Building;

(b) all Pipes in, upon, under and over and in each case exclusively serving the same or any part of it;

(c) all landlord's fixtures, fittings, plant, machinery, ducting, sprinklers, apparatus and equipment now or hereafter in or upon the Demised Premises and exclusively serving the same or any part of it;

(d) all additions, alterations and improvements thereto;

(e) for the avoidance of doubt, to the extent that it is within the Demised Premises, the joint forming part of the west exterior wall of the Building which is affixed to the Building and which covers the gap between the Building and the building constructed to the west of the Building; and

(f) the Truck Tunnel Section

but nevertheless excluding:

CONFIDENTIAL                                                                     CW0010013

the Estate and which shall apply uniformly and equally to all occupiers (or any class of occupiers) within the Estate provided that such substituted or additional regulations shall not derogate from the rights granted to the Tenant by this Lease and provided further that in the event of conflict between such substituted or additional regulations and the terms of this Lease (including the original Estate Regulations in Part A of Schedule 5 but excluding the original Estate Regulations in Part B of Schedule 5) the latter shall prevail;

"**Estate Services**" means the services set out in Schedule 4 Part II insofar as the same are attributable to the Estate excluding the Car Park;

"**Existing DLR Lease**" means the lease dated 17 July 1987 made between London Docklands Development Corporation (1) and London Regional Transport (2) and two supplemental leases dated 7 October 1997 and 19 January 1998 respectively both made between London Docklands Development Corporation (1) and Docklands Light Railway Limited (2) (including any renewal thereof whether granted pursuant to the Landlord and Tenant Act 1954 or otherwise);

"**Existing Lease**" means the 1998 Lease apportioned and severed insofar as it relates to the Demised Premises (and includes any variation or document supplemental to it whether or not expressly stated to be so) registered (as to part) with title number EGL430896 and (as to the remainder) is at the date of this Lease pending registration at the Land Registry;

"**Force Majeure**" means any cause beyond the reasonable control of the Landlord and/or the Estate Landlord and/or the Canary Wharf Landlord and/or the Estate Freeholder and/or the Management Company and/or the Tenant (as the case may be) and which:

(a)   affects the performance of the Landlord's, the Estate Landlord's, the Canary Wharf Landlord's, the Estate Freeholder's, the Management Company's and/or the Tenant's obligations; and

(b)   has not arisen by reason of any breach or non-observance or non-performance by the Landlord and/or the Estate Landlord and/or the Canary Wharf Landlord and/or the Estate Freeholder and/or the Management Company and/or the Tenant of its or their obligations herein contained;

"**Group Company**" means in relation to any company (the "**Relevant Company**") a company which is for the time being the parent undertaking or a subsidiary undertaking of the Relevant Company or which is another subsidiary undertaking of the parent undertaking of the Relevant Company (in each case within the meaning of Section 1162 of the Companies Act 2006);

"**Ground Floor Slab**" means that part of the structural slab of the Building at ground level directly below but not forming part of the Wearing Surface and Pits;

"**Ground Rent**" means the yearly rent of one thousand pounds (£1,000) and, from and including each Index Review Date (as defined in Schedule 6) such yearly rent as shall become payable under, and in accordance with Schedule 6;

CONFIDENTIAL    CW0010016

"**Pipes**" means all supply pipes soil pipes waste pipes sewers drains ducts conduits downpipes gutters watercourses wires cables channels flues service corridors trunking fibres (optic or otherwise) and all other conducting media (including any of a new and novel type character and/or effect) and includes any fixing louvres cowls and any other ancillary apparatus;

"**Plan 1**", "**Plan 2**" etc means the plans annexed hereto respectively marked Plan 1, Plan 2 etc;

"**Planning Acts**" means the Town and Country Planning Act 1990 the Planning (Listed Buildings and Conservation Areas) Act 1990 the Planning (Hazardous Substances) Act 1990 the Planning (Consequential Provisions) Act 1990 the Planning and Compensation Act 1991 and includes any other applicable town and country planning legislation;

"**Premium**" means four hundred and sixty nine million seven hundred and fifty thousand pounds sterling (£469,750,000.00) (inclusive of VAT, if any) as set out in Prescribed Clause LR7;

"**Prescribed Clauses**" means the clauses in the pages headed "**Prescribed Clauses**" which form part of this Lease and a reference to a Prescribed Clause shall be construed accordingly;

"**Prescribed Rate**" means 3% per annum above Base Rate;

