# Exhibit 21

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

| | |
|---|---|
| **IN RE LEHMAN BROTHERS HOLDINGS INC.**, *et al.*, Debtors. | Chapter 11 Case No. 08-13555 (JMP) |
| | (Jointly Administered) |

---

### DECLARATION OF LAURENCE RABINOWITZ, Q.C., IN SUPPORT OF PROOFS OF CLAIM OF CANARY WHARF MANAGEMENT LIMTED *et al.*

**LAURENCE RABINOWITZ, Q.C., hereby declares as follows:**

### A.    INTRODUCTION

1.    Canary Wharf Management Limited (the "Management Company") and Heron Quays (HQ2) T1 Limited and Heron Quays (HQ2) T2 Limited ("the Landlord", and together with the Management Company, the "Claimants") have filed proofs of claim against Lehman Brothers Holdings Inc ("LBHI"). On 15 August 2012, LBHI filed objections to the proofs of claim ("the Objections"). I have been asked by counsel for the Claimants, Sullivan & Cromwell LLP, to produce a report setting out my opinion on matters of English law arising out of the Objections.

2.    The structure of my report is as follows:

      (1)    Personal Background (Section B);

      (2)    Factual Background (Section C);

      (3)    The Issues (Section D)

      (4)    Executive Summary of Conclusions (Section E);

1



Δ π EXHIBIT 115
Deponent Rabinowitz
Date 9|4| Rptr KK
WWW.DEPOBOOK.COM

(5)    Principles of Contractual Construction (Section F);

(6)    The Effect of a Material Variation (Section G);

(7)    The Meaning of the Forfeiture Letter (Section H);

(8)    The Effect of Forfeiture on LBHI's Obligations (Section I);

(9)    The Meaning of Para 7(a) (Section J);

(10)    Anticipatory Breach of Para 7(a) (Section K);

(11)    Dilapidations, Service Charges and Costs (Section L); and

(12)    Conclusions (Section M).

## B.    PERSONAL BACKGROUND

### (1)    Current Occupation

3.    I am a practising barrister at the Commercial Bar in London at the Chambers of Lord Grabiner QC, One Essex Court. I was called to the Bar by Middle Temple in 1987, and was made a Queen's Counsel in 2002 and have been a Bencher of Middle Temple (i.e. a member of its governing body) since 2008. My practice covers many areas and often involves disputes between international and multi-national companies, both English and foreign. I am recommended in the latest editions of *Chambers UK Bar* and *Legal 500* (industry guides to the profession) as a "*star individual*" in the fields of Commercial Dispute Resolution, Banking & Finance and Energy & Natural Resources and also as a leading barrister in Civil Fraud, International Arbitration and Tax.

4.    I appear regularly as counsel in the High Court in London, as well as in the Court of Appeal and Supreme Court (having appeared as an advocate on a number of occasions in the House of Lords, which was England's highest court until its replacement by the Supreme Court in October 2009).

2

5.    Because commercial disputes usually arise out of a contractual framework, questions of contractual interpretation (also referred to by English lawyers as "contractual construction") arise in virtually all the work I do.

**(2)    Educational Background and Qualifications**

6.    I have a Bachelor of Arts degree and a Bachelor of Laws degree (first class, cum laude) from the University of Witwatersrand, Johannesburg, South Africa. I also have a degree in Jurisprudence (first class) and a Bachelor of Civil Law degree (first class) from the University of Oxford.

7.    I was awarded the Juta Prize for best non-graduating law student of the University of Witwatersrand (1982) and the Advocate's Prize for best graduating law student of the same university (1983).

8.    I was awarded a Rhodes Scholarship to study at the University of Oxford in 1983. After completing my degrees there, I was made the Eldon Scholar in 1986.

9.    Prior to my call to the Bar, the Honourable Society of the Middle Temple awarded me a Harmsworth Major Scholarship together with a Queen Mother's Scholarship.

10.    I am the current editor of *Weinberg & Blank on Take-overs and Mergers* (5th edition), the leading text on this subject.

**C.    FACTUAL BACKGROUND**

11.    My understanding of the factual background is based upon the documents referred to below and on information provided to me by Sullivan & Cromwell LLP, the attorneys for the Claimants.

12.    By a lease dated 16 March 2005 ("the Lease"), the Landlord granted a lease for a term of 30 years (from 3 July 2003) to an English company, Lehman Brothers Limited ("the Tenant"), of certain commercial premises, including the building at 25 Bank Street, Canary Wharf, London. I am instructed that the building was

constructed specifically at the request of LBHI and on the footing that it would be occupied by the Tenant for the duration of the Lease.

13.   LBHI was a party to the Lease as "Surety".  Schedule 4 of the Lease is entitled, "Covenants by the Surety".  I refer further below to the material provisions of Schedule 4, a copy of which is attached as Exhibit A.  Under English law, as I will explain below, Schedule 4 is considered to be a contract of indemnity.

14.   On 15 September 2008 joint administrators were appointed in England in the administrative insolvency proceedings of the Tenant.  On the same date, LBHI commenced proceedings under title 11 of the US Bankruptcy Code.[1]

15.   On 17 September 2009, the Claimants filed proofs of claim in the bankruptcy of LBHI.

16.   I am instructed that, from about April 2010 onwards, the Tenant failed to make payments in rent.  On this basis, pursuant to clause 8.1 of the Lease, the Landlord had a lawful right to forfeit the Lease by peaceable re-entry. Forfeiture is the label given by English law to the right of a landlord under a lease, upon the occurrence of a specified event, to bring the lease to an end and re-enter the premises.

17.   On 3 December 2010, the Claimants entered into an agreement with the Tenant (in administration) ("the Forfeiture Letter").  By para 1.1 of the Forfeiture Letter, the administrators of the Tenant consented to the Claimants forfeiting the Lease by means of peaceable re-entry, so that it would not be necessary to obtain the leave of the Court.[2]  I refer below to certain further provisions of the Forfeiture Letter, a copy of which is attached as Exhibit B.

---

[1] Objections, paras 5 and 7.
[2] Because the Tenant was in administration, the leave of the Court would otherwise have been required to exercise a right of forfeiture under the Lease: para 43(4) of Schedule B1 of the Insolvency Act 1986.

4

18.    On 20 December 2010, the Claimants' assignee granted a lease of the premises to JPMorgan Chase Bank, NA ("JPMorgan").[3]  I am instructed that the rent payable under the JPMorgan lease is substantially lower than that which would have been payable under the Lease.

19.    I am also informed that, prior to the execution of the lease with JPMorgan, LBHI had informed the Claimants that it would not execute a new lease of the premises on the same rents and other terms as the Lease.

20.    On 15 August 2012, LBHI filed its Objections to the Claimants' proofs of claim.  As I understand it, LBHI contends, in summary, that its obligations under Schedule 4 were discharged by a material variation of the Lease which it contends was effected by clause 4 of the Forfeiture Letter.   In the alternative, LBHI contends that its liability ceased upon forfeiture when the Tenant's obligations under the Lease ceased.   In the further alternative, LBHI contends that, pursuant to para 7 of Schedule 4, its liability continues only until the expiration of 180 days after forfeiture or until the grant of the lease to JPMorgan, whichever is sooner and, accordingly, that LBHI is released from any liability accruing after 20 December 2010 (the date of the JPMorgan lease). Finally, LBHI contends that the Claimants' claims for service charges, legal costs and dilapidations, including certain mechanical and electrical replacement costs are "*unrecoverable termination damages*", which I am instructed raises an issue about whether such costs are regarded by English law as penal or compensatory.

