# Exhibit 22

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

IN RE LEHMAN BROTHERS HOLDINGS INC *Et al*, Debtors

Chapter 11 Case No 08-13555(JMP)

(Jointly administered)

DECLARATION OF RICHARD MILLETT Q.C. IN SUPPORT OF REJECTION OF PROOFS OF CLAIM OF CANARY WHARF MANAGEMENT LIMITED *et al.*

RICHARD MILLETT Q.C. hereby declares as follows.

<u>Introduction</u>

1.  I have been asked by Lehman Brothers Holdings Inc ("LBHI") to provide a declaration of my opinion as to the objections ("the Objections") made by LBHI to the proofs of debt submitted by Canary Wharf Management Limited and others (together "the landlord") so far as that objection is based on and involves any consideration of English law.  In particular I make this declaration in response to the declaration of Laurence Rabinowitz Q.C. dated 11 October 2012 ("the Rabinowitz Declaration").  Save where identified I adopt the abbreviations used in the Rabinowitz Declaration.

2.  The structure of this report is as follows:

    (1) Personal background
    (2) Factual background
    (3) Executive summary of my conclusions
    (4) The principles of construction of contracts of guarantee and indemnity
    (5) Schedule 4 to the lease is a guarantee and not an indemnity
    (6)  The meaning, content and effect of a material variation



1

(7) The effect of the Forfeiture Letter on LBHI's obligations

(8) The effect of the anti-release clause

(9) The effect of the forfeiture on LBHI's obligations

(10) The meaning and effect of paragraph 7 of schedule 4 to the Lease

(11) The alleged anticipatory breach

(12) Dilapidations, service charges and costs

(13) General conclusion.

3.  I shall assume, as I have been instructed, that my role is not only to provide my opinion as to what English law is as to the various questions raised but also, as Mr Rabinowitz has done, to provide my opinion as to how English law would answer them in the context of the present dispute.

### (1) Personal Background

4.  I am a practising barrister in the Chambers of Mr Gordon Pollock Q.C., at 24 Lincoln's Inn Fields, London WC2A 3EG. My Chambers is known as Essex Court Chambers. I was called to the Bar by Lincoln's Inn in July 1985 and I have practised at the English Chancery and Commercial Bars continuously ever since. Before I joined Essex Court Chambers in 1990 I practised from 1986 in the Chambers of John Chadwick Q.C. (later Lord Justice Chadwick) at Queen Elizabeth Building, Temple, London EC4. In 2000 I was appointed to the Treasury Counsel "A" Panel, and in 2003 I was appointed Queen's Counsel. In 2010 I was appointed a Civil Recorder with a Chancery specialism and I have been sitting regularly since then as a deputy judge in London on Chancery and property business.

5.  My practice covers a broad range of domestic and international litigation and arbitration work. I am ranked in the 2013 *Legal 500* and *Chambers UK Bar* guides for banking, commercial dispute resolution, international arbitration, offshore work and energy. I have appeared in courts at every level in the English legal system, including frequent appearances in the Court of Appeal and appearances in the House of Lords (now the Supreme Court). I am a permanent member of the Bars of the British Virgin Islands and of Anguilla and have been called *pro hac vice* to the Bars of The Cayman Islands, Nevis, Bermuda, The Commonwealth of The Bahamas, the Isle of Man and The Seychelles. I am a member of both the Chancery

Bar Association and the Commercial Bar Association (COMBAR) and I sit on the main committee of the former and numerous sub-committees of each.

6. Among other publications, I am the co-author (with Geraldine Andrews Q.C.) of the Law of Guarantees (6th Edition, 2011), a work first published in 1992 and now regarded as a (if not the) standard textbook on the subject, and one which is frequently cited by senior courts and practitioners. I am also the editor of Halsbury's Laws of England, 5th edition, Vol 20 (2004) on Guarantee and Indemnity.

7. I was educated at Trinity Hall, Cambridge where I gained a BA, Part 1 in Classics and Part 1 and Part 2 in Law. I was awarded the Megarry Prize for Landlord and Tenant Law in 1985, having come top in that subject at Bar School.

8. I attach my current curriculum vitae as Appendix 1 hereto. I have disclosed all relevant publications by me in the last 10 years.

**(2) Factual Background**

9. As to the summary of facts at paragraphs 11 to 20 of the Rabinowitz Declaration, I make the following observations.

10. First, the rent payment dates under the lease follow the usual Canary Wharf rent payment dates rather than the traditional English quarter days. Rent payment dates are 1 January, 1 April, 1 July and 1 October. Full rent was, therefore, paid on or around 1 January 2010 for the period which expired 31 March 2012. This is consistent with the administrators of LBL vacating the space it had been occupying at or within the demised premises during March 2010. It is stated that the tenant failed to make further rent payments. However, it was on account of that liability that rents continued to be paid by Nomura International PLC ("Nomura") who had acquired the ongoing Lehman European business from the administrators. As to that, the acceptance of Nomura's occupation of part of the premises and their status as LBL's sub-tenant and its rent payments amounted to a waiver by landlord of its right to forfeiture under clause 8.1 of the lease. Indeed, the post 1 April 2010 but pre-forfeiture occupation of 25 Bank Street was by LBL's subtenants. Therefore, the rents "received" by the landlord from Nomura and the other sub-tenants were, in fact, due to LBL

as the Tenant and directed to the landlord on account of LBL's liabilities to pay rent under the lease.

11. Secondly, at paragraph 18 of the Rabinowitz Declaration Mr Rabinowitz has proceeded on the assumption that the lease entered into in favour of JP Morgan Chase Bank National Association ("JPM") dated 20 December 2010 ("the new lease") was granted by an assignee of the Claimants. However, I am told that that is not necessarily a sound assumption. The lease was an overriding lease granted by HQCB Investments Limited ("HQCBI"). The copy of the new lease supplied by the administrators is an exempt information version allowed under the Land Registration Rules 2003 and, therefore, a considerable amount of detail set out in that lease has been excluded and the true meaning of many clauses are currently unknown.

12. It may be that an overriding lease was granted simply because HQCBI granted the lease subject to what is defined as the occupational underlease, meaning an underlease of floors 18 and 19, which had been granted on 10 December 2010 to Jones Lang LaSalle ("JLL"). In that lease the landlord is referred to as Heron Quays Properties Limited. However, I am instructed that LBHI's understanding is that forfeiture of the LBL lease on 10 December 2010 was effected by the two original landlords, Heron Quays (HQ2) T1 Limited and Heron Quays (HQ2) T2 Limited pursuant to the letter of 3 December 2010 (see Exhibit B to the Rabinowitz Declaration). Accordingly, it appears that at some point on 10 December 2010 there was no longer an interest equivalent to the interest out of which the LBL lease had been granted.

13. The sequence seems to have been as follows:

(i)     Heron Quays (HQ2) T1 Limited and Heron Quays (HQ2) T2 Limited forfeited the LBL lease. It may be that they surrendered their interest to Heron Quays Properties Limited as part of a larger transaction intended to collapse the lease structure.

(ii)    Heron Quays Properties Limited granted a new occupational lease of floors 18 and 19 to Jones Lang LaSalle and then surrendered its 999 year lease (calculated from 1998) to HQCBI. The JLL sublease would have fallen, by operation of law[1], on the forfeiture of the LBL lease.

---

[1] Great Western Rly Co v Smith [1876] 2 Ch D 235 at 253, per Mellish LJ; Official Custodian for Charities v Mackey [1985] Ch 168.

4

(iii)    HQCBI, holding either a freehold interest or a longer leasehold interest than Heron Quays Properties Limited, granted or agreed to grant a new lease to JPM for a term of 999 years calculated from 20 December 2010.  It also seems that JPM, via Morgan Property Development Company Limited, acquired an interest in the premises as "buyer" pursuant to an agreement also dated 20 December 2010 between Heron Quays (HQ2) T1 Limited and Heron Quays (HQ2) T2 Limited as "seller", Morgan Property Development Company Limited as "buyer", Canary Wharf Holdings Limited and HQCB Properties (HQ2) Limited.  It is hard to tell, without all the relevant transaction documents, precisely where this sale agreement fitted in.

14. These arrangements, so far as one can tell without all the documents, collapsed the lease structure, cleared up the title and gave JPM a clean lease but may have had the consequence of breaking the nexus between the original landlords and LBL as to future liabilities.  Presumably the exempted provisions in the new lease contain an attempt to preserve that liability by contract.  Once the full documentation and their detailed provisions have been disclosed to LBHI they will need to be analysed.

15. In summary, the manner in which the reversionary interests were collapsed may affect the claims of the original landlords against LBHI for post forfeiture rent (if contrary to my views as I explain them below, such a liability existed).  I will need to review the full documentation once disclosed in order to form a final view about what happened.

16. Furthermore, I would not wish to be taken as accepting as complete and accurate Mr Rabinowitz's summary of LBHI's Objections at paragraph 20 of the Rabinowitz Declaration, and so I attach for completeness a copy of the Objections as Appendix 2 hereto.

17. In addition, it appears from the exchange of e-mails over the period 8 to 10 December 2010 between Richard Krasnow of Weil and Andrew Dietderich Sullivan & Cromwell that the Landlord had already lined up a new tenant for the Premises and was very close to agreeing terms with it.  LBHI, having been told orally at a meeting on 6 December 2010 about the economics of the new lease, wanted to review it under a confidentiality agreement in order to evaluate the proposed settlement and the Landlord's claims[2], and not to evaluate whether or not to take up a new lease.  The Landlord, at the request (it appears) of the new

---

[2] It is relevant that LBL, as tenant, had invested a substantial amount in fitting out the Premises, which would have had a substantial value to an incoming tenant, particularly one in the same line of business.

tenant, wanted LBHI to confirm, before being given the documents containing the terms of the new lease, that it would not take up a new lease, saying that the new tenant would not give the terms of the new lease to LBHI without that good faith commitment. In short, the Landlord demanded that LBHI confirm that it would not seek to take up a new lease in competition with the new tenant as a condition of letting LBHI review the new lease terms (see e.g. e-mail from Mr Dietderich of 8 December 2010 at 6.59). LBHI's response to that demand was that on the assumption that the economics of the new lease were as previously described, " ... *then LBHI would not elect to enter into a lease for the premises on the same terms as the current CW/LBL lease.*" I attach those e-mails at <u>Appendix 3</u> hereto.

18. Appendix 4 hereto comprises a tabbed bundle of the authorities, statutes, articles and other legal materials to which I shall refer in the course of this declaration.


**(3) <u>Executive summary of my conclusions</u>**

19. In summary my views are as follows:

   (i)     Although the ordinary principles of construction of contracts are generally applicable to contracts of guarantee or indemnity, the *contra proferentem* rule applies in cases where the document admits of doubt and in any event clear words are required in order to exclude or limit prevailing rules of law or principles of equity: see e.g. <u>Liberty Mutual v HSBC Bank plc</u> [2002] EWCA Civ 691 at para 56, Rix LJ.

   (ii)    Applying the relevant principles, on its true construction schedule 4 of the Lease is a guarantee and not an indemnity. That is because the basic obligation on LBHI is to pay or perform LBL's obligations in the Lease if LBL does not. Default by LBL is the trigger for all or any obligation by LBHI under schedule 4, and it is irrelevant that LBHI also contracts as a primary obligor (para 1) or as a joint and several obligor with LBL (para 2).

   (iii)   Neither paragraph 6(d) or 6(g) of schedule 4, on their true construction, operates to exclude the principle in <u>Holme v Brunskill</u> [1877] 3QBD 495, or to permit the landlord to expand LBL's liabilities beyond the original purview of the guarantee.

