# Exhibit 24



Neutral Citation Number: [2006] EWCA Civ 1659

Case No: 2005/2438

**IN THE SUPREME COURT OF JUDICATURE**
**COURT OF APPEAL (CIVIL DIVISION)**
**ON APPEAL FROM THE GUILDFORD COUNTY COURT**
**HIS HONOUR JUDGE REID Q.C.**
**ON APPEAL FROM DISTRICT JUDGE KUBIAK**

Royal Courts of Justice
Strand, London, WC2A 2LL

Date: 13 December 2006

Before:

**LORD JUSTICE AULD**
**LORD JUSTICE RIX**
and
**LORD JUSTICE LLOYD**

Between:

| | |
|---|---|
| (1) ROBERT REICHMAN<br>(2) MONICA DUNN | Claimants<br>Respondents |
| - and – | |
| (1) SARAH BEVERIDGE | Defendant |
| (2) MATTHEW GAUNTLETT | Defendant<br>Appellant |

The Appellant in person
The Respondents not present or represented
**Amanda Tipples** (instructed by **The Treasury Solicitor**) as advocate to the court

Hearing date: 13 November 2006

# Approved Judgment

**Lord Justice Lloyd:**

1. The Defendants were in practice together as solicitors in partnership, under the style Beveridge Gauntlett. They had offices in Yateley, Hampshire, which they held as tenants under a lease dated 30 August 2000 from the Claimants as landlords, for a term of 5 years from 26 January 2000. For reasons which do not matter for present purposes, they ceased to practise as solicitors in February 2003 and had no further need for the offices. They did not pay the rent due on 25 March 2003, or thereafter, nor the water rates due after that date. In January 2004 the Claimants sued for the arrears due up to then, seeking only a money judgment for the sums due. Mr Gauntlett, the Second Defendant, served a Defence in which, among other things, he said that the Claimants had failed to mitigate loss arising from any non-payment of rent. He said that the Claimants were fully aware of the plight of the Defendants which led to their ceasing to practise as solicitors, "but failed to forfeit the lease in order to mitigate their own loss". The First Defendant took the same point in her Defence.

2. Something of the factual context of the case can be gathered from Mr Gauntlett's Defence, in which, after the passage referred to above, he said that the landlords' agent at first indicated that they would accept the offer of someone who was their tenant of other premises to take a new lease of the premises let to the Defendants, surrendering her own, that the agent then said that compensation would be necessary for that to be allowed, and finally that no such surrenders would be allowed. The First Defendant put it succinctly in her Defence: the landlords failed to instruct agents to market the premises, failed to accept the offer of a prospective tenant who wanted to take an assignment or a new lease, and failed to accept an offer from the First Defendant to negotiate payment of a consideration for a surrender of the Defendants' lease.

3. Rather than investigate the contentions on the facts, a Deputy District Judge was persuaded to order a preliminary issue as to "whether it is necessary as a matter of law for a landlord to mitigate his loss when seeking to recover arrears of rent." That issue came before District Judge Kubiak on 1 February 2005. She held that a landlord was under no such duty. Mr Gauntlett appealed. The appeal was heard by His Honour Judge Reid Q.C. On 17 October 2005 he handed down a reserved judgment dismissing the appeal. Mr Gauntlett appeals to this court, with permission granted by Chadwick LJ. Mr Gauntlett appears in person, as he has throughout these proceedings. Miss Beveridge has taken no part in the proceedings since the hearing before the District Judge, at which she was professionally represented. The Claimants, having been represented by Counsel in the courts below, have chosen not to take part on this appeal, contending that the judge was right for the reasons he gave. In those circumstances the court was faced with the prospect of grappling with a point of law of sufficient importance to have justified the grant of permission for a second appeal but with argument only from one side. Fortunately, we have had very helpful submissions from Miss Tipples as advocate to the court, supported by a full and learned skeleton argument which is plainly the result of thorough research.

**The lease**

4. There is nothing unusual about the lease. I have mentioned the term. The rent was £23,010 per annum, payable monthly in advance, and the tenants were also liable to

08-13555-mg    Doc 43540-25    Filed 03/14/14    Entered 03/14/14 11:42:50    Exhibit 24
Pg 4 of 16
A.45

Judgment Approved by the court for handing down.                    Reichman and Dunn v Beveridge and Gauntlett

pay by way of rent the amount of any insurance premium incurred by the landlord for insuring the premises against specified risks. There were normal covenants by the tenants to pay outgoings and to keep the premises in proper repair and decoration, to use the premises only as offices, and not to assign or underlet, part with or share possession of the premises except by way of what were called a permitted assignment or a permitted underlease of the whole, on defined terms, and not in those cases without consent. The lease contained a proviso for forfeiture in the event (among others) of rent being unpaid for 14 days. The lease was excluded from the protection of Part II of the Landlord and Tenant Act 1954.

