UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
In re

LEHMAN BROTHERS HOLDINGS INC., et al.

Debtors.

Chapter 11 Case No.

08-13555 (SCC)

(Jointly Administered)
-----------------------------------------------------------------x

SUPPLEMENTAL DECLARATION OF STEPHANIE STIEFEL

STATE OF NEW YORK    )
                     : ss.:
COUNTY OF NEW YORK   )

STEPHANIE STIEFEL, being duly sworn, deposes and says:

1. I am a claimant in the above-captioned matter.

2. I am currently a Managing Director of Neuberger Berman Group LLC ("Neuberger" or "NB").

3. I was a partner of Neuberger Berman LLC at the time of its initial public offering in August 1999 and became a Managing Director of Neuberger Berman Inc. thereafter, including during the period from 2003 through 2009 when Neuberger was a part of Lehman Brothers Holdings Inc. ("LBHI").

4. I make this Supplemental Declaration on personal knowledge, except as otherwise indicated, to supplement and expand on my declaration herein of January 27, 2014.

5. Neuberger is an investment management firm that has provided financial services to high net worth individuals and institutional investors since it was founded in 1939. The NB Claimants in this proceeding -- Marvin Schwartz, David Weiner, Richard Levine, Richard Glasebrook, Judith Ann Kenney, Richard Nackenson, Henry Ramallo, Seth Finkel, Christian Reynolds and myself -- currently are all Managing Directors who joined Neuberger

between 1961 and 2002. Managing Directors at Neuberger are charged with managing to the specific investment goals of their clients. Neuberger has a long standing history of attracting and retaining superior portfolio management teams and generating superior results for its clients since it was founded in 1939 by Roy Neuberger. All of the NB Claimants maintain the portfolios of high net worth and institutional clients that chose Neuberger and its Managing Directors to provide investment management, financial planning, fiduciary and trusts services. These high net worth and institutional clients invest with Neuberger based on its reputation for trust and its mission to put clients first and deliver long-term performance. The reputation of Neuberger and the success of its Managing Directors are reflected in the high retention rate of Neuberger clients, which is estimated at nearly 95%. Not only do the Managing Directors play a vital role in the retention of Neuberger's clients, but our formulaic, production based compensation is locked into the growth of our clients' portfolios.

6. From its founding in 1939 and for the next 60 years, NB was a partnership (or LLC). In 1999, NB became a public corporation. At the time of the Neuberger IPO, four of the NB Claimants – Messrs. Schwartz, Levine and Weiner and myself -- were NB partners. In return for our partnership interests, to the extent relevant here, we received Founder Shares in the publicly traded Neuberger, which were restricted and could only be sold at a rate of 10% a year and for only for so long as such Founder Stockholder did not engage in any "Harmful Activity" within three years of the termination of such shareholders' employment with NB. The NB Founder Stockholders' Agreement, in turn, imposed restrictive covenants on us by defining "Harmful Activity" as follows:

> "Harmful Activity" by a [Founder Stockholder] means such [Founder Stockholder], directly or indirectly, either individually or as owner, partner, agent, employee, consultant or otherwise:
>
> (a) solicits or accepts business from (i) any Person who was a client of the [NB] during the one

2

year period prior to such [Founder Stockholder's] Employment Termination Date or, in the case of an action taken during such [shareholder's] employment with [NB], during the one-year period immediately prior to such action) or (ii) any prospective client of [NB] who, within the one year period prior to such Employment Termination Date (or, in the case of an action taken during such [shareholder's] employment with [NB], within the one-year period immediately prior to such action), had been directly solicited by such [shareholder] or where, directly or indirectly, in whole or in part, such [shareholder] supervised or participated in [NB's] solicitation activities related to such prospective client;

(b)    solicits or accepts business from or through, or engages in any sales or marketing activities with, any financial intermediary (including, without limitation, any broker-dealer, bank, insurance company, financial planner or other financial institution), or any person employed by or associated with a financial intermediary, with whom such [shareholder] had business contact during the one year period prior to such [shareholder's] Employment Termination Date;

(c)    (i) employs any current or former employee or consultant of [NB] (other than clerical, secretarial and other similar support personnel) or (ii) recruits, solicits or induces (or in any way assists another in recruiting, soliciting or inducing) any such Person to terminate his or her employment or consultantship with [NB]. . . .

(d)    Markets, promotes or otherwise trades on or (other than solely in connection with seeking new employment) claims (or in any way, other than in connection with the business of [NB], assists any Person in marketing, promoting or otherwise trading on or claiming as such [shareholder's] (or such other Person's), the investment performance record (including without limitation performance ratings or rankings provided by any rating or ranking service) of any mutual fund, client account or group of mutual funds or client accounts with which such Principal was associated while employed with [NB];

3

(e)   discloses to any person, firm or corporation any Confidential Information that is known to the [shareholder] as a result of his or her employment or professional association with [NB] or uses the same in any way other than in connection with the business of [NB] or;

(f)   publicly makes disparaging or derogatory comments regarding (i) [NB] or any member of [NB] or (ii) any current or former Principal, employee or consultant of [NB] in their capacity as a Principal, employee or consultant or with the effect of damaging the business or reputation of [NB].

