Page 1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   CASE NO. 08-13555-scc

4   - - - - - - - - - - - - - - - - - x

5   In the Matter of:

6

7   LEHMAN BROTHERS HOLDINGS, INC.,

8   ET AL,

9

10                  Debtors.

11   - - - - - - - - - - - - - - - - - x

12

13                      U.S. Bankruptcy Court

14                      One Bowling Green

15                      New York, New York

16

17                      April 1, 2014

18                      10:05 AM

19

20   B E F O R E :

21   HON. SHELLY C. CHAPMAN

22   U.S. BANKRUPTCY JUDGE

23

24

25   ECRO - F. FERGUSON

1    HEARING Re Evidentiary Hearing on RSU Claims

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24    Transcribed by:  Sheila Orms, Dawn South, Nicole Yawn, and

25    Sherri Breach

Page 3

```
 1    A P P E A R A N C E S :

 2   WEIL, GOTSHAL & MANGES LLP

 3         Attorneys for LBHI

 4         767 Fifth Avenue

 5         New York, NY 10153-0119

 6

 7   BY:  TERESA C. BRADY, ESQ.

 8         DENISE ALVAREZ, ESQ.

 9

10   WEIL, GOTSHAL & MANGES LLP

11         Attorneys for LBHI

12         1300 Eye Street, N.W.

13         Suite 900

14         Washington, D.C.  20005

15

16   BY:  RALPH I. MILLER, ESQ.

17

18   LAW OFFICES OF

19         Attorneys for Compensation Claimants

20         305 Madison Avenue

21         Suite 4700

22         New York, NY 10165

23

24   BY:  LISA M. SOLOMON, ESQ.

25
```

Page 4

```
 1   STAMELL & SCHAGER, LLP

 2        Attorneys for Claimants

 3        One Liberty Plaza

 4        35th Floor

 5        New York, NY  10006

 6

 7   BY:  ANDREW R. GOLDENBERG, ESQ.

 8        RICHARD J. SCHAGER, JR.

 9

10   KAPLAN LANDAU LLP

11        Attorneys for Neuberger Berman Claimants

12        1065 Avenue of the Americas

13        27th Floor

14        New York, NY  10018

15

16   BY:  EUGENE NEAL KAPLAN, ESQ.

17

18   LAW OFFICE OF

19        Attorneys for Represented Claimants

20        355 S. Grand Avenue

21        Suite 2450

22        Los Angeles, CA  90071

23

24   BY:  A. JAMES BOYAJIAN, ESQ.

25
```

Page 5

1    JULIEN & SCHLESINGER, ESQ.

2         Attorneys for Neuberger Berman Claimants

3         207 E. 94th St.

4         Suite 303

5         New York, NY 10128

6

7    BY:  MICHAEL SCHLESINGER, ESQ.

8

9    DAY PITNEY LLP

10        Attorneys for Fabio Liotti

11        One Jefferson Road

12        Parsippany, NJ   07054

13

14   BY:  MARGARITA Y. GINZBURG, ESQ.

15

16   RICH MICHAELSON MAGALIFF MOSER, LLP

17        Attorneys for Claimants

18        340 Madison Avenue

19        19th Floor

20        New York, NY   10173

21

22   BY:  HOWARD P. MAGALIFF, ESQ.

23        ROBERT N. MICHAELSON, ESQ.

24

25

Page 6

1   TELEPHONIC APPEARANCES:

2   DANIEL CARRAGHER, DAY PITNEY, LLP FOR FABIO LIOTTI

3   MICHAEL GRAN, STAMELL & SCHAGER, LLP

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2              THE COURT:  All right.  Mr. Miller?

3              MR. MILLER:  Yes, good morning, Your Honor.

4              THE COURT:  Good morning.

5              MR. MILLER:  Ralph Miller for Lehman Brothers

6     Holdings, Inc., known as LBHI.

7              Would you like for us to introduce people again

8     this morning?

9              THE COURT:  I think everyone can introduce

10    themselves as they rise for the first time.  I'm just

11    looking at the telephonic roster here.  We are connected,

12    and it looks like I only have Mr. Carragher from Day Pitney

13    on the line representing Fabio Liotti.

14             Is anyone else on the line who wishes to note

15    their appearance?

16       (No response)

17             THE COURT:  Okay.  I think we're ready to go.

18             MR. MILLER:  May it please the Court, Your Honor,

19    good morning, this is Ralph Miller again for LBHI.  I did

20    want to introduce who we did have this morning.

21             THE COURT:  Okay.

22             MR. MILLER:  I believe we previously introduced

23    Mr. Tom Hummel, co-general counsel with Lehman Brothers

24    Holdings, Inc.  With him is Mr. Tom --

25             THE COURT:  I'm sorry, give me one minute, I'm

Page 8

1    having a technical issue here.

2         (Pause)

3              MR. MILLER:  Also, we have Mr. Tom Beakey (ph)

4    from Alvarez and Marsal who is the person in charge of

5    claims revolution -- resolution essentially by LBHI.  We

6    also have some of the people that you met before, Your

7    Honor, Ms. Alvarez and Ms. Brady from Weil Gotshal and also

8    today lastly but not least, my partner Rob Lemons (ph) from

9    our business and management structuring group is here this

10   morning.

11             THE COURT:  Okay.

12             MR. MILLER:  Your Honor, we would like to begin if

13   we might by getting stipulated in some exhibits that we

14   believe are not questioned about --

15             THE COURT:  Sure --

16             MR. MILLER:  -- so that we can start with those in

17   the opening if that would be acceptable to the Court.

18   And --

19             THE COURT:  I did get some -- there was some late

20   breaking pleadings that I got.

21             MR. MILLER:  I think they're stipulations

22   essentially, agreements, Your Honor, on things.  And -- but

23   Ms. Alvarez, if she might address the Court on these

24   evidence issues --

25             THE COURT:  Sure.

Page 9

1           MR. MILLER:  -- maybe we can make sure that we go

2    smoothly when we do the opening, which is going to be just

3    to clarify for the Court.

4           Basically our case is going to be an annotated

5    opening.  I'm going to try to go through --

6           THE COURT:  Perfect.

7           MR. MILLER:  -- evidence with the Court, and when

8    I'm done with the opening, and subject to any questions,

9    hopefully we'll be finished with the LBHI case, Your Honor.

10          THE COURT:  Great.

11          MR. MILLER:  And we expect to give you some time

12   back on your three hours this morning, maybe an hour.

13          THE COURT:  Okay.  I mean, customarily, for better

14   or worse I ask a lot of questions, but because of the highly

15   structured nature of the next couple of days, I'm going to

16   do the best I can to refrain, so I don't cut into anybody's

17   time.

18          MR. MILLER:  Well, Your Honor, speaking for

19   myself, we welcome questions.

20          THE COURT:  Okay.

21          MR. MILLER:  We want to have a dialogue with the

22   Court --

23          THE COURT:  Sure.

24          MR. MILLER:  -- and these are -- these topics are

25   somewhat -- some of the issues that have come up are

Page 10

1    nuanced, and we want to make sure we're communicating fully.

2    So please ask any questions that you have, Your Honor.

3              THE COURT:  Okay.  Will do, that's great.

4              MS. ALVAREZ:  Good morning, Your Honor.

5              THE COURT:  Good morning.

6              MS. ALVAREZ:  We would like to offer into

7    evidence, and I have a list here that I can pass up to you a

8    handful of exhibits at the beginning of our case.

9              THE COURT:  Okay.

10             MS. ALVAREZ:  They are the stipulation that you

11   mentioned last week you reviewed.

12             THE COURT:  Right.

13             MS. ALVAREZ:  Which attaches several exhibits, as

14   well as essentially what we refer to as program documents,

15   which are, you know, documents that we distributed to

16   employees every --

17             THE COURT:  The organic documents that govern the

18   RSUs and the other compensation units?

19             MS. ALVAREZ:  Exactly.

20             THE COURT:  Okay.

21             MS. ALVAREZ:  And we have an agreement with most

22   of the representative participants as to the admissibility

23   of each of these exhibits.  We don't yet have an agreement

24   with the Neuberger claimants.  So I don't know if they have

25   an objection, but we'd like to offer these into evidence.

Page 11

1          THE COURT:  All right.  Let me hear from -- who's

2     representing the Neuberger?

3          MR. KAPLAN:  Eugene Kaplan.

4          THE COURT:  Okay, Mr. Kaplan.

5          MR. KAPLAN:  Along with Michael Schlesinger

6     representing Neuberger claimants.

7          THE COURT:  Okay.  What's your objection to the

8     admissibility of this exhibit?

9          MR. KAPLAN:  It's not this exhibit.  There are two

10    letters at the end of the exhibit list, we object to them on

11    hearsay grounds.  They are letters to participants.  They're

12    just letters, and we don't know how the out of court

13    statements come in for the truth thereof.

14          And since LBHI has chosen to make a number of

15    hearsay objections to my exhibits, I think what's sauce for

16    the goose is sauce for the gander.  I think they are

17    hearsay.  They are out of court statements.  I assume

18    they're being offered for the truth of the contents of those

19    letters.  I'm not objecting to the program documents,

20    although I think that's hearsay as well.

21          MS. ALVAREZ:  Your Honor, with regard --

22          THE COURT:  So you think the program documents

23    that establish your client's entitlement to any compensation

24    are hearsay?

25          MR. KAPLAN:  No, I think my clients are entitled

1    to compensation because their money was taken from them and

2    they did not get it.

3                    THE COURT:  Okay.  Listen, listen, it's nine

4    minutes after 10.

5                    MR. KAPLAN:  Yes.

6                    THE COURT:  Okay.  I want to keep the blood

7    pressure level down.

8                    MR. KAPLAN:  Yeah.

9                    THE COURT:  All right.  And I want to stay focused

10   on the legal issues and the facts.  I don't need hyperbole,

11   I don't need emotion, I just want to go forward step-by-step

12   and proceed through the next couple of days.

13                   MR. KAPLAN:  Yes, Your Honor, I understand.

14                   THE COURT:  So we're not off a good start at this

15   point.

16                   MR. KAPLAN:  What I said was, I could object on

17   hearsay grounds to the program documents but I'm not.  What

18   I'm objecting to are two letters that were sent -- that was

19   sent out to participants, which I see as -- if they're being

20   offered for the truth as hearsay.

21                   THE COURT:  Ms. Alvarez?

22                   MS. ALVAREZ:  Yes.  I believe he's referring to

23   what we call these "Dear Colleague" letters.

24                   THE COURT:  The "Dear Colleague" letters?

25                   MS. ALVAREZ:  The "Dear Colleague" letters --

                                                        Page 13

1                    THE COURT:  Okay.

2                    MS. ALVAREZ:  -- that were sent on a yearly basis

3        to employees.  They're actually referenced in paragraph 13

4        of the stipulation.  Basically they were information packets

5        that were distributed to employees every year, that would

6        include all the program documents attached to them.

7                    And in essence, they're not hearsay, and they're

8        really being offered to show the information flow that was

9        given to employees and the information that they received

10       about the program every year.

11                   THE COURT:  All right.  Could I -- do you have an

12       example there?

13                   MS. ALVAREZ:  Sure.

14                   THE COURT:  All right.  And is it necessary that I

15       make a determination on this issue now before we start?

16                   MS. ALVAREZ:  It's not absolutely necessary, it

17       would be helpful so that Mr. Miller could refer to these

18       documents in his opening.

19                   THE COURT:  Well, he can refer to them subject to

20       the -- my considering the hearsay objection, which I'm not

21       inclined to grant, but I'd like to have some time to think

22       about it --

23                   MS. ALVAREZ:  Sure.

24                   THE COURT:  -- since this is the first time I'm

25       hearing of it.

Page 14

1              MS. ALVAREZ:  Sure.

2              THE COURT:  You're going to have to help me

3    navigate around where you want me to look, to the extent

4    that you're not handing documents up.

5              Is what you're giving me in here --

6              MS. ALVAREZ:  Yes.

7              THE COURT:  -- because I can --

8              MS. ALVAREZ:  Yes.

9              THE COURT:  So where is it in --

10             MS. ALVAREZ:  What we have -- we also have loose

11   copies, Your Honor.

12             THE COURT:  Okay.

13             MR. KAPLAN:  Your Honor?

14             THE COURT:  Yes.

15             MR. KAPLAN:  I've just been handed copies of the

16   letters.  These are letters from 1995 that are outside the

17   scope of this hearing.  They have nothing -- there are no

18   program documents for those years that are being introduced.

19             So aside from them being hearsay, I would submit

20   that these two letters are not relevant to any of the issues

21   here, and are not accompanied by any of the program

22   documents that LBHI is seeking to introduce.  So I had those

23   as additional grounds for my objection.

24             THE COURT:  Okay.  I've got it, let's keep moving.

25        (Pause)

1          THE COURT:  Mr. Miller, the one thing that would

2     be helpful is, and I'm sure you were going to do this anyway

3     is to the extent that you're making arguments, in

4     particular, related to the Neuberger claimants, just give me

5     a heads-up, if and when you do that.

6          MR. MILLER:  I will try to do that, Your Honor.  I

7     am going to, for clarification, try to move from the general

8     to the specific, and so I'm going to start with some general

9     topics that apply to everyone, and then --

10          THE COURT:  Okay.

11          MR. MILLER:  -- near the end, I plan to address

12     several of the points that have been raised by claimants,

13     and I'll try to focus there.

14          Perhaps we can go ahead and pass out these

15     notebooks.

16          Your Honor, what we have done is prepared some

17     notebooks, and we have multiple copies, which we'll pass

18     around and have --

19          THE COURT:  Right.

20          MR. MILLER:  -- documents that have been premarked

21     mostly from the stipulation.

22          THE COURT:  Okay.

23          MR. MILLER:  And --

24          THE COURT:  Just to clarify what everyone's

25     expectation is, generally speaking when -- thank you, when I

 1    have a trial of this magnitude with this or a larger volume

 2    of exhibits, we have a clear understanding as to what's in

 3    the record and the meaning of it being in the record.

 4              So I assume it that all of these trial exhibits

 5    you folks are treating as being in the record, correct?

 6              MR. MILLER:  That is what LBHI would like to do,

 7    yes, that's our position.

 8              THE COURT:  Okay.  And I'll have to hear from each

 9    of the claimants on that.  But then there's the next level,

10    which is that as these things go, it's actually not as

11    voluminous as what I get sometimes, but be that as it may,

12    it's difficult, if not impossible for me to read every

13    single page and understand how it fits in.  So that it's

14    incumbent upon you folks if there's something on which you

15    specifically intend to rely and I'm opening this binder and

16    seeing you're doing exactly that, that you bring it to my

17    attention.  Otherwise, you know, the idea that I'm going to

18    be able to ferret out a particular document and marshal it

19    in support of anyone's position is really a stretch.

20              So in terms of an appellate record, right, what

21    I'm trying to say is that if your agreement is that all of

22    this is in and part of the record, that's fine.  But for my

23    purposes in being able to get through this, you're going to

24    need to point out to me either during the course of

25    testimony, presentation of evidence, or argument, specific

1    documents on which you would like me to focus.  So does that

2    make sense to folks?

3              MR. MILLER:  Your Honor, for LBHI, that's

4    precisely what we plan to be doing.

5              THE COURT:  Okay.

6              MR. MILLER:  And the notebook you will see are

7    specific documents with highlights on them, and what we're

8    going to do is talk about the highlights.

9              THE COURT:  Okay.

10             MR. MILLER:  And try to put the highlights in

11   context with the legal issues.

12             THE COURT:  Okay.  So that just to be clear, just

13   to -- I'd just like to be crystal clear on procedure, so

14   that in the event that there's a document that you haven't

15   brought to my attention and the claimants don't bring to my

16   attention, to the extent that this were going to go up on

17   appeal on an appellate record, it's fair game for the

18   claimants to rely on anything in these books that have been

19   admitted, whether or not anybody brought it to my attention.

20             MR. MILLER:  If that's the way the Court wants to

21   proceed, that's fine with me.

22             THE COURT:  Well, I'm just try to --

23             MR. MILLER:  I mean we --

24             THE COURT:  I prefer, I mean, I'm just trying to

25   understand what you folks think it means that these are your

Page 18

1    trial exhibits, and that they are admissible versus

2    admitted.  I'm just trying to clarify what your

3    understanding of what it means.

4              MR. MILLER:  For LBHI, Your Honor, we would like

5    to get specifically admitted certain program documents and

6    other documents, especially associated with the stipulation.

7              With regard to other documents, the fact that

8    they've been stipulated to be admissible, we do not

9    understand that they are automatically admitted.

10             THE COURT:  That's --

11             MR. MILLER:  We just understand that we've agreed

12   that if someone wants to use them, we're not going to fight

13   about them --

14             THE COURT:  Okay.

15             MR. MILLER:  -- if that distinction is okay.

16             THE COURT:  That's fine.  So we do have, I think,

17   a lack of clarity as to what the record is going to be when

18   the case leaves here, you know, in the event there's an

19   appeal.

20             So I go with -- when you identify documents and

21   you ask them to be admitted, those are admitted, not the

22   broader universe, unless you're all admitting -- you're all

23   agreeing that they're all admitted.

24             So it would be useful to know what everybody

25   thinks they're doing.  Mr. Miller, you've told me what you

Page 19

1      think you're doing.

2              MS. SCHAGER:  Good morning, Your Honor, Richard

3      Schager for the represented plaintiffs.  We anticipate that

4      the record on appeal would include the documents to which

5      we've stipulated.  My understanding is that we stipulated to

6      the admission of those documents, subject to the Court

7      accepting them, that there would be no objections to

8      admissibility.  There might be some objections --

9              THE COURT:  But you see, and I regret that we're

10     spending 20 minutes on preliminaries, there's a difference

11     between stipulating and agreeing the admissibility of

12     something, and then the next level being that you actually

13     ask for them to be admitted.

14              So stipulated to and admissibility is great

15     because then we don't have to fight over every document.

16     But if in your case, right, or in your rebuttal -- in your

17     case I'll say, if you want to move the admission of certain

18     documents, you need to do so.  In the absence of an

19     agreement that every single document in here is admitted as

20     opposed to simply not objected to.

21              MS. SCHAGER:  Your Honor, we move for the

22     admission of the documents that were the subject of the

23     stipulation.

24              THE COURT:  Mr. Miller?

25              MR. MILLER:  Yes, Your Honor, I was actually going

Page 20

1    to do the same thing.  The stipulation has been marked

2    several places, but the easiest number to remember is

3    Claimant's Exhibit 1.  And Claimant's Exhibit 1 has attached

4    to it 21 exhibits.

5            We would agree to the admissibility, for all

6    purposes, of Claimant's Exhibit 1, including the 21 attached

7    exhibits.

8            I believe that's what you want -- right?

9            THE COURT:  Claimant's 1 is your declaration?

10           MR. MILLER:  No, Claimant's 1, Your Honor, is the

11   stipulation which I believe is attached to my declaration as

12   well, Your Honor, but just for clarity both parties offered

13   the same document, agreed to authenticity.  There's a

14   general agreement on authenticity, Your Honor.

15           THE COURT:  Well, we're going to have to take a

16   minute for me to understand what you're talking about.  I

17   have Claimant's Trial Exhibits Volume I.  Is that where I

18   should be looking?

19           MR. MILLER:  Yes, Your Honor, if you go to

20   Claimant's Trial Exhibits Volume I, I believe Claimant's

21   CL001 is the stipulation.  Is that correct?

22           THE COURT:  Claimant's -- CLX001?

23           MR. MILLER:  Yes.

24           THE COURT:  Is your declaration.

25           MR. MILLER:  Okay.

1          MS. ALVAREZ:  It's actually, Your Honor, at CL001,

2   which is the joint appendix.

3          THE COURT:  Okay.  Then I have the --

4          MR. KAPLAN:  I beg your pardon, Your Honor, would

5   an ECF number help?

6          THE COURT:  No, an ECF number would not help.

7      (Pause)

8          THE COURT:  The problem I'm having is that the

9   binders are not organized.  These binders are not organized

10  in rationale fashion.  But be that as it may, I have -- so I

11  have CL001.  It has -- it's hard for me to figure out how

12  many exhibits attached to it.

13         The binder that I have ends at 19, but then it

14  continues on into the other binder.

15         MR. MILLER:  If I may request, Your Honor, I do

16  have an excerpt or just the stipulation, we could just mark

17  that as an exhibit, and admit it if the Court would like to.

18         THE COURT:  I'm just trying to understand at

19  threshold level what we're doing, what are we talking about.

20  What documents are going to be admitted into the record.

21         MR. KAPLAN:  Your Honor, we have the --

22         THE COURT:  So, Mr. Miller, your position is that

23  LBHI is going to ask for the admission of the documents that

24  you specifically identified during the course of your

25  argument and presentation?

1        MR. MILLER:  Yes, Your Honor, and I believe we've

2   actually passed up -- Ms. Alvarez did this just a moment

3   ago, we've actually passed up a short list of our exhibits

4   that we were moving to admit at this time.  I don't think we

5   completed the process of having them admitted.

6        THE COURT:  Okay.  You can do it at the end of the

7   trial, I'm just trying to understand --

8        MR. MILLER:  Yes, Your Honor, we --

9        THE COURT:  -- what people think we're doing.  So

10  this is the way I'm accustomed to doing it.  You proceed

11  through a trial, you identify exhibits either in your

12  argument or through a witness.  And at the end, you inform

13  the Court what it is that you want to seek to admit.

14        So what you've said is consonant with what my

15  practice would be.

16        MR. MILLER:  Thank you, Your Honor.

17        THE COURT:  And then after that, I don't know what

18  we're doing.  So I would like to hear from each of the

19  claimants' groups what they think they're doing with respect

20  to the admission of exhibits.

21        Is it your view that all this stuff comes in or

22  not?

23        MR. KAPLAN:  Your Honor, we are delighted to

24  follow the procedure you just outlined.  I speak for 52 of

25  the represented claimants, and I will let the others address

Page 23

1    that point, but we're delighted to proceed marking exhibits

2    -- offering exhibits as we proceed.

3            THE COURT:  Okay.  I'll try it one more time.  The

4    reason that you do it at the end of the trial is so that

5    during the course of the trial, every time you refer to an

6    exhibit you do not have to say, I now move for the admission

7    into evidence of this exhibit.  So that's why we wait until

8    the end, and I establish at the beginning what the protocol

9    is for the admission into evidence of the exhibits.

10           So is that clear?

11           MR. KAPLAN:  Yes, Your Honor.

12           THE COURT:  Okay.  Does any -- are any of the

13   represented claimants want to file a different procedure or

14   belief that the exhibits ought to be admitted somehow else?

15       (No response)

16           THE COURT:  So at the end of the day, I'm going to

17   have lists of exhibits that are admitted into evidence as

18   opposed to merely having been stipulated as to

19   admissibility.

20           Okay.  Are we clear now?

21           MR. MILLER:  Your Honor, that's clear to LBHI.

22           THE COURT:  Okay.  Anybody else?

23           MS. SOLOMON:  I just wanted to make sure that I

24   was clear as to the procedure, Your Honor --

25           THE COURT:  Okay.

1          MS. SOLOMON:  -- what I understand is that when we

2    are done with our case, you are simply asking that a list be

3    presented to Your Honor --

4          THE COURT:  Yes.

5          MS. SOLOMON:  -- on the exhibits that have been

6    admitted?

7          THE COURT:  Right.  Because when there are

8    voluminous exhibits, sometimes the parties simply agree that

9    everything is admitted, and then for the purposes of a

10   record on appeal, it's all admitted, so that there is a --

11   the specter of something being embedded in a document that

12   no one's referred to, and then a party argues it on appeal,

13   the Court hasn't been pointed to it, so it will not have

14   been addressed.

15         I'm simply trying to avoid unfair surprise, so

16   that everybody understands what the ground rules are, and

17   for me to alert you that you unless specifically point to a

18   document, I'm not going to go through every one of these and

19   ferret them out.

20         So I think we now have an understanding that this

21   is the -- our universe, but at the end of the trial, you

22   will identify the galaxy of exhibits that you want me to

23   consider, and that will be considered part of the record on

24   appeal if there is one.

25         MS. SOLOMON:  Makes perfect sense to me, Your

Page 25

1    Honor.

2              THE COURT:  Okay.  Twenty-five minutes later I

3    think maybe we have clarity.  All right.  Okay.  I think I'm

4    now ready, Mr. Miller.

5              MR. MILLER:  Thank you, Your Honor.  May it please

6    the Court.

7              The restricted stock units and contingent stock

8    awards that are at issue in this hearing were always treat

9    as equity in the operative program documents.  And they

10   should be classified as equity under this confirmed plan.

11   That is the sole purpose of the proceeding we have today.

12             The claims that have been made are not being

13   denied.  The request is to have them classified as claims at

14   the level of equity.  As I will explain for the next few

15   minutes, undisputed facts, LBHI believes, demonstrate that

16   two separate provisions of the Bankruptcy Code require these

17   claims to be classified as equity.

18             First, the stock units and stock awards at issue

19   are quote equity securities, close quote, as that term is

20   defined in Section 101.16 of the Bankruptcy Code.

21             Second, under Section 510(b) of the Code, these

22   are all claims for rescission or damages, quote, arising

23   from the purchase or sale, close quote, of a quote, security

24   of the debtor, close quote.  And they must be subordinated,

25   therefore, to all claims or interests that are senior to or

Page 26

1   equal to those securities of the debtor.

2          Now, in this case for 510(b), the security of the

3   debtor is clearly common stock of LBHI.  There was never any

4   possibility that these stock awards or stock units would be

5   anything except common stock.  There was never any promise

6   that these stock awards or stock units would become debt, or

7   that they would be paid in cash.  There are a couple of

8   exceptions on change of control I'm going to talk about,

9   Your Honor, but assuming no change of control, which we did

10  not have here, and there's also an exception for fractional

11  units.

12         So setting aside those two small exceptions, which

13  were essentially for circumstances that don't apply, they

14  were always to become unrestricted common stock.  They are

15  almost identical to common stock with one condition, and

16  that is that they are not transferrable.

17         But as will discuss in a moment, Section 101.16 of

18  the Bankruptcy Code specifically says that transferability

19  is not necessary for shares of a corporation to be traded as

20  an equity security.

21         The restricted stock units as we will show Your

22  Honor, had the ability to benefit from dividends on common

23  stock, while those stock awards were maturing and becoming

24  unrestricted.

25         THE COURT:  But in the nature of a pick feature,

Page 27

1    right?  In the form of --

2              MR. MILLER:  It was -- yes.

3              THE COURT:  -- additional units.

4              MR. MILLER:  That's correct, Your Honor.  It was a

5    payment in kind to the extent that what they got was -- on

6    the day of a dividend, a number of units were computed on

7    that price and they were added to the number of RSUs or

8    CSAs.

9              THE COURT:  What triggered a dividend event?

10             MR. MILLER:  I believe when the common stock paid.

11             THE COURT:  When the common stock paid the --

12             MR. MILLER:  If the common stock declared a

13   dividend at a quarterly point, then everybody's -- the

14   computers automatically increase the number of stock units

15   for a value equivalent to that dividend.

16             THE COURT:  Based on a current share price?

17             MR. MILLER:  Based on the share price at that

18   time.

19             THE COURT:  At that time, at that moment.

20             MR. MILLER:  Which meant that the value of the

21   RSUs, the number of RSUs actually were shifting based on the

22   movements and dividends of the common stock.

23             The --

24             THE COURT:  So if there was a hundred dollar

25   dividend, it would then purchase whatever routable portion

Page 28

1   -- it would convert that into a number of additional shares,

2   based on some formula?

3           MR. MILLER:  Yes, Your Honor, and it included

4   fractional shares as I understand it.  It was pretty

5   precise.

6           THE COURT:  Okay.

7           MR. MILLER:  Also, Your Honor, these shares could

8   vote.  There was a trust created.  A number of these shares

9   were put in a trust, and I'll go over the proxy in a moment,

10  that told employees how to vote their RSUs and their CSAs.

11          So they had the attributes of ownership that

12  included the ability to vote, the ability to receive

13  dividends, and they were appreciating or depreciating with

14  common stock, because at the end of five years, assuming

15  that the employee had met some relatively standard

16  conditions having to do with duration of employment, having

17  to do with no disparagement of the entity and having to do

18  with not violating non-competition clauses, they

19  automatically dropped away from their restrictions, and they

20  became transferrable common stock.

21          There is a very good summary that I'm going to

22  show it where it is in the documents --

23          THE COURT:  Okay.

24          MR. MILLER:  -- where the program documents

25  advises the participants, "you can consider the RSUs as

Page 29

1   shares of Lehman Brothers common stock that the firm holds

2   on your behalf for five years, which you will be entitled to

3   receive at that time, provided you meet certain terms and

4   conditions."

5           I believe that is the best single summary of what

6   these instruments were intended to be and the way that they

7   were described.  And I'm going to walk through and show --

8   I'm going to basically do a year in the first year in the

9   life of a typical Lehman employee, and show the

10  communications that they would've received from the

11  beginning, through the end of that year, and then I'm going

12  to do a fast forward five years later and discuss briefly

13  what happened at the end of the fifth year, assuming that

14  the conditions were all met how the stock award or the stock

15  unit automatically became common stock, if you would.

16          And I think this is relevant to a number of the

17  provisions in the statute, and to a number of the sort of

18  supplemental claims that have been made, such as the Wage

19  Act claims, and the economic duress claims.  It actually

20  bears on all of those things.

21          Now, the notebooks that we have passed out have

22  highlighted portions, I'm certainly not going to read all of

23  this, and I'm going to start with some legal issues, Your

24  Honor, and then as I say, I'm going to discuss the documents

25  and then I'm going to talk about the Wage Act and some other

Page 30

1    points.  That's how I'd like to organize my turn.

2         Maybe I could start with a little terminology.  In

3    the U.S. the term restricted stock units was used.

4    Overseas, the term contingent stock award was used.  The

5    documents try to give those almost exactly the same effect,

6    but because of variations in foreign law, for example,

7    German law, and English law, under certain circumstances,

8    there were changes in the contingent stock awards that gave

9    them a little different attribute or taxation consequences

10   or other things, because -- but the U.S. units were all

11   consistent.

12        The vast majority of what we have are the

13   restricted stock units, but there are some claimants with

14   contingent stock awards.  I'm going to call them stock units

15   or stock awards for short, but we don't believe that there

16   is any reason frankly to distinguish between those, and we

17   don't think any argument has been made that somehow the

18   overseas units are different from the U.S. units.  Except I

19   would point out, Your Honor, that if someone worked in the

20   United Kingdom and they wanted to make a claim, they're

21   probably going to have to deal with wage acts of England,

22   which are addressed in the briefing, and they're not going

23   to be dealing with the Wage Acts of New York.  That's, I

24   think, the only significant difference.

25        There are some variations year to year.  I'll try

1       to point out some of those.  They have been the source of

2       some contention.  But in the interest of efficiency, the

3       stipulation used representative documents.

4               We didn't try to put in the documents that were

5       the -- more of the same over the time period over and over

6       again.  But we did put in, in some instances, variations

7       where they changed.  And I'm going to try to point out as I

8       go through my opening some provisions that were put in, and

9       some provisions that were taken out.

10              And there's one provision in particular I want to

11      provide it to the Court, that dealt with bankruptcy --

12              THE COURT:  Right.

13              MR. MILLER:  -- that was in its early years, and

14      was removed in some later years --

15              THE COURT:  Right, which was the subject of --

16              MR. MILLER:  -- and I want to explain --

17              THE COURT:  -- some commentary in some of the

18      opposition.

19              MR. MILLER:  That's right, Your Honor.

20              THE COURT:  So just to make sure that I am clear,

21      we are talking about -- what's the beginning point of the

22      time period that we're talking about?

23              MR. MILLER:  2003, Your Honor.  If the five years

24      had passed --

25              THE COURT:  Then the stock issued, so we're not --

1          MR. MILLER:  If there was common stock --

2          THE COURT:  Right.

3          MR. MILLER:  -- and whatever happened to the

4    common stock, there's no doubt that that was classified as

5    equity.

6          THE COURT:  Right.  So if somebody is five year

7    period ran the week before the bankruptcy filing, they don't

8    have -- they wouldn't have an RSU at that moment, they would

9    have stock.

10         MR. MILLER:  Yes.  And there are -- by the way,

11   retirement, for example, triggered the loss of these

12   restrictions or the removal of restrictions, death,

13   disability.  So people could actually have gotten --

14         THE COURT:  Okay.

15         MR. MILLER:  -- these in shorter periods of time

16   under certain circumstances.

17         THE COURT:  And when you're talking about

18   employees who worked for a long period of time, then at the

19   moment of the filing, an employee could conceivably have had

20   stock that issued automatically as you put it, and then

21   still for the five year period leading up to the filing, had

22   RSUs, all issued pursuant to the same program, right, year

23   after year after year?

24         MR. MILLER:  Yes.  Well, Your Honor, technically

25   they would have a collection of stock units issued each year

1   so they would have some in the 2003 program, 2004 --

2              THE COURT:  Right.

3              MR. MILLER:  -- 2005, 2006, 2007 and so forth.

4              THE COURT:  But they also would have unrestricted

5   stock that --

6              MR. MILLER:  If they'd been there long enough,

7   yes.

8              THE COURT:  If they'd been there long enough,

9   right, that had been, they hit the five year mark, it

10  converted or issued, whatever the exact term is, and it's

11  stock like any other stock that they could hold that they

12  could trade.

13             MR. MILLER:  That's right.  And, Your Honor, I

14  don't believe we had any claimants who had said I should've

15  gotten my RSUs on September 1, 2008 turned into stock and I

16  never got my stock.  We don't have that here exactly.  We do

17  have --

18             THE COURT:  But, but --

19             MR. MILLER:  -- some people in 2008, and I want to

20  be clear on this, Your Honor, nine of them, who had some

21  commissions that were shown as being for the purchase of

22  RSUs or CSAs, and there was actually a partial issue of RSUs

23  and CSAs in the middle of the year in 2008, that was

24  unusual.  It's the only year where that happened.

25             But then they continued to work, and they had some

Page 34

1    more commissions that were shown as for RSUs and CSAs, and

2    2008, September 15th filing occurred for LBHI, and they

3    never were actually given a certificate or piece of paper

4    that said that they had prior RSUs or CSAs.

5          We are proposing to reclassify those amounts and

6    treat them as equity, as if they had gotten their units.

7          THE COURT:  Okay.  I guess what I'm focusing on is

8    an employee who had been an employee for a long time, and

9    then at the moment of the filing, had -- will have had

10   received -- say a ten year employee, right?

11         MR. MILLER:  Yes, Your Honor.

12         THE COURT:  So for the first five years, at the

13   moment of the filing then they have common stock that was

14   issued -- that was born as an RSU, matured, turned into

15   common stock, they took that, they held that they sold it,

16   whatever, and then in the next moment for the next five

17   years, where it hadn't matured yet, it was still an RSU.

18         MR. MILLER:  Yes, Your Honor.

19         THE COURT:  So RSU pursuant to the same program,

20   the only difference is the timing?

21         MR. MILLER:  That would be true, Your Honor.  I

22   suppose technically, and I just want to be completely

23   accurately, they probably would not have anything under --

24   from the 2004 program that had matured.  They would have

25   something say, from the 2002 program that had matured.

1              THE COURT:  Right.

2              MR. MILLER:  So they -- but the 2002 and 2004 were

3    not very distinguishable.  But they would unrestricted

4    common stock from 2002.

5              THE COURT:  Right.

6              MR. MILLER:  They would still have restricted

7    stock units from 2003, 2004.

8              THE COURT:  I think we're saying the same thing.

9              MR. MILLER:  I think we're saying the same thing,

10   I just want to make sure we're communicating, Your Honor.

11             THE COURT:  Okay.

12             MR. MILLER:  So with that housekeeping out of the

13   way, I want to turn for just a moment to tab 1, which the

14   Court is very familiar with, and that is the definitions in

15   the Code, and the second page of that is the term equity

16   security.

17             Again, I know the Court is familiar with this, but

18   I want to use some terminology and shorthand to refer to

19   some parts of the statute.  And, you know, that happens with

20   lawyers live with the statute a long time, we give it

21   shorthand terms.

22             The first subparagraph of Section 16 refers to a

23   share in a corporation whether or not transferrable or

24   denominated stock, or similar security.

25             I submit to Your Honor that the program documents,

1    and we're going to talk about this morning will show, that

2    the stock units and stock awards are shares in the

3    corporation.  They are not transferrable, which is okay, and

4    they are not denominated just as stock, they're called stock

5    units and stock awards, but they are similar to a share in a

6    corporation.  And that is frankly I believe a complete

7    answer to where we are.

8                 Because if that's what they are, they're equity

9    and we don't really need to go any further, the plan treats

10   equity securities in -- like other common stock.

11                Subparagraph C, which has been the subject of more

12   debate has to do with a warrant or right comma, other than a

13   right to convert comma, to purchase, sale, or subscribe to a

14   share, security or interest of a kind specified in

15   subparagraph A or B of this paragraph.

16                Now, the common stock of LBHI was certainly a

17   share in a corporation.  So it is clearly within 16(a).  And

18   these are certainly rights that have something to do with

19   ending up with a share in LBHI.

20                Now, whether the Court wants to classify them as a

21   warrant or a right, and whether there is a purchase or a

22   subscription, those are frankly sort of semantic issues, and

23   I think they could be characterized as any of those.

24                I do want to point out that there is case law

25   which is in our briefs, that says, that this phrase, other

Page 37

1   than a right to convert, which has been the source of

2   debate, modifies the word right, not the rest of the

3   section.

4            The legislative history shows that other than a

5   right to convert was dealing with convertible debentures,

6   debt, which could be changed.  And the word conversion is

7   occasionally used in the RSU documents.  But the operative

8   term here is right, right other than a right to convert.

9            THE COURT:  So the intention was to carve out a

10  convertible debenture and to make sure that that was not an

11  equity security, that was a debt security?

12           MR. MILLER:  We believe that is what the

13  legislative history shows, Your Honor.  And furthermore, we

14  think that the case law is pretty clear that right to

15  convert means an option on the part of the holder, to change

16  it from something to something else.

17           And an action --

18           THE COURT:  Isn't that precisely what the

19  claimants are saying, that it's a right to convert it from

20  an RSU to a share of stock?

21           MR. MILLER:  They are, Your Honor, but they're

22  saying it converted.  But I'm saying it was not a right to

23  convert.  They didn't have any optionality unless they

24  wanted to quit working.  They didn't have a right to leave

25  it something, they couldn't keep it as an RSU or a CSA like

Page 38

1    you can a debenture.  They did not have the option to change

2    it.  It converted automatically.  If they were there, it was

3    done, it changed.  It was not a right to make a conversion.

4             And I think it's an important point as you go

5    through this, Your Honor, and by the way, there are some tax

6    consequences of this as we will see at the end.  They didn't

7    have to pay any tax on this compensation until they got the

8    common stock.

9             If they didn't want the common stock, they could

10   flunk the conditions I guess, they could go out and

11   disparage the company, but the IRS didn't get money from the

12   employees, and it didn't get money -- and there wasn't a

13   deduction to LBHI, as we'll see at the end until it became

14   unrestricted common stock.

15            So they basically were on a track and it was going

16   to become common stock, and if they died, it was common

17   stock, it was in their estate, they had to pay tax on it.

18   So it's not like they had a right or an option to decide

19   whether this became common stock.  And there was nothing

20   else they could make it.

21            They couldn't say, we think we'd like to have

22   preferred stock or debt or something else, or leave it

23   something else.  RSUs and CSAs could not exist beyond the

24   five years.  They either disappeared because the conditions

25   were not met, or they become common stock.

1           And so I believe, Your Honor, that the case law

2    will show, and we think the correct interpretation is that

3    this other than a right to convert does not apply to these

4    programs, when the programs are fully understood.

5           Paragraph -- the second tab, Your Honor, deals

6    with Section 510(b).  And I know the Court virtually has

7    memorized Section 510(b), but I do want to talk about some

8    parts of the statute, so again I can refer to them with

9    shorthand later.

10          The Court recognizes that the Enron case dealt

11   with stock options.  Now, of course, a stock option, you

12   have to pay more money.  And it does have a right to convert

13   to stock.  It's a stock auction, and then you pay more

14   money, and then you have a right to convert it to stock.  So

15   there was no argument in the Enron case that it might have

16   been an equity security at that time, because it did have a

17   right to convert, and I don't think that's the grounds for

18   Judge Gonzalez.  He doesn't say it's an equity security, he

19   doesn't do that analysis as I recall.

20          So we have an additional issue here beyond Exxon,

21   which is, is it just an equity security to begin with.

22   There's no more money paid.  The compensation issue, we'll

23   see as we go through these documents, was defined as being

24   payment in RSUs, it's the same thing as paying somebody with

25   room and board, or paying somebody with airline travel

Page 40

1    rights, or paying somebody with founder stock.  I mean their

2    compensation was defined from the very beginning as being

3    partially cash, and partially stock units or stock awards.

4    That was known from the get go, as I will show the Court.

5           So the question is so what is this claim that they

6    are making.  Now, the interesting thing is that their claim

7    has sort of evolved.  And it started out in the claim world,

8    it seemed to look like damages.  That's what essentially

9    Judge Gonzalez was dealing with, it's the second clause,

10   damages arising from the purchase or sale of such a

11   security.  And here, the question is, is the -- is such a

12   security it's referring to a security of the debtor.

13          Now, there's two ways that you can actually

14   analyze this here.  The security in the debtor is either --

15   the stock unit or the stock award, as I say, in which case,

16   it's probably also a security, or it's the common stock

17   that's going to be unrestricted at the end.

18          But really it turns out now that they are not

19   saying they want their stock.  They're saying they want out

20   of the deal.  What the briefing now shows is that their

21   argument is, they want their money back.

22          THE COURT:  Right.  The -- they briefly -- the

23   claimants definitely seem to be taking the position that

24   they have a right to be paid in cash, and that the -- either

25   the failure of the ability to get stock or attain stock

Page 41

1    that's worth anything gives rise for damages that is not

2    subordinatable under 510(b), that's what seems to be the

3    argument.

4              MR. MILLER:  And, Your Honor, I want to make a

5    point that I don't think is in our briefing and as focused

6    away as I would like to, and I want to give Mr. Lemons

7    credit for pointing this out to me very clearly.  And that

8    is, although they don't use this word, what they're actually

9    asking for is rescission of the RSU program.

10             What they really want to do is to turn back the

11   clock and say, let's play like this didn't happen, let's set

12   it aside, for economic duress.  Let's set it aside for non-

13   disclosure.  Let's set it aside because we didn't understand

14   the deal.

15             When one sets aside a deal and gets back their

16   money, and you go back to the beginning, that is rescission.

17   What does Section 510(b) say about rescission, it's very

18   clear?

19             "For the purpose of distribution under this title,

20   a claim arising from rescission of a purchase or sale of a

21   security of the debtor, or an affiliate of the debtor is

22   subordinated."  Just like a claim for damages.

23             This was not in the Enron case.  This was not in

24   the original briefing.  But I suggest to the Court that this

25   is a compelling reason when you understand the claimants'

1   case why subordination is required.  They are seeking,

2   although they don't want to call it this, and they're going

3   to tell you I'm sure --

4          THE COURT:  Well, with -- not to diminish from the

5   credit you've given Mr. Lemon, it doesn't say a claim

6   arising for rescission of a purchase or sale of a security,

7   it says, a claim arising from rescission, which would

8   suggest to me that somebody did the rescinding and you have

9   a claim on account the fact that somebody rescinded your

10  security.

11         MR. MILLER:  Well, Your Honor --

12         THE COURT:  Maybe that's kind of the same thing.

13         MR. MILLER:  I guess actually, Your Honor, I see

14  it as a two-step process.  They are asking the Court to rule

15  that they can rescind the purchase.  Then they're saying,

16  the claim they have is for their money back.

17         THE COURT:  Yes, okay.

18         MR. MILLER:  So that's fine.  If the Court decided

19  you are going to rescind, because rescission often requires

20  a judicial action as one knows.

21         THE COURT:  Right.

22         MR. MILLER:  If you say, okay, it turns out the

23  Neuberger Berman people, for example, were coerced, we don't

24  believe they were for a lot of reasons, Your Honor, that

25  I'll talk about.  But let's say that you found that there

Page 43

1    was economic duress and they were coerced.  So they,

2    therefore, entered into an agreement against their will,

3    let's say that part of their compensation would be paid in

4    stock --

5              THE COURT:  Right.

6              MR. MILLER:  -- and stock awards, you decide to

7    set that aside.  You would be rescinding it.  Now, they have

8    a claim for their money back.  That is a claim for

9    rescission of a purchase or sale of the common stock.

10             THE COURT:  Well that -- right.  Well, that's --

11             MR. MILLER:  They don't want it anymore.

12             THE COURT:  That and counsel for Neuberger can

13   address this during this afternoon, but that's exactly the

14   cul de sac that I got myself into when I was going through

15   the Neuberger pleadings.  Because even -- exactly as you

16   said, even if I agreed that this was a terribly coercive

17   situation, which, you know, it is what it is, but then I get

18   into 510(b) and I couldn't get myself out of it.  So that's

19   something that I'm very interested in.

20             In other words, assuming, you know, the worst or

21   best set of facts, however you want to characterize it, then

22   I still come down to fitting within 510(b).  And the analogy

23   that I come to is fraud.  What could be worse than that

24   you're defrauded in connection with the purchase or sale of

25   security.  And in that situation, which I don't think is

Page 44

1   what Congress intended to limit 510(b) to, you're still

2   subordinated.

3           So even if you're the victim of a fraud in

4   connection with the purchase or sale of a security, your

5   claim is still subordinated under 510(b).

6           MR. MILLER:  Your Honor, I think you're very

7   gracious to call that a cul de sac.  I think we view that as

8   a dead end for the argument that they have.  I mean, I think

9   there's a way out of that, and that's -- we wanted to

10  suggest that.

11          And I flag that for the Court so that as we move

12  through the documents, you can be looking for the question

13  of whether anybody is saying that any of these promises,

14  provisions, representations were not followed.  I don't

15  think they are.

16          THE COURT:  Okay.

17          MR. MILLER:  What they're saying is, we don't want

18  any of them followed, we don't want stock, the stock's not

19  worth anything, we want to unravel the deal, and go back and

20  we know we worked with the hoax.  And by the way, going back

21  to your people who were there for a long period of time,

22  they made a lot of money on the appreciation of Lehman stock

23  up through 2008.

24          It was appreciating all the way up, so they got a

25  lot more money at the end of the five years than they

Page 45

1    would've gotten, frankly, if they'd taken that and put that

2    in most anything else at that time.  So they got the benefit

3    of that.  But just like other equity, equity is tied to the

4    fortunes of the business.  It rises and falls, and as I

5    would show in the documents in a moment, that was the

6    central purpose of the equity awards program, was to make

7    employees feel like owners of the business, and feel that

8    they were vested in the success or failure of the business.

9            Now, their position is, I think, no one told me

10   that I might have stock worth nothing, but these were people

11   who worked at an investment banking firm, Your Honor.  The

12   idea that they didn't understand that stock went up and

13   down, and stock could get to be worth nothing is frankly

14   incredible for all of these employees.

15           We're not talking about people who worked at a big

16   box store.  We're talking about people who worked for Lehman

17   Brothers.  And most of these people were in the upper

18   reaches of management, as the Court will see.  Some of them

19   were very highly compensated by any standard, both in cash

20   and in these units.  And to say that they didn't understand

21   that the stock could get to be worth nothing is absolutely

22   an incredible conclusion.

23           So, Your Honor, if I could move now to tab 3.

24   This is -- and this, by the way, is in the stipulation.

25           THE COURT:  Okay.

1          MR. MILLER:  I believe.  Yes.  This is a sample

2     employment contract that was selected by agreement for a

3     managing director.  It's in CLO1 and it's Exhibit 1.  And

4     we've highlighted that from the very beginning, employees

5     got letters like this, "We're delighted to confirm our offer

6     of full time employment as the" blank.  And then the fourth

7     bullet says, "At the firm's option, a portion of your total

8     compensation (combined base salary, bonus and other

9     compensation) may be payable in the form of restricted stock

10    units pursuant to the firm's employee stock awards program.

11    Please understand that the grand of restricted stock units

12    is subject to the standard terms and provisions of the

13    program."

14          THE COURT:  Okay.  So walk me through this letter

15    and if I'm a person who received it, I need to understand

16    what I'm getting.  So salary at the annualized rate of

17    $200,000, that's actually cash wages that the person would

18    get in the form of a paycheck?

19          MR. MILLER:  Yes.

20          THE COURT:  Okay.  And then -- because I start

21    with, "We will guarantee you a minimum total compensation of

22    850."  So I'm trying to determine what part of that gets

23    paid.  The confusing part that I have is that, so you have

24    the $200,000 which suggests that that was, you know, cash

25    pay.

Page 47

```
1              MR. MILLER:  It was my understanding is, yes, Your

2    Honor, that was cash pay.

3              THE COURT:  Indefeasible just like anybody else

4    would get wages as if they were working in a big box store.

5              Then you have these two bonus numbers.

6              MR. MILLER:  Yes, Your Honor.

7              THE COURT:  Okay.  And so that 200 plus 650 adds

8    up to 850.

9              MR. MILLER:  Yes, and then it deals with the next

10   year.  This particular letter has a guarantee of a bonus the

11   following year.

12             THE COURT:  The following year.

13             MR. MILLER:  Yes, Your Honor.

14             THE COURT:  Okay.  So what does the fourth bullet,

15   the "at the firm's option"?

16             MR. MILLER:  What that says, Your Honor, is that

17   some part of this combined base salary, bonus, and other

18   compensation may be payable in the form of restricted stock

19   units pursuant to the plan.  And what happened at the end of

20   the year or the bonus, it happened through the year for

21   those who were commissioned, was that a portion, which was

22   determined by the firm of the compensation was paid in the

23   form of stock units or stock awards.

24             THE COURT:  But this is the part that I don't

25   understand.  I understand that you say to somebody, you're
```

Page 48

1    going to get a minimum total compensation of 850, and then

2    it suggests, this suggests that no matter what else happens,

3    you're going to get 200,000 in cash.  And then for the 650,

4    we decide how much of that is going to be in cash, and how

5    much is going to be in RSUs.  That's what -- is that

6    accurate?

7            I just can't -- I don't understand, were the

8    employees being told that they were at risk at some point of

9    they're used to getting a paycheck in X amount, I don't

10   know, $200,000, that comes out to be, you know, call it

11   8,000, $9,000 a month, $9,500 a month.

12           So were they at risk that at a certain point, that

13   number in their cash paycheck would be lower because someone

14   would have then decided that instead of that cash they're

15   going to get an RSU?  I'm just trying to understand what

16   actually happened.

17           MR. MILLER:  Yes.  Well, Your Honor, I guess we

18   can try to develop those facts as we go through.  I don't

19   want to testify.

20           THE COURT:  Right.

21           MR. MILLER:  My understanding is that the RSUs for

22   employees who had a bonus, always came out of a bonus, they

23   did not come out of the base in practice.  I don't know if

24   we've ever had an example where --

25           THE COURT:  Because --

1          MR. MILLER:  -- anybody said --

2          THE COURT:  Right.

3          MR. MILLER:  -- that they didn't get their

4    December paycheck because it came in RSUs.  I think that --

5    I believe that's the facts, but if somebody knows the

6    situation where --

7          THE COURT:  Okay.

8          MR. MILLER:  -- a base salary was paid --

9          THE COURT:  Right.

10         MR. MILLER:  -- in RSUs and CSAs.

11         THE COURT:  I mean, this seems -- the fourth

12   bullet that you've highlighted does seem to suggest that the

13   firm could decide whatever it wanted.

14         MR. MILLER:  I think it does, yes, Your Honor.

15   But there is a calculation statement.  If you want to go to

16   tab 19, Your Honor, in let me see if I can find where that

17   came from.

18         THE COURT:  Right.

19         MR. MILLER:  That shows a --

20         THE COURT:  Right.

21         MR. MILLER:  -- calculation example I believe is

22   one of the stipulation documents.  Let me make sure that's

23   right, Your Honor.

24         THE COURT:  Okay.  So that's --

25         MR. MILLER:  Tab 19 is --

Page 50

```
 1              THE COURT:  -- exactly --

 2              MR. MILLER:  -- exhibit --

 3              THE COURT:  -- what I was thinking.  So this shows

 4    that you were paid $200,000, and that you earn a bonus of

 5    900, and then it gives you the equity component, and then

 6    under the payment, there's an additional cash payment bonus,

 7    less RSUs.

 8              MR. MILLER:  Right.

 9              THE COURT:  Right.

10              MR. MILLER:  This also shows, if you'll note in

11    the middle, an equity summary in U.S. dollars --

12              THE COURT:  Right.

13              MR. MILLER:  -- RSUs, the equity component is

14    $235,000 and they added in 2 cents for rounding, market

15    price 126, discount, there's a discount on the RSUs, the

16    stock is actually sold at a discount, which is part of the

17    program.  So --

18              THE COURT:  So the -- which results in the

19    employee getting more shares than someone would if they were

20    purchasing them on the market.

21              MR. MILLER:  Yes, that's correct, Your Honor,

22    think of it like an employee discount on the shares.  So

23    they got $2,486 -- 4,086.7 --

24              THE COURT:  Shares.

25              MR. MILLER:  -- 7 shares, that's the common stock
```

1    they will have.  They'll have that number of shares at

2    whatever the value of those two thousand --

3            THE COURT:  Five years hence.

4            MR. MILLER:  -- 486 five years hence, assuming

5    they meet the conditions.

6            And then they also -- there's some notes at the

7    bottom, which we didn't highlight.  It says, "All bonus

8    awards and equity awards are contingent on your being

9    employed on the such schedule bonus award date on or before

10   January 31st, 2006," in this case, "and not having given or

11   received notice of employment termination."

12           So, you know, they had to continue to be there.

13   But bear in mind, that the RSUs and the CSAs automatically

14   converted on death, disability and retirement.  So this --

15           THE COURT:  Okay.  That's right.

16           MR. MILLER:  These shares could become

17   transferrable, they are shares, they could become

18   transferrable at an earlier date than that for death,

19   disability or retirement.

20           Your Honor, at tab 4 is a different example, also

21   in the stipulation, it's Exhibit 2 to the stipulation of a

22   confirmation employment, and it basically has the same

23   paragraph that you saw before.

24           So we believe that this was consistently given to

25   people in the program.

1              Tab 5, Your Honor, is a document that is in the

2      joint appendix and it's a 2008 U.S. guide to working at

3      Lehman Brothers.  It's not -- it's somewhat redundant, but

4      it is helpful at clarifying.  One of the thing it states in

5      yellow at the bottom is that the employment is at will.  I

6      don't believe there's any dispute about the fact that these

7      were all willing employees.  There was no one year term,

8      five year term, whatever.

9              And so if somebody worked a year and they didn't

10     like the way the stock awards and stock units happened, they

11     could quit.  I mean, that's an important point in the Enron

12     case, that the employees made the decision everyday whether

13     to continue working on this basis or not, as have all these

14     people.

15             The second page does deal with bonuses, and this

16     stresses that at least at that point, bonuses are at the

17     sole discretion of the firm, with the dates vary from year

18     to year.  And it says that they're discretionary unless

19     otherwise agreed upon in writing.

20             You saw two examples of agreed bonuses.  Most of

21     these employees, my understanding is, did not have agreed

22     bonuses.  They were discretionary.  They were usually,

23     frankly, very generous, but they were not agreed to.

24             THE COURT:  So when one such employee embarks on

25     the year, they -- it's LBHI's view that then they have some

Page 53

1    sort of a base salary that they would collect in cash in the

2    form of a paycheck and then at the end of the year, they

3    were just -- they would wait and see what they got in terms

4    of a bonus that could take the form of some combination of

5    cash and RSUs.

6            MR. MILLER:  That's correct, Your Honor.  And to

7    some extent, I believe it's -- well, that's correct.  And

8    you'll notice that this document says that a portion of

9    bonuses may be awarded through the Lehman Brothers equity

10   award program or other firm sponsored programs.  That

11   clarifies I think your point that the practice at least was

12   that the stock awards and stock units came out of the bonus,

13   they didn't come out of the base salary.

14           THE COURT:  Could you clarify the commission issue

15   for me?

16           MR. MILLER:  I'll try, Your Honor.  Production

17   based employees, as they call them, were basically sales

18   people.

19           THE COURT:  Right.

20           MR. MILLER:  They brought in commissions by

21   selling -- getting people to trade with the business, just

22   like stockbrokers, as I understand.

23           THE COURT:  Okay.

24           MR. MILLER:  And there may be various -- there

25   were a lot of different parts of the Lehman operation.  And

Page 54

1    one of the other things to understand, Your Honor, I'll just

2    mention this for terminology, the only stock in the Lehman

3    system was stock of Lehman Brothers Holdings, Inc.

4              THE COURT:  Right.

5              MR. MILLER:  It was a -- it was the --

6              THE COURT:  Holding company.

7              MR. MILLER:  -- parent corporation.

8              THE COURT:  Right.

9              MR. MILLER:  There were various subsidiaries, some

10   of which were -- had employees, and some of which did not.

11   A major employer was Lehman Brothers, Inc., LBI, which was

12   the broker dealer, which has gone through a SIPA proceeding.

13             We have a note at the end of our brief that if

14   these claims turned out to be claims for money instead of

15   claims for stock, many of these claims would be claims

16   against Lehman Brothers, Inc. for money in the SIPA

17   proceeding, and not claims against LBHI.

18             So I just want to note that for the Court's --

19             THE COURT:  Understood.

20             MR. MILLER:  -- understanding.  But LBHI is

21   dealing with the stock issues because this was where all the

22   stock --

23             THE COURT:  Right --

24             MR. MILLER:  -- was.

25             THE COURT:  -- but what I'm focusing on is the

1     idea that we -- that some of the claimants were --

2              MR. MILLER:  Yes, let me go back to the

3     commission.

4              THE COURT:  -- commissioned.  Okay.

5              MR. MILLER:  Regardless of which entity they were

6     selling for, a portion of their commissions, and I believe

7     they were monthly commission statements, would have an

8     allocation to stock awards or stock units.  And that portion

9     was allocated out of their commissions.  And at the end of

10    the year, that portion was converted just like you saw into

11    tracking --

12             THE COURT:  So was there an understanding at the

13    outset that, and I'll make up a simple example, if you sell

14    a hundred dollars' worth of a mortgage, whatever it was that

15    they were selling, or stocks, trades, however you

16    characterize it, you will receive a commission of 1 percent.

17    Is that -- I mean, how was the commission -- what was the

18    understanding as to how the employee would earn the notional

19    amount of the commission, putting to one side for the

20    moment, the form in which that commission, the compensation,

21    would be paid?

22             MR. MILLER:  Well, Your Honor, you're going to

23    have some people testify, I think there were variations on

24    this.

25             THE COURT:  Okay.

1           MR. MILLER:  But my understanding is that yes,

2    there was a percentage, but there was also, I believe in the

3    employment arrangement, a very similar clause to the one

4    that is -- that we're seeing here, that says "a portion of

5    your commissions may be paid in the form of equity awards."

6           So from the very beginning there was an

7    understanding.  And I believe the testimony will --

8           THE COURT:  So the commission --

9           MR. MILLER:  -- be common in this industry.

10          THE COURT:  -- the rate of commission and the --

11   I'll say the rate of the commission was known, but the form

12   in which it would be paid was subject to this discretionary

13   allocation.

14          MR. MILLER:  That is my understanding, Your Honor.

15   And, you know, we -- I don't want --

16          THE COURT:  I appreciate that.

17          MR. MILLER:  -- to proffer that because it varies.

18          THE COURT:  Yeah.

19          MR. MILLER:  But, yes, that's my understanding.

20          THE COURT:  Okay.

21          MR. MILLER:  Is that that did vary, and I think,

22   in any event, that's the case, Your Honor.

23          Moving through some more of sort of the known

24   issues, at tab 6, Your Honor, is an excerpt from the

25   stipulation itself, and we use that just to show that the

Page 57

1    employee handbook, this is on page 4 for UK employees, had

2    almost exactly the same sort of statement, "At the firm's

3    discretion, a portion of your total compensation under any

4    discretionary bonus award may be made in the form of

5    contingent stock award, CSAs, under the appropriate Lehman

6    Brothers stock awards program."

7            We're just sort of showing that this sort of

8    statement was present in documents we think in all the

9    programs.

10           Tab 7 I want to flag for the Court as one that

11   there's been an objection made to as hearsay.  We're not

12   offering tab 7, Your Honor, to -- for the truth of the

13   matter asserted.  We are offering it as an example of the

14   format of communication.  I believe that there will be

15   testimony that a "Dear Colleague" letter of some kind came

16   in basically every year.  And it had a series of attachments

17   to it.

18           The letter itself is not important.  The idea is,

19   at the end of the year, or the middle of the year, that they

20   got some things that had the stuff we're going to talk about

21   later attached in some form.

22           Tab 10 is a useful example of the stock incentive

23   plan prospectus.  And this, among other things, states the

24   purpose of the plan, which is one of the things that we

25   think is relevant to the Court's consideration as to whether

Page 58

1    this is equity or something other than equity.  And the

2    highlight on page 2 at tab 10 says, "The purpose of the plan

3    is to strengthen holdings," that's LBHI, "by providing

4    incentive to such participants to encourage them to devote

5    their abilities to increase stockholder value and to sustain

6    excellence."

7            This theme runs throughout, that the purpose of

8    this was to create a sense of equity that is ownership in

9    the firm.

10           Now, page 5, and these are excerpts, Your Honor,

11   there were pages in the exhibit.  It's page 5 of -- on the

12   bottom.  It says, and this is another important theme, with

13   respect --

14           THE COURT:  Are we still on the same exhibit, I'm

15   sorry?

16           MR. MILLER:  Yes, Your Honor --

17           THE COURT:  Oh, it's --

18           MR. MILLER:  -- still at tab 10.

19           THE COURT:  I got it.

20           MR. MILLER:  "With respect to any RSUs granted

21   under the plan, the obligations of the company are limited

22   solely to the delivery of shares of common stock on the date

23   when such shares of common stock are due to be delivered

24   under each award agreement.  And in no event, will the

25   company become obligated to pay cash in respect of such

Page 59

1    obligation."

2         Then it has a paren that has to do with fractional

3    units.  Parenthesis, "except that the company may pay the

4    participant amounts in cash in respect of an RSU equal the

5    cash dividends paid to the holder of the same number of

6    shares of common stock that are subject to RSUs for

7    fractional shares or any amounts payable in cash upon the

8    occurrence of a change in control."

9         So the exceptions really are that they could pay

10   cash dividends if they wished, and they didn't have to pick,

11   and they could pay for fractional shares, or for any amount

12   payable in cash upon the occurrence of a change in control.

13        So this important because, Your Honor, there's --

14   throughout the plan documents, you will see there are a

15   number of statements that the only obligation of the company

16   is to deliver common stock.  It was never to deliver

17   anything else, it was never to deliver cash, it was never a

18   right to back out, there was never a right for a refund,

19   there was never a warranty.  This is a program of -- as you

20   said, they start out as stock awards or stock units, and

21   they grow up to be common stock, and they can't change to

22   something else.  And they never have a right to -- they

23   never have a money back guarantee.

24        Tab 11 is another program document.  This is

25   important because it is amended through November 8, 2007.

Page 60

1    So this was up through basically less than a year before the

2    Lehman bankruptcy.  And I think it's -- and it had all the

3    amendments, and it tended to be cumulative.

4         Again it states the purpose.  "The purpose of

5    Lehman Brothers Holdings, Inc. employee incentive plan, 'the

6    plan', is to strengthen Lehman Brother Holdings, Inc. by

7    providing selected employees of the company with the

8    opportunity to acquire a proprietary and vested interest in

9    the growth and performance of the company, thus generating

10   an increased incentive to contribute to the company's future

11   success and prosperity."

12        It goes on, and it's not highlighted, and says,

13   "enhancing the value of the company for the benefit of

14   stockholders, and enhancing the company's ability to attract

15   and retain individuals of exceptional talent."

16        So this had multiple programs, but they were all

17   key -- the program had multiple purposes, but they were all

18   keyed to promoting a proprietary perspective.

19        The bottom of this page notes that the plan should

20   be administered by the committee.  There's a committee

21   established, "which shall have the power to select those

22   participants who shall receive awards, and to determine the

23   terms of such awards."

24        This is an important point, Your Honor, because in

25   some instances you may hear some testimony from somebody who

Page 61

1   says, my boss explained something to me about this plan.

2   The documents always said, the committee sets the terms of

3   the plan.  And it was clear that there was nobody who had

4   authority in Lehman to go around and make up equity awards

5   programs.

6          THE COURT:  So -- but wouldn't any such testimony

7   be inadmissible and hearsay anyway?

8          MR. MILLER:  Well, yes, Your Honor, although some

9   people may say this was my state of mind.  I mean, that's

10  what their -- they may use it.  So I'm just making clear --

11         THE COURT:  Okay.

12         MR. MILLER:  -- that we don't believe that the

13  terms of this program could be varied by representations of

14  anybody.  It could only be varied by the plan committee.

15  That's the way the structure was, and everybody was told

16  that to begin with.

17         The top of this page numbered 4 still in tab 11

18  repeats --

19         THE COURT:  Stop on that point.  So in the

20  hypothetical, I know what the document says, but my boss sat

21  me down and told me, don't worry, we'll pay you in cash.

22  Don't I get to the same cul de sac that I'm in with respect

23  to Neuberger then?  In other words --

24         MR. MILLER:  Sure.  I think you do exactly, Your

25  Honor.  I mean, the answer is okay, so if they say, I kept

Page 62

1   working because my boss told me to do this, otherwise I

2   wouldn't have worked, so now I want cash instead, they want

3   to rescind the deal, because they say it wasn't the deal

4   they thought it was, we're back to a rescission, and we're

5   back to a rescission of something else.

6          And again, we don't believe that that's going to

7   actually happen, but I do want to flag for the Court that

8   there are a number of places in the program documents, where

9   they say only the committee could change the plan.  And

10   everything is communicated in writing, you will see that

11   here.

12          Page 4 is another repetition of the same, the

13   obligations to the company, and any subsidiary, limited

14   solely to delivery of common stock.  And it has these same

15   exceptions about certain times that there are payments.

16          THE COURT:  And -- but there was an allegation in

17   one of the claimant's briefs that -- about the removal of

18   the language, specifically referring to subordination in the

19   event of a bankruptcy.

20          MR. MILLER:  I'm going to come to that in a couple

21   of tabs, Your Honor.

22          THE COURT:  Okay.  I'll wait, I'll wait.

23          MR. MILLER:  But you're right --

24          THE COURT:  Yep.

25          MR. MILLER:  -- that is true, and I want to deal

Page 63

1    with that.

2              THE COURT:  Okay.

3              MR. MILLER:  I can skip to it now if you want me

4    to but --

5              THE COURT:  No, no, that's fine.

6              MR. MILLER:  -- I think it'll be in order and

7    it'll be a little clearer.

8              THE COURT:  That's fine, I'm going to start

9    keeping quiet again.

10             MR. MILLER:  No, Your Honor, I want to answer the

11   questions.

12             Section 9 is another statement about dividends

13   made at the discretion of the committee, it can provide the

14   participant with dividends or dividend equivalents and

15   voting rights prior to either vesting or earn-out.  Vesting

16   and earn-out are terms that were used to refer to these

17   awards.  And my understanding is that consistently

18   throughout the time period at issue, the committee did grant

19   dividend equivalence and did grant voting, some voting

20   rights at least.

21             Now, there is a clause at the bottom of 4 that the

22   participants like to emphasize, and I want to talk about the

23   clauses they like, as well as the clauses that we like.

24             This says, "The grant of an award shall not be

25   construed as giving a participant the rights of a

Page 64

1    stockholder of common stock unless and until shares of

2    common stock have been issued to participants pursuant to

3    awards hereunder."

4            Now, that's obviously a legal boilerplate

5    statement, I can do some hypotheticals.  For example, I

6    don't think a holder of a stock award could bring a

7    shareholder's derivative --

8            THE COURT:  Derivative action, right.

9            MR. MILLER:  I don't believe that they could go to

10   a shareholder's meeting and offer a motion, if that's all

11   they had.  So they are not an active shareholder, but they

12   do have attributes, I believe, of shares in the corporation.

13           Now, this is another clause on page 5 that the

14   participants place some emphasis on, and it goes back to the

15   exceptions really that I talked about before.  They say it's

16   an unfunded status of the plan.

17           "Since the plan is intended to constitute an

18   'unfunded' plan for long term incentive compensation with

19   respect to any payments not yet made to a participant."  Now

20   this is payments not yet made to a participant, "including

21   any participant optionee by the company, nothing herein

22   shall give any participant any rights that are greater than

23   those of a general creditor of the company."

24           Now, Your Honor, the way that payments could

25   occur, if we went back to the exceptions here on the prior

1    page, they could occur if the committee decided to pay

2    dividends as money.  Payments could occur if they wanted to

3    pay for fractional shares, or payments could occur if there

4    was a change in control.

5              In those circumstances, these would be payments as

6    general creditors, and as the Court knows, compensation of

7    employees actually gets a priority for $10,000 and certain

8    amount that varies, I think this is intended to say that

9    those particular payments are not necessarily in that

10   priority.  You don't have to deal with that, because that's

11   not one of the issues before you.

12             But I would suggest to you that this clause does

13   not mean that there was ever a right to get money back.

14   This is just saying that if a payment became due under one

15   of these exceptions, it was just general creditor status, it

16   was not preferred payment.

17             THE COURT:  I'm sorry, I lost you.  What payment

18   would be entitled to general creditor status?

19             MR. MILLER:  If you went back to the prior page,

20   subparagraph B, it said, "with respect to any restricted

21   stock units granted under the plan, the obligations of the

22   company or subsidiary are limited solely to delivery of

23   shares of common stock."

24             Now, skip down to a parenthesis, which says,

25   "except that the company or any subsidiary may pay to

Page 66

1    participant amounts in cash in respect of restrictive stock

2    units, equal to cash dividends, paid to a holder of shares

3    of common stock, for fractional shares or for any amounts

4    payable in cash upon the occurrence of a change in control."

5            Those are three exceptions when cash could become

6    payable to someone under the RSU program, and if you imagine

7    that a bankruptcy curtain fell between say a change of

8    control and the payment of amounts of money due under the

9    change of control, there would be amounts payable under the

10   program, but those amounts would be at the general creditor

11   level under this statement.

12           They're saying, the only reason that this clause

13   on page 5 could have existed, was if they were going to have

14   some right to get our money back, or that this means we

15   should have a right to get our money back.  And I'm

16   suggesting to the Court in context, this is a legalistic

17   provision that is designed to say, yes, there may be amounts

18   of money due at certain times, very limited times, not times

19   at issue with this Court, and if that happens, they're

20   general creditors.

21           So I want to flag that, because I don't think this

22   means what the claimants are going to say it means, and I

23   wanted to put it in perspective for the Court.

24           I will note, by the way, that there's also, and

25   it's not highlighted --

1          THE COURT:  Well, read the next sentence in that

2     section 16 and --

3          MR. MILLER:  Section 16, Your Honor?

4          THE COURT:  Yeah.

5          MR. MILLER:  Yes, I --

6          THE COURT:  "In its sole discretion, the committee

7     may authorize the creation of trust or other arrangements to

8     meet the obligations created under the plan to deliver

9     common stock or payments in lieu thereof."

10          So at least at first blush, that would appear

11     to --

12          MR. MILLER:  Well --

13          THE COURT:  -- support your reading, but I'm not

14     entirely certain.

15          MR. MILLER:  Well, yes --

16          THE COURT:  In other words, because it -- you're

17     talking -- when you think of unfunded, you think of

18     unfunded, and here it's talking about the delivery of common

19     stock or payments.  So it's distinguishing between two types

20     of units of compensation or kinds of compensation that

21     haven't been paid.  The phrase "or payments in lieu thereof"

22     is what I'm focusing on.

23          MR. MILLER:  Your Honor, I think we -- and we can

24     maybe explore this a little later, if you have the entire

25     document, you'll find that this document deals with stock

Page 68

1    options and it deals with other incentive awards.  And there

2    was a number of kinds of equity awards that are not at issue

3    here today, Your Honor.

4                    THE COURT:  Okay.

5                    MR. MILLER:  But the restricted stock units are

6    for this purpose.  I do want to mention the trust briefly.

7                    There was a trust created.  It held shares of

8    common stock primarily.  Sometimes it held little amounts of

9    money that were being used to buy common stock.  Well, what

10   the company did was it bought common stock, and put it in

11   trust.

12                   THE COURT:  Okay.  So now you're getting to my

13   point.  So in that sense, it was funded.

14                   MR. MILLER:  It was funded by stock.

15                   THE COURT:  By stock that was issued and

16   outstanding and that was --

17                   MR. MILLER:  That's correct, Your Honor.

18                   THE COURT:  -- and it was placed aside so that

19   when an RSU matured, so to speak, it then became stock that

20   that employee held.

21                   MR. MILLER:  That's correct, Your Honor, and there

22   is some documents dealing with the trust.

23                   THE COURT:  Okay.

24                   MR. MILLER:  And that is the stock, by the way,

25   that the RSU holders voted.  They could direct, as you will

1    see in a moment in the proxy.  The holders of stock units

2    and stock awards could direct the trustee to vote their

3    number of shares in favor of something, or against

4    something.  So that's how they got their voting rights.  Is

5    that they maintained voting control over that --

6              THE COURT:  So it's kind of like --

7              MR. MILLER:  -- the stock --

8              THE COURT:  -- they acted as certificate holders

9    in some kind of an CMBS trust.  They directed the trustee to

10   vote on their behalf.

11             MR. MILLER:  That's correct, Your Honor, and again

12   I'll come to that in just a moment in the tabs.

13             THE COURT:  Okay.

14             MR. MILLER:  So tab 12, Your Honor, is a 2003

15   equity award program, and this happens to be for a senior

16   vice-president.  There were different programs for different

17   employment positions, but they were generally very similar.

18             This is one of the documents in the stipulation.

19   It's Exhibit 3 to the stipulation.

20             This is another good summary on the first page,

21   "Each RSU represents the conditional right to receive one

22   share of Lehman Brothers common stock five years after the

23   RSU is granted, assuming continued employment with the

24   firm."

25             And then it goes on and says, "once your RSUs

1    convert to common stock, they become freely tradable.  They

2    cannot be sold, traded, pledged, or assigned before

3    conversion."

4            So the term conversion was used, Your Honor, but

5    it was an automatic conversion, it wasn't a right to

6    convert.  It happened automatically.

7            Now, the second page of tab 12 has two quotes that

8    again I think are a good summary of the purpose of the

9    program, and what the participants understood.  The first

10   highlight says "the program provides you with an incentive

11   to think and act like an owner every day, and allows you to

12   share in the firm's financial success over time."  That is

13   really the core of the way you'll see this program was set

14   up.  They felt like an owner.  They could vote, they got

15   dividends, and at the end of five years if they were still

16   working there, they got the right to buy -- to sell their

17   common stock.

18           Then this is a quote I used earlier, "You can

19   consider the RSUs as shares of Lehman Brothers' common stock

20   that the firm holds on your behalf for five years, which you

21   will be entitled to receive at that time, provided you meet

22   certain terms and conditions."

23           There is at the -- if you go over a couple of

24   pages, there is a sample calculation page.  I don't think we

25   need to dwell on that, but this is helpful to the Court to

Page 71

1   understand this sort of information is what was provided to

2   the program participants.  So if this was their first year,

3   they could see what their compensation statement was going

4   to look at I believe, or this is similar to the calculation

5   that was done.

6           The next page, Your Honor, has two important

7   points I've referred to, death, disability and retirement.

8   "Upon death, disability or retirement, the entire principal

9   portion and discount portion will vest immediately and

10  shares of Lehman Brothers' common stock will be issued

11  immediately."

12          So these people understood that their estate had

13  shares of common stock, another attribute of ownership.

14          Now, there's a discussion of tax treatment on the

15  next page, and I'm not going to read all of it, but briefly

16  under the tax regulations, the employees were not taxed

17  until they convert to common stock, so they appreciate on a

18  pre-tax basis for the five year period, which is a benefit.

19  And there is a summary of taxation rules on this page.

20          The last --

21          THE COURT:  I'm just pausing on your statement

22  they appreciate on the pre-tax basis.  So in the year in

23  which the RSU is issued, if it has a notional value of

24  $500,000, there's no tax on that.

25          MR. MILLER:  Well, I think the point is if one had

Page 72

1    common stock and you wanted to sell the common stock or you

2    got the dividends, for example, on common stock, you pay tax

3    on the dividends, and then you wouldn't have a tax that you

4    could reinvest somewhere else.

5            They appreciate and there's no tax on the

6    appreciation.  If the appreciation goes up, and the

7    appreciation goes down, the employees don't pay tax on it

8    when it goes up.

9            THE COURT:  So let's take an example.

10           MR. MILLER:  They only pay tax when --

11           THE COURT:  So they get $500,000 of RSUs or RSUs

12   convertible at that price, $500,000.  Then over the five

13   years it appreciates to a million dollars.  Okay.

14           MR. MILLER:  Yes, Your Honor.

15           THE COURT:  So in the fifth year, they get Lehman

16   stock worth a million dollars.  That's their tax event.

17           MR. MILLER:  Right.

18           THE COURT:  A million dollars of non-capital gains

19   on the five -- they didn't pay tax on the 500, so they're

20   not paying tax on the gain, they're just getting ordinary

21   income of a million dollars when they get the stock in five

22   years?

23           MR. MILLER:  I'm not sure whether it's all

24   ordinary income or not, Your Honor, but they -- it is all

25   taxed at that point, where you go back to send them a tax.

1          MS. BRADY:  Four, Your Honor, that's a special

2    permission --

3          MR. MILLER:  Stand up and identify yourself,

4    please, this is Ms. Brady and she's going to --

5          MS. BRADY:  Your Honor, Teresa Brady.

6          THE COURT:  Thank you.

7          MS. BRADY:  If you see on page 11 here, there are

8    tax considerations.  There's a block discussion RSUs.  In

9    the fourth bullet, it says "special provisions dealing with

10   capital gains will not apply upon conversion."

11         THE COURT:  So that's consistent with --

12         MR. MILLER:  Yes, that's consistent with what

13   you --

14         THE COURT:  -- what you're saying, Mr. Miller, is

15   that there was no tax event when the RSUs are issued.  The

16   tax event is when the stock issues and when the stock

17   issues, you have a tax event, but it's not a capital gain.

18         MR. MILLER:  That's correct, Your Honor.

19         THE COURT:  Okay.

20         MR. MILLER:  But they also have not had to pay tax

21   on an appreciation if the stock has gone up --

22         THE COURT:  Right.  Well, that would be --

23         MR. MILLER:  -- and then the stock --

24         THE COURT:  -- if you got $500,000 in stock, so

25   that would be income to you that would be taxed, and then if

Page 74

1    you sold the stock five years later for twice, then you

2    would have -- you know, all other things being equal, a

3    capital gain.

4             MR. MILLER:  Yes, Your Honor.

5             THE COURT:  So.  Okay.

6             MR. MILLER:  The last page in tab 12 is dividend

7    equivalents.  And it says dividend equivalents approved

8    quarterly on your RSUs and are reinvested as additional RSUs

9    without a discount.  It's worth noting the dividends are not

10   paid on stock option awards.  There are some stock option

11   awards, Your Honor, but they didn't get dividends.

12            And then voting rights, and this explains the

13   voting rights a little bit more.  "Lehman Brothers

14   established a trust and funded it with shares for your

15   benefit, to provide you with voting rights related to RSU

16   awards.  You will be able to direct the voting related to

17   shares held in the trust in proportion to the number of RSUs

18   you hold."

19            And then tab 13 is a proxy statement dealing with

20   the voting issue, Your Honor.  And if you flip over, this

21   happens to be February 2003 again, we believe this is a

22   representative sample.

23            It says, "proxies furnished to company employees

24   also indicate the number of shares, if any, and it says,

25   that relate to the total number of restricted stock units

Page 75

1    granted to the employee pursuant to various of the company's

2    incentive plans as defined below, which shares are held in

3    part in the 1997 trust under Lehman Brothers Holdings, Inc.

4    incentive plans."

5              And then if you skip down to the next highlight,

6    "Proxies returned by employees holding restricted stock

7    units related to shares held in the incentive plan trust

8    will be considered to be voting instructions returned to the

9    incentive plan trust trustee, with a defined term, with

10   respect to the number of shares determined pursuant to the

11   terms of the agreement governing incentive plan's trust as

12   described below under the voting spot."

13             And then I'm -- we don't need to read the next

14   highlight, but it explains how this works.

15             Now, I do want to be clear, Your Honor, the trust

16   did not necessarily have a share for every RSU that had been

17   issued.  So this is a proportional thing.  The voting rights

18   were not necessarily exactly the same voting rights, one-to-

19   one.  I want to be clear about that, but there were voting

20   rights, and they did -- the voting rights depended upon how

21   much was in the trust.

22             THE COURT:  Could Lehman have issued the RSUs

23   without any voting rights whatsoever?

24             MR. MILLER:  It could've designed the plan that

25   way I'm sure, Your Honor.  We don't know of any reason it

Page 76

1    didn't have to.  I think the -- my understanding from the

2    plan documents is that the belief was that giving holders of

3    stock units and stock awards voting rights increased their

4    feeling of ownership and participation.  And I think it is

5    another one of those attributes that makes it look like more

6    shares of a corporation.

7            I mean, one of the most important rights of a

8    shareholder in a corporation is the franchise.  And this

9    gives them a form of franchise.  So I think when you're

10   looking at the -- sort if it walks like a duck, quacks like

11   a duck test, this is something that is more like shares of

12   the corporation --

13           THE COURT:  Okay.

14           MR. MILLER:  -- and therefore, it's important.

15           If you -- tab 14 is one of those -- one of the two

16   documents that I'm going to talk about that have to do with

17   this provision that was included and then taken out dealing

18   with bankruptcy.

19           And so I want to focus the Court's attention on

20   that, and let's talk about it at this point.  This is the

21   2003 program I think -- let me make sure this is part of the

22   -- yes, this is Exhibit 4 to the stipulation, Your Honor.

23   And we've highlighted some sections.  There is a general

24   rule, an entitlement to receive common stock, and it simply

25   makes the statement "unless otherwise set forth herein, you

Page 77

1    shall receive one share of common stock for each unit which

2    you hold on November 30th, 2008, on maturity date."

3            So this established that in 2003, the maturity

4    date was November 30th of 2008.  We know September 15th was

5    the filing.  So nothing in the 2003 plan or later would've

6    reached the maturity date.

7            The occurrence of bankruptcy is dealt with in

8    subparagraph G, and it is also discussed on the next page,

9    treatment in bankruptcy.  And this paragraph G says that "if

10   there is an occurrence of a bankruptcy distribution event,

11   or death or disability, then all outstanding units held by

12   you shall become immediately payable, and you shall, as soon

13   as practical thereafter, receive freely transferrable shares

14   of common stock."

15           Again, what this says is, in a bankruptcy, what

16   you get is common stock.  It doesn't say in a bankruptcy you

17   get cash, it doesn't say anything different from what we're

18   saying here.  And I don't believe anybody here is

19   complaining that they want to be sure they have common

20   stock.  They do have, they will have after reclassification

21   their proportioned interest in the equity pool.

22           And while it is really hard to imagine how this

23   could happen, but in theory, if somewhere in the archives it

24   turns out that Lehman Brothers Holdings, Inc. holds the

25   patent on cold fusion, and it turns out that billions of

Page 78

1    dollars pour in from an unexpected source, they will get

2    shareholder distributions if the plan has to be revised, and

3    there is -- you know, if we pay off all our debts.

4         And by the way, a number of Lehman subsidiaries

5    have actually paid all their unsecured creditors, and are

6    moving into the mode where they've been dealing with post-

7    petition interest and other things.  But they might have

8    some shareholder benefits if they had shareholders.  They

9    won't.

10        THE COURT:  Can you -- I'm just -- the -- what I'm

11   staring at is the introductory phrase in G.  And it says,

12   "Notwithstanding the provisions of paragraphs 4(b), (c), (d)

13   and (e)."  So the entire paragraph is qualified by that.

14   And (b), (c), (d) and (e) all have to do with terminations.

15        So I'm trying to understand why it says that, as

16   opposed to notwithstanding 4(a).

17        MR. MILLER:  Well, Your Honor, I think 4(b), (c),

18   (d) and (e) are the -- are essentially the keep working here

19   and don't compete conditions.  And I think -- we're

20   speculating now, but I think the idea here is that if a

21   bankruptcy is looming, the employees ought to be free to go

22   ahead and find other jobs and maybe compete, and that their

23   stock units should not have been cut off for that.

24        That seems -- I don't think that has anything to

25   do with where we are here, but I think that was the idea if

Page 79

```
 1    there was going to be a scramble.

 2            Now, I'm going to suggest in a few moments, Your

 3    Honor, you've anticipated one of my points.  This paragraph

 4    is fairly unworkable if you actually examine and think about

 5    it.  Because if the company is moving into bankruptcy, the

 6    idea of running around and issuing a bunch of shares of

 7    common stock to people in a big hurry doesn't make a lot of

 8    sense.  Because what we now know about bankruptcy, and it's

 9    demonstrated here and other things, is there's a stay,

10    everything has to be sorted out, and equity is one of the

11    last things dealt with.

12            So I'm going to suggest to you that one of the

13    reasons these bankruptcy provisions were eliminated, is

14    because they were actually unworkable and unnecessary.  But

15    I'm anticipating that.  But if you think about what somebody

16    must have been thinking about here, that's probably what

17    they were.

18            THE COURT:  This -- I hear you.  I guess what, the

19    more interesting one is the treatment in bankruptcy

20    provision.

21            MR. MILLER:  Yes, Your Honor.

22            THE COURT:  You're going to get to that, so I'll

23    wait.

24            MR. MILLER:  All right.  Well, Your Honor, what

25    this says essentially, as you know, is if you're an
```

1    employee, that you receive a subordinated -- you receive

2    shares of common stock, and until grant, you shall be deemed

3    in the event of a bankruptcy of holdings, to be claims for

4    damages arising from the purchase or sale of common stock of

5    holdings within the meaning of Section 510(b) of the

6    Bankruptcy Code, and shall have in such bankruptcy the same

7    priority as, and no greater priority than the common stock

8    interest and holdings.

9                    THE COURT:  Right.

10                   MR. MILLER:  Basically it says what we're saying

11   here.

12                   THE COURT:  What the law is, right.

13                   MR. MILLER:  It is, by the way, it's a statement

14   of the law.

15                   THE COURT:  Right.

16                   MR. MILLER:  It says, what you will -- what will

17   happen under 510(b).  It's not actually a subordination

18   agreement.  It doesn't say you agree that, it says, this is

19   what's going to happen under 510(b), which is basically we

20   think the correct statement of the law.

21                   THE COURT:  Right.

22                   MR. MILLER:  And then it says that the terms can

23   be amended from time to time.

24                   Now, let's compare that with tab 15, which I

25   believe actually tab 15 has the same provisions in it.  Tab

Page 81

```
 1    15 is another of the --

 2              THE COURT:  Same year.

 3              MR. MILLER:  Same year, same provision.  Let's go

 4    to 2005.

 5              THE COURT:  Right.

 6              MR. MILLER:  In 2005, we have the same essential

 7    document, but it doesn't talk about bankruptcy at all.

 8              THE COURT:  At all.  It takes it out of the --

 9              MR. MILLER:  It just takes it out.

10              Now, Your Honor, I'll represent, and I have an

11    expert on this, that we have tried hard to find a living

12    human being who knows why this change was made, and we have

13    failed.  And we have a long litany of the efforts we have

14    made.  No one knows why it was removed.

15              We do know that there was, and we believe that the

16    evidence will show, there was no public announcement of the

17    removal of this provision.  There was no publicity

18    associated with the removal of this provision.

19              Now, I would suggest several --

20              THE COURT:  Is there something, and I'm totally

21    speculating just as a bankruptcy junkie, right, 2005 was the

22    enactment of BAPSPA.  Maybe, you know, maybe some bankruptcy

23    lawyer decided -- maybe someone read it and made some

24    determination, but I'm just speculating.

25              MR. MILLER:  Well, Your Honor, we believe that
```

Page 82

1    there were changes in the tax law, there were changes in the

2    bankruptcy law.

3              THE COURT:  Right.

4              MR. MILLER:  I believe the most logical inference

5    is someone said, look, this might be wrong, this might be

6    confusing, this is not a pleasant subject, why should we

7    even bring up bankruptcy, why do we need to give legal

8    advice to people in this document, and somebody said well,

9    let's take it out, let's not talk about it this year, and it

10   was scratched out.  I believe that's the most logical

11   conclusion.

12             THE COURT:  So nobody either side has any evidence

13   of why -- what occasioned the removal of the language?

14             MR. MILLER:  I believe that's the case.  Now, Your

15   Honor, I'd also point out --

16             THE COURT:  So the claimants are asking for an

17   inference though that it reflects a change in the

18   substantive treatment that the rights of the RSUs is

19   entitled to.

20             MR. MILLER:  Right, Your Honor.  And as you

21   consider that argument, I just want -- let's play out what

22   we've seen about the purposes of this program.

23             The purpose of this program are to incent

24   employees, to make them feel like owners, and to make them

25   want to keep working for the company.  If this were a change

Page 83

1    hypothetically, it would seem this would be a huge positive

2    that would want to be announced to the other employees, and

3    tell them, look, you're the only firm in Wall Street that

4    has a program that says, if we go bankrupt, we're going to

5    pay you back all the money that's tied up in your RSUs.

6    That could've doubled recruiting, Your Honor.

7            I mean, nobody to our knowledge has that kind of a

8    provision.  But I -- this is in the famous Sherlock Holmes

9    dog that did not bark, there is no crowing or announcement

10   or pride that says there's any change in the program.  It's

11   just that this legalistic explanation disappears.

12           So we suggest to Your Honor at the hearing, at the

13   end, you're not going to have any evidence that this removal

14   means anything.  It just is a non-event.  And that I think

15   is -- that's our position, obviously you'll listen to the

16   evidence, you'll (sic) see what the Court thinks.

17           But I think these documents frame that issue, and

18   the Court can see it's the same story except bankruptcy has

19   disappeared.

20           And by the way, I would note in tab 16, death or

21   disability is still here.  Those provisions are still

22   recognized.

23           Going to move more quickly and then we're going to

24   skip some of the tabs, Your Honor, because I do want to

25   talk, and I don't know if the Court is going to want to take

Page 84

1   any break.

2              THE COURT:  I'm okay without a break, but if

3   anybody wants to step out for a break, you're absolutely

4   welcome, even if you're sitting at counsel table.  I just

5   think it's important to keep going so we can use the time as

6   best we can.

7              MR. MILLER:  That's fine, Your Honor, I am --

8              THE COURT:  If you'd like to take a break, Mr.

9   Miller, that's fine.

10             MR. MILLER:  No, no, I'm fine, I was going to -- I

11  don't want to make an estimate on time, because I'm

12  notoriously bad at that, Your Honor.

13             THE COURT:  All lawyers are notoriously at time

14  estimates, so.

15             MR. MILLER:  But we are moving right along here.

16             THE COURT:  Okay.

17             MR. MILLER:  Tab 18, Your Honor, is an excerpt

18  from the stipulation.  This is another calculation example,

19  I'll just offer it to the Court to explain how the RSUs were

20  deducted and how they were calculated.  Tab 19 we've

21  actually already looked at, so we don't need to spend more

22  time with that.

23             We are not going to look at in any detail tabs 21

24  or 22, those are some numbers that might be useful in cross-

25  examination or for some other purpose later.

1             Tab 23, I would direct the Court's attention to,

2    the last one, and the last page there is a summary of who

3    the taxation effect occurred for LBHI with regard to this.

4    There's actually discussion which you've seen before of how

5    the taxation occurred for the employee in the stipulation as

6    well.  That's above it in that page.

7             This says, that once an RSU or CSA converted to

8    common stock, LBHI was entitled to and did, in fact, claim a

9    U.S. federal income tax deduction, as compensation spents

10   (ph) subject to any other limitations as may have been

11   required under federal, state, and local income tax laws for

12   the then prevailing amount or value of the award in the year

13   of payment to such employee.

14             The amount of such income tax deduction will be

15   based on the market price of the LBHI common stock as

16   quoted, on the New York Stock Exchange as of the

17   delivery/release date and deducted in the same taxable year.

18             This is one of a couple of important pieces of

19   evidence that the value of RSUs and CSAs for virtually all

20   purposes was variable and unpredictable.

21             THE COURT:  But -- so let me focus on this,

22   because my recollection is that there was some argument in

23   the claimants' papers, although I could be wrong, that

24   somehow Lehman was gaming the tax benefit of this.

25             So -- perhaps gaming is a poor choice of words,

Page 86

1    but in other words, the argument would be, look, Lehman took

2    a tax deduction for the compensation in year one, even

3    though year -- it did not -- it was not payable to the

4    employee until year five.  And what this says is the

5    opposite of that.

6                MR. MILLER:  That's correct, Your Honor.  That

7    corrects this notion.  There was some -- some arguments were

8    made at one point in the briefing that this was

9    asymmetrical.

10               THE COURT:  Right, right.

11               MR. MILLER:  That it was a deduction to Lehman

12   before -- for tax purposes before it was a --

13               THE COURT:  So they got the benefit of the --

14               MR. MILLER:  Before they got the benefit.

15               THE COURT:  The argument was, they got the benefit

16   of the deduction at the outset, not at the back end.

17               MR. MILLER:  Right.  This is a little bit of a cul

18   de sac, Your Honor, but I will mention in the Emert (ph)

19   deposition, which was a 30(b)(6) deposition, there was some

20   discussion about how accounting entries moved around with

21   regard to the grant of RSUs, and of course, they had to be

22   accounted for in some way.

23               Essentially all that moved around in the equity

24   portion of the balance sheet, and it didn't have tax

25   consequences.  And so Lehman did have to record compensation

Page 87

1     expense for shareholder reporting.  It was not hiding it for

2     earnings purposes, but it didn't get the tax deduction until

3     later.  So there was a separation.  And there's a federal --

4     there were federal tax guidelines that govern employee

5     equity awards, as you might imagine.  And Lehman tried, and

6     we believed complied, as far as we know, fully with those.

7              So the tax consequences were handled as described

8     here, and that's in the stipulation, Your Honor.

9              So if I might turn now and change subjects a

10    little bit, and I want to talk -- summarize what we've

11    talked about, and then talk about some of the other claims

12    that have been raised.

13             To summarize, these documents have shown that

14    employees were told they would be compensated in part with

15    stock units and stock awards if they chose to work at

16    Lehman.  The stock units and awards had many of the

17    characteristics of stock, they could be voted, they got the

18    benefit of dividends, and they increased or decreased in

19    value precisely with the value of common stock.

20             When the transaction restrictions were removed and

21    the unrestricted common stock was delivered, the employee

22    paid tax on the value of the common stock at that time, and

23    the company took a tax deduction for that employee expense

24    at that time.  And both of those events were based on the

25    price of the shares at that time, up, down, worth a lot,

Page 88

1    worth nothing, whatever happened.

2          So this really did function as quote, shares of

3    common stock that Lehman held on behalf of employees for

4    five years and then delivered it when conditions were met.

5          There's nothing in these documents that ever gave

6    employees a right to get their money back if the stock went

7    down in value or if Lehman went into bankruptcy.  When there

8    were any bankruptcy provisions, they just said, we'll hurry

9    up and give you the common stock.

10         There is nothing that told employees exactly how

11   many of the stock units -- how much the stock units or stock

12   awards ultimately --

13         THE COURT:  You know, now that you're -- now that

14   you've just said that again, again this is speculation, but

15   I'm wondering if one of the reasons that that didn't work,

16   was that it might have been viewed as a preference.

17         MR. MILLER:  It could've been, Your Honor.

18         THE COURT:  An acceleration of a right to receive

19   payment upon a bankruptcy that somebody might have decided

20   would be a preference in some manner.  But again, just

21   bankruptcy junkie speculation.

22         MR. MILLER:  There's a lot of good reasons,

23   frankly, Your Honor, to remove summaries of the law that are

24   unnecessary on documents, and that's what this was.  It was

25   a summary of the law, and so we don't believe that it has

Page 89

1    any significance, but Your Honor will decide what the law

2    is.

3           And one of the things that of course the Court

4    recognizes is, 510(b) is mandatory.  So even if there had

5    been some effort to contract around 510(b), we -- there's a

6    good deal of doubt as to how that could've possibly been

7    done.  So I do want to mention that, to deal with the same

8    issue we were talking about.

9           Continuing, Your Honor, the present claims as I

10   have said can be characterized either as claims for equity

11   securities, or they can be characterized as claims for

12   rescission or damages for the purchase of Lehman common

13   stock.

14          Now, I want to talk about the Wage Act and

15   economic coercion.  There are, of course, Wage Acts from a

16   number of states.  The vast majority of these employees

17   would be under the New York Wage Act we believe.  And this

18   is covered in our opening briefs on pages 30 through 34, and

19   covered in our reply on pages 30 through 38.  But the best

20   short answer is that wages are designed to deal with

21   quantifiable amounts of compensation.

22          And the value of a stock unit or stock award is

23   not quantifiable because it depends on the stock price five

24   years in the future, and nobody can predict stock use five

25   years in the future -- stock price.  And the Guiry, G-u-i-r-

1    y, Guiry versus Goldman Sachs case, which is discussed in

2    both briefs is squarely on point.  It's from the first

3    department in New York, it dealt with RSUs and it said that

4    RSU claims are not for wages, because quote, ultimate value

5    of the equity based compensation, close quote, depends on

6    the quote, stock price after the rights vested at the time

7    of delivery, close quote.

8            The Wage Acts and we can spend more time with

9    this, were historically having to do with hidden deductions.

10   Somebody was promised that they would make a hundred dollars

11   a week, and they got their paycheck, and they had $10 taken

12   out for uniforms, and they'd had $15 taken out for lunch,

13   and they got a check for $75.

14           THE COURT:  But isn't that like what arguments

15   that at least some of the claimants make here?

16           MR. MILLER:  That's what they're trying to do,

17   Your Honor, is to make those arguments.  But the point that

18   I am -- the key point under the law is that that does not

19   apply to something where they were told, you will receive an

20   indeterminate right in value in return for your

21   compensation.  And it turns out that that indeterminate

22   right is not worth as much as they hoped it was going to be

23   worth.  Because you can't -- you don't have the element of

24   certainty that it's required for those to be wages.

25           Wages are not compensation of some form.  And you

Page 91

1  can take -- there's a lot of examples of this.  An airlines

2  pays its employees in airline travel awards.  And it goes

3  broke and it can't deliver on the awards.  It's pretty clear

4  that those are not wages.  They were travel awards, they

5  might be worth nothing, they might be worth something or a

6  lot, depends on all kinds of things.

7          Or stock is a classic example, if someone is paid

8  in stock, and that stock goes down, even if they don't get

9  it right away, it's not wages.  And so we think it's quite

10  clear that -- and the Guiry case deals with this, that

11  something that could be worth nothing is not wages.  It may

12  be something else, but it's not wages, so the Wage Acts

13  don't apply.

14          THE COURT:  This is not a claim then that if

15  somebody says Lehman promised to pay me $200,000 in cash,

16  and then four months in, I got a notice that said, instead

17  of the cash that you were supposed to be paid this month,

18  we're withholding half of it, and we're going to pay you

19  later in stock.  That's not what occurred here, correct?

20          MR. MILLER:  That's correct, Your Honor, because

21  the documents always said that a portion, which we will

22  decide and tell you later, is going to be paid in stock.

23  And --

24          THE COURT:  Of your entire compensation, not just

25  your base or not just your bonus.

1           MR. MILLER:  Right.

2           THE COURT:  Not just your bonus, but also

3    including your base.

4           MR. MILLER:  That's correct, Your Honor.  And --

5           THE COURT:  So somebody could've gotten such a

6    phone call or notice and that would've been part of the

7    program you say.

8           MR. MILLER:  That's correct, Your Honor.  It was

9    an understanding they had going in, that part of what they

10   were paying -- and the other answer is, Your Honor, they --

11   what they were promised was to be paid in stock units and

12   stock awards, and they got paid in what was promised.

13           If somebody had been paid and say a place to live,

14   and they got offered a place to live, and they chose not to

15   live there, they were paid.  It wasn't that part of their

16   wages.  If they didn't like the place to live or they didn't

17   want it, or it turned out not to be as nice, that doesn't

18   change the fact that they were paid with what they had

19   agreed they would be paid with.

20           I would point out by the way, this is essentially

21   the same law in other states and in the United Kingdom, and

22   we have a discussion of English law, which has to do with

23   the concept of quantified wages, that wages have to be

24   quantifiable as a precise sum.  And if part of the agreement

25   is something that's not quantifiable, it's not a Wage Act

Page 93

1    issue.  It may be something else, but it's not a Wage Act

2    issue.

3              And by the way, if they did have a Wage Act claim,

4    it would also be subordinated.  Because it would also be --

5    it would be for damages related to the purchase of a

6    security.  So it actually --

7              THE COURT:  As opposed to an employee who had a

8    compensation arrangement for $200,000 cash pay all year, and

9    Lehman in the chaos leading to the filing, didn't issue a

10   check.

11             MR. MILLER:  That's correct, Your Honor.

12             THE COURT:  That would be a wage claim, that would

13   be either entitled to priority or would be an unsecured

14   claim on a pari passu with any other general unsecured

15   creditor.

16             MR. MILLER:  Yes, Your Honor, and that might have

17   a priority for --

18             THE COURT:  Some of it.

19             MR. MILLER:  -- compensation.

20             THE COURT:  Right.

21             MR. MILLER:  But that would be -- that's correct,

22   Your Honor.  But the thing that makes these Wage Act claims

23   subordinatable, if they were Wage Act claims, because

24   subordination does not say claims under federal law is all

25   that's governing, state law, any kind of state securities

1    laws, whatever it is, these are arising from a claim for

2    rescission or purchase of securities.  They're all mixed up

3    with Lehman common stock, and those are securities of the

4    debtor.

5              THE COURT:  Okay.

6              MR. MILLER:  There's no doubt about that.  So they

7    all have to do with people who are the debtor level.

8    They're not general unsecured creditors.  And I think

9    there's a pivot point in bankruptcy between general

10   creditors who don't have the insight, don't choose to deal

11   with a business with the knowledge and people who are on the

12   equity side of that business who buy stock and get paid in

13   stock, who deal with stock.  And these people were on the

14   equity side of that pivot point because they were employees,

15   they understood they were going to be in the stockholding

16   business.

17             And I might add, Your Honor, there's also

18   limitations problems with most of these Wage Act claims,

19   because they weren't brought with -- most of them were not

20   brought within the limitations period.  Because Wage Act

21   claims are something that people have to assert pretty

22   quickly.  They're not something that can be brought years

23   later.

24             So we believe that the Wage Act, although it's

25   creative, it is simply -- the Wage Acts are not an issue

Page 95

1    that present any determinative analysis here.

2             And economic duress, we've already talked about a

3    little bit.  First of all, economic duress, we would believe

4    here would probably have to be done under New York law,

5    because almost all these communications were with New York,

6    but it's very difficult to prove.

7             It requires a threat of an unlawful act that

8    compels performance.  And it also requires prompt complaints

9    about the duress.  The prompt complaint issue is actually a

10   complete answer to the whole economic duress issue.  Nobody

11   complained about this duress, anything like

12   contemporaneously or shortly thereafter.  It was only after

13   they got into this proceeding, years later, and lawyers got

14   involved, that somebody decided that they were going to

15   assert economic duress claims.

16            And as we will show you, when we get to cross-

17   examine some of these people, the people who are putting the

18   most emphasis and this is directed at Neuberger Berman, were

19   people who were receiving, in most instances, multiple

20   millions of dollars a year in cash, and multiple millions of

21   dollars a year in stock awards.

22            And the idea that they came in and said, you know,

23   I want all my money in cash now, I don't want to keep

24   working here, their real economic duress argument is, I

25   couldn't make nearly as much money anywhere else, so I had

Page 96

1    to keep working here.  That's really the ultimate Neuberger

2    Berman argument.

3            This was so -- this was just so much money that I

4    was going to make here, compared to what I could make

5    anywhere else, that I had to keep working here.  And it is

6    -- you will see that the restrictive covenants from

7    Neuberger Berman are very reasonable.  And reasonableness,

8    as the Court may know, is the test of lawfulness for

9    restrictive covenants.  They were one year covenants, they

10   were tied back to things like use of information, contacting

11   clients, dealing with people that they had dealt with

12   before.

13           Now, they're going to say, well, gee, I'm not any

14   good in the industry if I can't go back and try and use the

15   same clients or the same information for a year, but that's

16   -- those are completely appropriate restrictive economic

17   covenants.  And they didn't have to enter into them again

18   when -- they were all at will employees.  If they wanted to

19   go out and get some new clients, or they wanted to go out

20   and take another job, they were certainly free to do that.

21   Nobody -- there was no two year term, three year term of

22   continued employment.  There was no ability to make them sit

23   on the sidelines here generally.  It's just they're saying,

24   which, you know, I can't take my clients with me, and I want

25   to own these clients.  That's going to turn out to be the

Page 97

1   Neuberger Berman argument we believe.

2            And we don't think that's economic duress.  And we

3   don't think it meets any of the standards.  And because

4   there was no prompt complaint, it also doesn't constitute

5   economic duress.

6            But above all, the remedy for economic duress is

7   rescission of the agreement.  The remedy is that the

8   agreement is set aside and whatever was put into the

9   agreement is given back to the people that went into the

10  agreement and didn't want to make that payment, and now they

11  say they were forced to do it.

12           And rescission of this agreement, which is an

13  agreement to work for stock awards or stock units in part,

14  is subordinated under 510(b) as the first condition.  So

15  it's that cul de sac that you referred to, and we think that

16  it's a complete answer to the Neuberger Berman arguments.

17           I think we have also talked about the issues about

18  the subordination clause, as they like to call it, which it

19  really isn't.  It's really a summary of 510(b) and

20  bankruptcy law, which was removed.  And I think we have

21  dealt with all of the issues that have been raised by the

22  claimants, but we obviously will see how the case emerges.

23           We believe that the program documents and the

24  undisputed facts lead to the inescapable conclusion that

25  likely 3,500 claims that have already been reclassified

Page 98

```
1     without opposition, these 200 plus claims should be

2     reclassified as equity.

3              THE COURT:  Okay.  So that's the entire -- you've

4     taken up two hours and five minutes of the allotted three

5     hours, is that --

6              MR. MILLER:  That's correct, Your Honor.  Other

7     than offering exhibits for admissibility, which maybe we're

8     going to do at the end of the case --

9              THE COURT:  Right.

10              MR. MILLER:  -- this -- I want to confer with my

11     lawyers and make sure I haven't missed --

12              THE COURT:  Concludes -- would conclude your --

13     the opening segment.

14              MR. MILLER:  Yes.  I think this concludes our

15     opening statement.

16              THE COURT:  Okay.

17        (Pause)

18              MR. MILLER:  Ms. Alvarez makes one point that I do

19     want to stress, I think the Court knows it, but one of the

20     arguments that is being made here is that there was no

21     purchase involved --

22              THE COURT:  Yes.

23              MR. MILLER:  -- with these securities.  And the

24     Enron case, and other cases in our brief make the point that

25     agreement to work for stock or equity or conditional equity
```

Page 99

 1    is a form of purchase.

 2                THE COURT:  Purchase, yes.

 3                MR. MILLER:  That these parties agreed, I will

 4    work, like the signs, we'll work for food, we'll work for

 5    stock.  And that's a purchase.

 6                THE COURT:  Okay.

 7                MR. MILLER:  And I think that's clear but I wanted

 8    to --

 9                THE COURT:  I think that point was made very

10    clearly.

11                MR. MILLER:  I did want to make that point.  Thank

12    you, Your Honor.  At this -- based on that, our opening is

13    completed, Your Honor.

14                THE COURT:  All right.  So let me ask the -- all

15    of you what you'd like to do in terms of the next session.

16    We had when we thought it would take three hours, we had

17    said we would go from 10 to 1, at least this was at the

18    pretrial, we said we'd go from 10 to 1 and then from 2 to 5,

19    but we're now at 7 minutes after 12.  So my preference would

20    certainly be to take an hour and resume and finish early for

21    the day.

22                So I'm seeing a lot of nods, so no objections to

23    doing that?

24         (No response)

25                THE COURT:  All right.  So why don't we round up,

Page 100

1   and why don't we say we're going to resume at 1:15 for the

2   next three hour segment.  And you're welcome, of course, to

3   leave all your things in the courtroom.  All right.  Thank

4   you very much.

5        (Recessed at 12:09 p.m.; reconvened at 1:24 p.m.)

6             THE COURT:  All right, I'm ready when you are.

7   Who am I going to hear from first, Ms. Solomon?

8             MS. SOLOMON:  Yes, Your Honor.

9             THE COURT:  Okay.

10       (Pause)

11            THE COURT:  All right, let me just check to make

12  sure that we're okay in terms of those folks who are

13  participating on the phone.

14            If you can't hear us well enough the best way to

15  communicate that is to contact chambers and we'll do the

16  best that we can.

17            One thing that we need to make sure we do is at

18  the podium there's one of these nice new microphones that do

19  a good job of picking up all the sound, but at counsel table

20  they're the old fashion ones, so if folks are speaking from

21  counsel tables just try to pull that microphone towards you,

22  because that's the occasion when people on the phone are

23  unable to hear you and they get frustrated.

24            So, okay, I'm ready when you are.

25            MS. SOLOMON:  Very good, Your Honor.  Thank you.

Page 101

1          Your Honor, I'd like to really keep this as simple

2     as possible.

3          THE COURT:  Okay.

4          MS. SOLOMON:  What I intend to do is start out

5     with what the test is in this circuit for subordination

6     under 510(b) of the Bankruptcy Code and what it is not, and

7     then proceed from there as to the particular elements and

8     requirements of 510(b), security, damages, and purchase of

9     such a security arising from the purchase and sale, and

10    that, Your Honor, will take me to two doctrines that we

11    primarily rely upon here.  Alternative performance and the

12    wage loss.

13         Your Honor, as to the test in the circuit for

14    subordination there is not much dispute about it.  The

15    Second Circuit set forth it very clearly in the Med

16    Diversified case.  There in a case involving fraudulent

17    inducement and breach of contract the Court stated that

18    510(b) was proper, quote, "only if the claimant took on the

19    risk and return expectations of a shareholder rather than a

20    creditor."

21         Judge Gropper in the CIT case affirmed by the

22    Second Circuit read Med Diversified and in a consistent

23    manner in his decision he wrote, quote, "The reason question

24    is whether the claimant bargained for the risks and rewards

25    of a holder of equity rather than a holder of the debt."

Page 102

1          That's the test.  Did you bargain for the risk and

2     rewards of an equity holder rather than the holder of a

3     debt?

4          It's not the same as a but for test, it's not the

5     same as a causal connection test, and it's not the same as a

6     nexus test.  Because if that was the case, Your Honor, then

7     Judge Gropper in CIT could not have found the way he did

8     with regard to a divestiture of stock of the debtor, and

9     there he held that a tax agreement that was entered into in

10    connection with the stock agreement was not subject to a

11    subordination.

12         He expressly rejected the nexus test in CIT, and

13    he stated:

14         "There's no question that the tax agreement has a

15    nexus to the IPO and that both were agreed to in connection

16    with the spin off of CIT from Tyco.

17         As the foregoing cases demonstrate however, the

18    existence of a mere connection between the claim and the

19    purchase and sale of a security is not enough to support a

20    finding that the claim arises from the purchase or sale and

21    should be subordinated unless the purposes of the statute

22    would be served thereby."  Close quote.

23         That's the test in this circuit, Your Honor.  It's

24    not a but for test and it's not a nexus test.  The test very

25    clearly is did you bargain for the risks and returns of an

Page 103

1    equity holder?

2            Now let's turn to the facts of this case.  The

3    compensation claimants or the claimants in this litigation

4    came to Lehman over a number of years.  Some of them came to

5    Lehman prior to 1994 when the -- which I'll refer to as the

6    RSU program -- was implemented by Lehman some time mid year,

7    and there were various compensation claimants that came to

8    Lehman after 1994 over various years.

9            What were they told?  Well, Your Honor, some of

10   the submissions this morning as well as the submissions in

11   connection with our brief lay out that they were not told

12   very much.  What they were told though was that in each year

13   you may or you may not get some of your compensation in what

14   was ultimately going to be the issuance of stock equity.

15           THE COURT:  Well, let me just stop you at they

16   weren't told very much, because the documents that were

17   referenced this morning had a lot of different components.

18   They had -- and I'm generalizing, perhaps over generalizing,

19   but just to talk about basic principals.

20           So there were in some instances the dear colleague

21   letter, in some instances -- and that attached the

22   management ownership plan, there was is stock incentive

23   plan, there was the Lehman Brothers Holding employee

24   incentive plan, there was the what I would call the plain

25   English/glossy version, for example, at tab 12, the 2003

Page 104

1    equity award program.  So I don't think I would characterize

2    that as not much.

3           What they weren't told was with precision how much

4    of their compensation would be paid in the form of these

5    restricted stock units about which they were told quite a

6    lot.  It's just the not much I think only relates to the

7    toggle, if you will, between cash/cash and compensation

8    payable in the form of RSU.

9           So I'm just pushing back on your statement that

10   they weren't told too much.

11          MS. SOLOMON:  Understood, Your Honor, and let me

12   back up a little bit.

13          There was a stock incentive plan that was there,

14   but what were they exactly told when they were hired,

15   assuming these were even people who were hired after 1994?

16          Your Honor yourself questioned the employment

17   agreement that we looked at earlier this morning, and it

18   appears that in each year prior to the rendition of services

19   they were not told that any of their compensation would

20   eventually be paid in equity through the devices of RSUs.

21   There was no statement whatsoever to the employees.  It was

22   left up to the discretion of Lehman, and it was not a case

23   as in the case of Enron where employees were told at the

24   outset a certain minimum amount of your compensation you are

25   going to receive in equity through the devices of these

Page 105

 1   RSUs.

 2          THE COURT:  But again, I'm going to keep going

 3   back to this.  If you look at tab 3 in Mr. Miller's binder,

 4   which is a dear colleague letter dated 1999, it clearly

 5   says, "At the firm's option a portion of your total

 6   compensation ..." and then it has the components, "may be

 7   payable in the form of restricted stock units.  Please

 8   understand that the grant of restricted stock units is

 9   subject to the standard terms and provisions of the

10   program."

11          So that couldn't be a clearer statement as of that

12   date to the person who received this letter that basically

13   your entire compensation package is in play at the firm's

14   option.  So --

15          MS. SOLOMON:  That's correct, Your Honor.

16          THE COURT:  Right.

17          MS. SOLOMON:  I mean I don't disagree with that.

18          THE COURT:  Okay.

19          MS. SOLOMON:  The point is that it might be --

20          THE COURT:  Right.

21          MS. SOLOMON:  -- and it might not be.

22          THE COURT:  Right.  And at that moment in time on

23   June 3rd, 1999 when this person got this letter they could

24   have said to themselves, I can't live with that uncertainty,

25   I've got -- you know, I've got to be able to plan, I have to

Page 106

1    know with certainty that I have X thousand dollars coming in

2    every month, I'm going to go find another job, and they did

3    not do that.

4           And then if we're talking about -- I think by

5    definition we're talking about the five years proceeding the

6    filing, which you know, we're not going to debate the

7    circumstances leading up to it, it's kind of for the history

8    books now, but you're talking about people who started in

9    1994.  Well those people -- we're really only talking about

10   the five-year period leading up to the filing.  So those

11   folks, even if they began their employment in 1994, if they

12   were still working at Lehman in 2002, 2003 by that point in

13   time their -- at least there seemed to be examples of

14   documents that elaborated in some detail, you know, what

15   their compensation package looked like.

16          So I don't want to completely derail you, but what

17   I asked Mr. Miller this morning was, wait a minute, are you

18   telling me that without any notice whatsoever people who

19   were accustomed to bringing home, you know, $15,000 a month

20   in cash all of a sudden found their paycheck reduced?  And

21   he said, no, that's not the case.  So --

22          MS. SOLOMON:  Your Honor, I would disagree with

23   that.  First of all to the extent that the program was

24   introduced in mid 1994, and --

25          THE COURT:  Okay.

1          MS. SOLOMON:  -- that's exactly my understanding

2     is what happened to employees during that time.

3          THE COURT:  But -- right, but maybe this is my

4     lack of clarity.  But if you were an employee in 1994 as of

5     the time of the bankruptcy in 2008 you're not holding an RSU

6     from 1994, it became stock.

7          MS. SOLOMON:  That's correct.

8          THE COURT:  Right.

9          MS. SOLOMON:  And maybe you sold the stock after

10    you had the right to do so.

11         THE COURT:  Okay.  But you're not -- you're not

12    asserting a claim with respect to that are you?

13         MS. SOLOMON:  No, but it's -- Your Honor, it's a

14    bit of a snowball effect, because 1994 comes and goes, and

15    unbeknownst to you, you know, you're rendering your services

16    and you're told mid-year that now you're going to get not

17    payment in cash, which was the cash, my understanding prior

18    to 1994 --

19         THE COURT:  Okay.

20         MS. SOLOMON:  -- that they got all payment in cash

21    regardless of whether --

22         THE COURT:  Okay.

23         MS. SOLOMON:  -- what was the specific, you know,

24    component --

25         THE COURT:  Right.

Page 108

1          MS. SOLOMON:  -- bonus or not.  Then 1994 rolls

2     around and now you're told mid-year or later in the year

3     that oh, well part of your compensation --

4          THE COURT:  Okay.

5          MS. SOLOMON:  -- is not going to be paid in cash.

6          THE COURT:  Okay.  So let's take that person then.

7     So in 1995 that person either stayed with Lehman or left.

8     So -- but in no event do I have a claimant here today who's

9     asserting a claim related to what occurred in 1994.

10         MS. SOLOMON:  Well not specifically with regard to

11    that time period, but what happens is that -- and this is

12    really the purpose of the program -- you become handcuffed,

13    you become handcuffed to Lehman because now you're

14    compensation for 1994 you haven't received it all, it's been

15    withheld from you, and the only way --

16         THE COURT:  It's been -- well another word for

17    withheld is deferred.  It's a deferred compensation program.

18         So fast forward to 1999 and that stock that's been

19    you say withheld --

20         MS. SOLOMON:  Correct.

21         THE COURT:  -- I say -- or the other side says

22    deferred or issued pursuant to an RSU, in 1999 you then have

23    a share of common stock, right?

24         MS. SOLOMON:  Right.

25         THE COURT:  So the handcuff as it relates to what

Page 109

1    you earned in 1994 is sprung open, right?

2             MS. SOLOMON:  Right.  But now you have '95, '96,

3    '97 --

4             THE COURT:  Yes, you do.

5             MS. SOLOMON:  -- and '98.

6             THE COURT:  But -- so you're in 1998 and you've

7    now been doing this for four years and you are looking at

8    the value of Lehman common stock and you are saying to

9    yourself, I like that number on the piece of paper, look I

10   have my -- I see how many shares I have, it's a big number,

11   one more year and I get to cash out.  But at any point you

12   could leave.  You could go and go to another brokerage firm

13   and see what kind of a compensation arrangement they would

14   offer you.

15            The handcuff that you identify only describes the

16   RSU pre-issuance of common stock.  That's the handcuff.

17            MS. SOLOMON:  Correct.

18            THE COURT:  Because of the conditions of the

19   program, which at least as of the date that these plan

20   documents are in effect, couldn't be clearer.  That's the --

21   here are the bells and whistles, here are the belts -- the

22   conditions of your receiving this unit.  You know that.  So

23   you could say to yourself in 1999, I don't want to do this

24   anymore, I'm going to go to, you know, Banker's Trust or

25   Merrill Lynch or you know, unfortunately a lot of those

Page 110

1    firms aren't still around anymore, but there were -- the

2    point is that there were a number of other options that were

3    available to you.

4            MS. SOLOMON:  Well from the perspective of the

5    employee I don't know that they were because Lehman was

6    hardly unique in offering this kind of program.

7            THE COURT:  But that --

8            MS. SOLOMON:  So --

9            THE COURT:  -- but that's exactly -- but that's --

10   I don't think that that's an argument that helps you.  I

11   mean the -- well, I'm sorry, I'm going to let you keep

12   going.

13           MS. SOLOMON:  No, Your Honor, believe me I welcome

14   your questions, I really do, because --

15           THE COURT:  Okay.  All --

16           MS. SOLOMON:  -- we'd like to get to the heart --

17           THE COURT:  Right.

18           MS. SOLOMON:  -- the heart of what --

19           THE COURT:  Right.  All I was reacting to was your

20   one statement that they weren't told much about it, and the

21   only much that they weren't told was-- in my mind -- was the

22   at the firm's a portion of your total compensation could be

23   paid in the form of RSU.

24           And look, I'm with you, if I have a piece of paper

25   that says you get a minimum of 850, but by the way, most of

Page 111

1     it could be issued in stock I think I have a real decision

2     to make as to whether I could live with that.  I mean

3     $200,000 in cash in 1999 is a lot more than bankruptcy

4     judges make in 2014, so it's not an insignificant number,

5     but that's -- that's beside the point.  But why don't you

6     keep going.

7              MS. SOLOMON:  Yes, Your Honor.

8              By way of an analogy if somebody wanted to

9     conclude a bargain to become an equity holder, if somebody

10    called up their broker and says, hey, Joe, I want to buy 200

11    shares of Microsoft or Google stock.

12             THE COURT:  Right.

13             MS. SOLOMON:  So can you please go and buy the

14    stock for me?  Or by the way, just give me the money back.

15    Nobody does that.  Because if somebody wants to invest and

16    become an equity holder they have a firm commitment, they

17    tell their broker to go and buy the stock, and that's not

18    what happened here.

19             It was a situation where there was no firm

20    commitment, and if the claimants truly wanted to become

21    equity holders then the choice would not have been left up

22    to Lehman.

23             THE COURT:  Don't you have a -- don't you have

24    kind of an estoppel or waiver problem?  I asked Mr. Miller a

25    lot of questions about are there claimants in the claimant

Page 112

1   pool now who have common stock, albeit I understand which is

2   not worth anything under the Lehman plan, but who along a

3   continuum received these restricted stock units, some of

4   them hit the five years, they then have the stock.  So now

5   those folks who have the stock also have RSUs, right?

6          MS. SOLOMON:  Uh-huh.

7          THE COURT:  And they're not saying that I don't

8   want to have this stock anymore, they're just saying that I

9   don't -- I want to get cash for the RSUs.

10          In other words, while things were going well

11   prefiling, right, when the stock was worth something before

12   the disastrous summer of -- spring and summer of 2008 --

13          MS. SOLOMON:  Uh-huh.

14          THE COURT:  -- they were happy to live with the

15   deal and the uncertainty, but then when the decline began to

16   occur and then the ultimate bankruptcy it was only at that

17   point that they, in your analogy, decided that, you know, it

18   wasn't a real ask to own the stock.  I mean there's kind of

19   -- there seems like an inconsistency.

20          MS. SOLOMON:  I don't know that I would say they

21   were happy to live with it.  I would say that they did live

22   with it.

23          But I think the question is, what was the bargain

24   that was originally struck?  And the bargain, from my

25   perspective, that was struck was an agreement for the

Page 113

1    payment of compensation, and that compensation could either

2    be paid in cash or it could be paid in equity through the

3    device of the RSUs.

4            And the case law that we cite in our brief, one of

5    the first doctrines that we rely upon is the doctrine of

6    alternative performance, and there is very substantial

7    authority that says that when you have an alternative

8    performance obligation and it ultimately is rendered

9    impossible of performance, regardless of whose choice the

10   mode of performance was with, that the promisor needs to

11   perform its obligation.  And the reasoning of those cases is

12   that what is the essence of the obligation that was

13   promised?  And here it was compensation, payment of

14   compensation.  And Lehman has not questioned here that there

15   was an alternative performance obligation, and that was

16   payment of cash or payment of equity through the device of

17   the RSUs and the CSAs.

18           And what happened when the bankruptcy hit?  The

19   RSUs and CSAs had already been granted but not fully

20   performed on, and at that time performance on those

21   instruments became impossible of performance, Your Honor.

22   And why is that?  Because the employees -- the employment

23   was terminated and ultimately the stock was canceled, and

24   Lehman was not in a position any longer to perform on its

25   promise.  But the promise, that is the promise under the

Page 114

1    RSUs, but the promise was payment of compensation, and the

2    cash alternative obligation existed as of the filing date,

3    it was contingent but it existed, and bankruptcy law

4    recognizes contingent claims, and that's what the employees

5    had.  They had a contingent claim for Lehman's alternative

6    performance obligation.

7              Now what does Lehman say about this?

8              THE COURT:  You know, if you just -- if you think

9    about the construct that you're outlining though and you

10   think in terms of perhaps a smaller business than Lehman or

11   maybe -- maybe not, but if you think about the concept from

12   an accounting standpoint that there could be a liability of

13   the company, a looming liability of the company, in other

14   words converting from equity to a creditor, I don't know how

15   you would account for that on a balance sheet.  Because at a

16   certain point you would get to the point where a company is

17   says, you know, nearing the zone of insolvency, and it's got

18   to be running a set of numbers where it says, well, if we

19   file for bankruptcy we've got this huge springing obligation

20   that right now is equity, but it's going to convert into

21   debt, because that's what -- that's what you're saying.  Is

22   that --

23             MS. SOLOMON:  No, it's not.

24             THE COURT:  Well, what you're saying is that these

25   -- I mean the bankruptcy absolute priority scheme divides

Page 115

```
 1    the world into claims and interests, right?

 2            MS. SOLOMON:  Correct.

 3            THE COURT:  There's claims, I'm calling them debt,

 4    and there's equity, which are not debt, they're equity.

 5            So what you're positing though is that you could

 6    have this compensation system and this instrument that means

 7    until there's a bankruptcy you get equity, the moment

 8    there's a bankruptcy you get debt.

 9            So when you're trying to figure out what you do is

10    you approach the zone of insolvency you would have this

11    looming springing balance sheet item that you'd have to take

12    into account.  I just don't know -- I've never heard of such

13    a thing.

14            MS. SOLOMON:  Isn't it just a contingent

15    liability, Your Honor?  Contingent liabilities occur all the

16    time and the Bankruptcy Code expressly recognizes contingent

17    liability.

18            THE COURT:  Right.  That -- that's true, but the

19    bankruptcy -- but this is a -- this is something that morphs

20    from being equity that as you're approaching the zone of

21    insolvency, you know, the duties of the directors in fact

22    begin to shift.

23            MS. SOLOMON:  Well, I would think we certainty

24    would acknowledge that it's equity.  In fact the documents

25    that we went through this morning very clearly say that you
```

Page 116

1   do not have the rights of a shareholder until the act of

2   conversion occurs after five years.

3              THE COURT:  Right.  But that --

4              MS. SOLOMON:  So there's no equity here.

5              THE COURT:  No, but you're taking that statement

6   out of context.  That statement -- that statement in the

7   governing documents doesn't -- the negative implication is

8   not that you therefore have to rights of a general creditor.

9   That was to clarify that you didn't have -- you couldn't

10  bring a shareholder derivative suit, and the context there

11  is not what -- I don't believe what you folks make it out to

12  be in the papers.  That is not -- the negative implication

13  of that is not that and therefore you have the rights of

14  creditors.  It's that you have not even matured into having

15  all the rights of a shareholder.  You are -- you have

16  contingent shareholder rights, so.

17             MS. SOLOMON:  I agree with that, Your Honor.

18             THE COURT:  Okay.

19             MS. SOLOMON:  It is a contingent shareholder right

20  and something that had not matured as of the filing date.

21             THE COURT:  Uh-huh.

22             MS. SOLOMON:  The fact that the claimants did not

23  have the rights of shareholder doesn't necessarily lead me

24  to the conclusion that they have rights of a creditor just

25  by negative implication.  What leads me to that conclusion

1    is the doctrine of alternative performance as well as other

2    documents that -- of Lehmans that I will get for in a little

3    while.

4               THE COURT:  Okay.

5               MS. SOLOMON:  And I want to emphasize, Your Honor,

6    that the contingent claim that they have under the doctrine

7    of alternative performance arose at the time that services

8    were rendered.

9               So in other words if you look at it as kind of

10   like a V, at the time the services were rendered there --

11   there was two ways in which Lehman could perform and

12   discharge its compensation obligation.  One of them was

13   through a payment of cash and one of them was through the

14   issuance of equity through the device of the RSUs and the

15   CSAs.  And Lehman started down the path of payment of

16   equity, but it didn't get as far as it would like because

17   the bankruptcy had stymied its efforts.

18              And so the cash alternative was always there, it

19   didn't just spring into existence at the time of the

20   bankruptcy, it was a contingent claim.  And Lehman's

21   response to this is -- well they say it in a couple of

22   sentences.

23              "Putting aside the fact that at all times it was

24   within Lehman's sole discretion whether to pay part of

25   employees total compensation in either cash or equity-based

1    awards."

2            Well not true under the alternative performance

3    doctrine, Your Honor.  But going on:

4            "Claimants continue to ignore that Lehman already

5    paid them the compensation they were due in the form of

6    RSUs.  Once those RSUs were paid, as they were here,

7    claimants had no rights whatsoever to other modes of

8    performance in the form of cash or otherwise."

9            The legal defect, Your Honor, of that argument is

10   that the grant of an RSU somehow would be payment of

11   compensation, which it was not.

12           THE COURT:  So that -- your position is that the

13   grant of an RSU is not the payment of compensation?

14           MS. SOLOMON:  That's correct.  The payment of

15   compensation is when the RSU is converted to stock, that was

16   the ultimate payment that the claimants were interested in,

17   not the grant of a piece of paper, that in your words, Your

18   Honor said, didn't give them the rights of a shareholders,

19   didn't give them the rights of anything.  How could that be

20   a payment?  It was a form of --

21           THE COURT:  So a stock option is not a -- or a

22   warrant is not -- is not a form of compensation?

23           MS. SOLOMON:  Well the question, Your Honor, is in

24   these circumstances where there was an alternative

25   performance obligation, so it was --

Page 119

1          THE COURT:  But where does it say that there's an

2     alternative performance obligation?  None of these documents

3     say that and if it turns out the stock is not worth X we'll

4     give you cash, don't worry.  Where does it say that?

5          MS. SOLOMON:  That's the doctrine of alternative

6     performance, Your Honor.

7          When an obligation can be discharged through two

8     alternative means; cash, and another means, stock or

9     whatever it may be, that's what the courts construe it as.

10    And --

11         THE COURT:  Can you -- just point to me exactly

12    where in your papers I should be looking or what cases I

13    should be looking at on that one?

14        (Pause)

15         MS. SOLOMON:  If you look in our initial

16    memorandum, Your Honor --

17         THE COURT:  Right, page 32?

18         MS. SOLOMON:  It starts page 27 and goes on from

19    there.  The section, the compensation claims are not for

20    damages under 510(b).

21         THE COURT:  Uh-huh.

22         MS. SOLOMON:  And we cite a number of cases, and

23    we state here the case law -- this is on page 29 --

24    uniformly recognizes that where a contract provides the one

25    of two alternative modes of performance and one mode becomes

Page 120

1    impossible performance the promisor is not relieved from

2    performing the other.  And we cite the Supreme Court's

3    decision in Yankton and Second Circuit case, the Glidden

4    case from 1960, and that case involved a charter agreement

5    that was rendered impossible performance because the

6    preferred method --

7              THE COURT:  Well, let me ask -- let me ask you

8    this question.  Suppose the -- you know, suppose this was

9    American Airlines, right?  Well it turns out that the equity

10   holders of American Airlines actually got a return and are

11   making actually a large amount of money.  So where -- where

12   would RSU holders in American be?  They would be happy,

13   right?

14             I mean your argument turn is a result-oriented

15   argument.  The claimants are unhappy because the RSUs and

16   the stock are not worth anything.  But if the RSUs and the

17   stock were worth something they wouldn't be unhappy.

18             So you're trying to fit this into an alternative

19   performance situation.  This is not that you can take

20   different routes to get through, you know, the Suez Canal or

21   not.  I'm just --

22             MS. SOLOMON:  What's the difference, Your Honor?

23   I mean one, there's an ultimate destination.  In that case

24   it was the means of going through the Suez Canal or taking

25   another route.

Page 121

1          THE COURT:  Right.

2          MS. SOLOMON:  But the point was that they -- that

3     the charter company was hired to deliver the cargo, and it

4     didn't matter how the cargo got here -- got there.

5          THE COURT:  Right.

6          MS. SOLOMON:  And in this case the employees were

7     hired by Lehman --

8          THE COURT:  Right.  But if you're -- to make the

9     analogy work then the undertaking of Lehman would have been

10    that at the end of each calendar year the employee would

11    have a cash or cash equivalent compensation of X amount, and

12    that's not what the deal was.  The deal was --

13         MS. SOLOMON:  Well why would that have to be, Your

14    Honor?  I disagree with that.  The point was the payment of

15    their compensation, and Lehman started down the process --

16    down the route of paying their compensation through the

17    vehicle of the RSUs.

18         THE COURT:  Right.

19         MS. SOLOMON:  But the ultimate was Lehman wanted

20    to give them equity.  Well when do they get equity?  They

21    only get equity when it converts.

22         THE COURT:  Right.

23         MS. SOLOMON:  And they got RSUs in lieu of the

24    equity for Lehman's purposes, not for the purposes of the

25    employees, because if they got equity immediately well then

1    Lehman wouldn't have any handcuffs on the employees.

2           So the only way this works from Lehman's

3    perspective is give the employees the RSUs, make them hang

4    around for another five years, and then when do they get

5    their payment?  They don't get their payment when the RSUs

6    are granted to the employees, the payment they get is when

7    the stock converts to equity.  That's the payment.  And that

8    did not occur here --

9           THE COURT:  Well there's a difference between --

10          MS. SOLOMON:  -- and that's the impossibility of

11   performance.

12          THE COURT:  There's a difference between, you

13   know, in the analogy is the tax laws, the -- this is

14   deferred compensation.

15          MS. SOLOMON:  Correct.

16          THE COURT:  This is deferred compensation.  And

17   what you are positing is that when there's deferred

18   compensation that takes place in the form of stock you want

19   the upside but you don't want the downside.  You will be

20   perfectly happy if at the end of the deferral period the

21   compensation turns out to be worth a lot, but if it turns

22   out to be worth a little then your idea is that you then

23   invoke alternative performance and you say give me the cash

24   instead.  That's not what an equity component does.  That's

25   not -- you know, so I think you're -- I think your toggling

Page 123

1    in between this concept of alternative performance and

2    handcuffs.  I mean it just sounds to me more like what

3    you're really stressing is the unfairness of --

4              MS. SOLOMON:  No, not at all, Your Honor, I

5    disagree.

6              THE COURT:  Well then what --

7              MS. SOLOMON:  It's not a question -- this isn't a

8    question of were the employees happy or unhappy with it or

9    was it fair or was it unfair?  That's not -- and I don't

10   need to be making that argument at all to Your Honor, it's a

11   question of what were the contract rights and what were

12   their rights under the common law?  And the rights are set

13   forth in the doctrine of alternative performance.

14              And it is true that the RSUs were a form of

15   deferred compensation, but that deferred compensation had

16   not been paid to the employees.  The payment only occurred

17   upon conversion of the stock.  I mean the fact of the matter

18   is that the RSUs remained subject to forfeiture during the

19   entire term of the grants; isn't that correct?

20              THE COURT:  Absolutely.

21              MS. SOLOMON:  So how is it that --

22              THE COURT:  Absolutely.  And every single --

23              MS. SOLOMON:  -- compensation --

24              THE COURT:  -- and every single employee if they

25   read the plan documents knew that.

Page 124

```
 1              MS. SOLOMON:  That's correct.  So how is it that

 2    compensation could have been paid but still the subject of

 3    forfeiture?  That doesn't make my sense.

 4              THE COURT:  Because you were --

 5              MS. SOLOMON:  You can't forfeit something that

 6    you've already been paid.

 7              THE COURT:  You were absolutely told in your dear

 8    colleague letter, here's what's going to happen.  We're

 9    going to give you a guaranteed minimum of 200,000, and at

10    our option we're going to pay you in RSUs, which may turn

11    out to be funny money or may turn out to be really valuable,

12    and at that moment and every year every employee -- and

13    we're not talking about unsophisticated folks here who are

14    making 850,000 a year in 1999 -- every year that individual

15    who got that letter had the ability to say I'm going stick

16    with it because there's a lot of money in it for me or I'm

17    going to leave.  Every single employee who got that letter

18    had the ability do that.

19              We're not talking about, you know, -- you know

20    manicurists in Washington Heights who just brought a class

21    action because they're being paid $5 a day, people who have

22    no meaningful other options and don't have the skill set or

23    the tool set or the wherewithal to break out of the

24    handcuffs.

25              I mean, you know, I'm trying to be patient, but
```

Page 125

1    the notion that this was, you know, a handcuff that people

2    didn't realize that they were signing onto get something

3    that maybe wasn't going to be valuable and that one of the

4    reasons they couldn't leave was because most everybody else

5    in the business had the same compensation structure.  The

6    reason they had that compensation structure is because

7    that's what the brokerage houses did.  You got some cash and

8    you get this -- you get this -- there's a carrot, and the

9    carrot is stick with us, perform well, be an owner, and you

10   know, the rising tides will lift your boat too.  And

11   unfortunately here, you know, the boat was the Titanic, but

12   that doesn't retroactively enable you to recharacterize and

13   change the nature of your deal going in.

14          So -- and that's what I'm reacting to is that

15   aspect of your argument.

16          MS. SOLOMON:  And, Your Honor, I don't mean to

17   dwell too much on this point, but --

18          THE COURT:  I'm making you dwell, so that's quite

19   all right.

20          MS. SOLOMON:  Very good.  But I just want to

21   emphasize that this isn't a question of recharacterization

22   or springing up, it's a question of what were the

23   preexisting rights --

24          THE COURT:  Sure.

25          MS. SOLOMON:  -- of the claimants as of the time

Page 126

1    of the bankruptcy?

2            THE COURT:  Absolutely.

3            MS. SOLOMON:  And those rights were defined by

4    alternative performance rights that existed in this case and

5    that did not exist in the Enron case as well as their rights

6    under the wage laws which we'll get to in a little bit.

7            THE COURT:  Okay.

8            MS. SOLOMON:  And I also want to make the point

9    that as -- you know, the point I made earlier that they have

10   not received payment of compensation when they received the

11   grants of the RSUs.  This is highlighted by one of Lehman's

12   own documents, and that's the 1997 trust under LBHI

13   incentive plans, and that's claimants' document number 62 in

14   the joint appendix.

15       (Pause)

16           THE COURT:  The 1997 trust?

17           MS. SOLOMON:  Correct, Your Honor.

18           THE COURT:  Okay.  Give me a minute.  Okay.

19           MS. SOLOMON:  And I'd just like to briefly go

20   through that document --

21           THE COURT:  Sure.

22           MS. SOLOMON:  -- for a couple of points.  The

23   first is to highlight what I said a moment ago that payment

24   to the compensation claimants of their compensation did not

25   occur at the time of the grants of the RSUs but only upon

Page 127

1    the conversion of the stock.  And if that premise is correct

2    then their alternative performance rights continued up

3    through that date.  And by virtue of the fact that the RSUs

4    never converted to stock they still had their alternative

5    performance rights and they had not ceased as of the time of

6    the bankruptcy.

7            And where does the trust support the premise that

8    payment of compensation has not occurred?  Well if you look

9    at the third whereas clause on the first page it refers to

10   the trust holding certain assets, including shares, although

11   the trust also held cash as well, and it says there, "that

12   shall be held therein subject to the claims of the company's

13   general creditors."  So that mean that is the compensation

14   claimants have no better rights to the shares than any other

15   creditors.

16           And it goes on, "In the event the company becomes

17   insolvent as hereinafter defined until paid to

18   participants."

19           So there they're referring to the shares being

20   paid to --

21           THE COURT:  I'm sorry, the third whereas clause?

22           MS. SOLOMON:  Yes, Your Honor, on the first page.

23           THE COURT:  Yeah.  "Whereas the company wishes to

24   establish a trust ..."

25           MS. SOLOMON:  Correct.

Page 128

1          THE COURT:  And what are you saying that this

2     shows?

3          MS. SOLOMON:  It shows that the payment of their

4     compensation did not occur upon the grants of the RSUs but

5     only upon the conversion to the stock.

6          THE COURT:  I'm sorry, where -- where does it say

7     -- I just --

8          MS. SOLOMON:  If you read -- if you read it, Your

9     Honor, it says --

10          THE COURT:  Yeah.

11          MS. SOLOMON:  -- "The company wishes to establish

12     a trust" --

13          THE COURT:  A trust and to contribute --

14          MS. SOLOMON:  -- "and to contribute or sell the

15     trust assets including shares" --

16          THE COURT:  Right.

17          MS. SOLOMON:  -- "that shall be held therein" --

18          THE COURT:  Right.

19          MS. SOLOMON:  -- "subject to the claims of the

20     company general creditors in the event the company becomes

21     insolvent" --

22          THE COURT:  Okay.

23          MS. SOLOMON:  -- "until paid to participants."

24          THE COURT:  Right.

25          MS. SOLOMON:  So the shares get paid to

1    participants, and that is the payment of their compensation,

2    it's not the grant of the RSUs themselves.

3              And the trust goes on further --

4              THE COURT:  Okay.  So you're -- I mean that's just

5    an enormous boot strap of an argument.  You're saying that

6    in a whereas clause, which clearly is -- intends to

7    establish that and here you're saying that the word paid in

8    this context determines the question of whether or not upon

9    the issuance of the RSU that's a payment of compensation to

10   the shareholders.

11             This whereas clause is mere -- what it's saying is

12   that stuff is in the trust and it's in the trust subject to

13   the rights of the general creditors.  In other words if

14   assets find their way into the trust and the general

15   creditors have a claim on it it's subject to that which is

16   the law any way, right?

17             MS. SOLOMON:  Correct.

18             THE COURT:  Until paid to the participants.

19   You're boot strapping that word which means giving out.  It

20   -- the movement of the -- of the shares to the participants

21   at that point you're saying that that's the moment of

22   payment.  It's just -- it's a boot strap argument.

23             MS. SOLOMON:  I'm looking at the documents, and I

24   saw a statement, a presumption, a totally unsupported

25   statement by Lehman that payment of compensation occurred

Page 130

1    upon the grant of RSUs.

2             What is the support for that?  I -- and I went

3    back and I looked at the documents, and the documents say to

4    me, no, payment doesn't occur upon grant of the RSU, payment

5    occurs when the stock converts -- I'm sorry -- when the RSU

6    converts to stock, that's when the payment occurs.  And if

7    you go through the trust there's various provisions that

8    highlight the fact that RSU holders are creditors of the

9    company.

10            THE COURT:  Where -- where does it say that?

11            MS. SOLOMON:  So if you turn to paragraph 1-E.

12            THE COURT:  Same document?

13            MS. SOLOMON:  Yes, Your Honor.

14            THE COURT:  Establishment of trust?

15            MS. SOLOMON:  Correct.  And subparagraph E is at

16   the bottom of the page.

17            THE COURT:  Okay.

18            MS. SOLOMON:  And it says there:

19            "The principal of the trust and any earnings

20   thereon shall be held separate and apart from the funds of

21   the company and shall be used exclusively for the uses and

22   purposes of participants and general creditors as herein set

23   forth.

24            Participants shall have no preferred claim on or

25   any beneficial ownership interest in any assets of the

Page 131

1   trust.

2          Any rights created under the plan and this

3   agreement shall be mere unsecured contractual rights of

4   participants against the company."

5          So here very clearly it's saying that they are

6   unsecured creditors of the company.

7          THE COURT:  That's not -- I mean --

8          MS. SOLOMON:  Fairly clearly.  Can we settle on

9   that for the moment?

10          THE COURT:  No, but you can keep going.

11          MS. SOLOMON:  And if you turn a couple of pages

12   further, Your Honor, paragraph 3(b)(3), and it's Section 3,

13   it's trustee's responsibility regarding payments to trust --

14          THE COURT:  I'm sorry, I missed the reference,

15   Ms. Solomon.

16          MS. SOLOMON:  Sure, it's 3(b)(3).

17          THE COURT:  3(b)(3).  Okay.

18          MS. SOLOMON:  And that provides if at any time --

19   this particular paragraph deals with in the event of

20   insolvency, and it says:

21          "If at any time the trustee has determined the

22   company is insolvent the trustee shall discontinue payments

23   and shall hold the assets of the trust for the benefit of

24   the company's general creditors.

25          Nothing in the agreement shall in any way diminish

Page 132

1   any rights of participants to pursue their rights as general

2   creditors of the company with respect to benefits due under

3   the plan or otherwise."

4              THE COURT:  Okay.

5              MS. SOLOMON:  And I would submit that that is

6   further acknowledgment that the RSU holders are viewed as

7   general creditors of the company.

8              THE COURT:  Okay.  Is that -- is this -- so this

9   is the trust, 1997 trust, do you track that provision

10  through all of the other organic documents?

11             In other words, there was -- there was in the

12  briefing and in the argument this morning it was pointed out

13  that the bankruptcy language in I think the 2003 and maybe

14  2004 plans disappeared in 2005.  So this particular

15  language, can you track it through anywhere else but the

16  1997 trust?

17             MS. SOLOMON:  Well the 1997 trust was an integral

18  document --

19             THE COURT:  For --

20             MS. SOLOMON:  -- to all of the program documents,

21  and it was in existence until the end.

22             THE COURT:  Okay, but we -- I don't know what that

23  means.  This agreement was dated as of September 4th, 1997.

24             MS. SOLOMON:  Correct.

25             THE COURT:  Is it the document that was the

Page 133

1    operative document for the years -- the five years prior to

2    2008?

3                MS. SOLOMON:  Yes.

4                THE COURT:  We're only talking about claims for

5    the five years.  So where is the -- where's the document

6    that's this document's equivalent for those years?

7                MS. SOLOMON:  Your Honor, this is the document

8    that Lehman relies upon for voting rights.  It's the sole

9    document.

10               THE COURT:  Okay.  I'm -- I'm absolutely confused.

11   Is the 1997 trust the document that was operative as of --

12   during the five years prior to the filing?

13               MS. SOLOMON:  Yes, Your Honor.

14               THE COURT:  Okay.  Is that right, Mr. Miller?  I

15   just -- I need to -- I apologize for cutting into your time,

16   but --

17               MS. SOLOMON:  No, that's -- that's okay.

18               THE COURT:  -- I just need to -- I just need to

19   understand what -- what we're talking ability here.

20               MR. MILLER:  Ralph Miller for LBHI.

21               Your Honor, the 1997 trust was created in 1997 and

22   I believe this is the governing document which we do not

23   think was amended, it just created the trust.  The trust

24   remained operational through the bankruptcy --

25               THE COURT:  Okay.

Page 134

1            MR. MILLER:  -- date.  But the trust -- I do -- if

2    I might just clarify --

3            THE COURT:  Yeah.

4            MR. MILLER:  -- one point here --

5            THE COURT:  Yeah.

6            MR. MILLER:  -- because there's been a little bit

7    of confusion with this alternative payment.

8            THE COURT:  Well, I'm obviously -- I'm obviously

9    confused.

10            MR. MILLER:  Not for the Court, Your Honor.

11            Alternative payment would become an issue if it

12    were the position of LBHI that we're not going to deliver

13    any stock at this point to these claimants because, for

14    example, they couldn't complete the five years because of

15    they were fired.

16            Well what this motion requests is that all of the

17    stock units --

18            THE COURT:  Hold on, I'm going to shut him down in

19    a few minutes.

20            MR. MILLER:  Okay.

21            THE COURT:  Just hold on.

22            MR. MILLER:  But this relates to the trust, Your

23    Honor.

24            THE COURT:  Okay.

25            MR. MILLER:  What this motion says is that all of

1    the trust -- all of the units of stock awards and stock

2    units are treated as becoming common stock under the plan.

3              THE COURT:  Right.  Okay.  But --

4              MR. MILLER:  So -- so that has happened --

5              THE COURT:  -- hold on.

6              MR. MILLER:  -- and that's full performance of

7    what would have happened under the trust.

8              THE COURT:  Right.  But I -- my question is not --

9    you know, at some later point you can react to the -- to the

10   alternative performance argument, I was just trying to

11   simply understand as a factual matter whether this trust

12   document is the operative document that is in effect during

13   the plan years that we're concerned with, and I think your

14   answer is yes, right?

15             MR. MILLER:  Yes, Your Honor.  I think my answer

16   also was that this document is we believe irrelevant to

17   anything that's happening now.

18             MS. SOLOMON:  That wasn't the question.

19             MR. MILLER:  But it is -- it was -- the document

20   itself was in effect.

21             THE COURT:  Okay.  All right.  Well make a note

22   that at a certain point I'm going ask you to -- and I had --

23   I had made a note, but it's in light of the highly

24   structured nature of this hearing that I'm -- I'm doing this

25   in a way that I'm unaccustomed to, which is ordinarily I

Page 136

```
 1    would have more of a back and forth, but I'm trying to

 2    respect the procedure that you folks negotiated, so

 3    therefore it becomes more difficult to me when I get to a

 4    point that I'd like to hear the other side to I don't want

 5    to take away from your time.

 6            So, Mr. Miller, if you're going to keep running

 7    track of things that I'm going to want to hear about later

 8    I'm going to want to hear about your reaction to the two

 9    provisions that were pointed out by Ms. Solomon, and that as

10    I recall were also I think they were specifically pointed

11    out in the -- in the reply -- in the reply memorandum.

12            So -- so let's keep going.

13            MS. SOLOMON:  Correct, Your Honor.

14            THE COURT:  Okay?

15            MS. SOLOMON:  Okay.  Your Honor, that takes me to

16    the wage laws.

17            THE COURT:  Okay.

18            MS. SOLOMON:  And that is something also that

19    shareholders do not have the benefit of.  They don't have

20    the benefit of alternative performance obligations and they

21    don't have the obligation of wage laws.  And we've submitted

22    to Your Honor that the claimants here did have the benefit

23    of the wage laws.

24            Why is that?  Because they had earned commissions

25    and so-called discretionary bonuses, and in some case
```

1    guaranteed bonuses also, which are fixed dollar claim

2    amounts.  And at the end of the year with regard to for

3    instance the bonus claimants they were told, okay, this is,

4    you know, in their total compensation statements that they

5    received from the company --

6              THE COURT:  Right.

7              MS. SOLOMON:  -- this is the bonus amount that

8    you're receiving, a fixed dollar claim amount.

9              THE COURT:  But look at the -- look at the

10   compensation statement, look all though tab 19 of the

11   binder.

12             MS. SOLOMON:  Yes.

13             THE COURT:  Do you have the binder that Mr. Miller

14   used?

15             MS. SOLOMON:  Yes.  Yes, I do, Your Honor.

16             THE COURT:  Okay.  So 2005 total compensation

17   statement, right?

18             MS. SOLOMON:  Correct.

19             THE COURT:  Couldn't be more clear, paid salary,

20   $200,000.  Bonus, $900,000.  Total compensation, a million

21   one, right?  That's the compensation.

22             MS. SOLOMON:  Right.

23             THE COURT:  You say the 900,000 is not -- well,

24   that's not where it comes into play.  But then it says,

25   "Equity summary in U.S. dollars."

1              MS. SOLOMON:  Right.

2              THE COURT:  Okay?  And it's got the RSUs and the

3     equity component and it does the conversion and it's got the

4     employee discount and then it's got the number of shares,

5     right?

6              MS. SOLOMON:  Correct, yes.

7              THE COURT:  And then it's got the payment

8     schedule.

9              MS. SOLOMON:  Uh-huh.

10             THE COURT:  So payment, that was your word that

11    you pulled out of the 1997 trust, the whereas clause, right?

12    Payment.  So you were paid -- here's the -- the bonus is

13    $900,000, less the RSUs --

14             MS. SOLOMON:  Uh-huh.

15             THE COURT:  -- total cash payment, $665,000,

16    right?

17             MS. SOLOMON:  Right.

18             THE COURT:  So this -- if I get this compensation

19    statement it could not be clearer to me that what I got for

20    2005 was $665,000 in cash, that's the number I'm going to

21    report on my income tax --

22             MS. SOLOMON:  Uh-huh.

23             THE COURT:  -- and then I have this equity piece.

24    I have an RSU that if I am, as it says here, "All terms and

25    conditions of equity awards, including those related to

Page 139

```
 1    vesting and forfeiture, are subject to controlling plan

 2    documents."  And then it has the number -- it has the number

 3    of shares.

 4            So it doesn't say unless it turns out that these

 5    aren't worth anything in which case you'll get the $235,000

 6    in cash.

 7            MS. SOLOMON:  No.

 8            THE COURT:  At that -- at this moment in time the

 9    person who gets this, this you know, as senior vice

10    president --

11            MS. SOLOMON:  Right.

12            THE COURT:  -- knows that that's what they have.

13            MS. SOLOMON:  Your Honor, I want to be clear on

14    this point.  That we're not making the claim that the RSUs

15    themselves are wages, we're making the argument that there

16    was a bonus award made to the claimants not all of which was

17    going to be paid in RSUs, some of it was going to be paid in

18    cash --

19            THE COURT:  Right.

20            MS. SOLOMON:  -- in a month or two after the year

21    end.

22            THE COURT:  Okay.

23            MS. SOLOMON:  And that when you look at these

24    claimants they were clearly the holders of wages, the

25    individuals themselves.
```

Page 140

```
 1              THE COURT:  Okay.  So now I'm confused.

 2              If this -- this compensation statement that we're

 3    looking at, and I asked Mr. Miller this morning, if somebody

 4    was told your total cash payment is going to be 665- and --

 5    I mean the timing is off -- but --

 6              MS. SOLOMON:  Uh-huh.

 7              THE COURT:  -- if someone had cash coming to them

 8    then they in fact have a wage claim and Lehman -- so they're

 9    -- they have a wage claim.

10              MS. SOLOMON:  Right.  So --

11              THE COURT:  They're an unsecured creditor entitled

12    to the priority under the Code.  That's not --

13              MS. SOLOMON:  Well part of it -- part of it was

14    cash.  So part of it was an RSU and part of it was cash.

15              If you look at -- there was one individual --

16    there was one individual holding both components of its

17    claim.

18              THE COURT:  I really am -- so I'm now thoroughly

19    confused.

20              I believed that all of the claimants that we're

21    talking about in this proceeding are asking for their RSU-

22    related compensation to be turned into a general unsecured

23    claim.  I did not think that we were talking about any

24    claimants' claim that Lehman was seeking to subordinate any

25    claimants' claim for unpaid cash wages.
```

Page 141

1          MS. SOLOMON:  No, the cash wages, Your Honor --

2    the cash wages were paid.

3          THE COURT:  Right.

4          MS. SOLOMON:  But the question is the individual

5    who was the holder of the claim at any point in time.  I

6    mean the wage laws of the State of New York and the various

7    other states make very clear that you need to have full

8    disclosure made to wage holders.

9          THE COURT:  Okay.

10         MS. SOLOMON:  Were these -- even though their cash

11   was paid earlier on, were they a holder of a wage claim at

12   some point in time?  Yes, they clearly were, because --

13         THE COURT:  I don't -- I -- I'm sorry, I just -- I

14   literally do not understand your argument.  I don't

15   understand.

16         People go to work and they're told we're going to

17   pay you this amount of money, at our discretion we're going

18   to pay you part of it in cash and part of it in a restricted

19   stock unit, and then that's exactly what happens.  They

20   don't get told that we're going to pay you instead of an RSU

21   we're going to pay you in Monopoly money, they get what they

22   were told they were going to get.  They get cash or

23   restricted stock units.

24         So what's the wage claim?  They got what they were

25   told they were going to get.  They now are complaining

Page 142

1    because part of it's not worth anything.

2              I just don't -- I don't understand what is the

3    wage claim?

4              MS. SOLOMON:  That they are -- let's say this

5    occurs in December, okay?  December they meet with their

6    superiors and this particular claimant is told they have a

7    $900,000 bonus.

8              THE COURT:  Right.

9              MS. SOLOMON:  Well 235,000 of that is going to get

10   paid in RSUs, right?

11             THE COURT:  Right.

12             MS. SOLOMON:  But --

13             THE COURT:  And --

14             MS. SOLOMON:  -- much of it is --

15             THE COURT:  -- they actually -- and they get the

16   RSUs, they get them.

17             MS. SOLOMON:  Yeah, but before they get it, let's

18   say, you know, right after their meeting, okay, before they

19   get their RSUs or before they get their cash bonus are they

20   a holder of the wage claim?  Yes, I think that they are.

21   Because they've been advised --

22             THE COURT:  But that's -- but they got what they

23   -- they got what Lehman told them they were going to get.

24   They got cash and they got RSUs.  This is -- so they --

25             MS. SOLOMON:  But that's not the issue, the issue

Page 143

1    is one of disclosure.  So they might have gotten what Lehman

2    told them they were going to get, except that Lehman never

3    gave them the proper disclosure that was incident to

4    participation in their plan --

5              THE COURT:  Well --

6              MS. SOLOMON:  -- in Lehman's plan in the first

7    place.

8              THE COURT:  -- what would the -- what should the

9    disclosure have been?

10             MS. SOLOMON:  By the way guy, it's Lehman's view

11   that if you enlist in this plan your participation and

12   nothing else is going to make your wages that you would

13   otherwise be entitled to under state law, subject to

14   subordination under the Bankruptcy Code, in the event Lehman

15   files bankruptcy.

16             Lehman didn't say that to anybody, even though it

17   concerned the claimants' wages, and they were entitled to

18   that kind of disclosure from Lehman.

19             THE COURT:  So what if they got -- what if they

20   got instead of it being a restricted stock unit they got

21   just stock unrestricted, would Lehman had had to say, oh, by

22   the way, in the event we file for bankruptcy and there

23   aren't sufficient assets to cover the claims of all

24   creditors your stock will be worthless?

25             I mean again, I'm going to use the analogy, you

Page 144

1    know, in that formulation the volume of disclosures would be

2    -- would be boundless.

3            Just you're asking me to conclude that when this

4    person who got the compensation statement on, you know, for

5    2005, had no idea that something called equity --

6            MS. SOLOMON:  Uh-huh.

7            THE COURT:  -- shares -- shares listed under

8    equity summary that are called equity component that

9    specifically says that all terms and conditions of equity

10   awards, including those related to vestiture and forfeiture

11   are subject to controlling plan documents, which themselves

12   are subject to applicable law, that this person who in 2005

13   earned 1.1 million did not understand that equity might be

14   the value of the equity component might be at risk?

15           MS. SOLOMON:  But that's not the issue.  The issue

16   is because they are entering into this kind of arrangement

17   that their claim would be subject to 510(b) of the

18   Bankruptcy Code, and they would not have had that kind of

19   risk of forfeiture with regard to their wages if they were

20   just getting paid straight in cash compensation.  And the

21   wage laws --

22           THE COURT:  But they weren't getting -- they

23   weren't getting paid in straight cash compensation.

24           MS. SOLOMON:  Right, but that's the point, the

25   wage laws --

Page 145

1          THE COURT:  They were being told it's equity.

2          So when -- so your rule is that -- your rule is

3   that when people go to work at a company anywhere they have

4   to basically take a mandatory course in Chapter 11 so that

5   they understand that if the company goes bankrupt here's

6   what their wages are subject to, here's how the absolute

7   priority works -- rule works, here's -- I'm sorry, it --

8          MS. SOLOMON:  It's not my rule, Your Honor, it's

9   the Court of Appeals rule that says --

10          THE COURT:  What Court of Appeals rule is that?

11          MS. SOLOMON:  March versus Prudential.

12          THE COURT:  What does that say?

13          MS. SOLOMON:  Which is cited in our brief and

14   various other case law which establishes that with regard to

15   wage laws and wages of employees full disclosure has to be

16   made to the employees of all the risks attendant to

17   participation in this kind of employee benefit plan.

18          THE COURT:  So your argument here at this point is

19   boiling down to the fact that because none of the plan

20   documents specifically say that your -- this might be

21   subject to equitable subordination or treated as an equity

22   for the purposes of Chapter 11 that therefore these folks

23   are entitled to have a claim as a general unsecured

24   creditor.

25          MS. SOLOMON:  My position is there wasn't adequate

Page 146

1    disclosure made.

2              THE COURT:  Okay.  And the adequate -- the failure

3    to make adequate disclosure then doesn't fall within the

4    claim in connection with the purchase or sale of the

5    security.  So --

6              MS. SOLOMON:  It falls under the wage law, Your

7    Honor.  It gives them a fixed wage law claim, a fixed debt

8    claim, and the case law recognizes that a fixed debt claim

9    is not subject to subordination under 510(b) of the

10   Bankruptcy Code.

11             THE COURT:  Okay.

12        (Pause)

13             MS. SOLOMON:  Your Honor, we've made various other

14   arguments in our brief addressing the absence of a security

15   --

16             THE COURT:  Okay.

17             MS. SOLOMON:  -- and a purchase and a sale, and I

18   think that we mostly addressed those issues.

19             I did want to address a couple of points which

20   Lehman makes in its brief.

21             THE COURT:  Okay.

22             MS. SOLOMON:  We submitted to the Court that the

23   analysis of whether security exists or not should start and

24   end with whether or not there's an investment contract here,

25   and which we believe is consistent with the Supreme Court's

Page 147

1    decision in the Daniel case, and we think that the -- that

2    the reasoning that the Court employed there is fully

3    applicable here.

4              THE COURT:  So can I just -- I just want to -- I

5    just want to go back to this -- to the wage law claim.

6              MS. SOLOMON:  Sure.

7              THE COURT:  So in your papers at page 37 you say,

8    "Deductions or withholding from wages are unlawful unless

9    they are expressly authorized in writing by the employee."

10             So you're alleging a violation of that New York

11   labor law section.

12             MS. SOLOMON:  We are, Your Honor.

13             THE COURT:  An employee may not be forced to waive

14   labor law protections.

15             MS. SOLOMON:  That's correct, Your Honor.

16             THE COURT:  That's what you're alleging.

17             MS. SOLOMON:  In those cases --

18             THE COURT:  And that the compensation -- you then

19   go on to say "that the compensation claims are

20   distinguishable because they were given no choice but to

21   participate in the RSU CSA plan if they wanted to obtain or

22   keep their job."  So --

23             MS. SOLOMON:  I think that's really -- that's just

24   a very small part of that, but that is part of the argument

25   and as well as Your Honor noted that there were no signed

Page 148

1    written authorizations in many, many cases.

2          THE COURT:  So many employees did not sign written

3    authorizations for deductions from their wages.

4          So what you characterize as a deduction is the

5    implementation of the dear colleague letter that says you're

6    going to get total compensation of this and at our option

7    we're going to give it to you part in stock and part in

8    cash, and in essence you're saying the employees were

9    defrauded because they didn't realize that the stock part

10   might be subject to subordination under the Bankruptcy Code.

11         MS. SOLOMON:  Not that they were defrauded, Your

12   Honor, but that they didn't receive adequate disclosure

13   under the wage laws.

14         THE COURT:  "And that acceptance and continuation

15   of employment with Lehman, subject to the terms of the RSU

16   CSA plan, was not done with knowledge of the risks and

17   rewards specifically with respect to possible

18   subordination."

19         So are you going to -- is there going to be

20   testimony on that?

21         MS. SOLOMON:  No, I think that the documents speak

22   for themselves, Your Honor.

23         THE COURT:  So I'm not entitled to -- I'm not

24   entitled -- or you're not intending to proffer somebody who

25   got one of those wage statements and me to find out at any

Page 149

1    level what their level of sophistication was, what their

2    knowledge was, you just want me to find that nobody knew

3    that they had -- nobody knew the bankruptcy implication of

4    having an equity component of their compensation.

5             MS. SOLOMON:  I'm not sure which -- when you say

6    the wage statements are you referring to the total

7    compensation statements?

8             THE COURT:  Yeah.  Yeah.

9             MS. SOLOMON:  Well, I think that the -- as I said

10   the documents speak for themselves that -- and Lehman has

11   never alleged, and I think they concede the point that --

12   that there was no -- the only disclosure as to 510(b) that

13   was ever made to any of the claimants were those -- the

14   510(b) subordination clause that we were going over earlier

15   this morning, otherwise the word 510(b) does not appear in a

16   single document that was submitted to any claimants in all

17   of the thousands of pages of disclosure of various

18   conditions under which they could forfeit their wages.

19   There's no mention of 510(b), Your Honor.

20             THE COURT:  Okay.

21             MS. SOLOMON:  Going to the issue of whether or not

22   there's a security here.

23             Lehman makes the point and cites to the Enron

24   case, and they make the point relying on Enron that it's not

25   necessary to harmonize 510(b) with federal security

Page 150

1    statutes, but I think it's important to carefully note

2    exactly what Judge Gonzalez in Enron did and did not say.

3            And in specific he said -- and the discussion was

4    in the context of fraudulent inducement and specifically

5    actually fraudulent retention claims that he was considering

6    in that case -- and he said:

7            "Whether or not comparative statutory malices are

8    valuable in full context, comparative analysis of Rule 10

9    (b)(5) in the Securities Act does not appear fruitful here."

10           THE COURT:  Okay.

11           MS. SOLOMON:  And then he goes on further to say:

12           "That is not the say there could be no reason to

13   harmonize these two statutes, only that there's no evidence

14   that such harmony was intended or required here."

15           And so, you know, we believe that what Judge

16   Gonzalez had to say about fraudulent retention claims and

17   relying upon federal securities law with regard to those

18   claims is not relevant to the issue here of whether the

19   Court's analysis in Daniel should be considered with respect

20   to whether or not there's a security.  And in Daniel the

21   Supreme Court found that there was no security with regard

22   to a pension plan because there the pension plan had been

23   mandatorily imposed upon an employee, and the Court found

24   that there was not an investment decision and that the Court

25   was not willing to consider the claimant and employee there

Page 151

1    as an investor, but rather the Court in looking at the

2    economic realities of the situation found that he was only

3    looking for obtain a livelihood.

4           And we think that that reasoning is quite relevant

5    here with regard to the Lehman employees and that they were

6    only looking to make a livelihood and that they weren't --

7    and they did not come to Lehman to profit on Lehman's stock,

8    it was only a career decision to join Lehman and go along

9    with the compensation plan that Lehman had -- was ordaining

10   for its employees (indiscernible - 01:10:37).

11          THE COURT:  But to go back to the employees who at

12   the moment of the filing, say a ten-year employee who had

13   been working pursuant to the plan for -- from 1998 to 2008,

14   right?  So they've got grounding five years under their belt

15   of RSUs that converted, quote/unquote, into common stock,

16   right?

17          MS. SOLOMON:  That already converted?

18          THE COURT:  That already converted, right?

19          MS. SOLOMON:  Yes.

20          THE COURT:  And then they've got five years that

21   had not yet converted, so they presumably could be a

22   claimant here, right?

23          MS. SOLOMON:  Correct.

24          THE COURT:  So that person is not saying now --

25   because the common stock, if they were still holding it, is

Page 152

1   now worthless, right?

2           MS. SOLOMON:  Correct.  My particular clients,

3   every single last one of them already sold their common

4   stock as soon as it converted, but so --

5           THE COURT:  Okay.  Well --

6           MS. SOLOMON:  -- it would -- it's not relevant for

7   them.

8           THE COURT:  Right.  Okay.  But I'm going to --

9   well then maybe you're not the right person to ask the

10  question, but to me you -- you know, you can't have your

11  cake and eat it too.

12          So if you're a claimant who was there for ten

13  years and, you know, you rode the stock up, you know, didn't

14  sell it the moment that you converted, then if you follow

15  your argument through to its logical conclusion, then that

16  claimant who has five-years worth of stock issued, you know,

17  nominal amount, I don't know, you know maybe 10,000 shares

18  if you -- you know, if you take that one -- I'm making it

19  up, I don't know what the number is -- but say they have

20  10,000 shares that are worth nothing and then they have RSUs

21  that entitle them to another 10,000 shares that are now

22  unfortunately worth nothing, then why isn't that claimant

23  saying the whole thing was no good.  I didn't have

24  disclosure about any of it.  I didn't know that equity falls

25  to the bottom of the bankruptcy.  I want a wage claim for

Page 153

1     the whole ten years.

2            I don't understand the distinction between when

3     you have that person standing there, a ten-year employee

4     with five years worth of stock --

5            MS. SOLOMON:  Uh-huh.

6            THE COURT:  -- now worth nothing, five years worth

7     of RSUs now worth nothing.

8            MS. SOLOMON:  You mean what's the distinction

9     between the stock and the RSUs?

10           THE COURT:  Yeah.  I mean the whole thing

11    unfortunately has left them with a bucket of compensation

12    that isn't worth anything.  In retrospect they would rather

13    have been paid in cash.  They weren't given that option.

14           At any point in 1999, 2000, 2001, you know, and we

15    could go back and look at, you know, what the stock market

16    was doing then, but they stayed in.  They stayed with it.

17           MS. SOLOMON:  Well, they stayed -- you mean they

18    stayed in because they stayed with Lehman?  Because they

19    didn't stay in in the sense that they had any decision to

20    make with regard to the sale of their RSUs.  They couldn't

21    do that.  They were locked in for five years.  And that's

22    very different from the situation --

23           THE COURT:  And at any point --

24           MS. SOLOMON:  -- in Enron.

25           THE COURT:  That's right.  At any point -- at any

Page 154

1    point they could have said I'm going to go work somewhere

2    else.  I'm going to -- I don't like this, I want all cash, I

3    don't want an equity component, this is not working for me,

4    I can go somewhere else.  And I'm having, I think as you can

5    tell, I'm having a really hard time with that argument.

6              MS. SOLOMON:  But doesn't -- Your Honor, doesn't

7    Daniel respond to that issue?  Because the Court says I'm

8    not going to view the act of accepting employment or

9    remaining in employment as a -- as a decision to invest in

10   the company in that case, the Court was not -- that's what

11   the Court of Appeals below had found, but the Court said,

12   no, that's not -- it's not an investment decision, this

13   employee was making a decision to obtain a livelihood, and I

14   think that's the response, and I think that's the proper

15   response.

16             THE COURT:  Well, I'll go back and read it again,

17   I'm not -- I'm not seeing it that way at the moment, but I

18   hear the point that you're making.

19             And I'm being told that actually your notebook is

20   now on top of the microphone.

21             MS. SOLOMON:  Yes.

22             THE COURT:  On the podium.

23             MS. SOLOMON:  Oh.

24             THE COURT:  So that --

25             MS. SOLOMON:  I apologize, Your Honor.

Page 155

1            THE COURT:  -- folks can't hear you and the

2    assistant can't hear you.

3            MS. SOLOMON:  Okay.

4            THE COURT:  Okay.

5            MS. SOLOMON:  We have corrected that problem.

6            THE COURT:  So is -- am I going to hear from other

7    counsel?

8            MS. SOLOMON:  You are, Your Honor.

9            THE COURT:  Okay.

10           MS. SOLOMON:  And I just wanted to address one

11   other point.

12           THE COURT:  Sure.

13           MS. SOLOMON:  And that has to do with the removal

14   of the subordination clause --

15           THE COURT:  Sure.

16           MS. SOLOMON:  -- in later years.

17           I don't think that the issue here and I don't

18   think we need to speculate what was the reason that Lehman

19   removed the subordination clause.  Again, I think that

20   Lehman controlled all the documents and it was very easy for

21   it to say in any of the documents that it was distributing

22   to employees, give an explanation as to the -- the inclusion

23   of the subordination clause in the first place and as well

24   as the removal of the subordination clause.

25           And I think the best case where we -- you know, we

Page 156

1    have submitted that it was the intention of Lehman or

2    expressed intention in purposefully removing the clause from

3    all the documents for forever more that it expressed its

4    intention that these claims should not be subordinated, and

5    if it were its intention --

6              THE COURT:  You know, but it actually --

7              MS. SOLOMON:  -- or otherwise --

8              THE COURT:  -- doesn't matter what their intention

9    is because the law is what is law is.  I mean that's the

10   thing about all the time people put into orders that they

11   submit to this Court to the fullest extend of applicable

12   law, and I routinely strike it out because everything is

13   only --

14             MS. SOLOMON:  That's correct, Your Honor.

15             THE COURT:  -- to the fullest extent of applicable

16   law.

17             So here what you're suggesting is that it's even

18   worse.  I think what you're saying is that Lehman saw that

19   and they said to themselves, uh oh, we leave that in people

20   might really know their rights and may not want to work for

21   us, so let's take it out so we can trick them into working

22   for us and accepting this subordination risk.  And if that

23   is in fact what happened then that conduct and the claim

24   arising from that conduct gets subordinated under 510(b).

25             MS. SOLOMON:  Right, but we're not going to --

1    we're not going presume that was the case, because that

2    would have been bad faith.

3            THE COURT:  But that's --

4            MS. SOLOMON:  That would have been bad faith as

5    Your Honor just suggested.

6            THE COURT:  I understand, but --

7            MS. SOLOMON:  We're not suggesting it.  And so the

8    only other logical conclusion is that Lehman was not acting

9    in bad faith --

10           THE COURT:  Right.

11           MS. SOLOMON:  -- and that it's removal in fact

12   points to the conclusion that subordination should not

13   apply.

14           THE COURT:  Okay, I hear you.

15           MS. SOLOMON:  Thank you, Your Honor.

16           THE COURT:  Okay.

17       (Pause)

18           THE COURT:  Ms. Solomon, I don't recall that

19   you've appeared before, but this is in the nature of

20   spirited debate, it's not --

21           MS. SOLOMON:  I love it, Your Honor.

22           THE COURT:  I'm glad.

23       (Laughter)

24           MR. BOYAJIAN:  May it please the Court, good

25   afternoon, Your Honor, Jim Boyajian who's in from Los

Page 158

1    Angeles on behalf of seven claimants all the way from

2    California to Colorado --

3              THE COURT:  Okay.

4              MR. BOYAJIAN:  -- New Jersey, New York, UK.

5              THE COURT:  Okay, I assume you're admitted pro hac

6    to this court?

7              MR. BOYAJIAN:  Yes, I am, Your Honor.

8              THE COURT:  Okay.  Very good.

9              MR. BOYAJIAN:  And I'm going try to limit my

10   comments to about 15 minutes as I understand we have -- may

11   have some witnesses going up today.

12             THE COURT:  Okay.

13             MR. BOYAJIAN:  So I want to start off with a

14   couple points addressing some of what was --

15             THE COURT:  Could you tell me who your group is,

16   who do you represent?

17             MR. BOYAJIAN:  Okay.  So I represent commission

18   salespeople --

19             THE COURT:  Okay.

20             MR. BOYAJIAN:  -- in California and Colorado,

21   bonus people in east coast, New Jersey and New York.

22             THE COURT:  Okay.

23             MR. BOYAJIAN:  As well as one gentleman in London,

24   and they're claims range from a tiny claim of $6,000 for an

25   IT employee --

1            THE COURT:  Uh-huh.

2            MR. BOYAJIAN:  -- in New Jersey --

3            THE COURT:  Okay.

4            MR. BOYAJIAN:  -- to a $3 million claimant in

5    London.

6            THE COURT:  Okay.

7            MR. BOYAJIAN:  So I've had the opportunity to look

8    at this issue from many different angles.  I'd like to start

9    off with some big picture points.  First of all in response

10   to some of the ambiguities that were raised this morning on

11   the documents presented by counsel.

12            Generally ambiguity is construed against the

13   drafter of the document, especially when there is a

14   disparity between the party and power as was the case here.

15            Lehman drafted those documents and forced it on

16   its employees, so we ask the Court to construe any ambiguity

17   against the drafter.

18            Now this case involves novel instruments and

19   questions of first impression.  Debtor's counsel asked the

20   Court to take a very narrow view, almost tunnel vision view

21   of this case in the context and aftermath of the Enron case,

22   but that case is restricted strictly to stock options per

23   Judge Gonzalez' own footnote 3 from that case.

24            Moreover, the issues raised here were not raised

25   by the claimants in Enron, and Judge Gonzalez was not asked

Page 160

1    to consider things like the wage law arguments, the

2    impossibility of performance of actually getting a chance to

3    deliver the stock, the alternative performance arguments

4    raised by Ms. Solomon under state contract law, as well as

5    interpreting the definition of a security in the broader

6    context of the securities laws.

7          Of course I don't have to explain to Your Honor

8    that the Bankruptcy Code's definition is almost identical --

9    virtually identical to the 33 definitions of security, which

10   is why we're asking this Court to take the big picture view

11   and analyze whether or not there was a security here, which

12   is one of the 510(b) elements in the broader context of

13   securities law analysis, which of course is based on the

14   baseline test of the Howie case and its prodigy, including

15   the cases that we cited, Landrith (ph) and Foreman, which

16   I'll -- if I have time I'll --

17          THE COURT:  Okay.

18          MR. BOYAJIAN:  -- be happy to address those.

19          I'd like to address 510(b) just briefly and make a

20   few points.

21          THE COURT:  When you talk about the picking up on

22   what Ms. Solomon said, the impossibility --

23          MR. BOYAJIAN:  Yes.

24          THE COURT:  -- issue.  What's the impossibility

25   that occurred here?

Page 161

1        MR. BOYAJIAN:  The impossibility to deliver actual

2   stock as was promised as one of the alternatives --

3   obligations that Lehman took upon itself.

4        Lehman left itself many outs in these documents

5   and said, well, it's really up to our discretion whether --

6   whether or not we deliver RSUs, it's really up to our

7   discretion whether or not we deliver stock, and you have no

8   choice in the matter, and so you know, if under certain

9   circumstances if we decide to give you cash then so be it,

10  you know, that's really none of your investment decision.

11       THE COURT:  It's your decision whether or not to

12  accept the conditions of these as the conditions of your at

13  will employment, which is this here's how I'm going to pay

14  you.  I'm going give you some cash and I'm going to give you

15  some restricted stock units, some pieces of paper that

16  entitle you to receive stock at a certain point, and every

17  year I'm going to say the same thing to you, and every year

18  you can decide anew whether or not you come to work at

19  Lehman or whether you go to work somewhere else.

20       So when you started out by telling me that it was

21  forced upon them that's just not an accurate statement.

22       MR. BOYAJIAN:  I'd like to raise a consideration

23  for the Court.

24       THE COURT:  Sure.

25       MR. BOYAJIAN:  In 2006 Lehman exercised its

Page 162

1    unilateral right to amend the documents.

2              THE COURT:  Okay.

3              MR. BOYAJIAN:  And in 2006 they made a material

4    change which was to take out the competitive activity

5    provisions of a voluntary termination.

6              So what does that mean?  It means you've been

7    working at Lehman since 1998, you've collected, you know, a

8    whole array of RSUs, and 2006 rolls around, halfway through

9    the year you get an email saying, well guess what, if you go

10   work for the Red Cross or if you go travel the world, if you

11   simply leave for any reason not necessarily to go work for

12   your --

13             THE COURT:  Right.

14             MR. BOYAJIAN:  -- one of our competitors, you're

15   going to lose all your RSUs.

16             So I mean do you really have a choice to vote with

17   your feet, Your Honor?

18             THE COURT:  Sure you do.  You absolutely do.  You

19   are -- when you go into a situation and you understand or

20   are -- the operative documents surrounding your employment

21   make it I think pretty clear that the conditions of it can

22   be changed at the option of the employer, then other than

23   treating you in a way that violates, for example, your

24   civil rights, then you are engaging in that employment

25   situation --

Page 163

1                    MR. BOYAJIAN:  What happens if every bank and

2      every employer then across the country decides to use this

3      type of program?  Then you know what rights will employees

4      really have?  What bargaining power would they have to --

5                    THE COURT:  Well, you know, I mean -- like -- you

6      know, I mean I think that I'm not here to solve the world's

7      problems, but --

8                    MR. BOYAJIAN:  Well but this case is going to set

9      precedent of course.

10                    THE COURT:  I repeat, I'm not here to solve the

11     world's problems, I'm here to decide this case, you know,

12     under the facts and the law, and so far the essence of the

13     argument that I've gotten and I was told at the pretrial

14     it's not about asking for sympathy it's about applying the

15     law.

16                    The essence of the argument so far is that this

17     was outrageous, people were forced to do this, and that this

18     is outrageous, that people didn't understand that equity

19     meant equity, that it meant up and that it also meant down

20     or in this case down and out.  And I'm struggling, I'm

21     struggling with that.  I mean I'm not going to try to hide

22     it.  I am struggling with that argument.

23                    So why don't I let you keep going a little.

24                    MR. BOYAJIAN:  All right.  Well, I'd like to

25     actually address your questions about whether these RSU

Page 164

1    units were really equity, because it was our position that

2    they were not actually equity stakes in the company.  They

3    cannot be treated the same as shareholders.  In fact

4    Lehman's documents themselves stated that you do not have

5    the rights of a shareholder until the shares are actually

6    granted.  These RSUs are a facade.  There is no actual stock

7    underlying the RSUs with the employee's name on it like the

8    restricted -- like with restricted stock as opposed to RSUs.

9    Until the --

10             THE COURT:  So --

11             MR. BOYAJIAN:  -- until the RSUs vest three years

12    later.  So I mean let's go through a number of factors, Your

13    Honor.  So until the vesting date three years later what do

14    you really have?  You just have a credit saying that oh,

15    Lehman --

16             THE COURT:  Right.

17             MR. BOYAJIAN:  -- has an IOU --

18             THE COURT:  That's right, that's exactly right.

19    That's what you have, you have a piece of paper that says

20    that if you fulfill all of the conditions, all terms and

21    conditions, including those related to vesting and

22    forfeiture under the controlling plan documents, if you jump

23    through all those hoops then at the end of that period of

24    time you get Lehman stock.  That's exactly what you're told

25    that you have and that's exactly what you have.

Page 165

1          But in your scenario, which I'm -- which somewhat

2     contradicts what Mr. Miller said, Mr. Miller said that the

3     actual shares to be issued by the -- pursuant to the RSUs

4     were actually issued maybe not in a one to one but in some

5     manner and they were put into a trust and there was a

6     trustee and that trustee voted on behalf of the RSU holders.

7     So you just said something that is contrary to what

8     Mr. Miller said, so we should get to the bottom of that.

9          But suppose this were a Ponzi scheme.  Suppose

10    this were Madoff.  Suppose Lehman never issued any shares

11    whatsoever, they didn't exist.  It's still a claim under

12    510(b).  It's a fraud then that worse -- even worse it's a

13    fraud that was perpetrated upon you.  You were told that you

14    were going to be paid this amount, you weren't paid this

15    amount, you weren't -- you were told you were going to be

16    paid in this form of currency, in fact we never -- we never

17    minted that currency, it's a fraud.

18          MR. BOYAJIAN:  A different scenario, Your Honor.

19    There's no intention to defraud here, we've never made a

20    fraud claim.

21          THE COURT:  But that's even worse.  But I'm saying

22    that the reason you that haven't is because I think that you

23    can't show that.

24          But what I'm saying is that it's a fortiori.  If a

25    fraud claim -- if Lehman had intentionally defrauded your

Page 166

1    clients then that claim would be subordinated.

2          You are not claiming an intentional claim, you're

3    claiming a failure to disclose, you're claiming, you know,

4    all sorts of things, right?

5          MR. BOYAJIAN:  Right.

6          THE COURT:  So --

7          MR. BOYAJIAN:  The statutory right to payment

8    under the wage laws --

9          THE COURT:  Okay.

10         MR. BOYAJIAN:  -- from the various jurisdictions

11   where many employees worked across the states around the

12   world as well as contractual rights, the payment upon

13   impossibility of delivery of what was promised.  That's

14   really what we're arguing.

15         We're not arguing fraud, we're not arguing breach

16   of contract.  There was no breach of contract.  This is

17   simply an impossibility, and there is a wholly stand-alone

18   area of law called impossibility within the context of the

19   contract law, and that's what we're basing our claims on.

20         Again, these RSUs did not bear the hallmarks of

21   real equity.  They were not transferable, there was no

22   voting rights for three years, there was no real dividends

23   for three years once again, an then at once dividends, you

24   know, or dividend equivalents were given that was again

25   three years later, but those were simply more RSUs, more of

Page 167

```
1    this facade.  There was no legal title to ownership of any

2    stake in the company.  You did not share in the, you know,

3    piece of the pie of the company for the next five years.

4             And moreover, going to the purchase element of

5    510(b), Your Honor, I think this is a -- I hope I can do a

6    good job explaining this because it's a bit nuance.  But

7    there's a failure of consideration and because of that

8    there's no purchase in this scenario.

9             What I'm referring to is the fact that you receive

10   RSUs, let's say you receive RSUs in the year 2003.  You work

11   and you exchange your services arguendo for those RSUs, so

12   you get a quid pro quo.

13            THE COURT:  Right.

14            MR. BOYAJIAN:  You give your services you get

15   those RSUs; however, you have to continue performing

16   services for Lehman for the next five years in order to get

17   the stock.

18            THE COURT:  Right, and you were told that before

19   you worked day one as opposed to you work for a year where

20   you've been told that at the end of the year you're going to

21   get stock.

22            MR. BOYAJIAN:  Right.

23            THE COURT:  And then on New Year's Eve you get

24   called in by someone at Lehman and they say just kidding, in

25   fact we're changing it up.
```

1              That's not what happened here.  And when I first

2     read the papers it seemed to me that you were arguing that

3     in the middle of the year or contrary to the going in

4     explanation of your deal, for example, pursuant to the dear

5     colleague letter, that then somebody said to you we told you

6     before that we were going pay you $1 million in cash --

7              MR. BOYAJIAN:  Uh-huh.

8              THE COURT:  -- we changed our minds, even though

9     you've already worked 364 days, we're now going to not pay

10    you that $1 million in cash, we're going to pay you $900,000

11    in RSUs and $100,000.

12             That's not what happened.  What happened was your

13    going in deal said to you --

14             MR. BOYAJIAN:  Right, we're not arguing there's a

15    breach of contract, Your Honor, but we're arguing that

16    there's a failure for consideration for all subsequent

17    years.  Meaning if we even concede arguendo once again that

18    in 2003 you exchanged labor for RSUs, well going forward

19    what is your labor going for in 2004, 2005?  Are you

20    exchanging your labor for the 2003 right to convert to stock

21    or are you exchanging your labor for the 2004, 2005 RSUs?

22             THE COURT:  Both, because in 2003 when we gave you

23    the RSUs we told you that we're giving them to you subject

24    to all of the vesting and forfeiture provisions.  So when

25    you got them, when we told you we were going to give them to

Page 169

1    you they had those conditions on them and you kept working.

2           Yes, sir, can I help you?

3           MR. BOYAJIAN:  But you had a --

4           MR. KAPLAN:  May I address the Court, Your Honor?

5           THE COURT:  I'm sorry?

6           MR. KAPLAN:  May I address the Court as one of the

7    counsel for the representative claimants?

8           THE COURT:  Well ordinarily I don't kind of have,

9    you know, play doubles, so --

10          MR. KAPLAN:  Ordinarily I don't stand up, Your

11   Honor, but I do have a concern that I think is of interest

12   to the Court as well.

13          THE COURT:  Well, but what's the -- so we're

14   coming up on an hour and 45 minutes, why don't you tell me

15   how the rest of the afternoon is going play out.

16          MR. KAPLAN:  Well that's what I'm hoping to

17   explore, Your Honor --

18          THE COURT:  Okay.  Well --

19          MR. KAPLAN:  -- because we have two -- we have two

20   witnesses ready to testify in the courtroom, two more on

21   call, and while I have great respect for my colleagues we're

22   not keeping to the schedule that we had agreed to

23   beforehand.

24          THE COURT:  Well the fault is -- the fault is mine

25   because I'm not -- I'm not behaving, I'm not keeping quite.

Page 170

1          (Laughter)

2              MR. KAPLAN:  Your Honor has referred several times

3      to the three-hour limit and if we're not wedded to that

4      three-hour limit then I'll just sit back down and hold my

5      peace.

6              THE COURT:  I appreciate it, and it's my fault

7      entirely, because if I kept quite then we would be more

8      keeping to the schedule.

9              MR. KAPLAN:  Thank you, Your Honor.  I'm sorry to

10     interrupt.

11             THE COURT:  So --

12             MR. BOYAJIAN:  I'll wrap up, Your Honor.

13             THE COURT:  -- if you don't have -- I mean so far

14     -- and I mean this in the nicest possible way, I think

15     you're echoing largely what Ms. Solomon had to say.  So is

16     there anything new or in addition that you wanted to --

17             MR. BOYAJIAN:  Well, I think I was arguing that

18     these were illusory contracts, they're unenforceable.  Yes,

19     I was echoing the fact that they're void as a matter of law.

20     It's not -- it's not a rescission claim here, we're not

21     asking anyone to rescind the contract, we're saying that

22     they were void and unenforceable to begin with.

23             THE COURT:  So your client -- okay.  So your

24     clients are then going to give back the money that they

25     earned?

Page 171

1           MR. BOYAJIAN:  Well that was a long time ago, that

2      was far beyond the statute of limitations.

3           THE COURT:  Okay.

4           MR. BOYAJIAN:  I mean that's not at issue here,

5      Your Honor, and you know, much of that stock has been sold

6      and who knows what's been done with it by now, but we're

7      addressing the 2003 to 2008 RSUs which -- most of which were

8      not vested, did not have voting rights, did not have

9      dividend equivalence awarded, and we're simply illusory

10     instruments with no consideration based on the preexisting

11     duty rule.  The fact that you're exchanging your

12     consideration for one instrument you can't then give the

13     same consideration for multiple instruments going forward.

14          So these are -- you know, these are all

15     alternative arguments that we propose to the Court that

16     we're not raised in the Enron case and we kindly request

17     that the Court take the big picture in analyzing the 510(b)

18     provisions within the context of these broader laws.

19          One final note, Your Honor, on your point about

20     the cul-de-sac in 510(b).  There is a way out of that cul-

21     de-sac.  It's actually missing from Exhibit 1 of the

22     debtor's exhibits from this morning.  On --

23          THE COURT:  Okay.

24          MR. BOYAJIAN:  -- it's noted page 19.  So again,

25     this is the definition of a security.  So they've -- we've

Page 172

1    been discussing --

2              THE COURT:  In the Code, the definition --

3              MR. BOYAJIAN:  Yes.

4              THE COURT:  Okay.

5              MR. BOYAJIAN:  It's 11 U.S.C. 101.

6              THE COURT:  Right.

7              MR. BOYAJIAN:  So there's two parts to that test.

8    There's part (A) and part (B).  Part (A) is inclusive.

9              THE COURT:  Wait, are you in -- I'm not following

10   you.  What section are you in?  You're in 101?

11             MR. BOYAJIAN:  Right, 101 U.S.C.

12             THE COURT:  Right, 6 --

13             MR. BOYAJIAN:  11 U.S.C. 101.

14             THE COURT:  Right, 16?

15             MR. BOYAJIAN:  49(A) and (B).  Not equity

16   security.

17             THE COURT:  Okay, I'm sorry.

18             MR. BOYAJIAN:  The definition of security under

19   49.

20             THE COURT:  Oh, oh, the term security.

21             MR. BOYAJIAN:  Right.

22             THE COURT:  Okay.

23             MR. BOYAJIAN:  So I'm guessing this got cut off

24   the last page there, but there is a Section 7 under (B)

25   which is basically a way out if you have a debt claim for

Page 173

1    the rendering of services.

2              THE COURT:  Okay, I'm sorry, I don't -- I'm not

3    following what you're talking about.  So I'm looking in 101,

4    right?

5              MR. BOYAJIAN:  Yes.

6              THE COURT:  Which section under 101?

7              MR. BOYAJIAN:  101(B).  Okay, so you have --

8              THE COURT:  No, there's no 101(B).  So 101 --

9              MR. BOYAJIAN:  I'm sorry, 101, 49 --

10             THE COURT:  49, right.

11             MR. BOYAJIAN:  -- 49(B).

12        (Pause)

13             THE COURT:  101, 49(B), okay.  Does not include --

14             MR. BOYAJIAN:  Right.

15             THE COURT:  -- right?

16             MR. BOYAJIAN:  So even if an instrument does

17   qualify as a security under Subsection (A), and we're saying

18   it doesn't because of the Howie line of cases of investment

19   contract analysis --

20             THE COURT:  Okay.

21             MR. BOYAJIAN:  -- which applies to all of the

22   relevant definitions here, but even if it did then you can

23   kick it out under (B), and there's a missing subsection

24   number 7 which is not printed there, but to summarize --

25             THE COURT:  But does not include --

Page 174

1          MR. BOYAJIAN:  Right.  Let me see if I have it

2    here.

3          THE COURT:  -- debt --

4          MR. BOYAJIAN:  -- a debt or evidence of

5    indebtedness for services rendered is the relevant part.

6          THE COURT:  Debt or evidence of indebtedness for

7    goods sold and delivered for services rendered.

8          MR. BOYAJIAN:  It is our position that these --

9          THE COURT:  Okay.

10          MR. BOYAJIAN:  -- RSUs were an evidence of debt

11    for services rendered until they became convertible to

12    common stock.

13          THE COURT:  Okay.  I understand what you're

14    saying.

15          MR. BOYAJIAN:  Thank you.

16          THE COURT:  Okay.  All right, what's next?

17          MR. KAPLAN:  Well if Your Honor wants to take a

18    break we can take a break, if not I can open up on behalf of

19    the Lehman -- the Neuberger claimants.

20          THE COURT:  The Neuberger Berman.  Yeah, why don't

21    we keep going, okay?

22          MR. KAPLAN:  Okay.

23          THE COURT:  Mr. Michaelson, am I hearing from you

24    as well today?

25          MR. MICHAELSON:  No, Your Honor.

Page 175

1          THE COURT:  I'll try to withhold my

2     disappointment.

3          MR. MICHAELSON:  I hope you're sincere.

4          THE COURT:  I am.

5       (Laughter)

6          MR. MICHAELSON:  Thank you.

7          THE COURT:  Just let me say, which I say in every

8     -- in every case, to the extend that there are claimants

9     here I find it useful every once in a while to let there be

10    a little humor in the proceedings to relieve the tension,

11    but you should in no way view that as my not taking this

12    very, very seriously, which I certainly do.  But it's a hard

13    job for me and the lawyers and sometimes a little bit of

14    laughter helps get us through the day, so.

15         MR. KAPLAN:  Thank you, Your Honor.

16         THE COURT:  Okay.

17         MR. KAPLAN:  And I left my --

18         THE COURT:  I'm sorry?

19         UNIDENTIFIED SPEAKER:  He said (indiscernible -

20    01:40:28) every day?

21         THE COURT:  I can't -- I can't solve that problem.

22       (Laughter)

23         MR. KAPLAN:  If Your Honor please, Eugene

24    Kaplan --

25         THE COURT:  Yes.

```
 1              MR. KAPLAN:  -- for the Neuberger claimants.

 2              The record as to the Neuberger claimants is set

 3      out in the --

 4              THE COURT:  The separate --

 5              MR. KAPLAN:  -- declarations of Judith Kenny,

 6      Henry Ramallo (ph), and Stephanie Stefo (ph), and the

 7      supplemental declarations of Mr. Ramallo and Ms. Stefo.

 8      Ms. Stefo, Mr. Ramallo, and Christian Reynolds are here in

 9      the courtroom because --

10              THE COURT:  Okay.

11              MR. KAPLAN:  -- Mr. Miller has indicated that he

12      wants to cross-examine --

13              THE COURT:  Okay.

14              MR. KAPLAN:  -- with respect to their supplemental

15      declarations and the declaration of Mr. Ramallo.

16              THE COURT:  Okay.

17              MR. KAPLAN:  We also have exhibits, Neuberger

18      Berman A through O --

19              THE COURT:  Right.

20              MR. KAPLAN:  -- which I will -- which I will move

21      into evidence at an appropriate --

22              THE COURT:  Okay.

23              MR. KAPLAN:  -- moment.  I'd move them into

24      evidence now if you'd like, but --

25              THE COURT:  Okay.
```

1          MR. KAPLAN:  -- if you're waiting till the end

2     we'll wait till the end.

3          THE COURT:  Very good.

4          MR. KAPLAN:  Neuberger Berman was a stand-alone

5     firm up until the merger in 2000 -- October 2003.  So the

6     one thing that is clear is that none of the RSUs that were

7     granted to the Neuberger Berman people ever vested, because

8     they weren't granted for playing in 2003 on, they only had

9     two months or three months of 2003 --

10          THE COURT:  Okay.

11          MR. KAPLAN:  -- and then '04.

12          THE COURT:  Okay.

13          MR. KAPLAN:  The Neuberger Berman claimants here

14     were production-based employees.  That depending on whether

15     they were a wealth manager like Ms. Kenny or an asset

16     manager like Mr. Schwartz and Mr. Ramallo, the percentage of

17     their compensation varied from say one percent to one and a

18     half percent per year of assets under management.

19          So how they were compensated was simply you would

20     look, for example, on December 31st how many -- what their

21     assets under management were and then the next three months

22     they would be paid whatever one and a half percent per year

23     of those were for each monthly installment.

24          THE COURT:  Okay.

25          MR. KAPLAN:  If they were a wealth manager it

Page 178

1  would be one percent, more if they were an asset manager.

2          And what happened here was -- and that's the way

3  they were paid at Neuberger, but they were paid all in cash.

4  When they came to Lehman and all of a sudden they're

5  formulaic compensation instead of being paid all in cash was

6  now paid half in cash and half was deferred or taken out.

7          THE COURT:  Okay.  So you've been listening to the

8  -- so part of the arguments that have come before you are

9  the handcuff argument, right?

10          MR. KAPLAN:  Right.

11          THE COURT:  And so now what you're telling me is

12  that it was all cash when we were Neuberger Berman.

13          MR. KAPLAN:  Right.

14          THE COURT:  Then we became Neuberger Berman owned

15  by Lehman.

16          MR. KAPLAN:  That's right.

17          THE COURT:  And all of a sudden Lehman said no

18  more all cash, part cash, part stock.

19          MR. KAPLAN:  Right.

20          THE COURT:  Okay.  So --

21          MR. KAPLAN:  Changed the deal.

22          THE COURT:  -- so let's go to the handcuff --

23          MR. KAPLAN:  Right.

24          THE COURT:  -- mode, right?  Because at that point

25  what counsel have said so far is but I was handcuffed

Page 179

1    because you started to pay me, you gave me this part RSU

2    deal and in order to get that stock I had to wait the five

3    years.  So at the moment that there's the merger --

4              MR. KAPLAN:  Right.

5              THE COURT:  -- right, the Neuberger Berman folks

6    could say, I want to work for all cash, I'm not going do

7    this.

8              MR. KAPLAN:  No, we couldn't.  That's the

9    difference between the --

10             THE COURT:  Okay.

11             MR. KAPLAN:  -- Neuberger Berman claimants and the

12   other claimants.

13             THE COURT:  Okay.

14             MR. KAPLAN:  The Neuberger Berman claimants, who

15   were partners in Neuberger who then became managing

16   directors --

17             THE COURT:  Of Lehman.

18             MR. KAPLAN:  -- of Neuberger and then Lehman when

19   Neuberger went public --

20             THE COURT:  Right.

21             MR. KAPLAN:  -- they had in return for their

22   Neuberger stock, which then became Lehman stock -- not RSUs,

23   we're talking about stock.

24             THE COURT:  Okay.

25             MR. KAPLAN:  That's not at issue.  They had to

Page 180

1    sign three years restrictive covenants.

2              THE COURT:  Uh-huh.

3              MR. KAPLAN:  The other Neuberger claimants who

4    became managing directors either at Neuberger or at Lehman

5    also signed restrictive covenants.

6              THE COURT:  I'm sorry, what's the difference

7    between these two groups?

8              MR. KAPLAN:  There are four claimants who were

9    partners of Neuberger Berman before it became a public

10   entity.

11             THE COURT:  Yes.

12             MR. KAPLAN:  That when the IPO of Neuberger

13   happened --

14             THE COURT:  Uh-huh.

15             MR. KAPLAN:  -- and they switched from being

16   partners to managing directors --

17             THE COURT:  All pre-Lehman, this is all pre-

18   Lehman.

19             MR. KAPLAN:  All pre-Lehman, 1999.

20             THE COURT:  Okay.

21             MR. KAPLAN:  They in return for receiving founder

22   shares in Neuberger --

23             THE COURT:  Yes.

24             MR. KAPLAN:  -- signed restrictive covenants that

25   said that they could not compete or solicit for three

Page 181

```
 1    years --

 2              THE COURT:  Okay.

 3              MR. KAPLAN:  -- post their employment.

 4              THE COURT:  Okay.

 5              MR. KAPLAN:  At the time of the merger those four

 6    people had to sign an amended stockholder agreement which

 7    reiterated the three-year post employment --

 8              THE COURT:  Okay.

 9              MR. KAPLAN:  -- restrictive covenant --

10              THE COURT:  Right.

11              MR. KAPLAN:  -- in return for their Neuberger

12    share being converted to Lehman shares.

13              THE COURT:  Okay.  So stop there.  So with respect

14    to those at that point in time what were the options of

15    those people?  Not options in the stock sense.

16              MR. KAPLAN:  The options were to sit on a beach

17    for three years.

18              THE COURT:  Right.  Or?

19              MR. KAPLAN:  Or work at Lehman.

20              THE COURT:  Subject to those conditions.

21              MR. KAPLAN:  Subject to the three-year --

22              THE COURT:  Okay.

23              MR. KAPLAN:  -- covenant.

24              THE COURT:  Okay.

25              MR. KAPLAN:  The others had lesser restrictive
```

Page 182

1    covenants while they were Neuberger employees because they

2    weren't partners.

3              THE COURT:  Right.

4              MR. KAPLAN:  And then those restrictive covenants

5    continued when they went --

6              THE COURT:  To Lehman.

7              MR. KAPLAN:  -- to Lehman.

8              THE COURT:  Okay.

9              MR. KAPLAN:  So they all, it is our position,

10   basically had no choice, they didn't -- you see we're not

11   asserting economic duress because Mr. Miller decided to

12   create a bar that he wants me to jump over.  We're not

13   asserting that.

14             Judge Gonzalez made it clear that the standard is

15   conditions of employment that were willingly accepted.  And

16   our position is that the Neuberger claimants didn't have a

17   choice.  They either --

18             THE COURT:  But you just told me that --

19             MR. KAPLAN:  -- they could sit on a beach, which

20   is not -- which is not (indiscernible - 01:47:19) you can't

21   earn a living.

22             THE COURT:  But the reason that they had the you

23   have to sit on a beach condition was because they had earned

24   so much and they were key employees of the firm.

25             So there is a choice, you're just saying they

Page 183

1   didn't -- they didn't like the choice.  This is not about

2   involuntary servitude, they just didn't like the choice that

3   they had.

4            MR. KAPLAN:  Well, it's either -- yeah, it's give

5   up your livelihood and your career and the 40 years you've

6   put -- 40 some odd years you've put in the business the way

7   you want to continue to work or accept this dramatic change

8   in your pay structure --

9            THE COURT:  Well but --

10           MR. KAPLAN:  -- in which -- for which you have no

11  choice whether to accept it or not except sitting on a

12  beach.

13           THE COURT:  Well, I just -- I'm trying to link

14  this up to the claims that are before me.

15           With respect to the four who had the three-year

16  covenant --

17           MR. KAPLAN:  Right.

18           THE COURT:  -- so they -- I just can't even

19  articulate what the claim is that they have that somehow

20  that that choice, the live on the beach or not choice is now

21  Lehman's problem.  I just don't understand it.  They -- they

22  were founding directors, they got founder shares, right?

23           MR. KAPLAN:  Right.  Founder shares are not at

24  issue here.

25           THE COURT:  Okay.  They then had signed up a

Page 184

1     three-year restrictive covenant with Neuberger Berman,

2     right?

3              MR. KAPLAN:  And then that was reiterated by

4     Lehman --

5              THE COURT:  Okay.  But at the moment that they

6     signed that up with Neuberger Berman Lehman was nowhere in

7     the picture.

8              MR. KAPLAN:  Nowhere in the picture.

9              THE COURT:  So that's got nothing -- that moment

10    of oh, we had no choice, that had nothing to do with Lehman

11    whatsoever.

12             MR. KAPLAN:  That's right.  But they also -- they

13    also at that point were being paid by formula dollar for

14    dollar by Neuberger Berman.

15             THE COURT:  Okay.

16             MR. KAPLAN:  Now Lehman, the merger takes place.

17    As a condition of the merger there is an amended and

18    restated stockholder agreement.  The amended and restated

19    stockholder agreement carries forward three-year post

20    employment restrictive covenants.

21             THE COURT:  Uh-huh.

22             MR. KAPLAN:  And it says, this -- these

23    restrictive covenants are intended to prevent you from

24    working for --

25             THE COURT:  Competitors.

Page 185

1            THE COURT:  -- in this industry.

2            THE COURT:  Right.

3            MR. KAPLAN:  So you now have a choice of sitting

4    on a beach for three years or accepting -- or going to work

5    for Lehman.  You can't -- you got to give up -- so it's a

6    question of whether you give up everything that you've done

7    for 30 or 40 years in the business, give up your clients,

8    give up what you -- what you're livelihood is, or go work

9    under the terms that --

10           THE COURT:  Okay.  So --

11           MR. KAPLAN:  -- that are being imposed on you.

12           THE COURT:  -- so now we're in the cul-de-sac,

13   right?

14           MR. KAPLAN:  Right.

15           THE COURT:  So I -- those are the facts --

16           MR. KAPLAN:  Right.

17           THE COURT:  -- that's what occurred --

18           MR. KAPLAN:  Right.

19           THE COURT:  -- now what?  Now because you were

20   unfairly forced to continue to work and make a salary,

21   albeit paid in part cash and part stock --

22           MR. KAPLAN:  Right.

23           THE COURT:  -- because of that now that Lehman

24   failed you get all cash.  You get a claim because you were

25   unfairly coerced.

Page 186

1           MR. KAPLAN:  No, I --

2           THE COURT:  That's a classic -- that's classic

3    equitable subordination.

4           MR. KAPLAN:  No.  What I have is as demonstrated

5    in 2008 where my clients were compensated for the money that

6    was deferred, which had been placed in trust, so we know

7    that the money is being taken out of their paychecks and

8    placed in trust during the course of the year that then --

9    Lehman then --

10           THE COURT:  I'm sorry, what money are you talking

11    about now?

12           MR. KAPLAN:  The half of the income that is of

13    their formulaic compensation that is being deferred, right?

14           THE COURT:  They're getting paid --

15           MR. KAPLAN:  They're getting paid $10,000 a month.

16           THE COURT:  Right.

17           MR. KAPLAN:  So if they get 5,000 --

18           THE COURT:  Right.

19           MR. KAPLAN:  -- and 5,000 is deferred.  The 5,000

20    that's --

21           THE COURT:  Right.

22           MR. KAPLAN:  -- deferred, according to the

23    documents that we have for 2008, was placed in trust

24    apparently so that at the end of the year these RSUs could

25    be purchased, but we never got to 2000 -- purchasing RSUs in

Page 187

1    2008 so my clients were given their money for 2008 that had

2    been taken out, it was deferred, they were given the cash.

3              THE COURT:  Not following you at all, sorry.  I'm

4    just not following you at all.  I don't -- I just don't --

5              MR. KAPLAN:  In every year --

6              THE COURT:  Yes.

7              MR. KAPLAN:  -- they were paid a certain amount in

8    cash and a certain amount --

9              THE COURT:  In --

10             MR. KAPLAN:  -- was deferred.

11             THE COURT:  But --

12             MR. KAPLAN:  And at the end --

13             THE COURT:  -- like in the compensation statements

14   that I've seen for the non-Neuberger Berman employees,

15   right?  You got half -- you got some of your compensation in

16   cash and you --

17             MR. KAPLAN:  It wasn't a bonus, it was just

18   formulaic commissions, right?

19             THE COURT:  Okay.

20             MR. KAPLAN:  Formulaic compensation.

21             THE COURT:  Okay.  But some of it was in cash and

22   some of it was in RSUs.

23             MR. KAPLAN:  Some of it was deferred and at the

24   end of the year they were issued RSUs.

25             THE COURT:  Okay.  And going into -- on January 1

Page 188

1    of a given year they knew going in that they were going to

2    go to work every day and sell or manage or whatever they did

3    and that part of their compensation would be given to them

4    in the form of cash and part of it would be given to them in

5    the form of RSUs, right?

6              MR. KAPLAN:  Well I think would be deferred.

7              THE COURT:  Okay, deferred.  Okay.

8              MR. KAPLAN:  But in --

9              THE COURT:  But that wasn't a surprise to them,

10   right?

11             MR. KAPLAN:  I suppose not.

12             THE COURT:  Okay.

13             MR. KAPLAN:  In 2008 --

14             THE COURT:  Right.

15             MR. KAPLAN:  -- the amounts were deferred --

16             THE COURT:  Yes.

17             MR. KAPLAN:  -- but because Lehman failed --

18             THE COURT:  Yes.

19             MR. KAPLAN:  -- and Neuberger did not --

20             THE COURT:  Right.

21             MR. KAPLAN:  -- they were paid the amounts of cash

22   that Lehman had withheld and had been deferred.

23             THE COURT:  But -- okay.  But this is where you

24   have me confused.  When we've been talking about deferred up

25   to this point we've been talking about RSUs.

Page 189

1              MR. KAPLAN:  Right.

2              THE COURT:  No one has been talking to me about

3    deferral of cash compensation.  Are you -- do you mean that

4    the amount -- that the RSUs were cashed out?  I don't --

5              MR. KAPLAN:  No.  The amount that was withheld

6    from the employees for -- that then became RSUs in years

7    2003, 2004, 2005 --

8              THE COURT:  Yes.

9              MR. KAPLAN:  -- '06, '07 --

10             THE COURT:  Yes.

11             MR. KAPLAN:  -- was cash, a specific amount, not a

12   bonus not anything else, it was just cash taken out of their

13   wages --

14             THE COURT:  No, no, no.

15             MR. KAPLAN:  -- that ultimately became --

16             THE COURT:  No, hold on, hold on.  It was not --

17   this is the part that it's very important.  There's a

18   difference between saying that I'm going pay you $1 million

19   a year in cash --

20             MR. KAPLAN:  Right.

21             THE COURT:  -- and then saying just kidding, I'm

22   going to withhold a half a million dollars a year, and

23   instead of that I'm going to give you an RSU, versus I'm

24   going to compensate you in the amount of $1 million a year

25   and part of it's going to be in cash and part of it's going

Page 190

1    to be in the form of a deferred compensation RSU.  That's

2    not a withholding of cash, that's your -- that's your

3    compensation structure.  Withholding is I get a paycheck,

4    the government withholds taxes.  They take my cash from me.

5             MR. KAPLAN:  Right.

6             THE COURT:  That's not that the government is

7    saying just kidding, I'm not going pay you all in cash, I'm

8    going to pay you part in RSUs.  So when you're saying that

9    the amount that was withheld was then -- I'm sorry, maybe

10   I'm getting tired, but I'm just not following what you're

11   saying.

12            MR. KAPLAN:  When they were -- when Neuberger was

13   a stand-alone entity --

14            THE COURT:  Right.

15            MR. KAPLAN:  -- they were paid --

16            THE COURT:  In cash.

17            MR. KAPLAN:  -- on a formula in cash.

18            THE COURT:  Right.

19            MR. KAPLAN:  One hundred percent in cash.

20            THE COURT:  Right.

21            MR. KAPLAN:  In 2008 they were paid half in

22   cash --

23            THE COURT:  Right, and half in --

24            MR. KAPLAN:  -- and half was deferred, placed in

25   trust, and in 2009 they were paid that cash, they were paid

Page 191

1    money.

2         It's our argument that the same is true for the

3    amounts that Mr. Twotso (ph) shows on his schedule as having

4    been deducted that they say they were invested in RSUs, it

5    was their compensation, their commissions, their production-

6    based earnings that they earned, and some of it was taken by

7    Lehman out of their paychecks on a monthly basis when they

8    got paid and withheld from them, and at the end of the year

9    Lehman invested that or put that into RSUs.

10        But all of this goes back to the notion that my

11   clients did not have, because of the restrictive covenants

12   that handcuffed them, they did not have a choice but to

13   accept this compensation.

14        THE COURT:  Okay.  You've just -- you've just

15   mixed up apples and oranges, and I'm sorry, I'm just not

16   following you.

17        In -- when the merger occurred --

18        MR. KAPLAN:  Yes.

19        THE COURT:  -- you just said something like the

20   amount of the deferred RSUs were paid in cash.  You just

21   said something like that, that they were paid in cash.  Is

22   that not what you said?

23        MR. KAPLAN:  No, I said prior to the merger my

24   clients were paid in cash, and in 2008, the year that Lehman

25   filed for bankruptcy --

Page 192

```
 1              THE COURT:  Right.

 2              MR. KAPLAN:  -- the amount that was deferred --

 3              THE COURT:  Yes.  Was?

 4              MR. KAPLAN:  -- that would have been I suppose, if

 5    Lehman had survived --

 6              THE COURT:  Yes.

 7              MR. KAPLAN:  -- to the end of the year --

 8              THE COURT:  Right.

 9              MR. KAPLAN:  -- that amount of cash that was

10    deferred and placed in trust during the course of the

11    year --

12              THE COURT:  It wasn't cash that was deferred and

13    placed in trust, there was no cash that was deferred and

14    placed in trust.

15              MR. KAPLAN:  Of course there was.  There's a memo

16    that's in evidence, Exhibit N, that says your money that's

17    been deferred has been placed in trust and you're going to

18    get it.

19              THE COURT:  Would you show that to me?

20              MR. KAPLAN:  Sure.

21              THE COURT:  What you said before is that somebody

22    got cash.

23              MR. KAPLAN:  Question, "If part of my production

24    compensation was deferred ..." -- this is Neuberger

25    Berman N.
```

1              THE COURT:  Right.

2              MR. KAPLAN:  "If part of my production

3      compensation was deferred under the" --

4              THE COURT:  Right.

5              MR. KAPLAN:  -- "Lehman Brother equity award

6      program" --

7              THE COURT:  Right.

8              MR. KAPLAN:  -- "will I receive any of that

9      compensation?"

10              THE COURT:  And well --

11              MR. KAPLAN:  "If you receive production

12      compensation throughout the year and have had compensation

13      deferred under Lehman" --

14              THE COURT:  Right.

15              MR. KAPLAN:  -- "Brother equity award program

16      those deferrals have been placed in trust with Wells Fargo."

17              THE COURT:  Okay.

18              MR. KAPLAN:  You don't put RSUs in trust with

19      Wells Fargo, you put money in trust with Wells Fargo.

20              THE COURT:  If you receive production compensation

21      throughout the year and had compensation deferred --

22      compensation deferred under the Lehman Brothers equity award

23      program --

24              MR. KAPLAN:  That's the RSU program.

25              THE COURT:  That's the RSU program.  Those

Page 194

1    deferrals have also been placed in trust with Wells Fargo.

2            Are you telling me that that sentence means that

3    there was cash?

4            MR. KAPLAN:  Absolutely, and they were paid the

5    cash in January, and they were paid in January that cash.

6            THE COURT:  You will soon receive --

7            MR. KAPLAN:  And that's despite the fact that

8    Lehman Brothers granted interim RSUs in July.

9            THE COURT:  I'm going to be very honest with you.

10   I still do not know what you're talking about.  I just

11   don't.  I don't.  Maybe someone else can help me out here,

12   but I --

13           MR. KAPLAN:  I've got two Neuberger people who are

14   -- got their hand raised.

15           THE COURT:  I just don't understand, and maybe

16   Mr. Miller can help me clarify here.

17           Please, put your hands down.  Okay?

18           Help me with the predicate facts.  Were these

19   folks paid cash, cash, cash during the bankruptcy in January

20   2009?

21           MR. KAPLAN:  Yes, because they weren't --

22   Neuberger wasn't bankrupt.  Neuberger was not a bankrupt

23   subsidiary.  So they were able to be paid cash.

24           THE COURT:  If you'll indulge me.

25           MR. KAPLAN:  Yes.

Page 195

1            THE COURT:  And let me ask Mr. Miller what the

2    answer is.  All right?

3            MR. KAPLAN:  Sure.

4            MR. MILLER:  Yes, Your Honor, the answer is yes,

5    but you need to understand that Neuberger was in the process

6    of being sold.

7            THE COURT:  Yes, Neuberger was --

8            MR. MILLER:  In November of 2008, it was being --

9            THE COURT:  -- sold out of the bankruptcy, right?

10           MR. MILLER:  -- stalled in the bankruptcy.

11           THE COURT:  Right.

12           MR. MILLER:  And there were actually competing

13   bids at this time.  This is all public information.

14           THE COURT:  Right, in the bankruptcy?

15           MR. MILLER:  In the bankruptcy context --

16           THE COURT:  Neuberger was an asset of Lehman.  It

17   was being sold, right?

18           MR. MILLER:  Right.

19           THE COURT:  Okay.

20           MR. MILLER:  And Neuberger management made a

21   decision, which we believe we can show was for retention

22   purposes --

23           THE COURT:  Okay.

24           MR. MILLER:  -- to pay this deferred compensation

25   --

Page 196

```
1              THE COURT:  Right.

2              MR. MILLER:  -- in cash.  It was done by Neuberger

3    --

4              THE COURT:  This is the part of the story that you

5    weren't telling me.

6              MR. MILLER:  -- Berman.

7              THE COURT:  The part of the story that -- you were

8    leading me down this path of because it was paid in 2009,

9    that means that this same compensation is payable for

10   previous years, but what you neglected to get into -- maybe

11   you were going to -- is that this was part of a deal around

12   the sale of Neuberger Berman.  These individuals getting

13   something to which they were not otherwise entitled.

14             MR. KAPLAN:  Well, we don't know that they were

15   not otherwise entitled.

16             THE COURT:  Okay, but the fact that -- but my

17   point is --

18             MR. KAPLAN:  Mr. Miller says they're not otherwise

19   entitled.

20             THE COURT:  Okay, but that's what we're here to

21   decide, but the fact that, as part of -- you have a memo

22   dated November 17th, 2008, which I guess was -- it's heavily

23   redacted.

24             MR. KAPLAN:  But the redactions do not, with

25   respect, do not relate to anything --
```

Page 197

1           THE COURT:  Okay.  That's --

2           MR. KAPLAN:  -- having to do with this issue.

3           THE COURT:  -- fine.  That's fine, but my point is

4    that, if this is a Q&A that's being given to Neuberger

5    employees to explain what's happening to them, --

6           MR. KAPLAN:  That is true.

7           THE COURT:  Right?  And it reflects that, as part

8    of the deal, these folks were going to get this payment.

9    That's not dispositive, may not even be probative of what

10   was required.  All the time there are particular

11   arrangements that get negotiated as part of the sale of

12   assets in or out of bankruptcy.

13          MR. KAPLAN:  This was months before the sale of

14   the assets.  The Q&A there has absolutely nothing to do with

15   the sale of assets.  I would be glad to give Your Honor a

16   copy.

17          THE COURT:  Okay.

18          MR. KAPLAN:  An unredacted copy.  It talks about

19   what happened to my medical benefits, and am I going to be

20   reimbursed for my travel expenses.

21          THE COURT:  Okay.

22          MR. KAPLAN:  But --

23          THE COURT:  All right.  Why don't we keep going?

24   And at least I now understand.  I think the problem arises

25   from we have a lot of words that have multiple meanings.

Page 198

1   Compensation, payment, deferral -- and that's where my

2   confusion arises.  So I now understand that you mean that

3   these individuals were paid cash, cash in January of 2009.

4   That's what you mean.

5           MR. KAPLAN:  For the deferrals that took place

6   while Lehman was in charge --

7           THE COURT:  Okay.

8           MR. KAPLAN:  -- in 2008.

9           THE COURT:  I got it.  Okay.  Very good.  Thank

10  you.

11          MR. KAPLAN:  And --

12          THE COURT:  And that therefore, because now they

13  still have RSUs --

14          MR. KAPLAN:  That were deferred or --

15          THE COURT:  -- that were deferred --

16          MR. KAPLAN:  -- that came from wages that were

17  deferred on exactly the same basis.

18          THE COURT:  Right.  That therefore, they should

19  get cash for them.

20          MR. KAPLAN:  They should get cash for them.

21          THE COURT:  Okay.  At least I understand what

22  you're arguing now.

23          MR. KAPLAN:  And our argument additionally is that

24  we needn't reach the burden of economic duress of having

25  someone holding a gun to these claimants' head in order to

Page 199

1    get them to work for Lehman.  It is enough that they did not

2    -- because of the handcuffs imposed by the restrictive

3    covenants and the further handcuffs imposed --

4              THE COURT:  Okay.

5              MR. KAPLAN:  -- by the vesting period, --

6              THE COURT:  Right.  That --

7              MR. KAPLAN:  -- that they did not willingly accept

8    the RSU program, that it was forced on them as a condition

9    of employment, and therefore, they are not willing

10   purchasers.  The purchase has to be a volitional act.

11             THE COURT:  So -- okay.  So --

12             MR. KAPLAN:  And they did not act volitionally.

13             THE COURT:  So in the years prior to the

14   bankruptcy, --

15             MR. KAPLAN:  Right.

16             THE COURT:  Right?  Did anybody sue?  Nobody

17   complained.  They just worked --

18             MR. KAPLAN:  Nobody complained, because the law in

19   New York is --

20             THE COURT:  No, because they --

21             MR. KAPLAN:  -- you don't have to complain,

22   because they were always subject to the restraints of the --

23   since these were post-employment restrictive covenants, they

24   couldn't complain without triggering the restrictive

25   covenant.  There's a case called Soznoff (ph), which we've

Page 200

```
 1    cited --

 2              THE COURT:  Yeah.

 3              MR. KAPLAN:  -- in our brief which says that you

 4    don't have to complain while you're under the same

 5    obligations, and they continued throughout to be under these

 6    restrictive covenants, and therefore, there was no

 7    obligation for them to complain.

 8              THE COURT:  Okay.

 9              MR. KAPLAN:  With that, I guess we have our

10    witnesses here subject to cross-examination.

11              THE COURT:  Okay.  Very good.

12              MR. KAPLAN:  If Mr. Miller wants to proceed.

13              THE COURT:  Okay.

14              Are you folks okay with continuing on without a

15    break, or would you like a break?

16              MR. MILLER:  LBHI is planning to go forward,

17    Your Honor.

18              THE COURT:  I'm sorry?

19              MR. MILLER:  This is Ralph Miller again.  LBHI is

20    planning to go forward, if you'd like to.

21              THE COURT:  Okay.  All right.

22              Is there any more argument on this side, or are we

23    ready to go?

24              MR. KAPLAN:  No, I think we're finished with

25    argument.
```

Page 201

1                    THE COURT:  All?  Okay.  All right.

2                    And how many witnesses are we going to have?

3                    MR. MILLER:  We have cross-examination of

4        Ms. Stiefel and Mr. Ramallo and --

5                    THE COURT:  Okay.

6                    MR. MILLER:  And then, Mr. Reynolds, if I feel it

7        appropriate.

8                    THE COURT:  Okay.

9                    MR. MILLER:  And then, Mr. --

10                   THE COURT:  And is there anyone on the phone --

11                   MR. MILLER:  Mr. Schager has some witnesses as

12       well.

13                   THE COURT:  Okay.  And I'll --

14                   MR. MILLER:  Then he has to present his direct,

15       and then, --

16                   OPERATOR:  Your Honor, this is Court Call.  I

17       don't have anyone connected.

18                   THE COURT:  There's no one connected.  Okay.

19       Thank you.

20                   OPERATOR:  Thank you.

21                   MR. SCHAGER:  Hold on.  Sorry.  We are to have

22       someone connect Court Call shortly to London (sic), if we

23       want his testimony.

24                   THE COURT:  Well, --

25                   MR. SCHAGER:  And the relevance of his testimony

Page 202

1    was that he was an overseas --

2              THE COURT:  Okay.

3              MR. SCHAGER:  -- employee who was awarded CSAs.

4              THE COURT:  Is that person standing by?

5              MR. SCHAGER:  He was standing by, and he was going

6    to call in at 3:30.

7              THE COURT:  Oh, I see.  Okay.

8              MR. SCHAGER:  But, as to that other -- I've got

9    two witnesses in the courtroom, and our understanding

10   beforehand was that we would proceed with the direct

11   testimony before we got involved with the --

12             THE COURT:  Okay.

13             MR. SCHAGER:  -- cross-examinations.

14             THE COURT:  Okay.

15             MR. SCHAGER:  And, if that's acceptable to the --

16             THE COURT:  That's fine.

17             MR. SCHAGER:  -- Court, --

18             THE COURT:  Mr. Miller?

19             MR. MILLER:  Yes, Your Honor.

20             THE COURT:  That's fine, right?

21             MR. MILLER:  Yes, that's fine with LBHI,

22   Your Honor.

23             THE COURT:  Okay.  All right.

24             So, just on the claimant's side, I'm just ready to

25   hear whoever your first witness is.  I'm ready to hear them.

Page 203

1                 MR. KAPLAN:  Okay.  Your Honor, I would like to

2      call Sandy Fleishman --

3                 THE COURT:  I'm sorry.  Is there a confusion over

4      here?

5                 MR. KAPLAN:  No, I don't know, Your Honor.  Since

6      I put the declarations in as our direct, --

7                 THE COURT:  Right.

8                 MR. KAPLAN:  -- I don't know if Mr. Miller wants

9      to do his cross, or if Mr. Schager wants to --

10                THE COURT:  Well, why don't we complete your case

11     in chief, right, which would be the live direct?  And then,

12     Mr. Miller can cross everybody.  Doesn't that make some

13     logical sense?

14                MR. MILLER:  You mean cross -- I assume witnesses,

15     Your Honor?

16                THE COURT:  Yes.

17                MR. MILLER:  Yes, that's fine with us, Your Honor.

18     We would like to sort of know what the order is coming so we

19     can get ready.

20                THE COURT:  Okay.  I'll tell you what.  Here's

21     what we're going to do.  We're going to take a five-minute

22     break, and you all talk to each other, and however you

23     decide you want to do it is fine with me.  All right?  So

24     let's take a five-minute break, and then, we'll keep going.

25     All right?  Okay.

Page 204

1        (Pause)

2              MR. KAPLAN:  The issue has come up that, since --

3              THE COURT:  Okay.

4              MR. KAPLAN:  -- all of these claimants have missed

5    their day at work because we've been here, --

6              THE COURT:  Yes.

7              MR. KAPLAN:  Can we manage to go --

8              THE COURT:  We can.

9              MR. KAPLAN:  -- 'til 5:00 or so and get this done?

10             THE COURT:  Absolutely, absolutely.  The time

11   problem is my fault, because I asked a lot of questions.  So

12   I'm certainly not going to make that -- give these folks the

13   opportunity to testify.  So I've been going 'til 8:00 at

14   night on this other little trial that I've had every day.

15   So 5:00 is still going to be an early day for me.  So --

16             MR. KAPLAN:  Well, maybe it would go a little bit

17   long.  Whatever -- as long as we can get them all on today.

18             THE COURT:  Yes, yes.

19             MR. KAPLAN:  I think, yes, that would be fine.

20             THE COURT:  And can you just give me an idea of

21   what's going to happen tomorrow?  I know that tomorrow is

22   the folks that you don't represent.

23             MR. KAPLAN:  That's right.

24             THE COURT:  But, Mr. Miller, do you have some idea

25   of what exactly is going to happen tomorrow?

Page 205

1            MR. MILLER:  Well, Your Honor, it is reserved for

2    pro ses.  I think obviously one possibility is I don't

3    really see how we're going to get all these witnesses.  I

4    was told the typical testimony was going to be half an hour.

5    That's two hours and not much time for cross.  So there may

6    be some carryover, --

7            THE COURT:  All right.  So let's --

8            MR. MILLER:  -- if we have to have that.

9            THE COURT:  Okay.

10           MR. MILLER:  But I don't think we know how many

11   pro ses are going to want to speak.

12           THE COURT:  So you don't know?

13           MR. MILLER:  We don't know that.

14           THE COURT:  You don't know?

15           MR. MILLER:  Maybe they have some indication.

16           THE COURT:  Ms. Solomon?

17           MS. SOLOMON:  Your Honor, actually, I've been

18   retained by a pro se.  So I intended to address his argument

19   tomorrow during oral argument, and I know of one other pro

20   se, but I --

21           THE COURT:  Okay.  Well, that person's no longer a

22   pro se then.  They're retained by you.  So it's kind of --

23           MS. SOLOMON:  They are, but they had made an

24   argument in their brief that was not addressed today.  So I

25   thought it was more appropriate to address tomorrow, and

Page 206

1    that has to do with the Lehman sales commissions that were

2    never converted into RSUs.

3                  THE COURT:  Okay.  All right.  So I guess for

4    tomorrow we're just going to wait and see.  So perhaps the

5    best thing to do is just to start.  Yeah.

6                  MR. SCHAGER:  Your Honor, there was one other

7    piece of information that I could offer.

8                  THE COURT:  Sure.

9                  MR. SCHAGER:  My understanding is that there are

10   at least three people prepared to speak tomorrow.  Two of

11   them are here in court today.  Now, I'm not aware of what --

12   I don't know whether the Court has received any other calls,

13   but I'm aware of three people who intend to speak tomorrow.

14                  THE COURT:  We had gotten a number -- we have

15   gotten no calls.  We had gotten a couple of calls asking for

16   permission to testify or appear telephonically, and we

17   granted all of them, but, that being said, I don't know who

18   actually intends to call in.  So --

19                  MR. SCHAGER:  Okay.

20                  THE COURT:  All right.  So why don't we get

21   started and see how far we get?  And, once again, to the

22   extent that we're running late because I've been asking too

23   many questions, then we'll figure out a way to fix that.

24   All right?

25                  MR. SCHAGER:  Okay.  Your Honor, I propose to have

Page 207

1    four witnesses, three by telephone.  Sorry.  It's Richard

2    Schager.

3              When we first spoke with Judge Peck about this

4    case more than two years ago, he outlined several different

5    groups and wanted them addressed.  One was people paid --

6    U.S.. residents paid on a salary/bonus basis.

7              THE COURT:  Right.

8              MR. SCHAGER:  U.S. residents paid on a production

9    basis or a commission basis.

10             THE COURT:  Right.

11             MR. SCHAGER:  Overseas persons paid with

12   contingent stock awards or CSAs and then, the diverted

13   Berman group.  I have witnesses for each of those first

14   three groups.

15             THE COURT:  Okay.

16             MR. SCHAGER:  I think Weil Gotshal and I -- or I

17   should say Lehman and the represented claimants agreed that

18   the situation between the restricted stock units and the

19   contingent stock awards is not dramatically different.

20             THE COURT:  Okay.

21             MR. SCHAGER:  I have one witness I thought would

22   walk through the compensation statement in which the Court

23   has shown some interest.

24             THE COURT:  Okay.

25             MR. SCHAGER:  But, you know, it's time, and it

Page 208

1    might not be necessary, but it's sufficiently interesting,

2    illustrated by the testimony of the restricted stock award

3    person in the U.S. who was paid on the salary/bonus basis.

4    The forms are fairly similar.

5              THE COURT:  Okay.  Well, I suppose that I don't --

6    I'm trying to think out loud a little bit.  I mean, if

7    counsel essentially agrees that there aren't material

8    differences and there's no need for additional testimony

9    regarding the other type of instrument, then I'm prepared to

10   go along with that.  I just don't want to say that we

11   shouldn't have the other category of person testify and then

12   somehow I get told that I made an unsupported factual

13   finding with respect to the nature of the RSU versus the

14   CSA.

15             MR. SCHAGER:  Okay.

16             THE COURT:  Do you know what I'm saying?

17             MR. SCHAGER:  Right.

18             THE COURT:  I mean, if you need both, you need

19   both.  So we'll have to do both, but, if one can stand as

20   describing the other and no one's going to object to that,

21   then I'll do that as well.

22             MR. SCHAGER:  Okay.  May I ask with the speaker --

23   do we have Michael Gran on the phone?

24             Apparently not.  So --

25             OPERATOR:  Your Honor, this is Court Call.  We do

Page 209

```
 1    have Michael Gran, and his line is open.

 2              THE COURT:  Okay.

 3              Mr. Grand -- is it Grand?

 4              MR. SCHAGER:  Gran, G-R-A-N.

 5              THE COURT:  Mr. Gran, are you there?

 6              MR. GRAN:  Yes, I am.

 7              THE COURT:  All right.

 8              Now, you're going to examine, illicit testimony

 9    from Mr. Gran?

10              MR. SCHAGER:  That's correct, Your Honor.

11              THE COURT:  All right.

12              Then, Mr. Gran, I'm going to administer the oath

13    to you.  Can you hear me?

14              MR. GRAN:  I can hear you.

15              THE COURT:  All right.

16         (Witness Sworn)

17              THE COURT:  All right.  Please try to keep your

18    voice up as much as you can.

19              THE WITNESS:  Okay.

20    DIRECT EXAMINATION

21    BY MR. SCHAGER:

22    Q    Thank you, Mr. Gran, for making yourself available

23    tonight, and, Mr. Gran, we're going to be very quick because

24    of your schedule and the Court's.  Could you describe for us

25    your employment at the time you worked at Lehman Brothers?
```

Page 210

```
 1    Can you hear me, Mr. Gran?

 2    A    I'm afraid it's very difficult to hear.

 3         THE COURT:  Your microphone should be -- right.

 4         MR. SCHAGER:  Okay.

 5    BY MR. SCHAGER:

 6    Q    Sorry, Mr. Gran.  Can you hear me now?

 7    A    I can hear you a little bit better now.

 8    Q    Okay.  Thank you.  Can you tell us when you worked at

 9    Lehman Brothers?

10    A    Sure, I worked at Lehman Brothers, in fact, on two

11    separate occasions as an assistant analyst (sic) in 2006

12    through 2008.

13    Q    Can you describe for the Court your work during those

14    years, 2006 to 2008?

15    A    Certainly, I was there to work on setting up a new

16    policy (sic) about the management group and entities, and we

17    did that successfully and just from scratch started to

18    manage money for large institutions in Europe.

19         THE COURT:  I'm going to interrupt you for a

20    moment, because I need to make sure this is actually being

21    recorded.

22         Francis, are you getting it?

23         THE RECORDER:  Yes.

24         THE COURT:  Okay.

25         Okay.  Go ahead.
```

Page 211

BY MR. SCHAGER:

1

2    Q    Did you continue working at Lehman Brothers after the

3    bankruptcy?

4    A    Hello?

5    Q    Yes, Mr. Gran.  Did you continue working at Lehman

6    Brothers after the bankruptcy?

7    A    Yes, I was working -- you know, I continued with that

8    role, because the money was still being managed back to the

9    bankruptcy event, and the arrangement was the fact that I

10   was, in effect, working with Lehman Brothers administration

11   and paid by them through 2009 when the final separation

12   happened.

13   Q    Mr. Gran, have you had an opportunity to review your

14   proof of claim as it appears on the Epiq website?

15   A    I reviewed it.

16        MR. SCHAGER:  In each case, Your Honor, we have

17   the proof of claims attached to a declaration, and, in this

18   case, we do not.  This is a proof of claim that has been

19   marked CLX089, CLX089, and I would like to -- this would be

20   offered into evidence.

21        THE COURT:  Okay.

22   BY MR. SCHAGER:

23   A    Mr. Gran, do you have a copy of your proof of claim

24   available to you now?

25   A    Yes, I have it beside (sic) me.

1  Q    Okay.  I would like you to turn to the page marked page

2  three of four.

3  A    Page three of four?  Okay.

4  Q    This is a type of letter, Mr. Gran, that we have

5  elsewhere in the record, as you and I have discussed

6  separately.  Can you describe for me the significance of

7  this form to you?

8           THE COURT:  I'm sorry to interrupt.  Still

9  struggling with this.

10           MR. SCHAGER:  Your Honor, may I approach and offer

11  --

12           THE COURT:  I see this ends at CLX86.  Am I

13  missing something?

14           MR. MILLER:  Your Honor, for LBHI, we don't have a

15  copy of 89, either.

16           MR. SCHAGER:  I apologize, Your Honor.

17           MR. MILLER:  So --

18           THE COURT:  Okay.

19           MR. MILLER:  -- we need a copy as well (sic).

20           THE COURT:  All right.

21           You could hand that up.  That would be great.

22           MR. SCHAGER:  I do have copies, Your Honor.  I

23  apologize.

24      (Pause)

25  BY MR. SCHAGER:

1    Q    Mr. Gran, I'd like you to turn to page three of four of

2    your proof of claim.  That's the document entitled the 2007

3    total compensation statement.

4    A    Can you speak up?

5    Q    Yes, it's a document entitled 2007 total compensation

6    statement.  That's page three of four, page three of four of

7    your proof of claim.

8    A    Yes.

9    Q    Okay.  Now, --

10   A    Page three of four.

11   Q    Great.  Thank you.  This form is dated, in your case,

12   December 13, 2007, Mr. Gran.  Did you receive a --

13   A    Right.

14   Q    -- a form like this every year at that time?

15   A    It looks like the normal form for the letter (sic),

16   yes.

17   Q    And what was the significance of the form to you?

18   A    What was the -- I'm sorry?

19   Q    What did the form illustrate to you?

20   A    The form illustrated a breakdown of private

21   compensation with the compensations both between salary,

22   bonus, and the different compensation as what (indiscernible

23   - 2:21:00) award.

24   Q    Of your total compensation, Mr. Gran, as shown on this

25   form, what portion was your contingent stock award as

Page 214

1    opposed to your total -- what portion of your total

2    compensation was your contingent stock award?

3              THE COURT:  Mr. Gran, did you hear the question?

4              THE WITNESS:  No, I didn't hear anything.  It was

5    silent.

6              THE COURT:  Could you repeat the question again?

7              MR. SCHAGER:  Yeah.

8              THE WITNESS:  The line is silent.

9    BY MR. SCHAGER:

10   Q    Sorry.  Mr. Gran, does this microphone work a little

11   better?

12   A    Yes, that's better.  Hello?

13   Q    Okay.  Okay, Mr. Gran.  I hope this works a little

14   better.  The total compensation as shown on this form from

15   December 13, 2007 is $750,000.  Your bonus is shown -- your

16   total bonus is shown as 481,000, and then, the equity award,

17   so-called, the contingent stock award is shown as 129,000.

18   If I run those numbers, I believe the equity award was about

19   -- sorry -- about 27 percent of your claim.  Was that pretty

20   much an average equity award for you?

21   A    Well, I guess it's hard to say.  The average is not

22   really typical, but I can say (indiscernible - 2:23:15)

23   Lehman Brothers.  This would have been on the low side in

24   terms of percentage.

25   Q    Okay.  Now, I'm going to ask you to flip the page

1    backwards, Mr. Gran, to page two of four.

2    A    Okay.

3    Q    Can you explain to me, please, what this letter is?

4    This is a letter called personal award statement.

5    A    Yes, each of the heads of this group (indiscernible -

6    2:23:49) I was a member of (indiscernible - 2:23:51)

7    primarily because of the product we made (sic) was quite

8    substantial, but the organization wanted to pay us this way

9    and try to lock us in for a longer period of time and

10   continue trying to build this business, which we'd already

11   invested in my company, and my response (sic) to them to

12   that was it was a special award which was outside of the

13   bounds of their normal compensation schemes that they do as

14   standard, which is what the other letter which you just

15   described illustrated.

16   Q    Okay.

17   A    So --

18   Q    Mr. Gran, if I could interrupt, I think a little

19   background might be helpful.  Can you describe the business

20   that you were building that's the subject of page two of

21   four of your proof of claim?

22   A    Yes, we established a new financial (sic) company and

23   financial products.  We listed a number of products in

24   Paris, and we also established some individual investment

25   units (sic) with some large pension plans, and that all

Page 216

1   happened in a very short period of time in that previous

2   year of this award.

3   Q    Is it correct to say then, Mr. Gran, that you went back

4   to work at Lehman Brothers in 2006 and were working on a

5   special project for which you received a $1 million bonus at

6   the end of 2007?

7   A    That's correct.

8   Q    And that bonus is included in your proof of claim?

9   A    Yes, it was.

10  Q    Okay.  Mr. Gran, can you describe for us your general

11  compensation arrangements?  Were you paid typically on a

12  commission basis or a salary/bonus basis?

13  A    (Indiscernible - 2:55:54) on the salary/bonus basis.

14  Q    And what was your base salary?

15  A    The base salary was 185,000 (sic) pounds, which at that

16  time was $68,000.

17  Q    Okay.  Now, of your total compensation, roughly what

18  portion was your salary?  This is not the bonus.  This is

19  what portion was your salary.

20  A    Of total compensation, excluding the special award?

21  Q    Yes, sir, excluding the special award, please.

22  A    The salary was about 36 percent of total compensation.

23  Q    All right.  Now, I'd like to talk about taxes just for

24  a minute, Mr. Gran.  Again, referring to page three of your

25  proof of claim.

1   A    Okay.

2   Q    The proof of claims shows a total compensation of

3   $750,000 or 337,000 pounds with a portion called equity

4   award of -- I guess we'll just use the dollars -- $129,000.

5   Did you pay withholding tax in the United Kingdom on this

6   compensation?

7   A    No, because we didn't actually receive anything.  Just

8   received the writing (sic) for something in the future.  So

9   testing (sic) for compensation at that time, in fact, then

10  you didn't have to pay a tax in the U.K.

11  Q    But you did pay tax on the paid salary; is that

12  correct?

13  A    On salary and cash bonus, yes.

14  Q    On the salary and on the cash bonus?  Okay.  Mr. Gran,

15  when you -- when were you first awarded contingent stock

16  awards?

17  A    Well, first, in fact, would have been during my time

18  working at Lehman Brothers, which would have been probably

19  in 1997.

20  Q    You worked at Lehman in 2001; is that correct?

21  A    Yes, I actually was -- I had left in 2001 at that

22  point, but I was still there in the beginning of 2001.

23  Q    Did you get a contingent stock award for the year 2000?

24  A    I did.

25  Q    In 2006, did that award convert to stock?

Page 218

1    A    Well, I thought the conversion was accelerated because

2    I was what they called a good leader, and so, I was allowed

3    to have that compensation sooner than the normal time for

4    it, five-year duration.

5    Q    Very good.  And what tax did you pay on the stock when

6    it was converted?

7    A    Well, my recollection is that I received shares, but

8    the shares' quantity was reduced by the withholding tax.

9    Q    And the withholding tax -- sorry.  Withdrawn.  In the

10   United Kingdom, is there a bifurcated tax rate as we have

11   here with some gain tax, like capital gain rates so-called

12   and some tax paid at ordinary income rates?

13   A    Yes, and this was treated entirely as ordinary income.

14   Q    Was the market price of the stock higher when you

15   received it than it was at the time of the RSU grant?

16   Sorry, the contingent stock award grant?

17   A    I believe so.

18   Q    Now, did you pay any of the tax at capital gain rates?

19   A    No.

20   Q    Okay.

21   A    It was all ordinary income.

22   Q    Okay.  And I think we'll agree --

23   A    The basis for tax purposes would have been the price at

24   the time that you received the actual shares after the

25   conversion.  So you wouldn't pay tax on any gains based on

1   what the guy (sic) happened to be when they issued the CSA,

2   which is something that you could convert later.

3   Q    Right.  Thank you.  Now, Mr. Gran, let me ask about the

4   nature of the RSUs during the -- the CSAs, the contingent

5   stock awards at the time you held them.  Do you have any

6   recollection of being asked to vote those contingent stock

7   awards?

8   A    No, I don't remember being asked to vote.

9   Q    Do you recall being given an opportunity or a proxy

10  statement to vote the contingent stock awards?

11  A    No, I've never been given the option to do that on an

12  annual basis.  I would have remembered that.

13  Q    Mr. Gran, I would like you to think about the year --

14  sorry, the month January 2008.  You've described your

15  special project that you were brought in for, and you

16  described for us your special $1 million CSA bonus awarded

17  in November of 2007.  Let me ask this.  The skills that you

18  had in developing that project -- were those skills that

19  would have been attractive to another investment bank in

20  London, Barclays or Goldman Sachs or Morgan Stanley?

21  A    In principle, yes.

22  Q    If you had been offered a job by Barclays or Morgan

23  Stanley at that time, what would it have cost you to leave

24  Lehman Brothers?

25  A    More than likely, I would have to give up all of the

Page 220

1    CSAs, the entire amounts.  So the amount of my claim is

2    that.

3    Q    And that's $1.2 million?

4    A    Yes.

5    Q    Mr. Gran, you said you continued to work for Lehman

6    Brothers when it went into administration in 2008.  Can you

7    describe for the Court's benefit in a little more detail

8    what your responsibilities involved?  The lines are working

9    better now, and I think your comments are coming through

10   clearly.

11   A    Well, I was involved in ensuring that we retain and

12   increase the amount of assets that we had within the

13   balancing (sic) period (sic).  That was the primary

14   responsibility, but also oversight over how the funds are

15   managed and research for additional funds in the future.

16   Q    Now, one of the assets that you're referring to was the

17   special project in which you were involved from 2006 to

18   2008; is that correct?

19   A    That's correct.

20   Q    And what happened to that project?

21   A    I continued doing the same.

22   Q    I'm sorry.  I interrupted you.  Go ahead.

23   A    Go ahead.  Sorry.

24   Q    And what happened to that special project during those

25   years?

Page 221

1    A     Between 2006 and 2008?

2    Q     After the bankruptcy.

3    A     Oh, after the bankruptcy, one of the individuals who is

4    the head of the group was allowed to purchase the company,

5    which we had created in France and continued the operation.

6    Q     So the Lehman Brothers in administration in the U.K.

7    sold that special asset?

8    A     Yes, it did.

9    Q     Do you recall the purchase price?

10   A     I believe it was one Euro.

11         MR. MILLER:  Excuse me, Your Honor.

12         THE COURT:  Yes, Mr. Miller?

13         MR. MILLER:   I'm sorry.  I object.  I don't

14   understand why this is relevant to anything.

15         THE COURT:  I mean, I can imagine where this is

16   going, but I'm having a hard time seeing the relevance.

17   BY MR. SCHAGER:

18   Q    Mr. Gran, I think your comments have been very helpful,

19   and I'll just ask one question in finishing off, and that is

20   to restate if you had left Lehman to go work for a Barclays

21   in January of 2008, it would have meant giving up your

22   contingent stock award claim of 1.2 million; is that

23   correct?

24   A     That's correct.

25         MR. SCHAGER:  Your Honor, I have no further

Page 222

1    questions for Mr. Gran.

2                THE COURT:  All right.

3                Mr. Gran, stay on the line, please.

4                Mr. Miller, do you have cross-examination?

5                MR. MILLER:  Very briefly, Your Honor.  I want to

6    make sure Mr. Gran can hear me.

7                Mr. Gran, can you hear me when I speak into this

8    microphone?

9                THE WITNESS:  Yes, you're a little bit faint, but

10   I can hear you.

11               THE COURT:  Okay.  Mr. Miller, you can do this

12   sitting down, if it's more comfortable, if that mike will

13   get over your notebook there.  Yeah, there you go.

14               MR. MILLER:  Thank you, Your Honor.

15   CROSS-EXAMINATION

16   BY MR. MILLER:

17   Q    Mr. Gran, my name's Ralph Miller.  I represent Lehman

18   Brothers Holdings, Inc.  You and I have never met or spoken

19   before; is that correct?

20   A    That's correct.

21   Q    Mr. Gran, I understand you said that you worked at a

22   Lehman entity for a period of time and left.  Did I

23   understand that correctly?

24   A    You did.

25   Q    And, before you left, you were the recipient of some

Page 223

```
 1    contingent stock awards, some CSAs, correct?

 2    A    Yes.

 3    Q    And you chose to come back to Lehman after a period of

 4    time and start employment again, correct?

 5    A    I did.

 6    Q    And you knew when you came back that you would again

 7    receive compensation that would be partially in CSAs; was

 8    that correct?

 9    A    Well, as a standard, the offer letters would say that

10    you're eligible to participate if the company decided it.

11    Q    Well, but you understood that the compensation system

12    at that time included some portion of your compensation in

13    CSAs rather than all cash; is that correct?

14    A    Absolutely.

15    Q    And you still chose to come back at that time after

16    understanding how the CSA system worked, correct?

17    A    Yes, in fact, all banks have similar ideas (sic) how

18    the plan was, but --

19    Q    When you say all banks, what do you mean by that,

20    Mr. Gran?

21    A    What I mean is any organization you would join would

22    have a compensation plan which would incorporate some kind

23    of deferred compensation which would somehow be tried to tie

24    into a level of the price.

25    Q    And, in the interim that you were not working with
```

Page 224

1    Lehman, did you go to work for another bank, as you put it?

2    A    No, I did not.

3    Q    So, when you worked at the other firm -- and without

4    going into much detail -- did it have a deferred

5    compensation system?

6    A    No, they did not.

7    Q    So you voluntarily chose to go from an organization

8    that did not have a deferred compensation system back into

9    Lehman and the industry that had deferred compensation; is

10   that right?

11   A    No, it took some effort to get some detail on this

12   (sic), because the fact that I left to set up my own hedge

13   fund, which I did do, and I ran it for several years, and

14   Lehman Brothers asked me to come back to set up proprietary

15   (sic) asset management because when I had left Lehman

16   Brothers, they didn't have asset management.  So they

17   couldn't run (sic) the kind of fund that I was running

18   within the organization, but, once they could, they asked me

19   to come back, and that's why I was back.  I didn't go back

20   (indiscernible - 2:38:48) to whether or not the sort of

21   compensation schemes, CSAs or not.  It had no relevance.  It

22   was only about furthering my career.

23   Q    All right.  Well, you made a voluntary decision that

24   you would rather go to work for Lehman, including the

25   deferred compensation system, than continue with your own

Page 225

1    hedge fund; is that correct?

2    A    Sure, because no one ever had any reason to believe

3    that they wouldn't receive the deferred compensation in

4    these types of arrangements.

5    Q    Well, Mr. Gran, --

6    A    An outstanding (sic) organization would have believed

7    that they would not receive the compensation.

8    Q    Mr. Gran, did you -- excuse me.  I don't want to

9    interrupt you.  Are you finished?

10    A    No.  What I wanted to say is that the way this would

11    work is that an organization would give you an award, and

12    that award is what would actually be a tradeable value for

13    that compensation.  What happened to the stock that you

14    might be given in the future when you convert (indiscernible

15    - 2:40:03) on the tradeable value in general when you moved

16    around from bank to bank.  Or, if you left with a friendly

17    lever (sic).

18            It was all negotiable based on cash values, and

19    Lehman wasn't treated successfully (sic) until the time when

20    you actually need the stock, and, having been someone who

21    received the stock at one point and then later did not, I

22    understand also the way the other organizations treated this

23    value, many people were moving from bank to bank.  I can

24    tell you it was not treated as equity at any point in time.

25    It was treated as deferred compensation, which somebody

Page 226

1    would be losing.  Or even in an organization like Lehman

2    Brothers, if the stock cost went down after giving an award

3    like that, in most cases, they would try to make adjustments

4    for compensation.  In the year that happened, they already

5    make up for that.  Because when you (sic) do that, everyone

6    thought of it as deferred compensation.  Not bad, making

7    that mistake (sic).

8              MR. MILLER:  Your Honor, I do object to the

9    answer.  It's non-responsive, but --

10             THE COURT:  Well, we were struggling with a number

11   of things here.  One is the -- in order to accommodate the

12   witness, we're doing this telephonically, but it does kind

13   of create a non-standard dynamic in terms of the ability to

14   limit the witness' answering the question.  So Mr. Gran is

15   getting a lot more leeway than he would be if he were

16   sitting in the courtroom and Mr. Miller would be asking

17   simply yes or no questions.

18             So, Mr. Miller, if you want me to start enforcing

19   the rules of cross-examination, I'm happy to do that.

20             MR. MILLER:  Well, Your Honor, I simply wanted to

21   note that at this point.

22   BY MR. MILLER:

23   Q    Mr. Gran, you were asked to do a computation earlier on

24   how much you received in CSAs.  Do you recall that?  As a

25   percent of your total compensation?

Page 227

1   A    Yes, I was asked specifically for a particular document

2   to do a calculation.

3   Q    Right.  Going back to page three of four in the claims

4   form that was marked CLX89 -- do you remember that document

5   you looked at?

6   A    Yes, I do.

7   Q    If I'm reading that correctly, you received a total

8   compensation in pounds of 377,325 pounds, as shown in this

9   page; is that right?

10  A    I was not able to hear you any more.

11  Q    I'm sorry.  It looks like you received 377,325 total

12  compensation, shown on this page in pounds; is that right?

13  A    That's right.

14  Q    And, of that, 65,089 pounds was equity award, correct?

15  A    Yeah, the deferred part (sic) is 65,000 originally

16  (sic).

17  Q    Now, when I did that math, that looked like that was

18  about 17-and-a-quarter percent of your compensation that

19  year was in a value expressed as equity awards, right?

20  A    Only from the standpoint of this page, this computation

21  (sic) second page.

22  Q    Right, but for this example, that's the way it worked

23  out?

24  A    That's the way it worked for this example.

25  Q    And I believe you indicated that the portion that was

Page 228

1    paid in CSAs was always a portion of the bonus and never a

2    portion of the base salary; is that correct?

3    A    Yeah, I think it was just the way they calculate (sic)

4    the percentage really (sic).  Percentage of the bonus --

5    that the bonus didn't actually -- because I remember not

6    just the bonus, but also total compensation because, if I

7    remember the way the numbers worked, the organization used a

8    formula based on what level (sic) of the organization you

9    were and what the size of the compensation was, and there

10   were bands (sic) of compensation into the percentage, I

11   think, based on total compensation, not based on bonus.

12   Q    All right.  Well, just to briefly explain that to the

13   Court, there was something called the grid.  Do you recall

14   what that was with regard to the percentages?

15   A    Yes, from time to time, a grid was tried (sic).

16   Q    Can you explain to the Court what the grid was?

17   A    I think, you know, the grid was just the -- and it

18   changed over time -- was, in fact, we'd been getting, you

19   know, what I can describe to you as well, this is why you

20   got this percentage as a CSA, and this is how much your

21   bonus is because of these calculations.  It was only a way

22   of showing the table and showing how the calculation was

23   done, and it might have been the sum of that, or I don't

24   remember the compensation reviews, and I don't remember if I

25   actually received it or not, but it would be something that

Page 229

1    was, in fact, and traded for the OTO (ph).

2    Q    All right.

3              MR. MILLER:  I have no further questions,

4    Your Honor, on cross-examination.

5              THE COURT:  All right.

6              Mr. Gran, can I ask you a question?  It's the

7    judge.

8              THE WITNESS:  Sure.

9              THE COURT:  On the page three of four of this

10   document that I'm looking at -- can you hear me, sir?

11             THE WITNESS:  I can.

12             THE COURT:  Okay.  There's a line in the middle.

13   There's a total compensation summary, and then, it says

14   total compensation $750,000.  I'll stick with U.S. dollars.

15   And then, in the text below, it says that -- under

16   additional information, it says the notional value of your

17   2007 compensation, including the grant date value of the

18   discount portion of the CSAs awarded under the equity award

19   program is U.S. $793,125.  So there is a delta there of

20   approximately $43,000.  Is that attributable to the gross-up

21   that you get on account of acquiring the CSAs at a discount?

22   I'm just trying --

23             THE WITNESS:  That's the current (sic) based on

24   the discounts of the CSAs.

25             THE COURT:  Okay.  So --

Page 230

1           THE WITNESS:  They were trying to mark the rights

2    to have the shares.  If you were to have the shares then,

3    then they would be worth that at that time.

4           THE COURT:  At that time?  So the difference, the

5    discrepancy between when it says total compensation,

6    750,000, and the notional total value has to do with the

7    inclusion or not of the discounted shares?

8           THE WITNESS:  That's correct.

9           THE COURT:  Okay.  Thank you.

10          All right.  I think, Mr. Gran, we can bid you good

11   evening.

12   REDIRECT EXAMINATION

13   BY MR. SCHAGER:

14   Q    One final question, if I may, Mr. Gran?  And that is

15   this.  Are you familiar with something called a restricted

16   stock unit trust or an RSU trust?  Mr. Gran?

17   A    Not specifically, but I believe that there was an stock

18   unit trust, but I don't remember -- I don't have any

19   specific information about it.

20   Q    Okay.  Thank you.  I think we've concluded, Mr. Gran.

21   Sorry to keep you up so late.

22          THE COURT:  Thank you again.

23          THE WITNESS:  Thank you.

24          THE COURT:  All right.  What's next?

25          MR. SCHAGER:  Okay.  Your Honor, I would like to

1    call Sandy Fleishman Richmond to the stand, please.

2            THE COURT:  All right.

3            Come on up here, please.  Yes.  Would you raise

4    your right hand?

5        (Witness Sworn)

6            THE COURT:  Very good.  Ma'am, I'm afraid that

7    you're not allowed to have any documents with you when

8    you're testifying as a witness.

9    DIRECT EXAMINATION

10   BY MR. SCHAGER:

11   Q    Could you state your name again for the record, please?

12   A    Sandy Fleishman Richmond.

13   Q    Okay.  Ms. Fleishman, when did you start work at Lehman

14   Brothers?

15   A    I started working at Lehman Brothers in 1993.

16   Q    And, at the time of the bankruptcy, were you still

17   employed with Lehman Brothers?

18   A    Yes, sir.

19   Q    And can you describe for the Court your position,

20   please?

21   A    At that point, I had become a managing director.  I was

22   a part of the prime brokerage division, and I was

23   responsible for a sales organization within that division.

24   Q    Okay.  When did your employment at Lehman Brothers end?

25   A    I was employed at Lehman Brothers right through the

Page 232

1    bankruptcy, and then, I was part of the team that was

2    acquired by Barclays after they came in and purchased the

3    bankrupt entity.

4    Q    Could you describe what your responsibilities are for

5    Barclays now?

6    A    I continue to be a managing director at Barclays in the

7    prime brokerage division.  I am part of an origination sales

8    force covering a variety of investment managers and hedge

9    funds for various services.

10   Q    Thank you.

11          MR. SCHAGER:  Your Honor, I would like to show

12   Ms. Fleishman copies of two documents.

13          THE COURT:  Okay.

14          MR. SCHAGER:  They are both marked.  One is CLX59,

15   which is her declaration, and the second is a document

16   marked CLX60, which is the exhibit to the declaration.

17          THE COURT:  Okay.

18          MR. SCHAGER:  I can approach the Court, if I may

19   approach the Court, I can give copies of them.

20          THE COURT:  I have them here.

21          MR. SCHAGER:  Good.

22          THE COURT:  So we're at CLX59 and then CLX60,

23   which looks like it's the proof of claim.

24          Thank you.

25   BY MR. SCHAGER:

1    Q    Ms. Fleishman, can you look quickly at the last page of

2    CLX59, and that is your signature?

3    A    Yes, sir.

4    Q    And can I ask you to look at page -- sorry.  CLX60 --

5    this is your proof of claim; is that correct?

6    A    Yes, sir.

7    Q    Okay.  Can I refer you to page 10, and, when I say page

8    10, I'm looking at the numbering at the top, page 10 of 11.

9    It's a document with your name entitled equity awards

10   outstanding as of September 12th, 2008.

11   A    Yes.

12   Q    Was this part of your proof of claim when you filed it?

13   A    Yes, sir.

14   Q    Where did you obtain it?

15   A    I received it from the H.R. department at Lehman

16   Brothers.

17   Q    Okay.  Was that by your special request, or was that

18   generally available to employees?

19   A    I had requested it.

20   Q    Okay.  Thank you.  Going back to page nine,

21   Ms. Fleishman, your proof of claim -- this is Exhibit 1 to

22   your declaration.  Can I ask you whether that is your

23   handwriting on the form?

24   A    I'm sorry.  Just to be clear, we're talking about this

25   page?

1    Q    That's correct, yes.

2    A    Anything handwritten is my handwriting.

3    Q    Okay.  Now, in the upper left, there is the name of the

4    proceeding typed in.  Lehman Brothers Holdings -- sorry.

5    Name of debtor -- it says Lehman Brothers Holdings, Inc.

6    Above that just under the name of the Court is Lehman

7    Brothers Holdings claims processing center in care of Epiq

8    Bankruptcy Solutions.  Did you add that to the form?

9    A    No, sir.

10   Q    That was there when you got the form?

11   A    Yes.

12   Q    Okay.  Going over to the right-hand side,

13   Ms. Fleishman, under notice of scheduled claim, there is

14   some typed language there called Schedule G, executory

15   contract or unexpired lease and then description restricted

16   stock unit agreement.  Did you type that in the form?

17   A    No, sir.

18   Q    That was on the form when you received it?

19   A    Yes, it was.

20   Q    Okay.  And where did you receive the form?

21   A    Well, this was all part of the filing of the initial

22   claim.

23   Q    Okay.  That's how you filed it the claim, but, if you

24   did not fill out the form, then where did you receive the

25   form?

Page 235

```
 1    A    It was delivered to me from various Lehman groups that

 2    -- I mean, as you can imagine at the time, we were all

 3    scrambling to try to get an understanding of the process,

 4    and it was delivered to me through Lehman Brothers.

 5    Q    Sorry.  The form was delivered to you through -- from

 6    Lehman Brothers?

 7    A    Yes.

 8    Q    Okay.  So now, take a look at the last page of the

 9    proof of claim, please.  That's the envelope address.

10    A    Yes.

11    Q    Is that your handwriting on the envelope?

12    A    Yes, it is.

13    Q    Okay.  And you got that address from the address on

14    page one of the form?

15    A    Yes.

16    Q    So Lehman Brothers provided the form to you, told you

17    your claim was a Schedule G executory contract claim for

18    restrictive stock units and told you where to file?

19    A    Yes.

20    Q    I'm going to ask you to review, Ms. Fleishman, a

21    document that has been entered in the record.  It's a form

22    called a total compensation statement.  It's been marked as

23    CLX32.

24          MR. SCHAGER:  May I approach the witness,

25    Your Honor.
```

Page 236

```
 1              THE COURT:  Sure.

 2              MR. SCHAGER:  All right, and the Court has the

 3   form (sic)?

 4              THE COURT:  I'm not sure which one.

 5              MR. SCHAGER:  I would be happy to hand one up, if

 6   you'd like (indiscernible - 2:55:22).

 7              THE COURT:  I'm having a hard time with these

 8   unwieldy binders today.  CLX32?

 9              MR. SCHAGER:  Right.

10              THE COURT:  Okay.

11   BY MR. SCHAGER:

12   Q    Ms. Fleishman, I offer this form because it's something

13   that the parties have agreed to.  Does the form look

14   familiar to you?

15   A    Yes.

16   Q    Have you seen forms like this before?

17   A    It's similar to what we would receive every year at the

18   end of the year for compensation notification.

19   Q    Okay.  So you received letters -- sorry -- total

20   compensation statements in this form?

21   A    Yes.

22   Q    Okay.

23   A    Very much like this.

24   Q    Now, this form is dated at the lower right December 5,

25   2012.
```

Page 237

1    A    December 12th, 2005, I would imagine, but --

2    Q    I'm sorry.  I stand corrected.  Thank you.  Do you see

3    any significance in that date?

4    A    Well, the fiscal year end of Lehman Brothers was

5    November 30th at the time, I believe, and so, you would be

6    notified of your total compensation some time before the end

7    of December.

8    Q    Thank you.  On this form, CLX32, the employee is

9    described as having total compensation of $1,100,000 with

10   the salary portion being about $200,000.  That figures out

11   to about 18 percent.  Of your total compensation,

12   Ms. Fleishman, could you give the Court an average of what

13   your total salary was as a portion of your total

14   compensation?

15   A    Sure, well, it varied over time.  The salary was fixed

16   for, I think, most of us at $200,000.  And so, depending on

17   your total compensation, it would vary between anywhere from

18   11 percent to 20 percent, depending on the year.

19            THE COURT:  The year that $200,000 -- was at all

20   times during the period you're describing paid to you in

21   cash on a --

22            THE WITNESS:  Yes, salary was always paid in --

23            THE COURT:  Salary was always --

24            THE WITNESS:  -- cash biweekly.

25   BY MR. SCHAGER:

Page 238

1    Q    Now, on this CLX32, Ms. Fleishman, there is a total.

2    There's a figure given for a bonus of $900,000, and then,

3    there's a line underneath that showing a reduction that says

4    less RSUs of $235,000.  In the years 2003 to 2008, can you

5    advise the Court roughly what portion of your bonus was

6    shown as RSUs on this form?

7    A    Yes, it's somewhere -- again, it varied every year, to

8    be honest, based on your total compensation, and also you

9    referenced the grid.  So, over time, the percentages would

10   change.

11           THE COURT:  Right.

12   A    Not just by how much you earned, but by what the firm

13   determined, and so, on average, you know, somewhere between

14   20 and 40 percent probably was deferred.

15   Q    Sorry, 20 to 40 percent?

16   A    Yes.

17   Q    Thank you.  I'd like you --

18           THE COURT:  And then, the remainder, the 80 to 60

19   percent, was paid in cash, as it indicates here, on or

20   before January 31 after the first of the year?

21           THE WITNESS:  Correct.

22           THE COURT:  So you would have either had to -- I'm

23   just thinking about how it would work in terms of taxes.  So

24   then, you would have been paying estimated -- how would you

25   have been dealing with that tax issue as you moved through

Page 239

1      the prior year in anticipation --

2                  THE WITNESS:  Sure.

3                  THE COURT:  -- of getting a big sum of cash in

4      January?

5                  THE WITNESS:  So it was a five-year cliff.  So,

6      after you lasted -- after you made it through the five

7      years, you were just paying ordinary income tax on your

8      salary, your cash bonus, and then, the five-year deferral.

9                  THE COURT:  No, that's not -- I understand that.

10     That's not the question I'm asking you.  Putting aside the

11     RSUs, this is just a compensation structure that's back-end

12     loaded, right?

13                 THE WITNESS:  Yes.

14                 THE COURT:  So that you get to January 31st, 2006,

15     and this individual, whoever this is, has been paid over the

16     course of 2005 $200,000 on a monthly basis --

17                 THE WITNESS:  Yes.

18                 THE COURT:  -- biweekly basis?  And then, you're

19     going to get a check for $665,000?

20                 THE WITNESS:  Yes, yes.

21                 THE COURT:  What do you about the taxes?

22                 THE WITNESS:  You're paying ordinary tax --

23     ordinary income taxes on that.  And, remember, there was

24     always -- once you got over the five-year hurdle --

25                 THE COURT:  Yes.

Page 240

```
 1              THE WITNESS:  -- you were always getting five

 2   years ago as your -- as part of ordinary income.

 3              THE COURT:  Okay.  I -- I'm --

 4              THE WITNESS:  I'm sorry.  Did I --

 5              THE COURT:  It's getting late.  I'm going --

 6              THE WITNESS:  -- misunderstand?

 7              THE COURT:  -- to try it one more time.

 8              For 2005, this individual --

 9              THE WITNESS:  Yes.

10              THE COURT:  -- okay, is being informed in

11   December, you're going to be paid for the year total

12   compensation of a million-one.

13              THE WITNESS:  Yes.

14              THE COURT:  So as you've moved through the year

15   you're getting a paycheck and there's deductions and

16   withholding being --

17              THE WITNESS:  Yes.

18              THE COURT:  -- taken out of it.

19              THE WITNESS:  Yes.

20              THE COURT:  But you're going to have to file a tax

21   return for tax year 2005, right?

22              THE WITNESS:  Yes.

23              THE COURT:  And you're not getting -- as you move

24   through the year you're not getting the 665 --

25              THE WITNESS:  Yes.
```

Page 241

1          THE COURT:  -- right?  So when I was a partner in

2     a law firm I knew that in April I was getting a distribution

3     of cash.  So as I went through 2000 -- I went through the

4     year I was paying estimated payments because I knew that I

5     would be behind from the IRS's perspective --

6          THE WITNESS:  Right.

7          THE COURT:  -- if I didn't pay that.

8          THE WITNESS:  Yeah.

9          THE COURT:  So is that what -- I'm trying to

10    understand how you handled the tax --

11         THE WITNESS:  So the -- so what you have happen

12    here is you -- let's just pretend this was the first time

13    this person ever worked for Lehman Brothers.

14         THE COURT:  Sure.

15         THE WITNESS:  2005, they worked from January 1st.

16    They paid taxes on $200,000.  2006, they're going to

17    continue to have their $200,000 salary, but when they

18    receive that check for 665, they're paying ordinary income

19    tax --

20         THE COURT:  But my question is --

21         THE WITNESS:  -- at that time.

22         THE COURT:  -- for which tax year?  That's --

23         THE WITNESS:  That would be 2006 because it --

24    even though it was earned in 2005, you didn't receive it --

25         THE COURT:  It's not a group participation event,

1    folks.  Okay.  I have a witness on the stand and I'm trying

2    to elicit information.

3              The reason that I am confused is that this is a

4    statement that says, 2005 total compensation.

5              THE WITNESS:  Yes, ma'am.

6              THE COURT:  Okay.  So that that -- it would appear

7    to be not accurate.  If you -- the amount that's payable in

8    2006 you're telling me now would be a taxable income for

9    this person in the year 2006.  That's not what this

10   statement reflects.

11             THE WITNESS:  So, Your Honor, if I may.

12             THE COURT:  Sure.

13             THE WITNESS:  The way that the process worked was

14   that was fairly standard that you didn't actually receive

15   the payment of your bonus until the next fiscal year.

16             THE COURT:  I'm not questioning that.  I'm just

17   trying to understand what your tax life looked like.  And

18   this statement says that it is a summary of 2005

19   compensation --

20             THE WITNESS:  Correct.

21             THE COURT:  -- that you happen -- Lehman enjoyed

22   the float.

23             THE WITNESS:  Yes.

24             THE COURT:  They didn't give it to you until 2006.

25   But when you filed your income -- when this person files

Page 243

1    their income tax for the year, there's been testimony -- and

2    I think no dispute -- that you don't include an income, the

3    CSUs.  The only question that I'm trying to ask is whether

4    or not this person would include in income for 2005 the

5    amount payable in 2006.

6              THE WITNESS:  No.

7              THE COURT:  No?

8              THE WITNESS:  They would not.

9              THE COURT:  Okay.

10   BY MR. SCHAGER:

11   Q    So you paid -- as cash was received on those referred

12   to as a cash basis?

13   A    Yes.  She would pay the taxes on the income in the year

14   that you received the income, not necessarily the year you

15   earned it.

16             THE COURT:  Okay.  That --

17             THE WITNESS:  Okay.

18             THE COURT:  It's just the statement doesn't read

19   this way.

20             THE WITNESS:  Yes.  I understand.

21             THE COURT:  Do you understand?

22             THE WITNESS:  I understand where you could be very

23   confused about a lot of these things, myself included.  So

24   --

25             THE COURT:  All right.

```
 1            THE WITNESS:  -- excuse me for --

 2            THE COURT:  Okay.  Thank you.

 3            THE WITNESS:  -- being --

 4   BY MR. SCHAGER:

 5   Q    Going back to that statement, Ms. Fleishman, the line

 6   item that says, less RSUs, did you pay tax on the RSUs

 7   either in 2005 or in 2006?

 8   A    No, you did not.

 9   Q    So you had a bonus declared in 2005.  You said between

10   25 and 40 percent of it was withheld in designated RSUs and

11   you paid no tax in either 2005 or 2006 on what was

12   designated as RSUs; is that correct?

13   A    Yes, sir.

14   Q    Okay.  Did you ever pay tax on the RSUs?

15   A    You would pay tax on the RSUs five years later when

16   they were converted into stock and you could sell your

17   stock.  And so you would pay your ordinary income tax at

18   that point on that amount.

19   Q    Okay.  Ms. Fleishman, I would like to refer you back to

20   your proof of claim, the page marked at the top page 10 of

21   11.  You said you got this from human resources.  Did you

22   make a -- any special request for format when you put that

23   request to human resources for this form?

24   A    No.  I was just happy to receive it.

25   Q    Okay.  And just for the Court's benefit, Ms. Fleishman,
```

Page 245

1    there's a column called, fair market value on the granting.

2    That refers to the price of the Lehman shares on the

3    granting; is that correct?

4    A    Yes, sir.

5    Q    Okay.  And then the line time for -- sorry -- the

6    column for grant value, can you explain for the Court what

7    the line for grant -- the column for grant value means?

8    A    Yes. It would be the price of the stock on the grant

9    date times the number of RSUs granted.

10   Q    Okay.  And I noticed that the column that reads, total,

11   the numbers there are exactly the same as the grant value.

12   A    Yes.

13   Q    Okay.  And the only total on that page was the dollar

14   value of the grant; is that correct?

15   A    Yes, sir.

16   Q    Because they don't bother totaling up the number of

17   RSUs granted.

18   A    Correct.

19   Q    Was that because the dollar figure was more material to

20   you?

21   A    Yes.  That was -- when you looked at your total

22   compensation, what you were looking at was your

23   compensation.

24   Q    Okay.  And I see you also received a grant of stock

25   options in 2003.

1   A    Yes, sir.

2   Q    I think -- I would just note that for the record.  I

3   think we'll come back to that later.

4        I would like to discuss with you generally, Ms.

5   Fleishman, the RSU program.  You started work at Lehman in

6   1993, correct?

7   A    Yes.

8   Q    Did Lehman have an RSU program when you went to work

9   there?

10  A    I do not believe so.  I don't remember.

11  Q    Do you recall when the program was started?

12  A    It was when the IPU -- when the spinout from American

13  Express happened, which was shortly thereafter that.  I'm

14  not exactly sure what the -- what year it was, but it was

15  fairly soon after that.

16  Q    But you're quite certain it was after you went to work

17  at --

18  A    Yes.

19  Q    -- Lehman.  Okay.  When did you first participate in

20  the program?

21  A    I am not certain of the answer to that.  Shortly after

22  it would have been initiated I would have participated in it

23  because almost every employee did participate in the

24  deferred compensation.  So as soon as it was initiated I

25  would have participated at some level.

Page 247

1    Q    Were you offered an option to participate?

2    A    No, sir.

3    Q    Did you elect to participate in the program or did you

4    ask to participate in the program?

5    A    No.

6    Q    Okay.  Were you given any choice about participating in

7    the program?

8    A    No.

9    Q    Were you allowed to make an election about what portion

10   of your bonus would be withheld for the RSU program?

11   A    No.

12   Q    Did you sign any forms to join the program?

13   A    I don't believe so.

14   Q    Okay.  Were you able to negotiate the so-called hold

15   period or the cliff as I think you referred to it?

16   A    No.

17   Q    The period of time for -- during which the RSUs would

18   be withheld.  Did you -- w ere you able to negotiate that

19   five-year period?

20   A    No, sir.

21   Q    Were you able to accelerate the conversion of the RSUs

22   in any way?

23   A    No.

24   Q    Could you sell the RSUs?

25   A    No.

Page 248

1    Q    Could you -- did you ever try going to a bank to borrow

2    against them?

3    A    No.

4    Q    Okay.  So you -- your bonus is declared and 20 to 40

5    percent of it is withheld.  You can't sell them.  You can't

6    borrow against them.  You don't pay tax on them.  They just

7    sit there in an account?

8    A    It's --

9              MR. MILLER:  Objection, Your Honor.  I'm sorry.

10   I've been really trying hard not to --

11             THE COURT:  You have been trying hard

12             MR. MILLER:  --  object to him leading the

13   witness.

14             THE COURT:  -- Mr. Miller.  I think you're doing

15   quite well, but there's a limit to the number of leading

16   questions you can ask a witness.

17             MR. SCHAGER:  Okay.  Thank you, Your Honor.  I

18   apologize.

19   BY MR. SCHAGER:

20   Q    Let's walk through, Ms. Fleishman, what happens when

21   the RSUs were converted.  Did you receive grants of -- you

22   did receive grants of RSUs before 2003?

23   A    Yes.

24   Q    So you did realize income from the RSUs, correct?

25   A    Yes, sir.

Page 249

1    Q    Okay.  Did you pay a federal tax on the income from the

2    RSUs when they were converted?

3    A    Yes.

4    Q    Can you describe for the Court how that -- how you

5    learned about the amount of the tax and how it was paid?

6    A    It would be ordinary income tax on the conversion

7    amount.

8    Q    Okay.  I don't have a number, Ms. Fleishman, but let's

9    just use your example from your proof of claim.  You

10   received a grant of RSUs with a grant value of $355,000 in

11   2003.  The -- those -- did those -- you did not receive the

12   underlying stock.  Those were not converted; is that

13   correct?

14   A    That's correct.

15   Q    Okay.  Now if they had been converted, do you have some

16   -- could you tell me how you would have determined what tax

17   to pay that year?

18   A    Well, what would happen is Lehman Brothers would offer

19   you the opportunity to either write a check for the taxes

20   that you would owe or they would tell you that they would

21   sell enough shares to cover your tax obligation.  So that

22   was the -- you would elect which way you wanted to handle

23   it.

24   Q    And what was your personal election there?

25   A    I would take the net shares.  So after the -- so after

Page 250

1    taxes.

2    Q    Okay.  Was the share price higher in 2007 for your --

3    than it was in 2002 --

4    A    Yes.

5    Q    -- when your RSUs was granted?

6    A    Yes.  I'm sure it was.

7    Q    Okay.  Now did you pay any capital gain tax on any of

8    that?

9    A    No.

10   Q    All the tax was calculated as ordinary income?

11   A    Yes, sir.

12           THE COURT:  Okay.  I'm -- you've now lost me

13   because we're now talking about RSUs that never converted.

14           MR. SCHAGER:  I'm sorry, Your Honor.  I reverted

15   back.  I apologize.  I reverted back to her -- I was using

16   that for an illustration, but since she got RSUs in 2002 and

17   they were converted --

18           THE COURT:  Okay.

19           MR. SCHAGER:  -- I was going back to that

20   situation.

21           THE COURT:  Okay.  All right.  But I think we've

22   established fairly clearly through a number of witnesses

23   that at the date of conversion the shares are valued at the

24   stock -- then prevailing stock price and that then the

25   recipient paid ordinary income tax on that amount.  Have --

Page 251

1    I don't think that's controverted, so I think we can move

2    along.

3              MR. SCHAGER:  Okay, Your Honor.  Thank you.

4    BY MR. SCHAGER:

5    Q    And the conclusion was that it was taxed like salary,

6    correct?

7    A    Yes.

8    Q    Okay.

9              MR. SCHAGER:  Now my next question, Your Honor,

10   really deals with the situation that we haven't discussed

11   before, but it is discussed in the briefs.

12   BY MR. SCHAGER:

13   Q    Ms. Fleishman, did anyone ever tell you -- talk to you

14   about paying tax on the value of the RSUs at the time of the

15   grant so that you could pay capital gain tax on the gain

16   during the five -- that incurred during the five-year

17   holding period?

18   A    My understanding is that was not available.  You didn't

19   have that choice.

20   Q    Okay.  Are you familiar with the term of Section 83(b)

21   election?

22   A    Not really.  No.

23   Q    Okay.  But you were told that that was not a -- it was

24   not a choice to pay the tax in advance --

25   A    Correct.

Page 252

1   Q   -- at the time of the grant I should say.

2   A   I believe the structure was that you did -- you paid

3   taxes the five years afterwards.  You weren't given the

4   choice of whether you wanted to pay taxes up front or after

5   five years.

6   Q   Okay.  I would like to talk with you a moment, Ms.

7   Fleishman, about your stock options.  We looked earlier at

8   your form and you did receive grants of stock options in

9   2003.  Did you receive grants of stock options before 2003?

10  A   I do not believe so.  I think that might have been the

11  only time -- I think it was the only time I was ever granted

12  options.

13  Q   Okay.  Do you recall whether you elected to receive

14  stock options in 2003?

15  A   No.  That -- stock options were a part of the

16  compensation package for that year.  So I think the -- I

17  believe the way it worked at that time was in addition to

18  receiving RSUs, you were also receiving stock options as

19  part of your deferred --

20  Q   Did you have an understanding of how the stock options

21  would be taxed as compensation to you?

22  A   I believe it's just taxed as ordinary income.  I'm

23  sorry.  When you convert the options -- so you had the right

24  to buy the shares at a price over a period of time.  When

25  you converted --

Page 253

1  Q    I'm sorry.  That -- what you just said is -- now you're

2  defining a stock option, the right to purchase over a period

3  of time --

4  A    Correct.

5  Q    -- correct?

6  A    Correct.  So -- and at a particular price, and you

7  would pay a premium to have that right to purchase over

8  time.  Once you converted those shares, you would rationally

9  only do that if you were going to either want to hold the

10 shares or sell them -- in my case it was to sell them -- and

11 then you would pay capital gains on the profit.

12 Q    Okay.  Thank you.

13        Ms. Fleishman, I wanted to ask you a question

14 about the instrument that we've been calling the RSU trust

15 or the restricted stock unit trust.  Are you familiar with

16 that at all?

17 A    I was not familiar with that.  No.

18 Q    Do you recall yourself ever having the opportunity to

19 vote your RSUs?

20 A    I do not.

21 Q    I would like you to refer back, Ms. Fleishman, to once

22 again your proof of claim, that page you got from human

23 resources showing the grant value of your stock options.

24 And 2006 was a good year for you, correct?

25 A    Yes.

1    Q    Okay.  Why was it a good year?

2    A    Well, we had had record profits, I believe, and the

3    entire firm had been making a significant amount of money.

4    So it was a record year from a compensation perspective for

5    me --

6    Q    Okay.

7    A    -- personally.

8    Q    And from your personal perspective, was business good

9    for you that year?

10    A    Yes.

11    Q    Is the nature of your work client-oriented?

12    A    Yes.

13    Q    Okay.  So you have a group of clients you work with

14    regularly?

15    A    Yes.

16         THE COURT:  So for the year 2006, what was your --

17    if you recall what was your total cash compensation

18    including the portion that, as you've now described it to

19    me, would have been payable in January 2007.  Do you recall?

20         THE WITNESS:  So 2006 total cash comp -- I believe

21    the total compensation would have been that year 1.8 million

22    with 200 being the salary, so that brings it down to 1.6.

23    And if you've got the million of deferred, right --

24         THE COURT:  So then it would have looked something

25    like this compensation statement with 600 coming in in the

```
 1    January of the following year?

 2              THE WITNESS:  Yes.

 3              THE COURT:  Okay.  Thank you.

 4    BY MR. SCHAGER:

 5    Q    After January 2006 and after the -- sorry.  After

 6    January of 2007 and after that 2006 bonus had been paid,

 7    could you have marketed your skills and your business

 8    contacts to another firm?

 9    A    Yes.  I believe I could.  One issue that I've heard

10    discussed today was this idea of the handcuff; that you were

11    handcuffed to the firm.  And I think what's important to

12    understand is how restrictive that handcuff was --

13              THE COURT:  Hold on one second.

14              THE WITNESS:  Sorry.

15              THE COURT:  Mr. Miller is on his feet.

16              MR. MILLER:  Excuse me, Your Honor.  I don't

17    believe this is responsive to the question.  It sounds like

18    it's going off to be a speech.

19              THE COURT:  Well, it's not responsive to the

20    question.  So --

21              MR. MILLER:  So I object as non-responsive.

22              THE COURT:  All right.  Keep going, please.

23    BY MR. SCHAGER:

24    Q    My question, Ms. Fleishman, was could you have marketed

25    your skills to a Barclays at the time or to a Morgan Stanley
```

1    or to a Goldman Sachs?

2    A    I could have.  Yes.  I did not.

3    Q    Okay.  If they had offered you a higher bonus or a

4    higher salary and the offer was attractive to you, what

5    would you balance it against in terms of leaving Lehman?

6    A    So you would balance it against what you would be

7    giving up, which was your five years of deferred

8    compensation.

9    Q    Okay.  So if we're talking about January of 2007, we're

10   talking about just roughly $3.4 million.  That's --

11   A    Yes, sir.

12   Q    -- what it would have cost you to leave Lehman?

13   A    That's the deferred compensation I would have left

14   behind.  Yes.

15   Q    Okay.  Was leaving Lehman really an option?

16   A    It was a difficult option because of the restriction of

17   the good leaver policy over time.

18   Q    You said the -- that's the second time we've heard that

19   word today, Ms. Fleishman.  You called it a good leaver

20   policy?

21   A    Yes.

22   Q    Leaver, L-E-A-V-E-R, as in one who leaves?

23   A    Yes.

24   Q    Can you describe for us how the good leaver policy

25   existed and how it evolved over time?

Page 257

```
1    A    Yes.  So if you chose to leave Lehman Brothers and work

2    for a competitor, you would leave your deferred behind.  And

3    over time the definition of a competitor included almost

4    everyone.  And so the thought of leaving to go to an

5    investment management firm or any other type of firm you

6    essentially would be leaving your deferred behind.

7              THE COURT:  So let me ask you a question.  When

8    you look at this statement that's dated as of September

9    12th, 2008, which as it turned out was three days before the

10   filing, though had events unfolded differently, for example,

11   and the government had decided to bail Lehman out, it might

12   have been the case that Lehman continued and that as these

13   cliffs arrived, your stock was worth a very small fraction

14   of the numbers on this page, right?

15             THE WITNESS:  Yes.

16             THE COURT:  And you understood that, right?

17             THE WITNESS:  Yes.

18             THE COURT:  Okay.

19             MR. SCHAGER:  I'm not sure I did, Your Honor.

20             THE COURT:  My point is that this number on this

21   -- there's an RSU chart that's in Claimant's Exhibit 60 and

22   it lists the RSU total of Ms. Richmond as of the eve of the

23   bankruptcy filing at $3.8 million.  And my point simply was

24   that had Lehman continued and we were -- as a functioning

25   business and the RSUs continued and time marched on and we
```

Page 258

1     got to the cliffs, then these would have been -- they would

2     have converted into stock as the previous ones had done

3     after the five years and it was possible that the value

4     might have been much lower because the stock price could

5     have -- it could have become a penny stock out of

6     bankruptcy.

7                And that -- I asked Ms. Richmond and she responded

8     that she understood that she had a downside risk with

9     respect to the stock price, as I would expect her, frankly,

10    to understand given that she worked for Lehman for 15 years.

11    So --

12               MR. SCHAGER:  I think that's absolutely correct,

13    Your Honor.

14               THE COURT:  Okay.

15               MR. SCHAGER:  Let me follow that up, if I may,

16    with one --

17               THE COURT:  Sure.

18               MR. SCHAGER:  -- question.

19    BY MR. SCHAGER:

20    Q    Ms. Richmond, in the years that you received a

21    conversion of your RSUs into stock, were there ever years in

22    which the market price of the stock at the date of

23    conversion was lower than the market price at the date of

24    the grant?

25    A    I believe so.  Yes.

Page 259

1    Q    Okay.  And --

2    A    I should be able to just check the year-end stock

3    price, right, to see.

4    Q    Right.

5    A    It went up and down.

6    Q    Okay.

7              THE COURT:  Are we getting to the end?  I'm

8    sensing a lot of tiredness in the group here.  Do -- are we

9    -- do you have a lot more?

10             MR. SCHAGER:  No.  I'm concluded with my

11   examination --

12             THE COURT:  Okay.

13             MR. SCHAGER:  -- of Ms. Richmond, Your Honor --

14             THE COURT:  All right.

15             MR. SCHAGER:  -- or Ms. Fleishman.

16             THE COURT:  Very good.  Okay.  Mr. Miller.

17             MR. MILLER:  Since he's concluding, are you -- are

18   you concluded?

19             MR. SCHAGER:  I'm sorry.  I'm concluded.

20   CROSS-EXAMINATION

21   BY MR. MILLER:

22   Q    I want to make sure I address you correctly.  Do you

23   prefer to be called Ms. Fleishman, Ms. Fleishman-Richmond or

24   Ms. Richmond?

25   A    It is a little confusing.  I apologize.  I go by

Page 260

1    Fleishman at work.

2    Q    All right.  Ms. Fleishman, you made reference to

3    something you called the grid.  Do you recall that in one of

4    your answers?

5    A    Yes.  I referenced someone else referencing it.  Yes.

6              MR. MILLER:  May I approach the witness, Your

7    Honor?

8              THE COURT:  Yes.

9    BY MR. MILLER:

10   Q    I would like to give you a document which was part of a

11   stipulation that was referred to before.

12             MR. MILLER:  Your Honor, this is Exhibit 3 to

13   CL00-1, the stipulation.  And it is a 2003 equity award

14   program.

15   Q    You were at Lehman in 2003; is that correct?

16   A    Yes, sir.

17   Q    And I believe your declaration makes reference to

18   looking at program documents.  You did, from time to time,

19   look at program documents, right?

20   A    Yes.  Yes, I did.

21   Q    Did you traditionally get a set of program documents

22   that was something like a dear colleague letter that was

23   discussed?

24   A    Yes, sir.

25   Q    That was an annual event?

Page 261

1   A    Yes, it was.

2   Q    About when did that usually occur?

3   A    I would guess it occurred towards the time of year when

4   you would be receiving your award.  I'm not 100 percent

5   sure.

6   Q    If you can approximate what time of the calendar year

7   --

8   A    I would imagine toward the end of the calendar year.

9   Q    All right.  Was this equity award program booklet

10  typically one of the things that you got in that delivery of

11  materials?

12  A    Something like this.  Yes, sir.

13  Q    And if you would flip through, and there are numbers

14  here at the top, page something of 148, perhaps if you could

15  flip over to page 37 of 148.  Do you see that?

16  A    Yes, sir.

17  Q    There is a -- what's called a 2003 equity award

18  schedule.  Do you see that?

19  A    Yes.

20  Q    Is that what is commonly called the grid?

21  A    Yes, it would be.  This is the grid for a senior vice-

22  president.

23  Q    And what was your position at that time?

24  A    I was a managing director.

25  Q    All right.  Where is the -- is there a managing

Page 262

```
 1   director grid in here?

 2   A    No.

 3   Q    Not in this example?

 4   A    I don't believe so, sir.  It says, senior vice-

 5   president on the front of it.

 6   Q    All right.  So there would be a separate grid for each

 7   level of employee; is that --

 8   A    There might have been.

 9   Q    All right.

10           THE COURT:  Mr. Miller, could you give me a

11   minute, please.

12           MR. MILLER:  Sure.

13           THE COURT:  For future reference, note to all the

14   young lawyers and paralegals in the room, giant binders, not

15   very useful.

16      (Laughter)

17           THE COURT:  Smaller binders, much more useful.

18           MR. MILLER:  Yes.  If I may approach, Your Honor,

19   I have two free copies of --

20           THE COURT:  Sure.

21           MR. MILLER:  -- that which will help you in the

22   future.

23           THE COURT:  All right.  Thank you.

24           MR. MILLER:  All right.  So, Your Honor, we were

25   looking at in this document the -- this document actually
```

Page 263

```
 1    doesn't -- it's -- this --

 2              THE COURT:  What's the title on the top of the

 3    page?

 4              MR. MILLER:  It's salaried --

 5              THE COURT:  Salary.

 6              MR. MILLER:  -- members of the firm.

 7              THE COURT:  I got it.  Thank you.

 8              MR. MILLER:  All right.

 9    BY MR. MILLER:

10    Q    And, Ms. Fleishman, as I understand it the -- there's a

11    compensation range shown and then it's possible to read

12    across and there is a portion of the 2003 compensation paid

13    through the equity award program; is that right?

14    A    Yes, sir.

15    Q    It's (indiscernible)?

16    A    Yes, sir.

17    Q    So it's not discretion with regard to an individual

18    person.  Everybody in this position who made a certain

19    amount of money could look it up and figure out what the

20    percentages were; is that fair?

21    A    Yes, sir.

22    Q    Was that the consistent practice while you were at

23    Lehman; that there was a grid with this formula?

24    A    Yes.

25    Q    Do you recall getting RSUs in 1994?
```

Page 264

1    A    I do not recall getting RSUs in 1994.

2    Q    Did you -- when do you first recall getting RSUs?

3    A    I -- honestly, I don't know when the RSU program

4    started.  I would have started receiving them when it was

5    initiated.  What I suggested was it was probably when the

6    firm went public.  It might have been '94, '95 when --

7    Q    All right.

8    A    -- the spinout from American Express occurred.

9    Q    You think some time in the 1990s?

10   A    Yes, sir.

11   Q    Do you recall whether the first set of RSUs that you

12   received matured five years later?

13   A    Yes.

14   Q    And with that first group, do you recall whether the

15   value of the stock went up over that five-year period from

16   the 90s until later?

17   A    I don't know exactly where the yearend price for the

18   stock was each year.  It generally went higher.  There were

19   some significant dips in the stock price over time.  I

20   imagine it's -- I'm sorry.  I don't know the yearend stock

21   price for each year.

22   Q    All right.  You were asked some questions about leaving

23   and the possibility of leaving.  Do you remember that

24   general topic?

25   A    Yes, sir.

Page 265

1   Q    Were you aware that there was a practice of many

2   investment banking firms to compensate people for the

3   deferred compensation that they would leave if, as a part of

4   negotiations on having them change firms?

5   A    I'm -- I believe that did exist.  I never engaged in

6   those conversations so I have no firsthand knowledge of that

7   happening.

8   Q    Okay.  There was a reference to the so-called good

9   leaver policy.  Was -- what -- was there a program by which

10  parties could be approved to leave and retain their RSUs in

11  some way?

12  A    I'm sorry.  Ask that again.

13  Q    Yes.  I thought there was a reference to the so-called

14  good leaver policy.

15  A    Yes, sir.

16  Q    What did that policy have to do with as you understood

17  it?

18  A    So the good leaver policy was how you could leave the

19  firm and continue to keep your deferred compensation.  So --

20  and it -- as I had started to say, it changed over time and

21  it became very restrictive.  Initially, anyone other than a

22  major investment banking competitor was considered a firm

23  you could go to.  So, in other words, if you went to a

24  client, that would be a good leaver.  Over time, all of

25  those designations changed.

Page 266

```
 1    Q    You're now at Barclays?

 2    A    Yes, sir.

 3    Q    Does Barclays have a deferred compensation program now?

 4    A    Yes, it does.

 5    Q    Okay.  And --

 6    A    May I elaborate or am I not allowed to elaborate?

 7   Sorry.

 8              THE COURT:  Mr. Miller's call.

 9    Q    Well, I was going to ask you does that deferred

10   compensation program includes some sort of restricted stock

11   unit or stock award?

12    A    Yes, it does.  It's materially different than the

13   Lehman Brother's five-year cliff.  The Barclays program is

14   over a three-year time horizon and it's broken down between

15   cash and stock, a third, a third, a third.  And of that

16   third each year, you get that third -- so instead of waiting

17   the full five-years to have access to any of your deferred

18   comp, you get a third each year and that third each year is

19   split 50/50 between cash and stock.

20    Q    Now when you say cash and stock, is it actually stock

21   or is it the right to receive some stock?

22    A    I'm not sure.  I am not certain of the answer to that.

23    Q    Okay.  You did try to understand the Barclays' deferred

24   compensation program once you got to Barclays; is that

25   right?
```

1   A    Yes.

2   Q    And you tried to understand the deferred compensation

3   program while you were at Lehman; is that right?

4   A    Yes.

5   Q    It was important to you to understand how those things

6   worked?

7   A    Yes.

8           MR. MILLER:  I have no further questions of this

9   witness, Your Honor.

10          THE COURT:  Okay.  Any redirect?

11          MR. SCHAGER:  Your Honor, one quick question on

12  redirect, I think.

13  REDIRECT EXAMINATION

14  BY MR. SCHAGER:

15  Q    Ms. Fleishman, you described -- you said that you

16  thought you had some knowledge about practices among

17  investment banks for employees who might shift from one to

18  another.  In your experience what factors would the

19  recruiting investment bank consider when evaluating the RSUs

20  the employee was leaving behind?

21          MR. MILLER:  Excuse me.  Objection, Your Honor.  I

22  think she testified she's never done it and I think this is

23  asking her for what amounts to an expert opinion on custom

24  usage.

25          THE COURT:  Well, I mean, I also think it lacks

Page 268

1    foundation.  I don't know if the witness actually knows.

2              MR. SCHAGER:  Withdrawn, Your Honor.

3              THE COURT:  Okay.

4              MR. SCHAGER:  That's fine.

5              THE COURT:  All right.

6              Ms. Fleishman, thank you very much.

7              THE WITNESS:  Thank you.

8              THE COURT:  You can step down.

9              All right.  It's -- so we're now approaching the

10   four-hour mark.  What is it that you all would like to do

11   next?

12             MR. SCHAGER:  Your Honor, may I have two minutes

13   to discuss something with my nemesis.

14             THE COURT:  Sure.  I think it's clear that we're

15   not going to make it to finish today.  And the question is,

16   you know, I'm willing to take responsibility for a portion

17   of the overage, but not all of it.  So we're now at four

18   hours -- almost at four hours and I don't think I spoke for

19   more than an hour.  So simple math would indicate that the

20   claimant's time has been used.

21             So let's try to figure out what we're going to do.

22             MR. MILLER:  Your Honor, we have a request from

23   our part of the table that if he's going to take a two-

24   minute conversation, could we have a five-minute break so

25   some people can have a --

Page 269

```
 1              THE COURT:  Yes.  Absolutely.  So let's take a

 2      five-minute break.  I'll do you one better.  Take a ten-

 3      minute break and figure out what we're going to -- what you

 4      would like more to accomplish today, but I need to check

 5      with the wonderful person sitting over here because she

 6      didn't sign up to be after five o'clock today and I think

 7      I'm getting on everyone's patience in this building by

 8      staying as late as I do.

 9              So my preference would be to roll into tomorrow

10      unless we have witnesses who cannot make themselves

11      available.

12              So let's take a ten-minute break and I'm going to

13      have to also get some coverage over here in the front.  All

14      right.

15              Thank you.

16              UNIDENTIFIED SPEAKER:  Your Honor --

17              THE COURT:  Yes.

18              UNIDENTIFIED SPEAKER:  -- so we're on the --

19              THE COURT:  Yes, sir.

20              UNIDENTIFIED SPEAKER:  I'm willing to make myself

21      available (indiscernible), but without having my Blackberry

22      I can't check what I can and can't do.

23              THE COURT:  Okay.

24              UNIDENTIFIED SPEAKER:  Ms. Stiefel went down to

25      get --
```

```
 1              THE COURT:  Can you --

 2              UNIDENTIFIED SPEAKER:  -- hers from the guards.

 3   If Mr. Romallo can go down --

 4              THE COURT:  You can -- whoever needs to get their

 5   Blackberry or your smart phone, go downstairs and we'll call

 6   down to the CSOs and tell them to let you bring your devices

 7   up.  All right.  So we'll take care of that.

 8              And then, Francis, is there anyone around who can

 9   take --

10              THE CLERK:  I can stay.

11              THE COURT:  You can stay a little bit more?

12         (Recess taken at 5:14 p.m.; resume at 5:26 p.m.)

13              THE COURT:  All right.  What are -- what have we

14   decided to do?

15              MR. KAPLAN:  Well, Your Honor, if I might, as to

16   the new (indiscernible) --

17              THE COURT:  Yes.

18              MR. KAPLAN:  -- witnesses, Ms. Stiefel was here.

19   She had a client meeting at six that she pushed off, so she

20   left.

21              THE COURT:  Okay.

22              MR. KAPLAN:  She is -- because of pushing things

23   around from today, she can be available tomorrow between one

24   and two.  So I propose that we somehow deal with the pro

25   se's in the morning and then she'll be available for cross-
```

Page 271

1    examination and so on.  Mr. Miller indicated there's some

2    issues with her initial supplemental declaration.  We may

3    have to deal with those first.  We can deal with those

4    tomorrow or whenever.

5              The -- Mr. Romallo and Mr. Reynolds are both here.

6    They can come back tomorrow or they can testify tonight.

7    But if we don't want to go too much longer, they're

8    available tomorrow.

9              THE COURT:  Okay.

10             MR. KAPLAN:  I would suggest they come back

11   tomorrow afternoon as well because we have the pro se's in

12   the morning.

13             THE COURT:  That would seem to make sense.  I

14   mean, the risk that we have is that if we -- because we

15   don't know how many pro se's wish to appear, we could end up

16   with an empty morning.  But I don't know -- I just don't

17   know how to manage that.

18             MR. KAPLAN:  Yeah.  I mean -- yeah.  And I don't

19   really want to take these people away from --

20             THE COURT:  Oh, I understand.

21             MR. KAPLAN:  -- managing money the whole day if --

22             THE COURT:  I understand that.

23             MR. KAPLAN:  -- if I can avoid it since they've

24   done that this afternoon.

25             THE COURT:  Mr. Miller, what would you folks --

Page 272

1          MR. MILLER:  Yes.

2          THE COURT:  -- like to do?

3          MR. MILLER:  Thank you, Your Honor.  Ralph Miller

4     again for the record.

5          Mr. Kaplan made reference to the fact that we do

6     have a little procedural or it's an evidentiary issue.

7     There are declarations for at least one of these witnesses

8     that we have specific objections to, and if we can go over

9     those objections with the Court, perhaps -- one possibility

10    would be in the morning before we begin the pro se's, it's

11    possible that we won't have to call Ms. Stiefel if --

12         THE COURT:  Okay.  So those --

13         MR. MILLER:  -- our objections --

14         THE COURT:  -- those hit the docket on March 27th,

15    right, those supplemental declaration of Stephanie Stiefel

16    and Henry Romallo.

17         MR. KAPLAN:  Last Thursday after the conference.

18    Yeah.  It was the 27th.  Yeah.

19         THE COURT:  Okay.  And you have to refresh my

20    recollection.  Did we discuss those in the conference?

21         MR. KAPLAN:  We discussed it in the conference

22    that they had been prepared and circulated and that there

23    was some objections to them, and then I conferred with Ms.

24    Alvarez in the afternoon and she said she continued to have

25    the objections, but that I should go ahead and file them.

Page 273

```
 1    So I did.  And then they filed their objections -- they sent

 2    me copies of their objections on Friday, which I didn't

 3    frankly think too much of.  So then they filed formal

 4    objections yesterday, and that's where we are.

 5              My sense is that what they are objecting to is the

 6    sort of statements that are often made in declarations and

 7    in affidavits that the Court takes for what they're worth.

 8    And I think Your Honor can look at Ms. Stiefel's affidavit

 9    and decide what you want -- what you would consider to be

10    appropriate direct testimony from her and what you would

11    consider to be not appropriate and take it for what it's

12    worth.  And we needn't waste a whole lot of time and so

13    wouldn't waste time on her direct.

14              But Mr. Miller apparently has another view.

15              MR. MILLER:  Your Honor, may I approach?

16              THE COURT:  Yes.  I have the objection.

17              MR. MILLER:  Okay.  That's what I was going to

18    provide to the Court, Your Honor.

19              THE COURT:  Yeah.

20              MR. MILLER:  Well, going back to my -- what we

21    have done there is to excerpt sentences and phrases from the

22    declaration and state our objections to them.  Most of them

23    are legal conclusion and -- I mean, this is, essentially, in

24    our view, a brief more than a declaration.

25              And so --
```

Page 274

1            THE COURT:  Why wasn't this submitted -- because I

2      wasn't involved obviously when the stipulation was born.

3      Why were these submitted as supplemental declarations and

4      not as part of the first group of --

5            MR. KAPLAN:  Because initially we had indicated

6      that we were calling Ms. Stiefel as a witness, and in an

7      effort to avoid burdening the record with unnecessary direct

8      testimony we tried to avoid that by doing it in the form of

9      a declaration, which then was --

10           THE COURT:  Was that by -- did you agree to that,

11     Mr. Miller?

12           MR. KAPLAN:  There was a letter sent to me by Mr.

13     Miller where we had asked him to stipulate to facts that

14     were in our brief and he said, I can't stipulate to facts in

15     your brief.  But if you put them in the form of a

16     declaration, then if we choose we can cross-examine.  So we

17     put them in the form of a declaration with the person who

18     had -- from a person who had the most knowledge of the facts

19     from our side of the table.  And that's why we filed the

20     supplemental declaration in the hope of avoiding unnecessary

21     direct testimony.

22           But, you know, if you want me to put Ms. Stiefel

23     on on direct, I'll do that, too.  I mean, you know, I'm

24     trying to keep --

25           THE COURT:  I'm trying --

Page 275

1            MR. KAPLAN:  -- things streamlined.

2            THE COURT:  I'm trying very hard to not let this

3    kind of devolve into chaos.

4            MR. MILLER:  Your Honor, this is outside the

5    procedures order.  Mr. Kaplan made a request for us to

6    stipulate to facts.  We tried to respond in good faith and

7    say we can't stipulate to these facts and he decided to go

8    with these declarations.  We didn't get them until very

9    late.  We've been trying to object in timely fashions.  He

10   said -- we asked him to consider the objections in hopes he

11   would withdraw parts of it.  He decided not to withdraw any

12   of it.  So that's why we have a disagreement on the

13   document.

14           But we --

15           THE COURT:  Well --

16           MR. MILLER:  -- again, we'll --

17           THE COURT:  -- I mean, just --

18           MR. MILLER:  -- approach it any way the Court

19   wants to.

20           THE COURT:  -- just having -- I did look at this

21   when it came in.  I mean, if you look at paragraph number

22   10, you know, that is hearsay.  I mean, so, you know, if

23   these were supposed to be simple declarations of fact --

24           MR. KAPLAN:  Well, the first part is -- it may be

25   hearsay, but you -- we have the Romallo deposition -- the

1    Romallo declaration in evidence --

2            THE COURT:  But --

3            MR. KAPLAN:  -- and Mr. Romallo --

4            THE COURT:  -- she's saying as -- she's saying as

5    -- for -- either it's hearsay or it's a brief.  I mean, as

6    demonstrated in the declaration of Henry Romallo.  It -- her

7    --

8            MR. KAPLAN:  Right.  I --

9            THE COURT:  -- her view of Henry Romallo and his

10   situation is --

11           MR. KAPLAN:  I --

12           THE COURT:  -- just --

13           MR. KAPLAN:  I mean, you know, if it's that

14   sentence that's the big issue here, I don't have a problem

15   taking it out.  But it's clear that she knew, as a managing

16   director and former partner of Neubergers, she knew what

17   Heidi Steigler's (ph) role was in soliciting these things.

18   She didn't -- she does -- and that's -- the second part is

19   not hearsay.  That's based on her personal knowledge of what

20   her role -- of knowing what Ms. Steigler's role was, and she

21   doesn't say what the conversations are.  She doesn't relate

22   any hearsay.

23           THE COURT:  Well, look, I mean, you know, what for

24   that one -- you know, so take, for example, paragraph 17:

25   "This clearly evidences that the withheld amounts from 2003

Page 277

1    through 2007 similarly were and are compensation and not any

2    sort of equity investment."  So that's clearly the decision

3    that I have to make.  That's not -- that's her view.

4              MR. KAPLAN:  That's her view.

5              THE COURT:  That's her view.  But it -- I --

6              MR. KAPLAN:  I mean, but that's her view and you

7    take it as her view.  That's my attitude towards this.  This

8    is a declaration.  That's her view, and it's your ultimate

9    conclusion that's going to prevail.

10             THE COURT:  Mr. Miller, help me here.  I just --

11   we need to figure out a path forward.  I mean --

12             MR. MILLER:  Yes, Your Honor.

13             I think there's a simple solution to this, I

14   guess, Your Honor, and that is if the Court does not wish to

15   work through the declaration, which is fine with us, then

16   one of the options is to call this witness live and he can

17   elicit direct in lieu of the declaration and we'll object to

18   --

19             THE COURT:  Yeah.  I mean, I'm never -- in this

20   type of a situation, you know, I'm not a big fan of these

21   declarations because the lawyers write them.  The lawyers

22   write them.  So --

23             MR. KAPLAN:  Absolutely.

24             THE COURT:  So it's not fact testimony of the

25   witness.  It's a document written by a lawyer that somebody

1  signs.  I mean -- so, you know, I mean, I do this every day.

2  I'm really not interested in declarations except as a

3  convenience matter because it completely undercuts, to me,

4  the utility of the testimony because the lawyer is writing

5  the testimony.

6        So, you know, I think we ought to just -- if Ms.

7  Stiefel -- Steeple (sic), is it --

8        MR. KAPLAN:  Stiefel.

9        THE COURT:  -- is available , then you can put her

10  on the witness stand and, Mr. Miller, you can cross her.

11        MR. KAPLAN:  That's fine.

12        MR. MILLER:  That's fine with us, Your Honor.

13        THE COURT:  All right.  And --

14        MR. MILLER:  It's (indiscernible) --

15        THE COURT:  -- does the same go for Mr. Romallo or

16  did you not have objections?

17        MR. MILLER:  No.  Mr. Romallo, I think we

18  certainly need his testimony.  I mean, it's -- we know here,

19  for example, his supplemental declaration has what is clear

20  hearsay, but I am aware that she (sic) employed similar

21  tactics in, you know --

22        THE COURT:  Well --

23        MR. MILLER:  I mean, it's got a prayer for relief.

24  So we think that he ought to testify and, you know, have a

25  chance to get specific.  And we really need specifics,

Page 279

1    frankly, on him about this alleged coercion anyway.

2              THE COURT:  All right.  So then we're going to

3    have the --

4              MR. KAPLAN:  No problem.

5              THE COURT:  I'm sorry.

6              MR. KAPLAN:  No problem, Judge.  We'll --

7              THE COURT:  Okay.

8              MR. KAPLAN:  -- have -- the witnesses are here now

9    and they will be here tomorrow.

10             THE COURT:  Okay.

11             MR. KAPLAN:  So the only question is when.

12             THE COURT:  Well, we have a --

13             MR. KAPLAN:  And Ms. Stiefel is only available

14   Friday at 1:00, so if we could know that we start at one and

15   then we'll follow with Mr. Romallo and the others, that's --

16             THE COURT:  Well, I mean, I think --

17             MR. KAPLAN:  -- that's fine.

18             THE COURT:  -- the problem that we have is that

19   how long on the stipulation where the pro se's allocated,

20   the entire day?  Twenty minutes per person, right?

21             MR. MILLER:  Twenty minutes per person and there

22   was a time block that everyone understood that was somewhat

23   flexible, I think.

24             THE COURT:  Okay.  Well, I suppose what we're

25   going to have to do is we will start at 10:00.  We will

Page 280

1    start with whoever the pro se's are that are here.  We will

2    get through as many of them as we can until 12:00, and then

3    we're going to have to take a lunch break and then we're

4    going to have to come back at one in order to accommodate

5    the -- Ms. Stiefel's schedule, and then we're just going to

6    have to finish the pro se's after that if more than, doing

7    the math, six of them are here.  Is that alright with

8    everyone?

9            I mean, I -- I assume they counseled for the

10   represented claimants -- well, let me ask the question.  Is

11   it your intention to -- let me step back.

12           The pro se claimants have an expectation that

13   they're going to be given the microphone to speak in the

14   nature of testimony and/or argument?

15           MR. MILLER:  It's up to Your Honor as to how you

16   would like to have the pro se claimants proceed, of course.

17   I think Judge Peck wanted them to have --

18           THE COURT:  A chance to be heard.

19           MR. MILLER:  -- some chance to be heard.  And,

20   obviously --

21           THE COURT:  Right.

22           MR. MILLER:  -- they're both in the role of lawyer

23   and --

24           THE COURT:  Exactly.

25           MR. MILLER:  -- (indiscernible).  I think it's

Page 281

1    helpful to know which role they're in.

2              THE COURT:  Right.  Well, I would --

3              MR. MILLER:  And so --

4              THE COURT:  -- what -- I mean, just to give the

5    attorneys a head's up, what I've done in the past with pro

6    se claimants is to indicate to them that for their -- the

7    purposes of their presentation they are under oath and their

8    statements will be treated as testimony given under oath.

9    And then they talk.

10             So -- and then to the extent that one of you

11   wishes to question them, I suppose then we can then have

12   them take the witness stand and you can ask them questions

13   in the nature of cross-examination.

14             MR. MILLER:  Yes,  Your Honor.  I -- we would like

15   -- we --

16             THE COURT:  I mean, if you have a preferred

17   procedure I'm happy to hear it.

18             MR. MILLER:  That's fine with us, Your Honor.

19             We would like to get a clarification from Mr.

20   Schager and make sure we -- at least as to how many

21   witnesses he's planning to call and that schedule.  That's

22   still --

23             THE COURT:  So are those the only two Neuberger

24   witnesses, Mr. Romallo and Ms. Stiefel?

25             MR. KAPLAN:  And Mr. Reynolds we would keep very

Page 282

 1   brief.

 2              THE COURT:  Okay.  So we're -- so that in total, I

 3   think, we're talking about perhaps only an hour, recalling

 4   that originally this was all supposed to have been done

 5   within a three-hour time frame.

 6              MR. KAPLAN:  Yeah.  I mean, I don't -- certainly.

 7   I mean, I don't know how -- it depends on the cross-

 8   obviously, it depends on the cross-examination.  But direct

 9   shouldn't -- I mean, I was trying to avoid the direct, but

10   the direct --

11              THE COURT:  I understand.

12              MR. KAPLAN:  -- shouldn't be long.  Right.

13              THE COURT:  Okay.  All right.  So any others that

14   you were intending to call?

15              MR. SCHAGER:  Your Honor, a footnote on Mr.

16   Reynolds if I might.  I just don't want to waive this.  Mr.

17   Reynolds was designated as a rebuttal witness and we were

18   told that he is being called because he is going to bolster

19   the testimony of Mr. Romallo.

20              We would like to reserve our objection.  We don't

21   think he was timely designated and we don't think calling a

22   witness to bolster the testimony of another witness is

23   appropriate.

24              THE COURT:  Okay.

25              MR. KAPLAN:  Well, it -- it's not so much as to

Page 283

1    bolster the witness as to -- as it is to bolster Mr.

2    Romallo's testimony about his -- about the inducement and

3    threats from Ms. Kreiger (ph).  But --

4              THE COURT:  But that --

5              MR. KAPLAN:  -- also the threats and the

6    inducements that Mr. Reynolds received.  It is both.

7              THE COURT:  Okay.  But that's not a rebuttal --

8              MR. KAPLAN:  He --

9              THE COURT:  That's not a rebuttal witness.  You're

10   not rebutting anything.  You are putting in something in

11   further support of --

12             MR. KAPLAN:  It was -- well, he was designated a

13   rebuttal witness because it was after Mr. Miller indicated

14   that he wished to cross examine Mr. Romallo notwithstanding

15   that we had given the declarations as his direct.  And only

16   --

17             THE COURT:  Still --

18             MR. KAPLAN:  -- because they were going to cross-

19   examine Mr. Romallo that we needed -- that we wanted to call

20   Mr. Reynolds to testify to the similar state of facts that

21   he experienced.

22             THE COURT:  It's still not rebuttal.  It's still

23   not rebuttal.  I mean, it -- in a normal -- more normal case

24   you would identify somebody who you may call as a rebuttal

25   witness.  But, frankly, before you have an opportunity to

Page 284

1    hear their cross-examination I find it hard to understand

2    how you know what you're rebutting.

3              MR. KAPLAN:  Well --

4              THE COURT:  I mean, it sounds like you just didn't

5    designate Mr. Reynolds in the first round and then thought

6    better of it.

7              MR. KAPLAN:  No.  It was only after Mr. Miller's

8    -- Mr. Miller filed his objections saying, I object to Mr.

9    Romallo's statement that I am aware that others, including

10   Christian Reynolds, were similarly solicited by Ms. Kreiger

11   that I indicated that we wanted to call Mr. Reynolds.  Only

12   because that's what their objection was; that it was hearsay

13   when Mr. Romallo said it.

14             If there were -- had been no objection, then there

15   would be no need to call Mr. --

16             THE COURT:  That's not rebuttal.  That's simply

17   that you offered something that LBHI identified as hearsay

18   and then you decided that you had to call somebody else to

19   prove the point that you might not be able to prove out of

20   that witness's mouth.  That's not rebuttal.  That's you

21   should have designated Mr. Reynolds in the first round.

22             MR. KAPLAN:  So are you precluding his testimony?

23             THE COURT:  Unless you can do a better job of

24   convincing me that it's rebuttal in the sense -- in the way

25   that trial lawyers use that term, I'm going to preclude you

Page 285

1    from calling him as a witness.

2              MR. KAPLAN:  Well, then I have to wait to see what

3    the cross-examination is.

4              THE COURT:  I think you do.

5              MR. KAPLAN:  Okay.

6              THE COURT:  All right.  Let's try to finish up.

7              What other witnesses are you intending to call

8    tomorrow?

9              MR. SCHAGER:  Thank you, Your Honor.

10             Well, you can understand that I know what the

11   evidentiary procedures order was because for the represented

12   claimants I was the principal responder on that.

13             THE COURT:  Okay.  Are you about --

14             MR. SCHAGER:  And I drafted something --

15             THE COURT:  -- to overrule me?

16             MR. SCHAGER:  No, not at all.  Not at all.

17        (Laughter)

18             MR. SCHAGER:  But about nine months ago I proposed

19   an accelerated procedure and we got an accelerated procedure

20   in the order, but we didn't accelerate very much.  And now

21   we're up against this three-hour deadline --

22             THE COURT:  But I'm giving you relief.  I've -- we

23   are heading into our fifth hour of your three hours --

24             MR. SCHAGER:  Let me tell you what I need, Your

25   Honor, what I would like to have -- my goal as a minimum was

Page 286

1   to have one representative or one illustrative plaintiff

2   from each of three groups.  I outlined that.

3              THE COURT:  Right.

4              MR. SCHAGER:  And I think it is very important for

5   the Court to walk through what the situation was of the

6   commissioned sales person.  But, unfortunately, the guy who

7   I have who is Mr. Nicholas P. Howard who is here today, he's

8   not available tomorrow.

9              I've got a fourth witness who was attacked in the

10  briefing and she would like to offer some clarification.

11             THE COURT:  Well, why didn't you call that

12  gentleman today instead of the witnesses that you did call?

13             MR. SCHAGER:  Well, Mr. Graham was only available

14  today and it was the hour and he can't testify during the

15  working day in London.  And Ms. Richmond was the predominant

16  illustration because --

17             THE COURT:  Okay.

18             MR. SCHAGER:  -- she is the salary bonus person

19  and --

20             THE COURT:  Sure.

21             MR. SCHAGER:  -- of the 52 people I represent

22  here, 45 of them are salary bonus people.

23             THE COURT:  Okay.

24             MR. SCHAGER:  And I thought her situation should

25  be highlighted.  That is --

1          THE COURT:  Okay.

2          MR. SCHAGER:  -- the logic, Your Honor.

3          THE COURT:  All right.  But --

4          MR. SCHAGER:  And she covered a lot of ground and

5     I think Nicholas Howard could covered what he has to say and

6     --

7          THE COURT:  But I can't --

8          MR. SCHAGER:  -- under a half an hour.

9          THE COURT:  -- I can't solve -- I can't solve this

10    problem because you -- you're -- we're completely ignoring

11    the fact that the group negotiated for three hours and under

12    anyone's -- even accounting for the fact that I talk too

13    much, we're way over that allotted time.  So you had to have

14    made a choice about -- among all of you among which

15    witnesses that you call.

16          So now we're going on almost five hours, plus it

17    sounds like we're going to be doing a good three hours

18    tomorrow.  So, you know, five plus three is eight minus one

19    on account of me, that's more than 100 percent of -- more of

20    time than you allotted.

21          So I -- at some point the procedural unfairness of

22    it begins to become a real issue.  I mean, there's latitude

23    and then there's just completely ignoring what you

24    negotiated.  So I can't do anything about the fact that he's

25    not available tomorrow.  Arguably, there wasn't enough time

Page 288

1    anyway.

2            So who else do you have?

3            MR. SCHAGER:  Those two, Your Honor, Nicholas

4    Howard and Karen Kreiger.

5            THE COURT:  Okay.  So is Ms. Kreiger available?

6    She's available tomorrow from 1 to 2.  I'm sorry. Is it

7    Kreiger or Stiefel from one to two?

8            MR. KAPLAN:  Stiefel is from one to two.

9            THE COURT:  Okay.  And Ms. Kreiger is available

10   tomorrow?

11           MR. SCHAGER:  Ten o'clock.

12           MS. KREIGER:  (Indiscernible).

13           MR. SCHAGER:  Nicholas Howard is not available

14   tomorrow.

15           THE COURT:  Well, but this is the point that I

16   made.  We have -- your identifying all in seven witnesses:

17   Three Neuberger and four of yours.  So if we were doing this

18   in the three hours you would have had to all argue and do

19   seven witnesses.  It's not possible.  So something had --

20   there was not adequate planning or coordination.

21           So I can't fix that.  And I can't -- and I think

22   it's not fair to just say, notwithstanding that the stip

23   gave you three hours, you're just going to have unlimited

24   time.

25           MR. SCHAGER:  Well, Your Honor, I respect that

Page 289

1    analysis and, believe me, I know because I wrote it.

2              THE COURT:  I hear you.

3              MR. SCHAGER:  But --

4              THE COURT:  But --

5              MR. SCHAGER:  -- but the -- there are two

6    considerations there that could come into play.  One is

7    that, with all due respect, Lehman never wanted to put on

8    any witnesses that we had contemplated.

9              The second factor that we need to take into

10   account is Your Honor's old statement; that talking with

11   real people means an awful lot as opposed to looking at

12   declarations or, let's say, frankly, you might be listening

13   to the lawyers arguing.

14             So these are the people who have experienced the

15   plan.  They know how it was administered regardless of what

16   the boiler plate was.  They know how it was administered and

17   how it affected them.  And their views on this are the most

18   critical thing going on in the courtroom today.  And I know

19   that there was three hours there.  The third factor is that

20   we had some internal arrangements that, frankly, were not

21   respect.

22             So I've only taken, I think, about an hour with

23   the two witnesses that I put on, if even that much.  I know

24   the clock reads otherwise, but between Mr. Graham -- and I

25   am grateful for the Court's forbearance there -- and Ms.

Page 290

1    Fleishman, we haven't had as much time as collectively --

2              THE COURT:  Well, look --

3              MR. SCHAGER:  -- as the claimants' group had

4    planned on.

5              THE COURT:  Here's -- we're going to have to be a

6    little flexible tomorrow because we don't know how many pro

7    se's are going to be here.  And I think that if they come

8    and they want their 20 minutes, they should get their 20

9    minutes, all right, because --

10             MR. SCHAGER:  Absolutely.

11             THE COURT:  -- that's the deal for them.  And then

12   we will take a break at noon and then we will restart at one

13   and we will be done, subject to the additional number of pro

14   se's, we'll keep going until five o'clock and then -- and

15   then the record is going to be closed.  The evidentiary

16   record is going to be closed.

17             And Mr. Miller is probably very unhappy with me

18   because it effectively increases your time by 100 percent,

19   but I'm not going to be in the position of having anyone say

20   that their due process rights were, you know, somehow

21   violated because they didn't have sufficient time to present

22   their claims, notwithstanding the existence of a stipulation

23   heavily negotiated that allotted you three hours.  That's

24   just not the way I operate.

25             So that's what we're going to do.  All right.

Page 291

1              Yes, ma'am.

2              MS. GINZBURG:  Your Honor, may I move to the

3      microphone so you can hear me?

4              THE COURT:  Sure.

5              MS. GINZBURG:  Thank you.

6              Good afternoon, Your Honor.  Margarita Ginzburg

7      from Day Pitney.  We represent Fabio Lioti (ph) and my

8      partner, Dan Caraga (ph) was at the pretrial conference last

9      Thursday.

10             I just wanted to raise one very quick procedural

11     point with respect to closing arguments.  Mr. Caraga

12     understood that he could appear to make his closing argument

13     on Thursday.

14             THE COURT:  Yes.

15             MS. GINZBURG:  He reserved ten minutes.  I just

16     want to make sure that that's --

17             THE COURT:  He's very welcome.

18             MS. GINZBURG:  Okay.

19             THE COURT:  All right.

20             MS. GINZBURG:  Thank you very much.

21             THE COURT:  Thank you.  Okay.  All right.  Is

22     everybody clear on what we're doing tomorrow?

23             MS. SOLOMON:  Your Honor, I just wanted to make a

24     point that there was one hour reserved for the represented

25     participants at closing on Thursday.  So I would take it,

Page 292

1    then, is that ten minutes in addition to the hour?

2           THE COURT:  I don't know.  I don't know, but it's

3    ten minutes.  So let's not spend ten minutes talking about

4    it.  So --

5           MS. SOLOMON:  Okay.  Very good.

6           THE COURT:  -- we'll give that party their ten

7    minutes and not deduct it from the hour.  Okay.

8           MS. SOLOMON:  Thank you.

9           MS. GINZBURG:  Thank you, Your Honor.

10          THE COURT:  All right.

11          MR. SCHAGER:  Your Honor, I don't want to stretch

12   your patience and I probably have already.  Mr. Howard --

13          THE COURT:  You --

14          MR. SCHAGER:  -- is available --

15          THE COURT:  You haven't.

16          MR. SCHAGER:  -- for 20 or 30 minutes tonight.

17   And I think the Court would find the testimony useful if

18   it's a -- I would offer it, but it's --

19          THE COURT:  Mr. Miller.

20          MR. MILLER:  We'll suit the Court's pleasure.  I

21   mean, we've --

22          THE COURT:  All right.

23          MR. MILLER:  -- certainly got time for it.

24          THE COURT:  All right.  Twenty minutes it is.

25          MR. SCHAGER:  We would like to call Nicholas

Page 293

1      Howard, please.

2              THE COURT:  Would you raise your right hand,

3      please, sir?

4          (Witness sworn)

5              THE COURT:  Please have a seat.

6      DIRECT EXAMINATION

7      BY MR. SCHAGER:

8      Q    Mr. Howard, thank you for your patience and your

9      participation today.  Could you state your name for the

10     record, please?

11     A    It's Nicholas Howard.

12     Q    And, Mr. Howard, when did you come to work at Lehman?

13             THE COURT:  Can I just -- I'm sorry to interrupt.

14     I'm really trying very hard to keep up with what you folks

15     are doing.  But was Mr. Howard on the witness list?

16             MR. SCHAGER:  Your Honor, originally we schedule

17     -- we proposed a commissioned sales person named Michael

18     Petrochelli (ph) and he was --

19             THE COURT:  Okay.

20             MR. SCHAGER:  -- going to appear by telephone, but

21     given the Court's rules and Lehman's -- or Mr. Miller's

22     letter to the Court, we checked around and Mr. Howard is

23     substituted for Mr. Miller --

24             THE COURT:  Okay.

25             MR. SCHAGER:  -- for Mr. Petrochelli.

Page 294

```
 1              THE COURT:  All right.  I'm sorry.  I just must

 2   have missed that back and forth.

 3        (Pause)

 4              THE COURT:  But there's a declaration of Mr.

 5   Howard.

 6              MR. SCHAGER:  That's correct, Your Honor.

 7              THE COURT:  Okay.  So the testimony is now going

 8   to be in addition to the declaration?

 9              MR. SCHAGER:  Yes, Your Honor.  That was my

10   intention and I'll give you a reason why.  It's -- obviously

11   --

12              THE COURT:  I just -- you know --

13              MR. SCHAGER:  The declaration --

14              THE COURT:  -- I'm trying very hard to be patient,

15   but I just don't understand what's going on at this point.

16   Why do I have a declaration -- Mr. Miller, could -- do you

17   want to help --

18              MR. MILLER:  Your Honor --

19              THE COURT:  -- me out here?

20              MR. MILLER:  Pardon me.

21              THE COURT:  Can you clarify what's going on for

22   me, please?

23              MR. MILLER:  Your Honor, LBHI did not object to

24   this declaration.

25              THE COURT:  Okay.
```

Page 295

1              MR. MILLER:  So we don't know why he now wants to

2      call a witness --

3              THE COURT:  Well, that -- that's what my confusion

4      is.  We -- you didn't object to the declaration so the

5      declaration is in.  So, therefore, it would seem to me that

6      the only thing that there should be is the option with Mr.

7      Miller of cross-examining this declarant.  I don't

8      understand why I have a declaration not objected to and I'm

9      going to hear testimony.  I just don't understand.

10             MR. SCHAGER:  I would say, I'm pretty sure, Your

11     Honor, under the evidentiary procedures order the offering

12     of the declaration was not a waiver of a right to examine

13     the witness.  I know it's unusual, but --

14             THE COURT:  No.  I --

15             MR. SCHAGER:  -- that was the --

16             THE COURT:  No.  I -- I'm not -- that's not my

17     point.  My point is just, you know, the notion that this was

18     going to somehow be a streamline process is now -- has just

19     gone completely by the boards.

20             So why don't you just ask your questions?

21         (Pause)

22             MR. SCHAGER:  I'll do it as quickly as I can, Your

23     Honor --

24             THE COURT:  Very good.

25             MR. SCHAGER:  -- and I --

1            THE COURT:  Go ahead.

2            MR. SCHAGER:  And I would ask the Court's

3    permission to approach the witness and hand him --

4            THE COURT:  Yes.

5            MR. SCHAGER:  -- Exhibit CLX-88.

6            THE COURT:  Okay.

7            MR. SCHAGER:  And I will offer it to the Court if

8    the Court doesn't have it.

9            THE COURT:  Please.

10       (Pause)

11   BY MR. SCHAGER:

12   Q    Mr. Howard, good afternoon.  We'll be as quick as we

13   can and thank you again for your forbearance.

14            Can I take you to -- can I ask you to look at page

15   9 of 20 at the top of what I've given you as CLX-88?

16   A    Page 9?

17   Q    That's the page entitled, proof of claim at the top.

18   A    Oh, okay.

19   Q    And we're going to do this in a shorthand version, Mr.

20   Howard, but is it correct to say that the handwriting on the

21   form is your handwriting and the rest of the form was on the

22   form when it was given to you?

23   A    That's correct.

24   Q    So it was Lehman who told you to file as a Schedule G

25   executory contract claim, correct?

1    A    Correct.

2    Q    Okay.  May I -- again, accelerating the process I would

3    like to ask you to look at page 15 of 20 of CLX-88.

4              MR. SCHAGER:  Your Honor, I will note in the

5    record that we have a similar form in the record already.

6    It was attached to the faxed stipulation agreed to by the

7    parties.

8              THE COURT:  Okay.

9              MR. SCHAGER:  Okay.  So this is just Mr. Howard's

10   individual circumstance, but it goes across the board to all

11   the commissioned sales people.

12             THE COURT:  Okay.

13   BY MR. SCHAGER:

14   Q    Mr. Howard, sorry.  Before we get to the form, when did

15   you come to work at Lehman Brothers?

16   A    February 1993.

17   Q    And what was your position when you came there?

18   A    Managing director.

19   Q    Okay.  And you were still there at the time of the

20   bankruptcy, correct?

21   A    Correct.  Yes.

22   Q    And what was your position at Lehman Brothers during

23   the years 2003 to 2008?

24   A    I was managing director in the commissions paid sales

25   group.

Page 298

```
 1    Q    And at one point you were a sales manager for the
 2    commission-paid sales group; is --
 3    A    I was.
 4    Q    -- that correct?
 5    A    Yes.  Correct.
 6    Q    And when did that position end?
 7    A    Early 2003.
 8    Q    Early 2003.
 9    A    Yeah.  Correct.
10    Q    So for 2003 to 2008 you were a commissioned sales
11    person?
12    A    Correct.  Yes.
13    Q    Okay.  Thank you.
14              What I've pointed out to you on page 15 of 20 of
15    CLX-88, Mr. Howard, is that form familiar to you?
16    A    It is.  Yes.
17    Q    Did you receive those every year?
18    A    I did.
19    Q    Did you receive them more often than once a year?
20    A    We actually received these on a monthly basis.
21    Q    On a monthly basis.
22    A    Yeah.
23    Q    Okay.  Thank you.
24              I would like to direct your attention to -- well,
25    let's go to the right-hand side just for purposes of
```

Page 299

1  identification.  The first entry on that form called, year

2  total, $719,000, can you tell me what that number is?

3  A    Yeah.  That is the gross production number.  And what

4  does that mean?  It means the amount of commissions that

5  were generated by myself in that month, in December,

6  December '07.

7  Q    And the line below it is called net -- sorry.  Two

8  lines below that is average rate.  Is that the basis of your

9  compensation --

10  A    Correct.

11  Q    -- the average rate?

12  A    That's a 13 percent payout on the 719,000 produced.

13  Q    Okay.  And where does that number show up in the --

14  sorry.  Where does that 13 percent figure show up on the

15  form as your monthly income?

16  A    Well, it shows up on this form on the third line.

17  Q    Great.

18  A    Well, that's the percentage and then if you drop down

19  three or four lines to go to, total sales compensation, you

20  get that -- that's the total sales compensation number.  And

21  that's broken into two parts:  One is the cash commissions,

22  which is what I received at the end of each month on a gross

23  basis before taxes; and then the second piece is the cash

24  that was held back that would be held for the next five

25  years and would then be used to buy the restricted stock

Page 300

1    units, which would then convert into stock.

2    Q    Now that's the line you're referring to as the equity

3    accrual calculated, correct?

4    A    Correct.  Yes.

5    Q    Okay.

6    A    The way this worked was that the commissioned salesmen

7    would receive 13 -- in that month I received 13 percent of

8    the total production and that was broken into Item 1, cash

9    commissions that I actually directly received right then.

10   That was the cash that was received in -- by Lehman.  So

11   Lehman would receive in 719 -- sorry.  I would generate

12   719,000 of commissions for Lehman.  Lehman would pay me 13

13   percent of that, which totaled the cash -- which was the

14   cash commissions and also the line which is known as equity

15   accrual calculated.  That was also cash commissions, but it

16   was being held over for the next five years until conversion

17   date.  But it was actual -- it was -- you know, that was

18   real cash that went -- that came to Lehman and then I got a

19   percentage of it.

20   Q    Okay.

21   A    And then Lehman held a smaller percentage of that for

22   the five-year period.

23   Q    Okay.  Let me ask you to explain that to the Court.  If

24   you've got a million-dollar sale --

25   A    Yeah.

Page 301

1   Q     Sorry.  Let me withdraw that and ask what sales

2   business did you do?

3   A     Well, I was in the equity sales business and I did --

4   an easy example for the Court would be if -- let's just say

5   Client X, Client X purchased a million dollars worth of

6   General Motors.  The commission on that -- let's again keep

7   it easy -- would be 100,000 to Lehman.  It wasn't 100,000,

8   but let's just for the sake of explaining it easily it was

9   100,000.  The salesman would get -- again, to keep it easy

10  -- we'll say he would get ten percent.  Five --

11  Q     I'm going to interrupt you and ask, the ten percent was

12  an agreed upon rate between you and Lehman?

13  A     Yes.  I mean, I'm just simplifying it.  As you see --

14  Q     Right.

15  A     -- on the sheet it was actually 13 percent in December

16  of '07.

17  Q     And that was written down between you and Lehman that

18  your commission was 13 percent or ten percent in your

19  illustration?

20  A     It would vary depending on the product mix that the

21  salesman sold.  But that -- you know, the calculation that

22  month it came out to 13 percent.  So, you know, there was an

23  agreement that certain percentages would be paid on those

24  commissions.  And, you know, it just happened that the

25  average that month was 13 percent.  The next month may have

Page 302

1    been a little higher, may have been a little lower.  But it

2    was in that sort of band, sort of ten to 15 percent band,

3    and just depending on the product mix.

4    Q    I'm sorry.  I interrupted you.

5    A    So -- yes.  So if the commission was 100,000, the

6    agreement would be that the salesman would get ten percent

7    of it.  Ten percent would be $10,000.  How would that be

8    paid?  A percent -- part of that would be paid at the end of

9    the month directly out in cash and the remaining cash would

10   be held at Lehman Brothers until it was paid out five years

11   later through --

12            THE COURT:  When you say --

13            THE WITNESS:  -- through the restricted units.

14            THE COURT:  When you say remain in cash, you're

15   referring to the line on the schedule that says equity

16   accrual calculated, correct?

17            THE WITNESS:  Yes.  I am.  Yeah.

18            THE COURT:  Thank you.

19            THE WITNESS:  But if you think in terms of what

20   happened, Judge, it was actually cash that was actually --

21            THE COURT:  Thank you.

22            THE WITNESS:  -- made --

23            THE COURT:  Okay.

24            THE WITNESS:  -- or generated.

25   BY MR. SCHAGER:

Page 303

1    Q    Mr. Howard, I noticed that --

2              THE COURT:  Can I just interrupt you one more

3    time?

4              MR. SCHAGER:  Please do.

5              THE COURT:  So for calendar year 2007, then, your

6    total cash compensation, the numbers are a little blurry.  I

7    can't tell if that's a six or an eight, 769,331 or 789,331,

8    correct?

9              THE WITNESS:  I'm not quite sure where you're

10   looking at, Judge.

11             THE COURT:  I'm on page 7 --

12             THE WITNESS:  Okay.  Page 7.

13             THE COURT:  -- isn't that where you're looking?

14             MR. SCHAGER:  Well, that's the --

15             THE WITNESS:  This is this page, yes?

16             MR. SCHAGER:  Yeah.  That's --

17             THE WITNESS:  That's the month, Judge, of December

18   --

19             THE COURT:  And I have it -- on the far left it

20   says year total.

21             THE WITNESS:  Ah, yeah.  The year total.  Yeah.

22             THE COURT:  Do you see the year total?

23             THE WITNESS:  Yeah.  That's --

24             THE COURT:  Right.

25             THE WITNESS:  -- that's December to December,

Page 304

1    correct.  Yeah.

2              THE COURT:  Yes.  So for 2007 cash that you

3    actually got was, I can't tell if it's an eight or a six,

4    789,331, correct?

5              THE WITNESS:  Correct.  Correct.  Yes.

6              THE COURT:  And the next line, the 362, the equity

7    accrual, that's the RSU component, correct?

8              THE WITNESS:  Yes.  That -- what I was trying to

9    explain, Judge, was that it was actually cash generated by

10   clients for Lehman Brothers passed through in terms of -- in

11   the form of commissions.  That was hard cash that was then

12   set aside to buy the RSUs in five years' time, to buy the

13   stock --

14             THE COURT:  That's your --

15             THE WITNESS:  -- in five years' time.

16             THE COURT:  -- understanding, correct?

17             THE WITNESS:  Correct.  Yes.

18             THE COURT:  Go ahead.

19   BY MR. SCHAGER:

20   Q    Well, it -- on your example of a million-dollar product

21   --

22   A    Yes.

23   Q    -- and a hundred -- a ten percent commission, there's

24   no ambiguity that the client paid that commission to Lehman

25   Brothers, correct?

Page 305

1   A    Correct.

2   Q    And there's no ambiguity -- you had an agreement that

3   your commission from Lehman was 13 percent --

4   A    Correct.

5   Q    -- in -- based --

6   A    Yeah.

7   Q    -- on the -- on the riding (sic) year?

8   A    Yes.  Correct.

9   Q    Okay.  And Mr. Howard, I notice in the equity accrual

10  calculated under December, November, October and September

11  of 2008 there's a zero. I think the answer to that is

12  obvious, but can you explain to the Court why there's a zero

13  there for equity accrual calculated?

14  A    Well, that was the month that Lehman went -- you know,

15  filed for bankruptcy.  And obviously there was no cash

16  available on the cash commission line and there was no cash

17  available for -- on the equity accrual lines.

18  Q    Okay.  Now --

19  A    And they -- if I can just add, that's because those

20  items were paid out -- calculated and paid out at the end of

21  the month. If you would look up to the top of the month

22  you'll see that before Lehman filed I had actually generated

23  319,000 in commissions.  But there was actually no cash to

24  be paid out because there was no cash.

25  Q    Okay.  Thank you.

1           Was there an RSU program when you went to work at

2    Lehman?

3    A    Not in 1993. I don't recall exactly when it was

4    started, but as Ms. Fleishman said it was soon after the

5    IPO.  I think it might have been 1996 or something like

6    that.

7    Q    Okay.

8    A    1997.  But I don't --

9    Q    And I won't go too long.

10   A    -- precisely recall.

11   Q    We're accelerating this and I'm not going to go through

12   all the questions.  But you had no choice about

13   participating in the program; is that correct?

14   A    Correct.

15   Q    Okay.  And there was no negotiation about the duration

16   of the five-year period or the portion that would be held --

17   withheld for RSUs --

18   A    Correct.

19   Q    -- and so forth?  Okay.

20           MR. SCHAGER:  Now, Your Honor, there's -- at a --

21   an issue here that arises as a result of the partial

22   settlement that was discussed in earlier today and in the

23   hearing, there was a partial settlement of Mr. Howard's

24   claim that I think the Court should understand because it

25   relates directly to an argument that has appeared in the

Page 307

1    briefs and was eluded to this morning saying, under certain

2    circumstances it might not be an LBHI claim.  It would be an

3    LBI claim.

4              And I raise the subject first with the Court

5    anticipating -- well, asking whether there's an objection to

6    my going into that settlement agreement.  It's been

7    discussed openly in court and --

8              THE COURT:  Well, I don't know what you could

9    possibly ask this witness that would have a bearing on that

10   since it all is after the fact.  I don't understand what

11   question you could ask Mr. Howard that would elicit

12   admissible evidence on -- with respect to that point.

13             MR. SCHAGER:  Should I offer an explanation or

14   just ask the question?

15             THE COURT:  Well, Mr. Miller, do you know where

16   this is going?

17             MR. MILLER:  I'm not certain that we're

18   communicating and I'm not certain where he's going.  He is

19   not a Neuberger Berman employee.

20             THE COURT:  Yes.

21             MR. MILLER:  So this doesn't have anything to do

22   with the Neuberger Berman payments.

23             THE COURT:  Right.  Well --

24             MR. MILLER:  You're referring to a settlement.

25   You mentioned LBI --

Page 308

1              MR. SCHAGER:  I'm sorry.

2              MR. MILLER:  Okay.

3              MR. SCHAGER:  LBHI.

4              MR. MILLER:  All right.  I'm intimately familiar

5     with the LBHI settlement issue.  I wouldn't be familiar with

6     LBI because --

7              THE COURT:  Right.

8              MR. MILLER:  -- as we all know that's a different

9     --

10             THE COURT:  Different case.

11             MR. MILLER:  -- a different process.

12             The settlements were supposed to be confidential,

13    but I -- if the Court wants to know what the settlement was

14    that was offered, we're happy to go into it with the Court.

15    But I --

16             THE COURT:  I don't --

17             MR. MILLER:  -- I don't understand what the

18    relevance is.

19             THE COURT:  I don't understand what the relevance

20    is.  I just don't understand what the relevance is to -- you

21    put Mr. Howard on to talk about his compensation arrangement

22    and his understanding of it as it occurred in the years

23    leading up to going into bankruptcy.

24             So now you've identified a subject matter that is

25    wholly outside the scope of that and I don't know what this

Page 309

```
 1    witness could tell me on that subject that I would find

 2    admissible or relevant.

 3              MR. SCHAGER:  Well, that's a question to me, Your

 4    Honor, so I'll try answering it --

 5              THE COURT:  Yeah.

 6              MR. SCHAGER:  -- and that is that this equity

 7    accrual calculating line that we're looking at --

 8              THE COURT:  Yes.

 9              MR. SCHAGER:  -- was accrued and this -- it showed

10    on this statement and a portion of that for the 2008 year

11    was paid.  And it was paid directly by LBHI.  And now that

12    we're encountering an argument that, oh, it's really an LBI

13    obligation, you shouldn't be here, but it's not really an

14    LBI obligation.  It's an LBHI obligation.  That's -- that

15    would be the subject of the testimony that I would be

16    eliciting.  And that's been the subject of one of the other

17    declarations as well.

18              I'm -- I --

19              THE COURT:  Why don't you just ask the questions

20    because I'm not -- I'm not at all following what you're

21    saying.  So you can just ask the questions.

22    BY MR. SCHAGER:

23    Q    Mr. Howard, the year total equity accrual calculating

24    shown on the page that we've been looking at is $362,9000.

25    A    Uh-huh.
```

Page 310

```
 1    Q    IS that correct?

 2    A    Correct.

 3    Q    Okay.  Now did you receive a grant of RSUs in 2008?

 4    A    Yes.

 5    Q    Do you recall how big it was?

 6    A    I don't precisely.  No.

 7    Q    Okay.  Do you recall a settlement proposal made to you

 8    by LBI regarding the 362,000 accrued in 2008?

 9    A    Yes.

10              MR. MILLER:  Excuse --

11              THE COURT:  Okay.

12              MR. MILLER:  Excuse me.  First of all, if that's a

13    settlement at LBI (indiscernible) --

14              MR. SCHAGER:  I misspoke.  I apologize.

15              MR. MILLER:  That's a settlement by LBHI.  We

16    would point out that any settlement would be under Rule 408

17    --

18              THE COURT:  It would.

19              MR. MILLER:  -- and we would object to it as being

20    offered as some sort of admission --

21              THE COURT:  Right.

22              MR. MILLER:  -- which seems to be what it's being

23    offered for.

24              THE COURT:  So that's --

25              MR. MILLER:  So if he has some other rule outside
```

Page 311

1   of 408 --

2          THE COURT:  Right.

3          MR. MILLER:  -- you know --

4          THE COURT:  That's classic 408.

5          MR. SCHAGER:  Classic 408, Your Honor,  I agree,

6   except that it was openly discussed in court and I thought

7   it was --

8          THE COURT:  When was it --

9          MR. SCHAGER:  -- it was relevant.  But if --

10         THE COURT:  When was it -- no. It was not openly -

11  - when was it openly discussed in court?

12         MR. SCHAGER:  In the last conference before Judge

13  Peck.

14         THE COURT:  Well, now we're really kind of off the

15  reservation.  I was obviously not at the last conference

16  before Judge Peck.  So if there was some sort of an explicit

17  waiver of 408 protection of a settlement offer, then I'm

18  going to have to be shown that because what you've just gone

19  into is classic 408, classic, and I would be surprised,

20  although I'm happy to be educated on the point.  If someone

21  has a transcript to show me that there was a 408 waiver,

22  then, you know, I can look at that.  But you can't --

23         MR. SCHAGER:  Withdrawn.

24         THE COURT:  -- charge me with knowledge of

25  something that happened before the case was assigned to me.

Page 312

1          MR. SCHAGER:  Withdrawn, Your Honor.  I'm sorry to

2     have engaged in the distraction.  I thought it would be --

3          THE COURT:  Okay.

4          MR. SCHAGER:  -- helpful.

5     BY MR. SCHAGER:

6     Q    Mr. Howard, one last couple of questions here --

7          THE COURT:  I mean, you -- no.  Just let me say

8     that, you know, the purpose of 408 is to encourage

9     settlement.  And it goes without saying that the Lehman case

10    is of, you know, epic and unprecedented proportions, and

11    that in the course of the five years that it has unfolded,

12    there have been any number of settlements where Lehman is

13    making a cost benefit calculation as it's entitled to do.

14         To take any settlement discussions as evidence of

15    the underlying merits or not of a claim would be wrong in

16    the absence of an explicit waiver of the 408 protection.

17    And on that point I couldn't be more clear.

18         So --

19         MR. SCHAGER:  Your Honor --

20         THE COURT:  -- I'm going to leave it at that

21    unless somebody wishes to pursue it further.

22         MR. SCHAGER:  I have no desire to pursue it

23    further.

24         THE COURT:  Okay.  All right.  Then are you done

25    with this witness?

1          MR. SCHAGER:  No.  I have one more question.

2          THE COURT:  Go ahead.

3    BY MR. SCHAGER:

4    Q    And that is, Mr. Howard, how much of your compensation

5    was withheld for equity accrual calculated as of August of

6    2008?

7    A    It was -- well, I guess you can see it on the sheets

8    here.  For that year the commission percentage was 13

9    percent.  And, you know, the back of the envelope

10   calculation, if you go down to the cash commission and the

11   equity accrual piece it's about 30 percent.

12   Q    Okay.  Mr. Howard, I'm going to refer you to page 13 of

13   20 of this exhibit.  That's your handwriting.  It's

14   identified at the top, 13 of 20.

15   A    Yes.

16   Q    Okay.  The other Item A-1, you have an entry there in

17   the grid, value of the award units as $1,980,000.  That's

18   the value of your RSU claim?

19   A    Correct.  Yes.

20   Q    Okay.  Now that might refresh your recollection, but if

21   you had gone to work for a Morgan Stanley or a Goldman Sachs

22   in January of 2008, what would it have cost you in terms of

23   what you left behind at Lehman?

24   A    Well, it would have cost me the 1.9 million that's on

25   the page here.

Page 314

1   Q    Was it really an option to leave Lehman at that

2   expense?

3   A    Well, I could have left Lehman, but I would have -- I

4   could have left Lehman and walked away from the 1.9 million

5   or I could have gone to another firm, but, you know, they

6   would have to have come close to matching that otherwise it

7   would have been an uneconomic proposition.

8   Q    Did you have any discussions with any firm about hiring

9   on with them and leaving Lehman?

10  A    No, I did not.

11  Q    Okay.

12          MR. SCHAGER:  No further questions, Your Honor.

13          THE COURT:  All right.  Mr. Miller, any cross-

14  examination?

15          MR. MILLER:  Very briefly, Your Honor.

16          THE COURT:  Okay.

17  CROSS-EXAMINATION

18  BY MR. MILLER:

19  Q    Mr. Howard, you had worked for Lehman, I believe, from

20  1993 through 2008; is that right?

21  A    Yes.  Correct.  February 1993.

22  Q    And you -- your compensation was production based for

23  that entire time period?

24  A    No, it was not.  I was salary bonus up until 2003.

25  Q    Till 2003.

Page 315

1    A    Yeah.  So from 1993 to the beginning of 2003.

2    Q    All right.  And you talked about a cash portion in --

3    when we were looking at this page, that is 15 of 20 in the

4    exhibit that's before you.

5    A    Yes.

6    Q    All of the figures here started out as cash, didn't

7    they, in the sense that they -- that's the way Lehman got

8    paid was cash?

9    A    Yes.  That's right.

10   Q    So the difference between the 13.71 percent and the 100

11   percent, which is in 76.3 percent right, that was also cash

12   that came into Lehman, right?

13   A    Could you repeat that, please, sir?

14   Q    Yes.  Lehman got all of the cash for December '07 with

15   regard to this production commission --

16   A    Yes.

17   Q    -- that's at the top?

18   A    That's right, 719,000, et cetera, yeah.  Correct.

19   Q    So this amount that you said was equity accrual

20   calculated, that's no more cash than anything else in this

21   column right, or less cash.  It was all cash.

22   A    It was all cash.  Yes.

23   Q    It started as cash.

24   A    Yeah.  It started as cash.  Lehman would have received

25   719,000 and they paid to me the -- of the line item that's,

Page 316

1    I think it's 69,000 and they would -- which they would have

2    received as part of the 719,000.  And then they would have

3    held the 25,000, which they would also receive as part of

4    the 719,000.

5    Q    All right.

6    A    But the 25,000 would have been kept.  You know, they

7    would have got -- that was cash that came in.  It was then

8    held back to purchase stock at a later date.

9    Q    You say it was held back.  You don't actually know as a

10   matter of fact what Lehman did with that cash, where it put

11   it, right?

12   A    I was not -- no.  I -- yeah.  It was very, very

13   absolutely, absolutely not.  But we do know that it was cash

14   received.  What they did with it, which account they would

15   put it into, it presumably would go into a bank account for

16   Lehman Brothers somewhere because that was cash that came

17   into the firm.

18   Q    All right.  Now starting in 2003 you got monthly

19   production statements; is that true?

20   A    Yes.  That's correct.

21   Q    And each month when you got a production statement it

22   had the equivalent of this line for equity accrual

23   calculated, right?

24   A    Yes.  That's correct.

25   Q    So starting in 2003 you understood every month you were

1    having part of the commission was being put into this equity

2    calculated accrual category, right?

3    A    Yes.  I knew that.  correct.

4    Q    And you kept coming back and working month after month

5    after month, right?

6    A    Yes.  That's correct.

7    Q    And you understood you were an at will employee in the

8    sense that if you wanted to quit you didn't have a

9    contractual obligation to work for a certain number of

10   months; is that true?

11   A    I was certainly an at will employee.  I don't know

12   whether I would have any contractual obligation to be there

13   another month.  But it was -- it would be a limited period.

14   Q    All right.  And you did understand that one of your

15   options personally was that you could go to another firm and

16   say, I have -- I am valuable and if, assuming you met,

17   whatever restricting covenants you could try to get that

18   firm to compensate you for any deferred awards that you

19   might have at Lehman as an inducement to get you to change

20   firms.  That was an option you had, right?

21   A    That was an option I had.  Yeah.

22   Q    You chose not to take that option.

23   A    Correct.  And one thing I will add to that is that that

24   was a limited option because another firm would look at that

25   amount of money that I would have to be paid and that would

Page 318

1    put them off an employee of Lehman Brothers because the --

2    you know, the money that had been held back that they -- an

3    employee would ask another alternative employer to match

4    would be very substantial.

5              And that's why they were effectively hand -- they

6    were very effective handcuffs because our competitors knew

7    that if they were going to try and bid away our best people,

8    they were going to have to pay a lot of money to do that.

9    So effectively it became a very effective way of keeping

10   people from leaving the firm.

11   Q    Do you know if any other firms in the industry had

12   similar deferred compensation programs?

13   A    Some did, but many didn't.

14             MR. MILLER:  I have no further questions, Your

15   Honor.

16             MR. SCHAGER:  One quick follow up, Your Honor.

17             THE COURT:  Go ahead.

18   REDIRECT EXAMINATION

19   BY MR. SCHAGER:

20   Q    Mr. Howard, when you referred to the hiring firm hiring

21   an employee and having that expense to look at, would the

22   hiring firm be looking at the market share of the RSUs --

23   sorry -- the market share of the stock underlying the RSUs

24   or the grant value?

25             THE COURT:  You don't mean the market share.

Page 319

1              THE WITNESS:  Market value you mean.

2              THE COURT:  You mean the market price.

3              MR. MILLER:  Objection, Your Honor.  Foundation.

4    I don't know how he can know what another firm would be

5    looking at.

6              THE COURT:  Don't --

7              MR. SCHAGER:  That was the question that -- I was

8    just following up on the last question that was asked, Your

9    Honor.

10             THE COURT:  Well, he -- the statement was made

11   that -- the statement was made that the reason that he had

12   to stay at the firm was because it would be too costly to

13   leave, right?  So he doesn't -- I don't think there's any

14   foundation for knowing how the other firm would calculate

15   it.  But the better question, frankly, is when you saw this

16   amount being accrued, at what price did you think it was

17   going to convert into stock?  How did you think that --

18             THE WITNESS:  Well --

19             THE COURT:  -- that number --

20             THE WITNESS:  Yes.

21             THE COURT:  -- so a year end of -- at December to

22   December 2008 the equity accrual number is $362,000.

23             THE WITNESS:  Correct.

24             THE COURT:  Then what would happen if the Lehman

25   stock price went down, all right, after that date?

1                THE WITNESS:  Yeah.

2                THE COURT:  Would you still be entitled to

3      $362,000 of Lehman stock or did you get a grant of Lehman

4      stock in the amount of $362,000 on that date and you would

5      follow the stock price down as it went down?

6                THE WITNESS:  From my memory, Your Honor, what I

7      would look at would be the at the end of, for example, '08,

8      if the firm had still been --

9                THE COURT:  Right.

10               THE WITNESS:  -- in business, I would -- you know,

11     the documentation that would come to me would be the --

12     there was going to be $362,000 worth of cash would be

13     translated into so many units.  Those units -- I would be

14     eligible for those units in five years' time.

15               THE COURT:  At what price?  How many -- how would

16     you calculate the number of units?

17               THE WITNESS:  Well, if you go to --

18               THE COURT:  It would be --

19               THE WITNESS:  Can I refer you to another page on

20     here?

21               THE COURT:  Sure.

22               THE WITNESS:  Yeah.  If you go to page, what it

23     is, 14 of 20, Your Honor, you will see the same that's

24     referred to as the -- you know, as the grand price and the

25     grant value.  The grant price would be, from memory what --

Page 321

```
 1    what it was when --

 2              THE COURT:  But --

 3              THE WITNESS:  -- you received the -- yeah.  When

 4    you received the --

 5              THE COURT:  That's right.

 6              THE WITNESS:  -- strike.

 7              THE COURT:  Right.

 8              THE WITNESS:  Yeah.

 9              THE COURT:  Right.  And then once it matures, that

10    -- the value -- then there's a column that says grant value.

11              THE WITNESS:  Yeah.  So the --

12              THE COURT:  Right.

13              THE WITNESS:  -- grant value for 2008, Your Honor,

14    if the firm --

15              THE COURT:  It's just --

16              THE WITNESS:  -- had still been in business would

17    have been $362,000 at whatever the -- you know, if the firm

18    had been in business at $20 a share --

19              THE COURT:  Right.

20              THE WITNESS:  -- that would have been the grant

21    price.

22              THE COURT:  Right.  But then -- then later on if

23    all had gone -- if Lehman had continued in business, that

24    block of stock that had a value of 362 at the time of the

25    grant would be worth more or less depending upon --
```

Page 322

1             THE WITNESS:  Correct.

2             THE COURT:  -- what the Lehman share price did in

3       those ensuing years, right?

4             THE WITNESS:  Correct.  Yes.

5             THE COURT:  Okay.  Okay.

6             Yes, Mr. Miller.

7             MR. MILLER:  I just had one follow up question.

8             THE COURT:  Go ahead.

9       CROSS-EXAMINATION

10      BY MR. MILLER:

11      Q     With --

12            MR. MILLER:  May I --

13            THE COURT:  Yes.

14      Q     With regard to this page you just called the Court's

15      attention to, Mr. Howard, this right column is cut off.  Do

16      you see that?

17      A     On 14 of 20?

18      Q     Yes.

19      A     It is.  Yeah.  Yeah.

20      Q     I notice that this shows as of August 31st, 2008.  Do

21      you see that?

22      A     At the top, yes.  I see that.  Yeah.

23      Q     Was this market value as of August 31st, 2008?

24      A     Yeah.  That was -- that would have been the market -- I

25      think, I think, I'm pretty sure that's what it would have

Page 323

1    been because --

2    Q    Okay.

3    A    -- August -- by August the 31st the stock was a very

4    low price.

5    Q    So this appears to be the market value that's been cut

6    off on this page at 14 cents and a fraction a share?

7    A    That's correct.

8    Q    So I assume if we expanded that out to the market value

9    we're going to see that it's a very low relative total; is

10   that right?

11   A    Yes.

12   Q    Do you have any --

13   A    On August the 31st it was a low price.

14   Q    Do you have any idea of what that is?  The 63

15   something, is that thousands?  That's certainly not

16   millions, at the bottom.

17   A    That is a very low number so I would think it's six --

18   6863 or something like that.

19   Q    All right.

20   A    Six -- 6,000.  Yeah.

21   Q    So each year when you got this one of the things it

22   calculated was it calculated the market value of those units

23   at that date; is --

24   A    Correct.

25   Q    -- that right?

Page 324

1    A     Yes.  That is correct.

2    Q     So you could track those units as they progressed

3    toward the five-year mark?

4    A     Yeah.

5    Q     And at this point the value had dropped to under

6    $10,000, for all --

7    A     Correct.  Yes.

8    Q     You do understand that this motion is going to allow

9    you to still have whatever value those units have if they

10   were stock.  Did -- do you understand that?

11   A     Yes.  If it was stock, but my -- I think my argument

12   I'm making here, I think we're making, is that that we were

13   owed the cash that had been accrued, clearly accrued under

14   that other page in the documents we've seen here.  That was

15   money owed.  And that money owed would -- was -- would be

16   held at Lehman and put -- the stock would be purchased five-

17   years out.

18   Q     Can you direct the Court or us to any written document

19   that had ever told you that you were going to have the

20   option to get cash instead of this stock if Lehman -- if the

21   stock got to be very valueless?

22   A     Was there any documentation?

23   Q     Yes.  Do you have any documentation where anybody ever

24   said, if the stock goes down in value, we'll give you the

25   cash that was -- that the -- the cash accrual calculated --

Page 325

1    let me get the right term.  I'm sorry; that you could get

2    the equity accrual calculated as cash if the stock price

3    dropped?  Did you ever see that --

4    A    I think it was well understood that the RSUs were

5    looked at as IOUs.  That was money owed to the employees.

6    Q    But weren't they IOUs for stock?  They were -- that you

7    were owed stock, common stock?

8    A    They were IOUs for the cash that was -- had been

9    generated by the sales people and was being held at the firm

10   for the use down the road to run the business and also

11   including to pay out the stock that was owed to the

12   employees under the documentation.

13   Q    And can you point us to any written statement of that

14   -- to that effect; that this was a cash amount that was owed

15   to the employees?

16   A    I think it was understood that it was a cash -- there

17   was cash that was -- it was owed to the employees until it

18   was converted -- until there was a conversion five years

19   out.

20   Q    Okay.

21        MR. MILLER:  I pass the witness, Your Honor.

22        THE COURT:  All right.  We're going to be done for

23   today.

24        Thank you, Mr. Howard.  You can step down.

25        THE WITNESS:  Thank you.

Page 326

1           THE COURT:  And I'll see you folks at ten o'clock

2   tomorrow morning.  You can just tidy up and you can leave

3   your things in here overnight.  We'll lock up later.  All

4   right.

5           (A chorus of thank you)

6           THE COURT:  You can leave your things.  Yes.

7           Any -- yes, ma'am.

8           MS. KREIGER:  I'm just really confused as to

9   whether I am coming tomorrow or not.

10          THE COURT:  I believe that you're coming at 1:00

11  tomorrow.  No?

12          MR. SCHAGER:  No.  This is --

13          MS. KREIGER:  I'm not Ms. Stiefel.

14          MR. SCHAGER:  -- Karen Kreiger.

15          MR. KAPLAN:  She's not Ms. Stiefel.

16          THE COURT:  I thought that we agreed that Ms.

17  Kreiger was going to be able to testify tomorrow afternoon

18  subject to the occurrence of having too many pro se's and

19  therefore not enough time.

20          MR. KAPLAN:  So we have Ms. Stiefel coming at one.

21          THE COURT:  Yes.

22          MR. KAPLAN:  I asked Mr. Romallo if he could come

23  -- and he's coming at 11 in case we don't have a lot of pro

24  se's we don't have to waste time.

25          THE COURT:  Okay.

Page 327

1          MR. KAPLAN:  So we'll have him as well.  If we

2    have -- if he runs over, then we'll put him on after Ms.

3    Stiefel.

4          THE COURT:  Okay.  And please -- someone tell Ms.

5    Kreiger what you want her to do.

6          MR. KAPLAN:  So I guess after --

7          MR. SCHAGER:  I thought we had an understanding

8    that she was going to testify at ten.

9          MR. KAPLAN:  No.

10          THE COURT:  No, we did not.  We did not have that

11    understanding.  We have the understanding that the pro se's

12    were promised time at ten o'clock and we're going to stick

13    to that.

14          MR. KAPLAN:  All right.  We have to accommodate

15    the pro se's in the morning and only if they don't -- only

16    if they don't have a lot of pro se's and we have free time

17    we'll be able to put witnesses on.

18          MR. SCHAGER:  Well, we'll try to work something

19    out with Ms. Kreiger to have her available.

20          THE COURT:  Okay.  I'll just say it one more time.

21    At ten o'clock in the morning we're going to start with the

22    pro se's, whoever of them arrive.  They were allotted 20

23    minutes each.  They're going to have their 20 minutes each.

24    We're going to go until twelve o'clock.  By my calculation

25    that means we have time for six pro se's.  Then we're going

Page 328

1    to take an hour lunch, then we're going to resume at one

2    o'clock.

3            And the time in the afternoon is going to be

4    determined -- your time which is 100 percent over the limit

5    you were allocated in the stipulation that was heavily

6    negotiated.  The amount of time that you have for your

7    remaining witnesses will be determined by how many

8    additional pro se's we have.

9            All right.  Have a good evening.

10           MR. SCHAGER:  Thank you, Your Honor.

11           UNIDENTIFIED SPEAKER:  Thank you.

12           THE COURT:  Thank you, Francis.  See you tomorrow.

13   (Proceedings concluded at 6:32 p.m.)

14                            * * * * *

15

16

17

18

19

20

21

22

23

24

25

Page 329

1                          I N D E X

2

3                     W I T N E S S E S

4    WITNESS                BY                    PAGE

5    MICHAEL GRAN           MR. SCHAGER           209

6                           MR. MILLER            222

7                           MR. SCHAGER           230

8    SANDY FLEISHMAN        MR. SCHAGER           231

9                           MR. MILLER            259

10                          MR. SCHAGER           267

11   NICHOLAS HOWARD        MR. SCHAGER           293

12                          MR. MILLER            314

13                          MR. SCHAGER           318

14                          MR. MILLER            322

15

16

17

18

19

20

21

22

23

24

25

```
 1              C E R T I F I C A T I O N S

 2

            I, Sheila G. Orms, Dawn South, Nichole Yawn, and Sherri

 3   Breach certify that the foregoing is a correct transcript

 4   from the official electronic sound recording of the

 5   proceedings in the above-entitled matter.

 6   Dated:  April 3, 2014

 7   Shelia G. Orms          Digitally signed by Shelia G. Orms
                             DN: cn=Shelia G. Orms, o=Veritext, ou,
                             email=digital@veritext.com, c=US
 8                           Date: 2014.04.03 15:27:13 -04'00'

 9   Signature of Approved Transcriber

10   Dawn South             Digitally signed by Dawn South
                            DN: cn=Dawn South, o=Veritext,
11                          ou, email=digital@veritext.com,
                            c=US
12                          Date: 2014.04.03 15:27:44 -04'00'

     AAERT Certified Electronic Transcriber CET**D-408

13   Nicole Yawn            Digitally signed by Nicole Yawn
                            DN: cn=Nicole Yawn, o=Veritext, ou,
14                          email=digital@veritext.com, c=US
                            Date: 2014.04.03 15:28:24 -04'00'
15

16   SHERRI L. BREACH

17   AAERT Certified Electronic Reporter & Transcriber

18   CERT*D-397

19   Sherri Breach          Digitally signed by Sherri Breach
                            DN: cn=Sherri Breach, o=Veritext, ou,
                            email=digital@veritext.com, c=US
20                          Date: 2014.04.03 15:29:10 -04'00'

21   Veritext

22   330 Old Country Road, Suite 300

23   Mineola, New York 11501

24   Date: April 3, 2014

25
```