Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    CASE NO. 08-13555-scc

4    - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6

7    LEHMAN BROTHERS HOLDINGS, INC.,

8    ET AL,

9

10                   Debtors.

11   - - - - - - - - - - - - - - - - - x

12

13                        U.S. Bankruptcy Court

14                        One Bowling Green

15                        New York, New York

16

17                        April 3, 2014

18                        10:17 AM

19

20   B E F O R E :

21   HON. SHELLY C. CHAPMAN

22   U.S. BANKRUPTCY JUDGE

23

24

25   ECRO - F. FERGUSON

1   HEARING Re Evidentiary Hearing on RSU Claims

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Sheila Orms and Dawn South

```
 1   A P P E A R A N C E S :

 2   WEIL, GOTSHAL & MANGES LLP

 3        Attorneys for LBHI

 4        767 Fifth Avenue

 5        New York, NY 10153-0119

 6

 7   BY:  TERESA C. BRADY, ESQ.

 8        DENISE ALVAREZ, ESQ.

 9        ROBERT LEMONS, ESQ.

10

11   WEIL, GOTSHAL & MANGES LLP

12        Attorneys for LBHI

13        1300 Eye Street, N.W.

14        Suite 900

15        Washington, D.C.  20005

16

17   BY:  RALPH I. MILLER, ESQ.

18

19   LAW OFFICES OF

20        Attorneys for Compensation Claimants

21        305 Madison Avenue

22        Suite 4700

23        New York, NY 10165

24

25   BY:  LISA M. SOLOMON, ESQ.
```

Page 4

1    STAMELL & SCHAGER, LLP

2         Attorneys for Claimants

3         One Liberty Plaza

4         35th Floor

5         New York, NY  10006

6

7    BY:  ANDREW R. GOLDENBERG, ESQ.

8         RICHARD J. SCHAGER, JR.

9

10   KAPLAN LANDAU LLP

11        Attorneys for Neuberger Berman Claimants

12        1065 Avenue of the Americas

13        27th Floor

14        New York, NY  10018

15

16   BY:  EUGENE NEAL KAPLAN, ESQ.

17

18   LAW OFFICE OF

19        Attorneys for Represented Claimants

20        355 S. Grand Avenue

21        Suite 2450

22        Los Angeles, CA  90071

23

24   BY:  A. JAMES BOYAJIAN, ESQ.

25

Page 5

1   JULIEN & SCHLESINGER, ESQ.

2        Attorneys for Neuberger Berman Claimants

3        207 E. 94th St.

4        Suite 303

5        New York, NY 10128

6

7   BY:  MICHAEL SCHLESINGER, ESQ.

8

9   DAY PITNEY LLP

10       Attorneys for Fabio Liotti

11       One Jefferson Road

12       Parsippany, NJ  07054

13

14  BY:  MARGARITA Y. GINZBURG, ESQ.

15

16  RICH MICHAELSON MAGALIFF MOSER, LLP

17       Attorneys for Claimants

18       340 Madison Avenue

19       19th Floor

20       New York, NY  10173

21

22  BY:  HOWARD P. MAGALIFF, ESQ.

23       ROBERT N. MICHAELSON, ESQ.

24

25

Page 6

```
1                    P R O C E E D I N G S
2              MR. MILLER:  Good morning, Your Honor, Ralph
3    Miller --
4              THE COURT:  Good morning.
5              MR. MILLER:  -- here for LBHI again.  We have had
6    discussions about exhibits, Your Honor, and I think we have
7    a general agreement on what we believe should be admitted.
8    Would the Court like for us to try to read some numbers into
9    the record?
10             The only issue that I'm not certain about is at
11   one point I was told that there was a proposal to admit some
12   exhibits that were not referred to at all.  I believe that
13   maybe we have narrowed that, and if they are -- have those
14   been eliminated, or have we resolved those?  I think some of
15   them may be -- if there are other versions of things that
16   were discussed like other copies of a retention agreement --
17             THE COURT:  Right.
18             MR. MILLER:  -- or something, we don't object to
19   that.
20             THE COURT:  Okay.
21             MR. MILLER:  If there are other examples of
22   program documents, we don't object to that, but if they are
23   -- there also may be a little issue about deposition
24   designations, because we had a designation process, and we
25   don't think undesignated portions should come in, because we
```

Page 7

```
1    have not had optional completeness on those.

2              THE COURT:  Okay.  Yes.

3              MR. GOLDENBERG:  Your Honor, Andrew Goldenberg for

4    the claimants.  Our position is we'd like to include all the

5    exhibits that were marked in the claimant's exhibit list,

6    which include declarations and program documents referred to

7    in the briefs, but may not have been referred to.

8              THE COURT:  Right off the bat, I'm not following

9    you.  What does it mean to say that all of the exhibits that

10   were marked in what?

11             MR. GOLDENBERG:  The claimant's -- as per the

12   stipulation of the procedures order, we submitted an exhibit

13   list with exhibits marked CLX 1 through eighty --

14             THE COURT:  So it's not an exhibit list.  You're

15   just saying that -- I mean, we're back to where we were two

16   days ago.  You're just saying that every single document

17   that is in this book you want admitted into the record,

18   that's what you're saying?

19             MR. GOLDENBERG:  I'm saying every single document

20   that we referred to in our briefs or at this hearing, we'd

21   like in the record.

22             THE COURT:  That's a different statement than the

23   one that you started with.  The one that you started with

24   was, every single document that you put on the list pursuant

25   to the stipulation, which is every single document in these
```

Page 8

1    binders.  I do not know if you've referred to every single

2    one of them, so which is it that you want to do?

3            MR. GOLDENBERG:  We have referred to every single

4    one of them in our exhibit list in either the briefs or at

5    this hearing, so we'd like to enter in all those documents

6    into evidence.

7            THE COURT:  So you think that you've referred to

8    documents CLX001 through CLX0086?

9            MR. GOLDENBERG:  I believe so, Your Honor.  There

10   are declarations and program documents that have been cited

11   in our briefs, and have been filed with the Court.

12           THE COURT:  Okay.  I --

13           MR. MILLER:  Well, Your Honor, I don't think we

14   believe that merely citing an exhibit in a brief is

15   sufficient for us to know that they are introduced.

16           As I say, if they were referred to in the

17   testimony or presented in the argument or they are merely

18   another exemplar of something that was presented to the

19   Court, we don't have a problem, but there is a lot of stuff

20   in there, and if they haven't given us a specific list just

21   to say all of them, we don't believe is in the spirit of

22   what was discussed with the Court at the beginning of this

23   process.

24           MR. GOLDENBERG:  Your Honor, the specific list

25   that Mr. Miller's referring to has been submitted.  It

Page 9

1    includes CLX 1 through I believe 86 or 87, and there are

2    three other documents in addition to that, that was

3    introduced at the hearing.  They were Mr. Howard's

4    declaration, and his proof of claim, as well as Mr. Michael

5    Gran's proof of claim, and designated portions of --

6            THE COURT:  Well, you know, here -- I mean, the

7    problem is that, you know, just paging through this, there's

8    a hearing transcript, you know, there's a 10K, there's --

9            MR. GOLDENBERG:  Your Honor, we just want the

10   record to be inclusive and --

11           THE COURT:  I understand that you want the record

12   to be inclusive, but two days ago, I explained to you that

13   the problem that there is, is that it is impossible, it is

14   just literally impossible for me to read every single one of

15   these pages.  So to the extent that you specifically want to

16   develop an argument related to them, you needed to point

17   them out.  And now all you're doing is saying, there they

18   are, there are the two volumes.

19           So I'm telling you once again that simply, you

20   know, in all of these declarations or most of them, which

21   were written by lawyers, and are not the words of the

22   claimants, if you refer to all of these things, that's fine.

23   But it's not going to happen that I'm going to read every

24   single one of these pages.

25           So, Mr. Miller, I'm sorry, but you know, if

Page 10

1  there's an appeal after this decision, and they determine to

2  fish something out of these documents --

3              MR. MILLER:  Well --

4              THE COURT:  -- you're just going to have to deal

5  with it at the time I guess.

6              MR. MILLER:  Well, Your Honor, we are not agreeing

7  that they should put in these things that were not referred

8  to in the testimony or the category was not discussed in the

9  testimony or in their opening.

10             What we're saying is, is that it should be

11  limited, and I think we have some understanding of the ones

12  that we would object to, and maybe can we talk about those

13  categories?

14             MS. ALVAREZ:  Sure.  I mean, off the top of my

15  head, I can give you an example --

16             THE COURT:  Would you please?  That would be

17  helpful.

18             MS. ALVAREZ:  The 30(b)(6) deposition transcript

19  (indiscernible - away from the microphone) is on the exhibit

20  list.  We've each (indiscernible) specifically designated

21  certain portions of that transcript, and while the entire

22  transcript is on the exhibit list to be admitted.

23             MR. GOLDENBERG:  Your Honor, we would be happy to

24  exclude the entire transcript --

25             THE COURT:  But you --

1            MR. GOLDENBERG:  -- and there are designated

2      portions that we've included as an exhibit --

3            THE COURT:  But there's the point.

4            MR. GOLDENBERG:  -- but -- yeah.

5            THE COURT:  That's the point.

6            MR. GOLDENBERG:  Yeah.

7            THE COURT:  So now what should've been done before

8      is going to have to be done now.  So off the top, we have an

9      example where your response is, never mind, I don't really

10     want that whole exhibit admitted, I just want the

11     designations.

12           So that's the point that Mr. Miller is making is

13     that to go through these one-by-one-by-one, that was what

14     you were supposed to have done before we started here today,

15     and I'm not going to do it now.  We allocated two hours and

16     15 minutes to have an argument, so once again, there's just

17     a complete breakdown of a normal procedure the way a trial

18     is conducted.

19           MR. MILLER:  And, Your Honor, I would note we had

20     proposed by e-mail, and it was late last night that we'd try

21     to meet here 15 minutes before, and we were here, and nobody

22     came.  And there was no discussion before 10 o'clock on --

23     maybe that's not --

24           MR. GOLDENBERG:  That's not accurate.  I had a

25     discussion with Teresa Brady and the claimants agreed to

Page 12

1    allow all the exhibits that Lehman wants to submit into

2    evidence, to allow them to submit it.  There was no

3    objection to any of the documents they want in the record.

4              THE COURT:  But Lehman's exhibit list is a narrow

5    list.

6              MR. MILLER:  Okay.

7              THE COURT:  It's a --

8              MR. GOLDENBERG:  It is, Your Honor.

9              THE COURT:  Okay.  But you made no attempt to --

10             MR. GOLDENBERG:  We would be happy --

11             THE COURT:  -- come up with a --

12             MR. GOLDENBERG:  -- to make a -- we can only -- if

13   you want a limited list, we'd be happy to submit a limited

14   list of only documents that referred to -- that were

15   referred to at the hearing.

16             MR. MILLER:  Could --

17             THE COURT:  Well, you're going to have to do it

18   after today, and then you're going to have to submit it as

19   part of post-trial.  You can send a letter, or you can file

20   a pleading.

21             MR. GOLDENBERG:  If you prefer, we could file the

22   list today, Your Honor, just limiting the documents --

23             THE COURT:  Well, that's fine but you --

24             MR. GOLDENBERG:  -- after we've agreed with --

25             THE COURT:  Well --

Page 13

```
 1              MR. MILLER:  Is there any chance we could work on

 2      this maybe during the day a little bit, Your Honor, and see

 3      if at the end of the arguments, we could come back to this

 4      issue?

 5              THE COURT:  I wanted it to be done even before the

 6      argument.

 7              MR. MILLER:  Yes, we understand, Your Honor.

 8              THE COURT:  I -- you know, I mean, every day

 9      there's just a new unpleasant surprise here.  Mr. Kaplan?

10              MR. KAPLAN:  Your Honor, with respect to the

11      Neuberger list --

12              THE COURT:  Yes.

13              MR. KAPLAN:  -- we've agreed that Exhibits A

14      through O would be admitted as part of the record with the

15      agreement that we will substitute unredacted N and O for the

16      redacted ones.

17              THE COURT:  Okay.

18              MR. KAPLAN:  I had been requested by Neuberger to

19      redact them initially, but since there's been some issue --

20              THE COURT:  Okay.

21              MR. KAPLAN:  -- I will hand Your Honor these --

22              THE COURT:  Mr. --

23              MR. KAPLAN:  -- and there's no proprietary or --

24              THE COURT:  Okay.

25              MR. KAPLAN:  -- ethical information, it's all
```

Page 14

1    benefits.

2            THE COURT:  Okay.  All right.  So, Mr. Miller, is

3    that -- or Ms. Alvarez, is that all right with you folks?

4            MS. ALVAREZ:  Yes.

5            THE COURT:  Okay.  All right.  So that takes care

6    of Neuberger, and the other represented claimants, I don't

7    know how you want to handle this, if you want to --

8            MR. GOLDENBERG:  I can consult with --

9            THE COURT:  Ms. Alvarez.

10           MR. GOLDENBERG:  -- counsel, Ms. Alvarez or Ms.

11   Brady --

12           THE COURT:  Okay.

13           MR. GOLDENBERG:  -- and I can take care of this

14   before the end of today.

15           THE COURT:  Okay.

16           MR. MILLER:  If we can do that, Your Honor, then

17   we'll sort of all know what we're working with.

18           THE COURT:  I agree.

19           MR. MILLER:  That was our hope to do sooner as

20   well, Your Honor.

21           THE COURT:  I agree.  Okay.  All right.  So let's

22   note the time, let's call it 10:30.  So I think, Mr. Miller,

23   we had agreed that you were going to take 50 minutes, right,

24   and reserve 10 for rebuttal net of my taking up a lot of

25   band width, which I'm probably too tired to do, so it's your

Page 15

```
 1    lucky day.

 2              MR. MILLER:  Well, Your Honor, I'm not sure it's

 3    my lucky day.  I'd love to have dialogue with the Court.

 4              THE COURT:  Okay.

 5              MR. MILLER:  Shall I begin?

 6              THE COURT:  Yes, please.

 7              MR. MILLER:  All right.  May it please the Court.

 8              All of the evidence presented over the last two

 9    days has clarified some details of the Lehman equity awards

10    programs.  None of that evidence has conflicted with the

11    undisputed facts and the stipulation that's marked as CL0001

12    or its exhibits.  And all the facts in the record still lead

13    to the inescapable conclusion that the claims before this

14    Court must be classified under the LBHI plan as equity.

15              That's because the stock units and stock awards

16    that give rise to these claims are themselves "equity

17    securities" under the definition in Section 101.16, or

18    alternatively, the claims all arise from the purchase of

19    common stock in the debtor in ways that would require

20    subordination under Section 510(b).

21              Now, there are four topics that Ms. Alvarez and I

22    hope to discuss with the Court in the allotted time.  And,

23    of course, we welcome all questions about anything Your

24    Honor wants to address at any time.

25              First, I want to touch briefly on the evidence
```

Page 16

1    that shows that the restricted stock units and conditional

2    stock awards are "shares in a corporation" or constitute a

3    "similar security" under Section 101.16(a).

4            Second, I want to talk about the claims that are

5    being asserted here, what is the legal theory.  As now

6    characterized by the arguments of the claimants and their

7    lawyers, and as we understand them at this point, and that

8    has been a shifting landscape, and the way those claims all

9    lead back to Section 510(b).

10           Third, my colleague, Ms. Alvarez, is going to talk

11   about the Wage Act claims, and finally, sort of as a follow-

12   up, I plan to address some legal theories that the claimants

13   have offered to try to escape from the ruling of Judge

14   Gonzalez in the Enron case or the words of the Bankruptcy

15   Code, and also talk about some open issues that the Courts

16   or claimants have raised to try to be complete, sort of a

17   mop-up at the very end.

18           So starting with shares in a corporation, let me

19   turn to the definition of equity security, which the Court

20   recalls we had in tab 1 of the opening notebook.  And

21   subsection A refers to a share in the corporation, whether

22   or not transferrable or denominated "stock" or similar

23   security.

24           The evidence has indeed shown that stock units and

25   stock awards were not transferrable, but the statute says

Page 17

1    whether or not transferrable.  So the restriction on

2    transfer cannot, under the plain words of the statute,

3    remove the stock units or stock awards from the definition

4    of equity security.

5            That section also says they don't have to be

6    denominated as stock.  Of course, the word stock is used in

7    both names.  They could also qualify if the Courts finds --

8    if the Court finds that they are similar securities to

9    shares in a corporation.

10           Now, if these stock units and stock awards have to

11   be classified as something, and they do, the evidence has

12   shown that the best summary comes from Exhibit 3 to the

13   stipulation, which is the 2003 equity award program.  This

14   was from the first year in issue here.  And that program

15   document states, "you can consider the RSUs as shares of

16   Lehman Brothers common stock that the firm holds on your

17   behalf for five years, which you will be entitled to receive

18   at a time provided at that time, provided you meet certain

19   terms and conditions."

20           If the RSUs are shares of common stock in LBHI,

21   that the company holds on behalf of the beneficial owners

22   for five years, subject to certain terms and conditions, and

23   then releases as ordinary transferrable common stock, they

24   must be shares in a corporation.

25           The evidence has shown that they were intended to

Page 18

1    give the RSU owners a sense of ownership in the corporation,

2    what Ms. Krieger called skin in the game.  And they, in

3    fact, did that.  That is like common stock.  Their value

4    fluctuated with a value of unrestricted common stock, and

5    was pegged when they were completely unrestricted and

6    transferrable at the value of that stock on that day.

7            They received the same dividends as unrestricted

8    common stock.  They had some voting rights, even though not

9    exactly the same as common stock.  There were a very few

10   circumstances in which they could ever be redeemed for

11   money.  Those were change of control, payment for fractional

12   shares, or a decision, an election really, of LBHI to pay

13   dividends in cash, rather than as more shares.  None of

14   those circumstances is before the Court.

15           So under the program documents, all these

16   claimants were ever entitled to would be common stock.  The

17   stock awards and the stock units matured.  They had various

18   restrictions on them.  They were restricted common stock.

19   Those restrictions dropped away and if the two kinds of

20   requirements were met, they matured into common stock.  They

21   never matured into anything else.

22           Now, I want to use a couple of shorthands here.

23   There was a requirement for continuing work, which I call

24   the tenure requirement, remaining four or five years.  And

25   there were a group of requirements that had to do with not

```
                                                        Page 19
1    going to a competitor and -- that had to do with not

2    engaging in harmful or derogatory activity, I call those the

3    loyalty requirements.  And if the tenure loyalty

4    requirements were met, the removal of the restrictions or

5    conditions was automatic.  No one had to call, no one had to

6    ask, no one had to elect, it just happened.

7            And it happened, and at that point it had tax

8    consequences whether people wanted it or not.  At that

9    point, they had taxable income whether they wanted it or

10   not.  They couldn't say, no, thanks, don't give me stock, I

11   don't want to pay tax on that this year.  There was no

12   choice.  It was automatic.  And the only thing they could

13   ever become was common stock.

14           Now, the claims here are hard to understand, and

15   this was a comment Judge Gonzalez made in the Enron case.

16   He said because there are a lot of pro se claimants, it's

17   really hard to figure out what their claims are.  So I'm not

18   being critical, but that's common.

19           Most of the claim's forms, merely state that the

20   claimants had stock units or stock awards and now they want

21   money.  What this motion will do is give the claimants

22   exactly what the agreements in the program documents

23   promised; equity interest that are precisely the same under

24   the plan as common stock.

25           I do want to make one thing clear --
```

Page 20

1          THE COURT:  But let me stop you on that, because a

2    couple of the claimants pro se unrepresented seem to be

3    making the claim that there's an impossibility situation

4    here.

5          MR. MILLER:  I'm glad you raised that, Your Honor.

6    I do want to make one thing clear that seems to have been a

7    source of some confusion.  The present motion would waive

8    all of the tenure and loyalty conditions and restrictions

9    because some people who got RSUs or CSAs in 2007 could work

10   for five more years.

11         THE COURT:  Exactly.

12         MR. MILLER:  They couldn't stay away from

13   competitors --

14         THE COURT:  Right.

15         MR. MILLER:  -- and they couldn't -- and they

16   didn't have to --

17         THE COURT:  Right.

18         MR. MILLER:  -- avoid derogatory comments.

19         THE COURT:  Right.

20         MR. MILLER:  So they didn't have to meet the

21   tenure or loyalty requirements.

22         THE COURT:  Right.  And those claimants are

23   saying, look, it's -- the bankruptcy rendered the delivery

24   of the promise impossible.

25         MR. MILLER:  But what this motion does is to treat

Page 21

1    every RSU or CSA as if it were a share of common stock.

2    Whether they worked there for five more years or not, in

3    effect, it does what one set of program documents said would

4    happen.

5              The program has always said that the conditions

6    and the restrictions dropped away on death, disability or

7    retirement.  One set of documents also said bankruptcy.

8    That is the rule that the plan administrator has adopted and

9    has followed.  And for 3,500 other claimants, that rule has

10   been applied.  And regardless of how long they worked and

11   regardless of what they did or said, if they got a grant of

12   an RSU or a CSA, they are now on the books and records of

13   LBHI, the same as if they had shares of common stock at the

14   time the Chapter 11 was filed.

15             So that is the impossibility issue.  And it is

16   true that if we were saying, well, you know, if this were

17   American Airlines, for example, and the stock actually had

18   value, and we said, well, you know, if you work there, we're

19   going to waive say just the working requirement, but we're

20   going to check to see if you have loyalty or if you work for

21   competitors.  And they can say, well, I didn't have a

22   choice.  Then we would have this impossibility issue.  But

23   that fact pattern is not before the Court.

24             THE COURT:  So then what do you say to Ms. Krieger

25   who testified that she wanted to be able to sell her RSUs.

Page 22

```
 1    So between the time of the filing and you showed her, I
 2    believe it was Ms. Krieger, I think you showed her a
 3    statement that indicated that the value, the market value of
 4    her RSU holdings, as of August -- I'm going from memory, but
 5    as of immediately prior to the filing was $250 that it was,
 6    I think it was 5 cents was the market rate.
 7          So she says during this entire time, I haven't
 8    been able to sell the interest represented by those RSUs.
 9    What do you say to that?
10          MR. MILLER:  I say to that, Your Honor, that until
11    -- if you watched Too Big to Fail which is at least accurate
12    in part, I'm told, you know that until the Sunday night
13    before the filing early in the hours of Monday morning,
14    September 15, nobody knew whether there would be a Chapter
15    15 or not.
16          THE COURT:  A Chapter 11.
17          MR. MILLER:  I'm sorry, excuse me, a Chapter 11 --
18          THE COURT:  On September 15th.
19          MR. MILLER:  -- on September 15th, I'm sorry.
20          THE COURT:  Oh, I remember.  That was a weekend to
21    remember.
22          MR. MILLER:  And as the Court may know, there was
23    a trading session that was conducted on that Sunday with a
24    number of parties, assuming that there was going to be a
25    Chapter 11 filing that day, and it didn't happen, and all
```

Page 23

1    those trades had to be undone.

2            So the whole world was not sure, and frankly, it

3    teetered on the brink and if what had happened had been what

4    happened to AIG, then Ms. Krieger's 5 cents might well have

5    gone up and she might actually -- we might -- any of us not

6    be here, but that's one of those divisions in the history of

7    time that could've gone either way.

8            On the 15th of September, the value was virtually

9    zero.  So the delay, which is common, once there's a Chapter

10   15 as the Court knows it --

11           THE COURT:  11, Chapter 11.

12           MR. MILLER:  -- takes a little time to sort out

13   what's owed.  The delay in time has caused no damages.  The

14   delay in time is that she is getting exactly the same

15   opportunity to deal with those that she would've then.  She

16   couldn't sell them on September 16th or September 15th, and

17   she can't sell them now, but she still is in the books and

18   records.  She has her number of proportionate units.  And as

19   I said before, if somehow a hidden patent or a great asset

20   or a derivatives recovery or something pours $100 billion

21   into the LBHI estate --

22           THE COURT:  So the shares --

23           MR. MILLER:  -- and it becomes possible --

24           THE COURT:  The plan provides that the shares of

25   the debtor LBHI are now the shares of the reorganized debtor

Page 24

1    LBHI?

2            MR. MILLER:  My -- this is a little complicated.

3    My understanding is that the way the plan works, all the

4    shares are treated as part of an equity pool,

5    proportionately owned, sometimes sort of derogatory, called

6    the Golden Share.  There's essentially one big share --

7            THE COURT:  Right, that own --

8            MR. MILLER:  -- of the -- that the plan

9    administrator holds --

10           THE COURT:  I got it.

11           MR. MILLER:  -- for the benefit of all who have

12   equity interest, all common stockholders --

13           THE COURT:  I got it.

14           MR. MILLER:  -- and everybody who's been

15   reclassified as equity.

16           THE COURT:  Okay.  But the records keep track of

17   the proportionate ownership in that share.

18           MR. MILLER:  Right.  So the 850 shares of that

19   stock certificate Ms. Krieger had, she's got 850 share

20   units, if you will, in the Golden Share.

21           THE COURT:  I see, okay.

22           MR. MILLER:  That's her numerator over the

23   denominator.

24           THE COURT:  Right, okay.

25           MR. MILLER:  Now, Lehman Brothers in Europe is

Page 25

```
 1    solvent.

 2            THE COURT:  Right.

 3            MR. MILLER:  And it's paying -- it's not paying

 4    shareholders yet, but it's, you know, above the solvency

 5    line, and it's still collecting money.  It might pay

 6    shareholders.

 7            THE COURT:  Okay.

 8            MR. MILLER:  If something like that and it owes

 9    some debts back to LBHI, who knows how all this is going to

10    play out.  I mean, the Enron recovery has gone up and up and

11    up over the years.

12            THE COURT:  Well, also the -- I'm familiar with

13    the Adelphia recovery.  Adelphia is now 12 years out, and I

14    think Adelphia is over a hundred cent case as well.  So, you

15    know, I understand your point.

16            MR. MILLER:  Well, so all of those rights are

17    preserved.

18            THE COURT:  Okay.

19            MR. MILLER:  And full performance is still

20    possible.  Nobody has been prevented by impossibility in

21    terms of being able to claim this if it turns out that

22    there's some value.  The impossibility is that the market

23    doesn't give any value to those shares, so there's no way to

24    make them practically marketable, and there's no way to

25    trade them yet.  But it's certainly possible that the plan
```

Page 26

1    administrator, in theory, and I'm getting a little off the

2    reservation, a little off the tracks here, but you know, I

3    believe it's possible that if there certainly were value,

4    there'd have to be some way to distribute that, if I ask my

5    bankruptcy partner on that, if that's true.

6              THE COURT:  Yes, Mr. Lemons.

7              MR. LEMONS:  Robert Lemons for the record.  Yes,

8    Your Honor, if in the unlikely event that there turns out to

9    be surplus value after repaying all the creditors, the money

10   (indiscernible - away from microphone) to the estate, or you

11   know, pay the creditors more than a hundred cents plus their

12   interest entitlements, it would go to the equity, of course.

13             THE COURT:  Okay.  All right.

14             MR. MILLER:  So, in other words, this motion

15   produces complete performance by LBHI of all the promises in

16   the program, and it does not rely on any impossibility or

17   anything that the claimant should have done as a reason to

18   reduce their rights.

19             So -- and that is perhaps why 3,500 other

20   claimants have just chosen not to oppose, and by the way,

21   this reclassification process happened for them much

22   earlier.  The reason it happened so late for this group is

23   because they wanted discovery, and they wanted this long

24   procedure.

25             So this delay is not really the wish of the plan

Page 27

1    administrator.  In fact, the plan administrator would like

2    to reduce reserves, because as they are reclassified as

3    equity, it frees up reserves.

