**Objection Deadline: April 22, 2014 at 4:00 p.m. (Prevailing Eastern Time)[1]**
**Hearing Date and Time: May 14, 2014 at 10:00 a.m. (Prevailing Eastern Time)**

**BROWN RUDNICK LLP**
Seven Times Square
New York, New York 10036
212-209-4800
David J. Molton
Andrew Dash
Howard S. Steel

*Counsel for Newport Global Advisors LP*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------------------x

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| **LEHMAN BROTHERS HOLDINGS INC.**, *et al.*, | : | Case No. 08-13555 (SCC) |
| | : | |
| Debtors. | : | (Jointly Administered) |

--------------------------------------------------------------------x

### RESPONSE OF NEWPORT GLOBAL
### ADVISORS LP TO THE FOUR HUNDRED
### <u>FIFTY-EIGHTH OMNIBUS OBJECTION TO CLAIMS</u>

Newport Global Advisors LP ("<u>NGA</u>"), by and through its undersigned attorneys, as and for its response (the "<u>Response</u>") to the Four Hundred Fifty-Eighth Omnibus Objection to Claims (the "<u>Objection</u>"), dated March 13, 2014 [Docket No. 43532], filed by Lehman Brothers Holdings Inc. ("<u>LBHI</u>" or the "<u>Plan Administrator</u>"), respectfully states as follows:

---

[1] The Objection Deadline was extended by agreement with the Plan Administrator.

## PRELIMINARY STATEMENT

1.      At all relevant times, NGA managed private investment funds Newport Global Opportunities Fund L.P. ("NGOF") and Newport Global Credit Fund (Master) L.P. ("NGCF" and, together with NGOF, the "Funds").   Prior to the Debtors' Chapter 11 filings, Lehman Brothers Inc. ("LBI") was the Funds' prime broker.   Pursuant to the Prime Brokerage Agreements among the Funds and various Lehman entities, including the Debtors (each such agreement, a "PB Agreement"), LBI and its affiliates, including the Debtors, are jointly and severally liable for all damages suffered by the Funds upon a breach of that contract by the Lehman parties.   NGA is a third-party beneficiary of the PB Agreements.

2.      Several days prior to the commencement of LBI's SIPA proceeding and these Chapter 11 cases, NGA gave express instructions to LBI to transfer the Funds' securities to another prime broker.   Despite confirming the instruction and in breach of duties imposed by the PB Agreements, Lehman failed to transfer the Funds' securities.

3.      NGA was harmed as a direct result of this breach of the PB Agreements by Lehman.   Because Lehman failed to return the Funds' securities, the Funds' net asset value decreased and NGA's management fee, which is calculated as a percentage of the Funds' net asset value, was substantially reduced.   Moreover, as a direct result of Lehman's breach of the PB Agreements, NGA lost a valuable opportunity to be acquired by another entity.

4.      Given that each of the Debtors was a party to the PB Agreements and NGA was a third-party beneficiary under the PB Agreements, each of the Debtors is fully liable for all damages sustained by NGA as a result of Lehman's breach of the PB Agreements.   As a consequence, NGA timely filed proofs of claim against each of the Debtors (the "NGA Claims").

5.       The Objection seeks to disallow the NGA Claims on two bases.  Both are without merit.  First, the Plan Administrator seeks to disallow the NGA Claims on the basis that there is no privity between NGA and the Debtors.  This argument fails because NGA is a third-party beneficiary under the PB Agreements and the Debtors' liability to NGA is not dependent on privity.  The evidence set forth in the Declaration of Roger May submitted in support of this Response, dated April 22, 2014, attached hereto as **Exhibit A** (the "May Decl."), clearly establishes NGA's third-party beneficiary status under the PB Agreements.  The Objection fails to offer any contradictory proof.  As further discussed below, the evidence supporting the merits of the NGA Claims is more than adequate to defeat the Objection, especially given the current "sufficiency" stage procedural posture.

6.       Second, the Plan Administrator, noting that each of the PB Agreements states that Lehman shall not be "liable for any special, indirect, incidental or consequential damages arising out of this Agreement," asserts that the PB Agreements prohibit NGA from recovering the damages set forth in the NGA Claims.  See Objection ¶ 12.  The Plan Administrator is wrong.  The NGA Claims seek to recover direct damages and, therefore, any consequential damages waiver under the PB Agreements is inapplicable to the NGA Claims.  Further, even if the damages underpinning the NGA Claims were somehow found to be consequential damages, any waiver under the PB Agreements is unenforceable as a matter of law because Lehman intentionally breached the PB Agreements.  Accordingly, the Objection should be overruled.

## BACKGROUND

A.      **The Newport-Lehman Relationship.**

      1.      **The Prime Brokerage Agreement.**

      7.      In 2006, each of the Funds entered into a Prime Brokerage Customer Account Agreement with LBI and other Lehman Brothers Entities (as defined in the PB Agreements). See May Decl. ¶ 5 (and Exhibit A thereto).

      8.      Entering into the PB Agreements was a result of NGA's decision to use Lehman as the Funds' prime broker and to maintain prime brokerage customer accounts with Lehman. See May Decl. ¶ 6.

      9.      Pursuant to the PB Agreements, a prime brokerage account was opened at LBI for each Fund.  See PB Agreement ¶ 1(a) ("[A] prime brokerage account opened pursuant to this Agreement will be opened at Lehman Brothers Inc.").  Each of the PB Agreements is governed by New York law.  See id. ¶ 24.

      10.      As noted, each of the Debtors was a party to the PB Agreements and thus each of the Debtors is fully liable for all amounts owed to the Funds and NGA arising out of the breach of the PB Agreements.  See id. ¶ 1(a).

      2.      **The Margin Lending Agreement.**

      11.      In connection with the PB Agreements, Lehman caused each of the Funds to enter into a Margin Lending Agreement (the "MLA" and, together with the PB Agreement, the "Agreements") with LBI and Lehman Brothers International (Europe) ("LBIE"), pursuant to which LBIE agreed to make loans to the Funds in connection with their transactions under the PB Agreements.  See May Decl. ¶ 7 (and Exhibit B thereto).

B.      **Newport's Course of Dealing with Lehman.**

12.     Under the PB Agreements, the Funds' requests to purchase or sell securities were placed with, and confirmed by, Lehman.  See May Decl. ¶ 8 (and Exhibit C thereto).

13.     As the Funds' prime broker, LBI had custody of a substantial portion of the Funds' securities.  See id. ¶ 9.

14.     As is standard in the securities industry and mandated by SEC guidelines on prime broker relationships, under the Agreements, Lehman was obligated to comply with the instructions of the Funds regarding the Funds' securities entrusted to Lehman.  See id. ¶ 10.

15.     Thus, as a regulated broker dealer and by virtue of the course of conduct and implied duty of good faith and fair dealing, LBI and the Debtors had responsibilities to the Funds not specifically enumerated in the PB Agreements, including the obligation to return the securities upon the Funds' demand.

C.      **NGA As A Third-Party Beneficiary Under The Agreements.**

16.     Lehman undertook significant due diligence of NGA and the Funds prior to entering into the Agreements.  See May Decl. ¶ 11.  Included in that due diligence was receipt by Lehman of NGA's management agreement with the Funds.  See id.

17.     Additionally, NGA exchanged information with Lehman's credit department prior to executing the PB Agreements, which included information regarding NGA's management agreement, management fees, and NGA's limited partners.  See May Decl. ¶ 12 (and Exhibit D thereto).

18.     After entering into the PB Agreements, Newport received a loan from Lehman to allow Newport to trade securities pursuant to the PB Agreements' terms.  Upon information and

belief, LBHI funded Newport's loan because certain regulations prohibited LBI and LBIE from lending money to Newport.  See id. ¶ 13.

19.    Thus, Lehman was well aware of NGA's relationship to the Funds and its economic interest in the Agreements. See id. ¶ 14.  Specifically, Lehman was on notice that NGA's management fees were directly tied to the Funds' net asset value.  See id. ¶¶ 14, 16 Lehman was keenly aware that NGA and the Funds intended NGA to benefit under the Agreements.  Lehman acknowledged and shared that intent by engaging in joint marketing efforts with NGA where NGA's interest in the Agreements was fully disclosed to third-party investors.  See id. ¶ 14.

**D.    Newport's Instructions To Transfer Their Securities.**

20.    On or about September 10, 2008, the Funds instructed Lehman to transfer all of the Funds' assets held in Lehman accounts to Credit Suisse Securities (USA) LLC ("Credit Suisse"), which was to assume the duties as prime broker for the Funds going forward.  See May Decl. ¶ 18.

21.    The transfer request was expressly acknowledged by Lehman on or about September 11, 2008.  See May Decl. ¶ 19.

22.    On September 12, 2008, at Lehman's request, the Funds forwarded Letters of Authorization to Lehman to facilitate the transfer of the Funds' assets.  See id. ¶ 20 (and Exhibit E thereto).

23.    Upon receipt of the Letters of Authorization and related approvals from both Credit Suisse and the Funds, the transfer of the Funds' securities was "booked [by Lehman] on September 12, 2008." See id. ¶ 21 (and Exhibit F thereto).

24.    On September 15, 2008, LBHI and certain of its affiliates and subsidiaries sought protection under Chapter 11 of the Bankruptcy Code.  On September 19, 2008, LBI's SIPA proceeding was commenced.

25.    More than half a decade has passed and the Funds' securities have never been transferred per the Funds' instructions or returned to the Funds.  See id. ¶ 24.

**E.    The NGA Claims**

26.    On September 22, 2009, NGA timely filed the NGA Claims.  See May Decl. ¶ 25 (and Exhibit G thereto).

27.    The NGA Claims seek to recover for Lehman's pre-petition failure to comply with the Funds' instruction to transfer the Funds' securities to Credit Suisse under the PB Agreements, after which the Funds' net asset value decreased and, as a direct result, NGA's management fees correspondingly decreased.  See May Decl. ¶ 26.  NGA is entitled to recover no less than $30,200,000 lost management fees directly attributable to Lehman's breach of the PB Agreements.  See id.

28.    The NGA Claims also seek to recover for diminution-in-value damages based on NGA's lost opportunity to complete a pending acquisition transaction with another investment fund.  This transaction was scuttled as a direct result of Lehman's failure to return the Funds' securities.  See id. ¶ 27.  NGA is entitled to recover no less than $70 million for this lost opportunity.  See id.

29.    As each of the Debtors was a party to the PB Agreements, each of the Debtors is jointly and severally liable for all damages suffered by NGA under the Agreements.

F.    **The Objection**

30.    On March 13, 2014, four and a half years after the NGA Claims were filed, the

Plan Administrator filed the Objection.  The Plan Administrator asserts that "NGA is not a party

to either the Prime Brokerage Agreement or the Margin Lending Agreement" and, therefore,

NGA lacks contractual privity with the Debtors so as purportedly to preclude the NGA Claims.

See Objection ¶ 11.  The Plan Administrator also argues that, even if "NGA is . . . in privity with

the [Debtors] based on the Agreements," the NGA Claims should be disallowed and expunged

because the "Agreements prohibit recovery of the type of damages [NGA] seeks."   Id. ¶ 12.

Finally, the Plan Administrator asserts that NGA "has the burden to demonstrate the validity of

[the NGA Claims]" under Bankruptcy Code Section 502(a) and, further, that the NGA Claims

"may not be allowed to the extent that '[they are] unenforceable . . . under any agreement or

applicable law.'"   See id. ¶ 13 (citing 11 U.S.C. § 502(b)).

31.    As demonstrated in this Response, the Objection is without merit.

**STANDARD OF REVIEW**

32.    The Objection triggers a "Sufficiency Hearing," as defined in the *Order Pursuant*

*to Section 105 of the Bankruptcy Code, Bankruptcy Rule 9014, and General Order M-390*

*Authorizing the Debtors to Implement Claims Hearing Procedures and Alternative Dispute*

*Resolution Procedures for Claims Against Debtors*, dated April 19, 2010 (the "Claims

Procedures Order") [Docket No. 8474].

33.    Pursuant to the Claims Procedures Order, all hearings "to address the legal

sufficiency of [a] particular Contested Claim and whether [a] Contested Claim states a claim

against the asserted Debtor under Bankruptcy Rule 7012" are considered "Sufficiency Hearings"

when the Plan Administrator fails to serve the "holder of a Contested Claim (each, a Claimant)

with a Notice of ADR Procedures or a Notice of Merits Hearing." Claims Procedures Order ¶ 4(a). As of the date of this Response, the Plan Administrator has not served NGA with a Notice of Merits Hearing or a Notice of ADR Procedures. As such, the standard of review for this Objection is "equivalent to the standard applied by the Court upon a motion to dismiss for failure to state a claim." Id. ¶ 4(a)(i).

34. Under Fed. R. Civ. P. 12(b)(6) and Fed. R. Bankr. P. 7012(b), this Court must accept the factual allegations contained in the NGA Claims as true and draw all favorable inferences in NGA's favor. See Litwin v. Blackstone Grp., L.P., 634 F.3d 706, 715 (2d Cir. 2011). For purposes of this Sufficiency Hearing, NGA need prove only "'enough facts to state a claim for relief that is plausible on its face.'" Id. (quoting ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co., 553 F.3d 187, 196 (2d Cir. 2009)). As such, the issue before the Court is "not 'whether [NGA] will ultimately prevail, but whether [NGA] is entitled to offer evidence to support the claims.'" Sultan v. Read, No. 03 Civ. 7462, 2005 WL 486732, at *3 (S.D.N.Y. Mar. 1, 2005) (citation omitted). Accordingly, the Objection can be sustained "only if 'it appears beyond doubt that [NGA] can prove no set of facts in support of [the NGA Claims] which would entitle [it] to relief.'" Id. (quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957)).

35. The Objection cannot be sustained under this standard of review. The NGA Claims adequately plead NGA's entitlement to relief for the purposes of this Sufficiency Hearing. The May Declaration supplements the record and fully supports allowance of the NGA Claims. Conversely, the Plan Administrator does not offer a single factual or legal argument that establishes beyond doubt, as the law requires, that the NGA Claims are insufficient as a matter of

law.   Therefore, the NGA Claims should be allowed or, at the very least, NGA should be

permitted to offer evidence in support of its claims at a Merits Hearing.

**RESPONSE**

**I.    The Objection Is Insufficient To Overcome**
**The *Prima Facie* Validity Of The NGA Claims.**

36.    It is well settled that a properly filed proof of claim is *prima facie* evidence of the

validity of that claim.  See 11 U.S.C. § 502(a); Fed. R. Bankr. P. 3001(f); In re WorldCom, Inc.,

No. 02-13533, 2005 WL 3832065, at *4 (Bankr. S.D.N.Y. Dec. 29, 2005) ("A proof of claim is

deemed *prima facie* valid.").    To overcome this presumptive validity, "'the objector must

produce evidence which, if believed, would refute at least one of the allegations that is essential

to the claim's legal sufficiency.'"    In re King, 305 B.R. 152, 164 (S.D.N.Y. 2004) (quoting In re

Allegheny Int'l, Inc., 954 F.2d 167, 173-74 (3d Cir. 1992)).   The burden shifts back to the

claimant only when the objector refutes the validity or amount of the claimant's proof of claim.

See In re Residential Capital, LLC, No. 12-12020, 2014 WL 1058921, at *4 (Bankr. S.D.N.Y.

Mar. 17, 2014) (overruling debtor's claim objection where it "did not present evidence

specifically addressing the [claimant's] contentions . . . contained in the proof of claim").

37.    The Plan Administrator concedes that it bears the burden to rebut the validity of

the NGA Claims.  See Objection ¶ 13.  The Plan Administrator, nonetheless, fails to offer any

evidence or legal argument sufficient to refute NGA's entitlement, as a matter of law, to recover

as a third-party beneficiary under the Agreements.[2]   The Plan Administrator asserts only what

NGA has already stated in its proofs of claim—that NGA is not a party to the Agreements but

---

[2]   The Plan Administrator's citation to Bankruptcy Code Section 502(b) adds nothing.
Section 502(b) states, in pertinent part, that a claim may not be allowed to the extent that "such
claim is unenforceable against the debtor and property of the debtor, under any agreement or
applicable law."  11 U.S.C. § 502(b)(1); see Objection ¶ 13.  The Plan Administrator's bare
reference to this section without any meaningful analysis is merely conclusory boilerplate.

was damaged by Lehman's breach.  <u>See</u> Objection ¶ 11.  The Plan Administrator similarly offers

no evidence or sustainable legal argument to support its alternative argument that NGA's

damages are special, indirect, incidental or consequential to Lehman's breach of the Agreements

and thus barred under the Agreements.  Accordingly, the Objection must fail because the Plan

Administrator has not refuted any of the allegations essential to the NGA Claims, as required to

sustain a claim objection.

## II.    NGA Is A Third-Party Beneficiary Under The Agreements<br>      Entitled To Recover Against The Debtors On The NGA Claims.

38.    The Plan Administrator's argument that NGA must be in privity with the Debtors

to recover on the NGA Claims is without merit.  Indeed, the Plan Administrator's cursory

analysis ignores the well-established exception to the contractual privity requirement—recovery

as an intended third-party beneficiary.  Under governing New York law, a third-party beneficiary

may enforce a contract made for its benefit notwithstanding an absence of privity.  <u>See, e.g.,</u>

<u>Rekis v. Lake Minnewaska Mountain Houses, Inc.</u>, 573 N.Y.S.2d 331, 334 (3d Dep't 1991)

("Lack of privity . . . does not preclude plaintiff from seeking to enforce the contract.").  The

NGA Claims are allowable as a matter of law because NGA is an intended third-party

beneficiary under the Agreements.

39.    To enforce the Agreements as a third-party beneficiary, NGA must prove: (1) the

existence of a valid and binding contract between the parties to the contract; (2) that the contract

was intended to benefit the third party; and (3) that the benefit to the third party was sufficiently

immediate, and not incidental, to indicate the assumption by the contracting parties of a duty to

compensate the third party if the contract's benefit was lost.  <u>See</u> <u>All Am. Moving & Storage,</u>

<u>Inc. v. Andrews</u>, 949 N.Y.S.2d 17, 19-20 (1st Dep't 2012).  Each of these elements is present

here.

40.    <u>First</u>, there is no dispute that the Agreements are valid and binding contracts between the Funds and the Debtors.  This fact is not disputed in the Objection, nor could it be.  Thus, the first element is satisfied.

41.    <u>Second</u>, the Agreements were intended to benefit NGA.  Under applicable New York law, a third party may enforce a contract if, at the time of contracting, the contracting parties intended their performance to benefit the third party.  <u>See</u> <u>DFP Mfg. v. Northrop Grumman Corp.</u>, No. 97-CV-4494, 1999 WL 33458384, at *7-8 (E.D.N.Y. Mar. 23, 1999) (denying motion to dismiss third-party beneficiary claim where issue of fact existed as to the parties' intent to benefit the non-party).  The parties' intent to benefit the third party need not be expressly stated in the contract and may be determined by looking at the circumstances surrounding its execution.  <u>See</u> <u>Vista Co. v. Columbia Pictures Indus., Inc.</u>, 725 F. Supp. 1286, 1296 (S.D.N.Y. 1989) ("It is established . . . that 'the obligation to the third party plaintiff need not necessarily be expressly stated in the contract.'" (quoting <u>United States v. Ogden Tech. Labs., Inc.</u>, 406 F. Supp. 1090, 1092 (E.D.N.Y. 1973))); <u>Condren, Walker & Co. v. Wolf</u>, 796 N.Y.S.2d 596, 597 (1st Dep't 2005) (entitlement to recover as third-party beneficiary could not be determined from the face of the contract alone).  "Among the circumstances to be considered is whether manifestation of the intention of [both parties to benefit the third party] is sufficient, in a contractual setting, to make reliance by the beneficiary both reasonable and probable."  <u>Anwar v. Fairfield Greenwich Ltd.</u>, 728 F. Supp. 2d 372, 418-19 (S.D.N.Y. 2010).

42.    The promisee's intent, <u>i.e.</u>, the intent of the party to whom the contract's performance is promised, is a key part of "ascertaining whether a party is to be considered an intended beneficiary."  <u>Key Int'l Mfg., Inc. v. Morse/Diesel, Inc.</u>, 536 N.Y.S.2d 792, 796 (2d Dep't 1988) (promisors' lack of knowledge of third-party beneficiary's exact name or form

immaterial); <u>Johnson City Cent. Sch. Dist. v. Fid. & Deposit Co. of Md.</u>, 693 N.Y.S.2d 669, 671 (3d Dep't 1999) (issue of fact existed sufficient to defeat motion to dismiss where promisee intended to confer benefit of contract's performance on third party).  Although the Agreements contained mutual promises, Lehman promised to open and maintain prime brokerage accounts in the Funds' names.  <u>See, e.g.</u>, PB Agreement ¶ 1(a).  It was in this capacity as prime broker that Lehman breached its promise to the Funds, as promisees, under the Agreements.  <u>Id.</u> ¶ 21(b). The financial benefit of maintaining the prime brokerage accounts was a reason the Funds, under the guidance of their manager, NGA, chose to enter the Agreements.  <u>See</u> May Decl. ¶¶ 6, 15. The Funds intended, at least in part, to benefit NGA as their manager through the Agreements. The fee calculation under the management agreement between the Funds and NGA clearly manifests this intent, as does the entities' mutually beneficial relationship.

43.    Lehman was well aware that the Agreements benefitted NGA.  Prior to executing the PB Agreements with the Funds, NGA exchanged information with Lehman's credit department, which included information regarding NGA's management agreement, management fees, and NGA's limited partners.  <u>See id.</u> ¶ 12.  In fact, Lehman:  knew and therefore was on notice that NGA's management fee was directly linked to the Funds' net asset value, <u>see id.</u> ¶ 11; received copies of the management agreement between the Funds and NGA, <u>see id.</u>; and participated in investor meetings where Lehman and NGA co-marketed potential investors and NGA's management agreement with the Funds was repeatedly disclosed,  <u>see id.</u> ¶ 14.[3] Furthermore, LBHI in particular knew about the connection between NGA and the Funds

---

[3]  If the Plan Administrator chooses to seek an evidentiary Merits Hearing at a later date, NGA will offer documentary and testimonial evidence establishing the knowledge and intent of all Lehman Brothers Entities regarding the managerial relationship between the Funds and NGA, the relationship between NGA and Lehman, along with other relevant information.

because it funded a loan to Newport after the PB Agreements to allow Newport to trade securities.  See May Decl. ¶ 13.

44.     Thus, the absence of reference to NGA in the Agreements does not impact NGA's entitlement to relief under the Agreements.  See Ogden Tech. Labs., Inc., 406 F. Supp. at 1092 (The "obligation to perform to third-party plaintiff . . . may be implied [from] the contracts and surrounding circumstances.").  To the contrary, the circumstances surrounding the Agreements' execution and Lehman's knowledge of NGA's relationship to the Funds both demonstrate that, at the time the Agreements were executed, both Lehman and the Funds intended NGA to benefit under the Agreements.  Therefore, the second element is satisfied.

45.     Third, NGA's benefit under the Agreements was sufficiently immediate to indicate NGA's right to compensation arising from Lehman's breach of the Agreements.  NGA's benefit under the contract was "more than merely incidental to the benefits accorded to the contracting parties."  Johnson City Cent. Sch. Dist., 693 N.Y.S.2d at 671 (reversing dismissal of third party's breach of contract action where parties intended for plaintiff to ultimately receive the benefit of the contract's performance).  When the third party receives the ultimate benefit of the contract, its benefit is sufficiently immediate to allow the third-party beneficiary to enforce the contract.  See Key Int'l Mfg., Inc., 536 N.Y.S.2d at 796 (third party could recover under contract where "performance by the promisors was manifestly to be to the direct benefit of the [third party]").

46.     The NGA Claims seek to recover damages for the loss of the direct benefit owed to NGA under the PB Agreements.  NGA directly and immediately benefitted from Lehman's prime brokerage services under the PB Agreements because NGA's fee is calculated as a percentage of the Funds' net asset value.  See May Decl. ¶ 16.  All parties to the Agreements

understood that NGA would ultimately benefit from any increase in value of the Funds' securities. When Lehman failed to abide by the Funds' instructions to transfer or return the securities in breach of the PB Agreements, Lehman directly damaged NGA by eliminating NGA's control over the Funds' securities. As a result of this loss of control, NGA's management fee has been reduced and NGA lost the opportunity to close an acquisition deal under which another investment fund would have paid a premium to acquire NGA and the Funds. See id. ¶ 17.

47.    Over the past five plus years, NGA has been wrongfully prevented from managing the Funds' assets held hostage by Lehman. Corporate actions related to the Funds' securities in their Lehman accounts have come and gone without attention because of Lehman's breach or inaction. As a result of Lehman's breach of the Agreements, NGA has been prevented from accessing the market on the Funds' behalf, trading the Funds' securities, and realizing gains on the securities invested in each Fund. Moreover, Lehman effectively blocked NGA's opportunity to close its acquisition deal by failing to return the Funds' securities because, without the securities, NGA could not consummate the deal. In short, Lehman's breach prevented NGA from receiving any of the benefits it was intended to receive under the Agreements. As a result, the Debtors must compensate NGA for the damages caused by Lehman's breach of the Agreements. Thus, the third element required by law for finding third-party beneficiary status is satisfied.

48.    NGA has satisfied all three elements necessary to enforce the Agreements as a third-party beneficiary. The Plan Administrator's contention that NGA lacks privity and that the NGA Claims should be disallowed on that basis fails.

## III.   The Consequential Damages Waivers In
##        The Agreements Do Not Bar The NGA Claims.

49.    The Plan Administrator further claims that the Agreements "prohibit recovery of the type of damages asserted by NGA" because each of the consequential damages provisions states, inter alia, that Lehman will not "be liable for any special, indirect, incidental or consequential damages arising out of this Agreement."[4]   Objection ¶ 12.   This argument also fails.

### A.    The Plan Administrator Raises An Issue Of Fact For Trial.

50.    The issue of whether NGA seeks to recover direct or consequential damages is a question of fact reserved for trial and is outside the scope of a Sufficiency Hearing.   See Am. Elec. Power Co. v. Westinghouse Elec. Corp., 418 F. Supp. 435, 459-60 (S.D.N.Y. 1976) ("the precise demarcation between direct and consequential damages is a question of fact . . . that must be left for resolution at trial"; even where the parties' consequential damages clause included particularized definitions, "the precise scope of direct damages must be left for resolution at trial"); Niagara Mohawk Power Corp. v. Stone & Webster Eng'g Corp., No. 88-CV-819, 1992 WL 121726, at *28 (N.D.N.Y. May 23, 1992) ("Generally, whether damages are direct or consequential is an issue of fact which must be reserved for trial.").

51.    The Plan Administrator makes no effort to explain why or how the NGA Claims fall within the purview of the damages waivers under the Agreements.   See Objection ¶¶ 5, 12. Rather, in a completely conclusory fashion, the Plan Administrator merely repeats the terms of

---

[4]   The consequential damages clause in each of the PB Agreements states, inter alia, "[i]n no event will Lehman Brothers be liable for special, indirect, incidental or consequential damages arising out of this Agreement."   PBA ¶ 30.   The MLA's consequential damages provision is identical.   See MLA ¶ 7(o) ("In no event will Lender [LBIE] or Agent [LBI] be liable for any special, indirect, incidental or consequential damages arising out of this Agreement.").

the Agreements "that Lehman shall not be liable for any special, indirect, incidental or consequential damages . . . ." Id. ¶ 12. No supporting facts or additional arguments appear in the Objection. This is entirely insufficient and, in any event, whether NGA seeks to recover direct or consequential damages is a factual issue that must be determined at trial, and is not appropriate for resolution at this Sufficiency Hearing.

