EXECUTION COPY

## DEBT SERVICE DEPOSIT AGREEMENT

This Debt Service Deposit Agreement (this "Agreement"), dated as of November 22, 1994, by and among BANK OF AMERICA ARIZONA (the "Trustee"), UNIVERSITY MEDICAL CENTER CORPORATION (the "Issuer") and LEHMAN BROTHERS SPECIAL FINANCING INC., a Delaware corporation ("Lehman").

SECTION I.        DEFINITIONS

For purposes of this Agreement, unless the context clearly indicates otherwise, the words and terms defined in this Section I have the respective meanings given to them herein:

"Bonds" means the Issuer's Hospital Revenue Bonds, Series of 1991, originally issued in the aggregate amount of $50,655,000, the Issuer's Hospital Revenue Bonds, Series of 1992 originally issued in the aggregate amount of $28,405,000, and the Issuer's Hospital Revenue Bonds, Series of 1993, originally issued in the aggregate amount of $54,750,000.

"Bond Payment Date" means with respect to each Delivery Date, each date identified as a "Bond Payment Date" on Exhibit A unless such date is not a Business Day, in which case "Bond Payment Date" means the immediately succeeding Business Day provided that in determining whether any such date is a Business Day no effect shall be given to clause (c) or (d) of the definition of Business Day.

"Burdened Party" means, (i) in the case of (A) an Issuer or Trustee Event of Default or (B) a termination of this Agreement by the Issuer pursuant to Section 3.1 following a redemption, defeasance or refunding of the Bonds, Lehman and (ii) in the case of a Lehman Event of Default, the Issuer.

"Business Day" means any day other than (a) a Saturday or Sunday, (b) a day on which the principal corporate trust office of the Trustee is authorized or required by law to close, (c) a day on which banking institutions in the City of New York are authorized or required by law to close, or (d) a day on which any Qualified Securities which may be delivered hereunder are not subject to delivery in the City of New York.

"Closing Date" means November 22, 1994.

"Coupon Payment" means, for any Qualified Security, a payment of interest which is due to be paid thereon prior to the scheduled maturity of such security.

"Debt Service Fund" means the account created under the Indenture pursuant to Section 5.03 and designated thereunder as the Bond Fund.

"Default Rate" means a rate per annum equal to the cost (without proof or evidence of any actual cost to the party to whom such amount is owed) to the party to whom such amount is owed if it were to fund or of funding the relevant amount plus 1% per annum.

"Delivery Date" means each date identified as a "Delivery Date" on <u>Exhibit A</u> unless such date is not a Business Day, in which case "Delivery Date" means the immediately succeeding Business Day.

"Delivery Notice" means a notice substantially in the form of Exhibit E or in such other form as provided by the Qualified Dealer and is reasonably acceptable to the Trustee.

"Deposit Amount" means for each Delivery Date the amount set forth in Exhibit A.

"Differential" means the amount, if any, by which the Purchase Price of any Qualified Security delivered hereunder exceeds the Market Value thereof.

"Eligible Securities" means direct, full faith and credit, non-callable obligations of, the United States of America.

"Financing Documents" means the Indenture, the Master Trust Indenture and the Promissory Notes.

"Indenture" means the Bond Trust Indenture, dated as of January 15, 1991, by and among the Issuer and the Trustee.

"Insolvent" means (i) either the Trustee or Lehman as the case may be, shall (1) commence a voluntary case under the federal bankruptcy laws (as in effect on the date of this Agreement or hereafter), (2) file a petition seeking to take advantage of any other law, relating to bankruptcy, insolvency, reorganization, winding up or composition or adjustment of debts, (3) consent to any petition filed against it in an involuntary case under such bankruptcy or insolvency or other laws, (4) apply for or consent to the appointment of, or the taking of possession by, a trustee, receiver, custodian, liquidator or the like for itself or for all or a substantial part of its property, (5) admit in writing its inability to pay, or generally not be paying, its debts as they come due, (6) make a general assignment for the benefit of creditors, or (7) take any official action for the purpose of affecting any of the foregoing; or (ii) a case or other proceeding shall be commenced against either the Trustee or Lehman, as the case may be, in any court of competent jurisdiction seeking (1) relief under the federal bankruptcy laws (as in effect on the date of this Agreement or hereafter) or under any other law relating to bankruptcy, insolvency, reorganization, winding up or composition or adjustment of debts, or (2) the appointment of a trustee,

receiver, custodian, liquidator or the like for the Trustee or Lehman, as the case may be, or for all or a substantial part of its property, and any such case or proceeding shall continue undismissed and unstayed for a period of 60 consecutive calendar days, or an order granting the relief requested in any such case or proceeding against such party shall be entered and shall remain in effect and unstayed for a period of 60 consecutive days.

"Issuer" means University Medical Center Corporation.

"Issuer Event of Default" means the occurrence of an event specified in Section 7.2.

"Lehman Event of Default means the occurrence of an event specified in Section 7.3.

"Market Value" means with respect to any Qualified Security, the market value thereof (including accrued interest thereon) as specified by the Qualified Dealer delivering that security, provided that the Market Value of any Qualified Security shall in no event exceed the Purchase Price thereof.

"Master Indenture" means the Master Trust Indenture, dated as of June 1, 1986 as restated and amended as of July 1, 1987 between the Obligated Group Members and the Master Trustee, as amended and supplemented by the Supplemental Indenture Number One, dated as of June 1, 1986 by and between the obligated Group Members and the Master Trustee as amended and supplemented and the Supplemental Indenture Number Two, by and between the Obligated Group Members and the Master Trustee, dated as of July 1, 1987, as amended and supplemented by the Supplemental Indenture Number Three, by and between the Obligated Group Members and the Master Trustee, dated as of January 15, 1991, as amended and supplemented by the Supplemental Indenture Number Four, by and between the Obligated Group Members and the Master Trustee, dated as of March 1, 1992, as amended and supplemented by the Supplemental Indenture Number Five, by and between the Obligated Group Members and the Master Trustee, dated as of May 1, 1992.

"Master Trustee" shall mean Bank of America Arizona, as successor in interest to United Bank of Arizona, Citibank (Arizona) and Security Pacific Bank Arizona, or any further successor as trustee appointed and qualifying under the Master Indenture.

"Maturity Amount" means, with respect to any Qualified Security, the amount, payable in cash, representing the principal and interest due thereon, on its maturity date (but shall exclude any Coupon Payments).

"Promissory Notes" means the Series 1986 Note and the Series 1987 Note, each dated as of July 1, 1987, the Series 1991 Note, dated as of January 15, 1991, the Series 1992 Note, dated as of March 1, 1992 and the Series 1993 Note, dated as of May 1, 1993.

"Purchase Price" means, for any Eligible Security delivered hereunder, that price for such security, as set forth in the Delivery Notice, which will produce a rate of return on such security for the period from (and including) the date of its delivery to (but excluding) its Maturity Date of 6.5% per annum, assuming that interest on such security were compounded semi-annually on the basis of a year of 360 days with twelve thirty day months.

"Obligated Group Members" shall mean collectively the issuer and any other entities that become Obligated Group Members pursuant to the Master Indenture.

"Qualified Dealer" means Lehman Brothers Government Securities Inc., its successors or assigns, or any other dealer in Qualified Eligible Securities selected by Lehman and approved by the Trustee.

"Qualified Securities" for any Delivery Date means Eligible Securities which, to the extent available on the open market, (i) mature as close as possible to but not later than the related Bond Payment Date and (ii) have an aggregate Purchase Price which is as close as possible to but does not exceed the related Deposit Amount.

"Termination Value" means an amount, as determined by Lehman reasonably and in good faith on the basis of the arithmetic mean of quotations from at least three leading dealers in the relevant markets ("Dealers"), as are reasonably acceptable to the Trustee, of the amount, if any, that each such Dealer would require the Burdened Party to pay to the Dealer (expressed as a positive number if the Burdened Party is Lehman and a negative number if the Burdened Party is the Issuer) or would pay to the Burdened Party (expressed as a negative number if the Burdened Party is Lehman and a positive number if the Burdened Party is the Issuer) in consideration of such Dealer entering into an agreement with the Burdened Party which would have the effect of preserving for the Burdened Party the economic equivalent of its rights under this Agreement commencing on the termination date of this Agreement; provided, however, that:

(i)   if more than three quotations are provided, the Termination Value will be the arithmetic mean of such quotations, without regard to the quotations having the highest and lowest values,

(ii)   if exactly three quotations are provided, the Termination Value will be the quotation remaining after disregarding the highest and lowest quotations,

for purposes of clauses (i) and (ii), if more than one quotation has the same highest value or lowest value, then one of such quotations shall be disregarded, and

(iii)   if Lehman is unable to obtain three such quotations, the Termination Value shall be the amount, as reasonably determined in good faith by Lehman, to be the Burdened Party's total losses and costs (expressed as a positive number if the Burdened Party is Lehman and a negative number if the Burdened Party is the Issuer), or gains (expressed as a negative number if the Burdened Party is Lehman and a positive number if the Burdened Party is the Issuer) in connection with a termination of this Agreement, including any loss of bargain, cost of funding or, at the election of Lehman but without duplication, any loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position, and

provided further, however, that in any event the Termination Value shall also include (A) losses and costs in respect of any payment required to have been made (assuming satisfaction of each applicable condition precedent) on or before the date on which this Agreement shall be terminated or deemed terminated as provided herein and not made and (B) if such Termination in Value is being paid in connection with a termination of this Agreement following an Event of Default, hereunder, any incidental costs and expenses incurred by any burdened party in connection with such termination and the enforcement of its rights hereunder (including reasonable attorneys' fees).   Any determination of the Termination Value by Lehman shall be conclusive and binding on the parties hereto absent manifest error.

"Trustee Event of Default" means the occurrence of an event specified in Section 7.1.

SECTION II.      PURCHASE AGREEMENT

Section 2.1    Purchase and Sale of Qualified Securities.

(a)   Lehman shall cause a Qualified Dealer to deliver to the Trustee, on any Delivery Date, in accordance with the delivery requirements of Section 2.2 hereof, to the extent such securities are readily available in the open market, Qualified Securities selected by Lehman or the Qualified Dealer.

(b)   If Lehman causes a Qualified Dealer to deliver Qualified Securities, the Trustee shall, out of immediately available funds under the Indenture for such purpose or as otherwise provided by the Issuer, at the time of the delivery of such Qualified Securities, purchase such Qualified Securities and pay to the Qualified Dealer or Lehman, as applicable, in accordance with Section 2.2(b) hereof, an amount equal to the Purchase Price thereof.

(c)   Neither Lehman nor the Qualified Dealer is required to own any Qualified Securities at the time of Lehman's execution of this Agreement or at any time prior to the respective delivery dates thereof.  The Qualified Securities, and the interest thereon, will, prior to the delivery thereof to the Trustee, be the

sole property of the Qualified Dealer, and any profit or loss with respect to the holding or sale of any Qualified Securities delivered hereunder, even if purchased and identified to fulfill Lehman's obligations under this Agreement, shall, prior to such delivery, be for the sole account of the owner thereof.

Section 2.2    Delivery; Payment.

(a)    All Qualified Securities delivered hereunder shall be delivered to the Trustee to the account specified in Section 10.1 hereof, in such manner as at the time is generally acceptable for delivery of Qualified Securities.    All Qualified Securities delivered hereunder shall be delivered to the Trustee on a "delivery versus payment" basis.

(b) (i)    Lehman shall cause the Qualified Dealer to give the Trustee at least one Business Day's prior notice of the delivery of any Qualified Securities which are in book-entry form and at least two Business Days notice of any Qualified Securities which are being delivered in certificated form.    Any such notice shall specify the Maturity Amount, the Purchase Price, the Market Value, the Differential, the Bond Payment Date, the CUSIP Number and the security to be delivered and shall be in substantially the form of the Delivery Notice.    The Trustee may conclusively rely on the specification by the Qualified Dealer of the Market Value, the Purchase Price and the Maturity Amount of a Qualified Security.

(ii)    Concurrently with the delivery of any Qualified Securities, unless otherwise directed by Lehman in writing, the Trustee shall, subject to clause (iii) below, pay the Qualified Dealer delivering such Qualified Securities, in its individual capacity, the Market Value thereof, and to the Qualified Dealer as agent for Lehman, the Differential, if any.

(iii)    Lehman may in the Delivery Notice, direct the Trustee to pay (A) to the Qualified Dealer, the Market Value of any Qualified Securities delivered to the Trustee hereunder, and (B) to Lehman, the Differential, if any.    Any such payment to Lehman shall be at Lehman's account as set forth in Section 10.1 hereof.

(iv)    All payments to be made hereunder (either to Lehman or the Qualified Dealer) shall be made in immediately available funds from the Debt Service Fund by means of a bank or Federal funds wire.

(c)    The Trustee and the Issuer have been advised by Lehman that the Maturity Amount for any Qualified Security delivered hereunder shall, in almost all cases, exceed the Market Value thereof.

Section 2.3    Subsequent Deliveries.    If any Qualified Securities delivered by a Qualified Dealer pursuant to Section 2.1 hereof (A) mature prior to the Bond Payment Date for which such

Qualified Securities were delivered or (B) have a Coupon Payment, Lehman shall have the right, upon at least one Business Day's prior written notice to the Trustee in the form of the Delivery Notice, to cause a Qualified Dealer to deliver to the Trustee, at any time on or after the maturity date of such Qualified Securities (or, as applicable, on or after the interest payment date of such Coupon Payment) but prior to the date which is one Business Day before such Bond Payment Date, other Qualified Securities, provided that the Purchase Price thereof does not exceed the Maturity Amount of the securities which have so matured (or, as applicable, the amount of the Coupon Payment) and provided that Lehman shall pay the Trustee a fee of fifty dollars ($50) for each subsequent delivery pursuant to this Section 2.3 in any calendar month in excess of two (2). Any such deliveries by the Qualified Dealer shall conform to the requirements of Section 2.2(a). Upon the delivery by the Qualified Dealer of such Qualified Securities, the Trustee shall pay the Purchase Price thereof in the manner required by Section 2.2(b)(ii).

Section 2.4    Failure to Deliver. If in connection with any Delivery Date a Lehman Event of Default occurs, in addition to the rights set forth in Section 7.3 hereof, the Issuer shall have the right to invest the related Deposit Amount in any manner permitted under the Indenture.

Section 2.5    Direction by Issuer to Trustee. The Issuer hereby irrevocably instructs the Trustee and the Trustee agrees to take the actions and to make the purchases required hereby.


SECTION III.    DEFEASANCE OR REFUNDING

Section 3.1    Defeasance or Refunding.


(a)    The Issuer may, by giving Lehman at least fifteen (15) Business Days' prior notice, but without the consent of Lehman, redeem, defease or refund the Bonds as provided in the Indenture and have this Agreement continue and apply to any such refunding bonds (the "Refunding Bonds") and any Bonds remaining outstanding after such refunding, provided that:

(i)    on or prior to the date the Bonds are to be refunded (the "Refunding Date") the Issuer and the Trustee of the Refunding Bonds enter into such amendments of this Agreement with Lehman (the "Amended Agreement") as are necessary to have this Agreement pertain to the Deposit Amounts, Delivery Dates and Bond Payment Dates applicable to the Refunding Bonds and to any Bonds which remain outstanding after giving effect to such refunding (the "Amended Cash Flows"),

(ii)   if as measured on the Refunding Date, the Termination Value to Lehman of its investment rights with respect to the Deposit Amounts, Delivery Dates and Bond Payment Dates which would be remaining hereunder on such date, assuming that the Bonds were not then refunded (the "Original Cash Flows") would be greater than 105% of the Termination Value to Lehman of its investment rights with respect to the Amended Cash Flows, the Issuer shall on or before the Refunding Date pay to Lehman the amount of such difference,

(iii)   the last Delivery Date under the Amended Agreement is no later than the last Delivery Date hereunder, and

(iv)   Lehman receives any opinions and other assurances it may reasonably request to assure that the protections afforded it hereunder will continue under the Amended Agreement.

If the conditions described in paragraphs (i) through (iv) are satisfied but the Termination Value to Lehman of its investment rights with respect to the Amended Cash Flows would be greater than 105% of the Termination Value to Lehman of its investment rights with respect to the Original Cash Flows, Lehman may, at its option, pay the Issuer the amount of such difference or retain investment rights only with respect to such portion of the Amended Cash Flows as would have a Termination Value equal to 105% of the Termination Value of the Original Cash Flows.

(b)   In the event the Issuer determines to redeem, defease or refund the Bonds as provided in the Indenture, but this Agreement is not continued as provided in Section 3.1(a) hereof, (i) the Issuer shall pay or cause the Trustee to pay to Lehman the Termination Value if the Termination Value is a positive number, and (ii) Lehman shall pay to the Trustee the Termination Value if the Termination Value is a negative number.   Immediately upon payment of the Termination Value in accordance with this Section 3.1(b), this Agreement shall terminate.

(c) If a Termination Value is payable pursuant to this Section 3.1, the party owing such amount shall promptly but by no later than the later of (A) one Business Day after receipt of notice of the Termination Value from Lehman or (B) the date of such redemption, defeasance or refunding pay such amount.   Such payment shall be made in immediately available funds, to or at the direction of the party to whom such Termination Value is due.   The Issuer agrees that it shall not direct the Trustee to redeem, defease, refund or repurchase all or any portion of the Bonds unless it shall have sufficient funds to pay any Termination Value which may be due as provided herein.

SECTION IV.        REPRESENTATIONS AND WARRANTIES

Section 4.1    <u>Representations and Warranties</u>.   Each party hereto represents and warrants to the other parties hereto that:

(a)    it is duly organized and validly existing under the laws of its jurisdiction, incorporation or establishment;

(b)    it has the power to enter into and perform its obligations under this Agreement (including, in the case of the Issuer and the other Obligated Group Members, to pay the Termination Value in accordance herewith and, including, in the case of the Issuer and the other Obligated Group Members or the Trustee, to enter into and perform its obligations under the Indenture);

(c)    this Agreement (and in addition in the case of the Trustee, the Issuer and the other Obligated Group Members, the respective Financing Documents to which they are a party) has been duly authorized, executed and delivered by it and, assuming the due authorization, execution and delivery hereof by the other parties hereto or thereto in the case of the Financing Documents, constitutes a legal, valid and binding obligation of it enforceable against it in accordance with the terms hereof, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally, and subject, as to enforceability, to general principles of equity regardless of whether enforcement is sought in a proceeding in equity or at law;

(d)    its execution and delivery of this Agreement and its performance of its obligations hereunder do not and will not constitute or result in a default under, a breach or violation of, or the creation of any lien or encumbrance on any of its property under, its charter or by-laws (or equivalent organizational documents), or any other agreement (including in the case of the Issuer and the other Obligated Group Members and the Trustee, the Indenture or other Financing Documents to which they are a party), instrument, law, ordinance, regulation, judgment, injunction or order applicable to it or any of its property;

(e)    all consents, authorizations and approvals requisite for its execution, delivery and performance of this Agreement have been obtained and remain in full force and effect and all conditions thereof have been duly complied with, and no other action by, and no notice to or filing with, any governmental authority or regulatory body is required for such execution, delivery or performance;

(f)    there is no proceeding pending or threatened against it at law or in equity, or before any governmental instrumentality or in any arbitration, which would materially impair its ability to perform its obligations under this Agreement, and there is no such proceeding pending against it which purports

or is likely to affect the legality, validity or enforceability of the Agreement;

(g)    in the case of the Issuer and other Obligated Group Members:

(i)    the amount specified in Exhibit A hereto for each Delivery Date as the Deposit Amount therefor is the amount the Issuer is required to deposit into the Debt Service Fund pursuant to Section 5.02 of the Indenture on such Delivery Date,

(ii)    it is not entitled to claim, and shall not assert any claim, with respect to itself or its revenues, assets or property (irrespective of the use or intended use thereof), of immunity on the grounds of sovereignty or similar grounds from suit, jurisdiction of any court, relief by way of injunction, order for specific performance or for recovery of property, attachment of its assets (whether before or after judgment, in aid of execution, or otherwise) and execution or enforcement of any judgment to which it or its revenues or assets or property might otherwise be entitled in any suit, action or proceeding relating to this Agreement in the courts of any jurisdiction, nor may there be attributed to the Issuer or its revenues, assets or property any such immunity (nor shall such attribution be claimed by the Issuer),

(iii)    its obligation to make payments of the Deposit Amount to the Trustee on each Delivery Date are secured by a pledge of and a lien and charge upon the revenues of the Issuer, pursuant to Section 3.04 of the Indenture.

