UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————— x

In re:

LEHMAN BROTHERS HOLDINGS INC., *et al.*,

Debtors.

———————————————————————— x

:    Chapter 11

:    Case No. 08-13555 (SCC)

**OBJECTION OF LEHMAN BROTHERS SPECIAL FINANCING INC.
TO THE MOTION OF THE GROUP OF DEFENDANTS TO MODIFY CERTAIN
ORDERS AFFECTING LITIGATION OF ADVERSARY PROCEEDING NO. 10-03547**

WOLLMUTH MAHER & DEUTSCH LLP
500 Fifth Avenue
New York, New York 10110
(212) 382-3300

*Counsel for Plaintiff*
*Lehman Brothers Special Financing Inc.*

May 5, 2014

Lehman Brothers Special Financing Inc. ("LBSF"), through Lehman Brothers

Holdings Inc., the Plan Administrator under the Modified Third Amended Joint Chapter 11 Plan

of Lehman Brothers Holdings Inc. and Its Affiliated Debtors (the "Plan"), the Plaintiff in

Adversary Proceeding No. 10-03547 (the "Distributed Action"), hereby submits this Objection to

the Motion of Group of Defendants to Modify Certain Orders Affecting Litigation of Adversary

Proceeding (the "Motion")[1] and in support of the Proposed Scheduling Order filed in the

Distributed Action (the "Proposed Order") [Adv. Proc. Dkt. No. 717] and the Omnibus Reply to

the Objections and Responses to LBSF's Proposed Scheduling Order, dated May 5, 2014, (the

"Reply") attached hereto as Exhibit A, and states as follows:

1.        Pursuant to this Court's Order Extending Stay of Avoidance Actions and

Granting Certain Related Relief Pursuant to Section 105(a) of the Bankruptcy Code and

Bankruptcy Rule 7004(a)(1) [Dkt. No. 42417], LBSF submitted its Proposed Order on March 24,

2014 setting forth a protocol that LBSF believed would minimize costs, preserve judicial

resources, and maximize the efficient administration of this action.

2.        In response, the Group has submitted an order (the "Group's Proposed

Protocol") if entered would maximize expense, result in unwarranted demands on the Court's

resources, and avoid dealing with important issues in favor of wasteful motion practice that the

Group cannot demonstrate has any likelihood of success.

3.        The Group's Motion seeks to modify specific provisions set forth in the (i)

Alternative Dispute Resolution Procedures Order for Affirmative Claims of the Debtors Under

Derivatives Transactions with Special Purpose Vehicle Counterparties, dated July 18, 2012 [Dkt.

No. 59209] (the "ADR Order"); and (ii) Order Extending Stay of Avoidance Actions and

Granting Certain Related Relief Pursuant to Sections 105(a) of the Bankruptcy Code and

---

[1] The parties which have signed the Motion are referred to herein as the "Group."

Bankruptcy Rule 7004(a)(1), dated January 31, 2014 [Dkt. No. 41417] (the "Stay Order"), as they pertain to the Distributed Action.

4.    Specifically, the Group requests that the ADR Order and Stay Order be modified (i) to allow for Distributed Action defendants to participate in the Adversary Proceeding without restriction on such participation, and (ii) to allow for communications among Distributed Action defendants with respect to the Distributed Action, including with respect to potential settlement.  Motion at ¶ 2.

5.    The Group's Motion is unnecessary.  As discussed in the Proposed Order and Reply, LBSF's Proposed Order permits all Defendants to participate in the Distributed Action at each stage.

6.    In addition, the Group's attack on the ADR Order's confidentiality provision has no bona fide basis and should not be allowed.  The Group's modification to the ADR Order's confidentiality obligations owed to LBSF would chill settlement discussions among the parties.

7.    Although the Group's confidentiality modification purports to honor Rule 408 of the Federal Rules of Evidence, in reality it violates the Rule because the Rule imposes a confidentiality restriction as well as a bar against use of compromise offers and negotiations materials in court proceedings.  Rule 408 "evidences a strong public policy favoring the confidentiality of attempts to voluntarily resolve disputes."  McCormick on Evidence, at 811 (3d ed. 1984).  One of the principles underlying Rule 408 is the "promotion of public policy favoring the compromise and settlement of disputes."  *United States v. Contra Costa County Water Dist.*, 678 F.2d 90, 92 (9th Cir. 1982).

99.    Accordingly, courts generally have applied a presumption against disclosure of settlement negotiations if disclosure seems likely to chill parties' willingness to make the sort of disclosures in settlement discussions that are necessary to achieve agreement. *See, e.g., S.E.C. v. Thrasher*, 1995 WL 552719, at *1 (S.D.N.Y. Sept. 18, 1995); *Matsushita Electronics Corp. v. Loral Corp.*, 92-civ-5461(SAS), 1995 WL 527640, at *3-4 (S.D.N.Y. Sept. 7, 1995); *Morse/Diesel, Inc. v. Trinity Indus., Inc.*, 142 F.R.D. 80, 84 (S.D.N.Y. 1992); *Bottaro v. Hatton Assocs.*, 96 F.R.D. 158, 160 (E.D.N.Y. 1982); *see also Goodyear Tire & Rubber Co. v. Chiles Power Supply, Inc.*, 332 F.3d 976, 981 (6th Cir. 2003) ("The public policy favoring secret negotiations, combined with the inherent questionability of the truthfulness of any statements made therein, leads us to conclude that a settlement privilege should exist, and that the district court did not abuse its discretion in refusing to allow discovery"). Here, LBSF would be reluctant to be as forthright as it has been in the ADR process without the strongest confidentiality protections.

8.    For the reasons set forth herein, and in the Reply, LBSF respectfully requests that this Court enter LBSF's Proposed Order, and overrule Defendants' Proposed Order and their request for a modification of the ADR Order and the Stay Order as they pertain to the Distributed Action, and further grant LBSF such other and related relief as it deems just and proper.

Dated: New York, New York
May 5, 2014

/s/William F. Dahill
Paul R. DeFilippo
William F. Dahill
Vincent T. Chang
James N. Lawlor
Adam M. Bialek

WOLLMUTH MAHER & DEUTSCH LLP
500 Fifth Avenue
New York, New York 10110
(212) 382-3300

*Counsel for Plaintiff*
*Lehman Brothers Special Financing Inc.*

# EXHIBIT A

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————— x

In re:                    :     Chapter 11

:     Case No. 08-13555 (SCC)

LEHMAN BROTHERS HOLDINGS INC., *et al.*,

Debtors.

———————————————————————— x

LEHMAN BROTHERS SPECIAL FINANCING INC.,

Plaintiff,

-against-     Adversary Proceeding
No. 10-03547 (SCC)

BANK OF AMERICA NATIONAL ASSOCIATION, *et al.*,

Defendants.

———————————————————————— x

## OMNIBUS REPLY TO THE OBJECTIONS AND RESPONSES TO LBSF'S PROPOSED SCHEDULING ORDER

WOLLMUTH MAHER & DEUTSCH LLP
500 Fifth Avenue
New York, New York 10110
(212) 382-3300

*Counsel for Plaintiff*
*Lehman Brothers Special Financing Inc.*

May 5, 2014

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................1

STATEMENT OF FACTS .........................................................................................4

    A.    The Distributed Action's Unique Procedural History ...............................4

        1.    The ADR Program ...................................................................7

        2.    The Limited Discovery Order.....................................................8

    B.    Summary of The Claims ......................................................................10

    C.    LBSF's Proposed Order.......................................................................10

    D.    The Group's Proposed Protocol............................................................12

ARGUMENT .......................................................................................................14

I.    The Court Should Implement LBSF's Proposed Order.....................................14

    A.    A Determination of Class Certification First Will Provide For Streamlined
        Litigation and Orderly Case Management ..............................................15

        1.    Precedent Dictates That Class Certification
            Should Precede The Merits......................................................16

        2.    The Group Does Not and Cannot Demonstrate
            Why Determinations On The Merits Prior To Class
            Certification Are More Efficient In This Case .........................20

        3.    The Group Misrepresents or Overstates The Cases Upon Which It Relies
            Regarding Class Certification and/or Cases It Cites Are Inapposite .........22

            a.    *Tribune* And *Lyondell*...................................................22

            b.    *Authors Guild*..............................................................23

        4.    There Is No "Due Process" Right To A
            Prompt Decision On A Motion To Dismiss................................24

        5.    The Decisions Relied Upon By The Group
            For Its Prejudice Argument Are Unavailing...............................26

6.    The Standard Procedure For Initial Designation of Liaison Counsel
and An Executive Committee, Followed By Implementation
of A Class Structure, Provides Efficient and Fair Organization
For This Defendant Class Action...............................................................28

II.    Beginning with Motions to Dismiss Will Not Advance The
Just, Speedy and Efficient Determination of this Action..................................................32

A.    There is No "Silver Bullet" That Could Dismiss
All of The Claims In This Action ........................................................32

1.    The Group's Statute Of Limitations Defense Is Meritless
And Should Be Decided After Class Certification In Any Event.............33

2.    LBSF Has Stated Cognizable Claims In Each
Count of The Second Amended Complaint .............................................34

a.    LBSF Has Pled Entitlement To A
Declaratory Judgment In Counts I And II....................................34

b.    LBSF Has Properly Pled The State Law Clauses of Action
In Counts VI (Unjust Enrichment), VII (Constructive Trust),
VIII (Money Had And Received), X (Breach of Contract)
And XII (Replevin) ......................................................................37

c.    LBSF Has Properly Pled Avoidance Causes of Action In
Counts III, IV, V and XI For Violation of Sections 547,
548 (a)(1)(B), 549 and 548 (a)(1)(A) of The Bankruptcy Code ....39

3.    The Safe Harbor Provisions Of The Code Are Inapplicable ...................42

III.    The Remaining Points Raised In The Group's Proposed Protocol Are Without Merit.....45

A.    Disclosures By LBSF...........................................................................45

B.    Document Repository ..........................................................................46

C.    Amendment of Complaint.....................................................................47

D.    Process of Litigation After Phase I .......................................................47

E.    Consolidation of Briefing and Oral Argument ......................................47

F.    Termination of ADR Injunctions..........................................................48

IV.    JA Hokkaido's Objection Should Be Overruled...............................................................50

V.      Certain Trustee Defendants' Joint Limited Objection Is Meritless ...................................51

VI.     U.S. Bank National Association's Notice of Response To LBSF's Proposed Order .......52

CONCLUSION...........................................................................................................................53

# TABLE OF AUTHORITIES

**Case**                                                                                                           **Page(s)**

*Ad Hoc Committee on Judicial Administration v. Massachusetts,*
   488 F.2d 1241 (1st Cir. 1973) ............................................................27

*Amchem Products, Inc. v. Windsor,*
   521 U. S. 591 (1997) ........................................................................18

*American Pipe & Construction Co. v. Utah,*
   414 U.S. 538 (1974) .................................................................. 17-21

*Ampudia v. Lloyd,*
   531 F. App'x 32 (2d Cir. 2013) ......................................................28

*Appleton Elec. Co. v. Graves Truck Line, Inc.,*
   635 F.2d 603 (7th Cir. 1980)
   *cert denied,* 451 U.S. 976, 101 S. Ct. 2058 (1981) ...........................34

*Armstrong v. Manzo,*
   380 U.S. 545 (1965) ........................................................................27

*Ashcroft v. Iqbal,*
   556 U.S. 662, 129 S. Ct. 1937 (2009) ............................................32

*Attenborough v. Const. and Gen. Bldg. Laborers' Local 79,*
   238 F.R.D. 82 (S.D.N.Y. 2006) ............................................... 20-21

*Authors Guild, Inc. v. Google Inc.,*
   721 F.3d 132 (2d Cir. 2013) ..................................................... 19, 23-24

*Begier v. IRS,*
   496 U.S. 53 (1990) .........................................................................39

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (2007) ........................................................................35

*Benevento v. RJR Nabisco, Inc.,*
   89 CIV. 6266, 1993 WL 126424 (S.D.N.Y. Apr. 1, 1993) ...............37

*Bertrand v. Maram,*
   495 F.3d 452 (7th Cir. 2007) ........................................................16

*Bottaro v. Hatton Assocs.,*
   96 F.R.D. 158 (E.D.N.Y. 1982) ....................................................49

*Bowling v. Pfizer. Inc.*,
  142 F.R.D. 302 (S.D. Ohio 1991) ........................................................................17, 19

*Cal. Pub. Emp. Ret. Syst. v. Caboto-Gruppo Intesa BCI (In re WorldCom Sec. Litig.)*,
  496 F.3d 245 (2d Cir. 2007).......................................................................................22

*Cargo Partner AG v. Albatrans, Inc.*,
  352 F.3d 41 (2d Cir. 2003)..........................................................................................35

*Chambers v. Time Warner, Inc.*,
  282 F.3d 147 (2d Cir. 2002)........................................................................................43

*Charron v. Pinnacle Group N.Y. LLC*,
  269 F.R.D. 221 (S.D.N.Y. 2010) ................................................................................21

*Cleveland Bd. of Educ. v. Loudermill*,
  470 U.S. 532 (1985)....................................................................................................26

*Continental Illinois Nat'l Bank and Trust Co. of Chicago v. John Mohr & Sons*,
  80-C-2642, 1980 U.S. Dist. LEXIS 13040 (N.D. Ill. 1980) .................................21, 22, 31

*Counihan v. Allstate Ins. Co.*,
  194 F.3d 357 (2d Cir. 1999)........................................................................................37

*Curtin v. United Airlines, Inc.*,
  275 F.3d 88 (D.C. Cir. 2001) ................................................................................24, 25

*Cuzco v. Orion Builders, Inc.*,
  262 F.R.D. 325 (S.D.N.Y. 2009) ................................................................................18

*Diaz v. Paterson*,
  547 F.3d 88 (2d Cir. 2008)..........................................................................................18

*Dolmetta v. Uintah Nat'l Corp.*,
  712 F.2d 15 (2d Cir. 1983)..........................................................................................37

*Dominguez v. Morris*,
  77 A.D.3d 884, 909 N.Y.S.2d 383 (2d Dep't 2010) ..........................................33

*Drexel Burnham Lambert Grp. v. Galadari*,
  127 B.R. 87 (S.D.N.Y. 1991)......................................................................................27

*Eisen v. Carlisle & Jacquelin*,
  417 U.S. 156 (1974)....................................................................................................18

*Eliasen v. Green Bay & Western Railroad Company,*
    93 F.R.D. 408 (E.D. Wis. 1982) ......................................................................22, 31

*Elliot & Callan, Inc. v. Crofton,*
    615 F. Supp. 2d 963 (D. Minn. 2009) ...............................................................39

*Emmons v. Tennessee,*
    2008 WL 111977 (E.D. Tenn. Jan. 8, 2008) ......................................................24

*EPLG I v. Citibank N.A., (In re Qimonda Richmond LLC),*
    467 B.R. 318 (Bankr. D. Del. 2012) ..................................................................43

*Foti v. NCO Fin. Sys. Inc.,*
    424 F. Supp. 2d 643 (S.D.N.Y. 2006)................................................................26

*Gilmore v. Sw. Bell Mobile Sys., Inc.,*
    156 F. Supp. 2d 916 (N.D. Ill. 2001) .................................................................19

*Gomez v. Rossi Concrete Inc.,*
    No. 08cv1442, 2011 WL 666888 (S.D. Cal. Feb. 17, 2011) .............................16

*Goodyear Tire & Rubber Co. v. Chiles Power Supply, Inc.,*
    332 F.3d 976 (6th Cir. 2003) .............................................................................49

*Guy v. Abdulla,*
    57 F.R.D. 14 (N.D. Ill. 1972).............................................................................21

*Hansberry v. Lee,*
    311 U.S. 32 (1940).............................................................................................30

*Henry v. Gross,*
    803 F.2d 757 (2d Cir. 1986)...............................................................................19

*Horn v. Ass'd Wholesale Grocers, Inc.,*
    555 F.2d 270 (10th Cir. 1977) ...........................................................................19

*Howe v. Townsend (In re Pharmaceutical Industry Average Wholesale Price Litig.),*
    588 F.3d 24 (1st Cir. 2009)................................................................................30

*Hoxworth v. Blinder Robinson & Co.,*
    982 F.2d 912 (3d Cir. 1992)...............................................................................21

*Hungate v. United States,*
    626 F.2d 60 (8th Cir. 1990) ...............................................................................24

*I. Appel Corp. v. Val Mode Lingerie, Inc.*,
　　No. 97-CIV-6938(LMM), 2000 WL 231072 (S.D.N.Y. Feb. 28, 2000) ..........................39

