WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Garrett A. Fail

Attorneys for Lehman Brothers Holdings Inc.
and Certain of Its Affiliates

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------x
                                                          :
**In re**                                                 :    **Chapter 11**
                                                          :
**LEHMAN BROTHERS HOLDINGS INC., et al.,**    :    **Case No. 08-13555 (SCC)**
                                                          :
                        **Debtors.**                      :    **(Jointly Administered)**
                                                          :
-------------------------------------------------------------------x

## PLAN ADMINISTRATOR'S LIMITED OBJECTION TO
## STONEHILL'S MOTION REGARDING PROOFS OF CLAIM

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...............................................................1

RELEVANT BACKGROUND .................................................................2

COMPARISON OF THE ORIGINAL CLAIMS AND THE NEW CLAIMS ..............................3

LIMITED OBJECTION .......................................................................5

I.    The Relief Requested Must Be Subjected to Careful Scrutiny.....................................6

II.   Stonehill Should Not Be Permitted To
      Amend the Original Claims to Add the Diminution Claims.........................................9

      A.    The Diminution Claims Do Not Relate Back ..................................................10

            1.    The Diminution Claims Were Not Asserted in the Original Claims .........12

                  a)    General Reservations Are Insufficient to Provide
                        Notice ...............................................................................12

                  b)    Stonehill's Specific References
                        Were Insufficient to Provide Notice ..................................16

            2.    The Amount of the Diminution Claims Is Not Reasonably Close to
                  the Amount of the Securities-Related Portion of the Original Claims ......17

            3.    The Diminution Claims Do Not Describe
                  the Original Claims with Greater Specificity.............................................17

            4.    The New Claims Do Not Plead a New Theory
                  of Recovery on Facts Set Forth in the Original Claims ............................19

      B.    The Balance of Equities Further Prevents the Filing of the New Claims ........20

            1.    Stonehill Could Have Timely Asserted the
                  Diminution Claims and Offers No Justification For Delay ......................20

            2.    The Chapter 11 Estates And Their Creditors
                  Are Patently Prejudiced By the Diminution Claims .................................24

            3.    Other Creditors Will Not Receive A Windfall .........................................27

III.  Stonehill May Not Collect More than One Claim .....................................................28

CONCLUSION....................................................................................30

i

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Alexander's Inc.*,
    176 B.R. 715 (Bankr. S.D.N.Y. 1995) ...................................................................10

*Allstate Ins. Co. v. Credit Suisse Sec. (USA) LLC*,
    No. 11-2232, 2011 WL 4965150 (S.D.N.Y. Oct. 19, 2011)..............................11, 22

*Amerisource Corp. v. Rx USA Int'l Inc.*,
    No. 02-2514 2010 WL 2060017 (E.D.N.Y. May 26, 2010) ...................................28

*In re AM Int'l, Inc.*
    67 B.R. 79 (N.D. Ill. 1986) ..................................................................................12

*Aristeia Capital, L.L.C. v. Calpine Corp.* (*In re Calpine Corp.*),
    No. 07-8493, 2007 WL 4326738 (S.D.N.Y. Nov. 21, 2007).......................... *passim*

*Associated Container Transp. (Austl.) Ltd. v. Black & Geddes, Inc. (In re Black & Geddes, Inc.)*,
    58 B.R. 547 (S.D.N.Y. 1983)............................................................................19, 20

*In re Best Payphone, Inc.*,
    No. 01-15472, 2007 WL 1388103 (Bankr. S.D.N.Y. May 8, 2007) ..................7, 8, 9, 21, 22

*Branch Banking and Trust Co. v. Broaderip*,
    No. 10-00289, 2011 WL 3511774 (S.D. Ala Aug. 11, 2011)..................................14

*In re Ciena Capital LLC*,
    No. 08-13783, 2010 WL 3156538 (Bankr. S.D.N.Y. Aug. 10, 2010)...............21, 25

*Colucci v. Beth Israel Medical Center*
    531 F. App'x 118 (2d Cir. 2013) ............................................................................14

*CVI GVF (LUX) Masters S.a.r.l.* v. *Lehman Bros. Holdings Inc.*,
    445 B.R. 137 ........................................................................................................26

*DiGirolamo v. United States*,
    279 F. App'x 37 (2d Cir. 2008) ..............................................................................14

*In re Dow Corning Corp.*,
    215 B.R. 346 (E.D. Mich. 1997)............................................................................18

*In re Drexel Burnham Lambert Group Inc.*,
    151 B.R. 684 (Bankr. S.D.N.Y. 1993).........................................................10, 12, 22

ii

*In re Enron Creditors Recovery Corp.*,
    370 B.R. 90 (Bankr. S.D.N.Y. 2007) ............................................................................ *passim*

*Feldberg v. Quechee Lakes Corp.*,
    463 F.3d 195 (2d Cir. 2006) ....................................................................................... 14

*In re Flato*,
    68 F. Supp. 632 (S.D.N.Y. 1946) ............................................................................... 11

*Futuronics Corp. v. Sycamore Indus., Inc. (In re Futuronics Corp.)*,
    23 B.R. 281 (S.D.N.Y. 1982) ................................................................................. 6, 26

*In re G.L. Miller & Co.*,
    45 F.2d 115 (2d Cir. 1930) ......................................................................................... 11

*Gulf States Exp. Co. v. Manville Forest Prod. Corp. (In re Manville Forest Products Corp.)*,
    89 B.R. 358 (Bankr. S.D.N.Y. 1988) ......................................................... 7, 12, 17, 22

*Integrated Res., Inc. v. Ameritrust Co. N.A. (In re Integrated Res., Inc.)*,
    157 B.R. 66 (S.D.N.Y. 1993) ..................................................................................... 12

*In re Keene Corp.*,
    188 B.R. 903 (Bankr. S.D.N.Y. 1995) ....................................................................... 27

*In re Lehman Bros. Holdings Inc.*,
    433 B.R. 113 (Bankr. S.D.N.Y. 2010) ....................................................................... 26

*Leighty v. Brunn*,
    510 N.Y.S.2d 174 (App. Div. 1986) ........................................................................... 28

*Maxwell Macmillan Realization Liquidating Trust v. Aboff (In re Macmillan Inc.)*
    186 B.R. 35 (Bankr. S.D.N.Y. 1995) ......................................................................... 20

*Mazzeo v. United States (In re Mazzeo)*,
    131 F.3d 295 (2d Cir. 1997) ....................................................................................... 18

*In re Mercer's Kwik Stop Food Stores, Inc.*,
    No. 90-02046, 1993 WL 761989 (Bankr. N.D.N.Y. July 2, 1993) ............................. 20

*Midland Cogeneration Venture v. Enron Corp. (In re Enron Corp.)*,
    419 F.3d 115 (2d Cir. 2005) ..................................................................... 9, 10, 25, 26

*New Jersey v. W.R. Grace & Co. (In r W.R. Grace & Co.)*,
    No. 07-536, 2008 WL 687357 (D. Del. Mar. 11, 2008) ......................................... 7, 21

*Phelan v. Local 305 of United Ass'n of Journeymen & Apprentices of Plumbing and Pipefitting Indus. of U.S. & Can.*,
    973 F.2d 1050 (2d Cir. 1992) ............................................................................... 24, 28

iii

*In re PT-1 Commc'ns., Inc.*,
   292 B.R. 482 (E.D.N.Y. 2003) ...........................................................................12

*In re Robertson*,
   370 B.R. 804 (Bankr. D. Minn. 2007) ...............................................................14

*Simon v. Royal Business Funds Corp.*,
   310 N.Y.S.2d 409 (App. Div. 1970) ..................................................................28

*Singer v. Olympia Brewing Co.*,
   878 F.2d 596 (2d Cir. 1989)..........................................................................24, 28

*In re Sneijder*,
   407 B.R. 46 (Bankr. S.D.N.Y. 2009) ..........................................................8, 9, 10

*In re Spiegel, Inc.*,
   337 B.R. 816 (Bankr. S.D.N.Y. 2006) ...............................................................11

*In re Stavriotis*,
   977 F.2d 1202 (7th Cir. 1992) ........................................................................7, 23

*Toyota Motor Credit Corp. v. Rodriguez (In re Rodriguez)*,
   2010 WL 1838286 (M.D. Fla. May 3, 2010).............................................7, 11 , 17

*United States v. Zan Mach. Co.*,
   803 F. Supp. 620 (E.D.N.Y. 1992) ...............................................................24, 28

iv

TO THE HONORABLE SHELLEY C. CHAPMAN
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Holdings Inc. ("LBHI"), as Plan Administrator under the

Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its

Affiliated Debtors (the "Plan") for certain entities in the above-referenced chapter 11 cases (the

"Chapter 11 Estates"), submits this limited objection to the motion of Stonehill Institutional

Partners, L.P. ("Stonehill Institutional") and Stonehill Offshore Partners Limited ("Stonehill

Offshore" and together with Stonehill Institutional, "Stonehill"), dated April 15, 2014 [ECF No.

43988] (the "Motion"), and respectfully represents as follows:

**PRELIMINARY STATEMENT**

1.      In its original proofs of claim filed against the Chapter 11 Estates,

Stonehill included a liquidated claim for less than $1 million related to fifty-four distinct

securities custodied at Lehman Brothers Inc. ("LBI").  Stonehill now states that it has received

from LBI approximately $86 million in value on account of these securities.  Stonehill seeks to

assert new claims totaling an additional approximately $153 million relating to 281 distinct

securities.

2.      Stonehill cannot hide new claims behind the label "Re-Filed Proofs of

Claim."  Stonehill fails to satisfy the burdens required to add new claims or increase the amount

of its existing claims.  The original claims provided no notice of the new claims, which are not

reasonably close enough in amount to "relate back" to the original claims by any measure.

Stonehill filed its new claims later than approximately 1,200 other creditors whose claims in

these cases have been disallowed as late.  Equity favors the continued, strict enforcement of the

bar date in these cases, especially in circumstances where the creditor could have, but did not

disclose, information relating to its new claim.  Permitting Stonehill's new claims to be filed

would prejudice the Chapter 11 Estates by, among other things, opening the floodgates for other creditors whose claims have not been resolved to seek similar relief and render the bar date order meaningless.

## RELEVANT BACKGROUND

3.      Commencing on September 15, 2008 (the "Petition Date"), and periodically thereafter, the Chapter 11 Estates commenced with this Court voluntary cases under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases").

4.      On September 19, 2008, the District Court for the Southern District of New York appointed James W. Giddens as trustee to oversee the liquidation of LBI in a proceeding administered by the Court (the "SIPA Proceeding") under the Securities Investor Protection Act, 15 U.S.C. §§ 78aaa *et seq*.

5.      On July 2, 2009, this Court entered an order (the "Bar Date Order") [ECF No. 4271], setting forth the procedures and establishing September 22, 2009 (the "Bar Date") as the deadline for filing proofs of claim in the Chapter 11 Cases.  The Bar Date Order required creditors to "include supporting documentation or an explanation as to why such documentation is not available" and ordered that "any holder of a claim against the [Chapter 11 Estates] who is required, but fails to file a proof of such claim in accordance with the Bar Date Order . . . shall forever be barred, estopped, and enjoined from asserting such claim against the [Chapter 11 Estates] . . . ."  (Bar Date Order at 6, 9-10.)

6.      In September 2009, Stonehill Institutional and Stonehill Offshore each filed 20 identical proofs of claim – one against each of 20 Chapter 11 Estates – asserting that Stonehill is owed less than $44 million in aggregate from the Chapter 11 Estates jointly (the "Original Claims").  The Original Claims included a detailed accounting of the amounts alleged to be owed, including $42,861,471.30 for cash and an aggregate of $890,336.82 for various

2

quantities of fifty-four distinct securities held by LBI. A more detailed description of the Original Claims is set forth in the following section.

7.    On December 6, 2011, the Court entered an order (the "Confirmation Order") confirming the Plan. [ECF No. 23023]. The Plan became effective on March 6, 2012 (the "Effective Date"). The Confirmation Order provides that "[a]fter the Effective Date, . . . a proof of Claim relating to a prepetition Claim may not be filed or amended without authority of the Court." Confirmation Order ¶ 86.

8.    More than five-and-a-half years after the Petition Date, four-and-a-half years after the Bar Date, and two years after the Effective Date, Stonehill filed the Motion to file new proofs of claim (the "New Claims"), thereby attempting to assert approximately $153 million in "Diminution Claims," for the first time.

## COMPARISON OF THE ORIGINAL CLAIMS AND THE NEW CLAIMS

9.    Annexed hereto as Annex A is a comparison showing all of the changes Stonehill proposes to make to the text of the "Attachment" to Stonehill Offshore's Original Claim.

10.    The chart below illustrates certain of the key differences between the Original Claims and the New Claims.[1]    In summary, Stonehill is: (a) withdrawing approximately $31.8 million of the $42.9 million cash components; (b) withdrawing the entire $890,336.82 securities component; and (c) adding a new securities component for approximately $153 million relating to various quantities of 281 distinct securities.

---

[1] Stonehill did not include with the Motion a copy of the New Claim to be filed for Stonehill Institutional. Accordingly, the Plan Administrator and the Court were left to extrapolate from Stonehill Offshore's New Claim and footnote 3 of the Motion, which states that Stonehill Offshore's New Claim "is representative" of the New Claims against all of the Chapter 11 Estates. (Mot. ¶ 18, n. 3.) Stonehill Institutional should be prohibited from asserting more than the amounts set forth in the chart below and should be required to disclose if it is asserting less.

| | Original Claim | | | New Claims |
| --- | --- | --- | --- | --- |
| | **Stonehill Offshore** | **Stonehill Institutional** | **Total Original Claims** | **Total New Claims** |
| **Cash Components** | | | | |
| Overpayments to SIPA Trustee | $257,571.75 | $496,911.15 | $754,482.90 | -- |
| Outstanding principal & interest | Various Currencies | Various Currencies | Various Currencies | -- |
| Misdirected wires | $418,205.28 | $267,412.23 | $685,617.51 | -- |
| Cash collateral deposit | $5,500,000.00 | $4,500,000.00 | $10,000,000.00 | -- |
| Debit for unsettled trade | $655,000.00 | $1,310,000.00 | $1,965,000.00 | -- |
| Foreign currency hedges ("FX Hedges") | $6,135,929.26 | $4,919,145.22 | $11,055,074.48 | $11,055,074.48 |
| Unsettled bond purchase | $1,788,283.65 | -- | $1,788,283.65 | -- |
| **Securities Components** | | | | |
| Value of securities held by LBI | $395,473.59 | $494,863.23 | $890,336.82 | -- |
| "Diminution Claims" | -- | -- | -- | $152,985,727.00 |
| Aggregate Claim Amounts (*See* Original Claims ¶¶ 6-7; New Claims ¶¶ 8-11) | **$23,460,716.00** | **$20,291,092.12** | **$43,751,808.12** | **$164,040,801.48** |

11.     The crux of the Motion is the addition of what Stonehill refers to as claims "for diminution of the value of securities caused by LBI's delay in returning securities to Stonehill–the amounts of which Stonehill now attempts to fix." (Mot. ¶ 1.)  The Motion describes these as "newly-fixed claims" and labels them as "Diminution Claims."  (*Id.* ¶ 15.) The Motion states that the "previously unliquidated portion" of Stonehill Institutional's and Stonehill Offshore's claims is now asserted to be fixed amounts of $72,461,764 and $80,523,963, respectively, totaling approximately $153 million.  (*Id.*)

12.     Stonehill inserted new text to address the Diminution Claims in the New Claims, including the following:

9.   In addition, the Debtor and the Lehman Entities are obligated to Claimant for damages, interest, costs, attorneys' fees, including, but not limited to the amount representing the diminution in value of the securities held by LBI under the PB Agreement from the date in which LBI's SIPA Proceeding was commenced through the date that such securities were returned to Claimant. . . .
. . . .

