**Hearing Date and Time: June 19, 2014 at 10:00 a.m. (Eastern Time)**
**Response Deadline: June 9, 2014 at 4:00 p.m. (Eastern Time)**

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Richard W. Slack
Robert J. Lemons

Attorneys for Lehman Brothers Holdings Inc.
and Certain of Its Affiliates

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------ x

| | | |
|---|---|---|
| **In re** | : | **Chapter 11 Case No.** |
| | : | |
| **LEHMAN BROTHERS HOLDINGS INC.**, *et al.*, | : | **08-13555 (SCC)** |
| | : | |
| Debtors. | : | (Jointly Administered) |

------------------------------------------------------------------ x

## <u>OBJECTION TO PROOF OF CLAIM NUMBERS 67782, 68103, AND 64071</u>

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................1

JURISDICTION ..................................................................................................3

BACKGROUND ..................................................................................................4

    A.   The Chapter 11 Cases ...............................................................4

    B.   The Bonds ............................................................................6

    C.   The Proofs of Claim and New Proofs of Claim ..............................8

OBJECTION .......................................................................................................9

    D.   Applicable Standard..................................................................9

    E.   Giants Stadium Owes Money to LBSF Under the Swaps ...............10

    F.   Giants Stadium Materially Breached the Agreements....................11

        1.   Giants Stadium Denied LBSF the Right to Choose
Reference Market-makers and Conduct the Market Quotation Process ..............12

        2.   Giants Stadium Breached the Agreements by Terminating the
Swaps in Violation of the Indenture's Minimum Hedging Requirement ...........14

    G.   Giants Stadium's Loss Calculation Is Not Commercially Reasonable..........................15

        1.   Giants Stadium's Loss Calculation Ignores Numerous Contract
Rights and Significant Contemporaneously Available Information ...................16

            a)   Giants Stadium's Loss Calculation Fails to
Account for Both LBSF's Right to Cause a
Refinancing or Conversion of the Bonds and the Fact
That Giants Stadium Already Had Initiated a Refinancing ......................16

            b)   Giants Stadium's Loss Calculation Fails to
Reflect Its Own Contemporaneous Assessments of Loss..........................20

            c)   Giants Stadium's Loss Calculation Fails to Account for
Other Structural Limitations on LBSF's Liability Under the Swaps.........21

        2.   Giants Stadium's Loss Calculation Utilizes
Commercially Unreasonable Methodologies ......................................22

            a)   Giants Stadium's Use of Short-Term
Excessively High Auction Rates as a Proxy
for Long-Term Financing Costs is Commercially Unreasonable .............22

            b)   Giants Stadium's Loss Calculation Incorrectly Assumes
Payments under the Swaps Will Continue Unabated for 38 Years ...........23

            c)   Giants Stadium's Loss Calculation Was Flawed in Other Respects..........24

H.    The New Proofs of Claim Are Untimely and Improper ...................................................27

    1.    The New Valuation Statements Are Not Permitted Under the Agreements ........28

    2.    The New Proofs of Claim Are Untimely
Under Bankruptcy Law and the Bar Date Order ...................................................30

        a)    The New Proofs of Claim Should Not
Be Permitted as Late-Filed New Claims....................................................38

            i)    There Is No Reason for Giants
Stadium's Delay in Filing the New Proofs of Claim ......................39

            ii)    The Length of Giants Stadium's Delay Is Disruptive
to the Judicial Administration of These Chapter 11 Cases ............41

            iii)    The New Proofs of Claim Prejudice the
Chapter 11 Estates, Their Creditors, and the
Judicial Administration of the Chapter 11 Cases ...........................44

            iv)    Giants Stadium Did Not Act in Good Faith
in Belatedly Filing the New Proofs of Claim .................................49

        b)    The New Proofs of Claim Should Not Be
Permitted as Amendments to the Proofs of Claim.....................................50

            i)    The New Loss Calculations in the New
Proofs of Claim Do Not Relate Back to
the Loss Calculations in the Proofs of Claim.................................52

            ii)    Balancing of the Equities Weighs Against
Permitting the New Proofs of Claim as Amendments ...................56

RESERVATION OF RIGHTS ......................................................................................58

NOTICE.........................................................................................................................58

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*In re Adelphia Commc'ns Corp.*,
  2007 WL 601452 (Bankr. S.D.N.Y. Feb. 20, 2007) ................................................................. 9

*In re AM Int'l, Inc.*,
  67 B.R. 79 (N.D. Ill. 1986) ................................................................................................... 52

*Aristeia Capital, L.L.C. v. Calpine Corp. (In re Calpine Corp.)*,
  2007 WL 4326738 (S.D.N.Y. Nov. 21, 2007) ............................................................. *passim*

*In re Enron Corp.*,
  298 B.R. 513 (Bankr. S.D.N.Y. 2003),
  *aff'd sub nom. Midland Cogeneration Venture v. Enron Corp. (In re Enron Corp.)*,
   419 F.3d 115 (2d Cir. 2005) ........................................................................................ *passim*

*In re Enron Creditors Recovery Corp.*,
  370 B.R. 90 (Bankr. S.D.N.Y. 2007) ........................................................................... *passim*

*Freund v. Wash. Square Press, Inc.*,
  314 N.E.2d 419 (N.Y. 1974) .................................................................................................. 27

*Futuronics Corp. v. Sycamore Indus., Inc. (In re Futuronics Corp.)*,
  23 B.R. 281 (S.D.N.Y. 1982) ................................................................................................ 51

*Galli v. Metz*,
  973 F.2d 145 (2d Cir. 1992) .................................................................................................. 29

*Guardian Music Corp. v. James W. Guercio Enters., Inc.*,
  459 F. Supp. 2d 216 (S.D.N.Y. 2006),
  *aff'd*, 271 F. App'x 119 (2d Cir. 2008) ................................................................................. 12

*Integrated Res., Inc. v. Ameritrust Co. N.A. (In re Integrated Res., Inc.)*,
  157 B.R. 66 (S.D.N.Y. 1993) ....................................................................................... *passim*

*In re Keene Corp.*,
  188 B.R. 903 (Bankr. S.D.N.Y. 1995) ................................................................................. 44

*In re Kmart Corp.*,
  381 F.3d 709 (7th Cir. 2004) ........................................................................................ 45, 47

i

*In re Lehman Bros. Holdings Inc.*,
433 B.R. 113 (Bankr. S.D.N.Y. 2010),
*aff'd sub nom. CVI GVF (LUX) Master S.a.r.l.* v. *Lehman Bros. Holdings Inc.*,
445 B.R. 137 (S.D.N.Y. 2011) ............................................................. *passim*

*In re Oneida Ltd.*,
400 B.R. 384 (Bankr. S.D.N.Y. 2009) .................................................. 9

*Pioneer Inv. Servs. Co. v. Brunswick Assocs. L.P.*,
507 U.S. 380, 113 S.Ct. 1489 (1993) ................................................. *passim*

*In re Rockefeller Ctr. Props.*,
272 B.R. 524 (Bankr. S.D.N.Y. 2000) .................................................. 9

*Terwilliger v. Terwilliger*,
206 F.3d 240 (2d Cir. 2000) ............................................................. 27

**Statutes**

11 U.S.C. § 502 ............................................................................ 1, 9

11 U.S.C. § 562 ............................................................................ 36

11 U.S.C. § 101(25) ...................................................................... 4

11 U.S.C. § 101(53B) .................................................................... 4

28 U.S.C. § 157 ........................................................................... 3

28 U.S.C. § 1334 ......................................................................... 3

FED. R. BANKR. P. 2004 .............................................................. 47

FED. R. BANKR. P. 3003(c)(3) ...................................................... 32

FED. R. BANKR. P. 3007(a) .......................................................... 1

FED. R. BANKR. P. 9006(b)(1) ...................................................... 38

**Other Authorities**

ANTHONY C. GOOCH & LINDA B. KLEIN, DOCUMENTATION FOR DERIVATIVES 262, 859
(4th ed. 2002) ........................................................................... 26, 28

23 SAMUEL WILLISTON & RICHARD A. LORD, A TREATISE ON THE LAW OF CONTRACTS § 63:8
(4th ed. 2002) ........................................................................... 12

55 N.Y. JUR. 2D EQUITY § 107 ....................................................... 12

ii

TO THE HONORABLE SHELLEY C. CHAPMAN
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Holdings Inc. ("LBHI" and the "Plan Administrator"), as Plan

Administrator under the Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers

Holdings Inc. and Its Affiliated Debtors (the "Plan") for the entities, including Lehman Brothers

Special Financing Inc. ("LBSF," and with LBHI, "Lehman"), in the above-referenced chapter 11

cases (the "Chapter 11 Estates," as applicable), respectfully states as follows:

### PRELIMINARY STATEMENT

1.      The Plan Administrator files this objection, pursuant to section 502(b) of

title 11 of the United States Code (the "Bankruptcy Code") and Rule 3007(a) of the Federal

Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), seeking to disallow and expunge

proof of claim number 64071 (the "LBHI Proof of Claim"), proof of claim number 67782 (the

"LBSF New Proof of Claim"), and proof of claim number 68103 (the "LBHI New Proof of

Claim," and, together with the LBSF New Proof of Claim, the "New Proofs of Claim"), both of

which New Proofs of Claim were filed on December 6, 2011 – the day the Chapter 11 Estates

confirmed their chapter 11 plan – more than two years after the bar date for filing proofs of claim

against the Chapter 11 Estates and more than three years after Giants Stadium, LLC ("Giants

Stadium") purported to terminate the Swaps (defined below).

2.      Giants Stadium filed the New Proofs of Claim in connection with certain

derivatives swap transactions between LBSF and Giants Stadium that are fully described in the

adversary proceeding complaint (the "Complaint")[1] filed by the Plan Administrator against

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the
Complaint.

Giants Stadium on October 23, 2013, which is annexed hereto as <u>Exhibit A</u>.  The Complaint is expressly incorporated by reference as if fully set forth herein.

3.      LBSF and Giants Stadium were parties to two interest rate swap transactions (the "<u>Swaps</u>") that were intended to hedge interest rate risk on securities initially issued in auction rate form (the "<u>Bonds</u>") by Giants Stadium and underwritten by Lehman Brothers Inc. ("<u>LBI</u>").  LBHI guaranteed LBSF's obligations under the Swaps pursuant to two guarantees (the "<u>Guarantees</u>").  In the New Proofs of Claim, Giants Stadium claims amounts of approximately $585 million each purportedly due under the Swaps and the Guarantees.

4.      The Chapter 11 Estates do not owe any amount to Giants Stadium. Rather, Giants Stadium owes approximately $94 million, plus interest, to LBSF under the Swaps.

5.      Furthermore, even if, *arguendo*, Giants Stadium were owed money under the Swaps, Giants Stadium materially breached the swap agreements in multiple respects, and thus, as a matter of law, is not permitted to enforce the agreements.  Giants Stadium's breach negates its claims against LBSF under the Swaps and renders moot its claims against LBHI under the Guarantees.

6.      Moreover, Giants Stadium's Loss calculations under the Swaps – as set forth in the New Proofs of Claim, the LBHI Proof of Claim, and proof of claim 64070 (the "<u>LBSF Proof of Claim</u>," and, together with the LBHI Proof of Claim, the "<u>Proofs of Claim</u>") – are not commercially reasonable because, among many other things, they disregard certain unambiguous structural limitations (or caps) on Giants Stadium's calculation of "Loss" in connection with the Swaps.  For example, as discussed at length below, the swap agreements provided that LBSF could require Giants Stadium to refinance the underlying Bonds and pay only the cost to Giants Stadium of the refinancing.  Thus, LBSF (or any other swap counterparty

2

stepping into its shoes) had the ability to limit its exposure under the Swaps at any time by

exercising its right to cause Giants Stadium to refinance the underlying Bonds.  Yet Giants

Stadium ignored this right entirely in its calculations.  Any commercially reasonable calculation

of Loss, giving correct effect to all structural features of the Swaps, would be capped at a figure

which is a very small fraction of Giants Stadium's asserted claims.  Incredibly, Giants Stadium

asserts that its Loss under the Swaps exceeds the principal amount of the Bonds (and the notional

amount of the Swaps) by more than $177 million.

7.    Finally, the New Proofs of Claim – which nearly doubled the amount

Giants Stadium originally sought under the Swaps when it first filed the Proofs of Claim more

than two years earlier – are untimely under both the swap agreements themselves and the Bar

Date Order (as defined herein).  The New Proofs of Claim were filed in bad faith for the

improper purpose of, among other things, making the Chapter 11 Estates reserve significantly

higher amounts as a bargaining chip in settlement discussions.  The New Proofs of Claim,

therefore, do not constitute valid *prima facie* claims, and the Plan Administrator requests that

they be disallowed and expunged in their entirety.[2]

## JURISDICTION

8.    This Court has jurisdiction to consider this matter pursuant to 28 U.S.C.

§§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

---

[2] The Plan Administrator objects to the LBHI Proof of Claim for the reasons set forth herein, without prejudice to all rights of the Plan Administrator to object to the LBHI Proof of Claim on any other basis to the extent that the relief requested herein is not granted.  To the extent that the Court determines the LBHI New Proof of Claim amended the LBHI Proof of Claim, the Plan Administrator objects to the LBHI Proof of Claim on the basis that the LBHI Proof of Claim was amended and superseded and requests that the LBHI Proof of Claim be disallowed and expunged.

US_ACTIVE:\44478192\2\58399.0011

## BACKGROUND

### A.    The Chapter 11 Cases

9.    Commencing on September 15, 2008, and periodically thereafter, LBHI and certain of its subsidiaries commenced with this Court voluntary cases under chapter 11 of the Bankruptcy Code.

10.    On December 6, 2011, the Court approved and entered an order confirming the Plan [ECF No. 23023] (the "Confirmation Order").  The Plan became effective on March 6, 2012 (the "Effective Date").

11.    Pursuant to the Plan, the Plan Administrator is authorized to interpose and prosecute objections to claims filed against the Chapter 11 Estates.

