HEARING DATE AND TIME: May 14, 2014 at 10:00 a.m. (Eastern Time)

**CURTIS, MALLET-PREVOST,**
  **COLT & MOSLE LLP**
101 Park Avenue
New York, New York 10178-0061
Telephone: (212) 696-6000
Facsimile:  (212) 697-1559
L. P. Harrison 3rd
Turner P. Smith
Cindi Eilbott Giglio

*Counsel for Lehman Brothers Holdings Inc.*
 *and Certain of Its Affiliates*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------x

| | | |
|---|---|---|
| **In re** | : | **Chapter 11 Case No.** |
| | : | |
| **LEHMAN BROTHERS HOLDINGS INC.**, *et al.*, | : | **08-13555 (SCC)** |
| | : | |
| **Debtors.** | : | **(Jointly Administered)** |

-------------------------------------------------------------------x

**REPLY TO RESPONSE OF**
**NEWPORT GLOBAL ADVISORS LP TO THE FOUR**
**HUNDRED FIFTY-EIGHTH OMNIBUS OBJECTION TO CLAIMS**

Lehman Brothers Holdings Inc. ("LBHI" and the "Plan Administrator"), as Plan

Administrator under the Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers

Holdings Inc. and Its Affiliated Debtors (the "Plan") for the entities in the above-referenced

chapter 11 cases (collectively, the "Chapter 11 Estates"), files this reply (the "Reply") to the

Response (the "Response") of Newport Global Advisors LP ("NGA") [Docket No. 44071]

opposing the Four Hundred Fifty-Eighth Omnibus Objection to Claims (No Liability Claims)

[Docket No. 43532] (the "Four Hundred Fifty-Eighth Omnibus Objection to Claims"), and

respectfully represents as follows:

## PRELIMINARY STATEMENT

1.      As its name suggests, NGA[1] acted merely as an "advisor" to the two Newport Global funds that actually entered into contractual privity with Lehman Brothers Inc. ("LBI"). By its own description, NGA simply "managed" the investments the Funds made.  May Decl. ¶ 2.  NGA "administered the Funds' relationship with Lehman" (*id.* ¶ 3), but it was not itself a party to that relationship.  Indeed, NGA can point to no provision within the four corners of the Prime Brokerage or Margin Lending Agreements that gave NGA *any* express rights, benefits, or other protections to make it a true party in interest.  The *only* basis on which it pursues its two claims against the Chapter 11 Estates – one for lost management fees and one for the "lost opportunity" to complete an "acquisition transaction" (with an unidentified third party on undisclosed terms) – is as a third party beneficiary.

2.      But the law on third party beneficiary rights of action is stacked heavily against NGA.  There is no evidence on the face of the Prime Brokerage or Margin Lending Agreements that the parties intended to benefit NGA directly – let alone to ensure that NGA would receive an undiminished flow of management fees, or would reap the profits of some future transaction that was, on NGA's own evidence, unknown to LBI at the time of contracting.  To the contrary, the Prime Brokerage Agreement expressly assigned NGA a very specific and limited role.  NGA signed on to the Prime Brokerage Agreement "*solely* for the purposes of the representations in Sections 35" of the agreement (the provision that confirms that the Funds are not ERISA plans). With that, NGA eliminated any basis to claim any implied rights as a third party beneficiary.

3.      It is only logical that the Prime Brokerage and Margin Lending Agreements conferred no benefits on the Funds' outside advisor.  After all, LBI was simply agreeing to

---

[1] Capitalized terms used but not defined herein have the meanings ascribed to such terms in the Four Hundred Fifty-Eighth Omnibus Objection to Claims.

18406469

provide execution, custody and settlement services *to the Funds*.  In return, it charged the Funds

a standard set of brokerage fees and earned a market rate of interest on any margin loans it

extended.  LBI was certainly not taking on an unlimited obligation to compensate the Funds'

*advisor* for any manner of loss the advisor might suffer, directly or indirectly, by reason of the

Funds' investment activities.

4.      At bottom, NGA's entire case turns on a flawed syllogism.  NGA says throughout

its Response that "Lehman was well aware of NGA's relationship" to the Funds and knew that

NGA would be "benefitted" by activity in the Funds' accounts.  But knowing that another person

will benefit from performance of a contract does not mean that the contract party (here, LBI)

intended to make that person a third party beneficiary.  If that were the law, there would be no

end to the parade of possible claimants under a contract breach.  Not surprisingly, the Southern

District of New York recently rejected the exact argument NGA makes here, in a case brought

by an investment manager in a position similar to NGA's.  *See Aguinaga v. UBS AG*, No. 09 Civ.

03261 (RJH), 2010 WL 5093433, at *8 (S.D.N.Y. Dec. 14, 2010) (investment manager held not

to be a third party beneficiary to client's agreement with broker even though investment

manager's fee was based on value of client's assets under management), *infra* Part I.C.1.  The

case law is squarely against NGA on this score and no merits hearing will change that result.

5.      In short, NGA has not put before this Court sufficient grounds from which the

Court can conclude that NGA has a plausible basis to recover on its claims.  The relief requested

in the Plan Administrator's objection should be granted and NGA's claims should be expunged

in their entirety.

18406469

## BACKGROUND TO THE NGA CLAIMS

6.      NGA has asserted an escalating set of claims now totaling approximately $1.9 billion in aggregate,[2] against each of the Chapter 11 Estates.  The claims seek damages alleged to be the result of LBI's breach of the Prime Brokerage Agreement entered into between the Funds and LBI.

7.      On March 13, 2014, the Plan Administrator filed the Four Hundred Fifty-Eighth Omnibus Objection to Claims, arguing that this Court should disallow and expunge NGA's claims on the grounds that (1) NGA is not a party to the Prime Brokerage Agreement, and as such has no ability to assert a breach of contract claim thereunder, and (2) even if NGA could assert a claim for breach of the Prime Brokerage Agreement, NGA's recovery of damages is barred by the limitation of liability clause contained within the Prime Brokerage Agreement (the "Limitation of Liability Clause").

8.      On April 22, 2014, NGA filed its Response arguing that NGA is a third party beneficiary to the Prime Brokerage Agreement and that NGA seeks direct, rather than consequential, damages.

