UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

IN RE LEHMAN BROTHERS HOLDINGS INC *Et al*, Debtors

Chapter 11 Case No 08-13555(JMP)

(Jointly administered)

DECLARATION OF RICHARD MILLETT Q.C. IN SUPPORT OF LBHI's OPPOSITION TO CANARY WHARF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT

RICHARD MILLETT Q.C. hereby declares as follows.

Introduction

1. I have been asked by Lehman Brothers Holdings Inc ("LBHI") to provide an opinion in the light of an argument raised for the first time in Mr Rabinowitz's report of 17 July 2013 ("Mr Rabinowitz's second report") and the memorandum in support of the landlord's motion for summary judgment on liability ("the CW memorandum").

2. I adopt the abbreviations and expressions that I used in my first and second opinions (signed 10 January 2013 and 15 July 2013). I can confirm that I have seen nothing since those opinions that would cause me to change my views as expressed therein.

3. The issues that I have been asked to cover in this opinion arise out of the contrast which Canary Wharf seeks to draw between the language of paragraph 1 of schedule 4 to the lease and the language of clause 14 of the lease, which provides for a landlord's guarantee in favour of LBL as the tenant in respect of the landlord's obligation: see pp 7-8 of the CW memorandum. The comparison between paragraph 1 of schedule 4 to the lease and clause 14 of the lease was first made by the landlord in Mr Rabinowitz's second report. I have not had an opportunity to respond in writing to that report, so far as it raises new points, nor to the CW memorandum, and I have now been asked to do so.

1

4. Clause 14 of the lease contains the operative terms of the guarantee given by Canary Wharf Holdings Limited, the landlord's guarantor. The landlord has fastened on certain supposed differences of wording between clause 14 and paragraph 1 of schedule 4 to support its argument that, whereas clause 14 comprises a guarantee, paragraph 1 of schedule 4 comprises an indemnity.

5. There is no question that clause 14 is a guarantee: indeed that is the landlord's own case. However, it has much in common with schedule 4 and indeed contains certain very similar provisions. Some of those very similar provisions are ones which Mr Rabinowitz has opined made schedule 4 an indemnity and not a guarantee (viz, clauses 14.2 and 14.6 (which I address in further detail below), which are closely similar to paragraphs 2 and 6 in schedule 4). The comparison thus seriously undermines Mr Rabinowitz's own arguments. In my view they are both guarantees, but with slightly different contents to reflect the different commercial positions that the landlord and the tenant (LBL) respectively occupy under the lease.

6. For convenience, it is worth recalling and analysing Mr Rabinowitz's view in paragraph 39 of his first report and paragraph 48 of his second report. In his opinion schedule 4 is an indemnity and not a guarantee. Focusing on paragraph 1 of schedule 4:

    (a) His first point (paragraph 39(1) of his first report, and repeated verbatim in paragraph 48(1) of his second report) is based on the wording of the headings, but that is a wholly illegitimate point because clause 2.7 of the lease says that *"the title and headings in this Lease are for reference only and shall not affect its construction."*[1] So that supposed difference is not a valid point of difference at all.

    (b) Next (paragraph 39(2) of his first report, and repeated verbatim in paragraph 48(2) of his second report), Mr Rabinowitz relies "more importantly" on the words in paragraph 1 of schedule 4 that express it to be a primary obligation. However, the supposed force of that observation[2] is wholly undermined by the fact that those words also appear in clause 14.1 of the lease, where the landlord's guarantor also covenants with the tenant (LBL) "as a primary obligation", but which the landlord accepts are words of guarantee (and not indemnity). Indeed, the fact that the reference to primary obligation appears in a clause that the landlord expressly accepts is a guarantee demonstrates why the landlord's reliance on the "primary obligation" provision in para 1 of schedule 4 to support its case that it is an indemnity is wholly misplaced. I return to the issue of "primary obligation" in this context below.

    (c) As to the point made by Mr Rabinowitz (at paragraph 39(3) of his first declaration and again verbatim at paragraph 48(1) of his second report), I have

---

[1] See further my first opinion, paragraph 38(1).
[2] It actually has no force: see my first opinion at paragraph 38(2) and see further below.

