# EXHIBIT 38

## Miller, Samantha L.

| | |
|---|---|
| **From:** | Tulchin, David B. |
| **Sent:** | Wednesday, March 26, 2014 4:25 PM |
| **To:** | frank.bartolotta@morganstanley.com |
| **Cc:** | Shenker, Joseph C. |
| **Subject:** | Draft Affidavit |
| **Attachments:** | SC1-#3616115-v2-Bartolotta_Aff_.DOC |

Dear Frank - - this is what I prepared, based upon our discussion. You should of course feel free to make any changes. We of course want something that is completely accurate.
    Best regards,
     David



DEPOSITION EXHIBIT 5
5-7-14

1

CONFIDENTIAL

CW0075961

Draft of March 26, 2014

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
                                                           :
In re                                          :    Chapter 11
                                                  :
LEHMAN BROTHERS HOLDINGS INC. *et al.*,    :    Case No. 08-13555 (SCC)
                                                  :
                         Debtors.                   :    Jointly Administered
                                                  :
------------------------------------------------------------x

### AFFIDAVIT OF FRANK BARTOLOTTA

STATE OF NEW YORK   )
                              )    ss.:
COUNTY OF NEW YORK )

Frank Bartolotta, being duly sworn, deposes and says:

1. I am a member of the Bar of the State of New York and am currently [title] of Morgan Stanley & Co. From Fall 2000 to about April 2006, I was [Executive Vice President] of Lehman Brothers Holdings Inc. ("Lehman"). I make this affidavit based on my own personal knowledge.

2. In Fall 2000 I was asked to head up the negotiation for new premises for Lehman's European Headquarters to be based at Canary Wharf. This was to be a 1 million sq ft state-of-the-art office building at 25 Bank Street, London built to Lehman's specifications.

3. Negotiations took place in late 2000 and early 2001. During the course of negotiations I reported to Mark Marcucci in New York and all points of a material commercial significance went back to Lehman in New York.

4. An Agreement for Lease was entered into on March 30, 2001 between Heron Quays Properties Limited and Canary Wharf Group PLC (together "Canary Wharf"), on the one hand, and Lehman and Lehman Brothers Limited ("LBL") on the other. The agreement

CONFIDENTIAL                                                              CW0075962

attached a form of lease, in terms nearly identical to that subsequently executed on March 16, 2005 among Lehman, LBL, Heron Quays (HQ2) T1 Limited, Heron Quays (HQ2) T2 Limited, Canary Wharf Management Limited and Canary Wharf Holdings Limited following completion of the building (the "Lease").

5. I recall the negotiations around the provisions in the Lease dealing with the indemnity to be given by the parent company Lehman because we fought very hard for several weeks to limit those provisions to those of a guarantor under English law. However, Canary Wharf's position was immovable. George Iacobescu, CEO of Canary Wharf, insisted on a direct contractual obligation from Lehman that could be relied on whatever happened to LBL and to have certainty that Lehman would be required to pay the rents and other amounts due regardless of enforceability against LBL or LBL's condition or status.

6. There were many components to the overall deal. In addition to an 18 month rent free period and a Tenant Inducement of £65 per sq ft in relation to 25 Bank Street, as part of the transaction Canary Wharf agreed to a rental subsidy capped at £10 per square foot together with a £9.3 million fit out allowance and other payments totalling £15.96 million in relation to the premises we were vacating in Broadgate (also in London). Canary Wharf also agreed to sublease back 200,000 sq ft in the 25 Bank Street building for periods from 5 years to 10 years (so as to give us the flexibility we required as to expansion in the short and mid term). In this context we agreed on an above-market and step-up rental arrangement, from year 6 to year 10 of the Lease.

7. It is my distinct recollection that the position of Canary Wharf was that the deal as a whole made sense commercially only if Canary Wharf had complete certainty of income stream going forward, and thus that Canary Wharf required the "bulletproof" protection

CONFIDENTIAL                                                                                           CW0075963

of an indemnity from Lehman under English law. In the end we were forced to accept that position and the Lease included the indemnity from Lehman that Sir George Iacobescu of Canary Wharf demanded.

                                                                                                                           _____
                                                                                                                           Frank Bartolotta

Sworn to before me this
___ day of March 2014.

_____
Notary Public

CONFIDENTIAL                                                                                                                       CW0075964