# EXHIBIT 44

Page 1

1              F. Bartolotta
2        UNITED STATES BANKRUPTCY COURT
3        SOUTHERN DISTRICT OF NEW YORK
4
5
6    ------------------------------x
     IN RE:
7
8    LEHMAN BROTHERS HOLDINGS,           Chapter 11
9    INC., et al.,                 Case No. 08-13555 (SCC)
10            Debtors.
11
     ------------------------------x
12
13
14
15      VIDEOTAPED DEPOSITION OF FRANK BARTOLOTTA
16              New York, New York
17             Wednesday, May 7, 2014
18
19
20
21
22
23   Reported by:
24   THOMAS A. FERNICOLA, RPR
25   JOB NO. 73217

Page 6

1      F. Bartolotta
2  F R A N K  B A R T O L O T T A,
3     called as a witness, having been duly sworn
4     by a Notary Public, was examined and
5     testified as follows:
6  BY THE REPORTER:
7     Q.  Please state your full name and
8  address for the record.
9     A.  Frank Bartolotta, 5019 Rustic Oaks
10 Circle, Naples, Florida 34105.
11
12 EXAMINATION BY MR. ISAKOFF:
13    Q.  Mr. Bartolotta, how are you currently
14 employed?
15    A.  I'm employed as a consultant by
16 Morgan Stanley.
17    Q.  Have you ever had your deposition
18 taken before?
19    A.  No.
20    Q.  Okay.
21       Just to go over a couple of the
22 ground rules.  Obviously, we have a court
23 reporter and a videographer taking down
24 everything verbatim, so we should try not to
25 talk at the same time so there's a clear

Page 7

1      F. Bartolotta
2  record.
3       If there's anything you don't
4  understand about a question, please let me know
5  and I'll do my best to clarify it.
6       If you need a break at any time,
7  that's fine.  You can consult with your counsel
8  but not while a question is pending.
9     A.  Okay.
10    Q.  Do you have any questions before we
11 proceed?
12    A.  No.
13    Q.  We have never met before; correct?
14    A.  No, we have spoken on the phone but
15 never met.
16    Q.  We have.
17       What, if anything, did you do to
18 prepare to testify here today?
19    A.  Not much.  Just talked to my attorney
20 about how to answer the questions truthfully
21 and directly.
22    Q.  Okay.
23       Did you review the affidavit that was
24 recently filed?
25    A.  Yes, I did.

Page 8

1      F. Bartolotta
2     Q.  Okay.
3        Did you review anything else?
4     A.  No.  I looked back at the document,
5  the document that was in question that was sent
6  to me and that's it.
7     Q.  What document is that?
8     A.  The indemnity agreement that was in
9  the lease.
10    Q.  You're talking about Schedule 4 to
11 the lease?
12    A.  Yes.  Yes.
13    Q.  Okay.  All right.
14       And could you just briefly sketch
15 your educational background.
16    A.  Yes.
17       I went to Fordham Law School, and
18 after graduating from Williams College and
19 taught school for a brief period of time.
20       Joined White & Case in 1978.  Left
21 White & Case in 1984 to join Morgan Stanley
22 Realty.
23       I left Morgan Stanley Realty after
24 being transferred to London.  I left London in
25 1995 to join Credit Suisse back in New York.

Page 9

1      F. Bartolotta
2       And then I left Credit Suisse in 2000
3  to join Lehman Brothers in London.
4       Returned to New York with Lehman
5  Brothers in 2004.
6       Retired, left Lehman Brothers as an
7  employee in 2006, and worked for Lehman
8  Brothers as a consultant from 2006 until just
9  before the bankruptcy.  And then returned to
10 work for Lehman in the bankruptcy in January of
11 2009, and worked for Lehman as a consultant up
12 to August of 2012, and then joined Morgan
13 Stanley as a consultant in May of 2013.
14    Q.  All right.  Thank you very much.
15       What kind of law did you practice at
16 White & Case?
17    A.  Real estate.
18    Q.  How did you come to give an affidavit
19 this last March?
20    A.  I was called by Mr. Iacobescu who
21 asked if I would speak to his attorneys about
22 the litigation.  I said I would.  They called
23 me.  They asked me questions about what
24 happened during the negotiations and my role in
25 it, and asked me if I would be willing to sign

Page 10

1          F. Bartolotta
2  an affidavit based upon the discussions that we
3  had over the phone.
4      Q.   When was your conversation with
5  Mr. Iacobescu that you just referred to?
6      A.   It would have been some time mid
7  March.
8      Q.   Did he call you or did you call him?
9      A.   I think he called me.
10     Q.   And what -- how long did this
11 conversation last?
12     A.   My recollection it was very short.
13 He just asked me if I would speak to his
14 attorneys.
15     Q.   Okay.
16          Was anybody else on the phone?
17     A.   No, not to my knowledge.
18     Q.   Did he tell you what he wanted you to
19 speak to his attorneys about?
20     A.   No.  I knew it was in regard to
21 litigation, but he didn't say specifically
22 what.
23     Q.   Okay.
24          Did you let anybody from Lehman know
25 or any representative of Lehman know that you

Page 11

1          F. Bartolotta
2  had been approached --
3      A.   No.
4      Q.   -- with this request?
5      A.   No.
6      Q.   Let's make sure I just finish the
7  question just for the clear record.  Okay.
8           Was there anything else that you can
9  recall about your conversation with
10 Mr. Iacobescu?
11     A.   I had a couple of conversations with
12 him, but that was the one in which he asked me
13 to talk to his attorneys.
14     Q.   Okay.
15          Did you have any other conversations
16 with Mr. Iacobescu in and about March of this
17 year --
18     A.   No.
19     Q.   Hold on a second.  Let me finish the
20 question -- relating at all to the it care
21 would have claims against Lehman Brothers
22 Holdings, Inc.?
23     A.   Yes.  I was in London on a deal for
24 Morgan Stanley and I had lunch with
25 Mr. Iacobescu and we talked about a lot of

Page 12

1          F. Bartolotta
2  things.
3           I asked him -- I actually asked him
4  if what was going on with the litigation.  He
5  said it was still ongoing.  And that was really
6  all we talked about at that lunch, other than
7  the business that I had with Morgan Stanley
8  which he was involved with.
9      Q.   Just to make sure the record is
10 clear.  Do you recall anything else as to what
11 it was he wanted you to talk to his attorneys
12 about?
13     A.   No.  He just asked me to talk to the
14 attorneys.
15     Q.   Okay.
16          MR. ISAKOFF:  Let's mark this.
17          (Bartolotta's Exhibit 1, Affidavit
18    of Frank Bartolotta dated March 27, Bates
19    Nos. CW75982 to 84, was marked for
20    identification.)
21 BY MR. MASELLA:
22     Q.   Mr. Bartolotta, I'm handing you
23 what's been marked as Exhibit 1, Bartolotta
24 Exhibit 1.
25          Is this affidavit that you signed

