# EXHIBIT   50

## Page 1

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------X

In Re:
LEHMAN BROTHERS HOLDINGS INC.,
et al.,

        Debtors.

Chapter 11
CASE NO.: 08-13555(JMP)
(Jointly Administered)

--------------------------------------X

       125 Broad Street
       New York, New York
       September 12, 2013
       9:21 a.m.

      VIDEOTAPED DEPOSITION of RICHARD
MILLETT, before Melissa Gilmore, a Notary
Public of the State of New York.

    ELLEN GRAUER COURT REPORTING CO. LLC
    126 East 56th Street, Fifth Floor
      New York, New York 10022
        212-750-6434
        REF:  104785

## Page 2

1  A P P E A R A N C E S:
2
3  SULLIVAN & CROMWELL LLP
4  Attorneys for Canary Wharf Management, Heron
5  Quays (HQ2) T1 Limited and Heron Quays (HQ2) T2
6  Limited
7    125 Broad Street
8    New York, New York 10004-2498
9  BY:  MARC DE LEEUW, ESQ.
10    JOHN GARRETT McCARTHY, ESQ.
11    PHONE 212-558-4219
12    FAX 212-558-3588
13    E-MAIL deleeuwm@sullcrom.com
14
15
16  WEIL, GOTSHAL & MANGES LLP
17  Attorneys for Lehman Brothers Holdings Inc. and
18  the Witness
19    1300 Eye Street NW, Suite 900
20    Washington, DC 20005-3314
21  BY:  PETER D. ISAKOFF, ESQ.
22    PHONE 202-682-7155
23    FAX 202-857-0940
24    E-MAIL peter.isakoff@weil.com
25

## Page 3

1  A P P E A R A N C E S:  (Cont'd)
2
3  WEIL, GOTSHAL & MANGES LLP
4  Attorneys for Lehman Brothers Holdings Inc. and
5  the Witness
6    767 Fifth Avenue
7    New York, New York 10153
8  BY:  ARIELLE GORDON, ESQ.
9    PHONE 212-310-8000
10    FAX 212-310-8007
11    E-MAIL arielle.gordon@weil.com
12
13
14  ALSO PRESENT:
15    DANIEL SALEMI, Videographer
16
17
18
19
20
21
22
23
24
25

## Page 4

1  ------------------ I N D E X ------------------
2  WITNESS     EXAMINATION BY     PAGE
3  RICHARD MILLETT    MR. DE LEEUW    8, 341
4        MR. ISAKOFF     338
5
6
7  --------------- E X H I B I T S ---------------
8  MILLETT    DESCRIPTION     FOR I.D.
9  Exhibit 117  Portions of Textbook    46
10    Entitled The
11    Interpretation of
12    Contracts by Sir Kim
13    Lewison
14  Exhibit 118  Printout of Decision, CDV    55
15    Software Entertainment
16    A.G. versus Gamecock
17    Media Europe, Limited
18  Exhibit 119  Excerpts from the    79
19    O'Donovan and Phillips
20    Treatise, The Modern
21    Contract of Guarantee
22  Exhibit 120  Retyped Version of    150
23    Paragraph 1 from Schedule
24    4
25

MILLETT

1
2     A.   Yes, two-one.
3     Q.   There's a first class and a second
4  class, and you were in the upper of the second
5  class?
6     A.   Yeah.  There's a first class, an
7  upper second, lower second, and third.
8     Q.   I noticed in your report you
9  referred to a Megarry Prize for landlord and
10 tenant law?
11    A.   Megarry.
12    Q.   Megarry.  Thank you very much.
13       Is that a prize award by Cambridge
14 University?
15    A.   No, it's not.  It's a prize that is
16 awarded by the four ends of court for the top
17 mark in the landlord and tenant specialist
18 exam, which forms part of the bar exam for
19 England and Wales.
20    Q.   Through the -- that's a separate
21 school from Cambridge University?
22    A.   Yes.  It's the post graduate
23 professional training school.
24    Q.   How many times have you been
25 retained as an expert?

MILLETT

1
2     A.   I can't remember.  I can't remember
3  a precise number.  I can't give you a precise
4  figure.
5     Q.   Could you give me a ballpark figure?
6     A.   It's probably about ten.
7     Q.   I think you said it was probably
8  somewhere from five to ten with Weil.
9        Were those all expert retentions?
10    MR. ISAKOFF:  I'm going to object to
11 the form of that question.
12    A.   I did not say that I had been
13 retained by Weil Gotshal as an expert five to
14 ten times.
15       What I said was what that I had been
16 instructed, as a barrister, on cases by Weil
17 Gotshal between five and ten times, very much
18 as a ballpark.
19    Q.   That was my question.  How many
20 times have you been retained by Weil Gotshal as
21 an expert?
22    A.   To the best of my recollection, this
23 is the first such instruction.
24    Q.   In the previous instances in which
25 you have been working with Weil Gotshal, you

MILLETT

1
2  were being instructed as a barrister; is that
3  correct?
4     A.   Well, I'm still being instructed as
5  a barrister, but was instructed as an advocate
6  to fight at the case and advise on the case on
7  behalf of the client, but not as an expert.
8     Q.   Thank you.
9        Do you know Laurence Rabinowitz?
10    A.   Yes.
11    Q.   Do you believe he is a
12 well-respected commercial lawyer?
13    A.   Yes.
14    Q.   In fact, he is very highly regarded
15 in England as a commercial lawyer; is that
16 correct?
17    A.   Yes.
18    Q.   What were you given in connection
19 with drafting your first declaration in this
20 case?
21    MR. ISAKOFF:  I'm going to object to
22 that.  That's outside the scope of
23 discovery.
24    MR. DE LEEUW:  You're not allowing
25 him to answer?

MILLETT

1
2     MR. ISAKOFF:  No, not that question.
3  You might be able to ask him whether he
4  relied on something that he was given, but
5  you can't just ask for communications.
6     Q.   Do you recall what it was that you
7  looked at in connection with rendering your
8  opinions in your first declaration?
9     A.   A lot of English cases and a
10 Northern Irish case.
11    Q.   Do you recall anything else that you
12 looked at in connection with rendering your
13 opinions in your first declaration in this
14 case?
15    A.   Textbooks and some Australasian
16 cases.
17    Q.   Australasian being Australia and
18 Asia?
19    A.   Australia and New Zealand, actually.
20    Q.   Is there also any Canadian cases?
21    A.   There may be some Canadian cases.
22    Q.   Do you know whether you looked at
23 Lehman's objection, which has been marked as
24 Exhibit 60, in connection with reaching the
25 opinions in your first declaration in this

Page 125

```
 1              MILLETT
 2         So, simply fastening on the word
 3  "primary," and saying ah-ha, it's an indemnity,
 4  is the wrong approach.  You've got to look and
 5  actually work out what's going on when the word
 6  "primary" is used, set in its context, and work
 7  out whether what the parties are intending is
 8  actually that the person providing the putative
 9  surety, as it were, putative guarantor or
10  indemnifier, is actually undertaking an
11  independent liability, wholly independent of
12  that which arises as between principal and
13  creditor, here, Canary Wharf and LBL.
14         Q.   Well, but it doesn't have to be
15  independent, as Sir William Blackburne points
16  out in Vossloh.  If there is a joint and
17  several liability clause, then the liability of
18  the surety can be -- cannot be, does not need
19  to be independent in order for there to be an
20  indemnity; isn't that true?
21         MR. ISAKOFF:  Object to form.
22         A.   No, it's the wrong way of putting
23  it.  You didn't characterize what Sir Bill has
24  said.  He doesn't refer to joint and several.
25  He refers to joint, if you look at the words
```

Page 126

```
 1              MILLETT
 2  just before letter J on page 312.
 3         Q.   Let me maybe rephrase it to make it
 4  mirror exactly what Sir William Blackburne is
 5  saying.
 6         Is it fair to say that an indemnity
 7  can have a situation where, because there's a
 8  joint liability provision -- let me start
 9  again, because you were just about to answer.
10         Is it true that an indemnity,
11  because it has a joint liability provision, can
12  have a situation where the indemnitor has
13  liability that is not wholly independent of
14  liability of the principal?
15         A.   You've got yourself a bit muddled up
16  there.
17         The position is as follows.  If a
18  party, that's not characterizing as one thing
19  or the other, joins up jointly with the primary
20  obligor, the principal, which is the word we
21  use, correctly spelled this time, then his
22  liability will not be wholly independent of the
23  principal's liabilities.
24         In that situation, that person is
25  not an indemnifier, because his liability is
```

Page 127

```
 1              MILLETT
 2  not independent, even though he may be
 3  expressed to be primarily liable.  That's the
 4  point that Sir Bill is making.
 5         Q.   In that case, the primary obligor
 6  would not be an indemnitor?
 7         A.   Correct.  That's what he said.
 8         Q.   Isn't he referring to indemnities in
 9  paragraph 25?
10         A.   Yes, but he is saying, unless, as is
11  quite possible, he, that's the surety, has
12  undertaken his liability jointly with the
13  principal, his liability is wholly independent
14  of any liability which may arise as between the
15  principal and the creditor.
16         What he's describing there is the
17  indemnifier, the surety is an indemnifier if
18  his liability is wholly independent of any
19  liability, but if he's jointly liable, then
20  it's not.
21         Q.   Your testimony is that paragraph 25
22  is providing for an exception that if the
23  contract provides for joint liability as
24  between the surety and the principal, then that
25  provision means that the indemnitor -- excuse
```

Page 128

```
 1              MILLETT
 2  me -- the surety is not taking on an indemnitor
 3  role because there is not independent
 4  liability?
 5         MR. ISAKOFF:  Could I hear that
 6     back?  I lost you.
 7         A.   I'm sorry.
 8         Q.   You didn't understand?
 9         A.   I was trying to follow it.  I'm
10  trying to read what he was saying.
11         Q.   I realize you are trying to read at
12  the same time.
13         Have you read through the sentence?
14         A.   Yeah, to me --
15         Q.   Okay.  Paragraph 25 is describing
16  indemnities as opposed to guarantees, correct?
17         MR. ISAKOFF:  Object to form.
18         A.   Paragraph 25 does what it says.  It
19  sets out what the essential distinguishing
20  features of what is a properly so-called
21  indemnity, and there's a wide sense and a
22  narrow sense.
23         Q.   Put aside the wide sense and the
24  narrow sense for a moment.  We will get to
25  that.
```

MILLETT

1   MILLETT
2   of the word "indemnify" and "indemnified,"
3   would you agree with me that that's relevant,
4   but not dispositive, in considering whether a
5   contract is one of indemnity versus guarantee?
6       MR. ISAKOFF: Object to form.
7       A.   Yes.  I mean, I can't sit here and
8   say that it's utterly irrelevant to the
9   question before an English court was, what is
10  Schedule 4 as a matter of its true
11  characteristics, properly interpreted,
12  nobody -- of course, you would look at all the
13  words, and included in the words are the words
14  "shall indemnify and keep indemnified."  I'm
15  not going to pretend it's irrelevant.
16      Q.   Use of those words would tend to
17  support an argument that the contract is one of
18  indemnity, but, in your view, you would need to
19  look at all the rest of the words in context,
20  correct?
21      A.   No, I don't think it tends to
22  support the argument one way or the other.
23  There is part -- hang on.
24      Q.   I apologize.  I saw you were
25  continuing, so I stopped.

