# EXHIBIT 52

**UNITED STATES BANKRUPTCY COURT**

**SOUTHERN DISTRICT OF NEW YORK**

**IN RE LEHMAN BROTHERS HOLDINGS INC** *Et al*, **Debtors**

                  **Chapter 11 Case No 08-13555(JMP)**

                  **(Jointly administered)**

**FURTHER DECLARATION OF RICHARD MILLETT Q.C. IN SUPPORT OF OBJECTION TO PROOFS OF CLAIM OF CANARY WHARF MANAGEMENT LIMITED** *et al.*

**RICHARD MILLETT Q.C. hereby declares as follows.**

<u>Introduction</u>

1. I have been asked by Lehman Brothers Holdings Inc ("LBHI") to provide a further opinion on the matters the subject of my first opinion ("my first opinion") in the light of having seen certain deposition transcripts and exhibits used at the depositions. <u>Appendix 1</u> is a list of the depositions and new documents that I have reviewed. I adopt the abbreviations and expressions that I used in my first opinion.

2. I have not seen any further opinion of Mr Rabinowitz Q.C. in this matter although I understand that he may provide one in response to my first opinion in due course. I reserve the right to supplement this opinion or respond to any points Mr Rabinowitz may yet make.

3. By way of general observation, I can say that nothing I have seen in the new material I have read has caused me to change the opinions that I expressed in my first opinion. If anything, my views have been fortified, in the respects I will identify, as a result of reading the new material.

4. Before addressing the law and my conclusions, I have been asked to supplement the

1

information provided in my first report on my personal background. I gave deposition testimony as an expert in two cases in the last four years: In re Refco Inc. Securities Litigation in the District Court for the Southern District of New York and Viad v. Lloyds in Florida State Court. I also authored and edited several legal publications in the last ten years, including a textbook on guarantees that is regarded as a (if not the) standard textbook on the subject: reissue of Halsbury's Laws on Guaranties (Vol 20(1)) (2004), Run-Off Management and Commutation in Practice (IIL, 2006), Cross-Border Insolvency: The Effect of Insolvency Proceedings on Pending Arbitrations (2009 Butterworths JIBL), Hedgehogs and Sea-Urchins, Offshore Hedge Fund Litigation: A Review (Corporate Recovery, February 2010), Andrews and Millett on the Law of Guarantees (6th Edition, 2011). More information on my professional background can be found in my curriculum vitae, which is attached as Appendix 1 to my first report.

5. With regard to compensation, when I work in London, my hourly rate is £750 per hour. When I travel to the United States, which I will do for my deposition in this case, I charge a daily rate of £7,500 and half that rate for time spent travelling. In addition, I will be reimbursed for travel accommodations.

6. The matters that I have been asked to address in this supplemental opinion are these:

   (i)   The *contra proferentem* principle and its application.
   (ii)  The argument adverted to by Mr Briam in his deposition that LBHI had a right to demand that the landlord grant it a new lease.
   (iii) The argument that LBHI committed an anticipatory breach of clause 7(a) of Schedule 4 of the lease.

### (i) The *contra proferentem* principle

7. In my first opinion I said that the *contra proferentem* principle of interpretation of contracts in English law applies in cases where the document admits of doubt (paragraphs 19(i), 24 and 28(ii)). That remains my view as a matter of English law.

8. I see from the deposition of Sir George Iacobescu (attached hereto as Exhibit A) that it appears that Canary Wharf and its lawyers drafted the guarantee and put it forward, and also that there is no evidence to suggest that LBHI had made any changes (see Iacobescu

2

Pg 4 of 12

Dep. pp 20-21). If the Court finds these as facts, then in my opinion the landlord was the person putting the document forward and against whom it will be construed in case of ambiguity.

