# EXHIBIT 53

# ACTIVE ESTATES LTD v PARNESS ET AL
# [2002] EWHC 893 (Ch)

Chancery Division

Neuberger J

19 April 2002

*Winding up – Disclaimer of lease by liquidator – Whether guarantor of lease obliged to take up lease – Whether lessor had waived its rights to enforce claim against guarantor*

*Leases – Notices requiring guarantors to take up residue of lease on disclaimer – Whether notices had to conform to requirements of s 2 of Law of Property (Miscellaneous Provisions) Act 1999*

The claimant, A Ltd, was the successor in title to a lessor of property which on 22 April 1993 granted a 25-year lease of premises to the company. The defendants (Mr P and Mr O) acted as guarantors to this lease. Under the terms of the guarantee the defendants agreed (cl 8.2) on disclaimer by the lessee and if requested by the lessor to take up a new lease for the residue of the term. Alternatively, if disclaimer had taken place and the lessor did not require the guarantors to take up the residue then, under cl 8.3, the guarantor would make specified payments to the lessor.

In 1997, the company assigned the lease to G Ltd, though from early 1999 another company, J Ltd, was in occupation and paying the rent on behalf of G Ltd. In June 1999, G Ltd went into compulsory liquidation. After discussion with representatives of the claimant, it was agreed that J Ltd would remain in occupation with it paying reduced rent on behalf of G Ltd. The possibility of the lease being assigned to J Ltd if the liquidator of G Ltd disclaimed it was agreed in principle. The liquidator of G Ltd disclaimed the lease on 27 August 1999, J Ltd continued to make the reduced rent payments on behalf of G Ltd but without a new tenancy being created. In October 1999, the claimants sought to invoke cl 8.2 against the guarantors by requiring them to take up the residue of the lease. Rent payments from J Ltd ceased in April 2000 and in January 2001 a court order for possession of the premises was granted to the claimant.

In response to the claimant's demand that the defendants take up the residue of the lease from the date of disclaimer several points were raised. It was argued that the lease had been forfeited before the disclaimer or that the claimant had taken possession after disclaimer. It was contended that clause 8.2 could not be enforced because of delay on the part of the claimant. Finally, it was suggested that the notice had been a breach of the formal requirements of s 2 of the Law of Property (Miscellaneous Provisions) Act 1989.

**Held** – upholding the claim –

(1) There was no evidence that the lease had been surrendered or forfeited before the date of the disclaimer. Representatives of the claimant had made it clear that although J Ltd was paying the rent it was being regarded as doing so on behalf of G Ltd.

(2) With regard to the actions of the claimant between the date of disclaimer and the service of the notice on the guarantors on 7 October 1999, several points needed to be taken into account. Retaking possession after disclaimer is not consistent with requiring a guarantor to take up the residue of the lease, but on the facts the claimant did not retake possession. When the claimant agreed to accept a reduced rent from J Ltd that was not an enforceable agreement but rather an act of indulgence.

(3) When the notices were served on the guarantors the claimant was in a position to give possession of the property to the defendants because at best J Ltd enjoyed only a tenancy at will which the claimant could have terminated.

(4) With regard to events after 7 October 1999 (when the notices were served), there was nothing done by the claimants to prevent the enforcement of such notices. The delay on the part of the claimants was in the circumstances understandable and did not prejudice the position of the defendants.

(5) The argument that the notice failed to comply with the formal requirements of s 2 of the 1999 Act because it did not incorporate all the terms in a single document was misconceived because the relevant document was the original agreement under which the notice was served. *Spiro v Glencrown Properties Ltd and Another* followed.

**Statutory provisions considered**
Law of Property Act 1925, s 146
Protection from Eviction Act 1977
Insolvency Act 1986, s 178(4)(b)
Law of Property (Miscellaneous Provisions) Act 1989, s 2

**Cases referred to in judgment**
*Ashton and Others v Sobelman* [1987] 1 WLR 177, [1987] 1 All ER 755, [1987] EGLR 33, ChD
*Basch v Stekel* [2001] L & TR 1, CA
*Bircham & Co Nominees (2) Ltd and Another v Worrell Holdings Ltd* [2001] EWCA Civ 775, [2001] 47 EG 149, CA
*Coronation Street Industrial Properties Ltd v Ingall Industries Ltd* [1989] 1 WLR 304, [1989] 1 All ER 979, HL
*Hindcastle Ltd v Barbara Attenborough Associates Ltd* [1997] AC 70, [1996] 2 WLR 262, [1996] BPIR 595, [1996] 1 All ER 737, HL
*Javad v Aqil* [1991] 1 WLR 1007, [1991] 1 All ER 243, CA
*Mulholland's Will Trusts, In re; Bryan and Others v Westminster Bank Ltd* [1949] 1 All ER 460, ChD
*Spiro v Glencrown Properties Ltd and Another* [1991] Ch 537, [1991] 2 WLR 931, [1991] 1 All ER 600, ChD
*Walji and Others v Mount Cook Land Ltd* [2002] 1 P & CR 163, CA

*Edwin Prince* for the claimant
*Nicholas O'Brien* for the defendants

## NEUBERGER J:

*Introduction*

This case raises some not altogether easy points relating to the enforceability of the obligation of a guarantor to take up a new lease in the event of a liquidator of the tenant company disclaiming the lease.

