# EXHIBIT  56

# Association of British Travel Agents Ltd and others v British Airways plc and others

*a*

COURT OF APPEAL, CIVIL DIVISION
ALDOUS, CLARKE AND SEDLEY LJJ
15, 16 MAY 2000

*b*

*Contract – Variation – Calculation of commission – Airline association purporting to exclude passenger service charge from calculation of commission due to travel agents – Whether passenger service charge part of 'fares applicable' on which commission calculated – Whether airline association entitled to alter basis of commission unilaterally.*

*c*

The claimant travel agents entered into identical standard form agreements with IATA, an international airlines association to which the defendant airlines belonged.  The agreement incorporated IATA Resolution 814, section 9 of which made detailed provision as to commission paid to agents by airlines, and IATA Resolution 824, para 9 of which provided that the airlines would remunerate agents 'in a manner and amount as may be stated from time to time'.  Section 9.4.2 of Resolution 814 provided that 'fares applicable' on which commission would be paid excluded 'all taxes and other charges'.  In February 1999, IATA issued Agents Bulletin No 52, which concerned UK Passenger Service Charge (PSC).  By para 3,  the bulletin instructed agents to show PSC as a tax on tickets issued after 1 February for travel after 31 March.  At the same time, the defendant airlines provided that PSC was to be shown as a separate entry on airline tickets and as a tax.  On 14 May 1999, IATA issued Agents Bulletin No 55, which stated that PSC did 'not form part of the fares applicable to the air passenger transportation for the purposes of the calculation of commission'.  The agents submitted that PSC ought to be treated as part of the fare for the purposes of commission, as had been the case from the introduction of PSC in 1972 until February 1999.  They contended that the contract had been correctly construed and operated until that date and that nothing which occurred during 1999 had altered their contractual rights.  The judge accepted that submission and the airlines appealed, contending, inter alia, that, as a matter of construction, PSC did not constitute part of the 'fares applicable' for the purposes of resolution 814, and that the airlines had exercised their rights under para 9 of resolution 824 so that they were no longer liable to commission on PSC after 1 June 1999.

*d*

*e*

*f*

*g*

**Held** – (1) On its true construction, 'fares applicable' in section 9.4.2 of resolution 814 was the total price to the passenger, including charges such as PSC and taxes.  For the purposes of the calculation of commission, the meaning of the words 'and other charges' was coloured by the fact that it was part of the phrases 'taxes and other charges'.  It followed that 'taxes and other charges' were not intended to refer to contractual charges levied upon airlines by airport operators, such as PSC,  but to taxes and charges imposed by government authorities.  Where there was doubt as to the true meaning of the expression 'other charges', it ought to be construed against the airlines contra proferentes because the regulations were drafted by or on behalf of the airlines and because it appeared in an exclusion clause.  However, in the instant case, there was a sensible distinction to be drawn between a tax and charge, in that a tax raised revenue for the general treasury while a charge was used to fund specific aviation-related services or

*h*

*j*

CA                ABTA v British Airways (Clarke LJ)                205

a facilities. Accordingly, as at March 1999 the agents were entitled to commission on the total fare inclusive of PSC (see p 214 *b c f* to *h*, p 215 *d*, p 219 *h* and p 220 *b*, post).

(2) The covering letter of 14 May which enclosed Bulletin No 52 contained nothing which suggested that the airlines were purporting to exercise any right to state the remuneration of agents under para 9 of resolution 824; on the contrary, it purported to state the consequence of the instruction contained in

b Bulletin No 52. It was clear that the letter simply stated the airlines's understanding of the consequences of complying with Bulletin No 52 by putting PSC in the tax box on airline tickets; that is, a statement of the effect of sections 9.4.1 and 9.4.2 of resolution 814. The letter did not say that, even if that view was wrong, the airlines were exercising their power under para 9 of resolution 824 to state the manner and amount of the agent's remuneration, and a statement for

c the purposes of section 9 had to at least make it clear what the writer of the letter intended. If the writer had intended to state a new basis of remuneration, even if Bulletin No 52 was not an effective instruction to exclude PSC from the 'fares applicable', the letter would have been drafted in different terms. In those circumstances, the letter could not be fairly read as having that effect.

d Accordingly, the letter of 14 May was not a statement of new remuneration and the appeal would be dismissed (see p 216 *d* to *j*, p 219 *h* and p 220 *b*, post).

**Notes**
For the interpretation of express contractual terms, see 9(1) *Halsbury's Laws* (4th edn reissue) paras 772–777.

e
**Cases referred to in judgments**
*Investors Compensation Scheme Ltd v West Bromich Building Society, Investors Compensation Scheme Ltd v Hopkin & Sons (a firm), Alford v West Bromich Building Society, Armitage v West Bromich Building Society* [1998] 1 All ER 98, [1998] 1 WLR 896, HL.

f *Messier-Dowty Ltd v Sabena SA (No 2)* [2000] 1 All ER (Comm) 833, CA.

**Appeal**
The appellants, British Airways plc, Virgin Atlantic Airways Ltd and Deutsche Lufthansa AG (the airlines), appealed with the permission of Timothy Walker J

g from his decision on 26 November 1999 whereby he granted declarations and other relief to the respondent claimants, the Association of British Travel Agents Ltd, Jetset Europe plc, Majestic Travel Ltd and Phoenix Travel Ltd (the agents), for breaches of contracts. The facts are set out in the judgment of Clarke LJ.

h
*William Wood QC* (instructed by *Beaumont & Son*) for the airlines.
*Philip Shepherd* and *Bajul Shah* (instructed by *Simon Bunce*) for the claimants.

*Cur adv vult*

j 16 May 2000. The following judgments were delivered.

