**EXHIBIT    58**

# Carey Value Added SL v Grupo Urvasco SA

## [2010] EWHC 1905 (Comm)

QUEEN'S BENCH DIVISION (COMMERCIAL COURT)

BLAIR J

2, 23 JULY 2010

*Guarantee – Construction – Nature of guarantor's obligation – Defendant's subsidiary entering into loan agreement with claimant investment fund – Defendant guaranteeing obligations of subsidiary under loan agreement through deed of guarantee and indemnity – Claimant making demand to defendant under deed – Defendant seeking to rely on defences available to subsidiary – Whether deed being demand bond – Whether defendant under independent primary obligation to pay sums certified as due.*

The defendant and its subsidiary were Spanish companies. The Spanish subsidiary acquired a site in London through its own English subsidiary, with the purpose of building a hotel and luxury apartments there. The claimant investment fund provided some of the finance for the project through a sale and leaseback transaction in relation to the hotel. A loan agreement was entered into between the claimant and the Spanish subsidiary, together with a sale and purchase agreement in relation to the shares of the English subsidiary. In addition, the defendant entered into a deed of guarantee and indemnity, under which it guaranteed the obligations of the Spanish subsidiary under the loan agreement. Under cl 2(c) of the deed, the defendant undertook 'to be responsible as primary obligor for any failure by an Obligor to perform, discharge or fulfil for whatever reason any of the Guaranteed Obligations when due and promptly on demand by [the claimant]'. Under cl 2(d), the defendant undertook 'to indemnify [the claimant] immediately on demand against any cost, loss or liability suffered and expenses incurred … (i) in consequence of an Obligor's failure to perform any of its obligations under the Transactions Documents; (ii) if any obligation guaranteed by the Guarantor is or becomes unenforceable, invalid or illegal. The amount of the cost, loss or liability shall be equal to the amount which [the claimant] would otherwise have been entitled to recover under the Transaction Documents'. Clause 20.6 of the deed provided that: 'Any certification or determination by [the claimant] of a rate or amount under any Transaction Document or this deed is, in the absence of manifest error, conclusive evidence of the matters to which it relates.' Subsequently, disputes arose between the parties, and the claimant sought to rely on the deed of guarantee and indemnity. The defendant sought to rely on defences available to its Spanish subsidiary, which it argued was no longer liable to repay any part of the loan to the claimant and had very substantial claims against the claimant for breaches of the loan agreement that it was entitled to set off against any sums due to the claimant. The claimant sought summary judgment of its claim under the deed. It argued that the deed was on its true construction a demand bond, under which the defendant was obliged to pay as a separate independent obligation the amounts certified to be due. The claimant submitted that the very purpose of the deed was to enable it to recover from the defendant without having first to litigate the sorts of

*a*  defences raised by the defendant. It argued that as a result the defendant did not have a reasonable prospect of defending the claim under the deed.

**Held** – The deed of guarantee and indemnity was not a demand bond. The absence of language appropriate to a demand bond in a transaction outside the banking context created a strong presumption against the interpretation of

*b*  the instrument as a demand bond. The use of words such as 'on demand' did not in themselves have the effect of creating a demand bond. On the other hand, the avowed purpose of the instrument and the overall context of the contractual arrangements might be relevant in determining whether on-demand liability had been created. The difference between secondary and primary liability was not in itself decisive. The language of primary and

*c*  secondary liability was routinely found in the same contracts and was not itself a guide to the content of the liability. The mere incorporation of a principal debtor clause would not usually suffice in itself to determine the nature of the contract. Moreover, conclusive evidence clauses would be interpreted strictly, with any ambiguity being resolved in favour of the guarantor. Such a clause would not readily be construed as being conclusive of the legal existence

*d*  of the indebtedness or as precluding the guarantor from relying on any equitable set off. In the instant case, the language of cl 2.1.(d) was the language of co-extensive liability, and was certainly not indicative of the unqualified liability which arose under a demand bond. Moreover, any ambiguity in cl 20.6 should be resolved in favour of the defendant, with the result that the word

*e*  'amount' referred to the amount advanced, not the amount due and payable. On that basis, a certificate under cl 20.6 was not conclusive evidence as to liability. Accordingly, the presumption against the instrument being a demand bond was not rebutted, and the defendant had a real prospect of successfully defending the claim (see [17]–[24], [36]–[43], below).

*f*  *Hyundai Shipbuilding and Heavy Industries Co Ltd v Pournaras* [1978] 2 Lloyd's Rep 502 and *Marubeni Hong Kong and South China Ltd v Government of Mongolia* [2005] 2 All ER (Comm) 289 applied.

  *IIG Capital LLC v Van Der Merwe* [2008] 2 All ER (Comm) 1173 distinguished.
  *BOC Group plc v Centeon LLC* [1999] 1 All ER (Comm) 970 and *Gold Coast Ltd v Caja de Ahorros del Mediterraneo* [2002] 1 All ER (Comm) 142 considered.

*g*  **Notes**
For performance or demand bonds in general, see 49 *Halsbury's Laws* (5th edn) (2008) para 1271.

**Cases referred to in judgment**

*h*  *Bache & Co (London) Ltd v Banque Vernes et Commerciale de Paris SA* [1973] 2 Lloyd's Rep 437, CA.
  *BOC Group plc v Centeon LLC* [1999] 1 All ER (Comm) 53; *affd* [1999] 1 All ER (Comm) 970, CA.
  *Gold Coast Ltd v Caja de Ahorros del Mediterraneo* [2001] EWCA Civ 1806, [2002] 1 All ER (Comm) 142.

