# EXHIBIT 59

Case No: 2011 Folio 1600

Neutral Citation Number: [2012] EWHC 1758 (Comm)

**IN THE HIGH COURT OF JUSTICE**
**QUEEN'S BENCH DIVISION**
**COMMERCIAL COURT**

7 Rolls Building
Fetter Lane
London
EC4A 1NL

Monday, 21st May 2012

BEFORE:

**MR JUSTICE BLAIR**

------------------

BETWEEN:

**(1) CIMC RAFFLES OFFSHORE (SINGAPORE) LIMITED**
**(2) YANTAI CIMC RAFFLES OFFSHORE LIMITED**

Claimants

- and -

**SCHAHIN HOLDINGS S.A.**

Defendant

------------------

MR MICHAEL ASHCROFT QC (instructed by Curtis Davis Garrard LLP) appeared on behalf of the Claimants
MR MARCUS MANDER (instructed by Linklaters LLP) appeared on behalf of the Defendant

------------------

**Approved Judgment**
Crown Copyright ©

------------------

Digital Transcript of Wordwave International, a Merrill Communications Company
165 Fleet Street, 8th Floor, London, EC4A 2DY
Tel No: 020 7421 4046 Fax No: 020 7422 6134
Web: www.merrillcorp.com/mls     Email: mlstape@merrillcorp.com
(Official Shorthand Writers to the Court)

MR JUSTICE BLAIR:

1. This is a claim for summary judgment under a deed of guarantee and indemnity made on 18th December 2009. The background to the claim is as follows. The Claimants operate a shipyard in China. Two shipbuilding contracts for the construction of two semi-submersible drilling rigs were entered into on 12th July 2006, between the Claimants as builders and Baerfield Drilling LLC ("BDL") and Soratu Drilling LLC ("SDL") as buyers respectively. The contract price for each vessel was US$234m. BDL and SDL form part of a group of companies operating in the offshore oil and gas industry. They entered into the shipbuilding contracts with a view to chartering both rigs to the Brazilian oil company Petrobas S.A. under long-term charters.

2. Over the course of the building, the parties made a series of amendments to the shipbuilding contracts, in large part, the Defendant says, to address problems that were being caused by delays in construction. The Seventh Amendment to the BDL contract and the Eleventh Amendment to the SDL contract were entered into on 27th September 2009 and were in materially similar terms. By these amendments the parties agreed to defer a portion of the final "milestone payment"—that is, instalment—due under each contract until after delivery, by which time it was anticipated that the vessels would be generating revenue. The parties agreed that one twelfth of each payment should be made on delivery with the balance to be made in 11 monthly instalments thereafter. In the case of the BDL contract, the amount of the final instalment, that is milestone instalment 19, less liquidated damages for delay, was US$35,972,680.89. This sum was defined as "Adjusted Milestone 19." In the case of the SDL contract, the amount of the final instalment, that is milestone instalment 21, less liquidated damages, was US$38,535,674.04. This sum was defined as "Adjusted Milestone 21."

3. It appears that the banks financing the purchase of the rigs required BDL and SDL to restructure their financing arrangements. According to the Defendant's evidence, the banks were uncomfortable with the fact that by virtue of the Seventh and Eleventh amendments, a portion of the purchase price for each rig would be deferred until after delivery. The banks therefore wanted, it is said, a creditworthy entity to stand behind BDL and SDL such that, if BDL or SDL had insufficient funds to pay the Claimants, the Claimants would have recourse to a third party rather than the project assets, which by that time would be earning revenue from which the banks would be repaid. To this end, in order to permit refinancing to proceed, it was agreed that a guarantee should be provided. It is the guarantee which is the subject matter of this claim.

