# EXHIBIT   60



Neutral Citation Number: [2013] EWCA Civ 644

Case Nos: A3/2012/1404

**IN THE COURT OF APPEAL (CIVIL DIVISION)**
**ON APPEAL FROM HIGH COURT OF JUSTICE**
**(QUEEN'S BENCH DIVISION) (COMMERCIAL COURT)**
**BLAIR J**

Royal Courts of Justice
Strand, London, WC2A 2LL

Date: Friday 7th June 2013

Before :

**LADY JUSTICE ARDEN**
**LORD JUSTICE MCCOMBE**
And
**SIR BERNARD RIX**
- - - - - - - - - - - - - - - - - - - - -
Between :

|  |  |
|---|---|
| **(1) CIMC Raffles Offshore (Singapore) Limited** <br> **(2) Yantai CIMC Raffles Offshore Limited** | **Appellants/** <br> **Claimants** |
| - and - |  |
| **Schahin Holding SA** | **Respondent** <br> **/Defendant** |

(Transcript of the Handed Down Judgment of
WordWave International Limited
A Merrill Communications Company
165 Fleet Street, London EC4A 2DY
Tel No:  020 7404 1400, Fax No: 020 7831 8838
Official Shorthand Writers to the Court)

**Mr Christopher Butcher QC & Mr Marcus Mander** (instructed by **Linklaters LLP**) for the
**Appellants**
**Mr Michael Ashcroft QC & Mr David Lewis** (instructed by **Curtis Davis Garrard LLP**) for
the **Respondent**

Judgment
As Approved by the Court

Crown copyright©

**Sir Bernard Rix :**

1.      This appeal concerns the summary enforcement of a guarantee. The guarantee was given by a holding company for the sums due on delivery of two drilling rigs to their buyers, being two companies within the holding company's group. The guaranteed party was the builder of the rigs, and the guarantee was concerned with payment of the sums due on delivery under variations of the building contracts designed to take account of the failure of the builder to build the rigs on time. After the guarantee was made, the sums due on delivery were substantially increased by further agreement between the builder and the buyers, and the delivery dates were also delayed. The sums due on delivery were payable in twelve instalments over a period of one year from delivery, and the later increase was because more of the contracts' stage payments were postponed to the time of delivery. The builder sues to enforce its guarantee, and it claims not merely the sums originally guaranteed, but the substantially larger sums ultimately due under the latest variation of the shipbuilding contracts. The guarantor submits: that the guarantee has been discharged by reason of the changes in the buyers' obligations made without its consent, and in any event does not cover the larger liability. The builder ripostes: that the guarantee expressly extended to such variations, and was also so worded as to impose primary liability on the guarantor and thus to avoid all doctrines designed to protect a secondary party such as a guarantor from being prejudiced by material changes to the underlying contract. The judge held that the guarantee has not been discharged and that the guarantor is liable at least for the lesser sums due under the originally guaranteed variations of the building contracts; but that the question of any larger guaranteed liability would have to go to trial because matters of factual background were relevant to that question.

2.      The guarantor appeals against the summary judgment to pay the sums originally guaranteed to the builder; and the builder cross-appeals the judge's decision to give leave to defend to the guarantor in respect of the greater amount due to the builder under the final variation of the underlying contracts.

*The parties and the guaranteed contracts*

3.      The claimants in this litigation, CIMC Raffles Offshore (Singapore) Limited (formerly known as Yantai Raffles Shipyard Limited) and Yantai CIMC Raffles Offshore Limited (formerly known as Yantai Raffles Offshore Limited), operate a shipyard in China. It is unnecessary to distinguish between them. I will refer to them as the "builder". In this court they are respondents.

4.      The buyers are Baerfield Drilling LLC ("Baerfield") and Soratu Drilling LLC ("Soratu") (together, the "buyers"). In 2006 they entered into shipbuilding contracts with the builder for the construction of two semi-submersible drilling rigs. The

contract price for each rig was US$234 million. The rigs were purchased for the purpose of letting to Petrobras SA, the major Brazilian state oil and gas company, under long term charters. The guarantee and the judgment below also refer to Baerfield and Soratu as BDL and SDL respectively.

5.      Baerfield and Soratu are part of a group of companies active in the offshore oil and gas industry (known as Schahin Offshore Operations) ultimately owned and controlled by the Schahin family of Brazil.

6.      The guarantor is Schahin Holding SA, the defendant in this litigation and in this court the appellant (the "guarantor"). The guarantor is the holding company of other interests of the Schahin family, known as Grupo Schahin, which is active in real estate, electricity, telecommunications, engineering as well as oil and gas. The guarantor's only role in the transactions with which this litigation is concerned was as guarantor.

7.      Any facts to which I refer in this judgment are based on the evidence in the case, which, because the litigation is still at the stage of either summary judgment (in part) or pre-trial proceedings (in part), are not yet findings of any court and may be more or less controversial. Of course, the various transactions speak for themselves, and the question at this stage is whether they speak sufficiently clearly.

8.      The builder was late in constructing and delivering the rigs, which has put the buyers in turn in difficulties with Petrobras. There is currently an arbitration between the builder and the buyers concerning the final bill. The buyers say that payments otherwise due to the builder on delivery have been more than swallowed up in a set-off for damages for defective construction and delayed delivery. The builder seeks to recover the nominal amounts due on delivery, as varied by variations of the shipbuilding contracts, under the guarantee which is the subject-matter of this litigation.

9.      In the course of the shipbuilding contracts, various amendments were made to them. We are concerned with the seventh and eighth amendments to the Baerfield contract and the eleventh and twelfth amendments to the Soratu contract.

10.     On 27 September 2009 the seventh and eleventh amendments to the respective contracts were entered into. The guarantee is dated 18 December 2009. I shall call these earlier amendments the "pre-guarantee" amendments. The eighth and twelfth amendments to the contracts were entered into on 24 May 2010. I shall call these later amendments the "post-guarantee" amendments.

