# EXHIBIT 61

All England Official Transcripts (1997-2008)

# DŴR Cymru Cyfyngedig (Welsh Water) v Corus UK Ltd and another

*Contract - Enforceability - Certainty of terms - Service agreement - Agreement to supply water on agreed terms - Whether agreement intended to have contractual effect - Water Industry Act 1991, ss 55, 56*

[2007] EWCA Civ 285, (Transcript: Wordwave International Ltd (A Merrill Communications Company))

**COURT OF APPEAL (CIVIL DIVISION)**

**WARD, MAURICE KAY, MOORE-BICK LJJ**

**6, 30 MARCH 2007**

**30 MARCH 2007**

D Rose QC for the Defendant

N Pleming QC and A Robertson for the Claimant

DLA Piper UK LLP; Herbert Smith LLP

**MOORE-BICK LJ:**

[1]  This is an appeal from part of an order made by Hart J on an application by the Claimant, Dŵr Cymru Cyfyngedig (Welsh Water), for summary judgment under CPR r 24.2. The claim relates to amounts which are said to be due from the Defendant, Corus UK Ltd ("Corus"), in respect of the supply of non-potable water to its steelworks at Llanwern between 1 April 2004 and 31 March 2006.

[2]  The appeal is concerned with only one of the matters raised by Corus in its defence to the claim, namely, the effect of an agreement made on 20 December 1993 ("the Llanwern 1993 Agreement" or "the Agreement") between Welsh Water and British Steel plc, the predecessor in title of Corus, for the supply of water to the plant at Llanwern. It raises a short point of construction of a kind which, as the judge recognised, is eminently suitable for determination on an application under Pt 24 when all the relevant facts are before the court.

[3]  Under the Llanwern 1993 Agreement Welsh Water agreed to supply up to 91 megalitres of water a day to the plant at rates which were fixed for the year commencing 1 April 1994 and were to be adjusted in respect of subsequent years by reference to the rise and fall of the Producer Prices Index or the percentage change in the volumetric tariff for potable water in Welsh Water's scheme of charges, whichever was less. Two clauses of the Agreement are of particular importance in the context of the present dispute, namely, cl 12 and cl 17. They provided as follows:

*"TERMINATION*

12(1) Subject to the provisions of this Clause this Agreement shall be for a fixed term commencing on 11 February 1990 and ending on 31 March 2004.

*RENEWAL CLAUSE*

17 On expiry of this Agreement British Steel shall continue to have the right to be supplied non-potable water for the purposes associated with iron and/or steel production or processing at the Works. The terms of such supply shall be those agreed between British Steel and Dŵr Cymru at that time, or, in the event of failure to agree, determined by the Director General of Water Services under Section 56 of the Water Industry Act 1991 or any succeeding Act."

**[4]** The Water Industry Act 1991 makes provision for, among other things, the supply of water by water undertakers to domestic and commercial premises. In its original form it made provision for the continued existence of a Director General of Water Services whose function was to act as a regulator for the industry, but by s 36 of the Water Act 2003 his functions were transferred to a newly created Water Services Regulation Authority with effect from 1 April 2006 and references in the Act to the Director were replaced by references to the Authority. However, since the 1993 Llanwern Agreement refers to the Director, it is convenient for present purposes to continue to refer to him in the context of the statutory provisions.

**[5]** Sections 55 and 56 of the Act deal with supplies of water for non-domestic purposes. They provide, so far as is material for present purposes, as follows:

"55 *Supplies For Non-Domestic Purposes*

(1) This section applies where the owner or occupier of any premises in the area of a water undertaker requests the undertaker to provide a supply of water to those premises and -

(a) . . .

(b) the requested supply is for purposes other than domestic purposes.

(2) Where this section applies, it shall be the duty of the water undertaker, in accordance with such terms and conditions as may be determined under section 56 below -

(a) to take any such steps as may be so determined in order to enable the undertaker to provide the requested supply; and

(b) having taken any such steps, to provide that supply.

56 *Determinations on requests for non-domestic supplies*

(1) . . . any terms or conditions or other matter which falls to be determined for the purposes of a request made by any person to a water undertaker for the purposes of section 55 above shall be determined -

(a) by agreement between that person and the water undertaker; or

(b) in default of agreement by the Director according to what appears to him to be reasonable.

