# EXHIBIT   67

[IN THE COURT OF APPEAL.]

### HOLME *v.* BRUNSKILL.

*Principal and Surety—Discharge of Surety by Alteration of the Guaranteed Contract—Materiality of Alteration in Contract between Principals— Landlord and Tenant—Surrender of part of Demised Premises—Notice to quit.*

1877
June 7.

The plaintiff having agreed to let to G. B., as yearly tenant, a farm, including certain hill pastures and a flock of 700 sheep, the defendant gave the plaintiff a bond to secure the re-delivery to him at the end of the tenancy of the flock in good order and condition. In November the plaintiff gave G. B. a notice to quit, which was ineffectual to determine the tenancy at the expiration of the then current year. G. B. objected to the insufficiency of the notice, and on the 8th of April entered into an agreement with the plaintiff that G. B. should surrender a field to the plaintiff, that G. B.'s rent should be reduced 10*l.*, and the notice to quit should be considered as withdrawn. G. B. then continued tenant of the farm less the field at the reduced rent. In October, 1876, the plaintiff gave G. B. notice to quit on the 10th of April, 1877. On giving up the farm it was ascertained that the flock was reduced in number and deteriorated in quality and value, and the plaintiff sued the defendant on his bond:—

*Held,* by Brett, Cotton, and Thesiger, L.JJ., that neither the giving of the notice to quit and its withdrawal, nor the surrender of the field and the reduction of the rent, created a new tenancy.

*Tayleur* v. *Wilden* (Law Rep. 3 Ex. 303) distinguished.

*Held,* also, by Cotton and Thesiger, L.JJ., Brett, L.J. dissenting, that the contract of the surety was that the flock should be delivered up in good condition together with the farm as originally demised to the tenant; that the surety ought to have been asked to decide whether he would assent to the variation in the terms of the letting, and not having been asked to assent he was discharged from liability.

At the trial the judge left it to the jury to say whether the new agreement with the tenant had made any substantial or material difference in the relation between the parties, as regarded the tenant's capacity to fulfil the condition of the bond:—

*Held,* by Cotton and Thesiger, L.JJ., Brett, L.J. dissenting, that the question was one which ought not to have been submitted to a jury; that the surety was the sole judge whether it was reasonable that he should remain liable notwithstanding the new agreement.

ACTION on a bond against the defendant as surety. The bond was dated the 18th of March, 1873, and after reciting that the plaintiff had agreed to let to G. Brunskill, from year to year, a farm called Riggindale, and a stock of 700 heath going sheep, as regarded the arable land, from the 2nd of February, 1873; as

1878

HOLME
*v.*
BRUNSKILL.

regarded the lands for pasturage and sheep, from the 10th of April, 1873; and as regarded the dwelling-house and buildings from Whitsuntide then next; and after further reciting that the sheep were delivered to G. Brunskill on the 11th of April, 1873, and consisted of the number, species, and quality mentioned in the schedule to the bond, and it had been agreed that G. Brunskill and R. Brunskill, and C. H. Norman, should enter into the bond for the re-delivery of the said sheep or the offspring thereof in manner thereinafter expressed, stated that the condition of the bond was "if the above bounden G. Brunskill should, at the determination of the tenancy, deliver up unto H. P. Holme, along with the said farm and premises, the like number, species, and quality of good and sound sheep as were delivered to the said G. Brunskill as aforesaid;" and "in case the said stock of sheep should, at the determination of the said tenancy, be reduced or deteriorated in number, quality, or value, should pay to H. P. Holme compensation for such reduction or deterioration, to be ascertained by certain arbitrators" in manner therein provided: and "should yearly and every year during the tenancy pay, or cause to be paid, to H. P. Holme by way of rent or interest for the sheep, the sum of 35*l.* by two equal half yearly payments," then the bond should be void.

