# EXHIBIT 73

Neutral Citation Number: [2005] EWCA Civ 395

Case No: A3/2004/1494 and A3/2004/1519

**IN THE SUPREME COURT OF JUDICATURE**
**COURT OF APPEAL (CIVIL DIVISION)**
**ON APPEAL FROM THE HIGH COURT OF JUSTICE**
**QUEEN'S BENCH DIVISION, COMMERCIAL COURT**
**MR JUSTICE CRESSWELL**
**[2004] EWHC 472 (Comm)**

Royal Courts of Justice
Strand, London, WC2A 2LL

Date: Wednesday 13th April 2005

**Before :**

**LORD JUSTICE WALLER**
**LORD JUSTICE CARNWATH**
and
**SIR MARTIN NOURSE**

- - - - - - - - - - - - - - - - - - - - -
**Between :**

| | |
|---|---|
| **MARUBENI HONG KONG AND SOUTH CHINA LIMITED (A CORPORATION REGISTERED UNDER THE LAWS OF HONG KONG)** | **Appellant** |
| - and - | |
| **THE MONGOLIAN GOVERNMENT ACTING THROUGH THE MINISTRY OF FINANCE OF MONGOLIA** | **Respondent** |

- - - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - - -

**Mark Howard QC and David Garland** (instructed by **Ashurst**) for the **Appellant**
**Antony White QC** (instructed by **Richards Butler**) for the **Respondent**

Hearing date: 3rd March 2005
- - - - - - - - - - - - - - - - - - - - -
Judgment

Lord Justice Carnwath :

**Background**

1. On 29 March 1996, the claimant ("MHK") entered into a Deferred Payment Sales Contract (the "DPS1 Contract") with Buyan Holding Company Limited ("Buyan"), a Mongolian company. The contract was for the purchase by Buyan of machinery, equipment and materials for a cashmere processing plant. The purchase price was US$18,811,670. The first instalment of the price was to be paid within 60 days of the signature of the contract, and the remaining amount was to be paid in 12 equal semi-annual instalments. The first of these was due on 19 October 1998.

2. The defendant is the Government of Mongolia. Its involvement arises in this way. The contract provided for a document described as a "guarantee" to be issued by the Mongolian central bank on behalf of the Mongolian Government ("the Government"), in the form set out in a Schedule to the contract. In the event, a letter in somewhat modified form was issued by the Minister of Finance, dated 11th May 1996 ("the MMOF Letter"). On the same date, the Deputy Minister of Justice of Mongolia signed a document addressed to MHK, entitled "Legal Opinion of the Minister of Justice of the Government of Mongolia", referring to the "guarantee given by the Ministry of Finance, acting for and on behalf of the Government of Mongolia", and stating his opinion that the "guarantor" had "full power and authority" to enter into the guarantee.

3. The appeal concerns the effect of that letter as between MHK and the Government, in the dispute which has since arisen as to performance of the contract. For the background to the dispute it is sufficient to quote the judgment:

> "11. Between October 1996 and May 1997 the claimant supplied machinery, equipment and materials to Buyan under the DPS 1 Contract. A dispute arose as to the quality and fitness for purpose of Mitsuboshi machines supplied by MHK to Buyan.
>
> 12. In 1998 there was a Rescheduling contained in six agreements dated 4 February 1998 between MHK and/or Marubeni and Buyan and in 1999 there was a further Rescheduling contained in five agreements of about April 1999 between MHK and/or Marubeni and Buyan. The defendant says that these refinancing packages involved a material variation of the transaction to which the guarantee related, such as to result in the discharge of the defendant's obligations under the MMOF Letter. The claimant says that there was no such material variation and the obligations were not discharged.
>
> 13. It is MHK's case that Buyan repeatedly failed to pay instalments due under the DPS 1 Contract and has made no payments at all after 19 April 2000. MHK gave formal notice to

    the defendant on 5 November 2001, requiring repayment of the sum of US$13,796,556 together with accrued interest by 12 November 2001. No payment was made.

