# EXHIBIT   74

a

# McGuinness v Norwich and Peterborough Building Society

## [2011] EWCA Civ 1286

b  COURT OF APPEAL, CIVIL DIVISION
WARD, MOSES AND PATTEN LJJ
28, 29 SEPTEMBER, 9 NOVEMBER 2011

*Guarantee – Construction – Nature of guarantor's obligation – Guarantor entering into guarantee in respect of brother's borrowings – Brother defaulting on loan and*
c  *creditor seeking to enforce guarantee by petitioning for guarantor's bankruptcy – Whether sum demanded under guarantee a liability for a liquidated sum – Insolvency Act 1986, s 267(2)(b).*

The appellant guarantor provided a guarantee and indemnity to the respondent building society (the creditor) in respect of borrowing by his brother (the borrower). Clause 2.2 of the guarantee provided that the
d  guarantor guaranteed that 'all money and liabilities owing, or becoming owing to us in the future, by the Borrower (whether actual or contingent, whether incurred alone or jointly with another and whether as principal or surety) will be paid and satisfied when due'. Clause 2.3 of the guarantee provided that 'any amount claimed under the Guarantee is payable by you immediately on
e  demand by us'. Clause 2.4 provided '[a]s a separate obligation' for the guarantor to give an indemnity in respect of any loss and expenses caused by the borrower's default. Clause 4.2 provided that the guarantor's obligations were 'those of principal, not just as surety' and that the respondent was not 'obliged to make any demand on, or take any steps against, the Borrower or any other person' before enforcing the guarantee. The borrower defaulted on
f  the loan and the creditor proceeded to enforce the guarantee not by action but by serving on the guarantor a statutory demand and then petitioning for his bankruptcy. The amount of the mortgage debt and interest as of the date of the demand was £1,206,867·17. At the hearing of the bankruptcy petition, the guarantor submitted that his liability to the creditor under the guarantee was not a debt for a liquidated sum as was required under s 267(2)(b)[a] of the
g  Insolvency Act 1986 in order to found a creditor's petition, and that therefore the creditor could not proceed by way of a bankruptcy petition unless and until it had obtained a judgment on its claim. The deputy registrar found that the guarantor's liability under cll 2.2 and 2.3 to the creditor was as a debtor rather than in unliquidated damages and made a bankruptcy order in the sum
h  demanded under the guarantee. The judge below dismissed an appeal by the guarantor on the basis that cl 4.2 implied a concurrent liability on the guarantor. The guarantor appealed and on the appeal the court considered whether cll 2.2 and 2.3 imposed either a conditional payment or concurrent liability for the mortgage debt and if not whether cl 4.2 had the effect of imposing a concurrent liability on the guarantor as a principal debtor.

j  **Held** – The liability of the guarantor under cl 2.2 of the guarantee created a liability in debt to the creditor which the creditor could petition for under s 267(2)(b). A debt for a liquidated sum had to be a pre-ascertained liability under the agreement which gave rise to it. The issue in relation to

a  Section 267, so far as material, is set out at [15], below

guarantees was whether the liability of the guarantor could be treated as one which was reduced to a specified and agreed sum by the guarantee itself. A guarantee of a loan could impose one or more of the following types of liability on the guarantor: (a) a 'see to it' obligation, ie an undertaking by the guarantor that the principal debtor would perform his own contract with the creditor; (b) a conditional payment obligation, ie a promise by the guarantor to pay the instalments of principal and interest which fell due if the principal debtor failed to make those payments; (c) an indemnity; and (d) a concurrent liability with the debtor for what was due under the contract of loan. Where a guarantee on its proper construction contained a promise by the guarantor to pay the principal sum due and interest in the event of the debtor failing to pay, no difficulty arose; the claim was one in debt and as such was necessarily in a pre-agreed amount. The obligations in classes (b) and (d) created a liability in debt and it was well established that an indemnity (class (c)) was enforceable by way of action for unliquidated damages, the liability arising from the failure of the indemnifier to prevent the person indemnified from suffering the type of loss specified in the contract. Guarantees containing a class (a) 'see to it' liability gave rise to a claim for unliquidated damages because although the measure of the guarantor's liability was the amount of the debt, that was not the same as an obligation to pay a sum of money under the contract whether as a debt or agreed damages. In the instant case, the language of cl 2.2 was ambiguous as to the nature of the liability but when read with cll 2.3 and cl 2.4 was consistent with being read as a conditional payment obligation on the guarantor. The requirement for notice was not a pre-requisite to the enforcement of a liability in damages and was more consistent with cl 2.2 being read as a direct promise to pay the mortgage liabilities as they fell due. In addition although a request for payment of a presently due debt was unnecessary, it could be made a condition of payment and was a requirement where the guarantee was in the nature of a collateral promise to pay on demand if the principal debtor did not. Further cl 4.2 reflected the status of the guarantor as principal debtor by making it clear that his liability was concurrent with that of the borrower and not contingent upon it and therefore operating to confirm that cl 2.2 created a liability in debt. It followed that the appeal would be dismissed (see [7], [8], [36], [42], [56], [59]–[61], [66]–[70], below).

Bradford Old Bank Ltd v Sutcliffe [1918] 2 KB 833, Re J Brown's Estate, Brown v Brown [1893] 2 Ch 300 and Rowe v Young (1820) 2 Bli 391 applied.

Decision of Briggs J [2011] 1 All ER (Comm) 334 affirmed.

**Notes**

For the meaning of 'liquidated sum' see 3(2) Halsbury's Laws (4th edn) (2002 reissue) para 130.

For the Insolvency Act 1986, s 267, see 4(2) Halsbury's Statutes (4th edn) (2008 reissue) 345.

**Cases referred to in judgments**

Adney, Ex p (1776) 2 Cowp 460, (1776) 98 ER 1187.

Atwood v Partridge (1827) 4 Bing 209, (1827) 130 ER 749, Ct of CP.

Bradford Old Bank Ltd v Sutcliffe [1918] 2 KB 833, CA.

Bridge v Campbell Discount Co Ltd [1962] 1 All ER 385, [1962] AC 600, [1962] 2 WLR 439, HL.

Brown's (J) Estate, Re, Brown v Brown [1893] 2 Ch 300.

*a*  *Debtor, Re a, ex p Berkshire Finance Co Ltd v Debtor* (1962) 106 Sol Jo 468.

*Denham's Case* (undated) Stone 183.

*Dummelow, Re, ex p Ruffle* (1873) 8 Ch App 997, CA in Ch.

*Dutch v Warren* (1721) 1 Stra 406.

*Esso Petroleum Co Ltd v Alstonbridge Properties Ltd* [1975] 3 All ER 358, [1975] 1 WLR 1474.

*b*  *Ex p Broadhurst, Re Broadhurst* (1852) 22 LJ Bcy 21, (1852) 42 ER 1145.

*Firma C-Trade SA v Newcastle Protection and Indemnity Association, The Fanti, Socony Mobil Oil Co Inc v West of England Ship Owners Mutual Insurance Association (London) Ltd, The Padre Island* [1990] 2 All ER 705, [1991] 2 AC 1, [1990] 3 WLR 78, HL.

*c*  *Goodtitle v North* (1781) 2 Doug KB 584.

*Heylor v Hall* (1622) Palm 325.

*Hope v Premierpace (Europe) Ltd* [1999] BPIR 695.

*Miller, Re* [1901] 1 QB 51, CA.

*Mines v Sculthorpe* (1809) 2 Camp 215, (1809) 170 ER 1134, NP.

*Minet, Ex p* (1807) 14 Ves Jun 189, (1807) 33 ER 493, LC.

*d*  *Moschi v Lep Air Services Ltd* [1972] 2 All ER 393, [1973] AC 331, [1972] 2 WLR 1175, HL.

*MS Fashions Ltd v Bank of Credit and Commerce International SA (in liq) (No 2), High Street Services Ltd v Bank of Credit and Commerce International SA (in liq), Impexbond Ltd v Bank of Credit and Commerce International SA (in liq)* [1993] 3 All ER 769, [1993] Ch 425, [1993] 3 WLR 220, Ch D and CA.

*e*  *Owen v Routh* (1854) 14 CB 327, (1854) 139 ER 134, Ct of CP.

*Rowe v Young* (1820) 2 Bli 391, (1820) 4 ER 372.

*Stead, Ex p, Re Liddard* (1823) 1 G&J 301.

*Sudell, Re, ex p Myers* (1833) Mont & B 229.

*Sudell, Re, ex p Simpson* (1834) 1 Mont & A 541.

*f*  *Thompson, Ex p* (1833) Mont & B 219, Ct of Rev.

*Truex v Toll* [2009] EWHC 396 (Ch), [2009] 4 All ER 419, [2009] 1 WLR 2121.

*Utterson v Vernon* (1790) 3 Term Rep 539, (1790) 100 ER 721.

*Utterson v Vernon* (1792) 4 Term Rep 570, (1792) 100 ER 1181.

