# EXHIBIT   75

Ch.

A
[COURT OF APPEAL]

M.S. FASHIONS LTD. AND OTHERS v. BANK OF CREDIT AND
COMMERCE INTERNATIONAL S.A. (IN LIQUIDATION) AND
OTHERS

B
HIGH STREET SERVICES LTD. AND OTHERS v. BANK OF CREDIT
AND COMMERCE INTERNATIONAL S.A. (IN LIQUIDATION)

IMPEXBOND LTD. AND OTHERS v. SAME

[1992 M. No. 4775]
[1992 H. No. 5560]
C                                        [1992 No. 007615]

1992   Sept. 24, 25;                                  Hoffmann J.
       Nov. 27                                        Hoffmann L.J.

1993   March 15, 16; 25                    Dillon, Nolan and Steyn L.JJ.

D
*Insolvency—Winding up—Set-off—Company's debts to bank guaran-
teed by director as "principal debtor" by charging personal deposit
account with bank—Bank becoming insolvent—Director seeking
to set off claim to return of deposit against liability to pay
company's debts—Whether bank entitled to claim whole debt from
company leaving director to prove for deposit in winding up—
Insolvency Rules 1986 (S.I. 1986 No. 1925), r. 4.90*

E
Between 1984 and 1989 three company directors each signed
as a "principal debtor" an agreement with the bank whereby, as
guarantee for repayment of loans by the bank to his company,
the bank could withdraw money from his deposit account with
that bank towards satisfaction of his company's debts. In 1992
the bank was compulsorily wound up. The directors and
companies issued notices of motion seeking declarations that
F
the directors were entitled, pursuant to rule 4.90 of the
Insolvency Rules 1986,[1] to set off the sums in their deposit
accounts against the companies' respective liabilities to the bank.
The judge granted the declarations.

On the bank's appeal in the second and third cases:—
*Held*, dismissing the appeals, that where there were
existing cross-claims arising out of mutual dealings before the
commencement of the winding up of a company, rule 4.90 of the
Insolvency Rules 1986 took effect so as to bring about a set-off;
G
that where a liability had been entered into by a "principal
debtor" it was a primary liability not contingent upon the making
of a demand in writing and could constitute a valid cross-claim
for the purposes of the rule; and that, accordingly, the
indebtedness of the companies as at the date of the winding up
of the bank had been extinguished or reduced by the amounts
H
which on that date were standing to the credit of the directors
on their deposit accounts (post, pp. 445F, 447F–448D, 451F–
452A).

[1] Insolvency Rules 1986, r. 4.90: see post, p. 445G–H.

426

**M.S. Fashions Ltd. v. B.C.C.I. (C.A.)**                    [1993]

The following cases are referred to in the judgment of Dillon L.J. in the
Court of Appeal:                                                                                    A

*Barnett, Ex parte; In re Deveze* (1874) L.R. 9 Ch.App. 293
*Bradford Old Bank Ltd. v. Sutcliffe* [1918] 2 K.B. 833, C.A.
*Brown's (J.) Estate, In re; Brown v. Brown* [1893] 2 Ch. 300
*Caldicott, Ex parte; In re Hart* (1883) 25 Ch.D. 716, C.A.
*City Equitable Fire Insurance Co. Ltd. (No. 2), In re* [1930] 2 Ch. 293, C.A.
*Daintrey, In re; Ex parte Mant* [1900] 1 Q.B. 546, C.A.                            B
*Ellis & Co.'s Trustee v. Dixon-Johnson* [1924] 2 Ch. 451, C.A.; [1925] A.C.
    489, H.L.(E.)
*Halesowen Presswork & Assemblies Ltd. v. National Westminster Bank Ltd.*
    [1972] A.C. 785; [1972] 2 W.L.R. 455; [1972] 1 All E.R. 641, H.L.(E.)
*Hiley v. Peoples Prudential Assurance Co. Ltd.* (1938) 60 C.L.R. 468
*Joachimson (N.) v. Swiss Bank Corporation* [1921] 3 K.B. 110, C.A.
*Mid-Kent Fruit Factory, In re* [1896] 1 Ch. 567                                         C
*Palmer v. Day & Sons* [1895] 2 Q.B. 618, D.C.
*Pollitt, In re; Ex parte Minor* [1893] 1 Q.B. 455, C.A.
*Rowe v. Young* (1820) 2 Bli. 391
*Sovereign Life Assurance Co. v. Dodd* [1892] 2 Q.B. 573, C.A.
*Young v. Bank of Bengal* (1836) 1 Moo.Ind.App. 87, P.C.


The following additional cases were cited in argument in the Court of    D
Appeal:

*Batson v. Spearman* (1838) 9 Ad. & E. 298
*Birks v. Trippet* (1666) 1 Saund. 28
*Charge Card Services Ltd., In re* [1987] Ch. 150; [1986] 3 W.L.R. 697; [1986]
    3 All E.R. 289; [1989] Ch. 497; [1988] 3 W.L.R. 723; [1988] 3 All E.R.
    702, C.A.
*Esso Petroleum Co. Ltd. v. Alstonbridge Properties Ltd.* [1975] 1 W.L.R.    E
    1474; [1975] 3 All E.R. 358
*General Produce Co. v. United Bank Ltd.* [1979] 2 Lloyd's Rep. 255
*Hill v. Wade* (1616) Cro.Jac. 523
*Mackay, Ex parte; Ex parte Brown; In re Jeavons* (1873) L.R. 8 Ch.App.
    643
*National Benefit Assurance Co. Ltd., In re* [1924] 2 Ch. 339
*Palmer v. Carey* [1926] A.C. 703, P.C.                                                        F
*Quistclose Investment Ltd. v. Rolls Razor Ltd.* [1970] A.C. 567; [1967]
    3 W.L.R. 1097; [1968] 3 All E.R. 651, H.L.(E.)
*Wallis v. Scott* (1718) 1 Str. 88
*Welsh Development Agency v. Export Finance Co. Ltd.* [1992] B.C.C. 270,
    C.A.


The following cases are referred to in the judgment of Hoffmann L.J.:    G

*Barnett, Ex parte; In re Deveze* (1874) L.R. 9 Ch.App. 293
*Bradford Old Bank Ltd. v. Sutcliffe* [1918] 2 K.B. 833, C.A.
*Brown's (J.) Estate, In re; Brown v. Brown* [1893] 2 Ch. 300
*Charge Card Services Ltd., In re* [1987] Ch. 150; [1986] 3 W.L.R. 697; [1986]
    3 All E.R. 289; [1989] Ch. 497; [1988] 3 W.L.R. 723; [1988] 3 All E.R.
    702, C.A.                                                                                          H
*Daintrey, In re; Ex parte Mant* [1900] 1 Q.B. 546, C.A.
*Debtor, In re A; Ex parte Peak Hill Goldfield Ltd.* [1909] 1 K.B. 430, C.A.
*Dynamics Corporation of America, In re* [1976] 1 W.L.R. 757; [1976] 2 All
    E.R. 669

Ch.                    M.S. Fashions Ltd. v. B.C.C.I.

A    *Esso Petroleum Co. Ltd. v. Alstonbridge Properties Ltd.* [1975] 1 W.L.R.
     1474; [1975] 3 All E.R. 358
     *Farley v. Housing and Commercial Developments Ltd.* (1984) 26 B.L.R. 66
     *M.S. Fashions Ltd. v. Bank of Credit and Commerce International S.A.*
     [1992] B.C.C. 571, C.A.
     *Middleton v. Pollock; Ex parte Knight and Raymond* (1875) L.R. 20 Eq. 515
     *New Quebrada Co. Ltd. v. Carr* (1869) L.R. 4 C.P. 651
     *Northern Counties of England Fire Insurance Co., In re; Macfarlane's Claim*
B    (1880) 17 Ch.D. 337
     *Owen v. Wilkinson* (1858) 5 C.B.(N.S.) 526
     *Sovereign Life Assurance Co. v. Dodd* [1892] 2 Q.B. 573, C.A.
     *Stephens, Ex parte* (1805) 11 Ves. 24

     The following additional cases were cited in argument before Hoffmann J.:

C    *Barclays Bank Ltd. v. T.O.S.G. Trust Fund Ltd.* [1984] A.C. 626; [1984]
     2 W.L.R. 650; [1984] 1 All E.R. 1060, H.L.(E.)
     *Batchellor v. Lawrence* (1861) 9 C.B.(N.S.) 543
     *Bowyear v. Pawson* (1881) 6 Q.B.D. 540, D.C.
     *British Eagle International Airlines Ltd. v. Compagnie Nationale Air France*
     [1975] 1 W.L.R. 758; [1975] 2 All E.R. 390, H.L.(E.)
     *Caldicott, Ex parte; In re Hart* (1883) 25 Ch.D. 716, C.A.
D    *Commercial Bank of Australia Ltd. v. Official Assignee of the Estate of John
     Wilson & Co.* [1893] A.C. 181, P.C.
     *Debtor (No. 66 of 1955), In re A.; Ex parte the Debtor v. Waite's Trustee*
     [1956] 1 W.L.R. 1226; [1956] 3 All E.R. 225, C.A.
     *Ellis & Co.'s Trustee v. Dixon-Johnson* [1925] A.C. 489, H.L.(E.)
     *Halesowen Presswork & Assemblies Ltd. v. National Westminster Bank Ltd.*
     [1972] A.C. 785; [1972] 2 W.L.R. 455; [1972] 1 All E.R. 641, H.L.(E.)
E    *Hanson, Ex parte* (1811) 18 Ves. 232
     *Ince Hall Rolling Mills Co. Ltd. v. Douglas Forge Co.* (1882) 8 Q.B.D. 179
     *Langley Constructions (Brixham) Ltd. v. Wells* [1969] 1 W.L.R. 503; [1969]
     2 All E.R. 46, C.A.
     *Lep Air Services Ltd. v. Rolloswin Investments Ltd.* [1971] 1 W.L.R. 934;
     [1971] 3 All E.R. 45, C.A.; [1973] A.C. 331; [1972] 2 W.L.R. 1175;
     [1972] 2 All E.R. 393, H.L.(E)
F    *Mackay, Ex parte; Ex parte Brown; In re Jeavons* (1873) L.R. 8 Ch.App.
     643
     *Mersey Steel and Iron Co. v. Naylor, Benzon & Co.* (1882) 9 Q.B.D. 648,
     C.A.; (1884) 9 App.Cas. 434, H.L.(E.)
     *Peat v. Jones & Co.* (1881) 8 Q.B.D. 147, C.A.
     *Rolls Razor Ltd. v. Cox* [1967] 1 Q.B. 552; [1967] 2 W.L.R. 241; [1967]
     1 All E.R. 397, C.A.
     *Sass, In re; Ex parte National Provincial Bank of England Ltd.* [1896] 2 Q.B.
G    12
     *Ulster Bank Ltd. v. Lambe* [1966] N.I. 161
     *Welsh Development Agency v. Export Finance Co. Ltd.* [1992] B.C.C. 270,
     C.A.

