# EXHIBIT 80

Judgments

# Singapore Airlines Ltd and another v Buck Consultants Ltd

*Deed - Construction - Trust deed - Claimant employer bringing negligence action against defendant consultant regarding amendments to wording of employer's pension scheme - Construction of scheme to be determined as preliminary issue - Correct construction of scheme - Judge finding definition of 'earnings' including 'fluctuating emoluments' - Judge ordering defendant recovering difference between costs on standard and indemnity bases from scheme assets on basis applicable to litigation between trustee and beneficiary - Claimant appealing - Whether judge erring*

[2011] EWCA Civ 1542, (Transcript: Wordwave International Ltd (A Merrill Communications Company))

 **CA, CIVIL DIVISION**

**PILL, ARDEN LJJ, SIR MARK POTTER**

**24 NOVEMBER, 13 DECEMBER 2011**

**13 DECEMBER 2011**

M Furness QC for the Appellant/First Claimant

P Newman QC for the Respondent

Pitmans LLP; Linklaters LLP

**ARDEN LJ:**

**[1]**  This is an appeal by Singapore Airlines Ltd ("SA") from the order of Peter Smith J dated 20 January 2011. It raises important points about the meaning of "Earnings" for the purposes of The Singapore Airlines Pension and Life Assurance Scheme ("the Scheme") established by SA for its employees. The expression "Earnings" plays a key role in determining the amount of an employee's pensionable earnings and the amount of his or her contribution to the Scheme. The judge's order was made on a preliminary issue in a claim brought by SA in proceedings against the Respondent, Buck Consultants Ltd ("BC") for negligence in the drafting of a revised version of the rules of the Scheme in 2000. We are not concerned with those allegations in those proceedings save to note that the preliminary issue had to be resolved for the purposes of SA's action against BC. However, and this is relevant to an issue as to costs considered below (Issue 4), BC had also been appointed by order of the court to represent the members of the Scheme on the preliminary issue.

**[2]**  The Scheme was established by an interim trust deed made on 28 June 1974. SA is, and at all material times has been, the sole and principal employer for the purposes of the Scheme. The second Claimant in the action, Capital Cranfield Pension Trustees Ltd, is the Scheme's current trustee ("the Trustee"). From 1997, BC was retained by SA as an actuary pensions administrator and pension benefits consultant. It gave advice on, and drafted documents in relation to the Scheme.

**[3]**  The first rules of the Scheme ("the 1976 rules") were attached to the Definitive Trust Deed ("the Trust Deed") of 1 April 1976. The 1976 rules were expressed to take effect from 1 July 1974. In 1981 amended rules for the Scheme were adopted ("the 1981 rules"). The 1981 rules were expressed to take effect from 6 April 1975, subject to an immaterial exception.

**[4]**  The 1976 rules included the following definition "'Salary' means for each Member the annual rate of his basic remuneration from the Employers and London Weighting Allowance (if applicable) excluding any other emoluments."

**[5]**  The 1981 rules used the defined term "Earnings", as opposed to the term "Salary", but continued to employ the phrase "basic remuneration". Much of the argument on this appeal has focused on this important term. For simplicity, I propose to divide the definition of "Earnings" into its three component parts, which I shall call "Limbs". The definition of "Earnings" is as follows:

> "[Limb 1] 'Earnings' means for each Member the annual rate of his basic remuneration from the Employers.
>
> [Limb 2] For the purposes of calculating Earnings of an employee who is in receipt of fluctuating emoluments, the annual rate of any such emoluments to be included in his Earnings shall be taken as the average annual amount received over the last three years, or over such shorter period as he has been in receipt of such emoluments.
>
> [Limb 3] For the purposes of calculating Earnings of an employee paid on an hourly basis, remuneration in respect of any hours of work in excess of the Employer's standard working week for the time being in operation which is appropriate to the nature of such employee's employment will be ignored and the annual rate of his remuneration will be 52 times the weekly rate."

Neither the 1976 nor the 1981 rules define "basic remuneration" or "fluctuating emoluments".

**[6]**  I shall also refer below to cl 2(b) of the Trust Deed. This provides that "(b) the Trustees shall have full power to determine all questions and matters of doubt arising in connection with the Scheme whether relating to the construction thereof or the benefits thereunder or otherwise . . . ."

**[7]**  Rule 17 of the 1981 rules deals with limitations on benefits. Reference is made on this appeal to sub-rule (k), which provides in material part:

> "In this rule, 'Final Remuneration' means in relation to a Member at Normal Retiring Date, or the date of termination of his Service if earlier, the highest of -
>
> (i) his highest total yearly remuneration from the Employers for any one of the last five years (except that in calculating such remuneration the amount of any fluctuating emoluments shall be taken as the yearly average over the period of three or more years, or such lesser period as the Member has been in receipt of such emoluments, ending on the last day of that year); and
>
> (ii) the highest yearly average of his total emoluments from the Employers for any period of three or more consecutive years ending not more than ten years before the said date; and
>
> (iii) in the case of a deceased Member only, the yearly average of any fluctuating emoluments over the period of three or more years (or such lesser period as he was in receipt of such emoluments) ending at the date of his death together with the yearly rate of all other remuneration from the Employers applicable immediately before the date of his death; and

    (iv) in the case of a deceased member only, his highest total emoluments from the Employers for any year ending not more than three years before the date of his death;

    provided that -

    (1) a Member's remuneration shall for this purpose include remuneration from a sick pay or permanent health insurance scheme of the Employer (being a scheme under which benefit will not continue beyond Normal Retiring Date) benefits in kind to the extent that they are assessed or assessable under Schedule E as emoluments and otherwise to the extent agreed by the Commissioners of Inland revenue for this purpose, and directors' fees other than any to which the Member is not beneficially entitled or any which are treated for tax purposes as a receipt of a profession; and . . ."

