# EXHIBIT 84

**3 K. B.**        KING'S BENCH DIVISION.        493

It is a very familiar expression to everybody who knows the forms and powers of granting leases. It is in fact the purchase-money which the tenant pays for the benefit which he gets under the lease. Is it possible by any means to give to either of these items, which the plaintiff seeks to bring in, the meaning of the word "premium"? It seems to me that it is quite impossible. The expenditure on the house is not in any sense a "premium," and still less is the value of the surrendered lease, as to which it seems very doubtful whether the landlord ever got the benefit of it at all.

On the whole, therefore, I think the appeal fails and the Divisional Court was right.

*Appeal dismissed.*

C. A.
1915
KING
v.
CADOGAN
(EARL).
Warrington L.J.

Solicitors: *Crossman, Prichard & Co.; Lee & Pembertons.*

R. M.

---

## WILLIAMS v. LEWIS.

[1914 W. 2486.]

*Landlord and Tenant—Agricultural Land—Duty of Tenant to cultivate—Breach—Measure of Damages.*

1915
June 23, 24, 26, 28;
Oct. 14.

The duty of a tenant of agricultural land as declared by the common law and unaffected by express agreement is to cultivate the land in a good and husbandlike manner according to the custom of the country.

He is not further bound to deliver up the land at the end of the tenancy in a clean and proper condition, properly tilled and manured; nor is he necessarily bound or entitled to leave the land in the same condition as when he took it.

In case of a breach of his duty the measure of damages is the injury to the reversion occasioned by the breach.

TRIAL of action before Bray J.

The action was commenced at the Monmouthshire Summer Assizes before the learned judge and a special jury. In the course of the hearing the jury were discharged and the case proceeded before the learned judge alone.

494                    KING'S BENCH DIVISION.                [1915]

1915

WILLIAMS
v.
LEWIS.

S. R. C. *Bosanquet*, for the plaintiff.

*Micklethwait*, for the defendant.

The facts and arguments sufficiently appear from the judgment.

Oct. 14. BRAY J. read the following judgment:—This action was brought by the plaintiff, the landlord of a farm called the Twyn Farm in Llangibby, Monmouthshire, against the defendant, the late tenant of the farm, to recover damages for breach of his implied obligation arising out of the tenancy. The tenancy agreement was not in writing, and, so far as appeared, there were no special terms. The tenancy began in February, 1906, and ended in February, 1914. Several points of law were raised as to the extent of the implied obligations, and as to the measure of damages for their breach. As I was informed that it was desirable that there should be a decision on these points, I propose to deal with all of them, although some are not necessary for the decision of the case; and for this reason I have thought it better that I should put my judgment into writing.

The first question is: What is the extent of the implied obligations of the tenant of a farm to his landlord? I think the law is correctly stated in vol. 1 of Lord Halsbury's Laws of England, title Agriculture, s. 505, thus: " The law implies an undertaking or covenant on the part of an agricultural tenant to cultivate the land in a husbandlike manner, unless there is a particular agreement dispensing with that engagement; and the bare relation of landlord and tenant is a sufficient consideration for the tenant's promise to cultivate the land in a good and husbandlike manner according to the custom of the country." Farming in accordance with this obligation I will for short call " proper farming," and the condition of the land when it has been so farmed for a lengthened period I will call " proper condition." Sect. 507 says the custom of the country does not imply an immemorial or universal usage, but only the prevalent usage of the neighbourhood where the land lies which has subsisted for a reasonable length of time; and s. 509 says evidence showing that a holding has been managed in accordance with the custom of the

08-13555-mg    Doc 44409-84    Filed 05/22/14    Entered 05/22/14 19:27:39    Exhibit 84
Pg 4 of 8

country is proof that it has been treated in a good and husband-like manner. It was not really disputed that the law was as so laid down, but it was contended for the plaintiff that there was a further obligation, namely, that the tenant should deliver up the land at the termination of the tenancy in a clean and proper condition, properly tilled and manured. In my opinion, so far as this imports some greater obligation than the first obligation, it does not exist. That the tenant must continue to farm properly down to the termination of the tenancy is, of course, true, but so long as he does this he has, in my opinion, performed the whole of his obligation. I will give an illustration to show what I mean. Suppose that at the beginning of the tenancy the land is in an impoverished condition, that is, below proper condition, and the tenant enters and farms properly, but yet the land at the end of the tenancy has not got into proper condition. This may well happen if the tenancy has been a short one, say only two or three years. In such a case there has been, in my opinion, no breach of the obligation. The contention of the plaintiff would impose it, but the contention is wrong. I ought to add that in this case I find there was no custom imposing this greater obligation.

