Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    - - - - - - - - - - - - - - - - x

     In the Matter of:            x     Chapter 11

4                                 x

     LEHMAN BROTHERS HOLDINGS INC., x    Case No. 08-13555(SCC)

5    ET AL.,                      x

                                  x     (Jointly Administered)

6              Debtors.           x

     - - - - - - - - - - - - - - - - x

7    In the Matter of:            x

                                  x

8    LEHMAN BROTHERS HOLDINGS INC., x    Case No. 08-01420(SCC)

                                  x

9              Debtor.        x     (SIPA)

     - - - - - - - - - - - - - - - - x

10

11

12                   U.S. Bankruptcy Court

13                   One Bowling Green

14                   New York, New York

15

16                   May 14, 2014

17                   10:17 AM

18

19   B E F O R E :

20   HON. SHELLY C. CHAPMAN

21   U.S. BANKRUPTCY JUDGE

22

23

24

25

Page 2

1   HEARING Re Trustee's Objection to the General Creditor Proof

2   of Claim of Cornell Companies Inc. (Claim No. 4393[LBI ECF

3   No. 8046]

4

5   HEARING Re Lehman Brothers Holding Inc., et al. v.

6   AmeriCredit Financial Services Inc., et al. [Adversary

7   Proceeding No. 11-02403]

8

9   HEARING Re Lehman Brothers Special Financing Inc. v. Bank of

10  America, et al. [Adversary Proceeding No. 10-03547]

11

12  HEARING Re Lehman Brothers Special Financing Inc. v. Bank of

13  America National Association, et al. [Adversary Proceeding

14  No. 10-03542], Lehman Brothers Financial Products Inc. v.

15  The Bank of New York Mellon Trust Co., National Association,

16  et al. [Adversary Proceeding No. 10-03544], Lehman Brothers

17  Special Financing Inc. v. The Bank of New York Mellon

18  Corporation, et al. [Adversary Proceeding No. 10-03545],

19  Lehman Brothers Special Financing Inc. v. Wells Fargo Bank

20  National Association, et al. [Adversary Proceeding No. 10-

21  03809], Lehman Brothers Special Financing Inc. v. Bank of

22  New York Mellon National Association [Adversary Proceeding

23  No. 10-03811]

24

25  HEARING Re Motion of Group of Defendants to Modify Certain

Page 3

1    Orders Affecting Litigation of Adversary Proceeding [ECF No.

2    43983]

3

4    HEARING Re Four Hundred Fifty-Eighth Omnibus Objection to

5    Claims (No Liability Claims) [ECF No. 43532]

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Dawn South and Sheila Orms

Page 4

1    A P P E A R A N C E S :

2    WEIL, GOTSHAL & MANGES LLP

3         Attorneys for LBHI

4         767 Fifth Avenue

5         New York, NY 10153-0119

6

7    BY:  JACQUELINE MARCUS, ESQ.

8         RICHARD SLACK, ESQ.

9         LEE JASON GOLDBERG, ESQ.

10        RICHARD SLACK, ESQ.

11

12   MILBANK, TWEED, HADLEY & MCCLOY LLP

13        Attorney for LBHI

14        International Square Building

15        1850 K Street, NW

16        Washington, D.C. 20006

17

18   BY:  DAVID S. COHEN, ESQ.

19

20

21

22

23

24

25

Page 5

1   WOLLMUTH MAHER & DEUTSCH LLP

2        Attorneys for Lehman Brothers Special Finance

3        500 Fifth Avenue

4        New York, NY 10110

5

6   BY:  PAUL DEFILIPPO, ESQ.

7        ADAM M. BIALEK, ESQ.

8

9   CURTIS, MALLET-PREVOST, COLT & MOSLE LLP

10        Attorney for LBHI

11        101 Park Avenue

12        New York, NY 10178-0061

13

14   BY:  TURNER P. SMITH, ESQ.

15

16   JONES DAY

17        Attorneys for Lehman on Washington Tobacco

18        222 East 41st Street

19        New York, NY 10017-6702

20

21   BY:  LAURI W. SAWYER, ESQ.

22        JAYANT W. TAMBE, ESQ.

23        I-HENG HSU, ESQ.

24

25

Page 6

1   HUGHES HUBBARD & REED LLP

2       Attorneys for the SIPA Trustee

3       One Battery Park Plaza

4       New York, NY 1004-1482

5

6   BY:  JAMES C. FITZPATRICK, ESQ.

7       ROBERT B. FUNKHOUSER, ESQ.

8       JORDAN E. PACE, ESQ.

9

10   NIXON PEABODY LLP

11       Attorney for Deutsche Bank, as Trustee

12       100 Summer Street

13       Boston, MA 02110-2131

14

15   BY:  RICHARD C. PEDONE, ESQ.

16

17   WINSTON & STRAWN LLP

18       200 Park Avenue

19       New York, NY 10166

20

21   BY:  RICHARD W. REINTHALER, ESQ.

22

23

24

25

Page 7

```
 1   VENABLE LLP

 2        Attorneys for Morgan Stanley Gatex Inc., Garadex Inc.

 3        Euroamericas

 4        Rockerfeller Center

 5        1270 Avenue of the Americas

 6        Twenty-Fifty Floor

 7        New York, NY 10020

 8

 9   BY:  RISHI KAPOOR, ESQ.

10        DAVID N. CINOTTI, ESQ.

11

12   BRICKER & ECKLER LLP

13        Attorney for Nationwide Insurance Companies

14        100 South Third Street

15        Columbus, OH 43215-4291

16

17   BY:  QUINTIN F. LINDSMITH, ESQ.

18

19   BROWN RUDNICK LLP

20        Attorney for Newport Global Advisors

21        Seven Times Square

22        New York, NY 10036

23

24   BY:  HOWARD S. STEEL, ESQ.

25
```

Page 8

1    DIAMOND MCCARTHY LLP

2          Two Houston Center

3          909 Fannin Street

4          15th Floor

5          Houston, TX 77010

6

7    BY:   STEPHEN T. LODEN, ESQ.

8          HOWARD RESSLER, ESQ.

9

10   SATTERLEE STEPHENS BURKE & BURKE LLP

11         Attorney for The Helios Fund Defendants

12         230 Park Avenue

13         11th Floor

14         New York, NY 10169

15

16   BY:   RICHARD C. SCHOENSTEIN, ESQ.

17

18   AKIN GUMP STRAUSS HAUER & FELD LLP

19         Attorneys for Shinhan Bank, et. al.

20         One Bryant Park

21         New York, NY 10036-6745

22

23   BY:   JUSTIN BELL, ESQ.

24         DEBORAH NEWMAN, ESQ.

25

Page 9

1  MCDERMOTT WILL & EMERY LLP

2       Attorney for Carrington Funding Ltd.

3       340 Madison Avenue

4       New York, NY 10173-1922

5

6  BY:  ANDREW B. KRATENSTEIN, ESQ.

7

8  ALSTON & BIRD LLP

9       Attorney for Bank of America, Trustee

10      One Atlanta Center

11      1201 West Peachtree Street

12      Atlanta, GA 30309-3424

13

14  BY:  JOHN C. WEITNAUER, ESQ.

15

16  FROST BROWN TODD LLC

17      201 N. Illinois Street

18      Suite 1900

19      P.O. Box 44961

20      Indianapolis, IN 4244-0961

21

22  BY:  NELSON D. ALEXANDER, ESQ.

23

24

25

```
 1    JACKSON WALKER L.L.P.

 2         Attorney for RGA Reinsurance Co.

 3         100 Congress Avenue

 4         Suite 1100

 5         Austin, TX 78701

 6

 7    BY:  PATRICIA B. TOMASCO, ESQ.

 8

 9    MORGAN, LEWIS & BOCKIUS LLP

10         101 Park Avenue

11         New York, NY 10178-0060

12

13    BY:  ANDREW D. GOTTFRIED, ESQ.

14

15    KLEINBERG KAPLAN WOLFF & COHEN, P.C.

16         Attorney for Elliott International, L.P., The Liverpool

17         Limited Partnership

18         551 Fifth Avenue

19         New York, NY 10176

20

21    BY:  MATTHEW J. GOLD, ESQ.

22

23

24

25
```

1    FRESHFIELDS BRUCKHAUS DERINGER US LLP

2         Attorneys for Shield Securities Ltd.

3         601 Lexington Avenue

4         31st Floor

5         New York, NY 10022

6

7    BY:  DAVID Y. LIVSHIZ, ESQ.

8         CAITRIN MCKIERNAN, ESQ.

9

10   AJAMIE LLP

11        Pennzoil Place - South tower

12        711 Louisiana, Suite 2150

13        Houston, TX 77002

14

15   BY:  DAVID S. SIEGEL, ESQ.

16

17   CHAPMAN AND CUTLER LLP

18        Attorney for U.S Bank National Association, as Trustee

19        111 West Monroe Street

20        Chicago, IL 60603-4080

21

22   BY:  FRANKLIN H. TOP III, ESQ.

23

24

25

Page 12

1   REED SMITH LLP

2        Attorney for Bank of New York Mellon, as Indenture

3        Trustee

4        435 Sixth Avenue

5        Pittsburgh, PA 15219

6

7   BY:  ERIC A. SCHAFFER, ESQ.

8

9   STROOCK & STROOCK & LAVAN LLP

10        Attorney for Mizuho Bank Ltd.

11        180 Maiden Lane

12        New York, NY 10038-4982

13

14   BY:  SHERRY MILLMAN, ESQ.

15

16   SIDLEY AUSTIN LLP

17        Attorney for DePaul & Principal Life Insurance Co.

18        One South Dearborn Street

19        Chicago, IL 60603

20

21   BY:  MARK BLOCKER, ESQ.

22

23

24

25

```
 1                    P R O C E E D I N G S

 2              THE COURT:  All right.

 3              MS. MARCUS:  Good morning, Your Honor --

 4              THE COURT:  Good morning.

 5              MS. MARCUS:  -- Jacqueline Marcus of Weil, Gotshal

 6    & Manges LLP of for Lehman Brothers Holdings Inc. and its

 7    affiliated estates.

 8              We're here today for the 73rd omnibus claims

 9    hearing.  We start this morning's calendar with one

10    contested matter in the Lehman Brothers Inc. proceeding that

11    will be handled by Mr. Fitzpatrick on behalf of the SIPA

12    Trustee.

13              THE COURT:  All right, thank you.

14              MR. FITZPATRICK:  Good morning, Your Honor.

15              THE COURT:  Good morning.

16              MR. FITZPATRICK:  James Fitzpatrick from Hughes

17    Hubbard for the LBI Trustee.

18              Your Honor, I know that Your Honor has our papers

19    and I won't rehash all of the arguments in there, but if I

20    could briefly I think it's helpful to look at the three

21    alleged causes of action individually in order.

22              THE COURT:  Okay.

23              MR. FITZPATRICK:  I think that's the most logical

24    way to address them.  And if I could start, Your Honor, with

25    Cornell's alleged breach of contract claim.
```

Page 14

1          THE COURT:  Okay.

2          MR. FITZPATRICK:  Based on Cornell's own pleadings

3     and on the plain language of the contract we'd submit it's

4     clear there's no alleged breach of contract here.

5          If Your Honor looks at paragraphs 45 and 46 of the

6     Cornell Company's response that's where Cornell specifies in

7     its papers in the most detail what the purported breaches of

8     contracts are, but all that they say are that first there

9     was an Alaska correctional facility's project that did not

10    close.  That may be true, but there's nowhere in the

11    contract where LBI makes any guarantee or promise that any

12    particular project will close.

13         The retainer agreement is very clear that Lehman

14    will provide advice to Cornell, there's no allegation that

15    LBI did not provide that advice.  The only allegation is

16    that a particular project did not close and there's no

17    guarantee in the contract that it would.

18         So based looking at just the plain language of the

19    contract as well as that particular allegation we'd submit

20    it is clear there's not even a pled breach of contract claim

21    there.

22         The second thing Cornell points to Your Honor is

23    the way that LBI looked for accounting purposes the payment

24    that it received under the retainer agreement and they claim

25    that that is somehow a breach of the portion of the retainer

Page 15

1    agreement that states that the retainer fees will be applied

2    on a mutually agreed basis towards future contingent fees.

3            Again, we'd submit that what the contract is

4    clearly saying is that you pay an up front non-refundable

5    retainer and when LBI does work in the future you won't have

6    to make future payments because you've already paid the

7    retainer.  The contract is not saying anything, nor could it

8    be saying anything, about how LBI is supposed to treat that

9    revenue internally for its own accounting purposes.  And

10   again, we'd submit that's plain on the face of a contract.

11   It's no different than a retainer agreement that a law firm

12   would enter into, clearly the clients -- what's the client's

13   concerned with is when -- is when it's going to have to

14   start making payments for future work, it's not concerned

15   with how the law firm is going to book the revenue for its

16   own internal accounting purposes.

17           So starting with the breach of contract claim

18   there's no statute of limitations analysis necessary for

19   that at all.  It's just a straightforward, if Your Honor

20   looks at the allegations and looks at the contract itself,

21   there's no pled breach of contract claim.

22           We'd also submit that's a critical point, Your

23   Honor, because all the parties agree that for the other two

24   claims, fiduciary duty and fraud, the only way that they are

25   saved from a statute of limitations perspective is if

Page 16

```
 1   they're -- if they're saved by the tolling agreement.  The

 2   tolling agreement on its face is clear that it is only

 3   tolling claims that arise out of or are related in any way

 4   to the retainer agreement, which as we've just established

 5   has not been breached.  So the only claims that Cornell

 6   could have are claims that relate to or arise out of a

 7   contract which we'd submit clearly has not been breached.

 8            Start with the -- nonetheless they allege two,

 9   fiduciary duty and fraud.  Starting with fiduciary duty.

10   Here's where Cornell really wants to have it -- or needs to

11   have it both ways in order for the claim to proceed, because

12   in order for the claim to have been saved under the tolling

13   agreement it had to relate to arise out of the contract.

14            THE COURT:  Right.

15            MR. FITZPATRICK:  The contract however on its face

16   expressly disclaims any fiduciary duty between the parties.

17            Cornell doesn't dispute that that's what the

18   contract says or that that's what the contract means, what

19   Cornell argues in its response to the trustee's objection in

20   paragraph 41 in its only response here is that no, it's

21   fiduciary duty claim has nothing to do with the contract, it

22   all relates to conduct that occurred before the retainer

23   agreement.

24            Now first of all they don't specify what that

25   conduct is and the trustee is frankly at a loss as to what
```

1    that conduct could be, because all that happened prior to

2    the retainer agreement under both sides' contentions is that

3    there was a successful sale leaseback arrangement.  The only

4    allegation that something went wrong is that the retainer

5    agreement itself had an impact on that sale leaseback, but

6    prior to the retainer agreement there couldn't have been any

7    breach of fiduciary duty because there was nothing other

8    than a successful sale leaseback operation.

9              In any event it's not clear to us what Cornell is

10   alleging or how Cornell is alleging that LBI breached a

11   fiduciary duty prior to the retainer agreement, but even if

12   it were alleging something it's going to be barred by the

13   statute of limitations, because again, the only claims that

14   can be saved for statute of limitations purposes are those

15   that relate to the contract, and they necessarily have to

16   say we don't relate to the contract in order to avoid the

17   contract's express exclusion of fiduciary duty claims.

18              So that's fiduciary duty.

19              THE COURT:  Well, I think -- well this is maybe

20   more appropriate for Cornell's counsel, but I think they're

21   trying to get around that with the -- by making the point

22   that everything was fine until Arthur Anderson questioned

23   the effect of the retainer agreement on the accounting

24   treatment of is SPV and that's how they allege they get into

25   2002.  I think that's how they thread the needle, but I'll

Page 18

1      raise that with them.

2                MR. FITZPATRICK:  Agreed, Your Honor, and that may

3      be best raised with them, but even fit gets into 2002 it's

4      not saved for a statute of limitations unless that tolling

5      agreement applies.

6                THE COURT:  Correct.  Right.

7                MR. FITZPATRICK:  And the tolling agreement says

8      it has to relate to the -- to the contract.  And so we'd

9      submit that they can't disclaim any relationship to the

10     contract or else it's going to lose the effect of the

11     tolling agreement.

12               THE COURT:  Okay.

13               MR. FITZPATRICK:  With respect to the fraud claim,

14     Your Honor, again, the trustee has had some difficulty

15     evaluating the claim because it hasn't been pled with any

16     specificity in our view what the fraud -- what the purported

17     fraud is.

18               If we turn to Cornell's response to the trustee's

19     objection, again in paragraphs 35 and 37, are where we see

20     Cornell attempting to plead what the fraud would be, but the

21     only thing that they point to is statements by LBI that it

22     had expertise and that it had done this before, and we'd

23     submit that can't be fraud for a number of reasons.

24               First of all statements that we're good at that

25     and we know how to do this and we've done it before are

Page 19

```
 1   routinely considered puffery and not fraud under the case

 2   law.

 3           Second they haven't even pled that those

 4   allegations are false.  There's no allegation that LBI

 5   hadn't done this before.

 6           And third, again, that's not related to the

 7   retainer agreement, and LBI stating that it had done this

 8   before is not related to the retainer agreement in any event

 9   and so it's not going to be saved from the statute of

10   limitations by the tolling agreement.

11           At other -- now I will say Cornell's claims have

12   seemed to evolve a bit from when it went from the claim to

13   its actual response to the trustee's objection.

14           Under the claim the trustee initially interpreted

15   the fraud claim to be one that we gave an opinion that this

16   would all be okay essentially, that we could enter into the

17   retainer agreement and save the accounting treatment.

18   Cornell appears to have moved away from that.  There's no --

19   there's no statement in the response of what exactly was

20   said, who said it, who heard it, that it was relied on, that

21   it was known to be false at the time, all of which would be

22   necessary to plead a valid fraud claim.  And so at least as

23   we understand it Cornell has moved away from that, but to

24   the extent they haven't Your Honor has our briefing on why

25   it's extremely -- there's an extremely high bar to prove
```

Page 20

```
1     fraud on a -- for an opinion, and certainly that hasn't been

2     pled here in terms of we would -- for example, whoever made

3     that statement, which is not pled, would have to have known

4     it was -- known the opinion was false.

5                THE COURT:  Well it seems to have -- it seems to

6     be if you look at paragraph 37 it seems to have zeroed in on

7     the idea that once the problem with the retainer agreement

8     surfaced that at that point LBI did something bad by

9     refusing to give the money back and save the SPV

10    transaction.  That seems to be the -- where the bad

11    crystallizes.

12               MR. FITZPATRICK:  I agree that that's at least

13    suggested in these paper, Your Honor, but that's -- I mean

14    even if that's true that's clearly not fraud, there's no

15    statement, there's no false statement, et cetera.  It's not

16    clear to me what that cause of action would be.  Maybe it's

17    closest to breach of fiduciary duty, but if that's true

18    we're now in the post-contract period where we've disclaimed

19    any fiduciary duty.

20               THE COURT:  Are there allegations about the

21    genesis of the entire -- well are there allegations about

22    the genesis of creating the sale leaseback transaction from

23    the outset?  Was that -- whose idea was it?

24               MR. FITZPATRICK:  I believe it is certainly

25    alleged that LBI at least played a significant role in that.
```

Page 21

1    That is part of the background information of the claim.

2    But again, the sale leaseback, even pursuant to the

3    allegations, was fine in and of itself.  The issue, if the

4    allegations are true, arose from the existence of the

5    retainer agreement.

6            Now I expect there would be -- if this were to

7    proceed there'd be a dispute about whether in fact LBI did

8    anything wrong under the retainer agreement at all, but for

9    purposes of where we are today, you know, what we'd submit

10   is that the three causes of action that are pled are not --

11   are not valid causes of action.

12           THE COURT:  Okay.  All right.

13           MR. FITZPATRICK:  And the last point, which I

14   think is sufficiently briefed, Your Honor, is even if they

15   had pled fraud here even the tolling agreement isn't going

16   to save them, because the fraud was complete if there was

17   one as of the time of the payment of the retainer agreement.

18   Because even under the allegations that destroyed the

19   accounting treatment.  It -- and that's what starts the

20   limitations.  And both parties agree that that was before

21   the critical December 7th date.

22           What Cornell tries to do so save it is to say that

23   no, the cause of action didn't accrue until we were damaged

24   and they claim they weren't damaged until either Arthur

25   Anderson questioned it --

Page 22

```
 1              THE COURT:  Right.

 2              MR. FITZPATRICK:  -- or they themselves restated

 3     it, and we'd submit under Texas law (a), that's not when the

 4     cause of action accrues, and (b), it doesn't even really

 5     make common sense, because under their theory they would be

 6     determining when their cause of action accrued by when they

 7     restated their argument.

 8              Thank you.

 9              THE COURT:  Okay, thank you.

10         (Pause)

11              THE COURT:  Good morning.

12              MR. SIEGEL:  Good morning.  David Sigel for

13     Cornell, Your Honor.

14              THE COURT:  Good morning.

15              I want to pick up where -- on the last point that

16     was made with respect to the operation of the statute of

17     limitations, and the point was made that the way you have

18     set this up when the cause of action accrues is out of the

19     control of LBI.  In other words, Arthur Anderson comes on

20     the scene in 2002 and questions the sale leaseback

21     transaction because of the existence of the retainer

22     agreement, and you say, well that's when the cause of action

23     accrued before -- because before then as far as we knew

24     everything was hunky-dory, okay?

25              Arthur Anderson might not have come in at that
```

Page 23

1   point.  Maybe nothing would have happened until you get

2   close to the limitations period that the IRS has for looking

3   at transactions.  I'm somewhat making this up but you get

4   the idea of the hypothetical.

5          In the meantime LBI is not concealing anything,

6   everything is rolling along under the documents, and then at

7   that point the IRS says, oh, hold on, we question this sale

8   leaseback transaction because of the existence of this

9   retainer agreement.

10          Surely it can't be the case that the party who

11   should enjoy the benefit of the protection of the statute of

12   limitations is then at the mercy of some third party

13   questioning the transaction.

14          The transaction was done, they should be done.  It

15   shouldn't turn on whether or not somebody -- when somebody

16   elects to question it in the absence of any allegation,

17   which I think there is none, that somehow LBI did something

18   that caused the discovery rule to come into effect or for

19   there to be a tolling.

