**HEARING DATE AND TIME:  July 16, 2014 at 10:00 a.m. (Eastern Time)**

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Robert J. Lemons
Stephen A. Youngman

Attorneys for Lehman Brothers Holdings Inc.
and Certain of Its Affiliates

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------------------x

| | | |
|---|---|---|
| **In re** | : | **Chapter 11 Case No.** |
| | : | |
| **LEHMAN BROTHERS HOLDINGS INC.**, *et al.*, | : | **08-13555 (SCC)** |
| | : | |
| **Debtors.** | : | **(Jointly Administered)** |

--------------------------------------------------------------------x

## PLAN ADMINISTRATOR'S REPLY BRIEF IN SUPPORT OF DEBTORS' OBJECTION TO PROOFS OF CLAIM FILED BY 2138747 ONTARIO LTD. AND 6785778 CANADA INC. (CLAIM NOS. 33583 AND 33586)

# TABLE OF CONTENTS

**Page**

Preliminary Statement........................................................................................................1

Jurisdiction........................................................................................................................3

Background........................................................................................................................3

Additional Factual Background ........................................................................................4

Argument ..........................................................................................................................9

      A.      The Minority Shareholders Do Not Have Standing...............................................9

      B.      The Minority Shareholders Are Not Intended Third-Party Beneficiaries of the
            Equity Contribution Agreement Nor Can the Agreements Properly be Construed
            as a Single Agreement ........................................................................................13

      C.      LBHI Does Not Have Liability Under the SA......................................................18

            a.      LBHI Is Not Liable as an "Affiliate" of LB SkyPower ............................18

            b.      The Minority Shareholders Have Failed to State a Valid Veil-Piercing
                  Claim.......................................................................................................21

      D.      The Minority Shareholders' Fail to State a Claim for Breach of the Covenant of
            Good Faith and Fair Dealing...............................................................................24

Conclusion ......................................................................................................................25

US_ACTIVE:\44475763\6\58399.0011

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abundance Partners LP v. Quamtel, Inc.*,
  840 F. Supp. 2d 758 (S.D.N.Y. 2012)....................................................................20

*Albany–Plattsburgh United Corp. v. Bell*,
  307 A.D.2d 416 (N.Y. App. Div. 2003) ...............................................................11

*Albstein v. Elany Contr. Corp.*,
  30 A.D.3d 210 (N.Y. App. Div. 2006) .................................................................22

*Andejo Corp. v. S. St. Seaport Ltd. P'ship*,
  40 A.D.3d 407 (N.Y. App. Div. 2007) ...........................................................22, 24

*Andrew Greenberg, Inc. v. Svane, Inc.*,
  36 A.D.3d 1094 (N.Y. App. Div. 2007) ...............................................................11

*Cent. Hudson Gas & Elec. Corp. v. Empresa Naviera Santa S.A.*,
  56 F.3d 359 (2d Cir. 1995)...................................................................................14

*In re Chain*,
  255 B.R. 278 (Bankr. D. Conn. 2000) .............................................................21, 24

*Consol. Edison, Inc. v. Ne. Utils.*,
  426 F.3d 524 (2d Cir. 2005)..................................................................................14

*Debussy LLC v. Deutsche Bank AG*,
  No. 05 Civ. 5550 (SHS), 2006 U.S. Dist. LEXIS 16432 (S.D.N.Y. Mar. 29, 2006)...............10

*Eisenberg v. Flying Tiger Line, Inc.*,
  451 F.2d 267 (2d Cir. 1971)..................................................................................11

*In re Feinberg*,
  442 B.R. 215 (Bankr. S.D.N.Y. 2010) ..................................................................21

*Goldex Mines Ltd. v. Revill*,
  (1974), 7 O.R. 2d 216 (Can. Ont. C.A.)................................................................11

*Gosconcert v. Hillyer*,
  158 B.R. 24 (S.D.N.Y. 1993)................................................................................11

*In re Gulf Oil/Cities Serv. Tender Offer Litig.*,
  725 F. Supp. 712 (S.D.N.Y. 1989) .......................................................................14

US_ACTIVE:\44475763\6\58399.0011

*Harris v. Provident Life & Accident Ins. Co.*,
  310 F.3d 73 (2d Cir. 2002)................................................................24

*Henneberry v. Sumitomo Corp. of Am.*,
  No. 04 CIV. 2128 (PKL), 2005 WL 991772 (S.D.N.Y. Apr. 27, 2005).................................17

*Hercules Mgmt. Ltd. v. Ernst & Young*,
  [1997] 2 S.C.R. 165 (Can.) .............................................................10

*Kranze v. Cinecolor Corp.*,
  96 F. Supp. 728 (S.D.N.Y. 1951) .......................................................20

*LaSalle Nat'l Bank v. Ernst & Young L.L.P.*,
  285 A.D.2d 101 (N.Y. App. Div. 2001) ................................................14

*In re Marino*,
  90 B.R. 25 (Bankr. D. Conn. 1988) ...............................................21, 24

*McPheeters v. McGinn, Smith & Co.*,
  953 F.2d 771 (2d Cir. 1992)............................................................14

*Morris v. N.Y. State Dep't of Taxation & Fin.*,
  82 N.Y.2d 135 (N.Y. 1993) ...........................................................22

*Nordberg v. Lord, Day & Lord*,
  107 F.R.D. 692 (S.D.N.Y. 1985) ......................................................11

*Prudential Assurance Co. v. Newman Industries Ltd.*,
  (No. 2), [1982] 1 All E.R. 354 (A.C.)..................................................10

*Retropolis, Inc. v. 14th St. Dev. LLC*,
  17 A.D.3d 209 (N.Y. App. Div. 2005) .................................................22

*Rogers v. Bank of Montreal*,
  [1985] 64 B.C.L.R. 63 (Can. B.C. S.C.), *aff'd*, (1986), 9 B.C.L.R. 2d 190
   (Can. B.C. C.A.)......................................................................11

*Rosen v. Mega Bloks Inc.*,
  No. 06 Civ. 3474 (LTS) (GWG), 2007 U.S. Dist. LEXIS 48479 (S.D.N.Y.
  July 6, 2007)......................................................................16, 17

*Russo v. Heller*,
  80 A.D.3d 531 (N.Y. App. Div. 2011) ............................................22, 24

*Silverman v. Goldman*,
  1995 CarswellOnt 328  (Can. Ont. Gen. Div.) (WL).................................13

iv

*Simon v. Unum Grp.*,
    No. 07 Civ. 11426 (SAS), 2008 U.S. Dist. LEXIS 47719 (S.D.N.Y. June 19, 2008)............24

*Tempo Shain Corp. v. Bertek, Inc.*,
    120 F.3d 16 (2d Cir. 1997)..........................................................................................23

*This is Me, Inc. v. Taylor*,
    157 F.3d 139 (2d Cir. 1998)...............................................................................15, 16

*TNS Holdings, Inc. v. MKI Secs. Corp.*,
    92 N.Y.2d 335 (N.Y. 1988) ........................................................................................22

