# EXHIBIT C

## EXHIBIT 3

**Stock Purchase Agreement**
**dated as of June 11, 2007**

***EXECUTION VERSION***

## STOCK PURCHASE AGREEMENT

dated as of June 11, 2007

by and between

### LB SKYPOWER INC.,

as Purchaser,

### 1328392 ALBERTA ULC,

as Acquisitionco,

### SKYPOWER CORP.,

as SkyPower,

### THOSE PERSONS LISTED ON SCHEDULE A ATTACHED HERETO,

as the Shareholders,

### 6785778 CANADA INC.

as Shareholder Holdco

### THE PERSONS LISTED ON SCHEDULE B ATTACHED HERETO,

as the Option Holders,

### HSH NORDBANK AG,

as HSHN

### 2138746 ONTARIO INC.

as Adler Holdco I,

### 2138747 ONTARIO INC.

as Adler Holdco II, and

### KERRY ADLER

as Kerry Adler, and together with Adler Holdco, Adler.

LA1:#6351530v20

## **TABLE OF CONTENTS**

Page

ARTICLE I TRANSACTION AND CLOSING ..................................................................................3

    1.01    Transaction..............................................................................................................3
    1.02    Closing ...................................................................................................................4
    1.03    Withholding Taxes.................................................................................................6

ARTICLE II REPRESENTATIONS AND WARRANTIES OF THE SKYPOWER
              SHAREHOLDERS AS TO SKYPOWER.................................................................6

    2.01    Organization; Authority.........................................................................................6
    2.02    Capital Stock..........................................................................................................7
    2.03    Subsidiaries ...........................................................................................................7
    2.04    [Section 2.04 Intentionally Not Used]....................................................................8
    2.05    No Conflicts...........................................................................................................8
    2.06    Governmental Approvals and Filings......................................................................8
    2.07    Books and Records ................................................................................................9
    2.08    Financial Statements..............................................................................................9
    2.09    Absence of Changes ............................................................................................10
    2.10    No Undisclosed Liabilities ...................................................................................12
    2.11    Taxes...................................................................................................................12
    2.12    Legal Proceedings................................................................................................14
    2.13    Compliance with Laws ........................................................................................15
    2.14    Benefit Plans .......................................................................................................15
    2.15    Real Property .......................................................................................................16
    2.16    Tangible Personal Property; Investment Assets......................................................17
    2.17    Intellectual Property Rights ..................................................................................17
    2.18    Contracts .............................................................................................................19
    2.19    Licenses...............................................................................................................20
    2.20    Insurance .............................................................................................................21
    2.21    Affiliate Transactions ..........................................................................................21
    2.22    Employees; Labor Relations.................................................................................22
    2.23    Environmental Matters .........................................................................................23
    2.24    No Powers of Attorney .........................................................................................24
    2.25    Accounts Receivable; Accounts Payable ..............................................................24
    2.26    Brokers; Structuring Fees ....................................................................................24
    2.27    Propriety of Past Payments...................................................................................24
    2.28    Development Projects ...........................................................................................24
    2.29    Disclosure ...........................................................................................................25
    2.30    No United States Assets.......................................................................................25
    2.31    No Terra Winds Liabilities ..................................................................................25

ARTICLE III ADDITIONAL REPRESENTATIONS AND WARRANTIES OF ADLER
              AND THE SKYPOWER SHAREHOLDERS......................................................26

| 3.01 | Authority | 26 |
| 3.02 | No Conflicts | 26 |
| 3.03 | Capital Stock | 26 |
| 3.04 | Not a Non-Resident | 27 |
| 3.05 | Governmental Approvals and Filings | 27 |
| 3.06 | Legal Proceedings | 27 |
| 3.07 | Purchase for Investment | 27 |

**ARTICLE IV REPRESENTATIONS AND WARRANTIES OF THE PURCHASER ...............27**

| 4.01 | Organization | 27 |
| 4.02 | Authority | 28 |
| 4.03 | No Conflicts | 28 |
| 4.04 | Governmental Approvals and Filings | 28 |
| 4.05 | Legal Proceedings | 28 |
| 4.06 | Purchase for Investment | 28 |
| 4.07 | Funding | 29 |

**ARTICLE V REPRESENTATIONS AND WARRANTIES OF ACQUISITIONCO .................29**

| 5.01 | Organization | 29 |
| 5.02 | Authority | 29 |
| 5.03 | No Conflicts | 29 |
| 5.04 | Governmental Approvals and Filings | 30 |
| 5.05 | Legal Proceedings | 30 |
| 5.06 | Purchase for Investment | 30 |
| 5.07 | Funding | 30 |
| 5.08 | No Other Business | 30 |

**ARTICLE VI COVENANTS OF THE SKYPOWER SHAREHOLDERS AND SKYPOWER ..............30**

| 6.01 | Regulatory and Other Approvals | 31 |
| 6.02 | Investigation by Acquisitionco | 31 |
| 6.03 | No Solicitations | 31 |
| 6.04 | Conduct of Business | 32 |
| 6.05 | Financial Statements and Reports; Filings | 33 |
| 6.06 | Employee Matters | 33 |
| 6.07 | Certain Restrictions | 34 |
| 6.08 | Affiliate Transactions | 35 |
| 6.09 | Notice and Cure | 36 |
| 6.10 | Fulfillment of Conditions | 36 |
| 6.11 | Additional Covenants | 36 |
| 6.12 | Brokers; Structuring Fees | 36 |
| 6.13 | Insurance | 36 |

**ARTICLE VII COVENANTS OF ACQUISITIONCO AND PURCHASER .............................37**

| 7.01 | Regulatory and Other Approvals | 37 |
| 7.02 | Notice and Cure | 37 |
| 7.03 | Fulfillment of Conditions | 38 |

LA1:#6351530v20

- ii -

*Stock Purchase Agreement – Lehman/SkyPower – June 2007*

7.04   Additional Covenants ...................................................................................38

ARTICLE VIII CONDITIONS TO OBLIGATIONS OF PURCHASER AND
             ACQUISITIONCO ........................................................................................38

8.01   Representations and Warranties .....................................................................38
8.02   Operative Agreements ....................................................................................39
8.03   Performance ....................................................................................................39
8.04   Officer's Certificates ......................................................................................39
8.05   Orders and Laws .............................................................................................39
8.06   Regulatory Consents and Approvals ..............................................................39
8.07   Third Party Consents ......................................................................................40
8.08   Opinion of Counsel .........................................................................................40
8.09   Restructuring of Advisory Board, Board of Directors and Officers ..............40
8.10   Intentionally Omitted ......................................................................................40
8.11   Due Diligence .................................................................................................40
8.12   Proceedings .....................................................................................................40
8.13   Independent Engineer; Environmental Review ...............................................41
8.14   Budget; Business Plan; Projections ................................................................41
8.15   No Material Adverse Change ..........................................................................41
8.16   Excluded Assets ..............................................................................................41
8.17   Employee Benefit Documents .........................................................................41
8.18   Payment of Fees ..............................................................................................41
8.19   Exclusive Contribution Right .........................................................................41

ARTICLE IX CONDITIONS TO OBLIGATIONS OF SKYPOWER AND THE
            SKYPOWER SHAREHOLDERS ..............................................................42

9.01   Representations and Warranties .....................................................................42
9.02   Operative Agreements ....................................................................................42
9.03   Performance ....................................................................................................42
9.04   Officers' Certificates ......................................................................................42
9.05   Orders and Laws .............................................................................................43
9.06   Regulatory Consents and Approvals ..............................................................43
9.07   Proceedings .....................................................................................................43
9.08   No Material Adverse Change ..........................................................................43

ARTICLE X *[ INTENTIONALLY NOT USED]* ..........................................................43

ARTICLE XI SURVIVAL OF REPRESENTATIONS, WARRANTIES, COVENANTS
            AND AGREEMENTS .................................................................................43

11.01   Survival of Representations, Warranties, Covenants and Agreements ..........43

ARTICLE XII INDEMNIFICATION ..............................................................................44

12.01   Indemnity by SkyPower and the SkyPower Shareholders .............................44
12.02   Indemnification by Purchaser ........................................................................45
12.03   Claims for Indemnification ............................................................................45
12.04   Defense ...........................................................................................................45
12.05   Limitations on Damages .................................................................................46

12.06   Nature of Remedies ................................................................................47
12.07   Offset; Unpaid Claims ...........................................................................48
12.08   Indemnity Amounts to be Computed on After-Tax Basis; Interest ...........................48

ARTICLE XIII TERMINATION ................................................................................48

13.01   Termination...........................................................................................48
13.02   Effect of Termination..............................................................................49

ARTICLE XIV DEFINITIONS.................................................................................49

14.01   Defined Terms .......................................................................................49

ARTICLE XV MISCELLANEOUS............................................................................60

15.01   Notices ................................................................................................60
15.02   Entire Agreement...................................................................................61
15.03   Expenses ..............................................................................................61
15.04   Confidentiality; Publicity........................................................................62
15.05   Waiver..................................................................................................62
15.06   Amendment............................................................................................62
15.07   No Third Party Beneficiary .....................................................................63
15.08   No Assignment; Binding Effect ................................................................63
15.09   Headings ..............................................................................................63
15.10   Dispute Resolution; Arbitration................................................................63
15.11   Invalid Provisions ..................................................................................65
15.12   Governing Law ......................................................................................65
15.13   Judicial Proceedings; Waiver of Jury Trial; Designation of Agent ...........................65
15.14   Counterparts..........................................................................................66

## SCHEDULES AND EXHIBITS

| | |
|---|---|
| SCHEDULE A | SkyPower Corp. Shares to be Sold, Shareholders, and Consideration |
| SCHEDULE B | SkyPower Corp. Option Holders |
| SCHEDULE C | Persons Executing Employment Agreements |
| SCHEDULE D | Non-Canadian Shareholders |
| SCHEDULE E | Acquisitionco Shares |
| SCHEDULE F | Closing Date Board of Directors and Officers of SkyPower Corp. |
| EXHIBIT A-1 | Officer's Certificate of SkyPower |
| EXHIBIT A-2 | Officer's Certificate of Shareholder Holdco |
| EXHIBIT A-3 | Officer's Certificate of Adler Holdco I |
| EXHIBIT A-4 | Officer's Certificate of Adler Holdco II |
| EXHIBIT B-1 | Opinion of Counsel to SkyPower and the Shareholders (Alberta) |
| EXHIBIT B-2 | Opinion of Counsel to SkyPower and the Shareholders (Ontario) |
| EXHIBIT B-3 | Opinion of Counsel to SkyPower and the Shareholders (New York) |
| EXHIBIT B-4 | Opinion of Counsel to Purchaser |
| EXHIBIT C | Officer's Certificate of Purchaser |
| EXHIBIT D | Rights |
| EXHIBIT E | Terms of Employee Stock Option Agreement |
| EXHIBIT F | Escrow Agreement |

This **STOCK PURCHASE AGREEMENT** dated as of June 11, 2007 is made and entered into by and between LB SKYPOWER INC., a Delaware corporation ("**Purchaser**"), 1328392 Alberta ULC, an unlimited liability company organized in the Province of Alberta ("**Acquisitionco**"), SkyPower Corp., a corporation incorporated under the federal laws of Canada ("**SkyPower**"), the Persons listed on Schedule A attached hereto (each, a "**Shareholder**" and together, the "**Shareholders**"), 6785778 Canada Inc., a company incorporated under the laws of Canada ("**Shareholder Holdco**"), the Persons listed on Schedule B attached hereto (each, an "**Option Holder**" and together, the "**Option Holders**" ), HSH Nordbank AG ("**HSHN**"), 2138746 Ontario Inc., a corporation incorporated under the laws of Ontario ("**Adler Holdco I**"), 2138747 Ontario Inc., a corporation incorporated under the laws of Ontario ("**Adler Holdco II**") and Kerry Adler ("**Kerry Adler**" and, together with Adler Holdco, "**Adler**"). Capitalized terms not otherwise defined herein have the meanings set forth in Section 14.01. Collectively, the Shareholders, Shareholder Holdco, the Option Holders, HSHN, Adler Holdco I, Adler Holdco II and Adler are referred to as the "**SkyPower Shareholders**").

**WHEREAS**, Acquisitionco has proposed to issue (i) 2,702,258 shares of its Class A Common Stock ("**Class A Common Stock**"), (ii) 1,973,103 shares of its Class B Common Stock ("**Class B Common Stock**"), (iii) 616,800 shares of its Class C Common Stock ("**Class C Common Stock**"), (iv) options to acquire 112,341 shares of its Class D Common Stock ("**Convertible Common Stock**") and (v) certain rights to purchase an aggregate of one billion (1,000,000,000) additional shares of Class A Common Stock and Convertible Preferred Stock, evidenced in the form attached hereto as Exhibit F (the "**Rights**");

**WHEREAS**, Purchaser desires to purchase from Acquisitionco and Acquisitionco desires to issue and sell to Purchaser, the Class A Common Stock;

**WHEREAS**, Acquisitionco desires to grant to Purchaser, and Purchaser desires to hold, the Rights;

**WHEREAS**, (i) the Shareholders hold an aggregate of 625,075 shares of Class A Common stock of SkyPower (the "**Shareholder Shares**"); (ii) Shareholder Holdco holds 625,075 shares of Class A Common stock of SkyPower (the "**Shareholder Holdco Shares**"); (iii) Adler Holdco I holds an aggregate of 1,339,821.5 shares of Class A Common stock, of SkyPower (the "**Adler Holdco I Shares**"); (iv) Adler Holdco II holds an aggregate of 1,348,028.5 shares of Class A Common stock, of SkyPower (the "**Adler Holdco II Shares**" and together with the Adler Holdco I Shares, the "**Adler Shares**"); (v) HSHN holds an aggregate of 1,233,600 shares of Class B Common stock of SkyPower (the "**HSHN Shares**"); and (vi) the Option Holders hold options ("**the Options**") to purchase an aggregate of 232,902 shares of Class A Common stock of SkyPower;

**WHEREAS**, SkyPower desires to redeem the Adler Holdco I Shares and Adler Holdco I desires to sell such Adler Holdco I Shares back to SkyPower (the "**Adler Redemption**");

**WHEREAS**, the Option Holders other than Adler have elected, in respect of fifty percent (50%) of the Options, and Adler has elected in respect of one hundred percent (100%) of

his Options, to receive a cash payment equal to the aggregate fair market value of the shares of common stock of SkyPower issuable on the exercise of such Options less the aggregate exercise price (net of any applicable withholdings or deductions) (the "**Option Payment**") and the Option Payment has been paid in cancellation of such Options by SkyPower issuing to each Option Holder a demand non-interest bearing promissory note (collectively, the "**Option Notes**") with a principal amount equal to such Option Payment and SkyPower desires to repay the Option Notes;

**WHEREAS**, SkyPower has a need for capital to effect the Adler Redemption and to pay the Option Payment and it is in the best interest of Acquisitionco to advance SkyPower US$47,369,639 on an interest-free basis for such transactions (the "**Advance**");

**WHEREAS**, following the Adler Redemption and the Option Payment, Acquisitionco desires to purchase shares of Class A Common stock of SkyPower and SkyPower desires to sell such shares to Acquisitionco;

**WHEREAS**, SkyPower desires to use the subscription proceeds received from Acquisitionco to repay the Advance;

**WHEREAS**, Adler Holdco II desires to exchange the Adler Holdco II Shares for Class B Common Stock of Acquisitionco and Acquisitionco desires to issue the Class B Common Stock in exchange for the Adler Holdco II Shares;

**WHEREAS**, Shareholder Holdco desires to exchange the Shareholder Holdco Shares for Class B Common Stock of Acquisitionco and Acquisitionco desires to issue the Class B Common Stock in exchange for the Shareholder Holdco Shares;

**WHEREAS**, the Shareholders desire to sell the Shareholder Shares to Acquisitionco and Acquisitionco desires to purchase the Shareholder Shares;

**WHEREAS**, HSHN desires to sell and exchange the HSHN Shares to Acquisitionco in consideration for a cash payment (as to fifty percent (50%) of the HSHN Shares) and in exchange for Class C Common Stock (as to fifty percent (50%) of the HSHN Shares) and Acquisitionco desires to purchase the HSHN Shares and issue such Class C Common Stock;

**WHEREAS**, the Option Holders desire to exchange their remaining fifty percent (50%) of the Options for options to acquire Class B Common Stock of Acquisitionco (the "**Class B Options**") and Acquisitionco desires to issue such Class B Options in consideration for the cancellation of the remaining Options; and

**NOW, THEREFORE**, in consideration of the mutual promises, representations, warranties and covenants contained in this Agreement, the adequacy and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## ARTICLE I

## TRANSACTION AND CLOSING

1.01    Transaction.  On the terms and subject to the conditions set forth in this Agreement:

(a) Sale of Class A Common Stock; Grant of Rights

(i)    Acquisitionco agrees to sell to Purchaser, and Purchaser agrees to purchase from Acquisitionco Two million Seven Hundred and Two Thousand, Two Hundred and Fifty Eight (2,702,258) shares of the Class A Common Stock of Acquisitionco and the Rights on the Closing Date.

(ii)    The aggregate purchase price for the purchase by Purchaser of the Class A Common Stock of Acquisitionco and the Rights to purchase Class A Common Stock of Acquisitionco is US$87,500,000 payable in the manner provided in Section 1.02 (the "**Class A Purchase Price**").

(b) SkyPower Advance; Option Purchase; Purchase of SkyPower Common Stock

(i)     Acquisitionco agrees to make the Advance to SkyPower and SkyPower agrees to repay the Advance on the Closing Date.

(ii)    SkyPower agrees to repay the Option Notes.

(iii)   SkyPower agrees to sell to Acquisitionco and Acquisitionco agrees to purchase from SkyPower 1,460,382.5 shares of Class A Common stock of SkyPower on the Closing Date, for consideration equal to US$47,369,639, payable in the manner provided in Section 1.02 (the "**SkyPower Common Stock Purchase Price**").

(c) Shareholder Holdco Class B Common Stock Exchange

Shareholder Holdco agrees to sell to Acquisitionco and Acquisitionco agrees to purchase from Shareholder Holdco on the Closing Date, the number of Shareholder Holdco Shares set on Schedule A attached hereto, in exchange for the number of shares of Class B Common Stock of Acquisitionco set forth on Schedule E attached hereto and evidenced in the manner provided in Section 1.02 (the "**Shareholder Holdco Purchase Price**").

(d) Purchase of Shareholder Shares

Each Shareholder, severally and not jointly, agrees to sell to Acquisitionco and Acquisitionco agrees to purchase from such Shareholder on the Closing Date, the number of Shareholder Shares set forth aside such Shareholders name on Schedule A attached hereto for the consideration set forth opposite such Shareholder's name on Schedule A attached hereto in the manner provided in Section 1.02 (the "**Shareholder Share Purchase Price**").

(e) Option Exchange

Each Option Holder (other than Adler), severally and not jointly, agrees to sell for cancellation fifty percent (50%) of the Options set forth aside such Option Holder's name on Schedule B attached hereto for consideration equal to the number of options to purchase shares of Class B Common Stock of Acquisitionco set forth opposite the name of such Option Holder on Schedule B attached hereto (the "**New Options**").

(f) Redemption of Adler Holdco I Shares

Adler Holdco I agrees to sell to SkyPower and SkyPower agrees to receive from Adler Holdco I and redeem on the Closing Date, that number of the Adler Holdco I Shares set forth aside Adler Holdco I's name on Schedule A attached hereto in exchange for the consideration equal to the amount of cash set forth aside Adler Holdco I's name on Schedule A, evidenced in the manner provided in Section 1.02 (the "**Adler Holdco I Share Redemption Price**").

(g) Exchange of Adler Holdco II Shares

Adler Holdco II agrees to sell to Acquisitionco and Acquisitionco agrees to purchase from Adler Holdco II on the Closing Date, that number of the Adler Holdco II Shares set forth aside Adler Holdco II's name on Schedule A attached hereto in exchange for that number of shares of Class B Common Stock of Acquisitionco set forth aside Adler Holdco II's name on Schedule E, evidenced in the manner provided in Section 1.02 (the "**Adler Class B Common Stock Purchase Price**").

(h) Purchase of HSHN Shares

HSHN agrees to sell to Acquisitionco and Acquisitionco agrees to purchase from HSHN on the Closing Date, the number of HSHN Shares set out on Schedule A attached hereto, for the cash consideration set forth aside HSHN's name on Schedule A attached hereto and in exchange for the number of shares of Class C common Stock of Acquisitionco set forth on Schedule E attached hereto, each in the manner provided in Section 1.02 (the "**HSHN Purchase Price**").

1.02    Closing.  The Closing will take place at the offices of Goodmans LLP, 250 Yonge Street, Toronto, Ontario or at such other place as the Parties mutually agree, at 10:00 A.M. local time, on the Closing Date.  At the Closing, the following transactions will occur in the following order:

(a) Purchaser will pay US$$87,500,000 to Acquisitionco (the "**Aggregate Purchase Price**") by wire transfer of immediately available funds to such account as Acquisitionco may reasonably direct by written notice delivered to Purchaser by Acquisitionco at least two (2) Business Days before the Closing Date and Acquisitionco will issue Purchaser a certificate or certificates representing 2,702,258 shares of Class A Common Stock of Acquisitionco and the Rights in genuine and unaltered form, duly endorsed in blank or accompanied by duly executed stock powers endorsed in blank with requisite stock transfer tax stamps, if any, attached and containing any legends required by the Shareholders Agreement;

(b) Acquisitionco will advance to SkyPower US$47,369,639;

*Stock Purchase Agreement – Lehman/SkyPower – June 2007*

(c) SkyPower will pay to Adler Holdco I, the Adler Share Redemption Price by wire transfer of immediately available funds to such account as Adler Holdco I may reasonably direct by written notice delivered to SkyPower by Adler Holdco I at least two (2) Business Days before the Closing Date.

