# EXHIBIT H

Court File No. CV-10-8637-00CL

# Interwind Corp.
# (Formerly known as Skypower Corp.)

## RECEIVER'S NINTH REPORT TO THE COURT

**January 15, 2013**

**List of Appendices**

A     Eighth Report of the Receiver dated November 10, 2010 (without Appendices)

B     Statement of cash receipts and disbursements for the period March 30, 2010 to January 9, 2013

C     Excerpt from Tenth Report of the Initial Monitor

D     Affidavit of Tracey Weaver sworn January 14, 2013

E     Affidavit of James Szumski sworn January 10, 2013

F     Affidavit of Robert J. Chadwick sworn January 11, 2013

Court File No. CV-10-8637-00CL

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE RECEIVERSHIP OF INTERWIND CORP.**

BETWEEN:

**HSH NORDBANK AG, NEW YORK BRANCH**
**as administrative and collateral agent**

Applicant

- and -

**INTERWIND CORP.**

Respondent

**NINTH REPORT TO THE COURT**
**SUBMITTED BY PRICEWATERHOUSECOOPERS INC.**
**IN ITS CAPACITY AS RECEIVER**

**INTRODUCTION**

1.  By Order of this Court granted August 12, 2009 (the **"Initial Order"**), Interwind Corp. (formerly known as SkyPower Corp.) (**"Interwind"** or the **"Company"**) obtained relief under the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended (the **"CCAA Proceedings"**) which, among other things, provided for the appointment of KPMG Inc. as Monitor of Interwind (the **"Initial Monitor"**).

2.  On February 19, 2010, the Court issued an Order (the **"Claims Process Order"**) authorizing the Initial Monitor to conduct a claims process in the CCAA Proceedings (the **"Claims Process"**), which contemplated a call for certain claims against the directors and officers of the Company, certain post-filing claims against the Company and certain construction lien claims.

3.  On March 30, 2010, pursuant to an order of the Honourable Mr. Justice Morawetz (the **"Receivership Order"**), PricewaterhouseCoopers Inc. (**"PwC"**) was appointed as receiver (in such capacity, the **"Receiver"**), without security, of all of the current and future assets,

*pwc*

undertakings and properties of the Company (the "**Property**"), not including certain equipment (the "**Equipment**") listed in Exhibit 1 to Schedule 1.1(nn) to the Share Purchase Agreement dated December 15, 2009 between Interwind and enXco Service Corporation, pursuant to section 243(1) of the *Bankruptcy and Insolvency Act*, R.S.C. 1985, c. B-3, as amended (the "**BIA**") and section 101 of the *Courts of Justice Act*, R.S.O.1990, c. C.43, as amended (the "**Receivership Proceedings**"). Further orders of the Court also substituted PwC as Monitor of Interwind (in such capacity, the "**Monitor**") in the CCAA Proceedings and approved the issuance of an amended Initial Order, which facilitated this substitution and provided for certain other amendments.

4.    On October 15, 2010, the Court issued an order which, among other things, terminated the CCAA Proceedings (the "**CCAA Termination Order**").

5.    The purpose of this report (the "**Ninth Report**") is to:

    a)    Summarize the Receiver's activities since the Receiver's Seventh Report to the Court dated October 5, 2010 (the "**Seventh Report**");

    b)    Summarize the statement of cash receipts and disbursements of the Receiver;

    c)    Comment on the motion by HSH Nordbank AG, New York Branch, as administrative and collateral agent ("**HSH Nordbank**") for the SPV Approval and Vesting Order (as defined below); and

    d)    Seek an Order of the Court, *inter alia*:

        i)    Approving the Receiver's Eighth Report to the Court dated November 10, 2010 (the "**Eighth Report**"), a copy of which (without appendices) is attached as Appendix "**A**" and the Ninth Report, and the activities of the Receiver as described therein;

        ii)    Approving the Receiver's statement of cash receipts and disbursements for the period from March 30, 2010 to January 9, 2013 (the "R&D");

        iii)    Approving the fees and disbursements of the Receiver and its legal counsel for the period from October 1, 2010 to December 31, 2012, and the estimated fees and disbursements of the Receiver and its legal counsel up


**pwc**

to its date of discharge;

    iv) Authorizing the Receiver to pay any professional fees or disbursements of the Receiver and its legal counsel which exceed the estimated amounts (as summarized herein): (i) with the consent of HSH Nordbank and Lehman Brothers Holdings Inc. ("**Lehman**"), or (ii) pursuant to further orders of the Court;

    v) Discharging PwC as Receiver of Interwind upon completion of the Remaining Duties (as defined below) and providing a release to PwC from liability arising out of its appointment as Receiver; and

    vi) Discharging the Receiver's Charge, the Administration Charge and the KERP Charge (as those terms are defined in the Initial Order and the Receivership Order).

