**KAPLAN LANDAU LLP**
1065 Avenue of the Americas
27th Floor
New York, New York 10018
(212) 593-1700

**JULIEN & SCHLESINGER, P.C.**
207 East 94th Street
Suite 303
New York, NY 10128
(212) 962-8020

*Attorneys for Claimants:  Richard J. Glasebrook II (Claim No. 9682), Judith Ann Kenney (Claim
No. 13929), Richard Nackenson (Claim No. 13968), Henry Ramallo (Claim No. 17607),
Christian Reynolds (28442), Marvin C. Schwartz (Claim No. 20244), Stephanie Stiefel (Claim
No. 21711), David I. Weiner (Claim No. 18314), Seth Finkel (Claim No. 18067) and Richard
Levine (Claim No. 31657).*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x

In re

                                                          Chapter 11 Case No.

LEHMAN BROTHERS HOLDINGS INC., et al.            08-13555 (SCC)

                          Debtors.               (Jointly Administered)

------------------------------------------------------------------x

## NEUBERGER BERMAN CLAIMANTS' PROPOSED
## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Claimants Marvin C. Schwartz, Stephanie Stiefel, Richard J. Glasebrook II, Judith

Ann Kenney, Richard Nackerson, Henry Ramallo, Christian Reynolds, David I. Weiner, Richard

Levine and Seth Finkel (collectively the "Neuberger Claimants" or "NB Claimants") respectfully

submit their proposed findings of fact and conclusions of law following the Court's April 1-3,

2014 hearing on the application of Lehman Brothers Holdings Inc. ("LBHI" or "Lehman") to

reclassify the Neuberger Claimants' claims as equity interests under 11 U.S.C. § 510(b) and in

support of general creditor status for such withheld and unpaid production-based compensation claims.

The Neuberger Claimants respectfully submit that the Court make the following findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52, as made applicable herein pursuant to Rules 7052 and 9014 of the Federal Rules of Bankruptcy Procedure and Local Rule 7052-1.[1] Any and all findings of fact shall constitute findings of fact even if stated as conclusions of law and any and all conclusions of law shall constitute conclusions of law even if stated as findings of fact.

For the reasons stated below, the evidentiary record demonstrates that LBHI failed to establish that the Neuberger Claimants' claims should be reclassified as equity interests under 11 U.S.C. § 510(b) and the Court should enter an order denying the application of LBHI and allowing general creditor status to the unpaid, withheld and production based compensation claims of the Neuberger Claimants.

## **FINDINGS OF FACT**

1.  Neuberger Berman ("NB" or "Neuberger") is an investment management firm that provides financial services to high net worth individuals and institutional investors. (4/2 Tr. at pp. 87; 194; 222-23.)[2]

2.  Marvin C. Schwartz (Claim No. 20244), Stephanie Stiefel (Claim No. 21711), Richard J. Glasebrook II (Claim No. 9682), Judith Ann Kenney (Claim No. 13929), Richard Nackenson (Claim No. 13968), Henry Ramallo (Claim No. 17607), Christian Reynolds (28442), David I. Weiner (Claim No. 18314), Richard Levine (Claim No. 31657) and Seth

---

[1]  The Neuberger Claimants hereby join in all applicable findings of fact and conclusion of law made by the other Represented Participants in their Proposed Findings of Fact and Conclusions of Law (ECF No. _____).
[2]  As used herein, Neuberger Berman Exhibits will be referred to as "NB Ex. __"; Lehman Exhibits will be referred to as "Lehman Ex. ___"; and the Hearing Transcript will be referred to by date and page as, *e.g.,* "4/2 Tr. at p. __."

Finkel (Claim No. 18067) (collectively the "NB Claimants" or the "Neuberger Claimants")
are all NB Managing Directors who joined Neuberger between 1961 and 2002.

3.    From its founding in 1939 and for the next 60 years, NB was a partnership
(or LLC). In 1999, NB became a public corporation. At the time of the Neuberger IPO, four of
the NB Claimants -- Messrs. Schwartz, Levine and Weiner and Ms. Stiefel -- were NB partners.
In return for their partnership interests, these four claimants received Founder Shares in the
publicly traded Neuberger, which were restricted and could only be sold at a rate of 10% a year
and for only so long as such Founder Stockholder did not engage in any "Harmful Activity"
within three years of the termination of such shareholders' employment with NB. (*See*, NB Exs.
C, E, F and G; 4/2 Tr. at pp. 93-95.)

