# EXHIBIT A

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

In Re:                          )
                                ) Chapter 11
LEHMAN BROTHERS HOLDINGS         ) Case No. 08-13555 (JMP)
INC., et al.,                    ) (Jointly Administered)
                                )
                     Debtors.    )


\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION OF

FRANK TOLIN

DECEMBER 5, 2013

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION OF FRANK TOLIN, produced as a

witness at the instance of Lehman Brothers Holdings Inc.

Estate, and duly sworn, was taken in the above-styled

and numbered cause on the 5th day of December, 2013,

from 9:24 a.m. to 1:40 p.m., before Julie C. Brandt,

RMR, CRR, and CSR in and for the State of Texas,

reported by machine shorthand, at the offices of Locke

Lord, 2200 Ross Avenue, Dallas, Texas, pursuant to

the Federal Rules of Civil Procedure and the provisions

stated on the record or attached hereto.


Job No.:  68729

1                  A P P E A R A N C E S

2

    FOR LEHMAN BROTHERS HOLDINGS INC. ESTATE:
3
        Michael Rollin
4       Katherine Roush
        REILLY POZNER
5       1900 Sixteenth Street
        Denver, Colorado 80202
6

7

8

9   FOR THE WITNESS:

10      David Aker (via telephone)
        LAW OFFICE OF DAVE AKER
11      23 Southern Road
        Hartsdale, New York 10530
12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 26

1       Q.   When you were asked in the process of applying

2   for your loan how much money you earned, what records

3   did you consult for that question?

4       A.   I went to my previous income and I said,

5   well, this was my previous income, and I was told by

6   Ms. Washington under the rules that's fine, we'll go

7   ahead and put the income from Moser Patterson &

8   Sheridan.

9       Q.   I understand.  But at the time you were

10  actually earning substantially less?

11      A.   Yes.

12      Q.   And approximately how much less?

13      A.   I don't recall, but it was less.

14      Q.   In fact, you were in pretty severe financial

15  straits?

16      A.   Yes, I was.

17      Q.   Does that mean that you were not able to pay

18  your bills as they came due?

19      A.   Not all of them, no.

20      Q.   That means you actually owed more money on

21  your bills than you were taking in through your

22  employment?

23      A.   Yes.

24      Q.   Or through --

25      A.   Yes.

1       Q.   Or from any source.  Right?

2       A.   Yes.

3       Q.   You were upside down, as we say?

4       A.   Yes.

5       Q.   And approximately from what period of time

6    would you consider yourself upside down?  As soon as you

7    lost that job at Moser Patterson?

8       A.   I can't say that's true.  I can't say that.

9       Q.   Did you have savings at the time that carried

10   you through for a while?

11      A.   Yes, sir.

12      Q.   Okay.  Were you -- did you practice law --

13   during the period of time, again, orienting you to the

14   first half of 2005, were you practicing law out of your

15   home or were you practicing law out of an office space?

16      A.   It would have to be out of my home.

17              MR. ROLLIN:  Can I have the loan apps?

18      Q.   (BY MR. ROLLIN)  I'm going to mark as Exhibit

19   No. 2 a document that I understand to be a loan

20   application for the subject property from March of 2005.

21   Will you please take a look at this document, Exhibit 2,

22   and confirm that?

23              (Exhibit 2 marked.)

24      A.   Sure.

25              MR. AKER:  Can we go off the record for a

1    second?

2                  MR. ROLLIN:  Yes.

3                  (Break from 9:53 a.m. to 9:53 a.m.)

4       Q.    (BY MR. ROLLIN)  At Mr. Aker's request off the

5    record, I'm identifying the subject property as listed

6    in the -- in Exhibit 2 as 108-36 154th Street, South

7    Ozone Park, New York.  Is that your understanding,

8    Mr. Tolin, of the subject property address?

9       A.    Yes.

10      Q.    Now back to my previous question.  Will you

11   confirm that that's the March 2005 loan application?

12      A.    This looks like it.

13      Q.    And I want to do the same thing with the next

14   one, which I understand to be the May 2005 application.

15   And I'm going to mark that as Exhibit 3.

16                  (Exhibit 3 marked.)

17      Q.    (BY MR. ROLLIN)  Same question, asking you

18   just to confirm --

19      A.    Okay.

20      Q.    -- that this is, in fact, your May 2005 loan

21   application.

22      A.    It looks like it.

23      Q.    Okay.  And we were talking about the income at

24   your previous job.  I just wanted to make sure -- if you

25   look at the second page of both of those loan

1    applications, there's a table at the top, and it says

2    base employment income of approximately $6,600 a month.

3    Is that -- is that what you understand to be your income

4    previously at Moser Patterson?

5         A.    I don't know.  I don't -- I don't remember --

6         Q.    Okay.

7         A.    -- you know, what that comes to, you know,

8    after you take out the taxes.  I don't know.

