WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
David J. Lender
Peter D. Isakoff
Kevin F. Meade
Arielle Gordon

Attorneys for Lehman Brothers Holdings Inc.
and Certain of Its Affiliates

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------x
| | | |
|---|---|---|
| **In re:** | : | **Chapter 11 Case No.** |
| | : | |
| **LEHMAN BROTHERS HOLDINGS INC.,** *et al.,* | : | **08-13555 (SCC)** |
| | : | |
| Debtors. | : | **(Jointly Administered)** |

------------------------------------------------------------------x

**MEMORANDUM OF LAW IN OPPOSITION TO CANARY WHARF'S MOTION FOR
PARTIAL SUMMARY JUDGMENT AND IN SUPPORT OF LEHMAN BROTHERS
<u>HOLDINGS INC.'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT</u>**

# TABLE OF CONTENTS

**Page**

I. PRELIMINARY STATEMENT ...................................................................................1

II. COUNTER-STATEMENT OF UNDISPUTED FACTS .........................................6

    A.     CANARY WHARF, LBL AND LBHI ENTER INTO THE LEASE ...................6

    B.     LBL VACATES HQ2 AND CANARY WHARF BEGINS
           DISCUSSIONS WITH J.P.MORGAN ..................................................................8

    C.     CANARY WHARF'S FAILED NEGOTIATIONS WITH LBL AND
           LBHI .........................................................................................................................9

    D.     CANARY WHARF'S ATTEMPT TO CREATE A CLAIM UNDER
           PARAGRAPH 7(A) FOR POST-TERMINATION RENT ...................................12

    E.     CANARY WHARF FORFEITS THE LBL LEASE .............................................13

III. ARGUMENT .............................................................................................................15

    A.     CANARY WHARF HAS NO RIGHT TO POST-FORFEITURE
           AMOUNTS UNDER PARAGRAPH 1, AS A MATTER OF LAW. ...................16

           1.     Centuries of English Law Preclude the Claims for Post-Forfeiture
                    Amounts.....................................................................................................16

           2.     The Language of Paragraph 1 Precludes the Recovery of Post-
                    Forfeiture Amounts from LBHI, Regardless of Whether the Surety
                    Agreement is a Guarantee or an Indemnity. ...............................................22

           3.     Because the Surety Agreement is a Guarantee, LBHI's Obligation
                    are Co-Extensive with LBL's Except as Expressly Provided
                    Otherwise by Contract (as in Paragraph 7), and Therefore LBHI's
                    Obligations under Paragraph 1 Ceased at Forfeiture. ................................23

                a.     Paragraph 1 is a guarantee, and not an indemnity. ........................25

                b.     The Surety Agreement considered as a whole conclusively
                     confirms that it is a guarantee. ........................................................32

           4.     Canary Wharf's Reliance on Irrelevant, Inadmissible and
                    Contested Parol Evidence is Misplaced.....................................................35

           5.     If the Court Concludes that the Surety Agreement is Ambiguous as
                    to whether it a Guarantee or an Indemnity, or as to whether the
                    Scope of LBHI's Obligations Includes Post-Forfeiture Amounts,
                    That Ambiguity Should Be Resolved Against Canary Wharf. ..................37

           6.     Canary Wharf's Own Conduct Underscores Its Lack of Belief in
                    Its Current Paragraph 1 Argument...........................................................38

    B.     THE FORFEITURE AGREEMENT VITIATED LBHI'S GUARANTEE
           OBLIGATIONS, EVEN FOR PRE-FORFEITURE AMOUNTS.......................39

i

     C.     IF THERE ARE ANY DOUBTS ABOUT THE MERITS OF LBHI'S
ARGUMENTS, THE COURT SHOULD HOLD A HEARING UNDER
FEDERAL RULE OF CIVIL PROCEDURE 44.1................................................41

IV. CONCLUSION..........................................................................................................................42

# TABLE OF AUTHORITIES

**Page(s)**

**U.S. Cases**

*Adickes v. S.H. Kress & Co.*,
    398 U.S. 144 (1970)................................................................16

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)................................................................15

*Costello v. City of Burlington*,
    632 F.3d 41 (2d Cir. 2011)......................................................15

*Curley v. AMR Corp.*,
    153 F.3d 5 (2d Cir. 1998) .......................................................41

*Galu v. Swissair: Swiss Air Transp. Co.*,
    734 F. Supp. 129 (S.D.N.Y. 1990)..........................................41

*Gilstrap v. Radianz Ltd.*,
    443 F. Supp. 2d 474 (S.D.N.Y. 2006), *aff'd*, 233 Fed. Appx. 83 (2d Cir. 2007)....................21

*Hurwitz v. Sher*,
    982 F.2d 778 (2d Cir. 1992), *cert. denied*, 508 U.S. 912 (1993)............................................16

*Licci v. Am. Express Bank Ltd.*,
    704 F. Supp. 2d 403 (S.D.N.Y. 2010), *vacated in part sub nom. Lucci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161 (2d Cir. 2013)................21

*Mackley v. Sullivan & Liapakis, P.C.*,
    No. 98 CIV. 8460(SWK), 2001 WL 1658188 (S.D.N.Y. 2007) ............................................41

**U.K. Cases**

*Active Estates Ltd v. Parness*
    [2002] 3 EGRL 13  .......................................................19, 20

*Ass'n of British Travel Agents Ltd v. British Airways plc*
    [2000] 2 All ER (Comm) 204 ................................................38

*Birch v. Wright*
    (1786) 1 Term Rep 378 ......................................................1, 17

*Carey Value Added SL v. Grupo Urvasco SA*
    [2011] 2 All ER (Comm) 148 ................................................31

Dwr Cymru Cynfyngedig (Welsh Water) v. Corus UK Ltd
    [2007] EWCA Civ 285 .........................................................................................24

Franklin v. Carter
    (1845) 1 CB 750...................................................................................................17

Gray v. Owen
    [1910] 1 KB 622 .................................................................................................21

Holme v. Brunskill
    [1878] 3 QBD 495 ...............................................................................................39

Jones v. Carter
    (1846) 15 M&W 718 ...........................................................................................17

Liberty Mut. v. HSBC Bank plc
    [2002] EWCA Civ 691 ........................................................................................38

Marshall v. Mackintosh
    (1898) 78 LT 750.................................................................................................21

Marubeni Hong Kong v. Gov't of Mongolia
    [2005] 1 WLR 2497 .............................................................................................28

MS Fashions v. BCCI
    [1993] Ch 425 ......................................................................................................31

In re Park Air Services Plc
    [2000] 2 A.C. 172 ...............................................................................1, 17, 18, 19

Rainey v. Kearney
    [1990] N.I. 18......................................................................................2, 19, 20, 21

Reichman v. Beveridge
    [2006] EWCA Civ 1659 ...............................................................................1, 17, 20

Singapore Airlines Ltd v. Buck Consultants Ltd
    [2011] EWCA Civ 1542 .......................................................................................24

Stadium Finance Co. v. Helm
    [1965] 109 SJ 471 (CA).......................................................................................28

In re Strand Music Hall Ltd
    (1865) 35 Beav 153..............................................................................................24

Vossloh Aktiengesellschaft v. Alpha Trains (UK) Ltd
    [2010] EWHC 2443 ................................................................................... passim

iv

*Walls v. Atcheson*
(1826) 11 Moore CP and Exch. Reports 379 ...................................................................1, 17

*William v. Lewis*
[1915] 3 KB 493 ...................................................................21

**U.S. Statutes & Rules**

11 U.S.C. § 362...................................................................11, 38

11 U.S.C. § 365(a) ...................................................................38

Fed. R. Bankr. P. 6006(a) ...................................................................38

Fed. R. Bankr. P. 7056...................................................................15

Fed. R. Bankr. P. 9014...................................................................15, 38

Fed. R. Bankr. P. 9017...................................................................16, 41

Fed. R. Civ. P. 44.1 ...................................................................16, 41

Fed. R. Civ. P. 56(a) ...................................................................15

**U.K. Statutes**

Section 178(6) of the Insolvency Act 1986 ...................................................................17

**Other Authorities**

ALDRIDGE, LEASEHOLD LAW ...................................................................27, 33

ENCYCLOPAEDIA OF FORMS AND PRECEDENTS (5th ed. 2009), Vol. 22(2)A...................................27

HILL AND REDMOND, LAW OF LANDLORD AND TENANT ...................................................................18, 27

O'DONOVAN & PHILLIPS, THE MODERN CONTRACT OF GUARANTEE (2d ed. 2010).............. *passim*

WOODFALL, LANDLORD AND TENANT...................................................................17, 18

Lehman Brothers Holdings Inc. ("LBHI"), Plan Administrator under the Modified Third

Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors,

hereby opposes The Canary Wharf Claimants' Motion for Summary Judgment on Liability and

cross-moves for partial summary judgment, *i.e.*, that LBHI has no liability under Paragraph 1 of

the Surety Agreement (defined below), as a matter of law.

## I.    PRELIMINARY STATEMENT

In March 2005, Lehman Brothers Limited ("LBL") entered a thirty-year lease (the

"Lease"), commencing July 3, 2003, with subsidiaries of Canary Wharf Group plc ("Canary

Wharf"),[1] a London-based landlord, for approximately one million square feet of office space at

25 Bank Street in London ("HQ2").  Schedule 4 of the Lease is a surety agreement between

LBHI and Canary Wharf (the "Surety Agreement").[2]  The Lease and the Surety Agreement are

governed by English law.  In 2010, after LBL entered administration proceedings in England,

Canary Wharf terminated, or "forfeited," its lease with LBL in order to lease the building to

J.P.Morgan Chase Bank, National Association ("J.P.Morgan").

Under a centuries-old principle of English law, forfeiture of the Lease terminated all of

LBL's obligations under the Lease, including to pay rent and other amounts.  *See, e.g.*, *In re*

*Park Air Services Plc* [2000] 2 A.C. 172, 185 ¶ B (HL); *Reichman v. Beveridge* [2006] EWCA

*Civ 1659*; *Walls v. Atcheson* (1826) 11 Moore CP and Exch. Reports 379; *Birch v. Wright* (1786)

---

[1] These subsidiaries included Heron Quays (HQ2) T1 Limited and Heron Quays (HQ2) T2 Limited's (collectively, the "Landlord") and Canary Wharf Management Limited's (the "Management Company"). *See* LBHI's Response to Canary Wharf's Statement of Undisputed Material Facts and Statement of Undisputed Material Facts Pursuant to Local Rule 7056-1, ¶ 3 (hereinafter "LBHI's SUF").

[2] There is no relevant negotiating history concerning the Surety Agreement.  Neither Sir George Iacobescu, Canary Wharf's CEO, nor Frank Bartolotta, a former Lehman employee and personal friend of Mr. Iacobescu (a list of key players is attached hereto as an addendum), has personal knowledge about the parties' negotiations, communications or *actual* discussions about the Surety Agreement. *See infra* pp. 8, 36–37.  Mr. Bartolotta provided his affidavit while negotiating a deal on behalf of Morgan Stanley involving Canary Wharf. *See infra* p. 37 n.38.

1 Term Rep 378.[3]  Canary Wharf was well aware of this principle.  *See infra* n. 11.  Indeed,

LBL's counsel, a leading property litigator, specifically told Canary Wharf at the time that

following forfeiture, "a line is drawn under the amount of rent accruing.  And . . . your clients

would have no damages claim for loss of future rent." *See* Ex. 18.[4]  Canary Wharf nonetheless

argues in this case that both LBL and LBHI continued to be liable for hundreds of millions of

dollars for post-forfeiture rent (the vast majority of the claims at issue here) not based on English

law, but on a decision from Northern Ireland, *Rainey v. Kearney* [1990] N.I. 18.  But *Rainey* is

contrary to centuries of English law, is not binding, and has never been cited by an English court.

By asking this Court to follow *Rainey*, Canary Wharf is effectively asking this Court to presume

a change in English law that neither Parliament nor any English court has seen fit to make.

    Canary Wharf further argues that even if *LBL* cannot be held liable for post-forfeiture

amounts, LBHI can still be held liable because Paragraph 1 of the Surety Agreement allegedly

contains an indemnity contract.  But regardless of whether Paragraph 1 is a guarantee, as LBHI

argues, or an indemnity, as Canary Wharf argues, either way the express language unequivocally

limits the scope of LBHI's liability to damages arising from LBL's defaults, and there could be

no such defaults after forfeiture.  Specifically, the portion of Paragraph 1 upon which Canary

Wharf relies provides:

> . . . .the Surety shall indemnify and keep indemnified the Landlord and the
> Management Company against all claims demands losses damages liability costs
> fees and expenses whatsoever sustained by the Landlord or the Management
> Company by reason of or arising directly or indirectly out of any default by the
> Tenant in the performance and observance of any of its obligations or the
> payment of any rents and other sums[.]

