# EXHIBIT 2

# Linklaters

Linklaters LLP
One Silk Street
London EC2Y 8HQ
Telephone (+44) 20 7456 2000
Facsimile (+44) 20 7456 2222
DX Box Number 10 CDE
Direct Line 020 7456 4234
Direct Fax 020 7456 2222
katie.bradford@linklaters.com

Clifford Chance LLP
10 Upper Bank Street
Canary Wharf
London
E14 5JJ
FAO: Tony Briam

cc: Barry Gilbertson, PricewaterhouseCoopers LLP
(barry.gilbertson@uk.pwc.com)

Canary Wharf Management Limited
One Canada Square
Canary Wharf
London
E14 5AB



**By First Class Post and By Email: Tony.Briam@CliffordChance.com**   11 December 2009

Our Ref        Katie Bradford

Dear Sirs

## Lehman Brothers Limited (in administration) ("the Company")
## 25 Bank Street, Canary Wharf, London E14 5LE ("the Property")

We write on behalf of the Administrators of the Company. Pursuant to court orders dated 15 September 2008 and 30 November 2009, these are now Anthony Victor Lomas, Steven Anthony Pearson, Michael John Andrew Jervis, Dan Yoram Schwarzmann and Derek Anthony Howell. The Company has an underlease of the Property dated 16 March 2005 between Heron Quays (HQ2) T1 Limited and Heron Quays (HQ2) T2 Limited (1) Canary Wharf Management Limited (2) Canary Wharf Holdings Limited (3) the Company (4) and Lehman Brothers Holdings Inc (5) ("the **Underlease**").

You act for the Property's landlords, Heron Quays (HQ2) T1 Limited and Heron Quays (HQ2) T2 Limited, and the guarantor, Canary Wharf Holdings Limited. We anticipate you may also be instructed on behalf of Canary Wharf Management Limited, but in any event we are copying them direct into this letter.

We refer to previous correspondence and discussions between Barry Gilbertson of PricewaterhouseCoopers LLP, for the Administrators, and George Iacobescu of Canary Wharf Group plc, as to the Company's ongoing, but reducing, requirements for occupational space within the Property.

In November 2008, following the sale of part of the Lehman group businesses to Nomura International plc ("Nomura"), the Administrators confirmed to your clients that, subject to all caveats appropriate for administrators, it was their intention to remain at the Property and pay the rent under the Underlease until

This communication is confidential and may be privileged or otherwise protected by work product immunity.

Linklaters LLP is a limited liability partnership registered in England and Wales with registered number OC326345. It is a law firm regulated by the Solicitors Regulation Authority. The term partner in relation to Linklaters LLP is used to refer to a member of Linklaters LLP or an employee or consultant of Linklaters LLP or any of its affiliated firms or entities with equivalent standing and qualifications. A list of the names of the members of Linklaters LLP together with a list of those non-members who are designated as partners and their professional qualifications is open to inspection at its registered office, One Silk Street, London EC2Y 8HQ or on www.linklaters.com and such persons are either solicitors, registered foreign lawyers or European lawyers.

Please refer to www.linklaters.com/regulation for important information on our regulatory position.
A11503583/3.0/11 Dec 2009

Linklaters

at least 31 December 2009. As your response of 25 November 2008 indicated, this was the Administrators' early attempt to clarify their intentions rather than a contractual undertaking but they thought it right to set out their position at the time.

Thereafter, following tripartite negotiations, on 9 December 2008 the landlords granted consent to the Company to sub-let part of the Property to Nomura. On the same day, the Company and Nomura entered into a sub-underlease ("the **Nomura Sub-Underlease**"). The Nomura Sub-Underlease replaced the earlier sharing arrangements between the Company and Nomura to which the landlords had previously provisionally consented.

As your clients were aware, there has been a transitional period whilst the parts of the business sold to Nomura were separated from the residual assets under the Company's control. Employees who were previously employed by the Lehman group, and IT which supported that part of the business, were transferred to Nomura. This resulted in co-location of the Company and Nomura within the Property. The separation of both the people and the IT has been a highly complex process. As the separation (and administration) progressed, the extent of vacant space within the Property became more apparent. Since Spring 2009, the extent of vacant space going forward began to become clearer.

