# EXHIBIT 41

Page 1

1                    A. DIETDERICH
2           UNITED STATES BANKRUPTCY COURT
3           SOUTHERN DISTRICT OF NEW YORK
4   ---------------------------------x
5   In Re:                            Chapter 11 Case No.
                                      08-13555(JMP)
6   LEHMAN BROTHERS HOLDINGS INC., (Jointly Administered)
    et al.,
7
                   Debtors.
8   ---------------------------------x
9     VIDEOTAPED DEPOSITION OF ANDREW DIETDERICH
10                New York, New York
11                 June 11, 2013
12
13
14
15
16
17
18
19
20
21
22
23  Reported by:
24  KATHY S. KLEPFER, RMR, RPR, CRR, CLR
25  JOB NO. 62073

Page 54

A. DIETDERICH
1
2  Q.  Of course.
3      Did you have any conversations with
4  JPMorgan or its counsel about whether Canary
5  Wharf should provide LBHI with notice under the
6  guarantee?
7  A.  Yes.
8  Q.  What discussions did you have?
9  A.  We had a discussion with JPMorgan that
10 we had to reduce to writing clearly that LBHI
11 did not want the lease.  So we had to reduce --
12 you know, we wanted to reduce to writing that
13 LBHI, you know, would decline entering into a
14 replacement lease.
15 Q.  Did you have any discussions with
16 JPMorgan -- strike that.
17     To your knowledge, did Canary Wharf
18 have any discussions with JPMorgan where the
19 issue of -- strike that.
20     Did anyone from JPMorgan ever
21 discuss -- sorry.
22     (Exhibit 10, an e-mail chain bearing
23 Bates Nos. CW0010435 through 10436, marked
24 for identification, as of this date.)
25     MR. MEADE:  I'm handing you what has

Page 55

1              A. DIETDERICH
2  been marked as Exhibit 10.
3      MR. TULCHIN:  That's yours.  The one
4  with the sticker is yours.  I get the
5  unofficial version.
6  BY MR. MEADE:
7  Q.  I've handed you what has been marked
8  as Exhibit 10.  It's Bates-stamped CW0010435.
9      Mr. Dietderich, if you can look at the
10 earliest e-mail on the chain.  It's on page
11 10436.  It's an e-mail from yourself to Richard
12 Krasnow and Daniel Ehrmann at Alvarez & Marsal.
13     Your first line states, "Per George's
14 call with Daniel, we are regular U.S. counsel to
15 the Glick family and Canary Wharf."
16     Who are the Glicks?
17 A.  The Glicks are a family that had an
18 economic interest in Canary Wharf.
19 Q.  Do you know what that economic
20 interest is?
21 A.  They own part of it indirectly.
22 Q.  Let me clarify.  Sorry.  Let me
23 clarify.
24     What is their relationship to Canary
25 Wharf?

Page 56

1              A. DIETDERICH
2  A.  They're one of the owners.
3  Q.  Okay.  Now, in this e-mail you asked
4  Mr. Krasnow and Daniel Ehrmann to meet with you
5  on this day, correct?
6  A.  Yes.
7  Q.  And you had a meeting with Mr. Krasnow
8  at Weil Gotshal?
9  A.  Yes.
10 Q.  Who attended that meeting on behalf of
11 Canary Wharf?
12 A.  From memory, it was Richard -- sorry.
13 Q.  For Canary Wharf?
14 A.  For Canary Wharf, it was Sam Levinson,
15 I think Joe Shenker, and me.
16 Q.  Who is Mr. Levinson?
17 A.  Sam Levinson is -- I believe he's a
18 board member of Canary Wharf, but he's a
19 representative of the Glick family.
20 Q.  Representative?  Counsel for them?
21 A.  No, he's not a lawyer.  He's -- he's
22 a -- he's an advisor for the family.
23 Q.  And you mentioned an additional name?
24 A.  Joe Shenker.
25 Q.  Joe Shenker.  Who is Mr. Shenker?

