# EXHIBIT 42

```
          IN THE UNITED STATES BANKRUPTCY COURT
          SOUTHERN DISTRICT OF NEW YORK

          ---------------------------)
                                     )
          In re                      )
                                     )Chapter 11
                                     )
          LEHMAN BROTHERS             )Case No.
                                     )
          HOLDINGS INC., et al.,     )08-13555 (JMP)
                                     )
                                     )(Jointly Administered)
          Debtors.                   )
                                     )
                                     )
          ---------------------------)


          VIDEO DEPOSITION UPON ORAL EXAMINATION
                          of

                  ANTHONY MICHAEL BRIAM

              On Wednesday, 19th June 2013

              Taken at the offices of:
              Weil Gotshal & Manges LLP,
                    110 Fetter Lane,
                    London EC4A 1AY,
                         England



          Reported by:  Richard Harper
```

Page 1

```
                    I N D E X

 Deponent                             Page

 MR. ANTHONY MICHAEL BRIAM

 Direct Examination by Mr. Isakoff       4
 ReDirect by Mr. De Leeuw              194
 Direct Examination by Mr. Isakoff     216
            ----------

    Exhibits marked during this deposition

     Exhibit                Page

       43                    98
       44                   122
       45                   146
       46                   149
       47                   151
       48                   152
       49                   153
       50                   186
       51                   202
```

Page 3

```
                    A P P E A R A N C E S

        On behalf of the Lehman Brothers Holdings
     Inc:
        WEIL GOTSHAL & MANGES LLP
            1300 Eye Street NW
            Suite 900
            Washington, DC 20005-3314

        BY:  MR. PETER D. ISAKOFF
             MR. KEVIN F. MEADE


        On behalf of the Claimant:
        SULLIVAN & CROMWELL LLP
            125 Broad Street
            New York, New York 10004-2498
        BY:  MR. MARC DE LEEUW


     Videographer:  Wendy Viner

            Marten Walsh Cherer Ltd.,
            1st Floor, Quality House,
            6-9 Quality Court,
            Chancery Lane,
            London WC2A 1HP.

     Court Reporter:
            Richard Harper
            Marten Walsh Cherer Ltd.,
            1st Floor, Quality House,
            6-9 Quality Court,
            Chancery Lane,
            London WC2A 1HP.
```

Page 2

```
                    ANTHONY BRIAM

         (The deposition commenced at 9.33)
            THE VIDEOGRAPHER:  Here begins
    video tape Number 1 in the deposition of Tony
    Briam in Re: Lehman Brothers Holdings Inc., et al,
    in the United States Bankruptcy Court, Southern
    District of New York, Chapter 11 Case Number
    08-13555 (JMP).  Today's date is June 19th 2013
    and the time is 9.33 a.m.
            The video operator today is Wendy
    Viner of Marten Walsh Cherer Limited.  This video
    deposition is taking place at Weil Gotshal &
    Manges at 110 Fetter Lane London EC4.  Counsel,
    would you please voice identify yourselves and
    state who you represent.
            MR. ISAKOFF:  Peter Isakoff and
    Kevin Meade of Weil Gotshal & Manges LLP for
    Lehman Brothers Holdings Inc.
            MR. DE LEEUW:  Marc De Leeuw from
    Sullivan & Cromwell representing claimants, Canary
    Wharf and the witness, Tony Briam.
            THE VIDEOGRAPHER:  The court
    reporter today is Richard Harper of Marten Walsh
    Cherer Limited.  Would the court reporter please
    swear in the witness and we can proceed.
```

Page 4

1 (Pages 1 to 4)

## Page 21

ANTHONY BRIAM

1 matters involved in relation to 25 Bank Street,
2 again from 2008 onwards, and I have discussed, as
3 I say, discussed timing of matters and also the --
4 a little of the background with the LBL
5 negotiations.
6     Q.   Okay. What can you recall you and
7 she said?
8         MR. DE LEEUW: Again, the same
9 instruction. Do not disclose legal advice that
10 was given to Canary Wharf, or communications with
11 Canary Wharf seeking legal advice.
12     A.   The discussions with Sarah will
13 have included the attempts at negotiating a
14 surrender with LBL and the inability to reach
15 agreement on the terms of the surrender and,
16 ultimately, the forfeiture letter of the 3rd
17 December 2010. And the issues arising on the,
18 I believe, the 30th September 2010, when the
19 administrator to LBL was going to cease running
20 the building systems and abandon the building.
21 BY MR. ISAKOFF:
22     Q.   Did you discuss with her the issue
23 as to whether Canary Wharf would serve a notice
24 under section 7(a) of Schedule 4 to the LBL lease?