"**Proposed New DLR Lease**" means the agreed (for the purposes of this Lease) form of the draft New DLR Lease which has been initialled as such by the parties to this Lease;

"**Quarter Day**" means each of 1st January April July and October in any year;

"**Redevelopment**" means any redevelopment or demolition and rebuilding (as opposed to mere repair and maintenance) and, for the avoidance of doubt, occurring after the Term Commencement Date and "**Redevelop**" and "**Redeveloped**" shall be construed accordingly;

"**relevant associate**", in relation to any person, has the same meaning as for the purposes of paragraph 3 of Schedule 10 to VATA;

"**Rent Commencement Date**" means    20 December 2010    ;

"**Rents**" means the Ground Rent and the payments referred to in clauses 2.3.2, 2.3.3, 2.3.4 and 2.3.5 and Rent shall be construed accordingly;

"**Rights**" means the rights reserved by:

(a)   paragraph 1.7 Part 1 Second Schedule of a transfer dated 21 February 2002 made between (1) Canary Wharf Investments Limited (2) HQCB Investments Limited (3) Canary Wharf Limited and (4) Canary Wharf Management Limited and the similar rights as incorporated by reference into transfers dated 16 March 2005 and 20 April 2007 both made between (1) Canary Wharf

CONFIDENTIAL    CW0010020

(f) a deed of novation dated 28 January 1999 made between (1) Canary Wharf Investments Limited and others (2) Commission for the New Towns and (3) British Waterways Board;

"**Sections**" means the cross-sections of the Building shown on Plans 10-13 (inclusive);

"**Security Devices Zone**" the area to the north and east of and immediately adjacent to the Demised Premises shown for the purposes of identification only hatched blue on Plan 41;

"**Services Rent**" means the payments to be made to the Management Company (subject to clause 6.8) in accordance with clause 7;

"**Soffit**" means the cladding affixed to the underside of and forming part of the Building immediately above the DLR Concourse and Tunnel together with its fixings;

"**Southern Arcade**" means the wearing surface of the ground level arcade shown hatched blue on Plan 5 or such ground floor arcade as may from time to time be altered or substituted pursuant to the terms of this Lease but which in any event shall include the airspace up to (but excluding) the underside of the Building (as at the date of this Lease) above such arcade (or, where there is no building above any part of such wearing surface, the airspace up to (but excluding) a height equal to the underside of the Building (as at the date of this Lease) immediately adjoining such part of the wearing surface) and all street furniture above the wearing surface of such arcade from time to time;

"**Tarmac Lease**" means the lease of the premises to the west of the Heron Quays Land (being sections I and II Heron Quays) dated 15 November 1988 made between (1) London Docklands Development Corporation and (2) Tarmac Properties Limited as varied by a supplemental lease dated 28 October 1991 made between the same parties and a deed of variation dated 25 April 1992 made between the same parties;

"**Tenant**" means the party named as "Tenant" in Prescribed Clause LR3 and includes the Tenant's successors in title and assigns and also in the case of an individual his personal representatives;

"**Tenant's Maintenance Works**" means (subject to clause 6.5) such works as reasonably required by the Tenant to clean and maintain the Soffit in good repair and condition (or such equivalent or similar expression contained in the New DLR Lease);

"**Tenant's Restricted Works**" means (subject to clause 6.5) alterations to or the removal of the Soffit or the external walls of those parts of the Demised Premises as are adjoining the DLR Concourse and Tunnel but excluding the installation and use of structures and equipment for the purposes of cleaning maintaining or repairing the column walls and soffit of the Demised Premises (or such equivalent or similar expression contained in the New DLR Lease);

"**Term**" means 999 years from the Term Commencement Date including the period of any holding over or any extension or continuation whether by statute or at common law;

CONFIDENTIAL                                                                                    CW0010022

same to the Tenant) the rights and easements specified in Schedule 1 for all purposes contemplated by this Lease.