## D.    ISSUES

21.    The following issues of English law arise out of LBHI's Objections:

    (1)    Would a material variation of the Lease result in the discharge of LBHI's obligations under Schedule 4?  (see Section G)

---

[3] Objections, para 14.

5

(2)     Did the releases in clause 4 of the Forfeiture Letter in fact constitute a material variation of the terms of the Lease? (see Section H)

(3)     Did the forfeiture of the Lease mean that LBHI's liability under Schedule 4 ceased? (see Section I)

(4)     Is LBHI's liability under Schedule 4 limited to the payment of rent and other amounts due up to 20 December 2010 pursuant to para 7(b) of Schedule 4? (see Section J)

(5)     Did LBHI's refusal to execute a replacement lease on the same terms as the Lease constitute an anticipatory breach of para 7(a) of Schedule 4? (see Section K)

(6)     Are damages flowing from the cost of putting the premises back in to the state of repair required by the Lease (i.e. dilapidations), service charges and costs regarded by English law as penal or compensatory? (see Section L)

## E.    EXECUTIVE SUMMARY OF CONCLUSIONS

22.    My conclusions on the issues identified in para 21 above may be summarised as follows (adopting the same numbering):

(1)     Because Schedule 4 is a contract of indemnity and not a contract of guarantee, LBHI's obligations would not be discharged by a material variation of the Lease.  Even if (contrary to my view) Schedule 4 is a contract of guarantee, a material variation of the Lease would not discharge LBHI's obligations because paras 6(d) and/or (g) of Schedule 4 provide that a variation of the Lease will not discharge or exonerate LBHI.

(2)     In any event, clause 4 of the Forfeiture Letter does not effect a variation of the Lease because the releases are confined to claims for rent as an administration expense (which do not arise from the terms of the Lease)

6

while the Landlord's ability to claim for unpaid rent in the administration of the Tenant as an unsecured creditor is expressly preserved.

(3)   The Claimants are entitled to an indemnity in respect of losses flowing from the Tenant's default under the second part of para 1 of Schedule 4, even though, following the forfeiture, the Tenant is no longer bound by the covenants in the Lease because such losses arise from the Tenant's pre-forfeiture default. Even if (contrary to my view) Schedule 4 were limited to a guarantee of the Tenant's obligations under the Lease, forfeiture of the Lease resulting from the Tenant's repudiatory breach would trigger a liability on the part of the Tenant to pay damages for the loss of future rent, which the Claimants would be entitled to recover from LBHI. The assertion in the Objections that forfeiture releases LBHI from liability under Schedule 4 is not correct.

(4)   Para 7 of Schedule 4 confers an additional remedy on the Claimants and does not limit their right to be indemnified in respect of damages pursuant to para 1.

(5)   LBHI's decision not to execute a new lease in accordance with para 7(a) of Schedule 4 would likely constitute an anticipatory breach of contract. The damages recoverable by the Claimants include the difference between the rent and other charges payable for the remainder of the Lease and the sums payable under the lease with JP Morgan.

(6)   Claims in respect of dilapidations, service charges and/or legal costs would each be regarded under English law as a claim for ordinary compensatory damages that are recoverable. These damages would not be regarded as an unrecoverable penalty for the early termination of the Lease.

7

**F.    PRINCIPLES OF CONTRACTUAL CONSTRUCTION**

23.    Under English law, the modern approach to the interpretation of contracts of
suretyship and leases is to apply the same general principles as apply to the
interpretation of any other contract. It may therefore be helpful to identify at
the outset what those general principles are. They have been authoritatively
stated in a series of recent decisions of the House of Lords and Supreme Court:
*Investors Compensation Scheme v. West Bromwich Building Society* [1998] 1
W.L.R. 896 at 912-3; *Chartbrook Ltd v Persimmon Homes Ltd* [2009] UKHL
38, [2009] 1 AC 1101; *Re Sigma Finance Corp* [2009] UKSC 2, [2010] 1 All
ER 571; and *Kookmin Bank v Rainy Sky SA* [2011] UKSC 50, [2012] 1 All ER
1137.

24.    The key principles may be summarised as follows:

(1)    Interpretation of a contract involves the ascertainment of the meaning
which the document would convey to a reasonable person having all the
background knowledge which would reasonably have been available to
the parties in the situation in which they were at the time of the
contract: *Investors* at page 912H; *Kookmin* at para 14.

(2)    Subject to the exception in (3) below, this background knowledge
includes anything which would have affected the way in which the
language of the document would have been understood by a reasonable
man: *Investors* at page 913A.

(3)    The law excludes from the admissible background the previous
negotiations of the parties and their declarations of subjective intent:
*Investors* at 913B; *Chartbrook* at para 41.

(4)    The background may enable one to choose between the possible
meanings of words which are ambiguous or even to conclude that the
parties must, for whatever reason, have used the wrong words or
syntax: *Investors* at page 913C-D; *Chartbrook* at para 14.

(5)    The resolution of an issue of interpretation of a contract is an iterative process, which involves checking each of the rival meanings against other provisions of the document and investigating its commercial consequences: *Sigma* at para 12. If there are two or more possible constructions, it is generally more appropriate to adopt the construction which is most consistent with business common sense and to reject the other: *Kookmin* at paras 21 and 30.

(6)    If a detailed semantic and syntactical analysis of words in a commercial contract is going to lead to a conclusion that flouts business common sense, it must be made to yield to business common sense: *The Antaios* [1985] AC 191 at 201; *Investors* at 913 D-F.

25.    There are suggestions in some, particularly older, cases, that a special approach must be taken to the construction of contracts of suretyship, i.e. contracts of indemnity or guarantee (a distinction I explain further below), namely that in the event of ambiguity such contracts must be construed strictly in favour of the surety and that no liability is to be imposed on him which is not clearly and distinctly covered by the contract: e.g. *Blest v Brown* (1862) 3 De GF&J 367, 376. There is a divergence of views among treatise authors as to the extent to which this special approach has been overtaken by the modern case-law on the construction of contracts generally: O'Donovan and Phillips suggest that there is no need to preserve the older approach even as a rule of last resort[4]; by contrast, Andrews and Millett argue that the modern approach to construction is not inconsistent with the retention of a requirement that the courts should in general require evidence of clear intention in a case of suretyship.[5]

26.    I am not persuaded that, for any practical purposes, there is any material distinction between the two approaches. For my part, I consider that the modern principles of contractual construction, since they rely on the concept of

---

[4] *The Modern Contract of Guarantee* (2nd ed, 2010), para 5-07.
[5] *Law of Guarantees* (6th ed, 2012), para 4-002 on page 119.

the "*reasonable reader*", are sufficiently flexible to take account of the fact that the document being construed is a contract of suretyship (insofar as this would make any difference to the meaning that the document would otherwise convey to the reasonable reader). In any event, the views I express below about the meaning of Schedule 4 would be the same, regardless of whether there is a rule that a contract of suretyship must be construed strictly in favour of the surety or not.