(iv)     The Forfeiture Letter did effect a material variation of the Lease, and so LBHI's liabilities under schedule 4 were discharged pursuant to the principle in *Holme v Brunskill*. As I shall explain in further detail below, that principle is that that any variation to the principal contract, after the giving of the guarantee, which has the effect of actually or potentially prejudicing the surety, will discharge the surety's liability under the guarantee unless: (i) the guarantor consents to the variation; or (ii) it is not "material" in that the variation is <u>patently insubstantial or incapable of adversely affecting the guarantor</u>. This is fundamental principle of guarantee law and applies to guarantees of leases.[3] Mr Rabinowitz has focussed too narrowly on the fact that the Forfeiture Letter limited or reduced the administrators' liability for arrears of rent as an expense of the administration but failed to take account of the fact that the Forfeiture Letter, by reducing the amount of the pre-forfeiture arrears payable as an administration expense (which could have been paid by the administrators in full), automatically increased the liability of LBL's general estate for the arrears and hence LBHI's liability as guarantor. Alternatively, on the application of the principle in <u>Triodos Bank v Dobbs</u> [2005] 2 Ll Rep 588, LBHI cannot be liable beyond the purview of the guarantee, and any liability by LBL for post-administration rent as an ordinary debt falls outside the purview of the guarantee.

(v)     LBL did not repudiate the lease by failing to pay the rent with the effect that LBL, and hence LBHI, is liable in damages for the net present value of the lost future revenue stream post-termination. As a matter of English landlord and tenant law, when a landlord elects to forfeit a lease, that brings to an end any liability on the tenant for future rent and there is no basis for any liability in damages for the lost revenue stream: <u>Jones v Carter</u> (1846) 15 M & W); <u>Reichman v Beveridge</u> [2006] EWCA Civ 1659, at paras 26 and 42, per Lloyd LJ; <u>Woodfall on Landlord and Tenant Law</u>, (Release 90, October 2012) para 17.315. The English Supreme Court would not overrule <u>Reichman v Beveridge</u> and follow the Northern Irish decision in <u>Rainey Bros Ltd v Kearney</u> [1990] NI 18. The only basis in English law on which a lessor can claim the net present value of the future revenue stream is where the lease is disclaimed: in such circumstances (and only in such circumstances) Parliament has provided for a statutory right to the landlord to claim loss and damage (section 178(6) of the Insolvency Act 1986; <u>Re Park Air Services plc</u> [2000] 2 AC 172.

---

[3] <u>West Horndon Industrial Park v Phoenix Timber</u> [1995] 29 E.G 137.

(vi)    There was no anticipatory breach of the lease by LBHI in indicating that, if offered, it would not take a new lease under Schedule 4 para 7(b). The landlord gave no written notice to LBL under para 7(a) to take up a new lease, and made no demand for any sum under para 7(b), and so there were no obligations on LBHI which fell to be performed thereunder which could be or were breached, whether anticipatorily or at all. In fact, as is clear from the e-mails at the time, what happened was that the Landlord, having lined up JPM as the new tenant, then required LBHI to confirm that it did not wish to take up a new lease, which LBHI did duly confirm. That did not involve LBHI evincing an intention not to take up a new lease if the Landlord served a notice on LBHI requiring it to do so: the Landlord had made it plain that it was not going to do so unless LBHI insisted on having a new lease.

(vii)   The objection as to dilapidations and other matters such as rates and services charges are all as to the inadequacy of the proofs in respect of those matters and the extent to which they were met by JPM under the new lease. LBHI has not objected on the grounds that the sums so claimed are penal as a matter of English law. Its complaint is that the landlord has not attempted to prove quantum.

**(4)  The principles of construction of guarantees and indemnities**

20. I agree with Mr Rabinowitz's statement of the basic principles of English law as to the interpretation of commercial contracts. I also agree that those principles apply for the most part generally to leases, guarantees and indemnities.

21. However, there are particular principles governing the interpretation of contracts of guarantee and indemnity. In Blest v Brown (1862) De G, F and J, 367, Lord Campbell said (at p 376):

> "It must always be recollected in what manner a surety is bound. You bind him to the letter of his engagement. Beyond the proper interpretation of that engagement you have no hold upon him. He receives no benefit and no consideration. He is bound, therefore, as to the proper meaning and effect of the written agreement he has entered into."

22. In Eastern Counties Building Society v Russell [1947] 1 All ER 500 Hilbery J said:

8

"Rather will the court in case of doubt lean in [the surety's] favour.  Neither equity nor law will put a construction on the document which results in imposing on the surety any more than, on the strictest construction of the instrument, he must be said expressly to have undertaken, or so as to detract from the right given to the surety by the proviso defining the circumstances in which the surety is to be held discharged."

23.   This dictum was approved by the Court of Appeal in Estates Gazette Ltd v Benjamin Restaurants Ltd [1994] 1 WLR 1528, at 1533.  The Court balanced that by going on to say

"On the other hand, the words have to be fairly construed in their context and in accordance with their proper meaning without in any way favouring the guarantor, who is not placed in any more favourable position in this regard than any other contracting party.  The so-called rule of construction is very much a matter of last resort."

24.   However, the Court of Appeal did not say that there was no such rule of construction. Moreover, in Cattles plc v Welcome Financial Services Ltd [2010] 2 Ll Rep 514, the Court of Appeal (Lloyd LJ, at para 43) followed the dictum of Arden LJ in Arden LJ in Static Control Components (Europe) Limited v Egan [2004] EWCA Civ 392, [2004] 2 Lloyd's Rep 429 at paragraph 37 to the effect that the *contra proferentem* rule can be used where the document, properly construed, "admits of doubt".

25.   Commentators accept that one area where the strict rule of construction may remain applicable is in respect of interpretation of clauses which are designed to preserve the liability of the guarantor when he would otherwise be discharged under the general law: see O'Donovan & Phillips, The Modern Contract of Guarantee (2nd English End, 2010), para 5-05. The preponderance of judicial opinion favours such an approach.  In Liberty Mutual v HSBC Bank plc [2002] EWCA Civ 691 at para 56, Rix LJ approved Patten J's view that the modern principles of construction of contracts does not exclude a strict approach to words which purport to restrict or exclude the application of otherwise prevailing rules, since *"the reasonable man does not expect fundamental principles of law, equity and justice, such as rights of set-off or subrogation, to be excluded unless the contract clearly says so."* O'Donovan & Phillips say that "the issue remains an open one" (ibid).  However, in doing so they only cite the decision of Stanley Burnton J in Barclays Bank plc v Kingston [2006] 2 Ll Rep 59, in which he said he declined to interpret such clauses in a guarantee *"with the hostility traditionally shown to exclusion clauses"*.  In that case, Stanley Burnton J did not consider any of the cases concerned with construction of guarantees and in particular the decision of the Court of Appeal in Liberty Mutual which was binding on him.

26. Accordingly, my own view is that the issue is not "an open one", as O'Donovan & Phillips suggest. The editors of Chitty on Contracts (31st Edition, 2012), at Vol 2, para 44-066[4], treat Liberty Mutual as the principal authority on this issue. Furthermore, they say in clear terms that

> "Despite some contradictory dicta in the cases, the general approach seems to be that contracts of this kind must be strictly construed in favour of the surety and that no liability is to be imposed on him which is not clearly and distinctly covered by the contract."[5]

In the context of clauses which purport to exclude rules of common law or equity which are incidental to the contract of suretyship, the editors of Chitty go on to cite the decision of the House of Lords in Trafalgar House Construction (Regions) Ltd v General Surety & Guarantee Ltd [1996] 1 AC 199, at 208, per Lord Jauncey of Tullichettle, where he said:

> " ... there is no doubt that in a modern contract of guarantee parties may, if so minded, exclude one or more of the normal incidents of suretyship. However, if they choose to do so clear and unambiguous language must be used."

27. This view was repeated by the Court of Appeal in IIG Capital LLC v Van Der Merwe [2008] 2 Lloyd's Rep 187, by Waller LJ at para 19. In Vossloh Aktiengesellschaft v Alpha Trains (UK) Ltd [2011] 2 All ER (Comm) 307, Sir William Blackburne, summarising the law on the nature of guarantees and their construction, said at para 27[6]:

> "Context is important in deciding what the nature is of the obligation under consideration as even minor variations in language, plus a different context, can produce different results. See IIG Capital LLC v Van Der Merwe [2008] EWCA Civ 542, [2008] 2 Lloyd's Rep 187 ("IIG") at [20] (Waller LJ). But if, in a contract of guarantee (strictly so called), the parties are minded to exclude any one or more of the normal incidents of suretyship "clear and unambiguous language must be used to displace the normal legal consequence of the contract..." See IIG at [19] (Waller LJ)."

---

[4] Chitty on Contracts is the standard and most authoritative practitioners' textbook on the law of contract in use in England. It is afforded very great deference by all courts in England and the Commonwealth. Its editors number among the most eminent academic and practising commercial lawyers in England. The chapter on Suretyship is written by Professor Simon Whittaker, Professor of European Comparative Law in the University of Oxford. The 31st edition was published in October 2012.
[5] The authority cited for this proposition is Blest v Brown (supra).
[6] Mr Rabinowitz has drawn heavily on Vossloh but does not appear to have given any attention to this part of Sir William Blackburne's summary.

28. In summary, therefore, a balanced survey of the present law leads, in my opinion, to the following conclusions as to the proper approach to the construction of contracts of guarantee:

(i) Although guarantors are not generally in any more favourable position than any other contracting party, the court will take particular care to ensure that the liability of the surety is no greater than the language of the instrument fairly imposes on him.

(ii) The *contra proferentem* principal will apply in favour of the surety in cases of ambiguity or doubt.

(iii) In relation to provisions which purport to exclude or limit the normal incidents of suretyship so as to expand the surety's liability, clear and unambiguous words will be required. This seems to be common ground.[7]

29. For the reasons which I will explain under section (8) below, the language of paragraph 6 of schedule 4 to the lease is not sufficiently clear or free from doubt to oust the operation of the principle in <u>Holme v Brunskill</u>, which is a normal incident of a contract of guarantee[8], or to impose on LBHI any greater liability that it has undertaken by the clear and express words used.

**(5) <u>On its true construction schedule 4 to the Lease is a guarantee and not an indemnity</u>**

(i) <u>The applicable legal principles</u>

30. The distinction between a contract of guarantee and a contract of surety may often be important. For example, the Statute of Frauds 1677, which requires guarantees to be in writing under the hand of the guarantor, does not apply to indemnities, and nor does the principle in <u>Holme v Brunskill</u>. Telling the difference often calls for fine distinctions to be made. In <u>Yeoman Credit v Latter</u> [1961] 1 WLR 828, Holroyd Pearce LJ complained that the

---

[7] See paragraph 42 of the Rabinowitz Declaration and the unqualified adoption of the reference there to <u>Chitty</u> para 44-099.
[8] The principle in <u>Holme v Brunskill</u> does not apply to a contract of indemnity.

exercise of telling the difference *"has raised many hair-splitting distinctions of exactly that kind which brings the law into hatred, ridicule and contempt by the public."* Be that as it may, the basic touchstone of whether the contract is one of guarantee or of indemnity is whether the surety assumes an original liability to the creditor or whether his liability is contingent on the default of the principal debtor. The basic rule of thumb is that if the surety's liability is independent of any default by the principal debtor, then the contract will be one of indemnity. If the surety's liability depends on default by the principal debtor in his obligations, then the contract will be one of guarantee. These principles were recently summarised (I think accurately) by Sir William Blackburne in <u>Vossloh</u> at paras 20-26. Critically, he said at para 24:

> "An essential distinguishing feature of a true contract of guarantee – but not its only one - is that the liability of the surety (i.e. the guarantor) is always ancillary, or secondary, to that of the principal, who remains primarily liable to the creditor. **There is no liability on the guarantor unless and until the principal has failed to perform his obligation.** The guarantor is generally only liable to the same extent that the principal is liable to the creditor. This has the consequence that there is usually no liability on the part of the guarantor if the underlying obligation is void or unenforceable, or if the obligation ceases to exist (to which principle – the so-called principle of co-extensiveness - there are, however, a number of exceptions)" (emphasis added).