5. A number of provisions in the lease allowed the landlords or their representatives to enter the premises otherwise than by way of forfeiture. Clause 3.9 related specifically to the inspection of the state of the premises and, if the tenants did not do work which was specified to them, allowed the landlords to enter in order to have the work done. Clause 3.10 gave a right of entry if that were necessary for work to the building as a whole or to the rest of the building. Clause 3.18 required that the landlords be allowed to enter, within 6 months next before the expiration or sooner determination of the term, to advertise the premises for re-letting and that persons authorised by the landlords be permitted to view the premises on reasonable notice.

**Leases as contracts**

6. At the heart of Mr Gauntlett's argument is the proposition that a lease is a contract, even though it also creates an estate in land, that the courts have recognised increasingly over recent years that the rights and obligations of the parties should be ascertained by reference to principles of contract law, and that there is no reason why that should not also apply to the consequences of a breach of the tenant's covenant to pay rent. He relied on this striking passage in a judgment of Bollen J in the Supreme Court of South Australia:

> "There is no reason why in modern times mitigation of damage should not apply. It is an ordinary principle of contract law. With modern leases the law should recognise the importance of the contractual aspect of a lease. Why should not a landlord faced with abandonment take steps to try to reduce his loss? Why should a vendor of tomatoes faced with refusal to take delivery by his purchaser suffer if he does not sell if he can to another purchaser and yet a quiescent and immobile landlord not suffer if he fails to seek another tenant? Modern ideas say that there is no reason for this anomaly." See *Vickers v Stichtenoth Investments Pty Ltd* (1989) 52 SASR 90 at 100.

7. The contractual nature of a lease has been emphasised by the House of Lords in several cases over the last thirty years. In *United Scientific Holdings Ltd v Burnley Borough Council* [1978] AC 904, Lord Diplock said at 935:

> "The mediaeval concept of rent as a service rendered by the tenant to the landlord has been displaced by the modern concept of a payment which a tenant is bound by his contract to pay to the landlord for the use of his land."

08-13555-mg Doc 43540-25 Filed 03/14/14 Entered 03/14/14 11:42:50 Exhibit 24 Pg 5 of 16 A.45

Judgment Approved by the court for handing down. Reichman and Dunn v Beveridge and Gauntlett

Accordingly the rights and obligations of the parties in respect of rent, and in particular under rent review clauses, had to be determined as a matter of the construction of the contract, just as payment obligations would be under any other contract.

8. The potential application of the doctrine of frustration to leases (albeit only very exceptionally, and not on the facts of the particular case) was established in *National Carriers Ltd v Panalpina (Northern) Ltd* [1981] AC 1965.

9. The fact that a contractual periodic tenancy held by more than one tenant could be determined by any one of them giving notice to the landlord, without the need for all to join, was established in *Hammersmith and Fulham London Borough Council v Monk* [1992] 1 AC 478. Lord Bridge said of that issue, at 483:

> "As a matter of principle I see no reason why this question should receive any different answer in the context of the contractual relationship of landlord and tenant than that which it would receive in any other contractual context."

10. Elsewhere in the judicial hierarchy, Mr Assistant Recorder Sedley Q.C., as he then was, held in the county court in *Hussein v Mehlman* [1992] 2 EGLR 87 that a lease could be brought to an end by the tenant's acceptance of a repudiatory breach by the landlord. He held that a decision of the Court of Appeal to the contrary in *Total Oil Great Britain Ltd v Thompson Garages (Biggin Hill) Ltd* [1972] 1 QB 318 could no longer stand after *National Carriers*. Since then, other courts in England have held, or assumed, that a lease can be brought to an end by acceptance of a repudiatory breach, but there is no decision to that effect in this court.

11. There is no doubt that, where a party to a lease seeks to recover damages from the other for breach of covenant under the lease, the rules about mitigation of loss will apply.

12. However, Mr Gauntlett seeks to go further than that, and to establish that the same rule applies even if the landlord does not terminate the lease for breach of the tenant's covenants, but merely sues for each instalment of rent as it falls due. This proposition is not, in truth, part of the principles relating to mitigation of damages properly so-called, which apply only if the claim is for damages. The landlord's claim for rent is in debt and the rule does not apply to a claim in debt: see *Jervis v Harris* [1996] Ch 195. The principle to which Mr Gauntlett seeks to have recourse is, however, analogous to the doctrine of mitigation of loss: see McGregor on Damages, 17th edition, paragraph 7-030. It is based on words of Lord Reid in his speech in *White and Carter (Councils) Ltd v McGregor* [1962] AC 413, at 431.

**What Lord Reid said in *White and Carter (Councils) Ltd v McGregor***

13. In that case Mr McGregor contracted with the appellants for them to display advertisements for three years on litter bins. The contract was made on his behalf by an employee, without specific authority. As soon as he heard about it, on the very day it was made, he sought to cancel the contract. This was no doubt a repudiation of the contract, but the appellants did not accept it. They proceeded to do all that was required of them under the contract, and to sue Mr McGregor for the contractual sums

due. No act in pursuance of the contract had yet been done by the time of the repudiation, but Mr McGregor's co-operation was not necessary for the Appellants to do that which they were obliged to do under the contract.