See Declaration of Stephanie Stiefel, dated January 27, 2014 ("Stiefel Dec."), at Ex. A, pp. 12-14. See also id. at pp. 11. See also, Neuberger Berman Claimants Exhibits NB C; NB E, NB F; and NB G, which are true and accurate copies of the Stockholders Agreements executed by Messrs. Schwartz, Weiner, Levine and myself.

7.   The other NB Claimants -- Messrs. Glasebrook, Reynolds, Nackenson, Ramallo, Finkel and Ms. Kenney -- all were employees of NB at the time of the IPO or joined NB thereafter. They too were subject to contractually imposed restrictive covenants of at least one year post-employment under their respective employment contracts or in connection with their receipt of post-IPO Neuberger stock. An example of such a restrictive covenant is contained in the Declaration of Judith Kenney, dated January 27, 2014 at ¶ 4 and Ex. A at pp. 1-3.

8.   LBHI acquired Neuberger on October 31, 2003 for approximately $2.6 billion in cash and securities. Through the acquisition of Neuberger and its high net worth clients, Lehman added $67 billion of assets under its management. At that time, the Neuberger Claimants had been working for Neuberger for an aggregate of about 200 years, and had developed and managed substantial books of high net worth and institutional clients that

included endowments, foundations, and charitable organizations, all of which came under the umbrella of LBHI's new assets under management. On its acquisition, it became common knowledge that Neuberger was viewed as the "Crown Jewel" of Lehman.

9.   As a "condition precedent" to the merger, the Founder Stockholders -- Schwartz, Weiner, Levine and myself -- exchanged our NB shares for LBHI shares, which were subject to the same sales limitations, forfeiture provisions and restrictive covenants, which, as the Amended and Restated Stockholders Agreement, dated as of October 31, 2003, made clear were intended "to limit such [shareholder's] ability to earn a livelihood in a business similar to the business of [LBHI or NB]". *See* Stiefel Dec. at Ex. B, Neuberger Berman Exhibit, NB D (which is a true and accurate copy of this agreement) p. 5; *see also id.* pp. 4-6, 8-10.

10.   The other NB Claimants also became subject to new restrictive covenants that extended and further eviscerated their abilities to earn a living elsewhere in the securities/investment management industry. As demonstrated in the declaration and supplemental declaration of Henry Ramallo, I am advised that these claimants were coerced, pressured and, quite literally, threatened with their continued ability to earn a livelihood in their chosen professions into accepting retention bonuses -- payable in RSUs that vested at 20% a year for 5 years -- in return for continued employment by LBHI under stringent restrictive covenants. Indeed, I know that it was a job assignment of Heidi Steiger, the head of Neuberger's Wealth Management Division, in favor of the NB-LBHI merger, to recruit managing directors like Henry Ramallo, Richard Nackenson and others to become Lehman employees following the merger. True and accurate copies of the Retention Agreements of Richard Glasebrook, Seth

5

Finkel, Judith Kenney, Richard Nackenson, Christian Reynolds, Henry Ramallo and myself are contained in Neuberger Berman Exhibits NB B; NB H; NB I; NB J; NB K; NB L and NB M.[1]

11. As a result of the restrictive covenants that were reiterated or imposed at the time of the LBHI-NB merger, the NB Claimants had no choice but to continue employment with LBHI and participate in the LBHI compensation structure -- one that included the deferral of up to 50% of our earned, production based compensation and income in the form of RSUs that did not vest for five years -- because our books of business were transferred from NB to LBHI, and failure to accept LBHI's pay scheme would have resulted in the forfeiture of an aggregate of 200 years of work; the growth of our respective clients' assets; the relationship of trust between our clients and ourselves; and our entire books of business. This was a material and dramatic change from our prior formulaic, production and cash based compensation structure at Neuberger. The Neuberger Claimants were required to work for Lehman because our books of business were transferred to LBHI as part of the merger, and also because these books of business were bound by our clients' desire to work with us, the Neuberger Claimants, along with Neuberger, the institution. In sum, the NB Claimants could not leave LBHI without forsaking the basis of our entire livelihood, careers and life's work.

12. I can unhesitatingly state that the NB Claimants' claims should not be reclassified as equity interests because we never had an opportunity to negotiate our employment compensation contracts with LBHI, when our original employer, Neuberger, was acquired by LBHI. Our involuntary deferral of our earned, production based compensation in return for unvested RSUs and our participation in the Lehman RSUs for commissions pay scheme was entirely an involuntary product of the 2003 merger. It was required by our need to preserve our careers, livelihoods and substantial books of business, all of which would have been forfeited

---

[1] I received a retention bonus because my role at Neuberger was in changing from that of money manager to client development within the Straus Group.

unless we continued employment at LBHI because of the multiple restrictive covenants imposed on us and, I am advised, as a matter of law. Indeed, unlike others in the securities industry -- including at LBHI -- that are paid for their books of business based on a multiple of trailing 12 months' revenue, the Neuberger Claimants' compensation came from the application of a formula to the monthly production arising from our books of business and assets under management. As a result, Lehman unilaterally deferred more than $100 million of compensation that it owed, and continues to owe, to us and that it used for its own purposes in the years leading to its bankruptcy.