4         So under this analysis, the restricted stock

5    units, and conditional stock awards were always shares in

6    LBHI.  They did have some restrictions and conditions

7    attached, but there are all kinds of restrictions that are

8    commonly applied to common stock, that people get it under

9    certain circumstances, it can be restricted for trading, it

10   can have various sorts of things on it.  Stock can be

11   restricted in small corporations, so it can only be sold to

12   family members.  The fact that stock is restricted doesn't

13   mean it's not stock.

14        And if this is -- this motion is granted, these

15   stock units and stock awards would simply be unrestricted,

16   and they'd be unconditional, and they're the only thing that

17   exists that's an economic equivalent of common shares in

18   LBHI.

19        Now, we know it's disappointing to the holders who

20   would now prefer to have cash, but the stock was always all

21   that was promised, and only employees are entitled to

22   receive under the law.

23        Let me talk a little bit about 510(b).  Now, tab 2

24   in the opening notebook has the full text of Section 510(b).

25   And as the Court knows, subordination is required, it's not

Page 28

1    an option for two kinds of claims.

2            "A claim arising from rescission of a purchase or

3    sale of the security of the debtor," or two, and I'm going

4    to put in an ellipsis in here, "a claim … for damages

5    arising from the purchase or sale of such a security."  Now,

6    the phrase "such a security" is referring back to security

7    of the debtor.

8            Now, we are dealing with two possible securities

9    of the debtor here.  As I say, the stock awards and stock

10   units themselves may be considered securities of the debtor,

11   if the Court agrees that they are within the definition of

12   security, they're certainly not the security of anything

13   else except the debtor.  They couldn't be securities of some

14   other entity.  They weren't securities of LBI, for example,

15   even though they were employees of LBI, they were always

16   LBHI securities.

17           Now, the claimants try to argue that they -- that

18   they're not securities, because they should -- because of

19   the exclusion for "debt or evidence of indebtedness for

20   services rendered."

21           That is an exclusion from the definition of

22   security.  But we believe that that's an incorrect reading

23   of the term indebtedness.

24           Black's Law Dictionary states that the word

25   "indebtedness" means "the condition or state of owing

Page 29

1    money."  That's Black's Law Dictionary, Ninth Edition, 2009.

2            The record could not be more clear, that the

3    program documents only dealt with money in those three

4    narrow circumstances that do not apply here.  It dealt with

5    owing shares of stock.  And that is not indebtedness as that

6    term is commonly understood, and that was not a debt as that

7    term is commonly understood, particularly in bankruptcy

8    parlance.

9            The more compelling point, however, is that the

10   phrase security of the debtor must include the common stock

11   of LBHI.  That's the only security that we could be talking

12   about of the debtor.  It's a predominant kind of security,

13   there may be some others, but certainly common stock is a

14   security of the debtor LBHI, that's beyond question.

15           The issue then is whether under Section 510(b),

16   the Court is facing claims for damages arising from the

17   purchase or sale of security of the debtor.

18           Now, there's no doubt that all claimants are

19   seeking money damages as opposed to say specific performance

20   or an injunction.  Nobody is saying, I want you to give me a

21   piece of paper that says I have RSUs and I have CSAs.  If

22   they want that, we can do that for them probably.

23           THE COURT:  Actually I think -- I mean, it was a

24   little hard to tell, but I think that at least one of the

25   witnesses seemed to be saying that, and I think what you're

Page 30

1    saying is that you're going to do one better, they're not

2    only getting an RSU, they're going to get a share.

3              MR. MILLER:  Well, I don't think there's -- I

4    don't think it's possible to issue a share certificate, but

5    we can certainly get them some statement from the plan

6    administrator I assume that this is --

7              THE COURT:  When I say a share, I mean --

8              MR. MILLER:  Yes.

9              THE COURT:  -- not a piece of paper, but.

10             MR. MILLER:  So what we are talking about here are

11   money claims of some kind, and there's no doubt that all of

12   these claims arise from a program that was designed to lead

13   to the acquisition of a security of the debtor, the common

14   stock of LBHI, which had great value at the time the initial

15   services were provided.

16             Now, I do want to also say that conceptually, the

17   services provided were not just at the time of the initial

18   work.  The services were provided over the whole five years,

19   in terms of tenure and loyalty.  The person had to continue

20   to work there, which was part of the services, and the

21   person also had to refrain from disloyal activity, meaning,

22   going off to the competitors or taking derogatory action.

23             So there were both positive and negative services

24   that went over the whole stretch of the five years.  It was

25   not completely earned, frankly, under the agreements until

```
 1     the end of the five years.  And at that point, the services

 2     purchased a share of common stock.  The deal was, you do

 3     three things, you -- we give you a grant based on whatever

 4     you did in the year of the grant, then you have tenure for

 5     five more years, or your tenure is excused by death,

 6     disability, retirement or bankruptcy, and then you engage in

 7     loyalty over that time period --

 8              THE COURT:  So what you're --

 9              MR. MILLER:  -- unless that's excused.

10              THE COURT:  -- saying in essence, it was not only

11     deferred compensation, but it was that a portion of the

12     services were deferred --

13              MR. MILLER:  Yes, Your Honor.

14              THE COURT:  -- over the five years until the date

15     the restriction fell away?

16              MR. MILLER:  I'm saying that exactly.  It was a

17     complicated purchase agreement.  It was actually -- the term

18     earn-out was used at some point.  It was an earn-out.  It

19     was a period of time over which the results of the work were

20     to have effect.  And we saw, I think Mr. Shotton in

21     particular, illustrated that some of these people had a lot

22     of impact on the results.

23              And whether they continued to perform for five

24     years and their work had a long term success, that was one

25     of the goals of the program was to encourage them to have a
```

Page 32

1   commitment and a long-term commitment, and to stay there

2   long enough to follow-up on their own work.  So it was a

3   complicated purchase, but it was a purchase, it was a

4   purchase of common shares that occurred over a five-year

5   period, and where the payment was labor.

6          Now, this leads up to the Enron case.

7          THE COURT:  Right.

8          MR. MILLER:  And the key term in Section 510(b) is

9   purchase.  And Judge Gonzalez has dealt with that very

10  effectively, and I think some of his words are helpful, just

11  to focus on a couple of sentences.  I particularly commend

12  to the Court pages 150 and 151 in 341 Bankruptcy Reporter.

13         Judge Gonzalez says, "While it is true that the

14  claimants did not purchase the stock options on the open

15  market, they nonetheless exchanged value for the options:

16  Here, their labor.  Such exchange falls under a broad

17  reading of the term 'purchase'."

18         That, I would suggest, Your Honor, is absolutely

19  what this evidence has shown.  There was an exchange.  The

20  exchange of value was service.  As I suggest here, the

21  service was a little different because instead of having to

22  pay an extra amount for the stock options, they paid what

23  amounted to the option price through loyalty and tenure.

24  They continued to render service over the five year period

25  of certain types.  And when the labor was complete, and the

Page 33

1    restraints were complete, they had a purchase.

2           A little later on the page Judge Gonzalez then

3    "That claims alleging the fraudulently induced election of

4    stock options as a part of a compensation package or claims

5    'arising from' the purchase of a security and should thus be

6    subordinated pursuant to Section 510(b)."

7           THE COURT:  So that bit, the fraudulently induced

8    here would line up with the handcuff claims?

9           MR. MILLER:  It would, Your Honor, and it lines up

10   with -- it actually lines up nicely also with the coercion

11   claims.

12          But I want to go along to actually a more specific

13   statement by Judge Gonzalez.  On the same page, he turns to

14   the central argument of the claimants before the Court,

15   including Neuberger Berman claimants.  Here he explains,

16   "Some of the claimants assert a related claim, but highlight

17   a key factual difference.  These claimants argue that they

18   never elected to receive stock options, but rather were

19   required to take a minimum percentage of their annual bonus

20   in stock option form.  This factual distinction, these

21   claimants argue, demonstrates clearly that they did not

22   'purchase' stock options, as there was no voluntary exchange

23   of goods, services, or currency for the options.

24          "While this argument might appear at first blush

25   intuitively reasonable, the distinction is flawed.  Although

Page 34

1    implicit, there is nonetheless a bargain and exchange of

2    value.

3            "Here the exchange was made not at the time of

4    payment but prior to employment.  If these claimants were

5    required to receive a portion of their compensation as

6    options, that was a condition of employment that claimants

7    willingly accepted in return for their labor.  These

8    claimants thus 'purchased' the stock options with their

9    labor.  Therefore, the Court's previous conclusion is

10   equally applicable to this variation on the above theory."

11           THE COURT:  So with respect to the Neuberger

12   claimants --

13           MR. MILLER:  Close quote.

14           THE COURT:  -- so they -- what they say is, I

15   never had a choice because, you know, I was a Neuberger

16   Berman wealth manager, and I was going along and building my

17   book, and then Neuberger Berman went public, and I had to

18   become subject to this restrictive covenant, which I had

19   nothing to say about that, that was the decision of the

20   executive management.

21           And then -- so I did that, and I continued to

22   build my book, and then someone made a decision, not me, to

23   be acquired by Lehman, and I had to sign, in order to do

24   that and get the bonus that I was being given and exchange

25   my shares, et cetera, et cetera, I then had to sign up.

1          So at no point in this, did I have a meaningful

2    choice.  That's the story line of the Neuberger Berman

3    claimants.

4          MR. MILLER:  That's right, Your Honor, and it's

5    basically the same story line as in Enron, except for the

6    fact that there were various break points along the way

7    where people made a decision to keep coming to work.  There

8    are some good examples of those.

9          Mr. Gran, for example, left and came back.  There

10   -- it's been shown repeatedly, and I think actually the

11   testimony of Mr. Ramallo was a perfect illustration of the

12   reality of the fact pattern.

13          He said he was not happy that part of his

14   compensation be paid on a deferred basis in common stock of

15   LBHI, but he accepted that because the rest of the package

16   was such a great opportunity with LBHI, all things

17   considered, that it was more than he could get anywhere

18   else.

19          Now, that was a really acceptance of a condition

20   of employment.  People accept conditions of employment all

21   the time, they get an office that's too small, they don't

22   get their own secretary, they don't get a car, but they

23   decide that the mix of things that they're offered, all

24   things considered is a better use of their time today than

25   an economically where they want to put their time tomorrow,

Page 36

1    and that's exactly what happened here.

2            And in the paraphrasing Too Big to Fail, my

3    partner, Rob Lemons suggested a good phrase to summarize

4    this situation, "Too Good to Leave."  It was just such a

5    great deal, all things considered, that they accepted part

6    of the package that they now say in retrospect they didn't

7    like.

8            Now, the truth of the matter is, this was a great

9    package, and it would've been a great package if Chapter 11

10   had never occurred probably.  If LBHI had become AIG and had

11   come out of the dive and climbed back to altitude, so to

12   speak, then there wouldn't be any unhappiness about this.

13           So they took a risk, and these are risk taking

14   people.  These are people in -- working for an investment

15   banking firm.  They understand that risk.

16           THE COURT:  Well, Ms. Krieger is a risk taking

17   person.  Ms. Krieger seems to have risk follow her around.

18           MR. MILLER:  Well, Ms. Krieger --

19           THE COURT:  And an extremely unfortunate

20   situation, so she learned from her experiences before she

21   came to Lehman that she didn't want to take that risk, and

22   in fact, you know, she was not -- obviously not a portfolio

23   manager, not a wealth manager, and I think her earning

24   levels were, you know, were not in the same category.  I'm

25   not sure that's -- I think that's neither here nor there in

Page 37

1    terms of the issue, but I think you could probably sort

2    through these claimants and find, you know, quite an array

3    of people, you know, in terms of their contribution to the

4    -- you know, to the firm.  But I don't think that that

5    detracts from your point about, you know, you accept with

6    your conduct, you keep working, and you accept some of the

7    good with the bad, and you keep going.

8            MR. MILLER:  Well, I think that's -- Your Honor,

9    the point that I am making is really two points here.  First

10   of all, what she made is sort of an unconscionability

11   argument, although if you read her letter, she did some

12   rather sophisticated analysis of a lot of stuff.

13           THE COURT:  She did, right.

14           MR. MILLER:  We're not talking about people here

15   who are challenged in terms of their ability to read and

16   think.  We're talking about people at a high income levels.

17   We're not talking about having a big box store, at which all

18   the people who stock the shelves were going to be paid in

19   something years in the future they didn't understand what it

20   was or how they were going to get it.

21           THE COURT:  Well, I think --

22           MR. MILLER:  We are talking about mature --

23           THE COURT:  I --

24           MR. MILLER:  -- bright educated people here --

25           THE COURT:  I agree with that.

1           MR. MILLER:  -- Your Honor.

2           THE COURT:  And that's why it was somewhat

3    surprising, frankly, to hear some testimony that I think was

4    sincere and truthful, in which it seemed that some of the

5    witnesses actually believed that there was an account

6    sitting somewhere that Lehman was putting money into with

7    their name on it.  I mean, that was kind of a surprising

8    couple of moments to hear people describe when on the page

9    it says equity, and they say cash, that there seemed to be,

10   and I don't know if this is after the fact, but rather than

11   the words on the page year after year saying equity

12   deferral, that got translated and was said to me as cash

13   withholding.  And that was -- I mean, I guess this is more

14   directed towards those who were going to respond, but that

15   was a very surprising thing to hear from people who are, as

16   you say, very sophisticated all other things being equal.

17          MR. MILLER:  Well, Your Honor, candidly that's

18   what they have to say at this point.  And I mean I'm not

19   saying that they're being insincere, but I mean, their

20   position is, I'm disappointed.  But I would also suggest to

21   Your Honor that what they're really saying is, since I

22   didn't understand this, you ought to set the deal aside and

23   give me my money back.  And that, Your Honor, is rescission.

24          If what they're saying is, I just didn't

25   understand this, it's exactly the same as the fraudulent

Page 39

1   inducement claim that Judge Gonzalez rejected.  Okay.  If

2   you were fraudulently induced, and you want it set aside,

3   you're still subordinated.

4        So it's that cul de sac that Your Honor talked

5   about.

6        THE COURT:  Right.

7        MR. MILLER:  It doesn't make a difference whether

8   they say, I didn't understand the deal, I didn't know what

9   the deal was, I didn't mean to go into the deal, they all

10  understood that although they didn't like it, if it played

11  out as expected, they ended up with common stock and not

12  with money.

13       There's nobody who said, I thought five years from

14  now I was going to get a cashier's check.  There's no

15  evidence of that, no one said I thought I was going to get

16  money or I was going to get a brokerage account that I could

17  write checks on, they all said, yeah, five years from now I

18  was going to get common stock.

19       THE COURT:  So you may be getting to this, and if

20  you are, you can just tell me you are, and I won't ask for

21  an answer right now, but there were a couple of places where

22  the claimants argued or seemed to attach significance to the

23  fact when they got the preprinted claim form from Epiq the

24  field that said basis of the claim was Schedule I think G

25  executory contracts.

Page 40

1              And that that somehow indicates that at that point

2     in time, Lehman thought that these were general unsecured

3     claims.  And then there was also pointing to two paragraphs

4     -- well, there are three related points.  So there's that.

5              There's the paragraphs in the 1997 trust agreement

6     which are at Claimant's 62 that talk about in the event of

7     an insolvency, the trust is subject to the general creditors

8     of the company, there's that.

9              And then three, there's the removal of the

10    bankruptcy specific provisions after 2003.  And kind of

11    that's the body of stuff, and there was also an -- I

12    reference to the statement that says, an RSU does not give

13    you the claims as a shareholder, but I think I've gone

14    through that several times, and I have an answer on that

15    one.

16             But for these other three, I'd like you to respond

17    to why that doesn't add up to something that indicates that

18    these folks have the rights of unsecured creditors.

19             MR. MILLER:  Surely, Your Honor.  Well, first of

20    all --

21             THE COURT:  Or you can keep going, and then just

22    when you get to them in your outline.

23             MR. MILLER:  Your Honor, I'm happy -- I'd rather

24    do them in the order in which you'd like to hear them.

25             THE COURT:  Okay.

1          MR. MILLER:  So let's do them that way.

2          First of all, Epiq is an administrator that is

3    essentially -- was essentially trying to get all the claims

4    in some sort of buckets, and it had to deal with those

5    buckets with a computer.  And so what it did, was to send

6    out preprinted forms so that it would know what to do when

7    they came back and put them in a bucket.

8          The executory contracts bucket meant, these are

9    people who are believed to be making monetary claims for

10   something they said they didn't get because there was no

11   expectation that they were going to ask for stock.  And

12   we're going to have to do some omnibus objections and deal

13   with those.  And that's -- the Court has a series of -- I

14   think it's thirteen different omnibus objections --

15          THE COURT:  Right.

16          MR. MILLER:  -- that calls these various RSU

17   claims to be scheduled and the statement, you know, an

18   opposition, an objection was filed that said, these are

19   equity, you're wrong, they're not money, and 3,500 claimants

20   didn't respond and said, okay, I understand, so.

21          THE COURT:  So the executory contract that -- I

22   mean, Epiq is just an administrator, but be that as it may,

23   they're an agent of the debtor so.  But the executory

24   contract was the equity award program.

25          MR. MILLER:  Yeah.  So the executory contract was

Page 42

```
1    the equity award program and these were people who seemed to

2    be contending that under the equity award program, they had

3    some claim for money.

4              Some of them, you know, by the way, the equity

5    award program is more complicated than just RSUs and CSAs,

6    and there may have been some people who were entitled to

7    some money.  And there could've been a situation where

8    someone had -- where for some part of those programs, they

9    said they were going to pay dividends, and they hadn't paid

10   them.  I mean, there may be things that are not even in our

11   purview.  This was a much, much bigger bucket.

12             THE COURT:  So that was an executory contract that

13   at least at that moment in time, needed to be either assumed

14   or rejected?

15             MR. MILLER:  That was right.  And it also was an

16   executory contract that needed to be dealt with through an

17   objection for reserve purposes.  It had to be reserved --

18             THE COURT:  Okay.

19             MR. MILLER:  -- if it came in and then it had to

20   be addressed.

21             THE COURT:  Okay.

22             MR. MILLER:  It may be Mr. Lemons can also --

23             THE COURT:  You're getting a lifeline from Mr.

24   Lemons.

25             MR. MILLER:  -- speak to this.
```

1           MR. LEMONS:  Your Honor, I heard your admonition

2    on the first day that you don't do doubles, but just to

3    maybe clarify the record a little bit and to what happened.

4           As Your Honor is aware in a case of this

5    magnitude, there is a huge effort made at the beginning of

6    the case to try to fill out the schedules in a timely

7    fashion.  What timely is depends on the size of the case --

8           THE COURT:  Right.

9           MR. LEMONS:  -- and orders of the Court.

10          And the comment, and virtually all large

11   bankruptcy cases, the debtors take a very conservative

12   position as to what they listed on the schedules, they were

13   over inclusive to the extent that there was a choice one way

14   or the other.  And that is why, for example, there was a

15   typical legend on Schedule G saying that the inclusion of a

16   contract or lease --

17          THE COURT:  Right.

18          MR. LEMONS:  -- or other agreement on Schedule G

19   does not constitute an admission that touched a contract.

20   Lease or other agreement is an executory contract was in

21   effect on the applicable petition date, or is valid on

22   (indiscernible - away from microphone).

23          THE COURT:  Right.

24          MR. LEMONS:  So this is just part of the massive

25   administrative effort of trying to sort things into buckets,

Page 44

1    you know, for the debtors to try to figure out what to deal

2    with that happened early in the case.  The proof of claim

3    forms were, as I'm sure Your Honor, you know, can guess,

4    were electronically generated by Epiq, and it was just a

5    computer run, and it printed those.  Those were sent out to

6    all of the potential claimants.

7              THE COURT:  Right.

8              MR. LEMONS:  And they --

9              THE COURT:  Okay.

10             MR. LEMONS:  -- filled them in.  It didn't

11   guarantee them they had a claim, it frankly didn't prejudice

12   them, because these people obviously submitted their claims.

13             THE COURT:  Right.

14             MR. LEMONS:  That's really the sole import and

15   reason why these things ended up marked as, you know, being

16   on Schedule G.

17             THE COURT:  Okay.  All right.  Thank you.  Okay.

18   So the next bit then would be the 19 language in the 1997

19   trust agreement?

20             MR. MILLER:  Yes, Your Honor, and I'm -- I don't

21   know if you have copies of the trust, or if we need to get

22   them --

23             THE COURT:  I have it.  I have it right here.

24             MR. MILLER:  All right.  Let me direct the Court

25   to 304 clauses, and explain what we believe this was all

1    about.

2              First, if you turn to page 2, Section A, the last

3    sentence says, "The trust is not a part of any of the plans,

4    and does not itself provide retirement or other benefits to

5    any participant."  That is a first point here, that the

6    trust is not part of a plan, the trust does not provide any

7    benefits.

8              THE COURT:  Okay.

9              MR. MILLER:  And the trust was not publicized to

10   the participants, it was created internally, essentially for

11   the convenience and the financial planning of LBHI, but it

12   had this obligation to deliver stock in the future, to allow

13   it to purchase stock over time, and hold it to satisfy not

14   only the obligations of the RSU and CSA programs, but a

15   number of other equity award programs, the senior management

16   program, I believe stock options, whatever.  If it needed

17   shares of stock, it was, in effect, stockpiling stock that

18   it might have to deliver later.

19             Now, periods of time had also held little amounts

20   of money because it purchased that stock on the open market.

21   So money was put in, and then was used to purchase at

22   favorable times, the stock on the open market.  So it

23   sometimes held some money.  But it was primarily to hold

24   stock.

25             Now, if you look down below and I'm going to go

1    back to the whereas clause, because I think that explains

2    these, it looked -- on the same page, in subsection 1(e), it

3    says, "The principle of the trust and any earnings thereon,"

4    that would be if it held a little cash and got some

5    interest, "shall be held separate and apart from other funds

6    of the company and shall be used exclusively for the uses

7    and purposes of participants and general creditors as herein

8    set forth."

9            THE COURT:  Right.

10           MR. MILLER:  "Participants shall have no preferred

11   claim or any beneficial ownership interest in any assets of

12   the trust.  Any rights created under the plans in this

13   agreement shall be merely unsecured contractual rights of

14   participants against the company.

15           "Any assets held by the trust shall be subject to

16   the claims of the company's general creditors under federal

17   and state law in the event the company becomes insolvent, as

18   defined in Section 3(a) hereof."

19           Now, in bankruptcy language, the Court will

20   recognize that this is to make sure that if there were a

21   claim for monetary amounts, such as an election that had

22   been made to pay dividends in cash or there had been a

23   change of control, which could by the way be mixed up with a

24   bankruptcy, or there were fractional shares, those would be

25   general unsecured claims, they would not be secured claims

Page 47

1    secured by this trust.  That's what this is talking about.

2    And it was designed to make it clear that any claims for

3    money are unsecured claims.

4            The whereas clause is again --

5            THE COURT:  What about the sentence that says,

6    "any rights created under the plans and this agreement shall

7    be mere unsecured contractual rights of participants against

8    the company"?  What does that sentence mean?

9            MR. MILLER:  Well, that means, Your Honor, that

10   any plan -- any claims that do exist under the plans for

11   money are unsecured claims.  They're not secured claims.

12   That's all it says.

13           THE COURT:  But the claimants are saying that's

14   exactly what they have.  They --

15           MR. MILLER:  They have an unsecured claim for

16   stock, Your Honor, and there was stock in this trust, and

17   they would have an unsecured claim for stock certificates if

18   there was a shortage on that.  They would also have an --

19   but it -- would it be an unsecured claim.  It wouldn't be

20   that they were secured with specific stock certificates, for

21   example.

22           It's not like they would have a preference if

23   stock certificates were not generally available.  And it

24   also, Your Honor, says that again if there were monetary

25   claims, they're not keyed to the money in this trust.  And

Page 48

1    if I can finish with the whereas clause --

2              THE COURT:  Go ahead.

3              MR. MILLER:  -- and what happened to the money, I

4    think this will be even clearer.

5              Back to the whereas clause; the first -- the third

6    whereas clause, which they like to emphasize, "Whereas, the

7    company wishes to establish a trust, and to contribute

8    and/or sell to the trust assets including shares that shall

9    be held therein, subject to the claims of the company's

10   general creditors in the event the company becomes

11   insolvent, as defined herein, until paid to participants as

12   herein defined in such manner and at such times as the

13   company may specify to fulfill the company's obligations

14   under the plans."

15             So the subject to the claims of the company's

16   general creditors was a modifier of the goals of the plan.

17   Meaning that if there is an insolvency, the trust actually

18   goes away, and that's what happened, Your Honor.

19             The trust had a little cash in it, not a little,

20   but not a very large amount, and in the process of

21   administration, the trust was dissolved, and that cash was

22   put back in the general unsecured creditor pool.  That's

23   what was always intended.  It was not held apart, or some

24   other use, it was put back in, and all the documents are

25   designed to work that way.

Page 49

1           THE COURT:  But then why -- it says, "to

2     contribute and/or to sell to the trust assets including

3     shares that shall be held therein subject to the claims of

4     the general creditors in the event of insolvency."

5           So then under that logic, upon the bankruptcy, the

6     shares would get distributed to the general unsecured

7     creditors.

8           MR. MILLER:  Well, the shares were released to the

9     treasury stock I believe.  I'd also point out --

10           THE COURT:  Right?

11           MR. MILLER:  -- Your Honor, that the --

12           THE COURT:  Right?

13           MR. MILLER:  -- claimants are not parties to this

14     agreement.  The testimony shows they didn't even know that

15     the trust existed.  This didn't create any rights of

16     claimants.  What this did was to establish administratively

17     what the company was going to do to plan and deal with

18     various sorts of obligations.  I'm told by the way, there

19     are tax consequences that also impacted how it was

20     structured.  I can't explain those fully, I don't know them.

21           I would point out another paragraph 4 -- on page

22     4, it's in Section 3(a).  It says, "Subject to Section 3(b)

23     hereof, the trustee shall not make any payments if the

24     company is insolvent."  It says it won't pay.  And what it

25     says in Section B on page 4 is, "At all times during the

Page 50

1    continuance of this trust as provided in Section 1(e)

2    hereof, the principal and income of the trust shall be

3    subject to claims of general creditors of the company under

4    federal and state law, as set forth below."

5            And then it has a procedure.  The board of

6    directors and the chief executive officers have to inform of

7    insolvency, and the trust determines whether it's insolvent,

8    and any time the trustee determines it's insolvent in

9    paragraph 3, it's going to discontinue payments and hold the

10   assets for the benefit of the general creditors.  And then

11   number 4, it shall not resume payments until it's determined

12   the company is not insolvent, and thereafter has received an

13   instruction schedule.  And then it has a provision that

14   says, under certain circumstances it can be dissolved.

15           THE COURT:  So now that we're looking at this

16   again, I mean, if you look at Section 3.3, literally read,

17   "If at any time the trust is determined that the company is

18   insolvent," so clearly the company is insolvent, "the

19   trustee shall discontinue payments and shall hold the assets

20   of the trust for the benefit of the company's general

21   creditors."

22           And that seems to suggest that there's a reading

23   that says any shares that were in this trust actually go to

24   the general unsecured creditors.

25           MR. MILLER:  Your Honor, they go back, I believe,

Page 51

1    to the treasury of the company where they'd be subject to

2    the --

3              THE COURT:  To the general unsecured.

4              MR. MILLER:  -- general unsecured creditors,

5    right, and it gets there.

6              THE COURT:  So --

7              MR. MILLER:  But the part of the denominator in

8    the great equity interest.

9              THE COURT:  So then the sentence that says,

10   "any --" I'm back to 1(g), 1(e), "any rights created under

11   this plan, shall be mere unsecured contractual rights of

12   participants against the company."

13             So what's a -- who's a participant under this?

14             MR. MILLER:  I believe participants is defined,

15   Your Honor -- it says defined herein, let me see where the

16   definition is.