### B.    NGA Seeks To Recover Direct Damages.

52.    Beyond this, notwithstanding the Plan Administrator's characterization, the NGA Claims assert direct damages that are not barred under the Agreements. Direct or general damages are "those which are the natural and probable consequence of the breach" of contract. See Am. List Corp. v. U.S. News & World Rep., Inc., 549 N.E.2d 1161, 1164 (N.Y. 1989). Specifically, direct damages naturally and directly flow from the defendant's wrongful actions. See MBIA Ins. Corp. v. Morgan Stanley, No. 29951-10, 2011 WL 11556446, at *8 (N.Y. Sup. Ct. Westchester Cnty. May 26, 2011); Am. List Corp., 550 N.Y.S.2d at 593 (direct damages arise out of the breaching party's failure to satisfy a "definite obligation" under the contract). Determining whether damages are direct or consequential is a fact-intensive and case-specific analysis. See Biotronik A.G. v. Conor Medsys. Ireland, Ltd., 2014 N.Y. Slip Op. 02101, 2014 N.Y. LEXIS 575, at *13-14 (N.Y. Mar. 27, 2014) (rejecting cases that definitively categorize certain types of damages as consequential rather than general); DFP Mfg. Corp., 1999 WL 33458384, at *7 (third party's right "'to recover upon a contract made by other parties for his

benefit must rest upon the peculiar circumstances of each case rather than upon the law of some other case'" (quoting Seaver v. Ransom, 120 N.E. 639, 641 (N.Y. 1918))).[5]

53.    Lehman's failure to return or transfer the Funds' securities to Credit Suisse as instructed breached Lehman's obligations under the PB Agreements and directly damaged NGA by eliminating NGA's control over the Funds' securities.  This, in turn, led to a reduction in NGA's management fee.[6]  That NGA would be directly damaged by that breach was a natural and probable consequence of Lehman's course of dealing with NGA and the Funds.  Accordingly, NGA's injury flows directly and immediately from Lehman's breach of the PB Agreements.

54.    NGA also seeks to recover direct damages for the lost opportunity to close an acquisition transaction with another investment fund caused, in part, by the diminution in value of the Funds' securities.  See Emps.' Ret. Sys. of Ala. v. Resolution Trust Corp., 840 F. Supp. 972, 988 (S.D.N.Y. 1993) ("Where the loss is of a security having an ascertainable, immediately realizable market value, no part of that loss consists of 'lost profits or opportunity.'").  NGA is

---

[5]    The Plan Administrator relies on International Gateway Exchange v. Western Union Financial Services, Inc., 333 F. Supp. 2d 131 (S.D.N.Y. 2004), for the blanket proposition that courts regularly enforce consequential damages waivers.  See Objection ¶ 12.  However, the Plan Administrator fails to discuss subsequent New York authority that rejects a bright-line classification of damages as consequential or direct.  See Biotronik A.G., 2014 N.Y. LEXIS 575, at *13-14 (lost profits may qualify as general damages, even when incurred in a third-party transaction; rejecting the approach adopted in International Gateway).

[6]    The Plan Administrator inappropriately relies on cases where a contracting party sought to recover lost profits, which are often deemed consequential damages.  See, e.g., In re Vivaro Corp., No. 12-13810, 2014 WL 486288, at *4 (S.D.N.Y. Feb. 6, 2014) (plaintiff sought not to recover money directly owed under the terms of the contract, but rather "lost profits from unmade sales to third-parties in collateral transactions"); Betal Envtl. Corp. v. Local Union No. 78, Asbestos, Lead & Hazardous Waste Laborers, 162 F. Supp. 2d 246, 260 (S.D.N.Y. 2001) (recovery barred where consequential damages clause "distinctly excluded recovery of lost profits").  However, the Plan Administrator's argument fails to account for the fact that NGA does not seek to recover lost profits.  Rather the NGA Claims assert, inter alia, direct damages for the lost value of its management fee which directly resulted from Lehman's breach of the Agreements.

18

entitled to recover for this lost opportunity despite the consequential damages provisions in the Agreements because diminution-in-value damages are a type of direct damages.  See T.Co Metals, LLC v. Dempsey Pipe & Supply, Inc., 592 F.3d 329, 340 (2d Cir. 2010) (a consequential damages waiver did not bar the award of diminution-in-value damages); Emps.' Ret. Sys. of Ala., 840 F. Supp. at 988 (lost value of bonds, which were marketable securities, constituted direct damages).

55.    As a direct result of Lehman's breach of the Agreements, NGA was unable to exercise control over the Funds' securities and the value of the Funds' securities decreased, which caused NGA's then pending deal with another investment fund to acquire NGA to fall through.  But for Lehman's pre-petition breach of the PB Agreements, the Funds would not have sustained such a diminution in their total net asset value, and NGA would not have lost its opportunity to consummate the acquisition transaction or incurred the reduced management fee.  In sum, the NGA Claims seek to recover direct damages caused by Lehman's failure to perform under the Agreements.    Accordingly, any waiver of consequential damages under the Agreements provides no sustainable grounds for the Plan Administrator to seek disallowance of the NGA Claims.

## C.    Alternatively, NGA Is Entitled To Recover Under The Agreements Because The Consequential Damages Waivers Are Unenforceable.

56.    Even if it somehow were found that the NGA Claims assert claims for consequential damages, any waiver of such damages under the Agreements is unenforceable because of Lehman's intentional breach of the PB Agreements.

57.    Consequential damages waivers are "'strictly construed against the person seeking exemption from liability.'"  MBIA Ins. Corp. v. Patriarch Partners VIII, LLC, 842 F. Supp. 2d 682, 707 (S.D.N.Y. Feb. 6, 2012) (quoting HealthExtras, Inc. v. SG Cowen Secs.

Corp., No. 02 Civ. 9613, 2004 WL 97699, at *2 (S.D.N.Y. Jan. 20, 2004)).    Under governing

New York law, exculpatory clauses are generally "'disfavored by the law, . . . closely scrutinized

by the courts,'" and are only recognized when they do not offend public policy.    See Banc of

Am. Secs. LLC v. Solow Bldg. Co. II, L.L.C., 847 N.Y.S.2d 49, 53 (1st Dep't 2007) (citation

omitted).    Moreover, exculpatory clauses will not be enforced to insulate a party from liability

for intentional or reckless conduct.    See Soroof Trading Dev. Co., Ltd. v. GE Fuel Cells Sys.

LLC, 842 F. Supp. 2d 502, 516 (S.D.N.Y. 2012) ("[A]n exculpatory agreement, no matter how

flat and unqualified in terms, will not exonerate a party from liability . . . [for] willful or grossly

negligent acts.") (citation omitted).[7]    Specifically, exculpatory clauses are unenforceable where

the breach is caused by:  intentional wrongdoing;  willful misconduct, which includes fraudulent,

malicious or bad faith actions;  or gross negligence, which "betokens reckless indifference to the

rights of others."    Banc of Am. Secs. LLC, 847 N.Y.S.2d at 53 (citing Kalisch-Jarcho, Inc. v.

City of New York, 448 N.E.2d 413, 416 (N.Y. 1983)); see In re WorldCom, 2005 WL 3832065,

at *5 ("[L]iability for knowing or bad faith breaches of contract can never be limited.") (citation

omitted).

        58.    Lehman intentionally breached the Agreements by failing to abide by NGA's

instructions to transfer the Funds' securities to Credit Suisse.    That Lehman was aware of its

customers' instruction is beyond dispute:  Lehman confirmed and acknowledged its receipt of

the instructions on or about September 11, 2008.    See May Decl. ¶ 19.    This intentional breach

---

        [7]    Both International Gateway Exchange and DynCorp v. GTE Corp., 215 F. Supp. 2d
308 (S.D.N.Y. 2002), which are cited by the Plan Administrator for the general proposition that
exculpatory clauses are enforceable in New York, fail account for this exception and have since
been contradicted by more recent precedent applying New York law.    See Deutsche Alt-A Secs.
Mortg. Loan Trust, Series 2006-OA1 v. DB Structured Prods., Inc., 958 F. Supp. 2d 488, 500-01
(S.D.N.Y. 2013) (liability limiting provision did not bar plaintiff from seeking compensatory
damages for defendant's willful or grossly negligent breach of contract, despite holding in
DynCorp).

has continued for over half a decade and the Funds still have no access to their securities.  See id. ¶ 24.  Lehman's actions demonstrate a reckless indifference to the Funds' and NGA's rights and have directly damaged NGA.  Thus, the waivers are unenforceable against NGA.  Accordingly, the Plan Administrator cannot rely on its argument that the waivers bar the NGA Claims.

59.    Furthermore, at the very least, Lehman's conduct raises an issue of fact as to whether the breach of the Agreements was intentional or reckless.  Whether a party's conduct rises to the level of intentional or reckless conduct is an issue of fact which courts regularly decline to decide on a motion to dismiss.  See, e.g., Johnson & Johnson v. Guidant Corp., 525 F. Supp. 2d 336, 353 (S.D.N.Y. 2007) (issue of whether defendant's conduct constituted a willful breach could not be decided on a motion to dismiss); Sommer v. Fed. Signal Corp., 593 N.E.2d 1365, 1371 (N.Y. 1992) (the determination as to whether the defendant's conduct amounted to "a simple mistake or reckless indifference" and, therefore, rendered liability limitation unenforceable was "for a jury to determine"); In re WorldCom, 2005 WL 3832065, at *8-9 (claimant stated a claim for breach of contract for lack of good faith; evidentiary hearing was necessary to assess its merits).  As discussed above, the Plan Administrator offers no evidence explaining Lehman's failure to transfer the securities pre-petition, far less evidence sufficient to warrant dismissal at this stage in the claims objection process.  In any event, the enforceability of the waivers should not be decided under the Rule 12(b)(6) standard that governs this Sufficiency Hearing.

## **CONCLUSION**

The Objection fails for three reasons.  First, the Plan Administrator does not satisfy its burden to offer evidence sufficient to overcome the presumptive validity of the NGA Claims. Second, the NGA claims are valid and enforceable because NGA is a third-party beneficiary

under the PB Agreements.  <u>Third</u>, NGA seeks to recover direct damages which are outside the scope of the consequential damages waivers under the Agreements.  Even if the Court finds that the NGA Claims assert consequential damages, the Plan Administrator cannot enforce the waivers because Lehman intentionally breached the PB Agreements.  Therefore, the Objection fails and should be overruled.

WHEREFORE, for all the reasons set forth in this Response, NGA respectfully requests that the Court: (i) overrule the Objection; (ii) allow the NGA Claims; and (iii) grant such other and further relief as is just and proper.

Dated:  April 22, 2014
       New York, New York

                                        **BROWN RUDNICK LLP**

                                        _____/s/ David Molton_____
                                        David J. Molton
                                        Andrew Dash
                                          Howard S. Steel
                                        Seven Times Square
                                        New York, New York 10036
                                        212-209-4800

                                        _Counsel for Newport Global_
                                        _Advisors LP_

# EXHIBIT A

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------------x

| | | |
|---|---|---|
| In re | : | Chapter 11 Case No. |
| | : | |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, | : | 08-13555 (SCC) |
| | : | |
| Debtors. | : | (Jointly Administered) |

---------------------------------------------------------------------------x

**DECLARATION OF ROGER MAY**
**IN SUPPORT OF THE RESPONSE OF**
**NEWPORT GLOBAL ADVISORS LP TO THE FOUR**
**HUNDRED AND FIFTY-EIGHTH OMNIBUS OBJECTION TO CLAIMS**

Roger May declares as follows:

1.     I am a Senior Managing Director and Chief Operating Officer of claimant Newport Global Advisors LP ("NGA").  I submit this declaration in support of the Response of Newport Global Advisors LP to the Four Hundred Fifty-Eighth Omnibus Objection to Claims (the "Response").[1]

2.     At all relevant times, NGA managed private investment funds Newport Global Opportunities Fund L.P. ("NGOF") and Newport Global Credit Fund (Master) L.P. ("NGCF" and, together with NGOF, the "Funds").

3.     As Senior Managing Director and Chief Operating Officer, I administered the Funds' relationship with Lehman.

4.     I have personal knowledge of the matters set forth in this Declaration.  If called to testify, I could and would testify as follows:

---

[1] Capitalized terms not defined in this Declaration have the meanings ascribed to them in the Response.

A.    **The Newport-Lehman Relationship**

    i.    **The Prime Brokerage Agreement**

5.    In 2006, each of the Funds entered into a Prime Brokerage Customer Account Agreement with LBI and other Lehman Brothers Entities (as defined in the PB Agreements).  A true and accurate copy of a representative PB Agreement is attached hereto as **Exhibit A**.

6.    Entering into the PB Agreement was a result of NGA's decision to use Lehman as the Funds' prime broker and to maintain prime brokerage customer accounts with Lehman.  The financial benefit of maintaining the prime brokerage accounts was a reason the Funds, under the guidance of their manager, NGA, chose to enter the Agreements.

    ii.    **The Margin Lending Agreement**

7.    In connection with the PB Agreement, Lehman caused each of the Funds to enter into a Margin Lending Agreement (the "MLA" and, together with the PB Agreement, the "Agreements") with LBI and LBIE, pursuant to which LBIE agreed to make loans to the Funds in connection with their transactions under the PB Agreement.  A true and accurate copy of a representative MLA is attached hereto as **Exhibit B**.

B.    **Newport's Course of Dealing with Lehman**

8.    Pursuant to the terms of the PB Agreements, all of the Funds' requests to purchase or sell securities were placed with, and confirmed by, Lehman.  See representative email from Lehman representative Devin Filocco to me, as Chief Operating Officer of NGA, dated March 13, 2008, a true and accurate copy of which is attached hereto as **Exhibit C**.

9.    The Funds entrusted their securities to LBI as their prime broker and LBI was responsible for executing the Funds' instructions with respect to their Lehman accounts.

10.    As is standard in the securities industry and required under the Agreements, Lehman was obligated to comply with the instructions of the Funds regarding the Funds' securities entrusted to Lehman.

C.    **NGA As A Third-Party Beneficiary Under The Agreements**

11.    Lehman undertook significant due diligence of NGA and the Funds prior to entering into the Agreements.  Included in that due diligence was receipt by Lehman of NGA's management agreement for the Fund and the management agreement specifically states that NGA's management fees are directly tied to the Funds' net asset value.

12.    Additionally, NGA exchanged information with Lehman's credit department prior to executing the PB Agreements, which included information regarding NGA's management agreement, management fees, and NGA's limited partners.  See email from Donald C. DeGraff, Managing Director of Prime Brokerage Sales at Lehman Brothers, to me, as Chief Operating Officer of NGA, dated March 9, 2006 (attaching Lehman Brothers letter summarizing terms of prime brokerage services), a true and accurate copy of which is attached hereto as **Exhibit D**.

13.    After entering into the PB Agreements, Newport received a loan from Lehman to allow Newport to trade securities pursuant to the PB Agreements' terms.  Upon information and belief, LBHI funded Newport's loan because certain regulations prohibited LBI and LBIE from lending money to Newport.

14.    Upon information and belief, Lehman was keenly aware that NGA and the Funds intended NGA to benefit under the Agreements.  Lehman acknowledged and shared that intent by engaging in joint marketing efforts with NGA where NGA's interest in the Agreements was fully disclosed to third-party investors, as well as NGA's management agreement and fees.

15.     As the Funds manager, I have personal knowledge of the Funds' awareness of NGA's benefit under the Agreements.  In particular, the Funds knew that the benefit of the Agreements would flow, in part, to NGA as their manager because the management agreement tied NGA's management fees to the Funds' performance and a significant portion of the Funds' portfolio was entrusted to Lehman as the Funds' prime broker.

16.     I also know that NGA directly and immediately benefitted from Lehman's prime brokerage services under the Agreements.  The benefit NGA enjoyed was so direct and immediate because NGA's fee is calculated as a percentage of the Funds' net asset value.  All parties to the Agreements understood that NGA would ultimately benefit from any increase in value of the Funds' securities.

17.     When Lehman failed to transfer or return the securities in breach of the Agreements, Lehman eliminated NGA's control over the Funds' securities.  As a result of this loss of control, NGA's management fee has been reduced and NGA lost the opportunity to close an acquisition deal under which another investment fund was to acquire Newport.

**D.     Newport's Instructions To Transfer Their Securities**

18.      On or about September 10, 2008, I instructed Lehman to transfer all of the Funds' assets held in Lehman accounts to Credit Suisse Securities (USA) LLC ("Credit Suisse"), which was to assume the duties as prime broker for the Funds going forward.

19.     The transfer request was expressly acknowledged by Lehman on or about September 11, 2008.

20.     On September 12, 2008, at Lehman's request, I subsequently forwarded Letters of Authorization to Lehman to facilitate the transfer of the Funds' assets.  A true and accurate copy of an email dated September 12, 2008 from me to Mizan Rahman forwarding a representative Letter of Authorization, is attached hereto as **Exhibit E**.

4

21.     Upon receipt of the Letters of Authorization and related approvals from both Credit Suisse and the Funds, the transfer of the Funds' securities was "booked [by Lehman] on September 12, 2008."  A true and accurate copy of an email dated September 23, 2008 from Mizan Rahman to me, is attached hereto as **Exhibit F**.

22.     Despite Lehman's confirmation of the Funds' instruction, Lehman never effected the transfer to Credit Suisse.

23.     Upon information and belief, Lehman intentionally breached the Agreements by failing to abide by the Funds' instructions to transfer their securities to Credit Suisse.

24.      More than half a decade has passed and the Funds' securities have never been transferred per the Funds' instructions or returned to the Funds.

## E.   The NGA Claims

25.     On September 22, 2009, NGA timely filed the NGA Claims.  A true and accurate representative proof of claim filed by NGA against the Debtors in the Chapter 11 proceedings is attached hereto as **Exhibit G**.

26.     The NGA Claims seek to recover for Lehman's pre-petition failure to comply with the Funds' instruction to transfer the Funds' securities to Credit Suisse under the PB Agreement, after which the Funds' net asset value decreased, and as a direct result, NGA's management fee correspondingly decreased.  Thus, NGA is entitled to recover no less than $30,200,000 in lost management fees.

27.     The NGA Claims also seek to recover for diminution-in-value damages based on NGA's lost opportunity to complete a pending acquisition transaction with another investment fund, as a direct result of Lehman's failure to return the Funds' securities.  NGA is entitled to recover no less than $70 million for this lost opportunity.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 22, 2014.                    _____/s/ Roger May_____
                                                             ROGER MAY

# EXHIBIT A

| **Customer Account Agreement Prime Brokerage** | **LEHMAN BROTHERS INC.**<br>Lehman Brothers Inc.<br>745 Seventh Avenue<br>New York, NY 10019<br>(212) 526-7000 |
|---|---|

| Title: Newport Global Credit Fund (Master) LP | Account (and Group) No.: |
|---|---|
| | |

**Please Read Carefully, Sign and Return**

This agreement ("Agreement") sets forth the terms and conditions under which Lehman Brothers (as defined below) will open and maintain prime brokerage account(s) in your name and otherwise transact business with you as our customer. Throughout this Agreement references to "you" and "your" refer to you as our customer.

In consideration of Lehman Brothers opening a prime brokerage account for you, you agree to the following:

**1. PARTIES.** (a) A prime brokerage account opened pursuant to this Agreement will be opened at Lehman Brothers Inc. ("LBI"). All transactions, agreements and contracts between you and Lehman Brothers have been entered into in consideration of each other. You hereby agree that the parties to this Agreement shall consist of you and Lehman Brothers Inc., Lehman Brothers International (Europe), Lehman Brothers Finance S.A., Lehman Brothers Special Financing Inc., Lehman Brothers Holdings Inc. and any of their subsidiaries, parents, affiliates, divisions, officers, directors, agents and employees now existing or hereafter created, including successors and assigns (each such entity or person being referred to hereinafter as "Lehman Brothers or a "Lehman Brothers Entity," unless otherwise specified, and all such entities or persons being collectively referred to hereinafter as "Lehman Brothers"). Unless you advise Lehman Brothers in writing to the contrary, you represent that you are not an affiliate (as defined in Rule 144(a)(1) under the U.S. Securities Act of 1933 as may be amended, modified or supplemented) of the issuer of any security held in any account opened hereby.

(b) You represent and warrant to Lehman Brothers that you are either (i) not (A) an employee benefit plan (an "ERISA Plan") as defined in Section 3(3) of the U.S. Employee Retirement Income Security Act of 1974, as amended ("ERISA"), or (B) subject to ERISA or Section 4975 of the U.S. Internal Revenue Code of 1986, as amended (the "Code") or (ii) (A) an ERISA Plan or subject to ERISA or Section 4975 of the Code and (B) whose Investment Manager or General Partner is (and you covenant and agree that any successor Investment Advisor (or Investment Manager or General Partner, as the case may be) appointed by you will be) a Qualified Professional Asset Manager ("QPAM") as defined by the relevant prohibited transaction class exemption(s) issued pursuant to ERISA and you will provide Lehman Brothers with a Investment Advisor Representation Letter .

**2. APPLICABLE LAWS, RULES AND REGULATIONS; SEVERABILITY.** All transactions under this Agreement shall be subject to the applicable laws, rules and regulations of all U.S. and, if applicable, non-U.S. federal, state and self-regulatory authorities, including, but not limited to, the rules and regulations of the Board of Governors of the Federal Reserve System of the United States and the constitution, rules and customs of the exchange or market (and clearing house) where such transactions are executed or settled. In the event of any conflict between any such present or future laws, regulations and rules and the terms of this Agreement, the provision(s) of this Agreement so affected shall be deemed modified or superseded to conform to such laws, regulations and rules, but the remaining provisions of this Agreement shall remain in full force and effect.

**3. SECURITY INTEREST AND LIEN; REGISTRATION OF SECURITIES.** As security for the payment and performance of all of your obligations and liabilities from time to time outstanding to any Lehman Brothers Entity, whether under this Agreement or otherwise, each Lehman Brothers Entity shall have a continuing lien and first priority security interest in all your Assets, defined as (i) all property in which you now have or hereafter acquire an interest which is now or hereafter held by or through any Lehman Brothers Entity, including, but not limited to, any and all securities, accounts, instruments, documents, contract rights, contracts (including, but not limited to, open transactions, securities purchase or sale contracts, agreements to lend cash or securities,

commodity contracts, futures contracts, forward contracts, repurchase agreements, swap agreements, contracts for differences or any other agreement, without regard to the form of such agreement which may include oral agreements or agreements confirmed or signed by only one party to the agreement and agreements entered into or signed by a Lehman Brothers Entity on your behalf) (hereinafter "Contracts"), commercial paper and other securities, monies, deposit accounts and general intangibles (including all security entitlements in respect thereof, all income and profits thereon, all dividends, interest and other payments and distributions with respect thereto and all proceeds from any of the foregoing), and (ii) any and all rights, claims or causes of action you may now or hereafter have against any Lehman Brothers Entity. The continuing lien and first priority security interest shall apply to all such Assets, which from time to time may be deposited or credited to any account you may have with a Lehman Brothers Entity, be held or carried by a Lehman Brothers Entity for you, be due from a Lehman Brothers Entity to you, or be delivered to or in a Lehman Brothers Entity's possession or control for any purpose, including safekeeping. Such continuing lien and first priority security interest shall apply irrespective of whether or not Lehman Brothers has made advances in connection with such Assets, the number of accounts you have with Lehman Brothers or which particular Lehman Brothers Entity holds such Assets. You hereby acknowledge and agree that all such Assets held by or through any Lehman Brothers Entity are held as collateral by such Lehman Brothers Entity as agent and bailee for itself and all other Lehman Brothers Entities and, as such, each Lehman Brothers Entity shall comply with any orders or instructions originated by any other Lehman Brothers Entity with respect to or in connection with such collateral without your further consent. You and Lehman Brothers agree that all such Assets held in or credited to any account will be treated as financial assets under Article 8 of the Uniform Commercial Code as in effect in the State of New York (the "UCC") and that any account maintained by you with any Lehman Brothers Entity shall be a securities account under Article 8 of the UCC. In the event of a breach or default by you, a Lehman Brothers Entity shall have, in addition to the rights and remedies provided in this Agreement, all rights and remedies available to a secured creditor under the UCC and any other applicable law. You represent that all of the above-described Assets shall at all times be free and clear of all liens, claims and encumbrances of any nature other than the security interest created hereby. Assets consisting of securities shall be delivered in good deliverable form (or Lehman Brothers shall have the unrestricted power to place such securities in good deliverable form) in accordance with the requirements of the primary market for these securities. In addition, in order to satisfy any of your outstanding liabilities or obligations to any Lehman Brothers Entity, each Lehman Brothers Entity may, to the fullest extent permitted by law, at any time in its discretion and without prior notice to you, use, apply or transfer any and all securities or other property or Assets (including, without limitation, fully-paid securities and cash). You hereby agree that, except as otherwise specifically agreed in writing, each Lehman Brothers Entity may register and hold the securities and other property or Assets in your accounts in its name or the name of its designee. You shall execute such documents and take such other action as such Lehman Brothers Entity shall reasonably request in order to perfect its rights with respect to any of the Assets. In addition, you appoint Lehman Brothers as your attorney-in-fact to act on your behalf to sign, seal, execute and deliver all documents and do all such acts as may be required to realize upon any of Lehman Brothers' rights in the Assets.

**4. BREACH, BANKRUPTCY OR DEFAULT.** If you shall:

(i) breach, repudiate or default under this Agreement or any Contract with any Lehman Brothers Entity, whether heretofore or hereafter entered into;

(ii) make or repeat any misrepresentations in connection with this Agreement or any Contract with any Lehman Brothers Entity;

(iii) state that you will not perform any obligation to any Lehman Brothers Entity;

(iv) apply for, consent to or be the subject of an application or petition for the appointment of or the taking of possession by a receiver, custodian, trustee, liquidator or similar persons of yourself or of all of or a substantial part of your property;

(v) admit in writing your inability, or become generally unable, to pay your debts as such debts become due or give Lehman Brothers other grounds for insecurity, as determined by Lehman Brothers in its sole and absolute discretion (including, without limitation, death; mental incompetence; dissolution; the appointment of a receiver by or against you, any guarantor, co-signer or other party liable on or providing security for your obligations to any Lehman Brothers Entity

2

or the attachment against your or such other party's account(s) with any Lehman Brothers Entity; or any indication of your refusal or inability to satisfy promptly any Margin Call (as defined below) or other obligation);

(vi) make a general assignment for the benefit of your creditors; or

(vii) file or be subject of the filing or entry of a petition or order for relief or be subject of the commencement of a proceeding regarding reorganization, bankruptcy, liquidation, dissolution or insolvency;

then, any such event shall constitute, at Lehman Brothers' election, a default by you under this Agreement and any or all Contracts you may then have with any Lehman Brothers Entity, whether heretofore or hereafter entered into. In the event of any such default, each Lehman Brothers Entity shall have all of the rights of a secured party upon default under the UCC and other applicable laws, rules and regulations, including, without limitation, the right, without prior notice to you, to sell any and all Assets in which you have an interest (including without limitation this Agreement and any Contract) held by or through any Lehman Brothers Entity (either individually or jointly with others), to buy any or all property which may have been sold short, to exercise any and all options and other rights, to accelerate, cancel, terminate, liquidate, close out and net the settlement payments and/or delivery obligations under any or all outstanding transactions and/or to purchase or sell any other securities or property to offset market risk, and to set off or offset any obligation owing by any Lehman Brothers Entity to you against any obligations owing by you to any Lehman Brothers Entity, after which you shall be liable to Lehman Brothers for any remaining deficiency, loss, costs or expenses incurred or sustained by Lehman Brothers in connection therewith. Such purchases and/or sales may be effected publicly or privately without notice or advertisement in such manner as Lehman Brothers may in its sole discretion determine. At any such sale or purchase, any Lehman Brothers Entity may purchase or sell the property to or from itself or third parties free of any right of redemption and you shall remain liable to Lehman Brothers for any deficiency; it being understood that a prior tender, demand or call of any kind from Lehman Brothers, or prior notice from Lehman Brothers, of the time and place of such sale or purchase shall not be considered a waiver of Lehman Brothers' right to buy or sell any securities, commodities or other property or Asset held by Lehman Brothers, or which you may owe to Lehman Brothers. In addition, each Lehman Brothers Entity shall have the right, at any time and from time to time, to set off and otherwise apply any and all amounts owing by such Lehman Brothers Entity to you or for your account against any and all amounts now or hereafter owing by you to any Lehman Brothers Entity (including, without limitation, any indebtedness in your accounts), whether matured or unmatured, fixed, contingent or otherwise and irrespective of whether any Lehman Brothers Entity shall have made any demand therefor. Lehman Brothers agrees to notify you of any such set-off and application, provided, however, that the failure to give such notice shall not affect the validity of any such set-off and application. You agree that any obligation of a Lehman Brothers Entity to you shall be subject to there being no breach, repudiation, misrepresentation or default (however characterized) by you which is continuing under any Contract with a Lehman Brothers Entity. You and Lehman Brothers intend this Agreement to be a master netting agreement.