(iv)    the Issuer has entered into this Agreement for purposes of managing its borrowings or investments by increasing the predictability of its cash flow from earnings on its investments and not for purposes of speculation, and

(h)    in the case of each of the Issuer and other Obligated Group Members and the Trustee:

(i)    the Indenture has been duly authorized, executed and delivered by it,

(ii)    assuming the due authorization, execution and delivery thereof by the other parties thereto, the Indenture constitutes a legal, valid and binding obligation of it, enforceable against it in accordance with the terms thereof, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally, and subject, as to enforceability, to general principles of equity regardless of whether enforcement is sought in a proceeding in equity or at law,

(iii)    the Financing Documents to which it is a party are in full force and effect on the date hereof and no amendment, waiver or course of dealing has amended or terminated any of the

terms thereof since the original execution and delivery of the Financing Documents, except such as may have been delivered to Lehman pursuant to Section 6.1(d) hereof,

(iv)   no "event of default" or event which would with the passage of time or the giving of notice constitute an event of default has occurred and is continuing under any of the Financing Documents, and

(v)   the Issuer has not entered into any other agreements providing for the investment of funds held under the Indenture in the Debt Service Fund, including the forward delivery of Eligible Securities, which are required by the Agreement to be deposited with the Trustee according to the terms hereunder.

SECTION V.        COVENANTS

Section 5.1   Covenants.  Each of Lehman, the Issuer, the other Obligated Group Members and the Trustee covenants to the other parties to this Agreement that so long as it shall have any obligations under this Agreement it shall:

(a)   maintain in full force and effect all authorizations and agreements of and exemptions, consents, licenses, actions or approvals by, and all filings with or notices to, any governmental or other authority that are required to be obtained or made by such party with respect to this Agreement and will use all reasonable efforts to obtain or make any that may become necessary in the future;

(b)   comply in all material respects with all applicable laws, rules, regulations and orders to which it may be subject if failure so to comply would materially impair its ability to perform its obligations under this Agreement; and

(c)   if it is the Issuer, the other Obligated Group Members or the Trustee, not enter into any amendment or modification of any of the Financing Documents to which it is a party, or voluntarily create or permit to be created, any lien or charge, or fail to make any election under any of the Financing Documents to which it is a party, which would impair its ability to perform its obligations to Lehman hereunder.

(d)   if it is the Issuer or the other Obligated Group Members that, it will cause any person that becomes an Obligated Group Member pursuant to Section 11.1 of the Master Indenture to join in and execute this Agreement such that each such person shall become and be subject to all covenants, agreements and obligations of the Issuer and the other Obligated Group Members under this Agreement, or to cause each such person to execute and deliver to Lehman, an instrument satisfactory in form and substance to Lehman containing the agreement of each such person (a) to join in and execute this Agreement and (b) to become and be subject to all

covenants, agreements and obligations of the Issuer and the other Obligated Group Members under this Agreement. All Obligated Group Members shall be jointly and severally liable for the obligations of the Issuer under this Agreement; and

(e)   it will cause each instrument executed and delivered in accordance with subsection (d) above to be accompanied by an opinion of counsel, satisfactory to Lehman, for the person becoming an Obligated Group Member, addressed to and in form and substance satisfactory to Lehman, to the effect that such instrument has been duly authorized, executed and delivered by such person and constitutes a legal, valid and binding agreement enforceable in accordance with its terms, subject to customary exceptions for bankruptcy, insolvency and other laws affecting the enforcement of creditors' rights and application of general principles of equity.

Section 5.2   <u>Additional Covenants of Issuer</u>.   In addition to its covenants under Section 5.1, the Issuer covenants to the other parties to this Agreement that so long as it shall have any obligations hereunder:

(a)   on or before each Delivery Date it shall make payments of the related Deposit Amounts in immediately available funds into the Debt Service Fund; and

(b)   it shall not redeem, defease or refund the Bonds unless it shall have sufficient funds to pay the Termination Value, if any, to Lehman pursuant to Section 3.1 hereof.

Section 5.3   <u>Incorporated Provisions</u>. The Issuer, the Trustee and the other Obligated Group Members agrees that each of its covenants and other agreements in the Indenture and the other Financing Documents (the "Incorporated Provisions") which are materially relevant to the ability of the Trustee to perform its obligations or the rights and benefits accruing to Lehman under this Agreement are incorporated herein as fully as if set forth herein and Lehman were a named beneficiary thereof (including, without limitation, the right to consent to certain actions subject to consent under the Indenture and the other Financing Documents and the right to receive financial statements and other notices and information).   The Issuer, the Trustee and the other Obligated Group Members will observe, perform and fulfill each such agreement in the Indenture and the other Financing Documents.   If the Indenture or such other Financing Document ceases to be in effect prior to the termination of this Agreement, the Incorporated Provisions (other than those provisions requiring payments in respect of bonds, notes, warrants or other similar instruments issued under the Indenture) will remain in full force and effect for purposes of this Agreement as though set forth herein until such date on which all of the obligations of the Issuer, the Trustee and the other Obligated Group Members under this Agreement have been fully satisfied. Any amendment, supplement, modification

or waiver of any of the Incorporated Provisions without the prior written consent of Lehman shall have no force and effect with respect to this Agreement. Any amendment, supplement or modification for which such consent is obtained shall be part of the Incorporated Provisions for purposes of this Agreement.

SECTION VI.     CONDITIONS PRECEDENT

Section 6.1     Conditions Precedent. The performance of the obligations of the parties hereunder are conditioned upon satisfaction of the following conditions:

(a)     delivery to Lehman and Issuer of an opinion of counsel to the Trustee, in the form of Exhibit B;

(b)     delivery to Lehman and Trustee of an opinion of counsel to the Issuer, in the form of Exhibit C;

(c)     delivery to Lehman by the Issuer of a copy of the official statement for the Bonds;

(d)     delivery to Lehman by the Issuer of a copy of the Indenture and the other Financing Documents and any other Investment Agreement as defined in Section 4.1(b)(5) each certified by an authorized signatory of the Issuer as being a true and correct copy of such document as in full force and effect on the date hereof;

(e)     delivery by Lehman to the Issuer and Trustee of an opinion of inside counsel to Lehman, in the form of Exhibit D;

(f)     delivery to Lehman of a copy of any consent received by the Issuer to enter in to this Agreement; and

(g)     delivery to Trustee and to the Issuer of an opinion of counsel to Lehman in the form of Exhibit E.

(h)     delivery to Trustee and to the Issuer of a guarantee of Lehman Brothers in the form of Exhibit H.

SECTION VII.     DEFAULTS; TERMINATION

Section 7.1     Trustee Events of Default. The occurrence of any of the following events shall constitute a Trustee Event of Default:

(a)     the Trustee shall fail for any reason, other than that the Issuer has failed to deposit the related Deposit Amount, to purchase, at the Maturity Amount therefor, any Qualified Securities delivered by the Qualified Dealer in accordance with this Agreement;

(b)    the Trustee shall default in the performance of any other covenant or obligation under this Agreement, including the Incorporated Provisions, and such default is not cured within 5 Business Days of notice thereof from Lehman or the Issuer; or

(c)    any representation or warranty of the Trustee contained in this Agreement proves to have been incorrect, false or misleading in any material respect as of the date on which it was made.

Section 7.2    Issuer Events of Default.  The occurrence of any of the following events shall constitute an Issuer Event of Default:

(a)    the Issuer shall fail to make the Deposit Amount or the Trustee for any other reason shall fail to purchase, at the Maturity Amount thereof, any Qualified Securities delivered by the Qualified Dealer in accordance herewith;

(b)    the Issuer or any other Obligated Group Member shall default in the performance of any covenant or obligation under, or incorporated by reference in, this Agreement, other than as described in clause (a) above and such default is not cured within five Business Days of notice thereof from Lehman or the Trustee;

(c)    any representation or warranty of the Issuer or any other Obligated Group Member contained in this Agreement proves to have been incorrect, false or misleading in any material respect as of the date on which it was made;

(d)    an Event of Default as defined by and pursuant to Section 7.01 (d) and (e) of the Master Trust Indenture;

(e)    the interest and principal outstanding under the Bonds shall be declared due and payable at any time prior to the scheduled maturity thereof;

(f)    there shall be an investment of amounts in the Debt Service Fund other than pursuant to this Agreement; or

(g)    the Issuer or any other Obligated Group Member consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity (other than another Obligated Group Member) (or, without limiting the foregoing, if an entity such as an organization, board, commission authority, agency or body succeeds to the principal functions of, or powers and duties granted, to the Issuer or any other Obligated Group Member) and, at the time of such consolidation, amalgamation, merger or transfer either (i) the resulting or surviving or transferee entity fails to assume all the obligations of the Issuer or any other Obligated Group Member under this Agreement or by operation of law or pursuant to an agreement reasonably satisfactory to the other party to this Agreement or

(ii) the creditworthiness of the resulting, surviving or transferee entity is materially weaker than that of the Obligated Group Members on a consolidated basis.

Section 7.3    Lehman Events of Default. The occurrence of any of the following events shall constitute a Lehman Event of Default:

(a)    Lehman shall fail to cause a Qualified Dealer to deliver Qualified Securities on any Delivery Date and such failure shall continue for two Business Days after written notice thereof to Lehman from the Trustee or the Issuer;

(b)    any representation or warranty of Lehman contained in this Agreement proves to have been incorrect, false or misleading in any material respect as of the date on which it was made; or

(c)    Lehman is at any time Insolvent.

Section 7.4    Remedies Upon Occurrence of Trustee Event of Default. Upon the occurrence of a Trustee Event of Default, Lehman shall have the right to:

(a)    cause a Qualified Dealer to redeliver to the Trustee or sell to any other purchaser the Qualified Securities which were to be delivered in connection with any Delivery Date and which have not theretofore been delivered to and purchased by the Trustee and, subject to Section 9.2, make demand for the payment of interest on the Maturity Amount of such Qualified Securities from the date of such failure to purchase to the date such Qualified Securities are repurchased by the Trustee arising out of the Trustee's failure to purchase such Qualified Securities; and/or

(b)    immediately terminate this Agreement by giving notice thereof to the Trustee with a copy to the Issuer or any other Obligated Group Members and, subject to Section 9.2, if the Termination Value is a positive number, make demand upon the Trustee for the payment of the Termination Value; provided, however, that Lehman shall not be permitted to terminate this Agreement upon the occurrence of a Trustee Event of Default other than that the Issuer has failed to make the Deposit Amount unless (i) the Trustee fails to cure such Default within two (2) Business Day of receiving written notice thereof from Lehman or (ii) a separate Trustee Event of Default had occurred hereunder within one (1) year of the Trustee Event of Default in question and the Trustee does not resign as Trustee for the Bonds within two (2) Business Days after receiving a written notice from Lehman requesting the Trustee to resign as a result of the Trustee Event of Default in question.

If the Termination Value is payable pursuant to this Section 7.4(b), the party owing such amount shall promptly, but by no later than one Business Day after notice that such amount is due from

Lehman, pay such amount, in immediately available funds, to the party to whom such Termination Value is due. If any such amount is not paid when due, the party owing such amount shall pay interest on such amount for each date such amount is due and not paid at the Default Rate. Any amounts payable pursuant to Section 7.7 shall be payable upon demand as provided therein.

Notwithstanding anything to the contrary in this Agreement, the Trustee shall have no direct liability to Lehman hereunder except to the extent, if any, that the losses incurred by Lehman upon a Trustee Event of Default are caused by the Trustee's negligence or wilful misconduct or by a breach of its covenant contained in Section 5.1(c) hereof or by a breach of the Trustee's representations and warranties hereunder.

      Section 7.5    <u>Remedies Upon Occurrence of Issuer Event of Default</u>.  Upon the occurrence of an Issuer Event of Default, Lehman shall have the right to:

      (a)    cause a Qualified Dealer to redeliver to the Trustee or sell to any other purchaser the Qualified Securities which were to be delivered in connection with any Delivery Date and which have not theretofore been delivered to and purchased by the Trustee and make demand for the payment of its losses (calculated in accordance with Section 7.7) arising out of the Trustee's failure to purchase such Qualified Securities; and/or

      (b)    immediately terminate this Agreement by giving notice thereof to the Issuer or any other Obligated Group Members with a copy to the Trustee, and if the Termination Value is a positive number, make demand upon the Issuer for the payment of the Termination Value.

If a Termination Value is payable pursuant to this Section 7.5(b), the party owing such amount shall promptly, but by no later than one Business Day after notice that such amount is due from the party to whom such Termination Value is due, pay such amount, in immediately available funds, to or at the direction of the party to whom such Termination Value is due. If any such amount is not paid when due, the party owing such amount shall pay interest on such amount for each date such amount is due but not paid at the Default Rate. Any amounts payable pursuant to Section 7.7 shall be payable upon demand as provided therein. For purposes of any payment owed to Lehman pursuant to such demand, it is hereby understood and expressly agreed to, that the members of the Obligated Group shall be jointly and severally liable for such payment. In the event the Issuer does not pay the Termination Value, Lehman may demand in writing such payment from any and all of the Obligated Group Members as if such members were the Issuer.

      Section 7.6    <u>Remedies Upon Occurrence of Lehman Event of Default</u>.  Upon the occurrence of a Lehman Event of Default, the Issuer shall have the right to:

(a)     if such default is a default under Section 7.3(a), cause a qualified dealer selected by the Issuer or the Trustee to sell to the Trustee the Qualified Securities which were to be delivered and which have not yet been delivered to the Trustee and make demand for the payment of its losses in connection therewith, calculated as provided in Section 7.7;

(b)     if such default is a default under Section 7.3(a) and there has previously been such a default, and Lehman has failed to pay the Issuer's losses (as described in Section 7.7), immediately terminate this Agreement by giving notice thereof to Lehman with a copy to the Trustee; and

(c)     if such default is a default under Sections 7.3(b) or (c) hereof, immediately terminate this Agreement;  whereupon Lehman shall determine the Termination Value and if the Termination Value is a negative number, Lehman shall promptly, but no later than one Business Day after notice that such amount is due,  pay such amount, in immediately available funds, to the Issuer.  If any such amount is not paid when due, the party owing such amount shall pay interest on such amount for each date such amount is due but not paid at the Default Rate.  Notwithstanding anything to the contrary in this Agreement, if Lehman fails to determine the Termination Value within three Business Days of notice from the Issuer or the Trustee of the occurrence of a Lehman Event of Default then the Issuer (or if so directed by the Issuer, the Trustee) shall make such determination as if it were Lehman and the amount as so determined by the Issuer (or the Trustee) shall for purposes of this Section 7.6 be deemed the Termination Value.

Section 7.7     Loss Amount if Failed or Late Purchase.

(a)     Subject to Section 9.2, if the Trustee fails to purchase any Qualified Securities delivered by a Qualified Dealer in accordance with this Agreement and provided that Lehman has not exercised its right to terminate this Agreement as provided herein (in which case the Termination Value shall be due), the Trustee, in the case of a Trustee Event of Default under Section 7.1(a) or the Issuer under any other circumstances, shall pay to Lehman as liquidated damages for its losses and not as a penalty, on demand by Lehman, the sum of (w) interest on the Maturity Amount of such Qualified Securities for each day from and including the delivery date thereof to but excluding the date on which such securities are resold to a third party or to the Trustee, (x) the excess, if any, of the Maturity Amount of such Qualified Securities over the amount received by the Qualified Dealer upon such resale of the securities (the "Shortfall Amount"), (y) interest on the Shortfall Amount from and including the resale date to but excluding the date on which the Trustee or the Issuer, as applicable, compensates Lehman for its losses as described herein, and (z) any incidental costs and expenses incurred by Lehman in connection with the Trustee's failure to so purchase such Qualified Securities.  Interest shall accrue at a rate per annum equal to the Default Rate for purposes of clauses (w) and (y).

(b)     The amount of losses that shall be payable on demand against Lehman upon the occurrence of a Lehman Event of Default under Section 7.3(a) shall be the sum of (x) the excess, if any, of the purchase price actually paid by the Trustee upon the purchase of the Qualified Securities over the Purchase Price thereof (the "Excess Amount"), (y) interest on the Excess Amount from and including the related Delivery Date to but excluding the date on which Lehman compensates the Trustee or the Issuer, as applicable, for its losses as described herein and (z) any incidental costs and expenses incurred by the Trustee or the Issuer in connection with a Lehman Event of Default. Such interest shall accrue at a rate per annum equal to the Default Rate.

Section 7.8     <u>Application of Excess Funds</u>. The Issuer hereby directs the Trustee and the Trustee agrees that if at any time any amounts are due Lehman from the Issuer in connection with an Issuer Event of Default, the Trustee shall, upon demand from Lehman, and without further direction or instruction from the Issuer, apply any funds available under the Indenture which are not subject to the lien of the Indenture (including any funds which would otherwise be released to the Issuer) to the payment of such amounts.

Section 7.9     <u>Limited Rights Against the Debt Service Fund</u>. Neither Lehman nor any Qualified Dealer shall have any right to any amounts held in the Debt Service Fund except as expressly provided herein upon the delivery of a Qualified Security in accordance with this Agreement.

Section 7.10     <u>No Waiver; Remedies Cumulative</u>.     No failure or delay on Lehman's part in exercising any right or remedy hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any such right or remedy preclude any other or further exercise thereof or the exercise of any other right or remedy. Lehman's rights and remedies hereunder are cumulative and not exclusive of any rights or remedies provided by law, this Agreement or otherwise. None of the terms or provisions of this Agreement may be waived, modified or amended except in a writing duly signed by the Trustee, the Issuer and Lehman.


SECTION VIII.     ADDITIONAL SECURITY

Section 8.1     <u>Security and Source of Payment for Issuer's Obligations</u>. The Issuer and Lehman hereby agree that the Issuer's payment obligations arising hereunder are general obligations of the Issuer payable from any monies of the Issuer lawfully available for such purpose.

SECTION IX.     THE TRUSTEE

Section 9.1     <u>Acceptance by Trustee</u>. By execution and delivery of this Agreement, the Trustee accepts its duties and

obligations hereunder, as an addition to its duties and obligations as Trustee under the Indenture.

Section 9.2   Liability of the Trustee; Consultation with Legal Counsel.

(a)   The Trustee shall not be liable to any person for any action taken or neglected to be taken in performing or attempting to perform its obligations hereunder or preserving or seeking to preserve the funds it maintains under the Indenture or to purchase the Qualified Securities tendered pursuant to this Agreement, except for actions arising from its negligence or willful misconduct or for a breach of its representations or warranties or from a breach of its covenant under Section 5.1(c).

(b)   The Trustee may consult with counsel with respect to any question relating to its duties or responsibilities hereunder or otherwise in connection herewith and, except as expressly provided herein, shall not be liable for any action taken, suffered, or omitted by the Trustee in good faith upon the advice of such counsel. The Trustee may act through its officers, employees, agents and attorneys.