*In re Bear Steams Cos. Sec. Derivative, and ERISA Litig.*,
　　No. 08 MDL 1963 (RWS), 2009 WL 50132 (S.D.N.Y. Jan. 5, 2009) .............................29

*In re Bestline Prods. Sec. & Antitrust Litig.*,
　　No. MDL 162-Civ-JLK, 1975 U.S. Dist. LEXIS 13231 (D. Fla. Mar. 21, 1975)............34

*In re Crude Oil Commodity Futures Litig.*,
　　11 CIV. 3600 WHP, 2012 WL 569195 (S.D.N.Y. Feb. 14, 2012)...................................29

*In re Diamond Multimedia Sys. Inc. Sec. Litig.*,
　　1997 WL 773733 (N.D. Cal. 1997) .........................................................................17, 19

*In re Dreier LLP*,
　　452 B.R. 391 (Bankr. S.D.N.Y. 2011) ...............................................................................32

*In re Dunbar*,
　　313 B.R. 430 (Bankr. C.D. Ill. 2004)..................................................................................39

*In re Elliot*,
　　81 B.R. 460 (Bankr. N.D. Ill. 1987) ...................................................................................33

*In re Energy Systems Equip. Leasing Sec. Litig.*.
　　642 F. Supp. 718 (E.D.N.Y. 1986) .....................................................................................21

*In re FEMA Trailer Formaldehyde Prods. Liab. Litig.*,
　　No. 07-1873, 2010 U.S. Dist. LEXIS 39657 (E.D. La. Apr. 21, 2010)............................34

*In re First Central Fin. Corp.*,
　　377 F.3d 209 (2d Cir. 2004).................................................................................................37

*In re First Jersey Securities, Inc.*,
　　180 F. 3d 504 (3d Cir. 1999)................................................................................................34

*In re Inflight Newspapers, Inc.*,
　　423 B.R. 6 (Bankr. E.D.N.Y. 2010)....................................................................................33

*In re Integra Realty Resources, Inc.*,
　　354 F.3d 1246 (10th Cir. 2004) ...........................................................................................22

*In re IPO*,
　　471 F.3d 24 (2d Cir. 2006) ..................................................................................................20

*In re J.P. Jeanneret Assocs.*, Inc.,
    769 F. Supp. 2d 340 (S.D.N.Y. 2011).............................................................................35

*In re Jacobs*,
    401 B.R. 161 (Bankr. E.D. Pa. 2009) .............................................................................39

*In re Kelton Motors, Inc.*,
    130 B.R. 170 (Bankr. D. Vt. 1991).................................................................................34

*In re Koreag Controle et Revision S.A.*,
    961 F.2d 341 (2d Cir. 1992)............................................................................................37

*In re Railway Reorganization Estate, Inc.*,
    133 B.R. 578 (Bankr. D. Del. 1991) ..............................................................................33

*In re Rosalind Gardens Assocs.*,
    157 B.R. 75 (Bankr. S.D.N.Y. 1993) .............................................................................34

*In re Tribune Co. Fraudulent Conveyance Litig.*,
    No. 1:12-mc-02296-WHP (S.D.N.Y. Sept. 7, 2012) ........................................... 15, 22-23

*In re Victor Techs. Sec. Litig.*,
    102 F.R.D. 53 (N.D. Cal.)
    *aff'd*, 792 F.2d 862 (9th Cir. 1986)..........................................................................22, 30

*In re Wash. Mutual, Inc.*,
    442 B.R. 297 (Bankr. D. Del. 2011) ..............................................................................39

*Isaacs v. Brown*,
    865 F.2d 468 (2d Cir. 1989)....................................................................................... 26-27

*Jackson v. Mishkin* (*In re Adler*),
    263 B.R. 406 (S.D.N.Y. 2001) ......................................................................................40

*Jamison Bus. Sys., Inc. v. Unique Software Support Corp.*,
    CV 02-4887 (ETB), 2005 WL 1262095 (E.D.N.Y. May 26, 2005) ................................38

*Jiminez v. Weinberger*,
    523 F.2d 689 (7th Cir. 1975) .........................................................................................20

*Jones v. Ford Motor Credit Co.*,
    358 F.3d 205 (2d Cir. 2004)...........................................................................................17

*Kapiti v. Kelly*,
    2008 WL 3874310 (S.D.N.Y. Aug. 18, 2008)...............................................................17

*Katz v. Carte Blanche Corp.*,
 496 F.2d 747 (3d Cir. 1974)................................................................... 16-17

*Keller v. United States*,
 38 F.3d 16 (1st Cir. 1994)..................................................................27

*Lehman Bros. Special Fin. Inc. v. Ballyrock ABS CDO 2007-1 Ltd.*
*(In re Lehman Bros. Holdings Inc.)*,
 No. 09-01242 (JMP), 2011 WL 9375423 (S.D.N.Y. Nov. 3, 2011)....................15, 35, 36

*Lehman Bros. Special Fin. Inc. v. BNY Corporate Tr. Servs. Ltd.*
*(In re Lehman Bros. Holdings Inc.)*,
 422 B.R. 407 (Bankr. S.D.N.Y. 2010)..................................................35, 36, 42

*Lehman Bros. Special Fin. Inc. v. BNY Corporate Tr. Servs. Ltd.*
*(In re Lehman Bros. Inc.)*,
 No 09-0242, slip op (S.D.N.Y. Sept. 23, 2010)..............................................15

*Liberman v. Worden*,
 268 A.D.2d 337, 701 N.Y.S.2d 419 (1st Dep't 2000) ......................................33

*Loengard v. Santa Fe Indus., Inc.*,
 70 N.Y.2d 262 (1987) ..........................................................................33

*Los Angeles Cnty. Bar Ass'n v. Eu*,
 979 F.2d 697 (9th Cir. 1992) ..................................................................27

*Manufacturers Hanover Trust Co. v. Chemical Bank*,
 160 A.D.2d 113, 559 N.Y.S.2d 704 (1st Dep't 1990) ......................................38

*Matsushita Electronics Corp. v. Loral Corp.*,
 92-civ-5461(SAS), 1995 WL 527640 (S.D.N.Y. Sept. 7, 1995) ......................................49

*Matthews v. Eldridge*,
 424 U.S. 319 (1976)..........................................................................26

*McReynolds v. Merrill Lynch & Co., Inc.*,
 694 F.3d 873 (7th Cir. 2012) ..................................................................25

*Medien Patent Verwaltun AG v. Warner Bros. Entertainment Inc.*,
 No. 10-cv-419 (CM)(GWG), 014 WL 1169575 (S.D.N.Y. Mar. 21, 2014)....................27

*Morse/Diesel, Inc. v. Trinity Indus., Inc.*,
 142 F.R.D. 80 (S.D.N.Y. 1992) ..................................................................49

*Myers v. MedQuist, Inc.*,
    No. 05–4608, 2006 WL 3751210 (D.N.J. Dec. 20, 2006) ...........................................21, 31

*Nance v. Union Carbide Corp.*,
    540 F.2d 718 (4th Cir. 1976)
    *rev'd on other grounds*, 431 U.S. 952 (1977)..................................................................21

*Nelson v. Adams USA, Inc.*,
    529 U.S. 460 (2000)......................................................................................................24, 25

*Ortiz v. Fibreboard Corp.*,
    527 U.S. 815 (1999).............................................................................................................18

*Pa. Dept of Public Welfare v. Davenport*,
    495 U.S. 552 (1990)............................................................................................................39

*Peritz v. Liberty Loan Corp.*,
    523 F.2d 349 (7th Cir. 1975) ...................................................................................... 17-18

*Philip Morris Inc. v. Nat'l Asbestos Workers Med. Fund (In re Philip Morris Inc.)*,
    214 F.3d 132 (2d Cir. 2000)..........................................................................................18, 30

*Picard v. Merkin, (In re Bernard L. Madoff Inv. Securities LLC)*,
    11 MC 0012, 2011 WL 3897970 (S.D.N.Y. Aug. 31, 2011)............................................42

*PSINet, Inc. v. Cisco Sys. Capital Corp., (In re PSINet, Inc.)*,
    271 B.R. 1 (Bankr. S.D.N.Y. 2001) .................................................................................33

*Red Hawk Constr., Inc. v. United States*,
    108 Fed. Cl. 779 (Fed. Cl. 2013) .....................................................................................24

*Renco Metals, Inc. v. Williams Energy Marketing & Trading Co.*
*(In re Magnesium Corp. of Am.)*,
    460 B.R. 360 (Bankr. S.D.N.Y. 2011) .............................................................................42

*Reynolds v. Barrett*,
    741 F. Supp. 2d 416 (W.D.N.Y. 2010)
    *aff'd* 685 F.3d 193 (2d Cir. 2012) ...................................................................................25

*RTC v. KPMG Peat Marwick*,
    No. 92-1373, 1992 U.S. Dist. LEXIS 16670 (E.D. Pa. Sept 23, 1992) ......................22, 30

*Rutan v. Republican Party of 111*,
    868 F.2d 943 (7th Cir. 1989)
    *aff'd in part, rev'd in part*, 497 U.S. 62 (1990) ..............................................................17

*S.E.C v. Thrasher,*
    1995 WL 552719 (S.D.N.Y. Sept. 18, 1995)....................................................49

*S.E.C. v. Arias,*
    CV 12-2937 ADS GRB, 2012 WL 4849151 (E.D.N.Y. Sept. 14, 2012) ...................24, 25

*Schweizer v. Trans Union Corp.,*
    136 F.3d 233 (2d Cir. 1998)...........................................................................26

*Star Indus., Inc. v. Bacardi & Co. Ltd. Corp.,*
    02 CIV. 4239 (HB), 2003 WL 21056813 (S.D.N.Y. May 9, 2003) ............................ 25-26

*Thomas v. UBS AG,*
    706 F.3d 846 (7th Cir. 2013) ....................................................................16, 25

*Tucker v. U.S. Dep't of Commerce,*
    135 F.R.D. 175 (N.D. Ill. 1991)
    *aff'd*, 958 F.2d 1411 (7th Cir. 1992)................................................................19

*United States v. Contra Costa County Water Dist.,*
    678 F.2d 90 (9th Cir. 1982) .........................................................................49

*Walmart Stores, Inc. v. Visa USA Inc. (In re Visa Check/MasterMoney Antitrust Litig.),*
    280 F.3d 124 (2d Cir. 2001)..................................................................20, 21, 31

*Weinman v. Fidelity Capital Appreciation Fund,*
    04 C 5721, 2008 WL 753958 (N.D. Ill. Mar. 18, 2008)...................................30

*White v. Sims,*
    470 So. 2d 1191 (Ala. 1985) .........................................................................34

## Statutes and Rules

11 U.S.C. § 101.............................................................................................44

11 U.S.C. § 362.............................................................................................33

11 U.S.C. § 365.............................................................................................35

11 U.S.C. § 541.............................................................................................35

11 U.S.C. § 546.........................................................................................42-44

11 U.S.C. § 547............................................................................. *in passim*

11 U.S.C. § 548............................................................................. *in passim*

11 U.S.C. § 549 ................................................................................................ *in passim*

11 U.S.C. § 550 ................................................................................................ 40

11 U.S.C. § 741 ................................................................................................ 43

CPLR § 213 ..................................................................................................... 33

Fed. R. Civ. P. 12 ........................................................................................... 12

Fed. R. Civ. P. 15(c) ...................................................................................... 34

Fed. R. Civ. P. 23 ........................................................................................ 3. 11

Fed. R. Evid. 408 ........................................................................................... 17

## Other Authorities

Black's Law Dictionary (9th ed. 2009) ......................................................... 43, 44

Manual for Complex Litig. § 10.22 (4th ed. 2004) ....................................... 27

McCormick on Evidence (3d ed. 1984) ......................................................... 49

Newberg on Class Actions, § 10:9 (5th ed. 2013) ........................................ 31

TO THE HONORABLE SHELLEY C. CHAPMAN,
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Special Financing Inc. ("LBSF"), through Lehman Brothers

Holdings Inc. ("LBHI"), the Plan Administrator under the Modified Third Amended Joint

Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors (the "Plan"), the

Plaintiff in the instant adversary proceeding (the "Distributed Action"), hereby submits this reply

in support of the Proposed Scheduling Order (the "Proposed Order") [Adv. Proc. Dkt. No. 717]

and in response to the objections interposed to the Proposed Order (the "Objections"),[1] and

respectfully represents:

## **PRELIMINARY STATEMENT**[2]

1.      In this Distributed Action, LBSF seeks over $2 billion from at least 231

known, and many additional unknown defendants, who consist principally of the Trustees and

Noteholders in 45 SPVs.  In each of the SPVs, an Indenture[3] was executed, which contained

provisions specifying the parties entitled to priority of payment from the assets of the SPV.  In

each of the SPVs, LBSF was entitled to priority of payment over the Noteholders to the extent of

---

[1] This Reply responds to the following objections and joinders that have been submitted in response to the Proposed Order:  (i) JA Hokkaido Shinren's Objection to Plaintiff's Revised Proposed Scheduling Order [Adv. Proc. Dkt. No. 725]; (ii) Response of Group of 77 Defendants to LBSF's Proposed Scheduling Order [Adv. Proc. Dkt. No. 730]; (iii) Joinder of Certain Trustee Defendants to the Response of 77 Defendants to LBSF's Proposed Scheduling Order and Limited Objection to the Proposed Scheduling Order [Adv. Proc. Dkt. No. 731]; (iv) Notice of Response of U.S. Bank National Association, as Trustee to Lehman Brothers Special Financing, Inc.'s Proposed Scheduling Order [Adv. Proc. Dkt. No. 733]; and (v) Notice of Motion of Group of Defendants to Modify Certain Orders Affecting Litigation of Adversary Proceeding [Bankr. Proc. Dkt. No. 43983-1].  The Reply also responds to the following untimely joinders:  (i) Joinder of MKP Capital Management, L.L.C. to the Response of Group of 77 Defendants to LBSF's Proposed Scheduling Order [Adv. Proc. Dkt. No. 747]; and (ii) Joinder of Structured Credit Opportunities Fund II, L.P., Tricadia Credit Strategies Master Fund, Ltd., and Mariner LDC to the Response of Group of 77 Defendants to LBSF's Proposed Scheduling Order [Adv. Proc. Dkt. No. 748].  The Defendants that participated in the Response of Group of 77 Defendants are collectively referred to as "the Group."  The Response of Group of 77 Defendants is referenced herein as "Group Br. at __."

[2] All capitalized terms not otherwise defined herein shall have either the meanings set forth in the Second Amended Complaint, dated June 29, 2012 [Adv. Proc. Dkt. No. 303-1] or the meanings set forth below.

[3] In four of the SPVs, a Trust Deed rather than an Indenture was executed.  However, for simplicity, LBSF refers to the Indentures and Trust Deeds as "Indentures" herein.

over $2 billion.[4]  However, each of the Indentures also impermissibly provided that the priority

of payments was reversed solely as a result of a default occasioned by the bankruptcy of LBHI,

the guarantor of LBSF's obligations.  The first phase of this litigation included efforts to mediate

the dispute over an approximate 3½ year period while a stay of the action remained in effect.

While those efforts were very successful,[5] in January 2014 (partly as a result of pressure from

numerous Noteholder Defendants) LBSF requested a final extension of the stay and the

implementation of a scheduling order that would provide the means for advancing this litigation

to conclusion.  The Proposed Order set forth a protocol that LBSF believed would minimize

costs, preserve judicial resources, and maximize the efficient administration of this action.  In

response, the Group has submitted an order (the "Group's Proposed Protocol") that if entered

would maximize expense, result in unwarranted demands on the Court's resources, and

improperly delay dealing with the issues which should be decided first.

       2.      Specifically, LBSF's Proposed Order commences with the consideration

of LBSF's motion for class certification of the known and unknown Noteholder Defendants to

provide the Court, and the parties, with the efficient, well-proven structure of a class action,

which will permit rulings of this Court to have full, binding impact on all parties.  This same

class structure provides a tried and true mechanism to facilitate case management.  Under

LBSF's Proposed Order, all parties will get their opportunity to have relevant, substantive issues

heard and decided in the most efficient, widespread, binding and equitable manner.  The great

weight of authority holds that class certification should precede merits determinations.

---

[4] Claims against Canadian Imperial Bank of Canada ("CIBC") in Count IX, among others, of the Second Amended Complaint have since been resolved, which led to a commensurate reduction in the amount claimed from the balance of the defendants.