4

11.  The current amount owed for diminution in value of returned securities has been calculated by Claimant to be at least $80,523,963 [for Stonehill Offshore]….

(New Claims ¶¶ 9, 11.)  The foregoing paragraphs replaced the only preexisting text describing Stonehill's securities which read, in part: "as of the date of this Claim, approximately [$890,336.62] in securities . . . continues to be held by LBI."  (Original Claims ¶ 6.)

13.  The insertion of a new Exhibit C into the New Claims is a related substantive addition.  Exhibit C includes a list of the securities used to calculate the Diminution Claims.  (New Claims ¶ 11.)  As noted in the chart below, Exhibit C lists 281 distinct securities. The Original Claims include only forty-one of these.  (*Compare* Original Claims at Ex. A of Ex. B *with* New Claims at Ex. C.)  Thus, the New Claims *add* 240 distinct securities that were not included or listed in or, as described more fully below, claimed by the Original Claims.[2] These *additional* securities are presumably those that were recovered from LBI prior to the Bar Date.  A list of all of the additional securities Stonehill proposes to *add* to the New Claims is annexed hereto as <u>Annex B</u>.

|  | Original Claim | New Claims |
|---|---|---|
| **Number of Distinct Securities** | 54 | 281[*] |

[*] The New Claims do not include thirteen distinct securities that were listed in the Original Claims. Thus, the New Claims add 240 distinct securities.

## <u>LIMITED OBJECTION</u>

14.  The filing of New Claims that include Diminution Claims should not be permitted.  Despite Stonehill's characterization as a "re-filing," the requested relief would lead to new claims asserted against the Chapter 11 Estates or inequitable and impermissible amendments to existing claims.  Stonehill's request to withdraw elements of existing claims that have been satisfied should be approved.

---

[2] In addition, Stonehill has increased the quantity of certain securities that were included on the Original Claims.

## I.    The Relief Requested Must Be Subjected to Careful Scrutiny

15.    Stonehill may not circumvent the careful scrutiny and analysis applicable to a request to amend or late-file a proof of claim by arguing that the Motion is seeking authority to "re-file" proofs of claim.  (*See* Mot. at 1, ¶1.)

16.    Stonehill's argument fails even accepting, *arguendo*, Stonehill's assertions that the New Claims (i) only "fix the amounts of claims previously asserted in unliquidated amounts in the Original Proofs of Claim" (*id.* at 1); (ii) "further detail and fix the amounts of unliquidated claims already asserted [in the Original Claims]" (*id.* ¶ 1); (iii) "do not change the substance of the Original Proofs of Claim, but merely (a) fix the amounts of the Diminution Claims; (b) detail and clarify the liability of all Debtors under Stonehill's prime brokerage agreement with LBI, (c) detail and clarify which components of Stonehill's SIPA claims against LBI have been resolved, and (d) detail and clarify the basis for Stonehill's prior assertion of responsibilities resulting from LBI's status as a regulated broker-dealer, including . . . SEC's guidelines . . . [and] New York state law" (*id.* ¶ 18).[3]

17.    As described more fully in section II below, courts within the Second Circuit take a consistent approach in determining whether an amendment of a claim is proper or late-filing of a claim is appropriate.  These courts have employed the approach to *deny* "amendment" of claims and late-filing of "new claims" where the "amendment" or "new claim" falls into the above-categories identified by Stonehill.  *See, e.g.*, *Aristeia Capital, L.L.C. v. Calpine Corp.* (*In re Calpine Corp.*), No. 07-8493, 2007 WL 4326738, at *7 (S.D.N.Y. Nov. 21, 2007) (denying amendment that purported to detail and clarify debtor's liability under an agreement); *Futuronics Corp. v. Sycamore Indus., Inc. (In re Futuronics Corp.)*, 23 B.R. 281,

---

[3] As described in section II.A., below, the New Claims go well beyond Stonehill's characterizations.

284 (S.D.N.Y. 1982) (denying amendment that increased the amount of damages asserted but did

not otherwise change the substance of the claim); *Gulf States Exp. Co. v. Manville Forest Prod.*

*Corp. (In re Manville Forest Prod. Corp.)*, 89 B.R. 358, 375, n. 21 (Bankr. S.D.N.Y. 1988)

(denying "attempt to quantify damages" through informal amendment of claim); *see also In re*

*Stavriotis*, 977 F.2d 1202, 1205-07 (7th Cir. 1992) (denying amendment to fix the amount of tax

liability at the conclusion of an audit); *Toyota Motor Credit Corp. v. Rodriguez (In re*

*Rodriguez)*, 2010 WL 1838286, at *3 (M.D. Fla. May 3, 2010) (denying amendment that would

increase amount of claim, despite claimant's assertion that it was merely "describ[ing] its claim

with greater particularity by quantifying the claim in a more precise amount"); *cf. New Jersey v.*

*W.R. Grace & Co., (In r W.R. Grace & Co.)*, No. 07-536, 2008 WL 687357, at *5 (D. Del. Mar.

11, 2008) (affirming denial of late claim and reasoning creditor "could have filed a proof of

claim as to an unliquidated amount and . . . later amend it to set out a liquidated claim").

18.    Stonehill ignores these authorities and instead cites *In re Best Payphone,*

*Inc.*, No. 01-15472, 2007 WL 1388103 (Bankr. S.D.N.Y. May 8, 2007), for the proposition that

liquidating an unliquidated claim is not an amendment.  (Mot. ¶ 22.)  Reliance on *Best Payphone*

is misplaced.  In the first instance, *Best Payphone* supports *the Plan Administrator's* position that

liquidation of a claim *is* an amendment.  The Court, in fact, pointed out the strategic error the

creditor in *Best Payphone* made by not filing an amendment to liquidate the claim in an amount

certain.  *Best Payphone* at *21.  The Court described the "significant difference between filing a

proof of claim in a liquidated amount and fixing the amount of an unliquidated claim through

litigation" as follows:

> Had [the creditor] filed an amended claim for lost profits in the sum of
> $238,082.43, it would have been deemed allowed unless [the debtor] filed an
> objection to it.  11 U.S.C. §502(a).  Furthermore, the claim would have
> constituted *prima facie* evidence of the validity and amount of the debt, FED. R.

7

> BANKR. P. 3001(f), and the burden of going forward with evidence would have shifted to [the debtor]. At trial, however, [the creditor] shouldered the burden of going forward as well as the burden of persuasion.

*Id.* (emphasis added). Separately, unlike the present case, the debtor in *Best Payphone* was not opposing the assertion of new claims or the liquidation of unliquidated, unspecified proofs of claim; the debtor sought to limit a claim for lost profits from a liquidated amount asserted at trial ($238,082.43) to a previously-asserted liquidated amount ($84,000). *Id.* at *21. Unlike the present case, there was no question of "relation back" to, or notice of, a claim for lost profits, and the equities favored the creditor. Among other factors, the creditor's original proof of claim included a state court complaint which specifically referred to lost profits, *id.* at *4-5; the creditor had proceeded two times to attempt to liquidate its claim before the debtor asserted that amendment would be impermissible, *id.* at *21; and the debtor testified it had estimated its liability to the creditor to be $245,000 (*i.e.*, greater than the amount of the amended claim), *id.* at *22.

19.     Likewise, Stonehill's citation to *In re Sneijder*, 407 B.R. 46 (Bankr. S.D.N.Y. 2009) is misleading. (Mot. ¶ 22.) *Sneijder* does not stand for the proposition, or even in *dicta* suggest, that a creditor's filing of an unliquidated unsecured claim will allow the creditor to "avoid the risk of having a motion to file an amended claim [for the same unliquidated claim] denied." *Sneijder*, 407 B.R. at 53, n. 10. The Court in *Sneijder* was addressing one of several solutions to the problem posed when a chapter 13 debtor intends to surrender property and the secured creditor seeks to obtain an unsecured deficiency claim. The Court suggested as one alternative that:

> the secured creditor may amend (or seek leave to amend if the bar date has passed) the existing secured claim to a partially secured and partially unsecured claim, with the amount of the unsecured deficiency claim fixed through a foreclosure sale, a §506(a) valuation hearing, or an estimation proceeding under §502(c)(1).

8

*Id.* at 49.  But the Court noted as an alternative that:

> 'the prudent approach for a secured creditor who is uncertain of a deficiency should file a bifurcated claim composed of a secured and unsecured portion, or, in the alternative, the creditor should file a motion to value the collateral and obtain an order determining the amount of deficiency based on Section 506(a) of the Code.'

*Id.* at 53, n. 10 (quoting *In re Brooks*, 407 B.R. 429, 433 (Bankr. M.D. Fla. 2009)).  It was in this context that the Court stated that, in the latter alternative, "the secured creditor avoids the risk of" the first alternative, *i.e*, not being able to assert an unsecured claim at all.  *Id*.  As in *Best Payphone*, the Court in *Sneijder* ruled that the creditor "*may file an amended claim*" for the agreed amount of the unsecured deficiency, suggesting that liquidating an unliquidated claim is, indeed, an amendment.  *Id.* at 49 (emphasis added).  Unlike the present case, but as in *Best Payphone*, there was no question of "relation back" to, or notice of, the deficiency claim, and the equities favored the creditor: the debtor was on notice of the maximum amount owed to the creditor and was aware of the deficiency in the value of the creditor's collateral.  *Id.* at 55.

20.    Based on the foregoing cases, the Court must review the Motion as a motion to amend the Original Claims.

## II.    Stonehill Should Not Be Permitted To Amend the Original Claims to Add the Diminution Claims

21.    Application of controlling case law requires that Stonehill's request to amend the Original Claims to add the Diminution Claims be denied under the circumstances.

22.    The Second Circuit has cautioned that the Court "must subject post bar date amendments to careful scrutiny to assure that there was no attempt to file a new claim under the guise of amendment."  *Midland Cogeneration Venture v. Enron Corp.* (*In re Enron Corp.*), 419 F.3d 115, 133 (2d Cir. 2005) ("*Enron I*") (quoting *Integrated Res., Inc. v. Ameritrust Co. N.A.* (*In re Integrated Res., Inc.*), 157 B.R. 66, 70 (S.D.N.Y. 1993)); *accord In re Sneijder*, 407

US_ACTIVE:\44468789\19\58399.0011

B.R. 46, 54 (Bankr. S.D.N.Y. 2009) ("Post-bar date amendments should be scrutinized to ensure

that the amendment is not making a new claim against the estate."); *In re Alexander's Inc.*, 176

B.R. 715, 723 (Bankr. S.D.N.Y. 1995) ("Amendments after the bar date are to be scrutinized

very closely to insure that the amendment is in fact genuine and not entirely a new claim.").  "If

a creditor had an unqualified right after the bar date to amend proofs of claim dramatically for

any reason, the bar date in bankruptcy proceedings would be meaningless."  *In re Drexel

Burnham Lambert Group Inc.*, 151 B.R. 684, 695 (Bankr. S.D.N.Y. 1993) (quoting *In re

Stavriotis*, 977 F.2d 1202, 1206 (7th Cir. 1992)).

23.    In the Second Circuit, courts engage in a two-step inquiry to determine

whether a claimant may amend its claim after the bar date.  *Enron I*, 419 F.3d at 133.  A court

must first examine whether the purported amendment "relates back" to a timely-filed proof of

claim.  *Id.*  If an amendment does relate back to the timely-filed claim, courts will "examine each

fact within the case and determine whether it would be equitable to allow the amendment."  *Id.*

The party seeking to amend its claim after the bar date bears the burden of proof in each of the

two tests.  *See In re Enron Creditors Recovery Corp.*, 370 B.R. 90, 96, 100 (Bankr. S.D.N.Y.

2007) ("*Enron II*").

24.    As set forth below, Stonehill has not and cannot meet its burden in either

test.

A.    **The Diminution Claims Do Not Relate Back**

25.    The "relation back" doctrine applicable to amendments of proofs of claim

focuses on whether the original proof of claim put the debtor on reasonable and sufficient notice

of the substance of the amendment, not merely whether the claim asserted in the amended proof

of claim arose out of the same transaction or occurrence set forth in the original claim.  *See

Aristeia Capital, LLC v. Calpine Corp.* (*In re Calpine Corp.*), No. 07-8493, 2007 WL 4326738,

10

at *4-6 (S.D.N.Y. Nov. 21, 2007) ("The fact that the New Claims arise out of the same

Indentures is not sufficient to establish relation back because the Original Claims did not provide

the Debtors with reasonable notice of the proposed amendment."); *see also In re G.L. Miller &*

*Co.*, 45 F.2d 115, 117 (2d Cir. 1930) ("No facts were alleged and no indebtedness asserted which

would give the trustee in bankruptcy notice of the existence of any indemnity obligation . . . .");

*Allstate Ins. Co. v. Credit Suisse Sec. (USA) LLC*, No. 11-2232, 2011 WL 4965150, at *6

(S.D.N.Y. Oct. 19, 2011) (noting that an amendment would be unavailable because it was "not

foreshadowed in [the] proof of claim such that those involved in the proceeding [were] made

aware of the claims against the debtor's estate . . .") (internal citations and quotations omitted);

*In re Flato*, 68 F. Supp. 632, 633 (S.D.N.Y. 1946) (noting that "no notice had been given to the

Trustee" of the amended claim).

26.    In that regard, the District Court for the Southern District of New York has

previously stated that "Bar Dates would be rendered meaningless if creditors were granted leave

to amend to assert new novel claims based on broad language in a timely-filed Proof of Claim

and an attached [agreement]." *Calpine*, 2007 WL 4326738, at *5.  "Simply adding language to

the Original Claim reserving the right to file an amendment does not allow a party to circumvent

this Court's orders." *In re Spiegel, Inc.*, 337 B.R. 816, 820-21 (Bankr. S.D.N.Y. 2006); *accord*

*Allstate*, 2011 WL 4965150, at *5–6 (concluding that an amendment would be denied, despite a

reservation of the right to amend); *Toyota Motor Credit Corp. v. Rodriguez* (*In re Rodriguez*),

2010 WL 1838286, at *2–4 (M.D. Fla. May 3, 2010) (disallowing an amendment to a claim,

despite a reservation of the right to amend).