12.    On July 2, 2009, this Court entered an order setting forth the procedures and deadlines for filing proofs of claim in these chapter 11 cases, including procedures for filing proofs of claim and supporting documentation for claims based on Derivative Contracts[3] and Guarantees[4] (the "Bar Date Order") [ECF No. 4271].  The Bar Date Order established (i) September 22, 2009 (the "Bar Date") as the general deadline for filing proofs of claim and (ii) October 22, 2009 (the "Questionnaire Deadline") as the deadline for completing electronic questionnaires and uploading supporting documentation and evidence of underlying claim amounts in connection with proofs of claim filed against the Chapter 11 Estates based on (a) Derivative Contracts (each a "Derivative Questionnaire") and (b) Guarantees (each a "Guarantee Questionnaire" and, together with the Derivative Questionnaire, the "Questionnaires").

---

[3] "Derivative Contract" is defined in the Bar Date Order as "any contract that is any of (i) a 'swap agreement' as such term is defined in section 101(53B) of the Bankruptcy Code or (ii) a 'forward contract' as such term is defined in section 101(25) of the Bankruptcy Code . . . ."  *See* Bar Date Order at 6.

[4] "Guarantee" is defined in the Bar Date Order as "a promise, representation or agreement to answer for the payment of some debt or the performance of some duty in case of the failure of another person or entity who is liable in the first instance."  *See* Bar Date Order at 7.

4

13.     The Bar Date Order provided that each holder of a claim against a Chapter 11 Estate based on amounts allegedly owed to the holder under any Derivative Contract must complete the electronic Derivative Questionnaire and electronically upload supporting documentation on the website.  *See* Bar Date Order at 7.  The Bar Date Order further provided that each holder of a claim against a Chapter 11 Estate based on amounts allegedly owed to the holder pursuant to a Guarantee must complete the electronic Guarantee Questionnaire and electronically upload supporting documentation on the website.  *Id*. at 7-8.  A copy of the Bar Date Order was made publicly available at http://www.lehman-docket.com.

14.     Exhibit C to the Bar Date Order was a version of the Derivative Questionnaire that required that the claimant provide various information in support of its claim, such as the following:  copies of relevant agreements; a copy of the termination notice; a valuation statement; individual trade-level detail; trade value methodology and quotations; and unpaid amounts, collateral, and other costs associated with the claim pursuant to the Derivative Contract.  Also attached to the Bar Date Order was Exhibit D, a version of the Guarantee Questionnaire setting forth the information forming the basis of the claimant's assertions of a guarantee claim.  Thus, the Questionnaires required counterparties to state the amounts they claimed to be payable by the Chapter 11 Estates and provide details to support such amounts.

15.     The Bar Date and the Questionnaire Deadline gave derivatives counterparties significant time to prepare the Questionnaires.  In fact, the Questionnaire Deadline was set approximately a month after the Bar Date.

16.     Thousands of derivatives counterparties properly filled out the Questionnaires and met the Questionnaire Deadline.  The Chapter 11 Estates have relied upon

5

the Questionnaires in evaluating claims by derivatives counterparties, setting reserves, and

projecting creditors' ultimate recoveries.

**B.    The Bonds**

17.    The Swaps were an integral part of a project financing transaction to

finance the construction of the New Meadowlands Stadium (the "Stadium") in East Rutherford,

New Jersey.  The owners of the New York Giants football team (the "New York Giants") created

Giants Stadium as a limited liability corporation for their portion of the project financing and

construction of the Stadium.  Giants Stadium issued approximately $650 million of project

financing bonds ("ARS") in total, which initially were issued in the form of auction rate

securities.  $408 million of the ARS were underwritten by LBI (*i.e.*, the Bonds).  The remaining

ARS (the "Goldman Bonds") were underwritten by Goldman, Sachs & Co. (collectively with its

affiliates, "Goldman Sachs").

18.    So long as the ARS (as they originally existed) were in auction mode, the

interest rates on the ARS were set by periodic auctions.  LBI acted as broker-dealer and therefore

conducted the auctions for the Bonds.  Giants Stadium purchased insurance from Financial

Guaranty Insurance Company ("FGIC") and Financial Security Assurance ("FSA," and, together

with FGIC, the "Bond Insurers") to cover its principal and interest payments on the Bonds.

19.    The indenture governing the ARS (the "Indenture") required that at least

67% of the ARS be hedged for 15 years following their issuance and that 40% of the ARS

remain hedged for the following 25 years through their maturity (the "Minimum Hedging

Requirement").  *See* Indenture § 609(nn).  Accordingly, in order to hedge its interest rate risk

associated with the ARS, Giants Stadium entered into interest rate swap transactions with both

LBSF and Goldman Sachs.  Under the swap with Goldman Sachs, Giants Stadium paid a fixed

rate of interest and Goldman Sachs paid a floating rate based on LIBOR.  Under the two

6

substantively identical Swaps with LBSF, LBSF agreed to pay Giants Stadium under most circumstances a floating rate known as the "Actual Bond Rate" – an amount that was identical to the interest rate set on the Bonds – in return for which Giants Stadium agreed to pay LBSF interest at a fixed rate of 6.1885%.  In other circumstances, LBSF agreed to pay Giants Stadium a floating rate based on LIBOR.

20.    The Swaps had a combined notional amount of $408,325,000 (the same principal amount as the Bonds) and maturity dates of April 1, 2047.  The Swaps were subject to two separate standard 1992 form ISDA Master Agreements (the "Master Agreements"), the Schedules and annexes thereto, and the Confirmations thereunder (along with the Master Agreements and the Schedules, the "Agreements"), which are governed by New York law.  Each of the Swaps was documented by a separate and substantially identical Confirmation dated August 16, 2007, and each was subject to the terms of one of the two Master Agreements.

21.    Under the Master Agreements, if the Swaps were terminated prior to maturity, whichever party was in-the-money at the time of termination (regardless of which party was the Defaulting Party) was entitled to receive a Settlement Amount from the other party.

22.    On September 18, 2008, Giants Stadium delivered notices of termination to LBSF.  Giants Stadium sought to terminate the Swaps on the basis of LBHI's bankruptcy, and designated the same date, September 18, 2008, as the Early Termination Date with respect to the Swaps.  On October 2, 2008, Giants Stadium sent Calculation Statements to LBSF asserting total Settlement Amounts for the two Swaps of $301,025,197.12 payable to Giants Stadium.

7

C.      **The Proofs of Claim and New Proofs of Claim**

23.      On October 17, 2008, Giants Stadium filed proof of claim numbers 315
and 316 against LBSF and LBHI, respectively, in the amount of $301,828,087.35.[5]

24.      On September 22, 2009, Giants Stadium filed proof of claim numbers
33561 and 33562 against LBHI and LBSF, respectively, again in the amount of
$301,828,087.35.[6]

25.      On October 22, 2009, Giants Stadium also submitted a Derivative
Questionnaire (the "Initial Derivative Questionnaire") and a Guarantee Questionnaire (the
"Initial Guarantee Questionnaire," and, together with the Initial Derivative Questionnaire, the
"Initial Questionnaires"), in which Giants Stadium asserted claims against LBSF and LBHI, each
in the amount of $301,804,617.14, reflecting the same principal amount set forth in the
Calculation Statements and amending the interest amount owed under each Swap.

26.      On October 29, 2009, Giants Stadium filed the Proofs of Claim against
LBSF and LBHI, each in the same amount of $301,804,617.14.  The Proofs of Claim superseded
proof of claim numbers 33561 and 33562.

27.      On December 6, 2011, more than three years after having served the
Calculation Statements in which it claimed a total payment of approximately $301 million from
LBSF and two years after the Bar Date, Giants Stadium filed the New Proofs of Claim.[7]  In each
of the New Proofs of Claim, Giants Stadium purported to claim an amount – $585,210,327.94 –

---

[5] Also on October 17, 2008, Giants Stadium filed proof of claim numbers 216 and 219 against LBHI and LBSF, respectively, in the same amount.  These proofs of claim were withdrawn.

[6] These proofs of claim superseded proof of claim numbers 315 and 316.

[7] The claims register indicates that Giants Stadium filed the LBHI New Proof of Claim on May 14, 2012.  Giants Stadium alleges that it filed the LBHI New Proof of Claim on December 6, 2011, but that, due to a clerical error, this proof of claim was not reflected on the claims register on that date.

8

that is nearly double the amount Giants Stadium claimed in the Proofs of Claim, and assert new

hypothetical "credit" and "capital" charges.  Giants Stadium also filed a new Derivative

Questionnaire (the "New Derivative Questionnaire") and a new Guarantee Questionnaire (the

"New Guarantee Questionnaire," and, together with the New Derivative Questionnaire, the "New

Questionnaires").  In the New Derivative Questionnaire, filed on December 7, 2011, Giants

Stadium asserts the amount of $580,960,327.94, and in the New Guarantee Questionnaire, filed

on December 6, 2011, Giants Stadium asserts the amount of $585,210,327.94.  This Court has

expressed some skepticism about the near-doubling of the claim amounts, asking: "[I]sn't the

first question that somebody sitting down to the negotiating table would ask given this fact

pattern, how on earth can you justify an increase from $301 million to $585 million, what's that

about?  Isn't that the first question?  Perhaps not expressed in that way, but I think there would

be an element of huge exasperation built in the question."  *See* Tr. of Hr'g, Nov. 14, 2012, at

27:7-13 [ECF No. 32541].[8]

## OBJECTION

### D.    Applicable Standard

28.    A filed proof of claim is "deemed allowed, unless a party in interest . . .

objects."  11 U.S.C. § 502(a).  If an objection refuting at least one of the claim's essential

allegations is asserted, the claimant has the burden to demonstrate the validity of the claim.  *See*

*In re Oneida Ltd.*, 400 B.R. 384, 389 (Bankr. S.D.N.Y. 2009); *In re Adelphia Commc'ns Corp.*,

2007 WL 601452, at *5 (Bankr. S.D.N.Y. Feb. 20, 2007); *In re Rockefeller Ctr. Props.*, 272 B.R.

524, 539 (Bankr. S.D.N.Y. 2000).

---

[8] The Court later denied a motion to prevent discovery into the New Proofs of Claim, stating: "I don't know that there is a classic definition of a harassing subpoena in the context of a valuation dispute in which a claim jumps from approximately 300 million to approximately 600 million.  And to the extent that your client has knowledge concerning that valuation shift I think you should be turning over whatever you have that's non-privileged with respect to that."  *See* Tr. of Hr'g, Oct. 23, 2013, at 11:20-12.2 [ECF No. 40996].

9

29.     The Chapter 11 Estates do not owe any amounts to Giants Stadium.  As
set forth in the Complaint and herein, the Agreements and the Guarantees do not entitle Giants
Stadium to any of the amounts it claims for the following reasons:  (i) Giants Stadium owes
money to LBSF under the Swaps, not vice versa; (ii) Giants Stadium materially breached the
Agreements and, therefore, can enforce neither the Agreements against LBSF nor the Guarantees
against LBHI; (iii) Giants Stadium's calculation of Loss under the Swaps is not commercially
reasonable; and (iv) the New Proofs of Claim were improperly filed and untimely.  Because this
Objection denies that any amounts are due to Giants Stadium under the New Proofs of Claim,
Giants Stadium has the burden of demonstrating the validity of the New Proofs of Claim.  Giants
Stadium cannot meet its burden.

**E.      Giants Stadium Owes Money to LBSF Under the Swaps**

30.     Giants Stadium sought to terminate the Swaps on September 18, 2008.  As
fully set forth in the Complaint, Giants Stadium thereafter improperly calculated the Settlement
Amounts by, among other things:  (i) ignoring various critical bargained-for rights of LBSF
created by the plain terms of the transaction documents, including, but not limited to, LBSF's
rights to be informed of and consent to any amendment of the Indenture that materially and
adversely affected LBSF and to select and solicit bids from financial institutions under the
"Market Quotation" measure upon any early termination of the Swaps; (ii) attempting to apply a
prohibited *ipso facto* provision in the Agreements that purported to modify the methodology for
calculating Settlement Amounts; (iii) ignoring then-current facts vital to valuing the Swaps, such
as the impending termination and replacement of LBI as broker-dealer for the Bonds and the fact
that LBSF was paying a LIBOR-based floating rate (not an interest rate generated by auctions on
the Bonds) at the time of termination; and (iv) making erroneous, unreasonable, and inconsistent
assumptions about future facts, such as assuming that short-term auction rates generated at the

10

height of the financial crisis on the Goldman Bonds would continue for the 38 years remaining

on the Swaps and that LBSF, or any counterparty standing in LBSF's shoes, would not at some

point exercise its explicit and unambiguous right under the Swaps to cause a refinancing or

conversion of the Bonds (even though Giants Stadium already had begun exactly such a

refinancing process, contemporaneously expecting much lower new interest rates).  If Giants

Stadium properly had calculated the Settlement Amounts, it would have determined that as of

September 18, 2008, the Early Termination Date, Giants Stadium owed LBSF approximately

$94 million, and no amount would be due to Giants Stadium under the Agreements.  Because the

Chapter 11 Estates do not owe Giants Stadium any amount under the Agreements or the

Guarantees, the New Proofs of Claim do not constitute valid *prima facie* claims.

31.    Because a fair, accurate, and reasonable valuation of the Swaps

demonstrates that the Chapter 11 Estates do not owe Giants Stadium money and that Giants

Stadium, in fact, owes LBSF money, the Plan Administrator requests that the Court disallow and

expunge in their entirety the New Proofs of Claim.

**F.    Giants Stadium Materially Breached the Agreements**

32.    As an alternative basis for the relief requested, the Plan Administrator also

requests that the Court disallow and expunge the New Proofs of Claim in their entirety because,

as discussed below, Giants Stadium materially breached the Agreements by (i) denying LBSF its

critical rights under the Agreements to choose Reference Market-makers and conduct the Market

Quotation process and (ii) improperly terminating the Swaps in violation of the Minimum

Hedging Requirement, as set forth in the Indenture and expressly incorporated into the Swaps as

a condition precedent to termination.