---

[2] The 19 claims originally filed by NGA sought damages in the approximate amount of $4 million each, totaling approximately $76 million against all 19 of the Chapter 11 Estates. In its Response, NGA inexplicably increases the damages it seeks in each claim category by approximately $96 million. *See* Response ¶¶ 27-28. Of this amount, $26 million is attributed to NGA's alleged continuing loss of management fees; the remaining $70 million comes from an entirely new theory of recovery – the lost opportunity to close a sale transaction. *See id.* NGA does not explain how these numbers were calculated, nor does NGA explain or justify why it is amending its claims so late in the proceedings. The Plan Administrator reserves all rights to challenge the value of NGA's claims at a later date. However, that contest is beyond the scope of the current proceedings because, as explained more fully below, NGA is not entitled to any recovery on its claims, regardless of their asserted amounts.

18406469

**<u>REPLY</u>**

I.    **NGA Is Not a Third Party**
      **<u>Beneficiary of the Prime Brokerage Agreement</u>**

9.       "The test for determining who is a third-party beneficiary in New York is whether the two principal parties entered into the contract with the intention, either express or implied, *of directly and primarily* benefitting a third party."[3]  *Hoy v. Inc. Vill. of Bayville*, 765 F. Supp. 2d 158, 172 (E.D.N.Y. 2011) (emphasis added).  This intention must be manifested within the four corners of the agreement at issue.  *Debary v. Harrah's Operating Co.*, 465 F. Supp. 2d 250, 263 (S.D.N.Y. 2006), *aff'd sub nom. Catskill Dev., L.L.C. v. Park Place Entm't Corp.*, 547 F.3d 115 (2d Cir. 2008).

10.      Importantly, the party claiming to be a third party beneficiary has the burden of demonstrating that the contract terms give it an enforceable right.  *Hoy*, 765 F. Supp. 2d at 173; *Alicea v. City of New York*, 145 A.D.2d 315, 317, 534 N.Y.S.2d 983, 985 (App. Div. 1988).

11.      NGA cannot meet this burden and a merits hearing will not make its claims any more plausible.  Even viewing the allegations in the light most favorable to NGA, NGA has failed to demonstrate that the parties intended the Prime Brokerage Agreement to be "directly," let alone "primarily," for NGA's benefit.  Thus, NGA has no legal basis to support the assertion of its claims, and it claims cannot survive the motion to dismiss standard applicable at this Sufficiency Hearing stage in the case.[4]

---

[3] Specifically, under New York law, a putative third party beneficiary must show the following three elements: (1) the existence of a valid and binding contract between other parties, (2) that the contract was intended for the third party's benefit, and (3) that the benefit to the third party is sufficiently immediate to indicate the assumption by the contracting parties of a duty to compensate the third party if the benefit is lost.  *See BDG Oceanside, LLC v. RAD Terminal Corp.*, 14 A.D.3d 472, 473, 787 N.Y.S.2d 388, 390 (App. Div. 2005).

[4] The Plan Administrator and NGA agree that the hearing to consider the Four Hundred Fifty-Eighth Omnibus Objection to Claims will be a Sufficiency Hearing governed by Federal Rule of Civil Procedure 12(b)(6), the motion to dismiss standard. *See* Response ¶¶ 32-34. Under this standard, NGA's legal conclusions—*e.g.*, that "Lehman and the Funds intended NGA to benefit under the [Prime Brokerage Agreement]" (Response ¶ 44)—are not entitled to the assumption of truth and therefore must be set aside. *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009). New York

18406469

A.     *The Terms of the Prime Brokerage*
       *Agreement Do Not Evidence an Intention to Benefit NGA*

12.     It is clear on the face of the Prime Brokerage Agreement that the parties did not

express any intent to benefit NGA as a third party beneficiary.  Under New York law, "it is well-

settled that the intent to benefit the third party must be shown *on the face of the agreement*."

*Olin Corp. v. E.I. DuPont de Nemours & Co.*, No. 05-CV-100S (SC), 2007 WL 610625, at *3

(W.D.N.Y. Feb. 23, 2007) (emphasis added); *see also A & E Television Networks, LLC v. Pivot

Point Entm't, LLC*, No. 10 Civ. 09422 (AJN), 2013 WL 1245453, at *22 (S.D.N.Y. Mar. 27,

2013).  As explained by the Court of Appeals for the Second Circuit:  "A non-party to a contract

governed by New York law lacks standing to enforce the agreement in the absence of terms that

'*clearly evidence*[] an intent to permit enforcement by the third party' in question."  *Premium

Mortg. Corp. v. Equifax, Inc.*, 583 F.3d 103, 108 (2d Cir. 2009) (emphasis added) (quoting

*Fourth Ocean Putnam Corp. v. Interstate Wrecking Co.*, 66 N.Y.2d 38, 45, 485 N.E.2d 208, 212

(N.Y. 1985)).

13.     Absent an indication of such an intention on the face of the agreement, the third

party is "merely an incidental beneficiary with *no right to enforce the contract*."  *Air Atlanta

Aero Eng'g Ltd. v. SP Aircraft Owner I, LLC*, 637 F. Supp. 2d 185, 194 (S.D.N.Y. 2009)

(emphasis added) (internal quotation marks omitted).

14.     The rationale for this rule is obvious.  "If a contract is silent with respect to [a]

potentially far-reaching obligation not implicit in the parties' arrangement, and there is no basis

---

courts regularly dismiss third party beneficiary claims when the terms of a contract do not demonstrate a clear intent
to confer third party beneficiary status. *See Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372, 458 (S.D.N.Y.
2010) ("[T]he text [of the contract] fails to show an intent to confer third-party beneficiary status on
Plaintiffs. . . . Accordingly, the Court grants the PwC Member Firms' motion to dismiss the third-party-beneficiary
breach of contract claim."); *see also Debary v. Harrah's Operating Co.*, 465 F. Supp. 2d 250, 261 (S.D.N.Y. 2006)
("[Although] third party beneficiary status is a question of fact, . . . [t]he parties' intent can and should be gleaned
from the four corners of the resulting contract."), *aff'd sub nom. Catskill Dev., L.L.C. v. Park Place Entm't Corp.*,
547 F.3d 115 (2d Cir. 2008).

18406469

for inferring a duty, the duty may properly be held to be absent based on the language of the contract." *Fontaine v. Ryan*, 849 F. Supp. 190, 194 (S.D.N.Y. 1993). "Otherwise[,] the result would be one of trapping parties in surprise contractual obligations that they never intended." *Id.* (internal quotation marks omitted).

15.    The claims asserted by NGA attempt to do just that – trap the parties in surprise contractual obligations that they never intended. There is no basis in law or fact to extend third party rights to NGA in these circumstances. Allowing NGA to assert third party beneficiary rights would effectively make all prime brokers the guarantors of their clients' investment manager's fees. This would create liability where none has ever stood before, opening the floodgates to all categories of remote and unanticipated claimants.