2

already explained why the fact that paragraph 1 of schedule 4 obliges either the tenant or LBHI to perform the tenant's covenants in the lease does not turn it into an indemnity, and why he is wrong in law to say that a guarantee "involves only a promise to see to it that someone else will perform his obligations".[3] Although clause 14.1 of the lease is narrower and only contains a "see to it" form of guarantee, that is not a sound basis for saying that paragraph 1 of schedule 4 must therefore be no guarantee at all. It is quite simply a guarantee of both types ("see to it" and "do it"), as the House of Lords explained in *Moschi*[4]. There is also a good commercial rationale for why the landlord's guarantee would not be, or include, a guarantee of the "do it" type, but only a "see to it" type, namely that the landlord's guarantor could not himself perform all of the landlord's covenants, such as the covenant for quiet enjoyment (clause 6.1 of the lease) or the covenant to insure (clause 7 of the lease).[5]

7. The landlord's argument based on the comparison between clause 14.1 of the lease and paragraph 1 of schedule 4 really turns on the fact that clause 14.1, being a guarantee, does not contain the words *"and the surety shall indemnify ... breach,"* which comprise the second half of paragraph 1 of schedule 4. Its argument (at page 8 of the CW memorandum) appears to be that that distinction means that the latter was intended to be an indemnity. I believe that that argument is wrong.

8. The first and most fundamental point is that the words *"and the surety shall indemnify ... breach"* comprising the second part of paragraph 1 of schedule 4 do not create an indemnity in what in the *Vossloh* case Sir William Blackburne called "the narrow sense" (ie as opposed to a guarantee)[6]. That is because the express trigger for LBHI's liability remains a loss arising from a default by the tenant. So the critical words relied on by the landlord still impose on LBHI accessory, or secondary, obligations (accessory to the tenant's primary obligations under the lease)[7] and not primary and independent obligations. LBHI's liability under those words is not wholly independent of the liability of the tenant, but requires the landlord to show that its loss arises directly or indirectly out of the default by the tenant. A true indemnity in the narrow sense (i.e. imposing primary and independent obligations) would need not to be restricted in that way. In my view the landlord has lost sight of this critical point and its reliance on the second part of paragraph 1 of schedule 4 as comprising words of indemnity falls at this first hurdle.

9. There are numerous other reasons why the landlord's attempt to read paragraph 1 of schedule 4 as an indemnity by way of comparison with clause 14.1 of the lease is misconceived.

---

[3] See my first opinion at paragraph 38(3), and *McGuinness v Peterborough BS* [2012] 2 All ER (Comm) 265, at [7]-[9], per Patten LJ.
[4] See also Sir William Blackburne in *Vossloh* at [23].
[5] The landlord's guarantor would not have an insurable interest in the premises that would allow it validly to insure them if the landlord failed to do so.
[6] See *Vossloh*, [25].
[7] See *Vossloh*, [24], [26].

3

(i) If, as the landlord (rightly) says, the language of clause 14.1 of the lease is that of guarantee, the words in the first six lines of paragraph 1 of schedule 4 *"The Surety hereby covenants ... specified"* must also be words of guarantee. There is no material difference in the language. As I have said already, the fact that LBHI promises in paragraph 1 of schedule 4 both to see to it that LBL performs the covenants in the lease and to do so if LBL does not so perform cannot convert that language into an indemnity.

(ii) Accordingly, if the first six lines of paragraph 1 of schedule 4 are, as is clause 14.1, a guarantee, it is very far from apparent why the landlord would want or need an indemnity (in the narrow sense) as well. There is no good reason I can see why the draftsman would have sought to provide for both a guarantee and an indemnity in the narrow sense, with both sets of obligations covering the same subject matter, since one or other would be unnecessary and superfluous. It is a well-known canon of construction in English law that the court will, if it can, give effect to all parts of a contract and no part should be treated as inoperative or surplus. As Lord Romilly MR said in *Re Strand Music Hall Co Ltd* (1865) 35 Beav 153:

> "The proper mode of construing any written instrument is, to give effect to every part of it, if this be possible, and not to strike out or nullify one clause in a deed, unless it be impossible to reconcile it with another and more express clause in the same deed."[8]

(iii) The word "indemnify" does not, and in context cannot, make all the difference, particularly if the effect of doing so would be to render the first six lines of paragraph 1 of schedule 4 entirely superfluous, which on the landlord's reading it would. The landlord has yet to explain what purpose the first six lines of paragraph 1 of schedule 4 serve if the language of the remainder comprises an indemnity.