Page 13

1          F. Bartolotta
2  this last March 27th?
3          MR. MASELLA:  Let me know you're done
4    looking it over.
5      A.   (Document review.)
6           Yes.
7      Q.   Okay.
8           Do you recall how much time there was
9  between when you spoke to Mr. Iacobescu and he
10 asked you to speak to his lawyers and when you
11 contacted anybody representing Canary Wharf?
12     A.   I'm sorry, I don't remember how long
13 it was between my conversation, but it would
14 have been short.  Because it was all -- my
15 visit out there and my signing this was all
16 within a two-week time frame in March.
17     Q.   Okay.
18          Did you place a call to any attorneys
19 for Canary Wharf?
20     A.   Subsequent to my first contact from
21 the attorneys at Sullivan & Cromwell, yes.
22     Q.   Okay.
23          So after you spoke to Mr. Iacobescu
24 about speaking to his attorneys, who contacted
25 who?

Page 14

1  F. Bartolotta
2  A.  I believe someone contacted me.
3  Q.  Who do you know?
4  A.  It was Mr. Shenker and Mr. Tulchin.
5  Q.  Okay.
6      And what was said in that
7  conversation, if you can recall?
8  A.  They asked me questions about what
9  happened during the negotiations and what my
10 recollection of -- about the negotiations, and
11 in reference specifically to this document that
12 was delivered, how that occurred.
13 Q.  What do you recall you said in the
14 conversation?
15 A.  I told him that I was negotiating the
16 document, the lease documents, and I was trying
17 to avoid delivering this indemnity. And that
18 it was my understanding that we did not want to
19 deliver this document and that I couldn't close
20 the deal without delivering the document.
21     Canary Wharf, their attorneys and
22 Mr. Iacobescu was insisting that we deliver
23 this, and I basically booted it back to
24 New York because I was involved in many, many
25 other things around the documents and the

Page 15

1  F. Bartolotta
2  design of the building, and I wasn't successful
3  in avoiding delivery of the document.
4  Q.  Okay.
5      Did you yourself have any role in
6  negotiating the content of the Surety
7  Agreement?
8  A.  No.
9  Q.  Do you know whether there were any
10 changes to the Surety Agreement -- first of
11 all, do you know that Canary Wharf drafted the
12 Surety Agreement?
13 A.  Oh, yes.
14 Q.  Okay.
15     And do you know whether there were
16 any changes to that draft between the time it
17 was first shown to Lehman Brothers Holdings,
18 Inc. and when it was signed?
19 A.  I don't recall.
20 Q.  Do you know who it was at Lehman
21 Brothers Holdings, Inc. that was dealing with
22 the Surety Agreement?
23 A.  I remember the person's position. I
24 don't remember their name.
25 Q.  What was the position?

Page 16

1  F. Bartolotta
2  A.  He was in the Treasury Group.
3  Q.  And you didn't recall that person's
4  name when I asked you about a year ago --
5  A.  Right.
6  Q.  -- correct?
7  A.  Right.
8  Q.  Let's make sure I finish the
9  question.
10 A.  Uh-huh.
11 Q.  I'm sure you'd like to end it sooner
12 rather than later. It will be a little easier
13 if we can speak one at a time.
14     Can you recall anything else about
15 your conversation that you just talked about
16 with Mr. Tulchin and Mr. Shenker?
17 A.  When we talked over the phone, they
18 just said they were going to send me a document
19 that would reflect what our conversations were.
20     And then we had a couple of
21 conversations about the language that was in
22 there, that I wanted some changes, and then
23 they delivered the document.
24 Q.  Okay.
25     When you had this first

Page 17

1  F. Bartolotta
2  conversation --
3  A.  Uh-huh.
4  Q.  -- had you -- did you have a copy of
5  the Surety Agreement in front of you?
6  A.  No.
7  Q.  You eventually got a copy; correct?
8  A.  Yes.
9  Q.  In this first conversation, was there
10 any discussion with Mr. Shenker and Mr. Tulchin
11 about the distinction between a guarantee and
12 an indemnity under English law?
13 A.  Yes. I was told there was a
14 distinction.
15 Q.  And when for the first time did you
16 learn that there was such a distinction in
17 English law?
18 A.  I had some brief understanding of the
19 distinction when I had been there on the Morgan
20 Stanley deal, because an issue came up; but I
21 did not really fully understand what the
22 difference was.
23 Q.  When you say "there on the Morgan
24 Stanley deal," what is the time frame for that?
25 A.  When I was there in London in March.

Page 18

```
 1            F. Bartolotta
 2    Q.  In March of 2014?
 3    A.  Yes.
 4    Q.  Okay.
 5        Had you had any understanding of the
 6  distinction between a guarantee and an
 7  indemnity under English law prior to that time?
 8    A.  No.
 9    Q.  Are you aware of -- well, let me ask
10  it this way.
11        Was there any other discussion of
12  English law in the conversation with
13  Mr. Shenker and Mr. Tulchin the first time
14  before you saw the Surety Agreement?
15    A.  I don't recall if it was before or
16  after, but there was a brief discussion about
17  the fact that they were different.
18    Q.  A guarantee and an indemnity are
19  different?
20    A.  Yes.
21    Q.  Okay.
22        Do you recall what the difference is?
23    A.  As I understand it, the indemnity
24  means that the parent would have backed them up
25  in any instance, including bankruptcy, and the
```

Page 19

```
 1            F. Bartolotta
 2  guarantee might not include a backup when the
 3  subsidiary went bankrupt.
 4    Q.  Okay.
 5        Are you aware of the rule in English
 6  law that when a landlord forfeits a lease or
 7  terminates a lease because of the tenant's
 8  default that there can be no damages for lost
 9  future rent against the tenant?
10    A.  No.
11    Q.  You're not familiar with that rule?
12    A.  No. No.
13    Q.  Are you familiar with the issues that
14  are in litigation as between Lehman Brothers
15  Holdings, Inc. and Canary Wharf at this time?
16    A.  No.  Other than what I've just said.
17        (Bartolotta's Exhibit 2, EMail from
18     Mr. Tulchin to Frank Bartolotta, Bates
19     Stamp Nos. CW75954 to 58, was marked for
20     identification.)
21  BY MR. ISAKOFF:
22    Q.  We have marked as Exhibit 2 --
23  Exhibit 1 for the record is Bates stamp CW75982
24  to 84, and this one, No. 2, is CW75954 through
25  58.  And it is an email from Mr. Tulchin to
```