1   MILLETT
2       A.   They are part of the iterative
3   process of construction that an English court
4   would undertake.  They are relevant because
5   they are part of the exercise, but they are no
6   more than that.
7       Q.   Okay.  That was really my question.
8       In that part of the exercise, use of
9   the words "indemnify" or "indemnified" would
10  move the needle.  We don't need to discuss how
11  far it will move the needle, but it would move
12  the needle slightly or maybe largely in favor
13  of an indemnity?
14      MR. ISAKOFF: Object to form.
15      A.   I don't understand the image at all.
16      Q.   Would it be -- to use the image,
17  wouldn't it be fair to say that, as you go
18  through the contract, you look at all the
19  various words that the parties have utilized to
20  try to capture their intent; is that fair?
21      A.   That's true.
22      Q.   Okay.  And as you do that, certain
23  words may tend to support one characterization
24  of the obligation as opposed to the other,
25  correct?

1   MILLETT
2       A.   That's true, too.
3       Q.   And if, I take it, the parties were
4   to use the word "guarantee," I think you would
5   say that that would tend to move the needle
6   slightly towards a characterization of the
7   contract as one of guarantee rather than
8   indemnity, correct?
9       MR. ISAKOFF: Object to form.
10      A.   No.  You see, you say moving the
11  needle.  You would argue that as a barrister in
12  front of the commercial court, but as a judge,
13  who has actually got the job of interpreting
14  the document, you would look at the labels, you
15  look at the words, which have a legal content
16  in terms of art, if you like, and try to put
17  aside any preconceptions that the use of those
18  terms of art allows to intrude.
19      See, so I'm going to forget about
20  the use of the word "indemnity."  I'm going to
21  neutralize it, and I'm going to forget about
22  the use of the word "guarantee."  I'm going to
23  neutralize that.
24      I'm not going to go with what the
25  parties have chosen as their term of art

1   MILLETT
2   labels.  I'm going to look at the whole
3   document and interpret all the words, putting
4   them all together, and actually come to a
5   conclusion about what the parties were doing.
6       Q.   If you could go back to the Vossloh
7   decision, Exhibit 103, paragraph 25?
8       A.   Yes.  Yes.
9       Q.   You made reference to this earlier.
10  In paragraph 25, Sir William Blackburne refers
11  to both a broad sense of the words "contract of
12  indemnity" and a narrower sense.
13      Do you recall that?
14      A.   Yes, I do.
15      Q.   And what he is referring there, if I
16  can perhaps paraphrase, is that in the broader
17  sense, contract of indemnity means any
18  obligation imposed by law or by contract, and
19  in a narrower sense, a contract of indemnity is
20  a contract where you -- the indemnitor gives
21  some security for the performance of the
22  obligation, correct?
23      MR. ISAKOFF: Object to form.
24      A.   No, I'm not, with respect, sure that
25  you really characterized it properly.

```
 1            MILLETT
 2    A F T E R N O O N   S E S S I O N
 3        (Time noted:  1:05 p.m.)
 4        THE VIDEOGRAPHER:  This is tape
 5    three of the deposition of Mr. Richard
 6    Millett.  We are now on the record at
 7    1:05 p.m., September 12, 2013.
 8    R I C H A R D   M I L L E T T,   resumed and
 9        testified as follows:
10    CONTINUED EXAMINATION
11    BY MR. DE LEEUW:
12        Q.   Mr. Millett, with respect to the
13    second part of paragraph one of Schedule 4,
14    which you have circled on Exhibit 120, is it
15    not the case that there are contracts of
16    indemnity that sometimes provide for
17    obligations that will allow an indemnitor to be
18    liable when the principal is no longer bound by
19    a contract?
20        MR. ISAKOFF:  Object to form.
21        A.   I'm really sorry.  I don't mean to
22    keep being boring, but could you repeat the
23    question?
24        Q.   No, no, that's okay.  If you don't
25    understand, I want to make sure you understand
```

```
 1            MILLETT
 2    the question.  Let me ask it maybe more simply,
 3    if I could.
 4        Is it sometimes the case that
 5    contracts of indemnity will provide that the
 6    indemnitor will be liable for circumstances
 7    where the underlying principal will no longer
 8    be bound to the contract or liable on the
 9    contract?
10        MR. ISAKOFF:  Object to form.
11        A.   Contracts of indemnity, properly
12    say, characterized by the exercise that we have
13    been talking about, can do that.
14        Q.   And, in fact, one way in which
15    contracts of indemnity can provide for
16    liability of the surety in the case where an
17    underlying principal is no longer bound or
18    liable, by setting forth language like the
19    language in the second part of exhibit -- of
20    paragraph one of Schedule 4, which is circled
21    on Exhibit 120?
22        MR. ISAKOFF:  Object to form.
23        A.   No -- I mean, if I said yes or no,
24    it's not going to help you very much.  I mean,
25    I don't really know how to answer the question.
```

```
 1            MILLETT
 2        No, I don't think that's right.  You
 3    need -- if what you mean by that is the
 4    language on its own, taken on its own with
 5    nothing else around it, then maybe.  It
 6    depends.  I haven't looked at that.  We haven't
 7    debated that question.
 8        Q.   I'm not asking for a debate.  I'm
 9    just asking you, would you agree with me that
10    it is not unusual for a contract of indemnity
11    to provide language like in the second part of
12    paragraph one to allow for liability of the
13    surety in cases where the principal was no
14    longer bound or liable?
15        MR. ISAKOFF:  Object to form.  It
16    completely mischaracterizes -- I object to
17    form.
18        A.   If you had a contract of indemnity,
19    and you could decide that the contract, as a
20    whole, was one of the indemnity, then I would
21    accept this much, that the words which follow
22    the "and" down to the proviso, wouldn't be
23    inconsistent with it.
24        Q.   And those words, the words from
25    "and" down to the proviso, the second part of
```

```
 1            MILLETT
 2    paragraph one of Schedule 4, would not be
 3    unusual for a contract of indemnity, would
 4    they?
 5        MR. ISAKOFF:  Object to form.
 6        A.   I'm -- not be unusual?  You often
 7    see words -- would these words be unusual?  I
 8    don't know.  I can't really answer that
 9    question.
10        (Exhibit 121, Portions of Treatise
11        Entitled Law of Guarantees, marked for
12        identification.)
13        Q.   Let me hand you what's been marked
14    as Exhibit 121.
15        A.   Right.
16        Q.   What I have done here is to copy
17    quite a bit of the treatise that is written by
18    you and Ms. Andrews.
19        Is this the treatise that you
20    co-authored with Ms. Andrews, Law of
21    Guarantees?
22        A.   Yes.  This is the sixth edition of
23    it.
24        Q.   And just so you know, I have a copy
25    of the full treatise if you need it.  I tried
```

MILLETT

1
2  Q.  Where does it say that?
3  A.  First part of paragraph one.
4  Q.  I see.  So, what you're saying is
5  that paragraph one implies an obligation for
6  paragraph two?
7      MR. ISAKOFF:  Object to form.
8  A.  As I have said, in my opinion, this
9  is -- let me start up a little bit again.
10      I read those words in the last part
11  of clause two, paragraph two, as words of
12  limitation, so that where the landlord is
13  enforcing its rights hereunder, in other words,
14  under Schedule 4, it's entitled to, it doesn't
15  have to, but it's entitled to, may proceed
16  against the surety, as if the tenant -- the
17  surety was named as the tenant in the lease.
18  But no further than that.
19      I read out of that, that it may not
20  proceed against the surety to any wider extent
21  than it would against the tenant.
22  Q.  Does the fact that the provision
23  also says that it's a joint and several
24  liability between the surety and the tenant
25  affect your opinion in any way?

MILLETT

1
2  A.  No.
3  Q.  So, in your view, paragraph two is
4  limited by paragraph one insofar as the
5  obligation must become due from the tenant
6  before the landlord can proceed against the
7  surety?
8  A.  Well, there must be something to --
9  no, please be careful with the terminology.
10  There must be something which is capable of
11  being enforced as against the tenant.
12      So, if there's nothing to be
13  enforced against the tenant, no liability, no
14  obligation, one or the other, then there's
15  nothing to enforce against the surety.
16  Q.  Let's go back to paragraph one.
17  Let's assume for the moment that LBL is still
18  bound by the lease, okay?
19  A.  During the -- so we're talking about
20  the currency of the lease, during the lease?
21  Q.  During the lease.  Let's use
22  January 1, 2007.
23  A.  All right.
24  Q.  On January 1, 2007, you would agree
25  with me that LBL was bound to the lease.