9. I should say a little more about the maxim of construction *contra proferentem*. Although it is a maxim or canon of interpretation that can be traced back to the 17th century[1], it is still very much applied in modern times.[2] As to who is the *proferens* (literally, he who puts the document forward), there have been different formulations as to the person indicated. It could be the person who prepared the document, or the person who prepared the clause, or the person for whose benefit the clause operates. See Lewison, The Interpretation of Contracts, 5th Edn, 2011, para 7.08 at p 362 (attached hereto as Exhibit D).

10. On Sir George Iacobescu's evidence (if accepted by the Court), it was the landlord who put forward Schedule 4 to the lease. As Binnie J said in Co-operators' Life v Gibbens [2010] 3 L.R.C. 140 at 148 (attached hereto as Exhibit E), *"Whoever holds the pen creates the ambiguity and must live with the consequences."* In Tam Wing Chuen v Bank of Credit & Commerce Hong Kong Ltd [1996] 2 BCLC 69 at 77 (attached hereto as Exhibit F), Lord Mustill said:

> " ... the basis of the *contra proferentem* principle is that a person who puts forward the wording of a proposed agreement may be assumed to have looked after his own interests, so that if the words leave room for doubt about whether he is intended to have a particular benefit there is reason to suppose that he is not."

11. Ambiguity in this context does not mean merely a difficulty of construction, but rather,

> "some choice of an expression — by those who are responsible for putting forward the clause, which leaves one unable to decide which of two meanings is the right one.[3]

12. As I stated in my first opinion, my view is (and remains) that Schedule 4 to the lease is plainly a guarantee and not an indemnity, and there is no ambiguity about it. However, were the Court to conclude that the language of Schedule 4 is ambiguous in the sense understood in English law, then any ambiguity should be resolved in favour of LBHI and against the landlord as the *proferens*.

---

[1] See the masterly historical survey of the maxim by Peter Prescott Q.C. (sitting as a Deputy Judge of the High Court) in Oxonica Energy Ltd v Neuftec Ltd [2008] EWHC 2127 (attached hereto as Exhibit B).
[2] See, e.g., Association of British Travel Agents Ltd v British Airways plc [2000] 2 All ER (Comm) 204 (attached hereto as Exhibit C), in which Sedley LJ described it as *"a principle not only of law but of justice."*
[3] London & Lancashire Fire Insurance Co Ltd v Bolands Ltd [1924] AC 836, at 848, per Lord Sumner (attached hereto as Exhibit G).

3

### (ii) Whether LBHI had a right to demand that the landlord grant it a new lease

13. In late November and early December 2010, prior to forfeiture, the landlord repeatedly pressed LBHI to confirm that it did not want a new lease and would not seek to "compete" with JPMorgan for the space. I refer below to some examples of e-mails in which LBHI was requested to confirm that it would not seek to take over the lease or to take up a new lease. The requests proceeded on the unspoken assumption, as it seems to me, that LBHI had some legal or equitable right to take over the premises upon forfeiture of LBL's lease by the landlord which LBHI was being asked to give up.

14. I have been asked to consider whether LBHI did have any legal or equitable right to call for the existing lease or a new lease, quite apart from its contractual right to have a new lease if and when the landlord chose to serve a notice under paragraph 7(a) of Schedule 4 (attached hereto as Exhibit H).

15. At pages 165:9 to 168:24 of his deposition (attached hereto as Exhibit I), Mr Briam said (and I summarise his point) that, quite apart from paragraph 7(a) of Schedule 4 to the lease, it was arguable that following forfeiture LBHI could apply to an English court, as a surety, for a vesting order vesting the lease in LBHI. He accepted that he was not personally aware of any precedent for that but expressed surprise if it had not happened.