The facts are as follows. The lease in question demised 53–54 Commercial Street, Newport, Gwent (the premises), and was granted on 22 April 1993 by a company (the lessor), the predecessor in title of the claimant, Active Estates Ltd, to EHS Precision Engineers Ltd (the lessee). The lease was for a term of 25 years from 25 March 1993, at a rent payable quarterly in advance on the usual quarter days. The annual rent was £33,500, rising to £65,000 with effect from 25 March 1998, and thereafter subject to review every 5 years. The lease contained a proviso for re-entry in familiar form in the event, inter alia, of non-payment of rent, breach of covenant, or tenant's insolvency.

Apart from the lessor and the lessee, there were two other parties to the lease, namely the defendants, Joseph Parness, and George Osztreicher, therein referred to as 'the guarantor'.

Clause 8 of the lease was in these terms:

were served), such notices, standable and

quirements of gle document eement under *ther* followed.

‹ 755, [1987]

2001] EWCA

1989] 1 WLR

1996] 2 WLR

: *Ltd* [1949] 1

| 2 WLR 931,

:nforceability e event of a

Commercial ‹pril 1993 by ‹ctive Estates for a term of vance on the )0 with effect ırs. The lease inter alia, of

parties to the icher, therein

'8 GUARANTEE

The Guarantor covenants with the Landlord by way of indemnity and guarantee as follows:

8.1 that if the Tenant shall make any default at any time during the term in payment of rent, or in observing or performing any of the covenants or restrictions contained in this lease or shall tender a payment of rent to the Landlord which the Landlord shall (during a period in which the Landlord is entitled or would, after service of a notice under Section 146 of the Law of Property Act 1925, be entitled to re-enter the Demised Premises) refuse, the Guarantor will pay the rent and observe and perform the covenants or restrictions in respect of which the Tenant shall be in default, notwithstanding any time or indulgence granted by the Landlord to the Tenant or that this lease may have been assigned or that the Tenant may have ceased to exist or that the Tenant shall have surrendered part of the Demised Premises in which event the liability of the Guarantor under this Lease shall continue only in respect of the part of the Demised Premises not so surrendered or any other act or thing whereby but for this provision the Guarantor would have been released;

8.2 that if this lease shall be disclaimed, or the Tenant (being a corporation) shall be dissolved or cease to exist, the Guarantor will, if the Landlord shall by notice in writing within two months after receiving notice of such disclaimer dissolution or cesser so require, take from the Landlord a new lease of the Demised Premises for the residue of the term which would have remained had there been no disclaimer of this lease or dissolution or cesser (as the case may be) at the rent then being paid and subject to the same covenants and restrictions as in this lease with the exception of the guarantee covenants contained in this clause 9 such new lease to take effect from the date of such disclaimer or dissolution or cesser (as the case may be) and in such case the Guarantor shall pay the reasonable costs of such new lease and execute and deliver to the Landlord a counterpart of such new lease; and

8.3 that if this lease shall be disclaimed, or the Tenant (being a corporation) shall be dissolved or cease to exist, and for any reason the Landlord does not require the Guarantor to accept a new lease of the Demised Premises as is mentioned in the foregoing subclause then the Guarantor shall pay to the Landlord on demand an amount equal to the difference between any money received by the Landlord for the use or occupation of the Demised Premises and the rent reserved by this lease for the period commencing with the date of such disclaimer or dissolution or cesser (as the case may be) and ending on whichever is the earlier of the following dates:

8.3.1 the date 6 months after such disclaimer or dissolution or cesser (as the case may be);

8.3.2 the date (if any) upon which the Demised Premises are re-let.'

Clause 8.4 provided for a release of the defendants as guarantors with effect from 22 April 1998 if the guarantor so requested and if:

> '… the Tenant … shall have observed and performed the covenants herein contained …'

It is not suggested that cl 8.4 has been operated.

The reversion to the lease became vested in the claimant, and it is common ground, not least because of the definitions in the lease, that the claimant could, in principle, enforce the provisions of cl 8.

The lease was assigned by the lessee to a company called Gherkesh Ltd in 1997. Gherkesh was a company effectively owned by a Mr Lindsay Morgan and his family, and run by Mr Morgan. The premises were operated as a fast-food franchise, albeit through a different company, also owned by the Morgan family and run by Mr Morgan. From 1 March 1999, the operating company was a company called Jointport Ltd.

In early 1999, Gherkesh had difficulties in paying the rent, but, after a bailiff had been instructed by the claimant, the rent was paid by Jointport, and accepted by the claimant expressly on the basis that Jointport was acting as agent for Gherkesh. On 23 June 1999, Gherkesh was wound up by the High Court pursuant to a petition presented on 30 April 1999. News of the winding-up order only reached Mr Peter Waddington of the claimant, a day or two after he had had a meeting with Mr Morgan on 29 July 1999. At that meeting, Mr Morgan told Mr Waddington that the premises were occupied by Jointport. Although Mr Waddington did not recall this, it seems clear, from his note of the meeting and from the evidence of Mr Morgan, that that was said. Mr Morgan also told Mr Waddington that Gherkesh was in the process of being put into liquidation. They discussed what should happen, and reached an understanding to the following effect. First, whilst the lease was vested in Gherkesh, they agreed that Jointport could remain in occupation of the premises, and would pay the rent, albeit on behalf of Gherkesh. Secondly, if and when the lease was disclaimed by a liquidator of Gherkesh, it was agreed that Jointport would remain in occupation while there were negotiations for a new lease, essentially on the terms of the current lease, subject to the claimant being satisfied as to the reliability of Jointport's covenant and with its references. It was also agreed that, while this situation obtained, the rent otherwise payable under the lease, £65,000 per quarter, would be paid by Jointport, albeit at a reduced rate, £57,000 per quarter, and by monthly instalments, on behalf of Gherkesh.