**CLARKE LJ** (giving the first judgment at the invitation of Aldous LJ).
*Introduction*
1. This is an appeal from a judgment and order of Timothy Walker J dated 26 November 1999 and made after the trial of an action in which three travel agents, the second, third and fourth claimants (Jetset, Majestic and Phoenix) claimed

declarations and other relief against three airlines, namely British Airways plc (British Airways), Virgin Atlantic Airways Ltd (Virgin Atlantic) and Deutsche Lufthansa AG (Lufthansa). The appeal is brought with the permission of the judge because the issues which it raises are of some importance in the airline industry. Their resolution is likely to affect other travel agents and other airlines, although it is important to note that, subject to one exception, we (like the judge) are concerned only with the rights of the parties as at 31 March 1999, which was the date of the issue of the writ. In particular, subject to that one exception, we are not concerned with any modifications of their systems introduced by the airlines since then.

2. This action and this appeal arise out of new instructions given by the airlines to accredited IATA travel agents in January 1999. The reason for the litigation is that the change resulted in the airlines paying the travel agents less commission than before. The travel agents say that the annual reduction in commission is over £50m for the whole of the United Kingdom. The airlines say that it is far less than that but, whatever the true figure, it was substantial. The judge held that the airlines were in breach of contract in reducing the commission in that way and the first issue in this appeal is whether he was right so to hold. The second issue concerns an instruction with which the judge was not asked to deal, but which is also said to entitle the airlines to pay less commission. The third issue arises out of the further conclusion reached by the judge, namely that the airlines were in breach of implied terms of their contracts with the travel agents by requiring them to show a particular charge as a tax on tickets issued by them.

*Background and agreements*

3. The first claimant, the Association of British Travel Agents Ltd (ABTA), is the trade organisation of the British travel agency industry. Since there was some doubt as to its title to sue, it did not itself seek relief from the judge. The other claimants are members of ABTA. Most airline tickets are sold through travel agents who are specially accredited by IATA, which is an international trade association which represents the interests of airlines. An agent who wishes to become accredited to sell tickets on the services of IATA's 265 member airlines must enter into standard form agreements on terms dictated by IATA and its members.

4. Majestic and Phoenix entered into a standard form of agreement on 15 December 1993 and Jetset did so on 2 October 1997. It is common ground that all three agreements were on the same terms. They were on the terms of IATA Resolution 824, which is entitled 'Passenger Sales Agency Agreement (Version II)' and which incorporated (as the judge put it) a large substratum of IATA documentation including 'the Sales Agency Rules'. It thus incorporated Resolution 814, which is entitled 'Passenger Sales Agency Rules'. Resolution 824 was passed on 11 May 1992, whereas Resolution 814 had been passed on 17 January 1990. It is common ground that they were in force at the relevant time or times. It is also common ground that the agreements with which we are concerned are governed by English law because, by para 17 of Resolution 824, such agreements are to be interpreted and governed by the law of the principal place of business of the agent.

5. Resolution 824 provided, so far as relevant:

*a*

'2.  RULES, RESOLUTIONS AND PROVISIONS INCORPORATED IN AGREEMENT

2.1 (a) the terms and conditions governing the relationship between the Carrier and the Agent are set forth in the Resolutions (and other provisions derived therefrom) contained in the Travel Agent's Handbook ("the Handbook") as published from time to time under the authority of the Agency Administrator and attached to this Agreement.  The Handbook incorporates:

*b*

2.1(a)(i) the Sales Agency Rules,

2.1(a)(iv) other applicable IATA Resolutions;

2.2 the Agent acknowledges that it has received a copy of the current edition of the Handbook and has acquainted itself with the contents thereof. The Agent specifically acknowledges that it has read and understands the contents of the Handbook …

*c*

2.3 the Agency Administrator shall provide the Agent with subsequent editions of the Handbook and all amendments thereto.  The Agent shall be notified by the Agency Administrator of any amendments to the contents of the Handbook and such amendments shall be deemed to be incorporated herein unless within 30 days of receipt of such notification the Agent terminates this Agreement by notice in writing to the Agency Administrator.

*d*

2.4 the terms and expressions used in this Agreement shall, unless the context otherwise requires, have the meanings respectively provided for in the Sales Agency Rules.  In the event of any conflict, contradiction or inconsistency between any provisions with which the Agency is required to comply under Subpara 2.1 of this Paragraph, and any of the provisions of this Agreement, the provisions of this Agreement shall prevail.

*e*

3.  SELLING CARRIER'S SERVICES

3.1 the Agent is authorised to sell air passenger transportation on the services of the Carrier and on the services of other air carriers as authorised by the Carrier.  The sale of air passenger transportation means all activities necessary to provide a passenger with a valid contract of carriage including but not limited to the issuance of a valid Traffic Document and the collection of monies therefor.  The Agent is also authorised to sell such other ancillary and other services as the Carrier may authorise;

*f*

3.2. all services sold pursuant to this Agreement shall be sold on behalf of the Carrier and in compliance with Carrier's tariffs, conditions of carriage and the written instructions of the Carrier as provided to the Agent. The Agent shall not in any way vary or modify the terms and conditions set forth in any Traffic Document used for services provided by the Carrier, and the Agent shall complete these documents in the manner prescribed by the Carrier;

*g*

3.3 the Agent shall make only such representations as are authorised in this Agreement and by the Carrier.

*h*

3.5. with respect to previously issued Traffic Documents the Agent, its officers or employees shall issue, accept, reissue, validate or revalidate … all such Traffic Documents in accordance with the Carrier's tariffs, conditions of carriage and written instructions;

*j*

4.  OBSERVANCE OF LAWS AND REGULATIONS

The Agent shall observe all government laws and regulations applicable to the sale of air transportation, or any other acts performed by the Agent under this Agreement, in the territory or territories where the Approved Locations

of the Agent are situated and in all territories to or through which the Agent
may sell air passenger transportation.