*j*  *Hyundai Shipbuilding and Heavy Industries Co Ltd v Pournaras* [1978] 2 Lloyd's Rep 502, CA.
  *IIG Capital LLC v Van Der Merwe* [2008] EWCA Civ 542, [2008] 2 All ER (Comm) 1173; *affg* [2007] EWHC 2631 (Comm), [2008] 1 All ER (Comm) 435.
  *Marubeni Hong Kong and South China Ltd v Government of Mongolia* [2005] EWCA Civ 395, [2005] 2 All ER (Comm) 289, [2005] 1 WLR 2497.

*Owen (Edward) Engineering Ltd v Barclays Bank International Ltd* [1978] 1 All ER        *a*
976, [1978] QB 159, [1977] 3 WLR 764, CA.

**Application**

The claimant, Carey Value Added SL (formerly Losan Hotels World Value
Added I SL), applied for summary judgment on its claim against the defendant,
Grupo Urvasco SA, under a deed of guarantee and indemnity dated              *b*
21 December 2007, by which the defendant guaranteed the obligations of its
subsidiary, Grupo Hotelero Urvasco SA, under a loan agreement entered into
on the same date between the subsidiary (as borrower) and the claimant (as
lender). The facts are set out in the judgment.

                                                                             *c*
*Robert Miles QC* and *Andrew de Mestre* (instructed by *Mayer Brown International
  LLP*) for the claimant.
*Mark Hapgood QC* and *Tom Smith* (instructed by *Hogan Lovells International LLP*)
  for the defendant.

                                      *Judgment was reserved.*                *d*

23 July 2010. The following judgment was delivered.

**BLAIR J.**

[1] This is an application by the claimant, Carey Value Added SL, for
summary judgment on its claim under a deed of guarantee and indemnity        *e*
dated 21 December 2007 by which the defendant, Grupo Urvasco SA,
guaranteed the obligations of its subsidiary, Grupo Hotelero Urvasco SA,
under a loan agreement entered into on the same date between Grupo
Hotelero Urvasco (as borrower) and Carey (as lender). The loan was in
connection with development of a hotel and luxury apartments on the
Citibank House site on the Strand, central London. Carey claims             *f*
€55,435,526·07 plus accrued interest at 2·5% over the three-month Euribor rate
since the date of the demand under the deed of guarantee and indemnity.
Grupo Urvasco submits that Grupo Hotelero Urvasco had the right to rescind
a related agreement, following the exercise of which it was no longer liable to
repay any part of the loan to Carey. Accordingly, there is no outstanding
indebtedness on which the guarantee can bite. Alternatively, it submits that   *g*
Grupo Hotelero Urvasco has very substantial claims against Carey for breaches
of the relevant loan agreement which Grupo Urvasco is entitled to set off
against any sums due to Carey. In response, Carey says that the deed of
guarantee and indemnity prevents Grupo Urvasco from relying on those
defences and that Grupo Urvasco is obliged to pay as a separate, independent
obligation by way of demand bond the amounts certified to be due. The very   *h*
purpose of the material terms, it is submitted, is to enable Carey to recover
from Grupo Urvasco without having first to litigate these kinds of defences. As
a result, it submits that Grupo Urvasco does not have a reasonable prospect of
defending the claim.

[2] The facts are set out in the four witness statements filed by the parties.   *j*
Although overall the matter is highly contentious, so far as this summary
judgment application under the deed of guarantee and indemnity is concerned,
the ambit of the factual dispute is relatively limited. Grupo Urvasco and its
subsidiary, Grupo Hotelero Urvasco, are Spanish companies. Grupo Hotelero
Urvasco is a hotel developer which acquired the site in the Strand that I have

*a* mentioned through its own subsidiary, an English company called Urvasco Ltd. Prior to Carey coming on the scene, the development was funded by Banco Bilbao Vizcaya Argentaria SA (BBVA) pursuant to a credit agreement dated 22 December 2004 to which the three Urvasco companies were parties (Grupo Urvasco as guarantor). However it appeared that the BBVA financing would be insufficient to complete the development, and in about November 2007 Grupo

*b* Hotelero Urvasco approached Carey for further finance. As an investment fund rather than a traditional lender, the financing was to be provided by Carey by a sale and leaseback transaction in relation to the hotel.

[**3**] In implementation of the transaction, the parties entered into the following agreements all dated 21 December 2007. (1) A loan agreement between Grupo Hotelero Urvasco and Carey (then called Losan Hotels World

*c* Value Added I SL). Under the loan agreement, Carey agreed to advance to Grupo Hotelero Urvasco a loan to a maximum amount of the euro equivalent of £70,000,000 in various tranches. (2) A sale and purchase agreement (SPA) between Grupo Hotelero Urvasco and Carey in respect of the shares of Urvasco. The SPA provided the sale and leaseback element of the transaction

*d* under which, at completion, Carey (through its English nominee company, London Value Added I Ltd) was to purchase the shares in Urvasco from Grupo Hotelero Urvasco (subject to the latter's right of repurchase seven years later). Carey was entitled to apply any sums due under the loan agreement towards the purchase price. (3) The deed of guarantee and indemnity between Carey and Grupo Urvasco, under which the present claim is brought.

*e* [**4**] The first two tranches of the loan were €8m and €33·58m advanced on 28 December 2007 and 15 January 2008 respectively. In circumstances which are in dispute, further tranches were advanced in the sums of €4,106,798·62 on 2 April 2008, and €3,441,880·59 on 5 May 2008, but none thereafter. By July 2008, the parties were at odds with each other, though there were various proposals to resolve matters. It appears that work on the site ceased on

*f* 8 September 2008. On 8 July 2009, BBVA appointed receivers over the property in reliance on events of default under the BBVA credit agreement, namely the failure to pay the sums due on 31 December 2008 and 30 June 2009 totalling €29,854,152·62, and the voluntary abandonment of the development of the property for a period longer than 28 days.