4. The guarantee was given by the Defendant, Schahin Holdings S.A. I should explain the relationship between this company and the purchasers of the rigs. As explained in the Defendant's evidence, BDL and SDL form part of a group of companies known as "Schahin Offshore Operations," which is ultimately owned and controlled by members of the Schahin family of Brazil. The Defendant is the holding company of a separate group of companies also ultimately owned and controlled by members of the Schahin family known as Groupo Schahin or "Schahin Group." Schahin Group is active in various industries including real estate, oil and gas, electricity, telecommunications and engineering. The Defendant accepts, however, that the two groups of companies are ultimately owned and controlled by members of the same family.

5. The guarantee, as I shall explain, expressly refers to the Seventh and Eleventh Amendments. In May 2010, that is some five months after the guarantee was entered into, BDL, SDL and the Claimants entered into two further amendments to the contracts (the Eighth and Twelfth Amendments). By these amendments, the parties agreed to defer payment of further milestone payments until after delivery in addition to 19th and 21st final milestone payments that had been deferred under the Seventh and Eleventh amendments. This was achieved by defining the

      meaning of "Adjusted Milestone 19" and "Adjusted Milestone 21" so as to include a number of other milestone payments. In the case of the BDL contract, "Adjusted Milestone 19" was defined to include additionally the 13th, 14th, 15th, 16th, 17th and 18th milestones. The result was to increase the total amount of Adjusted Milestone 19 to US$50,972,680.89. In the case of the SDL contract, "Adjusted Milestone 21" was defined to include additionally the 15th, 16th, 17th, 18th, 19th and 20th milestones. The result was to increase the total amount of Adjusted Milestone 21 to US$56,535,674.04.

6.     The rigs have now been delivered. I am told that BDL and SDL will seek to recover losses against the Claimants in an arbitration, but I am not concerned with that aspect of the matter. I am only concerned with the Claimants' claim under the guarantee. In summary the Claimants' case is that it is entitled to summary judgment for all outstanding sums under the amendments I have identified. The claim is for US$77,603,750.70 plus interest, a figure which may increase. The Defendant raises two defences. First, it contends that, applying established principles, the Defendant was discharged from liability under the guarantee by the Eighth and Twelfth Amendments made to the shipbuilding contracts without its consent in May 2010. I shall call this the <u>Holme v. Brunskill</u> defence, after the name of the leading case. Second, if that is wrong and it was not discharged from liability, the defendant submits that on a correct construction of the guarantee it is not liable for the further sums which were added to the final milestone payments by the Eighth and Twelfth Amendments. On this basis, the Defendant accepts that the guarantee continues to apply in respect of the amounts originally covered (prior to the increases) and that it is liable for those amounts.

7.     There is no dispute as to the principles to be applied in determining summary judgment applications in respect of the construction of contracts. See, for example, <u>Easyair Limited v. Opal Telecom Ltd</u> [2009] EWHC 339 (Ch) at [15], Lewison J. Before examining the defences, I note that the Claimants assert that the Defendant consented to the later amendments in circumstances that made it clear that the Defendant accepted that the guarantee applied to the Eighth and Twelfth Amendments. Consent is capable of providing an answer to both defences, but the facts are disputed, and consent is not an issue suitable for disposition on a summary judgment application, as I think Mr Michael Ashcroft QC for the Claimants recognised.

8.     For summary judgment purposes the application has turned on the construction of the guarantee. The guarantee is subject to English law. It is common ground that it is not a "First demand" type of instrument. So far as its effect is concerned, the main debate has been whether, as the Claimants contend, it creates primary liability or, as the Defendant contends, secondary liability.