11.     Among other matters dealt with in the pre-guarantee amendments was the problem of an increase in project costs caused to the buyers by the delays in construction and the insufficiency of financing to cover them. The builder and the buyers therefore agreed to defer the greater portion of the final "Milestone Payment" due on delivery to the year following delivery, by which time it was anticipated that the rigs would be generating revenue under the Petrobras charters. Thus only one-twelfth of this final payment instalment would be made on delivery and the balance would be paid in eleven monthly instalments thereafter. In the case of Baerfield, the delivery payment ("milestone 19"), net of substantial liquidated damages for delay, was nearly $36 million. This was called "Adjusted Milestone 19". It was payable as to just under $3 million on delivery, and by eleven monthly instalments of $3 million. In the case of Soratu, the "adjusted milestone 21", net of liquidated damages, was just over $35 million, payable in twelve instalments in the same way.

12.     The amendments provided for the setting up of an account into which part of the proceeds from the rigs' earnings would be paid to secure and support the due payment of the post-delivery instalments.

13.     The post-guarantee amendments were caused by still further delays to the construction and delivery of the two rigs. The builder and the buyers therefore agreed to a substantial rescheduling of outstanding milestone payments, going significantly beyond the final milestones due on delivery. Thus in the case of the Baerfield contract the 13th to 18th milestones were all deferred to the time of delivery and the total of these instalments, plus "Adjusted Milestone 19" under the pre-guarantee amendment, were redefined as a new "Adjusted Milestone 19". The new total deferred to delivery was now, net of liquidated damages for delay, nearly $51 million. This was, as before, to be paid over a year (in fact eleven months) in twelve instalments beginning with delivery. Each instalment was now nearly $4.25 million. In the case of Soratu, the newly re-adjusted "adjusted milestone 21" now included the deferred 15th to 20th milestones, to give a total due on delivery, payable in twelve instalments of over $4.7 million, of some $57 million.

14.     Delivery dates were also re-adjusted. Ultimately, the Baerfield rig was delivered on 25 April 2011 (the pre-guarantee revised delivery date had been 30 September 2010); and the Soratu rig was delivered on 15 November 2010 (the pre-guarantee revised delivery date had been 30 September 2010).

15.     It probably makes sense, for the sake of clarity, to define the re-adjusted "Adjusted Milestone 19" and "Adjusted Milestone 21" under the post-guarantee amendments as the "Re-adjusted Milestones".

*The guarantee*

16.   It will be necessary to set out large parts of the guarantee, which I have done in Annex A to this judgment. In this section I shall limit citation to the critical wording over which there has been debate.

17.   On the present evidence the guarantee was not required by the builder, which, because of its defaults, was hardly in a position to demand one, but by the banks financing the projects. The banks were concerned, in the light of the pre-guarantee amendments, that if part of the payments due to the builder were to be outstanding after delivery, and if the buyers and the builder were to look to post-delivery earnings of the rigs to support the buyers' instalments (which was the logic of the deferral of eleven-twelfths of the delivery milestone), then there was a potential clash between banks and builder in the post-delivery scenario. This is reflected in recitals (b) and (c) of the guarantee, which refer to an Amended and Restated Credit Agreement (also dated 18 December 2009, the same day as the guarantee) and to the need to "induce the Lenders" to enter into it, and to the builder's agreement "to waive certain liens, charges, claims, mortgages and other encumbrances" which the builder may have against the rigs and the buyers. That waiver is provided for in section 1(d) of the guarantee, albeit it is balanced by a proviso at the end of that sub-clause which allows the builder to enforce its guarantee inter alia by looking to the account for which the pre-guarantee amendments made provision and into which part of the earnings of the rigs was to be paid to secure and support the post-delivery deferred instalment obligations. It is also reflected in section 6 of the guarantee ("Third Party Beneficiary") whereby the banks are made a third party beneficiary and entitled as such to enforce payment of the guarantee.

18.   It may be that it was for this reason that the guarantee contains language reminiscent of banking guarantees, and even of on demand performance bonds. However, Mr Michael Mander, counsel for the builder, volunteered that he does not say that the guarantee is a performance bond or demand guarantee as such bonds are sometimes called, but that it is like such instruments in that it contains provisions for its operation autonomously from the position under the underlying transactions. There is nothing in the judgment below which depends on regarding the guarantee as a demand guarantee or performance bond. On the contrary the judge expressly stated that the guarantee was *not* a demand guarantee (at para [27]) and there is no appeal from that decision.

19.   The guarantee, which is called "Deed of Guarantee and Indemnity", refers to the pre-guarantee amendments in its recital (a). It defines the outstanding eleven post-delivery instalments under adjusted milestones 19 and 21 under those amendments as the

"Deferred Payments". That expression then becomes, under section 1(a) of the guarantee, the defined content of the "Guaranteed Obligations":

> "The Guarantor hereby absolutely, unconditionally and irrevocably guarantees to the Guaranteed Party…as primary obligor and not merely as surety, the due and punctual payment in full of the BDL Deferred Payments and the SDL Deferred Payments as and when the same shall become due (the "Guaranteed Payments")."

20. Section 1 is headed "Guarantee and Indemnity". Section 1(a) already made reference to the guarantor being a "primary obligor and not merely as surety". That is developed in section 1(b), which states that the guarantor agrees "as separate, independent and alternative obligations" that: (i) any sum not recoverable "on the basis of a guarantee" shall nevertheless be recoverable "as if it [the guarantor] were the sole principal debtor"; and (ii) the guarantor bears "a primary obligation to indemnify" the builder against any loss suffered by it as a result of any sum or payment obligation becoming "void, voidable or unenforceable for any reason". However, section 1(b) concludes with a proviso that limits the guarantee to the amount recoverable by way of guarantee under clause 1(a), viz to the eleven deferred instalments under the pre-guarantee amendments:

> "*provided* that the amount payable by the Guarantor under this indemnity shall be no greater than the amount it would have had to pay under Section 1(a) if the amount claimed had been recoverable on the basis of a guarantee."