. . .

(5) The charges in respect of a supply provided in compliance with any request made for the purposes of section 55 above -

(a) shall not be determined by the Director . . . except in so far as, at the time of the request, no provision is in force by virtue of a charges scheme under section 143 below in respect of supplies of the applicable description; and

(b) in so far as they do fall to be determined, shall be so determined having regard to the desirability of the undertaker's -

(i) recovering the expenses of complying with its obligations under section 55 above; and

(ii) securing a reasonable return on its capital.

(6) To the extent that sub-section (5)(a) above excludes any charges from a determination under this section, those charges shall be fixed from time to time by a charges scheme under section 143 below, but not otherwise."


**[6]** Sections 142 and 143 of the Water Industry Act deal with the powers of water undertakers to charge for the services they provide and for the establishment of charges schemes. They provide, so far as is material, as follows:

"142 *Powers of undertakers to charge*

(1) Subject to the following provisions of this Chapter, the powers of every relevant undertaker shall include power -

(a) to fix charges for any services provided in the course of carrying out its functions . . .

(2) . . . the powers conferred by sub-section (1) above shall be exercisable -

(a) by or in accordance with a charges scheme under section 143 below; or

(b) by or in accordance with agreements with the persons to be charged.

. . .

(4) Except in so far as this Chapter otherwise provides, a relevant undertaker may fix charges under this section by reference to such matters, and may adopt such methods and principles for the calculation and imposition of the charges, as appear to the undertaker to be appropriate.

143 *Charges Schemes*

(1) A relevant undertaker may make a scheme ('a charges scheme') which . . . does any one or more of the following, that is to say -

(a) fixes the charges to be paid for any services provided by the undertaker in the course of carrying out its functions;

. . .

(5) Nothing in any charges scheme shall affect -

(a) any power of a relevant undertaker . . . to enter into such an agreement with any person in any particular case as determines the charges to be made for the services provided to that person by the undertaker;

. . ."

**[7]** In April 2003 Welsh Water introduced a tariff for large users of non-potable water as part of its charges scheme for the year 2004-2005 and a similar tariff has formed part of its charges scheme in subsequent years. The issue between the parties is whether, as Welsh Water contends, Corus became liable as from 1 April 2004 to pay for water in accordance with the current charges scheme or whether, as Corus contends, it is liable to pay charges fixed by reference to the terms of the Agreement.

**[8]** Before the judge Welsh Water contended that cl 17 conferred no contractual rights on Corus in relation to the period after 31 March 2004 but was simply describing the position that would arise under the statutory provisions on the expiry of the Agreement. Corus submitted that cl 17 was intended to have contractual effect entitling it to a continued supply on terms to be agreed or determined by the Director under s 56 of the Act. The judge preferred the Claimant's argument. He held that cl 17 did not contemplate that the Director would determine the charges for supplies after 31 March 2004 under s 56 if by that time a charges scheme had been introduced because the section expressly excludes his jurisdiction to do so. He rejected the argument that there was an implied term of the Agreement that Welsh Water would not act in such a way as to deprive the Director of the power to determine charges.

**[9]** The starting point in this case is whether cl 17 was intended to have contractual effect, in the sense of giving rise to rights and obligations between the parties, or whether it was intended simply to record the parties' understanding of the position that would obtain under the Act as from 1 April 2004. Miss Rose QC pointed to the language of the Agreement and submitted on behalf of Corus that cl 17 embodies a contract between the parties for the continued supply of water to the Llanwern plant on terms to be agreed or determined by the Director. In support of her submissions she relied on the fact that the Llanwern 1993 Agreement was the successor to an earlier agreement between British Steel's predecessor, Richard Thomas and Baldwins Ltd ("RTB"), and the Claimant which had itself given rise to a disagreement between them. In 1960 RTB entered into Heads of Agreement with the County Borough of Newport, at that time the local water supplier, for the supply of water to the plant at Llanwern for a period of thirty years. The Heads of Agreement provided in cl 8 for a right of renewal on terms to be agreed or settled by arbitration. RTB bore the capital cost of putting in place the infrastructure in the form of a reservoir (the Waltwood reservoir), pipeline and treatment plant needed to enable supplies to be made. In 1990 when the original term of the agreement expired a dispute arose over the appropriate level of charges for the supply of water in the future which was referred to arbitration. Eventually it was compromised on the terms of the Llanwern 1993 Agreement. It is no doubt for that reason that the preamble to that Agreement referred to the earlier Heads of Agreement and to the right of renewal contained in it and stated that the terms on which the agreement to supply water into the Waltwood Reservoir was to be renewed were embodied in the new Agreement.