The statement of claim, after setting out the bond and averring the performance of all conditions precedent, alleged that the tenancy was determined on the 29th of March, 1877; that G. Brunskill did not deliver up to the plaintiff, along with the farm, the like number, species, and quality of good and sound sheep as were delivered to him, nor did he pay compensation for the reduction and deterioration which had been ascertained in the manner provided by the bond, nor did he pay one half year's rent or interest for the sheep from the 10th of April, 1876.

At the trial at the Cumberland Summer Assizes, 1877, before Denman, J., the following facts were proved: The plaintiff was the owner of Riggindale Farm, consisting of 234 acres, and also of a right of pasturing sheep upon the commons and fells adjoining, all of which he had leased to G. Brunskill as tenant on the terms mentioned in the bond. On the 9th of November, 1875, the plaintiff gave to G. Brunskill a notice to quit the farm and lands

"on the 10th of April, 1876, or at the expiration of the year of your tenancy, which shall expire next after the expiration of one half-year from the service of the notice." On the 8th of April, at an interview between the plaintiff and G. Brunskill, the latter declined to accept the notice to quit on the ground that it was bad, and on that day an agreement was entered into between the parties as follows:—"I agree to give up the field called 'Bog,' now in my occupation, to my landlord, my yearly rent to be reduced by 10*l.*, also to give entry to the same on the 10th of April next, and to give up any claim I have to the use of the building known as the 'Stick-barn.'—G. Brunskill."

1878
HOLME
*v.*
BRUNSKILL.

The notice to quit was then withdrawn, and G. Brunskill then continued tenant of the farm, less the Bog Field, at the reduced rent. On the 5th of October, 1876, the plaintiff gave G. Brunskill a notice to quit on the 10th of April, 1877, which was admitted to be a good notice; before that day G. Brunskill filed a petition for liquidation of his affairs by an arrangement with his creditors, and the trustees of his estate gave up possession of the farm to the plaintiff on the 29th of March, 1877. It was afterwards ascertained, in the manner mentioned in the bond, by arbitrators, that the flock of sheep was reduced in number and deteriorated in value and quality, and they assessed the damages at 132*l.* It was also proved that the Bog Field was a field in which sheep did not usually pasture, but that it was occasionally used for pasturing sheep to the extent of twenty-five at a time being placed on it, and that it was also used during the lambing season; that the giving up the Bog Field would make an appreciable difference to the tenant in the spring, and that it might make a difference of perhaps fifteen in the number of the sheep that the farm would carry, and that it would compel the tenant to find hay either for the cattle or the sheep elsewhere.

The learned judge left it to the jury to say whether the new agreement with the tenant had made any substantial or material difference in the relation between the parties, as regarded the tenant's capacity to do the things mentioned in the condition of the bond, and for the breach of which the action was brought. The jury answered the question in the negative, and the learned judge reserved judgment.

1878

HOLME
v.
BRUNSKILL.

At the further consideration of the case, it was contended on behalf of the defendant; first, that the arrangement made on the 8th of April, 1876, amounted to a fresh tenancy as from the 10th of April, 1876, and to a surrender by operation of law of the original tenancy, and that the plaintiff could not sue in respect of a deficiency of sheep arising at the expiration of the new tenancy, as not being the tenancy contemplated in the condition of the bond. Secondly, that if the tenancy could be considered as the same there had been such an alteration in the terms of the bargain between G. Brunskill and the plaintiff, and such an alteration in the risk of the sureties, as to discharge them from their obligation. Thirdly, that the question of materiality was not for the jury, but that the judge was bound to hold that the alteration in the tenancy discharged the sureties, without reference to its materialty.

It was contended on behalf of the plaintiff that the tenancy continued until the 10th of April, 1877, varied only in its terms in one particular, but still remaining the same tenancy, and that the alteration in the agreement between G. Brunskill and the plaintiff was immaterial to the liability of the defendant in respect of the breach sued for, and did not increase the risk of the sureties.