    14. These proceedings were issued in August 2001."

**The MMOF letter**

4.    The material parts of the letter are in the following terms:

    "To: MARUBENI HONG KONG LTD

    In consideration of you entering into the Deferred Payment Sales Contract No 258500 (hereinafter called the "agreement") with Buyan Holding Company Ltd, a corporation duly organized and existing under the laws of Mongolia, with its principal office at I-4000-68-4 Ulaanbaatar, Mongolia (hereinafter called the "Buyer") for sales and purchase of a textile plant the contact (sic) price of which is United States Dollars Eighteen Million Eight Hundred Eleven Thousand Six Hundred Seventy (USD18,811,670), the undersigned Ministry of Finance of Mongolia unconditionally pledges to pay to you upon your simple demand all amounts payable under the Agreement if not paid when the same becomes due (whether at stated maturity, by acceleration or otherwise) and further pledges the full and timely performance and observance by the Buyer of all the terms and conditions of the Agreement. Further Ministry of Finance undertakes to hold indemnify and hold you harmless from and against any cost and damage which may be incurred by or asserted against you in connection with any obligations of the Buyer to pay any amount under the Agreement when the same becomes due and payable (whether at stated maturity, by acceleration or otherwise) or to perform or observe any term or condition of the Agreement or in connection with any invalidity or unenforceability of or impossibility of performance of any such obligations of the Buyer.

    This covenant shall come to force from the date of implementation of this agreement and remain in full force and effect until all amounts due to you by the Buyer under the Agreement have been paid in full and all the terms and conditions of the Agreement have been fully performed and observed by the Buyer.

    The Ministry of Finance hereby waives any right to require you to proceed against the Buyer or against any security received from the Buyer or any third party or to pursue any other remedy available to you…."

The letter also provided that –

> "… all disputes related to this pledge shall correlate in accordance with the jurisdiction Courts of England."

It is common ground that the proper law of the contract constituted by the MMOF letter is English law. (By contrast, disputes under the DPS1 contract itself were to be decided by Japanese arbitration under Japanese law.)

**The hearing before Cresswell J.**

5. The judge was presented with an agreed list of 5 issues, the hearing of which took 10 days, including expert evidence on both sides on Mongolian law. Group A (Issues 1 to 4) was concerned with whether the Government was bound by the letter. The judge decided this question in favour of MHK. He held, in summary, that the guarantee was issued with express actual authority of the Government; that the authorisation was valid as a matter of Mongolian law; that, if it was not actually authorised, the Minister of Finance had apparent authority to enter into the guarantee on behalf of the Government; and that the Deputy Minister of Justice had actual or apparent authority to issue an opinion letter in relation to such a transaction.

6. This part of the judgment is not directly subject to appeal. However, some of the discussion is relevant to the issues which are raised by the appeal. In particular, the judge made clear that his findings as to both actual and apparent authority depended on the letter being correctly characterised as a "guarantee", that is as imposing a secondary rather than a primary liability. The significance of this distinction lies at the heart of the appeal.

7. Group B (Issues 5(1) and (2)) was concerned with whether the letter had been subsequently discharged. The agreed issues were:

> "5. If the defendant is bound by the issue of the MMOF Letter, whether it was discharged as the result of refinancing agreements between the claimant and Buyan in February 1998 and April 1999; in particular:
>
> (1) Whether, on a true construction of the MMOF Letter, the defendant has undertaken a primary liability (joint and/or several) to the claimant so that the rule in *Holme v Brunskill* (1878) 3 Q.B.D. 495 has no application.
>
> (2) If the answer to 5(1) is no, whether the refinancing packages of February 1998 and April 1999 involved any material variation in the transaction to which the guarantee related such as to result in the discharge of the entirety of the defendant's obligations under the MMOF Letter."