*Wallis v Smith* (1882) 21 Ch D 243, CA.

*Ward, Re, ex p Ward* (1882) 22 Ch D 132, CA.

*g*  **Cases referred to in skeleton arguments**

*A debtor (No 64 of 1992), Re* [1994] 2 All ER 177, [1994] 1 WLR 264.

*A debtor (No 1 of 1987, Lancaster), Re, ex p the debtor v Royal Bank of Scotland plc* [1989] 2 All ER 46, [1989] 1 WLR 271, CA.

*h*  *Axel Johnson Petroleum AB v MG Mineral Group AG, The Jo Lind* [1992] 2 All ER 163, [1992] 1 WLR 270, CA.

*Charge Card Services Ltd, Re* [1986] 3 All ER 289, [1987] Ch 150, [1986] 3 WLR 697.

*Charles (a bankrupt), Re* (1811) 14 East 197.

*Debtors (669 of 1926), Re* [1927] 1 Ch 19, [1926] All ER Rep 456, CA.

*j*  *General Produce Co v United Bank Ltd* [1979] 2 Lloyd's Rep 255.

*Haine v Day* [2008] EWCA Civ 626, [2008] IRLR 642, [2008] ICR 1102.

*Hampton v Minns* [2002] 1 All ER (Comm) 481, [2002] 1 WLR 1.

*IIG Capital LLC v Van Der Merwe* [2008] EWCA Civ 542, [2008] 2 All ER (Comm) 1173.

*Jervis v Harris* [1996] 1 All ER 303, [1996] Ch 195, [1996] 2 WLR 220, CA.

268          All England Law Reports          [2012] 2 All ER (Comm)

*Lagos v Grunwaldt* [1910] 1 KB 41, [1908–10] All ER Rep 939, CA.          *a*

*Marshall, Ex p, Re Fox* (1833) 1 Mont & A 118, Bkptcy Ct.

*Marshall, Ex p, Re Fox* (1833) Mont & B 242, Ct of Rev.

*McGreavy, Re, Ex p McGreavey v Benfleet Urban DC* [1950] 1 All ER 442, [1950] Ch 269, CA.

*Meyer, Ex p* (1848) 6 De G M & G 775.          *b*

*Mills v Grove Securities Ltd* [1997] BPIR 243, CA.

*Navier v Leicester* [2002] EWHC 2596 (Ch), [2002] All ER (D) 104 (Nov).

*Noble (a bankrupt), Re, ex p the Bankrupt v Official Receiver* [1964] 2 All ER 522, [1965] Ch 129, [1964] 3 WLR 206, CA.

*Pinnel's Case* (1601) 5 Co Rep 117a, [1558–1774] All ER Rep 612, (1601) 77 ER          *c*
237.

*President of India v Lips Maritime Corp, The Lips* [1987] 3 All ER 110, [1988] AC 395, [1987] 3 WLR 572, HL.

*Remblance v Octagon Assets Ltd* [2009] EWCA Civ 581, [2010] 2 All ER 688.

*Royal Brompton Hospital NHS Trust v Hammond (Taylor Woodrow Construction (Holdings) Ltd, Pt 20 defendant)* [2002] UKHL 14, [2002] 1 All ER (Comm) 897,          *d*
[2002] 1 WLR 1397.

*Russell v Russell* [1999] 2 FCR 137.

*Salt v Corris Developments Ltd* [2011] EWHC 2105 (Ch), [2011] All ER (D) 10 (Aug).

*Sempra Metals Ltd (formerly Metallgesellschaft Ltd) v IRC* [2007] UKHL 34, [2007]          *e*
4 All ER 657, [2008] 1 AC 561, [2007] 3 WLR 354.

*Slade's Case* (1602) 4 Co Rep 91a.

*Strahan, Re, ex p Barwis* (1855) 6 De GM & G 762.

*T & N Ltd, Re* [2005] EWHC 2870 (Ch), [2006] 3 All ER 697, [2006] 1 WLR 1728.          *f*

*TS & S Global Ltd v Fithian-Franks* [2007] EWHC 1401 (Ch), [2008] 1 BCLC 277.

*United Australia Ltd v Barclays Bank Ltd* [1940] 4 All ER 20, [1941] AC 1, HL.

*Wehmeyer v Wehmeyer* [2001] BPIR 548.

*West End Networks Ltd (in liq), Re, Secretary of State for Trade and Industry v Frid* [2004] UKHL 24, [2004] 2 All ER 1042, [2004] 2 AC 506, [2004] 2 WLR 1279.          *g*

**Appeal**

Spencer McGuinness appealed with the permission of the Court of Appeal from the decision of Briggs J ([2010] EWHC 2989 (Ch), [2011] 1 All ER (Comm) 334) dismissing Mr McGuinness's appeal from the decision of Deputy Registrar Middleton making a bankruptcy order on 24 February 2010 on the          *h*
petition of the respondent, the Norwich and Peterborough Building Society, in respect of a sum of £1,223,883·26 alleged to be due under a guarantee and indemnity given by Mr McGuinness in relation to his brother's borrowing liabilities. The facts are set out in the judgment of Patten LJ.

*Peter Arden QC* and *Tim Calland* (instructed by *Moon Beever*) for the appellant.          *j*
*Angharad Start* and *Richard Hanke* (instructed by *Rosling King LLP*) for the respondent.

*Judgment was reserved.*

9 November 2011. The following judgments were delivered.

*a*   **PATTEN LJ** (giving the first judgment at the invitation of Ward LJ).

INTRODUCTION

[1]  On 24 February 2010 a bankruptcy order was made against Mr McGuinness in the High Court on the petition of the Norwich and Peterborough Building Society (the society). The petition was based on a debt

*b*   of £1,223,883·26 (including interest) due under a guarantee which Mr McGuinness entered into on 10 September 2008 in respect of a mortgage loan made by the society to his brother, Mr Craig Ross McGuinness.

[2]  The background to the giving of the guarantee and its enforcement by the society is not a matter of dispute. In April 2007 Mr Craig McGuinness obtained a mortgage for a term of 25 years from the society to assist him in the

*c*   purchase of a flat in the Docklands area of London. He subsequently acquired an adjoining flat (which is not charged to the society) and amalgamated both premises into one flat. The society did not consent to the works and when it discovered what had been done, it became concerned about the value and realisability of its security. It therefore threatened to call in the mortgage loan.

*d*   [3]  In order to avoid this Mr McGuinness provided a guarantee for his brother's mortgage liabilities. Mr Craig McGuinness failed to meet the monthly instalments of interest due from October 2008 onwards and therefore became liable under cl 13(a) of the mortgage conditions to repay the entirety of the loan and any accrued interest.

*e*   [4]  The flat was regarded as unsaleable and, instead of attempting to realise its security, the society proceeded to enforce the guarantee not by action but by serving on Mr McGuinness a statutory demand and then petitioning for his bankruptcy. The amount of the mortgage debt and interest as of the date of the demand (4 March 2009) was £1,206,867·17. Again this is not in dispute.

[5]  No application was made by Mr McGuinness to set aside the statutory demand nor was the debt paid. Failure to comply with the statutory demand

*f*   therefore established Mr McGuinness's inability to pay the debt which is one of the conditions required to be satisfied in the case of a creditor's petition under s 267(2)(c) of the Insolvency Act 1986: see s 268(1)(a). But at the hearing of the bankruptcy petition Mr McGuinness took the point that his liability to the society under the guarantee was not a debt for a liquidated sum as it is required to be under s 267(2)(b) in order to found a creditor's petition. Counsel for

*g*   Mr McGuinness (Mr Calland) submitted that on the authority of the decision of the House of Lords in *Moschi v Lep Air Services Ltd* [1972] 2 All ER 393, [1973] AC 331 it was a liability in damages of an unliquidated kind. He relied on the decision of Rimer J in *Hope v Premierpace (Europe) Ltd* [1999] BPIR 695 to the effect that a claim in damages or for an account is not a claim for a liquidated

*h*   sum even though the amount of the alleged liability is readily quantifiable. Therefore the society could not proceed by way of bankruptcy petition unless and until it had obtained a judgment on its claim.

[6]  The society does not accept this argument but its principal submission to the deputy registrar, which he accepted, was that, on the true construction of the guarantee, Mr McGuinness's liability to the society was as a debtor rather

*j*   than in damages. Mr McGuinness's appeal to Briggs J against the bankruptcy order was dismissed on the same grounds: see [2010] EWHC 2989 (Ch), [2011] 1 All ER (Comm) 334, [2011] 1 WLR 613. I granted permission for a second appeal on the basis that the question whether a liability under a guarantee was a debt for a liquidated sum within the meaning of the 1986 Act raised an issue of general importance for this court to consider particularly in the light of the

doubts expressed by Briggs J about the correctness of Rimer J's decision in *Hope's* case. But in order to understand how the argument that the appellant's liability in this case did not fall within the provisions of s 267(2)(b) it is necessary to begin by analysing the nature of a guarantor's liability and how that impacts on the provisions of the guarantee in this case.