     MOTIONS

H    M.S. FASHIONS LTD. AND OTHERS v. BANK OF CREDIT AND COMMERCE
         INTERNATIONAL S.A. (IN LIQUIDATION) AND OTHERS
         The plaintiffs, M.S. Fashions Ltd., M.S. Fashions (Wholesale) Ltd.
     and Mohammed Sarwar, as against the defendants, the Bank of Credit

428

**M.S. Fashions Ltd. v. B.C.C.I.**                    **[1993]**

and Commerce International S.A. (in liquidation) and Anthony A
Richmond and Roger Taylor, joint administrative receivers of the first
and second plaintiffs, by a notice of motion dated 5 June 1992, asked the
court to determine certain questions of law relating to the principles of
set-off in insolvency in respect of the first and second plaintiff companies'
gross aggregate indebtedness to the bank as at 5 July 1991, £596,945·36,
together with any interest thereon accruing thereafter.

The questions of law to be determined were (a) whether the third B
plaintiff's set-off, pursuant to rule 4.90 of the Insolvency Rules 1986, of
the bank's debt to him in respect of the amount standing to his credit on
his deposit account with the bank's Isle of Man branch, against his
liability to the bank as guarantor of the first and second plaintiff
companies' gross aggregate indebtedness to the bank, either as "principal
debtor," or alternatively following a demand for payment, made by the C
bank on 12 November 1991, constituted or took effect as a payment by
him, as guarantor of the companies' liabilities to the bank, of part of
their gross aggregate indebtedness thereby partially discharging it, so that
the true level of their indebtedness to the bank was the amount of their
net aggregate indebtedness, namely the gross aggregate indebtedness
after account was taken of the set-off; (b) whether, alternatively, by D
reason of the bank's liquidation and on its failure or inability to repay to
the third plaintiff, the sums standing to his credit on his Isle of Man
deposit account, the bank appropriated or was to be deemed to have
appropriated those sums in partial satisfaction and discharge of the gross
aggregate indebtedness of the companies, thus reducing the true level of
their indebtedness to the bank to the amount of their net aggregate indebtedness;
(c) whether the companies' offer to pay £318,031·92, contained in a letter E
dated 27 May 1992 from the third plaintiff's solicitors to the bank's
solicitors, was a good tender of all the sums due from the plaintiffs to
the bank, on payment of which the bank was bound to discharge the
debentures, mortgages and charges held by it in respect of the property
and assets of the companies, and to release all securities and guarantees
held by it in respect of such indebtedness; (d) whether, if the issue in (c) F
above were to be determined in the plaintiffs' favour, the second
defendants, Anthony Richmond and Roger Taylor, the companies' joint
administrative receivers, upon being informed by the plaintiffs' solicitors
by letter dated 29 May 1992 that funds were available to pay the
companies' preferential creditors and their reasonable costs until that
date, were under a duty to cease to act as joint administrative receivers,
to determine the receivership and to refrain from any act pursuant to G
their appointment by the bank, as such receivers, on 20 May 1992;
(e) whether, if the issue in (c) above were to be resolved in the plaintiffs'
favour, the joint administrative receivers' costs incurred after the tender
made on 27 May 1992 should be paid by the bank, by reason of its
refusal of such tender.

HIGH STREET SERVICES LTD. AND OTHERS v. BANK OF CREDIT AND H
COMMERCE INTERNATIONAL S.A. (IN LIQUIDATION)

The plaintiffs, High Street Services Ltd., Portmaid Fashions Ltd.,
Cira Ltd., Raees Ahmed, and Saeed Ahmed, by notice of motion dated

Ch.                         M.S. Fashions Ltd. v. B.C.C.I.

A   29 June 1992 sought as against the bank a declaration that in taking account of what was due (a) by the first, second and third plaintiffs under a cross-guarantee and debenture dated 10 June 1989, made between the first plaintiff and the bank; (b) by the first, second and third plaintiffs under a charge by way of legal mortgage dated 2 October 1989, made between the first three plaintiffs, the first plaintiff

B   and the bank, affecting 130, High Street, Gosport; (c) under a charge by way of legal mortgage dated 2 October 1989, between the first three plaintiffs and the bank, affecting 62, Somers Road, Southsea; (d) under a charge by way of legal mortgage, dated 2 October 1989, between the first three plaintiffs, the first plaintiff and the bank, affecting 1, Arundel Street, Porstmouth; (e) by the fifth plaintiff under

C   a charge by way of legal mortage dated 2 October 1989, between the first three plaintiffs, the fifth plaintiff and the bank, affecting 65, Ancaster Crescent, Kingston-upon-Thames; (f) under a charge by way of legal mortgage dated 22 December 1986, between the first plaintiff and the bank, affecting 132, High Street, Gosport; and (g) under a charge by way of legal mortgage dated 22 April 1988, between the first

D   three plaintiffs, the first plaintiff and the bank, affecting 131, High Street, Gosport whether the plaintiffs were entitled to set off sums standing to the credit of the fourth plaintiff in a deposit account with the bank at the date upon which it was placed into liquidation, namely 14 January 1992.

The motion further sought an account of what sums, including

E   interest, were standing to the credit of the fourth plaintiff in the deposit account on the date of the liquidation, an account of what, if anything, was due on the cross-guarantees, debentures and other legal charges, and an order that the plaintiffs be at liberty to redeem the property comprised in the cross-guarantees, debentures and other legal charges.


F        IMPEXBOND LTD. AND OTHERS v. BANK OF CREDIT AND COMMERCE
                    INTERNATIONAL S.A. (IN LIQUIDATION)

The plaintiffs, Impexbond Ltd., Tucan Investments Plc., and Nasir Abdul Amir, by a notice of motion dated 27 July 1992 sought (a) a declaration that by virtue of rule 4.90 of the Insolvency Rules 1986, an

G   account should be taken of what was due from the third plaintiff as co-principal debtor with the first plaintiff to the bank and from the bank to the third plaintiff; and that the sums due from him be set off against the sums due from the bank; (b) a declaration that by virtue of rule 4.90, an account be taken of what was due from the third plaintiff as co-principal debtor with the second plaintiff to the bank and from the bank to the

H   third plaintiff; and that the sums due from him be set off against the sums due from the bank.

The three motions were heard together by Hoffmann J.

The facts are stated in the judgment.

430

*Alan Steinfeld Q.C.* and *Francis Tregear* for the plaintiffs in the first case.

A

*Jonathan Sumption Q.C.* and *Helen Davies* for the plaintiffs in the second and third cases.

*Neville Thomas Q.C.* and *Robin Dicker* for the bank.

*Cur. adv. vult.*

B

27 November. Hoffmann L.J. read the following judgment. There are before the court motions under R.S.C., Ord. 14A in three actions which raise a common point of principle on the law of set-off in insolvency. A bank advances money to a company. Repayment is guaranteed by a director who has a deposit account with the bank. As between himself and the bank, the director is expressed to be a principal debtor. On the insolvency of the bank, can the director set off his claim for return of his deposit against his liability to pay the company's debt, so that the debt is wholly or pro tanto extinguished? Or can the bank claim the whole debt form the company and leave the director to prove in the liquidation for his deposit?

C

I shall set out briefly the facts of the three cases. In *M.S. Fashions Ltd. v. Bank of Credit and Commerce International S.A.* ("B.C.C.I.") Mr. Sarwar and his brother Mr. Safdar executed a mortgage deed dated 30 May 1984 to secure advances by B.C.C.I. to their companies, M.S. Fashions Ltd. and M.S. Fashions (Wholesale) Ltd. The main purpose of this document was to give B.C.C.I. a mortgage over a property which the brothers owned in Leeds. But it also contained a general covenant by which the brothers (defined, together with their companies, as "the principal debtor") covenanted to pay on demand in writing all moneys owed by all the persons defined as "the principal debtor," that is to say, each other and their companies.

D

E

On 9 December 1985 Mr. Sarwar gave B.C.C.I. additional security. He deposited money in an account with B.C.C.I. and signed a letter of charge by which he charged the deposit to secure the liabilities of the companies. He agreed that the bank could at any time without notice apply the deposit towards satisfaction of the companies' indebtedness and that "the liabilities hereunder shall be as that of principal debtor." In addition, he signed two unlimited guarantees of the companies' liabilities in B.C.C.I.'s standard form. These were expressed to be additional to any other security the bank might have.

F

In *High Street Services Ltd. v. B.C.C.I.* Mr. Raees Ahmed on 24 April 1989 executed three separate documents each headed "Cash deposit security terms—third party." Each was to provide security for advances to one of his companies: High Street Services Ltd., Portmaid Fashions Ltd. and Cira Ltd. They were standard forms which contained both a guarantee of the company's liabilities and also "as a separate and independent obligation" a covenant that on demand in writing the companies' liabilities would be recoverable from Mr. Ahmed as principal debtor. It also gave B.C.C.I. a charge and other rights in respect of a deposit account in Mr. Ahmed's name. In addition, Mr. Ahmed signed separate guarantees of the liabilities of each company in B.C.C.I.'s standard form.

G

H

A    In *Impexbond Ltd. v. B.C.C.I.*, Mr. Nasir Abdul Amir on 11 March 1985 deposited money with B.C.C.I. and executed a charge over the deposit to secure the liabilities of his company Impexbond Ltd. The document was similar to the letter of charge in the *M.S. Fashions* case and provided that "the liabilities hereunder shall be as that of principal debtor." On 29 May 1986 Mr. Amir executed a charge in similar form over the same and another deposit account to secure the liabilities of
B    Tucan Investments Plc. He also executed standard form guarantees of the liabilities of both companies.