**[8]** The parties agreed a list of issues to be determined at the trial of a preliminary issue. Those issues (with immaterial modification) are:

    "*Issue 1*: whether the definition of Earnings in the 1981 rules includes 'fluctuating emoluments';

    *Issue 2*: whether the payments known as '13th month payments' ('the 13MP) and 'London Weighting Allowance' ('the LWA') constitute either 'fluctuating emoluments' or 'basic remuneration'; and

    *Issue 3*: whether any limit applies to the type or amount of fluctuating emoluments included in the definition of Earnings."

**[9]** For the purposes of Issue 3, the averaging of fluctuating emoluments in accordance with Limb 2 of the definition of "Earnings" is to be ignored.

**[10]** The 13MP is the payment of an additional month's salary at the end of each calendar year. It has been paid annually to all employees more or less since the Scheme was established. These payments were not treated as pensionable for any group of employees in 1981 although they were treated as pensionable for management employees after 1985. The LWA, which has been paid to employees living in the London area since around 1971, has so far as material always been treated as pensionable. In addition, SA paid bonuses, cost of living allowances, shift allowances and overtime to some employees. It appears that these were not treated as pensionable at any time. It also paid certain benefits in kind, namely car allowances, entertainment allowances and free travel, but these have never been treated as pensionable.

*JUDGMENT OF PETER SMITH J*

**[11]** The judge's decision on the three issues set out in para 8 above was in summary as follows:

*Issue 1:*

**[12]** The judge answered this issue in the affirmative. He rejected SA's argument on Limb 2 of the definition of "Earnings" in the 1981 rules, which refers to fluctuating emoluments and caps them on the average basis. That argument amounted to saying that Limb 2 was redundant and had no purpose at all. The judge observed that this would not only offend the presumption against redundant drafting, but would also render r 17(k) redundant also since there would be no need to cap fluctuating emoluments. The judge accepted BC's submission that Limb 2 of the "Earnings" definition, albeit poorly drafted, introduced into the definition of "Earnings" fluctuating emoluments at the three-year averaged rate

for those employees in receipt of such emoluments.

*Issue 2:*

[13]  The judge concluded that the 13MP and LWA were basic remuneration, not fluctuating emoluments. Whilst it was true that the 13MP and the LWA varied, because they were liable to review on an annual basis, if they were held to fluctuate that would mean that every payment, even basic annual salary, which was also subject to review, would fall to be categorised as a fluctuating emolument. The judge accepted SA's contention that fluctuating emoluments referred to payments such as "commission, overtime, bonuses etc". 13MP and LWA, on the other hand, appeared to be contractual entitlements of the employees, fixed on an annual basis.

[14]  The judge observed that the drafter of the 1976 rules clearly thought LWA was not part of "basic remuneration" since the definition of "Salary" refers to both. There is no reference to LWA in the definition of "Earnings" in the 1981 rules. The judge decided that it was unlikely that the drafter of 1981 rules intended retrospectively to remove a benefit which had previously accrued to Members. On that "slender ground", the judge concluded that the absence of a reference to LWA in the definition of "Earnings" in the 1981 rules meant that LWA had been subsumed into "basic remuneration".

[15]  Although it was clear that 13MP was not included in the definition of "Salary" in the 1976 rules, the judge could see no reason for treating 13MP differently from LWA under the 1981 rules and, therefore, concluded that they also formed a part of basic remuneration.

*Issue 3:*

[16]  Benefits in kind became taxable emoluments for all directors and "higher paid employees" (increasingly in the judge's view a "misnomer" as this group was defined as those earning in excess of £8,500) in 1976. SA, as the employer, therefore had to agree the monetary value of these benefits in kind with the Revenue for income tax purposes. The judge rejected SA's submission that the lack of any machinery in the 1981 rules for valuing these benefits in kind meant that some benefits in kind were excluded from the definition of "Earnings". A number of the necessary calculations will already have been carried out for the Revenue. The judge stated that, if necessary, the court could supply the requisite machinery (relying on *Sudbrook Trading Estate Ltd v Eggleton* [1983] 1 AC 444, [1982] 3 All ER 1, [1982] 3 WLR 315), although he doubted that would be necessary given cl 2(b) (referred to in error as cl 2(a)) of the Trust Deed, which would permit a determination by the Trustee.

[17]  The judge gave a separate ruling on costs, which is summarised below.

*GROUNDS OF APPEAL*

[18]  Since SA appeals against each of the rulings of the judge, including costs, this court is required to consider each of issues 1, 2 and 3 and in addition a new issue, Issue 4, on costs. SA's challenge to the judge's ruling on Issue 3 is limited to submitting that benefits in kind (ie the taxable benefits relating to car allowances, entertainment allowances and free air travel) do not fall within the meaning of "Earnings" because they are impliedly excluded by reason of the lack of any machinery in the 1981 rules to allow them to be valued by the Trustee. Issue 3 arises only if the judge is right on Issue 1.

*Issue 1: Whether The Definition Of Earnings In The 1981 Rules Includes "Fluctuating Emoluments"*

**[19]** Definitions in statutes and deeds can be exhaustive or non-exhaustive. Non-exhaustive definitions are usually prefaced by the word "include". More often, however, a definition is intended to be exhaustive and it will then generally begin with the word "mean" or "means". It is difficult to read a definition which begins with the word "means" as other than exhaustive.