The next contention was one on the part of the defendant, not, perhaps, much relied on by the defendant's counsel, but put forward by the defendant himself and one of his witnesses, that the tenant fulfilled his obligation if he left the land in the same condition as when he took it. First I am satisfied there is no custom to that effect. It was said there was a custom that the tenant goes out as he comes in. This has no reference to claims for bad farming, it applies only to valuations of tenant right. As an illustration it applies in such a case as this: If a tenant on coming in pays for hay and straw at a fodder and dung price he is only entitled to fodder and dung price on leaving. The expert called by the defendant admitted this. So much for the custom. In my opinion the contention is not sound in law. It may well be that a considerable course of proper farming will restore the land to proper condition. If so the landlord has a right to have the land delivered up in proper condition. In the same way, if at the commencement of the tenancy the land is in better than

1915
WILLIAMS
v.
LEWIS.

Bray J.

08-13555-mg    Doc 44409-84    Filed 05/22/14    Entered 05/22/14 19:27:39    Exhibit 84
Pg 5 of 8

1915
———
WILLIAMS
v.
LEWIS.
———
Bray J.

proper condition as the result of what is called high farming, the tenant is not, in my opinion, bound to keep the land in better than proper condition so long as he farms properly. Arising out of this there was a contention that if the tenant during the tenancy had raised the land to a better condition than it had been at the commencement, he might during the last year or two lower it to the former condition. That contention is, in my opinion, equally unsound; he must continue to farm properly to the end of his tenancy. He need not do more than that, but he must do that. I must guard myself by saying that this does not involve the proposition that if a tenant has at any time got the land into a condition better than proper condition he must always keep it so, but merely that he must not lower it by improper farming. For instance, if he has been putting a lot of dung on a field it might not be improper farming in the case of grass land to mow it two years running, or in the case of arable to have two crops of corn running. The truth is that, when the land is at the commencement of the tenancy in better or worse condition than proper condition, it is proper and usual for the landlord and tenant to come to a special arrangement, and when the land is impoverished, that is, below proper condition, the tenant requires a temporary or permanent reduction of rent, or other allowance.

The next contention on the part of the defendant was that this was what is called a bytake. The tenant had rented for a considerable time before he took Twyn Farm a neighbouring farm called the Tregrwg Farm from the same landlord, on which there were a house and the usual farm buildings. On Twyn Farm in question there was no house, nor any farm buildings, and it was said that if Tregrwg Farm was in better than proper condition that would make up for Twyn Farm being in worse than proper condition, and that the two farms must be considered as one farm. In my opinion this contention is not sound. First I find that there is no custom to that effect; the land must be treated fairly all round. No doubt it happens that the land most distant from the foldyard gets less dung, but then it should be mown less often and grazed more. No doubt also it will happen that at any particular period some

fields may be in rather better condition than others. Of course there must be some give and take, but that would not justify a deliberate starving of the land without buildings, even though the land with the buildings has been correspondingly enriched. In this case the two tenancies were entirely separate. They were entered into at different times. Notice might be given, and was in fact given, to terminate one only, and Tregrwg was held for another year after the expiration of the tenancy of Twyn Farm. In my opinion this contention fails in law as well as in fact.

Lastly, there was a contention on the part of the defendant as to the measure of damages in case there was a breach by the tenant of his implied obligation through not having farmed properly. It was said that it was confined, so far as loss of fertility was concerned, to the manurial value of hay or straw improperly removed. For the purpose of estimating tenant right a table was published in the county giving manurial values for hay and straw fed on the land, and it was said that that table applied, and I could only give the manurial values shown in the table for the hay and straw that had been improperly removed. No such custom was proved, and in my opinion that is not the true measure of damages in all cases. In some cases when the only ground of complaint is that hay and straw have been improperly sold or removed instead of feeding them on the land, that may afford a good guide in assessing the damages, but, as will be seen later, this was by no means the only complaint. As the evidence proved no custom as to the measure of damages, the usual rule of law must, in my opinion, be followed in respect of all the breaches, namely, that it is the injury to the reversion occasioned by the breaches. In practice in such a case as the present it is the diminution in the rent that the landlord will get on reletting, or the allowance he will have to make to the incoming tenant. When a tenant is making his bargain with the landlord as to the rent he is to pay it is a common thing for him if he sees that the land is below proper condition to say that he must have it free of rent for a period, or at a smaller rent for the whole or some part of the tenancy. If a fair bargain is made and a reduction of rent agreed to, that forms a fair

<div style="margin-left:0">

1915
———
WILLIAMS
*v.*
LEWIS.
———
Bray J.