20          So that's kind of -- that's my -- one of my

21   leading concerns coming into this today.

22          MR. SIEGEL:  Well, let me address that, Your

23   Honor, first by saying in the evidence that was adduced to

24   the response of the trustee's objection we do cite

25   deposition testimony from Mr. Lavel (ph) who was a senior

Page 24

1   vice president at Lehman at the time, saying that he

2   understood at the time that the retainer payment was

3   accepted that it could have an affect on the three percent

4   equity of the special purpose vehicle.

5           So there really is an allegation that with the

6   knowledge that acceptance of that retainer fee at that time

7   could jeopardize or put in jeopardy the entire structure

8   that had been put in place he nevertheless accepted the

9   payment, and so there is an allegation that he understood

10  that it was dangerous --

11          THE COURT:  But you knew --

12          MR. SIEGEL:  -- accepted the payment, and didn't

13  tell anyone.

14          THE COURT:  No, no, no, but that's -- that's the

15  opposite of what I'm saying.  So all of that was out in the

16  open.  So he --

17          MR. SIEGEL:  No --

18          THE COURT:  -- acknowledges that accepting the

19  payment could have a --

20          MR. SIEGEL:  No, he acknowledged it after the fact

21  in a deposition.  We're not saying he said anything at the

22  time --

23          THE COURT:  But that's not --

24          MR. SIEGEL:  -- in 2002.

25          THE COURT:  But in the absence of an allegation

Page 25

1    that Mr. Lavel or anyone was an architect of this -- of a

2    scheme that somehow Cornell was not aware of the

3    implications of it, the fact that he later acknowledged that

4    he thought it could have an impact on it that's not his

5    call.

6            The -- Cornell proceeded with the transaction,

7    Cornell voluntarily entered into the retainer agreement, and

8    we're perfectly content to go ahead unless and until

9    somebody raised questions.  LBI wasn't preventing anybody

10   from looking at it.  Arthur Anderson came in when they came

11   in.

12           MR. SIEGEL:  Your Honor, I think ultimately for

13   purposes of the limitations argument our position is that

14   it's not dependent on any evidence that Lehman was

15   concealing or withholding this information.  We cite the

16   Texas Supreme Court case, the Atkins case in the brief, and

17   also the Waxler (ph) case, and they both say that there's no

18   -- cause of action doesn't accrue and limitations begin

19   running until there's been a legal injury, and the Carlson

20   (ph) case is instructive on this point because it involved

21   an allegation of professional malpractice by an accountant

22   who switched from one accounting method to another on behalf

23   of a plaintiff and then it was many months I think years

24   later before the IRS determined that that method was

25   improper and issued a deficiency notice and assessed the

Page 26

```
 1    plaintiff.  And the court held there was simply no injury

 2    until -- until the plaintiff had been assessed and paid --

 3    and paid the taxes.  And that case is directly on point.

 4    Any number of months could have gone by with all parties

 5    being ignorant that the IRS was ultimately going to say

 6    there was problem --

 7             THE COURT:  So --

 8             MR. SIEGEL:  -- and when they did --

 9             THE COURT:  -- five years later if the IRS had

10    said there was a problem you're --

11             MR. SIEGEL:  I don't know -- I don't know if it

12    was five years in that case, but the --

13             THE COURT:  Well --

14             MR. SIEGEL:  -- Texas Supreme Court said that it

15    could be delayed, and that delay was not --

16             THE COURT:  But in my --

17             MR. SIEGEL:  -- dependent on the --

18             THE COURT:  -- but in my hypothetical if Arthur

19    Anderson, taking an aggressive position, had said that it

20    was fine, hadn't questioned it, and then five years later

21    when the IRS statute of limitations is about to run for this

22    tax year then they questioned it, your argument would still

23    be that there could be an cause of action -- a non-time

24    barred cause of action against LBI?  That just doesn't feel

25    right.  That's not what a statute of limitations is supposed
```

Page 27

1    to do.

2              MR. SIEGEL:  Well, I think ultimately if the delay

3    were long enough then maybe a statute of repose would come

4    into play --

5              THE COURT:  Well, I don't --

6              MR. SIEGEL:  -- but for periods -- for purposes of

7    limitation that's what the Texas Supreme Court said that the

8    injury can -- the fact of the injury -- and we're not

9    talking about the discovery of the injury, we're talking

10   about the injury actually occurring when the IRS issues the

11   deficiency or when this transaction has to be restated.

12   When that happens the injury happen ands then the clock

13   begins running.

14             THE COURT:  Okay.  All right.  Why don't I let you

15   say what you were intending to say before I asked a

16   question.

17             MR. SIEGEL:  Well, Your Honor, just in terms of

18   limitations in general of course you noted yourself that the

19   way we're trying to thread the needle here, and we don't

20   think it's really threading the needle, we think it's fairly

21   straightforward, is that the tolling agreement saved any

22   cause of action for which a limitations defense wasn't

23   already available on the date of the tolling agreement.

24             THE COURT:  Right.

25             MR. SIEGEL:  We say that Arthur Anderson raised a

Page 28

1    concern about this structure in early 2002, we give you the

2    deposition testimony there of the Lehman personnel saying

3    that they didn't even respond to the concern raised by

4    Arthur Anderson until February of 2002, at or about the same

5    time Cornell convened a special committee of its board to

6    conduct an investigation.

7             All of these things were happening in early 2002,

8    the decision was then made that its earnings had to be

9    restated.  These were -- all of these things happened

10   several months after what would have been the cutoff date

11   under the tolling agreement.

12            So it's our position that it's clear cut that

13   these causes of action were not subject to a limitations

14   defense in December of 2001 when the tolling agreement was

15   entered into.

16            Now with respect to the arguments that were made

17   about the merits of the causes of action.  First with

18   respect to the breach of contract.

19            The essence of the breach of contract claim is

20   that the retainer fee was accepted and booked immediately

21   when the retainer agreement itself says that it should be

22   applied toward future contingency fees.  Had that been done

23   the sale leaseback special purpose vehicle transaction could

24   have been preserved.  It was the decision to accept payment

25   immediately and book it immediately that destroyed the

Page 29

```
 1    treatment -- the accounting treatment under the special

 2    purpose vehicle.

 3              And so it is a breach, it's a straightforward

 4    breach of the terms of the agreement which called for

 5    payment to be attributed going forward when work was done.

 6    And that's the other reason why the contract was breached,

 7    no work was done.

 8              The trustee takes the position that there's only a

 9    reference to one particular project, and of course that

10    project was never completed, but what the retainer agreement

11    contemplated was financial advisory services to be provided

12    going forward so that further financing arrangements like

13    the one that had been concluded in 2001 could be done.  None

14    of them were ever done, there's no -- there's no evidence

15    brought forth by the trustee that any work was performed

16    under that contract.

17              So it's a fairly straightforward cause of action.

18    You took $3.65 million and you didn't do any work, and not

19    only did you not do any work but you took the payment in

20    such a way that you knew would jeopardize the work that had

21    been done in the prior year.

22              THE COURT:  Well point to me -- I mean it is

23    called a retainer agreement, right?  So that suggests that a

24    retainer was paid, right?

25              MR. SIEGEL:  Right.
```

Page 30

1           THE COURT:  And what you're saying is that Lehman

2   -- LBI did not have the ability to apply that internally as

3   a matter of its own accounting practices as it saw fit.  Is

4   that what you're saying?

5           MR. SIEGEL:  Yes, especially given that what the

6   language says is that it should be applied toward future

7   contingent fees, and that's what it said.  Had they wanted

8   to book it immediately then that language should have read

9   differently in the --

10          THE COURT:  But the language that says applied

11  toward future contingent fees is as between Cornell and LBI,

12  it doesn't necessarily drive how LBI internally would have

13  booked that revenue so to speak.

14          MR. SIEGEL:  I think that's right, Your Honor, but

15  there was -- I mean obviously there was a supposition on my

16  client's part that work was going to be performed in order

17  to earn that fee and no work was performed.  That's the

18  basic allegation.

19          THE COURT:  Well what does the contract say?  What

20  -- what was the quid pro quo?

21          MR. SIEGEL:  The quid pro quo for the retainer

22  fee --

23          THE COURT:  Yeah.

24          MR. SIEGEL:  -- was to advise on similar deals

25  like the 2001 transaction --

Page 31

```
 1              THE COURT:  Okay.

 2              MR. SIEGEL:  -- that the retainer fee relates to,

 3    that the --

 4              THE COURT:  But -- but that's what I'm struggling

 5    with, because if it was a retainer fee I'm paying you this

 6    money to retain you to do what I ask you to do in the future

 7    and then I happen to not ask you to do something I get to

 8    keep the retainer fee.  Or if I do ask you to do something

 9    then you apply that against the fees that would otherwise be

10    payable for what I've asked you to do.

11              So so far I'm not -- I'm not quite there with you

12    yet.

13              MR. SIEGEL:  Well Cornell certainly takes the

14    position that it wanted further work done and that it asked

15    for work to be done and that no work was done.

16              THE COURT:  Is that alleged in the complaint?

17              MR. SIEGEL:  I believe it is, Your Honor.  I

18    actually don't have the complaint in front of me.

19              THE COURT:  Let's see.  Count I is -- when you're

20    injured.  Count I, breach of contract.  Defendant has not

21    used its best efforts to provide Cornell with finance

22    opportunities.  Defendant's failure to use its best efforts

23    is in direct breach of the contract.

24              MR. SIEGEL:  And if you read the -- read the

25    deposition testimony that we affixed to our response none of
```

Page 32

1    the opponents could have --

2              THE COURT:  Excuse me.

3              MR. SIEGEL:  -- none of the opponents could

4    identify a single project that they could tie to the

5    acceptance of this retainer fee.

6         (Pause)

7              THE COURT:  So that's the -- that's the total of

8    it is that the -- LBI did not use its best efforts to

9    provide Cornell with finance opportunities.

10             MR. SIEGEL:  Yes.

11             THE COURT:  That's it.

12             MR. SIEGEL:  That's it.  That's the breach of

13   contract claim.

14             Of course I would add, Your Honor, that the

15   record, you know, the record was in the process of being

16   made on all of these claims when Lehman filed bankruptcy and

17   everything was stayed.  I mean what -- you know, my client's

18   central position here today is that the trustee is seeking

19   what is in essence a summary dismissal of these claims

20   without them having been fully litigated or discovered.

21             THE COURT:  And then Count II you are alleging

22   that LBI induced Cornell to do the whole scheme.

23             MR. SIEGEL:  Yeah, I mean the representations that

24   were made were we have experience with these kind of

25   financing arrangements, we've done this successfully in the

Page 33

1    past, and it's even more specific than that.  Mr. Lavel

2    admits that conceived -- Lehman Brothers conceived of the

3    structure whereby Lehman would take the three percent equity

4    in the special purpose vehicle.  And so part of the fraud

5    claim is a failure to disclose that if Lehman was going to

6    take the three percent equity that could be jeopardized by

7    accepting the retainer fee when the retainer agreement was

8    signed.  And this was all -- you asked counsel for the

9    trustee who conceived of the plan?  Lehman did.  And given

10   that Lehman conceived of it it should have been -- had a

11   heightened sense of awareness of the impact of accepting

12   this retainer fee.

13             THE COURT:  And then Count III is the breach of

14   fiduciary duty, which is somewhat made up I have to say.  I

15   mean the idea that there was a fiduciary relationship before

16   there was any formal relationship --

17             MR. SIEGEL:  Actual, Your Honor, the formal -- the

18   retainer agreement comes at the end of what had already

19   been --

20             THE COURT:  Sure.

21             MR. SIEGEL:  -- a two-year relationship and it was

22   designed to, as you said, retain Lehman services going

23   forward.  But they're not -- it's not completely distinct

24   from what came before it because of the operation of

25   accepting the retainer fee.  Had Lehman --

Page 34

```
 1                THE COURT:  Well you say --

 2                MR. SIEGEL:  Had Lehman dreamt up --

 3                THE COURT:  -- you say it arises -- that it arose

 4      based on their duty to provide Cornell investment services

 5      and advice regarding the sale leaseback transaction.

 6                MR. SIEGEL:  Right.

 7                THE COURT:  It still doesn't sound like a

 8      fiduciary duty.

 9                MR. SIEGEL:  Cornell was in the business of

10      operating detention facilities.  It wasn't an investment

11      bank.  It hired Lehman for Lehman's expertise in arranging

12      financing.  It's the specific reason it hired Lehman.  It

13      believed Lehman's representations about its expertise to be

14      able to arrange these kinds of deals.  And we contend that

15      with a disparity in expertise --

16                THE COURT:  But what was the -- how --

17                MR. SIEGEL:  -- fiduciary duty arises.

18                THE COURT:  What was -- how did the relationship

19      come into being pursuant to which Lehman provided --

20      allegedly provided the advice regarding the sale leaseback

21      transaction?  As you said the retainer agreement comes at

22      the end.

23                So what you're saying is that there's a fiduciary

24      relationship because LBI had a duty to provide Cornell

25      advice regarding the sale leaseback transaction.
```

Page 35

1            MR. SIEGEL:  Your Honor, I frankly don't know who

2     made the first phone call.  I think the relationship existed

3     since at least 1999.  I suspect that Cornell sought

4     financing to expand its operations, went looking for

5     investment banking expertise and found somebody at Lehman,

6     the relationship began, the sale leaseback transaction took

7     at least 18 to 24 months worth of work, and during that

8     entire time we contend that a fiduciary relationship arose.

9            THE COURT:  Okay.  All right, thank you.

10            MR. SIEGEL:  Thank you, Your Honor.

11            MR. FITZPATRICK:  Your Honor, just a few points.

12            In connection with the breach of contract claim I

13     now understand, although this is not how I read Cornell's

14     opposition, that the breach of contract claim is a failure

15     to do any work under the retainer agreement.  I don't think

16     that can be Cornell's intention.

17            Paragraph 45 of their response to the trustee's

18     objection specifically says that Jim Lavel testified that

19     even though LBI worked on that project for at least two

20     years it never closed.

21            So there can't be an allegation that LBI didn't

22     provide advice.  Cornell has specifically said LBI worked on

23     it for two years, what they say here is that it didn't

24     close, and as we've already said the contract never

25     guaranteed that it would.

Page 36

1            THE COURT:  Well the way I'm reading that

2    allegation, which is admittedly pretty succinct, is that it

3    was supposed to be bringing lots of opportunities.

4            So perhaps the -- perhaps what they're alleging is

5    well maybe there was one but it didn't use its best efforts

6    to find -- provide financial advisory services concerning

7    future financing vehicles and strategic develop of Cornell's

8    business, including advice with respect to acquisitions,

9    joint ventures, et cetera, et cetera.  So it seems like it's

10   a -- it was a broader scope of work.

11           MR. FITZPATRICK:  Well if that -- if that is the

12   contention, Your Honor, first of all I'm not aware of any

13   allegation that Lehman Brothers was asked to do something

14   and didn't, and the contract is specific that Lehman will,

15   if requested by the company, advise the company with respect

16   to any financing, et cetera.  I'm not aware of any

17   allegation that we were asked and didn't provide something.

18   The contract also is expressed that nor does it commit

19   Lehman to provide or underwrite financing for future

20   projects.  So that's not -- you know, that's disclaimed.

21           So regardless, Your Honor, I don't -- I don't

22   think there's any allegation that points to anything

23   specific that Lehman didn't do that would be a breach of the

24   contract.

25           THE COURT:  Okay.  Do you have a response to the

Page 37

 1    description of the way the statute of limitations works in

 2    Texas?

 3             MR. FITZPATRICK:  Yes, Your Honor.

 4             There are a series of negligence, not fraud, cases

 5    in Texas in which the court has held in situations where --

 6    for example, in the case cited by Cornell a business sought

 7    tax advice -- the tax -- the accountant switched essentially

 8    -- and I might have this backwards -- from like the accrual

 9    method to another method.  Something that in and of itself

10    the court said was not wrongful and so there was no damage

11    at that time because nothing bad had happened.  Nothing bad

12    happened until the IRS came and gave an assessment, and

13    under that scenario in a negligence case where there was no

14    damage until the IRS came in the court did say that's when

15    it accrues, even recognizing that there could be some delay.

16    But that's different from fraud.  These are all negligence

17    cases where the Texas courts hold this.

18             In fraud the law is -- in a fraud case is law is

19    clear that the -- first of all it's actionable as soon as

20    the fraud is perpetrated, and second of all where an act in

21    itself is wrongful as soon as there's any legal injury at

22    all, even if it's not discovered yet and even if most of the

23    damage hasn't happened yet, it becomes actionable.  And

24    under Cornell's own pleading the accounting treatment of

25    this was destroyed.  They plead and we'd submit that -- we'd

Page 38

1    submit of course if this went further that that's not true

2    and that Arthur Anderson was overreacting -- but under their

3    own pleading the whole point of the sale leaseback was

4    destroyed once LBI accepted payment of the retainer

5    agreement -- the fee under the retainer agreement, and it's

6    undisputed that that's outside of the limitations period.

7            The subsequent acts of what Arthur Anderson

8    advised and how Cornell decided to take that advice and what

9    they -- what they put in their 10-K, which again as we note

10   in our papers, actually stated that Lehman's position was

11   reasonable, but nonetheless they put that in there -- they

12   put that in their 10-K.  That can't be when the cause of

13   action accrues.  They can't have control over when their own

14   cause of action accrues.

15           And just the last -- the last point, Your Honor,

16   with respect to the -- the fraud claim.  To the extent the

17   allegations are -- and I'm not disputing them for purposes

18   of where we are today that the structure was conceived by

19   LBI -- again, that's not -- that's not a fraud claim.  There

20   has to be an actual misrepresentation, and the only

21   misrepresentation that we've seen in any of the papers is

22   that, you know, we've done this before, we have the

23   expertise, (a), there's no allegation that that's false, and

24   you know, certainly -- certainly no allegation that the

25   person making that intended -- you know, was intentionally

1    making a false statement, and fraud has to be pled with some

2    particularity, and that certainly isn't present here, Your

3    Honor.

4             THE COURT:  Okay.

5             MR. FITZPATRICK:  Thank you, Your Honor.

6             THE COURT:  All right.

7             Okay.  Well, I will take this under and get back

8    to you.  I would certainly suggest that to the extent that

9    the parties haven't already contemplated the possibility of

10   an economic settlement you might want to do that since my

11   ruling is likely to be up or done.  So it might be a good

12   idea for you folks to talk to each other.

13            I do note that there's a request for among the

14   out-of-pocket expenses and the retainer $50 million for

15   damages for the corporate enterprise, so it's quite a large

16   demand.

17            So, thank you.

18            MR. FITZPATRICK:  Your Honor, I believe that's the

19   only LBI matters.

20            THE COURT:  I believe it is.

21            MR. FITZPATRICK:  Okay.  May we be excused?  Thank

22   you, Your Honor.

23            THE COURT:  Yes, thank you.  All right.

24            MS. MARCUS:  Your Honor, turning to the LBHI

25   matters.  Item 2 on the agenda is the status conference in

Page 40

1   the adversary proceeding captioned LBHI versus AmeriCredit

2   Financial Services.  That'll be handled by David Cohen of

3   Milbank.

4           THE COURT:  Okay, thank you.

5           MR. COHEN:  Good morning, Your Honor.

6           THE COURT:  Good morning.

7           MR. COHEN:  David Cohen, Milbank, Tweed, Hadley &

8   McCloy here on behalf of LBHI as plan administrator and

9   LBSF, and we're here for a status conference on the

10  adversary proceeding that LBHI commenced against --

11          THE COURT:  All right.

12          MR. COHEN:  -- AmeriCredit.

13          THE COURT:  And I thought I saw Mr. Reinthaler out

14  there didn't I?

15          MR. COHEN:  He is right there.

16          THE COURT:  I don't have good sight lines up here.

17          Well, I think the reason for coming in today was

18  simply to discuss scheduling.

19          MR. COHEN:  Okay.

20          THE COURT:  I don't think you had any expectation

21  that we were doing anything on the merits today did you?

22          MR. COHEN:  That was our understanding is that we

23  were not doing anything on the merits.

24          THE COURT:  Not doing anything of the merits.

25  Okay.

Page 41

```
 1              Well it seems to me, and I think today

 2    demonstrates, that for substantial matters it's a good idea

 3    to take you on a -- put you on a special day.

 4              MR. COHEN:  Certainly.

 5              THE COURT:  Rather than you have to be here with a

 6    large crowd.  So should we -- is this -- it's fully briefed?

 7              MR. COHEN:  It is fully briefed.

 8              THE COURT:  It is fully briefed.  All right.  Why

 9    don't --

10              MR. COHEN:  And we are generally available.  I

11    think there are some scheduling issues on the defendant's

12    side.

13              THE COURT:  Okay.  Mr. Reinthaler, why don't you

14    come on up and let's try to -- and perhaps we could have

15    done this over the phone.  I apologize.

16              MR. REINTHALER:  No, I told Mr. Cohen before the

17    hearing began that we're available before May 24 or any day

18    after June 20.

19              MR. COHEN:  As the Court may now I have another

20    hearing in this court and I took my vacation already.

21         (Laughter)

22              THE COURT:  Okay.  I am not available before

23    May 24th, so when was the --

24              MR. REINTHALER:  Any day after June 20.

25              THE COURT:  Any day after June 20.  How about --
```

Page 42

1    would you like to come -- Mr. Cohen, you come up from

2    Washington.

3            MR. COHEN:  Yes.

4            THE COURT:  How -- would you like to come on the

5    afternoon of Monday, June 23rd?  Is afternoon better for you

6    for travel?

7            MR. COHEN:  That would be fine, Your Honor.

8            THE COURT:  All right.  So let's do that on the

9    afternoon of June 23rd, 2 o'clock.

10           MR. COHEN:  Thank you, Your Honor.

11           MR. REINTHALER:  Thank you.

12           THE COURT:  All right.  If for some reason there

13   are developments in the next couple weeks in other matters

14   where I have to give those -- give that date to someone who

15   needs it more urgently we'll call you and let you know.

16           MR. COHEN:  Thank you very much, Your Honor.

17           THE COURT:  All right?  Thank you.

18           MR. REINTHALER:  Thank you.

19           THE COURT:  Thank you for coming in today.  Okay.

20           MS. MARCUS:  Jacqueline Marcus again, Your Honor.

21           Item 3 on the agenda arises in the adversary

22   proceeding captioned Lehman Brothers Special Financing Inc.