*Toronto Dominion Bank v. Alex L. Clark Ltd.*,
    1993 CarswellOnt 237 (Can. Ont. C.J.) (WL) .........................................................9

*TVT Records v. Island Def Jam Music Grp.*,
    412 F.3d 82 (2d Cir. 2005)..................................................................................15, 16

**Statutes**

28 U.S.C. § 157(b) ...........................................................................................................3

28 U.S.C. § 1334................................................................................................................3

**Other Authorities**

Fed. R. Bankr. P. 1015(b) ................................................................................................3

US_ACTIVE:\44475763\6\58399.0011

TO THE HONORABLE SHELLEY C. CHAPMAN,
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Holdings Inc. ("LBHI" or the "Plan Administrator"), as Plan Administrator under the Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors (the "Plan")[1] for the entities in the above-referenced chapter 11 cases (the "Chapter 11 Entities"), files this reply (the "Reply") in support of the Debtors' Objection to Proofs of Claim Filed By 2138747 Ontario Ltd. and 6785778 Canada Inc. (Claim Nos. 33583 and 33586), ECF No. 18397 (the "Objection"), and in opposition to the Opposition to Debtors' Objection to Proofs of Claim Filed By 2138747 Ontario Ltd. and 6785778 Canada Inc. (Claim Nos. 33583 and 33586), ECF No. 19315 (the "Response"), filed by 2138747 Ontario Ltd. and 6785778 Canada Inc. (collectively, the "Minority Shareholders") and respectfully represent as follows:

## **Preliminary Statement**

1.      The Minority Shareholders do not have standing to assert and prosecute the Claims.  The asserted claims belong to SkyPower – the entity in which the Minority Shareholders had a minority equity interest – not to the Minority Shareholders.  In fact, the entity claim of SkyPower has already been settled among LBHI and SkyPower's court-appointed receiver, Pricewaterhouse Coopers Inc. ("PwC").

2.      More specifically, in August 2009, SkyPower commenced insolvency proceedings under the Companies' Creditors Arrangement Act (Canada), which were subsequently transferred to receivership proceedings under the Bankruptcy and Insolvency Act (Canada).  PwC was appointed as receiver for SkyPower and empowered to control and liquidate SkyPower's assets, including SkyPower's claim against LBHI.  In its capacity as receiver for

---

[1] Capitalized terms not defined herein shall have the meaning ascribed to them in the Objection.

US_ACTIVE:\44475763\6\58399.0011

SkyPower, PwC filed proof of claim number 66602 (the "SkyPower Claim") against LBHI

asserting the same claims asserted by the Minority Shareholders.  PwC negotiated and entered

into a settlement with LBHI in respect of the SkyPower Claim.  Pursuant to that settlement, the

SkyPower Claim was allowed as an LBHI Class 7 Claim in the amount of $50 million.

3.      PwC, as receiver for SkyPower, is the only party with standing to assert

the Claims.  The interests of the Minority Shareholders are derivative of SkyPower's claims and,

accordingly, under both Canadian and U.S. law, the Minority Shareholders lack standing to

prosecute such claims.  Because PwC, as receiver, has compromised and settled such claims on

behalf of SkyPower, the Minority Shareholders' Claims should be disallowed and expunged.

4.      Likewise, the Minority Shareholders' plea for third-party beneficiary

status under the Equity Contribution Agreement (defined below) falls short.  The Minority

Shareholders bear the burden of establishing that they are third-party beneficiaries.  The Minority

Shareholders are neither parties to the Equity Contribution Agreement nor identified as express

third party beneficiaries of that agreement.  The Minority Shareholders have not, and cannot,

show in any of the operative transaction documents that they were intended beneficiaries, nor

does their tortured attempt to mesh unrelated documents together create third-party beneficiary

status.  Neither the facts nor the law support the Minority Shareholders' third-party beneficiary

claim.

5.      The Minority Shareholders' other arguments – i.e., that LBHI is an

"Affiliate" of SkyPower under certain of SkyPower's governance documents or LBHI is liable

under a veil-piercing theory – do not withstand scrutiny.  Their argument that LBHI is liable as

an "Affiliate" ignores the plain language of the applicable transaction documents, arguing for

liability where none exists.  As to their veil-piercing argument, the Minority Shareholders fail to

US_ACTIVE:\44475763\6\58399.0011

allege sufficient facts to support such a claim, instead relying on conclusory statements and "bare-bone" allegations. Their claim for breach of the covenant of good faith and fair dealing swiftly fails. There is no such claim under New York law when a claim for breach of contract is, like here, also pled on the same facts.

6.      The Minority Shareholders have no standing to pursue their Claims – those Claims are derivative of the claims of the entity, SkyPower, and SkyPower, by PwC, its receiver, has already settled those claims. The Minority Shareholders remaining claims, even if not already settled, are without merit. Accordingly, the Court should grant the Objection and enter an order disallowing and expunging the Minority Shareholders' Claims.

## Jurisdiction

7.      This Court has subject matter jurisdiction to consider and determine this matter pursuant to 28 U.S.C. § 1334 and section 14.1 of the Plan. This is a core proceeding pursuant to 28 U.S.C. § 157(b).

## Background

8.      Commencing on September 15, 2008 and periodically thereafter, LBHI and certain of its subsidiaries commenced with this Court voluntary cases (together, the "Chapter 11 Cases") under chapter 11 of the Bankruptcy Code. The Chapter 11 Cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

9.      On December 6, 2011, the Court approved and entered an order confirming the Plan, ECF No. 23023 (the "Confirmation Order"). The Plan became effective on March 6, 2012. Pursuant to sections 6.1 and 9.1 of the Plan, the Plan Administrator is authorized to object to claims filed against the Chapter 11 Entities and to control and effectuate the claims reconciliation process with respect thereto.

3

## Additional Factual Background

10.    On June 1, 2007, Lehman Brothers Inc. ("LBI") – an entity that is not a debtor in this proceeding and is being separately administered pursuant to the Securities Investor Protection Act – and SkyPower Corp. ("SkyPower") signed a letter of intent (the "Letter of Intent") for the potential acquisition of SkyPower, a copy of which is annexed hereto as Exhibit A.  LBHI is neither a party to nor specifically referenced in the Letter of Intent.

11.    On or about June 11, 2007, Goodmans LLP, LBI's Canadian counsel for the transaction, prepared a memorandum (the "Goodmans Steps Memo") regarding "Proposed Investment in SkyPower Corp."  A copy of the Goodmans Steps Memo is annexed hereto as Exhibit B.  The memorandum described a potential acquisition of SkyPower by LBI, indirectly through LB SkyPower Inc., a separate and distinct legal entity established for the purpose of purchasing Skypower.  LBHI is not referenced in the memorandum.

12.    On June 11, 2007, various entities including LB SkyPower, SkyPower, and the Minority Shareholders entered into a Stock Purchase Agreement (the "SPA") pursuant to which LB SkyPower acquired a controlling interest in SkyPower, and the Minority Shareholders received $87.5 million at closing.  A copy of the SPA is annexed hereto as Exhibit C.  LBHI is neither a party to nor specifically referenced in the SPA.