(d) SkyPower will repay the Option Notes.

(e) Acquisitionco will pay to (which transactions will take place simultaneously):

(i) each Shareholder, the Shareholder Share Purchase Price set forth opposite such Person's name on Schedule A attached hereto;

(ii) Adler Holdco II, the Adler Class B Common Stock Purchase Price;

(iii) Shareholder Holdco, the Shareholder Holdco Purchase Price; and

(iv) HSHN, the HSHN Purchase Price

in each case, net of any applicable withholdings or deductions, by wire transfer of immediately available funds to such account as payee may reasonably direct by written notice delivered to Acquisitionco by such payee at least two (2) Business Days before the Closing Date;

(f) Acquisitionco will issue and deliver to Shareholder Holdco, Adler Holdco and HSHN, a certificate or certificates representing the number and class of shares set beside such Person's name on the attached Schedule E, genuine and unaltered form, duly endorsed in blank or accompanied by duly executed stock powers endorsed in blank with requisite stock transfer tax stamps, if any, attached and containing any legends required by the Shareholders Agreement.

(g) Acquisitionco will pay to SkyPower, the SkyPower Common Stock Purchase Price by wire transfer of immediately available funds to such account as SkyPower may reasonably direct by written notice delivered to Acquisitionco by SkyPower at least two (2) Business Days before the Closing Date.

(h) SkyPower will repay US$47,369,639 to Acquisitionco by wire transfer of immediately available funds to such account as Acquisitionco may reasonably direct by written notice delivered to SkyPower by Acquisitionco at least two (2) Business Days before the Closing Date.

(i) Sk yPower will issue and deliver to Acquisitionco a certificate or certificates representing 1,460,382.5 shares of Class A Common stock of SkyPower, in genuine and unaltered form, duly endorsed in blank or accompanied by duly executed stock powers endorsed in blank, with requisite stock transfer tax stamps, if any, attached.

(j) Acquisitionco will issue and deliver to the Option Holders the New Options.

(k) At the Closing, there shall also be delivered to the respective Parties, as applicable, the opinions, certificates and other documents and instruments to be delivered under Articles VI and VII.

1.03    Withholding Taxes.  Subject to this Section 1.03, each Non-Canadian Shareholder will take all reasonable steps to obtain and deliver to Acquisitionco, on or before the Closing, a certificate issued by the Minister of National Revenue pursuant to section 116 of the Tax Act in respect of the sale of such Non-Canadian Shareholder's Shares to Acquisitionco (the "**Certificate**").

If a Certificate specifying a certificate limit in an amount which is not less than a portion of total purchase price allocable to such Non-Canadian Shareholder (the "**Pro Rata Shareholder Purchase Price**"), is not delivered to Acquisitionco at or before the Closing, Acquisitionco shall be entitled to withhold from the Pro Rata Shareholder Purchase Price the amount that Acquisitionco may be required to remit pursuant to subsection 116(5) of the Tax Act in connection with such purchase (the "**Withheld Amount**"), which Withheld Amount will be held by the Escrow Agent pursuant to the Escrow Agreement.  The Withheld Amount deposited with the Escrow Agent shall be deemed to have been paid to such Non-Canadian Shareholder to satisfy Acquisitionco's obligations to such Non-Canadian Shareholder under Section 1.02.

## ARTICLE II

## REPRESENTATIONS AND WARRANTIES OF THE SKYPOWER SHAREHOLDERS AS TO SKYPOWER

The SkyPower Shareholders hereby represent and warrant as to SkyPower as follows:

2.01    Organization; Authority.  SkyPower is a corporation duly organized, validly existing and in good standing under the Laws of Canada.  SkyPower has full corporate power and authority to conduct its business as and to the extent now conducted and to own, use and lease its Assets and Properties.  SkyPower has full corporate power and authority to execute and deliver the Operative Agreements to which it is a party and to perform its obligations thereunder and to consummate the transactions contemplated thereby.  Section 2.01 of the Disclosure Schedule lists all lines of business in which SkyPower is participating or engaged. SkyPower is duly qualified, licensed or admitted to do business and is in good standing in those jurisdictions specified in Section 2.01 of the Disclosure Schedule, which are the only jurisdictions in which the ownership, use or leasing of its Assets and Properties, or the conduct or nature of its business, makes such qualification, licensing or admission necessary.  The name of each director and officer of SkyPower on the date hereof, and the position held by each, are listed in Section 2.01 of the Disclosure Schedule.  The SkyPower Shareholders will deliver or cause SkyPower to deliver, prior to the Closing, to Acquisitionco, true and complete copies of the charter documents of SkyPower as in effect on the date hereof.

2.02   Capital Stock. The authorized capital stock of SkyPower consists solely of an unlimited number of shares of Class A Common stock, Class B Common stock, Class C Common stock, Class D Preference stock, Class E Preference stock, Class F Preference stock, and Class G Preference stock of SkyPower (collectively, the "**SkyPower Shares**"). The SkyPower Shares are duly authorized, validly issued, outstanding, fully paid and nonassessable. Except as disclosed in Section 2.02 of the Disclosure Schedule, there are no outstanding Options with respect to SkyPower. Neither SkyPower nor any Subsidiary is party to any agreement pursuant to which either such Person has granted preemptive rights, rights of first refusal, registration rights and similar rights with respect to the SkyPower Shares or any other shares of capital stock of SkyPower or any agreement relating to voting of the SkyPower Shares or any other shares of capital stock of SkyPower.

2.03   Subsidiaries. Section 2.03 of the Disclosure Schedule lists the name of each Subsidiary and all lines of business in which each Subsidiary is participating or engaged. Each Subsidiary is duly organized, validly existing and in good standing under the Laws of its jurisdiction of organization, and has full power and authority to conduct its business as and to the extent now conducted and to own, use and lease its Assets and Properties. Each Subsidiary is duly qualified, licensed or admitted to do business and is in good standing in those jurisdictions specified in Section 2.03 of the Disclosure Schedule, which are the only jurisdictions in which the ownership, use or leasing of such Subsidiary's Assets and Properties, or the conduct or nature of its business, makes such qualification, licensing or admission necessary. Section 2.03 of the Disclosure Schedule lists for each Subsidiary all record owners of the outstanding capital stock of each Subsidiary and the number of shares held by each such record owner. Except as disclosed in Section 2.03 of the Disclosure Schedule, all of the outstanding shares of capital stock of each Subsidiary have been duly authorized and validly issued, are fully paid and nonassessable, and are owned, beneficially and of record, by SkyPower or the Subsidiaries wholly owned by SkyPower free and clear of all Liens. Except as disclosed in Section 2.03 of the Disclosure Schedule, there are no outstanding Options with respect to any Subsidiary. The name of each director and officer of each Subsidiary on the date hereof, and the position with such Subsidiary held by each, are listed in Section 2.03 of the Disclosure Schedule. Neither any Shareholder, SkyPower nor any Subsidiary is party to any agreement pursuant to which any Shareholder, SkyPower or such Subsidiary has granted preemptive rights, rights of first refusal, registration rights or similar rights with respect to the capital stock of such Subsidiary or any other Subsidiary or any agreement relating to voting of shares of capital stock of such Subsidiary or any other Subsidiary. No Subsidiary has granted any Person rights to cause the registration for sale under any securities Laws of any shares of capital stock of such Subsidiary. The SkyPower Shareholders will cause SkyPower to provide Acquisitionco with access to true and complete copies of the certificate or articles of incorporation and by-laws (or other comparable corporate charter documents) of each of the Subsidiaries as in effect on the date hereof. Neither SkyPower nor any of its Subsidiaries, directly or indirectly, owns any capital stock of or other equity interests in any corporation, partnership or other entity or Person other than the Subsidiaries or has made any loan or entered into any commitment to purchase equity interests issued by or lent money to any Person. Pursuant to that certain Exchange Agreement, dated as of December 23, 2005, by and among SkyPower, SkyPower Wind Energy Fund LP, SkyPower I GP Inc., and Terra Winds Resources Corp. ("**Terra Winds**"), SkyPower, directly or indirectly through its Subsidiaries, was granted and currently holds certain exchange rights with respect to Terra Winds (the "**Exchange Rights**"). Neither SkyPower nor any of its Subsidiaries has sold,

transferred, granted, waived, assigned or otherwise alienated or incumbered any of the Exchange
Rights.

2.04    [Section 2.04 Intentionally Not Used]

2.05    No Conflicts. The execution and delivery by SkyPower and the SkyPower
Shareholders of this Agreement do not, and the execution and delivery by SkyPower and the
SkyPower Shareholders of the Operative Agreements, the performance by SkyPower and the
SkyPower Shareholders of their obligations, including, in the case of the SkyPower
Shareholders, obligations to cause SkyPower actions, under this Agreement and such Operative
Agreements and the consummation of the transactions contemplated hereby and thereby will not:

(a) conflict with or result in a violation or breach of any of the terms, conditions
or provisions of the certificate or articles of incorporation or by-laws (or other comparable
organizational documents) of SkyPower or any Subsidiary;

(b) subject to obtaining the consents, approvals and actions, making the filings
and giving the notices disclosed in Section 2.05 of the Disclosure Schedule, conflict with or
result in a violation or breach of any term or provision of any Law or Order applicable to
SkyPower or any Subsidiary or any of their respective Assets and Properties; or

(c) except as disclosed in Section 2.05 of the Disclosure Schedule, (i) conflict
with or result in a violation or breach of, (ii) constitute (with or without notice or lapse of time
or both) a default under, (iii) require SkyPower or any Subsidiary to obtain any consent,
approval or action of, make any filing with or give any notice to any Person as a result or under
the terms of, (iv) result in or give to any Person any right of termination, cancellation,
acceleration or modification in or with respect to, (v) result in or give to any Person any
additional rights or entitlement to increased, additional, accelerated or guaranteed payments
under, or (vi) result in the creation or imposition of any Lien upon SkyPower or any Subsidiary
or any of their respective Assets and Properties under, any Contract or License to which
SkyPower or any Subsidiary is a party or by which any of their respective Assets and Properties
is bound, except as would not individually or in the aggregate, reasonably be expected to have a
SkyPower Material Adverse Effect.

2.06    Governmental Approvals and Filings. No consent, approval or action of,
filing with or notice to any Governmental or Regulatory Authority on the part of SkyPower, any
SkyPower Shareholder or any Subsidiary is required in connection with the execution, delivery
and performance of this Agreement or any of the Operative Agreements to which any of them is
a party or the consummation of the transactions contemplated hereby or thereby.

2.07    Books and Records. The minute books and other similar records of
SkyPower and the Subsidiaries as made available to Purchaser prior to the Closing contain a true
and complete record, in all material respects, of all action taken at all meetings and by all written
consents in lieu of meetings of the stockholders, the Boards of Directors and committees of the
Boards of Directors of SkyPower and such Subsidiaries. The stock transfer ledgers and other
similar records of SkyPower and the Subsidiaries as made available to Purchaser prior to the
Closing accurately reflect all record transfers prior to the Closing in the capital stock of

LA1:#6351530v20                        - 8 -

*Stock Purchase Agreement – Lehman/SkyPower – June 2007*

SkyPower and such Subsidiaries. Except as set forth in <u>Section 2.07 of the Disclosure Schedule</u>, neither SkyPower nor any Subsidiary has any of its Books and Records recorded, stored, maintained, operated or otherwise wholly or partly dependent upon or held by any means (including any electronic, mechanical or photographic process, whether computerized or not) which (including all means of access thereto and therefrom) are not under the exclusive ownership and direct control of SkyPower or the Subsidiaries.

2.08   <u>Financial Statements</u>. The SkyPower Shareholders will deliver or cause SkyPower to deliver to Acquisitionco prior to the Closing true and complete copies of the following financial statements:

(a) Unaudited consolidated financial statements of SkyPower for the year ended December 31, 2004 and period ended December 31, 2003, including balance sheet, cash flows, shareholders equity and statement of operations and notes thereto;

(b) Draft audited consolidated financial statements of SkyPower for the years ended December 31, 2006 and 2005, including balance sheet, cash flows, shareholders equity and statement of operations and notes thereto with final auditor's report.

All financial statements (i) were prepared in accordance with GAAP applied consistently throughout the periods involved, except as disclosed therein, (ii) fairly present the consolidated financial condition and results of operations of each of SkyPower and its consolidated subsidiaries as of the respective dates thereof and for the respective periods covered thereby, and (iii) were compiled from the Books and Records of each of SkyPower and its consolidated subsidiaries, as applicable, regularly maintained by management and used to prepare the financial statements of each of SkyPower and its consolidated subsidiaries in accordance with the principles stated therein. Each of SkyPower and its subsidiaries have maintained their Books and Records in accordance with reasonable business practices, including the maintenance of an adequate system of internal controls, and in a manner sufficient to permit the preparation of financial statements in accordance with GAAP. The financial condition and results of operations of each Subsidiary are, and for all periods referred to in this <u>Section 2.08</u> have been, consolidated with those of SkyPower.

2.09   <u>Absence of Changes</u>. Except for the execution and delivery of this Agreement and the transactions to take place pursuant hereto on or prior to the Closing Date, since the Audited Financial Statement Date there has not been any SkyPower Material Adverse Effect, or any event or development which, individually or together with other such events, could reasonably be expected to result in a SkyPower Material Adverse Effect. Without limiting the foregoing, except as disclosed in <u>Section 2.09 of the Disclosure Schedule</u>, there has not occurred between the Audited Financial Statement Date and the date hereof:

(i)     any declaration, setting aside or payment of any dividend or other distribution in respect of the capital stock of SkyPower or any Subsidiary not wholly owned by SkyPower, or any direct or indirect redemption, purchase or other acquisition by SkyPower or any Subsidiary of any such capital stock of or any Option with respect to SkyPower or any Subsidiary not wholly owned by SkyPower;

(ii)    any authorization, issuance, sale or other disposition by SkyPower or any Subsidiary of any shares of capital stock of or Option with respect to SkyPower or any Subsidiary, or any modification or amendment of any right of any holder of any outstanding shares of capital stock of or Option with respect to SkyPower or any Subsidiary;

(iii)    (x) any increase in the salary, wages or other compensation of any officer, employee or consultant of SkyPower or any Subsidiary; (y) any establishment or modification of (A) targets, goals, pools or similar provisions in respect of any fiscal year under any Benefit Plan, employment-related Contract or other employee compensation arrangement or (B) salary ranges, increase guidelines or similar provisions in respect of any Benefit Plan, employment-related Contract or other employee compensation arrangement; or (z) any adoption, entering into or becoming bound by any Benefit Plan, employment-related Contract or collective bargaining agreement, or amendment, modification or termination (partial or complete) of any Benefit Plan, employment-related Contract or collective bargaining agreement, except to the extent required by applicable Law and, in the event compliance with legal requirements presented options, only to the extent the option which SkyPower or Subsidiary reasonably believed to be the least costly was chosen;

(iv)    (A) incurrences by SkyPower or any Subsidiary of any Liability or Indebtedness with respect to which the obligations of SkyPower or its Subsidiaries exceed $50,000, or (B) any voluntary purchase, cancellation, prepayment or complete or partial discharge in advance of a scheduled payment date with respect to, or waiver of any right of SkyPower or any Subsidiary under, any Indebtedness of or owing to SkyPower or any Subsidiary;

(v)    any physical damage, destruction or other casualty loss (whether or not covered by insurance) affecting any of the plant, real or personal property or equipment of SkyPower or any Subsidiary in an aggregate amount exceeding $50,000;

(vi)    other than as may be required as a result of changes in GAAP, any material change in (x) any pricing, investment, accounting, financial reporting, inventory, credit, allowance or Tax practice or policy of SkyPower or any Subsidiary, or (y) any method of calculating any bad debt, contingency or other reserve of SkyPower or any Subsidiary for accounting, financial reporting or Tax purposes, or any change in the fiscal year of SkyPower or any Subsidiary;

(vii)    other than as may be required as a result of changes in GAAP, any write-off or write-down of or any determination to write off or write down any of the Assets and Properties of SkyPower or any Subsidiary outside the ordinary course of business consistent with past practice;

(viii)    any acquisition or disposition of, or incurrence of a Lien (other than a Permitted Lien) on, any Assets and Properties of SkyPower or any Subsidiary, other than in the ordinary course of business consistent with past practice;

(ix)    any (x) amendment of the certificate or articles of incorporation or by-laws (or other comparable corporate charter documents) of SkyPower or any Subsidiary,

(y) recapitalization, reorganization, liquidation or dissolution of SkyPower or any Subsidiary or (z) merger or other business combination involving SkyPower or any Subsidiary and any other Person;

(x)     any entering into, amendment, modification, termination (partial or complete) or granting of a waiver under or giving any consent with respect to (A) any Contract which is required (or had it been in effect on the date hereof would have been required) to be disclosed in Section 2.18 of the Disclosure Schedule or (B) any material License held by SkyPower or any Subsidiary;

(xi)     capital expenditures or commitments for additions to property, plant or equipment of SkyPower and/or the Subsidiaries constituting capital assets outside the ordinary course of business consistent with past practice;

(xii)     any commencement or termination by SkyPower or any Subsidiary of any line of business;

(xiii)     any transaction by SkyPower or any Subsidiary with SkyPower, any SkyPower Shareholder, officer, director or Affiliate (other than SkyPower or any Subsidiary) of SkyPower or any Subsidiary (A) outside the ordinary course of business consistent with past practice or (B) other than on an arm's-length basis, other than pursuant to any Contract in effect on the Audited Financial Statement Date and disclosed pursuant to Section 2.18 of the Disclosure Schedule;

(xiv)     an y disposition or lapse of any rights SkyPower or any of its Subsidiaries has under Intellectual Property or disposition of or disclosure to any Person of any trade secret, formula, process, know-how, software, or other Intellectual Property not theretofore a matter of public knowledge;

(xv)     any other adverse change in any rights SkyPower or any of its Subsidiaries has under or to Intellectual Property, other than the expiration thereof in accordance with its terms as described in Section 2.09 of the Disclosure Schedule;

(xvi)   the cre ation of any new Subsidiary;

(xvii)   any entering into of a Contract to do or engage in any of the foregoing after the date hereof; or

(xviii)  any other transaction involving or development affecting SkyPower or any Subsidiary outside the ordinary course of business consistent with past practice.

2.10     No Undisclosed Liabilities. Except as reflected or reserved against in the balance sheet included in the Audited Financial Statements or in the notes thereto, there are no Liabilities against, relating to or affecting SkyPower or any Subsidiary or any of their respective Assets and Properties.

2.11   Taxes.  Except as set forth in Section 2.11 of the Disclosure
Schedule (with references to the applicable paragraph below):

(a)  SkyPower and each Subsidiary have filed all Tax Returns required to be filed
by applicable Law.  All Tax Returns were (and, as to Tax Returns not filed as of the date
hereof, will be) true, complete and correct and filed on a timely basis.  SkyPower and each
Subsidiary (i) has paid all Taxes that are due, or claimed or asserted by any taxing authority to
be due, from SkyPower and such Subsidiary for the periods covered by the Tax Returns or
(ii) has duly and fully provided reserves adequate to pay all Taxes in accordance with GAAP;

(b)  SkyPower and each Subsidiary have established and will maintain on its
Books and Records reserves adequate to pay all Taxes not yet due and payable and such
reserves are clearly identified as reserves for current Taxes;

(c)  there are no Liens for Taxes upon the assets of SkyPower (or any Subsidiary)
except Permitted Liens;

(d)  SkyPower and each Subsidiary have complied and will comply with all
applicable Laws, rules, and regulations relating to the payment and withholding of Taxes and
have, within the time and in the manner prescribed by Law, withheld from employee wages and
paid over to the proper Governmental or Regulatory Authority all required amounts;

(e)  neither SkyPower nor any Subsidiary has requested (and no request has been
made on its behalf) any extension of time within which to file any Tax Return.  Neither
SkyPower nor any Subsidiary has executed any outstanding waivers or comparable consents
regarding the application of the normal reassessment period as defined in the Tax Act ("**normal
reassessment period**") for any Taxes or Tax Returns (and no extensions have been executed on
their behalf).  The normal reassessment period for the assessment of all Taxes has expired for
all applicable Tax Returns of SkyPower and each of its Subsidiaries through the date hereof.
Tax Returns for SkyPower and each of its Subsidiaries have been examined by the appropriate
taxing authorities for all periods through the date hereof.  No deficiency for any Taxes has been
suggested, proposed, asserted or assessed against SkyPower or any Subsidiary that has not been
resolved and paid in full;

(f)  no audits or other administrative proceedings or court proceedings are
presently pending or, to the Knowledge of any SkyPower Shareholder, threatened with regard
to any Taxes or Tax Returns of SkyPower or any Subsidiary;

(g)  no power of attorney currently in force has been granted by SkyPower or any
Subsidiary concerning any Tax matter;

(h)  neither SkyPower nor any Subsidiary has received any written ruling of a
taxing authority relating to Taxes, or any other written and legally binding agreement with a
taxing authority relating to Taxes;

(i)  no agreement as to indemnification for, contribution to, or payment of Taxes
exists between any SkyPower or any Subsidiary, on the one hand, and any other person, on the
other including without limitation SkyPower, including pursuant to any Tax sharing agreement,

lease agreement, purchase or sale agreement, partnership agreement or any other agreement. Neither SkyPower or any Subsidiary has any liability for Taxes of any person, or as a transferee or successor, by contract or otherwise;

(j) the Sk yPower Shareholders have provided Acquisitionco with access to, or have caused SkyPower to provide Acquisitionco with access to, (or, in the case of Tax Returns to be filed on or before the Closing Date, will make available) complete and accurate copies of all Tax Returns and associated work papers filed by or on behalf of SkyPower and the Subsidiaries for all taxable years ending on or prior to the Closing Date;

(k) no jurisdiction in which SkyPower or any Subsidiary has not filed a specific Tax Return has asserted that SkyPower or such Subsidiary is required to file such Tax Return in such jurisdiction. Section 2.11 of the Disclosure Schedule lists all jurisdictions and nations in which SkyPower or any Subsidiary files any Tax Returns and indicates in the case of income or franchise Tax filings whether such filings are made on a consolidated, combined or unitary basis and the allocation factors for the most recent taxable year for which filings have been made;

(l) neither Sk yPower nor any Subsidiary has claimed, nor will it claim in any Tax Return for a period ending at or before the Closing Date, any reserve under any one or more of subparagraph 40(1)(a)(iii), paragraphs 20(1)(m) or 20(1)(n) of the Tax Act or any equivalent provincial provision, if such amount could be included in the income of SkyPower or any Subsidiary for any period ending after the Closing Date.