6.   Unless otherwise stated, all monetary amounts contained herein are expressed in Canadian Dollars and exclude harmonized sales tax ("**HST**"). Capitalized terms not otherwise defined are as defined in the Receivership Order and the Receiver's previous reports.

**RECEIVER'S ACTIVITIES SINCE THE DATE OF THE SEVENTH REPORT**

7.   The activities of the Receiver since the Seventh Report have included, *inter alia*, the following:

    a) Assisting in the resolution of two disputed claims in the Claims Process, which was discussed in the Eighth Report;

    b) Recovering the remainder of the Company's interconnection deposit with Hydro-Québec Transénergie relating to the Equipment;

    c) Seeking the return of certain deposits and/or performance related consideration in connection with transactions that have closed in the CCAA Proceedings of Interwind and in these Receivership Proceedings;

    d) Meeting with CPV Canada Development ULC ("**CPV**") with respect to certain assets it acquired from Interwind in the CCAA Proceedings (the "**Wind Development Business**"), and discussing the status of its projects;


pwc

e) Resolving certain claims of Interwind against Lehman and Lehman Brothers Special Financing, Inc. ("**LBSF**") in their respective U.S. Chapter 11 proceedings;

f) Pursuing the recovery of HST input tax credits paid during the Receivership Proceedings from the Canada Revenue Agency ("**CRA**");

g) Consulting with HSH Nordbank and Lehman (the "**Secured Lenders**") on matters where their direction was required, providing information on the Receivership Proceedings to them and consulting with them on the terms of the proposed Termination Agreement and SPV Approval and Vesting Order (both as defined below); and

h) Making distributions, as appropriate, to HSH Nordbank.

8.  To the best of its knowledge and belief, as of the date of this report, the Receiver has complied with all of its statutory duties and obligations pursuant to the BIA.

## RECEIVER'S STATEMENT OF RECEIPTS AND DISBURSEMENTS

9.  Attached as Appendix "B" is the R&D, which reflects an excess of receipts over disbursements of approximately $5.4 million.

10. As at the date of this Ninth Report, the Receiver estimates there are accrued, unpaid obligations of approximately $15,000, primarily related to outstanding professional fees of the Receiver and its legal counsel (the "**Accrued Obligations**"). The Accrued Obligations are anticipated to be paid from the Receiver's funds on hand before a final distribution is made.

## REMAINING ASSETS OF THE COMPANY

11. The remaining Property in the Receiver's possession (the "**Remaining Assets**") consists primarily of the following:

a) Cash of approximately $5.4 million;

b) Potential recoveries related to the earn-out component of the sale to CPV of the Wind Development Business (the "**CPV Earnout**"). The terms of the CPV Earnout were previously provided to the Court under seal and remain confidential. The right to receive earnout payments continues for a period of time;



c) Potential recoveries related to the Company's claims in the Lehman bankruptcy estates (the "**Lehman Claims**"), including:

    i) Two resolved and admitted claims against LBSF relating to foreign exchange currency option transactions which have been allowed in the approximate total amount of $14.6 million. A distribution in respect of these claims was received in December 2012 in the approximate amount of $3.2 million. Further distributions may be made from the LBSF estate in due course;

    ii) A claim filed against Lehman relating to an equity contribution agreement (the "**ECA Claim**"). The claim has been filed in the amount of $121,565,476.68. As of the date of this Ninth Report, no distributions have been received on this claim as it has not been resolved with LBHI. This claim is anticipated to be resolved pursuant to the proposed Termination Agreement discussed below;

d) Potential recoveries from the CRA related to HST input tax credits paid during the Receivership Proceedings;

e) A one-third interest in a joint venture seeking to develop a hydroelectric project in Panama (the "**Panama JV Interest**"). The Receiver understands that the project is at a very early stage of development and it is unclear if any recoveries will be realized from the joint venture interest;

f) Shares in a number of inactive subsidiaries with no realizable assets (the "**Inactive Subsidiaries**"); and

g) Various books and records of the Company and certain IT assets.