4.    The NB Founder Stockholders' Agreement, in turn, imposed restrictive
covenants on the former partners by defining "Harmful Activity" as follows:

> "Harmful Activity" by a [Founder Stockholder] means such
> [Founder Stockholder], directly or indirectly, either individually or
> as owner, partner, agent, employee, consultant or otherwise:
>
> > (a)    solicits or accepts business from (i) any
> > Person who was a client of the [NB] during the one
> > year period prior to such [Founder Stockholder's]
> > Employment Termination Date or, in the case of an
> > action taken during such [shareholder's]
> > employment with [NB], during the one-year period
> > immediately prior to such action) or (ii) any
> > prospective client of [NB] who, within the one year
> > period prior to such Employment Termination Date
> > (or, in the case of an action taken during such
> > [shareholder's] employment with [NB], within the
> > one-year period immediately prior to such action),
> > had been directly solicited by such [shareholder] or
> > where, directly or indirectly, in whole or in part,
> > such [shareholder] supervised or participated in
> > [NB's] solicitation activities related to such
> > prospective client;

(b)      solicits or accepts business from or through, or engages in any sales or marketing activities with, any financial intermediary (including, without limitation, any broker-dealer, bank, insurance company, financial planner or other financial institution), or any person employed by or associated with a financial intermediary, with whom such [shareholder] had business contact during the one year period prior to such [shareholder's] Employment Termination Date;

(c)      (i) employs any current or former employee or consultant of [NB] (other than clerical, secretarial and other similar support personnel) or (ii) recruits, solicits or induces (or in any way assists another in recruiting, soliciting or inducing) any such Person to terminate his or her employment or consultantship with [NB]. . . .

(d)      Markets, promotes or otherwise trades on or (other than solely in connection with seeking new employment) claims (or in any way, other than in connection with the business of [NB], assists any Person in marketing, promoting or otherwise trading on or claiming as such [shareholder's] (or such other Person's), the investment performance record (including without limitation performance ratings or rankings provided by any rating or ranking service) of any mutual fund, client account or group of mutual funds or client accounts with which such Principal was associated while employed with [NB];

(e)      discloses to any person, firm or corporation any Confidential Information that is known to the [shareholder] as a result of his or her employment or professional association with [NB] or uses the same in any way other than in connection with the business of [NB] or;

(f)      publicly makes disparaging or derogatory comments regarding (i) [NB] or any member of [NB] or (ii) any current or former Principal, employee or consultant of [NB] in their capacity as a Principal, employee or consultant or with the

effect of damaging the business or reputation of
[NB].

(*See* NB Exs. C, E, F and G. *See also*; 4/2 Tr. at pp. 93-95; Declaration of Stephanie Stiefel,

dated January 27, 2014 ("Stiefel Dec."), at Ex. A, pp. 12-14. *See also id.* at pp. 11.) Ms. Steifel

summarized these restraints in her testimony as follows: "I could not solicit clients. . . . I could

not accept clients. . . . I could not interact with any of the referral sources that I had cultivated

over the years and I was essentially not able to do my job for a period of three years. . . . I would

have to sit on a beach for three years." (4/2 Tr. at p. 95.)

  5. The other NB Claimants -- Messrs. Glasebrook, Nackenson, Ramallo,

Reynolds, Finkel and Ms. Kenney -- all were employees of NB at the time of the IPO or joined

NB thereafter. They too were subject to contractually imposed restrictive covenants of at least

one year post-employment under their respective employment contracts or in return for being

awarded Neuberger stock, either at the time of the IPO or thereafter. (*See* 4/2 Tr. at pp. 95; 195;

227.)

  6. An example of such restrictive covenants is found in the letter agreement

executed in connection with, and in consideration of, Ms. Kenney's June 2001 promotion to

Senior Vice President, that included an award of 2,000 shares of Neuberger Restricted Stock.

(NB Ex. A). In that agreement, Ms. Kenney was required to enter explicit restrictive covenants

that continued throughout her employment at Neuberger and for one year thereafter, regardless

of whether her employment termination was voluntary or involuntary or with or without her

cause:

   (a) You will not, directly or indirectly . . . solicit, recruit, hire
    or otherwise encourage the resignation of any executive,
    employee, agent, consultant or independent contractor of
    NB or induce or attempt to induce any executive,
    employee, agent, consultant, or independent contractor of

NB or any of its parents, subsidiaries or affiliates to terminate their association with NB or any of its parents, subsidiaries or affiliates.

(b)     You will not, directly or indirectly . . . solicit the business of or provide or perform any services to any client or prospective client to whom you provided or performed services while employed by NB or as to whom you learned confidential information while at NB. You also agree not to assist any person or entity in competition with NB to solicit or service any such client to reduce its business with NB. . . . The term "prospective client" applies to any person or entity who has been solicited or identified for solicitation by NB, its parents, subsidiaries or affiliates during the twelve (12) month period prior to the date you cease to be an employee of NB.

(c)     You further agree and acknowledge that any knowledge or information of any type whatsoever of a confidential nature relating to the business of NB or any of its parents, subsidiaries or affiliates, including, without limitation, all types of trade secrets, concepts, techniques, methods, client lists and client information of any kind, employee lists or information, information regarding product development, prospective investment products and strategies, marketing plans, management organization information, opening policies or manuals, performance results, business plans, financial records, or other financial commercial, business or technical information (collectively, "Confidential Information"), must be protected as confidential, not copied, disclosed or used, directly or indirectly, other than for NB's benefit at any time, unless and until such knowledge or information is in the public domain through no wrongful act by you. You agree that you will not, directly or indirectly, divulge or disclose to anyone (other than NB or any of its affiliates or any person employed or designated by such entities), publish or make use of any such Confidential Information without NB's prior written consent, except pursuant to an order or a court having competent jurisdiction or under subpoena from an appropriate government or regulatory agency.