9         Q.    Okay.  But you took it off your records from

10   Moser Patterson?

11        A.    I didn't.  I gave Ms. Washington everything,

12   and she said, okay, no problem, I'll fill it out.  And

13   again, I thought she was, you know, on the up and up, so

14   I kind of trusted her.

15        Q.    When did you purchase the subject property?

16        A.    Back in 1993.  Back in 1993.

17        Q.    And who did you buy it from?

18        A.    Dennis Gentles.

19        Q.    Okay.  This wasn't one of the properties that

20   you had been managing for your father?

21        A.    No.

22        Q.    And did you buy it at the time to be an

23   investment property?

24        A.    I bought it at the time with the possibility

25   of moving into it eventually.

1   to do the best you can with the loan application.

2       A.   Well, I'm looking at the company, and I

3   believe that's who I made the payments to.  If that's

4   what it says, then yeah.

5       Q.   Is there any other account listed here, any

6   other liability listed here that could be a mortgage

7   payment on the subject property prior to the refinance?

8       A.   No, that's the reason why I said that looks

9   like it.

10      Q.   And had you been renting this property out

11  continuously, more or less, from the time you bought it

12  until the time that you sold it?

13      A.   There were times when it -- yeah.  For the

14  most part, yeah.

15      Q.   Okay.  Did you -- other than the subject

16  property, did you own any other properties?

17      A.   Years ago, you know, but I never did anything

18  with them.

19      Q.   What's years ago?

20      A.   Maybe in the '80s --

21      Q.   Okay.

22      A.   -- and early '90s.  I don't recall, but it's

23  been a while.

24      Q.   So did you buy those properties?

25      A.   No.  They were given to me.

Page 40

1            MR. AKER:  Okay.

2       Q.   (BY MR. ROLLIN)  If you look about halfway

3   down the page, it shows your street address.  I've got a

4   hole punched in mine, but I think it's 194-176th Street

5   in Jamaica, New York.  Do you see that?

6       A.   Yeah.

7       Q.   Look on the -- oh, I'm sorry.  It's the first

8   page.

9       A.   Yes.

10       Q.   About midway down, it says present address.

11   It's right underneath the redactions for your Social

12   Security number.

13       A.   Yes.  Yes.

14       Q.   And was your then current address 194-176th

15   Street in Jamaica?

16       A.   It never was.  That's a fictitious address.

17       Q.   What was your address?

18       A.   134 -- right up under it -- further down,

19   134-40 176th Street.

20       Q.   Okay.  Could that be a typographical error?

21   Rather than -- 194 rather than 134-40?

22       A.   I don't know.

23       Q.   Okay.  And that home that you were -- that's

24   where you were living the 176th Street address?

25       A.   That's my parents's home address.  I had moved

Page 41

1    back there again to save money.

2        Q.    Okay.   Who were you living there with at the

3    time?

4        A.    My parents.

5        Q.    Okay.   Did you have a mortgage obligation or a

6    rent obligation in connection with living there?

7        A.    No.

8        Q.    And for what period of time did you live in

9    your parents's home?

10        A.    I don't recall.

11        Q.    That -- where it says present address and it

12    has the wrong address, where it says -- the box is

13    checked, do you see that says owned.   Right?

14        A.    Uh-huh.

15        Q.    In other words, this suggests that you own the

16    property that you were living in at the time.

17        A.    I understand what it says now, yes.

18        Q.    Okay.   But that's not true?

19        A.    No, and I didn't put that there.

20        Q.    And you hadn't lived there for the preceding

21    15 years.   Right?

22        A.    I had never lived there.   It's a fictitious

23    address.

24        Q.    Well, even as to the home that you were living

25    in at the time, your parents's home, you neither owned

Page 43

1    places.  I lived in DC for a while, and then I, you

2    know, came back and lived in New York.

3         Q.   Had you owned any of those places that you

4    lived?

5         A.   No.

6         Q.   Okay.  You were always a renter?

7         A.   Yes.

8         Q.   Now it says -- where you directed me to your

9    then current accurate address 134-41 76th Street

10   Jamaica, that is actually the name and address of your

11   employer; that's the section of the application.

12   Correct?

13        A.   Yes.

14        Q.   And it does not show that you were

15   self-employed.  Correct?  Do you see that box that you

16   could check if you were self-employed?

17        A.   Yes.

18        Q.   And that's not accurate either because you

19   were self-employed at the time.  Right?

20        A.   Yes.

21        Q.   And I asked that sort of a compound question.

22   First, it's not accurate.  Correct?

23        A.   That is true.

24        Q.   Because you were, in fact, self-employed at

25   the time?

Page 44

1       A.    That is true.

2       Q.    And you had not been at the job working for

3  yourself for five years and one month previous to

4  filling out this loan application.   Right?

5       A.    No, I had not.

6       Q.    In fact, it had only been several months at

7  the most?

8       A.    At the most, yes.

9       Q.    And is it true that you had been employed as a

10  lawyer for about five years at that time?

11       A.    I'm not sure that's true.

12       Q.    When did you first begin your law practice?

13       A.    My law practice or being employed as a lawyer?

14       Q.    How about when did you get your law degree?

15       A.    '98.

16       Q.    Okay.  Did you go into law practice right

17  afterwards?