---

[3] All English law authorities cited herein are attached in alphabetical order as Exhibits 53 to 85 to the
Declaration of Kevin F. Meade, dated May 22, 2014, ("Meade Decl.") being filed herewith.

[4] References to "Ex. __" are to exhibits attached to the Meade Decl.

Since LBL had no "obligation" under English law to pay rent (or any other amount) following forfeiture, it could not have defaulted on any such obligation, and therefore there is no damage from any such default for LBHI to "indemnify."

In any event, Canary Wharf's construction of the Surety Agreement as an indemnity is incorrect; it is a guarantee.  In construing surety agreements, English courts look to the substance of the obligation as expressed in the entire document, and not to conclusory labels.  Contrary to Canary Wharf's assertions, the use of the words "indemnify" and "primary obligation" in Paragraph 1 does not have particular significance or automatically mean that the Surety Agreement is an indemnity.  Instead, those words are commonly used in surety agreements construed by English courts to be guarantees.  Indeed, the Surety Agreement itself shows why labels are not determinative given the use of the term "guarantee" elsewhere in the Surety Agreement.  *See, e.g.,* Ex. 1 at ¶¶ 8, 10.  Moreover, to the extent labels matter at all, in publicly filed bond prospectuses, Canary Wharf, through a subsidiary, identified LBHI as a "Guarantor," stating that LBHI "guarantees [LBL's] obligations."  *See infra* p. 27.

Both Paragraph 1 and the Surety Agreement as a whole make clear that the Surety Agreement is a guarantee rather than an indemnity.[5]  Paragraph 1 expressly provides that LBHI shall perform "until the Tenant shall cease to be bound," and also that its obligations are to make good on any default by LBL.  LBHI's liability is thus directly tied to LBL's performance and defaults, the hallmark of a guarantee under English law.

---

[5] Under English law, guarantees and indemnities are two forms of suretyship which differ in two respects relevant to this motion: (1) a guarantor's liability is presumptively co-extensive with the primary obligor's liability (*i.e.*, because LBL is not liable for post-forfeiture amounts under English law, neither is LBHI) and (2) a guarantee, but not an indemnity, is vitiated by a material variation in the underlying obligation to which the guarantor did not consent (which is relevant both to pre- and post-forfeiture amounts).

Other provisions contained in the Surety Agreement would be entirely superfluous if the Surety Agreement were an indemnity agreement.  For example, Paragraph 6 contains several provisions that have application only if the Surety Agreement is a guarantee, as even Canary Wharf's expert, Laurence Rabinowitz, concedes.

Similarly, Paragraph 7, which provides Canary Wharf with specific remedies against LBHI if the Lease is forfeited, including allowing Canary Wharf to put a lease to LBHI and require LBHI to pay the rent going forward, would again be surplusage if the Surety Agreement were an indemnity and LBHI were already obligated to pay post-forfeiture rent.  Mr. Rabinowitz's only explanation for the use of the term "guarantee" and the inclusion of provisions in the Surety Agreement that are wholly at odds with its being an indemnity is that these are either drafting errors or for "the avoidance of doubt."  In contrast, LBHI's expert, Richard Millett -- a recognized expert in the English law of guarantees (having co-authored a leading treatise on the subject) -- provides a fully-harmonized analysis of the entire Surety Agreement and concludes that it is a guarantee in both form and substance.[6]

Canary Wharf's own conduct further demonstrates that it knew it had no right to post-forfeiture rent from LBHI under Paragraph 1, and that its exclusive remedies, in the event of forfeiture, were under Paragraph 7.  Specifically, in 2010, Canary Wharf was negotiating a long-term lease of HQ2 to J.P. Morgan.  If Paragraph 1 of the Surety Agreement truly were an indemnity embracing lost post-forfeiture rent, Canary Wharf would have simply proceeded to

---

[6] To the extent there is ambiguity as to whether the Surety Agreement, considered as a whole, is a guarantee or an indemnity this Court would be required, under the *contra proferentem* principle, to construe the Surety Agreement against Canary Wharf.  *See* Declaration of Richard Millett QC in Support of Rejection of Proofs of Claim of Canary Wharf Management Limited *et al.*, dated January 10, 2013, (Ex. 51) at ¶ 19(i) (hereinafter "Millett Decl."); Further Declaration of Richard Millett QC in Support of Objection to Proofs of Claim of Canary Wharf Management Limited *et al.*, dated July 15, 2013, (Ex. 52) at ¶¶ 7–12  (hereinafter "Millett Supp. Decl."); Rabinowitz Dep. (Ex. 47) 31:4–16, 35:11–14, September 4, 2013 (hereinafter "Rabinowitz Dep."); pp. 37–38, *infra*.

4

forfeit the Lease, sign a lease with J.P. Morgan and enforce its supposed indemnity under Paragraph 1 against LBHI for any resulting rent shortfall.  Instead, however, Canary Wharf embarked on a contorted campaign to set up an anticipatory repudiation claim for lost post-forfeiture rent under Paragraph 7 by repeatedly seeking LBHI's confirmation that it was not interested in taking a new lease to HQ2, despite Canary Wharf's having already determined *not* to serve a notice on LBHI under Paragraph 7(a) because of J.P.Morgan's explicit instructions not to do so.  But why would Canary Wharf go through so much effort if it had the kind of broad indemnity protection under Paragraph 1 it now claims and LBHI were already on the hook for any rent shortfall?  No reasonable party that believed it had such broad indemnity rights embracing post-forfeiture rent from LBHI under Paragraph 1 of the Surety Agreement would have gone to the lengths that Canary Wharf did in trying to manufacture an entirely redundant (albeit legally ineffective) anticipatory repudiation claim under Paragraph 7(a).

Finally, a relatively small portion of Canary Wharf's claims is for pre-forfeiture rent and other amounts.  While LBHI would normally be liable for such amounts not paid by LBL, it is not so liable here.  The forfeiture agreement between Canary Wharf and LBL, to which LBHI did not consent, materially modified LBL's obligations to LBHI's prejudice by releasing administration priority treatment to pre-forfeiture amounts due that the LBL estate almost certainly would have paid in full.  This material modification vitiated LBHI's guarantee obligations, including its obligation to pay pre-forfeiture rent and other amounts under English law.

Accordingly, as more fully set out below, Canary Wharf's motion for partial summary judgment should be denied, and LBHI's cross-motion should be granted.

## II.    COUNTER-STATEMENT OF UNDISPUTED FACTS

Canary Wharf's statement of undisputed facts omits numerous events and provides virtually none of the context in which this dispute arose.  Canary Wharf's brief also references several statements of "fact" not found in its statement of undisputed facts, and that are also misleading.  The following statement of undisputed facts provides a proper context both for Canary Wharf's motion and for LBHI's cross-motion.

### A.    CANARY WHARF, LBL AND LBHI ENTER INTO THE LEASE

Canary Wharf is the parent company for a group of entities that developed and manage a business complex in London.  *See* LBHI's SUF ¶¶ 1, 3.  One of its buildings, HQ2, located at 25 Bank Street, is a thirty-floor office tower with more than one million square feet.  *See* LBHI's SUF ¶ 2.[7]  On March 16, 2005, LBL entered into the Lease with the Landlord, the Management Company, and Canary Wharf Holdings Limited ("CWHL").  *See* LBHI's SUF ¶ 5.  The Lease was governed by English law.  *See* LBHI's SUF ¶ 6.  Pursuant to the Surety Agreement, which Canary Wharf drafted, LBHI served as LBL's "surety" under the Lease.  *See* LBHI's SUF ¶¶ 4, 7–8.  Paragraph 1 of the Surety Agreement provides in relevant part:

> The Surety hereby covenants with the Landlord and as a separate covenant with the Management Company as a primary obligation that the Tenant or the Surety shall at all times until the Tenant shall cease to be bound by the Tenant's covenants in the Lease during the Term duly perform and observe all the covenants on the part of the Tenant contained in this Lease including the payment of the rents hereby reserved and all other sums payable under this Lease in the manner and at the times herein specified and the Surety shall indemnify and keep indemnified the Landlord and the Management Company against all claims demands losses damages liability costs fees and expenses whatsoever sustained by the Landlord or the Management Company by reason of or arising directly or

---

[7] Prior to HQ2's construction, Canary Wharf, through a subsidiary, issued a series of bonds that were to be repaid out of rent from securitized leases, which later included the Lease.  Although Canary Wharf references the securitization, *see* Canary Wharf's Memorandum of Law, filed March 14, 2014, pp. 6, 19 (ECF No. 43539) (hereinafter "Canary Wharf's Br."), it is not relevant to the current dispute.  *See infra* p. 36.

6

indirectly out of any default by the Tenant in the performance and observance of
any of its obligations or the payment of any rents and other sums[.]

LBHI's SUF ¶ 9.

Paragraph 7 of the Surety Agreement sets forth Canary Wharf's remedies in the event of

forfeiture --

(a) The Surety hereby further covenants with the Landlord and the Management
Company that:- . . .

(ii) if this Lease shall be forfeited . . .

THEN the Surety shall if the Landlord by notice in writing given to the Surety
within one hundred and eighty (180) days after such disclaimer or other event so
requires accept from and execute and deliver to the Landlord a counterpart of a
new lease of [HQ2] . . . for a term commencing on the date of the disclaimer or
other event and continuing for the residue then remaining unexpired of the Term
such new lease to be at the cost of the Surety and to be at the same rents and
subject to the same covenants conditions and provisions as are contained in this
Lease[.]

(b) If the Landlord shall not require the Surety to take a new lease the Surety shall
nevertheless upon demand pay to the Landlord a sum equal to the Rent and other
sums that would have been payable under this Lease but for the disclaimer or
other event in respect of the period from and including the date of such disclaimer
or other event until the expiration of one hundred and eighty (180) days therefrom
or until the Landlord shall have granted a lease of [HQ2] to a third party
(whichever shall first occur)[.]

LBHI's SUF ¶ 10.  Paragraph 7 thus provided Canary Wharf with two potential remedies against

LBHI if Canary Wharf forfeited the Lease.  It could either (a) provide LBHI with written notice,

requiring LBHI to take on a new lease for HQ2 on the same terms as and for the remaining term

of the forfeited Lease, or (b) demand payment from LBHI of a sum equal to rent and other

expenses between the date of forfeiture and either 180 days or re-letting to a third party,

whichever occurred first.  Canary Wharf did neither.  *See* LBHI's SUF ¶¶ 69, 73, 78.

There is no evidence as to the negotiating history of the Surety Agreement, other than

that it was drafted by Canary Wharf and that LBHI, although initially resistant to taking on any

suretyship obligations, ultimately agreed to include the Surety Agreement in the Lease. *See*

LBHI's SUF ¶ 12. Canary Wharf's references to the deposition testimony of Mr. Iacobescu to

the effect that Canary Wharf "always ask[s] for an indemnity," "insisted 'from day one' on an

obligation from Lehman to pay 'come hell or high water,'" and "would not have entered into any

. . . lease agreement unless [it] had the parent company indemnity . . .," Canary Wharf's Br. p. 5,

is both inadmissible under English law, *see* p. 35, *infra*, and irrelevant in any event. Mr.

Iacobescu was not present for any of the negotiations over the Surety Agreement, and does not

know what was communicated during those negotiations. *See* LBHI's SUF ¶ 11. Similarly

inadmissible is the recently-filed affidavit and testimony of Frank Bartolotta. Like Mr.

Iacobescu, Mr. Bartolotta disclaimed any involvement in the negotiation of the Surety

Agreement; did not have any understanding of the distinction between guarantees and

indemnities under English law; and knew only that Canary Wharf would not agree to the Lease

unless LBHI accepted the Surety Agreement as ultimately drafted. *See* LBHI's SUF ¶ 13.

## B.    LBL VACATES HQ2 AND CANARY WHARF BEGINS DISCUSSIONS WITH J.P.MORGAN

On September 15, 2008, LBHI and LBL filed bankruptcy and insolvency proceedings,

respectively.[8] LBHI's SUF ¶ 14. LBL initially remained in HQ2, but, after informing Canary

Wharf, vacated in March 2010. *See* LBHI's SUF ¶ 17. Certain subtenants remained in HQ2

through December 2010. *See* LBHI's SUF ¶ 18. Faced with the prospect of a nearly vacant

building, Canary Wharf, without LBHI's knowledge, began discussions with J.P.Morgan in early

2010 concerning HQ2, and signed a detailed Memorandum of Understanding ("MOU") on

---

[8] Approximately one year later, on September 17, 2009, the Management Company and the Landlord
filed proofs of claim numbers 14824 and 14826 against LBHI in this Court, claiming the amounts of
$195,550,000 and $4,280,970,000, asserting that LBHI was liable under "Schedule 4 of the Lease
Agreement (the '*Guarantee*')" pursuant to which "the Debtor, among other things, *guaranteed* all of the
Tenant's obligations arising under the Lease Agreement." *See* LBHI's SUF ¶¶ 15–16.