Now, the Company occupies substantially reduced space in the Property, as set out in section 1.3.

The Administrators previously indicated that they would continue to be open with the landlords regarding their intentions in respect of the Company's occupation of the Property and rental payments under the Underlease, as their review of requirements progressed. By our letter of 23 June 2009, the Administrators confirmed that it remained their intention to remain at the Property and pay the rents under the Underlease until at least 31 December 2009. On 1 October 2009, full payment of the rents and Estate Service Charge was made for the quarter expiring 31 December 2009.

One potential solution discussed was for Nomura to take an assignment of the Underlease or enter into a new tripartite deal with the Company with your clients releasing the Company from the Underlease. This did not proceed as a result of Nomura's decision to re-locate to Watermark Place in the City. Following their review of their available options, we write to bring you up to date on the Administrators' position.

## 1 The Company's occupation of the Property

**1.1** The Property was the Company's headquarters, consisting of c. 1m square feet over basements, lower mezzanine, ground and 30 upper floors, equating to 1,023,293 square feet of net internal area as measured by Plowman Craven & Associates in their report of September 2003. In addition to those net internal areas, Nomura occupies 2,041 square feet in Basement Level 1. The Underlease includes 256 car parking spaces. The Underlease expires on 2 July 2033.

**1.2** The current rent payable under the Underlease (from 9 November 2009) is £55,861,565.00 pa net, which equates to circa. £54.48 per square foot in the prime office space, plus £640,000 pa for the car park spaces (exclusive of VAT). This office rent is considerably above current market rental levels. In addition there is an Estate Service Charge payable to your clients, which is calculated yearly (from 1 January).

**1.3** The Company currently occupies 290,146 sq ft nia of the Property and 65 car parking spaces in order to conduct the administration of the Company and other Lehman group companies. We enclose a stacking plan which shows the occupation of the Property as at 1 January 2010. This indicates the Company occupies 5 and a half floors as offices (193,603 sq ft nia) and areas in respect of basements, reception, plant and other amenities (96,543 sq ft nia).

CONFIDENTIAL                                                        CW0000181

Linklaters

## 2 Sub-tenants' occupation of the Property

2.1 In this paragraph we set out the details of the sub-tenants' occupation of the Property. Your clients are, of course, fully aware of these sub-lettings and have copies of the relevant documents.

2.2 Nomura occupies part of the Property pursuant to the Nomura Sub-Underlease and a further sub-underlease. The Nomura Sub-Underlease is of 354,256 square feet nia over the following floors of the Property: Floors 31, 30, 27, 26, Part 7, 5, Part 4, 3, Part 2 and Part 1, plus 143 car parking spaces. The Nomura Sub-Underlease expires on 31 March 2011: Nomura can break the Nomura Sub-Underlease on 30 September 2010 or 31 December 2010.

2.3 A further sub-underlease was granted to Nomura on 13 May 2009 of 4,198 square feet over Part Floor 7 and Part Basement Level 1 ("the **Second Nomura Sub-Underlease**"). 2,157 sq ft of the Second Nomura Sub-Underlease falls within the net internal area, as set out in the Plowman Craven report. The remaining 2,041 sq ft falls outside that measured net internal area. The Second Nomura Sub-Underlease also expires on 31 March 2011 and again Nomura can break on 30 September 2010 or 31 December 2010.

2.4 By agreement, Nomura pays its rents directly to your clients. The Nomura rents are a direct pass-through of the full Underlease rents, apportioned to the Nomura space.

2.5 In early 2009, Nomura announced its intention to move from the Property to Watermark Place in the City. Your clients have seen the press reports regarding its re-location. The Administrators believe that Nomura is likely to re-locate during 2010.

2.6 5 further floors of the Property are sub-let and wholly occupied by other sub-tenants (see the enclosed stacking plan). Details of the sub-leases are set out below:

2.6.1 Floor 16 (25,191 square feet nia): Sub-let to the Financial Services Authority ("the **FSA Sub-lease**"). The current rent under the sub-lease is £1,158,786 pa, which the FSA pays to the Company. The sub-lease expires on 2 September 2010 and contains a tenant option to break on 3 March 2010.