Page 57

1              A. DIETDERICH
2  A.  He's a lawyer with Sullivan &
3  Cromwell.
4  Q.  To your recollection, who attended on
5  behalf of LBHI?
6  A.  Richard Krasnow, and I believe Richard
7  had one or maybe two other lawyers with him from
8  Weil.
9  Q.  Okay.  What's your recollection of
10 what was discussed at that meeting?
11 A.  Well, at that meeting -- and for the
12 purpose of the e-mail, too -- at that meeting we
13 discussed trying to get confirmation from LBHI
14 that it didn't want to enter into a replacement
15 lease so we could do the mitigation transaction
16 with JPMorgan.
17 Q.  Do you recall what Mr. Krasnow stated
18 at that meeting?
19 A.  Mr. Krasnow wanted a lot of
20 information about the transaction before he
21 would give that confirmation.
22 Q.  Did he express why he wanted that
23 information?
24 A.  To -- from memory, not specifically.
25 I think he just wanted to assess the

Page 58

1          A. DIETDERICH
2   transaction.
3       Q.   Okay.  But did he explain why he
4   wanted to assess the transaction?
5           MR. TULCHIN:  Asked and answered.
6       Q.   You can answer.
7       A.   I don't recall anything specific
8   beyond what I said.
9       Q.   Sure.
10      A.   Actually, can I correct that?  I do
11  recall.  Now that I remember, I do recall.
12      Q.   Go ahead.
13      A.   I think he wanted to make sure there
14  had been an earlier conversation in a
15  stipulation -- this relates to the stipulation
16  that I mentioned earlier.  There had been a
17  conversation about whether or not, after we were
18  done mitigating our losses, our losses, our
19  unmitigated losses, would be in excess of the
20  stipulated amount.
21          So, said differently, there had been
22  discussions, again, we weren't on the front line
23  of these discussion, about stipulating the
24  amount of the claim on the -- on the indemnity,
25  surety, whatever you want to call it, and there

Page 59

1          A. DIETDERICH
2   was a concern that we not do some fantastic deal
3   with JPMorgan that then covers our losses to the
4   extent where the stipulated claim would be
5   inappropriate.
6       Q.   Understood.
7       A.   Okay.  So that was the main reason
8   why, I think, main articulated reason Richard
9   had why he wanted to see the deal.
10      Q.   And what was the response?  When he
11  requested information about the deal, what was
12  the response?
13      A.   Well, the solution to that was really
14  the same solution that was in the stipulation.
15      Q.   Sure.
16      A.   Which is to say the stipulation
17  included a statement by us that we are
18  contemplating -- I forget the exact words, but
19  we are contemplating a mitigating transaction,
20  but after we're done with that, our losses will
21  still be more than the stipulated claim.
22          So the solution to this impasse was
23  for us to get permission, which I believe we had
24  gotten specifically from JPMorgan through Canary
25  Wharf, to disclose verbally to Richard the

Page 60

1          A. DIETDERICH
2   amount JPMorgan was paying.
3       Q.   Okay.
4       A.   So that would allow us to do the math
5   and to show the stipulated claim was still
6   greater than the unmitigated losses.
7       Q.   But did he ask for documentation
8   relating to the deal?
9       A.   Yes, he wanted to see the document.
10          MR. TULCHIN:  Do me a favor.  You're
11      answering the question before Mr. Meade has
12      finished it.  Just wait.  Wait until he
13      finishes his question.
14      Q.   I'll ask it again.  Did he ask for
15  documentation relating to the deal?
16      A.   Yes.
17      Q.   And what was the response?
18      A.   We needed JPMorgan's permission to
19  give them the documentation.
20      Q.   Was there any discussion of whether
21  JPMorgan was permitting you to show the
22  documentation?
23      A.   At that time, JPMorgan was not until
24  we confirmed that LBHI was not interested in a
25  real estate placement lease.