## Page 22

ANTHONY BRIAM

1         MR. DE LEEUW: That calls for a yes
2 or no answer.
3     A.   I do not recall.
4 BY MR. ISAKOFF:
5     Q.   Do you know what I am talking about
6 when I refer to the notice under section 7(a) of
7 the Schedule 4 of the LBL lease?
8     A.   I do, but I do not recall having
9 discussed it with Sarah.
10     Q.   Do you know whether such a notice
11 was ever drafted?
12     A.   I do not recall whether a notice
13 was drafted.
14     Q.   Do you know whether there was any
15 draft of any papers to be filed in the United
16 States court seeking permission to serve such a
17 notice?
18     A.   I am not aware of the filing of any
19 such papers.
20     Q.   My question, maybe it was not
21 clear, is: Do you recall whether there was any
22 drafting of any such papers that could have been
23 filed in a bankruptcy court in New York?
24     A.   I have no recollection of any such.

## Page 23

ANTHONY BRIAM

1     Q.   Can you briefly sketch your
2 educational background?
3     A.   Briefly, I attended two primary
4 schools, one called Steeple Claydon --
5 S-T-E-E-P-L-E C-L-A-Y-D-O-N, which is in
6 Buckinghamshire in England, and another one --
7 that was for a year or a year and a half. Then I
8 attended another primary school called Potton --
9 P-O-T-T-O-N County primary school. The first one
10 was from '55 to '56, the second one was from '56
11 to '61. I then passed what we called -- it does
12 not exist any more, it may do in certain
13 counties -- the 11-Plus, which is an examination
14 for your education, 11-Plus -- and went to a
15 school in a town called Biggleswade --
16 B-I-G-G-L-E-S-W-A-D-E, which is in Bedfordshire.
17 Potton is also in Bedfordshire, coincidentally.
18 I was a pupil there from 1961 to 1968. In 1968
19 I went up to Clare College -- C-L-A-R-E, in
20 Cambridge where I studied from 1968 to 1971.
21 Then, from 1971 to 1972, I attended the College of
22 Law in Lancaster Gate and passed my solicitors'
23 finals exams in 1972 and then started my training
24 as a solicitor with a firm in the West End of

## Page 24

ANTHONY BRIAM

1 London called Boodle Hatfield & Co -- B-O-O-D-L-E,
2 Hatfield -- H-A-T-F-I-E-L-D. The training lasted
3 from 1972 to 1974, whereupon I qualified as a
4 solicitor.
5     Q.   And how have you been employed
6 since?
7     A.   From 1974, when I qualified as a
8 solicitor to 1975, I remained as a qualified
9 solicitor at Boodle Hatfield, handling
10 conveyancing, as we called it then, real estate,
11 and a bit of private client and trust work as
12 well. I moved, in roughly February 1975, from
13 Boodle Hatfield to -- over in the west end of
14 London as I mentioned -- to Allen & Overy, who are
15 based in the City of London. I was there from '75
16 to '76. I then left Allen & Overy and joined, in
17 1976, June 76, Clifford-Turner -- there is a
18 hyphen between Clifford and Turner -- where
19 I became a partner on the 1st May 1981.
20 Clifford-Turner merged with Coward Chance on 1st
21 May 1987 and became Clifford Chance, and I have
22 been a partner there since. So, through from 1st
23 May '81 to date, although there was the merger in
24 1987, and I have specialised in real estate

6 (Pages 21 to 24)