2.3   In consideration of the payment to the Landlord of the Premium (receipt whereof the Landlord hereby acknowledges) and covenants reserved by and contained in this Lease the Landlord hereby demises unto the Tenant the Demised Premises together with the rights and easements specified in Schedule 1 subject to and where appropriate with the benefit of the matters contained or referred to in Schedule 3 excepting and reserving the rights and easements specified in Schedule 2 to hold the Demised Premises unto the Tenant from and including the Term Commencement Date for the Term yielding and paying unto the Landlord (or such other party as is expressly provided hereunder) by way of rent during the Term yearly and proportionately for any fraction of a year:

2.3.1   the Ground Rent payable annually in advance on 1 January in each year, the first payment, being a proportionate sum in respect of the period from and including the Rent Commencement Date to the 31 December following the Rent Commencement Date, to be made on the Rent Commencement Date;

2.3.2   the Services Rent as provided in clause 7;

2.3.3   the monies referred to in clause 3.2 to be paid to the Landlord, the Estate Landlord, the Canary Wharf Landlord, the Estate Freeholder or the Management Company as therein provided;

2.3.4   all sums to be paid by the Tenant to the Landlord, the Estate Landlord, the Canary Wharf Landlord, the Estate Freeholder or the Management Company or any other person pursuant to clause 3.6; and

2.3.5   all sums to be paid by the Tenant to the Landlord, the Estate Landlord and Canary Wharf Landlord, the Estate Freeholder or to the Management Company or any other person pursuant to clause 6.18; and

2.3.6   any other monies which are by this Lease stated to be recoverable as rent in arrear to be paid to the Landlord or the Management Company as herein provided.

3.   **TENANT'S COVENANTS**

The Tenant hereby covenants with the Landlord (and in the case of clauses 3.6, 3.7, 3.8, 3.9, 3.12, 3.13, 3.14, 3.16 and 3.17 with the Estate Landlord) and as a separate covenant with the Estate Freeholder (and in the case of clauses 3.1, 3.2, 3.4, 3.6, 3.8, 3.9, 3.13, 3.14, 3.16 and 3.17 with the Management Company) as follows:

3.1   **Payment of rents**

To pay the Rents on the days and in the manner aforesaid without any counterclaim deduction (save as required by law) abatement or set-off (whether legal or equitable) whatsoever in the form of immediately realisable funds.

CONFIDENTIAL                                                                                   CW0010025

### 3.2 Interest on arrears

Without prejudice to any other right or remedy or power herein contained or otherwise available to the party entitled to receive such Rents if any of the Rents reserved by this Lease (whether formally demanded or not) or any other payment due under this Lease from the Tenant to the Landlord, the Management Company, the Estate Landlord, the Canary Wharf Landlord or the Estate Freeholder or any part thereof shall not be paid within 10 Business Days of the date upon which the same became due to pay interest to the relevant party upon the sum of money owing calculated on a daily basis at the Prescribed Rate compounded quarterly on the Quarter Days for the whole period from the date upon which such sum became due until the date of payment to the relevant party both before and after any judgement.

### 3.3 Outgoings

To indemnify the Landlord from and against any Outgoings (save those which the Landlord is required by law to pay and in respect of which by law it is not possible to obtain such an indemnity notwithstanding any agreement to the contrary) but (in relation to any Outgoings which may at any time be assessed or imposed in respect of the Demised Premises together with other land or property) only to the extent that the same are properly attributable to the Demised Premises or upon the owner or occupier of them (excluding (but without prejudice to clause 6.18) any tax payable by the Landlord occasioned by the grant of and any disposition of or dealing actual or deemed with the reversion to this Lease or any tax payable by the Landlord on or in relation to the Ground Rent).

### 3.4 Contribution to Common Items and Car Park Access

3.4.1   To pay to the Management Company within 10 Business Days of written demand accompanied by reasonable evidence of such cost or expenditure having been incurred a fair proportion (to be determined by the Estate Landlord whose decision shall be final and binding (save for obvious error) on the parties hereto) of the costs of making, laying, repairing, maintaining, rebuilding, decorating, cleansing and lighting, as the case may be, any roads, service tunnels, ways, forecourts, passages, pavements, party walls or fences, party structures, Pipes or other conveniences and easements whatsoever which may belong to or be capable of being used or enjoyed by the Demised Premises in common with any adjoining or neighbouring property (but not insofar as the same are reasonably and properly capable of being recoverable from the Tenant pursuant to clause 7).

3.4.2   To pay to the Landlord or to whom the Landlord directs within 10 Business Days of written demand accompanied by reasonable evidence of such cost or expenditure having been incurred the whole or a fair proportion of the cost of the repair, maintenance, renewal, lighting and operation of the Car Park Access and the other reasonable outgoings and expenditure properly incurred in relation thereto in accordance with clause 4.8 and attributable to the use of the same by the owners, tenants and occupiers of the Demised Premises.