## G.    THE EFFECT OF A MATERIAL VARIATION

27.    LBHI contends that there is a rule of English law that a guarantee is discharged if there is a material variation of the underlying contract to which the guarantor does not consent ("the material variation rule").[6]

28.    I agree that there is such a rule: *Holme v Brunskill* [1877] 3 QBD 495.[7] I also agree that, as set out in the authorities invoked by LBHI,[8] a variation is deemed to be material unless it is self-evident that it is unsubstantial or will not prejudice the guarantor.

29.    Proceeding from this basis, LBHI further contends that clause 4 of the Forfeiture Letter effected a material variation to the Lease to which LBHI did not consent, and that, as a result, LBHI's obligations under Schedule 4 are enforceable.[9]

30.    As a matter of English law, this further contention is not correct for a number of reasons. I set out these reasons below.

31.    In this section, I will assume for the sake of the discussion that the Forfeiture Letter effected a variation of the Lease that was material (an assumption I revisit and conclude to be mistaken in Section H below), and that LBHI did not

---

[6] Objections, para 17.
[7] Cited by LBHI at Objections, para 17.
[8] Objections, para 18.
[9] Objections, paras 19 to 20.

consent to such variation.  At this stage, the question is whether, on these assumptions, the material variation rule would apply so as to discharge LBHI.

32.    In summary, under English law, even on these assumptions, LBHI would not, by reason of that variation, have been discharged from liability under Schedule 4. This is because the material variation rule applies only to contracts of guarantee.  Schedule 4 is not a contract of guarantee but rather a contract of indemnity, and consequently the material variation rule does not apply to it.

33.    It is convenient to explain the distinction between a guarantee and an indemnity by reference to the decision, in 2010, of Sir William Blackburne, sitting in the High Court of England, in *Vossloh Aktiengesellschaft v Alpha Trains (UK) Ltd* [2010] EWHC 2443 (Ch), [2011] 2 All ER (Comm) 307, which provides one of the most comprehensive recent judicial analyses of the nature of a contract of suretyship.  As the judge acknowledges (para 19), his analysis is drawn from some of the leading treatises but also accords with his own experience of the law in this area.  I would add that the guarantee/indemnity distinction is so fundamental to the law in this area that it is generally addressed in the very first chapter of the relevant treatises.[10]

34.    The starting point is that a contract of suretyship is a contract by which one person (the surety) agrees to answer for the liability of another (the principal) to a third party (the creditor), under which the surety's liability is in addition to, and not in substitution for, the liability of the principal: *Vossloh*, para 21.  There are two categories of suretyship: contracts of guarantee and contracts of indemnity.

35.    A contract of guarantee is a contract whereby the guarantor promises the creditor to be responsible for the due performance by the principal of his obligations under the contract, if the principal fails to perform them: *Vossloh*, para 23.  An essential feature of a true contract of guarantee is that the liability

---

[10] *Law of Guarantees*, para 1-003; *Modern Contract of Guarantee*, para 1-91.

11

of the guarantor is always secondary to that of the principal. Under the principle of "*co-extensiveness*", the guarantor is generally liable to the creditor only to the same extent as the principal is liable to the creditor: *Vossloh*, para 24.

36. By contrast, a contract of indemnity is a contract where the person who gives the indemnity undertakes his indemnity obligation by way of security for the performance of the principal of his obligations under the contract. The essential feature of a contract of indemnity is that a primary (rather than secondary) liability falls upon the giver of the indemnity and (unless given only jointly with the principal) this obligation is wholly independent of any liability that may arise as between the creditor and the principal: *Vossloh*, para 25. Because the obligation under an indemnity is primary and independent, the principle of co-extensiveness does not apply: *Vossloh*, para 26.

37. The above distinctions between a guarantee and an indemnity are significant when it comes to the application of the material variation rule. It is precisely because liability under a guarantee is co-extensive with the liability of the principal that a guarantee must be discharged in the event of a material variation of the principal contract. Conversely, since liability under an indemnity is primary and not co-extensive with that of the principal, there is no automatic rule that a material variation of the principal contract discharges the giver of the indemnity. As stated in *Vossloh* (para 27), the fact that the indemnity is primary and independent "*prevents the discharge of the principal or any variation or compromise of the creditor's claims against the principal from necessarily affecting the liability of the indemnifier under his contract with the creditor.*" This proposition is supported by the leading treatises.[11]

38. Sir William Blackburne's use of the word "*necessarily*" leaves open the possibility that a given contract of indemnity may provide that the indemnifier

---

[11] *Chitty on Contracts*, paragraph 44-007; *Law of Guarantees*, paragraph 1-013; *The Modern Contract of Guarantee*, para 7-70.

will be discharged in the event of a material variation of the underlying contract.[12]   The important point for present purposes is that the material variation rule, triggering the automatic discharge of a guarantee, does not apply to contracts of indemnity.

39.    As a matter of English law, it is clear that LBHI's obligations under Schedule 4 constitute an indemnity and not a guarantee.  I reach this conclusion for the following reasons:

(1)    I note that para 1 of Schedule 4 is headed "*Indemnity by Surety*". Although the label used is not conclusive (particularly because clause 2.7 of the Lease says that headings are for reference only), this indicates that the parties intended it to take effect as an indemnity rather than a guarantee.

(2)    More importantly, para 1 is expressed to be a "*primary obligation*". As already noted, an essential feature of a guarantee is its secondary nature. A primary obligation in a contract of suretyship must therefore be in the nature of an indemnity.

(3)    The primary obligation in para 1 is a covenant that *either* the Tenant *or* the Surety will perform the covenants in the Lease.  Thus, in contrast with a guarantee, which involves only a promise to see to it that someone else will perform his obligations, para 1 includes a promise that LBHI will itself perform the covenants in the Lease.  This reinforces the primary nature of LBHI's obligation under para 1 of Schedule 4.

(4)    The second part of para 1 expressly provides that LBHI will "*indemnify and keep indemnified*" the Claimants against losses etc flowing from the Tenant's default.  In its terms, therefore, this imports an obligation on the part of LBHI to indemnify the Claimants.  It is difficult to

---

[12] A point made expressly in *The Modern Contract of Guarantee*, para 7-70.

conceive of a clearer indication that LBHI's obligations under Schedule 4 are in the nature of an indemnity.

(5)    Para 2 expressly provides that the Surety is jointly and severally liable with the Tenant for the obligations in the Lease and that the Claimants may proceed against the Surety "*as if the Surety was named as the Tenant in this Lease*". Again, this treats the Surety as undertaking a primary liability in respect of the obligations in the Lease, equivalent to the obligations undertaken by the Tenant.