31. As <u>O'Donovan and Phillips</u> put it (op. cit., at para 1-91):

> "The distinction between a contract of guarantee and a contract of indemnity is that in a contract of indemnity a primary liability is assumed whether or not the third party makes default, whilst ... in a contract of guarantee the surety assumes a secondary liability to the creditor for the default of another who remains primarily liable to the creditor."

32. The distinction is always a question of construction of the terms of the instrument and the character of the bargain. The labels that the parties use can be a useful guide, particularly if they are repeated, but it is no more than that: see <u>Western Credit Ltd v Alberry</u> [1964] 2 Al ER 938, at 940, per Davies LJ. The essential character of the bargain is paramount.

33. In <u>Vossloh</u>, Sir William Blackburne also said this (at para 27):

> "A contract which contains a provision preserving liability in circumstances where a guarantor would otherwise be discharged (for example, the granting of time by the creditor to the principal or a material variation of the underlying contract between the principal and the creditor, without (in either case) the guarantor's consent) will usually indicate that the contract is one of guarantee because such a provision would be

unnecessary if the contract were one of indemnity.[9] On the other hand, a provision stating that the surety is to be liable in circumstances where the principal has ceased to be liable (for example, on the principal's release by the creditor) may be indicative either of a guarantee (because the provision would be unnecessary in the case of a contract of indemnity) or of an indemnity (because it makes clear that the liability of the surety was intended to continue regardless of the liability of the principal)." (emphasis added).

34. One point which Sir William Blackburne did not cover in his summary of the legal principles in Vossloh[10] is that words that provide that the surety will be a primary obligor, or liable as if he is a principal debtor, or similar formulae, do not convert what is otherwise a guarantee into an indemnity. That is the dominant view, shared by the commentators on the subject: see eg O'Donovan & Phillips (op. cit.) at para 1-105; see also Carey Value Added SL v Grup Urvasco SA [2011] 2 All ER (Comm) 140, at para 22. In MS Fashions v BCCI [1993] Ch 425, Dillon LJ explained that the purpose of including a principal debtor clause in a guarantee was to dispense with the requirement of a demand on the guarantor as a pre-requisite to enforcing the demand against him[11].

35. Similarly, words of indemnity against loss arising as a result of having entered the agreement, if they are predicated on an underlying liability of the principal debtor, will not turn what is otherwise a contract of guarantee into an indemnity: see eg Stadium Finance v Helm (1965) 109 SJ 471 (CA); and see Vossloh at paras 42-58. More difficult are the cases where there are mixed guarantee and indemnity provisions, which can be read as indemnities and not guarantees: see eg Sofaer v Anglo Irish Asset Finance Ltd [2011] BPIR 1736. However, each instrument must be construed according to its own context and terms.

36. Subject to the points that I have made above, I would not disagree with the summary of the law set out in paragraphs 32 to 38 of the Rabinowitz Declaration.

(ii)    The terms and context of schedule 4 to the lease

---

[9] It is not a black and white test, and it has been held that the absence of the usual provisions which conserve the surety's liability does not mean that the instrument is not a guarantee: see Associated British Ports v Ferryways NV [2009] EWCA Civ 189, at paras 11 and 12. But their presence is likely to fortify the conclusion that the instrument is a guarantee. Associated British Ports is a case a fortiori the present.

[10] Although the point is covered later in his judgment when dealing with the indemnity clauses in the instrument before him, such as clause 2 of the instrument, which contained "primary obligor" provisions which he said (at para 45) were not enough to convert secondary obligations into purely primary obligations.

[11] This dictum was followed in TS&S Global Ltd v Fithian-Franks [2008] 1 BCLC 277.

37. At paragraph 39 of the Rabinowitz Declaration Mr Rabinowitz has set out a list of eight reasons why he says that LBHI's obligations under schedule 4 of the lease constitute an indemnity and not a guarantee. I disagree with him. My reasons are as follows:

(i)   The operative words of para 1 of schedule 4 make it plain that LBHI's obligations are secondary or accessory to those of LBL and only arise in the event that LBL defaults. There are three powerful pointers to that conclusion:

(a) the words that say that LBHI's liability subsists for only so long as LBL continues to be bound by its covenants in the lease during the Term; so if LBL ceases to be so bound, so does LBHI. That is a clear application of the co-extensiveness principle;

(b) the words that say that LBHI covenants that LBL or LBHI ("the Tenant or the Surety") will perform LBL's covenants; LBHI is promising both that LBL will perform its covenants and also that if it does not do so then LBHI will perform LBL's covenants. This is a composite form of guarantee which comprises both a "see to it" element and a "do it" element. Under the "see to it" element, LBHI promises that LBL will perform its covenants, and if LBL does not then LBHI is in breach of contract and must pay damages; and under the "do it" element LBHI promises that if LBL does not perform its covenants then LBHI will do so. Critically for present purposes, both forms of assumption of liability are characteristic of a guarantee: see <u>Moschi v Lep Air Services</u> [1973] AC 331 at 344G-345C, per Lord Reid.

(c) the fact that the words of indemnity are in respect of all *"claims, demands, losses, damages"* etc *"arising directly or indirectly out of any default by the Tenant in the performance and observance of any of its obligations or the payment of any rents or other sums."*

(ii)  Para 2 provides that the liability of LBHI will be joint and several with LBL, and not separate and independent of LBL's liability. Furthermore, it expressly provides that the landlord may proceed against LBHI <u>as if</u> it were named as Tenant in the lease, which serves to emphasise that LBHI is not the Tenant and has not taken on the obligations of the Tenant, but only <u>as if</u> he were the Tenant: see further below.

(iii)    Para 3, which is a waiver of any right to require the landlord to proceed against the Tenant, would be quite unnecessary if the contract were one of indemnity. The existence of the right of the guarantor to compel the creditor to pursue the principal debtor first is controversial but it has never been finally settled[12] and the words *"any right"* are there to ensure that, to the extent that there is any such right in law, it is waived. Such a right of compulsion does not exist, even arguably, if the contract is one of indemnity.

(iv)    Paras 4 and 5 are standard provisions in most well drawn guarantees. Their presence is consistent with the instrument being a guarantee (although I would not put it higher than that).

(v)    Para 6, on the other hand, is not only standard in a well drawn guarantee but wholly unnecessary if the instrument is intended to be an indemnity. I note that Rabinowitz has suggested that they are there "for the avoidance of doubt". He may have been prompted to make that suggestion by Sir William Blackburne's observation in Vossloh in the passage at para 27 of his judgment I have quoted above which follows after the passage I have highlighted. However, there is no language that suggests that para 6 is there to avoid any doubt that the document is an indemnity, not least since it is at best extremely doubtful, without those words, that it is an indemnity. My view is that, on the contrary, para 6 puts it beyond any reasonable doubt that LBHI's obligations are intended to be those in the nature of a guarantee.

(vi)    Within para 6, I would draw particular attention to the words in para 6(d) *"(subject to section 18 of the Landlord and Tenant (Covenants) Act 1995)"*. Section 18, which I attach in appendix 4, applies in terms to guarantees properly so called and could never have application to an indemnity contract. The fact that any variation of the lease would be subject to section 18 demonstrates that the nature of LBHI's obligations were intended to be those of guarantor, otherwise the reference to section 18 would make no sense.

(vii)    Para 7 is a common provision in lease guarantees: see e.g. Active Estates v Parness [2002] BPIR 865.

---

[12] See the discussion in Andrews and Millett, The Law of Guarantees (6th Edn, 2011, para 11-002).

(viii)    Para 8 is headed "Benefit of guarantee and indemnity". Clause 2.7 of the lease provide that *"titles and headings appearing in this Lease are for reference only and shall not affect its construction"*, and so strictly the heading of para 8 is an irrelevance. In any event I would place limited weight on the labels used by the parties. However, since Mr Rabinowitz has relied on headings in schedule 4, I should give my views without prejudice to these threshold objections. If any guidance is to be gained from them, it is notable that the parties considered that at least some part of schedule 4 constituted a guarantee (the benefit of which would enure to successors and assigns without the need for any assignment). In order to make sense of the composite expression "guarantee and indemnity" and give proper meaning to both elements, the word "guarantee" properly describes the character of the agreement as a whole and the word "indemnity" refers to the specific payment obligations ("shall indemnify and keep indemnified") within para 1. As I explain below, those words are not, contrary to Mr Rabinowitz' view, words that make the contract one of indemnity but merely words which quantify LBHI's payment obligation. However, if the contract as a whole is an indemnity, then the reference to "guarantee" is heterodox and inconsistent.[13]

(ix)    The heading to para 10 describes LBHI as "Guarantor". This is unlikely to have been a mistake in the context of a commercial contract of very high value which has been drafted by a leading firm of solicitors (Clifford Chance). This is not a case where "something has gone wrong with the language". But if it is, then the word is ambiguous or doubtful and, applying the *contra proferentem* principle of construction, it is to be resolved in favour of LBHI as meaning what it says: LBHI is indeed a guarantor.

38. I now turn to address each of Mr Rabinowitz' eight reasons in turn, which I can do shortly by reference to my views as stated above.

(1)    The fact that para 1 of schedule 4 is headed Indemnity is irrelevant and in any event does not support Mr Rabinowitz's analysis. It is irrelevant because, as I have already said, clause 2.7 of the lease provides that the titles and headings appearing in the lease

---

[13] Mr Rabinowitz has (at footnote 15) dismissed section 18 as irrelevant because it deals with assignment. So it does, but if LBHI was not a guarantor, section 18 would have no application and the parties would not have had to provide a carve-out for it.

"are for reference only and shall not affect its construction". Even if the title were relevant, it does not support his analysis because it is simply shorthand for the words of indemnification that appear within clause 1. As I have said above, LBHI's obligation to indemnify the landlord are triggered by default by LBL in the performance and observance of its own obligations under the lease. LBHI is not obliged to indemnify the landlord in respect of any loss or damage which does not arise out of any default by LBL. The use of "indemnity" in the heading, even if it were a permissible aid to construction (which it is not) cannot convert the operative provisions thereunder into an indemnity unless those provisions provide in substance for an indemnity. They do not.

(2) The fact that para 1 is expressed to be a "primary obligation" does not mean that the obligations assumed by LBHI are not those of a guarantor. As I have already noted, "primary obligor" or "principal debtor" clauses, which are very common provisions in many guarantees properly so called, do not turn what are otherwise guarantees into indemnities. In this case, it is plain from the words that immediately follow, namely "that the Tenant or the Surety shall at all times until the Tenant shall cease to be bound by the Tenant's covenants' in the Lease during the Term duly perform and observe all the covenants on the part of the Tenant contained in this Lease" that LBHI is taking on obligations which are accessory to those of LBL. I note that in Vossloh the words in the instrument connoting primary obligation were not enough to turn what were secondary obligations into primary obligations (see paras 45 and 46).

(3) The fact that para 1 provides either that LBL or LBHI will perform the covenants and not that LBHI will see to it that LBL does so, is not a basis for characterising schedule 4 as an indemnity. Mr Rabinowitz is wrong to say that "a guarantee … only involves a promise to see to it that someone else will perform his obligations." As Lord Reid made clear in Moschi v Lep Air Services (supra), a guarantee can comprise either an obligation to "see to it" that the principal debtor performs or an obligation to perform if the principal debtor defaults. This is simply a guarantee of the latter kind. There may be a difference as to whether the cause of action to enforce it lies in debt or in damages, but that is not an issue that arises for consideration in this case.[14]

---

[14] See the discussion in O'Donovan & Phillips (op. cit.) paras 6-129 to 6-132.