14. The House of Lords, reversing the lower courts in Scotland, held by a majority that, faced with a repudiation of the contract, the innocent party may accept the repudiation and sue for damages, but he may alternatively disregard or refuse to accept the repudiation and then the contract remains in full effect: see Lord Reid at [1962] AC page 427, and Lord Hodson at page 445, with whom Lord Tucker agreed: page 434. The decision in the case is of no help to Mr Gauntlett. However, at page 431 Lord Reid said this:

> "It may well be that, if it can be shown that a person has no legitimate interest, financial or otherwise, in performing the contract rather than claiming damages, he ought not to be allowed to saddle the other party with an additional burden with no benefit to himself. If a party has no interest to enforce a stipulation, he cannot in general enforce it: so it might be said that, if a party has no interest to insist on a particular remedy, he ought not to be allowed to insist on it. And just as a party is not allowed to enforce a penalty, so he ought not to be allowed to penalise the other party by taking one course when another is equally advantageous to him."

Neither Lord Hodson nor Lord Tucker alluded to such a possibility.

15. On the facts, however, any such principle could have been of no assistance to Mr McGregor because he had not attempted to prove that the Appellants had no legitimate interest in completing the contract and claiming the contract price rather than damages.

16. Lord Reid's observations have been referred to in several subsequent cases, principally concerning charterparties in which the owner claims hire and the charterers wish to be made liable, if at all, for damages instead. They have hardly ever been applied so as to relieve the repudiating party of liability for the contract price. The relevant cases are as follows:

    i) *Attica Sea Carriers Corporation v Ferrostaal Poseidon Bulk Reederei GmbH, The Puerto Buitrago* [1976] 1 Lloyds' Reports 250. This concerned a charterparty by demise of a bulk carrier. The vessel was in a poor state of repair. The owners argued that the charterers were bound to repair it before redelivery, and that they were entitled to hire until it had been redelivered in a proper state of repair. Mocatta J accepted this proposition. The Court of Appeal held to the contrary, that if the vessel was out of repair when redelivered, the charterers were liable in damages, but that the redelivery was nevertheless valid. On that basis the issue to which Lord Reid's comments were relevant did not arise. Nevertheless Lord Denning MR considered whether, if the redelivery had been a repudiation of the contract, the owners would have been entitled to refuse to accept it and sue for hire thereafter. He said at page 255 that the decision in *White and Carter* had no application "in a case in which the plaintiff ought, in all reason, to accept the repudiation and sue for damages, provided that damages would provide an adequate remedy

08-13555-mg    Doc 43540-25    Filed 03/14/14    Entered 03/14/14 11:42:50    Exhibit 24
Pg 7 of 16

Judgment Approved by the court for handing down.                    Reichman and Dunn v Beveridge and Gauntlett

A.45

for any loss suffered by him". Orr LJ agreed with Lord Denning on the principal point. As for the *White and Carter* point, he said at page 256 that in the instant case, first, the owners could not perform the contract without the co-operation of the charterers and, secondly, the charterers had set out to prove that the owners had no legitimate interest in claiming the hire rather than damages. Browne LJ also agreed with Lord Denning on the principal point and with Orr LJ on the *White and Carter* point. Thus, Lord Reid's observations were not the basis of the decision, and if the case had turned on them, the case would have been distinguished from *White and Carter* on the facts.

ii) *Gator Shipping Corporation v Trans-Asiatic Oil Ltd, The Odenfeld* [1978] 2 Lloyd's Reports 357. In this case, as held by Kerr J, the charterers repudiated the charterparty, and the question arose whether the owners were obliged to accept that repudiation, or could disregard it and sue for the hire. The judge reviewed *White and Carter* and *Attica Sea Carriers*, and held that "any fetter on the innocent party's right of election whether or not to accept a repudiation will only be applied in extreme cases, viz. where damage would be an adequate remedy *and* where an election to keep the contract alive would be wholly unreasonable": see page 374. On the facts he held that the owners were entitled to refuse to accept the repudiation.

iii) *Clea Shipping Corp v Bulk Oil International, The Alaskan Trader* [1984] 1 All ER 129. In this case a vessel subject to a charterparty for 24 months suffered a major engine breakdown after nearly a year, such that the repairs would take several months. The charterers said they had no further use for the vessel but the owner proceeded with the repairs and then sought to hold the charterers liable for hire for the rest of the period of the charterparty, once the repairs had been completed – some seven months. On an arbitration, the award was that the owners had no legitimate interest in pursuing their claim for hire rather than asserting a claim for damages. Lloyd J dismissed an appeal against the award. He reviewed the cases which I have mentioned and held, at 137, that:

> "this court is bound to hold that there is some fetter [on the innocent party's right to elect to disregard the repudiation], if only in extreme cases; and for want of a better way of describing that fetter it is safest for this court to use the language of Lord Reid, which, as I have already said, was adopted by a majority of the Court of Appeal in *The Puerto Buitrago*."

He also said that the correct analysis was that, the court, on equitable grounds, refused to allow the innocent party to enforce his full contractual rights.

iv) *Ocean Marine Navigation Ltd v Koch Carbon Inc, The Dynamic* [2003] EWHC 1936 Comm. In this case, an arbitrator had held in favour of the charterers that the owners were limited to damages and could not claim hire. On appeal from the award, Simon J held that the arbitrator had not applied the law correctly in rejecting the owners' claim to hire, and he remitted the award. He reviewed the cases already mentioned, but did not depart from the formulation used by Lloyd J.