13.     In its briefs, Lehman suggests that the Neuberger Claimants "had a choice when it came to voting in favor or against the merger with Lehman." Apart from the fact that the merger was approved by the Neuberger board of directors -- of which only claimant Marvin Schwartz was one of numerous directors -- and, thus, was a fait accompli by the time of a shareholder vote, no claimant, individually -- even Mr. Schwartz, the single largest Neuberger shareholder -- or all of us collectively had sufficient votes to block the merger. Of course, none of us could vote with our feet -- as other employees might have when faced with a merger or acquisition not to their liking -- since we were handcuffed to Lehman by the multiple restrictive covenants imposed on us and would have been required to "sit on the bench" and out of our industry for anywhere from one to three years had we not worked for LBHI.

14.     Lehman also argues in its briefs that each Neuberger Claimant "voluntarily elected to become a Lehman employee and remain a Lehman employee" and accept deferred payment in RSUs "because they would have great difficulty finding any other employer who would pay them as much as they could receive by remaining with Lehman." This is manifestly wrong.

15.     But for the restrictive covenants that bound us to Lehman, Marvin

7

Schwartz and the other members of the Straus Group -- Richard Glasebrook; Henry Ramallo; David Weiner and myself -- which had over $17 billion under management, for example, could have taken our clients and investment management expertise and opened our own shop, sharing our profits from an annual investment advisory fee of between 1.25 and 1.75% with no corporate hierarchy and paying only overhead costs and related transactional expenses. Each Straus Group member would have earned far, far in excess of their pay at Lehman -- at least $221 million a year less expenses divided among the Group members, as opposed to approximately 30% of that, or $66 million a year, while at Lehman[2] -- especially since half of that pay was in RSUs that never vested and yet is unrealized since LBHI failed just short of the first five year vesting period -- four years and eleven months after its merger with Neuberger. The same can be said for the other Neuberger Claimants that work in other money management groups: we all could have earned a lot more elsewhere than at Lehman, if not for the restrictive covenants that handcuffed us to LBHI.

16.     In sum, the Neuberger Claimants had no bargaining power, made no election and had no choice but to participate in the Lehman RSU pay scheme. The receipt of deferred RSUs, instead of presently earned production compensation, as we had received previously at the independent Neuberger before the merger simply was not a condition of employment that we willingly accepted, or, indeed, voluntarily accepted at all. Instead, it only was the result of a mandated employment contract that materially changed the terms of our pre-LBHI compensation and was forced on us by the merger and the restrictive covenants that handcuffed us to Lehman.

---

[2] $17 billion is an average of the funds under Straus Group management during the Lehman years. This is multiplied by an average investment advisory fee of 1.3% to yield annual advisory fees of $221 million. At Lehman, the Group members received approximately 30% of the Group's annual advisory fees in compensation, at least half of which was deferred by Lehman as RSUs.

8

17.     Moreover, in early 2009 all of the Neuberger Claimants' received full payment of their production based, formulaic compensation -- commissions -- that had been deferred during 2008 by LBHI. This clearly evidences that the withheld amounts from 2003 through 2007 similarly were and are compensation and not any sort of equity investment. The two memoranda from Neuberger management that we receive in late 2008 make clear that: "If you receive production compensation throughout the year and have had compensation deferred under the Lehman Brothers Equity Awards Program, those deferrals have . . . been placed in the trust with Wells Fargo. You will soon receive an individual statement of your deferral and, to the extent you are entitled to such deferrals, the payments will be made in January 2009." November 17, 2008 Memorandum from George Walker and Heather Zuckerman to U.S. Employees of Neuberger Berman Holdings (NB Exhibit NB N). Such deferred 2008 production compensation thereafter was "paid on January 26, 2009" to us. NB Exhibit NB O. (NB N and NB O are true and accurate copies of memoranda that we received in the ordinary course of NB business that have been redacted at the request of Neuberger to omit irrelevant matters.)

18.     In sum, the Neuberger Claimants are general creditors of LBHI that are entitled to recover their deferred and unpaid production based compensation.

WHEREFORE, for all of the foregoing reasons, and those set forth in the Neuberger Claimants' Opening and Reply Memoranda and the Declarations of Judith Ann Kenney, Henry Ramallo and myself and in the Opening and Reply Memoranda submitted on behalf of the other Represented Participants, the various omnibus objections by LBHI to

reclassify the claims of the Neuberger Claimants as equity interests under Section 510(b) must be denied and the Neuberger Claimants' general creditor compensation claims must be allowed.

_____
STEPHANIE STIEFEL

Sworn to before me this
26th day of March, 2014.

_____
Notary Public

MARY F. GATTUSO
NOTARY PUBLIC, State of New York
No. 01GA5071980
Qualified in New York County
Commission Expires January 21, 2015