17             THE COURT:  You've got to love corporate lawyers

18   who don't put the definitions up front.

19             MS. SOLOMON:  Your Honor, if I may, the definition

20   section is at the end of the document.

21             THE COURT:  Yeah, that's another place they put

22   it, thank you.  Participants shall mean an individual who

23   holds an eligible award or such individuals estate of

24   beneficiaries, eligible award means award under a plan.

25             So that -- so participant, in fact, I think refers

Page 52

1   to an employee who's participating under the equity awards

2   program.  And then the way I think you could read that is,

3   it says, "mere unsecured contractual right".  I mean, I

4   think that's where we started today perhaps that that means

5   that they have a right to compel performance under the

6   contract.  And here performance under the contract is the

7   issuance of the share.

8          MR. MILLER:  I think that's exactly right, Your

9   Honor.  And this -- again, this document is not part of a

10  plan, it didn't contribute -- it didn't create rights.  The

11  participants were not parties, they're not described as

12  beneficiaries.  They are -- and the assets were specifically

13  held for the benefit of general creditors.

14          If the Court should rule that there is some

15  monetary obligation to pay and it's not subordinated, these

16  would be general creditors.  If the Court holds that they're

17  subordinated as equity --

18          THE COURT:  Well, but it also looks like it says

19  that there would be general creditors who have a claim

20  against these assets.

21          MR. MILLER:  These assets are just general

22  assets --

23          THE COURT:  But they're all --

24          MR. MILLER:  -- of the company.

25          THE COURT:  They're all just shares.

Page 53

```
 1              MR. MILLER:  That's true, Your Honor.

 2              THE COURT:  So it kind of -- it's another

 3      circularity, I think.

 4              MR. MILLER:  I believe that's right, Your Honor.

 5              THE COURT:  Okay.

 6              MR. MILLER:  You also asked about the removal of

 7      the bankruptcy provisions.  I think we've talked about that

 8      some, Your Honor.

 9              What those bankruptcy provisions said is exactly

10      consistent with or precisely consistent with what has ended

11      up happening here.  In that what they said was, that

12      bankruptcy was going to work like death, disability or

13      retirement, in that the remaining obligations of tenure and

14      loyalty disappear, just like they do in death, disability

15      and retirement.  And if the company is in a position to

16      issue stock, it was going to try to get out and issue stock.

17      It doesn't say anybody gets money, and it gives a -- kind of

18      a notice that 510(b) may apply or will apply.

19              So it actually has sort of a cautionary statement

20      of the law.  As we discussed, all references to bankruptcy

21      were removed later.  We believe that the -- we don't know

22      why, but we believe the most logical explanation is people

23      decided why are we saying this, you know, if there's a

24      bankruptcy who knows what's going to be happening, and

25      furthermore, the law changes, and we don't want to be giving
```

Page 54

1    legal advice in these documents, we don't have to, so they

2    were just removed.

3          There was no announcement to anyone that there'd

4    been an improvement or enhancement and unlike all the other

5    investment banking firms, if we should become insolvent,

6    you're going to get cash for a -- cash claims for your

7    deferred compensation, that would actually be quite a

8    significant benefit.

9          Someone like Ms. Krieger who had been through two

10   bankruptcies would be really pretty interested in that.  If

11   she were on the line about whether to stay or whether to

12   leave, that might make her stay and that might make her feel

13   even, if it's possible, even more like an owner than she

14   already felt.

15         So it makes no sense that this could be inferred

16   as a change in the program.  There's also -- I mentioned at

17   the beginning, this rule that changes in the plan is going

18   to be made by the committee --

19         THE COURT:  Right.

20         MR. MILLER:  -- committee documents, minutes, all

21   those things have been produced.  There's nothing that

22   indicates that there was any change in the plan --

23         THE COURT:  Okay.

24         MR. MILLER:  -- for the removal of this provision.

25   It is, as she said, the only way you could figure out -- Ms.

Page 55

1    Krieger said, the only way you could figure out about this

2    bankruptcy change was to compare the fine print, as she put

3    it, and see that there was some fine print for a couple of

4    years, and the fine print went away.

5         And it's not appropriate to call that a

6    subordination clause, as the claimants like to.  It's not a

7    clause that says something that wasn't subordinated will

8    become subordinated.  That's under 510(a).  It's not a

9    510(a) clause, it's a 510(b) disclosure or statement, if you

10   will.

11        THE COURT:  Right.

12        MR. MILLER:  And if they say, okay, because I

13   didn't get a 510(b) statement, then the later plan years

14   should be set aside, we have rescission, and we're right

15   back into 510(b).

16        I do want to clarify one point here --

17        THE COURT:  There's one more thing and I'm

18   watching the clock --

19        MR. MILLER:  Yes.

20        THE COURT:  -- and I have taken up a fair amount

21   of your time, but there's one more specific thing that I

22   wanted you to respond to, and that's the November 17th, 2008

23   Q and A that informed the Neuberger claimants that you're

24   going to get cash for your 2008 deferral in January 2009.

25        MR. MILLER:  Yes, Your Honor.  I think that Ms.

Page 56

1    Steiger, actually gave us the facts on that, because she

2    confirmed that this was in the middle of an auction process.

3              UNIDENTIFIED:  Ms. Stiefel.

4              MR. MILLER:  I'm sorry, Ms. --

5              THE COURT:  Stiefel.

6              MR. MILLER:  There's a Ms. Steiger and there's Ms.

7    Stiefel.  I'm sorry, I'm going to get her name --

8              THE COURT:  Stiefel.

9              MR. MILLER:  Stiefel, S-t-e --

10             THE COURT:  Yes.

11             MR. MILLER:  Okay.  I got it.  I'm sorry, Your

12   Honor.

13             Ms. Stiefel I think made it clear that they were

14   in the middle of an option process that Bain and other

15   parties started and there were other people who were looking

16   at it, and then -- and management meanwhile was trying to

17   put together its own plan, maybe not visible to the

18   employees, and management issued the Q and A.

19             And if you look at the rest of the Q and A, which

20   is now unredacted, and I encourage the Court to do that, I

21   just saw it yesterday, you will see that this is a whole

22   bunch of stuff that says, please don't leave.  We're still

23   open for business, we're operating, don't go anywhere.

24   You're going -- things are going to be fine.

25             So this was all management who was in the process

Page 57

1    -- and this was not a debtor.  This subsidiary was not --

2              THE COURT:  Right, so this was not a debtor.

3              MR. MILLER:  This was a non-debtor --

4              THE COURT:  Non-debtor entity.  So --

5              MR. MILLER:  -- subsidiary.

6              THE COURT:  -- therefore, so that gets exactly to

7    my question, which is that -- so these payments are made in

8    January of 2009, at which point in time, management won the

9    auction, right.

10             UNIDENTIFIED:  (indiscernible)

11             MR. MILLER:  Well, Your Honor, management was

12   trying to win the auction, the auction -- I believe the

13   closing had not been --

14             THE COURT:  Okay.

15             MR. MILLER:  -- completed.  I don't -- I have a

16   timeline somewhere.

17             THE COURT:  I don't think the closing was

18   completed, but my question is that, so cash gets paid to

19   these individuals.

20             MR. MILLER:  Yes, Your Honor.

21             THE COURT:  And that cash came out of -- couldn't

22   -- it couldn't be debtor cash, right, because there --

23             MR. MILLER:  Well --

24             THE COURT:  -- would have -- I mean, this is just

25   interesting to me, we're going back in ancient history here.

Page 58

1    So somebody pays these people cash, that's contrary on its

2    face to the existing program.  And now these folks are

3    saying, ah-ha, the fact that we were paid cash demonstrates

4    that we were really entitled to cash.  When what the context

5    indicates is that there was a bidding war, the value of the

6    business as the witnesses testified very clearly, the value

7    of the business resides largely in the relationships, which

8    are tied up because of the restrictive covenants, but be

9    that as it may.

10            So then the management at Neuberger decides, we

11   need to keep these people in place, we're going to pay them

12   this cash.

13            So my question, being a bankruptcy judge is, huh,

14   what was the authority to pay that cash?  This is a dialogue

15   I'm having in my head, right.  And I say, well, wait,

16   Neuberger was not a debtor entity.  Neuberger's not a debtor

17   entity, these employees have shares, RSUs redeemable,

18   convertible into debtor stock.  And yet this payment was

19   made.  Did they seek Court authority?  I'm just sharing with

20   you my little dialogue in my head.  Because was it an

21   unauthorized payment, or did the Lehman -- did the Neuberger

22   management have this right to just pay this cash?

23            So I don't have -- I'm not at the -- I ran out of

24   time talking to myself, and I don't have an answer.  So I'm

25   hoping you can supply me with an answer for how did this

1    come about.

2            MR. MILLER:  Well, I made need assistance again

3    from the real bankruptcy lawyer here, but let me try.  I do

4    have a timeline which I will represent to the Court we

5    believe is accurate.

6            THE COURT:  Okay.

7            MR. MILLER:  In Thanksgiving -- in the

8    Thanksgiving period in 2008, management of Neuberger Berman

9    working with Lehman developed a proposal for a management

10   buy-out of 51 percent of the business with Lehman retaining

11   49 percent of the business.

12           December 1st, 2008, the auction was held, and the

13   management proposal was successful.  And there was an

14   agreement entered into with NBSH Acquisition LLC, which was

15   the acquisition vehicle, which was entered into as of

16   December 1st, 2008.

17           On December 22nd, 2008, the bankruptcy court

18   approves the management buy-out by LBSH (sic) Acquisition,

19   ECF No. 2350.

20           Now, I understand, and I guess our belief is, is

21   that part of that approval was that Lehman was doing

22   something to support the management buy-out, and there was

23   some splitting of the sheets.  There was a division of

24   assets.  And we know that LBHI was the cash manager.  So

25   LBHI had to figure out how much cash went into the new

Page 60

1      Neuberger entity --

2              THE COURT:  Right.

3              MR. MILLER:  -- it had a 39 percent interest in.

4              THE COURT:  Right.  So it was an asset -- it was a

5      stock purchase agreement or an asset purchase agreement?

6              MR. MILLER:  I don't know the answer to that, but

7      I believe it was a separate subsidiary.

8              THE COURT:  It was a separate subsidiary.  Well,

9      I'm not going to guess, but I'm just reacting --

10             MR. MILLER:  Do we know?

11             THE COURT:  -- to your statement that the assets

12     included cash --

13             MR. MILLER:  Well --

14             THE COURT:  -- had to be bucketed, but.

15             MR. MILLER:  Yes.

16             THE COURT:  Okay.  So.

17             MR. MILLER:  And we can check on this, but I am

18     told, Your Honor, that part of the agreement between --

19             THE COURT:  Management.

20             MR. MILLER:  -- Lehman and management was that

21     this production income that had come into the cash accounts

22     of LBHI --

23             THE COURT:  Right.

24             MR. MILLER:  -- all of that production income that

25     was not already drawn down --

Page 61

```
 1              THE COURT:  Right.

 2              MR. MILLER:  -- was going to go to Neuberger to do

 3    with --

 4              THE COURT:  Right.  So --

 5              MR. MILLER:  -- as it wished.

 6              THE COURT:  So --

 7              MR. MILLER:  So management had control.

 8              THE COURT:  -- it's like a post-closing

 9    adjustment.  You have a purchase of a business, and there's

10    a delay between the signing and the closing, and you have to

11    account for the revenue that the business generates between

12    the signing and the closing.  And usually, I mean, I'm not

13    -- I haven't seen it, but I'm talking about how it will

14    usually go, is that part of the purchase price assumes a

15    certain division of that cash flow, and then if it's high or

16    low, there would be a post-closing adjustment to make up for

17    that.  Otherwise, there's no way to really kind of peg the

18    consideration that somebody pays in that kind of a

19    transaction.

20              So I think what you're saying is that the fees

21    begin to continue to generate, and then they followed --

22    they left Lehman and went to Neuberger Berman as of the time

23    it was closed, and that was the cash that -- I mean, this is

24    all with a question mark at the end of it --

25              MR. MILLER:  Well --
```

Page 62

1            THE COURT:  -- that that was the cash.  But also

2    -- so given the time frame and given -- well, it's just

3    interesting to me whether or not at the time, and I still

4    think that probably in that period of time, there was still

5    kind of fog before that was settled over the case.

6            But I just -- no one at the time made a motion to

7    approve the payment of these monies.  Mr. Lemons, did they?

8            MR. LEMONS:  Your Honor, if I may, I was --

9            THE COURT:  In the fog.

10           MR. LEMONS:  Well, I was in the fog of derivative

11   termination notices coming in, so --

12           THE COURT:  Okay.

13           MR. LEMONS:  -- not personally involved in

14   Neuberger.  My understanding of what happened is that, and

15   this will sound a little bit vague, but essentially, there

16   was a sorting out of assets between Neuberger and Lehman

17   that occurred as part of this whole transaction process,

18   assets and cash from Lehman went to Neuberger.  Neuberger's

19   management then did whatever it wanted with that cash.  And

20   it decided to pay these employees this amount because it was

21   Neuberger's cash, a non-debtor's cash, and it was

22   Neuberger's decision.  There was a decision made and no need

23   to seek bankruptcy court approval, because this was an act

24   by a non-debtor outside of the restrictions of 363 and the

25   other restrictions of the Bankruptcy Code.

Page 63

```
 1              THE COURT:  Right.  I mean so that --

 2              MR. LEMONS:  That's the general outline of --

 3              THE COURT:  Yeah.  Well, that's what -- I mean,

 4      that's what I would assume that it was, you know,

 5      Neuberger's cash and they made a decision to do what they

 6      wanted to with it.  But I think -- go ahead, I'm sorry.

 7              MR. MILLER:  And I believe Ms. Stiefel said that.

 8      She said the decision to pay this cash was made by the

 9      management of Neuberger Berman.

10              THE COURT:  Oh, that's clear, but I think what the

11      claimants are asking for is an inference that just based on

12      this answer that if you receive production compensation

13      through the year, and have compensation deferred under the

14      equity award program, those deferrals have been placed in

15      the trust with Wells Fargo, and you're going to get a

16      payment.

17              So I think that that's being cited as evidence of

18      that, when it says equity, it really means cash.

19              MR. MILLER:  Yes, Your Honor, and if you read the

20      whole redacted document, one of the things that you will

21      notice is that there is a statement that they say what's

22      going to happen next year, and then there's sort of a vague

23      statement that says, there's going to be some sort of a

24      deferred compensation program next year.  It doesn't say

25      what I tis.
```

Page 64

1            MR. KAPLAN:  That's the next document.  That's O.

2            MR. MILLER:  Okay.  It's the other document, O.

3       One of those two documents.  Well, it's one of the documents

4       that's been cut into two pieces; is that not true?  I'm

5       sorry?

6            MR. KAPLAN:  The one that was distributed on the

7       17th of November and one that was disseminated on the 31st.

8            MR. MILLER:  Okay.

9            THE COURT:  But why was this -- so why was this

10      produced in a redacted form?

11           MR. KAPLAN:  I was asked by the Neuberger

12      counsel's office that they considered the other parts of it

13      irrelevant --

14           THE COURT:  Right, they considered it --

15           MR. KAPLAN:  -- to the issue.

16           THE COURT:  -- irrelevant because it doesn't

17      reflect favorably on the point that they're to make.  That's

18      not the --

19           MR. KAPLAN:  No, no.

20           THE COURT:  -- standard for redaction.

21           MR. KAPLAN:  No, no, that's not true.  It talks

22      about their travel expenses and what's going to happen in

23      the year 2009.  And they -- and the Neuberger counsel's

24      office, not the claimants, and not me, decided that it

25      should be redacted.  Then when Mr. Miller asked that it be

Page 65

1    unredacted --

2              THE COURT:  Okay.  Just for future reference,

3    that's not the way it works.  If you redact a document it's

4    because you're claiming that it's privileged, under

5    attorney/client privilege or work product or some common

6    interest privilege, not applicable here, or because it

7    contains sensitive proprietary --

8              MR. KAPLAN:  Right.

9              THE COURT:  -- commercial information that would

10   pass the standard articulated under Section 107.  It -- the

11   producer of the document does not get to make the relevance

12   cut, I do.

13             MR. KAPLAN:  Your Honor, I understand that.  The

14   document was produced in discovery without objection.  The

15   first time there was a question about the document was two

16   weeks ago, when I got an objection to it from Ms. Alvarez.

17   And at that I indicated what the other subject matter in the

18   document was.

19             MR. MILLER:  Well --

20             MR. KAPLAN:  And then when we started this

21   hearing, there was an issue about the entirety of the

22   document, and I agreed to produce the entire document.

23   That's how it evolved.

24             THE COURT:  Let's move on.  Go ahead, Mr. Miller.

25             MR. MILLER:  Yes, Your Honor, again, just a couple

Page 66

1    of more points of fact on the timing.  The actual closing I

2    think was May 4th, 2009, so the closing took some time.  I

3    do understand that since that time management has purchased

4    Lehman's business interests over time, and there's an

5    agreement for the remaining interests to be purchased over

6    time, so management will ultimately end up with a hundred

7    percent share.

8              I think when you read those documents in context,

9    as I say, this is a whole series of assurances and one of

10   the assurances is that there will be some kind of deferred

11   compensation.  I would point out that LB -- that Neuberger

12   Berman did not have tradable common stock.  So it didn't

13   really have the option to replace the LBHI program at that

14   point with a common stock program.  It had to deal with

15   cash.  The only way it could do this, it couldn't say this,

16   okay, you're going to Neuberger stock, Neuberger stock

17   didn't exist.

18             So in terms of what was practical for Neuberger if

19   it wanted to retain people, money was the only option.

20             So, Your Honor, I realize our time has been --

21             THE COURT:  Did you have other points that you

22   wanted to make because I --

23             MR. MILLER:  Well, a few other --

24             THE COURT:  -- have rather interrupted you.

25             MR. MILLER:  -- yes, so a few other key points,

1    Your Honor --

2               THE COURT:  Okay.

3               MR. MILLER:  -- that I just want to -- actually

4    what I'd like to do is if we can let Ms. Alvarez talk about

5    the Wage Act for just less than ten minutes.

6               THE COURT:  Sure, okay.

7               MR. MILLER:  And then I have just a few more

8    follow-up points, which --

9               THE COURT:  Okay.

10              MR. MILLER:  -- might take three minutes or five

11   minutes.

12              THE COURT:  Okay.

13              MR. MILLER:  And then I do want to reserve ten

14   minutes if I might --

15              THE COURT:  Okay.

16              MR. MILLER:  -- for whatever may be said that I'm

17   not expecting.

18              THE COURT:  Okay.

19              MS. ALVAREZ:  Good morning, Your Honor.

20              THE COURT:  Good morning.

21              MS. ALVAREZ:  I'll just spend a few minutes on the

22   Wage Act claims.

23              Ms. Solomon clarified earlier this week, if I

24   understood her correctly, that claimants are not contending

25   that the actual RSUs or CSAs are wages, but that claims are

Page 68

1    instead for fixed amounts that were allegedly withheld by

2    Lehman from their compensation.

3            The evidence that we've seen, Your Honor, shows

4    that the claimants were paid their compensation.  Lehman

5    agreed to pay them partly in cash, and partly in these

6    restricted stock units or contingent stock awards.

7            And I'll point you to -- it's Exhibit 1 to the

8    stipulation, so the stipulation is CL001, it's one of the

9    sample employment contracts.  I'm just pointing to the

10   highlighted language that was in the opening statement

11   binders.  It says very clearly, that at the firm's option, a

12   portion of your total compensation may be payable in the

13   form of restricted stock units.  And there's no dispute here

14   that these claimants were paid in restricted stock units.

15           This is not one of those cases as Your Honor

16   pointed out a couple of days ago where an employee of

17   promise to pay a certain amount in cash, and then halfway

18   through the year decided hey, I'm going to withhold, you

19   know, a certain amount of cash and not pay you everything.

20           Lehman was very clear up front in the employment

21   contracts, employee handbooks what was going to be paid, and

22   that a portion would be paid in cash, and a portion would be

23   paid in RSUs or what we would consider equity.

24           Another point I would just like to point out is

25   that to the extent that the claimants are alleging that

Page 69

1    these RSUs are wages, the wage laws provide that unless you

2    have a quantifiable amount, they are not wages.  And a good

3    source for this would be Guiry versus Goldman Sachs, which

4    is a First Department case in New York.  And the vast

5    majority of these claimants were employed in New York State.

6              In Guiry --

7              THE COURT:  But aren't they saying that they do

8    have a quantifiable amount, and the quantifiable amount is

9    the notional value, notional amount of the RSUs that they

10   got during the subject year?  So they got, you know,

11   $500,000 worth of RSUs which was then converted to shares

12   because that's what they did, but they're basically saying

13   that $500,000 is the fixed amount that you should now give

14   me in cash.  Plus I think some of them have indicated that

15   they want interest on that because of the five year old.

16             MS. ALVAREZ:  Right.  The problem with that, Your

17   Honor, is that they were not promised that fixed amount.

18   That amount was used to determine how many RSUs they would

19   be granted.  They would be granted those RSUs, and assuming

20   the necessary conditions were met, at the end of the five

21   year period, that was used to issue common stock.

22             And in the end, the value of their compensation

23   really was the value of the common stock at the end of the

24   five year period.  And, you know, a good example of that was

25   this was the (indiscernible) you referenced earlier that was

Page 70

1    attached to Ms. Krieger's proof of claim form, which is

2    CLX55.

3              By August 31st, 2008, her shares, if issued,

4    would've been worth 5 cents a share, it would've been $205

5    of compensation.  There was no fixed amount at the time the

6    RSUs were issued.

7              And if you look at Guiry versus Goldman Sachs,

8    that's exactly what the Court held.  That case also, Your

9    Honor, involved RSUs that had been issued to a commission-

10   based employee.

11             THE COURT:  Is that in -- is that case in your

12   papers?

13             MS. ALVAREZ:  Yes, it is.  It's in our opening

14   memo on pages 33 and 34.  It's also in our responding --

15             THE COURT:  Okay.

16             MS. ALVAREZ:  -- memo, so it's in both of them.

17             THE COURT:  Okay.

18             MS. ALVAREZ:  And let me just read a quote from

19   that case.  The Court there held that "It is always possible

20   that a deferred award of stock or stock option ultimately

21   will turn out to have no value."  And that wages was not

22   intended to include supplemental income that could prove

23   worthless when ultimately received.  And I think that's just

24   a perfect example and completely analogous to our situation

25   here.

1              The other point I just wanted to point out is

2       there was some argument over the last couple of days about

3       non-disclosure that Lehman didn't disclose enough about the

4       program.  It's clear that every -- at least every claimant

5       who testified here knew that at the firm's option, a portion

6       of his or her compensation could be paid in these restricted

7       stock units or contingent stock awards.

8              Mr. Miller also demonstrated at the beginning

9       during his opening that they were informed of this in their

10      employment contracts, the employee handbook, the program

11      documents that were distributed throughout the years.

12             Your Honor pointed out yesterday that the only

13      evidence of non-disclosure that you had seen related to

14      whether -- what would happen in the event of a bankruptcy.

15             Now, what would happen in the event of a

16      bankruptcy is not the sort of disclosure required by the

17      wage laws.  Typically, these disclosures require, you know,

18      the amounts of the amounts -- the amounts that will be

19      withheld from compensation when they'll be withheld, what

20      they would be used for.

21             What happens in the event of a bankruptcy is

22      essentially legal advice.  And as we know, these were not

23      unsophisticated people, they knew that the price of stock

24      could go up, the price of stock could go down, and yet they

25      continued, they made the decision to continue working for

Page 72

1      Lehman under this compensation scheme.

2              And then the final item that I'd like to point

3      out, Your Honor, is that even if claimants do have a valid

4      claim for compensation in the form of RSUs, that gets us

5      back to 510(b).  That's a damages claim for unpaid comp in

6      the form of RSUs and that arises from the purchase or sell

7      of a security.

8              So -- I mean, and there are several cases.

9      There's obviously Enron.  In --

10              THE COURT:  I think that Mr. Ramallo specifically

11     seemed to be making that claim, but I could be recalling

12     incorrectly.

13              MS. ALVAREZ:  Making which?

14              THE COURT:  The claim that he didn't get the RSUs.

15     It was a little hard to tell, but in any event.

16              MS. ALVAREZ:  Right.  Well, in the end, we think

17     that gets us back to the same cul de sac --

18              THE COURT:  Okay.

19              MS. ALVAREZ:  -- described in 510(b),

20     subordination.

21              THE COURT:  Okay.  Thank you.

22              MS. ALVAREZ:  Thank you.

23              MR. MILLER:  Very briefly, Your Honor, just so I

24     have a full fair opening.  There are a few more points I'd

25     just like to take through in about five minutes or less.

Page 73

1              THE COURT:  Sure.

2              MR. MILLER:  First, there were 3,500 claimants who

3     were reclassified and that included all of the employees of

4     Neuberger Berman except the ten who are here with counsel,

5     and perhaps a few more that are pro se that are hard to

6     identify.  There were about a thousand of those.

7              Those were people who are recognized that they

8     were willing to accept equity and not cash.  So it's -- the

9     3,500 includes a lot of Neuberger Berman people.  I just

10    want the Court to know that.

11             No one complained by the way about this alleged

12    coercion or economic duress in 2003, 2004, 2005, 6, 7 or 8,

13    all the complaints first arose when lawyers were retained,

14    the RSU objections were filed and somebody decided, hey,

15    maybe there's economic duress.  There's not a shred of

16    evidence, nobody's produced an e-mail, nobody's produced

17    anything that said, there was duress, there was

18    unconscionability, there was anything.  There's just nothing

19    in the record about that.

20             And the Neuberger Berman claimants say that they

21    had no choice about changing firms, but no one tried.

22    There's not a person who testified, there's not any evidence

23    that somebody went out and looked.

24             Mr. Shotton who testified got a deal from LBHI

25    when he came over as the global head of risk management.

Page 74

1    LBHI bought out the bonus he left behind at JPMorgan.  There

2    is evidence that that was the practice in the industry.

3            This whole idea that they had handcuffs, what it

4    really meant was, they were not valuable enough anywhere

5    else to get anybody to buy out their prior work, their

6    future potential was not enough to make them more valuable

7    anywhere else.  That was the economics.

8            And so they willingly accepted the condition of

9    employment.  They didn't like it, but they willingly

10   accepted it perhaps and that is the correct test as

11   specified in Enron.

12           Fourth point, if you look at the Twotso

13   declaration, the ten claimants made multiples of their cash

14   compensation in 2003 and later years.  The cash compensation

15   alone put them at the very top of the range of annual

16   compensation in this country.  Their willing acceptance of a

17   condition that they did not like was, on this record, driven

18   by other benefits that far outweighed it.  And that is not

19   economic coercion, there's no doctrine that converts a

20   contract into something else.  A contract for delivery of

21   stock after a five year period with certain performance

22   required into a contract for money that was somehow on a

23   piece of paper at an earlier date, that was used to compute

24   the number of shares of stock.

25           The money here was to convert to shares of stock

Page 75

1    on a date.  And there was the discount.  So it was -- in

2    effect, it was an early purchase of this conditional stock.

3    And so they got the appreciation, they held it literally

4    held for them.

5          The discussion with Ms. Krieger about compensation

6    ratios is a little complex.  But one of the points it made

7    is that the equity awards program actually benefitted

8    employees by letting Lehman compete with others.  All the

9    other firms had these equity awards programs.  If Lehman

10   didn't have one, it either had to pay too high a

11   compensation ratio which had a lot of negative effects, or

12   it couldn't retain and get good people.

13         So the idea that this was somehow harming

14   employees is a misunderstanding.  And there was no trickery

15   here, everything was fully disclosed.