**5. ADEQUATE ASSURANCES.** Subject to, and not as a limitation of, the rights of Lehman Brothers under this Agreement, if at any time Lehman Brothers has reasonable grounds for insecurity with respect to your performance of any of your obligations, Lehman Brothers may demand, and you shall give, adequate assurance of due performance within 24 hours, or within any shorter period of time Lehman Brothers demands that is reasonable under the circumstances. The adequate assurance of performance that may be demanded by Lehman Brothers may include, but shall not be limited to, the delivery by you of additional property as collateral.

**6. EXECUTION FEES AND SERVICE CHARGES.** You understand that your account(s) will be charged brokerage commissions or mark-ups/mark-downs in connection with the execution of transactions ("Execution Fees") and may be charged certain other fees for custody and other services furnished to you ("Service Fees"). You further understand that Execution Fees may be changed from time to time upon prior written notice to you and that Service Fees may be changed from time to time upon prior written notice to you and, in each case, you agree to be bound thereby.

**7. AMOUNTS OWED; TRUTH-IN-LENDING.** You hereby acknowledge receipt of Lehman Brothers' Truth-in-Lending disclosure statement. You understand that interest will be charged on any amount you owe in your account(s) in accordance with the methods described in such statement or in any amendment or revision thereto which may be provided to you. Any amount due which is not paid at the close of an interest period will be added to the opening balance for the next interest period.

3

**8. COLLECTION AND OTHER ACCOUNT-RELATED COSTS.** You hereby agree to pay, on demand, all reasonable costs, liabilities and damages incurred by Lehman Brothers (including, without limitation, costs of collection, attorneys' fees, court costs and other expenses) in connection with (i) enforcing its rights hereunder, (ii) any investigation, litigation or proceeding involving your account or any property therein (including, without limitation, claims to such property by third parties), (iii) your use of or access to any Lehman Brothers or third-party system or (iv) Lehman Brothers' acting in reliance upon instructions, including, but not limited to, instructions transmitted via electronic means, including facsimile or electronic mail, from you or your authorized agents (including investment managers or advisers). In each case and whether or not demand has been made therefor, you hereby authorize Lehman Brothers to charge your account(s) for any and all such costs, liabilities and damages, including, without limitation, those incurred in connection with the liquidation of any of your Assets.

**9. IMPARTIAL LOTTERY ALLOCATION.** You agree that, in the event Lehman Brothers holds on your behalf securities in its name, in the name of its designee or in bearer form which are called in part, you will participate in the impartial lottery allocation system for such called securities in accordance with the rules of The New York Stock Exchange, Inc. or any other appropriate self-regulatory organization. When any such call is favorable, no allocation will be made to any account in which, to the knowledge of Lehman Brothers, any officer, director or employee of Lehman Brothers has any financial interest until all other customers have been satisfied on an impartial lottery basis.

**10. SECURITIES EVENTS.** Lehman Brothers shall inform you if Lehman Brothers becomes aware of the occurrence or prospective occurrence of any of the following with respect to any securities in your account(s): conversions, subdivision or consolidation; redemption; a takeover offer; calls, including calls on partly-paid securities and published calls; a capitalization issue; rights issue; distribution of income in the form of securities; or a certificate which may at a future date be exchanged for securities or an entitlement to acquire securities. Subject to Section 19 herein, if Lehman Brothers receives notice from you that you wish to act on any of the events referenced in this section and such notice is received by Lehman Brothers within a reasonable time for Lehman Brothers to act on such event, Lehman Brothers will act in accordance with your wishes. You represent that you review all prospectuses and offering statements that you may receive and understand the risks inherent with your securities transactions, including any risks associated with the above-described securities events.

**11. VOTING RIGHTS.** If any right to vote arises with respect to securities in your account, you may inform Lehman Brothers that you wish to exercise such right as you specify. Subject to Section 19 hereof, if Lehman Brothers receives this notice within a reasonable time to act, it will act in accordance with your wishes. If Lehman Brothers does not receive such timely notice from you, it will use its discretion to decide whether and how to vote such securities.

**12. WAIVER, ASSIGNMENT AND NOTICES.** Neither Lehman Brothers' failure to insist at any time upon strict compliance with this Agreement or with any of the terms hereof nor any continued course of such conduct on its part shall constitute or be considered a waiver by Lehman Brothers of any of its rights or privileges hereunder. Any purported assignment of your rights and/or obligations hereunder without obtaining the prior written consent of an authorized representative of Lehman Brothers shall be null and void. Each Lehman Brothers Entity reserves the right to assign any of its rights or obligations hereunder or under any Contract to any other Lehman Brothers Entity without prior notice to you. Notices and other communications to you (including, without limitation, Margin Calls) that are sent by electronic means, including facsimile or electronic mail, sent by express delivery service or mailed, in each case to the address or number provided by you, shall, until the respective Lehman Brothers Entity has received notice in writing of a different address or number, be deemed to have been personally delivered to you. Margin Calls may also be communicated orally, without subsequent written confirmation.

**13. FREE CREDIT BALANCES.** You hereby authorize Lehman Brothers to use any free credit balance awaiting investment or reinvestment in your account(s) in accordance with all applicable rules and regulations and to pay interest thereon at such rate or rates and under such conditions as are established from time to time by Lehman Brothers for such account(s) and for the amounts of cash so used.

**14. RESTRICTIONS ON ACCOUNT.** You understand that Lehman Brothers, in its sole and absolute discretion, may restrict or prohibit trading of securities or other property in your account(s) and may terminate your account(s), and you shall nevertheless remain liable for all of your obligations to the Lehman Brothers Entities under

4

this Agreement or any Contract. In the event that Lehman Brothers, in its sole and absolute discretion, determines to impose such restrictions on your account(s) due to credit, margin, legal, regulatory, money laundering or other concerns, Lehman Brothers shall be under no obligation to provide you with prior notice of such restriction.

**15.    CREDIT INFORMATION AND INVESTIGATION.** You authorize Lehman Brothers, in its discretion, at any time and from time to time, to make or obtain reports concerning your credit standing and business conduct (including, but not limited to, obtaining audited account statements, if such are available). You may make a written request for a description of the nature and scope of the reports made or obtained by Lehman Brothers and the same will be provided to you within a reasonable period of time.

**16.    SHORT AND LONG SALES.** In placing any sell order for a short sale, you will designate the order as such and hereby authorize Lehman Brothers to mark the order as being "short". You are required to and will comply with all applicable rules and regulations relating to short sale transactions. In placing any sell order for a long order, you will designate the order as such and hereby authorize Lehman Brothers to mark the order as being "long". The designation of a sell order as being long shall constitute a representation by you that you own the security with respect to which the order has been placed, that such security is not restricted under Rules 144 and/or 145 under the U.S. Securities Act of 1933 (as may be amended, modified or supplemented) or any other applicable law, rule or regulation and, as such, may be sold without restriction in the open market and that, if Lehman Brothers does not have the security in its possession at the time you place the order, you shall deliver the security by settlement date in good deliverable form or pay to Lehman Brothers any losses and expenses it may incur or sustain as a result of your failure to make delivery on a timely basis.

**17.    MARGIN ACCOUNTS.** All Loans made hereunder are demand loans. You hereby agree to deposit and maintain such cash or collateral as margin in your margin accounts, if any, as Lehman Brothers may in its sole discretion require, and you agree to pay forthwith on demand any amount owing with respect to any of your margin accounts to satisfy Lehman Brothers' demand for such payment (a "Margin Call"). In addition, you further agree to deposit promptly and maintain such other collateral with Lehman Brothers as is required by any Contract you may have with any Lehman Brothers Entity. Upon your failure to make any such payment or deposit, or if at any time Lehman Brothers, in its sole discretion, deems it necessary for its protection, whether with or without prior demand, call or notice, Lehman Brothers shall be entitled to exercise all rights and remedies provided herein. No demands, calls, tenders or notices that Lehman Brothers may have made or given in the past in any one or more instances shall invalidate your waiver of the requirement to make or give the same in the future.

**18.    SECURITIES CONTRACTS.** You acknowledge and agree that any positions in your account(s) shall be deemed "securities contracts" within the meaning of Sections 555 and 741(7) (as may be amended, modified or supplemented) of the U.S. Bankruptcy Code.

**19.    CONSENT TO LOAN OR PLEDGE OF SECURITIES IN MARGIN ACCOUNTS.**

(a) Except as noted in subparagraph (b) below, within the limits of applicable law and regulations, you hereby authorize Lehman Brothers to lend either to itself or to others any securities held by Lehman Brothers in any of your accounts, to convey therewith all attendant rights of ownership (including voting rights and the right to transfer the securities to others), and to use all such property as collateral for its general loans. Any such property, together with all attendant rights of ownership, may be pledged, repledged, hypothecated or rehypothecated either separately or in common with other property for any amounts due to Lehman Brothers thereon or for a greater sum, and Lehman Brothers shall have no obligation to retain a like amount of similar property in its possession and control. You hereby acknowledge that, as a result of such activities, Lehman Brothers may receive and retain certain benefits to which you will not be entitled. In certain circumstances, such loans, pledges, repledges, hypothecations or rehypothecations may limit, in whole or in part, your ability to exercise voting and other attendant rights of ownership with respect to the loaned or pledged securities. You agree to waive the right to vote, or to provide any consent or to take any similar action with respect to these securities in the event that the record date or deadline for such vote, consent or other action falls during the period of any such loan, pledge, repledge, hypothecation or rehypothecation.

(b) Unless otherwise agreed by Lehman Brothers and you, you will be entitled to receive all distributions, including, but not limited to, cash, stock dividends and interest payments, made on or in respect of any loaned,

pledged, repledged, hypothecated or rehypothecated securities which are not otherwise received by you, to the full extent you would be entitled if the securities had not been loaned, pledged, repledged, hypothecated or rehypothecated.

**20. OPTIONS.** You are aware of and agree to be bound by the Rules of the applicable Options Exchange or Association as well as The Options Clearing Corporation (OCC). You represent and warrant not to enter into any purchase or sale of equity, debt, foreign currency or index put or call options without having read and fully understood the terms, conditions and risks as set out in the Characteristics and Risks of Standardized Options booklet and applicable supplements. You understand that short options positions are assigned on an automated random basis and may be assigned on the day written. You understand that the official closing price may be determined some time after the close of trading for purposes of this section. You understand that listed equity options may be automatically exercised by the OCC at expiration if the options are in-the-money by an amount equal to or in excess of a minimum amount determined by the OCC by reference to the composite closing price. You will notify Lehman Brothers of your intention to exercise listed options that are out-of-the-money by any amount, at-the-money, or in-the-money but are not subject to automatic exercise, no later than 1 hour past the close of trading for that option on that day. You will notify Lehman Brothers of your intention not to exercise an option that is in-the-money, and subject to automatic exercise, no later than 1 hour past the close of trading for that option on that day. You understand that listed options on an underlying index are automatically exercised by the OCC at expiration if the options are in-the-money by an amount equal to or in excess of a minimum amount determined by the OCC by reference to the composite closing price. You will notify Lehman Brothers of your intention to exercise any option early or not to exercise an option on an underlying index which is in-the-money no later than 15 minutes prior to the close of trading for that option on that day. If notification is not given to Lehman Brothers within the times noted, Lehman Brothers is under no obligation to take action but will endeavor to comply with your instructions. Except as required by the OCC Rules, Lehman Brothers has no obligation to exercise any option absent specific instructions from you to that effect. You agree to not violate, whether acting alone or in concert with others, the position or exercise limits of the applicable listed options exchange.

**21. PRIME BROKERAGE SERVICES.** Under the terms and conditions of this Agreement, LBI will act as a prime broker for you in accordance with the no-action letter of the Securities and Exchange Commission dated January 25, 1994, as such letter may be amended, modified or supplemented from time to time (the "SEC Letter") and the provisions set forth below:

(a)     LBI will, subject to the terms and conditions of this Agreement, accept for clearance and settlement trades executed on your behalf by such executing brokers as you may designate from time to time and who have received LBI's prior approval and who have previously executed an agreement with LBI setting forth the terms and conditions under which such executing brokers will be authorized to accept orders from you for settlement by LBI (the "Executing Brokerage Agreement").

(b)     LBI shall be responsible for settling trades executed on your behalf by your executing broker(s) and reported to LBI by you and your executing broker(s) provided that you have reported to LBI on trade date, by the time designated to you by LBI, all the details of such trades including, but not limited to, the contract amount, the security involved, the number of shares or the number of units and whether the transaction was a long or short sale or a purchase, and further provided that LBI has either affirmed or not "DK'd" ("indicated it does not know") and has not subsequently disaffirmed such trades. In the event that LBI determines not to settle a trade, LBI shall not have settlement responsibility for such trade and shall, instead, send you a cancellation notification to offset the notification sent to you under sub-paragraph (c) of this paragraph. You shall be solely responsible and liable to your executing broker(s) for settling such trade. In addition, LBI may be required to cease providing prime brokerage services to you in accordance with the Executing Brokerage Agreement.

(c) On the day following each transaction, LBI shall send you a confirmation of each trade placed with an executing broker in accordance within the SEC Letter based upon the information you provided to LBI. Any confirmations issued by LBI as prime broker shall identify the executing broker and provide you with the information required by the SEC Letter. Confirmations of the execution of orders and other activity in your account(s) which have been provided or made available to you by 10:00 a.m. (New York time) on the business day immediately following the trade date shall be conclusive if not objected to by 2:00 p.m. (New York time) on such business day or, if such reports are provided or made available to you after 10:00 a.m. (New York time) on such business day, then such confirmations shall be conclusive if not objected to within four (4) hours after such

6

confirmations have been provided or made available to you. Monthly statements shall be sent to you in accordance with the SEC Letter. Information contained in monthly statements of account, to the extent not included in an activity report, shall be conclusive if not objected to within ten (10) days after such statements have been provided or made available to you. LBI may send communications to your address of record or another address provided to LBI in writing. All communications sent to such address, whether by mail, facsimile, telegraph, messenger, electronic means or otherwise, shall be deemed to have been given to you personally as of the date and time sent, whether actually received or not.

(d)  In the event of: (i) the filing of a petition or other proceeding in bankruptcy, insolvency or for the appointment of a receiver by or against your executing broker, (ii) the termination of your executing broker's registration and the cessation of business by it as a broker-dealer, or (iii) your executing broker's failure, inability or refusal, for any reason whatsoever or for no reason at all, to settle a trade, and if LBI agrees to settle any trades executed on your behalf by such executing broker, regardless of whether LBI either affirmed or did not DK and did not disaffirm such trades, you shall be solely responsible, and liable to LBI, for any losses arising out of or incurred in connection with LBI's agreement to settle such trades.

(e)  You shall maintain in your account with LBI such minimum net equity in cash or securities as LBI, in its sole discretion, may require from time to time (the "Lehman Brothers Net Equity Requirements"), which shall in no event be less than the minimum net equity required by the SEC Letter (the "SEC Net Equity Requirements"). In the event your account falls below the SEC Net Equity Requirements, you hereby authorize LBI to notify promptly all executing brokers with whom it has an Executing Brokerage Agreement on your behalf of such event. Moreover, if you fail to restore your account to compliance with the SEC Net Equity Requirements within the time specified in the SEC Letter, LBI shall, without notice to you: (i) notify all such executing brokers that LBI is no longer acting as your prime broker and (ii) either not affirm or "DK" ("indicate that it does not know") all prime brokerage transactions on your behalf with a trade date after the business day on which such notification was sent. In the event : (i) your account falls below the Lehman Brothers Net Equity Requirements, (ii) LBI determines in its sole discretion that there would not be enough cash in your account to settle such transactions or that a maintenance Margin Call may be required as a result of settling such transactions, or (iii) LBI determines in its sole discretion that the continuation of prime brokerage services to you presents an unacceptable risk to Lehman Brothers taking into consideration all the facts and circumstances, then LBI may disaffirm all your prime brokerage transactions and/or cease to act as your prime broker. In any such case, LBI shall send a cancellation notification to you, and you understand that you must settle outstanding trades directly with the relevant executing broker and that you authorize LBI to provide the executing broker with any information useful to settle such trades. You further agree that LBI will not be bound to make any investigation into the facts surrounding any transaction to which you are a party and that immediately upon notice to you and, if required, to the executing brokers, LBI may cease acting as your prime broker.

(f)  If you have instructed your executing broker(s) to send confirmations to you in care of LBI, as your prime broker, the confirmation sent by such executing broker is available to you promptly from LBI (once received), at no additional charge.

(g)  If your account is managed on a discretionary basis, you hereby acknowledge that your prime brokerage transactions may be aggregated with those of other accounts of your adviser, according to your adviser's instructions, for execution by your executing broker(s) in a single bulk trade and for settlement in bulk by LBI. You understand that no part of any transaction may be allocated to any other account where such other account's net equity is below the minimum levels established in the SEC Letter and that, should such a net equity deficiency occur in any such other account, LBI must disaffirm the entire transaction. In the event any trade is disaffirmed, as soon as practicable thereafter, LBI shall supply your executing broker(s) with the allocation of the bulk trade, based upon information provided by your adviser.

(h)  You hereby authorize LBI to disclose your name, address and tax I.D. number to your executing broker(s) to enable such executing broker to establish on its books an account for you to be used in the event transactions are disaffirmed by LBI.

(i)  Lehman Brothers will not be responsible or liable for any acts or omissions of any executing broker or its employees. You understand that Lehman Brothers does not act as investment adviser or solicit orders, that Lehman

7

Brothers does not advise prime brokerage customers, perform any analysis, or make any judgment on any matters pertaining to the suitability of any order, or offer any opinion, judgment or other type of information pertaining to the nature, value, potential or suitability of any particular investment.

(j) You agree to indemnify and hold Lehman Brothers harmless from any loss, claim or expense, including attorneys' fees, incurred by Lehman Brothers in connection with Lehman Brothers acting or declining to act as prime broker for you and to fully reimburse Lehman Brothers for any legal or other expenses (including the cost of any investigation and preparation) which Lehman Brothers may incur in connection with any claim, action, proceeding or investigation arising out of or in connection with this Agreement or any transactions hereunder.

(k) You represent and warrant that you are currently in compliance, and during the term of this Agreement will remain in compliance, with all applicable requirements of the SEC Letter, including, but not limited to, the requirement that you execute an agreement with each executing broker.

(l)   The prime brokerage services hereunder shall be provided in a manner consistent with the SEC Letter.

**22. LEGALLY BINDING.** You hereby agree that this Agreement and all of the terms hereof shall be binding upon you and your estate, heirs, executors, administrators, personal representatives, successors and assigns. You further agree that all purchases and sales shall be for your account(s) in accordance with your oral or written instructions. You hereby waive any and all defenses that any oral instruction was not in writing as may be required by any applicable law, rule or regulation. With respect to any of your accounts maintained in connection with this Agreement, you hereby authorize Lehman Brothers to act and rely on any instructions (including, without limitation, instructions to transfer cash or securities, purchase or sell securities, enter into derivative or other transactions or borrow money or securities) received by Lehman Brothers from any of the persons listed on Exhibit A, as such list may be amended by you from time to time. In addition, you hereby authorize Lehman Brothers to act and rely on any instructions received by Lehman Brothers from any of your employees or agents (including any investment manager or adviser) that Lehman Brothers reasonably believes is authorized to so act on your behalf.

**23. AMENDMENT.** You agree that Lehman Brothers may modify the terms of this Agreement at any time upon prior written notice to you. By continuing to accept services from Lehman Brothers thereafter, you will have indicated your acceptance of any such modification. If you do not accept such modification, you must notify Lehman Brothers in writing; your account may then be terminated by Lehman Brothers, after which you will remain liable to Lehman Brothers for all outstanding liabilities and obligations. Otherwise, this Agreement may not be modified absent a written instrument signed by an authorized representative of Lehman Brothers.

**24. GOVERNING LAW.** THIS AGREEMENT SHALL BE DEEMED TO HAVE BEEN MADE IN THE STATE OF NEW YORK AND SHALL BE CONSTRUED, AND THE CONTRACTUAL AND ALL OTHER RIGHTS AND LIABILITIES OF THE PARTIES DETERMINED, IN ACCORDANCE WITH THE LAW OF THE STATE OF NEW YORK WITHOUT GIVING EFFECT TO ANY CONFLICTS OF LAW PRINCIPLES THEREOF.

**25. JURISDICTION; WAIVER OF JURY TRIAL.** The parties shall attempt in good faith to promptly resolve any dispute arising out of, relating to or in connection with this Agreement or any transactions hereunder by negotiations by executives of the parties who have the authority to settle the controversy. With respect to any suit, action or proceedings relating to this Agreement ("Proceedings"), each party irrevocably submits to the exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City and waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party. ANY RIGHT TO A TRIAL BY JURY WITH RESPECT TO ANY CLAIM OR ACTION IS HEREBY WAIVED BY ALL THE PARTIES TO THIS AGREEMENT.

**26. WAIVER OF IMMUNITIES.** Each party irrevocably waives, to the fullest extent permitted by applicable law, with respect to itself and its revenues and assets, all immunity on the grounds of sovereignty or other similar grounds from (i) suit, (ii) jurisdiction of any court, (iii) arbitration, (iv) relief by way of arbitration award, injunction, order for specific performance or recovery of property, (v) attachment of its assets (whether before or

after judgment) and (vi) execution or enforcement of any judgment or arbitration award and irrevocably agrees, to the fullest extent permitted by applicable law, that it will not claim any such immunity.

**27. TRANSFERS.** Lehman Brothers shall have the right to transfer Assets between any account in order to satisfy any of your obligations to Lehman Brothers. When giving instructions to transfer Assets from your accounts to any bank or other entity, you agree that all such requests will have been approved by an authorized signatory and you agree to provide Lehman Brothers with an accurate account number designating the account to receive such Assets. You agree to indemnify and hold Lehman Brothers harmless from and against all liabilities arising from the provision of an inaccurate account number or any other liabilities arising as a result of the transfer at your request.

**28. PROVISION OF DATA.** With respect to any market data or other information that Lehman Brothers or any third party service provider provide to you, (i) Lehman Brothers and any such provider are not responsible or liable if any such data or information is inaccurate or incomplete in any respect; (ii) Lehman Brothers and any such provider are not responsible or liable for any actions that you take or do not take based on such data or information; (iii) you will use such data or information solely for the purposes set forth in this Agreement and any other agreement between us; (iv) such data or information is proprietary to Lehman Brothers and any such provider and you will not retransmit or disclose such data or information to third parties except as required by applicable law or regulation; and (v) you will use such data or information solely in compliance with applicable laws, rules and regulations.

**29. EXTRAORDINARY EVENTS.** You agree that Lehman Brothers will not be liable for any loss caused, directly or indirectly, by government restrictions, exchange or market rulings, suspension of trading, war (whether declared or undeclared), terrorist acts, insurrection, riots, fires, flooding, strikes, failure of utility services, accidents, adverse weather or other events of nature, including but not limited to earthquakes, hurricanes and tornadoes, or other conditions beyond Lehman Brothers' control. In the event that any communications network, data processing system, or computer system Lehman Brothers uses is rendered inoperable, Lehman Brothers will not be liable to you for any loss, liability, claim, damage or expense resulting, either directly or indirectly, therefrom.

**30. LIMITATION OF LIABILITY.** Lehman Brothers shall not be liable in connection with the execution, clearing, handling, purchasing or selling of securities, commodities or other property, or other action, except for gross negligence or willful misconduct on Lehman Brothers' part. You understand that certain securities may be held outside the United States by unaffiliated, foreign agent banks and depositories. Lehman Brothers will not be liable to you for any loss, liability or expense incurred by you in connection with these arrangements except to the extent that any such loss, liability or expense results from Lehman Brothers' gross negligence or willful misconduct. In no event will Lehman Brothers be liable for any special, indirect, incidental or consequential damages arising out of this Agreement.

**31. HEADINGS; COUNTERPARTS.** The headings of the provisions hereof are for ease of reference only and shall not affect the interpretation or application of this Agreement or in any way modify or qualify any of the rights provided for hereunder. This Agreement may be executed in counterparts, each of which shall be deemed an original.

**32. TELEPHONE CONVERSATIONS.** For the protection of both you and Lehman Brothers, and as a tool to correct misunderstandings, you hereby authorize Lehman Brothers, at Lehman Brothers' discretion and without prior notice to you, to monitor and/or record any or all telephone conversations or electronic communications between you and Lehman Brothers or any of Lehman Brothers' employees or agents. You acknowledge that Lehman Brothers may determine not to make or keep any of such recordings and that such determination shall not in any way affect any party's rights.

**33. CUMULATIVE RIGHTS; ENTIRE AGREEMENT.** The rights, remedies, benefits and protections afforded to each Lehman Brothers Entity under this Agreement and under any Contract you may have with any Lehman Brothers Entity, whether heretofore or hereafter entered into, are cumulative and in addition to any other rights, remedies, benefits and protections that any Lehman Brothers Entity may have. To the extent that the provisions of any Contracts you have with any Lehman Brothers Entity, whether heretofore or hereafter entered into, are inconsistent (whether the inconsistency be between the Contracts or within a single Contract), the conflict shall be resolved in favor of the provision which affords Lehman Brothers with the maximum rights, remedies, benefits or

9

protections. You hereby appoint Lehman Brothers as your agent and attorney-in-fact to take any action (including, but not limited to, the filing of financing statements) necessary or desirable to perfect and protect the security interest granted herein or to otherwise accomplish the purposes of this Agreement. Except as set forth above, this Agreement represents the entire agreement and understanding between you and Lehman Brothers concerning the subject matter hereof.

**34. CAPACITY TO CONTRACT; ANTI-MONEY LAUNDERING; AFFILIATIONS.** You represent that you have the capacity and authority to enter into this Agreement. You represent to the best of your knowledge that you do not maintain or transact business for or with nor will you introduce individuals or entities to Lehman Brothers that the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC") has listed as "Specially Designated Nationals and Blocked Persons" nor with any client in an embargoed country as determined by OFAC. Furthermore, you represent that you have conducted thorough due diligence with respect to all of your clients, and you do not know or have any reason to suspect that the monies used to fund the account have been or will be derived from or related to any illegal activities, including but not limited to, money laundering activities. You agree to provide Lehman Brothers with any information that it may require in relation to compliance with any applicable money laundering regulations. Each representation or warranty made by you in this Agreement will be deemed to be repeated by you on each date on which a transaction occurs hereunder.