Section 9.3   Payment of Trustee Fees.   Lehman has no liability or responsibility for payment of the Trustee's fees or expenses for its services hereunder, including any such fees or expenses arising out of or in connection with the liquidation of the Qualified Securities as provided herein.

Section 9.4   Trustee Cooperation.

(a)   The Trustee shall not act in contravention of its obligations hereunder or invest amounts in the Debt Service Fund other than pursuant to this Agreement; provided, however, that any amounts held in the Debt Service Fund in excess of those required to meet its obligations under the Agreement may be invested as directed by the Issuer in accordance with the terms of the Indenture.

(b)   The Trustee shall not make any payments or distributions from the Debt Service Fund other than payments or distributions (i) required by this Agreement, (ii) to pay principal of, redemption premium and interest on the Bonds or (iii) to the extent not inconsistent with the terms of this Agreement, to make payments required by the Indenture.

Section 9.5   Successor Trustee.   If the Trustee shall resign or be discharged from its duties and obligations under the Indenture, the Issuer shall appoint a successor Trustee pursuant to the terms of the Indenture; provided, however, the successor trustee shall be reasonably acceptable to Lehman.   The Issuer agrees that if the Trustee fails for any reason to perform its duties to Lehman under this Agreement in accordance with the terms hereof, or is at any time Insolvent or breaches in any material

respect its representations and warranties to Lehman hereunder, the Issuer shall promptly, subject to the terms of the Master Trust Indenture, upon request of Lehman, appoint a successor Trustee acceptable to Lehman; provided, however, any bank, corporation or association (i) into which the Trustee may be converted or merged, (ii) with which the Trustee or any successor to it may be consolidated, or (iii) to which it may sell or transfer its assets and corporate trust business as a whole or substantially as a whole, or any corporation, merger, consolidation, sale or transfer, ipso facto, shall be and become successor Trustee hereunder and shall be vested with all of the title to the whole property or trust estate hereunder.

SECTION X.     MISCELLANEOUS

Section 10.1  _Notices_.  All notices, demands or other communications hereunder shall be given or made in writing and shall be delivered personally, or sent by certified or registered mail, postage prepaid, return receipt requested, or overnight delivery service, telex or telecopy to the party to whom they are directed at the following addresses, or at such other addresses as may be designated by notice from such party to all other parties:

> To Lehman:
>
> Lehman Brothers Special Financing Inc.
> 7th Floor
> American Express Tower
> World Financial Center
> New York, NY  10285
> Attention: Pat Appel
> Telephone: (212) 526-9833
> Telecopy:  (212) 528-6923

| Bank Name: | Chemical Bank, New York |
| ABA # | 021000128 |
| AC Name | Lehman Brothers Special Financing Inc. |
| AC # | 066-143543 |
| Further Credit to: | #098-90020 |

<u>To the Trustee</u>:

Bank of America Arizona
Corporate Trust Department 6300
101 North First Avenue
Suite 2000
Phoenix, Arizona 85003
Attention:  Audrey Adamic
Telephone: (602) 594-2427
Telecopy:  (602) 594-4375
Account Name and Number:


[FOR DELIVERY OF BOOK-ENTRY GOVERNMENT OBLIGATIONS]

Bank Name:  Bank of America
ABA #121000358
Account Name:  Bank America SF/SPEC
Account #867194900
Further Credit to:  University Medical
                    Center Forward Debt Svc.


<u>To the Issuer</u>:

University Medical Center
1501 North Campbell Avenue
Tucson, Arizona 85724
Attention: Mr. Gregory A. Pivirotto
           (Chief Executive Officer)
            and
           Mr. Pitt R. Calkin
           (Chief Financial Officer)
Telephone: (602) 694-4660
Telecopy:  (602) 694-4085

　　　　Any notice, demand or other communication given in a manner prescribed in this Section shall be deemed to have been delivered on receipt.

　　　　Section 10.2　　<u>Binding Effect; Transfer</u>.

　　　　This Agreement shall be binding upon the Trustee, the Issuer, the other Obligated Group Members and Lehman and upon their respective permitted successors and transferees.  Lehman shall be entitled to transfer this Agreement, and its interests and obligations hereunder upon notice to the Trustee, with a copy to the Issuer, provided that the transferee shall assume all of the rights and obligations of Lehman hereunder.  Such transferee shall immediately assume the rights and obligations of Lehman hereunder upon the delivery of such notice to the Trustee, with a copy to the Issuer.  None of the parties may transfer this Agreement without the prior written reasonable consent of the other parties.  If the Bonds are at any time rated by Standard & Poor's Ratings Group

("S&P") the parties hereto will not transfer this Agreement except upon receipt of written notice from S&P that such transfer shall not adversely affect S&P's rating on the Bonds.

Section 10.3   Limitation. Nothing expressed or implied herein is intended or shall be construed to confer upon any person, firm or corporation other than the parties hereto, any right, remedy or claim by reason of this Agreement or any term hereof, and all terms contained herein shall be for the sole and exclusive benefit of the parties hereto, and their successors and permitted transferees.

Section 10.4   Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without regard to conflict of law principles.

Section 10.5   Role of Lehman.

(a)   It is expressly understood and agreed that in performing its obligations hereunder, Lehman is not acting as a fiduciary, agent or other representative for the holders of the Bonds or for any other person, that Lehman has made no investigation with respect to the tax-exempt status of the Bonds, and that neither Lehman nor any of its directors, officers, employees, agents or affiliates shall be liable or responsible for: (i) the payment of any amounts owing on or with respect to the Bonds; (ii) the use or application by the Trustee of any moneys payable to the Trustee hereunder; (iii) any acts or omissions of the Issuer or the Trustee under, or with respect to, the validity, tax exemption or enforceability of, the Bonds, the Indenture or any other Financing Document; or (iv) the Trustee's performance of its obligations under the Indenture or any other Financing Document or any other agreement or instrument with respect to the Bonds. Without limiting the foregoing, Lehman shall have no duty to ascertain whether the Trustee is in compliance with any applicable statute, regulation or law, the Indenture or any other Financing Document.

(b)   The Issuer acknowledges that the economic terms of this Agreement have been individually negotiated by it and that, to the extent it has deemed necessary, it has consulted with its own legal, tax and investment advisors regarding its decision to enter into this Agreement. The Issuer understands that in entering this Agreement pursuant to which it is agreeing upon the rate of return it will receive during the term of this Agreement on amounts held in the Debt Service Fund and thereby minimizing the risks resulting from fluctuations in interest rates during the term hereof it is also foregoing the possibility of receiving greater returns on such amounts from such fluctuations.

Section 10.6   Counterparts. This Agreement may be executed in one or more counterparts and when each party hereto has executed at least one counterpart, this Agreement shall become

binding on all parties and such counterparts shall be deemed to be one and the same document.

Section 10.7    _Severability_. If one or more provisions of this Agreement or the applicability of any such provisions to any set of circumstances shall be determined to be invalid or ineffective for any reason, such determination shall not affect the validity and enforceability of the remaining provisions or the applicability of the same provisions or any of the remaining provisions to other circumstances.

Section 10.8    _Amendments, Changes and Modifications_. This Agreement may be amended or any of its terms modified only by a written document authorized, executed and delivered by each of the parties hereto.

Section 10.9 _Termination_. Unless earlier terminated pursuant to Section 3.1, 7.4, 7.5, or 7.6 hereof, this Agreement shall terminate on the later of the last Bond Payment Date set forth in _Exhibit A_ and the date on which the Trustee and the Issuer have satisfied all of their obligations hereunder.

IN WITNESS WHEREOF, the Trustee, the Issuer and Lehman have caused this Debt Service Deposit Agreement to be executed by their respective duly authorized officers, all as of the date and year first above written.

BANK OF AMERICA ARIZONA

By: _Audrey Adamic_

     Name: Audrey Ad......

     Title: Trust Officer.

UNIVERSITY MEDICAL CENTER CORPORATION

By: _____

     Name:

     Title:

LEHMAN BROTHERS SPECIAL FINANCING INC.

By: _____

     Name:

     Title:

IN WITNESS WHEREOF, the Trustee, the Issuer and Lehman have caused this Debt Service Deposit Agreement to be executed by their respective duly authorized officers, all as of the date and year first above written.

BANK OF AMERICA ARIZONA

By:_____
     Name:
     Title:

UNIVERSITY MEDICAL CENTER CORPORATION

By:_____
     Name: *Pitt R. Calkin*
     Title: *Treasurer*

LEHMAN BROTHERS SPECIAL FINANCING INC.

By:_____
     Name:
     Title:

IN WITNESS WHEREOF, the Trustee, the Issuer and Lehman have caused this Debt Service Deposit Agreement to be executed by their respective duly authorized officers, all as of the date and year first above written.

BANK OF AMERICA ARIZONA

By: _____
      Name:
      Title:


UNIVERSITY MEDICAL CENTER CORPORATION

By: _____
      Name:
      Title:


LEHMAN BROTHERS SPECIAL FINANCING INC.

By: _____
      Name: Maureen C. Daniels
      Title: Vice President

Execution Copy

## DEBT SERVICE DEPOSIT AGREEMENT

This Debt Service Deposit Agreement (this "Agreement"), dated as of March 31, 2004, by and among U.S. BANK NATIONAL ASSOCIATION, a national banking association organized under the laws of the United States of America as Bond Trustee under the Indenture (as defined herein) (the "Trustee"), UNIVERSITY MEDICAL CENTER CORPORATION, an Arizona nonprofit corporation (the "Issuer") and LEHMAN BROTHERS SPECIAL FINANCING INC., a Delaware corporation ("Lehman").

SECTION I.         DEFINITIONS

For purposes of this Agreement, unless the context clearly indicates otherwise, the words and terms defined in this Section I have the respective meanings given to them herein:

"Bond Payment Date" means with respect to each Delivery Date, each date identified as a "Bond Payment Date" on Exhibit A unless such date is not a Business Day, in which case "Bond Payment Date" means the immediately succeeding Business Day provided that in determining whether any such date is a Business Day no effect shall be given to clause (c) or (d) of the definition of Business Day.

"Bonds" means a portion of the $52,000,000 University Medical Center Corporation (Tucson, Arizona) Hospital Revenue Bonds Series 2004.

"Burdened Party" means, (i) in the case of (A) an Issuer or Trustee Event of Default or (B) a termination of this Agreement by the Issuer pursuant to Section 3.1 following a redemption, defeasance or refunding of the Bonds, Lehman and (ii) in the case of a Lehman Event of Default, the Issuer.

"Business Day" means any day other than (a) a Saturday or Sunday, (b) a day on which the principal corporate trust office of the Trustee is authorized or required by law to close, (c) a day on which banking institutions in the City of New York are authorized or required by law to close, or (d) a day on which any Qualified Securities which may be delivered hereunder are not subject to delivery in the City of New York.

"Closing Date" means March 31, 2004.

"Coupon Payment" means, for any Qualified Security, a payment of interest which is due to be paid thereon prior to the scheduled maturity of such security.

"Dealer" means a leading dealer in the relevant markets selected by Lehman in good faith (a) from among dealers of the highest credit standing which satisfy all the criteria that Lehman applies generally at the time in deciding whether to offer or to make an extension of credit and (b) to the extent practicable, from such dealers having an office in the same city.

"Debt Service Fund" means the account created under the Indenture and designated thereunder as the Bond Fund.

"Default Rate" means a per annum rate equal to the lesser of (a) Three Month LIBOR plus 1% per annum, or (b) the maximum rate permitted by law.

"Delivery Date" means each date identified as a "Delivery Date" on Exhibit A unless such date is not a Business Day, in which case "Delivery Date" means the immediately succeeding Business Day.

"Delivery Notice" means a notice substantially in the form of Exhibit E or in such other form as provided by the Qualified Dealer and is reasonably acceptable to the Trustee.

"Deposit Amount" means for each Delivery Date the amount set forth in Exhibit A.

"Differential" means the amount, if any, by which the Purchase Price of any Qualified Security delivered hereunder exceeds the Market Value thereof.

"Eligible Securities" means (i) direct obligations of, or obligations guaranteed unconditionally as to full and timely payment of the principal thereof and interest thereon by, the United States of America, (ii) bonds, debentures, notes or other evidences of indebtedness issued by any of the following agencies or any other like governmental or government-sponsored agencies which are hereafter created: Federal Financing Bank; Federal Home Loan Bank System, Federal National Mortgage Association, Export-Import Bank of the United States, Federal Home Loan Mortgage Corporation, Federal Housing Administration, Student Loan Marketing Association, Government National Mortgage Association and the interest portion of Resolution Trust Corporation securities; and (iii) commercial paper rated Prime-1 by Moody's or A-1 or better by S&P at the time of purchase thereof.

"Financing Documents" means, collectively, the Indenture and the Master Trust Indenture and the Promissory Note.

"Guaranteed Rate" means rate per annum equal to 4.19% assuming that the interest on the applicable security were compounded semi-annually on the basis of a year of 360 days with twelve thirty day months.

"Illegality" means any event due to the adoption of, or any change in, any applicable law after the date on which this Agreement is entered into, or due to the promulgation of, or any change in, the interpretation by any court, tribunal or regulatory authority with competent jurisdiction of any applicable law after such date, it becomes unlawful to perform any absolute or contingent obligation to make a payment or delivery or to receive a payment or delivery in respect of this Agreement or to comply with any other material provision of this Agreement.

"Incipient Illegality" means (a) the enactment by any legislative body with competent jurisdiction over the Issuer of legislation which, if adopted as law, would render unlawful (i) the performance by the Issuer of any absolute or contingent obligation to make a payment or delivery or to receive a payment or delivery in respect of this Agreement or the compliance by the Issuer with any other material provision of this Agreement or (ii) the performance by the Issuer of any contingent or other obligation which the Issuer relating to this Agreement, (b) any assertion in any proceeding, forum or action by the, in respect of the Issuer or in respect of any entity located or organized under the laws of the state in which the Issuer is located to the effect that performance under this Agreement or similar agreements is unlawful or (c) the occurrence with respect to the Issuer of any event that constitutes an Illegality.

"Indenture" means the Bond Trust Indenture, dated as of January 15, 1991, by and between the Issuer and the Trustee, as amended and supplemented to the date hereof and as supplemented by the Third Supplemental Indenture.

"Insolvent" means (i) either the Trustee or Lehman as the case may be, shall (1) commence a voluntary case under the federal bankruptcy laws (as in effect on the date of this Agreement or hereafter), (2) file a petition seeking to take advantage of any other law, relating to bankruptcy, insolvency, reorganization, winding up or composition or adjustment of debts, (3) consent to any petition filed against it in an involuntary case under such bankruptcy or insolvency or other laws, (4) apply for or consent to the appointment of, or the taking of possession by, a trustee, receiver, custodian, liquidator or the like for itself or for all or a substantial part of its property, (5) admit in writing its inability to pay, or generally not be paying, its debts as they come due, (6) make a general assignment for the benefit of creditors, or (7) take any official action for the purpose of affecting any of the foregoing; or (ii) a case or other proceeding shall be commenced against either the Trustee or Lehman, as the case may be, in any court of competent jurisdiction seeking (1) relief under the federal bankruptcy laws (as in effect on the date of this Agreement or hereafter) or under any other law relating to bankruptcy, insolvency, reorganization, winding up or composition or adjustment of debts, or (2) the appointment of a trustee, receiver, custodian, liquidator or the like for the Trustee or Lehman, as the case may be, or for all or a substantial part of its property, and any such case or proceeding shall continue undismissed and unstayed for a period of 60 consecutive calendar days, or an order granting the relief requested in any such case or proceeding against such party shall be entered and shall remain in effect and unstayed for a period of 60 consecutive days.

"Issuer Event of Default" means the occurrence of an event specified in Section 7.2 hereof.

"Lehman Cure Period" has the meaning specified in Section 7.3(a) hereof.

"Lehman Event of Default" means the occurrence of an event specified in Section 7.3 hereof.

"Market Value" means with respect to any Qualified Security, the market value thereof (including accrued interest thereon) as specified by the Qualified Dealer delivering that Qualified

Security, provided that the Market Value of any Qualified Security shall in no event exceed the Purchase Price thereof.

"Master Trust Indenture" means the Master Trust Indenture, dated as of June 1, 1986 as amended and restated as of July 1, 1987 between the Obligated Group Members and the Trustee, as amended and supplemented to the date hereof.

"Maturity Amount" means, with respect to any Qualified Security, the amount, payable in cash, representing the principal and interest due thereon, on its maturity date (including any Coupon Payments).

"Obligated Group Members" shall mean, collectively, the Issuer and any other entities that become Obligated Group Members (as defined in the Master Trust Indenture) pursuant to the Master Trust Indenture.

"Promissory Note" means the Series 2004 Note, dated as of March 3, 2004.

"Purchase Price" means, for any Eligible Security delivered hereunder, that price for such Eligible Security, as set forth in the Delivery Notice, which will produce a rate of return on such Eligible Security for the period from (and including) the date of its delivery to (but excluding) its maturity date of the Guaranteed Rate.

"Qualified Dealer" means Lehman Brothers Inc., its successors or assigns, or any other dealer in Qualified Eligible Securities selected by Lehman.

"Qualified Securities" for any Delivery Date means Eligible Securities which, to the extent available on the open market, (i) mature as close as possible to but not later than the related Bond Payment Date and (ii) have an aggregate Purchase Price which is as close as possible to but does not exceed the related Deposit Amount.

"Specified Indebtedness" means any obligation of the Issuer (whether present or future, contingent or otherwise, as principal or surety or otherwise) in respect of borrowed money.

"Termination Amount" means an amount, as determined by Lehman reasonably and in good faith on the basis of the arithmetic mean of quotations from at least three Dealers, of the amount, if any, that each such Dealer would require the Burdened Party to pay to the Dealer (expressed as a positive number if the Burdened Party is Lehman and a negative number if the Burdened Party is the Issuer) or would pay to the Burdened Party (expressed as a negative number if the Burdened Party is Lehman and a positive number if the Burdened Party is the Issuer) in consideration of such Dealer entering into an agreement with the Burdened Party which would have the effect of preserving for the Burdened Party the economic equivalent of its rights under this Agreement commencing on the termination date of this Agreement; provided, however, that:

(i)      if more than three quotations are provided, the Termination Amount will be the arithmetic mean of such quotations, without regard to the quotations having the highest and lowest values,

(ii)      if exactly three quotations are provided, the Termination Amount will be the quotation remaining after disregarding the highest and lowest quotations,

for purposes of clauses (i) and (ii), if more than one quotation has the same highest value or lowest value, then one of such quotations shall be disregarded, and

(iii)      if Lehman is unable to obtain three such quotations, the Termination Amount shall be the amount, as reasonably determined in good faith by Lehman, to be the Burdened Party's total losses and costs (expressed as a positive number if the Burdened Party is Lehman and a negative number if the Burdened Party is the Issuer), or gains (expressed as a negative number if the Burdened Party is Lehman and a positive number if the Burdened Party is the Issuer) in connection with a termination of this Agreement, including any loss of bargain, cost of funding or, at the election of Lehman but without duplication, any loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position, and

provided further, however, that in any event the Termination Amount shall also include (A) losses and costs in respect of any payment required to have been made (assuming satisfaction of each applicable condition precedent) on or before the date on which this Agreement shall be terminated or deemed terminated as provided herein and not made and (B) if such Termination Amount is being paid in connection with a termination of this Agreement following an Event of Default, hereunder, any incidental costs and expenses incurred by Lehman in connection with such termination and the enforcement of its rights hereunder (including reasonable attorneys' fees). Any determination of the Termination Amount by Lehman shall be conclusive and binding on the parties hereto absent manifest error.

"Third Supplemental Indenture" means the Third Supplemental Bond Trust Indenture, dated February 1, 2004, between the Issuer and the Trustee.