[5] Besides the settlement with CIBC, an additional 39 defendants have settled, or are in the process of settling, with LBSF during the Stay.

3.      On the other hand, the Group's Proposed Protocol would create chaos, needlessly multiply expense, and strain the resources of the Court.  The primary difference is that the Group's Proposed Protocol puts class certification last, after unidentified motions to dismiss, which is contrary to the requirement that class certification should be decided before decisions on the merits.  The Group has failed to identify a single dispositive argument that is so important that it justifies departing from the customary practice of addressing class certification first.

4.      If the Group's Proposed Protocol is entered, and class certification is deferred, rulings by the Court prior to class certification may have no binding effect on absent and non-participating Defendants, who may claim the right to re-litigate the same issues after class certification is decided.  Notably, 63 of the named Noteholder Defendants have not joined in the Group or otherwise objected to the Proposed Order.  Thus, such non-participating Noteholder Defendants, as well as unnamed Noteholders, could assert that rulings favorable to LBSF do not bind them because they are situated differently from the moving party or parties, or did not have the full and fair opportunity to litigate the issues prior to class certification, causing another round of litigation over (i) whether the prior rulings apply to all the Noteholder Defendants and/or (ii) separately litigating the issue as to such a Noteholder Defendant.  This is precisely why Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 23, and a substantial number of cases ruling on it, have consistently held that class certification should be determined as early as possible, including before dealing with substantive motions.  With a class/sub-class structure in place, the question of who is/is not similarly situated is addressed up front, subclasses can be created as needed, motions will be submitted by class representatives only, and rulings will bind (and benefit as the case may be) all Noteholder Defendants equally.  The Group's efforts to

ignore the foregoing and to assert that its form of order is preferable are unsupported by logic, or

law, because as discussed below, the Group does not in fact cite precedent to support its position.

5.     Finally, the Group's assertion that LBSF's Proposed Order is

"unprecedented, unworkable, and unfair," is not only incorrect, but in fact, more properly

describes the Group's Proposed Protocol, which seeks to inflict as much confusion and

inefficiency as possible.  Lest there be any doubt about the Group's true objective to impose

chaos over order, the Group argues that the ADR Stay should be abolished, and that the

confidentiality provision of the ADR Order and protocol should also be abolished.  As the Court

knows, the ADR program has been a widely admired success (the Debtors have recovered more

than $2.25 billion as a result of 328 ADR settlements with 435 derivatives counterparties),

saving all parties substantial costs in reaching resolutions without the Court's involvement and

providing significant assets to the Debtors for distribution to creditors.  LBSF's Proposed Order

plainly permits any party subject to the ADR Stay to participate in the relevant Phase under the

Proposed Order.  Defendants need no more, and certainly there is no bona fide reason to abrogate

confidentiality.  The Group's Proposed Protocol seeks to undo more than three years of

successful management of this adversary proceeding and successful ADR efforts, in one fell

swoop.  Respectfully, the Court should continue the balanced and measured approach which has

brought such success and enter LBSF's Proposed Order.

## STATEMENT OF FACTS

**A.     The Distributed Action's Unique Procedural History**

6.     LBHI and its subsidiaries (the "Debtors") comprised what was once the

fourth largest investment bank in the United States.  Upon filing for bankruptcy on September

15, 2008 and shortly thereafter, the Debtors commenced one of the largest and most complicated

4

chapter 11 cases in history.  Among the many accomplishments by the Debtors was the

implementation of a number of ADR procedures[6] that have led to the resolution of billions of

dollars of claims held by and against the Debtors without the need for Court intervention,

including hundreds of millions of the claims asserted in this case.  Nearly all of the progress to

date has been achieved without contest before the Court, including the success accomplished by

LBSF in this action.

       7.       Before commencing the Distributed Action, LBSF combed its internal

records to identify as many parties as possible as defendants and as representatives of a

noteholder defendant class.  That search, however, was only of limited value for the following

reasons:  (i) because of LBSF's role in these transactions as credit default swap provider, it only

possessed limited information with respect to the beneficial owners of the notes; and (ii) the

---

[6] *See e.g.,* Alternative Dispute Resolution Procedures Order for Affirmative Claims of Debtors Under Derivatives Contracts, dated September 17, 2009 [Bankr. Proc. Dkt. No. 5207]; Order Pursuant to Section 105 of the Bankruptcy Code, Bankruptcy Rule 9014, and General Order M-390 Authorizing the Debtors to Implement Claims Hearing Procedures and Alternative Dispute Resolution Procedures for Claims Against Debtors, dated April 19, 2010 [Bankr. Proc. Dkt. No. 8474]; Order Supplementing the September 17, 2009 Alternative Dispute Resolution Procedures Order to Add a Fourth Mediator, dated September 23, 2010 [Bankr. Proc. Dkt. No. 11537]; Tier 2 Alternative Dispute Resolution Procedures Order for Affirmative Claims of Debtors Under Derivatives Contracts for Amounts Not More Than $1 Million, dated September 27, 2010 [Bankr. Proc. Dkt. No. 11649]; Alternative Dispute Resolution Procedures Order for Affirmative Claims of the Debtors Under Derivatives Transactions With Special Purpose Vehicle Counterparties, dated March 3, 2011 [Bankr. Proc. Dkt. No. 14789]; Supplemental Order Pursuant to Section 105(a) of the Bankruptcy Code and General Order M-390 for Authorization to Implement Alternative Dispute Resolution Procedures for Affirmative Claims of Debtors Under Derivatives Transactions with Special Purpose Vehicle Counterparties, dated August 15, 2011 [Bankr. Proc. Dkt. No. 19251]; Supplemental Order Pursuant to Section 105(a) of the Bankruptcy Code and General Order M-390 for Authorization to Implement Alternative Dispute Resolution Procedures for Affirmative Claims of Debtors Under Derivatives Transactions With Special Purpose Vehicle Counterparties, dated November 10, 2011 [Bankr. Proc. Dkt. No. 21942]; Order Amending the Tier 2 Alternative Dispute Resolution Procedures Order For Affirmative Claims of Debtors Under Certain Derivatives Contracts, dated May 2, 2012 [Bankr. Proc. Dkt. No. 27698]; Amended Order Providing for Alternative Dispute Resolution Procedures for Affirmative Claims of the Debtors Under Derivatives Transactions with Special Purpose Vehicle Counterparties, dated July 18, 2012 [Bankr. Proc. Dkt. No. 29507]; Order Amending the Order Pursuant to Section 105 of the Bankruptcy Code, Bankruptcy Rule 9014, and General Order M-390 Authorizing the Debtors to Implement Claims Hearing Procedures and Alternative Dispute Resolution Procedures for Claims Against Debtors, dated December 13, 2012 [Bankr. Proc. Dkt. No. 32791]; Order Supplementing the Tier One and SPV Alternative Dispute Resolution Procedures Orders to Add Two Additional Mediators, dated June 13, 2013 [Bankr. Proc. Dkt. No. 37940]; and Order Pursuant to Section 105(a) of the Bankruptcy Code and General Order M-452  Further Amending the Alternative Dispute Resolution Procedures for Affirmative Claims of Debtors Under Derivatives Transactions with Special Purpose Vehicles, dated October 2, 2013 [Bankr. Proc. Dkt. No. 40267].

notes in controversy were issued over several years beginning in 2002 and were subsequently

traded in secondary market transactions unknown to LBSF.[7]

8.      Although LBSF had difficulty identifying the hundreds of entities that

held the Notes and received the challenged Distributions, to avoid potential statute of limitations

issues, on September 14, 2010, within the two year period after the LBHI and LBSF petition

dates, LBSF filed its complaint (the "Original Complaint") based upon the information then

available to it.  The Original Complaint named the Trustees under the Indentures, and the

Noteholder Defendants individually and as representatives of the Noteholder Class, and was

subsequently amended to add additional defendants on October 1, 2010 (the "First Amended

Complaint").

9.      All of the SPVs that are the subject of the Distributed Action are governed

by a set of transaction documents that includes an Indenture which governs the rights of the

Noteholders and LBSF to payment from the SPV.  The Original Complaint asserted claims

against the indenture trustees (the "Trustee Defendants"), the SPVs (the "Issuer Defendants" or

"Co-Issuer Defendants"), and holders of notes (the "Notes") issued by the Issuer Defendants (the

"Noteholder Defendants") both individually and as representatives of a class of noteholders (the

"Noteholder Class").[8] Payment priorities in the Indentures were reversed pursuant to *ipso facto*

clauses (the "Priority Modification Provisions"), which were invoked after LBHI filed for

bankruptcy, and which LBSF seeks to undo in this action.  The Priority Modification Provisions

---

[7] Moreover, identifying the beneficial owner of the Notes, *i.e.*, the one person or entity with the economic interest in
a Note, is difficult.  Generally, most of these Notes are held in a "street name."  For example, many of the Notes at
issue in the Transactions had the same "registered" holder, The Depository Trust Company or its nominee, Cede &
Co. (together "DTC").  DTC apparently holds the Notes on behalf of its participant banks which in turn may or may
not be the holders of the beneficial interests of these Notes.

[8] The Trustee Defendants, Issuer Defendants, Co-Issuer Defendants, and Noteholder Defendants are referred to
herein collectively as the "Defendants."

effected a transfer of LBSF's right to payment priority to the Noteholders, which LBSF seeks to

undo or avoid, and recover from either the initial or any subsequent transferee. Moreover, when

the Distributions of the assets of the SPVs to the Trustee Defendants and Noteholders occurred

based upon the Priority Modification Provisions, additional potentially avoidable transfers

occurred. The Distributed Action seeks, among other things: (i) a declaratory judgment that the

Priority Modification Provisions are unenforceable *ipso facto* clauses and that the Trustee

Defendants' Distributions of the Issuer Defendants' assets violated the automatic stay,

restoration of LBSF's rights to priority, and recovery of the assets wrongly distributed to the

Trustees and Noteholders; (ii) avoidance of the transfers occasioned by the Priority Modification

Provisions, and of the Distributions, pursuant to sections 547, 548 and 549 of the Bankruptcy

Code; and (iii) recovery of the billions of dollars distributed to the hundreds of Noteholders and

the Noteholder Class (the "Transactions"). The amount believed to have been wrongfully

distributed is over $2 billion.

      10.    This Court stayed this action through a series of orders since October 20,

2010 (the "Stay"), one month after LBSF filed the Original Complaint.[9] Despite the Group's

complaint of the "years of delay already created by LBSF" with respect to the Stay (Group Br. at

2), few Defendants ever objected to extensions of the Stay in the past 3½ years.[10]

      1.    The ADR Program

      11.    The Stay has permitted the Debtors to employ innovative alternatives to

litigation: in particular, the Court-established alternative dispute resolution ("ADR") program,

set forth in the orders described in footnote 5 above applicable to this case, the most recent of

---

[9] By this Court's January 31, 2014 Order, the Avoidance Actions are currently stayed until the later of (i) May 20, 2014 or (ii) thirty days after the date which this Court enters a scheduling order governing the instant action. [Bankr. Proc. Dkt. No. 42417]

[10] Out of 152 Noteholder Defendants and Trustee Defendants, only 14 filed objections to the Stay.

which was dated July 18, 2012 [Bankr. Proc. Dkt. No. 29507] (the "ADR Order").  Under the

ADR Order, a stay (the "ADR Stay") has allowed LBSF and many Noteholder Defendants the

opportunity to pursue consensual resolutions, including by communicating and negotiating

through, among other things, the exchange of relevant documentation, and evaluation of

potential defenses.  Any communications in the ADR process are strictly confidential to foster

the potential for settlement negotiations.  *See* ADR Order ¶ 13.

12.    The ADR program has produced "remarkable successes," *see* Tr. of Hr'g,

June 15, 2011 at 31:11, in resolving disputes between the Debtors and their creditors or

counterparties.  Indeed, the Court further promoted the Debtors' ADR efforts by ordering the

addition of two additional mediators under, *inter alia*, the Amended Order Providing for

Alternative Dispute Resolution Procedures for Affirmative Claims of the Debtors Under

Derivatives Transactions With Special Purpose Vehicle Counterparties.  *See* Bankr. Proc. Dkt.

No. 37940.  As the Court recognized during the hearing on January 29, 2014, the ADR measures

"demonstratively have been extremely beneficial to the Lehman estate . . . [and] also have been

beneficial to the counterparties themselves by avoiding the expense, burden and delay of

litigation."  *See* Tr. of Hr'g Jan. 29, 2014 at 47:19-22.  As a result of the ADR process, case-wide

to date, the Debtors have recovered more than $2.25 billion through 328 ADR settlements with

435 counterparties, all with minimal Court intervention.

2.    The Limited Discovery Order

13.    In addition, this Court issued LBSF's Order Granting Plaintiff's Motion

for Expedited Discovery Pursuant to Bankruptcy Rules 7026 and 9014 and Establishing a

Protocol Governing the Confidentiality of and Access to Certain Discovery Material, Adv. Proc.

Dkt. No. 27) (the "Discovery Order"), which ordered, among other things, that:

8

> LBSF shall be permitted to conduct . . . discovery from the Avoidance Action Defendants and non-parties to ascertain the current identity, address and noteholder status of each Noteholder as of the date each Issuer made its post-petition distributions being challenged in the Amended Complaint, as required to effect service of the Amended Complaint upon all putative members of the Noteholder Class and amend the Amended Complaint as appropriate including, without limitation, the immediate service of subpoenas . . . necessary to identify any and all members of the Noteholder Class.

The purpose of the Discovery Order was, among other things, to permit LBSF to identify, through limited disclosure, additional members of the Noteholder Class that received Distributions from the Trustee Defendants as a result of the Priority Modification Provisions, so that LBSF could name them as Noteholder Defendants and serve those entities in the Distributed Action with process.

14.     During the Stay, LBSF launched an extensive discovery process and served party discovery and non-party subpoenas upon (i) the Trustee Defendants requesting information regarding the Distributions each Trustee Defendant made to Noteholders in connection with the Priority Modification Provision; and (ii) various non-parties including DTC and its participant banks requesting information regarding Distributions it received and made with respect to each Transaction.  On June 23, 2012, LBSF filed its second amended complaint (the "Second Amended Complaint" or "SAC") which, among other things, named 165 new parties and corrected the names of 35 Noteholder Defendants named in the First Amended Complaint.  LBSF continues to make numerous efforts to identify the remaining members of the putative Noteholder Class, and anticipates seeking leave to further amend the Second Amended Complaint based upon such information.

B.    **Summary of The Claims**

15.    The Second Amended Complaint asserts numerous bases upon which

LBSF can rely in an effort to undo the operation of the Priority Modification Provisions, avoid

the transfers to Defendants, and recover the Distributions:

- Count I – declaratory judgment that the Priority Modification Provisions are
  unenforceable *ipso facto* clauses;

- Count II – declaratory judgment that Distributions violate the automatic stay;

- Count III – avoidance of prepetition transfer avoidable under section 547 of
  the Bankruptcy Code;

- Count IV – avoidance of prepetition transfer avoidable under section
  548(a)(1)(B) of the Bankruptcy Code;

- Count V – avoidance of unauthorized post-petition transfer under section 549
  of the Bankruptcy Code;

- Count VI – unjust enrichment;

- Count VII – constructive trust;

- Count VIII – monies had and received;[11]

- Count X – breach of contract as against Noteholder Defendants in connection
  with Pyxis ABS CDO 2007-1 Ltd.;

- Count XI – prepetition transfer avoidable under section 548(a)(1)(A) of the
  Bankruptcy Code; and

- Count XII – replevin.

C.    **LBSF's Proposed Order**

16.    LBSF's Proposed Order contemplates a three stage litigation process to

govern the Distributed Action, "Phase I," "Phase II" and "Phase III."  *See* Bankr. Proc. Dkt. No.

---

[11] As stated above, at footnote 4, Count IX of the Second Amended Complaint against CIBC has been resolved.

43704 and Adv. Proc. Dkt. No. 717. LBSF's Proposed Order permits the Court to address complicated issues prevalent among all Defendants in an efficient manner.

17.     Phase I addresses class certification and issues ancillary to class certification as required by Fed. R. Civ. P. 23, which states that class certification issues be decided "[a]t an early practicable time after a person sues or is sued as a class representative." Rule 23(c)(1)(a). Phase I will begin upon expiration of the Stay and will involve class certification and various related issues, including potential motions by Defendants for class representative appointment, class discovery, class certification briefing and disposition, and the application of class tolling and statute of limitations issues.[12]

18.     Phase II adjudicates individualized pretrial issues that may not be resolved by virtue of class certification, such as statute of limitation defenses (in the absence of class tolling) and challenges to personal jurisdiction. Phase II, which is similar to Phase II in the Group's Proposed Protocol, begins once the matters addressed in Phase I have been determined.