27.    Consistent with this notice requirement, "to be within the scope of a

permissible amendment, the second claim should not only be of the same nature as the first but

also *reasonably* within the amount to which the first claim provided notice." *Integrated Res.,*

*Inc. v. Ameritrust Co. N.A.* (*In re Integrated Res., Inc.*), 157 B.R. 66, 66 (S.D.N.Y. 1993))

(permitting amendment with no increase in claim amount) (quoting *In re AM Int'l, Inc.,* 67 B.R.

79, 82 (N.D. Ill. 1986)) (emphasis added).   Courts have routinely disallowed amendments of

claims where the increased amount was not reasonably within the amount to which the original

claim provided notice.  *See In re PT-1 Commc'ns., Inc.*, 292 B.R. 482, 487 (E.D.N.Y. 2003)

(disallowing amendment to quadruple amount of claim from $565,653.90 to $2,977,903.94); *In*

*re Drexel Burnham Lambert Group Inc.*, 151 B.R. 684, 695 (Bankr. S.D.N.Y. 1993) (disallowing

amendment to increase claim from $2,979.05 to $3,500,000); *Gulf States Exp. Co. v. Manville*

*Forest Prod. Corp. (In re Manville Forest Products Corp.)*, 89 B.R. 358, 375 (Bankr. S.D.N.Y.

1988) (disallowing informal amendment to increase amount of claim from approximately $16

million to approximately $31 million); *AM Int'l.,* 67 B.R. at 82 (disallowing amendment to

increase claim from $51,743.07 to $183,156.54 where claimant failed "to give any notice of the

scope of what it would eventually claim").

28.     Subject to the foregoing restrictions, an amendment will relate back to a

timely filed proof of claim if it "(1) corrects a defect of form in the original claim, (2) describes

the original claim with greater specificity, or (3) pleads a new theory of recovery on the facts set

forth in the original claim." *Calpine*, 2007 WL 4326738, at *4.

### 1.   The Diminution Claims Were Not Asserted in the Original Claims

29.     The Original Claims did not put the Chapter 11 Estates on "reasonable

notice" of the Diminution Claims.

#### a)   General Reservations Are Insufficient to Provide Notice

30.     Stonehill argues that "on the face of the [Original Claims], Stonehill has

already asserted the Diminution Claims . . . ." (Mot. ¶ 19.)  In support of this, Stonehill points

only to broad language in concluding paragraphs and a "Reservation of Rights" section of the

Original Claim:

> [T]he Lehman Entities, including the Debtor, are fully liable for any and all amounts owed to Claimant in connection with the PB Agreement or otherwise in connection with Claimant's prime brokerage relationship with Lehman Brothers.
> . . . .
> To the extent not set forth in this Claim, Claimant also makes claim for all indirect, nominal or consequential damages, interest, costs, attorneys' fees, and other amounts owed or owing to it, to the extent recoverable under the applicable agreement and/or applicable law, whether or not liquidated, unliquidated, fixed, contingent, unmatured, undisputed, in law or equity, secured or unsecured, directly or indirectly related to the matters discussed in the this Claim. . . .

(Original Claim ¶¶ 13, 18.)

31.     As stated above, courts, including the United States District Court for the

Southern District of New York and this Court, have found that such broad language alone is

insufficient to permit a subsequent amendment or assertion of a new claim.  In *Calpine*, for

example, two creditors asserted claims for principal and interest on account of convertible notes

issued by the debtor.  2007 WL 4326738, at *2.  One creditor's claim also stated:

> any and all other amounts due or to become due under the Indenture and the Notes, whether now due or hereafter arising, which amounts may, presently, be unliquidated or contingent, but may become fixed and liquidated in the future, including . . . compensatory, secondary and/or punitive damages.

*Id*.  The other creditor's claim stated: "other unliquidated charges under the Indenture," including

"all other interest, charges, penalties, premiums, and advances which may be due or become due

under the Notes and the Indenture."  *Id*.  After the bar date, claimants sought to amend their

proofs of claim to assert damages arising from the debtor's breach of the conversion rights

contained in the indentures.  The claimants argued that the amendment did not assert "new

claims" because such claims were already included in the original claims' above-quoted catch-all

provisions.  *Id*. at *3.  This Court refused to permit the amendment and the District Court

likewise rejected the creditors' argument, stating that "the Original Claims did not mention the

Noteholders' conversion rights or any alleged breach of those rights. . . . [and] the catch-all

provision would not have provided the Debtors reasonable notice that the Noteholders were

asserting claims for breach of those rights." *Id.*

        32.    The United States Court of Appeals for the Second Circuit has likewise

found broad "placeholder" language insufficient to preserve rights in similar contexts.  For

example, in *Colucci v. Beth Israel Medical Center*, the court affirmed the district court's denial

of a motion to reconsider on the basis that such motion was untimely, notwithstanding the timely

assertion of a placeholder motion, reasoning: "[a]ny interpretation of the rules permitting

piecemeal filing, as [the plaintiff] advances here, would allow parties to circumvent the purpose

of Rule 60's time limits by filing incomplete motion papers at the deadline." 531 F. App'x 118,

120 (2d Cir. 2013).  In finding that the court lacked jurisdiction to review an order dismissing a

complaint in *Feldberg v. Quechee Lakes Corp.*, the court employed similar reasoning:

> Permitting the [plaintiffs] to supplant their timely yet insufficient 'placeholder'
> Rule 59(e) motion . . . with their subsequent augmented filing . . . would afford
> them an easy way to circumvent Rule 60(b)'s prohibition on granting an
> enlargement of time for filing motions under Rule 59(e).

463 F.3d 195, 197 (2d Cir. 2006).  The concern of the court is familiar: notice.  In *Feldberg*, the

court stated that, "while a Rule 59(e) motion need not be 'comprehensive,' it must nevertheless

'apprise the court and the opposing party of the grounds upon which reconsideration is sought.'"

*Id.*; *accord DiGirolamo v. United States*, 279 F. App'x 37, 38 (2d Cir. 2008) (finding that the

appellant's letter submission was a "timely yet insufficient 'placeholder' submission" that did

not toll the time to file an appeal).[4]

---

[4] Other courts have ruled similarly in different contexts.  *See, e.g., Branch Banking and Trust Co. v. Broaderip*, No. 10-00289, 2011 WL 3511774, at *9, n. 5 (S.D. Ala Aug. 11, 2011) (granting plaintiff's motion for summary judgment and stating "'Fourteenth Affirmative Defense' which attempts to reserve the right to assert affirmative defenses at any point is not a cognizable placeholder for asserting new affirmative defenses in response to a summary judgment motion."); *In re Robertson*, 370 B.R. 804, 810 (Bankr. D. Minn. 2007) (denying the United

33.     Here, in particular, Stonehill's "Reservation of Rights" provides no reasonable notice of an increase in a claim related to Stonehill's securities.  Paragraph 6 of the Original Claims claims a particular dollar amount for particular securities held by LBI but includes neither a reference to unliquidated claims nor a reservation of rights with respect to such securities.  In stark contrast, the same paragraph both lists particular dollar amounts for the seven cash components of Stonehill's claims *and* includes the following reference with respect to such cash components:

> In addition to the foregoing, interest may be payable or claimable *on the cash balances described above*, and additional misdirected wires and/or other amounts may have been received by LBI or other Lehman Entities prior to the date hereof or may be received by LBI or other Lehman Entities after the date of this Claim. Claimant fully reserves the right to amend this Claim to include any and all such amounts as part of its Claim.

(Original Claims ¶ 6 (emphasis added).)  Paragraph 7 then asserted that the "amounts *described above*, in the aggregate equal to [$43,751,808.12], plus the additional unliquidated amounts *referenced above* are obligations of the Lehman Entities, including the Debtor."  (*Id.* ¶ 7.) Paragraph 8 then asserted "*[t]he amounts* owed under the PB Agreement *discussed above* are also recoverable by Claimant" under a different theory of liability, namely "as a result of willful and material misrepresentation."  The face amount of the Original Claims is the sum of securities and cash components listed and described therein.  Given the rules of construction, the inclusion of a reservation of rights with respect to cash components, and the exclusion of one for the securities component, Stonehill could have, but did not, provide notice of a dramatic increase in its claims.

---

States Trustee's motion to dismiss a chapter 7 case because the Trustee failed to meet procedural prerequisites for such motion and stating "[u]nder the common, every-day meaning of the statutory verbiage there is no room for an equivocal placeholder, the planting of a stake that is somehow to reserve the right to draw a conclusion for later exercise, to toll the period under § 704(b)(2) for the filing of a motion under § 707(b)(2), or both").

US_ACTIVE:\44468789\19\58399.0011

b)      **Stonehill's Specific References**
        **Were Insufficient to Provide Notice**

34.      Stonehill points to the "factual description of Stonehill's prime brokerage

relationship with [LBI] and the other Lehman Debtors" in the Original Claims (Mot. ¶ 1) and

asserts that the Diminution Claims "arise from the same facts and allegations detailed in" the

Original Claims (*id.* ¶ 3.)  As set forth above, however, the "relation back" doctrine applicable to

amendments to proofs of claim is not satisfied by establishing only that new claims arise out of

the same transaction or occurrence that gave rise to the original claim.  *See supra* ¶ 25.  The

original claims must also place the debtor on "reasonable notice" of the substance of the

amendment.  *Id.*

35.      There are only two items in the Original Claims that can be considered

"factual description[s]" of Stonehill's securities.  The first is Stonehill's statement that:

"Between the commencement of the SIPA Proceeding and the date of this Claim, the *majority of

Claimant's securities* and a portion of Claimant's cash *have been returned.*"  (Original Claims

¶ 6.)  The second is the subsequent sentence that estimated the value of the securities held by

LBI to be $395,473.59 for Stonehill Offshore and $494,863.23 for Stonehill Institutional.  (*Id.*)

36.      The Original Claims did *not* include, as an assertion of fact, that *any* of

Stonehill's securities had lost, or may lose, value while in the custody of LBI.  (*Compare*

Original Claims *with* New Claims at ¶¶ 9-11.)  The Original Claims did not identify any of the

240 securities listed on Annex B, which LBI returned to Stonehill *prior* to the Bar Date.  (*See*

Original Claims *passim.*)  Taken together, the *only reasonable* conclusion that could be drawn

was, and is, that the Original Claims did not include Diminution Claims.

16

### 2. The Amount of the Diminution Claims Is Not Reasonably Close to the Amount of the Securities-Related Portion of the Original Claims

37.    The New Claims seek $152,985,727 for Stonehill's securities – some 173 times the $890,336.82 sought by the Original Claims for Stonehill's securities.  No precedent can support finding these amounts to be "reasonably close" to one another.[5]  Indeed, as discussed above, courts have held that even a proposed doubling or single-digit multiple of the amount of a claim does not constitute an amendment that is "reasonably close" in amount.  *See supra* ¶ 27 (citing: *Manville Forest*, 89 B.R. at 375; *AM Int'l,* 67 B.R. at 82).

### 3. The Diminution Claims Do Not Describe the Original Claims with Greater Specificity

38.    Stonehill does not assert that the New Claims correct a defect in the form of the Original Claims.  (Mot. ¶ 18.)  Stonehill asserts instead that "by fixing the amount of the previously unliquidated Diminution Claims and clarifying the basis for which the Debtors are liable for a delay in returning Stonehill's securities, the Re-Filed Proofs of Claim 'describe the claim with greater particularity.'"  (*Id.* at ¶ 28.)

39.    This statement suffers from at least three fatal flaws.  First, it presumes, incorrectly, that the Diminution Claims were previously asserted.  As explained in section II.A.1., *supra*, they were not.  *See also supra* ¶¶ 9-13.  Second, quantifying a claim in a more precise amount is not considered describing an original claim with greater particularity.  As noted above, the court in *Toyota* specifically rejected an amendment despite the argument that the proposed amendment merely "describe[d] its claim with greater particularity by quantifying the claim in a more precise amount."  *See supra* at ¶ 17 (quoting *Toyota*, 2010 WL 1838286, at *3).  Third, it presumes, incorrectly, that the Diminution Claims were "unliquidated."

---

[5] The amount sought by the Diminution Claims ($152,985,727) is more than triple the total amount listed in the Original Claims ($43,751,808.12).

US_ACTIVE:\44468789\19\58399.0011

40.     Stonehill cannot credibly argue that the Diminution Claims were fully "unliquidated" on the Bar Date.  (Mot. *passim*.)  The fact that Stonehill did not assert specific values does not make its claims "unliquidated."

41.     The Second Circuit has defined a liquidated claim as a claim whose value is "easily ascertainable" such that the value of the claim can be determined "by reference to an agreement or by a simple computation."  *See Mazzeo v. United States (In re Mazzeo)*, 131 F.3d 295, 304 (2d Cir. 1997); *cf. In re Dow Corning Corp.*, 215 B.R. 346, 359 (E.D. Mich. 1997) (concluding that the "accepted definition" of a liquidated claim is a claim whose "value is capable of ready ascertainment, irrespective of whether the validity of the claim is in dispute").

42.     Stonehill provides no explanation whatsoever for its use of the term "unliquidated" to describe any portion of the Diminution Claims.  Using its own simple theory of valuation for the Diminution Claims (*i.e.*, subtracting value on transfer date from value on Petition Date)[6], Stonehill could have, for example, asserted the "easily ascertainable" fixed dollar amount now alleged for the diminution in value of all 240 securities it had recovered prior to the Bar Date: approximately $101 million in liquidated claims by Stonehill's own calculation.  *See* New Claim Ex. C.  Using its own valuation, Stonehill also could have put parties on notice that, as of the Bar Date, its securities still held by LBI had lost approximately 99.4% of their value.[7] Had Stonehill done so then, its statement now that it "listed claim amounts as 'not less than' a liquidated amount that Stonehill was able to calculate at the time [it filed the claim]" might ring truer.  (Mot. ¶ 11.)

_____

[6] The Plan Administrator reserves all rights to dispute liability for or valuation (including methodology) of any claims Stonehill may be permitted to assert against the Chapter 11 Estates.

[7] Stonehill claimed a value of $890,336.82 for its securities.  Exhibit C of the New Claims ascribes a Petition Date-value of over $138 million for these securities. (*Compare* Original Claims ¶ 6 *with* New Claims at Ex. C.)

43.    The Plan Administrator objects to the filing of the New Claims to the extent that they assert or support the Diminution Claims but not to the extent that they describe the Original Claims with greater specificity.  Accordingly, the Plan Administrator does not object to the additions and deletions reflected on Annex A other than (1) the insertion of paragraphs 9 and 10 into the New Claims and (2) the additions and deletions contained in paragraphs 11-12 and 17-18 of the New Claims to the extent they assert or support the Diminution Claims.