33.    Under principles of law and equity, Giants Stadium cannot seek to enforce

a contract that it materially breached in order to collect amounts asserted in the New Proofs of

11

Claim.  *See* 55 N.Y. JUR. 2D EQUITY § 107 ("A party to a contract who fails to perform a material

obligation of the contract . . . may not seek the aid of a court of equity in the protection of alleged

rights arising out of or connected with the contract.  Equity will not find grounds for granting

relief to a party previously in default  nor will equity open its doors to one who seeks to enforce

alleged rights arising from a contract which the petitioner has breached or violated."); *Guardian*

*Music Corp. v. James W. Guercio Enters., Inc.*, 459 F. Supp. 2d 216, 223 (S.D.N.Y. 2006), *aff'd*,

271 F. App'x 119 (2d Cir. 2008) ("It is black-letter law that '[a] party to a contract who is

already personally in default cannot, as a general principle . . . maintain a suit for its breach, even

if the other party subsequently breaches the contract as well [because] a contracting party cannot

benefit from its own breach.'  This rule is valid whether one seeks recovery at law or in equity.")

(quoting 23 SAMUEL WILLISTON & RICHARD A. LORD, A TREATISE ON THE LAW OF CONTRACTS §

63:8 (4th ed. 2002)).

### 1.    Giants Stadium Denied LBSF the Right to Choose Reference Market-makers and Conduct the Market Quotation Process

34.    Giants Stadium and LBSF agreed to a modified process for calculating

Settlement Amounts under the Swaps.  In virtually all situations other than a Lehman bankruptcy

filing, the Swaps were to be valued upon termination as if the Swaps' floating rate payments

were set at LIBOR+0.38%, rather than at the Actual Bond Rate.  LBSF specifically negotiated

for this formulation because the Swaps were extremely atypical instruments whose valuation

would otherwise rely on subjective determinations that could be abused to LBSF's detriment.

LIBOR+0.38% was considered a reasonable proxy for the Actual Bond Rate, one that would

permit a less controversial, and more fair, valuation.  Pursuant to the valuation using deemed

LIBOR+0.38% floating rate payments, LBSF unquestionably is the in-the-money party.  The

Swaps, however, provide that if the Event of Default that triggers termination is a Lehman

US_ACTIVE:\44478192\2\58399.0011

bankruptcy filing, then a modified Market Quotation measure applies.  Putting aside for the

moment that this change in LBSF's rights is a classic *ipso facto* clause, which is invalid, and

assuming, *arguendo*, that the modified Market Quotation measure applied here, Giants Stadium

breached the Agreements by strategically shutting LBSF out of the Market Quotation process.

The parties agreed that rather than follow the Market Quotation process as set forth in the

standard 1992 form ISDA Master Agreement,[9] LBSF – even if it were the Defaulting Party –

would have the right to select two of the four Reference Market-makers and to solicit quotations

from all Reference Market-makers.  This highly unusual and specifically negotiated provision

was of material benefit to LBSF, because, among other things, as the party soliciting quotations

from the Reference Market-makers, LBSF would have the right to explain the material economic

terms of the Swaps, including the unusual and valuable protections the Swaps would provide to a

party assuming LBSF's position.  LBSF understood that absent clear direction, the valuation of

the bespoke Swaps would be open to manipulation and abuse – both of which are unfortunately

evident in the current claims.

        35.    After terminating the Swaps, Giants Stadium did not allow LBSF to select

two Reference Market-makers, nor did it allow LBSF to solicit quotations from any Reference

Market-maker.  Instead, in flagrant disregard of clear and unambiguous language in the

Confirmations giving LBSF the exclusive right to perform those tasks, Giants Stadium undertook

those tasks on its own.  In outright violation of the Agreements, Giants Stadium selected all of

the Reference Market-makers and sought quotations from them without obtaining a contractually

---

[9] Market Quotation is one of the two measures to calculate the Settlement Amount due to the "in-the-money" party upon the early termination of a swap transaction provided for in the standard 1992 form ISDA Master Agreement. As defined therein, Market Quotation typically requires that, upon early termination of a swap, the Non-defaulting Party select four leading dealers, or "Reference Market-makers," and solicit quotations from them for the amount that they would pay or accept as payment to step into the shoes of the Defaulting Party.

required written waiver from LBSF of its rights with respect to the Market Quotation process.

Giants Stadium then improperly determined that the Market Quotation process had failed and

utilized a "Loss" methodology for valuing the Swaps.  Thus, Giants Stadium materially breached

the Agreements; it cannot now enforce the Agreements against LBSF and LBHI.

> **2.      Giants Stadium Breached the Agreements by Terminating the
> Swaps in Violation of the Indenture's Minimum Hedging Requirement**

36.      Giants Stadium also breached the Agreements by terminating the Swaps in

violation of the Minimum Hedging Requirement set forth in the Indenture (which requirement

expressly was incorporated into the Swaps as a condition precedent to termination).  Giants

Stadium's termination of the Swaps violated the Minimum Hedging Requirement because after

taking the termination of the Swaps into account, it left more than 33% of the ARS without

hedges.

37.      Part 1(*l*)(i) of the Schedules states that Giants Stadium cannot declare an

Early Termination Date if doing so would violate the Minimum Hedging Requirement set forth

in Section 609(nn) of the Indenture.  Given this restriction, Giants Stadium needed to amend the

provision in the Indenture (or execute replacement hedges) before terminating.  Sections

1101(a)(viii) and 1102(a)(7) of the Indenture provide that any amendment to the Indenture that

materially prejudices a Qualified Swap Provider (*i.e.*, LBSF) or materially affects the rights or

obligations of a Qualified Swap Provider is not permitted unless the Qualified Swap Provider

consents.  Any removal of the Minimum Hedging Requirement absent LBSF's consent

materially and adversely affected LBSF because LBSF obtained the right, as an express term of

the Agreements, that the Swaps not be terminated if doing so would violate the Minimum

Hedging Requirement.  This contractual right would be illusory if Giants Stadium unilaterally

could change the Minimum Hedging Requirement without LBSF's consent.  Thus, Giants

14

Stadium breached the Agreements and the Indenture by purporting to amend the Minimum

Hedging Requirement without LBSF's consent.

38.     Nonetheless, without LBSF's knowledge or consent, Giants Stadium

executed a Third Supplemental Indenture, dated as of September 18, 2008 (the "Third

Supplemental Indenture"), by which it purported to amend the Minimum Hedging Requirement

so that Giants Stadium would be able to terminate the Swaps without violating the Indenture.

Giants Stadium's failure to obtain LBSF's consent to amend the Indenture rendered the Third

Supplemental Indenture invalid.  Consequently, Giants Stadium's termination of the Swaps

breached Part 1(l)(i) of the Schedules, and Giants Stadium cannot enforce the Agreements

against LBSF or the Guarantees against LBHI.

### G.     Giants Stadium's Loss Calculation Is Not Commercially Reasonable

39.     As set forth in the Complaint, Giants Stadium's calculation of the

Settlement Amounts using the Loss methodology is not commercially reasonable because it

failed to properly calculate the Settlement Amounts as a receivable to LBSF.  Giants Stadium's

calculation of the Settlement Amounts is also not commercially reasonable because it (i) failed to

account for certain structural caps on LBSF's liability under the Swaps, including LBSF's right

to cause Giants Stadium to refinance or convert the Bonds, (ii) ignored significant

contemporaneously-available information, (iii) valued the Swaps employing improper

assumptions, and (iv) applied improper hypothetical charges.  Such calculation of Loss does not

comport with the Agreements' definition of "Loss" as the "amount [the Non-defaulting Party]

reasonably determines in good faith to be its total losses and costs (or gain . . .)" incurred in

connection with the terminated transactions.  Master Agreement § 14 (definition of "Loss").

15

1.      **Giants Stadium's Loss Calculation Ignores Numerous Contract
        Rights and Significant Contemporaneously Available Information**

a)      **Giants Stadium's Loss Calculation Fails to
        Account for Both LBSF's Right to Cause a
        Refinancing or Conversion of the Bonds and the Fact
        That Giants Stadium Already Had Initiated a Refinancing**

40.     A commercially reasonable calculation of Loss must take into account all

of the provisions of the Swaps, including LBSF's right, pursuant to paragraph 4 of the

Confirmations, to cause Giants Stadium to refinance or convert the Bonds, provided that LBSF

paid the costs and expenses associated therewith.[10]  LBSF's right to request that Giants Stadium

refinance or convert the Bonds – a request that could not be unreasonably denied – was crucial to

LBSF's ability to limit any Loss under the Swaps.

41.     Under paragraph 4 of the Confirmations, LBSF (or any party stepping into

its shoes) could have requested that Giants Stadium refinance the Bonds with, or convert the

Bonds into, a bond paying the same fixed interest rate that Giants Stadium was paying under the

Swaps with LBSF (or such party) paying "all costs and expenses" of the refinancing or

conversion.  Under such circumstances, Giants Stadium would have suffered *no* loss, and any

loss that LBSF (or such party), which would then have resold the refinanced or converted

instruments into the market, would have suffered would have been limited to the difference

between the cost of acquiring all of the Bonds and the market value of the much more saleable

refinanced or converted bonds.  Because of the ability of LBSF (or any party stepping into its

---

[10] Paragraph 4 of the Confirmations provides:  "[LBSF] may, at any time, request that [Giants Stadium] . . . (b) refinance, remarket or replace the [Bonds] with another series of securities of identical maturity, with all costs and expenses of any conversion, refinancing, remarketing or replacement being for the account of [LBSF].  [Giants Stadium] shall consider any request in good faith and not withhold its consent unreasonably, it being understood that it will be deemed reasonable, without limitation, for [Giants Stadium] to withhold its consent if it concludes that such conversion, refinancing, remarketing or replacement will (i) result in any additional cost, risk or loss of financial or business flexibility or (ii) require the preparation of disclosure materials during a period of time when [Giants Stadium] concludes in its sole discretion that the preparation of disclosure materials is inappropriate or inconvenient (which the issuer may determine for a period of no more than 180 days in any 360 day period)."

16

shoes) to cause a refinancing or conversion, a commercially reasonable valuation of the Swaps cannot be divorced from the cost of simply refinancing or converting the Bonds.  Given that the cost of a refinancing or conversion of the Bonds as set forth above would be a very small fraction of Giants Stadium's claim amounts, the claim amounts are commercially unreasonable and untenable.

42.    Moreover, the terms of the First Supplemental Indenture dated as of August 1, 2007 (the "First Supplemental Indenture") specifically contemplate a refinancing or conversion – Section 2.11 of the First Supplemental Indenture permits Giants Stadium to convert the interest rate of the Bonds from an auction rate to a fixed or floating rate without amending the Indenture.   This type of built-in flexibility, which is not typical in bond indentures, shows that before the first auction for the Bonds even was conducted, the parties had built in a simple, low-cost mechanism to remove the Bonds from the auction market if that market proved to be an inefficient financing source.  Giants Stadium's assumptions in its calculation of Settlement Amounts that the temporarily inflated, short-term interest rates of 9.90-10.65% per annum would apply for the next 38 years, and that, even if such high rates were in place, LBSF would never require Giants Stadium to refinance or convert the Bonds, are neither realistic nor reasonable.

43.    In fact, Giants Stadium had no expectation that it would be paying high short-term rates for an extended period of time.  This is because a refinancing was not merely a theoretical possibility; rather, it was already anticipated.  At around the same time that it was calculating its Loss under the Swaps, Giants Stadium, together with Goldman Sachs, already had mapped out an actionable plan to refinance the Bonds, to be effective mere months after the calculation date.  The cost of that refinancing, as determined contemporaneously, would have been a very small fraction of Giants Stadium's claim amounts.

17

44.     There are many factors that would have caused the cost of a refinancing or conversion of the Bonds to a fixed-rate instrument to be very low.  Despite being a special purpose vehicle, Giants Stadium had substantial assets and was a creditworthy borrower.  The resultant credit profile of the Bonds would have dramatically reduced the interest rate associated with any refinancing or conversion.  On September 17, 2008 – one day before termination of the Swaps – Moody's published an investment grade rating for the Bonds, based on the underlying creditworthiness of Giants Stadium without giving any effect to the credit enhancement provided by the Bond Insurers.  This rating reflects the market perception (and reality) that a purchaser of the Bonds was investing in an entity with long-term creditworthiness.  In fact, contemporaneous reports provided to the indenture trustee of the Bonds, the National Football League (the "NFL"), Goldman Sachs, and bond insurer FSA show that construction of the Stadium was ahead of schedule and that Giants Stadium financially was in excellent standing.

45.     One key reason Giants Stadium was viewed as a creditworthy entity is that it had promises from the New York Giants football team and the NFL that made it virtually certain that the Stadium would be completed and would be used by the team.  First, the New York Giants signed a Non-relocation Agreement with the indenture trustee of the Bonds, which prohibited the New York Giants from playing home football games anywhere other than at the Stadium.  This agreement distinguishes the Bonds from other construction debt financing, where the project can be abandoned in times of economic distress.  Giants Stadium was ensured a steady stream of income from the Stadium lease with the New York Giants, as long as the New York Giants were not in bankruptcy.  Second, along with the issuance of the Bonds, Giants Stadium entered into a credit agreement with the NFL (the "Credit Agreement") pursuant to which Giants Stadium was provided with a $150 million line of credit.

18

US_ACTIVE:\44478192\2\58399.0011

46.     Third, the NFL, through a side letter agreement (the "NFL Side Letter Agreement") with Giants Stadium, had the contractual ability to cure any default by Giants Stadium with respect to the Bonds, as well as any default of the New York Giants' bank debt.  In the event of a default of either the bank debt or the Bonds, the NFL had various rights to remedy adverse credit events, among them the right to foreclose on both debts and effectively "rebundle" the team and Giants Stadium.  The NFL routinely negotiates for and obtains these types of provisions, among other things, to prevent a default that would divide ownership of a team from its stadium.  Given the high value of the New York Giants franchise, if Giants Stadium defaulted, the NFL likely would have exercised its rights and taken the necessary steps to complete the Stadium, as it previously had done when faced with potential debt defaults of other NFL franchises.  According to Forbes, the New York Giants franchise was worth $1.178 billion in 2008 and $1.183 billion in 2009  – both of which amounts exceeded the aggregate amount of the debt of Giants Stadium and the franchise (without even giving effect to the substantial increase in value of an NFL franchise once it has opened a new stadium).  Thus, even if Giants Stadium defaulted, the Bonds' holders would suffer no loss whatsoever.