16.    Not a single provision of the Prime Brokerage Agreement indicates *any* intent to confer a benefit on NGA and NGA, in its Response, points to none. To the contrary, the Prime Brokerage Agreement contains only a "deafening silence" as to whether NGA receives a derivative benefit. *See Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372, 457-58 (S.D.N.Y. 2010) (holding that contract's "deafening silence" on third party beneficiary rights indicated lack of parties' intent to confer benefit on third party).

17.    It is not just that the Prime Brokerage Agreement is silent as to any rights NGA could claim or enforce. The agreement actually expresses the *opposite* intent. Its provisions specifically *limit* liability under the Prime Brokerage Agreement. For example, the Prime Brokerage Agreement has an integration clause: "Except as set forth above, this Agreement represents the entire agreement and understanding between [the Funds] and Lehman Brothers concerning the subject matter hereof." Prime Brokerage Agreement ¶ 33. This demonstrates the parties' intent to limit the agreement to the stated terms and rule out enforceability by non-

signatories.  *See Debary v. Harrah's Operating Co.*, 465 F. Supp. 2d 250, 267-68 (S.D.N.Y.

2006) (holding that a contract's silence regarding third party beneficiary rights, in addition to its

integration clause, foreclosed entity's argument that it was a third party beneficiary to that

contract), *aff'd sub nom. Catskill Dev., L.L.C. v. Park Place Entm't Corp.*, 547 F.3d 115 (2d Cir.

2008).

18.    The Prime Brokerage Agreement contains other provisions which also show that

the parties intended to limit, rather than expand, liability.  For example, the Prime Brokerage

Agreement has a limitation of liability clause that provides, in relevant part,

> Lehman Brothers shall not be liable in connection with the execution, clearing,
> handling, purchasing or selling of securities, commodities or other property, or
> other action, except for gross negligence or willful misconduct on Lehman
> Brothers' part. . . . *Lehman Brothers will not be liable to you for any loss,
> liability or expense incurred by you in connection with these arrangements except
> to the extent that any such loss, liability or expenses results from Lehman
> Brothers' gross negligence or willful misconduct.  In no event will Lehman
> Brothers be liable for any special, indirect, incidental or consequential damages
> arising out of this Agreement.*

Prime Brokerage Agreement ¶ 30 (emphasis added).  The clear implication of this clause is to

curtail the liability that could arise out of the Prime Brokerage Agreement, not expand it by

providing additional, unspecified parties with additional, unspecified rights.

19.    Another example is the Prime Brokerage Agreement's indemnity clause, which

provides,

> [The Funds] agree to indemnify and hold Lehman Brothers harmless from any
> loss, claim or expense, including attorneys' fees, incurred by Lehman Brothers in
> connection with Lehman Brothers acting or declining to act as prime broker for
> [the Funds] and to fully reimburse Lehman Brothers for any legal or other
> expenses (including the cost of any investigation and preparation) which Lehman
> Brothers may incur in connection with any claim, action, proceeding or
> investigation arising out of or in connection with this Agreement or any
> transactions hereunder.

18406469

Prime Brokerage Agreement ¶ 21(j).  NGA's claims against the Chapter 11 Estates plainly fit within this indemnity provision and the Funds will, in due course, have to answer for the expense the Plan Administrator has incurred in defending against them.  But again, the clear intent of this provision is to *limit* liability under the Prime Brokerage Agreement, not expand it.

20.     Even more telling is that NGA affirmatively signed on to the Prime Brokerage Agreement.  But it did so "*solely* for the purposes of the [ERISA] representation in Section 35." *Id.* at 11 (emphasis added).  In other words, given the opportunity to write itself directly into the agreement, NGA did so, but not to procure a benefit from the contract parties.  It chose instead to limit its role – to make clear that it was participating *solely* to confirm its customers' (the Funds') representation that they are not investing as ERISA or defined benefit plans.  By that step, NGA forfeited any right to claim the status of an implied (let alone express) third party beneficiary.

B.     *The Court Should Not Consider the Extra-Contractual*
       *Circumstances Surrounding the Prime Brokerage Agreement*

21.     Because the Prime Brokerage Agreement is not ambiguous, the Court should not consider extra-contractual circumstances to change the meaning or to bring non-parties within the contract's ambit.  *Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372, 457-58 (S.D.N.Y. 2010) (if contract is unambiguous, courts "cannot look to establish third-party beneficiary status through surrounding circumstances" because "surrounding circumstances cannot give rise to third-party beneficiary status absent some indication in the actual agreement of the parties' intent") (internal quotation marks omitted); *Debary v. Harrah's Operating Co.*, 465 F. Supp. 2d 250, 267 (S.D.N.Y. 2006) ("The parties' intention to benefit the third party must appear from the four corners of the instrument. . . .  This court will not consider surrounding circumstances when—as here—the intent of the parties is clear on the face of the contract." (internal quotation marks omitted)), *aff'd sub nom. Catskill Dev., L.L.C. v. Park Place Entm't Corp.*, 547 F.3d 115

-9-

(2d Cir. 2008); *see also Consol. Edison, Inc. v. Ne. Utils.*, 426 F.3d 524, 528 (2d Cir. 2005) ("To create a third party right to enforce a contract, *the language of the contract* must *clearly evidence*[] an intent to permit enforcement by the third party." (emphasis added) (internal quotation marks omitted)).

22.     Nevertheless, even if this Court does consider the surrounding circumstances— which it should not—they all point to the conclusion that NGA is not an intended third party beneficiary under the Prime Brokerage or Margin Lending Agreements.

C.     *The Circumstances Surrounding the Agreements Do Not Indicate that the Parties Intended to Make NGA a Direct, Primary Beneficiary*

23.     NGA concedes, as it must, that no provision in the Prime Brokerage Agreement indicates an intent of the parties to provide a direct benefit to NGA.  As a result, NGA's entire argument turns on how NGA characterizes the circumstances surrounding the execution of the Prime Brokerage Agreement.  *See* Response ¶¶ 41-48.

24.     In making its claims, NGA relies on the barest allegations of fact.  NGA asserts only that:  (1) NGA earned a management fee, based on the Funds' assets under management, (2) the Funds entered into the Prime Brokerage Agreement and Margin Lending Agreement, (3) the Prime Brokerage Agreement was allegedly breached when certain securities were not transferred when the Funds requested, and (4) as a result of this breach, the Funds' net asset value declined, which in turn caused a reduction in NGA's management fee.  *See* Addendum to Proof of Claim of Newport Global Advisors, at 1-5, annexed as Exhibit A to Proof of Claim No. 26353.[5]  These assertions of fact, even if taken as true, do not establish any intent to provide NGA with a benefit under the Prime Brokerage Agreement.