(iv) On the other hand, the words in the second part of paragraph 1 of schedule 4 can be given full effect, and can easily be read as an adjunct to, and expansive of, the operative words of guarantee in the first six lines: see paragraph 38(6) of my first opinion. When interpreting the words *"and the Surety shall indemnify"* in the second part of paragraph 1 of schedule 4, it is instructive to note the similarity with the covenant given by the tenant to the landlord directly at clause 4.32 of the lease. That clause provides that the tenant will *"keep the Landlord ... fully indemnified from*

---

[8] See also more recently, for example, *Dwr Cymru Cynfyngedig (Welsh Water) v Corus UK Ltd* [2007] EWCA Civ 285 and *Singapore Airlines Ltd v Buck* [2011] EWCA Civ 1542, at [43]. Although there are cases which suggest that with "boilerplate" documents (including leases) a construction argument based on surplusage carries little weight (eg *Beaufort Developments (NI) Ltd v Gilbert Ash (NI) Ltd* [1999] 1 AC 266), they do not assist the landlord here because they would also permit LBHI to say that the words *"and the Surety shall indemnify"* etc are themselves mere surplusage. In other words, it would be open to both sides to claim that the words that the other is relying on are surplusage, which leads to stalemate. The court will not conclude that words are surplusage unless it really has little choice. Cases such as *Re Strand Music Hall* are just examples of the common sense approach whereby the court will award the "tie-breaker" to the party who can make sense of the whole. That party is LBHI.

4

*and against all actions proceedings claims demands losses costs expenses damages and liability arising from any breach of the Tenant's covenants or any other obligations contained in or ancillary to this Lease ...".* The word "indemnify" here simply has its usual meaning, namely to pay in full, or to hold harmless. Clause 4.32 is a general "hold harmless" covenant which expands the scope of the tenant's covenants beyond the specific express covenants and ensures that the tenant is liable for all of the landlord's losses caused by any breach of its covenants, even if otherwise they would be too remote in law to be recoverable for damages for breach of contract. In just the same way, by the words in the second half of paragraph 1 of schedule 4 following " *...and the Surety shall indemnify"*, which are in almost identical terms to clause 4.32, the draftsman was doing the same thing, namely ensuring that LBHI, in its capacity as a guarantor, held the landlord harmless to a like extent. The fact that LBHI was agreeing to undertake liability of such a scope does not in any way alter the <u>capacity</u> in which LBHI was contracting and turn it from guarantor into indemnitor. In other words, it does not affect LBHI's legal status as guarantor. On the contrary, it reinforces the character of LBHI's obligations as co-extensive with those of the tenant and that LBHI is not undertaking any liability that the tenant would not itself have under clause 4.32. This is the key characteristic of a contract of guarantee: see above and in particular *Vossloh* at paragraph 26.

(v)   It is, moreover, commercially perfectly understandable why the draftsman was content to cast the words of the landlord's guarantee in clause 14.1 of the lease in fairly abbreviated terms but wished to cast the words of the tenant's guarantee in paragraph 1 of schedule in wider terms so as to include the second half from the words *"and the Surety shall indemnify...."*. The tenant undertook very many more covenants to the landlord, covering a far wider range of different matters, than the landlord undertook to the tenant. Furthermore, the tenant undertook important express pecuniary obligations to the landlord (most fundamentally, to pay the rent) whereas the landlord undertook no express pecuniary obligations to the tenant at all[9]. One can rationalise the "hold harmless" covenant (both on the tenant's part in clause 4.32 and co-extensively on LBHI's part in paragraph 1 of schedule 4) as there in order to ensure that the tenant and LBHI could not avail themselves of the rules of English law on remoteness of damage and in particular those that might otherwise enable the tenant to escape liability for damages for non-payment of money.[10] Accordingly, the differences in position occupied by the landlord and the tenant respectively mean that it would not be appropriate to include in clause 14.1 of the lease (landlord's guarantee) the language one finds in the second half of paragraph 1 of schedule 4 (tenant's guarantee).