Page 20

```
 1            F. Bartolotta
 2  you, Mr. Bartolotta, saying, "Frank, As
 3  discussed a few minutes ago, here is Schedule
 4  44," and attaching to it a copy of Schedule 44
 5  to the lease.
 6        Do you see that?
 7    A.  Yes.
 8        MR. MASELLA:  Now, I don't think the
 9  witness has reviewed the document yet, have
10  you?
11        THE WITNESS:  No.
12        MR. MASELLA:  Okay.  Take a moment to
13  review the document and let him know when
14  you're done.
15        MR. ISAKOFF:  Of course.
16    A.  (Document Review.)
17        Okay.
18    Q.  Do you recall receiving this?
19    A.  Yes.
20    Q.  And it says on the first page, "As
21  discussed a few minutes ago."
22        Do you recall whether this was after
23  only a single conversation you had with
24  Mr. Tulchin by this time?
25    A.  I believe this was after the first
```

Page 21

```
 1            F. Bartolotta
 2  call, I asked to see the document since I
 3  didn't really recall what was in the document.
 4  And since it seemed to be the point of the
 5  whole litigation, I wanted to just take a look
 6  at it, so I requested it.
 7    Q.  You referred to this a couple of
 8  times during this deposition as an indemnity.
 9    A.  Uh-huh.
10    Q.  Do you know that it's an indemnity
11  within the meaning of English law?
12    A.  I do not.  I only said that because
13  it says Indemnity.
14    Q.  In the title to Section 1 of this?
15    A.  Yes.
16    Q.  Okay.
17        Do you see that in Section 10, which
18  is on the last page of this --
19    A.  Uh-huh.
20    Q.  -- it refers to a guarantor?
21    A.  Yes.
22    Q.  Okay.
23        Did anybody point out that Section 10
24  uses the term "guarantor"?
25    A.  No.
```

Page 22

1    F. Bartolotta
2    Q. And if you look at Section 8, you see
3    that Section 8 refers to "this guarantee and
4    indemnity."
5        Did anybody point that out to you?
6    A. No.
7    Q. Do you have a recollection of anybody
8    back in 2001 referring to this as an indemnity
9    as distinguished from a guarantee or a surety
10   agreement?
11   A. No, I don't.
12   Q. Now, how about in 2000?
13   A. No.
14   Q. Did Mr. Iacobescu refer to it as an
15   indemnity?
16   A. Oh, I don't recall.
17       (Brijesh P. Dave and Richard Katz
18   enter the deposition proceedings.)
19   BY MR. ISAKOFF:
20   Q. But I assume Mr. Tulchin did?
21   A. Yes.
22   Q. Did anybody discuss with you Section
23   7? I'm talking about Mr. Tulchin or anybody
24   from Sullivan & Cromwell discuss with you
25   Section 7 which provides what happens in the

Page 23

1    F. Bartolotta
2    event there's a forfeiture of the underlying
3    lease?
4    A. We didn't even get into the details
5    of this document. I just asked for this
6    document to look at it, and it was really more
7    about what was the language in my affidavit.
8    Q. Okay.
9        Did anyone tell you that in English
10   law the word "indemnity" has two different
11   meanings quite different from one another?
12   A. I don't recall having the specific
13   conversations about the difference. To me, it
14   was all the same, guarantee, indemnity, it all
15   means the same thing.
16   Q. Okay.
17   A. I'm not an English lawyer either.
18   Q. I appreciate that, sir.
19       (Bartolotta's Exhibit 3, EMail,
20   Bates No. CW75959, was marked for
21   identification.)
22   BY MR. ISAKOFF:
23   Q. Mr. Bartolotta, we've marked as
24   Exhibit 3, CW75959, and it's just the next item
25   in the chronology of communications between you

Page 24

1    F. Bartolotta
2    and Sullivan & Cromwell.
3        Now, this says this is a follow-on to
4    the last email about -- it looks like about 20
5    minutes later, asking do you have time for a
6    quick call.
7        Do you recall having a telephone
8    conversation?
9    A. Yes. We had several conversations
10   over the two or three-day period from when they
11   first contacted me to the time I delivered.
12   Q. Do you happen to remember what the
13   subject of this was, having just gotten the
14   Surety Agreement?
15   A. No. We had several quick calls about
16   the drafts of the document.
17   Q. Okay.
18       (Bartolotta's Exhibit 4, EMail from
19   Mr. Tulchin, Bates No. CW75960, was
20   marked for identification.)
21   BY MR. ISAKOFF:
22   Q. We've marked as Exhibit 4, CW75960,
23   which is Mr. Tulchin's email to you two minutes
24   after the last exhibit and saying that he'll
25   call you. I'm just doing this for

Page 25

1    F. Bartolotta
2    completeness, really, because this doesn't say
3    much.
4    A. Okay.
5    Q. But do you recall that he then called
6    you?
7    A. Uh-huh. Yes.
8    Q. Yes. Okay. All right.
9        (Bartolotta's Exhibit 5, EMail from
10   Mr. Tulchin, Bates No. CW75961 to 64, was
11   marked for identification.)
12   BY MR. ISAKOFF:
13   Q. For the record, we've just marked
14   Exhibit 5 which is CW759961 to 64, which is an
15   email from Mr. Tulchin to you about an hour and
16   18 minutes after the last one, attaching what
17   looks like a draft of your affidavit.
18       Why don't you take whatever time you
19   need to review this and let me know if I've
20   accurately characterized it.
21   A. (Document Review.)
22   Yes.
23   Q. Okay.
24       Now, you might want to get out
25   Exhibit 1, which is the final --

7 (Pages 22 to 25)

Page 26

    F. Bartolotta
2 A. Uh-huh.
3 Q. -- because we may want to compare
4 different portions of this where there were
5 some changes.
6  Did you actually do any of the
7 drafting of the affidavit in the sense of doing
8 the word processing on it, or did you just
9 comment on drafts that Mr. Tulchin sent you?
10 A. I commented on drafts.
11 Q. Okay.
12  Did you dictate any of the affidavit
13 to Mr. Tulchin?
14 A. No. I just marked the document for
15 the revisions that I thought were appropriate,
16 or I might have even given it to him over the
17 phone. I don't recall whether I sent anything
18 or just spoke to him over the phone, but I made
19 revisions to the draft.
20 Q. Okay.
21  But you didn't draft any of this --
22 A. No.
23 Q. -- in the first instance?
24 A. No.
25 Q. Okay.