MILLETT

1
2  A.  2007, yes.
3  Q.  As of 2007, LBL was bound to the
4  lease and the surety states, in paragraph one,
5  that it will duly perform and observe all the
6  covenants on the part of the tenant contained
7  in this lease, including the payment of rent.
8      Do you see that?
9  A.  Yes.
10  Q.  So, coming back to my hypothetical,
11  on January 1, 2007, a rent payment would be
12  due.  And instead of sending payment to LBL,
13  could Canary Wharf, as the landlord, send a
14  bill to LBHI?
15  A.  If it was due, yes, it could.  And
16  that's precisely right.  That's exactly the
17  effect of it.  It is to preclude the need for
18  demand before enforcing the obligations.
19  Q.  Could it send that notice on
20  December 31 to LBHI, and ask that LBHI pay the
21  amount that's coming up due the next day?
22  A.  Not if it hasn't fallen due yet, no,
23  because there's no obligation to be performed
24  by either of them.
25  Q.  But could it ask that LBHI make the

MILLETT

1
2  payment on January 1?
3  A.  Well, you can ask, but it would get
4  a pretty dusty answer, and once the date had
5  passed, and there was a liability on the part
6  of the tenant to pay the rent, then Canary
7  Wharf could legitimately turn to LBHI and say
8  your tenant hasn't paid yesterday or midnight,
9  actually, please pay.
10  Q.  But before we get to LBL failing to
11  pay, there's nothing wrong, in fact, it's
12  explicitly permitted under paragraphs one and
13  paragraphs two of Schedule 4, for Canary Wharf
14  to send a bill and ask LBHI to make the payment
15  rather than LBL, correct?
16  A.  No.  Let's be careful.
17      Once the tenant's obligation has
18  fallen due under the covenants in the lease,
19  including the obligation to pay rent, then once
20  that liability has accrued, then I accept that
21  Canary Wharf has got the choice, it can either
22  go to LBL and say pay up, or it can go to LBHI
23  and say your tenant hasn't paid up, please pay.
24  Q.  When the payment is due, Canary
25  Wharf can ask either party to pay.  It doesn't

Page 189

MILLETT

1             MILLETT
2 need for LBL to become delinquent in its
3 payments.
4     A.   But it would, by definition, have
5 become delinquent in its payment by failing to
6 pay.
7     Q.   No.  I said my example is they are
8 sending the notice on December 31, and they are
9 asking for the payment to be made on January 1.
10 There's nothing wrong with that.  And, in fact,
11 that's permitted under paragraphs one and two
12 of Schedule 4, correct?
13     A.   No.  I think I don't agree with
14 that.  I don't quite see how you get that out
15 of it.
16     Q.   If I could ask you to turn to
17 paragraph six of Schedule 4 that's been marked
18 as Exhibit 3.
19     A.   Sorry.
20     Q.   Paragraph six.
21     A.   Yes.
22     Q.   This is the paragraph that contains
23 a whole list of various events that will not
24 discharge or affect the liability of the
25 surety, correct?

Page 190

1             MILLETT
2     A.   In any way release, discharge, or in
3 any way lessen or affect the liability of the
4 surety is what clause six says.
5     Q.   I think you referred to paragraph
6 6(d) as a provision that was designed to
7 address the rule of Holme versus Brunskill; is
8 that right?
9        MR. ISAKOFF:  Object to form.  Why
10 don't you show him what you are referring
11 to?
12        MR. DE LEEUW:  I'm trying to make
13 this a little bit more efficient.
14        MR. ISAKOFF:  Then I object to how
15 you're doing it.
16        MR. DE LEEUW:  That's fine.
17     A.   What do you want me to look at?
18 Sorry.
19     Q.   6(d).  Would you agree with me that
20 paragraph 6(d) is designed to address the rule
21 in Holme versus Brunskill?
22        MR. ISAKOFF:  Object to form.
23     A.   (Perusing.)  Subject to your use of
24 the word "address," I think that -- it does
25 what it says, and the rule of Holme and

Page 191

1             MILLETT
2 Brunskill, I've explained in my opinion.
3     So, on its face, any variation of
4 the terms of the lease is what is being caught.
5     Q.   You would agree --
6     A.   Covered.
7     Q.   -- would you not, that paragraph
8 6(d) was intended to avoid a material variation
9 rule that would allow a party to get -- a
10 surety to get out of its obligations if the
11 contract were considered to be a guarantee --
12        MR. ISAKOFF:  Objection.
13     Q.   -- in Home versus Brunskill; is that
14 fair?
15     A.   Yes.
16     Q.   So, maybe the word "address" was
17 what was causing you the problem in my prior
18 question.
19     Would you agree with me that
20 paragraph 6(d) was drafted with the rule of
21 Holme versus Brunskill in mind?
22        MR. ISAKOFF:  Object to form.
23     A.   I have no idea what was in the
24 draftsman's mind.
25     What I do know is that that is a

Page 192

1             MILLETT
2 fairly standard clause you see in guarantees,
3 not in indemnities, but in guarantees, in order
4 to preclude the guarantor from being discharged
5 by a variation of the terms of the lease,
6 because a variation of the terms of the lease,
7 without his consent, under the rule of Holme
8 and Brunskill, will release him.
9     Q.   Thank you.  And you would agree with
10 me that the insertion of a clause like 6(d)
11 could be used to support an argument either
12 that the contract is one of a guarantee or one
13 of an indemnity, correct?
14     A.   No, not really.  I don't see the
15 parity.
16     I think -- my own view is that one
17 has to be careful in overgeneralizing, but the
18 presence of these, what people have called
19 exclusion clauses, which remove the equitable
20 rights of a guarantor to be released in certain
21 circumstances, in my view, tends strongly to
22 indicate that the document, as a whole, is a
23 guarantee, they're simply unnecessary in the
24 case of an indemnity, but you've got -- I
25 emphasize that, in order to form a final

Page 193

MILLETT

1
2  opinion, you have to look at the document as a
3  whole.
4        And, of course, if there are other
5  indicia in the document which point strongly in
6  favor of it being an indemnity, all other roads
7  point to Rome sort of thing, then the presence
8  of that provision may lead the court to give it
9  no weight.
10     Q.  You recall that, in the Vossloh
11 decision, there was a discussion by Sir William
12 Blackburne that exclusion clauses, like the one
13 you're referring to, could be read either to
14 support an argument that the contract is one of
15 guarantee, or to be doubly sure that it was one
16 of indemnity, right?
17     A.  Yes. It's paragraph 27. I think we
18 have set it out, or I have set it out in my
19 opinion.
20     Q.  And could I ask you to look back at
21 the treatise that you co-wrote, which has been
22 marked as Exhibit 121, page 13?
23     A.  Page 13?
24     Q.  Correct.
25     A.  Right.

Page 194

MILLETT

1
2      Q.  In the first full paragraph on page
3  13, you are referring to so-called exclusion
4  clauses, correct?
5      A.  Yes.
6      Q.  And in the second sentence, you say,
7  "Although it may be argued, by parity of
8  reasoning, that this tends to indicate that the
9  contract is a guarantee, such a provision may
10 point towards the opposite conclusion because
11 it may show that it was intended that the
12 liability of the obligor should continue
13 regardless of what might happen to the
14 principal debtor."
15       Do you see that?
16     A.  Yes.
17     Q.  And that's, again, another reference
18 to the fact that an exclusion clause might
19 point either to the contract being one of
20 guarantee, or to it being a contract of
21 indemnity, correct?
22     A.  Yes.
23     Q.  And you didn't say, in page 13 of
24 your treatise, that the presence of an
25 exclusion clause is a strong point of support

Page 195

MILLETT

1
2  for the contract being one of guarantee, do
3  you?
4      A.  Not in so many terms, but if you
5  look at the previous paragraph, which starts at
6  the foot of page 12, and I will read it slowly
7  so that you really have it.
8        "The question whether a particular
9  contract happens to be a guarantee or an
10 indemnity, and whether the normal incidents of
11 a contract of that class have been modified, is
12 a matter of construction in each case, and is
13 often very difficult to resolve. A contract of
14 suretyship which contains a provision
15 preserving liability in circumstances in which
16 a guarantor would otherwise be discharged (such
17 as the granting of time to the principal or a
18 material variation of the underlying contract
19 without the surety's consent) will usually be
20 construed as a guarantee, because such a
21 provision would be unnecessary if the contract
22 was an indemnity."
23       That's really what I was referring
24 to before. The normal approach is that if
25 these provisions are there, then it normally

Page 196

MILLETT

1
2  points to it being a guarantee, but that isn't
3  to say that that's always the case, as the next
4  paragraph goes on to explain.
5      Q.  Right. And the next paragraph goes
6  on to explain that the presence of these type
7  of clauses may very well point towards the
8  opposite conclusion?
9      A.  When you say may very well, where
10 did I say that?
11     Q.  You say, "Such a provision may point
12 towards the opposite conclusion, because it may
13 show that it was intended that the liability of
14 the obligor should continue regardless of what
15 might happen to the principal debtor."
16     A.  That's what the text says, yes. The
17 words very well don't appear in there. They
18 appeared in your question, but not in my text.
19     Q.  You would agree with me that the
20 presence of paragraph 6(d) and 6(g) may show
21 that it was intended that the liability of the
22 obligor should continue regardless of what
23 might happen to the principal debtor.
24     A.  Well, you can't discount that, no.
25     Q.  Could I ask you to turn to paragraph

Page 197

MILLETT

1  eight of Schedule 4, which has been marked as
2  Exhibit 3?  Back to Schedule 4 on the right
3  side.
4      Q.   So which paragraph?
5      A.   Paragraph eight.
6      Q.   Paragraph eight.
7      A.   Paragraph eight, benefit of
8  guarantee and indemnity.
9      Q.   Right.  You agree that there are
10  times when a particular clause may be both a
11  guarantee and an indemnity obligation, correct?
12      MR. ISAKOFF:  Object to form.
13      A.   Well, something can't be both black
14  and white.  So, no, I don't agree with the way
15  you have put the -- the formulation of the
16  question.
17      Q.   Do you agree that a particular
18  contract provision may have both a guarantee
19  obligation and an indemnity obligation?
20      A.   Yes, in the most general of terms,
21  you can, but -- but wait, you have to
22  characterize by biting the bullet, grab the
23  mettle, the particular obligation you've got.
24          You can have a contract where there
25  are some guarantee obligations, and some

Page 198

MILLETT

1
2  separate indemnity obligations, perhaps
3  relating to a different subject matter.  But
4  where the subject matter of the surety's, using
5  that word neutrally, surety's obligations are
6  covering a single underlying group of
7  obligations by the principal debtor, then
8  you've got to decide whether it's a guarantee
9  or whether it's an indemnity.  It can't be
10  both.
11          Finishing off this answer, you very
12  often see either the expression, guarantee and
13  indemnity, used as a heading or shorthand for
14  the instrument itself.  It is -- I don't think
15  I've come across a case where a court has
16  construed it as both running in parallel, but
17  it is a shorthand often used.
18      Q.   So, in that case where there's a
19  shorthand often used, where the words
20  "guarantee" and "indemnity" are used, it still
21  befalls the court to figure out whether it's a
22  guarantee or an indemnity, right?
23      A.   Yes, that's fair.
24      Q.   So, the fact that the words
25  "guarantee" and "indemnity" are used doesn't