16. Like Mr Briam, I am unaware of any precedent for such an argument. The main landlord and tenant textbooks I have consulted (Hill & Redman and Woodfall) do not, so far as I have been able to detect, mention any case in which a surety of a lease has been entitled to relief from forfeiture by way of an order vesting the lease in it. The right to a vesting order is governed by section 146(4) of the Law of Property Act 1925 (attached hereto as Exhibit J), which accords standing to an under-lessee claiming an estate or interest in the property comprised in the lease to apply for a vesting order. By section 146(5)(e) (Exhibit J) an under-lessee includes any person deriving title under an under-lessee (such as a mortgagee by sub-demise). There is no reference to sureties having any right to apply. Sureties of a tenant's obligations under a lease are not under-lessees and have no estate or interest in the land comprised in the lease. Nor would any rights of subrogation provide a surety with any right to call for the vesting of a lease, not least because the act of forfeiture brings the lease to an end, but also because the surety, on full payment of what is due from the tenant, is

4

subrogated to the landlord's rights, not the tenant's rights.

17. Accordingly, my view is that in English law it is not even arguable that LBHI would be entitled to have the LBL lease vested in it in place of LBL following forfeiture. Nor is there any basis on which LBHI could have called for a new lease. The only circumstances in which LBHI could call for a new lease is where the landlord had served a notice under paragraph 7(a) on it and then refused to grant a new lease. That is self-evidently not this case.

### (iii) Anticipatory breach of clause 7(a) of Schedule 4

18. At paragraphs 95 to 104 of my first opinion, I addressed the question of whether LBHI committed an anticipatory repudiatory breach of its obligation to take a new lease pursuant to paragraph 7(a) of Schedule 4 to the lease. I have been asked to review those paragraphs in the light of the depositions and further documents that I have read.

19. I can confirm that my opinion on this issue stands. If anything it is even more robust. I understand that it is not for me as an expert witness on English law to opine as to the primary facts or the conclusions to be drawn from those facts. However, since Mr Rabinowitz has expressed the view, at paragraph 72 of Mr Rabinowitz's Declaration (attached hereto as Exhibit K), that *"LBHI's express statement that it would not execute a new lease, if notice were given, would likely be regarded as an anticipatory breach of its obligations under para 7(a) ... "*, I have been asked to consider that view further in light of the factual material I have seen.

#### (a) Was there any anticipatory breach?

20. Under English law an anticipatory breach of a contract occurs when, before the time at which a party is bound to perform it arrives, he expresses an intention to break it or else acts in such a way as to lead a reasonable person to conclude that he does not intend to fulfill his bargain.[4]

21. It is important to understand that LBHI was simply under no contractual, or any other, obligation whatever to take up a new lease unless and until the landlord served on LBHI the requisite notice under paragraph 7(a) within the requisite 180 days from date of (inter alia)

---

[4] See Chitty on Contracts (31st Edn, 2012), Vol 1 paragraph 24-022 (attached hereto as Exhibit L).

5

forfeiture. The landlord had a free choice whether to serve its notice or not.

22. It is also important to note that, in fact, the landlord never did put squarely to LBHI the question whether, if the landlord served a paragraph 7(a) notice, LBHI would comply with it. It follows that LBHI never did make any "express statement" that, if the landlord served a paragraph 7(a) notice, LBHI would not execute a new lease. Having seen more of the factual background, I am not sure what evidence Mr Rabinowitz is relying on for his factual premise that LBHI made any such "express statement" (see Exhibit K). The e-mail correspondence on the subject at the time is far more oblique. LBHI was asked, for example:

(i) whether it had any "intention of taking over the existing Lease or taking up a new lease" (e-mail Mr Briam to Mr Krasnow, 3 December 2010, 12.50 attached hereto as Exhibit M);

(ii) for its "position on the taking up a new lease" (e-mail Mr Briam to Mr Krasnow, 5 December 2010 18.33 (attached hereto as Exhibit N));

(iii) to confirm that it was "not interested in taking the lease yourself" (e-mail Mr Dietderich to Mr Krasnow, 6 December 2010, 10.56 (attached hereto as Exhibit O)); and

(iv) to confirm that "you do not want a new lease" (e-mail Mr Dietderich to Mr Krasnow 8 December 2010, 10.40 (attached hereto as Exhibit P)).