This arrangement was confirmed by Mr Waddington in two letters dated 3 August 1999, the first to his solicitors, a copy of which was thereafter sent to Mr Morgan, and the other to the Official Receiver, who, by then, he knew to be the liquidator of Gherkesh. The letter to the Official Receiver confirmed that Gherkesh had not paid rent due in June, and that Jointport had paid the rent on behalf of Gherkesh. The letter then went on:

> 'We have not terminated the tenancy but have agreed in principle with the tenant that Jointport Ltd will take an assignment of the lease in the event that the Insolvency Service disclaims the lease.'

In the letter to the claimant's solicitors, a copy of which, as I have said, was subsequently sent to Mr Morgan, Mr Waddington confirmed that the claimant and Jointport had:

> '… provisionally agreed that subject to covenant and bank references and on the assumption the Official Receiver disclaims the lease [the claimant] will assign the lease to Jointport Ltd, another of [Mr Morgan's] companies.'

The letter went on:

> 'I should mention that he remains in occupation and is trading, and in respect of the current quarter's rent, it was paid by post-dated cheques.'

Before he knew of the disclaimer, Mr Waddington wrote to Mr Morgan on 27 August 1999, confirming that:

> '… following the liquidation of Gherkesh Ltd we are pursuing the personal guarantors under the lease in the first instance …'

The letter continued:

> 'Until such time as this matter has been resolved, any payments due in respect of the premises which are received from Jointport Ltd will be accepted only on the basis that Jointport Ltd is acting as agent for Gherkesh Ltd in liquidation. Our September invoice will reflect the Personal Agreement we came to in respect of the rent, but our invoices will be issued on a "without prejudice" basis.'

At some point during the next 4 weeks, it came to the attention of Mr Waddington, through the service of a formal notice, that the Official Receiver, as the liquidator of Gherkesh, had disclaimed the lease on 27 August 1999. Following that notification, the claimant sent, on 30 September 1999, a rent statement addressed to Gherkesh at Mr Morgan's premises, in these terms:

> 'To rent due per quarter, 29 September 1999 to 24 December 1999, £57,500 pa payable monthly in advance by standing order under the terms of the Personal Agreement.'

Monthly payments were made substantially in accordance with that demand by Jointport in October, November and December 1999. The first such payment was received by the claimants on or before 5 October 1999.

On 6 October 1999, the claimant's solicitors sent a notice to each of the defendants, purportedly pursuant to cl 8.2 of the lease, requesting them to take up a new lease of premises in accordance with their obligations thereunder.

Thereafter, in December 1999 and March 2000, the claimant served rent statements addressed to Gherkesh, in similar terms to the September 1999 statement at Mr Morgan's address. Jointport initially paid substantially in accordance with those requests; however, by April 2000, no money was being paid by Jointport. The claimant's solicitors then wrote to the defendants' solicitors explaining what was happening, seeking to make it clear that the

claimant was not releasing the defendants from any obligation under cl 8.2. They also suggested that the defendants might like to talk to Mr Morgan. Despite letters from the claimant's solicitors to Jointport, Jointport did not continue negotiations, although they remained in occupation of the premises. In July 2000, the claimant started proceedings in the High Court for possession of the premises against Jointport, and obtained an agreed order for possession in January 2001, that order being a varied version of an earlier agreed order made on 26 October 2000.

The issues
The claimant now seeks to enforce cl 8.2 of the lease against the defendants by requiring them to take a new lease of the premises with effect from the date of disclaimer, subject to the same terms, and at the same rent, as the lease.

The defences which are raised on behalf of the defendants are as follows. First, the lease was surrendered by forfeiture or surrender before the purported disclaimer. Secondly, possession was taken by the claimant after the purported disclaimer, which prevents the claimant from enforcing cl 8.2, either on the basis that the claimant thereby lost the right to enforce cl 8.2, or on the basis that the claimant's cl 8.2 notices were invalid. Thirdly, the claimant cannot enforce cl 8.2 due to delay. Fourthly, the claimant cannot enforce cl 8.2 by virtue of the provisions of s 2 of the Law of Property (Miscellaneous Provisions) Act 1989. Of these four arguments, Mr Nicholas O'Brien, who appears on behalf of the defendants, concentrated on the second and fourth arguments, and in my view he was right to do so.

*Was the right to enforce cl 8.2 lost by the date of the disclaimer?*
So far as the first argument is concerned, it seems to me to be unrealistic to conclude that, so long as the lease was vested in Gherkesh, ie until the disclaimer, there was any arrangement which could fairly be characterised as a surrender or a forfeiture, thereby putting an end to the lease. The arrangement which the claimant agreed on 29 July 1999 with Jointport is the only basis upon which it is argued that the lease was forfeited or surrendered. As Mr Edwin Prince, who appears on behalf of the claimant, says, surrender would involve some consensual act on the part of the claimant landlord and Gherkesh as tenant, and forfeiture would normally involve an intention to forfeit on the part of the claimant landlord. None the less, I accept that circumstances can arise in which either surrender or forfeiture occur without the parties concerned intending it to happen.