    7 … MONIES DUE BY AGENT TO CARRIERS—REMITTANCE

    7.1  a Traffic Document shall be issued immediately money is received by
the Agent for specified passenger air transportation or ancillary services sold
under this Agreement and the Agent shall be responsible for remittance to
the Carrier of the amount payable in respect of such Traffic Document;

    7.2   all monies collected by the Agent for transportation and ancillary
services sold under this Agreement, including applicable remuneration
which the Agent is entitled to claim thereunder, are the property of the
Carrier and must be held by the Agent in trust for the Carrier or on behalf of
the Carrier until satisfactorily accounted for to the Carrier and settlement
made;

    9.   REMUNERATION

    for the sale of air transportation and ancillary services by the Agent under
this Agreement the Carrier shall remunerate the Agent in a manner and
amount as may be stated from time to time and communicated to the Agent
by the Carrier.  Such remuneration shall constitute full compensation for the
services rendered to the Carrier.'

    6.  By para 13 each party was entitled to give notice of termination to the other,
such notice to take effect no earlier than the last day of the following month.

    7.  Section 9 of Resolution 814, which made more detailed provisions relating
to commission provided, so far as relevant:

    '9.1.   RATE OF COMMISSION

    commission paid to Agents for the sale of international air passenger
transportation shall be as may be authorised from time to time by the
Member, provided that the Agent complies with the applicable rules
governing sales of the transportation …

    9.2  AUTHORITY TO PAY COMMISSION

    Agents duly appointed by the Member shall be paid commission for the
sale of international air passenger transportation.

    9.3  INTERLINE SALES

    the amount of fare on which commission shall be computed may include
interline passenger transportation over the services of other Members with
which the Agent's principal as an interline traffic agreement …

    9.4  CONDITION FOR PAYING COMMISSION

    9.4.1  commission shall be paid to an Agent on the amount of the fares
applicable to the air passenger transportation or charter price paid over to
the Member …

    9.4.2  The "fares applicable" are the fares (including fare surcharges) for the
transportation in accordance with the Member's tariffs and shall exclude any
charges for excess baggage or excess valuation of baggage as well as all taxes
and other charges collected by the Agent.'

    8.  None of the parties to this action has sought to terminate the contract
between them.  Nor did the agency administrator take any steps to amend the
handbook during the period with which this appeal is concerned.  I understand
that the administrator will not do so without an appropriate resolution of IATA
under IATA's constitution or rules.  However, in the 1997 edition of the
handbook there is a 'Glossary of Commonly Used Terms' which sets out what

CA                ABTA v British Airways  (Clarke LJ)                209

*a* are described as 'terms commonly used in the airline industry'.  There is no suggestion that the meanings of such terms have altered over the years, so that it seems to me to be a legitimate aid to construction of Resolutions 824 and 814.

9.  It is sufficient to refer to the definition of 'fare' as follows:

*b* 'FARE means the amount charged by the carrier for the carriage of a passenger and his allowable free baggage and is the current fare which a Member, in the publication it normally uses to publish fares, holds out to the public, or the appropriate segment of the public, as being applicable to the class of service to be furnished.'

*c* 10.  The issue between the parties in this action arose out of the way in which one of the charges made by BAA plc (BAA) to the airlines was treated as from February 1999.  BAA charges airlines using its airports by reference to three ingredients, namely a charge on landing based on the weight of the aircraft, a parking charge and a passenger service charge.  We are concerned with the passenger service charge, which is known as 'UK PSC' and which I shall call 'PSC'.  The three charges together make up the total user charges made by BAA *d* to the airlines.  They thus become part of the airlines' operating costs or overheads.

*e* 11.  The history and nature of the PSC is shortly as follows.  It has been in existence since 1972, long before the privatisation of the British Airports Authority in July 1987.  It is not a charge levied on passengers for the use of the airport.  It is, as the judge held, merely a convenient method of charging the airline by reference to the volume of passengers it puts through the airport's terminal facilities.  It is ordinarily calculated by reference to each 'terminal departing passenger'.  Other United Kingdom airports, whether publicly or privately owned, levy charges on airlines on the same basis.  The PSC is to be contrasted with Air Passenger Duty (APD), which was introduced by s 28 of the *f* Finance Act 1994 and is levied on the carriage of 'any chargeable passenger'.  APD is collected by the operator of the aircraft who then accounts to the Commissioners of Customs and Excise for the payment.  Although it too is payable by the airline, it is a true tax, whereas the PSC is not.

*g* 12.  Until February 1999 the airlines made no attempt to treat the PSC differently from the other user charges.  They simply treated it as part of their overheads which, just like any other overhead, they no doubt sought to meet out of revenue, including ticket sales.  Commission was paid to the agents calculated by way of percentage of the price of the ticket, exclusive of taxes.  The PSC was not referred to on the ticket issued to the passenger.  A typical ticket showed a *h* total figure made up of four ingredients.  The example we have shows ingredients of £131, GB £10, FR £2·30 and QX £5·20, making a total of £148·50.  The first box expressly stated that it was the fare, whereas the others stated that they were taxes.  The notation GB referred to APD, whereas the notations FR and QX referred to other taxes.  Thus, for example, FR was a reference to a French tax.  It is common ground that the PSC was not included on the tickets as a tax.

*j* 13.  Commission was paid by the airlines to the agents on the fare.  Thus in the above example, it was paid on the sum of £131 but not on the taxes.  It is not suggested that at that time commission was not properly payable on that basis on the true construction of the agreement.  The airlines simply paid commission on the fare element shown on the ticket.  They did not suggest that the PSCs were 'other charges' within the meaning of section 9.4.2 of Resolution 814.  Mr Wood

submits that that approach was correct because they were not collected by the agent and thus could not fairly be said to be 'other charges collected by the agent' within the meaning of that expression in section 9.4.2.