*g* [**5**] The defendant contends that the financial difficulties which Grupo Hotelero Urvasco ran into were caused by Carey's wrongful failure to provide financing for the development works. As it was put by Mr Mark Hapgood QC for Grupo Urvasco, Carey cynically and deliberately starved it of cash. Carey strongly denies this. It maintains that it had the funds available to advance, going so far as to place one further tranche into an escrow account. But as it

*h* was put by Mr Robert Miles QC for Carey, in its view, Grupo Hotelero Urvasco was pretty much bust. Carey has, it submits, a compelling case that there was a default within the terms of the loan agreement and, as a result, it had no obligation to advance further tranches. Among the matters it relies on are: (a) material adverse changes in the financial position of each of the Urvasco companies from December 2007 to mid-2008 such that Grupo Urvasco was in

*j* negotiations with its creditors, (b) the fact that the development had suffered very substantial delays in the first four months of 2008 and the long-stop date for completion of 30 April 2009 would not be met and (c) the failure to provide required documentation and notice of a claim against Urvasco to the monitoring surveyor, as well as failure to follow the procedure required under the loan agreement.

[6] On 9 July 2009, Grupo Hotelero Urvasco issued proceedings in the
Commercial Court against Carey and its nominee company claiming
declaratory relief in respect of its right to rescind the SPA pursuant to cl 6.17
thereof, and thereby to cancel the indebtedness under the loan agreement, and
claiming damages in respect of Carey's alleged breaches of the loan agreement.
I shall have to come back to cl 6.17 of the SPA which has been central to the
argument on the summary judgment application. There is an issue about the
time of service of these proceedings. Although the nominee's address for
service was the same address as that of Carey's solicitors, Mayer Brown, the
firm has no record of the proceedings having been received. It is however
common ground that Mr Couto of Grupo Urvasco notified Carey on
4 December 2009 that the proceedings had been commenced, but they were
not formally served on Carey in Spain until 22 December 2009. I shall refer to
them as the 'loan agreement proceedings', and they are presently ongoing in
the Commercial Court.

[7] It is not in dispute that about €49m in total was advanced by Carey to
Grupo Hotelero Urvasco (leaving aside interest), and nothing has been repaid.
Following the receipt of consent from BBVA (which was required by the terms
of an inter-creditor agreement), by a letter dated 20 November 2009, Carey
demanded repayment from Grupo Hotelero Urvasco of all sums outstanding
under the loan agreement, and made a demand of Grupo Urvasco under the
deed of guarantee and indemnity, both in the amount of €55,108,702·58. The
following month, further demands were made of: (1) Grupo Hotelero Urvasco
by a letter dated 23 December 2009 in which the amount outstanding under
the loan agreement was certified by Carey as being €55,426,655·61. This was in
reliance on cl 11(a) of the loan agreement, which provides that Carey's
certificate as to any amount payable to Carey by Grupo Hotelero Urvasco
under that agreement is conclusive save to the extent of any manifest error;
and (2) Grupo Urvasco by a letter dated 24 December 2009 in which the
amount outstanding under the deed of guarantee and indemnity was certified
by Carey as €55,435,526·07. This was in reliance on cl 20.6 of the deed, which
provides that any certification or determination by Carey of a rate or amount
under the deed is, in the absence of manifest error, conclusive evidence of the
matters to which it relates. I will come back to this clause, which again has
been important in the argument on this application.

[8] On 29 December 2009, a number of significant events occurred, which I
shall take in the order of the agreed chronology. By letter of that date, Grupo
Hotelero Urvasco rescinded, or purported to rescind, the SPA pursuant to
cl 6.17 on the basis that Carey had failed to advance tranches which it was
obliged to provide under the loan agreement. In the loan agreement
proceedings, Carey denies the effectiveness of this purported rescission on a
number of grounds including that (a) there was no obligation to advance
further tranches under the loan agreement because of the existing defaults and
(b) Grupo Hotelero Urvasco had waived its rights to or was estopped from
relying on cl 6.17 (including by reference to an agreement made between the
parties in October 2008).

[9] On or about 29 December 2009, the property was finally sold by the
receivers, the sale being to Adprotel Strand SL, a BBVA subsidiary, for a gross
sum of £116,441,700.

[10] Also on 29 December 2009, the present proceedings were begun by
Carey against Grupo Urvasco under the deed of guarantee and indemnity.
Following service of the defence, Carey issued its application for summary

*a*    judgment on 31 March 2010. Grupo Urvasco says that it should be dismissed, and that at the case management conference in respect of the loan agreement proceedings which has been listed to take place on 29 September 2010, a direction should be made that both actions are joined or heard together.

*b*    THE PARTIES' CONTENTIONS

[**11**] In summary, Carey contends that the deed of guarantee and indemnity takes effect as equivalent to a performance bond, though it is better described in this case as a demand bond, which is payable on a demand and a certificate, and that on this basis no defences which are available to Grupo Hotelero Urvasco are available to Grupo Urvasco in defence to the claim made against it *c*    by Carey under the deed of guarantee and indemnity. (In this respect Mr Miles accepted the substance of the characterisation of Carey's argument at para 80, p 24 of Grupo Urvasco's skeleton argument.)

[**12**] Equally in summary, Grupo Urvasco submits that the deed of guarantee and indemnity does not give rise to obligations akin to those imposed by a performance bond. It asserts that Grupo Hotelero Urvasco is not indebted to *d*    Carey in any amount in respect of the loan agreement. This is on the basis that (1) Grupo Hotelero Urvasco has it says rescinded the SPA under cl 6.17, and that following such rescission it is not obliged to make any repayment in respect of moneys advanced to it by Carey under the loan agreement; and/or (2) Grupo Hotelero Urvasco is entitled to set off the damages said to be due to *e*    it from Carey as a result of Carey's alleged breaches of the loan agreement. Accordingly, Grupo Urvasco submits, there are no amounts owing by Grupo Hotelero Urvasco to Carey in respect of any 'Guaranteed Obligations' which are the subject of the deed of guarantee and indemnity.