9.     The deed begins by naming the parties, that is the Defendant as guarantor, and the Claimants, the builder and co-builder, defined as the "Guarantee party." The significant terms for present purposes are as follows. I begin with recital A:

        "Baerfield Drilling LLC ("**BDL**"), Builder and Co-Builder are parties to a Shipbuilding Contract for the Construction and Sale dated July 12, 2006 (as amended, supplemented or otherwise modified from time to time, the "**BDL Shipbuilding Contract**") and Soratu Drilling LLC ("**SDL**"), Builder and Co-builder are parties to a Shipbuilding Contract for the Construction and Sale dated July 12, 2006 (as amended, supplemented or otherwise modified from time to time, the "**SDL Shipbuilding Contract**," and together with the BDL Shipbuilding Contract, the "**Shipbuilding Contracts**"). Pursuant to clause 3(e) of the Seventh Amendment dated as of September 27, 2009 to the BDL Shipbuilding Contract (the "**BDL Seventh Amendment**"), the parties agreed to divide Adjusted Milestone 19 (as defined in the BDL Shipbuilding Contract) into 12 equal instalments, the first to be paid by BDL on the later of September 30, 2010 and the effective date of the delivery and acceptance of the Vessel referred to therein, and the remaining 11 instalments to be paid by BDL on the last day of each of the 11 months following the due

    date of the first instalment (such 11 deferred payments, the "**BDL Deferred Payments**"). Pursuant to Clause 3(e) of the Eleventh Amendment dated as of September 27, 2009 to the SDL Shipbuilding Contract (the "**SDL Eleventh Amendment**"), the parties agreed to divide Adjusted Milestone 21 (As defined in the SDL Shipbuilding Contract) into 12 equal instalments, the first to be paid by SDL on the later of July 31, 2010 and the effective date of the delivery and acceptance of the Vessel referred to therein, and the remaining 11 instalments to be paid by SDL on the last day of each of the 11 months following the due date of the first instalment (such 11 deferred payments, the "**SDL Deferred Payments**") ...

10.    Then recital C reads as follows:
    "To induce the Lenders to enter into the Credit Agreement and to extend credit thereunder, and for other good and valuable consideration, the receipt and sufficiency for which are hereby acknowledged, the Guarantor has agreed to guarantee the Guaranteed Obligations as hereinafter defined. The Guaranteed Party has agreed to waive certain liens, charges, claims, mortgages and other encumbrances which the Guaranteed Party may have against BDL, SDL and each of their respective properties (including each Vessel and all Materials and Equipment (as each such term is defined in the Shipbuilding Contracts) installed onto such Vessel) as further described herein."

11.    Clause 1 is entitled "Guarantee and Indemnity." So far as material it reads as follows:
    "(a) The Guarantor hereby absolutely, unconditionally and irrevocably guarantees to the Guaranteed Party and its respective successors and assigns, as primary obligor and not merely a surety, the due and punctual payment in full of the BDL Deferred Payments and the SDL Deferred Payments as and when the same shall become due (the "**Guaranteed Obligations**").

    (b) As primary obligor and as separate, independent and alternative obligations, the Guarantor unconditionally and irrevocably agrees (i) that any sum which, although expressed to be payable by the Guarantor under this Deed, is for any reason (whether or not now existing and whether or not now known or becoming known to the Guarantor, the Guaranteed Party or the Third Party Beneficiary) not recoverable from the Guarantor on the basis of a guarantee will nevertheless be recoverable from it as if it were the sole principal debtor and will be paid by it to the Guaranteed Party on demand and (ii) as a primary obligation to indemnify the Guaranteed Party against any loss suffered by it as a result of any sum expressed to be payable by the Guarantor under this Deed, and otherwise in the manner specified in this Deed or any payment obligation of the Guarantor under this Deed being or becoming void, voidable or unenforceable for any reason (whether or not now existing and whether or not now known or becoming known to the Guaranteed Party); *provided* that the amount payable by the Guarantor under this indemnity shall be no greater than the amount it would have had to pay under Section 1(a) if the amount claimed had been recoverable on the basis of a guarantee.