21. On behalf of the guarantor it is submitted that this proviso makes it impossible to construe the guarantee as covering the higher sums due post delivery under the post-guarantee amendments. The guarantor also submits that the alteration of the structure and amount of the payments deferred until after delivery of the rigs under the post-guarantee amendments means that the guarantee is discharged in the absence of the guarantor's consent to those changes. It is in dispute whether the guarantor did so consent in the period after the guarantee was given. The builder says it did, the guarantor says it did not. That is a factual issue which the judge recognised had to go to trial. However, the guarantor submits that that factual issue does not matter because the guarantee itself provided for consent to such changes *in advance* of them. For these purposes the guarantor relies on section 2.

22. Section 2 is headed "Obligations Unconditional" and appears to be directed at removing any defence based on the *Holme v. Brunskill* (1878) 3 QBD 495 (CA) doctrine whereby a material variation to a guaranteed contract without a guarantor's consent may lead to the discharge of a guarantee. Thus section 2 says in part that –

"…The obligations of the Guarantor under Section 1 are absolute and unconditional…irrespective of any other circumstance whatsoever that might otherwise constitute a legal or equitable discharge or defense of a surety or guarantor, it being the intent of this Section 2 that the obligations of the Guarantor hereunder shall be absolute and unconditional under any and all circumstances. Without limiting the generality of the foregoing, it is agreed that the occurrence of any one or more of the following shall not alter or impair the liability of the Guarantor hereunder, which shall remain absolute and unconditional as described above:

(a)  at any time or from time to time, without notice to the Guarantor, the time for any payment of any of the Guaranteed Obligations shall be extended, or such payment shall be waived; or

(b)  any of the terms of all or any of the Guaranteed Obligations, the Shipbuilding Contracts, or any agreement or instrument relating thereto, shall be modified, supplemented, novated (*novada*) or amended in any respect, or any right of the Guaranteed party shall be waived or not exercised. For the avoidance of doubt, this Deed and the guarantee granted hereunder shall extend to any variation of or amendment to the Shipbuilding Contracts insofar as any such variation affects the Guaranteed Obligations and to any agreement supplemental thereto between BDL, SDL and/or the Guaranteed Party."

23.  It is to section 2(b), as well as to section 1(b), that most of the disputed submissions of the parties have been directed. The guarantor in particular relies on section 2(b)'s language "shall extend to any variation of or amendment to the Shipbuilding Contracts", both to found its claim for the outstanding instalments under the post-guarantee amendments and to rebut the guarantor's complaint that those post-guarantee amendments have discharged the guarantee.

24.  I would at the outset make certain observations about the structure of section 2. First, everything there said is said in the context of the guaranteed obligations under section 1 and those are prima facie limited to the eleven post delivery instalments under the pre-guarantee amendments (see, for instance, the opening words cited above – "The obligations of the Guarantor under Section 1"). Secondly, the first sentence cited above sets out the general stipulation of unconditionality, and the second sentence then sets out examples of such unconditionality, starting with the words "Without limiting the generality of the foregoing". Prima facie, therefore, those examples should not extend the scope of the first sentence, but of course may assist in its interpretation. Thirdly, the two examples given under section 2(a) and (b) are expressly stated as examples of matters that "shall not alter or impair the liability of the Guarantor hereunder", rather than as matters that might increase its liability. Fourthly, the second sentence of section 2(b), which begins with the words "For the avoidance of doubt", is therefore given as an example of amendments of the shipbuilding contracts (the subject-matter of the first sentence under section 2(b))

which similarly shall not alter or impair the liability of the guarantor under the guarantee.

25.  Section 3 is headed "Waiver of Defenses". It expressly waives any defence by reason of –

> "(c) any counterclaim, set-off or other claim which BDL, SDL or the Guarantor has or claims with respect to any part of the Guaranteed Obligations…
>
> (e) any other circumstance whatsoever that might otherwise constitute a legal or equitable discharge or defense of a surety or guarantor."

*The argument below*

26.  The builder's claim form claimed $60,612,857.06 pursuant to the guarantee, that is the sums deferred under the post-guarantee amendments, alternatively damages or an indemnity in the like amount. Its particulars of claim assert (at para 19) that the guarantee "covered and extended" to such payments, but these were now variously calculated at up to $77,603,750.70. The difference between that sum and the sum for which the builder obtained summary judgment is currently pleaded as $45,195,574.71 (plus interest). I am not certain how these figures work, but the outstanding figure of some $45 million is nearly equal to the sum for which the order below gave judgment which, less the $4 million odd interest also allowed, was some $49 million.

27.  Summary judgment was applied for before the service of any defence. But the judge, Blair J [2012] EWHC 1758 (Comm), identified two defences as having been raised by the guarantee:

> "6…The Defendant raises two defences. First, it contends that, applying established principles, the Defendant was discharged from liability under the guarantee by the Eighth and Twelfth [the post-guarantee] Amendments made to the shipbuilding contracts without its consent in May 2010. I shall call this the *Holme v. Brunskill* defence, after the name of the leading case. Second, if that is wrong and it was not discharged from liability, the defendant submits that on a correct construction of the guarantee it is not liable for the further sums which were added to the final milestone payments by the Eighth and Twelfth Amendments. On this basis, the Defendant accepts that the guarantee continues to apply in respect of the amounts originally covered (prior to the increases) and that it is liable for those amounts."

28.     Although the judge there referred to the first defence as being the *Holme v. Brunskill* defence, it may be truer to say that it was a defence based on the submission that the clauses designed to exclude a *Holme v. Brunskill* defence failed to do so because the post-guarantee amendments fell outside the "general purview" of the guarantee. The leading case in respect of this development of doctrine is not *Holme v. Brunskill* but *Trade Indemnity Company Limited v. Workington Harbour and Dock Board* [1937] AC 1.

*The judgment below*

29.     The judge rejected the first defence. He considered that the post-guarantee amendments were within the purview of the guarantee and that it was not arguable otherwise. The amendments were not "a different obligation rather than a true variation of an existing obligation". It is not clear whether he came to this conclusion irrespective of the wording of the guarantee, because he referred to section 2 of the guarantee as supportive of his conclusion. He did so first at para [21] of his judgment, where he observed that section 2 allows that the shipbuilding contracts may be amended "in any respect". He did so again at para [22], where he referred specifically to section 2(b)'s provisions that amendments to the shipbuilding contracts "shall not impair" the guarantor's liability and that the guarantee "shall extend to" any variation or amendment thereof. Thirdly, he considered that the *Holme v. Brunskill* defence could be and was excluded by provisions making the guarantor a primary obligor.