**[10]** Mr Pleming QC for Welsh Water submitted that the first sentence of cl 17 recognised that the Llanwern 1993 Agreement would expire on 31 March 2004 and is itself a strong indication that the parties were not intending to make provision in the Agreement for the supply of water after 31 March 2004. The reference in that context to a continuing right to a supply of water simply reflected the statutory right under s 55(2) of the Water Industry Act, of which both parties were clearly aware. That, he submitted, is clear from the second sentence in which the parties expressly provided for the terms of supply to be determined by the Director in the exercise of his statutory powers under s 56 if they were unable to agree. The Director has no power to act otherwise than under the statute and the parties can, therefore, only

have contemplated that water would continue to be supplied under the Act rather than under the Agreement. He submitted that by expressly providing for the Director to determine the conditions of supply under s 56 of the Act the parties must be taken to have accepted that his powers would be restricted if a charges scheme had been introduced by April 2004. The fact that under those circumstances he could not determine the charging rate simply reinforced the conclusion that the parties did not intend to provide for further supplies to be made under the Llanwern 1993 Agreement.

[11]  The importance for the continued operation of the plant at Llanwern of an assured supply of water at a pre-determined price was no doubt an important part of the background to the original Heads of Agreement and to the construction of cl 8 in particular. However, following the enactment of the Water Industry Act 1991, which imposed on water undertakers an obligation to provide supplies for industrial purposes, the need to ensure a right to future supplies became of less importance for the construction of the Llanwern 1993 Agreement. The fact is that renewal of the existing contractual arrangements was no longer essential to ensuring a right to continuity of supplies. However, the terms of supply, and especially charging rates, are inevitably of great importance to a customer whose business depends on the use of large volumes of water and it is obvious that no customer of that kind would wish to place itself at the mercy of a monopoly supplier, if it could avoid doing so. The obvious solution is to enter into an agreement for future supplies under which the price will be fixed by arbitration in the absence of agreement.

[12]  The fact that the opening words of cl 17 refer in terms to the expiry of the Agreement is not in my view sufficient to demonstrate that the parties were not intending to provide for their respective rights and obligations thereafter. In the context of an agreement providing for the supply of water on specific terms for a prescribed period the expression "expiry of this agreement" is apt to refer simply to the expiry of the period during which the agreed terms apply. The fact that in the same sentence the clause goes on to provide that Corus shall *continue* to have a right to be supplied suggests that the parties were not contemplating that their relationship under the Agreement would come to an end but that they were seeking to provide for their continuing rights and obligations when the original period expired.

[13]  Although it is possible to construct attractive arguments by reference to the terms of the legislation and the powers of the Director, in the absence of anything to suggest that the parties had questions of that kind in mind I think that the nature of the Agreement and the terms of cl 17 itself provide a more reliable guide to their intentions. In my view what points most strongly to the conclusion that they intended cl 17 to have contractual effect is the very fact that they chose to include it in the Agreement. Surplusage is by no means unknown in commercial contracts, of course, but it is unusual for parties to include in the operative part of a formal agreement of this kind a whole clause which is not intended to have contractual effect of any kind. One starts, therefore, from the presumption that it was intended to have some effect on the parties' rights and obligations. Of course, there was nothing to prevent them including a provision clarifying and recording their understanding of the statutory position as it would apply from 1 April 2004, but there is no evidence to suggest that the obligations of Welsh Water under the Water Industry Act had arisen for discussion and no reason to think that cl 17 was included to provide Corus with reassurance that Welsh Water recognised its responsibility in that regard. Moreover, if that been the parties' intention, I would have expected the clause to have been written in a way that made that clear. In fact, however, the language is redolent of obligation ("shall continue to have the right to be supplied"; "[t]he terms of supply shall be those agreed, or . . . determined . . ."). There is no reference to a request for supply or indeed to s 55 at all, despite the fact that it is s 55 rather than s 56 which imposes an obligation on the water undertaker to provide a supply. Moreover, as Miss Rose submitted, the parties proceeded on the footing that the Director would determine the terms of supply if they were unable to agree, not that Welsh Water could outflank the Agreement by introducing a charges scheme under s 143. Finally, the fact that the clause is described as a "renewal clause" is in my view another small pointer in the direction of the same conclusion.