Dec. 21, 1877. DENMAN, J., after stating the facts and pleadings, delivered the following judgment : —

In order to decide whether there is an alteration in the risk such as to discharge the surety, I think it is impossible to lay down an absolute rule that in all cases it is for the judge to decide as matter of law, whether the alteration was such as to have that effect or not. There must, I think, be many cases in which the judge would have to take the opinion of the jury upon the question, whether the alteration was of such a character as to affect the surety in any way by substantially or materially altering the risk. By way of example, I think it is impossible to say that if in the present case the evidence were that the landlord and tenant had merely agreed that the landlord should have the exclusive use of a small shed on the premises during the continuance of the tenancy, such an agreement would necessarily discharge the surety. I think it would in that case be a question for the jury at the most,

VOL. III.          QUEEN'S BENCH DIVISION.                    499

whether the shed in question was of such importance, whether it
played so material and substantial a part, if any at all, in assisting
the tenant in keeping up his stock of sheep, as that the depriving
himself of it, by allowing the use of it to the landlord, would render
him less capable of performing the condition of the bond.    In the
present case I think that if the same tenancy had continued to
exist, it would have been a question for the jury upon the evidence
whether the alteration in its terms, so far as it relates to the
giving up of the Bog Field, did make any material difference in the
risk, in the sense above explained, and the jury having in effect
found that it did not, I should not feel myself justified in holding
the contrary as matter of law, and on that ground giving judgment
for the defendants.    The matter was one in its nature far more fit
for the consideration of a special jury for the county of Cumber-
land than for a lawyer, and I cannot even say that I am dissatisfied
with the view they took, though I might possibly, perhaps, through
ignorance of sheep farming, come to a different conclusion upon
the evidence if it had been for me to decide the question.

   But as to the other contentions of the defendant, namely, that
the contract between the plaintiff and the principal was a different
contract, and that the tenancy was a new tenancy after the agree-
ment of March, 1876, I am of opinion that on this ground the
sureties are not liable; I think it is impossible to contend that
the words "farm and lands called Riggindale" in the recital of
the bond, meant anything except Riggindale Farm as it then
existed, namely, a farm of 234 acres including the Bog Field, and
though in one sense it would still be called Riggindale Farm after
the new agreement, I do not think that that fact would justify me
in holding that I could reject that part of the recital of the bond
as immaterial; on the contrary, I think it was a material part of
the bond, and any such alteration of the holding as the diminution
of the farm by seven acres, and a reduction of the rent by 10*l.*,
however unprejudicial it may in fact have been to the sureties, is
on the face of it such an alteration in the agreement between the
plaintiff and the principal as necessarily to make it a new and
different agreement which, unless assented to by the surety, must
discharge him from his obligation.    *Whitcher* v. *Hall* (1), and *North*

                    (1) 5 B. & C. 269.

1878

HOLME
*v.*
BRUNSKILL.

500                          QUEEN'S BENCH DIVISION.              VOL. III.

1878

HOLME
*v.*
BRUNSKILL.

*Western Ry. Co.* v. *Whinray* (1), are strong authorities to this effect, and I do not think that the case of *Sanderson* v. *Aston* (2) is in conflict with those decisions, for it only decides that where the surety undertook generally to be responsible for the conduct of a person as clerk and traveller, without any reference in the bond to the terms of the agreement as to the kind of notice which was to be given by either party, the mere substitution of an agreement for a one month's notice for an agreement for a three months' notice was not sufficient to discharge the surety. In the present case I think it impossible to say that the alteration was not such as to make a new agreement in a particular expressly referred to in the condition of the bond, and therefore within the authorities to constitute an altered contract for the performance of which the sureties had given no undertaking.