8. The judge decided both issues against MHK, with the result that MHK's claim failed. His final comment was:

> "This conclusion should not come as a surprise to any person experienced in the law and practice of domestic or international finance. A standard form bank guarantee will typically contain a number of provisions designed in an attempt to avoid the application of the rule in *Holme v Brunskill*…. Reschedulings would almost inevitably lead to the discharge of a surety from liability, unless the surety consented to the same. MHK recognised this but chose not to consult the defendant… "

**The appeal**

9. For MHK, Mr Howard helpfully summarised the central issue in the appeal. It turns on the correct characterisation of the MMOF Letter: was it an unconditional independent promise by the Mongolian Government to pay on demand all amounts payable under the sales contract (that is a demand bond), or was it a secondary or conditional promise to act as a surety? In the former case, the obligation to pay arises upon a simple demand or demand supported by a specified document. In the latter case, not only must the claimant prove the actual indebtedness of the debtor, but the guarantor has all the defences available to the debtor, and is discharged automatically (under the rule in *Holme v Brunskill*) if there is any variation of the arrangements with the principal debtor without his consent which might prejudice his interests.

10. Procedurally, MHK applied to the Court of Appeal for permission to appeal, initially only on the ground that the MMOF Letter was, on its true construction, "a demand guarantee or demand bond" creating primary obligations. (For simplicity, I shall use the single term "demand bond".) Jacob LJ. adjourned the application for further written submissions, noting that the judge had found that there was no actual or apparent authority for the Minister of Finance to undertake a primary liability. MHK then applied to amend its grounds of appeal to challenge that finding. Waller LJ. granted MHK permission to amend the grounds of appeal, and to appeal on the grounds as so amended.

11. By a respondent's notice, the Government asks for the appeal to be dismissed on the ground that MHK should not have been permitted to advance the case that the instrument was a demand bond, having expressly disclaimed it in opening. It submits, further, that, even if the MMOF Letter did create primary obligations, the result under the rule in *Holme v Brunskill* should be the same.

12. It is unfortunate that the clarity of the issues, so carefully agreed by the parties, became obscured by uncertainty as to the precise nature of MHK's case at different stages. However, it will be convenient to consider first the case as now put, before considering, if it becomes necessary to do so, whether it is a case which it should be permitted to advance.

**Submissions**

13. Mr Howard says that the wording of the letter is to be interpreted against the background of previous authorities which have treated similar wording as giving rise to an independent obligation. They are *Esal Commodities v. Oriental Credit* CA [1985] 2 Lloyd's Rep. 546; *Siporex Trade SA v. Banque Indosuez* [1986] 2 Lloyd's Rep. 146; and *IE Contractors v. Lloyd's Bank* CA [1990] 2 Lloyd's Rep. 496. The same approach has been confirmed more recently by this court in *Gold Coast Ltd v. Caja de Ahorros del Mediterraneo* [2001] EWCA Civ 1806. Those authorities show, it is said, that:

> "… where in international transactions a bond or guarantee is expressed to be payable upon demand, in the absence of clear words indicating that liability under it is conditional upon the existence of liability or the part of the account party in connection with the underlying transaction, the guarantee is intended and should be construed as an independent guarantee entitling the beneficiary to payment simply against an appropriately worded demand accompanied by such other documents (if any) as the guarantee may require."

14. In relation to the MMOF Letter he relies in particular on the wording of the first promise, under which the obligation of the Mongolian Government is expressed to be "unconditional", and the trigger is a "simple demand". Further, the express waiver of any right to require MHK to proceed against the buyer or against any security is inconsistent with the idea that the Government should be able to avail itself of defences available to the buyer. Further, it is unlikely that the parties intended the rights under a letter governed by English law to be dependent on the resolution of issues, which under the main contract were to be determined by Japanese arbitration.