LIABILITY UNDER A GUARANTEE

[7] It is common ground that a guarantee of a loan may impose one or more of the following types of liability on the guarantor. These are: (1) a 'see to it' obligation, ie an undertaking by the guarantor that the principal debtor will perform his own contract with the creditor; (2) a conditional payment obligation, ie a promise by the guarantor to pay the instalments of principal and interest which fall due if the principal debtor fails to make those payments; (3) an indemnity; and (4) a concurrent liability with the debtor for what is due under the contract of loan.

[8] The obligations in classes (2) and (4) create a liability in debt. But it is well established that an indemnity is enforceable by way of action for unliquidated damages: see *Firma C-Trade SA v Newcastle Protection and Indemnity Association, The Fanti, Socony Mobil Oil Co Inc v West of England Ship Owners Mutual Insurance Association (London) Ltd, The Padre Island* [1990] 2 All ER 705 at 715–717, [1991] 2 AC 1 at 33–36. The liability arises from the failure of the indemnifier to prevent the person indemnified from suffering the type of loss specified in the contract. A guarantee of the 'see to it' type has also been held by the House of Lords to create a liability in damages. The obligation undertaken by the guarantor is not one to pay the debt but consists of a promise that the debt will be paid by the principal debtor: see *Moschi's* case [1972] 2 All ER 393, [1973] AC 331.

[9] Mr Moschi guaranteed the performance by a company of its obligation to discharge a pre-existing debt to the respondent at the rate of £6,000 per week subject to a cap on his liability of £40,000. When the company defaulted the creditor treated the contract as repudiated and proceeded to sue on the guarantee. Mr Moschi contended that as the contract had been brought to an end no further contractual instalments were payable and consequently there was no liability to make such payments under the guarantee. Lord Reid rejected this argument for the following reasons ([1972] 2 All ER 393 at 398–399, [1973] AC 331 at 344–345):

'To meet that argument I think it is necessary to see what in fact the appellant did undertake to do. I would not proceed by saying this is a contract of guarantee and there is a general rule applicable to all guarantees. Parties are free to make any agreement they like and we must I think determine just what this agreement means. With regard to making good to the creditor payments of instalments by the principal debtor there are at least two possible forms of agreement. A person might undertake no more than if the principal debtor fails to pay any instalment he will pay it. That would be a conditional agreement. There would be no prestable obligation unless and until the debtor failed to pay. There would then on the debtor's failure arise an obligation to pay. If for any reason the debtor ceased to have any obligation to pay the instalment on the due date then he could not fail to pay it on that date. The condition attached to the undertaking would never be purified and the subsidiary obligation would never arise.

*a*    On the other hand, the guarantor's obligation might be of a different kind. He might undertake that the principal debtor will carry out his contract. Then if at any time and for any reason the principal debtor acts or fails to act as required by his contract, he not only breaks his own contract but he also puts the guarantor in breach of his contract of guarantee. Then the creditor can sue the guarantor, not for the unpaid

*b*    instalment but for damages. His contract being that the principal debtor would carry out the principal contract, the damages payable by the guarantor must then be the loss suffered by the creditor due to the principal debtor having failed to do what the guarantor undertook that he would do.

*c*    In my view, the appellant's contract is of the latter type. He "personally guaranteed the performance by [the company] of its obligation to make the payments at the rate of £6,000 per week". The rest of the clause does not alter that obligation. So he was in breach of his contract as soon as the company fell into arrears with its payment of the instalments. The guarantor, the appellant, then became liable to the creditor,

*d*    the respondents, in damages. Those damages were the loss suffered by the respondents by reason of the company's breach. It is not and could not be suggested that by accepting the company's repudiation the respondents in any way increased their loss.

The respondents lost more than the maximum which the appellant guaranteed and it appears to me that the whole loss was caused by the

*e*    company having failed to carry out its contract. That being so, the appellant became liable to pay as damages for his breach of contract of guarantee the whole loss up to the maximum of £40,000.'

[**10**] Lord Diplock reached the same conclusion. In his speech he traces the historical treatment of guarantees by the courts of common law not as

*f*    obligations to pay a sum of money but as obligations to see to it that the debtor performs his own obligations to the creditor. Prior to the Common Law Procedure Acts 1852–1860 this had procedural consequences. For a claim in debt the appropriate form of action was indebitatus assumpsit. But an action for compensation for breach of other types of contractual obligations had to be brought by way of special assumpsit: see [1972] 2 All ER 393 at 400, [1973] AC

*g*    331 at 347.

[**11**] Lord Diplock's conclusions about the nature of a guarantor's liability are set out at [1972] 2 All ER 393 at 401–402, [1973] AC 331 at 348–349:

'It follows from the legal nature of the obligation of the guarantor to

*h*    which a contract of guarantee gives rise that it is not an obligation himself to pay a sum of money to the creditor, but an obligation to see to it that another person, the debtor, does something; and that the creditor's remedy for the guarantor's failure to perform it lies in damages for breach of contract only. That this was so, even where the debtor's own obligation that was the subject of the guarantee was to pay a sum of money, is clear

*j*    from the fact that formerly the form of action against the guarantor which was available to the creditor was in special assumpsit and not in indebitatus assumpsit (*[Mines v Sculthorpe* (1809) 2 Camp 215, (1809) 170 ER 1134]).'

The legal consequence of this is that whenever the debtor has failed voluntarily to perform an obligation which is the subject of the guarantee the creditor can recover from the guarantor as damages for breach of his

*a*

contract of guarantee, whatever sum the creditor could have recovered from the debtor himself as a consequence of that failure. The debtor's liability to the creditor is also the measure of the guarantor's.'

A DEBT FOR A LIQUIDATED SUM?

*b*

[12] Subject to compliance with the relevant insolvency rules (see rr 6.96–6.114 of the Insolvency Rules 1986, SI 1986/1925) a creditor may prove in a bankruptcy for any 'bankruptcy debt': see s 322(1) of the 1986 Act. 'Bankruptcy debt' is defined by s 382 in the following terms:

*c*

'(1) "Bankruptcy debt", in relation to a bankrupt, means (subject to the next subsection) any of the following—(a) any debt or liability to which he is subject at the commencement of the bankruptcy, (b) any debt or liability to which he may become subject after the commencement of the bankruptcy (including after his discharge from bankruptcy) by reason of any obligation incurred before the commencement of the bankruptcy, (c) any amount specified in pursuance of section 39(3)(c) of the Powers of Criminal Courts Act 1973 in any criminal bankruptcy order made against him before the commencement of the bankruptcy, and (d) any interest provable as mentioned in section 322(2) in Chapter IV of Part IX.

*d*

(2) In determining for the purpose of any provision in this Group of Parts whether any liability in tort is a bankruptcy debt, the bankrupt is deemed to because subject to that liability by reason of an obligation incurred at the time when the cause of action accrued.

*e*

(3) For the purposes of references in this Group of Parts to a debt or liability, it is immaterial whether the debt or liability is present or future, whether it is certain or contingent or whether the amount is fixed or liquidated, or is capable of being ascertained by fixed rules or as a matter of opinion; and references in this Group of Parts to owing a debt are to be read accordingly.

*f*

(4) In this Group of Parts, except in so far as the context otherwise requires, "liability" means (subject to subsection (3) above) a liability to pay money or money's worth, including any liability under an enactment, any liability for breach of trust, any liability in contract, tort or bailment and any liability arising out of an obligation to make restitution.'

*g*

[13] Rule 12.3(1) of the 1986 rules also states that—

'[s]ubject as follows, in both winding up and bankruptcy, all claims by creditors are provable as debts against the company or, as the case may be, the bankrupt, whether they are present or future, certain or contingent, ascertained or sounding only in damages.'

*h*

[14] A bankruptcy debt as defined therefore includes not only a liability in debt properly so-called but any claim for damages whether in contract or in tort including a contingent or future liability. It also does not matter whether the debt or liability is liquidated or remains to be ascertained. The extended definition in s 382(3) includes both.

[15] But the qualifications for petitioning as a creditor are more restricted. Section 267 (so far as material) provides:

*j*

'(1) A creditor's petition must be in respect of one or more debts owed by the debtor, and the petitioning creditor or each of the petitioning creditors must be a person to whom the debt or (as the case may be) at least one of the debts is owed.

*a*

(2) Subject to the next three sections, a creditor's petition may be presented to the court in respect of a debt or debts only if, at the time the petition is presented—(a) the amount of the debt, or the aggregate amount of the debts, is equal to or exceeds the bankruptcy level, (b) the debt, or each of the debts, is for a liquidated sum payable to the petitioning creditor, or one or more of the petitioning creditors, either immediately or at some certain, future time, and is unsecured, (c) the debt, or each of the debts, is a debt which the debtor appears to be unable to pay or to have no reasonable prospect of being able to pay, and (d) there is no outstanding application to set aside a statutory demand served (under section 268 below) in respect of the debt or any of the debts.'