Thus a common feature of all three cases appears to be that the director signed a document saying that his liability to pay the company's debts was to be as that of a principal debtor. Mr. Thomas, who appeared for B.C.C.I. questioned whether this was entirely true. In the *M.S.*
C    *Fashions* case he said that including Mr. Sarwar and his brother in the definition of the "principal debtor" was strange, and possibly a mistake. But the bank seems to have wanted to pile up as many cumulative rights as possible against the directors, and I cannot say that as a matter of construction it would make no sense to give effect to the definition. There is no claim for rectification, and I doubt whether it would be possible to show the necessary contrary intent on the part of both parties.
D    Mr. Thomas also said that the reference to liability being as that of principal debtor in the *M.S. Fashions* and *Impexbond* cases letters of charge was odd, because the letters did not expressly create any liability. They merely constituted a charge over the deposit in favour of B.C.C.I. On the other hand, I think it is a tenable view that such charges over deposits can be analysed as the creation of a liability on the part of the
E    chargor for the company's debt, not exceeding the amount of the deposit, which can be set off against B.C.C.I.'s liability to repay the deposit. It seems to me that the reference to the liability of the depositor as being that of a principal debtor should, as a matter of construction, be taken as having this effect. Whether or not this is the only way in which it can take effect (see *In re Charge Card Services Ltd.* [1987] Ch. 150, 175) I think that the principal debtor clause enables it to do so.
F    B.C.C.I. was compulsorily wound up on 14 January 1992. At that date, the state of accounts between the parties in the three cases was as follows. In the *M.S. Fashions* case, Mr. Sarwar had about £300,000 in the deposit account with B.C.C.I. and his companies owed it about £572,000. Mr. Sarwar claims to set off his deposit against what he owes B.C.C.I. under the mortgage deed and the letter of charge, and says that
G    this will pro tanto extinguish liability of the companies as well. In the *High Street Fashions* case, Mr. Ahmed had about £426,000 on deposit and the companies owed B.C.C.I. over £1m. Mr. Ahmed claims to be able to set off B.C.C.I.'s liability on the deposit against his liability in respect of the companies' debts. In the *Impexbond* case, the companies owed B.C.C.I. about £3·3m. and Mr. Amir had about £4·5m. on deposit. He claims to be able to set off part of this sum against his liability to pay
H    the companies' debts, and to prove in the liquidation of B.C.C.I. for the rest.

The *M.S. Fashions* case litigation was precipitated by B.C.C.I. (through its liquidators) appointing administrative receivers of both M.S.

432
Hoffmann L.J.              M.S. Fashions Ltd. v. B.C.C.I.                    [1993]

Fashions companies on 20 May 1992. On the following day the companies       A
applied to Millett J. for leave to bring proceedings against B.C.C.I. and
an order restraining the administrative receivers from acting. On the
following day Millett J. refused relief on the ground that the claim to set-
off was not arguable. On the same day the Court of Appeal (Woolf and
Scott L.JJ.) [1992] B.C.C. 571 expressed a provisional contrary view,
and gave leave to commence originating summons proceedings against
B.C.C.I. claiming a declaration that the companies' indebtedness had        B
been partially extinguished by the set-off of Mr. Sarwar's deposit. But
the Court of Appeal refused injunctive relief, on the grounds that even
after set-off, the companies would still owe B.C.C.I. about £300,000. On
28 July 1992 Mr. Sarwar paid the balance of the indebtedness and costs,
and the administrative receivers were discharged by consent. The set-off
issue comes before the court on a motion to determine an issue of law       C
under R.S.C., Ord. 14A. Similar motions are brought in the *High Street
Services* and *Impexbond* cases.

    Insolvency set-off has been a creature of statute since the time of
Queen Anne (see section 11 of 4 & 5 Anne c. 17). The current provision
applicable to companies is rule 4.90 of the Insolvency Rules 1986:

    "(1) This rule applies where, before the company goes into            D
    liquidation there have been mutual credits, mutual debts or other
    mutual dealings between the company and any creditor of the
    company proving or claiming to prove for a debt in the liquidation.
    (2) An account shall be taken of what is due from each party to the
    other in respect of the mutual dealings, and the sums due from one
    party shall be set off against the sums due from the other. . . .
    (4) Only the balance (if any) of the account is provable in the        E
    liquidation. Alternatively (as the case may be) the amount shall be
    paid to the liquidator as part of the assets."

This language is substantially the same as that used in earlier bankruptcy
statutes going back to the Bankruptcy Act 1869 (32 & 33 Vict. c. 71).
Between the Supreme Court of Judicature Act 1875 (38 & 39 Vict. c. 77)
and the Insolvency Rules 1986, the bankruptcy rule was also applied in      F
company liquidations.

    Certain principles as to the application of these provisions have been
established by the cases. First, the rule is mandatory ("the mandatory
principle"). If there have been mutual dealings before the winding up
order which have given rise to cross-claims, neither party can prove or
sue for his full claim. An account must be taken and he must prove or       G
sue (as the case may be) for the balance. Secondly, the account is taken
as at the date of the winding up order ("the retroactivity principle").
This is only one manifestation of a wider principle of insolvency law,
namely, that the liquidation and distribution of the assets of the insolvent
company are treated as notionally taking place simultaneously on the
date of the winding up order: see *In re Dynamics Corporation of America*
[1976] 1 W.L.R. 757, 762, *per* Oliver J. Thirdly, in taking the account    H
the court has regard to events which have occurred since the date of the
winding up ("the hindsight principle"). The hindsight principle is
pervasive in the valuation of claims and the taking of accounts in

433

Ch.                    M.S. Fashions Ltd. v. B.C.C.I.                Hoffmann L.J.

A    bankruptcy and in winding up. A good example of the principle being
applied outside the context of set-off is *In re Northern Counties of
England Fire Insurance Co.; Macfarlane's Claim* (1880) 17 Ch.D. 337, in
which the value of a claim under a fire insurance policy was determined
by reference to the loss suffered in a fire which occurred a month after
the insurance company had been wound up.

B    In reading the cases, the interaction of these principles has to be
borne in mind. Mr. Thomas for B.C.C.I. said that the right of set-off
under rule 4.90 was procedural and that the mutual credits and debits of
B.C.C.I. and the directors retain their separate existences until such time
as the account is taken in the context of the director filing a proof
or a defence to a claim by the liquidator. This is of course true in the
somewhat trivial sense that no account will be taken until something
C    happens which makes it necessary to apply rule 4.90 and to take one.
But that cannot in my judgment affect the substantive rights of the
parties which, whatever the context in which the question may
subsequently arise, are treated as having been determined by an account
taken at the date of the winding up. This is a consequence of the
mandatory and retroactivity principles. Thus in *Farley v. Housing and
D    Commercial Developments Ltd.* (1984) 26 B.L.R. 66, Mr. Farley was
director of a building company engaged in erecting two buildings for a
developer. On 5 February 1975 the building company resolved to go into
creditors' voluntary winding up. At that date, the building company had
a claim for money owing under the contract but the developer said it had
a cross-claim for damages. Three years later, the liquidator of the
building company assigned the benefit of its claim to Mr. Farley
E    personally. He argued that he was entitled to claim in full against the
developer, leaving it to prove in his company's liquidation for its
damages. But Neill J. rejected this submission. He said, at p. 78, that on
the date of the winding up section 31 of the Bankruptcy Act 1914 (in
similar terms to rule 4.90) immediately took effect and that "the balance
of the account and no more became the sum thereafter owing to or from
F    the respective parties."

Mr. Thomas cited a number of cases which he said were at variance
with the retroactivity principle. But I think that on examination it will be
found that none of them are concerned with this principle at all. *New
Quebrada Co. Ltd. v. Carr* (1869) L.R. 4 C.P. 651 was decided on
demurrer to a replication. A company made a call on the three joint
holders of shares. They pleaded a set-off. The company's replication
G    alleged lack of mutuality because after the commencement of the action
and before the plea, one of the three had been adjudicated bankrupt and
his joint interest in the debt due from the company had thereby vested
in his assignees. The shareholders argued that nothing passed to the
assignees because on the bankruptcy, by virtue of the then equivalent of
rule 4.90, the bankrupt's share of the debt was automatically set off
H    against the company's claim for calls. The Court of Common Pleas held
that there had been no bankruptcy set-off: the bankrupt's individual
interest in a joint debt could not be set off against the company's joint
claim against the three shareholders.

                                        Ch. 1993-20

434

Hoffmann L.J.          M.S. Fashions Ltd. v. B.C.C.I.          [1993]

None of this represents any challenge to the retroactivity principle. It    A
is true that Brett J. went on to deal with what the position would be if
the set-off rule did apply and said, at p. 653:

> "I think its only effect is to transfer the claim to the assignees,
> subject, when they seek to enforce it, to a right of the plaintiffs to
> deduct their debt. It does not, I think, extinguish the mutual debts,
> but if it did, I should have thought it would have answered the plea    B
> of set-off. In either view I think it does not leave a right of action in
> the bankrupt against the plaintiffs, and that he cannot, therefore,
> avail himself of his claim against the plaintiffs under an ordinary
> plea of set-off . . ."

This passage is not altogether easy because Brett J. is mounting one
rejected hypothesis on another, but I take him to mean that the set-off    C
rule does not mean that the debt owed to the bankrupt does not pass to
his assignees. It does, and is then subject to the account-taking procedure
of the rule. So whether or not the set-off rule applies, the bankrupt no
longer retains a cause of action which can be used as non-bankruptcy set-
off against the company. Brett J. is not in my view addressing himself to
the retroactivity principle.                                               D

In *In re A Debtor; Ex parte Peak Hill Goldfield Ltd.* [1909] 1 K.B.
430 the debtor owed the company £1,453 in respect of the costs of
unsuccessful litigation. The company presented a bankruptcy petition.
Two weeks before the hearing, the debtor bought £1,460 nominal value
of the company's debenture stock and claimed a set-off. But a couple of
days before the petition was heard, a judgment creditor of the debtor
obtained the appointment of a receiver of the debenture stock by way of    E
equitable execution. The Court of Appeal decided that the execution had
deprived the debtor of his beneficial interest in the stock. Accordingly
there was no mutuality and a receiving order was made. Fletcher Moulton
and Farwell L.JJ., like Brett J. in the *New Quebrada* case, L.R. 4 C.P.
651, thought that bankruptcy set-off applied only after the debtor had
become bankrupt and involved a taking of an account with the trustee,
not the bankrupt. Accordingly, the debtor could resist the receiving order    F
only by a valid plea of statutory set-off. This required mutuality at the
date of the hearing of the petition.