**[20]** SA is concerned on the preliminary issue to argue for the narrowest definition of "Earnings". It submits that Limb 1 of "Earnings" limits the definition to basic remuneration. Limb 1 also uses the word "means", which is, as explained, strongly indicative of it being an exhaustive definition. But if that is so, SA must find a role for Limbs 2 and 3 which, on this analysis, have no role in determining the scope of the term "Earnings".

**[21]** The central argument for SA, for whom Mr Michael Furness QC appears, proceeds attractively on the basis that the definition of "Earnings" can (and should be) read as a coherent whole. Read as a whole, submits Mr Furness, it is clear that Limb 1 is the only operative part of the definition: it is exhaustive of "Earnings" and limits "Earnings" to basic remuneration alone. It would be straining the meaning of Limb 1 to do as the judge did and find a way of treating it as but one of a number of components which make up "Earnings" rather than as the only component. That, he submits, is the natural way to read Limb 1, given the use of the word "means". Any other approach leads to an internal inconsistency between Limb 1 and the other Limbs.

**[22]** Mr Furness further submits that the function of Limbs 2 and 3 is merely to lay down computational rules. Thus Limb 3 enables those concerned to calculate "basic remuneration" in the case of those paid on an hourly basis. There is no definition of "basic remuneration" but, essentially, says Mr Furness, it means remuneration which does not vary. A person paid by an hourly rate will have a contract requiring him to provide a fixed number of hours on a regular basis.

**[23]** Limb 2 creates more difficulty because it proceeds on the basis that "fluctuating emoluments" may constitute "Earnings". Limb 2 does not, however, expressly state that fluctuating emoluments are included. The explanation for Limb 2, on Mr Furness's submission, is that it was inserted out of an abundance of caution to comply with Revenue requirements. At the time when the 1981 rules came into effect, fluctuating emoluments had to be subject to a cap in line with Limb 2.

**[24]** In interpreting the 1981 rules, it is now well-established that the court should have regard to the fiscal context at the time the 1981 rules were made: *British Airways Pension Trustees Ltd v British Airways plc* [2002] PLR 247 at 30. Accordingly it is clear on Mr Furness' submission that we should have regard to the Revenue practice at the time that the 1981 rules were adopted.

**[25]** The effect of the word "means" in Limb 1 is so strong, submits Mr Furness, that the only function that Limb 2 can play is merely to state the Revenue requirement even though, in fact, it had no application in the case of this Scheme because fluctuating emoluments are not within the definition of "Earnings". This, submits Mr Furness, is a realistic approach since the drafter of a document such as the 1981 rules was likely to be following a precedent. It is easier in such a case to come to the conclusion that a redundant provision was included (ie not deleted) in error. It is not an uncommon experience to find that the detailed provisions of pension fund schemes contain minor mistakes. The definition in question appears in an appendix to the 1981 rules and thus may have received less attention than it should have done.

[26] Mr Furness then turns to the judge's reliance on r 17(k) in para 35 of his judgment where he holds that Mr Furness' argument makes the references here to fluctuating emoluments irrelevant if they were not within "Earnings". The judge appears to be proceeding on the basis that Final Remuneration, which the Revenue required to be capped as described in r 17(k), would be capped only by reference to basic remuneration in the case of this Scheme if "Earnings", and hence "Pensionable Earnings", did not include fluctuating emoluments. Mr Furness did not pursue that point. Rather his submission is that the judge's point can be met in relation to Limb 2 by remembering that in a scheme such as this the drafter would be concerned to ensure that all Revenue limits were reflected "just to ensure that the Revenue was happy". That would be so even if the requirements did not apply. Rule 17(k) was carried forward from the previous rules which expressly included the LWA. This might have reasonably been perceived to be a fluctuating emolument as it would not have been a constant amount.

[27] Furthermore, submits Mr Furness, the fact that there was no machinery for valuing any fluctuating remuneration representing a non-monetary benefit in kind indicates that Limb 2 was not intended to have operative force.

[28] Mr Furness has a discrete argument on Limb 3. It starts from the premise that, contrary to his primary case, fluctuating emoluments are included within the definition of "Earnings". Even if that were the case, and supposing that overtime counts as fluctuating emoluments, he submits that Limb 3 has the effect of limiting the "Earnings" of hourly-paid workers to their agreed hours and excluding overtime. This is because in the case of hourly-paid employees Limb 3 applies "For the purposes of calculating Earnings". It thus imposes an absolute limit on the number of hours that can count as "Earnings".

[29] Mr Paul Newman QC, for BC, challenges the basic premise of SA's argument that Limb 1 sets out an exhaustive definition. He submits that every word has to be given weight in Limb 1 and in particular a reason has to be found for the fact that in Limb 1 "Earnings" are defined as meaning "for each Member" the annual rate of his basic remuneration from the Employers. Limb 1 thus creates a rule, and in fact the only rule, which applies to all members. The other rules contained in Limbs 2 and 3 apply only to the groups of members who fall within them.

[30] In any event, Mr Newman submits, SA's interpretation should be rejected because it effectively renders Limb 2 redundant. This is contrary to established principles of construction. In so far as there are exceptional circumstances in which the court is prepared to accept that a term or provision is redundant, this case does not fall within them.

[31] Furthermore, submits Mr Newman, SA's interpretation should be rejected because it is also inconsistent with the opening words of Limb 2. Those words indicate that the purpose of Limb 2 is to enable fluctuating emoluments to be included in "Earnings" where an employee is entitled to fluctuating emoluments.

[32] Mr Newman's case on Limb 3 is that it excludes overtime from the definition of Earnings. He draws from this the conclusion that it was intended that fluctuating emoluments should be included in Earnings: there could be no other purpose in excluding overtime, which of its nature is a fluctuating emolument.