</div>

indication of the loss to the landlord occasioned by the breach. That I find is what happened here. Mr. Hannah, the incoming tenant, had agreed to take the farm some time before February, 1914, but no rent had been definitely fixed. Some time before February, 1914, he complained to the plaintiff of the condition of the farm, and he asked to have it free of rent for twelve months. There was a good deal of negotiation between them, and in fact he entered into possession in February, 1914, before the negotiations were concluded. The negotiations ultimately resulted in an agreement that he should be compensated by receiving the damages which the plaintiff might recover in the present action. This was, no doubt, an equitable arrangement, but it does not help me because I have to assess the damages. This agreement will not affect the damages. The landlord will recover no more and no less than he is entitled to in law. I have to solve the problem of arriving at what was the injury to the reversion. I think I have now dealt with all the questions of principle, and will now consider whether there have been any, and what, breaches by the defendant of his implied obligations, and to assess the damages.

Now the plaintiff claimed that there were the following breaches : First, that in respect of the whole of the grass land, namely, about forty-eight acres, the defendant had during the last year but one, namely, 1912, mowed forty-one acres, and during the last year had mowed the whole forty-eight acres. Next, that as regards one of the two arable fields, namely, a field of eight acres, he had during the last two years had two crops of oats in succession, and had also left it in very foul condition and full of couch; next, that he had neglected the hedges and fences; and, lastly, that he had neglected to properly clean out the ditches and grips. It was contended on the part of the plaintiff that the defendant had done this deliberately in revenge for having had his tenancy terminated by notice to quit. The defendant denied the breaches, and said that if there had been any such breaches the land was in as good a condition as, or in a better condition than, the land had been at the commencement of his tenancy.

[The learned judge then discussed the facts in detail and found

3 K. B.            KING'S BENCH DIVISION.                              499

that the defendant had committed various breaches of his obliga-    1915
tion. Judgment was given for the plaintiff for 83*l*. 12*s*. 6*d*.]    WILLIAMS
                                                                         *v.*
                                       *Judgment for plaintiff.*    LEWIS.

Solicitors for plaintiff: *Kinch & Richardson, for Percy Laybourne & Co., Newport, Monmouthshire.*

Solicitors for defendant: *Taylor, Rowley & Co., for E. Waddington, Usk.*

                                                                                           W. H. G.

---

[IN THE COURT OF APPEAL.]                C. A.

O'DRISCOLL AND ANOTHER *v.* MANCHESTER INSURANCE    1915
                           COMMITTEE.                   *June* 24, 25,
                                                                    28, 30.
[1914 O. 175.]

*Practice—Attachment of Debts—" Debt "—Fees payable by National Insurance Committee to Panel Doctor—National Health Insurance (Administration of Medical Benefit) Regulations, 1912, arts. 39, 40, 42—National Health Insurance (Medical Benefit) Regulations (England), 1913, arts. 35, 37—National Insurance Act, 1911 (1 & 2 Geo. 5, c. 55)—Rules of the Supreme Court, 1883, Order XLV., r. 1—Issue as to Debt owing or accruing—Reference to Master to ascertain Amount—Appeal from Finding of Master.*

An insurance committee, acting under the National Insurance Acts, 1911 and 1913, and the Regulations made thereunder, entered into agreements with the panel doctors of their district by which the whole amounts received by the committee from the National Insurance Commissioners were to be pooled and distributed among the panel doctors in accordance with a scale of fees; the total amount available for medical benefit so received by the committee was to be the limit of their liability to the panel doctors; and if the total pool was insufficient to meet all the proper charges of the panel doctors in accordance with the scale there was to be a pro rata reduction for each doctor, and on the other hand if it should be in excess of the amount required the balance was to be distributed among the panel doctors:—

*Held*, that where a panel doctor has done work under his agreement with the insurance committee, and the committee have received funds in respect of medical benefit from the National Insurance Commissioners, there is a debt owing or accruing from the insurance committee to the panel doctor which may be attached under Order XLV., r. 1, notwithstanding that as a matter of calculation the exact share payable to him may not yet have been ascertained.

Decision of Rowlatt J. [1915] 1 K. B. 811 affirmed.

Where a garnishee issue is tried by a judge without a jury, and the