23   versus Bank of America.  It's adversary proceeding 10-3547,

24   which we refer to generally as the distributed action.

25           THE COURT:  Right.

                                                                Page 43

 1              MS. MARCUS:  Today's hearing relates to the

 2    proposed scheduling order that addresses how this action

 3    will move forward as well as various objections filed in

 4    connection with that order.

 5              Inasmuch as I believe Your Honor this is the first

 6    substantive hearing we've had before you with respect to the

 7    SPV avoidance actions with the Court's permission I thought

 8    I'd start with a brief summary of how we've gotten to this

 9    point.

10              THE COURT:  Sure.  I was in the courtroom at Judge

11    Peck's last hearing so I heard some of it, but it certainly

12    couldn't hurt to hear it again.

13              MS. MARCUS:  Okay.  Well, I won't give you too

14    much of it then, and I read in the newspaper that you were

15    in the courtroom and I didn't see you that day.

16              Mr. Defilippo of Wollmuth Maher & Deutsch will

17    actually handle the --

18              THE COURT:  Okay.

19              MS. MARCUS:  -- revised proposed order when I'm

20    through.

21              So beginning in the fall of 2009 Judge Peck

22    entered a series of orders that established alternative

23    dispute resolution procedures for dealing with affirmative

24    claims of the debtors under derivatives contracts.

25              The original order was supplemented by an order

Page 44

1    approving procedures for so-called Tier II matters which

2    were matters with recovery potential of less than five

3    million, and another order that was initially entered in

4    March of 2011 that provided special procedures for

5    affirmative claims of the debtors for derivatives

6    transactions with special purpose vehicles.

7              The avoidance actions were commenced on or about

8    September 15th, 2010.

9              We generally group the derivatives related

10   avoidance actions into two groups.  The distributed action

11   was commenced as a defendant class action and the defendants

12   are noteholders in the SPVs.  In the non-distributed actions

13   the defendants are the SPVs themselves.

14             The difference is that in the distributed action

15   the applicable SPV issuers had made distributions to their

16   respective noteholders, and the non-distributed actions, the

17   funds that are the subject of the disputes, remain in the

18   possession of the SPV issuers themselves.

19             Although at the time the avoidance actions were

20   commenced the ADR process was in its infancy, the debtors

21   commenced the litigation in order to be sure to preserve

22   valuable causes of action.

23             Accordingly, in order to provide the debtors and

24   all of the defendants with the opportunity to allow the ADR

25   procedures to play out the debtors sought and obtained stay

Page 45

```
 1    of the avoidance actions in effect freezing these actions.

 2              For ease of reference and to be consistent with

 3    the pleadings filed by LBSF and others I'll refer to this

 4    stay as the litigation stay.

 5              The litigation stay applies to all avoidance

 6    actions whether or not they involve derivatives matters and

 7    regardless of whether an ADR is pending as to such action.

 8              As Your Honor is aware, and you just eluded to,

 9    the litigation stay was extended by Judge Peck numerous

10    times, most recently in January of this year.

11              In addition to the litigation stay there's another

12    stay that is triggered by the commencement of an ADR

13    proceeding pursuant to the SPV ADR procedures order.  We'll

14    refer to that stay as the SPV ADR stay.  It is triggered by

15    the delivery of an SPV derivatives ADR package.

16              Pursuant to the amended SPV ADR order the SPV ADR

17    stay continues until settlement or termination of a

18    particular mediation.

19              In January the plan administrator on behalf of the

20    estates made a final request for an extension of the

21    litigation stay and outlined a process for arriving at a

22    scheduling order that will determine how these cases will

23    move forward.

24              With respect to the distributed action we are at

25    the tail end of that process and are before you today
```

Page 46

1    seeking a scheduling order that will govern this action.

2              With respect to the five non-distributed actions

3    we're a bit further behind, and as the Court will hear when

4    we get to item 5 on the agenda, the scheduling conference,

5    the plan administrator proposes that we effectively model

6    the scheduling order in those actions on the order that the

7    Court enters with respect to the distributed action.

8              Now as I have at each of these --

9              THE COURT:  But in the non-distributed actions

10   it's not a class --

11             MS. MARCUS:  That's exactly right.

12             THE COURT:  -- right?  Okay.

13             MS. MARCUS:  And it's much simpler than for that

14   reason.

15             THE COURT:  It's much simpler.  Okay.

16             MS. MARCUS:  And fewer defendants as well.

17             THE COURT:  Right.  Right.

18             MS. MARCUS:  Now as I have at each of the hearings

19   before Judge Peck seeking to extend the stay I'd like to

20   report on the benefits that the debtors have realized from

21   the ADR process and the litigation stay and the SPV stay.

22             As indicated in the fifty-third status report

23   filed on April 24th by my partner, Peter Broomburger (ph),

24   as a result of mediation the debtors have achieved

25   settlements in 328 ADR matters involving 435 counterparties,

Page 47

1    generating in excess of two and a quarter billion dollars

2    for the estates.

3              Another measure of success is that 147 out of the

4    158 ADR matters in Tier I that have reached the mediation

5    stage have been settled.  That's an astounding 93 percent

6    success rat, and the work continues.

7              There are at least nine additional Tier I

8    mediations that have been scheduled to commence between

9    today the end of June and many more in the pipeline.

10             With respect to the avoidance actions specifically

11   more than 123 defendants of the SPV actions currently are

12   subject to the SPV ADR procedures.

13             As we've described in paragraph 5 of LBSF's

14   opposition to JA Hokkaido Shinren's application to lift the

15   litigation stay the 150 defendants in the non-distributed

16   actions have almost all been dealt with.  We have reached

17   final resolution with over 133 defendants and there are

18   pending ADR proceedings with respect to 15 defendants.

19             The distributed action, as Your Honor eluded to,

20   is a bit more complicated.  That matter is a defendant class

21   action.  The plan administrator has identified over 170

22   noteholders who have received in excess of $2.8 billion of

23   distributions.

24             Notwithstanding the size and complexity of this

25   action, as also described in paragraph 15 of the opposition,

Page 48

```
 1    the plan administrator has made substantial progress in this

 2    action as well.  There are pending ADR proceedings with

 3    respect to 108 defendants in the distributed action.  LBSF

 4    has conducted in-person mediation sessions with 31

 5    defendants and has settled with and dismissed 23 defendants,

 6    and there are an additional 16 other defendants that we're

 7    working on settlements with.

 8            The foregoing statistics demonstrate and I don't

 9    think anyone would agree that the ADR program has been a

10    resounding success.  Judge Peck has commented on numerous

11    occasions.  In February of 2013 he described the process as

12    quote, "One of the most extraordinarily successful aspects

13    of case administration in this massive case."

14            Absent the stay much of that success would not

15    have been possible, particularly within this time frame and

16    with so little burden on the Court.

17            And to be clear, Your Honor, although the

18    litigation stay will expire soon the plan administrator

19    intends to continue to utilize the ADR procedures and to

20    resolve as many of these disputes as possible through

21    mediation rather than litigation.  We hope to be able to

22    continue to resolve these matters expeditiously and to

23    generate additional value for the estate and its creditors.

24            That concludes my presentation of the background,

25    Your Honor.  Before I turn the podium over to Mr. Defilippo
```

Page 49

1   in terms of the calendar I wanted to point out that we will

2   essentially be treating three matters together.  Item 3,

3   which deals with the proposed scheduling order, item 4,

4   which is JA Hokkaiod's application to lift the litigation

5   stay, and item 6, which is a motion filed in the main case

6   by the group of 77 defendants in the distributed action

7   which essentially is the mirror image of item 3.

8            THE COURT:  Okay.

9            MS. MARCUS:  Thank you, Your Honor.

10           MR. DEFILIPPO:  Good morning, Your Honor.

11           THE COURT:  Good morning.

12           MR. DEFILIPPO:  Paul Defilippo for the plaintiff.

13           Your Honor, this case involves 47 SPVs, special

14   purpose vehicles, which issued notes under indentures.  LBSF

15   was the provider of a credit default swap to each of the

16   issuers and had priority to payment from the SPV assets,

17   which we estimate total $3 billion at the time default was

18   declared.  Each of the deals had priority modification

19   provisions which reversed payment priority on default.

20   That's the so-called flip clause.

21           THE COURT:  Right.

22           MR. DEFILIPPO:  Each of the SPV trustees declared

23   a default solely due the LBHI's Chapter 11 filing,

24   implemented the priority modifications, liquidated the

25   collateral, and distributed to the noteholders.

Page 50

```
 1              Defendants are the issuers, the trustees, and

 2      hundreds of noteholders individually, and as representatives

 3      of a putative class of noteholders who received the benefits

 4      of the priority modification provisions in the indentures or

 5      the distributions from one of the SPVs as a result of the

 6      enforcement of the ipso facto clauses.

 7              The original complaint was filed within two years

 8      of the LBHI petition date, has been amended twice to add

 9      defendants and claims since then as LBSF was entitled to

10      conduct discovery for the purposes of identifying as many

11      noteholders as possible.

12              The case has been otherwise stayed for about three

13      and a half years while the parties are engaged in the ADR

14      process, which as Ms. Marcus noted as been successful thus

15      far and which LBSF hopes will continue to be successful.

16              THE COURT:  So let me ask what may be a stupid

17      question.  Is everything accounted for in terms of the

18      distributions?

19              MR. DEFILIPPO:  No, Your Honor.

20              THE COURT:  I mean when you add everything up do

21      you get the sum total of the distributions?

22              MR. DEFILIPPO:  We have not --

23              THE COURT:  Or are there still missing defendants

24      in other words?

25              MR. DEFILIPPO:  There are still absent class
```

1    members, yes, Your Honor.  We think about 20 percent of the

2    distributions.

3              THE COURT:  Twenty percent in amount?

4              MR. DEFILIPPO:  In the amount of about 400 million

5    is the number I've been given are not accounted for by

6    defendants who are in the case.

7              We've proposed an order to govern the procedures

8    for the conduct of this action going forward, which we have

9    suggested should take up class certification in Phase I,

10   followed in Phase II by the statute of limitations and

11   personal jurisdiction defenses, and then all other

12   dispositive motions in Phase III.  And the biggest bone of

13   contention between the parties is the timing of decisions on

14   the merits, and that's the issue with your permission I'd

15   like to address first.

16             THE COURT:  Okay.

17             MR. DEFILIPPO:  The -- what we've called the group

18   of 77 noteholder defendants plus two joinders proposes that

19   motions to dismiss on the merits should go first, although

20   they haven't specified what issues are susceptible for

21   resolution.

22             THE COURT:  Well so my guess on that, and I'll

23   speak to them when they get up, but my guess on that is that

24   that's going to be a series of motions that says why Judge

25   Peck's ruling with respect to the flip clause doesn't apply

Page 52

1    to them.  Is the that a good guess?

2              MR. DEFILIPPO:  That's a good guess, Your Honor,

3    yes.

4         (Laughter)

5              THE COURT:  Okay.

6              MR. DEFILIPPO:  Of course.  And before I

7    specifically address why we don't think it's necessary for

8    this Court to revisit Judge Peck's decisions I'd like to

9    point out that we have cited numerous cases to Your Honor --

10             THE COURT:  Well it's not -- I'm not going to,

11   right?  I mean that's law of the case.  What I meant by that

12   was that they would attempt to say why the exact words in

13   the particular agreement at issue in their case are not the

14   exact words that Judge Peck made a determination on in the

15   Bank of New York case.  And I'm not at all smart enough to

16   know whether that makes sense or not, but that's just a

17   guess.

18             MR. DEFILIPPO:  But, Your Honor, that's exactly

19   why it's wise to deal with class certification first,

20   because those alleged distinctions that allow BNY and

21   Ballyrock decisions to be challenged are the basis or the

22   potential basis for what we've described in our papers as

23   the one-way intervention problem.

24             In class procedure you can't have a merits

25   determination before certification of the class if that will

1    permit absent class members or non-moving defendants to

2    allege that they are differently situated than the moving

3    party who has gotten a merits ruling.

4          So if you --

5          THE COURT:  Right.

6          MR. DEFILIPPO:  -- synthesize all the cases in our

7    brief, including several from the Second Circuit, including

8    that Jones versus Ford Motor Company case, Philip Morris

9    Judge Wood's Cuzco (ph) versus O'Ryan (ph) case, they

10   basically say if you have a putative class and there is

11   something that you can raise that's an easy decision --

12   that's what the Curtain (ph) case -- the D.C. Circuit case

13   says -- if there's an easy way to get rid of the whole case

14   and moot class certification so you don't have to go through

15   that process then by all means you have the discretion to do

16   that.  But they haven't identified a single issue that would

17   moot the class certification process.

18          So, for example --

19          THE COURT:  But one -- the -- yes, I agree with

20   that characterization, although I would say that the JA

21   Hokkaido -- I don't know if I'm pronouncing that correctly

22   -- party is -- does raise an issue that I think merits

23   specific focus, but --

24          MR. DEFILIPPO:  Would you like me to go there?

25          THE COURT:  You don't have to go there now.

1           MR. DEFILIPPO:  Okay.

2           THE COURT:  But as a footnote to your general

3    pronouncement I've identified that as one potential issue

4    that might merit stepping out of line so to speak and being

5    heard.

6           MR. DEFILIPPO:  Yes, understandable, Your Honor.

7           So to put that Author's Guild decision in context

8    here, that was an example of the kind of rare occurrence

9    that justifies taking merits determinations out of order.

10          If you can substantially narrow the claims of the

11   class, and you know, most of these cases arise in the

12   context of a defendant who's the subject of a class action,

13   not a plaintiff who is seeking to hold the defendant class

14   liable, and even though one-way intervention has mostly been

15   applied to plaintiffs' classes it is equally pernicious if

16   the defendants are able to utilize it against a single

17   plaintiff.  It has the same adverse consequence, and that's

18   the reason for the inclusion in the rule of the early

19   practicable time for the determination of class

20   certification.

21          THE COURT:  How long -- in your view if we were to

22   go the route that you suggest how long do you believe the

23   class certification process would take?

24          MR. DEFILIPPO:  This may be over optimistic, but

25   we should be able to conduct the discovery within four

1    months -- four to six months, and subject to Your Honor's

2    calendar have hearings shortly after that.

3              THE COURT:  So the suggestion that it would be

4    2016 before we got to motions to dismiss, kind of the third

5    phase, you believe is --

6              MR. DEFILIPPO:  Well, Your Honor --

7              THE COURT:  -- is exaggerated.

8              MR. DEFILIPPO:  -- you think that's exaggerated

9    and it also fails to take into consideration that as part of

10   the class certification process you must necessarily

11   consider some merits issues in determining the commonality

12   questions.  So you will have plenty of opportunities to hear

13   merits arguments in the class process, and you know, they

14   may give rise to --

15             THE COURT:  And would I have the ability to kind

16   of pull people out of line during that process?

17             MR. DEFILIPPO:  Of course, Your Honor, you have

18   the inherent power to control your docket.

19             THE COURT:  Okay.

20             MR. DEFILIPPO:  We have attempted to show in our

21   response, Your Honor, why the three points that the

22   defendants have contended are appropriate for consideration.

23   First, failure to state a claim on which relief can be

24   granted.  Statute of limitations and personal jurisdiction

25   are not the kinds of arguments that are important enough to

Page 56

1    justify departing from the general rule that class

2    certification should go first.

3            We think if there are safe harbors to be litigated

4    as affirmative defenses they don't appropriately get

5    considered on a motion to dismiss, they may require

6    discovery, they may require -- they will invariably require

7    the Court to you look outside the pleadings, and several of

8    the claims are not barred by any safe harbor.  The

9    declaratory judgment action, for example, on the

10   applicability of BNY and Ballyrock is not barred, the

11   imputed intent, 548(a)(1)(a) claim is not barred, nor is the

12   549 claim.  So you would not terminate the litigation even

13   by the application of a safe harbor.

14           We think we've adequately pled each of the claims

15   and they meet the plausibility standard, especially in light

16   of Your Honor's intent to respect Judge Peck's decisions.

17   No contrary decisions on those points have been cited to the

18   Court, so we think Your Honor would appropriately deny a

19   motion to dismiss the DJ action on that ground.

20           The defendants in the Ballyrock case actually

21   argue that the resolution of a flip clause required

22   discovery.  So I'm not sure whether you'll hear that

23   argument from the defendants in this case, but if you do

24   that also makes it inappropriate for resolution on a motion

25   to dismiss.  And if the defendants lose on that issue again

Page 57

1    and are granted leave to appeal the resolution of the

2    appellate process would fragment the litigation and probably

3    bog us down interminably.

4           So holding that issue until later in the case

5    allows the Court to rule on a full factual record, and even

6    if you did depart from BNY and Ballyrock that does not

7    eliminate the need for class certification.

8           With respect to the claim that some counts may be

9    time barred.  The original complaint was timely filed, we

10   don't believe there are any statute of limitations defenses

11   applicable to the declaratory judgment or state law claims,

12   and once we file the original complaint and asked for a

13   class we should get the benefit of American Pipe tolling

14   which says the statute of limitations is tolled as to class

15   until there's a decision on certification.

16          We also believe we could use 540 -- 550(f) for the

17   avoidance actions and have the benefits in relation back

18   under 15(c) to overcome statute of limitations issues.

19          And with respect to the claim that the Court may

20   lack jurisdiction we have shown in the response to JA

21   Hokkaido why we believe the Court has jurisdiction over

22   absent foreign defendants.  You have nationwide jurisdiction

23   of course over all the defendants who are not foreign, no

24   other defendant has come forward specifically to suggest it

25   is similarly situated to JA Hokkaido, and we believe that

Page 58

1   the points that we've raised in opposition to JA Hokkaido

2   are meritorious and JA Hokkaido has not really answered them

3   in its response.  The --

4            THE COURT:  But you just said that you haven't

5   identified anyone else who's similarly situated.

6            MR. DEFILIPPO:  To JA Hokkaido.

7            THE COURT:  To JA Hokkaido.

8            MR. DEFILIPPO:  Correct.  And none of the -- none

9   of the named defendants have suggested they are similarly

10  situated either.

11           THE COURT:  Right.

12           MR. DEFILIPPO:  Whether class members may be

13  similarly situated remains to be seen.

14           THE COURT:  But none of the group of 77 has said

15  that that's their situation.

16           MR. DEFILIPPO:  That's correct, Your Honor.

17           One of the arguments that the group raises is that

18  they have a due process right to prompt consideration of

19  their motions to dismiss, but we submit that following Rule

20  23 and following the cases under Rule 23 that suggest that

21  class certification should go first could not possibly give

22  rise to a due process violation.

23           All but 14 of the defendants by the way were happy

24  to delay resolution of this case for the last three and a

25  half years, and we've cited two Court of Appeals decisions

Page 59

1    that hold that a litigant does not have a due process right

2    to have its issues heard at any particular time.

3         At bottom, Your Honor, the problem with the

4    groups' approach is that the merits decisions, if made prior

5    to class certification, are not necessarily binding on

6    either non-participating named defendants or absent class

7    members, and there are over 60 named defendants who are not

8    part of the group of 77.

9         We will probably, although this decision has not

10   been formalized yet, probably be asking the Court to certify

11   at least the declaratory judgment aspect of this under the

12   non-opt out provisions of Rule 23 so that should eliminate

13   any concern that the defendants might raise that why would

14   you bother certifying a class if we can opt out.  Either

15   under 23(b)(1) or (b)(2) we believe we can certify a DJ

16   action under the non-opt out provisions, and there is case

17   law support for the proposition that the DJ, the non-opt out

18   portion of it should actually be heard first, especially if

19   it's combined with injunctive relief.

20        So if you do certify all of the noteholder

21   defendants will be bound to your decision on the DJ issue.

22        Under the liaison counsel point, Your Honor.  Your

23   Honor has the power to appoint an interim class counsel

24   under the rule and we view that no differently than

25   appointment of the liaison counsel.

Page 60

1              As you have no doubt noticed the groups' proposed

2    order only requires that they use best efforts to coordinate

3    themselves, their submissions and their arguments, and we

4    are hopeful that Your Honor will agree that some measure of

5    control beyond best efforts is necessary here.

6              If the class is certified and class counsel is

7    appointed Your Honor may or may not see fit to continue

8    liaison counsel, you don't necessarily have to.  So liaison

9    counsel would probably only continue through the class

10   certification portion.  But it's a common feature of a

11   multiparty complex litigation, and we actually took most of

12   that section of the order out of the Tribune order.

13             If the individual defendants want to be heard on

14   issues of importance to them our proposed order permits them

15   to ask Your Honor for permission to do so.

16             They made some other requests in their order, Your

17   Honor, I'd just like to address briefly.

18             THE COURT:  Okay.

19             MR. DEFILIPPO:  On the disclosures issues they

20   have the contact information for each defendant who has been

21   named in this case.  It's a schedule to the second amended

22   complaint.  And additional disclosures we don't think are

23   appropriate either on a one-way basis or at this time since

24   under Rule 26 both sides are supposed to make that

25   disclosure within 14 days after the initial conference,

1    which hasn't occurred yet, so we think it's premature for

2    initial disclosures here, but to the extent there is

3    additional information that the defendants want I think

4    they're free to get it from the trustees, including pristine

5    sets of deal documents if the defendants need them.

6            We think we should have the right to ask you for

7    leave to amend, especially if after discovery we come up

8    with new theories or want to additional defendants.

9            We strongly oppose termination of the ADR stay or

10   the confidentiality restrictions for the reasons in our

11   brief.  The defendants don't need to terminate the stay,

12   they can participate in each phase of the litigation that

13   affects them.  And without confidentiality we think we would

14   not have been as successful in resolving claims in the ADR

15   process as we have been.

16           As for the trustee's issues, Your Honor, they

17   don't want to be involved in the class certification phase,

18   but they will need to produce documents and maybe provide a

19   witness for a deposition, depending on what the documents

20   say.

21           If there's a substantive issue presented to the

22   Court in the class certification phase I think they ignore

23   it at their peril.  They're parties to this litigation and

24   there's no reason why they should have a second bite at the

25   apple on substantive issues once Your Honor has decided.