13.    On June 11, 2007, various parties, including LB SkyPower, the Minority Shareholders, Kerry Adler, and HSH Nordbank AG ("HSH Nordbank") entered into a Unanimous Shareholder Agreement (the "SA") concerning the investment in SkyPower.  A copy of the SA is annexed hereto as Exhibit D.  LBHI is neither a party to nor specifically referenced in the SA.  The SA contains an integration clause specifying that the SA "constitute[s] the entire agreement between the Parties with respect to the subject matter hereof and supersede[s] all prior

4

communications, proposals, representations and agreements . . . including, without limitation, the letter of intent dated June 1, 2007 . . . ."  SA art. 11.7.

14.    On or about September 5, 2007, LBI issued a memorandum to SkyPower's board of directors regarding "Deemed and actual Shareholder dilution related to the expected GE Turbine Frame Agreement and the anticipated HSH Nord Bank Turbine Warehouse Facility" (the "September Memo").  A copy of the September Memo is annexed hereto as Exhibit E.

15.    On February 22, 2008, LBHI (as sponsor), SkyPower (as borrower), and HSH Nordbank (as collateral agent) entered into the Amended and Restated Equity Contribution Agreement (the "Equity Contribution Agreement").  A copy of the Equity Contribution Agreement is annexed hereto as Exhibit F.  The Minority Shareholders are not parties to the Equity Contribution Agreement or identified as third party beneficiaries thereof.

16.    LBHI invested heavily in SkyPower—$388,096,915 prior to filing for chapter 11 and $59,684,687 after filing for chapter 11 of which only $28,043,151 was returned, resulting in a net outlay by LBHI of $31,641,536 post-filing.  LBHI is both a secured creditor of SkyPower and majority indirect shareholder.  LBHI has lost its entire investment in SkyPower, both its secured debt position and its indirect equity position.  The Minority Shareholders are not the only parties that lost significant sums of money as a result of investing in SkyPower.

17.    In or around August 2009, SkyPower commenced insolvency proceedings under the Companies' Creditors Arrangement Act (Canada).  SkyPower subsequently changed its name to Interwind Corp. ("Interwind").  On March 30, 2010, the insolvency proceedings were transferred to receivership proceedings under the Bankruptcy and Insolvency Act (Canada) and PwC was appointed as receiver for Interwind f/k/a SkyPower.  A copy of the initial Order, dated

5

March 30, 2010, appointing PwC as receiver (the "Initial Appointment Order" is annexed hereto

as Exhibit G. As receiver for SkyPower (now Interwind), PwC filed its proof of claim numbered

66602 asserting that LBHI breached its alleged obligation to fund SkyPower under the Equity

Contribution Agreement – the very same claim asserted by the Minority Shareholders.

18.    A formal claims process was not required in the Canadian insolvency

proceedings. However, PwC and its counsel reviewed the secured claims of the HSH syndicate

of lenders and LBHI and reported to the Canadian Court during the course of SkyPower's

Canadian insolvency proceedings. In its Ninth Report filed with the Canadian Court (the "Ninth

Report"), PwC specifically advised that the prior ranking secured creditor had significant

amounts owing to it to be satisfied prior to any distribution to, or potential recovery by, LBHI:

> At the date of this Ninth Report, notwithstanding the distributions
> made to HSH Nordbank to date, there remains a significant
> shortfall in the recovery of HSH Nordbank, even before accounting
> for any entitlement HSH Nordbank may have to interest and costs.
> In the affidavit of Kerry Adler, sworn August 12, 2009, in support
> of the initial application in the CCAA Proceedings, the principal
> balance owing to HSH Nordbank was estimated at approximately
> $214 million, and the principal owing to Lehman was estimated at
> approximately $37 million. Since the start of the CCAA
> Proceedings, HSH Nordbank has received interim distributions
> totaling approximately $185 million. The net indebtedness owing
> to HSH Nordbank, after accounting for distributions made to date
> excluding interest and costs, is approximately $29 million. Based
> on information provided to the Receiver by HSH Nordbank, the
> amount owing to HSH Nordbank, after accounting for distributions
> made to date including interest and costs is in excess of
> $46 million.

Ninth Report at ¶ 21. A copy of the Ninth Report is annexed hereto as Exhibit H.

19.    PwC negotiated and entered into a resolution with LBHI in January 2013

(the "SkyPower Settlement") in respect of the SkyPower Claim and two foreign exchange claims

made by PwC against the LBHI estate (collectively the "LBHI Claims"). A copy of the

SkyPower Settlement is annexed hereto as Exhibit I. The SkyPower Settlement provides:

6

- the SkyPower Claim against the LBHI estate was settled at US$50 million, the foreign exchange claim no. 1 at US$11,990,427.28 and the foreign exchange claim no. 2 at $2,700,000;

- SkyPower's first ranking creditor's claim ("HSH Syndicate Lenders' Claim") was allowed at US$45 million against SkyPower;

- the SkyPower receivership was terminated with the bulk of remaining assets to be transferred to a special purpose vehicle ("SPV"), with proceeds from the transferred assets used to pay costs and charges of the SPV and priority sales costs of the receivership, then payment of the HSH Syndicate Lenders' Claim to a maximum of US $45 million, and thereafter to LBHI in its capacity as second secured creditor;

- the key transferred assets under SkyPower Settlement included potential recoveries in respect of the LBHI Claims.

20.     The SkyPower Settlement specifically provided:

H.  The Lehman Entities each agree that upon the execution of this Agreement and the transfer of the Interwind Lehman Claims to the SPV:

1.  The ECA Claim (Claim Number 66602, as amended) shall be allowed against LBHI for all purposes of the Lehman Bankruptcy Case in the amount of US$50 Million (the "ECA Claim Allowed Amount").  LBHI agrees that such ECA Claim shall be an LBHI Class 7 Claim, as defined in the Third Amended Joint Plan of Reorganization dated August 31, 2011 as previously approved in the Lehman Bankruptcy case (the "Third Lehman Plan").

SkyPower Settlement at § II.H., p. 5.

21.     As part of the SkyPower Settlement, the Equity Contribution Agreement was terminated:

WHEREAS as the ECA Claim shall be resolved as part of this agreement, the Equity Contribution Agreement dated February 22, 2008 as among SkyPower Corp., LBHI as sponsor and HSH as collateral agent, shall be terminated and treated as at an end;

SkyPower Settlement at p. 1.

22.     A subsequent amendment to the SkyPower Settlement was entered into in July 2013 to reflect certain assets which would remain in the SkyPower bankruptcy estate and not be transferred to the SPV.

7

23.     The SkyPower Settlement was approved by the Canadian Court by order granted January 31, 2013.  The amendment was approved by the Canadian Court on July 31, 2013.