(m)SkyPower and each Subsidiary has duly and timely collected all amounts on account of GST and any other sales or transfer taxes, including goods and services, harmonized sales and provincial or territorial sales taxes, required by Law to be collected by it and has duly and timely remitted to the appropriate Authority any such amounts required by Law to be remitted by it.

(n) neither SkyPower nor any Subsidiary has, either directly or indirectly, transferred property to or acquired property from a Person with whom SkyPower or such Subsidiary was not dealing at arm's length for purposes of the Tax Act for consideration other than consideration equal to the fair market value of the property at the time of disposition or acquisition.

(o) neither SkyPower nor any Subsidiary is a party to any Tax sharing, tax allocation agreement or similar agreement or arrangement pursuant to which it will have any obligation to make payments on or after the Closing Date.

(p) SkyPower and each Subsidiary is duly registered under subdivision (d) of Division V of Part IX of the ETA with respect to the goods and services tax and harmonized sales tax and, as applicable, under Division I of Chapter VIII of Title I of the *Quebec Sales Tax Act* with respect to the Quebec sales tax.

(q) neither SkyPower nor any Subsidiary will at any time be deemed to have a capital gain pursuant to subsection 80.03(2) of the Tax Act as a result of any transaction or event taking place in any taxation year ending on or before the Closing Date.

(r)  there are no circumstances existing which could result in the application of section 78 of the Tax Act or any equivalent provincial legislation to SkyPower or any Subsidiary.

(s)  SkyPower and each Subsidiary has non capital losses and net operating loss carryforwards and tax credit carryforwards available to offset future income in the amounts and with the expiration dates set forth on Section 2.11 of the Disclosure Schedule. None of the net operating loss carryforwards are subject to a separate return limitation year limitation.

(t)  none of the Class A Common shares or Class B Common shares of SkyPower are, or will be at any time up to and including Closing, "taxable preferred shares", as defined in the Tax Act.

2.12   Legal Proceedings. Except as disclosed in Section 2.12 of the Disclosure Schedule (with paragraph references corresponding to those set forth below):

(a)  there are no Actions or Proceedings pending or, to the Knowledge of any SkyPower Shareholder, threatened against, relating to or affecting SkyPower or any Subsidiary or any of their respective Assets and Properties;

(b)  there are no facts or circumstances Known to any SkyPower Shareholder that could reasonably be expected to give rise to any such Action or Proceeding, except as would not, individually or in the aggregate, reasonably be expected to have a SkyPower Material Adverse Effect; and

(c)  there are no Orders outstanding against SkyPower or any Subsidiary.

2.13   Compliance with Laws. Prior to the Closing, Acquisitionco will have had access to all responses of counsel for SkyPower and the Subsidiaries to auditors' requests for information delivered in connection with the Audited Financial Statements (together with any updates provided by such counsel) regarding Actions or Proceedings pending or threatened against, relating to or affecting SkyPower or any Subsidiary. SkyPower and each of its Subsidiaries have complied in a timely manner with all Laws and Orders that materially affect the Business or Condition of SkyPower and no notice, charge, claim, action or assertion has been received by SkyPower or any of its Subsidiaries or has been filed, commenced or, to the Knowledge of any SkyPower Shareholder, threatened against SkyPower or any of its Subsidiaries alleging any violation of any of the foregoing.

2.14   Benefit Plans. Section 2.14 of the Disclosure Schedule contains a true and complete list of each Benefit Plan. Neither SkyPower nor any Subsidiary has scheduled or agreed upon future increases of benefit levels (or creations of new benefits) with respect to any Benefit Plan, and no such increases or creation of benefits have been proposed, made the subject of representations to employees or requested or demanded by employees under circumstances which make it reasonable to expect that such increases will be granted. Except as disclosed in Section 2.14 of the Disclosure Schedule, no loan is outstanding between SkyPower or any Subsidiary and any employee.

(a) Acquisitionco has been given access to complete and correct copies of the following documents prior to the Closing: (i) all Benefit Plans and any predecessor plans referred to therein, any related trust agreements, and service provider agreements, insurance contracts or agreements with investment managers, including without limitation, all amendments thereto; (ii) current summary plan descriptions of each Benefit Plan; (iii) any applicable tax Law determination with respect to any Benefit Plan; (iv) the two most recent financial statements prepared with respect to each Benefit Plan with respect to which such statements are prepared; and (v) the two most recent actuarial reports of the qualified actuary of any Benefit Plan with respect to which actuarial valuations are conducted.

(b) Neither SkyPower nor any Subsidiary maintains or is obligated to provide benefits under any life, medical or health plan which provides benefits to retirees or other terminated employees. Neither SkyPower, any Subsidiary, nor any other corporation or organization controlled by or under common control with any of the foregoing has at any time contributed to any "multiemployer plan."

(c) Each of the Benefit Plans is, and its administration is and has been since inception, in all material respects in compliance with, and has been administered in compliance with, and neither SkyPower nor any Subsidiary has received any claim or notice that any such Benefit Plan is not in compliance with, the documentation referred to in Section 2.14(a) and all applicable Laws and Orders. Each Benefit Plan intended to provide for the deferral of income, the reduction of salary or other compensation or to afford other Tax benefits complies with the requirements of the applicable provisions of the Laws required in order to provide such Tax benefits.

(d) Neither SkyPower nor any Subsidiary is in default in performing any of its contractual obligations under any of the Benefit Plans or any related trust agreement or insurance contract. All contributions and other payments required to be made by SkyPower or any Subsidiary to any Benefit Plan with respect to any period ending before or at or including the Closing Date have been made or reserves adequate for such contributions or other payments have been or will be set aside therefor and have been or will be reflected in Financial Statements in accordance with GAAP. There are no material outstanding liabilities of, or related to, any Benefit Plan, other than liabilities for benefits to be paid to participants in such Benefit Plan and their beneficiaries in accordance with the terms of such Benefit Plan.

(e) No benefit under any Benefit Plan, including, without limitation, any severance or parachute payment plan or agreement, will be established or become accelerated, vested, funded or payable by reason of any transaction contemplated under this Agreement.

(f) No Benefit Plan of SkyPower or any Subsidiary is a Pension Plan.

(g) There are no pending or, to the Knowledge of any SkyPower Shareholder, threatened claims by or on behalf of any Benefit Plan, by any Person covered thereby, or otherwise, which allege any violation of Law which could reasonably be expected to result in liability on the part of SkyPower, any Subsidiary or any fiduciary of any such Benefit Plan, nor is there any basis for such a claim, except as would not, individually or in the aggregate, reasonably be expected to have a SkyPower Material Adverse Effect.

2.15    Real Property. Section 2.15 of the Disclosure Schedule contains a true and correct list as of the Effective Date of (i) each parcel of real property leased (which, for the purposes of this Section 2.15, includes any sub-lease) by SkyPower or any Subsidiary (as lessor or lessee), (ii) each parcel of real property, including, without limitation, the Optioned Lands, in which SkyPower or any Subsidiary has an option or similar right to acquire an interest in real property, including, without limitation, the Options to Lease (including information as to the grantor of each Option to Lease and the term of each Option to Lease); and (iii) to the Knowledge of SkyPower, all Liens (other than Permitted Liens) relating to or affecting any parcel of real property referred to in clauses (i) and (ii). Since the Effective Date, neither SkyPower nor any Subsidiary has entered into any agreement relating to or affecting any parcel of real property referred to in clauses (i) and (ii), nor has either SkyPower or any Subsidiary purchased, leased or otherwise gained interest in any real property.

(a)    Neither SkyPower nor any Subsidiary owns, directly or indirectly, any real property.

(b)    The SkyPower Shareholders have no reason to believe that any of the leases included in Section 2.15 of the Disclosure Schedule are not enforceable against the lessors thereunder (except to the extent provided in Section 2.15 of the Disclosure Schedule.) The SkyPower Shareholders have no reason to believe that the Options to Lease described in Section 2.15 of the Disclosure Schedule can not be exercised (individually or in the aggregate) such that SkyPower is not reasonably likely to be able to complete development of any of the Development Projects (except to the extent provided in Section 2.15 of the Disclosure Schedule.)  The SkyPower Shareholders have no reason to believe that the counterparties under the leases of Options to Lease do not have good and marketable title in fee simple to the property subject thereto, free and clear of all Liens, including, without limitation, any prior options, which could interfere in any material respect with SkyPower's ability to complete the Development Projects (except to the extent provided in Section 2.15 of the Disclosure Schedule.)

(c)    Except as disclosed in Section 2.15 of the Disclosure Schedule, to the Knowledge of the SkyPower Shareholders, the improvements on the real property identified in Section 2.15 of the Disclosure Schedule and necessary for any project described in Section 2.28 of the Disclosure Schedule are in good operating condition and in a state of good maintenance and repair, ordinary wear and tear excepted, are adequate and suitable for the purposes for which they are presently being used and, to the Knowledge of any SkyPower Shareholder, there are no condemnation or appropriation proceedings pending or threatened against any of such real property or the improvements thereon.

(d)    Neither SkyPower nor any Subsidiary has any obligation or liability in respect of real property that was leased or optioned in connection with the Business which is no longer occupied or which was disposed of prior to the date hereof.

2.16    Tangible Personal Property; Investment Assets. SkyPower or a Subsidiary is in possession of and has good title to, or has valid leasehold interests in or valid rights under Contract to use, all tangible personal property used in or reasonably necessary for the conduct of

their business, including all tangible personal property reflected on the balance sheet included in
the Unaudited Financial Statements and tangible personal property acquired since the Unaudited
Financial Statement Date other than property disposed of since such date in the ordinary course
of business consistent with past practice. All such tangible personal property is free and clear of
all Liens, other than Permitted Liens and Liens disclosed in <u>Section 2.16 of the Disclosure
Schedule</u>, and is in good working order and condition, ordinary wear and tear excepted, and its
use complies in all material respects with all applicable Laws.

(a)    <u>Section 2.16 of the Disclosure Schedule</u> describes each Investment Asset
owned by SkyPower or any Subsidiary on the date hereof. Except as disclosed in <u>Section 2.16
of the Disclosure Schedule</u>, all such Investment Assets are owned by SkyPower or a Subsidiary
free and clear of all Liens other than Permitted Liens.

2.17    <u>Intellectual Property Rights</u>.  SkyPower has developed certain water pump
technology described on <u>Section 2.17 of the Disclosure Schedule</u> (the "**Water Pump
Technology**," and together with all trade secrets and confidential business information of
SkyPower and its Subsidiaries, the "**SkyPower Confidential Technology and Information**")
and is seeking to patent the Water Pump Technology. Once a patent is issued, SkyPower or a
Subsidiary will have all right, title and interest in the Water Pump Technology. SkyPower is
seeking registration in Canada of the word "SkyPower" as a trademark, and to the SkyPower
Shareholders' Knowledge there is no reason why such registration might be denied. Except as
hereinbefore set forth, neither SkyPower nor any Subsidiary has licensed or otherwise allowed
any other Person to use the Water Pump Technology. Neither SkyPower nor any Subsidiary has
interests in, nor any contractual rights or license to use, any Intellectual Property and no such
rights are necessary or advisable in the conduct of the business of SkyPower or any Subsidiary.

(a)    With respect to each item of SkyPower Confidential Technology and
Information:

(i)    the item is not subject to any outstanding injunction, judgment,
order, decree, ruling or charge, nor, to the Knowledge of any SkyPower Shareholder, is any of
the foregoing threatened;

(ii)    no claim or investigation is pending or, to the Knowledge of any
SkyPower Shareholder, threatened which challenges the legality, validity, enforceability, use or
ownership of the item;

(iii)    none of SkyPower or any of the Subsidiaries has agreed to
indemnify any Person for or against any interference, infringement, misappropriation or other
violation with respect to the item;

(iv)    none of SkyPower or any of the Subsidiaries has taken, or is aware
of nor is any SkyPower Shareholder aware of, any actions, including a sale or offer for sale, the
disclosure of which could lead to the invalidity of any such item; and

(v)    the SkyPower Shareholders have delivered or caused SkyPower to
deliver to Acquisitionco prior to the Closing documentation with respect to any invention,
process, design, computer program or other know-how or trade secret included in or represented

by the item, which documentation is accurate in all material respects and reasonably sufficient in detail and content to identify and explain such invention, process, design, computer program or other know-how or trade secret and to facilitate its full and proper use without reliance on the special knowledge or memory of any Person, except, in each case, to the extent that would not individually or in the aggregate, reasonably be expected to have a SkyPower Material Adverse Effect.

(b) SkyPower and the Subsidiaries have taken reasonable security measures to protect the secrecy, confidentiality and value of their SkyPower Confidential Technology and Information, including without limitation, any trade secrets.

(c) No claim has been threatened or asserted by any Person that SkyPower or any of the Subsidiaries has interfered with, infringed upon, misappropriated or otherwise violated any Intellectual Property rights of any third party, and no claim has been asserted by any alleging any such interference, infringement, misappropriation or violation (including any claim that SkyPower or any Subsidiary must license or refrain from using any Intellectual Property rights of any third party), and to the Knowledge of any SkyPower Shareholder, there is no valid basis for any such claim, except, to the extent that would not individually or in the aggregate, reasonably be expected to have a SkyPower Material Adverse Effect. To the Knowledge of any SkyPower Shareholder, no third party has interfered with, infringed upon, misappropriated or otherwise violated any rights of SkyPower or any of the Subsidiaries with respect to SkyPower Confidential Technology and Information, except, to the extent that would not individually or in the aggregate, reasonably be expected to have a SkyPower Material Adverse Effect. The SkyPower Shareholders have made available or have caused SkyPower to make available to Acquisitionco all infringement and validity studies, including opinions of counsel, prepared by or on behalf of any SkyPower or any of the Subsidiaries.

2.18    Contracts. Section 2.18(a) of the Disclosure Schedule (with paragraph references corresponding to those set forth below) contains a true and complete list of each of the following Contracts or other arrangements (Acquisitionco having been given access to true and complete copies or, if none, reasonably complete and accurate written descriptions of which, together with all amendments and supplements thereto and all waivers of any terms thereof prior to the Closing), to which SkyPower or any Subsidiary is a party or by which any of their respective Assets and Properties is bound:

(i)     (A) all Contracts (excluding Benefit Plans) providing for a commitment of employment or consultation services for a specified or unspecified term or otherwise relating to employment or the termination of employment; and (B) any written or unwritten representations, commitments, promises, communications or courses of conduct (excluding Benefit Plans and any such Contracts referred to in clause (A)) involving an obligation of SkyPower or any Subsidiary to make payments in any year, other than with respect to salary or incentive compensation payments in the ordinary course of business, to any employee exceeding $35,000 or any group of employees exceeding $100,000 in the aggregate;

(ii)      all Contracts with any Person containing any exclusivity provision or covenant prohibiting or limiting the ability of SkyPower or any Subsidiary to engage in any business activity or compete with any Person or prohibiting or limiting the ability of any Person to compete with SkyPower or any Subsidiary;

(iii)     all shareholder agreements and all partnership, joint venture or other similar Contracts with any Person;

(iv)      all Contracts relating to Indebtedness of SkyPower or any Subsidiary or to preferred stock issued by SkyPower or any Subsidiary;

(v)       all Contracts with consultants, advisors, salesmen, distributors, dealers, manufacturer's representatives, sales agencies, franchisees or customers that are not cancelable by SkyPower or any Subsidiary or notice of not more than thirty (30) days and without liability, penalty or premium, and all Contracts providing for the payment of any bonus or commission based on sales or earnings;

(vi)      all Contracts relating to (A) the future disposition or acquisition of any Assets and Properties, other than dispositions or acquisitions in the ordinary course of business consistent with past practice, and (B) any merger or other business combination;

(vii)     all Contracts between or among SkyPower or any Subsidiary on the one hand, and any officer, director or Affiliate of SkyPower, on the other hand, and all Contracts between any one or more of the foregoing;

(viii)    all collective bargaining or similar labor Contracts;

(ix)      all Contracts that (A) limit or contain restrictions on the ability of SkyPower or any Subsidiary to declare or pay dividends on, to make any other distribution in respect of or to issue or purchase, redeem or otherwise acquire its capital stock, to incur Indebtedness, to incur or suffer to exist any Lien, to purchase or sell any Assets and Properties, to change the lines of business in which it participates or engages or to engage in any merger, consolidation or other business combination or (B) require SkyPower or any Subsidiary to maintain specified financial ratios or levels of net worth or other indicia of financial condition;

(x)       all other Contracts that (A) involve the purchase or sale of equipment (including supply and warranty of turbines), real property, construction (including turbine installation and balance of plant), and project operations and service; or that (B) (i) involve the payment or potential payment, pursuant to the terms of any such Contract, by or to SkyPower or any Subsidiary of more than $250,000 at one time or in any twelve (12) month period or (ii) cannot be terminated within thirty (30) days after giving notice of termination without resulting in any material cost or penalty to SkyPower or any Subsidiary;

(xi)      all Contracts with any Band; and

(xii)     all Contracts, including licenses, sublicenses, agreements and permissions, by which SkyPower or any of the Subsidiaries uses the Intellectual Property owned by a third party or a third party uses SkyPower Confidential Technology and Information.

- 19 -

*Stock Purchase Agreement – Lehman/SkyPower – June 2007*

(b) Except as disclosed in Section 2.18 of the Disclosure Schedule neither SkyPower, any Subsidiary nor, to the Knowledge of any SkyPower Shareholder, any other party to such Contract is, or has received notice of termination or notice that it is, in violation or breach of or default under any such Contract (or with notice or lapse of time or both, would be in violation or breach of or default under any such Contract) in any material respect, except to the extent that would not individually or in the aggregate, reasonably be expected to have a SkyPower Material Adverse Effect.. There are no outstanding claims for indemnification under any such Contract.

2.19    Licenses. Section 2.19 of the Disclosure Schedule contains a true and complete list of all Licenses used in and material, individually or in the aggregate, to the business or operations of SkyPower or any Subsidiary (and all pending applications for any such Licenses), setting forth the grantor, the grantee, the function and the expiration and renewal date of each. Prior to the Closing, The SkyPower Shareholders have delivered to Acquisitionco true and complete copies of all such Licenses. Except as disclosed in Section 2.19 of the Disclosure Schedule:

(i)    SkyPower and each Subsidiary owns or validly holds all Licenses that are material, individually or in the aggregate, to its business or operations; and

(ii)    neither SkyPower nor any Subsidiary is, or has received any notice that it is, in default (or with the giving of notice or lapse of time or both, would be in default) under any such License, except, to the extent that would not individually or in the aggregate, reasonably be expected to have a SkyPower Material Adverse Effect.

2.20    Insurance. Section 2.20 of the Disclosure Schedule contains a true and complete list of all liability, property, workers' compensation, directors' and officers' liability and other insurance policies currently in effect that insure the business, operations or employees of SkyPower or any Subsidiary or affect or relate to the ownership, use or operation of any of the Assets and Properties of SkyPower or any Subsidiary and that (i) have been issued to SkyPower or any Subsidiary or (ii) have been issued to any Person (other than SkyPower or any Subsidiary) for the benefit of SkyPower or any Subsidiary. The insurance coverage provided by any of the policies described in clause (i) above will not terminate or lapse by reason of the transactions contemplated by this Agreement. Each policy listed in Section 2.20 of the Disclosure Schedule is valid and binding and in full force and effect, no premiums due thereunder have not been paid and neither SkyPower, any Subsidiary nor the Person to whom such policy has been issued has received any notice of cancellation or termination in respect of any such policy or is in default thereunder. The insurance policies listed in Section 2.20 of the Disclosure Schedule, in light of the respective business, operations and Assets and Properties of SkyPower and the Subsidiaries, are in amounts and have coverages that are reasonable and customary for Persons engaged in such businesses and operations and having such Assets and Properties and are placed with insurers that are reputable and, to the Knowledge of any SkyPower Shareholder, financially sound. Neither SkyPower, any Subsidiary nor the Person to whom such policy has been issued has received notice that any insurer under any policy referred to in this Section 2.20 is denying liability with respect to a claim thereunder or defending under a reservation of rights clause.

2.21    Affiliate Transactions. Except as disclosed in Section 2.21 of the Disclosure Schedule, (i) there are no Liabilities between SkyPower or any Subsidiary, on the one hand, and any officer, director or Affiliate (other than SkyPower or any Subsidiary) of SkyPower or a Subsidiary, on the other, (ii) no such officer, director or Affiliate provides or causes to be provided any assets, services or facilities to SkyPower or any Subsidiary, (iii) neither SkyPower nor any Subsidiary provides or causes to be provided any assets, services or facilities to any such officer, director or Affiliate and (iv) neither SkyPower nor any Subsidiary beneficially owns, directly or indirectly, any Investment Assets issued by any such officer, director or Affiliate. Except as disclosed in Section 2.21 of the Disclosure Schedule, each of the Liabilities and transactions listed in Section 2.21 of the Disclosure Schedule was incurred or engaged in, as the case may be, on an arm's-length basis. Except as disclosed in Section 2.21 of the Disclosure Schedule, since the Audited Financial Statement Date, all settlements of intercompany Liabilities between SkyPower or any Subsidiary, on the one hand, and any such officer, director or Affiliate, on the other, have been made, and all allocations of intercompany expenses have been applied, in the ordinary course of business consistent with past practice.