12. The Remaining Assets include proceeds from the sale of certain lands (the "**Solar Real Property**") sold pursuant to a transaction with 1495359 Alberta ULC (the "**Solar Transaction**") in the CCAA Proceedings. Based on a confidential valuation of the Solar Real Property prepared by KPMG LLP at the request of the Initial Monitor, the fair market value of the Solar Real Property was approximately $224,000 as at November 20, 2009 when the Solar Transaction was completed. As discussed in the tenth report of the Initial Monitor (an excerpt of which is included in Appendix "C"), the assets sold in the Solar Transaction were properly

**pwc**

charged by the Secured Lenders' security, with the possible exception of the Solar Real Property. The Receiver is not aware of any other secured claims against the Solar Real Property.

**PROPOSED TERMINATION AGREEMENT AND PROPOSED SPV APPROVAL AND VESTING ORDER**

13.    HSH Nordbank has applied to the Court for an order (the "**SPV Approval and Vesting Order**") pursuant to which most of the Remaining Assets shall be transferred to a special purpose vehicle (the "**SPV**") in full satisfaction of the claims of HSH Nordbank against the Company. The SPV Approval and Vesting Order is being sought in connection with the conclusion of the Receivership Proceedings.

14.    The Secured Lenders and the Receiver have discussed the conclusion of the Receivership Proceedings given that the majority of the value of the Company's assets has now been realized. Certain additional proceeds may be realized at a later date, such as earn-out proceeds from the sale of the Wind Development Business to CPV. The Secured Lenders have been negotiating a form of agreement for the use and terms of the SPV to hold the Transferred Assets (as defined below) until they are fully realized, and the resolution of certain issues in the Receivership Proceedings, including the admission and valuation of the ECA Claim in the Lehman estate in the amount of $50 million. In addition, the agreement provides that the Secured Lenders would allow $224,000 of remaining proceeds from the Solar Transaction, representing the estimated value of the Solar Real Property, to remain in the Interwind estate with no secured claim attaching thereto (the "**Unsecured Assets**"). The proposed agreement between the Secured Lenders (the "**Termination Agreement**") is included as Exhibit A to the Affidavit of Michael F.G. Pepe filed in support of the SPV Approval and Vesting Order.

15.    If the proposed Termination Agreement is executed by the Secured Lenders and the SPV Approval and Vesting Order is granted, the following assets (the "**Transferred Assets**") will be transferred to the SPV:

   a)    cash in the Receiver's possession, less the Unsecured Assets and cash sufficient to satisfy the Accrued Obligations and a reserve for the remaining costs of these Receivership Proceedings;

   b)    the Lehman Claims, including the ECA Claim which will be admitted in the Lehman estate in the amount of $50 million;


pwc

- 7 -

   c) the entitlement of Interwind to the CPV Earnout;

   d) the balance of any deposits, retainers or refunds received pertaining to the Receivership Proceedings, including potential recoveries from the CRA related to HST input tax credits paid during the Receivership Proceedings; and

   e) the Panama JV Interest.

16. Under the proposed Termination Agreement, the only residual assets of the Company that will remain in the Receiver's possession will be the Unsecured Assets, the shares of the Inactive Subsidiaries, and the Company's books and records and remaining IT assets not related to the Transferred Assets.

17. Once the Accrued Obligations have been paid, the proposed Termination Agreement contemplates that Interwind will be assigned into bankruptcy and the trustee in bankruptcy will be responsible for administering the distribution of the Unsecured Assets. It is further contemplated that PwC will act as trustee in bankruptcy of Interwind, subject to the affirmation of the Office of the Superintendent of Bankruptcy and/or the approval of the Court. This is discussed further below.

*Receiver's assessment of the proposed Termination Agreement and SPV Approval and Vesting Order*

18. Overall, the Receiver is supportive of the proposed Termination Agreement (and the associated application for the SPV Approval and Vesting Order) as a means to facilitate the conclusion of the Receivership Proceedings and reduce the go-forward costs associated with realizing on the Remaining Assets.