(d)     You further agree that following the termination of your employment, you shall deliver to NB all documents or other tangible and intangible materials in your possession, including all copies thereof, which contain or are derived

> from Confidential Information, and that you shall not misappropriate, utilize, disclose or infringe upon the Confidential Information of NB or any of its affiliates (including the recreation or reconstruction of Confidential Information from memory).

(*See Id.; see also* Declaration of Judith Kenney, dated January 27, 2014 at ¶ 4 and Ex. A at pp. 1-3.)

7.      LBHI acquired Neuberger on October 31, 2003. Through the acquisition of Neuberger and its high net worth clients, Lehman added over $50 billion of assets under its management. At that time, the Neuberger Claimants had developed and managed substantial books of high net worth and institutional clients and asset management groups for Neuberger, all of which came under the umbrella of LBHI's new assets under management. (4/2 Tr. at p. 113.)

8.      On the acquisition of Neuberger, the Founder Stockholders -- Schwartz, Weiner, Levine and Stiefel -- exchanged their NB shares for an equivalent amount of LBHI shares, which were subject to the same sales limitations, forfeiture provisions and restrictive covenants, which, as the Amended and Restated Stockholders Agreement, dated as of October 31, 2003, made clear were intended "to limit such [shareholder's] ability to earn a livelihood in a business similar to the business of [LBHI or NB]". (*See* NB Ex. D; 4/2 Tr. at pp. 96-97; Stiefel Dec. at Ex. B, p. 5; *see also id.* pp. 4-6; 8-10.)

9.      The Amended and Restated Shareholders Agreement provided that:

> Section 3.1.    <u>Covenant not to Engage in Harmful Activity;</u> <u>Liquidated Damages.</u> (a) Each Principal [*e.g.,* Schwartz, Steifel, Levine and Weiner] covenants and agrees with the Company that it will not, prior to the third anniversary of the Employment Termination Date of such Principal, engage in any Harmful Activity. . . .

(b)    . . . . Each Principal understands that the provisions of this Section 3.1 may limit such Principal's ability to earn a livelihood in a business similar to the business of the Company Group [LBHI, Neuberger and their subsidiaries].

\* \* \* \*

"Harmful Activity" by a Principal means such Principal, directly or indirectly, either individually or as owner, partner, agent, employee, consultant or otherwise:

(a)    solicits or accepts business from (i) any Person who was a client of the Company Group during the one year period prior to such Principal's Employment Termination Date (or, in the case of an action taken during such Principal's employment with the Company Group, during the one-year period immediately prior to such action) or (ii) an prospective client of the Company Group who, within the one year period prior to such Employment Termination Date (or, in the case of an action taken during such Principal's employment with the Company Group, within the one-year period immediately prior to such action), had been directly solicited by such Principal or where, directly or indirectly, in whole or in part, such Principal supervised or participated in the Company Group's solicitation activities related to such prospective client;

(b)    solicits or accepts business from or through, or engages in any sales or marketing activities with, any financial intermediary (including, without limitation, any broker-dealer, bank, insurance company, financial planner or other financial institution), or any person employed by or associated with a financial intermediary, with whom such Principal had business contact during the one year period prior to such Principal's Employment Termination Date;

(c)    (i) employs any current or former employee or consultant of the Company Group (other than clerical, secretarial and other similar support personnel) or (ii) recruits, solicits or induces (or in any way assists another in recruiting, soliciting or inducing) any such Person to terminate his or her employment or consultantship with the Company Group, unless, in the case of (i) or (ii), such person shall have ceased to be employed by or a consultant to the Company Group for a period of at least one year prior to the time of such employment, recruitment, solicitation or inducement;

(d)    markets, promotes or otherwise trades on or (other than solely in connection with seeking new employment) claims (or in any way, other than in connection with the business of the Company Group, assists any Person in marketing, promoting or otherwise trading on or claiming) as such Principal's (or such other Person's), the investment performance record (including without limitations performance rating or rankings provided by any rating and ranking service) of any mutual fund, client account or group of mutual funds or client accounts with which such Principal was associated while employed with the Company Group;

(e)    discloses to any person, firm or corporation any Confidential Information that is known to the Principal as a result of his or her employment or professional association with the Company Group or uses the same in any way other than in connection with the business of the Company Group; or

(f)    publicly makes disparaging or derogatory comments regarding (i) the Company Group or any member of the Company Group or (ii) any current or former Principal, employee or consultant of the Company Group in their capacity as a Principal, employee or consultant or with the effect of damaging the business or reputation of the Company Group.