18       A.    I started working for an attorney, yes.

19       Q.    Okay.  And if you turn to the -- we're still

20  in Exhibit 2.  If you turn to page 3, about two-thirds

21  of the way down, that's your signature.  Right?

22       A.    Yes, sir.

23       Q.    You understood what you were doing when you

24  were signing this document.  Right?

25       A.    First, when this document was presented to me,

Page 52

1      A.   I wouldn't say twice as big, no.

2      Q.   Well, you knew that you were asking for

3   $120,000 on a property that you owed $75,000 on.  Right?

4      A.   Yes, sir.

5      Q.   Okay.  And you know that that additional money

6   gets built into the monthly payment.  Right?

7      A.   Yes, sir.

8      Q.   And when you add interest, even at 5.5

9   percent, you recognize that when you do the math, you're

10   going to have a larger payment than the payment that you

11   had at the time?

12     A.   Yes, sir.

13     Q.   Okay.  Now let's talk about Exhibit 3.

14     A.   Yeah.

15     Q.   That's the May 2005 loan application.  Right?

16     A.   Yes, sir.

17     Q.   And that's actually executed on the date of

18   and at the closing.  Agreed?

19     A.   Yes, sir.

20     Q.   And this is the one that's $160,000?

21     A.   Yes, sir.

22     Q.   And you saw that?

23     A.   Yes, sir.

24     Q.   You knew that you were taking out a loan for

25   $160,000?

Page 53

 1      A.    Yes, sir.

 2      Q.    And you knew that your mortgage payment was

 3  going to have to be larger than your existing mortgage

 4  payment?

 5      A.    Yes, sir.

 6      Q.    And the subject property address is blocked

 7  out of this copy, and I think this is the copy you gave

 8  us.  Do we all agree that the subject property address

 9  is the same one as on Exhibit 2, the previous loan

10  application?

11      A.    I'm not sure that's the case, but you should

12  have a copy in your files that doesn't have this

13  redaction in it.

14      Q.    One thing that I'm trying to make sure of is

15  that we're only talking about one subject property

16  throughout this whole case.

17      A.    I agree, but I'm not sure that there's that

18  same error, because at the closing what they did was,

19  there was a bunch of erroneous addresses.  So I had to

20  go in and start correcting them.  And they said, well,

21  now sign this.  Okay, well, yeah.  And then I'm just

22  correcting addresses.  But I'm not sure that that same

23  deficiency was here as it is in there.  But I did give

24  you what BNC had in their files, so it should be

25  nonredacted.

Page 55

1    the same, so your monthly payment on your rental

2    property is still $753.  Correct?

3         A.   I'm sorry.  Where --

4         Q.   I'm on page 2.  There's a schedule of

5    liabilities.

6         A.   Monthly payments -- yes.

7         Q.   The mortgage payment on the subject property

8    at the time is still $753.  Correct?

9         A.   Yes, sir.

10        Q.   And the balance of the subject property is

11   still $75,241.  Right?

12        A.   Yes, sir.

13        Q.   If you -- remember we looked at the series of

14   checked boxes that say yes and no?

15        A.   Yes, sir.

16        Q.   Item L still says that you intend to occupy

17   that property as your primary residence.  Right?

18        A.   Yes, sir.

19        Q.   And it says -- item M right below that says,

20   Have you had an ownership interest in a property in the

21   past three years?  Do you see that?

22        A.   Yes.

23        Q.   And it says yes?

24        A.   Yes.

25        Q.   And there's a sub question.  And that's, one,

Page 56

1    what type of property did you own?  And then it gives

2    you some choices, whether it's going to be a principal

3    residence, a second home or an investment property.

4    Right?

5        A.   That's right.

6        Q.   And what's indicated there is that it's a

7    principal residence?

8        A.   Yes, sir.

9        Q.   And what residence is that?  What home is that

10   referring to?

11       A.   I don't know.  You know, I didn't see this.

12   Even at the closing -- you know what, it's equivalent to

13   going to the store and getting a cell phone.  And then

14   the person says -- all right, you stand in line.  This

15   is what you're signing here.  Okay.  All right.  You

16   don't get a chance to look at that.  And it's

17   different -- you know, when they give you your

18   disclosures ahead of time, then you've got an

19   opportunity to review them, but none of that occurred.

20       Q.   Well, you understand that at the closing --

21   tell me if this is how it went.  There's a closing agent

22   sitting there and you're sitting there.  Right?

23       A.   Uh-huh.

24       Q.   And the closing agent is handing you each

25   document for you to sign.  Right?

Page 60

1    then gives you a pork chop.  What do you do?  What do

2    you do?  That's what happened.

3         Q.    You equate the situation to being starving and

4    having to violate your religious principles?

5         A.    I equate it to the person intentionally

6    stalling the process out, waiting until the 11th hour to

7    make it less likely --

8         Q.    Okay.

9         A.    -- that I would walk away.

10        Q.    So you knew that you were signing documents

11   that had interest rates and loan amounts and other loan

12   terms that you did not want, but you felt you had to do

13   it?