8

August 13, 2010.  *See* LBHI's SUF ¶¶ 19–20.  The MOU provided that J.P. Morgan would take a

999-year lease of HQ2 in exchange for £██████████████████████████████

████████████████.  *See* LBHI's SUF ¶¶ 20–21.

### C.    CANARY WHARF'S FAILED NEGOTIATIONS WITH LBL AND LBHI

At the same time it was negotiating with J.P.Morgan, Canary Wharf was also attempting

to negotiate agreements with both LBL and LBHI.  As of September 2010, Canary Wharf and

LBL (which was still in legal possession of HQ2) were discussing a consensual surrender of the

building, a form of lease termination.  *See* LBHI's SUF ¶ 22.  Canary Wharf insisted that any

surrender had to be structured so as to preserve its claims against LBHI.  *See* LBHI's SUF ¶ 23.

LBL's UK attorney, Katie Bradford,[9] however, explained at the time:

> [O]nce the lease is ended by surrender, in law[,] claims under the lease in respect
> of future rent, must end- whether against the principal ( the tenant) or its
> guarantor.  So if a surrender is agreed, there is no claim over to be pursued or
> saved.

*See* LBHI's SUF ¶ 24.  Canary Wharf and LBL, nevertheless, reached an agreement in principle,

under which LBL would surrender the Lease and pay £1.5 million ($2.4 million), and in return

Canary Wharf would release all other claims against LBL.  *See* LBHI's SUF ¶ 25.

Because Canary Wharf was concerned about losing its claims against LBHI upon a

surrender, Canary Wharf sought to achieve a Court-approved settlement with LBHI *before* any

actual surrender took place.  *See* LBHI's SUF ¶ 26.  Although in late October 2010, Canary

Wharf and LBHI reached a tentative agreement on the amount of a settlement, they never

reached agreement on other essential terms and conditions.  *See* LBHI's SUF ¶ 27.  One of these

conditions was ██████████████████████████████████████████████

---

[9] Ms. Bradford is head of Linklaters LLP's Property Litigation Unit.  *See*
http://www.linklaters.com/WhoWeAre/OurPeople/Pages/KatieBradford.

██████████████████████████████████████████████████████████

████.[10]  *See* LBHI's SUF ¶ 28.  But Canary Wharf could not do that, having already agreed in principle that it would have *no* claim against LBL.  *See supra* p. 9.

Unable to reach agreement with LBHI under these circumstances, Canary Wharf tried to re-cut its agreement in principle with LBL.  On November 12, 2010, Canary Wharf sent LBL a revised draft surrender agreement that provided for an acknowledged claim against LBL in the amount of £262.5 million (approximately equal to the proposed agreement that was under discussion with LBHI).  *See* LBHI's SUF ¶¶ 34–35.  Then, exactly *one minute* after Canary Wharf transmitted this re-cut draft to LBL, Canary Wharf e-mailed LBHI that the draft agreement with LBL "provides for acknowledgement/preservation of our claim in the sum of £262.5m."  *See* LBHI's SUF ¶¶ 38–39.  Canary Wharf's communication to LBHI was misleading because it knew that LBL was all but certain to reject the re-cut deal, as occurred on November 26, 2010.  *See* LBHI's SUF ¶¶ 36–37, 42; *see also id.* at ¶ 47.  As LBL's counsel, Ms. Bradford, then explained to Canary Wharf, "my clients struggle to see how they can acknowledge claims which are currently in the region of c.£35 million (representing accrued rent and estate charges) at a substantially higher sum."  *See* LBHI's SUF ¶ 43.  While LBL recognized that Canary Wharf was entitled to claim rent as and when it accrued while the Lease remained in effect, "it will take some years before that sum exceeds £200 million."  *See* LBHI's SUF ¶ 44.  She further added:

> . . . your clients can take steps to bring the lease to an end, either consensually through a surrender, or through forfeiture.  In either case, *a line is drawn under the amount of rent accruing.*  And in either case, *your clients would have no damages claim for loss of future rent.*

---

[10] ██████████████████████████████████████████████████

██████████████.  *See* LBHI's SUF ¶ 29.

LBHI's SUF ¶ 45 (emphasis added).[11]

Canary Wharf thus found itself in a quandary of its own making: (i) it could not reach an agreement with LBHI because it could not represent that its claims against LBL had not been "allowed, recognized or acknowledged . . . in an amount less than" the amount tentatively agreed with LBHI; (ii) it could not agree with LBL because LBL would not re-cut the deal; and (iii) it could not proceed with the J.P.Morgan transaction until it obtained possession of HQ2, but could not accept the Lease surrender without losing its claims for lost future rent. LBL's counsel, Ms. Bradford, however, came forward with a suggestion she thought might help Canary Wharf resolve this impasse. Canary Wharf could (1) forfeit the lease, (2) serve LBHI with written notice under Paragraph 7(a) of the Surety Agreement requiring it to take a replacement lease, and (3) bring a claim against LBHI for breach if it refused to perform. *See* LBHI's SUF ¶ 46. But Canary Wharf chose not to pursue this course of action because J.P.Morgan specifically told Canary Wharf that it would not complete the transaction if Canary Wharf served a Paragraph 7(a) notice. *See infra* pp. 12–13; LBHI's SUF ¶¶ 60–66.[12] Instead, Canary Wharf attempted to have its cake and eat it too by manufacturing a claim against LBHI for anticipatorily repudiating an obligation to assume a new lease under Paragraph 7(a), in order to proceed with J.P.Morgan, its preferred new tenant. LBHI's SUF ¶¶ 30–33, 77.

---

[11] Here, Ms. Bradford was paraphrasing the settled principle of English law that once a lease terminates, there can be no liability for lost future rent, whether as damages or otherwise. *See supra* at 1-2; *infra* at pp. 16–19. Canary Wharf was well aware of this principle. *See* Ex. 3, at CW0032605.

[12] Canary Wharf's clear intent to abide by J.P.Morgan's insistence that there be no Paragraph 7(a) notice is underscored by the undisputed fact that it never even prepared either a draft Paragraph 7(a) notice or a substitute lease, much less any form of request for relief from the automatic stay (which would have been required for Canary Wharf to exercise its Paragraph 7(a) remedy). *See* 11 U.S.C. § 362; LBHI's SUF ¶¶ 74–76.

### D.    CANARY WHARF'S ATTEMPT TO CREATE A CLAIM UNDER PARAGRAPH 7(A) FOR POST-TERMINATION RENT

On November 24, 2010, LBHI learned through a press leak that Canary Wharf had been negotiating with J.P.Morgan and immediately asked for information to evaluate the deal's impact on LBHI's then-pending discussions with Canary Wharf.  *See* LBHI's SUF ¶¶ 40–41.  Canary Wharf, however, falsely told LBHI that *J.P.Morgan* would not permit it to provide any information about the deal unless LBHI first represented that it was not interested in taking a lease on HQ2.  *See* LBHI's SUF ¶ 57.  This condition made no sense to LBHI since, under the plain terms of the Surety Agreement, it had no right to demand a lease.  *See* LBHI's SUF ¶ 55; *see also* Rabinowitz Dep. 36:4–37:18; Millett Supp. Decl. ¶¶ 13–17.[13]  Between November 30, 2010 and December 9, 2010, Canary Wharf pressed LBHI on no less than ten separate occasions to confirm that it did not want to take a lease.  *See* LBHI's SUF ¶¶ 48–54.  On December 9, solely in order to break the logjam so that it could obtain the due diligence information, LBHI's counsel advised Canary Wharf that LBHI "would not elect" to take a lease.  *See* LBHI's SUF ¶ 56.

Canary Wharf's assertion that *J.P.Morgan* had wanted confirmation that LBHI was uninterested in a lease was pure pretext.[14]  J.P.Morgan's only concern was that Canary Wharf not serve a Paragraph 7(a) notice on LBHI at all, such that no issue concerning LBHI's taking a new lease could arise.  *See* LBHI's SUF ¶ 59.  To that end, J.P.Morgan specifically told Canary Wharf -- contemporaneously with these communications with LBHI -- that if Canary Wharf

---

[13] On the contrary, the Surety Agreement's structure was that, following a forfeiture, Canary Wharf could *put* a lease to LBHI at *Canary Wharf's* option, but *LBHI* had no right to demand a lease under any circumstances.  *See* Millett Supp. Decl. ¶¶ 13–17; Rabinowitz Dep. 36:4–37:18.

[14] Indeed, J.P.Morgan's counsel, Jeremy Clay of Mayer Brown International LLP, testified at his deposition that he never even saw the e-mail "confirmation" that Canary Wharf had purportedly obtained from LBHI at J.P.Morgan's supposed request.  *See* LBHI's SUF ¶ 58.

12

exercised its Paragraph 7(a) option to demand that LBHI take a new lease, *J.P.Morgan would not proceed to "complete," i.e., close, the transaction.* *See* LBHI's SUF ¶¶ 60–62.  This prohibition was so important to J.P.Morgan that, as part of the final executed transaction documents,

███████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████.  *See* LBHI's SUF ¶¶ 67–69.

### E.    CANARY WHARF FORFEITS THE LBL LEASE

Meanwhile, in place of their September 30 agreement in principle, and without LBHI's consent, LBL and Canary Wharf signed a December 3, 2010 letter agreement (the "Forfeiture Agreement"), which provided that (1) the Landlord would forfeit the Lease by 11:59 p.m. on December 10, 2010, (2) Canary Wharf would release any administration expense claim for unpaid amounts up to the date of forfeiture, and (3) LBL would pay Canary Wharf £1.5 million (approximately $2.4 million).  *See* LBHI's SUF ¶ 79.

On Friday, December 10, 2010, the same day as the forfeiture, LBHI finally gained access to information about the proposed Canary Wharf/J.P.Morgan transaction.  *See* LBHI's SUF ¶¶ 80–81.  Although Canary Wharf provided a draft of its agreement with J.P.Morgan to LBHI shortly thereafter, that draft did not include any provisions ███████████████████

████████████████████████████████████████████.  *See* LBHI's SUF ¶ 82.  Canary Wharf never informed LBHI that it had agreed to the substance of such provisions that very day, or that their language was negotiated over the ensuring weekend and agreed upon in almost final form by Monday, December 13, 2010.  *See* LBHI's SUF ¶¶ 70–71.

On December 20, 2010, Canary Wharf and J.P.Morgan closed on their transaction.  *See* LBHI's SUF ¶ 72.  The executed principal agreement contained Sections 7.16.4 and 11.3.2,

██████████████████████████████████████████████████████████████████████

██████████████████████████████.  *See* LBHI's SUF ¶¶ 68–69.  Canary Wharf, however,

13

continued to hide these provisions from LBHI.  In January 2011, in response to LBHI's

continuing requests for due diligence information, Canary Wharf sent LBHI a *redacted* copy of

the final version of the J.P.Morgan agreement and other closing documents.  The accompanying

cover letter claimed that the redactions had been made "to prevent disclosure of privileged legal

advice in which the parties share a common legal interest."  *See* LBHI's SUF ¶¶ 83–84.  But in

all of the 152 documents provided in January 2011 to LBHI's counsel, the *only* redactions were

of Sections 7.16 and 11.3.2, ███████████████████████████████████

███, redactions that could not conceivably be justified by any legitimate assertion of

privilege.[15]  LBHI's SUF ¶ 85.  Canary Wharf was finally ordered to provide an unredacted copy

of the J.P.Morgan agreement to LBHI years later, only after Judge Peck overruled Canary

Wharf's effort to block all meaningful discovery.[16]  *See* LBHI's SUF ¶¶ 88–89.

## PROCEDURAL HISTORY

LBHI filed an Objection to the Landlord's and Management Company's guarantee claims

on August 15, 2012; Canary Wharf filed a Response on October 12; and LBHI filed a Reply on

January 10, 2013.  On August 22, 2013, LBHI demanded mediation, and, on January 9, 2014, the

parties mediated their dispute, though without any resolution.

Each party proffers the opinions of its English law experts, both Queen's Counsel

("QC"),[17] in support of its positions.[18]  LBHI's QC, Mr. Millett, is an experienced expert

---

[15] No Canary Wharf witness, including Andrew Dietderich of Sullivan & Cromwell, the author of the cover letter, took responsibility for making the redactions or tried to defend them.  *See* LBHI's SUF ¶ 86.