2.6.2 Floor 18 (25,188 square feet nia): Sub-let to Heron Quays Properties Limited. The current rent under the sub-lease is £1,375,012.92 pa. plus £17,500 pa for 7 car parking spaces. By arrangement, Heron Quays Properties Limited pays its sub-rent directly to your clients. The sub-lease expires on 2 July 2013. This floor is further sub let to JLL.

2.6.3 Floor 19 (25,190 square feet nia): Sub-let to Heron Quays Properties Limited. The current rent under the sub-lease is £1,375,122.10 pa. plus £15,000 pa. for 6 car parking spaces. By arrangement, Heron Quays Properties Limited pays its sub-rent directly to your clients. The sub-lease expires on 2 July 2013. This floor is further sub let to JLL.

2.6.4 Floor 20 (25,188 square feet nia): Sub-let to Heron Quays Properties Limited. The current rent under the sub-lease is £1,375,012.92 pa. plus £17,500 pa. for 6 car parking spaces. By arrangement, Heron Quays Properties Limited pays its sub-rent directly to your clients. The sub-lease expires on 2 July 2013. This floor is further sub let to ATOS.

2.6.5 Floor 21 (25,302 square feet nia): Sub-let to Heron Quays Properties Limited. The current rent under the sub-lease is £1,381,236.18 pa. plus £17,500 pa. for 7 car parking spaces. By arrangement, Heron Quays Properties Limited pays its sub-rent directly to your clients. The sub-lease expires on 2 July 2013. This floor is further sub let to ATOS.

CONFIDENTIAL                                                                                    CW0000182

Linklaters

### 3 Current vacant space in the Property

3.1 The Company occupies 290,146 sq ft nia of the Property in order to conduct the administration of the Company and other Lehman group companies. The stacking plan enclosed, and referred to above, indicates the areas occupied by the Company being 5 and a half floors as offices (193,603 sq ft nia) and areas in respect of basements, reception, plant and other amenities (96,543 sq ft nia). This equates to 28.30% of the net internal area within the Property (including for these purposes the additional Nomura basement area). Our clients calculate that the proportion of each year's rent attributable to the Company's occupied space is £15,807,154.08 pa.

3.2 8 floors (floors Part 2, 6, 9, 10, 11, 12, 14, 17 and 29) of the Property are currently vacant ("the **Vacant Floors**"). The Vacant Floors comprise 249,184 square feet nia, which equates to 24.30% of the net internal area within the Property (including the additional Nomura basement area). Our clients calculate that the proportion of each year's rent attributable to the Vacant Floors is £13,575,544.32 pa.

3.3 The Company uses 65 car park spaces. 169 car park spaces are sub-let. The remaining 22 car park spaces are no longer required by the Company ("the **Vacant Car Park Spaces**"). Our clients calculate that the proportion of rent attributable to the Vacant Car Park Spaces is £55,000 pa. The proportion of each year's rent attributable to the 65 used car park spaces is £162,500 pa.

### 4 The Company's requirement for space within the Property

4.1 The Administrators have previously highlighted to your clients their concern that the Company is being asked to pay very significant sums of rent for the Property, including for substantial space (both vacant and sub-let) which is not being used for the benefit of the administration.

4.2 The Administrators are conscious of their responsibility to act in the interests of the creditors of the Company as a whole. Accordingly, the Administrators have considered various alternative solutions:

4.2.1 Persuading Nomura to take an assignment of the Underlease. This did not proceed as a result of Nomura's decision to re-locate to Watermark Place in the City.

4.2.2 Staying within 25 Bank Street and paying rent on new current market terms in respect of a defined, reduced area within the Property, under a new letting from your clients. This could be in substitution of the Underlease, or running beneath it. Barry Gilbertson wrote to George Iacobescu on 17 July 2009 to request a response to a RFP to negotiate terms for a letting of part (only) of the Property. Your clients responded on 24 July 2009, stating that they expected full performance of the Company's obligations throughout the term of the Underlease and so would not respond to the RFP. The Administrators found this response disappointing and as a result had to pursue other options. We understand your clients did not find the RFP attractive due to the AIG guarantee and securitisation of rents from the Property. We do not have details of either the AIG guarantee nor the securitisation and further do not accept that these arrangements, outside the landlord and tenant relationship, are relevant, let alone overriding considerations. In any event, this proposal did not depend on terminating the Underlease.