Page 61

1          A. DIETDERICH
2           (Exhibit 11, an e-mail bearing Bates
3       Nos. CW0010463, marked for identification,
4       as of this date.)
5   BY MR. MEADE:
6       Q.   Mr. Dietderich, I'm showing you what's
7   been marked as Exhibit 11.  This is an e-mail
8   Bates-stamped CW0010463 from Andrew Dietderich
9   to Richard Krasnow, Rupert Jones, Erika DelNido
10  and copying several people.
11          Mr. Dietderich, have you seen this
12  e-mail?
13      A.   Yes.
14      Q.   Do you recall sending it?
15      A.   Yes.
16      Q.   Okay.  Now, in the e-mail you wrote
17  that, if you can see on the -- sorry, on the
18  first line, "Canary Wharf and third party are
19  setting closing time -- it's a big deal to
20  coordinate and has politicians making
21  announcements, et cetera -- and they both are
22  asking (now rather urgently, for the British)
23  for confirmation that you are not queuing up to
24  be our new tenant instead."
25          Did you -- now, the third party here

Page 62

1  A. DIETDERICH
2 is JPMorgan, correct?
3  A. Yes.
4  Q. Now, what did you mean when you said
5 "confirmation that you are not queuing up to be
6 our new tenant"?
7  A. That they didn't want to step into the
8 lease.
9  Q. Now, and you wrote further down, "The
10 longer we leave open the theoretical possibility
11 of a replacement lease instead of third party
12 deal, the more head scratching it is causing at
13 the third party and Canary Wharf."
14  What did you mean by that?
15  A. Well, JPMorgan had now been asking us
16 for a substantial period of time, a week or two,
17 which in a deal like this is a lot of time, to
18 confirm that LBHI didn't want a lease, something
19 that we thought was relatively straightforward.
20  Q. Right.
21  A. And we had not yet been able to secure
22 that confirmation, and so people were getting
23 very, very worried on what LBHI was thinking and
24 why aren't they confirming they don't want the
25 lease to allow us to do this deal.

Page 63

1  A. DIETDERICH
2  Q. Okay. And so what did you mean by
3 "LBHI leaving open the possibility of a
4 replacement lease"?
5  MR. TULCHIN: I think it says, I'm
6 sorry, "theoretical possibility"; is that
7 where you're reading?
8  MR. MEADE: Correct.
9 BY MR. MEADE:
10  Q. How was -- strike that. How was LBHI
11 leaving open the theoretical possibility of a
12 replacement lease?
13  A. By failing to confirm they didn't want
14 one.
15  (Exhibit 12, an e-mail chain bearing
16 Bates Nos. CW0010464 through 10466, marked
17 for identification, as of this date.)
18 BY MR. MEADE:
19  Q. I'm handing you what has been marked
20 as Exhibit 12. This is an e-mail Bates-stamped
21 CW0010464. The top e-mail is from Mr.
22 Dietderich to Mr. Krasnow, with several
23 individuals copied, on Wednesday, December 8,
24 2010, 6:59 P.M.
25  Mr. Dietderich, if you could just look

Page 64

1  A. DIETDERICH
2 through this chain. Do you recall these
3 e-mails?
4  A. Yes, I do.
5  Q. If you could go down to the e-mail on
6 the page Bates-stamped 10465 from -- on
7 Wednesday, December 8 at 5:02 P.M. Do you see
8 that e-mail?
9  A. Uh-huh.
10  Q. Did you see where you wrote, "It is
11 not tenable for either of them that you reserve
12 the right to compete with the new tenant for the
13 space"; do you see that?
14  A. Yes, I do.
15  Q. The last sentence?
16  How was LBHI reserving the right to
17 compete?
18  A. By not confirming whether it wanted
19 the lease or not.
20  Q. I'm just not sure, though, I
21 understand what you mean, though, by not
22 confirming the right to compete, how were
23 they -- sorry. Strike that.
24  By not confirming whether they wanted
25 the lease, how did you believe they were

Page 65

1  A. DIETDERICH
2 reserving the right to compete?
3  MR. TULCHIN: It's self-evident, I
4 think.
5  Go ahead, Mr. Dietderich, if you can.
6  MR. MEADE: Mr. Dietderich can answer
7 the question.
8  THE WITNESS: We had, at this point,
9 we had now been trying for an entire week to
10 get confirmation from LBHI that they didn't
11 want a lease, okay? If LBI wants a lease on
12 the replacement terms, right, it eliminates,
13 right, our need to mitigate damages because
14 there are no damages. Right?
15  If LBI wants -- perhaps LBI would say
16 that you're mitigating damages in an
17 appropriate way? We have a better idea to
18 do it.
19 BY MR. MEADE:
20  Q. You could have mitigated your damages
21 simply by doing the transaction with JPMorgan?
22  A. That's what we were trying to do,
23 exactly what -- that's exactly what we were
24 trying to do, was trying to mitigate our damages
25 by doing the transaction with JPMorgan, and