MARTEN WALSH CHERER LTD     1ST FLOOR, 6 - 9 QUALITY COURT, CHANCERY LANE     LONDON, WC2A 1HP
TEL: (020) 7067 2900              E-MAIL: info@martenwalshcherer.com                FAX: (020) 7831 6864

```
                ANTHONY BRIAM                                        ANTHONY BRIAM
 1                                                     1
 2    A.    Umm hmm.                                   2    A.    I do not and it may not have been
 3    Q.    "...will proceed to close down the         3  me that sent it.
 4  building."  Do you see that?                       4    Q.    If you will turn to the second page
 5    A.    No, that is not from Sarah Dawson.         5  of this exhibit, this is your response to
 6  That, "My clients will proceed to close down the   6  Ms. Taylor, would you agree, at the bottom?
 7  building", is from Katie Bradford, because it was  7    A.    Yes.
 8  her clients, LBL, who were going to close down the 8    Q.    This is now 26th September and you
 9  building.                                          9  write in the second paragraph: "I confirm that it
10    Q.    Can you tell me where Sarah               10  will be impossible for CW to take a surrender on
11  Dawson's comments begin and where they end, with  11  30 September, due to the necessity for
12  respect to that point as to ----                  12  securitization approval and approval from the US
13    A.    Well, I cannot ----                       13  court of the settlement of the claims against LBHI
14    Q.    I have to finish my question -- as        14  (although it is hoped that these approvals will be
15  she has indicated -- as Sarah has indicated in her 15  forthcoming reasonably shortly)."  Was that true,
16  e-mail to Katie that she has, "added responses to 16  that it was impossible for CW to take a surrender
17  the two points you have raised below"?            17  for those two reasons?
18    A.    Without the different colours it is      18    A.    It was commercially impossible,
19  not possible to be absolutely certain, although my 19  yes.
20  belief, having read this for the first time --    20    Q.    Tell me why?
21  I say perhaps for the second time, as I was copied 21    A.    First of all, without
22  in on 23rd September 2010 -- my belief is that    22  securitization approval Canary Wharf would have
23  Sarah's response starts after the word "building" 23  been in breach of their obligations under the
24  in the fourth line.                               24  securitization, would have probably resulted in --
25    Q.    I am handing you what has been           25  could have, I say probably -- may have resulted in

                                           Page 65                                              Page 67

                ANTHONY BRIAM                                        ANTHONY BRIAM
 1                                                     1
 2  previously marked as exhibit 29, which is CW 587   2  default action by the securitization trustees.
 3  to 89.  This time you are one of the               3    Q.    What, if anything, had been done to
 4  correspondents on this chain.  If you will turn to 4  secure approval as of the time of this e-mail?
 5  the last page this is from Beatrice Taylor.  Who   5    A.    I do not recall exactly what would
 6  is Beatrice Taylor?                                6  have been done but certainly there would have been
 7    A.    Beatrice Taylor is a transactional        7  discussions with securitization trustees, with
 8  real estate lawyer at Linklaters.                  8  which I had no involvement whatsoever.
 9    Q.    And who is Katie Bradford?                 9    Q.    You would not have had any
10    A.    Katie Bradford is a real estate          10  involvement?
11  litigator at Linklaters, and you will see from   11    A.    No.
12  exhibit 28, page 1, her sign off is "Katie       12    Q.    Would you have been advised about
13  Bradford, Partner, Property and Finance          13  them?
14  Litigation."                                     14    A.    I would have been aware that
15    Q.    Okay.  In her first line,               15  securitization trustee approval would be required,
16  Ms. Taylor in her e-mail in the last page of this 16  but not part of my role.  That would be part of
17  exhibit says: "Further to our telephone         17  the role of those who were more adept in such
18  conversation, please see attached mark-up of the 18  matters.
19  Agreement For Surrender which remains subject to 19    Q.    Okay.  Do you know what it would
20  our client's comments."  Do you recall this      20  have taken to get securitization trustee approval?
21  conversation that she is referencing?            21    A.    No.
22    A.    No, I do not.                            22    Q.    But would it have required the
23    Q.    Do you recall when you had sent any     23  provision of substitute properties for the
24  changes to the draft surrender agreement that   24  property that was being surrendered?
25  Mr. Jervis' letter sent to your client?         25         MR. DE LEEUW:  Objection to form.

                                           Page 66                                              Page 68
```