CONFIDENTIAL   CW0010026

or to carry out any Redevelopment or alterations which would or might otherwise affect them (other than to an immaterial extent) then it shall first produce detailed plans and a specification of such alterations or adjustments or the Redevelopment (insofar as it would or might so affect the Southern Arcade and/or the Truck Tunnel Section) to the Landlord, the Estate Landlord, the Estate Freeholder and the Management Company for approval (such approval, subject to clause 6.17.2, not to be unreasonably withheld or delayed) and such approval shall be deemed to have been given within 15 Business Days of the Tenant making such application for approval if the Landlord makes no substantive reply to any application by the Tenant pursuant to this clause 6.17.1 within such 15 Business Day period.

6.17.2  The dimensions of:

(a) the Southern Arcade cannot be adjusted pursuant to a Redevelopment or other such alterations in a manner so that the clear width of that arcade is reduced to less than 4.50 metres or the clear height to less than 4.70 metres or in a manner which would cause the Southern Arcade to fail to comply with any statutory regulations and planning and fire regulations and insurance requirements relating to the Adjoining Property which it serves;

(b) the dimensions of the Truck Tunnel Section cannot be adjusted pursuant to a Redevelopment or other such alterations in a manner so that the Truck Tunnel Section (as adjusted) shall be any less commodious or convenient (other than to an immaterial extent) than at the date of this Lease.

6.17.3  Once the relevant alterations, adjustments or Redevelopment has been completed the Landlord and the Tenant will enter into such supplementary documents to this Lease by way of surrender of part and/or the grant of a supplementary lease to the extent necessary to give full and proper effect to such alterations, adjustment or Redevelopment.

6.18    **VAT**

6.18.1  Save as otherwise provided in this Lease, all sums payable by any party to this Lease to any other party to this Lease pursuant to its terms shall be deemed to be exclusive of any VAT which is or may be chargeable on the supply or supplies for which such sums (or any part of such sums) are the whole or part of the consideration for VAT purposes.

6.18.2  Where, pursuant to the terms of this Lease, any party to this Lease (for the purposes of this clause 6.18.2, the "**Supplier**") makes or is deemed to make a supply to any other party to this Lease (for the purposes of this clause 6.18.2, the "**Recipient**") for VAT purposes and VAT is or becomes chargeable on such supply, the Recipient shall, subject to the receipt of a valid VAT invoice in respect of such supply from the Supplier (which the Supplier shall provide within all applicable time limits), pay to the Supplier (in addition to and at the same time as any other consideration for such supply) a sum equal to the amount of such VAT.

CONFIDENTIAL    CW0010059

6.18.3   Where, pursuant to the terms of this Lease, any party to it is required to reimburse or indemnify any other party to it for any cost, fee, charge, disbursement or expense (or any proportion of it), such first party shall also reimburse or indemnify such other party for any part of such cost, fee, charge, disbursement or expense (or the relevant proportion of it) which represents VAT, save to the extent that such other party is entitled to credit or repayment in respect of such VAT from HM Revenue & Customs. Subject to clause 6.18.4, such other party shall use reasonable endeavours to obtain such a credit or repayment.

6.18.4   None of the Landlord, the Estate Landlord, the Canary Wharf Landlord, the Estate Freeholder and the Management Company shall be under a duty to exercise or not to exercise any option or right conferred on the Landlord, the Estate Landlord, the Canary Wharf Landlord, the Estate Freeholder or the Management Company by the legislation relating to VAT (including any regulations made thereunder) so as to reduce or avoid any liability to VAT referred to in clause 6.18.2 or so as to entitle or enable the Landlord, the Estate Landlord, the Canary Wharf Landlord, the Estate Freeholder or the Management Company (as the case may be) to obtain credit or repayment from HM Revenue & Customs in respect of such VAT as is referred to in clause 6.18.3.

6.18.5   The Landlord warrants and undertakes to the Tenant that:

(a)   neither it nor any relevant associate of it has made an option to tax pursuant to paragraph 2 of Schedule 10 to VATA in relation to the Demised Premises; and

(b)   neither it nor any relevant associate of it will make an option to tax pursuant to paragraph 2 of Schedule 10 to VATA in relation to the Demised Premises (unless it is required by law to do so or the Tenant has agreed in writing in advance that it may do so or the Tenant has itself made such an option, in which case it shall inform the Landlord of such option forthwith).