(6)    Para 6 of Schedule 4 specifies that the occurrence of certain events will not "*release discharge or in any way lessen or affect the liability of the Surety*". These events include, by para 6(d), "*any variation of the terms of this Lease*" and, by para 6(g), "*any other act omission matter or thing whatsoever whereby but for this provision the Surety would be exonerated*". It is sometimes said that a contract which contains a provision preserving liability in circumstances in which a guarantor would otherwise be discharged (e.g. a material variation) should be construed as a guarantee, because such a provision would be unnecessary if the contract was an indemnity.[13] But such provisions may instead point to the opposite conclusion, namely that the contract is one of indemnity, because they show the parties' intention that the liability of the surety should continue regardless of what might happen to the principal debtor.[14] In my opinion, read in the context of Schedule 4 as a whole, it is clear that para 6 was included to serve the latter purpose and to confirm "for the avoidance of doubt" that dealings between the Claimants and the Tenant would not impact on LBHI's liability under the indemnity. Para 6(g) is especially noteworthy and has the effect that nothing short of a release under seal will discharge LBHI. This opens up a very real prospect of LBHI remaining liable in

---

[13] *Law of Guarantees*, para 1-013.
[14] *Ibid.*

circumstances where the Tenant is not liable (e.g. where the Tenant has been released but there has been no release under seal of LBHI), thus confirming the primary and independent nature of LBHI's liability under Schedule 4.[15]

(7)    Although para 8 of Schedule 4 uses the expression "*guarantee and indemnity*", it does so in the context of an ancillary provision which provides that the benefit of Schedule 4 will enure for the benefit of the Claimants' successors and assigns. I am unable to identify any substantive provision of Schedule 4 to which the word "*guarantee*" in para 8 could cross-refer. I infer that the expression "*guarantee and indemnity*" may simply have been carried across in error from an earlier precedent. In any event, this expression would indicate that the contract contained *both* a guarantee *and* an indemnity. In that event, and assuming a complete overlap between the guarantee and the indemnity, the guarantee part would be redundant "*since the creditor is almost invariably going to be better off enforcing the primary obligation undertaken in an indemnity.*"[16]

(8)    The heading to para 10 refers to "*Guarantor*" rather than "*Surety*". I regard this as an obvious error which may have been carried over from an earlier precedent: it is to be noted in this regard that the text correctly refers to LBHI as "*the Surety*". Para 10 concerns an "*Authorised Guarantee Agreement*". This is a type of agreement created by statute[17] to cater for the assignment of a tenancy: an authorised guarantee agreement is one whereby the former tenant (the assignor) guarantees the performance of covenants in the Lease by the new tenant (the

---

[15] Para 6(d) of Schedule 4 is expressed to be subject to section 18 of the Landlord and Tenant (Covenants) Act 1995. Section 18 deals with the assignment of a lease and consequently has no application in the present case.
[16] *Law of Guarantees*, op cit, para 1-014 at page 16.
[17] Landlord and Tenant (Covenants) Act 1995, section 16.

assignee). I do not, therefore, consider that para 10 sheds any real light on the nature of the substantive obligations created by Schedule 4.

40.    Once it is recognised that Schedule 4 is a contract of indemnity rather than guarantee, it follows that the material variation rule does not apply to discharge LBHI's obligations thereunder.

41.    However, even if (contrary to my view) Schedule 4 constitutes a contract of guarantee, it remains the case that the material variation rule would not apply. This is because, as foreshadowed above, para 6(d) of Schedule 4 expressly disapplies the rule, by stipulating that a variation of the Lease will not discharge LBHI. For good measure, para 6(g) of Schedule 4 provides in broad terms that nothing that would otherwise exonerate the Surety shall be effective to do so. Accordingly, on LBHI's assumption (which I regard as mistaken) that Schedule 4 constitutes a contract of guarantee, with the result that a material variation of the Lease would in principle lead to its discharge, the effect of para 6(d) and/or 6(g) is that LBHI remains liable.

42.    There is nothing unusual about provisions like paras 6(d) and 6(g). On the contrary, as stated in one treatise:[18]

> "... in practice any well-drawn contract of suretyship will nowadays expressly permit variation of the obligations or the giving of time, without discharging the surety. At common law, such an agreement takes effect according to its terms, but in cases of doubt or uncertainty will be construed in favour of the surety."

43.    I consider that the broad terms of paras 6(d) and 6(g) leave no real room for doubt as to what was intended. They make clear that the material variation rule does not apply so as to discharge LBHI's obligations under Schedule 4.

---

[18] *Chitty on Contracts*, para 44-099.

### H.    THE MEANING OF THE FORFEITURE LETTER

44.    I now turn to consider whether, on its true construction, clause 4 of the Forfeiture Letter did in fact effect a material variation of the Lease.  Clause 4 provides, so far as material:

> "We, [the Claimants] agree that:
>
> (a)    in consideration of [the Tenant] agreeing to pay to the Landlord £1.5m on the date of forfeiture as notified by the Landlord to [the Tenant] in writing …, [the Tenant] is unconditionally and irrevocably released and discharged from any claims as an administration expense for unpaid rent that fell due and was payable under the Lease before the date of forfeiture,
>
> …
>
> (c)    [the Tenant] is unconditionally and irrevocably released and discharged from any claims as an administration expense for any estate service charge and other sums that fell due and were payable under the Lease and Car Parking Agreement before the date of forfeiture;
>
> provided that [the Tenant] agrees that [the Claimants] may claim against [the Tenant] as an unsecured creditor for any unpaid rent and estate charge and any other sums falling due under the Lease up to the date of forfeiture."

45.    An administrative expense is an expense which is payable from the assets of the company in administration in priority to the claims of other creditors.  English insolvency legislation[19] identifies the expenses that qualify as administration expenses and their order of priority *inter se*.  They include, for example, expenses properly incurred by the administrator in performing his functions in the administration of the company.  It has been held that rent which becomes due during a period when the administrator is retaining the property for the purposes of the administration may qualify as an administration expense: *Goldacre (Offices) Ltd v Nortel Networks UK Ltd (in administration)* [2009] EWHC 3389 (Ch); *Leisure (Norwich) II Ltd v Luminar Lava Ignite Ltd (in administration)* [2012] EWHC 951 (Ch) at para 26.

---

[19] In particular, rule 2.67 of the Insolvency Rules 1986.

46.  The meaning of clause 4(a) is that, in return for a payment of £1.5m, the Claimants gave up any further entitlement to recover pre-forfeiture rent *as an administrative expense* but not otherwise.  Clause 4(c) similarly releases only claims as an administrative expense.  The proviso at the end of clause 4 ("*provided that* ...") expressly preserves the Claimants' ability to claim for pre-forfeiture rent (and other sums) as an unsecured creditor in the Tenant's administration.  Under the English insolvency legislation, a landlord is able to prove as a creditor in an administration for rent up to the date of the administration, as well as rent due in future: *Leisure (Norwich)* at para 17(a).

47.  The terms of the Lease do not confer any right on the Claimants to have rent treated as an administration expense in any administration of the Tenant.  Any such right would arise, not from the terms of the Lease, but under the insolvency legislation in the event of a later decision by the administrators to retain possession of the premises for the purpose of discharging their duties in the administration.

48.  It follows that clause 4 of the Forfeiture Letter does not constitute a variation of the Lease.  Claims for unpaid rent or estate service charges *as an administrative expense* do not arise from the terms of the Lease.  Consequently, the release of such claims (as an administrative expense) in return for £1.5m cannot constitute a variation of the terms of the Lease.  Conversely, the proviso to clause 4 preserves the Claimants' claims (as an unsecured creditor) in respect of unpaid rent and estate charges under the Lease, and, accordingly, there is no variation of the Claimant's rights under the Lease in that regard.