(4) The second part of para 1 does contain words referring to an indemnity. However, one must read them in context and not in a vacuum. To my mind the better reading of para 1 is that it comprises a single covenant (as the introductory words say), and that part which begins "and the Surety shall indemnify" is simply a follow-on from what goes before, namely the obligation to perform if LBL does not. The words of indemnity tell us the (very wide) extent of LBHI's obligation when performing its covenant to perform the lease if LBL does not. They are no more than "hold harmless" words to ensure that concepts like foreseeability and remoteness do not operate to cut down the <u>amount</u> that can be recovered by the landlord from LBHI by way of "claims, demands, losses" etc that arises, directly or indirectly, from LBL's default. They do not describe or qualify the juridical nature of the liability assumed by LBHI. Even if para 1 is properly to be split into two separate covenants (which I firmly believe is not the right reading of para 1), the words of indemnity must still be read in the context not only of the first part of para 1 but, critically, the next following part of para 1, which provides that the liability to indemnify attaches in respect of losses etc arising out of LBL's default. That serves to reinforce the accessory nature of the liability.

(5) The fact that para 2 provides that the liability of LBHI will be joint and several with LBL, making LBHI a primary obligor, does not turn schedule 4 into an indemnity as opposed to a guarantee. As I have said, first, LBHI's liability is joint and several with LBL, and not separate and independent of LBL's liability. Furthermore, it expressly provides that the landlord may proceed against LBHI <u>as if</u> it were named as Tenant in the lease, which serves to emphasise that LBHI is not the Tenant and has not taken on the obligations of the Tenant, but only as if he were the Tenant: see <u>Berghoff v Swinbrook Developments Ltd</u> [2009] EWCA Civ 413, at para 32, Rix LJ. Moreover, the provision is about "proceeding" against LBHI, which suggests that it is designed (as in <u>MS Fashions</u>) to make it clear that the landlord is not required to serve a demand on LBHI in order for its liability to accrue due.

(6) Clause 6, which contains a set of common provisions designed to exclude the operation of common law and equitable principles which, if engaged, would discharge LBHI from liability. In the passage in para 27 of <u>Vossloh</u> which I highlighted, Sir William Blackburne observed that the presence of these provisions "will usually indicate" that the instrument is intended to be a guarantee. He goes on to suggest that a provision which

says that the guarantor is to continue to be liable where the principal is not may indicate either a guarantee or an indemnity. It may indicate an indemnity where the parties wished to avoid doubt. However, in this case, had the parties intended that para 6 was to avoid doubt, they would have said so. As I have already said, the reference in para 6(d) to section 18 of the <u>Landlord and Tenant (Covenants) Act 1995</u> would make little sense if LBHI's obligations were not intended to be those of a guarantor. I will address para 6(g) below, but the presence of such a clause (which is not an uncommon attempt at a catch-all) does not turn the instrument into an indemnity any more than the other sub-paragraphs.

(7) As to para 8, and the heading "guarantee and indemnity", Mr Rabinowitz' view that the reference to guarantee is a mistake carried across from earlier drafting is based on his *a priori* view that he cannot find any substantive provision in schedule 4 to which the word guarantee could refer. That is because he has already taken the view that clause 1 is not a guarantee. If he is wrong about that, as I think he is, then the foundation of his assumption that the reference to "guarantee" is a drafting error disappears. So his argument pulls itself up by its own bootstraps. His view that, in any event, even if there is an overlap, the landlord can always enforce the indemnity elements, rather depends on the wording of the contract concerned and the extent to which the guarantee and indemnity obligations (each properly so called) relate. The decision of Lewison J in <u>Sofaer v Anglo Irish Asset Finance plc</u> [2011] EWHC 1480[15] is based on a very different set of words. In that case, the main provision was clearly one of indemnity, and the guarantee provision was so wide that it is hard to see why the draftsman had included it.

(8) The same point goes for the reference to "Guarantor" in para 10 of schedule 4, which again Mr Rabinowitz dismisses as "an obvious error". There is no basis for that assumption. Moreover, the fact that the text refers to LBHI as the Surety is neutral, given (i) that the word is as apt to describe a guarantor as it is an indemnifier, and (ii) that LBHI is defined as the Surety throughout. However, the text goes on to say *"(here meaning the Tenant whose obligations hereunder were originally guaranteed by that Surety"*), which strongly supports the characterisation of LBHI's obligations as those of guarantor.

---

[15] This is the case which is used to exemplify the point being made in <u>Andrews and Millett</u> at para 1-014, on which Mr Rabinowitz relies.

**(6) The meaning, content and effect of a material variation**

39. The English law on this topic does not appear to be controversial in this case, given paragraph 28 of the Rabinowitz Declaration. However, it is useful to set out some key principles.

40. The case of Holme v Brunskill, which has been specifically held to apply in the context of property (see for example West Horndon Industrial Park v Phoenix Timber [1995] 29 E.G 137), established the rule that any variation to the principal contract, after the giving of the guarantee, which has the effect of actually or potentially prejudicing the surety, will discharge the surety's liability under the guarantee unless: (i) the guarantor consents to the variation; or (ii) it is not "material" in that the variation is patently insubstantial or incapable of adversely affecting the guarantor.

41. This rule rests on the principle that

> "the law will not assist a party to enforce a bargain who has placed the other party in jeopardy by unilateral alteration of the instrument by which their bargain was made".[16]

42. As one commentator has recently observed, the rationale for the principle is that

> "a surety, in general, agrees only to guarantee a specific actual or potential liability. If the principal liabilities change, the risks change, and it cannot be said that the surety agreed to take those new risks if he was not consulted."[17]

43. The following excerpt from the judgment of Cotton LJ in Holme v Brunskill is the most often cited and sets out the general legal principle (emphasis added):

---

[16] Per Taylor, J, Petro Can Exploration Inc. v Tormac Transport Ltd (1983) 23 B.L.R. 1, BCSC at paragraph 22.

[17] Choo Choy, "Discharge of guarantees: the rule in Holme v Brunskill revisited" (2007) 7 JIBFL 450.

"The cases as to discharge of surety by an agreement made by the creditor, to give time to the principal debtor, are only an exemplification of the rule stated by Lord Loughborough in the case of Rees v Berrington: "It is the clearest and most evident equity not to carry on any transaction without the knowledge of him [the surety], who must necessarily, have a concern in every transaction with the principal debtor. You cannot keep him bound and transact his affairs (for they are as much his as your own) without consulting him."

The true rule in my opinion is, that if there is any agreement between the principals with reference to the contract guaranteed, the surety ought to be consulted, and that if he has not consented to the alteration, although in cases where it is without inquiry evident that the alteration is unsubstantial, or that it cannot be otherwise than beneficial to the surety, the surety may not be discharged; yet, that if it is not self-evident that the alteration is unsubstantial, or one which cannot be prejudicial to the surety, the Court, will not, in an action against the surety, go into an inquiry as to the effect of the alteration, or allow the question, whether the surety is discharged or not, to be determined by the finding of a jury as to the materiality of the alteration or on the question whether it is to the prejudice of the surety, but will hold that in such a case the surety himself must be the sole judge whether or not he will consent to remain liable notwithstanding the alteration, and that if he has not so consented he will be discharged."[18]

44. A variation is material unless it is self-evident that the alteration is unsubstantial, or, one which is not prejudicial to the surety.[19] The question of whether a variation is material is an objective one[20] and case law illustrates that the materiality threshold is low so that even a minor variation in the underlying contract will trigger discharge of the surety. A surety may also be discharged where, although the variation ultimately has little effect on the surety's risk, the variation is *potentially prejudicial when made*.[21] In other words, a variation is regarded as material if it could prejudice the guarantor, regardless of whether it has in fact done so and regardless of whether the likelihood of it doing so is remote.[22]

45. Closely linked to the rule in Holme v Brunskill is a related, but separate, principle of more general application, articulated in Triodos Bank NV v Dobbs [2005] 2 Ll Rep 588 (esp at

---

[18] Holme v Brunskill [1877] 3 QBD 495 per Cotton LJ at p505.

[19] Ibid. See also Ankhar Pty Ltd v National Westminster Finance (Australia) Ltd (1987) 162 C.L.R. 549 (at 559); Selous Street Properties Ltd v Oronel Fabrics Ltd [1984] EDG 360 per Hutchinson J at page 396 cited in Howard de Walden Estates Ltd v Pasta Place Ltd and others [1995] 1 EGLR 79 per Morland, J at page 81.

[20] Howard de Walden Estates Ltd v Pasta Place Ltd and others [1995] 1 EGLR 79 at page 81.

[21] Ibid at page 361.

[22] Sea Emerald SA v Prominvestbank – Joint Stockpoint Commercial Industrial and Investment Bank [2008] EWHC 1979 (Comm) at paragraph 142. This is the most recent case to consider the Triodos principle.

paragraph 34)[23]. In <u>Triodos</u> the Court of Appeal clarified that even if a guarantor expressly agrees to amendments and variations, the guarantor will be bound only to the extent that an amendment or variation is clearly contemplated and remains within the general purview of the Guarantee. For the guarantor to be liable for an increased amount, express wording will be required to which he will have to consent. In <u>Triodos</u>, Chadwick LJ said:

> "the guarantor is not to be taken to have agreed that his liability under the guarantee would be **increased or made more onerous** by a subsequent agreement made between the lender and the borrower (to which he is not party) **unless there are clear words in the guarantee which show that he did agree to be bound to a more onerous obligation in the future imposed without further reference to him.**" (emphasis added).

46. <u>Holme v Brunskill</u> materiality is not the test for whether a new obligation is within the "purview" of the guarantee or not. The rule in <u>Holme v Brunskill</u> is concerned with variations of existing obligations within the scope of the guarantee, the effect of which is to discharge the guarantor entirely. The principle in <u>Triodos</u> as to scope or "purview", on the other hand, is concerned with whether a particular contract or obligation is within the guarantee at all to begin with as a matter of the construction of the guarantee. A modification of a guaranteed obligation is not put outside the "purview" of the guarantee simply because it would be regarded as material for the purposes of <u>Holme v Brunskill</u>. There is no hint in Longmore LJ's judgment in <u>Triodos Bank v Dobbs</u> that the test for whether the assumption of a different obligation by the principal debtor amounts to a variation within the scope of the guarantee or an entirely new contract is anything other than one of degree. The Court of Appeal did not apply the materiality test in <u>Holme v Brunskill</u> as the appropriate test for "purview". In my view that was not an oversight. One cannot test the question whether a change is a variation or a new contract outside the scope of the guarantee by reference to a test which assumes that the variation is otherwise within the scope of the guarantee. It can be put simply: if the new obligation is outside the purview of the guarantee on its true construction, then there is no need to invoke the rule in <u>Holme v Brunskill</u>. It is just not guaranteed at all.

---

[23] Further, Barclay, M., 2010. Case Comment – When is a variation not a variation? Landlord & Tenant Review, 2010. Volume 14, Issue 1, pp. 7-11 says that the <u>Triodos</u> case is important in the context of guarantees relating to leasehold properties because, "*although it was not a case arising under a lease, the principles of law reiterated by the Court of Appeal appear to be of general application to all contracts of guarantee.....The fact that a guarantor has agreed to the inclusion of an anti-release clause is not the end of the matter. The question is whether the proper construction of the original agreement, including the anti-release clause, permits the actual variations which have taken place without the guarantor's further express consent*".

**(7) The effect of the Forfeiture Letter on LBHI's obligations**

47. There are two issues which call for analysis. The first is what the Forfeiture Letter does, and the second is what effect that has on LBHI's obligations.

(i)    What the Forfeiture Letter does

48. The key provision is clause 4. The material parts are set out at paragraph 44 of the Rabinowitz Declaration. I also agree with Mr Rabinowitz' summary of the law at paragraph 45 of the Rabinowitz Declaration.

49. Properly analysed, the consequences of the Forfeiture Letter are as follows.

(i)    The *Nortel*[24] judgment makes it clear that the full amount of rent due under a lease for the period during which administrators are in occupation of the premises is payable *as an administration expense*[25], regardless of the amount of space the administrators occupied at any given time.

(ii)    Accordingly, the full amount of rent for the period during which the Premises were occupied for the purpose of the administration (i.e. the period ending on the exit of Nomura) should have been paid out ahead of *pari passu* payments to the general body of unsecured creditors.