08-13555-mg    Doc 43540-25    Filed 03/14/14    Entered 03/14/14 11:42:50    Exhibit 24
Pg 8 of 16
A.45

Judgment Approved by the court for handing down.                              Reichman and Dunn v Beveridge and Gauntlett

17. There is, therefore, a very limited category of cases in which, although the innocent party to a contract has not accepted a repudiation by the other party, and although the innocent party is able to continue to perform all his obligations under the contract despite the absence of co-operation from the other party, nevertheless the court will not allow the innocent party to enforce his full contractual right to maintain the contract in force and sue for the contract price. The characteristics of such cases are that an election to keep the contract alive would be wholly unreasonable and that damages would be an adequate remedy, or that the landlord would have no legitimate interest in making such an election. Mr Gauntlett seeks to establish that a case where the tenant has not only failed to pay rent and all other sums due under the lease, but has also abandoned the demised premises is, or may be, within this category of cases.

**Would damages be an adequate remedy for the landlord?**

18. Mr Gauntlett's proposition has to be that, if the landlord terminates the tenancy and takes steps to re-let, and if the sums payable to him as a result are less than those that would have been payable during the period of the lease after the date on which he took possession, he can recover that loss by way of damages from the tenant. Otherwise damages would not be an adequate remedy for the loss caused, as compared with the landlord's position if he held the tenant to the lease and sued for the rent as it fell due.

19. Once the landlord has taken possession he cannot recover rent under the lease. The question is whether he can recover damages for the loss of the future rent, which would have to be on the basis that it was loss caused by the tenant's breach of contract. There is no English case which decides that the landlord can recover damages of this kind. There is at least one English decision to the contrary, but it is of some antiquity. In Canada and Australia, however, the highest courts have decided that such damages can be recovered.

**Commonwealth cases on repudiation of leases**

20. The Supreme Court of Canada held that a landlord can recover loss of bargain damages after retaking possession in *Highway Properties Ltd v Kelly, Douglas & Co Ltd* (1971) 17 DLR (3d) 710. In that case the Supreme Court overruled a previous decision of the Ontario Court of Appeal which had held that the landlord had no claim for future damages after taking possession: see *Goldhar v Universal Sections and Mouldings Ltd* (1962) 36 DLR (2d) 450, especially at page 462. In *Highway Properties* Laskin J said this, in a passage quoted in *National Carriers* by Lord Wilberforce, Lord Simon and Lord Roskill:

> "It is no longer sensible to pretend that a commercial lease, such as the one before the court, is simply a conveyance and not also a contract. It is equally untenable to persist in denying resort to the full armoury of remedies ordinarily available to redress repudiation of covenants, merely because the covenants may be associated with an interest in land."

21. The same result was established by the High Court of Australia in *Progressive Mailing House Pty Ltd v Tabali Pty Ltd* (1985) 157 CLR 17. That was an unusual case on the facts, where a lease had been granted, but the lessor was obliged to carry

out certain works within 12 weeks of obtaining development approval, and the lessee was to take possession within 14 days of receiving notice that the works had been completed, with the first payment of rent falling due 2 months later. In fact the lessee went into possession before the lease was executed, and paid rent. The lessor had the works done, and gave notice of that, but the tenant disputed whether they had been done properly, denied that he was bound to pay rent, and refused to pay rent though, apparently, remaining in possession. The landlord sued for possession, arrears of rent and damages, the latter to include the loss, as a result of the re-entry, of the benefit of the future payments of rent that would have fallen due under the lease. The judge ordered possession and payment of the rent and damages claimed. The Defendant appealed only on damages, unsuccessfully, to the Court of Appeal of the Supreme Court of New South Wales and then to the High Court. The High Court held that the tenant's conduct amounted to a repudiation, that neither the presence in the lease of a proviso for forfeiture nor the fact that the landlord had re-entered under it excluded the possibility of claiming damages caused by the repudiation, and also that the right to claim damages was not limited to damages arising before the re-entry, but included loss of bargain damages, that is to say damages for the loss of the rent that would have become payable after the date of termination for the rest of the term. The High Court did not need to consider the quantification of those damages.

**The courses open to the landlord**

22. The landlord can always decide not to take any particular action, and hold the tenant to the lease. Alternatively he may re-enter and thereby put an end to the lease. In *Highway Properties* the Supreme Court mentioned a third possible course of action for the landlord which, I must confess, came as a surprise to me. Laskin J said at page 716 that

> "[the landlord] may advise the tenant that he proposes to re-let the property on the tenant's account and enter into possession on that basis",

and at page 718 that English and Canadian case law allows for a limitation on the operation of a surrender, despite repudiation and possession, if the landlord gives notice to that effect to the tenant, and that:

> "under the present case law the landlord is not under a duty to mitigate, but mitigation is in fact involved where there is a re-letting on the tenant's account."