16         By the way, I would note, and I think Mr. Schager

17   may agree with this because we've discussed it, the evidence

18   has not shown any distinction between RSUs and CSAs.  We

19   don't think there's any reason you need to treat them

20   differently.

21         The final point, Your Honor, which I think we've

22   made, but I do just want to make sure it's clear.  All of

23   the arguments lead to what Your Honor called the cul de sac

24   of Section 510(b).

25         The claimants have offered no evidence to get them

Page 76

1    out of that cul de sac.  No legal theory gets them away from

2    the fact that they are seeking either damages or rescission

3    from a complex system that ended up being an exchange of

4    labor for common stock of LBHI.  And that's a purchase of a

5    security of the debtor.

6             They paid with labor, they paid with loyalty, they

7    paid with tenure, which was more labor, and they ended up

8    with common stock.  That's a purchase.

9             It's the same as if somebody agreed to work for a

10   while managing a hotel, and at the end of the time, they'd

11   own the hotel, or managing an apartment and getting free

12   rent.  They exchanged labor for something.

13            THE COURT:  Well, they would say on that one, they

14   would say, but then the hotel burns down.

15            MR. MILLER:  Well, if the hotel burns down, then

16   obviously they have to figure out what the arrangements

17   were.  But this hotel did not burn down and disappear.

18            If the answer was that I get to buy the hotel as

19   is/where is, I get the hotel as is/where is at some point in

20   the future, which -- this was as is/where is stock, they got

21   themselves a burned down hotel, and they've got to buy

22   insurance on it.

23            So, you know, by the way, since I work on the

24   derivatives, I can tell you that these people could've

25   purchased credit protection in Lehman stock, if they liked

Page 77

1    to, insurance was available, if that was their concern, but

2    it cost them money.  And so it is actually possible to

3    insure, now probably in small quantities, but it's possible

4    to do that.

5         All these claims go back to the purchase of these

6    common shares of LBHI.  It's a complicated purchase, it

7    takes five years, but the only outcome is that the claimants

8    get a share of stock.  And that's exactly what the claimants

9    will have if the motion to reclassify is granted, and what

10   35 other claimants have.

11        And the Court talked about the balance in

12   bankruptcy between debt and equity, and if we think about

13   the characteristics of debt, and I know the Court is very

14   familiar with this, it is normally something that either can

15   be determined at the time it's entered into or has a formula

16   that allows it to be determined.  And it's something that

17   does not share in the upside of the business.

18        And the exposure to the downside is limited by

19   going to the top of the priority pyramid.  That's sort of

20   the trade out of debt.

21        On the pure equity end of the spectrum, there is

22   no guarantee that there is -- and so the fixed value of that

23   varies literally minute-to-minute on the stock exchange if

24   you buy stock.  And -- but there's an upside.  It's sharing

25   in the participation, and there's a downside, and in order

Page 78

1    to have people who have the knowledge and want to go into

2    the equity side of the equation, they go to the bottom of

3    the priority period, a pyramid.

4           These awards are clearly on the equity side of

5    that divide.  They had upside, they didn't have a guaranteed

6    amount or a formula, they were knowledgeable people dealing

7    with the business over a long period of time, just like

8    investors select the business.  They are not people who

9    delivered packages for Lehman Brothers because they had a

10   package delivery service.  They were not people who sold

11   food or who delivered electricity, who didn't have the kind

12   of knowledge, and you had a fixed rate, those are on the

13   debt side of the spectrum.

14          So when you look at this, the Enron case is

15   correct, that what 510(b) is about, is about which side of

16   the teeter totter do these rights go on.  And these rights

17   clearly go on the equity side of the teeter totter.  And in

18   that case, they have to wait in line because they had the

19   upside benefit and they didn't have any guarantee, and they

20   knew what they were getting into, maybe they weren't happy

21   about this part of it, but overall they agreed to it.  And

22   under those circumstances, the law requires, it's not an

23   option, and I want to stress LBHI doesn't care which

24   claimants get paid, but it wants to pay the claimants who

25   were entitled to get paid, and not pay claimants who were

Page 79

1   not entitled to get paid the limited cash assets, because it

2   doesn't look like there's going to be enough to go around.

3          And unfortunately, and we are sorry about this,

4   LBHI has concluded and believes the Court should conclude,

5   that these people are on the side, they have to wait in

6   line, to see if there's any money left over for equity.

7          THE COURT:  All right.  Thank you very much.

8          MR. MILLER:  Thank you, Your Honor.

9          THE COURT:  All right.  Would you like to keep

10  going, or would the claimants who are arguing like to take a

11  few minutes break?  Now, that you've --

12         MR. SCHAGER:  Five to 12, Your Honor, I would ask

13  this, what's the backstop for the Court?

14         THE COURT:  Well, I don't think I know what you

15  mean by that.  What I'd like to have happen is that there

16  not be repetition among the folks who stand up.  So have you

17  had a chance to coordinate your remarks?

18         MR. SCHAGER:  I believe we have, Your Honor, yes.

19         THE COURT:  Okay.  All right.  Well, why don't we

20  take one of the 15-minute folks, and then perhaps we'll take

21  a short break.

22         MS. SOLOMON:  Your Honor, (indiscernible).

23         THE COURT:  You had an agreed order.

24         MS. SOLOMON:  That -- yeah, that Mr. Schager would

25  go first and he's the longer one.

Page 80

1            THE COURT:  Okay.  All right.  Then I'm going to

2    need to take a break until five minutes after 12, all right,

3    and then we will start at five minutes after 12, and we will

4    go till we're finished.  All right?

5            Okay.  Thank you.

6        (Recessed at 11:54 a.m.; reconvened at 12:11 p.m.)

7            THE COURT:  And remind me before we depart to have

8    some clarity about the submissions that I'd like you to

9    make.

10           Mr. Schager, for half an hour, yes, give or take?

11           MR. SCHAGER:  Hopefully, you won't have a lot of

12   questions, Your Honor, so I can stretch it out a little bit.

13           THE COURT:  I wouldn't count on that, but go head.

14           MR. SCHAGER:  Your Honor, before I start, I would

15   like to offer to the Court, and I had distributed to

16   counsel, a compilation of statutory provisions and one page

17   of website of history, may I approach the bench and offer

18   it?

19           THE COURT:  Okay.

20           MR. SCHAGER:  It's obviously not evidence, it's

21   just for the convenience of the Court.

22           THE COURT:  Okay.

23           MR. SCHAGER:  Your Honor, it might surprise you to

24   hear that I'm not challenging Enron here today.  I'm not

25   running away from it, I think it's a final decision, I think

Page 81

1      it's completely inapplicable.  I'm also not running away

2      from the statute, and nor are the claimants.  The statute I

3      think is very clear, and that's what we're going to address

4      in my time this morning, my allotment, it's supposed to be a

5      half an hour out of the hour allotted for the claimants.

6              I want to focus primarily on the statutory

7      definitions particularly of equity security and security.

8      And I'm going to start right away with the definition of

9      equity security, because I think it's very clear.  That's

10     tab 1 of the statutory compilation I've just given you.

11             There is no question that the term equity security

12     is a narrower definition than the definition of security at

13     101.49, and that's fine, but the first thing to note in it

14     is what we have highlighted in 101.16(c).  And that is,

15     other than a right to convert.

16             In the fact stipulation, Your Honor, that's part

17     of the record here, that conversion is a negotiated term,

18     but the fact stipulation does contain the concession that

19     what happened with RSUs is that they converted at the end of

20     the hold period.

21             THE COURT:  But there was no right to convert.

22             MR. SCHAGER:  Well, I think -- there was no right

23     to convert, Your Honor?

24             THE COURT:  No, there wasn't --

25             MR. SCHAGER:  There was no right to accelerate

Page 82

1    conversion, that's correct.

2         THE COURT:  No, there was no right to convert.

3    The RSU converts into stock, it's not a right to convert.  A

4    right to convert is you hold a debt security that you can

5    convert to an equity security.  That's a right to convert.

6         The holder of the RSU didn't have any right to

7    convert.  The instrument converted by itself.  So keep

8    going.

9         MR. SCHAGER:  Well, that's an interesting point,

10   Your Honor, but I don't think it's correct, because there

11   were ways to walk away from the RSUs, we've emphasized that.

12        You exercise a right to convert by staying

13   employed and honoring the employment arrangements.  And if

14   we're going to consider that consideration for a purchase as

15   we have talked about elsewhere, that's certainly the ability

16   to get something by performing certain conditions.

17        I think I -- you know, I don't think we can brush

18   it off so easily, Your Honor.  There was a right to walk

19   away, there was a right to stay around, and that staying

20   around ultimately involved the right to convert.

21        But I wanted to call the Court's attention to one

22   other thing, and that is, the rest of 101.16(c), which is

23   the right to purchase seller subscribed to a share.  There

24   is under tab 3, the second page, that's the definition of

25   security from the Bankruptcy Code.

Page 83

1           THE COURT:  Uh-huh.

2           MR. SCHAGER:  And that same language appears in

3    Section 101.15, that's significant to us in terms of looking

4    at stock options.  Right.  So the -- but the language is

5    parallel, 101.49.

6           THE COURT:  So in Enron, were there at RSUs at

7    issue in Enron?

8           MR. SCHAGER:  No, there were not, Your Honor.

9           THE COURT:  There were stock options.

10          MR. SCHAGER:  They were stock options, that's

11   right.  And that's one of the main distinguishing features.

12   But the -- and I want to get that, because that's a very

13   important point for us, but I just wanted to walk right

14   through 101.16, and that is that the -- it's emphasized

15   there that the right to convert is excluded from the

16   definition of an equity security.

17          Now, the argument was made, two arguments were

18   made there that I think I have to address.  One is that A

19   and B, you have -- the RSUs were really a share of stock, or

20   an interest in a limited partnership.  No one is disputing

21   that a share of stock in a corporation or a limited

22   partnership interest is security, also defined that way in

23   101.49(a).  Okay.  It would not make sense to include an RSU

24   that does not have those rights in A or B.  If RSUs fit

25   anywhere in 101.16(a), it would have to fit in (c), and

Page 84

1    that's what brings into focus the right to convert, which is

2    a specific exclusion for something like an RSU that

3    converts.

4              Now, I have also included, Your Honor, the

5    legislative history, the definition of Section -- it was

6    15 --

7              THE COURT:  Where in the organic documents

8    governing RSUs are there -- is there a right to convert?

9    Where is there a right to convert?  Show me.

10             MR. SCHAGER:  In fact stipulation, I believe it's

11   paragraph 3, Your Honor, specifically describes the -- what

12   happens to RSUs at the end of the holding period.

13             THE COURT:  It says --

14             MR. SCHAGER:  Those RSUs get converted.

15             THE COURT:  They convert, right.

16             MR. SCHAGER:  If you meet certain conditions that

17   have been --

18             THE COURT:  Right.

19             MR. SCHAGER:  -- discussed on several occasions.

20             THE COURT:  Okay.  So you've answered my question.

21   There is no right to convert, the instrument, the

22   restriction on the stock unit falls away, and it becomes

23   stock.  It starts out life as a restricted stock unit, and

24   after the satisfaction of the hold period, the time period,

25   the earn-out, however you want to characterize it, it

Page 85

1    converts.  Nobody has to do anything.  Nobody exercises a

2    right.  The restricted stock unit becomes a stock unit.

3    It's not -- does not require a -- the exercise of a right to

4    convert.

5             MR. SCHAGER:  Like a stock option requires an

6    exercise.  I think you're right, Your Honor, and I'm not

7    sure -- I don't think I dispute that.  But I will say, I

8    will point to the legislative history once again for this

9    focus on a right to convert.

10            THE COURT:  Go ahead.

11            MR. SCHAGER:  And the legislative history uses the

12   passive voice.  Securities that are convertible into equity

13   securities are not equity securities until they're

14   converted.

15            THE COURT:  Right.  And the example that's given

16   is such as convertible debentures, which is debt.

17            MR. SCHAGER:  That's correct.

18            THE COURT:  That is describing a conversion from

19   debt to equity, which is a right that somebody exercises.

20            MR. SCHAGER:  There are many kinds of convertible

21   instruments, Your Honor.  The statute itself doesn't refer

22   to debt securities.  The statute says a security with a

23   right to convert.

24            And I don't think the legislative history by using

25   an example of convertible securities effectively amends the

1     statute that said --

2             THE COURT:  Then you shouldn't be using the

3     legislative history at all.  You can read some of the

4     decisions that I've written for my view on legislative

5     history.  My view on legislative history is that when you

6     rarely, if ever, should resort to legislative history

7     because it's unreliable indication of exactly what it is

8     that the drafters of the provision intended.

9             MR. SCHAGER:  Okay.  And I'm not going to dispute

10    that, Your Honor.

11            THE COURT:  Okay.

12            MR. SCHAGER:  I think that's fine, I'm happy to

13    focus on the statutory language.

14            THE COURT:  Okay.

15            MR. SCHAGER:  And the statutory language has

16    nothing about convertible debt.  It says, an instrument with

17    a right to convert, and that's -- and I emphatically think

18    that's what an RSU did, because it didn't just happen

19    automatically under all circumstances.  You had to do

20    something in order for that conversion to take place.

21    That's the whole logic that we've been talking about in

22    terms of this so-called purchase with your labor in Enron,

23    which I have some other distinctions about.

24            But that's what happens here.  There is a right to

25    get those shares if you stay around long enough and perform

Page 87

1    your negative covenants.

2              And then I would refer the Court, Your Honor, to

3    Section 101.49.  And in conclusion, on 101.16, obviously is

4    the RSUs as conversion rights are not covered by 101.40 --

5    16.

6              101 --

7              THE COURT:  So just to go back to the point about

8    the right to convert, so you concede that a stock option is

9    an equity security?  Is a stock option --

10             MR. SCHAGER:  Yes, I concede that --

11             THE COURT:  Okay.

12             MR. SCHAGER:  -- the stock option is an equity

13   security, it's right there in 101.16(c).

14             THE COURT:  Okay.

15             MR. SCHAGER:  Yeah.

16             THE COURT:  So with a stock option, where somebody

17   actually has to pay money, right, in order to --

18             MR. SCHAGER:  Critical difference.

19             THE COURT:  -- get the stock --

20             MR. SCHAGER:  Yes.

21             THE COURT:  -- they have to pay money.

22             MR. SCHAGER:  That's right.

23             THE COURT:  Right?  The money doesn't get paid

24   automatically, you have to actually decide I'm going to buy

25   that stock option, I'm going to exercise the right, right?

1          To convert the stock option into stock, I have to

2     affirmatively do that, right?

3          MR. SCHAGER:  Well, I would agree with all of

4     that, Your Honor, except the word conversion.

5          THE COURT:  Okay.  I have to turn the stock option

6     into a piece of stock, right?

7          MR. SCHAGER:  You exercise a stock option, Your

8     Honor, absolutely correct.

9          THE COURT:  All right.  Exercise a stock option.

10         MR. SCHAGER:  Yeah.  Right.

11         THE COURT:  And I have to affirmatively do

12    something.

13         MR. SCHAGER:  Right.

14         THE COURT:  But in the case of the RSUs, where you

15    don't have to pay the money, to get the stock, all you have

16    to do is be around and still be at Lehman, and in fact, you

17    get a bonus, because you're getting the stock at the

18    discount price, you're getting the friends and family

19    discount, that is less of an equity security than the

20    situation where you have to pay money to get the stock.

21         Just walking away from the statute --

22         MR. SCHAGER:  Yeah.

23         THE COURT:  -- the logic of your position is that

24    a right to convert which you say that's not the purchase of

25    an exercise of a stock option, the mere conversion without

Page 89

1    any affirmative act means that an RSU is not an equity

2    security.  But in the case where you actually have to do

3    something or you don't get the stock, that's an equity

4    security.  There's no logic to that.

5              MR. SCHAGER:  Well, the logic is there in the

6    statute, Your Honor.  That's how it's defined.  Yes, an

7    equity -- a stock option is an equity security, that's

8    clear, because it's right there as a right to purchase,

9    which is the black letter law definition of a stock option;

10   a word of -- a right to purchase, sell, or subscribe to a

11   share.

12             THE COURT:  And if you're going down this path,

13   then the counter argument would be that the RSU is a right

14   to purchase a share, which you purchased with your five

15   years of continued labor at LBHI.

16             MR. SCHAGER:  No, I don't --

17             THE COURT:  Well, you can't --

18             MR. SCHAGER:  There is --

19             THE COURT:  You're picking and choosing words

20   right in the same statute.  If you say that there's a

21   warrant or right, and if it's not a right to convert, then

22   it's a right to purchase the stock.  That's what an RSU is.

23   A RSU is a right to purchase the stock with your labor.

24             MR. SCHAGER:  The RSU is a right to receive stock

25   on conversion.

Page 90

```
 1              THE COURT:  Okay.  Why don't you keep going.

 2              MR. SCHAGER:  This may come clear when we look a

 3   little more at the definition of a stock option, and how the

 4   stock options worked in Enron, Your Honor, which is

 5   something that I wanted to spend some time on.

 6              THE COURT:  Mr. Schager, you know, the statutory

 7   analysis is not going to get you there.  There -- I've

 8   listened to two days of testimony.  I've looked at reams of

 9   these documents, okay, there's not been a single shred of

10   evidence, live testimony, or documentary evidence that

11   indicates that any of these people at any level had any

12   reasonable understanding that if they didn't get these

13   shares of stock, they got cash.  That's the fundamental

14   question here, is that the claimants accepted these RSUs,

15   continued to work, in many instances, the five years rolled

16   off.  They got the shares.

17              They continued to work, and it was only when

18   catastrophe struck, that they then constructed an argument

19   that this, in fact, was not an equity deferral program.

20   This was somehow my cash that Lehman withheld from my

21   paycheck, that now in bankruptcy, I should get.

22              Never once, for one second, during all the

23   testimony did anybody indicate any reasonable basis for a

24   belief that there was cash being withheld from their

25   paychecks.
```

Page 91

1               The "Dear Colleague" letters, the glossy

2     brochures, the compensation statements, the way their

3     compensation was treated for the purposes of taxes, every

4     single thing was consistent with the real time understanding

5     that they were getting part of their pay in cash, and part

6     of it in deferred equity compensation.

7               There is nothing, nothing in the record that any

8     of these people in real time believed anything otherwise.

9     Indeed, it would be truly extraordinary for me to find that

10    they did when I am -- when you're talking about the global

11    head of risk management at Lehman Brothers, with an under

12    graduate degree in particle physics, that he didn't

13    understand that part of his pay was in equity.  Okay.

14              The Neuberger Berman broker, who made upwards of

15    $10 million, that he didn't understand that the deferred

16    portion of his compensation was equity, and that there was

17    upside risks and upside gain and downside risk.

18              Ms. Stiefel, she understood it.  She understood

19    it, she just didn't want to give up her well-earned

20    reputation, book of business and livelihood.  There was

21    somebody who clearly loved what she did.

22              Every single one of these witnesses, every single

23    one, not one of them said that they didn't understand what

24    was going on.  Not one.

25              And now we have what amounts to a clever lawyer

Page 92

1   argument based on an incorrect reading of the statute, and I

2   came into this with an extremely open mind, and I've become

3   more and more dismayed as we've gone through these three

4   days.

5           So keep taking me through the legislative history

6   and the statutory definitions, but --

7           MR. SCHAGER:  Well, I'm going to back up a moment,

8   Your Honor.

9           THE COURT:  -- it's not going to get you there.

10          MR. SCHAGER:  I -- well, I'm going to back up a

11  moment anyway because I think there are -- the approach

12  here, defined by Lehman, is that there are one of two

13  reasons that these claims should be basically converted to

14  equity --

15          THE COURT:  Right.

16          MR. SCHAGER:  -- or subordinated to the equity

17  level.

18          THE COURT:  Right.

19          MR. SCHAGER:  One is that there is something to do

20  with the purchase or sell of a security, under 510(b).  And

21  obviously, the central fact is, are these RSUs securities.

22  And the testimony that we had yesterday from every plaintiff

23  about the absence of an investment decision relates directly

24  to whether these equity --

25          THE COURT:  They absolutely made an investment

Page 93

1    decision.

2           MR. SCHAGER:  -- whether these were securities.

3           THE COURT:  Their decision was to continue to

4    work, and accept compensation in the form partially at the

5    firm's discretion, at the firm's discretion in the form of

6    RSUs.  That what -- they made a volitional decision to

7    accept that compensation; not a single one of them had to do

8    it.  Was it a tough choice?  Sure it was.  But they decided

9    to take it.

10          So the fact that they then could not vote at a

11   shareholder's meeting, that doesn't matter.  They agreed to

12   accept compensation in the form of something called a

13   restricted stock unit.  It wasn't called deferred cash

14   compensation convertible into stock, it was called a

15   restricted stock unit.  And every single piece of paper that

16   they got year in and year out talked about it in those

17   terms.

18          MR. SCHAGER:  Your Honor, I was trying to make two

19   points, one on the definition of securities and one on

20   equity security.  But let's turn with what you've just said

21   on the definition of securities.  And there's a whole line

22   of pieces that we've discussed that involve several Supreme

23   Court decisions that say that what the employer is looking

24   at, at the economic -- in the economic reality analysis,

25   it's clear that the employee is selling his labors to obtain

Page 94

1    a livelihood.  And all of these witnesses testified to that.

2              The RSUs were a relatively small part of the

3    overall package, and the fact is, that they were -- they

4    came to Lehman for their careers.  They all testified to

5    that.  I know that you don't like the idea of declarations,

6    but we've got forty of them in there that basically say that

7    and they're uncontested.  (Indiscernible) Lehman --

8              THE COURT:  What's your point?  What's your point,

9    is that they came --

10             MR. SCHAGER:  That if someone comes to work, Your

11   Honor --

12             THE COURT:  Yes.

13             MR. SCHAGER:  -- and the Supreme Court has said

14   that -- that's a Supreme Court's (indiscernible), selling

15   his labors primarily to obtain a livelihood.

16             THE COURT:  Okay.  And the term said --

17             MR. SCHAGER:  So what's granted pursuant to the

18   livelihood, this is the (indiscernible) line of cases that's

19   not a security because there's no investment decision there,

20   your decision is to come to work for your livelihood, for

21   your career.

22             THE COURT:  There's no logic to what you're

23   saying.  There's no logic to what you're saying.  I -- you

24   get a job offer, and you're told, here's the compensation

25   that you're going to be paid.  At that moment in time, you

Page 95

1   decide, huh, do I want to work at One Bowling Green.  Do I

2   want to have this kind of office or that kind of office, do

3   I want to make this much in salary and these benefits.  You

4   have a decision that you make.

5           And in this case, each and every one of these

6   individuals at some point in time, had a decision.  Do I go

7   to work for Lehman, or do I not go to work for Lehman.  Do I

8   go to work for Neuberger Berman, or do I not go to work for

9   Neuberger Berman.

10          There was a lot of talk about handcuffs.  There

11  are no handcuffs.  There were no handcuffs.  There were

12  choices, there were choices.

13          MR. SCHAGER:  There were choices to go to work --

14          THE COURT:  There were cost --

15          MR. SCHAGER:  -- that's correct.

16          THE COURT:  Yes, there were cost benefit choices.

17  So once you get a letter that says, come to work for Lehman

18  Brothers, this is what we're going to pay you, and you

19  accept, that's it.  This was not, and I clarified this at

20  every turn, this was not a bait and switch.  This was not a

21  bait and switch.  This was not come to work for Lehman

22  Brothers, and we're going to pay you $200,000 a year in

23  cash, and then six months in, you get a notice in your

24  paystub that says, we've changed the terms of your

25  employment, we're now going to deduct half of what you would

1   otherwise get and we're going to give you RSUs instead.

2   That is not what happened.

3          MR. SCHAGER:  Your Honor, the -- I'm going to

4   refer you to the Daniel's (ph) case again and many cases

5   that cite it.  That when the employee comes to work, and

6   he's given a job, and a salary or a wage, and he's given an

7   interest in the employee benefit plan --

8          THE COURT:  Yes.

9          MR. SCHAGER:  -- he does not have a right to sue

10  under securities laws for anything that happens with the

11  employment benefit plan because it is not a security.  And

12  it makes no -- that's the line from Daniels and I'll read it

13  again, because primarily --

14         THE COURT:  You can read it --

15         MR. SCHAGER:  -- the --

16         THE COURT:  -- all you want, it's inapposite.  It

17  does not apply to this situation.  It is citing a body of

18  case law that is inapposite to this situation.  You -- what

19  that compares to here is the fact the origin of 510(b),

20  which is you when you have an equity security, you can't

21  convert your claim because your equity security all of a

22  sudden becomes worthless, you can't elevate your claim on

23  your equity security by suing with respect to the purchase

24  or sell of that equity security.

25         So what that line of cases says is that you've got

Page 97

```
 1    to claim for your wages, but you don't get a claim under the
 2    securities laws.  It's the same type of concept.
 3              MR. SCHAGER:  You have a --
 4              THE COURT:  You don't start with something and
 5    then get to elevated, turn it into something else.
 6              MR. SCHAGER:  Well, the holding is you have a
 7    claim for your wages, of course, if they have not been paid,
 8    you have a claim --
 9              THE COURT:  Right.  So here --
10              MR. SCHAGER:  -- for your interest in the pension
11    claim --
12              THE COURT:  -- the claimants --
13              MR. SCHAGER:  -- but it's not a securities claim.
14              THE COURT:  Right.  Here the claimants have a
15    claim for their wages.  They got paid their cash and we've
16    established already that they -- their RSU, the conversion
17    feature fell away as a result of the bankruptcy, and they
18    now have stock.
19              There is -- there are no unpaid wages here.  They
20    got what they were told they were going to get.  Cash and
21    RSUs that become stock after you get through the
22    restrictions.  That's what they were told and that's what
23    they got.
24              Unfortunately catastrophe struck and the stock is
25    not worth anything.  And if they did have those claims then
```

Page 98

1   each and every claimant who accepted stock prior to 2008

2   then one could make the argue they're estopped, they waived

3   it, they accepted it, they wanted it.

4           MR. SCHAGER:  Accepted stock, Your Honor.

5           THE COURT:  Yes, they accepted the stock.

6           MR. SCHAGER:  Right.

7           THE COURT:  They accepted the benefit of being in

8   the program, which was during the years leading up to the

9   bankruptcy the greatest rise in the stock market ever, which

10  then of course precipitously dropped, and they got that

11  stock, those individuals who started and then went into the

12  -- through the bankruptcy.  They got the full benefit of

13  that run up, which now many of them now look back and they

14  say, people should have gone to jail.

15          Okay, well, but they got the benefit, those folks

16  whose RSUs converted prior to the filing they actually got

17  the benefit of that run up in Lehman's stock.

18          MR. SCHAGER:  Well that's --

19          THE COURT:  -- and now -- and then for the extent

20  that they continued and had RSUs that were still restricted

21  they then said no good anymore because it came down.  That's

22  all this case is about.

23          MR. SCHAGER:  Well, the case is about the statute,

24  Your Honor, I'm sorry.  Yeah, of course the people who had

25  their RSUs that converted don't have a claim for equity,

1   they don't -- they're in an equity position because their

2   RSUs --

3            THE COURT:  But what about the --

4            MR. SCHAGER:  -- converted.

5            THE COURT:  What about the --

6            MR. SCHAGER:  That's right --

7            THE COURT:  What about the folks --

8            MR. SCHAGER:  -- in the legislative history with

9   what the statute says.

10           THE COURT:  -- who collected shares and sold them

11  for five or ten years before the bankruptcy, okay?

12           MR. SCHAGER:  And --

13           THE COURT:  And in a regular type of a contract

14  case you would say, waiver, estoppel.

15           You can't accept the benefit of a program and then

16  claim that it's not what it was that entire time.  You can't

17  accept the characterization of it for that entire period of

18  time and then when it becomes less valuable to you you say,

19  forget that history, now what I want is something else.