You represent that you are of legal age and that, unless you have notified Lehman Brothers to the contrary, neither you nor any member of your immediate family is: (i) an employee or member of any exchange, (ii) an employee or member of the National Association of Securities Dealers, Inc. or any of its affiliates, (iii) an individual or an employee of any corporation or firm engaged in the business of dealing, as broker or principal, in securities, options or futures or (iv) an employee of any bank, trust company or insurance company. If you are signing on behalf of others, you hereby represent that the persons(s) or entity(ies) on whose behalf you are signing is/are authorized to enter into this Agreement and that you are duly authorized to sign this Agreement and make the representations contained herein in the name and on behalf of such other person(s) or entity(ies) and you agree to indemnify and hold Lehman Brothers harmless from any claim or claims arising from your unauthorized execution of this Agreement on the behalf of such other person(s) or entity(ies). You hereby authorize Lehman Brothers to accept faxed copies of this or any other document or instruction as if it were the original and further to accept signatures on said faxes as if they were original.

**35. ERISA.** The investment manager or advisor for Customer represents that Customer is not benefit plan an ERISA Plan as defined in Section 3(3) of ERISA, or subject to ERISA or Section 4975 of the Code, or Similar Law. The investment manager further represents and warrants that Customer is not a person acting on behalf of an ERISA Plan and that the Customer's assets do not constitute assets of an ERISA Plan.

10

*PLEASE COMPLETE THIS INFORMATION AND SIGN THE APPROPRIATE SPACE BELOW:*

**THIS AGREEMENT IS DATED AS OF** _____, 200_

Newport Global Credit Fund (Master) LP
*Name of Customer*

21 Waterway Ave, Suite 150        USA
*Address*                              *Country*

The Woodlands , TX        77380
*City, State*                          *Zip Code + 4*

**BY SIGNING THIS AGREEMENT, YOU ACKNOWLEDGE THAT:**

**YOU HAVE RECEIVED A COPY OF THIS AGREEMENT AND AGREE TO ITS TERMS AND CONDITIONS.**

CUSTOMER
NAME:        Newport Global Credit Fund (Master) LP
                   *Individual or Printed Name of Company*

SIGNATURE:   _____
                   *Signature of Authorized Person*

PRINT NAME:  Timothy T. Janszen, Authorized officer of Ultimate General Partner
                   *Printed Name and Title of Signatory or Name of General Partner if Signer is a Partnership*

BY:          _____
                   *Authorized Signatory and Title of General Partner if Above Signer is a Partnership Otherwise Blank*

**ACKNOWLEDGED AND AGREED**

**BY: Newport Global Advisors LP solely for the purposes of the representation in Section 35**

**By:** _____

Name: Timothy T. Janszen

Title: CEO

**ACCEPTED AND AGREED TO:**

_____

Lehman Brothers Inc., as signatory for itself and as agent for the affiliates named herein

11

**EXHIBIT A**
**AUTHORIZED PERSONS**

| <u>Name</u> | <u>Specimen Signature</u> |
|---|---|
| Roger A. May | *Roger A. May* |
| Thomas Reeg | |
| Ryan Langdon | |

# EXHIBIT B

| | |
|---|---|
| **Margin Lending Agreement** | ~~LEHMAN BROTHERS~~ |
| | **INTERNATIONAL (EUROPE)** |

Lehman Brothers International (Europe)
25 Bank Street,
London E14 5LE
United Kingdom

| | |
|---|---|
| Borrower: Newport Global Credit Fund (Master) LP | Reference No.: |

This Margin Lending Agreement (this "Agreement") by and among Lehman Brothers International (Europe) ("Lender") and the above-listed borrower ("Borrower") is arranged by Lehman Brothers Inc. ("Agent"), a broker-dealer registered with the U.S. Securities and Exchange Commission ("SEC") under the U.S. Securities and Exchange Act of 1934, as amended, and governs all loans (the "Loans") of money or securities that Lender may, from time to time in its sole and absolute discretion, agree to make to Borrower in connection with transactions entered into by Borrower in the Lehman Brothers Inc. Customer Account Agreement – Prime Brokerage dated _____, as amended from time to time (the "LBI Account Agreement").

1.  **AGENT AS AGENT OF LENDER AND BORROWER.**

    (a) Lender and Borrower (the "Principals") each appoints Agent to act as agent with regard to any and all actions necessary to effect Loans as described in this Agreement and Agent acknowledges and accepts such appointment.

    (b) As agent of each of the Principals and in compliance with all applicable regulations, Agent will arrange all Loans.

    (c) In connection with each Loan, Agent acts solely in its capacity as agent for the Principals pursuant to instructions from the Principals. Agent shall have no responsibility or personal liability to either Principal arising from any failure by a Principal to pay or perform any obligation hereunder. Notwithstanding anything herein to the contrary, Agent shall not have any responsibility for or any obligation or liability to either Principal with respect to the monitoring of margin maintenance hereunder. Each Principal agrees to proceed solely against the other to collect or recover any amount owing to it or to enforce any of its other rights in connection with, or as a result of, any Loan. The Principals acknowledge that Agent is acting solely as an agent hereunder, and the Principals agree to hold Agent harmless from all liability except for losses or damages caused by Agent's gross negligence or wilful misconduct.

    (d) Each Principal and Agent hereby agree that any and all notices, demands, communications, payments or deliveries of any kind relating to any Loan may be delivered or made solely through Agent.

2.  **PURPOSE OF THE LOANS.** Unless notice is provided to Lender in advance of a Loan, the proceeds of each Loan shall be utilized by Borrower solely to satisfy its payment or delivery obligations under the LBI Account Agreement from time to time in effect between Borrower and Agent.

3.  **LOAN TERMS.**

    (a) Subject to all other applicable provisions of this Agreement, all Loans that are loans of securities shall be governed by the terms of a standard-form Global Master Securities Lending Agreement (May 2000 version), as modified and supplemented by the Schedule to GMSLA and 2000 UK Tax Addendum attached thereto (collectively, the "GMSLA"), which terms are hereby incorporated into this Agreement as if set forth fully herein. In the event of any conflict between the terms of the GMSLA incorporated herein and the terms expressly set forth herein, the terms expressly set forth herein shall control. In furtherance of the foregoing (and not by way of limitation), Lender,

**LEHMAN BROTHERS**

Borrower and Agent agree that: (i) the fees payable by Borrower with respect to Loans of securities will be governed by this Agreement (including the TCR (as defined in Section 4 hereof)), not by Paragraph 7 of the GMSLA; (ii) the ~~collateralization and margin requirements and procedures relating to Loans of securities will be governed by this~~ Agreement (including the TCR), not by Paragraph 5 of the GMSLA; (iii) the obligations of Borrower to Lender and Agent will be secured by a first priority security interest in certain property of Borrower (as set forth herein and in the LBI Account Agreement), not by Borrower transferring title in certain property pursuant to the GMSLA, including Paragraphs 2.3 and 4.2 of the GMSLA; and (iv) the term Posted Collateral (as used in Paragraph 9.1 of the GMSLA) will be deemed to be a reference to the collateral held by Lender and Agent pursuant to this Agreement and the LBI Account Agreement.

(b) All Loans are demand loans. Immediately upon Lender's demand from time to time, Borrower shall repay outstanding amounts under any or all Loans of money (together with all accrued interest) and/or redeliver Equivalent Securities (as defined in the GMSLA) under any or all Loans of securities. The inclusion of Section 6 hereof and of provisions in the GMSLA relating to Events of Default (as defined therein) shall not affect the status of the Loans as demand loans or Borrower's obligations set forth in the preceding sentence.

4.   **INTEREST AND LOAN FEES.**  Borrower agrees that interest and fees will accrue on all outstanding Loans of money and securities in accordance with the methods described in a terms and conditions rider that has been separately provided to it or in any amendment or revision thereto which may be provided to it (the "TCR"). Borrower agrees that all such accrued interest and/or fees not paid at the close of an applicable period shall constitute an additional Loan of money hereunder.

5.   **COLLATERAL.**

(a) Lender may from time to time, in its sole and absolute discretion, demand that Borrower deliver for credit to a securities account maintained by Lender (any such account, "Lender's Account") collateral in the form of cash or securities, in such amounts and/or currencies as are determined by Lender in its sole discretion. Borrower shall immediately comply with any such demand and any failure to immediately comply shall constitute a default under this Agreement. Borrower shall ensure that at all times the Market Value (as defined below) of the cash and securities collateral delivered to Lender's Account exceeds the sum of (i) the aggregate Market Value (as defined below) of the cash and securities lent under outstanding Loans and (ii) the margin requirement determined by Lender from time to time in its sole and absolute discretion and notified to Borrower (the "Margin Requirement").

"Market Value" means:

(i) with respect to cash, the amount of such cash (converted, if necessary, into U.S. dollars at a spot rate obtained from a source selected by Lender in its sole and absolute discretion); and

(ii) with respect to securities, the price for such securities obtained from a source selected by Lender in its sole and absolute discretion; provided that, (A) if prices for such securities are available on an exchange, the price shall be the closing price on such exchange and (B) the price of securities that are suspended, or in respect of which there is no source or a discontinuous source, shall be determined by Lender in its sole and absolute discretion. Market Value is determined by Lender solely for the purposes of determining Margin Requirements and should not be relied on by Borrower for any other purposes.

(b) As security for Borrower's payment and performance of all of its obligations and liabilities (whether or not mature or contingent) from time to time ("Liabilities") to Lender under this Agreement, the GMSLA or in connection with any Loan and for all obligations owing to Lender (the "Obligations"), Lender shall have a lien on and a continuing first priority security interest in all of Borrower's cash, securities, financial assets and other property from time to time delivered under this Agreement or otherwise held by, or under the control of, Lender (the "Collateral"), irrespective of whether or not Lender has made advances to Borrower in connection with such securities or other property. All Collateral shall be free and clear of all prior liens, claims and encumbrances (other than the lien in favor of Lender and its affiliates), and Borrower will not cause or allow any of the Collateral, whether now owned or hereafter acquired, to be or become subject to any liens, claims or encumbrances of any nature other than the security interest created in Lender's favor and in favor of its affiliates. Borrower agrees that any Collateral may be registered and held in the name of Agent or its designee. Borrower shall execute such documents and take such other action as

**LEHMAN BROTHERS**

2

Lender shall reasonably request in order to perfect Lender's rights with respect to any Collateral. In addition, Borrower hereby appoints Agent and each of its affiliates as Borrower's agent and attorney-in-fact to take any action, including without limitation to sign, seal, execute and deliver all documents, as may be required to perfect Lender's interest in and to realize upon all of Lender's rights in the Collateral or to otherwise accomplish the purposes of this Agreement. In order to satisfy any of Borrower's Obligations, Lender may, to the fullest extent permitted by law, at any time in its discretion and without prior notice to Borrower, use, apply or transfer any and all Collateral.

(c) Except as noted in the last sentence of this subsection, within the limits of applicable law and regulations, Borrower hereby authorizes Lender to lend either to itself or to others any or all Collateral, to convey therewith all attendant rights of ownership (including voting rights and the right to transfer the securities to others), and to use all such Collateral as collateral for its general loans. Any Collateral, together with all attendant rights of ownership, may be pledged, repledged, hypothecated or rehypothecated either separately or in common with other property for any amounts due to Lender thereon or for a greater sum, and Lender shall have no obligation to retain a like amount of similar property in its possession and control. Borrower hereby acknowledges that, as a result of such activities, Lender may receive and retain certain benefits to which Borrower will not be entitled. In certain circumstances, such loans, pledges, repledges, hypothecations and rehypothecations may limit, in whole or in part, Borrower's ability to exercise voting and other attendant rights of ownership with respect to the loaned or pledged securities. Borrower agrees to waive the right to vote, or to provide any consent or to take any similar action with respect to these securities in the event that the record date or deadline for such vote, consent or other action falls during the period of any such loan, pledge, repledge, hypothecation or rehypothecation. Unless otherwise agreed by Lender and Borrower, Borrower will be entitled to receive all distributions, including, but not limited to, cash, stock dividends and interest payments, made on or in respect of any loaned, pledged, repledged, hypothecated or rehypothecated securities which are not otherwise received by Borrower, to the full extent Borrower would be entitled if the securities had not been loaned, pledged, repledged, hypothecated or rehypothecated.

(d) Upon satisfaction by Borrower of all Obligations (and all other obligations owed by Borrower to each affiliate of Lender), Lender shall return to Borrower the Collateral.

(e) Borrower authorizes and requests Agent, as agent for Borrower, to transfer cash or securities from the account(s) of Borrower opened and maintained pursuant to the LBI Account Agreement (the "LBI Customer Account(s)") to Lender's Account as Collateral under this Agreement. In addition, if, at any time, Borrower has provided excess collateral under this Agreement and also (i) is required to deliver margin, collateral or other credit support (including title transfer credit support) to Lender under any other agreement or (ii) is required to deliver day trading margin to LBI for the benefit of any of its LBI Customer Account(s), then Borrower authorizes and requests Lender to transfer such excess collateral to itself (or to LBI, as the case may be) on Borrower's behalf in order to satisfy (to the extent possible) Borrower's obligation to deliver margin or credit support under such other agreement (or, in the case of the LBI Customer Account(s), to deliver day trading margin in compliance with New York Stock Exchange regulations). If Lender or Agent makes a delivery on Borrower's behalf pursuant to this Section 5(e), such delivery shall have the same effect as if Borrower itself had made such delivery under the applicable agreement.

6. EVENTS OF DEFAULT. The occurrence of each of the following is an "Event of Default" hereunder:

(i) any "Event of Default" (as defined in the GMSLA);

(ii) any event of the type described in Section 4 of the LBI Account Agreement;

(iii) Borrower's failure to maintain collateral as required by Section 5 hereof;

(iv) Borrower's failure to make any payment or delivery when required hereunder;

(v) Borrower's failure to comply with or perform any other agreement or obligation hereunder;

(vi) the occurrence of an Act of Insolvency (as defined in the GMSLA) with respect to Borrower or with respect to any general partner, managing member or analogous representative entity of Borrower;

**LEHMAN BROTHERS**

3

(vii) any representation made or deemed to have been made by Borrower shall be incorrect or untrue in any respect when made or deemed made;

(viii) Borrower is suspended or expelled from or surrenders its membership or participation in any securities exchange or association or other self-regulatory organization or is suspended from dealing in securities by any governmental agency, or any of the assets of Borrower or the assets of an investor held by, or to the order of, Borrower are transferred or ordered to be transferred to a trustee by a regulatory authority pursuant to any securities regulating legislation;

(ix) Borrower states that it is unable to, or intends not to, perform any of its obligations under this Agreement or any other agreement between Borrower and Lender or Agent or any affiliates of Lender or Agent;

(x) there is a material adverse change in the business affairs of Borrower;

(xi) any event of default or equivalent event occurs under any other agreement between Borrower and Lender or Agent or any of their affiliates; or

(xii) any material document or constitutive document of Borrower is modified in a manner which, in the sole and absolute discretion of Lender, may have a material adverse effect on any Loan or Borrower's ability to perform its obligations under this Agreement or any other agreement between Borrower and Lender or Agent or any affiliates of Lender or Agent.

Upon the occurrence of an Event of Default, all Loans shall become immediately due and payable and Lender shall have all of the rights of a secured party upon default under the Uniform Commercial Code in effect from time to time in the State of New York and other applicable laws, rules and regulations, all rights set forth in the GMSLA arising upon an "Event of Default" thereunder and all rights arising under the LBI Account Agreement after a default thereunder or under a Contract (as defined therein) including, without limitation, the right without prior notice to Borrower, to cancel any outstanding commitments to or relative to any Loanand/or apply any Collateral to, or sell any or all of the Collateral and apply the proceeds to, any Loan (or to the purchase of securities that are the subject of any Loan); after which Borrower shall be liable to Lender and Agent for any remaining deficiency, loss, costs or expenses incurred or sustained by Lender or Agent in connection therewith. Such purchases and/or sales may be effected by Lender (or Agent, as its agent) publicly or privately without notice or advertisement in such manner as Lender may in its sole discretion determine. At any such sale or purchase, Lender, Agent or any of Lender or Agent's affiliates may purchase or sell the property to or from itself or third parties free of any right of redemption. Lender shall have the right to convert currencies in connection with the exercise of its rights hereunder in such manner as it may determine, in its sole discretion, to be commercially reasonable.

7.  **MISCELLANEOUS.**

(a) Capacity to Contract. Borrower represents and warrants to Lender and Agent that it has the capacity and authority to enter this Agreement and each Loan and make each pledge of Collateral. Each representation or warranty made by Borrower in this Agreement will be deemed to be repeated on each date on which (i) a Loan is made, (ii) Collateral is delivered or released or (iii) any other transaction occurs hereunder.

(b) ERISA. (i) Borrower represents and warrants to Lender and Agent that it is either (i) not (A) an employee benefit plan (an "ERISA Plan") as defined in Section 3(3) of the U.S. Employee Retirement Income Security Act of 1974, as amended ("ERISA"), or (B) subject to ERISA or Section 4975 of the U.S. Internal Revenue Code of 1986, as amended (the "Code") or (ii) (A) an ERISA Plan or subject to ERISA or Section 4975 of the Code and (B) whose Investment Manager or General Partner is (and it covenants and agrees that any successor Investment Manager or General Partner appointed by it will be) a Qualified Professional Asset Manager ("QPAM") as defined by the relevant prohibited transaction class exemption(s) issued pursuant to ERISA and it will provide Lender and Agent with a Investment Advisor Representation Letter.

LEHMAN BROTHERS                          4

(ii) The investment manager or advisor for Borrower represents that Borrower is not an ERISA Plan as defined in Section 3(3) ERISA, or subject to ERISA or Section 4975 of the Code, or Similar Law. The investment manager further represents and warrants that Borrower is not a person acting on behalf of an ERISA Plan and that the Borrower's assets do not constitute assets of an ERISA Plan.

(c) Compliance with Regulations. All Loans are subject to the laws, rules and regulations of the United States, England and any other applicable jurisdiction and applicable regulatory and self-regulatory authorities, including but not limited to the SEC, The Financial Services Authority of England and Wales (the "FSA"), all relevant securities and commodities exchanges and the Board of Governors of the Federal Reserve System.

(d) FSA Customer Protections. Lender is authorised by the FSA and is regulated by its rules (the "Rules"). Affiliates (such as Agent) of Lender may not be authorised by the FSA and certain services provided outside of England and Wales pursuant to this Agreement may not be regulated by the Rules. Lender and Borrower acknowledge and agree that cash held for Borrower hereunder is received as collateral within full ownership under a collateral arrangement and is subject to the security interest contained herein. Accordingly, such cash will not be client money pursuant to the Rules (or any successor provisions thereto) and will not be subject to the protections conferred by the Rules. Such cash will not be segregated from the money of Lender or any other counterparty of Lender and will be held free and clear of all trusts. The parties further agree that Lender will use such cash in the course of its business and Borrower will, therefore, rank as a general creditor of Lender in respect of such cash. Notwithstanding the choice of law provision as set forth in Clause (m) in this Section 7 below, this Clause (d) of Section 7 shall be construed in accordance with the laws of England.

(e) Adequate Assurances. Subject to, and not as limitation of, the rights of Lender under this Agreement, if at any time Lender has reasonable grounds for insecurity with respect to Borrower's performance of any Obligation, Lender may demand, and Borrower shall give, adequate assurance of due performance within 24 hours, or within any shorter period of time Lender demands that is reasonable under the circumstances. The adequate assurance of performance that may be demanded by Lender may include, but shall not be limited to, the delivery by Borrower of additional property as Collateral.

(f) Costs and Expenses. Borrower hereby agrees to pay, on demand, all reasonable costs, liabilities and damages incurred by Lender or Agent (including, without limitation, costs of collection, attorneys' fees, court costs and other expenses) in connection with enforcing their rights hereunder or incurred or charged for custody of the Collateral. In each case and whether or not demand has been made therefor, Borrower hereby authorizes Lender to increase the amount of any outstanding Loan by any and all such costs, liabilities and damages, including without limitation, those incurred in connection with the liquidation of any of the Collateral.

(g) Securities Events. Lender shall inform Borrower if Lender becomes aware of the occurrence or prospective occurrence of any of the following with respect to any securities pledged to Lender: conversions, subdivision or consolidation; redemption; a takeover offer; calls, including calls on partly-paid securities and published calls; a capitalization issue; rights issue; distribution of income in the form of securities; or a certificate which may at a future date be exchanged for securities or an entitlement to acquire securities. Subject to 5(c), above, if Lender receives notice from Borrower that Borrower wishes to act on any of the events referenced in this paragraph and such notice is received by Lender within a reasonable time for Lender to act on such event, Lender will act in accordance with Borrower's wishes. Borrower represents that it will review all prospectuses and offering statements than it may receive and understands the risks inherent with the Loans, including any risks associated with the above-described securities events.

(h) Voting Rights. If any right to vote arises with respect to securities pledged to Lender, Borrower may inform Lender that Borrower wishes to exercise such right as Borrower specifies. Subject to 5(c), above, if Lender receives this notice within a reasonable time to act, it will act in accordance with Borrower's wishes. If Lender does not receive such timely notice from Borrower, it will use its discretion to decide whether and how to vote such securities.

(i) Waiver, Assignment and Notices. Neither Lender's failure to insist at any time upon strict compliance with this Agreement or with any of the terms hereof nor any continued course of such conduct on its part shall constitute or be considered a waiver by Lender of any of its rights or privileges hereunder. Any purported assignment of your

**LEHMAN BROTHERS**                                5

rights and/or obligations hereunder without obtaining the prior written consent of an authorized representative of Lender and Agent shall be null and void. Lender and Agent each reserves the right to assign any of its rights or obligations hereunder or under any other agreement with Borrower to any of their affiliates without prior notice to Borrower. Notices and other communications to you (including without limitation demands for collateral) that are sent by electronic means, including facsimile or electronic mail, sent by express delivery service or mailed, in each case to the address or number provided by Borrower, shall, until Agent has received notice in writing of a different address or number, be deemed to have been personally delivered to Borrower. Demands for additional Collateral may also be communicated orally, without subsequent written confirmation.

(j) <u>Securities Contract; Margin Payment; Settlement Payment</u>. Borrower acknowledges and agrees that each Loan shall be deemed to be a "securities contract" within the meaning of Sections 555 and 741(7) (as may be amended, modified or supplemented) of the U.S. Bankruptcy Code and each payment or delivery hereunder, including each payment or delivery of collateral, shall be deemed to be a "margin payment" or "settlement payment" (each as defined in Section 101 and 741 of the U.S. Bankruptcy Code) made to and held by a "stockbroker" within the meaning of Sections 362 and 546 of the U.S. Bankruptcy Code.

(k) <u>Legally Binding</u>. Borrower hereby agrees that this Agreement and all of the terms hereof shall be binding upon it and its successors and assigns. Borrower hereby waives any and all defences that any oral instruction was not in writing as may be required by any applicable law, rule or regulation. Borrower hereby authorizes Lender and Agent to accept and act on any instructions received by Lender and/or Agent from any investment manager or advisor that Lender and/or Agent believe is authorized to act on Borrower's behalf. Borrower hereby agrees to pay, on demand, all reasonable costs, liabilities and damages incurred by Lender and/or Agent (including, without limitation, attorneys' fees, court costs and other expenses) in connection with Lender and/or Agent acting in reliance upon instructions from any such investment manager or advisor, including, but not limited to, instructions transmitted via electronic means, including facsimile or electronic mail.

(l) <u>Amendment</u>. Borrower agrees that Lender may modify the terms of this Agreement at any time upon prior written notice to Borrower. By failing to immediately discharge all of its Obligations upon delivery of any such notice, Borrower will have indicated its acceptance of any such modification. If Borrower does not accept such modification, Borrower must notify Lender in writing; Lender may then demand immediate discharge of all of Borrower's Obligations. Otherwise, this Agreement may not be modified absent a written instrument signed by an authorized representative of Lender.

(m) <u>GOVERNING LAW</u>. THIS AGREEMENT SHALL BE DEEMED TO HAVE BEEN MADE IN THE STATE OF NEW YORK AND SHALL BE CONSTRUED, AND THE CONTRACTUAL AND ALL OTHER RIGHTS AND LIABILITIES OF THE PARTIES DETERMINED, IN ACCORDANCE WITH THE LAW OF THE STATE OF NEW YORK WITHOUT GIVING EFFECT TO ANY CONFLICTS OF LAW PRINCIPLES THEREOF, SAVE FOR CLAUSE (D) IN THIS SECTION 7 WHICH SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAWS OF ENGLAND.

(n) <u>JURISDICTION; WAIVER OF JURY TRIAL</u>. The parties shall attempt in good faith to promptly resolve any dispute arising out of, relating to or in connection with this Agreement or any transactions hereunder by negotiations by executives of the parties who have the authority to settle the controversy. With respect to any suit, action or proceedings relating to this Agreement ("Proceedings"), each party irrevocably submits to the exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City and waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party. ANY RIGHT TO A TRIAL BY JURY WITH RESPECT TO ANY CLAIM OR ACTION IS HEREBY WAIVED BY ALL THE PARTIES TO THIS AGREEMENT.

(o) <u>NO CONSEQUENTIAL DAMAGES</u>. IN NO EVENT WILL LENDER OR AGENT BE LIABLE FOR ANY SPECIAL, INDIRECT, INCIDENTAL OR CONSEQUENTIAL DAMAGES ARISING OUT OF THIS AGREEMENT.

LEHMAN BROTHERS

6

(p) Waiver of Immunities. Lender and Borrower each irrevocably waives, to the fullest extent permitted by applicable law, with respect to itself and its revenues and assets, all immunity on the grounds of sovereignty or other similar grounds from (i) suit, (ii) jurisdiction of any court, (iii) arbitration, (iv) relief by way of arbitration award, injunction, order for specific performance or recovery of property, (v) attachment of its assets (whether before or after judgment) and (vi) execution or enforcement of any judgment or arbitration award and irrevocably agrees, to the fullest extent permitted by applicable law, that it will not claim any such immunity.

(q) Headings. The headings of the provisions hereof are for ease of reference only and shall not affect the interpretation or application of this Agreement or in any way modify or qualify any of the rights provided for hereunder.

(r) Cumulative Rights; Entire Agreement. The rights, remedies, benefits and protections afforded to Lender and Agent under this Agreement and under any other agreement Borrower may have with Lender or Agent or any affiliate of Lender or Agent, whether heretofore or hereafter entered into, are cumulative and in addition to any other rights, remedies, benefits and protections that Lender or Agent may have. To the extent that the provisions of any agreements Borrower has with Lender or Agent, whether heretofore or hereafter entered into, are inconsistent (whether the inconsistency be between the agreements or within a single agreement), the conflict shall be resolved in favor of the provision which affords Lender or Agent (as applicable) with the maximum rights, remedies, benefits or protections. Except as set forth above, this Agreement represents the entire agreement and understanding between Borrower, Agent and Lender concerning the subject matter hereof.

LEHMAN BROTHERS                          7

IN WITNESS WHEREOF, the parties hereto have caused their respective duly authorized representatives to execute this Agreement on this, the _____ day of _____, _____.