"Three Month LIBOR" as of any date of determination means the rate for deposits in US dollars for a period of three months which appears on the Telerate Page 3750 as of 11:00 a.m., London time, on the day that is two Business Days before the day for which such determination is being made. If no such rate appears on the Telerate Page 3750 as of such date, Lehman may select another nationally recognized published source to determine Three Month LIBOR.

"Trustee Event of Default" means the occurrence of an event specified in Section 7.1 hereof.

SECTION II.          PURCHASE AGREEMENT

Section 2.1    Purchase and Sale of Qualified Securities.

(a)    Lehman shall cause a Qualified Dealer to deliver to the Trustee, on any Delivery Date, in accordance with the delivery requirements of Section 2.2 hereof, to the extent such Qualified Securities are readily available in the open market, Qualified Securities selected by Lehman or the Qualified Dealer.

(b)    If Lehman causes a Qualified Dealer to deliver Qualified Securities, the Trustee shall, out of immediately available funds under the Indenture for such purpose or as otherwise provided by the Issuer, at the time of the delivery of such Qualified Securities, purchase such Qualified Securities and pay to the Qualified Dealer or Lehman, as applicable, in accordance with Section 2.2(b) hereof, an amount equal to the Purchase Price thereof.

(c)    Neither Lehman nor the Qualified Dealer is required to own any Qualified Securities at the time of Lehman's execution of this Agreement or at any time prior to the respective delivery dates thereof. The Qualified Securities, and the interest thereon, will, prior to the delivery thereof to the Trustee, be the sole property of the Qualified Dealer, and any profit or loss with respect to the holding or sale of any Qualified Securities delivered hereunder, even if purchased and identified to fulfill Lehman's obligations under this Agreement, shall, prior to such delivery, be for the sole account of the owner thereof.

Section 2.2    Delivery; Payment.

(a)    All Qualified Securities delivered hereunder shall be delivered to the Trustee to the account specified in Section 9.1 hereof or such other account designated by the Trustee in writing to Lehman from time to time, in such manner as at the time is generally acceptable for delivery of Qualified Securities. All Qualified Securities delivered hereunder shall be delivered to the Trustee on a "delivery versus payment" basis.

(b)    (i)    Lehman shall cause the Qualified Dealer to give the Trustee at least two Business Days prior notice of the delivery of any Qualified Securities which are in book-entry form and at least two Business Days notice of any Qualified Securities which are being delivered in certificated form. Any such notice shall specify the Maturity Amount, the Purchase Price, the Market Value and the Differential if available, the Bond Payment Date, the CUSIP Number and the security to be delivered and shall be in substantially the form of the Delivery Notice. The Trustee may conclusively rely on the specification by the Qualified Dealer of the Market Value, the Purchase Price and the Maturity Amount of a Qualified Security and any other information set forth in the Delivery Notice.

(ii)    Concurrently with the delivery of any Qualified Securities, unless otherwise directed by Lehman in writing, the Trustee shall, subject to clause (iii) below, pay the Qualified Dealer delivering such Qualified Securities, in its individual capacity, the Market Value thereof, and to the Qualified Dealer as agent for Lehman, the Differential, if any.

(iii)    Lehman may in the Delivery Notice, direct the Trustee to pay (A) to the Qualified Dealer, the Market Value of any Qualified Securities delivered to the Trustee hereunder, and (B) to Lehman, the Differential, if any. Any such payment to Lehman shall be at Lehman's account as set forth in the Delivery Notice.

(iv)    All payments to be made hereunder (either to Lehman or the Qualified Dealer) shall be made in immediately available funds from the Debt Service Fund by means of a bank or Federal funds wire.

(c)    The Trustee and the Issuer are hereby advised by Lehman that the Maturity Amount for any Qualified Security delivered hereunder shall, in almost all cases, exceed the Market Value thereof.

Section 2.3    Subsequent Deliveries.    If any Qualified Securities delivered by a Qualified Dealer pursuant to Section 2.1 hereof (A) mature prior to the Bond Payment Date for which such Qualified Securities were delivered or (B) have a Coupon Payment, Lehman shall, upon at least two Business Days prior written notice to the Trustee in the form of the Delivery Notice, cause a Qualified Dealer to deliver to the Trustee, at any time on or after the maturity date of such Qualified Securities (or, as applicable, on or after the interest payment date of such Coupon Payment) but prior to the date which is one Business Day before such Bond Payment Date, other Qualified Securities, provided that the Purchase Price thereof does not exceed the Maturity Amount of the securities which have so matured (or, as applicable, the amount of the Coupon Payment.)    Any such deliveries by the Qualified Dealer shall conform to the requirements of Section 2.2(a). Upon the delivery by the Qualified Dealer of such Qualified Securities, the Trustee shall pay the Purchase Price thereof in the manner required by Section 2.2(b)(ii).

Section 2.4    Late Delivery; Failure to Deliver.

(a)    If Lehman fails to cause a Qualified Dealer to deliver Qualified Securities as required hereunder by 4:30 p.m. New York City time on any Deposit Date or during the Lehman Cure Period, the Trustee shall, on each such date or on the next Business Day if investment on such date is not possible, invest the related Deposit Amount on an overnight basis in Permitted Investments (as defined in the Indenture) and if Lehman's failure continues beyond the Lehman Cure Period, the Trustee shall invest the related Deposit Amount in Permitted Investments with the longest possible maturities, provided such maturities are not later than the related Bond Payment Date.

(b)    No failure on Lehman's part to cause a Qualified Dealer to deliver Qualified Securities hereunder shall terminate or affect Lehman's right to cause future sales of Qualified Securities in accordance with this Agreement.

Section 2.5    Direction by Issuer to Trustee.    The Issuer hereby irrevocably instructs and directs the Trustee to enter into this Agreement and the Trustee agrees to take the actions and to make the purchases required hereby.

SECTION III.        DEFEASANCE OR REFUNDING

Section 3.1    Defeasance or Refunding.

(a)     The Issuer may, by giving Lehman at least fifteen (15) Business Days prior notice, but without the consent of Lehman, redeem, defease, repurchase, or refund the Bonds as provided in the Indenture, provided that if the Issuer takes any such action, the Issuer shall pay to Lehman in immediately available funds the Termination Amount by no later than the later of (A) one Business Day after receipt of notice of the Termination Amount from Lehman or (B) the date of such redemption, defeasance or refunding.  Such payment shall be made in immediately available funds, to or at the direction of Lehman.

(b)     Immediately upon payment of the Termination Amount in accordance with this Section 3.1 this Agreement shall terminate.  The Issuer agrees that it shall not redeem, defease, refund or repurchase the Bonds unless it shall have sufficient funds to pay any Termination Amount which may be due as provided herein.

(c)     If pursuant to clause (a) above this Agreement would be terminated in connection with the issuance of bonds to refund the Bonds (the "Refunding Bonds") and a Termination Amount would be payable to Lehman, the Issuer may, by written notice to Lehman, request that Lehman continue this Agreement and have such Agreement apply to the Refunding Bonds. Lehman agrees that if it receives such a request it shall agree to so continue this Agreement with respect to the Refunding Bonds and the Bonds remaining outstanding after such refunding, provided that:

(i)     Lehman receives such request (together with all relevant details relating thereto) at least 30 days in advance of the issuance of the Refunding Bonds;

(ii)     on or prior to the date the Bonds are to be refunded (the "Refunding Date") the Issuer and the trustee of the Refunding Bonds enter into such amendments of this Agreement with Lehman (the "Amended Agreement") as are necessary to have this Agreement pertain to the deposit amounts, deposit dates and bond payment dates applicable to the Refunding Bonds and to any Bonds which remain outstanding after giving effect to such refunding (the "Amended Cash Flows");

(iii)     if as determined on the Refunding Date, the Termination Amount payable to Lehman in respect to the Deposit Amounts, Deposit Dates and Bond Payment Dates which would be remaining hereunder on such date, assuming that the Bonds were not then refunded (the "Original Cash Flows") would be greater than the Termination Amount to Lehman of its investment rights with respect to the Amended Cash Flows, the Issuer shall on or before the Refunding Date pay to Lehman the amount of such difference;

(iv)    the last Deposit Date under the Amended Agreement is no later than the last Deposit Date hereunder;

(v)    the Refunding Bonds have a credit rating at least equivalent to the credit rating of the Bonds without giving effect to any bond insurance and are secured by revenues at least equivalent to the Bonds; and

(vi)    Lehman receives any opinions and other assurances it may reasonably request to assure that the protections afforded it hereunder will continue under the Amended Agreement.

If the conditions described in paragraphs (i) through (vi) are satisfied but the Termination Amount to Lehman of its investment rights with respect to the Amended Cash Flows would be greater than the Termination Amount to Lehman of its investment rights with respect to the Original Cash Flows, Lehman may, at its option, pay the Issuer the amount of such difference or retain investment rights only with respect to such portion of the Amended Cash Flows as would have a Termination Amount equal to the Termination Amount of the Original Cash Flows.

## SECTION IV.    REPRESENTATIONS AND WARRANTIES

Section 4.1    <u>Representations and Warranties</u>.    Each party hereto represents and warrants to the other parties hereto at all times during the term of this Agreement that:

(a)    it is duly organized and validly existing under the laws of its jurisdiction, incorporation or establishment;

(b)    it has the power to enter into and perform its obligations under this Agreement (including, in the case of the Issuer, to pay the Termination Amount in accordance herewith and, including, in the case of the Issuer or the Trustee, to enter into and perform its obligations under the Indenture and the other Financing Documents to which it is a party);

(c)    this Agreement has been duly authorized, executed and delivered by it and, assuming the due authorization, execution and delivery hereof by the other parties hereto, constitutes a legal, valid and binding obligation of it enforceable against it in accordance with the terms hereof, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally, and subject, as to enforceability, to general principles of equity regardless of whether enforcement is sought in a proceeding in equity or at law;

(d)    its execution and delivery of this Agreement and its performance of its obligations hereunder do not and will not constitute or result in a default under, a breach or violation of, or the creation of any lien or encumbrance on any of its property under, its charter or by-laws (or equivalent organizational documents), or any other agreement (including in the case of the Issuer and the Trustee, the Indenture or other Financing Documents to which it is a party), instrument, law, ordinance, regulation, judgment, injunction or order applicable to it or any of its property;

(e)    all consents, authorizations and approvals requisite for its execution, delivery and performance of this Agreement have been obtained and remain in full force and effect and all conditions thereof have been duly complied with, and no other action by, and no notice to or filing with, any governmental authority or regulatory body is required for such execution, delivery or performance;

(f)    there is no proceeding pending or threatened against it at law or in equity, or before any governmental instrumentality or in any arbitration, which would materially impair its ability to perform its obligations under this Agreement, and there is no such proceeding pending against it which purports or is likely to affect the legality, validity or enforceability of the Agreement;

(g)    in the case of the Issuer:

(i)    all Deposit Dates, Bond Payment Dates and Deposit Amounts as indicated on Exhibit A of this Agreement are true and correct in all respects;

(ii)    it is not entitled to claim, and shall not assert any claim, with respect to itself or its revenues, assets or property (irrespective of the use or intended use thereof), of immunity on the grounds of sovereignty or similar grounds from suit, jurisdiction of any court, relief by way of injunction, order for specific performance or for recovery of property, attachment of its assets (whether before or after judgment, in aid of execution, or otherwise) and execution or enforcement of any judgment to which it or its revenues or assets or property might otherwise be entitled in any suit, action or proceeding relating to this Agreement in the courts of any jurisdiction, nor may there be attributed to the Issuer or its revenues, assets or property any such immunity (nor shall such attribution be claimed by the Issuer);

(iii)    it has delivered to Lehman its most recent annual audited statement of financial condition and its most recent quarterly unaudited statement of financial condition and the Issuer has not experienced since the date of its last published financial statement any material adverse change in its business, assets, operations or financial condition;

(iv)    it has not nor does it anticipate that there shall be any occurrence or existence of (1) a default, event of default or other similar condition or event (however described and including any such conditions or events which will become events of default with the passing of time or the giving of notice) in respect of the Issuer under one or more agreements or instruments relating to any Specified Indebtedness of the Issuer which has resulted in any Specified Indebtedness becoming, or becoming capable at such time of being declared, due and payable under such agreements or instruments, before it would otherwise have been due and payable or (2) a default by the Issuer in making one or more payments on the due date thereof under such agreements or instruments (after giving effect to any applicable notice requirement or grace period);

(v)    it is solvent and has, and will have after giving effect to this Agreement, sufficient capital to conduct its business and to pay its debts as they become due;

DSDA:                                  10

(vii)   it has not experienced any Incipient Illegality with respect to this Agreement; and

(viii)   other than in the ordinary course of business with respect to Medicare and Medicaid reviews and audits, it is not subject to any administrative, governmental or other investigation, special review or order, or pending order or similar event, and

(h)   in the case of each of the Issuer and the Trustee:

(i)   each of the Financing Documents to which it is a party has been duly authorized, executed and delivered by it,

(ii)   assuming the due authorization, execution and delivery thereof by the other parties thereto, the Indenture and the other Financing Documents to which it is a party constitute legal, valid and binding obligations of it, enforceable against it in accordance with the terms thereof, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally, and subject, as to enforceability, to general principles of equity regardless of whether enforcement is sought in a proceeding in equity or at law,

(iii)   the Indenture and the other Financing Documents to which it is a party are in full force and effect on the date hereof and no amendment, waiver or course of dealing has amended or terminated any of the terms thereof since the original execution and delivery of the Indenture and the other Financing Documents to which it is a party, except such as may have been delivered to Lehman pursuant to Section 6.1(d) hereof,

(iv)   no "event of default" or event which would with the passage of time or the giving of notice constitute an event of default has occurred and is continuing under any of the Financing Documents to which it is a party, and

(v)   the Issuer has not entered into any agreements providing for the forward delivery of Eligible Securities or for the investment of funds held in the Debt Service Fund under the Indenture except for this Agreement and the Debt Service Deposit Agreement dated as of November 22, 1994 as amended (the "1994 Agreement") between the Issuer, the Trustee and Lehman relating to the Debt Service Fund of the Issuer's Hospital Revenue Bonds, Series of 1993 and a portion of the debt service fund of the Issuer's Hospital Revenue Bonds, Series 2004.

SECTION V.     COVENANTS AND ACKNOWLEDGMENTS

Section 5.1     Covenants. Each of Lehman, the Issuer and the Trustee covenants to the other parties to this Agreement that so long as it shall have any obligations under this Agreement it shall:

(a)    maintain in full force and effect all authorizations and agreements of and exemptions, consents, licenses, actions or approvals by, and all filings with or notices to, any governmental or other authority that are required to be obtained or made by such party with respect to this Agreement and will use all reasonable efforts to obtain or make any that may become necessary in the future;

(b)    comply in all material respects with all applicable laws, rules, regulations and orders to which it may be subject if failure so to comply could materially impair its ability to perform its obligations under this Agreement; and

(c)    if it is the Issuer or the Trustee, not enter into any amendment or modification of the Indenture or other Financing Documents to which it is a party which could impair its ability to perform its obligations to Lehman hereunder except nothing contained hereunder shall restrict the Issuer's ability to issue additional bonds under the Indenture; and

(d)    if it is the Issuer, the Issuer agrees that, during the term of this Agreement, it shall deliver to Lehman its most recently available statement of financial condition (both audited and unaudited) as such are issued.

Section 5.2    Role of Lehman; Independent Judgment.  The Issuer acknowledges and agrees that in connection with its decision to enter into this Agreement and its subsequent negotiation and execution of this Agreement, (i) neither Lehman, nor any of its directors, officers, employees, agents or affiliates (each of the foregoing, including Lehman, a "Lehman Party") has acted as a fiduciary  or financial or investment advisor to or agent or other representative of the Issuer, (ii) the Issuer has, to the extent it has deemed necessary, consulted with its own legal, tax, regulatory, accounting, financial and investment advisors in determining the suitability and appropriateness of this Agreement as well as in negotiating the specific terms hereof and has not relied upon any advice from any Lehman Party, with respect to such matters; the Issuer understands the terms, conditions and risks of this Agreement and is capable of assuming such risks; and (iii) the terms and conditions of this Agreement have been individually negotiated by it and the Trustee are the result of arms-length negotiations among Lehman, the Trustee and the Issuer.

Section 5.3    No Liability.  Each of the Issuer and the Trustee agrees that no Lehman Party shall be liable or responsible for:  (i) the payment of any amounts owing on or with respect to the Bonds; (ii) the Trustee's use or application of any moneys payable to the Trustee hereunder; (iii) any acts or omissions of the Issuer or the Trustee under, or with respect to, the Bonds or the Indenture or any related document; or (iv) determining whether the Issuer or the Trustee is in compliance with any applicable statute, regulation or law, the Bonds, the Indenture or any other related document.

Section 5.4    Fixed Rate of Return.  The Issuer has entered into this Agreement for purposes of managing its borrowings or investments by increasing the predictability of its cash flow from earnings on its investments and not for purposes of speculation.  The Issuer understands that in consideration of entering into this Agreement on the Closing Date it is

NYA 657907.5

foregoing its right to receive investment earnings on the Deposit Amounts deposited in the debt service fund in the future and that by accepting the Guaranteed Rate the Issuer has minimized the risks resulting from fluctuations in interest rates during the term of this Agreement but also has foregone the possibility of receiving greater returns on such amounts from such fluctuations.

Section 5.5    Termination Amount.  Each of the Issuer and the Trustee understands that if under any of the circumstances provided herein (including upon the occurrence of a redemption or a defeasance of the Bonds on or prior to the last Deposit Date), a Termination Amount would be due Lehman, the size of such Termination Amount will vary depending, in large part, on prevailing interest rates at the time such Termination Amount is calculated.

Section 5.6    Fees and Commissions.  Issuer acknowledges that in connection with the negotiation, execution and delivery of this Agreement by Lehman, Lehman has not paid a broker's fee.

SECTION VI.        CONDITIONS PRECEDENT

Section 6.1    Conditions Precedent.  The performance of the obligations of the parties hereunder are conditioned upon satisfaction of the following conditions:

(a)    delivery to Lehman and Issuer of an opinion of counsel to the Trustee, in the form of Exhibit B;

(b)    delivery to Lehman and Trustee of an opinion of counsel to the Issuer, in the form of Exhibit D;

(c)    delivery to Lehman by the Issuer of a copy of the official statement for the Bonds;

(d)    delivery to Lehman by the Issuer of a copy of the Indenture and the other Financing Documents each certified by an authorized signatory of the Issuer as being a true and correct copy of such document as in full force and effect on the date hereof; and

(e)    delivery by Lehman to the Issuer and Trustee of an opinion of inside counsel to Lehman, in the form of Exhibit C;

(f)    delivery to Lehman of a copy of any consent received by the Issuer to enter in to this Agreement.

SECTION VII.       DEFAULTS; TERMINATION

Section 7.1    Trustee Events of Default.  The occurrence of any of the following events shall constitute a Trustee Event of Default:

(a)      the Trustee shall fail for any reason, other than that the Issuer has failed to deposit the related Deposit Amount, to purchase, at the Purchase Price therefor, any Qualified Securities delivered by the Qualified Dealer in accordance with this Agreement and such failure to purchase such Qualified Securities shall continue for two (2) Business Days after telephonic notice, confirmed by facsimile, from Lehman to the Trustee; provided, however, the Trustee pays to the Provider its Loss Amount (calculated in accordance with Section 7.7) from and including the first date on which the Qualified Securities were tendered for purchase up to and excluding the date on which the Trustee actually purchases such Qualified Securities;

(b)      the Trustee shall default in the performance of any other covenant or obligation under this Agreement and such default is not cured within 5 Business Days of notice thereof from Lehman or the Issuer; or

(c)      any representation or warranty of the Trustee contained in this Agreement proves to have been incorrect, false or misleading in any material respect as of the date on which it was made.