19.     Phase III involves any other pretrial matters not addressed during Phase I or Phase II, including, *e.g*., responsive pleadings and/or motions to dismiss (on a class-wide basis upon class certification), followed by fact and expert discovery.

20.     As part of the Proposed Order, the Debtors also intend to seek a modification of the ADR Stay imposed by the ADR Order to allow all Defendants engaged in ADR to participate in litigation of Phase I. This modification will allow all Defendants to participate in the stages of litigation and put all Defendants on the same footing, which will prevent the piecemeal resolution of the same issues depending upon which Defendants emerge from the ADR process sooner.

---

[12] Notably, the Group has not contended that the class certification process would be lengthy or difficult. In fact, it has presented no reasons why certification would be denied in this case. Accordingly, the procedures set forth in Phase I could be even more expedited than envisioned under the Proposed Order.

\*                    \*                    \*

21.       In sum, the Proposed Order provides the Court with the opportunity to efficiently address complicated matters on a class-wide basis instead of a haphazard free-for-all based upon a handful of Defendants that elect to participate (remembering that approximately half of the Noteholders have not objected nor have they been heard from).  The Proposed Order streamlines the process by which this Court can steer the Distributed Action going forward, which is necessary to permit efficient and fair resolution for all parties in this multi-billion dollar case.

D.      **The Group's Proposed Protocol**[13]

22.       Unlike LBSF's Proposed Order, Phase I of the Group's Proposed Protocol seeks to dive into the substantive motions pursuant to Fed. R. Civ. P. 12(b)(6) prior to class certification.  The Group does not explain why it believes that the Second Amended Complaint may be dismissed, other than to state in the most general terms that the Second Amended Complaint:  "fails to state a cognizable claim . . . claims are time barred as to certain defendants, and that LBSF cannot establish personal jurisdiction over certain defendants."  Group Br. at 6. Nor does the Group identify which purportedly dispositive motions it intends to be covered by Phase I, since challenges to personal jurisdiction are to be raised in Phase II of the Group's Proposed Protocol, just as in LBSF's Proposed Order.  The Group suggests, but does not guarantee, that motions to dismiss might be similarly "grouped" to avoid duplication, but at the same time it reserves the "right" to plead facts and raise arguments specific to each of them.  The

---

[13] The (i) Trustee Defendants Bank of America National Association, The Bank of New York Mellon, BNY Corporate Trustee Services Ltd., Citibank, N.A., Deutsche Bank Trust Company Americas, U.S. Bank National Association and U.S. Bank Trust National Association; (ii) Noteholder Defendants MKP Capital Management, L.L.C., Structured Credit Opportunities Fund II, L.P., Tricadia Credit Strategies Master Fund, Ltd., and Mariner LDC adopt the order proposed by the Group.  *See* Adv. Proc. Dkt. Nos. 731, 747, and 748.  Noteholder Defendant JA Hokkaido generally objects to issues raised in LBSF's Proposed Order, which are addressed herein, but does not expressly adopt the order proposed by the Group.  *See* Adv. Proc. Dkt. No. 725.

12

prospect of receiving dozens of individual briefs on whatever issues the fertile imaginations of defense counsel can concoct should be sufficiently alarming to convince the Court that controlling what Defendants can do and how they can do it is a prerequisite to the sound management of this case. Other than the Group's standardless "best efforts" commitment to coordinate briefing, the Group's approach only invites chaos.

23.    Phase II of the Group's Proposed Protocol contemplates any remaining dispositive motions pursuant to Fed. R. Civ. P. 12, including motions based upon statutes of limitation (to the extent not addressed in Phase I) and upon lack of personal jurisdiction. Once the Court has ruled upon the motions, Defendants are to submit answers.

24.    Finally, it is not until Phase III of the Group's Proposed Protocol, after the Court has waded through potentially scores of motions, none of which will terminate this case in its entirety, and none of which are applicable to all Defendants, that the Court would address class certification motions and ancillary issues, including fact and expert discovery.

25.    In addition to unleashing a torrent of motions, the Group's Proposed Protocol launches a frontal assault on the ADR process, seeking to eviscerate the ADR Stay in its entirety and terminate the confidentiality protections implemented through the ADR Order. The Group's proposals would bring the ADR process to a halt, as all parties will be chilled from engaging in that process when its confidentiality is no longer respected and when the pace of unstayed litigation diverts the attention of the parties and the Court from possible resolution of these disputes. *See* ¶¶ 99-101, *infra*.

26.    The Group's approach puts the cart before the horse. The Group's Proposed Protocol seeks to decide "merits" issues first, but in the absence of a class structure, leaves those issues open to re-litigation if absent class members choose to second-guess any

13

decision that is reached.  As stated below, the standard approach is to decide class certification

issues before addressing motions on the merits.  The Group has not made a sufficiently weighty

showing why this Court should depart from standard procedure.

27.    Furthermore, under the Group's Proposed Protocol, LBSF and the Court

face the potential for a multiplicity of motions without the requirement of consolidated briefing.

The Group's endeavor to use "best efforts" to coordinate briefing is cold comfort in light of the

fact that the Group's Proposed Protocol has no mechanism that would require even a single

Defendant to avoid making duplicative arguments either in redundant briefs or oral arguments

that would needlessly consume the time of the Court and the parties.  *See* ¶¶ 57, 98, *infra*.

28.    Simply put, the Group's Proposed Protocol should be rejected.

## **ARGUMENT**

## **I.    The Court Should Implement LBSF's Proposed Order**

29.    LBSF's Proposed Order promotes efficiency by permitting the Court to

address many substantive issues on a class-wide basis even if many Defendants elect not to

participate in the Distributed Action and/or remain unknown.  Without class certification,

"dormant," non-participating or absent parties may attempt to re-litigate any ruling made by this

Court on the Priority Modification Provisions or any other substantive issue.  However, with

class certification, such dormant or absent parties would be bound.  Moreover, the number of

motions submitted on substantive issues would be reduced dramatically, to a workable number,

preserving judicial and party resources.

30.    Significantly, the Group has not suggested that class certification would be

denied by this Court.  Rather, it apparently contends that repudiation of the BNY[14] decision on

---

[14] Defined below.

the Priority Modification Provisions, either by this Court or interlocutory appeal[15] would dispose

of the Distributed Action. But this assumption is erroneous. As set forth herein at ¶¶ 64-83,

significant claims alleged in the Distributed Action would survive motions to dismiss even if the

*BNY* decision were not followed.

       31.    Under LBSF's Proposed Order, the class representative will provide the

necessary coordination and structure. Before class certification, an Executive Committee and

Liaison Counsel structure – mechanisms common in complex litigation[16] – would provide for

such coordination. While the Group contends, without citing any authority whatsoever, that such

a structure would violate Defendants' due process rights, it ignores the plain language of Rule 23

which recognizes the need for pre-class certification coordination and control and explicitly

allows a court to appoint an interim class counsel to serve those functions. There is no

suggestion that the interim class counsel mechanism of Rule 23 – a far more intrusive case

management device than the protocol LBSF has proposed – violates due process and thus such

arguments fail here as well. *See* ¶¶ 48-51, *infra*.

    **A.**    **A Determination of Class Certification First Will
Provide For Streamlined Litigation and Orderly Case Management**

       32.    The Group contends that its position is "consistent with standard practice"

(Group Br. at 3) and that LBSF's position is "unprecedented" and supported by "no cases." *Id.*

at 1. The Group is flat out wrong. Almost all of the cases the Group cites on this point do not,

---

[15] It is doubtful that an interlocutory appeal of the *ipso facto* clause issues would even be granted by the District Court. *See Lehman Bros. Special Fin. Inc. v. Ballyrock ABS CDO 2007-1 Ltd. (In re Lehman Bros. Holdings Inc.),* No. 09 -01242 (JMP), 2011 WL 9375423, at *6 (S.D.N.Y. Nov. 3, 2011) (interlocutory appeal of similar *ipso facto* clause held to be unenforceable denied). The Group's reliance upon *Lehman Bros. Special Fin. Inc. v. BNY Corporate Tr. Servs. Ltd. (In re Lehman Bros. Inc.),* No 09-0242, slip op (S.D.N.Y. Sept. 23, 2010), Dkt. No. 117, is overstated because the Distributed Action's procedural posture is more similar to the *Ballyrock* interlocutory appeal, which was dealing with a motion to dismiss, as compared to the *BNY* interlocutory appeal, which was dealing with a summary judgment motion.

[16] *See, e.g.*, *In re Tribune Co. Fraudulent Conveyance Litig.*, No. 1:12-mc-02296-WHP (S.D.N.Y. Sept. 7, 2012), Dkt. No. 45.

in fact, support its position.  In fact, four of the appellate cases that the Group cites explicitly

state that the normal practice is to resolve class certification issues first.  *See* ¶ 49, *infra* (citing

*inter alia*, *Thomas v. UBS AG*, 706 F.3d 846, 849 (7th Cir. 2013)).  And, as the Group

completely fails to acknowledge, Rule 23 itself states that class certification should be heard at

the earliest practical opportunity.  United States Supreme Court and Second Circuit case law call

for Rule 23 issues to be decided before merits issues.

     1.    <u>Precedent Dictates That Class Certification Should Precede The Merits</u>

     33.    Consistent with precedent, a determination of class certification prior to

the merits of the case permits the Court to make rulings that are binding upon all Defendants.  In

this case, the need for early class certification is manifest.  The putative Noteholder Class is

composed of 144 Noteholder Defendants, plus an unknown number of absent class members,

only 81 of whom apparently have agreed to any form of coordination.  In such circumstances,

class certification is necessary before any decision on the merits to clarify who will be bound by

the Court's pre-trial rulings.  *See Bertrand v. Maram*, 495 F.3d 452, 455 (7th Cir. 2007) ("Class-

action status must be granted (or denied) early . . . to clarify who will be bound by the decision").

If a decision on the merits is rendered before certification, absent or inactive class members

could simply sit on the sidelines and, after a decision is rendered, collaterally attack any such

decision, leading to confusion and wasted effort.  Thus, where a party seeks a ruling on the

merits of class claims prior to class certification, courts generally postpone determination of the

merits in order to "avoid the problem of 'one-way intervention'—whereby a potential class

member could await the outcome of a determination on the merits before deciding whether to

join the class."  *Gomez v. Rossi Concrete Inc.*, No. 08cv1442, 2011 WL 666888, at *1 (S.D. Cal.

Feb. 17, 2011); *Katz v. Carte Blanche Corp.*, 496 F.2d 747, 762 (3d Cir. 1974) (noting that the

federal class action rule provides protection against one-way intervention after an interlocutory

merits determination).

34.     Other courts have also decided that early class certification is necessary to

avoid fragmented litigation.  *See In re Diamond Multimedia Sys. Inc. Sec. Litig*., No. C 96-2644,

1997 WL 773733, at *2 (N.D. Cal. 1997)) (citing judicial inefficiency of one-way intervention as

basis for certifying class before deciding motion to dismiss); *Bowling v. Pfizer, Inc*., 142 F.R.D.

302, 303-04 (S.D. Ohio 1991) ("[w]e will consider class certification before the Defendants'

dispositive motions because it may promote judicial efficiency by resolving this dispute in one

law suit"); *see generally American Pipe & Construction Co. v. Utah,* 414 U.S. 538, 548 (1974)

(amendment to Rule 23 to allow determination of class certification "[a]s soon as practicable"

designed "specifically" to reconcile "defect" in former rule allowing "members of a class to

benefit from a favorable judgment without subjecting themselves to the binding effect of an

unfavorable one").

35.     At a fundamental level, class certification at this stage is required by Rule

23 itself.  *See Rutan v. Republican Party of Ill*., 868 F.2d 943, 947 (7th Cir. 1989) (*en banc*)

("The district court dismissed the complaint under Fed. R. Civ. P. 12(b)(6) for failure to state a

claim upon which relief can be granted but did not first consider whether the action may be

properly brought as a class action.  This violates Fed. R. Civ. P. 23(c)(1) . . . ."), *aff'd in part,*

*rev'd in part*, 497 U.S. 62 (1990).  Although the Group studiously ignores the text of Rule 23,

the Rule specifically dictates that class certification be decided at "an early practicable time'

after a person sues."  Fed. R. Civ. P. 23(c)(1); *see Kapiti v. Kelly*, No. 07-3782, 2008 WL

3874310, at *3 (S.D.N.Y. Aug. 18, 2008) (citing *Jones v. Ford Motor Credit Co*., 358 F.3d 205,

215 (2d Cir. 2004) (quoting Fed. R. Civ. P. 23(c)(1))); *see also Peritz v. Liberty Loan Corp*., 523

F.2d 349, 353-54 (7th Cir. 1975) (1966 amendments to Rule 23 require class certification prior to a determination on the merits).[17]

36.    Contrary to the Group's claim that literally no cases support LBSF's position, (Group Br. at 1), in fact numerous courts have decided class certification issues before merits related issues, including motions to dismiss.  Indeed, the United States Supreme Court has ruled that class certification issues should precede even "threshold" merits issues such as Article III standing in certain cases without even suggesting that due process considerations were implicated.  *See Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 831 (1999) (relying upon *Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997) and deciding that Article III standing issues should be decided after class certification issues because class certification issues are  "logically antecedent" to merits related issues such as standing).[18]

37.    Likewise, a court's decision on the merits "should ordinarily not occur before or simultaneous with a decision on class certification."  *Cuzco v. Orion Builders, Inc.*, 262 F.R.D. 325, 335-36 (S.D.N.Y. 2009) (citing, *inter alia*, *Philip Morris Inc. v. Nat'l Asbestos Workers Med. Fund* (*In re Philip Morris Inc.*), 214 F.3d 132, 135 (2d Cir. 2000) (class certification necessary to abate the multi-billion dollar specter of a risk-free intervention decision by thousands of putative plaintiffs)).[19]  The Second Circuit has noted the onerous effect of failing to decide class certification promptly, finding that a district court's failure to decide class

---

[17] *See also Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178 (1974) ("This procedure [inquiry into the merits before resolving the class status] is directly contrary to the command of subdivision (c)(1) that the court determine whether a suit denominated as a class action may be maintained as such '[a]s soon as practicable after the commencement of (the) action'").

[18] The *Amchem* case involved "an array of jurisdictional barriers" including challenges to justiciability, subject matter jurisdiction, and lack of standing because some claimants had not yet sustained any cognizable injury.  The court decided that class certification issues should be decided before all of these issues.

[19] *See e.g., Diaz v. Paterson*, 547 F.3d 88, 94 (2d Cir. 2008) (describing lower court opinion adjudicating class certification in August 2006 and 12(b)(6) motion in February 2007).

certification "early in the proceedings not only produced below an atmosphere of confusion, but also made our appellate review more difficult." *Henry v. Gross*, 803 F.2d 757, 769 (2d Cir. 1986).[20]  In accordance with *Philip Morris*, courts ordinarily decide class certification before a decision on the merits. *See, e.g., Horn v. Ass'd Wholesale Grocers, Inc.*, 555 F.2d 270, 273-76 (10th Cir. 1977) (stating that "the words 'as soon as practicable after the commencement of the action' are not to be ignored").

38.    Dispositive motions such as motions to dismiss are encompassed within the "merits" determinations which should not be reached until after class certification. *See Gilmore v. Sw. Bell Mobile Sys., Inc.*, 156 F. Supp. 2d 916, 926 (N.D. Ill. 2001) ("[w]here possible, before considering the merits of defendant's Rule 12(b)(6) motion, it should first be determined whether this case is appropriate for class certification") (citation omitted); *Bowling*, 142 F.R.D. at 303-4 (considering class certification before motions to dismiss and for summary judgment); *Tucker v. U.S. Dep't of Commerce*, 135 F.R.D. 175, 176 (N.D. Ill. 1991) ("The parties briefed the motion to dismiss, but this court determined that it would be premature to consider that motion without having first decided whether to certify the proposed class"), *aff'd*, 958 F.2d 1411 (7th Cir. 1992); *In re Diamond Multimedia Sys. Inc. Sec. Litig.*, 1997 WL 773733, at *2 ("proceeding with the motions to dismiss in the absence of class certification would result in an inefficient use of scarce judicial resources and significantly prejudice the defendants").