**4.    The New Claims Do Not Plead a New Theory
of Recovery on Facts Set Forth in the Original Claims**

44.    Stonehill asserts, without more, that "at most, the Re-Filed Proofs of Claim 'plead a new theory of recovery on the facts set forth in the original claim,' plainly justifying leave to amend."  (Mot. ¶ 28.)  This is untrue.  The Diminution Claims are not based "on the facts set forth in the original claim."  They are based on newly-alleged facts, including that: (a) Stonehill had, on the Petition Date, 240 additional securities custodied with LBI that were not listed on or identified in the Original Claims, (b) the Petition Date-value of the securities listed on the Original Claims was over 155 times the value claimed by Stonehill on the Original Claims; and (c) approximately half of Stonehill's securities lost value between the Petition Date and the dates on which LBI returned the securities.

45.    Stonehill cites no case in which a court considered an amendment that would substantially increase a creditor's recovery to be merely "pleading a new theory of recovery."  Indeed, the District Court for the Southern District of New York adopted the contrary position in *Associated Container Transp. (Austl.) Ltd. v. Black & Geddes, Inc. (In re Black & Geddes, Inc.)*, 58 B.R. 547 (S.D.N.Y. 1983).  In that case, the court affirmed the Bankruptcy Court's denial of an amendment that asserted a new constructive trust theory of recovery because

this theory would have granted the claim a higher priority and, thus, permitted the claimant to recover more from the debtor's estate than the debtor had anticipated. *Id.* at 553-54. The present facts, where the Diminution Claims would multiply the size of Stonehill's claims, are similar to those in *Black & Geddes*. They are in marked contrast to the facts of cases which permit amendments to plead new theories of recoveries on facts asserted in original claims. In *Maxwell Macmillan Realization Liquidating Trust v. Aboff (In re Macmillan Inc.)*, for example, it was the "same legal fees and costs which the creditor sought to recover on both theories." 186 B.R. 35, 49-50 (Bankr. S.D.N.Y. 1995). The Bankruptcy Court found that, "[g]iven that the recoveries sought are the same, there is no prejudice to the creditor body." *Id.*

## B.    The Balance of Equities Further Prevents the Filing of the New Claims

46.    In balancing the equities, courts consider a number of equitable factors, including: (a) justification for the inability to file the amended claim at the time the original claim was filed; (b) bad faith or dilatory behavior on the part of the claimant; (c) whether other claimants might be harmed or prejudiced; (d) undue prejudice to the opposing party (*i.e.*, the Chapter 11 Estates); and (e) whether other creditors would receive a windfall were the amendment not allowed. *See Enron II*, 370 B.R. at 95 (citing *Integrated Res., Inc. v. Ameritrust Co. N.A. (In re Integrated Res., Inc.)*, 157 B.R. 66, 70 (S.D.N.Y. 1993) (internal citation omitted)); *In re Mercer's Kwik Stop Food Stores, Inc.*, No. 90-02046, 1993 WL 761989 (Bankr. N.D.N.Y. July 2, 1993). As described below, each of these five factors weighs in favor of the Chapter 11 Estates and against Stonehill.

### 1.    Stonehill Could Have Timely Asserted the
### Diminution Claims and Offers No Justification For Delay

47.    Stonehill offers no explanation whatsoever for why it failed to clearly articulate the Diminution Claims – in theory or in amount – or, at the very least, to include a list

US_ACTIVE:\44468789\19\58399.0011

of all of its affected securities *prior to the Bar Date*.  Accordingly, Stonehill has flatly failed to

satisfy its burden of proof with respect to the first two factors.[8]  *See Enron II* at 96, 100; *cf. In re*

*Ciena Capital LLC*, No. 08-13783, 2010 WL 3156538 (Bankr. S.D.N.Y. Aug. 10, 2010).[9]

48.   Stonehill offers instead only two misguided excuses for its failure to act

diligently to amend the Original Claims in the more than four years *since the Bar Date*.  Neither

tilts the balance of equity in favor of Stonehill.

49.   First Stonehill suggests that it delayed purposefully and chose as a matter

of strategy to sit on its information, waiting for the Plan Administrator to object to the Original

Claims so that it could, in a response, assert entirely new Diminution Claims.  (Mot. ¶ 2 ("Had

the Plan Administrator objected, Stonehill would have had the opportunity to prove the entirety

of its claims at trial before this Court, including claims asserted in unliquidated amounts….").)

Generally, such delay should not be sanctioned or encouraged.  *See New Jersey v. W.R. Grace &*

*Co.*, (*In r W.R. Grace & Co.*), No. 07-536, 2008 WL 687357, at *5 (D. Del. Mar. 11, 2008)

(dismissing, as unpersuasive, claimant's argument that it did not immediately file a late claim

upon learning of such claim because claimant "thought it would litigate the claim, settle it, or at

least have the [claim] fixed before [filing the claim] in the Bankruptcy Court . . .").  Such delay

is inconsistent with indicia of good faith and with a creditor's burdens of going forward and

persuasion with respect to claims asserted in uncertain amounts.  *See In re Best Payphone*, *Inc.*,

No. 01-15472, 2007 WL 1388103 (Bankr. S.D.N.Y. May 8, 2007).  It would also promote a

waste of judicial and estate resources.  As *Best Payphone* demonstrates, the filing of an objection

---

[8]  Stonehill has not attempted to demonstrate excusable neglect, which is required for the filing of a late claim.

[9]  In *Ciena*, a case cited by Stonehill, this Court found that a creditor could not demonstrate excusable neglect where all factors included in the "excusable neglect" inquiry favored the creditor but the creditor provided no reason for failing to timely file a claim. 2010 WL 3156538, at *3-4.

21

would not have obviated the current dispute over whether the Diminution Claims are a permissible amendment or a disguised late-filed claim. *See supra* ¶ 18 (discussing *Best Payphone*, 2007 WL 1388103); *see also Gulf States Exp. Co. v. Manville Forest Prod. Corp. (In re Manville Forest Products Corp.)*, 89 B.R. 358, 375 (Bankr. S.D.N.Y. 1988) (treating a creditor's assertion of additional damage amounts in response to a claims objection as an "informal motion to amend").  Here, in particular, where Stonehill admits without an objection that almost 75% of the "cash" components of its Original Claims ($32,696,733.64) has been satisfied by LBI and the remaining 25% of its "cash" components ($11,055,074.48) has yet to be allowed in order to receive distributions from LBI, an objection would have been wasteful.  (*See* Mot. ¶ 13; New Claims ¶ 8.)

50.    Consistent with the foregoing, courts have denied requests to amend proofs of claim where the creditor could have, but did not disclose, information relating to the claim.  *See, e.g.*, *Allstate Ins. Co. v. Credit Suisse Sec. (USA) LLC*, No. 11-2232, 2011 WL 4965150, at *6 (S.D.N.Y. Oct. 19, 2011) (refusing to allow an amendment where "defendants could, and should, have asserted their . . . claims prior to the bar dates . . . [and] [m]ore importantly, defendants have not pointed to any court that has excused their failure to file proofs of claim."); *In re Drexel Burnham Lambert Group Inc.*, 151 B.R. 684, 695 (Bankr. S.D.N.Y. 1993) ("Delay was not justified because creditor calculated the adjusted amounts based on information in its possession when it filed its earlier proof of claim and could have filed a protective claim based on that information.").  As the Seventh Circuit reasoned when denying a post-bar date amendment:

> If a creditor knows that after analyzing information which is wholly within its own control it may later seek to amend its claim drastically, it must not keep that knowledge secret.  If it does so, and later surprises the debtor or other creditors, it should not claim surprise if the bankruptcy court elects to deny the amendment.

US_ACTIVE:\44468789\19\58399.0011

*In re Stavriotis,* 977 F.2d 1202, 1206–07 (7th Cir. 1992) (denying amendment where creditor

"offered no excuse or justification for its delay in notifying the court and other creditors of its

potential amendment. . . . [and] it would have taken minimal effort for the [creditor] to request an

extension of the bar date or to notify the creditors and the court of its ongoing audit").  As

described above, Stonehill could and should have asserted its claims prior to the Bar Date based

on information in its possession when it filed the Original Claims.

   51.  Second, Stonehill attempts to rely on the "course of dealing between the

parties" to justify the delay in seeking an amendment.  (Mot. ¶ 35.)  There is no foundation for

such reliance: the dealings to which Stonehill points bear no reference to the Diminution Claims

and occurred well before Stonehill ever raised the specter of the Diminution Claims.  The

Chapter 11 Estates were not on notice of the Diminution Claims when they engaged in a post-

Bar Date settlement (in 2010) of Stonehill's unrelated claims (*id.*) or, likewise, when Stonehill

filed "objections and responses" to discovery in January and February 2013 (*id.* ¶¶ 14-15).

Stonehill concedes it first referenced additional amounts not set forth in the Original Claims in

November 2013 and January 2014 – after the Plan Administrator's fourth Plan distribution.  (*Id.*

¶ 15).  Stonehill has no excuse for failing to seek to amend its claim prior to that time.

US_ACTIVE:\44468789\19\58399.0011

**2.    The Chapter 11 Estates And Their Creditors
Are Patently Prejudiced By the Diminution Claims**

52.    Stonehill's argument that the Chapter 11 Estates would benefit by the filing of the Diminution Claims is absurd.  (Mot. ¶¶ 4, 33.)  Comparing apples to oranges, Stonehill asserts a phantom "$600 million" savings to the Chapter 11 Estates by comparing the sum of the face amounts of its forty Original Claims ($875,036,162.40) to the face amount of a single New Claim ($164,040,801.48).[10]  (*Id.* ¶¶ 31, 33.)  The only relevant comparison, though, is of the damages asserted in an Original Claim to the damages asserted in a New Claim.  Here, Stonehill is seeking to increase the amount of its securities-related damages from $890,336.82 to $152,985,727.00, more than $152 million.

53.    Moreover, Stonehill could never recover $875,036,162.40 based on the Original Claims.  Stonehill's recovery was capped at a "single recovery" of combined distributions (from the Chapter 11 Estates and LBI) of $43,751,808.12.  *See Phelan v. Local 305 of United Ass'n of Journeymen & Apprentices of Plumbing and Pipefitting Indus. of U.S. & Can.*, 973 F.2d 1050, 1063 (2d Cir. 1992) ("When a plaintiff receives a payment from one source for an injury, defendants are entitled to a credit of that amount against any judgment obtained by the plaintiff as long as both payments represent common damages."); *Singer v. Olympia Brewing Co.*, 878 F.2d 596, 600 (2d Cir. 1989) ("[A] plaintiff is entitled to only one satisfaction for each injury."); *United States v. Zan Mach. Co.,* 803 F. Supp. 620, 623 (E.D.N.Y. 1992) ("It is hornbook law that a plaintiff cannot recover twice for the same injury.").  Thus, Stonehill makes no "concession" by increasing the amount of its claim and acknowledging the single recovery rule (Mot. ¶ 33), which applies equally to the Original Claims as it does the New Claims.

---

[10] Stonehill incorrectly asserts that the face amounts of the New Claims are approximately $202 million.  Only the New Claim against LBHI, which includes unrelated guarantee claims, is approximately $202 million.  The face amount of the New Claims against all other Debtors is $164,040,801.48.

Indeed, Stonehill has acknowledged the limitations of the single recovery rule before and cannot credibly assert it is entitled to collect 100% on each of its forty claims. *See* ECF. No. 43335 (requesting reserve in amount of a single New Claim, not the aggregate of 40 New Claims).

54.    Stonehill's comparison of its "miniscule" claims to the assets of a singular "estate" is also meaningless.  Stonehill filed claims against twenty separate Chapter 11 Estates, each with its own assets, liabilities, and projected recoveries for creditors.  A New Claim would, in fact, be the largest claim asserted against half of the Chapter 11 Estates.  Further, even if the assumption upon which Stonehill relies were true, Stonehill's argument relying on the New Claims being "miniscule compared to the assets of the estate" is not supported by the case law Stonehill cites.  (Mot. ¶ 31.)  Indeed, as noted above, in *Ciena*, the Court refused to permit the filing of a late claim even though the new claim was "remarkably small compared to the bankruptcy estate." *Ciena*, 2010 WL 3156538, at *3-4.  This argument was also unpersuasive in *Enron I*.  In that case, a creditor challenged the Court's finding of prejudice notwithstanding the Court's comment that the late-filed claim was not substantial in relation to the debtor's estate. *Enron I*, 419 F.3d at 131.  Despite the fact that the creditor's $12.5 million claim was "outweighed 68,000 to 1" by the other claims in Enron's bankruptcy, the Second Circuit agreed that the claim was "sufficiently large" that permitting its late filing would be unduly prejudicial. *Id*. at 131-32 (reasoning that "while a claim of $12.5 million might seem insignificant in the face of a $900 billion bankruptcy, courts have previously upheld findings of prejudice in cases in which the late-filed claim was a small fraction of the total claims").

55.    Stonehill's dismissal of concerns for disruption of the claims process is summary and premature.  (Mot. ¶ 32.)  Stonehill asserts that "[i]t would seem extremely unlikely that amendment of Stonehill's claims will open any floodgates," and that a "floodgates"

argument "does not appear relevant herein," based solely on the passage of time since the Bar

Date and Effective Date.  (*Id.*)  Ignoring that the passage of time did not dissuade Stonehill from

filing its Motion,[11] Stonehill failed to consider what the Court must: that there remain

approximately 3,600 disputed claims outstanding against the Chapter 11 Estates.  This is far

more than the total number of claims in most chapter 11 cases.

56.     This Court has often acknowledged the importance of the Bar Date in the

current cases.  The Court determined that "the extraordinary size of the claims management

project is itself a significant factor in determining prejudice," and found:

> The prejudice to the Debtors is not traceable to the filing of any single additional
> claim but to the impact of permitting exceptions that will encourage others to seek
> similar leniency.  In view of the need to bring finality to the enormous task of
> resolving those claims that have already been filed in these cases, the Court
> concludes that strict application of the Bar Date Order is needed to effectively
> manage the claims process and that permitting additional claims will lead to an
> opening of the claims process with foreseeable prejudice to the Debtors.

*In re Lehman Bros. Holdings Inc.*, 433 B.R. 113, 121 (Bankr. S.D.N.Y. 2010) (also noting that

"[a]lowing the filing of late claims also would expose the Debtors to the risk of a virtually never

ending claims resolution process").  The Court's opinion was affirmed on appeal.  *See CVI GVF

(LUX) Masters S.a.r.l.* v. *Lehman Bros. Holdings Inc.*, 445 B.R. 137, 143 (concluding that the

Court did not abuse its discretion in finding prejudice on the foregoing basis).  It was fully

consistent with extensive precedent.  *See, e.g., Enron I*, 419 F.3d at 131-32 (refusing to consider

late-filed claim "in isolation" and considering as a factor in the prejudice analysis "whether

allowing a claim would be likely to precipitate a flood of similar claims with a mountain of such

---

[11] The length of delay in filing post-bar date amendments is in and of itself a factor in the prejudice analysis.  *See
See Aristeia Capital, LLC v. Calpine Corp.* (*In re Calpine Corp.*), No. 07-8493, 2007 WL 4326738, at *6 (S.D.N.Y.
Nov. 21, 2007) ("The timing of the filing of the New Claims . . . more than six months after the Bar Date further
supports a finding of prejudice"); *Futuronics Corp. v. Sycamore Indus., Inc. (In re Futuronics Corp.)*, 23 B.R. 281,
284 (S.D.N.Y. 1982) (noting, as part of the prejudice analysis, that the "[debtor] had been in Chapter XI bankruptcy
proceedings for over six years when [the claimant] first attempted to file its amended claim").