47.     The credit quality underlying the Bonds and the various agreements entered into by the New York Giants and the NFL, including the Non-relocation Agreement, the Credit Agreement, and the NFL Side Letter Agreement, taken together, made the possibility of a default highly improbable, and also created a strong credit profile that would have made the Bonds attractive to refinance or convert (thus reducing any cost of refinancing or conversion under paragraph 4 of the Confirmations).

48.     The substantial value of the Bonds, supported by Giants Stadium's rights in the Non-relocation Agreement and the Credit Agreement, was borne out in reality after the

19

early termination of the Swaps.  Although Barclays Capital Inc. ("Barclays") purchased the

Bonds for pennies on the dollar as part of the sale of LBI's assets in the week of LBHI's chapter

11 filing, Barclays marked them up to near par within 60 days.  In early 2009, Goldman Sachs

provided a bridge loan for the Bonds at an 8% interest rate, and in 2010, Giants Stadium

refinanced the Bonds and the Goldman Bonds with new long-term bonds at a 7.10% fixed

interest rate and term loans at LIBOR+2.25% (*i.e.*, far less than the rates of 9.90-10.65%

assumed in the Calculation Statements).  The cost of this refinancing was a very small fraction of

Giants Stadium's claim amounts.

49.    In short, Giants Stadium's asserted Loss completely ignores contract rights

to refinance and contemporaneously available information and it is made even more egregious

when viewed in the context of the far, far smaller costs that Giants Stadium incurred in the

refinancing beginning the following year.

**b)    Giants Stadium's Loss Calculation Fails to
Reflect Its Own Contemporaneous Assessments of Loss**

50.    Communications at the time of Giants Stadium's termination of the Swaps

reveal the extent of Giants Stadium's post-hoc inflation of its claims.  In an effort to obtain

consent to amend the Indenture and terminate the Swaps, Giants Stadium provided the NFL and

the Bond Insurers with its expected claim amounts.  These communications recognize that the

amounts owed on the Swaps could be a receivable to LBSF and also expose the

unreasonableness of Giants Stadium's later calculations of Loss.  Giants Stadium ultimately

submitted claims that were wildly inconsistent with what it told the NFL and the Bond Insurers.

20

      c)      **Giants Stadium's Loss Calculation Fails to Account for
Other Structural Limitations on LBSF's Liability Under the Swaps**

51.      The fact that Giants Stadium's asserted Loss in its New Proofs of Claim ($585 million) vastly exceeds the face value of the Bonds ($408 million) itself evidences that the Loss calculation is not commercially reasonable.

52.      First, it is completely untenable for Giants Stadium to assert a $585 million termination payment. If Giants Stadium were to receive such a termination payment, it could have redeemed the $408 million of Bonds at par and pocketed $177 million of cash – thereby converting a large liability ($408 million of synthetically fixed-rate bonds) into a large asset ($177 million of cash). As facially ridiculous as this is, this is the outcome that Giants Stadium asserts is somehow reasonable.

53.      Second, any commercially reasonable Loss calculation must take into account LBSF's option to purchase the Bonds, a vital structural limitation of LBSF's potential liability. A "Loss" in excess of the face amount of the Bonds could not occur because LBSF (or any counterparty standing in its shoes) could at any time buy all of the Bonds and thus limit its exposure. Under the Agreements, any commercially reasonable valuation is unquestionably capped at the amount that it would cost a counterparty to purchase the Bonds, less any residual value of the Bonds. Because of the auction feature of the Bonds, they could easily be acquired for par through the auction process. And Barclays' actual acquisition of the Bonds demonstrated that, due to the failure of the auction rate securities market, the Bonds almost certainly could have been purchased at a price much lower than par. Based on those Bond prices and Giants Stadium's contemporaneous expectation of refinancing rates, the Swaps would have been very valuable to any party considering stepping into LBSF's shoes, a benefit that would have accrued to Giants Stadium.

21

2.     **Giants Stadium's Loss Calculation Utilizes**
       **Commercially Unreasonable Methodologies**

54.     Giants Stadium's Loss calculation also is commercially unreasonable because it improperly (i) used short-term auction rates from the Goldman Bonds to project the interest rate that Giants Stadium would pay for the next 38 years, (ii) relied on faulty assumptions regarding how long payments on the Swaps would continue, and (iii) applied hypothetical credit and capital charges, which should not be included in a Loss calculation. Correcting *any* of these flawed assumptions would have led to a Loss calculation that is a very small fraction of the amount of Giants Stadium's claim.

a)     **Giants Stadium's Use of Short-Term**
       **Excessively High Auction Rates as a Proxy**
       **for Long-Term Financing Costs is Commercially Unreasonable**

55.     As set forth in the Complaint, Giants Stadium sought to project the interest rate it would pay over the remaining stated life of the Swaps (*i.e.*, the next 38 years) by using as a proxy the short-term interest rate that had been set in the most recent auction for the Goldman Bonds. This is not a reasonable assumption.

56.     The use of short-term interest rates as a proxy for long-term interest rates is flawed on many levels. First, as a general matter in financial markets, long-term rates are always distinct from short-term rates, as the former incorporate numerous pricing factors that the latter do not. Second, the failure of the auction rate securities market caused the Goldman Bonds to be auctioned at artificially high rates that were completely divorced from Giants Stadium's long-term credit quality and its access to the fixed-rate debt market (a market that did not share the dysfunction of the auction rate securities market). Third, the assumption is inconsistent with contemporaneous information, *i.e.*, the advice Goldman Sachs was providing to Giants Stadium

22

that the long-term rate for Giants Stadium debt would be much lower than the prevailing auction

rates, and that its financing costs would revert to historically normal levels within mere months.

57.    Giants Stadium already had been provided with Goldman Sachs' view of

Giants Stadium's long-term borrowing rate but inappropriately ignored such rate, choosing

instead to use a short-term rate designed to improperly inflate the amount of its claims.

### b)    Giants Stadium's Loss Calculation Incorrectly Assumes Payments under the Swaps Will Continue Unabated for 38 Years

58.    Giants Stadium's Loss calculation is also flawed because it assumes

payments on the Swaps would continue unabated for the next 38 years.  This assumption is

entirely inconsistent with – and belied by – the high short-term interest rate used by Giants

Stadium to calculate Loss.

59.    Giants Stadium's assumption that it would continue to pay Bond interest

rates of 9.90-10.65% is itself inconsistent with that 38-year time frame because such a high rate

implies substantial credit risk, *i.e.*, a high probability that Giants Stadium would default long

before the 2047 maturity.  Upon any such default and acceleration, LBSF (or a replacement

counterparty) would have the right to terminate the Swaps using a valuation methodology

favorable to it, and its obligation to make further payments under the Swaps would cease forever,

sharply reducing the calculated Loss.  Giants Stadium's valuation never comes to grips with the

inherent inconsistency between the high interest rate used in its calculation and the assumption

that cash flows based on this high interest rate would continue without fail for the next 38 years.

60.    The assumption that payments on the Swaps would continue for 38 years

is also inconsistent with Giants Stadium's own expectations at the time that it sent the notice of

early termination that it would make prepayments on the Bonds.  Such prepayments would have

materially reduced LBSF's obligations (or those of a replacement counterparty) under the Swaps.

23

c)    **Giants Stadium's Loss Calculation Was Flawed in Other Respects**

61.    First, Giants Stadium's Loss calculation incorrectly uses the LIBOR curve as its discount rate for the projected cash flows on the Swaps.  The LIBOR curve assumes essentially no risk of an early termination of those payments.  This discount rate is inconsistent with the nature of the projected cash flows, which are driven by a higher interest rate. That higher rate in the Loss calculation is indicative of a higher probability that the dealer's large swap payments will cease early.

62.    Second, the Loss calculation improperly seeks to recover hypothetical losses that Giants Stadium never incurred.  On December 6, 2011 – more than three years after having served the Calculation Statements claiming a total payment of approximately $301 million from LBSF – Giants Stadium filed the New Proofs of Claim alleging that LBSF and LBHI each owe it approximately $585 million.  In the New Proofs of Claim, Giants Stadium claims to have "supplemental elements of Loss," including a "credit charge" ($93.9 million for the FGIC-insured Swap and $18.9 million for the FSA-insured Swap) and a "capital charge" ($149.9 million for the FGIC-insured Swap and $27.8 million for the FSA-insured Swap).  Putting aside that these manufactured hypothetical charges were untimely and barred (as discussed below), these purely hypothetical "credit" and "capital" charges may not properly be included in a Loss calculation.

63.    "Loss" means the "amount [the Non-defaulting Party] reasonably determines in good faith to be its total losses and costs (or gain . . .)" incurred in connection with the terminated transactions.  Master Agreement § 14 (definition of "Loss").  Rather than representing Giants Stadium's economic loss incurred in connection with its termination of the Swaps, the separate "credit" and "capital" charges represent Giants Stadium's attempt to quantify the amount a swap counterparty might have charged Giants Stadium to enter into

24

replacement swaps.  Specifically, the "credit" charges represent an amount that Giants Stadium

speculates a replacement swap counterparty may have charged to compensate it for the risk of a

potential credit loss if Giants Stadium were to default under the swap.  The "capital" charges

represent an amount that Giants Stadium speculates a replacement swap counterparty may have

charged to compensate it for the cost of capital that it theoretically would have to set aside as

reserves based on its purported inability to hedge interest rate risk and credit risk for the duration

of the 38-year transaction.  Of course, if these transactions were heavily in-the-money to Giants

Stadium, as it claims, then these hypothetical charges would be *de minimus* or negative.  Credit

risk (*i.e.*, the risk of counterparty default) would be relevant only if the swap counterparty

expected to be in-the-money under the transactions, which would be highly unlikely if Giants

Stadium's interest rate projections were at all accurate; and any capital costs that a swap

counterparty might incur would be more than offset by the massive upfront payment that the

dealer would receive if Giants Stadium's view of the mark-to-market value was at all accurate.

 In any case, Giants Stadium never paid these hypothetical charges to any swap counterparty.

These purely theoretical charges were never incurred by Giants Stadium and allowing Giants

Stadium to recover them from the Chapter 11 Estates would be an unfair windfall.

        64.    Under the plain language of the Agreements, Giants Stadium was required

to "reasonably determine[] in good faith . . . its total losses."  A good faith, reasonable

determination of Giants Stadium's total losses would take into account that the Swaps existed to

provide Giants Stadium with an effectively fixed interest rate on the Bonds, and would be

designed to quantify what the cost would be to Giants Stadium to obtain alternative financing at

such an effectively fixed interest rate, which, after giving effect to LBSF's contractual rights, is

the true measure of what Giants Stadium lost by the early termination of the Swaps.  The "good

25

faith" obligation requires Giants Stadium, as Non-defaulting Party, to act in a commercially

reasonable manner and not simply apply the formulation that will yield it the highest theoretical

Loss.

65.     In this instance, a good faith determination would not try to determine the

price of entering into a financing transaction involving monoline insurance guarantees but rather

the cost of achieving the same economic result – an effectively fixed rate of interest on the

Bonds – through the financing tools that were available on and after the Early Termination Date.

Indeed, commentators caution that "[n]ondefaulting parties should be aware . . . that if the

reasonableness of their actions is questioned, it will be because the defaulting party is looking at

the claim with the benefit of hindsight.  A nondefaulting party should, therefore, always consider

whether the approach it proposes to take produces, or arguably produces, a result more favorable

to it than valuation on the Early Termination Date and, then, should consider whether taking the

proposed approach, in the circumstances, may be regarded as suspect." ANTHONY C. GOOCH &

LINDA B. KLEIN, DOCUMENTATION FOR DERIVATIVES 262 (4th ed. 2002).

66.     The fact that the hypothetical credit and capital charges are absent from its

Loss calculation in the Calculation Statements – which took Giants Stadium and its financial

advisor, Goldman Sachs, several weeks to generate – is telling.  That it then took them several

more years to "determine" what Giants Stadium supposedly "lost" only emphasizes the obvious

fact that Giants Stadium did not view its true Loss as including the hypothetical charges.

67.     Moreover, the hypothetical charges increase Giants Stadium's purported

"Loss" far beyond any conceivable benefit that Giants Stadium ever would have received under

the Swaps had LBSF fully performed under the Agreements, as the total claimed amount (*i.e.*,

approximately $585 million) exceeds the $408 million face value of the Bonds.  As discussed

26

above, any commercially reasonable Loss calculation must take into account LBSF's option to

purchase the Bonds, a vital structural limitation of LBSF's potential liability.  A "Loss" in excess

of the face amount of the Bonds could not occur because LBSF (or any counterparty standing in

its shoes) could at any time buy all of the Bonds and thus limit its exposure.  Under the

Agreements, any commercially reasonable valuation is unquestionably capped at the amount that

it would cost a counterparty to purchase the Bonds, less any residual value of the Bonds.  Under

New York law, Giants Stadium may not recover more from LBSF's breach than it would have

gained had LBSF fully performed under the Agreements.  *See Freund v. Wash. Square Press,*

*Inc.*, 314 N.E.2d 419, 421 (N.Y. 1974) ("it is . . . fundamental that the injured party should not

recover more from the breach than he would have gained had the contract been fully

performed"); *see also Terwilliger v. Terwilliger*, 206 F.3d 240, 249 (2d Cir. 2000) (vacating and

remanding district court's award of damages because it was "in an amount incorrectly exceeding

what [plaintiff] would have received from full performance of the contract").

        68.     In short, Giants Stadium's Loss calculation, by ignoring myriad

contractual rights, known facts and proper valuation methodologies, cannot meet any standard of

commercial reasonableness.

## H.      The New Proofs of Claim Are Untimely and Improper

        69.     The filing of the New Proofs of Claim on December 6, 2011 – more than

three years after having delivered the Calculation Statements and more two years after the Bar

Date – claiming an amount nearly double the amount sought in the Calculation Statements and

the Proofs of Claim is untimely and improper.  In addition, the new valuation statements

provided with the New Proofs of Claim that set forth the new hypothetical charges are untimely

and improper under the terms of the Agreements.