---

[5] This Addendum is generally representative of the addenda attached to all of NGA's claims.

18406469

25.     First, in order for NGA to be an intended third party beneficiary, the parties must have intended the Prime Brokerage Agreement to provide NGA with a direct and *primary* benefit.  *Hoy v. Inc. Vill. of Bayville*, 765 F. Supp. 2d 158, 172 (E.D.N.Y. 2011).  That is plainly not the case.

26.     The primary function of a brokerage agreement is to aggregate securities under the charge of a sophisticated securities broker so that the broker can execute securities trades as directed by the owner.  In the context of this case, the Prime Brokerage Agreement directly benefitted the Funds.  If there was a derivative benefit, it accrued to the Funds' investors.  If NGA is truly arguing that the *primary* purpose of a brokerage agreement is to provide an investment advisor with its management fee, NGA is plainly wrong.  If that were so, the entire brokerage industry would be turned on its head.

27.     NGA nevertheless argues that four circumstances show the parties' intent to benefit NGA under the Prime Brokerage Agreement:  (1) NGA receives a management fee calculated as a percentage of the Funds' net assets, which may be affected by performance of the Prime Brokerage Agreement, (2) "Lehman was well aware that the [Prime Brokerage Agreement] benefitted NGA" and therefore must have shared in the Funds' supposed intent to benefit NGA in connection with the management agreement, (3) "Lehman . . . participated in investor meetings where Lehman and NGA co-marketed potential investors and NGA's management agreement with the Funds was repeatedly disclosed," and (4) "LBHI . . . funded a loan to Newport after the [Prime Brokerage Agreement] to allow Newport to trade securities." Response ¶¶ 19, 42-43.  NGA goes on to argue that the benefit to NGA is direct, and not incidental, because NGA receives "the ultimate benefit of the contract."  *Id.* ¶ 45.  NGA is wrong.

18406469

28.     None of those four propositions, even if accepted as true for these purposes,

establishes that the parties intended the Prime Brokerage Agreement to be for NGA's benefit.

And even if the parties *did* somehow intend for NGA to receive a benefit, it could have only

been incidental to the main and intended purpose of the brokerage agreement.  It is certainly not

sufficiently direct to indicate that the parties assumed a duty to compensate NGA if its incidental

benefits were diminished or lost.

> (1)     NGA's Derivative Management Fee Does Not
> Create an Intended Third Party Beneficiary Relationship

29.     NGA argues that its management agreement with the Funds, under which it

receives a management fee calculated as a percentage of the Funds' net assets, demonstrates the

Funds' intent to confer a benefit on NGA under the Prime Brokerage Agreement and establishes

NGA as a third party beneficiary.[6]  Response ¶¶ 41-44.  That very argument was recently

rejected in *Aguinaga v. UBS AG*, by the District Court for the Southern District of New York.

No. 09 Civ. 03261 (RJH), 2010 WL 5093433 (S.D.N.Y. Dec. 14, 2010).  In that case, the court

held that, notwithstanding the fact that an investment manager received a one percent

---

[6] Importantly, NGA's Response fails to cite a single factually analogous case to support its argument, but rather relies on general propositions of law stated in factually dissimilar cases. For example, NGA analogizes the facts of the case at bar to *Johnson City Central School District v. Fidelity and Deposit Company of Maryland*, 263 A.D.2d 580, 581-82, 693 N.Y.S.2d 669, 670-71 (App. Div. 1999), where a key fact underlying the existence of the third party beneficiary relationship was that the contract *identified* the third party as the ultimate recipient of a supplier's product. However, *Johnson City* is distinguishable from the case at bar because the Prime Brokerage Agreement does not contain any indication that a third party—let alone NGA—should receive a benefit from its terms. Additionally, NGA analogizes the facts of the case at bar to *Key International Manufacturing, Inc. v. Morse/Diesel, Inc.*, 142 A.D.2d 448, 453-55 (App. Div. 1988), in which the court held that a landowner was a third party beneficiary to a construction contract between its subsidiary and an architect because (1) an officer of the subsidiary "unequivocally stated" its intent to benefit the landowner, and (2) the architect's performance would directly benefit the landowner. Again, this case is distinguishable because (1) the Funds never "unequivocally stated" their intent to provide NGA with a benefit, and (2) the parties' performance did not confer a direct benefit on NGA. Rather, NGA's claims are hornbook examples of *indirect* claims, in that they logically require a two-step analysis: (1) the alleged breach of the Prime Brokerage Agreement caused a loss to the Funds' net asset value, (2) the loss to the Funds' net asset value caused a reduction in NGA's management fee and apparently "scuttled" an acquisition opportunity for NGA. These cases are factually inapposite to the case at bar and should not be accorded any weight in analyzing the present factual circumstances. In fact, NGA's argument is directly undercut by case law from this District. *See, e.g., Mademoiselle Knitwear, Inc. v. Liz Claiborne, Inc.* No. 98 Civ. 3252 (HB), 1999 WL 377853, at *10 (S.D.N.Y. June 9, 1999) (holding that entity does *not* become a third party beneficiary to an agreement merely because that agreement may guarantee profits to that entity).

management fee based on the value of the assets in a client's investment account, the investment manager was not an intended third party beneficiary of the client's brokerage agreements with the client's broker. *Id.* at *8.

30.    The facts in *Aguinaga* are similar to the facts presented here.  In *Aguinaga,* an investment management company entered into a management agreement with a client, under which the manager would receive a management fee of one percent of the client's assets under management. *Id.* at *2.  Thereafter, the client opened a securities account with a UBS entity and executed several account agreements with UBS. *Id.* at *2-3.  The investment manager was not a party to any of the UBS account agreements. *Id.* at *6.  But it did execute a separate power of attorney agreement with the client. *Id.* at *3.  The power of attorney gave the manager the authority to manage all of the assets in the UBS account. *Id.*

31.    The investment manager later sued UBS for breach of the account agreements.  UBS moved to dismiss, arguing that the manager was not the "real party in interest." *Id.* at *1, *4-5.  In opposition, the manager argued that it was the "real party in interest" because it was a third party beneficiary of the account agreements and therefore had standing to sue. *Id.* at *8.  It premised this argument on the ground that it "was compensated on the basis of the value of the assets it managed for [the client]." *Id.*