10. There is a further point of comparison that tells powerfully against the landlord's case. Both

---

[9] Other than under its own, very limited, indemnity at clause 6.8 of the lease, which, like clause 4.32, is of the "wide," hold harmless, variety.

[10] Which until the decision of the House of Lords in *Sempra Metals v Commissioners of Inland Revenue* [2008] 1 AC 561 (which post-dated the execution of the lease) remained an unsteady area of the law.

5

clause 14 of the lease and schedule 4 contain a "no release" clause, at clause 14.6 of the lease and paragraph 6 of schedule 4. That is a striking overlap. These are in virtually identical terms, allowing only for the differences in role as between the landlord and the tenant. So for example, paragraph 6(b) of schedule 4 (no discharge due to landlord's refusal to accept rent at a time when it was entitled to forfeit) is absent from clause 14.6 of the lease because it would be inapposite to a landlord's guarantee. As Sir William Blackburne said at para 27 of *Vossloh*, the presence of these provisions "will usually indicate" that the instrument is intended to be a guarantee.[11] Indeed, if schedule 4 were an indemnity then paragraph 6 of schedule 4 would be surplusage. As I have already said, the court strains away from surplusage in favour of giving every part of the contract meaning and content if possible.

11. The only other difference is that in clause 14.1 the landlord's guarantor is called a guarantor and in schedule 4 LBHI is referred to as the surety. There is nothing in this distinction here: indeed in the *Vossloh* case itself Sir William Blackburne used the word "surety" to describe a guarantor strictly so called (see *Vossloh*, at [23]). It does not surprise me that the draftsman used the word "guarantor" in the main body of the lease to describe the landlord's guarantor and the word "surety" to describe the tenant's guarantor (i.e. LBHI). Indeed, in <u>Andrews & Millett</u> (6th Edition, 2011), the precedent for a Rent Guarantee (at P14-001)[12] uses the word "surety" to describe the guarantor of the tenant's liability for rent. Moreover, it is well established that labels do not control the interpretation and legal effect of a document.

12. Neither do the apparent differences in the language of the headings and text of clause 14.7 ("Benefit of guarantee") and paragraph 8 of schedule 4 ("Benefit of guarantee and indemnity") provide any support for the landlord's case. First, as I have said, the headings are not a permissible aid to construction. Secondly, the word "guarantee" is used in the text of both clause 14.7 and paragraph 8 of schedule 4. Thirdly, the word "indemnity" in paragraph 8 of schedule 4 is simply a reference back to the "hold harmless" words in paragraph 1, the meaning and function of which I have explained above and also further below. I refer to paragraph 37(viii) of my first opinion where I deal with this issue.

13. In simple terms, then, the choice is between the landlord's case that paragraph 1 of schedule 4 is an indemnity because of the words *"and the Surety shall indemnify...."* and following, in which case the words up to that point, even though they are words of guarantee just like clause 14.1, are surplusage and must be ignored, and LBHI's case that one reads the whole of paragraph 1 as a guarantee, with the words from *"and the Surety shall indemnify...."* prescribing the scope of liability as a "hold harmless" in favour of the landlord.

14. The landlord's approach (a) requires the court to read the word "indemnify" as going well beyond its normal usage elsewhere in the lease, where it denotes a "hold harmless"

---

[11] See my first opinion at paragraph 38(6).
[12] This precedent has used the word *surety* since the first edition of the book in 1992.