Page 27

    F. Bartolotta
2  Now, if you'll look at paragraph 3 of
3 Exhibit 5, it says, the second sentence says,
4 "During the course of negotiations, I reported
5 to Mark Marcucci in New York and all points of
6 a material commercial significance went back to
7 New York."
8  Have I read it accurately?
9 A. Yes.
10 Q. Okay.
11  And if you'll notice on paragraph 3
12 of the final takes much of that out.
13  Was that at your request?
14 A. Yes.
15 Q. What was it -- what was the reason
16 why you asked for that to be changed?
17 A. The reason was that I didn't think my
18 reporting to Mr. Marcucci was relevant to the
19 point, because although technically I reported
20 to him, I reported both locally and to him.
21 And he didn't have anything specific in terms
22 of the negotiations of this document and in
23 many ways didn't really involve himself in the
24 negotiation of the documents.
25  I would negotiate things, send them

Page 28

    F. Bartolotta
2 back, and say this is where I'm going, but most
3 of the hard business decisions were made
4 jointly with London and New York.
5 Q. Okay.
6  In the final Exhibit 1, where it
7 says, "The question of whether Lehman itself,
8 the parent in New York, would extend an
9 indemnity went back to Lehman at its
10 headquarters in New York," was that word
11 "indemnity" your word or Mr. Tulchin's?
12 A. It was in the draft that was sent to
13 me and I agreed with it because that's what the
14 document said.
15 Q. And that that's what the word on the
16 heading?
17 A. Yes.
18 Q. -- of Section 1 of the --
19 A. Yes.
20 Q. Let me finish my question.
21  That's because the heading of
22 Section 1 of Schedule I used the word
23 "indemnity"; correct?
24 A. Correct.
25 Q. And for no other reason; correct?

Page 29

    F. Bartolotta
2 A. Correct.
3  MR. MASELLA: Objection.
4  You may answer.
5 BY MR. ISAKOFF:
6 Q. Okay.
7  If you'll turn to the second page of
8 the draft affidavit that is part of Exhibit 5,
9 it begins, "I recall the negotiations around
10 the provisions in the lease dealing with the
11 indemnity to be given by the parent company,
12 Lehman."
13  Is the word "indemnity" there used,
14 so far as you know, for the same reason that it
15 was in the paragraph we just discussed,
16 paragraph 3?
17 A. Yes.
18 Q. And that was in the draft as you got
19 it; correct?
20 A. Yes.
21 Q. And then that sentence continues,
22 where it says, "The indem -- I recall the
23 negotiations around the provisions in the lease
24 dealing with the indemnity to be given by the
25 parent company, Lehman, because we fought very

8 (Pages 26 to 29)

```
                                                Page 30
 1                F. Bartolotta
 2   hard for several weeks to limit those
 3   provisions to those of the guarantor under
 4   English law."
 5          Do you see that?
 6       A.  Yes.
 7       Q.  And in the final, looking at the
 8   beginning of paragraph 5 of Exhibit 1, it says,
 9   "I recall the negotiations around the
10   provisions in the lease dealing with the
11   indemnity to be given by the parent company,
12   Lehman, because we fought very hard to limit
13   liability to the English subsidiary."
14       A.  Uh-huh.
15       Q.  Was that change made at your request?
16       A.  Yes.
17       Q.  Why did you request that change?
18       A.  Because I thought the way it was
19   drafted was leading into the argument of what's
20   an indemnity or a guarantee.  And I wanted to
21   describe it as I understood it, which is
22   basically it's a full obligation of the parent
23   to back up the subsidiary in any event.
24          So I didn't want to get into a legal
25   argument.  I didn't feel I was, you know, I had
```

```
                                                Page 31
 1                F. Bartolotta
 2   the knowledge to do that.
 3       Q.  Right.
 4          And, in fact, you had no recollection
 5   of there being any fight to limit the
 6   provisions to those of the guarantor under
 7   English law; correct?
 8       A.  No.  I had recollection of their --
 9   of us trying to avoid any liability of the
10   parent.
11       Q.  Right.
12          But you recall the point of
13   contention being was whether Lehman would sign
14   the Surety Agreement at all; correct?
15       A.  Yes.
16       Q.  Okay.
17          And so far as you know, there was no
18   fight to limit the provisions of that Surety
19   Agreement to those of the guarantor under
20   English law?
21       A.  The fight was to prevent to limit the
22   liability to the English subsidiary.  Just what
23   I said.
24       Q.  Right.
25          But this sentence that was given to
```

```
                                                Page 32
 1                F. Bartolotta
 2   you in draft was without basis so far as your
 3   knowledge is concerned; correct?
 4       A.  No.  You're putting words in my
 5   mouth.  I said I didn't like the way it was
 6   worded.  I changed it to this way because this
 7   was my understanding of what we were trying to
 8   do, was trying to avoid the parent having any
 9   liability.
10       Q.  Okay.
11          At this point in your discussions
12   with Sullivan & Cromwell, you didn't tell them
13   that Lehman had fought to limit the provisions
14   to those of the guarantor under English law
15   because you didn't even know what that meant
16   back at the time of the negotiations; correct?
17       A.  No, I wouldn't have used those words.
18       Q.  Okay.
19          Now, paragraph 5 goes on to say after
20   Canary Wharf's position was immovable, it says,
21   "George Iacobescu, CEO of Canary Wharf,
22   insisted on a direct contractual obligation
23   from Lehman that" --
24          MR. TULCHIN:  Can I ask you if you're
25   reading from the draft or the final --
```

```
                                                Page 33
 1                F. Bartolotta
 2          MR. ISAKOFF:  Draft.
 3          MR. TULCHIN:  -- because it's not
 4   clear from the record.
 5          MR. ISAKOFF:  I'm sorry, I'm reading
 6   from paragraph 5 of Exhibit 5.  Thank you.
 7   BY MR. ISAKOFF:
 8       Q.  It says, George Iacobescu, CEO of
 9   Canary Wharf, insisted on a direct contractual
10   obligation from Lehman that could be relied on
11   whatever happened to LBL and have certainty
12   that Lehman would be required to pay the rents
13   and other amounts due regardless of
14   enforceability against LBL or LBL's condition
15   or status."
16          Are those words that you used in your
17   conversations with Mr. Tulchin?
18       A.  I don't recall if those were my
19   direct -- those are my exact words.  We had an
20   open conversation about what was the setting of
21   what happened.  I don't recall if those were my
22   exact words.
23       Q.  Okay.
24          Now, if you look at paragraph 5 in
25   Exhibit 1, which is the final version, it says,
```