Page 199

MILLETT

1
2  point in either the direction of guarantee or
3  indemnity?
4      A.   Well, if there's no other
5  indication, no, it wouldn't, but, again, I
6  think there's probably common ground about
7  this, you have to look at every single word
8  that's used, and there is -- it is not
9  irrelevant, to use the expression I think we
10  agreed before, that the parties chose to
11  characterize this instrument as a guarantee and
12  indemnity.  I'm not sure it takes you very far,
13  personally.
14      Q.   And the reason you say it doesn't
15  take you very far is because by saying
16  guarantee and indemnity, it still doesn't tell
17  you which obligations might be guarantee
18  obligations and which obligations might be
19  indemnity obligations; is that fair?
20      MR. ISAKOFF:  Object to form.
21      A.   Well, in my opinion, and I think I
22  have covered this point actually, at page 16,
23  my first opinion, and I said it was notable
24  that the parties considered that at least some
25  part of Schedule 4 constituted a guarantee.  So

Page 200

MILLETT

1
2  you've got to make sense of the composite
3  expression.
4          My opinion is that you make sense of
5  the composite expression by looking at clause
6  one as a composite, as having a composite
7  function.
8      Q.   Both the guarantee and an indemnity
9  are in clause one?
10      MR. ISAKOFF:  Object to form.
11      A.   Well, as we have covered before, the
12  words "indemnity" and "shall keep indemnified"
13  are contained in clause one, but that doesn't
14  convert it into an indemnity.  It isn't, as
15  we've -- we've been over this.
16      Q.   But what you're saying there is that
17  you believe the words in paragraph eight of
18  Schedule 4 indicate that paragraph one has a
19  composite guarantee and indemnity obligation?
20      MR. ISAKOFF:  Object to form.
21      A.   I think the right way of reading
22  clause eight is simply a reference back,
23  possibly quite a clever and convenient
24  reference back to clause one, which is a
25  guarantee, which contains, as the second

MILLETT

1
2   element of it after the words "and," as we've
3   discussed, are the words "indemnity."
4       In my own view, it's really the only
5   sensible way you can read it.  Otherwise,
6   you've got to give those -- you've got to put a
7   line through one or other.  The draftsman put
8   both words in, and was presumably doing so for
9   a purpose.
10      Q.   You agree that indemnification
11  clauses may overlap with a guarantee obligation
12  completely, would you not?
13      A.   Well, they can do, but if they're
14  covering different subject matters, yes.
15      Q.   And in those cases, the guarantee
16  aspect of the clause would be redundant,
17  because the creditor is almost invariably going
18  to be better off enforcing the primary
19  obligations undertaken in an indemnity,
20  correct?
21      MR. ISAKOFF:  Object to form.
22      A.   Well, I'm guessing what you're
23  asking me, but that was, in effect, what
24  happened in the Sofaer case, where the word
25  "guarantee" was used, but the judge said, well,

MILLETT

1
2   actually, that's just verbiage.
3       In fact, when I look at the whole of
4   this contract, I think it's an indemnity, but
5   you've got to be careful here, as
6   Mr. Rabinowitz agrees, and I will agree with
7   him, the courts don't readily conclude the
8   parties have used words by accident or mistake,
9   and, therefore, one of the first rules of
10  construction of a commercial contract in
11  English law is that you look at each word, and
12  you give it its natural meaning.
13      If you do that in the context of
14  clause eight, in my opinion, it's very clear.
15  It refers back to clause one, properly
16  understood as a single composite covenant in
17  the way we discussed prior to the break.  If
18  you say it's an indemnity, because the word
19  "indemnity" appears there, that would require
20  you to put a line through the word
21  "guarantee" -- "guarantor" or "guarantee," and
22  that means there's a problem.  That means the
23  draftsman got something wrong, and it's not
24  impossible, it's just unlikely.  It's
25  inconsistent with what's gone before.

MILLETT

1
2       Q.   And your view is that the
3   draftsperson, draftspeople got something wrong
4   in entitling paragraph one an indemnity, and in
5   stating that paragraph one is a primary
6   obligation, and in saying that the surety shall
7   indemnify and keep indemnified the landlord?
8       MR. ISAKOFF:  Object to form.
9       Q.   Is that fair?
10      A.   No, I don't think that's quite fair.
11      I don't reach my opinion by looking
12  at the labels.  It's Mr. Rabinowitz, when he
13  put up his first opinion, who used the labels
14  as part of the exercise.
15      Now, clause 2.7 of the lease says --
16  I don't want to get this wrong, so let's --
17  what it says is, the titles and headings, this
18  is page ten of the lease, "The titles and
19  headings appearing in this lease are for
20  reference only and shall not affect its
21  construction."
22      So I tried to be faithful to that
23  and didn't look at indemnity.  That works both
24  ways.  It could be very convenient, because it
25  allows me to ignore the word "indemnity" in

MILLETT

1
2   clause one, but it also means that it have to
3   ignore the word "guarantee" in clause eight,
4   and guarantor in clause ten.
5       So, the argument, if you're looking
6   at headings, is entirely neutral.  I don't rely
7   on them, so I don't agree with what you have
8   put to me.
9       Q.   I didn't just ask you about
10  headings, sir.  I asked you about the word
11  "primary obligation" in paragraph one, and the
12  word "indemnify" and "keep indemnified" in
13  paragraph one.
14      Is that, in your view, a drafting
15  error by the draftsperson?
16      A.   No, absolutely not.  What it does,
17  as I've explained before, is that it is an
18  expression which does not connote the indemnity
19  relationship.  It is a whole -- it is a word
20  that means hold harmless, which, in English
21  law, terms of art or English legal language,
22  means paying up in full.
23      Q.   And the word "primary obligation" is
24  not a primary obligation, in your view?
25      A.   We have been around that boy a

Page 205

```
 1              MILLETT
 2    number of times.
 3       Q.   Is it a primary obligation in
 4    paragraph one?
 5       A.   As I say, I think I have covered
 6    this a number of times.  I don't believe,
 7    looking at the guarantee as a whole, whether
 8    looking myopically at the word in clause one or
 9    the whole of the document, that LBHI is a
10    primary obligor or primary obligor in the way
11    in which you mean it, i.e., as an indemnifier.
12          I have explained, in my opinion,
13    what the purpose of those words "primary
14    obligation" is.
15       Q.   Could I ask you to take a look again
16    at paragraph 6(d) of Schedule 4 marked as
17    Exhibit 3?
18       A.   Okay.  I have that.
19       Q.   You reach the opinion that the
20    forfeiture letter discharges LBHI's obligation,
21    notwithstanding paragraph 6(d), because the
22    forfeiture letter does not vary the terms of
23    the lease; is that correct?
24       A.   That's a reasonable summary of my
25    opinion, but I prefer to stick with the words
```

Page 206

```
 1              MILLETT
 2    in my opinion, if you don't mind.
 3       Q.   Would you also agree that the rule
 4    of Holme versus Brunskill is that the surety's
 5    obligation shall be discharged upon a material
 6    variation of the principal contract?
 7          MR. ISAKOFF:  Object to form.
 8       A.   Without his consent, yes.
 9       Q.   Thank you.  Even though you say that
10    paragraph 6(d) is not triggered by the
11    forfeiture letter, you say paragraph 6(d) --
12    excuse me.  Strike that.  I will ask it again.
13          Even though you say paragraph 6(d)
14    is not triggered by the forfeiture letter, you
15    opined that LBHI's obligations are discharged
16    because the forfeiture letter otherwise varies
17    the relationship between LBHI and Canary Wharf;
18    is that fair?
19       A.   Not quite.  The forfeiture letter
20    causes -- the forfeiture letter either causes
21    obvious prejudice to LBHI, or, at the very
22    least, causes it -- or, at the very least,
23    can't be shown not to cause it prejudice, and
24    you will appreciate that the rule in Holme and
25    Brunskill has this negative burden of proof.
```

Page 207

```
 1              MILLETT
 2       So to that extent, the rule is
 3    triggered, but in my opinion, the law in
 4    England is wider than simply -- sorry -- the
 5    rule in Holme and Brunskill and the principle
 6    underlying that case goes to a variation of
 7    prejudicial -- no, not -- obviously not
 8    prejudicial variation of the commercial risks
 9    inherent in the relationship.
10       Q.   Just to make sure I've got -- I'm
11    going to follow up on that, just to make sure
12    I've your opinion correctly.
13          Your opinion is that the forfeiture
14    letter triggers the rule of Holme versus
15    Brunskill, but paragraph 6(d), which you
16    earlier told me was drafted, generally, with
17    that rule in mind, is not triggered; is that
18    fair?
19          MR. ISAKOFF:  Object to form.
20       A.   Well, whatever I -- the transcript
21    will obviously reveal what I said before.
22          The short answer to the question, I
23    think, as we can probably cut through this, is
24    the rule in Holme and Brunskill is a little bit
25    wider than simply a variation of the printed
```

Page 208

```
 1              MILLETT
 2    words on the page of the principal contract.
 3          If the creditor and principal debtor
 4    run their relationship in such a way as to
 5    alter the balance of the commercial risk and to
 6    expose the guarantor to a much -- to a greater
 7    commercial risk that he will have to pay up,
 8    then he is discharged.
 9       Q.   But that same analysis, the scope of
10    the rule will not apply to paragraph 6(d) in
11    your rule; is that correct?
12       A.   Well, because -- that is correct,
13    because 6(d), on its terms, says variation of
14    the terms of the lease.  It doesn't say
15    variation of the mode of performance of the
16    lease.
17       Q.   Could I ask you to turn to paragraph
18    50 of your first declaration, which has been
19    marked as Exhibit 106?
20       A.   Yes, I have it.
21       Q.   You are responding to
22    Mr. Rabinowitz.  In the second sentence, you
23    say, "His simple point is that the forfeiture
24    letter did not vary any term of the lease but
25    operated as a waiver of a right conferred on
```