23. The language of the landlord's e-mails on this question is all in terms of LBHI's free choice, as if LBHI had some kind of election to take up the lease or not. However, as I have already explained above, LBHI had no such choice absent the landlord having served a notice under paragraph 7(a) after forfeiture. The landlord made no mention of any obligation under paragraph 7(a) of Schedule 4, whether contingent or accrued due. LBHI's response, when it came after these repeated requests from the landlord, was that it *"would not elect to enter into a lease for the premises on the same terms as the current CW/LBL lease"* (e-mail Mr Krasnow to Mr Dietderich, 9 December 2010, 12.39 (attached hereto as Exhibit Q)), indicating what its preference would be if given a choice (which was a wholly hypothetical situation).

24. Applying the legal principle I identified in paragraph 20 above, I consider that an English court would conclude that LBHI had not expressed any intention to break any promise or had acted in such a way to lead a reasonable person to conclude that LBHI intended not to

6

perform any obligations that it had. That is clear from the terms of the discussions themselves, which did not proceed on the basis that LBHI was then under any obligation whatever, and which did not even mention paragraph 7(a).

25. That is also clear from the fact that these discussions took place before the forfeiture on 10 December 2010, and so before even the landlord had any right to serve a paragraph 7(a) notice on LBHI, let alone served any such notice. The landlord's right to serve a notice under paragraph 7(a) was in the nature of a put option. The landlord had that option only if and when it forfeited the lease. Once it forfeited, its put option rights accrued, and it could elect to serve a paragraph 7(a) notice (see Exhibit H). Only once it did so would LBHI's obligations to take a new lease fall due. Prior to the forfeiture, the landlord has no rights at all, even to serve a notice. Ms Kendall accepted, in my opinion correctly, that unless and until the landlord, in its discretion, gave notice to LBHI to take a new lease, LBHI would have no right to take such a lease (Ms Kendall Dep. p 86:8-17 (attached hereto as Exhibit R)). It would have no obligation either, in my view. Reduced to its simplest terms, in English law you cannot have an anticipatory breach of a contingent contractual obligation before the contingency matures. A *fortiori*, you certainly cannot have an anticipatory breach of a contractual obligation before it even comes into existence.

26. I note that Ms Kendall's evidence in her deposition is that the e-mail exchanges with LBHI of early December 2010 were in some way equivalent to the service of a notice under paragraph 7(a), for the purposes of making a claim for anticipatory breach (see, e.g., Ms Kendall Dep. p 17:2-9; p 25:9-18; pp 136:18-139:11; and pp 156:15-157:4 (Exhibit R)). In particular, she said, at page 138:23-25: "*The service of a notice was rendered if you like otiose, we didn't need to. We had done it by exchange of e-mails*" (Exhibit R). I have been asked to give my opinion whether this is sound as a matter of English law.

27. The answer, in my view, is plainly no, for the following reasons:

   (i)   The tenor and language of the landlord's e-mails was not about whether, if the landlord forfeited and served a paragraph 7(a) notice, LBHI would perform its obligations, but whether LBHI was in some way going to call for a lease (see above paragraphs 22 & 23). I see no equivalence at all.

   (ii)  The background to the repeated requests by the landlord was that JPMorgan would

7

not proceed to simultaneous contract and completion of the deal, which would "drop dead" by the year end, if the landlord served a paragraph 7(a) notice on LBHI (see e-mail Mr Clay to Mr Turner, 3 December 2010, 17.06 (attached hereto as Exhibit S)). It is clear that the landlord did not want to risk the JPMorgan deal, or risk delaying it, by serving a notice (see, e.g., Ms Kendall Dep. p 136:8-22; p 152:9-19 (Exhibit R)).