As I see it, during the discussions between Mr Morgan and Mr Waddington, the claimant made it clear that it was continuing to treat Gherkesh as the tenant. The claimant also made it clear that Jointport could continue to occupy the premises, as it had done before the discussions of 29 July, effectively as licensee of Gherkesh, and that Jointport could pay the rent as agent for Gherkesh. Furthermore, insofar as it might be said that Mr Morgan could not agree to this arrangement on behalf of Gherkesh because it was in liquidation, the position was explained to the Official Receiver, as agent for Gherkesh, by the letter of 3 August; that letter makes it clear that there was no intention to put an end to the lease. The Official Receiver thought the lease survived the arrangement: otherwise he would not have disclaimed it. Even without the letter to the Official Receiver, there could have been no forfeiture or surrender, in my view.

As mentioned, I accept that it is possible for a lease to be surrendered or forfeited without the landlord intending to effect a surrender or a forfeiture. But, to my mind, any act or statement said to give rise to a surrender or forfeiture where it was plainly not intended to do so, should only be held to have that effect if it is incapable of having any other effect. In this case, it was agreed that the lease would continue and that Jointport could remain Gherkesh's licensee, paying the rent on behalf of Gherkesh. There is no reason why the court should not conclude that the arrangement had a different effect.

It seems to me that the claimant's case on this first point is stronger than that of the successful party in *Ashton and Others v Sobelman* [1987] 1 WLR 177, where Mr John Chadwick QC (as he then was), sitting as a judge of the High Court, rejected at 764H the proposition that (quoting from 185):

> '... a landlord may effect a re-entry of premises against his tenant by an arrangement made with an existing sub-tenant under which the sub-tenant is to remain in occupation of the premises as the tenant of the landlord for the residue and otherwise on the terms of his existing sublease.'

He went on to say that the authority cited to make out that proposition could, at most, support the contention that (to quote from 186):

> '... a landlord may effect a re-entry against his tenant by an arrangement with an existing sub-tenant under which the sub-tenant is to remain in occupation as the tenant of the landlord on the terms of a new tenancy.'

In this case, it seems to me it cannot possibly said that there was any intention on the part of the claimant or of Jointport (or indeed of Gherkesh) to create a new tenancy while the lease was vested in Gherkesh.

The defendants rely on the way in which the claimant pleaded its previous claim against Jointport. That cannot alter the proper analysis of the nature and effect of the arrangement agreed between Mr Waddington and Mr Morgan, based on the oral and documentary evidence before me. The defendants were not parties to the proceedings between the claimant and Jointport; there was no suggestion that the defendants knew of the contents of any documents in these proceedings. In any event, there is nothing in the documents in these proceedings which casts doubt on the conclusion I reach.

*Was the right to enforce cl 8.2 lost by 7 October 1999?*

The next issue is whether the claimant lost the right to enforce cl 8.2 between the date of the disclaimer and 7 October 1999, when the notices under the clause were served.

The defendants' argument is that, upon a disclaimer, or more accurately, once the claimant was notified of the disclaimer, the second part of the agreement of 29 July 1999 took effect, which involved the claimant granting, and Jointport taking, a tenancy of the premises, which necessitated the claimant taking possession, and, once the claimant took possession, it was not thereafter open to it to seek to enforce cl 8.2. In other words, Mr O'Brien contends that the claimant was not entitled to serve the cl 8.2 notices, because it had taken possession of the premises by granting Jointport a tenancy with effect from the date of notification of the disclaimer, by virtue of the

agreement of 29 July 1999, a contention supported by the rent statement of 30 September 1999 and the acceptance of the first instalment of the monthly payments on or about 5 October.

In effect, therefore, this argument of the defendants rests on the proposition that, if a landlord takes possession after a disclaimer, it is not open to him subsequently to seek to invoke a provision such as cl 8.2. It seems to me that the defendants' contention thus raises two questions, namely, whether the proposition is right in principle, and, if it is, whether it applies in relation to the facts of the present case.

Support for the proposition in principle is said to be found in the speech of Lord Nicholls of Birkenhead in *Hindcastle Ltd v Barbara Attenborough Associates Ltd* [1997] AC 70 at 89A–C, [1996] BPIR 595 at 605 where he said this:

> 'If no vesting order is made and the landlord takes possession, the liabilities of other persons to pay the rent and perform the tenant's covenants will come to an end as far as the future is concerned. If the landlord acts in this way, he is no longer merely the involuntary recipient of a disclaimed lease. By his own act of taking possession he has demonstrated that he regards the lease as ended for all purposes. His conduct is inconsistent with there being a continuing liability on others to perform the tenant covenants in the lease. He cannot have possession of the property and, at the same time, claim rent from the property from others.'

That observation has irresistible force in the context of a provision such as cl 8.1, in respect of which it was made. If a landlord re-enters into possession of the demised premises, his action is inconsistent with the lease continuing, as I have already indicated, and, in particular, therefore, with the rent under the lease accruing thereafter. If the landlord cannot recover the rent from the tenant in respect of the period after his re-entry, he plainly cannot recover from a surety either. However, it is by no means so clear that the same conclusion should apply to a provision such as cl 8.2, where a landlord has re-entered after a disclaimer. After all, it could be said that cl 8.2 is simply an option whose express conditions have to be satisfied before it can be exercised, and in respect of which the guarantors have the protection of a strict 2-month time-limit for its enforcement. There is simple force in the point that there is no inconsistency between the landlord taking possession and thereafter seeking to enforce an option in his favour to require a third party to take a new lease. As I see it, there is no inevitable loss of the right to enforce a provision such as cl 8.2, when read on its own, where a landlord has retaken possession after a disclaimer, at least not on the face of it.