*Changes in February and June 1999*

14. In January 1999 IATA issued a bulletin, namely Agents Bulletin No 52, relating to the UK PSC. The relevant part of the bulletin stated:

> 'COLLECTION AS A TICKET TAX SHOWN SEPARATELY TO FARES APPLICATION RULES
>
> 1. INTRODUCTION
>
> BSPUK Airlines will shortly be introducing a new ticket tax covering Passenger Service Charges (PSCs) charged by UK airport authorities and this Bulletin details the rules of application of PSCs and the specific airport charges to be applied. BSPUK, IATA and AUKDA Agents, must apply the PSCs in accordance with the terms of their Agency Agreements. The attached list entitled 'Airlines Applying PSCs' indicates those airlines that have advised BSP that they wish PSCs to be collected …
>
> 2. DESCRIPTION
>
> A PSC is an amount of money charged to airlines by airport authorities for the facilities provided for passengers and is not subject to VAT. Charges of a similar nature are applied in some European Countries and in the USA …
>
> 6. TICKETING
>
> The UK PSC must be shown as a tax in tickets. MCOs and MPDs separately and additional to the fare in accordance with normal rules. The code 'UB' has been assigned. Individual airport PSCs will not be identified in tickets and the amount entered as the PSC amount under code "UB" will be the sum of the PSCs applicable to the ticketed routing. In situations where the total number of taxes exceeds the available number of tax boxes, for tickets/STDs issued in the UK, the following priority of tax box entries shall apply:
>
> 1st box—UK APD code: "GB"...
>
> 2nd box—UK PSC code: "UB"
>
> 3rd box—all other taxes consolidated under code "XT" and detailed in the fare calculation area in accordance with normal procedure.
>
> For tickets/MPDs or other forms with only two tax boxes, the following priority shall apply:
>
> 1st box—UK APD—Code "GB" …
>
> 2nd box—all other taxes including "UB" consolidated under XT as above.'

15. In para 3 the bulletin stated that the PSC must be charged for all tickets issued on or after 1 February 1999 for travel commencing on or after 1 April 1999.

16. Neither IATA nor the airlines had given ABTA or the travel agents any notice of their intention to publish the bulletin, which, perhaps not unnaturally, caused something of an outcry. It is common ground that para 2 of the bulletin accurately describes a PSC, but complaint is made about para 1, which the judge criticised as 'startling in its inaccuracy'. His criticism was to my mind justified because it was not true that the PSC was a tax, let alone a new tax, although I accept Mr Wood's submission that its inaccuracy is not relevant to the true construction of the contract between the parties. The bulletin contained no reference to any change in the agents' entitlement to commission.

CA                    ABTA v British Airways  (Clarke LJ)                    211

*a*  17.  At about the same time, on 18 January 1999, BA issued a notice entitled 'Passenger Service Charge (PSC)'.  It stated among many other things that travel agents and airlines were to collect the PSC at the time of ticket sale and show it in the tax box of the ticket and that the two letter code was UB.  Virgin and Lufthansa issued similar notices, but it is not suggested that the terms of any of these notices affect the outcome of this appeal.

*b*  18.  The agents treated Bulletin No 52 as an instruction to include the appropriate PSC as a tax in the tax box (or one of the tax boxes) on tickets issued after 1 February for travel on and after 1 April.  The examples of such tickets referred to by the judge were BA tickets issued to a Mr Sutcliffe on 1 April for a flight from Heathrow to Amsterdam on 18 June and a return flight from Amsterdam to Heathrow on 20 June.  They show a fare of £123 and three taxes, *c*  namely a GB tax of £10, a UB tax of £7·30 and an XT tax of £9·40, making a total of £149·70.  That transaction was treated before the judge as a sample transaction, to be judged as at the date of the issue of the writ on 31 March.  It is common ground that GB and XT are references to taxes properly so called and that UB is a reference to the PSC at Heathrow.

*d*  19.  Two issues arose before the judge.  The agents accepted that the GB tax and the XT tax were genuine taxes within the meaning of section 9.4.2 of Resolution 814.  They submitted to the judge that they were entitled to commission on £130·30 because the UB of £7·30 was not a tax, but should have been treated as part of the fare, as it had always been ever since the PSCs were introduced in 1972 until then.  They submitted that the contract had been *e*  correctly construed and operated by the parties until then and that nothing which occurred after the beginning of 1999 altered their contractual rights.  The judge accepted that submission.  The airlines say that the judge was wrong.  I shall treat that as issue A in this appeal.

20.  The other issue before the judge, which the judge considered first, was *f*  whether IATA or the airlines were contractually entitled to require the agents to state the PSC as a tax on the tickets.  The judge held that they were not and granted a declaration in these terms:

'The First, Second and Third Defendants are not entitled to require the Claimants to designate passenger service charges payable in respect of the use of United Kingdom airports as a tax on any traffic document.'

*g*

21.  I shall return to that issue, which I shall call issue C, after considering a point which was not expressly considered by the judge, but which it is agreed that we should address on this appeal.

*h*  22.  The reason the judge did not consider it was that he was not expressly asked to do so.  It raises the one point relevant to the rights of the parties after 31 March 1999 to which I referred earlier.  It arises out of IATA Bulletin No 55 or its covering letter dated 14 May 1999 in which it was expressly stated that as a consequence of PSCs being shown separately on tickets, 'PSCs do not form part of the fares applicable to the air passenger transportation for the purposes of the *j*  calculation of commission'.

23.  The airlines say that, if that was not the position before the effective date of that notice, which was I think 1 June, it was thereafter because the notice or letter was an exercise of the airlines' power to vary the travel agents' commission under para 9 of Resolution 824.  It is common ground that the judge would have rejected that argument.  I shall consider it under issue B below.  It will then be

necessary to set out the letter in more detail.  I shall, however, consider first issue A on the basis that there was no statement from IATA or the airlines that the agents' commission would be affected by the change introduced pursuant to Bulletin No 52.