[**13**] As to Grupo Urvasco's first point, its evidence is to the effect that Grupo Hotelero Urvasco had concerns about Carey's financial position and its ability *f*    to meet its commitment under the loan agreement. Accordingly, Grupo Hotelero Urvasco sought some form of 'guarantee' that the tranche payments would be made, and this was provided by the inclusion of a provision in the SPA entitling Grupo Hotelero Urvasco to rescind the SPA in the event of a failure by Carey to advance funding under the loan agreement, and to cancel any outstanding indebtedness under the loan agreement. It contends that in the *g*    evidence of Mr Garcia-Tapia for Carey, he appears to accept that cl 6.17 was included in the SPA as a result of Grupo Hotelero Urvasco's concern about Carey's ability to comply with its funding obligations under the loan agreement. I do not read it that way. Mr Garcia-Tapia merely says that Grupo Hotelero Urvasco asked for cl 6.17 to be included. In any case, factual matters *h*    as regards why cl 6.17 came to be included (so far as relevant and admissible) are not for the summary judgment application.

[**14**] Clause 6.17 of the SPA provides that—

'[i]f the Purchaser [Carey] fails to advance any Tranche due to be advanced under and in accordance with the Loan and fails to remedy such *j*    breach within a period of 30 days of notice from the Seller [Grupo Hotelero Urvasco] requiring such remedy, the Seller shall be entitled to rescind this Agreement by written [notice] to the Purchaser without liability of any kind on the Seller's part under this Agreement. Upon such rescission the Seller shall not be obliged to repay the Loan. In the event of delay on the part of the Purchaser in advancing any Tranche, the Long

Stop Date shall be extended by an equivalent period. For the avoidance of *a*
doubt, this Clause shall not apply in relation to the Initial Payment due on
Completion in respect of which Clause 5.6 shall apply.'

[15] In the loan agreement proceedings, Carey contends that it was not
obliged to advance further tranches of the loan because Grupo Hotelero
Urvasco was already in default under the loan agreement. It also submits that *b*
cl 6.17 is penal, or that it is entitled to relief against forfeiture. As regards the
notice of rescission given on 29 December 2009, it submits that by then
demand had been made under the deed of guarantee and indemnity, and that
the subsequent notice of rescission cannot affect the accrued debt. In any case,
liability under the deed is preserved by cl 6(g), which provides that the
obligations of Grupo Urvasco will not be affected by 'any unenforceability, *c*
illegality or invalidity of any obligation of any person under the Transaction
Documents or any other document or security'. Thus, it submits, even if Carey
is unable to enforce the loan agreement, the deed remains enforceable. On that
last point, Grupo Urvasco responds that cl 6(g) does not apply to the cl 6.17
right which it submits is a contractual right to cancel the indebtedness under
the loan agreement, rather than an act which renders the loan agreement *d*
unenforceable, illegal or invalid.

[16] There is (or was) a disagreement as to how these factual disputes were to
be regarded on the summary judgment application. In its written submissions,
Grupo Urvasco suggested that for the purposes of the application, the court
must proceed on the basis that Carey breached the loan agreement, that Grupo
Hotelero Urvasco was entitled to, and has, rescinded the SPA with the effect *e*
that all outstanding indebtedness it owes under the loan agreement had been
cancelled, and that Grupo Hotelero Urvasco has a claim against Carey for
damages for breach of contract in an amount which exceeds the claim made by
Carey under the loan agreement and the guarantee. Mr Hapgood did not
pursue this stance in oral argument, and for the reasons given by Mr Miles, it is *f*
not correct. As he points out, it is very often the case in a claim under a
guarantee that there is an underlying dispute between the creditor and the
debtor. On a summary judgment application, if the dispute is one of substance
which cannot itself be determined summarily (which is not at issue here) the
court does not assume that the debtor is right. It simply assumes that there is a
dispute as to the underlying liability, and the question is whether the guarantor *g*
is nevertheless liable. In the present case, as Mr Miles made clear in argument,
this turns on whether the deed of guarantee and indemnity is on its true
construction (as Carey submits) in the nature of a demand bond, and I come
now to consider the nature of the instrument.

*h*

THE NATURE OF THE DEED OF GUARANTEE AND INDEMNITY

[17] It is not in dispute that unless the right is expressly excluded, a guarantor
can prima facie avail himself of any right of set-off possessed by the primary
debtor against the creditor (see *BOC Group plc v Centeon LLC* ([1999] 1 All ER
(Comm) 53, affirmed [1999] 1 All ER (Comm) 970). Carey's fundamental
submission is that this principle does not apply here, because the deed of *j*
guarantee and indemnity takes effect as equivalent to a performance bond.
Mr Miles points out that characterisation in this regard is bedevilled by
terminology, and the deed is best described, he says, not as a performance bond
but as a 'demand bond'. It is not, however, a matter of the label to be attached,
but a question of the substance of the obligations. (This point is common

*a*    ground.) The distinction is, he submits, between a primary, independent obligation, and a secondary obligation. He submits that the deed in this case created a primary, independent obligation, so that the principal debtor's defences are unavailable for set-off.

[**18**] In support of its case, Carey places considerable reliance on *IIG Capital*
*b*    *LLC v Van Der Merwe* [2008] EWCA Civ 542, [2008] 2 All ER (Comm) 1173. In that case, the directors of a company executed 'deeds of guarantee' in favour of a lender. The loan agreement was governed by New York law, under which the directors argued that reasonable notice of the demand for repayment should have been given. The company had (it was argued) a complete defence to the claim, and the directors sought to rely on that defence against liability on the
*c*    guarantee. It was held however both by the master, and by Lewison J ([2007] EWHC 2631 (Comm), [2008] 1 All ER (Comm) 435), and by the Court of Appeal that the guarantee imposed a primary obligation on the directors, who had bound themselves to pay on demand as primary obligors the amount stated in a certificate.