    (c) This guarantee constitutes a guarantee of payment and the Guaranteed Party shall not have any obligation to enforce the Shipbuilding Contracts prior to being entitled to the benefits of this Deed. If BDL or SDL fails to pay any BDL Deferred Payment or SDL Deferred Payment on the due date thereof, the Guarantee Party shall proceed against the Guarantor, in the first instance, to enforce the obligations of the Guarantor hereunder without first proceeding against BDL or SDL, and without first resorting to any other

rights or remedies available to the Guaranteed Party. In furtherance hereof, if the Guaranteed Party is prevented by law from collecting or otherwise hindered from collecting or enforcing payment of the Guaranteed Obligations in accordance with the terms of the Shipbuilding Contracts, the Guaranteed Party shall be entitled to receive hereunder from the Guarantor after demand therefor, the sums which would have otherwise been due had such collection or enforcement not been prevented or hindered.

(d) In furtherance of the foregoing, if BDL or SDL fails to pay any BDL Deferred Payment or SDL Deferred Payment on the due date thereof, the Guaranteed Party, on behalf of itself and all persons claiming any interest in or through Guaranteed Party, hereby irrevocably agrees to waive any and all liens, charges, claims, mortgages and other encumbrances over or against BDL and SDL and each of its respective properties ..."

12. Clause 2 is entitled "Obligations Unconditional." It provides:
"This guarantee is a continuing guarantee which shall remain in full force and effect until all of the Guaranteed Obligations have been satisfied or performed in full, notwithstanding any intermediate satisfaction or performance of the Guaranteed Obligations by BDL or SDL, the Guarantor, or any other person. The obligations of the Guarantor under Section 1 are absolute and unconditional, irrespective of the value, genuineness, validity, regularity or enforceability of the obligations of BDL and SDL under the Shipbuilding Contracts, and, to the fullest extent permitted by applicable law, irrespective of any other circumstance whatsoever that might otherwise constitute a legal or equitable discharge or defense of a surety or guarantor, it being the intent of this Section 2 that the obligations of the guarantor hereunder shall be absolute and conditional under any and all circumstances. Without limiting the generality of the foregoing, it is agreed that the occurrence of any one or more of the following shall not alter or impair the liability of the Guarantor hereunder, which shall remain absolute and unconditional as described above:

(a) at any time or from time to time, without notice to the Guarantor, the time for any payment of any of the Guaranteed Obligations shall be extended or, such payments shall be waived; or

(b) any of the terms of all or any part of the Guaranteed Obligations, the Shipbuilding Contracts, or any agreement or instrument relating thereto, shall be modified, supplemented, novated (*novada*) or amended in any respect, or any right of the Guaranteed Party under the Shipbuilding Contract shall be waived or not exercised. For the avoidance of doubt this Deed and the guarantee granted hereunder shall extend to any variation of or amendment to the Shipbuilding Contracts insofar as any such variation or amendment affects the Guaranteed Obligations and to any agreement supplemental thereto between BDL, SDL and/or the Guaranteed Party."

13. Section 3 goes on to deal with "Waiver of Defenses". It provides that:
"The enforceability and effectiveness of this Deed and the liability of the Guarantor and the rights, remedies, powers and privileges of the Guaranteed Party under this Deed shall not be affected, limited, reduced, discharged or terminated, and the Guarantor hereby expressly waives to the fullest extent permitted by law any defense now or in the future arising, by reason of …"

14. The instrument then goes on to set out in sub-sections (a) to (e) a number of eventualities of which the only one I need refer to is (e):

> "Any other circumstance whatsoever that might otherwise constitute a legal or equitable discharge or defense of a surety or guarantor."

15. I now come to consider the two defences raised by the Defendant. The second defence, that is as to the scope of the guarantee, might appear to come first logically and that was how Mr Marcus Mander, counsel for the Defendant approached it in oral argument. I shall, however, follow the order taken by the parties in their written submissions, noting that if made out, the first defence, that is, as to unauthorised variation of the principal contract, provides a complete defence, whereas the second on the construction of the guarantee provides only a partial defence.