30.     As to that last matter, the judge recognised that "the incorporation of a principal debtor clause will not usually suffice in itself to determine the nature of the contract. It will not automatically convert a guarantee into an indemnity" (at para [26]). Moreover, authority had not clearly established that the imposition of primary as well as secondary authority in itself negatived the rule in *Holme v. Brunskill*, save in the case of a demand guarantee, which our guarantee was not (at para [27]). However, what was decisive in this case was section 1(c) (at para [28]). That provided as follows:

> "If BDL or SDL fails to pay any BDL Deferred Payment or SDL Deferred Payment on the due date thereof, the Guaranteed Party shall proceed against the Guarantor, in the first instance, to enforce the obligations of the Guarantor hereunder without first proceeding against BDL or SDL and without resorting to any other rights or remedies available to the Guaranteed Party."

31.     I have to say, however, with respect to the judge, that section 1(c), far from being decisive, strikes me as being a fairly standard recognition that there never is any need for a guaranteed party to sue the principal obligor first before proceeding against a guarantor. I do not consider that section 1(c) throws any light at all on the issue of

whether the primary obligor provisions of the guarantee in this case exclude the *Holme v. Brunskill* doctrine, or, more to the point, demonstrate that the "general purview" doctrine of *Trade Indemnity* is side-stepped.

32.    For the reasons indicated above, the judge concluded that the guarantor had no real prospect of successfully contending that it was discharged from liability.

33.    The judge then turned to the guarantor's second defence, which assumed in the alternative that the guarantee had not been discharged. On this point, the judge was in the guarantor's favour in as much as he concluded that a trial would be necessary. Despite the builder's reliance again on section 2(b)'s language that the guarantee "shall extend" to any variation of the shipbuilding contracts, the judge accepted that there was a serious argument that in context "shall extend" meant no more than that any variation "shall not alter or impair" the guarantor's liability. The judge then expressed the following important conclusion about the facts of the case:

> "33. In my view, the commercial purpose and background, both of which are in dispute, may be significant in resolving this issue. Further, and in any event, the Claimant's factual case, again in dispute, is that the Defendant consented to the amendments…
>
> 34. However, these factual issues cannot be resolved at the summary judgment stage. I have to decide whether the Defendant has a real prospect of showing that its construction of the guarantee is the right one. In my view, it does."

*The cross-appeal*

34.    It seems to me more convenient to consider the builder's cross-appeal first: for if the builder were right that there is no defence to the proposition that the guarantee expressly extends to the greater sums deferred under the post-guarantee contracts, then that would be an end of the litigation. If the builder were to be correct in this point, then plainly it would be hopeless for the guarantor to contend that the post-guarantee amendments were not "within the purview" of the guarantee. Whether that is a question of pure construction, even if a special rule for the interpretation of guarantees, as Mr Michael Ashcroft QC submits on behalf of the builder, or a rule of law created by a special equitable consideration for guarantors deriving from the rule in *Holme v. Brunskill*, as Mr Christopher Butcher QC submits on behalf of the guarantor, nevertheless if the guarantee expressly covers the higher sums deferred under the post-guarantee amendments, then, as it seems to me, the issue between the parties is decided. On the other hand, if the cross-appeal were to fail, for the reasons given by the judge, namely that the process of construction cannot safely be completed without regard to the factual matrix and thus without trial, then in my judgment one would have to approach the guarantor's appeal relating to the

"purview" of the guarantee with caution to see whether there is some reason why that issue could still be treated as a pure question of law, irrespective of the guarantee's factual matrix, and thus could be disposed of summarily without trial.

35.    Mr Ashcroft, both in his written skeleton, and in his oral submissions, argued the cross-appeal relatively lightly. He nowhere addressed the judge's concern that the issue could not be decided without reference to the factual matrix. He merely submitted that, on what he called a short point of construction, the guarantor had no reasonable prospect of establishing that the guarantee did not extend to the further liabilities under the post-guarantee amendments or amount to consent in advance to the guaranteeing of those further liabilities. He submitted that the language of section 2, and in particular section 2(b)'s "shall extend to any variation", constituted not merely an answer to the *Holme v. Brunskill* problem that a variation of an underlying contract might lead to the discharge of a guarantor, but a positive consent to the additional post-delivery obligations created by the post-guarantee amendments.

36.    In my judgment, however, this submission must fail. Without seeking to address the judge's concerns about the factual matrix, which we were never invited to do, this court could not properly reverse the commercial judge's view that a trial is necessary. The matter, however, goes much further than that. I would refer to my observations at para [24] above about the structure of section 2. In the light of those observations, I consider that there is a powerful argument that the language of "extend to", which is the high-point of Mr Ashcroft's submission, has to be considered in the light of the section as a whole: and that is primarily concerned with avoiding the possibility of "a legal or equitable defense or discharge" and with a stipulation that waiver or any variation or amendment "shall not alter or impair the liability of the Guarantor hereunder". In that context, it is reasonable to see that "shall extend to" means no more than "shall survive". Moreover, and, as it seems to me, of great significance, the question immediately arises: what is the "liability of the Guarantor hereunder"? Prima facie the answer to that is the "Guaranteed Obligations" as defined by section 1(a), and those appear to me to be limited to the deferred post-delivery instalments under the pre-guarantee amendments. The limitation on the *amount* for which the guarantee provides appears to me to be underlined by the proviso at the end of section 1(b): "*provided* that the amount payable by the Guarantor under this indemnity shall be no greater than the amount it would have to pay under section 1(a)…". After all, the guarantee nowhere purports to be an "all monies" guarantee. I observe that the judge also, in passing, adverted (at his para [30]) to the guarantor's reliance on the definition of the guaranteed obligations.