[14]  This is ultimately a short question of construction which does not bear a great deal of elaboration. I have come to

the conclusion that the judge was wrong to prefer the construction put forward by Welsh Water and that cl 17 was intended to have contractual effect. The question then is whether it achieved that object and, if so, what are the consequences.

[15] Mr Pleming submitted that even if the parties did intend cl 17 to give rise to legal rights and obligations, that does not assist Corus in the present case because, unless the statutory mechanism applies, the Director has no power to make a determination with the result that the contract provides no mechanism for determining terms and is therefore unenforceable. The first part of the argument is based on the proposition that the power of the Director to determine terms for the supply of water is statutory and arises only in relation to supplies made pursuant to a request falling within s 55(1) of the Act. If that is the case, however, the parties are bound by the statutory mechanism as a whole, including the restrictions on the Director's powers in sub-ss (5) and (6). The Director's power to determine charges is circumscribed under sub-s (5)(a) by the existence of any relevant charges scheme and, where no relevant charges scheme exists, by the requirement in sub-s (5)(b) to have regard to the desirability of the undertaker's recovering its expenses and securing a reasonable return on capital. If, on the other hand, the supply does not come within s 55(1), the Agreement provides no machinery for determining the conditions of supply and cannot be supplemented by a reference to arbitration or the decision of any third party. Therefore it fails altogether.

[16] In response to those arguments Miss Rose submitted that the supply of water pursuant to a contract between a water undertaker and a customer necessarily involves a request for supply under s 55(1) and therefore the Director has both the power and the obligation to determine the terms of supply as provided for in s 56 of the Act. If by introducing a charges scheme Welsh Water deprived the Director of the power to determine the terms of charges for water supplied under the Agreement, it had acted in breach of the Agreement and was liable in damages. Alternatively, she submitted that if the supply of water under the Agreement fell outside the terms of s 55 altogether, so that the Director has no power to determine the terms of supply and the contractual machinery failed, it was possible for the court to give effect to the parties' intentions by itself determining the terms on which supplies were to be made by reference to what is reasonable.

[17] Although it may not be inevitable that a request for the provision of a supply of water under s 55 of the Water Industry Act will lead to the creation of a contract between the water undertaker and the owner or occupier in question, I see no reason why the existence of a contract for the supply of water should take the matter outside the terms of s 55(1). In such cases the contract reflects both the occupier's request and the water undertaker's response to it. I think that Miss Rose was right, therefore, in saying that s 55 applies in this case and that the Director had the power to determine terms of supply as from 1 April 2004 under s 56 of the Act, as the parties appear to have assumed.

[18] It is clear from ss 142 and 143 of the Act, and indeed was common ground before us, that water undertakers have the power to enter into agreements with individual customers to supply water on agreed terms, including terms governing charges, despite the existence of a relevant charges scheme. It follows from that and from the terms of ss 56(5) and 56(6) that if there is a charging scheme in force at the time when a supply is requested under s 55(1) the customer must either reach agreement with the water undertaker in relation to charges or must accept the charges scheme in force from time to time thereafter: see s 56(6). However, I think it is implicit in the language of ss 55(1) and 56(5)(a), as well as in the language of s 56(6), that the position is to be determined as at the date when the request for supplies is first made. In particular, s 56(5)(a) does not appear to contemplate a continuing request since, as Mr Pleming pointed out, the expression "at the time of the request" clearly refers to the request for supply referred to in s 55(1). That makes perfectly good sense because it means that both parties know at the outset whether the Director will have the power under s 56(5)(b) to determine future charges, taking into account in addition to the matters mentioned in that sub-section the particular circumstances under which water is supplied, or whether the customer will simply be bound by the charges scheme in force from time to time, which is likely to reflect the average cost of supplying water of

similar quality throughout the area as a whole.