I also think that the defendant is entitled to succeed on the ground that the tenancy which was contemplated by the bond ceased by the operation of the notice to quit given in November, 1875, followed by the fresh agreement in April, 1876. The only distinction which was pointed out between the present case and that of *Tayleur* v. *Wildin* (3), which was cited for the defendant (but for which distinction it would be precisely in point), is that in that case the notice which had been given was a good notice to quit on the proper day, given in proper time, whereas in the present case the notice was given too late to be a good notice for the day for which it gave notice to quit. But it would have been available as a notice to quit in the following year, and was not therefore wholly void or necessarily inoperative; and therefore it appears to me, when the landlord and tenant agreed together that as from the day mentioned in that notice, as the day for quitting, the rent should be reduced and a field given up by the tenant, the tenancy became a new tenancy as much or even more clearly than was the case in *Tayleur* v. *Wildin*. (3) I am therefore of opinion that the defendant is not responsible for the deficiency of sheep which existed at the expiration of this new tenancy, or for the non-payment of the amount assessed by the arbitrators in respect of that deficiency. I therefore give judgment for the defendant.

(1) 10 Ex. 77.                          (2) Law Rep. 8 Ex. 73.
(3) Law Rep. 3 Ex. 303.

VOL. III.          QUEEN'S BENCH DIVISION.                    501

The plaintiff appealed.

1878

HOLME
*v.*
BRUNSKILL.

May 7. *C. Russell*, Q.C., and *Dickinson*, for the plaintiff. First, no new tenancy was created between the landlord and tenant, for an alteration in the terms of the holding does not create a new tenancy. In Com. Dig. tit. Surrender (I. 2) it is laid down that if a lessee surrender or accept a new lease of part of the estate, that will operate as a surrender for that part only. So in Bacon's Abrid. tit. Leases (S.) 3, "If tenant for years of land accepts a new lease by indenture of part of the same lands, this is a surrender for that part only, and not for the whole, because there is no inconsistency between the two leases for any more than that part only which is so doubly leased; and though a contract for years cannot be so divided or severed as to be avoided for part of the years, and to subsist for the residue, either by act of the party, or by act in law, yet the land itself may be divided or severed, and he may surrender one or two acres, either expressly or by act in law, and yet the lease for the residue remains entire, whereas in the other case the contract for the whole would be divided, which the law will not allow." An alteration in the rent does not create a new tenancy: *Clarke* v. *Moor.* (1) The case of *Tayleur* v. *Wildin* (2), is distinguishable on the ground that in the present case the notice to quit was inoperative. Secondly, there was not such an alteration in the terms of the contract between the plaintiff and the principal debtor as would discharge the surety. For all practical purposes the contract has no relation to the farm, as to its extent or mode of management. The farm still remained Riggendale Farm, though the rent had been reduced and the Bog Field given up to the landlord; there is a distinction between the farm and its appurtenances; the agreement related only to part of the farm, and the guarantee was only for the re-delivery of the sheep to be pastured on the adjacent commons and fells, and in respect of the rent to be paid for their use. [On this point they cited *Whitcher* v. *Hall* (3); *Petty* v. *Cooke* (4); *North Western Ry. Co.* v. *Whinray* (5); *Skillett* v. *Fletcher* (6); *Hollier* v. *Eyre.* (7)]

(1) 1 J. & Lat. 723.
(2) Law Rep. 3 Ex. 303.
(3) 5 B. & C. judgment of Littledale,
J., at p. 277.
(4) Law Rep. 6 Q. B. 790, 795.
(5) 10 Ex. 77.
(6) Law Rep. 2 C. P. 469.
(7) 9 H. L. C. 57.

502                         QUEEN'S BENCH DIVISION.                    VOL. III.

<div style="float:left">

1878
―――
HOLME
*v.*
BRUNSKILL.