15. He criticises the judgment for disregarding these authorities, and for giving too much weight to the description of the MMOF Letter as a "guarantee" in the Legal Opinion letter. Such a description was not regarded as conclusive in the *Gold Coast* case (see paras 18 and 21). Further, the judge failed to recognise that the commercial purpose of the MMOF Letter was to provide security which was readily and easily realisable, on a failure by Buyan to meet its payment obligations. This purpose would be frustrated by a construction requiring MHK to prove default before making demand under the MMOF Letter.

16. He also relies on the terms of the DPS1 contract, referred to in the terms of the MMOF Letter, which required (by Article 7.1) the procurement of a letter of guarantee, the stated purpose being "in order to secure the due and punctual payment" by Buyan of the contract sums. In the context of international trade, security provided by a government, whose credit standing is likely to be superior, should not be treated in English law as less extensive than that provided by a bank.

17. Mr White, for the Government, says that reliance on *Esal*, and the cases following it, is misconceived. They all relate to irrevocable instruments issued by banks. The Government is not a bank, and is not in the business of providing irrevocable financial instruments in return for a fee or commission. Outside the field of first demand instruments or performance bonds issued by banks, the courts have not been willing, in the absence of clear words, to interpret documents in which a party undertakes obligations in relation to an agreement between two other parties as imposing unconditional primary liability. The mere fact that the obligation of the guarantor is expressed to be to pay "on demand", and without conditions, is insufficient to create primary liability.

18. In support of this submission, he refers to three cases relating to very different contexts, one to hire purchase, and the others to building contracts. The first, also relied on by the judge, was *Stadium Finance Limited -v- Helm* [1965] 109 SJ 471 (CA transcript 25/5/65). The document in question was described as an "indemnity form", signed by the mother of an infant purchaser under a hire purchase agreement, which contained the following:

> "I will upon demand pay to you such sum or sums of money as may at any time or from time to time have become payable by the customer but be unpaid by him."

The Court of Appeal held that this obligation created secondary rather than primary liability. Lord Denning MR said (transcript p 3-4):

> "In every case we come back to the test. Was one of these two persons primarily liable and the other only secondarily liable? If so, it is a guarantee by the one who is only secondarily liable. … you cannot judge the difference simply by reference to the literal construction of the document. … you have to look at the substance of the matter. … Taking this indemnity form, Clause 1 was clearly a guarantee. It is an agreement to pay on demand any sum which the guarantor ought to have paid and has not…"

19. Similarly, in the building context, in *General Surety and Guarantee Co -v- Frances Parker Limited* (1977) 6 Bld LR 16, Donaldson J declined to read the words "will forthwith pay on demand", in a counter-guarantee provided by the parent of a building contractor, as creating a primary liability. In *Trafalgar House Construction (Regions) Limited -v- General Surety & Guarantee Co. Limited* [1996] AC 199, the House of Lords reversed the ruling of the Court of Appeal that a bond provided jointly by a building sub-contractor and a surety company was an on-demand guarantee comparable to the performance bond in *Esal (Commodities) Limited -v- Oriental Credit Limited*. Mr White relies on the words of Lord Jauncey at p. 208:

> "…clear and unambiguous language must be used to displace the normal legal consequences of the contract [of suretyship]".

**Discussion**

20. One of the problems in cases of this kind is terminology. In ordinary legal language, a "guarantee", in contrast with an "indemnity" imposes a secondary liability:

> "The distinction between the two contracts is, in brief, that in a contract of guarantee the surety assumes a secondary liability to answer for the debtor who remains primary liable; whereas in a contract of indemnity the surety assumes a primary liability, either alone or jointly with the principal debtor." (Chitty on Contracts (29th Ed) Vol 2 para 44.013)

The obligation of the guarantor-

> "is not an obligation himself to pay a sum of money to the creditor, but an obligation to see to it that another person, the debtor, does something…" (*Moschi v LEP Air Services* [1973] AC 331, 347, per Lord Diplock)

21. The different usages are referred to by Andrews and Millett, Law of Guarantees (4th Ed) p 14, in a section headed "Performance bonds":

> "Bonds are simple covenants by one person to pay another, either conditionally or unconditionally. A performance bond, also commonly called a performance guarantee, or (confusingly) a demand guarantee, is a binding contractual undertaking given by a person, usually a bank, to pay a specified amount of money to a named beneficiary on the occurrence of a certain event, which is usually the non-fulfilment of a contractual obligation undertaken by the principal to the beneficiary."