*b*

*c*

[**16**] Section 267 does not refer to a 'bankruptcy debt' as such. That defined term appears in s 322 in relation to the proof of debts. The word used by s 267 is 'debt' which s 385 states is to be construed in accordance with s 382(3). Section 382(3) (unlike s 382(1)) does not define debt as including a liability (as defined in s 382(4)). The two remain distinct. It has a different purpose which is to make it clear that the debts *or* liabilities referred to in s 382(1) can include debts or liabilities which are future or contingent, liquidated or unascertained. A debt within s 267 would therefore include debts of that kind but for the express provisions of s 267(2) which requires the petition debt to be for a liquidated sum.

*d*

[**17**] The possible inclusion of a damages liability as the basis of a good petitioning creditor's debt cannot therefore be based on the extended definition of 'bankruptcy debt' in s 382(1) and (4). It has to be found in the practice and decisions of the court as to what constitutes a debt in a liquidated sum for the purposes of a creditor's petition.

*e*

[**18**] Mr Arden QC's case is that a see to it liability of the kind described in *Moschi*'s case does not qualify. Although the guarantor's liability is readily ascertainable by reference to the state of account between the creditor and the principal debtor, it is not fixed or specified in the guarantee itself. The measure of damages is as a matter of law the amount which the debtor has failed to pay. But the creditor's claim remains one for damages in that sum; not for an amount which the guarantor agreed to pay under the terms of the guarantee. It is not therefore a claim for a liquidated sum. The question, however, which also arises from the language of s 267 is whether a claim in damages (as opposed to one in debt) qualifies as a good petitionable debt at all.

*f*

*g*

[**19**] If Mr Arden is right and a see to it liability under a guarantee does not qualify as a petitionable debt under s 267(2)(b), the consequences are at first glance surprising. Assuming (as I do for the moment) that Mr McGuinness's liability is of this kind, it would mean that the court could make a bankruptcy order on the society's petition against Mr McGuinness's brother as principal debtor but not against him as guarantor even though the liability of both would be identical in financial terms and as readily calculable in one case as in the other. But experience teaches one in this field as in many other areas of law that views about what might constitute a rational system of law often have to give way to an established practice which cannot be altered except by legislation. The answer to the question posed by s 267(2)(b) has, as I have said, to be found by examining the practice of the bankruptcy court both before and after the passing of the Bankruptcy Act 1869 when the requirement for a petition debt to be in a liquidated sum first appears.

*h*

*j*

[**20**] One of the submissions made by Ms Start on behalf of the society was that an historical examination of this kind was strictly unnecessary because the 1986 Act was not a consolidating statute as such and should be interpreted free of the shackles of the past. I reject that submission. Although the 1986 Act did undoubtedly incorporate a number of significant changes in the law and practice of insolvency (including personal insolvency), there is nothing in the Cork Report which preceded it (see *Report of the Review Committee on Insolvency Law and Practice* (Cmnd 8558) (1982)) or in the terms of the Act itself to suggest that any change was intended in relation to the conditions which govern a creditor's petition in bankruptcy.

[**21**] The Bankruptcy Act 1914 did not include the defined term of a 'bankruptcy debt' equivalent to s 382. But in substance it made the same distinction between debts which can found a creditor's petition and those which are provable in the bankruptcy. Section 30(3) of the 1914 Act refers to all debts and liabilities (including future and contingent liabilities) being provable with the exception of unliquidated damages in tort: see s 30(1). But s 4 restricted the creditor's right to petition to a 'debt' in a liquidated sum. The 1986 Act removed the restrictions on proving for unliquidated damages in tort but s 267 repeated in terms the requirement that there should be a debt in a liquidated sum which was contained in s 4(1)(b) of the 1914 Act.

[**22**] What then does this term mean? It first appears in s 6 of the Bankruptcy Act 1869. The Bankruptcy Act 1849 simply required there to be a single debt of at least £50 due to the creditor. At that time bankruptcy was restricted to traders but this restriction was removed by the Bankruptcy Act 1861. The 1869 Act widened the class of provable debts by including demands for unliquidated damages in contract and for breach of promise. Section 31 also made it clear that these debts and liabilities could be both present and future, certain or contingent. One can therefore trace to the 1869 Act the distinction made in all subsequent bankruptcy statutes between provable and petitionable debts.

[**23**] A 'liquidated sum' has never been defined in any of this legislation and appears to be the codification in the 1869 Act of earlier decisions of the courts as to what constituted a good petitioning creditor's debt. So in *Ex p Broadhurst, Re Broadhurst* (1852) 22 LJ Bcy 21, (1852) 42 ER 1145 a covenant by the father of two existing partners in favour of an incoming partner to pay any shortfall in the debts due to the firm below a stated sum and to bear the debts of the existing partners in excess of a stated sum was treated not as a contractual liability to pay a stated or liquidated sum but as a liability for unliquidated damages. Maule J said ((1852) 22 LJ Bcy 21 at 25, (1852) 42 ER 1145 at 1147) that—

> 'The question now before the Court is, whether the debt or alleged debt or demand asserted to be due is one which will be sufficient, as a petitioning creditor's debt, to support an adjudication in bankruptcy. I am of opinion that it is not. It is clear from the recitals in the deed of partnership which contains the covenant in question, that the engagement entered into was one entered into for the benefit of Mr. Walker [the petitioning creditor]. The covenant was with Mr. Walker for the benefit of Mr. Walker, and was not a covenant with Mr. Walker for the benefit and on behalf of Walker, Perry & Broadhurst. They had, in fact, no interest in it, but Mr. Walker was alone interested; it was a covenant to pay the difference between the debts due from the old firm stated in the schedule

*a*  and any further debts; it was to pay the excess of one set of debts over the other set of debts—over the amount of debts due to the firm. That being so, it seems to me impossible to turn the covenant into a covenant to pay a liquidated sum, or any sum, to Walker. The covenant could not be performed by doing that; the object of the parties was to put the firm in the same position in which they would be if the debts, active and passive,

*b*  were to the amount stated in the covenant, and there is no specific sum engaged to be paid to Walker. It cannot be treated at law as a specific sum of money to be received, for the right to receive would be co-extensive only with the demand sustained; and this cannot be so made the subject of computation as to be a fit ground for a petitioning creditor's debt. No action could be framed upon it. I do not mean to say that a covenant to pay

*c*  to A. for the benefit of A, B. and C. may not make a good petitioning creditor's debt. In the present case there might not be a sufficient damage to constitute the debt; or, even suppose that damage to the amount of 100*l*. was shewn, still it does not follow that the money could have been recovered, as anything to be recovered must be in the shape of damage,

*d*  and such damage is not of a character to amount to a petitioning creditor's debt.'

[**24**] In *Owen v Routh* (1854) 14 CB 327, (1854) 139 ER 134 the claim was for breach of an undertaking to deliver some shares on a certain day. The defendant pleaded that he was discharged from the liability by his adjudication in bankruptcy. This applied to the defendants' 'debts and sums of money due

*e*  or claimed to be due' on the date of the vesting order. The issue therefore for the court was whether the liability on the undertaking was a debt or a sum of money due. The submissions made on behalf of the plaintiff included one to the effect that only debts were provable and that a claim in damages was not therefore barred by the vesting order and this was accepted by counsel for the

*f*  defendant. His argument was that an undertaking to deliver shares on a specified day created a provable debt because the shares would be treated as money's worth in the amount of their value at the date for delivery. The Court of Common Pleas rejected this analysis and treated the claim as one in damages in a sum to be measured by reference to the price of the shares at trial. They were therefore unliquidated.

*g*  [**25**] References are made in the argument and the short judgment to the earlier case of *Utterson v Vernon* (1790) 3 Term Rep 539, (1790) 100 ER 721. This concerned an agreement to lend the bankrupt some stock which she undertook to replace. The act of bankruptcy and the declaration of her bankruptcy took place before the stock was replaced. The issue was whether

*h*  the agreement created a provable debt. It was argued that the agreement did not provide for payment of a sum certain but only for the replacement of the stock at some indefinite point in the future. It was therefore a claim for unliquidated damages.

[**26**] At the trial before Lord Kenyon CJ the judges expressed different views about what constituted a provable debt. Lord Kenyon CJ thought that there

*j*  was a provable debt in an amount equal to the value of the stock on the day of bankruptcy. Ashurst J held that the only provable debts were those which could be recovered in the form of an indebitatus assumpsit. This would exclude any claim in damages. Buller J said that the form of action was not determinative and the real question was whether the amount of the debt could be ascertained without the intervention of a jury. Grose J also took the view that a creditor

could prove for a claim in damages provided that they were in a liquidated sum. *a*
The court therefore held by a majority that there was a provable debt.