In *Sovereign Life Assurance Co. v. Dodd* [1892] 2 Q.B. 573 Mr.
Dodd borrowed £1,170 from the Sovereign Life Assurance Co. on the
security of his life assurance policies. Before the policies matured, the    G
company was wound up. But Mr. Dodd went on paying his premiums
until the policies became due. By this time there was a scheme of
arrangement under which policy holders were only entitled to substantially
reduced payments in respect of their policies. When the company sued
Mr. Dodd for repayment of the £1,170, he pleaded a set-off of the full
amount due on his policies. The company said that he was entitled to
set-off only the reduced sum payable under the scheme of arrangement.    H
The Court of Appeal held that he was entitled to rely by way of set-off
on the full amount. This is a good example of the hindsight principle, by
which account is taken of the fact that the policies have actually matured

A    after the winding up date. Bowen L.J. expressly drew an analogy with
*MacFarlane's Claim*, 17 Ch.D. 337.

Mr. Thomas referred to several other cases which are also in my
judgment illustrations on the hindsight principle, and I do not think it is
necessary to analyse them at length. In my judgment the retroactivity
principle is firmly established. It follows that I reject the submission that
there can be no set-off until such time as B.C.C.I. decides to sue the
B    directors and they plead a set-off by way of defence. If there are existing
cross-claims arising out of mutual dealings before the winding up, then I
consider that rule 4.90 takes effect.

This brings me to the question of whether such cross-claims exist. Mr.
Thomas said that with the possible exception of the *M.S. Fashions* case,
in which a demand in writing was made in November 1991, B.C.C.I. had
C    no claims against the directors, whether now or at the date of the winding
up. The liability of the directors was contingent upon the making of a
demand and none had been made. Since the liability of the directors was
merely contingent, it could not form the subject of set-off. No doubt
they would be entitled to plead set-off if B.C.C.I. decided to make a
demand and sue them on their guarantees, but this may never happen.
In particular, it will not happen if B.C.C.I. can recover the advances
D    from the companies themselves.

The problem of contingent claims can often be solved by the hindsight
principle. *MacFarlane's Claim* was a case in which a subsequent event
enabled the court for the purposes of proof to quantify a claim against
the insolvent company which had been contingent at the date of the
winding up. The same would apply to quantification for the purposes of
E    set-off. *In re Daintrey; Ex parte Mant* [1900] 1 Q.B. 546 shows the
hindsight principle applied to a contingent claim in favour of the
insolvent. An extended discussion of this and similar cases can be found
in *In re Charge Card Services Ltd.* [1987] Ch. 150 and it would be
superfluous to cover the same ground. Sometimes, however, the insolvent
estate needs to be wound up before it is known either that the
contingency has occurred or that it will not occur. The court must then
F    put some value on the contingent claim and it will do this for the
purposes of ordinary proof or the taking of an account under rule 4.90.
There is no similar mechanism for valuing claims by the insolvent, but I
am not sure that this is a real problem. Until the contingency occurs, the
liquidator or trustee will not be able to use the claim as either a cause of
action or a set-off. If the other party has a cross-claim, he will be able to
G    prove for the full amount. I suppose it may happen that the contingency
occurs long after the winding up has been completed and the company is
then restored to the register and brings an action. The defendant may
have proved for his cross-claim and received a small dividend. Can he
still rely on the full claim as a set-off, giving credit for the dividend? For
my part, I do not see why not.

If the relationship between B.C.C.I. and the directors was governed
H    only by the standard form guarantees I think that there would be no
answer to the submission that the liability of the directors remains
contingent. All the guarantees in the B.C.C.I. standard form require a
demand in writing before any liability arises on the part of the guarantor.

436

Hoffmann L.J.          M.S. Fashions Ltd. v. B.C.C.I.          [1993]

It is well established that in such a case, no cause of action arises until    A
the demand is made: see *Bradford Old Bank Ltd v. Sutcliffe* [1918]
2 K.B. 833. It would follow that (apart from the *M.S. Fashions* case)
there is nothing due from the directors to B.C.C.I. and no basis for set-
off against what is owed to them on the deposit accounts.

In fact, however, the directors are also liable to B.C.C.I. under the
various instruments I have described and which deems them to be
principal debtors. This liability is in my judgment not contingent at all.    B
It is either a joint and several liability with the companies or at any rate
a several liability for the same debt. In the *M.S. Fashions* case and the
*Impexbond* case the letters of charge made no mention of the need for
any demand. In the case of the mortgage deed in the *M.S. Fashions* case
and the charge on the deposit in the *High Street Fashions* case the
obligation was to pay on demand in writing. However, in the case of    C
primary obligations as opposed to secondary ones like guarantees, a
provision for demand in writing is not regarded as creating a contingency:
see *In re J. Brown's Estate; Brown v. Brown* [1893] 2 Ch. 300. Thus in
the case of a promissory note payable "on demand," the debt arises
immediately the note is given and is not contingent upon demand.

In my judgment the "principal debtor" clauses have the effect of    D
creating primary liability for the purposes of the rule that the debt is not
contingent upon demand. This was the provisional view of Walton J. in
*Esso Petroleum Co. Ltd. v. Alstonbridge Properties Ltd.* [1975] 1 W.L.R.
1474, 1483, and I think it was correct. It is true that for some purposes
the courts will look to the underlying reality of the suretyship relationship
rather than the formal agreement that liability is to be as principal
debtor. But this is only for the purpose of protecting the surety's    E
equitable rights against the principal debtor and giving effect to such
consequences as may affect the creditor, such as the surety's right to take
over securities and the rule against double proof. Otherwise there is no
reason why creditor and surety should not make whatever terms they
choose. The right to a demand before liability can accrue is not inherent
in the nature of suretyship and will not be implied unless expressly
provided. There seems accordingly no reason why the parties should not    F
modify the effect of such a provision.

One therefore has on the one hand a liability of B.C.C.I. to the
individual director against a several liability of the director to pay the
same debt as that for which the company is liable. Such liabilities may be
set off against each other. Outside the context of suretyship this was
regarded as beyond doubt in *Owen v. Wilkinson* (1858) 5 C.B.(N.S.)    G
526. It was also applied in a suretyship context by Lord Eldon L.C. in
*Ex parte Stephens* (1805) 11 Ves. 24. This is not an easy case to interpret
because it involved a fraud by one of the parties and it is necessary to
analyse, first, what part the fraud played in the decision and secondly,
whether it would still be a necessary element today. Miss Stephens had
entrusted some gilt-edged stock to her bankers who collected the
dividends on her behalf. They dishonestly sold the stock and kept the    H
£3,000 proceeds, but continued to make payments which they pretended
were the dividends they had received. Meanwhile, Miss Stephens's
brother borrowed £1,000 from the bankers on the security of a joint and

437
Ch.                    M.S. Fashions Ltd. v. B.C.C.I.                Hoffmann L.J.

A   several promissory note signed by himself and his sister. The bankers
    were then adjudged bankrupt and Miss Stephens and her brother
    petitioned Lord Eldon for an order that the £1,000 owed by Miss
    Stephens on the promissory note be set off against the £3,000 which she
    had discovered that the bankers owed her as damages for the conversion
    of her stock. The problem was therefore very similar to that in the
    present case, because the alternative was to allow the bankers' assignees
B   to sue the brother for the full £1,000 and leave Miss Stephens to prove
    in the bankruptcy for her £3,000.

        Lord Eldon L.C. thought that this would be unfair. He said, at p. 28:

        "She had a demand against her brother for the sum of £1,000, as
        paid to his use; also upon the statute of mutual debts and credits;
        and they shall not be permitted to say, she shall not, if she chooses,
C       pay the debt; when the consequence is, that she loses her money,
        and they can call upon him. If she had this equity before the
        bankruptcy, so she has it afterwards; and therefore she has a clear
        right to say, they shall hold £1,000 of her money in discharge of the
        note; and shall deliver up the note."

D       In *Middleton v. Pollock; Ex parte Knight and Raymond* (1875) L.R.
    20 Eq. 515, 520, Sir George Jessel M.R. explained the basis of Lord
    Eldon L.C.'s decision:

        "If she had not by fraud been kept in ignorance of the facts, she
        would have known that the bankers had a £3,000 debt due to her,
        and that she owed them £1,000 on the promissory note, and she
        would have said to them, 'Set one against the other, and pay as
E       much of the balance as you can;' and in that case she would have
        paid £1,000 as the surety, and would have had a right to sue the
        brother from time to time, and to stand in the place of the bankers
        as his creditors. After the bankruptcy the assignees could be in no
        better position: they only took what the bankrupts were entitled to,
        and they could not have been allowed to say, 'You had no right of
F       set-off before action brought,' because it was their own fraud which
        prevented her knowing the facts which gave rise to the right of set-
        off. *But the right of set-off was indisputable. There was a several
        demand on the one side and on the other*; and therefore the only
        relief that she got was relief against the neglect to assert that right
        in due time, which was not really neglect, but rather omission—
        caused by the fraudulent concealment by the bankers of the true
G       facts of the case; and neither they nor their assignees could take
        advantage of their fraudulent concealment to deprive her of that
        right of set-off." (Emphasis added.)

    Sir George Jessel M.R. said, in the passage I have italicised, that the
    right to set-off was indisputable. The bankers were severally liable to
    Miss Stephens for £3,000 and she was severally liable to them for £1,000.
H   If one then applies the manadatory principle, one would think that there
    was nothing more to be said. Rule 4.90 applies. But Sir George Jessel
    M.R. seems to be saying that in the ordinary way, Miss Stephens ought
    to have done something about asserting her right of set-off before the

438

Hoffmann L.J.                M.S. Fashions Ltd. v. B.C.C.I.                [1993]

bankruptcy. The implication is that, but for the fraud which prevented    A
her from knowing that she ought to do something, she would have been
unable to assert the set-off once the bankruptcy had supervened.

I am naturally nervous at finding that I do not fully understand the
reasoning of Sir George Jessel M.R., but I cannot follow why it mattered
that Miss Stephens had not asserted a right of set-off before the
bankruptcy and therefore needed to be relieved, on the ground of fraud,
against that omission. I can only think that the consequences of the    B
mandatory principle (as illustrated by *Farley v. Housing and Commercial
Developments Ltd*, 26 B.L.R. 66) were not as fully appreciated in 1875
as they are today. In my view the fraud would not today be a material
element in deciding whether rule 4.90 applied. All that is necessary is
that there should have been mutual dealings resulting in cross-claims and
it does not matter that one of the parties was unaware of her cross claim    C
until after the relevant date. I therefore regard *Ex parte Stephens*,
11 Ves. 24, as similar to *Owen v. Wilkinson*, 5 C.B.(N.S.) 526, and to
this case.