[33] There is yet another reason, Mr Newman submits, for rejecting SA's interpretation. It is clear that in the 1976 rules the LWA was a component of "Salary," which was the key component in the identification of pensionable earnings under those rules. However, and this is common ground, the power of amendment contained in cl 16 of the Trust Deed deprived of legal effect any amendment that had the effect of removing accrued rights. The 1981 rules were adopted with retrospective effect. Accordingly, if, as SA submitted to the judge, the LWA was neither basic remuneration nor a fluctuating emolument, then the 1981 rules had purported to remove an accrued right. The 1981 rules ought to be read on the basis that the amendment was within the enabling power in the Trust Deed: see *Bank of Credit and Commerce*

*International SA v Ali* [2001] UKHL 8, [2002] 1 AC 251 at 269, [2001] 1 All ER 961.

**[34]** The definition of "Earnings" was new in the 1981 rules and departed from the previous definition of "Salary". Mr Newman submits that the idea that the drafter did not give it full consideration should be rejected. That might have been more probable if what the drafter was doing was merely cutting and pasting a provision from the previous rules but that was not the case.

**[35]** Mr Newman submits that the presence of r 17(k) serves to confirm that the explanation given by Mr Furness for the presence of Limb 2 in the definition of "Earnings", as simply replicating Revenue requirements, cannot be correct. Rule 17(k), which quite clearly replicates IR12, the Revenue's guidance note on occupational pension schemes, does not make the same provision as Limb 2, most obviously because it contains four provisos which are not replicated in Limb 2 at all.

**[36]** I will now set out my conclusions on this Issue. There is in this case a tension between on the one hand giving the word "means" in Limb 1 its normal meaning and on the other hand ascribing to Limb 2 a role in defining the scope of "Earnings" and giving it, in that sense, operative effect. I have no doubt, however, that this apparent conflict is to be resolved in the manner suggested by Mr Newman and for substantially the reasons he gives. It is not a case of a straight conflict. Limb 1 and Limb 2 can be read as both having operative effect in defining relevant amounts as "Earnings". That is because the meaning provided in Limb 1 applies specifically "for each Member". Limb 1 then lays down a rule which applies to the remuneration of all Members of the Scheme. Every Member's basic remuneration will count as "Earnings" for the purposes of the Scheme.

**[37]** So read it is, in my judgment, clear that Limb 1 is not telling the reader any more than the lowest common denominator for every member. That is not inconsistent with the notion of the subsequent Limbs providing for further elements of remuneration to be included. In my judgment, it can be seen from r 17(k) that the drafter was well aware that some members of SA also received fluctuating emoluments and that the drafter regarded these as Earnings, albeit not as part of basic remuneration.

**[38]** So, building on a phrase used by Sir Mark Potter in argument, I consider that the succeeding Limbs in the definition of "Earnings" should be treated as if they were steps in a ladder, making provision for the separate types of remuneration mentioned in them. Once the court can rationalise the definition in this way, and find a structure within it appropriate to the task in hand, that is really sufficient to conclude the matter.

**[39]** The argument that Limbs 2 and 3 are merely providing for "computational rules" put forward by Mr Furness is an attractive one, but the mere fact that a rule is computational does not mean that it cannot also be substantive, or vice-versa. Mr Furness's own discrete argument on Limb 3 contained the seeds of destruction of his main case because, if the function of Limb 3 as he reads it is to exclude overtime, it is imposing a severe restriction on the earnings of hourly-paid employees. It has, therefore, substantive effect. It is highly unlikely that the drafter would have inserted a wholly redundant Limb 2 between operative Limbs 1 and 3 and, in any event, Limb 3 might be unnecessary if Limb 2 did not import into the concept of Earnings, fluctuating emoluments.

**[40]** Moreover, since there is no evidence these members did not receive holiday pay and sick pay entitlement, Mr Newman's suggestion that the hourly-paid workers received a benefit because the multiplier in Limb 3 was 52 weeks in any year remains at best a matter of speculation. In this connection we were reminded of what I had said in *British Airways Pension Trustees Ltd v British Airways plc*:

"26 There have been several reported cases about the interpretation of provisions of pension schemes in recent years. There are no special rules of construction but pension schemes have certain characteristics which tend to differentiate them from other analogous instruments. I mention some of those characteristics in the following paragraphs.

27 First, members of a scheme are not volunteers: the benefits which they receive under the scheme are part of the remuneration for their services and this is so whether the scheme is contributory or non-contributory. This means that they are in a different position in some respects from beneficiaries of a private trust. Moreover, the relationship of members to the employer must be seen as running in parallel with their employment relationship. This factor, too, can in appropriate circumstances have an effect on the interpretation of the scheme."

**[41]** The judge did not accept, as appears to be common ground between the parties on this appeal, that overtime was wholly excluded from "Earnings" because of the provisions of Limb 3. He held:

"40 Further there is logic in Mr Newman QC's submission that when one looks at the third category, the hourly paid employees, that their basic emoluments are the prima facie entitlement as set out in the third limb. However if they have overtime or the like then those also fall to be included in the second limb subject to the three year averaging rules as fluctuating emoluments."

**[42]** Both parties to this appeal take the view that the judge fell into error in the second sentence of para 40, which I have just set out. This court, however, cannot be bound by the parties' agreement on the matter of the true interpretation of a document. The exclusion of overtime will inevitably be significant to hourly-paid employees. Such an employee might be paid an hourly rate but then agree to do a relatively substantial number of extra hours on a regular basis to meet a shortage of skilled staff in some particular field. I do not consider that this matter was fully argued on this appeal. I would have wished to hear argument for upholding the judge before coming to any conclusion on this point. Accordingly I would merely note in this judgment that the parties did not agree with the judge's conclusion in the second sentence of para 40. If the parties require this issue to be resolved by this court, there will, if my Lords agree, have to be further submissions.