Page 62

1            Finally on JA Hokkaido, Your Honor --

2            THE COURT:  Uh-huh.

3            MR. DEFILIPPO:  -- is really pressing to make a

4    motion to dismiss for lack of personal jurisdiction, and

5    they allege that we have to plead facts establishing

6    personal jurisdiction citing the Marine Midland case, but

7    that case does not say that.  It says we have to prove

8    jurisdiction exists over them by a preponderance of the

9    evidence after a hearing, which may be evidentiary and which

10   may occur after discovery.

11           We're giving relief from the ADR stay to allow JA

12   Hokkaido to present its motion at the time Your Honor rules

13   that all such motions should be presented, and we have

14   identified at least four basis for the exercise of personal

15   jurisdiction over JA Hokkaido in our brief that we submit

16   brings their motion within the scope of the general rule

17   that class certification issues should go first and they

18   should be allowed to bring their motion at the point in time

19   when Your Honor determines that all personal jurisdiction

20   motions should proceed.

21           We are sensitive to their complaints that they

22   have to spend money to defend themselves, but they invested

23   two billion yen in a synthetic CDO, and so we're not dealing

24   with widows and orphans.  They -- they invest money globally

25   we believe, they invested money in a deal with an obvious

Page 63

1   U.S. nexus, it was marketed by PPM and it was structured by

2   Lehman, both U.S. companies, under Judge Lifland's decision.

3   That is a significant factor in subjecting them to the

4   jurisdiction of this court.

5          We don't contend the choice of law provision as

6   dispositive, but it is an important factor to consider and

7   the choice of law -- the documents provided that the choice

8   of law in JA Hokkaido's deal was New York, they ignore the

9   argument that the long arm of statute provides for

10  jurisdiction over them, and they have no real response to

11  our argument that since they received property of the estate

12  Your Honor has jurisdiction over that property wherever it's

13  located and you have in rem jurisdiction to require them to

14  appear here and defend themselves.

15         So the strong defenses that we believe we have to

16  the JA Hokkaido jurisdictional motion we believe brings this

17  within the general rule as well, that class certification

18  should proceed first, this motion should go in Phase II just

19  like the group of 77 suggests.

20         And in conclusion, Your Honor, we respectfully ask

21  that you enter our proposed order, deny the counter-order

22  and the two motions that relate to it.

23         THE COURT:  Okay, thank you.

24         MR. DEFILIPPO:  Thank you.

25         THE COURT:  All right, so who would like to be

Page 64

1    heard next?

2              MR. BOCCUZZI:  I would, Your Honor.

3              THE COURT:  Okay.

4              MR. BOCCUZZI:  Good morning, Your Honor.

5              THE COURT:  Good morning.

6              MR. BOCCUZZI:  My name is Carmine Boccuzzi, I'm

7    from --

8              THE COURT:  Spell your last name?

9              MR. BOCCUZZI:  B as in boy, O-C-C-U-Z-Z-I.  I'm

10   from Cleary Gottlieb Steen & Hamilton, and I'm part of the

11   group of 77, and in the interest of coordinating I was going

12   to present the groups' part -- the arguments about the

13   ordering of the phases.

14             THE COURT:  Okay.

15             MR. BOCCUZZI:  And then Mr. Blocker from Sidley

16   Austin is going to discuss the liaison counsel issue and

17   then other aspects of our order.

18             THE COURT:  So let me start by telling what my

19   concerns are, because what I see is a series of motions that

20   would be filed by the defendants that would say don't apply

21   Bank of New York decision, we're different, all right?  And

22   maybe there'll be 20 motions, maybe there'll be 40 motions,

23   maybe there'll be 77 motions, and everybody will come up

24   with some reason why they're different.  And that's what

25   you're suggestion amounts to in its most extreme form.

Page 65

1            So when I (indiscernible - 01:08:18) that with the

2      argument that oh, you can't do class certification first

3      because then we won't get to dispositive motions until 2016

4      it doesn't make sense, I mean with the exception of

5      something along the lines of the JA Hokkaido argument, which

6      seems to be truly or at least somewhat unique.

7            My choices are do class certification for a group

8      that certainly seems like a good candidate for class

9      certification versus entertain a long series of motions that

10     will need careful attention and that will inevitably delay.

11            So, you know, I'm presented with the peripheral

12     rock in the hard place.

13            So the aspect of the proposed order that makes

14     perfect sense to me is what I call the raise your hand to

15     ask to get out of line provision.  I mean if at any point

16     you believe that there's something unique -- a defendant

17     believes there's something unique at their situation they

18     would always have the ability to make a letter request, you

19     know, along the lines of what we do now with respect to a

20     premotion conference saying, you know, now that we've gotten

21     to this point, look, we're special, we want special

22     treatment, and that could be considered, but that's

23     enormously different from saying the very first thing we're

24     going to do is have a couple a dozen 12(b)(6) motions,

25     because then if I render one decision then the next one that

1    comes up it's going to be -- you know, I'm going to have to

2    sort it into well is it like Bank of New York or is it like

3    the other one?

4            And the analogy that I'll draw, it's not a perfect

5    analogy, but as many of you may know there's a lot of

6    litigation now over the scope of the safe harbor, 546(e),

7    that's up at the Second Circuit, and in those cases, for

8    example, a lot may turn on the precise nature of the

9    plaintiff.  Whether the plaintiff is a successor to the

10   debtor, whether the plaintiff is standing in the shoes of

11   the creditors, et cetera.

12           The reason I'm raising that is because it presents

13   exactly the type of situation that I'm worried about here,

14   that there will be these fine factual or structural

15   distinctions that are raised as a basis for saying get me --

16   let me out of here, and that's why to be perfectly frank I

17   believe that the order that's proposed makes more sense and

18   will get you to a disposition more quickly, subject to the

19   right to raise your hand to be asked to -- to ask to step

20   out of line.  So --

21           MR. BOCCUZZI:  Just to address that concern.

22           THE COURT:  Of course.

23           MR. BOCCUZZI:  I mean I think if it's phrased as

24   the parade of horribles, which is multiple 12(b)(6) motions

25   by many different people --

Page 67

```
 1              THE COURT:  Right.

 2              MR. BOCCUZZI:  -- I hear what Your Honor is saying

 3    as a matter of case efficiency --

 4              THE COURT:  Right.

 5              MR. BOCCUZZI:  -- and case management and timing;

 6    however, that's not what we're proposing, and we were hoping

 7    that the demonstrative exhibit of 77 of us putting in one

 8    response and putting in a proposed order that's very much in

 9    line with really the common practice, which is you use the

10    12(b)(6) vehicle to narrow or eliminate whole swabs of the

11    case or the whole case is the best way to proceed.

12              And just to set the table --

13              THE COURT:  So -- so what -- so hypothetically

14    there would be a 12(b)(6) motion signed by 77 of you?

15              MR. BOCCUZZI:  I think our goal is to deliver to

16    the Court an efficient pleading, because we also recognize

17    it's in our interest if you bombard a court with tons of

18    motions to dismiss I think the judicial reaction is often

19    well there's got to be some issue here and you just get

20    yourself into a denial situation.

21              And to take a step back this is not just an

22    exercise in crossing our arms and saying, you know, put

23    Dante aside and ignore it.  This case has ten additional

24    causes of actions that were not in Dante and that really

25    bring to the fore threshold legal arguments.
```

Page 68

```
 1            So there are at least four or five quasi contract

 2    claims, which under the clear case law in this circuit and I

 3    think most other jurisdictions, quasi contract laws don't

 4    live if you have agreements -- written enforceable

 5    agreements.  The court's not going to create something when

 6    you've got something.  So that's one set.

 7            You have two breach of contract claims that are

 8    unique to one of the CDO's, depicts a structure, never dealt

 9    with before, breach of contract claim, probably disposable

10    on a 12(b)(6) motion to dismiss.

11            And then you've got --

12            THE COURT:  But -- so what you're saying may well

13    work hypothetically with respect to the 77, but what do I do

14    about the folks who aren't here, then what?

15            MR. BOCCUZZI:  Well the folks who aren't here it's

16    a bit of a hypothetical, Your Honor, because they've been

17    looking for four years.  Part of this -- the reasons for

18    these stays wasn't just so they could have their ADR

19    procedure --

20            THE COURT:  Sure.

21            MR. BOCCUZZI:  -- it was so they could find the

22    folks who got the money.  And to the extent they haven't

23    found them yet it's a real question whether these people

24    will ever be found, will ever come forward, or will every

25    get the proper notice that if there is a class judgment
```

1    they'll say I'm not bound by this, I never heard about this,

2    I never had the proper notice.  They really want to create

3    a --

4              THE COURT:  Well there are -- I mean there are

5    ways that I can skin that cat, that's not -- I mean there

6    are ways to deal with that, so that doesn't really work.

7              As an answer you have the real risk that other

8    people are going to come in after your, you know,

9    dispositiveish motion and then I'm going to have to do it

10   again multiple times, and to the extent that there are

11   causes of action that -- what you're talking about is

12   trimming as opposed eliminating.

13             MR. BOCCUZZI:  And I would also add, Your Honor,

14   though for many of these CDOs they had different contractual

15   language then the Dante case, and so the Dante case number

16   one, whether it was really framed as a -- to use their term

17   -- the flip clause, the documents have different language

18   which support arguments that it was not a flip clause.

19             And number two, in Dante the judge was very clear

20   that in that structure the swap agreement made no reference

21   to payment priority and that's how we dealt with the 560

22   argument.

23             THE COURT:  But then -- but then we get to a

24   position, where as counsel said, in the process of the class

25   certification procedures and determining commonality if it

Page 70

1    emerges -- if a subgroup emerges that has that argument we

2    could off ramp them and deal with it.  I mean we have -- I

3    have the inherent ability and flexibility to deal with those

4    issues as they arise.

5          The -- it seems entirely clear me that number one

6    it's not inconsistent with due process rights of the

7    defendants to proceed the way the estate suggests, subject

8    to reasonable flexibility on my part to let people engage in

9    some bespoke procedures when they identify something that

10   entitles them to it.  But if I flip it -- no pun intended --

11   if I flip it and I have, you know, the very first thing is

12   threshold dispositive motions it's not going to -- it's not

13   going to move forward as quickly.

14         MR. BOCCUZZI:  But then, Your Honor, we get to the

15   case law.  So the Author's Guild case says very clearly --

16   there they actually reversed a class certification, the

17   Second Circuit being they, where they said in this case

18   class consideration would be informed by or perhaps mooted

19   by issues -- consideration of the threshold legal questions,

20   and that fed off of the McLaughlin case, which is not cited

21   in our papers because I think this issue got sharpened in

22   their reply, but that's another Second Circuit case, 522

23   F.3d 215 and the Flag Telecom case, also the Second Circuit,

24   574 F.3rd 29 which say that where something doesn't state a

25   claim those issues shouldn't be certified.

Page 71

1           So at the very -- at the very least -- and one

2    other point which is most of their case law all predates the

3    2003 amendment to Rule 23.  Rule 23 used to have very clear

4    language that said as soon as practicable after the

5    commencement of the case, in 2003 that was amended to say at

6    an early practicable time.  And the advisory committee notes

7    are very interesting because they say changing this language

8    comports it with actually what happens and how parties

9    proceed.

10          And I point out the leading 12(b)(6) case, the

11   Twomble case, was in a non-certified class action where the

12   Supreme Court reversed a denial of a motion to dismiss by

13   the Second Circuit all before the class was certified there.

14   And it also says this language allows the court where

15   defendant -- if the court has good reasons to entertain

16   motions to dismiss to let that happen.  I think they say

17   summary judgment.  Because even then most of their cases the

18   courts grapple with -- I'm sorry -- summary judgment before

19   or after class certification.  We're even more threshold and

20   earlier than that, we're at the motion to dismiss stage, and

21   when you have --

22          THE COURT:  But are you suggesting that you're

23   going to tender a motion to dismiss that's fully dispositive

24   of the 77's claims?  That it's going to knock out every

25   single claim?

Page 72

1            MR. BOCCUZZI:  I think our motion, yes, could

2      knock out everything, and if not everything certainly --

3      because then you get to questions of how does this relate to

4      class certification?  Typicality?  It could knock out

5      certain defendants, it could knock out -- I mean -- yeah,

6      defendants, it can knock out certain CDOs.

7            And so what they're saying is do class

8      certification first, do 12(b)(6) -- because they're not

9      saying don't do 12(b)(6), they're saying --

10            THE COURT:  Right.

11            MR. BOCCUZZI:  -- do it after, and then they say,

12      oh, so if things change then revisit class certification,

13      but that can't be efficient and effective if only because

14      they're immediately adding in a new issue by saying no

15      12(b)(6), which is -- their argument is while all this time

16      is running they continue the collect in their view nine

17      percent statutory New York State interest on everything.  So

18      that's going to be another issue we all have to litigate,

19      and that can't be consistent with the rule one fair,

20      efficient, inexpensive adjudication to add issues.

21            THE COURT:  But if we can hypothesize that class

22      certification being done, it's May of 2014, if we can

23      hypothesize that class classification would be done by

24      January 1, 2015 and you all then will have -- you can file

25      your dispositive motion the next day and you will then have

Page 73

1    had the benefit of everything that comes out during the

2    class certification process in order to fine tune what you

3    have to say.

4           I'm just not seeing the prejudice to the

5    defendants in proceeding with the class certification and

6    then promptly -- promptly thereafter filing your is it

7    (b)(6).  I'm just not seeing it, because there's -- if you

8    were to file a 12(b)(6) soon, by the time you get done

9    briefing, by the time you get done argument, and even if I

10   didn't have the rather hefty queue that I have at the moment

11   you're -- you know, January 1 is just -- you're not going to

12   have a disposition of something of that magnitude.

13          So if the goal all working together is expedition

14   and efficiency in my mind you get there -- you all get this

15   faster at less cost with no prejudice to anybody's rights by

16   doing essentially in parallel process.  Doing the class

17   certification and then being ready the next day to tender

18   your 12(b)(6), and then we have the advantage of having the

19   class in place and removing the specter of the multiple do-

20   overs for the people who aren't part of your 77.

21          MR. BOCCUZZI:  Just to speak to that, Your Honor.

22   I think the 77 signed the brief, but there are more than

23   that, about 200 something who are named.

24          THE COURT:  Right.

25          MR. BOCCUZZI:  To the extent they're named and

Page 74

1    they're here, I mean if they don't file their 12(b)(6), you

2    know, you have them, I don't think they can create a do-over

3    situation for you.  They're named defendants in this case.

4    And so if Your Honor set a schedule that said -- the only

5    specter that they try to muster about the do-over are the --

6            THE COURT:  Oh, but that's even --

7            MR. BOCCUZZI:  -- people they haven't found.

8            THE COURT:  Right.  But that's even -- but that's

9    even worse.  So if I have the -- the 77 file their 12(b)(6)

10   and then the others -- the found but not 77, right, so

11   there's three buckets.  There's the 77 -- I'm simplifying.

12           MR. BOCCUZZI:  Yeah.

13           THE COURT:  Then there's the found but not part of

14   the 77, right, and then there's the unfound.  So we're at

15   risk with respect to the latter two categories.

16           So what your --

17           MR. BOCCUZZI:  No, no, because the order we're

18   proposing says parties in this -- the defendants will file

19   their 12(b)(6) motion by X date.

20           THE COURT:  Right.

21           MR. BOCCUZZI:  That's everyone, it's not just us

22   77.

23           THE COURT:  Right.

24           MR. BOCCUZZI:  So they've got --

25           THE COURT:  So --

1           MR. BOCCUZZI:  -- if they don't file it they

2    haven't file a 12(b)(6) motion, and --

3           THE COURT:  Right.  So -- right.  So

4    hypothetically if the 77 act together --

5           MR. BOCCUZZI:  You have one motion.

6           THE COURT:  -- I get one --

7           MR. BOCCUZZI:  Uh-huh.

8           THE COURT:  -- plus 200.

9           MR. BOCCUZZI:  But why would the --

10        (Laughter)

11          MR. BOCCUZZI:  -- why would the 200 people who

12   didn't even file anything today do that?  Just to harass

13   Your Honor?  I just -- they have to have a showing that

14   these people are particularly litigious who are unpleasant,

15   but I just don't -- I just -- I think that's --

16          THE COURT:  Well but why -- but if they --

17          MR. BOCCUZZI:  -- that's a kimera (ph).

18          THE COURT:  -- if they've chosen -- they've chosen

19   not to join with you so they've adopted, you know, the

20   laying the weed strategy, which is their right, okay, and

21   then when the Court enters an order that says now is the

22   time to step up I think it's a fair guess, maybe not 200 but

23   some of them are going to step up, so --

24          MR. BOCCUZZI:  Again, Your Honor, I just don't --

25   I just don't see that happening.  I just think again they

Page 76

1    don't have an interest in doing that, we don't have an

2    interest in their doing it.

3             THE COURT:  So what do you think --

4             MR. BOCCUZZI:  If anything you'd get breached and

5    maybe just join our brief so that's just -- then you keep

6    saying me too.  That's not -- that's not a burden to the

7    Court, that would be efficient.

8             I mean on the class certification point I would

9    add I think he said optimistically four to six months of

10   class discovery, that gets us to the end of this year.

11   We're in June, May/June, right, yeah, it's six months till

12   the end of the year and he said that was optimistic, then

13   they've got to finish collateral estoppel discovery, right,

14   and so you're in January and they haven't -- we haven't

15   finished briefing class certification.

16            So I think at most --

17            THE COURT:  My timetable is more aggressive than

18   yours.

19            MR. BOCCUZZI:  More than his, but he's saying he

20   needs at least four to six months of class certification

21   discovery.

22            But putting -- but putting that aside again I

23   think at the very least then if we want to be efficient --

24   and remember the prejudice to the defendants just to --

25   because you were trying to --

Page 77

1                THE COURT:  Uh-huh.

2                MR. BOCCUZZI:  -- find the prejudice.  The

3       prejudice to us is we are in the ADR process, this is an odd

4       situation where plaintiffs are saying let's move slowly on

5       the merits, and the reason why is clear, it's because they

6       want to continue to use the Dante case, which they see as

7       favorable precedent in that -- in the court order mediation

8       process as leverage, which Judge McMann said in that

9       settlement process.

10               So I think it's fair at this point that the case

11      is starting up again for us to say, no, both for Your Honor

12      and in this mediation process, which everyone is

13      participating in good faith, look at this, they have 12

14      claims, 6 of them fall away under basic contract principals.

15      The avoidance claims -- the 549 doesn't even apply because

16      this is not a post-petition situation because it's different

17      from what happened in Dante.  And in the safe harbors

18      otherwise cover the preference claim and the other theories.

19               So it's very real prejudice for us to embark.  If

20      it's going to be a fair ADR process and we're now in the

21      litigation why not let us get on the table the issues that

22      go to the legal merits here, and --

23               THE COURT:  I was following you until you made the

24      an nexus to the ADR process.  Why does the order of class

25      certification versus 12(b)(6) practice affect the fairness

1    and utility of the ADR process?

2            MR. BOCCUZZI:  Because -- because now the stay is

3    being lifted, we are starting litigation --

4            THE COURT:  Right.

5            MR. BOCCUZZI:  -- we've waited through the period

6    of the stay --

7            THE COURT:  Right.

8            MR. BOCCUZZI:  -- and so now it would be fair for

9    the defendants here to be able to present their defenses

10   both as to claims that have never been looked at by this

11   Court and also to explain why they're different from the

12   Dante case.  Otherwise we're in a regime where we're just

13   living as if that's the rule of the day.

14           And I would just to put a marker down, I don't

15   know if law of the case solves it for them because we

16   weren't in that case.  That was an adversary proceeding.

17   And so just following, you know, we're now in the land of

18   the 7,000's --

19           THE COURT:  Well law --

20           MR. BOCCUZZI:  -- from --

21           THE COURT:  Right, but law of the case is

22   different from being estopped -- collaterally estopped.

23           MR. BOCCUZZI:  I understand that, but it's usually

24   -- I think all the case law applies it in the context of a

25   case, and a case is understood by the federal rules, which

Page 79

1    is here our case, not the case that we were not involved in.

2    It's a rule so judges aren't bombarded by the same party

3    saying, oh, revisit this issue.  And say well wait, you've

4    been here, I decided this, let's move forward, counsel.

5             So I don't think the law of the case paradigm

6    works for them.

7             I mean I think at the very least, Your Honor, and

8    I'm surprised they haven't potentially suggested this, is

9    maybe the way to skin the cat would be to have 12(b)(6) and

10   class cert go together, and so you're raising the legal

11   issues --

12            THE COURT:  Well but that's -- that's in essence

13   what I was -- that's in essence what I was suggesting that

14   they proceed in parallel and you get -- you're going to get

15   to the finish line at the same time --

16            MR. BOCCUZZI:  Well, I had understood --

17            THE COURT:  -- on those issues.

18            MR. BOCCUZZI:  -- I had understood what Your Honor

19   is saying is you do class certification after the class

20   certification is decided one way or the other then you have

21   a 12(b)(6) motion.

22            THE COURT:  Well but you're -- you're maybe

23   improving upon what I was thinking, and to the extent that

24   they could proceed in parallel so that when we get to class

25   certification it's -- we've certified -- we've certified the

Page 80

```
 1    class but with a leaner and meaner scope.

 2              MR. BOCCUZZI:  Right.

 3              THE COURT:  I mean --

 4              MR. BOCCUZZI:  I mean at least --

 5              THE COURT:  -- that to me would be -- that would

 6    be perfect, right?  That would be perfect.  That would

 7    address everybody's legitimate concerns.  It would deal with

 8    the fact that I don't think that you've said that all 77 can

 9    get out on everything, you've identified some causes of

10    action that you believe, your words, clearly should go.  I

11    mean I express no view on any of that yet.

12              MR. BOCCUZZI:  I understand.

13              THE COURT:  And it would also satisfy my concerns

14    about the other 200 and the unfound, because I do not want

15    multiple bites after the apple and I do not share your

16    optimism about the conduct of the two --

17              MR. BOCCUZZI:  I was so proud of what we've done,

18    Your Honor, I mean --

19         (Laughter)

20              THE COURT:  I am --

21              MR. BOCCUZZI:  -- proposed order, 77 folks, and

22    not a lot of other --

23              THE COURT:  I am very proud of you too.

24              MR. BOCCUZZI:  Thank you.

25         (Laughter)
```

Page 81

1          MR. BOCCUZZI:  Sorry.

2          THE COURT:  No, it is an achievement to see

3   signature pages that have that level of cooperation, all --

4   you know, completely seriously, but I can't guess as to what

5   other parties who haven't joined the group are going -- are

6   going to do, and then we have the issue of -- you know, the

7   liaison counsel and we need to have the ability to have the

8   group continue to work together.