24.     PwC's Ninth Report filed in support of the approval of the SkyPower Settlement provides as follows:

> The Secured Lenders and the Receiver have discussed the conclusion of the Receivership Proceedings given that the majority of the value of the Company's assets has now been realized. Certain additional proceeds may be realized at a later date, such as earn-out proceeds from the sale of the Wind Development Business to CPV.  The Secured Lenders have been negotiating a form of agreement for the use and terms of the SPV to hold the Transferred Assets (as defined below) until they are fully realized, **and the resolution of certain issues in the Receivership Proceedings, including the admission and valuation of the ECA Claim in the Lehman estate in the amount of $50 million.**  In addition, the agreement provides that the Secured Lenders would allow $224,000 of remaining proceeds from the Solar Transaction, representing the estimated value of the Solar Real Property, to remain in the Interwind estate with no secured claim attaching thereto (the "Unsecured Assets").  (emphasis added)

Ninth Report at ¶ 14 (emphasis added).

25.     Kerry Adler, President of 6785778 Canada Inc., a Minority Shareholder, was notified of the Canadian hearings to approve the SkyPower Settlement and amendment.  The Minority Shareholders did not attend the hearing nor oppose the relief sought in the Canadian Court.  There was no appeal of the Canadian orders.  Accordingly, the Canadian orders are final and nonappealable.

26.     Recognition of the Canadian orders approving the SkyPower Settlement was sought from the United States Bankruptcy Court for the District of Delaware in the chapter 15 case of Interwind Corp. (f/k/a SkyPower Corp.) on notice to the Minority Shareholders' US counsel.  The Minority Shareholders did not oppose the relief sought.  By order entered

September 9, 2013, the Delaware Bankruptcy Court entered an order recognizing the Canadian

orders approving the SkyPower Settlement and amendment (the "Recognition Order").  There

was no appeal or request for reconsideration of the Recognition Order; accordingly, the

Recognition Order is final and non-appealable.  A copy of the Recognition Order is annexed

hereto as Exhibit J.

**Argument**

**A.       The Minority Shareholders Do Not Have Standing**

27.       As a threshold matter, the Minority Shareholders do not have standing to

prosecute their Claims against LBHI, and thus, the Claims can and should be disallowed and

expunged.  Claimants advance several theories for imposing liability on LBHI as a result of its

"failure to fund" SkyPower, but all of the asserted claims belong to SkyPower, the entity, and not

to the Minority Shareholders individually.  PwC, in its capacity as receiver for SkyPower, is the

only party with standing to assert those claims, and PwC, as receiver, prosecuted, and settled,

those claims against LBHI.  Accordingly, the Minority Shareholders cannot prosecute the Claims

and allowing them to do so would penalize LBHI and expose it to the risk of double liability for

the same claims that LBHI already settled with the proper party.

28.       The Receiver was given the authority to deal with the assets of SkyPower,

including resolution of claims, pursuant to the Initial Appointment Order (¶¶ 5(f) and (i)).  The

Minority Shareholders did not oppose or appeal this order.  In a Canadian insolvency proceeding,

the cause of action previously held by the Company vests in the trustee acting on the Company's

behalf.  *Toronto Dominion Bank v. Alex L. Clark Ltd.*, 1993 CarswellOnt 237, ¶¶ 5-6 (Can. Ont.

C.J.) (WL).

29.       Because the Minority Shareholders' Claims are derivative of SkyPower's

(and thus PwC's) claims, the Claimants lack standing to pursue their breach of contract, veil-

9

piercing, and breach of good faith and fair dealing claims. Accordingly, the Minority

Shareholders' Claims should be disallowed and expunged in their entirety.

30.    "When deciding issues of 'shareholder standing,' that is, whether claims

should be brought directly or derivatively, courts must look to the law of the fund's state of

incorporation." *Debussy LLC v. Deutsche Bank AG*, No. 05 Civ. 5550 (SHS), 2006 U.S. Dist.

LEXIS 16432, at *7 (S.D.N.Y. Mar. 29, 2006) (citations omitted). SkyPower is a Canadian

company, and accordingly, the question of shareholder standing is a matter of Canadian law.

31.    Canadian law provides that shareholders are restricted from commencing

litigation where the causes of action properly belong to the corporation. The rule in *Foss v.*

*Harbottle*, as it is known, has been described as follows:

> The rule in *Foss v. Harbottle* provides that individual shareholders
> have no cause of action in law for any wrongs done to the
> corporation and that if an action is to be brought in respect of such
> losses, it must be brought either by the corporation itself (through
> management) or by way of a derivative action.

*Hercules Mgmt. Ltd. v. Ernst & Young,* [1997] 2 S.C.R. 165, ¶ 59 (Can.).

32.    The legal rationale for the rule is described in *Prudential Assurance Co. v.*

*Newman Industries Ltd*. (No. 2), [1982] 1 All E.R. 354 (A.C.) at 367: "[t]he company acquires

causes of action for breaches of contract and for torts which damage the company. No cause of

action vests in the shareholder. When the shareholder acquires a share he accepts the fact that

the value of his investment follows the fortunes of the company . . . ." *Id.*

33.    The "rule is sound from a policy perspective, inasmuch as it avoids the

procedural hassle of a multiplicity of actions." *Hercules Mgmt. Ltd. v. Ernst & Young*, [1997] 2

S.C.R. 165, ¶ 59 (Can).

34.    Shareholder claims are derivative if they "arise solely because the

company itself has been damaged" and all the damages alleged are consequential in the sense

10

that they flow from the damage caused to the company. *Rogers v. Bank of Montreal*, [1985] 64

B.C.L.R. 63, ¶ 109 (Can. B.C. S.C.), *aff'd*, (1986), 9 B.C.L.R. 2d 190 (Can. B.C. C.A.). To have

a personal cause of action, a shareholder must have suffered an independent and direct injury that

is distinct from that suffered by the corporation. *Goldex Mines Ltd. v. Revill* (1974), 7 O.R. 2d

216 (Can. Ont. C.A.).

35. Canadian law on this issue is not unique, as New York law applies a

similar standard for determining if a shareholder claim is derivative.[2] Under New York law, "if

the gravamen of the [shareholder's] complaint is injury to the corporation the suit is

derivative . . . ." *Eisenberg v. Flying Tiger Line, Inc.*, 451 F.2d 267, 269 (2d Cir. 1971) (applying

New York law); *see also Andrew Greenberg, Inc. v. Svane, Inc.*, 36 A.D.3d 1094, 1097 (N.Y.

App. Div. 2007) ("Claims to recover corporate assets, such as those for fraudulent conveyance or

diversion of assets by officers to their own enrichment are derivative claims . . . as are claims

that turn on piercing the corporate veil or alter ego liability where the claim could be brought by

any creditor of the debtor." (internal citations omitted)); *Albany–Plattsburgh United Corp. v.