2.22    Employees; Labor Relations.

(a) Except as disclosed in Section 2.22 of the Disclosure Schedule, no employee of SkyPower or any Subsidiary is presently a member of a collective bargaining unit and, to the Knowledge of any SkyPower Shareholder, there are no threatened or contemplated attempts to organize for collective bargaining purposes any of the employees of SkyPower or any Subsidiary. Since the organization of SkyPower, there has been no work stoppage, strike or other concerted action by employees of SkyPower or any Subsidiary. During that period, SkyPower and the Subsidiaries have complied in all material respects with all applicable Laws relating to the employment, including, without limitation those relating to wages, hours and collective bargaining;

(b) Section 2.22 of the Disclosure Schedule contains a complete list of all employees of SkyPower and each Subsidiary, as well as their length of service, salary and other compensation (other than pursuant to the Benefit Plans listed on the Disclosure Schedule); and (ii) a complete list of all employees on leave, the reason for leave and an expected date of return. SkyPower has not received any information that would lead it to believe that any of such Persons will or may cease to be employees for any reason because of the consummation of the transactions contemplated by this Agreement;

(c) There are no written employment contracts with any employees of SkyPower or any Subsidiary and there are no employment contracts with employees which are not terminable on the giving of reasonable notice in accordance with applicable Law;

(d) All material liabilities to employees of SkyPower and each Subsidiary have or shall have been paid or accrued to the Closing Date in respect of remittance and assessments in respect of any Statutory Plan for income tax and any other employment related legislation, accrued wages, taxes, salaries and commissions. There are no material outstanding, or, to the knowledge of SkyPower or any Subsidiary, pending or threatened assessments, actions, claims, orders, prosecutions or suits against SkyPower or any Subsidiary or its directors or officers pursuant to or under any applicable rules, regulations, orders, Statutory Plans or applicable

*Stock Purchase Agreement – Lehman/SkyPower – June 2007*

Law, including unemployment insurance, employer health tax, employment standards, labour relations, occupational health and safety, human rights, workers' compensation and pay equity;

(e) SkyPower and each Subsidiary is in compliance in all material respects with all applicable Law respecting employment, employment practices and standards, terms and conditions of employment, wages and hours, occupational health and safety, human rights, labour relations, pay equity and workers compensation; and

(f) All accruals for vacation pay, premiums for employment insurance, health premiums, Canada Pension Plan premiums, all other Statutory Plans, accrued wages, salaries, bonuses and commissions up to the Date of Closing have either been paid in full by SkyPower and each Subsidiary or have been reflected in their books and records.

2.23    Environmental Matters. Each of SkyPower and the Subsidiaries has obtained all Licenses which are required under applicable Environmental Laws in connection with the conduct of the business or operations of SkyPower or such Subsidiary. Each of such Licenses is in full force and effect and each of SkyPower and the Subsidiaries is in compliance in all material respects with the terms and conditions of all such Licenses and with all applicable Environmental Laws. In addition:

(a) no Order has been issued, no Environmental Claim has been filed, no penalty has been assessed and no investigation or review is pending or, to the Knowledge of any SkyPower Shareholder, threatened by any Governmental or Regulatory Authority with respect to any alleged failure by SkyPower or any Subsidiary to have any License required under applicable Environmental Laws in connection with the conduct of the business or operations of SkyPower or any of the Subsidiaries or with respect to any generation, treatment, storage, recycling, transportation, discharge, disposal or Release of any Hazardous Material generated by SkyPower or any Subsidiary, and, to the Knowledge of any SkyPower Shareholder, there are no facts or circumstances in existence which could reasonably be expected to form the basis for any such Order, Environmental Claim, penalty or investigation;

(b) neither SkyPower nor any Subsidiary owns, operates or leases a treatment, storage or disposal facility requiring a permit under any resource conservation or other Laws; and, without limiting the foregoing, (i) no polychlorinated biphenyl is or has been present, (ii) no asbestos or asbestos-containing material is or has been present, (iii) there are no underground storage tanks or surface impoundments for Hazardous Materials, active or abandoned, and (iv) no Hazardous Material has been Released in a quantity reportable under, or in violation of, any Environmental Law or otherwise Released, in the cases of clauses (i) through (iv), at, on or under any site or facility now or previously owned, operated or leased by SkyPower or any Subsidiary or, to the Knowledge of any SkyPower Shareholder, at, on or under any Optioned Lands;

(c) no Hazardous Material generated by SkyPower or any Subsidiary has been recycled, treated, stored, disposed of or Released by SkyPower or any Subsidiary at any location;

LA1:#6351530v20                                           - 22 -

(d) no Liens have arisen under or pursuant to any Environmental Law on any site or facility owned, operated or leased by SkyPower or any Subsidiary, or, to the Knowledge of any SkyPower Shareholder, on any Optioned Lands, and no federal, provincial or local Governmental or Regulatory Authority action has been taken or, to the Knowledge of any SkyPower Shareholder, is in process that could subject any such site or facility to such Liens, and neither SkyPower nor any Subsidiary would be required to place any notice or restriction relating to the presence of Hazardous Materials at any site or facility owned by it or, to the Knowledge of any SkyPower Shareholder, on any Optioned Lands, in any deed to the real property on which such site or facility is located; and

(e) there have been no environmental investigations, studies, audits, tests, reviews or other analyses conducted by, or that are in the possession of, SkyPower or any Subsidiary in relation to any site or facility now or previously owned, operated or leased by SkyPower or any Subsidiary or on any Optioned Lands which have not been delivered to Acquisitionco prior to the Closing, except, in each case, to the extent that would not individually or in the aggregate, reasonably be expected to have a SkyPower Material Adverse Effect.

2.24    No Powers of Attorney.  Neither SkyPower nor any Subsidiary has any powers of attorney or comparable delegations of authority outstanding.

2.25    Accounts Receivable; Accounts Payable.  The accounts and notes receivable of SkyPower and the Subsidiaries reflected on the balance sheet included in the Unaudited Financial Statements, and all accounts and notes receivable arising subsequent to the Unaudited Financial Statement Date, (i) arose from bona fide sales transactions in the ordinary course of business and are payable on ordinary trade terms, (ii) are not subject to any valid set-off or counterclaim, (iii) do not represent obligations for goods sold on consignment, on approval or on a sale-or-return basis or subject to any other repurchase or return arrangement, (iv) are collectible in the ordinary course of business consistent with past practice in the aggregate recorded amounts thereof, net of any applicable reserve reflected in the balance sheet included in the Unaudited Financial Statements, and (v) are not the subject of any Actions or Proceedings brought by or on behalf of SkyPower or any Subsidiary.

2.26    Brokers; Structuring Fees.  Except as provided in Section 6.12 hereof, and except for an aggregate amount not to exceed U.S.$6 million in respect of Marathon Capital and Genuity Capital which will be paid at Closing by SkyPower, there are no fees, commissions and expenses due to any Person for a structuring fee, finder's fee, brokerage commission or similar payment with respect to the Transaction.

2.27    Propriety of Past Payments.  No payment has been made by or on behalf of SkyPower or any of its Subsidiaries with the understanding that any part of such payment is to be used for any purpose other than that described in the documents supporting such payment, and neither SkyPower nor any of its Subsidiaries, any director, officer, employee or agent of SkyPower or any of its Subsidiaries or any other Person associated with or acting for or on behalf of SkyPower and any of its Subsidiaries has, directly or indirectly, made any illegal contribution, gift, bribe, rebate, payoff, influence payment, kickback or other payment to any Person, private or public, regardless of form, whether in money, property or services, to obtain

*Stock Purchase Agreement – Lehman/SkyPower – June 2007*

any benefit for SkyPower or any of its Subsidiaries, or any of their Affiliates in violation of any federal, provincial, local, municipal, foreign, international, multinational or other administrative statute, regulation, order, ordinance, treaty or Law. Neither SkyPower nor any of its Subsidiaries has accepted or received any unlawful contribution, payment, gift, kickback, expenditure or other item of value.

        2.28   Development Projects. Section 2.28 of the Disclosure Schedule describes the wind and solar projects currently in development by SkyPower and its Subsidiaries (the "**Development Projects**") and includes a summary of each Development Project. There is no fact or circumstance currently known or reasonably foreseeable (based on the information currently available to the SkyPower Shareholders) that is likely to cause any Development Project not to achieve its respective schedule or to exceed its expected development budget, as such budget was delivered to Purchaser via electronic mail on May 29, 2007 at 2:40am eastern standard time in a file labeled "SkyPower Corp_Monthly Budget_May 23_07v3.xls", except as set out in Section 2.28 of the Disclosure Schedule. To the Knowledge of the SkyPower Shareholders, the plans and budget for each Development Project are adequate to see such project through to completion. Except as set forth on Section 2.28 of the Disclosure Schedule, SkyPower has obtained or in the ordinary course of business will obtain interconnection of, or transmission capacity for, all such Development Projects, and the SkyPower Shareholders, in good faith, know of no facts, circumstances or other issues which would preclude or hamper completion or commercial operation of the Development Projects, including without limitation, access to transmission lines or availability of turbines.

        2.29   Disclosure. All material facts relating to the Business or Condition of SkyPower and its Subsidiaries have been disclosed to Acquisitionco in or in connection with this Agreement. No representation or warranty contained in this Agreement, and no statement contained in the Disclosure Schedule or in any certificate, list or other writing furnished to Acquisitionco pursuant to any provision of this Agreement (including without limitation the Financial Statements and the Operative Documents), contains any untrue statement of a material fact or omits to state a material fact necessary in order to make the statements herein or therein, in the light of the circumstances under which they were made, not misleading other than that they were prepared in good faith on the basis of reasonable assumptions. The factual statements made by the SkyPower Shareholders on their own behalf and on behalf of SkyPower in response to the written inquiries submitted by Acquisitionco or Purchaser are accurate and responsive in all material respects and documents provided to Acquisitionco in response to such written inquiries are materially complete and accurate versions of such documents.

        2.30   No United States Assets. Neither SkyPower nor any Subsidiary has any ownership interest whatsoever to assets located in the United States and or has made any sales in or into the United States in the last fiscal year.

        2.31   No Terra Winds Liabilities. Except as set forth in Section 2.31 of the Disclosure Schedule, neither SkyPower nor any Subsidiary has any obligation, directly or indirectly, for any liabilities of Terra Winds.

*Stock Purchase Agreement – Lehman/SkyPower – June 2007*

## ARTICLE III
## ADDITIONAL REPRESENTATIONS AND WARRANTIES OF ADLER AND THE SKYPOWER SHAREHOLDERS

Adler and each SkyPower Shareholder hereby individually represents and warrants on its own behalf as follows:

3.01    Authority.  Adler has full power and authority to execute and deliver the Operative Agreements on behalf of Adler and on behalf of each of the other SkyPower Shareholders.  Adler holds a voting trust and power of attorney on behalf of HSHN and has the authority to bind HSHN with respect to this Agreement, and in particular to the transfer of shares contemplated hereby, as its attorney whenever such a transfer is required pursuant to the provisions hereof.  Upon the execution and delivery of the Operative Agreements by Adler on behalf of each of the SkyPower Shareholders, the Operative Agreements will constitute the legal, valid and binding obligations of Adler and of each of the SkyPower Shareholders in accordance with their terms subject to bankruptcy, insolvency and other applicable Laws affecting creditors' rights generally and to principles of equity.  The performance by each SkyPower Shareholder of its obligations hereunder and under each of the Operative Agreements to which it is a party, have been duly and validly authorized.

3.02    No Conflicts.  The execution and delivery by such SkyPower Shareholder of this Agreement does not, and the execution and delivery by such SkyPower Shareholder of the Operative Agreements to which it is a party, the performance by such SkyPower Shareholder of its obligations under this Agreement and such Operative Agreements and the consummation of the transactions contemplated hereby and thereby will not:

(a)  conflict with or result in a violation or breach of any term or provision of any Law or Order applicable to such SkyPower Shareholder; or

(b) (i) conflict with or result in a violation or breach of, (ii) constitute (with or without notice or lapse of time or both) a default under, (iii) require such SkyPower Shareholder to obtain any consent, approval or action of, make any filing with or give any notice to any Person as a result or under the terms of, (iv) result in or give to any Person any right of termination, cancellation, acceleration or modification in or with respect to, (v) result in or give to any Person any additional rights or entitlement to increased, additional, accelerated or guaranteed payments under, or (vi) result in the creation or imposition of any Lien upon such SkyPower Shareholder or any of its Assets and Properties under, any Contract or License to which such SkyPower Shareholder is a party or by which any of its respective Assets and Properties is bound.

3.03    Capital Stock.  The SkyPower Shares represent all the issued and outstanding capital stock of SkyPower.  The SkyPower Shares are duly authorized, validly issued, outstanding, fully paid and nonassessable.  The SkyPower Shares are duly authorized and validly issued and outstanding.  Such SkyPower Shareholder owns the SkyPower Shares set forth in Schedule A beside each such SkyPower Shareholder's name, respectively, beneficially and of record, free and clear of all Liens.  The delivery of a certificate or certificates at the

LA1:#6351530v20                                                          - 25 -

Closing representing the SkyPower Shares in the manner provided in Article I will transfer good and valid title to the SkyPower Shares owned by such SkyPower Shareholder, free and clear of all Liens.

      3.04   Not a Non-Resident.

Other than those Persons listed on Schedule D hereto, each SkyPower Shareholder is a resident of Canada under the Tax Act.

      3.05   Governmental Approvals and Filings. No consent, approval or action of, filing with or notice to any Governmental or Regulatory Authority on the part of any SkyPower Shareholder is required in connection with the execution, delivery and performance of this Agreement or the Operative Agreements to which it is a party or the consummation of the transactions contemplated hereby or thereby.

      3.06   Legal Proceedings. There are no Actions or Proceedings pending or, to the Knowledge of any SkyPower Shareholder, threatened against, relating to or affecting such SkyPower Shareholder or any of its Assets and Properties which could reasonably be expected to result in the issuance of an Order restraining, enjoining or otherwise prohibiting or making illegal the consummation of any of the transactions contemplated by this Agreement or any of the Operative Agreements.

      3.07   Purchase for Investment. The stock acquired by any SkyPower Shareholder will be acquired by such SkyPower Shareholder for its own account for the purpose of investment. Such SkyPower Shareholder will refrain from transferring or otherwise disposing of any of such stock, or any interest therein, in such manner as to cause Acquisitionco to be in violation of any securities Laws registration requirements.

## ARTICLE IV

### REPRESENTATIONS AND WARRANTIES OF THE PURCHASER

Purchaser hereby represents and warrants to the SkyPower Shareholders as follows:

      4.01   Organization. Purchaser is a corporation duly organized, validly existing and in good standing under the Laws of the State of Delaware. Purchaser has full corporate power and authority to execute and deliver this Agreement and the Operative Agreements to which it is a party, to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.

      4.02   Authority. The execution and delivery by Purchaser of this Agreement and the Operative Agreements to which it is a party, and the performance by Purchaser of its obligations hereunder and thereunder, have been duly and validly authorized by the Board of Directors of Purchaser, no other corporate action on the part of Purchaser or its stockholders being necessary, except such action as shall be obtained in the ordinary course of business. This Agreement has been duly and validly executed and delivered by Purchaser and constitutes, and

LA1:#6351530v20

- 26 -

*Stock Purchase Agreement – Lehman/SkyPower – June 2007*

upon the execution and delivery by Purchaser of the Operative Agreements to which it is a party, such Operative Agreements will constitute, legal, valid and binding obligations of Purchaser enforceable against Purchaser in accordance with their terms subject to bankruptcy, insolvency and other applicable Laws affecting creditors' rights generally and to principles of equity.

4.03    No Conflicts. The execution and delivery by Purchaser of this Agreement do not, and the execution and delivery by Purchaser of the Operative Agreements to which it is a party, the performance by Purchaser of its obligations under this Agreement and such Operative Agreements, and the consummation of the transactions contemplated hereby and thereby will not conflict with or result in a violation or breach of any of the terms, conditions or provisions of the articles of incorporation or by-laws (or other comparable corporate charter document) of Purchaser.

4.04    Governmental Approvals and Filings. No consent, approval or action of, filing with or notice to any Governmental or Regulatory Authority on the part of Purchaser is required in connection with the execution, delivery and performance of this Agreement or the Operative Agreements to which it is a party or the consummation of the transactions contemplated hereby or thereby.

4.05    Legal Proceedings. There are no Actions or Proceedings pending or, to the knowledge of Purchaser, threatened against, relating to or affecting Purchaser or any of its Assets and Properties which could reasonably be expected to result in the issuance of an Order restraining, enjoining or otherwise prohibiting or making illegal the consummation of any of the transactions contemplated by this Agreement or any of the Operative Agreements.

4.06    Purchase for Investment. The SkyPower common stock will be acquired by Purchaser for its own account for the purpose of investment, it being understood that the right to dispose of such common stock shall be entirely within the discretion of Purchaser (or such assignee, as the case may be). Purchaser will refrain from transferring or otherwise disposing of any of the SkyPower common stock, or any interest therein, in such manner as to cause the SkyPower Shareholders to be in violation of any securities Laws registration requirements.

4.07    Funding. Purchaser has sufficient funds on hand or otherwise available pursuant to credit facilities or capital commitments to satisfy its obligations under this Agreement at or prior to Closing.

ARTICLE V

REPRESENTATIONS AND WARRANTIES OF ACQUISITIONCO

Acquisitionco hereby represents and warrants to the Purchaser and to the SkyPower Shareholders as follows:

5.01    Organization. Acquisitionco is an unlimited liability company duly organized, validly existing and in good standing under the Laws of Alberta, Canada. Acquisitionco has full power and authority to execute and deliver this Agreement and the

Operative Agreements to which it is a party, to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.

5.02    Authority. The execution and delivery by Acquisitionco of this Agreement and the Operative Agreements to which it is a party, and the performance by Acquisitionco of its obligations hereunder and thereunder, have been duly and validly authorized by the Board of Directors of Acquisitionco, no other action on the part of Acquisitionco or its stockholders being necessary, except such action as shall be obtained in the ordinary course of business. This Agreement has been duly and validly executed and delivered by Acquisitionco and constitutes, and upon the execution and delivery by Acquisitionco of the Operative Agreements to which it is a party, such Operative Agreements will constitute, legal, valid and binding obligations of Acquisitionco enforceable against Acquisitionco in accordance with their terms subject to bankruptcy, insolvency and other applicable Laws affecting creditors' rights generally and to principles of equity.

5.03    No Conflicts. The execution and delivery by Acquisitionco of this Agreement do not, and the execution and delivery by Acquisitionco of the Operative Agreements to which it is a party, the performance by Acquisitionco of its obligations under this Agreement and such Operative Agreements, and the consummation of the transactions contemplated hereby and thereby will not conflict with or result in a violation or breach of any of the terms, conditions or provisions of the articles of incorporation or by-laws (or other comparable corporate charter document) of Acquisitionco;

5.04    Governmental Approvals and Filings. No consent, approval or action of, filing with or notice to any Governmental or Regulatory Authority on the part of Acquisitionco is required in connection with the execution, delivery and performance of this Agreement or the Operative Agreements to which it is a party or the consummation of the transactions contemplated hereby or thereby.

5.05    Legal Proceedings. There are no Actions or Proceedings pending or, to the knowledge of Acquisitionco, threatened against, relating to or affecting Acquisitionco or any of its Assets and Properties which could reasonably be expected to result in the issuance of an Order restraining, enjoining or otherwise prohibiting or making illegal the consummation of any of the transactions contemplated by this Agreement or any of the Operative Agreements.

5.06    Purchase for Investment. The SkyPower Shares will be acquired by Acquisitionco for its own account for the purpose of investment, it being understood that the right to dispose of such SkyPower Shares shall be entirely within the discretion of Acquisitionco (or such assignee, as the case may be). Acquisitionco will refrain from transferring or otherwise disposing of any of the SkyPower Shares, or any interest therein, in such manner as to cause the SkyPower Shareholders to be in violation of any securities Laws registration requirements.

5.07    Funding. Upon Purchaser providing funds to Acquisitionco, Acquisitionco will have sufficient funds on hand or otherwise available pursuant to credit facilities or capital commitments to satisfy its obligations under this Agreement at or prior to Closing.

5.08    No Other Business. Acquisitionco has not engaged in any business other than the Business or entered into any agreements other than this Agreement and the other Operative Agreements to which it is a party.

## ARTICLE VI

## COVENANTS OF THE SKYPOWER SHAREHOLDERS AND SKYPOWER

Each of the SkyPower Shareholders and SkyPower covenant and agree that, at all times from and after the date hereof until the Closing, and, where expressly provided, after Closing, SkyPower and such SkyPower Shareholders will comply with all covenants and provisions of this Article VI, except as specifically provided otherwise in Article VI of the Disclosure Schedule, as required by applicable Law or to the extent Acquisitionco or Purchaser may otherwise consent in writing.

6.01    Regulatory and Other Approvals. Each SkyPower Shareholder, SkyPower and the Subsidiaries will, as promptly as practicable (a) take all commercially reasonable steps necessary or desirable to obtain all consents, approvals or actions of, make all filings with and give all notices to Governmental or Regulatory Authorities or any other Person required of such SkyPower Shareholder, SkyPower or any Subsidiary to consummate the transactions contemplated hereby and by the Operative Agreements, (b) provide such other information and communications to such Governmental or Regulatory Authorities or other Persons as Acquisitionco or such Governmental or Regulatory Authorities or other Persons may reasonably request in connection therewith and (c) cooperate with Acquisitionco in connection with the performance of their obligations. Each SkyPower Shareholder, SkyPower and the Subsidiaries will provide prompt notification to Acquisitionco when any such consent, approval, action, filing or notice referred to in clause (a) above is obtained, taken, made or given, as applicable, and will advise Acquisitionco of any communications (and, unless precluded by Law, provide copies of any such communications that are in writing) with any Governmental or Regulatory Authority or other Person regarding any of the transactions contemplated by this Agreement or any of the Operative Agreements.