19. The Company has two principal secured creditors, HSH Nordbank and Lehman. In the Initial Monitor's Sixth, Seventh, Tenth and Twelfth Reports to the Court, the Initial Monitor reported on the advice provided by its counsel on the security of HSH Nordbank and Lehman (the **"Secured Lenders"**) over the assets of Interwind sold in the various transactions which took place in the CCAA Proceedings. This was also considered by the Receiver's counsel and detailed in the Receiver's Second Report to Court dated May 19, 2010. The advice given to the Receiver with respect to the security of the Secured Lenders was that it is registered, valid and enforceable, and that the combined effect of the security of the Secured Lenders and the Second Amended and Restated Subordination Agreement, dated April 15, 2009, between the



Secured Lenders and the Company, is to charge all of Interwind's personal property to the benefit of HSH Nordbank in priority to Lehman.

20. The Initial Monitor noted in its Tenth Report the advice it received in respect of each transaction consummated in the CCAA Proceedings, concluding that in each case all of the assets sold by the Company were properly charged by the Secured Lenders' security, with the possible exception of the Solar Real Property, which remained subject to further review. As indicated above, in order to facilitate the conclusion of the Receivership Proceedings, the proposed Termination Agreement provides that the estimated proceeds from the sale of the Solar Real Property will remain in the Interwind estate with no secured claim attaching thereto.

21. At the date of this Ninth Report, notwithstanding the distributions made to HSH Nordbank to date, there remains a significant shortfall in the recovery of HSH Nordbank, even before accounting for any entitlement HSH Nordbank may have to interest and costs. In the affidavit of Kerry Adler, sworn August 12, 2009, in support of the initial application in the CCAA Proceedings, the principal balance owing to HSH Nordbank was estimated at approximately $214 million, and the principal owing to Lehman was estimated at approximately $37 million. Since the start of the CCAA Proceedings, HSH Nordbank has received interim distributions totaling approximately $185 million. The net indebtedness owing to HSH Nordbank, after accounting for distributions made to date excluding interest and costs, is approximately $29 million. Based on information provided to the Receiver by HSH Nordbank, the amount owing to HSH Nordbank, after accounting for distributions made to date including interest and costs is in excess of $46 million.

22. The proposed Termination Agreement provides that recoveries from the Transferred Assets in the SPV will accrue first to HSH Nordbank. If recoveries from the Transferred Assets in the SPV exceed $45 million, then the right to any excess recoveries beyond that amount shall be distributed to Lehman.

23. The Receiver has estimated the realizable value of the Transferred Assets, and is of the view that the recoveries from the Transferred Assets will not exceed the total amount owing to the Secured Lenders. In arriving at this conclusion, the Receiver has considered the maximum value that could be realized from the CPV Earnout based on information provided by CPV to the Receiver on the portion of the Wind Development Business sold to CPV which is still under development, as well as the estimated value to be realized from the Lehman Claims. The sum

**pwc**

total of these potential realizations is less than the total combined debt of the Secured Lenders by a considerable margin. It is not apparent to the Receiver that the other Transferred Assets are of any material value at the present time. As such, the proposed Termination Agreement and SPV Approval and Vesting Order is not prejudicial to the Company's unsecured creditors.

24.   The Initial Order and the Receivership Order established certain Court-ordered super-priority charges, including an Administration Charge, a Receiver's Charge, a KERP Charge and a Marathon Charge (as those terms are defined in the Initial Order and Receivership Order). Each of those charges has continued in the Receivership Proceedings pursuant to, among other things, the CCAA Termination Order.

25.   Certain amounts secured by the Administration Charge and Receiver's Charge rank in priority to the Secured Lenders. Once the Accrued Obligations and any further professional costs arising in the Receivership Proceedings to which the Receiver's Charge pertains have been paid, it is not expected that any further amounts will become due and owing under these charges and the distribution of the Transferred Assets to the SPV will not prejudice the beneficiaries of these charges.

26.   The Receiver did not receive any claims from creditors pursuant to section 81.1, 81.4, or 81.6 of the BIA. All employees of the Company were terminated prior to the Receiver's appointment, and the Receiver understands that there are no potential claims which could be asserted by the Company's former employees pursuant to section 81.4 of the BIA. The Receiver notes that more than two years have elapsed since the Receiver's appointment, and no such claims have been raised in this time period.