10.    The other NB Claimants also became subject to additional restrictive covenants that extended and further eviscerated their abilities to earn a living elsewhere than at NB or LBHI in the securities/investment management industry. As demonstrated in the testimony and declaration of Henry Ramallo, these claimants were cajoled, coerced, pressured and, quite literally, threatened with their continued ability to earn a livelihood in their chosen professions by their employer, including by Heidi Steiger, a Neuberger executive committee member, into accepting retention bonuses -- payable in RSUs that vested at 20% a year for 5 years -- in return for continued employment by LBHI under restrictive covenants. As Mr. Ramallo's testimony made clear, Ms. Steiger "told me that there was no choice." (4/2 Tr. at p. 212.) Such restrictive covenants, for example, provided as follows:

Non-Solicitation; Company Information

1.    In connection with the Merger, you will become entitled to receive distribution(s) from the retention bonus pool and you will exchange your shares of common stock of NB Inc. (*"NB Stock"*) for the Merger Consideration (as defined in the Merger Agreement), and you hereby acknowledge and agree that:

(a)    it is essential to the success of the Merger and the firm's enterprise in the future, and it is hereby so represented that your shares of NB Stock that are being transferred to Lehman upon consummation of the Merger be protected by covenants not to solicit clients or employees of the Firm; and

(b)    the Firm would suffer significant and irreparable harm, on and after the Effective Date, from your engaging in certain activities relating to the clients or employees of the Firm.

2.    Therefore, you agree that the covenants and restrictions contained in this Schedule B are reasonable and necessary for the Lehman and its affiliates to enjoy the full benefit of the business acquired in connection with the Merger and that the covenants and restrictions will not unreasonably restrict your professional opportunities should your employment with NB Inc. terminate. Accordingly, you agree that, you will not, directly or indirectly, either individually or as an owner, partner, agent, employee, advisor, consultant or otherwise (other than on behalf of the Firm while employed by the Firm) during your employment with the Firm and for a period of twelve months after  your Date of Termination (the "Restricted Period"):

(a)    solicit or accept business from any individual or entity for whom any member of the firm provides services within the one-year period before or after the Date of Termination;

(b)    solicit or accept business from any prospective client of the Firm who, within the one-year period prior to the Date of Termination, you had directly solicited or where, directly or indirectly, in whole or in part, you supervised or participated in the Firm's solicitation activities related to such prospective client;

(c)    solicit or accept business from or through, or engage in any sales or marketing activities with, any broker-dealer, bank, insurance company, financial planner or other financial institution (or any person employed by or associated with any such entity), with whom you had business contact during the one-year period prior to the Date of Termination;

(d)    employ any current or former employee or consultant of the Firm (other than clerical, secretarial and other support personnel); or

(e)    solicit (or assist in soliciting) any such person described in (d) to terminate his or her employment or consulting services with the Firm. . . .

\* \* \* \*

Company Information

3.    You acknowledge that, during the course of your employment with the Firm, you have had, and will continue to have, access to confidential and proprietary information of the Firm. In recognition of the foregoing, you agree, at all times during the term of the your employment with the Firm and thereafter, to hold in confidence, and not to use, except for the benefit of the Firm, or to disclose to any person, firm, corporation or other entity without written authorization of the Firm, any Confidential Information of the Firm. You further agree not to make copies of such Confidential Information except as authorized by the Firm.

(*See*, NB Ex. B. *See also,* 4/2 Tr. at pp. 97; 99; 195-99; Declaration of Henry Ramallo, dated January 27, 2014 at ¶¶ 5-8 and Ex. A., p. 2 and Schedule B; NB Exs. H, I, J, K, L and M.) Mr. Ramallo testified: "I signed this agreement because I had no other choice." (4/2 Tr. at p. 199.)

11.    As a result of the restrictive covenants that were reiterated or imposed at the time LBHI acquired NB, the NB Claimants had no choice but to continue employment with LBHI and participate in a LBHI compensation structure that was materially different from the cash based compensation structure that previously existed at Neuberger. (4/2 Tr. at pp. 88-93; 199; 212.) The LBHI pay scheme included the withholding of approximately 50% of the NB

Claimants earned, production based income and the awarding of a like amount of RSUs that did not vest for five years. The NB Claimants were compelled to enter this materially different compensation structure because the Neuberger Claimants' books of business were transferred from NB to LBHI, and failure to accept LBHI's pay scheme would have resulted in the forfeiture of their years of work, the growth of their clients' assets, the relationship of trust between clients and Claimants and their entire books of business. (*See* 4/2 Tr. at pp. 93; 121-21; 199; 204.) As Ms. Steifel testified: "your clients are your strength, and your clients are your power. And so even when I was in management, I still kept a book of business because without it, you have no security." (4/2 Tr. at p. 93.)

12.     The Neuberger Claimants were required to work for Lehman because their books of business were transferred to LBHI for value as part of the acquisition. The NB Claimants could not leave LBHI without forsaking the basis of their entire livelihood. (See 4/2 Tr. at pp. 194-95.)