14        A.    I knew that there was some things I did not

15   like, yes.

16        Q.    Let's see if you can answer my question.

17        A.    Yes.

18        Q.    You knew that the interest rate was 9.6

19   percent, but you signed it anyway?

20        A.    Yes.

21        Q.    And you knew that the loan amount was

22   $160,000, but you signed it anyway?

23        A.    Yes.

24        Q.    And you knew that it was an adjustable rate

25   mortgage right on the document, and you signed it

Page 61

1    anyway?

2        A.    Some of the documents say fixed interest rate.

3        Q.    On the final closing?    In these final

4    documents, like the adjustable rate note, that says

5    fixed on it?

6        A.    On some of the TILA documents that BNC

7    prepared, it says fixed rate.

8        Q.    In this final closing packet?

9        A.    This is one of the documents that they gave

10   me, but again, this says adjustable rate on that little

11   checkbox, but some of the documents that they have say

12   fixed.

13       Q.    And you knowingly signed documents that said

14   you had an adjustable rate mortgage.    Correct?

15       A.    Yes, sir.

16       Q.    At the closing?

17       A.    Yes, sir.

18       Q.    Let's go back to my previous set of questions.

19   You knew that you could read the documents in their

20   entirety if you wanted to and you were willing to take

21   the time to do so?

22       A.    No.    That's what I'm telling you, no, I did

23   not.

24       Q.    You did not believe you had the right to do

25   so?

1      A.    No, I did not.

2      Q.    I'm talking about the right.  Not the

3  practicality, but the right.

4      A.    No, I didn't understand.  I didn't look at it

5  that way as me having the right to do it.  I didn't

6  think of it that way.

7      Q.    Okay.  And you chose not to?  For whatever

8  subjective reasons, you chose not to read the documents?

9      A.    I -- well, how do I answer that?  Again, I

10  didn't think I had the right at the time to go ahead and

11  stop everything and read in its entirety.  I did not

12  think that.

13      Q.    Now when you sat down in the closing, how much

14  cash did you expect to get from the transaction?

15      A.    The difference between what was owed, what

16  everyone got -- needed to get paid for disbursements and

17  whatever was left from the 120.

18      Q.    And was that -- well, from the 160.  Right?

19      A.    Now it's 160, but originally I expected 120.

20      Q.    But at the closing it was 160?

21      A.    Yes, sir.

22      Q.    So at the -- is it fair to estimate that you

23  knew at the closing that you were going to get about

24  $60,000 in cash?

25      A.    At some point, yes.

Page 63

1    Q.   And you knew that this was at a time when you

2    were strapped for cash?

3    A.   Yes, sir.

4    Q.   In fact, you were unable to pay your bills as

5    they came due?

6    A.   That's right.  Not all of them, no.

7    Q.   This is going to be No. 4.

8                   (Exhibit 4 marked.)

9    Q.   (BY MR. ROLLIN)  I'm marking a document as

10   Exhibit No. 4, and I'm handing it to you, and it is an

11   occupancy affidavit.

12   A.   Thank you.

13   Q.   Please take a look at that and confirm that

14   you signed it on May 3, 2005.

15   A.   Yes.

16   Q.   And this document says that within 60 days

17   after the security instrument is recorded, you intended

18   to occupy the residence as a primary residence.  Right?

19   A.   I guess that's what it says.  I'll take your

20   word for it.

21   Q.   Well, you can read it.

22   A.   Okay.  I have the right to?

23   Q.   You have the right to read it, yeah.

24   A.   Okay.  Okay.  That's what it looks like.

25   Q.   But you knew that within 60 days, you weren't

Page 64

1    going to be able to move into that house?

2         A.    I've never seen this document.

3         Q.    But you knew within 60 days you weren't going

4    to be able to move into that house.  Right?

5         A.    Yes, I knew.  Yes.

6         Q.    And that is your signature?

7         A.    Yes, sir, it looks like it.

8         Q.    Okay.

9                   MR. AKER:  Can I have the HUD 1?

10                  (Exhibit 5 marked.)

11        Q.    (BY MR. ROLLIN)  I'm marking Exhibit 5.  This

12   is the HUD 1.  Just confirm that for me and that you

13   signed it.

14        A.    Oh, I'm sorry.

15        Q.    Sorry.  Bad hand-off.

16        A.    That's okay.  That looks like my signature.

17        Q.    Okay.  And you see that this indicates that

18   the amount of money that will be going to you at the

19   closing would be $59,000 and change?

20        A.    Where?

21        Q.    Bottom of the first page.

22        A.    Yes.  Okay.

23        Q.    And all of the payments going out to others as

24   part of the closing and the settlement of the loan are

25   reflected on the back page.  Right?

Page 65

1      A.   Some of them, yes.

2      Q.   Well, what are not?

3      A.   I think I sent that in a document to you.  I

4  would have to look and see.  I don't want to say that

5  this is accurate, you know.

6      Q.   I think you did send this to us.

7      A.   Okay, yeah, I understand.  But if I sent it to

8  you, it's because I sent the file that BNC gave me.