[16] Canary Wharf had urged the Court to adopt an exceedingly narrow scope for discovery, a scope that, if adopted, would have permitted Canary Wharf to keep covered up the true reason for its decision not to serve a Paragraph 7(a) notice.  *See* LBHI's SUF ¶ 87.

[17] QC is an honor granted to select senior barristers in the United Kingdom.

witness, a recognized authority on the English law of guarantees and is deeply experienced in

English landlord-tenant law.  *See* Millett Decl. ¶ 6; Millett Supp. Decl. ¶ 4; Millett Dep. (Ex. 50)

25:8–26:6, September 12, 2013 (hereinafter "Millett Dep.").  Mr. Millett co-authored LAW OF

GUARANTEES, a treatise on guarantees that is now in its sixth edition, which is considered a (if

not the) authoritative treatise on the subject.[19]  *See* Millett Decl. ¶ 6; Millett Supp. Decl. ¶ 4;

Millett Dep. 168:13–23.  Mr. Millett also received the Megarry Prize for his knowledge in

landlord-tenant law, having begun his law practice in that field.  *See* Millett Decl. ¶ 7; Millett

Dep. 25:8–23.  By contrast, Mr. Rabinowitz, while a very capable commercial litigator, has

never served as an expert witness and has no special expertise in the law of guarantees or

landlord-tenant law.  *See* Rabinowitz Dep. 7:22–8:10, 20:14–22:14.

## III.    ARGUMENT

Summary judgment is proper where "the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(a); Fed. R. Bankr. P. 7056, 9014(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23

(1986); *Costello v. City of Burlington*, 632 F.3d 41, 45 (2d Cir. 2011).  The moving party bears

the burden of demonstrating the absence of any genuine issue of material fact, and all inferences

to be drawn from the underlying facts must be viewed in the light most favorable to the non-

---

[18] Mr. Millett's first two opinions are attached as Exhibits 51 and 52.  Mr. Millett has prepared a short additional opinion to address a point first raised by Mr. Rabinowitz in his July 17, 2013 report.  *See* Declaration of Richard Millett QC in Support of LBHI's Opposition to Canary Wharf's Motion for Partial Summary Judgment and Cross-Motion for Partial Summary Judgment ("Millett Summary Judgment Decl.").

[19] English courts rely on Mr. Millett's treatise, *see, e.g., Vossloh Aktiengesellschaft v. Alpha Trains (UK) Ltd.* [2010] EWHC 2443, ¶ 19 (Ch), as does Canary Wharf's expert Mr. Rabinowitz.  *See* Declaration of Laurence Rabinowitz, filed Oct. 12, 2012, attached to the Declaration of Marc De Leeuw as Exhibit 21, at ¶ 37 n. 11 (ECF No. 43540-22) (hereinafter "Rabinowitz Decl.") (citing Mr. Millett's treatise as a "leading" treatise on guarantees in his opinion); Rabinowitz Dep. 43:6–20 (calling Mr. Millett's treatise "one of the key textbooks" on guarantees).

moving party.  *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *see also Hurwitz v. Sher*, 982 F.2d 778, 780 (2d Cir. 1992), *cert. denied*, 508 U.S. 912 (1993).

English law governs the Lease and the Surety Agreement.  *See* LBHI's SUF ¶ 6.  Under Fed. R. Civ. P. 44.1, made applicable by Fed. R. Bank. P. 9017, determinations of foreign law are treated as questions of law.  *See* Fed. R. Civ. P. 44.1; Fed. R. Bankr. P. 9017.

## A.   CANARY WHARF HAS NO RIGHT TO POST-FORFEITURE AMOUNTS UNDER PARAGRAPH 1, AS A MATTER OF LAW.

Canary Wharf is not entitled to post-forfeiture rent and other amounts under Paragraph 1 of the Surety Agreement, as a matter of law, for three basic reasons.  First, under bedrock principles of English law, when a lease is terminated by forfeiture, the tenant's and surety's obligations thereupon cease.  Second, regardless of whether the Surety Agreement is a guarantee or an indemnity, the scope of Paragraph 1 is limited by its express terms to losses "arising directly or indirectly out of any *default* by [LBL] *in the performance and observance of any of its obligations or the payment of any rents or other sums*."  And because LBL had no performance or payment obligations to Canary Wharf post-forfeiture, there could be no post-forfeiture defaults for "payment of rent or other sums" by LBL upon which LBHI would then have to make good.  Finally, in any event, the Surety Agreement is a guarantee, rather than an indemnity, and thus, by definition, LBHI's liability ceased with LBL's upon forfeiture, except as expressly provided for in, and subject to the limitations of, Paragraph 7.

### 1.   Centuries of English Law Preclude the Claims for Post-Forfeiture Amounts.

Canary Wharf's claim for damages for post-forfeiture amounts is contrary to long-settled English law, which holds that upon a tenant's default, a landlord may either (1) retain the lease and claim for rent and other amounts as they become due or (2) forfeit the lease and recover the premises.  Millett Decl.¶¶ 73–74, 80, 87.  A landlord, however, cannot have both.  He cannot

take back the premises and also recover lost future rent and other amounts.[20]  *See id.*  This

principle has been settled for over two hundred years, *see Jones v. Carter* (1846) 15 M&W 718;

*Franklin v. Carter* (1845) 1 CB 750; *Walls v. Atcheson* (1826) 11 Moore CP and Exch. Reports

379; *Birch v. Wright* (1786) 1 Term Rep 378, and was recently reaffirmed by the English Court

of Appeal in 2006 in *Reichman v. Beveridge* [2006] EWCA Civ 1659 and by the House of Lords

in 2000 in *In re Park Air Services Plc* [2000] 2 A.C. 172.

In *Reichman*, the landlord sued its tenant for nonpayment of rent and other amounts.

*Reichman*, at ¶ 1.  The tenant argued that it was not liable for the accrued rent because the

landlord should have forfeited the lease and mitigated its losses by re-letting the premises.  *Id.*

The court disagreed, holding that the landlord acted reasonably, because under English law, the

landlord could not forfeit the lease and also collect any post-forfeiture rent shortfall from the

tenant, and thus the only way it could recover rent from the tenant following the tenant's default

was to hold the tenant to the lease and collect rent as it came due.  *Id.* at ¶¶ 26 ("[A] landlord

cannot recover damages from the tenant for loss of rent after he has re-entered so as to bring the

lease to an end . . . There is no English authority which decides otherwise."); *id.* at 27–28, 42.[21]

---

[20]The one statutory exception to this rule does not apply here.  Section 178(6) of the Insolvency Act 1986
permits a landlord to sue for future rent when a liquidator of a tenant disclaims a lease.  This statute was
enacted because a landlord in that situation would otherwise have no remedy because he has lost the
ability to keep the lease in effect.  *See In re Park Air Services Plc* [2000] 2 A.C. 172, 183, ¶ G (HL).
Parliament has created no similar exception where, as here, a landlord voluntarily forfeits a lease.
Additionally, there was also no liquidation here.

[21] Canary Wharf is incorrect in arguing that *Reichman*'s discussion of whether post-termination rent is
available was dicta.  *See* Canary Wharf's Br. pp. 20–21.  As Mr. Millett explains, the subject in *Reichman*
that the court said was "not directly in issue" and that would be "wrong to decide . . . unnecessarily" was
whether leases can be repudiated under English law, an issue wholly separate from whether a landlord can
recover damages for lost post-termination rent.  *See Reichman*, at ¶ 27, 42; Millett Decl. ¶ 67 n.31; Millett
Dep. 277:8–293:8; *see also* WOODFALL, LANDLORD AND TENANT, quoted in the text at p. 18.

In *In re Park Air Services Plc*, at 185 ¶ B, decided in 2000, the House of Lords[22]

similarly restated this well-established rule:

> The landlord could forfeit the lease if it contained a proviso for entry in the event
> of liquidation, as any well-drawn lease did.  This would enable him to relet the
> property but he would lose the right to future rent under the lease, for he could not
> have both rent and possession, and he could not obtain compensation for the
> consequences of his own action in forfeiting the lease.

The two principal treatises[23] on English landlord and tenant law likewise restate this

principle as an unambiguous rule of English law.  *See* WOODFALL, LANDLORD AND TENANT, at ¶

17.315; HILL & REDMOND, LAW OF LANDLORD AND TENANT ¶ 1543.  As set forth in WOODFALL,

LANDLORD AND TENANT, in the wake of *Reichman*:

> In principle a repudiatory breach gives the party not in breach a choice whether or
> not to accept the repudiation. . . . [I]f a landlord accepts a repudiation by the
> tenant (assuming that a lease is capable of repudiation [*i.e.*, the issue left open in
> *Reichman*, *see* n. 21, *supra*]) he is not entitled to sue for damages representing the
> loss of future rent.  But the landlord need not accept a repudiatory breach by the
> tenant and if he does not he is entitled to sue for rent quarter by quarter as it falls
> due.

Thus, under all authoritative sources, Canary Wharf is not entitled to post-forfeiture amounts

from LBL, the tenant, as a settled matter of English law.[24]

The rule that a forfeiting landlord cannot collect future rent is grounded in the nature of

rent under English law.  Under English law, the obligation to pay rent is tied to the actual

---

[22] The Appellate Committee of the House of Lords was the English court of last resort until October 2009,
when the Supreme Court of the United Kingdom was established.  *See Significance to the UK*, THE
SUPREME CT., http://supremecourt.uk/about/significance-to-the-uk.html.

[23] Both QC's relied on treatises to develop their opinions.  *See, e.g.,* Millett Decl. ¶ 31 (quoting from
O'DONOVAN & PHILLIPS, THE MODERN CONTRACT OF GUARANTEE (2d ed. 2010)); Rabinowitz Decl. ¶
37 n.11 (relying on Mr. Millett's textbook as a "leading" treatise).  Mr. Rabinowitz acknowledged at his
deposition that WOODFALL, LANDLORD AND TENANT is a "reputable" treatise and is "more expert" on
English landlord-tenant law than he is.  *See* Rabinowitz Dep. 146:23–147:24.

[24] As noted above, LBL's counsel, Ms. Bradford of Linklaters LLP, had likewise advised Canary Wharf
that it could not recover post-termination rent damages.  *See supra* pp. 10–11.

occupation of the land, and once possession is relinquished, any rent obligation necessarily

ceases. *See* Millett Decl. ¶ 77. As the House of Lords highlighted in *In re Park Air Services*, at

187, ¶¶ D-F:

> … rent is not a simple debt. It is the consideration for the right to remain in
> possession. . . . Rent in respect of a future rental period may never become
> payable at all. Rent payable in the future under a subsisting lease cannot be
> treated as a series of future debts making up a pure income stream.

In other words, a tenant in England has no obligation to pay rent once it has no further interest in

the land, as occurs upon forfeiture. *See* Millett Decl. ¶¶ 77, 80. Therefore, once Canary Wharf

recovered possession through forfeiture on December 10, 2010, it lost any entitlement to post-

forfeiture rent from LBL, as well as the ability to recover damages attributable thereto.[25]

Although English law is plain that a landlord cannot recover for lost post-forfeiture rent,

Canary Wharf nonetheless argues to the contrary, relying on a decision from the Court of Appeal

of Northern Ireland, *Rainey v. Kearney* [1990] N.I. 18. *See* Canary Wharf's Br. pp. 21–22.

Unlike the English law cases cited at pp. 16–19, *supra*, *Rainey* is not controlling precedent in any

English court, as Canary Wharf's own expert Mr. Rabinowitz has acknowledged. *See*

Rabinowitz Dep. 134:17–20 ("*Rainey* is . . . not binding"); Millett Decl. ¶ 75, n. 35, 36. And

*Rainey* is wrongly decided in that it, like Mr. Rabinowitz, incorrectly assumes that a lease, which

creates an interest in land, is no different from an ordinary commercial contract under English

---

[25] The basic English law principle that a landlord is not entitled to recover post-forfeiture amounts from a tenant applies equally to a tenant's surety. Commenting on whether a claim for post-forfeiture rent could be brought against a surety, the court wrote:

> If a landlord re-enters into possession of the demised premises, his action is inconsistent
> with the lease continuing, as I have already indicated, and, in particular, therefore, with
> the rent under the lease accruing thereafter. *If the landlord cannot recover the rent from
> the tenant in respect of the period after his re-entry, he plainly cannot recover from a
> surety for non-payment of that rent.*

*Active Estates Ltd v. Parness* [2002] 3 EGRL 13 (Ch) (Neuberger, J.) (emphasis added)

law.  *See* Report of Laurence Rabinowitz, QC, dated July 17, 2013, attached to the Declaration

of Marc De Leeuw as Exhibit 15, at ¶¶ 89(1)–(6) (ECF No. 43540-16) (hereinafter "Rabinowitz

Report"); Rabinowitz Dep. 66:2–10.  Canary Wharf urges this Court to follow the Northern

Ireland decision in *Rainey* rather than the controlling English cases LBHI cites because (1)

English courts "typically" give deference to Northern Ireland decisions, (2) the decision is

consistent with other common-law jurisdictions such as Australia and Canada, and (3) it relies on

English precedent.  *See* Canary Wharf's Br. p. 21.[26]  But none of these arguments can justify

ignoring long-standing binding English precedents.