4.2.3 Sub-letting the Vacant Floors directly to third parties, or sub-letting the Vacant Floors to your clients' group so as further to sub-let to third parties, as with existing arrangements. Barry Gilbertson wrote to George Iacobescu on 13 August 2009 suggesting that landlord and tenant proceed jointly to market the vacant space within the Property as the

CONFIDENTIAL    CW0000183

Linklaters

        Administrators found it difficult to capture commitments from potential sub-tenants without your clients' involvement. However, your clients responded on 21 August 2009, stating that they expected full performance of the Company's obligations throughout the term of the Underlease and did not see how joint marketing could assist the Administrators in sub-letting the Vacant Floors. This has severely restricted the Company's ability to progress prospective sub-lettings. See further, section 5 below.

4.2.4    The Company moving out of the Property completely. As your clients are aware, the Administrators took time to review this option thoroughly. In Barry Gilbertson's letter of 13 August 2009, he indicated that a move was likely to be in the first half of 2010. These plans have now crystallised and the Administrators have recently signed an agreement to take space elsewhere. Given our clients' confidentiality commitments in that respect, we do not set out details here, but anticipate, your clients are aware of the agreement. The Company is proposing to complete its move from the Property by 31 March 2010.

## 5 Marketing

5.1    As set out above, one potential solution considered by the Administrators was sub-letting one or more of the Vacant Floors (and linked parking facilities) to third parties. The Administrators instructed Knight Frank LLP, chartered surveyors, to review the potential market for the Vacant Floors. Knight Frank has had a number of discussions and viewings with active potential sub-tenants and their respective agents, in respect of potentially sub-letting either single floors or floors in combination. However, the uncertainty surrounding the Company's administration has made it impossible to progress negotiations with the potential sub-tenants without your clients' support and involvement. Real interest came from the following potential sub-tenants:

5.1.1    **LOCOG (London Organising Committee of the Olympic Games)**: LOCOG was interested in taking 50,000 to 200,000 sq ft in the Property on a short-term let to December 2012. Details were sent to them on 8 October 2009 and a first viewing was held on 12 October 2009 with subsequent viewings thereafter. LOCOG issued a RFP on 13 October 2009. The Property was LOCOG's preferred option and the Administrators believe they would have taken space in the Property. However, LOCOG ended negotiations as a result of the uncertainty surrounding the Company's administration and following direct discussions they had with your clients. The Administrators do not have details of these discussions. Our clients have been told that LOCOG has now taken 89,000 sq ft at 25 Canada Square.

5.1.2    **Thomson Reuters**: Thomson Reuters was interested in taking 160,000 to 200,000 sq ft in the Property. Details were sent on 20 October 2009 and a viewing was held on 28 October 2009. Thomson Reuters issued a RFP on 22 October 2009. However, Thomson Reuters did not progress negotiations due to the uncertainty surrounding the Company's administration. Thomson Reuters is still actively looking for space and our clients have been told it is now pursuing other options within the Canary Wharf estate.

5.1.3    **MF Global**: MF Global was interested in taking 120,000 sq ft in the Property. A first viewing was held on 20 February 2009, with subsequent viewings thereafter. However, MF Global decided not to progress negotiations further as they considered the scenario "too complicated" as a result of the Company's administration. MF Global is still actively looking for space.

CONFIDENTIAL        CW0000184

Linklaters

**5.2**  In addition to those listed above, the Administrators have also had various discussions and viewings with other potential sub-tenants and their agents, principally, Royal Bank of Canada, FSA, News International Plc, Shell International and EMEA. In each case, the potential sub-tenants raised queries on the administration sought reassurance on your clients' support and involvement in respect of the potential sub-lettings as a result of the uncertainty surrounding the Company's status. As the Administrators could not confirm that your clients would be fully co-operative in respect of the potential sub-lettings, it was impossible to progress negotiations further.