17

```
                                      Page 74                                            Page 75
 1           A. DIETDERICH                           1           A. DIETDERICH
 2   discussed," that's exactly what I mean. I mean  2   documents?
 3   that we did a deal with JPMorgan and we still   3       A.   Me personally or Sullivan & Cromwell?
 4   had, you know, substantial unmitigated losses   4       Q.   Well, Sullivan & Cromwell.
 5   along the same lines.                           5       A.   You know, at -- I'm a deal lawyer, not
 6       Q.   If you have a look at 1771 of that     6   a litigator.
 7   same exhibit. This is Mr. Krasnow's response    7       Q.   I understand.
 8   where Mr. Krasnow wrote, if you go down one,    8       A.   Right. So, after this involvement,
 9   two, three, four, five lines, you see where it  9   you know, this e-mail of Richard, we basically
10   says "at a minimum"?                           10   transitioned to a, you know, the team that --
11          "At a minimum, we will need copies of   11   primarily the team that was helping in the
12   the final, executed agreement with JPMorgan,   12   litigation for the claim.
13   with all schedules, a blacklined copy of the   13          So I understand there's been discovery
14   same reflecting changes made to the version that 14 since then, including probably the changes that
15   you had sent us, and copies of the AIG agreement 15 Richard has requested, but I don't have any
16   and any related agreements pertaining to AIG's 16   specific recollection.
17   payment or deferral of payment, of amounts due 17           (Exhibit 17, a letter dated January
18   under the lease."                              18      27, 2011, marked for identification, as of
19          Now, after he sent this e-mail, did     19      this date.)
20   you have additional conversations with him about 20 BY MR. MEADE:
21   this information, with Mr. Krasnow?           21       Q.   I'm handing you what has been marked
22       A.   I don't remember. I don't remember.  22   as Exhibit 17. This is -- this is not a
23       Q.   Do you recall that in January 2011 you 23 Bates-stamped document. This is the cover
24   provided Mr. Krasnow with additional information 24 letter which accompanied the documents that you
25   regarding the JPM transaction, specifically   25   provided to Mr. Krasnow.
```

```
                                      Page 76                                            Page 77
 1           A. DIETDERICH                           1           A. DIETDERICH
 2          Please take a look at it and just let    2       A.   I could find out by process of
 3   me know if you remember it.                     3   elimination.
 4          (Document review.)                       4       Q.   I don't need to know that badly. I
 5       A.   Yes, this one I don't have an          5   was just curious.
 6   immediate recollection of, but I can read it.   6          (Exhibit 18, Agreement Relating to the
 7   It's been signed on my behalf by somebody.      7      Grant of a Lease of 25 Bank Street, Canary
 8       Q.   Who is LJL?                            8      Wharf, London, bearing Bates Nos.
 9       A.   I don't know. I don't know.            9      LBHI_CW0013640 through 13765, marked for
10       Q.   Somebody working for you?             10      identification, as of this date.)
11       A.   Yes, I would assume. It's not --     11   BY MR. MEADE:
12          MR. TULCHIN: Mr. Dietderich, hold on.  12       Q.   I'm handing you what has been marked
13      Hold on. I may be the only one in this     13   as Exhibit 18. This is a document which has
14      room -- I suspect there's one other        14   been Bates-stamped LBHI_CW0013640.
15      person -- who is having trouble with the   15          Mr. Dietderich, I can represent to you
16      fact that you're talking over Mr. Meade and 16   this was one of the documents that accompanied
17      he's talking over you, and my interest is in 17 your January 27, 2011 cover letter.
18      a clean transcript which accurately reflects 18         If you could please turn to the page
19      your testimony. To do that, the two of you 19   that Bates-stamped 13667. Well, first, let me
20      have to speak separately.                  20   ask you, have you seen this document before?
21   BY MR. MEADE:                                 21       A.   Again, it appears to be the same
22       Q.   Mr. Dietderich, here's the question: 22   agreement. I haven't reviewed it and I wasn't
23   Do you know who LJL is?                       23   involved in its drafting.
24       A.   I can't immediately recall.          24       Q.   Now, if you can turn to page 13667.
25       Q.   That's fine. That's fine.            25          Do you see the Section 7.16 has been
```