17 (Pages 65 to 68)

ANTHONY BRIAM

1  You can answer.
2  A. It could well have done but I would
3  need to check that with a colleague.
4  BY MR. ISAKOFF:
5  Q. Okay. Was it, putting aside
6  securitization approval, would it have been
7  impossible for CW to take a surrender on 30
8  September because there had not yet been approval
9  from a US court of a settlement of claims against
10 LBHI?
11 A. The impossibility would be that if
12 a surrender were taken without the court approval
13 having been obtained to a deal with LBHI,
14 I understand that the position would have been
15 that there would have been a very strong argument
16 by LBHI that its liabilities going forward had
17 been expunged by the surrender without its
18 involvement in the surrender.
19 Q. Can you explain to me what -- first
20 of all, would you have agreed with that argument?
21 A. Given the preceding breach by the
22 announcement that no rent was going to be paid
23 going forward, back from the end of March,
24 I believe, 2010, Canary Wharf would have had their

Page 69

ANTHONY BRIAM

1  rights under the indemnity, but this is something
2  which was sensible for Canary Wharf not to allow.
3  I say not to allow, not to enter into.
4  Q. Would they have had a right under
5  section 7(a) of the Schedule 4 of the lease to
6  serve a substitute lease on LBHI at that
7  point ----
8  A. No.
9  Q. -- once there was a surrender?
10 A. No.
11 Q. I am showing you what has been
12 previously marked as exhibit 3, CW 11478 to 81.
13 Can you identify the document?
14 A. Yes, I have it in front of me.
15 Q. What is it?
16 A. It is Schedule 4 to the lease.
17 Q. If you look at 7(a), it says: "The
18 surety hereby further covenants with the Landlord
19 and the Management Company that:- (i) if the
20 Crown or a liquidator or trustee in bankruptcy
21 shall disclaim or surrender this lease..." Then
22 it continues: "THEN the Surety [Landlord] shall
23 if the Landlord by notice in writing given to the
24 Surety within one hundred and eighty days..." and

Page 70

ANTHONY BRIAM

1  so on, can tender a new lease. Why would that not
2  apply if you had accepted a surrender of LBL's
3  lease on September 30 2010, as discussed in your
4  e-mail to Ms. Taylor?
5  A. 7(a)(ii) would not apply because
6  the lease was not forfeited. 7(a)(iii) would not
7  apply because the tenant has not ceased to exist.
8  7(a)(i), relates to the circumstances set out in
9  7(a)(i), which are: "If the Crown or a liquidator
10 or trustee in bankruptcy shall disclaim or
11 surrender this Lease." We are not here involved
12 with the Crown disclaiming or surrendering, we are
13 not involved with a liquidator disclaiming or
14 surrendering, and a trustee in bankruptcy is the
15 -- effectively the liquidator of an individual,
16 not of a company. There is no concept of a
17 trustee in bankruptcy of a company here. It is
18 either an administrator or a liquidator, they were
19 not a trustee in bankruptcy.
20 Q. So if any surrender agreement had
21 been entered into at any time, as between LBL and
22 Canary Wharf, you are saying that the remedy
23 available under section 7 of this schedule would
24 simply never apply?

Page 71

ANTHONY BRIAM

1  A. That is my understanding.
2  Q. If that is true then why were you
3  not discussing forfeiture of the lease with LBL in
4  September 2010?
5  A. There was the potential for the
6  deal with LBHI to be negotiated and concluded in
7  advance of a surrender.
8  Q. Why would that be better for Canary
9  Wharf than a forfeiture?
10 A. A forfeiture under UK law of a
11 lease with the tenant in administration requires
12 leave of the court, without the consent of the
13 administrator.
14 Q. Why would you not -- why would it
15 not be to your advantage to have an agreement with
16 the administrator of forfeiture, rather than
17 surrender?
18 MR. DE LEEUW: I think you are now
19 asking Mr. Briam's hypothetical advice about what
20 he might have concluded would be best for Canary
21 Wharf. I think that is a little bit outside the
22 bounds. I am letting you try to go, but I do not
23 want to get into a point where he is really just
24 testifying about the potential strategy that

Page 72

18 (Pages 69 to 72)

### Page 73

ANTHONY BRIAM

Canary Wharf might have employed.