6.18.6   If the Landlord and/or a relevant associate of the Landlord is in breach of the warranty and/or its covenant in clause 6.18.5 then:

(a)   any sum payable by the Tenant pursuant to this Lease to the Landlord and/or any other party to this Lease shall be inclusive of any VAT which, as a result of such breach is or will be chargeable on the supply or supplies for which such sum (or any part of such sum) is the whole or part of the consideration for VAT purposes; and

(b)   for the avoidance of doubt, the Tenant shall not indemnify the Landlord and/or any relevant associate of the Landlord and/or any other party to this Lease in respect of any VAT borne or suffered by such person as a result of the effect of clause 6.18.6(a).

6.18.7   Without limiting the circumstances in which the Landlord or a relevant associate of it would be treated as making an option to tax pursuant to

CONFIDENTIAL                                                                                        CW0010060

paragraph 2 of Schedule 10 to VATA, the Landlord and/or a relevant associate of it shall be treated for the purposes of this clause as making such an option to tax where the Building is or becomes linked internally or by a covered walkway to another building in respect of which the Landlord or a relevant associate of it has made such an option to tax and where such option to tax is treated as having effect in relation to the Building.

6.18.8 The Supplier shall provide the Recipient with a valid VAT invoice. Notwithstanding anything to the contrary in this Lease, a party shall only pay VAT (if any) in respect of a supply to it on production of a valid VAT invoice.

### 6.19 New DLR Lease (Tenant's Restricted Works)

6.19.1 If the Tenant wishes to carry out any Tenant's Restricted Works:

(a) where the Tenant has served written notice on the Landlord with details of its proposals, the Landlord will promptly serve these details on Dockland Light Railway Limited as though they were its own proposals;

(b) the Landlord shall then use reasonable endeavours to procure that Docklands Light Railway Limited gives written notice to the Landlord as to whether such proposals are acceptable and if not reasons for its objection. The Landlord will promptly pass that information to the Tenant.

(c) if Docklands Light Railway Limited withholds its approval to such proposals on grounds other than the safe and proper operation and maintenance of the docklands light railway the Landlord shall at the written request (but not otherwise) of the Tenant acting reasonably apply to the court for a declaration that such approval has been unreasonably withheld;

(d) if Docklands Light Railway Limited gives no such notice within 28 days of receiving the aforementioned proposals, those proposals shall be deemed approved in accordance with the provisions of the Proposed New DLR Lease (and any equivalent or similar or additional provisions (subject to such additional provisions having been approved by the Tenant in accordance with the provisions of this Lease) contained in the New DLR Lease);

(e) if Docklands Light Railway Limited objects (as aforesaid) the Landlord shall use reasonable endeavours to procure that Docklands Light Railway Limited puts forward modifications to such proposals so as to meet its requirements for the safe and proper maintenance and operation of the docklands light railway whilst still meeting the development objectives of the proposal as notified and generally shall use reasonable endeavours in cooperation with the Tenant to finalise the necessary approval and any terms and conditions of that approval provided that the form thereof shall not be finalised without the

CONFIDENTIAL    CW0010061

(a) all types of retailing including without limitation hairdressers snackbars travel agents funeral directors and showrooms;

(b) banks building societies estate agents betting offices and similar uses where the services are provided principally to visiting members of the public;

(c) restaurants cafes public houses winebars and food takeaways.

7.1.1 The Tenant covenants with the Landlord and as a separate covenant with the Management Company and as a separate covenant with the Estate Landlord (to the extent only of its interest under the 1998 Lease) and as a separate covenants with the Canary Wharf Landlord (to the extent only of its interest under the 1987 Lease) and as a separate covenant with the Estate Freeholder to pay to the Management Company:

(a) the Estate Service Charge Percentage (as indicated in the last available Certificate by the Estate Surveyor issued pursuant to clause 7.2.2 or in the case of the first year reasonably determined by the Management Company but subject to the provisions of clause 7.3) of the Estimated Estate Expenditure in advance by equal quarterly instalments on the Quarter Days during each Estate Financial Year the first payment being a proportionate sum in respect of the period from and including the Estate Service Charge Commencement Date to the next Quarter Day to be made on the Estate Service Charge Commencement Date;

(b) if the Estimated Estate Expenditure is revised as contemplated in the definition of Estimated Estate Expenditure within sixteen (16) days after written demand an amount equal to the difference between the aggregate on account payments due from the Tenant pursuant to clause 7.1.1 and (where greater) the aggregate amount which would have been so paid if such revised Estimated Estate Expenditure had been certified to the Tenant at the commencement of the relevant Estate Financial Year.