## I.    THE EFFECT OF FORFEITURE ON LBHI'S OBLIGATIONS

49.  Para 1 of Schedule 4 (with bracketed text added) provides:

> "The Surety hereby covenants with the Landlord and as a separate covenant with the Management Company as a primary obligation that **[i]** the Tenant or the Surety shall at all times until the Tenant shall cease to be bound by the Tenant's covenants in the Lease during the Term duly perform and observe all the covenants on the part of the Tenant contained in this Lease including the payment of the rents

hereby reserved and all other sums payable under this Lease in the manner and at the times herein specified and **[ii]** the Surety shall indemnify and keep indemnified the Landlord and the Management Company against all claims demands losses damages liability costs fees and expenses whatsoever sustained by the Landlord or the Management Company by reason of or arising directly or indirectly out of any default by the Tenant in the performance and observance of any of its obligations or the payment of any rents and other sums Provided That the Landlord and the Management Company shall notify the Tenant of any such actions or other matters and take all reasonable steps to mitigate such losses having regard to the nature of the breach"

50.   LBHI contends that, by virtue of the words, "*until the Tenant shall cease to be bound by the Tenant's covenants*", its obligations under Schedule 4 ceased when the Tenant's obligations under the Lease ceased, and that this happened upon forfeiture of the Lease. It contends that LBHI is "*released of any and all liability that accrued post-forfeiture*".[20]

51.   In my view, this is not correct.

52.   It is important to appreciate that para 1 of Schedule 4 falls into two parts, as I have sought to indicate by inserting "[i]" and "[ii]" in the quotation above. Part [i] entails a covenant that the Tenant (or LBHI) will perform the Tenant's covenants in the Lease. I agree that this part of para 1 is circumscribed by the words "*until the Tenant shall cease to be bound by the Tenant's covenants*". Following forfeiture, LBHI was no longer obliged to procure that the Tenant (or LBHI itself) perform the covenants in the Lease.

53.   However, it is important to note that part [ii] of para 1 is not circumscribed in that way. It involves a promise by LBHI to indemnify the Claimants against all losses sustained "*by reason of or arising directly or indirectly out of any default by the Tenant*". These words import the widest conceivable causal nexus between the default of the Tenant and the losses sustained by the Claimants.

---

[20] Objections, para 21.

19

54.    I understand that the losses claimed by the Claimants include the rent and other amounts that would have been paid under the Lease, had it run its full term, less sums received by way of mitigation from the lease with JPMorgan.  Such losses plainly fall within the scope of the indemnity contained in part [ii] of para 1 of Schedule 4.  Although LBHI seeks to describe liability in respect of such losses as "*liability that accrued post-forfeiture*",[21] this is not an accurate description because LBHI's liability is to provide indemnification in respect of loss that arise as a result of the Tenant's antecedent (i.e. pre-forfeiture) default under the Lease .  The act of forfeiture on the part of the Landlord does not, in my view, break the chain of causation between the Tenant's default and the loss of future rent.   A break in the chain would require some unwarrantable or unreasonable behaviour on the part of the Landlord: *The Oropesa* [1943] P 32 at page 39. Far from being unreasonable, however, it will usually be entirely reasonable for a landlord faced with a serious breach of covenant to forfeit the lease, not least because (as in the present case) this will enable the landlord to mitigate his losses by granting a new lease of the premises at the then prevailing market rent.[22]

55.    There is nothing surprising about this conclusion, since an indemnity, being a primary obligation, is "*independent of the continuing obligation of another*".[23] LBHI's invocation of the principle of co-extensiveness[24] would be appropriate if Schedule 4 were a guarantee but is misplaced in the context of an indemnity.

56.    Further, even if para 1 of Schedule 4 ended at the words "*times herein specified*" (so that it was confined to part [i] and did not include part [ii]), and even if (contrary to my view) Schedule 4 were a contract of guarantee rather

---

[21] Objections, para 21.
[22] I note that, in *Reichman v Beveridge* [2006] EWCA Civ 1659, discussed below, the opposite argument was advanced, namely that a landlord who decided *not* to forfeit the lease and to continue claiming rent had acted unreasonably by failing to mitigate his losses.  The argument did not succeed, but the case implicitly supports the proposition that where a landlord *does* forfeit the lease, it is all the more difficult to argue that he has acted unreasonably.
[23] *The Modern Contract of Guarantee*, para 1-91.
[24] Objections, para 21.

than an indemnity, the Claimants would still be able to recover their losses (including loss of future rent) from LBHI pursuant to Schedule 4. This is, in summary, for the following reasons:

(1)     It is established at the highest authority that the termination of the principal contract on account of the debtor's breach does not discharge a guarantor: *Moschi v Lep Air Services Ltd* [1973] AC 331. *Moschi* concerned a guarantee in respect of a contract under which the principal debtor had to pay by instalments in respect of services previously rendered by the creditor. It was argued that, when the creditor terminated the underlying contract following the debtor's repeated failure to keep up with the instalments, the guarantor's obligations thereby came to an end. The House of Lords unanimously rejected the argument, observing that it would have the paradoxical effect of depriving the creditor of the benefit of the guarantee "*at the moment he most needs it – namely, on a repudiation by the principal promisor of his obligations under the contract*": *Moschi* at page 356H *per* Lord Simon of Glaisdale.

(2)     The reasoning of the House of Lords was that the guarantor's obligation is to "*see to it that the debtor performed his own obligations to the creditor*": *Moschi* at page 348D. Where the debtor fails to perform his obligations, the creditor can recover from the guarantor as damages for breach of the contract of guarantee whatever sum the creditor could have recovered from the debtor himself as a consequence of that failure. The debtor's liability to the creditor is thus also the measure of the guarantor's: *Moschi* at page 349A-B.

(3)     It is therefore necessary to examine the effect in English law of the principal debtor committing a serious ("*repudiatory*") breach of the principal contract. Faced with such a breach, the innocent party (here, the creditor) may elect to (a) "*affirm*" the contract, i.e. choose to keep it alive and insist on future performance, or (b) "*accept*" the breach and

21

bring the contract to an end. The effect of termination is to discharge the unperformed (future) obligations under the contract (the "*primary obligations*") and to substitute by operation of law a "*secondary obligation*" on the part of the contract-breaker to pay damages to compensate the innocent party for the loss he has sustained as a result of the failure to perform the primary obligations: *Moschi* at page 350 C-E. Damages for breach of contract are assessed as the sum needed to place the innocent party into the position he would have been in, had the contract been performed in accordance with its terms: *Robinson v Harman* (1848) 1 Exch. 850, 855.

(4)     It follows that, where the principal contract is terminated for a repudiatory breach, the creditor is entitled to recover (as against the debtor, and therefore also against the guarantor) whatever sum would place him in the same position as if the contract had been performed for its full term. In *Moschi*, damages were awarded for the present value of the unpaid instalments (subject to a monetary cap in the guarantee): *Moschi* at 345 C-E and 358 B-C.

(5)     Thus far, I have been dealing with the general law of contract. In the context of leases, forfeiture (sometimes called "*re-entry*") is the means by which a landlord puts an end to the lease.[25] In principle, and as a matter of logic, one would expect the consequences of a forfeiture on account of the tenant's breach to be the same as for the termination of a (non-lease) contract on account of a repudiatory breach, namely that the landlord would be entitled to recover from the tenant in breach the losses flowing from the forfeiture, such as any difference between the rent under the lease and the market rent at the date of forfeiture for the remainder of the term.

---

[25] E.g. *Reichman* at para 22.