(iii)    By the Forfeiture Letter, the Landlord agreed that only £1.5m of the outstanding rent for the period would be paid as an expense of the administration, the remainder to be paid out of whatever was available to the general body of unsecured creditors. On any view, £1.5m is significantly less than the full amount of rent outstanding for the period during which the administrators were in occupation.

(iv)    The landlord thus agreed to give up its claim against LBL for all but £1.5 million of pre-forfeiture rent that would have been recoverable in full as an administration

---

[24] Goldacre (Offices) Limited v Nortel Networks UK Limited (in administration) [2009] EWHC 3389 (Ch). *Nortel* confirmed the Lundy Granite (In Re Lundy Granite Co., ex p. Heavan (1871) 6 Ch App 462) principle (under which rent in respect of liquidator-occupied premises for the purposes of the liquidation is payable as a liquidation expense) applied to an administration as it did a liquidation.

[25] In simple terms, amounts payable as an administrative expense will rank: (a) behind secured creditors with a fixed charge and creditors with a proprietary interest in assets; but (b) *pari passu* with other administration expenses; and (c) ahead of all other creditors.

expense in accordance with the Nortel decision, even though the administrators could have paid it in full, and instead to treat the balance as a provable claim.

(v)  But for the Forfeiture Letter, LBHI would not have been exposed to liability under schedule 4 to the lease either for the substantial majority of the pre-forfeiture rent or for other outstandings such as service charges, because such costs would have been paid (as an administration expense). The effect of the Forfeiture Letter is to expose LBHI to a materially increased liability which it would not have had but for the Forfeiture Letter.

50. Mr Rabinowitz does not appear to take issue with this analysis. His simple point is that the Forfeiture Letter did not vary any term of the lease but operated as a waiver of a right conferred on the landlord under the insolvency legislation. In my opinion, this is a little simplistic.

51. There are two further legal principles of relevance. First, it has been well established since the 19th century that a variation to the principal contract imposed by statute, and not by consensus of the parties to the principal contract, will discharge the guarantor: Finch v Jukes [1877] WN 211; Pybus v Gibb (1856) 6 E&B 902.

52. Secondly, the courts will not insist on the requirement of variation in a strict contractual sense, and the operation of the relationship in a way which is different from that envisaged by the contract (so as to amount to a waiver by the creditor of what he was entitled to) will suffice: see Bank of Baroda v Patel [1996] 1 Ll Rep 391, where Potter J went on to say (at page 396) that conduct by the creditor to the prejudice of the surety could be sufficient to discharge the guarantor. Moreover, there is a view, controversial but entirely open as a matter of law, that the guarantor will be discharged by any conduct by the creditor which is prejudicial to the guarantor. Support for that proposition is to be found in Black v Ottoman Bank (1862) 15 Moo PCC 472, a decision of the Privy Council[26].

53. Applying these principles, the proper analysis is this:

---

[26] O'Donovan and Phillips are of the view that there is no such principle (*op. cit.*, para 8-114). However, in the main case on which they rely, namely Bank of India v Transcontinental Commodity Merchants Ltd [1983] 2 Ll Rep 298, Robert Goff LJ expressly left the point open for future argument (at p 302).

(i)     Upon LBL entering administration, two variations to the parties' rights and obligations under the lease were imposed on the parties by statute:

(a) that the landlord could not exercise its forfeiture right under clause 8.1(c)(iii) of the lease without the leave of the administrators or the court (see Insolvency Act 1986, Schedule B1 para 43(4)); and

(b) that the rent while LBL continued to occupy any part of the premises for the purposes of the administration would be paid as an expense of the administration.

(ii)    These were statutory variations on the way in which the lease was to be performed. They were not, however, prejudicial to LBHI because although the landlord could not forfeit it would be paid in full while the administrators occupied any part of the premises, and that reduced any exposure under the guarantee from having the premises occupied by an insolvent tenant. The disadvantage imposed on the landlord by being deprived by statute of his right to forfeit was balanced by the advantage to it of not having to prove for the rent which continued thereafter to accrue and instead having a right to be paid it in priority to the general body of creditors as an administration expense.

(iii)   The Forfeiture Letter, which did operate contractually as between the landlord and LBL, then further varied the relationship between the landlord and LBL by LBL and the landlord agreeing retrospectively to treat the rent incurred while the administrators were in occupation as an ordinary liability of LBL and no longer an expense of the administration (but for £1.5 million).  That retrospectively removed the advantage to the landlord of having the rent treated as an expense of the administration but did not and could not allow the landlord any balancing restrospective forfeiture, but only prospective forfeiture.  It operated to vary with retrospective and irreversibly prejudicial effect to LBHI the terms on which the parties to the lease had been operating as varied by the statute.

54. So to summarise, the Forfeiture Letter was a contractual variation of an earlier statutory variation to the lease, or specifically, the agreed manner of its performance.  Both variations, even though not formal variations to the express language of the lease, would be variations

for the purposes of the rule in <u>Holme v Brunskill</u>. The earlier was not prejudicial to LBHI, and the latter was very much to its prejudice.

55. The variation meant that LBHI's commercial risk as guarantor was increased by being deprived of the legal protection of having the rent incurred while the administrators were in occupation paid 100% to the Landlord as and when it fell due by LBL (by its administrators), and instead it exposed LBHI to the risk, indeed the near certainty, that the Landlord would now, as an ordinary unsecured creditor, not recover 100% of that rent from LBL's estate but would turn to collect it (or at least the shortfall over what the Landlord can obtain in a distribution) instead from LBHI. To put it shortly, LBHI, as guarantor, incurred no risk in respect of LBL's liability for rent in respect of periods of occupation of the Premises because it would fall as a matter of law to be paid in priority as an administration expense and would always be timely paid by LBL 100%; but once the Landlord and LBL agree that that rent falls to be paid as an ordinary unsecured liability of LBL, LBHI is exposed to that risk.

(ii)    <u>The effect on LBHI's obligations</u>

56. Analysed in that way, the arrangements agreed under the Forfeiture Letter amounted to a variation. The variation was on any view prejudicial to LBHI (and the Rabinowitz Declaration does not appear to take issue with that). LBHI is accordingly discharged from all liability thereunder.

57. If I am wrong, and the Forfeiture Letter did not amount to a variation within the rule in <u>Holme v Brunskill</u>, there is nonetheless an alternative approach which leads to the same result, namely by the application of the principle in <u>Triodos</u>. LBHI never agreed to guarantee the payment of rent accruing due during the period after LBL had entered administration and for which the landlord only had a proof in the administration. The lease never contemplated such an arrangement, and that is why entry into administration gave the landlord the right to forfeit. The landlord would legitimately be expected by all parties to have exercised that right but for the statutory prohibition. The statutory prohibition, designed to protect the creditors of LBL, came at a price designed to give equal and opposite protection to the landlord, namely that the rent and other outgoings would be treated as an expense of the administration. It was never contemplated by the terms of the lease or the guarantee that LBL would be allowed to remain in occupation following its administration

26

but that the landlord should not have its priority right to rent. Such arrangements, and the concomitantly increased risk to the landlord of non-recovery from LBL, can fairly be said to lie outside the "purview" of the guarantee. The effect of the forfeiture letter was to create obligations which lay outside the purview of the guarantee and which are not, therefore, guaranteed at all.

**(8) The effect of the anti-release clause**

58. The Rabinowitz Declaration relies on sub-paragraphs 6(d) and 6(g) of schedule 4 to the lease to say that the application of the rule in Holme v Brunskill is excluded, and so LBHI remains liable.

59. Paragraph 6 provides as follows:

> **"No release of Surety**
> None of the following or any combination thereof shall release discharge or in any way lessen or affect the liability of the Surety under this Lease:
> ...
>
> (d) (subject to Section 18 of the Landlord and Tenant (Covenants) Act 1995, any variation of the terms of this Lease (including any reviews of the rent payable under this Lease) or the transfer of the Landlord's reversion or the assignment of this Lease.
> ...
>
> (g) any other act omission or thing whatsoever whereby but for this provision the Surety would be exonerated either wholly or in part (other than a release under seal given by the Landlord and/or the Management Company as the case may be."

60. It is important to keep firmly in mind the principles of construction I have set out above. Construed strictly and resolving any doubt in favour of LBHI as guarantor, the expression in paragraph 6(d) "any variation of the terms of this Lease" means just that. It is a reference to a formal variation of the express terms of the lease. It has no wider application to any variation in the mode of performance of the terms or any change to the relationship. It is the landlord's own case that the Forfeiture Letter did not effect any variation to the terms of the lease, and in the strict sense that is correct. However, as the cases to which I have referred show, the rule in Holme v Brunskill is not restricted in its application to those cases where there is a formal contractual variation, but can apply where the variation is not contractually binding but the parties agree or permit a varied mode of performance or proceed on that basis (Bank of Baroda v Patel (supra)). That is what happened here. If there is any doubt or ambiguity about that, it falls to be resolved in favour of LBHI.

61. Put another way, the language of paragraph 6(d) is not sufficiently clear and unambiguous, nor wide enough, to exclude the rule in <u>Holme v Brunskill</u> in all circumstances of its application, but only where it would be engaged by a formal variation to the terms of the lease.

62. As to paragraph 6(g), this is a very widely drawn catch-all. English courts have been very loath to allow creditors to use them to fix guarantors with liability that they otherwise would not have had: see e.g. <u>West Horndon Industrial Park Ltd v Phoenix Timber plc</u> [1995] 29 EG 137, where the guarantee contained a term which provided that the guarantor was liable to make good the principal's default *"notwithstanding.... any... act or thing whereby but for this provision the Guarantor would have been released"*, but the court held that it did not constitute *"a complete carte blanche to entitle the landlord to extract every and any additional burden from the surety."* In my opinion, paragraph 6(g) does not contain sufficiently clear and specific words to oust "the normal incidents of suretyship"[27]. Nor can paragraph 6(g) operate so as to impose on LBHI liabilities which are not "clearly and distinctly covered by the contract"[28].

63. In any event, neither paragraph 6(d) nor paragraph 6(g) can be relied upon to exclude the application of the <u>Triodos</u> principle. If, as I consider, LBL's liability for post-administration rent as an ordinary provable liability of LBL and not a priority expense of the administration is outside the purview of the guarantee, nothing in paragraph 6 can bring it within the purview of the guarantee.

**(9) <u>The effect of the forfeiture on LBHI's obligations</u>**

64. Even if the guarantee is not discharged, I consider that paragraph 1 of schedule 4 cannot assist the landlord. Mr Rabinowitz takes a different view, and at section I of the Rabinowitz Declaration he propounds an argument to the effect, in summary, that LBL was liable in damages for post-forfeiture rent as damages for breach of contract, and that LBHI is liable to indemnify the landlord in respect of that loss and damage under paragraph 1.

65. I disagree with Mr Rabinowitz' argument, at its every step, for the following reasons:

---

[27] Lord Jauncey in <u>Trafalgar House Construction</u> (*supra*).
[28] <u>Chitty</u>, (*supra*)

(i) Properly construed, paragraph 1 of schedule 4 is not two separate covenants, but one single covenant. As such, if LBL ceases to be bound by its covenants in the lease, so LBHI ceases to be liable in respect of them.

(ii) In any event, LBL never incurred any liability, and the landlord never had any claim, for damages for loss of rent after forfeiture. The law in England is that even if (which is itself not settled) a lease can be repudiated by the tenant by his non-payment of rent, the landlord has an election either to forfeit the lease or to ignore the repudiation, keep the lease on foot and claim rent when it falls due. He has no right to claim damages for loss of future rent. Contrary to what Mr Rabinowitz says at para 56(6) of the Rabinowitz Declaration, <u>Reichman v Beveridge</u> is direct authority (against him) on the point.

66. Before I turn to each of these points, I should draw attention to two matters at the outset. First, a lease is not in all respects an ordinary commercial contract, but an instrument that creates an interest in land[29]. The payment of rent is very closely tied to the right to use the land: see <u>United Scientific Holdings v Burnley BC</u> [1978] AC 904 at 935 per Lord Diplock. Once the landlord forfeits the lease, the land is no longer available for the tenant to use and the rent cannot fall due. I expand on this fundamental point below.