23. The only English authority on that point is *Walls v. Atcheson* (1826) 11 Moore CP and Exch. Reports 379 (which is not in the English Reports), less fully reported at 3 Bing. 462. In that case a tenant took premises for a year, occupied them and paid rent for a quarter and then quitted. After about four weeks the landlord re-let the premises, at a slightly lower rent, and they remained let for some months, but they were empty for the last two months of the original term of a year. The landlord then sued to recover the loss of rent under the original lease, including both the amount by which the rent was less under the later lettings, and the whole rent for the later period when the premises were vacant, but she failed. The Court of Common Pleas (Best CJ, Park J, Burrough J and Gaselee J) held that putting in another tenant amounted either to accepting a surrender or to evicting the tenant, so as to put an end to the right to claim

08-13555-mg    Doc 43540-25    Filed 03/14/14    Entered 03/14/14 11:42:50    Exhibit 24
Pg 10 of 16

Judgment Approved by the court for handing down.                                    Reichman and Dunn v Beveridge and Gauntlett

A.45

the rent. Sergeant Vaughan had argued that the lettings were for the tenant's account. Only Gaselee J referred to that argument. He said at 382:

> "If the plaintiff had given the defendant notice, that, if he would not occupy the apartments himself, she would let them to another tenant, on his account, the case would have been different."

24. The possibility alluded to in that passage does not seem ever to have been relied on in any subsequent English case, but it has been used in Canada: see *Green v Tress* [1927] 2 DLR 180, and other cases referred to in *Goldhar* (cited at paragraph [20] above) at pages 459-460.

25. The scope and effect of this possible course of action seem to me somewhat uncertain and questionable, and Gaselee J's remark a rather slender basis for it. A landlord whose rights and obligations are governed by English law could not be criticised for taking the view that it would not be wise to place reliance on that approach to the consequences of a tenant's default.

26. Moreover, the actual decision in *Walls v Atcheson* is authority for the proposition that, subject to that possible exception which did not apply on the facts, a landlord cannot recover damages from the tenant for loss of rent after he has re-entered so as to bring the lease to an end, though it is fair to say that it was not argued on the basis of acceptance of the tenant's repudiation and damages for that breach of contract. There is no English authority which decides otherwise, despite the developments in Canada and Australia which I have described. Woodfall on Landlord and Tenant, at paragraph 17.315, suggests that a landlord may accept a tenant's repudiation and sue for loss of future rent, but the authorities cited are those which I have mentioned from Canada and Australia. It does not seem to me that this is a correct statement of English law as it now stands on this point.

27. By contrast, if it had been held in *White and Carter* that the appellants could not hold Mr McGregor to the contract, they would have been entitled to damages in respect of all their lost profit. Similarly the owners in the charterparty cases would have got repudiation damages quantifiable by reference to loss of the future hire as set against market rates if lower. It may be a logical development to hold that a landlord, having forfeited the lease, can recover damages for the loss of future rent, at least if the breach which led to the forfeiture was fundamental and repudiatory, but it does not seem to me that English law has yet reached that stage. We were shown the Blundell lectures delivered in 2000 by Lord Millett and Sir David Neuberger, respectively against and for the proposition that the doctrine of repudiation is and should be part of the English law of landlord and tenant. It is clear from those powerful texts that there is much to be said each way on the point of principle. I note that the Law Commission's very recent report Termination of Tenancies for Tenant Default, LC303, does not refer to the question of repudiation, being concerned only with the procedure by which tenancies may be brought to an end.

28. If it is still the law of England that damages for the loss of future rent cannot be recovered after the landlord has taken back possession of the premises following a tenant's default, as seems to me to be the case, then damages cannot be an adequate remedy for the landlord in the circumstances suggested by Mr Gauntlett, and one of the conditions for the intervention of equity so as to fetter the landlord's ability to

08-13555-mg Doc 43540-25 Filed 03/14/14 Entered 03/14/14 11:42:50 Exhibit 24 Pg 11 of 16 A.45

Judgment Approved by the court for handing down.     Reichman and Dunn v Beveridge and Gauntlett

hold the tenant to the lease is not satisfied. Even if it is not clear that this is the position under English law, the uncertainty of the position at law would be relevant to the reasonableness or otherwise of the landlord's conduct. The landlord could not be criticised for wishing to avoid embarking on litigation which might have to go to the House of Lords before the point was settled.

**Would it be wholly unreasonable for the landlord not to terminate the lease?**

29. Miss Tipples suggested that the observations in *White and Carter* might only apply if the innocent party had some acts still to perform under the contract, albeit acts which could be done without the co-operation of the repudiating party, and that in the case of a landlord the relevant acts would already have taken place, namely the grant of the lease, so that the observations were not relevant. She showed us passages from Sir Guenter Treitel's Law of Contract, 11th ed, at pages 1015-6, which suggest that this is a relevant distinction. It is not clear to me why the principle should be affected by that distinction. In *White and Carter* the innocent party did have more to do, but in the charterparty cases this may not have been so.