20           MR. SCHAGER:  All of these people testified, Your

21  Honor, and they did in the declarations as well that have

22  not been rebutted, is that when they had the ability to make

23  an investment decision, a fundamental characteristic of a

24  security as used in 510(b), when they have the ability to

25  make an investment decision they sold.  Prior to having that

Page 100

1    ability they've got some other bundle of rights but they're

2    not securities as defined in the Code.

3             THE COURT:  So what are they?  What is it?

4             MR. SCHAGER:  Well if I could use an illustration,

5    Your Honor.

6             THE COURT:  What is a restricted stock unit

7    awarded pursuant to an equity program?  What is it?

8             MR. SCHAGER:  A restricted stock unit regardless

9    of what it's awarded to.  A restricted stock unit is a

10   contract undertaking, we paid you -- we will pay you in five

11   years for these services that you declared in current year.

12            THE COURT:  We will pay you in stock.  We will pay

13   you in stock.

14            MR. SCHAGER:  We will pay you in a currency called

15   stock, that's correct.

16            THE COURT:  We will pay you in stock, shares of

17   the corporation.  It doesn't say we will pay you in shares

18   of the corporation that we guarantee to you will be at least

19   the issuance amount of these RSUs, otherwise we will pay you

20   in cash.  It doesn't say that.  It says we will pay you in

21   stock at the then prevailing market price.

22            MR. SCHAGER:  Your Honor, there are equity awards,

23   Lehman knew how to issue them.  Mr. Miller has referred to

24   other types of equity and awards that they had.

25            I'll pick an example of restricted stock, because

Page 101

1   that's in the literature that's covered in our brief.  You

2   can issue restricted stock with all the same restrictions

3   that are contained in the RSUs, right?  You can match them

4   up line for line, okay?  Then when the employee receives

5   them he can look at those and say the award was going gain

6   over the next five years, I'd rather pay the income tax now

7   even though it's subject to these restrictions.

8           THE COURT:  That wasn't the deal that each of the

9   claimants signed up for.  They signed up for being paid in

10  cash and restrictive stock units.

11          At that moment in time if that dear colleague

12  letter had said, at the firm's option we're going to pay you

13  with Monopoly money --

14          MR. SCHAGER:  Your Honor --

15          THE COURT:  -- and that employee --

16          MR. SCHAGER:  -- what I'm trying to explore

17  here --

18          THE COURT:  -- and that employee decided to take

19  the job, then at the firm's discretion that employee could

20  have been paid in Monopoly money.

21          There was nothing illegal about the compensation

22  in a restricted stock unit, it didn't say we're going the

23  pay you in -- you know, in contraband, it offered to pay

24  with a perfectly legal form of compensation, a restricted

25  stock unit.

1          And the notion that the lack of an investment

2     decision, that's a red herring argument, because that going

3     in it was clearly explained, for example, you don't have the

4     rights of a shareholder until you get the stock, but the

5     stock -- your stock is going to be placed in trust and a

6     trustee is going to vote on behalf of you, a beneficiary of

7     that pool of stock.

8          That's what you got, that's what they knew they

9     got, that's what they accepted by not leaving the employment

10    of Lehman and by continuing to work.

11         MR. SCHAGER:  The question still, Your Honor, is

12    what that is that they got.  Okay?  And I'm trying -- I've

13    tried to address this in two different ways now, but I'm

14    going go back to the last one that I was dealing with, and

15    that is if you got -- if you really got something, the

16    employee, at the time of the award then he had a right to

17    elect to pay tax on it right then.

18         THE COURT:  So what you're saying is that the --

19         MR. SCHAGER:  And then over the incremental time

20    the increased gain he could get at a capital gain rate that

21    all the employees talked about they're not having that

22    option.  the literature says they don't have that option.

23         THE COURT:  They didn't have that option --

24         MR. SCHAGER:  They didn't have that option.

25         THE COURT:  -- that's exactly right.  The option

1    that they --

2              MR. SCHAGER:  And what does the literature say

3    about why they don't have that option?  It's because they

4    don't have anything exact the contract right to get paid in

5    five years time.

6              THE COURT:  They had the right to not accept that

7    form of compensation, that going in they knew would not be

8    income to them until the stock was issued.  And Lehman's

9    treatment of it was entirely consistent with that, because

10   they booked it as a compensation expense at the end of the

11   five years.  The story is entirely consistent.  Lehman did

12   not deduct it as a compensation expense until the end of the

13   five years.

14             Now, now there's a retrospective look that says,

15   well that enabled Lehman to, you know, in essence cook the

16   books, and you know, deflate its -- you know, undervalue its

17   expenses.

18             The irony in that argument is that if you go down

19   that rabbit hole you would get to the point that says that

20   Lehman would have gone under much, much earlier, and that

21   might have been a good thing.  But those aren't -- those

22   aren't our facts.  Those aren't our facts.

23             MR. SCHAGER:  Just a quick point clarification,

24   Your Honor, and that is that the compensation expense as you

25   correctly note was a tax deduction at the end of the five-

Page 104

1    year period --

2              THE COURT:  Right.

3              MR. SCHAGER:  -- when it was recognized as

4    income --

5              THE COURT:  That's right.

6              MR. SCHAGER:  -- for the five-year period.

7              THE COURT:  Right.

8              MR. SCHAGER:  The compensation expense was

9    actually amortized over the five-year period, so that Lehman

10   did recognize it before financial statement disclosure

11   purposes as a compensation expense over the five-year

12   period.

13             I've got two unfinished thoughts, Your Honor --

14             THE COURT:  Go ahead.

15             MR. SCHAGER:  -- and I'm -- I guess I'll just

16   finish off my comparison, and that is what's been referred

17   to in the papers and the tax code as the 83(b) election.  An

18   employee did not have the right to do that because he had no

19   property received.  If he had received property under

20   Section 81 then the employee has the obligation to pay tax

21   on it, and under 83(b) there's that ability to make --

22   that's really enforced by 83(b) and under 83(b) you're not

23   required to make the tax payment at the time of the grant,

24   you make the tax payment when the restrictions are lifted.

25   But you do have the right to -- you have to right to pay tax

Page 105

1    as if there were no restrictions so you can get capital gain

2    treatment for the accrual over the following five years.

3              That's something that's available for restricted

4    stock, that's something that's available for a grant of

5    securities, if you'll pardon the expression, but it's not

6    available for RSUs because there's no grant, there's nothing

7    granted, it's I think comparable to a lease.  You've got a

8    promise to pay something over time, but you don't have the

9    payment until you get it five years later.

10             THE COURT:  Right.  You've got a promise to pay in

11   stock.  In stock.  And the -- LBHI has made good on that

12   promise.  The promise was to pay in stock, not in cash.

13             MR. SCHAGER:  Your Honor, I'm going find the cite,

14   but I'm going to mention a case, because I think what you

15   have is -- yes, you have a right that would be discharged in

16   stock.

17             It's the American Wager case that I'm having

18   trouble finding the citation for, but that's the case where

19   the consultant was promised to be paid a certain percentage

20   of the value of the IPO when the company went public, okay?

21             THE COURT:  Right.

22             MR. SCHAGER:  And that's really the hypothetical.

23   That case illustrates the hypothetical.  What happens if an

24   employee was terminated for cause?  Right?  And he gets no

25   RSUs.

Page 106

1           THE COURT:  Right.

2           MR. SCHAGER:  So he goes to court.  What does he

3    fight over in court, the RSU agreement?  No, he doesn't

4    fight over that.  He fights over whether there was cause to

5    terminate him.

6           THE COURT:  Right.

7           MR. SCHAGER:  And if he wins --

8           THE COURT:  Yes.

9           MR. SCHAGER:  -- that's his remedy.  His remedy is

10   not the RSUs, his remedy is money damages.

11          THE COURT:  Well, hold on, you're making that up.

12   I mean --

13          MR. SCHAGER:  I'm not making it up, that's the

14   American Wager case, Your Honor.

15          THE COURT:  But you're -- you could sue for

16   specific performance.  If you -- I mean or the damages would

17   be the amount of the value of the stock that you didn't

18   receive.  That -- that doesn't --

19          MR. SCHAGER:  Actually in the case he was

20   initially awarded the stock and that wasn't what he wanted.

21   He wanted cash.  Well wait, there's another step to this,

22   because he got the cash that he wanted --

23          THE COURT:  Okay, so --

24          MR. SCHAGER:  -- and then the company went

25   bankrupt and he had to sue in bankruptcy and there was the

Page 107

1    action there to subordinate his claim because it was a stock

2    claim.  And the court said, no, there's no subordination

3    here.

4            THE COURT:  It wasn't a stock claim because it was

5    as claim on a money judgment.

6            If these folks want cash on account of the value

7    of their stock that amount of cash unfortunately is zero,

8    because the stock is not worth anything.

9            So if Lehman Brothers the moment before the

10   bankruptcy or if they were -- if it was not a crash landing

11   on September 15th as it was, if they had done bankruptcy

12   planning and they had said all the RSUs vest, everybody has

13   got stock, then these folks would have gone into the

14   bankruptcy with stock.  Good news, the five-year hold is up,

15   you can -- you're going into bankruptcy with stock.

16           There's just -- there's no way -- there's no way

17   around it.  You have not cited any single thing to me that

18   indicates a basis for saying that this was a promise in the

19   event of the bankruptcy to pay you cash in the amount of the

20   RSUs that you were issued in a given year.  Nothing says

21   that.  Nothing.  Nothing.

22           There would be no -- there's no basis for anybody

23   to make that assertion that they thought or they commenced

24   their employment and continued their employment with the

25   expectation that they would some day get cash for their

Page 108

1    shares.  Zero.

2             MR. SCHAGER:  There was certainly the reasonable

3    expectation that they would be paid the bonuses that were

4    declared, Your Honor.

5             THE COURT:  And they were.  They were all given --

6    they all got their RSUs or this -- and -- unrestricted RSUs.

7    They got what they bargained for, they just don't like it

8    because it's not worth -- it's not worth anything.

9             MR. SCHAGER:  The question under 510(b) is whether

10   they got securities.

11            THE COURT:  Okay, so let's -- so let's assume for

12   the --

13            MR. SCHAGER:  Right?

14            THE COURT:  -- sake of the rest of your -- of your

15   argument that they're not securities, right?  So then what?

16   Let's assume -- I'm sorry, not for the purposes of 510(b).

17   So they're not equity securities, but then you're saying

18   that 510(b) doesn't apply because they're not?  Why doesn't

19   510(b) apply?

20            MR. SCHAGER:  Because -- well the language of

21   510(b) is that purchases and sales or actions for rescission

22   in connection with the purchase or sale of security gets

23   subordinated.

24            THE COURT:  Okay.  So now --

25            MR. SCHAGER:  So if there's not a security --

Page 109

1           THE COURT:  -- so these --

2           MR. SCHAGER:  -- I don't think 510(b) applies.

3           THE COURT:  -- these aren't securities.  They're

4    not securities.

5           MR. SCHAGER:  So what would happen?  They end up

6    with the -- with the rights of a creditor.

7           I promised you earlier that we'd try to walk

8    through how the stock options worked in Enron.

9           THE COURT:  I -- you can skip that.

10          MR. SCHAGER:  Well, I'm going to get on the -- if

11   I may, Your Honor, I would like to get on the record two

12   facts involved there.

13          THE COURT:  Go ahead.

14          MR. SCHAGER:  One is that when an option is

15   exercised, as we discussed earlier, there's a payment for it

16   and there's an investment decision about whether to pay the

17   exercise price.  Again, an option that doesn't exist for RSU

18   holders.

19          THE COURT:  The investment decision is to go to

20   work and stay for the five years in order to earn -- have

21   the restriction of the stock fall away.

22          MR. SCHAGER:  Well what was --

23          THE COURT:  The payment is in labor and continued

24   rendering of services as opposed to cash.

25          MR. SCHAGER:  Now in Enron, Your Honor, it was not

Page 110

1    the labor analysis that applied to the recipient the

2    exercise price.  The exercise price was a separate cash

3    price.  And Judge Gonzalez focused very specifically on

4    that.  Mr. Miller and I would refer to the same pages for

5    the analysis.  Okay?  There's -- but there's certainly an

6    exercise price in connection with getting the underlying

7    stock.

8              Now in terms of what the employee got with his

9    labor, and again that was Judge Gonzalez' analysis, they

10   came to work and they got the stock options.  Okay?  And

11   what did they get with the stock options?  They got

12   something that is statutorily recognized as a security.

13             We have searched, and I'm sure Your Honor will be

14   searching, for a case that holds that instruments like these

15   RSUs are securities under the Bankruptcy Code.  We haven't

16   found it and we don't think it exists, we don't think that

17   any court has stretched the envelope that far to hold

18   something in the nature of an RSU, a contract promise to pay

19   you some day regardless of the currency you select --

20             THE COURT:  A contract promise to pay you stock.

21   A contract promise to pay you stock, not cash.  A contract

22   -- I can't say it enough times.

23             MR. SCHAGER:  And I hear it every time, Your

24   Honor., but --

25             THE COURT:  It's a contract promise to pay you in

Page 111

1   stock, and the only thing that anybody put before me, which

2   doesn't get me anywhere, is the statement from Neuberger

3   Berman that says, oh, look, you're going to get cash.

4   That's the only thing.  And that arose in a unique situation

5   in which Neuberger having entered Lehman was getting out

6   alive from Lehman whole, and in order to keep the value the

7   management decided to pay cash.  That's not support for the

8   general concept that equity meant cash.  That's the only

9   piece of paper anywhere that gives any indication that

10  anybody ever was going to get or thought they were going to

11  get cash for these.  That's it.

12          MR. SCHAGER:  I -- and I'll keep going back to it

13  too, Your Honor, the question is what they did get and

14  whether it falls within definition of a security --

15          THE COURT:  Okay.

16          MR. SCHAGER:  -- or whether it falls within --

17          THE COURT:  Do you have any new --

18          MR. SCHAGER:  -- the definition of --

19          THE COURT:  Do you have any new points?

20          MR. SCHAGER:  Whether it falls within the

21  definition of a security or the definition of an equity

22  security, and Your Honor, it doesn't fall within either one,

23  and I think the case law supports us on that.

24          I think I'd like to address the hypothetical that

25  the Court developed with Mr. Miller about the sale of a

Page 112

1    hotel, and I'm just going to address that briefly, but I

2    think it illustrates what we're talking about.

3          If the seller of a hotel sells it with a contract

4    promise to perform services over five years and get free

5    rent, right, and then the purchaser goes into bankruptcy,

6    well, the seller has still got his claim for the hotel,

7    right?

8          THE COURT:  It depends what the contract says.  It

9    depends what the contract says.  Which is exactly my point.

10   If the contract gives some backstop, sure.  It all depends

11   on what the contract says, so it doesn't really help to go

12   through the hypothetical.

13         So we go back to the contract here and the

14   contract resides in a combination of documents, the dear

15   colleagues letter, the equity awards program, and all the --

16   all the surrounding documents, and the contract here doesn't

17   say that you have a guaranteed minimum.  If at the time the

18   RSU matures your stock is not worth at least as much as the

19   price -- the Lehman market price today we'll make it up to

20   you in cash.  It doesn't say that.  It could have said that;

21   it didn't.

22         You're getting RSUs for this amount, here's the

23   market price today, you divide the amount by the market

24   price you get a number of shares.  Those shares are going

25   into a trust for you.  In five years when you're still there

Page 113

1   when those shares have increased in value that's what you

2   get, that's income to you then, it's ordinary income.

3   That's what the deal was.

4           MR. SCHAGER:  Your Honor, no.

5           THE COURT:  That -- do you -- you don't agree that

6   that's what the deal was?

7           MR. SCHAGER:  You say the shares went into the

8   trust, Your Honor?

9           THE COURT:  Yes.

10          MR. SCHAGER:  No.

11          THE COURT:  No?

12          MR. SCHAGER:  No.  There's no evidence in the

13  record of that.

14          What happened was that over time Lehman would use

15  the trust mostly when shared vested, which was not the same

16  thing as the hold period, and over the -- over time Lehman

17  would fund trust for some of the shares.  We have no idea

18  how many shares went into the trust, it was certainly not --

19          THE COURT:  But now --

20          MR. SCHAGER:  -- a one for one ratio with the

21  RSUs.

22          THE COURT:  Okay.  So now you're making --

23          MR. SCHAGER:  They would hedge their obligations

24  --

25          THE COURT:  Now you're making --

1              MR. SCHAGER:  -- to some degree.

2              THE COURT:  Now you're making up a new argument,

3      because now you're telling me this there was a fraud,

4      because --

5              MR. SCHAGER:  I absolutely did not say fraud, Your

6      Honor --

7              THE COURT:  Well --

8              MR. SCHAGER:  -- I was correcting your factual

9      assumptions, which I don't think is supported by the record.

10             THE COURT:  Well in your -- when your -- when you

11     submit your papers then you make -- then you issue findings

12     on that point and I'll take those into consideration.

13             MR. SCHAGER:  Okay.

14             THE COURT:  Mr. Miller, you can respond.

15             Is there anything else you'd like the add other

16     than the fact that you have not enjoyed our time together?

17             MR. SCHAGER:  Your Honor, I've been delighted with

18     our time together and I thank you for the patience you've

19     shown over the last couple of days.

20             THE COURT:  I -- this is -- this is spirited

21     debate, which I greatly enjoy.

22             MR. SCHAGER:  As do I, Your Honor.

23             THE COURT:  Okay.

24             MR. SCHAGER:  We both have focused on the legal

25     process and we both have the statute in mind.

 1                THE COURT:  We do.

 2                MR. SCHAGER:  We obviously read it different ways,

 3      but I think we can both go back and read it again.

 4                THE COURT:  Sounds good.  Thank you.

 5                MR. SCHAGER:  Thank you.

 6                THE COURT:  Who's next?

 7           (Pause)

 8                MR. BOYAJIAN:  May it please the Court.  Good

 9      afternoon, Your Honor, James Boyajian on behalf of seven

10      claimants.

11                Your Honor, I had two points I would -- was

12      planning on going through in order, which were again that

13      there's no security or equity because there's no investment

14      decision based on the 1933 Securities Act, Howie, and

15      Daniel's line of cases, which we believe are highly relevant

16      here and not in opposite.

17                If Your Honor will turn to Exhibit 4 of

18      Mr. Schager's trial exhibit today you can see that the

19      definition of the 33 Act, which far precedes the Bankruptcy

20      Code's definition of security --

21                THE COURT:  Okay.  I'm not interpreting the 33

22      Act, I'm interpreting the Bankruptcy Code.

23                MR. BOYAJIAN:  Which is derived from the 33 Act

24      and its line of cases --

25                THE COURT:  I'm interpreting the Bankruptcy Code.

Page 116

1    The Bankruptcy Code.  The words in the Bankruptcy Code.

2    So --

3              MR. BOYAJIAN:  Which are further defined by

4    securities cases that arose under the 33 Act, which is

5    governing on the Bankruptcy Code's interpretation of the

6    word security.

7              THE COURT:  Okay.

8              MR. BOYAJIAN:  Also to respond to Mr. Miller's

9    comments earlier about there being --

10             THE COURT:  So --

11             MR. BOYAJIAN:  -- stock going to a trust -- yes.

12             THE COURT:  -- under your reading of this, under

13   tab 4 RSU is not -- is not covered?

14             MR. BOYAJIAN:  That's correct.  Under the cases

15   interpreting the 1933 Act's definition of a security an RSU

16   is not covered as a security.

17             THE COURT:  So there's a case that says an RSU is

18   not a security?

19             MR. BOYAJIAN:  There's a case that says RSU

20   holders do not have the same rights as stockholders, and

21   that's the only case interpreting an RSU --

22             THE COURT:  Okay.  But there -- but there's no

23   case that says that under the 33 Act or the Bankruptcy Code

24   an RSU is not a security.

25             MR. BOYAJIAN:  I believe --

Page 117

1          THE COURT:  I mean we will stipulate that an RSU

2     holder does not have the same rights as a shareholder.

3     That --

4          MR. BOYAJIAN:  Correct.

5          THE COURT:  It says it in -- it says it in the

6     documents, Lehman made no attempt to hide that fact from

7     anybody.

8          But I'm asking you is there a case that says that

9     a restricted stock unit is not a security?

10          MR. BOYAJIAN:  There is not, Your Honor.  This is

11     an issue of first impression.  The only case that comes

12     close is the Fleet Boston case out of Massachusetts which

13     interpreted the RSU -- the RSU instruments in that case

14     under Delaware law.

15          THE COURT:  Okay.

16          MR. BOYAJIAN:  Which is also Delaware law is the

17     law that governs these RSU instruments as well.

18          THE COURT:  And what did Fleet Boston say?

19          MR. BOYAJIAN:  It said that the RSU holders did

20     not have the rights of stockholders.  You can't -- you can't

21     treat them the same way.

22          THE COURT:  Okay.  So my decision on this point is

23     going to be it's a case of first impression as far as you're

24     aware.

25          MR. BOYAJIAN:  Yes, Your Honor; however, we do

Page 118

```
 1    think the Daniel's decision is highly illuminating on this

 2    point in that the employees in the Daniel case came to --

 3    came to take their jobs for the sole -- I'm not -- sorry --

 4    not the sole purpose, but the primary purpose of being

 5    employed, having their career, having a job, not to be

 6    investors of their employer, and that's the situation here.

 7    These men and women were simply --

 8              THE COURT:  Well, Ms. Krieger -- Ms. Krieger gave

 9    very powerful testimony on this point.  I mean she had an

10    enormous personal stake, personal involvement, ownership

11    interest, feeling of family toward the people she worked

12    with toward Lehman Brothers.  She recognized that part of

13    her compensation was going to be come in the form of these

14    stock units and she was unhappy about it, very unhappy about

15    it, and that was earned by bitter experience.

16              Very wisely, and we've seen this happen more times

17    than any of us care to, that employees' retirements get

18    destroyed when a company goes into bankruptcy.

19              So she knew, and you know what she said?  She said

20    it was a time in my life, I didn't have a choice.  I didn't

21    like it, but I did it.

22              So I think that her choice was particularly

23    wrenching because of her personal circumstances, but

24    nonetheless she did it.  The other witnesses they too made

25    choices.  They too made choices.  Mr. Shotton decided to
```

Page 119

1    move his family from Great Britain to the United States

2    based on a piece of paper that told him in no uncertain

3    terms you might get part of your compensation in a

4    restricted stock unit.

5              There was -- there was no hiding the ball here,

6    there was no bait and switch, it was a deal that each and

7    every one of these folks accepted and were happy with until

8    the cycle turned.

9              It's very sad.  I -- it makes me sad, but you

10   know, commerce relies on enforcing agreements as they're

11   written.  It relies on it, otherwise where are we?

12             And I will cite to you a case that was handed down

13   two days ago by the District Court in which the District

14   Court actually reversed in part Judge Peck's decision

15   concerning the Lehman plan, and the Bankruptcy Court

16   reversed the approval of the fees of certain professionals

17   and made the following statement, "That bankruptcy judges

18   are not entitled to tweak the law in order to suit the

19   purposes of a particular case."

20             If I were -- if I were empowered to tweak the law

21   you better believe I would tweak it to help people who

22   suffer from unfortunate circumstances, but I don't have that

23   power, I frankly wouldn't want that power.

24             So, you know, I don't know where we go with this

25   argument that each of you keeps making.

1              MR. BOYAJIAN:  We're not asking Your Honor to

2      tweak the law, we're asking Your Honor to look at the entire

3      universe of the law --

4              THE COURT:  No, you're asking me to tweak --

5              MR. BOYAJIAN:  -- which is far broader than

6      bankruptcy.

7              THE COURT:  -- the documents.  You're asking me to

8      tweak the --

9              MR. BOYAJIAN:  Well let's look at one of the

10     documents, Your Honor.

11             THE COURT:  Sure.

12             MR. BOYAJIAN:  Number 3 on Lehman's trial exhibit

13     from the opening statement is an employment agreement with a

14     redacted name.

15             THE COURT:  Right, so this is one of these dear

16     colleague letters, right?

17             MR. BOYAJIAN:  Right.

18             THE COURT:  Okay.

19             MR. BOYAJIAN:  Okay.  So taking the document --

20             THE COURT:  Well this is an offer letter, right?

21     Yeah, this is an offer letter.

22             MR. BOYAJIAN:  Right.

23             THE COURT:  Okay.

24             MR. BOYAJIAN:  Which became the basis of the

25     employment agreement.

Page 121

1            THE COURT:  Right.  Uh-huh.

2            MR. BOYAJIAN:  Okay.  So the second paragraph

3    about halfway through it says, "For the performance used

4    years ending November 30, '99 and November 30, 2000 we will

5    guarantee you a minimum total compensation of $850,000."

6            THE COURT:  Right.

7            MR. BOYAJIAN:  Okay, that's a guarantee,

8    unqualified guarantee.

9            THE COURT:  Of compensation.

10           MR. BOYAJIAN:  Of compensation.

11           THE COURT:  Right.

12           MR. BOYAJIAN:  But in a fixed liquid amount.

13   Now --

14           THE COURT:  It -- you got to read the bullet

15   points.

16           MR. BOYAJIAN:  Well let's read the bullet points.

17           THE COURT:  Sure.

18           MR. BOYAJIAN:  Let's go to -- directly to the most

19   relevant bullet point number 4.  It says, "At the firm's

20   option a portion of your total compensation" --

21           THE COURT:  Right.

22           MR. BOYAJIAN:  -- "may be payable in the form of

23   restricted stock and pursuant to the firm's employee stock

24   award program."

25           THE COURT:  Yep.

Page 122

1           MR. BOYAJIAN:  It doesn't say anything -- it

2    doesn't include a -- a qualifying sentence before saying --

3    or a portion of a sentence that would say notwithstanding

4    the foregoing.  In that if I were an employee trying to

5    interpret this document I would -- I would understand that

6    to mean that I'm guaranteed at least 850,000 in cash.

7           THE COURT:  You wouldn't be a very smart employee

8    if that's what your reading was.  And Mr. Shotton testified

9    exactly the contrary.  Mr. Shotton, who is a proverbial

10   rocket scientist, okay, testified exactly the opposite.  He

11   knew what these words meant and he relied on the fact that

12   the quote/unquote practice on the street was that it would

13   shake out in a certain way and it would be 33 percent and he

14   bought on.

15          There's nothing in this document that says we

16   guarantee you a minimum of $850,000 in cash.  In fact what I

17   found so shocking frankly about this letter was it doesn't

18   even say a portion of your total bonus.  It says a portion

19   of your total compensation.  That's the part that frankly

20   blew me away.  That when you signed on to work for Lehman

21   Brother you had, unlike -- unlike Ms. Stiefel who testified

22   about a draw -- a guaranteed draw to help you get started,

23   this letter gives you nothing.  It gives you no guarantee of

24   anything.

25          MR. BOYAJIAN:  I mean, Your Honor, it has a --

Page 123

1              THE COURT:  Do you understand?

2              MR. BOYAJIAN:  -- it has a dollar sign which

3     implies U.S. legal tender of $850,000.

4              THE COURT:  And with the words that say

5     compensation.  It doesn't say cash.

6              I mean I'm not going to beat a dead horse.

7              MR. BOYAJIAN:  Again, Your Honor, there may be

8     some ambiguity, especially for foreign employees who may

9     have interpreted the word compensation to mean the word

10    cash, especially when there's a dollar figure amount stated.

11    So as I said in my opening, any ambiguity should be

12    interpreted in favor of the employees given their -- their

13    large disparity in the bargaining power here --

14             THE COURT:  So it's your argument --

15             MR. BOYAJIAN:  -- as well as the fact that Lehman

16    was the sole drafter of this --

17             THE COURT:  You're telling me that --

18             MR. BOYAJIAN:  -- agreement.

19             THE COURT:  -- your clients believed, got this

20    letter and your clients believed that they were going to get

21    850- -- a client of yours who got this letter expected

22    $850,000 in cash?