Lender:

LEHMAN BROTHERS INTERNATIONAL (EUROPE)

By: _____
    Name: David Swanson
    Title: Managing Director

Borrower:

NEWPORT GLOBAL CREDIT FUND (MASTER) LP

By: _____
    Name: Timothy T. Janszen
    Title: Authorized Officer of Ultimate General Partner

Investment Advisor (for the sole purpose of agreeing to and acknowledging the representation contained in Section 7 (b) (ii))

By: _____
    Name: Timothy T. Janszen
    Title: CEO

Agent hereby agrees to and acknowledges its role as agent for both parties in accordance with Section 1.

Agent:

LEHMAN BROTHERS INC.

By: _____
    Name:
    Title:

LEHMAN BROTHERS       8

H
A
N
D

D
E
L
I
V
E
R
Y

FILED / RECEIVED

SEP 2 2 2009

EPIQ BANKRUPTCY SOLUTIONS, LLC

*TP.*

RECEIVED BY: _____    _____    *3:30*

DATE    TIME

# EXHIBIT C

████████████████

**From:**        Steel, Howard S.
**Sent:**        Tuesday, April 22, 2014 12:39 PM
████        ████████████████

████

Howard S. Steel
Brown Rudnick LLP
Seven Times Square
New York, New York 10036
212.209.4917 (direct)
908.670.0056 (cell)
212.938.2806 (direct fax)
hsteel@brownrudnick.com

**From:** Roger May [mailto:rmay@ngalp.com]
**Sent:** Wednesday, September 23, 2009 6:04 PM
**To:** Molton, David J.; Dash, Andrew S.; Steel, Howard S.
████████████████████

████████████████████.

**From:** Filocco, Devin [mailto:Devin.Filocco@kbcfp.com]
**Sent:** Thursday, March 13, 2008 4:40 PM
**To:** Roger May
**Cc:** Convertible OPS (New York)
**Subject:** DTC ID Confirm DK'd vs. KBC

Please be advised as the below confirm was DK'd today. Please confirm that you know the trade and are prepared to settle with our DTC 352.

Also please confirm that our allocation and instructions are correct.

Regards,

Devin Filocco
212.845.2956

LEHMAN BROTHERS
074
BAS 94029 CUST#948-01775
PRIME BROKER

Trade Time: 11-Mar-2008 09:57:01 EDT  Value Date:14-Mar-2008
Account name: Newport a/c LB
Security: Bonten Media Acq (144A) 9% 01/06/2015 (BONTEN9_150601)
Maturity Date: 01-Jun-2015
ISIN: US09852TAA43
CUSIP: 09852TAA4
Contract Number: IN-080311-544
YOU BOUGHT 860,000 @ 75.5
Trade amount: USD 649,300
Accrued interest (103 days): USD 22,145
Total consideration: USD 671,445

---

This message may contain confidential, proprietary, or legally privileged information. No confidentiality or privilege is waived by any transmission to an unintended recipient. If you are not an intended recipient, please notify the sender and delete this message immediately. Any views expressed in this message are those of the sender, not those of any entity within the KBC Financial Products group of companies (together referred to as "KBC FP").

This message does not create any obligation, contractual or otherwise, on the part of KBC FP. It is not an offer (or solicitation of an offer) of, or a recommendation to buy or sell, any financial product. Any prices or other values included in this message are indicative only, and do not necessarily represent current market prices, prices at which KBC FP would enter into a transaction, or prices at which similar transactions may be carried on KBC FP's own books. The information contained in this message is provided "as is", without representations or warranties, express or implied, of any kind. Past performance is not indicative of future returns.

Click here to report this email as spam.

# EXHIBIT D

███████████████

| | |
|---|---|
| **From:** | Steel, Howard S. |
| **Sent:** | Monday, April 21, 2014 11:17 AM |
| **To:** | Dash, Andrew S.; Molton, David J. |
| **Cc:** | Molino, Elizabeth A. |

███████                    ████████████████████████████
███████████                ████████████████████████

Howard S. Steel
Brown Rudnick LLP
Seven Times Square
New York, New York 10036
212.209.4917 (direct)
908.670.0056 (cell)
212.938.2806 (direct fax)
hsteel@brownrudnick.com

-----Original Message-----
From: Roger May [mailto:rmay@ngalp.com]
Sent: Monday, April 21, 2014 10:08 AM
To: Steel, Howard S.

████████████████████████████████████████

████████████████████████████████████

███████

-----Original Message-----
From: DeGraff, Donald C [mailto:ddegraff@lehman.com]
Sent: Thursday, March 09, 2006 2:44 PM
To: Roger May
Subject: FW: Newport/Lehman Prime Broker Pricing Sheet

> Roger, the attachment is a summary of terms for Lehman's pb services.
> You have received pb documents from Jennifer Geismar in 11/05.  The
> financing and margin rates will obviously only apply if and when you
> effect leverage on the long or short side.  The only item I would like
> to alert you to is the debit balance charge of FF+75 bps.  This is the
> rate that will apply to the loan provided by Lehman to Newport, which
> will arise after you initiate your first few purchases.  Lehman will
> settle those trades without receiving payment from Newport and will
> not be repaid until the Limited Partners fund the Newport Prime Broker

1

> accounts at Lehman.   The FF+75 bps debit balance charge will begin on
> settlement date and end on the date the account gets funded.  This
> rate will be applied to to the settlement value of the trade.  After
> the original trade is paid for (establishing equity in the account),
> subsequent trades that produce an account debit will incur a FF+45
> rate unless the subsequent settlement values exceed account equity and
> required margin amounts.  For trades in which equity and margin
> amounts are breached the FF+75 charge will exist until the LP again
> funds those purchases.
>
> Additionally, there are several limits to our agreement which include
> but may not be limited to:
>
> 1) The advance will be capped at $25mm.
> 2) Outstanding advances need to be paid back in 10-12 days.
> 3) Commitment to advance funds limited to 2 months from Newport
> Global's launch.
> 4) If account is liquidated, leaving a zero equity position, we do not
> guarantee that we will advance additional funds.
> 5) No advance will occur until Lehman receives:
>
>                    (1) all completed and executed prime broker documentation;
>                    (2) consent letters from Limited Partners acknowledging Lehman's
> rights and the LP's obligation under the LP agreement, and
>                    (3) assignment of right from partnership to call for capital
> directly from the Limited Partners.
>
> Also, as pointed out by Lehman's Legal Team (Jennifer Geismar) all
> prime broker accounts need to maintain a "minimum net equity" of
> $500,000.00.  This must be deposited in the prime broker account prior
> to initial transactions.
>
> Jennifer Geismar will be speaking with Emily Hsu at your outside
> counsel to pick-up pb documentation discussion that took place in
> January.  She suggested that only minor issues remained open.  The
> only other item yhat you need to be aware is that when Lehman receives
> a trade confirm from your executing broker on a given transaction,
> Lehman forwards to Newport for your confirmation.  Your Team asked for
> three days before they have to instruct Lehman to accept or reject
> trade.  That will not work as the S.E.C. does not allow a prime broker
> to reject a trade if they haven't done so by trade date +1.  We need
> you to instruct us within 4 hours of your receipt of the confirmation.
>
>
>  <<Newport Global Pricing.doc>>
> Regards Don DeGraff
>
>
> Don DeGraff
> Managing Director
> Lehman Brothers
> 212-526-6548.o

> 908-500-8814.c
> ddegraff@lehman.com
>

---------------------------------------------------------------------------

This message is intended only for the personal and confidential use of the designated recipient(s) named above.  If you are not the intended recipient of this message you are hereby notified that any review, dissemination, distribution or copying of this message is strictly prohibited.  This communication is for information purposes only and should not be regarded as an offer to sell or as a solicitation of an offer to buy any financial product, an official confirmation of any transaction, or as an official statement of Lehman Brothers.  Email transmission cannot be guaranteed to be secure or error-free.  Therefore, we do not represent that this information is complete or accurate and it should not be relied upon as such.  All information is subject to change without notice.

# LEHMAN BROTHERS

Don De Graff
Lehman Brothers
Managing Director
Prime Brokerage Sales

March, 9, 2006

Mr. Roger May
Newport Global Advisors
25 227 Grogan's Mill Road
Suite 125
The Woodlands, Texas
77380

Dear Roger,

 On behalf of Lehman Brothers, I would like to thank you for the opportunity to provide prime broker services for the Newport Global Opportunities Fund, LP.  This document represents a summary of agreed upon terms.

## Pricing:

### Financing Rates

| | |
|---|---|
| Debit Balance on secured basis | Fed Funds + 45 bps |
| Debit Balance on unsecured basis | Fed Funds + 75 bps |
| Short Sale Proceeds | Fed Funds (Flat) |
| Credit Balances | Fed Funds − 35 bps |

### Securities Lending Fees:
| | |
|---|---|
| U.S. General Collateral "GC" | 35 bps |

**Stock Loan Fees:**                      All other securities borrowed directly from Lehman Brothers will be charged fees at market rates. No greater than 25% of short positions by market value may be borrowed away.

Also, on the next page please find our margin schedule for long corporate bonds.  This matrix, as well as the pricing schedule above is for reference and may be subject to change based upon required due diligence with Lehman's credit department.

# LEHMAN BROTHERS

CONFIDENTIAL

**Margin Schedule for outright long Corporate Bonds**
**Open and Overnight Financing Only**
**[Non Facilities or Term]**

|  | AAA | AA | A | BBB+ | BBB | BBB- | BB | B | CCC | CC | C | Def/NR |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Bond Maturities** | | | | | | | | | | | | |
| 0Y - 5Y | 2.5% | 2.5% | 3.0% | 4.0% | 4.0% | 5.0% | 10.0% | 10.0% | 20.0% | 40.0% | 40.0% | 50.0% |
| 5Y - 10Y | 4.0% | 4.0% | 4.5% | 5.0% | 5.0% | 5.0% | 10.0% | 10.0% | 20.0% | 40.0% | 40.0% | 50.0% |
| 10Y - 30Y | 5.0% | 5.0% | 5.0% | 5.0% | 8.0% | 8.0% | 10.0% | 10.0% | 20.0% | 40.0% | 40.0% | 50.0% |

**Long Default swap positions**  *[Lehman sells Default Swap (protection) to counterparty] or short bonds*
No Initial Margin

**Margin Schedule for  Long - Short credit positions**
***Same Issuer Offsets:***  *Eligible for long bond or short default swap positions vs long default swaps or short bond positions.*

*Long bond [through reverse repo] vs. Long Defaultswap [Lehman sells Defaultswap to counterparty]*
Reduction based on mismatches between durations of long credit vs short credit positions
   Mismatch calculated as ratio of difference of durations to the longer duration of bond or defaultswap
     *Mismatch = (Longer Duration - Shorter Duration) / Longer Duration*
Corporate bonds and defaultswaps must meet eligibility criteria to qualify for offsets

*Long bond [through reverse repo] vs. Short bond [through repo]*
If duration of short bond is greater than duration of long bond, mismatch offset = 0%
If duration of long bond is greater than duration of short bond,
     Duration Mismatch Offset = [Duration of Long Bond - Duration of short Bond] / Duration of Long Bond
     [expressed as a percentage]

| Margin Offset Table | | |
|---|---|---|
|  | **Same Issuer Offset** | |
| **Duration Ratio** | **Bond vs. Bond or CDS vs. CDS** | **Bond vs. CDS** |
| 0% - 20% | 50% | 25% |
| 20% - 50% | 40% | 20% |
| 50% - 70% | 25% | 15% |
| > 70% | 15% | 10% |

The reduction is applied to the usual margin rate applied to the long corporate bond position
Reduction applies to the Hedged portion of the long corporate bond position
   --- hedged portion defined as market value of long corporate bond that is exactly offset by notional of defaultswap or market value of short bond

LEHMAN BROTHERS
745 SEVENTH AVENUE
NEW YORK, NY 10019
212-526-6548

# LEHMAN BROTHERS

I look forward to working with you and your team.

Yours Sincerely,

Don De Graff

# EXHIBIT E

**From:**              Roger May
**Sent:**              Friday, September 12, 2008 12:05 PM
**To:**               Rahman, Mizan (NY); Prime Newport
**Cc:**               Banas, Kimberly; Goodwin, Rachel; Tsonos, Nicholas
**Subject:**        Security Transfer Request for NGOF and NGC
**Attachments:**   MX-2300N_20080912_112124.pdf


<<MX-2300N_20080912_112124.pdf>> Mizan,

Attached are two requests with attachments to transfer securities from Lehman to CS.  Please contact me with any questions, thanks.

Roger

**Newport Global Advisors**
21 Waterway Avenue
Suite 150
The Woodlands, Texas 77380
713 559 7400 Office
713 559 7499 Fax

## NEWPORT GLOBAL ADVISORS

To:        Mizan Rahman
Company:   Lehman Brothers
Phone:     212-528-9004
Fax:       646-758-5178

### Letter of Authorization

**Date:**   09/12/08

**RE:**     Newport Global Opportunity Fund a/c- 5601775
            Account Number:     306-35-285

**Dear Mizan:**

**Please consider this as authorization to move the securities attached in the following spreadsheet as Exhibit 1.**

Any questions please contact Roger May at 713-559-7403.  Thank you.

**Funds Authorized By:**

**Newport Global Advisors**
21 Waterway Avenue
Suite 150
The Woodlands, Texas  77380
713 559 7400 Office
713 559 7499 Fax

## NEWPORT GLOBAL ADVISORS

To:           Mizan Rahman
Company:   Lehman Brothers
Phone:       212-528-9004
Fax:          646-758-5178

| Letter of Authorization |
| --- |

**Date:**      09/12/08

**RE:**        Newport Global Credit a/c- 5601773
              Account Number:      306-35-285

**Dear Mizan:**

**Please consider this as authorization to move the securities attached in the following spreadsheet as Exhibit 1.**

Any questions please contact Roger May at 713-559-7403.  Thank you.

**Funds Authorized By:**

# EXHIBIT F

████████████

**From:** Steel, Howard S.
**Sent:** Tuesday, April 22, 2014 12:41 PM
**To:** Molino, Elizabeth A.

████ ████████████████████

████████ ████████████████████████████████

Howard S. Steel
Brown Rudnick LLP
Seven Times Square
New York, New York 10036
212.209.4917 (direct)
908.670.0056 (cell)
212.938.2806 (direct fax)
hsteel@brownrudnick.com

-----Original Message-----



-----Original Message-----
From: Rahman, Mizan (NY) [mailto:mizan@lehman.com]
Sent: Tuesday, September 23, 2008 1:35 PM
To: Roger May
Cc: Prime Newport
Subject: Transfer booking confirmation

Hi Roger,

I can confirm your attached request for transfer to CSFB was booked on 09/12.  Also, please note some items could not be booked because some bonds were due to mature on 09/15 and couple of items were delisted.
These items I have highlighted in red. The booking time stamp can be viewed in column "Q".

Request:
 <<Security Transfer Request for NGOF and NGC>>

Booking confirmation:
 <<BookingConfirmation.xls>>
_____
Mizan Rahman

LEHMAN BROTHERS

Capital Markets Prime Services

745 Seventh Avenue : New York : NY10019

212 528 9004 : mizan@lehman.com


- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
- - - - - - - -


This message is intended only for the personal and confidential use of the designated recipient(s) named above.  If you are not the intended recipient of this message you are hereby notified that any review, dissemination, distribution or copying of this message is strictly prohibited.  This communication is for information purposes only and should not be regarded as an offer to sell or as a solicitation of an offer to buy any financial product, an official confirmation of any transaction, or as an official statement of Lehman Brothers.  Email transmission cannot be guaranteed to be secure or error-free.

Therefore, we do not represent that this information is complete or accurate and it should not be relied upon as such. All information is subject to change without notice.


--------

IRS Circular 230 Disclosure:

Please be advised that any discussion of U.S. tax matters contained within this communication (including any attachments) is not intended or written to be used and cannot be used for the purpose of (i) avoiding U.S. tax related penalties or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

| Client Ref | Client Name | Tran Status | Version | System Ref | Client Product ID | Product Description | Action | Account | Entity | Quantity | Price | Broker | Trade Dt | Setl Dt | Setl Ccy | Dt Entered |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| PTM_61471192 | NEWPORT GLOBAL ADVISORS LP PBCG | Booking Passed | NEW TRADE | YPC9H0 | XS0231413708 | HELLAS Fm Oct 12 | Sell | 5601773 | LBIE | 1,000,000 | 88.1300 | CSFB | 09/12/2008 00:00 | 09/16/2008 00:00 | EUR | 09/12/2008 16:32 |
| PTM_61471193 | NEWPORT GLOBAL ADVISORS LP PBCG | Booking Passed | NEW TRADE | YPC9H2 | XS0250110664 | IESY HESSEN GMBH | Sell | 5601773 | LBIE | 2,000,000 | 95.5000 | CSFB | 09/12/2008 00:00 | 09/16/2008 00:00 | EUR | 09/12/2008 16:32 |
| PTM_61471194 | NEWPORT GLOBAL ADVISORS LP PBCG | Booking Passed | NEW TRADE | YPC9H1 | US031042AC84 | AMES TRUE TEMPER | Sell | 5601773 | LBIE | 3,000,000 | 79.5000 | CSFB | 09/12/2008 00:00 | 09/16/2008 00:00 | USD | 09/12/2008 16:32 |
| PTM_61471195 | NEWPORT GLOBAL ADVISORS LP PBCG | Booking Passed | NEW TRADE | YPC9HY | US098527AA43 | BONTEN MEDIA ACQ | Sell | 5601773 | LBIE | 5,000,000 | 73.0000 | CSFB | 09/12/2008 00:00 | 09/16/2008 00:00 | USD | 09/12/2008 16:32 |
| PTM_61471196 | NEWPORT GLOBAL ADVISORS LP PBCG | Booking Passed | NEW TRADE | YPC9G9 | US12502BAC72 | CCH I/CCH I CP | Sell | 5601773 | LBIE | 2,000,000 | 74.5000 | CSFB | 09/12/2008 00:00 | 09/16/2008 00:00 | USD | 09/12/2008 16:32 |
| PTM_61471197 | NEWPORT GLOBAL ADVISORS LP PBCG | Booking Passed | NEW TRADE | YPC9JF | US263578AG16 | DUANE READE INC | Sell | 5601773 | LBIE | 3,000,000 | 95.5000 | CSFB | 09/12/2008 00:00 | 09/16/2008 00:00 | USD | 09/12/2008 16:32 |
| PTM_61471198 | NEWPORT GLOBAL ADVISORS LP PBCG | Booking Passed | NEW TRADE | YPC9HP | US28140JAD28 | EDUCATION MGMT | Sell | 5601773 | LBIE | 3,000,000 | 86.5000 | CSFB | 09/12/2008 00:00 | 09/16/2008 00:00 | USD | 09/12/2008 16:32 |
| PTM_61471199 | NEWPORT GLOBAL ADVISORS LP PBCG | Booking Passed | NEW TRADE | YPC9HH | US305560AF16 | FAIRPOINT COMMUN | Buy | 5601773 | LBIE | 2,000,000 | 98.5000 | CSFB | 09/12/2008 00:00 | 09/16/2008 00:00 | USD | 09/12/2008 16:32 |
| PTM_61471200 | NEWPORT GLOBAL ADVISORS LP PBCG | Booking Passed | NEW TRADE | YPC9H4 | US45763UAC99 | INMARSAT FINANCE | Sell | 5601773 | LBIE | 830,000 | 101.5000 | CSFB | 09/12/2008 00:00 | 09/16/2008 00:00 | USD | 09/12/2008 16:32 |
| PTM_61471201 | NEWPORT GLOBAL ADVISORS LP PBCG | Booking Passed | NEW TRADE | YPC9HS | US44980YAK38 | IPCS INC | Sell | 5601773 | LBIE | 2,000,000 | 89.5000 | CSFB | 09/12/2008 00:00 | 09/16/2008 00:00 | USD | 09/12/2008 16:32 |
| PTM_61471202 | NEWPORT GLOBAL ADVISORS LP PBCG | Booking Passed | NEW TRADE | YPC9HN | US518613AB07 | LAUREATE EDUCATI | Sell | 5601773 | LBIE | 3,084,333 | 84.5000 | CSFB | 09/12/2008 00:00 | 09/16/2008 00:00 | USD | 09/12/2008 16:32 |
| PTM_61471203 | NEWPORT GLOBAL ADVISORS LP PBCG | Booking Passed | NEW TRADE | YPC9HR | US56075RAF91 | MAJESTIC STAR | Sell | 5601773 | LBIE | 2,500,000 | 55.3800 | CSFB | 09/12/2008 00:00 | 09/16/2008 00:00 | USD | 09/12/2008 16:32 |
| PTM_61471204 | NEWPORT GLOBAL ADVISORS LP PBCG | Booking Passed | NEW TRADE | YPC9HG | US652366AA38 | NEWPORT TV/NTV F | Sell | 5601773 | LBIE | 3,000,000 | 76.0000 | CSFB | 09/12/2008 00:00 | 09/16/2008 00:00 | USD | 09/12/2008 16:32 |
| PTM_61471205 | NEWPORT GLOBAL ADVISORS LP PBCG | Booking Passed | NEW TRADE | YPC9JC | US657337AF87 | NORTH ATL TRADNG | Sell | 5601773 | LBIE | 3,235,000 | 78.0000 | CSFB | 09/12/2008 00:00 | 09/16/2008 00:00 | USD | 09/12/2008 16:32 |
| PTM_61471206 | NEWPORT GLOBAL ADVISORS LP PBCG | Booking Passed | NEW TRADE | YPC9JD | US729136AF87 | PLIANT CORP | Sell | 5601773 | LBIE | 2,890,000 | 73.0000 | CSFB | 09/12/2008 00:00 | 09/16/2008 00:00 | USD | 09/12/2008 16:32 |
| PTM_61471207 | NEWPORT GLOBAL ADVISORS LP PBCG | Booking Passed | NEW TRADE | YPC9JG | US75040PAF53 | RADIO ONE INC | Sell | 5601773 | LBIE | 3,250,000 | 84.0000 | CSFB | 09/12/2008 00:00 | 09/16/2008 00:00 | USD | 09/12/2008 16:32 |
| PTM_61471208 | NEWPORT GLOBAL ADVISORS LP PBCG | Booking Passed | NEW TRADE | YPC9HL | US88706QAA22 | HELLAS II | Sell | 5601773 | LBIE | 3,150,000 | 67.0000 | CSFB | 09/12/2008 00:00 | 09/16/2008 00:00 | USD | 09/12/2008 16:32 |
| PTM_61471209 | NEWPORT GLOBAL ADVISORS LP PBCG | Booking Passed | NEW TRADE | YPC9HV | US91528XAA72 | UNO RESTAURANT | Sell | 5601773 | LBIE | 3,000,000 | 43.0000 | CSFB | 09/12/2008 00:00 | 09/16/2008 00:00 | USD | 09/12/2008 16:32 |
| PTM_61471210 | NEWPORT GLOBAL ADVISORS LP PBCG | Booking Passed | NEW TRADE | YPC9H8 | US92769PAC68 | VIRGIN RIVER CAS | Sell | 5601773 | LBIE | 3,360,000 | 70.0000 | CSFB | 09/12/2008 00:00 | 09/16/2008 00:00 | USD | 09/12/2008 16:32 |
| PTM_61471211 | NEWPORT GLOBAL ADVISORS LP PBCG | Booking Passed | NEW TRADE | YPC9D0 | B02F2N9 | WESTERN FOREST PRODUCTS INC | Sell | 5601773 | LBIE | 214,000 | 0.8500 | CSFB | 09/12/2008 00:00 | 09/16/2008 00:00 | USD | 09/12/2008 16:32 |
| PTM_61471212 | NEWPORT GLOBAL ADVISORS LP PBCG | Booking Passed | CANCEL | YPC90G | US025169AH62 | AMERCO | Sell | 5601775 | LBIE | 900,000 | 0.0000 | | 09/12/2008 00:00 | 09/16/2008 00:00 | USD | 09/12/2008 18:31 |
| PTM_61471213 | NEWPORT GLOBAL ADVISORS LP PBCG | Booking Passed | NEW TRADE | YPC90L | US025169AC75 | AMER COLOR GRAPH | Sell | 5601775 | LBIE | 15,000,000 | 28.0000 | CSFB | 09/12/2008 00:00 | 09/16/2008 00:00 | USD | 09/12/2008 16:34 |
| PTM_61471214 | NEWPORT GLOBAL ADVISORS LP PBCG | Booking Passed | NEW TRADE | YPC90N | US031042AB02 | AMES TRUE TEMPER | Sell | 5601775 | LBIE | 38,900,000 | 64.0000 | CSFB | 09/12/2008 00:00 | 09/16/2008 00:00 | USD | 09/12/2008 16:34 |
| PTM_61471215 | NEWPORT GLOBAL ADVISORS LP PBCG | Booking Passed | NEW TRADE | YPC90V | US001706AB69 | AMH HOLDINGS INC | Sell | 5601775 | LBIE | 5,500,000 | 71.0000 | CSFB | 09/12/2008 00:00 | 09/16/2008 00:00 | USD | 09/12/2008 16:35 |
| PTM_61471216 | NEWPORT GLOBAL ADVISORS LP PBCG | Booking Passed | NEW TRADE | YPC90X | 03236C103 | AMTROL HOLDINGS INC | Sell | 5601775 | LBIE | 3,663,125 | 0.0000 | CSFB | 09/12/2008 00:00 | 09/16/2008 00:00 | USD | 09/12/2008 16:36 |
| PTM_61471217 | NEWPORT GLOBAL ADVISORS LP PBCG | Booking Passed | NEW TRADE | YPC91T | US098527AA43 | BONTEN MEDIA ACQ | Sell | 5601775 | LBIE | 7,500,000 | 73.0000 | CSFB | 09/12/2008 00:00 | 09/16/2008 00:00 | USD | 09/12/2008 16:36 |
| PTM_61471218 | NEWPORT GLOBAL ADVISORS LP PBCG | Booking Passed | NEW TRADE | YPC93Y | US12501BAR50 | CCH I LLC | Sell | 5601775 | LBIE | 13,000,000 | 54.0000 | CSFB | 09/12/2008 00:00 | 09/16/2008 00:00 | USD | 09/12/2008 16:36 |
| PTM_61471219 | NEWPORT GLOBAL ADVISORS LP PBCG | Booking Passed | NEW TRADE | YPDSMT | US12501BAP94 | CCH I LLC | Sell | 5601775 | LBIE | 16,000,000 | 50.0000 | CSFB | 09/12/2008 00:00 | 09/16/2008 00:00 | USD | 09/12/2008 16:59 |
| PTM_61471220 | NEWPORT GLOBAL ADVISORS LP PBCG | Booking Passed | NEW TRADE | YPDSMV | 16117M107 | CHARTER COMMUNICATIONS-CL A | Sell | 5601775 | LBIE | 471,500 | 1.9100 | CSFB | 09/12/2008 00:00 | 09/16/2008 00:00 | USD | 09/12/2008 16:59 |
| PTM_61471221 | NEWPORT GLOBAL ADVISORS LP PBCG | Rejected | NEW TRADE | | US252768AC05 | DIAMOND TRIUMPH | Sell | 5601775 | LBIE | 16,600,000 | 0.0000 | | 09/12/2008 00:00 | 09/16/2008 00:00 | USD | 09/12/2008 16:59 |
| PTM_61471222 | NEWPORT GLOBAL ADVISORS LP PBCG | Booking Passed | NEW TRADE | YPDSMY | 313549404 | FEDERAL MOGUL CORP | Sell | 5601775 | LBIE | 301,914 | 16.0300 | CSFB | 09/12/2008 00:00 | 09/16/2008 00:00 | USD | 09/12/2008 16:59 |
| PTM_61471223 | NEWPORT GLOBAL ADVISORS LP PBCG | Booking Passed | NEW TRADE | YPDSMZ | US42703XAG43 | HERBST GAMING | Sell | 5601775 | LBIE | 2,500,000 | 8.0000 | CSFB | 09/12/2008 00:00 | 09/16/2008 00:00 | USD | 09/12/2008 16:59 |
| PTM_61471224 | NEWPORT GLOBAL ADVISORS LP PBCG | Booking Passed | NEW TRADE | YPDSM4 | US42703XAE94 | HERBST GAMING | Sell | 5601775 | LBIE | 52,750,000 | 11.0000 | CSFB | 09/12/2008 00:00 | 09/16/2008 00:00 | USD | 09/12/2008 16:59 |
| PTM_61471225 | NEWPORT GLOBAL ADVISORS LP PBCG | Booking Passed | NEW TRADE | YPDSM8 | US56075TAC27 | MAJESTIC STAR | Sell | 5601775 | LBIE | 54,840,000 | 12.5000 | CSFB | 09/12/2008 00:00 | 09/16/2008 00:00 | USD | 09/12/2008 17:00 |
| PTM_61471226 | NEWPORT GLOBAL ADVISORS LP PBCG | Booking Passed | NEW TRADE | YPDSM9 | US58985CAA80 | MERISANT WORLDWI | Sell | 5601775 | LBIE | 46,801,000 | 17.0000 | CSFB | 09/12/2008 00:00 | 09/16/2008 00:00 | USD | 09/12/2008 17:00 |
| PTM_61471227 | NEWPORT GLOBAL ADVISORS LP PBCG | Booking Passed | CANCEL | YPDSVZ | US657303AB99 | NORTH ATL HLDG | Sell | 5601775 | LBIE | 8,000,000 | 0.0000 | | 09/12/2008 00:00 | 09/16/2008 00:00 | USD | 09/12/2008 18:30 |
| PTM_61471228 | NEWPORT GLOBAL ADVISORS LP PBCG | Booking Passed | NEW TRADE | YPDTQK | US657337AE13 | NORTH ATL TRADNG | Sell | 5601775 | LBIE | 13,220,000 | 42.0000 | CSFB | 09/12/2008 00:00 | 09/16/2008 00:00 | USD | 09/12/2008 17:00 |
| PTM_61471229 | NEWPORT GLOBAL ADVISORS LP PBCG | Booking Passed | NEW TRADE | YPDTQX | 729136507 | PLIANT CORP PLIANT CORPORATION REDEEMABLE PFD S | Sell | 5601775 | LBIE | 29,400 | 62.0000 | CSFB | 09/12/2008 00:00 | 09/16/2008 00:00 | USD | 09/12/2008 17:00 |
| PTM_61471230 | NEWPORT GLOBAL ADVISORS LP PBCG | Booking Passed | NEW TRADE | YPDT07 | US729136AF87 | PLIANT CORP | Sell | 5601775 | LBIE | 7,000,000 | 73.0000 | CSFB | 09/12/2008 00:00 | 09/16/2008 00:00 | USD | 09/12/2008 17:00 |
| PTM_61471231 | NEWPORT GLOBAL ADVISORS LP PBCG | Booking Passed | CANCEL | YPDWJD | US74163XAD75 | PRIMUS TELECOMM | Sell | 5601775 | LBIE | 4,546,000 | 0.0000 | | 09/12/2008 00:00 | 09/16/2008 00:00 | USD | 09/12/2008 18:30 |
| PTM_61471232 | NEWPORT GLOBAL ADVISORS LP PBCG | Booking Passed | NEW TRADE | YPDWJS | 741929103 | PRIMUS TELECOMMUNICATIONS GP | Sell | 5601775 | LBIE | 10,293,451 | 0.2700 | CSFB | 09/12/2008 00:00 | 09/16/2008 00:00 | USD | 09/12/2008 17:01 |
| PTM_61471233 | NEWPORT GLOBAL ADVISORS LP PBCG | Booking Passed | NEW TRADE | YPDWJP | 825427107 | SHREVEPORT GAMING HLDGS INC | Sell | 5601775 | LBIE | 88,668 | 0.0000 | CSFB | 09/12/2008 00:00 | 09/16/2008 00:00 | USD | 09/12/2008 17:01 |
| PTM_61471234 | NEWPORT GLOBAL ADVISORS LP PBCG | Rejected | NEW TRADE | | 1US842529 | 1US842529 | Sell | 5601775 | LBIE | 16,654 | 0.0000 | | 09/12/2008 00:00 | 09/16/2008 00:00 | USD | 09/12/2008 18:36 |
| PTM_61471235 | NEWPORT GLOBAL ADVISORS LP PBCG | Rejected | NEW TRADE | | 1US842511 | 1US842511 | Sell | 5601775 | LBIE | 549,576 | 0.0000 | | 09/12/2008 00:00 | 09/16/2008 00:00 | USD | 09/12/2008 18:36 |
| PTM_61471236 | NEWPORT GLOBAL ADVISORS LP PBCG | Booking Passed | NEW TRADE | YPDW0Z | US89612AAC45 | TRICOM SA | Sell | 5601775 | LBIE | 7,560,000 | 45.0000 | CSFB | 09/12/2008 00:00 | 09/16/2008 00:00 | USD | 09/12/2008 17:02 |
| PTM_61471237 | NEWPORT GLOBAL ADVISORS LP PBCG | Booking Passed | NEW TRADE | YPDW0S | US897853AH08 | TRUE TEMPER | Sell | 5601775 | LBIE | 39,800,000 | 59.0000 | CSFB | 09/12/2008 00:00 | 09/16/2008 00:00 | USD | 09/12/2008 17:02 |
| PTM_61471238 | NEWPORT GLOBAL ADVISORS LP PBCG | Booking Passed | NEW TRADE | YPDW1F | US91528XAA72 | UNO RESTAURANT | Sell | 5601775 | LBIE | 22,500,000 | 43.0000 | CSFB | 09/12/2008 00:00 | 09/16/2008 00:00 | USD | 09/12/2008 17:02 |
| PTM_61471239 | NEWPORT GLOBAL ADVISORS LP PBCG | Booking Passed | NEW TRADE | YPDW05 | US925817AD06 | VICORP RESTAURNT | Sell | 5601775 | LBIE | 34,645,000 | 15.0000 | CSFB | 09/12/2008 00:00 | 09/16/2008 00:00 | USD | 09/12/2008 17:02 |
| PTM_61471240 | NEWPORT GLOBAL ADVISORS LP PBCG | Booking Passed | NEW TRADE | YPDW1Q | US92769PAF99 | VIRGIN RIVER CAS | Sell | 5601775 | LBIE | 40,395,000 | 42.5000 | CSFB | 09/12/2008 00:00 | 09/16/2008 00:00 | USD | 09/12/2008 17:02 |