Section 7.2    <u>Issuer Events of Default</u>.  The occurrence of any of the following events shall constitute an Issuer Event of Default:

(a)      the Issuer shall fail to deposit the Deposit Amount or the Trustee for any other reason shall fail to purchase, at the Purchase Price thereof, any Qualified Securities delivered by the Qualified Dealer in accordance herewith;

(b)      the Issuer shall default in the performance of any covenant or obligation under, or incorporated by reference in, this Agreement, other than as described in clause (a) above and such default is not cured within five Business Days of notice thereof from Lehman or the Trustee;

(c)      the Issuer has experienced or is experiencing a material adverse change, as determined by Lehman in Lehman's sole discretion, in its business, assets, operations or financial condition;

(d)      any representation or warranty of the Issuer contained in this Agreement proves to have been incorrect, false or misleading in any material respect;

(e)      the Issuer (1) is dissolved (other than pursuant to a consolidation, amalgamation or merger); (2) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due; (3) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (4) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition (A) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its

NYA 657907.5

winding-up or liquidation or (B) is not dismissed, discharged, stayed or restrained in each case within 30 days of the institution or presentation thereof; (5) has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (6)(A) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets or (B)(I) there shall be appointed or designated with respect to it, an entity such as an organization, board, commission, authority, agency or body to monitor, review, oversee, recommend or declare a financial emergency or similar state of financial distress with respect to it or (II) there shall be declared or introduced or proposed for consideration by it or by any legislative or regulatory body with competent jurisdiction over it, the existence of a state of financial emergency or similar state of financial distress in respect of it; (7) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 30 days thereafter; (8) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (1) to (7) (inclusive); or (9) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts;

(f)    the Issuer consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity (or, without limiting the foregoing, if an entity such as an organization, board, commission authority, agency or body succeeds to the principal functions of, or powers and duties granted, to the Issuer) and, at the time of such consolidation, amalgamation, merger or transfer either (i) the resulting or surviving or transferee entity fails to assume all the obligations of the Issuer under this Agreement or by operation of law or pursuant to an agreement reasonably satisfactory to the other party to this Agreement or (ii) the creditworthiness of the resulting, surviving or transferee entity is materially weaker than that of the Issuer;

(g)    the Issuer shall default with respect to the Bonds and/or any Specified Indebtedness.

Section 7.3    <u>Lehman Events of Default</u>.  The occurrence of any of the following events shall constitute a Lehman Event of Default:

(a)    Lehman shall fail, on any Deposit Date, to cause a Qualified Dealer to deliver Qualified Securities and such failure is not cured within five Business Days after written notice thereof to Lehman from the Trustee or the Issuer (the "Lehman Cure Period");

(b)    any representation or warranty of Lehman contained in this Agreement proves to have been incorrect, false or misleading in any material respect as of the date on which it was made; or

(c)    Lehman is at any time Insolvent.

Section 7.4   Remedies Upon Occurrence of Trustee Event of Default.   Upon the occurrence of a Trustee Event of Default, Lehman shall have the right to:

(a)      cause a Qualified Dealer to redeliver to the Trustee or sell to any other purchaser the Qualified Securities which were to be delivered in connection with any Delivery Date and which have not theretofore been delivered to and purchased by the Trustee and, subject to Section 8.2, make demand for the payment of its losses (calculated in accordance with Section 7.7) arising out of the Trustee's failure to purchase such Qualified Securities; and/or

(b)      immediately terminate this Agreement by giving notice thereof to the Trustee with a copy to the Issuer and, subject to Section 8.2, (i) if the Termination Amount is a positive number, make demand upon the Trustee for the payment of the Termination Amount, and (ii) if the Termination Amount is a negative number, pay such Termination Amount to the Trustee.

Notwithstanding anything to the contrary herein, Lehman agrees not to terminate this Agreement as a result of a Trustee Event of Default under Section 7.1(a) if (i) such Trustee Event of Default has been cured, (ii) the Trustee has tendered its resignation as Trustee under the Indenture, (iii) the Trustee has been replaced by a successor trustee in accordance with the Indenture and this Agreement within sixty (60) days of occurrence of the Trustee Event of Default, and (iv) the Trustee pays to the Provider its Loss Amount (calculated in accordance with Section 7.7) from and including the first date on which the Trustee Event of Default shall occur up to and excluding the date on which Trustee Event of Default shall have been cured.

If the Termination Amount is payable pursuant to this Section 7.4(b), the party owing such amount shall promptly, but by no later than one Business Day after notice that such amount is due from Lehman, pay such amount, in immediately available funds, to the party to whom such Termination Amount is due.   If any such amount is not paid when due, the party owing such amount shall pay interest on such amount for each date such amount is due and not paid at the Default Rate.   Any amounts payable pursuant to Section 7.7 shall be payable upon demand as provided therein.

Notwithstanding anything to the contrary in this Agreement, the Trustee shall have no direct liability to Lehman hereunder except to the extent, if any, that the losses incurred by Lehman upon a Trustee Event of Default are caused by the Trustee's negligence or willful misconduct or by a breach of its covenant contained in Section 5.1(c) hereof or by a breach of the Trustee's representations and warranties hereunder.

Section 7.5   Remedies Upon Occurrence of Issuer Event of Default.   Upon the occurrence of an Issuer Event of Default, Lehman shall have the right to:

(a)      cause a Qualified Dealer to redeliver to the Trustee or sell to any other purchaser the Qualified Securities which were to be delivered in connection with any Delivery Date and which have not theretofore been delivered to and purchased by the Trustee and make demand for

the payment of its losses (calculated in accordance with Section 7.7) arising out of the Trustee's failure to purchase such Qualified Securities; and/or

(b)    immediately terminate this Agreement by giving notice thereof to the Issuer with a copy to the Trustee, and (i) if the Termination Amount is a positive number, make demand upon the Issuer for the payment of the Termination Amount and (ii) if the Termination Amount is a negative number, pay such amount to the Issuer.

If a Termination Amount is payable pursuant to this Section 7.5(b), the party owing such amount shall promptly, but by no later than one Business Day after notice that such amount is due from the party to whom such Termination Amount is due, pay such amount, in immediately available funds, to or at the direction of the party to whom such Termination Amount is due. If any such amount is not paid when due, the party owing such amount shall pay interest on such amount for each date such amount is due but not paid at the Default Rate. Any amounts payable pursuant to Section 7.7 shall be payable upon demand as provided therein.

Section 7.6    Remedies Upon Occurrence of Lehman Event of Default.   Upon the occurrence of a Lehman Event of Default, the Issuer shall have the right to:

(a)    if such default is a default under Section 7.3(a), cause a qualified dealer selected by the Issuer or the Trustee to sell to the Trustee the Qualified Securities which were to be delivered and which have not yet been delivered to the Trustee and make demand for the payment of its losses in connection therewith, calculated as provided in Section 7.7;

(b)    if such default is a default under Section 7.3(a) and there has previously been such a default, and Lehman has failed to pay the Issuer's losses (as described in Section 7.7), immediately terminate this Agreement by giving notice thereof to Lehman with a copy to the Trustee; and

(c)    if such default is a default under Sections 7.3(b) or (c) hereof, immediately terminate this Agreement; whereupon the Burdened Party shall determine the Termination Amount and (i) if the Termination Amount is a negative number, Lehman shall promptly, but no later than one Business Day after notice that such amount is due, pay such amount, in immediately available funds, to the Issuer and (ii) if the Termination Amount is a positive number, Lehman may demand payment by the Issuer of the Termination Amount in which case the Issuer shall promptly, but no later than one Business Day after notice that such amount is due, pay, in immediately available funds, the Termination Amount to Lehman. If any such amount is not paid when due, the party owing such amount shall pay interest on such amount for each date such amount is due but not paid at the Default Rate.

Section 7.7    Loss Amount if Failed or Late Purchase.

(a)    Subject to Section 8.2, if the Trustee fails to purchase any Qualified Securities delivered by a Qualified Dealer in accordance with this Agreement and provided that Lehman has not exercised its right to terminate this Agreement as provided herein (in which case the

Termination Amount shall be due), the Trustee, in the case of a Trustee Event of Default under Section 7.1(a) or the Issuer under any other circumstances, shall pay to Lehman as liquidated damages for its losses and not as a penalty, on demand by Lehman, the sum of (w) interest on the Purchase Price of such Qualified Securities for each day from and including the delivery date thereof to but excluding the date on which such securities are resold to a third party or to the Trustee, (x) the excess, if any, of the Purchase Price of such Qualified Securities over the amount received by the Qualified Dealer upon such resale of the securities (the "Shortfall Amount"),(y) interest on the Shortfall Amount from and including the resale date to but excluding the date on which the Trustee or the Issuer, as applicable, compensates Lehman for its losses as described herein, and (z) any incidental costs and expenses incurred by Lehman in connection with the Trustee's failure to so purchase such Qualified Securities. Interest shall accrue at a rate per annum equal to the Default Rate for purposes of clauses (w) and (y).

(b)     If Lehman fails to deliver any Qualified Securities in accordance with this Agreement and provided that the Issuer has not exercised its right to terminate this Agreement as provided herein (in which case the Termination Amount shall be due) the amount of losses that shall be payable on demand against Lehman upon the occurrence of a Lehman Event of Default under Section 7.3(a) shall be the excess, if any, of the interest the Trustee would have earned on the related Deposit Amount had the Deposit Amount been invested at the Guaranteed Rate (the "Guaranteed Interest") over the amount of the interest the Trustee actually earned by investing the related Deposit Amount in Eligible Securities as provided by Section 5.2(c) hereof; provided that if the Trustee fails to invest such Deposit Amount in Eligible Securities as provided by Section 5.2(c), the amount of losses payable by Lehman shall be equal to the excess, if any, of the Guaranteed Interest over an amount equal to the interest the Trustee would have earned based on the prevailing rates for Eligible Securities at such time had the Trustee invested such Deposit Amount in Eligible Securities as provided in Section 5.2(c).

Section 7.8     Application of Excess Funds. The Issuer hereby directs the Trustee and the Trustee agrees that if at any time any amounts are due Lehman from the Issuer in connection with an Issuer Event of Default, the Trustee shall, upon demand from Lehman, and without further direction or instruction from the Issuer, apply any funds available under the Indenture which are not subject to the lien of the Indenture (including any funds which would otherwise be released to the Issuer) to the payment of such amounts.

Section 7.9     Limited Rights Against the Debt Service Fund. Neither Lehman nor any Qualified Dealer shall have any right to any amounts held in the Debt Service Fund except as expressly provided herein upon the delivery of a Qualified Security in accordance with this Agreement.

Section 7.10     No Waiver; Remedies Cumulative. No failure or delay on any party's part in exercising any right or remedy hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any such right or remedy preclude any other or further exercise thereof or the exercise of any other right or remedy. Such party's rights and remedies hereunder are cumulative and not exclusive of any rights or remedies provided by law, this Agreement or

otherwise. None of the terms or provisions of this Agreement may be waived, modified or amended except in a writing duly signed by the Trustee, the Issuer and Lehman.

## SECTION VIII.    THE TRUSTEE

Section 8.1    _Acceptance by Trustee_  By execution and delivery of this Agreement, the Trustee accepts its duties and obligations hereunder, as an addition to its duties and obligations as Trustee under the Indenture and no implied duties or obligations shall be read into this Agreement against the Trustee.

Section 8.2    _Liability of the Trustee; Consultation with Legal Counsel._

(a)    The Trustee shall not be liable to any person for any action taken or neglected to be taken in performing or attempting to perform its obligations hereunder or preserving or seeking to preserve the funds it maintains under the Indenture or to purchase the Qualified Securities tendered pursuant to this Agreement, except for actions arising from its negligence or willful misconduct or for a breach of its representations or warranties or from a breach of its covenant under Section 5.1(c).

(b)    The Trustee may consult with counsel reasonably satisfactory to Lehman with respect to any question relating to its duties or responsibilities hereunder or otherwise in connection herewith and, except as expressly provided herein, shall not be liable for any action taken, suffered, or omitted by the Trustee in good faith upon the advice of such counsel. The Trustee may act through its officers, employees, agents and attorneys.

(c)    The Trustee shall be entitled to rely conclusively upon any certificate, notice or other document delivered to it hereunder by the  Issuer or Lehman or any of its affiliates as provided herein, or any Qualified Dealer as to the truth, accuracy and validity thereof which is reasonably believed by the Trustee in good faith to have been signed by an authorized officer or signatory of such entity.

Section 8.3    _Payment of Trustee Fees_.  Lehman has no liability or responsibility for payment of the Trustee's fees or expenses for its services hereunder, including any such fees or expenses arising out of or in connection with the liquidation of the Qualified Securities as provided herein.

Section 8.4    _Trustee Cooperation._

(a)    The Trustee shall not act in contravention of its obligations hereunder or invest amounts in the Debt Service Fund other than pursuant to this Agreement and the 1994 Agreement.

(b)    The Trustee shall not make any payments or distributions from the Debt Service Fund other than payments or distributions (i) required by this Agreement or the 1994 Agreement,

DSDA:                                            19

NYA 657907.5

(ii) to pay principal of, redemption premium and interest on the Bonds or (iii) to the extent not inconsistent with the terms of this Agreement, to make payments permitted by the Indenture.

Section 8.5    Successor Trustee. If the Trustee shall resign or be discharged from its duties and obligations under the Indenture, the Issuer shall appoint a successor Trustee pursuant to the terms of the Indenture; provided, however, the successor trustee shall be reasonably acceptable to Lehman. The Issuer agrees that if the Trustee fails for any reason to perform its duties to Lehman under this Agreement in accordance with the terms hereof, or is at any time Insolvent or breaches in any material respect its representations and warranties to Lehman hereunder, the Issuer shall promptly, upon request of Lehman, appoint a successor Trustee reasonably acceptable to Lehman.

SECTION IX.        MISCELLANEOUS

Section 9.1    Notices. All notices, demands or other communications hereunder shall be given or made in writing and shall be delivered personally, or sent by certified or registered mail, postage prepaid, return receipt requested, or overnight delivery service, telex or telecopy to the party to whom they are directed at the following addresses, or at such other addresses as may be designated by notice from such party to all other parties:

To Lehman:

Lehman Brothers Special Financing Inc.
745 Seventh Avenue, 5th Floor
New York, NY 10019
Attention: Municipal Financial Products - Middle Office
Telephone:    212-526-2240
Fax:          646-758-2988

To the Trustee:

U.S. Bank National Association
60 Livingston Avenue
St. Paul, MN 55107
Attention: Jeff Backstrom
Telephone: (651) 495-3781
Telecopy: (651) 495-8108
email: jeffery.backstrom@usbank.com
cc: email: deborah.scherer@usbank.com

[FOR DELIVERY OF BOOK-ENTRY GOVERNMENT OBLIGATIONS]
Federal Reserve Bank of Cleveland
For USBank

ABA 042-000-013
CINTI / 1050
Ref: 94403416 - UMC Debt Service Fund, Series 2004

[FOR DELIVERY OF DTC ELIGIBLE SECURITIES]
DTC: 2803 US Bank N.A.

To the Issuer:

University Medical Center Corporation
1501 North Campbell Avenue
Tucson, AZ 85724-5178

Attention: Chief Financial Officer
Telephone: (520) 694-4082
Fax: (520) 694-4085
Federal Tax ID:  86-0492210

Any notice, demand or other communication given in a manner prescribed in this Section shall be deemed to have been delivered on receipt.

Section 9.2    Binding Effect; Transfer.  This Agreement shall be binding upon the Trustee, the Issuer and Lehman and upon their respective permitted successors and transferees Lehman shall be entitled to transfer all or any portion of this Agreement and its interests and obligations hereunder, to any subsidiary or affiliate of Lehman, or to any office, branch or subsidiary of any affiliate of Lehman and upon notice to the Issuer and the Trustee, and Lehman shall otherwise be able to transfer all or any portion of this Agreement only with the consent of the Issuer (such consent not to be unreasonably withheld or delayed) and notice to the Trustee; provided, however, that if the Issuer does not consent or object to such transfer within ten (10) Business Days of the request therefor, the Issuer's consent shall have be deemed to have been received, and provided further, that such consent shall not be required if such transfer is to any entity rated at least an "A-", "A3", or "A-" by Standard & Poor's, a division of The McGraw-Hill Companies, Moody's Investors Service, Inc. or Fitch IBCA, Inc., respectively, and provided further that in all such instances the transferee shall assume all of the rights and obligations of Lehman hereunder.  The Trustee may not transfer this Agreement without the prior written consent of Lehman.

Section 9.3    Limitation.  Nothing expressed or implied herein is intended or shall be construed to confer upon any person, firm or corporation other than the parties hereto, any right, remedy or claim by reason of this Agreement or any term hereof, and all terms contained herein shall be for the sole and exclusive benefit of the parties hereto, and their successors and permitted transferees.

DSDA:                                        21

NYA 657907.5

Section 9.4    <u>Governing Law</u>.    This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without regard to conflict of law principles.

Section 9.5    <u>Counterparts</u>.    This Agreement may be executed in one or more counterparts and when each party hereto has executed at least one counterpart, this Agreement shall become binding on all parties and such counterparts shall be deemed to be one and the same document.

Section 9.6    <u>Severability</u>.    If one or more provisions of this Agreement or the applicability of any such provisions to any set of circumstances shall be determined to be invalid or ineffective for any reason, such determination shall not affect the validity and enforceability of the remaining provisions or the applicability of the same provisions or any of the remaining provisions to other circumstances.

Section 9.7    <u>Amendments, Changes and Modifications</u>.    This Agreement may be amended or any of its terms modified only by a written document authorized, executed and delivered by each of the parties hereto.

Section 9.8    <u>Termination</u>.    Unless earlier terminated pursuant to Section 3.1, 7.4, 7.5, or 7.6 hereof, this Agreement shall terminate on the later of the last Bond Payment Date set forth in <u>Exhibit A</u> and the date on which the Trustee and the Issuer have satisfied all of their obligations hereunder.

IN WITNESS WHEREOF, the Trustee, the Issuer and Lehman have caused this Debt Service Deposit Agreement to be executed by their respective duly authorized officers, all as of the date and year first above written.

U.S. BANK NATIONAL ASSOCIATION,
as Trustee

By: _____
Name: Deborah M Scherer
Title: ASSISTANT VICE PRESIDENT


UNIVERSITY MEDICAL CENTER
CORPORATION


By:_____
Name:
Title:


LEHMAN BROTHERS SPECIAL FINANCING INC.


By:_____
Name:
Title:

Apr-07-2004  12:05pm   From-University Medical Center Administration   5206944085        T-858  P.002/003  F-623

IN WITNESS WHEREOF, the Trustee, the Issuer and Lehman have caused this Debt Service Deposit Agreement to be executed by their respective duly authorized officers, all as of the date and year first above written.

U.S. BANK NATIONAL ASSOCIATION,
as Trustee

By:_____
Name:
Title:

UNIVERSITY MEDICAL CENTER
CORPORATION

By: _Kevin J. Burns_____
Name: KEVIN S. BURNS
Title: Chief Financial Officer

LEHMAN BROTHERS SPECIAL FINANCING INC.

By:_____
Name:
Title:

NYA 657907.5

IN WITNESS WHEREOF, the Trustee, the Issuer and Lehman have caused this Debt Service Deposit Agreement to be executed by their respective duly authorized officers, all as of the date and year first above written.

U.S. BANK NATIONAL ASSOCIATION,
as Trustee

By:_____
Name:
Title:

UNIVERSITY MEDICAL CENTER
CORPORATION

By:_____
Name:
Title:

LEHMAN BROTHERS SPECIAL FINANCING INC.