---

[20] The *Authors Guild v. Google*, 721 F.3d 132 (2d Cir. 2013), decision cited by the Group is addressed below.

2.      The Group Does Not and Cannot Demonstrate
Why Determinations On The Merits Prior To
<u>Class Certification Are More Efficient In This Case</u>

39.      The Group has made no showing that a motion to dismiss could end, or even significantly reduce the scope of, this action.  Against this backdrop, LBSF submits that the only efficient way to proceed is to certify the class and impose a workable case management structure, which will bind all Defendants to the motions that may be made later.  The counter-arguments propounded by the Group simply do not provide a basis for determining the merits prior to class certification.

40.      First, the Group contends, without benefit of authority, that "LBSF's order leaves open the possibility that if defendants or claims are dismissed and the Rule 23 factors consequently change, class certification would need to be re-litigated again" (Group Br. at 9). That argument is completely without merit, as it could be made in any case in which class certification is decided before merits issues, but that is the standard practice required by Rule 23. Indeed, the flexibility of Rule 23 in permitting such issues to be re-visited is a benefit of Rule 23 and a reason favoring certification of a class. *E.g., Jiminez v. Weinberger*, 523 F.2d 689, 697-98 (7th Cir. 1975).  The Second Circuit has endorsed several flexible solutions to dealing with individualized issues which arise late in a litigation, including:  "appointing a magistrate judge or special master to preside over individual damages proceedings," "decertifying the class after the liability trial and providing notice to class members concerning how they may proceed to prove damages," "creating subclasses," or "altering or amending the class." *See Walmart Stores, Inc. v. Visa USA Inc*. (*In re Visa Check/MasterMoney Antitrust Litig*.), 280 F.3d 124, 141 (2d Cir. 2001) *overruled on other grounds by In re IPO*, 471 F.3d 24 (2d Cir. 2006)*, and superseded by statute on other grounds as stated in Attenborough v. Const. and Gen. Bldg. Laborers' Local 79,*

238 F.R.D. 82, 100 (S.D.N.Y. 2006); *see also Charron v. Pinnacle Group N.Y. LLC*, 269 F.R.D.

221, 242-44 (S.D.N.Y. 2010).[21]

   41. Second, the Group contends that "[i]ronically, only once all of those

efforts are addressed in dealing with the novelty of certifying a defendant class . . . does LBSF

propose to have the Court address 'individualized defenses', which if they predominate over

common ones, would have defeated certification in the first place."  Group Br. at 14.  Notably,

the Group also leaves "individualized defenses" such as personal jurisdiction to be addressed

during Phase II of the Group's Proposed Protocol.  Nonetheless, the presence of scattered

individualized defenses such as statutes of limitations does not mean that individual issues

predominate over common ones.  As noted below, there is little likelihood that any limitation

defense will be successful.  In any event, possible statute of limitations issues provide no basis

for derailing class certification.  *See In re Energy Systems Equip. Leasing Sec. Litig.*, 642 F.

Supp. 718, 752-53 (E.D.N.Y. 1986) (holding that "possible differences in the application of a

statute of limitations to individual class members, including the named plaintiffs, does not

preclude certification of a class action") (citations omitted); *see also Hoxworth v. Blinder*

*Robinson & Co.*, 980 F.2d 912, 924 (3d Cir. 1992).  Moreover, the benefit of hearing class

certification issues first is that class certification would simplify the statute of limitations issue

by rendering most, if not all, Defendants subject to *American Pipe* tolling, thus defeating any

---

[21] Moreover, subclasses could address arguable divisions which emerge within the class.  *See Continental Illinois Nat'l Bank and Trust Co. of Chicago v. John Mohr & Sons*, 80-C-2642, 1980 U.S. Dist. LEXIS 13040, at *8-12 (N.D. Ill. 1980) (certifying defendant class) (court holds that if distinct legal theories later become important, subclasses could be used; in addition were each of the creditors to proceed individually, conflicting interpretations of the contract as well as the significance attached to the trustee's representations might result in allowing recovery for some creditors while denying recovery to others) (citing *Guy v. Abdulla*, 57 F.R.D. 14, 17 (N.D. Ill. 1972)); *see In re Wal-Mart Stores, Inc. Wage & Hour Litig.*, 505 F. Supp. 2d 609, 615 (N.D. Cal. 2007) ("'the shape and form of a class action evolves only through the process of discovery'") (quoting *Myers v. MedQuist, Inc.*, No. 05–4608, 2006 WL 3751210, at *4 (D.N.J. Dec. 20, 2006)).

statute of limitations defense.  *See Cal. Pub. Emp. Ret. Syst. v. Caboto-Gruppo Intesa BCI* (*In re WorldCom Sec. Litig.*), 496 F.3d 245, 255-56 (2d Cir. 2007).[22]

42.     Third, although the Group contends (without explanation) that the defense class action procedure is a "novelty" (Group Br. at 14), it provides no real challenge to the propriety of class certification in this case, given that the common issues arising from the transactions at issue and the circumstances surrounding those transactions far outstrip any individualized ones.  Indeed, in *Integra*, the Tenth Circuit upheld the certification of a defendant class very similar to this one.  *See In re Integra Realty Resources, Inc.*, 354 F.3d 1246, 1264-66 (10th Cir. 2004).[23]

43.     For the foregoing reasons, the Group's arguments that class certification should not be determined before merits issues are not persuasive.

3.     The Group Misrepresents Or Overstates The Cases
Upon Which It Relies Regarding Class Certification
and/or the Cases It Cites Are Inapposite

a.     *Tribune* and *Lyondell*

44.     In contrast to the overwhelming case law supporting LBSF's Proposed Order, the Group relies heavily upon unpublished case management arrangements in *Lyondell*

---

[22] Under *American Pipe* and its progeny, after the filing of the Original Complaint, the statutes of limitations were tolled with respect to absent defendants pending the Court's decision on class certification.

[23] *See also Continental Illinois Nat'l Bank*, 1980 U.S. Dist. LEXIS 13040, at *8-12 (certifying defendant class of creditors of Wisconsin Steel) (court holds that if distinct legal theories later to become important, subclasses could be used; in addition were each of the creditors to proceed individually, conflicting interpretations of the contract as well as the significance attached to the trustee's representations might result in allowing recovery for some creditors while denying recovery to others); *In re Victor Techs. Sec. Litig.*, 102 F.R.D. 53, 61 (N.D. Cal. 1984), *aff'd*, 792 F.2d 862 (9th Cir. 1986) ("The general motivation behind these motions for defendant class certification is to avoid proceeding against each of the approximately 93 defendant underwriters separately"); *RTC v. KPMG Peat Marwick*, No. 92-1373, 1992 U.S. Dist. LEXIS 16670, at *7 (E.D. Pa. Sept 23, 1992) ("if this court were to deny plaintiff's motion for certification of the defendant class, the probable result would be piecemeal litigation against individuals in various parts of the country.  Such a splintering of this cause of action would be a waste of scarce judicial resources and would not afford defendants any greater opportunity for a fair defense"); *Eliasen v. W.R. Co.*, 93 F.R.D. 408, 413 (E.D. Wis. 1982) (bondholder action was certifiable as a Rule 23(b)(1)(B) class action because of risk that individual adjudications would practically impair the rights of absent class members).

and *Tribune*.  Neither case has any precedential value.  Although motions to dismiss apparently were decided before class certification in those cases, there is no indication that any party opposed such a protocol.  Nor is there any indication that the issue was briefed and that the courts deliberated on the issue.  Certainly, neither court rendered any sort of reasoned opinion on the topic.  Indeed, Defendants' sole "evidence" that the protocol even existed is an oblique reference to the entire docket sheet in the *Lyondell* case (No. 10-05525).  Apparently, there was no particular order issued by the court setting forth the manner in which motions were heard.

45.     The same is true of the *Tribune* court, which set out an extensive case management procedure but provided no reasoned basis whatsoever for hearing class certification motions after the motion to dismiss.  It is thus unclear whether the issue was litigated, or even considered by the court in *Tribune*.

b.     *Authors Guild*

46.     The Group also relies heavily upon *Authors Guild* (Group Br. at 11-12).  But none of the parties in *Authors Guild* even briefed the issue of the timing of the class certification motion *vis-a-vis* the motion to dismiss, focusing instead on the question of whether class certification should have been granted at all.  As a result, the Second Circuit's opinion was short and conclusory, failing to discuss, among other opinions, its prior decision in *Philip Morris*.  In any event, the *Authors Guild* court did not set out a rule that motions to dismiss go before class certification.  Rather, the *Authors Guild* court held that, in a copyright infringement case, Judge Chin erred because he did not consider an affirmative defense of fair use that would have had a powerful impact on class certification.  *Authors Guild*, 721 F.3d at 134 ("the resolution of Google's fair use defense in the first instance will necessarily inform and perhaps moot our analysis of many class certification issues, including those regarding the commonality

23

of plaintiffs' injuries, the typicality of their claims, and the predominance of common questions

of law or fact") (citing Fed. R. Civ. P. 23(a)(2), (3), (b)(3)).

47.    Here, as set out above, the opposite is true – there are no simple resolution

of merits issues that could have meaningful impact on class certification issues because there are

no merits defenses which can address all claims, particularly on a pre-answer  motion.  Thus, the

reasoning behind *Author's Guild* does not apply here.

4.    There Is No "Due Process" Right To A
Prompt Decision On A Motion To Dismiss

48.    At pages 10-11 of its brief, the Group cites eleven cases for the

proposition that due process grants Defendants the right to respond to a pleading and dismiss it

prior to class certification.  However, most of the cases cited by the Group do not involve a class

action and none of them have any relevance to this case.[24]  The Group utterly has failed to show

that it has a due process right, or any right, to have its putative motions to dismiss decided before

class certification.  The only case cited by the Group which even approaches relevance is

*Hungate*, 626 F.2d at 62.  But *Hungate* did not involve class certification and addressed a

complaint that failed on its face under Rule 8's pleading standard.  *Id*.  A similar proposition was

stated in *Curtin v. United Airlines, Inc*., 275 F.3d 88, 92-93 (D.C. Cir. 2001) where the court

observed "fatal flaws in plaintiffs' claim."  Neither authority is relevant here.  The Group has not

– and cannot – contend that Judge Peck's earlier rulings, which support LBSF's allegations, were

so flawed that their reversal is a foregone conclusion.  *See* ¶¶ 68-70, *infra*.  In addition, as set

---

[24] Among the cases upon which the Group erroneously relies at pages 10-11 of its brief, which have nothing to do with class certification or the timing of class certification are the following:  *Nelson v. Adams USA, Inc*., 529 U.S. 460, 465 (2000); *Hungate v. United States*, 626 F.2d 60, 62 (8th Cir. 1980); *Red Hawk Constr., Inc. v. United States*, 108 Fed. Cl. 779, 784 (Fed. Cl. 2013); *S.E.C. v. Arias*, CV 12-2937 ADS GRB, 2012 WL 4849151 (E.D.N.Y. Sept. 14, 2012) *report and recommendation adopted*, 12 CV 2937 DRH GRB, 2012 WL 4849346 (E.D.N.Y. Oct. 11, 2012); and *Emmons v. Tennessee*, No. 3:07-cv-405, 2008 WL 111977, at *1 (E.D. Tenn. Jan. 8, 2008) (standing for the unexceptional proposition that defendants cannot be sanctioned or charged with ethical violations for filing dispositive motions).

forth below, LBSF has pled a number of other claims which cannot be resolved on a motion to

dismiss.

49.     Similarly, the Group fails to acknowledge that four of the cases it cites

reaffirm the proposition that hearing class certification issues before merits issues is "the usual

order of disposition in such circumstances."  *Curtin*, 275 F.3d at 92-93; *see also Reynolds v.

Barrett*, 741 F. Supp. 2d 416, 425 (W.D.N.Y. 2010), *aff'd* 685 F.3d 193 (2d Cir. 2012) ("in

general, issues relating to class certification should be decided before a decision on the merits")

(citations omitted);[25] *Thomas*, 706 F.3d at 849 ("[n]ormally the issue of class certification should

be resolved first") (citations omitted); *McReynolds v. Merrill Lynch & Co., Inc.*, 694 F.3d 873,

879 & n.4 (7th Cir. 2012).

50.     In addition, the Group cites several cases stating that plaintiffs have the

right to prompt disposition of a Rule 12 motion, but that do not say that defendants have any

comparable right.  Group Br. at 10 (citing *S.E.C. v. Arias*, No. 12-cv-2937, 2012 WL 4849151, at

*4 (E.D.N.Y. Sept. 14, 2012) and *Nelson v. Adams USA, Inc.*, 529 U.S. 460, 465 (2000)).  In

*Arias*, the plaintiff sought to have the motions to dismiss heard promptly and the court ruled that

the motion should be heard promptly, rejecting the defendants' motion to stay).  Further, in

*Nelson*, the court found that due process concerns were implicated because the Rule 12 motions

were being adjudicated too quickly – the opposite of the Group's purported concern in this case.

529 U.S. at 465 ("due process does not countenance such swift passage from pleading to

judgment in the pleader's favor").[26]

---

[25] Moreover, the Group fails to acknowledge that the *Reynold's* court's decision to address merits issues first turned largely on the fact that the party seeking class certification had moved for summary judgment and thereby implicitly waived its right to have class issues heard first.  *Id.*

[26] *Nelson* stands only for the proposition that defendants have a right to ultimately have their Rule 12 motions heard, even if such motions are not heard until trial.  *See Star Indus., Inc. v. Bacardi & Co. Ltd. Corp.*, 02 CIV. 4239 (HB),

51.     Finally, the Group fails to mention that the Second Circuit in *Schweizer v. Trans Union Corp.*, 136 F.3d 233, 239 (2d Cir. 1998) upheld the district court's decision to hear summary judgment issues before class certification issues because the plaintiffs "never moved to certify the class." *Id.* ("The decision to award summary judgment before acting on class certification was well within the discretion of the district court, particularly since Schweizer never moved to certify the purported class") (citations omitted).[27]

5.      The Decisions Relied Upon By The Group
        For Its Prejudice Argument Are Unavailing

52.     As set out above, the Group's refrain that Defendants would suffer from a "six year" delay is groundless.  Group Br. at 16 n.8.  Almost four years of the "delay" resulted from extensions of the Stay, during which the Chapter 11 Estates negotiated hundreds of millions of dollars of settlements to the benefit of the parties, the Chapter 11 Estates and the Court.  In addition, during the Stay, LBSF conducted Court-ordered discovery to identify members of the putative Noteholder Class.  During this time, few of the Defendants complained about the operation of the stay.  Under such circumstances, the Group's complaints regarding alleged delay ring hollow.

53.     Most of the cases the Group cites on the delay point involve such issues as the necessity for prompt pre-deprivation hearings in the benefits or employment context and have nothing to do with alleged delays in civil litigation.  *See, e.g., Matthews v. Eldridge*, 424 U.S. 319 (1976); *Cleveland Bd. Of Educ. v. Loudermill*, 470 U.S. 532, 547 (1985); *Isaacs v.*

---

2003 WL 21056813, at *2 (S.D.N.Y. May 9, 2003) ("Unlike *Nelson*, defendants will have their chance to respond to the amended complaint at trial, thus the due process concerns expressed in *Nelson* are not present here").

[27] *Foti v. NCO Fin. Sys. Inc.*, 424 F. Supp. 2d 643, 647 n.2 (S.D.N.Y. 2006) relied largely on *Schweizer*.  In addition, *Foti* turned on the difficulties posed by "a nationwide class that would include tens of millions of people."  The class in this case does not pose comparable problems.

*Brown*, 865 F.2d 468, 477 (2d Cir. 1989); *see also Armstrong v. Manzo*, 380 U.S. 545, 552 (1965) (delay in seeking adoption decree). These cases all turn on the property or liberty interest of the party deprived of his or her benefits, job, or right to adoption, and they have no application here.

54.     Indeed, contrary to the Group's suggestion that due process rights are at issue here, two Circuit courts which have considered this issue have flatly ruled that there is no such right in civil litigation. "Notwithstanding the fundamental rights of access to the courts, the Bar Association does not cite, nor has our independent research revealed, any decision recognizing a right to judicial determination of a civil claim within a prescribed period of time as an element of such right . . . we agree with our colleagues on the First Circuit that '[d]elay per se is not unconstitutional.'" *Los Angeles County Bar Ass'n v. Eu*, 979 F.2d 697, 706-07 (9th Cir. 1992) (quoting *Ad Hoc Committee on Judicial Administration v. Massachusetts*, 488 F.2d 1241, 1244 (1st Cir. 1973)).