US_ACTIVE:\44468789\19\58399.0011

claims."); *Enron II*, 370 B.R. at 99 ("the Debtors would be unduly prejudiced due to the possibility of opening the floodgates for other similarly situated creditors to come forward to amend their claims or file late claims"); *In re Keene Corp.*, 188 B.R. 903, 910 (Bankr. S.D.N.Y. 1995) (finding prejudice given the possibility of "opening the floodgates" and "the legal fees the estate would potentially expend in litigating these matters. . . ."). The magnitude of the remaining claims process remains significant by any measure. The Court's and Plan Administrator's concern for the fair and efficient administration of these cases remains relevant. Enforcement of the Bar Date Order remains critical.

### 3.    Other Creditors Will Not Receive A Windfall

57.    Stonehill does not assert that other creditors of the Chapter 11 Estates will receive a windfall if the Court denies the Motion. As the Court recognized in *Enron II*, "although other creditors may receive an increased distribution if the amendment is not allowed, such a distribution does not constitute a windfall." *Enron II*, 370 B.R. at 99; *see also Calpine*, 2007 WL 4326738, at *7 (same).

58.    Over the course of these cases, the Court has disallowed approximately 1,400 proofs of claim filed by purported creditors because the claims were late-filed after the Bar Date.[12] In each instance, the proof of claim was filed prior to November 2013. Permitting Stonehill to assert the Diminution Claims after those claims were asserted and disallowed would grant a windfall to Stonehill compared to creditors whose recoveries have been precluded by enforcement of the Bar Date Order.

---

[12] *See, e.g.,* ECF Nos. 12527, 12413, 12407, 12424, 18427, 19521, 21379, 22950, 24673, 27106, 27640, 28394, 29142, 30356, 31142, 32142, 32146, 33270, 34461, 38388.

US_ACTIVE:\44468789\19\58399.0011

### III.    Stonehill May Not Collect More than One Claim

59.    Stonehill cites no authority for its alternative requests for relief and such
requests should be denied summarily.  (Mot. ¶¶ 37-38.)  Applicable case law prevents entry of an
order declaring (1) that Stonehill is entitled to more than one satisfaction for any given injury;
(2) that Stonehill can disregard the substance of the Original Claims; or (3) if Stonehill cannot
assert the New Claims for the Diminution Claims, Stonehill may nonetheless collect distributions
on account of the Original Claims in respect of the Diminution Claims.

60.    It is settled that a party cannot recover twice for the same injury.  *See*
*Phelan v. Local 305 of United Ass'n of Journeymen & Apprentices of Plumbing and Pipefitting*
*Indus. of U.S. & Can.*, 973 F.2d 1050, 1063 (2d Cir. 1992); *Singer v. Olympia Brewing Co.*, 878
F.2d 596, 600 (2d Cir. 1989 *United States v. Zan Mach. Co.,* 803 F. Supp. 620, 623 (E.D.N.Y.
1992); *see also Amerisource Corp. v. Rx USA Int'l Inc.*, No. 02–2514, 2010 WL 2060017, at *6
(E.D.N.Y. May 26, 2010) (noting that "equitable rules against double recovery and unjust
enrichment" would prevent the plaintiff from collecting damages under separate provisions of
the same contract that compensate the plaintiff for the same loss); *Leighty v. Brunn*, 510
N.Y.S.2d 174, 175 (App. Div. 1986) ("It is beyond cavil that a plaintiff is entitled to only one
recovery with respect to an identical damage claim."); *Simon v. Royal Business Funds Corp.*, 310
N.Y.S.2d 409, 410‒11 (App. Div. 1970) (dismissing plaintiff's cause of action against defendant
where plaintiff's complaint failed to allege additional damages to those the plaintiff already
recovered from a co-defendant in a separate proceeding).

61.    The Original Claims are identical, asserting the same liabilities against
twenty Chapter 11 Estates.  If Stonehill is precluded from asserting the Diminution Claims, it is
indisputable that Stonehill is prevented from recovering more than once for any of the damages

alleged in the Original Claims. Stonehill concedes that it has received distributions from LBI to satisfy all portions of its Original Claims other than the FX Hedges. (*See* Mot. ¶ 13; New Claims ¶ 8.) Accordingly, if the Original Claims were allowed, the maximum that Stonehill could collect from the Chapter 11 Estates in aggregate is the singular amount claimed for the FX Hedges ($11,055,074.48), not, as Stonehill asserts, "up to $40 million" from "each" Chapter 11 Estate. (Mot. ¶ 37.)

62.    Stonehill cannot disregard the substance of the Original Claims. As described above, no portion of the $43,751,808.12 asserted in the Original Claims was unallocated; specific amounts were attributed among eight distinct components of the claims: one for the FX Hedges; six for other cash components; and one for securities-related components. *See supra* ¶¶ 9-11. Stonehill cites nothing that would support treating the face amount of its Original Claims as an effective "slush fund" that Stonehill may reallocate, from time to time and in its discretion, as various components of the claim are otherwise satisfied, to increase the size of an overall recovery. (Mot. ¶ 37.) Further, Stonehill offers no support on which the Court may rely to avoid considering any reallocation as an amendment to the Original Claim or the filing of a new late claim. (*Id.*) Accordingly, Stonehill is not free to reallocate the values attributed to the various portions of its Original Claims.

63.    Assuming that the Court "den[ies] Stonehill leave to file such amended claims" (Mot. ¶ 37), the Bar Date Order serves as an absolute bar to Stonehill's attempt to recover from the Chapter 11 Estates on account of the Diminution Claims:

> any holder of a claim against the [Chapter 11 Estates] who is required, but fails to file a proof of such claim in accordance with the Bar Date Order . . . shall forever be barred, estopped, and enjoined from asserting such claim against the [Chapter 11 Estates] . . . ."

29

(Bar Date Order at 9-10.) This order and the Plan clearly prevent Stonehill from recovering from the Chapter 11 Estates any amount for which a claim is not permitted to be filed.  (*See* Plan § 13.7.)

## CONCLUSION

64.    The Motion should be denied to the extent it seeks to assert Diminution Claims.  The Original Claims should be amended to reflect that, at a minimum, substantially all of the Original Claims have been satisfied by LBI.

WHEREFORE the Plan Administrator respectfully requests that the Court deny the request to assert Diminution Claims and grant such other and further relief as is just.

Dated:    May 7, 2014
New York, New York

/s/ Garrett A. Fail
Garrett A. Fail

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Lehman Brothers Holdings Inc.
and Certain of Its Affiliates

## ANNEX A

~~UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK~~
————————————————————x
~~In re:~~                                    ~~Chapter 11 Case No.~~

~~LB Rose Ranch LLC~~                          ~~09-10560 (JMP) Debtor~~

                                             ~~(Jointly Administered)~~
————————————————————x

## ATTACHMENT TO PROOF OF CLAIM OF
## STONEHILL OFFSHORE PARTNERS LIMITED

Stonehill Offshore Partners Limited ("Claimant") hereby files this claim (the Proof of Claim Form together with this Attachment are referred to herein as the "Claim") in the chapter 11 case of LB Rose Ranch LLC (the "Debtor") and, in support of the Claim, represents as follows:

### Background

1.     Claimant is a private investment fund organized as an exempted company under the laws of the Cayman Islands. Stonehill Capital Management LLC ("SCM") is Claimant's investment adviser and an authorized signatory for Claimant.

2.     Prior to the commencement of these chapter 11 cases, Claimant had various business relationships with and was party to a number of agreements with the Debtor and its affiliates. A description of certain of these business relationships and agreements and the claims of Claimant against the Debtor arising thereunder is set forth below.[1]

### Prime Brokerage

---

[1] Stonehill Institutional Partners, L.P., an affiliate of Claimant, was also a party to a number of agreements with the Debtor and its affiliates and ~~is filing~~has filed separate proofs of claim in these cases. SCM was a signatory for Claimant for various agreements in its capacity as investment adviser and authorized signatory of Claimant.

3.     *The PB Agreement.* Lehman Brothers Inc. ("LBI"), an affiliate of the Debtor currently in a liquidation proceeding (the "SIPA Proceeding") under the Securities Investment Protection Act of 1970, as amended ("SIPA"), was Claimant's sole prime broker until September 17, 2008, two days before commencement of the SIPA Proceeding.  Claimant was party to a Customer Account Prime Brokerage Agreement (Account No.: 732-40125) (the "PB Agreement") between Claimant and LBI "as signatory for itself and as agent for the affiliates named herein."  The PB Agreement (Paragraph 1) provides that the parties to the PB Agreement consist of Claimant and "Lehman Brothers Inc., Lehman Brothers International (Europe), Lehman Brothers Finance S.A., Lehman Brothers Special Financing Inc., Lehman Brothers Holdings Inc. [("LBHI")] and any of their subsidiaries, parents, affiliates, divisions, officers, directors, agents and employees now existing or hereafter created." Such entities are defined as and referred to throughout the PB Agreement collectively and interchangeably as "Lehman Entities" and "Lehman Brothers" and are referred to interchangeably in this Claim as "Lehman Entities" or "Lehman Brothers" (which terms include the Debtor).[2] Thus,

4.     Although paragraph 21 of the PB agreement refers specifically to "LBI" in connection with prime brokerage services, LBI acted as agent for and signed on behalf of the other Lehman Entities in that capacity.  Paragraph 4 of the PB Agreement states that the Claimant "and Lehman Brothers intend this agreement to be a master netting agreement,"

---

[2] Although paragraph 21 of the PB Agreement refers specifically to "LBI" in connection with prime brokerage services, as noted above LBI acted as agent for and signed on behalf of the other Lehman Entities in that capacity. In addition, paragraph 4 of the PB Agreement states that the Claimant "and Lehman Brothers intend this Agreement to be a master netting agreement", which is an additional indication that the parties intended all Lehman Entities to share in the benefits and burdens of the PB Agreement.

which is an additional indication that the parties intended all Leman Entities to share in the benefits and burdens of the PB Agreement.  In the LBI Trustee's Preliminary Investigation Report and Recommendations, dated August 25, 2010 (the " Trustee's  Report "), the Trustee noted that prime brokerage customer account agreements "included all Lehman entities as parties for certain purposes such as subjecting property in the account to claims and liens." (Trustee's Report at p. 46).  By becoming parties to the PB Agreement and availing themselves of the benefits of the PB Agreements, including by imposing claims and liens on customer property, the Debtors and other Lehman Entities also obligated themselves under such agreement on a joint and several bases with LBI.

5.    3. Thus, the Debtor and its affiliated debtors and debtors-in-possession were parties to the PB Agreement. LBHI had the ability to influence and control LBI, its wholly-owned subsidiary, as well as the other Lehman Entities including with respect to the Lehman Entities' obligations under the Prime Brokerage Agreement.  Having reaped the benefits of the PB Agreement, LBHI, the Debtor and its affiliated debtors -in-possession must remain bound by their obligations and liabilities thereunder.  As a party to the PB Agreement, the Debtor is fully liable for all amounts owed to Claimant in connection with the PB Agreement.  A copy of the PB Agreement is attached to this Claim as Exhibit A.

6.    4. As Claimant's sole prime broker and pursuant to the PB Agreement, LBI had custody of a substantial portion of Claimant's assets, including both cash and securities, and was "responsible for settling trades executed on [Claimant's] behalf by [Claimant's] executing broker(s)." (PB Agreement, Paragraph 21(b)).  In addition, the PB Agreement authorized "Lehman Brothers to lend either to itself or to others any securities held by Lehman Brothers in any of [Claimant's] accounts" but provided that Claimant "will be

entitled to receive all distributions, including, but not limited to, cash . . . made on or in respect of any loaned, pledged, repledged, hypothecated or rehypothecated securities." (PB Agreement Paragraph 19). As a regulated broker dealer and by virtue of course of conduct among the parties, industry practice and custom, and an implied duty of good faith and fair dealing, LBI (as well as the other Lehman Entities) also had ~~responsibilities~~obligations implied by law to Claimant not specifically enumerated in the PB Agreement ~~which provide an additional basis for the claims asserted by Claimant under the PB Agreement~~. The failure of LBI to return Claimant's cash and securities therefore constituted a breach of the PB Agreement by the Debtor and the other Lehman Entities.

~~5. *Claims Arising Under PB Agreement.* On September 17, 2008, two days before the commencement of the SIPA proceeding, Claimant directed LBI to transfer Claimant's securities and cash to another prime broker. LBI agreed to effectuate the transfers conditioned on Claimant posting $5.5 million in cash collateral. On September 17, 2008, the required $5.5 million was deposited (the "Cash Collateral Deposit") by Claimant with LBI. In October 2008, at the time of the initial delivery by LBI of certain of Claimant's securities to Claimant, LBI conducted an analysis of Claimant's cash balance as of September 19, 2008 (the "True-Up") which resulted in a net amount of $2,248,173.04 purportedly being owed by Claimant to LBI. That amount was paid by Claimant to the SIPC trustee on October 21, 2008.[3]~~

---

[3] ~~Claimant reserved its rights with respect to such payment because Claimant did not agree that it owed the net amount calculated by LBI but did not want to risk delay and potential subsequent failure of LBI to return the securities, which likely would have further damaged Claimant.~~

7.      6. On January 26, 2009, Claimant filed a proof of claim in the SIPA Proceeding asserting various claims – categorized as "components" of the claim against LBI under SIPA (the "SIPA Claim").  A copy of the SIPA Claim is attached to this Claim as Exhibit B.  Between the commencement of the SIPA Proceeding and the date of this Claim, the majority Amendment, virtually all of Claimant's securities and a portion of Claimant's cash held at LBI have been returned.  However, as of the date of this Claim, approximately $395,473.59 in securities (fair market value as of September 9, 2009) and approximately $23,065,243.02 in cash continues to be held by LBI.  As more fully described in the SIPA Claim, the current balance of the cash component of the SIPA Claim includes the following[4] to Claimant pursuant to a Notice of SIPA Trustee's Determination of Claim (SIPA Claim No. 900002114) dated March 23, 2010 (as corrected on June 4, 2010), Schedule A to the SIPA Trustee's Distribution Notice dated June 27, 2013 (as corrected on August 22, 2013), and a Declaration, Release and Assignment entered into by Claimant on September 5, 2013 (collectively, the "SIPA Claim Determination").