27

### 1.    The New Valuation Statements Are Not Permitted Under the Agreements

70.    The Agreements do not provide a mechanism for submitting new Loss calculations to claim additional amounts due – such as by providing the new valuation statements – after the delivery of the Calculation Statements.  Section 6(d)(i) of the Master Agreement states that "[o]n or as soon as reasonably practicable following the occurrence of an Early Termination Date, the [Non-defaulting Party] will make the calculations . . . contemplated by Section 6(e) and will provide to the other party a statement . . . showing, in reasonable detail, such calculations (including all relevant quotations and specifying any amount payable under Section 6(e))." Master Agreement § 6(d)(i).  Section 6(d)(ii) of the Master Agreement then states that "[a]n amount calculated as being due in respect of any Early Termination Date under Section 6(e) will be payable on the day that notice of the amount payable is effective (in the case of an Early Termination Date which is designated or occurs as a result of an Event of Default) . . . ." *Id.* § 6(d)(ii).

71.    Read together, these two sections of the Master Agreement provide a framework for the Non-defaulting Party to promptly calculate the amount due from the Defaulting Party and seek payment of such amount from the Defaulting Party.  "The ISDA forms assume that [parties] will comply with their commitment to supply the statements [of losses] so that settlement can occur expeditiously, and no mechanism is included to sanction undue delay." ANTHONY C. GOOCH & LINDA B. KLEIN, DOCUMENTATION FOR DERIVATIVES 859 (4th ed. 2002). Consistent with this principle, the Agreements do not contain any provisions allowing the Non-defaulting Party to seek yet-to-be-determined unliquidated amounts or later submit new calculations that increase the amount it already has declared due from the Defaulting Party and seek payment of such additional amounts.

28

72.    Notwithstanding the plain language of the Agreements, including the fact that the Agreements do not provide for the submission of amended or supplemental valuation statements, and the principle of expeditious settlement, Giants Stadium attached a schedule to the Calculation Statements that contained a vague, unspecific, and ineffective purported reservation of rights (the "Purported Reservation"):

> Please note that this calculation of Loss does not include important and bargained-for benefits of the Transaction to the Non-Defaulting Party, including without limitation . . . the fact that any replacement swap is likely to involve a significant credit charge and a significant premium payable to the counterparty over and above the fixed rate corresponding to expected future payments on the auction rate securities . . . . We continue to work expeditiously to determine the full extent of our Loss and, in the event that the value of these benefits can be adequately ascertained with further analysis, we reserve the right to deliver a supplemental statement for incremental amounts.

Schedule 1 to Calculation Statement, dated as of October 2, 2008, at 3.

73.    Giving effect to the Purported Reservation impermissibly would render meaningless the Agreements' express provision requiring the Non-defaulting Party to calculate the amount due from, and provide a statement showing such calculations to, the Defaulting Party "as soon as reasonably practicable" after the Early Termination Date.  *See*, *e.g.*, *Galli v. Metz*, 973 F.2d 145, 149 (2d Cir. 1992) ("Under New York law an interpretation of a contract that has 'the effect of rendering at least one clause superfluous or meaningless . . . is not preferred and will be avoided if possible.' . . .  Rather, an interpretation that 'gives a reasonable and effective meaning to all terms of a contract is generally preferred to one that leaves a part unreasonable or of no effect.'") (internal citations omitted).

74.    Even assuming, *arguendo*, that the Purported Reservation were effective when the Calculation Statements were delivered, by the time Giants Stadium filed the Proofs of Claim over a full year later, the "reasonably practicable" time in which Giants Stadium could

29

have provided a new valuation statement with increased or supplemental amounts, or LBSF

could have expected to receive a new valuation statement with increased or supplemental

amounts, had long since passed.  Thus, had Giants Stadium provided the new valuation

statements for the first time in the *Proofs of Claim* – which it filed over a year after delivery of

the Calculation Statements – even that would have contradicted the express language of the

Agreements requiring Giants Stadium to calculate its Loss "as soon as reasonably practicable"

after the Early Termination Date.

75.    In short, the Agreements here do not permit Giants Stadium to wait three

years to seek hundreds of millions in additional amounts, and the New Proofs of Claim should be

disallowed and expunged for this reason alone.

**2.    The New Proofs of Claim Are Untimely
Under Bankruptcy Law and the Bar Date Order**

76.    In addition to the new valuation statements being untimely and improper

under the Agreements, the New Proofs of Claim, which are based on calculations set forth for the

first time in the new valuation statements, are untimely and improper under bankruptcy law and

the Bar Date Order.

77.    This Court has found that "[b]ar dates are 'critically important to the

administration of a successful chapter 11 case.'  They are not designed merely as a 'procedural

gauntlet' but rather serve 'as an integral part of the reorganization process' and the efficient

administration of bankruptcy cases."  *In re Lehman Bros. Holdings Inc.*, 433 B.R. 113, 119

(Bankr. S.D.N.Y. 2010) ("*Lehman I*"), *aff'd sub nom. CVI GVF (LUX) Master S.a.r.l.* v. *Lehman

Bros. Holdings Inc.*,  445 B.R. 137 (S.D.N.Y. 2011) ("*Lehman II*") (internal quotation marks and

citation omitted).

30

78.     In these chapter 11 cases, in which the Court and the Chapter 11 Estates are endeavoring to manage "the largest claims allowance process in the history of bankruptcy practice," the importance of complying with of the Bar Date Order cannot be understated.  *See Lehman I*, 433 B.R. at 117, 121 ("[e]nforcement of the Bar Date Order is an essential part of the orderly administration of the claims that have been filed in compliance with that order").  In fact, this Court has commented on the unique nature of the Bar Date Order in these chapter 11 cases:

> Given the [Chapter 11 Estates'] multi-faceted worldwide business activities before filing for bankruptcy, it comes as no surprise that the Bar Date Order is not a typical one.  It is a bespoke document that balances the needs of the [Chapter 11 Estates] and creditors alike, many of whom are sophisticated counterparties in the global financial marketplace.  The Bar Date Order is the product of litigation and negotiation and reflects a pragmatic compromise with representatives of various objecting parties in interest relating to the burden of compiling and presenting information in support of each claim.

*Lehman I*, 433 B.R. at 118.

79.     The bespoke Bar Date Order reflects the unprecedented challenges of managing the claims allowance process for the Chapter 11 Estates' more than 10,000 prepetition Derivative Contracts (representing more than one million transactions).  Because valuing those Derivative Contracts is a "massive undertaking," the Chapter 11 Estates explained prior to entry of the Bar Date Order that they require "basic information from counterparties to these Derivative Contracts to reconcile the [t]ransactions with [the Chapter 11 Estates'] books and records and adequately assess whether the amounts set forth on a claim form are accurate.  Absent this information, [the Chapter 11 Estates'] ability to assess the [p]roofs of [c]laim will be delayed immeasurably and will likely result in the objection to virtually all claims followed by

31

time-consuming discovery to obtain information that is basic to the valuation of the Derivative

Contracts." Mandelblatt Declaration at 3.[11]

80.    Accordingly, to enable the Chapter 11 Estates to evaluate claims based on

Derivative Contracts, the Court required derivatives counterparties to complete the electronic

Derivative Questionnaire and electronically upload supporting documentation on the dedicated

website. As the Chapter 11 Estates have explained previously, "[t]he Derivative Questionnaire

was designed with the specific purpose of facilitating the [Chapter 11 Estates'] six-step unwind

of the Derivative Contracts. Without the information requested in the Derivative Questionnaire,

the [Chapter 11 Estates'] ability to evaluate the [p]roofs of [c]laim with respect to the date of

effective termination, the methodology of valuation, and the accuracy of such valuation would be

severely impaired." Mandelblatt Declaration at 15.

81.    The Derivative Questionnaire did "not require counterparties to submit

more than is typically required in the resolution of derivative claims." Mandelblatt Declaration

at 21. For matured or terminated Derivative Contracts, like the Swaps, the Derivative

Questionnaire demanded that the claimant provide amounts (due to and from the [Chapter 11

Estate]), typically required to calculate a Settlement Amount: "Transaction Valuations,"

"Unpaid Amounts," "Collateral," "Interest," and "Other costs." The Derivative Questionnaire

also demanded that the claimant provide a "Derivative Claim Amount" that corresponded to the

Settlement Amount of the Derivative Contract. Giants Stadium timely completed the Initial

Derivative Questionnaire, listing a total "Derivative Claim Amount" of $301,804,617.14

---

[11] The "Mandelblatt Declaration" is the *Declaration of Gary H. Mandelblatt in Support of Debtors' Motion Pursuant to Section 502(b)(9) of the Bankruptcy Code and Bankruptcy Rule 3003(c)(3) for Establishment of the Deadline for Filing Proofs of Claim, Approval of the Form and Manner of Notice Thereof and Approval of the Proof of Claim Form* (attached as "Exhibit C" to *Debtors' Omnibus Reply to Objections to Motion of the Debtors, Pursuant to Section 502(b)(9) of the Bankruptcy Code and Bankruptcy Rule 3003(c)(3), for Establishment of the Deadline for Filing Proofs of Claim, Approval of the Form and Manner of Notice Thereof and Approval of the Proof of Claim Form*, dated June 23, 2009 [ECF No. 4113]).

US_ACTIVE:\44478192\2\58399.0011

("Transaction Valuations" was listed as $301,025,197.12, and "Interest" was listed as $779,420.02).

82.    The Chapter 11 Estates have explained the need to obtain this "*readily available*" information from derivatives counterparties in order to efficiently administer the claims reconciliation process and their chapter 11 cases:  "Given the massive quantity of [t]ransactions, the [Chapter 11 Estates] face significant challenges and immense delay if [c]ounterparties do not provide basic information requested in the proposed [p]roof of [c]laim form . . . .  This information should be in the counterparties' systems and readily available because it is used to mark-to-market their portfolios on daily basis (for most large financial institutions or funds) or monthly or, at most, quarterly (for most if not all other counterparties) for periodic reporting requirements.  ***Since the Commencement Date, nine months, several quarters and a fiscal year end have passed.  Counterparties are supposed to deliver this information upon termination of the Derivative Contracts.***"  Mandelblatt Declaration at 11-12 (emphasis added).

83.    In addition, the Derivative Questionnaire required that the claimant provide supporting information for the amounts asserted, including, among other things, copies of relevant agreements, a copy of the termination notice, a valuation statement, and individual trade-level detail.  As with the amounts themselves, "providing this information is a standard contractual requirement in the governing documents including ISDA Master Agreements."  Mandelblatt Declaration at 8 ("[a]ny counterparty that believes it has a claim must have collected, reviewed, and/or prepared [the documents required by the Derivative Questionnaire] in order to substantiate the basis for a claim").  Under the category "Valuation Statements" on the

33

Initial Derivative Questionnaire, Giants Stadium provided its two Calculation Statements, dated as of October 2, 2008.[12]

84.    For purposes of evaluating Giants Stadium's claim amount under the Agreements, the Calculation Statements were the linchpin of the Initial Derivative Questionnaire, just as they would be for settlement of the Swaps outside bankruptcy:  "In the event of a valid termination under the governing documents, typically the non-defaulting party must promptly provide a 'valuation statement' that sets out in reasonable detail the methodology of the asserted valuation of the contract so that one party or the other can make a termination payment.  The [Chapter 11 Estates] must have the valuation statement to understand the calculation of the counterparties' claim."  Mandelblatt Declaration at 9.  Moreover, in the case of the "Loss" methodology, "[i]t is critical that the [Chapter 11 Estates] receive the necessary information required to understand the counterparty's loss calculation to verify the reasonableness and validity of the calculation because minor differences in loss methodology can lead to significant differences in valuation."  Id. at 14-15.

85.    Given the exigencies of their chapter 11 cases, the Derivative Questionnaire was intended to provide the Chapter 11 Estates with a standardized, streamlined basis for determining their derivatives liabilities with certainty and finality, just as the delivery of a calculation settlement outside of bankruptcy would provide a counterparty with a basis for determining its liability.  The requirements of the Derivative Questionnaire were not intended to deviate from the ISDA procedures and allow derivatives counterparties to file claims for

---

[12] In a spreadsheet entitled "Individual Trade Level Detail," Giants Stadium listed, among other things, a "Valuation Date" of September 18, 2008, for the Swaps and "Values" of $254,631,976.50 and $46,393,220.62, respectively, for each Swap.  Under the category "Unpaid Amounts," Giants Stadium provided an "Itemized Statement of Claim Amount and Interest" that set forth the same amounts as the "Values" above as the "Termination Amounts" and added interest to arrive at a "Total Claim Amount" (i.e., the Settlement Amounts).

34

terminated Derivative Contracts that contained placeholders for amounts to be determined later.

Permitting such subsequent claim amendments would defeat the whole purpose of the Derivative

Questionnaire process by thwarting the Chapter 11 Estates' ability to evaluate a derivatives

counterparty's calculations and claim amount in a timely fashion following the Questionnaire

Deadline.  Moreover, because the Agreements do not provide a placeholder mechanism for

making new Loss calculations to claim additional amounts due after delivering the Calculation

Statements, permitting such subsequent claims in the chapter 11 process would unfairly enable a

derivatives counterparty to demand greater amounts through the claims process than it could

demand pursuant to the ISDA procedures.

        86.     Despite the express language of the Agreements and the principle of

expeditious settlement underlying the standard 1992 form ISDA Master Agreement, the

Purported Reservation in the three-year-old Calculation Statements is the *only* basis upon which

Giants Stadium has tried to justify the New Proofs of Claim.  But, neither the Proofs of Claim

nor the Initial Questionnaires contain the Purported Reservation or any other reservation of

amendment rights except with regard to fees and expenses.[13]  In addition, neither the "Individual

Trade Level Detail" nor the "Itemized Statement of Claim Amount and Interests" provided by

Giants Stadium in the Initial Derivative Questionnaire contains any indication that the asserted

amounts are not the actual amounts due from LBSF under the Swaps.  If the amounts claimed by

Giants Stadium in the New Derivative Questionnaire were an accurate representation of its Loss

as of the Early Termination Date, then Giants Stadium was required to provide this information

---

[13] The Derivative Questionnaire also contains the following requirement:  "If claim includes other costs, please include a schedule that lists each such cost by vendor and indicate the service provided and amount paid."  Giants Stadium responded by stating that "Claimant reserves the right to amend this claim amount to include other fees and expenses as permitted under the ISDA Master Agreements (FGIC- and FSA-Insured) or applicable law."

US_ACTIVE:\44478192\2\58399.0011

as soon as reasonably practicable after the Early Termination Date – long before it even filed the Initial Derivative Questionnaire.