32.    The court rejected this argument, holding that the fact that an investment manager is compensated based on the value of its client's account does not, by itself, make that manager a third party beneficiary to the agreements that control the account. *Id.*  First, the account agreements did not refer to the manager in any way. *Id.*  In contrast, the only reference to the manager was in the power of attorney, which simply gave the manager the power to manage the assets in the account. *Id.*  "In other words, nothing in the [account agreements] evidence[d] any

intent that [the manager] should benefit from [the client's] opening an account with [UBS]." *Id.*
Second, "any benefit to [the manager], namely one percent of any gain in the value of the
account, was incidental, and [the manager points] to no evidence demonstrating that [UBS]
intended to compensate [the manager] or any other party by one percent of the amount of any
losses in the account." *Id.* In fact, "it defies belief that [UBS] would have ever agreed to such an
arrangement." *Id.* Therefore, the *Aguinaga* court concluded, the manager "cannot assert claims
pursuant to [the client's] account agreements with [UBS] as [a] third-party beneficiar[y], and [is
not a real party] in interest under such a theory." *Id.*

33.    The *Aguinaga* court rejected the exact argument that NGA raises here in its
Response. The notion that "[t]he fee calculation under the management agreement between the
Funds and NGA" establishes a third party beneficiary relationship is patently insufficient. In the
words of the *Aguinaga* court, the mere fact that NGA is "compensated on the basis of the value
of the assets it manage[s] for [the Funds]" does not create a third party beneficiary relationship.
*Id.*

34.    For this Court to reach a different result, the Court would need to find that the
parties intentionally undertook the responsibility to compensate NGA if NGA were to lose its
management fee. *Id.* ("Under New York law, [a non-party] may claim [third party beneficiary
rights] when, [*inter alia*], the benefit to the non-party is immediate, and not incidental, so that the
contracting parties *had assumed a duty to compensate him if the benefit is lost*." (emphasis
added)). Again, in the words of *Aguinaga*: "[I]t defies belief that [the parties] would have ever
agreed to such an arrangement." *Id.*; *see also Fontaine v. Ryan*, 849 F. Supp. 190, 194 (S.D.N.Y.
1993) ("If a contract is silent with respect to [a] potentially far-reaching obligation not implicit in
the parties' arrangement, and there is no basis for inferring a duty, the duty may properly be held

18406469

to be absent based on the language of the contract. . . .  Otherwise[,] the result would be one of

trapping parties in surprise contractual obligations that they never intended." (internal quotation

marks omitted)).

> (2)     Having Knowledge of NGA's Right to
>          Charge a Management Fee Does Not Create
>          <u>an Intended Third Party Beneficiary Relationship</u>

35.     NGA argues that LBI knew NGA would earn a management fee, which

demonstrates that NGA was an intended third party beneficiary of the Prime Brokerage

Agreement – "Lehman[] knew and therefore was on notice that NGA's management fee was

directly linked to the Funds' net asset value."  Response ¶ 43.  However, even assuming that fact

to be true, merely being aware that NGA could derive a benefit from the Prime Brokerage

Agreement under an entirely separate contractual arrangement does not create an intended third

party beneficiary relationship.  That very argument was rejected by the District Court for the

Southern District of New York in *Foundation Ventures, LLC v. F2G, Ltd.*, No. 08 Civ. 10066

(PKL), 2010 WL 3187294 (S.D.N.Y. Aug. 11, 2010).

36.     In *Foundation Ventures*, the court held that a broker-dealer was not a third party

beneficiary to a fundraising contract between a marketing firm and the firm's client even though

the client was "well aware" that the broker-dealer could potentially derive a benefit from that

contract.  *Id.* at *9-10.  The marketing firm had entered into an agreement with a client under

which the marketing firm obtained the exclusive right to raise capital for the client.  *Id.* at *1-2.

The agreement stated that "all transactions in [the client's] securities contemplated by this

agreement will be effected through a [registered] broker-dealer" and the firm's website disclosed

that "[s]ecurities [are] offered through G. T. Jeffers and Company" (a specific broker-dealer).  *Id.*

at *2.

37.     When the client later refused to make certain payments to the marketing firm, the

firm and the broker-dealer brought breach of contract claims against the client. *Id.* at *2-3.  The

client moved to dismiss the broker-dealer's claims, arguing that the broker-dealer could not

enforce the fundraising agreement because it was not a party to the agreement. *Id.* at *3.  In

response, the broker-dealer argued that it was an intended third party beneficiary because (1) the

client was "well aware that [the firm] would, if necessary, use . . . the [broker-dealer] to carry out

its obligations under the [agreement]," and (2) the firm had sent an invoice to the client that was

"payable to [the broker-dealer]." *Id.*  The court rejected both arguments and held that these facts

did not create a third party beneficiary relationship. *Id.*

38.     The *Foundation Ventures* court explained that the broker-dealer did "not plead

enough facts [to support a conclusion that] that the [agreement] was intended to benefit [the

broker-dealer] and that this benefit was immediate, rather than incidental, such that [the firm and

the client] assumed a duty to compensate [the broker-dealer] if the benefit was lost." *Id.* at *10.

Importantly, no facts were pled "to show that [the client] intended the [agreement] to benefit [the

broker-dealer] specifically." *Id.*  Indeed, "[w]ithout pleading facts to show [the client's and the

firm's] intention to benefit it, [the broker-dealer could not] claim that the intended benefit was

'sufficiently immediate' to merit relief." *Id.*  As explained by the court, the circumstances

described by the broker-dealer "at most [showed] that *some benefit incidental to the performance*

*of the contract* may accrue to [the broker-dealer], which is not enough for [the broker-dealer] to

enforce the underlying contract." *Id.* (emphasis added) (internal quotation marks omitted).

39.     The reasoning of *Foundation Ventures* directly forecloses NGA's argument that

LBI's alleged knowledge of NGA's management fee creates an intended third party beneficiary

relationship.  Even assuming that "Lehman was well aware" that NGA's management fee was

18406469

based on the Funds' account value (Response ¶ 43), it does not demonstrate any *intent* for NGA

to receive this benefit.  *Found. Ventures*, 2010 WL 3187294, at *9-10.  Rather, the existence of

the management fee, and the fact that it might have been known to the contract parties,

demonstrates at most that some benefit incidental to the performance of the Prime Brokerage

Agreement may accrue to NGA.  This is simply not enough for NGA to enforce the Prime

Brokerage Agreement.[7]

## II.    Assuming NGA Is a Third Party Beneficiary to the Prime Brokerage Agreement, NGA Cannot Recover on Its Claims Because They Are Barred by the Limitation of Liability Clause and Are Speculative