6

obligation, (b) is diametrically inconsistent with the undisputed effect of the first part of paragraph 1 of schedule 4 as words of guarantee, and moreover makes it superfluous; (c) is diametrically inconsistent with the very words within the supposed indemnity that impose liability on LBHI only for loss arising from breach of covenant by the tenant, and not independently of the tenant; (d) is inconsistent with many other provisions of schedule 4, not least paragraph 6; and (e) has no obvious commercial rationale beyond that which explains the giving of a guarantee.

15. LBHI's approach, however, (a) involves no surplusage; (b) respects the basic principle of construction that all parts of the contract must, if they can, be given meaning and effect; (c) is consistent with both parts of paragraph 1 describing secondary or accessory liability on the part of LBHI; (d) is consistent with the rest of schedule 4 and clauses 4.32, 6.8 and 14 of the lease and (e) has a commercial rationale.

16. Focusing more closely on the words "primary obligation", it is not to my mind surprising that this expression is used in both clause 14.1 and paragraph 1 of schedule 4. If one finds it in what is indisputably a guarantee in clause 14.1, its presence in paragraph 1 of schedule 4 cannot be relied on as support for the landlord's argument (per paragraph 39(2) of Mr Rabinowitz's first report and paragraph 48(2) of his second report) that paragraph 1 of schedule 4 is an indemnity, in the sense of imposing on LBHI independent primary as opposed to accessory secondary obligations. In my view the expression "primary obligation" is not a simple tag to lead the court to say that therefore the obligations undertaken by LBHI are primary obligations as opposed to secondary or accessory obligations. That is not only borne out by the use of the expression in clause 14.1 itself but is entirely consistent with precedent, which is strongly against such a simplistic and literalist approach.

17. It is well established in English law that calling a third person undertaking liability for the obligations of another a primary obligor or principal debtor is not enough to turn him from a guarantor to an indemnitor. In *CIMC Raffles Offshore (Singapore) Ltd v Schahin Holdings SA* [2012] EWHC 1758, Blair J was faced with a "Guarantee and Indemnity" which spelled out in terms that the Guarantor was contracting "as primary obligor and not merely as surety"[13] and which also stipulated in clear terms that "as a primary obligor and as separate, independent and alternative obligations, the Guarantor unconditionally and irrevocably agrees ... (ii) as a primary obligation to indemnify the Guaranteed Party against any loss suffered by it ..."[14] At [26][15], Blair J said, of these provisions,

> "the incorporation of a principal debtor clause will not usually suffice in itself to determine the nature of the contract. It will not automatically convert a guarantee into an indemnity. Ultimately the question whether particular provisions are effective to convert the secondary liability created by a guarantee into a primary liability is one of construction of the instrument as a whole: see [*Vossloh*] at [27] and [29]."

---

[13] See clause 1(a) of the guarantee in that case set out by Blair J at [11]. Note the use of the word "surety" there.
[14] See Blair J, also at [11].

7

18. At [27] Blair J went on to say:

> "Further, I do not think that it is clearly established on the authorities that the fact that an instrument imposes primary as well as secondary liability in itself negatives the rule in Holme v Brunskill."

19. The Court of Appeal upheld Blair J on his statement of those principles, or at least found no fault with it. Blair J did go on to find that the instrument was not a guarantee (or at least that the rule in *Holme v Brunskill* did not apply to it), but only because of a provision in the instrument that required the creditor to proceed first against the guarantor to enforce the guaranteed obligations (see [28]). However, the Court of Appeal disagreed with Blair J on that point, and held that the provision which required the creditor to sue the guarantor first before proceeding against the principal obligor did not mean that the instrument was not a guarantee and that the rule in *Holme v Brunskill* did not apply: see [2013] EWCA Civ 644, at [29]-[31].