Page 34

1  F. Bartolotta
2  "After, however, Canary Wharf's position was
3  immovable," it says, "George Iacobescu, CEO of
4  Canary Wharf, insisted on a full indemnity."
5  Let me just stop there.
6  Do you have a recollection of him
7  using those words back in 2000 or 2001?
8  A. No. My use of the word is simply
9  because when I saw the document it said
10 "indemnity," and so that's what I called it.
11 Q. Okay.
12 Then it adds, "I.e., a direct
13 contractual obligation from the parent, Lehman,
14 that could be relied on no matter what happened
15 to LBL, the English subsidiary."
16 Were those words you used with
17 Mr. Tulchin?
18 A. Yes. Because that was my
19 understanding. There was an absolute
20 obligation of the parent, whether you called it
21 guarantee or indemnity, that's what it really
22 was, a direct full obligation of the parent to
23 back up the subsidiary.
24 Q. Okay.
25 Now, do you know whether, in the

Page 35

1  F. Bartolotta
2  event a landlord forfeits a lease and the
3  tenant is no longer obligated to pay rents,
4  whether the guarantor, a guarantor is obligated
5  to pay those rents?
6  A. Under --
7  MR. MASELLA: I'm going to object to
8  the hypothetical.
9  You may answer.
10 A. Under English law?
11 Q. Yes.
12 A. No, I'm not an English lawyer. I
13 don't.
14 Q. Okay.
15 Now if you'll compare paragraph 6 of
16 Exhibit 5 with paragraph 6 of Exhibit 1, there
17 are some figures that appear in the Exhibit 5,
18 which is the draft, but don't appear in the
19 final.
20 Was it your idea to take those out?
21 A. Yes.
22 Q. And what was the reason for that?
23 A. Because I couldn't recall the exact
24 numbers myself. I had a good idea what they
25 were, but I couldn't recall and I didn't want

Page 36

1  F. Bartolotta
2  to go back and read the lease documents again
3  to see if the numbers were accurate.
4  The only one I really remembered was
5  the rent-free period.
6  Q. There's a sentence at the end of
7  paragraph 6 in Exhibit 1, the final, which does
8  not appear at least in those exact words in
9  Exhibit 5. And they say, "These upfront
10 payments and obligations assumed by Canary
11 Wharf appeared to make Canary Wharf even more
12 determined to obtain the indemnity."
13 First of all, is the word "indemnity"
14 used there for the same reason it was in
15 paragraphs --
16 A. Everywhere in this --
17 Q. -- 3 and 5?
18 A. Sorry. Everywhere in this document I
19 used the word because that's what the document
20 said. To make it easy to go back and forth.
21 Q. And was this something that you, this
22 sentence that I just read from Exhibit 1, is
23 that something that you recall saying to
24 Mr. Tulchin?
25 A. Yes.

Page 37

1  F. Bartolotta
2  Q. Okay.
3  So the point being that because
4  Canary Wharf was making various commitments on
5  its side, it wanted to get the Surety Agreement
6  that it had drafted signed by Lehman Brothers
7  Holdings, Inc.; correct?
8  A. Well, that's not what this sentence
9  is saying. What this sentence says, okay, is
10 during the course of the negotiations we were
11 asking for more and more and more. And my
12 discussions with George Iacobescu was, it was
13 getting to the point where we were asking for
14 much more than we had started with. And he was
15 becoming more insistent that there was no way
16 this deal could go through without this
17 indemnity being delivered because we were
18 asking for much, much more than we had started
19 negotiations on.
20 Q. Okay.
21 When you refer to the indemnity,
22 you're referring to Schedule 4?
23 A. Yes.
24 Q. And so far as you know, there was
25 nothing about the terms of Schedule 4 that

Page 38

1         F. Bartolotta
2  changed during the negotiations, even while
3  Canary Wharf was making other concessions;
4  correct?
5       A.   I wouldn't know because I wasn't
6  involved in the negotiation of the document.
7       Q.   Okay.
8            (Bartolotta's Exhibit 6, EMail from
9       Mr. Tulchin, Bates No. CW75965 to 68, was
10      marked for identification.)
11 BY MR. ISAKOFF:
12      Q.   We've marked, Mr. Bartolotta, as
13 Exhibit 6, CW75965 to 68, which is another
14 email from Mr. Tulchin to you on March 27th,
15 which is the day after Exhibit 5 that we just
16 looked at, attaching a new version of the
17 affidavit; correct?
18      A.   Yes.
19      Q.   If you'll turn back to Exhibit 5, I'd
20 like to compare that with this one, if we
21 could.
22           Exhibit 5, we already looked at this
23 language in paragraph 3 which in that draft
24 says, "During the course of negotiations, I
25 reported to Mark Marcucci in New York and all

Page 39

1         F. Bartolotta
2  points of a material commercial significance
3  went back to Lehman in New York."
4            Do you see that?
5       A.   Yes.
6       Q.   And then in this version, it says,
7  "During the course of negotiations Lehman
8  people in London were involved in the decisions
9  on most issues but the question of whether
10 Lehman itself, the parent in New York, would
11 extend an indemnity went back to Lehman at its
12 headquarters in New York."
13           MR. MASELLA:  I'm sorry, you've lost
14      me.  Which exhibit are we talking about?
15           MR. ISAKOFF:  6.
16           MR. MASELLA:  You want to compare 1
17      and 6 or 1 and 5?
18           MR. ISAKOFF:  5 and 6.
19           MR. MASELLA:  5 and 6.
20           MR. ISAKOFF:  I apologize.
21           MR. MASELLA:  That's fine.  Okay.  So
22      paragraph 3 in 5 and 6.
23 BY MR. ISAKOFF:
24      Q.   And the question is, is this a change
25 that you requested between 5 and 6?