Page 217

MILLETT

1
2  guarantor. That's the prejudice.
3      Q.   Its exposure to additional liability
4  would be -- would be in place as a result of a
5  release of some portion of the administration
6  expense. Is that what you are saying?
7      A.   I said what I said. It increases
8  the risk on LBHI of having to pay under the
9  guarantee. In circumstances where, so far as
10 back rent was concerned, I'm assuming that the
11 figures are of the order we've been talking
12 about, there was no such risk.
13     Q.   When you're saying risk, is the risk
14 of paying some portion of the amounts owed
15 under the lease?
16     MR. ISAKOFF:  Object to form.
17     A.   In circumstances where that risk had
18 been removed by the -- by the bankruptcy,
19 because it carried with it -- sorry -- by the
20 administration, because it carried with it the
21 priority for rent.
22     Q.   Now, what you're saying, just so I
23 make sure, I will finish this up, and then we
24 can take a break, what you're saying is it's
25 not just any rent. It's rent that would be

Page 218

MILLETT

1
2  claimable as an administrative expense; is that
3  fair?
4      A.   Well, is what fair?
5      Q.   Well, you said that Canary Wharf
6  gave up a claim for back rent.
7          They didn't give up a claim for back
8  rent, did they?
9      MR. ISAKOFF:  Object to form.
10 You've mischaracterized his testimony.
11     A.   That's not what I said, no, no, no.
12     Q.   I'm just trying to -- maybe I'm
13 trying to -- you said something that was just
14 wrong. So I'm just trying to make sure if I
15 can narrow it, I think I will understand what
16 you are saying.
17         It's not any rent that was due as of
18 December 3, 2010. It was only rent in which
19 the administrators were in occupation of the
20 building, correct?
21     MR. ISAKOFF:  Object to form.
22     A.   Let's just be clear. The effect of
23 the forfeiture letter, we can read it, 3rd of
24 December letter, is that the -- is that Canary
25 Wharf, in exchange for a million and a half

Page 219

MILLETT

1
2  pounds, gave up the claim to back rent,
3  whatever it was, and I don't know what it was,
4  as an administrative expense. That's the
5  point.
6          So, instead of getting, say,
7  30 million, and I use the figure purely by way
8  of illustration, off the top, in priority to
9  all the other creditors representing that back
10 rent, if that's what the back rent was, it only
11 got a million and a half, pushing the balance
12 of the 28 and a half down as an unsecured debt,
13 swelling the deficiency for the unsecured
14 creditors, and concomitantly increasing LBHI's
15 exposure under its guarantee.
16     Q.   The 30 million hypothetical number
17 that you are using there, the number that you
18 are referring to is an amount that would be
19 payable as an administrative expense; is that
20 correct?
21     A.   Yes. That's the example I'm trying
22 to give, yes.
23     Q.   And the only amounts that are
24 payable as an administrative expense are for
25 amounts when LBL is in occupation of the

Page 220

MILLETT

1
2  building as in -- in administration, correct?
3      MR. ISAKOFF:  Object to form.
4      A.   Well, I'm not sure you've got it
5  exactly right. It's the Nortel liability which
6  we refer to. Mr. Rabinowitz and I, I think,
7  have no quarrel with each other about what that
8  is. It's the Nortel liability.
9      Q.   But just the fact that the lease is
10 in place doesn't necessarily give rise to a
11 claim for administrative expense for all back
12 rent. It's only for those rents that are
13 required to be paid as an administrative
14 expense under the Nortel decision, correct?
15     A.   That is correct.
16     Q.   And you don't know exactly what
17 administrative expenses were due under the
18 Nortel judgment when you say that there was a
19 variation by virtue of the forfeiture letter to
20 settle that claim for one and a half million
21 pounds, correct?
22     A.   Well, that is correct, but the
23 burden -- as a matter of English law, the
24 burden of proving the variation is not
25 material, not prejudicial, lies on the -- lies

1          MILLETT
2 on Canary Wharf in this case.
3          So, in the absence of any figures,
4 the English court would proceed to presume
5 prejudice.
6     Q.   You say, in paragraph 49 sub (iii)
7 of your first declaration that's been marked as
8 Exhibit 106, "On any view, 1.5 million pounds
9 is significantly less than the full amount of
10 rent outstanding for the period during which
11 the administrators were in occupation."
12          Do you see that?
13     A.   Yes.
14     Q.   You didn't, in fact, know what was
15 the full amount of rent outstanding for the
16 period during which the administrators were in
17 occupation, did you?
18     A.   No.  That's a fair observation, but
19 on any view, unless you're going to tell me
20 that I'm wrong, just looking at the period for
21 which I did know that the administrators were
22 in occupation, and looking at the passing rent
23 under the lease, although I have no primary
24 instructions as to what the precise numbers
25 are, because my clients don't know, and if they

1          MILLETT
2 do know, they haven't told me, on any view,
3 that is right.  I can't give you the figure.
4          MR. ISAKOFF:  Are you ready for a
5 break?  We've been going for about an hour
6 and ten minutes.
7          MR. DE LEEUW:  I have a couple of
8 follow-ups.  Wait until I finish this line
9 of questioning.
10          MR. ISAKOFF:  The line of
11 questioning will end in one minute, and
12 then we will take a break.
13     Q.   Do you know when the LBL
14 administrators were in occupation of the
15 building giving rise to a claim for
16 administrative expense?
17          MR. ISAKOFF:  Object to form.
18     A.   Well, they were in occupation -- do
19 I know precisely?  I can't remember, is the
20 truth.  I did know.  And I did know when I
21 wrote the opinion.  I haven't refreshed my
22 memory as to those facts.
23          But I do know they were in
24 occupation, and you'll correct me if I'm wrong
25 about this, until the 30th of September 2010,

1          MILLETT
2 but it may have been -- it may have been
3 earlier than that.  My recollection is that
4 there was a subletting to Nomura.
5          MR. DE LEEUW:  Thank you.  Why don't
6 we take a break?
7          THE VIDEOGRAPHER:  We are now off
8 the record at 2:13 p.m., September 12,
9 2013.
10          (Recess taken.)
11          THE VIDEOGRAPHER:  This is tape four
12 of the deposition of Mr. Richard Millett.
13 We are now on the record at 2:18 p.m.,
14 September 12, 2013.
15 BY MR. DE LEEUW:
16     Q.   Mr. Millett, could I ask you to take
17 a look at page 407, the treatise you co-wrote,
18 which has been marked as Exhibit 121?
19     A.   Page 407?
20     Q.   Yes, correct.
21     A.   Okay.
22     Q.   You see here in the first full
23 paragraph on page 407 of Exhibit 121, it's
24 stated in your treatise that, "A variation is
25 material, so as to entitle a surety to full

1          MILLETT
2 discharge.  However, only if it is an act by
3 the creditor which affects the risk of default
4 by the principal, and consequently the risk of
5 the surety being called upon to honor the
6 guarantee."
7          Do you see that?
8     A.   Yes.
9     Q.   In this case, the variation of the
10 forfeiture letter did not affect the risk of
11 default by LBL, did it?
12     A.   I think it did, because the amount
13 of the provable back rent, whatever it was,
14 went from being payable 100 percent in priority
15 to all other creditors, to being a provable
16 debt at 18 cents on the dollar, or whatever it
17 is.
18     Q.   Isn't that exactly what you were
19 referring to in the last sentence on page 407
20 of Exhibit 121, when you say that, "The type of
21 variation that affects the risk of default by
22 the principal must be contrasted with the
23 variation which merely affects the amount of
24 the surety's ultimate liability, but which
25 leaves the risk of default by the principal

Page 237

```
 1              MILLETT
 2   Exhibit 122.
 3              (Exhibit 122, Portion of O'Donovan
 4        and Phillips Treatise Entitled The Modern
 5        Contract of Guarantee, marked for
 6        identification.)
 7        Q.   It's a portion of the same O'Donovan
 8   and Phillips treatise called The Modern
 9   Contract of Guarantee.
10        A.   Okay.  This is the English edition,
11   2010.
12        Q.   This is another portion of the
13   O'Donovan and Phillips treatise that was not
14   contained in the appendix that you provided
15   which we marked earlier as Exhibit 119.
16              Do you recognize Exhibit 122?
17        A.   I mean, I recognize -- yes, I
18   recognize what it is.  I mean, I haven't read
19   it recently.
20        Q.   If I could ask you to turn to
21   paragraph 688 --
22        A.   688.
23        Q.   -- of Exhibit 122.
24              Have you read paragraph 688 of the
25   O'Donovan and Phillips treatise before?
```

Page 238

```
 1              MILLETT
 2        A.   I can't remember.  Can I read it
 3   now?
 4        Q.   Please.
 5        A.   (Perusing.)  I have read that.
 6        Q.   Okay.  The first sentence of
 7   paragraph 688 of Exhibit 122 says, "The
 8   creditor, instead of releasing the principal
 9   debtor absolutely, may release the principal
10   debtor from only a portion of the debt, making
11   it clear that liability remains for the
12   balance."
13              Do you see that?
14        A.   Yes.
15        Q.   And that's, in fact, what happened
16   in the forfeiture letter, according to your
17   view.  Canary Wharf released LBL for a portion
18   of the debt that was recoverable as an
19   administrative expense, while leaving the rest
20   of the claims for other rent available; is that
21   correct?
22        A.   Well, shall we look at the
23   forfeiture letter?
24        Q.   Sure.
25        A.   I just don't want to embrace
```

Page 239

```
 1              MILLETT
 2   something you put to me as a paraphrase.  You
 3   understand why that is.
 4        Q.   I will hand to you what I'm marking
 5   as Exhibit 123.
 6              (Exhibit 123, Document Bates Stamped
 7        LBHI_CW 234 through 243, marked for
 8        identification.)
 9        Q.   It's a document bearing production
10   number LBHI_CW 234 through 243.
11              Do you recognize Exhibit 123?
12        A.   (Perusing.)  I do.
13        Q.   This Exhibit 123 is what you
14   referred to as the forfeiture letter?
15        A.   Yes.
16        Q.   And the release that you referred to
17   in the forfeiture letter is set forth in
18   paragraph 4(b) -- I should say -- I will take
19   that back.
20              The release that you referred to in
21   the forfeiture letter is referred to in
22   paragraph four of Exhibit 123 on pages four to
23   five, right?
24        A.   Well, I can read clause four.  We
25   can look at the words.
```