(iii) In the agreement with JPMorgan dated 20 December 2010 the landlord expressly undertook not to serve any paragraph 7(a) notice on LBHI (clause 7.16.4) and expressly warranted that it had not done so (clause 11.3.2) (see Agreement Relating to the Grant of a Lease of 25 Bank Street, Canary Wharf, London E14 5LE (attached hereto as Exhibit T)). Had the exchange of e-mails to which Ms Kendall referred been "equivalent to" the service of a clause 7(a) notice, then the warranty would to all intents and purposes have been false and the undertaking completely empty. Sir Iacobescu, Mr Briam and Ms Kendall testified that the warranty was true as of 20 December 2010 and remains so (see Sir Iacobescu Dep. p 238:11-23 (Exhibit A); Mr Briam Dep. pp 191-192 (Exhibit I); and Ms Kendall Dep. pp 39:5-40:16 (Exhibit R)).

(iv) The English court would construe the e-mail exchange objectively and as a whole. Objectively viewed, LBHI was not agreeing, through the e-mail exchange, to treat the landlord as having complied with its notice obligation under paragraph 7(a), or waiving the need for any notice. It is important that the landlord's request for confirmation from LBHI that it would not want a new lease was the condition it imposed for giving LBHI sight of the JPMorgan transaction documents. It is not a commercially reasonable interpretation of the e-mail exchange to conclude from it that LBHI had agreed to assume a liability in damages for refusing to take up a putative new lease under paragraph 7(a) as the price of seeing the JPMorgan deal terms.

(v) The exchange of e-mails was no more than an attempt to set up and preserve the very argument for anticipatory breach now being advanced by the landlord to which Mr Rabinowitz refers. Ms Kendall admitted as much (see, e.g., Ms Kendall Dep. p 156:15-24 (Exhibit R)). On that basis, it was not, as it seems to me, a genuine attempt to require LBHI to comply with any obligations to the landlord. I think an English judge would regard the e-mail exchange as, at best, simply the landlord

8

paving the way for the JPMorgan deal as JPMorgan had requested, and, at worst, a forensic set-up by the landlord in an attempt to have LBHI foreswear an obligation that could only have arisen upon the landlord's service of a notice under paragraph 7(a) of Schedule 4, which, given the circumstances of the pending JPMorgan transaction, it had no intention whatever of serving.

(b) Was there any acceptance of anticipatory breach?

28. In any event, as a matter of English contract law it is essential for an anticipatory repudiation of a contract to be accepted by the other party in order to give rise to any claim for damages. It is clear law that the acceptance must be clear and unequivocal and communicated to the breaching party (see Vitol SA v Norelf Ltd [1996] AC 800 (attached hereto as Exhibit U)). Acceptance is usually done by communicating the fact to the breaching party, although it is enough if there is an *"unequivocal overt act which is inconsistent with the subsistence of the contract ... without any concurrent manifestation of intent communicated to the other party."*[5] I have seen no evidence that the landlord ever told LBHI that it was treating its stance in the e-mails – which it was expressly and repeatedly invited by the landlord to take – as an anticipatory repudiation or breach of contract, or that the landlord performed any overt and unequivocal act that was inconsistent with any then-existing obligations that LBHI had as to which LBHI could be said to be in breach. The entry into the agreement with JP Morgan on 20 December 2010 cannot conceivably have been unequivocally inconsistent with any outstanding and enforceable obligation that LBHI had to take a lease under paragraph 7(a) of Schedule 4, not least because the agreement between the landlord and JP Morgan expressly forbade the landlord from serving the notice under paragraph 7(a) that would have brought LBHI's obligation to take a lease into existence. It was only consistent with there being no such obligation, either at that time or ever in the future.

(c) Loss

29. It is also very difficult to see how the alleged anticipatory breach could have caused the landlord any loss. The landlord chose to forfeit and chose not to serve a paragraph 7(a) notice for its own commercial reasons, namely to preserve the deal with JPMorgan. As Ms Kendall accepted, had the landlord objected JPMorgan would have "strenuously objected"

---

[5] State Trading Corporation of India v M Golodetz Ltd [1989] 2 Ll Rep 277 (attached hereto as Exhibit V).