Despite this, I have come to the conclusion that the proposition relied on by the defendants is correct in principle, and that Lord Nicholls of Birkenhead's observation applies to a provision such as cl 8.2, just as much as to a provision such as cl 8.1.

First, cl 8.2 is really supplementary to cl 8.1. If cl 8.1 goes, then it seems logical that cl 8.2 goes. While it is a little dangerous to argue by reference to a hypothetical situation, if cl 8.1 did not have the words from and including 'notwithstanding', so that the guarantors would be released from cl 8.1 by a variation in the lease, it does not seem to me realistic to treat cl 8.2 as enforceable, if cl 8.1 has been discharged by such a variation. The close

connection between cl 8.1 and cl 8.2 for this purpose appears to me to derive support from what Lord Templeman said in *Coronation Street Industrial Properties Ltd v Ingall Industries Ltd* [1989] 1 WLR 304 at 307, namely:

> 'The surety's obligation to take a new lease after a disclaimer gives effect to the surety's obligation to procure compliance with the terms of the old lease.'

Secondly, re-taking possession after disclaimer is scarcely consistent with requiring a new lease to be taken by the guarantor in the context of cl 8.1 and cl 8.2. If, which I doubt, the obligation of the guarantor to take a lease with effect from the date of disclaimer means that the liability for rent runs from that date, it seems peculiar that the landlord should be able to have possession for part of that time. If, as I think (supported by Chadwick LJ in a passage quoted below), liability for rent under the new lease granted to the guarantors takes effect from the date on which it is granted, then it seems to me that there would be an unlikely hiatus between the guarantor's liability to pay rent under cl 8.1, which would cease when the landlord took possession, pursuant to what Lord Nicholls of Birkenhead said, and the resurrection of its liability under cl 8.2, from the date it takes up the new lease.

Thirdly, if the landlord lawfully re-entered the premises before the lease was disclaimed, there can be no real doubt but that his right to enforce cl 8.2 would (subject to any question of relief from forfeiture) be lost. The effect of s 178(4)(b) of the Insolvency Act 1986 suggests that there should be no difference, as between the landlord and the guarantor, if the re-entry is effected after the disclaimer. That is because the issue is the enforceability of a provision in the lease, not as between the landlord and the tenant whose liquidator has disclaimed, but as between the landlord and a third party, namely the guarantor. In this connection s 178(4) is in these terms:

> 'A disclaimer under this section—
>
> (a) operates so as to determine, as from the date of the disclaimer, the rights, interests and liabilities of the company in or in respect of the property disclaimed; but
>
> (b) does not, except so far as is necessary for the purpose of releasing the company from any liability, affect the rights or liabilities of any other person.'

Fourthly, it is possible to arrive at this conclusion without doing any significant violence to the words of cl 8.2. It either involves implying a limitation on the enforceability of the clause, or else treating the word 'guarantor' in cl 8.2 as carrying with it a requirement that, at the time the clause is sought to be enforced against the guarantor, he is still a guarantor.

Fifthly, I note that this conclusion appears to have been assumed as correct, on all sides in the decision of the Court of Appeal in *Basch v Stekel* [2001] L & TR 1, to which I refer more fully below.

If, as I therefore think, Lord Nicholls of Birkenhead's observation applies to cl 8.2 as well as to cl 8.1, it is necessary to consider whether the claimant 'took possession' of the premises, after learning of the disclaimer of the lease, on or before 7 October 1999.

As mentioned, Mr O'Brien suggests that, by agreeing on 29 July 1999 to grant a right of occupation to Jointport once the disclaimer took effect, the claimant must, of necessity, have 'taken possession' when that agreement took effect ie when the claimant had notice of the disclaimer. He says that, as the arrangement involved the claimant giving possession to Jointport, the claimant would have had no ability to do this unless it had first taken possession for itself.

Attractively though that argument was presented, I have come to the conclusion that, on the facts of this case, it should be rejected. The arrangement between the claimant and Jointport prior to the disclaimer was, as I have said, that, at least during the insolvency of Gherkesh and until the disclaimer, the claimant was prepared to let Jointport remain in occupation provided the rent was paid. Accordingly, the rent statements were addressed by the claimant to Gherkesh, and the arrangement involved treating the lease as continuing, and Jointport paying the rent on behalf of the tenant, Gherkesh. There was thus no question of the claimant taking possession before the disclaimer.

The position after the disclaimer was the same as that before the disclaimer, subject to three differences. The first difference was the agreed variation or indulgence, that is, the reduction in the rent and the fact that it could be paid monthly rather than quarterly. The second was that the agreement as to the future grant of a new lease to Jointport. The third difference was that the lease had been disclaimed.

In my view, the fact that the claimant was prepared to agree a reduced rate of rent payable monthly, rather than quarterly, cannot, on its own, assist the defendants' argument. If, for example, the claimant had agreed to take a reduced payment by instalments, rather than the full rent in one payment, before the disclaimer, that would not have made any difference to my conclusion that there was no taking of possession before the disclaimer. The fact that a landlord agrees to take a lower sum than that to which he is entitled, and the fact he is prepared to accept payment by instalments, cannot of itself give rise to the conclusion that there is, as it were, a surrender or a forfeiture of the original lease. Indeed, in this case, the granting of an indulgence was specifically contemplated by the claimant and the guarantor in the lease itself: see the closing words of cl 8.2.