*Issue A*

24.  This raises a short question of construction of the contract and involves considering the provisions of both Resolution 824 and Resolution 814.  Section 9.2 of Resolution 814 provided that agents 'shall be paid commission for the sale of international air passenger transportation'.  Section 9.4.1 provided that commission 'shall be paid to the Agent on the amount of fares applicable to the air passenger transportation'.  The expression the 'fares applicable' was expressly defined in section 9.4.2.  The question for decision is whether the 'fares applicable' as so defined included PSC or not.  As I have already indicated, section 9.4.2 provided—

   'the "fares applicable" are the fares … for the transportation in accordance with the Members' tariffs and shall exclude any charges for excess baggage or excess valuation of baggage as well as all taxes and other charges collected by the Agent.'

25.  The airlines say that in order to be 'fares applicable' the fares must be 'fares for the transportation in accordance with their tariffs', that their tariffs, which can vary at short notice, can be seen at any time from the information promulgated to travel agents on their Galileo computer system and that that information shows the position substantially as shown on the tickets since the change announced in Bulletin No 52, namely the fare exclusive of PSC, which is shown separately.  On that basis Mr Wood submits that there is no basis for holding that the PSC is part of the 'fares for the transportation in accordance with the Member's tariffs' and that it follows that the agents are only entitled to commission on the fare expressly stated on the ticket.

26.  Mr Wood further submits that that construction is clearly correct on the basis of the first part of section 9.4.2 and that it is not necessary to consider the second part of the clause, which would only be relevant if that construction were wrong.  However, he submits that consideration of the second part of the clause leads to the same conclusion.  He notes that the second part of the clause is introduced by the word 'and' and not 'but' and submits that the purpose of the second part of the clause is simply to underline the meaning of the first part, for the avoidance of doubt.

27.  Against that, Mr Shepherd submits that sections 9.4.1 and 9.4.2 must be construed in their context, which involves a consideration of the relevant provisions of both resolutions.  In particular he observes that by paras 3.1 and 3.2 of Resolution 824 the agents are authorised to sell 'air passenger transportation services', which are defined in para 3.1 as 'all activities necessary to provide a passenger with a valid contract of carriage including but not limited to the issuance of a valid Traffic Document'.  He further observes that by para 3.2 all services sold pursuant to the contract 'shall be sold on behalf of the Carrier and in compliance with Carrier's tariffs'.  He submits that the definition in para 3.1 must include the provision of terminal facilities because the passenger has to pass through the terminal in order to board an aircraft and that it follows from section 9.2 of Resolution 814 that the commission to be paid to the agent includes

CA              ABTA v British Airways  (Clarke LJ)              213

*a* commission for the sale of those services.  Finally, he submits that the reference to member's tariffs should not be given a narrow meaning as between the airlines and the agents, but should have regard to the wider meaning which is used in the industry as evidenced by the glossary which forms part of the handbook.

28.  Mr Shepherd submits that it follows that the 'fares applicable' include PSC, as in effect they have always done since 1972, and that the remaining question is

*b* whether PSCs are 'other charges collected by the Agent' within the meaning of section 9.4.2.  He submits that they are not, essentially for the reason given by the judge, namely that 'other charges' in the expression 'all taxes and other charges collected by the Agent' should be construed (as it used to be called) ejusdem generis, so that 'other charges' should be construed as meaning charges like a tax and not as extending to any contractual charges.  If necessary Mr Shepherd

*c* submits that the resolutions should be construed (again as it used to be said) contra proferentes.

29.  In these circumstances the question arises how the problem of construction should be approached.  In this regard we have been referred to the familiar recent cases on the correct approach to the construction of a contract,

*d* including of course to *Investors Compensation Scheme Ltd v West Bromwich Building Society*  [1998] 1 All ER 98, [1998] 1 WLR 896 and to some of the cases which followed it.  However, in my judgment, this appeal does not raise any new question of principle.   The correct approach is to construe the particular contractual provisions, namely sections 9.4.1 and 9.4.2, in the context of the contract as a whole, which of course includes both Resolutions 814 and 824, and

*e* to consider the contract as a whole against its surrounding circumstances or, to put it another way, in its factual matrix.   As I see it, the surrounding circumstances or factual matrix include a consideration of the way in which PSC has been considered in the past.  In addition, as I said earlier, it seems to me that the glossary of terms commonly used in the airline industry is a legitimate aid to

*f* construction of terms used in a document or documents produced by the airline industry.  Finally, I accept Mr Shepherd's submission that, in the case of doubt or ambiguity, the relevant clause should be construed contra proferentes, which in this case must mean against the airlines, because the documents which form Resolutions 824 and 814 were drafted and proffered by the airlines, or by IATA on their behalf, and were offered to the agents on a take it or leave it basis.

*g*
30.  Although I see the force of Mr Wood's submissions, like the judge, I prefer those of Mr Shepherd.  I do not think that the expression 'fares applicable' should be given too narrow a meaning.  In section 9.4.1 of Resolution 814 the 'fares applicable' are those applicable 'to air passenger transportation', which (as Mr Shepherd submits) is defined in para 3.1 of Resolution 824 as 'all activities

*h* necessary to provide a passenger with a valid contract of carriage'.  I accept Mr Shepherd's submission that those include terminal facilities.   In these circumstances I would expect the fare to include payment for those facilities and, in my judgment, it does.  It seems to me that Mr Wood's construction of the expression 'fares … for the transportation in accordance with the Member's

*j* tariffs' in section 9.4.2 is too narrow.  If regard is had to the glossary it can I think be seen that the word 'fare' in the airline industry does not simply focus on its meaning as between the airline and the travel agent, but on its meaning as between the airline and the passenger.

31.  Mr Wood submits that, even on that basis, 'the publication it [ie the airline] normally uses to publish fares' is the Galileo system.  However, I am

214            All England Law Reports    [2000] 2 All ER (Comm)

unable to accept that submission. Airlines publish their fares in a number of
ways, including in the press. It appears to me that (albeit no doubt with some
exceptions) the ordinary passenger is only interested in the overall cost to him of
getting from A to B, which he or she would regard as the fare. The passenger is
not concerned with how that fare is broken down as between 'fare', 'tax' or
'charges', but only with the total price.