[**19**] Having set out the applicable principles, Waller LJ (with whom
*d*    Lawrence Collins and Rimer LJJ agreed) said that the question at the end of the day was what, on the true construction of the deeds of guarante, the directors agreed (see [2008] 2 All ER (Comm) 1173 at [30]). He continued:

'[31] I turn thus to the operative language of the deeds of guarante. By condition 2.1 the guarantor (Mr or Mrs Van Der Merwe) agreed "as
*e*    principal obligor … not merely as surety" that "if … the Guaranteed Moneys are not paid in full on their due date … it (the guarantor) will immediately upon demand unconditionally pay to the Lender (IIG) the Guaranteed moneys which have not been so paid". The guaranteed moneys are defined as "all moneys and liabilities … which are now or may at any time hereafter be due, owing, payable, *or expressed to be due, owing or*
*f*    *payable, to the Lender from or by the Borrower*" … The obligation to pay moneys "expressed to be due" "upon demand" "unconditionally" as "principal obligor" "not merely as surety" would indicate that the Van Der Merwes were taking on something more than a secondary obligation.

[32] Clause 4.2 then provides that "[a] certificate in writing signed by a
*g*    duly authorised officer … stating the amount at any particular time due and payable by the Guarantor … shall, save for manifest error, be conclusive and binding on the Guarantor for the purposes hereof". I agree with the judge that that clause puts the matter beyond doubt. Any presumption has by the language used been clearly rebutted. Apart from manifest error, the Van Der Merwes have bound themselves to pay on
*h*    demand as primary obligor the amount stated in a certificate pursuant to cl 4.2.'

(There was held to be no manifest error in that case, and at the hearing of this application Grupo Urvasco made it clear that no such contention is advanced on its behalf in this case.)

*j*    [**20**] The correct question, Carey submitted, is as set out in Waller LJ's judgment in the *IIG Capital* case at [8], namely whether Grupo Urvasco was assuming a secondary liability dependent on the primary liability of Grupo Hotelero Urvasco, or whether it was assuming a primary liability independent of the liability of Grupo Hotelero Urvasco. It is accepted (at least on this summary judgment application) that if the liability is secondary in nature,

*a*

Grupo Urvasco can rely on Grupo Hotelero Urvasco's defences. Thus the issue on the application is to identify the nature of the obligations assumed by Grupo Urvasco under the deed, which is a matter of construction of the wording and context of the deed.

*b*

[21] For Grupo Urvasco, Mr Mark Hapgood submits that there is a profound conceptual flaw in Carey's case. The distinction which it draws is between two possibilities, namely secondary liability or primary liability. But to say that someone is primarily liable begs the question of the content of that primary liability. To say that someone is primarily or secondarily liable is meaningless, since it depends on the definition of the liability in question, and in either case, the liability may be co-extensive with that of the underlying debtor and, he submits, is in this case. As to demand bonds, typically these are short instruments (unlike the present deed of guarantee and indemnity), since there is no need for the extensive language found in guarantees to preserve the beneficiary's rights in case of variation of the underlying contract and so forth (this is to be found in cl 6 of this deed). The *IIG Capital* case is, he submits, an unusual case explained by the wording of the instrument in question.

*c*

*d*

[22] I agree with Mr Hapgood that the difference between secondary liability and primary liability is not in itself decisive. It was clearly not treated as such in the *IIG Capital* case: in the passage from Waller LJ's judgment (at [32]) that I have set out above, he concludes that the defendants bound themselves to pay on demand as primary obligor the amount stated in a certificate. It was the fact that a certificate in the prescribed form was agreed to be conclusive and binding on the defendants save in the case of manifest error which clinched the argument in IIG's favour (see [32], and Lewison J ([2008] 1 All ER (Comm) 435 at [51])). In any case, the language of primary and secondary liability is routinely found in the same contracts, and is not in itself a guide to the content of the liability. Thus it has been said, in my view rightly, that the mere incorporation of a principal debtor clause will not usually suffice in itself to determine the nature of the contract. To take the familiar distinction between a guarantee and an indemnity, a principal debtor clause will not automatically convert one into the other (see Andrews and Millett *The Law of Guarantees* (5th edn, 2008) para 1–014). In fact, although Carey's skeleton argument at one point makes reference to an indemnity, it is Carey's case (as I have explained) that the deed in question took effect as a performance bond, or as it preferred to put it, a demand bond. Its case is that the demand as certified (such certification being conclusive) gives rise to the liability, as in the *IIG Capital* case. This is the case which it must make out to be entitled to summary judgment.

*e*

*f*

*g*

*h*

[23] As Tuckey LJ pointed out in *Gold Coast Ltd v Caja de Ahorros del Mediterraneo* [2001] EWCA Civ 1806 at [10], [2002] 1 All ER (Comm) 142 at [10], on-demand guarantees or performance bonds have now been a feature of commercial life for many years. Such instruments are neither guarantees nor indemnities—the analogy drawn in the case law is with letters of credit (see *Edward Owen Engineering Ltd v Barclays Bank International Ltd* [1978] 1 All ER 976 at 983, [1978] QB 159 at 171 per Lord Denning MR). As Carnwath LJ explained in *Marubeni Hong Kong and South China Ltd v Government of Mongolia* [2005] EWCA Civ 395 at [23], [2005] 2 All ER (Comm) 289 at [23], [2005] 1 WLR 2497: ' "demand bonds" (however described) are a specialised form of irrevocable instrument, developed by the banking world for its commercial customers. They have been accepted by the courts as the equivalent of irrevocable letters of credit'. Often, as the cases show, they provide for payment of, or up to, a

*j*

QBD        Carey Value Added v Grupo Urvasco (Blair J)        149

*a* specified amount, upon the making of a demand that conforms with the requirements of the instrument (for example as regards any supporting documents), and which is made within the validity period of the instrument. The issuer is not concerned with disputes between the parties as to the underlying contract. There is no standard nomenclature by which such an instrument can automatically be classified however, and the authorities make it

*b* clear that the nature of the instrument in question is a matter of construction of the instrument as a whole without any preconceptions as to what it is (see the *Gold Coast* case [2002] 1 All ER (Comm) 142 at [15] and the *IIG Capital* case [2008] 2 All ER (Comm) 1173 at [7]).