16. The principle is clear, at least in its application to guarantees in the sense of contracts of suretyship. A material variation to the principal contract will discharge the surety. This was established in the case of Holme v. Brunskill (1878) 3 QBD 495 (CA) 505. However, a surety will not be discharged by a variation to which it has consented, whether at the time, or in advance. As Mr Mander recognised, modern contracts of guarantee invariably contain provisions designed to circumvent the rule as in this case. Nevertheless, he submits that the principle does apply in this case. This is because, he submits, such provisions or consents only render the surety liable on the contract as varied where it remains a contract within the general purview of the original guarantee: see Trade Indemnity Co v. Workington Harbour [1937] AC 1 (HL), 21 to 22; Triodos Bank N.V. v. Dobbs [2005] EWCA 630 at [14] to [18], Longmore LJ, with whom Neuberger LJ agreed.

17. Applying those principles, the first question which arises, it is submitted, is whether the amendments effected by the Eighth and Twelfth Amendments were within the purview of the guarantee. If they were not, the further question arises whether the Defendant is nevertheless unable to claim that it is discharged by virtue of the various provisions of the guarantee relied upon by the Claimants, which the Claimants argue had the effect of creating a primary liability on the Defendant. In that respect Mr Mander submits that what was contemplated by the guarantee was the risk of BDL and SDL failing to pay the 11 deferred payments under the Seventh and Eleventh Amendments. The effect of the Eighth and Twelfth amendments, it is submitted, was to render the Defendant liable additionally for all the remaining milestone instalments due under each of the two contracts. Further, the Eighth and Twelfth Amendments contemplated further substantial delays in the delivery of both vessels, which would mean, it was submitted, further losses to SDL and BDL and a correspondingly higher chance of a claim on the guarantee accordingly. Since there were no words in the guarantee which indicated that the Defendant agreed to accept such an increased liability, the amendments which were made were impermissible variations, which were outside the purview of the guarantee. If the Claimants, or the financing banks, wished to obtain a guarantee of those wider obligations, a fresh guarantee was required.

18. For the Claimants, Mr Ashcroft QC submits that, in the cases upon which the Defendant relies, the changes that were held to fall outside the scope of the guarantees in question were so fundamental that they simply could not fairly be described as variations at all. In the Triodos Bank case it is submitted, the majority concluded: (1) that it was important to distinguish between a true variation of an existing obligation and the entering into of what is in fact a different obligation and; (2) that the relevant agreement was a "replacement on terms so different from the original agreement" that it "cannot be an amendment or variation of the initial contract." See Longmore LJ at [13] and [15].

19. In the present case the changes made by the Eighth and Twelfth Amendments plainly can and should be regarded as variations or amendments. The clear commercial purpose of the guarantee, it is submitted, supports the Claimants' construction. The financing banks were uncomfortable

    that any portion of the purchase price would be deferred until after delivery. As is clear from the terms of the guarantee itself, they wished to minimise the risk of the Claimants being able to pursue BDL and/or SDL and their assets following delivery of the rigs in respect of sums that were payable by BDL and/or SDL post-delivery. The clear commercial purpose strongly supports, it is submitted, a construction of the guarantee as extending to the increase in the deferred payment obligations effected by the Eighth and Twelfth amendments.

20. On this point my conclusion is as follows. If, on its true construction, the guarantee does not extend to the further sums which were added to the final milestone payments by the Eighth and Twelfth Amendments then, as Mr Mander recognised, there would be no scope for the application of the rule in Holme v. Brunskill, because these amendments would not be material to the Defendant's liability as guarantor. But that issue is in dispute, since the Claimants submit that the guarantee does extend to these amendments.

21. Leaving aside for a moment the answer to that question, which is the subject of the second defence, I consider that these amendments *were* clearly within the purview of the guarantee. The guarantee recognises in a number of places, for example clause 2, that the shipbuilding contracts may be amended "in any respect." It is true that the effect of the Eighth and Twelfth Amendments was substantially to increase the amount of "Adjusted Milestone 19" and "Adjusted Milestone 21" respectively. It may also, as Mr Mander submitted, have delayed the contractual timetable, increased costs, and the risk of the guarantees being called. But it is not in my view arguable that the Eighth and Twelfth Amendments constituted the entering into of what was in fact a different obligation rather than a true variation of an existing obligation. Applying the Triodos Bank case, the amendments were, in my view, clearly a true variation of an existing obligation. Consequently, I consider that the Defendant's contentions on this point are not arguable.