37.    I would therefore dismiss the cross-appeal. It follows that there has to be a trial in which the true interpretation of the guarantee, for the purpose of considering whether or not it extends to the much greater post-delivery payments provided for by the post-guarantee amendments, will have to be considered in the light of its factual matrix.

*The appeal*

38.    In these circumstances I approach the appeal on the basis that it is not possible to decide, without a trial, whether or not the builder is correct to submit that the guarantee extends expressly to cover any amount which subsequent amendment to the shipbuilding contracts may have provided should be deferred after delivery of the respective rigs, or whether the guarantor is correct to submit that the language relied on by the builder for that purpose only relates to the exclusion of the *Holme v. Brunskill* doctrine whereby a material amendment to an underlying contract may discharge a guarantee.

39.    The issue on the appeal, however, is closely related to the issue which must go to trial. It is whether the "anti-discharge" or "anti-avoidance" provisions of the guarantee, that is to say the guarantee's provisions designed to avoid the consequences of the *Holme v. Brunskill* doctrine, go so far as to cover or extend to, not just any variation of the shipbuilding contracts but, a variation of such a kind as to lie outside "the purview" of the guarantee. If they do not, then the further question arises whether the post-guarantee amendments might be said to lie outside the purview of the guarantee. Whether those are pure questions of construction, or whether they depend on a rule of law necessarily influenced by issues of contractual interpretation, a matter about which the parties are in dispute, it seems to me to be inevitable that those questions must be closely aligned to the issue of the meaning of the guarantee which arises on the cross-appeal. It is therefore only if the answer to the "purview" issue is one on which there could be no reasonable prospect of any uncertainty such as the guarantee's factual matrix might assist to resolve that it would be proper or fair for a court to give summary judgment in advance of trial.

40.    In order to examine this issue, analysis suggests that four matters need to be investigated. (i) What is the purview doctrine? (ii) Do the anti-avoidance provisions of the guarantee, including the provisions for the guarantor's liability as a primary obligor, exclude the purview doctrine? (iii) If they do not, are the post-guarantee amendments sufficiently fundamental to lie outside the guarantee's purview? (iv) Can these questions be answered sufficiently confidently, in the absence of reviewing the matrix of the guarantee, to admit of summary disposal?

41.    *(i) What is the purview doctrine?* The leading authority is *Trade Indemnity Company Limited v. Workington Harbour and Dock Board* [1937] AC 1. That case concerned construction works the performance of which was required by the employer to be guaranteed by an insurance company. A guarantee up to the amount of £50,000 was provided. The work proved unexpectedly difficult and the constructor required further funds. The employer provided an additional £45,000, but the constructor went into liquidation. The employer's engineer's final certificate included the loan in a figure

due from the guarantor, but it was held that the loan was outside and independent of the contract and thus should not have been within the engineer's certificate. This was despite language within the guarantee to the effect that the guarantor should not be "released or discharged…by any agreement…for any alteration in or to the said works or the contract".  The effect was that the claim against the guarantor failed, but I rather think that this was not because the guarantee was discharged, but rather because the loan was an entirely extraneous matter.

42.     It was in this context that Lord Atkin said (at 21):

> "The words "any arrangement…for any alteration in or to the said works or the contract" are very wide. Probably they would have to be cut down so as not to include such changes as have been suggested as substituting a cathedral for a dock, or the construction of a dock elsewhere, or possibly such an enlargement of the works as would double the financial liability. An author of great authority [*Rowlatt on Principal and Surety, 2nd ed. (1926), p. 118*], happily still with us, suggests that such words only relate to alterations "within the general purview of the original guarantee"."

Thus this observation is not a decision of any kind, but it is the judicial basis of the doctrine that even very wide words in a guarantee's anti-avoidance clause may not cover something that goes beyond the parties' reasonable contemplation.

43.     *The Nefeli* [1986] 1 Lloyd's Rep 339 concerned an extension to a charterparty. Bingham J held that there was no guarantee, but he went on to hold that if any guarantee had been given, it would not have covered the extension of the charterparty for a further year. Bingham J cited Lord Atkin's observation from the *Trade Indemnity* case, and continued (at 345):

> "Had the *Nefeli* charter been for 12 months with an option for the charterers to renew for a further 12 months, a mere exercise of that option might very well not, in my judgment, have taken the extended charter outside the general purview of the original guarantee. But that was not the position. This was a 12 month charter with no option. When the extension was agreed the charter had run for six months only. The effect of the charter [*sc* the extension] was greatly to increase the potential liability of the guarantor, the more so since the charter would last long after the end of the existing sub-charter. The original guarantee did not apply to this, and it makes no difference that the extension was agreed by means of an addendum rather than a separate contract to take effect at a future date."

44.     As I understand *The Nefeli*, the purview doctrine was not applied to the scope of a guarantee's anti-discharge provisions but to the scope of the guarantee itself: did it

apply to the charter's extension? Bingham J held that it did not, and that the extended charter was outside the guarantee's purview. If the original charter had already contained the possibility of an extension, that might have been different. The form in which the charter was extended did not matter. Moreover, no question of discharge arose.

45.     *The Kalma* [1999] 2 Lloyd's Rep 374 was another case about a guarantee of a charter, but there the guarantee did exist and moreover contained an anti-discharge provision: "It is further agreed that our obligations under this letter of guarantee are not altered…by reason of any extension for payment being given by you to [the charterer]…or by any variation in the terms of the charter…" By an addendum to the charter, which had been for a time charter trip of a minimum two months, a further six/eight month trip was added. A second addendum gave the option of a further voyage. It was held that the two addenda were not variations within the purview of the guarantee. Cresswell J said that "They were so fundamental that they could not properly be described as a variation at all." However, the questions posed to Cresswell J did not raise the issue of discharge of the guarantee.