[19] In this context continuity of supply under the 1993 Llanwern Agreement is of some importance. Water was supplied under the Agreement from December 1993 and if, as I think, the parties agreed that Corus should continue to receive supplies under the Agreement (rather than simply under the statutory provisions) as from 1 April 2004, the relevant request was made long before any charges scheme had been introduced. It follows that the present case does not fall within s 56(5)(a) and (6) and the Authority has the power to determine terms of charging under s 56(1)(b). In so doing, however, it must comply with the terms of s 56(5)(b).

[20] In my view, therefore, it is unnecessary to consider either of Miss Rose's alternative arguments, which I shall therefore deal with as shortly as I can. The Water Industry Act 1991 gives water undertakers the power to establish charges schemes which are generally applicable to different types of supply and different groups of customers. That, after all, is the very nature of a charges scheme. The 1993 Llanwern Agreement could not prevent Welsh Water from introducing a charges scheme of that kind which covered the supply of water to the plant at Llanwern, but to do so in circumstances that interfered with the operation of the machinery agreed between the parties for the determination of charges would in my view amount to a breach of contract. In a case where parties have agreed that some aspect of their relationship shall be determined in accordance with a particular machinery, whether established by contract, or, as in this case, by statute, it is implicit that neither of them will take steps to prevent that machinery from operating in accordance with their agreement. If I am wrong, therefore, in the view that I take of the effect of ss 55 and 56 of the Act and the introduction of a charges scheme does deprive the Authority of power to determine charges in this case, I would hold that Welsh Water is in breach of the Agreement. The effect would be that Corus would be liable to pay charges calculated in accordance with the charges scheme in force from time to time, but could recover as damages for breach of contract any difference between those charges and the amount it would have been obliged to pay if charges had been determined by the Director under s 56(1)(b) of the Act.

[21] Finally there is the question whether, if the supply in this case does not come within s 55(1) of the Act and the Director has no power to determine terms of supply, the failure of the mechanism agreed between the parties renders the contract unenforceable. It has frequently been said that the court will strive to uphold and give effect to the parties' agreement when it is clear that they intended it to have legal effect, all the more so where, as here, it has been performed over a considerable period of time. In support of her submission Miss Rose drew our attention to *Sudbrook Trading Estate Ltd v Eggleton* [1983] 1 AC 444, [1982] 3 All ER 1, [1982] 3 WLR 315, a case concerning the exercise by a tenant of an option to purchase the reversion at a price to be agreed between valuers appointed by the parties. The House of Lords held that the contract was to be construed as an agreement to sell the reversion at a reasonable price to be ascertained by objective standards and that therefore the failure of the contractual mechanism as a result of the lessor's refusal to appoint a valuer did not render it unenforceable as an agreement to agree. Other examples of the application of the same principle may be found in *Chitty on Contracts*, 29th ed paras 2-126 to 2-129 to which reference was made in the course of argument.

[22] The terms on which water was supplied prior to 1 April 2004 are those set out in the 1993 Llanwern Agreement. They are detailed and comprehensive, covering not only volume (cl 1), charges (cl 6) and quality (cl 5) but also matters such as measurement (cl 3), point of supply (cl 4), billing arrangements (cl 7) and termination rights (cl 12). Although I suspect that the only really contentious issue is likely to be that of charges, the Agreement does not provide that the other terms shall continue to apply and I do not think that is to be implied. Rather, the parties appear to have proceeded on the assumption that all necessary terms would have to be agreed or determined by the Director. Where many important terms have been left undecided and the contractual machinery for resolving disagreements is incapable of being operated, it may be impossible to avoid the conclusion that the agreement as a whole is unenforceable because the parties have failed to establish objective criteria capable of being applied by the court itself. In my view that is a very

real difficulty in the present case, but I would not rule out altogether the possibility that with the assistance of expert evidence the court could determine sufficient terms by reference to what is reasonable in the circumstances. However, in the light of the conclusion to which I have come on the other issues raised in this case it is unnecessary to reach a final decision on that point.

**[23]** For these reasons I would allow the appeal.

**MAURICE KAY LJ:**

**[24]** I entirely agree.

**WARD LJ:**

**[25]** I also agree.

*Appeal allowed.*