</div>

Thirdly, that the question of materiality had been properly left to the jury: *Sanderson* v. *Aston.* (1)

*Aspinall, Q.C.,* and *C. Crompton,* for the defendant. First, there was a new letting and a surrender of the premises. There was a surrender of part, and a reduction of rent of the remainder; a creation of a new rent issuing out of a different thing. The concurrence of the two created a new tenancy. *Tayleur* v. *Wildin* (2) is in point. Secondly, when the subject-matter of the contract is specified as the letting of Riggindale Farm, any alteration as to the farm will invalidate the suretyship, because the surety might or might not have continued the suretyship if he had known of the altered circumstances. The Bog Field having been given up to the landlord, the contract in respect of which the suretyship attached was altered, and the surety released, for the tenant did not get what the surety bargained he should get, that is, Riggindale Farm including the Bog Field: *Whitcher* v. *Hall.* (3) Thirdly, whether the giving up of the Bog Field was a reasonable or material alteration, was a question of which the surety was the sole judge: *Polak* v. *Everett.* (4) And the judge was wrong in leaving that question to the jury.

*C. Russell* was heard in reply.

<div style="text-align:right">*Cur. adv. vult.*</div>

June 7. The following judgments were delivered.

COTTON, L.J. This is an appeal of the plaintiff against a judgment of Denman, J., in favour of the defendant, Robert Brunskill. The action was on a bond for 1000*l.*, dated the 18th of March, 1873, executed by George Brunskill, Robert Brunskill, and others in favour of the plaintiff. The plaintiff was at the date of the bond, and still is, the owner of a farm called Riggindale, and before the execution of the bond he had agreed with George Brunskill to let to him as yearly tenant Riggindale Farm, including certain hill pasture held therewith, and also a flock of 700 sheep, and the bond in which Robert Brunskill joined as surety for George Brunskill, was given to the plaintiff to secure the delivery to him at the end of the tenancy of the flock of

---

(1) Law Rep. 8 Ex. 73.                    (3) 5 B. & C. 269.
(2) Law Rep. 3 Ex. 303.                   (4) 1 Q. B. D. 669.

VOL. III.        QUEEN'S BENCH DIVISION.                503

sheep in good order and condition. The material part of the
condition of the bond is as follows.  [The Lord Justice read the
condition.]

On the 9th of November, 1875, the plaintiff gave to George
Brunskill a notice to quit the farm, which was in terms, a notice
to quit " on the 10th of April, 1876, or at the expiration of the
year of your tenancy, which shall expire next after the expiration
of one half year from the service of the notice." The notice
being served less than six months before the 10th of April, 1876,
was ineffectual to determine the tenancy on that day, but was
effectual to determine it on the 10th of April, 1877.  Before the
10th of April, 1876, George Brunskill and the plaintiff met, and
George Brunskill objected to the insufficiency of the notice to
quit.  Whereupon the plaintiff stated that he did not wish to
take the farm from him, but that he wanted part of the farm
called the Bog Field, and it was thereupon agreed that George
Brunskill should surrender this on the 10th of April then next,
and that his rent should from that time be reduced by 10l. a year,
and that the notice to quit should be considered as withdrawn.
This agreement was carried into effect, and George Brunskill con-
tinued to hold the remainder of the farm; but early in October
following, the plaintiff gave him due notice to quit on the 10th
of April, 1877.  Before this time arrived George Brunskill got
into difficulties and had become insolvent.  His trustee, some-
time in March, 1877, gave up the farm, and it was then ascer-
tained that the flock referred to in the bond was reduced in number
and deteriorated in quality and value; and the action has been
brought to recover from the defendant, under his bond, compensa-
tion for the diminished value of the flock.

Mr. Justice Denman, before whom the action was tried, gave
judgment for the defendant, and against this judgment the
plaintiff has appealed.