As I understand it, the terms "demand bond", as used in the grounds of appeal and "first demand bond" (as used by the judge – para 137) are intended in the same sense. The same authors refer to the difficulties experienced by the courts in determining whether a particular contract which provides for payment "on demand" is a performance bond, or -

> "… whether it is a guarantee in the true sense (sometimes referred to in this context as a "see to it" guarantee)".

A similar contrast is drawn in Jack, Documentary Credits 3rd Ed para 12.4:

> "Whatever the undertaking may be called, a distinction must be drawn between what is referred to in this chapter as an independent guarantee (encompassing demand guarantees, demand bonds etc) and a true contract of guarantee (or

> suretyship). Although the terminology unfortunately overlaps, the legal nature is very different…"

22. Chitty, Law of Contracts (29th Ed) vol 2 para 44-014 discusses the development of the law of "performance guarantees", starting with *Edward Owen Engineering Ltd v Barclays Bank International Ltd* [1978] QB 159:

    > "A number of cases have involved discussion of the nature of 'performance guarantees' which are, in essence, exceptionally stringent contracts of indemnity. They are contractual undertakings, normally granted by banks, to pay or repay, a specified sum in the event of any default in performance by the principal debtor of some other contract with a third party, the creditor. An unusual feature of several modern cases has been that the bank's liability arises on mere demand by the creditor, notwithstanding that it may appear on the evidence that the principal debtor is not in any way in default, or even that the creditor is in default under the principal contract. Such guarantees are sometimes called 'first demand guarantees'. It has been held that performance guarantees of this nature are analogous to a bank's letter of credit…"

23. Those passages provide the context for discussing the cases relied on by Mr Howard. They show that "demand bonds" (however described) are a specialised form of irrevocable instrument, developed by the banking world for its commercial customers. They have been accepted by the courts as the equivalent of irrevocable letters of credit. As such, they have been described as part of "the lifeblood of commerce"; and, in the words of Donaldson LJ:

    > "Thrombosis will occur if, unless fraud is involved, the courts intervene and thereby disturb the mercantile practice of treating rights thereunder as being the equivalent of cash in hand."
    > (*Intraco Limited -v- Notis Shipping Corporation* [1981] 2 Lloyd's Rep. 256,257)

    It cannot be assumed that cases relating to such banking instruments provide any useful guidance when construing guarantees given outside the banking context. The authorities relied on by Mr Howard must be seen in this light.

24. In *Esal* the instrument was issued by a bank; it was described on its face as a "performance bond"; and it was for a specified amount, being 10% of the purchase price. The only difficulty arose from the wording:

    > "We undertake to pay the said amount on your written demand in the event that the supplier fails to execute the contract in perfect performance…"

The question was whether this had the effect that the performance bond was ineffective unless and until a breach of the underlying contract had been established. This reading was rejected as being inconsistent with the commercial purpose of a performance bond, that is, to enable the beneficiary to obtain prompt and certain payment, in a context in which the bank is "not concerned in the least" with the relations between the supplier and the customer (p 549, per Ackner LJ).