[**27**] The Lord Chancellor, who had originally sent the case to the court for
determination, is reported at (1792) 4 Term Rep 570, (1792) 100 ER 1181 to
have been doubtful about the decision and remitted the case for
reconsideration. On this occasion the court held unanimously for the
defendant bankrupt. Lord Kenyon CJ said ((1792) 4 Term Rep 570 at 571, (1792) *b*
100 ER 1181 at 1182) that—

> '[t]he question in this case depends on a simple principle of law, which
> cannot be doubted. It is clear, that where one person, previous to his
> bankruptcy, is indebted to another in a precise sum which is ascertained,
> the latter may prove his debt under the commission: but it is as clear, that *c*
> where there is only a cause of action existing, where the debt is to arise on
> a stipulation which has not been broken previous to the time of the
> bankruptcy, and where the debt remains to be inquired into, there the
> creditor cannot prove his debt under the commission, and the demand will
> remain undischarged by the certificate.'

[**28**] It will be apparent from the judgments in these cases that during the first *d*
half of the nineteenth century no real distinction was made between debts
which were provable and those which would found a creditor's petition. Under
the Bankrupts (England) Act 1825 the petitioning creditor was required to
make an affidavit of the truth of his debt or debts and to prove the relevant act
of bankruptcy. The debt had to exceed the minimum sum of £100 but could be
payable at a future date. Prior to the 1825 Act contingent or unliquidated *e*
claims were not provable on the ground that they were difficult to quantify.
Creditors whose debts fell within this category were not therefore able to prove
in the bankruptcy. As a consequence, their debts were not extinguished but
continued to be enforceable against the bankrupt's after-acquired property. The
question whether the particular debt had survived the bankruptcy was the issue *f*
in both *Owen v Routh* and *Utterson v Vernon*. But the 1825 Act made contingent
debts provable and the category of provable debts was gradually expanded
through successive Bankruptcy Acts so that by 1869 only claims for
unliquidated damages in tort remained unprovable; a restriction now removed
by the 1986 Act.

[**29**] Cases after 1869 (and, to a lesser extent, after 1825) as to whether a debt *g*
is provable are not therefore entirely reliable guides as to what continued to be
a good petitioning creditor's debt. The express requirement in the 1869 Act that
it should be in a liquidated sum reflects the earlier practice of not admitting to
proof in bankruptcy debts which were not quantified and required to be
determined by a jury. But the historical background to the retention of the
requirement that a petitionable debt should be in a liquidated sum is, I think, an *h*
important guide to what type of debt should qualify.

[**30**] In *Re Dummelow, ex p Ruffle* (1873) 8 Ch App 997 the issue was whether a
creditor could vote at the first creditors' meeting. Section 16(3) of the 1869 Act
excluded a right to vote in the case of creditors in respect of 'any unliquidated
or contingent debt, or any debt, the value of which is not ascertained'. The
Court of Appeal held that a claim for untaxed costs was either unliquidated or *j*
ascertained. Mellish LJ said (at 1001) that—

> '[t]he question really is, what is meant by an "unliquidated debt" in the
> 3rd sub-section. The fair construction of the clause seems to me this: "a
> contingent debt" refers to a case where there is a doubt if there will be any

a    debt at all; "a debt, the value of which is not ascertained," means a debt the
amount of which cannot be estimated until the happening of some future
event; and "an unliquidated debt" includes not only all cases of damages to
be ascertained by a jury, but beyond that, extends to any debt where the
creditor fairly admits that he cannot state the amount. In that case there
must be some further inquiry before he can vote.'

b    [31] *Re Ward, ex p Ward* (1882) 22 Ch D 132 was concerned with whether a
creditor could petition in respect of the liability of a broker who failed to settle
the sums due on the purchase by him of shares traded on the London Stock
Exchange. He was declared a defaulter in accordance with the Stock Exchange
rules and under those rules his liability to the vendor firm was assessed at
c    £5,623. They petitioned for his bankruptcy but were met with a plea that their
claim was not for a liquidated sum due at law or in equity as required by s 6 of
the 1869 Act but was a claim for unliquidated damages.

[32] The Court of Appeal held that the claim was for a debt in a liquidated
sum because the incorporation of the Stock Exchange rules into the contract
meant that the contract itself provided the means of ascertaining the amount
d    due. Cotton LJ said (at 135) that—

'[r]ule 170 in the case of a defaulter really alters the original contract,
and provides a new contract as between the defaulter and his creditor, and
then the amount of the liability is fixed and ascertained in accordance with
that altered contract.'

e    [33] In *Re Miller* [1901] 1 QB 51 a prospective partner paid £2,000 to a broker
on terms that he should have the option of demanding its repayment if he did
not become a partner in the firm by a specified date. The firm was hammered
before that date and having given notice to determine the agreement, the
prospective partner then petitioned for bankruptcy in that sum. The Court of
Appeal held that the alleged debt of £2,000 was not a liquidated sum and could
f    not therefore found a petition because the hammering of the firm was not an
event which entitled notice of determination to be served under the
agreement. The only remedy for the firm's inability to perform the contract
was one in damages which was not a debt in a liquidated sum.

[34] In *Re a Debtor, ex p Berkshire Finance Co Ltd v Debtor* (1962) 106 Sol Jo 468
g    a Divisional Court in Bankruptcy had to consider whether a judgment debt in
respect of sums due under a hire-purchase agreement was a good petitioning
creditor's debt. In most cases the existence of a judgment debt will be
conclusive but the judgment sum in this case included the balance of all the
remaining hire charges which became payable on the premature determination
of the agreement. Since the judgment was obtained, the House of Lords in
h    *Bridge v Campbell Discount Co Ltd* [1962] 1 All ER 385, [1962] AC 600 had held
that provisions of this kind constituted a penalty. The Divisional Court
therefore exercised their power to go behind the judgment and held that the
creditor had, on a proper application of the law, no more than a cause of action
against the debtor for unliquidated damages. There is, however, nothing in the
judgment of Cross J to suggest that had the creditor had a good cause of action
j    for a liquidated sum based on the contract it would not have qualified.

[35] Finally in this context I should mention *Truex v Toll* [2009] EWHC 396
(Ch), [2009] 4 All ER 419, [2009] 1 WLR 2121 which concerned an attempt by
a solicitor to bankrupt a client who had not paid the solicitor's fees. Although
the client had made a belated attempt to have the bills taxed, the Registrar held
that the sum due must on any view exceed the statutory minimum and that the

client had in any event accepted the bills as payable. The debtor's appeal was allowed on the basis that a claim for solicitor's fees not judicially assessed was not a claim for a liquidated sum under s 267 of the 1986 Act and that there had been no binding admission of the debt. Proudman J said:

'[36] In my judgment whether a sum is liquidated and whether there is a defence to the claim are separate issues and the first must be determined before the second is addressed. Accordingly any admission, acknowledgment or agreement converting the amount claimed from an unliquidated to a liquidated sum must be one from which the client has bound himself not to resile. A mere acknowledgment would be insufficient to bind him to forego judicial assessment or determination.

[37] On this basis it was not possible to say that any part of the work done by Mr Truex had been quantified, or was quantifiable by the bankruptcy court as a mere matter of arithmetic. It seems to me that the Chief Registrar conflated the issue of whether there was a genuine dispute about a liquidated debt with that of whether the sum claimed was liquidated in the first place. The bill as a whole was capable of challenge as to quantum, was thus for an unliquidated sum and did not fulfil the requirement of s 267. The same point applies to the Chief Registrar's alternative finding that there could not be a genuine dispute as to at least £750 of the costs.'

[36] These authorities indicate and I think establish that a debt for a liquidated sum must be a pre-ascertained liability under the agreement which gives rise to it. This can include a contractual liability where the amount due is to be ascertained in accordance with a contractual formula or contractual machinery which, when operated, will produce a figure. *Ex p Ward* is the obvious example of that. Claims in tort are invariably unliquidated because they require the assistance of a judicial process to ascertain the amount due by way of damages. In some cases the calculation of the award will be straightforward and obvious but the unliquidated nature of the claim excludes it from being a good petitioning creditor's debt which satisfies the requirements of s 267.

[37] The most obvious use of the term 'liquidated' has been in relation to liquidated damages. 'Liquidated' has been defined judicially as meaning the sum which the parties have by their contract assessed as the damages to be paid for its breach: see *Wallis v Smith* (1882) 21 Ch D 243 at 267 per Cotton LJ. If a genuine pre-estimate of loss the provision is enforceable according to its terms. I would therefore regard a claim for liquidated damages as one for a liquidated sum within the meaning of s 267 unless a claim in damages is excluded by the use of the word 'debt'.

[38] Another familiar context in which the word 'liquidated' appeared was RSC Ord 13 which governed when a plaintiff could enter final judgment against a defendant who failed to give notice of intention to defend. Final judgment could only be entered when the writ was indorsed with a claim for a liquidated demand: see RSC Ord 13, r 1. Claims in debt or for liquidated damages fell within this rule but it did not include claims in tort where the damages were necessarily unliquidated or those for contractual damages where the measure of liability was not specified in the contract itself.