As I mentioned at the beginning of this judgment, the point at issue
has already received interlocutory consideration by Millett J. and the
Court of Appeal in the *M.S. Fashions* case, Court of Appeal (Civil    D
Division) Transcript No. 484 of 1992. Millett J. refused interlocutory
relief on the ground that there could plainly be no set-off. He said that it
was elementary that set-off operated only by way of defence and was not
equivalent to payment. The bank could release its claims against the
directors—even the director against whom written demand had been
made—and still enforce its claims against the companies. No question of
set-off would arise until B.C.C.I. actually sued a director. Meanwhile,    E
there was nothing to stop B.C.C.I. from suing the companies.

In the Court of Appeal, Scott and Woolf L.JJ. disagreed. They said
that the mandatory principle applied to the directors' obligations as at
the date of the winding up and that the effect of the set-off was to
diminish or extinguish the debt owed by them and their companies. As
will be apparent, I respectfully agree with this analysis.    F

It remains to notice some subsidiary points taken by Mr. Thomas on
behalf of B.C.C.I. He argued that because the deposits were charged to
B.C.C.I. the directors had no beneficial interest in the money and
accordingly there was no mutuality between their claims and those of
B.C.C.I. This is a pleading paradox but in my view fallacious. Ignoring
for the moment the question of whether such a charge is conceptually
possible, the charge was of a debt owed by B.C.C.I. to secure a debt    G
owed to B.C.C.I. The account to be taken by rule 4.90 must require an
unwinding of that arrangement so that the deposit is set off against the
debt it was intended to secure. There is a similar answer to Mr. Thomas's
alternative submission that B.C.C.I. were entitled under their security
documents to transfer the deposit to a suspense account rather than
applying it in discharge of the debt. In my judgment this clause cannot    H
survive the winding up of B.C.C.I. and the application of the mandatory
principle. It is designed to entitle B.C.C.I. to postpone the taking of an
account and inconsistent with taking one as at the date of winding up.

439

Ch.                    M.S. Fashions Ltd. v. B.C.C.I.            Hoffmann L.J.

A       Finally, Mr. Thomas said that although rule 4.90 might result in a set-off between B.C.C.I and the director, this did not amount to payment of the debt owed by the company. It gave the director a complete or pro tanto defence but not the company. This, I think ignores the fact that the director's set-off operates in respect of the *same debt* as that owed by the company. If, as I think it must be, the set-off is equivalent to payment by the director (see *Ex parte Barnett; In re Deveze* (1874) L.R.

B    9 Ch.App. 293) then I think it must operate also to extinguish to the same extent the debt owed by the company.

       I will therefore declare that the indebtedness of each of the companies as at the date of the winding up has been extinguished or reduced by the amount which on that date was standing to the credit of the directors on their respective deposit accounts.

C

*Order accordingly.*

*Solicitors: Zaiwalla & Co.; Slaughter & May; Lovell White Durrant.*

T. C. C. B.

D    Appeals from Hoffmann L.J.

High Street Services Ltd. and Others v. Bank of Credit and Commerce International S.A. (In Liquidation)

       By an amended notice of appeal dated 11 January 1993, the bank appealed and sought declarations that, as at the date of the winding up

E    of the bank, namely 14 January 1992, the debts owed by High Street Services Ltd., Portmaid Fashions Ltd., Cira Ltd. and Saeed Ahmed were not and had not been extinguished by the debt owed by the bank to Raees Ahmed concerning the amounts standing to the credit of his deposit account as at 14 January 1992.

       The grounds of appeal were that Hoffmann L.J. erred in law (1) in holding that the charge in favour of the bank, of the chose in action

F    constituted by the deposit, required to be "unwound" for the purposes of rule 4.90 of the Insolvency Rules 1986; (2) in failing to hold that there was no debt due to Raees Ahmed which was eligible for set-off under rule 4.90 as, given that the chose in action constituted by the deposit had been charged to the bank, the position was governed by the rules relating to security not set-off and/or there was no debt due to Raees Ahmed in

G    respect of which he could submit a proof and/or Raees Ahmed no longer had the beneficial interest in the debt constituted by the deposit so that there was no mutuality; (3) in holding that, pursuant to the cash deposit security terms, Mr. Raees Ahmed was under a present liability to the bank at the date of its winding up; (4) in holding that clause 7(b)(ii) of the cash deposit security terms had the effect of creating primary liability so that the liability of Raees Ahmed to the bank pursuant to such terms

H    was not contingent upon demand; (5) in failing to hold that the requirement in clause 7(b) of the cash deposit security terms that any sums be repaid on demand made in writing was a condition precedent to any liability of Raees Ahmed; and (6) in failing to hold that the obligaton

440

of Raees Ahmed pursuant to the cash deposit security terms was to pay      A
a sum due upon a collateral obligation.

### IMPEXBOND LTD. AND OTHERS v. BANK OF CREDIT AND COMMERCE INTERNATIONAL S.A. (IN LIQUIDATION)

The bank appealed by an amended notice of appeal dated 11 January
1993.                                                                      B

The first two grounds of appeal were the same as those in the *High
Street Services* case, save that the deposit account in question related to
Nasir Abdul Amir. Additional grounds were that Hoffmann L.J. erred
(1) in holding that the letters of charge created a liability on the part of
Mr. Amir for the debts of Impexbond Ltd. and Tucan Investments Plc.;
and (2) in failing to hold that the letters of charge operated as equitable
charges by Mr. Amir to the bank of the property constituted by the          C
choses in action represented by the sums standing to the credit of the
deposit accounts.

The bank did not appeal in the *M.S. Fashions* case.

*Neville Thomas Q.C.* and *Robin Dicker* for the bank. The judge erred
in law in holding that rule 4.90 of the Insolvency Rules 1986 required an
unwinding of the bank's security over the deposit. The cash deposit         D
security terms and the letter of charge each operated as an equitable
charge by the guarantor to the bank of the property constituted by the
choses in action represented by the sums standing to the credit of the
deposit accounts. Contrary to the view expressed by Millett J. in *In re
Charge Card Services Ltd.* [1987] Ch. 150, 175, such a charge is not a
conceptual impossibility: see *Ex parte Mackay; Ex parte Brown; In re       E
Jeavons* (1873) L.R. 8 Ch.App. 643 and *Welsh Development Agency v.
Export Finance Co. Ltd.* [1992] B.C.C. 270. Given that the chose in
action in respect of the deposit account had been charged in favour of
the bank, the position was governed by the rules relating to security and
not to set-off. There was no debt due to the guarantor in respect of
which he could submit a proof. As a result of the charge-back the           F
guarantor no longer had the beneficial interest in the debt constituted by
the deposit. Accordingly there was no mutuality and no debt due to the
guarantor eligible for set-off under rule 4.90: see *Ex parte Caldicott; In re
Hart* (1883) 25 Ch.D. 716.

Set-off is mandatory whether it is B.C.C.I. which is in liquidation or
the guarantor. Thus, if Hoffmann L.J. is correct, in other cases, if it was
the guarantor which went into liquidation while the bank remained           G
solvent (the more likely occurrence) the bank would only be entitled to
claim the net amount from the principal debtor, i.e., after taking into
account any set-off arising between it and the guarantor. In taking the
necessary account there would be included not merely a guarantor's
claim for sums owed on a current account or deposit account (whether
charged to the bank or not) but also, for example, liquidated claims for
damages or contingent claims. Since all mutual debts, credits and dealings  H
are required to be included in the account to be taken under rule 4.90
the result would be that in many cases the creditor bank would not know
what was the net sum owing by the principal debtor. There would be

441

Ch.                     M.S. Fashions Ltd. v. B.C.C.I. (C.A.)

A  potential difficulties if the principal debtor was also to go into liquidation.
The creditor's right to prove in the principal debtor's liquidation would
be reduced to the net sum owing, after taking into account any sums
owed by him to the guarantor. As a matter of principle the secured
creditor is entitled to rely first on the personal covenant of the principal
debtor and then to rely on the security provided by the guarantor.

B  In both the Impexbond and High Street Services actions, the debts
constituted by the deposits were charged to the bank to secure the
potential liability of the guarantors. While moneys remained owing by
the principal debtor (in relation to the letter of charge) or the guarantor
remained potentially liable under his guarantee (in relation to the cash
deposit security terms) the guarantor was not entitled to bring an action
for the return of the deposit; nor could he prove in respect of it in the

C  liquidation. The rules relating to set-off were irrelevant. The position
was governed by the rules relating to security. There was no debt "due"
to him for the purposes of rule 4.90. Nor was there any mutuality. The
position was analogous to that which exists where money has been paid
by X to Y for a special purpose. In such cases, if there is a surplus in Y's
hands in respect of the moneys paid to him, he is not entitled to raise,
by way of set-off, a claim which he has against X: see *In re Pollitt;*

D  *Ex parte Minor* [1893] 1 Q.B. 455; *In re Mid-Kent Fruit Factory* [1896] 1
Ch. 567 and *In re City Equitable Fire Insurance Co. Ltd. (No. 2)* [1930]
2 Ch. 293.

In the *High Street Services* case, the judge erred in holding that a
debt existed under the cash deposit security terms prior to any demand
being made. On the true construction of the terms, the parties clearly

E  intended the requirement of a demand to be a real stipulation and not
mere words: see *Bradford Old Bank Ltd. v. Sutcliffe* [1918] 2 K.B. 833,
849. The rule that the words "on demand" are not regarded as creating
a contingent liability applies where there is a direct liability: see *Bradford
Old Bank Ltd. v. Sutcliffe* [1918] 2 K.B. 833 and *Hill v. Wade* (1616)
Cro.Jac. 523. The rule does not apply where the sum is payable under
some collateral agreement or a debt is created by such an agreement. In

F  such a case, a demand is necessary under the terms of the agreement,
and no liability exists unless and until a demand is made: see *Bradford
Old Bank Ltd. v. Sutcliffe* [1918] 2 K.B. 833 and *In re J. Brown's Estate;
Brown v. Brown* [1893] 2 Ch. 300. The judge over-stated the position
when he said that Walton J.'s provisional view in *Esso Petroleum Co.
Ltd. v. Alstonbridge Properties Ltd.* [1975] 1 W.L.R. 1474, 1483 was that

G  "the 'principal debtor' clauses have the effect of creating primary liability
for the purposes of the rule that the debt is not contingent upon
demand." The assistance to be obtained from that case is limited: see
*General Produce Co. v. United Bank Ltd.* [1979] 2 Lloyd's Rep. 255,
259.