**[43]** On my conclusions on this Issue thus far, there is no redundancy in the drafting of the definition of Earnings and no need to investigate or to consider the probability or improbability of redundancy. I do, however, accept that the fact that one interpretation of a provision renders that provision otiose is a strong indication that that interpretation is not the correct one. In my judgment, it is also unnecessary to pursue the r 17(k) point relied on by the judge.

**[44]** Had I been persuaded that, on analysis, the provision remained ambiguous, I would have wished to consider further the argument put by Mr Newman on the limitation to the power of amendment (see para 33 above) but, in the circumstances (and without casting doubt on the potential importance of the points made by Mr Newman), I do not consider it is necessary to invoke that principle on this Issue.

**[45]** Mr Furness' submission about the absence of a machinery for computing non-monetary benefits (see para 27 above) should be mentioned here though it has greater relevance under Issue 3 below than under this Issue. The only purpose he could suggest for Limb 2, apart from its function of laying down an effective and operative rule for the computation of fluctuating emoluments, is that it is there out of a super-abundance of caution to keep the Revenue happy. But, if it is right that a machinery for valuation of non-monetary benefits is needed, it ought to have been included to achieve that purpose also. Certainly I do not consider that the absence of machinery for definitively establishing the value of a benefit in kind is so compelling that it must mean that fluctuating emoluments are outside the definition of "Earnings". In Limb 2, the drafter clearly assumed that they were within the definition of "Earnings". It would in my judgment subvert the court's duty to interpret the provisions that we find in a document if we were to make the assumption that the drafter was acting under a mistake in including Limb 2, thus depriving it of effect when another

interpretation is open to us which does not in any way strain the language of the definition.

*Issue 2: Whether Either "Fluctuating Emoluments" Or "Basic Remuneration" Include Payments Known As 13 MP And The LWA*

**[46]** On this Issue, Mr Furness does not suggest that the LWA could never be basic remuneration. He submits that the inference which the court should draw from the fact that it was not repeated in the definition of "Earnings" in the 1981 rules when it had been specifically included in the definition of "Salary" in the 1976 rules, was that the drafter of the 1981 rules did not regard the LWA as basic remuneration.

**[47]** Mr Furness submits that 13MP cannot be a fluctuating emolument since it was a fixed annual entitlement. He also submits that it cannot be basic remuneration because it is paid in addition to the basic remuneration.

**[48]** I do not accept that the LWA could not be basic remuneration in the 1981 rules simply because the definition of "Salary" in the 1976 rules made a specific reference to it in addition to the phrase "basic remuneration". The drafter has used a new expression, "Earnings", and the definition of that expression is very different from that of "Salary". Moreover, there could be many reasons why the drafter did not refer specifically to the LWA and we should not in my judgment assume that a particular explanation is correct.

**[49]** Mr Newman contended that, if SA was right and the LWA and 13MP were neither fluctuating emoluments nor basic remuneration, that would mean that they fell into a non-pensionable "black hole". That difficulty does not in my judgment arise.

**[50]** In my judgment, both the LWA and 13MP were contractual entitlements and thus should be treated as falling within Limb 1 as part of "basic remuneration". As Sir Mark Potter put it in argument, one might consider basic remuneration to include remuneration that employees received "come rain or shine". I consider that this aptly describes the position in relation to the LWA and 13MP.

*Issue 3: Whether Any Limit Applies To The Type Or Amount Of Fluctuating Emoluments Included In The Definition Of Earnings*

**[51]** This issue is limited to taxable benefits in kind in respect of car allowances, entertainment allowances and free air travel. I will call these "the benefits in kind". No-one suggests that non-taxable benefits in kind should be included.

**[52]** Mr Furness submits that, if he is wrong on his primary argument and fluctuating emoluments are therefore included within "Earnings", then, even if the benefits in kind were treated as fluctuating emoluments by Revenue practice, nonetheless they were outside the definition of "Earnings" on its true interpretation. They were impliedly excluded as fluctuating emoluments for the purposes of the Scheme because the rules provided no mechanism for their valuation. If they were to be valued in accordance with Revenue practice then there needed to be a power for the Trustee to take an estimated amount for the purpose of assessing members' contributions and those of SA, with power to make the necessary adjustments when the finally agreed amount was known. The judge relied on cl 2(b) of the Trust Deed as allowing the Trustee to make a determination in this regard but, Mr Furness submits, it was extremely unlikely that the drafter of the 1981 rules would have regarded this as adequate. The lack of a proper set of provisions dealing with valuation issues was a strong indication that they were not included in Earnings. In Mr Furness' experience benefits

in kind are not usually included in pension schemes save for senior management.

[53]  Mr Furness relies by analogy on the approach adopted by Sir Andrew Morritt V-C in *Redrow plc v Pedley and others* [2002] EWHC 983 (Ch), [2003] OPLR 29 at 32 where he held that it was "astonishing" and "most improbable" if the drafter of a pension fund deed had intended to include benefits in kind in the relevant phrase not to provide any machinery for ascertaining the pensionable value of those benefits. Moreover, there was in that case a provision similar to the cl 2(b) on which the judge relied in this case. The Vice-Chancellor considered that such a provision could not correct the omission. So too here, Mr Furness submits that the drafter would not have left the Trustee to muddle through on the basis of that very general provision alone.