9          So I mean it just seems to me -- I'm a big fan of

10  smart people working together to work things out -- it seems

11  to me that there's still room here for this conversation to

12  continue and I'm happy to participate in it with you to try

13  to come up with some tweaks that would help address

14  everybody's concerns.  I do think as I've said a number of

15  times now that I think that something unique like the JA

16  Hokkaido situation, you know, deserves to step out of line.

17         MR. BOCCUZZI:  And I believe there are folks in

18  the group of 77 who have personal jurisdiction defenses.

19         THE COURT:  Well they haven't -- haven't been

20  raised yet.

21         MR. BOCCUZZI:  Right.  The idea was to say they

22  would raise it at either Phase I or Phase II --

23         THE COURT:  Right.

24         MR. BOCCUZZI:  -- depending on how -- which would

25  come first --

```
 1                THE COURT:  Right.  But I --

 2                MR. BOCCUZZI:  -- before the class cert.

 3                THE COURT:  That personal jurisdiction defense in

 4     my mind is separate from 12(b)(6) and/or statute of

 5     limitations type issues on the other hand.  Just the way I

 6     compartmentalize it.

 7                So -- so I guess the question is do you think it

 8     would be worthwhile continuing to have some conversations to

 9     try to meld your concepts and see if you can come up with

10     something that both sides could live with?

11                MR. DEFILIPPO:  Could we have a few minutes to

12     discuss that, Your Honor?

13                THE COURT:  Sure.  Ms. Marcus, I'm trying to think

14     of what I have next.  I think the only -- well, I have the

15     -- I have the non-distributed, right?

16                MS. MARCUS:  That will take five minutes.

17                THE COURT:  That will take five minutes.  And then

18     I have the --

19                MS. MARCUS:  Claim objection.

20                THE COURT:  Yeah, I have the Newport Global.

21     Those are the only two other things, right?

22                MS. MARCUS:  That's correct, Your Honor.

23                THE COURT:  So should I keep going and then some

24     folks can go use the conference room and keep talking?  What

25     makes the most sense?
```

1          MS. MARCUS:  Your Honor, I thought if we could

2    have a couple of minutes to consult with our clients --

3          THE COURT:  Sure.

4          MS. MARCUS:  -- before we decide whether to do

5    that.  But in the meantime if you'd like we can handle the

6    non-distributed, that will really just take a few minutes

7    and there are a couple of attorneys in the room --

8          THE COURT:  Okay.

9          MS. MARCUS:  -- to whom this pertains.

10         THE COURT:  So why don't we do that.

11         MS. MARCUS:  Maybe you can go talk and I'll just

12   zip through that.

13         THE COURT:  Okay.  Okay.  That sounds good.

14         MR. LODEN:  Your Honor?

15         THE COURT:  Yes.

16         MR. LODEN:  My name is Steven Steve Loden, I'm

17   here on behalf of JA Hokkaido.

18         THE COURT:  Yes.

19         MR. LODEN:  I just want to make sure you're aware

20   we are --

21         THE COURT:  Very good.

22         MR. LODEN:  -- (indiscernible - 01:32:04) and when

23   you feel it's appropriate I'm happy to address whatever

24   questions --

25         THE COURT:  Well so far I've been making your

Page 84

1   arguments for you, so.

2          MR. LODEN:  You have, Your Honor, and I've been

3   silent.

4          THE COURT:  Okay, good.

5          Ms. Marcus?

6          Perhaps -- perhaps this group could --

7       (Court confers with clerk)

8          THE COURT:  If you don't need to listen to what

9   Ms. Marcus is going say perhaps you could go into a

10  conference room or out into the hallway.

11      (Pause)

12         THE COURT:  They need to have t-shirts that say 77

13  on them I guess.

14         MS. MARCUS:  We had a joke that we were going to

15  use in the other courtroom, which was the jaws, we need a

16  bigger boat joke.

17         THE COURT:  We need a bigger boat.  I've actually

18  -- I've made that joke.  I've made that joke in some of

19  my --

20         MS. MARCUS:  But you mooted it by changing rooms.

21         THE COURT:  I did.  I made that joke in

22  (indiscernible - 01:33:28).  I think on the record.

23         MR. COHEN:  I think you did.

24         THE COURT:  I think I did.  I think I said at one

25  point we need a bigger boat, and sadly there are some who

1    are so young they don't get the joke.

2              MS. MARCUS:  That is sad.

3              THE COURT:  Isn't that sad?

4              MR. COHEN:  I did get the joke.

5              THE COURT:  You did get the joke.

6              MR. COHEN:  I did get the joke.  I have a gray

7    hair to prove it.

8              MS. MARCUS:  Okay.

9              THE COURT:  Okay.

10             MS. MARCUS:  Matter number 5 is the scheduling

11   conference with respect to the five non-distributed deals as

12   we've called them.

13             THE COURT:  Right.

14             MS. MARCUS:  While there's as we talked about

15   earlier a certain amount of overlap between the issues in

16   the distributed action and the issues in the non-distributed

17   actions there are fewer issues in the non-distributed

18   actions.

19             THE COURT:  Right.

20             MS. MARCUS:  As Your Honor eluded to there are no

21   class certification issues.

22             In addition with respect to the non-distributed

23   actions it's not clear whether they'll ever be litigated

24   because the plan administrator continues to settle with

25   various defendants, and from time to time you'll see on the

Page 86

```
1     docket we file notices of dismissal --

2              THE COURT:  Yes.

3              MS. MARCUS:  -- as we settle these out.

4              THE COURT:  Yes.

5              MS. MARCUS:  On the other hand the defendants in

6     the non-distributed actions want to make sure that their

7     rights are not prejudiced if the Court gets to the point of

8     hearing dispositive motions in the distributed action.

9              The plan administrator has consulted with counsel

10    for several of the defendants in the non-distributed action

11    and we believe that there's general agreement that the

12    scheduling will be handled in the following manner.

13             The plan administrator will file a proposed

14    scheduling order within two weeks of the Court's entry of a

15    scheduling order in the distributed action.  The parties'

16    intent is that the scheduling order will mimic the schedule

17    in the -- excuse me -- the scheduling order in the

18    distributed action.  And then the defendants in the non-

19    distributed action will have 14 days to file written

20    objections to the proposed scheduling order.  And the plan

21    administrator and the defendants will have a certain period

22    of time to try to resolve any issues regarding the proposed

23    scheduling order.

24             If the parties are unable to agree on the terms of

25    a proposed order then the dispute will be set for a hearing
```

Page 87

1   before the Court.

2          THE COURT:  So let me just understand that.  So

3   that it really has to do with what ultimately will be the

4   timing of dispositive motions?

5          MS. MARCUS:  I think that's -- that's right, Your

6   Honor.

7          THE COURT:  That's going to be the -- that's going

8   to be the main thing, right the main driver?

9          How are you, Mr. Schaffer?

10         MR. SCHAFFER:  Good to see you, Your Honor.

11         THE COURT:  Good to see you.

12         MR. SCHAFFER:  Eric Schaffer Reed Smith, here for

13   Bank of New York Mellon.

14         We are in the distributed and the non-distributed.

15   For purposes of the distributed we're part of the group of

16   five indenture trustees, some, but not all.

17         THE COURT:  Okay.

18         MR. SCHAFFER:  For purposes of the non-distributed

19   I think there are fewer of us.  To make it easy I agree with

20   her.

21      (Laughter)

22         THE COURT:  Okay.

23         MS. MARCUS:  And, Your Honor, for Your Honor's

24   benefit essentially most of the defendants in the non-

25   distributed actions are represented -- the trustees in those

Page 88

1   matters are either Bank of New York Mellon --

2            THE COURT:  Okay.

3            MS. MARCUS:  -- or U.S. Bank, and Mr. Top is here

4   on behalf of U.S. Bank.

5            THE COURT:  Okay.  So the proposal is that you're

6   going to enter an order that says what you said --

7            MS. MARCUS:  Yes.

8            THE COURT:  -- and then we're going to wait and

9   see what happens in the distributed action, and then if you

10  can agree on a mimicking procedure you'll present -- you'll

11  file that on presentment, and if not we'll all come back and

12  get together again.

13           MS. MARCUS:  That's exactly right.

14           THE COURT:  Okay.

15           MS. MARCUS:  And in the interim the litigation

16  stay with respect to those actions would be continued.

17           THE COURT:  Would be continued, right.

18           MS. MARCUS:  And I have a form of proposed order.

19           THE COURT:  That's signed off by everybody?

20           MS. MARCUS:  That Mr. Top and Mr. Schaffer have

21  signed off on.

22           THE COURT:  That's great.  Okay.

23           MS. MARCUS:  And I'm happy to hand it up, it's

24  literally three paragraphs.

25           THE COURT:  Okay.

1          MS. MARCUS:  We have the time.  Especially when

2     they get back, maybe we can save some time.

3          THE COURT:  Okay.

4          MR. TOP:  Just real briefly.  You know -- Frank

5     Top on behalf of -- from Chapman and Cutler on behalf of

6     U.S. Bank national association, as trustee, and we actually

7     filed a former -- a formal response just to try to keep

8     these cases, you know, in tandem, because we don't want --

9          THE COURT:  Sure.

10         MR. TOP:  -- one side prejudiced over the other.

11         THE COURT:  Okay.

12         MR. TOP:  And we're in agreement with the --

13         THE COURT:  Okay.

14         MR. TEP:  -- proposed orders.

15         THE COURT:  All right.  Very good.

16         Okay, so you can just -- I'll take a copy,

17    Ms. Marcus and then you can -- you folks can just email --

18    email it or drop off a disk.  Thank you.

19         MS. MARCUS:  And for the benefit of Mr. Top and

20    Mr. Top and Mr. Schaffer and Mr. Pedone, the only thing I

21    did -- I had circulated it yesterday to them, all I did this

22    morning was take off the draftee.

23         THE COURT:  Okay.

24         MS. MARCUS:  So there have been no changes made.

25         THE COURT:  Okay.  Terrific, wonderful.  Thank you

Page 90

```
 1    all.  Thank you very much.  Good to see you.

 2             All right.

 3             MS. MARCUS:  Should we turn to the --

 4             THE COURT:  Should we do --

 5             MS. MARCUS:  -- claim objections?

 6             THE COURT:  -- to the claim objection and then we

 7    can wrap up with --

 8             MS. MARCUS:  Sure.

 9             THE COURT:  Yeah.

10             MS. MARCUS:  That will be handled by Turner Smith

11    of Curtis, Mallet.

12             THE COURT:  Okay.

13        (Pause)

14             THE COURT:  So this is a so-called sufficiency

15    hearing, correct?

16             MR. SMITH:  That's right, Your Honor.

17             THE COURT:  Okay.

18             MR. SMITH:  And just for the record Turner Smith

19    with Curtis, Mallet-Prevost, Colt & Mosle, we are conflicts

20    counsel to LBHI.

21             THE COURT:  Okay.

22             MR. SMITH:  So as Your Honor knows we're at the

23    sufficiency hearing stage, the motion to dismiss standard

24    will apply, and I know you've had a chance -- or I hope

25    you've had a chance to look at the -- the briefs that were
```

Page 91

1    filed, but just to put you very quickly into the picture.

2              This is a classic third-party beneficiary

3    structure, we've got party A and party B contracting, and

4    party C then steps up and says --

5              THE COURT:  Right, so those parties --

6              MR. SMITH:  -- I want the benefit.

7              THE COURT:  -- in this case are LBI and the funds.

8              MR. SMITH:  Yes.  The prime brokerage agreement --

9              THE COURT:  Right.

10             MR. SMITH:  -- is the agreement that we're focused

11   on.

12             The claimant is third-party beneficiary is neither

13   the funds or LBI but it's the advisor to the fund.

14             THE COURT:  Right.

15             MR. SMITH:  Newport Global Advisors.  And as we've

16   pointed out in our papers I think the name say it alls.

17   They are simply an advisor to the funds.

18             Now they started this claim process with a

19   $4 million claim and that claim was for lost management

20   fees.

21             THE COURT:  Right.

22             MR. SMITH:  The underlying dispute by the way is

23   that there was an order entered -- there was an order made

24   or request made to LBI to transfer securities to Credit

25   Suisse.

Page 92

```
 1                THE COURT:  Right.

 2                MR. SMITH:  Somehow that got bottled up, the

 3      petition is filed or administration commences, and the

 4      securities are whatever --

 5                THE COURT:  Right.

 6                MR. SMITH:  -- they're gone.

 7           The loss then claimed by the advisor is those

 8      securities, had LBI not breached its obligations, those

 9      securities would be in the fund and I would be earning my --

10                THE COURT:  Right.

11                MR. SMITH:  -- management fees.  A very peculiar

12      and very remote and contingent form of third-party

13      beneficiary claim.

14           The -- that was a $4 million claim, well that's

15      now ballooned to $30 million --

16                THE COURT:  Right.  With the --

17                MR. SMITH:  -- and they've tacked on another

18      claim, entirely different claim.  That claim is a

19      $70 million claim, and it says in 2008 when this whole

20      problem arose we are poised to be acquired in some fashion.

21      Now they don't say who was the acquirer or what the terms

22      are going to be or is anybody ready, willing, and able to do

23      it, they just say we were poised to be acquired and because

24      we didn't have the securities there we -- the transaction

25      fell apart so $70 million, that's what you owe.  They don't
```

Page 93

1    explain how we get to that number.

2              So let's then step through the traditional third-

3    party claimant -- third-party beneficiary analysis.  The --

4    it's a three-part test, the first is, is there a contract?

5    Yes, everybody agrees there is.

6              Second, is this beneficiary a primary or direct

7    beneficiary in the parties' -- A and B parties here?

8              THE COURT:  Right.

9              MR. SMITH:  And clearly they are not.

10             THE COURT:  Right.

11             MR. SMITH:  And in fact there is a provision in

12   the agreement, the prime brokerage agreement by which the

13   advisory firm, the claimant here, signs on --

14             THE COURT:  Signs --

15             MR. SMITH:  -- solely --

16             THE COURT:  -- solely as to ERISA.

17             MR. SMITH:  Now solely is not just to product NGA,

18   it's to protect LBI.  It knows now that it's not dealing

19   with that advisor with whatever duties it might otherwise

20   owe to a customer.

21             So in that sense we think we've eliminated any

22   notion or any argument that there's a direct beneficiary

23   here.  Otherwise the contract is completely silent as to the

24   existence of an NGA or obligations that might be owed to

25   NGA, and so that is again one of the tests for third-party

Page 94

1    beneficiary, is there anything that you can point to within

2    the four corners of the agreement that would establish that

3    the parties actually intended to (indiscernible - 01:42:38)

4    this benefit.  Clearly they did not.

5              So NGA falls to the general circumstances, and

6    they say at paragraph 43 of their response, well look, LBI

7    knew that we were the advisors and LBI was they say on

8    notice.  I'm not sure why they say that, but it's LBI must

9    have been on notice that Newport Global Advisors would be

10   earning a fee that was tied to whatever the --

11             THE COURT:  Well in fact it's a little -- it's a

12   little more loose than that because it's -- Lehman was well

13   aware, LBHI in particular knew.  I mean it migrates --

14             MR. SMITH:  It does migrate, and --

15             THE COURT:  It migrates.

16             MR. SMITH:  -- you know there's a very interesting

17   fact here.  They never filed this claim against LBI to my

18   knowledge in the LBI estate.

19             So they've come up with this claim late, they've

20   inflated it, tacked on another unrelated claim, and brought

21   it against LBHI under some theory of guarantee or whatever,

22   but that -- we don't have to reach that issue at this stage

23   of the proceedings, because we can get rid of it at this

24   stage of the proceedings, a merits hearing is not going

25   improve their -- their pleading.

1              The -- so the $30 million, claim which is the lost

2      management fees, the only fallback position they can argue

3      for is that somehow the general circumstances, which we were

4      just talking about, compel the conclusion that they were an

5      intended beneficiary.  The case law is against them on that.

6              We've cited the Court to two Southern District

7      cases, one of which is essentially this situation where the

8      investment manager is saying -- is saying to the broker I

9      was going to be benefited under this provision -- under

10     these -- this contract performance and therefore I'm the

11     third-party beneficiary.  The court says, no, they say no in

12     that context, and the Southern District in the Foundation

13     Ventures says similarly with a -- in that one it was a

14     fundraiser for who was going to issue shares -- he was going

15     raise money and then issue shares through a broker/dealer.

16     The broker/dealer says, since that primary agreement failed,

17     I, as a broker/dealer, lost the opportunity to participate

18     in that initial offering.

19             The only cases that they cite to are easily

20     distinguishable.  These are cases where party A and party B

21     knew that their performance was going to be for the benefit

22     of party C.

23             So you have a supplier of building materials to a

24     builder, well they both know that it's going to be

25     installed, the subject of the agreement is going to happen

Page 96

1    at party C's level.  Same thing with an architect who

2    contracts with a subsidiary, he knows it's going to the

3    parent.

4              So on that basis that $30 million is purely

5    incidental type of a relationship and third-party

6    beneficiary rules wouldn't apply.

7              On that $70 million claim, which really comes out

8    of left field, this is a -- the claim that there was a

9    transaction that failed or lost a business opportunity

10   because Newport didn't have the securities in its account

11   and supposedly that aborted a transaction.

12             Well that claim is logically impossible to assert

13   on the basis of a 2006 agreement, because the transaction

14   they're talking about didn't fall out of bed until 2008, and

15   it's impossible for LBI to have known that they're some time

16   two years into the future that there would be a transaction

17   pending and that that -- that that transaction or to

18   benefits of that transaction should somehow be preserved or

19   indemnified or insured on behalf of this Newport Global

20   Advisors.

21             Two other arguments and then I'll step down.

22             There is a limitation of liability clause in the

23   prime brokerage agreement.  Case law tells you that the

24   third-party beneficiary who claims a right as a third-party

25   beneficiary also takes on the burdens of being a party to

Page 97

1     the contract, and the principal contracting parties can

2     assert and argue the defenses that would normally apply.

3            The limitation -- there are two forms of the

4     limitation of liability.  Part one is that you can only

5     plead gross negligence.  There's an exclusion for any other

6     kind of conduct.  There is no pleading of that here and the

7     circumstances that I just described where these securities

8     get locked up is not a gross negligence event.

9            The second preclusion is consequential damages.

10    There's a very broad and very traditional no lost profits,

11    no incidental, no consequentials.

12           What we're talking about I think is obvious

13    because as we've just discussed in eliminating a third-party

14    beneficial link or the incidental link is truly a foreign

15    consequential damages.  So they're going to be knocked out

16    on that.

17           And then finally if you were to allow them to push

18    that one step and that second step, third step forward they

19    bump up against the Kenford rule, which is that these

20    damages are speculative in nature.  You'd have had to

21    reconstruct based on a series of hypotheses and assumptions

22    about what securities would have been in the pool that they

23    would have been able to manage or what fees they might have

24    earned and what alternatives there may have been available

25    to them.  That's impermissible or it's incapable of being

Page 98

1    determined with reasonable certainly, and the Kenford line

2    oaf cases tells you, well that's -- you can strike the claim

3    on that basis.

4              So for those reasons I think we've beat the claim

5    at the sufficiency hearing level, we'd ask that the claims

6    be expunged in their entirety.

7              THE COURT:  All right, thank you.

8              THE COURT:  Good afternoon.

9              MR. STEEL:  Good morning -- good afternoon, Your

10   Honor.  Howard Steel of Brown Rudnick on behalf of Newport

11   Global Advisors.

12             One correction to the comments of Mr. Smith.  The

13   parties to the underlying agreement are not only LBI and the

14   funds but it's all the Chapter 11 debtors, therefore these

15   claims are brought against all the Chapter 11 debtors.

16   There's actually 19 proofs of claims pending in this

17   objection.

18             THE COURT:  Who is the prime brokerage agreement

19   with?

20             MR. STEEL:  It was with LBI and all of Lehman, and

21   it also named parties, Lehman Brothers Holding Inc., Lehman

22   Brothers Special Financing, and all their affiliates and

23   subsidiaries.  So it's our position that each of the Chapter

24   11 debtors are counterparties to the prime brokerage

25   agreement.  The prime broker was LBI.

1                THE COURT:  The prime brokerage agreement, is

2      there a copy attached anywhere?

3                MR. STEEL:  Yes, it's attached to the May

4      declaration which -- at Exhibit A, Your Honor, to the May

5      declaration, docket 44071.

6                THE COURT:  Customer account agreement prime

7      brokerage?

8                MR. STEEL:  Yes.  And it's Section 1, Your Honor,

9      the parties' disagreements shall consist of Lehman Brothers

10     Inc., Lehman Brothers International Europe, Lehman Brothers

11     Finance, and it goes on.

12         (Pause)

13               THE COURT:  Okay.  So that's on the Lehman side of

14     things, but on the Newport side of things there's no dispute

15     that your client is not a party to these agreements other

16     than in the limited capacity in which it signed, right?

17               MR. STEEL:  Well yes, they signed for the ERISA

18     representation, and it's our position that we're a third-

19     party beneficiary.

20               THE COURT:  As a result -- so it's your position

21     that as a result of signing the ERISA representation you

22     became a third-party beneficiary of the entire agreement?

23               MR. STEEL:  No, Your Honor, that's not our

24     position.