Bell*, 307 A.D.2d 416, 419 (N.Y. App. Div. 2003) ("The pertinent inquiry is whether the thrust of

the plaintiff's action is 'to vindicate his personal rights as an individual and not as a stockholder

on behalf of the corporation.'") (internal citations omitted). A shareholder only has standing to

pursue a direct claim "'where the injury sustained to one's stock is peculiar to him alone, and

does not fall alike upon other stockholders . . . .'" *Nordberg v. Lord, Day & Lord*, 107 F.R.D.

692, 698 (S.D.N.Y. 1985) (citations omitted); *see also Gosconcert v. Hillyer*, 158 B.R. 24, 29

---

[2] New York law governs the SPA, the SA, and the Equity Contribution Agreement. *See* SPA art. 15.12 ("This Agreement shall be governed by and construed in accordance with the Laws of New York applicable to a Contract executed and performed in such State, without giving effect to the conflicts of laws principles thereof."); SA art. 11.2 (same); Equity Contribution Agreement § 12.01(m) ("THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN THAT STATE.").

US_ACTIVE:\44475763\6\58399.0011

(S.D.N.Y. 1993) (finding that a creditor that did not allege distinct injury lacked standing to assert alter ego claim that should be brought by bankruptcy trustee).

36.    Here, under both Canadian and New York law, the Minority Shareholders' claims are wholly derivative of those of SkyPower as evidenced by the damages they allege. Specifically, the alleged damages are the loss of their investment in SkyPower as a result of SkyPower's insolvency:

> With the Debtors' bankruptcy in September 2008 came the failure to fund SkyPower as required under, inter alia, the Shareholder Agreement and the Equity Contribution Agreement. And with that failure to fund came the dire financial straits that resulted in SkyPower filing a Canadian insolvency proceeding – and Claimants' investment being wiped out.

(Resp. ¶ 15.)  Claimants have not alleged (nor could they) any personal, distinct injuries arising from LBHI's alleged "failure to fund" that are independent of their status as shareholders in the now-defunct SkyPower.  (*See id.* ¶¶ 15, 29, 31.)  The Minority Shareholders' claims are purely derivative of those belonging to SkyPower, and PwC, as receiver for SkyPower, is the only party with standing to assert those claims against LBHI.[3]

37.    PwC pursued the SkyPower Claim directly, as it was authorized to do, and SkyPower has already been compensated by LBHI pursuant to the SkyPower Settlement.  As a result, a derivative claim pursued by the Minority Shareholders, or other third party, on behalf of SkyPower is not required and should not be permitted.  Accordingly, the Minority Shareholders lack standing to bring claims individually against LBHI, and as they fail to meet this basic threshold, the Claims should be disallowed and expunged in their entirety.

---

[3] Claimants have not sought, or obtained leave, to pursue a derivative action on behalf of SkyPower.  Under the Canada Business Corporations Act (the "CBCA"), a party may be given leave to bring a derivative action on behalf of a company if, among other things, the party has given notice to the directors of the corporation of its intent to seek leave to pursue such an action, and the directors of the corporation have not brought the action.  CBCA s. 239. Regardless, as discussed herein, PwC, as receiver for SkyPower, already chose to prosecute SkyPower's "failure to fund" claims in these proceedings, and subsequently reached a resolution in respect of the claims.

US_ACTIVE:\44475763\6\58399.0011

38.    PwC has settled the SkyPower Claim against LBHI for its alleged "failure

to fund" SkyPower.  The settlement has been approved by the Canadian Court and recognized by

the US Court.  The SkyPower Settlement specifically resolved the SkyPower Claim and brought

an end to the Equity Contribution Agreement.  As such, there is no further claim to pursue in

respect of the Equity Contribution Agreement.  The Minority Shareholders were notified of the

SkyPower Settlement and had an opportunity to speak to the proposed settlement before the

Canadian or US Courts.  They chose not to oppose the SkyPower Settlement, PwC's authority to

enter into the resolution, or Court-approval of the settlement.  The Minority Shareholders also

did not appeal the orders granted by the Canadian or US Courts.  The Minority Shareholders are,

therefore, barred from seeking to reopen the issue indirectly by way of pursuing their Minority

Shareholder Claims.

39.    Indeed, by their attempt to prosecute the derivative claim of the company

for their own personal gain the Minority Shareholders ignore the superior ranking creditors of

SkyPower who are entitled to recovery before any shareholders.  Specifically, the Minority

Shareholders cannot ignore the millions of dollars of claims of secured and unsecured creditors

of SkyPower ranking ahead in priority to their equity claim.  (Section 6(8) of the CCAA, section

140.1 of the BIA and section 136 of the BIA); *see also Silverman v. Goldman*, 1995 CarswellOnt

328, ¶ 8 (Can. Ont. Gen. Div.) (WL).  The Minority Shareholders offer no legal basis for

ignoring the superior ranking creditors.

**B.    The Minority Shareholders Are Not Intended Third-Party Beneficiaries of the
Equity Contribution Agreement Nor Can the Agreements Properly be Construed as
a Single Agreement**

40.    Even if the Minority Shareholders could somehow allege a particularized

harm, the Minority Shareholders' Claims for breach of the Equity Contribution Agreement must

be dismissed because the Minority Shareholders have the burden of establishing third-party

13

beneficiary status under the Equity Contribution Agreement, and they have not met, and cannot

meet, that burden.  *See Cent. Hudson Gas & Elec. Corp. v. Empresa Naviera Santa S.A.*, 56 F.3d

359, 370-71 (2d Cir. 1995) (finding that the burden of establishing third-party beneficiary status

rests on party claiming that status).  To establish third-party beneficiary status, the language in

the agreement must "'*clearly* evidence[] an intent to permit enforcement by a third party[.]'"

*Consol. Edison, Inc. v. Ne. Utils.*, 426 F.3d 524, 528 (2d Cir. 2005) (citation omitted) (emphasis

in original); *see In re Gulf Oil/Cities Serv. Tender Offer Litig.*, 725 F. Supp. 712, 733 (S.D.N.Y.

1989) ("[T]he parties' intent to benefit a third party must be shown on the face of the

agreement.").  "Absent clear contractual language evincing such intent, New York courts have

demonstrated a reluctance to interpret circumstances to construe such an intent . . . ." *LaSalle*

*Nat'l Bank v. Ernst & Young L.L.P.*, 285 A.D.2d 101, 108-09 (N.Y. App. Div. 2001).[4]

41.    The mere fact that a party may receive some incidental benefit from a

contract is insufficient to create third-party beneficiary status.  *See, e.g.*, *McPheeters v. McGinn,*

*Smith & Co.*, 953 F.2d 771, 773 (2d Cir. 1992) ("A third-party beneficiary exists, however, 'only

if the parties to that contract intended to confer a benefit on him when contracting; it is not

enough that some benefit incidental to the performance of the contract may accrue to him.'"

(quoting *Kyung Sup Ahn v. Rooney Pace, Inc.,* 624 F. Supp. 368, 371 (S.D.N.Y. 1985))).