6.02    Investigation by Acquisitionco. Each SkyPower Shareholder, SkyPower and the Subsidiaries will (a) provide Acquisitionco and its officers, directors, employees, agents, counsel, accountants, financial advisors, consultants and other representatives (together "**Representatives**") with full access, upon reasonable prior notice and during normal business hours, to all officers, employees, agents and accountants of SkyPower and the Subsidiaries and their Assets and Properties and Books and Records, and (b) furnish Acquisitionco and such other Persons with all such information and data (including without limitation copies of financial information, Contracts, Benefit Plans and other Books and Records) concerning the business and operations of SkyPower and the Subsidiaries as Acquisitionco or any of such other Persons reasonably may request in connection with such investigation.

6.03    No Solicitations. Each SkyPower Shareholder, SkyPower and the Subsidiaries will not take, nor will they permit, SkyPower or any of its Affiliate or Subsidiaries

(or authorize or permit any investment banker, financial advisor, attorney, accountant or other Person retained by or acting for or on behalf of SkyPower, the Subsidiaries or any such Affiliate) to take, directly or indirectly, any action to solicit, encourage, receive, negotiate, assist or otherwise facilitate (including by furnishing confidential information with respect to SkyPower or any Subsidiary or permitting access to the Assets and Properties and Books and Records of SkyPower or any Subsidiary) any offer or inquiry from any Person concerning an Acquisition Proposal. If any SkyPower Shareholder, SkyPower, any Subsidiary or any such Affiliate (or any such Person acting for or on their behalf) receives from any Person any offer, inquiry or informational request referred to above, such SkyPower Shareholder will promptly advise such Person, by written notice, of the terms of this Section 6.03 and will promptly, orally and in writing, advise Acquisitionco of such offer, inquiry or request and deliver a copy of such notice to Acquisitionco.

    6.04 Conduct of Business. Each SkyPower Shareholder, SkyPower and the Subsidiaries will conduct business only in the ordinary course consistent with past practice. Without limiting the generality of the foregoing, each SkyPower Shareholder, SkyPower and the Subsidiaries will:

    (a) use commercially reasonable efforts to (i) preserve intact the goodwill and the present business organization and reputation of SkyPower and the Subsidiaries, (ii) keep available (subject to dismissals and retirements in the ordinary course of business consistent with past practice) the services of the present officers, employees and consultants of SkyPower and the Subsidiaries, (iii) maintain the Assets and Properties of SkyPower and the Subsidiaries in good working order and condition, ordinary wear and tear excepted, (iv) maintain the good will of any Persons with whom SkyPower or any Subsidiary has significant business relationships and (v) continue all current activities relating to the business and operations of SkyPower and the Subsidiaries;

    (b) except to the extent required by applicable Law or as a result of changes in GAAP, (i) cause the Books and Records to be maintained in the usual, regular and ordinary manner, (ii) not permit any material change in (A) any pricing, investment, accounting, financial reporting, credit, allowance or Tax practice or policy of SkyPower or any Subsidiary, or (B) any method of calculating any bad debt, contingency or other reserve of SkyPower or any Subsidiary for accounting, financial reporting or Tax purposes and (iii) not permit any change in the fiscal year of SkyPower or any Subsidiary;

    (c) (i) use, and will cause SkyPower and the Subsidiaries to maintain in full force and effect substantially the same levels of coverage as the insurance afforded under the Contracts listed in Section 2.18 of the Disclosure Schedule, and (ii) cause any and all benefits under such Contracts paid or payable (whether before or after the date of this Agreement) with respect to the business, operations, employees or Assets and Properties of SkyPower and the Subsidiaries to be paid to SkyPower and the Subsidiaries; provided, however, that SkyPower may purchase run-off directors' and officers' insurance providing coverage reasonably equivalent to the policies of SkyPower currently in effect, subject to terms and conditions no less advantageous to the directors and officers of SkyPower than those contained in the policy currently in effect, for all present and former directors and officers of SkyPower, covering claims made prior to or within six years after the Closing arising from facts or events which

occurred on or prior to the closing provided that the premiums will not exceed in the aggregate $300% of the premiums currently charged to SkyPower for directors' and officer's liability insurance; and provided, further, that from and after the Closing, SkyPower (or its successor) will honor any obligations in effect on the date hereof to indemnify the current and former directors and officers of SkyPower in respect of matters for which SkyPower may indemnify such directors and officers its articles, charter, by-laws, applicable Law and contracts of indemnity as applicable; and

(d) comply, and cause SkyPower and the Subsidiaries to comply, in all material respects, with all Laws and Orders applicable to the business and operations of SkyPower and the Subsidiaries, and promptly following receipt thereof to give Acquisitionco copies of any notice received from any Governmental or Regulatory Authority or other Person alleging any violation of any such Law or Order.

6.05    Financial Statements and Reports; Filings. As promptly as practicable and in any event no later than forty five (45) days after the end of each fiscal quarter ending after the date hereof and before the Closing Date (other than the fourth quarter) or ninety (90) days after the end of each fiscal year ending after the date hereof and before the Closing Date, as the case may be, SkyPower will deliver to Acquisitionco true and complete copies of (in the case of any such fiscal year) the audited and (in the case of any such fiscal month or quarter) the unaudited consolidated balance sheet, and the related audited or unaudited consolidated statements of operations, stockholders' equity and cash flows, of SkyPower and its consolidated Subsidiaries, in each case as of and for the fiscal year then ended or as of and for each such fiscal quarter and the portion of the fiscal year then ended, as the case may be, together with the notes, if any, relating thereto, which financial statements shall be prepared on a basis consistent with the Audited Financial Statements.

(a) As promptly as practicable, SkyPower will deliver to Acquisitionco true and complete copies of such other financial statements, reports and analyses as may be prepared or received by SkyPower or any Subsidiary relating to the business or operations of SkyPower or any Subsidiary or as Acquisitionco may otherwise reasonably request.

(b) As promptly as practicable, the SkyPower Shareholders will deliver copies of all License applications and other filings made by SkyPower or any Subsidiary after the date hereof and before the Closing Date with any Governmental or Regulatory Authority (other than routine, recurring filings made in the ordinary course of business consistent with past practice).

6.06    Employee Matters. Except as may be required by Law, each SkyPower Shareholder, SkyPower and the Subsidiaries will refrain from directly or indirectly:

(a) making any representation or promise, oral or written, to any officer, employee or consultant of SkyPower or any Subsidiary concerning any material term or condition of employment or any Benefit Plan, except for statements as to the rights or accrued benefits of any officer, employee or consultant under the terms of any Benefit Plan existing as of the date hereof;

LA1:#6351530v20                                              - 31 -

*Stock Purchase Agreement – Lehman/SkyPower – June 2007*

(b) making any increase in the salary, wages or other compensation of any officer, employee or consultant of SkyPower or any Subsidiary;

(c) adopting, entering into or becoming bound by any Benefit Plan, employment-related Contract or collective bargaining agreement, or amending, modifying or terminating (partially or completely) any Benefit Plan, employment-related Contract or collective bargaining agreement, except to the extent required by applicable Law and, in the event compliance with legal requirements presents options, only to the extent that the option which SkyPower or Subsidiary reasonably believes to be the least costly is chosen;

(d) establishing or modifying any (i) targets, goals, pools or similar provisions in respect of any fiscal year under any Benefit Plan, employment-related Contract or other employee compensation or benefit arrangement or (ii) salary ranges, increase guidelines or similar provisions in respect of any Benefit Plan, employment-related Contract or other employee compensation arrangement; or

(e) granting, funding, or accelerating the vesting of any payment or benefit award to any officer, employee or consultant;

The SkyPower Shareholders will, and will cause SkyPower to, administer each Benefit Plan, or cause the same to be so administered, in all material respects in accordance with provisions of all applicable Laws. The SkyPower Shareholders will, and will cause SkyPower to, promptly notify Acquisitionco in writing of each receipt by SkyPower or any Subsidiary (and furnish Acquisitionco with copies) of any notice of investigation or administrative proceeding by any Governmental Authority or other Person involving any Benefit Plan.

6.07   Certain Restrictions.  Other than as contemplated by this Agreement or the Operative Agreements, the SkyPower Shareholders will, and will cause SkyPower to, refrain from:

(a) amending the certificates or articles of incorporation or by-laws (or other comparable corporate charter documents) or taking any action with respect to any such amendment or any recapitalization, reorganization, liquidation or dissolution of any such corporation;

(b) authorizing, issuing, selling or otherwise disposing of any shares of capital stock of or any Option with respect to SkyPower or any Subsidiary, or modifying or amending any right of any holder of outstanding shares of capital stock of or Option with respect to SkyPower or any Subsidiary;

(c) declaring, setting aside, paying or receiving any dividend or other distribution in respect of the capital stock of SkyPower or any Subsidiary not wholly owned by SkyPower, or directly or indirectly redeeming, purchasing, otherwise acquiring or receiving payment in respect of a redemption or other acquisition of, any capital stock of or any Option with respect to SkyPower or any Subsidiary not wholly owned by SkyPower;

(d) acquiring or disposing of, or incurring any Lien (other than a Permitted Lien) on, any Assets and Properties of SkyPower or any Subsidiary, other than in the ordinary course of business consistent with past practice;

(e) (i) entering into, amending, modifying, terminating (partially or completely), granting any waiver under or giving any consent with respect to (A) any Contract that would, if in existence on the date of this Agreement, be required to be disclosed pursuant to Section 2.18 of the Disclosure Schedule or (B) any material License held or used by SkyPower or any Subsidiary or (ii) granting any irrevocable powers of attorney;

(f) violating, breaching or defaulting under in any material respect, or taking or failing to take any action that (with or without notice or lapse of time or both) would constitute a material violation or breach of, or default under, any term or provision of any License held or used by SkyPower or any Subsidiary or any Contract to which SkyPower or any Subsidiary is a party or by which any of their respective Assets and Properties is bound;

(g) (i) incurring Indebtedness in an aggregate principal amount exceeding $50,000 (net of any amounts of Indebtedness discharged during such period), or (ii) voluntarily purchasing, canceling, prepaying or otherwise providing for a complete or partial discharge in advance of a scheduled payment date with respect to, or waiving any right of SkyPower or any Subsidiary under, any Indebtedness of or owing to SkyPower or any Subsidiary;

(h) engaging with any Person in any merger or other business combination;

(i) making c apital expenditures or commitments for additions to property, plant or equipment constituting capital assets in an aggregate amount exceeding $50,000;

(j) making an y change in the lines of business in which they participate or are engaged;

(k) writing off or writing down any of their Assets and Properties outside the ordinary course of business consistent with past practice, unless required as a result of a change to GAAP;

(l) chan ging any accounting practices, policies or procedures or any methods of reporting income, deductions or other items for income tax purposes (except insofar as may have been required by applicable Law or GAAP rule; or

(m) entering into any Contract to do or engage in any of the foregoing.

Notwithstanding the foregoing, the disposition by SkyPower or its Subsidiaries of the Excluded Assets is permitted under the terms of this Agreement.

6.08    Affiliate Transactions.  Except as set forth in Section 6.08 of the Disclosure Schedule, immediately prior to the Closing, all Indebtedness and other amounts owing under Contracts between any officer, director or Affiliate (other than SkyPower or any Subsidiary) of SkyPower, on the one hand, and SkyPower or any of the Subsidiaries, on the other, will be paid in full, and the SkyPower Shareholders will cause SkyPower to terminate and

will cause any such officer, director or Affiliate to terminate each Contract with SkyPower or any Subsidiary. Prior to the Closing, neither SkyPower nor any Subsidiary will enter into any Contract or amend or modify any existing Contract, and will not engage in any transaction outside the ordinary course of business consistent with past practice or not on an arm's-length basis, with any such officer, director or Affiliate.

6.09    Notice and Cure. The SkyPower Shareholders will notify Acquisitionco in writing (where appropriate, through updates to the Disclosure Schedule) of, and contemporaneously will provide Acquisitionco with true and complete copies of any and all information or documents relating to, and will use all commercially reasonable efforts to cure or cause SkyPower to cure before the Closing, any event, transaction or circumstance, as soon as practicable after it becomes Known to the SkyPower Shareholders, occurring after the date of this Agreement that causes or will cause any covenant or agreement of the SkyPower Shareholders under this Agreement to be breached or that renders or will render untrue any representation or warranty of the SkyPower Shareholders as to themselves or as to SkyPower contained in this Agreement as if the same were made on or as of the date of such event, transaction or circumstance. No notice given pursuant to this Section shall have any effect on the representations, warranties, covenants or agreements contained in this Agreement for purposes of determining satisfaction of any condition contained herein or shall in any way limit Acquisitionco's right to seek indemnity under Article XI.

6.10    Fulfillment of Conditions. SkyPower and each SkyPower Shareholder will (a) execute and deliver at the Closing each Operative Agreement that such SkyPower Shareholder or SkyPower as applicable, is required hereby to execute and deliver as a condition to the Closing and (b) take all commercially reasonable steps necessary or desirable and proceed diligently and in good faith to satisfy each condition to the obligations of Purchaser and Acquisitionco contained in this Agreement (including, without limitation, the disposition of the Excluded Assets) and will not take or fail to take any action that could reasonably be expected to result in the nonfulfillment of any such condition.

6.11    Additional Covenants. SkyPower will (i) redeem the Adler Shares on or prior to the Closing Date and (ii) promptly following the Closing, will, and will cause each of its principal wholly-owned Subsidiaries to, be continued to Alberta and convert their organizational structure in accordance with Section 8.17 hereto.

6.12    Brokers; Structuring Fees. In addition to an amount not to exceed U.S.$6 million which will be paid at Closing by SkyPower as contemplated by Section 2.26 hereof, SkyPower will pay at Closing, or promptly thereafter at Purchaser's request, an amount not to exceed U.S.$1.5 million in respect of fees and expenses (including legal and outside consultants of Purchaser.

6.13    Insurance. Promptly following the Closing, SkyPower will obtain a key man life insurance policy on Adler, in form, substance and amount and from an issuer acceptable to Purchaser Group (the "**Key Man Life Insurance Policy**"). Adler will cooperate promptly with all reasonable requests by Purchaser Group or the designated insurance policy issuer to facilitate the issuance of the Key Man Life Insurance Policy.

ARTICLE VII

COVENANTS OF ACQUISITIONCO AND PURCHASER

Each of Acquisitionco and Purchaser covenants and agrees with SkyPower and the SkyPower Shareholders that, at all times from and after the date hereof until the Closing, and, where expressly provided, after Closing, Acquisitionco will comply with all covenants and provisions of this Article VII, except to the extent SkyPower or any SkyPower Shareholder may otherwise consent in writing.

7.01    Regulatory and Other Approvals.  Each of Acquisitionco and Purchaser will as promptly as practicable (a) take all commercially reasonable steps necessary or desirable to obtain all consents, approvals or actions of, make all filings with and give all notices to Governmental or Regulatory Authorities or any other Person required of Acquisitionco or Purchaser to consummate the transactions contemplated hereby and by the Operative Agreements, (b) provide such other information and communications to such Governmental or Regulatory Authorities or other Persons as the SkyPower Shareholders or such Governmental or Regulatory Authorities or other Persons may reasonably request in connection therewith and (c) cooperate with the SkyPower Shareholders in connection with the performance of their obligations under Section 5.01.  Each of Acquisitionco and Purchaser will provide prompt notification to SkyPower or the SkyPower Shareholders when any such consent, approval, action, filing or notice referred to in clause (a) above is obtained, taken, made or given, as applicable, and will advise SkyPower or the SkyPower Shareholders of any communications (and, unless precluded by Law, provide copies of any such communications that are in writing) with any Governmental or Regulatory Authority or other Person regarding any of the transactions contemplated by this Agreement or any of the Operative Agreements.

7.02    Notice and Cure.  Each of Acquisitionco and Purchaser will notify SkyPower and the SkyPower Shareholders in writing of, and, to the extent not prohibited pursuant to confidentiality or other agreements, contemporaneously will provide SkyPower and the SkyPower Shareholders with true and complete copies of any and all information or documents relating to, and will use all commercially reasonable efforts to cure before the Closing, any event, transaction or circumstance, as soon as practicable after it becomes known Acquisitionco or Purchaser, as applicable, occurring after the date of this Agreement that causes or will cause any covenant or agreement of Acquisitionco or Purchaser, as applicable, under this Agreement to be breached or that renders or will render untrue any representation or warranty of Acquisitionco or Purchaser, as applicable, contained in this Agreement as if the same were made on or as of the date of such event, transaction or circumstance.  No notice given pursuant to this Section shall have any effect on the representations, warranties, covenants or agreements contained in this Agreement for purposes of determining satisfaction of any condition contained herein or shall in any way limit the SkyPower Shareholders right to seek indemnity under Article XII.

7.03    Fulfillment of Conditions. Each of Acquisitionco and Purchaser will execute and deliver at the Closing each Operative Agreement that such Party is hereby required to execute and deliver as a condition to the Closing, will take all commercially reasonable steps necessary or desirable and proceed diligently and in good faith to satisfy each other condition to the obligations of SkyPower and the SkyPower Shareholders contained in this Agreement and will not take or fail to take any action that could reasonably be expected to result in the nonfulfillment of any such condition.

7.04    Additional Covenants. Following the Closing, (i) Acquisitionco will incorporate a new corporation ("**GPCo**") pursuant to the laws of Ontario, Canada; (ii) Acquisitionco and GPCo will form a new limited partnership (the "**LP**") pursuant to the laws of the Province of Ontario, Canada. Acquisitionco will cause GPCo to be the general partner of the LP and to be entitled to a 0.01% interest in such LP and will cause Acquisitionco to be the sole limited partner of the LP and to be entitled to a 99.99% interest in such LP; and (iii) Acquisitionco will transfer all of the SkyPower Shares to such LP and will cause such transfer to be effected on a tax-deferred basis pursuant to subsection 97(2) of the Tax Act.

ARTICLE VIII

CONDITIONS TO OBLIGATIONS OF PURCHASER AND ACQUISITIONCO

The obligations of Purchaser and Acquisitionco (the "**Purchaser Group**") to purchase the SkyPower Shares and to perform their other obligations at the Closing are subject to the fulfillment, at or before the Closing, of each of the following conditions (all or any of which may be waived in whole or in part by the Purchaser Group in its sole discretion):

8.01    Representations and Warranties. Each of the representations and warranties made by the SkyPower Shareholders on their own behalf and on behalf of SkyPower in this Agreement or any Operative Agreement (other than those made as of a specified date earlier than the Closing Date) shall be true and correct in all material respects on and as of the Closing Date as though such representation or warranty was made on and as of the Closing Date, and any representation or warranty made as of a specified date earlier than the Closing Date shall have been true and correct in all material respects on and as of such earlier date; provided that to the extent that any representation or warranty is qualified as to materiality pursuant to the terms of such representation or warranty, such representation or warranty shall be true and correct in all respects as of the Closing Date unless such representation or warranty was made as of a specified date earlier than the Closing Date in which case such representation shall be true and correct in all respects on and as of such earlier date.

8.02    Operative Agreements. The Purchaser Group shall have received the Operative Agreements duly executed and delivered by each party thereto other than Purchaser and Acquisitionco.

8.03    Performance. Each of SkyPower and the SkyPower Shareholders shall have performed and complied with, in all material respects, each agreement, covenant and obligation required by this Agreement or any Operative Agreement to be so performed or

complied with by SkyPower or such SkyPower Shareholders at or before the Closing, in all material respects, each agreement, covenant and obligation required by this Agreement or any Operative Agreement to be so performed or complied with by SkyPower or any SkyPower Shareholder at or before the Closing.

8.04    Officer's Certificates. Each of SkyPower, Shareholder Holdco, Adler Holdco I and Adler Holdco II have delivered to the Purchaser Group a certificate, dated the Closing Date and executed in the name and on behalf of the Chairman of the Board, the President or any Vice President of each of the applicable SkyPower Shareholders and of SkyPower, authorizing and approving the Transaction contemplated hereby and by the Operative Agreements and the obligations of such Party related thereto and otherwise substantially in the form and to the effect of Exhibits A1-4 hereto.

8.05    Orders and Laws. There shall not be in effect on the Closing Date any Order or Law restraining, enjoining or otherwise prohibiting or making illegal the consummation of any of the transactions contemplated by this Agreement or any of the Operative Agreements or which could reasonably be expected to otherwise result in a material diminution of the benefits of the transactions contemplated by this Agreement or any of the Operative Agreements to the Purchaser Group, and there shall not be pending or threatened on the Closing Date any Action or Proceeding in, before or by any Governmental or Regulatory Authority which could reasonably be expected to result in the issuance of any such Order or the enactment, promulgation or deemed applicability to the Purchaser Group, the SkyPower Shareholders, SkyPower or the transactions contemplated by this Agreement or any of the Operative Agreements of any such Law.

8.06    Regulatory Consents and Approvals. All consents, approvals and actions of, filings with and notices to any Governmental or Regulatory Authority necessary to permit the Parties to perform their obligations under this Agreement and the Operative Agreements and to consummate the transactions contemplated hereby and thereby (a) shall have been duly obtained, made or given, (b) shall be in form and substance reasonably satisfactory to the Purchaser Group, (c) shall not be subject to the satisfaction of any condition that has not been satisfied or waived and (d) shall be in full force and effect, and all terminations or expirations of waiting periods imposed by any Governmental or Regulatory Authority necessary for the consummation of the transactions contemplated by this Agreement and the Operative Agreements shall have occurred.

8.07    Third Party Consents. The consents (or in lieu thereof waivers) listed in Section 8.07 of the Disclosure Schedule (a) shall have been obtained, (b) shall be in form and substance reasonably satisfactory to the Purchaser Group, (c) shall not be subject to the satisfaction of any condition that has not been satisfied or waived and (d) shall be in full force and effect.