27.   All amounts due and payable to employees under the key employee retention program (the "KERP") approved in the CCAA Proceedings have been paid by the Company. The KERP contemplates that additional amounts would become due and payable if the proceeds of asset sales exceeded a specific dollar threshold. However, at the date of this report, no additional proceeds will be realized from asset sales contemplated in the KERP that would result in the total exceeding that threshold.

28.   If any realizations are made on the CPV Earnout, additional amounts may become due and owing under the Marathon Charge. Therefore, it is appropriate to continue the Marathon Charge over the CPV Earnouts. The Receiver notes that the additional amounts that may become due to Marathon can only be triggered by the receipt of CPV Earnout proceeds, such


pwc

- 10 -

that restricting the Marathon Charge to the proceeds of the CPV Earnout, as contemplated by the motion for the SPV Approval and Vesting Order, will not result in any material prejudice to Marathon.

29. The Receiver is of the view that the implementation of the Termination Agreement would provide the following benefits:

    a) transferring the Transferred Assets to the SPV will avoid the ongoing costs associated with continuing the Receivership Proceedings, which otherwise could continue for several years until the realization of the Transferred Assets is complete;

    b) settling the amount of the ECA Claim and allow the claim to be admitted in the Lehman estate. This will provide for a recovery on this claim;

    c) resolving the remaining claim of HSH Nordbank to the proceeds from the Transferred Assets at $45 million. This avoids the potential cost of having this amount determined through litigation;

    d) carving out the $224,000 of Unsecured Assets and avoiding the cost of further investigating and litigating the issue; and

    e) providing for the conclusion of the Receivership Proceedings following completion of the Remaining Matters (as hereinafter defined). This will allow for the Unsecured Assets to be used to fund the costs of administering the bankruptcy proceedings of Interwind, and the remaining funds to be distributed to Interwind's creditors, including Lehman, as provided for in the scheme of distribution under the BIA (as discussed below).

30. The Receiver is informed by counsel for the Secured Lenders that the proposed Termination Agreement has been approved by HSH Nordbank but that approval by Lehman is still pending. On January 14, 2013, counsel for HSH Nordbank advised the Receiver that its position in connection with its pending motion that, in the event that the proposed Termination Agreement is not approved by Lehman and executed by the parties prior to the hearing date of January 25, 2013, HSH Nordbank intends to seek an order, in the alternative to the relief sought in the HSH Nordbank motion, for the transfer of the Transferred Assets, as contemplated by the proposed Termination Agreement, with Interwind's claims in Lehman's Chapter 11 proceedings to be negotiated at a later date.



**pwc**

31. The Receiver intends to file a supplement to this Ninth Report in advance of the hearing of the HSH Nordbank motion and the PwC motion to update the Court as to the status of the discussions between the Secured Lenders on the settlement and execution of the proposed Termination Agreement, and/or any further relief sought by the parties.

## AUTHORITY TO ASSIGN THE COMPANY INTO BANKRUPTCY

32. Pursuant to paragraph 5(p) of the Receivership Order, the Receiver is authorized to assign Interwind into bankruptcy without further leave of the Court.

33. As indicated above, if the proposed Termination Agreement is completed, the SPV Approval and Vesting Order is granted, and the Transferred Assets are transferred to the SPV, there will be a limited amount of Unsecured Assets remaining in the Interwind's estate. In that case, in order to provide for the distribution of the Unsecured Assets to the creditors of Interwind and conclude the administration of Interwind's estate in an orderly manner, the Receiver is of the view that it would be appropriate to assign Interwind into bankruptcy.

34. The costs to be incurred in connection with the administration of the bankruptcy are to be funded from the Unsecured Assets. The Receiver will serve Canada Revenue Agency ("CRA") and the Ministry of Finance with notice of its motion seeking the relief described herein.

## REMAINING MATTERS TO BE COMPLETED IN THE RECEIVERSHIP PROCEEDINGS

35. If the proposed Termination Agreement is completed and this Court grants the SPV Approval and Vesting Order, and once the Transferred Assets have been transferred to the SPV, the Receiver will have completed its duties and obligations, as set out in the Receivership Order and subsequent Orders of the Court, except for the following remaining matters (the "Remaining Matters"):

   a) payment of the Accrued Obligations;

   b) coordinating with US counsel for the recognition of orders granted in these proceedings and obtaining an order terminating the recognition proceedings commenced pursuant to the provisions of Chapter 15 of the U.S. Bankruptcy Code in the United States Bankruptcy Court, District of Delaware (the "Chapter 15 Proceedings");


pwc

c)   assigning the Company into bankruptcy and distributing the Unsecured Assets to the Trustee; and

d)   other administrative matters incidental to the Receiver's appointment and pending discharge, including the filing of reports pursuant to section 246 (3) of the BIA and receipt of any remaining HST input tax credits generated during the Receivership proceedings, which will be transferred to the SPV upon receipt.