13.     Following the acquisition, and in order to keep their respective books of business, client relationships and stock interests, the Neuberger Claimants became subject to the Lehman compensation scheme for Managing Directors that required that as much as 50% of their annual compensation be withheld and awarded, instead, in RSUs that would not vest for 5 years and would not vest at all if the Neuberger Claimants ceased employment at Lehman. (*See* 4/2 Tr. at pp. 204-205.) From 2003 through 2007, the Neuberger Claimants earned collectively over $100 million in production based compensation that was withheld by LBHI and for which they received RSUs, none of which was ever paid as a result of the bankruptcy of LBHI before the vesting period elapsed. (*See* Lehman Ex. 3.)

14.    The Neuberger Claimants chose to work at NB and to accept its cash-based compensation system. (*See* 4/2 Tr. at pp. 88-93.) The Neuberger Claimants were required to work at Lehman -- and participate in the RSU for earned commissions structure -- under the terms of their far reaching restrictive covenants against "Harmful Activity" in order to preserve their careers and what they previously had built, earned and negotiated. (*See* 4/2 Tr. at pp. 97-100.) As Mr. Ramallo explained: "there were no options for me to get another job that I currently have anywhere else, I'm convinced of that. . . . I would not have a portfolio management position any place else. . . ." (4/2 Tr. at p. 213.)

15.    When the acquisition occurred, the Neuberger Claimants were forced to choose between: continuing their career at LBHI and involuntarily participating in Lehman's requisite pay scheme or finding another career in another line of work. Mr. Ramallo made this clear during cross-examination: "there were no options for me sir . . . there were no options. I wasn't going back to engineering. I wasn't going back to accounting. The only place I . . . would continue . . . to pursue . . . portfolio management . . . was Neuberger Berman." (4/2 Tr. at p. 221).

16.    The Neuberger Claimants, in order to preserve, service and build on their client relationships and their books of business, that otherwise would be forfeited to Lehman as part of its acquisition of NB's goodwill and assets, and to realize on their past NB partnership, labors and earnings, had no choice but to remain as LBHI employees and to participate in the Lehman mandated compensation scheme from which they could not escape without ruining their careers as investment professionals and losing substantial compensation and decades of client development. As Ms. Steifel testified when cross-examined by Mr. Miller:

> . . . . I was out of business, because I could not solicit and
> accept clients, I could not network with the intermediaries that I

had cultivated, and what typically happens, the way that you continue to build your business is that you are trying to touch them [clients and referral sources] with, you know, different materials so that they think of you, if there is a situation, a life cycle situation where there's an asset management opportunity.

So the facts -- I know you believe that if you just eliminate the time period that you would've been, you know, open for business, and you could just continue what you do, but the reality is, you're hoping to continually touch them. You build a database of these referral sources, and you send them a recent article, or you send them something about the markets.

So you essentially are out of business because if you're doing your job properly, and how I was successful in building my business is that I'm reaching out and touching them. It's not perfect. The database always has to be, you know, updated and adjusted and sometimes you get busy with client demands, so your best intentions don't necessary get executed in that way.

But effectively I believe that I would be out of business because my base of generating a business, I would go from a book of let's say in 2003, it was 700 million to zero. And when you have zero, you are valueless to your competitor, because you can't bring your clients, they're not going to generate revenue. And if you go to a competitor, someone has to pay you, it's coming from somewhere. And if you're not generating revenue, then you are a los[s] leader.

And maybe you're a nice person and maybe you have a great personality, but effectively it can take five to seven years to build a business. And if you are closed with respect to all the clients that you did this wonderful work for, help them buy houses, help them send their kids to college, and all these wonderful things that you've been responsible for, and if you eliminate that, then you are out of business.

Q      Your --

A      You are worthless in the marketplace. (4/2 Tr. at pp. 135-36.)

The Neuberger Claimants had no bargaining power and made no volitional election, but were required to remain in the employ of LBHI in order to continue to earn a livelihood. (*See* 4/2 Tr. at pp. 100-101; 125; 135.)

17.    The Neuberger Claimants established that they had absolutely no choice but to become part of the Lehman compensation scheme when Neuberger was acquired by Lehman in October 2003. Each Neuberger Claimant was handcuffed by restrictive covenants that precluded their engaging in their chosen occupation elsewhere than at Neuberger; restrictive covenants that, as part of its acquisition, Lehman insisted be ratified and extended. As Ms. Steifel candidly testified: "I did not feel I had a choice. I had too much to lose. I had worked too long and too hard and had established wonderful relationships and had a great business." (4/12 Tr. at p. 104.)

18.    The Neuberger Claimants were required by Lehman to submit to a pay scheme that allowed Lehman unilaterally to withhold and defer half or more of their currently earned, formulaic, production based compensation for at least five years in the form of unvested RSUs in order for the Neuberger Claimants to maintain the billions of dollars of assets under management and client relationships -- their books of business -- and the resulting revenue stream from their books of business that Lehman bought when it acquired Neuberger. (*Id., see also,* 4/2 Tr. at pp. 124-25; 133.)