9      Q.   Okay.

10     A.   You understand?

11     Q.   I understand.

12     A.   So this is just full disclosure to you guys.

13     Q.   Will you look at this, and to the best of your

14  recollection, testify, tell me whether or not this was

15  your understanding at the time of closing about the

16  moneys that would be paid out of the funds to others?

17     A.   To the best of my recollection, yes.

18     Q.   Okay.  Now there's no payment here listed to

19  Ms. Washington.  Correct?

20     A.   No.

21     Q.   Okay.  There are several payments to Gordon,

22  Gordon & Gordon.  Right?

23     A.   Yes.

24     Q.   Now if we look at the next page -- I'm going

25  to mark Exhibit 6.

Page 66

1                    (Exhibit 6 marked.)

2          Q.    (BY MR. ROLLIN)  And I'm handing you what's

3    been marked for identification as Exhibit 6.  It's a

4    notice of broker compensation.  I'll ask you to confirm

5    that and confirm that that's your signature also from

6    the time of the closing.

7          A.    Yes.

8          Q.    And do you see that it lists the compensation

9    that the broker will receive as $350 for processing,

10   $450 for the appraisal and $350 for the application fee.

11   Right?

12         A.    Yes.

13         Q.    Okay.  And this doesn't list any obligations

14   to pay Ms. Washington anything?

15         A.    No, it does not.

16         Q.    And it also states, doesn't it, that there

17   will be no fee --

18                And in that same list, there's a row for

19   points.

20         A.    Yes.

21         Q.    Correct?

22                And it says zero dollars.  Right?

23         A.    Yes.

24         Q.    So no fee is to be paid for points.  Right?

25         A.    Yes.

Page 67

1      Q.    There's nothing in the loan documentation that

2  you ever saw that created an obligation to pay for

3  points.   Right?

4      A.    No.   But, again, I didn't look at the loan

5  document itself.

6      Q.    And there's nothing in the loan documentation

7  anywhere that says you had an obligation to pay anything

8  to Ms. Washington, any fee?

9      A.    I realize that now, but again, you give your

10  word, you keep it.   So that's all I did.

11      Q.    So Ms. Washington came to you and said, you

12  owe me $2,500 for points --

13      A.    She said that you owe me -- my fee is $2,500,

14  and you can pay me after the closing.

15      Q.    So she told you that before the closing?

16      A.    That's right.

17      Q.    And then in the closing you got these

18  documents?

19      A.    Yes, sir.

20      Q.    And that fee is nowhere listed in these

21  documents?

22      A.    I realize that, yes.

23      Q.    And then did she come to you afterwards and

24  say, Now pay me my fee, or did you go to her voluntarily

25  and say, Here is your fee?

1   the other ones are all fine?

2        A.   The other ones appear to be fine.   And then

3   this driver's license, the wording there to the right of

4   that, that's definitely not my handwriting.

5        Q.   Could it be that of the closing agent, Mr. --

6   I don't even know how you say his name.

7        A.   Well, that's the attorney.   He pronounces it

8   Liechtung.

9        Q.   Liechtung.   Thank you.

10       A.   Yeah.   But I don't know whose signature -- who

11  wrote that driver's license thing there.   I don't have a

12  clue.

13       Q.   But you were at the closing?

14       A.   Yes, I was.

15       Q.   That was you; that wasn't somebody else?

16       A.   Yeah, I was at the closing.   Yes.

17       Q.   We're not dealing with an identity theft or

18  something?

19       A.   No, but I just answered the question asked.

20       Q.   I understand.   And do you not have a

21  recollection of any time at the closing -- a lot of

22  times you have to give your driver's license and they go

23  make a photocopy of it or they look at it just to make

24  sure they're dealing with the right person.   Do you have

25  a recollection of that happening?

Page 74

1        A.    I believe that, yes.  I don't have a

2    recollection of it, but I believe I saw in the file a

3    copy of my driver's license.  I don't know whether I did

4    that at the closing or Ms. Washington asked me for that

5    prior to the closing.

6        Q.    Okay.  But before the loan was completed and

7    closed, they verified your identity; that's the best of

8    your recollection?

9        A.    I believe so.  I don't have any direct

10   remembrance of them verifying me being Frank Tolin, no,

11   but I imagine that's what happened.

12       Q.    I'm going to mark for identification Exhibit

13   No. 11.

14              (Exhibit 11 marked.)

15       Q.    (BY MR. ROLLIN)  This is a SafeCheck results.

16   I'll just ask you to take a look at that and confirm

17   that that is what it purports to be.

18       A.    Yes.

19       Q.    And the consumer statement in point number 2,

20   that's from you.  Right?  You wrote that?

21       A.    I don't believe -- if I wrote this or there

22   was an issue that occurred, somebody did it on my

23   behalf.

24       Q.    Well, you see it's written in the first person

25   as if from you?

Page 97

1     A.    No, sir.

2     Q.    Does that mean the way I phrased the question

3   is accurate?