First, Northern Ireland decisions cannot overrule controlling English precedent.  *See*

Millett Decl. ¶ 75 n.36; Rabinowitz Dep. 134:17–20.  Moreover, no English authority has ever

given *Rainey* any deference.  Indeed, it appears that *Rainey* has never been cited by any English

court or, for that matter, any leading English treatise on landlord and tenant law.  *See* Millett

Decl. ¶ 81; Rabinowitz Dep. 128:19–129:23, 132:22–133:7.

Second, in *Reichman*, which post-dated *Rainey*, the English Court of Appeal recognized

that even though a landlord may be able to sue for loss of future rent under Australian and

Canadian law, it is "not . . . a correct statement of English law as it now stands."  *Reichman*, at ¶

26.

And third, the English cases that *Rainey* discussed do not at all support its holding, but

rather are clearly distinguishable both from the facts in *Rainey* and those here.  *See* Millett Decl.

---

[26] Canary Wharf also argues that the Court should follow *Rainey* because Judge Hutton, who authored the decision, subsequently served in the House of Lords.  Although we question the relevance of Lord Hutton's subsequent career, we note that he no longer serves on the highest court in the United Kingdom, whereas Judge Neuberger, who authored *Active Estates Ltd v. Parness*, *supra* at n.25, now Lord Neuberger, is the current President of the Supreme Court of the United Kingdom.  *See* Millett Decl. ¶ 79 n.40; *Biographies of the Justices*, THE SUPREME CT., http://supremecourt.uk/about/biographies-of-the-justices.html.

¶¶ 82–83.  Specifically, *Marshall v. Mackintosh* (1898) 78 LT 750, did not concern a lease agreement; *Gray v. Owen* [1910] 1 KB 622, awarded damages only in respect of rent accruing between the surrender and the re-letting and not of lost rent for the remainder of the term of the lease; and *William v. Lewis* [1915] 3 KB 493, involved neither termination of a lease for breach nor forfeiture.  *See id*.

By relying on *Rainey*, Canary Wharf is not asking this Court to apply English law, but rather is improperly asking this Court to anticipate that there will be a *change* in well-established English law.  *See Licci v. Am. Express Bank Ltd.,* 704 F. Supp. 2d 403, 410 (S.D.N.Y. 2010), *vacated in part sub nom. Lucci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161 (2d Cir. 2013) (expert's mere "prediction of the Israeli courts' willingness to more broadly interpret the law," did not establish existence of actual conflict in law of negligence between Israel and New York); *Gilstrap v. Radianz Ltd.,* 443 F. Supp. 2d 474, 491 (S.D.N.Y. 2006), *aff'd*, 233 Fed. Appx. 83 (2d Cir. 2007) ("Though the federal courts are called upon not infrequently to apply the laws of other nations, they should be more hesitant to engage in such a task when doing so would necessarily involve expanding, extending, or departing from well-settled and long established principles of foreign law.").

For these reasons, Canary Wharf's argument that LBL was liable for the "entire unpaid value of the Lease," *i.e.*, all post-forfeiture amounts, because it stopped paying rent and vacated the premises, is incorrect.  *See* Canary Wharf's Br. pp. 19–22.  Under established English law, Canary Wharf has never been entitled to collect lost post-forfeiture rent from LBL.  *See supra* pp. 16–19.  And since, as discussed below, LBHI's liability under Paragraph 1 of the Surety Agreement is no greater than LBL's liability, LBHI likewise is not liable for any lost post-forfeiture rent under Paragraph 1.

     **2.**     **The Language of Paragraph 1 Precludes the Recovery of Post-Forfeiture Amounts from LBHI, Regardless of Whether the Surety Agreement is a Guarantee or an Indemnity.**

Much of Canary Wharf's brief rests on its argument that, if the Surety Agreement is an "indemnity," LBHI is automatically liable for any and all loss sustained by Canary Wharf. *See* Canary Wharf's Br. pp. 1–3, 13–19. But the "indemnity" label is not a magic talisman that overrides the terms of the parties' agreement.

Here, regardless of whether the Surety Agreement is a guarantee or an indemnity -- and as we explain in the next section, it is clearly a guarantee -- Paragraph 1 of the Surety Agreement, by its own terms, excludes any liability by LBHI for post-forfeiture amounts. Indeed, LBHI's liability under Paragraph 1 is expressly limited to losses Canary Wharf suffered *as a result of LBL's default on its obligations or the payment of rents and other sums*. Specifically, the relevant language in Paragraph 1 provides:

> . . . the Surety shall indemnify and keep indemnified the Landlord and the Management Company against all claims demands losses damages liability costs fees and expenses whatsoever sustained by the Landlord or the Management Company *by reason of or arising directly or indirectly out of any default by the Tenant in the performance and observance of any of its obligations or the payment of any rents and other sums*[.]

Ex. 1 at ¶ 1 (emphasis added). As explained above, because it is well-settled under English law that forfeiture brings a lease and the obligations to pay rent contained therein to an end, LBL had no obligation to pay rent to Canary Wharf following the forfeiture. *See supra* pp. 16–19. LBL therefore could not be in "default" on any such obligation, and LBHI's surety obligations with respect to such post-forfeiture "defaults" never arose. *See* Millett Decl. ¶¶ 37(i)(c), 38(1), 64–65, 70–71; Millett Summary Judgment Decl. ¶ 27.

In other words, LBHI is only required to make Canary Wharf whole under Paragraph 1 for amounts attributable to LBL's defaults. But since LBL had no obligation to pay post-

forfeiture rent, there were no defaults in that regard upon which LBHI would have to make good.

*See* Millett Decl. ¶¶ 37(i)(c); 38(1), 64–65, 70–71; Millett Summary Judgment Decl. ¶ 27.

Canary Wharf cannot square its claims for post-forfeiture amounts with the actual language of

Paragraph 1.  Merely characterizing Paragraph 1 as an indemnity rather than a guarantee does not

expand the scope of LBHI's surety obligations beyond those provided for in the contract.

Accordingly, with respect to any claims based on lost post-forfeiture amounts under

Paragraph 1, Canary Wharf's motion should be denied and LBHI's motion should be granted,

irrespective of whether the Surety Agreement is construed to be a guarantee or an indemnity.

> **3.      Because the Surety Agreement is a Guarantee, LBHI's Obligation are Co-Extensive with LBL's Except as Expressly Provided Otherwise by Contract (as in Paragraph 7), and Therefore LBHI's Obligations under Paragraph 1 Ceased at Forfeiture.**

In any event, Canary Wharf is incorrect that the Surety Agreement is an indemnity.

Rather, the plain language and substance of Paragraph 1, as well as the entirety of the Surety

Agreement read as a whole, demonstrates that the Surety Agreement is a guarantee and not an

indemnity contract within the meaning of English law.  This means that, by definition, LBHI's

liability is co-extensive with LBL's, and therefore ceased at forfeiture when LBL's obligations

ceased, except to the extent expressly set forth otherwise in the contract, as in Paragraph 7.

In distinguishing between guarantees and indemnities, English courts examine the

particular words providing for the surety's obligation in the context of the whole agreement:

> [E]ach case must depend upon the true construction of the actual words in which
> the surety's obligation is expressed.  This involves 'construing the instrument in
> its factual and contractual context having regard to its commercial purpose,' a
> task which the court approaches 'by looking at it as a whole without any
> preconceptions as to what it is.'

*Vossloh*, at ¶ 20 (quoting *Gold Coast Ltd v. Caja de Ahorros del Mediterraneo* [2001] EWCA

Civ 1806 at [11] and [15], [2002] 1 All ER (Comm) 142 at [11] and [15]); Millett Dep. 143:3–

144:5. Because surety agreements are "bedevilled by imprecise terminology," English courts look to the substance of the contractual obligation rather than the labels utilized by the parties (*i.e.*, "guarantee" or "indemnity"). *Id.* Furthermore, like American courts, English courts endeavor to give meaning to each term and provision, such that to the extent possible none is rendered meaningless or superfluous. *See* Millett Summary Judgment Decl. ¶ 9(ii), n.8; *In re Strand Music Hall Ltd* (Lord Romilly MR) (1865) 35 Beav 153; *Dwr Cymru Cynfyngedig (Welsh Water) v. Corus UK Ltd* [2007] EWCA Civ 285; *Singapore Airlines Ltd v. Buck Consultants Ltd* [2011] EWCA Civ 1542, at [43].

Under a guarantee, the guarantor's liability is secondary to the primary obligor's and arises from the primary obligor's default. *See* Millett Decl. ¶¶ 30–31; Rabinowitz Dep. 45:16–48:2. Additionally, the guarantor's liability is co-extensive with and no greater than the primary obligor's unless specifically otherwise provided by contract, as for example in Paragraph 7 of the Surety Agreement.[27] *See* Millett Decl. ¶ 30; Rabinowitz Dep. 47:9–21, 104:15–106:4. By contrast, an indemnitor's liability to the creditor is independent, and its obligations are not necessarily contingent on the primary obligor's default. *See* Millett Decl. ¶¶ 30–31; Rabinowitz Dep. 45:16–48:2. A key distinction between a guarantee and an indemnity, therefore, is whether the surety's liability is ancillary or secondary to the principal debtor's, in which case it is a guarantor and its liability is presumptively co-extensive with the principal debtor's. *See* Millett

---

[27] If the Court agrees that LBHI has no obligation for post-forfeiture rent regardless of whether Paragraph 1 is a guarantee or indemnity, as discussed at pp. 16–22, *supra*, the issue of whether the Surety Agreement is a guarantee or an indemnity is still material to Canary Wharf's *pre*-forfeiture claim because, as discussed below, a material modification of LBL's obligations would vitiate LBHI's surety obligations if the Surety Agreement is a guarantee, but not if it is an indemnity. Such material modification would also serve as an alternative ground for eliminating any post-forfeiture claim under the Surety Agreement if, as we argue, it is a guarantee. *See infra* pp. 39–41.

Decl. ¶¶ 30–31.  These principles were reviewed in some detail in *Vossloh*, a case relied upon

extensively in the opinions of both QCs:

> An essential distinguishing feature of a true contract of guarantee–but not its only
> one–is that the liability of the surety (ie the guarantor) is always ancillary, or
> secondary, to that of the principal, who remains primarily liable to the creditor.
> There is no liability on the guarantor unless and until the principal has failed to
> perform his obligations.  The guarantor is generally only liable to the same extent
> that the principal is liable to the creditor.  This has the consequence that there is
> usually no liability on the part of the guarantor if the underlying obligation is void
> or unenforceable, or if the obligation ceases to exist (to which principle–the so-
> called principle of co-extensiveness–there are, however, a number of exceptions).
> . . .
>
> In contrast to the contract of guarantee is the contract of indemnity. . . . Its
> essential distinguishing feature is that, unlike a contract of guarantee (strictly so
> called), a primary liability falls upon the giver of the indemnity.  Unless (as is
> quite possible) he has undertaken his liability jointly with the principal, his
> liability is wholly independent of any liability which may arise as between the
> principal and the creditor. . . . The fact that the obligation to indemnify is primary
> and independent has the effect that the principle of co-extensiveness does not
> apply to a contract of indemnity.

*Vossloh*, at ¶¶ 24–26; *see also* Millett Decl. ¶ 30; Rabinowitz Decl. ¶¶ 33–36; Rabinowitz Dep.

45:16–48:2, 104:15–106:4.  THE MODERN CONTRACT OF GUARANTEE similarly summarized the

distinction:

> The distinction between a contract of guarantee and a contract of indemnity is that
> in a contract of indemnity a primary liability is assumed whether or not the third
> party makes default, whilst, as has been seen, in a contract of guarantee the surety
> assumes a secondary liability to the creditor for the default of another who
> remains primarily liable to the creditor.

O'Donovan & Phillips, THE MODERN CONTRACT OF GUARANTEE ¶ 1-91 (2d ed. 2010).

> a.    Paragraph 1 is a guarantee, and not an indemnity.