**5.3**  Going forward, the Administrators will fully co-operate with your clients in respect of sub-letting the Vacant Floors of the Property.

## 6    1 January 2010 rental payment

**6.1**  As from 1 January 2010 the Administrators intend to pay the rent and Estate Service Charge under the Underlease for the areas in the Property which are occupied by the Company for the benefit of the administration, and only for those areas. Our clients calculate that the proportion of rent attributable to the Company's occupied space is £15,807,154.08 pa and the proportion of rent attributable to the 65 used car park spaces is £162,500 pa. The Company will therefore make a rent payment of £15,969,654.08 pa, which equates to £3,992,413.52 per quarter. Similar adjustments will apply in respect of the Estate Service Charge.

**6.2**  The Administrators offer back to your clients the Vacant Floors and the Vacant Car Park Spaces as from 1 January 2010 so that your clients can use or re-let the space. The Administrators are content to return the Vacant Floors and the Vacant Car Park Spaces to your clients either by way of a sub-lease or a series of sub-leases, in any combination your clients wish, or as your clients may otherwise reasonably request.

**6.3**  The Administrators will leave the Vacant Floors as from 1 January 2010 cleared of all items other than furniture and cabling (i.e. as a "plug and play" environment). The Administrators will leave the satellite equipment rooms on each of the Vacant Floors as they are currently provided, as Knight Frank has advised the Administrators that these are valuable to future potential tenants.

**6.4**  On 1 January 2010, the Company will stop paying rent and Estate Service Charge for areas of the Property which are sub-let. As Heron Quays Properties Limited pays its sub-rent for Floors 18, 19, 20 and 21 directly to your clients, these arrangements will continue unaffected. The Administrators will pass any sub-rent received from the FSA for the quarter starting 1 January 2010 up to your clients. Thereafter, the Administrators shall direct the FSA to remit rents and other sums direct to your clients.

**6.5**  The balance of the rents due under the Underlease will fall to be treated as an unsecured claim in the Company's administration.

**6.6**  We note that on 17 September 2009, no doubt in anticipation of this position, your clients made a claim against the Company's surety, Lehman Brothers Holdings Inc., in the US Chapter 11 proceedings for anticipated unpaid rents, building service charges and other fees and costs through to the expiry of the term of the Underlease in July 2033.

## 7    1 April 2010 rental payment

**7.1**  The Company is proposing to move from the Property by 31 March 2010. Accordingly, effective from 1 April 2010, the Administrators will offer to transfer or terminate the Underlease by

CONFIDENTIAL                                                                                                            CW0000185

Linklaters

    assignment or surrender of the Underlease back to your clients. Alternatively, should your clients reasonably request, the Administrators would enter into sub-leases of part/s, to enable your clients to use or re-let the Property as a whole or in part. In the latter case, where the Underlease remains vested in the Administrators, we would ask your clients to cover our clients' costs of the sub-letting arrangements but they would of course be fully co-operative so as to restrict those costs as far as possible.

**7.2**    As from 1 April 2010, the Company will no longer pay any rent and Estate Service Charge under the Underlease. Any claim that your clients may make for the rent and Estate Service Charge will rank as an unsecured claim in the Company's administration. As noted above, your clients have already made a claim against the Company's surety, Lehman Brothers Holdings Inc., in the US Chapter 11 proceedings for anticipated unpaid rents, building service charges and other fees and costs through to the expiry of the term of the Underlease. The Company will of course pass on to your clients any rents and other sums arising under the sub-leases received from the sub-tenants. As set out above, we anticipate your clients' own rents as sub-tenants can continue to be dealt with within your clients' organisation. Our clients will direct the FSA to remit rents and other sums direct to your clients.

**7.3**    The Administrators propose to leave the space in the Property from 1 April 2010 cleared of all items other than furniture and cabling (i.e. as a "plug and play" environment). The Administrators are willing to consider leaving the auditorium, the 7th Floor facilities (including the restaurant) and the satellite equipment rooms on each of the floors as they are currently provided, as Knight Frank has advised the Administrators that these facilities are valuable to future potential tenants.