Page 78

1            A. DIETDERICH
2  redacted?
3      A.   Yes, I do.
4      Q.   Okay.  Now, sir, if you could look
5  back at your cover letter that accompanied it,
6  you noted, "Additionally, certain portions of
7  the enclosed documents have been redacted to
8  prevent disclosure of privileged legal advice in
9  which the parties share a common legal
10 interest."
11          (Document review.)
12     Q.   Sir, if you could look back at Exhibit
13 15 real quick.
14     A.   Uh-huh.
15     Q.   This is the final unredacted version
16 which was produced in discovery in this case.
17 7.16 is in here unredacted.
18          Do you see that on page --
19     A.   Yes.
20     Q.   -- 5308?
21          Mr. Dietderich, do you know what the
22 basis was for redacting 7.16 in the version that
23 you sent to Mr. Krasnow in January of 2011?
24     A.   I assume it's stated in my -- on
25 the -- in the letter.

Page 79

1            A. DIETDERICH
2      Q.   Well, do you know how that provision
3  reflects privileged legal advice?
4      A.   I'm not an expert in that question.
5      Q.   That was not a decision you made is
6  what I'm asking?
7      A.   Personally?
8      Q.   Well, your letter states that certain
9  provisions of this agreement were redacted
10 because they reflect -- "to prevent disclosure
11 of privileged legal advice in which the parties
12 share a common legal interest."
13          What I'm asking you is how did Section
14 7.16, which was subsequently produced
15 unredacted, disclose privileged legal advice?
16          MR. TULCHIN:  I think the question
17     that was pending was whether you did it,
18     whether you made the decision to do the
19     redactions.
20 BY MR. MEADE:
21     Q.   Well, let's start there.  Did you make
22 the decision to do the redactions?
23     A.   No.
24     Q.   Do you know how Section 7.16 reflects
25 privileged legal advice?

Page 80

1            A. DIETDERICH
2      A.   I assume that it's --
3          MR. TULCHIN:  Don't assume anything.
4     He's just asking you do you know.  Either
5     the answer is yes or no.  That's his
6     question.
7          THE WITNESS:  Well, then no.
8          MR. MEADE:  Just give me five minutes.
9     Were you -- did you have something
10    else to say?
11         THE WITNESS:  No, I was just going to
12    say I assume we had a basis for the
13    statement made in the cover letter.
14         MR. TULCHIN:  Don't assume anything.
15    He's not asking you for assumptions.  That's
16    a different question.
17         MR. MEADE:  Just give us five minutes.
18    We may be able to wrap up.
19         MR. TULCHIN:  Okay.
20         THE VIDEOGRAPHER:  The time is 2:16
21    P.M.  We're going off the record.
22         (Recess.)
23         THE VIDEOGRAPHER:  The time is 2:25
24    P.M.  We're back on the record.  Video
25    number 2.

Page 81

1            A. DIETDERICH
2          THE WITNESS:  May I correct now?
3          MR. MEADE:  Please.
4          MR. TULCHIN:  Okay.  Go ahead.
5          THE WITNESS:  So I would just
6     like to -- I just recalled that I was a
7     participant, I was deposed earlier in a
8     personal insurance dispute between a
9     contractor and an insurance company.
10 BY MR. MEADE:
11    Q.   Okay.
12    A.   So this is my second deposition.
13    Q.   But that was just a personal matter of
14 yours?
15    A.   Yes.
16    Q.   Okay.  That's fine.  Thank for the --
17    A.   And very minor.  That's why I had
18 forgotten it.
19    Q.   Thank you for that clarification.
20         (Exhibit 19, an e-mail chain bearing
21    Bates Nos. CW0022598 through 22600, marked
22    for identification, as of this date.)
23         (Exhibit 20, an e-mail chain bearing
24    Bates Nos. CW0010440 through 10452, marked
25    for identification, as of this date.)

21