BY MR. ISAKOFF:

Q. Then let me ask you about your actual strategy. Did you actually consider approaching Canary Wharf -- I am sorry -- approaching LBL in and about the fall of 2010 about a forfeiture agreement, as distinguished from surrender, so as to be able to exercise whatever remedies you may have had under section 7 of Schedule 4?

MR. DE LEEUW: I will ask you to try to rephrase that question. You are asking him now about what he was thinking about potential legal advice. I think that is going a little too far. You can ask him if the subject matter was discussed or communicated, but to just ask him what was in his mind about potential legal advice, that is going a little too far.

BY MR. ISAKOFF:

Q. Okay. Did you ask us with anybody the potential for a forfeiture agreement, as distinguished from a surrender agreement, between Canary Wharf and LBL in September or October 2010?

A. I do not recall specifically having

### Page 74

ANTHONY BRIAM

had those discussions.

Q. Going back to exhibit 28, as I understand -- tell me, is what you are saying to Ms. Taylor that Canary Wharf was unable to take the risk of losing its claim against LBHI by taking a surrender prior to the time it had court approval of any settlement of claims with LBHI? Is that what you mean by impossible?

MR. DE LEEUW: Objection.

A. Sorry, which e-mail are you referring me to?

BY MR. ISAKOFF:

Q. I am referring you to your e-mail to Beatrice Taylor on September 26th 2010 at 6.35 p.m. I am asking whether it is what you are saying to her, when you say it is "impossible for CW to take a surrender on September 30" -- absent -- "approval from the US court of the settlement of the claims against LBHI", that you were unwilling for Canary Wharf to take the risk that taking the surrender would cause a loss of those claims?

MR. DE LEEUW: I object. You just read that sentence by excising a portion of it and

### Page 75

ANTHONY BRIAM

then saying that Mr. Briam said something that the e-mail does not say, so I object to it.

BY MR. ISAKOFF:

Q. You may answer.

A. **My confirmation that it was impossible for CW to take a surrender due to those two necessities would have been taken after -- my words would have followed instructions from Canary Wharf Group.**

Q. But it is part of the point that Canary Wharf did not want to be at risk of losing its claim against LBHI by taking a surrender prior to having the LBHI claim fixed in the US court?

A. **That was certainly a concern of Canary Wharf Group at the time.**

Q. Turn to the first page of exhibit 29, Bates number CW 587 on it. At the very top you write to Katie Bradford and Beatrice Taylor: "Katie/Beatrice - I'm in a meeting at Canary Wharf at present - please can one of you call me on my mobile" -- and then you put the number in -- "urgently". Do you recall having sent that e-mail and having that telephone conversation?

A. **I do not.**

### Page 76

ANTHONY BRIAM

Q. Do you know what the urgency was on September 27th 2010?

A. **Specifically, I do not.**

Q. What is your recollection of the events of September 30th 2010?

A. **My recollection of the events on 30th September were that there was a letter from the administrators, or one of the administrators, confirming that they would be closing down the building, in essence, with tenant -- with the administrators no longer having any need to occupy or continue providing the services in the building -- services to the building. That was a very serious issue for Canary Wharf Group, because throughout their dealings with this building from September 2008, following the insolvency, Canary Wharf were trying to do everything they could to mitigate the losses. Canary Wharf were very concerned that by the building closing, effectively, and the systems being turned off, the fire, other emergency systems being turned off, that the building would fast deteriorate. They urgently, therefore, needed to have an arrangement in place with the administrator under which Canary**

19 (Pages 73 to 76)

MARTEN WALSH CHERER LTD   1ST FLOOR, 6 - 9 QUALITY COURT, CHANCERY LANE   LONDON, WC2A 1HP
TEL: (020) 7067 2900   E-MAIL: info@martenwalshcherer.com   FAX: (020) 7831 6864

**Page 185**

ANTHONY BRIAM

have been apparent to the world at large, they would have no business in taking up a new lease and, effectively, this was the end of the matter. We would not have needed -- in our view, that was the end of the matter and notice expressing itself to be on the face of it pursuant to paragraph 7(a) could have been served but was not.