7.1.2 Each such payment made by the Tenant under clause 7.1.1 is referred to herein as an "**Estate Payment on Account**".

7.2 The Management Company shall, as soon as reasonably practicable after the end of each Estate Financial Year but in any event within six months of such date prepare and send to the Tenant:

7.2.1 an account or accounts, each duly certified by the Accountant, showing the Estate Expenditure for that Estate Financial Year and the amount (if any) which the Management Company has chosen to utilise from the Estate Reserve Fund in defraying Estate Expenditure pursuant to clause 7.4.1 hereof (the "**Estate Appropriation**") and containing a fair summary of the various items comprising the Estate Expenditure;

7.2.2 a certificate or certificates by the Estate Surveyor showing the Estate Surveyor's calculation of the Estate Service Charge Percentage for the Estate Financial Year;

CONFIDENTIAL                                                                CW0010073

## SCHEDULE 6
## INDEXATION OF GROUND RENT

1. In this Schedule, the following expressions shall have the following meanings:-

   "**Index**" means the Retail Price Index (all items) published by the Office for National Statistics contained in the Monthly Digest of Statistics (or contained in any official publication substituted therefor) or such other index as may from time to time be published in substitution therefor or as may be determined in accordance with the provisions of paragraph 4 of this Schedule.

   "**Index Review Date**" means the tenth anniversary of the 1 January next following the Term Commencement Date and each tenth anniversary of that anniversary and "Relevant Index Review Date" shall be construed accordingly.

   "**Index Review Figure**" means the figure published in the Index for the month in which the Relevant Index Review Date shall occur.

2. The Ground Rent shall be revised on each of the Index Review Dates so that, as from each Index Review Date, the Ground Rent shall equal the higher of:-

   (a) the Ground Rent payable immediately prior to the Relevant Index Review Date; and

   (b) $A \times \dfrac{B}{C}$

   where:

   "A" = one thousand pounds (£1,000) per annum;

   "B" = the Index Review Figure for the Relevant Index Review Date;

   "C" = the figure published in the Index for the month in which the Term Commencement Date falls.

3. If after the date hereof the Index comes to be calculated by reference to a different base rate or base figure then the indexation of the Ground Rent envisaged by this Schedule shall be calculated as if that change had not taken place.

4. If the Index ceases to be published or if for any other reason it becomes impossible or impracticable to calculate revisions in the Ground Rent using the Index then there shall be substituted therefor such index or comparable method of calculating revisions in the Ground Rent as the Landlord and the Tenant shall agree and if no agreement is reached then either party may at any time by written notice to the other require the matter to be determined by an independent expert. In default of agreement as to the identity of the independent expert, an independent expert shall be appointed by the president of the Royal Institution of Chartered Surveyors on the written application of either party.

5. The following provisions shall have effect in relation to the independent expert:

CONFIDENTIAL        CW0010113

5.1 his decision shall be final and binding upon the parties;

5.2 he shall consider (inter alia) any written representations made on behalf of either party (if made reasonably promptly) but shall not be bound thereby;

5.3 the parties shall use all reasonable endeavours to procure that the independent expert shall give his decision as speedily as possible;

5.4 the costs of appointing the independent expert and his costs and disbursements in connection with his duties hereunder shall be shared between the parties in such proportions as the independent expert shall determine or in the absence of such determination then equally between the parties; and

5.5 if the independent expert shall be or become unable or unwilling to act then the procedure hereinbefore contained for the appointment of an expert may be repeated as often as necessary until a decision is obtained.

6. Pending agreement or determination of the revised rent on the Relevant Index Review Date (the date of agreement or determination being called the "**Determination Date**") in respect of the period (the "**Interim Period**") beginning with the Relevant Index Review Date and ending on the Determination Date, the Tenant shall pay to the Landlord the Ground Rent at the yearly rent payable immediately before the Relevant Index Review Date.

7. Within 10 Business Days of the Determination Date, the Tenant shall pay to the Landlord as arrears of rent the amount by which the revised Ground Rent exceeds the Ground Rent actually paid during the Interim Period (apportioned on a daily basis) together with the interest on such amount at Base Rate, such interest to be calculated on the amount of the shortfall on a day-to-day basis from the date on which it would have been payable if the revised Ground Rent had then been agreed or determined to the Determination Date.

CONFIDENTIAL                                                                        CW0010114