(6)  Surprisingly, there is no direct authority on this subject in English law. In *Reichman v Beveridge* [2006] EWCA Civ 1659, the Court of Appeal observed that, although the landlord's ability to recover damages for loss of future rent was recognised in other common law jurisdictions, such as Canada and Australia, there was no case in English law establishing such a claim and one case (dating from 1826) which indicated that the landlord could not so claim. However, the Court expressly stated that the question of whether such damages could be claimed was not "*directly in issue before us, and it would be wrong to decide it unnecessarily*".[26]

(7)  The Court in *Reichman* appears, regrettably, to have overlooked a decision of the Court of Appeal of Northern Ireland which in fact did decide that a landlord who forfeits the lease is entitled to recover damages for the loss of future rent: *Rainey Brothers Ltd v Kearney* [1990] NI 18.[27]  Although decisions of the Northern Ireland Court of Appeal are not binding as a matter of English law, they are entitled to "*the greatest respect*": *Secretary of State for Work and Pensions v Amanda Deane* [2010] EWCA Civ 699.  The decision in *Rainey* would command particularly great respect in an English court because the judge who gave the sole judgment, Lord Hutton (then Chief Justice of Northern Ireland), was subsequently elevated to the House of Lords, the final court of appeal for England and Wales as well as Northern Ireland. I also note that, although *Rainey* was a decision under the law of Northern Ireland, Lord Hutton's judgment is entirely founded on an

---

[26] The argument in *Reichman* was that a landlord, faced with repeated non-payment of rent by the tenant, had acted unreasonably and failed to mitigate his loss by electing to affirm the lease and continue to claim rent, rather than forfeit the lease and recover damages.  The Court of Appeal held that, in the absence of any case demonstrating an entitlement to claim damages for the loss of future rent, the landlord's conduct was not unreasonable.

[27] The oversight may have arisen because neither the landlord nor the tenant in *Reichman* was represented in the Court of Appeal by Counsel.  Although an advocate to the Court was appointed, she appears to have missed the *Rainey* decision.  From all that appears in the judgments, the Court of Appeal was unaware of it.

analysis of earlier English (rather than Northern Irish) case-law. There is every reason to believe, therefore, that his analysis was intended to reflect the law of England as well as that of Northern Ireland.

(8)    I would therefore expect an English court, in a case where the point was necessary to the decision, to follow *Rainey* by holding that a landlord is entitled to recover damages for loss of future rent where the lease is forfeited for a repudiatory breach by the tenant. This would maintain consistency between the law of England and the law in other common law jurisdictions such as Northern Ireland, Australia and Canada. From a policy point of view, this would also serve to uphold the promises made by the parties to a lease by compensating the landlord for his loss of bargain when a lease is prematurely terminated by reason of the tenant's default.

(9)    A combination of the principles established in *Rainey* and *Moschi* leads to the conclusion that the forfeiture of the Lease for the Tenant's failure to pay rent gives the Claimants the right to recover from LBHI such damages as would place the Claimants in the same position as if the Lease had been performed for its full term, including damages for any loss of future rent.[28]

57.    Put shortly, therefore, although the Tenant's obligations under the Lease ceased upon forfeiture, I do not agree that this exempts LBHI from liability to compensate the Claimants for losses flowing from the Tenant's repudiatory breach of the Lease. LBHI is entitled to be indemnified pursuant to part [ii] of

---

[28] This is precisely the conclusion reached by the Supreme Court of Victoria in *Nangus Pty Ltd v Charles Donovan Ptd Ltd (in liq)* [1989] VR 184, a case cited in *The Modern Contract of Guarantee* at fn 321. Decisions of the Australian federal and state courts are not binding on the English courts, but they are regularly cited (as in *Reichman*) and treated as persuasive. In *AG v Clough* [1963] 1 QB 773 at page 792, described a decision of the Australian (federal) High Court as "*most persuasive authority*" and said he would "*hesitate very long if in a matter which pertained to the common law of England, this country should differ, unless it had to, with another Commonwealth country.*" In *Hyam v DPP* [1975] AC 55 at page 76, the House of Lords referred to a decision of the Supreme Court of Victoria as "*persuasive authority*" for a particular proposition on which there was no direct English authority.

para 1 or alternatively to claim damages for the Tenant's repudiatory breach pursuant to part [i] of para 1.

**J.    THE MEANING OF PARA 7 OF SCHEDULE 4**

58.    Para 7 of Schedule 4 provides:

> "(a)    The Surety hereby further covenants with the Landlord and the Management Company that:-
>
> > (i)    if the Crown or a liquidator or trustee in bankruptcy shall disclaim or surrender this Lease or
> >
> > (ii)    if this Lease shall be forfeited or
> >
> > (iii)    if the Tenant shall cease to exist unless the same occurs as part of an amalgamation merger or reconstruction resulting in a solvent corporation
>
> THEN the Surety shall if the Landlord by notice in writing given to the Surety within one hundred and eighty (180) days after such disclaimer or other event so requires accept from and execute and deliver to the Landlord a counterpart of a new lease of the Demised Premises (duly stamped at the Surety's expense) for a term commencing on the date of the disclaimer or other event and continuing for the residue then remaining unexpired of the Term such new lease to be at the cost of the Surety and to be at the same rents and subject to the same covenants conditions and provisions as are contained in this Lease
>
> (b)    If the Landlord shall not require the Surety to take a new lease the Surety shall nevertheless upon demand pay to the Landlord a sum equal to the Rent and other sums that would have been payable under this Lease but for the disclaimer or other event in respect of the period from and including the date of such disclaimer or other event until the expiration of one hundred and eighty (180) days therefrom or until the Landlord shall have granted a lease of the Demised Premises to a third party (whichever shall first occur)"

59.    LBHI contends that, by virtue of para 7(b) of Schedule 4, its liability (if any) under Schedule 4 ceased on 20 December 2010 with the grant of the lease to JPMorgan.    The implicit premise for this contention must be that para 7(b)

25

represents the exclusive remedy of the Claimants in a case where the Lease is forfeited and the option to require LBHI to execute a new lease is not exercised.

60.  Again, I do not agree.

61.  The starting point for any consideration of this issue, is that para 7(a) of Schedule 4, which is a put option, represents an *additional* remedy for the Landlord, which does not prejudice the Claimants in the exercise of any other rights which arise under Schedule 4. There are two reasons for this:

(1)  First, para 7(a) is not expressed to be an exclusive remedy in a case where the Lease is forfeited (or any of the other events in para 7(a) occur).

(2)  Secondly, the opening words, "*The Surety hereby further covenants ...*" (emphasis added), indicate an intention to confer an additional right.

62.  I am fortified in my conclusion that para 7(a) is to be regarded as an additional remedy and not an exclusive or exhaustive remedy, by recent judicial authority. In *Shaw v Doleman* [2009] EWCA Civ 279, [2009] 2 BCLC 123 Elias LJ, sitting in the English Court of Appeal, said (at para 61) that a similarly-worded put option in a guarantee of a lease "*provides an additional remedy for the landlord*", and that its existence did not affect the meaning to be given to the other covenants in the guarantee.[29]

63.  Once it is accepted that para 7(a) is an additional, and not an exclusive or exhaustive, remedy, it is obvious that the same must be true of para 7(b). If the Landlord does not exercise the put option in para 7(a), para 7(b) gives him the right to receive a one-off sum of money.  The benefit of this remedy from the Landlord's point of view is that he can claim immediate payment ("*upon*

---

[29] It appears that put options of this kind were introduced into guarantees of leases as additional protection to guard against the effect of an early 20th century Court of Appeal decision (*Stacey v Hill* [1901] 1 KB 660) which held that a statutory disclaimer of the lease would discharge the guarantor. *Stacey* was eventually overruled by the House of Lords in *Hindcastle Ltd v Barbara Attenborough Ltd* [1997] AC 70.