67. Secondly, it remains an open question whether the doctrine of termination by repudiatory breach applies to leases at all. Strictly speaking, the present state of the law is that, short of the Supreme Court it does not: <u>Total Oil (Great Britain) Ltd v Thompson Garages (Biggin Hill) Ltd</u> [1972] 1 QB 318 (CA). In <u>Hussein v Mehlman</u> [1992] EGLR 87, a county court judge[30] decided that the <u>Total Oil</u> case was no longer good law. In <u>Reichman v Beveridge</u> Lloyd LJ said since the issue was not directly before the court it would be wrong to decide it

---

[29] The limitations of leases as contracts is well illustrated by <u>PW & Co v Milton Gate Investments Ltd</u> [2004] 3 EGLR 103, Neuberger J, esp at para 73. In that case it was held that where a head tenant served an upwards notice to quit on the landlord, that would bring to an end the subtenancy as a matter of law (by the rule in Pennell v Payne [1995] QB 192) notwithstanding that the head tenant and landlord had agreed contractually that it would not.

[30] A county court judge is even lower than a high court judge in the English judicial hierarchy, and according to the English doctrine of precedent <u>Total Oil</u> was binding on him. It is fair to point out that the county court judge who decided <u>Hussein v Mehlman</u> later became a member of the Court of Appeal (Sedley LJ). It is also fair to point out that the modern view is that the doctrine of repudiation does apply to leases: see <u>Halsbury's Law of England</u> (2006 reissue), Vol 27(1) para 601. Lloyd LJ was in my view right in <u>Reichman</u> to treat the point as undecided authoritatively and the point remains open at Supreme Court level.

unnecessarily[31]. Mr Rabinowitz's entire opinion on this point rests, therefore, on the assumption that it is settled law that the doctrine of repudiation applies to leases, an assumption which is not sound.

(i)      Paragraph 1 of schedule 4: one covenant or two?

68. Mr Rabinowitz starts by accepting (at para 52) that because of the words in paragraph 1 *"until the Tenant shall cease to be bound by the Tenant's covenants"* LBHI would, following forfeiture, no longer be obliged to procure that LBL or itself perform the covenants in the lease. That is an important concession. However, he goes on to say that this does not matter because there is a second, separate, covenant within paragraph 1 that operates to make LBHI liable to indemnity the landlord for all losses and damages etc, and that this second covenant continues to apply even though LBL has ceased to be bound by its covenants.

69. I disagree. Paragraph 1 is a single covenant comprising a single obligation. That is clear from the opening words *"The Surety hereby covenants with the landlord and as <u>a</u> separate covenant with the Management Company as <u>a</u> primary obligation ..."* . The language is that of a single covenant and a single obligation. Accordingly, if the first part ceases to bite, the second part also ceases to bite.

70. Furthermore, the broader text demonstrates that the words *"and the Surety shall indemnify"* are not a separate self-standing obligation but simply follow on from and qualify the promise in first part of the paragraph. As I have said above, those words describe the extent of LBHI's obligation when performing its covenant to perform the lease if LBL does not. That is plain from the fact that the obligation to "indemnify" are expressly said to arise in respect of losses which arise out of the default of LBL *"in the performance and observance of any of its obligations and payment of any rents and other sums"*. So if LBL's liabilities have ceased because the Term has come to an end (which it did on re-entry by the landlord), then by definition so have LBHI's liabilities. It would be commercially absurd and internally inconsistent for paragraph 1 both to relieve LBHI from the obligation to perform LBL's

---

[31] In the last sentence of paragraph 56(6), Mr Rabinowitz says that the Court of Appeal expressly stated that issue of whether damages could be claimed was not *"directly in issue before us and it would be wrong to decide it unnecessarily."* He is wrong about that. In fact, the issue to which the Court of Appeal was referring (at para 42 of its judgment) was not the issue of whether damages could be claimed but whether the doctrine of repudiation applied to leases, which is a different (and *a priori*) issue.

covenants once LBL ceases to be bound to perform them, but nonetheless to impose liability on LBHI to indemnify the landlord for losses arising out of LBL's having failed to perform them. As Mr Rabinowitz rightly points out, English courts strain away from interpretations with commercially absurd consequences.[32] To read paragraph 1 as containing two separate promises (as Mr Rabinowitz does) involves having the second promise undermine the first, whereas to read it as a single covenant (as I do) not only ensures internal consistency but also reinforces the application of the principle of co-extensiveness which applies as the essential feature of schedule 4 as a guarantee.

71. Accordingly, since (as is common ground) LBHI ceased, following forfeiture, to be liable to procure that LBL perform the covenants in the lease or to do itself, there is no loss or damage arising out of LBL's default on which the words of indemnity can bite. Paragraph 1 cannot, therefore, be a basis for LBHI's liability. Instead, post-forfeiture, the landlord's remedies against LBHI are all contained in paragraph 7 (as to which see below). If Mr Rabinowitz' reading of paragraph 1 were correct it would render paragraph 7 unnecessary.

72. If this analysis is correct, it means that it is not necessary to get into the question of whether LBL (and hence LBHI) was liable for damages for the lost future rent. However, I shall address that issue any event.

(ii)    Damages for lost future rent?

73. Under English law a landlord cannot recover damages from a tenant for loss of rent after the lease has come to an end by forfeiture: see Reichman v Beveridge, para 36, Lloyd LJ[33]. Where the tenant is in breach of covenant, the landlord has an election to keep the lease on foot and continue to claim rent or to forfeit the lease and re-enter. He cannot both forfeit the lease and claim damages for the lost rent which would otherwise later accrue due during the remainder of the term.

74. The editors of the two principle practitioner's works on landlord and tenant law have adopted Reichman v Beveridge unquestioningly as stating the law: see Woodfall, Landlord and Tenant, para 7.315 (Release 90, October 2012), and Hill & Redman, Law of Landlord,

---

[32] See the Rabinowitz Declaration, paras 24(5) and (6).
[33] Rix and Auld LJJ agreed. It was a strong Court of Appeal. Rix LJ was and remains one of the foremost commercial contract lawyers on the appellate bench.

para 1543[34]. It is significant that, before <u>Reichman v Beveridge</u> was decided, the editors of <u>Woodfall</u> had (as Lloyd LJ pointed out at para 26) suggested, on the basis of some Commonwealth authorities, that a landlord might accept a tenant's repudiation and sue for future rent, but Lloyd LJ expressly disapproved that suggestion and the editors have consequently revised their text to remove it and to cite <u>Reichman v Beveridge</u> without criticism. Consequently this ought to be a very short point.

75. However, Mr Rabinowitz relies on <u>Rainey Bros Ltd v Kearney</u> [1990] NI 18, a decision of the Court of Appeal of Northern Ireland. I agree with him that Northern Irish decisions are to be afforded considerable respect in an English court. I also agree that the decision was founded entirely upon three earlier English cases and so is not a decision on purely Northern Irish law. However, I do not agree that an English court[35] would follow <u>Rainey v Kearney</u> in preference to <u>Reichman v Beveridge</u>. I believe that the English court would[36], if asked, say that <u>Rainey v Kearney</u> was wrongly decided.

76. <u>First</u>, the decision in <u>Rainey v Kearney</u> was *per incuriam*[37] a line of cases stretching back to the eighteenth century to the effect that the liability for rent will continue for so long and only for so long as the tenant remains in possession of the premises with the consent of the landlord. Compensation for use and occupation cannot be recovered as <u>rent</u> subsequent to the determination of the lease. That is why the landlord is never entitled to rent for the period following the service of a claim form in an action for possession for forfeiture, but only damages (or "mesne profits") and only in respect of such period as the tenant continues thereafter to occupy the premises against the landlord's interest: see <u>Birch v Wright</u> (1786) 1 Term Rep 378; <u>Jones v Carter</u> (1846) 15 M&W 718; <u>Franklin v Carter</u> (1845) 1 CB 750. In <u>Jones v Carter</u>, Parke B said (at page 726):

> "the bringing of an ejectment for forfeiture, and serving it on the lessee in possession, must be considered as the exercise of the lessor's option to determine the lease; and the option must be exercised once and for all ... for after such an act, by which the lessor treats the lessee as a trespasser, the lessee would know that he was no longer to consider himself as holding under the lease, and bound to perform the covenants contained in it; ..."

---

[34] The editors of <u>Hill and Redman</u> make the point there that the landlord has no duty to mitigate his loss, but must either forfeit or keep the lease on foot and recover the rent as it falls due: <u>United Scientific Holdings</u> (*supra*).

[35] The only relevant court for this purpose would be the UK Supreme Court, since at every judicial level below it <u>Reichman v Beveridge</u> would be binding precedent.

[36] That is to say, the UK Supreme Court. Any Court of Appeal faced with this question would be bound to follow <u>Reichman v Beveridge.</u>

[37] I.e. decided without citation of and in ignorance of the relevant cases.

77. The point is that if the landlord elects to forfeit, then the tenant has thereafter no interest in the land <u>at all</u> and no liability to pay future rent <u>at all</u>. Rent is special. It has been described in modern times as "axiomatic" that rent has four specific characteristics: it must be (1) a periodical sum (2) paid in return for the occupation of land, (3) issuing out of the land, and (4) for non-payment of which a distress is leviable: see <u>Escalus Properties Ltd v Robinson</u> [1996] QB 2312, at 233, Nourse LJ. So rent cannot fall due in respect of a particular period unless the tenant has the status of tenant with and interest in and possession of the land in respect of that period.

78. The kernel of the error in <u>Rainey v Kearney</u>, and in Mr Rabinowitz' adoption of that decision, lies in the mistaken assumption that a lease is in all respects like any other commercial contract which if repudiated, discharges both parties from their unperformed obligations but replaces them, by implication of law, with a secondary obligation to pay damages sustained in consequence of their non-performance[38]. However, future rent is different. As Lord Millett pointed out in <u>Re Park Air Services</u> [2000] 2 AC 172 (at page 187D-F):

> " ... rent is not a simple debt. It is the consideration for the right to remain in possession. The tenant's liability to pay future rent is not debitum in praesenti solvendum in futuro[39]. Its existence depends upon future events. Rent in respect of a future rental period may never become payable at all. Rent payable in future under a subsisting lease cannot be treated as a series of future debts making up a pure income stream."

79. More recently, as Neuberger J[40] said in <u>Active Estates v Parness</u> [2002] 3 EGRL 13:

> "If a landlord re-enters into possession of the demised premises, his action is inconsistent with the lease continuing, as I have already indicated, and, in particular, therefore, with the rent under the lease accruing thereafter. If the landlord cannot recover the rent from the tenant in respect of the period after his re-entry, he plainly cannot recover from a surety for non-payment of that rent."

80. Where a lease is forfeited by the landlord, the tenant's primary obligation to pay rent is discharged but unlike ordinary commercial contracts it is not replaced with an implied secondary obligation to pay damages sustained in consequence of the non-performance of that primary obligation. That is because forfeiture by the landlord is not merely the

---

[38] See <u>Photo Production Ltd v Securicor Transport Ltd</u> [1980] AC 827, at 849 per Lord Diplock.
[39] A debt obligation existing in the present and dischargeable in the future.
[40] Now Lord Neuberger, President of the Supreme Court. Before his appointment as a judge David Neuberger Q.C. was an eminent specialist practitioner in landlord and tenant law.

equivalent of the acceptance of a repudiatory breach by the tenant. It is the act by which the landlord regains possession of, and the tenant loses his interest in, the land and (if he remains in occupation) becomes a trespasser. Forfeiture removes the entire juridical basis for the prospective liability of the tenant for rent. The landlord cannot simultaneously treat the tenant as liable for lost future rent as an unperformed future obligation and regain possession of the premises, since the latter removes the foundation for the former. Where a lease has been terminated by forfeiture, there is in my opinion no room, as there is in ordinary contracts, for the implication of a secondary obligation to pay damages for the lost future rent. That is why the landlord has an election between having the premises and having the rent. He cannot have both[41].