30. The important point is whether it could be said that a landlord was acting wholly unreasonably in failing to take steps to find an alternative tenant to whom to let in place of the defaulting tenant, rather than leaving the lease in place and suing for the rent as it falls due. That is to be considered against the background of the rights and obligations under the lease. If the lease remains in force, the landlord is entitled to the rent and other sums falling due. Of course, if the tenant is in default there may be a question whether the landlord will in fact recover the sums due in full, but if so the same would be true of any claim for damages to which he may be entitled if the lease is brought to an end. No doubt if the rental market has improved the landlord will forfeit and re-let at a profit, so the question is only likely to arise if the landlord would not be able to re-let easily or only at a lower rent. In that case, as already discussed, the landlord cannot under English law expect to be able to sue the tenant for damages in respect of the difference between the lower rent under a new letting and the rent to which he would have been entitled under the original lease. His right to the original rent comes to an end as soon as he takes possession in a way which is inconsistent with the continuance of the original tenancy. Leaving aside the *Walls v. Atcheson* approach, the landlord had, in the present case, no relevant right to go into the premises under the lease (or not until only 6 months of the term remained, in July 2004). There may be some scope for saying that steps preparatory to re-letting can be taken without amounting to a re-entry such as to forfeit the lease, as in *Oastler v. Henderson* (1877) 2 QBD 575, for example, but the landlord would be entitled to take a cautious line on that, knowing that the tenant would wish to argue that the lease had been determined sooner rather than later.

31. Another factor of practical relevance is that it would almost always be open to the tenant under the terms of the lease (as in the present case) to seek to find an assignee or sub-tenant and to ask the landlord's consent to the assignment or underletting. Of course the tenant might face practical and economic problems in this respect. If the current rent is higher than the market rent, it would be difficult to find an assignee, except perhaps at a reverse premium, and a sub-tenant might not be prepared to pay enough rent to cover the obligations under the headlease. Moreover not only the landlord but also the prospective assignee would, typically, require payment of all arrears of rent before consenting to, or taking, the assignment, as the case may be.

08-13555-mg Doc 43540-25 Filed 03/14/14 Entered 03/14/14 11:42:50 Exhibit 24 Pg 12 of 16 A.45

Judgment Approved by the court for handing down. Reichman and Dunn v Beveridge and Gauntlett

Nevertheless, it seems to me that it would be difficult to describe the landlord's position as wholly unreasonable if it took the line that the tenant, whose default created the problem, should bear the burden of finding a solution, in circumstances in which the lease allows the tenant to do so, with an obligation on the landlord not unreasonably to refuse consent to such a proposal.

32. No attempt has been made in any previous English case of which I am aware to establish that it would be wholly unreasonable for the landlord to hold the tenant to the lease, though the point was raised indirectly in one case. The point has been taken in three Australian cases, with different results.

   i) In *Maridakis v Kouvaris* (1975) 5 ALR 197, Ward J, in the Supreme Court of the Northern Territory, held that a landlord was under no duty to mitigate by taking steps to re-let the premises.

   ii) In *Tall-Bennett & Co Pty Ltd v Sadot Holdings Pty Ltd* (1988) 4 BPR 9522, Young J, in the Supreme Court of New South Wales, Equity Division, reviewed the cases which I have mentioned and held that, even if there were a principle that an innocent party will not be allowed to insist on its remedy for the contract price, i.e. for the rent, where it would be grossly unreasonable to do so, that could not be said to be so in the case he had to decide. He referred to the fact that if the tenant wants to go out of possession and be relieved of the economic burden of the rent he can try to underlet or find an assignee. He said that he saw nothing unreasonable in a landlord insisting on maintaining his position as a result of the grant of the lease, being reluctant to assume the trouble of finding a new tenant and then suing the original tenant for damages, and leaving it to the tenant to find an assignee or sub-tenant. He therefore rejected the tenant's arguments.

   iii) By contrast, in *Vickers & Vickers v Stichtenoth Investments Pty Ltd* (cited above at paragraph [6]) Bollen J in the Supreme Court of South Australia, on appeal from the Commercial Tribunal, decided the case to the opposite effect, though apparently without citation of *White and Carter* and the following cases, nor of *Tall-Bennett*, though *Maridakis* was cited. Mr and Mrs Vickers were liable under a lease which they had assigned, and under which the assignees had abandoned the premises in September 1987 and defaulted in payment of rent. The respondent landlord re-entered the premises in September 1988 and sought to recover the rent up till then from Mr and Mrs Vickers. The judge considered the decision of the High Court of Australia in *Progressive Mailing House*, and held that it followed from this case that "all ordinary principles of contract law apply to leases". He had also cited an article in the Sydney Law Review by A J Bradbrook, "The application of the principle of mitigation of damages to landlord-tenant law" (1977) 8 SLR 15 which advocates the contractual approach to the relationship, rather than the approach based on property rights. The judge then drew the analogy with a contract for the sale of tomatoes, in the passage quoted above, and held that:

   > "mitigation as one ordinary principle of contract law applies to leases. That is to say, when a tenant abandons the leased premises the landlord is under duty to take reasonable steps to mitigate his loss by seeking another tenant. Of course

08-13555-mg    Doc 43540-25    Filed 03/14/14    Entered 03/14/14 11:42:50    Exhibit 24
Pg 13 of 16
Judgment Approved by the court for handing down.                    Reichman and Dunn v Beveridge and Gauntlett

A.45

> circumstances may make it impossible or impractical for him for do that or find a tenant. But I think that the principle applies."