23             MR. BOYAJIAN:  I believe some of them would have.

24    I can't speak for them directly, but I can certainly see how

25    it would be misconstrued that way.

Page 124

```
 1            THE COURT:  You would ask though wouldn't you?  If

 2    you were moving your family from England wouldn't you ask?

 3    I'd want to be sure.  I'd want to be sure before I moved by

 4    family from England what I was getting paid and how I was

 5    getting paid it.  I don't think that I would move them

 6    unless I really understood all the details.

 7            MR. BOYAJIAN:  I'd like to move to my second

 8    point, Your Honor --

 9            THE COURT:  Sure.

10            MR. BOYAJIAN:  -- about the wage laws, I think it

11    ties into this line of questioning.

12            Earlier Ms. Alvarez brought up the Guiry case,

13    which we believe is totally irrelevant here, because we

14    never did argue that the RSUs are themselves the wages,

15    which is what was at issue in this case.

16            We are arguing rather that there's a fixed

17    guaranteed amount that was promised to the employees and

18    that many labor laws and the public policies of other states

19    and countries where those employees were based do apply and

20    do preclude simply -- you know, simply forcing the employees

21    to take what is effectively a forfeiture of their wages.

22            So I'd like to begin with New York Labor Law

23    Section --

24            THE COURT:  Give me -- give me an --

25            MR. BOYAJIAN:  -- 193(b) --
```

Page 125

```
 1                THE COURT:  Give me an illustration -- give me an

 2    illustration of that using a construction worker.  What's a

 3    wage -- give me an illustration of that in ordinary, you

 4    know, someone who works at a big box store or a construction

 5    worker or any --

 6                MR. BOYAJIAN:  All right, let's go with the

 7    construction worker --

 8                THE COURT:  Okay.

 9                MR. BOYAJIAN:  -- making $60,000 a year.

10                THE COURT:  Okay.

11                MR. BOYAJIAN:  The company would come to them and

12    say, okay, we reserve the right at the firm's option to pay

13    you part of your wages in cash and part in RSUs, and you

14    won't be about to convert those.

15                THE COURT:  No, no, no, that's just calling a

16    construction worker someone who works at Lehman.  I'm

17    talking about real life.  What's a real -- a real life wage

18    claim is I worked --

19                MR. BOYAJIAN:  Right.

20                THE COURT:  -- you didn't pay me.

21                MR. BOYAJIAN:  Right.

22                THE COURT:  Right?

23                MR. BOYAJIAN:  I rendered the services --

24                THE COURT:  I rendered the services --

25                MR. BOYAJIAN:  -- I received no consideration in
```

1  return.

2         THE COURT:  -- and you didn't pay me.

3         MR. BOYAJIAN:  Right.

4         THE COURT:  We had a deal you were going to pay me

5  $20 an hour to build your garage.

6         MR. BOYAJIAN:  Right.

7         THE COURT:  I built the garage, you didn't pay me,

8  right?

9         MR. BOYAJIAN:  Right.  So the company goes

10  bankruptcy and then I have a 507(a) priority claim for my

11  wages.

12         THE COURT:  Right.  Because the promise was to pay

13  you in cash.

14         Here, if the employee had at the time of the

15  filing it was in the middle of a payroll period and there

16  were unpaid wages --

17         MR. BOYAJIAN:  Uh-huh.

18         THE COURT:  -- then that employee would have a

19  priority claim for wages.

20         That's not this case.  This case is about the

21  stock.  This is not a case under the Bankruptcy Code for

22  wages.

23         MR. BOYAJIAN:  Well, but they were again

24  guaranteed a certain amount of pay and according to the New

25  York Labor Law Section 193(b), which has two elements, you

Page 127

1     have to give written -- you have to obtain express written

2     authorization from the employee and it has to be for the

3     benefit of the employee.  And case law has interpreted that

4     second part has held that it can't be for the benefit of the

5     employer.  And we did have testimony to that effect from

6     Ms. Krieger who did state on the record about the many ways

7     that the RSU was designed and did benefit the company by

8     keeping more cash for the general use of the company --

9               THE COURT:  Right.  So it --

10              MR. BOYAJIAN:  -- and inflating its financial

11    health to credit agencies and regulators.

12              THE COURT:  So it benefited the company enabling

13    it to stay -- keep in business and keep making money and

14    keep paying all the claimants their salaries during those

15    five-year periods and paying -- and allowing those claimants

16    who had RSUs that had been held for five years to cash those

17    in at the then prevailing very high market price of Lehman

18    stock.  But none of that was a benefit to any of the

19    claimants, that was only a benefit to Lehman.

20              MR. BOYAJIAN:  Yes, we believe so.  It was

21    primarily --

22              THE COURT:  Okay.  So it's your argument that the

23    claimants, who by definition here, held RSUs in the run up

24    to 2008 they got no benefit from this.  It's an absurd --

25    that's absurd, okay?

Page 128

```
 1              MR. BOYAJIAN:  If I may, Your Honor.

 2              THE COURT:  I mean I'm trying to be patient.

 3              MR. BOYAJIAN:  Yes.

 4              THE COURT:  But it's absurd.

 5              MR. BOYAJIAN:  It's not a real benefit, because

 6    had they received cash instead of course the company

 7    reserved the right to pay either cash or RSUs and also

 8    reserved the right to amend the terms that --

 9              THE COURT:  So how about this, so how about --

10              MR. BOYAJIAN:  -- unilaterally --

11              THE COURT:  -- that -- so what you're saying is

12    that was it a two-way deal?  If you got one of these letters

13    and it had -- and you got restrictive stock units, right,

14    and then that stock value doubled over the five years,

15    right, putting aside taxes, and then you got double the

16    value.  So you got $50,000 of RSUs in year one, and in year

17    five there were $100,000.  You're saying at that point the

18    right thing to do would be to give the employee the $50,000.

19    I don't think the employee would want that.  I think that

20    employee wants that $100,000 that they then pay tax on,

21    albeit at the ordinary income rate, but they come out ahead

22    even at a 30 percent marginal rate.  They come out ahead.

23    Of course it was a benefit to them as long as the -- as long

24    as everything kept going.  It was a benefit to them.

25              MR. BOYAJIAN:  Your Honor is assuming that those
```

Page 129

1    same employees did not have the ability to take the same

2    amount in cash and go, you know, to another investment

3    agency and choose to invest their wages in a way that they

4    saw more fitting or more beneficial to them.

5           So in fact this -- this was a detriment to them

6    because they were given no investment decision.  Their wages

7    were simply withheld from them.

8           THE COURT:  So when the person who received the

9    letter that's Exhibit 3 or Mr. Shotton, for example, gets

10   the letter, we're delighted to confirm our offer of full-

11   time employment, your argument is that misreading this and

12   misconstruing this as a promise of $850,000 in cash they

13   accepted employment.

14          Because if they understood what the letter said,

15   which it clearly says, then they made their investment

16   decision at that moment, which was to accept this

17   compensation and make the investment decision that they

18   would in essence invest themselves with Lehman for as long

19   as they wanted to, and then until the five years went by

20   they wouldn't get the stock.  That's a decision.

21          MR. BOYAJIAN:  But they were not choosing to

22   invest in Lehman, Your Honor, they were coming to --

23          THE COURT:  They were choosing to work at Lehman.

24          MR. BOYAJIAN:  No, they were --

25          THE COURT:  Were they choosing to work at Lehman?

Page 130

1          MR. BOYAJIAN:  They were choosing to continue

2     their careers at Lehman.

3          THE COURT:  Okay.  Were they choosing to work at

4     Lehman?  Did anybody --

5          MR. BOYAJIAN:  Yes.

6          THE COURT:  Did anybody drag them into the

7     building and chain them to a desk?

8          MR. BOYAJIAN:  No.

9          THE COURT:  They could have gone somewhere else,

10    right?

11         MR. BOYAJIAN:  Correct.  However, they came to

12    Lehman for the sole -- primary or sole purpose of continuing

13    their careers and livelihood like as I cited the Howie case

14    supporting earlier and that's no security.

15         THE COURT:  And they decided -- they made a

16    decision at that point, they weighed the pluses and the

17    minuses and they decided to go to work for Lehman.  It was a

18    choice.  Maybe it was a difficult choice, maybe as the years

19    went by as they continued to look at the stock options it

20    was a difficult choice, but if everyone does a cost benefit,

21    if there was nothing better they didn't choose to leave.

22         MR. BOYAJIAN:  To an earlier point about

23    Mr. Shotton, Your Honor, it's actually not even my argument,

24    it's his own testimony that he said if he was paid all in

25    cash he would have had the ability to take that money and

Page 131

1   decide wherever he wanted to put that money and he would

2   have probably decided not to buy Lehman stock.

3          THE COURT:  Okay.  And he should --

4          MR. BOYAJIAN:  So it was a detriment.  Under the

5   New York Labor Law this is not for the benefit of the

6   employee, it's for the benefit of the employer, and

7   therefore it is a violation, an unlawful withholding of

8   wages against the laws and public policies of the State of

9   New York and it's -- as a result it's void as a matter of

10  law.  It is not rescission.  We are not asking for an

11  agreement or an order by the Court deeming these agreements

12  void as -- I'm sorry -- deeming these agreements to be

13  rescinded, we are asking the Court to recognize what the law

14  already does recognize in that this was not for the benefit

15  of the employees, it was simply for the benefit of the

16  employer, and there's case law cited in our briefs to that

17  effect.  And to simply recognize that the law holds these

18  kinds of contracts void as a matter of law --

19         THE COURT:  Okay.  So if they're void then what?

20  If they're void what's the remedy?

21         MR. BOYAJIAN:  Then -- then the remedy is either

22  the alternative performance obligation to pay in cash --

23         THE COURT:  There is no alternative performance

24  obligation to pay in cash.  That's made up.  There is no

25  alternative obligation to pay in cash.  It doesn't say

Page 132

1      anything about an alternative obligation to pay in cash.

2              MR. BOYAJIAN:  Well at any time Lehman could have

3      just cashed out these employees, and they reserved the right

4      to amend the terms at any time unilaterally.  So they could

5      have changed the terms in --

6              THE COURT:  There was no --

7              MR. BOYAJIAN:  -- a subsequent year saying, well,

8      we're going to give you cash now.

9              THE COURT:  There was no -- there was no

10     alternative performance requirement.  Lehman very clearly

11     said in the firm's discretion we're going to pay you this

12     way or that way.  It's a black box.  That's what you were

13     told, that's what you accepted.  So you can't now say that

14     it's void and that therefore you pay us in cash.

15             MR. BOYAJIAN:  I will let Ms. Solomon --

16             THE COURT:  Sure.

17             MR. BOYAJIAN:  -- follow up on the alternative

18     performance --

19             THE COURT:  Okay.

20             MR. BOYAJIAN:  -- arguments further; however, I'd

21     like to add one alternative remedy.

22              If it's void as a matter of law then you're

23     entitled to restitution, Your Honor.  Not rescission,

24     restitution to be put in the same position that you would

25     have been had the invalid and unlawful contract never been

Page 133

1    entered into.

2            And I want to remind the Court that each of these

3    agreements changed year to year, it wasn't the same

4    agreement.  So the fact that they got the benefit --

5            THE COURT:  And every year --

6            MR. BOYAJIAN:  -- of that plan in general, you

7    know, seven or ten years ago is irrelevant to the now --

8            THE COURT:  And do you remember the --

9            MR. BOYAJIAN:  -- modified version of the

10   agreement.

11           THE COURT:  Do you remember the part about how

12   they were at will employees?

13           MR. BOYAJIAN:  Yes.

14           THE COURT:  So every year they had a new decision

15   that they could make.  So if somehow the first year they had

16   a misunderstanding that they thought they were going to get

17   all cash and then you get to the second year and it didn't

18   happen or they didn't like the spread, they didn't like how

19   the bonus was allocated between cash and stock once again

20   they could have left, but they didn't year after year after

21   year.  And everything was fine until the sky fell in

22   September of 2008.

23           MR. BOYAJIAN:  Right.

24           THE COURT:  And that's what happened here, and

25   it's very sad, but it's not --

Page 134

1          MR. BOYAJIAN:  They didn't leave for a number of

2    reasons.

3          THE COURT:  -- an occasion to rewrite all of these

4    documents and to recreate everybody's understanding and what

5    they relied on and how they acted in reliance on that

6    understanding.

7          MR. BOYAJIAN:  Finally those -- the other element

8    in the labor law of New York which requires express written

9    authorization.

10          As we know, Your Honor, the subordination clause

11    was removed from later years beginning in 2005, so not only

12    did they not give the notice and not disclose that material

13    term, but they actually had it in earlier and they decided

14    to take it out.

15          THE COURT:  We've been through this.  There's very

16    little indication that anybody noticed that, relied on that,

17    and there's no testimony whatsoever about what they in fact

18    meant.  And agreements are always subject to applicable law.

19    And the fact that that was taken out remains a mystery, but

20    there's been no evidence that anybody at that point then was

21    misled into believing that that meant that they then had a

22    claim for cash.  There's just no evidence of that, nothing.

23    There's no evidence of that.

24          It's fine to go back after the fact and comb

25    through all the documents and construct an argument, but it

Page 135

1    really has nothing to do with the affect of applicable law

2    on the documents that are made subject to applicable law.

3              MR. BOYAJIAN:  One final comment and I promise

4    I'll wrap up, Your Honor.

5              If the Court decides to uphold these RSU

6    agreements as valid under the wage laws and valid

7    enforceable agreements then will employees really have the

8    right to vote with their feet when every investment bank

9    adopts this policy, this kind of plan?  Not only every

10   investment bank, but what if this becomes a trend across

11   pretty much any industry?

12             I myself counsel corporations, and so what I would

13   do if this is upheld is I would turn around to my

14   corporation clients and I would instruct them to issue RSUs

15   instead of actual common stock, stock options, anything that

16   gave any investment decision to the employee, because simply

17   we all know that, and it was on the record, that employee

18   compensation is a large chunk of the --

19             THE COURT:  Are you making any claim --

20             MR. BOYAJIAN:  -- cost of a business.

21             THE COURT:  -- that these folks didn't receive

22   minimum wage?  You're not making any claim that these folks

23   didn't receive minimum wage are you?

24             MR. BOYAJIAN:  No, we're not.

25             THE COURT:  No, they made a lot more than minimum

1    wage, right?

2              MR. BOYAJIAN:  But they were -- all their claims

3    -- for example, I have a client in New Jersey, Mr. Kasupley

4    (ph) who was an IT programmer, I believe he was making

5    something in the ballpark of 50- to $60,000 and he only

6    started working for Lehman two years before the bankruptcy.

7    So yes, two years accrued RSUs in the amount of about 6,000

8    or so -- 6,000 to $7,000 and he is an immigrant from Italy

9    and he may not necessarily have understood all the terms of

10   this --

11             THE COURT:  Look, you know, we can't be all

12   things --

13             MR. BOYAJIAN:  -- agreement.

14             THE COURT:  -- to all people, okay?

15             MR. BOYAJIAN:  Well, but debtor wanting the treat

16   all the people --

17             THE COURT:  So -- okay, so you advise your

18   corporations then that every time they want to hire an

19   employee you better bring them in for a four-week course and

20   we better make sure they understand ever word of English,

21   ever provision of the Internal Revenue Code, every provision

22   of the Bankruptcy Code.  It's an absurd position.  It's an

23   absurd position.

24             This is not about a case of illiterate immigrants

25   who were duped into become employees and then not paid a

Page 137

1    decent working wage.  That's not what this case is about.

2              MR. BOYAJIAN:  Right.  But the RSUs did not give

3    them any actual equity stake in the company.

4              THE COURT:  If every investment bank -- it doesn't

5    matter.  If the dear colleague letter had said at our option

6    we're going to pay you in Monopoly money, we're going to pay

7    you in gift certificates to a fast food restaurant, it

8    doesn't matter.  As long as the unit of composition was not

9    illegal and the employee accepted it it doesn't matter.

10             So in your hypothetical if every investment bank

11   and every corporation decides that it wants to partially pay

12   its employees in some stock like instrument they can do

13   that, and if an employee doesn't want to work there they can

14   go work somewhere else.

15             That's just the -- I just don't understand how

16   anyone could take any other position in this type of a case.

17   We're not talking about -- we're not talking about slave

18   labor, we're not talking about working in bad conditions for

19   below minimum wage.  We're talking about a voluntary

20   decision to work for a lot of money at a prominent

21   investment bank, period.

22             The bank failed, we know that, everyone is sorry,

23   maybe people should have gone to jail, it is what it is.

24   That's not my job.  My job is to continue to help wind down

25   this estate, and that's what I'm going to do.

Page 138

1           So I just find your examples not persuasive.

2           MR. BOYAJIAN:  In closing, Your Honor, I'd just

3    like to say that because it became impossible to deliver the

4    actual stock certificates and give the holders of the RSUs

5    any equity interest whatsoever in the company the result is

6    that they should be returned to the full payment of their

7    services, and that's --

8           THE COURT:  Did you -- did you hear Mr. -- did you

9    hear Mr. Miller indicate then in fact they do have the

10   shares that are --

11          MR. BOYAJIAN:  We disagree on the fact -- factual

12   -- there's a factual dispute here.  Mr. Miller has stated

13   that there were shares underlying the RSUs at all times.  We

14   have not -- we do not believe that is accurate, Your Honor.

15   We -- what we understand --

16          THE COURT:  Well --

17          MR. BOYAJIAN:  -- is that the RSU trust existed

18   and the shares would be placed in that trust three years

19   later when the RSUs vested.  Okay?

20          THE COURT:  Okay.  And then Mr. --

21          MR. BOYAJIAN:  So three years --

22          THE COURT:  -- Mr. Miller today --

23          MR. BOYAJIAN:  So for three years there was no --

24          THE COURT:  Mr. Miller --

25          MR. BOYAJIAN:  -- stock underlying the RSUs.

Page 139

1          THE COURT:  Mr. Miller today indicated that the

2     restrictions fell away at the moment of the bankruptcy and

3     that the full amount of the RSUs now exists in the form of

4     stock with -- for each of these claimants.  That's what I

5     believe he said this morning.  So that --

6          MR. BOYAJIAN:  On what basic?  We haven't seen any

7     document or any contractual language to that effect.

8          THE COURT:  Well, we can --

9          MR. BOYAJIAN:  That's unfounded.

10          THE COURT:  Mr. Lemons?

11          MR. LEMONS:  May I clarify, Your Honor, just --

12          THE COURT:  Sure.

13          MR. LEMONS:  Not to inject myself into the debate,

14     but the plan provides that holders of equity with retain the

15     economic rights that they would have had as equity, because

16     that's what Mr. Miller was referring to when there was an

17     actual physical piece of paper issued as stock are not as

18     relevant.

19          THE COURT:  Right.  But the point is that if

20     somebody had -- the question is that at the moment of the

21     bankruptcy if somebody had $5 million of RSUs --

22          MR. LEMONS:  Under --

23          THE COURT:  -- or -- using an amount is the wrong

24     thing to do.  Shares.  Shares.  Then does that person now

25     have that -- a proportionate number of shares based on the

Page 140

1    then outstanding number of shares?

2            MR. LEMONS:  If our objection is granted, Your

3    Honor, to their claims, and they are reclassified as equity

4    as we have asked the Court to do --

5            THE COURT:  Yes.

6            MR. LEMONS:  -- they will end up with a percentage

7    of the economic rights to the equity of the company --

8            THE COURT:  That --

9            MR. LEMONS:  -- equivalent to what they would have

10   received if the RSUs had been converted into shares.

11           THE COURT:  Okay.  Thank you.

12           So your last statement is what happens under the

13   plan?  You --

14           MR. BOYAJIAN:  Would you like me to respond, Your

15   Honor?

16           THE COURT:  Sure.  Go ahead.

17           MR. BOYAJIAN:  What happens under the plan is --

18   okay, so assuming you're a commissions salesperson, for the

19   first ten months you render services, you get nothing in

20   return.  In November they finally give you stock options --

21   I'm sorry -- restricted stock units, okay?  So --

22           THE COURT:  Yeah.

23           MR. BOYAJIAN:  -- between January and November

24   you've gotten nothing in exchange.  In November they give

25   you the RSUs.  Three years from the -- from January you then

Page 141

1    get vesting rights.  Okay, the RSUs vest.

2            THE COURT:  Uh-huh.

3            MR. BOYAJIAN:  And that's when the voting rights

4    kick in because the share is actually placed in the trust,

5    which then gives the trustee the right -- the ability to

6    send you a proxy and give you the right to vote, and that's

7    also when we understand dividend equivalence begin accruing.

8    So it's not until three years later that you have some

9    attenuated right to possible equity in the company.  But

10   again, that can all be forfeited, that -- you know, and even

11   the dividend equivalents are not really dividends, they're

12   more -- they're simply more RSUs.  The CSA holders actually

13   had no voting rights whatsoever.

14           THE COURT:  I'm not interested in this point.  I'm

15   not interested in this point.  I am interested in a response

16   to the fact that at the moment -- if this motion is granted

17   you get the stock attributable to the RSUs that you had at

18   the moment of the bankruptcy filing irrespective of the

19   fulfillment of the vesting conditions.  You get it whether

20   or not the five years had gone by or not.  You have what

21   the --

22           MR. BOYAJIAN:  There was an intervening bankruptcy

23   event which caused the impossibility to deliver the stock

24   options.

25           THE COURT:  Okay.

Page 142

1          MR. BOYAJIAN:  All right.

2          THE COURT:  Thank you.

3          MR. BOYAJIAN:  Thank you, Your Honor.

4          THE COURT:  Who's next?

5          Go ahead, Ms. Solomon.

6          MS. SOLOMON:  Good afternoon, Your Honor.

7          THE COURT:  Good afternoon.

8          MS. SOLOMON:  I just want to very, very briefly

9    respond to one point you raised --

10         THE COURT:  Okay.

11         MS. SOLOMON:  -- with Mr. Schager --

12         THE COURT:

13         MS. SOLOMON:  -- and that has to do with the right

14   to convert under 101-16.

15         THE COURT:  Okay.

16         MS. SOLOMON:  I believe that the RSUs provides a

17   right to convert to stock, as we've submitted to the Court,

18   and the way that it's converted -- it doesn't automatically

19   convert, Your Honor -- the way it is converted is by the

20   employee performing the services and satisfying the

21   conditions, and without the employee doing that the RSU will

22   not convert.  It's not a situation that it automatically

23   converts five years later without any action on the part of

24   the employee.

25         THE COURT:  Okay.

Page 143

1          MS. SOLOMON:  As to the alternative performance

2    argument, Your Honor, we've submitted that there were

3    alternative performance obligations of Lehman here, and the

4    alternative performance obligation consists of their

5    obligation to pay in cash.

6          THE COURT:  Where does -- where does it say that?

7          MS. SOLOMON:  Your Honor, any employment contract

8    that an employer enters into with its employee provides for

9    payment of compensation, and in this case Lehman provided

10   the terms under which they could pay their compensation,

11   and they said at our discretion we can implement this

12   procedure --

13         THE COURT:  Okay.

14         MS. SOLOMON:  -- that we have for the --

15         THE COURT:  At our discretion we can pay you --

16         MS. SOLOMON:  -- RSUs.

17         THE COURT:  -- not in cash.

18         MS. SOLOMON:  Right.

19         THE COURT:  That's what it said.

20         MS. SOLOMON:  And if they didn't do that then how

21   is it going to get paid?  In cash.  That's the only other

22   way it can be get paid.

23         THE COURT:  But where -- where does it say that?

24         MS. SOLOMON:  Well what, they're going to get paid

25   in funny money?  No, obviously they're going to get paid in

Page 144

1    cash.  That's -- I mean it's --

2              THE COURT:  It's a pretty big -- it's a pretty big

3    leap.

4              MS. SOLOMON:  I don't think so, Your Honor.

5              THE COURT:  It doesn't say that, Ms. Solomon.  It

6    doesn't say that.

7              MS. SOLOMON:  Well --

8              THE COURT:  It doesn't say that in the event -- I

9    mean the fallacy in this -- in this line of argument is that

10   if Lehman had been rescued by the government on

11   September 14th, 2008 and survived and the share price stayed

12   at a couple of pennies --

13             MS. SOLOMON:  Uh-huh.

14             THE COURT:  -- then your argument goes away and

15   you would have to then make the argument that well, it

16   really meant that if the stock wasn't as worth as the

17   notional amount of the compensation you have to top it up in

18   cash.  It doesn't say that.

19             MS. SOLOMON:  No, I'm not talking about cash --

20             THE COURT:  Sure you are.

21             MS. SOLOMON:  -- that backstopping the RSU, I'm

22   not taking at that.  I'm saying --

23             THE COURT:  So let me --

24             MS. SOLOMON:  -- there's just two options here.

25   Any --

Page 145

1                THE COURT:  But where does it say --

2                MS. SOLOMON:  -- rational employee --

3                THE COURT:  Where --

4                MS. SOLOMON:  Any rational employee reading an

5      employment agreement when they get terms laid out to them --

6      put aside the issue of whether they're going pay them in

7      RSUs or equity or whatever -- when somebody gets an

8      employment contract and it says we're going to pay you --

9      and I'm going back to this employment agreement that we

10     referred to throughout these proceedings, okay?  And, you

11     know, anybody -- if that clause was not in there about that

12     at our option we could pay you in another form and if

13     everything else was the same --

14               THE COURT:  Well you can't -- but you can't say

15     that, that's --

16               MS. SOLOMON:  No, no, no --

17               THE COURT:  -- that's the --

18               MS. SOLOMON:  -- just please allow me, Your Honor,

19     just -- I'm trying --

20               THE COURT:  That's the whole point of the

21     agreement.  That --

22               MS. SOLOMON:  But -- you're saying to me how --

23     what is the alternative performance that it's in cash?  Well

24     if they don't pay them in the form of RSUs or equity how

25     else would they get paid, Your Honor?

1          THE COURT:  That's an absurd hypothetical.  This

2     letter says here's your compensation.  You're going to get

3     this much salary, you're going to get this much bonus, and

4     at the firm's option some of all of that --

5          MS. SOLOMON:  Right.

6          THE COURT:  -- can be paid not in cash.  That's

7     what it says.

8          MS. SOLOMON:  Right, exactly.  Exactly, Your

9     Honor.  Not in cash.  So if it doesn't get paid in the RSUs

10    or the equity, however they want to pay it out, it gets paid

11    in cash.  That's an alternative performance --

12         THE COURT:  They got the --

13         MS. SOLOMON:  -- obligation.

14         THE COURT:  They got the RSUs.

15         MS. SOLOMON:  Your Honor, you're not letting me --

16         THE COURT:  They got them.

17         MS. SOLOMON:  -- you're not -- I understand they

18    got the RSUs and the performance on the RSUs was rendered

19    impossible.

20         THE COURT:  Okay.

21         MS. SOLOMON:  That's the point, okay?

22         MS. SOLOMON:  So there's alternative performance

23    obligations, and the case law that we cite in our brief

24    supports that proposition.  The case of Draiken versus

25    Avondale (ph), in that case there was a contract that

Page 147

1    provided at the discretion of Avondale this may be paid in

2    cash or in whole or in part and the equivalent percentage of

3    working interest in acquired oil and gas fields.  So the oil

4    and gas fields something happened to them and they couldn't

5    be issued so the -- that was the facts of the case, Your

6    Honor, okay?

7            And so the -- so the promisor said, well, I can't

8    deliver, and the court said, well, I'm sorry, that's too

9    bad, because the essence of the obligation, even though it

10   was in your discretion, was that there was going to be

11   payment of compensation.  It was either going to be in cash

12   or in the equivalent percentage of the acquired oil and gas

13   fields.  So if you can't deliver the required oil and gas

14   fields so guess what, now you have to pay in cash.