# EXHIBIT G

United States Bankruptcy Court Southern District of New York
Lehman Brothers Holdings Claims Processing Center
c/o Epiq Bankruptcy Solutions, LLC
FDR Station, P.O. Box 5076
New York, NY 10150-5076

# PROOF OF CLAIM

| In re:<br>Lehman Brothers Holdings Inc., et al | Chapter 11<br>Case No. 08-13555 (JMP)<br>(Jointly Administered) |
|---|---|
| Name of Debtor Against Which Claim is Held<br>Lehman Brothers Holdings Inc. | Case No. of Debtor<br>08-13555 |

Filed: USBC - Southern District of New York
Lehman Brothers Holdings Inc., Et Al.
08-13555 (JMP)                    0000026387

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503. Additionally, this form should not be used to make a claim for Lehman Programs Securities (See definition on reverse side.)

## THIS SPACE IS FOR COURT USE ONLY

Name and address of Creditor: (and name and address where notices should be sent if different from Creditor)

Newport Global Advisors LP

c/o Brown Rudnick LLP

David J. Molton, Esq.

Seven Times Square

New York, NY 10036

Telephone number: 212.209.4800    Email Address: dmolton@brownrudnick.com

☐ Check this box to indicate that this claim amends a previously filed claim.

Court Claim Number:_____
(If known)

Filed on: _____

Name and address where payment should be sent (if different from above)

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check this box if you are the debtor or trustee in this case.

Telephone number:                    Email Address:

1. **Amount of Claim as of Date Case Filed:** $ See Exhibit A, Attached
If all or part of your claim is secured, complete Item 4 below; however, if all of your claim is unsecured, do not complete item 4.
If all or part of your claim is entitled to priority, complete Item 5.
If all or part of your claim qualifies as an Administrative Expense under 11 U.S.C. § 503(b)(9), complete Item 6.
☐ Check this box if all or part of your claim is based on a Derivative Contract.*
☐ Check this box if all or part of your claim is based on a Guarantee.*

*IF YOUR CLAIM IS BASED ON AMOUNTS OWED PURSUANT TO EITHER A DERIVATIVE CONTRACT OR A GUARANTEE OF A DEBTOR, YOU MUST ALSO LOG ON TO http://www.lehman-claims.com AND FOLLOW THE DIRECTIONS TO COMPLETE THE APPLICABLE QUESTIONNAIRE AND UPLOAD SUPPORTING DOCUMENTATION OR YOUR CLAIM WILL BE DISALLOWED.

☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of interest or additional charges. Attach itemized statement of interest or charges to this form or on http://www.lehman-claims.com if claim is a based on a Derivative Contract or Guarantee.

2. **Basis for Claim:** See Exhibit A, Attached
(See instruction #2 on reverse side.)

3. **Last four digits of any number by which creditor identifies debtor:**_____
3a    **Debtor may have scheduled account as:** _____
(See instruction #3a on reverse side.)

4. **Secured Claim (See instruction #4 on reverse side.)**
Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.
Nature of property or right of setoff: ☐ Real Estate    ☐ Motor Vehicle    ☐ Other
Describe:
Value of Property: $_____ Annual Interest Rate_____%
Amount of arrearage and other charges as of time case filed included in secured claim, if any:
$_____ Basis for perfection: _____
Amount of Secured Claim: $_____    Amount Unsecured: $_____

5. **Amount of Claim Entitled to Priority under 11 U.S.C. §507(a). If any portion of your claim falls in one of the following categories, check the box and state the amount.**

Specify the priority of the claim:

☐ Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries or commissions (up to $10,950), earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier – 11 U.S.C. § 507(a)(5).

☐ Contributions to an employee benefit plan – 11 U.S.C. § 507(a)(5).

☐ Up to $2,425 of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. § 507(a)(7).

☐ Taxes or penalties owed to governmental units – 11 U.S.C. § 507(a)(8).

☑ Other – Specify applicable paragraph of 11 U.S.C. § 507(a)(2).

**Amount entitled to priority:**

6. **Amount of Claim that qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9):** $_____
(See instruction #6 on reverse side.)

$ See Exhibit A, Attached

7. **Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim.
8. **Documents:** Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages and security agreements. Attach redacted copies of documents providing evidence of perfection of a security interest. (See definition of "redacted" on reverse side.) If the documents are voluminous, attach a summary.
DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.
If the documents are not available, please explain:

FOR COURT USE ONLY

**FILED / RECEIVED**

**SEP 22 2009**

**EPIQ BANKRUPTCY SOLUTIONS, LLC**

| Date:<br>9/19/09 | Signature: The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any.<br><br>By: _[signature]_<br>Roger May, Senior Managing Director |
|---|---|

Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

**EXHIBIT A**

**ADDENDUM TO PROOF OF CLAIM OF
NEWPORT GLOBAL ADVISORS LP**

1.      Newport Global Advisors LP ("NGA") manages the following investment

funds:  Newport Global Opportunities Fund L.P. ("NGOF"), and Newport Global Credit

Fund (Master) L.P. ("NGCF" and together, with NGOF, the "Funds").  NGA receives a

management fee (the "Management Fee") for managing the Funds, calculated as a

percentage of the Funds' net asset value.

2.      Prior to the commencement of these chapter 11 proceedings on September

15, 2008 (the "Petition Date"), the Funds each entered into a Customer Account Prime

Brokerage Agreement (each such agreement, a "Prime Brokerage Agreement") with

Lehman Brothers Inc. ("LBI") and other Lehman Brothers Entities (as defined in the

Prime Brokerage Agreement) (all such Lehman Entities named as parties to said Prime

Brokerage Agreement shall be referred to as "Lehman"), including but not limited to

Lehman Brothers Holdings Inc. ("LBHI") and Lehman Brothers International (Europe)

("LBIE").[1]  A representative Prime Brokerage Agreement is attached hereto as Exhibit A.

Pursuant to the Prime Brokerage Agreements, prime brokerage accounts (the

"Accounts") were opened at LBI for the Funds.  Each Prime Brokerage Agreement was

in effect as of the Petition Date and remains in effect as of the date hereof.  Upon

---

[1]      The Prime Brokerage Agreement provides that the parties to the agreement "shall consist of [Fund] and Lehman Brothers Inc., Lehman Brothers International (Europe), Lehman Brothers Finance S.A., Lehman Brothers Special Financing Inc., Lehman Brothers Holdings Inc. and any of their subsidiaries, parents, affiliates, divisions, officers, directors, agents and employees now existing or hereafter created, including successors and assigns . . . all such entities being collectively referred to hereafter as 'Lehman Brothers'[]."  Prime Brokerage Agreement ¶ 1(a) at 1.

1

information and belief, the Accounts remain with and under the control of Lehman, and were not transferred to Barclays Capital, Inc. or other third party in connection with any asset sale.

3.     Also prior to the Petition Date, each of the Funds, as Borrower, entered into a Margin Lending Agreement (each such agreement, a "Margin Lending Agreement," and together with the Prime Brokerage Agreement, the "Agreements") with LBIE as Lender, and LBI, as Agent, pursuant to which LBIE agreed to make loans to the Funds in connection with transactions entered into by the Funds under the Prime Brokerage Agreements.  A representative Margin Lending Agreement is attached hereto as Exhibit B.  Each of the Margin Lending Agreements was in effect as of the Petition Date and remains in effect as of the date hereof.

4.     Because Lehman has failed to return certain of the Funds' assets held pursuant to the Agreements in the Accounts, and prepetition, has failed to comply with the Funds' instruction to transfer securities held under the Agreements to Credit Suisse, which would have assumed the duties as the prime broker for the Funds going forward, the Funds' net asset value has decreased as a direct result of Lehman's actions, and the Management Fee has been correspondingly reduced by 50%.  NGA hereby asserts a claim against LBHI for the reduction of its Management Fee on account of Lehman's actions described herein.  The loss to NGA for year 2009 is fixed at $4,021,500.  NGA files this Proof of Claim for this amount, and amounts presently undetermined for any subsequent years' reduction in its Management Fee as a result of Lehman's actions described herein.

5.     As certain of the damages described above are contingent, unliquidated and likely to continue, the exact amount of NGA's total claim as set forth herein is

2

unknown at this time.  NGA reserves the right to amend or supplement this claim from time to time hereafter as it may deem necessary and proper.

6.      NGA reserves all of its rights and defenses, whether under title 11 of the United States Code or other applicable law, as to any claims that may be asserted against NGA by LBHI, including, without limitation, any rights of setoff and/or recoupment not expressly observed above.  NGA reserves the right to amend and/or supplement this Proof of Claim and any Exhibit attached hereto at any time and in any manner.  NGA reserves the right to file additional proofs of claim for additional claims which may be based on the same or additional documents.  NGA reserves the right to file additional proofs of claim for administrative expenses or other claims entitled to priority.  NGA reserves the right to file claims for the payment of interest (subject to applicable law) and for the reimbursement of all reasonable expenses (including attorneys' fees and collection fees) incurred by NGA in connection with the claims described herein.  NGA further reserves all of its rights as against the other debtors in these Chapter 11 proceedings and against other Lehman entities, including LBI and LBIE, in any other Lehman proceeding in the United States or overseas.

7.      This Proof of Claim is filed under the compulsion of the bar date set in this case and is filed to protect NGA from forfeiture of its claim by reason of said bar date.  The filing of this Proof of Claim shall not constitute: (a) a waiver, release, or limitation of NGA's rights against any person, entity or property (including, without limitation, LBHI or any other person or entity that is or may become a debtor in a case pending in this Court) in which NGA has a security interest or lien, (b) a consent by NGA to the jurisdiction or venue of this Court or any other court with respect to the proceedings, if any, commenced in any case against or otherwise involving NGA with

3

respect to the subject matter of the claims set forth in this Proof of Claim, any objection

or other proceeding commenced with respect thereto or any other proceeding commenced

in these cases against or otherwise involving NGA, (c) a waiver, release, or limitation of

the right of NGA to trial by jury in this Court or any other court in any proceeding as to

any and all matters so triable herein, whether or not the same be designated legal or

private rights or in any case, controversy, or proceeding related hereto, notwithstanding

the designation or not of such matters as "core proceedings" pursuant to 28 U.S.C. §

157(b)(2), and whether such jury trial right is pursuant to statute or the U.S. Constitution,

(d) a consent by NGA to a jury trial in this Court or any other court in any proceeding as

to any and all matters so triable herein or in any case, controversy, or proceeding related

hereto, pursuant to 28 U.S.C. § 157(e) or otherwise, (e) a waiver, release, or limitation of

NGA's right to have any and all final orders in any and all non-core matters or

proceedings entered only after *de novo* review by a U.S. District Court Judge, (f) a waiver

of the right to move to withdraw the reference with respect to the subject matter of this

claim, any objection thereto or other proceeding which may be commenced in this case

against or otherwise involving NGA, (g) a consent to the termination of LBHI's liability

to NGA by any particular court, including, without limitation, this Court, (h) a consent to

the final determination or adjudication of any claim or right pursuant to 28 U.S.C. §

157(c), or (i) an election of remedies.  No judgment has been rendered on this claim.

This claim is not subject to any setoff or counterclaim rights by LBHI.

8.    All notices and distributions in respect of this claim should be forwarded

to:  Newport Global Advisors LP, c/o Brown Rudnick LLP, David J. Molton, Esq., and

Andrew Dash, Esq., Seven Times Square, New York, NY 10036.

**EXHIBIT A**

# Customer Account Agreement Prime Brokerage

**LEHMAN BROTHERS INC.**

Lehman Brothers Inc.
745 Seventh Avenue
New York, NY 10019

(212) 526-7000

| Title: Newport Global Credit Fund (Master) LP | Account (and Group) No.: |
|---|---|

**Please Read Carefully, Sign and Return**

This agreement ("Agreement") sets forth the terms and conditions under which Lehman Brothers (as defined below) will open and maintain prime brokerage account(s) in your name and otherwise transact business with you as our customer. Throughout this Agreement references to "you" and "your" refer to you as our customer.

In consideration of Lehman Brothers opening a prime brokerage account for you, you agree to the following:

**1. PARTIES.** (a) A prime brokerage account opened pursuant to this Agreement will be opened at Lehman Brothers Inc. ("LBI"). All transactions, agreements and contracts between you and Lehman Brothers have been entered into in consideration of each other. You hereby agree that the parties to this Agreement shall consist of you and Lehman Brothers Inc., Lehman Brothers International (Europe), Lehman Brothers Finance S.A., Lehman Brothers Special Financing Inc., Lehman Brothers Holdings Inc. and any of their subsidiaries, parents, affiliates, divisions, officers, directors, agents and employees now existing or hereafter created, including successors and assigns (each such entity or person being referred to hereinafter as Lehman Brothers or a "Lehman Brothers Entity," unless otherwise specified, and all such entities or persons being collectively referred to hereinafter as "Lehman Brothers"). Unless you advise Lehman Brothers in writing to the contrary, you represent that you are not an affiliate (as defined in Rule 144(a)(1) under the U.S. Securities Act of 1933 as may be amended, modified or supplemented) of the issuer of any security held in any account opened hereby.

(b) You represent and warrant to Lehman Brothers that you are either (i) not (A) an employee benefit plan (an "ERISA Plan") as defined in Section 3(3) of the U.S. Employee Retirement Income Security Act of 1974, as amended ("ERISA"), or (B) subject to ERISA or Section 4975 of the U.S. Internal Revenue Code of 1986, as amended (the "Code") or (ii) (A) an ERISA Plan or subject to ERISA or Section 4975 of the Code and (B) whose Investment Manager or General Partner is (and you covenant and agree that any successor Investment Advisor (or Investment Manager or General Partner, as the case may be) appointed by you will be) a Qualified Professional Asset Manager ("QPAM") as defined by the relevant prohibited transaction class exemption(s) issued pursuant to ERISA and you will provide Lehman Brothers with a Investment Advisor Representation Letter .

**2. APPLICABLE LAWS, RULES AND REGULATIONS; SEVERABILITY.** All transactions under this Agreement shall be subject to the applicable laws, rules and regulations of all U.S. and, if applicable, non-U.S. federal, state and self-regulatory authorities, including, but not limited to, the rules and regulations of the Board of Governors of the Federal Reserve System of the United States and the constitution, rules and customs of the exchange or market (and clearing house) where such transactions are executed or settled. In the event of any conflict between any such present or future laws, regulations and rules and the terms of this Agreement, the provision(s) of this Agreement so affected shall be deemed modified or superseded to conform to such laws, regulations and rules, but the remaining provisions of this Agreement shall remain in full force and effect.

**3. SECURITY INTEREST AND LIEN; REGISTRATION OF SECURITIES.** As security for the payment and performance of all of your obligations and liabilities from time to time outstanding to any Lehman Brothers Entity, whether under this Agreement or otherwise, each Lehman Brothers Entity shall have a continuing lien and first priority security interest in all your Assets, defined as (i) all property in which you now have or hereafter acquire an interest which is now or hereafter held by or through any Lehman Brothers Entity, including, but not limited to, any and all securities, accounts, instruments, documents, contract rights, contracts (including, but not limited to, open transactions, securities purchase or sale contracts, agreements to lend cash or securities,

commodity contracts, futures contracts, forward contracts, repurchase agreements, swap agreements, contracts for differences or any other agreement, without regard to the form of such agreement which may include oral agreements or agreements confirmed or signed by only one party to the agreement and agreements entered into or signed by a Lehman Brothers Entity on your behalf) (hereinafter "Contracts"), commercial paper and other securities, monies, deposit accounts and general intangibles (including all security entitlements in respect thereof, all income and profits thereon, all dividends, interest and other payments and distributions with respect thereto and all proceeds from any of the foregoing), and (ii) any and all rights, claims or causes of action you may now or hereafter have against any Lehman Brothers Entity. The continuing lien and first priority security interest shall apply to all such Assets, which from time to time may be deposited or credited to any account you may have with a Lehman Brothers Entity, be held or carried by a Lehman Brothers Entity for you, be due from a Lehman Brothers Entity to you, or be delivered to or in a Lehman Brothers Entity's possession or control for any purpose, including safekeeping. Such continuing lien and first priority security interest shall apply irrespective of whether or not Lehman Brothers has made advances in connection with such Assets, the number of accounts you have with Lehman Brothers or which particular Lehman Brothers Entity holds such Assets. You hereby acknowledge and agree that all such Assets held by or through any Lehman Brothers Entity are held as collateral by such Lehman Brothers Entity as agent and bailee for itself and all other Lehman Brothers Entities and, as such, each Lehman Brothers Entity shall comply with any orders or instructions originated by any other Lehman Brothers Entity with respect to or in connection with such collateral without your further consent. You and Lehman Brothers agree that all such Assets held in or credited to any account will be treated as financial assets under Article 8 of the Uniform Commercial Code as in effect in the State of New York (the "UCC") and that any account maintained by you with any Lehman Brothers Entity shall be a securities account under Article 8 of the UCC. In the event of a breach or default by you, a Lehman Brothers Entity shall have, in addition to the rights and remedies provided in this Agreement, all rights and remedies available to a secured creditor under the UCC and any other applicable law. You represent that all of the above-described Assets shall at all times be free and clear of all liens, claims and encumbrances of any nature other than the security interest created hereby. Assets consisting of securities shall be delivered in good deliverable form (or Lehman Brothers shall have the unrestricted power to place such securities in good deliverable form) in accordance with the requirements of the primary market for these securities. In addition, in order to satisfy any of your outstanding liabilities or obligations to any Lehman Brothers Entity, each Lehman Brothers Entity may, to the fullest extent permitted by law, at any time in its discretion and without prior notice to you, use, apply or transfer any and all securities or other property or Assets (including, without limitation, fully-paid securities and cash). You hereby agree that, except as otherwise specifically agreed in writing, each Lehman Brothers Entity may register and hold the securities and other property or Assets in your accounts in its name or the name of its designee. You shall execute such documents and take such other action as such Lehman Brothers Entity shall reasonably request in order to protect its rights with respect to any of the Assets. In addition, you appoint Lehman Brothers as your attorney-in-fact to act on your behalf to sign, seal, execute and deliver all documents and do all such acts as may be required to realize upon any of Lehman Brothers' rights in the Assets.

   4.  **BREACH, BANKRUPTCY OR DEFAULT.**  If you shall:

   (i)  breach, repudiate or default under this Agreement or any Contract with any Lehman Brothers Entity, whether heretofore or hereafter entered into;

   (ii)  make or repeat any misrepresentations in connection with this Agreement or any Contract with any Lehman Brothers Entity;

   (iii)  state that you will not perform any obligation to any Lehman Brothers Entity;

   (iv)  apply for, consent to or be the subject of an application or petition for the appointment of or the taking of possession by a receiver, custodian, trustee, liquidator or similar persons of yourself or of all of or a substantial part of your property;

   (v)  admit in writing your inability, or become generally unable, to pay your debts as such debts become due or give Lehman Brothers other grounds for insecurity, as determined by Lehman Brothers in its sole and absolute discretion (including, without limitation, death; mental incompetence; dissolution; the appointment of a receiver by or against you, any guarantor, co-signer or other party liable on or providing security for your obligations to any Lehman Brothers Entity

or the attachment against your or such other party's account(s) with any Lehman Brothers Entity; or any indication of your refusal or inability to satisfy promptly any Margin Call (as defined below) or other obligation);

    (vi) make a general assignment for the benefit of your creditors; or

    (vii) file or be subject of the filing or entry of a petition or order for relief or be subject of the commencement of a proceeding regarding reorganization, bankruptcy, liquidation, dissolution or insolvency;

then, any such event shall constitute, at Lehman Brothers' election, a default by you under this Agreement and any or all Contracts you may then have with any Lehman Brothers Entity, whether heretofore or hereafter entered into. In the event of any such default, each Lehman Brothers Entity shall have all of the rights of a secured party upon default under the UCC and other applicable laws, rules and regulations, including, without limitation, the right, without prior notice to you, to sell any and all Assets in which you have an interest (including without limitation this Agreement and any Contract) held by or through any Lehman Brothers Entity (either individually or jointly with others), to buy any or all property which may have been sold short, to exercise any and all options and other rights, to accelerate, cancel, terminate, liquidate, close out and net the settlement payments and/or delivery obligations under any or all outstanding transactions and/or to purchase or sell any other securities or property to offset market risk, and to set off or offset any obligation owing by any Lehman Brothers Entity to you against any obligations owing by you to any Lehman Brothers Entity, after which you shall be liable to Lehman Brothers for any remaining deficiency, loss, costs or expenses incurred or sustained by Lehman Brothers in connection therewith. Such purchases and/or sales may be effected publicly or privately without notice or advertisement in such manner as Lehman Brothers may in its sole discretion determine. At any such sale or purchase, any Lehman Brothers Entity may purchase or sell the property to or from itself or third parties free of any right of redemption and you shall remain liable to Lehman Brothers for any deficiency; it being understood that a prior tender, demand or call of any kind from Lehman Brothers, or prior notice from Lehman Brothers, of the time and place of such sale or purchase shall not be considered a waiver of Lehman Brothers' right to buy or sell any securities, commodities or other property or Asset held by Lehman Brothers, or which you may owe to Lehman Brothers. In addition, each Lehman Brothers Entity shall have the right, at any time and from time to time, to set off and otherwise apply any and all amounts owing by such Lehman Brothers Entity to you or for your account against any and all amounts now or hereafter owing by you to any Lehman Brothers Entity (including, without limitation, any indebtedness in your accounts), whether matured or unmatured, fixed, contingent or otherwise and irrespective of whether any Lehman Brothers Entity shall have made any demand therefor. Lehman Brothers agrees to notify you of any such set-off and application, provided, however, that the failure to give such notice shall not affect the validity of any such set-off and application. You agree that any obligation of a Lehman Brothers Entity to you shall be subject to there being no breach, repudiation, misrepresentation or default (however characterized) by you which is continuing under any Contract with a Lehman Brothers Entity. You and Lehman Brothers intend this Agreement to be a master netting agreement.