By: _____
Name:  T. Courtney Jenkins
Title:    Vice President

**EXHIBIT A**

| Principal Account | | | Interest Account | | |
|---|---|---|---|---|---|
| Delivery Date* | Bond Payment Date* | Deposit Amount | Delivery Date* | Bond Payment Date* | Deposit Amount |
| 03/31/04 | 07/01/04 | $0.00 | 03/31/04 | 07/01/04 | $126,195.00 |
| 04/30/04 | 07/01/04 | $0.00 | 04/30/04 | 07/01/04 | $126,195.00 |
| 06/01/04 | 07/01/04 | $0.00 | 06/01/04 | 07/01/04 | $126,195.00 |
| 06/30/04 | 07/01/04 | $0.00 | 06/30/04 | 07/01/04 | $126,195.00 |
| 07/31/04 | 01/01/05 | $0.00 | 07/31/04 | 01/01/05 | $128,333.00 |
| 08/31/04 | 01/01/05 | $0.00 | 08/31/04 | 01/01/05 | $128,333.00 |
| 09/30/04 | 01/01/05 | $0.00 | 09/30/04 | 01/01/05 | $128,333.00 |
| 10/31/04 | 01/01/05 | $0.00 | 10/31/04 | 01/01/05 | $128,333.00 |
| 11/30/04 | 01/01/05 | $0.00 | 11/30/04 | 01/01/05 | $128,333.00 |
| 12/31/04 | 01/01/05 | $0.00 | 12/31/04 | 01/01/05 | $128,333.00 |
| 01/31/05 | 07/01/05 | $0.00 | 01/31/05 | 07/01/05 | $128,333.00 |
| 02/28/05 | 07/01/05 | $0.00 | 02/28/05 | 07/01/05 | $128,333.00 |
| 03/31/05 | 07/01/05 | $0.00 | 03/31/05 | 07/01/05 | $128,333.00 |
| 04/30/05 | 07/01/05 | $0.00 | 04/30/05 | 07/01/05 | $128,333.00 |
| 05/31/05 | 07/01/05 | $0.00 | 05/31/05 | 07/01/05 | $128,333.00 |
| 06/30/05 | 07/01/05 | $0.00 | 06/30/05 | 07/01/05 | $128,333.00 |
| 07/31/05 | 07/01/06 | $27,083.00 | 07/31/05 | 01/01/06 | $128,333.00 |
| 08/31/05 | 07/01/06 | $27,083.00 | 08/31/05 | 01/01/06 | $128,333.00 |
| 09/30/05 | 07/01/06 | $27,083.00 | 09/30/05 | 01/01/06 | $128,333.00 |
| 10/31/05 | 07/01/06 | $27,083.00 | 10/31/05 | 01/01/06 | $128,333.00 |
| 11/30/05 | 07/01/06 | $27,083.00 | 11/30/05 | 01/01/06 | $128,333.00 |
| 12/31/05 | 07/01/06 | $27,083.00 | 12/31/05 | 01/01/06 | $128,333.00 |
| 01/31/06 | 07/01/06 | $27,083.00 | 01/31/06 | 07/01/06 | $128,333.00 |
| 02/28/06 | 07/01/06 | $27,083.00 | 02/28/06 | 07/01/06 | $128,333.00 |
| 03/31/06 | 07/01/06 | $27,083.00 | 03/31/06 | 07/01/06 | $128,333.00 |
| 04/30/06 | 07/01/06 | $27,083.00 | 04/30/06 | 07/01/06 | $128,333.00 |
| 05/31/06 | 07/01/06 | $27,083.00 | 05/31/06 | 07/01/06 | $128,333.00 |
| 06/30/06 | 07/01/06 | $27,083.00 | 06/30/06 | 07/01/06 | $128,333.00 |
| 07/31/06 | 07/01/07 | $27,917.00 | 07/31/06 | 01/02/07 | $126,979.00 |
| 08/31/06 | 07/01/07 | $27,917.00 | 08/31/06 | 01/02/07 | $126,979.00 |
| 09/30/06 | 07/01/07 | $27,917.00 | 09/30/06 | 01/02/07 | $126,979.00 |
| 10/31/06 | 07/01/07 | $27,917.00 | 10/31/06 | 01/02/07 | $126,979.00 |
| 11/30/06 | 07/01/07 | $27,917.00 | 11/30/06 | 01/02/07 | $126,979.00 |
| 12/31/06 | 07/01/07 | $27,917.00 | 12/31/06 | 01/02/07 | $126,979.00 |
| 01/31/07 | 07/01/07 | $27,917.00 | 01/31/07 | 07/01/07 | $126,979.00 |
| 02/28/07 | 07/01/07 | $27,917.00 | 02/28/07 | 07/01/07 | $126,979.00 |
| 03/31/07 | 07/01/07 | $27,917.00 | 03/31/07 | 07/01/07 | $126,979.00 |
| 04/30/07 | 07/01/07 | $27,917.00 | 04/30/07 | 07/01/07 | $126,979.00 |
| 05/31/07 | 07/01/07 | $27,917.00 | 05/31/07 | 07/01/07 | $126,979.00 |
| 06/30/07 | 07/01/07 | $27,917.00 | 06/30/07 | 07/01/07 | $126,979.00 |
| 07/31/07 | 07/01/08 | $30,000.00 | 07/31/07 | 01/02/08 | $125,583.00 |
| 08/31/07 | 07/01/08 | $30,000.00 | 08/31/07 | 01/02/08 | $125,583.00 |

*If any Delivery Date or Bond Payment Date specified above is not a Business Day, such date will be the immediately succeeding Business Day; provided, however, that with respect to any date specified as a Bond Payment Date, the determination of whether such date is a Business Day shall be made without giving effect to clauses (c) and (d) of the definition of Business Day.

**EXHIBIT A**

| Principal Account | | | Interest Account | | |
| --- | --- | --- | --- | --- | --- |
| Delivery Date* | Bond Payment Date* | Deposit Amount | Delivery Date* | Bond Payment Date* | Deposit Amount |
| 09/30/07 | 07/01/08 | $30,000.00 | 09/30/07 | 01/02/08 | $125,583.00 |
| 10/31/07 | 07/01/08 | $30,000.00 | 10/31/07 | 01/02/08 | $125,583.00 |
| 11/30/07 | 07/01/08 | $30,000.00 | 11/30/07 | 01/02/08 | $125,583.00 |
| 12/31/07 | 07/01/08 | $30,000.00 | 12/31/07 | 01/02/08 | $125,583.00 |
| 01/31/08 | 07/01/08 | $30,000.00 | 01/31/08 | 07/01/08 | $125,583.00 |
| 02/29/08 | 07/01/08 | $30,000.00 | 02/29/08 | 07/01/08 | $125,583.00 |
| 03/31/08 | 07/01/08 | $30,000.00 | 03/31/08 | 07/01/08 | $125,583.00 |
| 04/30/08 | 07/01/08 | $30,000.00 | 04/30/08 | 07/01/08 | $125,583.00 |
| 05/31/08 | 07/01/08 | $30,000.00 | 05/31/08 | 07/01/08 | $125,583.00 |
| 06/30/08 | 07/01/08 | $30,000.00 | 06/30/08 | 07/01/08 | $125,583.00 |
| 07/31/08 | 07/01/09 | $23,333.00 | 07/31/08 | 01/02/09 | $124,083.00 |
| 08/31/08 | 07/01/09 | $23,333.00 | 08/31/08 | 01/02/09 | $124,083.00 |
| 09/30/08 | 07/01/09 | $23,333.00 | 09/30/08 | 01/02/09 | $124,083.00 |
| 10/31/08 | 07/01/09 | $23,333.00 | 10/31/08 | 01/02/09 | $124,083.00 |
| 11/30/08 | 07/01/09 | $23,333.00 | 11/30/08 | 01/02/09 | $124,083.00 |
| 12/31/08 | 07/01/09 | $23,333.00 | 12/31/08 | 01/02/09 | $124,083.00 |
| 01/31/09 | 07/01/09 | $23,333.00 | 01/31/09 | 07/01/09 | $124,083.00 |
| 02/28/09 | 07/01/09 | $23,333.00 | 02/28/09 | 07/01/09 | $124,083.00 |
| 03/31/09 | 07/01/09 | $23,333.00 | 03/31/09 | 07/01/09 | $124,083.00 |
| 04/30/09 | 07/01/09 | $23,333.00 | 04/30/09 | 07/01/09 | $124,083.00 |
| 05/31/09 | 07/01/09 | $23,333.00 | 05/31/09 | 07/01/09 | $124,083.00 |
| 06/30/09 | 07/01/09 | $23,333.00 | 06/30/09 | 07/01/09 | $124,083.00 |
| 07/31/09 | 01/04/10 | $0.00 | 07/31/09 | 01/04/10 | $122,917.00 |
| 08/31/09 | 01/04/10 | $0.00 | 08/31/09 | 01/04/10 | $122,917.00 |
| 09/30/09 | 01/04/10 | $0.00 | 09/30/09 | 01/04/10 | $122,917.00 |
| 10/31/09 | 01/04/10 | $0.00 | 10/31/09 | 01/04/10 | $122,917.00 |
| 11/30/09 | 01/04/10 | $0.00 | 11/30/09 | 01/04/10 | $122,917.00 |
| 12/31/09 | 01/04/10 | $0.00 | 12/31/09 | 01/04/10 | $122,917.00 |
| 01/31/10 | 07/01/10 | $0.00 | 01/31/10 | 07/01/10 | $122,917.00 |
| 02/28/10 | 07/01/10 | $0.00 | 02/28/10 | 07/01/10 | $122,917.00 |
| 03/31/10 | 07/01/10 | $0.00 | 03/31/10 | 07/01/10 | $122,917.00 |
| 04/30/10 | 07/01/10 | $0.00 | 04/30/10 | 07/01/10 | $122,917.00 |
| 06/01/10 | 07/01/10 | $0.00 | 06/01/10 | 07/01/10 | $122,917.00 |
| 06/30/10 | 07/01/10 | $0.00 | 06/30/10 | 07/01/10 | $122,917.00 |
| 07/31/10 | 01/01/11 | $0.00 | 07/31/10 | 01/01/11 | $122,917.00 |
| 08/31/10 | 01/01/11 | $0.00 | 08/31/10 | 01/01/11 | $122,917.00 |
| 09/30/10 | 01/01/11 | $0.00 | 09/30/10 | 01/01/11 | $122,917.00 |
| 10/31/10 | 01/01/11 | $0.00 | 10/31/10 | 01/01/11 | $122,917.00 |
| 11/30/10 | 01/01/11 | $0.00 | 11/30/10 | 01/01/11 | $122,917.00 |
| 12/31/10 | 01/01/11 | $0.00 | 12/31/10 | 01/01/11 | $122,917.00 |
| 01/31/11 | 07/01/11 | $0.00 | 01/31/11 | 07/01/11 | $122,917.00 |
| 02/28/11 | 07/01/11 | $0.00 | 02/28/11 | 07/01/11 | $122,917.00 |

*If any Delivery Date or Bond Payment Date specified above is not a Business Day, such date will be the immediately succeeding Business Day; provided, however, that with respect to any date specified as a Bond Payment Date, the determination of whether such date is a Business Day shall be made without giving effect to clauses (c) and (d) of the definition of Business Day.

NYA 657907 5

**EXHIBIT A**

| Principal Account | | | Interest Account | | |
|---|---|---|---|---|---|
| Delivery Date* | Bond Payment Date* | Deposit Amount | Delivery Date* | Bond Payment Date* | Deposit Amount |
| 03/31/11 | 07/01/11 | $0.00 | 03/31/11 | 07/01/11 | $122,917.00 |
| 04/30/11 | 07/01/11 | $0.00 | 04/30/11 | 07/01/11 | $122,917.00 |
| 05/31/11 | 07/01/11 | $0.00 | 05/31/11 | 07/01/11 | $122,917.00 |
| 06/30/11 | 07/01/11 | $0.00 | 06/30/11 | 07/01/11 | $122,917.00 |
| 07/31/11 | 01/01/12 | $0.00 | 07/31/11 | 01/01/12 | $122,917.00 |
| 08/31/11 | 01/01/12 | $0.00 | 08/31/11 | 01/01/12 | $122,917.00 |
| 09/30/11 | 01/01/12 | $0.00 | 09/30/11 | 01/01/12 | $122,917.00 |
| 10/31/11 | 01/01/12 | $0.00 | 10/31/11 | 01/01/12 | $122,917.00 |
| 11/30/11 | 01/01/12 | $0.00 | 11/30/11 | 01/01/12 | $122,917.00 |
| 12/31/11 | 01/01/12 | $0.00 | 12/31/11 | 01/01/12 | $122,917.00 |
| 01/31/12 | 07/01/12 | $0.00 | 01/31/12 | 07/01/12 | $122,917.00 |
| 02/29/12 | 07/01/12 | $0.00 | 02/29/12 | 07/01/12 | $122,917.00 |
| 03/31/12 | 07/01/12 | $0.00 | 03/31/12 | 07/01/12 | $122,917.00 |
| 04/30/12 | 07/01/12 | $0.00 | 04/30/12 | 07/01/12 | $122,917.00 |
| 05/31/12 | 07/01/12 | $0.00 | 05/31/12 | 07/01/12 | $122,917.00 |
| 06/30/12 | 07/01/12 | $0.00 | 06/30/12 | 07/01/12 | $122,917.00 |
| 07/31/12 | 01/02/13 | $0.00 | 07/31/12 | 01/02/13 | $122,917.00 |
| 08/31/12 | 01/02/13 | $0.00 | 08/31/12 | 01/02/13 | $122,917.00 |
| 09/30/12 | 01/02/13 | $0.00 | 09/30/12 | 01/02/13 | $122,917.00 |
| 10/31/12 | 01/02/13 | $0.00 | 10/31/12 | 01/02/13 | $122,917.00 |
| 11/30/12 | 01/02/13 | $0.00 | 11/30/12 | 01/02/13 | $122,917.00 |
| 12/31/12 | 01/02/13 | $0.00 | 12/31/12 | 01/02/13 | $122,917.00 |
| 01/31/13 | 07/01/13 | $0.00 | 01/31/13 | 07/01/13 | $122,917.00 |
| 02/28/13 | 07/01/13 | $0.00 | 02/28/13 | 07/01/13 | $122,917.00 |
| 03/31/13 | 07/01/13 | $0.00 | 03/31/13 | 07/01/13 | $122,917.00 |
| 04/30/13 | 07/01/13 | $0.00 | 04/30/13 | 07/01/13 | $122,917.00 |
| 05/31/13 | 07/01/13 | $0.00 | 05/31/13 | 07/01/13 | $122,917.00 |
| 06/30/13 | 07/01/13 | $0.00 | 06/30/13 | 07/01/13 | $122,917.00 |
| 07/31/13 | 01/02/14 | $0.00 | 07/31/13 | 01/02/14 | $122,917.00 |
| 08/31/13 | 01/02/14 | $0.00 | 08/31/13 | 01/02/14 | $122,917.00 |
| 09/30/13 | 01/02/14 | $0.00 | 09/30/13 | 01/02/14 | $122,917.00 |
| 10/31/13 | 01/02/14 | $0.00 | 10/31/13 | 01/02/14 | $122,917.00 |
| 11/30/13 | 01/02/14 | $0.00 | 11/30/13 | 01/02/14 | $122,917.00 |
| 12/31/13 | 01/02/14 | $0.00 | 12/31/13 | 01/02/14 | $122,917.00 |
| 01/31/14 | 07/01/14 | $0.00 | 01/31/14 | 07/01/14 | $122,917.00 |
| 02/28/14 | 07/01/14 | $0.00 | 02/28/14 | 07/01/14 | $122,917.00 |
| 03/31/14 | 07/01/14 | $0.00 | 03/31/14 | 07/01/14 | $122,917.00 |
| 04/30/14 | 07/01/14 | $0.00 | 04/30/14 | 07/01/14 | $122,917.00 |
| 05/31/14 | 07/01/14 | $0.00 | 05/31/14 | 07/01/14 | $122,917.00 |
| 06/30/14 | 07/01/14 | $0.00 | 06/30/14 | 07/01/14 | $122,917.00 |
| 07/31/14 | 01/02/15 | $0.00 | 07/31/14 | 01/02/15 | $122,917.00 |
| 08/31/14 | 01/02/15 | $0.00 | 08/31/14 | 01/02/15 | $122,917.00 |

*If any Delivery Date or Bond Payment Date specified above is not a Business Day, such date will be the immediately succeeding Business Day; provided, however, that with respect to any date specified as a Bond Payment Date, the determination of whether such date is a Business Day shall be made without giving effect to clauses (c) and (d) of the definition of Business Day.

**EXHIBIT A**

| Principal Account | | | Interest Account | | |
|---|---|---|---|---|---|
| Delivery Date* | Bond Payment Date* | Deposit Amount | Delivery Date* | Bond Payment Date* | Deposit Amount |
| 09/30/14 | 01/02/15 | $0.00 | 09/30/14 | 01/02/15 | $122,917.00 |
| 10/31/14 | 01/02/15 | $0.00 | 10/31/14 | 01/02/15 | $122,917.00 |
| 11/30/14 | 01/02/15 | $0.00 | 11/30/14 | 01/02/15 | $122,917.00 |
| 12/31/14 | 01/02/15 | $0.00 | 12/31/14 | 01/02/15 | $122,917.00 |
| 01/31/15 | 07/01/15 | $0.00 | 01/31/15 | 07/01/15 | $122,917.00 |
| 02/28/15 | 07/01/15 | $0.00 | 02/28/15 | 07/01/15 | $122,917.00 |
| 03/31/15 | 07/01/15 | $0.00 | 03/31/15 | 07/01/15 | $122,917.00 |
| 04/30/15 | 07/01/15 | $0.00 | 04/30/15 | 07/01/15 | $122,917.00 |
| 05/31/15 | 07/01/15 | $0.00 | 05/31/15 | 07/01/15 | $122,917.00 |
| 06/30/15 | 07/01/15 | $0.00 | 06/30/15 | 07/01/15 | $122,917.00 |
| 07/31/15 | 01/04/16 | $0.00 | 07/31/15 | 01/04/16 | $122,917.00 |
| 08/31/15 | 01/04/16 | $0.00 | 08/31/15 | 01/04/16 | $122,917.00 |
| 09/30/15 | 01/04/16 | $0.00 | 09/30/15 | 01/04/16 | $122,917.00 |
| 10/31/15 | 01/04/16 | $0.00 | 10/31/15 | 01/04/16 | $122,917.00 |
| 11/30/15 | 01/04/16 | $0.00 | 11/30/15 | 01/04/16 | $122,917.00 |
| 12/31/15 | 01/04/16 | $0.00 | 12/31/15 | 01/04/16 | $122,917.00 |
| 01/31/16 | 07/01/16 | $0.00 | 01/31/16 | 07/01/16 | $122,917.00 |
| 02/29/16 | 07/01/16 | $0.00 | 02/29/16 | 07/01/16 | $122,917.00 |
| 03/31/16 | 07/01/16 | $0.00 | 03/31/16 | 07/01/16 | $122,917.00 |
| 04/30/16 | 07/01/16 | $0.00 | 04/30/16 | 07/01/16 | $122,917.00 |
| 05/31/16 | 07/01/16 | $0.00 | 05/31/16 | 07/01/16 | $122,917.00 |
| 06/30/16 | 07/01/16 | $0.00 | 06/30/16 | 07/01/16 | $122,917.00 |
| 07/31/16 | 07/01/17 | $96,667.00 | 07/31/16 | 01/01/17 | $122,917.00 |
| 08/31/16 | 07/01/17 | $96,667.00 | 08/31/16 | 01/01/17 | $122,917.00 |
| 09/30/16 | 07/01/17 | $96,667.00 | 09/30/16 | 01/01/17 | $122,917.00 |
| 10/31/16 | 07/01/17 | $96,667.00 | 10/31/16 | 01/01/17 | $122,917.00 |
| 11/30/16 | 07/01/17 | $96,667.00 | 11/30/16 | 01/01/17 | $122,917.00 |
| 12/31/16 | 07/01/17 | $96,667.00 | 12/31/16 | 01/01/17 | $122,917.00 |
| 01/31/17 | 07/01/17 | $96,667.00 | 01/31/17 | 07/01/17 | $122,917.00 |
| 02/28/17 | 07/01/17 | $96,667.00 | 02/28/17 | 07/01/17 | $122,917.00 |
| 03/31/17 | 07/01/17 | $96,667.00 | 03/31/17 | 07/01/17 | $122,917.00 |
| 04/30/17 | 07/01/17 | $96,667.00 | 04/30/17 | 07/01/17 | $122,917.00 |
| 05/31/17 | 07/01/17 | $96,667.00 | 05/31/17 | 07/01/17 | $122,917.00 |
| 06/30/17 | 07/01/17 | $96,667.00 | 06/30/17 | 07/01/17 | $122,917.00 |
| 07/31/17 | 07/01/18 | $101,250.00 | 07/31/17 | 01/02/18 | $118,083.00 |
| 08/31/17 | 07/01/18 | $101,250.00 | 08/31/17 | 01/02/18 | $118,083.00 |
| 09/30/17 | 07/01/18 | $101,250.00 | 09/30/17 | 01/02/18 | $118,083.00 |
| 10/31/17 | 07/01/18 | $101,250.00 | 10/31/17 | 01/02/18 | $118,083.00 |
| 11/30/17 | 07/01/18 | $101,250.00 | 11/30/17 | 01/02/18 | $118,083.00 |
| 12/31/17 | 07/01/18 | $101,250.00 | 12/31/17 | 01/02/18 | $118,083.00 |
| 01/31/18 | 07/01/18 | $101,250.00 | 01/31/18 | 07/01/18 | $118,083.00 |
| 02/28/18 | 07/01/18 | $101,250.00 | 02/28/18 | 07/01/18 | $118,083.00 |

*If any Delivery Date or Bond Payment Date specified above is not a Business Day, such date will be the immediately succeeding Business Day; provided, however, that with respect to any date specified as a Bond Payment Date, the determination of whether such date is a Business Day shall be made without giving effect to clauses (c) and (d) of the definition of Business Day.