55.     The few cases the Group cites that have anything to do with civil litigation are cases in which plaintiffs complained that stays of litigation deprived them of their right to adjudicate their claims. *See Drexel Burnham Lambert Group, Inc. v. Galadari*, 127 B.R. 87, 101 (S.D.N.Y. 1991); *Medien Patent Verwaltun AG v. Warner Bros. Entertainment Inc.*, No. 10-cv-419 (CM)(GWG), 2014 WL 1169575, at *1 (S.D.N.Y. Mar. 21, 2014). Here, LBSF does not seek a stay; rather it simply seeks a case management order. Finally, cases cited by the Group involve delays far longer than the purported delay at issue in this case. *See Drexel*, 127 B.R. at 101 (S.D.N.Y. 1991) (vacating stay, citing Creditor's Committee's seven year delay in deciding claims). *Accord Keller v. United States*, 38 F.3d 16, 20-21 (1st Cir. 1994) (finding that eight year interval between trial and judgment did not violate due process).

27

56.     Through the artful use of ellipses, the Group attempts to conceal the fact

that *Ampudia v. Lloyd*, 531 F. App'x 32, 34 (2d Cir. 2013) has nothing to do with our case.

*Ampudia* involved a *pro se* litigant who skipped a scheduled deposition and stormed out of a re-

scheduled deposition, despite a court order instructing him to appear and multiple reminders

about that order at the deposition.  Since the *pro se* litigant's testimony was pivotal to the case,

his obstreperous deposition conduct prevented the defendants from obtaining discovery.  The

court nowhere hinted that mere delay was in itself prejudicial and its decision turned in

considerable part upon the fact that the "district court explicitly provided *Ampudia* with notice

that his claims would be dismissed if he did not appear for his re-scheduled deposition."  *Id*.

And contrary to the ellipsed version provided by the Group, the court did not suggest that mere

cost to defendants constituted prejudice.  Rather, the court found such prejudice from "litigation

costs to defendants, who had to expend resources *preparing for the depositions at which*

*Ampudia did not testify*."  *Id*. (emphasis not in original; excised from parentheticals provided by

the Group).

6.     The Standard Procedure For Initial Designation of
       Liaison Counsel and An Executive Committee,
       Followed By Implementation of A Class Structure, Provides
       Efficient and Fair Organization For This Defendant Class Action

57.     In advance of class certification, and in the event a class is not certified,

LBSF's Proposed Order seeks to organize the parties through steering committees and liaison

counsel to avoid a litigation free-for-all involving the submissions of scores of redundant court

papers and overlapping and duplicative oral arguments.  While complaining (with no support)

that LBSF's Proposed Order deprives Defendants of due process, the Group proposes essentially

no case management order other than bald assurances that it will use "best efforts" to avoid

duplication.  Despite the Group's claims that such structures transgress its fundamental rights,

28

the use of liaison counsel and executive committees is of course well-accepted in complex cases.

*See Manual for Complex Litig.* at § 10.22 (4th ed. 2004) ("Complex litigation often involves

numerous parties with common or similar interests but separate counsel.  Traditional procedures

in which all papers and documents are served on all attorneys and each attorney files motions,

presents arguments and examines witnesses may waste time and money, confuse and misdirect

the litigation and burden the court unnecessarily. . . More often, however, the court will need to

institute procedures under which one or more attorneys are selected and authorized to act on

behalf of other counsel and their clients with respect to specified aspects of the litigation").

58.     Contrary to the arguments made by the Group, the organizational structure

proffered in the Proposed Order implicates no due process concerns.  Indeed, Rule 23 itself

specifically provides the Court with discretion to appoint an "interim class representative" that

would speak for the entire class prior to the certification of the Noteholder Class.  *See In re

Crude Oil Commodity Futures Litig.*, 11 CIV. 3600 WHP, 2012 WL 569195, at *1 (S.D.N.Y.

Feb. 14, 2012) ("Rule 23(g)(3) of the Federal Rules of Civil Procedure provides that 'the court

may designate interim counsel to act on behalf of a putative class before determining whether to

certify the action as a class action.'  The same factors that apply in choosing class counsel at the

time of class certification apply in choosing interim class counsel") (citing *In re Bear Steams

Cos. Sec. Derivative, and ERISA Litig.*, No. 08 MDL 1963 (RWS), 2009 WL 50132, at *11

(S.D.N.Y. Jan. 5, 2009).  It has never been suggested that an interim class counsel violates due

process and thus there is no reason why the operation of LBSF's Proposed Order during the

interim period before class certification implicates due process concerns.  Indeed, an interim

class representative would speak for all Defendants on all matters, which would intrude upon

Defendants' rights to a greater extent than LBSF's Proposed Order which permits Defendants to

retain their separate counsel and provides a mechanism for them to express separate viewpoints in briefs and at oral argument, upon a showing of good cause.

59.    Thereafter, any due process concerns will be addressed specifically by this Court upon the briefing of class certification motions, when the Court determines the adequacy of representation requirement of Rule 23(a)(4). *See, e.g., Weinman v. Fidelity Capital Appreciation Fund*, 04 C 5721, 2008 WL 753958, at *2 (N.D. Ill. Mar. 18, 2008) ("Even though this was a mandatory defendant class under Fed. R. Civ. P. 23(b)(1)(B), the fact that both the Bankruptcy Court and the Tenth Circuit concluded that the class was adequately represented is sufficient for due process purposes.") (citing *Hansberry v. Lee*, 311 U.S. 32, 43 (1940)).

60.    Once the Court certifies the class, class counsel will provide the necessary organization. *See* Fed. R. Civ. P. 23(g). *See also Howe v. Townsend* (*In re Pharmaceutical Industry Average Wholesale Price Litig.*), 588 F.3d 24, 38 n.15 (1st Cir. 2009) (orders certifying classes also must "appoint class counsel under Rule 23(g)") (citation omitted).  The Court may retain some of the committee or liaison structure to bolster the class representative.  As the Second Circuit opined, early class certification binds the entire class and prevents the possibility of second-guessing a decision on the merits. *See In re Philip Morris Inc*., 214 F.3d at 135 (class certification necessary to abate the multi-billion dollar specter of a risk-free intervention decision by thousands of putative plaintiffs).

61.    For cases involving widely held instruments like the Notes, class actions provide particular case management benefits. *See In re Victor Techs*., 102 F.R.D. at 61 ("The general motivation behind these motions for defendant class certification is to avoid proceeding against each of the approximately 93 defendant underwriters separately"); *RTC*, 1992 U.S. Dist. LEXIS 16670, at *7 ("if this court were to deny plaintiff's motion for certification of the

defendant class the probable result would be piecemeal litigation against individuals in various parts of the country. Such a splintering of this cause of action would be a waste of scarce judicial resources and would not afford defendants any greater opportunity for a fair defense"); *Eliasen*, 93 F.R.D. at 413 (bondholder action was certifiable as a Rule 23(b)(1)(B) class action because of risk that individual adjudications would practically impair the rights of absent class members).

62.     There are well-established standards for class leadership, and there is flexibility as needed to create the appropriate structure upon certification.

> In larger cases . . . a court may need a more elaborate leadership structure for both the plaintiff and defendant side of the case. Cases may include lead counsel, liaison counsel, trial counsel, steering committees, coordinating committees, management committees, executive committees, etc. A court must first determine the structure appropriate for the given case.

Newberg on Class Actions, § 10:9 (5th ed. 2013) (citation omitted). Due to the size of the Noteholder Class and the different Transactions, organization through subclasses may be appropriate. *See Continental Illinois Nat'l Bank*, 1980 U.S. Dist. LEXIS 13040, at *8-12 (holding that if distinct legal theories later become important, subclasses could be used) (citing *Abdulla*, 57 F.R.D. at 17). *See also In re Wal-Mart Stores, Inc. Wage & Hour Litig.*, 505 F. Supp. 2d at 615 ("the shape and form of a class action evolves only through the process of discovery'") (quoting *Myers*, 2006 WL 3751210, at *4).

*            *            *

63.     As shown above, putting class certification into Phase I and prior to substantive motions provides the only mechanism for orderly, binding proceedings to move forward. Additionally, the well-developed mechanisms of class leadership and flexibility provide the parties and the Court with a fair and efficient manner of proceeding.

31

**II.**    **Beginning With Motions To Dismiss Will Not Advance The**
          **Just, Speedy and Efficient Determination of This Action**

64.    The Group provides no basis for displacing the general rule that class

certification should be decided before the merits, whether by dispositive motions or otherwise.

**A.**    **There Is No "Silver Bullet" That Could**
          **Dismiss All of The Claims In This Action**

65.    The Group's argument that LBSF's Proposed Order is "unworkable and

unfair" because there are purported "legal deficiencies in the complaint" and that a "threshold

motion" may "quite possibly resol[ve] . . . this case" (Group Br. at 1-2), is long on rhetoric and

short on substance.  Tellingly, apart from repeating its mantra that motion practice will dispose

of LBSF's claims, the Group does not articulate any particular deficiencies in the Second

Amended Complaint or set out any specific arguments that will dispose of this Action in a

motion to dismiss.  Rather, the Group baldly claims that (i) "LBSF fails to state a cognizable

claim"; (ii) "LBSF's claims are time-barred as to certain defendants," and (iii) "LBSF cannot

establish personal jurisdiction over certain defendants."  Group Br. at 6.  As briefly explained

below, the Group is wrong as a matter of law.  LBSF's claims are adequately pled and easily

pass the plausibility requirement.  *In re Dreier LLP*, 452 B.R. 391, 407 (Bankr. S.D.N.Y. 2011)

("A claim is plausible when the factual allegations permit 'the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged.'") (quoting *Ashcroft v. Iqbal*,

556 U.S. 662, 129 S. Ct. 1937, 1949 (2009).

66.    Further, individual defenses such as statute of limitations or lack of

personal jurisdiction, raise questions of fact, requiring discovery.

1.      The Group's Statute of Limitations Defense Is Meritless and Should
        <u>Be Decided After Class Certification In Any Event</u>

67.     LBSF's claims are not time-barred.

    a.      Counts I and II seeking declaratory judgments are subject to a six

year statute of limitations, which began to run no earlier than

September 15, 2008, the LBHI filing date.[28]  Accordingly, the

limitations period on these claims have not expired as to any

defendants, even unnamed Noteholders.

    b.      Counts VI (Unjust Enrichment), VII (Constructive Trust), VIII

(Money Had and Received) and X (Breach of Contract) are each

subject to a six year statute of limitations.  *See* CPLR 213(1).[29]

LBSF's claims accrued each time the Trustee Defendants made

Distributions to the Noteholder Defendants after September 15,

2008 pursuant to the Priority Modification Provision and would be

timely commenced until at least September 2014.

    c.      Count III (Violation of Section 547 of the Bankruptcy Code –

preference); Count IV (Violation of Section 548 (a)(1)(B) of the

Bankruptcy Code – fraudulent transfer); Count V (Violation of

---

[28] *See PSINet, Inc. v. Cisco Sys. Capital Corp.*, (*In re PSINet, Inc.*), 271 B.R. 1, 41 n.77 (Bankr. S.D.N.Y. 2001) (recognizing that CPLR § 213(1), "applying a six-year statute to claims for which no other limitations period is prescribed by law," applied to debtor's claim for declaratory judgment in adversary proceeding); *See In re Railway Reorganization Estate, Inc.*, 133 B.R. 578, 582 (Bankr. D. Del. 1991) (determining that no statute of limitations would bar plaintiff's declaratory judgment action and finding *ipso facto* clause unenforceable); *In re Elliot*, 81 B.R. 460, 463 (Bankr. N.D. Ill. 1987) ("There is no statute of limitations on an action brought under Section 362(a) of the [Bankruptcy] Code").

[29] *Loengard v. Santa Fe Indus., Inc.*, 70 N.Y.2d 262, 266 (1987) (unjust enrichment); *Dominguez v. Morris*, 77 A.D.3d 884, 884-85, 909 N.Y.S.2d 383, 383-84 (2d Dep't 2010) (constructive trust); *In re Inflight Newspapers, Inc.*, 423 B.R. 6, 20 (Bankr. E.D.N.Y. 2010) (money had and received).  Under New York law, a plaintiff has six years to bring a breach of contract claim.  *See* CPLR 213(2); *Liberman v. Worden,* 268 A.D.2d 337, 339, 701 N.Y.S.2d 419 (1st Dep't 2000).

Section 549 of the Bankruptcy Code – unauthorized post-petition transfer); and Count X (Violation of Section 548(a)(1)(A) – fraudulent transfer) are all subject to a two-year statute of limitations.[30]  The Original Complaint was filed within that two year period, so each originally named Defendant has no limitations defense.  In addition, after the filing of the Original Complaint, the statutes of limitations were tolled with respect to absent defendants pending the Court's decision on class certification under *American Pipe & Construction Co. v. Utah*, 414 U.S. 538, 554 (1974) and its progeny.[31]  Moreover, to the extent a transfer is avoided, LBSF has a year after avoidance in which to sue the transferee to recover the property transferred or its value under section 550(f) of the Bankruptcy Code, and none of the challenged transfers have yet been avoided.  Finally, LBSF will be able to show that amendments to the Original Complaint relate back to its filing date under Fed. R. Civ. P. 15(c).

---

[30] *See In re Kelton Motors, Inc.*, 130 B.R. 170, 179 n.14 (Bankr. D. Vt. 1991) (fraudulent conveyance or preference) (citation omitted); *In re Rosalind Gardens Assocs.*, 157 B.R. 75, 82 (Bankr. S.D.N.Y. 1993) (post-petition transfer).

[31] *See also Appleton Elec. Co. v. Graves Truck Line, Inc.*, 635 F.2d 603, 609-10 (7th Cir. 1980), *cert denied*, 451 U.S. 976, 101 S. Ct. 2058 (1981) (applying *American Pipe* tolling rule to defendant class actions); *In re Bestline Prods. Sec. & Antitrust Litig.*, No. MDL 162-Civ-JLK, 1975 U.S. Dist. LEXIS 13231, at *6-7 (D. Fla. Mar. 21, 1975) (applying *American Pipe* rule to toll the statute of limitations as to members of a defendant class, even though denying certification of the class); *In re FEMA Trailer Formaldehyde Prods. Liab. Litig.*, No. 07-1873, 2010 U.S. Dist. LEXIS 39657, at *8-9 (E.D. La. Apr. 21, 2010) (court was persuaded by the reasoning in *Appleton* coupled with *American Pipe* and concluded that unidentified defendant class described as "unnamed manufacturers" tolled statute of limitations as to defendants that fit within the class description); *White v. Sims*, 470 So. 2d 1191, 1193-94 (Ala. 1985) (Supreme Court of Alabama specifically rejecting the argument that tolling did not apply to defendants who are not specifically named in the class action).

    2.      LBSF Has Stated Cognizable Claims In Each
               Count of The Second Amended Complaint

        a.      LBSF Has Pled Entitlement To A
               Declaratory Judgment In Counts I And II

68.      The Court's precedent holds that the claims in Counts I and II are meritorious, which satisfies the plausibility requirement.  *See Lehman Bros. Special Fin. Inc. v. BNY Corporate Tr. Servs. Ltd.* (*In re Lehman Bros. Holdings Inc*.), 422 B.R. 407 (Bankr. S.D.N.Y. 2010) ("*BNY*"); *Lehman Bros. Special Fin. Inc. v. Ballyrock ABS CDO 2007-1 Ltd.* (*In re Lehman Bros. Holdings Inc*.), No. 09 -01242 (JMP), 2011 WL 9375423 (S.D.N.Y. Nov. 3, 2011) ("*Ballyrock*").  In evaluating the claims against a hypothetical motion to dismiss, the Court must accept the well pleaded allegations of the Complaint as true and draw legitimate inferences favorable to plaintiff.  *In re J.P. Jeanneret Assocs., Inc*., 769 F. Supp. 2d 340, 353 (S.D.N.Y. 2011) ([i]n reviewing a motion to dismiss pursuant to Rule 12(b)(6), a court "must liberally construe all claims, accept all factual allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff") (citing *Cargo Partner AG v. Albatrans, Inc*., 352 F.3d 41, 44 (2d Cir. 2003)); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 572 (2007).