- approximately $257,571.75, the amount of an overpayment by Claimant to the SIPC trustee on October 21, 2008 when Claimant "zeroed out" its LBI cash balance as part of the True-Up (Component 1 of the SIPA Claim);

[4] Amounts included as component 6 of the SIPA Claim are not included in this Claim because such amounts were solely obligations of LBI.  Amounts included as component 7 of the SIPA Claim are not included in this Claim because such amounts were settled with the SIPA Trustee.

- principal, interest and other payments (in various currencies) on securities custodied at LBI that should have been but were not remitted to Claimant as required by the PB Agreement in the following amounts:

  USD 6,173,078.91
  GBP 5,262,140.69
  EUR     122,442.03
  CAD     164,576.11

  (Component 2 of the SIPA Claim)

- approximately $418,205.28[5] the amount of misdirected wires sent to LBI after September 19, 2008 through the date of this Claim that should have been but were not remitted to Claimant as required by the PB Agreement (Component 3 of the SIPA Claim);

- $5,500,000, the Cash Collateral Deposit (Component 4 of the SIPA Claim);

- $655,000, an amount debited by LBI on August 12, 2008 from Claimant's account for a trade that never settled (Component 5 of the SIPA Claim);

8.    • Pursuant to the SIPA Claim Determination, all of the components of the SIPA Claim have been resolved other than Component 8, which represents an aggregate of $6,135,929.26, the aggregate amount of in losses as of September 19, 2008, on foreign currency hedges entered

---

[5] Dollar amount is based on exchange rates as of September 10, 2009.

into under the PB Agreement (,[2] and ~~C~~component ~~8 of the SIPA Claim)~~[6]~~;~~

- ~~10,~~ pursuant to which Claimant fully reserved the right ~~$1,788,283.65, the purchase price for bank debt sold by Claimant to a third party, which amount was paid by the third party to LBI, and for which LBI acknowledged receipt, but which was only posted to Claimant's account on October 10, 2008 and was excluded from the True Up calculation and is owed to Claimant (Component 9 of the SIPA Claim); and~~

~~In addition~~ to ~~the foregoing,~~ seek interest that may be payable or claimable on ~~the~~ cash balance~~d described above, and,~~ additional misdirected wires, and/or other amounts that may have been received by LBI or other Lehman Entities ~~prior to the date hereof or may be received by LBI or other Lehman Entities after the date.~~ Component 8 of Claimant's SIPA claim arising from foreign currency hedges has not yet been admitted as a general unsecured claim in LBI's SIPA proceeding although it may be so admitted in the future.

- ~~of this Claim. Claimant fully reserves the right to amend this Claim to include any and all such amounts as part of its Claim. (Component 10 of the SIPA Claim)~~

---

[2] Although Claimant believes that LBI may have been the only Lehman entity directly involved with the foreign currency hedges, such hedges were entered into under the PB Agreement and are therefore obligations of all of the "Lehman Entities", as noted above.

[6] ~~Although Claimant believes that LBI may have been the only Lehman entity directly involved with the foreign currency hedges, such hedges were entered into under the PB Agreement and are therefore obligations of all of the "Lehman Entities", as noted above.~~

7. The amounts described above, in the aggregate equal to approximately $23,460,716[7] plus the additional unliquidated amounts referenced above, are obligations of the Lehman Entities, including the Debtor, under the PB Agreement.

9.    In addition, the Debtor and the Lehman Entities are obligated to Claimant for damages, interest, costs, attorneys' fees, including, but not limited to the amount representing the diminution in value of the securities held by LBI under the PB Agreement from the date in which LBI's SIPA Proceeding was commenced through the date that such securities were returned to Claimant.  The PB Agreement obligated the Debtor and the Lehman Entities to provide services consistent with the SEC's guidelines on prime brokerage relationships (PB Agreement Paragraph 21(l)).  It is an established element of the brokerage relationship that a broker-dealer must promptly return the securities upon request and, pursuant to the terms of the PB Agreement, the Debtor and all the Lehman Entities were made jointly and severally liable for any breach of the obligation to return securities.[3] Therefore, the Debtor and the Lehman Entities were responsible, separate and apart from LBI's obligations as a broker-dealer subject to SIPA regulation (and notwithstanding any limitation under SIPA with respect to such a diminution in value claim), for the prompt return of the securities to Claimant upon request when LBI commenced its SIPA Proceeding, and must repay Claimant for Claimant's losses due to the failure to return the securities or cause the securities to be returned.

---

[7] Foreign currency amounts that comprise component 2 of the SIPA Claim have been converted into US Dollars based on the exchange rate as of the close of business on September 10, 2009.

[3] Such breach rose to the level of gross negligence and/or willful misconduct and therefore was not subject to the limitation on liability set forth in Paragraph 30 of the PB Agreement.

10.    A further basis for the diminution in value claim is that LBI and the Lehman Entities were required under state law to act in accordance with their respective obligations as a bailees of the securities, and therefore to return the securities to Claimant (PB Agreement Paragraph 3). Under New York law, which governs the PB Agreement, a bailee has a duty to return goods to a bailor and is liable for loss or damage to the goods.  LBI was further obligated to hold the securities as financial assets under Article 8 of the Uniform Commercial Code (PB Agreement Paragraph 3), which entitles the owners of securities to have property that is held in a security account protected from the intermediary's other creditors.

11.    The current amount owed for diminution in value of returned securities has been calculated by Claimant to be at least $80,523,963.  The calculation of this amount is shown on the spreadsheet attached to this Claim as Exhibit C.[4] This amount, plus the amount owing on component 8 of the SIPA Claim, gives an aggregate Claim amount equal to approximately $86,659,892.26.

12.    8. TheIn addition to the bases for asserting the Claim against the Debtors described above, the amounts owed under the PB Agreement discussed above are also recoverable by Claimant as a result of willful and material misrepresentations made by and/or on behalf of the Lehman Entities regarding their financial position and related

---

[4]The diminution in value claim is based on the difference in value of securities held at LBI as of the close of business on September 12, 2008, the last business day before the commencement of these cases and the last date on which Claimant was able to obtain its securities from LBI, and the date such securities were returned. Claimant does not mark its portfolio on a daily basis and prices for the securities in Claimant's portfolio, other than those that trade on public markets, are not available on a daily basis.  Therefore, other than with respect to publicly traded securities, Claimant used the value of the securities as of the last valuation date prior to September 12, 2008 and the date of return, as applicable.

matters, both publicly[8][5] and by a senior representative of the Lehman Entities directly to SCM, Claimant's investment adviser.  Such misrepresentations induced Claimant (and likely induced similarly situated customers and counterparties of the Lehman Entities) to refrain from terminating Claimant's prime brokerage (and other counterparty) relationships with the Lehman Entities.

13.    9. During a phone call held in early September 2008, shortly before the Lehman chapter 11 filing and the commencement of the SIPA Proceeding, Mr. John Wickham, believed to be head of Lehman Brothers Global Client Services and acting as a representative of the Lehman Entities, called John Motulsky of SCM in response to Mr. Motulsky's voicemail message to Alex Kirk, believed to then be a senior officer of LBHI, asking about the Lehman Entities' financial stability, specifically in connection with the Lehman Entities' prime brokerage and other commercial relationships with Claimant and its affiliates.

14.    10. In response to questions and concerns expressed by Mr. Motulsky regarding the Lehman Entities' financial strength and viability, Mr. Wickham sought to reassure Claimant (through SCM and Mr. Motulsky) regarding the Lehman Entities' financial condition and the stability of its prime brokerage operation.  Mr. Motulsky recalls that Mr. Wickham stated that that Lehman had adequate liquidity because unlike Bear Stearns it prudently financed its customers with matched funding and had sufficient liquidity from sources it believed to be reliable to meet all of its obligations for a year even if no new financing was

---

[8][5] For example, on an earnings call held on September 10, 2008, five days prior to LBHI's chapter 11 filing, Lehman Brothers' CFO at the time, Ian Lowitt, stated regarding Lehman Brothers' liquidity position that "our liquidity position . . . remains very strong."

available, that it had $12 billion of surplus cash, and also cited the availability of secured financing from the federal reserve, none of which was used.

15.    11. Mr. Motulsky also recalls that Mr. Wickham also stated that Lehman's unrealized appreciation in various assets (one of which was Neuberger Berman, half of which Mr. Wickham stated might soon be sold at a profit to realize value and add to tangible equity) were more than sufficient to cover possible unrealized losses in its portfolio and provide incremental equity that would be required for a planned spinout of most of Lehman's commercial real estate portfolio, and conveyed a message that Lehman Brothers' prime brokerage operation would continue operating in the normal course, and that Claimant should be comfortable continuing its customer and counterparty relationship with Lehman Brothers.[9][6] A few days after this conversation the Debtor commenced this chapter 11 case and LBI commenced its SIPA Proceeding.

16.    12. As a result of the material misrepresentations by Lehman Brothers and its representatives to the public, including and by Mr. Wickham, who acted with apparent authority on behalf of Lehman Brothers Holdings Inc.LBHI and its affiliates, to SCM, Lehman Brothers and their representatives succeeded in persuading the Claimant to refrain from demanding the return of its assets held by LBI and other Lehman Entities and otherwise taking actions to promptly reduce its commercial exposure to Lehman Brothers prior to the effective curtailment of LBI's normal operations and the subsequent commencement of the SIPA Proceeding.

---

[9][6] Many of Mr. Wickham's comments appeared to be taken from talking points Mr. Wickham received from the Lehman Entities for communications with customers, rather than being "off the cuff" remarks orof Mr. Wickham's personal views regarding Lehman's financial condition.

17.   ~~13.~~ Thus, by virtue of the public misrepresentations of Lehman Brothers and private misrepresentations by Mr. Wickham, Lehman Brothers' agent, directly to SCM, which misrepresentations were intended <u>for the benefit of the Lehman Entities</u> to convince Lehman Brothers' customers and counterparties in general and SCM in particular of the financial stability and health of Lehman Brothers despite the fact that Lehman Brothers' officers knew or should have known that there were substantial risks that Lehman Brothers' liquidity and capital may not continue to support its operations, the Lehman Entities, including the Debtor, are fully liable for any and all ~~amounts owed to~~<u>direct, indirect, nominal or consequential damages incurred by</u> Claimant in connection with the PB Agreement or otherwise arising in connection with Claimant's prime brokerage <u>and counterparty</u> relationship with Lehman Brothers<u>, including the claim arising from diminution in value of securities that were not timely returned to Claimant</u>.

18.   ~~14.~~ Claimant is entitled to assert and is asserting against the Lehman Entities, including the Debtor, the full amount of claims arising under <u>or relating to</u> the PB Agreement ~~notwithstanding the pending SIPA Claim~~, provided that Claimant may not recover more than 100% of the amount of such claims.

<u>Reservation of Rights</u>

19.   ~~15.~~ No payments have been made to Claimant on account of the claims asserted herein.~~10~~

---

~~10 Claimant has received distributions in the SIPA Proceeding on account of its SIPA Claim, but such claim has not been paid in full.~~

20.    16. Claimant reserves all of its rights to supplement or amend this Claim in any and all respects, including to liquidate amounts which are presently unliquidated or estimated.

21.    17. In the event that the Debtor or any of the other debtors assert or Claimant shall determine that another debtor or other party is obligated or liable for any of the categories of claims and amounts set forth herein, this Claim shall be deemed to have been asserted against such other debtor or other party for such category and amount.

22.    18. To the extent not set forth in this Claim, Claimant also makes claim for all direct, indirect, nominal or consequential damages, interest, costs, attorneys' fees, and other amounts owed or owing to it, to the extent recoverable under the applicable agreement and/or applicable law, whether or not liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, in law or equity, secured or unsecured, directly or indirectly related to the matters discussed in this Claim. Claims for amounts asserted herein which are or could be deemed to be postpetition interest under the Bankruptcy code are asserted to the extent allowed under the Bankruptcy Code and applicable non-bankruptcy law.

23.    19. The filing of the Claim is not and shall not be deemed or construed as consent by Claimant to the jurisdiction of this Court or any other court with respect to proceedings, if any, commenced in any case against or otherwise involving Claimant.

24.    20. Neither the substance nor the act of filing this claim, nor any later appearance, pleading, claim, or action in these cases, is intended or shall be deemed to be a waiver, release, or modification by Claimant of its (a) right to have final orders in non-core matters entered after de novo review by a District Judge; (b) right to trial by jury in any proceeding so triable in this case or any case, controversy or proceeding related to these cases;

(c) rights under the applicable safe harbor provisions of the Bankruptcy Code; (d) right to seek

to have the District Court withdraw the reference in any matter subject to mandatory or

discretionary withdrawal; or (e) other rights, remedies, claims, actions, defenses, setoffs or

recoupments to which Claimant is or may be entitled, all of which are hereby expressly

reserved.