87.     Nonetheless, Giants Stadium relies on the Purported Reservation – contradicting the requirements and purpose of the Derivative Questionnaire – to assert new hypothetical charges in the New Proofs of Claim that are not allowed under the Agreements. The calculations set forth in the Calculation Statements are intended to quantify Giants Stadium's Loss on the Early Termination Date, without regard to any events after that date.  This structure is also consistent with section 562 of the Bankruptcy Code, which requires a counterparty that terminates a swap agreement to calculate damages as of the termination date. Giants Stadium took approximately two weeks from the Early Termination Date to deliver the Calculation Statements.  Given that Giants Stadium designated an Early Termination Date of September 18, 2008, it has not explained (and, given section 562 of the Bankruptcy Code, likely cannot explain) what happened during the *more than three years* between delivery of the Calculation Statements and the filing of the New Proofs of Claim that has any bearing on Giants Stadium's calculation of Loss.

88.     Giving effect to the Purported Reservation is tantamount to allowing Giants Stadium to file a placeholder claim in the Initial Derivative Questionnaire with amounts "to be determined" and then allowing Giants Stadium to assert such new amounts for the first time years after the Bar Date.  This is not allowed under the Bar Date Order or the Agreements themselves.

89.     Furthermore, the calculations for the hypothetical charges claimed in the New Proofs of Claims are new and bear no relationship to Giants Stadium's calculation of Loss in the Calculation Statements.  Under the category "Valuation Statements" in the New Derivative

36

Questionnaire, Giants Stadium provided the new valuation statements containing the calculations for the hypothetical "credit" and "capital" charges for the first time.[14]  In addition, Giants Stadium provided a new interest calculation based on the new amounts asserted.

90.    For more than two years after the Bar Date and the Questionnaire Deadline, Giants Stadium refused to provide the Chapter 11 Estates with documents or other information as requested by the Chapter 11 Estates sufficient to allow the Chapter 11 Estates to evaluate Giants Stadium's calculation of its new hypothetical charges, which, as discussed below, has been highly prejudicial to the Chapter 11 Estates, their creditors, and the judicial administration of these chapter 11 cases.  Moreover, in the Initial Derivative Questionnaire, Giants Stadium did not even explain how the calculation of the hypothetical "credit" and "capital" charges would be performed.

91.    When the Bar Date Order was entered, with its specific detailed requirements for derivatives claims (including requirements related to counterparties' calculations), it was not intended that derivatives counterparties would have the opportunity to assert claims for new amounts, based on new calculations, years after the Bar Date.  Yet, that is what Giants Stadium seeks to do here.  The Court should recognize the New Proofs of Claim for what they are:  late-filed new claims, which are invalid under the Bar Date Order ("any holder of a claim against the [Chapter 11 Estates] who is required, but fails to file a proof of such claim in accordance with the Bar Date Order on or before the Bar Date, specifically, including filling out the Derivative Questionnaire or the Guarantee Questionnaire and uploading required information to the [Lehman claims] website . . . shall be forever barred, estopped, and enjoined from

---

[14] The new valuation statements also revised the initial calculation of the purported Settlement Amounts based on alleged calculation errors.  The new valuation statements refer to "revised calculation statement[s] attached as Schedule 3 hereto," but neither of the new valuations statements contains a Schedule 3.

37

asserting such claim against the [Chapter 11 Estates] (or filing a [p]roof of [c]laim with respect

thereto)" (Bar Date Order at 9-10) (emphasis in original)), section 502(b)(9) of the Bankruptcy

Code (a claim may not be allowed "to the extent that . . . proof of such claim is not timely

filed"), and applicable case law.

<b>a)        The New Proofs of Claim Should Not<br><u>Be Permitted as Late-Filed New Claims</u></b>

92.      Under the standards for allowing late-filed new claims, the Court should

not permit the New Proofs of Claim.  Bankruptcy Rule 9006(b)(1) provides bankruptcy courts

with the discretion to permit late-filed proofs of claim when a claimant establishes excusable

neglect, and the burden is on the claimant to prove that it did not timely file the claim because of

excusable neglect.  *See In re Enron Corp.*, 298 B.R. 513, 525 (Bankr. S.D.N.Y. 2003)

("*Enron I*"), *aff'd sub nom. Midland Cogeneration Venture v. Enron Corp.* (*In re Enron Corp.*),

419 F.3d 115 (2d Cir. 2005) ("*Enron II*") (citation omitted).  Giants Stadium cannot meet its

burden of showing excusable neglect in filing the New Proofs of Claim more than two years after

the Bar Date.  The Court should exercise its discretion and not permit the New Proofs of Claim

as late-filed new claims.

93.      "The seminal case interpreting the 'excusable neglect' language of

Bankruptcy Rule 9006(b)(1) is *Pioneer Inv. Servs. Co. v. Brunswick Assocs. L.P.*, 507 U.S. 380,

113 S.Ct. 1489 (1993)."  *Enron I*, 298 B.R. at 525.  *Enron I* explained that in *Pioneer*, the

Supreme Court "clarified that whether a claimant's neglect of a deadline is excusable is an

equitable determination, taking into account all of the relevant circumstances surrounding the

claimant's omission."  *Id*. (citing *Pioneer*, 507 U.S. at 395).  "These equitable considerations

include (1) the danger of prejudice to the debtor, (2) the length of delay and its potential impact

on judicial proceedings, (3) the reason for the delay, including whether it was within the

38

reasonable control of the movant, and (4) whether the movant acted in good faith." *Id.* (internal

quotation marks omitted).  All of these equitable considerations weigh against Giants Stadium.

**i)     There Is No Reason for Giants
Stadium's Delay in Filing the New Proofs of Claim**

94.     For late-filed new claims, the Second Circuit takes a "hard line" approach

in applying the *Pioneer* test and focuses on the third factor:  the reason for the delay, including

whether it was within the reasonable control of the movant.  *Enron II*, 419 F.3d at 122-123

(internal quotation marks and citations omitted).  This Court has followed the Second Circuit's

"hard line" approach in applying the *Pioneer* factors numerous times in these chapter 11 cases.

*See, e.g.*, *Lehman I*, 433 B.R. at 120-21, 126-27.  In its application of the *Pioneer* factors in these

chapter 11 cases, the Court expressly has followed the Second Circuit by deeming the reason for

the delay the "central focus in determining excusable neglect." *Id.* at 127 (noting that it found

excusable neglect in those instances where creditors consciously endeavored to comply with the

bar date and established that their delay was the result of justifiable confusion over the

application of the bar date to their particular claims).

95.     There is no credible reason for Giants Stadium's delay in filing the New

Proofs of Claim.  The delay was not the result of confusion over the application of the Bar Date

or the Questionnaire Deadline:  Giants Stadium filed a set of proofs of claim on the Bar Date and

filed the Initial Questionnaires on the Questionnaire Deadline.  In fact, Giants Stadium has

provided no explanation whatsoever for its delay in filing the New Proofs of Claim, including the

new valuation statements, more than two years after the Bar Date and more than three years after

it delivered the Calculation Statements.  In the absence of such explanation, Giants Stadium

cannot meet its burden of establishing excusable neglect.  *See id*. at 120 (finding that a creditor

"must explain the circumstances surrounding the delay in order to supply the Court with

39

sufficient context to fully and adequately address the reason for delay factor and the ultimate

determination of whether equities support the conclusion of excusable neglect").

96.     In addition, it is self-evident that filing the New Proofs of Claim, including

the new valuation statements, was wholly within Giants Stadium's control.  The United States

District Court for the Southern District of New York in *Calpine*, affirming the bankruptcy

court's refusal to allow new claims as late-filed claims or amendments, noted that the claimants

did not offer any explanation as to why no proof of claim supplements were filed until more than

six months after the bar date.  *Aristeia Capital, L.L.C. v. Calpine Corp. (In re Calpine Corp.)*,

2007 WL 4326738, at *6 (S.D.N.Y. Nov. 21, 2007).  Similarly, there is no reason why Giants

Stadium was unable to determine the amounts asserted in the New Proofs of Claim at the time it

filed the Proofs of Claim (other than that the amounts were neither reasonable nor actually

incurred), especially in light of (i) the contractual and statutory requirement that the Swaps be

valued as of the Early Termination Date, (ii) Giants Stadium's obligation under the Agreements

to provide a calculation statement as soon as reasonably practicable, and (iii) its statement more

than three years *before* filing the New Proofs of Claim that it was working "expeditiously" to

determine the full extent of its Loss.  Giants Stadium cannot provide any credible explanation for

waiting *another two years* – more than two years after filing the Proofs of Claim – to seek the

amounts asserted in the New Proofs of Claim.

97.     As this Court has found, "[c]ritically, in the Second Circuit, 'the equities

will rarely if ever favor a party who fails to follow the clear dictates of a court rule, and . . .

where the rule is entirely clear . . . a party claiming excusable neglect will, in the ordinary

course, lose under the *Pioneer* test.'"  *Lehman I*, 433 B.R. at 120 (quoting *Enron II*, 419 F.3d at

123).  The equities unquestionably favor the Chapter 11 Estates on this factor, and based on its

40

importance in the *Pioneer* analysis, the Court should deem the equities dispositive and not permit the New Proofs of Claim as late-filed new claims.

<b>ii)    The Length of Giants Stadium's Delay Is Disruptive
<u>to the Judicial Administration of These Chapter 11 Cases</u></b>

98.    In *Enron I* and in *In re Enron Creditors Recovery Corp.*, 370 B.R. 90 (Bankr. S.D.N.Y. 2007) ("*Enron III*"), the court considered whether to permit claims filed six and fifteen months, respectively, after the bar date as late-filed new claims.  In both cases, the court found the delay "substantial," noting that the bar date order was meant to function as a statute of limitations and effectively exclude late claims in order to provide the debtors and their creditors with finality to the claims process and permit the debtors to make swift distributions under any confirmed plan of reorganization.  *Enron I*, 298 B.R. at 526; *Enron III*, 370 B.R. at 103.  "To find otherwise, that is, outside of the context of excusable neglect, would vitiate the very purpose of the Bar Date Order and would clearly prejudice the Debtors' reorganization process."  *Enron I*, 298 B.R. at 526.  There is no excusable neglect in this case, and, as discussed below, the New Proofs of Claim deny the Chapter 11 Estates the necessary finality in their claims process and ability to make distributions to holders of allowed claims.

99.    The Second Circuit has commented that in determining "how long is too long," courts generally consider the degree to which the delay may disrupt the judicial administration of the case.  *Enron II*, 419 F.3d at 128 (internal quotation marks and citation omitted).  Some courts also have suggested that a relevant consideration is whether a plan has been filed or confirmed by the time a late claim is submitted, but the Second Circuit refused to find the plan filing date to be conclusive as it minimized the importance of the bar date and failed to recognize adequately the practical centrality to bankruptcy reorganizations of negotiations among creditors and debtors.  *Id*. at 128-29 (citations omitted).  The Second Circuit instead

41

observed that the lateness of a claim must be considered in the context of the proceeding as a whole.  *Id*. at 128.

100.    In *Enron II*, the creditor argued that the late inclusion of its $12.5 million claim would not have disrupted the proceedings because the claim was *de minimis* in the context of the Enron bankruptcy and including it simply would involve plugging the number into the computer program used to calculate creditor distributions and allowing the program to "spit out" a result.  *Id*. at 129.  The Second Circuit called this contention unpersuasive because it ignored the "arduous process of valuing assets, validating claims, and negotiating a compromise among a host of creditors."  *Id*.  In the Chapter 11 Estates' cases, the burden of reconciling their complex derivatives transactions was a key factor in developing the bespoke Bar Date Order.  The Chapter 11 Estates have explained that "[u]nder normal circumstances, at any one time most derivatives transactions of a major dealer such as Lehman remain outstanding and reconciliation is a continuous process with its clients and professional counterparties.  Here, reconciliation needs to occur with respect to nearly all of the more than one million derivative[s] [t]ransactions <u>at the same time</u>."  Mandelblatt Declaration at 11 (emphasis in original).

101.    To allow counterparties to continue filing new claims – especially those of the magnitude of the New Proofs of Claim – after the Bar Date would undermine the reconciliation process, making the formulation and negotiation of the Plan nearly impossible because the Chapter 11 Estates could never be certain of their liabilities.  *See Enron II*, 419 F.3d at 128 (finding that bar dates serve "the important purpose of enabling parties to a bankruptcy case to identify with reasonable promptness the identity of those making claims against the bankruptcy estate and *the general amount of the claims*, a necessary step in achieving the goal of successful reorganization") (internal quotation marks and citation omitted and emphasis added).

42

102.    In *Enron II*, the Second Circuit found that, even though a late claim was submitted long before the debtors' final reorganization plan was filed or confirmed, it was nonetheless submitted long after the commencement of the negotiations required to develop that plan.  Thus, "[t]he bankruptcy court could well have concluded that the negotiations were at a sufficiently advanced stage that the belated introduction of a multi-million dollar claim would have a disruptive effect."  *Id*.  In these chapter 11 cases, the disruptive effect of the New Proofs of Claim – asserting amounts nearly double the amounts asserted in the Proofs of Claim (not the $12.5 million at issue in *Enron II*) – is even greater, as the Plan already had been negotiated and filed and was confirmed on the day the New Proofs of Claim were filed.

103.    The length of Giants Stadium's delay (not to mention the grandiose nature of the New Proofs of Claim, as discussed below), combined with its lack of any explanation for waiting three years, weighs heavily against Giants Stadium.  *See Enron II*, 419 F.3d at 129 ("where an explanation is nonexistent, or not credible, *both* the 'reason for the delay' and the 'length of the delay' factors might weigh in favor of the debtor, even if the delay is, in absolute terms, quite short") (emphasis in original).  In *Enron II*, the Second Circuit concluded that, "against the backdrop of an exceedingly complex reorganization, and given the absence of any persuasive explanation for the delay," it was not an abuse of discretion for the bankruptcy court in *Enron I* to find that six months constituted an unacceptable delay.  *Id*. at 130.  Here, Giants Stadium has not offered – and cannot offer – any credible explanation for waiting more than three years after the Early Termination Date to file the New Proofs of Claim in these chapter 11 cases, which are the largest and most complex in history.