40.    For NGA to claim the benefits of the contract between the Funds and LBI, it must

also bear the contract's burdens and limitations.[8]  NGA's claims seek damages that are barred by

the Limitation of Liability Clause.  The Prime Brokerage Agreement states that "Lehman

Brothers shall not be liable in connection with the execution, clearing, handling, purchasing or

selling of securities, commodities or other property, or other action, except for gross negligence

or willful misconduct on Lehman Brothers' part."  Prime Brokerage Agreement ¶ 30.  This

---

[7] Similarly, NGA's additional allegations do not support a finding that NGA is a third party beneficiary to the Prime Brokerage Agreement. NGA argues that "Lehman acknowledged and shared" the Funds' alleged intent to benefit NGA because (1) "Lehman . . . participated in investor meetings where Lehman and NGA co-marketed potential investors and NGA's management agreement with the Funds was repeatedly disclosed," and (2) "LBHI . . . funded a loan to Newport after the [Prime Brokerage] Agreement[] [was executed] to allow Newport to trade securities." Response ¶¶ 19, 42-43. However, even assuming these allegations are true, they are insufficient to establish a third party beneficiary relationship. Rather, NGA uses these irrelevant facts in an attempt to bolster its thin arguments. First, the joint marketing efforts, *at most*, indicate potential *knowledge* that NGA could receive a benefit under the Prime Brokerage Agreement and thus this fact is insufficient to establish an intended third party beneficiary relationship. *See Found. Ventures*, 2010 WL 3187294, at *9-10. Second, the alleged loan to "Newport," *at most*, demonstrates an intent to provide the Funds with the ability to buy and sell securities on margin, as contemplated in the Margin Lending Agreement. The loan simply cannot be reasonably interpreted to indicate anything else. As a result, neither fact helps to establish the existence of an intended third party beneficiary relationship.

[8] "[A] third-party beneficiary, whose rights are derivative, is subject to the same defenses as are available to the contracting party." *Artwear, Inc. v. Hughes*, 202 A.D.2d 76, 82, 615 N.Y.S.2d 689, 693 (App. Div. 1994); *see also Publrs. Consortium, Inc. v. Arsenal Pulp Press, Black Books, Comics One Corp. (In re Publishers Consortium, Inc.)*, 345 F. App'x 710, 712 (2d Cir. 2009) ("[T]hird-party beneficiaries generally have no greater rights in a contract than does the promisee." (internal quotation marks omitted)).

18406469

clause goes on to state that "[i]n no event will Lehman Brothers be liable for any special, indirect, incidental or consequential damages arising out of this Agreement." *Id.*

41.     NGA has alleged no facts to support an argument that the purported breach of the Prime Brokerage Agreement flowed from gross negligence or willful misconduct.  However, even assuming such facts could be alleged, the Prime Brokerage Agreement is explicit that consequential damages may never be recovered.  And that is exactly the form of damages that NGA seeks – (i) damages arising from the lost opportunity to earn management fees, and (ii) damages arising from NGA's lost opportunity to "complete a pending acquisition transaction with another investment fund" (apparently the chance to be acquired by another firm).  Response ¶¶ 28, 46.

42.     NGA tries to get around this limitation on damages by arguing that claims based on the lost opportunity to earn management fees or to sell itself in an unrelated transaction are really claims to recover *direct* damages.  Response ¶¶ 52-55.  As a back-up, NGA also argues that, in any event, the Limitation of Liability Clause is inapplicable because the manner in which the Prime Brokerage Agreement was breached demonstrates a reckless indifference to NGA's and the Funds' rights.  *Id.* ¶¶ 56-59.  Even construing NGA's allegations in the light most favorable to NGA, NGA fails to establish that its claims seek direct damages or that the Limitation of Liability Clause is inapplicable.[9]

---

[9] NGA overstates the law concerning this Court's inability to determine whether damages are consequential or direct under a motion to dismiss standard. In fact, on February 6, 2014, Judge Martin Glenn issued a decision dismissing a party's claim under Federal Rule 12(b)(6) after finding that the claim was barred by a consequential damages clause. *Vivaro Corp. v. Raza Commc'n, Inc. (In re Vivaro Corp.)*, No. 12-13810 (MG), 2014 WL 486288, at *3-5 (Bankr. S.D.N.Y. Feb. 6, 2014) (Glenn, J.). Accordingly, it is more than appropriate for this Court to dismiss NGA's claims at this juncture because, even viewing the allegations in the light most favorable to NGA, NGA's claims are barred by the Limitation of Liability Clause.

18406469

A.    *NGA's Claim for Lost Management Fees*
      *Is Barred by the Limitation of Liability Clause*
      *Because It Seeks to Recover Consequential Damages*

43.    NGA's claim for lost management fees seeks to recover damages for the potential

management fees it could have earned but for the alleged breach of the Prime Brokerage

Agreement.  Response ¶¶ 52-53, 55.

44.    In an action for breach of contract, a plaintiff may seek: (1) "direct" or "general"

damages, or (2) "consequential" or "special" damages.  *Schonfeld v. Hilliard*, 218 F.3d 164, 175

(2d Cir. 2000).  Direct damages "are the natural and probable consequence of the breach of a

contract."  *Biotronik A.G. v. Conor Medsystems Ireland, Ltd.*, 2014 N.Y. LEXIS 575, at *8 (N.Y.

Mar. 27, 2014).  "By contrast, consequential, or special, damages do not directly flow from the

breach."  *Id.* at *8-9 (internal quotation marks omitted).

45.    The New York Court of Appeals has explained that these general rules apply to

lost profits.  *Id.* at *9.  Lost profits may be either general or consequential damages, depending

on whether the non-breaching party "*bargained for such profits* and they are the *direct and*

*immediate fruits of the contract*."  *Id.* (emphasis added).  Moreover, the important distinction

with respect to lost profits is whether such profits flowed directly from the breached contract or

were, instead, the result of a separate agreement with a nonparty.  *Id.* at *13-14.  As explained by

the Court of Appeals for the Second Circuit:  "Lost profits are consequential damages when, as a

result of the breach, the non-breaching party suffers loss of profits on collateral business

arrangements."  *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 109 (2d

Cir. 2007); *see also Vivaro Corp. v. Raza Commc'n, Inc. (In re Vivaro Corp.)*, No. 12-13810

(MG), 2014 WL 486288, at *3 (Bankr. S.D.N.Y. Feb. 6, 2014) (Glenn, J.) (holding that damages

were consequential when they were based on "unmade sales to third-parties in collateral transactions [which were not] governed by the [underlying] contract").