20. This approach is perfectly orthodox and reflects the well-known principle in English law that the main purpose of a "principal debtor" or "primary obligor" clause is to ensure that the creditor can pursue the guarantor without first having to make a demand. In *MS Fashions v BCCI* [1993] Ch 425, Hoffmann LJ (sitting at first instance) said (at pages 436D-F) that:

> "In my judgment the "principal debtor" clauses have the effect of creating primary liability for the purposes of the rule that the debt is not contingent upon demand. This was the provisional view of Walton J. in *Esso Petroleum Co. Ltd. v. Alstonbridge Properties Ltd.* [1975] 1 W.L.R. 1474, 1483, and I think it was correct. It is true that for some purposes the courts will look to the underlying reality of the suretyship relationship rather than the formal agreement that liability is to be as principal debtor. But this is only for the purpose of protecting the surety's[16] equitable rights against the principal debtor and giving effect to such consequences as may affect the creditor, such as the surety's right to take over securities and the rule against double proof. Otherwise there is no reason why creditor and surety should not make whatever terms they choose. The right to a demand before liability can accrue is not inherent in the nature of suretyship and will not be implied unless expressly provided. There seems accordingly no reason why the parties should not modify the effect of such a provision."[17]

21. In *Carey Value Added SL v Grupo Urvasco SA* [2011] 2 All ER (Comm) 140, Blair J (at [22]) said:

> "In any case, the language of primary and secondary liability is routinely found in the same contracts, and is not in itself a guide to the content of the liability. Thus it has been said, in my view rightly, that the mere incorporation of a principal debtor clause will not usually suffice in itself to determine the nature of the contract. To take the familiar distinction between a guarantee and an indemnity, a principal debtor clause will not automatically convert one into the other (Andrews and Millett, The Law of Guarantees, 5th edn (2008), 1-014)."

---

[16] Hoffman LJ's use of the word *surety* here to mean *guarantor* demonstrates why the landlord's reliance on the difference of nomenclature between clause 14.1 of the lease (guarantor) and schedule 4 (surety) is unsound.

[17] Upheld by the Court of Appeal, by Dillon LJ at page 447G.

22. Accordingly, the reference in paragraph 1 of schedule 4 to LBHI accepting a primary obligation, or the reference at clause 10 of the main body of the lease to LBHI covenanting with the landlord "as a primary obligation", is not sufficient to enable the court to characterise the obligations assumed by LBHI as an indemnity and not as a guarantee, so as to render the rule in *Holme v Brunskill* or the general principle of co-extensiveness inapplicable.

23. For the same reason, the use of the word "indemnity" or "indemnify" does not automatically convert a guarantee into an indemnity: see for example the *CIMC Raffles* case I have referred to above. In *Marubeni Hong Kong v Govt of Mongolia* [2005] 1 WLR 2497 the Court of Appeal was faced with the question of whether the rule in *Holme v Brunskill* applied to an instrument under which the obligor clearly undertook express indemnity obligations to the creditor (the terms of which Carnwath LJ set out at [4]). Carnwath LJ, having (at [20] to [27]) reviewed the cases on the differences between guarantees, indemnities and performance bonds[18], concluded that the instrument was not a performance bond but was a guarantee and the rule in *Holme v Brunskill* did apply to it. He expressly said (at [32]) that the words of indemnity did not make the difference.

24. Although of course the meaning and nature of each contract must always turn on its own wording, these are good examples of recent cases where the court has not been at all impressed by reliance on "principal debtor" or "primary obligor" clauses or by the use of the language of indemnity to convert a guarantee into an indemnity. Furthermore, it is clear from the draftsman's use of the word "indemnify" in other parts of the lease (see clause 4.32) that it is intended to mean no more than "hold harmless". In the context of paragraph 1 of schedule 4 the word cannot convert accessory liability into primary liability not least because, as I have explained above, the object of the indemnification obligation is itself accessory and depends on default by the tenant.

25. Finally, a study of several of the readily available practitioners' precedents for guarantees in leases is revealing. So:

   (i)   Hill and Redmond's Law of Landlord and Tenant, precedent L1, contains both a "principal debtor" obligation and language of indemnity (see draft clauses 1, 1(a); 1(b); 2; 3). Note that the precedent for a guarantee also contains (at paragraph 5) an anti-release clause in very similar terms to paragraph 6 of schedule 4. There is no suggestion in the text that the contract thereby created is not a guarantee but an indemnity.