Page 40

1         F. Bartolotta
2       A.   Okay.
3            MR. MASELLA:  So take a look at
4       paragraph 3 in 5 and 6.
5       A.   Yes.
6       Q.   And why did you request this?
7       A.   Simply because it seemed to me that
8  it made it sound -- the first draft made it
9  sound like Mark Marcucci was the
10 decision-maker.  And, in reality, he was not
11 really the decision-maker.  It was a
12 combination of local London people that I
13 reported to, other people in New York, and
14 Mr. Marcucci, to my knowledge, had nothing to
15 do with the document, the negotiation of the
16 indemnity.
17           (Bartolotta's Exhibit 7, EMail from
18      Mr. Tulchin, Bates No. CW75969 to 72, was
19      marked for identification.)
20 BY MR. ISAKOFF:
21      Q.   We've marked as Exhibit 7, CW75969 to
22 72, which is also an email to you from
23 Mr. Tulchin on March 27 attaching a new version
24 of the affidavit saying he -- that "I've made
25 the one change you requested and the final

Page 41

1         F. Bartolotta
2  version is attached."
3            And the one -- I would just ask you
4  to compare the very last line of Exhibits 6 and
5  7.
6            MR. MASELLA:  6 and 7.  That's one.
7            THE WITNESS:  That's 7.
8            MR. MASELLA:  This is 6.  So you want
9       him to compare the last line of 6 and 7;
10      correct?
11      A.   Yes, got it.
12           MR. TULCHIN:  The last line of the
13      last paragraph?
14           MR. ISAKOFF:  Yes.
15           MR. MASELLA:  The last paragraph or
16      the last line?
17           MR. ISAKOFF:  I'm looking at the last
18      line of the last paragraph.
19           MR. MASELLA:  So this one with this
20      one.
21      A.   Okay.
22      Q.   And in 6, it says, "In the end, Mark
23 Marcucci, the Lehman executive in New York
24 responsible for this decision, accepted that
25 position and the lease included the indemnity

## Page 42

1      F. Bartolotta
2  from Lehman that George Iacobescu of Canary
3  Wharf demanded," and in Exhibit 7 that sentence
4  is shortened to say, "In the end Lehman
5  accepted that position and the lease included
6  the indemnity from Lehman."
7      And I would ask, was that a change
8  you requested?
9      A.  Yes.
10     Q.  And what was the reason you requested
11 the change?
12     A.  The same reason I said before in the
13 other paragraph, and that is that Mark
14 Marcucci, to my knowledge, was not making the
15 decision on the delivery of this document.
16 This was made at a much senior, more senior
17 level.
18     Q.  At Lehman Treasury?
19     A.  Yes.
20     Q.  Okay.
21     And the term "indemnity" here is the
22 same as used throughout, is for convenience
23 because that's what the section heading of
24 paragraph 1 said?
25     A.  Yes.

## Page 43

1      F. Bartolotta
2      Q.  I'd ask you to hang on to Exhibit 7
3  while we look at Exhibit 8.
4      A.  Okay.
5      (Bartolotta's Exhibit 8, EMail from
6      Mr. Tulchin, Bates No. CW75973 to 76, was
7      marked for identification.)
8  BY MR. ISAKOFF:
9      Q.  Marked as Exhibit 8, CW75973 to 76,
10 another email from Mr. Tulchin to you on
11 March 27, 2014, attaching another version of
12 the affidavit.
13     And I would ask you, again, to turn
14 to the last page of Exhibit 7 and the last page
15 of Exhibit 8 where the word "absolute" seems to
16 be substituted for "bullet proof."
17     Was that a change that you requested?
18     A.  Yes.
19     Q.  Why?
20     A.  I just didn't like "bullet proof" in
21 quotes.
22     Q.  Okay.
23     And do you recall whether there were
24 any further changes after this?
25     A.  I don't think so.

## Page 44

1      F. Bartolotta
2      (Bartolotta's Exhibit 9, EMail from
3      Mr. Tulchin, Bates No. CW75977, was
4      marked for identification.)
5  BY MR. ISAKOFF:
6      Q.  Exhibit 9 is CW75977, which is
7  another email from Mr. Tulchin to you telling
8  you who the notary is going to be.
9      Do you see that?
10     A.  Yes.
11     Q.  And saying that the notary is going
12 to be there at around 3:00 o'clock that
13 afternoon, if you look down to the --
14     A.  Yes.
15     Q.  And did the notary show up then?
16     A.  I'm not sure exactly the time, but he
17 did show up that afternoon, yes.
18     Q.  Did you ever find out whether there
19 was any urgency about your signing this
20 affidavit?
21     A.  No, I didn't ask.
22     Q.  Did you ever think about calling
23 Lehman or any of its representatives before you
24 signed this?
25     A.  No.

## Page 45

1      F. Bartolotta
2      (Bartolotta's Exhibit 10, EMail
3      dated March 27, 2014, Bates No. CW75979,
4      was marked for identification.)
5  BY MR. ISAKOFF:
6      Q.  Exhibit 10 is CW75979.  It's an email
7  from you to Mr. Iacobescu on March 27, 2014 at
8  3:02 p.m. where you say in the second
9  paragraph, "With regard to the Lehman
10 litigation, I will be signing the affidavit
11 this afternoon and delivering it to S&C."
12     Do you see that?
13     A.  Yes.
14     Q.  Do you recall how much after this you
15 signed the affidavit?
16     A.  No, I don't.
17     Q.  Okay.
18     It starts off, it says, "Thanks again
19 for your assistance on the Heintz transaction.
20 It looks like we're done but for the signatures
21 on the document."
22     What was that in reference to?
23     A.  Morgan Stanley was selling its
24 building in Canary Wharf to Heintz, and there
25 were two deeds of release that Canary Wharf

Page 46

1  F. Bartolotta
2  needed to deliver in connection with the
3  transaction. And we were trying to close very
4  quickly, and I asked George if he could get his
5  attorney to act on it quickly as we wanted to
6  deliver the documents to Heintz in Texas that
7  day or the day after. And his attorney just
8  couldn't get a hold of him. So I had called
9  George and said could you please try and get
10 your attorney to sign these. They were already
11 agreed to. It was just a matter of getting
12 them signed and delivered.
13    Q.   Is this the same transaction you were
14 discussing with Mr. Iacobescu when you first
15 spoke with him about speaking to Sullivan &
16 Cromwell lawyers?
17    A.   No. They're two different things.
18       When I went to London, I had lunch
19 with George, talked to him about the Morgan
20 Stanley deal. We mentioned the Lehman
21 litigation, but they were two unrelated,
22 completely unrelated things.
23    Q.   Okay.
24       Last line of this -- actually, before
25 we get there.