Page 240

```
 1              MILLETT
 2        Q.   I'm not asking you to repeat the
 3   words.  The releases that you are referring
 4   to --
 5        A.   I see, yes.
 6        Q.   -- for reaching your opinion are set
 7   forth in paragraph four of Exhibit 123,
 8   correct?
 9        A.   Yes.
10        Q.   And now to go back to my question.
11   The releases that you are relying on in this
12   case are a release for a portion of the debt,
13   while some liability remains for the balance;
14   isn't that correct?
15        A.   I don't like your formulation, a
16   portion of the debt.  To an English lawyer,
17   that has connotations which I'm not very keen
18   on.
19              What it says is that there's a --
20   LBL is unconditionally and irrevocably released
21   and discharged from any claims as an
22   administration expense for paid rent that fell
23   due and was payable under the lease before the
24   date of forfeiture.
25              Sorry.  I'm just reading.  LBL is
```

Page 241

MILLETT

1
2  unconditionally and irrevocably released.
3     Q.   From the claims?
4     A.   And discharged from any claims as an
5  administration expense for unpaid rent that
6  fell due and was payable under the lease before
7  the date of forfeiture, and then the same in
8  relation to estate service charges, and then
9  other sums that fell due under the lease and
10  Car Parking Agreement, which is a separate
11  contract, before the date of forfeiture, and
12  then the proviso is important.
13     Q.   The proviso being the end of
14  paragraph four of Exhibit 123 on page five?
15     A.   Yes.
16     Q.   Which says that, "LBL agrees that we
17  and/or CWML may claim against LBL as an
18  unsecured creditor for any unpaid rent and
19  estate service charge and other sums falling
20  due under the lease up to the date of
21  forfeiture."
22        Do you see that?
23     A.   Yes.
24     Q.   So, to go back to my question
25  earlier, assuming, as you have, that there are

Page 242

MILLETT

1
2  some rents that would be payable as an
3  unsecured claim, and some rents payable as an
4  administrative expense, isn't it true that the
5  releases in the forfeiture letter that you are
6  relying on release LBL from only a portion of
7  the debt, while liability remains for the
8  balance?
9     A.   No.  This is why I quarrel with the
10  formulation. I'm glad we looked at the
11  provisions.
12        It's clear to me that what it does
13  is to release LBL from liability to pay rent as
14  an administration expense.  Now, you say
15  portion.  If what you mean is there are some
16  periods of the lease under which the rent was
17  referable to periods when the administrators
18  were in occupation, therefore, it's payable as
19  an administrative expense, yes, that's what's
20  being referred to.
21        There is no reference to any rent
22  that fell due during the currency of the lease
23  when the administrators were not in occupation.
24  And so what is being released, what is being
25  released and discharged is LBL's obligations to

Page 243

MILLETT

1
2  pay Nortel rent as an administration expense.
3  There is nothing else.
4     Q.   Let me just give you a hypothetical
5  set of facts, since you say you don't know what
6  the facts were as of 2010.
7        If, hypothetically, LBL stopped
8  occupying the building as of March 31, 2010,
9  and there was a dispute about whether any rents
10  were payable from April 1 through September 30,
11  2010, as an administrative expense, and there
12  was also no dispute that, as of September 30,
13  2010, there was no dispute that any back rent
14  would be payable as an administrative expense
15  under Nortel, if that were the case, would you
16  not agree with me that the effect of the
17  releases in the forfeiture letter were to
18  release LBL from a portion of the debt, while
19  making clear that liability remains for the
20  balance?
21        MR. ISAKOFF:  I object to the form,
22     and I have to have that question read
23     back.  I'm sorry.  It was very, very long,
24     and rambling, and I couldn't follow it.
25        (Record read.)

Page 244

MILLETT

1
2        MR. ISAKOFF:  I don't understand the
3     question.  If you understand it and can
4     explain what the question is that you are
5     answering, go ahead, so that we have a
6     clear record.  Otherwise, I don't think we
7     do.
8     Q.   Do you understand, Mr. Millett?
9     A.   I think I understand.
10     Q.   Well, why don't I give you the
11  hypothetical facts first, and make sure you
12  understand the hypothetical facts, and then I
13  will ask you the question.
14     A.   Yeah, okay.
15     Q.   The hypothetical facts is that as of
16  March 31, 2010, LBL ceased occupying the
17  premises.
18        Are you with me so far?
19     A.   Yes.
20     Q.   There was a dispute --
21        MR. ISAKOFF:  Were there still
22     subtenants?
23        MR. DE LEEUW:  I'm giving -- sir,
24     you don't have a -- you don't have a place
25     here to be speaking.  Object or object to

MILLETT

1          MILLETT
2   release for other quarters; is that fair?
3          MR. ISAKOFF:  Object to form.
4       A.   That's fair as far as it goes.  Of
5   course, the difficulty is you just don't know
6   to what extent the release of one impacted on
7   the commercial deal in respect of the other,
8   but I don't agree with your formulation, which
9   is why I was having trouble with it.
10      Q.   But what you are agreeing with is
11  that there's a debt due for each quarter, and
12  what you are saying is there is a release of
13  debt for particular quarters, but no releases
14  for other quarters, and that would be a full
15  release for certain debts and a partial release
16  or no release for other quarters?
17      A.   Yeah.  I mean, you have a slight
18  problem with the hypothesis.  I suspect is that
19  on the 3rd of December 2010, the final quarter
20  hadn't yet finished.
21      Q.   But you would agree with me that,
22  for the final quarter, there was either no
23  release or a partial release?
24      A.   I can read the contract.  I don't
25  know what they did in relation to that.  The

MILLETT

1          MILLETT
2   contract is silent about that.
3       Q.   Well, it says that that rent will be
4   recoverable as an unsecured claim.
5       A.   No.  With great respect, it does
6   not.  And, again, you are putting words into
7   the letter that aren't there, with great
8   respect.
9          All it's simply saying is that any
10  unpaid rent is the -- sorry -- it's the
11  proviso.
12      Q.   The proviso you are referring to is
13  on page five.
14      A.   The point I'm making here is that
15  this letter does not distinguish between those
16  periods for which unpaid rent that was due was
17  due as an administrative expense, and that's
18  why I don't like -- that's why I found the way
19  you put the question very tricky to answer,
20  because it's not what the letter does.
21         It doesn't draw that distinction.
22  You might not have that distinguishing effect
23  when you do the math, but it doesn't do that.
24      Q.   What you don't know is what the
25  facts are in terms of what rent was outstanding

MILLETT

1          MILLETT
2   for what period, and which of those were for
3   administrative expense versus just an unsecured
4   claim?
5       A.   That is correct.  That's what I said
6   before, and I'm proceeding on a number of
7   different assumptions or hypotheses as to what
8   those were.
9       Q.   You don't read what O'Donovan and
10  Phillips say in their treatise, which has been
11  marked as Exhibit 122, as saying that -- excuse
12  me.
13      A.   122 is right.
14      Q.   122.  You don't read that paragraph
15  688 as saying that if you release a portion of
16  the entire debt outstanding on the principal
17  contract, that does not operate as a full
18  discharge of the surety?
19         MR. ISAKOFF:  Object to form.
20         There's too many negatives.
21      Q.   Do you read the O'Donovan and
22  Phillips treatise, which has been marked as
23  Exhibit 122, paragraph 688, as saying that if
24  the release is only of a portion of the entire
25  debt outstanding under the principal contract,

MILLETT

1          MILLETT
2   then there will not be a full discharge of the
3   surety?
4       A.   Well, I can see what it says.  I
5   don't disagree with -- I don't disagree, in the
6   short time you have given me to look at it,
7   necessarily with its conclusions, although I
8   have to go and look at the cases which are
9   referred to.  They're Australian.
10         And, of course, as I said before,
11  this is an English edition of what is actually
12  an Australian publication.  This bit of it
13  seems to be highly Australian, if you look at
14  it, if you look at footnote 209, but it seems
15  to me that's a million miles away from this
16  case, not only because there was no release of
17  a portion of a debt anyway under the forfeiture
18  letter, but, secondly, and perhaps more
19  importantly for the purposes of answering your
20  question, the release in the forfeiture letter
21  wasn't a complete release.
22         The forfeiture letter did not say to
23  LBL, oh, don't worry, you don't have to pay any
24  rent at all during the time when the
25  administrators were in occupation.  The

Page 253

MILLETT

1
2   variation -- it wasn't a release of that
3   liability.  It was a release of the liability
4   to pay it as an administrative expense,
5   administration expense.
6           In other words, Canary Wharf
7   weren't -- what Canary Wharf was doing was
8   agreeing to line up as a creditor in respect of
9   sums in respect of which otherwise they would
10  have a priority for release.
11      Q.   What you're saying there is that
12  some portion of the outstanding amounts due
13  under the lease were released, and some portion
14  of them were not; isn't that fair?
15      A.   It's not fair.  Absolutely not.
16      Q.   Why is that not true?
17      A.   Because what was varied here was not
18  the obligations as obligations.  It was the
19  manner of their performance.
20          On what Canary Wharf and LBL were
21  agreeing to do between them, for their own
22  reasons, is to let LBL off the hook for having
23  to pay the rent as an administrative expense.
24  In other words, in priority.  It was a
25  variation in the waterfall of priorities.

Page 254

MILLETT

1
2   Okay.
3           It's not a release in the same way
4   that O'Donovan and Phillips are referring to in
5   688.
6       Q.   You wouldn't agree with me that it
7   was a release in the manner of performance for
8   some portion of the amounts outstanding?
9       A.   No, it wasn't even -- no, it wasn't.
10  It was a variation in the mode of performance
11  of a debt which fell to be performed by paying
12  it as a priority, and by means of a variation,
13  ceased to be payable that way.
14      Q.   What the forfeiture letter was, was
15  a, according to you, a variation in the mode of
16  performance of a portion of the total debt that
17  was outstanding as of December 3, 2010; isn't
18  that correct?
19      A.   I don't think I said that it was a
20  mode -- a release of the mode of performance of
21  a portion of the total debt outstanding.
22          I go back to the answer I gave ten
23  minutes ago, which was that, to the extent that
24  it was a release at all, which it was not --
25  sorry.  Let me start again.