9

(see Ms Kendall Dep. p 158:5-18 (Exhibit R)). She also said that had there been no e-mail exchange with LBHI, "*I don't know what our position would have been*" (see Ms Kendall Dep. p 140:19-22 (Exhibit R)). This would suggest to an English court that LBHI's conduct in the e-mails had not necessarily caused the landlord not to serve a paragraph 7(a) notice. So any case to the effect that the landlord had been led not to serve a paragraph 7(a) notice by anything said or done by LBHI, which would be an essential causal link in establishing any loss, would not in my view succeed. What is more, it was the landlord who invited LBHI to confirm that it would not "elect" to take a new lease, so that it could clear the way for the JPMorgan deal. The only reason why LBHI confirmed that it was "not interested" in a new lease was so that it could see the confidential terms with JPMorgan, and only since the landlord made that confirmation a condition of sight of those documents. Furthermore, I have seen suggestions in the deposition evidence that if the landlord had served a notice under paragraph 7(a) it would have been contrary to the Bankruptcy Code, without the leave of the Federal Bankruptcy court. I am not in a position to opine on whether that is right or not, but if it is right then it would provide a further strong reason why as a matter of English law the landlord had not been caused any actionable loss by the position taken by LBHI about a new lease.

## Conclusions

28. I re-affirm my opinions that I expressed in my first opinion. The deposition evidence that I have now seen serves, if anything, to reinforce my conclusions that Schedule 4 to the lease was a guarantee and not an indemnity. In addition, I consider that LBHI is not liable for any rent or sums representing unpaid rent post-forfeiture, and given that no notice was served under paragraph 7(a) of Schedule 4, LBHI's only liability post-forfeiture could be under paragraph 7(b), and then only until 20 December 2010 when the premises were re-let to JPMorgan.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

*[signature]*

Executed on ___15 July___ 2013

10

RICHARD MILLETT Q.C.

## APPENDIX 1

### Materials Considered

| Legal Authorities |
|---|
| Association of British Travel Agents Ltd v British Airways plc [2000] 2 All ER (Comm) 204. |
| Chitty on Contracts (31st Edn, 2012), Vol 1. |
| Co-operators' Life v Gibbens [2010] 3 L.R.C. 140. |
| Hill & Redman, Law of Landlord. |
| Law of Property Act 1925. |
| Lewison, The Interpretation of Contracts, 5th Edn, 2011. |
| London & Lancashire Fire Insurance Co Ltd v Bolands Ltd [1924] AC 836. |
| Oxonica Energy Ltd v Neuftec Ltd [2008] EWHC 2127. |
| State Trading Corporation of India v M Golodetz Ltd [1989] 2 Ll Rep 277. |
| Tam Wing Chuen v Bank of Credit & Commerce Hong Kong Ltd [1996] 2 BCLC 69. |
| Vitol SA v Norelf Ltd [1996] AC 800. |
| Woodfall, Landlord and Tenant. |

| Evidence |
|---|
| Andrew Dietderich Deposition Transcript, June 11, 2013. |
| Anthony Michael Briam Deposition Transcript, June 19, 2013. |
| Daniel Ehrmann Deposition Transcript, June 27, 2013. |
| Declaration of Laurence Rabinowitz, Q.C., In Support of Proofs of Claim of Canary Wharf Management Limited et al., October 12, 2012 [ECF No. 31343]. |
| Deposition Exhibits 1-96 |
| E-mail exchange between Andrew Dietderich and Richard Krasnow (Dec. 6, 2010). |
| E-mail from Tony Briam, Clifford Chance LLP, to 'Richard.krasnow@eil.com' (Dec. 5, 2010, 18:33). |
| Pamela Kendall Deposition Transcript, June 20, 2013. |
| Richard Krasnow Deposition Transcript, June 25, 2013. |
| Rider, 7.16 Claims under the Lehman Lease, December 13, 2010. |
| Sir George Iacobescu Deposition Transcript, June 18, 2013. |
| William C. Viets Deposition Transcript, June 26, 2013. |

11