As to the second difference between the events before disclaimer and following disclaimer, it is clear that any agreement between the claimant and Jointport as to the possible grant of a new lease did not amount to an enforceable contract. There was, at most, an agreement in principle, that a new lease would be granted by the claimant to Jointport, subject to references and subject to covenant. Such an arrangement was plainly not enforceable, even under the law as it stood before the passing of s 2 of the 1989 Act. The existence of that arrangement emphasises, both before and after notice of the disclaimer was received by the claimant, that there was not intended to be any sort of binding arrangement involving the grant of a long-term tenancy between the claimant and Jointport, unless and until those negotiations came to fruition.

The third point of distinction between the pre-disclaimer and post-disclaimer periods is the existence of the disclaimer itself. That is undoubtedly a more powerful point. Unlike the position during the earlier period, the claimant cannot rely on the fact that there was in existence a lease vested in someone, which lease could be treated as being continuing as

between the claimant, Gherkesh and Jointport. The disclaimer (as demonstrated by the passage I have quoted from the speech of Lord Nicholls of Birkenhead) put an end to the lease so far as Gherkesh was concerned. Accordingly, unlike in *Ashton*, and unlike in relation to the pre-disclaimer period, there was no interest in possession by reference to which Jointport's occupation could be related or from which it could be derived. Therefore there is obvious attraction in the contention that there must have been the grant of a right by the claimant to Jointport, which involved the claimant taking possession.

Despite the force of that argument, I do not consider that the arrangement agreed on 29 July 1999, which came into effect by the end of September, as supported by the rent statement of 30 September 1999, and the acceptance of the first monthly instalment, had the effect of the claimant taking possession.

At any rate, in the context of this argument, it seems to me the effect of the disclaimer can be over-stated. The effect of the disclaimer was not to determine the lease for all purposes, as s 178(4) of the 1986 Act makes clear. While the disclaimer determined the lease as against Gherkesh, it did not prevent the lease being treated as enforceable as between, for instance, the claimant and the defendants, or the claimant and the original lessee: see the observations in *Hindcastle* at 87G–89A, especially at 88H and 89E–G. In particular, at 88H ([1997] BPIR 595 at 605), Lord Nicholls of Birkenhead said:

> '... when the lease is disclaimed it is determined and the reversion accelerated but the rights and liabilities of others, such as guarantors and original tenants, are to remain *as though* the lease had continued and not been determined. In this way the determination of the lease is not permitted to affect the rights or liabilities of other persons. Statute has so provided.'

At 89F ([1997] BPIR 595 at 606) Lord Nicholls of Birkenhead explained that, if a liquidator of the tenant disclaims, the sub-tenant's interest continues unaffected by the determination of the tenants' interest.

Subject to the indulgence with regard to the reduced rate of rent and the payment by instalments, and subject to the negotiation for a possible new lease, it seems to me that the claimant and Jointport were simply accepting that the situation on the ground, as it was before the disclaimer, could continue after the disclaimer. In other words, they accepted that Jointport could remain in occupation and would be sent rent statements and pay the rent, on behalf of Gherkesh, as before. The disclaimed lease was neither in the heaven of perfect existence, nor in the hell of complete determination. It was in the purgatory of disclaimer, with the features identified by Lord Nicholls of Birkenhead, and with the possibilities of being determined as between parties unaffected by the disclaimer, or being subject to a vesting order. The claimant neither did anything, nor intended to do anything, which put an end to that state of affairs. The arrangement it entered into, as appears from the evidence, was with the intention of 'holding the ring' with a view to the possibility either of granting a formal lease to Jointport, or of requiring the defendants to take a new lease pursuant to cl 8.2. Accordingly, I reject the second point raised by the defendants.

*Was there a right to serve the cl 8.2 notices on 7 October 1999?*

The defendants none the less contend that, when the cl 8.2 notices were served, the claimant was not in a position to give possession of the premises to the defendant, as Jointport was in possession, and therefore the cl 8.2 notices were invalid. I do not think that that point is well-founded in principle or on the facts.

So far as principle is concerned, I would refer to *Basch v Stekel* [2001] L & TR 1, where, at para [26], Chadwick LJ said this:

> 'The effect of the notice,' – that is a notice under an equivalent provision to cl 8.2 – 'if valid, is to bring into existence a contract under which the [guarantors] are obliged to take a grant. When they take a grant the landlord will, under the terms of that grant, be required to deliver possession; but he will not be required to deliver vacant possession until the grant is taken. By serving a notice the landlord asserts that he is ready, willing and able to give vacant possession at the time when the grant is taken.'

In other words, in this case, the claimant must be in a position to give possession to the defendants when the lease is granted. Neither the claimant nor the defendants sought to force the issue of the grant of the new lease while Jointport was in occupation. If Jointport had been in occupation, and the claimant had not been able to exclude Jointport at the time the defendants sought to take the lease, then the claimant may have had a problem. But Jointport has now vacated and no problem, to my mind, therefore arises for the claimant in this connection.

Quite apart from this, assuming that I am wrong and that the claimant had to have been able to give possession on 7 October, I consider that, as at that date, Jointport had no more than a tenancy at will of the premises, and could therefore have been excluded by the claimant without further ado. In that connection, reference was made to two decisions of the Court of Appeal in relation to the status of a person occupying premises during negotiations for a tenancy. In *Javad v Aqil* [1991] 1 WLR 1007, the occupier was held to be a tenant at will on the grounds that it cannot have been intended to grant him any greater right while the negotiations were being pursued. In *Walji and Others v Mount Cook Land Ltd* [2002] 1 P & CR 163, the Court of Appeal upheld the first instance decision that the occupier had become a periodic tenant even though there had been negotiations for the grant of a tenancy.