32. In these circumstances I would construe 'fares applicable' in section 9.4.2
as the total price to the passenger, including charges like PSC and indeed taxes
because that is the only thing that the passenger, as a member of the public, is
really interested in. Moreover (for the reasons already given), it represents the
total cost of the 'air passenger transportation'. I would reach that conclusion
without construing section 9.4.2 against the airlines, but the application of the
contra proferentes principle leads to the same conclusion.

33. The next question is what items are excluded from that fare for the purpose
of the calculation of commission. The answer depends upon the meaning of the
phrase: 'and shall exclude any charges for excess baggage or excess valuation of
baggage as well as all taxes and other charges collected by the Agent'.

34. In this regard there does not seem to me to be any significance in the use
of the word 'and' and not 'but' in section 9.4.2. In either event the two parts of
the section should be read together. I do not read the second part of it as otiose
or adding nothing, although I recognise that (as so often) some parts of it are
included for the avoidance of doubt. For example the reference to excess baggage
adds nothing to the first part of the clause, because I accept the submission that
(as appears from the definition in the glossary) the fare would not ordinarily cover
excess baggage.

35. The essential question is whether the reference to 'other charges' is a
reference to any charge or whether it is coloured in any way by being part of the
expression 'as well as all taxes and other charges collected by the Agent'. Mr
Wood submits that the ordinary and natural meaning of 'other charges' is that it
refers to all other charges, and in particular to charges like PSC, which may in
some cases be indistinguishable from a tax, especially where (as is often the case
and was here until 1987) the airport authority is an entity of the state. However,
whether a charge is indistinguishable from a tax seems to me to depend, not on
whether the person levying it is a state entity, but on the nature of the charge.

36. In this case the words 'and other charges' does seem to me to be naturally
affected by the fact that it does not appear by itself but as part of the phrase 'taxes
and other charges'. I have reached the conclusion that the taxes and charges were
not intended to refer to contractual charges levied on the airlines by owners or
operators of airports, but to refer to taxes and charges imposed by the appropriate
government authority. In this regard it may be noted that at the relevant time the
outer wrapper of the standard IATA ticket contained the following statement:

> 'NOTICE OF GOVERNMENT IMPOSED TAXES AND FEES
> The price of this ticket may include taxes and fees which are imposed on
> air transportation by government authorities. These taxes and fees, which
> may represent a significant portion of the costs of air travel, either included
> in the fare, or shown separately in the TAX box(es) of this ticket. You may
> also be required to pay taxes or fees not already collected.'

37. In my opinion that notice correctly reflected the approach of the parties at
all times relevant to the resolution of this issue.

*a*
38.  Mr Wood submits that no one has suggested any sensible meaning for charge unless it has the wide meaning for which he contends.  He submits that the problem with Mr Shepherd's construction, and therefore with the construction preferred by the judge, is that it reads 'taxes and other charges' as if it read 'taxes and other taxes'.   However, in the course of the argument Mr Shepherd drew our attention to an IATA document dated December 1998 which

*b*
was originally dated July 1995 and which distinguishes between a tax and a charge.  It describes a tax as 'an impost for raising revenue for the general treasury and which will be used for general public purposes' and a charge as 'an impost for raising revenue for specific aviation-related facilities or services'.   While a document of that kind is of limited assistance, it does suggest that a sensible meaning can be given to a charge as a form of impost or tax.  In my opinion, in

*c*
all these circumstances, where there is doubt as to the true meaning of the expression 'other charges', it should be construed against the airlines contra proferentes, both for the reasons already given and because it appears in an exclusion clause.  In my judgment, in its context, it should be given the more limited meaning contended for on behalf of the agents.

*d*
39.  In all these circumstances, I would construe sections 9.4.1 and 9.4.2 in the same way as the judge and hold that, as at 31 March 1999, the agents were entitled to commission on the total fare, inclusive of PSC, but exclusive of taxes and any other charge of the nature of a tax or impost.

*e*
*Issue B*

40.  The question under this head is whether the airlines exercised their rights under para 9 of Resolution 824 so that they were no longer liable to commission in respect of PSC after 1 June 1999.   It will be recalled that para 9 provided:

*f*
    'REMUNERATION for the sale of air transportation and ancillary services by the Agent under this Agreement the Carrier shall remunerate the Agent in a manner and amount as may be stated from time to time and communicated to the Agent by the Carrier.   Such remuneration shall constitute full compensation for the services rendered to the Carrier.'

*g*
41.  Mr Wood submits that that paragraph gave the airlines power to alter the agents' contractual rights to remuneration in any way they liked.   Thus, for example, they could state at any time that the agents would no longer be paid on a commission basis but on a flat rate basis.  It follows, he submits, that they could at any time alter the basis of the agents' remuneration and that they did so by Bulletin No 55 or by letter dated 14 May 1999.

*h*
42.  It was at one time suggested that the airlines exercised their rights under para 9 in Bulletin 52, or perhaps in a covering letter, in January 1999.  However, Mr Wood did not pursue any such submission during his submissions on this appeal.  As I understand it, his submission now depends upon the covering letter dated 14 May 1999, which enclosed Bulletin No 55, or, alternatively, upon a

*j*
notice or notices issued by the airline individually.  It is not, however, necessary to consider the notices separately because it is not suggested that they were in significantly different terms from the covering letter, which, to my mind, was written on behalf of the airlines, albeit by IATA.

43.  The covering letter included the following:

216          All England Law Reports    [2000] 2 All ER (Comm)

'PASSENGER SERVICE CHARGES
   Bulletin 52 detailed the rules of application of Passenger Services Charges and although the process is generally understood, some clarification appears to be needed and the following points are brought to your attention:

   1. PSCs are now to be shown separately on tickets. As this is the only available place for the moment, the "Tax" box should be used, although consideration is being given to changing the description

   2. As a consequence of 1. above, PSCs do not form part of the fares applicable to the air passenger transportation for the purposes of the calculation of the commission.'