[**24**] It has also been held that the absence of language appropriate to a

*c* demand bond in a transaction outside the banking context creates a strong presumption against the interpretation of the instrument as a demand bond (see the *Marubeni Hong Kong and South China* case [2005] 2 All ER (Comm) 289 at [30] and the *IIG Capital* case [2008] 2 All ER (Comm) 1173 at [8]–[9]). Plainly, the use of words such as 'on demand' do not in themselves have the effect of creating a demand bond (see the *IIG Capital* case [2008] 1 All ER (Comm) 435

*d* at [25]). On the other hand, the avowed purpose of the instrument (*Hyundai Shipbuilding and Heavy Industries Co Ltd v Pournaras* [1978] 2 Lloyd's Rep 502 at 508) and the overall context of the contractual arrangements (the *BOC Group* case [1999] 1 All ER (Comm) 53 at 66) may be relevant in determining whether on-demand type liability has been created. Outside the banking context, *IIG Capital* is an example of a case in which, on the language in question, the

*e* presumption referred to in the *Marubeni Hong Kong and South China* case was rebutted.

[**25**] With those principles in mind, I come to the language of the deed of guarantee and indemnity. By cl 2.1:

*f* '[Grupo Urvasco] irrevocably and unconditionally:

(a) guarantees to the Losan Entities [that is Carey] punctual and complete performance by the Obligors [that is Grupo Hotelero Urvasco] of the Guaranteed Obligations;

(b) [this has to do with the lease of the property]

(c) undertakes with the Losan Entities to be responsible as primary

*g* obligor for any failure by an Obligor to perform, discharge or fulfil for whatever reason any of the Guaranteed Obligations when due and promptly on demand by any Losan Entity:

(i) fully, punctually and specifically perform or procure to be performed the relevant Guaranteed Obligations as if it were itself a direct and primary obligor to the Losan Entities in respect of such Guaranteed Obligations

*h* and be liable as if the Transaction Documents had been entered into directly between the Guarantor and the Losan Entities;

(ii) pay the amount of any Guaranteed Obligation which has not been paid by the relevant Obligor and without any deduction or withholding; and

(d) undertakes with the Losan Entities to indemnify any of them

*j* immediately on demand against any cost, loss or liability suffered and expenses incurred by any Losan Entity:

(i) in consequence of an Obligor's failure to perform any of its obligations under the Transactions Documents;

(ii) if any obligation guaranteed by the Guarantor is or becomes unenforceable, invalid or illegal.

> The amount of the cost, loss or liability shall be equal to the amount    *a*
> which that Losan Entity would otherwise have been entitled to recover
> under the Transaction Documents.'

[**26**] 'Guaranteed Obligations' are defined as in cl 1.1 as 'all obligations of the
Obligors under or in connection with the Transaction Documents'.

[**27**] Taking the points in the order set out in its skeleton argument, first,    *b*
Carey relies on the fact that the deed imposes obligations on Grupo Urvasco
which are expressly described as being 'primary' (cl 2.1(c)) and by way of
'indemnity' (cl 2.1(d)). In the language of cl 2.1(c), it emphasises the words
'primary obligor' and 'on demand'. Grupo Urvasco is to be liable as if the loan
agreement had been entered into directly between it and Carey. It has to pay
without any deduction or withholding. In the language of cl 2.1(d), it    *c*
emphasises the obligation to indemnify Carey immediately on demand, an
obligation that subsists even if any obligation guaranteed by the guarantor is or
becomes unenforceable, invalid or illegal. Carey submits that these words are
clearly indicative of a primary liability, and are very similar to the wording in
the *IIG Capital* case.    *d*

[**28**] Second, it is said that cl 20.6 of the deed of guarantee and indemnity
contains an express provision for Carey to certify conclusively the amount due
from Grupo Urvasco under the deed. Clause 11(a) of the loan agreement made
similar provision as to amounts payable under the loan agreement by Grupo
Hotelero Urvasco. Thus a certificate from Carey stating the amount due under
the loan agreement is conclusive. Therefore, it is submitted, Grupo Urvasco is    *e*
bound by Carey certifying that sums are due under the loan agreement and
under the deed. Again, the *IIG Capital* case is relied on in this regard.

[**29**] Third, Carey submits that the deed contains a range of other terms
which support the primary and independent nature of the obligations it
undertook. By cl 3.2, the indemnities referred to in the deed are 'continuing
obligations of Grupo Urvasco, separate and independent from the other    *f*
obligations of Grupo Urvasco and shall survive the termination of this deed or
any Transaction Document [which includes the loan agreement]'. Thus, it is
said, any link between the liability under the loan agreement and liability under
the deed is severed. By cl 6(g) of the deed, the obligations of Grupo Urvasco
under the deed are not affected by any act, omission, matter or thing which,
but for cl 6, would reduce, release or prejudice any of its obligations under the    *g*
deed, including, and whether or not known to it or Carey (or others), any
unenforceability, illegality or invalidity of any obligation of any person under
the transaction documents or any other document or security. Thus, it is
submitted, even if Carey is unable to enforce the loan agreement, the deed of
guarantee and indemnity remains enforceable. By cl 20.4 of the deed, all    *h*
moneys payable by Grupo Urvasco under the deed 'shall be paid in full without
set-off or counterclaim of any kind and free and clear of, and without any
deduction or withholding of any kind'. The combination of these matters, it is
submitted, demonstrates a clear and unanswerable case that the obligations of
Grupo Urvasco under the deed are primary, separate and independent.