22. In any case, the rule in Holme v. Brunskill can be negatived by suitable contractual provisions. Clause 2(b) of the guarantee (set out above) is apt, in my view, to do so in this case. This provision makes it plain that the guarantor's liability is not to be impaired by amendments to the shipbuilding contracts. It states that the guarantee shall extend to any variation or amendment insofar as it affects the guaranteed obligations. I consider later whether or not this provision is sufficient to extend the scope of the guarantee to cover the Eighth and Twelfth Amendments, but it is certainly sufficient to protect against automatic discharge: see Andrews v. Millett, *Law of Guarantees*, 6th Ed, at pages 167 to 168

23. Mr Ashcroft QC for the Claimants has a further argument; in fact it has been his main argument. He submits, simply, that the "Deed of Guarantee and Indemnity" imposed primary obligations on the Defendant. He relies particularly on clauses 1(a), 1(b) and 2, which I have quoted. As a matter of law, he submits, amendments to the shipbuilding contracts do not operate to discharge the primary obligations contained in the deed. So, it is submitted, even if, contrary to the Claimants' case, the Defendant did not consent to the Eighth and Twelfth Amendments, the Defendant's primary obligations were not discharged anyway.

24. In response, the Defendant submits that clauses such as clause 1(a) and (b) are common and not generally sufficient in themselves to convert a guarantee into a contract of indemnity, and thus create a purely primary liability. Such a conclusion, it is submitted, would be inconsistent with the other provisions of the document. The document is described as a "guarantee". It relates to "Guaranteed Obligations" and recites that the Defendant has agreed to "guarantee" them. It also describes the Defendant as "the Guarantor" and the Claimants as the "Guaranteed Party." It contains numerous provisions designed to preserve the Defendant's liability in circumstances where it would be discharged were it a surety, none of which would add anything if the intention was to create a purely primary liability. Further, it is submitted that even if these provisions are

effective to create a truly primary liability, the mere fact that the guarantor's liability is partly primary does not prevent it from being discharged in circumstances where there is a variation to the principal contract, which is outside the purview or contemplation of the parties at the time when the guarantee was concluded.

25. It is submitted by the Defendant that the correct approach to a principal debtor clause is that it gives rise to the inference that the guarantor agreed not to be discharged by a variation, so avoiding the application of the rule in <u>Holme v. Brunskill</u>. Where the relevant variation is beyond what was contemplated, however, the position must be different. There can be no such inference and the clause is not to be construed as preserving the liability of the guarantor in those circumstances unless that is clearly stated.

26. My conclusions on the primary liability issue are as follows. As to the last point, I have already said that in my view the relevant variation did not go beyond what was contemplated. As regards to the Defendant's other submissions, I think that Mr Mander was right to say that the incorporation of a principal debtor clause will not usually suffice in itself to determine the nature of the contract. It will not automatically convert a guarantee into an indemnity. Ultimately, the question whether particular provisions are effective to covert the secondary liability created by a guarantee into a primary liability is one of construction of the instrument as a whole: see Sir William Blackburne's judgment in <u>Vossloh Aktiengesellschaft v. Alpha Trains</u> [2011] 2 All ER Comm 307 at [27] and [45].

27. Further, I do not think that it is clearly established on the authorities that the fact that an instrument imposes primary as well as secondary liability in itself negatives the rule in <u>Holme v. Brunskill</u>. It is established that the rule does not apply to a demand guarantee, which is an autonomous contract, (see <u>Marubeni Hong Kong Ltd v. Mongolian Govt</u> [2005] 1 WLR 2497 at [9], <u>WS Tankship II BV v Kwangju Bank Ltd</u> [2011] EWHC 3103 (Comm) at [143]), but this is not such an instrument.