46.     *Triodos Bank NV v. Dobbs* [2005] EWCA Civ 630, [2005] 2 CLC 95 concerned a guarantee of two 1996 loan agreements. The loans were to finance a construction project. In time, phase two of the project led to the provision of further finance in 1998 and again in 1999. By 1999 the original 1996 finance of £900,000 had risen to £2.6 million, albeit the defendant guarantor's liability was capped throughout at just £50,000. The question was whether the original guarantee extended to the borrowing under the latest, 1999, facility. It contained an "anti-discharge" clause (clause 2.4.1, see at para [7]) to the effect that the bank could "at any time as it thinks fit and without reference to the Guarantor…grant time for payment or grant any other indulgence or agree to any amendment, variation, waiver or release in respect of an obligation of the Company under the Loan Agreement". Summary judgment was given at first instance against the guarantor. In this court, however, the judgment was reversed, and the claimant was left to trial on an alternative case of estoppel by convention.

47.     Longmore LJ held that even if the 1999 facility could be regarded as an amendment or variation within clause 2.4.1, nevertheless "a replacement on terms so different from the original agreement…cannot be an 'amendment or variation' of the initial contract" (at [13]). Having referred to *Trade Indemnity*, he also said (at para [14]) that on the same hypothesis, namely that even if in principle the 1999 facility was such an amendment or variation, "the question would still arise whether it was 'within the general purview of the original guarantee'." At para [18] he said that "this requirement is still law". He concluded that the 1999 facility was not within the purview of the original agreements.

48.     Neuberger LJ agreed. Chadwick LJ approached the matter rather as one of pure construction. He did not refer to *Trade Indemnity* or to the purview doctrine, but asked himself whether the later agreements were "within the scope of the 1996 guarantee" (at para [33]). He thought that some of the subsequent facilities were, but that the ultimate 1999 facility was not. In a paragraph which sets out his reasoning in some detail, there are resonances for the present case. He said:

> "34. It is important to keep in mind that the underlying obligation of the guarantor under the 1996 guarantee – clause 2.1 – is in respect of monies and liabilities due, owing or incurred by the Company 'under or pursuant to' the 1996 loan agreements. It is important to keep in mind, also, that the guarantor is not to be taken to have agreed that his liability under the guarantee would be increased or made more onerous by a subsequent agreement made between the lender and the borrower (to which he is not a party) unless there are clear words in the guarantee which show that he did agree to be bound to a more onerous obligation in the future imposed without further reference to him. In the present case, clause 2.4.1 of the 1996 guarantee, read with clause 2.1, exposed the guarantor to the risk that his liability in respect of obligations of the Company under the 1996 agreement might be made more onerous by an amendment or variation *of those obligations*. Clause 2.4.1 did not expose him to the risk of liability in respect of additional obligations of the Company which were not properly to be regarded as an amendment or variation of existing obligations."

49.     Transposing those remarks into the context of the present dispute, I observe that the question becomes: whether clause 2's anti-discharge provisions are concerned with amendments of the existing obligations guaranteed (or as section 2(b) says: "any variation of or amendment to the shipbuilding contracts *insofar as any such variation or amendment affects the Guaranteed Obligations"* (emphasis added)), that is the obligations to pay the post-delivery deferred instalments of the delivery payments (adjusted milestones 19 and 21) under the pre-guarantee amendments; or on the other hand whether they also cover subsequent amendments to the shipbuilding contracts which add substantially to those existing obligations by linking to them *prior* milestone payments which are additionally deferred to the time of, and after, delivery.

50.     *Triodos* was applied by Andrew Smith J in *Sea Emerald SA v. Prominvestbank Joint Stockpoint Commercial Industrial and Investment Bank* [2008] EWHC 1979 (Comm), [2008] 1 Lloyd's Law Rep Plus 96. The claimant sued the bank on the latter's guarantee to refund payments made to a shipyard under a shipbuilding contract. The claim failed because the guarantee was given without authority. However, Andrew Smith J went on to consider what the position would have been if the guarantee had been valid. In that connection he reasoned as follows:

> "142…However, even where the subsequent agreement is one to which the guarantor has assented (under the terms of the guarantee itself or separately), it must be within the "general purview" of the original guarantee if the guarantor is

to remain liable. As I understand the judgment of Longmore LJ (especially at para 18), that is a distinct requirement of law, not simply a matter of the interpretation of the provision of the guarantee providing for a variation, but on the facts of this case, it does not matter…"

The judge then said that on his interpretation of the guarantee, there would have been no discharge; but that on a different interpretation there would have been, since in that case the payments concerned were not paid by way of instalments of the price, still less reflecting progress in construction of the vessel (at para [145]).

51.  So what is the purview doctrine? Is it a doctrine of pure construction, albeit of particular application to contracts of guarantee? Or is it a doctrine of law, reflecting the equitable concerns of *Holme v. Brunskill*, however much it may be influenced by matters of interpretation? There is something for both theories in the cases cited above, and the matter has not perhaps been authoritatively resolved. Moreover, the above cases show the purview doctrine applied in two situations. In one situation, such as *The Nefeli*, the issue is not concerned with the discharge of a guarantee but is simply as to its scope. It either applies or does not apply to the new arrangement. In the other situation, however, the issue is not directly whether the guarantee covers the new arrangement, but whether an "anti-discharge" provision operates to exclude the *Holme v. Brunskill* doctrine. That was the situation contemplated by *Rowlatt* and thus by Lord Atkin, and was the subject-matter of the actual decision in *Triodos*. In other words, it is even possible that there are two closely allied doctrines. One is a principle of pure construction, which may always arise in a guarantee, and that is the question of what the guarantee covers. The other is a principle as to the scope of an "anti-discharge" provision, which seeks expressly to throw the cloak of present consent over future events so as to prevent those events subverting the guarantee. The latter principle, but not the former, is tied up with the doctrine of *Holme v. Brunskill*.

52.  There is the still further possibility, which is reflected in the intricate submissions in the current case, where an "anti-discharge" provision (section 2) may have both a protective and an aggressive aspect. It may seek protectively to defend the creditor from the danger of future events discharging his guarantor in the absence of the guarantor's subsequent consent; and it may seek additionally and aggressively to bind the guarantor to an enhanced liability without taking a further guarantee.