One ground on which the defendant relied in supporting the
judgment was, that his obligation under the suretyship bond had
expired before the deficiency arose, that is to say, that by the
notice to quit and agreement made as to the surrender of the Bog
Field, and the withdrawal of the notice, a new tenancy was created,
to which the bond did not apply; and for this he relied on the case

1878

HOLME
*v.*
BRUNSKILL.

of *Tayleur* v. *Wildin* (1) as an authority, that under the circumstances, a new tenancy was created; and it was on the authority of *Tayleur* v. *Wildin* (1), that Mr. Justice Denman, as we understand, principally relied, but we are unable to agree with this view. In *Tayleur* v. *Wildin* (1), the tenant continued in the occupation of the farm after the day for which the notice to quit, which was withdrawn, had been effectually given, and the rent for which the surety was sued accrued in respect of the occupation after that day, and the Court considered the continuance of the tenant's possession after that time as a new tenancy, and that the guarantee which applied only to the old tenancy was therefore gone. But in the present case, the tenancy of George Brunskill was, in fact, determined on or before the day when, if the notice to quit had not been withdrawn it would have ended. The deficiency and deterioration of the flock therefore occurred at the determination of the very tenancy to which the bond referred. It was, however, argued that the effect of giving up the Bog Field, must be a surrender of the old tenancy. But we are of opinion that this cannot be maintained, and that notwithstanding the surrender to a landlord of part of the land demised, the former tenancy of the remainder of the farm still continues.

It was contended by the defendant, that even if there was a continuance of the old tenancy the effect of the surrender of the Bog Field was to discharge him as surety from all liability. The Bog Field contained about seven acres, and the jury, in answer to a question left to them, at the trial, found that the new agreement with the tenant had not made any substantial or material difference in the relation between the parties, as regards the tenant's capacity to do the things mentioned in the condition of the bond, and for the breaches of which the action was brought. The plaintiff's contention was that this must be treated as a finding that the alteration was immaterial, and that, except in the case of an agreement to give time to the principal debtor, a surety was not discharged by an agreement between the principals made without his assent, unless it materially varied his liability or altered what was in express terms a condition of the contract.

In my opinion this contention on behalf of the plaintiff cannot

(1) Law Rep. 3 Ex. 303.

be sustained.  No doubt, there is a distinction between the cases, which have turned on the creditor agreeing to give time to the principal debtor, and the other cases.  Where a creditor does bind himself to give time to the principal debtor, he with an exception hereafter referred to, does deprive the surety of a right which he has, that is to say of the right at once to pay off the debt which he has guaranteed, and to sue the principal debtor, and without inquiry whether the surety has, by being deprived of this right, in fact suffered any loss, the Courts have held that he is discharged. The exception to which I have referred is, where the creditor on making the agreement with the principal debtor expressly reserves his right against the surety, but this reservation is held to preserve to the surety the right above referred to, of which he would be otherwise deprived.   The cases as to discharge of a surety by an agreement made by the creditor, to give time to the principal debtor, are only an exemplification of the rule stated by Lord Loughborough in the case of *Rees* v. *Berrington* (1): "It is the clearest and most evident equity not to carry on any transaction without the knowledge of him [the surety], who must necessarily, have a concern in every transaction with the principal debtor. You cannot keep him bound and transact his affairs (for they are as much his as your own) without consulting him."

1878

HOLME
*v.*
BRUNSKILL.

The true rule in my opinion is, that if there is any agreement between the principals with reference to the contract guaranteed, the surety ought to be consulted, and that if he has not consented to the alteration, although in cases where it is without inquiry evident that the alteration is unsubstantial, or that it cannot be otherwise than beneficial to the surety, the surety may not be discharged; yet, that if it is not self-evident that the alteration is unsubstantial, or one which cannot be prejudicial to the surety, the Court, will not, in an action against the surety, go into an inquiry as to the effect of the alteration, or allow the question, whether the surety is discharged or not, to be determined by the finding of a jury as to the materiality of the alteration or on the question whether it is to the prejudice of the surety, but will hold that in such a case the surety himself must be the sole judge whether or not he will consent to remain liable notwithstanding

(1) 2 Ves. J. 540.

QUEEN'S BENCH DIVISION.              VOL. III.

1878

HOLME
*v.*
BRUNSKILL.

the alteration, and that if he has not so consented he will be dis-
charged.   This is in accordance with what is stated to be the law
by Amphlett, L.J., in the *Croydon Gas Company* v. *Dickenson* (1).