25. In *Siporex* Hirst J. applied the same approach to the interpretation of an instrument issued by a bank pursuant to an obligation in an international trade agreement to provide a performance bond. The instrument was described in correspondence between the parties and with the bank as a performance bond. The judge commented:

> "There is in my judgment no real hardship on the bank in imposing this strict liability to pay. A performance bond is a commercial instrument. No bank is obliged to enter into it unless they wish to and no doubt when they do so, they properly exact commercial terms and protect themselves by suitable cross-indemnities, such as were entered into in the present case."(p 158)

26. In *I.E. Contractors*, the documents again were issued by a bank; were described as (or assumed to be) "performance bonds" (see issue (1) p 498); and were for damages up to specified amounts. The difficulty arose from the unusual form and language of the documents (see p 501-2), and the wording of the operative clause:

> "We undertake to pay you, unconditionally, the said amount on demand, being your claim for damages brought about by the above-named principal."

It was held that this wording required the demand to contain some reference, express or implicit, to a claim for damages; but that this requirement was satisfied on the facts of the case (p 502).

27. The judgment of Staughton LJ contains some general discussion of the law relating to performance bonds. He discusses the possibility of different triggering events for payment under a performance bond: at one extreme, a simple demand "without requiring the presentation of any other document or the assertion of any fact"; and, at the other, a bond "conditioned upon the existence of facts rather than the production of a document asserting those facts" (p 499). He concludes, following *Esal*:

> "… there is a bias or presumption in favour of the construction which holds a performance bond to be conditioned upon documents rather than facts. But I would not hold the presumption to be irrebuttable, if the meaning is plain." (p 500)

The latter observation was not necessary to the decision. There was no argument that the instrument in that case required more than the *assertion* of a claim to damages.

28. In all these cases the documents were issued by banks, and were described as, or assumed to be, performance bonds. Not surprisingly, the courts interpreted them against the background of the law relating to such instruments. They provide no useful analogy for interpreting a document which was not issued by a bank and which contains no overt indication of an intention to create a performance bond or anything analogous to it.

29. The most recent authority relied on by Mr Howard, decided since the date of the MMOF Letter, is the *Gold Coast* case. It concerned the interpretation of a refund guarantee issued by a bank pursuant to an obligation in a shipbuilding contract. Payment of specified amounts was to be made on "your first written demand", subject (under condition 1) to receipt of a certificate issued by Lloyds Bank that the refund had become due. The Court of Appeal held the instrument "had all the hallmarks of a first demand guarantee":

> "It describes itself as a guarantee, but this is simply a label; it does not use the language of guarantee. Rather, the obligation, which is expressed to be an 'irrevocable and unconditional undertaking', is that the banks 'will pay' on a first written demand. The only express condition of payment is contained in condition 1. This requires a certificate but makes no reference to arbitration or underlying liability under the shipbuilding contract. The instrument contains its own dispute resolution provisions." (para [21])

Mr Howard relies on the court's disregard of the term "guarantee". However, the other features of the instrument were sufficient to displace the ordinary sense of that term. In particular, the provision for a bank certificate as a trigger for payment was a clear indication that the obligation to pay was independent of any need to establish default under the main contract.

30. Turning to the MMOF Letter, the starting-point in my view is that it is not a banking instrument, and it is not described, either on its face or in the supporting Legal Opinion letter, in terms appropriate to a demand bond or something having similar legal effect. The Legal Opinion describes it as a guarantee. The terminology is not of course conclusive. However, I agree with Cresswell J that, if MHK had wanted the additional security of a demand bond, one would have expected them to have insisted on appropriate language to describe it, in both the instrument itself, and in the Legal Opinion. The absence of such language, in a transaction outside the banking context, creates in my view a strong presumption against MHK's interpretation. (Since the letter did not follow the contractual form, I do not think that Mr Howard can find support in the words of Article 7.1 of the DPS contract.)

31. The question then becomes whether there are sufficient indications in the wording of the instrument to displace that presumption. Mr Howard relies on the words "unconditionally pledges" and "simple demand". However, they are qualified by the following words, which indicate that the obligation only arises if "the amounts

payable under the agreement (are) not paid when the same becomes due". As Cresswell J said, this is wording appropriate to a secondary obligation, that is one conditional upon default by the buyer. It is true that in *Esal* similar wording was held insufficient to displace the ordinary effect of what was admittedly a performance bond. However, here the starting-point is different, and there is no reason for reading the words in other than their ordinary meaning.