[39] The authorities in the field of bankruptcy as to what constitutes a liquidated sum are consistent with this approach. In *Ex p Broadhurst* (1852) 22 LJ Bcy 21, (1852) 42 ER 1145 the measure of liability under the contract was

a  readily calculable but that did not make it a liquidated claim. As Maule J put it in his judgment, there was no specific sum engaged to be paid to the creditor.

[**40**] For this reason *Hope*'s case [1999] BPIR 695 was in my view correctly decided on its facts. The misappropriation by the employee of money from his employer gave rise in that case to an obvious liability either for money had and received or for breach of trust or for deceit. But as Rimer J held, none of those

b  claims is for a liquidated sum properly so-called. They are all claims for monetary compensation in a sum equivalent to the employer's loss. Much of the argument on this appeal centred on a paragraph in the judgment (at 699) where Rimer J said:

c  'Mr Rainey submits that it follows that none of the company's claims for a remedy is in the nature of an order for payment of a liquidated sum. It is irrelevant that the company claims to be able to identify its claim down to the last penny. It is still faced with the difficulty that its range of alternative claims against the debtor are claims for damages or for an account and payment. A claim for damages is not a claim for a liquidated sum; and nor

d  is a claim whose remedy is that of an account, even though it may be that the taking of the account so ordered could be dealt with in a summary way and a judgment there and then given for a specific sum.
I accept that submission.'

[**41**] Read in context, the judge was not saying that a claim in damages could not be a debt within the meaning of s 267 regardless of the nature of the claim.

e  All that he was asked to decide was whether the claims on which the petition was based were for a liquidated sum.

[**42**] The issue therefore in relation to guarantees is whether the liability of the guarantor can be treated as one which is reduced to a specified and agreed sum by the guarantee itself. Where the guarantee on its proper construction contains a promise by the guarantor to pay the principal sum due and interest

f  in the event of the debtor failing to pay no difficulty arises. The claim is one in debt and as such is necessarily in a pre-agreed amount. But guarantees containing a see to it liability give rise on Lord Diplock's analysis in *Moschi*'s case [1972] 2 All ER 393, [1973] AC 331 to a claim for unliquidated damages. Although the measure of the guarantor's liability is the amount of the debt, that is not the same as an obligation to pay a sum of money under the contract

g  whether as a debt or agreed damages.

[**43**] Therefore, as a matter of general principle and ordinary language, Mr Arden is, I think, right in his submission that the liability under a guarantee of the see to it type would not constitute a debt for a liquidated sum. The only possible caveat is if the practice of the bankruptcy courts prior to 1869 was to

h  regard such liabilities as debts which would found a creditor's petition and be provable in the bankruptcy. If that is right then it would, I think, support a construction of s 6 of the 1869 Act which accommodated such guarantees.

[**44**] We were referred to a number of decided cases on guarantees starting with *Heylor v Hall* (1622) Palm 325 and with *Denham's Case* Stone 183 which is reported in *Montagu's Bankrupt Laws* (1805) vol 2, p 120 but is undated. Both

j  reports are extremely short and give no details of the nature of the guarantor's liability. But they do indicate that sureties were even then subject to the bankruptcy laws.

[**45**] In *Ex p Stead, Re Liddard* (1823) 1 G&J 301 the issue raised was whether a liability under a guarantee which resulted in a judgment was provable in the bankruptcy of the guarantor where the act of bankruptcy pre-dated the

judgment. Lord Eldon LC ordered that the petitioner should be at liberty to take out a future commission against the debtor but no further indication is given in the report of the eventual outcome.

[**46**] Of more assistance is *Atwood v Partridge* (1827) 4 Bing 209, (1827) 130 ER 749 where the defendant had guaranteed the due payment by another of the premiums due under an insurance policy. The benefit of the policy was assigned to the plaintiffs who were compelled to meet the premiums when the insured defaulted. The defendant became bankrupt and the issue once again was whether the liability for breach of covenant was discharged and the debt was provable in the bankruptcy. The court held that the liability was not discharged. Best CJ said ((1827) 4 Bing 209 at 211, (1827) 130 ER 749 at 750):

'Robinson owes the Plaintiffs money. The Defendant does not become a surety for that debt; but Robinson having agreed, by way of security, to pay the premium upon a policy of insurance, the Defendant undertakes to guarantee, not the payment of Robinson's debt to the Plaintiffs, but of that premium. There was, therefore, no debt due from the Defendant to the Plaintiffs, contingent or otherwise. Upon Robinson's failing to pay the premium the Plaintiffs were entitled to recover from the Defendant unliquidated damages, the amount of which might have varied, according to circumstances. If Robinson continued alive, as was found by the jury, the amount would have been the premium paid by the Plaintiffs. If Robinson had died, it might have been the whole sum insured. How is it possible, then, to say that this was a debt due from the Defendant.'

[**47**] In *Re Sudell, ex p Myers* (1833) Mont & B 229 the guarantee was for the amount of £12,000 being the sum drawn down by the debtor. The issue was whether it created a provable debt on the basis that contingent debts were now included as a result of the 1825 Act. One of the arguments presented to the court was that there was no debt contracted for and that the guarantee merely created a liability sounding in damages.

[**48**] The court held that there was a liability in debt albeit of a contingent nature and that the debt was therefore provable. The guarantee was therefore treated as falling into the first of Lord Reid's examples in *Moschi's* case by creating a liability for payment of the debt albeit on a contingent basis. Sir George Rose said (at 241–242):

'I never knew it doubted that a debt on a guarantee when the contingency had happened could be proved. I recollect fifty of such cases: it was the constant practice of the commissioners to admit such proofs. In all the cases, from [*Ex p Adney* (1776) 2 Cowp 460, (1776) 98 ER 1187] and [*Ex p Minet* (1807) 14 Ves Jun 189, (1807) 33 ER 493], no man ever thought of objecting that a guarantee was not a debt; but the difficulty was as to its being a contingency. Suppose the common case of an engagement to replace stock: that engagement is not a debt; yet it was always proveable, and why is it? Because it was a fair equitable engagement, which would be available against assets.'

[**49**] The only reason why an agreement to replace stock was held to constitute a provable debt was that the stock was treated as money's worth and if replaced on a specified date created in substance a liability to pay a specified sum which was readily ascertainable: see *Utterson v Vernon* (1790) 3 Term Rep 539, (1790) 100 ER 721 and *Owen v Routh* (1854) 14 CB 327, (1854) 139 ER 134 referred to earlier. The reference in Sir George Rose's judgment to guarantees invariably creating debts has therefore to be read in the context of the

*a* guarantee under consideration in that case. This is, I think, confirmed by what he said in the subsequent case of *Re Sudell, ex p Simpson* (1834) 1 Mont & A 541 which was an application for a rehearing of the petition considered in *Ex p Myers*. The earlier decision appears to have been controversial on the question whether liability under a guarantee is ordinarily to be treated as giving rise to a contingent debt. The court overcame this difficulty in *Ex p Simpson* by

*b* emphasising that under the terms of the contract the guarantor had made himself a principal debtor in respect of the sums due. Sir George Rose (at 567–568, 569) also revisited what he had said in *Ex p Myers*:

'In [*Ex p Myers*] I said, that "I never knew it doubted that a debt on a guarantee, when the contingency had happened, could be proved, and that

*c* I recollected fifty of such cases."

I now repeat, after consideration, that where a guarantee becomes absolute before the bankruptcy, and was capable of valuation, the practice always has been to consider it proveable. This practice, having been adopted during so long a period without adverse applications, proves the general impression as to the existence of the rule.

*d* To a certain extent it may be laid down as a rule, that so far as guarantees are concerned, a debt proveable and a petitioning creditor's debt are convertible terms.

That Lord Eldon did not supersede in the case of the guarantee [*Ex p Stead*] is a strong authority, as proving his Lordship was of opinion that it would support the commission.

*e* The meaning of the word "guarantee", when used in any writing, is to be ascertained from the nature of the instrument, and of the transaction in each particular case; and its being used is not conclusive as to whether the party using it be or be not a mere surety.

The undertaking in this case is a direct contract of debt. There is a

*f* circumstance, no doubt, as to the mode of payment; but that no further affects the contract than as shewing how the money is to be paid.

Let it be assumed that the document in question was a mere guarantee to be answerable for the debt of another, if that other did not pay; and suppose,

1st, That the contingency happened before bankruptcy.

*g* 2d, It happened after.

1st, If the contingency had occurred before the bankruptcy there could have been no difficulty; for the circumstances which had already happened shewed *Lyne* and *Suddell* to be so completely insolvent as would prove to any commissioner that they were utterly disabled from ever paying.