The question whether a debt is collateral does not depend on the
defendant's liability being secondary rather than primary. Guarantee

H  claims are merely one example of a collateral claim. Indeed the issue
whether an obligation is collateral and thus whether a demand is
necessary has arisen in cases having nothing to do with secondary
liabilities: see *In re J. Brown's Estate; Brown v. Brown* [1893] 2 Ch. 300;

442

*Batson v. Spearman* (1838) 9 Ad. & E. 298; *Bradford Old Bank Ltd. v. Sutcliffe* [1918] 2 K.B. 833 and *Birks v. Trippet* (1666) 1 Saund. 28. The obligations of the guarantor in the High Street Services action under the cash deposit security terms were collateral. In particular, no liability would exist in the absence of that agreement and the guarantor was, in effect, being charged with the liability of another: see *Hill v. Wade*, Cro.Jac. 523 and *Wallis v. Scott* (1718) 1 Str. 88.

A

*Jonathan Sumption Q.C.* and *Mark Hapgood* for the High Street Services and Impexbond plaintiffs. The liabilities of principal debtors are always enforceable without the demand: see *Rowe v. Young* (1820) 2 Bli. 391. Rule 4.90 is a rule for ascertaining the amount of any debt owed between two parties who have had mutual dealings. It is mandatory and unqualified by any considerations relating to security. Before any question can arise as to the effect on the set-off of a charge, it has to be established that the charge still subsists. It does not subsist unless the debt secured by it is still outstanding.

B

C

*Ex parte Barnett; In re Deveze* (1874) L.R. 9 Ch.App. 293 is authority for the proposition that a security interest may be discharged by the repayment of the secured debt as a result of the operation of insolvency set-off. There the decision was that the bankrupt could not insist on his claim being discharged from free funds. The reasoning of the court would have led to the same result if it had been the solvent claimant rather than the bankrupt who held security. It followed that it was irrelevant for the purposes of set-off that the creditor could not prove while the security subsisted. He did not need to: compare *Ellis & Co.'s Trustee v. Dixon-Johnson* [1925] A.C. 489.

D

*Ex parte Barnett*, L.R. 9 Ch.App. 293 justified the general terms in which the principle was stated by Dixon J. in *Hiley v. Peoples Prudential Assurance Co. Ltd.* (1938) 60 C.L.R. 468, 498 and Lord Selborne's statement was the basis of the House of Lords' decision in *Halesowen Presswork & Assemblies Ltd. v. National Westminster Bank Ltd.* [1972] A.C. 785 that set-off was mandatory. The same principle applied where the debt itself was subject to a security interest, because the problem was essentially the same. The creditor, it was said, could not prove while his debt was charged. The answer was that the charge had gone because the secured liability had been paid off by set-off. That was why the proceeds of a life policy charged to the office which issued it might nevertheless be set off in insolvency: see *Sovereign Life Assurance Co. v. Dodd* [1892] 2 Q.B. 573 and compare *In re National Benefit Assurance Co. Ltd.* [1924] 2 Ch. 339; *Hiley v. Peoples Prudential Assurance Co. Ltd.*, 60 C.L.R. 468; *In re Daintrey; Ex parte Mant* [1900] 1 Q.B. 546 and *Palmer v. Day & Sons* [1895] 2 Q.B. 618. Those decisions also show that there was no want of mutuality where the charged debt was to be set off against the same liability which it secured.

E

F

G

*In re City Equitable Fire Insurance Co. Ltd. (No. 2)* [1930] 2 Ch. 293 is not inconsistent with any of these points. The decision is concerned with a payment made to or retained by the debtor for a special purpose. The basis of the rule in such cases is that money so paid is subject to a trust for the fulfilment of a purpose other than the discharge of the liabilities which it is sought to set it off against, with a resulting trust for

H

Ch.                      M.S. Fashions Ltd. v. B.C.C.I. (C.A.)

A    the payer: see *Quistclose Investment Ltd. v. Rolls Razor Ltd.* [1970] A.C.
     567 and *Halesowen Presswork & Assemblies Ltd. v. National Westminster
     Bank Ltd.* [1972] A.C. 785. Where there is a surplus after the purpose is
     fulfilled, the payer is not a creditor for that surplus; it is his property in
     equity. The special purpose in *In re City Equitable Fire Insurance Co.
     Ltd. (No. 2)* for which the insurer retained the money was the satisfaction
     of the obligations of the reinsurer under the particular treaty. The
B    retained funds were applied to that purpose only after the beginning of
     the winding up: see p. 296. The only issue concerned the surplus, which
     the liquidator wished to apply against other liabilities of the reinsurer
     unconnected with the treaty: see p. 307. It was held that it was not
     available for set-off against those because that was outside the purpose
     for which the retention had been permitted. That feature of the case is
C    common to all the cases on the point: see *Young v. Bank of Bengal*
     (1836) 1 Moo.Ind.App. 87; *In re Pollitt; Ex parte Minor* [1893] 1 Q.B.
     455 and *In re Mid-Kent Fruit Factory* [1896] 1 Ch. 567.
         There was nothing in the reasoning of the court in *In re City Equitable
     Fire Insurance Co. Ltd. (No. 2)* to suggest that there could have been no
     set-off of the retention fund against the reinsured's liabilities under the
     treaty. On the contrary, satisfaction of those liabilities was the very
D    purpose for which the retention fund was retained. If the bank is right,
     then the retention fund could not even have been applied against the
     reinsurer's liabilities under the treaty, and should have been retained
     until those liabilities had been discharged from free assets. That was not
     what the court said. Equally, the court's reasoning in that case would not
     prevent a set-off of the deposit against the advance in the present cases,
E    because if the analogy with special purpose payments is good, the special
     purpose here was to meet the liability for the advance. *In re City
     Equitable Fire Insurance Co. Ltd. (No. 2)* is direct authority against the
     bank's contention that the result of paying off the debt which the fund
     secured was merely to leave the creditor with an unencumbered right of
     action for what it was worth. A charge is simply a right vested in the
     chargee to require the indebtedness to be paid from the specific fund
F    represented by the deposit: see *Palmer v. Carey* [1926] A.C. 703.
         *Thomas Q.C.* replied.

                                                         *Cur. adv. vult.*


     25 March.   The following judgments were handed down.
G
     DILLON L.J.


     *Preliminary*
         The court has before it appeals by the Bank of Credit and Commerce
     International S.A. ("B.C.C.I."), a company in liquidation, acting by its
H    liquidators against orders made by Hoffmann L.J., sitting as an additional
     judge of the Chancery Division, on 27 November 1992 in two cases
     which raise, on slightly different documents and facts, essentially the
     same questions.

444

Dillon L.J.          M.S. Fashions Ltd. v. B.C.C.I. (C.A.)          [1993]

Stated broadly, the problem is this. If a bank lends money to a    A
company and takes a guarantee of the company's indebtedness from a
director of the company, and also takes from the director a deposit of
money with the bank which is charged in favour of the bank with the
payment to the bank of the company's indebtedness to the bank or the
director's liability to the bank as guarantor of the company's indebtedness,
and if the bank later becomes insolvent and is put into liquidation, can
the company or the director compel the bank to apply the director's    B
deposit in reduction of the company's indebtedness, and also of the
director's liability as guarantor, or can the bank require the company to
pay the full amount of its indebtedness to the bank without regard to the
director's deposit and, if so, does that leave the director to prove as an
unsecured creditor in the liquidation of the bank for the amount of his
deposit?                                                              C
    To answer this involves consideration of the law of set-off in
companies' liquidation and can also raise questions as to the principles of
equity as to the enforcement of securities if set-off is not available.

*The facts and documents*
*Impexbond*                                                            D
    One of the appeals concerns two associated companies, Impexbond
Ltd. and Tucan Investments Plc. These both banked with B.C.C.I. and
unlimited guarantees in B.C.C.I.'s standard form of the companies'
indebtedness to B.C.C.I. were given by a Mr. Nasir Abdul Amir on, in
relation to Impexbond, 11 March 1985, and in relation to Tucan
Investments Plc., 29 May 1986. In addition, on 11 March 1985 in respect
of Impexbond Ltd. and on 29 May 1986 in respect of Tucan Investments    E
Plc., Mr. Amir signed the bank's form designated "letter of charge by an
individual as security for the liabilities of a third party." By those letters
of charge Mr. Amir agreed that B.C.C.I. might hold any money standing
to the credit of certain specified accounts of his as security, and he
charged such moneys or deposits so standing with the repayment of all
the moneys due to the bank on any account from Impexbond Ltd. and
Tucan Investments Plc. He also agreed in each letter of charge that his    F
liabilities thereunder should be as that of a principal debtor.
    When B.C.C.I. was ordered to be wound up on 14 January 1992 the
aggregate liability of Impexbond Ltd. and Tucan Investments Plc. to
B.C.C.I. was about £3·3m. (with cross-guarantees in favour of B.C.C.I.),
while the amount to the credit of Mr. Amir's specified accounts
(renumbered on transfer to a different branch of B.C.C.I.) was about    G
£4·5m.

*High Street Services*
    The other appeal concerns three associated companies, High Street
Services Ltd., Cira Ltd. and Portman Fashions Ltd., which all banked
with B.C.C.I. On 24 April 1989 a director, Mr. Raees Ahmed, signed
unlimited guarantees in B.C.C.I.'s standard form of each of the three    H
companies' indebtedness to B.C.C.I. He also on the same date, 24 April
1989, signed in respect of each of the three companies a document in the
same printed form headed "cash deposit security terms—third party."

Ch.                M.S. Fashions Ltd. v. B.C.C.I. (C.A.)              Dillon L.J.