[54]  Mr Newman takes the contrary position. He submits that the only point on this Issue arises from the lack of a valuation mechanism. As to this, he submits that there is no evidence as to whether, and if so what, machinery was required. Insofar as machinery is needed, there is appropriate machinery in cl 2(b). On his submission it was wholly impractical to prescribe how benefits in kind should be valued because of their variety. In contrast to Mr Furness, Mr Newman submits on the basis of his solicitors' experience that it is not at all uncommon for benefits in kind to be included in earnings for the purpose of a pension scheme.

[55]  Mr Newman submits that the significance of the absence of machinery for valuation is diminished by the fact that benefits in kind are expressly brought into account in proviso (1) to r 17(k) without any such machinery. Mr Newman submits that Revenue practice was intended to be followed. There was a version of IR12 in force in 1991. This shows that provisional amounts can be taken, contributions collected and any necessary adjustments made later. The Trustee could do this under cl 2(b) of the Trust Deed and thus that clause was both sufficient and appropriate to deal with any issue about the computation of the value to be attributed to a benefit in kind.

[56]  Neither counsel relied on *Sudbrook Trading Estate v Eggleton* [1983] 1 AC 444, [1982] 3 All ER 1, [1982] 3 WLR 315, which the judge cites in para 58 of his judgment for the proposition that if a document is "defective of machinery, then the courts will supply the necessary machinery rather than let the relevant trust provision fail". This authority had not in fact been deployed before the judge. Mr Newman submits that it is not relevant to the question of the intention of the drafter as to what payments were to be included in the definition of "Earnings". Mr Furness agrees. What the court has to decide is the logically prior question of whether the definition of "Earnings" is broad enough to include benefits in kind at all.

[57]  In my judgment, benefits in kind are clearly a form of fluctuating emolument. The word "emolument" is used in the context of "fluctuating emoluments" in the definition of "Earnings" in contradistinction to the word "remuneration". The word "emolument" has a long-accepted meaning in tax law in relation to Schedule E as including non-cash benefits (see *Heaton v Bell* [1970] AC 728, [1969] 2 All ER 70, (1969) 46 TC 211). The word "emolument" should *prima facie* receive a similar meaning in the definition of "earnings". Fluctuating emoluments are, according to the construction of Limb 2 which I have held to be correct under Issue 1 above, within the definition of "Earnings".

[58]  The only question in the present case therefore is whether benefits in kind are excluded by implication from "Earnings" because there is no machinery for their computation.

[59]  So far as the absence of such machinery is concerned, given the fact that the scheme is being operated in the shadow of Revenue rules for pension schemes, which in turn bring in rules for the taxation of employees' remuneration, I am satisfied that benefits in kind for the purposes of the definition of "Earnings" are to be brought into account only to the extent that they are assessable under Sch E.

[60] I note that in *Redrow* the Vice-Chancellor rejected a similar argument because the tax rules could not be applied without some modification. He held at 32:

> "The solution suggested by counsel for the Employees is that a term should be implied to the effect that the provisions of ICTA relating to such matters should be applied by the trustees. But the provisions of ICTA cannot be so applied without amendment; both uncertainty as to the amount until after the year end, the problems of time apportionment when switching from a tax year to a scheme year and the valuation of non-taxable benefits in kind preclude a simple application of ICTA."

[61] However, in this case the tax rules had already been adopted for the purpose of establishing the amount of benefits in kind for the purpose of r 17(k). From this, I conclude that such difficulties as there were were not regarded as insuperable. In addition, I have already concluded in para 59 above that non-taxable benefits in kind are not included.

[62] Moreover, the 1981 rules are distinguishable from those in *Redrow*. In particular, the definition of "earnings" in that case contained no reference to fluctuating emoluments. On the contrary, it was held, especially having regard to the fact that there was no apparent intention to depart from the previous definition, that "earnings", as well as basic remuneration, was limited to cash payments. The provisions relating to "qualifying remuneration" (used to limit contributions) and limitations on benefits, on the other hand, expressly included references to benefits in kind, which would have been unnecessary if they were already included in "earnings". For reasons which are not explained in *Redrow*, non-taxable benefits were treated as included in benefits in kind. In the present case, by contrast, there was manifestly an intention in the 1981 rules to depart from the previous definition of "Earnings", and, moreover, that definition expressly includes fluctuating emoluments. Furthermore, I have held in the para 59 above that non-taxable benefits are not included. The new definition of "Earnings" is then expressly used in this case for the purpose of limiting contributions and for calculating death benefits. Thus, in contrast to *Redrow*, death benefit is not limited to basic remuneration. That is one indication that the present scheme is more generous. There are two points of similarity in that (1) neither scheme contained machinery for valuing benefits and (2) rule 17(k) in both cases expressly included benefits in kind. That was held to point against those benefits being included in "Earnings" in *Redrow*. I deal with point (1) in the next paragraph. As to point (2), the force of that point is in my judgment diminished by the differences between the schemes noted earlier in this paragraph and to a lesser degree by the fact that r 17(k) in this case refers to remuneration which is calculated in some respects in a different way from "Earnings", particularly in regard to fluctuating emoluments. Accordingly, in my judgment, the judge was right to make the point that the provisions in question in that case were very different from the ones which he had to interpret.

[63] On the basis of the conclusion reached in para 61 above, the only difficulties of valuation which arise are difficulties as to the timing in valuing the benefits in kind. The annual remuneration of an employee for the purpose of calculating monthly pension contributions is fixed by the Trustee as at the previous 1 July under the definition of "Pensionable Earnings" taken with the definition of "Scheme Anniversary Date". Thus if "Pensionable Earnings" have to be assessed on (say) 14 July, there may be some doubt as to "Earnings" as at the immediately preceding 1 July. This, however, is a practical problem calling for a practical solution by the Trustee. The Trustee has wide powers under cl 2 (b) of the Trust Deed, which (contrary to the submission made by Mr Furness) are clearly not limited to simply interpreting Scheme rules. In addition, if necessary, the Trustee could seek the directions of the court. To reach the more drastic conclusion that the absence of machinery mandates that benefits in kind are excluded from earnings, and therefore from Pensionable Earnings, would to my mind in this case be to allow the tail to wag the dog. I would therefore dismiss the appeal on this Issue.