25               THE COURT:  Okay.

Page 100

```
 1              MR. STEEL:  Our position is we're a third-party
 2    beneficiary under the four corners of the agreement -- and
 3    I'll present that to Your Honor -- and also because Your
 4    Honor is permitted, contrary to Lehman's representations, to
 5    look at extrinsic evidence, to look at the surrounding
 6    circumstances of entry into the agreement, we believe that
 7    the facts set forth in the May declaration are very
 8    sufficient at this sufficiency stage hearing to have a
 9    plausible claim of third-party beneficiary given the
10    surrounding circumstances of Newport entering into this
11    agreement.  And I'll dive into that depending on where Your
12    Honor would like me to start addressing these issues.
13              THE COURT:  Well, I think you should start with
14    the fact or with my telling you that I agree with
15    Mr. Smith's road map in virtually ever respect, so you're
16    going have to persuade me why he's wrong.
17              MR. STEEL:  Sure.
18              THE COURT:  And in particular signing the ERISA
19    representation does lend additional and particular support I
20    think to the argument.  I mean if your client was -- entered
21    the picture then it is clearly only in that -- in that
22    respect.
23              So I guess you should just go down the
24    arguments --
25              MR. STEEL:  Let me navigate the road map.
```

Page 101

```
 1              THE COURT:  -- and try to convince me.

 2              MR. STEEL:  Yeah, let me start with the ERISA

 3    signature.  I believe that's a required signature from the

 4    investment manager under the ERISA statute.

 5              THE COURT:  Okay.

 6              MR. STEEL:  It's not dispositive of the parties'

 7    intent --

 8              THE COURT:  Okay.

 9              MR. STEEL:  -- who to benefit under the

10    agreement --

11              THE COURT:  Well, do you agree that I start with

12    the four corners of the document?

13              MR. STEEL:  I believe that under the cases we

14    cited, Foundation Ventures that Mr. Smith cited, Fishteen

15    versus Miranda (ph), Vista versus Columbia, US versus Ogden

16    Lotts (ph), you look at both the agreement, and you can also

17    look at the surrounding circumstances.

18              THE COURT:  But I -- when I went to law school,

19    right, you -- before you went into extrinsic evidence you

20    had to find an ambiguity, right?

21              MR. STEEL:  Yep.

22              THE COURT:  That's still good -- that's the way it

23    works, right?

24              MR. STEEL:  And I appreciate that, and I did

25    research on that, and I'm looking at the research results in
```

Page 102

1    the cases that I just cited to you --

2              THE COURT:  Okay.

3              MR. STEEL:  -- the Court did not consider the

4    issue of ambiguity of the contract terms first.  It just

5    said --

6              THE COURT:  Well, let me --

7              MR. STEEL:  -- on when valuing third party

8    beneficiaries, so.

9              THE COURT:  Well, I mean, here's the distinction

10   that I draw.  I mean, you don't -- it's not that I have to

11   be a robot, right, and just do a word scan of the document,

12   right.  You read the document in the context.  But that's

13   different in my mind from affirmatively bringing in

14   extrinsic evidence.

15             So the context here is that your clients and

16   advisor to these funds, these funds contract with Lehman to

17   be the prime broker, and that's it.  I mean, that kind of

18   sets the context of the document, and there's nothing in the

19   document that specifically says or even suggests that the

20   advisor has any rights under this agreement.

21             MR. STEEL:  Well, that's why I think that the road

22   map makes Your Honor compelled to look at the surrounding

23   circumstances too, in addition with what the agreement says.

24             And I point Your Honor to Section 21 of the prime

25   brokerage agreement.  And I believe that this demonstrates

Page 103

1    an intent to not only benefit the funds, but also the

2    investment manager.

3              THE COURT:  Section 21?

4              MR. STEEL:  Yep.

5              THE COURT:  Okay.

6              MR. STEEL:  And what Section 21 says -- if I may,

7    Your Honor.

8              THE COURT:  Sure.

9              MR. STEEL:  Section 21 basically says that LBI

10   will act as a prime broker, will set up accounts in Lehman

11   under your name, accept for clearance and settlements of

12   trades via your broker operate, it'll follow your investment

13   manager's instructions.

14             What this sets up is an agreement to be a

15   functional operating prime broker.  All right.  So when you

16   view this language in the light most favorable to the

17   advisor, which you're required at the sufficiency, it

18   indicates a benefit to NGA.

19             Because you've got to look at the other

20   surrounding circumstances to when Newport and Lehman entered

21   into this agreement, and what this claim that we're seeking

22   to assert involves.

23             NGA's total --

24             THE COURT:  Wait, I don't understand that.  How

25   does this -- how does what you just read to me indicate that

Page 104

1    this is for the benefit of the claimant?

2              MR. STEEL:  Yeah, because the investment manager

3    is responsible for the fund's investment decisions and

4    operations, okay.

5              THE COURT:  Right.

6              MR. STEEL:  So they naturally would benefit from a

7    functioning operable prime broker.  So the claim is all

8    predicated that Lehman breached this agreement.  All right.

9              In the weeks leading up to Lehman's failure and

10   the filing of the SIPA proceeding, and the Chapter 11

11   proceedings, Newport Global advisors gave them clear

12   instructions that if they abided by --

13             THE COURT:  Okay.

14             MR. STEEL:  -- if Lehman abided by Section 12 --

15             THE COURT:  Now, what did Newport -- so did

16   Newport -- did the funds -- so as a result of Lehman's not

17   following the instructions of your client, bad things

18   happened, you say, damage occurred.  Okay.

19             MR. STEEL:  Yes.  One, we believe this was willful

20   misconduct and gross negligence, and we still have not

21   received any explanation as to why those instructions were

22   not filed, when thousands upon thousands of counterparties'

23   instructions were filed during the same time frame, and even

24   post time a hundred ten thousand.

25             THE COURT:  And when was the time frame?

Page 105

1          MR. STEEL:  Well, it was the week before Lehman

2     filed.

3          THE COURT:  They had a few things going on.

4          MR. STEEL:  I appreciate that, most definitely.

5     But that's why I bring up the 110,000 similar accounts that

6     were --

7          THE COURT:  Yes.

8          MR. STEEL:  -- transferred post filing.

9          THE COURT:  Okay.  But here's my question.  My

10    question is, the funds, have they filed claims against

11    Lehman?

12         MR. STEEL:  Yes, Your Honor.

13         THE COURT:  Okay.

14         MR. STEEL:  And they're still pending five and a

15    half years later, we have not even received any --

16         THE COURT:  Well --

17         MR. STEEL:  -- objections to those claims --

18         THE COURT:  But --

19         MR. STEEL:  -- or any distribution on.

20         THE COURT:  But the funds are asserting their

21    claims against Lehman.  Lehman, you didn't follow the

22    instructions of my investment advisor, and you owe me money,

23    right?

24         MR. STEEL:  Yes.

25         THE COURT:  That has nothing to do with that.

Page 106

1                    MR. STEEL:  Those are --

2                    THE COURT:  Right?

3                    MR. STEEL:  Yes, those are separate claims.

4                    THE COURT:  Those are separate claims.  Are they

5     asserting claims over against you?

6                    MR. STEEL:  Are the funds --

7                    THE COURT:  Are the funds asserting claims against

8     your client because Lehman didn't follow your instructions?

9                    MR. STEEL:  No.  The funds have --

10                   THE COURT:  No.

11                   MR. STEEL:  -- filed separate claims for the loss

12    of the value of the securities --

13                   THE COURT:  Right.

14                   MR. STEEL:  -- for them not being returned because

15    of the breach --

16                   THE COURT:  Right.

17                   MR. STEEL:  -- of the agreement --

18                   THE COURT:  Right.

19                   MR. STEEL:  -- as it pertains to the funds.

20                   THE COURT:  And you're saying, Lehman, because my

21    clients lost value, I lost money.

22                   MR. STEEL:  Well, I'm saying the natural and

23    probable and direct result to them failing as a prime broker

24    was the lack of access to the security portfolio managed by

25    the investment manager, which is completely tied to what the

Page 107

1   percentage proportion management fee is, on a resulting

2   basis.

3          THE COURT:  Right.

4          MR. STEEL:  So you took the year before Lehman

5   failed --

6          THE COURT:  Oh, I understand.

7          MR. STEEL:  -- and you take the portfolio --

8          THE COURT:  I understand the math, I'm still

9   trying to understand -- you know, I'm reading the words, but

10  I'm still trying to understand why you believed that this

11  confers on the advisor third party beneficiary rights, as

12  opposed to simply stating LBI's undertaking to provide prime

13  brokerage services.  They're agreeing to be the broker,

14  they're agreeing to do what they're asked.  They're not

15  agreeing to be held responsible for -- to the advisor.

16         MR. STEEL:  Well, it's our position that that's

17  the natural result and given the underlying facts and the

18  questions of fact about the relationship between Newport and

19  Lehman, that we set forth in detail in the May declaration,

20  that's why, Your Honor, I don't believe it's sufficient at

21  this stage to rule as a judgment on the pleadings.

22         If you look at the May declaration, in combination

23  with the prime brokerage agreement, you see an extremely

24  unique relationship.  All right.  This is just not your

25  ordinary prime brokerage customer.

Page 108

1           Lehman and Newport were so intertwined, you could

2      almost say that Lehman was imbedded in Newport as the back

3      office.  And the big point why we think we can definitely

4      satisfy the test of third party beneficiary, deals with a

5      lot of the pre contract and behavior between the parties.

6           Before Lehman and Newport entered into the prime

7      brokerage agreement, Lehman actively sought to advance and

8      benefit NGA, the investment manager's interest.  They went

9      into investor meetings, hand-in-hand, and said, potential

10     investors, we're the backbone of Newport's operations, we're

11     the back office for Newport, and the manager is going to

12     benefit from us being such an efficient and smooth prime

13     broker.  They're going to get a management fee based on a

14     proportion of the securities being -- the value of the

15     securities being held in the prime brokerage account, the

16     Lehman accounts.

17          So that was straight up, presented to the

18     investment community, and Lehman, it's our position, set

19     forth uncontroverted May declaration.  We raise an issue of

20     fact, a bunch of questions of fact, whether Lehman intended

21     to benefit the investment manager under the prime brokerage

22     agreement.

23          THE COURT:  But you then -- so you have this

24     situation, but then you execute documents that are

25     completely standard, they look like, not negotiated at all,

1     and nothing is said about any of that.  There's no

2     acknowledgement, there's no provision, there's nothing.

3     It's just a standard brokerage agreement.

4              MR. STEEL:  But, Your Honor, it raises another

5     question of fact, and this is our point here why this is not

6     appropriate at an sufficiency stage to rule on a motion to

7     dismiss judgment for the pleadings, because then you look at

8     the course of dealing under the contract, the operations

9     between Lehman, clear trades, and sent trade confirmations

10    to the investment advisor.  They were on the phone with the

11    investment advisor.

12             For all extents and purposes, Lehman dealt

13    exclusively with the investment advisor on --

14             THE COURT:  Isn't that the way it works, though?

15             MR. STEEL:  Well, that lends itself to saying that

16    they were also --

17             THE COURT:  No, it doesn't, it --

18             MR. STEEL:  -- aware that there was a benefit.

19             THE COURT:  -- lends itself to saying that that's

20    the way it works, that the investment advisor is doing its

21    job.  It's making -- it's giving instructions with respect

22    to its clients' accounts, and that it's acting on behalf of

23    its clients' accounts, and it's dealing, it's interfacing

24    with the broker, and it's essentially being a conduit for

25    those instructions.

1          MR. STEEL:  Well, that's our point, it's a natural

2   and probable result, and when your broker stops functioning

3   and doesn't abide by your instructions, and you lose access

4   to your securities, and the result is that corporate events

5   occur, and you're not able to participate --

6          THE COURT:  And the fund --

7          MR. STEEL:  Has a claim for that.

8          THE COURT:  -- had a claim.

9          MR. STEEL:  That's true.

10         THE COURT:  Right.  And because you've lost money,

11  because the value of the fund went south, why should that be

12  something that Lehman's responsible for, whether they acted

13  -- unless they directly, intentionally did something to harm

14  you by violating a provision of the contract that directly

15  deals with you?

16         MR. STEEL:  That's our position, they were aware

17  of the management fee, they promoted it to third parties,

18  they breached the agreement by gross negligence or willful

19  misconduct by failing to abide by clear instructions to

20  transfer the securities out of the Lehman morass.

21  Thereafter, they did not transfer post filing.  They didn't

22  abide by any corporate --

23         THE COURT:  So if all of that -- if I agree with

24  any or all of that, then if you -- and you say we're in this

25  contract as if we were a party, right.

Page 111

1             MR. STEEL:  That's --

2             THE COURT:  Then you run into the limitation on

3    incidental and consequential damages.

4             MR. STEEL:  Well, again, Your Honor, that's -- all

5    the case law says that that's a question of fact that's not

6    lending itself readily to judgment on the pleadings.

7             THE COURT:  Well, it's a question of fact whether

8    -- how much they are, but it's not a question of fact that

9    what you allege is identifiable as a consequential damage,

10   which is by the terms of the contract barred.  The question

11   of fact is how much of the consequential damages are they.

12            You're trying to convince me that whether or not

13   something is a consequential damage.

14            MR. STEEL:  Yes.

15            THE COURT:  Right?

16            MR. STEEL:  Yes, Your Honor, I'm trying to

17   convince you --

18            THE COURT:  Is a question of fact.

19            MR. STEEL:  Yeah.  Two things I'm trying to

20   convince you.

21            THE COURT:  Okay.

22            MR. STEEL:  One, we're alleging direct damages;

23   and two, that any limitation on liability in the prime

24   brokerage agreement is inapplicable and unenforceable

25   against the manager.

Page 112

```
 1              THE COURT:  Because?

 2              MR. STEEL:  Both, I submit, are questions of fact.

 3    The latter, it's unenforceable because Lehman committed

 4    willful misconduct and gross negligence that directly

 5    harmed.  I mean, we've submitted uncontroverted sufficient

 6    facts in the May declaration that says that they failed to

 7    abide by clear instructions in breach of the agreement.  I

 8    submit that that was intentional and reckless.

 9              And I think it's uncontroverted at this stage in

10    the litigation.  And I think that limitation of liability

11    clause which are disfavored and closely scrutinized under

12    these set of facts cannot be the basis to dismiss our claims

13    on a 12(b)(6).

14              On the direct damages point, the Biotronic case

15    that we cite to and also Lehman cites to, rejects a Bright-

16    Line rule saying this is consequential damages as compared

17    to direct damages.  It goes through that in quite length.

18              I don't believe that we can set forth claims like

19    the Vibra (ph) case that Lehman also relies on, where we're

20    just saying we lost an opportunity to set resale stuff, or

21    get replacement value for some goods.

22              We submit that the failure to transfer the

23    securities into a safe harbor, and then shutting us out, and

24    putting us in the dark, and allowing us not to access them,

25    so they just atrophied directly and probably resulted in the
```

Page 113

1    decrease in the management fees.  It's straight math.

2            THE COURT:  And so if I were to agree with you on

3    all of that, then I should also agree with you that the fact

4    that you weren't able to enter into a transaction is

5    Lehman's -- is something that's on Lehman, that Lehman owes

6    your client $70 million because after the world came to an

7    end on September 15th, 2008, some transaction didn't come

8    together, and that was something that Lehman intended by its

9    entering into the prime brokerage agreement to promise you?

10           MR. STEEL:  They promised to abide by the

11   instructions with respect to this.

12           THE COURT:  And then all consequential damages

13   flowing from that, they're responsible for, including the

14   fact that you weren't able to consummate some transaction

15   that you've been working on for a couple of years before

16   then.

17           MR. STEEL:  Again, our position is it's not a

18   consequential damage, it's a direct damage because what

19   would the fund in the M&A transaction being offered to sell.

20   Their security portfolio, without access to security

21   portfolio, there's no opportunity to (indiscernible)

22   transaction.

23           THE COURT:  What do you think the difference is

24   between a direct damage and a consequential damage?

25           MR. STEEL:  Well, direct damage is of a natural

Page 114

1     and probable result of the breach.

2               THE COURT:  And what's a consequential damage?

3               MR. STEEL:  Well, they'd have to -- you'd have to

4     take it a step further to see if there was a separate

5     collateral sort of a resale opportunity.

6               So I think it's triggered automatically --

7               THE COURT:  Isn't it true --

8               MR. STEEL:  -- by the lack of access to

9     securities.

10              THE COURT:  -- that your clients have -- are the

11    ones who have the direct damage, and everything else is

12    consequential?  A direct damage is what happened to the

13    securities in your clients' account, because Lehman failed

14    to follow the instruction.  Everything else is

15    consequential, I think.

16              I don't -- I'm not hearing a crisp distinction

17    between direct and consequential in your view of damages.

18              MR. STEEL:  Our position is it's still a question

19    of fact that the records should be built as opposed to just

20    judgment on the pleadings, because I think there is a

21    question of fact whether the direct and probable

22    consequences of freezing our clients out from their

23    securities portfolios automatically triggered the reduction

24    in the management fee, and the loss of them, and any

25    opportunity which both were well aware to Lehman.

1          And the only reason they were not consummated was

2     because Lehman's willful misconduct.

3          THE COURT:  So do you think that Lehman had other

4     agreements that look like this?

5          MR. STEEL:  I'm sure they did.

6          THE COURT:  Right.  So do you think that every

7     investment advisor who finds himself in this situation then,

8     I have to give them an allowed claim?  No?

9          MR. STEEL:  Not at all, Your Honor.  That that was

10    the purposes of us submitting the May declaration to show

11    what a unique relationship that Lehman was well aware and

12    promoted this particular investment manager as a third party

13    beneficiary.

14          I think we set forth uncontroverted facts to that

15    effect, and in the cases that were cited to Your Honor, Your

16    Honor is allowed to consider those surrounding

17    circumstances.  And right now, this is a sufficiency

18    hearing.  That was the first thing that Mr. Turner said in

19    -- over and over, the road map really -- what you asked me

20    to address at first was -- raised question after question of

21    fact, and it's not appropriate for judgment on the pleadings

22    at this time in a sufficiency hearing.

23          I mean, we're still trying to figure out and drill

24    down what was the intent to NGA leading up to the contract.

25    What's the intent to NGA subsumed in the contract.  What was

the intent to benefit NGA in connection with the course of dealing of the contract, so.

THE COURT: But Mr. Smith's argument is that you don't -- I don't need to get to intent, because I can leave the contract and I can see nothing within the four corners of the contract that remotely indicates anything that makes the advisor a third party beneficiary of the contract. Nothing.

MR. STEEL: And I think that's contrary to the cases that I cited, the four cases --

THE COURT: Okay.

MR. STEEL: -- which didn't look solely to the contracts.

THE COURT: Okay.

MR. STEEL: And determined on whether it's ambiguous or not. And I also think within the four walls of the contract, that Section 21 supports our position --

THE COURT: Okay.

MR. STEEL: -- when you look at the surrounding circumstances.

THE COURT: Okay. Thank you very much.

MR. STEEL: Thank you, Your Honor.

THE COURT: Any reply? Mr. Smith?

MR. SMITH: I know you have a full courtroom, I'll pass on the reply.

```
 1              THE COURT:  Okay.  All right.  We'll get back to

 2    you, thank you very much.

 3              MR. SMITH:  Thank you, Judge.

 4              THE COURT:  Thank you.  All right.  So should we

 5    revert to the 77, the distributed action, and then I know I

 6    have folks waiting for a conference as well.  And, Ms.

 7    Marcus, I think that's it, is it not?

 8              MS. MARCUS:  That's correct.

 9              THE COURT:  Have we reached détente?

10              MR. BOCOUZZI:  Unfortunately, I don't think so,

11    Your Honor.  They could add their gloss, but we would -- we

12    thought we could get to the concerns that Your Honor had

13    raised, and really be an efficient way to deal with

14    everything, was to do a concurrent briefing of the motions

15    to dismiss, and the motion for class certification.

16              The discovery from class cert could inform both

17    ways really, help the Court --

18              THE COURT:  Uh-huh.

19              MR. BOCOUZZI:  -- deal with what, if anything, you

20    could certify or needed to, or what was left in the case.

21    And also we were prepared to say, and if there's a concern

22    about people jumping out of the weeds, put in the order that

23    the defense side is limited to X number of briefs, which we

24    also think answers any concerns about self-governance.

25              Someone reminded that Judge Gerber in the Lyondell
```

Page 118

```
 1   case is letting the defendant self-govern in that case.  But

 2   Lehman doesn't want to do that.  So I think we're just left

 3   now with -- we're happy to turn in another proposed order

 4   that would track the things I'm saying and leave it to Your

 5   Honor to decide that.  But that's the status after the hall

 6   visit.

 7              THE COURT:  And why don't I hear from Mr.

 8   Defilippo.

 9              MR. DEFILIPPO:  Thank you, Your Honor, Paul

10   Defilippo for the plaintiff.

11              On the parallel track issue, Your Honor, if you

12   remember the Ballyrock decision actually involved a motion

13   to dismiss that was denied.  And our pleading here pleads

14   the flip clause ipso facto claim almost exactly the way it

15   was pled in Ballyrock.

16              So if Your Honor is, in fact, going to follow

17   Judge Peck's decisions, then there's no reason to have a

18   motion to dismiss on the ipso facto clause.  We've plead it

19   the same way we've done it already, unless the objective is

20   to give the defendants a chance to seek interlocutory

21   appeal, which you may also recall was denied in Ballyrock.

22   But that's not to say they're not willing to try it again.

23              And that gets us back to the whole fragmented

24   litigation problem, if we go that route.  So that's why we

25   don't think parallel tracking the merits determinations and
```

1    the class issues are necessarily a good idea.

2            With respect to the other allegedly dispositive

3    issues, Your Honor's instincts we think were correct

4    initially when you said anybody who thinks they have good

5    cause to step out of line can raise their hand, send me a

6    letter and if they do, in fact, I'll give them the

7    opportunity.  Why doesn't that work?  We think it works

8    perfectly.

9            The mediators who are conducting the ADR process

10   are experienced lawyers, and some of them are former judges.

11   They are hearing the arguments that would be raised on

12   motions to dismiss in the process of mediating the cases.

13   And when people get the feedback from the mediators, they

14   have, you know, shown the willingness to settle that we are

15   here to promote.  And that's another reason we think taking

16   those issues away from the mediators doesn't make sense at

17   this point.

18           THE COURT:  I have to say, I'm really inclined to

19   go the class certification route first.  I think there's a

20   reasonable basis for doing it.  I think it's the most

21   efficient overall.  I think it's the least costly overall.

22   I think that if there emerges something that is unique that

23   you believe merits what we've been calling stepping out of

24   line, I'll hear it, I'll read it, and I'll decide.