42.    Here, the Minority Shareholders cannot establish that they are intended

third-party beneficiaries of the Equity Contribution Agreement.  Therefore, they have no rights

to assert claims for an alleged breach of the Equity Contribution Agreement against LBHI.  It is

undisputed that the Minority Shareholders are not parties to the Equity Contribution Agreement.

Despite being unable to point to anything on the face of the Equity Contribution Agreement to

---

[4] As noted previously, the Equity Contribution Agreement is governed by New York law.  Equity Contribution
Agreement § 12.01.

US_ACTIVE:\44475763\6\58399.0011

establish third-party beneficiary status—and notwithstanding the fact that the Equity

Contribution Agreement was executed *eight months subsequent* to the SA—the Minority

Shareholders argue that the existence of the SA establishes that they are third-party beneficiaries

of the Equity Contribution Agreement.  (*See* Resp. ¶ 29) (alleging that "the Equity Contribution

Agreement was intended to benefit Claimants, as minority shareholders of SkyPower and parties

to the Shareholder Agreement.")  Specifically, the Minority Shareholders argue that the

"operative agreements should be read together as part of a single transaction" and that it is

"likewise apparent" that the Minority Shareholders are intended third-party beneficiaries of the

Equity Contribution Agreement.  (*See* Resp. ¶ 27.)

        43.     The Minority Shareholders do not cite any legal authority to support their

contention that being party to a prior, separate agreement somehow automatically confers third-

party beneficiary status with respect to a later agreement to which they are not a party.  Instead,

they cite to two cases for the proposition that "the operative agreements should be read together

as part of a single transaction" that are completely irrelevant to the third-party beneficiary

question and do not even contain a reference to that body of law.  (*See* Resp. ¶ 21 (citing *TVT*

*Records v. Island Def Jam Music Grp.*, 412 F.3d 82, 89 (2d Cir. 2005) (determining that two

contracts between record labels, producer, and artist should be considered a single agreement

where contracts were designed to effectuate the production and release of a record); *This is Me,*

*Inc. v. Taylor*, 157 F.3d 139, 143 (2d Cir. 1998) (reading several contracts together to constitute

a single agreement and concluding that jury verdict finding third-parties personally liable for

breach of guaranty should be sustained)).

        44.     Moreover, the two cases the Minority Shareholders rely upon are

inapposite.  Unlike the agreements here, the terms of the contracts in *TVT Records* and *This is*

*Me, Inc.* plainly indicated an intent by the parties that the agreements constitute a single transaction. In *TVT Records*, for example, the second agreement required one of the record labels to honor the terms and conditions set forth in the first agreement, and also modified the profit distribution formula provided for in the first contract. *TVT Records*, 412 F.3d at 89. Similarly, the agreements at issue in *This is Me, Inc.* cross-referenced each other and had been drafted to split the terms of an initial contract into two agreements. *This is Me, Inc.*, 157 F.3d at 141–43. In contrast, the Equity Contribution Agreement neither alters the terms of the SA, as the second *TVT Records* agreement did the first, nor memorializes terms contained in a prior agreement, as did the contracts in *This is Me, Inc.* In fact, the Equity Contribution Agreement does not even *reference* the SA. The cases cited by the Minority Shareholders are thus distinguishable where, as here, the respective parties to the SA and the Equity Contribution Agreement plainly did not intend for those agreements to form the basis of a single transaction.

45.    Furthermore, the Minority Shareholders' argument is based on an incomplete reading of Second Circuit precedent. Even assuming, *arguendo*, that the Equity Contribution Agreement and the SA were "integral parts" of a single, larger transaction, their status as such does not mean that every provision in the Equity Contribution Agreement should be read into the SA, or vice versa. *See Rosen v. Mega Bloks Inc.*, No. 06 Civ. 3474 (LTS) (GWG), 2007 U.S. Dist. LEXIS 48479, at *12 (S.D.N.Y. July 6, 2007). *Rosen* addressed whether arbitration provisions in employment contracts executed as "exhibits" to a stock purchase agreement should be read to apply to a dispute arising under the latter agreement. *Id.* at *12. Notwithstanding that (i) all agreements were executed simultaneously, (ii) the index to the stock purchase agreement stated that "exhibits" were an integral part of the stock purchase agreement, and (iii) the stock purchase agreement contained an integration clause stating that the

16

stock purchase agreement with the exhibits comprised the entire agreement between the parties, the court refused to find the arbitration provisions applicable to the dispute:

> The mere fact that a document is an 'integral part' of a larger transaction does not mean that any provision contained in that document must be applied to all other documents that are part of the same transaction. . . .  Parties are free to enter into multiple contracts as part of a single transaction without provisions in one contract governing another contract.

*Id.* at *4–5.  Accordingly, even assuming that the SA and Equity Contribution Agreement were drafted to create a single transaction—which they were not—controlling precedent within the Second Circuit holds that the provisions of the Equity Contribution Agreement should not be read into the SA.  The fact that these agreements should not be read together further demonstrates that the Minority Shareholders are neither direct nor intended beneficiaries of the Equity Contribution Agreement and therefore lack enforceable rights under it.  *See Henneberry v. Sumitomo Corp. of Am.*, No. 04 CIV. 2128 (PKL), 2005 WL 991772, at *12–13 (S.D.N.Y. Apr. 27, 2005) (rejecting argument by employee shareholder that he was an intended third-party beneficiary of party's agreement to invest in company because his status as both an employee and shareholder of company did not establish an intent to benefit him personally under the agreement).

46.     The facts further undermine the Minority Shareholders' attempt to bootstrap their position as parties to the SA into beneficiaries of the Equity Contribution Agreement.  They argue that the Equity Contribution Agreement—signed eight months after the SA—was "simply the mechanism used to implement and effectuate . . . 'Lehman's' obligations under the [SA] to provide equity and credit support."  (Resp. ¶ 29.)  Notably, the Equity Contribution Agreement does not contain any reference to the SA.  Furthermore, in addition to the initial $87,500,000 investment, LBHI made eight additional equity investments totaling

17

$157,400,990 in the eight month period *after* the signing of the SA and *before* execution of the Equity Contribution Agreement, which belies the Minority Shareholders' argument that the Equity Contribution Agreement was simply the tool for implementation of the SA and for their intended benefit. Thus, neither the facts nor the law support the Minority Shareholders' direct or third-party beneficiary claim, and these claims necessarily fail.

**C.      LBHI Does Not Have Liability Under the SA**

47.      It is undisputed that LBHI is not a party to the SA but that LB SkyPower is. By asserting that LBHI is liable for a breach of the SA, the Minority Shareholders are effectively asking this Court to read LB SkyPower out of, and LBHI into, the SA. They try to do so based on two theories: (i) that LBHI is liable as an "Affiliate" of LB SkyPower and (ii) that LBHI is liable under a veil-piercing theory. Neither argument withstands scrutiny. To the extent that LBHI has obligations related to the funding of SkyPower, those obligations can arise solely from the Equity Contribution Agreement, to which LBHI is a party, and not under the SA, to which LBHI is a stranger.