8.08    Opinion of Counsel. The Purchaser Group shall have received the opinions of (i) Bennett Jones LLP, counsel to SkyPower and the SkyPower Shareholders, (x) with respect to Alberta law and (y) with respect to Ontario law, and (ii) Dorsey & Whitney LLP, with respect to New York law, dated the Closing Date, substantially in the form and to the effect of Exhibits B1-3 hereto, and to such further effect as the Purchaser Group may reasonably request.

LA1:#6351530v20                                    - 37 -

*Stock Purchase Agreement – Lehman/SkyPower – June 2007*

8.09    Restructuring of Advisory Board, Board of Directors and Officers.
Acquisitionco and SkyPower shall have effectuated a restructuring of their respective Advisory
Board, Board of Directors and Officers such that the Advisory Board, Board of Directors and
Officers shall, on or before the Closing Date, be as set forth on Schedule F attached hereto and
applicable officers and directors shall have tendered, effective on or before the Closing Date,
their resignations as such directors and officers.

8.10    Intentionally Omitted

8.11    Due Diligence.  SkyPower Shareholders shall have delivered to the
Purchaser Group all materials referenced in Article II or in the Disclosure Schedule as being
delivered prior to Closing (and all updates to the Disclosure Schedule required to be made by the
SkyPower Shareholders to make the Disclosure Schedule accurate in all material respects), and
such materials, including without limitation all corporate documents for SkyPower and
Acquisitionco, which documents shall include evidence of the grant by Acquisitionco to
Purchaser of the exclusive right to make all future equity investments or capital contributions
required or sought by Acquisitionco, and the Disclosure Schedule updates shall be in form and
substance satisfactory to the Purchaser Group.

8.12    Proceedings.  All proceedings to be taken on the part of any SkyPower
Shareholder or SkyPower in connection with the transactions contemplated by this Agreement or
any Operative Agreement and all documents incident thereto, including without limitation the
execution and delivery of the Employment Agreements, the Shareholders Agreement, the
operating plan and the hiring plan, shall be reasonably satisfactory in form and substance to the
Purchaser Group, and the Purchaser Group shall have received copies of all such documents and
other evidences as the Purchaser Group may reasonably request in order to establish the
consummation of such transactions and the taking of all proceedings in connection therewith.

8.13    Independent Engineer; Environmental Review.  The Purchaser Group
shall have received independent third party review and assessment in form and substance
reasonably satisfactory to the Purchaser Group, regarding (i) Development Project wind quality
assumptions, (ii) project cost assumptions, and (iii) environmental and hazardous material
assumptions.

8.14    Budget; Business Plan; Projections.  The Purchaser Group shall have
received and approved the business plan, budget and projections and such documents and other
evidences as the Purchaser Group may reasonably request with regard to the Development
Projects, and such shall be reasonably satisfactory in form and substance to the Purchaser Group.

8.15    No Material Adverse Change.  No SkyPower Material Adverse Change
shall have occurred and be continuing and the Purchaser Group shall not have become aware
after the Effective Date of any information or other matter affecting SkyPower, any Subsidiary
or any of their Assets or the transactions contemplated hereby that is inconsistent in a material
and adverse manner with any information or other matter disclosed to the Purchaser Group prior
to the Effective Date.

*Stock Purchase Agreement – Lehman/SkyPower – June 2007*

8.16    Excluded Assets. The Excluded Assets shall be sold or otherwise disposed of by SkyPower.

8.17    Employee Benefit Documents. The Parties shall have agreed on final form of all Employee Benefit Documents for Acquisitionco, including the Employee Stock Option Plan, the terms of which are attached hereto as Exhibit E. The Persons listed on Schedule C shall have entered into the Employment Agreements.

8.18    Payment of Fees. SkyPower shall have paid, or agreed to pay post Closing at request of Purchaser, the fees described in Section 2.26.

8.19    Exclusive Contribution Right. The Shareholders Agreement shall be executed contemporaneously herewith, in form and substance satisfactory to Purchaser and shall evidence, to Purchaser's satisfaction, the grant by Acquisitionco to Purchaser of the exclusive right to contribute additional capital to Acquisitionco, at a deemed Acquisitionco valuation of U.S.$175,000,000, subject to the exceptions, limitations, terms and conditions set forth therein.

## ARTICLE IX

## CONDITIONS TO OBLIGATIONS OF SKYPOWER AND THE SKYPOWER SHAREHOLDERS

The obligations of the SkyPower and the SkyPower Shareholders hereunder are subject to the fulfillment, at or before the Closing, of each of the following conditions (all or any of which may be waived in whole or in part by the majority SkyPower Shareholders in their sole discretion):

9.01    Representations and Warranties. Each of the representations and warranties made by any member of the Purchaser Group in this Agreement (other than those made as of a specified date earlier than the Closing Date) shall be true and correct in all material respects on and as of the Closing Date as though such representation or warranty was made on and as of the Closing Date and any representation or warranty made as of a specified date earlier than the Closing Date shall have been true and correct in all material respects as of such date; provided that to the extent that any representation or warranty is qualified as to materiality pursuant to the terms of such representation or warranty, such representation or warranty shall be true and correct in all respects as of the Closing Date unless such representation or warranty was made as of a specified date earlier that the Closing Date in which case such representation shall be true and correct in all respects on and as of such earlier date.

9.02    Operative Agreements. SkyPower and the SkyPower Shareholders shall have received the Operative Agreements duly executed and delivered by the parties thereto other than SkyPower and such SkyPower Shareholders.

9.03    Performance. Each member of the Purchaser Group shall have performed and complied with, in all material respects, each agreement, covenant and obligation required by this Agreement to be so performed or complied with by such Party at or before the Closing.

9.04    Officers' Certificates. Each member of the Purchaser Group shall have delivered to SkyPower and the SkyPower Shareholders a certificate, dated the Closing Date and executed in the name and on behalf of such member of the Purchaser Group by the Chairman of the Board, the President or any Vice President of such Party authorizing and approving the Transaction contemplated hereby and by the other Operative Documents and the obligations of such Party related thereto and otherwise substantially in the form and to the effect of Exhibit D hereto.

9.05    Orders and Laws. There shall not be in effect on the Closing Date any Order or Law that became effective after the date of this Agreement restraining, enjoining or otherwise prohibiting or making illegal the consummation of any of the transactions contemplated by this Agreement or any of the Operative Agreements.

9.06    Regulatory Consents and Approvals. All consents, approvals and actions of, filings with and notices to any Governmental or Regulatory Authority necessary to permit the Parties to perform their obligations under this Agreement and the Operative Agreements and to consummate the transactions contemplated hereby and thereby (a) shall have been duly obtained, made or given, (b) shall not be subject to the satisfaction of any condition that has not been satisfied or waived and (c) shall be in full force and effect, and all terminations or expirations of waiting periods imposed by any Governmental or Regulatory Authority necessary for the consummation of the transactions contemplated by this Agreement and the Operative Agreements shall have occurred.

9.07    Proceedings. All proceedings to be taken on the part of any member of the Purchaser Group in connection with the transactions contemplated by this Agreement and all documents incident thereto shall be reasonably satisfactory in form and substance to SkyPower and the SkyPower Shareholders, and SkyPower and the SkyPower Shareholders shall have received copies of all such documents and other evidences as SkyPower and the SkyPower Shareholders may reasonably request in order to establish the consummation of such transactions and the taking of all proceedings in connection therewith.

9.08    No Material Adverse Change. No material adverse change shall have occurred and be continuing in the financial condition of any member of the Purchaser Group precluding its ability to perform its obligations hereunder.

## ARTICLE X

## *[ INTENTIONALLY NOT USED]*

## ARTICLE XI

## SURVIVAL OF REPRESENTATIONS, WARRANTIES, COVENANTS AND AGREEMENTS

11.01    Survival of Representations, Warranties, Covenants and Agreements. Notwithstanding any right of any member of the Purchaser Group (whether or not exercised) to

investigate the affairs of any SkyPower Shareholder, SkyPower and the Subsidiaries or any right of any party (whether or not exercised) to investigate the accuracy of the representations and warranties of the other party contained in this Agreement, SkyPower, each SkyPower Shareholder and each member of the Purchaser Group have the right to rely fully upon the representations, warranties, covenants and agreements of the others contained in this Agreement. Except where otherwise expressly set forth herein, the representations, warranties, covenants and agreements of SkyPower, each SkyPower Shareholder and each member of the Purchaser Group contained in this Agreement will survive the Closing until that date which is the later of (x) thirteen (13) months after the Closing Date or (y) sixty (60) days after the date of delivery of the 2007 Audited Financial Statements, in the case of representations and warranties and any covenant or agreement to be performed in whole or in part on or prior to the Closing provided that the representations and warranties in Sections 2.11 or 2.23 shall survive after the Closing for the longer of six (6) years or the applicable statute of limitations period and the representations and warranties in Sections 2.01, 2.02, 3.01, 3.02, 3.03, 4.01, 4.02, 4.03, 5.01, 5.02, and 5.03 shall survive indefinitely; provided that any representation, warranty, covenant or agreement that would otherwise terminate in accordance this Agreement will continue to survive if a Claim Notice or Indemnity Notice (as applicable) shall have been timely given under Article XII on or prior to such termination date, until the related claim for indemnification has been satisfied or otherwise resolved as provided in Article XII.

## ARTICLE XII

## INDEMNIFICATION

12.01    Indemnity by SkyPower and the SkyPower Shareholders.  SkyPower and each SkyPower Shareholder shall, severally and not jointly, indemnify and hold harmless the Purchaser and its Affiliates together with their respective directors, officers, employees and agents (each a "**Purchaser Indemnified Party**") from and against all claims, damages, losses, liabilities, costs, deficiencies and expenses (including, without limitation, investigative costs, settlement costs and any reasonable outside legal, accounting or other expenses for investigating or defending any actions or threatened actions) (collectively, the "**Losses**") to which any Purchaser Indemnified Party becomes subject, which Losses arise out of or are incurred in connection with each and all of the following:

(a) any breach of any representation or warranty made by SkyPower or any SkyPower Shareholder in this Agreement or as re-certified in a certificate delivered by SkyPower or any SkyPower Shareholder at the Closing;

(b) any breach of any covenant, agreement or obligation of SkyPower or any SkyPower Shareholder contained in this Agreement;

(c) any fraud or willful misconduct by SkyPower or any SkyPower Shareholder in connection with this Agreement or the transactions contemplated by this Agreement; and

(d) any claims or Liabilities for purchase price or indemnification or breach of any covenant, representation or warranty or other matters arising out of the sale of any Assets or Subsidiaries by SkyPower or any SkyPower Shareholder prior to the Closing Date.

12.02   Indemnification by Purchaser. Purchaser shall indemnify and hold harmless each SkyPower Shareholder and its respective agents (each, a "**Shareholder Indemnified Party**") from Losses to which any Shareholder Indemnified Party becomes subject, which Losses arise out of or are incurred in connection with each and all of the following:

(a) any breach of any representation or warranty made by Purchaser or Acquisitionco in this Agreement;

(b) any breach of any covenant, agreement or obligation of Purchaser or Acquisitionco contained in this Agreement; and

(c) any fraud or willful misconduct by Purchaser or Acquisitionco in connection with this Agreement or the transactions contemplated by this Agreement.

12.03   Claims for Indemnification. A Party seeking indemnification (the "**Indemnified Party**") under this Article 12 shall give written notice (a "**Claim Notice**") to the other Party (the "**Indemnifying Party**") as soon as practicable after the Indemnified Party becomes aware of any fact, condition or event which may give rise to Losses for which indemnification may be sought under this Section 12.03 (a "**Claim**"). The failure of the Indemnified Party to timely give a Claim Notice to the Indemnifying Party hereunder shall not affect the Indemnified Party's rights to indemnification hereunder, except and only to the extent that the Indemnifying Party demonstrates actual damage caused by such failure. No Purchaser Indemnified Party shall be entitled to make a Claim until such Claims, in the aggregate, exceed US$1,000,000.00; provided however that once such Claims exceed this threshold amount, Claims may include the threshold amount.

12.04   Defense. In the case of a Claim involving the assertion of a claim by a third party (whether pursuant to a lawsuit or other legal action or otherwise, a "**Third-Party Claim**"), the Indemnifying Party may, upon written notice to the Indemnified Party, take control of the defense and investigation of such Third-Party Claim if the Indemnifying Party acknowledges to the Indemnified Party in writing the obligation of the Indemnifying Party to indemnify the Indemnified Party with respect to all elements of such Third-Party Claim. If the Indemnifying Party assumes the defense of any such Third-Party Claim, the Indemnifying Party shall select counsel reasonably acceptable to the Indemnified Party (and separate from counsel to the Indemnifying Party if there is any conflict or divergence of interest between the Indemnifying Party and the Indemnified Party) to conduct the defense of such claims or legal proceedings and, at the sole cost and expense of the Indemnifying Party, shall take all steps necessary in the defense or settlement thereof. The Indemnifying Party shall not consent to a settlement of or the entry of any judgment arising from, any such Third-Party Claim, without the prior written consent of the Indemnified Party (which consent shall not be unreasonably withheld or delayed). The Indemnified Party shall be entitled to participate in (but not control) the defense of any such Third-Party Claim, with its own counsel and at its own expense; provided, however, that the Indemnified Party shall be entitled to settle any Third Party Claim involving

criminal penalties, civil fines without the consent, but at the expense, of the Indemnifying Party if the Indemnifying Party shall unreasonably fail to do so after being requested to do so by the Indemnified Party. If the Indemnifying Party does not assume the defense of such Third-Party Claim within twenty (20) days after the date such claim is made: (a) the Indemnified Party may defend against such Third-Party Claim in such manner as it may deem reasonably appropriate, provided that the Indemnified Party shall not consent to a settlement of or the entry of any judgment arising from such Third-Party Claim without the prior written consent of the Indemnifying Party (which consent shall not be unreasonably withheld or delayed), and (b) the Indemnifying Party shall be entitled to participate in (but not control) the defense of such action, with its counsel and at its own expense. Regardless of which Party shall assume the defense of the Third-Party Claim, the Parties agree to cooperate fully with one another in connection therewith. Such cooperation shall include the providing of records and information which are relevant to such Third-Party Claim and making employees and officers available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder and to act as a witness or respond to legal process, in each case to the extent that the Party being requested to provide records and information or to make employees and officers available can do so without waiving any evidentiary privileges to which it is entitled.

12.05  <u>Limitations on Damages</u>.  Except for Losses resulting from a Party's fraud or willful misconduct, neither the Shareholder Indemnified Parties nor the Purchaser Indemnified Parties shall be entitled to be indemnified for Losses for any special, indirect, non-compensatory, consequential, incidental, punitive or exemplary damages of any type, including lost profits, loss of business opportunity or business interruptions whether arising in contract or tort (including negligence, whether sole, joint, or concurrent or strict liability) or otherwise; provided that the foregoing shall not preclude the Purchaser Group from proving and recovering its actual losses based on a diminution  in the value of the SkyPower Shares and assets purchased under this Agreement. Without limiting the generality of the foregoing, damages recovered by a third party from a Shareholder Indemnified Party or a Purchaser Indemnified Party, regardless of the theory under which such damages were recovered by such third party, including consequential or punitive damages recovered by such third party, shall be considered direct damages for purposes of, and shall be recoverable under, this Agreement.

(a)  Notwithstanding any other provision of this Agreement, (i) the maximum aggregate liability of Purchaser to the Shareholder Indemnified Parties shall not exceed $43,750,000 (fifty percent (50%) of the Aggregate Purchase Price), provided that the maximum liability of Purchaser to any SkyPower Shareholder (as a further limitation and not additional to the foregoing clause) shall not exceed an amount equal to the pro rata portion of such amount attributable to such SkyPower Shareholder based on its shares in SkyPower prior to the transactions contemplated by <u>Section 1.02</u> (such pro rata amount, the "**Shareholder Amount**"); and (ii) the maximum aggregate liability of a SkyPower Shareholder to the Purchaser Indemnified Parties under this Agreement shall not exceed its Shareholder Amount, provided that the maximum liability of any SkyPower Shareholder except Adler with respect to breach of <u>Sections 2.01, 2.02, 3.01, 3.02 and 3.03</u> shall be twice its Shareholder Amount (provided further that for any claim brought by a Purchaser Indemnified Party within eighteen months after the Closing Date, the maximum liability of Adler for a breach of Section 3.01 shall be the Aggregate Purchase Price). Notwithstanding the foregoing, (x) there shall be no time limitation and the aggregate liability to an Indemnified Party, after application of any offset,

shall be unlimited for claims arising from fraud and willful misconduct of such Indemnified Party, (y) the maximum liability of a SkyPower Shareholder to the Purchaser Indemnified Parties for claims with respect to tax matters shall not exceed twice the Shareholder Amount for such SkyPower Shareholder and (z) claims made under <u>Section 12.01(d)</u> shall not be subject to the limitation on claims under <u>Section 12.06</u> and this <u>Section 12.05(b)</u>.

(b) Each Purchaser Indemnified Party and each Shareholder Indemnified Party shall have a duty to mitigate any Loss, including to recover under an applicable insurance policy (including title insurance) or under a contractual right of set-off or indemnity. In the event that an Indemnified Party receives insurance proceeds after being paid (or having a Third-Party Claim paid) under an indemnity under this <u>Article 12</u>, then such Indemnified Party shall promptly remit such proceeds to the Indemnifying Party up to the amount previously paid by such Indemnifying Party with respect to such matter. In the event that any Person entitled to indemnification hereunder receives insurance proceeds in respect of a Claim for which indemnification is provided by an Indemnifying Party prior to the date such indemnification payment is due, such payment shall be reduced on a dollar-for-dollar basis by the amount of insurance proceeds received by such Person with respect to such Claim. Notwithstanding anything to the contrary in the two preceding sentences, all amounts in respect of Claims for indemnification shall be paid when due. Each Indemnifying Party shall be fully subrogated to the rights of the Indemnified Party against any other person (including, without limitation, rights against any insurer or under any applicable insurance policy) in respect of any Claim for which the Indemnifying Party is liable hereunder, and the Indemnified Party shall execute and deliver to or upon the request of the Indemnifying Party any written confirmations of such subrogation or other assignment of rights as may reasonably be requested by the Indemnifying Party in order to give effect to such subrogation. Without limiting the generality of the foregoing, in the event that an Indemnified Party receives any insurance proceeds, surety bond payments, or other payments from any other person in respect of any Claim that has been paid by an Indemnifying Party hereunder, such Indemnified Party shall promptly remit such proceeds to the Indemnifying Party. Notwithstanding anything to the contrary in this <u>Section 12.05(b)</u>, no Person shall be required to remit any insurance or similar proceeds to an Indemnifying Party if such insurance or similar proceeds are received by such Person from an Affiliate of such Person (unless such Affiliate writes insurance policies for non-Affiliates) or through self-insurance.

12.06  <u>Nature of Remedies</u>. After the Closing occurs, the indemnities set forth in this <u>Article 12</u> shall be the exclusive remedies of any Shareholder Indemnified Party or any Purchaser Indemnified Party for any breach of warranty, covenant or any other provision of this Agreement or any other claim arising under this Agreement, except for any claims for Losses resulting from a Party's fraud or willful misconduct. Except as preserved in the preceding sentence, each Party expressly waives any right to assert, claim or bring an action arising under this Agreement after Closing, except for a claim for indemnification in accordance with <u>Sections 12.01, 12.02, 12.03, 12.04 and 12.05</u> above. The Parties shall not be entitled to a rescission of this Agreement or to any further indemnification rights or claims of any nature whatsoever in respect thereof, all of which the Parties hereby waive.

12.07  <u>Offset; Unpaid Claims</u>. If there shall exist any amount payable by any SkyPower Shareholder to any member of the Purchaser Group hereunder on any date upon

which a payment is otherwise due to be made by any member of the Purchaser Group to such SkyPower Shareholder hereunder, an amount equal to such amount shall be deducted from such payment amount and applied to reduce the amount owing by such SkyPower Shareholder to such member of the Purchaser Group. If there shall exist any matter with respect to which a Claim Notice has been delivered by any member of the Purchaser Group to any SkyPower Shareholder, but with respect to which the amount of the indemnification obligation has not been determined (such matter, an "**Unresolved Claim**"), such Person shall have the right to retain any payment that would otherwise be made to such SkyPower Shareholder hereunder an amount equal to the estimate, as reasonably determined by such Person, for such Unresolved Claim, if any until such time as the Unresolved Claim is resolved either between the Parties or by a court of competent jurisdiction. Any unpaid Claims shall accrue interest at a rate of 8% per annum. Purchaser and Acquisitionco shall have the right to treat any unpaid Claim as a preferred capital and to recover such amount in accordance with the priority of payments set forth in the Shareholders Agreement.

12.08  Indemnity Amounts to be Computed on After-Tax Basis; Interest. Any amount of indemnification payable pursuant to the provisions of this Article 12 shall (i) to the extent possible, be treated as an adjustment to the Aggregate Purchase Price, (ii) be net of any Tax benefit actually realized and the then present value (based on a discount rate of eight percent (8%) per annum) of any Tax benefit to be realized by the Indemnified Party (including, where Purchaser, Acquisitionco or SkyPower is the Indemnified Party, their Affiliates), and (iii) be increased by the amount of any Tax required to be actually paid by the Indemnified Party on the accrual or receipt of the indemnification payment (including any amount payable pursuant to this clause (iii)). For purposes of the preceding sentence, the amount of any non-federal income Tax benefit or cost shall take into account the federal income tax effect of such benefit or cost.