36.   Notwithstanding the fact that there would be certain Remaining Matters, the Receiver is of the view that it would be appropriate to seek an order of this Honourable Court discharging the Receiver upon the filing of a Certificate with the Court certifying that all of the Remaining Matters have been completed.

**REQUEST FOR FEE APPROVAL**

37.   The Receiver and its counsel, Borden Ladner Gervais LLP ("**BLG**") and Goodmans LLP ("**Goodmans**"), have maintained detailed records of their professional time and disbursements since March 30, 2010.

38.   Pursuant to paragraphs 15 to 17 of the Receivership Order, the fees and disbursements of the Receiver and the fees and disbursements of its legal counsel are authorized to be paid on a periodic basis subject to any final approval as ordered by the Court.

39.   Pursuant to the CCAA Termination Order, the fees and disbursements of the Receiver, BLG and Goodmans were approved by the Court to September 30, 2010. The Receiver is seeking approval of the Court of its fees for the period from October 1, 2010 to December 31, 2012 (the "**Fee Period**") and those of its legal counsel for the Fee Period in connection with the performance of their duties in these Receivership Proceedings, inclusive of an accrual for the fees and disbursements of the Receiver and its legal counsel to complete the receivership proceedings.

40.   The total fees of the Receiver during the Fee Period amount to $246,879.50, together with disbursements in the amount of $12,421.13 and US $116,679.67 (all excluding HST). The time spent by Receiver's personnel during the Fee Period is more particularly described in the Affidavit of Tracey Weaver of PwC (the "**Weaver Affidavit**"), sworn in support hereof and attached as Appendix "**D**". The Weaver Affidavit includes a summary of the personnel, hours, and hourly rates charged by the Receiver in respect of the Receivership



Proceedings for the Fee Period. The Weaver Affidavit also sets out the fees and disbursements of Mayer Brown LLP, Dickstein Shapiro LLP and Ashby & Geddes P.A., U.S. counsel to the Receiver, which comprise US $116,679.67 of the disbursements total shown above.

41. BLG has acted as primary counsel for the Receiver in these Receivership Proceedings. The total fees and disbursements incurred by BLG for the Fee Period amount to $144,521.85. The time spent by BLG personnel during the Fee Period is more particularly described in the Affidavit of James Szumski of BLG (the "**Szumski Affidavit**"), attached as Appendix "E".

42. Goodmans has acted for the Receiver primarily in respect of the resolution of certain Construction Lien Claims discussed in previous report of the Receiver. The total fees and disbursements incurred by Goodmans for the Fee Period amount to $14,541.21. The time spent by Goodmans personnel during the Fee Period is more particularly described in the Affidavit of Robert J. Chadwick of Goodmans (the "**Chadwick Affidavit**"), attached as Appendix "F".

43. The Receiver's Fees and Disbursements for the period from January 1, 2013 to completion of all work relating to the Receivership Proceedings up to the effective date of the Receiver's discharge will be calculated and billed at the standard hourly rates currently in effect. In addition to the fees incurred to date, and on the assumption that there are no delays, disputes or unforeseen developments in connection with the Receivership Proceedings and the performance of the Remaining Duties (hereinafter defined), the Receiver's fees and disbursements for the period from January 1, 2013 up to the effective date of the Receiver's discharge are estimated not to exceed $80,000. This includes the anticipated costs of Mayer Brown LLP and Ashby & Geddes P.A. in regards to the conclusion of the Chapter 15 Proceedings, which are estimated not to exceed $20,000.

44. Similarly, BLG's fees and disbursements for the period from January 1, 2013 up to the effective date of the Receiver's discharge are estimated not to exceed $50,000 (together with the Receiver's estimate of costs to complete noted in paragraph 43 above, the "**Completion Fee Estimate**").