19.    The Neuberger Claimants involuntary deferral of their earned production compensation in return for unvested, and ultimately worthless, RSUs was entirely a product of the 2003 acquisition that could not be avoided because of the multiple restrictive covenants imposed on them and as a matter of law. Lehman unilaterally deferred more than $100 million

of compensation that it withheld from, and continues to owe, to the Neuberger Claimants and that it used for its own purposes in the years leading to its bankruptcy. (Lehman Ex. 3.)

20.    The post-bankruptcy payment of the Neuberger Claimants' production based compensation that had been withheld and deferred during 2008 clearly establishes that the withheld amounts from 2003 through 2007 similarly were and are compensation that had been withheld and not any sort of "purchase" or investment in any "equity securities" of LBHI. "If you receive production compensation throughout the year and have had compensation deferred under the Lehman Brothers Equity Awards Program, those deferrals have . . . been placed in the trust with Wells Fargo. You will soon receive an individual statement of your deferral and, to the extent you are entitled to such deferrals, the payments will be made in January 2009." (*See* NB Ex. N.) Such deferred 2008 production compensation thereafter was "paid on January 26, 2009" to the Neuberger Claimants (*see* NB Ex. O), and establishes that, in the previous years, the withheld production based compensation was similarly placed "in trust" until converted into RSUs by LBHI. (*See* 4/2 Tr. at pp. 101-104; 207.)

## CONCLUSIONS OF LAW

1.    The Neuberger Claimants were required to remain in the employ of Lehman in order to retain their substantial books of business worth billions of dollars that they had spent decades cultivating and building. Apart from any restrictive covenants, it is unlikely that, as Managing Directors and substantial shareholders of NB that had sold NB's "good will" and client lists to Lehman, the Neuberger Claimants could lawfully seek to retain or solicit any of their existing clients if they decided to leave Lehman. *See, e.g., Bessemer Trust Co., N.A. v. Branin,* 16 N.Y.3d 549 (2011).

2.      In this proceeding, LBHI erroneously seeks to reclassify the employment contract and production based compensation claims of the NB Claimants that were unilaterally diverted by Lehman into unvested RSUs as equity claims and subordinate such claims pursuant to Section 510(b). In doing so, LBHI erroneously relies on a line of cases flowing from *In re Enron Corp.,* 341 B.R. 141 (S.D.N.Y. 2006).

3.      *Enron* and its progeny, however, clearly do not apply to the facts here and cannot serve as basis for subordination. The *Enron* rationale is that "a claim will be subordinated under Section 510(b) if the claim is for damages and if those damages 'arise from' the purchase or sale of a security." *Enron,* 341 B.R. at 148-149. In concluding that the *Enron* employees stock option claims arose from the purchase of a security, Judge Gonzalez found that the employees had "exchanged value for the options: here, their labor. Such exchange falls under a broad reading of the term 'purchase'." *Id.* at 151. The *Enron* court continued:

> Some of the Claimants . . . argue that they never elected to receive stock options, but rather were required to take a minimum percentage of their annul bonus in stock option form…. Although implicit, there is nonetheless a bargain and exchange of value. Here, the employment. If these Claimants were required to receive a portion of their compensation as options, *that was a condition of employment the Claimants willingly accepted in return for their labor. These Claimants, thus, "purchased" the stock options with their labor.*

*Id. (emphasis supplied).*

4.      Unlike the *Enron* employees, here the requirement that the Neuberger Claimants accept up to 50% of their annual production based compensation in RSUs *was not at all* "a condition of employment the Claimants willingly accepted in return for their labor . . . . [and] thus 'purchased' the [RSUs and] stock options with their labor", but rather a condition that

was thrust on them by the acquisition and their only manner to retain control of their billions of dollars worth of business and client relationships developed over decades.

5.      The Neuberger Claimants had no choice. They were held hostage to the LBHI compensation scheme, since if they did not accept RSUs as part of their compensation they would lose their jobs and forfeit their books of business, client relationships and, *e.g.* Founder Shares, if they sought to work elsewhere.

6.      The NB Claimants had no alternative to LBHI employment and the compensation scheme that went with it. This compelled participation does not give rise to "damages arising from" a voluntary purchase of a Lehman security and cannot be subordinated under Section 510(b).

7.      The Second Circuit's decision in *In re Med Diversified*, 461 F.3d 251 (2d Cir. 2006), also supports the position of the Neuberger Claimants. In *Med Diversified*, the court found § 510(b) subordination applied because claimant "took on the risk and return expectations of a shareholder when *he agreed* to exchange . . . employment claims for shares of the debtor . . . ." 461 F.3d at 256 (emphasis added). Once the *Med Diversified* claimant "bargained not for cash but to become a stockholder . . . he became bound by the choice he made to trade the relative safety of cash compensation for the upside potential of shareholder status. . . ." *Id.*

8.      Here, the Neuberger Claimants *did not bargain* to become LBHI shareholders; the compensation scheme was a mandatory condition of the acquisition which was required in order for the Neuberger Claimants to retain their clients and their business. The Neuberger Claimants had no "choice" and made no "trade."