4     A.    Yes, sir.

5     Q.    Okay.  And she said about 5.5 percent, not

6   right at 5.5 percent.  Correct?

7     A.    You know what?  I'm saying about 5.5 percent

8   because I can't recall whether it was 5.25, 5.5, but she

9   did give me a number in the mid to low 5's.

10    Q.    And she was talking about something she

11  thought she could do in the future, not something she

12  had done or had secured.  Correct?

13    A.    Oh, no, she said she could do it.

14    Q.    She said she could do it in the future, not

15  that she had done it?

16    A.    No, she didn't say that she had done it.  If

17  she had done it, we could have, you know, taken care of

18  it right then and there.

19    Q.    And she hadn't -- as far as you know, all she

20  had done is look at your credit report.  Correct?

21    A.    I don't recall.

22    Q.    And she hadn't submitted it to underwriting,

23  as far as you know?

24    A.    I don't know.  I don't know --

25    Q.    Okay.

1        A.    -- because she was giving me a line of crap,

2    and then in reviewing the documents, it looked like she

3    was just preparing these applications and not doing

4    anything with them in order to just stall the process

5    and drag it out.

6        Q.    By not doing anything with them, you mean not

7    submitting them to a lender for approval?

8        A.    Yes.  It's a possibility, yes.

9        Q.    So your belief, based on what you've seen, is

10    Ms. Washington was completing loan applications, not

11    submitting them to a lender intentionally to drag out

12    the process to increase the financial stress?

13        A.    I believe so.  That's a possibility.  I'm not

14    sure about that, but that is an assumption on my part,

15    based on her character.

16        Q.    And based on your review of the documents that

17    you've seen?

18        A.    Based on what I've seen.  And again, I'm not

19    an expert, and you know, my understanding of what it is

20    I'm looking at is limited.

21        Q.    Is that your subjective belief that you hold

22    today that that's what she was doing?

23        A.    In part, yes.

24        Q.    And what else?

25        A.    I believe that she asked for more money than

Page 99

1    she wanted -- than I wanted to create a surplus, knowing

2    that I trusted her.

3        Q.    You mean the $160,000?

4        A.    That's right.  That's right.

5        Q.    Okay.

6        A.    And I found out subsequently that she was

7    being sued in court.  So she got the money from me to

8    pay off -- help pay one of the other gentlemen that was

9    suing.  But in part, yeah.  And then I would have to

10   stop and think about everything else that I believe that

11   has occurred, but to the best of my recollection, that's

12   it for now.

13       Q.    Now had she told you, at this time that you

14   were first engaged with her about the possibility of her

15   helping you get a loan, that she was working with any

16   particular lenders?

17       A.    No, she didn't go into that much detail, but

18   over the years, she would offer, Hey, you should let me

19   take care of this for you.  You know, I can get you a

20   great deal.  Then you know what, I said, she's been

21   telling me this.  I'll go ahead and do it.

22       Q.    But it was your understanding that she was,

23   allegedly at least, an independent broker; that is, she

24   could go to any lender that would get her the best deal

25   for her clients?

Page 100

1    A.    I never questioned that, you know.  I never

2    questioned that, but to a degree, you know, sometimes --

3    I got that impression sometimes, but I never questioned

4    it.

5    Q.    Was it your expectation that she would go to

6    whatever lender was necessary to get you the best deal

7    that she could?

8    A.    I can't say that.  It's my expectation that

9    whoever it was she was associated with, that she could

10   go ahead and get that deal.  So I'm not clear that she

11   could go around to different people.  It's just that,

12   Hey, no, I can get that loan for you.  So I don't know,

13   you know --

14   Q.    You didn't know one way or the other whether

15   she worked with one lender or if she had the ability to

16   work with multiple lenders?

17   A.    Yeah, I didn't question it.

18   Q.    It's not something you knew at the time --

19   A.    No.

20   Q.    -- one way or the other?

21   A.    If you tell me something, I'm going to trust

22   and believe what it is you have to say.

23   Q.    And you didn't direct her to go to any

24   particular lender?

25   A.    No, definitely not.

Page 101

1    Q.    That was entirely her choice, as far as you

2    know?

3    A.    In retrospect, yes.

4    Q.    Did you ever sign a broker agreement with her?

5    A.    I don't recall.

6    Q.    But when you were talking earlier about at

7    closing relying on people to hand you documents and you

8    sign it, you were talking about Ms. Washington?

9    A.    No, not just her.  The attorney had one of his

10   employees in there, and then they were both just passing

11   documents.

12   Q.    But Ms. Washington was there?

13   A.    Yeah, she was one of the people there.

14   Q.    And she was the person with whom you had had

15   this long relationship.  Right?