Paragraph 1, even read on its own, demonstrates that LBHI's liability is dependent on

LBL's default and is co-extensive with LBL's liability.  Paragraph 1 begins by providing that

"the Surety shall at all times *until the Tenant shall cease to be bound* by the Tenant's covenants

in the Lease" perform under the Lease.  Ex. 1 at ¶ 1 (emphasis added).  This is a clear statement

that LBHI's liability is co-extensive with LBL's, the hallmark of a guarantee. *See Vossloh*, at ¶ 24. The language that the "Tenant or the Surety shall" perform simply means that LBHI is promising that LBL will perform its covenants, a "see to it" element, and also that LBHI will perform if LBL does not, a "do it" element. *See* Millett Decl. ¶ 37(i)(b). Both elements are characteristic of English guarantees and indicate that LBHI's obligations are secondary to LBL's obligations. *See id.*; *see also id.* at ¶ 38(3).

Paragraph 1 further specifies that LBHI's liability under the Surety Agreement can arise *only* from LBL's default under the Lease. Specifically, LBHI's obligation is to make good on losses "*by reason of or arising directly or indirectly out of any default by the Tenant in the performance and observance of any of its obligations or the payment of any rents or other sums.*" This italicized language expressly links LBHI's liability to LBL's defaults.[28] *See* Millett Decl. ¶¶ 37(i)(c), 38(4); *Vossloh*, at ¶¶ 24, 44–46; THE MODERN CONTRACT OF GUARANTEE, at ¶ 1-91; Millett Summary Judgment Decl. ¶ 8. Even Mr. Rabinowitz conceded that LBHI has no liability under Paragraph 1 absent LBL's default, *see* Rabinowitz Dep. 76:12–77:9, and that that is an indication of a guarantee, *see id.* at 46:9–22.

Despite this concession by its expert, Canary Wharf asserts four principal arguments for why the Surety Agreement is an indemnity, each of which is meritless.

*First*, Canary Wharf superficially focuses on the words "indemnity" and "indemnify" in Paragraph 1's heading and text. *See* Canary Wharf's Br. p. 15. Section 2.7 of the Lease,

---

[28] Canary Wharf incorrectly argues that LBHI's position "depends entirely on an interpretation of Paragraph 1 that construes it to contain a single obligation so that the phrase 'until the Tenant shall cease to be bound' applies to and modifies the obligation to indemnify in the second part of the sentence." *See* Canary Wharf's Br. 16. But both portions of Paragraph 1, whether deemed to comprise one obligation or two, are substantively the same. The second part of Paragraph 1, like the first part, only underscores that LBHI's obligations are those of a guarantor while specifying the extent of its hold harmless obligation in the event of LBL's default.

however, provides that titles and headings appearing in the Lease "are for reference only and shall not affect its construction," and in any event, English courts analyze and rely upon the substance of the surety's obligations rather than the parties' labels. *See Vossloh*, at ¶ 20; *see also* Rabinowitz Dep. 43:21–44:10. Indeed, to the extent that labels matter at all, Canary Wharf has repeatedly referred to LBHI as a "Guarantor" and the Surety Agreement as a "Guarantee," even in publicly filed disclosure documents. For example, in filed documents relating to its bond issuance, Canary Wharf, through a subsidiary, identified LBHI as a "*Guarantor*," stating that LBHI "*guarantees* [LBL's] obligations." *See* Ex. 34 at p. 156; Ex. 35 at p. 145; *see also* Ex. 36 at CW0027530 (describing LBHI as a "guarantor"); Canary Wharf's Proofs of Claims, *see supra* n.8. And, of course, LBHI is also sometimes referred to as "guarantor" and as giving a "guarantee," even within the Lease and the Surety Agreement themselves. *See infra* pp. 33–34.

As noted in *Vossloh*, English law recognizes that the word "indemnity" has two distinct and quite different meanings. It can be used in a "wide sense" to mean "pay in full," or in a "narrow sense" to mean a contract of indemnity. *See Vossloh*, at ¶ 25. As a result, the verb "indemnify" is often found within guarantees in the "pay in full," *i.e.* hold harmless, sense. *See e.g.*, *Vossloh*, at ¶¶ 35, 44–46, 53 (construing the surety contract to be a guarantee even though the guarantor agreed to "indemnif[y] each Beneficiary" in a provision titled "GUARANTEE AND INDEMNITY"). Form lease guarantees contained in English treatises routinely provide that the guarantor will "indemnify" the landlord. *See e.g.,* HILL AND REDMOND'S LAW OF LANDLORD AND TENANT, precedent L1; ALDRIDGE, LEASEHOLD LAW, precedent P95-97; ENCYCLOPAEDIA OF FORMS AND PRECEDENTS (5th ed. 2009), Vol. 22(2)A;[29] *see also* Millett

---

[29] These treatises make clear that the forms provided are guarantees, and not indemnity contracts. *See e.g.*, ENCYCLOPAEDIA OF FORMS AND PRECEDENTS (5th ed. 2009), Vol. 22(2)A at [1635] (citing to *Holme v. Brunskill*, the material modification rule, which is applicable only to guarantees); ALDRIDGE,

Summary Judgment Decl. ¶ 25.  Accordingly, it is scarcely surprising that English courts have

routinely construed surety provisions containing the word "indemnity" or "indemnify" to be

guarantees based on the entirety of the document.[30]  *See* Rabinowitz Dep. 52:5–23, 58:9–15

(admitting this to be true).

Further, the Lease itself uses the terms "indemnity" and "indemnify" in the same hold-

harmless sense as Paragraph 1 of the Surety Agreement.  Specifically, Section 4.32 of the Lease,

entitled "Indemnity," required LBL --

> [t]o keep the Landlord and the Management Company fully indemnified from and
> against all actions proceedings claims demands losses costs expenses damages
> and liability arising from any breach of the Tenant's covenants or other
> obligations contained in or ancillary to this Lease[.]

Lease § 4.32.  Inasmuch as LBL was not a surety at all, this use of the verb "indemnify" could

only be in the "wide" "hold harmless" sense.  In sum, the appearance of the words "indemnity"

and "indemnify" in Paragraph 1 of the Surety Agreement, the phraseology of which is almost

identical to Section 4.32 of the Lease, simply represented an obligation on behalf of LBHI to

hold Canary Wharf harmless with respect to LBL's defaults.  *See* Millett Summary Judgment

Decl. ¶ 9(iv).

*Second*, Canary Wharf argues that the word "and" separates Paragraph 1 into two

independent obligations, the second of which is disconnected from and therefore not modified by

the phrase "until the Tenant shall cease to be bound."  *See* Canary Wharf's Br. p. 16.  But that

---

LEASEHOLD LAW, at P.097 (explaining that a "guarantor's liability" ceases after forfeiture or disclaimer
which is why provisions like Paragraph 7 of the Surety Agreement are advisable for landlords).

[30] In addition to *Vossloh, see also Stadium Finance Co. v. Helm* [1965] 109 SJ 471 (CA) (appellate court
holding that the words "indemnify and keep indemnified" neither turn a guarantee into an indemnity nor
create a separate free-standing indemnity obligation); *Marubeni Hong Kong v. Gov't of Mongolia* [2005]
1 WLR 2497 at [32] (holding a surety agreement under which the surety assumed "a primary obligation,
in the form of an indemnity against cost or damage resulting from the buyer's default" to be a guarantee).

interpretation ignores the limiting language in the second part of Paragraph 1, which

unequivocally limits LBHI's liability to amounts arising from LBL's "defaults."  LBL cannot

default on its obligations once it has "cease[d] to be bound" to those obligations.  *See* Millett

Decl.¶ 38(4) ("hold harmless"); Millett Dep. 204:9–22 ("hold harmless"); *see also* Millett

Summary Judgment Decl. ¶ 8.  Thus, the two parts of Paragraph 1 are logically interrelated and

Canary Wharf's argument is meritless.  Further, it would make no commercial sense for there to

be both a guarantee and an indemnity covering the same obligations.  Indeed, if there were an

indemnity obligation in the latter portion of Paragraph 1, it would swallow entirely the guarantee

obligation in the earlier portion, making it wholly superfluous, an outcome that English courts

avoid.  *See* Millett Decl. ¶ 70; Millett Summary Judgment Decl. ¶ 9(ii)–(iii); *supra* p. 24.

*Third*, Canary Wharf argues that a few differences between Section 14 of the Lease and

the Surety Agreement demonstrate that the latter is an indemnity contract.  *See* Canary Wharf's

Br. p. 18.  Most of Canary Wharf's arguments here, as elsewhere, are based on superficial

references to headings and labels.  *See id.* (noting that Paragraph 1 of the Surety Agreement is

titled "Indemnity by Surety" (although, as noted below, other provisions of the Surety

Agreement refer to it as a guarantee) and Section 14.1 of the Lease is titled "Covenant by

Landlord's Guarantor" and that LBHI is called the "Surety" rather than the "Tenant's

Guarantor").  But Section 2.7 of the Lease and English case law establish that such reliance is

misplaced.  *See supra* p. 27; Millett Summary Judgment Decl. ¶¶ 11–12.

In any event, Section 14's provisions are substantively almost identical to the Surety

Agreement, underscoring that the Surety Agreement, like Section 14, is a guarantee.[31]  To be

---

[31] *See* Millett Summary Judgment Decl. ¶¶ 5, 10, 16; *see also infra* p.32 (Paragraph 2 of the Surety
Agreement is substantively identical to Clause 14.2 of the Lease), p. 33 (Paragraph 6 of the Surety
Agreement is an anti-release provision like Section 14.6 in the Lease), p. 31 (the Surety Agreement,

sure, Section 14.1 (i) does not contain the verb "indemnify" found in Paragraph 1 and (ii) does not state that the "Surety shall" perform the Landlord's covenants. But these minor differences are wholly insufficient to transform the Surety Agreement into an indemnity contract.

It is scarcely surprising that the Landlord's Guarantor (CWHL) provisions did not include the "indemnify and keep indemnified" language that is found in the latter portion of Paragraph 1 of the Surety Agreement. Because the Landlord primarily covenanted to provide LBL with quiet enjoyment of HQ2 and provide related services -- not to pay money -- the notion of Canary Wharf "indemnify[ing]" LBL is not really germane. *See* Millett Summary Judgment Decl. ¶ 9(v). In contrast, because LBL assumed numerous, substantial obligations to pay money to Canary Wharf, this hold harmless language is at least pertinent. *See id.*

Additionally, that the Landlord's Guarantor assumed only a "see to it" guarantee, as compared to the "see to it" and "do it" obligations of Paragraph 1 of the Surety Agreement, *see* p. 26, *supra*, has no bearing on whether Paragraph 1 is a guarantee or an indemnity. "See to it" and "do it" are two types of guarantees. *See id.* And it is not surprising that Section 14.1 of the Lease does not provide that the Landlord's Guarantor shall perform the Landlord's covenants, because CWHL was not itself in a position to provide quiet enjoyment to a building (or perform services on it) that it did not hold title to. *See* Millett Summary Judgment Dec. ¶ 6(c).

In sum, the differences between Section 14 of the Lease and the Surety Agreement, if meaningful at all, are best understood as merely reflecting the logical consequences of the differences in the nature of the primary obligors' underlying obligations.

*Fourth*, Canary Wharf argues that Paragraph 1 is an indemnity because it uses the phrase "as a primary obligation." *See* Canary Wharf's Br. pp. 16–17. In England, however, such

---

Section 10 of the Lease, and Section 14.1 of the Lease refer to the guarantors' (LBHI's and CWHL's) obligations as "primary obligations").

"primary obligor" phraseology is very common in guarantees, and is included so as to make clear that there is no requirement that a creditor first serve a demand on the guarantor before proceeding against him.  *See* Millett Decl. ¶¶ 34, 38(2); Rabinowitz Dep. 60:22–61:9; O'DONOVAN & PHILLIPS, at ¶¶ 1-105; *Carey Value Added SL v. Grupo Urvasco SA* [2011] 2 All ER (Comm) 148, ¶ 22; *MS Fashions v. BCCI* [1993] Ch 425.[32]  English courts have routinely held surety contracts containing the words "primary obligor" to be guarantees rather than indemnities.  *See, e.g.*, *Vossloh*, at ¶¶ 35, 45 (holding that the surety agreement was a guarantee even though the surety agreed to be "a principal debtor" and to have a "primary obligation.")  Indeed, even Section 14 of the Lease, titled "Landlord's Guarantor," which Canary Wharf correctly presumes to be a guarantee obligation, not an indemnity, uses the same "as a primary obligation" phraseology.  *See* Lease § 14.1; Canary Wharf's Br. p. 18; Millett Summary Judgment Decl. ¶¶ 16–22.  Thus, the "as a primary obligation" phrase in Paragraph 1 has no bearing on whether the Surety Agreement is a guarantee or an indemnity.[33]

In sum, the language of Paragraph 1 clearly provides that LBHI's obligations are wholly ancillary to LBL's defaults, and thus the Surety Agreement is a guarantee, not an indemnity. Canary Wharf's arguments to the contrary rest upon a distorted understanding of the Paragraph's actual language that is refuted by controlling English law.