## 8    Management

**8.1**    The Company currently manages the Property. It is proposed this will cease from 1 April 2010, and accordingly all contracts with management and building suppliers would be terminated on 31 March 2010. The Administrators offer their co-operation should your clients wish to discuss taking over the management of the Property.

## 9    Continued Co-operation

**9.1**    The Administrators will be fully co-operative with your clients in respect of potentially sub-letting the Vacant Floors of the Property or assisting your clients to re-let the whole Property.

**9.2**    The Administrators are also very happy to discuss the management of the Property with your clients.

The Administrators act on behalf of the Company and neither they, their firm, nor their representatives shall incur any personal liability whatever under or in relation to this letter, the Company's Underlease or in relation to its subject matter. The exclusion of liability set out in this paragraph shall arise and continue notwithstanding the termination of the agency of the Administrators before or after the signing of this letter and the Administrators, their firm and their representatives shall be entitled to rely on, enforce and enjoy the benefit of this paragraph as if they were party to this letter.

Linklaters

Please do contact us if you have any queries in relation to this letter. Please also inform your clients that they should feel free to contact Barry Gilbertson directly if they wish.

Yours faithfully

*Linklaters LLP*

Linklaters LLP

Encs.

CONFIDENTIAL                                                                                                                      CW0000187

| Flr | Comments | | 
|---|---|---|
| 31 | Sublet - Nomura (to 31-Mar-2011) | Tower Floor - Amenities - Dining / Meeting Rooms |
| 30 | | Tower Floor - Executive Floor and Client Meeting Rooms |
| 29 | MOTHBALLED - PwC / Lehman | |
| 28 | PwC / Lehman Occupied | |
| 27 | Sublet - Nomura (to 31-Mar-2011) | Tower Floor - Office Intensive |
| 26 | | Tower Floor - Office Intensive |
| 25 | PwC / Lehman Occupied | |
| 24 | PwC / Lehman Occupied | |
| 23 | PwC / Lehman Occupied | |
| 22 | PwC / Lehman Occupied | |
| 21 | Sublet - Canary Wharf Group (NYSE - to July 2013) | Non standard fit out |
| 20 | | |
| 19 | Sublet - Canary Wharf Group (Jones Lang La Salle - to Jul 2013) | Non standard fit out |
| 18 | | |
| 17 | MOTHBALLED - PwC / Lehman | |
| 16 | Sublet - FSA (to Sept 2010) | Non standard fitout |
| 15 | PwC / Lehman in use - Store | |
| 14 | MOTHBALLED - PwC / Lehman | |
| 13 | MOTHBALLED - PwC / Lehman | |
| 12 | MOTHBALLED - PwC / Lehman | |
| 11 | MOTHBALLED - PwC / Lehman | |
| 10 | MOTHBALLED - PwC / Lehman | |
| 9 | MOTHBALLED - PwC / Lehman | |
| 8 | LANDLORD DEMISE - PwC / Lehman PLANT | |
| 7 | PwC / Lehman AMENITIES plus Nomura Sublet | |
| 6 | MOTHBALLED - PwC / Lehman | |
| 5 | | Podium Floor - Full Trading |
| 4 | | Podium Floor - Full Trading |
| 3 | Sublet - Nomura (to 31-Mar-2011) | Small Podium Floor - Full Trading |
| 2 | | CERs |
| 1 | | Small Podium Floor - Training Suite/General Office Space |
| G | LANDLORD DEMISE - PwC / Lehman RECEPTION | |
| B, M | LANDLORD DEMISE - PwC / Lehman BASEMENTS / MEZZ | |

:PWS relates to Lehman Landlord Demise which we have
assume as L6 (tech area); Level 7 Amenity area; and ground
floor reception area, and the area for management suite

.PW relates to areas actively used and occupied by LBIA for the
purposes of the Administration - floors 22 to 25, 28 and part 4