Q. Okay. Isn't it a fact that there were reasons why Canary Wharf would not want to serve a notice under the section 7(a) at that point?

A. By Friday December 10th, I am not certain but reasonably confident that the draft agreement in circulation would have contained a provision that (a), confirming that we had not and (b), saying that we would not. So JP Morgan had made their views clear, as you are aware, and I am now aware again of Jeremy Clay's e-mail on the topic.

Q. So JP Morgan's views had been clear since at least December 3, that it did not want Canary Wharf to do so and that if it did, it would not proceed to a simultaneous exchange and completion, as actually did occur on December

**Page 186**

ANTHONY BRIAM

20th, correct?

A. That is a statement made by Mr. Clay's e-mail, yes.

(Exhibit 50 was marked for identification)

Q. We have marked as exhibit 50 a document Bates stamped CW 30796 thru 801. The first page contains an e-mail from ----

A. Can I just -- you say to 801? This only goes to 798. My apologies for interrupting but ----

MR. DE LEEUW: Mine only goes to 798 as well. Do you have an attachment? If you do I do not.

MR. ISAKOFF: Okay. I guess that is not part of what we have in the folder.

A. My apologies.

BY MR. ISAKOFF:

Q. That is all right. Jeremy Clay, at the e-mail at the bottom says: "I refer to various exchanges yesterday." This is written, evidently, on Monday, December 13. Do you recall having any kind of communications with Jeremy Clay on Sunday December 12?

A. We were working through the weekend

**Page 187**

ANTHONY BRIAM

on various aspects of this deal. I am sure there were exchanges but the contents of them I would not recall in any detail.

Q. Do you know whether they were written, as opposed to oral?

A. I cannot recall. They may have been both.

Q. I would represent to you that we have not received any written documents that come from December 12th on this subject and hope to get those from you if you have not -- if they have not been discarded before July 10th. Do you recall whether there were phone calls on December 12th?

A. I cannot recall on a particular day I had phone calls that length of time ago, but it is apparent from what Jeremy Clay is saying here that there must have been communications.

Q. On December 20th were you at the closing?

A. Yes, I was.

Q. And how many different steps were there in the closing?

A. There were very many. I have no recollection of all of them and the closing agenda

**Page 188**

ANTHONY BRIAM

as such, I am aware of the overall nature of what was happening.

Q. When you say "agenda" what are you referring to?

A. Well, I would be referring to the fact that in a room such as this, there would have been documents all laid out on the table and it would have been agreed in which order everything would happen.

Q. So it was a very carefully orchestrated event?

A. It was an organised event. How careful the orchestration is, is probably a very subjective matter. It was much more carefully orchestrated by virtue of the fact that I would have had extremely little involvement in its orchestration.

Q. So you were not the master of ceremonies?

A. Better people than I at organising these things would have probably put everything out and sorted ----

Q. Who was in charge of making sure that the agenda was followed and that things

47 (Pages 185 to 188)

MARTEN WALSH CHERER LTD     1ST FLOOR, 6 - 9 QUALITY COURT, CHANCERY LANE     LONDON, WC2A 1HP
TEL: (020) 7067 2900        E-MAIL: info@martenwalshcherer.com                 FAX: (020) 7831 6864

**Page 189**

ANTHONY BRIAM

1  followed in the proper order?
2     A.  Probably Justin Turner, who has
3  already been mentioned today, and perhaps Angela
4  Kearns -- K-E-A-R-N-S, and Ian Painter(?), but --
5  and there would have been people there from our
6  tax department.  I say people, it may be it was
7  one person.  I cannot recall the numbers of people
8  that would have been there.
9     Q.  Was Clifford Chance in charge of
10 the closing?
11    A.  Clifford Chance and Mayer Brown
12 would have been -- it was at Clifford Chance's
13 offices, but both Clifford Chance and Mayer Brown
14 would have been there checking that everything was
15 as it should be.
16    Q.  Was it important that steps proceed
17 in a certain order?
18    A.  On a closing like this, yes it
19 would be.
20    Q.  If there had not been a
21 simultaneous exclusion and completion would that
22 have complicated matters, or simply stretched them
23 out?
24    A.  It -- if they had not been