*demand*") of a liquidated and certain sum, without the need to prove any actionable damage flowing from the Tenant's default (or its amount) or to take any steps by way of mitigation (in contrast with para 1 which expressly requires the Claimants to take all reasonable steps to mitigate their losses). This may be particularly advantageous for the Claimants in a situation where the market rent at the date of forfeiture is *higher* than the rent payable under the Lease. In that situation, para 7(b) would nevertheless enable the Claimants to continue to claim the rent under the Lease for 180 days (or until the execution of a replacement lease), regardless of the improvement in the market.

64.    Para 7(b) thus provides an additional benefit to a Landlord who does not exercise the put option, but (like para 7(a)) this is without prejudice to the Landlord's pre-existing rights under the other provisions of Schedule 4.    One can test the position in this way:

(1)    The effect of LBHI's argument, if correct, would be to deprive the Claimants of their express indemnity, under part [ii] of para 1, to recover damages flowing from the Tenant's default, in a case where such default led to the forfeiture of the Lease and the Claimants did not exercise the option in para 7(a).

(2)    Clear words would be required to impose such a drastic restriction on the Landlord's ability to recover damages under para 1 (e.g. "*save in the case of forfeiture*").    Indeed, since a right of forfeiture arises only upon the occurrence of a <u>serious</u> breach (and thus one liable to result in the greatest losses), the suggested restriction on the ability to claim under the indemnity would tend to operate in the very case where the indemnity was most needed.

(3)    In fact, there is nothing in the wording of para 1 to suggest that the indemnity should cease to be available in a case of forfeiture occasioned by the Tenant's default and, on a commercially sensible construction, this is unlikely to have been the parties' intentions.

27

65.    Moreover, that para 7 was not intended to be an exclusive remedy in the event
of a disclaimer, is also apparent from para 2 of Schedule 4. This provides:

> "The Surety hereby further covenants with the Landlord and as a
> separate covenant with the Management Company that the Surety is
> jointly and severally liable with the Tenant (whether before or after
> any disclaimer by a liquidator or trustee in bankruptcy) for the
> fulfilment of all the obligations of the Tenant under this Lease and
> agrees that the Landlord or the Management Company in the
> enforcement of its rights hereunder may proceed against the Surety as
> if the Surety was named as the Tenant in this Lease"

66.    Thus, para 2 makes express provision as to a remedy which is to be available to
the Claimants *before or after disclaimer*", namely that the Claimants will
(also) have the right to proceed against LBHI for breach of covenant as if
named as the Tenant in the Lease. It is accordingly impossible to conclude that
the parties intended para 7 to deal exhaustively with the Claimants rights after
disclaimer: this would fail to give effect to the express provision of para 2. The
true construction of Schedule 4 must be, therefore, that para 7 was intended to
confer additional rights in the event of a disclaimer.

67.    It is true that para 2 does not deal expressly with the Claimants' rights in the
case of forfeiture. However, once it is accepted that, in a case of disclaimer,
para 7 confers rights which are additional rather than substitutive, the same
conclusion must apply to forfeiture because para 7 draws no distinction in its
application as between cases of disclaimer, on the one hand, and forfeiture, on
the other.

68.    For these reasons, I do not agree that para 7(b) imposes a limit on LBHI's
liability following forfeiture of the Lease to indemnify the Claimants against
damages suffered as a result of the Tenant's default.

**K.    ANTICIPATORY BREACH OF PARA 7(a)**

69.    By the time of the Forfeiture Letter, LBHI had itself been under chapter 11
protection for over 2 years. If US insolvency law is similar to English law (and
I am informed that it is in this regard), then the effect of LBHI executing a new

28

lease on the same terms as the Lease following the forfeiture would have been to turn LBHI's obligation to pay rent for the remaining term into an administration expense, thus giving the Claimants priority over all of LBHI's other unsecured creditors.

70.  I am instructed that LBHI informed the Claimants, before the execution of the new lease with JPMorgan, that it would not execute a new lease on the same rents and covenants as the Lease.  In these circumstances, the Landlord did not give notice under para 7(a) requiring LBHI to execute a new lease.

71.  Under English law, if a promisor under a contract, even before the time for performance has arrived, evidences an intention not to perform it (an "*anticipatory breach*"), the promisee may treat this as an immediate breach of contract and bring his action accordingly: *Moschi* at page 356A.

72.  Although it is true that LBHI's obligation under para 7(a) to execute a new lease is triggered by the receipt of notice from the Landlord, I consider that LBHI's express statement that it would not execute a new lease, if notice were given, would likely be regarded as an anticipatory breach of its obligations under para 7(a), particularly when LBHI's statement is seen in the context of LBHI's own longstanding insolvency and the detrimental effect on other creditors of LBHI executing an onerous new lease while under chapter 11 protection.

73.  Since damages are awarded to put the Landlord into the position it would have been had LBHI performed its obligations under para 7(a), these would include the rent and other charges that the Claimants would have received under a new lease with LBHI (at the same rent and covenants as the Lease) less sums received by way of mitigation from the lease executed with JPMorgan.

## L.    DILAPIDATIONS, SERVICE CHARGES AND COSTS

74.  Under the Lease, the Tenant gave certain covenants as to the state of the premises, including covenants to repair the premises and keep them in good and

substantial repair (clause 4.5 of the Lease), to keep all plant, machinery and other equipment properly maintained and in good working order and condition (clause 4.6), to prepare and decorate the premises (clause 4.7) and to keep the premises in a clean condition (clause 4.8). Further clause 4.10 obliges the Tenant, "*immediately prior to the expiration or sooner determination of the Term*" and if required by the Landlord, to take various steps to ensure that the premises are reinstated to a particular specification. In addition, clause 4.24(c) provides for the recovery of costs and expenses incurred in connection with the recovery of rent or in procuring the remedying of the breach of any covenant by the Tenant, clause 4.32 requires the Tenant to indemnify the Claimants from any claims, demands, losses, etc. arising from any breach of the Tenant's covenants and clause 9 provides for the recovery of service charges. Similarly, para 1 of Schedule 4 provides that the Surety will indemnify the Landlord for its costs, fees and expenses.

75.    I am instructed that the damages claimed by the Claimants include the cost of restoring the premises into the state of repair required by the Lease (which are sometimes referred to as "dilapidations") and certain service charges and costs. I am not asked to comment on the quantum of costs claimed but I am asked to consider whether such damages are regarded by English law as a penalty for the early termination of the Lease that is not recoverable or as ordinary compensatory damages that are recoverable.

76.    The classic statement of the law as regards penalties in England is found in the speech of Lord Dunedin sitting in the House of Lords in *Dunlop Pneumatic Tyre Co v New Garage and Motor Co Ltd* [1915] AC 79 at pages 86-7, where he differentiated between a penalty (which is impermissible under English law) and liquidated damages (which are permissible). In this oft-quoted passage (internal citations omitted), he laid down the following propositions:

> "1.    Though the parties to a contract who use the words "penalty" or "liquidated damages" may prima facie be supposed to mean what they say, yet the expression used is not conclusive. The Court must find out whether the payment stipulated is in truth a penalty or liquidated

damages. This doctrine may be said to be found passim in nearly every case.