81. If Rainey v Kearney were rightly decided, it would require the overruling of two hundred years of settled law, at the highest level, as to the particular characteristics of rent and its relationship with the right to possession and forfeiture[42]. There is no policy reason that I can see why the UK Supreme Court would consider such a step justified. The fact that courts in the Commonwealth have taken a different approach is not itself a good policy reason. It is also worth pointing out that Reichman v Beveridge has stood for six years and has not to my knowledge provoked either academic or judicial criticism or any adverse reaction from the UK property industry. One's admiration for the industry which led to the discovery by Mr Rabinowitz of Rainey v Kearney must be tempered by the fact that Rainey v Kearney is not cited in any of the major textbooks on landlord and tenant law in England and has not been considered or even cited in any case in England ever. There are usually good reasons why decisions lie undiscovered for decades.

82. Secondly, the three first instance cases on which the Court of Appeal relied in Rainey v Kearney, on closer analysis, are at best very slender support for the far-reaching proposition that the landlord may both forfeit the lease and claim damages for the lost future rent. First, they were all decided at a time when the law was thought to be[43] that a lease could not be repudiated. Secondly, there does not appear to have been any argument on this particular point in any of them. Thirdly, they were all likewise *per incuriam* the line of English cases on the nature of forfeiture and the liability for rent.

---

[41] There is a statutory exception to that rule in in cases where the liquidator of the tenant disclaims the lease (see below).
[42] It would also have been referred to in Re Park Air Services (supra).
[43] As it still may be.

83. A closer study of the three cases reveals the following:

(i)     Marshall v Mackintosh (1898) 78 LT 750. This was a case about a building agreement, not a lease. The defendant builder was not in possession under a lease and the effect of the breach of the building agreement was that the proposed lease would not be granted. At the time of the breach the time had not yet come for him to pay the rent. He had no interest in the land: see Marquis of Camden v Batterbury (1859) 5 CBNS 808, at 816 (affd (1860) 7 CBNS 864)[44]. The building agreement was treated as an ordinary contract and the issue about the difference between a lease and an agreement for a lease did not arise. In Rainey v Kearney the Court of Appeal of Northern Ireland dismissed the argument based on the differences between a lease and an agreement for a lease but cited no cases and devoted no analysis in support of its rejection of that distinction.

(ii)    Gray v Owen [1910] 1 KB 622. In that case Bucknill J did not actually award damages by way of lost rent for the remainder of the term of the lease, but only in respect of the rent accruing in the interval between the surrender and the re-letting.

(iii)   William v Lewis [1915] 3 KB 493. This case was about a series of alleged breaches of covenant of an agricultural tenancy where the breaches related to the condition in which the outgoing tenant had left the land at the end of the lease and the manner in which he had farmed it during the term[45]. It was not a case concerned with termination of the lease for breach of covenant and it involved no forfeiture. The landlord claimed damages by reference to the damage to his reversionary interest by reason of the breach of covenant relating to farming, which the court held could be measured by reference to lost future rent. Not all breaches of covenant will damage the reversionary interest. There is no reason why breach of the covenant to pay rent would ordinarily do so. There is no claim in this case that LBL damaged the landlord's reversionary interest by any breach of covenant.

84. Thirdly, it is important to note that the only instance in which the landlord is ever entitled to damages for lost future rent is following disclaimer, under section 178(6) of the Insolvency

---

[44] Beyond perhaps a tenancy at will, but one under which no rent was reserved.
[45] The case is principally about whether an agricultural tenant in the nineteenth century had an obligation to the landlord to do more than husband the land in accordance with the custom of the country. The tenant was found in breach of that obligation.

Act 1986. The statutory right is to be calculated in the same way as damages for breach of contract: see Re Park Air Services (supra) at page 180 B-E, per Lord Hobhouse; page 184D per Lord Millett. However, as Lord Millett pointed out in that case, the introduction of the statutory right of disclaimer in 1929 was to cure disadvantages for the landlord and the liquidator alike. So far as concerned the landlord, before 1929, where the tenant went into liquidation, although the landlord could forfeit the lease and re-let the property he would lose the right to future rent under the lease, for he could not have both possession and he could not obtain compensation for the consequences of his own action in forfeiting the lease (see Lord Millett at page 184B). If the law in England was as per Rainey v Kearney, the rationale for the introduction of the statutory right of disclaimer would disappear, and there would be no need for Parliament to have given the landlord an express right to claim damages (which include damages for future rent). It should go without saying that where the lease is forfeited by the landlord and not disclaimed by the tenant's liquidator the landlord has no right to damages for future rent.

85. For these reasons, I do not share Mr Rabinowitz' confidence that the UK Supreme Court would follow Rainey v Kearney and overrule Reichman v Beveridge. On the contrary, I think that it would follow Reichman v Beveridge and refuse to follow Rainey v Kearney.

86. Mr Rabinowitz also relies (at footnote 28) on a decision of the Supreme Court of Victoria in Nangus Pty Ltd v Charles Donovan Pty Ltd (in liq) [1989] VR 1984. However, I would not regard that as persuasive enough authority to tempt a UK Supreme Court to overrule Reichman v Beveridge. First, the issue of whether a lease can be repudiated was conceded by the guarantor (and in any event appears to be settled law in the state of Victoria). Secondly, the guarantor neither cited authority to support his proposition - a fact that the court held against him – nor sought to argue it from first principles by reference to the early cases and the peculiar nature of rent. Thirdly, the landlord's response was simply to say that future rent fell to be recovered as an ordinary head of damages for loss of bargain, which rather assumes the conclusion.

87. In summary, therefore, LBL's obligation to pay rent terminated when the term came to an end on forfeiture. LBL had no liability for future rent, whether as damages for lost rent or at all. There is nothing in paragraph 1 of schedule 4 either to create such a liability in LBL nor

to impose it on LBHI. Paragraph 1 imposed co-extensive liability, and if LBKL was not liable (which it was not) neither was LBHI.

88. The scheme and intention of schedule 4 was that it would be paragraph 7 of schedule 4 which provide the remedies open to the landlord on forfeiture and not paragraph 1. I now turn to paragraph 7 of schedule 4.

(10)      **The meaning and effect of paragraph 7 of schedule 4**

89. Where the lease is forfeited by the landlord and the term terminates, the sole remaining source of guarantee liability in respect of covenants in the lease that are yet to be performed and will now not be performed by LBL is paragraph 7. That is because the lease has come to an end and paragraph 1 provides that LBHI's liability as guarantor ends when LBL's liability as tenant ends. Paragraph 7 starts with the words "further covenant" because it is just that, a separate covenant, necessitated by the fact that if the lease was forfeited or the tenant ceased to exist, the landlord would be wholly without any remedy against LBHI in respect of any period following the forfeiture of the lease by virtue of paragraph 1.

90. I should point out at the outset that this is <u>not</u> so where the lease is disclaimed, since in that event section 178(4) of the Insolvency Act expressly preserves the liability of third parties (such as guarantors), and paragraph 2 of schedule 4 serves to confirm that LBHI would be liable notwithstanding any disclaimer for the fulfilment of the obligations of LBL under the lease. So if there was a disclaimer by LBL, the landlord would have a statutory claim under section 178(6) for damages for future rent (and it is arguable that under paragraph 2 of schedule 4 LBHI would be liable for that sum[46]). However, paragraph 7 also covers the situation where the lease has been disclaimed. That overlap is a historical quirk and is explained by the fact that, as the Rabinowitz Declaration rightly points out at footnote 29, these kinds of provisions were inserted in order to guard against the effect of disclaimer, which from 1901[47]until 1997 was thought to operate to discharge a guarantor from liability. However, the fact that there is an overlap between paragraphs 1 and 2 and paragraph 7 in

---

[46] My own provisional view is that such argument would not succeed because the liability of LBL to the landlord damages under section 178(6) is not clearly an obligation of LBNL "under this Lease" under paragraph 2. However, it is not necessary for me to reach a concluded view on that point.

[47] <u>Stacey v Hill</u> [1901] 1 KB 660 was a case involving individuals. The statutory right of disclaimer was introduced by the Bankruptcy Act 1869 with regard to individuals, and in respect of companies by section 267 of the Companies Act 1929.

the case of a disclaimer does not mean that there is an overlap in the case of forfeiture. Much of Mr Rabinowitz' view is based on an erroneous failure to treat disclaimer and forfeiture separately. In particular, paragraphs 65 to 67 of the Rabinowitz Declaration tend to ignore both the effect of section 178(4) of the Insolvency Act 1986 and the fact that paragraph 2 only refers to disclaimer whereas paragraph 7 refers to both disclaimer and forfeiture.

91. Accordingly, so far as concerns disclaimer, I would agree with Mr Rabinowitz that paragraph 7 provides for an additional remedy against LBHI in the case of <u>disclaimer</u>; but he is, I think, wrong to extend that conclusion to cases of <u>forfeiture</u>, where in my view paragraph 7 is the sole remedy as against LBHI. <u>Shaw v Doleman</u> [2009] 2 BCLC 123, on which Mr Rabinowitz relies, is not of assistance to him because it is all about disclaimer and it turns on the rather different wording of the particular guarantee in that case.

92. My view applies to both paragraph 7(a) and 7(b). I agree with paragraph 63 of the Rabinowitz Declaration as far as it goes, but I disagree that it is without prejudice to the landlord's rights under paragraph 1. Once the lease has been forfeited and the term has ended, LBL and LBHI alike have no further liability to perform and observe the covenants in the lease and (as I have said) have no liability for post-forfeiture damages for lost future rent.

93. As to Mr Rabinowitz' purported "test" in paragraph 64:

   (i)    Sub-paragraph (1) assumes too much. Where the lease is forfeited, LBL can still remain liable for breaches of covenant by LBL which have accrued during the term, and LBHI is liable as guarantor for those. LBHI would be liable under paragraph 1 in respect of rent which had accrued due but had not been paid prior to forfeiture, but in respect of the period post forfeiture, paragraph 1 has no operation. As I say, any damages flowing from breaches of covenant during the term (eg repairing covenants) would be covered by paragraph 1.

   (ii)   Sub-paragraphs (ii) and (iii) proceed on the misapprehension that LBHI is arguing that if the lease if forfeited, then the breach of covenant that occasioned it cannot sound in damages and be covered by the indemnity. That is not LBHI's case. LBHI's case is far simpler. Forfeiture is not just a reaction by the landlord to a breach but

38

the exercise of a landlord's remedy in itself, and one with a substantive effect on the term. Since it terminates the term, rent is not payable thereafter and the tenant is not in default for not paying it thereafter. That being so, LBHI cannot be liable under the guarantee for any post-forfeiture rent. Any serious breaches by LBL that occasion loss to the landlord during the currency of the term are of course picked up by paragraph 1.

94. The purpose of paragraph 7 is to give the landlord an option, where the lease has been forfeited, either to put an identical lease onto LBHI or else (at the landlord's election) to recover on demand from LBHI 180 days of rent that *"would have been payable under this Lease but for the disclaimer or other event."* It gives the landlord up to 180 days of rent which he would not have got but for clause 7.[48]

### (11)    The alleged anticipatory breach of paragraph 7

95. This is a short point. Under English law an anticipatory breach occurs when, before the time arrives at which a party to an executory contract is bound to perform, he expresses an intention not to do so, or acts is such a way as to lead a reasonable person to conclude that he does not intend to fulfill his part: <u>Chitty</u> Vol 1 para 24-022.