> He therefore remitted it to the tribunal to consider the issue of failure to mitigate on the facts.

33. It seems to me that the decision of Bollen J, in *Vickers*, involves an inadequately reasoned leap from the principle that the general law of contract applies to leases to the conclusion that the landlord cannot hold the tenant to his obligations under the lease. Because the decision was made without addressing the factors relevant under the line of cases derived from *White and Carter*, it seems to me that it cannot be regarded as sound, by contrast with *Tall-Bennett* in which those cases were cited, and the opposite conclusion was reached.

34. In the article by Mr Bradbrook mentioned above, the author deplores the failure of the judiciary and of all the State legislatures in Australia except that of Queensland to recognize the application to landlord and tenant law of the principle of mitigation of damages, by which he means the principle that a landlord "may simply sit back and sue the defaulting tenant for the rent as it accrues". He advocates applying the principle of mitigation of damages so as not to allow the landlord that choice but to require him to take reasonable steps to attempt to secure an alternative tenant. Even Mr Bradbrook, however, recognises that one problem is that the actions of the landlord in attempting to re-let might be held to bring the lease to an end, and with it the obligation to pay rent; he calls this a valid objection but one which can easily be rectified by appropriate legislative reform. He refers to the possible escape from this problem offered by *Walls v Atcheson* but comments that, first, this course is "generally unknown outside the legal profession" (for myself, I wonder how well known it is even inside the profession), and secondly that its precise application is still doubtful so that its use might be challenged, and he gives some grounds on which it might be open to challenge: see (1977) 8 SLR at page 24. His conclusion is to recommend State legislation, with a number of different possible models. Even he, therefore, did not contend that the state of the law as it then stood allowed the conclusion to which Bollen J came in *Vickers*. Bollen J considered that the decision in *Progressive Mailing House* had achieved what Mr Bradbrook thought remained to be done. As regards recovery of damages for loss of future rent, it does, but that is only one of the two necessary conditions. Since the judge did not address the factors which Lord Reid, Lord Denning and others have said are relevant for the application of the principle, I cannot accept that his conclusion is justified by his reasoning.

35. In reference to the analogy which Bollen J drew with a sale of tomatoes, one distinction is that the property in the tomatoes may well not have passed to the buyer, whereas the tenant already has the property rights in the lease and the landlord's right to payment of each instalment of rent arises as each in turn falls due, by way of a debt. Only the mitigating effect of the intervention of equity along the lines indicated by Lord Reid in *White and Carter* could relieve the tenant of its liability for the rent and other sums falling due.

36. The few relevant English cases are not consistent with the landlord being subject to this equitable fetter. In *Boyer v Warbey* [1953] 1 QB 234, which was concerned with a statutory tenancy, and preceded *White and Carter*, the tenant had vacated without

08-13555-mg    Doc 43540-25    Filed 03/14/14    Entered 03/14/14 11:42:50    Exhibit 24
Pg 14 of 16

Judgment Approved by the court for handing down.                                   Reichman and Dunn v Beveridge and Gauntlett

A.45

notice, whereas he was bound to give three months' notice. The landlord did re-let, and sued for the rent due up to the date of the re-letting (some three months) which the tenant resisted, claiming that the landlord should have re-let more quickly. Denning LJ said this at pages 244-5:

> "He [the tenant] went out of possession, it is true, and thereupon the landlords would have been entitled to recover possession if they had so wished. But they did not so wish. They were not bound to accept possession whenever the tenant chose to offer it. They were entitled to hold him to the tenancy until he gave a valid three months' notice to quit. Very sensibly they did try to re-let; and as soon as they re-let the statutory tenancy came to an end by surrender by operation of law. But until it came to an end by valid notice to quit or by surrender they were entitled to hold the tenant liable for rent."

Similarly Romer LJ said at 247:

> "A tenant who goes out of possession without giving due notice has no right to dictate to his landlord how he shall deal with his property; and why the landlords here should have disposed of the flat in a manner disadvantageous to themselves in order to save the tenant from the full consequences of his wrongful act I am at a loss to conceive."

37. In *Bhogal v Cheema* [1999] L&TR 59, Sir John Vinelott had to consider a claim by the landlord that a surety under a lease which had been disclaimed by the liquidator of the tenant company was liable for rent arrears, to which the surety responded by arguing that, following the disclaimer, the landlord was obliged to mitigate the loss of rent from the tenant. The landlord had not taken possession nor taken steps to re-let. The judge said, at page 65:

> "However, the landlord cannot be compelled to take possession and, of course, it will not be in his interest to do so if the market rent of the premises is less than the rent payable under the lease, unless possibly he takes the view that his remedy against the surety is unlikely to yield the full amount of the rent."