15           THE COURT:  It's not -- it's not this case.  I've

16   listened to this for three days now.  It's not this case.

17           Let me ask you a different hypothetical.

18           MS. SOLOMON:  Sure.

19           THE COURT:  Suppose that an employee of Lehman

20   Brothers was told we're going to pay you $200,000 for the

21   year, cash, all cash.

22           MS. SOLOMON:  Right.

23           THE COURT:  Okay?  And we're going to pay it to

24   you on January 1st --

25           MS. SOLOMON:  Uh-huh.

1                THE COURT:  -- in arrears -- we're going to pay

2       you in arrears.  What I'm trying to set up and I'm too tired

3       to do it frankly particularly well, is the hypothetical

4       where as of the moment of the filing, okay, you have unpaid

5       cash wages --

6                MS. SOLOMON:  Right.

7                THE COURT:  -- of $200,000, okay?  We're in

8       bankruptcy now.

9                MS. SOLOMON:  Uh-huh.

10               THE COURT:  Lehman promised to pay you $200,000 in

11      cash wages.  What happens?

12               MS. SOLOMON:  You get a claim.

13               THE COURT:  For what?

14               MS. SOLOMON:  $200,000.

15               THE COURT:  You get $200,000?

16               MS. SOLOMON:  No, you get --

17               THE COURT:  No, you get --

18               MS. SOLOMON:  -- like any other unsecured creditor

19      --

20               THE COURT:  You get like any other --

21               MS. SOLOMON:  -- which is what --

22               THE COURT:  Right.

23               MS. SOLOMON:  -- which is what we're asking for.

24               THE COURT:  You get -- right.  You get like any

25      other -- no, no, no.  What you're asking for is for the

Page 149

1    stock attributable to the RSUs to be worth the amount of the

2    cash.

3            MS. SOLOMON:  Well, that begs the question.

4            THE COURT:  So if you had --

5            MS. SOLOMON:  Right?

6            THE COURT:  -- you're not -- that's what you're

7    asking for.

8            So in the hypothetical I gave you if you match

9    that up to with what you're asking for here you're saying I

10   worked for $200,000, I get $200,000, I don't care about this

11   bankruptcy thing.  I want --

12           MS. SOLOMON:  I'm certainly not saying that, Your

13   Honor.

14           THE COURT:  Well, but that's what --

15           MS. SOLOMON:  And I'm sorry if that's the

16   impression that came across to the Court.

17           THE COURT:  But that's what you're -- that's what

18   your claim is for.  Your claim is for we just heard all this

19   argument that it was for compensation of $850,000.  The

20   gripe here is that the RSUs are not worth that amount of

21   money and you want the cash instead.

22           MS. SOLOMON:  Well, the issue -- the issue is --

23   and you may disagree, Your Honor -- but the issue is are

24   there alternative performance obligations?  And I don't

25   think you accept that.

Page 150

1                THE COURT:  I don't.

2                MS. SOLOMON:  But assuming that you did, just for

3      a moment, okay, then wouldn't they be entitled to the cash

4      obligation?

5                THE COURT:  No.

6                MS. SOLOMON:  Logically --

7                THE COURT:  No.

8                MS. SOLOMON:  -- under alternative performance law

9      I think they would, Your Honor.

10               THE COURT:  No, they would not.

11               MS. SOLOMON:  And, you know, the

12     recharacterization of the claims here as equity and giving

13     them the treatment of equity holders under the plan does not

14     respond to that issue and does not answer their question,

15     and the RSU trust, which we spent some time this morning on,

16     goes to that issue as well.  We went through a number of

17     clauses in the RSU trust itself which recognizes the rights

18     of the participants in the plan, which these claimants are,

19     as general unsecured creditors.

20               THE COURT:  That's not -- the words are there but

21     that's not the best reading of the documents.

22               MS. SOLOMON:  Well, I can only rely on the words,

23     Your Honor, and the point is that it recognizes them as

24     general unsecured creditors, and I heard somebody say this

25     morning, well, to be able to compel the right to issue the

Page 151

1    shares.  Is that correct?  Something like that?

2              THE COURT:  Something like that.

3              MS. SOLOMON:  Along those lines?  But isn't the

4    point that when there's a general unsecured creditor they

5    have a claim as to all of the assets of the estate and there

6    is nothing --

7              THE COURT:  That's not --

8              MS. SOLOMON:  -- nothing in any of these documents

9    that restrict them solely as to the shares.  In fact the

10   trust does exactly to the contrary and says, you are a

11   general unsecured creditor no better than any other general

12   unsecured creditor of the estate.

13             I think that's what the trust says, Your Honor,

14   but you have the provisions before you and I think we spent

15   sufficient time this morning, but that -- I think that is a

16   fair interpretation and the correct interpretation of the

17   trust language.

18             THE COURT:  So -- so even though it hasn't been

19   shown that any of the claimants saw that document and relied

20   on it that you get to rest your argument on that, but that's

21   not the same way we apply the rules with respect to the

22   removal of the bankruptcy language --

23             MS. SOLOMON:  Well, I'll get to that in a moment.

24             THE COURT:  -- in the document.

25             No, but you -- in other words you want to use as a

Page 152

1   sword the fact that the 1997 agreement said this, that, and

2   the other thing, even though none of the claimants knew

3   about that, but you don't want to concede that the

4   bankruptcy laws apply and are applicable even though none of

5   the claimants had knowledge of it.  In fact you're saying

6   the opposite, that because they weren't told the bankruptcy

7   implications that therefore they can't be held to them.

8           So you --

9           MS. SOLOMON:  I -- I don't think one has --

10          THE COURT:  -- want to have it --

11          MS. SOLOMON:  -- to do with the other, and I heard

12  Lehman's --

13          THE COURT:  Well, you want --

14          MS. SOLOMON:  -- counsel this morning talking

15  about the fact that the trust was not publicized to the

16  claimants, obviously trying to distance themselves from the

17  damaging language in the trust itself, but I don't think

18  it's the general tenor of contract law that whether somebody

19  knows or does not know about a contract that is going to

20  affect the interpretation of the contract.

21          THE COURT:  Right.  And whether or not somebody --

22          MS. SOLOMON:  And the contract exists.

23          THE COURT:  Exactly.

24          MS. SOLOMON:  And the fact of the matter also --

25          THE COURT:  And whether or not somebody knows

Page 153

1   about the existence and operation of the bankruptcy laws

2   doesn't affect how the rights that they're granted --

3           MS. SOLOMON:  Well --

4           THE COURT:  -- exist.

5           MS. SOLOMON:  -- under the wage laws that might

6   not be correct.

7           But I think that as to the trust agreement itself

8   it is clear that the trust was expressly referred to in all

9   of the RSU program documents year after year after year

10  after year, and it seems like this document got buried away

11  in the 30,000 pages or documents that were provided in the

12  data repository, the very complex document production system

13  that was set up by Lehman --

14          THE COURT:  So the whole -- the whole thing --

15          MS. SOLOMON:  -- and there was only one single

16  copy of this document.

17          THE COURT:  Okay, great, so the whole thing was

18  the big fraud.

19          MS. SOLOMON:  I didn't say it was a fraud, but I

20  think that --

21          THE COURT:  Because you don't want to say it's a

22  fraud because then we're back into the fact that a fraud

23  related to securities get subordinated under 510(b), so --

24          MS. SOLOMON:  Your Honor, I'm not suggesting it's

25  a fraud, I think you are, but --

Page 154

1          THE COURT:  Well --

2          MS. SOLOMON:  -- but --

3          THE COURT:  Well because you don't want to own it.

4    You want to say --

5          MS. SOLOMON:  No.

6          THE COURT:  -- that there's a secret document that

7    Lehman buried away in a drawer --

8          MS. SOLOMON:  They don't like it.

9          THE COURT:  -- and that -- pardon me?

10         MS. SOLOMON:  They don't like it.

11         THE COURT:  And they don't like it, so they --

12         MS. SOLOMON:  That's not fraud though.

13         THE COURT:  That's not fraud?  They form a

14   trust --

15         MS. SOLOMON:  No, they produced it.  They produced

16   it and I have it right here.

17         THE COURT:  They form a -- if you don't mind.

18         They form a trust, right, and then they build an

19   equity -- an equity award program, and secretly they know

20   that what they're really doing is giving people something

21   called equity that's really debt.  So they do that for years

22   and years and years and years, and then in the context of

23   this litigation or whatever, someone finds that document

24   from 1997 and says, ah ha, Lehman knew all along that this

25   was -- that these folks were getting something that was the

Page 155

1   same thing as the right of a general creditor.  That kind of

2   sounds like a fraud to me.

3            MS. SOLOMON:  I'm not making that argument, Your

4   Honor.

5            THE COURT:  Okay.

6            MS. SOLOMON:  What I'm saying is that we're

7   entitled to rely on Lehman's own contract documents that it

8   drafted --

9            THE COURT:  Okay.

10           MS. SOLOMON:  -- itself.  And that were

11  specifically referred to in all of the RSU program

12  documents.

13           THE COURT:  Okay.

14           MS. SOLOMON:  Your Honor, as to the removal of the

15  bankruptcy clause it's been suggested that the subordination

16  clause in the RSU itself was merely a statement of law, but

17  I don't agree with that characterization.  Namely for the --

18  primarily for the reason that in the statement about -- or

19  the clause that was actually included in the RSU agreements

20  itself it referred to the claims that would arise from --

21  and I don't have the language exactly correct -- but you

22  know, the failure to deliver shares or whatever it is, would

23  be deemed to be a claim for purposes of 51099(b).  And it's

24  clear that what they were trying to do was get effectively a

25  subordination agreement in the RSU agreement itself by using

Page 156

1    the language that it would be deemed.

2           And in fact Lehman's argument has evolved over the

3    course of these proceedings and it claims now that, well

4    it's not -- you know, it's not -- it's not a subordination

5    agreement, just a statement of the law, but in fact earlier

6    in these proceedings Lehman did rely on 510(e) -- 510(a) of

7    the Bankruptcy Code, although they appear not to be relying

8    on it anymore.  I expect because there was -- you know,

9    there was no disclosure to the employees other than the

10   inclusion in the document itself with regard to that

11   specific clause, and they apparently by inclusion of the

12   clause in the RSU agreement itself considered it necessary,

13   maybe clarifying of their rights.

14          THE COURT:  You're making that up.  You're making

15   that up.  You --

16          MS. SOLOMON:  Well, they put it in, Your Honor.

17          THE COURT:  -- have no -- you have no idea why the

18   clause was in there and why it was removed.  And Mr. Miller

19   very candidly said that he didn't either.  So you don't

20   know.  You're just --

21          MS. SOLOMON:  Well --

22          THE COURT:  You're just asking for an inference.

23          MS. SOLOMON:  That they considered it necessary in

24   their agreement?

25          THE COURT:  You can't tell -- you can't stand

1    there and tell me what Lehman considered.

2              MS. SOLOMON:  Well --

3              THE COURT:  You --

4              MS. SOLOMON:  -- if somebody -- if somebody --

5    people don't generally put superfluous clauses in their

6    agreements, correct?

7              THE COURT:  Lawyers put superfluous clauses in

8    agreements all the time.

9              You cannot stand there and testify and tell me

10   what Lehman was thinking.  You can tell me --

11             MS. SOLOMON:  I don't --

12             THE COURT:  -- that I can draw an inference, but

13   you cannot tell me what Lehman -- why Lehman did what it

14   did.

15             MS. SOLOMON:  No, and I didn't -- I didn't -- and

16   if my words were not chosen exactly in that manner, you

17   know --

18             THE COURT:  Okay.

19             MS. SOLOMON:  -- I withdraw that point.

20             THE COURT:  Okay.

21             MS. SOLOMON:  But, Your Honor, you may infer --

22             THE COURT:  I'm a stickler.  Yes.

23             MS. SOLOMON:  You may infer --

24             THE COURT:  Okay.

25             MS. SOLOMON:  -- that they considered it necessary

Page 158

1    or clarifying with regard to --

2              THE COURT:  Okay.  But we have --

3              MS. SOLOMON:  -- what the rights --

4              THE COURT:  -- we have no evidence.

5              MS. SOLOMON:  That's right, and we don't need to

6    speculate, but the evidence that we do have -- and I don't

7    think it is appropriate for us to speculate -- but the

8    evidence that we do have, Your Honor, is that they put it in

9    at one point and then two years later or with regard to this

10   litigation, I don't know when it went in exactly, but two

11   years later forever more they took that clause out.

12             THE COURT:  But wait, this -- they didn't remove

13   it in response to this litigation.

14             MS. SOLOMON:  No, no, no.  I didn't mean to

15   suggest that, but for 2003 and 2004 --

16             THE COURT:  Right.

17             MS. SOLOMON:  -- the clause was in there, and

18   then --

19             THE COURT:  Right.  But you know -- you know the

20   doctrine of evidence that says subsequent repairs are not

21   admissible evidence of a prior defect?  I mean --

22             MS. SOLOMON:  Yeah, but we have -- we have an RSU

23   agreement for each year.

24             THE COURT:  I --

25             MS. SOLOMON:  And I know that much of their

Page 159

1   argument is based upon what was the prior practice for all

2   the -- all the years.

3             THE COURT:  Okay.  I --

4             MS. SOLOMON:  I think that's the heart of their

5   argument.  This was the practice and was ongoing.

6             THE COURT:  Okay.

7             MS. SOLOMON:  So I think -- I think it is

8   appropriate to look at what they did in 2003 and 2004 versus

9   the subsequent years, and we know that --

10            THE COURT:  But the law --

11            MS. SOLOMON:  -- forever more they took out the

12  subordination clause.  And generally when --

13            THE COURT:  Well, no, it's not a --

14            MS. SOLOMON:  -- somebody --

15            THE COURT:  -- it's not a subordination clause,

16  it's language relating to bankruptcy.  It's not -- it's not

17  -- we're not talking about a subordination agreement, we're

18  just talking about language relating to bankruptcy.

19            MS. SOLOMON:  I think -- I think it is a

20  subordination agreement because it says that your claims

21  arising under this will be deemed to be --

22            THE COURT:  Right.  That's not --

23            MS. SOLOMON:  -- claims for purposes of 510(b),

24  not that they are --

25            THE COURT:  That's not --

Page 160

1          MS. SOLOMON:  -- they want the consent of the

2     claim holders that these are going to be considered claims

3     and then therefore they're forever estopped from making an

4     argument to the contrary.  That sounds to me like it's a

5     subordination agreement.

6          THE COURT:  No, now that's making it up.  That's

7     making it up.  That's not -- that's not -- you just got done

8     telling me that they're not proceeding under 510(b), it's

9     not a subordination agreement.

10          MS. SOLOMON:  Now they're not.  Before they were.

11          THE COURT:  Okay.

12          MS. SOLOMON:  So they've reconsidered that

13     position.

14          THE COURT:  Okay.

15          MS. SOLOMON:  So generally when a clause is an

16     agreement and then it's subsequently is taken out and it in

17     the course of contract negotiations or a formalized

18     agreement from year to year I think that there's a strong

19     suggestion that it no longer applies, and that a reasonable

20     person looking at that clause would understand that.  And I

21     heard that there was no particular claimant --

22          THE COURT:  So the reasonable person looking at it

23     in this case are the claimants, which you're telling me

24     understand bankruptcy law and they looked at those documents

25     and they compared them year to year and they said, wow, this

Page 161

1      is great, I'm not -- I'm no longer subordinated in the event

2      of a bankruptcy.

3                  MS. SOLOMON:  Well, I mean either they understood

4      it or they didn't understand it, but --

5                  THE COURT:  Or they didn't have any --

6                  MS. SOLOMON:  -- I don't think you can have it

7      both ways.  So you mean they didn't understand it when it

8      was in there but it was still enforceable against them?  You

9      know, so maybe there were some people --

10                 THE COURT:  But look, we just had -- we just had

11     testimony --

12                 MS. SOLOMON:  Yeah.

13                 THE COURT:  -- not testimony, argument --

14                 MS. SOLOMON:  Right.

15                 THE COURT:  -- that had I'm expected to believe

16     that somebody earning $850,000 a year didn't really

17     understand that that wasn't being paid all in cash.

18                 So I think this whole concept of that you're

19     trying to urge of what people understood and didn't

20     understand, it's all being bandied back and forth to suit

21     your particular argument at that particular moment.  So we

22     had no --

23                 MS. SOLOMON:  Well, what we're talking about here

24     is the removal of the subordination whatever.

25                 THE COURT:  No, no, but we've had no testimony by

Page 162

1   anybody who said that that -- the removal of that provision

2   then they relied on that to continue to be an employee at

3   Lehman Brothers.

4        MS. SOLOMON:  This is -- this is a matter of

5   contract interpretation, and it's a well settled rule of

6   contract interpretation that you look when you're

7   determining what is a reasonable interpretation of the

8   agreement is what would a reasonable person looking over

9   this, a hypothetical reasonable person looking at these

10  documents what would they understand that to mean?

11       THE COURT:  Okay.

12       MS. SOLOMON:  And the hypothetical reasonable

13  employee comparing the agreements from '03 and '04 to the

14  later years would understand that 510(b) was in there at an

15  earlier point and then at a later point it was taken out.

16  And gosh, could that actually mean that 510(b) does not

17  apply?  Perhaps so.

18       THE COURT:  And gosh, could that actually mean

19  that anybody -- anybody actually did that?  And if they did

20  the people in this room are having a hard time understanding

21  what 510(b) means, do you think that somebody working at

22  Lehman Brothers in the IT department had any idea?  It's

23  lawyer boilerplate.  They wouldn't understand the 1997 trust

24  agreement if they get it.  There's completely contradictory

25  testimony.

Page 163

1        You're now telling me that these people didn't

2   understand that they were getting stock instead of cash, but

3   if they had looked as these very complicated plan documents

4   they would have understood that their rights were being

5   changed in the event of a bankruptcy.

6        MS. SOLOMON:  Do you think they had a right to

7   understand that?  Isn't the purpose of the wage law, Your

8   Honor?  And let's turn to the wage laws just for a --

9        THE COURT:  Quickly, please.

10       MS. SOLOMON:  -- a few moments okay?

11       I've heard it bandied about here that, you know,

12  these individuals were all sophisticated financially, but

13  the fact of the matter is they're not lawyers, they're not

14  sophisticated legally, and they don't understand the

15  connotations of 510(b) of the Bankruptcy Code, and that is

16  something that --

17       THE COURT:  So now you're arguing against your own

18  point.

19       MS. SOLOMON:  No, I'm not, I'm not.  I'm focusing

20  on the wage laws for a moment, okay, Your Honor?  And, you

21  know, weren't they entitled to have a reasonable explanation

22  from their employer when their employer were signing them up

23  into the RSU plan, which you know, it's been told -- it's

24  been described as a condition of their employment, weren't

25  they entitled to know what the consequences of their

Page 164

1   participation in the plan would be?  And isn't that the --

2   isn't that the underlying premise of the wage laws?

3           Because the wage laws are there because it's

4   recognized that employees typically do not hire lawyers to

5   pour over their employment agreements, and that's why the

6   wage laws are there to protect them in the first instance,

7   and that's exactly what did not happen in this case.

8           THE COURT:  So Mr. Shotton, when he moved his

9   family from England and signed up to make a million and a

10  half dollars a year --

11          MS. SOLOMON:  Whatever the amount was, Your Honor.

12          THE COURT:  -- okay, gee, if he had only realized

13  that he should talk to a lawyer.  That's not what the

14  testimony was.  He understood -- not to pick on him --

15          MS. SOLOMON:  Yeah.

16          THE COURT:  -- but he understood that his

17  compensation package was going to be comprised at the firm's

18  discretion of cash and stock.  He understood that.

19  Ms. Krieger understood that.  She understood that.

20          MS. SOLOMON:  But do you think that they had a

21  right to understand by virtue of their participation in the

22  plan and nothing else that in the event of Lehman's

23  bankruptcy their compensation would be automatically

24  forfeited?  Was that a right that they had?

25          I mean the wage laws -- you know there's a lot of

Page 165

1    wage law that I've gone over, Your Honor, wage law case law

2    that deals with the enforceability of these types of

3    agreements, and you know, there's newer case law, the Guiry

4    decision has been cited to Your Honor.

5              THE COURT:  Okay.  So -- so you want a cause of

6    action for the failure to -- the failure to describe the

7    bankruptcy consequences of this.

8              MS. SOLOMON:  That's a wage law claim.

9              THE COURT:  It's a wage law claim.

10             MS. SOLOMON:  Enforcement of their wage law

11   rights.  That's exactly what it is.  And when Lehman failed

12   to disclose the consequences of the bankruptcy -- of an

13   event of bankruptcy upon these employees' compensation I

14   construe it as -- as equivalent --

15             THE COURT:  You know --

16             MS. SOLOMON:  -- to the signing of a note, a fixed

17   debt claim.

18             THE COURT:  Well, you know what, this was a trial

19   that's now concluding, and you could have gone out and you

20   could have gone out and attempted to bring in an expert or

21   attempted to bring in examples from other investment banks

22   and RSU programs and demonstrate that, you know, in the

23   medical field it's called standard of care --

24             MS. SOLOMON:  Uh-huh.

25             THE COURT:  -- that somehow Lehman and Lehman only

Page 166

1    didn't do what it had to do, and that maybe they have to

2    hold a session on the, you know, civil rights, maybe they

3    have to hold a session on the Internal Revenue Code, maybe

4    they have to hold a session on, you know, you pick it.

5            MS. SOLOMON:  Well, I --

6            THE COURT:  All -- everyone operates pursuant to

7    applicable law, and what you're suggesting is that before

8    you can become an employee anywhere you're going to have to

9    -- the employer is going to have to sit down and go through

10   and I guess make sure every single employee understands

11   every single possible ramification of their employment.  Is

12   that -- that's your rule?

13       A    No.  No, Your Honor, not every single possible

14   ramification, but the significant ramifications, yes, that

15   is what I'm proposing to the Court.

16            And I think that counsel for Lehman themselves

17   recognized that when on their bankruptcy blog they have

18   written in discussing the Marsh case, Marsh versus

19   Prudential, which is a Court of Appeals decision --

20            THE COURT:  Wait, wait, wait, you're --

21            MS. SOLOMON:  -- discussing the disclosure.

22            THE COURT:  -- you're telling me something from

23   the -- from what?  From what blog?

24            MS. SOLOMON:  From (indiscernible - 03:23:49)

25   bankruptcy blog.  It's cited in our brief.

1            THE COURT:  Yes.

2            MS. SOLOMON:  And it says:

3            "Marsh provides that plan participants should, as

4    a condition to participation, sign a written authorization

5    acknowledging that they were given notice of and understand

6    the risks associated with participation in the plan."

7            That didn't occur here.

8            THE COURT:  Was there -- so you're saying that

9    that's -- that's the problem.  See this is -- the argument

10   changes --

11           MS. SOLOMON:  No.

12           THE COURT:  -- here like every seven minutes.

13           So now this -- the claim is that there was no

14   written -- there was no written notice, that they don't have

15   a piece of paper.

16           MS. SOLOMON:  Well it wasn't explained orally and

17   there was no -- and the argument all along has been that

18   there were --

19           THE COURT:  Right.  Do you remember the testimony

20   by Ms. Krieger --

21           MS. SOLOMON:  -- there were written

22   authorizations.

23           THE COURT:  -- about the extensive sessions with

24   HR and about how she was trained to then tell -- to help

25   explain all of the compensation arrangements to her team?

Page 168

1           MS. SOLOMON:  Yeah, but not with regard to the

2    consequences of bankruptcy.  That's what I'm focusing on

3    Your Honor, I wasn't going to any other issue, only what

4    were the consequences of bankruptcy by Lehman with regard to

5    the claimants' participation in the plan.  That was not

6    disclosed to them ever.

7           THE COURT:  Okay.

8           MS. SOLOMON:  And it is my position that it should

9    have been disclosed, the RSU documents themselves advise

10   claimants that they should consult with their tax advisors,

11   but didn't --

12          THE COURT:  And it should have said they should

13   consult with their bankruptcy advisor.

14          MS. SOLOMON:  Legal advisor perhaps because there

15   were very serious legal consequences if you're --

16          THE COURT:  That --

17          MS. SOLOMON:  -- if Your Honor is going to rule

18   that by virtue of their participation in the plan and

19   nothing else they forfeit their right to compensation that

20   they've earned.

21          THE COURT:  Thank you.

22          MS. SOLOMON:  Thank you.

23          THE COURT:  Mr. Kaplan, if you would wrap up?

24          MR. KAPLAN:  Yes, Your Honor.

25          Had the Neuberger clients walked into Lehman --

Page 169

1    Neuberger claimants walked into Lehman on day one and been

2    given an employment contract such as you've seen this

3    morning I wouldn't be here, but the Neuberger claimants

4    became Lehman employees because their firm was acquired by

5    Lehman.

6            THE COURT:  It doesn't -- Mr. Kaplan, it just

7    doesn't matter.  We went through this with -- with

8    Mr. Ramallo at length and he very candidly testified that he

9    understood at that moment in time that he had a choice to

10   make and he made that choice, and it turned out to be a

11   very, very lucrative choice.

12           MR. KAPLAN:  No, he didn't have a choice, Your

13   Honor.

14           THE COURT:  Yes, he did, he had --

15           MR. KAPLAN:  What he said was he had to stay at

16   Neuberger and Lehman because he had no choice other than not

17   to be an asset management.

18           THE COURT:  I'll tell you something, okay, when

19   you go around the country and you talk to, as I do, other

20   judges who reside other Chapter 13 cases, all right, and one

21   of the things that has to be considered is your ability to

22   get a job, right?  And those debtors who make $17,000 a

23   year, they get told that it's all well and good that you'd

24   like to be X, that you'd like to be a banker, but you need

25   to expand your search and you need to look for a job that

Page 170

1    will pay back your debts.

2           So while as a human being I'm sympathetic to the

3    desire of a person to continue to do what they like doing

4    and build on what they've built up, all right, and I heard

5    Mr. Ramallo, he started at $60,000 and he built himself up,

6    and that's great, and Ms. Stiefel started in Q Garden Queens

7    and never imagined that she would get to where she is, and

8    she liked it and it gave her satisfaction and she didn't

9    want to give it up.  I get that very much.  But that's not

10   the same as not having a choice.  It's a difficult choice,

11   it's a cost balance, it's a plus minus, and at that moment

12   in time -- and I think it's not useful to talk about it in

13   terms of going and sitting on a beach --

14           MR. KAPLAN:  But it was.

15           THE COURT:  No, it was not the same as going and

16   sitting on the beach.  It's deciding that you had a good

17   thing, you don't want to have to continue to do it at this

18   firm, you're angry at the acquisition, you wish it weren't

19   happening, you're angry that you're powerless to have it be

20   something else, you don't have to go sit on the beach.

21           You could go for the period of time that you are

22   restricted, and as Mr. Miller brought out it was not a

23   thousand percent restriction, although I believe it was

24   pretty restrictive, you could have gone and taken the money

25   that you had saved up and taken the money in the case of

Page 171

1    Ms. Stiefel that you got for your founder shares and you

2    could have done something else.  And then after the end of

3    the three years you could go and you could start over and

4    you could send your client list a letter that said, hey, I'm

5    back.  In fact people do that all the time when they have

6    other life events, when they take a maternity leave, when

7    they have other things that they want to do, they take a

8    different path in the road and they come back.

9           It's a choice.  It's a choice that they simply did

10   not want to make.  But then they did make it and in fact it

11   turned out to a lucrative choice, because they made a lot of

12   money, and in fact they turned out to be among the lucky

13   ones because Neuberger went into Lehman and it came out of

14   Lehman, and they got to get back what they loved.

15          So in my book that's not duress, that's not

16   handcuffs, that's not we had no choice.  That's we made a

17   choice, it wasn't perfect, but we made a choice.