    **5. ADEQUATE ASSURANCES.** Subject to, and not as a limitation of, the rights of Lehman Brothers under this Agreement, if at any time Lehman Brothers has reasonable grounds for insecurity with respect to your performance of any of your obligations, Lehman Brothers may demand, and you shall give, adequate assurance of due performance within 24 hours, or within any shorter period of time Lehman Brothers demands that is reasonable under the circumstances. The adequate assurance of performance that may be demanded by Lehman Brothers may include, but shall not be limited to, the delivery by you of additional property as collateral.

    **6. EXECUTION FEES AND SERVICE CHARGES.** You understand that your account(s) will be charged brokerage commissions or mark-ups/mark-downs in connection with the execution of transactions ("Execution Fees") and may be charged certain other fees for custody and other services furnished to you ("Service Fees"). You further understand that Execution Fees may be changed from time to time upon prior written notice to you and that Service Fees may be changed from time to time upon prior written notice to you and, in each case, you agree to be bound thereby.

    **7. AMOUNTS OWED; TRUTH-IN-LENDING.** You hereby acknowledge receipt of Lehman Brothers' Truth-in-Lending disclosure statement. You understand that interest will be charged on any amount you owe in your account(s) in accordance with the methods described in such statement or in any amendment or revision thereto which may be provided to you. Any amount due which is not paid at the close of an interest period will be added to the opening balance for the next interest period.

**8. COLLECTION AND OTHER ACCOUNT-RELATED COSTS.** You hereby agree to pay, on demand, all reasonable costs, liabilities and damages incurred by Lehman Brothers (including, without limitation, costs of collection, attorneys' fees, court costs and other expenses) in connection with (i) enforcing its rights hereunder, (ii) any investigation, litigation or proceeding involving your account or any property therein (including, without limitation, claims to such property by third parties), (iii) your use of or access to any Lehman Brothers or third-party system or (iv) Lehman Brothers' acting in reliance upon instructions, including, but not limited to, instructions transmitted via electronic means, including facsimile or electronic mail, from you or your authorized agents (including investment managers or advisers), In each case and whether or not demand has been made therefor, you hereby authorize Lehman Brothers to charge your account(s) for any and all such costs, liabilities and damages, including, without limitation, those incurred in connection with the liquidation of any of your Assets.

**9. IMPARTIAL LOTTERY ALLOCATION.** You agree that, in the event Lehman Brothers holds on your behalf securities in its name, in the name of its designee or in bearer form which are called in part, you will participate in the impartial lottery allocation system for such called securities in accordance with the rules of The New York Stock Exchange, Inc. or any other appropriate self-regulatory organization. When any such call is favorable, no allocation will be made to any account in which, to the knowledge of Lehman Brothers, any officer, director or employee of Lehman Brothers has any financial interest until all other customers have been satisfied on an impartial lottery basis.

**10. SECURITIES EVENTS.** Lehman Brothers shall inform you if Lehman Brothers becomes aware of the occurrence or prospective occurrence of any of the following with respect to any securities in your account(s): conversions, subdivision or consolidation; redemption; a takeover offer; calls, including calls on partly-paid securities and published calls; a capitalization issue; rights issue; distribution of income in the form of securities; or a certificate which may at a future date be exchanged for securities or an entitlement to acquire securities. Subject to Section 19 herein, if Lehman Brothers receives notice from you that you wish to act on any of the events referenced in this section and such notice is received by Lehman Brothers within a reasonable time for Lehman Brothers to act on such event, Lehman Brothers will act in accordance with your wishes. You represent that you review all prospectuses and offering statements that you may receive and understand the risks inherent with your securities transactions, including any risks associated with the above-described securities events.

**11. VOTING RIGHTS.** If any right to vote arises with respect to securities in your account, you may inform Lehman Brothers that you wish to exercise such right as you specify. Subject to Section 19 hereof, if Lehman Brothers receives this notice within a reasonable time to act, it will act in accordance with your wishes. If Lehman Brothers does not receive such timely notice from you, it will use its discretion to decide whether and how to vote such securities.

**12. WAIVER, ASSIGNMENT AND NOTICES.** Neither Lehman Brothers' failure to insist at any time upon strict compliance with this Agreement or with any of the terms hereof nor any continued course of such conduct on its part shall constitute or be considered a waiver by Lehman Brothers of any of its rights or privileges hereunder. Any purported assignment of your rights and/or obligations hereunder without obtaining the prior written consent of an authorized representative of Lehman Brothers shall be null and void. Each Lehman Brothers Entity reserves the right to assign any of its rights or obligations hereunder or under any Contract to any other Lehman Brothers Entity without prior notice to you. Notices and other communications to you (including, without limitation, Margin Calls) that are sent by electronic means, including facsimile or electronic mail, sent by express delivery service or mailed, in each case to the address or number provided by you, shall, until the respective Lehman Brothers Entity has received notice in writing of a different address or number, be deemed to have been personally delivered to you. Margin Calls may also be communicated orally, without subsequent written confirmation.

**13. FREE CREDIT BALANCES.** You hereby authorize Lehman Brothers to use any free credit balance awaiting investment or reinvestment in your account(s) in accordance with all applicable rules and regulations and to pay interest thereon at such rate or rates and under such conditions as are established from time to time by Lehman Brothers for such account(s) and for the amounts of cash so used.

**14. RESTRICTIONS ON ACCOUNT.** You understand that Lehman Brothers, in its sole and absolute discretion, may restrict or prohibit trading of securities or other property in your account(s) and may terminate your account(s), and you shall nevertheless remain liable for all of your obligations to the Lehman Brothers Entities under

4

this Agreement or any Contract. In the event that Lehman Brothers, in its sole and absolute discretion, determines to impose such restrictions on your account(s) due to credit, margin, legal, regulatory, money laundering or other concerns, Lehman Brothers shall be under no obligation to provide you with prior notice of such restriction.

**15.    CREDIT INFORMATION AND INVESTIGATION.** You authorize Lehman Brothers, in its discretion, at any time and from time to time, to make or obtain reports concerning your credit standing and business conduct (including, but not limited to, obtaining audited account statements, if such are available). You may make a written request for a description of the nature and scope of the reports made or obtained by Lehman Brothers and the same will be provided to you within a reasonable period of time.

**16.    SHORT AND LONG SALES.** In placing any sell order for a short sale, you will designate the order as such and hereby authorize Lehman Brothers to mark the order as being "short". You are required to and will comply with all applicable rules and regulations relating to short sale transactions. In placing any sell order for a long order, you will designate the order as such and hereby authorize Lehman Brothers to mark the order as being "long". The designation of a sell order as being long shall constitute a representation by you that you own the security with respect to which the order has been placed, that such security is not restricted under Rules 144 and/or 145 under the U.S. Securities Act of 1933 (as may be amended, modified or supplemented) or any other applicable law, rule or regulation and, as such, may be sold without restriction in the open market and that, if Lehman Brothers does not have the security in its possession at the time you place the order, you shall deliver the security by settlement date in good deliverable form or pay to Lehman Brothers any losses and expenses it may incur or sustain as a result of your failure to make delivery on a timely basis.

**17.    MARGIN ACCOUNTS.** All Loans made hereunder are demand loans. You hereby agree to deposit and maintain such cash or collateral as margin in your margin accounts, if any, as Lehman Brothers may in its sole discretion require, and you agree to pay forthwith on demand any amount owing with respect to any of your margin accounts to satisfy Lehman Brothers' demand for such payment (a "Margin Call"). In addition, you further agree to deposit promptly and maintain such other collateral with Lehman Brothers as is required by any Contract you may have with any Lehman Brothers Entity. Upon your failure to make any such payment or deposit, or if at any time Lehman Brothers, in its sole discretion, deems it necessary for its protection, whether with or without prior demand, call or notice, Lehman Brothers shall be entitled to exercise all rights and remedies provided herein. No demands, calls, tenders or notices that Lehman Brothers may have made or given in the past in any one or more instances shall invalidate your waiver of the requirement to make or give the same in the future.

**18.    SECURITIES CONTRACTS.** You acknowledge and agree that any positions in your account(s) shall be deemed "securities contracts" within the meaning of Sections 555 and 741(7) (as may be amended, modified or supplemented) of the U.S. Bankruptcy Code.

**19.    CONSENT TO LOAN OR PLEDGE OF SECURITIES IN MARGIN ACCOUNTS.**

(a) Except as noted in subparagraph (b) below, within the limits of applicable law and regulations, you hereby authorize Lehman Brothers to lend either to itself or to others any securities held by Lehman Brothers in any of your accounts, to convey therewith all attendant rights of ownership (including voting rights and the right to transfer the securities to others), and to use all such property as collateral for its general loans. Any such property, together with all attendant rights of ownership, may be pledged, repledged, hypothecated or rehypothecated either separately or in common with other property for any amounts due to Lehman Brothers thereon or for a greater sum, and Lehman Brothers shall have no obligation to retain a like amount of similar property in its possession and control. You hereby acknowledge that, as a result of such activities, Lehman Brothers may receive and retain certain benefits to which you will not be entitled. In certain circumstances, such loans, pledges, repledges, hypothecations or rehypothecations may limit, in whole or in part, your ability to exercise voting and other attendant rights of ownership with respect to the loaned or pledged securities. You agree to waive the right to vote, or to provide any consent or to take any similar action with respect to these securities in the event that the record date or deadline for such vote, consent or other action falls during the period of any such loan, pledge, repledge, hypothecation or rehypothecation.

(b) Unless otherwise agreed by Lehman Brothers and you, you will be entitled to receive all distributions, including, but not limited to, cash, stock dividends and interest payments, made on or in respect of any loaned,

pledged, repledged, hypothecated or rehypothecated securities which are not otherwise received by you, to the full extent you would be entitled if the securities had not been loaned, pledged, repledged, hypothecated or rehypothecated.

**20.  OPTIONS.** You are aware of and agree to be bound by the Rules of the applicable Options Exchange or Association as well as The Options Clearing Corporation (OCC). You represent and warrant not to enter into any purchase or sale of equity, debt, foreign currency or index put or call options without having read and fully understood the terms, conditions and risks as set out in the Characteristics and Risks of Standardized Options booklet and applicable supplements. You understand that short options positions are assigned on an automated random basis and may be assigned on the day written. You understand that the official closing price may be determined some time after the close of trading for purposes of this section. You understand that listed equity options may be automatically exercised by the OCC at expiration if the options are in-the-money by an amount equal to or in excess of a minimum amount determined by the OCC by reference to the composite closing price. You will notify Lehman Brothers of your intention to exercise listed options that are out-of-the-money by any amount, at-the-money, or in-the-money but are not subject to automatic exercise, no later than 1 hour past the close of trading for that option on that day. You will notify Lehman Brothers of your intention not to exercise an option that is in-the-money, and subject to automatic exercise, no later than 1 hour past the close of trading for that option on that day. You understand that listed options on an underlying index are automatically exercised by the OCC at expiration if the options are in-the-money by an amount equal to or in excess of a minimum amount determined by the OCC by reference to the composite closing price. You will notify Lehman Brothers of your intention to exercise any option early or not to exercise an option on an underlying index which is in-the-money no later than 15 minutes prior to the close of trading for that option on that day. If notification is not given to Lehman Brothers within the times noted, Lehman Brothers is under no obligation to take action but will endeavor to comply with your instructions. Except as required by the OCC Rules, Lehman Brothers has no obligation to exercise any option absent specific instructions from you to that effect. You agree to not violate, whether acting alone or in concert with others, the position or exercise limits of the applicable listed options exchange.

**21.  PRIME BROKERAGE SERVICES.** Under the terms and conditions of this Agreement, LBI will act as a prime broker for you in accordance with the no-action letter of the Securities and Exchange Commission dated January 25, 1994, as such letter may be amended, modified or supplemented from time to time (the "SEC Letter") and the provisions set forth below:

(a)  LBI will, subject to the terms and conditions of this Agreement, accept for clearance and settlement trades executed on your behalf by such executing brokers as you may designate from time to time and who have received LBI's prior approval and who have previously executed an agreement with LBI setting forth the terms and conditions under which such executing brokers will be authorized to accept orders from you for settlement by LBI (the "Executing Brokerage Agreement").

(b)  LBI shall be responsible for settling trades executed on your behalf by your executing broker(s) and reported to LBI by you and your executing broker(s) provided that you have reported to LBI on trade date, by the time designated to you by LBI, all the details of such trades including, but not limited to, the contract amount, the security involved, the number of shares or the number of units and whether the transaction was a long or short sale or a purchase, and further provided that LBI has either affirmed or not "DK'd" ("indicated it does not know") and has not subsequently disaffirmed such trades. In the event that LBI determines not to settle a trade, LBI shall not have settlement responsibility for such trade and shall, instead, send you a cancellation notification to offset the notification sent to you under sub-paragraph (c) of this paragraph. You shall be solely responsible and liable to your executing broker(s) for settling such trade. In addition, LBI may be required to cease providing prime brokerage services to you in accordance with the Executing Brokerage Agreement.

(c) On the day following each transaction, LBI shall send you a confirmation of each trade placed with an executing broker in accordance within the SEC Letter based upon the information you provided to LBI. Any confirmations issued by LBI as prime broker shall identify the executing broker and provide you with the information required by the SEC Letter. Confirmations of the execution of orders and other activity in your account(s) which have been provided or made available to you by 10:00 a.m. (New York time) on the business day immediately following the trade date shall be conclusive if not objected to by 2:00 p.m. (New York time) on such business day or, if such reports are provided or made available to you after 10:00 a.m. (New York time) on such business day, then such confirmations shall be conclusive if not objected to within four (4) hours after such

6

confirmations have been provided or made available to you. Monthly statements shall be sent to you in accordance with the SEC Letter. Information contained in monthly statements of account, to the extent not included in an activity report, shall be conclusive if not objected to within ten (10) days after such statements have been provided or made available to you. LBI may send communications to your address of record or another address provided to LBI in writing. All communications sent to such address, whether by mail, facsimile, telegraph, messenger, electronic means or otherwise, shall be deemed to have been given to you personally as of the date and time sent, whether actually received or not.

(d)    In the event of: (i) the filing of a petition or other proceeding in bankruptcy, insolvency or for the appointment of a receiver by or against your executing broker, (ii) the termination of your executing broker's registration and the cessation of business by it as a broker-dealer, or (iii) your executing broker's failure, inability or refusal, for any reason whatsoever or for no reason at all, to settle a trade, and if LBI agrees to settle any trades executed on your behalf by such executing broker, regardless of whether LBI either affirmed or did not DK and did not disaffirm such trades, you shall be solely responsible, and liable to LBI, for any losses arising out of or incurred in connection with LBI's agreement to settle such trades.

(e)    You shall maintain in your account with LBI such minimum net equity in cash or securities as LBI, in its sole discretion, may require from time to time (the "Lehman Brothers Net Equity Requirements"), which shall in no event be less than the minimum net equity required by the SEC Letter (the "SEC Net Equity Requirements"). In the event your account falls below the SEC Net Equity Requirements, you hereby authorize LBI to notify promptly all executing brokers with whom it has an Executing Brokerage Agreement on your behalf of such event. Moreover, if you fail to restore your account to compliance with the SEC Net Equity Requirements within the time specified in the SEC Letter, LBI shall, without notice to you: (i) notify all such executing brokers that LBI is no longer acting as your prime broker and (ii) either not affirm or "DK" ("indicate that it does not know") all prime brokerage transactions on your behalf with a trade date after the business day on which such notification was sent. In the event : (i) your account falls below the Lehman Brothers Net Equity Requirements, (ii) LBI determines in its sole discretion that there would not be enough cash in your account to settle such transactions or that a maintenance Margin Call may be required as a result of settling such transactions, or (iii) LBI determines in its sole discretion that the continuation of prime brokerage services to you presents an unacceptable risk to Lehman Brothers taking into consideration all the facts and circumstances, then LBI may disaffirm all your prime brokerage transactions and/or cease to act as your prime broker. In any such case, LBI shall send a cancellation notification to you, and you understand that you must settle outstanding trades directly with the relevant executing broker and that you authorize LBI to provide the executing broker with any information useful to settle such trades. You further agree that LBI will not be bound to make any investigation into the facts surrounding any transaction to which you are a party and that immediately upon notice to you and, if required, to the executing brokers, LBI may cease acting as your prime broker.

(f)    If you have instructed your executing broker(s) to send confirmations to you in care of LBI, as your prime broker, the confirmation sent by such executing broker is available to you promptly from LBI (once received), at no additional charge.

(g)    If your account is managed on a discretionary basis, you hereby acknowledge that your prime brokerage transactions may be aggregated with those of other accounts of your adviser, according to your adviser's instructions, for execution by your executing broker(s) in a single bulk trade and for settlement in bulk by LBI. You understand that no part of any transaction may be allocated to any other account where such other account's net equity is below the minimum levels established in the SEC Letter and that, should such a net equity deficiency occur in any such other account, LBI must disaffirm the entire transaction. In the event any trade is disaffirmed, as soon as practicable thereafter, LBI shall supply your executing broker(s) with the allocation of the bulk trade, based upon information provided by your adviser.

(h)    You hereby authorize LBI to disclose your name, address and tax I.D. number to your executing broker(s) to enable such executing broker to establish on its books an account for you to be used in the event transactions are disaffirmed by LBI.

(i)    Lehman Brothers will not be responsible or liable for any acts or omissions of any executing broker or its employees. You understand that Lehman Brothers does not act as investment adviser or solicit orders, that Lehman

Brothers does not advise prime brokerage customers, perform any analysis, or make any judgment on any matters pertaining to the suitability of any order, or offer any opinion, judgment or other type of information pertaining to the nature, value, potential or suitability of any particular investment.

(j) You agree to indemnify and hold Lehman Brothers harmless from any loss, claim or expense, including attorneys' fees, incurred by Lehman Brothers in connection with Lehman Brothers acting or declining to act as prime broker for you and to fully reimburse Lehman Brothers for any legal or other expenses (including the cost of any investigation and preparation) which Lehman Brothers may incur in connection with any claim, action, proceeding or investigation arising out of or in connection with this Agreement or any transactions hereunder.

(k) You represent and warrant that you are currently in compliance, and during the term of this Agreement will remain in compliance, with all applicable requirements of the SEC Letter, including, but not limited to, the requirement that you execute an agreement with each executing broker.

(l)    The prime brokerage services hereunder shall be provided in a manner consistent with the SEC Letter.

**22.  LEGALLY BINDING.**  You hereby agree that this Agreement and all of the terms hereof shall be binding upon you and your estate, heirs, executors, administrators, personal representatives, successors and assigns. You further agree that all purchases and sales shall be for your account(s) in accordance with your oral or written instructions.  You hereby waive any and all defenses that any oral instruction was not in writing as may be required by any applicable law, rule or regulation.  With respect to any of your accounts maintained in connection with this Agreement, you hereby authorize Lehman Brothers to act and rely on any instructions (including, without limitation, instructions to transfer cash or securities, purchase or sell securities, enter into derivative or other transactions or borrow money or securities) received by Lehman Brothers from any of the persons listed on Exhibit A, as such list may be amended by you from time to time.  In addition, you hereby authorize Lehman Brothers to act and rely on any instructions received by Lehman Brothers from any of your employees or agents (including any investment manager or adviser) that Lehman Brothers reasonably believes is authorized to so act on your behalf.

**23.  AMENDMENT.**  You agree that Lehman Brothers may modify the terms of this Agreement at any time upon prior written notice to you.  By continuing to accept services from Lehman Brothers thereafter, you will have indicated your acceptance of any such modification.  If you do not accept such modification, you must notify Lehman Brothers in writing; your account may then be terminated by Lehman Brothers, after which you will remain liable to Lehman Brothers for all outstanding liabilities and obligations.  Otherwise, this Agreement may not be modified absent a written instrument signed by an authorized representative of Lehman Brothers.

**24.  GOVERNING LAW.**  THIS AGREEMENT SHALL BE DEEMED TO HAVE BEEN MADE IN THE STATE OF NEW YORK AND SHALL BE CONSTRUED, AND THE CONTRACTUAL AND ALL OTHER RIGHTS AND LIABILITIES OF THE PARTIES DETERMINED, IN ACCORDANCE WITH THE LAW OF THE STATE OF NEW YORK WITHOUT GIVING EFFECT TO ANY CONFLICTS OF LAW PRINCIPLES THEREOF.

**25.  JURISDICTION; WAIVER OF JURY TRIAL.**  The parties shall attempt in good faith to promptly resolve any dispute arising out of, relating to or in connection with this Agreement or any transactions hereunder by negotiations by executives of the parties who have the authority to settle the controversy.  With respect to any suit, action or proceedings relating to this Agreement ("Proceedings"), each party irrevocably submits to the exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City and waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party.  ANY RIGHT TO A TRIAL BY JURY WITH RESPECT TO ANY CLAIM OR ACTION IS HEREBY WAIVED BY ALL THE PARTIES TO THIS AGREEMENT.

**26.  WAIVER OF IMMUNITIES.**  Each party irrevocably waives, to the fullest extent permitted by applicable law, with respect to itself and its revenues and assets, all immunity on the grounds of sovereignty or other similar grounds from (i) suit, (ii) jurisdiction of any court, (iii) arbitration, (iv) relief by way of arbitration award, injunction, order for specific performance or recovery of property, (v) attachment of its assets (whether before or

after judgment) and (vi) execution or enforcement of any judgment or arbitration award and irrevocably agrees, to the fullest extent permitted by applicable law, that it will not claim any such immunity.

**27. TRANSFERS.** Lehman Brothers shall have the right to transfer Assets between any account in order to satisfy any of your obligations to Lehman Brothers. When giving instructions to transfer Assets from your accounts to any bank or other entity, you agree that all such requests will have been approved by an authorized signatory and you agree to provide Lehman Brothers with an accurate account number designating the account to receive such Assets. You agree to indemnify and hold Lehman Brothers harmless from and against all liabilities arising from the provision of an inaccurate account number or any other liabilities arising as a result of the transfer at your request.

**28. PROVISION OF DATA.** With respect to any market data or other information that Lehman Brothers or any third party service provider provide to you, (i) Lehman Brothers and any such provider are not responsible or liable if any such data or information is inaccurate or incomplete in any respect; (ii) Lehman Brothers and any such provider are not responsible or liable for any actions that you take or do not take based on such data or information; (iii) you will use such data or information solely for the purposes set forth in this Agreement and any other agreement between us; (iv) such data or information is proprietary to Lehman Brothers and any such provider and you will not retransmit or disclose such data or information to third parties except as required by applicable law or regulation; and (v) you will use such data or information solely in compliance with applicable laws, rules and regulations.

**29. EXTRAORDINARY EVENTS.** You agree that Lehman Brothers will not be liable for any loss caused, directly or indirectly, by government restrictions, exchange or market rulings, suspension of trading, war (whether declared or undeclared), terrorist acts, insurrection, riots, fires, flooding, strikes, failure of utility services, accidents, adverse weather or other events of nature, including but not limited to earthquakes, hurricanes and tornadoes, or other conditions beyond Lehman Brothers' control. In the event that any communications network, data processing system, or computer system Lehman Brothers uses is rendered inoperable, Lehman Brothers will not be liable to you for any loss, liability, claim, damage or expense resulting, either directly or indirectly, therefrom.

**30. LIMITATION OF LIABILITY.** Lehman Brothers shall not be liable in connection with the execution, clearing, handling, purchasing or selling of securities, commodities or other property, or other action, except for gross negligence or willful misconduct on Lehman Brothers' part. You understand that certain securities may be held outside the United States by unaffiliated, foreign agent banks and depositories. Lehman Brothers will not be liable to you for any loss, liability or expense incurred by you in connection with these arrangements except to the extent that any such loss, liability or expense results from Lehman Brothers' gross negligence or willful misconduct. In no event will Lehman Brothers be liable for any special, indirect, incidental or consequential damages arising out of this Agreement.

**31. HEADINGS; COUNTERPARTS.** The headings of the provisions hereof are for ease of reference only and shall not affect the interpretation or application of this Agreement or in any way modify or qualify any of the rights provided for hereunder. This Agreement may be executed in counterparts, each of which shall be deemed an original.

**32. TELEPHONE CONVERSATIONS.** For the protection of both you and Lehman Brothers, and as a tool to correct misunderstandings, you hereby authorize Lehman Brothers, at Lehman Brothers' discretion and without prior notice to you, to monitor and/or record any or all telephone conversations or electronic communications between you and Lehman Brothers or any of Lehman Brothers' employees or agents. You acknowledge that Lehman Brothers may determine not to make or keep any of such recordings and that such determination shall not in any way affect any party's rights.

**33. CUMULATIVE RIGHTS; ENTIRE AGREEMENT.** The rights, remedies, benefits and protections afforded to each Lehman Brothers Entity under this Agreement and under any Contract you may have with any Lehman Brothers Entity, whether heretofore or hereafter entered into, are cumulative and in addition to any other rights, remedies, benefits and protections that any Lehman Brothers Entity may have. To the extent that the provisions of any Contracts you have with any Lehman Brothers Entity, whether heretofore or hereafter entered into, are inconsistent (whether the inconsistency be between the Contracts or within a single Contract), the conflict shall be resolved in favor of the provision which affords Lehman Brothers with the maximum rights, remedies, benefits or

9

protections. You hereby appoint Lehman Brothers as your agent and attorney-in-fact to take any action (including, but not limited to, the filing of financing statements) necessary or desirable to perfect and protect the security interest granted herein or to otherwise accomplish the purposes of this Agreement. Except as set forth above, this Agreement represents the entire agreement and understanding between you and Lehman Brothers concerning the subject matter hereof.

**34. CAPACITY TO CONTRACT; ANTI-MONEY LAUNDERING; AFFILIATIONS.** You represent that you have the capacity and authority to enter into this Agreement. You represent to the best of your knowledge that you do not maintain or transact business for or with nor will you introduce individuals or entities to Lehman Brothers that the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC") has listed as "Specially Designated Nationals and Blocked Persons" nor with any client in an embargoed country as determined by OFAC. Furthermore, you represent that you have conducted thorough due diligence with respect to all of your clients, and you do not know or have any reason to suspect that the monies used to fund the account have been or will be derived from or related to any illegal activities, including but not limited to, money laundering activities. You agree to provide Lehman Brothers with any information that it may require in relation to compliance with any applicable money laundering regulations. Each representation or warranty made by you in this Agreement will be deemed to be repeated by you on each date on which a transaction occurs hereunder.