NYA 657907.5

**EXHIBIT A**

| Principal Account | | | Interest Account | | |
|---|---|---|---|---|---|
| Delivery Date* | Bond Payment Date* | Deposit Amount | Delivery Date* | Bond Payment Date* | Deposit Amount |
| 03/31/18 | 07/01/18 | $101,250.00 | 03/31/18 | 07/01/18 | $118,083.00 |
| 04/30/18 | 07/01/18 | $101,250.00 | 04/30/18 | 07/01/18 | $118,083.00 |
| 05/31/18 | 07/01/18 | $101,250.00 | 05/31/18 | 07/01/18 | $118,083.00 |
| 06/30/18 | 07/01/18 | $101,250.00 | 06/30/18 | 07/01/18 | $118,083.00 |
| 07/31/18 | 07/01/19 | $106,250.00 | 07/31/18 | 01/02/19 | $113,021.00 |
| 08/31/18 | 07/01/19 | $106,250.00 | 08/31/18 | 01/02/19 | $113,021.00 |
| 09/30/18 | 07/01/19 | $106,250.00 | 09/30/18 | 01/02/19 | $113,021.00 |
| 10/31/18 | 07/01/19 | $106,250.00 | 10/31/18 | 01/02/19 | $113,021.00 |
| 11/30/18 | 07/01/19 | $106,250.00 | 11/30/18 | 01/02/19 | $113,021.00 |
| 12/31/18 | 07/01/19 | $106,250.00 | 12/31/18 | 01/02/19 | $113,021.00 |
| 01/31/19 | 07/01/19 | $106,250.00 | 01/31/19 | 07/01/19 | $113,021.00 |
| 02/28/19 | 07/01/19 | $106,250.00 | 02/28/19 | 07/01/19 | $113,021.00 |
| 03/31/19 | 07/01/19 | $106,250.00 | 03/31/19 | 07/01/19 | $113,021.00 |
| 04/30/19 | 07/01/19 | $106,250.00 | 04/30/19 | 07/01/19 | $113,021.00 |
| 05/31/19 | 07/01/19 | $106,250.00 | 05/31/19 | 07/01/19 | $113,021.00 |
| 06/30/19 | 07/01/19 | $106,250.00 | 06/30/19 | 07/01/19 | $113,021.00 |
| 07/31/19 | 07/01/20 | $111,667.00 | 07/31/19 | 01/02/20 | $107,708.00 |
| 08/31/19 | 07/01/20 | $111,667.00 | 08/31/19 | 01/02/20 | $107,708.00 |
| 09/30/19 | 07/01/20 | $111,667.00 | 09/30/19 | 01/02/20 | $107,708.00 |
| 10/31/19 | 07/01/20 | $111,667.00 | 10/31/19 | 01/02/20 | $107,708.00 |
| 11/30/19 | 07/01/20 | $111,667.00 | 11/30/19 | 01/02/20 | $107,708.00 |
| 12/31/19 | 07/01/20 | $111,667.00 | 12/31/19 | 01/02/20 | $107,708.00 |
| 01/31/20 | 07/01/20 | $111,667.00 | 01/31/20 | 07/01/20 | $107,708.00 |
| 02/29/20 | 07/01/20 | $111,667.00 | 02/29/20 | 07/01/20 | $107,708.00 |
| 03/31/20 | 07/01/20 | $111,667.00 | 03/31/20 | 07/01/20 | $107,708.00 |
| 04/30/20 | 07/01/20 | $111,667.00 | 04/30/20 | 07/01/20 | $107,708.00 |
| 05/31/20 | 07/01/20 | $111,667.00 | 05/31/20 | 07/01/20 | $107,708.00 |
| 06/30/20 | 07/01/20 | $111,667.00 | 06/30/20 | 07/01/20 | $107,708.00 |
| 07/31/20 | 07/01/21 | $116,667.00 | 07/31/20 | 01/04/21 | $102,125.00 |
| 08/31/20 | 07/01/21 | $116,667.00 | 08/31/20 | 01/04/21 | $102,125.00 |
| 09/30/20 | 07/01/21 | $116,667.00 | 09/30/20 | 01/04/21 | $102,125.00 |
| 10/31/20 | 07/01/21 | $116,667.00 | 10/31/20 | 01/04/21 | $102,125.00 |
| 11/30/20 | 07/01/21 | $116,667.00 | 11/30/20 | 01/04/21 | $102,125.00 |
| 12/31/20 | 07/01/21 | $116,667.00 | 12/31/20 | 01/04/21 | $102,125.00 |
| 01/31/21 | 07/01/21 | $116,667.00 | 01/31/21 | 07/01/21 | $102,125.00 |
| 02/28/21 | 07/01/21 | $116,667.00 | 02/28/21 | 07/01/21 | $102,125.00 |
| 03/31/21 | 07/01/21 | $116,667.00 | 03/31/21 | 07/01/21 | $102,125.00 |
| 04/30/21 | 07/01/21 | $116,667.00 | 04/30/21 | 07/01/21 | $102,125.00 |
| 06/01/21 | 07/01/21 | $116,667.00 | 06/01/21 | 07/01/21 | $102,125.00 |
| 06/30/21 | 07/01/21 | $116,667.00 | 06/30/21 | 07/01/21 | $102,125.00 |
| 07/31/21 | 07/01/22 | $122,083.00 | 07/31/21 | 01/01/22 | $96,292.00 |
| 08/31/21 | 07/01/22 | $122,083.00 | 08/31/21 | 01/01/22 | $96,292.00 |

*If any Delivery Date or Bond Payment Date specified above is not a Business Day, such date will be the immediately succeeding Business Day; provided, however, that with respect to any date specified as a Bond Payment Date, the determination of whether such date is a Business Day shall be made without giving effect to clauses (c) and (d) of the definition of Business Day.

NYA 657907.5

**EXHIBIT A**

| Principal Account | | | Interest Account | | |
|---|---|---|---|---|---|
| Delivery Date* | Bond Payment Date* | Deposit Amount | Delivery Date* | Bond Payment Date* | Deposit Amount |
| 09/30/21 | 07/01/22 | $122,083.00 | 09/30/21 | 01/01/22 | $96,292.00 |
| 10/31/21 | 07/01/22 | $122,083.00 | 10/31/21 | 01/01/22 | $96,292.00 |
| 11/30/21 | 07/01/22 | $122,083.00 | 11/30/21 | 01/01/22 | $96,292.00 |
| 12/31/21 | 07/01/22 | $122,083.00 | 12/31/21 | 01/01/22 | $96,292.00 |
| 01/31/22 | 07/01/22 | $122,083.00 | 01/31/22 | 07/01/22 | $96,292.00 |
| 02/28/22 | 07/01/22 | $122,083.00 | 02/28/22 | 07/01/22 | $96,292.00 |
| 03/31/22 | 07/01/22 | $122,083.00 | 03/31/22 | 07/01/22 | $96,292.00 |
| 04/30/22 | 07/01/22 | $122,083.00 | 04/30/22 | 07/01/22 | $96,292.00 |
| 05/31/22 | 07/01/22 | $122,083.00 | 05/31/22 | 07/01/22 | $96,292.00 |
| 06/30/22 | 07/01/22 | $122,083.00 | 06/30/22 | 07/01/22 | $96,292.00 |
| 07/31/22 | 07/01/23 | $127,917.00 | 07/31/22 | 01/01/23 | $90,188.00 |
| 08/31/22 | 07/01/23 | $127,917.00 | 08/31/22 | 01/01/23 | $90,188.00 |
| 09/30/22 | 07/01/23 | $127,917.00 | 09/30/22 | 01/01/23 | $90,188.00 |
| 10/31/22 | 07/01/23 | $127,917.00 | 10/31/22 | 01/01/23 | $90,188.00 |
| 11/30/22 | 07/01/23 | $127,917.00 | 11/30/22 | 01/01/23 | $90,188.00 |
| 12/31/22 | 07/01/23 | $127,917.00 | 12/31/22 | 01/01/23 | $90,188.00 |
| 01/31/23 | 07/01/23 | $127,917.00 | 01/31/23 | 07/01/23 | $90,188.00 |
| 02/28/23 | 07/01/23 | $127,917.00 | 02/28/23 | 07/01/23 | $90,188.00 |
| 03/31/23 | 07/01/23 | $127,917.00 | 03/31/23 | 07/01/23 | $90,188.00 |
| 04/30/23 | 07/01/23 | $127,917.00 | 04/30/23 | 07/01/23 | $90,188.00 |
| 05/31/23 | 07/01/23 | $127,917.00 | 05/31/23 | 07/01/23 | $90,188.00 |
| 06/30/23 | 07/01/23 | $127,917.00 | 06/30/23 | 07/01/23 | $90,188.00 |
| 07/31/23 | 07/01/24 | $134,167.00 | 07/31/23 | 01/02/24 | $83,792.00 |
| 08/31/23 | 07/01/24 | $134,167.00 | 08/31/23 | 01/02/24 | $83,792.00 |
| 09/30/23 | 07/01/24 | $134,167.00 | 09/30/23 | 01/02/24 | $83,792.00 |
| 10/31/23 | 07/01/24 | $134,167.00 | 10/31/23 | 01/02/24 | $83,792.00 |
| 11/30/23 | 07/01/24 | $134,167.00 | 11/30/23 | 01/02/24 | $83,792.00 |
| 12/31/23 | 07/01/24 | $134,167.00 | 12/31/23 | 01/02/24 | $83,792.00 |
| 01/31/24 | 07/01/24 | $134,167.00 | 01/31/24 | 07/01/24 | $83,792.00 |
| 02/29/24 | 07/01/24 | $134,167.00 | 02/29/24 | 07/01/24 | $83,792.00 |
| 03/31/24 | 07/01/24 | $134,167.00 | 03/31/24 | 07/01/24 | $83,792.00 |
| 04/30/24 | 07/01/24 | $134,167.00 | 04/30/24 | 07/01/24 | $83,792.00 |
| 05/31/24 | 07/01/24 | $134,167.00 | 05/31/24 | 07/01/24 | $83,792.00 |
| 06/30/24 | 07/01/24 | $134,167.00 | 06/30/24 | 07/01/24 | $83,792.00 |
| 07/31/24 | 07/01/25 | $140,000.00 | 07/31/24 | 01/02/25 | $77,083.00 |
| 08/31/24 | 07/01/25 | $140,000.00 | 08/31/24 | 01/02/25 | $77,083.00 |
| 09/30/24 | 07/01/25 | $140,000.00 | 09/30/24 | 01/02/25 | $77,083.00 |
| 10/31/24 | 07/01/25 | $140,000.00 | 10/31/24 | 01/02/25 | $77,083.00 |
| 11/30/24 | 07/01/25 | $140,000.00 | 11/30/24 | 01/02/25 | $77,083.00 |
| 12/31/24 | 07/01/25 | $140,000.00 | 12/31/24 | 01/02/25 | $77,083.00 |
| 01/31/25 | 07/01/25 | $140,000.00 | 01/31/25 | 07/01/25 | $77,083.00 |
| 02/28/25 | 07/01/25 | $140,000.00 | 02/28/25 | 07/01/25 | $77,083.00 |

*If any Delivery Date or Bond Payment Date specified above is not a Business Day, such date will be the immediately succeeding Business Day; provided, however, that with respect to any date specified as a Bond Payment Date, the determination of whether such date is a Business Day shall be made without giving effect to clauses (c) and (d) of the definition of Business Day.

**EXHIBIT A**

| Principal Account | | | Interest Account | | |
|---|---|---|---|---|---|
| Delivery Date* | Bond Payment Date* | Deposit Amount | Delivery Date* | Bond Payment Date* | Deposit Amount |
| 03/31/25 | 07/01/25 | $140,000.00 | 03/31/25 | 07/01/25 | $77,083.00 |
| 04/30/25 | 07/01/25 | $140,000.00 | 04/30/25 | 07/01/25 | $77,083.00 |
| 05/31/25 | 07/01/25 | $140,000.00 | 05/31/25 | 07/01/25 | $77,083.00 |
| 06/30/25 | 07/01/25 | $140,000.00 | 06/30/25 | 07/01/25 | $77,083.00 |
| 07/31/25 | 07/01/26 | $146,667.00 | 07/31/25 | 01/02/26 | $70,083.00 |
| 08/31/25 | 07/01/26 | $146,667.00 | 08/31/25 | 01/02/26 | $70,083.00 |
| 09/30/25 | 07/01/26 | $146,667.00 | 09/30/25 | 01/02/26 | $70,083.00 |
| 10/31/25 | 07/01/26 | $146,667.00 | 10/31/25 | 01/02/26 | $70,083.00 |
| 11/30/25 | 07/01/26 | $146,667.00 | 11/30/25 | 01/02/26 | $70,083.00 |
| 12/31/25 | 07/01/26 | $146,667.00 | 12/31/25 | 01/02/26 | $70,083.00 |
| 01/31/26 | 07/01/26 | $146,667.00 | 01/31/26 | 07/01/26 | $70,083.00 |
| 02/28/26 | 07/01/26 | $146,667.00 | 02/28/26 | 07/01/26 | $70,083.00 |
| 03/31/26 | 07/01/26 | $146,667.00 | 03/31/26 | 07/01/26 | $70,083.00 |
| 04/30/26 | 07/01/26 | $146,667.00 | 04/30/26 | 07/01/26 | $70,083.00 |
| 05/31/26 | 07/01/26 | $146,667.00 | 05/31/26 | 07/01/26 | $70,083.00 |
| 06/30/26 | 07/01/26 | $146,667.00 | 06/30/26 | 07/01/26 | $70,083.00 |
| 07/31/26 | 07/01/27 | $154,167.00 | 07/31/26 | 01/04/27 | $62,750.00 |
| 08/31/26 | 07/01/27 | $154,167.00 | 08/31/26 | 01/04/27 | $62,750.00 |
| 09/30/26 | 07/01/27 | $154,167.00 | 09/30/26 | 01/04/27 | $62,750.00 |
| 10/31/26 | 07/01/27 | $154,167.00 | 10/31/26 | 01/04/27 | $62,750.00 |
| 11/30/26 | 07/01/27 | $154,167.00 | 11/30/26 | 01/04/27 | $62,750.00 |
| 12/31/26 | 07/01/27 | $154,167.00 | 12/31/26 | 01/04/27 | $62,750.00 |
| 01/31/27 | 07/01/27 | $154,167.00 | 01/31/27 | 07/01/27 | $62,750.00 |
| 02/28/27 | 07/01/27 | $154,167.00 | 02/28/27 | 07/01/27 | $62,750.00 |
| 03/31/27 | 07/01/27 | $154,167.00 | 03/31/27 | 07/01/27 | $62,750.00 |
| 04/30/27 | 07/01/27 | $154,167.00 | 04/30/27 | 07/01/27 | $62,750.00 |
| 06/01/27 | 07/01/27 | $154,167.00 | 06/01/27 | 07/01/27 | $62,750.00 |
| 06/30/27 | 07/01/27 | $154,167.00 | 06/30/27 | 07/01/27 | $62,750.00 |
| 07/31/27 | 07/01/28 | $162,083.00 | 07/31/27 | 01/01/28 | $55,042.00 |
| 08/31/27 | 07/01/28 | $162,083.00 | 08/31/27 | 01/01/28 | $55,042.00 |
| 09/30/27 | 07/01/28 | $162,083.00 | 09/30/27 | 01/01/28 | $55,042.00 |
| 10/31/27 | 07/01/28 | $162,083.00 | 10/31/27 | 01/01/28 | $55,042.00 |
| 11/30/27 | 07/01/28 | $162,083.00 | 11/30/27 | 01/01/28 | $55,042.00 |
| 12/31/27 | 07/01/28 | $162,083.00 | 12/31/27 | 01/01/28 | $55,042.00 |
| 01/31/28 | 07/01/28 | $162,083.00 | 01/31/28 | 07/01/28 | $55,042.00 |
| 02/29/28 | 07/01/28 | $162,083.00 | 02/29/28 | 07/01/28 | $55,042.00 |
| 03/31/28 | 07/01/28 | $162,083.00 | 03/31/28 | 07/01/28 | $55,042.00 |
| 04/30/28 | 07/01/28 | $162,083.00 | 04/30/28 | 07/01/28 | $55,042.00 |
| 05/31/28 | 07/01/28 | $162,083.00 | 05/31/28 | 07/01/28 | $55,042.00 |
| 06/30/28 | 07/01/28 | $162,083.00 | 06/30/28 | 07/01/28 | $55,042.00 |
| 07/31/28 | 07/01/29 | $170,000.00 | 07/31/28 | 01/02/29 | $46,938.00 |
| 08/31/28 | 07/01/29 | $170,000.00 | 08/31/28 | 01/02/29 | $46,938.00 |

*If any Delivery Date or Bond Payment Date specified above is not a Business Day, such date will be the immediately succeeding Business Day, provided, however, that with respect to any date specified as a Bond Payment Date, the determination of whether such date is a Business Day shall be made without giving effect to clauses (c) and (d) of the definition of Business Day.