69.      The Group hangs its hat on the notion that the rulings made by Judge Peck in *BNY* and *Ballyrock* are either inapposite or will be repudiated by this Court or reversed on interlocutory appeal.  Group Br. at 2, 6-7, 13-15.  In *BNY*, Judge Peck held that substantially similar priority modification provisions were unenforceable *ipso facto* clauses under sections 365(e)(1) and 541(c)(1)(B) of the Bankruptcy Code and that any attempt to enforce such provisions would violate the automatic stay triggered by LBSF's bankruptcy filing.  *See BNY*, 422 B.R. at 420-21.  The *BNY* Court further held that the priority modification provisions do not fall within the limited "safe harbor" for *ipso facto* clauses in swap agreements pursuant to section

560 of the Bankruptcy Code because, among other reasons, the safe harbor applies only to

"liquidate, terminate or accelerate" swap agreements or to "offset or net out" of the parties'

positions and does not apply to modifications of a debtor's payment rights.  *Id*. at 421.

70.    The Bankruptcy Court's decisions in *BNY* and *Ballyrock* are directly on

point and provide the basis and rationale for invalidating the Priority Modification Provisions

here.  The Group's arguments that (i) the ruling in *BNY* is "factually distinguishable," (ii) *BNY's*

"conclusions . . . are contested," and (iii) it is unclear how *BNY* may apply here (Group Br. at 6),

are conclusory and unpersuasive.  The Group has not explained the supposed factual differences

between this case and *BNY*.  The *BNY* decision is directly on point and deals with an almost

identical *ipso facto* provision in a similar transaction.  Nor has the Group demonstrated that the

conclusions of the *BNY* decision are vulnerable.  The Group ignores that *Ballyrock* reaffirmed

the *BNY* decision and held that the priority modification provision was an unenforceable *ipso

facto* clause.  *See Ballyrock*, 2011 WL 9375423, at \*5-6.  Further, while the Group cites one

District Court Judge's discussion of the *BNY* decision (Group Br. at 7), it fails to mention that, in

denying a motion for interlocutory appeal, a different District Court judge subsequently held that

"Ballyrock fails to demonstrate . . . there is a substantial ground for difference of opinion" and

observed the "dire warnings that failure to review Judge Peck's decision would allow 'turmoil'

in the structured finance business to continue [are] overstated."  *Id*., at \*2, \*6.  There is no basis

for the Group to assert that this Court's prior on point rulings in *BNY* and *Ballyrock* would

suddenly be tossed to the side.

      b.      LBSF Has Properly Pled The State Law Clauses of
Action In Counts VI (Unjust Enrichment),
VII (Constructive Trust), VIII (Money Had And
<u>Received), X (Breach of Contract) And XII (Replevin)</u>

71.     "In order to prevail on claims of unjust enrichment . . . 'a plaintiff must

prove that the defendant was enriched, that such enrichment was at plaintiff's expense, and that

the circumstances were such that in equity and good conscience the defendant should return the

money or property to the plaintiff.'"  *Benevento v. RJR Nabisco, Inc.*, 89 CIV. 6266, 1993 WL

126424, at *8 (S.D.N.Y. Apr. 1, 1993) (quoting *Dolmetta v. Uintah Nat'l Corp.*, 712 F.2d 15, 20

(2d Cir. 1983).  LBSF has pled each of the elements.  *See* SAC ¶¶127-28.  Moreover, the

Noteholder Defendants experienced an opportunistic windfall at the expense of LBSF by

receiving, through the *ipso facto* clause's operation, a much greater payment than they were

entitled to but for LBHI's bankruptcy filing.  Thus, circumstances are such that the equities – as

well as the law – demand that the distributions be returned to LBSF.

72.     A constructive trust is an equitable remedy, the elements of which include

the following:  (1) a confidential or fiduciary relationship; (2) a promise, express or implied; (3)

transfer of the subject res made in reliance on that promise; and (4) unjust enrichment.  *See In re

First Central Fin. Corp.*, 377 F.3d 209, 212 (2d Cir. 2004) (citations omitted).  Not all elements

need be present in a given case; the most important element is unjust enrichment.  *Counihan v.

Allstate Ins. Co.*, 194 F.3d 357, 362 (2d Cir. 1999).  The absence of any one factor will not itself

defeat the imposition of a constructive trust when otherwise required by equity.  *See In re

Koreag Controle et Revision S.A.*, 961 F.2d 341, 352-53 (2d Cir. 1992).

73.     Here, LBSF pleads a confidential and fiduciary relationship.  *See* SAC ¶

130.  LBSF has pled an implied promise not to improperly transfer collateral in which LBSF had

an interest.  *Id*.  In entering into the Swap Agreements and making payments thereunder, LBSF

37

relied on the Trustees' implicit promise not to improperly transfer Collateral in which LBSF had

an interest to other parties.  *Id*.  The Noteholders were unjustly enriched.  *Id*. ¶ 131.

74.    A claim for money had and received is a vehicle to recover a payment

mistakenly made to a party that had no right to receive the payment.  *See Manufacturers*

*Hanover Trust Co. v. Chemical Bank*, 160 A.D.2d 113, 117-18, 559 N.Y.S.2d 704, 707-8 (1st

Dep't 1990).  In Paragraph 135 of the Second Amended Complaint, LBSF pleads the elements of

money had and received.  LBSF pleads that money was mistakenly paid to the Noteholders.

SAC ¶ 135 ("As a result of the Distributions, the Noteholders received funds that rightfully

belonged to LBSF.  Indeed, the Distributions resulted in an enormous windfall to the

Noteholders.  LBSF received nothing in return.").  LBSF has also pled that the Noteholder

Defendants had no right to receive the Distributions.  *Id*. ("LBSF was substantially 'in-the-

money' on the Swap Agreements. . . . Equity and good conscience dictate that the Noteholders

not be permitted to retain the portion of the Collateral that rightfully belongs to LBSF").

75.    The elements of a claim for replevin are as follows:  (1) that plaintiff has a

possessory right superior to that of the defendant; and (2) that plaintiff is entitled to the

immediate possession of that property.  *See Jamison Bus. Sys., Inc. v. Unique Software Support*

*Corp*., CV 02-4887 (ETB), 2005 WL 1262095, at *14 (E.D.N.Y. May 26, 2005).  LBSF had a

senior lien on the collateral and thus a superior right to that of the Defendants.  *See* SAC ¶¶ 168-

69.  LBSF was entitled to the immediate possession of that property.  *Id*. ¶¶ 170-71.

      c.      LBSF Has Properly Pled The Avoidance Causes of Action In
      Counts III, IV, V and XI For Violation of Sections 547,
      <u>548(a)(1)(B), 549 and 548 (a)(1)(A) of The Bankruptcy Code</u>[32]

76.      The reversal of payment priority pursuant to the *ipso facto* clause

constituted a "transfer" of an "interest of the debtor in property", *i.e.*, the right to Senior Payment

Priority,[33] to the Noteholders.  Here, the Priority Modification Provisions transferred LBSF's

valuable right to Senior Payment Priority and replaced it with Junior Payment Priority, which

was worth nothing.[34]  LBSF has adequately pled that the transfer was made on account of an

antecedent debt, based on LBSF's obligation to transfer Senior Payment Priority to the

Noteholder Defendants on default, pursuant to the Transaction Documents,[35] which arose when

the right to payment arose, even if that right to payment was contingent.[36]  The Second Amended

Complaint alleges that LBSF was insolvent, all pre-petition transfers were made within 90 days

of the petition date, and allowed the recipients to receive more than they would have gotten in a

Chapter 7 proceeding if the transfer not been made.  *See* SAC ¶¶ 97–108.

---

[32] The discussion of the alternative pleading of claims in the Second Amended Complaint is without prejudice to any of LBSF's rights.

[33] The concept of "transfer" under the Bankruptcy Code is extremely broad.  *See* 11 U.S.C. § 101(54); S. Rep. No. 95-989, at 27 (1978); *accord* H.R. Rep. No. 95-595, at 314 (1977) ("The definition of transfer is as broad as possible"); *I. Appel Corp. v. Val Mode Lingerie, Inc.*, No. 97-civ-6938(LMM), 2000 WL 231072, at *6 (S.D.N.Y. Feb. 28, 2000).  "The hallmark of a transfer is the change in the rights of the transferor with respect to the property after the transaction."  *In re Dunbar*, 313 B.R. 430, 435 (Bankr. C.D. Ill. 2004).  Senior Payment Priority was an interest of the debtor in property, as it would have become part of the estate had the modification not occurred in those cases where modification occurred before bankruptcy.  *See Begier v. IRS*, 496 U.S. 53, 58-59 (1990).

[34] Courts have concluded that provisions analogous to the Priority Modification Provisions fit within the confines of a "transfer" under section 101(54).  *See, e.g., In re Jacobs*, 401 B.R. 161, 171 n.13 (Bankr. E.D. Pa. 2009) (pre-bankruptcy execution of a subordination agreement that ceded to a third party "certain of [the debtor's] 'collection rights' as an unsecured creditor" of the debtor's counterparty was a "transfer" for purposes of section 101(54)); *In re Wash. Mutual, Inc.*, 442 B.R. 297, 300-05 (Bankr. D. Del. 2011) (transfer where, upon the occurrence of an "Exchange Event," ownership of "Trust Preferred Securities" was exchanged for ownership of new "Depositary Shares" per an "involuntary automatic transfer").

[35] The Noteholders were creditors because they held claims, consisting of enforceable obligations under the relevant documents.  *See Pa. Dept of Public Welfare v. Davenport*, 495 U.S. 552, 559 (1990) ("right to payment" means "nothing more nor less than an enforceable obligation.")

[36] *See In re First Jersey Securities, Inc.*, 180 F. 3d 504, 510-11 (3d Cir. 1999); *Elliot & Callan, Inc. v. Crofton*, 615 F. Supp. 2d 963, 969 (D. Minn. 2009) (a debt is antecedent if it is incurred before the transfer).

77.      In the unlikely event that *BNY* is repudiated and the Priority Modification Provisions are ruled enforceable, the Priority Modification Distributions would nevertheless constitute preferences for the reasons set forth above.

78.      If the Court determines that no antecedent debt existed, then to the extent the modification of LBSF's rights was deemed to have occurred prior to the petition date, it would be avoidable as a constructive fraudulent transfer under section 548(a)(1)(B), as valuable property rights were transferred for less than reasonably equivalent value while LBSF was insolvent.  LBSF's Second Amended Complaint pleads each of these elements.  *See* SAC ¶¶ 109–118.

79.      Regardless of whether *BNY* is repudiated LBSF may also avoid and recover the transfers of Senior Payment Priority, and the Distributions, as transfers made with the actual intent to hinder or delay LBSF's creditors pursuant to section 548(a)(1)(A) of the Bankruptcy Code.  That section provides that a Debtor "may avoid any transfer . . . of an interest of the debtor in property, or any obligation . . . incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily – (A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted. . . ."  11 U.S.C. § 548(a)(1)(A).

80.      LBSF satisfied its pleading requirement for such claims in the Second Amended Complaint.  *See* SAC ¶¶ 146 - 166.  A court may impute the transferee's intent to the debtor when the transferee is in a position to dominate or control the debtor's disposition of property.  *See Jackson v. Mishkin* (*In re Adler*), 263 B.R. 406, 445 (S.D.N.Y. 2001) ("Under the domination or control rule, the requisite intent derives from a *transferee* who is in the position to

40

dominate or control the debtor's disposition of his property, a circumstance that § 548(a)(1)(A)

anticipates by its provision that the fraudulent conveyance by the debtor may be voluntary or

*involuntary*") (emphasis in original).

81.     Here, a transferee (*i.e.* the Trustee) controlled the disposition of the funds

to be distributed to LBSF or the Noteholder Defendants.  This is evident from the Transaction

Documents, which gave the Trustee control over the Collateral.  The Issuer Defendants or the

Trustee Defendants terminated the Swap Agreements, liquidated the Collateral, applied the *ipso*

*facto* clause, and transferred the Collateral's proceeds first to the Trustees and then to the

Noteholders (the "Collateral Transfer")—all without LBSF's consent.  Accordingly, the relevant

intent to consider is the Trustee's.

82.     The Trustee's intent to "hinder or delay" LBSF's creditors, *see* 11 U.S.C.

§ 548(a)(1)(A), can be inferred from the circumstances surrounding the Collateral Transfer.  The

Trustee held monies and/or property for the benefit of, among others, LBSF, and knew that

LBSF's parent, LBHI, and its principal brokerage affiliate Lehman Brothers Inc. ("LBI") had

just entered bankruptcy proceedings, and yet it transferred assets away from LBSF.  The

Collateral Transfer was of questionable legality, hasty and not in the ordinary course of business;

the period during which the Collateral Transfer occurred was characterized by a global financial

crisis and disruptions in the financial and credit markets which followed LBHI's chapter 11

filing and LBI's SIPA case.  Additionally, the Collateral Transfers were improper because, at the

time of LBHI's chapter 11 filing, the Trustee knew or should have known that the Priority

Modification Provisions constituted unenforceable *ipso facto* clauses or an illegal transfer that

violated the Bankruptcy Code.  LBSF also received no consideration in exchange for the

Collateral Transfer and was deprived of substantial amounts of valuable property thereby.  Thus,

41

the transfer of the funds to the Noteholder Defendants may be avoided as an actual fraudulent

transfer under section 548(a)(1)(A).

83.     Finally, LBSF's claims under section 549 of the Bankruptcy Code have

also been pled sufficiently.  *See* 11 U.S.C. § 549; SAC ¶¶ 119-125.  Modifications of payment

priority that occurred post-petition were not authorized by the Court or by any provision of the

Bankruptcy Code, and did not constitute the kinds of events that were permitted by sections 555

or 560, which only permit liquidation, termination or acceleration, but not modification, of

specified contracts.  *BNY*, 422 B.R. at 420-21.

### 3.    The Safe Harbor Provisions of The Code Are Inapplicable

84.     No safe harbor provision under section 546 of the Bankruptcy Code

constituted a defense to LBSF's claims that could extinguish the entire Distributed Action at the

pleadings stage.  As an initial matter, any protection that a Defendant may argue under a safe

harbor provision of the Bankruptcy Code is an affirmative defense that should be dealt with at

the summary judgment stage, not on a motion to dismiss.  *See Picard v. Merkin*, (*In re Bernard

L. Madoff Inv. Securities LLC*), 11 MC 0012, 2011 WL 3897970, at *12 (S.D.N.Y. Aug. 31,

2011) ("[t]he Court finds no substantial grounds for difference of opinion as to the correctness of

the standards relied on by the Bankruptcy Court in its refusal—at the pleading stage—to dismiss

on the grounds of the Funds' Section 546(e) affirmative defense"); *see also Renco Metals, Inc. v.

Williams Energy Marketing & Trading Co.* (*In re Magnesium Corp. of Am.*), 460 B.R. 360, 363,

366 (Bankr. S.D.N.Y. 2011) (ruling that application of Section 546(e) safe harbor cannot be

determined on a motion for summary judgment because "[t]hat issue will require greater factual

development and cannot be decided as a matter of law, on summary judgment").

85.    The safe harbors in sections 546 (e),(f),(g) and (j) only protect pre-petition transfers from avoidance and none has any application to unauthorized post-petition transfers avoidable under section 549, or to transfers avoidable under 548(a)(1)(A).  LBSF believes a substantial number of the potentially avoidable transfers that are the subject of this action occurred post-petition.  Moreover, the imputed intent fraudulent transfer claims will survive a motion to dismiss based on the application of any of the safe harbors.

86.    This case clearly does not involve a repurchase agreement, as defined, rendering 546(f) inapplicable, or a netting agreement, rendering 546(j) inapplicable.  Whether 546(g) applies to any of the transferees as financial participants or swap participants cannot be determined on a motion to dismiss given the requirements of the definitions of those terms. *Chambers v. Time Warner, Inc*., 282 F.3d 147, 153 (2d Cir. 2002) (holding that a court may rely only on documents actually incorporated by plaintiff in the complaint in deciding a motion to dismiss).