# **ANNEX B**

## SECURITIES NOT INCLUDED IN ORIGINAL CLAIMS

| CUSIP | Security Description |
|---|---|
| 88553X103 | 3DFX INTERACTIVE INC |
| 00374N107 | ABOVENET INC |
| 003881307 | ACACIA RESEARCH - ACACIA TECHNOLOGIES |
| 00685R102 | ADELPHIA RECOVERY TRUST SERIES ARAHOVA INT |
| 007942105 | ADVANTA CORP-CL A (FORMERLY COMMON) |
| 007942204 | ADVANTA CORP-CL B NON-VTG |
| 009451AH8 | AIRPLANES PASS THRU TRUST STF CL D 10.875% 03/15/2019 009451AH8 |
| 029320991 | AMERICAN RICE INC ESCROW CUSIP |
| 029318AA0 | AMERICAN RICE INC MTG NOTES W/CONTINGENT INT 13% 07/31/2002 029318AA0 |
| 031042AC8 | AMES TRUE TEMPER INC SENIOR NOTE 144A 6.7906% 1/15/2012 031042AC8 |
| 04518GAB7 | ASIA GLOBAL CROSSING LTD SR NT *IN DEFAULT* 13.375% 10/15/2010 04518GAB7 |
| TT3070725 | BANQUE PALLAS IN DEFAULT 10.125% 02/08/2026 TT3070725 |
| 112013AB3 | BRODER BROS CO SR NOTE 11.25% 10/15/2010 112013AB3 |
| 119003AF8 | BUDGET GROUP INC SR NTS *IN DEFAULT* 9.125% 04/01/2006 119003AF8 |
| 13077Y9A6 | CALIFORNIA STATEWIDE CMNTYS DEV AUTH SPL FACS DEV UTD AIR 5.62500 10/01/2034 13077Y9A6 |
| 13134YAA5 | CALPINE CONSTRUCTION FINANCE CO L P /CCFC FINANCE CORP 144A 11.6025% 08/26/2011 13134YAA5 |
| 13135BAE6 | CALPINE GENERATING CO 9.07% 04/01/2009 13135BAE6 |
| 13135BAF3 | CALPINE GENERATING CO LLC SR SECD NT *IN DEFAULT* 7.755% 04/01/2010 13135BAF3 |
| ARP2006N1025 | CAPEX SA-ORD AP 1 PAR (BB SYMBOL: CAPX AR) |
| 140661AD1 | CAPMARK FINL GROUP INC SR NT FLT 10 3.74625% 5/10/2010 140661AD1 |
| 144500AC9 | CARRIER INTL S A SR NOTE SER B 13.25% 02/15/2009 144500AC9 |
| 149479107 | CATTLESALE COMPANY |
| 15115MAL5 | CELLNET DATA SYS INC/SR DISC 14% 10/01/2007 15115MAL5 |
| 15133CAC5 | CENTAUR MINING & EXPL LTD SENIOR SECD NOTE 11% 12/01/2007 15133CAC5 |
| 155560AA3 | CENTRAL TRACTOR FARM & COUNTRY INC SR NOTE 10.625% 04/01/2007 155560AA3 |
| 12542AAB3 | CHS ELECTRONICS INC SENIOR NOTES 9.875% 04/15/2005 12542AAB3 |
| 125568AE5 | CIT GROUP FDG CO CDA SR NT 5.6% 11/02/2011 125568AE5 |
| U12605AD0 | CIT GROUP INC EURO MEDIUM TERM NOTE 5.305% 5/13/2009 U12605AD0 |
| 12560PEA5 | CIT GROUP INC MEDIUM TERM SR NTS 2.9050% 10/27/2008 12560PEA5 |
| 125581AV0 | CIT GROUP INC NEW SR NT 3.04938% 01/30/2009 125581AV0 |

## SECURITIES NOT INCLUDED IN ORIGINAL CLAIMS

| CUSIP | Security Description |
|---|---|
| 125577AV8 | CIT GROUP INC R/MD   5.09125      12/19/2008 2.72875% 12/19/2008 125577AV8 |
| 195204AA0 | COLO.COM SR NOTE 144A - IN DEFAULT 13.875% 03/15/2010 195204AA0 |
| 196267AD0 | COLOR TILE INC SR NT IN DEFAULT 10.75% 12/15/2001 196267AD0 |
| 200334100 | COMDISCO HOLDING COMPANY INC |
| 20038K109 | COMFORCE CORP |
| 21061PAD8 | CONSUMER PACKAGING INC SR NOTE 9.75% 02/01/2007 21061PAD8 |
| 2107959D4 | CONTINENTAL AIRLINES INC SR NOTES GTD-REG-ESCROW-DEFAULT 11.5% 03/15/1997 2107959D4 |
| 210795308 | CONTINENTAL AIRLINES INC-CL B |
| 126684AC3 | COUNTRYWIDE ASSET BK CERT SERIES 2006-2N CLASS A3 5.658% 03/25/2034 126684AC3 |
| 12668YAB9 | COUNTRYWIDE ASSET-BACKED CERTI SERIES 2006-S10 CLASS A3.42688%10/25/2036 12668YAB9 |
| 12668XAC9 | COUNTRYWIDE ASSET-BACKED CTFS SERIES 2006-S8 CLASS A3 5.555% 04/25/2036 12668XAC9 |
| 12668VAF6 | COUNTRYWIDE ASSET-BCK CERTIF SERIES 2006-S7 CLASS A6 5.693% 11/25/2035 12668VAF6 |
| 2284499A4 | CROWN PAPER CO SR SUB NOTES -ESCROW CUSIP- 11% 09/01/2005 2284499A4 |
| 126683AB7 | CWHEQ HOME EQUITY LN TR SER 2006-S5 CLASS A2 5.681% 06/25/2035 126683AB7 |
| 126685DW3 | CWHEQ HOME EQUITY LOAN TRUST MTGPC/SERIES 2006-S2 A-2-VAR 5.627% 07/25/2027 126685DW3 |
| 126685DX1 | CWHEQ HOME EQUITY LOAN TRUST MTGPC/SERIES 2006-S2 A-3-VAR 5.841% 07/25/2027 126685DX1 |
| 12668VAA7 | CWHEQ HOME EQUITY LOAN TRUST MTGPC/SERIES 2006-S7 A-1-VAR 2.5513% 11/25/2035 12668VAA7 |
| 2338609B3 | DAIRY MART CONVENIENCE STORES INC - ESCROW - 10.25% 03/15/2004 2338609B3 |
| 238259Z65 | DAUPHIN CNTY PA GEN AUTH REV OFFICE & PKG-FORUM PL-SER A 6% 01/15/2025 238259Z65 |
| 243457108 | DECISIONONE CORP NEW |
| 247361VV7 | DELTA AIR LINES INC DEL EQUIP TR CTF SER 1990 C 10.79% 03/26/2014 247361VV7 |
| 247367AC9 | DELTA AIR LINES INC DEL PASS THRU TRS CTF 1992 B-1 9.375% 09/11/2017 247367AC9 |
| 247361VU9 | DELTA AIR PTC 1990-B16 10.79% 03/26/2014 247361VU9 |
| 247361VW5 | DELTA AIR PTC 1990-D16 10.79% 03/26/2014 247361VW5 |
| 247361VR6 | DELTA AIR PTC 1990-G3 10.79% 09/26/2013 247361VR6 |
| 247367AF2 | DELTA AIRLINES INC DEL PASS THRU TRS PASS THRU CTF 10.5% 04/30/2016 247367AF2 |
| 247701AB1 | DELTA MILLS INC SR NOTE SER B 9.62500 09/01/2008 247701AB1 |
| 262497AG5 | DRYPERS CORP SR NTS SER-B 10.25% 06/15/2007 262497AG5 |
| 2695249C0 | EAGLE GEOPHYSICAL INC SR NT SER B -ESCROWED- 10.75% 07/15/2008 2695249C0 |
| U29302AJ2 | ENRON CORP EURO DEB 0.97% 12/31/2049 U29302AJ2 |
| 29357YAA1 | ENRON CORP PRIVATE PLACEMENT (CLN ) 8% 08/15/2049 29357YAA1 |

**SECURITIES NOT INCLUDED IN ORIGINAL CLAIMS**

| CUSIP | Security Description |
|---|---|
| 2003368R9 | ESC COMDISCO INC NOTE - ESCROW - 6.125% 01/15/2003 2003368R9 |
| 4983269C3 | ESC KITTY HAWK INC SR SECD NTS 9.95% 11/15/2004 4983269C3 |
| 2107959L6 | ESCROW CONTINENTAL AIRLINES INC   "IN DEFAULT" 10% 11/15/2001 2107959L6 |
| 40065L9B9 | ESCROW GUANGDONG INTL TR & INV 144A 8.75% 11/23/2003 40065L9B9 |
| 40065L9A1 | ESCROW GUANGDONG INTL TR & INVT 144A-IN DEFAULT 6.75% 11/15/2020 40065L9A1 |
| 297862AB0 | ETOYS IND CONV SUB NOTE-IN DEFAULT 6.25% 12/01/2004 297862AB0 |
| 302088AH2 | EXODUS COMMUNICATIONS INC SR NT - IN DEFAULT 10.75% 12/15/2009 302088AH2 |
| 302088AK5 | EXODUS COMMUNICATIONS INC SR NT 144A -IN DEFAULT 11.6250% 07/15/2010 302088AK5 |
| 302088AB5 | EXODUS COMMUNICATIONS INC SR NTS - IN DEFAULT 11.25% 07/01/2008 302088AB5 |
| 302088AL3 | EXODUS COMMUNICATIONS INC US$ SR NT 11.625% 07/15/2010 302088AL3 |
| 302088AN9 | EXODUS COMMUNICATIONS SENIOR NOTES- *IN DEFAULT* 11.375% 07/15/2008 302088AN9 |
| XS0108551366 | EXODUS COMMUNICATIONS SENIOR NOTES 10.75% 12/15/2009 |
| 269282109 | EXX INC-CL A |
| G33365PB0 | FCE BANK PLC EURO MEDIUM TERM NOTE 5.728% 09/30/2009 G33365PB0 |
| XS0299967413 | FCE BANK PLC EURO MEDIUM TERM NOTE 7.125% 01/15/2013 G33365SS0 |
| XS0282593440 | FCE BANK PLC EURO MEDIUM TERM NOTE 7.125% 01/16/2012 G33365SQ4 |
| 33762E108 | FIRSTCITY LIQUIDATING TRUST CL B CBI |
| 339130AX4 | FLEMING COMPANIES INC SENIOR NOTES 9.25% 06/15/2010 339130AX4 |
| 339130AP1 | FLEMING COS INC NTS 10.125% 04/01/2008 339130AP1 |
| 358430AA4 | FRIEDE GOLDMAN INTL INC SUB NT CV-IN DEFAULT 4.50% 09/15/2049 358430AA4 |
| 36099ACJ0 | FULTON CNTY GA DEV AUTH SPL FACS REV DELTA AIRLINES INC 5.30% 05/01/2013 36099ACJ0 |
| 370425RU6 | GENERAL MOTORS ACCEPTANCE CORP GLOBAL NOTES 7.25% 03/02/2011 370425RU6 |
| 361990484 | GH WATER SUPPLY HL SHS |
| 37937WAD1 | GLOBAL RATED ELIGIBLE ASSET TR 1998-A ASST BACKED NT -DEFAULT 0% 01/15/20037WAD1 |
| 37937WAA7 | GLOBAL RATED ELIGIBLE ASSET TR CL A2 7.33% 03/15/2006 37937WAA7 |
| 37937WAB5 | GLOBAL RATED ELIGIBLE ASSET TR SERIES 1998-A CL-A-DEFAULT 7.06% 09/15/2007 37937WAB5 |
| XS0301812557 | GMAC BANK GMBH EURO MEDIUM TERM NOTE 5.75% 05/21/2010 N3592XB66 |
| 38012TAB8 | GMACM HOME EQUITY LN TR SERIES 2006-HE3 CLASS A2 5.75% 10/25/2036 38012TAB8 |
| 36186LAB9 | GMACM HOME EQUITY LN TR SERIES 2007-HE2 CLASS A2 6.054% 12/25/2037 36186LAB9 |
| 36186LAC7 | GMACM HOME EQUITY LN TR SERIES 2007-HE2 CLASS A3 6.193% 12/25/2037 36186LAC7 |
| 36186LAD5 | GMACM HOME EQUITY LN TR SERIES 2007-HE2 CLASS A4 6.424% 12/25/2037 36186LAD5 |

**SECURITIES NOT INCLUDED IN ORIGINAL CLAIMS**

| CUSIP | Security Description |
|---|---|
| 36186LAG8 | GMACM HOME EQUITY LN TR SERIES 2007-HE2 CLASS A6 6.249% 12/25/2037 36186LAG8 |
| 361856CV7 | GMACM HOME EQUITY LOAN TRUST MTGPC/SERIES 2004-HE1 A-3-VAR 2.6818% 06/25/2034 361856CV7 |
| 38012TAD4 | GMACM HOME EQUITY LOAN TRUST MTGPC/SERIES 2006-HE3 A-4-VAR 6.088% 10/25/2036 38012TAD4 |
| 36186KAD7 | GMACM HOME EQUITY LOAN TRUST MTGPC/SERIES 2007-HE1 A-4-VAR 5.952% 08/25/2037 36186KAD7 |
| 361881AA3 | GMD BONDHOLDER TRUST OFFSHORE TR CTF 144A 0% 12/31/2026 361881AA3 |
| G3944MAA5 | GMD BONDHOLDER TRUST OFFSHORE TR CTF REG S 0% 12/31/2026 G3944MAA5 |
|  | GREAT 98-A SERIES A-2 FRN |
| 393505UY6 | GREEN TREE FINL CORP SER 1997-4 MFD HSG SR/SUB 7.73% 02/15/2029 393505UY6 |
| 393505YC0 | GREENTREE FINANCIAL CORPORATION MTGPC/SERIES 7.75% 03/15/2028 393505YC0 |
| 36228YAC9 | GST NETWORK FUNDING INC SR SECD DISC NTE DEFAULT 10.50% 05/01/2008 36228YAC9 |
| 362359AC5 | GT GROUP TELECOM INC SENIOR DISC EXCH NTS-DEFAULTED 13.25% 02/01/2010 362359AC5 |
| 422660AD2 | HECHINGER CO *IN DEFAULT* 6.95% 10/15/2003 422660AD2 |
| 422660AC4 | HECHINGER CO SR DEBS 9.45% 11/15/2012 422660AC4 |
| XS0097617996 | HIH WINTERTHUR UNDER&AGY SVC LTD EURO MEDIUM TERM NOTE 5.987% 12/31/2049 Q36895AB8 |
| 44930K108 | ICO GLOBAL COMMUNICATIONS HLDGS LTD DEL CL A |
| 5071476 | INDORAYON INTL FINANCE USD-DEFAULTED 10% 03/29/2001 Y3982EAA6 |
| 457659AM2 | INSILCO CORP SR SUB NOTE SER-B *IN DEFAULT* 12% 08/15/2007 457659AM2 |
| 457661AA4 | INSILCO HOLDINGG CO SR DISC NT 14% 08/15/2008 457661AA4 |
| 462213AK5 | IONICA PLC -SNR DISC NTS 15% 12/31/2049 462213AK5 |
| 462213AJ8 | IONICA PLC SR NOTE 13.50% 08/15/2006 462213AJ8 |
| 465266AC8 | IT GROUP INC SENIOR SUB NOTE SER B 11.25% 04/01/2009 465266AC8 |
| 477122AV7 | JET EQUIPMENT TR MEZZANINE NOTE CL B 95-B 7.83% 08/15/2012 477122AV7 |
| 48282H308 | KAANAPALI LAND LLC |
| 488035AE6 | KELLSTROM INDS INC CONV SUB NOTES-*DEFAULTED* 5.50% 06/15/2003 488035AE6 |
| 488035AC0 | KELLSTROM INDS INC SUB NTS CONV 5.75% 10/15/2002 488035AC0 |
| 493137AD5 | KEY PLASTICS INC SR SUB NOTE SER B 10.25% 03/15/2007 493137AD5 |
| 49373X103 | KGEN PWR CORP COM 144A |
| 537902AC2 | LIVENT INC SR NTS - IN DEFAULT 9.375% 10/15/2004 537902AC2 |
| 54986QAA5 | LUKENS INC MEDIUM TERM NOTES 6.50% 02/01/2006 54986QAA5 |
| XS0282003820 | LUXFER HOLDINGS PLC 11.831% 02/06/2012 G5698WAD0 |
| XS0302940688 | MAC CAPITAL LTD R/MD   .000000001  07/24/2023 0% 7/24/2023 G5753NAB6 |