43

         **iii)**    **The New Proofs of Claim Prejudice the
Chapter 11 Estates, Their Creditors, and the
Judicial Administration of the Chapter 11 Cases**

       104.    The Second Circuit has noted that many of the considerations for prejudice are the "same as those taken into account in evaluating the length of the delay, and indeed, some courts have conflated the two analyses." *Enron II*, 419 F.3d at 130 (citations omitted). "'Prejudice' . . . concerns not just the harm to the debtor but also the adverse impact that a late claim may have on the judicial administration of the case." *In re Keene Corp.*, 188 B.R. 903, 910 (Bankr. S.D.N.Y. 1995); *see also Lehman I*, 433 B.R. at 120 ("[t]he prejudice factor calls for consideration of the overall negative effect, if any, on a debtor and its estate from allowing a late claim").

       105.    According to the court in *Keene*, *Pioneer* did not define prejudice, but subsequent cases have identified a number of considerations, including "the size of the late claim in relation to the estate, whether a disclosure statement or plan has been filed or confirmed with knowledge of the existence of the claim, [and] the disruptive effect that the late filing would have on a plan close to completion or upon the economic model upon which the plan was formulated and negotiated." *Keene*, 188 B.R. at 910 (citations omitted); *see also Lehman I*, 433 B.R. at 120 (citing *Keene*). Examining these considerations cumulatively, as the court did in *Enron III*, 370 B.R. at 102, the Chapter 11 Estates and their creditors will be prejudiced if the Court permits the New Proofs of Claim as late-filed claims.

       106.    In finding that the prejudice factor favored the Chapter 11 Estates as to certain other late-filed claims in these chapter 11 cases, this Court determined that "the extraordinary size of the claims management project is itself a significant factor in determining prejudice":

US_ACTIVE:\44478192\2\58399.0011

> The prejudice to the [Chapter 11 Estates] is not traceable to the
> filing of any single additional claim but to the impact of permitting
> exceptions that will encourage others to seek similar leniency. In
> view of the need to bring finality to the enormous task of resolving
> those claims that have already been filed in these cases, the Court
> concludes that strict application of the Bar Date Order is needed to
> effectively manage the claims process and that permitting
> additional claims will lead to an opening of the claims process with
> foreseeable prejudice to the [Chapter 11 Estates].

*Lehman I*, 433 B.R. at 121; *see also Enron II*, 419 F.3d at 131-32 (refusing to consider late-filed

claim "in isolation").

107.    In light of the concerns giving rise to entry of the bespoke Bar Date Order,

the Court should consider the prejudice that would result in these chapter 11 cases if even a small

handful of the thousands of derivatives counterparties were permitted to file new claims to assert

so-called "incremental amounts," as Giants Stadium did, based on hypothetical losses. *See*

*Enron II*, 419 F.3d at 130 (considering as a factor in the prejudice analysis "whether allowing a

claim would be likely to precipitate a flood of similar claims") (citing *In re Kmart Corp.*, 381

F.3d 709, 714 (7th Cir. 2004) ("[I]f the bankruptcy court allowed all late-filed claims of nearly a

million dollars where a simple 'innocent mistake' . . . was to blame for the tardiness of the proof

of claim, we think Kmart could easily find itself faced with a mountain of such claims.")); *Enron*

*III*, 370 B.R. at 99 ("the Debtors would be unduly prejudiced due to the possibility of opening

the floodgates for other similarly situated creditors to come forward to amend their claims or file

late claims"); *see also Lehman I*, 433 B.R. at 127 ("[a]lowing the filing of late claims also would

expose the [Chapter 11 Estates] to the risk of a virtually never ending claims resolution

process"); *Lehman II*, 445 B.R. at 143 (concluding that the Court did not abuse its discretion in

finding prejudice on the foregoing basis). The Chapter 11 Estates would be prejudiced if Giants

Stadium were allowed to file the New Proofs of Claim given the flood of similar claims that

45

foreseeably could follow and the burdensome reconciliation process (*e.g.*, verifying the "reasonableness and validity of the calculation[s]") that would be required for such new claims.

108.    Moreover, the Second Circuit has found that the size of a late-filed claim "cannot be irrelevant" to the prejudice analysis, noting that some courts have taken into account whether allowance of a particular late claim would jeopardize the success of the reorganization, by, for example, affecting the distribution to creditors and equity holders. *Enron II*, 419 F.3d at 130 (internal quotation marks and citations omitted).  Here, the size of the New Proofs of Claim is highly prejudicial to the Chapter 11 Estates and their creditors, as the New Proofs of Claim have affected distributions to other creditors primarily in two ways.  First, the size of the New Proofs of Claim impacts the recovery of holders of allowed claims in the classes in which the New Proofs of Claim were placed.  Second, the New Proofs of Claim have compelled the Chapter 11 Estates to reserve cash for the New Proofs of Claim that is nearly twice the amount required to be reserved based on the Proofs of Claim.

109.    The sheer size of the New Proofs of Claim underscores their prejudicial effect.  In *Enron II*, a creditor challenged the bankruptcy court's finding of prejudice notwithstanding the bankruptcy court's comment that the late-filed claim was not substantial in relation to the Enron estate and was filed before Enron and its subsidiaries filed their draft plan of reorganization and disclosure statement.  *Enron II*, 419 F.3d at 131.  The creditor argued that Enron had notice of its claim, which it could have taken into account in crafting its reorganization plan, and that the creditor's $12.5 million claim was "outweighed 68,000 to 1" by the other claims in Enron's $858 billion bankruptcy.  *Id.*

110.    The Second Circuit agreed with the bankruptcy court's conclusion that, among other things, the claim was "sufficiently large" that permitting its late filing would be

46

unduly prejudicial to the Enron estate.  *Id*. at 132.  Indeed, the Second Circuit noted that "while a

claim of $12.5 million might seem insignificant in the face of a $900 billion bankruptcy, courts

have previously upheld findings of prejudice in cases in which the late-filed claim was a small

fraction of the total claims."  *Id*. at 131 (citing *Kmart*, 381 F.3d at 714 ("affirming a finding of

prejudice where a $750,000 claim was outweighed 8,000 to one by other claims in a $6 billion

bankruptcy, while noting that '[p]erhaps this would be a different case had [the] claim only

asserted, say $75,000 or $80,000 in damages,' a ratio of 80,000 to one")).

   111. Here, the New Proofs of Claim seek to *increase* the aggregate amount

sought in the Proofs of Claim by approximately $568 million (*i.e.*, $284 million against LBSF

and $284 million against LBHI) in the aggregate.  Even in these chapter 11 cases, $568 million is

a substantial amount of money.  *See Calpine*, 2007 WL 4326738, at *6-7 (finding that new

claims, couched as amendments, estimated in the hundreds of millions of dollars, supported

finding of prejudice and that "a finding of prejudice can be based on the size of the contested

claims and the disruptive effect that allowance of the contested claims would have on the current

administration of the estate"); *see also Enron II*, 419 F.3d at 131 ("considered in absolute terms,

$12.5 million is 'no small amount'") (quoting *Kmart*, 381 F.3d at 714).  Allowing the New

Proofs of Claim *alone* would have a disruptive effect on these chapter 11 cases; allowing even a

few commensurate new claims would have an exponentially disruptive effect.

   112. The Second Circuit also has identified whether the debtor had advance

knowledge of a late-filed claim as a factor in the prejudice analysis.  *Enron II*, 419 F.3d at 130

(citations omitted).  Until just prior to the Plan confirmation hearing, the Chapter 11 Estates had

no knowledge that Giants Stadium would seek exorbitant amounts in the New Proofs of Claim,

despite conducting a Bankruptcy Rule 2004 examination of Giants Stadium.  Notably, if the

47

amounts asserted in the New Proofs of Claim were real and reasonable, the Derivative

Questionnaire had been designed specifically to elicit the very information that Giants Stadium

ultimately provided in the New Proofs of Claim more than two years after the Bar Date.

113.    The Chapter 11 Estates formulated and negotiated the Plan based upon

assumptions about their estimated liabilities gleaned from, among other things, the Derivative

Questionnaire (the deadline for which was more than a year after the commencement of the

chapter 11 cases).  For this reason, permitting derivatives counterparties to avoid the

requirements of the Derivative Questionnaire and file belated derivatives claims for hundreds of

millions of dollars necessarily would "adversely affect the [Chapter 11 Estates'] assessment of

their liabilities."  *See Enron I*, 298 B.R. at 526 (refusing to allow a late-filed guarantee claim

even though the guarantee at issue was listed on the debtors' schedules and the debtors had not

yet filed their proposed plan and disclosure statement); *see also Enron II*, 419 F.3d at 125

(finding the record supported the bankruptcy court's ruling).

114.    Permitting derivatives counterparties to avoid the requirements of the

Derivative Questionnaire and file belated derivatives claims for hundreds of millions of dollars

also would "negatively impact [the Chapter 11 Estates'] bankruptcy proceedings" by forcing the

Chapter 11 Estates to devote considerable resources and expenses to tracking down information,

including calculations and actual claim amounts, from counterparties just to assess the universe

of asserted derivatives claims.  *Id.*; *see also* Mandelblatt Declaration at 15 ("Given the sheer

volume of [t]ransactions, the manpower and expense of contacting each counterparty

individually and requesting documentation and information regarding valuation and

methodology would require an exponential increase of resources and expenses devoted to the

cost of unwinding the Derivative Contracts.").  Here, where the Plan was formulated without

48

knowledge of the exorbitant hypothetical charges asserted in the New Proofs of Claim, the

negative impact on, and prejudice to, the Chapter 11 Estates is even more obvious.

### iv)    Giants Stadium Did Not Act in Good Faith in Belatedly Filing the New Proofs of Claim

115.    Filing the New Proofs of Claim on December 6, 2011 – at or around the

same time that the parties had agreed to attempt mediation and on the date of the Plan

confirmation hearing – was nothing more than a tactical maneuver designed to maximize Giants

Stadium's leverage in, and influence over, settlement negotiations.  The delayed timing bespeaks

a lack of good faith to the detriment of other creditors.  First, because the New Proofs of Claim

were filed before the Effective Date, Giants Stadium was not forced to seek Court authority to

purportedly amend the Proofs of Claim pursuant to paragraph 86 of the Confirmation Order,

which would have interfered with Giants Stadium's attempt to use the inflated claim amounts as

leverage.[15]  Of course, Giants Stadium still had an independent obligation to seek Court-approval

to file these New Proofs of Claim.  Second, LBSF and LBHI were each required, pursuant to

section 8.4 of the Plan,[16] to reserve for the New Proofs of Claim based on the new amount of

approximately $585 million each, instead of the original amount of approximately $301 million

each.  The inflated amounts of the New Proofs of Claim harmed – and continue to harm – other

creditors who otherwise would receive the additional cash required to be reserved for Giants

---

[15] Paragraph 86 of the Confirmation Order provides that "[a]fter the Effective Date, other than a proof of Claim relating to an executory contract or unexpired lease that is rejected pursuant to the Plan, a proof of Claim relating to a prepetition Claim may not be filed or amended without the authority of the Court."  Based on the tactical timing of the filing of the New Proofs of Claim, Giants Stadium was able to avoid the application of this provision and, for the time being, avoid having to explain its dilatory behavior in filing the New Proofs of Claim.

[16] Section 8.4 of the Plan ("Disputed Claims Holdback") provides, in pertinent part:  "From and after the Effective Date, and until such time as all Disputed Claims have been compromised and settled or determined by Final Order, the Plan Administrator shall, consistent with and subject to section 1123(a)(4) of the Bankruptcy Code, retain from Available Cash an aggregate amount equal to the Pro Rata Share of the Distributions that would have been made to each holder of a Disputed Claim if such Disputed Claim were an Allowed Claim against such Debtor in an amount equal to . . . the filed amount of such Disputed Claim . . . ."

49

Stadium, thereby prejudicing – and continuing to prejudice – holders of allowed claims and

increasing the pressure on the Chapter 11 Estates to settle the dispute in order to free up the cash

for distributions.[17]

116.    Permitting the New Proofs of Claim under these circumstances will send

the wrong message to the numerous creditors who have ongoing disputes with the Plan

Administrator – that they can leverage negotiations by recalculating their losses and trying to file

new claims on the eve of settlement negotiations.  Based on Giants Stadium's lack of good faith

in filing the New Proofs of Claim and seeking the amounts set forth therein, the New Proofs of

Claim should not be permitted.

**b)    The New Proofs of Claim Should Not Be
Permitted as Amendments to the Proofs of Claim**

117.    As discussed above, the New Proofs of Claim represent Giants Stadium's

"attempt to file . . . new claim[s] under the guise of . . . amendment[s]."  *See Enron II*, 419 F.3d

at 133 (quoting *Integrated Res., Inc. v. Ameritrust Co. N.A. (In re Integrated Res., Inc.)*, 157 B.R.

66, 70 (S.D.N.Y. 1993)).  Giants Stadium, however, may not amend the Proofs of Claim as of

right.  *See, e.g.*, *Enron I*, 298 B.R. at 520 ("amendments are not automatic").  Even if, *arguendo*,

the Court considers the New Proofs of Claims within the framework of amendments and not new

proofs of claims, the New Proofs of Claim will not withstand the "careful scrunity" required of

"post bar date amendments" because the New Proofs of Claim do not relate back to the Proofs of

Claim, significantly prejudice the Chapter 11 Estates and their creditors, were unduly delayed

without justification, and lacked good faith.  Courts have cited the latter considerations as

---

[17] In response to creditors arguing that subordination of their late-filed claims would eliminate any prejudice because the claims' allowance would not reduce the distribution to other creditors, the court in *Calpine* noted that the disruption in the judicial administration of the estate can constitute prejudice, separate and apart from any decreased distribution.  *Calpine*, 2007 WL 4326738, at *7.  Here, both reduction in distributions to other creditors and disruption in the judicial administration of the estates are present.

50

weighing *against* allowance of amendments. *See*, *e.g.*, *Futuronics Corp. v. Sycamore Indus.,*

*Inc., (In re Futuronics Corp.)*, 23 B.R. 281, 283 (S.D.N.Y. 1982) (motions to amend should be

denied when there is evidence of, *inter alia*, undue delay, bad faith or dilatory motive, or undue

prejudice).   Moreover, the New Proofs of Claim, if considered amendments, would undermine

the detailed requirements of the Derivative Questionnaire and the Chapter 11 Estates' evaluation

of claims based on the Derivative Questionnaire.   The New Proofs of Claim – filed on the date of

the Plan confirmation hearing – should not be permitted as amendments.