46.     NGA's claim for lost management fees seeks precisely that – profits it lost in a collateral business arrangement (*i.e.*, NGA's management agreement with the Funds).  As such, this claim for lost profits falls squarely within the bar on consequential damages set forth in the Limitation of Liability Clause.

47.     Moreover, the *indirectness* of NGA's lost management fee claim is demonstrated by the fact that, in order to measure it, one must perform two steps: (1) determine whether the alleged breach of the Prime Brokerage Agreement caused a loss to the Funds' net asset value, then (2) determine whether the loss to the Funds' net asset value caused a reduction in NGA's management fees.  NGA's own explanation of it lost management fee income belies any argument that it could be considered "direct."  *See* Response ¶ 27 ("The NGA Claims seek to recover for Lehman's pre-petition failure to comply with the Funds' instruction to transfer the Funds' securities . . . after which [1] the Funds' net asset value decreased and, [2] as a direct result, NGA's management fees correspondingly decreased.").

48.     Under well-settled case law, NGA's lost management fee claim can only be characterized as a claim to recover consequential damages.  It is therefore barred by the Limitation of Liability Clause and should be expunged.

B.      *NGA's Lost Business Opportunity Claim*
        *Is Similarly Barred by the Limitation of Liability*
        <u>*Clause Because It Seeks to Recover Consequential Damages*</u>

49.     As a simple matter of logic, a claim based on a lost opportunity "to close an acquisition deal" (May Decl. ¶ 17) cannot be "the natural and probable consequence of the breach" of the Prime Brokerage Agreement.  *See Biotronik A.G. v. Conor Medsystems Ireland,*

18406469

*Ltd.*, 2014 N.Y. LEXIS 575, at *8 (N.Y. Mar. 27, 2014).  As such, this claim is also barred by

the Limitation of Liability Clause.  LBI's alleged failure to transfer the Funds' securities to

Credit Suisse did not *naturally* give rise to NGA's lost opportunity to close a transaction with a

separate entity.  That lost opportunity was therefore not the *probable consequence* of the alleged

LBI breach.

50.    To arrive at a different conclusion, this Court would need to find that a primary,

direct benefit of the Prime Brokerage Agreement was to provide NGA with the opportunity to

"close an acquisition" at a later date, with some unknown (and still undisclosed) entity.  No facts

are pleaded to support that illogical result.  Moreover, this is a claim that depends entirely on

what is contained in an agreement wholly distinct from the Prime Brokerage Agreement: the

supposedly aborted acquisition agreement between NGA and "another investment fund."  It

certainly does NGA no service to its cause that NGA chooses to disclose no facts about the

proposed acquisition, only its enormous price tag – a "lost opportunity" claim of $70 million.

Indeed, NGA appears to deliberately obscure exactly what the lost acquisition transaction

actually involved.  In its Response, NGA describes the contract as one "to acquire NGA *and the

Funds*."  Response ¶ 46 (emphasis added).  But in the supporting declaration of Roger May, the

same transaction is described only as a transaction to acquire "Newport," whatever that means.

May Decl. ¶ 17.  In all events, NGA's lost business opportunity claim seeks consequential, not

direct, damages, and is properly barred by the Limitation of Liability Clause as a result.[10]

---

[10] NGA's attempt to analogize its lost business opportunity claim to a claim for diminution in value is equally
unpersuasive. Even assuming that claims for the diminution in value of securities constitute direct damages, it is
obvious that these rules should not apply to the lost business opportunity claim because that claim clearly does not
seek recovery for the diminution in the value of the account securities. NGA describes the lost business opportunity
claim as follows:  "NGA also seeks to recover direct damages for the *lost opportunity to close an acquisition* with
another investment fund *caused*, in part, *by the diminution of the Funds' securities*." Response ¶ 54 (emphasis
added). The very fact that the securities' diminution in value "*caused*" NGA's lost opportunity demonstrates that
this is not a claim for diminution in value at all.

18406469

C.      *The Limitation of Liability Clause Applies to NGA's Claims*

51.      As its final argument, NGA contends that the Limitation of Liability Clause does not apply to its claims because:  (1) "Lehman intentionally breached the [Prime Brokerage Agreement]," (2) "[t]his intentional breach has continued for over half a decade," and (3) these "actions demonstrate a reckless indifference to the Funds' and NGA's rights."  Response ¶¶ 57-58.

52.      "New York law recognizes limitation of liability provisions as an allocation of risk of economic loss in the event that the contemplated transaction is not fully executed, *which the courts should honor*."  *Vivaro Corp. v. Raza Commc'n, Inc. (In re Vivaro Corp.)*, No. 12-13810 (MG), 2014 WL 486288, at *4 (Bankr. S.D.N.Y. Feb. 6, 2014) (Glenn, J.) (emphasis added) (internal quotation marks omitted).  In order to avoid a limitation of liability clause, a party must make "'nothing short of . . . a compelling demonstration of egregious intentional misbehavior evincing extreme culpability; malice, recklessness, deliberate or callous indifference to the rights of others, or an extensive pattern of wanton acts.'"  *Id.* at *5 (quoting *Deutsche Lufthansa AG v. Boeing Co.*, No. 06 CV 7667 (LBS), 2007 WL 403301, at *3 (S.D.N.Y. Feb. 2, 2007)); *see also Metro. Life Ins. Co. v. Noble Lowndes Int'l, Inc.*, 84 N.Y.2d 430, 438-39, 643 N.E.2d 504, 509 (N.Y. 1994) ("[T]he conduct necessary to pierce an agreed-upon limitation of liability in a commercial contract[] must smack of intentional *wrongdoing*." (emphasis in original) (internal quotation marks omitted)).

53.      NGA has not pleaded any facts that would establish a plausible claim that the Limitation of Liability Clause is inapplicable.  Even considering the allegations in the light most favorable to NGA, NGA has, *at most*, alleged facts sufficient to support the conclusion that Lehman entities throughout the world entered into various insolvency proceedings and, as a

result, lost access to certain assets and the ability to perform under agreements in the ordinary

course.  That does not show malice or wrongdoing of any kind and NGA therefore fails to make

a "compelling demonstration of egregious intentional misbehavior evincing extreme culpability."

*See In re Vivaro Corp.*, 2014 WL 486288, at *5.  As a result, this Court must find that the

Limitation of Liability Clause can be enforced against NGA so that its claims should be

expunged.