   (ii)  Aldridge, Leasehold Law, precedent P.095-0.97, also contains words of indemnity (see draft clause 2); again there is no suggestion in the text that the contract thereby created is not a guarantee but an indemnity. It contains, moreover, an obligation on

---

[18] Performance bonds are irrevocable undertakings (normally issued by banks or other financial institutions) to pay a specified sum of money to the beneficiary on breach of the underlying contract, or on demand. They are akin to a promissory note or letter of credit. The key point is that the equitable defences such as the rule in *Holme v Brunskill* are not available to the issuer of a performance bond.

9

moreover, an obligation on the part of the guarantor to take a new lease on forfeiture because, as the note explains at paragraph P.097, if the tenant's covenant comes to an end on forfeiture (which it does) then the guarantee also comes to an end, and so a well-drawn lease will provide an additional covenant on the guarantor to take a new lease and become a tenant (otherwise the landlord would have no remedy).

(iii) <u>Encyclopaedia of Forms and Precedents</u> (2009 edn.), Vol 22(2)(A), *Landlord and Tenant (Business Tenancies)* has a precedent for the lease of a whole office block. The guarantee contained in it provides that the guarantor covenants as a principal debtor (see paragraph 6.1.1) and to indemnify the landlord against all losses resulting from non-payment of rent and from non-performance or non-observance of the covenants, and an anti-release clause again in similar terms and scope to that at paragraph 6 of schedule 4 (see paragraph 6.1.2.1). Yet again, there is no suggestion in the text that the contract thereby created is not a guarantee but an indemnity. On the contrary, the editors explain that the anti-release provisions are necessary because otherwise the rule in *Holme v Brunskill* will apply to discharge the guarantor (see footnotes 183-185).

26. In light of the guidance given by these precedents, it is not surprising that in the lease in this case one finds (i) a principal debtor obligation and (ii) indemnity language in a document that the draftsman nonetheless intended should be a guarantee. It is easy to see how paragraph 1 of schedule 4 came to be drafted, and any well trained draftsman of a lease guarantee properly so called would in my view have included these provisions, as well as the anti-release clause.

27. By way of post-script, and in any event, it important to keep firmly in mind that even if paragraph 1 of schedule 4 were to be read as an indemnity, the requirement that the losses the subject of the indemnity must be *"by reason of or arising directly or indirectly out of any default by the Tenant"* means that post-forfeiture rent cannot be recovered anyway since there is no such thing in English law as post-forfeiture rent and any such loss felt by the landlord does not arise out of any default by the tenant, directly or indirectly. So the causation requirement expressly built into the putative indemnity means that the landlord would never be able to recover any post-forfeiture rent from LBHI, even if it were an indemnity in the narrow sense, except if the landlord chose to avail itself of its remedies under paragraph 7 of schedule 4, which it did not do in this case.

<u>Conclusion</u>

28. The comparison that the landlord has sought to draw between clause 14.1 of the lease and paragraph 1 of schedule 4 wholly undermines the landlord's case that the latter is an indemnity and not a guarantee.

29. In particular, the designation of the landlord's guarantor in clause 14.1 as a primary obligor, and the presence of materially identical provisions in both clause 14 and schedule 4 (clauses

10

14.2 and 14.6, materially identical to paragraphs 2 and 6 of schedule 4) demonstrates, insofar as it is not already plain from the English case law, that the words of primary obligation cannot turn what is a guarantee into an indemnity.

30. What is more, it is clear from the draftsman's use of the word "indemnify" elsewhere in the lease, most pertinently clause 4.32, that it just means "hold harmless". There are very good reasons, having regard to the differences in the respective positions of the landlord and the tenant under the lease and the differences in the nature and extent of their covenants to each other covered by the respective landlord and tenant guarantees, why the draftsman chose to insert the words "and the Surety shall indemnify" into paragraph 1 of schedule 4 but not into clause 14.1 of the lease.

*[signature]*

RICHARD MILLETT Q.C.

Essex Court Chambers,

Lincoln's Inn Fields,

London WC2A 3EG

<u>22 May 2014</u>