Page 47

1  F. Bartolotta
2    A.   Uh-huh.
3    Q.   You say, "Small world. I hadn't
4  worked with Joe Shenker since 1982 when we did
5  the first commercial paper financing of real
6  estate."
7       Had you spoken with Mr. Shenker since
8  1982?
9    A.   I don't think so, no. In fact, I
10 didn't even remember who he was when he first
11 called me.
12    Q.   Okay.
13       And then the next paragraph says,
14 "Hopefully, the next time I come to London we
15 can enjoy some time together with our wives at
16 Harry's Bar without having to discuss business
17 issues."
18    A.   Yes.
19    Q.   Had you met Mr. Iacobescu's wife
20 before?
21    A.   Oh, yes. Yes.
22    Q.   On how many occasions?
23    A.   Over the -- from 1990 to 2005,
24 numerous times, you know, we went out socially.
25    Q.   Okay.

Page 48

1  F. Bartolotta
2    Q.   So he's a social friend of yours?
3    A.   Yes, I would call him a friend.
4    Q.   Okay.
5       (Bartolotta's Exhibit 11, Series of
6  EMails, Bates Nos. CW75980 to 81, was
7  marked for identification.)
8  BY MR. ISAKOFF:
9    Q.   Mr. Bartolotta, Exhibit 11 is CW75980
10 to 81, which is an email chain also on
11 March 27th between you and Sullivan & Cromwell
12 lawyers, including Mr. Tulchin and Mr. Shenker.
13       Have I correctly characterized the
14 document?
15    A.   Yes.
16    Q.   Did you ever get together with
17 Mr. Shenker?
18    A.   No.
19       MR. ISAKOFF: All right. Why don't
20 we take a break?
21       THE WITNESS: Okay.
22       THE VIDEOGRAPHER: The time is 2:52.
23 We're going off the record.
24       (Recess taken from 2:52 p.m. to
25 3:09 p.m.)

Page 49

1  F. Bartolotta
2       THE VIDEOGRAPHER: The time is 3:09.
3  We're back on the record.
4  BY MR. ISAKOFF:
5    Q.   Mr. Bartolotta, do you still have
6  Exhibit 10 in front of you. It's the email
7  from you to Mr. Iacobescu dated March 27th.
8       MR. MASELLA: There it is.
9  BY MR. ISAKOFF:
10   Q.   I know I asked you about this before
11 the break and I may have misunderstood your
12 answer. The question I have is, the Heintz
13 transaction that this refers to, is that
14 something that you had been talking to
15 Mr. Iacobescu about in mid March of this year
16 in London?
17   A.   I had spoken to him about it before
18 that time and then again when I went to London,
19 I talked to him about it, yes.
20   Q.   Okay.
21       Were there any other things connected
22 to Morgan Stanley that you were talking to
23 Mr. Iacobescu about in and about March of this
24 year?
25   A.   We talked about things that we did

13 (Pages 46 to 49)

Page 58

1       F. Bartolotta
2       MR. ISAKOFF: Object to form. It
3   assumes there is only two possibilities.
4       MR. MASELLA: You may answer.
5       A.   It appeared to me to be a reflection
6   of our discussion.
7       Q.   Now, with respect to the drafts that
8   followed this, did the changes that were made
9   on the successive drafts, including the changes
10  that Mr. Isakoff pointed out to you on direct
11  examination, did those changes get made because
12  you asked for them to be made?
13      A.   Yes.
14      Q.   Now, can I ask you, Mr. Bartolotta,
15  to go back to Exhibit 1. This is the executed
16  affidavit.
17      And could you look, please, sir, on
18  the paragraph 5 on the second page. I'm just
19  going to read it and then I want to ask you
20  some questions.
21      Paragraph 5 says this, I recall the
22  negotiations around the provisions in the lease
23  dealing with the indemnity to be given by the
24  parent company Lehman because we fought very
25  hard to limit liability to the English

Page 59

1       F. Bartolotta
2   subsidiary. However Canary Wharf's position
3   was immovable. George Iacobescu, CEO of Canary
4   Wharf, insisted on a full indemnity, i.e., a
5   direct contractual obligation from the parent,
6   Lehman, that could be relied on no matter what
7   happened to LBL (the English subsidiary). He
8   insisted that Lehman would be required to pay
9   the rents and other amounts due regardless of
10  whether LBL remained obligated to pay."
11      Now that's the full paragraph 5;
12  correct?
13      A.   Yes.
14      Q.   Can you tell me, sitting here today
15  May 7, 2014, what you remember about the
16  negotiations that pertain to what's said in
17  paragraph 5?
18      MR. ISAKOFF: Objection. Lack of
19  foundation.
20      MR. MASELLA: You may answer.
21      A.   During the negotiations, this
22  indemnity, as it's called, was on the table and
23  I objected to it because I did not want to have
24  the U.S. entity be responsible.
25      Canary Wharf insisted that they would

Page 60

1       F. Bartolotta
2   not complete the deal without this document.
3   At that point, because I was working on many
4   things and was not going to be my decision I
5   was booted back to New York for consideration
6   on the premise that Canary Wharf would not
7   complete the transaction without delivery of
8   that document.
9       It was then negotiated in New York
10  and delivered back and slipped into the
11  documents as is. So that reflects my
12  understanding, I could not complete the deal
13  without that document being delivered.
14      Whether the words were changed or
15  not, I do not know because I did not negotiate
16  the document, but the document was ultimately
17  delivered to Canary Wharf's satisfaction and
18  the deal was completed.
19      Q.   Do you recall Mr. Iacobescu -- well,
20  strike that.
21      Let me start with this. Did you
22  speak directly to Mr. Iacobescu about this
23  subject?
24      A.   Yes.
25      Q.   And you recall those conversations?

Page 61

1       F. Bartolotta
2       A.   Yes.
3       Q.   Do you recall Mr. Iacobescu saying to
4   you, in words or substance, that Canary Wharf
5   would not do the deal without a direct
6   contractual obligation from the parent in
7   New York --
8       A.   Yes.
9       MR. ISAKOFF: Wait a minute. Let him
10  finish the question. Then let me object.
11  BY MR. TULCHIN:
12      Q.   -- that could be relied on, no matter
13  what happened to the English subsidiary?
14      MR. ISAKOFF: I object to the form.
15      MR. MASELLA: You may answer.
16      A.   Can you ask the question again
17  because I lost track when I answered.
18      Q.   Sure.
19      Do you recall Mr. Iacobescu in your
20  conversation saying that Canary Wharf would not
21  do the deal unless the parent in New York was
22  on the hook to pay the rent no matter what
23  happened to the English subsidiary?
24      MR. ISAKOFF: I object to the form.
25      MR. MASELLA: You may answer.