Page 255

MILLETT

1
2           It was a variation in the mode of
3   performance of discharge of obligations in
4   respect of a number of quarters of rent.
5       Q.   My question wasn't about a release.
6           Was the forfeiture letter, in your
7   view, a variation of the mode of performance
8   with respect to some of the total debt
9   outstanding from LBL?
10      A.   No.  I said this before.  It's not.
11  It was a variation of the mode of performance
12  of discharge of the obligations in relation to
13  debts -- sorry -- rents, if they were debts,
14  for periods during which the administrators
15  were in occupation.  As I said, they arise
16  quarter by quarter.
17      Q.   And those quarters that you are
18  referring to, where the administrators were in
19  occupation, was a portion of the total time for
20  which Canary Wharf could seek some repayment;
21  is that not correct?
22      A.   Mathematically, that's certainly
23  right, but as a matter of law, it is incorrect.
24      Q.   Could I ask you to turn to paragraph
25  6(g) of Schedule 4, which has been marked as

Page 256

MILLETT

1
2   Exhibit 3?
3           MR. ISAKOFF:  It's the guarantee.
4       A.   Got it.  Which paragraph?
5       Q.   6(g).
6       A.   6(g), yes.
7       Q.   Your opinion is that paragraph 6(g)
8   is not applicable here, because it is very
9   widely drawn, and shouldn't be enforced as a
10  catch-all; is that correct?
11      A.   Well, again, I prefer to use the
12  words I used in my opinion.
13          Can you just direct me to the
14  passage in my opinion?
15      Q.   Paragraph 62, sir.
16          MR. ISAKOFF:  62.
17      A.   Paragraph 62, yes.  It's a very
18  widely long catch-all, which the English courts
19  have been loathe to enforce.
20      Q.   And so, therefore, your opinion is
21  that it should not be enforced in this case?
22          MR. ISAKOFF:  Object to form.
23      A.   That isn't my opinion.  My opinion
24  is that 6(g) doesn't contain sufficiently clear
25  and specific words which would oust the normal

Page 277

```
 1            MILLETT
 2     We are now on the record at 3:26 p.m.,
 3   September 12, 2013.
 4   BY MR. DE LEEUW:
 5     Q.   Mr. Millett, you have read the
 6   Reichman decision as well, have you not?
 7     A.   Yes, I have.
 8     Q.   The Reichman case did not raise the
 9   question for the court's determination of
10   whether a landlord could recover compensation
11   for damages lost for future rent following
12   forfeiture, correct?
13          MR. ISAKOFF:  Object to form.
14     A.   It does.
15     Q.   The issue --
16     A.   I disagree.
17     Q.   The issue in Reichman was whether
18   the landlord acted wholly unreasonably by
19   failing to forfeit the lease; is that not
20   correct?
21     A.   That was the macro issue, but I have
22   to say I think, and it's part of the ratio of
23   the judgment, that the Court of Appeal does go
24   on to say that the law of England is that
25   damages for the loss of future rent can't be
```

Page 278

```
 1            MILLETT
 2   recovered after the landlord has taken back
 3   possession of the premises following a tenant's
 4   default.
 5     Q.   Let me break that in two, if I can.
 6          The question posed to the court was
 7   whether it was wholly unreasonable, under the
 8   White and Carter precedent, for the landlord
 9   not to forfeit the lease and find a new tenant.
10          MR. ISAKOFF:  Object to form.
11     Q.   Correct?
12          MR. ISAKOFF:  Object to form.
13     A.   Could you say it again?
14     Q.   The question posed for decision in
15   the Reichman case was whether the landlord
16   acted wholly unreasonably, under the White and
17   Carter precedent, in failing to take steps to
18   find an alternative tenant and forfeiting the
19   lease.
20          MR. ISAKOFF:  Object to the form.
21     A.   That was one of the issues in the
22   case.
23     Q.   Well, that was the issue in the
24   case, was it not?
25          MR. ISAKOFF:  Object to form,
```

Page 279

```
 1            MILLETT
 2   argumentative.
 3     A.   I think the arguments go further
 4   than that.
 5     Q.   That was the question that the court
 6   needed to decide; is that not correct?
 7          MR. ISAKOFF:  Object to form, asked
 8   and answered and argumentative.
 9     A.   I think we've covered this.
10     Q.   The question before the court to
11   decide in Reichman was whether or not the
12   landlord's conduct was wholly unreasonable; is
13   that fair?
14          MR. ISAKOFF:  The same objection,
15   asked and answered for now the third or
16   fourth time, argumentative.
17          He's answered it.
18     A.   I mean, that was, I mean, certainly
19   one of the questions in the case, but in order
20   for the judge to be able to answer it, he had
21   to deal with, had to deal with the arguments
22   that he covers at paragraphs 22 through to 28.
23   It was part of the ratio of the decision.
24     Q.   In paragraph 42, that's part of the
25   conclusion is Reichman, is it not?
```

Page 280

```
 1            MILLETT
 2     A.   Yes.  I realize -- as well -- and
 3   under the conclusions, yes, that's right, part
 4   of the conclusions.
 5     Q.   And the conclusion is that the
 6   landlord did not act wholly unreasonable in
 7   failing to forfeit the lease, correct?
 8     A.   That's, as I say, the sort of macro
 9   conclusion.  That was the main issue in the
10   case, but in order to get there, the Court of
11   Appeal had to get there by a series of rational
12   steps based on legal principle.
13          And if you read paragraph 42, to my
14   mind, it's pretty plain that the Court of
15   Appeal is saying that there is no case in
16   English law that shows that a landlord can
17   recover damages from a former tenant in respect
18   of loss of future rent after termination, and
19   one case which decides that he cannot.  In
20   those circumstances, either damages are not an
21   adequate remedy for the landlord, or at least
22   the landlord would be acting reasonably in
23   taking the view that he should not terminate
24   the lease because he may well not be able to
25   recover such damages.
```

Page 281

```
 1            MILLETT
 2        So, now, your characterization of
 3   the issue in the case is correct, but it
 4   ignores the steps required to get there.  The
 5   learned lord justice says -- reaches his
 6   conclusion in paragraph 42 in those
 7   circumstances because of the learning and the
 8   conclusion of law that he has reached prior to
 9   that.
10        Q.   Isn't the conclusion in Reichman
11   that either the landlord could not recover
12   damages for future rent, or at least the state
13   of the law was uncertain enough so that the
14   landlord did not act wholly unreasonably in not
15   terminating the lease?
16            MR. ISAKOFF:  Object to form.
17        A.   That's a reformulation of the
18   penultimate sentence in paragraph 42.
19        Q.   In other words --
20            MR. ISAKOFF:  Were you finished?
21            THE WITNESS:  I was, yes.
22        Q.   In other words, the judge didn't
23   determine what would be the right determination
24   of whether a landlord could recover damages as
25   compensation for loss of future rent?
```

Page 282

```
 1            MILLETT
 2            MR. ISAKOFF:  Object to form.
 3        A.   No.  I see why you say that.  I
 4   think that is an overstretched approach to the
 5   rule of -- doctrine of precedence in England.
 6        In my opinion, it is absolutely a
 7   central part of the ratio of this case that
 8   the -- that explains how the Court of Appeal
 9   got to where it got to.  It was essential for
10   it to be able to decide that the damages are
11   not an adequate remedy, because -- and that was
12   the issue before it.
13        It couldn't duck the point, but as a
14   follow-up, the Court of Appeal said, or at
15   least the landlord would be acting reasonably
16   in taking the view that he shouldn't terminate
17   the lease.
18        Q.   So, it did duck the point, didn't
19   it?
20        A.   No, it didn't duck the point.
21   Absolutely not.
22        Q.   Didn't --
23            MR. ISAKOFF:  Excuse me.  You're
24   interrupting him now.  You've got to stop
25   doing that.
```

Page 283

```
 1            MILLETT
 2            MR. DE LEEUW:  Stop.  Stop.
 3            MR. ISAKOFF:  You stop.
 4        A.   It didn't duck the point.  Can I
 5   just explain why?  I do disagree with this.
 6        Paragraphs 22 and following aren't
 7   there simply because Amanda Tipples turned up
 8   in court with a whole lot of interesting law.
 9   Lord Justice Patten is a man of relatively
10   limited patience as a judge, and he would not
11   have spent a lot of time and intellectual
12   energy doing a close analysis and very learned
13   analysis, in my view, if he didn't think it was
14   absolutely central.
15        The Court of Appeal in England, I
16   don't know about your Courts of Appeal here,
17   are immensely pushed for time.  They don't do
18   anything unless they absolutely have to.
19        It's clear to me that this was not
20   just an interesting academic aside.  That is
21   not what the Court of Appeal does.
22        If you look carefully at 22 and
23   following, he actually decides the point, and
24   he does so because he thinks it matters, and we
25   can see that it matters in the conclusions.
```

Page 284

```
 1            MILLETT
 2        Q.   Isn't it true that, in paragraph 28,
 3   what he says is, it can't be concluded what the
 4   law is, but the landlord did not act wholly
 5   unreasonably by acting the way it did in the
 6   light of the uncertainty under English law?
 7        A.   No.  What you're focusing on is one
 8   of two separate questions.  There are two
 9   questions, I think, which are in play.  Stand
10   back from the decision.
11        The first is whether, as a matter of
12   general principle, it is possible for a lease
13   to be terminated by the doctrine of accepted
14   repudiation, right?  That's the first issue, as
15   to which, in paragraph 27, he says that there
16   are arguments each way on the point.
17        I have my own views about them, if
18   you are interested in them, and I have looked
19   at the Blundell lectures, but he does say, and
20   I'm quoting from five lines down in paragraph
21   27, "It may be a logical development to hold
22   that a landlord, having forfeited the lease,
23   can recover damages for the loss of future
24   rent, at least if the breach which led to the
25   forfeiture was fundamental and repudiatory, but
```

Page 285

```
 1              MILLETT
 2    it does not seem to me that English law has yet
 3    reached that stage."
 4              Now, to my mind, that's a
 5    conclusion.  English law has not matured
 6    sufficiently to allow the court to reach that
 7    result.
 8              Now, in order for the court in New
 9    York to reach that result, it would be
10    developing English law beyond the parameters,
11    which even the Court of Appeal, as recently as
12    seven years ago refused to do.  So English law
13    has not gone that far.
14              Now, that is not an aside.  It was
15    essential.
16              Paragraph 28, he then goes on to
17    say, and this is the second aspect of it, "If
18    it is still the law of England that damages for
19    the loss of future rent cannot be recovered
20    after the landlord has taken back possession of
21    the premises following a tenant's default, as
22    seems to me to be the case, then damages cannot
23    be an adequate remedy for the landlord in the
24    circumstances suggested by Mr. Gauntlett."
25              And that's about the second aspect,
```