In my judgment, at any rate as at 7 October 1999, Jointport had no more than a tenancy at will. It does not appear that it was envisaged that negotiations for a new lease to Jointport would even start until after the disclaimer, and there had therefore been very little time for such negotiations. I appreciate that it can be said that the terms of such a new lease were arguably agreed, because they were likely to be the terms of the disclaimed lease, but even if that is right, the claimant had made it quite clear that it wished to see references for Jointport, and to be satisfied that Jointport represented a good covenant. Nothing had been supplied in that connection by 7 October 1999. In these circumstances, I consider that there is no real basis for contending that Jointport was anything other than a tenant at will, as at the date of the service of the cl 8.2 notices. It was not fanciful for the claimant to wish to see references and be satisfied as to Jointport's reliability, particularly bearing in mind Jointport's difficulty in reliably meeting the rent on behalf of

Gherkesh, and Gherkesh's record. Accordingly, even if the claimant had to have been able to give possession as at 7 October 1999, I think it could have satisfied that test.

Just as the seller of a property, which he occupies, is able to give possession even though, when a notice to complete is served, he is in occupation, so is the seller of a property, with a licensee or tenant at will in occupation, able to give possession. At least as a matter of legal right, he can physically exclude the licensee or tenant at will (subject to the provisions of the Protection from Eviction Act 1977, in the case of residential premises) just as easily as he can vacate himself, if he is in occupation.

*Was the right to enforce cl 8.2 lost due to events after 7 October 1999?*

I turn to the position after 7 October 1999. Once the notices were served on 7 October 1999, then, if they were valid, they gave rise to an immediately enforceable contract between the claimant and the defendants for the grant and acceptance of a lease, as explained by Chadwick LJ in the passage quoted from his judgment in *Basch v Stekel* [2001] L & TR 1. On that basis, I do not see how it can be said that the events subsequent to 7 October 1999 give the defendants a defence to a claim for specific performance of cl 8.2, if they had no such defence as at 7 October 1999. If, on that date, there arose an enforceable contract for the grant and acceptance of a new lease, then it seems to me impossible to identify any action or communication on the part of the claimant which put an end to that contract.

As there was a concluded contract for the grant of a lease on 7 October 1999, I consider that the defendants would have to show some agreement with the claimant, some accepted repudiation by the claimant, or some act of abandonment by the claimant, to justify the contention that that contract had come to an end. Far from that, it seems to me that the claimant made it clear by the cl 8.2 notices, and its subsequent communications with the defendants, that it intended to enforce cl 8.2. In my judgment, any delay on the part of the claimant after 7 October is not enough to assist the defendants in the present case. In specific performance actions, where there is delay on the part of a claimant, it seems to me that it is not normally enough for the defendant merely to establish delay. He has to show either that the delay was so great that it evidenced an intention on the part of the claimant to abandon the contract, or that the delay would cause the defendant unfair prejudice if he was forced to complete the contract. Neither of those requirements is satisfied here, particularly when one bears in mind the communications between the claimant and the defendants, where the claimant was making it clear that it was not abandoning its claim to enforce its rights under cl 8.2.

I accept that it is possible that, some time after October 1999, the claimant may have created a periodic tenancy in favour of Jointport by virtue of its continuing acceptance of rent. Without going into the matter in detail, I do not consider that such a periodic tenancy is established, due to the fact that the delay was the fault of Jointport, which renders it difficult and unattractive to characterise the claimant as having the intention of granting a tenancy. However, even if there had been a periodic tenancy granted to Jointport, I do not think that it would assist the defendants. As I have said, after 7 October 1999, there was a binding contract for lease between the claimant and the defendants. The mere fact that the claimant may have created a tenancy of a property after it had agreed to grant a lease (by implication with vacant possession) to the defendants does not enable the defendants, without more, to

treat the contract as at an end. It may be that, by serving a notice making time of the essence for the grant of the new lease, it would have been possible for the defendants to avoid the contract because, by the time the notice took effect, the claimant may have been unable to get possession back, and to complete the contract. However, no such notice was served by the defendants in the present case, and now that the claimant is seeking to enforce the contract, any tenancy was determined and there is no problem for the claimant. In my view, the observations of Lord Nicholls of Birkenhead at [1997] AC 70 at 89A–C as to the effect of taking possession do not apply once a provision such as cl 8.2 has been implemented. After such implementation, as I say, the situation is entirely different. The landlord is no longer seeking to exercise his right under cl 8.2; he is seeking to invoke an enforceable contract which has arisen as a result of his exercise of his right under cl 8.2.

*The effect of s 2 of the 1989 Act*

That brings me to the final argument raised by the defendant, namely that based on s 2 of the 1989 Act. Section 2 is in these terms, so far as relevant:

> '(1) A contract for the sale or other disposition of an interest in land can only be made in writing and only by incorporating all the terms which the parties have expressly agreed in one document or, where contracts are exchanged, in each.
> (2) The terms may be incorporated in a document either by being set out in it or by reference to some other document.
> (3) The document incorporating the terms or, by contracts of exchange, one of the documents incorporating them (but not necessarily the same one) must be signed by or on behalf of each party to the contract.'