44.  Two questions arise, or potentially arise, for decision. The first is whether para 9 empowered the airlines to alter the remuneration as alleged and the second is whether, if it did, the letter of 14 May had that effect. It is convenient to consider the second question first.

45.  The answer to this question depends upon the meaning of the letter. Mr Wood submits that the effect of the letter is to state the new remuneration of the agents in accordance with the airlines' rights under para 9. However, the difficulty which I have with that submission is that there is nothing in the letter which suggests that the airlines were purporting to exercise any such right as they might have under that paragraph. On the contrary, all that the letter is purporting to do is to state the consequence of the instruction contained in Bulletin No 52. Thus in the paragraph numbered 1 which I have just quoted the letter underlined the instruction in Bulletin No 52 that the 'Tax' box should be used to show the PSC. Paragraph 2 then simply stated: 'As a consequence of 1 above, PSCs do not form part of the fares applicable for the purpose of the calculation of the commission.'

46.  It is to my mind clear that the letter simply stated the airlines' understanding of the consequences of complying with Bulletin No 52 by putting the PSC in a tax box. It was thus intended to be a statement of the effect of sections 9.4.1 and 9.4.2 of Resolution 814. It was for that reason that (as Aldous LJ pointed out in the course of the argument) the paragraph states that PSCs do *not* form part of the fares applicable (my emphasis).

47.  What the letter does not do is to say that, even if that view is wrong, the airlines were nevertheless exercising their separate power under para 9 of Resolution 824 to state the manner and amount of the agents' remuneration. I accept Mr Wood's submission that para 9 does not require any particular form of words to be used, but it does seem to me that a statement for the purposes of para 9 must at least make it clear what the writer of the letter intended. If the writer of the letter had intended to state a new basis of remuneration even if Bulletin No 52 was not an effective instruction to exclude PSCs from the 'fares applicable', he would have drafted the letter in different terms. In these circumstances I do not think that the letter can fairly be read as having that effect.

48.  For those reasons I would hold that the letter of 14 May was not a statement of new remuneration having effect under para 9. However, since I recognise that a different view of the letter is possible, I would if necessary hold that para 9 does not empower the airlines to alter the basis of remuneration set out in section 9 of Resolution 814. In my judgment para 9 of Resolution 824 should be read together with section 9 of Resolution 814. By para 2 of Resolution 824, Resolution 814 forms part of the contract and, although para 2.4 provides that in the event of any conflict, contradiction or inconsistency between the

*a*  provisions of the two, those in Resolution 824 shall prevail, the two resolutions should, if reasonably practicable, be construed to avoid any such inconsistency.

49.  As I see it, they can be so construed.  Section 9 contains detailed provisions as to the payment of commission which clearly confer contractual rights upon both parties.  Thus in section 9.1 the airlines are given the right to change the rate of commission and in section 9.2 the agents are given the right to be paid

*b*  commission.  The conditions for the payment of commission are set out in some detail in para 9.4.  The airlines have exercised their right to alter the rate of commission from time to time.  Thus, for example, they (or perhaps some of them) reduced the rate from 9% to 7% some time ago.  At one time it was suggested on their behalf that they could justify the reduction of commission on the facts here by exercising their rights under section 9.1, but that suggestion was

*c*  abandoned some time ago.

50.  The effect of the airlines' submission that they can justify the reduction in commission by reliance on para 9 of Resolution 824 is that that paragraph gives them the right to vary the rights and obligations of the parties set out in sections 9.2 and 9.4 of Resolution 814.  It would in my view be very surprising if it had that

*d*  effect.  Resolution 814 is part of the handbook, which is incorporated into the contract by para 2.1(a) of Resolution 824.  Paragraph 2.3 contains express provisions as to amendments to the handbook.  Thus one would expect any changes to the rights and obligations of the parties to be made as there provided.

51.  Paragraph 9 is not drafted in terms which suggest that it was intended to give the airlines unilateral rights to alter the rights and obligations of the parties

*e*  in other resolutions contained in the handbook such as Resolution 814.  It merely states that the airline shall remunerate the agent in such a manner and amount as may be stated from time to time and communicated to the agent.  In my judgment, that provision should be construed together with resolutions such as Resolution 814 and not as entitling the carrier to change Resolution 814.  Any

*f*  such change would have to be achieved by the machinery expressly provided in para 2.4 of Resolution 824.  Thus the airlines cannot use para 9 to state some remuneration calculated on some basis inconsistent with the rights of the agents conferred upon them by Resolution 814.  It follows that, even if my view of the meaning of the letter of 14 May were held to be wrong, I would hold that the airlines were not entitled to reduce the commission payable under section 9.2 of

*g*  Resolution 814 by making a statement under para 9 of Resolution 814.

52.  For these reasons I would determine issue B in favour of the travel agents.

*Issue C*

53.  Under this head the airlines challenge the first declaration granted by the

*h*  judge, which it will be recalled was in these terms:

'The First, Second and Third Defendants are not entitled to require the Claimants to designate passenger service charges payable in respect of the use of United Kingdom airports as a tax on any traffic document.'

*j*  54.  Before the hearing of the appeal both parties deployed extensive written arguments covering a wide range of issues.  However, during Mr Wood's submissions yesterday afternoon there was some discussion as to the approach which the airlines really wished to adopt to the risks of misleading the public or of acting unlawfully.  In the light of those discussions Mr Wood and his instructing solicitors took instructions from BA, Virgin and Lufthansa.

**218**          All England Law Reports     [2000] 2 All ER (Comm)

55.  As a result Mr Wood indicated this morning that the airlines accept that the following term should be implied into the contracts between the airlines and the UK travel agents:

> 'The airlines are not entitled to give instructions to agents which, if carried out, would have the effect of the agents misleading the public or doing anything unlawful.'