[**30**] In response, Grupo Urvasco submits that it is of significance that the    *j*
deed is not called an 'on demand bond', and is specifically expressed to be
supplemental to the SPA. The definition of 'Guaranteed Obligations' means (it
is said) actual obligations of Grupo Hotelero Urvasco. As regards cl 2.1(c), it is
said that Carey has emphasised some parts of the wording, whilst minimising
the effect of other parts. In particular, Grupo Urvasco relies on the fact that it

*a* is liable for any failure by Grupo Hotelero Urvasco to perform or discharge the guaranteed obligations when due. This, it submits, shows that its liability is co-extensive with that of Grupo Hotelero Urvasco. The liability of Grupo Urvasco is not unconditional and arising only on the presentation of a demand by Carey, but conditioned on there having been a failure by an obligor (ie Grupo Hotelero Urvasco) to perform, discharge or fulfil its own obligations

*b* when due. This is made clear, it is said, by the words 'which has not been paid by the relevant Obligor' in cl 2.1(c)(ii). The clause does not include the 'unconditionally' and 'not merely as surety' language relied on by Lewison J and the Court of Appeal in the *IIG Capital* case. As regards cl 2.1(d), the indemnity clause, it is specifically provided that '[t]he amount of the cost, loss

*c* or liability shall be equal to the amount which that Losan Entity would otherwise have been entitled to recover under the Transaction Documents'. This shows, it is submitted, that Carey is only entitled to the amount which it would in fact have been entitled to recover from Grupo Hotelero Urvasco under the loan agreement.

[**31**] As regards cl 20.6, it is submitted that the certification provided for is

*d* only as to amount and not as to liability. It does not impose an unconditional liability to pay upon a certified demand being made. It is different from the equivalent clause in the *IIG Capital* case where the certification was both as to amount and as to whether that amount was 'due' and 'payable', ie liability (see Lewison J: [2008] 1 All ER (Comm) 435 at [51]). Carey is thus wrong, it is said, to characterise the certification under cl 20.6 as extending to the amount being

*e* 'due' under the deed and/or loan agreement. This is the one word which is conspicuous by its absence from cl 20.6.

[**32**] As regards the other matters relied on by Carey, it is said that cl 6(g) does not impact on the right of rescission contained in cl 6.17 of the SPA because rescission is a concept different from 'unenforceability, illegality or invalidity'. It

*f* is submitted that cl 20.4 precludes Grupo Urvasco from relying on its own rights of set-off against Carey in relation to moneys payable by it under the deed, but does not preclude rights of set-off available to Grupo Hotelero Urvasco being relied on in order to ascertain what moneys, if any, are in fact payable by Grupo Urvasco under the deed.

*g*

DISCUSSION AND CONCLUSION

[**33**] In his lucid submissions on behalf of Carey, Mr Robert Miles pointed out that there is no dispute that Carey has advanced some €49m to Grupo Hotelero Urvasco, of which nothing has been repaid. The parent company

*h* should therefore now be required to pay on its guarantee. It is, he says, a matter of timing. Should it transpire in the loan agreement proceedings that Grupo Hotelero Urvasco has a good claim, then to that extent the guarantor will fall to be reimbursed. In the meantime, Grupo Urvasco should make payment without regard to the underlying dispute. The certification provisions (which featured centrally in his argument) were clearly intended to have that

*j* effect, and should be enforced as such.

[**34**] On its part, Grupo Urvasco places central reliance on cl 6.17 of the SPA, which gave the borrower a right to rescind upon failure to advance any tranche due to be advanced. The clause provided further that upon such rescission the borrower should not be obliged to repay the loan. Although in dispute, its case is that its obligation to repay the loan has by virtue of an expressly negotiated

*a*

term ceased altogether. Mr Mark Hapgood says that this is only one of three rights to rescind given by the SPA, and that taken as a whole, the agreement is more like a joint venture agreement than a conventional loan.

[35] In fact, neither party has suggested on the summary judgment application that the factual matrix is of any particular significance in construing the deed of guarantee and indemnity. Carey's case that the deed took effect as a demand bond is squarely based on the construction of the terms of the instrument, which require close consideration.

*b*

[36] A convenient starting point is to identify what was the subject matter of the obligation. In *IIG Capital*, the case on which Carey principally relies, the relevant provision is set out in the judgment of the Court of Appeal ([2008] 2 All ER (Comm) 1173 at [6]). At first instance, Lewison J said ([2008] 1 All ER (Comm) 435 at [48]):

*c*

'The definition of "Guaranteed Monies" … is of considerable significance. It includes not only those moneys which HPIE [the borrowers] actually owe IIG but also moneys "*expressed* to be due, owing or payable" by HPIE to IIG. These words point towards the conclusion that the guaranteed monies may extend beyond what is actually owing by HPIE to IIG; and hence that the liability of Mr and Mrs Van Der Merwe is not necessarily co-extensive with that of HPIE.'

*d*

The use of the words 'expressed to be' means that the definition in the *IIG Capital* case is (in my view) appreciably wider than the definition of 'Guaranteed Obligations' in the deed of guarantee and indemnity, which in cl 1.1 are defined as 'all obligations of the Obligors under or in connection with the Transaction Documents'.