28. Taken as a whole, however, in my view this deed imposed primary liability on the Defendant. This appears particularly clearly from clause 1(c), which provides that:
    > "If BDL or SDL fails to pay any BDL Deferred Payment or SDL Deferred Payment on the due date thereof, the Guaranteed Party shall proceed against the Guarantor, in the first instance, to enforce the obligations of the Guarantor hereunder without first proceeding against BDL or SDL and without first resorting to any other rights or remedies available to the Guaranteed Party."

    An obligation to proceed first against the guarantor to enforce the guaranteed obligations is inconsistent with the secondary liability created by a contract of suretyship, whether it contains "principal debtor" wording or not.

29. On this particular contract of guarantee therefore, whatever the position may be generally, I accept the Claimants' submission. I do not think that the rule in <u>Holme v. Brunskill</u> applies to the obligations created by this Deed which are primary in nature. For all these reasons, in my view, the Defendant has no real prospect of successfully contending that it was discharged from liability under the guarantee by the Eighth and Twelfth Amendments, even if they were made without the Defendant's consent as it claims.

30. That brings me to the second defence. The Defendant's short point is that what was guaranteed were the obligations of BDL and SDL under the Seventh and Eleventh Amendments: see clause 1(a) of the guarantee set out above. The defined "Guaranteed Obligations" comprised the "BDL Deferred Payments" and "SDL Deferred Payments," which were defined to mean the 11 deferred payments payable under the Seventh and Eleventh Amendments: see recital A. The "Guaranteed

      Obligations" were not therefore, it is submitted, defined to mean whatever amount might be comprised in Adjusted Milestones 19 and 21 as those terms might be defined from time to time, or whatever amounts might be due to the Claimants on or after delivery, but unpaid.

31. The Claimant's response is twofold. First it submits, for reasons that I have already set out, that the commercial purpose of the transaction strongly supports a construction that extends the guarantee to the payment obligations in the Eighth and Twelfth Amendments. Second, it refers to clause 2(b) of the guarantee, which provides in the second sentence as follows:
    > "For the avoidance of doubt this Deed and the guarantee granted hereunder shall extend to any variation of or amendment to the Shipbuilding Contracts insofar as any such variation or amendment affects the Guaranteed Obligations and to any agreement supplemental thereto between BDL, SDL and/or the Guaranteed Party."

    This language, these Claimants submit, makes it explicit that the guarantee does extend to amendments of the shipbuilding contracts such as the Eighth and Twelfth Amendments.

32. As to this point, the Defendant submits that this sentence has to be construed in context. It is placed, not in clause 1, which defines the scope of the guarantee, but in clause 2, which is to do with the nature of the obligations. The meaning of clause 2(b), it is submitted, is shown by the introductory words:
    > "Without limiting the generality of the foregoing, it is agreed that the occurrence of any one or more of the following shall not alter or impair the liability of the Guarantor hereunder, which shall remain absolute and unconditional as described above:"

    So, the argument goes, the second sentence of clause 2(b) is apt to show that the guarantee is not to be impaired by amendments of the Shipbuilding Contracts, but not to extend the guarantee to cover such amendments.

33. In my view, the commercial purpose and background, both of which are in dispute, may be significant in resolving this issue. Further, and in any event, the Claimant's factual case, again in dispute, is that the Defendant consented to the amendments and acknowledged that the guarantee extended to them by signing further agreements called the "BDL and SDL Advance and Equity Conversion Agreements" dated 23rd August, 2010.

34. However, these factual issues cannot be resolved at the summary judgment stage. I have to decide whether the Defendant has a real prospect of showing that its construction of the guarantee is the right one. In my view, it does.

35. As I have said, on the basis that I have rejected its discharge defence, the Defendant accepts that the guarantee continues to apply in respect of the amounts originally covered (prior to the increases) and that it is liable for those amounts. The Claimants are entitled to summary judgment to that extent. I have no doubt that the parties can agree the figures.