53.  I suppose a typical banking "all monies" guarantee is of the latter kind: subject to the possibility of a cap, it covers not only current but also future liabilities and at the same time obviates discharge by strenuous anti-avoidance provisions. However, the present guarantee is not an "all monies" guarantee, and it is certainly not of a typical banking nature.

54.     *(ii) Do the guarantee's anti-avoidance provisions exclude the purview doctrine?* It is submitted, in effect, on behalf of the builder, that the provisions of the guarantee's section 2 exclude the purview doctrine by the breadth and clarity of their language. At its extreme, this submission becomes the argument already discussed under the heading of the cross-appeal, namely that section 2(b) expressly extends the guarantee to cover the deferred liabilities agreed in the post-guarantee amendments. However, that issue is destined for trial. In its fall-back form, the builder's submission is that either section 2, and/or section 1's treatment of the guarantor's liability as a primary liability, excludes the doctrine of *Holme v. Brunskill*. It may be supposed, for the sake of argument, that it does, to a greater or lesser degree, according to the anti-avoidance terms in question. However, the question is not whether the *Holme v. Brunskill* doctrine is excluded, for the guarantor accepts that, to a substantial degree, it is. The question is whether the *purview doctrine* is excluded, and there the guarantor submits that it is not. Mr Butcher submits that, however apparently wide the anti-discharge language may seem to be, the question always has to be asked whether the new events lie within the purview of the guarantee: because if they do not, they may fall outside the guarantee as a whole, including its anti-avoidance provisions. He submits that is the nature of the doctrine, and that certainly *Triodos* suggests that that is so.

55.     In this context, I refer in particular to the provisions of the guarantee that render the guarantor a primary obligor. The judge utilised these provisions to underpin his conclusion that the *Holme v. Brunskill* doctrine was excluded (at para [29]). However, I have already said that that does not seem to me the issue, since the real issue raised by the appeal is whether the purview doctrine is excluded (or overcome).

56.     Moreover, Mr Ashcroft accepts that the primary obligor part of his argument is the most complicated. The judge also seems to have accepted that that was the case: see above at [30]. In the end he was persuaded that section 1(c) was decisive: but in my view that sub-clause is typical of the general situation of guarantees and indicates nothing about primary liability, a fortiori in a situation where there is an exclusion of rights of set-off under the principal contracts.

57.     A reference to a few of the relevant authorities will demonstrate that there is no obvious answer. Thus in *Heald v. O'Connor* [1979] 1 WLR 497 Fisher J said that the phrase "as a primary obligor and not merely as a surety" is merely part of a common form to avoid the consequences of giving time or indulgence to the principal debtor and does not convert what is in reality a guarantee into an indemnity (at 503D). In *Marubeni & South China Ltd v. Government of Mongolia* [2004] EWHC 472 (Comm), [2004] 2 Lloyd's Rep 198, Cresswell J concluded, in an obiter part of his judgment, that even a guarantee under which the guarantor accepted primary liability did not thereby exclude the principles underlying *Holme v. Brunskill* (at [142]). In this court in *Marubeni* [2005] EWCA Civ 395, [2005] 1 WLR 2497 this issue was not reached. A case comment on *Marubeni* in (2005) JIBLR 488 suggests that in this context an important distinction is to be made between first demand guarantees or performance bonds issued by banks and other forms of guarantee: but that even so,

the *Holme v. Brunskill* doctrine is not necessarily ousted by provisions for primary liability (at 493):

> "Equity prevents two parties to a triangular relationship altering their arrangements behind the back of the third…If anything the justification for the rule in *Holme v. Brunskill* is heightened in the case of a primary liability instrument, given the more onerous nature of such an instrument on the part of the guarantor…"

The authors submit, citing textbook and Commonwealth authority, that any ousting of the *Holme v. Brunskill* doctrine must be clear and unequivocal and that there is no clear decision to support the view that it can be achieved merely by a primary obligor clause.

58.     Mr Ashcroft cited *IIG Capital LLC v. Van der Merwe* [2008] EWCA Civ 542, [2008] 2 Lloyd's Rep 187, *Wittmann (UK) Ltd v. Willdav Engineering SA* [2007] BLR 509 and *WS Tankship II BV v. The Kwangju Bank Ltd* [2011] EWHC 3103 (Comm) at paras [142]ff. However, those cases ultimately turned on their own language and form (eg in *WS Tankship* Blair J distinguished a demand guarantee from other types of guarantee) and none of them are concerned with the purview doctrine.

59.     In sum, the role of primary obligor language in a guarantee is complex and ultimately dependent, as it would seem, on the language and nature of the particular guarantee concerned. None of the cases deal with the purview doctrine.

60.     I would nevertheless accept, for the sake of argument, that section 1(b) of the guarantee (rather than section 1(c)) appears on the face of it to be a powerful clause for the purpose of excluding the *Holme v. Brunskill* doctrine. The question remains, however, whether it also excludes the purview doctrine, in any of its manifestations. There is no authority which provides any guidance in that respect. In principle, it is at least reasonably arguable that it does not.

61.     *(iii) How is the purview doctrine to be applied in this case? Triodos* is a recent decision of this court on the issue which arises on this appeal. But it has been criticised in *Andrews and Millett*, *Law of Guarantees*, 6th ed, at 166-167 on the basis that it gives no guidance as to "where the line is likely to be drawn in the future between those variations to the principal contract which would be regarded as falling "within the purview" of the original agreement, and those which would fall outside it". The authors also submit that the result in *Triodos* appears contrary to the common sense of business dealings, on the ground that additional finance to carry out phase 2

of a construction project is essentially part of the original project and "The financial cap on the surety's liability stayed the same throughout".