The plaintiff, in support of his contention, that having regard to
the finding of the jury, the surety was not discharged, relied on
various dicta to the effect that any material change in the contract
between the principals will discharge the surety.   Even if by
these expressions the judges intended to state that to have the
effect of releasing the surety the alteration must be material, it
does not follow that they intended to lay down that no alteration
would discharge the surety unless the jury in an action to enforce
his liability, held it to be material, or to express any opinion at
variance with the rule laid down by me.   The case of *Sanderson* v.
*Aston* (2), was specially relied on by the plaintiff.   But Martin, B.,
though he did not formally dissent from the decision of the majo-
rity of the Court, was not satisfied with the judgment; and if the
decision is to be considered as based on the reason given by
Pollock, B., that the Court was entitled to consider whether the
alteration was material, it cannot, in our opinion, be sustained.

In the present case, although the Bog Field contained seven acres
only, yet it cannot be said to be evident that the surrender of it
could not prejudicially affect the surety.   Some of the witnesses
for the plaintiff admitted that it was occasionally used for pastur-
ing, that its loss would be appreciable in the spring, and that it
might make a difference of fifteen in the number of the sheep
which the farm would carry.

The case may also be considered in another point of view.   The
bond given by the defendant the surety, was to guarantee the
delivery up of the flock of sheep therein referred to at the deter-
mination of the tenancy of the Riggindale Farm, which in our
opinion, must mean Riggindale Farm as then demised to George
Brunskill, and the bond certainly implied that he should continue
to hold the farm as then demised till the flock was given up.   The
contention of the plaintiff, if it could be supported, would make a
variation in this contract, as to the materiality of which there
is at least a doubt, and would make the defendant liable for a
deterioration of the flock during the time when the tenant held

(1) 2 C. P. D. at p. 51.            (2) Law Rep. 8 Ex. 73.

VOL. III.          QUEEN'S BENCH DIVISION.                    507

a smaller farm than that contemplated by the contract of the
surety.

<div style="float:right; text-align:center;">
1878
<hr>
HOLME
*v.*
BRUNSKILL.
</div>

The plaintiff's counsel relied on some observations made by
Lord Cottenham in the case of *Hollier* v. *Eyre.* (1)   But, in fact,
those observations are in favour of the defendant and not of the
plaintiff.   What Lord Cottenham says is, " the surety will be left
to judge for himself between his original undertaking and another
substituted for it, but that is not the case where the contract
remains the same, though part of the subject-matter is withdrawn
from its operation."   In this case, as already pointed out, the
original contract of the surety was that the flock should be
delivered up in good condition, together with the farm, as then
demised to the tenant.   No part of that which was guaranteed
was ever withdrawn from the operation of the bond.   But the
plaintiff attempts to substitute for the contract that the flock
should be given up in good condition, with the farm, as then
demised, a contract that it should be delivered up in like con-
dition with a farm of different extent.   In my opinion the surety
ought to have been asked to decide whether he would assent to
the variation.   He never did so assent, and in my opinion was
discharged from liability, notwithstanding the finding of the jury,
inasmuch as in my opinion the question was not one which ought
to have been submitted to them.

Lord Justice Thesiger concurs in this judgment.

BRETT, L.J.   I speak with great deference when I say I cannot
bring my mind altogether to agree with this judgment, and I feel
bound to observe that I arrive at another view than that which
has been expressed.   As to the first part of the judgment I
entirely agree.   I do not think there was any new tenancy, and I
ground that view on the fact of the finding of the jury, amongst
other things, that the alteration was immaterial.   It is the latter
part of this view with which I cannot agree.   In the first place,
this case comes before us fettered by certain rules.   We are
bound to observe that it is a direct appeal from the decision of my
Brother Denman, after a trial by jury; we are, therefore, not at
liberty to ask whether the question he left was left in proper

(1) 9 H. L. C. 57.