32. That sense is reinforced by the following pledge of –

   ".. the full and timely performance and observance by the buyer
   of all the terms and conditions of the agreement."

   It is not suggested, as I understand it, that this indicates anything other than a secondary obligation. It is true that the letter also contains a primary obligation, in the form of an indemnity against cost or damage resulting from the buyer's default. However, this does not assist MHK in this case, and there is no reason to treat this as qualifying the ordinary meaning of the earlier part of the letter.

33. Finally, Mr Howard relies on the clause under which the Government waives "any right" to require MHK to proceed against the buyer, or to pursue any other remedy. He suggests that this indicates the commercial purpose of the instrument, analogous to that of a performance bond, to provide security which is readily and easily realisable. If that was the intention, it seems to me a round-about way of indicating the purpose. In any event, it is at best a neutral indication. In a normal performance bond there would be no need for such a waiver, because there would be no question of the issuing party having any such right. Nor am I impressed by the fact that establishing a default under the main contract may require recourse to Japanese arbitration. Whatever the reasons which led the parties to the respective contracts to choose different systems of law, that by itself cannot in my view be a reason for altering the natural interpretation of the MMOF Letter.

34. I conclude, therefore, that the judge was correct to reject the submission that the MMOF Letter was to be treated as a demand bond or its equivalent.

35. This is sufficient to dispose of the single ground of appeal. I record that Mr Howard also hinted at an alternative submission that, even if not a demand bond, the instrument should be construed as creating some form of primary liability, sufficient to displace the rule in *Holme v Brunskill*. A variation of such an argument (based on *Hyundai v Pournaras* [1978] 2 Lloyd's Rep 502) was rejected by the judge (para 131-136), and was not expressly subject to appeal. Mr Howard did not himself rely on that case, and there was no application to amend the grounds of appeal to indicate any alternative interpretation.

36. The conclusion I have reached on the interpretation of the MMOF Letter makes it unnecessary to consider MHK's appeal against the judge's finding that the Minister of Finance had no authority, actual or apparent, to undertake a primary liability.

37. It also makes it unnecessary to consider Mr White's submission that MHK should not have been permitted, in its closing argument, to advance the argument that this was a demand bond. However, it may be appropriate to make two comments:

   i) Mr White appears to have had legitimate cause for complaint at MHK's apparent change of position on the demand bond issue. The authority of the Minister of Finance to issue the instrument on behalf of the Government was directly in issue. This depended on examination of conflicting expert evidence on Mongolian law and practice, including the interpretation of Article 14(2) of the Mongolian Budget Law, under which the instrument was allegedly authorised. For that exercise to be manageable and useful, it was important for both parties and the judge to know at the outset of the hearing what interpretations of the instrument were still in play (whether or not, as Mr Howard suggests, the contention was covered by the pleadings.)

   ii) On the other hand, I can understand why the judge did not make a specific ruling. The transcript does not suggest that Mr White articulated very clearly the nature of his objection, or the ruling (if any) he was asking the judge to make. Where a new point is sought to be raised in closing, the objection may take a number of forms, and the court's response will differ accordingly. If the objection is that the new point is not covered by the pleadings, the court can insist on an application to amend, and rule accordingly. If the problem is that the witnesses have not had an opportunity to deal with the new point, it may be possible to recall them. It might have been open to Mr White to make a more fundamental objection: that a complex and expensive case had been conducted for 10 days by each party on a particular basis, and that it would be contrary to the overriding objectives of the CPR to allow a change. It is unnecessary for us to consider how, if such an objection had been made, the judge should have dealt with it.

**Conclusion**

38. For these reasons, I would dismiss the appeal, and confirm the judge's order.

**Sir Martin Nourse**

39. I agree.

**Lord Justice Waller**

40. I also agree.