*h* 2d, If the contingency were after the bankruptcy. If any doubt arise whether it then would be proveable, the 135th section of the bankrupt act gives the creditors the benefit of that doubt; and certainly the construction made in this case is favourable to the creditors.

The general and leading intent of the bankrupt statutes is, first, legally to

*j* distribute the assets; and, second, to release the bankrupt from all demands which depriving him of his property has disabled him from meeting …

There are many engagements to pay money, as for the value of goods, which before the bankruptcy would not have been the subject of an action of "debt," but for which an action of assumpsit must have been brought;

a

yet if the only reason of the necessity for the action of assumpsit, instead of debt, was that the amount was not ascertained, and the commissioners could ascertain that amount, it would constitute a debt proveable.

I must not, however, be understood to lay down a general rule that all guarantees are proveable; such is not the law.'

b

[**50**] What I take from these passages is that the ability to prove for a liability under a guarantee existed even when the liability which it imposed was not one as principal debtor as such but was an obligation to pay a specified sum on the happening of a contingency. Even that view was not unanimous across the court. Although the Chief Judge took the same view as Sir George Rose, Sir John Cross described the question of whether mere guarantees created contingent debts as one of extreme nicety on which he was not prepared to venture an opinion. But there is nothing in *Ex p Myers* or *Ex p Simpson* to support an extension of the principle of what constitutes a contingent debt to a case such as *Atwood v Partridge* where the liability was of the see to it kind and Ms Start was unable to direct us to any case where that had been done. Indeed in *Ex p Thompson* (1833) Mont & B 219 the same court decided that a guarantee to pay an annual sum in the event of default of the principal debtor did not give rise to a provable contingent debt if the act of bankruptcy preceded the debtor's default.

c

d

[**51**] I therefore conclude that there is nothing in the practice of the court in relation to liability under guarantees which displaces what I consider to be the correct construction of s 267 of the 1986 Act. It follows that the petition was defective and that the bankruptcy order should not have been made unless the proper construction of Mr McGuinness's guarantee is the one adopted by Briggs J and the deputy registrar. Although not necessary for the resolution of this appeal, my view is that 'debt' in the earlier Bankruptcy Acts was treated by the courts as wide enough to include a liability in contract for damages in a liquidated sum. That, I think, is evident from the judgment of Mellish LJ in *Re Dummelow, ex p Ruffle* (1873) 8 Ch App 997 quoted above where he described an unliquidated debt as including a claim in damages and from the court's rejection in cases like *Utterson v Vernon* of the view that the ability to prove for a debt depended upon it being recoverable in the form of an indebitatus assumpsit. The better view is that expressed by Grose J in that case ((1790) 3 Term Rep 539 at 549, (1790) 100 ER 721 at 726) that—

e

f

g

'[w]here a demand rests merely in damages, and is not capable of a clear certain liquidation, it cannot be proved under a commission of bankrupt: but I consider this as a contract to do a specific act, which the bankrupt is rendered utterly incapable of performing by the bankruptcy; and his incapacity to perform it is attended *with a certain damage* to the plaintiff. The value of the stock is mixed in the general mass of the bankrupt's property, of which the assignees and the other creditors are possessed; and there is no reason why in substantial justice the plaintiff should not have the same advantage which the rest of the creditors have, especially as the amount of his demand is capable of being ascertained. Several cases have been mentioned, the principles of which fully warrant us in deciding in favour of the plaintiff. I perfectly concur with my Lord Chief Justice in the observations which he has made on the case of [*Dutch v Warren* (1721) 1 Stra 406], and in those made by my brother *Buller* on that of [*Goodtitle v North* (1781) 2 Doug KB 584]. Much has been said respecting the form of the action: but I do not by any means think it collusive; it may illustrate,

h

j

a   but cannot decide, the question. On the whole I am of opinion that this being a case of clear liquidated damages for the not performing a specific act, which the bankruptcy has rendered impossible to be done, the plaintiff may come in under the commission, and the time of the bankruptcy is the time when the amount of is to be ascertained by the price of the stock on that day.'

b   [52] Although as explained earlier the court changed its mind as to whether the contract could be construed in that way, there is nothing in its second judgment which casts doubt upon the statement of the law.

[53] The decisions in these and other similar cases also, I think, support a meaning of the word 'debt' which is evident from the language of s 267(2)(b)

c   and the earlier Bankruptcy Acts in their use of the phrase 'debt … for a liquidated sum'. A debt properly so-called is always liquidated even though some arithmetic may be required. The words 'for a liquidated sum' therefore add nothing unless a debt can include a liability for damages in contract.

CONSTRUCTION

d   [54] I turn then to the issue of construction which was decided against Mr McGuinness in the courts below. The guarantee is headed 'Guarantee and Indemnity' and, after setting out the names of the parties, there is then a maximum liability clause in these terms:

'THE MAXIMUM AMOUNT WHICH YOU ARE LIABLE TO PAY UNDER THIS GUARANTEE IS £1,115,653.00 (One million, one hundred

e   and fifteen thousand, six hundred and fifty three pounds—the "Maximum Amount") *PLUS* THE OTHER AMOUNTS SET OUT IN CLAUSE 3.'

[55] The principal terms of the guarantee are contained in cll 2–4 and I set them out in full:

'2. GUARANTEE AND INDEMNITY

f   2.1 In return for our lending, agreeing to lend or continuing to lend money, or granting credit facilities, to the Borrower you accept the liabilities set out below. These liabilities are unconditional and you cannot withdraw from them, except as set out in Clause 5.

2.2 You guarantee that all money and liabilities owing, or becoming owing to us in the future, by the Borrower (whether actual or contingent,

g   whether incurred alone or jointly with another and whether as principal or surety) will be paid and satisfied when due.

2.3 Any amount claimed under the Guarantee is payable by you immediately on demand by us.

2.4 As a separate obligation you agree to make good (in full) any losses

h   or expenses that we may incur if the Borrower fails to pay any money owed to us, or fails to satisfy any other liabilities to us, or if we are unable to enforce any of the Borrower's obligations to us or they are not legally binding on the borrower (whatever the reason).

2.5 You will also make good any losses or expenses which we may incur if we take steps to enforce this Guarantee or if we try to do so.

j   3. LIMIT ON THE GUARANTEE

This Guarantee is a continuing security, and covers all the liabilities of the Borrower to us. However, if there is a Maximum Amount stated on page 1 of this Guarantee, you will not be liable for more than:-

3.1 the Maximum Amount; *plus*

3.2 any interest payable by you under Clause 6; *plus*

3.3 any amounts payable by you under Clause 2.5 and/or Clause 10.     *a*

4. OUR PROTECTION

4.1 None of your obligations under this Guarantee will be affected if any of the following happen (even if it would have been if this Clause did not exist):-

4.1.1 we vary, extend, discharge, compromise, review or otherwise deal with any rights we have or may in the future have against the Borrower, or any other person in respect of the Borrower's obligations;     *b*

4.1.2 we take, vary, release or otherwise deal with any security or guarantee in respect of the Borrower's liabilities;

4.1.3 we enforce, fail to enforce or release any rights under any security or guarantee;     *c*

4.1.4 any other guarantee or arrangement intended or expected to secure the Borrower's liabilities to us is never put in place or is (for whatever reason) unenforceable.

4.1.5 we terminate or vary any contract, relationship or arrangement with the Borrower to enter into any new contract, relationship or arrangement;     *d*

4.1.6 we give the Borrower (or any other person) time to pay or any other waiver or concession;

4.1.7 the Borrower or any other person becomes insolvent, bankrupt or subject to liquidation, winding-up or administration;

4.1.8 any obligation of the Borrower is or becomes invalid or unenforceable;     *e*

4.1.9 any claim or enforcement of payment is made against the Borrower or any other person;

4.1.10 there are any changes to our, your or the Borrower's name, constitution or membership;

4.1.11 you die or become mentally ill;     *f*

4.1.12 the Borrower dies or becomes mentally ill;

4.1.13 we do or fail to do anything else.

4.2 Your obligations under this Guarantee are those of principal, not just as surety. We will not be obliged to make any demand on, or take any steps against, the Borrower or any other person before enforcing this Guarantee.

4.3 Until all the Borrower's liabilities to us are paid in full, you agree that, whether or not you have made any payment under this Guarantee, you will not:     *g*

4.3.1 share in any security we hold or any money we receive;

4.3.2 take or receive any money or security from the Borrower or any other person in connection with this Guarantee;

4.3.3 enforce or dispose of, or otherwise deal with, any right or pursue any claim against the Borrower or any other person in respect of the Borrower's liabilities to us;     *h*

4.3.4 make any claim in the insolvency of the Borrower or any such person which would compete with our claim.

If, in breach of the above, you do receive any security, rights or money then you will hold them on trust for us and transfer them to us on demand.     *j*

4.4 This Guarantee is in addition to, and will not be affected by, any other security or right held by us in respect of the liabilities of the Borrower.'