A    In these latter documents the term "deposited moneys" was defined
as meaning any moneys including accrued interest standing to the credit
then or in the future of any deposit account Mr. Ahmed might have with
B.C.C.I. It was agreed that B.C.C.I. might at any time, without further
order or notice, appropriate whether by way of set-off or otherwise the
deposited moneys in or towards satisfaction of the indebtedness of
Mr. Ahmed to B.C.C.I. It was acknowledged by Mr. Ahmed that
B    repayment to him of the deposited moneys was conditional upon B.C.C.I.
having received payment in full of his indebtedness to B.C.C.I., and that
otherwise he should not be entitled to withdraw the deposited moneys
except at the absolute discretion of B.C.C.I.
    In a further section of the "cash deposit security terms" Mr. Ahmed
agreed to guarantee to pay and/or discharge to B.C.C.I. upon written
C    demand all liabilities of the company to B.C.C.I. Mr. Ahmed further
declared "as a separate and independent obligation hereunder" that the
company's liabilities "shall be recoverable by you from me as principal
debtor and/or by way of indemnity and shall be repaid by me on demand
made in writing by you or on your behalf whether or not demand has
been made on the [company]."
D    At the time of the order for the compulsory winding up of B.C.C.I.
Mr. Ahmed had about £426,000 on deposit with B.C.C.I., and the three
companies owed B.C.C.I. in the aggregate over £1m. B.C.C.I. had the
benefit of cross-guarantees in its favour by the three companies and
charges on other properties including a charge by Mr. Ahmed on his
home.
    Before the judge there was also a third case, heard at the same time,
E    which involved a company, M.S. Fashions Ltd. and a Mr. Sarwar. But
the facts were slightly different in that a demand had actually been made
by the liquidators of B.C.C.I. on M.S. Fashions Ltd. and Mr. Sarwar,
and B.C.C.I. has not appealed the decision of Hoffmann L.J. in relation
to M.S. Fashions Ltd. That matter is resolved.

F    *Set-off in companies' liquidation*

    It has for long been established that in personal bankruptcy or
insolvency and companies' liquidation there is to be set-off where there
have been mutual credits, mutual debts or other mutual dealings. The
current provision applicable to companies' liquidation is rule 4.90 of the
Insolvency Rules 1986, which provides, so far as material:
G
    "(1) This rule applies where, before the company goes into
    liquidation, there have been mutual credits, mutual debts or other
    mutual dealings between the company and any creditor of the
    company proving or claiming to prove for a debt in the liquidation.
    (2) An account shall be taken of what is due from each party to the
    other in respect of the mutual dealings, and the sums due from one
H    party shall be set off against the sums due from the other. . . .
    (4) Only the balance (if any) of the acount is provable in liquidation.
    Alternatively (as the case may be) the amount shall be paid to the
    liquidator as part of the assets."

446

Dillon L.J.          M.S. Fashions Ltd. v. B.C.C.I. (C.A.)          [1993]

It is common ground that where there are such mutual credits, mutual     A
debts or other mutual dealings the set-off is mandatory and cannot be
excluded by any contract between the parties: see *Halesowen Presswork*
*& Assemblies Ltd. v. National Westminster Bank Ltd.* [1972] A.C. 785.

If there are indeed mutual credits or mutual debts or mutual dealings
between a company, or a bankrupt, and a creditor, then the set-off
applies notwithstanding that one or other of the debts or credits may be
secured. See, for instance, the judgment of Lord Selborne L.C. in          B
*Ex parte Barnett; In re Deveze* (1874) L.R. 9 Ch.App. 293 and the
judgment of Dixon J. in *Hiley v. Peoples Prudential Assurance Co. Ltd.*
(1938) 60 C.L.R. 468, 498. Dixon J. added: "To the extent that the
secured debt is answered by set-off the security is freed."

In *Hiley's* case a life assurance company had issued a policy to a
policy holder. Subsequently the policy holder charged the policy and        C
other property to the company to secure an advance by the company to
the policy holder. Later the company was ordered to be wound up and
the liquidator repudiated the policy. It was held that the policy holder
was entitled to set off his claim against the company for repudiating
his policy against his liability to the company in respect of the advance.
Dixon J. said, at pp. 496–497:
                                                                            D
    "In the first place, the general rule does not require that at the
    moment when the winding up commences there shall be two
    enforceable debts, a debt provable in the liquidation and a debt
    enforceable by the liquidator against the creditor claiming to prove.
    It is enough that at the commencement of the winding up mutual
    dealings exist which involve rights and obligations whether absolute
    or contingent of such a nature that afterwards in the events that       E
    happen they mature or develop into pecuniary demands capable of
    set off. If the end contemplated by the transaction is a claim
    sounding in money so that, in the phrase employed in the cases, it is
    commensurable with the cross-demand, no more is required than
    that at the commencement of the winding up liabilities shall have
    been contracted by the company and the other party respectively        F
    from which cross money claims accrue during the course of the
    winding up."

That is in line with the judgment of Romer L.J. in *In re Daintrey; Ex*
*parte Mant* [1900] 1 Q.B. 546, 573–574, and the judgment of Lord
Russell of Killowen C.J. in *Palmer v. Day & Sons* [1895] 2 Q.B. 618. It
also covers the actual circumstances in *Sovereign Life Assurance Co. v.*   G
*Dodd* [1892] 2 Q.B. 573. In that case the policy, which had been charged
by the holder to the issuing company as security for a loan, matured after
a petition had been presented for the winding up of the company but
before any winding up order had been made; but it was then the general
view, contrary to the present view, that the relevant date for the
application of set-off was the date of the presentation of the petition
rather than the date of the order. Set-off was none the less held to be     H
applicable.

It is said, however, for B.C.C.I. that, even accepting the foregoing,
there is even now—let alone at the date of the winding up order—no

A    relevant personal liability on Mr. Amir or Mr. Ahmed to be set off against their deposits because the personal liability of each of them is merely that of guarantor, a guarantor's liability is contingent on the demand being made, and no demand has even now been made on Mr. Amir or Mr. Ahmed.

It is accepted by B.C.C.I. that the liabilities of the principal debtors, the various companies, to B.C.C.I. were at all times presently enforceable

B    by B.C.C.I. without any need for a demand before the issue of a writ, even if the indebtedness was described in the relevant documents as "repayable on demand." That is in accordance with many authorities and it is sufficient to take the statement by Bayley J. in *Rowe v. Young* (1820) 2 Bli. 391, 465, where he said:

C       "the rules which the law has laid down as to cases in which a demand is or is not necessary, must be considered. One of these rules I take to be this, that where a man engages to pay upon demand what is to be considered his own debt, he is liable to be sued upon that engagement, without any previous demand; . . ."

But Bayley J. went on to say:

D       "but . . . if he engage to pay upon demand what was not his debt, what he is under no obligation to pay, what but for such engagement he would never be liable to pay any one, a demand is essential, and part of the plaintiff's title."

Consequently it has been held in various contexts that to enforce liability against a mere surety there must be a demand before action brought: see the decision of Chitty J. in *In re J. Brown's Estate; Brown v. Brown*

E    [1893] 2 Ch. 300 and the decision of this court in *Bradford Old Bank Ltd. v. Sutcliffe* [1918] 2 K.B. 833.

Essentially, however, the question is one of the construction of the contract: see *N. Joachimson v. Swiss Bank Corporation* [1921] 3 K.B. 110, 129, where Atkin L.J. said:

F       "The question appears to me to be in every case, did the parties in fact intend to make the demand a term of the contract? If they did, effect will be given to their contract, whether it be a direct promise to pay or a collateral promise, though in seeking to ascertain their intention the nature of the contract may be material."

In the present case in the letters of charge signed by Mr. Amir in respect of Impexbond Ltd. and Tucan Investments Plc. he has expressly

G    agreed that his liabilities thereunder—namely the companies' liabilities charged on his deposits—shall be as that of a principal debtor.

Similarly in the forms setting out the cash deposit security terms which Mr. Ahmed signed in respect of High Street Services Ltd. and its associated companies he accepted that the liabilities of those companies should be recoverable from him as principal debtor and they were thus within the definition of his indebtedness; he also authorised the

H    appropriation of the deposited moneys in satisfaction of his indebtedness without further notice to him.

The effect of that must be to dispense with any need for a demand in the case of Mr. Amir since he has made the companies' debts to B.C.C.I.

448

Dillon L.J.           M.S. Fashions Ltd. v. B.C.C.I. (C.A.)           [1993]

his own debts and thus immediately payable out of the deposit without          A
demand. In the case of Mr. Ahmed there must be immediate liability
even though the word "demand" was used, because he accepted liability
as a principal debtor and his deposit can be appropriated without further
notice.

The banking relationship between B.C.C.I. and the various companies
of course ceased when B.C.C.I. went into liquidation. Therefore we have
a situation in which, though the situation is tripartite rather than bipartite          B
as in the cases referred to earlier, all the rights are immediately
enforceable so far as relevant to the question of set-off. There is a debt
presently due from each of the companies to B.C.C.I. and equally due
from Mr. Amir or Mr. Ahmed as the case may be as a principal debtor to
B.C.C.I. and there is the liability from B.C.C.I. to Mr. Amir or
Mr. Ahmed for the deposits. That satisfies entirely, in my judgment, the          C
requirements for statutory set-off as explained by Dixon J., and
consequently rule 4.90 has automatic effect.

If there is set-off between Mr. Amir and Mr. Ahmed and B.C.C.I.
that must automatically reduce or extinguish the indebtedness to
B.C.C.I. of the companies. The statutory set-off is not something which
B.C.C.I. can, as it were, place in a suspense account. It operates to          D
reduce or extinguish the liability of the guarantor and necessarily
therefore operates as in effect a payment by him to be set against the
liability of the principal debtor. A creditor cannot sue the principal
debtor for an amount of the debt which the creditor has already received
from a guarantor. This is subject, however, to one point, which has been
called "the charge point" to which I now turn.

                                                                               E

*The charge point*

The basis of this is that it is said for B.C.C.I. that the moneys placed
on deposit by Mr. Amir and Mr. Ahmed were moneys paid to B.C.C.I.
for a special purpose, viz. to be charged in favour of B.C.C.I. as security
for the indebtedness to B.C.C.I. of the relevant companies, and it is said
also that, on authority, moneys paid for a special purpose are, whether
before or after that purpose has been achieved, outside the scope of the          F
set-off and mutual dealing provisions of insolvency law—for present
purposes rule 4.90 of the Rules of 1986.

The argument put forward depends in part on a decision of this court
in *Ex parte Caldicott; In re Hart* (1883) 25 Ch.D. 716 but even more on
a decision of this court in *In re City Equitable Fire Insurance Co. Ltd.
(No. 2)* [1930] 2 Ch. 293 and an earlier case of *Young v. Bank of Bengal*          G
(1836) 1 Moo.Ind.App. 87.