*Issue 4: Was The Judge Wrong In Principle In The Order Which He Made As To The Costs Of Preliminary Issue?*

[64] The circumstances in which an order for costs can be successfully appealed are limited. They were as follows

described by Murray-Smith LJ in *Roache v News Group Newspapers Ltd* [1998] EMLR 161 at 172:

> "Before the court can interfere it must be shown that the judge has either erred in principle in his approach, or has left out of account, or taken into account, some feature that he should, or should not, have considered, or that his decision is wholly wrong because the court is forced to the conclusion that he has not balanced the various factors fairly in the scale."

**[65]** The judge ordered SA to pay BC's costs on the standard basis. This was the conventional order and no issue arises on it. However, the judge went on to order that BC should recover the difference between its costs on the standard and indemnity bases from the Scheme assets on the basis of the principle applicable to litigation between trustee and beneficiary (set out below). The judge considered that, notwithstanding the context in which the preliminary issue arose, and albeit that BC had a not inconsiderable personal interest in the outcome, the preliminary issue was not hostile litigation against the Trustee of the Scheme. The judge in effect decided that the costs fell within category (2) of the categories of costs on which costs are conventionally ordered in proceedings concerning the interpretation of trust instruments. These categories are set out in para 67 below.

**[66]** SA is liable to indemnify the Trustee for costs payable out of the Scheme assets.

**[67]** The principles as to the award of costs of proceedings as between trustee and beneficiary were established in *Re Buckton* [1907] 2 Ch 406 at 414, 76 LJ Ch 584, 97 LT 332, and are conveniently summarised in Lewin on Trusts (18 ed) at paras 21 - 79, which reads in material part as follows:

> "Conventionally [proceedings for the construction of a trust instrument] are treated as being divisible into three categories following the classification in the leading case *Re Buckton* [1907] 2 Ch 406 at 413 to 417:
>
> (1) Proceedings brought by the trustee to have the guidance of the court as to the construction of the trust instrument or some other question of law arising in the administration of the trust or in relation to the trusts on which the trust property is held. In such cases, the costs of all parties are, whatever the outcome, usually treated as necessarily incurred for the benefit of the trust fund and ordered to be paid out of it . . . .
>
> (2) Proceedings in which the application is made by someone other than the trustee, but raises the same kind of point as in the first category and would have justified an application by the trustee. Such proceedings differ in form but not in substance from the first category and similar considerations apply as to costs.
>
> (3) Proceedings in which the application is made by someone other than the trustee, but differ in substance from the second category, and in substance as well as form from the first category, in that they have the character of a hostile claim founded on a point of construction or law raised by someone other than the trustee to a beneficial interest in or entitlement to the trust fund. The distinction, though one not easy to draw in practice, between this kind of litigation and litigation within the first two categories, is that the claim is brought not in substance for the benefit of the trust fund, but for the benefit of the Claimant, and is resisted for a similar reason . . . . Here the general principles as to costs of hostile litigation apply between the Claimant and the party against whom the claim is directed, and so the general rule is that the unsuccessful party will be ordered to pay the costs of the successful party, subject to the general qualifications which apply in ordinary hostile litigation."

**[68]** Mr Furness points out that it was BC which suggested the construction point be tried as a preliminary issue. The Claimants (SA and the Trustee) acceded to BC's request on the basis that a representation order was made appointing BC as representative of the class of Scheme members. Nothing was said or agreed at the time about the costs of the preliminary issue. The judge's order as to costs, Mr Furness submits, will have to be set aside if the appeal on Issue 1 is allowed. If it is not allowed, then nonetheless the order which the judge made as to the difference between standard basis and indemnity basis should be set aside as wrong in principle. It is clear that BC does not fall within category (1) above, but nor does it, on Mr Furness' submission, fall within either category (2) or category (3). The preliminary issue

will determine an issue as to interpretation of the 1981 rules but that is not all. It also determines an issue in the negligence proceedings. Therefore, on Mr Furness's submission, the application for the preliminary issue should be considered as a hostile proceeding against the Trustee because it arises in hostile litigation and at BC's insistence. The costs of this appeal should be dealt with on a consistent basis. BC expects to receive the difference between its costs on the standard and indemnity bases both here and below out of the Scheme assets whichever the result of this appeal on Issues 1, 2 and 3. It would, on Mr Furness's submission, be an extraordinary result if BC lost the preliminary issue but nonetheless was entitled to claim its costs out of the Scheme assets. If BC loses the preliminary issue, it should pay costs in the ordinary way without any indemnity out of the Scheme assets. The judge was wrong in principle, submits Mr Furness, to have regard only to BC's role on behalf of Members and not to its role as defending its own interests.

[69] Mr Newman submits that the applicable principles are those in *Re Buckton* and that the question whether an application falls within category (2) or category (3) is a question of fact. The judge, on Mr Newman's submission, has to decide which category applies as a matter of substance and not of form. As the summary in Lewin shows, the judge is required to exercise his judgment as to which category applies as it may not be easy to tell this. An appellate court should not interfere with such a finding unless it is plainly wrong. The judge found that this was litigation for the benefit of the members of the Scheme. He considered that it was not hostile litigation within category (3). He was entitled to reach this conclusion. It was not plainly wrong in the present case. The preliminary issue had all the hallmarks of a traditional construction summons. Questions of law arise only after this question of fact has been decided. Therefore the appeal on costs should be dismissed.