25           But I see no -- I don't even see the tunnel by

Page 120

```
1    starting with a series of 12(b)(6) motions.  I just -- I'm

2    very concerned with due process, but I'm also very concerned

3    with efficient process.  And I think the best way to address

4    everybody's concerns is to deal with the class first, and in

5    the process of that, I think there will be some natural

6    sorting and movement towards narrowing, and then we can take

7    up the 12(b)(6) promptly after we get to the end of that.

8            I really don't see why the class certification

9    given how well organized a substantial group is, and how

10   well organized generally this matter is, should take as long

11   -- should take six months.  Maybe I'm just being overly

12   aggressive or overly optimistic.  I just don't believe it

13   should take that long.  And I think that going the 12(b)(6)

14   route, multiple iterations will take much longer and will

15   create a lot of difficulties.

16           It will -- I will end up having to sort these

17   actions into lots of different little buckets, and I just

18   see that as something that is not going to promote the

19   efficient resolution of the case.

20           So what I would suggest you do is get back

21   together and look at the order and add language that -- I

22   want personal jurisdiction claims to be able to proceed.

23   They're in a separate category, and I want there to be an

24   ability to raise other unique and uniquely dispositive type

25   issues in the nature of a letter request, requesting a pre-
```

```
1     motion conference, and I can consider them that way.

2              MR. DEFILIPPO:  Yes, Your Honor.

3              THE COURT:  Now, do I have to deal anymore

4     specifically with the liaison counsel issue?

5              MR. BLOCKER:  Well, Judge, can we be heard on

6     that?

7              THE COURT:  Sure.

8              MR. BLOCKER:  I'm Mark Blocker from Sidley Austin

9     in Chicago, and I'm going to speak to the liaison counsel

10    issue, as well as the other issues that Mr. Defilippo

11    raised, if you have any interest in hearing about them.

12             Let me just start with an overview here.  What

13    Lehman wants by using Lehman -- liaison and executive

14    counsel is to have each grouping of defendants designate

15    people who would serve on the executive committee, and then

16    a liaison counsel who would essentially be the only person

17    who would be allowed to participate in various phases.

18             So their proposal is that a liaison counsel would

19    be the only one to participate in, for example, class

20    certification discovery.

21             We think that that proposal is truly

22    extraordinarily -- it's extraordinary and it's

23    unprecedented, and we would ask the Court to reject that and

24    allow us to self-govern.

25             If you're counting cases here, Judge, the only
```

Page 122

1    case they have where there was any use of this in the

2    context of a defendant class action --

3              THE COURT:  Uh-huh.

4              MR. BLOCKER:  -- and we understand, in the context

5    of a plaintiff's class action, it's much more common to have

6    that.  But the reason that it's done in the plaintiff's

7    class action is usually is what you have is warring camps of

8    plaintiff's class action lawyers.

9              THE COURT:  Right.

10             MR. BLOCKER:  And there has to be some semblance

11   of order to that.

12             Look at the back of the room.  There's -- we have

13   the lawyers for 77 defendants who filed a single brief.  We

14   are not warring.  We are already in the process --

15             THE COURT:  You're singing Kumbaya, it's

16   wonderful.

17             MR. BLOCKER:  We are already self-governing, Your

18   Honor.  And so the expression a picture speaks a thousand

19   words, this picture speaks a thousand words.  We can self-

20   govern.  We do not need a liaison or executive committee

21   structure, for which we think there's no precedent in the

22   defendant class action context.

23             But let me address the Tribune case, because

24   that's really the only case that the plaintiffs had, but if

25   you look at --

1          THE COURT:  Well, let me suggest this --

2          MR. BLOCKER:  Uh-huh.

3          THE COURT:  -- I agree with you.

4          MR. BLOCKER:  Okay.

5          THE COURT:  Okay.

6          MR. BLOCKER:  And I'll shut up.

7          THE COURT:  Okay.  So why don't we, as we're

8     tweaking the order --

9          MR. BLOCKER:  Uh-huh.

10         THE COURT:  -- why don't we agree that you're

11    going to self-govern unless the debtor, you know, raises his

12    hand and steps out of line and says that the self-governance

13    is not working and asks me to revisit it, you know, for

14    something like Clause Joe (ph).

15         MR. BLOCKER:  That makes sense to us.

16         THE COURT:  If the self-governance falls apart and

17    doesn't work, then they should have the ability to come to

18    me and say they didn't speak truthfully or it has or they

19    did speak truthfully, but it just has fallen apart.

20         I mean, it may well be that at this stage, you're

21    all able to get along and self-govern, but that perhaps

22    parties' interest will diverge and something else will

23    happen.  And then they ought to be able to revisit it.  But

24    I think if you continue to conduct yourselves the way you

25    have leading up to today, then they should be happy.

Page 124

1          MR. BLOCKER:  Okay.  Thank you, Your Honor.

2          THE COURT:  Is that acceptable?

3          UNIDENTIFIED:  Yes, Your Honor.

4          MR. SCHAFFER:  Your Honor, Eric Schaffer.

5          THE COURT:  Yes.

6          MR. SCHAFFER:  I --

7          THE COURT:  You're wearing your distributed hat?

8          MR. SCHAFFER:  I don't want to interfere.

9          MR. BLOCKER:  No, go ahead.  I have two other

10   issues I wanted to raise, Your Honor.

11          THE COURT:  Okay.  You're rising with your

12   distributed hat now, right?

13          MR. SCHAFFER:  Yes, yes.

14          THE COURT:  Okay.

15          MR. SCHAFFER:  But I'm here, Your Honor, just with

16   regard to the group of five trustees --

17          THE COURT:  Okay.

18          MR. SCHAFFER:  -- that I referenced before.  We

19   have two that I would call housekeeping issues.  One is that

20   we've objected that any scheduling order should provide that

21   the trustees need not have any involvement in class action

22   issues.

23          Now, I heard plaintiff say, well, you have to

24   participate in discovery, and we certainly agree with that.

25   We think an order should make clear that because we are not

Page 125

1   part of any punitive class, that we simply participate in

2   discovery.  We'll respond to requests, but we don't have to

3   otherwise --

4           THE COURT:  I think that that was the intent.

5           UNIDENTIFIED:  Yes, Your Honor.

6           THE COURT:  Okay.

7           MR. SCHAFFER:  And the one other point we had is

8   that no opinions or orders on any class action issues should

9   have any preclusive effects on any of the trustee's claims

10  or defenses.

11          Now there I heard counsel saying, no, no, you're

12  going to try and have a second bite at the apple.  My

13  response to that is, we're not implicated in any of the

14  class action issues, so we shouldn't have to spend a lot of

15  time and money on issues that really just affect the 77 and

16  others who stand with them.

17          THE COURT:  Okay.  I agree with both things that

18  you said, but I'm not clear on why the first part of it

19  doesn't give you a hypothetical second bite at the apple.

20  You're a trustee, so you're in a different position, right.

21  So -- say the first thing that you said again, Mr. Schaffer,

22  the first part of it.

23          MR. SCHAFFER:  The question is, if you enter an

24  order in connection with the class action issues, should we

25  be bound in any way.  And to the extent that you're dealing

Page 126

1   with issues that relate solely to the noteholders --

2           THE COURT:  Right.

3           MR. SCHAFFER:  -- then it follows we ought not to

4   be bound.  And while that seems self-obvious to me, I hear

5   plaintiff saying, oh, no, anything that's been covered in

6   any form in connection with the class action --

7           THE COURT:  But what you're saying is, that it's

8   going to be an empty set, nothing.

9           MR. SCHAFFER:  Yes.  Yes.

10          THE COURT:  Right?

11          MR. SCHAFFER:  Yes.

12          THE COURT:  So if it's in fact an empty set then

13  it doesn't matter.

14          MR. DEFILIPPO:  That's correct, Your Honor, but if

15  you do make a determination that has substantive --

16          THE COURT:  How -- yeah, I'm just trying to

17  picture something that's not an empty set on this issue.

18  Some substantive determination that you would want to and

19  that the trustees would properly be bound by.  And I'm --

20          MR. DEFILIPPO:  You give them warning in advance,

21  that they have the chance to participate.

22          THE COURT:  Yes.  So --

23          MR. SCHAFFER:  Your Honor, I think that works.

24          THE COURT:  -- that works?

25          MR. SCHAFFER:  If they raise their hands and say,

1    we're now going to try and bound you with something --

2              THE COURT:  Good.

3              MR. SCHAFFER:  -- then we're on notice.

4              THE COURT:  Okay.  Excellent.

5              MR. SCHAFFER:  Thank you.

6              THE COURT:  Okay.

7              MR. BLOCKER:  Judge, I just wanted to touch on a

8    couple of other items, about which there are disputes

9    between the two orders, and you can provide guidance and

10   we'll work with Lehman --

11             THE COURT:  Okay.

12             MR. BLOCKER:  -- to implement whatever Your Honor

13   decides.

14             But one issue that we've -- there is agreement and

15   disagreement as to whether to lift the ADR stay so that all

16   defendants can participate in the litigation.  And I think I

17   can summarize the positions of the parties essentially as

18   follows.

19             Lehman's position is, they agree the ADR stay

20   should be lifted, but only on an as-needed basis, and we

21   don't know what that means, and we think that will lead to

22   satellite litigation.

23             What we think is appropriate is if this is going

24   to become real litigation, if we're going to start working

25   on issues like class certifications and motions to dismiss,

Page 128

1    the defendant should be able to freely participate without

2    having to make some petition or have some further ruling

3    about whether the ADR stay applies.

4            So our proposal and our order, Your Honor, was to

5    have the ADR stay lifted, so that defendants can participate

6    in every phase of the litigation without exception, without

7    any further guidance from Lehman.

8            THE COURT:  Well, I actually wanted to talk about

9    this particular aspect of it, because I didn't understand

10   how it is that certain of the defendants aren't prejudiced.

11           I -- in my mind, you were going to do both.  But I

12   have -- I think I have a lack of an understanding on how

13   exactly this was going to work.  I have to say if the next

14   thing you were going to talk about is the confidentiality --

15           MR. BLOCKER:  Yes.

16           THE COURT:  -- I think the confidentiality should

17   stay in place.

18           MR. BLOCKER:  Okay.  Well, can I make my pitch on

19   that --

20           THE COURT:  Okay.

21           MR. BLOCKER:  -- and see if I can change your

22   mind?  But first of all on the first point, Your Honor,

23   about letting defendants freely participate.

24           What we understand Lehman to be meaning is they

25   will make applications periodically to lift the stay for

Page 129

1   whenever they see fit, in order to allow whatever defendants

2   they think are appropriate to participate in the ADR stay.

3   We just don't think we should have to go through that

4   process.  We just want --

5           THE COURT:  Well, I'm not understanding this.  I

6   thought I'd been doing pretty well understanding everything

7   that you folks were saying.

8           MR. BLOCKER:  Well, maybe you should ask Lehman

9   then what it has in mind.

10          THE COURT:  But can you explain this to me, I

11  don't understand.

12          MR. DEFILIPPO:  Mr. Slack is going to.

13          THE COURT:  Okay.  Thank you.  How are you?

14          MR. SLACK:  Hi.  Richard Slack from Weil Gotshal.

15          THE COURT:  So help me out, Mr. Slack.  I don't

16  understand the lifting the stay --

17          MR. SLACK:  The interplay between the AD -- yes.

18          THE COURT:  Yeah.

19          MR. SLACK:  Let me try and explain what we were

20  doing in our order, and how the two interrelate.  And I

21  think it works actually really, really well.

22          THE COURT:  But up till now everything's --

23  there's been a stay.  So it wasn't an issue.

24          MR. SLACK:  That's right, it hasn't been an issue.

25          THE COURT:  Right.

1          MR. SLACK:  There's been -- well, there's been --

2     there's actually two separate --

3          THE COURT:  Two stays, right.

4          MR. SLACK:  -- stays in place.  One if the ADR

5     stay.

6          THE COURT:  Right.

7          MR. SLACK:  And the other is the avoidance action

8     stay.

9          THE COURT:  Right.  So we're coming to the end of

10    the avoidance action stay.

11         MR. SLACK:  That's correct.

12         THE COURT:  Right, okay.

13         MR. SLACK:  So the ADR stay essentially says that

14    when you're in this ADR process, that litigation is stayed,

15    it allows the parties essentially to go through the ADR

16    process without having -- without litigating with each

17    other --

18         THE COURT:  Right.

19         MR. SLACK:  -- as you go.  And it's obviously been

20    very effective and --

21         THE COURT:  Right.

22         MR. SLACK:  -- for both parties, neither party has

23    to spend money --

24         THE COURT:  Okay.

25         MR. SLACK:  -- essentially litigating with each

Page 131

1    other.

2            THE COURT:  Right.

3            MR. SLACK:  So how this would work in --

4            THE COURT:  In a non-stayed world.

5            MR. SLACK:  In a non-stayed world --

6            THE COURT:  Right.

7            MR. SLACK:  -- let's say that you had a defendant

8    that was in ADR, but also a defendant in this action.

9            THE COURT:  Right.

10           MR. SLACK:  The way we set it up and I think the

11   way the order it sounds like Your Honor is going to issue

12   it, is that class cert is going to go first.

13           THE COURT:  Right.

14           MR. SLACK:  So what we would propose doing is

15   still having the ADR stay in place, but having it lift with

16   respect to the class cert issues --

17           THE COURT:  Okay.

18           MR. SLACK:  -- while they were going on.

19           THE COURT:  Right.

20           MR. SLACK:  So that everybody under your order --

21           THE COURT:  Yes.

22           MR. SLACK:  -- that you do, could -- everybody, no

23   matter who it is, and no matter if they're in ADR or not --

24           THE COURT:  Right.

25           MR. SLACK:  Could participate in the class cert.

Page 132

1            And then, Your Honor, this is a little different.

2    This is what you came up with today.  Let's assume that

3    somebody comes in, they're in ADR, they raise their hand and

4    they say, there's something different about us, Your Honor,

5    and we want to have a separate motion.

6            In that kind of a circumstance, Your Honor

7    would --

8            THE COURT:  On a one-off basis lift the -- could,

9    could.

10            MR. SLACK:  I mean, you could also take into

11    account, for example, well maybe what you should do is

12    finish the ADR --

13            THE COURT:  Right.

14            MR. SLACK:  -- and then raise your hand --

15            THE COURT:  Okay.

16            MR. SLACK:  -- in a month or two or whenever --

17            THE COURT:  Right.

18            MR. SLACK:  -- it is when the ADR is up, but that

19    would be up to Your Honor.

20            THE COURT:  So what I would characterize --

21            MR. SLACK:  But in that --

22            THE COURT:  -- this as the best of both worlds'

23    proposal, right?  That you're saying, there's not going to

24    be prejudice to those who are in the ADR process, you still

25    get the benefit of the possibility of getting out to ADR --

```
1              MR. SLACK:  Yes.

2              THE COURT:  -- but your rights aren't being

3    prejudiced, and you're only being asked to litigate for the

4    phase that we're in.  It's limited to the phase that we're

5    in, so that --

6              MR. SLACK:  Exactly.

7              THE COURT:  -- that's what I thought we were going

8    to do.

9              MR. SLACK:  So that's exactly right.  And I would

10   say this, if there's ever a time, Your Honor, where somebody

11   actually feels prejudiced by the ADR stay, they think it

12   hasn't been lifted appropriately, they can always come to

13   Your Honor, I don't think --

14             THE COURT:  But the effect of the -- what I'm --

15   the way you've described it, which is the way I was thinking

16   about it, is that effectively, the ADR stay has been lifted

17   is not in place for the purpose of participating --

18             MR. SLACK:  That's right.

19             THE COURT:  -- in the phase one.  And ADR is --

20             MR. SLACK:  That's right.

21             THE COURT:  -- still continuing to go along.

22             MR. SLACK:  That's absolutely right, Your Honor.

23             THE COURT:  So.

24             MR. SLACK:  That's exactly the way we proposed it.

25   And as your scheduling order, if you're phase two, however
```

Page 134

1    you want to call it says we're going to have any kind -- you

2    know, certain motions, the ADR stay would lift with respect

3    to phase two.

4            THE COURT:  Sure, it would have to.

5            MR. SLACK:  That's right.

6            THE COURT:  It would have to.  So --

7            MR. SLACK:  But it's just going to lift as you're

8    going.

9            THE COURT:  So --

10           MR. SLACK:  So I'm done explaining.

11           THE COURT:  That doesn't make you happy.  So tell

12   me why.

13           MR. BLOCKER:  No.  No, Your Honor.  Because what

14   that suggests -- it would be easier and more efficient to

15   lift the stay generally so defendants can participate in

16   this litigation.  We will obviously be bound by whatever

17   order, scheduling order Your Honor enters, and whatever

18   phasing Your Honor enters it in, but there's no reason that

19   -- take the example that Mr. Slack was talking about, where

20   a defendant decides that it needs to come in and ask Your

21   Honor for something.

22           So now that defendant first needs to go to Lehman,

23   get some permission to get the ADR stay lifted, they need to

24   go to Your Honor, who has very limited hearing dates, set up

25   a hearing date to --

Page 135

1            THE COURT:  Okay.  But let's fix that.

2            MR. BLOCKER:  -- get the ADR stay lifted.

3            THE COURT:  So we can fix that.

4            MR. BLOCKER:  I can fix it.  If you lift the stay

5    entirely so we don't have to do this on a piecemeal basis,

6    that makes more sense.

7            THE COURT:  Okay.  So let me meet you halfway, all

8    right.  So you're all going to participate in what we're

9    going to define as Phase 1.  And you're all going to

10   continue to be in ADR.  If you want to do something else,

11   then in that request, it can be a combined request for

12   relief from the stay, and a request to do that thing that

13   you believe that you want to do.

14           MR. BLOCKER:  Right.  The only reason I'm

15   quibbling with Your Honor about that is, it seems wasteful

16   to have that interim step.  If a defendant believes it needs

17   to do X, whatever Your Honor is hypothesizing as X, why

18   should --

19           THE COURT:  But now we're --

20           MR. BLOCKER:  -- it have to go through the

21   process?

22           THE COURT:  Now we're getting -- now we're all

23   becoming really, really lawyers, okay.

24           MR. BLOCKER:  Yes, we are, yes.

25           THE COURT:  Okay.  We're really becoming lawyers.

Page 136

1    Because if the only thing that I'm saying that can be done

2    in the litigation, is what's going to be part of Phase 1,

3    then that's the only thing that you can do anyway, other

4    than the raise your hand procedure.

5            MR. BLOCKER:  Okay.

6            THE COURT:  So we're now arguing about nothing.

7            MR. BLOCKER:  Well --

8            THE COURT:  Another lawyer wants to convince me.

9            MR. BOCOUZZI:  Just to be an egghead lawyer, the

10   possibility, that gets the possibility and someone over at

11   that table raised it, if someone got an order and they want

12   to try to get appeal -- appeal to the district court, or

13   withdraw the reference, it seems like we're inviting --

14   unless Your Honor says that's part of the phase, otherwise

15   we're just inviting ancillary litigation for say, can I lift

16   the stay, so that I can move to withdraw the reference, or

17   for an appeal, and then get that permission --

18           THE COURT:  That's --

19           MR. BOCOUZZI:  -- and if it's not, now you're in

20   violation of the stay.

21           THE COURT:  That's not the kind of thing that I

22   was anticipating was going to happen.

23           UNIDENTIFIED:  Meaning you envisioned it being

24   outside of --

25           MR. BOCOUZZI:  (indiscernible)

Page 137

1              THE COURT:  I'm sorry?

2              MR. BOCOUZZI:  You weren't anticipating what, that

3     there'd be an attempt to appeal something, or an attempt

4     to --

5              THE COURT:  I don't understand what would give

6     rise to motions to withdraw the reference at this particular

7     point.  Now, you're making me very concerned that I'm

8     missing something because the whole point of this

9     conversation was, everybody's coordinated, we're not doing

10    things piecemeal.

11             So you're now giving me concern that you want to

12    set up that will enable you to, in fact, do things very

13    piecemeal.  So now you've lost me.

14             MR. BOCOUZZI:  It's not a proposal to make it

15    piecemeal, Your Honor, it's just trying to understand if

16    people have rights to do something, whether they have to go

17    through the initial stay procedure or just -- we're

18    participating in ADR, so it's just saying yes, everyone is

19    (indiscernible) ADR, but there's not a threshold to sort of

20    lift the stay for anything that they may deem or may be a

21    question that's not part of the protocol.

22             THE COURT:  I'm -- the stay is going to stay in

23    place, other than with respect to the participation in Phase

24    1.

25             MR. BLOCKER:  Your Honor, with respect to the

Page 138

1    confidentiality issue, I understand Your Honor's comments.

2    We'd ask you to consider the following, which is there's a

3    reason we think the confidentiality piece should be lifted

4    as well as -- the plaintiffs are seeking -- Lehman is

5    seeking to treat this as a class action, right.  They claim

6    this should be certified as a class.

7            I know of no class in which the defendants are not

8    allowed to talk among themselves about any topic that's of

9    interest to them, including settlement.  And I don't see why

10   if this case is going to be forward, it shouldn't be treated

11   like any other litigation so that defendants can talk among

12   themselves about any topic they want, including settlement.

13           THE COURT:  But I might -- I would be inclined to

14   agree with you, but when you become a class, we will revisit

15   it, and I would be very inclined to agree with you.  But for

16   right now, where what we're hoping is that there will

17   continue to be ADR resolutions, and there seems to be every

18   indication that that's been working, then I don't want to

19   take that away just yet.

20           MR. BLOCKER:  Yeah.  Your Honor, on that front, I

21   guess an observation I would make is most of the statistics

22   that Lehman's counsel talked about in terms of the ADR and

23   how successful the program has been, have almost been

24   entirely in the context of the non-distributed actions, not

25   as much success, as far as I know, in the distributed

```
 1   actions.  That's why we're here today.  That's why you've

 2   got a group of 77 defendants that are noteholders.  And so I

 3   don't think there has been that same level of success.

 4            THE COURT:  Well, but that might change now that

 5   we're moving into the post litigation stay phase and heading

 6   towards the class certification.

 7            MR. BLOCKER:  I guess that remains to be seen,

 8   Your Honor.

 9            I just want to address a couple of final issues.

10   We have proposed in our order, a number of items that we

11   thought would help the defendants organize, so that we could

12   self-govern --

13            THE COURT:  Okay.

14            MR. BLOCKER:  -- and stay organized.  And I just

15   want to tic those off for you and explain we want it, and

16   why what Lehman's proposed isn't sufficient.

17            First of all, we asked for contact information for

18   all the defendants.  Now, that sounds like a simple thing.

19   Yes, we could go to the docket, but there are about 50 or 60

20   defendants who have not appeared.  It's quite possible

21   Lehman has the lawyer contact information for those

22   defendants.  And if they do, we'd like to help bring --

23            THE COURT:  Okay.

24            MR. BLOCKER:  -- them into the group or understand

25   why they haven't appeared.
```

Page 140

1          THE COURT:  So that --

2          MR. BLOCKER:  So it seems --

3          THE COURT:  That seems like an easy one.

4          MR. BLOCKER:  Okay.  The next one is --

5          THE COURT:  Can I get a response, Mr. Slack, is

6     that your --

7          MR. SLACK:  I didn't actually hear, I --

8          THE COURT:  Contact information.

9          MR. BLOCKER:  For all defendants appearing or not

10    appearing.