**a.      LBHI Is Not Liable as an "Affiliate" of LB SkyPower**

48.      The Minority Shareholders' argument that LBHI is liable under the SA as an "Affiliate"[5] of LB SkyPower, (*see* Resp. ¶ 24), is incorrect. Not only is LBHI not a signatory to the SA or otherwise bound by its terms, but that document does not impose liability on any "Affiliate" whatsoever. The Minority Shareholders assert that, under articles 6.1 and 6.2 of the SA, as "Affiliates" of LB SkyPower, LBHI and LBI "[a]re responsible for being the sole source of equity investments for Lehman's investment vehicle (1328392 Alberta) and therefore the sole

---

[5] "The term "Affiliate" is defined in the SA to include "any Person that directly, or indirectly through one of [sic] more intermediaries, Controls or is Controlled by or is under common Control with the Person specified." SA art. 1.1(c).

US_ACTIVE:\44475763\6\58399.0011

funding source for SkyPower." (Resp. ¶ 24.) They further allege that, under articles 8.1 through

8.3, LBHI and LBI as "Affiliates" of LB SkyGroup "[m]aintain the exclusive right to provide

follow-on equity capital" and are further "obligated to make SkyPower competitive in the RFP

process and must provide reasonable assistance and use commercially reasonable efforts to do

so." (*Id.*)

49.    A thorough review of the SA, however, makes clear that no obligation

whatsoever is imposed on any "Affiliate" of LB SkyGroup via the articles cited. Rather, those

articles exclusively identify "Lehman"—defined to mean LB SkyPower, *see* SA at 1—as the

party with rights and liability under the SA. *See id.* arts. 6.1-6.2, 8.1–8.3. The Minority

Shareholders have rewritten the SA to read in the term "Affiliate" where it simply does not exist.

By way of example, article 6.1 states:

> *Lehman* shall have the exclusive right to make all equity
> investments in the Corporation (after the initial closing of the
> Acquisition), at the Initial Pre-Money Valuation, except in the case
> of [certain exceptions not relevant here].

SA art. 6.1 (emphasis added). Article 6.2(c) states:

> *Lehman may at any time elect to reinvest by exercise of the Rights,*
> *all or a part of its* portion of proceeds of Project Back-leveraged
> debt in the form of the subscription price for additional Class A
> Shares at the Initial Pre-Money Valuation.

*Id.* art. 6.2(c) (emphasis added). Similarly, article 8.1 provides:

> [a]s and when determined by *Lehman* to be necessary to fund
> expenditures contemplated by an approved annual operating
> Budget for the Operating Plan, *Lehman* will exercise the Rights.

*Id.* art. 8.1 (emphasis added). Finally, article 8.2 provides:

> *Lehman* will as appropriate either: (a) provide reasonable
> assistance to Opco or any other relevant Subsidiary in obtaining a
> credit rating, as required; or (b) use commercially reasonable
> efforts to provide a "keep well", guarantee or other suitable
> arrangement . . . .

19

*Id.* art. 8.2 (emphasis added).  None of these provisions make any reference to an obligation of an Affiliate, such as LBHI.  The Minority Shareholders would therefore impose liability on LBHI where none was contemplated.

50.    Indeed, the term "Affiliate" appears in *only four articles of the SA*, none of which in any way relate to a financial obligation of an Affiliate to support LB Skypower, as the Minority Shareholders suggest:

- Approval requirements for the provision of goods or services by Lehman or an Affiliate to SkyPower, *see id.* art. 8.4;

- Rights of Lehman and its Affiliates to transfer or sell shares, *see id.* art. 10.1(a)–(b);

- Notice to the parties to the SA not required for sale of shares to a Lehman Affiliate, *see id.* art. 10.4(a);

- Lehman Affiliate may act as investment banker for SkyPower with respect to a monetization event, *see id.* art. 10.5(a)(i).

51.    Thus, even if LBHI could somehow owe *any* obligation under the SA notwithstanding the plain and simple fact that it is not a signatory to the SA and did not otherwise agree to be bound by its terms, it is a well-established principle of New York contract law that if the parties to a multi-party contract explicitly promise separate performances, then each party is liable only for the performance it promised.  *See Abundance Partners LP v. Quamtel, Inc.*, 840 F. Supp. 2d 758, 767 (S.D.N.Y. 2012) ("Where the plain language of a contract signed by multiple parties indicates that only one party has assumed an obligation, only that party will be held liable for a failure to perform."); *Kranze v. Cinecolor Corp.*, 96 F. Supp. 728 (S.D.N.Y. 1951) (holding that because two of the parties to a multi-party contract assumed separate obligations, each party was only liable for the obligation it assumed).

52.    The Court should not frustrate the intentions of the contracting parties by reading a term into articles from which it was deliberately excluded.  The Minority Shareholders'

20

effort to impose liability on LBHI as an "Affiliate" of LB SkyPower is contrary to the plain

language of the SA. Accordingly, the Court should reject it.

### b. The Minority Shareholders Have Failed to State a Valid Veil-Piercing Claim

53. The Minority Shareholders have not alleged sufficient facts to impose

liability on LBHI under the SA by means of a veil-piercing theory.[6] A proof of claim is

considered *prima facie* valid only where it alleges a valid legal basis to support imposing liability

on the debtor, which the Claims—even as supplemented by the Response—fail to do with

respect to veil piercing. *See In re Chain*, 255 B.R. 278 (Bankr. D. Conn. 2000); *In re Marino*, 90

B.R. 25 (Bankr. D. Conn. 1988).

54. In *Chain*, for example, the court determined that a proof of claim "did not

set forth sufficient factual allegations" to support it where the claim was based on an

unenforceable guaranty that failed to comply with the Connecticut statute of frauds. *In re Chain*,

255 B.R. at 280–81. Similarly, the court in *Marino* determined that a claim was not *prima facie*

valid where the alleged liability arose under a lease providing that, upon default, damages would

be calculated by a "termination value" determined using schedules purportedly attached to the

lease. *In re Marino*, 90 B.R. at 28. Because the claimant provided the court with no evidence

that such schedules existed, the court determined that no damages for default could be calculated.

*Id.*; *see also In re Feinberg*, 442 B.R. 215, 220 (Bankr. S.D.N.Y. 2010) (proofs of claim are

*prima facie* valid "[a]ssuming that the averments in [the] filed claims meet the standard of

sufficiency. . . ." (internal quotations and citation omitted)). Accordingly, the Minority

---

[6] The Minority Shareholders argue that both LBHI and LBI are liable for breaches of the SA, and request that the Court pierce the corporate veil with respect to both. (*See* Resp. ¶ 32.) As the Plan Administrator's counsel does not represent LBI, this reply will not address whether the corporate veil should be pierced with respect to that entity.

Shareholders' veil-piercing claims are *prima facie* valid only if the Minority Shareholders have "set forth factual allegations" sufficient to support imposing liability on LBHI.