## ARTICLE XIII

## TERMINATION

13.01  Termination. This Agreement may be terminated, and the transactions contemplated hereby may be abandoned:

(a) at any time before the Closing, by mutual written agreement of the Parties;

(b) at any time before the Closing, by the SkyPower Shareholders (acting as a group) or by the Purchaser Group, in the event (i) of a material breach hereof by any non-terminating party if such non-terminating party fails to cure such breach within five (5) Business Days following notification thereof by the terminating party or (ii) upon notification of the non-terminating party by the terminating party that the satisfaction of any condition to the terminating party's obligations under this Agreement becomes impossible or impracticable with the use of commercially reasonable efforts if the failure of such condition to be satisfied is not caused by a breach hereof by the terminating party; or

(c) at any time after June 30, 2007 by the SkyPower Shareholders (acting as a group) or by the Purchaser Group upon notification of the non-terminating parties by the

terminating party if the Closing shall not have occurred on or before such date and such failure to consummate is not caused by a breach of this Agreement by the terminating party.

13.02   Effect of Termination. If this Agreement is validly terminated pursuant to Section 13.01, this Agreement will forthwith become null and void, and there will be no liability or obligation on the part of any Party (or any of their respective officers, directors, employees, agents or other representatives or Affiliates), except as provided in the next succeeding sentence and except that the provisions with respect to expenses in Section 15.03 and confidentiality in Section 15.04 will continue to apply following any such termination. Notwithstanding any other provision in this Agreement to the contrary, upon termination of this Agreement pursuant to Section 13.01(b) or (c), each Party will remain liable to the other Parties for any breach of this Agreement by such Party existing at the time of such termination and the applicable Party may seek such remedies, including damages and fees of attorneys, against the other with respect to any such breach as are provided in this Agreement or as are otherwise available at Law or in equity.

## ARTICLE XIV

## DEFINITIONS

14.01   Defined Terms. As used in this Agreement, the following defined terms have the meanings indicated below:

"Acquisition Proposal" means any proposal for a merger or other business combination to which SkyPower or any Subsidiary is a party or the direct or indirect acquisition of any equity interest in, or a substantial portion of the assets of, SkyPower or any Subsidiary, other than the transactions contemplated by this Agreement .

"Acquisitionco" has the meaning ascribed to it in the forepart of this Agreement.

"Actions or Proceedings" means any action, suit, proceeding, arbitration or Governmental or Regulatory Authority investigation or audit.

"Adler" has the meaning ascribed to it in the forepart of this Agreement.

"Adler Class B Common Stock Purchase Price" has the meaning ascribed to it in Section 1.01.

"Adler Holdco" has the meaning ascribed to it in the forepart of this Agreement.

"Adler Redemption" has the meaning ascribed to it in the forepart of this Agreement.

"Adler Shares" has the meaning ascribed to it in the forepart of this Agreement.

"Adler Share Purchaser Price" has the meaning ascribed to it in Section 1.01.

"Adler Share Redemption Price" has the meaning ascribed to such term in Section 1.01.

"Affiliate" means any Person that directly, or indirectly through one of more intermediaries, controls or is controlled by or is under common control with the Person specified. For purposes of this definition, control of a Person means the power, direct or indirect, to direct or cause the direction of the management and policies of such Person whether by Contract or otherwise and, in any event and without limitation of the previous sentence, any Person owning ten percent (10%) or more of the voting securities of another Person shall be deemed to control that Person. Notwithstanding the foregoing, at no time and in no event will Acquisitionco, Purchaser or any Person controlling Purchaser be deemed to be an Affiliate of SkyPower, any Subsidiary or any SkyPower Shareholder.

"Aggregate Purchase Price" has the meaning ascribed to such term in Section 1.02(a).

"Agreement" means this Stock Purchase Agreement and the Exhibits, the Disclosure Schedule and the Schedules hereto and the certificates delivered in accordance with Sections 8.04 and 9.04, as the same shall be amended from time to time.

"Amended Acquisitionco Charter" means those Articles of Amendment of Acquisitionco filed on June 11, 2007, evidenced by the Certificate of Amendment and Registration of Restated Articles.

"Assets and Properties" of any Person means all assets and properties of every kind, nature, character and description (whether real, personal or mixed, whether tangible or intangible, whether absolute, accrued, contingent, fixed or otherwise and wherever situated), including the goodwill related thereto, operated, owned or leased by such Person, including without limitation cash, cash equivalents, Investment Assets, accounts and notes receivable, chattel paper, documents, instruments, general intangibles, real estate, equipment, inventory, goods and Intellectual Property; provided however, that with reference to SkyPower such term shall not include the Excluded Assets.

"Audited Financial Statement Date" means the last day of the most recent fiscal year of SkyPower for which Financial Statements are delivered to Acquisitionco pursuant to Section 2.08.

"Audited Financial Statements" means the Financial Statements for the most recent fiscal year of SkyPower delivered to Acquisitionco pursuant to Section 2.08.

"Band" means any body of Persons constituting a "band" under the Indian Act, R.S.C. 1985 c.I-5, as well as any other group of aboriginal or First Nations Persons acting in concert as, or holding themselves out, as a group or band, and any corporation or other Person established by or purporting to act on behalf of any such "band" or group.

"Benefit Plan" means any Plan relating to employee benefits with respect to which SkyPower or any Subsidiary contributes or has contributed or has any actual, secondary or contingent liability.

"Board of Directors" means (a) with respect to a corporation, the board of directors of the corporation, (b) with respect to a partnership, the board of directors or similar governing body of the general partner, and (c) with respect to any other Person, the governing body of such Person exercising the authority or serving a similar function as the board of directors of a corporation.

"Books and Records" means all files, documents, instruments, papers, books and records relating to the Business or Condition of SkyPower, including without limitation financial statements, Tax Returns and related work papers and letters from accountants, budgets, pricing guidelines, ledgers, journals, deeds, title policies, minute books, stock certificates and books, stock transfer ledgers, Contracts, Licenses, customer lists, computer files and programs, retrieval programs, operating data and plans and environmental studies and plans.

"Business" means the business of developing, owning or operating wind or solar energy projects in Canada.

"Business Day" means a day other than Saturday, Sunday or any day on which banks located in Toronto, Canada are authorized or obligated to close.

"Business or Condition" means the business, condition (financial or otherwise), results of operations, Assets and Properties and prospects of an entity and its Subsidiaries taken as a whole.

"Certificate" has the meaning ascribed to such term in Section 1.03.

"Class A Common Stock" has the meaning ascribed to it in the forepart of this Agreement.

"Class A Purchase Price" has the meaning ascribed to such term in Section 1.01.

"Class B Common Stock" has the meaning ascribed to it in the forepart of this Agreement.

"Class B Options" has the meaning ascribed to it in the forepart of this Agreement.

"Class C Common Stock" has the meaning ascribed to it in the forepart of this Agreement.

"Convertible Common Stock" has the meaning ascribed to it in the forepart of this Agreement.

"Closing" means the closing of the transactions contemplated by Section 1.02.

"Closing Date" means (a) the fifth Business Day after the day on which the last of the consents, approvals, actions, filings, notices or waiting periods described in or related to the filings described in Article VII or Article VIII has been obtained, made or given or has expired, as applicable, or (b) such other date as the Parties mutually agree upon in writing.

"Contract" means any agreement, lease, Option to Lease, license, evidence of Indebtedness, mortgage, indenture, security agreement, or other contract (whether written or oral) with any Person, including without limitation any of the foregoing or any other arrangement with any Band.

"Development Project(s)" has the meaning ascribed to it in Section 2.28.

"Disclosure Schedule" means the record delivered to Acquisitionco by SkyPower or the SkyPower Shareholders, as applicable, herewith and dated as of the date hereof, containing all lists, descriptions, exceptions and other information and materials as are required to be included therein by the SkyPower Shareholders or SkyPower, as applicable, pursuant to this Agreement.

"Employment Agreement(s)" means those certain employment agreements dated as of the date hereof by and between Acquisitionco and the Persons listed on Schedule C attached hereto.

"Environmental Claim" means, with respect to any Person, any written or oral notice, claim, demand or other communication (collectively, a "claim") by any other Person alleging or asserting such Person's liability for investigatory costs, cleanup costs, Governmental or Regulatory Authority response costs, damages to natural resources or other property, personal injuries, fines or penalties arising out of, based on or resulting from (a) the presence, or Release into the environment, of any Hazardous Material at any location, whether or not owned by such Person, or (b) circumstances forming the basis of any violation, or alleged violation, of any Environmental Law. The term "Environmental Claim" shall include, without limitation, any claim by any Governmental or Regulatory Authority for enforcement, cleanup, removal, response, remedial or other actions or damages pursuant to any applicable Environmental Law, and any claim by any third party seeking damages, contribution, indemnification, cost recovery, compensation or injunctive relief resulting from the presence of Hazardous Materials or arising from alleged injury or threat of injury to health, safety or the environment.

"Environmental Law" means any Law or Order relating to the regulation or protection of human health, safety or the environment or to emissions, discharges, releases or threatened releases of pollutants, contaminants, chemicals or industrial, toxic or hazardous substances or wastes into the environment (including, without limitation, ambient air, soil, surface water, ground water, wetlands, land or subsurface strata), or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of pollutants, contaminants, chemicals or industrial, toxic or hazardous substances or wastes.

"Escrow Agent" means Goodmans LLP.

"Escrow Agreement" means the escrow agreement to be entered into on the Closing Date, substantially in the form of Exhibit F hereto.

"ETA" means the *Excise Tax Act* (Canada).

"Excluded Assets" means: (a) ninety-five thousand (95,000) common shares in the capital of KMX Corp. beneficially owned by SkyPower (the "**KMX Shares**"); (b) a certain

LA1:#6351530v20                                      - 49 -

nominal price repurchase right in favour of SkyPower, pro rata to its respective interest in NIM Tech Inc. granted to SkyPower pursuant to a letter agreement dated October 13, 2005 among, *inter alios*, SkyPower and Miroslaw Wrobel, Michael Maris and Amar Dhanantwari acting on behalf of NIM Tech Inc.; and (c) a certain share purchase option to acquire an additional number of shares in the capital of a technology corporation to be incorporated to pursue the development of Mobile Cube technology granted to SkyPower pursuant to a letter agreement dated October 21, 2003 among Kerry Adler, on behalf of SkyPower, and Robert Niederer, Rene Pardo and Khalid Hossain.

"Financial Statements" means the consolidated financial statements of SkyPower and its consolidated Subsidiaries delivered to Acquisitionco pursuant to Section 2.08 or 6.05.

"GAAP" means Canadian generally accepted accounting principles applied on a consistent basis and which are in accordance with recommendations from time to time of the Canadian Institute of Chartered Accountants (as published in the CICA handbook) at the date on which such generally accepted accounting principles are applied.

"GPCo" has the meaning ascribed to such term in Section 7.04.

"GST" means all Taxes payable under the ETA or under any provincial legislation similar to the ETA and any reference to a specific provision of the ETA or any such provincial legislation shall refer to any successor provision thereto of like or similar effect.

"Governmental or Regulatory Authority" means any court, tribunal, arbitrator, authority, agency, commission, official or other instrumentality of any country, province, county, city or other political subdivision.

"Hazardous Material" means (a) any petroleum or petroleum products, flammable explosives, radioactive materials, asbestos in any form that is or could become friable, urea formaldehyde foam insulation and transformers or other equipment that contain dielectric fluid containing levels of polychlorinated biphenyls (PCBs); (b) any chemicals or other materials or substances which are now or hereafter become defined as or included in the definition of "hazardous substances," "hazardous wastes," "hazardous materials," "extremely hazardous wastes," "restricted hazardous wastes," "toxic substances," "toxic pollutants" or words of similar import under any Environmental Law; and (c) any other chemical or other material or substance, exposure to which is now or hereafter prohibited, limited or regulated by any Governmental or Regulatory Authority under any Environmental Law.

"HSHN" has the meaning ascribed to it in the forepart of this Agreement.

"HSHN Purchase Price" has the meaning ascribed to it in Section 1.01.

"HSHN Shares" has the meaning ascribed to it in the forepart of this Agreement.

"Indebtedness" of any Person means all obligations of such Person (a) for borrowed money, (b) evidenced by notes, bonds, debentures or similar instruments, (c) for the deferred purchase price of goods or services (other than trade payables or accruals incurred in the

ordinary course of business), (d) under capital leases and (e) in the nature of guarantees of the obligations described in clauses (a) through (d) above of any other Person.

"Intellectual Property" means all intellectual property rights of any nature or form of protection of a similar nature or having equivalent or similar effect to any of the foregoing, including, without limitation:

(a)     inventions, discoveries, processes, designs, techniques, developments, technology, and related improvements, whether or not patentable, and patents, patent applications, divisionals, continuations, reissues, renewals, registrations, confirmations, re-examinations, certificates of inventorship, extensions, and the like, and any provision applications of any such patents or patent applications (collectively "Patents");

(b)     any word, name, symbol, color, designation, or device or any combination thereof (to the extent the same may be trademarked under applicable Law), including, without limitation, any pending trademark, trade dress, service mark, service name, trade name, brand name, logo, domain name, or business symbol, and any foreign or international equivalent of any of the foregoing and all goodwill associated therewith (collectively "Trademarks");

(c)     any work, whether or not a registered copyright, that incorporates, is based upon, derived from, or otherwise uses any intellectual property, including, without limitation, mechanical and electronic design drawings (including, without limitation, computer-aided design files), specification, software (including, without limitation, source code and object code), processes, technical or engineering data, test procedures, schematics, writings, materials, products, artwork, packaging and advertising materials algorithms, flowcharts, and know-how (collectively "Copyrights");

(d)     technical, scientific, and other know-how and information, trade secrets, knowledge, technology, means, methods, processed, practices, formulas, assembly procedures, computer programs, source code, apparatuses, specifications, books, records, production data, publications, databases, reports, manuals, data and results, in written, electronic, or any other form not known or hereafter developed (collectively "Trade Secrets"); and

(e)     mask work and similar rights protecting integrated circuit or chip topographies or designs.

"Investment Assets" means all debentures, notes and other evidences of Indebtedness, stocks, securities (including rights to purchase and securities convertible into or exchangeable for other securities), interests in joint ventures and general and limited partnerships, mortgage loans and other investment or portfolio assets owned of record or beneficially by SkyPower or any Subsidiary and issued by any Person other than SkyPower or any Subsidiary (other than trade receivables generated in the ordinary course of business of SkyPower and the Subsidiaries).

"Key Man Life Insurance Policy" has the meaning ascribed to it in Section 6.13.

"Knowledge of SkyPower" "Knowledge of any SkyPower Shareholder" or "Known to any SkyPower Shareholder" means the knowledge of any officer, director or employee of such SkyPower Shareholder, SkyPower, or any Subsidiary, as applicable.

"Laws" means all laws, statutes, rules, regulations, ordinances and other pronouncements having the effect of law of any country, province, county, city or other political subdivision or of any Governmental or Regulatory Authority.

"Liabilities" means all Indebtedness, obligations and other liabilities of a Person (whether absolute, accrued, contingent, fixed or otherwise, or whether due or to become due).

"Licenses" means all licenses, permits, certificates of authority, authorizations, approvals, registrations, franchises and similar consents granted or issued by any Governmental or Regulatory Authority.

"Liens" means any mortgage, pledge, hypothec, assessment, security interest, lease, lien, adverse claim, levy, charge or other encumbrance of any kind, or any conditional sale Contract, title retention Contract or other Contract to give any of the foregoing.

"Loss" means any and all damages, fines, fees, penalties, deficiencies, diminution in value, losses and expenses (including without limitation interest, court costs, fees of attorneys, accountants and other experts or other expenses of litigation or other proceedings or of any claim, default or assessment).

"LP" has the meaning ascribed to such term in Section 7.04.

"New Options" has the meaning ascribed to such term in Section 1.01.

"Non-Canadian Shareholder(s)" means any Person listed under Article I of Schedule D hereto.

"Non-Canadian Optionholder(s)" means any Person listed under Article II of Schedule D hereto.

"Operative Agreements" means this Agreement, the Employment Agreements, the Rights Agreement, the Shareholders Agreement, the Amended Acquisitionco Charter, and any other support or other agreements to be entered into in connection with the transaction, each such agreement in the form agreed upon by the Parties.

"Option" with respect to any Person means any security, right, subscription, warrant, option, "phantom" stock right or other Contract that gives the right to (a) purchase or otherwise receive or be issued any shares of capital stock of such Person or any security of any kind convertible into or exchangeable or exercisable for any shares of capital stock of such Person or (b) receive or exercise any benefits or rights similar to any rights enjoyed by or accruing to the holder of shares of capital stock of such Person, including any rights to participate in the equity or income of such Person or to participate in or direct the election of any directors or officers of such Person or the manner in which any shares of capital stock of such Person are voted.

*Stock Purchase Agreement – Lehman/SkyPower – June 2007*

"the Options" has the meaning ascribed to it in the forepart of this Agreement.

"Option Holder(s)" has the meaning ascribed to it in the forepart of this Agreement.

"Option Holder Shares" has the meaning ascribed to it in the forepart of this Agreement.

"Option Purchase Price" has the meaning ascribed to it in Section 1.01.

"Optioned Lands" means any lands subject to an Option to Lease.

"Option to Lease" means any option granted to SkyPower or any Subsidiary to lease or use or be granted any easement, license, right to occupy or use, or right-of-way over any real property.

"Order" means any writ, judgment, decree, injunction or similar order of any Governmental or Regulatory Authority (in each such case whether preliminary or final).

"Pension Plan(s)" means, collectively, each Benefit Plan which is a "registered pension plan," as that term is defined in subsection 248(1) of the Tax Act.

"Permitted Lien" means (a) any Lien for Taxes not yet due or delinquent or being contested in good faith by appropriate proceedings for which adequate reserves have been established in accordance with GAAP, (b) any statutory Lien arising in the ordinary course of business by operation of Law with respect to a Liability that is not yet due or delinquent and (c) any minor imperfection of title or similar Lien which individually or in the aggregate with other such Liens does not materially impair the value of the property subject to such Lien or the use of such property in the conduct of the business of SkyPower or any Subsidiary.

"Person" means any natural person, corporation, limited liability company, general partnership, limited partnership, proprietorship, other business organization, trust, union, association or Governmental or Regulatory Authority.

"Plan" means any employment agreement and any bonus, incentive compensation, deferred compensation, pension, profit sharing, retirement, stock purchase, stock option, restricted stock, deferred stock, stock ownership, stock appreciation rights, phantom stock, equity-related, leave of absence, layoff, vacation, day or dependent care, legal services, cafeteria, life, health, accident, disability, workmen's compensation or other insurance, change in control, retention, severance, separation or other employee benefit plan, practice, policy or arrangement of any kind, whether written or oral, including, but not limited to, any employee benefit plan.

"Pro Rata Shareholder Purchase Price" has the meaning ascribed to such term in Section 1.03.

"Purchaser" has the meaning ascribed to it in the forepart of this Agreement.

*Stock Purchase Agreement – Lehman/SkyPower – June 2007*

"Purchaser Indemnified Parties" has the meaning ascribed to it in <u>Section 12.01</u>.

"Purchaser Group" has the meaning ascribed to it in the introductory paragraph to <u>Article VIII</u>.

"Purchase Price" means any of the Class A Purchase Price, the SkyPower Common Stock Purchase Price, the Shareholder Holdco Purchase Price, the Shareholder Share Purchase Price, the Option Purchase Price, the HSHN Purchase Price, or the Adler Class B Common Stock Purchase Price, as the context requires.

"Release" means any release, spill, emission, leaking, pumping, injection, deposit, disposal, discharge, dispersal, leaching or migration into the indoor or outdoor environment, including, without limitation, the movement of Hazardous Materials through ambient air, soil, surface water, ground water, wetlands, land or subsurface strata.

"Representatives" has the meaning ascribed to it in <u>Section 6.02</u>.

"Rights" has the meaning ascribed to it in the forepart of this Agreement.

"Rights Agreement" means that certain Rights Agreement dated as of June 11, 2007 by and between Purchaser and Acquisitionco.

"Shares" has the meaning ascribed to it in the forepart of this Agreement.

"Shareholder(s)" has the meaning ascribed to it in the forepart of this Agreement.

"Shareholders Agreement" means that certain Unanimous Shareholder Agreement date as of June 11, 2007 by and between Purchaser, Adler, Adler Holdco II, HSHN, Shareholder Holdco, the Shareholders, and Acquisitionco.

"Shareholder Amount" has the meaning ascribed to such term in <u>Section 12.05(a)</u>.

"Shareholder Holdco" has the meaning ascribed to it in the forepart of this Agreement.

"Shareholder Holdco Purchase Price" has the meaning ascribed to such term in <u>Section 1.01</u>.

"Shareholder Holdco Shares" has the meaning ascribed to it in the forepart of this Agreement.

"Shareholder Shares has the meaning ascribed to it in the forepart of this Agreement.

"Shareholder Share Purchase Price" has the meaning ascribed to <u>Section 1.01</u>.

"Shareholder Indemnified Parties" has the meaning ascribed to it in <u>Section 12.02</u>.

"SkyPower" has the meaning ascribed to it in the forepart of this Agreement.

"SkyPower Class B Stock" has the meaning ascribed to it in the forepart of this Agreement.

"SkyPower Common Stock Purchase Price" has the meaning ascribed to Section 1.01.

"SkyPower Confidential Technology and Information" has the meaning ascribed to it in Section 2.17 hereto.

"SkyPower Material Adverse Effect" shall mean a material adverse effect on the business, condition (financial or otherwise), Assets and Properties, liabilities, results of operations or prospects of SkyPower and its Subsidiaries on or the validity or enforceability in any material respect of any Operative Document; provided, however, that none of the following shall be or will be at the Closing, deemed to constitute and shall not be taken into account in determining the occurrence of a SkyPower Material Adverse Effect: (a) any effect or change that results from the announcement of the execution and delivery of this Agreement, and (b) any effect or change that results from the taking of any action required pursuant to this Agreement or expressly permitted by the written consent of the Purchaser Group pursuant to this Agreement.