45. The Completion Fee Estimate, which totals $130,000, represents the Receiver's best estimate of the reasonable costs required to complete the Receivership Proceedings. It is


pwc

- 14 -

possible that certain unforeseen matters may arise which cause this amount to be exceeded. However, in the present circumstances, the Receiver will be transferring the Transferred Assets to the SPV without recourse to recover additional costs if they are incurred. In order to address this contingency, the Receiver intends to hold a reserve of $190,000 from the Transferred Assets in consideration of the Completion Fee Estimate. Should the costs of the Receiver and its legal counsel be less than the Completion Fee Estimate, the remaining funds held in reserve will be transferred to the SPV. Should those costs exceed the Completion Fee Estimate, the Receiver will seek the approval of the HSH Syndicate and Lehman (the only parties affected by this reserve) prior to making any additional payments from the reserve or, in the alternative, may apply to the Court for advice and direction.

46.   In the event that the proposed Termination Agreement is not approved by Lehman and additional motions are made, the Receiver reserves the right to amend its Completion Fee Estimate and the associated reserve.

47.   The Receiver respectfully submits that the Receiver's fees and disbursements and the fees and disbursements of BLG and Goodmans are reasonable in the circumstances and have been validly incurred in accordance with the provisions of the Appointment Order. Accordingly, the Receiver now seeks the approval of the Court of the Receiver's fees and disbursements and BLG and Goodmans' fees and disbursements, as well as the Completion Fee Estimate.

**RELIEF SOUGHT**

48.   The Receiver respectfully requests this Court to make an order:

    a)   Approving the Receiver's Eighth Report and the Ninth Report, and the activities of the Receiver as described therein, as well as the R&D;

    b)   Approving the fees and disbursements of the Receiver, as described in this Ninth Report and as set out in the Weaver Affidavit, including the reasonable fees and disbursements of the Receiver up to its date of discharge (including its US legal counsel);

    c)   Approving the fees and disbursements of the Receiver's legal counsel, BLG and Goodmans, as described in this Ninth Report and as set out in the


pwc

- 15 -

Szumski Affidavit and the Chadwick Affidavit, respectively, including the reasonable fees and disbursements of BLG in connection with services to be provided to the Receiver up to its date of discharge;

d)      Authorizing the Receiver to pay any professional fees or disbursements of the Receiver and its legal counsel which exceed the estimated amounts: (i) with the consent of HSH Nordbank and Lehman, or (ii) pursuant to further orders of the Court;

e)      Ordering that upon the Receiver filing the Certificate with the Court certifying that it has completed the Remaining Matters PwC shall be discharged as Receiver of the undertaking, property and assets of Interwind, provided however that notwithstanding its discharge herein (a) PwC shall remain Receiver for the performance of such incidental duties as may be required to complete the administration of the receivership herein, and (b) PwC shall continue to have the benefit of the provisions of all Orders made in this proceeding, including all approvals, protections and stays of proceedings in favour of PwC in its capacity as Receiver;

f)      Ordering and declaring that PwC is hereby released and discharged from any and all liability that PwC now has or may hereafter have by reason of, or in any way arising out of, the acts or omissions of PwC while acting in its capacity as Receiver herein, save and except for any gross negligence or willful misconduct on the Receiver's part and without limiting the generality of the foregoing, ordering that PwC is hereby forever released and discharged from any and all liability relating to matters that were raised, or which could have been raised, in the within Receivership Proceedings, save and except for any gross negligence or willful misconduct on the Receiver's part;

g)      Ordering that upon the Receiver filing the Certificate with the Court, the Receiver's Charge shall be fully and finally terminated, discharged and released;

h)      Ordering that the Administration Charge, be fully and finally terminated, discharged and released; and

**pwc**

i)    Ordering that that the KERP Charge, be fully and finally terminated, discharged and released.

49. The relief sought in paragraph 48(d) to (g) is subject to the execution of the Termination Agreement by HSH Nordbank and Lehman. As indicated above, the Receiver intends to file a supplement to this Ninth Report in advance of the hearing of the HSH Nordbank motion and the PwC motion to update the Court as to the status of the discussions between the Secured Lenders on the settlement and execution of the proposed Termination Agreement, and/or any further relief sought by the parties.

All of which is respectfully submitted on this 15th day of January, 2013.

**PricewaterhouseCoopers Inc.**
In its capacity as Receiver of Interwind Corp.

Mica Arlette
Senior Vice President

pwc