9.      The penalties for "Harmful Activities" imposed by the several restrictive covenants further illustrate that the NB Claimants did not take on the typical expectations of a

stockholder.  By virtue of these penalties, Lehman made sure that the NB Claimants did not

compete with LBHI.  Provided that the NB Claimants did not do so, and did not violate the

covenants, only then, after five years, would they receive the value of the commissions that they

previously earned and were entitled to as part of their compensation.  The restrictive covenants

thus reinforce that Claimants did not willingly accept RSUs as a form of compensation in

exchange for their labors or that they received RSUs in order to obtain the possible benefits of a

typical equity holder.

      10.    The restrictive covenants incident to the Lehman's acquisition of

Neuberger make it unmistakable that the Neuberger Claimants could work no place other that at

Lehman, especially since their books of business and client goodwill were thereby acquired by

Lehman.  As a matter of law, the various pre and post-merger restrictive covenants entered by

the Neuberger Claimants inured to the benefit of, and were fully enforceable by, LBHI.  *See,*

*e.g., Johnson Controls, Inc. v. A.P.T. Critical Systems, Inc.*, 323 F.Supp.2d 525, 536 (S.D.N.Y.

2004) (finding restrictive covenants enforceable because plaintiff employer had purchased the

firm that previously employed employee and had acquired its client relationships and goodwill);

*Weiser LLP v. Coopersmith*, 74 A.D.3d 465, 467-68, 902 N.Y.S.2d 74, 76 (1st Dept. 2010)

(enforcing restrictive covenants in former firm's partnership agreement because new employer

agreed to assume liabilities and obligations of purchased firm in return for the restrictions and

because the "the covenant was not more extensive than reasonably necessary to protect Weiser's

legitimate interests in enjoying the goodwill acquired in the merger").

      11.    Since the LBHI RSUs never vested, the Neuberger Claimants now are

entitled to the production based compensation that they earned while employed at LBHI, in the

amounts that Lehman unilaterally allocated to RSUs each year.  The Neuberger Claimants cannot

be deprived of their justly earned compensation through subordination under Section 510(b).

The longstanding public policy and the provisions of the New York Labor Law against forfeiture

of earned compensation -- commissions and production based earnings -- requires nothing less.

*See, e.g., Labor Law § 190(1); Reilly v. Natwest Markets Group Inc.,* 181 F.3d 253, 264-65 (2nd

Cir. 1999) (the NB Claimants production based compensation "falls comfortably within the

definition of 'commission' that is expressly included within the Labor Law's definition of

'wages'.").

13.    For subordination under Section 510(b) to occur there must be "damages"

flowing from a volitional act by the Neuberger Claimants to "purchase" RSUs. Here, far from

being a voluntary purchase -- the volitional choice of stock over cash or other compensation or

"a condition of employment that claimants willingly accepted" -- the Neuberger Claimants were

compelled to join the LBHI compensation scheme by the acquisition and their respective

restrictive covenants.

13.    Participation by the Neuberger Claimants in the Lehman RSU Award

Program bear the very hallmarks of an unconscionable contract, which "has been defined as one

which is so grossly unreasonable as to be unenforceable because of an absence of meaningful

choice on the part of one of the parties together with contract terms which are unreasonably

favorable to the other party." *King v. Fox,* 7 N.Y.3d 181, 191 (2006). *See also, e.g., Gillman v.
Chase Manhattan Bank, N.A.,* 73 N.Y.2d 1, 10 (1988). The continued handcuffs imposed by

restrictions that only began post-employment prevented any repudiation of Lehman's continued

and unilateral deferral of earned production compensation. *See, e.g., Sosnoff v. Carter,* 165

A.D.2d 486, 492, 568 N.Y.S.2d 43, 47 (1st Dept. 1991).

14.    Here, the "employment" contracts of the Neuberger Claimants plainly are unconscionable. The Neuberger Claimants, in order to preserve their ability to earn a living in their chosen occupation and maintain the substantial books of business they had built over the course of their careers and the income stream flowing therefrom, had no choice but to participate in LBHI pay scheme, a compensation package that was a material change from the cash based compensation structure at Neuberger before the acquisition by LBHI and one that unreasonably favored Lehman by allowing it to benefit from the tax and accounting aspects of substituting paper RSUs payable after five years for the cash compensation that the Neuberger Claimants had earned and to which they otherwise would have been entitled to under the long-standing, pre-existing Neuberger formulaic, production based compensation system.