16   A.    Yes, sir.

17   Q.    She was the person you trusted?

18   A.    Yes, sir.  Well, one of the people I trusted.

19   You know, again, the same -- if you go to, let's say,

20   get a cell phone.  You go stand in line.  And then the

21   person gives you this long printout with this fine print

22   and said, I need you to sign here, and this is just this

23   and this is just this and this is just this.  You say

24   okay.  Nobody sits there and reads that whole long

25   printout.  You trust that that person is going to tell

1      Q.   (BY MR. ROLLIN)  Just for the record, if

2   you'll confirm that these are, in fact, your

3   interrogatory responses marked as Exhibit 16 --

4      A.   Sure.

5      Q.   -- and then answer my question.

6      A.   Thank you very much.

7      Q.   Thanks.

8      A.   These are my responses.  Okay.  And --

9      Q.   If you can direct me to the page.

10     A.   Sure.  Page 9, the answer to question 7.

11     Q.   Yes, sir.

12     A.   And again, just for my clarity, would you

13  reiterate your question?

14     Q.   My question was -- what I asked is that you

15  tell me everything that you know BNC did wrong in

16  connection with this transaction.

17     A.   Okay.  All right.  Again, referring to

18  question 7, I didn't receive any right to rescind the

19  loan.  Nothing with regard to that.

20     Q.   A quick question about that.  I'm going to

21  stop you just to --

22     A.   Sure.

23     Q.   -- kind of clarify things.

24          Do you know whether a right to rescind was

25  sent?

Page 128

1      Q.    Do you have any legal basis for believing that

2  a right to rescind is required for second homes?

3      A.    Unless the right to rescind is here.  I don't

4  know if there's a difference -- distinction between

5  second home and another home.  I don't know.

6      Q.    Just not something you know about?

7      A.    No, sir, I do not know.

8      Q.    Okay.  Very good.  What else did BNC do wrong

9  that you know?

10     A.    BNC failed to provide me my documents after

11  written request to do so.

12     Q.    When did you send a written request for the

13  documents?

14     A.    I sent it on two occasions, and I believe I

15  sent you those documents also.

16     Q.    After the closing?

17     A.    After the closing, yes.

18     Q.    Okay.  And do you believe they have a legal

19  obligation after the closing to do so?

20     A.    Yes, sir.

21     Q.    And what's the basis for that belief?

22     A.    I have to actually go and look up a statute

23  or, you know, TILA, but, yes, they typically -- once you

24  request those documents, they have a fixed amount of

25  time to give you your file and they didn't do that.

Page 130

```
 1    BNC before the closing; that was only afterwards?

 2         A.    Yes.

 3         Q.    Okay.  Go ahead.  What else do you know BNC

 4    did wrong?

 5         A.    There is a discrepancy in the fees that were

 6    actually disclosed and the actual fees disbursed.

 7         Q.    What's that?  Describe that.

 8         A.    It's more than $100.  I think I went ahead --

 9    on page 10, second full paragraph, I think I outlined

10    that.

11         Q.    I'm sorry.  Page 10, you said?

12         A.    Yes, sir.

13         Q.    Let's take a look at that real quick.

14         A.    Second full paragraph.

15         Q.    So you believe that you paid -- do I

16    understand correctly, you believe you overpaid the

17    appraisal fee by $150?

18         A.    I believe that there should be no more than a

19    $100 difference than what is disclosed and what is

20    actually paid.  Now I can't say that I overpaid it, but,

21    again, those numbers have to be within a certain amount

22    and they were not.

23         Q.    What is the comparison that you're making?

24    Between what two documents?  You've got the exhibits in

25    front of you.
```

Page 132

1    that group told you that there was a discrepancy?

2        A.   Yes.  And I have to double-check that, because

3    it's been so long --

4                 MR. AKER:  Can we go off the record for a

5    minute?

6                 MR. ROLLIN:  Yes.

7                 (Break from 12:43 p.m. to 12:44 p.m.)

8        A.   So, but yeah, did I answer your question?

9        Q.   (BY MR. ROLLIN)  Yes, I believe you did.

10       A.   Okay.  And then --

11       Q.   What else?

12       A.   -- the broker's fee, the $2,500.  Okay.

13       Q.   And we talked about that earlier.

14       A.   Yes, we did.

15       Q.   That's where there was nothing in the

16   settlement statement or the broker compensation form,

17   but you paid it anyway?

18       A.   Yeah, but I didn't realize that.  I didn't

19   know that.  And again, you know, some -- a lot of this

20   stuff could have been resolved had I gotten a phone call

21   and then we said, hey, wait a minute.  We know --

22   Mr. Tolin, we know that there's something wrong here.

23   And you say, well, what is it?  And then we could have

24   put our heads together and said, hey, I'm paying this

25   fee and -- you know, or look at this loan application.

Page 133

1    This is what's being put on here.  There's so many

2    internal things or red flags that even were raised with

3    BNC that were not addressed.

4        Q.   I think we're deviating from the premise of my

5    question.

6        A.   I'm sorry.

7        Q.   And I want to go back.  We were talking about

8    the second full paragraph on page 10 of Exhibit 16 --

9        A.   Yes, sir.

10       Q.   -- your interrogatory responses.  And what I

11   haven't heard with respect to that or with respect to

12   the $2,500 payment to Ms. Washington is what you know

13   BNC did wrong.  And I would like you to take out of your

14   mind Ms. Washington.