---

[32] Contrary to Canary Wharf's argument, *see* Canary Wharf's Br. at p. 17, Mr. Millett certainly did not concede that "the contract makes Lehman a 'primary obligor'" in the sense that Canary Wharf attempts to use the term (*i.e.*, as denoting an indemnitor).  *See* Millett Dep. 205:3–14 ("I don't believe . . . LBHI is a primary obligor . . . in the way in which you mean it, *i.e.*, as an indemnifier.")  Instead, LBHI was a "primary obligor" as the term is typically used in guarantees (*i.e.*, dispensing with the demand requirement).  *See* Millett ¶¶ 34, 38(2).

[33] The same is true as regards Canary Wharf's reference to the "primary obligation" language in Section 10 of the Lease.  *See* Canary Wharf's Br. p. 17.

      b.     <u>The Surety Agreement considered as a whole conclusively confirms that it
is a guarantee.</u>

In construing the scope of a surety agreement, English courts look at the entirety of the document, not just selected phrases in isolation. *See Vossloh*, at ¶ 20. Here, the Surety Agreement's other provisions confirm that it is a guarantee and not an indemnity.

Paragraph 2 provides that LBHI "is jointly and severally liable with the Tenant . . . for the fulfil[l]ment of all the obligations of the Tenant under this Lease . . ." Ex. 1 at ¶ 2. In other words, LBHI's liabilities are "joint" with, and not independent from, LBL's liabilities. *See* Millett Decl. ¶¶ 37(ii), 38(5); Millett Dep. 126:10–127:4. Paragraph 2 also expressly provides that Canary Wharf can proceed against LBHI "as if" it were LBL. *See* Ex. 1 at ¶ 2. This reinforces the notion that LBL's and LBHI's liabilities are co-extensive, *i.e.*, that LBHI can be pursued "as if" it were LBL and no further. *See* Millett Dep. 185:4–21; Millett Decl. ¶ 38(5). *See also* Section 14 of the Lease, which Canary Wharf correctly argues is a guarantee, *see* Canary Wharf's Br. p. 18, which includes the identical "jointly and severally liable" and "as if" language, *see* Lease § 14.2; Millett Summary Judgment Decl. ¶ 5.

Paragraphs 3 and 6 would be entirely superfluous if the Surety Agreement were an indemnity. Paragraph 3 waives LBHI's right to require Canary Wharf to proceed against LBL before proceeding against it. Ex. 1 at ¶ 3. But that provision would be unnecessary if the Surety Agreement were an indemnity contract, because Canary Wharf already would not be required to do so. *See* Millett Decl. ¶ 37(iii). Paragraph 6 contains provisions intended to address certain English legal and equitable principles that, if applicable, would discharge LBHI's liability. But again these principles apply only in the context of guarantees, and not to indemnities. *See* Ex. 1 at ¶ 6; Millett Decl. ¶¶ 37(v), 38(6); Millett Dep. 191:19–193:9; *Vossloh*, at ¶ 27 (an anti-release provision "will usually indicate that the contract is one of guarantee because such a provision

32

would be unnecessary if the contract were one of indemnity"). In fact, Canary Wharf's expert, Mr. Rabinowitz, conceded that "if this were a contract of indemnity, . . . [y]ou would not need I think any part of paragraph 6." Rabinowitz Dep. 86:12–20; *see also* Millett Summary Judgment Decl. ¶ 10.[34] And Paragraph 6 is almost identical to Section 14.6 of the Lease, which Canary Wharf correctly asserts to be part of a *guarantee* granted by the Landlord to LBL. *See* Canary Wharf's Br. p. 18.[35]

Paragraph 7, which is also common in English lease guarantees, provides Canary Wharf with specific remedies in the event of forfeiture. *See* Ex. 1 at ¶ 7(a)-(b); Millett Decl. ¶ 37(vii). As one English treatise explains, provisions like Paragraph 7 are included in leases as a way to collect rent from the guarantor after the guarantor's liability comes to an end by way of forfeiture or other early termination of the lease. *See* Aldridge, LEASEHOLD LAW, at P097; Millett Summary Judgment Decl. ¶ 25(ii). If Paragraph 1 were an indemnity that made LBHI unconditionally and unlimitedly liable to Canary Wharf for lost post-forfeiture rent, there would have been no need to include a specific paragraph providing for limited and conditional post-forfeiture remedies.

Paragraphs 8 and 10 identify the Surety Agreement as a guarantee and LBHI as the "guarantor." Without supporting evidence, Mr. Rabinowitz speculates that these references are either expressions "carried across in error from an earlier precedent" or an "obvious error." *See*

---

[34] Mr. Rabinowitz seeks to avoid the import of Paragraph 6 by arguing in his report that it was merely included "to confirm 'for the avoidance of doubt' that dealings between the Claimants and the Tenant would not impact on LBHI's liability," but there is no evidence to support that. *See* Rabinowitz Decl. ¶ 39(6); Rabinowitz Report ¶ 48(6).

[35] Canary Wharf also ignores the import of Paragraph 6(d)'s reference to Section 18 of the Landlord and Tenant (Covenants) Act 1995, a statute only applicable to guarantees and never to indemnities, as Mr. Rabinowitz further admitted. *See* Rabinowitz Dep. 87:20–88:4 (admitting that the statute "would only be relevant in the context of a contract of guarantee"). Canary Wharf's only response is to refer to the statute as "not relevant here," *see* Canary Wharf's Br. at p. 9, without ever attempting to explain how its inclusion could be consistent with the notion that the Surety Agreement is an indemnity.

Rabinowitz Decl. ¶ 37(7)–(8). Paragraph 8's title, "Benefit of guarantee and indemnity," makes sense only if the Surety Agreement is a guarantee, *i.e.*, as a reference to Paragraph 1, which contains a guarantee obligation and uses the verb "indemnify" in the sense of "pay in full." *See* Millett Dep. 197:6–204:22; Millett Decl. ¶ 37(viii); Millett Summary Judgment Decl. ¶ 12; *supra* pp. 27–28. Paragraph 10, which requires LBHI to execute the deed referenced in Section 4.21.2(b)(i) of the Lease, in the form of Schedule 8, if the Lease is assigned, refers to LBHI as a "Guarantor" and LBL as the "Tenant (here meaning the Tenant whose obligations hereunder were originally *guaranteed* by that Surety)." [36] *See* Ex. 1 at ¶ 10 (emphasis added); Millett Decl. ¶ 38(8). [37]

Accordingly, the entirety of the Surety Agreement reinforces that it is a guarantee, not an indemnity, meaning that, except for the specific and limited remedies provided in Paragraph 7, LBHI's obligations are co-extensive with and no greater than LBL's and otherwise ceased when LBL's obligations ceased on December 10, 2010. Canary Wharf's interpretation would effectively ignore multiple provisions in the Surety Agreement and would thereby violate the basic canon of contract construction requiring courts to give meaning, if possible, to all of the provisions of a contract. LBHI's interpretation, however, gives meaning to the entire document and should be adopted by the Court.

---

[36] Paragraphs 5 and 6 of Schedule 8 to the Lease, called "Guarantee" and "Guarantor to join in new lease," respectively, also are to the same effect. Paragraph 5 states that "[*If there is a guarantor, repeat the provisions set out in paragraphs 1 to 9 (inclusive) of Schedule 4]*" and Paragraph 6 provides that "the *Guarantor* shall join in, and execute and deliver to the Landlord a counterpart of, such new lease in order to guarantee the obligations of the Tenant under it in the terms of Schedule 4 to the Lease," further illustrating that the Surety Agreement is a guarantee. *See also* Lease §§ 4.21.1(c)(iii), (d); 4.21.2(b)(iv) (emphasis added).

[37] Finally, Paragraphs 4 and 5 are standard provisions in lease guarantees and are entirely consistent with the Surety Agreement being a guarantee. *See* Millett Decl. ¶¶ 37(iv); Ex. 1 at ¶¶ 4–5.

### 4.    Canary Wharf's Reliance on Irrelevant, Inadmissible and Contested Parol Evidence is Misplaced.

Canary Wharf urges this Court to consider irrelevant, inadmissible and contested parol evidence in interpreting the Surety Agreement.  *See* Canary Wharf's Br. p. 18.  It argues that "in interpreting [the Surety Agreement], an English court would take into account the background facts known or reasonably available to the parties."  Canary Wharf's Br. pp. 18–19.  But Canary Wharf does not offer any admissible evidence of "background facts."  Mr. Rabinowitz's speculation that Canary Wharf "might be expected to seek the strongest possible security" from LBHI has no bearing on whether Canary Wharf either bargained for or obtained that level of protection.  *See* Canary Wharf's Br. pp. 18–19.  Moreover, parol evidence as to the Surety Agreement's meaning is inadmissible in any event.  As Mr. Rabinowitz has said, what occurred "at the time of negotiations and what occurred to [the parties] at the time of the negotiations is, as a matter of English interpretation of contracts, completely irrelevant."  *See* Rabinowitz Dep. 71:2–14; Rabinowitz Decl. ¶ 24(3).

Furthermore, neither the testimony of Canary Wharf's CEO to the effect that Canary Wharf "always ask[ed] for an indemnity" and that it "would not have entered into any . . . lease agreement unless [it] had the parent company indemnity," Canary Wharf's Br. p. 19, nor the recently-filed Affidavit of Frank Bartolotta, a former Lehman employee, rise even to the level of inadmissible parol evidence.  Neither Mr. Iacobescu nor Mr. Bartolotta participated in the negotiations over the Surety Agreement and both have no knowledge as to what the parties discussed in relation to the Surety Agreement.  *See* Ex. 45 at 7:18–8:10, 12:20–13:16; Ex. 44 at 15:5–8, 37:24–38:6.

Moreover, Canary Wharf's argument that it wanted "the certainty of an uninterrupted cash flow provided by an indemnity" because "the rental income would be securitized in the

form of bonds" is similarly nothing more than one party's statement about its alleged wishes and desires. *See* Canary Wharf's Br. pp. 6, 19. Regardless of what Canary Wharf might have wanted, the only thing that is relevant is what it received, *i.e.*, the Surety Agreement. If Canary Wharf's argument were valid, one would expect every landlord issuing bonds being repaid from rental streams to obtain indemnities from its tenant's parent company, which is most definitely not the case. Indeed, in 2007, when Canary Wharf, through a subsidiary, issued a series of bonds backed by rental payments from tenants occupying eight Canary Wharf buildings, including HQ2, many of the tenants had no "[g]uarantor" at all, *see* Ex. 34 at pp. 151–59, and LBHI was identified as a "Guarantor" that "guarantees the obligations" of LBL, *see id.* at p. 156. *See also* Ex. 35 at pp. 141–49.

Mr. Bartolotta's recent affidavit and subsequent deposition testimony similarly add nothing. Mr. Bartolotta's only knowledge is that LBHI preferred not to assume any liability or sign any surety agreement, but nonetheless acceded to signing the Surety Agreement. *See* Ex. 44 at 59:14–60:18. Mr. Bartolotta not only had no involvement in the negotiations over the Surety Agreement, but had no understanding of the difference between a guarantee and an indemnity under English law. *See id.* at 15:5–8, 17:9–18:8, 37:24–38:6. He stated that his affidavit, which was drafted subject to his review by Sullivan & Cromwell, used the term "indemnity" only because that word appeared in the title to Paragraph 1 of the Surety Agreement, not because he intended it to have the legal significance under English law that is at issue in this dispute. *See* Aff. of Frank Bartolotta, filed March 28, 2014, at ¶¶ 3, 5, 6, 7 (ECF No. 43804-1); Ex. 44 at 19:22–21:15, 28:6–29:17, 36:6–20, 42:21–25. Nor did Mr. Bartolotta have any knowledge as to whether LBHI agreed to be liable for LBL's obligations post-forfeiture, as he was unfamiliar with the rule that forfeiture terminates any rent obligations and precludes lost post-forfeiture rent

damages.  *See* Ex. 44 at 19:5–12, 34:25–35:13.  He emphasized on multiple occasions at his

deposition that he is not an "English lawyer" and acknowledged that he did not appreciate the

legal implications of the words he used in his affidavit.  *See id.* at 23:17, 34:25–14, 77:24–78:11.

His affidavit thus adds literally nothing relevant to this record, whether as inadmissible parol

evidence or otherwise.[38]

       In short, there is no admissible parol evidence in this record as to the meaning or nature

of the Surety Agreement.