.PWm relates to space that is 100% mothballed and not used.
Lights off, a/c off

| | Demised Sq.Ft. |
|---|---|
| 31 | 26,114 |
| 30 | 26,112 |
| 29 | 26,114 |
| 28 | 26,109 |
| 27 | 26,112 |
| 26 | 26,112 |
| 25 | 26,110 |
| 24 | 25,076 |
| 23 | 25,078 |
| 22 | 25,076 |
| 21 | 25,605 |
| 20 | 25,484 |
| 19 | 25,487 |
| 18 | 25,485 |
| 17 | 25,486 |
| 16 | 25,488 |
| 15 | 25,492 |
| 14 | 24,380 |
| 13 | 24,893 |
| 12 | 24,495 |
| 11 | 24,880 |
| 10 | 24,873 |
| | |
| 6 | 69,817 |
| 5 | 69,756 |
| 4 | 69,511 |
| 3 | 47,137 |
| 2 | 48,745 |
| 1 | 45,670 |
| Total | 1,023,293 |

| | | | |
|---|---|---|---|
| PwC / LEH | 193,603.000000 | 18.92% |
| | 96,543.000000 | 9.43% |
| PwC / LEH mothballed | 249,184.000000 | 24.35% |
| Nomura Sublet | 356,414.000000 | 34.83% |
| Other Sublet | 127,549.000000 | 12.46% |
| TOTAL | 1,023,293.000000 | 100.00% |

| Level | Code | Sq Ft |
|---|---|---|
| LEVEL 31 | N | 26,114 |
| LEVEL 30 | N | 26,112 |
| LEVEL 29 | PWm | 26,114 |
| LEVEL 28 | PW | 26,109 |
| LEVEL 27 | N | 26,112 |
| LEVEL 26 | N | 26,112 |
| LEVEL 25 | PW | 26,110 |
| LEVEL 24 | PW | 25,076 |
| LEVEL 23 | PW | 25,078 |
| LEVEL 22 | PW | 25,076 |
| LEVEL 21 | S | 25,605 |
| LEVEL 20 | S | 25,484 |
| LEVEL 19 | S | 25,487 |
| LEVEL 18 | S | 25,485 |
| LEVEL 17 | PWM | 25,486 |
| LEVEL 16 | S | 25,488 |
| LEVEL 15 | PW | 25,492 |
| LEVEL 14 | PWm | 24,380 |
| LEVEL 12 | PWm | 24,893 |
| LEVEL 11 | PWm | 24,495 |
| LEVEL 10 | PWm | 24,880 |
| LEVEL 9 | PWm | 24,873 |
| LEVEL 8 | PWS | 336 |
| LEVEL 7 | | |
| LEVEL 6 | PWm | 69,817 |
| LEVEL 5 | N | 69,756 |
| LEVEL 4 | | |
| LEVEL 3 | N | 47,137 |
| LEVEL 2 | | |
| LEVEL 1 | | |
| GRND | PWS | 32,626 |
| B, M | PW | 9,247 |
| LEVEL 1 | N | 15,818 |
| LEVEL 1 | PW | 19117 |
| LEVEL 1 | PWS | 10735 |
| LEVEL 2 | N | 44499 |
| LEVEL 2 | PWm | 4246 |
| LEVEL 4 | PW | 12298 |
| LEVEL 4 | N | 57213 |
| LEVEL 7 | N | 17541 |
| LEVEL 7 | PWS | 52,846 |

| | | | |
|---|---|---|---|
| 26,114 | | 31 |
| 26,112 | | 30 |
| 26,114 | | 29 |
| 26,109 | | 28 |
| 26,112 | | 27 |
| 26,112 | | 26 |
| 26,110 | | 25 |
| 25,076 | | 24 |
| 25,078 | | 23 |
| 25,076 | | 22 |
| 303 | 25,302 | 21 |
| 296 | 25,188 | 20 |
| 297 | 25,190 | 19 |
| 297 | 25,188 | 18 |
| 25,486 | | 17 |
| 297 | 25,191 | 16 |
| 25,492 | | 15 |
| 24,084 | 296 | 14 |
| 24,892 | | 13 |
| 24,495 | | 12 |
| 24,880 | | 11 |
| 24,873 | | 10 |
| 336 | | 9 |
| | | 8 |
| 69,817 | | 7 |
| 69,757 | | 6 |
| | | 5 |
| 47,137 | | 4 |
| | | 3 |
| | | 2 |
| | | 1 |
| 17,541 | | |
| 52,846 | | |

CONFIDENTIAL

CW0000188