**Page 190**

ANTHONY BRIAM

1  simultaneous and, by that exchange of agreements
2  happening on one day and completion on another day
3  after that, then it would be -- it would have
4  taken longer overall simply because, in order to
5  do the contract, you would have been checking
6  everything, that it was in agreed form and there
7  were no gaps and so on and so forth.  Then you
8  would be coming back later on and checking that
9  all the closing documents were in the same as had
10 been attached to the contract.  So I suspect that
11 it would have been a more laborious undertaking to
12 do them separately.  I say more laborious, I mean
13 not majorly significantly more laborious.
14    Q.  To your understanding, would
15 JP Morgan have taken possession of the premises
16 prior to completion if it had not been a
17 simultaneous exchange and completion?
18        MR. DE LEEUW:  Objection.
19    A.  I do not recall that issue being
20 discussed and in fact, in terms of physical
21 occupation JP Morgan did not, so far as I know,
22 beneficially occupy the building for some time.
23 I can depose that to an extent from my own
24 knowledge, through sitting in an office which

**Page 191**

ANTHONY BRIAM

1  overlooks the building.
2  BY MR. ISAKOFF:
3     Q.  Let me show you what has been
4  previously marked as exhibit 15.  This is Bates
5  stamped CW 5282 thru 400?
6     A.  I have it in front of me.
7     Q.  Is this the final SPA?
8     A.  Yes.
9     Q.  And who was the seller?
10    A.  The seller ----
11        MR. DE LEEUW:  Objection.  Go
12 ahead.
13    A.  -- as defined in the agreement, is
14 HQCB Investments Limited.
15 BY MR. ISAKOFF:
16    Q.  And that is a Canary Wharf limited
17 entity?
18    A.  Correct.
19    Q.  If you will turn to the page 35 of
20 the agreement, where the Bates number ends 5319,
21 at the very bottom there is a provision, 11.3.2.
22 Do you see that?
23    A.  I do.
24    Q.  It says:  "The seller hereby

**Page 192**

ANTHONY BRIAM

1  warrants that no notice or demand has been served
2  on or given to LBHI pursuant to paragraph 7(a) of
3  Schedule 4 to the Lehman Lease."  Do you see
4  that?
5     A.  I do.
6     Q.  That was a true statement, right?
7     A.  That is correct.
8     Q.  In fact, nobody had given notice to
9  LBHI pursuant to paragraph 7(a) of Schedule 4 to
10 the Lehman lease, correct?
11    A.  Not so far as I am aware.
12        MR. ISAKOFF:  Why don't we take a
13 few minutes and see if we have any further
14 questions.  Give us a few minutes.
15        (Off the record at 4.57)
16        (Back on the record at 5.03)
17 BY MR. ISAKOFF:
18    Q.  Mr. Briam, I have no further
19 questions at this time.  As I indicated on a
20 couple of occasions earlier in the testimony and
21 I do not -- it is not your fault for not
22 understanding what the obligations are of Canary
23 Wharf in response to our discovery requests but
24 unfortunately, in our view, they failed to make

48 (Pages 189 to 192)

MARTEN WALSH CHERER LTD       1ST FLOOR, 6 - 9 QUALITY COURT, CHANCERY LANE       LONDON, WC2A 1HP
TEL: (020) 7067 2900          E-MAIL: info@martenwalshcherer.com                  FAX: (020) 7831 6864