2.     The essence of a penalty is a payment of money stipulated as in terrorem of the offending party; the essence of liquidated damages is a genuine covenanted pre-estimate of damage.

3.     The question whether a sum stipulated is penalty or liquidated damages is a question of construction to be decided upon the terms and inherent circumstances of each particular contract, judged of as at the time of the making of the contract, not as at the time of the breach.

4.     To assist this task of construction various tests have been suggested, which if applicable to the case under consideration may prove helpful, or even conclusive. Such are:

(a)     It will be held to be penalty if the sum stipulated for is extravagant and unconscionable in amount in comparison with the greatest loss that could conceivably be proved to have followed from the breach.

(b)     It will be held to be a penalty if the breach consists only in not paying a sum of money, and the sum stipulated is a sum greater than the sum which ought to have been paid (Kemble v. Farren (4)). This though one of the most ancient instances is truly a corollary to the last test. Whether it had its historical origin in the doctrine of the common law that when A. promised to pay B. a sum of money on a certain day and did not do so, B. could only recover the sum with, in certain cases, interest, but could never recover further damages for non-timeous payment, or whether it was a survival of the time when equity reformed unconscionable bargains merely because they were unconscionable, - a subject which much exercised Jessel M.R. in Wallis v. Smith (5) - is probably more interesting than material.

(c)     There is a presumption (but no more) that it is penalty when "a single lump sum is made payable by way of compensation, on the occurrence of one or more or all of several events, some of which may occasion serious and others but trifling damage".

On the other hand:

(d)     It is no obstacle to the sum stipulated being a genuine pre-estimate of damage, that the consequences of the breach are such as to make precise pre-estimation almost an impossibility. On the contrary, that is just the situation when it is probable that pre-estimated damage was the true bargain between the parties.

31

77.   Thus, the English law doctrine of penalties applies where (a) the contract stipulates for the payment of a sum of money, (b) the event which triggers payment is a breach of contract, and (c) the sum in question is stipulated *in terrorem* of the party in breach rather than as a genuine pre-estimate of loss. As to these requirements:

(1)    The Claimants are not seeking to recover any sum of money fixed by the Lease. The Lease contains no "liquidated damages" clause specifying a sum of money payable in respect of the Tenant's failure to carry out repairs or to pay service charges or costs. The Claimants, as I understand it, are claiming as damages the losses they have suffered as a result of the Tenant's failures in that regard. A claim for unliquidated damages falls outside the scope of the English law doctrine of penalties altogether.

(2)    The Claimants' claim in damages does arise from the Tenant's failure, in breach of clause 4.10 of the Lease, to put the premises into the requisite state of affairs prior to the forfeiture of the Lease. However, although not strictly relevant to the English law penalty doctrine analysis, it is worth noting that the Tenant's obligation under clause 4.10 would have been triggered even if the Tenant had not committed a repudiatory breach of the Lease and the Lease had run to its full term, since clause 4.10 is triggered immediately prior to "*the expiration or sooner determination of the Lease*" (and thus would apply where the Lease had come to an end by effluxion of time).

(3)    An obligation to pay damages is not a sum stipulated *in terrorem* of the party in breach. It is true that an obligation to pay damages may act as a disincentive for one party to breach the Lease in such a way as to result in its forfeiture. However, this fact does not engage the English doctrine of penalties, which is concerned only with the question whether sums stipulated by the contract as being payable upon a breach represent a genuine pre-estimate of loss or not. The fact that a breach

32

of contract may (and usually will) result in an obligation to pay damages is not, even if the quantum of damages may be substantial, capable of engaging the English law penalties doctrine.

78.    A decision of the English Court of Appeal is instructive in this regard.    In *Jervis v Harris* [1996] Ch 195, a lease provided for the lessee to carry out certain repairs and, if the lessee failed to do so, the lessor was entitled on notice to enter the property and carry out repairs at the lessee's expense.    When the lessor brought proceedings to recover the expenses, the lessee argued that the provision of the lease was a penalty.    This argument was rejected by the English Court of Appeal on the ground that the lessor's right to payment arose in debt upon the lessor carrying out the necessary repairs and was not triggered by a breach of contract on the part of the lessee.    In other words, requirement (b) mentioned in para 77 above was absent.    As Millett LJ said (at page 206E):

> "But it is well settled that the event on which the sum alleged to be a penalty becomes payable must be a breach of some other contractual obligation owed by the obligor to the obligee.    That is not the case here.    There is only one relevant obligation on the part of the tenant, and that is to repay the landlord his costs of carrying out repairs himself."

79.    In the present case, the English law doctrine of penalties has no application for the reasons explained above.    A claim to recover for damages resulting from the Tenant's failure to restore the premises to the state required by the Lease and services charges and costs would be regarded in English law as a normal compensatory damages claim and therefore recoverable.

## M.    CONCLUSIONS

80.    For the reasons set out above, my conclusions are, in summary, as follows:

(1)    Because Schedule 4 is a contract of indemnity and not a contract of guarantee, LBHI's obligations would not be discharged by a material variation of the Lease.

(2)    Even if (contrary to my view) Schedule 4 is a contract of guarantee, a material variation of the Lease would not discharge LBHI's obligations because paras 6(d) and/or 6(g) of Schedule 4 provide that a variation of the Lease will not discharge or exonerate LBHI.

(3)    In any event, on its true construction, clause 4 of the Forfeiture Letter does not effect a variation of the Lease because the releases are confined to claims for rent as an administration expense (which do not arise from the terms of the Lease) while the Landlord's ability to claim for unpaid rent in the administration of the Tenant as an unsecured creditor is expressly preserved.

(4)    The Claimants are entitled to an indemnity in respect of losses flowing from the Tenant's default under part [ii] of para 1 of Schedule 4, even though, following the forfeiture, the Tenant is no longer bound by the covenants in the Lease because such losses arise from the Tenant's pre-forfeiture default.    Thus, the Claimants are entitled to the rents and other charges they would have received had the Lease run its full term, less sums received by way of mitigation from the JPMorgan lease.

(5)    Even if (contrary to my view) Schedule 4 were limited to a guarantee of the Tenant's obligations under the Lease, forfeiture of the Lease resulting from the Tenant's repudiatory breach would trigger a liability on the part of the Tenant to pay damages for the loss of future rent, which the Claimants would be entitled to recover from LBHI.

(6)    Para 7 of Schedule 4 confers an additional remedy on the Claimants and does not limit their right to be indemnified in respect of damages pursuant to para 1.

(7)    LBHI's decision not to execute a new lease in accordance with para 7 of Schedule 4 would likely be regarded as an anticipatory breach of contract.    The damages recoverable by the Claimants would include the

34

rent and other charges payable for the remainder of the Lease less sums received by way of mitigation from the lease with JP Morgan.

(8)    Claims in respect of dilapidations, service charges and costs would be regarded under English law as a claim for ordinary compensatory damages and recoverable. It would not be treated as an unrecoverable penalty for the early termination of the Lease.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on __11 October__, 2012

_____
Laurence Rabinowitz QC