96. In the leading case of <u>Hochster v de la Tour</u> (1853) 2 El & Bl 678, Lord Campbell CJ's explanation of the doctrine proceeds entirely on the basis that there is in existence a binding contract, and that the parties are in a contractual relationship even before the day for performance has arrived. The need for a binding contract is also clear from Lord Wrenbury's exposition of the doctrine in <u>Bradley v H Newsom Sons & Co</u> [1919] AC 16, at page 53:

> "There can be no breach of an obligation in anticipation. It is not breach not to do an act at a time when its performance is not contractually due. If there be a contract to do an act at a future time, and the promisor, before that time arrives, says that when the time does arrive he will not do it, he is repudiating his promise which binds him in the present, but is in no default in not doing an act which is only to be done in the future. He is recalling or repudiating his promise, and that is wrongful. His breach is a breach of a presently binding promise, not an anticipatory breach of an act to be done in the future."

---

[48] Presumably, if the lease had been disclaimed by LBL's liquidator, the landlord would give credit in his proof for damages under section 178(6) for any recoveries he would or could have made under paragraph 7.

97. Although it is possible to commit an anticipatory breach of a contingent obligation, the leading cases on that point[49] are cases where the contingency was outside the control of the innocent party and in any event related to the conditions for the performance of the obligation on the future date. There is no case to my knowledge where the contingency was the act of the innocent party himself bringing the relevant binding contract into being in the first place.

98. In this case, since the landlord had given neither notice nor demand, there was no obligation for LBHI to perform or to breach. The existence of any obligation binding on LBHI to take a new lease or pay up to 180 days rent following the forfeiture was conditional upon the landlord's giving of the notice or making of the demand. Only once that notice was given or demand made did any obligation binding on LBHI come into existence. Until that point, the landlord had merely a put option. The landlord's put option was either an irrevocable offer by LBHI or a conditional contract, but on no view was it an unconditionally binding agreement: see Spiro v Glencrown [1991] Ch 537; Active Estates Ltd v Parness [2002] BPIR 865[50]. Either way, in order to be exercised, the conditions of exercise must be strictly complied with: United Scientific Holdings Ltd v Burnley BC [1978] AC 904. Once it is exercised, a binding contract comes into existence: Basch v Stekel [2001] L & TR 1, per Chadwick LJ at para 27. As Lord Simon of Glaisdale put in in United Scientific Holdings (supra),

"the parties, on the exercise of the option, are brought into a new legal relationship."

99. Accordingly, it follows that a party to a contract cannot commit an anticipatory breach of a conditional obligation before the time that the condition is satisfied and obligation has become binding on him, at least where the fulfillment of the condition lies entirely in the other party's hands. If the grantee of the option decides, for whatever reason, not to exercise the option so as to bring about the new legal relationship, then there is no obligation in respect of which the grantor of the option could be in breach.

100.     The Rabinowitz Declaration confuses a binding executory contract with an option. They are not the same. Paragraph 7 conferred an option on the landlord. It was up to the

---

[49] Frost v Knight (1872) LR 7 Ex 111; Synge v Synge [1894] 1 QB 466.
[50] In Active Estates v Parness Neuberger J was dealing with a clause almost identical to paragraph 7 of schedule 4 (save that it had no reference to forfeiture in it). He held that it was a put option and that the reasoning of Hoffman J in Spiro v Glencrown applied to it.

landlord whether or not to satisfy the condition for paragraph 7(a) or (b) by serving a notice or making a demand. It chose not to do so. Whether or not influenced in that decision by anything said by LBHI, its choice meant that no obligation under paragraph 7, executory or otherwise, ever came into existence at all. That being so, there was no obligation for LBHI to breach, anticipatorily or at all.

101.    In addition, it was a pre-requisite of the landlord's right to exercise its option that it first forfeit the lease. The discussions on which the landlord relies to say that LBHI anticipatorily breached its obligations under paragraph 7 all occurred even before the landlord effected forfeiture on 10 December 2008. So the contract which LBHI is said to have breached was, at the time of its alleged breach, doubly conditional.

102.    Furthermore, as a matter of fact, LBHI did not express any intention to the landlord, or act in any way so as to lead a reasonable person to conclude, that it would not comply with a notice from the landlord under paragraph 7(a) or a demand under paragraph 7(b). The fact that objectively it was likely not to do so is not the point: what is needed is some actual word or deed from LBHI. A reasonable assumption that, <u>had</u> the landlord served a notice, LBHI would not have complied is not enough. On the facts of this case, as the e-mail correspondence at appendix 3 of this opinion shows, LBHI only said that it would not take up a new lease because the Landlord had demanded confirmation of that fact in order to be able to continue to pursue the deal with JPM untroubled by any competition for the lease by LBHI, and as the condition for allowing LHBI sight of the new lease documentation. The Landlord can hardly complain that LBHI, in doing what it was invited to do, breached its obligation under clause 7. In short, the Landlord elected not to require LBHI to take up a new lease, and having done so it cannot complain that LBHI was in breach in not doing so.

103.    Accordingly, for all these reasons I disagree that the landlord is entitled to the rents that it would have received under a new lease to LBHI (less the amounts received from JPM under the new lease) by way of damages for anticipatory breach of contract.

104.    Further, and in any event, once the premises were re-let to JPM on 20 December 2008, it was thereafter impossible for the landlord either to seek to put a new lease onto LBHI under paragraph 7(a) or to claim any rent under paragraph 7(b). The landlord cannot claim damages in respect of the period after 20 December 2008. So under the proper measure of damages the landlord would be confined to its loss between the date on which

LBHI indicated that it would not take a new lease and 20 December 2008 when the JPM lease was executed. That is no more than a few days.

### (12)     Dilapidations, service charges and costs

105.     The Rabinowitz Declaration assumes that LBHI's objection to liability for these sums is that they amount to a penalty. That is not the basis of LBHI's objection, and there is nothing about penalty in the Objections.

106.     LBHI's complaint is simpler. It is that the landlord has not proved its case by discovery or other evidence as to its losses. It has not proved that it has sought to enforce the repairing covenants against the sub-tenants (JLL or Nomura). It has not sought to prove that it served a notice of dilapidations on LBL or LBHI. It has not provided any evidence as to the state of the premises when JPM went into occupation. LBHI has been given no evidence as to the extent and cost of the dilapidations. Nor is there any evidence of the basis on which JPM calculated its discount to reflect the fitting out of the premises to its requirements, and (crucially) the extent to which that discount was for reinstatement as opposed to fitting out for JPM's own use and benefit (for which neither LBL nor LBHI could be liable). In the case of a covenant to keep in good repair, the measure of the landlord's loss is limited by section 18(1) of the Landlord and Tenant Act 1927 to the diminution in the value of the reversion owing to the breach of covenant, and therefore the landlord needs to prove the value of the reversion of the Premises as affected by the alleged breaches of the repairing covenants, and it is not sufficient to discharge that burden by reliance on the price fetched for the premises under the transaction with JPM. The proper processes must be followed: see Baroque Investments Limited v Heis [2012] EWHC 2886, esp paras 14 to 17.

107.     Accordingly, I express no opinion for the time being as to matters of law covered by Mr Rabinowitz at section L of the Rabinowitz Declaration, although I reserve the right to do so should the need arise.

108.     There is one point in the Response to Objection which Mr Rabinowitz has not covered but which I have been asked to deal with. Response paragraph 28 refers to the Tenant's failure to reinstate following the administrator's vacation from the building. The obligation under clause 4.10 of the lease is a traditional English law yielding-up covenant

which applies at the "expiration or sooner determination" of the term, i.e. the obligation arose only at the time that the lease was determined on forfeiture in December 2010 and not March 2010.

**(13)      General conclusion**

109.      I refer back to the summary of conclusions under Section (3) of this Declaration. My general conclusion is that, to the extent that they rely upon English law, LBHI's Objections are well founded.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on ___10 January___ 2013

_____
RICHARD MILLETT Q.C.

43

APPENDIX 1



**RICHARD MILLETT QC**
Born 1961

Essex Court Chambers    Tel: +44 (0) 20 7813 8000
24 Lincoln's Inn Fields    Fax: +44 (0) 20 7813 8080
London WC2A 3EG    Email: rmillett@essexcourt.net
United Kingdom

**Richard Millett QC** is a leading commercial and chancery litigation silk with an international practice, particularly in the corporate and banking fields.

*Legal 500* 2011 ranks Richard Millett QC as a leading silk in five categories: banking, commercial litigation, energy, insurance and reinsurance and media and entertainment.

*Chambers & Partners* 2011 ranked Richard Millett Q.C as a leading silk in four categories: banking and finance, commercial dispute resolution, international arbitration and offshore litigation.

Current cases of interest

Acting for Explorer Fund in the multi-million dollar litigation brought by Liongate Select Fund in a dispute about the validity of redemptions and its status as creditor.

Acting for Renova and Viktor Vekselberg in Cayman in a derivative action relating to a private equity fund and the wrongful diversion of the Faberge brand (*Renova Resources v Gilbertson*).

Acting in Cayman for the liquidators and shareholders of a structured fund vehicle in relation to a loan agreement and derivative product relating to Lehman Bros; part of the *Anthracite* litigation.

Acting for Kuwait Airways Corporation in their ongoing efforts to enforce their US $1.2bn judgments worldwide against IAC.

Acting for a Russian Government entity in a very substantial London arbitration arising out of a major construction project in Moscow.

The *Antonio Gramsci* litigation (piercing the corporate veil and Article 23 agreements in a substantial alleged corporate group fraud).

The *Pacific China Group* case (about enforcement of New York Convention awards) to go from the Eastern Caribbean Supreme Court to the Privy Council in 2013.

Advising several Madoff client groups in the BVI litigation brought by the liquidators of Fairfield Sentry.

Some recent cases of interest (2010-2012)

*Cadogan Oil v Tolley,* the first decision about proprietary claims to the fruits of alleged bribes after *Sinclair v Versailles.*

Acting for Sir Jack Hayward and the trustees of his family trusts in the Bahamian court in the claims brought by the beneficiaries.

Acting for *Danone* in a US $ billion worldwide fraud litigation (BVI, Seychelles, Samoa).

The € multi-billion *Elektrim* litigation and arbitrations.

Acting in litigation for the heirs to the fortune of Loucas Haji-Ioannou in their litigation against John Frangos.

Acting for a Cayman hedge fund in a claim against Barclays Capital over product mispricing.

Specialist practice areas

- Arbitration and arbitration-related litigation
- Banking, Securities, Derivatives and offshore company litigation
- Chancery
- Commercial Litigation
- Company Law
- Insolvency & Corporate Recovery
- Insurance & Reinsurance
- Media & Entertainment
- Mediation
- Professional Negligence
- Public Procurement Contracts
- Restitution
- Telecommunications

Legal publications

He is co-author, with Geraldine Andrews QC, of Andrews and Millett on the Law of Guarantees (6th Edition, 2011).

He is editor of Run-Off Management and Commutations in Practice (IIL, 2006).

He is editor of the 2004 reissue of Halsbury's Laws on Guarantees (Vol 20(1)).

Career

| | |
|---|---|
| 2010 | Appointed Civil Recorder (Chancery). |
| 2010 | Called to St Kitts and Nevis Bar (specific case) |
| 2009 | Called to Cayman Bar (for various cases) |
| 2007 | Called to Anguilla Bar (permanent) |
| 2006 | Called to Cayman Bar  (for various cases) |
| 2005 | Called to BVI Bar (permanent) |
| 2003 | Silk |
| 2000—03 | Treasury A Panel |
| 1990 | Essex Court Chambers |
| 1987—92 | Panel Member, Counsel to the Department of Trade and Industry for company directors' disqualifications |
| 1986 | Chambers of Peter Whiteman QC, Temple |
| 1985 | Call: Lincoln's Inn |

Education

University of Michigan (1980)
BA (Classical Tripos Pt 1, Law Tripos Pts Ib and II) Trinity Hall, Cambridge University (BA 1984)
Inns of Court School of Law
Megarry Prize for Landlord and Tenant Law (1985)

Awards

Megarry Prize for Landlord and Tenant

Languages

French (working knowledge)

Member and further professional qualifications

Also called to the Bars of Isle of Man, Bermuda and The Seychelles for specific cases (all within past four years).

Chancery Bar Association
Commercial Bar Association (COMBAR)
London Common Law and Commercial Bar Association
Royal Television Society