38. In another case of secondary liability, so to speak, the Court of Appeal had to consider a claim by the landlord for arrears of rent against the original tenant, where the lease had been assigned three times in succession: *Norwich Union Life Insurance Society v Low Profile Fashions Ltd* [1992] 1 EGLR 86. The tenant cited *White and Carter* and argued that the landlord should be restrained from pursuing a remedy against the original tenant when, because of alternative remedies against the second assignee and the surety, it was wholly unreasonable to pursue the original tenant. That seems a rather bold step from the cautious words of Lord Reid, and one which, if it was available at all, could presumably have been deployed by any one, or all, of several people each of whom is liable to the landlord, so as to produce an inextricable circle, with no effective remedy. Beldam LJ rejected the argument as being irrelevant to a case of cumulative, as opposed to alternative, remedies.

08-13555-mg    Doc 43540-25    Filed 03/14/14    Entered 03/14/14 11:42:50    Exhibit 24
Pg 15 of 16                                                        A.45

Judgment Approved by the court for handing down.                    Reichman and Dunn v Beveridge and Gauntlett

**Conclusion**

39. Mr Gauntlett urged on us a modern approach to the relationship between landlord and tenant, focussing on principles of contract law, and a policy approach which would not leave premises empty, after the tenants had abandoned them and while the landlord waited for the end of the lease, so as to avoid the waste of useful space and to ensure that property is put to beneficial use. As to the latter factor, if there is enough demand for the space, the market rent may exceed that payable under the lease in which case the landlord will no doubt terminate the lease and re-let at a profit. Equally, the tenant can attempt to find an assignee or sub-tenant to use the premises; it is not only the landlord who can take steps to fill the space.

40. Leaving aside policy issues of that kind, it seems to me that Mr Gauntlett's submissions fail to take account of the present state of English law as to the consequences of the premature termination of a tenancy, or of the very limited scope for the intervention of equity as explained in *White and Carter* and subsequent cases. Having regard to the way in which that has been explored and explained in the cases, in particular *The Odenfeld* (see paragraph [16 ii)] above), it seems to me impossible to say that a tenant could successfully invoke equity in that way. First, it seems to me very far from clear, to say the least, that the landlords were acting unreasonably in not taking their own steps to find a new tenant, rather than leaving it to the tenants to propose one, or in rejecting a proposal made by the tenants. Given the extremely limited nature of the test ("wholly unreasonable"), it would have to be a most extraordinary case for a tenant to be able to show that the landlord's conduct could properly be characterised in this way. Secondly, if it be the case that in 2003 the market rent was lower than that reserved by the lease, damages would not be an adequate remedy for the landlords if they terminated the lease by way of forfeiture and then re-let at a lower rent, because under English law as it stands they could not recover damages to compensate for the loss of rent. If, on the other hand the market rent was the same or higher, it should have been possible for the tenants to take their own steps to find an assignee. If they had found an assignee (or subtenant) whom the landlords had refused to accept on reasonable terms, that may have been a different matter; they would have had a statutory remedy under the Landlord and Tenant Act 1985, and there would have been a number of different steps open to them. In the present case, so far as we know, the tenants did not seek to establish that the landlords' refusal to agree to an assignment to a possible new tenant was in breach of the statutory obligation.

41. It is also to be noted that it is for the party in breach to establish that the innocent party's conduct is wholly unreasonable and that damages would be an adequate remedy. Mr Gauntlett's position seems to be that any landlord, knowing that the tenants have abandoned the premises, ought to take steps to re-let, and therefore to terminate the tenancy, and look to the tenant for damages to cover any resulting loss. It does not seem to me that this could be right. It cannot follow from what Lord Reid said in *White and Carter*. It is clear from that and the later cases that it would be extremely rare for this principle to apply, whereas Mr Gauntlett seeks to apply it to what must be a very common set of circumstances.

42. With the benefit of the industry and learning of Miss Tipples, the argument in this court has been much fuller than it was before District Judge Kubiak or His Honour Judge Reid Q.C. With that benefit, I have come to the same conclusion as each of

them did, namely that, on the present state of English law, the contention which Mr Gauntlett wishes to advance by way of defence on quantum is not open to him. I do not decide whether or not repudiation plays any, and if so what, part in the English law of landlord and tenant. That is not directly in issue before us, and it would be wrong to decide it unnecessarily. There is, however, no case in English law that shows that a landlord can recover damages from a former tenant in respect of loss of future rent after termination, and there is at least one case which decides that he cannot. In those circumstances, either damages are not an adequate remedy for the landlord, or at least the landlord would be acting reasonably in taking the view that he should not terminate the lease because he may well not be able to recover such damages. In principle, moreover, if the landlord chooses to regard it as up to the tenant to propose an assignee, sub-tenant or, if he wishes, a substitute tenant under a new tenancy, rather than take the initiative himself, that is not unreasonable, still less wholly unreasonable.

43. For those reasons, what Lord Reid said in *White and Carter*, as developed in the later cases cited above, does not apply to the position in which the present parties found themselves after the Defendants had abandoned the premises. I would therefore dismiss this appeal.

**Lord Justice Rix**

44. I agree

**Lord Justice Auld**

45. I also agree.