18          MR. KAPLAN:  I don't know if it pays for me to

19   continue, but I will.

20          You know, if we were in the District of

21   Massachusetts where the law is that restrictive covenants,

22   every time there's a material change of employment status

23   the restrictive covenant falls away and there has to be a

24   new restrictive covenant negotiated this would be an easy

25   case and I wouldn't be here.  Because these people who had

Page 172

1   these three-year restrictive covenants or the one-year

2   restrictive covenants --

3           THE COURT:  That they --

4           MR. KAPLAN:  -- that they had from Neuberger --

5           THE COURT:  Yes, that they voluntarily entered

6   into.  They chose --

7           MR. KAPLAN:  At Neuberger.

8           THE COURT:  At Neuberger.

9           MR. KAPLAN:  But when there is a material change

10  in terms of their employment with the RSU program they then

11  did not have a choice because they were tied by the

12  Neuberger restrictive covenants going forward, and that's

13  why they didn't -- they didn't agree under the -- under the

14  words of Med Diversified the Seventh Circuit said that the

15  man trade his -- agree to exchange employment claims for his

16  shares.  Bargain not for cash but to become a shareholder.

17  They didn't bargain for anything.

18          THE COURT:  Yes they did.  They decided to go

19  along instead of not.  They just --

20          MR. KAPLAN:  They didn't have a choice whether to

21  go along or not.  You're not --

22          THE COURT:  You and I have a different definition

23  of choice.

24          MR. KAPLAN:  Absolutely.

25          THE COURT:  They had a choice.  It was a plus

Page 173

1    minus cost benefit hard choice.  They had a choice and they

2    made it.  Nobody drove up to Neuberger Berman with a truck

3    and threw them in the back and put a padlock on it and drove

4    them over to 745 7th Avenue and made go in there and work

5    for Lehman Brothers and chain them to their desk.  That's

6    not what happened.

7              MR. KAPLAN:  That's true.

8              THE COURT:  They chose not to take a garden leave.

9              MR. KAPLAN:  One of the conditions of the merger

10   or the acquisition was that they remain at 40th Street and

11   Third Avenue as part -- as a separate entity, but that's

12   beside the point.

13             THE COURT:  That is a smart-aleck remark.

14             MR. KAPLAN:  The point, Your Honor, is --

15             THE COURT:  Most attorneys would say I'm sorry,

16   Your Honor.  That's a smart-aleck response, and at ten

17   minutes after 2:00 I have zero patience for smart-aleck

18   responses.

19             MR. KAPLAN:  I apologize, Your Honor.

20             The point, Your Honor, is this, that so they have

21   a choice as you said to go out and do something else is in

22   reality not a choice.  It is give up your career, give up

23   your livelihood, give up your profession and go do something

24   else for a year or 3 years or 18 months and maybe at the end

25   of that period you can reconstruct your business.  That is

Page 174

1    not a choice, that is not a willing decision, that is not

2    agreed.

3             THE COURT:  And so because the management of

4    Neuberger Berman decided to sell themselves at Lehman -- to

5    Lehman that now Lehman should give these people the cash

6    instead of the stock that was --

7             MR. KAPLAN:  Deducted from their payrolls.

8             THE COURT:  It was never deducted from their --

9             MR. KAPLAN:  It was.  That's what the 2008

10   document shows, that what was done here was the cash was

11   deducted from their monthly paychecks and placed into a

12   trust account --

13            THE COURT:  Where's the -- where -- you have this

14   account statement for that trust account?

15            MR. KAPLAN:  I don't have the account statement, I

16   have the statement that says it was placed in trust with --

17   into a trust with Wells Fargo, and as I understand it at the

18   end of the year that money would be given to LBHI to

19   purchase the RSUs.

20            THE COURT:  Do you have -- well you had discovery,

21   did you get the trust document that shows the cash balance

22   in that trust account with all their names on it?

23            MR. KAPLAN:  No.

24            THE COURT:  Did you get that?  No.  Because you've

25   taken a document which was -- which was inappropriately

Page 175

1   redacted to begin with and you've used that as evidence that

2   all along there was this cash that was deducted and was

3   being put into an account.  There's been no evidence of

4   that.  There's no evidence of that.

5           MR. KAPLAN:  There's been testimony that they were

6   paid on a -- on a production compensation basis that they

7   would get paid some in cash and some would be withheld,

8   deferred, held back, and then at the end of the year they

9   would get a statement which would show that amount of the

10  withheld amount being placed into the RSUs, and that

11  together with the cash that was available at 2008 because it

12  was being held by Neuberger and not by Lehman from a

13  November 17th memo that predates the date of the agreement

14  for a management buy out, which Mr. Miller conceded was on

15  Thanksgiving weekend, shows that there was cash withheld

16  from these people by Neuberger, which was a separate

17  subsidiary, and at the end of the year when there was time

18  to give it over pursuant to the equity award program it was

19  given over.  But there's no question that these people had

20  their cash withheld, their specific --

21          THE COURT:  Where's the account?  Show me the

22  account statement.  Where is it?

23          MR. KAPLAN:  The money went to the RSU program --

24          THE COURT:  The money went --

25          MR. KAPLAN:  -- and is reflected in the RSU

Page 176

1    program.

2              THE COURT:  The money went to the RSU program.

3    Okay, so it doesn't exist.  There's no account out there

4    that says cash held in trust for Neuberger Berman employees.

5              MR. KAPLAN:  Not at the moment because it was

6    distributed in 2008 and the prior years went -- went to the

7    RSU program.  But that doesn't mean that they didn't have

8    their commissions withheld and that doesn't mean that under

9    the -- under the New York Labor Law they're entitled to

10   their commissions.

11             The fact that -- it just doesn't -- it doesn't

12   make sense that all of a sudden this vanishes because of

13   what happened here.  They had commissions withheld --

14             THE COURT:  So why -- is every Neuberger Berman

15   employee in the same boat?

16             MR. KAPLAN:  Is every Neuberger employee?

17             THE COURT:  Yeah.

18             MR. KAPLAN:  No, there are Neuberger Berman

19   employees including the one that I represented who

20   unfortunately defaulted when --

21             THE COURT:  No, how many --

22             MR. KAPLAN:  -- they were served with this notice.

23             THE COURT:  -- employees are there at Neuberger

24   Berman who went -- who went back at the time of the

25   demerger?  How many were there?

Page 177

1            MR. KAPLAN:  I'm not sure exactly, but I would

2       assume --

3            THE COURT:  Hundreds?

4            MR. KAPLAN:  Hundreds or thousands, yes.

5            THE COURT:  Okay.  And they probably a lot of them

6       had RSUs, right?

7            MR. KAPLAN:  I assume a lot of them did, yes.

8            THE COURT:  Okay.  And how many do you represent?

9            MR. KAPLAN:  Ten.

10           THE COURT:  Okay, so the rest of them are just not

11      on their game?  They just -- they just don't need the money?

12           MR. KAPLAN:  No, one of them I know defaulted and

13      when I tried to open the default I was -- Lehman vigorously

14      opposed by motion.

15           So I -- that's -- I don't represent Neuberger

16      Berman, I represent ten clients and those ten clients

17      retained me to -- and Mr. Kramer retained me to represent

18      him as another member of the Strauss Group, but he had been

19      served with an earlier objection and had defaulted.

20           You know, I can't -- there was one other fellow

21      here who was a Neuberger Berman wealth advisor who has a

22      claim, we don't represent him.  I don't know what his

23      circumstances are.

24           All I know is these people were all bound by

25      restrictive covenants going in and it is our view that they

Page 178

1    had absolutely no choice but to continue their employment.

2             THE COURT:  Okay, so that's Your -- so that's the

3    question you want me to rule on.

4             MR. KAPLAN:  That's correct.

5             THE COURT:  Whether or not they had any choice.

6             MR. KAPLAN:  Yes.

7             THE COURT:  Okay.  Thank you.

8             Mr. Miller, did you want some rebuttal time before

9    everybody passes out?

10            MR. MILLER:  Your Honor, unless you have some

11   questions for us we believe the issues have been fully

12   developed in the Court's questions and we do not seek any

13   rebuttal.

14            THE COURT:  Okay.  All right, very good.

15            Let's take a few minutes to talk about post-trial

16   submissions, which I think, you know, I really don't want to

17   be voluminous.

18            So, Mr. Miller, did you have -- have you had a

19   chance to talk to your adversaries about -- about how we

20   should do this?

21            MR. MILLER:  Well, yes, Your Honor, I'll come

22   around to the microphone --

23            THE COURT:  Okay.

24            MR. MILLER:  -- and there have been some other

25   discussions.

1          First of all we I think need some clarification as

2    a group as to whether the Court prefers proposed findings of

3    facts and conclusions of law or some other kind of briefing

4    or both.

5          THE COURT:  I don't want both, but I'd like to

6    give you your preference.  I mean what I typically do after

7    a very lengthy trial is findings of fact, non-advocacy

8    pieces.  Very straight up the middle findings of fact with

9    record citations both to transcripts, you know, page line of

10   testimony, and documents, and then -- and this is where the

11   optionality comes in -- most of the time in a large trial I

12   have a post-trial brief that then refers to the findings of

13   fact.

14         Alternatively if it would be easier for you to

15   just do findings of fact and conclusions of law that's fine

16   too.  I know you've all put a lot of work into this and I'm

17   not looking to unduly burden you, but it assists us in

18   preparing a decision, you know, to have -- to have

19   something, and I think, you know, we would -- we would want

20   it in searchable PDF form and Word form, you know, numbered

21   paragraphs, I don't know, within X period of time and we

22   agree to X length.

23         You know, I could be more definitive but I like to

24   give the -- you know, counsel the choice of how they'd like

25   to -- they'd like to do it.

Page 180

1          MR. MILLER:  Well, Your Honor, first of all I

2    think we had discussed the fact that everyone feels that

3    whatever time limit we set it probably should run from the

4    availability of the transcripts --

5          THE COURT:  Yes.

6          MR. MILLER:  -- since people don't know how long

7    that's going to be exactly and --

8          THE COURT:  Right.

9          MR. MILLER:  -- we really can't start doing --

10          THE COURT:  Sure.

11          MR. MILLER:  -- some of these things in detail.

12          THE COURT:  And as I've -- and as I've told you

13   I've got a lot on my plate, so as a realistic matter I'm

14   really not going to get to this until June, so that is

15   intended to just take a little bit of the pressure off of

16   you.

17          MR. MILLER:  Yes, Your Honor.  And as far -- I

18   think there's also a feeling that each group would like some

19   opportunity after whatever the submission is to have some

20   objections or to express their views on the other parties'

21   submissions.

22          THE COURT:  Okay.

23          MR. MILLER:  So there is some desire for a follow

24   up.

25          As far as LBHI is concerned we don't feel a need

Page 181

1    for additional briefing on the issues, we think our briefs

2    already cover our issues.

3              THE COURT:  Okay.

4              MR. MILLER:  But if the Court for its convenience

5    would like findings of fact and some post-trial briefing or

6    conclusions of law we're happy to do that and to exchange

7    that simultaneously and then have a response.

8              One point the Court had said that you would like

9    to have the claimants explain how the factual evidence which

10   they have primarily presented that's new --

11             THE COURT:  Right, that's the big --

12             MR. MILLER:  -- what it was for --

13             THE COURT:  That's the big one.

14             MR. MILLER:  All right.

15             THE COURT:  I mean that's kind of the big one for

16   me.

17             MR. MILLER:  Well if you'd like to have that in

18   the form of a post-trial brief then frankly LBHI would be

19   happy to sit that out since we think we've already done that

20   and then we'll respond to that, and -- but again, that's --

21   that can be in the format of findings of fact and

22   conclusions of law or not, so --

23             THE COURT:  I mean I think that what makes the

24   most sense is for the claimants to go first and to give me

25   findings of fact that you believe you showed.  I mean a lot

Page 182

1    of what we've been arguing about this morning has to do with

2    what you believe you maintain you've shown as facts.

3              So I think that that would be a useful thing to do

4    for you to give me a set of proposed findings with record

5    citations to the transcript and the documents and a brief,

6    you know, post-trial submission that says why you win, you

7    know --

8              MS. SOLOMON:  And so you're talking about a

9    separate brief, Your Honor?

10             THE COURT:  Well you're going to do findings of

11   fact and then, you know, based on those -- and it can be --

12   it can be very brief.  I mean it can basically be a redo of

13   your initial submission, but with findings of fact.

14             So I just need some guidance to understand what it

15   is that you think that you've proven and why you think that

16   means you win.  It's just as simple as that.

17             So do you want more definition around it than

18   that?

19             MS. SOLOMON:  No, I think that's sufficient.

20             THE COURT:  But I'd like it to be coordinated, I

21   don't want to have multi-overlapping sets of papers.

22             MR. KAPLAN:  No, I was just going to ask --

23             THE COURT:  Expect for -- expect for Neuberger.

24             MR. KAPLAN:  Yeah, I was going ask if I could --

25             THE COURT:  Yeah.

Page 183

1           MR. KAPLAN:  Yeah.

2           THE COURT:  I mean -- no, but among the other

3    claimants.

4           MR. KAPLAN:  Yeah.

5           MS. SOLOMON:  So you're asking for one joint

6    submission?

7           THE COURT:  I am, yeah.

8           MS. SOLOMON:  Okay.

9           THE COURT:  Because you know, I think we've all

10   agreed now that as it turns out there's no distinction

11   between the RSUs and the CSAs and --

12          MS. SOLOMON:  Your Honor, I don't agree with that

13   actually.

14          THE COURT:  See that -- this is the problem,

15   somebody said that and now somebody else disagrees with it.

16          MS. SOLOMON:  It's in our exhibit list and LBHI

17   does not have any objection to it.  I understand that

18   they're -- with regard to the voting rights and I apologize

19   if I didn't get to this issue --

20          THE COURT:  Well somebody, one of your colleagues

21   -- one of your co-counsel --

22          MR. BOYAJIAN:  I did mention that, Your Honor.

23          MS. SOLOMON:  And yes, but --

24          THE COURT:  No, but somebody else said that it

25   turns out there's no difference between the RSUs and the

Page 184

1    CSAs.

2            MS. SOLOMON:  Yeah, but that's not correct,

3    because as to the voting rights the voting rights there is a

4    distinction and CSA holders did not have voting rights if

5    they resided in certain geographics locations, and that's

6    set forth clearly in the RSU trust agreement.  That's -- as

7    far as I know the only distinction, but that's a significant

8    distinction.

9            THE COURT:  Okay.  Why don't we say 30 days after

10   the transcript is available there's a findings of fact and

11   post-trial brief and/or conclusions of law are submitted.

12           MS. SOLOMON:  Could we ask for a little more time,

13   Your Honor?

14           MR. KAPLAN:  Can we ask for 60 days or something

15   like that?

16           MR. MILLER:  It's fine with LBHI for them to take

17   whatever time they need, Your Honor.

18           THE COURT:  Well, you know, I just want to say

19   though that there was definitely a sense from the folks that

20   came in that this was a war of attrition that was being

21   orchestrated by LBHI and the lawyers to wear people down.

22           So what I want to make very clear and I'm going to

23   say it out loud on the record is that I'm happy to abide by

24   that request, but if there's a reaction when you inform your

25   clients that this is yet another example of this being

Page 185

1    dragged out that I want to say out loud that at your request

2    we're going to go out 60 days, there's not going to be a

3    Lehman distribution in that period of time so nobody's

4    economic rights are prejudiced, and that this is not any

5    indication of, you know, furtherance of any purpose in

6    delaying the adjudication of these cases.  In fact from my

7    perspective, because of everything that I have backed up on

8    my plate, it's fine with me because I'm just not going get

9    to it until June in any event.  So --

10            MS. SOLOMON:  Of course not, Your Honor, and --

11            THE COURT:  All right?  I'm not suggesting that

12   you would tell them that, but there was definitely some

13   feeling that this has all been about stringing people along

14   and getting people to fall by the wayside through a war of

15   attrition and --

16            MS. SOLOMON:  I don't think it was suggested that

17   it was coming from the Court.  Perhaps from our adversary's

18   counsel, but you know, and if I were doing -- if I were

19   doing this alone obviously 30 days would be sufficient,

20   but --

21            THE COURT:  I understand, you want --

22            MS. SOLOMON:  -- it's a joint --

23            THE COURT:  -- you want to be -- that's --

24            MS. SOLOMON:  -- and there's -- everybody has --

25            THE COURT:  -- it's absolutely -- it's absolutely

Page 186

1    fine with me.

2            So then how many days thereafter would you like,

3    Mr. Miller?

4            MR. MILLER:  Your Honor, if we could have 30 days

5    after that --

6            THE COURT:  Sure.

7            MR. MILLER:  -- to provide a response --

8            THE COURT:  Sure.

9            MR. MILLER:  -- which will include our own

10   findings of fact I think that would probably do it.

11           THE COURT:  Okay.  So we're going to want them in

12   numbered paragraphs with record citations, eventually

13   they'll be filed on the docket and you'll provide PDF and

14   Word documents to us, and then once we have both sets we'll

15   -- we'll do our work.  All right?

16           MR. KAPLAN:  Three sets.

17           THE COURT:  Three sets.

18           MR. KAPLAN:  Thank you, Your Honor.

19           THE COURT:  Okay.  Spirited debate, nothing

20   personal, all right?

21           MR. KAPLAN:  And I apologize again, Your Honor.

22           THE COURT:  It's okay.

23           All right, thank you all very much.

24           I do hope that all the claimants understand that

25   as evidenced by the fact that we've taken three days that

Page 187

1    the Court is taking this very seriously and all the parties

2    certainly are.

3              MS. SOLOMON:  Thank you, Your Honor.

4              THE COURT:  Yes, Mr. Miller?

5              MR. MILLER:  Your Honor, I believe we're down to

6    one question on one exhibit, and if we can take care of that

7    now maybe --

8              THE COURT:  Sure.

9              MR. MILLER:  -- we won't have to reconvene for

10   that purpose, and Ms. Brady is going handle that for us.

11             THE COURT:  Yes, Ms. Brady.

12             MS. BRADY:  Your Honor --

13             THE COURT:  Want to come up -- come up to the

14   microphone.  You know I've been on trial for a month?  So

15   this is me at low -- this is me at low energy.  Go ahead.

16             MS. BRADY:  Your Honor, we -- Teresa Brady for the

17   estate.

18             THE COURT:  Yes.

19             MS. BRADY:  The parties just have a dispute over

20   one exhibit.

21             THE COURT:  Okay, which one?

22             MS. BRADY:  CLX071.

23             THE COURT:  Okay, it's a memo from Mr. Palizi

24   (ph).

25             MS. BRADY:  Yes.  This is an email from Mr. Palizi

Page 188

1    to Chris Taninga (ph) at Lehman Brothers.  The cover -- and

2    it attaches a nearly 50-page PowerPoint presentation.  And

3    the cover email indicates that these were some slides that

4    were being provided to Mr. Dick Fold (ph) in preparation for

5    annul shareholder meeting.

6              THE COURT:  Okay.

7              MS. BRADY:  And there hasn't been any testimony

8    regarding this document at trial and that's why we object to

9    it being entered as evidence.

10             It is cited in the claimants' brief, but we don't

11   have any testimony about the background of the document, you

12   know, there's a lot of information in these 50 pages, so we

13   object to it being entered as evidence.

14             THE COURT:  All right.  Ms. Solomon?

15             MS. SOLOMON:  Your Honor, I was actually

16   interested in one single page from this document, and that

17   is 7557, and there's -- there's been a lot of talk back and

18   forth about the trust and what it meant, and the RSU trust

19   and when it got funded and when, you know, holders of RSUs

20   and CSAs were entitled to vote their RSUs.  And this is just

21   an example --

22             THE COURT:  Which page again, 7 --

23             MS. SOLOMON:  This is 7557, Your Honor.

24             THE COURT:  Yeah.

25             MS. SOLOMON:  And this is just an example, it

Page 189

1    shows as of 11/05, it says, RSU trust implications and it

2    says, "Sixty million RSUs outstanding, 35 million in trust."

3            To give the Court just a, you know, as an example

4    of at that particular point in time just a little more than

5    half of the outstanding RSUs were in the trust and that at

6    that particular point in time it was only possible at most

7    for half of the holders of those RSUs to potentially have

8    voting rights if they did under the applicable trust

9    agreement and the other rules that would -- that apply.

10           MS. BRADY:  Your Honor, LBHI has never taken the

11   position that there is a one to one ratio in the shares

12   available in the trust and the outstanding RSUs.

13           THE COURT:  Right.

14           MS. BRADY:  And in fact what the trust -- the

15   proxy statement shows is that there was a proportional

16   share, and the votes --

17           THE COURT:  Right.  And Mr. Miller -- Mr. Miller

18   made that -- argued exactly that during the opening

19   argument.  He never argued that it was one to one.  He

20   specifically said that it -- that there was voting, but that

21   it was not -- there was not a one to one correspondence

22   between RSUs outstanding and shares that were in the trust.

23           MS. SOLOMON:  But the proportional voting goes to

24   a different issue.  That the proportional voting goes to the

25   issue of after holders are given a right to vote, depending

Page 190

1   upon how many vote, for instance, if one person does not

2   vote their vote will be counted depending upon the

3   proportion of votes that are cast by RSU holders to the

4   total outstanding.

5           THE COURT:  Well --

6           MS. SOLOMON:  That's the ratio.  That's what the

7   proportional voting --

8           THE COURT:  But to -- I mean to take a -- to take

9   a page from a deck of last year's slides that are going to

10  Dick Fold that we don't know were they ever used, were they

11  changed, who wrote them, it -- this is not a document that

12  was publicly filed, that -- I mean I don't know anything

13  about this.  It's just a random statement on a page.

14          MS. SOLOMON:  It's a detailed analysis of the

15  various implications of the RSUs, and in this instance the

16  trust document itself prepared by Lehman employees

17  themselves.

18          THE COURT:  I don't know who -- I don't know who

19  Mr. Palizi is, who Mr. Taninga is, I don't know if there was

20  a reply back that said, yeah, we're going to fix these,

21  they're last years, they were wrong.

22          MS. SOLOMON:  Your Honor, they stipulated to the

23  authenticity of this document already.

24          THE COURT:  But -- yes, but all that authenticity

25  means is that in fact this is a document that was send from

```
 1   Mr. Palizi to Mr. Taninga that it's not a fake.  It doesn't

 2   help me --

 3           MS. SOLOMON:  I mean it's certainly relevant to

 4   the issues before the Court.  So I don't think anybody is

 5   arguing about that.  And again, it's only as of this one

 6   particular point in time to give the Court an example --

 7           THE COURT:  But --

 8           MS. SOLOMON:  -- an idea --

 9           THE COURT:  -- all that it -- all that you can

10   tell me is that it says this on this page.  You don't have a

11   witness here to explain it, give it context, state whether

12   it was accurate, state whether it was updated.  It's just --

13   I mean but for the fact that it's -- it's a Lehman document

14   it would be hearsay, but there's a hearsay exception because

15   it's of a party.

16           But look, I mean I'll let it in, but you have no

17   -- but there's no -- there's no foundation, there's no

18   explanation, there's no context, there's no indication

19   whether it's right, whether it's wrong, whether it was

20   changed, just that it says this on the page.

21           Mr. Miller?

22           MR. MILLER:  Just to clarify, Your Honor, and I'm

23   not trying to question your ruling, I want to understand.

24   If you say you'll let it in can we limit it to this page as

25   opposed to the other --
```

Page 192

```
 1              THE COURT:  Yes, this --

 2              MR. MILLER:  -- 43 pages --

 3              THE COURT:  -- this page.

 4              MS. SOLOMON:  That's fine.

 5              MR. MILLER:  -- of cryptic --

 6              THE COURT:  No --

 7              MS. SOLOMON:  I have no issue with that.

 8              THE COURT:  Yeah.  I mean you -- so but the

 9   argument is going to be limited to that on this last year's

10   deck that was provided on this date these are what the

11   numbers on this page said.

12              MS. SOLOMON:  Right, and I would just request that

13   the covering -- you know, the covering email and if there's

14   a cover page also be included.

15              THE COURT:  Okay.

16              MR. MILLER:  Certainly reasonable, Your Honor, for

17   context.  Our concern was since we didn't know exactly what

18   it was going to be used for, but all those pages of who

19   knows what inscriptive PowerPoint talk --

20              THE COURT:  Right.

21              MR. MILLER:  -- being in the record, that's what

22   our objection was.

23              THE COURT:  Right.  I mean, you know, once again

24   -- well, I won't go into it.

25              So we're going limit it to that -- that one page
```

1      with the cover page and the transmittal email.

2                Yes?

3                MR. KAPLAN:  Your Honor, on another issue.  In

4      connection with the findings of fact when we refer to

5      exhibits when they're multi-page exhibits I assume you would

6      like the page --

7                THE COURT:  Yes.  Yes.

8                MR. KAPLAN:  Some of them we can't do more than

9      that, right?

10               THE COURT:  Right.

11               MR. KAPLAN:  We can put in if there's a heading on

12     it or something, but -- right.

13               THE COURT:  Right.

14               MR. KAPLAN:  Okay.

15               THE COURT:  Right.  I mean the point is that

16     otherwise --

17               MR. KAPLAN:  To try and point you to --

18               THE COURT:  -- we have to -- we have to spend

19     an --

20               MR. KAPLAN:  Right.

21               THE COURT:  -- enormous amount of time searching

22     for the record cites --

23               MR. KAPLAN:  Right.

24               THE COURT:  -- and that -- that just creates a lot

25     of --

Page 194

1           MR. KAPLAN:  So when we give record cites to

2    exhibits we should try and particularize.

3           THE COURT:  The more particular the better, yes.

4           MR. KAPLAN:  Absolutely.

5           THE COURT:  So did we ever get the final set of

6    exhibits or are you going to just submit that to me later?

7           MS. BRADY:  Your Honor, I have a list right here

8    if that would be helpful of LBHI's exhibits that the

9    claimants do not object to.

10          THE COURT:  Okay.  What would be helpful is if you

11   just sent -- sent -- each of you sent chambers an email that

12   just says here are the exhibits that are by agreement of the

13   parties constitute the record.

14          MS. SOLOMON:  And it's just an exhibit list

15   obviously.

16          THE COURT:  Just a list.

17          MS. SOLOMON:  Yeah.

18          MR. MILLER:  And obviously that'll be served on

19   each side so we can check and make sure we all have the same

20   ones.

21          THE COURT:  Yes.  You should all share the

22   document numbers and then someone should send me one email

23   that just says here are the respective parties' exhibits

24   that by agreement are -- are the -- constitute the record.

25   Okay?

Page 195

1            MR. MILLER:  Certainly, Your Honor.

2            MS. SOLOMON:  Thank you, Your Honor.

3            THE COURT:  Okay, thank you everybody.  Thank you

4    for your patience and your endurance.

5            MR. MILLER:  And thank you for your time, Your

6    Honor.

7            MR. KAPLAN:  Thank you, Your Honor.

8            THE COURT:  Sure.

9            UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

10        (Proceedings concluded at 2:23 PM)

11                        * * * * *

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 196

1                    C E R T I F I C A T I O N

2        I, Sheila G. Orms and Dawn South, certify that the

3    foregoing is a correct transcript from the official

4    electronic sound recording of the proceedings in the above-

5    entitled matter.

6

7

8

9    Signature of Approved Transcriber

10

11

12

13    AAERT Certified Electronic Transcriber CET**D-408

14

15    Veritext

16    330 Old Country Road

17    Suite 300

18    Mineola, NY 11501

19    Date:  April 7, 2014

20

21

22

23

24

25