You represent that you are of legal age and that, unless you have notified Lehman Brothers to the contrary, neither you nor any member of your immediate family is: (i) an employee or member of any exchange, (ii) an employee or member of the National Association of Securities Dealers, Inc. or any of its affiliates, (iii) an individual or an employee of any corporation or firm engaged in the business of dealing, as broker or principal, in securities, options or futures or (iv) an employee of any bank, trust company or insurance company. If you are signing on behalf of others, you hereby represent that the persons(s) or entity(ies) on whose behalf you are signing is/are authorized to enter into this Agreement and that you are duly authorized to sign this Agreement and make the representations contained herein in the name and on behalf of such other person(s) or entity(ies) and you agree to indemnify and hold Lehman Brothers harmless from any claim or claims arising from your unauthorized execution of this Agreement on the behalf of such other person(s) or entity(ies). You hereby authorize Lehman Brothers to accept faxed copies of this or any other document or instruction as if it were the original and further to accept signatures on said faxes as if they were original.

**35. ERISA.** The investment manager or advisor for Customer represents that Customer is not benefit plan an ERISA Plan as defined in Section 3(3) of ERISA, or subject to ERISA or Section 4975 of the Code, or Similar Law. The investment manager further represents and warrants that Customer is not a person acting on behalf of an ERISA Plan and that the Customer's assets do not constitute assets of an ERISA Plan.

*PLEASE COMPLETE THIS INFORMATION AND SIGN THE APPROPRIATE SPACE BELOW:*

**THIS AGREEMENT IS DATED AS OF** _____, 200_

Newport Global Credit Fund (Master) LP
*Name of Customer*

21 Waterway Ave, Suite 150         USA
*Address*                        *Country*

The Woodlands, TX          77380
*City, State*              *Zip Code + 4*

**BY SIGNING THIS AGREEMENT, YOU ACKNOWLEDGE THAT:**

**YOU HAVE RECEIVED A COPY OF THIS AGREEMENT AND AGREE TO ITS TERMS AND CONDITIONS.**

*CUSTOMER*          Newport Global Credit Fund (Master) LP
*NAME:*          _____
                 *Individual or Printed Name of Company*

*SIGNATURE:*     _____
                 *Signature of Authorized Person*

*PRINT NAME:*    Timothy T. Janszen,   Authorized officer of Ultimate General Partner
                 *Printed Name and Title of Signatory or Name of General*
                 *Partner if Signer is a Partnership*

*BY:*            _____
                 *Authorized Signatory and Title of General Partner if Above*
                 *Signer is a Partnership Otherwise Blank*

**ACKNOWLEDGED AND AGREED**

**BY: Newport Global Advisors LP solely for the purposes of the representation in Section 35**

**By:** _____

Name: Timothy T. Janszen

Title: CEO

**ACCEPTED AND AGREED TO:**

_____

Lehman Brothers Inc., as signatory for itself and as agent for the affiliates
named herein

11

EXHIBIT A
AUTHORIZED PERSONS

| Name | Specimen Signature |
|------|--------------------|
| Roger A May | Roger A May |
| Thomas Reeg | |
| Ryan Langdon | |

12

**EXHIBIT B**

## Margin Lending Agreement

## ~~LEHMAN BROTHERS~~
## INTERNATIONAL (EUROPE)

Lehman Brothers International (Europe)
25 Bank Street,
London E14 5LE
United Kingdom

| | |
|---|---|
| Borrower: Newport Global Credit Fund (Master) LP | Reference No.: |

This Margin Lending Agreement (this "Agreement") by and among Lehman Brothers International (Europe) ("Lender") and the above-listed borrower ("Borrower") is arranged by Lehman Brothers Inc. ("Agent"), a broker-dealer registered with the U.S. Securities and Exchange Commission ("SEC") under the U.S. Securities and Exchange Act of 1934, as amended, and governs all loans (the "Loans") of money or securities that Lender may, from time to time in its sole and absolute discretion, agree to make to Borrower in connection with transactions entered into by Borrower in the Lehman Brothers Inc. Customer Account Agreement – Prime Brokerage dated _____, as amended from time to time (the "LBI Account Agreement").

### 1.   AGENT AS AGENT OF LENDER AND BORROWER.

(a) Lender and Borrower (the "Principals") each appoints Agent to act as agent with regard to any and all actions necessary to effect Loans as described in this Agreement and Agent acknowledges and accepts such appointment.

(b) As agent of each of the Principals and in compliance with all applicable regulations, Agent will arrange all Loans.

(c) In connection with each Loan, Agent acts solely in its capacity as agent for the Principals pursuant to instructions from the Principals. Agent shall have no responsibility or personal liability to either Principal arising from any failure by a Principal to pay or perform any obligation hereunder. Notwithstanding anything herein to the contrary, Agent shall not have any responsibility for or any obligation or liability to either Principal with respect to collect or recover any amount owing to it or to enforce any of its other rights in connection with, or as a result of, any Loan. Each Principal agrees to proceed solely against the other to collect or recover any amount owing to it or to enforce any of its other rights in connection with, or as a result of, any Loan. The Principals acknowledge that Agent is acting solely as an agent hereunder, and the Principals agree to hold Agent harmless from all liability except for losses or damages caused by Agent's gross negligence or wilful misconduct.

(d) Each Principal and Agent hereby agree that any and all notices, demands, communications, payments or deliveries of any kind relating to any Loan may be delivered or made solely through Agent.

### 2.   PURPOSE OF THE LOANS.   Unless notice is provided to Lender in advance of a Loan, the proceeds of each Loan shall be utilized by Borrower solely to satisfy its payment or delivery obligations under the LBI Account Agreement from time to time in effect between Borrower and Agent.

### 3.   LOAN TERMS.

(a) Subject to all other applicable provisions of this Agreement, all Loans that are loans of securities shall be governed by the terms of a standard-form Global Master Securities Lending Agreement (May 2000 version), as modified and supplemented by the Schedule to GMSLA and 2000 UK Tax Addendum attached thereto (collectively, the "GMSLA"), which terms are hereby incorporated into this Agreement as if set forth fully herein. In the event of any conflict between the terms of the GMSLA incorporated herein and the terms expressly set forth herein, the terms expressly set forth herein shall control. In furtherance of the foregoing (and not by way of limitation), Lender,

## LEHMAN BROTHERS

Borrower and Agent agree that: (i) the fees payable by Borrower with respect to Loans of securities will be governed by this Agreement (including the TCR (as defined in Section 4 hereof)), not by Paragraph 7 of the GMSLA; (ii) the collateralization and margin requirements and procedures relating to Loans of securities will be governed by this Agreement (including the TCR), not by Paragraph 5 of the GMSLA; (iii) the obligations of Borrower to Lender and Agent will be secured by a first priority security interest in certain property of Borrower (as set forth herein and in the LBI Account Agreement), not by Borrower transferring title in certain property pursuant to Paragraph 9.1 of the GMSLA, including Paragraphs 2.3 and 4.2 of the GMSLA; and (iv) the term Posted Collateral (as used in Paragraph 9.1 of the GMSLA) will be deemed to be a reference to the collateral held by Lender and Agent pursuant to this Agreement and the LBI Account Agreement.

(b) All Loans are demand loans. Immediately upon Lender's demand from time to time, Borrower shall repay outstanding amounts under any or all Loans of money (together with all accrued interest) and/or redeliver Equivalent Securities (as defined in the GMSLA) under any or all Loans of securities. The inclusion of Section 6 hereof and of provisions in the GMSLA relating to Events of Default (as defined therein) shall not affect the status of the Loans as demand loans or Borrower's obligations set forth in the preceding sentence.

4.    **INTEREST AND LOAN FEES.** Borrower agrees that interest and fees will accrue on all outstanding Loans of money and securities in accordance with the methods described in a terms and conditions rider that has been separately provided to it or in any amendment or revision thereto which may be provided to it (the "TCR"). Borrower agrees that all such accrued interest and/or fees not paid at the close of an applicable period shall constitute an additional Loan of money hereunder.

5.    **COLLATERAL.**

(a) Lender may from time to time, in its sole and absolute discretion, demand that Borrower deliver for credit to a securities account maintained by Lender (any such account, "Lender's Account") collateral in the form of cash or securities, in such amounts and/or currencies as are determined by Lender in its sole discretion. Borrower shall immediately comply with any such demand and any failure to immediately comply shall constitute a default under this Agreement. Borrower shall ensure that at all times the Market Value (as defined below) of the cash and securities collateral delivered to Lender's Account exceeds the sum of (i) the aggregate Market Value (as defined below) of the cash and securities lent under outstanding Loans and (ii) the margin requirement determined by Lender from time to time in its sole and absolute discretion and notified to Borrower (the "Margin Requirement").

"Market Value" means:

(i) with respect to cash, the amount of such cash (converted, if necessary, into U.S. dollars at a spot rate obtained from a source selected by Lender in its sole and absolute discretion); and

(ii) with respect to securities, the price for such securities obtained from a source selected by Lender in its sole and absolute discretion; provided that, (A) if prices for such securities are available on an exchange, the price shall be the closing price on such exchange and (B) the price of securities that are suspended, or in respect of which there is no source or a discontinuous source, shall be determined by Lender in its sole and absolute discretion. Market Value is determined by Lender solely for the purposes of determining Margin Requirements and should not be relied on by Borrower for any other purposes.

(b) As security for Borrower's payment and performance of all of its obligations and liabilities (whether or not mature or contingent) from time to time ("Liabilities") to Lender under this Agreement, the GMSLA or in connection with any Loan and for all obligations owing to Lender (the "Obligations"), Lender shall have a lien on and a continuing first priority security interest in all of Borrower's cash, securities, financial assets and other property from time to time delivered under this Agreement or otherwise held by, or under the control of, Lender (the "Collateral"), irrespective of whether or not Lender has made advances to Borrower in connection with such securities or other property. All Collateral shall be free and clear of all prior liens, claims and encumbrances (other than the lien in favor of Lender and its affiliates, and Borrower will not cause or allow any of the Collateral, whether now owned or hereafter acquired, to be or become subject to any liens, claims or encumbrances of any nature other than the security interest created in Lender's favor and in favor of its affiliates. Borrower agrees that any Collateral may be registered and held in the name of Agent or its designee. Borrower shall execute such documents and take such other action as

**LEHMAN BROTHERS**                                    2

Lender shall reasonably request in order to perfect Lender's rights with respect to any Collateral. In addition, Borrower hereby appoints Agent and each of its affiliates as Borrower's agent and attorney-in-fact to take any action, including without limitation to sign, seal, execute and deliver all documents, as may be required to perfect Lender's interest in and to realize upon all of Lender's rights in the Collateral or to otherwise accomplish the purposes of this Agreement. In order to satisfy any of Borrower's Obligations, Lender may, to the fullest extent permitted by law, at any time in its discretion and without prior notice to Borrower, use, apply or transfer any and all Collateral.

(c) Except as noted in the last sentence of this subsection, within the limits of applicable law and regulations, Borrower hereby authorizes Lender to lend either to itself or to others any or all Collateral, to convey therewith all attendant rights of ownership (including voting rights and the right to transfer the securities to others), and to use all such Collateral as collateral for its general loans. Any Collateral, together with all attendant rights of ownership, may be pledged, repledged, hypothecated or rehypothecated either separately or in common with other property for any amounts due to Lender thereon or for a greater sum, and Lender shall have no obligation to retain a like amount of similar property in its possession and control. Borrower hereby acknowledges that, as a result of such activities, Lender may receive and retain certain benefits to which Borrower will not be entitled. In certain circumstances, such loans, pledges, repledges, hypothecations and rehypothecations may limit, in whole or in part, Borrower's ability to exercise voting and other attendant rights of ownership with respect to the loaned or pledged securities. Borrower agrees to waive the right to vote, or to provide any consent or to take any similar action with respect to these securities in the event that the record date or deadline for such vote, consent or other action falls during the period of any such loan, pledge, repledge, hypothecation or rehypothecation. Unless otherwise agreed by Lender and Borrower, Borrower will be entitled to receive all distributions, including, but not limited to, cash, stock dividends and interest payments, made on or in respect of any loaned, pledged, repledged, hypothecated or rehypothecated securities which are not otherwise received by Borrower, to the full extent Borrower would be entitled if the securities had not been loaned, pledged, repledged, hypothecated or rehypothecated.

(d) Upon satisfaction by Borrower of all Obligations (and all other obligations owed by Borrower to each affiliate of Lender), Lender shall return to Borrower the Collateral.

(e) Borrower authorizes and requests Agent, as agent for Borrower, to transfer cash or securities from the account(s) of Borrower opened and maintained pursuant to the LBI Account Agreement (the "LBI Customer Account(s)") to Lender's Account as Collateral under this Agreement. In addition, if, at any time, Borrower has provided excess collateral under this Agreement and also (i) is required to deliver margin, collateral or other credit support (including title transfer credit support) to Lender under any other agreement or (ii) is required to deliver day trading margin to LBI for the benefit of any of its LBI Customer Account(s), then Borrower authorizes and requests Lender to transfer such excess collateral to itself (or to LBI, as the case may be) on Borrower's behalf in order to satisfy (to the extent possible) Borrower's obligation to deliver margin or credit support under such other agreement (or, in the case of the LBI Customer Account(s), to deliver day trading margin in compliance with New York Stock Exchange regulations). If Lender or Agent makes a delivery on Borrower's behalf pursuant to this Section 5(e), such delivery shall have the same effect as if Borrower itself had made such delivery under the applicable agreement.

6. EVENTS OF DEFAULT. The occurrence of each of the following is an "Event of Default" hereunder:

(i) any "Event of Default" (as defined in the GMSLA);

(ii) any event of the type described in Section 4 of the LBI Account Agreement;

(iii) Borrower's failure to maintain collateral as required by Section 5 hereof;

(iv) Borrower's failure to make any payment or delivery when required hereunder;

(v) Borrower's failure to comply with or perform any other agreement or obligation hereunder;

(vi) the occurrence of an Act of Insolvency (as defined in the GMSLA) with respect to Borrower or with respect to any general partner, managing member or analogous representative entity of Borrower;

LEHMAN BROTHERS

3

(vii) any representation made or deemed to have been made by Borrower shall be incorrect or untrue in any respect when made or deemed made;

(viii) Borrower is suspended or expelled from or surrenders its membership or participation in any securities exchange or association or other self-regulatory organization or is suspended from dealing in securities by any governmental agency, or any of the assets of Borrower or the assets of an investor held by, or to the order of, Borrower are transferred or ordered to be transferred to a trustee by a regulatory authority pursuant to any securities regulating legislation;

(ix) Borrower states that it is unable to, or intends not to, perform any of its obligations under this Agreement or any other agreement between Borrower and Lender or Agent or any affiliates of Lender or Agent;

(x) there is a material adverse change in the business affairs of Borrower;

(xi) any event of default or equivalent event occurs under any other agreement between Borrower and Lender or Agent or any of their affiliates; or

(xii) any material document or constitutive document of Borrower is modified in a manner which, in the sole and absolute discretion of Lender, may have a material adverse effect on any Loan or Borrower's ability to perform its obligations under this Agreement or any other agreement between Borrower and Lender or Agent or any affiliates of Lender or Agent.

Upon the occurrence of an Event of Default, all Loans shall become immediately due and payable and Lender shall have all of the rights of a secured party upon default under the Uniform Commercial Code in effect from time to time in the State of New York and other applicable laws, rules and regulations, all rights set forth in the GMSLA arising upon an "Event of Default" thereunder and all rights arising under the LBI Account Agreement after a default thereunder or under a Contract (as defined therein) including, without limitation, the right, without prior notice to Borrower, to cancel any outstanding commitments for or relative to any Loanand/or apply any Collateral to, or sell any or all of the Collateral and apply the proceeds to, any Loan (or to the purchase of securities that are the subject of any Loan); after which Borrower shall be liable to Lender and Agent for any remaining deficiency, loss, costs or expenses incurred or sustained by Lender or Agent in connection therewith. Such purchases and/or sales may be effected by Lender (or Agent, as its agent) publicly or privately without notice or advertisement in such manner as Lender may in its sole discretion determine. At any such sale or purchase, Lender, Agent or any of Lender or Agent's affiliates may purchase or sell the property to or from itself or third parties free of any right of redemption. Lender shall have the right to convert currencies in connection with the exercise of its rights hereunder in such manner as it may determine, in its sole discretion, to be commercially reasonable.

## 7. MISCELLANEOUS.

(a) Capacity to Contract. Borrower represents and warrants to Lender and Agent that it has the capacity and authority to enter this Agreement and each Loan and make each pledge of Collateral. Each representation or warranty made by Borrower in this Agreement will be deemed to be repeated on each date on which (i) a Loan is made, (ii) Collateral is delivered or released or (iii) any other transaction occurs hereunder.

(b) ERISA. (i) Borrower represents and warrants to Lender and Agent that it is either (i) not (A) an employee benefit plan (an "ERISA Plan") as defined in Section 3(3) of the U.S. Employee Retirement Income Security Act of 1974, as amended ("ERISA"), or (B) subject to ERISA or Section 4975 of the U.S. Internal Revenue Code of 1986, as amended (the "Code") or (ii) (A) an ERISA Plan or subject to ERISA or Section 4975 of the Code and (B) whose Investment Manager or General Partner is (and it covenants and agrees that any successor Investment Manager or General Partner appointed by it will be) a Qualified Professional Asset Manager ("QPAM") as defined by the relevant prohibited transaction class exemption(s) issued pursuant to ERISA and it will provide Lender and Agent with a Investment Advisor Representation Letter.

LEHMAN BROTHERS                                                       4

(ii) The investment manager or advisor for Borrower represents that Borrower is not an ERISA Plan as defined in Section 3(3) ERISA, or subject to ERISA or Section 4975 of the Code, or Similar Law. The investment manager further represents and warrants that Borrower is not a person acting on behalf of an ERISA Plan and that the Borrower's assets do not constitute assets of an ERISA Plan.

(c) Compliance with Regulations. All Loans are subject to the laws, rules and regulations of the United States, England and any other applicable jurisdiction and applicable regulatory and self-regulatory authorities, including but not limited to the SEC, The Financial Services Authority of England and Wales (the "FSA"), all relevant securities and commodities exchanges and the Board of Governors of the Federal Reserve System.

(d) FSA Customer Protections. Lender is authorised by the FSA and is regulated by its rules (the "Rules"). Affiliates (such as Agent) of Lender may not be authorised by the FSA and certain services provided outside of England and Wales pursuant to this Agreement may not be regulated by the Rules. Lender and Borrower acknowledge and agree that cash held for Borrower hereunder is received as collateral with full ownership under a collateral arrangement and is subject to the security interest contained herein. Accordingly, such cash will not be client money pursuant to the Rules (or any successor provisions thereto) and will not be subject to the protections conferred by the Rules. Such cash will not be segregated from the money of Lender or any other counterparty of Lender and will be held free and clear of all trusts. The parties further agree that Lender will hold cash in the course of its business and Borrower will, therefore, rank as a general creditor of Lender in respect of such cash. Notwithstanding the choice of law provision as set forth in Clause (m) in this Section 7 below, this Clause (d) of Section 7 shall be construed in accordance with the laws of England.

(e) Adequate Assurances. Subject to, and not as limitation of, the rights of Lender under this Agreement, if at any time Lender has reasonable grounds for insecurity with respect to Borrower's performance of any Obligation, Lender may demand, and Borrower shall give, adequate assurance of due performance within 24 hours, or within any shorter period of time Lender demands that is reasonable under the circumstances. The adequate assurance of performance that may be demanded by Lender may include, but shall not be limited to, the delivery by Borrower of additional property as Collateral.

(f) Costs and Expenses. Borrower hereby agrees to pay, on demand, all reasonable costs, liabilities and damages incurred by Lender or Agent (including, without limitation, costs of collection, attorneys' fees, court costs and other expenses) in connection with enforcing their rights hereunder or incurred or charged for custody of the Collateral. In each case and whether or not demand has been made therefor, Borrower authorizes Lender to increase the amount of any outstanding Loan by any and all such costs, liabilities and damages, including without limitation, those incurred in connection with the liquidation of any of the Collateral.

(g) Securities Events. Lender shall inform Borrower if Lender becomes aware of the occurrence or prospective occurrence of any of the following with respect to any securities pledged to Lender: conversions, subdivision or consolidation; redemption; a takeover offer; calls, including calls on partly-paid securities and published calls; a capitalization issue; rights issue; distribution of income in the form of securities; or a certificate which may at a future date be exchanged for securities or an entitlement to acquire securities. Subject to 5(c), above, if Lender receives notice from Borrower that Borrower wishes to act on any of the events referenced in this paragraph and such notice is received by Lender within a reasonable time for Lender to act on such event, Lender will act in accordance with Borrower's wishes. Borrower represents that it will review all prospectuses and offering statements that it may receive and understands the risks inherent with the Loans, including any risks associated with the above-described securities events.

(h) Voting Rights. If any right to vote arises with respect to securities pledged to Lender, Borrower may inform Lender that Borrower wishes to exercise such right as Borrower specifies. Subject to 5(c), above, if Lender receives this notice within a reasonable time to act, it will act in accordance with Borrower's wishes. If Lender does not receive such timely notice from Borrower, it will use its discretion to decide whether and how to vote such securities.

(i) Waiver, Assignment and Notices. Neither Lender's failure to insist at any time upon strict compliance with this Agreement or with any of the terms hereof nor any continued course of such conduct on its part shall constitute or be considered a waiver by Lender of any of its rights or privileges hereunder. Any purported assignment of your

LEHMAN BROTHERS                5

rights and/or obligations hereunder without obtaining the prior written consent of an authorized representative of Lender and Agent shall be null and void. Lender and Agent each reserves the right to assign any of its rights or obligations hereunder or under any other agreement with Borrower to any of their affiliates without prior notice to Borrower. Notices and other communications to you (including without limitation demands for collateral) that are sent by electronic means, including facsimile or electronic mail, sent by express delivery service or mailed, in each case to the address or number provided by Borrower, shall, until Agent has received notice in writing of a different address or number, be deemed to have been personally delivered to Borrower. Demands for additional Collateral may also be communicated orally, without subsequent written confirmation.

(j) <u>Securities Contract; Margin Payment; Settlement Payment.</u> Borrower acknowledges and agrees that each Loan shall be deemed to be a "securities contract" within the meaning of Sections 555 and 741(7) (as may be amended, modified or supplemented) of the U.S. Bankruptcy Code and each payment or delivery hereunder, including each payment or delivery of collateral, shall be deemed to be a "margin payment" or "settlement payment" (each as defined in Section 101 and 741 of the U.S. Bankruptcy Code) made to and held by a "stockbroker" within the meaning of Sections 362 and 546 of the U.S. Bankruptcy Code.

(k) <u>Legally Binding.</u> Borrower hereby agrees that this Agreement and all of the terms hereof shall be binding upon it and its successors and assigns. Borrower hereby waives any and all defences that any oral instruction was not in writing as may be required by any applicable law, rule or regulation. Borrower hereby authorizes Lender and Agent to accept and act on any instructions received by Lender and/or Agent from any investment manager or advisor that Lender and/or Agent believe is authorized to act on Borrower's behalf. Borrower hereby agrees to pay, on demand, all reasonable costs, liabilities and damages incurred by Lender and/or Agent (including, without limitation, attorneys' fees, court costs and other expenses) in connection with Lender and/or Agent acting in reliance upon instructions from any such investment manager or advisor, including, but not limited to, instructions transmitted via electronic means, including facsimile or electronic mail.

(l) <u>Amendment.</u> Borrower agrees that Lender may modify the terms of this Agreement at any time upon prior written notice to Borrower. By failing to immediately discharge all of its Obligations upon delivery of any such notice, Borrower will have indicated its acceptance of any such modification. If Borrower does not accept such modification, Borrower must notify Lender in writing; Lender may then demand immediate discharge of all of Borrower's Obligations. Otherwise, this Agreement may not be modified absent a written instrument signed by an authorized representative of Lender.

(m) GOVERNING LAW. THIS AGREEMENT SHALL BE DEEMED TO HAVE BEEN MADE IN THE STATE OF NEW YORK AND SHALL BE CONSTRUED, AND THE CONTRACTUAL AND ALL OTHER RIGHTS AND LIABILITIES OF THE PARTIES DETERMINED, IN ACCORDANCE WITH THE LAW OF THE STATE OF NEW YORK WITHOUT GIVING EFFECT TO ANY CONFLICTS OF LAW PRINCIPLES THEREOF, SAVE FOR CLAUSE (D) IN THIS SECTION 7 WHICH SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAWS OF ENGLAND.

(n) JURISDICTION; WAIVER OF JURY TRIAL. The parties shall attempt in good faith to promptly resolve any dispute arising out of, relating to or in connection with this Agreement or any transactions hereunder by negotiations by executives of the parties who have the authority to settle the controversy. With respect to any suit, action or proceedings relating to this Agreement ("Proceedings"), each party irrevocably submits to the exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City and waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party. ANY RIGHT TO A TRIAL BY JURY WITH RESPECT TO ANY CLAIM OR ACTION IS HEREBY WAIVED BY ALL THE PARTIES TO THIS AGREEMENT.

(o) NO CONSEQUENTIAL DAMAGES. IN NO EVENT WILL LENDER OR AGENT BE LIABLE FOR ANY SPECIAL, INDIRECT, INCIDENTAL OR CONSEQUENTIAL DAMAGES ARISING OUT OF THIS AGREEMENT.

LEHMAN BROTHERS                                        6

(p) Waiver of Immunities.  Lender and Borrower each irrevocably waives, to the fullest extent permitted by applicable law, with respect to itself and its revenues and assets, all immunity on the grounds of sovereignty or other similar grounds from (i) suit, (ii) jurisdiction of any court, (iii) arbitration, (iv) relief by way of arbitration award, injunction, order for specific performance or recovery of property, (v) attachment of its assets (whether before or after judgment) and (vi) execution or enforcement of any judgment or arbitration award and irrevocably agrees, to the fullest extent permitted by applicable law, that it will not claim any such immunity.

(q) Headings.  The headings of the provisions hereof are for ease of reference only and shall not affect the interpretation or application of this Agreement or in any way modify or qualify any of the rights provided for hereunder.

(r) Cumulative Rights; Entire Agreement.  The rights, remedies, benefits and protections afforded to Lender and Agent under this Agreement and under any other agreement Borrower may have with Lender or Agent or any affiliate of Lender or Agent, whether heretofore or hereafter entered into, are cumulative and in addition to any other rights, remedies, benefits and protections that Lender or Agent may have.  To the extent that the provisions of any agreements Borrower has with Lender or Agent, whether heretofore or hereafter entered into, are inconsistent (whether the inconsistency be between the agreements or within a single agreement), the conflict shall be resolved in favor of the provision which affords Lender or Agent (as applicable) with the maximum rights, remedies, benefits or protections.  Except as set forth above, this Agreement represents the entire agreement and understanding between Borrower, Agent and Lender concerning the subject matter hereof.

LEHMAN BROTHERS                    7

IN WITNESS WHEREOF, the parties hereto have caused their respective duly authorized representatives to execute this Agreement on this, the _____ day of _____ _____.

Lender:

LEHMAN BROTHERS INTERNATIONAL (EUROPE)

By: _____
Name: David Swanson
Title: Managing Director

Borrower:

NEWPORT GLOBAL CREDIT FUND (MASTER) LP

By: _____
Name: Timothy T. Janszen
Title: Authorized Officer of Ultimate General Partner

Investment Advisor (for the sole purpose of agreeing to and acknowledging the representation contained in Section 7 (b) (ii))

By: _____
Name: Timothy T. Janszen
Title: CEO

Agent hereby agrees to and acknowledges its role as agent for both parties in accordance with Section 1.

Agent:

LEHMAN BROTHERS INC.

By: _____
Name:
Title:

LEHMAN BROTHERS                    8

**ADMIT ONE** STAPLES

7370644

## H A N D   D E L I V E R Y

FILED / RECEIVED

SEP 2 2 2009

EPIQ BANKRUPTCY SOLUTIONS, LLC

*TP.*

RECEIVED BY: _____

DATE _____

3:30

TIME