**EXHIBIT A**

| Principal Account | | | Interest Account | | |
|---|---|---|---|---|---|
| Delivery Date* | Bond Payment Date* | Deposit Amount | Delivery Date* | Bond Payment Date* | Deposit Amount |
| 09/30/28 | 07/01/29 | $170,000.00 | 09/30/28 | 01/02/29 | $46,938.00 |
| 10/31/28 | 07/01/29 | $170,000.00 | 10/31/28 | 01/02/29 | $46,938.00 |
| 11/30/28 | 07/01/29 | $170,000.00 | 11/30/28 | 01/02/29 | $46,938.00 |
| 12/31/28 | 07/01/29 | $170,000.00 | 12/31/28 | 01/02/29 | $46,938.00 |
| 01/31/29 | 07/01/29 | $170,000.00 | 01/31/29 | 07/01/29 | $46,938.00 |
| 02/28/29 | 07/01/29 | $170,000.00 | 02/28/29 | 07/01/29 | $46,938.00 |
| 03/31/29 | 07/01/29 | $170,000.00 | 03/31/29 | 07/01/29 | $46,938.00 |
| 04/30/29 | 07/01/29 | $170,000.00 | 04/30/29 | 07/01/29 | $46,938.00 |
| 05/31/29 | 07/01/29 | $170,000.00 | 05/31/29 | 07/01/29 | $46,938.00 |
| 06/30/29 | 07/01/29 | $170,000.00 | 06/30/29 | 07/01/29 | $46,938.00 |
| 07/31/29 | 07/01/30 | $178,333.00 | 07/31/29 | 01/02/30 | $38,438.00 |
| 08/31/29 | 07/01/30 | $178,333.00 | 08/31/29 | 01/02/30 | $38,438.00 |
| 09/30/29 | 07/01/30 | $178,333.00 | 09/30/29 | 01/02/30 | $38,438.00 |
| 10/31/29 | 07/01/30 | $178,333.00 | 10/31/29 | 01/02/30 | $38,438.00 |
| 11/30/29 | 07/01/30 | $178,333.00 | 11/30/29 | 01/02/30 | $38,438.00 |
| 12/31/29 | 07/01/30 | $178,333.00 | 12/31/29 | 01/02/30 | $38,438.00 |
| 01/31/30 | 07/01/30 | $178,333.00 | 01/31/30 | 07/01/30 | $38,438.00 |
| 02/28/30 | 07/01/30 | $178,333.00 | 02/28/30 | 07/01/30 | $38,438.00 |
| 03/31/30 | 07/01/30 | $178,333.00 | 03/31/30 | 07/01/30 | $38,438.00 |
| 04/30/30 | 07/01/30 | $178,333.00 | 04/30/30 | 07/01/30 | $38,438.00 |
| 05/31/30 | 07/01/30 | $178,333.00 | 05/31/30 | 07/01/30 | $38,438.00 |
| 06/30/30 | 07/01/30 | $178,333.00 | 06/30/30 | 07/01/30 | $38,438.00 |
| 07/31/30 | 07/01/31 | $187,500.00 | 07/31/30 | 01/02/31 | $29,521.00 |
| 08/31/30 | 07/01/31 | $187,500.00 | 08/31/30 | 01/02/31 | $29,521.00 |
| 09/30/30 | 07/01/31 | $187,500.00 | 09/30/30 | 01/02/31 | $29,521.00 |
| 10/31/30 | 07/01/31 | $187,500.00 | 10/31/30 | 01/02/31 | $29,521.00 |
| 11/30/30 | 07/01/31 | $187,500.00 | 11/30/30 | 01/02/31 | $29,521.00 |
| 12/31/30 | 07/01/31 | $187,500.00 | 12/31/30 | 01/02/31 | $29,521.00 |
| 01/31/31 | 07/01/31 | $187,500.00 | 01/31/31 | 07/01/31 | $29,521.00 |
| 02/28/31 | 07/01/31 | $187,500.00 | 02/28/31 | 07/01/31 | $29,521.00 |
| 03/31/31 | 07/01/31 | $187,500.00 | 03/31/31 | 07/01/31 | $29,521.00 |
| 04/30/31 | 07/01/31 | $187,500.00 | 04/30/31 | 07/01/31 | $29,521.00 |
| 05/31/31 | 07/01/31 | $187,500.00 | 05/31/31 | 07/01/31 | $29,521.00 |
| 06/30/31 | 07/01/31 | $187,500.00 | 06/30/31 | 07/01/31 | $29,521.00 |
| 07/31/31 | 07/01/32 | $196,667.00 | 07/31/31 | 01/02/32 | $20,146.00 |
| 08/31/31 | 07/01/32 | $196,667.00 | 08/31/31 | 01/02/32 | $20,146.00 |
| 09/30/31 | 07/01/32 | $196,667.00 | 09/30/31 | 01/02/32 | $20,146.00 |
| 10/31/31 | 07/01/32 | $196,667.00 | 10/31/31 | 01/02/32 | $20,146.00 |
| 11/30/31 | 07/01/32 | $196,667.00 | 11/30/31 | 01/02/32 | $20,146.00 |
| 12/31/31 | 07/01/32 | $196,667.00 | 12/31/31 | 01/02/32 | $20,146.00 |
| 01/31/32 | 07/01/32 | $196,667.00 | 01/31/32 | 07/01/32 | $20,146.00 |
| 02/29/32 | 07/01/32 | $196,667.00 | 02/29/32 | 07/01/32 | $20,146.00 |

*If any Delivery Date or Bond Payment Date specified above is not a Business Day, such date will be the immediately succeeding Business Day; provided, however, that with respect to any date specified as a Bond Payment Date, the determination of whether such date is a Business Day shall be made without giving effect to clauses (c) and (d) of the definition of Business Day.

NYA 657907.5

**EXHIBIT A**

| Principal Account | | | Interest Account | | |
|---|---|---|---|---|---|
| Delivery Date* | Bond Payment Date* | Deposit Amount | Delivery Date* | Bond Payment Date* | Deposit Amount |
| 03/31/32 | 07/01/32 | $196,667.00 | 03/31/32 | 07/01/32 | $20,146.00 |
| 04/30/32 | 07/01/32 | $196,667.00 | 04/30/32 | 07/01/32 | $20,146.00 |
| 06/01/32 | 07/01/32 | $196,667.00 | 06/01/32 | 07/01/32 | $20,146.00 |
| 06/30/32 | 07/01/32 | $196,667.00 | 06/30/32 | 07/01/32 | $20,146.00 |
| 07/31/32 | 07/01/33 | $206,250.00 | 07/31/32 | 01/01/33 | $10,313.00 |
| 08/31/32 | 07/01/33 | $206,250.00 | 08/31/32 | 01/01/33 | $10,313.00 |
| 09/30/32 | 07/01/33 | $206,250.00 | 09/30/32 | 01/01/33 | $10,313.00 |
| 10/31/32 | 07/01/33 | $206,250.00 | 10/31/32 | 01/01/33 | $10,313.00 |
| 11/30/32 | 07/01/33 | $206,250.00 | 11/30/32 | 01/01/33 | $10,313.00 |
| 12/31/32 | 07/01/33 | $206,250.00 | 12/31/32 | 01/01/33 | $10,313.00 |
| 01/31/33 | 07/01/33 | $206,250.00 | 01/31/33 | 07/01/33 | $10,313.00 |
| 02/28/33 | 07/01/33 | $206,250.00 | 02/28/33 | 07/01/33 | $10,313.00 |
| 03/31/33 | 07/01/33 | $206,250.00 | 03/31/33 | 07/01/33 | $10,313.00 |
| 04/30/33 | 07/01/33 | $206,250.00 | 04/30/33 | 07/01/33 | $10,313.00 |
| 05/31/33 | 07/01/33 | $206,250.00 | 05/31/33 | 07/01/33 | $10,313.00 |
| 06/30/33 | 07/01/33 | $206,250.00 | 06/30/33 | 07/01/33 | $10,313.00 |

*If any Delivery Date or Bond Payment Date specified above is not a Business Day, such date will be the immediately succeeding Business Day; provided, however, that with respect to any date specified as a Bond Payment Date, the determination of whether such date is a Business Day shall be made without giving effect to clauses (c) and (d) of the definition of Business Day.

NYA 657907.5

**EXHIBIT B**

[LETTERHEAD OF COUNSEL TO TRUSTEE]

University Medical Center Corporation
Tucson, Arizona

Lehman Brothers Special Financing Inc.
New York, NY

Re:    $52,000,000 University Medical Center Corporation
(Tucson, Arizona) Hospital Revenue Bonds Series 2004

Ladies and Gentlemen:

We have acted as counsel to U.S. Bank National Association (the "Trustee") in connection with the execution and delivery by the Trustee of the Debt Service Deposit Agreement, dated as of March 31, 2004 (the "Debt Service Deposit Agreement") by and among the Trustee, University Medical Center Corporation (the "Issuer") and Lehman Brothers Special Financing Inc. ("Lehman"). Capitalized terms used herein and not defined herein have the respective meanings given to them in the Debt Service Deposit Agreement.

In rendering this opinion, we have examined, among other things, copies of the Debt Service Deposit Agreement and the Financing Documents.

In connection with the foregoing, we have also examined originals or copies satisfactory to us of all such corporate records, agreements, certificates and other documents as we have deemed relevant and necessary as a basis for the opinions hereinafter expressed. In such examination we have assumed the genuineness of all signatures, the authenticity of all documents submitted to us as originals, and the conformity with the original documents of all documents submitted to us as copies.

In giving the opinions expressed below we do not purport to be experts in or generally familiar with or qualified to express legal opinions based on the laws of any jurisdiction other than the federal laws of the United States of America and the laws of the State of _____ (the "State").

Based upon the foregoing examination and review, we are of the opinion that:

(i)    The Trustee has full legal right, power and authority to enter into the Debt Service Deposit Agreement.

(ii)    The Debt Service Deposit Agreement has been duly authorized, executed and delivered by the Trustee.

NYA 657907.5

(iii)    The stipulation of New York law as the governing law of the Debt Service Deposit Agreement is enforceable under State law.

(iv)    Assuming for purposes of the opinion expressed in this paragraph (iv) that State law and New York law are the same, the Debt Service Deposit Agreement is a legal, valid and binding obligation of the Trustee, enforceable against it in accordance with the terms thereof, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally, and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

(v)    The execution and delivery by the Trustee of the Debt Service Deposit Agreement and the performance of its obligations thereunder do not and will not constitute or result in a default under, a breach or violation of, or the creation of any lien or encumbrance on any of its property under, its charter or by-laws, or the Indenture, or any other agreement, instrument, judgment, injunction or order applicable to it or any of its property.

(vi)    The Indenture is a legal, valid and binding obligation of the Trustee, enforceable against it in accordance with the terms thereof, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally, and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

We are furnishing this opinion to you solely for your benefit and no other person is entitled to rely hereon. This opinion is not to be used, circulated, quoted or otherwise referred to for any other purpose.

Very truly yours,

NYA 657907.5

**EXHIBIT C**

[LETTERHEAD OF COUNSEL TO LEHMAN

University Medical Center Corporation
1501 North Campbell Avenue
Tucson, AZ 85724-5178

U.S. Bank National Association
60 Livingston Avenue
St. Paul, MN 55107

Re:   $52,000,000 University Medical Center Corporation
      (Tucson, Arizona) Hospital Revenue Bonds Series 2004

Ladies and Gentlemen:

I have acted as counsel to Lehman Brothers Special Financing Inc. ("Lehman") in connection with the execution and delivery by Lehman of the Debt Service Deposit Agreement, dated as of March 31, 2004 (the "Agreement") by and among Lehman, U.S. Bank National Association, as Trustee (the "Trustee") and University Medical Center Corporation (the "Issuer"). Capitalized terms used herein and not defined herein have the respective meanings given to them in the Agreement.

In connection with the opinions expressed below, I have examined, or have had examined on my behalf, a copy of the Agreement executed by Lehman and such other agreements, instruments, documents and records of Lehman and certificates and statements by public officials and officers of Lehman as I have deemed necessary or appropriate as a basis for the opinions hereinafter expressed.

Based on the foregoing but subject to the assumptions, exceptions, qualifications and limitations hereinafter expressed, I am of the opinion that:

1.   Lehman is a corporation duly incorporated, validly existing and in good standing under the laws of the State of Delaware and has the corporate power and authority to execute and deliver the Agreement and to perform its obligations thereunder.

2.   The Agreement has been duly and validly authorized, executed and delivered by Lehman and each constitutes the legal, valid and binding obligation of Lehman, enforceable against Lehman in accordance with its terms.

C-1

The foregoing opinions are subject to the following assumptions, exceptions, qualifications and limitations:

A.   My opinion in paragraph 2 above is subject to the effect of any bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally (including, without limitation, the effect of statutory or other laws regarding fraudulent or other similar transfers) and general principles of equity, regardless of whether enforceability is considered in a proceeding in equity or at law.

B.   I am a member of the Bar of the State of New York and render no opinion on the laws of any jurisdiction other than the State of New York, the United States of America and the General Corporation Law of the State of Delaware.

C.   My opinions are limited to the present laws and to the facts as they presently exist.  I assume no obligation to revise or supplement this opinion should the present laws of the jurisdictions referred to in paragraph B above be changed by legislative action, judicial decision or otherwise.

D.   This letter is rendered to you in connection with the Agreement and the transactions related thereto and may not be relied upon by any other person or by you in any other context or for any other purpose.  This letter may not be quoted in whole or in part, nor may copies thereof be furnished or delivered to any other person, without the prior written consent of Lehman, except that you many furnish copies hereof (i) to your independent auditors and attorneys, (ii) to any United States, state or local authority having jurisdiction over you or over Lehman, (iii) pursuant to the order or any legal process of any court of competent jurisdiction or any governmental agency, and (iv) in connection with any legal action arising out of the Agreement.

E.   I have assumed with your permission (i) the genuineness of all signatures by the Trustee and the Issuer, (ii) the authenticity of documents submitted to me as originals and the conformity with the original documents of all documents submitted to me as copies, and (iii) the due execution and delivery, pursuant to due authorization, of the Agreement by each party other than Lehman.

Very truly yours,

C-2

NYA 657907.5

**EXHIBIT D**

[LETTERHEAD OF COUNSEL OF ISSUER]

U.S. Bank National Association
1501 North Campbell Avenue
Tucson, AZ 85724-5178

Lehman Brothers Special Financing Inc.
New York, NY

Re:     $52,000,000 University Medical Center Corporation
        (Tucson, Arizona) Hospital Revenue Bonds Series 2004

Ladies and Gentlemen:

    We have acted as counsel to University Medical Center Corporation (the "Issuer") in connection with its execution and delivery of the Debt Service Deposit Agreement dated as of March 31, 2004 ("Debt Service Deposit Agreement"), by and among Lehman, U.S. Bank National Association, as Trustee (the "Trustee") and the Issuer and its execution and delivery of the Indenture (as defined in the Debt Service Deposit Agreement. Capitalized terms used herein and not defined herein have the respective meanings given to them in the Debt Service Deposit Agreement.

    In connection with our representation of the Issuer, we have examined the Issuer's Articles of Incorporation and Bylaws as amended to date, and the minutes of meetings of the Issuer at which official action was taken with respect to the Bonds, the Financing Documents and the Debt Service Deposit Agreement. In such examination we have assumed the genuineness of all signatures other than those on behalf of the Issuer, the authenticity of all documents submitted to us as originals, and the conformity to the original documents of all documents submitted to us as certified copies or reproduced copies. As to various questions of fact material to the opinions expressed in this letter, including all opinions expressed as being to our knowledge, we have relied upon, certificates of officers of the Issuer, and upon the representations and warranties of the Issuer set forth in the Indenture and the Agreement, in each case without any further inquiry on our part. In basing the opinions set forth in this letter on "our knowledge," the words "our knowledge" signify that, in the course of our representation of the Issuer as counsel in connection with the transactions contemplated by the Agreement, no facts have come to our attention that would give us actual knowledge that any such opinions or other matters are not accurate. Except as otherwise stated in this opinion, we have undertaken no independent investigation or verification of such matters. Further, the words "our knowledge" and similar language as used in this opinion are intended to be limited to the actual knowledge of Roy W. Kyle, Esq. and any of our attorneys who have had primary responsibility for reviewing and negotiating the Agreement or the Financing Documents on behalf of the Issuer.

D-1

In giving the opinions expressed below we do not purport to be experts in or generally familiar with or qualified to express legal opinions based on the laws of any jurisdiction other than the laws of Arizona (the "State").

Based upon the foregoing examination and review, we are of the opinion that:

(i)    The Issuer has full legal right, power and authority to enter into the Debt Service Deposit Agreement and the Indenture and to authorize and direct the Trustee, pursuant to the Debt Service Deposit Agreement, to make purchases of the Qualified Eligible Securities in accordance with the terms therein.

(ii)    The Debt Service Deposit Agreement and the Indenture have been duly authorized, executed and delivered by the Issuer.

(iii)    The stipulation of New York law as the governing law of the Debt Service Deposit Agreement is enforceable under the laws of the State.

(iv)    Assuming for purposes of the opinion expressed in this paragraph (iv) that State law and New York law are the same, each of the Debt Service Deposit Agreement is a legal, valid and binding obligation of the Issuer, enforceable against it in accordance with the terms thereof, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally, and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

(v)    The Issuer's execution and delivery of the Debt Service Deposit Agreement and the performance of its obligations thereunder do not and will not conflict with or constitute or result in a default under, a breach or violation of, or the creation of any lien or encumbrance on any of its property under the Indenture, or, to out knowledge, any other agreement, instrument, judgment, injunction or order applicable to it or any of its property.

(vi)    All consents, authorizations and approvals requisite for the Issuer's execution, delivery and performance of the Debt Service Deposit Agreement have been obtained and remain in full force and effect and all conditions thereof have been duly complied with, and no other action by, and no notice to or filing with, any governmental authority or regulatory body is required for such execution, delivery or performance.

(vii)    The Indenture is a legal, valid and binding obligation of the Issuer, enforceable against it in accordance with the terms thereof, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally, and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

(viii)    The Issuer is not entitled to claim immunity on the grounds of sovereignty or other similar grounds with respect to itself or its revenues or assets (irrespective of their use or intended use) from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction, order

NYA 657907.5

for specific performance or for recovery of property, (iv) attachment of its assets (whether before or after judgment) or (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be made subject to in any suit, action or proceedings relating to this Agreement in the courts of any jurisdiction and no such immunity (whether or not claimed) may be attributed to such party or its revenues or assets.

We are furnishing this opinion to you solely for your benefit and no other person is entitled to rely hereon. This opinion is not to be used, circulated, quoted or otherwise referred to for any other purpose.

Very truly yours,

LEWIS and ROCA, LLP


Roy W. Kyle

D-3

<b>EXHIBIT E</b>

<b>Lehman Brothers Special Financing Inc.</b><br>
<b>Notice of Tender</b><br>
<b>Under the Debt Service Deposit Agreement</b><br>
<b>Dated as of:</b>

To:        _____, as Trustee
           Attention:
           Fax:
           Phone:

From:      Lehman Brothers Inc.
           Attention:
           Fax:
           Phone:

Date:      [ _____ ]

Re:        [ _____ ]

**Date and Price**
Purchase Date:
Specified Purchase Price:                    [ _____ ]
                                             [ _____ ]

**Specific Government Obligations**

| Cusip | Type | Maturity | Coupon | Face Amount | Maturity Amount | Accrued Interest |
|-------|------|----------|--------|-------------|-----------------|------------------|
| [ ____ ] | [ ____ ] | [ ____ ] | [ ____ ] | [ ____ ] | [ ____ ] | [ ____ ] |

**Delivery vs Payment (Book Entry Delivery)**

   On the Purchase Date, LBI will deliver Face value  [ _____ ]  [BILLS/NOTES] maturing [ _____ ]

                [ _____ ]
                [ _____ ]
                [ _____ ]
                [ _____ ]
                             Re:
                   [ _____ ]

On the Purchase Date, LBI will receive [ _____ ]

        Chase NYC/Lehman
        ABA Number 021-000-021
        Account Number 066206677

E-1

NYA 657907.5