87.    Moreover, section 546(e) is not applicable because the Priority Payment Modifications are not "transfer[s] . . . in connection with a securities contract."  Section 741(7) of the Bankruptcy Code defines "securities contract" as "a contract for the purchase, sale, or loan of a security[.]"  11 U.S.C. § 741(7)(A)(i).  Here, the Payment Priority Modifications occurred pursuant to the Indentures, which are not "securities contracts" because the Indentures are not "contract[s] for the purchase, sale, or loan of a security[.]"  *Id*.; *see also EPLG I v. Citibank N.A.* (*In re Qimonda Richmond LLC*), 467 B.R. 318 (Bankr. D. Del. 2012) (refusing to find that an indenture was a "securities contract" within the Bankruptcy Code's definition); *cf*. Black's Law Dictionary (9th ed. 2009) (defining a "trust indenture," like the Indentures here, as "[a] document containing the terms and conditions governing a trustee's conduct and the trust beneficiaries'

43

rights.").[37]  The transfer of the right to Senior Payment Priority also does not fall within the

definition of "settlement payment" or "margin payment" because it was the transfer of an interest

in property and not a "payment" of any kind.  Furthermore, transfer of the Distributions occurred

pursuant to the Indenture or the Notes, neither of which is a securities contract.[38]  In any event,

section 546(e) does not shield unauthorized transfers under section 549, or actual fraudulent

transfers under section 548(a)(1)(A), so to the extent that the Payment Priority Modifications

occurred or Distributions were made post-petition, or with imputed intent, then they are not safe

harbored under section 546(e).

       88.     Likewise, the transfer of the right to Senior Payment Priority from LBSF

to the Noteholder Defendants is not safe harbored under section 546(g) because it was not a

transfer "under or in connection with" a "swap agreement."  11 U.S.C. §§ 101(53B), 546(g).

The legislative history provides that "[t]he definition of 'swap agreement' [in section 101(53B)]

however, should not be interpreted to permit parties to document non-swaps as swaps.

Traditional commercial arrangements . . . cannot be treated as 'swaps' under . . . the Bankruptcy

Code simply because the parties purport to document or label the transactions as 'swap

agreements.'"  H.R. Rep. No. 109-31, pt. 1, at 122 (2005).  Here, the transfers of the right to

senior payment priority and the Distributions were made under the Indenture, but they are

independent of the swap between LBSF and the Issuer Defendants.  The Payment Priority

---

[37] The Payment Priority Modifications occurred pursuant to trust deeds rather than Indentures for four of the forty-five SPVs that are the subject of the Distributed Action.  Trust deeds are analogous to trust indentures, like the Indentures here.  *See* Black's Law Dictionary (9th ed. 2009) (stating under definition of "deed of trust" that a deed of trust is also termed a trust deed or a trust indenture).

[38] As set forth above the Indentures are not securities contracts.  As for the Notes, the definition of "securities contract" includes a "contract for the purchase, sale, or loan of a security" and the definition of "security" includes "note," so defining a "note" as a "securities contract" leads to an absurd result.  Accordingly, the Notes are not securities contracts.  The Indentures and the Notes likewise are not commodity contracts or forward contracts.

Modification deals with the Noteholder Defendants' rights to priority of payment under the Indenture.  Likewise, the transfer of the Distributions was simply a payment under the Indenture.

<p style="text-align:center">*          *          *</p>

89.    In sum, the Group's contention that motions to dismiss should go first because they might dispose of the entire (or substantially all) of this action are without merit. The obstacles to dismissal of any of the claims are substantial, and many of the claims are simply unsuited for dismissal by pre-answer motion and prior to discovery.  This is not a case like *Authors Guild*, where the resolution of one defense will have far reaching implications for the case as a whole.  Accordingly, the Court should follow the weight of authority that class certification should be determined before the merits of the action and enter LBSF's Proposed Order.

### III.    The Remaining Points Raised In The Group's Proposed Protocol Are Without Merit

90.    Beyond urging that motions to dismiss go first and class certification last, the Group's Proposed Protocol raises a number of points allegedly aimed to "promote litigation efficiency, avoid bias, and preserve the parties' due process rights."  Group Br. at 22.  As set forth below, the Group's proposals generally fail to advance any of those purported objectives and instead seek to place unneeded and substantial burden on LBSF.

### A.    Disclosures By LBSF

91.    The Group seeks the disclosure of specific information from LBSF, including:  (i) contact information for each Defendant; (ii) the itemized monetary amount LBSF seeks from each Defendant; (iii) the capacity in which each Defendant is being sued; and (iv) the grouping of Defendants by Issuer.

<p style="text-align:center">45</p>

92.     As regards the Group's first request, the contact information for Defendants who have appeared in the Distributed Action is publicly available on the Court's docket.  Most of the counsel for Defendants with whom LBSF has been dealing already have appeared.  In addition, LBSF forwarded this information in a spreadsheet to the Group on March 9, 2014.  Further, the corporate contact information for each of the Noteholder Defendants is appended as a schedule to LBSF's Second Amended Complaint.

93.     The Group's remaining requests do not serve its goal of promoting "litigation efficiency."  The itemized monetary amounts sought from the Group constitute confidential information produced pursuant to the Expedited Discovery Order, to which both parties and non-parties are subject.  The capacity in which each Defendant is being sued, and the grouping of Defendants by Issuer Defendants is information that is in the possession of the Trustee Defendants, and should be requested from them.  Moreover, there is no basis for LBSF to make initial disclosures, as Phase I involves either class certification under the Proposed Order, or dispositive motions under the Group's Proposed Protocol.  Finally, any such disclosures should be reciprocal.

**B.     Document Repository**

94.     As LBSF informed counsel for the Group during the meet and confer session, the Trustee Defendants maintain pristine sets of the documents the Group requests, and therefore the Trustee Defendants should be required to provide those documents to the Group.  For the sake of efficiency, and to avoid potential claims that such documents are incomplete or inaccurate, the transaction documents should be provided by the Trustee Defendants, not LBSF.  To the extent LBSF is required to produce such documents, Defendants should also be required to provide the transaction documents in their possession.

46

### C.    Amendment of Complaint

95.    The Group purports to restrict amendments to LBSF's Second Amended Complaint to thirty days after entry of a case management order.  However, LBSF should be afforded the opportunity to amend its complaint in light of additional discovery it receives, including the identification of absent members of the Noteholder Class in the event that class certification is not granted.

### D.    Process of Litigation After Phase I

96.    The Group's proposal permits 45 days for "limited discovery pertaining to any factual issues raised in any Phase II Motions to Dismiss."  Group Proposed Protocol ¶ 7(a). To the extent statute of limitations issues have not been addressed through American Pipe, which is to be addressed in Phase II of the Group's Proposed Protocol (¶ 7) and LBSF's Proposed Order (¶ 38), LBSF agrees that discovery may be needed.  However, in light of the magnitude of this case, it is unrealistic for such discovery to be completed within 45 days, and accordingly, LBSF submits that this discovery period should be no less than four months.

97.    Under the Group's Proposed Protocol, merits discovery is stayed until thirty days after the Court has ruled upon all Phase II motions to dismiss.  *See* Group's Proposed Protocol ¶ 11.  Given that under the Group's proposal, the motions to dismiss would have been denied in Phase I, to promote litigation efficiency, merits discovery should ensue within thirty days after denial of the Group's Phase I motions to dismiss and should be taken concurrently with and after jurisdictional discovery in Phase II and class discovery in Phase III.

### E.    Consolidation of Briefing and Oral Argument

98.    The Group's Proposed Protocol fails to provide an orderly mechanism for litigation efficiency and it does not prevent the Distributed Action from devolving into a free-for-

47

all.  As stated herein, Defendants' proposal permits any Defendant "to submit a brief on its own

behalf and participate in oral argument."  *Id.* ¶ 6(d).  The prospect that dozens of individual

Defendants will brief whatever issues their fertile minds can concoct should be sufficiently

alarming to persuade this Court that determining what Defendants can do and how they can do it

is necessary to manage this case effectively.  Other than the Group's standardless "best efforts"

commitment to coordinate briefing, the Group's approach only invites chaos.  Similarly, the

Group's Proposed Protocol provides no mechanism for the coordination of class certification

discovery, other than a weak "best efforts" commitment.  *Id.* ¶ 10(g).  The proposal also states

that each Defendant is entitled to participate in merits discovery, again with only a "best efforts"

undertaking to achieve coordination.  *Id.* ¶ 11(e).  Lastly, the proposal states that each Defendant

may submit a brief seeking summary judgment, subject to a "best efforts" attempt at

coordination.  *Id.* ¶ 14(f).  Contrary to LBSF's Proposed Order, the Group has failed to advance a

streamlined approach to moving the litigation forward; instead the Group's Proposed Protocol

will undoubtedly subject this Court to a litigation free-for-all, in which up to 152 motions could

be brought by 152 Defendants related to twelve separate claims.

### F.    Termination of ADR Injunctions

99.    The Group's Proposed Protocol seeks to eradicate the successes which

have been achieved to date pursuant to existing Court orders, in particular the ADR Order.  The

Group seeks to lift the ADR Stay to permit the Defendants to participate in each stage of the

litigation, and eliminate the requirement of confidentiality in the discussions between the

Noteholder Defendants and LBSF by allowing unrestricted communications regarding the

Distributed Action among all other Defendants.  It should be noted that as regards the Group's

effort to lift the ADR Stay, LBSF's Proposed Order permits all Noteholder Defendants to

participate in the Distributed Action at each stage.  To lift the ADR Stay in its entirety is

unnecessary.  Moreover, while the confidentiality provision in the Group's Proposed Protocol

states that it does not modify any existing confidentiality obligations "to third parties," the

provision forthrightly modifies confidentiality obligations owed to LBSF in a way that will chill

settlement discussions among the parties.

        100.    Although the Group's confidentiality provision purports to honor Fed. R.

Evid. 408, in reality, it violates the Rule because the Rule imposes a confidentiality restriction as

well as a bar against use of Rule 408 materials in court proceedings.  Rule 408 "evidences a

strong public policy favoring the confidentiality of attempts to voluntarily resolve disputes."

McCormick on Evidence, at 811 (3d ed. 1984).  One of the principles underlying Rule 408 is the

"promotion of public policy favoring the compromise and settlement of disputes."  *United States

v. Contra Costa County Water Dist*., 678 F.2d 90, 92 (9th Cir. 1982).

        101.    Accordingly, courts generally have applied a presumption against

disclosure of settlement negotiations if disclosure seems likely to chill parties' willingness to

make the sort of disclosures in settlement discussions that are necessary to achieve agreement.

*See, e.g., S.E.C. v. Thrasher*, 1995 WL 552719, at *1 (S.D.N.Y. Sept. 18, 1995); *Matsushita

Electronics Corp. v. Loral Corp*., 92-civ-5461(SAS), 1995 WL 527640, at *3-4 (S.D.N.Y. Sept.

7, 1995); *Morse/Diesel, Inc. v. Trinity Indus., Inc*., 142 F.R.D. 80, 84 (S.D.N.Y. 1992); *Bottaro

v. Hatton Assocs*., 96 F.R.D. 158, 160 (E.D.N.Y. 1982); *see also Goodyear Tire & Rubber Co. v.

Chiles Power Supply, Inc*., 332 F.3d 976, 981 (6th Cir. 2003) ("The public policy favoring secret

negotiations, combined with the inherent questionability of the truthfulness of any statements

made therein, leads us to conclude that a settlement privilege should exist, and that the district

court did not abuse its discretion in refusing to allow discovery").  Here, LBSF would be

reluctant to be as forthright as it has been in the ADR process without the strongest

confidentiality protections.

## IV.    JA Hokkaido's Objection Should Be Overruled

102.    Noteholder Defendant JA Hokkaido Shinren ("JAH") submitted a separate

objection to LBSF's Proposed Order [Adv. Proc. Dkt. No. 725] (the "JAH Objection").  JAH

also has separately moved to lift the litigation Stay in order to file a motion to dismiss for lack of

personal jurisdiction [Adv. Proc. Dkt. No. 714] (the "JAH Lift Stay Application").[39]  The JAH

Objection adds nothing constructive to the important case management issues before the Court.

JAH accuses LBSF of failing to meet and confer.  This is disingenuous.[40]  Counsel for the parties

played "phone tag," but were unable to connect.  Substantively, JAH complains that the use of

representative/class counsel is violative of due process, and that the staging of class certification

ahead of "resolution of individual defenses" is unfair.  For the same reasons stated above in

response to the Group's Objection, these concerns are overblown and/or without merit.

103.    Ultimately, the JAH Objection, like the JAH Lift Stay Application, is a

request by one Defendant for special treatment based on nothing more than that Defendant's

apparent personal conviction to make a motion to dismiss.  There is nothing special about JAH

or its purported grounds for dismissal.  Even the Group agrees that it would be "more orderly to

address" JAH's motion to dismiss for lack of personal jurisdiction in Phase II.  Group Br. at 26

n.24.  Moreover, as LBSF will establish in the response to JAH's separate motion to terminate

the Stay as to it, this Court has jurisdiction over JAH.  Just because one particular Defendant is

louder than the others does not make that Defendant right or entitle that Defendant to special

---

[39] LBSF will submit its opposition to JAH's Lift Stay Application when due on May 7, 2014.

[40] It is also highly ironic given that LBSF's request for more time to meet and confer with JAH on the personal jurisdiction issues the parties had been examining was met with the filing of the JAH Lift Stay Application that same day without further discussion.

treatment.  JAH's repeated – and unfounded – insistence that it "wants out" is no basis to disrupt the orderly management of this litigation.

**V.       Certain Trustee Defendants' Joint Limited Objection Is Meritless**

104.      Certain Trustee Defendants have joined the Group's Response (Trustee Ltd. Obj. at 2), and it should be overruled for the reasons set forth above.  It is worth noting that one Trustee Defendant, Wells Fargo Bank National Association, has not objected to LBSF's Proposed Order.

105.      In addition, the Trustee Defendants assert an additional limited objection to LBSF's Proposed Order, which should also be denied.  The Trustee Defendants argue that since they are not alleged to be part of the Noteholder Class in the Second Amended Complaint, any order that this Court enters regarding the (i) class certification discovery, the Class Certification Motion and the Phase I Tolling Motion (together, the "Class Action Issues"); and (ii) Motion to Amend, "should expressly provide that (i) none of the [Trustee Defendants] will need to have any involvement in any Class Action Issues; and (ii) no opinions or orders of this Court on any Class Action Issue will have any preclusive effect . . . on any claims or defenses of any of the [Trustee Defendants]."  Trustee Ltd. Obj. at 3.

106.      As explained *supra* at ¶ 94, to the extent a document repository is necessary or certain documents or information is needed for class discovery, the Trustee Defendants should be required to produce them during the class discovery, as required under Phase I of LBSF's Proposed Order.  Moreover, the Trustee Defendants have set forth no explanation as to why they should not participate in such discovery.  Accordingly, any scheduling order entered by this Court should not expressly provide that the Trustee Defendants have no involvement in any Class Action Issues.

51

107.    Further, while there may be no opinion or order of this Court regarding any Class Action Issues which has any preclusive effect upon the Trustee Defendants, there is no reason (and the Trustee Defendants have proffered no reason) why the Trustee Defendants should be treated differently from any other Defendant in the Distributed Action.  If the Trustee Defendants choose to sit idly on the sidelines and not participate in the Distributed Action, that is their prerogative; however, this Court's rulings should bind (or not bind) the Trustee Defendants as they will all other Defendants in the Distributed Action.  The Trustee Defendants' request for special treatment should be overruled.

## VI.    U.S. Bank National Association's Notice of Response To LBSF's Proposed Order

108.    The Notice of Response of U.S. Bank National Association to LBSF's Proposed Scheduling Order in Adversary Proceeding Case Number 10-03542 (the "Non-Distributed Action") merely attaches the submission it filed in the main bankruptcy proceeding and the Non-Distributed Action (the "Response").  The Response notes that the Proposed Order filed in the Distributed Action does not "suggest a protocol for the Non-Distributed Actions" and U.S. Bank suggests that since the Distributed Action and the Non-Distributed Action are substantially similar, the cases should "follow a parallel litigation path."  (Response at 3).  U.S. Bank further seeks "that any scheduling order entered for the Distributed Action also apply to the Non-Distributed Action."  (Response at 3).

109.    LBSF is conferring with U.S. Bank and other defendants in the Non-Distributed Actions to address their concerns and draft a comparable proposed order.

52

## CONCLUSION

For all of the reasons set forth herein, LBSF respectfully requests that the Court

overrule the Objections, enter the Proposed Order, and grant LBSF such other and further relief

as is just.

Dated: New York, New York
May 5, 2014

<div style="margin-left: 50%;">

_____/s/Paul R. DeFilippo_____

Paul R. DeFilippo
William F. Dahill
Vincent T. Chang
James N. Lawlor
Adam M. Bialek

WOLLMUTH MAHER & DEUTSCH LLP
500 Fifth Avenue
New York, New York 10110
(212) 382-3300

*Counsel for the Plaintiff*
*Lehman Brothers Special Financing Inc.*

</div>

53