**SECURITIES NOT INCLUDED IN ORIGINAL CLAIMS**

| CUSIP | Security Description |
|---|---|
| XS0045549812 | MAXWELL COMMUN 8.375% 09/01/2030 |
| DE0004115027 | MAXWELL COMMUNICATIONS EURO DEBS 0% 06/15/2049 G59024AF9 |
| CH0001129714 | MAXWELL COMMUNICATIONS VAR RATE LIQUID 5% 12/31/2050 |
| 586169AN4 | MEMPHIS TN HLTH EDL&HSG FAC BRD MFHR SECUR.-A-IN DEFAULT 8.68% 12/15/2049 586169AN4 |
| 59832WAE9 | MIDWEST GENERATION LLC PASSTHRU CTF SER A 8.30% 07/02/2009 59832WAE9 |
| 607168AY7 | MOBILE ALA INDL DEV BRD SOLID WSTE DISP RV REF-MOBILE ENERGY 6.95% 01/01/2020 607168AY7 |
| 55376WAD1 | MTS INC SR SUB NOTE 9.375% 03/19/2009 55376WAD1 |
| XS0119594405 | MULIAKERAMIK FINANCE LTD SENIOR B VAR RT 0% 10/31/2007 |
| XS0119591302 | MULIALERAMIK FINANCE LTD SENIOR A VAR RATE 7.18750% 10/31/2007 |
| 640071AR7 | NEENAH CORP SR SECD NT 9.50% 01/01/2017 640071AR7 |
| 64007P103 | NEENAH ENTERPRISES INC |
| 64999BJL9 | NEW YORK N Y CITY INDL DEV AGY SPL FAC REV NORTHWEST AIRLINES 6% 06/01/2027 64999BJL9 |
| 666107AA5 | NORTHERNSTAR NAT GAS INC SR NTS 144A 5% 05/15/2013 666107AA5 |
| 667280408 | NORTHWEST AIRLS CORP |
| 612MMI9C4 | NORTHWESTERN CORP - MONTANA POWER CO - CONTRA CUSIP - 0% 12/23/2026 612MMI9C4 |
| 612MMI9B6 | NORTHWESTERN CORP - MONTANA POWER CO - TENDER OFFER - 7.07% 12/20/2006 612MMI9B6 |
| 612MMI8A9 | NORTHWESTERN CORP - MONTANA POWER CO - TENDER OFFER - 7.96% 12/21/2026 612MMI8A9 |
| 66899ABG6 | NORTHWESTERN CORP -CONTRA CUSIP- 7.875% 03/15/2007 66899ABG6 |
| 66899ABH4 | NORTHWESTERN CORP -CONTRA CUSIP- 8.75% 03/15/2049 66899ABH4 |
| 66899ABF8 | NORTHWESTERN CORPORATION SENIOR DEBENTURE 6.95% 11/15/2028 66899ABF8 |
| 62936EAF5 | NPV VI INC 1998-2 HEALTH CARE RCVBLES NT 6.10% 5/1/2004 62936EAF5 |
| 629377AL6 | NRG ENERGY INC BONDS-DEFAULT 8.6250% 04/01/2031 629377AL6 |
| 629377AG7 | NRG ENERGY INC DEFAULT 8.25% 09/15/2010 629377AG7 |
| 629377AK8 | NRG ENERGY INC NOTES-DEFAULT 7.75% 04/01/2011 629377AK8 |
| 629377AN2 | NRG ENERGY INC SENIOR DEB 6.50% 05/16/2006 629377AN2 |
| 629377AE2 | NRG ENERGY INC SR NOTE 7.50% 06/01/2009 629377AE2 |
| 629377AD4 | NRG ENERGY INC SR NOTE 7.50% 06/15/2007 629377AD4 |
| 629ESC9Q9 | NWA A SEN - ESCROW CUSIP - 2.30% 12/31/2049 629ESC9Q9 |
| 629ESC9W6 | NWA A SEN - ESCROW CUSIP - 2.39% 12/31/2049 629ESC9W6 |
| 629ESC9U0 | NWA A SEN - ESCROW CUSIP - 2.52% 11/01/2004 629ESC9U0 |
| 629ESC9S5 | NWA A SEN - ESCROW CUSIP - 5.52% 10/01/2007 629ESC9S5 |

## SECURITIES NOT INCLUDED IN ORIGINAL CLAIMS

| CUSIP | Security Description |
|---|---|
| 629ESC9B2 | NWA A SEN - ESCROW CUSIP - 6.36% 03/01/2005 629ESC9B2 |
| 683990873 | OPEN CONNECT SYSTEMS INC RESTRICTED |
| 703044107 | PATENT LITIGATION TR BENEFICIAL TRUST INTERESTS |
| 70557RAA8 | PEGASUS AVIATION LEASE SECURITIZATION IIASTBK/SERIES 5.81% 05/10/2031 70557RAA8 |
| | PEREGRINE INVEST HOLDINGS LTD |
| 69336V101 | PGT INC |
| 717113AA2 | PHAR-MOR INC SR NOTE-DEFAULTED 11.72% 09/11/2002 717113AA2 |
| 69337YAE4 | PHH MORTGAGE TRUST SER 2007-SL1 CLASS TAGS 144A 6.60% 12/25/2027 69337YAE4 |
| 693344AA1 | PHP HEALTHCARE CORPORATION SUB DEB CONV 144A 6.5% 12/15/2002 693344AA1 |
| 693344AC7 | PHP HEALTHCARE CORPORATION SUB DEB CV 6.50% 12/15/2002 693344AC7 |
| G7111WAA1 | PIV INVESTMENT FINANCE CV REG S-DEFAULT 4.50% 12/01/2049 G7111WAA1 |
| CH0007054882 | POLLY PECK 5.625% 09/20/2049 |
| CH0007054015 | POLLY PECK EURO #53800 -SF-"DEFAULT" 6% 12/31/2010 |
| CH0007054742 | POLLY PECK EURO #55857 "DEFAULT" 5.75% 12/31/2010 |
| CH0007067793 | POLLY PECK INTERNATIONAL "DEFAULT" 8.75% 01/03/2010 |
| XS0015080673 | POLLY PECK INTL EURO #62976-*IN DEFAULT* 7.25% 01/04/2005 G71536AG4 |
| CH0007055665 | POLLY PECK INTL FINANCE CHF 6.25% 03/29/2049 |
| CH0007054304 | POLLY PECK INTL FINANCE LTD 6.25% 11/19/1990 |
| DE0004837372 | POLLY PECK INTL FINANCE-DM EURO #55888 CPN 6% 04/20/2010 |
| 736508847 | PORTLAND GENERAL ELECTRIC CO NEW |
| 755246AA3 | READ RITE CORP CONV SUB NOTES 6.50% 09/01/2004 755246AA3 |
| 76114EAE2 | RESIDENTIAL CAP LLC SR SECD NT 8.50% 05/15/2010 76114EAE2 |
| 76110VTD0 | RESIDENTIAL FDG MTG SECS II IN SERIES 2006-HSA1 CLASS A-2 5.19% 02/25/2036 76110VTD0 |
| 76110VSQ2 | RESIDENTIAL FDG MTG SECS II SERIES 2005-HS2 CLASS A-I-1 3.30688%12/25/2035 76110VSQ2 |
| XS0110843629 | RSL COMM PLC 12.875% 03/01/2010 |
| 74972EAC2 | RSL COMMUNICATION PLC SR NTS- *IN DEFAULT* 9.1250% 03/01/2008 74972EAC2 |
| XS0087917596 | RSL COMMUNICATIONS GLOBAL USD- *IN DEFAULT* 10% 03/15/2008 G7703AAD7 |
| XS0108136036 | RSL COMMUNICATIONS PLC 12.875% 03/01/2010 |
| 74972EAN8 | RSL COMMUNICATIONS PLC GRD US$ SR NT- *IN DEFAULT* 12.8750% 03/01/2010 74972EAN8 |
| 483058111 | RTS KAISER GOVT PROGRAMS INC PUT RT PUR PFD KAISER GROUP |
| 78649QAA3 | SAFETY KLEEN SERVICES INC SR SUB NOTE- IN DEAULT 9.25% 06/01/2008 78649QAA3 |

## SECURITIES NOT INCLUDED IN ORIGINAL CLAIMS

| CUSIP | Security Description |
| --- | --- |
| XS0103759089 | S-AIR GROUP FIN 7.50% 11/15/2007 |
| N5639BAA6 | SAIR GROUP FINANCE B V *IN DEFAULT* 4.375% 6/8/2006 N5639BAA6 |
| CH0007268961 | S-AIR GROUP IN DEFAULT 2.125% 11/04/2004 |
| CH0010348594 | SAIR GROUP -IN DEFAULT 4.25% 02/02/2007 010645182 |
| H7110NAD5 | S-AIR GROUP SWSAIR 0.125% 12/31/2049 H7110NAD5 |
| CH0004931496 | SAIRGROUP - IN DEFAULT 2.75% 07/30/2004 |
| CH0001207908 | SAIRGROUP *IN DEFAULT* 5.125% 03/01/2003 H83970AX33 |
| CH0001207569 | SAIRGROUP ZUERICH VARIABLE RATE 4.125% 02/15/2013 H83970AU9 |
| CH0001188025 | SASEA HOLDINGS 3.25% 10/01/2042 |
| 81375BAJ1 | SECURITIZED MULTIPLE ASSET RATED TR 1997-5 ASSET BACKED 7.72% 06/15/2005 81375BAJ1 |
| 81375BAK8 | SECURITIZED MULTIPLE ASSET RATED TR 1997-5ASSET BACKED 7.056% 03/15/2005 81375BAK8 |
| 81375BAN2 | SECURITIZED MULTIPLE ASSET RATED TR ASSET BKD NT 7.056% 06/15/2005 81375BAN2 |
| 81375BAM4 | SECURITIZED MULTIPLE ASSET SERIES 1997-6 CL A-1 7.71% 11/15/2006 81375BAM4 |
|  | SECURTIZIED MULTIPLE ASSET A2 97-5 0% 06/29/2005 |
| 784123AF8 | SFC NEW HLDGS INC SR SUB NT 13.25% 08/15/2003 784123AF8 |
| 78442FDQ8 | SLM CORP MEDIUM TERM NTS 3.06% 07/27/2009 78442FDQ8 |
| 836153AC0 | SOURCE MEDIA INC SR SECD NTS 12.00000 11/01/2049 836153AC0 |
|  | SOUTHEAST BANKING CORP EURO 0-CPN STAMPED CERT 0% 12/18/1996 |
| 852591AA4 | STALLION OILFIELD SVCS LTD / CORP SR NT 144A 9.75% 02/01/2015 852591AA4 |
| 853763AA8 | STANDARD PACIFIC CORP CVT SENIOR SUB NOTES 6% 10/01/2012 853763AA8 |
| 867833600 | SUNSHINE MNG & REFNG COMPANY PAR %0.01 |
| CH0003532998 | SWISSAIR CORP ***IN DEFAULT 6.25% 04/12/2005 |
| CH0000939394 | SWISSAIR DEFAULTED 5.50% 07/23/2004 |
| 87941TAE5 | TELEGLOBE INC DEB- *IN DEFAULT* 7.7% 07/20/2029 87941TAE5 |
| 87941TAD7 | TELEGLOBE INC GTD DEB 7.2% 07/20/2009 87941TAD7 |
| 88605P108 | THUNDERBIRD RESORTS INC COM 144A |
| G88576106 | THUNDERBIRD RESORTS INC NEW |
| H8817H100 | TRANSOCEAN INC NEW |
| 292689AC0 | TXU - ENERGY GROUP OVERSEAS BV GTD NOTES 7.375% 10/9/98 7.425% 10/15/2017 292689AC0 |
| 292689AD8 | TXU - ENERGY GROUP OVERSEAS BV GTD NT 7.55% 10/15/2027 292689AD8 |
| XS0108297044 | TXU EASTERN FUNDING 7.25% 03/08/2030 |

## SECURITIES NOT INCLUDED IN ORIGINAL CLAIMS

| CUSIP | Security Description |
|---|---|
| 873169AJ5 | TXU EASTERN FUNDING CO GTD SR NOTE 6.75% 05/15/2009 873169AJ5 |
| 873169AF3 | TXU EASTERN FUNDING GTD SR NT- IN DEFAULT 6.45000 05/15/2005 873169AF3 |
| XS0120313605 | TXU EUROPE FUNDING LTD EURO ISSUE- IN DEFAULT 7% 11/30/2007 |
| 902549AE4 | UAL CORP ORD SETTLEMENT BD 5% 02/01/2021 902549AE4 |
| 904677AG6 | UNIFI INC SR SC NT 11.5% R/MD 05/15/2014 904677AG6 |
| 92326YAF6 | VENTURE HOLDINGS TRUST *IN DEFAULT* 11.00000 12/31/2049 92326YAF6 |
| 92326YAD1 | VENTURE HOLDINGS TRUST SR NOTE SER B 9.50% 07/01/2005 92326YAD1 |
| G93447111 | VIATEL HOLDING BERMUDA LIMITED NEW |
| 9262G0AF6 | VICTORIA FIN LTD 144A VR 090908-021709 0% 2/17/2009 9262G0AF6 |
| 9262G0AL3 | VICTORIA FIN LTD 144A VR 090908-121208 0% 12/12/2008 9262G0AL3 |
| G8439CAN0 | VICTORIA STANFIELD EURO MEDIUM TERM NOTE 4.835% 03/28/2008 G8439CAN0 |
| 85431AFH5 | VICTORIA STANFIELD FIN LTD MTN VR 032406-032509 3.13% 3/24/2009 85431AFH5 |
| 93934WAA3 | WASHINGTON MUT PFD FDG TR I PERPETUAL 144A *IN DEFAULT* 6.534% 12/29/2049 93934WAA3 |
| 92923CAK0 | WCI COMMUNITIES INC CONV 4% 8/5/2023 92923CAK0 |
| 92923CAM6 | WCI COMMUNITIES INC CONV SENIOR SUB NOTE 7.875% 10/1/2013 92923CAM6 |
| 960080AB5 | WESTFED HOLDINGS INC MNT SER DEB SPLT CPN 15.50% 09/15/2049 960080AB5 |
| 963150AA5 | WHEELING PITTSBURGH STL CORP SR SECD NT 6% 08/01/2010 963150AA5 |
| 978093AE2 | WOLVERINE TUBE INC SENIOR NOTE SER B 10.50% 04/01/2009 978093AE2 |
| 00374N123 | WTS ABOVENET |
| 449246115 | WTS ICG COMMUNICATIONS INC |
| 64007P111 | WTS NEENAH ENTERPRISES INC |
| 94769A119 | WTS WEBLINK WIRELESS EXP PENDING 2012 |
| 987406AA3 | YOSEMITE SECURITIES TRUST I 99-A LNKD ENRN OBLG LDS-DFLT 8.25% 11/15/2049 987406AA3 |
| 989ESC991 | ZIFF DAVIS MEDIA INC SR SECD NT - ESCROW CUSIP - 0% 05/01/2012 989ESC991 |