116.    118.    The Court "has the discretion to grant or deny an amendment to a timely

filed proof of claim." *Enron III*, 370 B.R. at 94-95 (citation omitted).   In the Second Circuit,

courts engage in a two-step inquiry to determine whether a claimant may amend its claim after

the bar date.   Giants Stadium fails both steps. First, a court must examine whether "there was [a]

timely assertion of a similar claim or demand evidencing an intention to hold the estate liable."

*Enron II*, 419 F.3d at 133 (quoting *Integrated Res.*, 157 B.R. at 70).   An amendment will meet

this threshold and "relate back" to the original claim if the amendment (1) corrects a defect of

form in the original claim, (2) describes the claim with greater particularity, or (3) pleads a new

theory of recovery on the facts set forth in the original claim.   *Id.* (quotation marks and citations

omitted)).

119.    Second, if an amendment relates back to the timely filed claim, courts will

"examine each fact within the case and determine whether it would be equitable to allow the

amendment." *Id.* (quoting *Integrated Res.*, 157 B.R. at 70).   "In balancing the equities the court

. . . considers five equitable factors:  (1) undue prejudice to the opposing party; (2) bad faith or

dilatory behavior on the part of the claimant; (3) whether other creditors would receive a

windfall were the amendment not allowed; (4) whether other claimants might be harmed or

08-13555-mg    Doc 44269    Filed 05/08/14    Entered 05/08/14 20:35:12    Main Document
Pg 57 of 64

prejudiced; and (5) justification for the inability to file the amended claim at the time the original

claim was filed." *Enron III*, 370 B.R. at 95 (citing *Integrated Res.*, 157 B.R. at 70 (internal

citation omitted)).

> **i)**     **The New Loss Calculations in the New
> Proofs of Claim Do Not Relate Back to
> the Loss Calculations in the Proofs of Claim**

120.    Courts considering the first prong – relation back – have focused on

whether the debtor had reasonable and sufficient notice of the amendment.  As the party that

would be asserting relation back, Giants Stadium bears the burden of proof.  *See Enron III*, 370

B.R. at 96.  Giants Stadium cannot meet its burden of showing that the New Proofs of Claim

satisfy the first prong of the test for amendment.

121.    First, the exorbitant amounts asserted in the New Proofs of Claim,

reflecting at least an additional $284 million each for new "credit" and "capital" charges,

aggregating to a total claim amount in each claim that is $177 million more than the face value of

the Bonds and the total notional amount of the Swaps themselves – preclude their relation back:

**"Ordinarily, to be within the scope of a permissible amendment, the second claim should

not only be of the same nature as the first but also *reasonably* within the amount to which

the first claim provided notice."**  *Integrated Res.*, 157 B.R., at 70 (quoting *In re AM Int'l, Inc.*,

67 B.R. 79, 82 (N.D. Ill. 1986)) (emphasis added).

122.    Second, the New Proofs of Claim contain calculations of novel

hypothetical charges that are substantively dissimilar from any calculations contained in the

Proofs of Claim, which further precludes the New Proofs of Claim from relating back to the

Proofs of Claim.  *See Calpine*, 2007 WL 4326738, at *5 (finding that certain claims asserted in

purportedly amended proofs of claim were "both novel and substantively dissimilar to the

specific claims" made in the original proofs of claim and that it was not an abuse of discretion

US_ACTIVE:\44478192\2\58399.0011

for the bankruptcy court to find that the purportedly amended proofs of claims did not relate back to the original proofs of claim).

123.    To the extent the Proofs of Claim purport to "give notice of the transaction or occurrence giving rise to" to the amendment, the amendment nonetheless "substantially prejudice[s]" the Chapter 11 Estates and their creditors.  *See Integrated Res.*, 157 B.R. at 70-71 (internal quotation marks and citation omitted)).  Indeed, the mere fact that amended claims arise out of the same agreement as the original claims is insufficient grounds for relation back if the original claims did not provide reasonable notice of the amendment.  *See Calpine*, 2007 WL 4326738, at *5 (holding that the fact that purported amended claims arose out of same indentures was not sufficient to establish relation back because original claims did not provide debtors with reasonable notice of proposed amendment).

124.    Specifically, whether the Purported Reservation provided notice of the new calculations and amounts asserted in the New Proofs of Claim must be assessed in the context of the Agreements and the bespoke Bar Date Order.  As a threshold matter, the Agreements themselves do not provide a mechanism for placeholder claims or the submission of new Loss calculations to claim additional amounts after the delivery of the Calculation Statements, so the Purported Reservation is ineffective under the Agreements.

125.    Moreover, Giants Stadium did not even comply with its own Purported Reservation, which expressly stated that Giants Stadium reserved its right to supplement based on its "expeditious" work in determining the so-called "full extent" of its Loss.  In the following thirteen months, Giants Stadium filed *four* sets of proofs of claim and the Initial Questionnaires (prior to filing the New Proofs of Claim and the New Questionnaires), none of which contained the new valuation statements or any explicit reservation of amendment rights as to the Proofs of

53

Claim themselves.  Giants Stadium's attempt to file its New Proof of Claims more than three years after its Purported Reservation was anything but expeditious.  The failure to abide by the terms of its own Purported Reservation renders any alleged notice that Giants Stadium subsequently would amend the Proofs of Claim to be facially unreasonable and insufficient.

126.    By the time Giants Stadium filed the Proofs of Claim, the Court had entered the Bar Date Order, which contained detailed requirements for asserting claims based on terminated Derivative Contracts.  These requirements largely mirrored a Non-defaulting Party's obligations under the standard 1992 form ISDA Master Agreement to promptly demand payment of an amount certain and provide the Defaulting Party with a valuation statement (except that claimants had over a year from the commencement of the chapter 11 cases to assert their claims, which is significantly more time than derivatives counterparties have to assert their payment demands under the standard 1992 form ISDA Master Agreement).

127.    Giants Stadium's inclusion of the new valuation statements with the New Proofs of Claim and the New Derivative Questionnaire more than two years after the Bar Date is a blatant attempt to circumvent the basic requirements of the Bar Date Order and the Derivative Questionnaire, and Giants Stadium's use of the Purported Reservation as a "placeholder claim" for the new calculations and amounts that it asserted in the New Proofs of Claim is improper. *See Calpine*, 2007 WL 4326738, at *5 ("Bar dates would be rendered meaningless if creditors were granted leave to amend to assert new novel claims based on broad language in a timely-filed Proof of Claim and an attached Indenture.") (citations omitted).  Allowing the New Proofs of Claim as amendments would vitiate the Bar Date and the Questionnaire Deadline.  As discussed above, the requirements of the Derivative Questionnaire were designed to elicit the

54

necessary information from derivatives counterparties by the Questionnaire Deadline, which was

vital to the claims reconciliation process and all that flowed from it in these chapter 11 cases.

128.    While the Bar Date Order afforded derivatives counterparties more time

than they would have had outside of bankruptcy to assert their claims, the Bar Date Order made

clear that the Bar Date and the Questionnaire Deadline were the respective times for asserting

fully fleshed claims and submitting supporting documentation.  Thus, to the extent the Purported

Reservation was effective under the Agreements, the Bar Date Order required Giants Stadium to

exercise the Purported Reservation no later than the time it filed the Proofs of Claim and the

Initial Questionnaires.  (Nevertheless, even if the Purported Reservation were effective when the

Calculation Statements were delivered, the Purported Reservation, by its own terms, was stale by

the time Giants Stadium filed the Proofs of Claim over a year later.)

129.    Because Giants Stadium had neither exercised the Purported Reservation

nor provided the new valuation statements by the time it filed the Proofs of Claim (and hence

failed to abide by the terms of its own Purported Reservation by failing to expeditiously

determine the full extent of its Loss), the Chapter 11 Estates did not have reasonable and

sufficient notice that Giants Stadium would – or could – come back more than two years after the

Bar Date and file the New Proofs of Claim, setting forth new calculations and demanding new

excessive hypothetical charges.  The Purported Reservation (which was buried in a year-old

document attached to the Proofs of Claim and never asserted in any of the proofs of claim Giants

Stadium filed) can only be construed as having given the Chapter 11 Estates reasonable and

sufficient notice of the forthcoming New Proofs of Claim – and therefore potentially relate back

to the Proofs of Claim – if the parallel requirements of the Agreements and the Bar Date Order

are ignored entirely, not to mention the plain language of the Purported Reservation itself.

55

130.    Giants Stadium cannot meet its burden for relation back.  Accordingly, the

New Proofs of Claim fail to satisfy the requisite first prong of the test for allowing belated

amendments and "no further analysis under the two-prong test is necessary."  *Enron III*, 370

B.R. at 98 (citation omitted).  The Court should not permit the New Proofs of Claim as

amendments.

### ii)    Balancing of the Equities Weighs Against Permitting the New Proofs of Claim as Amendments

131.    Even if the Court finds that the New Proofs of Claim relate back to the

Proofs of Claim, the New Proofs of Claim should not be permitted as amendments based on a

balancing of the equities.  Each of the five equitable factors weighs heavily in favor of the

Chapter 11 Estates and against Giants Stadium:  (1) the New Proofs of Claim unduly prejudice

the Chapter 11 Estates; (2) Giants Stadium demonstrated bad faith and dilatory behavior in filing

the New Proofs of Claim; (3) other creditors will not receive a windfall if the New Proofs of

Claim are not allowed; (4) other claimants will be harmed and prejudiced by allowance of the

New Proofs of Claim; and (5) Giants Stadium has no justification for its failure to file the New

Proofs of Claim at the time the Proof of Claims were filed.  *See Enron III*, 370 B.R. at 95 (citing

*Integrated Res.*, 157 B.R. at 70 (internal citation omitted)).

132.    The equitable analysis of belated amendments closely resembles the

"excusable neglect" analysis for belated new claims set forth by the Supreme Court in *Pioneer*.

*See Enron II*, 419 F.3d at 133 (citing *Enron I*, 298 B.R. at 524-25).  The Second Circuit has

noted that "[i]f there is a difference between the two analyses, it is [that] [w]hile belated

*amendments* will ordinarily be 'freely allowed' *where other parties will not be prejudiced*,

56

belated *new* claims will ordinarily be denied, even absent prejudice, unless the reason for the delay is compelling." *Enron II*, 419 F.3d at 133-134 (intermediate emphasis added).[18]

133.    Under the same equitable analysis used for belated new claims, as set forth in detail above, the New Proofs of Claim should not be permitted as amendments.  In balancing the equities for amended proofs of claim, "[t]he critical consideration is whether the opposing party will be unduly prejudiced by the amendment." *Enron II*, 419 F.3d at 133 (quoting *Integrated Res.*, 157 B.R. at 70) (internal quotation marks and citation omitted).

134.    As discussed above, the Chapter 11 Estates and their creditors are prejudiced by the New Proofs of Claim, including by virtue of the markedly increased amounts sought therein.  By contrast, in affirming the allowance of a challenged amendment, the district court in *Integrated Resources* found that "[t]he record contains evidence that the [creditors'] amended proofs of claim seek *no increase in the amount* or priority of the . . . original claims . . . .  This factor alone goes to support three of the five factors that need to be considered when balancing the equities . . . (i.e., undue prejudice to opposing party; whether other creditors would receive a windfall were the amendment not allowed; whether other claimants might be harmed or prejudiced)." *Integrated Res.*, 157 B.R. at 72 (citation omitted and emphasis added).

135.    The other creditors in these chapter 11 cases also will not receive a windfall if the Court does not permit the New Proofs of Claim as amendments.  As the court in *Enron III* recognized, "although other creditors may receive an increased distribution if the amendment is not allowed, such a distribution does not constitute a windfall." *Enron III*, 370 B.R. at 99; *see also Calpine*, 2007 WL 4326738, at *7 (same).

---

[18] Apart from Giants Stadium's desire to inflate the amount of its claims prior to the commencement of the mediation, there is no reason, much less a compelling one, for Giants Stadium's delay in filing the New Proofs of Claim.

US_ACTIVE:\44478192\2\58399.0011

136.    Here, the new valuation statements are impermissible under the Agreements, so even if other creditors were to receive an increased distribution if the New Proofs of Claim are not permitted as amendments, such increased distribution would be proper and not a windfall.  Accordingly, there is no windfall.

137.    Balancing of the equities is not a close call here.  None of the equitable factors weighs in Giants Stadium's favor, and all of them favor the Chapter 11 Estates.  The Court should not permit the New Proofs of Claim as amendments.

## RESERVATION OF RIGHTS

138.    The Plan Administrator reserves all rights to object to the New Proofs of Claim and the LBHI Proof of Claim on any other basis to the extent that the relief requested herein is not granted.  The Plan Administrator reserves the right to conduct discovery regarding the New Proofs of Claim and the LBHI Proof of Claim and to supplement this filing as a result thereof.

## NOTICE

139.    No trustee has been appointed in these chapter 11 cases.  Notice of this Objection has been provided to (i) the United States Trustee for Region 2, (ii) the Securities and Exchange Commission, (iii) the Internal Revenue Service, (iv) the United States Attorney for the Southern District of New York, (v) Giants Stadium, and (vi) all other parties entitled to notice in accordance with the procedures set forth in the second amended order entered on June 17, 2010, governing case management and administrative procedures for these cases [ECF No. 9635].  The Plan Administrator submits that no other or further notice need be provided.

140.    No previous request for the relief sought herein has been made by the Plan Administrator or the Chapter 11 Estates to this or any other Court.

58

WHEREFORE the Plan Administrator respectfully requests entry of an order granting the

relief requested herein and such other and further relief as is just.

Dated:    May 8, 2014
          New York, New York

                                          /s/ Richard W. Slack
                                        Richard W. Slack
                                        Robert J. Lemons

                                        WEIL, GOTSHAL & MANGES LLP
                                        767 Fifth Avenue
                                        New York, New York 10153
                                        Telephone: (212) 310-8000
                                        Facsimile: (212) 310-8007

                                        Attorneys for Lehman Brothers Holdings Inc.
                                        and Certain of Its Affiliates