> D.    *Even If the Limitation of Liability Clause Does*
>       *Not Apply to NGA's Claims, NGA Cannot Recover on Its*
>       *Claims Because They Were Unforeseeable and Are Speculative*

54.    Even if this Court finds that the Limitation of Liability Clause is inapplicable—

which it should not—NGA's claims should be dismissed because (1) at the time of contracting,

the parties did not reasonably foresee that a failed acquisition transaction between two strangers

to the contract was a likely consequence of the contract's breach, and (2) the damages sought in

all of NGA's claims are purely speculative and not calculable to a reasonable degree of certainty.

55.    Under New York law, in order for a party to recover lost profits or consequential

damages: (1) at the time of contracting, the parties must have contemplated the damages as the

probable result of a breach of the contract, and (2) the damages must be capable of proof to a

reasonable degree of certainty.  *See Kenford Co. v. Cnty. of Erie*, 67 N.Y.2d 257, 261, 493

N.E.2d 234, 235 (N.Y. 1986); *see also Nat'l Investor Servs. Corp. v. Integrated Fund Servs.,*

*Inc.*, 85 F. App'x 779, 781 (2d Cir. 2004).

56.    NGA's lost management fee claim cannot be calculated to a reasonable degree of

certainty.  This lost management fee claim is based on the value of the Funds' assets.  Therefore,

in order to calculate the amount of its lost management fees, NGA must first establish what the

Funds' asset value *would have been* if not for the breach.  Stated another way, to recover its

18406469

allegedly lost fees, NGA must make this Court reasonably certain that, if the agreement had not

been breached, the Funds' assets would have had a specific value.  This is an impossible showing

to make, as any number of events could have altered the value of the Funds' assets (and, in turn,

the management fee to which NGA would be entitled).

57.    Indeed, NGA's calculation of its management fee claim must take into account

innumerable variables, such as general trends in securities markets and NGA's own ability to

pick successful investments.  Because calculations such as this are riddled with speculation and

assumption, New York courts do not allow parties to recover damages of this kind.  *See Kenford*,

67 N.Y.2d at 261-63, 493 N.E.2d at 235-36 (entity could not recover lost profit damages

because, even though damages were calculated using "contemporary economic theory,"

calculation was based on "speculation and conjecture").

58.    NGA's lost business opportunity claim also fails for this reason.  First, NGA

nowhere asserts that LBI knew of any prospective sale of NGA—or the Funds—to another fund,

or even that such a transaction was on the horizon at the time the Funds opened their brokerage

accounts with LBI in 2006.  As such, it cannot be said that the parties contemplated that NGA

might lose an opportunity to be acquired in the event that the Prime Brokerage Agreement was

breached two years into the future.  Put another way, NGA has put forward no allegation of fact

from which this Court could plausibly conclude that the parties, at the time of contracting in

2006, contemplated that they would be liable to NGA for NGA's lost opportunity sell itself to

some unknown investment fund in 2008.  *See Kenford Co. v. Cnty. of Erie*, 73 N.Y.2d 312, 319-

20, 537 N.E.2d 176, 179 (N.Y. 1989) (entity's damages for lost appreciation in value of land

were not recoverable because, even though entity had hope that land would appreciate in value,

counterparty had not assumed obligation to compensate entity if land's value did not appreciate).

59.     <u>Second</u>, the lost business opportunity claim is not capable of proof to a reasonable

degree of certainty.  To arrive at any measurement of what the lost business opportunity meant in

dollar terms to *NGA* (as opposed to the Funds who apparently were also being acquired), NGA

would have to show that (1) there was a buyer ready, willing and able to close on an acquisition,

(2) the putative buyer failed to close the transaction solely because an NGA client lost securities

it had left in the custody of LBI, (3) the acquisition was priced, as NGA alleges, at a "premium"

and no similar transaction was available to NGA as an alternative, and (4) the full amount of the

claimed loss was borne directly and solely by NGA, not by the Funds it was advising (even

though, as described in the pleadings, the acquisition was one fund acquiring another).  All of

this is rife with one assumption built upon another.  These are not the kind of damages that New

York law considers to be calculable to a reasonable degree of certainty.  *See Kenford*, 67 N.Y.2d

at 261-63, 493 N.E.2d at 235-36 (lost profit damages were not recoverable because calculation

required too many assumptions based on "speculation and conjecture").  In short, NGA's lost

opportunity claim is speculative, and NGA has made no showing that this claim is directly

traceable to the alleged breach of the Prime Brokerage or Margin Lending Agreements.  *See*

*Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Ams.*, 618 F. Supp. 2d 280, 306 (S.D.N.Y.

2009) ("[A] plaintiff is only entitled to consequential damages if those damages are reasonably

certain and directly traceable to the breach." (internal quotation marks omitted)).

60.     As a result, even if this Court determines that the Limitation of Liability Clause

does not apply to NGA's claims, NGA's claims are nonetheless unrecoverable.

## <u>RESERVATION OF RIGHTS</u>

61.     In the event that the Court denies the Four Hundred Fifty-Eighth Omnibus

Objection to Claims with respect to the No Liability Claims, the Plan Administrator reserves the

right to object to the No Liability Claims on all other grounds.  The Plan Administrator reserves

the right to conduct discovery as to the No Liability Claims and any matters raised in the

Response and to supplement this filing as a result thereof.

## CONCLUSION

62.     As set forth above, this Court should disallow NGA's claims in their entirety.

First, NGA has no basis on which to assert its claims for breach of the Prime Brokerage

Agreement.  It is neither a party to, nor a third party beneficiary of, the Prime Brokerage

Agreement.  Second, even if this Court somehow concludes that NGA has a basis on which to

assert a claim for breach of contract, the claims are subject to the same defenses that would be

available to the actual parties in privity.  These include the Limitation of Liability Clause, which

bars claims for consequential and speculative damages such as those made by NGA here.

*[Remainder of Page Intentionally Left Blank]*

18406469

WHEREFORE, for all the reasons set forth in the Four Hundred Fifty-Eighth Omnibus

Objection to Claims and this Reply, the Plan Administrator respectfully requests that the Court:

(i) grant the relief requested in the Four Hundred Fifty-Eighth Omnibus Objection to Claims,

(ii) disallow and expunge the No Liability Claims in their entirety, and (iii) grant such other and

further relief as is just and proper.

Dated: May 12, 2014
       New York, New York

**CURTIS, MALLET-PREVOST,
  COLT & MOSLE LLP**

By:     _/s/ L. P. Harrison 3rd_
          L. P. Harrison 3rd
          Turner P. Smith
          Cindi Eilbott Giglio
      101 Park Avenue
      New York, New York 10178-0061
      Telephone: (212) 696-6000
      Facsimile:  (212) 697-1559

_Counsel for Lehman Brothers Holdings Inc.
  and Certain of Its Affiliates_

18406469