16 (Pages 58 to 61)

Page 74

1         F. Bartolotta
2         MR. MASELLA:  You may answer.
3     A.    I don't understand when you say
4  what's important.  What -- to me, the thing
5  that I remember the most about the transaction,
6  as it relates to what we're talking about here,
7  is that I could not complete the transaction
8  without signing the document called Indemnity
9  in the Schedule 4.
10        That's the one thing that really
11  sticks out, because it was a hard fought
12  negotiation over an extended period of time and
13  the document was the last thing that we had to
14  get through to get the deal complete.
15        And so it stands out to me that we
16  were -- we were -- the deal was heavily
17  negotiated and this is last point of the whole
18  thing was delivering this agreement.
19     Q.    And did you understand at the time
20  that what Lehman would be required to deliver
21  was this absolute promise from the New York
22  parent to pay no matter what might happen to
23  the English subsidiary?
24        MR. ISAKOFF:  I object to form and
25     calls for a legal conclusion.

Page 75

1         F. Bartolotta
2         MR. MASELLA:  You may answer.
3     A.    That was my understanding.
4         MR. TULCHIN:  Nothing else.
5         MR. ISAKOFF:  All right.  Let's take
6     a break and we'll have a few more
7     questions.
8         MR. MASELLA:  We don't need a break.
9         MR. ISAKOFF:  I need a break.  I need
10     to consult with my client for a minute.
11        THE VIDEOGRAPHER:  The time is 3:39.
12     We're going off the record.
13        (Recess taken from 3:39 p.m. to
14     3:45 p.m.)
15        THE VIDEOGRAPHER:  The time is 3:45.
16     We're back on the record.
17
18  EXAMINATION BY MR. ISAKOFF:
19     Q.    Mr. Bartolotta, I appreciate you
20  making yourself available to us for this and I
21  just have another couple of questions.
22        If you'll look at Exhibit 1, which is
23  the --
24     A.    Yes.
25     Q.    -- this is the final of your

Page 76

1         F. Bartolotta
2  affidavit.  And on Mr. Tulchin's examination,
3  he pointed you to paragraph 7 and he pointed
4  the words "complete certainty of income stream
5  going forward."
6         Do you see that?
7     A.    Yes.
8     Q.    Now, is it your testimony that
9  Mr. Iacobescu told you that Canary Wharf would
10  not go forward with the deal unless LBHI,
11  Lehman Brothers Holdings, Inc., agreed to sign
12  on the Schedule 4?
13     A.    Yes.
14        MR. MASELLA:  Objection.  Misstates
15     the testimony.
16        You may answer.
17     A.    Yes.
18     Q.    And do you have enough expertise in
19  English law to know whether Schedule 4 provides
20  for complete certainty of income stream going
21  forward from LBHI under any and all
22  circumstances, including where Canary Wharf
23  terminated the LBL lease and did not serve a
24  notice under Section 7 of the Surety Agreement
25  requiring Lehman Brothers Holdings, Inc. to

Page 77

1         F. Bartolotta
2  accept a substitute lease?
3     A.    I'm not an English lawyer.  I did not
4  understand the difference.
5     Q.    Okay.
6         So you don't know whether Schedule 4
7  itself unconditionally provided for complete
8  certainty of income stream going forward;
9  correct?
10     A.    It was my understanding that's what
11  it did.  I don't know for sure under English
12  law, but my understanding, that's what that
13  document accomplished.
14     Q.    Okay.
15        But you don't have any independent
16  expertise of your own?
17     A.    No.
18     Q.    Okay.
19        And I know that Mr. Tulchin asked you
20  whether you believed everything that's factual
21  in the affidavit to be true and you testified
22  that you thought it was.
23     A.    Uh-huh.
24     Q.    Are you aware of all of the legal
25  implications of some of the terms that are

20 (Pages 74 to 77)

TSG Reporting - Worldwide    877-702-9580

Page 78

1    F. Bartolotta
2  sprinkled throughout the affidavit, including
3  the use of the word "indemnity"?
4    A.  I used the word "indemnity" because
5  that's what document was called.  My
6  understanding, I'm not an English lawyer, I
7  don't know the real difference, I didn't know
8  the difference at the time, all my
9  understanding was is that the parent was going
10 to stand behind the subsidiary in all
11 instances.
12   Q.  Okay.
13       So it's fair to say you think the
14 document is true -- that the affidavit is true
15 as a factual matter, but you may not be aware
16 of all the legal implications of what it
17 actually says; is that correct?
18   A.  Correct.
19       MR. ISAKOFF:  Nothing further.
20       MR. TULCHIN:  Nothing from me.
21       MR. MASELLA:  Just before we go off
22 the record, the witness would like the
23 opportunity to review the transcript and
24 prepare an errata.
25       And thank you very much, everyone,

Page 79

1    F. Bartolotta
2  for your courtesy here today.
3     THE VIDEOGRAPHER:  The time is 3:48.
4  This is the completion of today's
5  deposition, May 7, 2014.
6     (The deposition was concluded at
7  3:48 p.m.)

16  FRANK BARTOLOTTA

18 Subscribed and sworn to before me
19 this    day of       2014.

Page 80

1    F. Bartolotta

3    C E R T I F I C A T E

5  STATE OF NEW YORK )
6               ) ss.:
7  COUNTY OF NEW YORK )

9     I, THOMAS A. FERNICOLA, Registered
10 Reporter and Notary Public within and for
11 the State of New York, do hereby certify
12 that the within is a true and accurate
13 transcript of the proceedings held on May
14 7, 2014.
15     That I am not related to any of the
16 parties to this action by blood or
17 marriage; and that I am in no way
18 interested in the outcome of this matter.
19     IN WITNESS WHEREOF, I have hereunto
20 set my hand this 7th day of May, 2014.

23     THOMAS A. FERNICOLA, RPR

Page 81

1    F. Bartolotta
2  ------------------------ INDEX -------------------
3  ATTORNEY                          PAGE
4  Ms. Isakoff                        6
5  Mr. Tulchin                        51
6  Mr. Isakoff                        75

21 (Pages 78 to 81)