Page 286

```
 1              MILLETT
 2    not about repudiation, but about whether you
 3    can ever get damages representing the loss of
 4    future rent following re-entry or forfeiture.
 5    And he says, and to me in absolutely crystal
 6    clear terms, no.
 7       Q.   And you think that the last two
 8    sentences do not express any doubt about what
 9    the conclusion might be.  "Even if it is not
10    clear that this is the position under English
11    law, the uncertainty of the position at law
12    would be relevant to the reasonableness or
13    otherwise of a landlord's conduct.  The
14    landlord could not be criticized for wishing to
15    avoid embarking on litigation which might have
16    to go to the House of Lords before the point
17    was settled."
18              Do you not read that as the court
19    stating that the point of law has not been
20    determined and won't be determined in this
21    case?
22       A.   Well, you're right to some extent.
23    It's certainly there, but the way I read that,
24    as -- and I don't think there's any real
25    dispute about it, is, simplifying it, what the
```

Page 287

```
 1              MILLETT
 2    Court of Appeal is saying is the law in England
 3    does not allow a landlord to recover damages
 4    for the loss of future rent once he's taken
 5    back possession.
 6              In order for the law to say that he
 7    can, it's got to go to the House of Lords,
 8    which is now the Supreme Court, and who knows
 9    what would happen there.  That's all very
10    interesting, but the -- but the landlord
11    couldn't be criticized for not wanting to go
12    all the way to the House of Lords to have the
13    point determined.
14              That's all he's saying.  He's not
15    saying the law is in doubt, I don't know what
16    it is at all.
17       Q.   So, you don't read the statement by
18    the judge in Reichman that there is uncertainty
19    of the position at law to be a statement that
20    he doesn't reach a conclusion as to what the
21    right position is as a matter of English law?
22              MR. ISAKOFF:  Object to form.
23       A.   Well, no, I don't.  It's -- he is
24    saying -- it's an even if.  Even if it's not
25    clear that this is the position under English
```

Page 288

```
 1              MILLETT
 2    law, so you should never construe cases like
 3    they are statutes.
 4              But it's obvious to me that he's
 5    saying two things in 28.  A, it seems to me not
 6    to be the law in England that a landlord can
 7    get damages for loss of future rent once he has
 8    re-entered.
 9              And, two, even if I'm wrong that
10    it's not clear, I think it is, but if I'm wrong
11    about it, then it would have to go to the House
12    of Lords anyway, and the landlord can't be
13    criticized for not taking that course.
14              That's how I read it.
15       Q.   In other words, based on your
16    reading, the court in Reichman didn't need to
17    reach the conclusion as to whether or not
18    damages for future rent were recoverable, and
19    did not do so?
20              MR. ISAKOFF:  Object to form.
21       A.   No, I don't say that at all, because
22    if the argument had been the other way --
23    actually, it's clear that the landlord can
24    recover damages, then it wouldn't have been
25    necessary to get into the second point.
```

Page 289

MILLETT

1           MILLETT
2           No, it's a very normal way of
3   writing a judgment. I'm right on A, but if I'm
4   wrong on A, then B. It doesn't mean that it
5   wasn't necessary to arrive at the conclusion in
6   A.
7           Q.   Isn't it the case, sir, that, in
8   fact, the conclusion in Reichman was, given the
9   unsettled state of the law, I don't need to
10  determine whether a landlord can recover for
11  future rent, because I determined that the
12  landlord in this case did not act wholly
13  unreasonably?
14          MR. ISAKOFF: Object to form.
15          A.   That would be a very fair question
16  if the decision in Reichman had been rather
17  different, and I can well see lots of judges
18  doing exactly that, saying it's all very
19  difficult, I don't know what the answer is, I
20  don't want to stick my neck out. You know
21  what, it's so difficult, it's not unreasonable
22  for the landlord to do what he does.
23          But that isn't, looking at the
24  decision, what happened in the case. The Court
25  of Appeal, as I said before, there need to be

Page 290

1           MILLETT
2   good reasons for doing this, actually went and
3   decided the point.
4           What was unnecessary, in my opinion,
5   was the secondary bit, because it was perfectly
6   open to Lord Justice Patten to say, given the
7   views I have taken about the present position
8   or the position under English law, the question
9   of reasonableness of the landlord's conduct
10  doesn't arise.
11          Q.   So, you would agree with me, would
12  you not, that the question of whether the
13  landlord could recover future rent as damages
14  in the case of re-entry was not necessary for
15  the decision in Reichman?
16          MR. ISAKOFF: Object to form.
17          A.   It was central to the decision in
18  Reichman.
19          Q.   But was it necessary for the
20  decision in Reichman?
21          MR. ISAKOFF: Objection.
22          A.   Yes.
23          MR. ISAKOFF: Asked and answered.
24  You don't have to ask the same question
25  over and over again.

Page 291

1           MILLETT
2           A.   It was necessary for the decision.
3   I'm not saying that the court -- a court -- I
4   wasn't sitting on the panel. I haven't seen
5   the arguments, but -- and I haven't read the
6   judgment in the first instance, and I'm not
7   saying that if I knew more, and certainly
8   Mr. Rabinowitz hasn't been able to point to
9   anything to draw it to my attention, I'm not
10  saying it isn't impossible for a lazy court to
11  come to a different conclusion.
12          But this is a well-reasoned
13  decision, and I have -- I have no real doubt at
14  all that any English judge, faced with this
15  decision, would regard it as authoritative, not
16  obiter dictum, O-B-I-T-E-R D-I-C-T-U-M.
17          Q.   Could I ask you to turn to Schedule
18  4 that's been marked as Exhibit 3?
19          A.   Can I just add one more thing?
20          Q.   Please.
21          A.   Sorry. And that is that even if
22  you're right, and I don't accept for a moment
23  that you are, that Reichman is -- the decision
24  in Reichman is all obiter, and everything that
25  we've seen in that judgment is all just so much

Page 292

1           MILLETT
2   paper, the English Court of Appeal, and
3   certainly the English high court, would be
4   bound by the decision in Walls and Atcheson,
5   which is referred to at paragraph 23, which was
6   the Court of Common Pleas, which was a court of
7   sufficient seniority certainly to bind the
8   court of the first instance after 1873.
9           Q.   You would agree with me that the
10  decision in Walls and Atcheson did not deal
11  with a tenant's repudiatory breach, correct?
12          A.   Well, that's -- that is right, and
13  that's because the doctrine of repudiatory
14  breach is of far more recent origin, and much
15  more immature in its development.
16          The principle that a landlord can't
17  recover damages by way of nonpayment of rent,
18  regardless of repudiation or otherwise, once he
19  has taken back the premises, is of very ancient
20  origin.
21          Q.   You would agree with me that the law
22  now in England is that there can be a
23  repudiatory breach in England of a lease,
24  correct?
25          A.   I don't -- no, I don't think it's

MILLETT

1            MILLETT
2  settled.  I think there are arguments on that
3  both ways, and the Blundell lectures set those
4  out in interesting detail.
5        My own view, for what it's worth, is
6  that -- is that there are extremely compelling
7  reasons why a lease can't be terminated by a
8  doctrine of accepted repudiatory breach.
9    Q.   You would agree, generally, that
10  over the years, courts in England have treated
11  leases more like other contracts?
12      MR. ISAKOFF:  Object to form.
13    Q.   Correct?
14      MR. ISAKOFF:  Object.
15    A.   Courts over the years have treated
16  leases more like other contracts?
17    Q.   Yeah, I see you have a problem.
18      You would agree that there has been
19  a -- would you agree with me that there has
20  been a trend in English law to treat leases
21  more like other contracts?
22      MR. ISAKOFF:  Object to form.
23    A.   I don't agree with that.  If you can
24  point me to anything that identifies that
25  trend, I'd be happy to look at it, but, no, it

1            MILLETT
2  hasn't been my experience.
3    Q.   Well, there used to be a doctrine
4  that frustration of leases was now possible,
5  correct?
6    A.   Yes, that's right.
7    Q.   And now it's the case that -- and
8  now it's the case that frustration of leases is
9  available, correct?
10    A.   Well, it's just -- that's a bit
11  black and white, a bit simplistic.
12      Would you like me to answer the
13  question?
14    Q.   Is it the case that frustration of
15  leases has been accepted as a doctrine?
16    A.   It is possible, since 1977,
17  following the Panel Peanut case, that it is
18  possible for a lease to be discharged by
19  frustration, but that is the, to my knowledge,
20  the limit of the incursion of contractual
21  principles into the law of landlord and tenant.
22      I would also add that, and I looked
23  at Panel Peanut, that there is the world of
24  difference between discharge by frustration and
25  discharge for accepted repudiation.  I mean, I

1            MILLETT
2  could list them, but they are category
3  different, and I don't accept at all, and one
4  can spend a lot of time on this, that you can
5  extrapolate or rationalize, from the fact that
6  the House of Lords, in 1977, decided that a
7  lease was capable of discharge by frustration,
8  that it was also capable of discharge by the
9  application of the doctrine of repudiatory
10  breach.
11    Q.   Can I ask you to turn to Exhibit 3,
12  Schedule 4, paragraph seven, please?
13    A.   Yes, paragraph seven.
14    Q.   Would you agree with me that there's
15  nothing in paragraph seven that explicitly says
16  that it is the exclusive remedy to the landlord
17  in the case of forfeiture?
18      MR. ISAKOFF:  Object to form.
19      You want to hear it back?
20      THE WITNESS:  No.  I understand the
21  question.
22    A.   There is nothing in there which says
23  that it's -- there's nothing in there, by way
24  of express words, that says that it's the
25  exclusive remedy of the landlord, and there may

1            MILLETT
2  be others.
3      I mean, for example, if the lease
4  was forfeited, but the tenant then refused to
5  give up possession, the landlord would have a
6  right to go to the court and demand an order of
7  possession.  So it's not an exclusive remedy.
8    Q.   Is there anything from paragraph
9  seven or elsewhere that says that paragraph
10  seven of Schedule 4 is the exclusive remedy of
11  the landlord as against the surety in the case
12  of forfeiture?
13      MR. ISAKOFF:  Object to form.
14    A.   I think I have answered that.
15  There's nothing in there that says that it's
16  the exclusive remedy in terms.
17    Q.   Your conclusion that Canary Wharf's
18  exclusive remedy in this case is under
19  paragraph seven is based on your interpretation
20  of paragraph one; is that correct?
21      MR. ISAKOFF:  Object to form.
22    A.   I'm sorry.  Can you say that again,
23  please?
24    Q.   You conclude in this case, do you
25  not, that Canary Wharf's exclusive remedy is