The argument on behalf of the defendants on this point is as follows. The contract creating the option was made in cl 8.2, and it was valid under s 2, as it was contained in a single document, namely the lease, signed by both parties. However, the contract that arose as a result of the purported exercise of the option (namely the contract to grant and take the new lease) is not enforceable because there exists no document which satisfies the requirements of s 2. There is only a notice executed by the claimant alone, purporting to seek to enforce cl 8.2. I reject that argument on two grounds.

First, it seems to me that, assuming cl 8.2 is treated as a straightforward option, the argument is disposed of by the decision and reasoning of Hoffmann J in *Spiro v Glencrown Properties Ltd and Another* [1991] Ch 537. The only possible relevant distinction between that case and this case, as Mr O'Brien says, is that cl 8.2 is a put option (ie it is the potential grantor or lessor who is to exercise it), not a call option (as in *Spiro*, where it is the potential grantee or purchaser who can exercise the option). Despite that distinction, I consider that the essence of the reasoning of Hoffmann J applies equally to put options. At [1991] Ch 537 at 541C–E, he said this:

> 'Apart from authority, it seems plain enough that s 2 was intended to apply to the agreement which created the option and not to the notice by which it was exercised …

> The language of s 2 places no obstacle in the way of construing the grant of the option as the relevant contract. An option to buy land can properly be described as a contract for the sale of that land conditional on the exercise of the option.'

Hoffmann J then went on to consider a number of authorities and at the end of his judgment, at [1991] Ch 537 at 546E–G, he said this:

> 'In my judgment there is nothing in the authorities which prevents me from giving s 2 of the Act of 1989 the meaning which I consider to have been the clear intention of the legislature. On the contrary, the purposive approach taken in cases like *Mulholland* [1949] 1 All ER 460 encourages me to adopt a similar approach to s 2. And the plain purpose of s 2 was, as I have said, to prescribe the formalities for recording the consent of the parties. It follows that in my view the grant of the option was the only "contract for the sale or other disposition of an interest in land" within the meaning of the section and the contract duly complied with the statutory requirements.'

Mr O'Brien argues that the difference between a put option, as in cl 8.2, and a call option, as in *Spiro*, is that the latter creates an immediate interest in land whereas the former does not. I accept that, but I can see no reason in principle or logic, or, based on the reasoning in Spiro or the wording of s 2 why that should produce a different result. It does not seem to me that the fact that the option in Spiro created an interest in land was of the essence of the decision. My view is reinforced by the way in which Chadwick LJ analysed and approved *Spiro* in the Court of Appeal in *Bircham & Co Nominees (2) Ltd and Another v Worrell Holdings Ltd* [2001] EWCA Civ 775, [2001] 47 EG 149 at paras [39]–[43]. It is true that in that case the Court of Appeal held that the enforceability of a right of pre-emption could run into difficulties as a result of s 2. It is also true that the main argument to the contrary was based on the proposition that a right of pre-emption created an equitable interest in the property, an argument which was rejected. But the mere fact that that argument was rejected does not, to my mind, mean that it is illegitimate to conclude that the reasoning in *Spiro*, as approved in *Bircham*, should only apply to call options, and not to put options. All the terms of the new lease are contained in the option – ie, in this case, in cl 8.2. In the case of a right of pre-emption the position is different. The terms are not contained in the grant of the right, but in the offer made pursuant to it. Further, when an option is exercised, there is, as a matter of law (subject to statutory formalities) an immediate binding contract (see per Chadwick LJ in para [26] of *Basch v Stekel* [2001] L & TR 1). By contrast, the operation of a right of pre-emption merely involves making an offer: if the offeree sends the offer back, agreed and countersigned, then I would have thought that there was a powerful case for saying there was then an agreement in common law and which satisfied s 2.

Quite apart from this, even if a put option in general is not enforceable, despite the decision in *Spiro*, I would, albeit with hesitation, hold that the special nature of the right contained in cl 8.2 would take it outside the normal run of put options for this purpose. In support of that view, I would refer again to the decision of the House of Lords in *Coronation Street Industrial*

*Properties Ltd v Ingall Industries Ltd* [1989] 1 WLR 304, in particular in the speech of Lord Jauncey of Tullichettle at 309, where he said this:

> 'The gravamen of [the argument of counsel for the surety] was that with the single anomalous exception of an option to the tenant to renew his lease options in leases did not touch and concern the land and consequently did not run with the land. The provision with which this appeal was concerned was an option in favour of the lessor. I very much doubt whether it is correct so to describe the provision. I would prefer to describe it as a contingent obligation by the surety on the lease being disclaimed on behalf of the lessee to accept a lease of the premises for the unexpired portion of the lease. The contingency is a timeous demand being made by the lessor.'

It is fair to say that the leading speech in that case was that of Lord Templeman, which whom the other three members of the House of Lords agreed, as did Lord Jauncey of Tullichettle. However, it seems to me that the thrust of the passage I have already quoted from Lord Templeman, as well as his closing observations at 309, tend to support the proposition which is clearly contained in the speech of Lord Jauncey of Tullichettle.

*Conclusion*

In these circumstances, while paying tribute to the way in which Mr O'Brien advanced his arguments, I have come to the conclusion that all the contentions of the defendants as to why they should not be required to take a new lease of the premises pursuant to cl 8.2 fail, and that I should therefore accord to the claimant the relief it seeks.

Solicitors: *Davies Arnold Cooper* for the claimant
*Freed Kemp Rapport* for the defendants