56.  It came as no surprise to me (or I think any of us) that the airlines were willing to adopt that approach because they are all airlines of high repute.  Indeed it is right to record that we were told by Mr Wood on behalf of the airlines that none of his clients had ever intended to instruct the agents to act in a misleading way, that they regretted that they had instructed the agents to describe PSC as a tax and that they would not knowingly repeat such instructions.

57.  The effect of this development is, as I see it, that it is not now necessary for us to consider whether the judge was correct to grant the declaration that he did, or indeed to consider those parts of his judgment of which the airlines particularly complain.  Given the concession just stated it is not to my mind appropriate that the declaration granted by the judge should stand and the only question is what, if any, declaration should take its place.

58.  Mr Shepherd submits that we should make a declaration either in the form of the concession set out above or in a wider form, whereas Mr Wood submits that there is no need for a declaration in any form and that it will be sufficient if we simply recite the concession in the order of the court.

59.  As to the width of any possible declaration I would not express it in any wider terms than have been conceded because it is important that the implied term should be both clear and certain.  In the absence of the concession, I, for my part, would have held that such a term should be implied into the contract.  Such a term seems to me to be necessary to make the contract work.  It also satisfies what may be called the officious bystander test.

60.  As to whether a declaration should now be granted, the court has a wide discretion: see for example the recent decision of this court dated 21 February 2000 in *Messier-Dowty Ltd v Sabena SA (No 2)* [2000] 1 All ER (Comm) 833.  As that case shows, one of the relevant considerations is whether a declaration would serve a useful purpose.  Mr Shepherd submits that here it would because it would show the view taken by this court as to the obligations of the airlines under this contract in the form in which it was at the relevant time.  On the other hand Mr Wood submits that, given the concession, there is no need for a declaration as between the parties and that the declaration will have no legal effect other than as between the parties.

61.  I accept Mr Wood's submission that any declaration will do no more than state the position as between the parties to this action because these are not formally representative proceedings.  However, they are in practice likely to be treated, at least by some, as representative proceedings and I have reached the conclusion that, on balance, it would be appropriate to grant the declaration.  I do so because it seems to me to be a sensible step to take and not because of any criticism of the airlines in the past.  I would only add this.  It does seem to me that the course which the proceedings took before the judge might have been somewhat different if the concession set out above had been made at that time.

62.  Finally, I would only add by way of postscript that there have been potentially significant changes in the airlines' practice since May 1999.  The judge

*a*   referred to some of them and I do not think that it is necessary for me to detail them beyond saying that we have been told by Mr Wood that the present position is substantially as follows.

63. Steps are being taken to amend section 9.4.2 of Resolution 814 by taking appropriate steps through IATA, and then presumably by taking appropriate steps under the relevant paragraph of Resolution 824.

*b*   64. As to the tickets, some changes have been made to tickets issued by individual airlines, but steps have also been taken with regard to IATA tickets. They include the following. (1) What were the tax boxes are now the 'Tax/fee/charge boxes'. (2) The wrapper now contains a notice in these terms:

'Notice of Government and airport imposed taxes fees and charges

*c*   The price of this ticket may include taxes, fees and charges which are imposed on air transportation by Government Authorities and Airports. They may represent a significant portion of the cost of air travel and are either included in the fare or shown separately in the "TAX/FEE/CHARGE" box(es) of this ticket. You may also be required to pay taxes, fees or charges not already collected. The sum identified as UB in the "TAX/FEE/CHARGE" *d*   box(es) of the ticket is not a tax. It is the amount of the Passenger Service Charge to be paid by the airline to the airport authorities in respect of your use of the airport facilities in the UK.'

(3) In this regard IATA have issued an important bulletin, namely bulletin number 63, which was issued on 7 April 2000.

*e*   65. None of these changes (which I do not pretend set out the complete picture) affects the conclusions which I have reached because they postdate the events with which we are concerned. I mention them simply to show that changes have been made to meet some of the problems which this litigation shows to have arisen.

*f*

*Conclusion*

66. For the reasons which I have given I would dismiss the appeal on the commission point and hold that as at 1 June the airlines were not entitled to pay less commission than previously. Having regard to the airlines' concession stated *g*   above I would discharge the first declaration made by the judge and replace it with a declaration in the terms of the concession.

**SEDLEY LJ.**

67. I agree with the entirety of Clarke LJ's reasoning and conclusions. I would, *h*   however, for my part, be disposed to place more weight than he has found it necessary to do upon the principle that any doubt—and for an individual reading the texts without the bright beam of analysis which has been shone upon them in this court some doubt is probably inevitable—should be resolved against the airlines. This is a principle not only of law but of justice.

*j*   68. The central feature of the circumstances forming the background to these contracts is that they are unilaterally dictated by the airlines. Although the contra proferentem rule tends to feature more frequently in arguments on exclusion clauses, its origin and first purpose is to limit the power of a dominant contractor who is able to deal on his own take-it-or-leave it terms with others: see 9(1) *Halsbury's Laws* (4th edn, reissue) para 771 (especially footnote 36) and para 776. The 'proferens', properly so called, is the party whose form of contract it is.

220          All England Law Reports     [2000] 2 All ER (Comm)

69.  The present case seems to me to present a paradigm situation for the application of the principle.  The defendants and others sought to use their controlling position in order to compel travel agents to mislead the public about what their fares included, and by so doing to disguise a significant fare increase. Like the judge at first instance, I am glad to find that the standard form of contract properly read does not licence the defendants to do any such thing.

**ALDOUS LJ.**
70.  I agree with the judgment of Clarke LJ.

*Appeal dismissed with costs. Order of judge varied by deleting first declaration and substituting declaration that airlines are not entitled to give instructions to agents which, if carried out, would have the effect of the agents misleading the public or doing anything unlawful.*

Dilys Tausz    Barrister.