*e*

[37] In the *IIG Capital* case, the guarantor agreed that if the guaranteed moneys were not paid in full on their due date, it would immediately upon demand unconditionally pay them to the lender. There is in my view force in Grupo Urvasco's submission that this is wider language than in the present case. By cl 2.1(c) of the deed of guarantee and indemnity, Grupo Urvasco undertakes to be responsible as primary obligor for any failure of Grupo Hotelero Urvasco to discharge any of the guaranteed obligations when due. This tends to suggest that the guarantor's liability is the same as that of the borrower (see e g the *BOC Group* case [1999] 1 All ER (Comm) 53 at 67). It is correct (as Carey points out) that cl 2.1(d) creates an obligation on Grupo Urvasco to indemnify Carey. However the clause is qualified by the proviso that the amount in question shall be equal to the amount that Carey would otherwise have been entitled to recover under the loan agreement. It is correct, as Carey says, that there is a certification provision in the loan agreement as well as in the deed of guarantee and indemnity. Nevertheless, the language of cl 2.1(d) appears to me to be the language of co-extensive liability, and certainly not indicative of the unqualified liability which arises under a demand bond.

*f*

*g*

*h*

[38] The crucial point in my view, in agreement with Carey, is as to the effect of the certification and conclusive evidence provision. A conclusive evidence clause was upheld in the context of bank guarantees in *Bache & Co (London) Ltd v Banque Vernes et Commerciale de Paris SA* [1973] 2 Lloyd's Rep 437. That case concerned such a clause contained in a bank guarantee issued to commodity brokers on behalf of its customers. It was held that the conclusive evidence clause was valid and that if notice of default was given it was binding according to its terms. In the *IIG Capital* case [2008] 2 All ER (Comm) 1173 at [12], Waller LJ records the defendant directors' submission that since the case was

*j*

*a*  concerned with a performance bond being given by a bank, it was not an authority which assisted to any great degree in a case outside that context. He said: 'I, of course, understand that submission but it goes no further than requiring an anxious scrutiny of the language of the clause used in any particular case in order to ascertain whether the guarantee is secondary or primary.' In the result, the clause in the *IIG Capital* case was upheld as having the effect contended for by the lender.

*b*

[**39**] In the *IIG Capital* case, the relevant clause provided that a 'certificate in writing signed by a duly authorised officer … stating the amount at any particular time due and payable by the Guarantor … shall, save for manifest error, be conclusive and binding on the Guarantor for the purposes hereof' (see [6]). Clause 20.6 of the deed of guarantee and indemnity is drafted in different terms, and the parties are in disagreement as to whether it makes any difference of substance. Clause 20.6 provides that '[a]ny certification or determination by [Carey] of a rate or amount under any Transaction Document or this deed is, in the absence of manifest error, conclusive evidence of the matters to which it relates'.

*c*

*d*  [**40**] The word 'rate' clearly refers to an interest rate, and I do not think that this is in dispute. Carey submits that the reference to 'amount' means the amount due. Grupo Urvasco submits that it means the amount advanced. It seems to me that either reading is a possible one, and the question is which is the correct one in context, and again, the *IIG Capital* case is important in that regard. As I have said, the certificate in the *IIG Capital* case was as to the 'amount at any particular time due and payable'. Those words are missing from cl 20.6. There is in my view a major difference between a certificate as to 'amount' and a certificate as to 'amount … due and payable'. I do not consider it appropriate to construe the clause so as to include the absent words. It can, and in my view should, be construed as referring to the amount advanced.

*e*

[**41**] A further point is made in a leading work on the law of guarantees, O'Donovan and Phillips *The Modern Contract of Guarantee* (2003) (English edn) paras 5–104, 5–105, in which the authors say:

*f*

'Conclusive evidence clauses will be interpreted strictly, with any ambiguity being resolved in favour of the guarantor. Thus, the clause will not readily be construed as being conclusive of the legal *existence* of the indebtedness or as precluding the guarantor relying on any equitable set off since this operates to reduce or extinguish the claim itself …

*g*

The fact that conclusive evidence clauses are strictly construed also means that the guarantor may raise arguments as to whether the document served upon him can properly be described as a "certificate" or "statement" and as to whether the person who has signed the certificate comes within the class of persons authorised to do so.'

*h*

This passage is referred to in the *IIG Capital* case [2008] 2 All ER (Comm) 1173 at [13] without any suggestion that it does not accurately state the law, and in my view, the views expressed in it are correct. In so far as there is any ambiguity in cl 20.6, it should be resolved in favour of Grupo Urvasco. On that basis also, I conclude that a certificate under cl 20.6 is not conclusive evidence as to liability.

*j*

[**42**] In view of that conclusion, for the purposes of the summary judgment application I can deal with Carey's third set of points relatively briefly. In agreement with Carey, I consider that cl 20.4 of the deed of guarantee and indemnity is capable of excluding the right of set-off possessed by the primary

*a*

debtor against the creditor, and is not limited to precluding Grupo Urvasco from relying on its own rights of set-off against Carey in relation to moneys payable by it under the deed. As regards cl 6.17 of the SPA, this is (to put it neutrally) an unusual provision. Each party takes a wholly different view as to its effect and application, and Grupo Hotelero Urvasco may entirely fail to make out its case on it in the loan agreement proceedings. If it is correct, its obligation to repay the loan has ceased by virtue of its rescission. In this regard, I consider it arguable that cl 6(g) does not impact on the right of rescission contained in cl 6.17 of the SPA because rescission is a concept different from 'unenforceability, illegality or invalidity'. If Grupo Hotelero Urvasco makes out its case on cl 6.17, it is therefore arguable that there is no liability under the deed of guarantee and indemnity.

*b*

*c*

[43] Grupo Urvasco has demonstrated, in my judgment, that it is well arguable that this is not an instrument which contains language appropriate to a demand bond. Further, it is a transaction outside the banking context, and subject to the presumption expressed in the *Marubeni Hong Kong and South China* case [2005] 2 All ER (Comm) 289 against the interpretation of the instrument as a demand bond. That presumption is not in my view rebutted. I consider that Grupo Urvasco has a real (in the sense of a realistic as opposed to fanciful) prospect of successfully defending the claim. It follows that Carey is not entitled to summary judgment. I am grateful to both parties for their assistance.

*d*

*Application refused.*

*e*

Rakesh Rajani      Barrister.