62.     In the present case, however, those strictures do not apply. The guarantee, although connected with the financing of the rigs in an indirect way, and generated by the concern of the financing banks, was a security primarily directed in favour of the builder, who deserved no favours. On the contrary, its defaults put the projects entirely in jeopardy. On the guarantor's case the guarantee did have a limit to its amount, but on the builder's case the guarantee was in principle unlimited, subject to the necessary connection with the shipbuilding contracts. On the builder's case, the post-guarantee amendments have increased the amount covered by the guarantee by tens of millions of dollars. On any view, the delaying of substantial milestone payments which should all have been paid by the buyers *prior* to delivery thereby increasing the equity in the rigs after delivery, have by reason of the post-guarantee amendments been added to milestone payments 19 and 21 due on and after delivery. Although by a slight of draftsmanship, these accumulated and delayed milestone payments have all been dubbed "adjusted milestone payments 19 and 21", which was the language adopted in the pre-guarantee amendments, this development was, so far as we know at present, an entirely unexpected event. It was quite unlike, for instance, some mere slippage in the delivery dates (although that happened as well) or some rescheduling in the payment of the original post-delivery instalments. What happened was that rigs which should have been paid for, subject to the deferred instalments under the pre-guarantee amendments, were no longer paid for. That reduced the buyers' equity in the rigs and put considerably greater pressure on the generation of post-delivery earnings from Petrobras. Moreover, because of the further delayed delivery dates and the complaints of further defects in construction which had not been compensated in the liquidated damages for which allowance had already been made, a situation has been arrived at where, at any rate on cases made by the buyers and Petrobras respectively, substantial damages are claimed for which the buyers seek to hold the builder responsible. That is the situation in which there is a significant increase in the amount due on delivery and unpaid by the buyers.

63.     Is such a situation within the purview of the guarantee? The post-guarantee amendments were still amendments to the building contracts. Those contracts, as amended, were still contracts for the building of rigs and not cathedrals. Although the liability to pay post-delivery instalments has increased by some 40% or more, it has not doubled (an example given by Lord Atkin). And, of course, these are liabilities for which the buyers were in any event responsible at some time or other. So there are powerful arguments for saying that the post-guarantee amendments were within the purview of the guarantee. On the other hand, the qualitative matters referred to in the previous paragraph, and the still substantial size of the increase in liability, are powerful arguments in the other direction. The analogy with a charter extension for which there was no option in the original charter is not inapposite (*cf The Nefeli* and *The Kalma*). Moreover, Chadwick LJ's analysis in *The Triodos* seems not inappropriate.

*Decision: (iv) Is this a case for summary disposal?*

64.     If this was a trial of the builder's claim, or even if the sole issue on an application for summary judgment was whether the guarantee was or was not discharged by reason of the post-guarantee amendments having been made without post-guarantee consent, then, on matters which are ultimately issues of law, this court would strain to provide an answer. In the present case, however, that is not the situation. There has in any event to be a trial of the issue on the cross-appeal, and that is so because the judge was satisfied that the question of construction which arises on the cross-appeal may depend on evidence concerning the guarantee's factual matrix (as well of course of the issue of consent outside the guarantee itself).

65.     In these circumstances, I have concluded, after some hesitation which further analysis has disposed of, that this is not a case in which the baby can safely be ordered to be cut in half. Ultimately, the various questions of construction which arise on both appeal and cross-appeal, or the closely allied question of the purview of the guarantee, will have to be considered as a whole, in the light of the evidence which will be forthcoming at trial. Moreover, this is not a case where the issues of law which arise on the appeal are straightforward: each of them presents difficulties of analysis, and the jurisprudence is somewhat opaque. It would be highly unfortunate if the evidence provided at trial should indicate that a summary decision was wrong or might arguably and reasonably be said to have been in error. In the meantime the arbitration between the builder and the buyers proceeds as to the underlying merits, and the security in the rigs and/or in the earnings generated by them in theory at least remains. No one has suggested that the guarantor is merely seeking to escape from liability in a situation of insolvency. Prudence would in any event have dictated that the guarantor should have been asked for a new guarantee or for a formal indication of consent. In my judgment, wisdom suggests that there should be a single trial of the issues of both appeal and cross-appeal.

*Conclusion*

66.     In sum, I would allow the guarantor's appeal and dismiss the builder's cross-appeal.

*Postscript*

67.     Following the distribution of these judgments in draft to the parties, the builder has submitted that I had failed to take account of a concession made by Mr Butcher on behalf of the guarantor, that if the guarantee on its proper construction did not extend to the post-guarantee amendments, then the guarantee would not be discharged. This enabled Mr Ashcroft to submit that either the builder was entitled to the full amount claimed under the post-guarantee amendments, or, if the guarantee did not extend to them, it was entitled to the original amounts guaranteed under the pre-guarantee amendments pursuant to Mr Butcher's concession. Therefore, the builder should, at

the very least, at this interlocutory stage, be entitled to recover the lower amount for which the judge gave judgment.

68.    However, as Mr Butcher went on to explain under questioning from the court, his concession was only made subject to the doctrine of purview. Indeed, a very large part of the submissions before the court was concerned with the doctrine of purview. Therefore, if the guarantee did not extend to the post-guarantee amendments, Mr Butcher's submission, in one form or another, and despite the concession, remained that the guarantee was discharged. For otherwise, he would and could not have been concerned to argue the doctrine of discharge at all. The sole question would have been whether the guarantee did or did not extend to the post-guarantee amendments.

69.    I can say that I did take account of Mr Butcher's concession and I am happy to record it, but I considered, and continue to consider, that it does not affect my analysis above. Whatever the concession entails, Mr Butcher nevertheless argued that the post-guarantee amendments were not within the purview of the guarantee or its anti-avoidance provisions, and that nothing in the guarantee did extend to cover the post-guarantee amendments either expressly or so as to exclude the purview doctrine and its consequences in terms of *Holme v. Brunskill*.

70.    It may be that Mr Butcher's concession and his overall submissions do not cohere, in which case, and perhaps in any case, it does not bind the court. But whether those submissions cohere or not, in the circumstances of the overall argument, and where it in any event remains in issue whether or not the guarantee does extend to the subsequent amendments, for Mr Ashcroft asserts that it does, I do not see how, on the submissions made, and on my analysis of their consequences, and at this interlocutory stage of the proceedings, I can depart from my judgment herein, as Mr Ashcroft has asked the court, exceptionally, to do.

**Lady Justice Arden:**

71.    I agree.

**Lord Justice McCombe:**

72.    I also agree.