1878
HOLME
*v.*
BRUNSKILL.

form. There cannot be a motion here for misdirection, and we are not at liberty to say that the finding of the jury was contrary to the evidence. It is a general rule that we have no right to look at the verdict, but accept it according to its ordinary construction. I find the question left to the jury was, whether the new agreement with the tenant, which we are told did not alter the tenancy, made a substantial or material difference in the relation between the parties as to the tenant's capacity to do the things mentioned in the bond, and for breach of which the action was brought. They not only found that, but my Brother Denman says that the matter is far more fit for the consideration of a jury of the county of Cumberland than for a lawyer, and he cannot say that he is dissatisfied with their view. Therefore there is the finding of the jury with the assent of the judge. If it were necessary to give an opinion, considering I have not an intimate knowledge of these things, but from what I know of Cumberland farmers, so far from dissenting from the opinion of the jury, I think it is a substantial finding. When one remembers how many views are taken as to farms in Cumberland, I should be inclined to agree with the jury and say it did not make any material difference. We are bound by that finding, and can act in conformity with it. Where there is a suretyship bond, and there are some alterations in the contract or relation of the parties under the bond as to guaranteeing its performance, the question is whether the alteration is not material or substantial, and whether the surety is released. I cannot bring my mind to think he is, for the law takes no notice of alterations that are neither material nor specific. The proposition of law as to suretyship to which I assent is this, if there is a material alteration of the relation in a contract, the observance of which is necessary, and if a man makes himself surety by an instrument reciting the principal relation or contract, in such specific terms as to make the observance of specific terms the condition of his liability, then any alteration which happens is material; but where the surety makes himself responsible in general terms for the observance of certain relations between parties in a certain contract between two parties, he is not released by an immaterial alteration in that relation or contract. My opinion is in accordance with the finding of the

jury, and it will be most dangerous in this particular case to put
ourselves in the place of a jury and because we think seven acres
may make a difference, or 10*l.* a year may make a difference, to
set aside the finding of the jury, which is that neither one is
material or substantial. I think the surety is not released. The
doctrine of the release of suretyship is carried far enough, and
to the verge of sense, and I shall not be one to carry it any further.

1878

HOLME
*v.*
BRUNSKILL.

*Judgment affirmed.*

Solicitors for plaintiff: *Johnston & Harrison, for Harrison &
Little, Penrith.*

Solicitor for defendant: *Arnison, Penrith.*

————

EX PARTE BRADLAUGH.

*June 6.*

*Obscene Book, Order for Destruction of*—20 & 21 *Vict. c.* 83, *s.* 1—*Absence of
Jurisdiction*—*Certiorari taken away*—2 & 3 *Vict. c.* 71, *s.* 49—*Metropolitan
Police Courts.*

A section in an Act of Parliament taking away the certiorari held not to apply
in the case of a total absence of jurisdiction.

An order by a magistrate for the destruction of obscene books under 20 & 21
Vict. c. 83, s. 1, is bad if it merely states that the magistrate was satisfied that
the books were obscene, but not that he was satisfied that the publication of them
would be a misdemeanour, and proper to be prosecuted as such.

IN this case the applicant in person had obtained a rule nisi for
a certiorari to bring up an order of a metropolitan magistrate,
under 20 & 21 Vict. c. 83, for the destruction of certain books of
which the applicant claimed to be the owner, as obscene publica-
tions, on the ground that the order did not shew any jurisdiction
on the face of it, because it did not state that the magistrate was
satisfied that the publication of the books would be a mis-
demeanour, and proper to be prosecuted as such.

The order was in substance as follows: It recited that complaint
had been made by John Green to Mr. Flowers, one of the metropo-
litan police magistrates, sitting at Bow Street, within the metro-
politan police district, that he had reason to believe that certain
obscene books were kept by Edward Truelove, at his shop No. 256,
Holborn, in the county of Middlesex, within the metropolitan