[56] It is common ground that cl 2.4, which contains an indemnity in respect of loss and expenses caused by the borrower's default, creates a liability in

a  damages. The two issues of construction are essentially whether cll 2.2 and 2.3 (which, as cl 2.4 makes clear, are separate from the obligation under that clause) impose either a conditional payment or concurrent liability for the mortgage debt which was the view of the deputy registrar; and, if they do not, whether cl 4.2 has the effect of imposing a concurrent liability on Mr McGuinness as a principal debtor which was the construction favoured by

b  Briggs J.

   [**57**] Mr Arden's submission is that cl 2.2 contains an obligation of the see to it type which sounds in damages and is unaffected by the provisions of cl 4.2. The latter are solely concerned, he says, with removing the need for a demand under cl 2.3 and did not deprive Mr McGuinness of his status as surety.

c  [**58**] As Briggs J observed, a guarantee can be drafted (and often is) so as to create liabilities both in debt and for damages. Mr Arden's principal argument is that when read alone, cl 2.2 is clearly framed in terms of a promise that the sums due under the mortgage will be paid and satisfied when due. This, he says, is therefore a promise to see to it that the borrower will perform his own obligations under the mortgage. It is not a promise to pay the mortgage

d  liabilities if the borrower fails to do so.

   [**59**] The deputy registrar thought that the reference in cl 2.2 to the sums due under the mortgage being paid and satisfied was the language of debt rather than damages. It was also significant he said that the admitted damages obligation under cl 2.4 was stated to be a separate obligation. The statement in cl 2.4 about it being a separate obligation cannot simply be referable to the type

e  of losses it covers because the indemnity extends to any shortfall in the payment by the borrower of the mortgage debt. There is therefore an overlap between the liabilities covered by cl 2.2 and those within cl 2.4. It therefore raises the question as to why an indemnity of this kind was included in cl 2.4 if the primary liability under cl 2.2 was also no more than a covenant to ensure

f  that the mortgage liabilities were met by the borrower.

   [**60**] The reference in cl 2.2 to the mortgage liabilities being paid and satisfied cannot be divorced from the context in which it appears: that is an undertaking that they will be paid when they fall due. The real question is paid by whom? If what the guarantor is promising is that he will pay them as they fall due should the borrower fail to do so then one has a conditional payment obligation. But

g  if the concluding words of cl 2.2 mean no more than they will be paid by the borrower when due, one is dealing with a see to it liability in damages.

   [**61**] The language of cl 2.2 taken by itself is ambiguous on this point but the balance is tipped in favour of the society's construction by the features of cl 2.4 which I have referred to and by cl 2.3 which makes the sums due under the guarantee payable on demand. The requirement for notice is not a pre-requisite

h  to the enforcement of a liability in damages and seems to me more consistent with cl 2.2 being read as a direct promise to pay the mortgage liabilities as they fall due. Although a request for payment of a presently due debt is unnecessary, it can be made a condition of payment and is a requirement where the guarantee is in the nature of a collateral promise to pay on demand if the

j  principal debtor does not: see *Bradford Old Bank Ltd v Sutcliffe* [1918] 2 KB 833 at 849 and *Re J Brown's Estate, Brown v Brown* [1893] 2 Ch 300. The position was explained by Bayley J in *Rowe v Young* (1820) 2 Bli 391 at 465, (1820) 4 ER 372 at 404–405 in these terms:

   '… the rules which the law has laid down as to cases in which a demand is or is not necessary, must be considered. One of these rules I take to be

this, that where a man engages to pay upon demand what is to be considered his own debt, he is liable to be sued upon that engagement, without any previous demand.'

But Bayley J went on to say:

'… but … if he engage to pay upon demand what was not his debt, what he is under no obligation to pay, what but for such engagement he would never be liable to pay any one, a demand is essential, and part of the plaintiff's title.'

[**62**] It is therefore strictly unnecessary to consider cl 4.2 but I propose to deal with it because it figured centrally in the reasoning of the judge. Briggs J held that the effect of cl 4.2 was to make the debt that of the guarantor. He referred in his judgment to the decision of this court in *MS Fashions Ltd v Bank of Credit and Commerce International SA (in liq) (No 2), High Street Services Ltd v Bank of Credit and Commerce International SA (in liq), Impexbond Ltd v Bank of Credit and Commerce International SA (in liq)* [1993] 3 All ER 769, [1993] Ch 425 where the issue was whether guarantors of a company's liabilities to BCCI who had charged moneys deposited by them with the bank as security for their guarantee obligations could set off these sums against their liabilities under the guarantees pursuant to r 4.90 of the 1986 rules. The issue turned on whether the liability under the guarantee was a primary one or merely a liability contingent on the making of a demand.

[**63**] The guarantee contained principal debtor clauses similar to the one contained in cl 4.2. Hoffmann LJ (at first instance) said:

'In my judgment the "principal debtor" clauses have the effect of creating primary liability for the purposes of the rule that the debt is not contingent upon demand. This was the provisional view of Walton J in *Esso Petroleum Co Ltd v Alstonbridge Properties Ltd* [1975] 3 All ER 358 at 367, [1975] 1 WLR 1474 at 1483 and I think it was correct. It is true that for some purposes the courts will look to the underlying reality of the suretyship relationship rather than the formal agreement that liability is to be as principal debtor. But this is only for the purpose of protecting the surety's equitable rights against the principal debtor and giving effect to such consequences as may affect the creditor, such as the surety's right to take over securities and the rule against double proof. Otherwise there is no reason why creditor and surety should not make whatever terms they choose. The right to a demand before liability can accrue is not inherent in the nature of suretyship and will not be implied unless expressly provided. There seems accordingly no reason why the parties should not modify the effect of such a provision.' (See [1993] 3 All ER 769 at 778–779, [1993] Ch 425 at 436.)

[**64**] In the Court of Appeal Dillon LJ said ([1993] 3 All ER 769 at 785, [1993] Ch 425 at 447–448):

'In the present case in the letters of charge signed by Mr Amir in respect of Impexbond and Tucan he has expressly agreed that his liabilities thereunder—namely the companies' liabilities charged on his deposits—shall be as that of a principal debtor.

Similarly in the forms setting out the cash deposit security terms which Mr Ahmed signed in respect of High Street Services Ltd and its associated companies he accepted that the liabilities of those companies should be recoverable from him as principal debtor and they were thus within the

a    definition of his indebtedness; he also authorised the appropriation of the deposited moneys in satisfaction of his indebtedness without further notice to him.

The effect of that must be to dispense with any need for a demand in the case of Mr Amir since he has made the companies' debts to BCCI his own debts and thus immediately payable out of the deposit without demand. In

b    the case of Mr Ahmed there must be immediate liability even though the word "demand" was used, because he accepted liability as a principal debtor and his deposit can be appropriated without further notice.'

[**65**] Mr Arden submits that the purpose of cl 4.2 is to lend weight to the other provisions of cl 4 (contained in cl 4.1) which are designed to protect the

c    society against any possible release of the guarantee by its dealings with the borrower. Clause 4.2 removes the need to give notice under cl 2.3 but does not alter the nature of the guarantor's liability under cl 2.2.

[**66**] I am not persuaded by this. It seems to me that the first sentence of cl 4.2 has to be given some meaning. If the guarantor's obligations are to be those of a principal and not merely those of a surety then something has to be

d    added to cl 2 by cl 4.2. Clause 4.2 does not refer to the requirement of notice in cl 2.3 and it seems to me to be odd for the draftsman to have introduced a requirement to make a demand under cl 2.3 and then to have taken it away in cl 4.2. The better view is that the second sentence of cl 4.2 reflects the status of the guarantor as principal debtor by making it clear that his liability is concurrent with that of the borrower and not contingent upon it. The Society

e    is entitled to proceed against the guarantor without first exhausting its remedies against the borrower and the guarantor cannot rely on any failure to do so as a failure to mitigate which reduces his own liability.

[**67**] It was said in argument that cl 4.2 could not easily convert cl 2.4 into a principal debtor obligation given that it relates in part to a claim for consequential loss and expenses beyond the non-payment of the mortgage

f    debt. How therefore, it is said, can it have any different effect on cl 2.2? The answer to that question depends upon the premise which one operates from. On my own construction of cl 2.2 the provisions of cl 4.2 operate merely to confirm that cl 2.2 creates a liability in debt. But I cannot see why cl 4.2 should not apply more generally to any of the obligations under cl 2 which are capable

g    of taking effect as a liability in debt. Clause 2.2 is an obvious candidate because the measure of liability is the unpaid mortgage debt and interest which is quantified. It follows that the liability of Mr McGuinness under cl 2.2 of the guarantee did create a liability in debt to the society which it could petition in bankruptcy.

CONCLUSION

h    [**68**] For these reasons I would dismiss this appeal.

**MOSES LJ.**
[**69**] I agree.

**WARD LJ.**
[**70**] I also agree.

j    *Appeal dismissed.*

Rukhsana Ali    Barrister.