In *Ex parte Caldicott*, 25 Ch.D. 716 a father and his son had entered
into a partnership and had arranged banking facilities for the partnership
with Lloyds Banking Co. The father had charged certain land owned by
himself to the bank, but the land had been sold, and had been replaced
by the proceeds, placed on deposit with the bank. The firm later became
bankrupt, which involved the administration in bankruptcy of their joint          H
estate, and the separate administration in bankruptcy of the separate
estate of the father. The issue before the court was whether the bank, in
proving against the joint estate, had to give credit for the moneys it held

449
Ch.                          M.S. Fashions Ltd. v. B.C.C.I. (C.A.)                    Dillon L.J.

A    on deposit from the father. the essence of the decision, as I understand
     it, is contained in the final paragraph in the brief judgment of Lord
     Selborne L.C., with which Cotton and Lindley L.JJ. agreed, viz. that the
     money on deposit with the bank was a security, but not a security on the
     joint estate, and the rule in bankruptcy was that a valuation or giving up
     of a security was only necessary when, in the case of a proof by creditors
     of the joint estate it was a security on the joint estate. The judgment was
B    only concerned with the joint estate.
         Lord Selborne L.C. did, however, say in the penultimate paragraph
     of his judgment, at p. 722:

         "It appears to me a fallacy to say that the money so deposited was a
         debt due from the bank to the father, in the sense that an action
         could have been brought by him for it, so long as it remained in the
C        hands of the bank, and there was a balance due from the firm to
         them which the mortgage of the real estate was intended to secure;
         and I cannot think that the conversion of the security into money,
         and the deposit with the bank of the money, which continued to be
         the subject of the security, can make any difference in principle."

D        What I understand him to have been meaning by that is that the
     money still in the hands of the bank was held by the bank as a security
     and therefore, as it was not a security on the joint estate it did not have
     to be taken into account in determining the amount of the bank's proof
     against the joint estate. I do not understand him to have been saying that
     as the father could not have brought an action against the bank for the
     money so long as there was a balance due from the firm to the bank,
E    there could not have been any statutory set-off in the father's separate
     estate to reduce the joint indebtedness to the bank. If that is the correct
     interpretation, *Ex parte Caldicott* does not govern the present case.
         *In re City Equitable Fire Insurance Co. Ltd. (No. 2)* [1930] 2 Ch. 293
     is the most important of the trio of cases which, in the words of
     Lord Simon of Glaisdale in *Halesowen Presswork & Assemblies Ltd. v.
     National Westminster Bank Ltd.* [1972] A.C. 785, 808 show that "mutual
F    dealings" in, as it is now, rule 4.90 do not cover a transaction in which
     property is made over for a "special (or specific) purpose." Lord
     Kilbrandon said [1972] A.C. 785, 821:

         "In *In re City Equitable Fire Insurance Co. Ltd. (No. 2)* [1930] 2 Ch.
         293 a fund held by way of a guarantee against the carrying out of
         specific obligations was held to be 'special' in this sense. In all these
G        cases the funds may be said to have been impressed with quasi-trust
         purposes, and that is sufficient to destroy the mutuality which is a
         prerequisite of the right to set-off arising, since it is necessary that
         the debts were between the parties in the same right, a condition
         which the holding of a sum as trustee would destroy: . . ."

H    The other two cases in the trio are *In re Pollitt; Ex parte Minor* [1893]
     1 Q.B. 455 and *In re Mid-Kent Fruit Factory* [1896] 1 Ch. 567.
         The essential facts of the *City Equitable Fire Insurance* case [1930]
     2 Ch. 293 were that the City Equitable, as reinsurer, entered into a
     treaty of reinsurance with an insurance company. Under that treaty a

450

Dillon L.J.            M.S. Fashions Ltd. v. B.C.C.I. (C.A.)              [1993]

certain percentage of the premium payable to the City Equitable as the        A
reinsurer was to be retained and accumulated by the insurer "as security
for the due performance of the obligations of the reinsurer" under the
treaty. The City Equitable was put into compulsory liquidation and the
treaty of reinsurance was terminated in accordance with its terms. Then,
after all claims of the insurer under the treaty had been satisfied out of
the accumulated fund, there was a surplus of £8,000 left in the hands of
the insurer. The insurer claimed to set off against that surplus sums due        B
from the City Equitable under other contracts, relying on section 31 of
the Bankruptcy Act 1914, the then current predecessor of rule 4.90. It
was only the set off of the surplus that was in issue, and it was held that
the insurer was not entitled to that.

In giving the leading judgment in this court Lord Hanworth M.R.
said, at p. 312:                                                                  C

"Different considerations apply where money has been handed over
for a specific purpose and not treated as a mere item in accounts
kept between the bankrupt and his creditors. . . . The effect of
handing over money for a specific purpose appears from the cases to
be that it is taken out of the course of accounts between the parties
to be held, so to speak, in suspense between them, until that specific        D
purpose for which it had been handed over has been completed; and
even then it appears that the nature and quality of the specific
purpose still attaches to the balance of the fund, if any, which
remains in the hands of the depositee. The fund having been
originally placed in the depositee's hands for the particular purpose,
the nature and quality of that purpose still attaches to the balance of
the fund unless and until there has been some subsequent agreement        E
releasing it from the specific purpose. Indeed, it must in all cases be
the balance of the fund which is in dispute in cases such as this."

Because the fund was accumulated by the depositee/insurer for a
special purpose under the particular treaty of reinsurance, there was no
mutuality between the liquidator of the City Equitable's claim for the
balance of the accumulated fund and, on the other hand, the claims of        F
the insurer against the City Equitable under other contracts. Those debts
were not, in Lord Kilbrandon's words [1972] A.C. 785, 821, "in the same
right." Therefore, there was no set-off.

But, as I see it, there had at the earlier stage, before the surplus was
ascertained, been ample mutuality between the liquidator's claim for the
accumulated fund and the claims of the insurer for the due performance        G
of the obligations of the City Equitable under the particular treaty of
reinsurance under which the accumulated fund had been accumulated.
Therefore, at that earlier stage, there was no objection to set-off of the
claims under the particular treaty of reinsurance; the insurer was not
required to hand over the accumulated fund to the liquidator intact and
without deductions even under the particular treaty of reinsurance.

The two other cases in the trio, In re Pollitt; Ex parte Minor [1893]        H
1 Q.B. 455 and In re Mid-Kent Fruit Factory [1896] 1 Ch. 567, were
likewise cases in which what was in issue was the surplus of a deposited
fund remaining after the specific purpose for which it had been deposited

A  had been satisfied; it was held that the surplus could not be set-off under the statutory provisions against other debts which had nothing to do with those specific purposes.

These three cases do not, in my judgment, bear at all on the problem with which we are concerned in the present case, and do not prevent the set-off which the present directors assert.

B  *Young v. Bank of Bengal,* 1 Moo.Ind.App. 87 is a very similar case to *In re City Equitable Fire Insurance Co. Ltd.* A firm of merchants had deposited paper with the bank to secure a particular loan. When the firm became bankrupt, the bank sold the paper, and the proceeds produced a surplus after paying off the particular loan and interest on it. The bank claimed to set the surplus off under the statute against other debts due from the firm to the bank for which the bank held the firm's promissory

C  notes. It was held that the bank could not do so because the case did not come within the clause of mutual credit in the Indian Insolvency Act (9 Geo. 4, c. 73). The reasoning of Lord Brougham seems to me to be in line with that of Lord Hanworth M.R. in *In re City Equitable Fire Insurance Co. Ltd. (No. 2)* [1930] 2 Ch. 293.

Lord Brougham incidentally stated, at p. 145, that the introduction of

D  the words "mutual credit" extends the right of set-off to cases where the party receiving the credit is not debtor in presenti to him who gives the credit: "Accordingly the relation, contemplated by the statute has been held to be established where the debt is immediately due from the one party, and only due at a future date from the other." This anticipated Dixon J.'s statement in *Hiley's* case, 60 C.L.R. 468. In the present case,

E  therefore, there is nothing in the charge point to defeat the set-off claimed.

Mr. Amir is, of course, claiming to prove in the liquidation for his deposits, subject to the set-off. Mr. Ahmed technically has no claim to prove because the amount due from him to B.C.C.I. exceeds the amount of his deposit; but the wording "balance (if any) of the account" in paragraph 4 of Rule 4.90 shows that the set-off applies even if its effect

F  is to reduce the claim in the liquidation to nil.


*Principles of equity as to enforcement of securities*

My conclusions on the foregoing point make it unnecessary to consider the implications of the rule in equity, stated by Viscount Cave L.C.

G  in *Ellis & Co.'s Trustee v. Dixon-Johnson* [1925] A.C. 489, 491, and stated also by Sargant L.J. in the court below [1924] 2 Ch. 451, 473, that if a creditor holding security sues for his debt he is under an obligation on payment of the debt to hand over the security, and if, having improperly made away with the security he is unable to return it to his debtor, he cannot have judgment for the debt.

H  For these reasons, which are substantially those of Hoffmann L.J., I would dismiss these appeals.


NOLAN L.J.    I agree with the judgment of Dillon L.J.

452

M.S. Fashions Ltd. v. B.C.C.I. (C.A.)                    [1993]

Steyn L.J.   I agree with the reasons given by Dillon L.J., and with    A
the order which he has proposed. There is nothing which I can usefully
add.

*Appeals dismissed with costs.*

Solicitors: *Lovell White Durrant; Glanvilles, Portsmouth; Slaughter &*    B
*May.*

G. F.

—————    C

[COURT OF APPEAL]

*In re* ARROWS LTD. (No. 4)    D

*In re* BISHOPSGATE INVESTMENT MANAGEMENT LTD. AND
ANOTHER

*In re* HEADINGTON INVESTMENTS LTD. AND OTHERS

1993   March 23, 24;                                   Dillon, Steyn and    E
       24, 25;                                              Rose L.JJ.
       25, 26;
April   7

Crime—Evidence—Documents, admissibility of—Examinations by
    company office-holders—Examinees charged with criminal
    offences—Director of Serious Fraud Office requiring transcripts    F
    and other documents relating to examinations—Whether use of
    documents by Serious Fraud Office subject to court's control—
    Insolvency Act 1986 (c. 45), s. 236—Criminal Justice Act 1987
    (c. 38), s. 2(3)(8)

N., T. and M., who had been examined by office-holders,
namely, liquidators or receivers, of various companies, under
section 236 of the Insolvency Act 1986, were charged with    G
criminal offences. The Director of the Serious Fraud Office
served notices, under section 2(3) of the Criminal Justice Act
1987,[1] requiring the office-holders to produce the transcripts of
the examinations. In the first case, on an application by the
office-holders the judge directed that they release and disclose
to the Director the transcripts and N.'s affirmations in the
examination upon undertakings by the Director that he would    H
not use the transcripts or affirmations in evidence against N.
save in the circumstances specified in section 2(8) of the Act of

---

[1] Criminal Justice Act 1987, s. 2(3): see post, p. 461A.