[70] Mr Newman further submits that a representation order had been made appointing BC to represent all the members and they benefit substantially by the answers to the questions put before the court. Neither a trustee nor a representative beneficiary is prevented from obtaining an order for payment of their costs by reason of the fact that they may have an interest in the outcome of the proceedings. BC should have credit for the fact that the preliminary proceedings have saved a second set of proceedings.

[71] In my judgment, in determining whether category (2) in *Re Buckton* applies, regard has to be had to the substance as well as the form of the application. This indeed was the basis on which the litigation initiated by the beneficiary against the trustee in *Re Buckton* was placed in category (2) although it appeared from its form to be within category (3). In this case, when the question of substance is confronted, it immediately becomes apparent that BC had a direct financial benefit in the outcome of the preliminary issue. In my judgment, contrary to the conclusion of the judge, that factor takes this case outside category (2). The issues arising on the preliminary issue were designed to bring to an end the allegations (or some of them) of professional negligence made against it. Moreover, BC's interest in the litigation was antipathetic to the Scheme because BC was contending that it was not liable for damages for negligence to the Trustee and SA.

[72] Category (3) is also not applicable because the preliminary issue resolved questions of interpretation of the 1981 rules for the benefit of Members, as well as deciding issues for the benefit of BC. The fact that the preliminary issue stood to benefit BC should in my judgment to that extent place the preliminary issue, as regards the liability of the Scheme assets for the costs of the preliminary issue, on the same footing as litigation adverse to the interests of the trust, even though serendipitously the resolution of the Issues will in fact also benefit the Members.

[73] In these circumstances, in my judgment, the judge was in error in his conclusion that in substance this preliminary issue was purely a dispute between the Members and the Trustee as to the true construction of the 1981 rules and that this case fell purely within category (2). The hearing before him was no doubt conducted in the objective way that very many construction summonses brought by beneficiaries or trustees are conducted, but this was far from being an ordinary case as between beneficiary and trustee because it was being conducted in the course of contested negligence

proceedings brought by SA against BC. In a case such as this the judge's conclusion as to the appropriate category is not a finding of fact. The question of determining into which category a particular case falls is at the end of the day one of law and I have approached this issue on that basis. (Moreover, on that point, Mr Newman fairly accepted that this court is in as good a position as the judge to determine the appropriate category.)

[74]  The judge's order as to the incidence of the difference between BC's costs on a standard basis and on an indemnity basis must therefore be set aside and it thus falls to this court to determine the appropriate order as to costs. While neither counsel volunteered a middle course, that is say one where BC recovers only a proportion of its costs over and above the standard basis, each was constrained to accept that it was a course open to the court. Mr Furness informs us that he has been unable to find any case like the present where the question of the costs payable to a beneficiary who is represented by a party with a different interest in the litigation has arisen. Additionally, Mr Newman informs us that the costs incurred by BC are no more than would have been incurred by a member acting as Claimant on the preliminary issue, nor any more than BC would have incurred had it been acting purely in its own interests.

[75]  In my judgment, the categories of proceedings enumerated in *Re Buckton* should not be regarded as closed. This appears to be the view of the editors of Lewin, which continues, after the passage cited above, by arguing that a fourth category of costs may exist, although the particular one argued for is not apt for the present case. There is, in my judgment, room for a further category where the issue of construction is being pursued, not simply by a beneficiary, but also by a third party for its own separate interests, and where, if the issue had been pursued by the beneficiary alone, the costs would have fallen within category (2). It follows that, while in the usual case the court is very slow to interfere with the decision of a judge on costs, the judge in this case was in error in failing to consider whether the case could fall outside the three categories summarised by Lewin.

[76]  In my judgment, therefore, where a Claimant acts in a dual capacity in bringing proceedings against the trustee for the determination of a question as to the true construction of a trust instrument, the case falls outside the three categories to be found in *Re Buckton*. In my judgment, the principled approach in such a situation requires a sharing of the costs between the parties. The beneficiary should receive an indemnity out of the trust fund for his share but the third party should bear his or her share without any such indemnity, just as he would have done if he or she had brought proceedings without joining a beneficiary as co-claimant. After all, his or her separate interests are not shared by the beneficiaries.

[77]  It is, of course, difficult to find any basis other than equality for a sharing of costs, but this is not one of those situations in which the court cannot act because of a lack of clarity about the appropriate shares. I would therefore order that the burden of the costs over and above those recovered on a standard basis should be borne equally by BC and the Scheme members. Accordingly there should in my judgment be a payment out of the Scheme assets for only one half of the difference between standard and actual costs.

[78]  Accordingly, I would allow the appeal in part on this issue.

*DISPOSAL OF THIS APPEAL*

[79]  For the reasons given above, I would dismiss the appeals on the substantive Issues (Issues 1 to 3) and allow it in part on the costs Issue (Issue 4). My answers to the Issues are as follows:

> "*Issue 1*: The definition of 'Earnings' in the appendix to the 1981 rules includes fluctuating emoluments.

*Issue 2:* 'Basic remuneration' includes the 13th month payment and the London Weighting allowance.

*Issue 3*: The taxable amount of benefits in kind for car allowance, entertainment allowance and free travel constitute 'fluctuating emoluments' for the purpose of the definition of 'Earnings'.

*Issue 4:* Only one half of the difference between the amount of the costs incurred by BC on the preliminary issue on a standard basis and its costs on an indemnity basis should be paid out of the Scheme assets."

**SIR MARK POTTER (P):**

**[80]**  I agree.

**PILL LJ:**

**[81]**  I also agree.

*Appeal dismissed.*