11         MR. SLACK:  So I --

12         THE COURT:  You've got to come up to the mic so we

13    can record you.

14         MR. SLACK:  I'll have to talk to my client.  I

15    know that there's been -- that the people who have appeared

16    are obviously on the docket.  And so those are easy.  But

17    I'd need to talk to my client and then we can have a

18    conversation off line.

19         THE COURT:  Okay.  Well, it seems to me whatever

20    you have you ought to share with them for the sake of

21    efficiency.

22         MR. BLOCKER:  We'll talk with Lehman, given your

23    comments, Your Honor.

24         The second piece of information we thought would

25    be helpful is knowing the amounts that Lehman is seeking

Page 141

```
1    from each defendant.  Because right now, no defendants know

2    that, other than in the context of ADR.  And so it would --

3    I know of no litigation again where the defendants as a

4    group or individually are not going to be told how much is

5    being sought for each defendant.

6              And the reason that --

7              THE COURT:  You mean the amount -- you mean

8    linking up the distributee with the amount of the

9    distribution received?

10             MR. BLOCKER:  How much Lehman is seeking in

11   damages, how much they are seeking to recover from each

12   defendant in this action.  And the reason that information

13   is important, Your Honor, is one way we might decide to

14   coordinate and self-govern is by looking at the size of

15   relative exposures.  It would be useful for Lehman to

16   provide the information, so we had information about the

17   size of relative exposures, which right now we don't have

18   and can't get frankly because of the ADR.

19             THE COURT:  Because of the confidentiality?

20             MR. BLOCKER:  Yes.  Because that's the only

21   context in which we have.

22             THE COURT:  So is that the end of your list?

23             MR. BLOCKER:  No, I have three others, Your Honor.

24             THE COURT:  Okay.  Well, let me hear -- I think

25   it's better to do them one-by-one.
```

Page 142

1              MR. BLOCKER:  Sure, if you want me Mr. Slack to

2      come up, I'm happy to have him up here.

3              MR. DEFILIPPO:  I think the trustees have that

4      information on what's been distributed to the defendants,

5      Your Honor, we don't have it all.

6              MR. BLOCKER:  Judge, there's a difference between

7      what was distributed to the defendants, and what Lehman is

8      seeking out of that distribution.  So for my own client --

9              MR. DEFILIPPO:  (indiscernible)

10             MR. BLOCKER:  -- I know there's a delta between

11     those two.

12             MR. BOCOUZZI:  No, that's not true at all.

13             THE COURT:  So --

14             MR. BOCOUZZI:  No, for some of the deals, there

15     are mark-to-market issues, and I know this because I'm the

16     defendant in one of them, where the amount that was

17     distributed to my client, they're actually claiming less

18     because the way the deal was structured at the end of the

19     day when the music stopped, apart from the clause they say

20     is the flip clause, Lehman would've only been entitled to so

21     much after you value the swap and terminate it and the rest

22     of it.

23             THE COURT:  Okay.

24             MR. BOCOUZZI:  So it's not always a one-to-one

25     match.

Page 143

1            THE COURT:  Okay.

2            MR. BLOCKER:  Right.  So we can't get the

3     information from the trustees.  The table right here is the

4     only place we can get that information, so we're asking that

5     it be provided so that defendants can coordinate, so they

6     will know the relative exposure.

7            THE COURT:  So are there any confidentiality

8     issues with respect to that?  I don't think so.  I wouldn't

9     think so.

10            MR. DEFILIPPO:  We're going to have to put it in

11     the record here.

12            THE COURT:  You're going -- right.

13            MR. DEFILIPPO:  I'm not sure we know.

14            THE COURT:  Well --

15            MR. BLOCKER:  I've never heard that before, Judge.

16            THE COURT:  That -- well, that's not a good

17     answer.  That's not a good answer.  So I think that to the

18     extent that you know it, which I certainly hope you know it,

19     I think you ought to share that within some practical time

20     frame.

21            MR. BLOCKER:  And I think this goes with the same

22     -- in the same vein, Your Honor --

23            THE COURT:  And to the extent that the trustees, I

24     mean, let's you know, do a Judge Gerber sauce for the goose

25     here, right, to the extent that the trustees have a database

Page 144

1   with respect to the distributions, apart from what Lehman's

2   claiming, then that ought to be shared with everybody as

3   well, to the extent that the trustees don't assert some sort

4   of a confidentiality issue, which they might assert.

5             UNIDENTIFIED:  Your Honor, I suspect that's a non-

6   issue, because they've done discovery of us, and we've told

7   them that in almost every instance it all went to DTC.

8             MR. BLOCKER:  I mean, at the end of the day --

9             THE COURT:  Okay.

10            MR. BLOCKER:  -- we're only going to be able to

11  get it from Lehman.  But we'll take --

12            THE COURT:  Okay.

13            MR. BLOCKER:  -- Your Honor's point if there are

14  other places --

15            THE COURT:  Okay.

16            MR. BLOCKER:  -- we can get some information --

17            THE COURT:  All right.

18            MR. BLOCKER:  -- we will.

19            THE COURT:  All right.

20            MR. BLOCKER:  And the two last items, Your Honor,

21  then I promise I'm done.  One thing that we thought would be

22  helpful to organize is to have a grouping of defendants by

23  issuer, so there are 47 different transactions here.  If

24  Lehman could tell us which defendants have been involved in

25  which transactions, that would allow defendants to

Page 145

1    coordinate and present a united front and a coordinated

2    front on whatever deals are out there, and I assume there's

3    no objection to doing that.

4              MR. DEFILIPPO:  One second, please, Your Honor.

5         (Pause)

6              THE COURT:  I will add while they're whispering to

7    amuse you, that the Government and the United States for the

8    purposes of determining the workload of this court, does not

9    count this case.

10             UNIDENTIFIED:  Oh, my God, counts it as one.

11             THE COURT:  Zero.

12             UNIDENTIFIED:  Zero, doesn't it count it at all,

13   why is this?

14             THE COURT:  Why?  Because it was filed more than

15   five years ago.

16             UNIDENTIFIED:  Oh, okay.

17             MR. BLOCKER:  Duly noted, Your Honor.

18             THE COURT:  My employer, the Government of the

19   United States.

20             MR. BLOCKER:  Welcome to the Lehman case.

21             THE COURT:  Happy to be here.

22        (Pause)

23             MR. DEFILIPPO:  Your Honor, I think in combination

24   with information from the trustees, we can probably provide

25   this information.

Page 146

```
 1              THE COURT:  You can piece it together.

 2              MR. BLOCKER:  Well, okay, we are happy to consult

 3    with the trustees, too, but if Lehman --

 4              THE COURT:  But that was a yes.

 5              MR. BLOCKER:  Yes.

 6              THE COURT:  That was a yes.

 7              MR. BLOCKER:  Last item, Your Honor, is we in our

 8    order, we have proposed the creation of a document

 9    depository, so that the documents for each of the 47

10    transactions is loaded into one place, that everybody agrees

11    is complete and correct, and there's no dispute over which

12    documents they are.

13              For the last four years, Lehman has been

14    conducting discovery on its own, without any defendants, and

15    so we would like Lehman to contribute whatever it is they've

16    collected to that document depository.

17              And it seems like a small --

18              THE COURT:  And how would access to that, how

19    would that work as a practical matter?

20              MR. BLOCKER:  I think it would be worked out

21    amongst the parties in some way that would be acceptable to

22    both sides, but the idea would be, there would be one

23    database available to all of the defendants and to Lehman.

24              THE COURT:  So it strikes me as that now we're

25    going to embark on the class certification process that
```

Page 147

1    that's something that would be something logical that would

2    have to be done in any event.

3            MR. DEFILIPPO:  Yes, Your Honor, except we think

4    the only ones with the pristine complete set of documents

5    are the trustees.

6            MR. BLOCKER:  Well, that's all well and good, Your

7    Honor, but whatever they've got, they can give, and if we

8    need to negotiate or figure out if it's incomplete, that's

9    one thing.  But Lehman is sitting on a huge cache of stuff

10   they've collected over the last four years.  And it's only

11   fair and equitable that they contribute whatever it is

12   they've got to a database.

13           We'll talk with the trustees, and our proposed

14   order included a reference to getting stuff from the

15   trustees as well.  There's no reason Lehman, who's got it

16   all in one shot, as opposed to having to go eight different

17   trustees, can't give us and contribute whatever it is they

18   have.

19           THE COURT:  It seems to me you can work together

20   to do this, and that will help streamline matters.

21           MR. SCHAFFER:  Your Honor --

22           THE COURT:  Yes, Mr. Schaffer.

23           MR. SCHAFFER:  -- from the trustee perspective,

24   Eric Schaffer, in many instances what the trustees have will

25   be incomplete.  There are certain core documents that relate

Page 148

1    to the trustee, that the trustees would, of course, have,

2    but there's a lot of --

3              THE COURT:  You might not have schedules and the

4    like.

5              MR. SCHAFFER:  And there's a lot of things going

6    to how the deals were put together.  I would think that in

7    almost if not every instance Lehman would have it.  If

8    there's something where they can't find something, we're

9    certainly happy to respond to a request.  We might ask that

10   it be done pursuant to appropriate discovery, so we don't

11   have questions of whether we are acting in contravention of

12   any privacy rights.

13             THE COURT:  Right, right, okay.  Well, it seems to

14   me that you've largely prevailed on all of your points.

15             MR. BLOCKER:  Okay.  Well then, with that, I will

16   sit down, Your Honor, but thank you very much.

17             THE COURT:  Okay.  Thank you.

18             MR. LODEN:  Your Honor, if I may just address a

19   couple of issues with respect to Ja Hokkaido.  Again, it's

20   Steve Loden of Diamond McCarthy on behalf of Ja Hokkaido,

21   along with my partner, Howard Ressler.

22             I haven't risen to address the substance until

23   now, because quite honestly every time the topic came up

24   during the hearing this morning, it sounded like my position

25   got better.

1           So I -- and I understand the Court's comments

2    previously that you will allow personal jurisdiction issues

3    to go forward, in effect, us to step out of line.

4           So I -- assuming that assumption is correct, and

5    that is, in fact, what the Court is doing --

6           THE COURT:  Right.

7           MR. LODEN:  -- then I rise just to address the

8    process for us stepping out of line.  There's been

9    discussion about a letter and a request and raising your

10   hand and things like that.

11          THE COURT:  Well, I -- let's --

12          MR. LODEN:  I think we're beyond that.

13          THE COURT:  Let's simplify it.

14          MR. LODEN:  Okay.

15          THE COURT:  With respect to true matters of

16   raising lack of personal jurisdiction, you just file a

17   motion.

18          MR. LODEN:  We can do that by the end of this

19   week, Your Honor.

20          THE COURT:  Okay.  So you just file a motion, and

21   agree -- reach out to counsel for the estate, agree on a

22   briefing schedule, and call chambers and get a hearing date

23   as you would if -- as you would in the case where it was a

24   stand-alone matter.

25          MR. LODEN:  That's what we'll do, Your Honor.

Page 150

1           THE COURT:  All right.

2           MR. LODEN:  Thank you.

3           THE COURT:  Nice and simple.  Yes, Mr. Slack?

4           MR. SLACK:  May I be heard just on the ADR stay

5    portion of that, and I just wanted a clarification.  Because

6    let's say you have somebody who's been served with an ADR --

7           THE COURT:  They're not relieved from that.

8           MR. SLACK:  Well, it seems to me that the question

9    is, should a party have to go through the ADR process before

10   raising their hand and making a personal jurisdiction

11   motion.  In other words, we certainly have had in the ADR

12   process a number of parties that we've resolved where they'd

13   had personal jurisdiction issues, and we had very

14   experienced mediators, including former judges, and they

15   listened to that, and they talked to both sides, and we've

16   been able to resolve a number of those.

17          And it seems to me that rather than having a

18   blanket rule that it would just allow anybody with a

19   personal jurisdiction motion to make it, it seems to me that

20   if they are in ADR, and that ADR is not completed, it seems

21   to me that that should be able to -- they're not really

22   prejudiced for a few months while it goes through ADR.  They

23   should go through ADR and then if they want to raise their

24   hand and talk to Your Honor about a personal jurisdiction

25   motion, that makes more sense, given again, the success that

Page 151

1    we've had in ADR with counterparties, with exactly these

2    kinds of issues.

3            THE COURT:  But it just seems to me if somebody on

4    the basis of lack of personal jurisdiction wants to get a

5    determination, that they ought to be able to get a

6    determination.  I mean, how many -- again, it's all a

7    question of size.  How many folks are we talking about?

8            MR. SLACK:  You know, it could be dozens who think

9    they have -- you know, for -- you know, there's a number of

10   foreign entities and foreign holders.  And you could dozens

11   and dozens of motions from foreign holders.  I don't know

12   exactly how many, somebody may, I don't, but it's going to

13   be dozens and dozens of people who are foreign who now

14   rather than going through ADR and trying to settle these --

15           THE COURT:  Well --

16           MR. SLACK:  -- and again, we settled a lot of

17   these are able just to file a motion.

18           THE COURT:  Are there dozens in the 77, are there

19   dozens?

20           MR. LODEN:  Your Honor, I can address that

21   partially.  When we were contemplating what to do with

22   respect to my client's issues, personal jurisdiction issues,

23   we sought to line up me toos, because we thought we would

24   have a bigger voice if we came in with people behind us.

25   And we called many of the foreign defendants that Mr. Slack

1    is referencing on the docket, and none of them wanted to

2    join in our current motion.

3              So we -- as far as our efforts, we are the only

4    ones.

5              THE COURT:  All right.  So then they can make

6    their motion and everybody else is going to stay in ADR

7    until they're not.  And then they can ask to get out of it.

8              MR. SLACK:  So can we just instead of making a

9    rule, since it sounds like it's not what I'm hearing from

10   Mr. Loden, is this isn't going to be a global issue, let's

11   just make -- let's just allow --

12             THE COURT:  You're here --

13             MR. SLACK:  -- Mr. Loden's client --

14             MR. LODEN:  Well, it's even more simple than that,

15   Your Honor.

16             THE COURT:  You're here, I'm giving you the

17   relief.

18             MR. LODEN:  It's even more simple than that, we

19   have an application on file if the Court --

20             THE COURT:  Now, don't tell me you're a me too?

21             MR. GOTTFRIED:  I am, Your Honor.  I am --

22             MR. LODEN:  We've looked, Your Honor, I promise we

23   looked.

24             MR. GOTTFRIED:  Your Honor, Andrew Gottfried,

25   Morgan Lewis representing Deutsche Hypotheka Und Arts Blanc

Page 153

1    (ph).  We are a me too.  We had a personal --

2              THE COURT:  Are you in ADR?

3              MR. GOTTFRIED:  Excuse me?

4              THE COURT:  Are you in ADR?

5              MR. GOTTFRIED:  Yes, we are.  And we have also

6    been the beneficiary of this stay for three and a half

7    years, and we think we should have our opportunity to make a

8    motion to dismiss.  The speed of ADR is very much controlled

9    by Lehman, as to how they schedule these matters.

10             THE COURT:  How long have you been in ADR?

11             MR. GOTTFRIED:  I believe since March, we started

12   the process, we're still exchanging documents.  We don't

13   know when we're going to have an actual mediation in the

14   matter.  We don't have a schedule for that.

15             THE COURT:  Well, what's the typical life cycle of

16   an ADR?  I mean, I'm beginning to feel that --

17             MR. GOTTFRIED:  I don't know the answer, I can't

18   answer what a typical life --

19             THE COURT:  Well, let's ask Mr. Slack.

20             MR. SLACK:  So there's not a one size fits all,

21   but generally you exchange pleadings.  Once the pleadings

22   are in, and it goes into -- we put them into the mediators,

23   who then themselves they'll appoint a mediator.

24             The mediations happen pretty quickly from then on.

25   Each of them has sort of their own schedule, so it's a

Page 154

1   little different, but typically they get scheduled within

2   about a month of getting all the pleadings in, or a month

3   and a half.  And you have your mediation session.

4           And then the only issue, as I'm sure you're aware,

5   Your Honor, sometimes one session isn't enough, and

6   sometimes it is, and sometimes the mediators want some

7   additional information.

8           So we're still in the stages of this it sounds

9   like where, you know, this just started.  So it's -- but

10  it's only going to be probably a month or so before there's

11  a mediation, I would think, if you're in the pleading stage

12  already, a month and a half, two months, somewhere in there.

13          MR. GOTTFRIED:  If I were to have an assurance

14  that the stay would be released as to us in a month and a

15  half, that would be fine.

16          THE COURT:  I'm not in a position to determine

17  whether --

18          MR. GOTTFRIED:  But I don't have any confidence in

19  that.

20          THE COURT:  If I'm not in a position to determine

21  whether or not something can happen in a month and a half

22  particularly when, you know, we're heading into the summer

23  time where who knows had what plans.

24          I mean certainly by the end of the summer, I would

25  agree with you, and you could renew your application, but

Page 155

1    I'm not going to be -- I'm not now going to be nickeled and

2    dimed, I'm just not.

3         MR. GOTTFRIED:  Okay.  Thank you, Your Honor.

4         MR. BOCOUZZI:  And just for the record, Your

5    Honor, there are lots of representations about the ADR

6    process, and they don't necessarily comport to my experience

7    of it.  I'm in the mediation process going on for about nine

8    months, so the one month, I don't want to -- we don't get

9    into this, but I think it takes a bit longer.

10         THE COURT:  Okay.  Well, I think that I can make

11   the general observation that one size doesn't necessarily

12   fit all in this case.  So some are going to go more quickly,

13   and some are going to go more slowly.

14         MR. SLACK:  Can I just speak to that?  I think

15   what I said was once the pleadings were completed, because

16   of the SPB ADR process and there's a long history to it, the

17   initial times for putting in the initial pleadings because

18   when we were -- we weren't sure that -- especially we're

19   dealing with a non-distributed deals.

20         THE COURT:  Right.

21         MR. SLACK:  We built in time, which is what the

22   counterparties wanted and the trustees wanted.

23         So when we just imported that for the distributed

24   deals, there's still this extra time built in for the

25   pleadings.  It probably -- it may not be entirely necessary.

Page 156

1    So the pleading stage can be a little bit longer.  Once you

2    hit the pleading stage, actually putting it in and getting

3    the mediation is just a quicker part of the process.

4              THE COURT:  Uh-huh.

5              MR. SLACK:  And again, some mediators will

6    obviously use one session, some will have more, et cetera.

7    But that's really what I was talking about from the time the

8    pleadings get put in.

9              THE COURT:  Yeah, yeah.  Okay.

10             MR. LODEN:  Your Honor, very shortly one quick

11   clarification question.  I think you said enough from the

12   bench today that gives me confidence that you granted our

13   application.  Would you like for us to submit an order or --

14             THE COURT:  Well, do you want to do a separate

15   order, or do you just want to put a line in the order that

16   you're going to submit globally today?  I don't have a --

17             MR. LODEN:  We've already submitted an order as

18   part of our application.  We're happy to e-mail it to

19   chambers again or however you would like.

20             MR. DEFILIPPO:  We would propose to put it in our

21   order, Your Honor.

22             MR. LODEN:  Of course.

23             THE COURT:  Let's -- they've been taking very

24   extensive notes.

25             MR. LODEN:  Okay.

Page 157

1          THE COURT:  So I think I would be comfortable

2     seeing it in one global order.  All right?

3          MR. LODEN:  Again, I'm not sure how long that

4     order will take, but we're ready and can file and hope to

5     file our motion by the end of the week.

6          THE COURT:  All right.  Well, I'm -- today is

7     Wednesday --

8          MR. LODEN:  Yes, Your Honor.

9          THE COURT:  -- I think -- I don't know if they'll

10    be ready by the end of the week, and I am not going to be

11    here on Friday.  But as soon as I get their order, I'll

12    enter it.  So at most, you're talking about a delay of gain

13    for a couple of days.

14         MR. LODEN:  Okay, fine.

15         THE COURT:  All right?

16         MR. DEFILIPPO:  Thank you, Your Honor.

17         THE COURT:  Okay.  All right.  Are we concluded

18    except for the conference?

19         MS. MARCUS:  Yes, Your Honor, I think that

20    concludes the --

21         THE COURT:  All right.  Thank you all very much

22    for your patience.  It's good to see you.

23    (Proceedings concluded at 1:12 PM)

24                         * * * * *

25

Page 158

1                    I N D E X

2

3                  R U L I N G S

4   IDENTIFICATION                    Page      Line

5   **Five Non-Distributed Deals**      89        16

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 159

1                       C E R T I F I C A T I O N

2

3    I, Dawn South, certify that the foregoing transcript is a

4    true and accurate record of the proceedings.

5               Dawn South

6    Digitally signed by Dawn South
     DN: cn=Dawn South, o=Veritext,
     ou, email=digital@veritext.com,
7    c=US
     Date: 2014.05.15 14:46:58 -04'00'

8    AAERT Certified Electronic Transcriber CET**D-408

9

10

         I, Sheila G. Orms, certify that the foregoing is a

11   correct transcript from the official electronic sound

12   recording of the proceedings in the above-entitled matter.

13

14   Dated:  May 15, 2014

15               Shelia G. Orms

16   Digitally signed by Shelia G. Orms
     DN: cn=Shelia G. Orms, o=Veritext,
     ou, email=digital@veritext.com, c=US
     Date: 2014.05.15 14:47:38 -04'00'

17   Signature of Approved Transcriber

18

19

     Veritext

20

     330 Old Country Road

21

     Suite 300

22

     Mineola, NY 11501

23

24

25