55.     A claimant "seeking to pierce a corporate veil . . . bear[s] a heavy burden . . . ." *TNS Holdings, Inc. v. MKI Secs. Corp.*, 92 N.Y.2d 335, 339 (N.Y. 1988); *see also Retropolis, Inc. v. 14th St. Dev. LLC*, 17 A.D.3d 209, 210 (N.Y. App. Div. 2005).  The claimant must show that (1) the owner of a corporation exercised complete domination of the corporation with respect to the transaction at issue; and (2) such domination was used to commit a fraud or wrong against the plaintiff that resulted in injury.  *Morris v. N.Y. State Dep't of Taxation & Fin.*, 82 N.Y.2d 135, 141 (N.Y. 1993).  To state a claim for veil-piercing, a party must plead particularized facts; conclusory statements or "bare-bones allegations" will not suffice.  *Russo v. Heller*, 80 A.D.3d 531, 532 (N.Y. App. Div. 2011) (dismissing veil-piercing claim because "'bare-bones' allegations do not provide the particularity required . . . ."); *Andejo Corp. v. S. St. Seaport Ltd. P'ship*, 40 A.D.3d 407, 407 (N.Y. App. Div. 2007) (finding that conclusory statements that defendants "dominated and controlled their subsidiaries" were not particularized facts warranting piercing the corporate veil); *Albstein v. Elany Contr. Corp.*, 30 A.D.3d 210, 210 (N.Y. App. Div. 2006) (affirming dismissal of veil-piercing claim where plaintiff "alleged nothing more than that the corporation was 'undercapitalized' and functioned as . . . [the owner of the corporation's] 'alter ego'").

56.     The Minority Shareholders rely entirely on conclusory statements and "bare-bones allegations"—rather than particularized facts—to support their veil-piercing claim.  Indeed, with respect to LBHI, the Minority Shareholders have pled only one allegation that could potentially be characterized as a fact as opposed to a conclusion:  that "LBI and LBHI created LB SkyPower, the indirect wholly-owned subsidiary of LBI and LBHI, with the sole purpose of

22

serving as the vehicle through which LBI and LBHI would invest in SkyPower." (Resp. ¶¶ 34-35.) The Minority Shareholders' conclusory assertions that LB SkyPower is "completely controlled by LBHI," "merely a shell and instrument of LBHI," and under LBHI's "complete domination and control" appear to all be based on this single pled "fact." (*See* Resp. ¶¶ 34–37.) The only "evidence" put forth by the Minority Shareholders in support of this point is a vague reference to three documents—the Letter of Intent, the Goodmans Steps Memo, and the September Memo.[7]  And the sole connection manufactured by the Minority Shareholders between these three documents and LBHI is that "LBI signed the Letter of Intent . . . which indicated that LBI and its affiliates (i.e., LBHI) would be participating in the [acquisition of SkyPower]." (Resp. ¶ 34.)

57.     The Letter of Intent and the Goodmans Steps Memo are not relevant documents, however, because the SA contains an integration clause expressly providing that it supersedes "all prior communications, proposals, representations and agreements . . . *including . . . the letter of intent dated June 1, 2007 between Lehman Brothers Inc. and Opco* . . . ." SA ¶ 11.7 (emphasis added); *see also Tempo Shain Corp. v. Bertek, Inc.*, 120 F.3d 16, 21 (2d Cir. 1997) ("[A] merger clause provision indicates that the subject agreement is completely integrated, and parol evidence is precluded from altering or interpreting the agreement."). Simply put, the Minority Shareholders' veil-piercing argument is based on

---

[7] Even a cursory review of these documents shows they in no way evidence LBHI's purported "complete domination and control of LB SkyPower." The Letter of Intent is an agreement to which LBI, and not LBHI, is a party. Indeed, neither the Letter of Intent nor the Goodmans Steps Memo specifically references LBHI. (*See generally* Letter of Intent; Goodmans Steps Memo.) Rather, the Letter of Intent makes reference to "certain" unnamed affiliates of LBI, while the Goodmans Steps Memo references no LBI affiliates whatsoever, other than LB SkyPower. (*See* Letter of Intent at 1; *see generally* Goodmans Steps Memo.) The September Memo is a memorandum to SkyPower's board of directors from LBI, not LBHI. The only mention of LBHI in the September Memo is to the anticipated execution by LBHI of the Equity Contribution Agreement and LBHI's issuance of a guaranty related to a turbine sale, (*see* September Memo at 1), a statement the Minority Shareholders did not find sufficiently probative of veil-piercing to cite in the Response. (*See generally* Resp.)

23

nothing more than conclusory statements and "bare-bones allegations"—averments that fall far short of the particularity required to state a veil-piercing claim under New York law.  *See, e.g.*, *Russo*, 80 A.D.3d at 532; *Andejo Corp.*, 40 A.D.3d at 407.  Moreover, the Minority Shareholders allege nothing asserting that any supposed "domination and control" was used to commit a fraud or wrong against them.  Accordingly, the Minority Shareholders' claims against LBHI for breach of the SA under a veil-piercing theory are not *prima facie* valid and should be disallowed and expunged in their entirety.  *See, e.g.*, *In re Chain*, 255 B.R. at 280; *In re Marino*, 90 B.R. at 28.

**D.    The Minority Shareholders' Fail to State a Claim for Breach of the Covenant of Good Faith and Fair Dealing**

58.    The Minority Shareholders' asserted claim for breach of the covenant of good faith and fair dealing does not withstand scrutiny.  "New York . . . does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled."  *Harris v. Provident Life & Accident Ins. Co.*, 310 F.3d 73, 81 (2d Cir. 2002); *see Simon v. Unum Grp.*, No. 07 Civ. 11426 (SAS), 2008 U.S. Dist. LEXIS 47719, at *16-17 (S.D.N.Y. June 19, 2008) (dismissing claim for breach of the covenant of good faith and fair dealing because "[a]s pled, the claim does not state a distinct cause of action based on a separate set of facts and so is not independent from the underlying breach of contract claim as required by New York law").  The Minority Shareholders' purported good faith and fair dealing claim is based on the same conduct underlying their breach of contract claims—LBHI's alleged failure to fund SkyPower. (*Compare* Resp. ¶ 26, *with* Resp. ¶ 38.)  Accordingly, the Minority Shareholders' good faith and fair dealing claim fails as a matter of law.

24

## Conclusion

WHEREFORE, for the reasons set forth above and in the Objection, the Plan

Administrator respectfully requests that the Court enter an order disallowing and expunging the

Claims in their entirety, and granting such other and further relief as the Court may deem just

and appropriate.

Dated: June 3, 2014
      New York, New York

                             */s/ Stephen A. Youngman*
                             Robert J. Lemons
                             Stephen A. Youngman

                             WEIL, GOTSHAL & MANGES LLP
                             767 Fifth Avenue
                             New York, New York 10153
                             Telephone:  (212) 310-8000
                             Facsimile:   (212) 310-8007

                             Attorneys for Lehman Brothers Holdings Inc. and
                             Certain of Its Affiliates

US_ACTIVE:\44475763\6\58399.0011