"SkyPower Shares" has the meaning ascribed to it in the forepart of this Agreement.

"SkyPower Shareholder(s)" has the meaning ascribed to it in the forepart of this Agreement.

"Statutory Plans" means statutory benefit plans which SkyPower or any Subsidiary is required to participate in or comply with, including the Canada and Quebec Pension Plans and plans administered pursuant to applicable health tax, workplace safety insurance and employment insurance legislation.

"Subsidiary" means (i) a subsidiary as defined under GAAP, including without limitation, any corporate subsidiary as to which SkyPower owns at least fifty percent (50%) of the voting securities or has the contractual power presently to elect at least fifty percent (50%) of directors and (ii) non-corporate entities (including without limitation, limited liability companies and limited partnerships) in which SkyPower has the right to at least fifty percent (50%) of the profits or fifty percent (50%) of the assets, (ii) Terrawinds Resources Corp. and (iii) any partnership the only general partner or general partners of which are SkyPower or one or more of its Subsidiaries. Further, where any representation in Articles 2 or 3 cover Subsidiaries, such representation shall be deemed to cover all joint venture entities in which SkyPower has any equity or voting interest; provided, however, that representations with respect to such joint venture entities shall only be deemed to be given on a 'best of knowledge' basis.

"Taxes" or "Tax" means all taxes, levies, duties, assessments, reassessments and other charges of any nature whatsoever imposed by any Authority, whether direct or indirect, including income tax, profits tax, gross receipts tax, corporation tax, sales and use tax, wage tax, payroll tax, worker's compensation levy, capital tax, stamp duty, real and personal property tax,

land transfer tax, customs or excise duty, excise tax, turnover or value added tax on goods sold or
services rendered, withholding tax, social security, Canada or Quebec pension plans and
employment or unemployment insurance charges or retirement contributions, and any interest,
fines, additions to tax and penalties thereon.

"Tax Act" means the *Income Tax Act* (Canada).

"Tax Return" means all returns, reports, declarations, elections, notices, filings,
forms, statements and other related documents required to be filed by Law in respect of Taxes.

"Third Party Claim" has the meaning ascribed to it in Section 12.04.

"Transaction" means all transactions contemplated by this Agreement.

"Unaudited Financial Statement Date" means the last day of the most recent
fiscal quarter of SkyPower for which Financial Statements are delivered to Acquisitionco
pursuant to Section 2.07.

"Unaudited Financial Statements" means the Financial Statements for the most
recent fiscal quarter of SkyPower delivered to Acquisitionco pursuant to Section 2.08.

"Water Pump Technology" has the meaning ascribed to such term in Section 2.17.

"Withheld Amount" has the meaning ascribed to such term in Section 1.03.

(a) Construction of Certain Terms and Phrases. Unless the context of this
Agreement otherwise requires, (i) words of any gender include each other gender; (ii) words
using the singular or plural number also include the plural or singular number, respectively;
(iii) the terms "**hereof**," "**herein**," "**hereby**" and derivative or similar words refer to this entire
Agreement; (iv) the terms "**Article**" or "**Section**" refer to the specified Article or Section of this
Agreement; and (v) the phrases "**ordinary course of business**" and "**ordinary course of
business consistent with past practice**" refer to the business and practice of SkyPower or a
Subsidiary. Whenever this Agreement refers to a number of days, such number shall refer to
calendar days unless Business Days are specified. All accounting terms used herein and not
expressly defined herein shall have the meanings given to them under GAAP. For the purposes
hereof, two Persons are considered to be at "arm's length" to one another if they would be
considered to be dealing at arm's length under the Tax Act.

## ARTICLE XV

## MISCELLANEOUS

15.01 Notices. All notices, requests, demands and other communications under
this Agreement shall be in writing and shall be deemed to have been duly given: (a) on the date
of service if served personally on the party to whom notice is to be given; (b) on the day of
transmission if sent via facsimile transmission to the facsimile number given below, and
telephonic confirmation of receipt is obtained promptly after completion of transmission; (c) on

LA1:#6351530v20                           - 56 -

the day after delivery to Federal Express or similar overnight courier or the Express Mail service maintained by the United States Postal Service; or (d) on the fifth day after mailing, if mailed to the party to whom notice is to be given, by first class mail, registered or certified, postage prepaid and properly addressed, to the party as follows:

If to the Purchaser Group, to:

LB Skypower Inc.
c/o Lehman Brothers Inc.
745 Seventh Avenue; New York, NY 10019-6801
Facsimile No.: 212-520-0327
Attn: Andrew Weber

with a copy to:

Lehman Brothers Inc.
745 Seventh Avenue; New York, NY 10019-6801
Facsimile No.: 646-758-2651
Attn: Office of General Counsel

If to Adler or any of the other SkyPower Shareholders other than HSHN, to:

c/o SkyPower Corp.
250 Yonge Street, Suite 1600
Toronto, Ontario M5B2L7
Facsimile No.: 416-981-8686
Attn: Kerry Adler

If to HSHN, to:

c/o HSH Nordbank AG
New York Branch
230 Park Avenue
New York, NY 10169-0005

with a copy to:

c/o SkyPower Corp.
250 Yonge Street, Suite 1600
Toronto, Ontario M5B2L7
Facsimile No.: 416-981-8686

*Stock Purchase Agreement – Lehman/SkyPower – June 2007*

Attn: Kerry Adler

Any party from time to time may change its address, facsimile number or other information for the purpose of notices to that party by giving notice specifying such change to the other party hereto.

      15.02  Entire Agreement. This Agreement and the Operative Agreements supersedes all prior discussions and agreements between the parties with respect to the subject matter hereof and thereof, including without limitation (i) that certain letter of intent; between the parties dated May 11, 2007 and (ii) that certain letter of intent between the parties dated June 1, 2007, and contains the sole and entire agreement between the parties hereto with respect to the subject matter hereof and thereof.

      15.03  Expenses. Except as otherwise expressly provided in this Agreement (including without limitation as provided in Section 13.02), whether or not the transactions contemplated hereby are consummated, each party will pay its own costs and expenses, and the SkyPower Shareholders shall pay the costs and expenses of the SkyPower Shareholders and the Subsidiaries, incurred in connection with the negotiation, execution and closing of this Agreement and the Operative Agreements and the transactions contemplated hereby and thereby.

      15.04  Confidentiality; Publicity. (a) Each party hereto will hold, and will use its best efforts to cause its Affiliates, and their respective Representatives to hold, in strict confidence from any Person (other than any such Affiliate or Representative), unless (i) compelled to disclose by judicial or administrative process (including without limitation in connection with obtaining the necessary approvals of this Agreement and the transactions contemplated hereby of Governmental or Regulatory Authorities) or by other requirements of Law or (ii) disclosed in an Action or Proceeding brought by a party hereto in pursuit of its rights or in the exercise of its remedies hereunder, all documents and information concerning any other party or any of its Affiliates furnished to it by the other party or such other party's Representatives in connection with this Agreement or the transactions contemplated hereby, except to the extent that such documents or information can be shown to have been (a) previously known by the party receiving such documents or information, (b) in the public domain (either prior to or after the furnishing of such documents or information hereunder) through no fault of such receiving party or (c) later acquired by the receiving party from another source if the receiving party is not aware that such source is under an obligation to another party hereto to keep such documents and information confidential. In the event the transactions contemplated hereby are not consummated, upon the request of the other party, each party hereto will, and will cause its Affiliates and their respective Representatives to, promptly redeliver or cause to be redelivered all copies of documents and information furnished by the other party in connection with this Agreement or the transactions contemplated hereby and destroy or cause to be destroyed all notes, memoranda, summaries, analyses, compilations and other writings related thereto or based thereon prepared by the party furnished such documents and information or its Representatives.

      (b) Except in accordance with Paragraph (a) above, neither Party, nor their respective Affiliates or Representatives, without the written consent of the other, will make any

LA1:#6351530v20

- 58 -

public announcement or issue any press release with respect to the transactions contemplated by this Agreement. In no event will SkyPower, the SkyPower Shareholders or either of their respective Subsidiaries, Affiliates or Representatives make any public announcement or issue any press release with respect to the transactions contemplated by this Agreement without the approval of the Purchaser Group.

15.05  Waiver. Any term or condition of this Agreement may be waived at any time by the party that is entitled to the benefit thereof, but no such waiver shall be effective unless set forth in a written instrument duly executed by or on behalf of the party waiving such term or condition. No waiver by any party of any term or condition of this Agreement, in any one or more instances, shall be deemed to be or construed as a waiver of the same or any other term or condition of this Agreement on any future occasion. All remedies, either under this Agreement or by Law or otherwise afforded, will be cumulative and not alternative.

15.06  Amendment. This Agreement may be amended, supplemented or modified only by a written instrument duly executed by or on behalf of each party hereto.

15.07  No Third Party Beneficiary. The terms and provisions of this Agreement are intended solely for the benefit of each party hereto and their respective successors or permitted assigns, and it is not the intention of the parties to confer third-party beneficiary rights upon any other Person other than any Person entitled to indemnity under Article XII.

15.08  No Assignment; Binding Effect. Neither this Agreement nor any right, interest or obligation hereunder may be assigned by any party hereto without the prior written consent of the other party hereto and any attempt to do so will be void, except (a) for assignments and transfers by operation of Law, (b) the assignment by any SkyPower Shareholder to a wholly-owned affiliate or subsidiary holding company of such SkyPower Shareholder (provided that such SkyPower Shareholder shall remain obligated under this Agreement and under any applicable Operating Agreement) and (c) that Purchaser or Acquisitionco may assign any or all of its rights, interests and obligations hereunder (including without limitation its rights under Article XII) to (i) a wholly-owned subsidiary, provided that any such subsidiary agrees in writing to be bound by all of the terms, conditions and provisions contained herein, (ii) any post-Closing purchaser of all of the issued and outstanding stock of the SkyPower Shareholders or a substantial part of its assets or (iii) any financial institution providing purchase money or other financing to Purchaser, Acquisitionco or the SkyPower Shareholders from time to time as collateral security for such financing, but no such assignment shall relieve any SkyPower Shareholder, Purchaser or Acquisitionco, as the case may be, of its obligations hereunder. Subject to the preceding sentence, this Agreement is binding upon, inures to the benefit of and is enforceable by the parties hereto and their respective successors and assigns.

15.09  Headings. The headings used in this Agreement have been inserted for convenience of reference only and do not define or limit the provisions hereof.

15.10  Dispute Resolution; Arbitration.

(a) The parties agree that disputes under this Agreement shall be resolved pursuant to arbitration in accordance of the rules and procedures of the American Arbitration Association. The place of the arbitration will be New York, New York.

(b) The parties will agree on the appointment of an arbitrator (the "Sole Arbitrator"). If the parties are unable to agree upon a Sole Arbitrator, each party will appoint a person as arbitrator, and those two arbitrators will appoint a third arbitrator (the "Arbitrators").

(c) The Sole Arbitrator or, as the case may be, the Arbitrators appointed above will in its or their absolute discretion, establish reasonable rules to govern all aspects of the arbitration and to ensure that the arbitration is conducted expeditiously. The parties may request that the Sole Arbitrator or the Arbitrators, as the case may be, decide between final and complete proposals submitted by each of the parties.

(d) The decision of the Sole Arbitrator or the Arbitrators with respect to the dispute must be rendered, in writing and must contain a brief recital of the facts and principles upon which the decision was made and the reasons therefor. The decision or award of the Sole Arbitrator or the Arbitrators made pursuant to this Schedule is final and binding upon each of the parties and there is no appeal therefrom. Thereafter, any action may only be for the purpose of enforcing the decision or award and the recovery of costs incidental to the action.

(e) The decision or award of the Sole Arbitrator or Arbitrators, as the case may be, will be conclusively deemed to determine the interpretation of this Agreement or any Operative Agreements and the rights and liabilities as between the parties in respect of the matter in disagreement.

(f) Except as may be otherwise agreed by the parties, or as may be ordered by the Sole Arbitrator or the Arbitrators, the Sole Arbitrator or the Arbitrators will be entitled to its or their usual charges for services rendered to be paid equally by the parties.

(g) Subject to this paragraph, no dispute that is or may be the subject of a submission to arbitration in accordance with this Section will give rise to a cause of action between or will be made the subject matter of an action in any court of law or equity by either of the parties unless and until the dispute has been submitted to arbitration and finally determined in accordance with this Section and any action commenced thereafter with respect to the dispute may only be for judgment in accordance with the decision of the Sole Arbitrator or the Arbitrators, as applicable, and the costs incidental to the action. In any action of this sort, the decision of the Sole Arbitrator or the Arbitrators, as applicable, will be conclusively deemed to determine the rights and liabilities between the parties in respect of the dispute.

Notwithstanding the foregoing, if the actions or inactions of a party are, in the honest view of the other party, producing or likely to produce irreparable harm that cannot be adequately compensated for by damages or that will result in damages that are difficult to estimate, the aggrieved party may apply to a court for injunctive or mandatory injunctive relief to remedy the situation pending the conduct of arbitration. The court before which the proceeding is brought may, if it determines that arbitration would not, in the circumstances be beneficial to a continuing relationship between the parties, grant the aggrieved party the right to proceed with

an action notwithstanding the otherwise general application of arbitration as the chosen mode of dispute resolution.

(h) The parties desire that any dispute that is to be determined in accordance with the dispute resolution provisions should be conducted in strict confidence and that there will be no disclosure to any Person of the fact of the dispute or any aspect of the dispute except as necessary for the resolution of the dispute. Any hearing will be attended only by those Persons whose presence, in the opinion of any party or the arbitrator, is reasonably necessary for the determination of the dispute. All matters relating to, all evidence presented to, all submissions made in the course of, and all documents produced in accordance with the dispute resolution procedure or any order of the arbitrator or created in the course of or for the purposes of the arbitration, including any award or interim award by the arbitrator, will be kept confidential and will not be disclosed to any Person without the prior written consent of all parties to the arbitration except as required to enforce the award or as required by law or as permitted by an order of the arbitrator made pursuant to a motion or application on notice to all parties to the arbitration.

15.11   Invalid Provisions. If any provision of this Agreement is held to be illegal, invalid or unenforceable under any present or future Law, and if the rights or obligations of any party hereto under this Agreement will not be materially and adversely affected thereby, (a) such provision will be fully severable, (b) this Agreement will be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part hereof, and (c) the remaining provisions of this Agreement will remain in full force and effect and will not be affected by the illegal, invalid or unenforceable provision or by its severance herefrom.

15.12   Governing Law. This Agreement shall be governed by and construed in accordance with the Laws of New York applicable to a Contract executed and performed in such State, without giving effect to the conflicts of laws principles thereof.

15.13   Judicial Proceedings; Waiver of Jury Trial; Designation of Agent. SUBJECT TO SECTION 15.10, ANY JUDICIAL PROCEEDING ARISING OUT OF OR IN CONNECTION WITH ANY CLAIM UNDER THIS AGREEMENT (INCLUDING TO ENFORCE ANY ARBITRATION AWARD OR TO COMPEL ARBITRATION PURSUANT TO SECTION 15.10) MAY BE BROUGHT IN ANY COURT OF COMPETENT JURISDICTION IN THE BOROUGH OF MANHATTAN IN THE CITY OF NEW YORK, COUNTY OF NEW YORK, AND, BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH PARTY  (A) ACCEPTS, GENERALLY AND UNCONDITIONALLY, THE NONEXCLUSIVE JURISDICTION OF EACH SUCH COURT AND ANY RELATED APPELLATE COURT AND IRREVOCABLY AGREES TO BE BOUND BY ANY JUDGMENT RENDERED THEREBY IN CONNECTION WITH ANY LOAN DOCUMENT CLAIM AND (B) TO THE FULLEST EXTENT IT MAY LEGALLY AND EFFECTIVELY DO SO, IRREVOCABLY WAIVES ANY OBJECTION, INCLUDING, WITHOUT LIMITATION, ANY OBJECTION TO THE LAYING OF VENUE OR BASED ON THE GROUNDS OF FORUM NON CONVENIENS, IT MAY NOW OR HEREAFTER HAVE TO THE BRINGING OF ANY SUCH ACTION OR PROCEEDING IN SUCH JURISDICTION. EACH PARTY NOT LOCATED IN NEW YORK SHALL APPOINT AND MAINTAIN CT CORPORATION SYSTEM, THE PRENTICE-HALL CORPORATION SYSTEM INC. OR A

SIMILAR ENTITY (THE "**SERVICE AGENT**") AS AGENT TO RECEIVE ON ITS
BEHALF SERVICE OF PROCESS IN ANY PROCEEDING IN A STATE OR FEDERAL
COURT LOCATED IN THE BOROUGH OF MANHATTAN IN THE CITY OF NEW YORK
BY ENTERING INTO AN AGREEMENT AS OF THE DATE OF THIS AGREEMENT WITH
THE SERVICE AGENT TO SUCH EFFECT, AND SUCH PARTY SHALL MAINTAIN
SUCH AGREEMENT (OR AN APPROPRIATE SUBSTITUTE TO THE SAME EFFECT
WITH THE SAME OR A DIFFERENT SERVICE AGENT) FOR THE ENTIRE TERM OF
THIS AGREEMENT AND EACH OF THE OTHER OPERATIVE DOCUMENTS TO WHICH
IT IS A PARTY. THE FOREGOING CONSENT TO JURISDICTION AND APPOINTMENT
OF AGENT TO RECEIVE SERVICE OF PROCESS SHALL NOT CONSTITUTE A
GENERAL CONSENT TO SERVICE OF PROCESS IN THE STATE OF NEW YORK FOR
ANY PURPOSE EXCEPT AS PROVIDED ABOVE AND SHALL NOT BE DEEMED TO
CONFER RIGHTS ON ANY PERSON OTHER THAN THE PARTIES HERETO. NOTHING
HEREIN SHALL AFFECT THE RIGHT OF ANY PARTY OR ANY OTHER INDEMNIFIED
PERSON TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR
SHALL LIMIT THE RIGHT OF ANY PARTY OR ANY OTHER INDEMNIFIED PERSON
TO BRING PROCEEDINGS IN THE COURTS OF ANY OTHER JURISDICTION. IN
LIGHT OF THE EXPRESS AGREEMENT OF THE PARTIES TO SUBMIT TO THE
JURISDICTION OF NEW YORK COURTS FOR THE RESOLUTION OF ANY AND ALL
DISPUTES ARISING UNDER THIS AGREEMENT AND BROUGHT IN NEW YORK
COURTS PURSUANT TO THIS SECTION 15.13, EACH PARTY FURTHER HEREBY
KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES, TO THE FULLEST
EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL AFFIRMATIVE
DEFENSES IT COULD OR MIGHT OTHERWISE BE ABLE TO ASSERT BASED ON AN
ALLEGED INCAPACITY OF SUCH PARTY TO ASSERT A CLAIM OR
COUNTER-CLAIM IN THE STATE COURTS OF THE STATE OF NEW YORK LOCATED
IN THE BOROUGH OF MANHATTAN WHETHER ON THE GROUNDS THAT SUCH
PARTY HAS FAILED TO COMPLY WITH ANY OR ALL REGISTRATION,
CERTIFICATION, NOTIFICATION, FILING OR DESIGNATION-OF-AGENT
GOVERNMENTAL REQUIREMENTS OF THE STATE OF NEW YORK OR ON OTHER
GROUNDS. EACH PARTY HERETO EACH HEREBY KNOWINGLY, VOLUNTARILY
AND INTENTIONALLY, IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE
FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE
TO A TRIAL BY JURY IN ANY JUDICIAL PROCEEDING INVOLVING ANY CLAIM
ARISING OUT OF, RELATING TO OR IN CONNECTION WITH ANY OPERATIVE
DOCUMENT CLAIM. EACH PARTY HERETO (A) CERTIFIES THAT NO
REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS
REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD
NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER
AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE
BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER OPERATIVE
DOCUMENTS, AS APPLICABLE, BY, AMONG OTHER THINGS, THE MUTUAL
WAIVERS AND CERTIFICATIONS IN THIS SECTION 15.13. THE PROVISIONS OF THIS
SECTION 15.13 SHALL SURVIVE THE TERMINATION OF THIS AGREEMENT AND
THE PAYMENT IN FULL OF THE OBLIGATIONS.

15.14  <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument.

**IN WITNESS WHEREOF**, this Agreement has been duly executed and delivered by the duly authorized officer of each party hereto as of the date first above written.

**LB SKYPOWER INC.**

By: _____

Name:

Title:

**1328392 ALBERTA ULC**

By: _____
Name:
Title:

S-2

*Stock Purchase Agreement – Lehman/SkyPower – June 2007*

**SKYPOWER CORP.**

By: _____

     Name:  Kerry Adler
     Title:

**6785778 CANADA INC.**

By:  _____

Name:  Kerry Adler
Title:

*Stock Purchase Agreement – Lehman/SkyPower – June 2007*

**HSH NORDBANK AG,** by its Attorney, Kerry
Adler

By: _____

Name: Kerry Adler

Title:

*Stock Purchase Agreement – Lehman/SkyPower – June 2007*

**2138746 ONTARIO INC.**

By: _____

Name: Kerry Adler
Title:

*Stock Purchase Agreement – Lehman/SkyPower – June 2007*

**2138747 ONTARIO INC.**

By:  _____
    Name: Kerry Adler
    Title:

*Stock Purchase Agreement – Lehman/SkyPower – June 2007*

_____    }    _____
Witness                          **KERRY ADLER**

S-8

**KERRY ADLER,** as an Attorney for the Shareholders
listed in Schedule "A" attached hereto

_____

**KERRY ADLER**

*Stock Purchase Agreement – Lehman/SkyPower – June 2007*

**KERRY ADLER,** as an Attorney for the Option Holders
listed in Schedule "B" attached hereto


_____

**KERRY ADLER**

GOODMANS\\5456420.1

S-10

*Stock Purchase Agreement – Lehman/SkyPower – June 2007*