15.    Additionally, as this Court made clear: "the doctrine of business compulsion provides that the making of a contract may be under such circumstances of business necessity as will render the same involuntary and excuse the allegedly coerced party from its performance, especially where undue advantage or a threat to do unlawful injury is shown." *In re Market Square Assoc. Ltd.,* 56 B.R. 566, 573-74 (S.D.N.Y. 1986). Here, the threatened loss of their careers, substantial books of business and future revenue and earning streams, plainly depicts a lack of free will by the Neuberger Claimants. *See, e.g., Yuk Fung Ma v. J.C. Sake Inc.,* 31 Misc.3d 1234(A), 2011 N.Y. Slip. Op. 50999 at \*3 (Sup. Ct. 2011). "A crucial element of coercion or duress is lack of free choice. The circumstances involved must be such that the party . . . had *no practical alternative* open to him." *Korn v. Franchard Corp.,* 388 F. Supp. 1326, 1333 (S.D.N.Y. 1975) (emphasis added). In this regard, an "'actual or threatened serious injury to business or employment' by a private party can be as coercive as other forms of coercion . . . and that '[t]o imperil a man's livelihood, his business enterprises, or his solvency, [is] ordinary

21

quite as coercive as, for example, detaining his property.'" *Medimmune, Inc. v. Genentech, Inc.,* 549 U.S. 118, 132 (2007). Indeed, "it always is for the interest of a party under duress to choose the lesser of two evils. But the fact that a choice was made according to interest does not exclude duress. It is the characteristic of duress properly so called." *Union Pac R.R. Co. v. Public Service Comm.,* 248 U.S. 67, 70 (1918). *See also, e.g., First Nat. Bank of Cincinnati v. Pepper,* 454 F.2d 626, 633 (2d Cir. 1972). Here, the NB Claimants had no free choice or, for that matter, any choice at all.

16.    At the time of the acquisition, each of the Neuberger Claimants was required either to leave Neuberger Berman and forfeit their longstanding client relationships and books of business valued at billions of dollars in assets **or** join Lehman with its compensation structure that contractually mandated participation in the Equity Award -- RSUs -- Program. Each of the Neuberger Claimants was required and coerced by their respective restrictive covenants to participate in the RSU Program, which withheld up to 50% of their yearly compensation for up to five years, in order to continue to cultivate their client relationships and books of business that they had worked for so many years to build and which made Neuberger such an attractive firm for Lehman to acquire.

17.    The Neuberger Claimants had no bargaining power, made no election and had no choice but to participate in the Lehman RSU scheme. The decision to receive deferred RSUs, instead of presently earned commissions, simply was not "a condition of employment that the Claimants *willingly accepted* in return for their labor" and, thus, equity that they purchased, *In re Enron,* 341 B.R. at 151 (emphasis supplied), but, instead, the result of an unconscionable employment contract that was forced on the Neuberger Claimants by the acquisition and the restrictive covenants that handcuffed them to Lehman.

18.    All of the Neuberger Claimants' compensation that was withheld for RSUs never vested prior to LBHI's 2008 bankruptcy and the Neuberger Claimants, therefore, were never fully compensated for their production based labors between 2003 and 2007.  The NB Claimants are general creditors of LBHI and are owed the production-based compensation that they earned and which was withheld by LBHI.

19.    The Neuberger Claimants' claims cannot be reclassified as equity interests under Section 510(b) and the Neuberger Claimants general creditor compensation claims are allowed.

Dated: New York, New York
        June 5, 2014

                                Respectfully submitted,
                                KAPLAN LANDAU LLP

                                By: _____
                                    Eugene Neal Kaplan (EK-4229)

                                1065 Avenue of the Americas
                                27th Floor
                                New York, New York 10018
                                (212) 593-1700

                                Michael S. Schlesinger (MS-0399)
                                JULIEN & SCHLESINGER, P.C.
                                207 East 94th Street
                                Suite 303
                                New York, New York 10128
                                (212) 962-8020

                                *Attorneys for the Neuberger Claimants*

## AFFIRMATION OF SERVICE

EUGENE NEAL KAPLAN, an attorney who is not a party to this action, and is duly licensed to practice in the courts of the State of New York, affirms under penalty of perjury pursuant to CPLR §2106, that I served the annexed Neuberger Berman Claimants' Proposed Findings of Fact and Conclusion of Law by electronic transmission to the e-mail addresses below, the attorneys of record, on June 5, 2014.

Ralph I. Miller, Esq.
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
(212) 310-8965
ralph.miller@weil.com

Richard J. Schager, Jr., Esq.
Andrew R. Goldenberg, Esq.
STAMELL & SCHAGER LLP
One Liberty Plaza – 23rd Floor
New York, New York 10006-1404
(212) 566-4047
schager@ssnyc.com
goldenberg@ssnyc.com

Lisa M. Solomon
LAW OFFICES OF LISA M. SOLOMON
One Grand Central Place
305 Madison Avenue, Suite 4700
(212) 471-0067
lisa.solomon@att.net

Howard P. Magaliff, Esq.
Robert N. Michaelson, Esq.
RICH MICHAELSON MAGALIFF MOSER LLP
340 Madison Avenue, 19th Floor
New York, New York
(212) 220-9402
hmagaliff@r3mlaw.com
rmichaelson@r3mlaw.com

LAW OFFICES OF A. JAMES BOYAJIAN
355 S. Grand Avenue, Suite 2450
Los Angeles, CA 90071
(424) 258-0777
jamesboyajian@gmail.com

Dated: June 5, 2014

EUGENE NEAL KAPLAN

2