15       A.   Okay.

16       Q.   Take out Ms. Gordon.

17       A.   Okay.

18       Q.   What did BNC do wrong here?

19       A.   Let me finish going through this.

20       Q.   Do we agree that the second full paragraph of

21   page 10 of your interrogatory responses does not address

22   something that you know BNC did?

23       A.   I can't say that, and may I clarify why?

24       Q.   Yeah.

25       A.   Because I don't know -- and again, if the bank

Page 134

1   had an agent at the closing -- whether that agent at the

2   closing has an obligation to go through this and

3   double-check it and make sure it's right also.  So

4   that's my reservation.

5       Q.   I understand that, but subject to that

6   reservation, you don't know about anything listed in the

7   second paragraph of page 10 of your interrogatory

8   responses that BNC did?

9       A.   I can't say that for sure, no.

10      Q.   Okay.

11      A.   All right.

12      Q.   Please proceed.

13      A.   All right.

14      Q.   Again, with the qualifier as facts that you

15  know that BNC did.

16      A.   Yeah.

17      Q.   Okay.

18      A.   I believe that -- and again, I'm sorry if I

19  deviate, but I believe that under the circumstances BNC

20  should have at the very least notified me of the fraud

21  alert.  I don't believe that they contacted me.  Yeah, I

22  don't believe that.  And --

23      Q.   But let me back up.

24      A.   Okay.

25      Q.   You agree that nobody extended credit to you

Page 140

1    question and we can all rely on that the way that

2    lawyers who deal in these types of matters do.

3         A.    I understand that.  I understand that.  You

4    know what?  After reviewing these documentation, there's

5    nothing else that I can think of.  And again, you know,

6    I will -- you know, as I go through other things that

7    I'm trying to get to you guys, I will look through those

8    and see, but there's nothing that I can think of.

9         Q.    Thank you.  I would like to ask you about the

10   recordation issue that Mr. Aker raised on the phone.

11        A.    Sure.

12        Q.    It is your understanding that the loan was not

13   recorded at the time or shortly after the closing.

14   Right?

15        A.    Yes.

16        Q.    And is it your claim that that is something

17   that BNC did wrong?

18        A.    Either BNC or an agent acting on BNC's behalf

19   did wrong.

20        Q.    And how much money did that cost you?

21        A.    Roughly about $5,000.  I gave you guys the

22   disbursal checks for that.

23        Q.    Okay.  Now thinking back on all of the things

24   that you can think of now, having had access to the

25   documents and the time to do so that you know BNC did

Page 171

1                          CHANGES AND SIGNATURE

2    PAGE       LINE     CHANGE                    REASON

3    _____

4    _____

5    _____

6    _____

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____

25   _____

Page 172

```
 1          I, FRANK TOLIN, have read the foregoing
    deposition and hereby affix my signature that same is
 2  true and correct, except as noted above.

 3

 4
                    _____
 5                           FRANK TOLIN

 6

 7

 8  THE STATE OF _____)
    COUNTY OF _____)
 9
                Before me, _____, on
10  this day personally appeared FRANK TOLIN, known to me
    (or proved to me under oath or through
11  _____) (description of identity
    card or other document)) to be the person whose name is
12  subscribed to the foregoing instrument and acknowledged
    to me that they executed the same for the purposes and
13  consideration therein expressed.
                Given under my hand and seal of office this
14  _____ day of _____, _____.

15

16
                    _____
17                  NOTARY PUBLIC IN AND FOR
                    THE STATE OF _____
18                  COMMISSION EXPIRES: _____

19

20

21

22

23

24

25
```

Page 173

1              UNITED STATES BANKRUPTCY COURT
               SOUTHERN DISTRICT OF NEW YORK
2
     In Re:                      )
3                                ) Chapter 11
     LEHMAN BROTHERS HOLDINGS     ) Case No. 08-13555 (JMP)
4    INC., et al.,               ) (Jointly Administered)
                                 )
5                   Debtors.      )

6

7

8              REPORTER'S CERTIFICATION

9              ORAL DEPOSITION OF

10                  FRANK TOLIN

11               DECEMBER 5, 2013

12

13        I, Julie C. Brandt, Certified Shorthand Reporter in

14   and for the State of Texas, hereby certify to the

15   following:

16        That the witness, FRANK TOLIN, was duly sworn by

17   the officer and that the transcript of the oral

18   deposition is a true record of the testimony given by

19   the witness;

20        That the deposition transcript was submitted on

21   December 17, 2013 to the witness or to the attorney

22   for the witness for examination, signature and return to

23   me by January 4, 2013;

24        I further certify that I am neither counsel for,

25   related to, nor employed by any of the parties or

Page 174

1    attorneys in the action in which this proceeding was

2    taken, and further that I am not financially or

3    otherwise interested in the outcome of the action.

4    Certified to by me December 17th, 2013.

5

6

7

8

9

10

11    _____

12    Julie C. Brandt, CSR, RMR, CRR
      Texas CSR No. 4018
13    Expiration Date:  12/31/14

14

15

16

17

18

19

20

21

22

23

24

25