       **5.      If the Court Concludes that the Surety Agreement is Ambiguous as to
               whether it a Guarantee or an Indemnity, or as to whether the Scope of
               LBHI's Obligations Includes Post-Forfeiture Amounts, That
               Ambiguity Should Be Resolved Against Canary Wharf.**

       To the extent there remains any ambiguity as to whether the Surety Agreement is a

guarantee or an indemnity or whether, if an indemnity, it embraces an obligation to pay post-

forfeiture amounts, any such ambiguity must be resolved against Canary Wharf as the drafter,

profferer and beneficiary of the Surety Agreement under the *contra proferentem* principle.  *See*

---

[38] Even though Mr. Bartolotta had made clear to Sullivan & Cromwell that he had no understanding of the
distinction between guarantees and indemnities in English law, and was not involved in the negotiations
over the Surety Agreement, Sullivan & Cromwell's first draft attempted to have Mr. Bartolotta swear that
Lehman "fought very hard for several weeks to limit those provisions [in the Surety Agreement] to those
of a guarantor under English law."  *See* Ex. 44 at 17:9–18:20; Ex. 38 at CW0075963.  To his credit, Mr.
Bartolotta had that unsupported and heavily loaded language removed.  *See* Ex. 44 at 29:21–32:17.

Also notable are the circumstances surrounding the affidavit.  Mr. Bartolotta is a long-time friend of Mr.
Iacobescu.  *See id.* at 9:18–10:23, 47:13–48:3.  The two also alluded to potential employment for Mr.
Bartolotta in an email from Mr. Bartolotta to Mr. Iacobescu congratulating him on what Mr. Bartolotta
mistakenly believed to be the settlement of the Canary Wharf claim –an email Mr. Bartolotta sent while at
Lehman Brothers.  *See* Ex. 37.  Moreover, Mr. Iacobescu's request that Mr. Bartolotta contact Sullivan &
Cromwell regarding the Canary Wharf dispute came at a time when Mr. Bartolotta, in his role as
consultant for Morgan Stanley, was working on a transaction involving a Canary Wharf building and
which required deeds of release from Canary Wharf—a process Mr. Iacobescu helped facilitate.  *See* Ex.
44 at 6:13–16, 9:18–10:23, 45:18–46:22, 49:10–19; Ex. 39.  Finally, Mr. Bartolotta did not advise LBHI's
representatives that he was providing the affidavit to Canary Wharf nor did he offer LBHI's
representatives the opportunity to correct any mistaken implications before it was filed.  *See* Ex. 44 at
10:24–11:5.

Millett Decl. ¶ 19(i); Millett Further Decl. ¶¶ 7–12; *Ass'n of British Travel Agents Ltd. v. British Airways plc* [2000] 2 All ER (Comm) 204 (it is "a principle not only of law but of justice"); *Liberty Mut. v. HSBC Bank plc* [2002] EWCA Civ 691, ¶ 56 (Rix LJ).  Mr. Rabinowitz agreed that *contra proferentem* applies to documents that, considered as a whole, are ambiguous, Rabinowitz Dep. 35:11–14, and that if the *contra proferentem* principle is engaged here, the Surety Agreement would be construed against Canary Wharf, *see id.* at 31:4–16.

### 6.    Canary Wharf's Own Conduct Underscores Its Lack of Belief in Its Current Paragraph 1 Argument.

The unavailability of post-forfeiture rent damages under Paragraph 1 was so obvious to Canary Wharf in 2010 that it drove much of Canary Wharf's conduct.  *See supra* pp. 12–13.  For example, Canary Wharf would not have worried about "jeopardis[ing]" its claim against LBHI if it first settled with LBL by terminating the Lease and relinquishing all claims against it.  *See* Ex. 37.  Nor would it have tried to manufacture an anticipatory repudiation claim against LBHI under Paragraph 7 that would be, at best, fully redundant of the Paragraph 1 claim asserted in its motion.  *See id*.  Instead, Canary Wharf would have simply accepted LBL's surrender, retaken possession, completed its transaction with J.P.Morgan and then pursued its purportedly free-standing indemnity claim under Paragraph 1 against LBHI.

That Canary Wharf instead went to great lengths to try to trick LBHI into an anticipatory repudiation claim under Paragraph 7[39] demonstrates that Canary Wharf was well aware that its exclusive post-termination remedies against LBHI (if any) were under Paragraph 7, and that it knew that it had no right to damages for post-termination rent under Paragraph 1.  *See supra* pp.

---

[39] Neither Canary Wharf nor LBHI is moving for summary judgment with respect to Canary Wharf's fact-bound anticipatory repudiation claim under Paragraph 7(a).  We note, however, that the claim is legally insufficient under both English law and the United States Bankruptcy Code.  *See* Millett Decl. ¶¶ 95–104; Millett Supp. Decl. ¶¶ 18–29; 11 U.S.C. §§ 362(a)(3), (6), 365(a); Fed. R. of Bankr. P. 6006(a), 9014(a)–(b).

12–13.  Even worse, Canary Wharf then attempted to hide these facts from both LBHI and this

Court (by attempting to avoid meaningful discovery), which, once discovered, not only showed

the lack of merit in its anticipatory repudiation claim -- given the evidence demonstrating that it

had no intention whatsoever of serving a Paragraph 7(a) notice on LBHI, *see supra* p. 11 -- but

also served to reveal Canary Wharf's contemporaneous lack of belief in its current Paragraph 1

argument.

### B.    THE FORFEITURE AGREEMENT VITIATED LBHI'S GUARANTEE OBLIGATIONS, EVEN FOR PRE-FORFEITURE AMOUNTS.

As explained above, the Surety Agreement is a guarantee, and, under English law, a

guarantee is discharged if the primary debtor and creditor agree to a material variation to the

underlying obligations without guarantor's consent.  *See Holme v. Brunskill* [1878] 3 QBD 495.

A variation is considered to be material for this purpose unless it is self-evident that the alteration

is unsubstantial and not prejudicial to the guarantor.  *See* Millett Decl. ¶ 44.  The materiality

threshold for this purpose is decidedly low and embraces a variation that *could* prejudice the

guarantor, regardless of whether it has in fact done so, and even if the likelihood of it doing so is

remote.  *See id*.  Canary Wharf has the burden of proving that the Forfeiture Agreement could

not have prejudiced LBHI.  *See* Millett Dep. 220:16–221:5.

Similar to American bankruptcy law, under English law, rent that accrued while the LBL

administrators or their subtenants occupied HQ2 was payable as an administration expense.  *See*

Millett Decl. ¶¶ 49(i)-(ii), 53(i)-(ii).  The Forfeiture Agreement between Canary Wharf and LBL

extinguished Canary Wharf's administration expense claim against LBL in exchange for

approximately $2.4 million.  These administration expense claims against LBL, which would

otherwise have been paid presumably in full,[40] were thereby demoted to general unsecured

claims. *See supra* p. 13; Millett Decl. ¶¶ 53–54. Thus, without LBHI's consent, the Forfeiture

Agreement between LBL and Canary Wharf materially increased LBHI's exposure under the

Surety Agreement by, in effect, foisting all but $2.4 million of what had been priority

administration expense claims onto LBHI. Because this modification prejudiced LBHI, it

vitiated its obligations under the Surety Agreement, including its obligation to pay outstanding

pre-forfeiture amounts. *See* Millett Decl. ¶¶ 52, 55–56; Millett Dep. 253:11–25.

Canary Wharf argues that Paragraph 6(d) of the Surety Agreement, which permits

variations of "*lease terms*" without vitiating the guarantee, prevents the Forfeiture Agreement

from vitiating LBHI's guarantee. *See* Response of Canary Wharf to Objection to Proofs of

Claim Numbers 14824 and 14826, filed October 12, 2012, at ¶ 57 (ECF No. 31341). But

Paragraph 6(d) does not apply because the Forfeiture Agreement was not a variation of the

Lease's "terms," but rather a prejudicial variation to LBL's obligation to perform. *See* Millett

Decl. ¶¶ 60–61; *see also* Rabinowitz Dep. 108:21–109:3.

Canary Wharf also relies upon Paragraph 6(g), which provides that LBHI is not released

"by any other act omission matter or thing whereby but for this provision the Surety would be

exonerated either wholly or in part." Ex. 1 at ¶ 6(g). But Paragraph 6(g) does not help Canary

Wharf because English courts resist reliance on catch-all provisions, such as paragraph 6(g), to

fix a guarantor with liability that it would otherwise not have unless the provision contains

sufficiently clear and unambiguous language to that effect. *See* Millett Decl. at ¶¶ 25, 62. And

Paragraph 6(g) does not contain any such sufficiently clear and unambiguous language. *See id.*

at ¶ 62.

---

[40] *See* Ex. 40 at Section 5 (indicating that expenses incurred by the Administrators are being paid and there is adequate cash to do so).

Moreover, even if LBHI's obligations were not vitiated in full, based on a treatise relied upon by Canary Wharf, LBHI should be at least relieved from any pre-forfeiture based liability that would have been paid by LBL as an administration expense but for the Forfeiture Agreement.  *See* O'DONOVAN & PHILLIPS, at ¶ 6-88; Millett Dep. 238:6–242:8, 251:9–252:3, 253:11–255:23.  Accordingly, LBHI is not liable for pre-forfeiture amounts.

### C.    IF THERE ARE ANY DOUBTS ABOUT THE MERITS OF LBHI'S ARGUMENTS, THE COURT SHOULD HOLD A HEARING UNDER FEDERAL RULE OF CIVIL PROCEDURE 44.1.

LBHI respectfully requests that if there is any question about the scope of the Surety Agreement, the Court hold a hearing at which it could obtain the benefit of hearing directly from Mr. Millett, a widely respected expert on the English law of guarantees and landlord/tenant law. *See* Fed. R. Civ. P. 44.1; Fed R. Bankr. P. 9017; Fed. R. Civ. P. 44.1 advisory committee's notes; *Curley v. AMR Corp.*, 153 F.3d 5, 12–13 (2d Cir. 1998); *Galu v. Swissair: Swiss Air Transp. Co.*, 734 F. Supp. 129, 131 (S.D.N.Y. 1990); *Mackley v. Sullivan & Liapakis, P.C.*, No. 98 CIV. 8460(SWK), 2001 WL 1658188, at *4 (S.D.N.Y. 2007).

## IV.    CONCLUSION

For the foregoing reasons, Canary Wharf's motion for partial summary judgment should

be denied and LBHI's cross-motion for partial summary judgment should be granted.


Dated:  May 22, 2014                                     Respectfully submitted,

                                                     _____/s/ David J. Lender_____
                                                     David J. Lender
                                                     Peter D. Isakoff
                                                     Kevin F. Meade
                                                     Arielle Gordon
                                                     WEIL, GOTSHAL & MANGES LLP
                                                     767 Fifth Avenue
                                                     New York, New York 10153
                                                     Telephone: (212) 310-8000
                                                     Facsimile: (212) 310-8007

                                                     *Attorneys for Lehman Brothers Holdings Inc.*
                                                     *and Certain of Its Affiliates*

**ADDENDUM**

| NAME | DESCRIPTION |
|---|---|
| Bartolotta, Frank | Canary Wharf Affiant and former LBHI employee in London |
| Bradford, Katie | Attorney at Linklaters LLP, LBL's counsel |
| Briam, Anthony (Tony) | Attorney at Clifford Chance LLP, Canary Wharf's counsel |
| Cash, Debra | Managing Director at Alvarez & Marsal |
| Clay, Jeremy | Attorney at Mayer Brown International LLP, J.P.Morgan's counsel |
| DeMarco, Jennifer | Attorney at Clifford Chance LLP, Canary Wharf's counsel |
| Dawson, Sarah | Attorney at Clifford Chance LLP, Canary Wharf's counsel |
| Dietderich, Andrew | Attorney at Sullivan & Cromwell, Canary Wharf's Counsel |
| Ehrmann, Daniel | Head of international operations and co-head of derivatives at LBHI |
| Iacobescu, George | Canary Wharf's CEO |
| Jervis, Michael (Mike) | Joint Administrator to LBL |
| Jones, Anita | Attorney at Mayer Brown International LLP, J.P.Morgan's counsel |
| Kendall, Pamela | In-house counsel at Canary Wharf |
| Krasnow, Richard | Attorney at Weil, Gotshal & Manges LLP, LBHI's counsel |
| Millett, Richard | LBHI's expert |
| Rabinowitz, Laurence | Canary Wharf's expert |
| Taylor, Beatrice | Attorney at Linklaters LLP, LBL's counsel |
| Turner, Justin | Attorney at Clifford Chance LLP, Canary Wharf's counsel |