## Page 205

                    ANTHONY BRIAM
 1  that ----
 2       Q.   You see there the amount set forth
 3  in paragraph 4 hereof is $399,311,280 -- million
 4  dollars ----
 5       A.   Yes.
 6       Q.   -- is that roughly, if you know,
 7  similar to £262.5 million?
 8       A.   I should have let you finish asking
 9  your question, sorry.  It does now fall into place
10  that that was a sum which, at the exchange rates
11  current in 2010, towards the end of 2010, would
12  have been the same amount and, indeed, was
13  referred to, I think, in Mr. Iacobescu's e-mail
14  when he talked about plus or minus 5% on 260
15  million, or something like that.
16       Q.   Thank you.  So now, going back, now
17  that you have looked through these documents, is
18  your recollection refreshed as to the reason for
19  the change from September 30th 2010 to November
20  12th 2010 to insert an allowed claim of $262.5
21  million(sic) against LBL ----
22       A.   Yes, it is.
23            MR. ISAKOFF:  Objection to form.
24  BY MR. DE LEEUW:

## Page 206

                    ANTHONY BRIAM
 1       Q.   What is your recollection as to the
 2  reason for the change to add £262.5 million to the
 3  LBHI surrender agreement?
 4       A.   Canary Wharf Group was being asked,
 5  as part of the settlement arrangements in relation
 6  to their claim in the New York courts, to
 7  represent that their claims had not been
 8  disallowed or expunged or acknowledged in an
 9  amount less than paragraph 4, which, let us assume
10  on the exchange rates would be the 262.5 million.
11  Given that that representation was being made, if
12  Canary Wharf Group had breached that
13  representation and gone ahead with the zero
14  acknowledgment of claim, this agreement -- there
15  would have been the consequences for this
16  agreement for breach of representation.
17       Q.   When you talk about this agreement,
18  you mean the agreement between Canary Wharf and
19  LBHI to settle the claim?
20       A.   Correct.  The agreement attached to
21  the e-mail of Thursday, November 4 ----
22       Q.   Exhibit 51?
23       A.   Exhibit 51, yes.
24       Q.   Can I ask you to take a look at

## Page 207

                    ANTHONY BRIAM
 1  exhibit 4, which is an e-mail exchange on November
 2  26th 2010, which you were asked about earlier
 3  today.  Do you have that?
 4       A.   I do.
 5            MR. ISAKOFF:  Hold on a second.
 6  I do not have that in front of me.  Okay.
 7  BY MR. DE LEEUW:
 8       Q.   Do you see on the second page of
 9  exhibit 4, this is an e-mail from Katie Bradford
10  to yourself on November 26th 2010.  Is that right?
11       A.   Correct.
12       Q.   You see the 8th paragraph, which
13  begins: "However, and forgive us..."  Do you see
14  that?
15       A.   Yes.
16       Q.   The third sentence in that
17  paragraph, the paragraph on the second page of
18  exhibit 4 says: "In the circumstances of
19  agreement 3 in the draft settlement [agreement]
20  with LBHI (namely that your client does not
21  currently anticipate entering into a lease for all
22  or substantially of the premises within 12 months
23  of the court ratifying the LBHI settlement)..."
24  Then it goes on.  Do you see that?

## Page 208

                    ANTHONY BRIAM
 1       A.   Yes, I do.
 2       Q.   Can you look back at exhibit 51,
 3  the document you had in front of you.  Do you see
 4  that?
 5       A.   Yes.
 6       Q.   That paragraph 3, do you believe
 7  that Ms. Bradford at Linklaters is referring to?
 8            MR. ISAKOFF:  Objection to form.
 9       A.   Yes.
10  BY MR. DE LEEUW:
11       Q.   The settlement agreement?
12       A.   Yes, the settlement agreement must
13  be what she is referring to.
14       Q.   Understood.  So now, with the
15  benefit of exhibit 4, I will ask:  Do you have any
16  recollection as to whether LBL had any knowledge
17  about the negotiations going on with LBHI about
18  this very point?
19            MR. ISAKOFF:  Object to form.
20       A.   These words indicate that they have
21  seen the draft -- that Katie Bradford had seen the
22  draft settlement agreement because had she not
23  seen it, she would not have been able to recite
24  paragraph 3, the existence of paragraph 3, or

MARTEN WALSH CHERER LTD    1ST FLOOR, 6 - 9 QUALITY COURT, CHANCERY LANE    LONDON, WC2A 1HP
TEL: (020) 7067 2900         E-MAIL: info@martenwalshcherer.com         FAX: (020) 7831 6864