# EXHIBIT   45

IN THE UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
---------------------------)
                           )
In re                      )
                           )Chapter 11
                           )
LEHMAN BROTHERS            )Case No.
                           )
HOLDINGS INC., et al.,     )08-13555 (JMP)
                           )
                           ) (Jointly Administered)
              Debtors.     )
                           )
                           )
---------------------------)
```

VIDEO DEPOSITION UPON ORAL EXAMINATION
of

SIR GEORGE IACOBESCU

On Tuesday, 18th June 2013

Taken at the offices of:
Weil Gotshal & Manges LLP,
110 Fetter Lane,
London EC4A 1AY,
England

Reported by: Richard Harper

Pg 3 of 21
LEHMAN BROTHERS v HOLDINGS 18 JUNE 2013 DEPOSITION OF SIR GEORGE IACOBESCU

6

SIR GEORGE IACOBESCU

A. I gave depositions in one or two cases, but not of this nature.

Q. All right. Are you familiar with US deposition procedure?

A. No.

Q. Okay. Have you ever given a deposition in the United States?

A. No.

Q. I am obviously here asking you questions. We have a court reporter. I should make every effort to speak one at a time, so that the court reporter is able to make a clear record.

A. Thank you.

Q. I am entitled to your best recollection. If at any time you need a break, just say so and, of course, we'll take one, probably about once and hour or so.

You may consult with your counsel on matters of privilege and that's the only time you may consult while a question is pending. Other than that, I am entitled to your answer. If there is something about a question you don't understand or wish me to clarify it, let me know and I may do so. Do you understand that you are

7

SIR GEORGE IACOBESCU

testifying here not only in your individual capacity but as a representative of the claimants?

A. Yes.

Q. Okay and do you know the topics for which you have been designated?

A. Yes.

Q. Okay. Let's get exhibit 1. That's already been marked. We already had one deposition, so we are going to be using a couple of the same exhibits, again.

THE COURT REPORTER: Does that need to be marked for him?

Mr. ISAKOFF: No, this one's already been marked.

THE COURT REPORTER: Okay.

BY MR. ISAKOFF:

Q. And if you'll turn to the third page, Schedule A, this is for the record, exhibit 1 is the notice of deposition of Canary Wharf, lists a number of topics in Schedule A and you are designated for the first two.

The first one is the lease dated March 16th 2005, among Canary Wharf, LBHI, LBL and others. What, if any, involvement did you have in

8

SIR GEORGE IACOBESCU

the negotiation of that lease?

A. I had -- I had involvement on that from the day the deal started with Lehman and -- but I was not involved in the daily negotiation of the lease, but it followed the agreement for lease.

Q. Can you put a time frame on that, on when your involvement first started?

A. In 2000.

Q. Okay. Were you -- and topic 2 is Schedule 4 to the lease including all communications and negotiations. Do you know what Schedule 4 to the lease is?

A. Yes, I do.

Q. And what is it?

A. It is the indemnity that we received from LBHI.

Q. The guarantee?

A. Yes -- no, the indemnity.

Q. What is the difference between a guarantee and an indemnity?

A. I'm not -- I'm not legal and I do not want to pretend to have total legal understanding. The guarantee -- the indemnity for

9

SIR GEORGE IACOBESCU

us was a primary obligation; that the lease and the rents will follow uninterrupted for whatever reason and the guarantee was a secondary -- it's a secondary instrument that backs up the covenant of the tenant.

Q. What, if any, involvement did you have in the negotiation of Schedule 4?

A. It's generally -- It generally followed my and my colleagues' instructions.

Q. Okay. What, if anything, have you done to prepare for your testimony today?

A. I went practically through a bunch of documents, abbreviated not -- I could not read all the documentation. There are probably several tomes of files, but I -- in the time I had, I just went quickly through the documents available and I met with our counsel yesterday to -- just to go through the headings.

Q. Okay. How long did you spend with the documents?

A. Probably a day, adding -- adding up all the hours, probably a full day.

Q. Okay. How long did you spend with counsel?

3 (Pages 6 to 9)

MARTEN WALSH CHERER LTD 1ST FLOOR, 6 - 9 QUALITY COURT, CHANCERY LANE LONDON, WC2A 1HP
TEL: (020) 7067 2900 E-MAIL: info@martenwalshcherer.com FAX: (020) 7831 6864

10

SIR GEORGE IACOBESCU
A. Probably -- that's probably the same day. I would say probably eight or nine hours.
Q. So that's two days in total?
A. No, it is a combination of time.
Q. I understand. When you say you went through documents for a day and met with counsel for the day, is that the same single day?
A. No, no. No, I'm -- I went through the documents on Saturday and I met with the counsel on Sunday.
Q. Which counsel did you meet with?
A. With the two gentlemen that are present here, with David Tulchin and Marc De Leeuw.
Q. What, if anything, did you do specifically to prepare yourself with respect to topics 1 and 2, on page 3, of exhibit 1?
A. Specifically, not. I just went through the whole pile of documentation that we had on the whole process.
Q. Did you seek to question anybody who was involved in the negotiations of the lease or the guarantee?

11

SIR GEORGE IACOBESCU
A. No. As a matter of fact, I was recommended by counsel to use my own memory and not try to guess from others.
Q. Okay.
MR. TULCHIN: Mr. Iacobescu, please, do not reveal communications that you had with counsel.
A. Okay.
MR. TULCHIN: Don't reveal the substance of any of them.
BY MR. ISAKOFF:
Q. What, if anything, did you do to determine what specific communications and negotiations there were, with respect to the guarantee, in which you were not personally involved?
A. Could you repeat the question, please.
Q. What, if anything, did you do to determine what specific communications and negotiations there were, with respect to the guarantee, in which you were not personally involved?
MR. TULCHIN: Objection.

12

SIR GEORGE IACOBESCU
MR. ISAKOFF: By the "guarantee", I am referring to Schedule 4 to the lease.
MR. TULCHIN: Which he has referred to as an indemnity, so I object to the form.
MR. ISAKOFF: Yeah, I would appreciate it, Mr. Tulchin, from the outset, if you would confine yourself to objection to form and not coach the witness with respect to any substance, no speaking objections, please.
MR. TULCHIN: Sir, I did object to form and there is no coaching; there wasn't and won't be.
MR. ISAKOFF: Thank you.
A. I think my involvement was to see at the end of the contract when the lease was drawn, to see that it confirms to our instructions.
BY MR. ISAKOFF:
Q. Okay. Do you know whether there were any substantive negotiations over the terms of the guarantee?
MR. TULCHIN: Same objection.
A. I do not know exactly what took place between the lawyers but my assumption is

13

SIR GEORGE IACOBESCU
that all our instructions and the people on my side that participated followed the instructions that were given.
BY MR. ISAKOFF:
Q. Oh. Were there any -- was there a series of drafts that led to the final form of the guarantee as ultimately executed, or was it simply accepted as presented?
MR. TULCHIN: Same objection.
A. I do not know.
BY MR. ISAKOFF:
Q. Do you know whether there was any discussion between the negotiators of whether it was an indemnity or a guarantee?
A. No, I don't know.
Q. Let's, um -- have you had any conversations concerning Canary Wharf's claims against Lehman Brothers Holdings Inc. with anybody other than counsel?
MR. TULCHIN: Ever?
MR. ISAKOFF: Yes.
A. We had discussions internally inside Canary Wharf.
BY MR. ISAKOFF:

MARTEN WALSH CHERER LTD 1ST FLOOR, 6 - 9 QUALITY COURT, CHANCERY LANE LONDON, WC2A 1HP
TEL: (020) 7067 2900 E-MAIL: info@martenwalshcherer.com FAX: (020) 7831 6864

SIR GEORGE IACOBESCU
BY MR. ISAKOFF:
Q. Okay. What has been your involvement with Canary Wharf between 1988 and today?
A. I was originally in charge with the construction and the construction budget. The company went in administration in 1991 and from 1992 to 1995, I was one of the three board members. In 1995, when the company was reacquired by Paul Reichmann with a group of investors from New York and Prince Alwaleed, I became deputy chief executive and, since 1997, I am chief executive and, as of last year, I took also the role of chairman.
Q. Are you aware -- first of all, the -- Well, let's just look at it.
(Exhibit was marked for identification)
Mr. Iacobescu, I am showing you what's been previously marked as exhibit 3, which is the Schedule 4 to the lease between Canary Wharf and LBL. It is the document I have been calling the guarantee that your counsel insists that it is an indemnity. Have you ever seen this document before?

SIR GEORGE IACOBESCU
A. Yes.
Q. And is this document substantially similar to other guarantees or indemnities, as you refer to it, in Canary Wharf leases?
A. By and large, yes. We always ask the top company to be the surety of the tenant.
Q. Okay. Are you aware of any substantive differences between exhibit 3 and other such documents in -- relating to Canary Wharf leases?
A. I cannot say without reading them side by side.
Q. Okay.
A. But, I -- sorry.
Q. I am just asking whether you are aware of any material difference?
A. No.
MR. TULCHIN: Wait until he finishes the question, please. As Mr. Isakoff said at the beginning, if there is, you know, sort of back and forth while the question is going, the court reporter won't get it all.
A. Okay.
MR. ISAKOFF: And, Mr. Tulchin,

SIR GEORGE IACOBESCU
just for future reference, as long as we are at the beginning here, it is Mr. Isakoff.
MR. TULCHIN: I am sorry. I beg your pardon.
MR. ISAKOFF: Not a problem. Pure guess work on anybody's part how to pronounce it.
BY MR. ISAKOFF:
Q. To your knowledge, has Canary Wharf ever made a claim on a document like exhibit 3, with respect to any of its other tenancies?
A. I am hesitating, because the general answer would be no, but it is possible that about 12 years or 13 years ago, we had a small tenant that went bankrupt and we might have had a claim, but to the general question the answer is no.
Q. Do you know as between Canary Wharf on one hand and LBHI, which is Lehman Brothers holdings Inc. on the other, who drafted what has become exhibit 3?
A. We think it has been drafted back and forth between Clifford Chance and Lehman's lawyers and it's -- I know for sure that it's every time there was a draft, it went to New York

SIR GEORGE IACOBESCU
to LBHI's approval.
Q. Do you know whether there was more than one draft?
A. No.
Q. Do you know who did the first draft?
A. Simply no.
THE COURT REPORTER: I'm sorry?
A. No.
BY MR. ISAKOFF:
Q. Is it fair to say that this is a Canary Wharf form, since it is similar to other such documents in Canary Wharf leases?
A. Yes.
MR. TULCHIN: Wait until he finishes the question, please.
BY MR. ISAKOFF:
Q. Is it fair to infer that Canary Wharf and its counsel did the first draft of this document for that reason?
A. Yes.
Q. Do you know whether there were any substantive changes that were even sought by LBHI with respect to that first draft?

22

SIR GEORGE IACOBESCU
A. Not to my knowledge.
Q. If you will turn, please, to the page of this document which is Bates stamped CW0011480, I am referring to the printed number at the bottom right; are you with me?
A. Yes.
Q. It starts with paragraph 7?
A. Yes.
Q. 7(a) speaks of certain events. Have you -- do you know whether Canary Wharf has ever previously been involved in a forfeiture of a lease?
A. No.
Q. Is that that you don't know, or that there has been none?
A. It has been none.
Q. Okay, this was the first one, the one on December 3, 2010?
A. Yes.
MR. TULCHIN: Wait until he finishes the question, please.
BY MR. ISAKOFF:
Q. And when I say December 3, 2010, that was the letter agreement between Canary Wharf

23

SIR GEORGE IACOBESCU
and LBL calling for forfeiture on December 10, 2010, correct?
A. Correct, in principle. I do not know if the date was December 10.
Q. All right, well, we'll have a chance to look. Has Canary Wharf been involved in a situation where there was a lease surrender by the tenant?
A. Yes.
Q. On how many occasions?
A. Probably one or two small tenancies.
Q. When?
A. Actually, probably -- I don't recall exactly the dates.
Q. Do you recall whether it was one or two?
A. Yes, probably it was one or two.
Q. Do you recall which of those it was?
A. We had a surrender from JP Morgan on two floors that belonged to Bear Stearns.
THE COURT REPORTER: Sorry, it belonged to?

24

SIR GEORGE IACOBESCU
A. To Bear Stearns, where JP Morgan paid full price to the end of the lease, rent rates and service charge.
BY MR. ISAKOFF:
Q. So I take it in that circumstance there was no claim on the guarantee?
A. Absolutely right.
Q. Okay. Were there any other circumstances of involving a lease surrender?
A. I do not know exactly.
Q. If you will look at the portion of paragraph 7(a) that begins with the word "THEN" in all caps, it says: "Then the Surety shall if the Landlord by notice in writing given to the Surety within 180 days after such disclaimer or other event so requires except from and execute and deliver to the landlord a counterpart of a new lease." Do you see that?
A. Yes.
Q. To your knowledge, has Canary Wharf ever given such a notice in writing within 180 days after the events referred to in paragraph 7(a)?
A. We were very much aware of that

25

SIR GEORGE IACOBESCU
clause and we have done the operational equivalent of that by asking our lawyers to ask LBHI's lawyers to confirm or not. That has been done prior and post the forfeiture and there is correspondence relating to that.
Q. Let me ask the question, again. To your knowledge, has Canary Wharf ever served a notice in writing to the surety within 180 days after such disclaimer or other event to require to accept a new lease?
MR. TULCHIN: Objection. It has been asked and answered. You can go ahead.
A. I am going to have to repeat the same thing. We knew we were very much aware of the clause. We could -- we did not see the purpose of sending that kind of notice to a company that was in Chapter 11 but we have made every effort via our lawyers, both Clifford Chance and Sullivan & Cromwell to offer the lease and it has been rejected.
Q. Did you serve a notice after the forfeiture?
BY MR. ISAKOFF:
Q. Did you receiver a notice after the

MARTEN WALSH CHERER LTD 1ST FLOOR, 6 - 9 QUALITY COURT, CHANCERY LANE LONDON, WC2A 1HP
TEL: (020) 7067 2900 E-MAIL: info@martenwalshcherer.com FAX: (020) 7831 6864

SIR GEORGE IACOBESCU

sure that if they are to buy the building, they would not be in competition with LBHI and if LBHI were to take the building, that their agreement would be null and void.

Q. My question, sir, was whether there had been any discussion or communication between anybody on behalf of JP Morgan, on one hand, and Canary Wharf, on the other, of serving a notice under section 7(a) of exhibit 3 at the time of the discussions between Clifford Chance, Sullivan and Cromwell and Weil Gotshal to which you've referred?

A. Yes. JP Morgan were anxious that that notice not be served ----

Q. And that was ----

A. -- in order so we can agree the deal if there is a deal there.

Q. Okay. So at the time when you were asking Weil Gotshal whether -- strike that. Is it not a fact that as of December 10, 2010, when the forfeiture took effect, JP Morgan had told Canary Wharf not to serve the notice under section 7(a) of exhibit 3?

A. I don't want to exaggerate the pull



SIR GEORGE IACOBESCU

or the power of JP Morgan in that transaction. We were guided by our self-interest. There was no signed deal. There was no obligation with JP Morgan either on their side or on our side; so we followed what was good for the company. I repeat again, if LBHI, there is absolutely no rhyme nor reason in anybody, I should be fired if I would give away a £1 billion deal for the sake of a JP Morgan sale, and everybody that works for me. We are not taking from JP Morgan. It was one of the deals in waiting. They could have walked. We didn't no know that there was a deal with JP Morgan until December 19th. We didn't know they were going to follow. We had an aborted deal with building two buildings with them in Canary Wharf. So they could change. They had several alternatives on what to do. And there was nothing that would -- I think it was very clear, they said from day 1, "It is not binding we can change our mind" and so did we. If we had an opportunity to get an LBHI lease, that would be our Number 1 value, because the duty was to the securitization. As you probably know, the building was in the securitization.



SIR GEORGE IACOBESCU

Q. So is it fair to say that Canary Wharf, acting in its own interest, following the forfeiture on December 10, 2010 -- if you want I can show you the dates, so we can go again, so you can understand the question -- why don't we do that? I will withdraw that question. Let's look at the forfeiture letter of December.

Mr. Iacobescu, I am showing you what has been previously marked as exhibit 20. It is an e-mail attaching what I have been referring to as the forfeiture letter dated December 3, 2010. And if you need to go ahead but does this refresh your recollection that the forfeiture took effect on December 10, 2010? Look at the bottom of page 1 of the forfeiture letter.

A. Is it December 10th, because I see December 3rd on it, sir?

Q. Yeah, if you look at the bottom of the first page it says, "Further that we shall exercise that right", referring to forfeiture -- "before 11:59[pm] on 10 December 2010." Do you see that?

A. Sorry, I'm not seeing it.

Q. If you look at page Bate stamped



SIR GEORGE IACOBESCU

CW0010443. This is the letter that's dated December 3. At the bottom of the first page, there is a reference to when the right will be exercised to forfeit the lease. Do you see that?

A. Yes.

Q. Does this refresh your recollection that forfeiture took place on December 10, 2010?

A. Yes, it refreshes my memory that it was signed on 3rd December and yes, that is correct. That is what it says.

Q. So having in mind that you did not yet have a signed deal with JP Morgan on December 10, 2010, is it, in fact, the case that it would have been against Canary Wharf's interest to serve LBHI under paragraph 7(a) of what we have been referring to as exhibit 3, because it might have interfered with the pending deal with JP Morgan?

A. No, I do not think so.

Q. Would it have interfered with the deal with JP Morgan if you'd served the notice under 7(a)?

A. If we knew that there is interest from LBHI, we would have served the notice. If the response from -- on our questions from LBHI

38

SIR GEORGE IACOBESCU
was a positive response, we would have served the notice, I assure you.
Q. Okay. Is it not, in fact, the case that JP Morgan didn't want you to serve the notice?
A. That's correct.
Q. And they even went so far as to include that in the final deal, correct?
A. Correct.
Q. And so isn't it a fact that on December 10, 2010, you had very much in mind that if you had served the notice, it would have fouled the deal with JP Morgan Chase?
MR. TULCHIN: Asked and answered. Go ahead if you can.
A. I think I did. I'm sorry. I think the answer is very clear. If LBHI wanted to take the lease, we would have accepted that gladly and if not, the normal logic is that a company in Chapter 11 would not be able to take a lease worth 3 billion or more than 3 billion, close to £4 billion in its length and that was strengthened by the fact that Sullivan and Cromwell disclosed the terms of the potential deal with JP Morgan. It's

39

SIR GEORGE IACOBESCU
probably the delta between the value of the building at the time, which was over 1 billion sold on the market versus a sale of 450 or 470 that we assumed, or in my understanding, LBHI made the right judgment in saying, "We're not going to take an over-rented or over-valued building at this point, when we know that the market would not be more than half the value of it." It would have been suicidal. So, I think we followed the proper procedure, but clearly in everybody's mind is that we are dealing with a company in Chapter 11 and would they do it? The answer as expected was no.
BY MR. ISAKOFF:
Q. So if the answer was no, why was it that JP Morgan Chase, in the final deal, precluded you from serving the notice?
A. I think it was purely their -- I am saying it with all due respect -- their paranoia not to have a deal that could be contested by somebody else. They just wanted to have surety of what they were getting.
Q. Did LBHI, as surety, have a right to take over LBL's position on its own?
A. I think they had plenty of

40

SIR GEORGE IACOBESCU
opportunity in March 2010 when LBL stopped paying the rent to step in and we would have welcomed that.
Q. My question to you is a little bit different. LBL was the tenant, correct?
A. Correct.
Q. At the point where you forfeited the lease, LBL ceased being the tenant, correct?
A. Correct.
Q. Did LBHI have the right to say that it was the tenant over Canary Wharf's objection?
A. That opportunity was open to them. It was open to them. We asked the question and they did refuse it.
Q. You are changing my question?
A. No, I am not changing your question.
Q. Let me ask the question again, because then you didn't understand it. My question is whether LBHI had a right over Canary Wharf's objection to be the new tenant once LBL ceased being the tenant?
MR. TULCHIN: Question has been asked and answered.

41

SIR GEORGE IACOBESCU
A. Canary Wharf has not objected. We did not object in any form or shape. We just took -- we just took for granted what we were told by the lawyers, which we assumed worked under the instructions from LBHI.
BY MR. ISAKOFF:
Q. I don't believe you've understood my question, so let me try one more time.
A. Then I apologise.
Q. That's fine. That's fine. My question to you is whether LBHI had the unilateral right to become the new tenant even if Canary Wharf did not want it to after LBL creased being the tenant?
MR. TULCHIN: Object to the form. If you are asking him for a legal opinion as opposed to his understanding.
A. Yes, unfortunately, without coaching, it's not a legal opinion I can give.
THE COURT REPORTER: It's not, sorry?
A. It's not a legal opinion, but if you could help me, I would appreciate if you say so.

Pg 9 of 21
LEHMAN BROTHERS v HOLDINGS 18 JUNE 2013 DEPOSITION OF SIR GEORGE IACOBESCU

42

SIR GEORGE IACOBESCU
BY MR. ISAKOFF:
Q. All right. Well, let's look if you have exhibit 3 in front of you, which is Schedule 4 to the lease.
A. Yes.
Q. Okay, and you've got to the right page. If you look at paragraph 7(a), which speaks of what happens if there is a surrender or a forfeiture, do you see that?
A. Yes.
Q. It says: "THEN the Surety shall if the Landlord by notice in writing" -- etc. Does not that suggest to you that LBHI did not have the unilateral right to take over the tenancy -- as a layman?
A. Well, you have to make assumptions that people think with two halves of their brains, because we did ask the question and the answer was no. So how could I even infer that somebody would want, with the other side of the brain, want to take the lease, and they were free to say so.
Q. My question is different. My question is whether they had a right to do it if they wanted it and Canary Wharf did not want it.

43

SIR GEORGE IACOBESCU
I am not ----
MR. TULCHIN: This is your argument. Go ahead if you can, Mr. Iacobescu.
A. I can't answer that. I'm sorry, I can't answer that.
MR. ISAKOFF: Why don't we take our first break.
(Off the record at 10.21)
(Back on the record at 10.31)
BY MR. ISAKOFF:
Q. Mr. Iacobescu, were there any discussions of which you were aware concerning whether or not to formally comply with section 7(a) of the Schedule 4 of the lease and send the notice of reference, therein, following the forfeiture of the lease?
MR. TULCHIN: Objection to the form and counsel's recharacterisation of the witness's prior answer.
BY MR. ISAKOFF:
Q. You may answer the question.
MR. TULCHIN: You can answer, Mr. Iacobescu.
A. Yes, there were discussions with

44

SIR GEORGE IACOBESCU
Clifford Chance, there were discussions with Sullivan and Cromwell and the decision was offer, go and ask, discuss if that is an acceptable way to do it.
BY MR. ISAKOFF:
Q. Do you know whether there were any discussions with any representatives of LBHI concerning a formal notice under section 7(a) of Schedule 4 of the lease?
MR. TULCHIN: Same objection. You can answer.
A. I was not in the discussions between Clifford Chance and Sullivan and Cromwell and Weil Gotshal, so I cannot speak about the discussions that took place there.
BY MR. ISAKOFF:
Q. So, it is fair to say, you just don't know?
A. I don't know.
Q. Do you know whether a notice, a formal notice under section 7(a) of Schedule 4 of the lease was ever drafted?
MR. TULCHIN: Same objection. You can answer, Mr. Iacobescu.

45

SIR GEORGE IACOBESCU
A. I don't know.
BY MR. ISAKOFF:
Q. You never saw one?
A. I don't know -- no, I never saw it.
Q. Were you aware of any discussions concerning the potential requirements of section 365 of the United States Bankruptcy Code, the automatic stay, as it pertains to a notice of this sort that section 7(a) describes?
A. No.
Q. To your understanding as a layman, did LBHI have any right to prevent you, Canary Wharf, from re-letting or selling the premises to JP Morgan Chase once LBL was no longer the tenant?
A. I do believe that they acquiesced to a sale to JP Morgan and it was not disclosed, because we were bound by confidentiality, but they had acquiesced to that transaction by refusing to take the lease.
Q. My question to you is a little bit different, which is was there anything that LBHI -- did LBHI have any right to prevent you from re-letting or selling the premises to JP Morgan Chase?

12 (Pages 42 to 45)

MARTEN WALSH CHERER LTD 1ST FLOOR, 6 - 9 QUALITY COURT, CHANCERY LANE LONDON, WC2A 1HP
TEL: (020) 7067 2900 E-MAIL: info@martenwalshcherer.com FAX: (020) 7831 6864

46

SIR GEORGE IACOBESCU

MR. TULCHIN: Objection to the form to the extent that it calls for this witness to give a legal opinion.

A. I think I gave my answer.

BY MR. ISAKOFF:

Q. Your answer was that you believe that LBHI had acquiesced and that was not my question, whether they had acquiesced. My question was whether LBHI had a right to prevent Canary Wharf from re-letting or selling the premises to somebody else once LBL was no longer the tenant; whether LBHI had the right to prevent Canary Wharf if it wanted?

MR. TULCHIN: I object on two grounds. One, it has been asked and answered and two, it calls for this witness to give a legal opinion, which is improper. If you can answer, Mr. Iacobescu, go ahead.

A. My only answer is that it was up to LBHI to know their rights.

BY MR. ISAKOFF:

Q. Are you aware that any motion was prepared for use in the United States seeking relief from the automatic stay, or some form of

47

SIR GEORGE IACOBESCU

relief asking LBHI to assume or reject anything relating to the LBL lease?

A. No.

Q. When, for the first time, did Canary Wharf begin having any discussions, at any time, with JP Morgan Chase concerning either release or a sale of the building, and the building I am referring to is the one that had LBL in it?

A. It was probably in, I think, March or April 2010. I have seen Frank Bisignano, who was the chief operating officer of Lehman -- of Lehman, my apologies -- of JP Morgan, and we were discussing several alternatives. JP Morgan had one alternative -- we discussed all the alternatives. One alternative was for JP Morgan to continue the work on the river side at Canary Wharf -- have you been to Canary Wharf?

Q. I have not.

A. Can we offer you a free trip?

Q. Yes, can I bring my wife?

A. And grandson and children, because we will show you. Okay, you are more than welcome also if we could give you a tour there, we would

48

SIR GEORGE IACOBESCU

honoured.

49

SIR GEORGE IACOBESCU

Q. Okay. At that time, was there any default in the lease with LBL?

A. Yes, LBL stopped paying rent, or we knew -- I cannot point exactly the days, but we have been told by LBL and end of March they stopped paying rent. So they defaulted on that

50

SIR GEORGE IACOBESCU

point.

Q. Okay. Do you know whether the discussions that you were having with JP Morgan Chase concerning offering JP Morgan an interest in the building or a sale of the building, whether that predated the end of March?

A. I don't know exactly, but we knew that -- can I add something to it?

Q. Sure.

A. We knew that Nomura's lease will come to an end and Nomura will move out of the building, because Nomura was a tenant for about 400,000 square feet.

Q. Is that 400,000 square feet?

A. Nomura, yes. But we knew that their lease was -- we tried very, very hard to make a deal with Nomura to stay there, but then we realised that we were losing Nomura too, so we contemplated an empty building.

Q. The effort to retain Nomura, did you realise that that was not going to succeed before or after LBL stopped paying rent at the end of March 2010?

A. We tried -- we pretty much knew --

51

SIR GEORGE IACOBESCU

I need to refresh my memory when did Nomura tell us that they would be leaving. But we made huge efforts, I cannot tell you how many meetings and offers and inducements we offered to Nomura to stay, but ultimately they got a much better deal somewhere else and they decided to leave.

Q. Now, when -- was there some claim that Nomura had against Canary Wharf connected with the premises?

A. It was not a claim, it was an accommodation. There were a lot of disagreements between Nomura and LBL and Nomura were very concerned that, once LBL stopped paying rent, they have no locus in the building. Their agreement, practically Nomura took place from LBL. Once LBL were in default, Nomura had no right to be in the building.

Q. I guess I have seen something in the documents and I am just -- maybe you could help me out. There was something about Canary Wharf paying something in excess of £6.5 million to Nomura and I'm just asking what was that in connection with, to your recollection?

A. That is -- what Nomura has done,

52

SIR GEORGE IACOBESCU

Nomura came and offered that they would cover the rent. They would pay rent to us until they exit the building on September 30th. And their requirement was that they will pay the rent but they would ask us to go against LBL and the money that we paid Nomura was a refund of the delta of payments at the end of their stay, which was September 30th.

Q. What do you mean by "delta"?

A. Because Nomura paid an amount of money and LBL paid a little bit of money by March, so we netted off what Nomura has overpaid.

Q. I am not following what the source of the overpayment was, overpaid on what?

A. There was an overpayment between LBL and Nomura and we had no -- obviously, we shouldn't get more rent than the building should produce.

Q. I see. So between what LBL paid and what Nomura paid, Canary Wharf had been overpaid by some amount?

A. In a way in a way. It was a settlement with Nomura. It was a -- it wasn't exactly a number but it was a settlement with

53

SIR GEORGE IACOBESCU

Nomura not oblige us to sue LBL.

(Exhibit 23 was marked for identification)

Q. We have marked, as exhibit 23, a letter from Canary Wharf to JP Morgan Chase dated 5 March, 2010 Bates Stamp CW10412 to 18. Have you ever seen this before, Mr. Iacobescu?

A. Yes, since I signed it, of course, I have seen it.

Q. That is your signature on page 7?

A. Correct.

Q. What is this?

A. It's the correspondence with JP Morgan where we made them available data about the building on the Strand that we were pursuing there for them to purchase a building.

Q. Does this refresh your recollection that discussions concerning their interest in acquiring 25 Bank street, which is the building that we have been discussing that LBL was in some time prior to March 5, 2010?

A. Correct, yes.

(Exhibit 24 was marked for identification)

Q. We have marked as exhibit 24 an e-mail chain bearing Bates number CW19076 to 79.

MARTEN WALSH CHERER LTD 1ST FLOOR, 6 - 9 QUALITY COURT, CHANCERY LANE LONDON, WC2A 1HP
TEL: (020) 7067 2900 E-MAIL: info@martenwalshcherer.com FAX: (020) 7831 6864

SIR GEORGE IACOBESCU

£30 million.

Q. Was it your agreement with LBL, ultimately, that the administration expense claim would be fixed at zero?

A. They paid an amount of about 1.5 million and we kept our claim as an unsecured creditor.

THE COURT REPORTER: Credit or creditor?

A. Creditor.

THE COURT REPORTER: Thank you.

BY MR. ISAKOFF:

Q. So in exchange for £1.5 million, you agreed there would be no administration claim against LBL?

A. Yes.

Q. But if you had not done that, you had a £30 million unpaid rent claim as of September 30th 2010, is that correct?

A. I think we have today about £20 million as unsecured creditor's claim.

Q. Okay but had you not settled the administration expense claim for £1.5m, you would have had an administration expense claim against

SIR GEORGE IACOBESCU

LBL for approximately £30 million for unpaid rent as of September 30th 2010, correct?

A. Approximately, yes. I do not know exactly the number.

Q. All right. Were there any negotiations following receipt of this draft surrender agreement that's attached as part of this exhibit concerning the terms of a surrender agreement?

A. Probably, yes. Probably documents travelled back and forth but the crux of it was on 30th September.

Q. But, in fact, there was no final deal on a surrender, correct?

A. No.

Q. Why was that?

A. There was no final deal on the surrender because somehow LBL and LBHI became inter-linked and as I mentioned before, LBHI, after we thought that we had an agreement, put a series of conditions, which were not acceptable to LBL. And the conditions specifically is that the, call it £250 million settlement with Daniel Ehrmann, has to be replicated in LBL

SIR GEORGE IACOBESCU

settlement, which LBL said "No, we are not going to agree to anything that's going to be zero if you want your building. If not, you can wait." That destroyed the attempt of having both the agreement with LBHI and getting our building via you surrender.

Q. Were there any three-way negotiations in which a representatives of LBHI, LBL and Canary Wharf were in the same negotiation with respect to a three-way deal?

A. We did ask for it and we could never achieve -- I am not informed but I assume that there were lots of discussions between LBHI and LBL but they never -- they wanted to meet all three of us.

Q. Do you know whether there were any such discussions?

A. Yes.

Q. What is it that you know?

A. We knew many times from Mike Jervis when he told us, "I am going to New York tomorrow to meet with LBHI." That's the extent that we know.

(Exhibit 28 was marked for identification)

SIR GEORGE IACOBESCU

Q. We have marked as exhibit 28 an e-mail chain Bates stamped CW 480 to 83. It starts at the bottom of page 482, with an e-mail from Sarah Dawson to Katie Bradford dated September 20, 2010. Do you see that, Mr. Iacobescu?

A. Yes.

Q. Who is Katie Bradford, if you know?

A. She was one of the lawyers and I assume she was one of the litigation lawyers at Linklaters representing LBL.

Q. And Sarah Dawson was at Clifford Chance representing Canary Wharf?

A. Correct.

Q. There is -- in her second paragraph she says: "We understand that our clients have been assured by Mike Jervis that any surrender would be structured in such a way as to preserve our client's claims against the US guarantor." Do you see that?

A. Yes.

Q. Do you know what that reference is?

A. That reference is to discussions that we had with Mike Jervis where we made it

SIR GEORGE IACOBESCU

to obtain Bond Holder Consent to the Surrender by end October." Did you ever get that consent?

A. I think yes. I cannot guarantee that but I think yes, otherwise we could not do it.

Q. It says: "...by end October (long stop date end November)." What does that mean?

A. I am not sure in what context that the was discussed, but ----

Q. What does "long stop date" mean?

A. Long stop date, I mean, that was all linked with LBL saying, "We are not going to make any deal with you unless we know the agreed claim with LBHI". That is what they mentioned as one of the two sides' leverage. "We will not agree a surrender with you unless we know exactly the claim agreed with LBHI", which we didn't see originally as linked, but suddenly they became linked, they became inter-meshed.

Q. What does the linkage between the claims against LBL and LBHI have to do with obtaining bond holder consent that you reference here in paragraph ----

A. Nothing to do with that ----

SIR GEORGE IACOBESCU

MR. TULCHIN: George, do me a favour. The questioner had not finished his question when you started talking. Let's try to keep the questions and answers separate. It will make for a better transcript.

A. Okay.

BY MR. ISAKOFF:

Q. What does "long stop date" mean, as you use it here in paragraph 2?

A. It is probably the date, the maximum date, that we would allow to agree the claim with Alvarez & Marsal.

Q. What does bond holder consent have to do with the claim with Alvarez & Marsal?

A. No, they are not linked in any form or shape.

Q. I am talking solely about paragraph 2 here, where it says: "We will work to obtain Bond Holder Consent to the Surrender by end October ..."

A. Okay.

Q. "...(long stop date end November)."

A. I am sorry.

Q. " I am trying to understand what

SIR GEORGE IACOBESCU

the term "long stop date" means, in your parlance?

A. I think it is purely, purely to reflect the date which both parties have given to come up with an agreement.

Q. Is it a commitment by which, if it is not accomplished, the agreement is off?

A. Could be. It could be. I do not know exactly. I don't know if the words here are purely the result of saying -- of LBL saying, "We need to resolve it", i.e. they were very anxious to do a surrender but they were very anxious to do a surrender only in the knowledge of what the LBHI settlement is and that there is a bond holder agreement.

Q. Okay. In paragraph 4 it says: "We agree that our claim in the administration will be £0 and that we shall make no claim in respect of the period post 30 September 2010." What does that mean?

A. I think exactly what it says. That, as an administration expense, we will not claim against LBL and, as I mentioned, we kept our claim as an unsecured claim, and we will make no claim after that period against LBL.

SIR GEORGE IACOBESCU

Q. If you would make no claim in that period for past September 30 against LBL, would that not preclude a claim in the range of £250 million against LBL?

A. Number one, that was our position here. Then, in the discussions with LBHI, that was the condition that was imposed by LBHI. It was not the condition created by us.

Q. Okay.

A. The 250 million could have been a surrender premium and in -- probably it was somehow irrelevant to LBL because they had no money.

Q. But, as I understand what you have written here, you are telling LBL that you will make no claim of anything like £250 million, but that only came up later because of what LBHI was telling you it wanted?

A. Correct. At this point we had no idea that LBHI would impose that conditions. If we knew that, that would not be here, that was based on information we had at the time from LBHI.

Q. Okay. The next paragraph says: "Canary Wharf will contribute £5m towards a

126

SIR GEORGE IACOBESCU

Q. Just -- so this is a 1 million square feet this 25 Bank Street?

A. 1 million 40, yes.

Q. How many floors?

A. 31 floors.

Q. About 35,000 square feet per floor?

A. Actually, the floors at the base are -- you have eight or nine floors of 70,000 square feet. I should have brought you a picture to see, but the fact is that we built the trading floors over a running train, over you probably know what the DLR is, we built it over the DLR with the DLR running, in order to satisfy the customer requirement. These are the biggest trading floors in London, so that tells you a little bit why you want a single tenant and, by a miracle in a way, JP Morgan looked for that size, because there is no other tenant.

Q. The next paragraph says ----

A. Except of course LBHI -- I am sorry.

Q. Jokes don't come through on the record, you know.

A. Okay.

128

SIR GEORGE IACOBESCU

127

SIR GEORGE IACOBESCU

129

SIR GEORGE IACOBESCU

Pg 15 of 21
LEHMAN BROTHERS v HOLDINGS 18 JUNE 2013 DEPOSITION OF SIR GEORGE IACOBESCU

142

SIR GEORGE IACOBESCU

not know the date.

Q. Of 2010?

A. Yes.

Q. Before the forfeiture letter that we looked at earlier, of December 3?

A. I don't know exactly but I am sure there are papers.

144

SIR GEORGE IACOBESCU

143

SIR GEORGE IACOBESCU

145

SIR GEORGE IACOBESCU

37 (Pages 142 to 145)

MARTEN WALSH CHERER LTD 1ST FLOOR, 6 - 9 QUALITY COURT, CHANCERY LANE LONDON, WC2A 1HP
TEL: (020) 7067 2900 E-MAIL: info@martenwalshcherer.com FAX: (020) 7831 6864



146

SIR GEORGE IACOBESCU
I meant pounds. Sorry.
BY MR. ISAKOFF:
Q. £100 million is more than $100 million?
A. It is about twice, 55 today.
Q. Do you know what it was back in October 2010?
A. No, but I think the rate of exchange we used in everything was 1.6 or something, I think so.

147

SIR GEORGE IACOBESCU

148

SIR GEORGE IACOBESCU

149

SIR GEORGE IACOBESCU

Pg 17 of 21
LEHMAN BROTHERS v HOLDINGS 18 JUNE 2013 DEPOSITION OF SIR GEORGE IACOBESCU

170

SIR GEORGE IACOBESCU

[redacted]

171

SIR GEORGE IACOBESCU

[redacted]

172

SIR GEORGE IACOBESCU

[redacted]

173

SIR GEORGE IACOBESCU

[redacted]

44 (Pages 170 to 173)

MARTEN WALSH CHERER LTD 1ST FLOOR, 6 - 9 QUALITY COURT, CHANCERY LANE LONDON, WC2A 1HP
TEL: (020) 7067 2900 E-MAIL: info@martenwalshcherer.com FAX: (020) 7831 6864



Pg 18 of 21
LEHMAN BROTHERS v HOLDINGS 18 JUNE 2013 DEPOSITION OF SIR GEORGE IACOBESCU

174

SIR GEORGE IACOBESCU

[redacted]

175

SIR GEORGE IACOBESCU

[redacted]

176

SIR GEORGE IACOBESCU

[redacted]

177

SIR GEORGE IACOBESCU

[redacted]

45 (Pages 174 to 177)

MARTEN WALSH CHERER LTD 1ST FLOOR, 6 - 9 QUALITY COURT, CHANCERY LANE LONDON, WC2A 1HP
TEL: (020) 7067 2900 E-MAIL: info@martenwalshcherer.com FAX: (020) 7831 6864



Pg 19 of 21
LEHMAN BROTHERS v HOLDINGS 18 JUNE 2013 DEPOSITION OF SIR GEORGE IACOBESCU

190

SIR GEORGE IACOBESCU

191

SIR GEORGE IACOBESCU

(Exhibit 34 was marked for identification)

Q. We have marked as exhibit 34 an e-mail with attachment, Bates stamped CW 775 to 806. Mr. Iacobescu, have you seen this before?

A. I have not seen it in that form but I am fully aware of it.

Q. You have not seen this document before?

A. No, but I am aware of it. I would have been aware of that at the time.

Q. Okay. Sarah Dawson is a lawyer at Clifford Chance representing Canary Wharf?

A. Yes.

Q. She is writing to Beatrice Taylor, who is a lawyer at Linklaters representing the administrators and LBL, right?

A. Yes.

Q. She is tendering a deed that calls for LBL and its administrators to acknowledge a valid claim of Canary Wharf against LBL of £262.5 million, correct?

A. Correct.

Q. Was that acceptable to LBL?

192

SIR GEORGE IACOBESCU

A. Absolutely not. We went back and we put it in based on the stip from LBHI, at which point LBL said, "Absolutely not, you want the asset, it is zero", so that is the conundrum for us.

Q. When you tendered this, when you, meaning Canary Wharf, tendered this to LBL you knew that it was unacceptable, correct?

A. Not 100%. Not 100%, because they said that they are comfortable with a claim of 250 million. But then we thought that if they are comfortable with a claim for 250 million against LBHI they will be comfortable with a repeat of the same claim in that document and obviously they said, "No, absolutely not".

Q. But you knew at the time -- you, Canary Wharf, knew at the time that this draft was sent to LBL and its administrators for its consideration, that this was not likely to be accepted by LBL, correct?

A. It was not likely but we figured that for the sake of achieving the settlement they would agree to it. Obviously which they did not, and we have done that as a result of the LBHI

193

SIR GEORGE IACOBESCU

request.

Q. You told LBHI that you had sent draft surrender documentation to LBL's administrators that included an acknowledgment of a claim against LBL for £262.5 million, correct?

A. After we received the stipulation I assumed.

Q. You told them that right after Ms. Dawson sent this draft deed to Beatrice Taylor, correct, right after?

A. I am not sure what you are asking me and I am not sure of the ----

(Exhibit 35 was marked for identification)

Q. We have marked as exhibit 35 CW 11679 to 80. It is some e-mails which you are shown, Mr. Iacobescu. Do you see that?

A. Yes.

Q. If you will look at the bottom e-mail on the first page from Pamela Kendall to Dan Ehrmann, copying you and others, this is sent at 2.17 p.m. ----

A. Yes.

Q. -- New York time?

A. Yes.

49 (Pages 190 to 193)

MARTEN WALSH CHERER LTD 1ST FLOOR, 6 - 9 QUALITY COURT, CHANCERY LANE LONDON, WC2A 1HP
TEL: (020) 7067 2900 E-MAIL: info@martenwalshcherer.com FAX: (020) 7831 6864

SIR GEORGE IACOBESCU

Canary Wharf?
A. I think it does, yes.
MR. TULCHIN: Well, make sure you look.
A. Yes.
BY MR. ISAKOFF:
Q. Okay, and it has it in a number of different places, correct?
A. Yes.
Q. Would you turn please to page 35 of the document, Bates stamped CW 5319. If you look towards the bottom of that page, 11.3.2, it says: "The Seller" and the seller is Canary Wharf, correct?
A. Yes.
Q. "...hereby warrants that no notice or demand has been served on or given to LBHI pursuant paragraph 7(a) of Schedule 4 to the Lehman Lease." Do you see that?
A. Yes.
Q. Was that warranty true at the time?
A. I believe so.
MR. ISAKOFF: All right, I have no further questions.

SIR GEORGE IACOBESCU

REDIRECT BY MR. TULCHIN

By MR. TULCHIN:
Q. Mr. Iacobescu, I am going to have a few questions.
A. Yes.
Q. Going back to the time when the lease was entered into, the lease with LBL, what did you understand, as the CEO of Canary Wharf, that LBHI had agreed to do in connection with the obligations of LBL in the lease?
MR. ISAKOFF: Objection. Calls for legal conclusion.
BY MR. TULCHIN:
Q. You can go ahead and answer.
A. What I asked from day one, from the first day that we started negotiating the deal with Jeremy Isaac, who is the chief executive of LBL, Frank Bartolotta , who was LBHI, and Mark Marcucci, who is the global head of real estate, is that we should have an absolute solid guarantee, come hell or high water, that the rent will flow over the next 30 years and, as a matter of fact, we always thought that we are dealing with LBHI. We needed -- we always asked for the

SIR GEORGE IACOBESCU

top company, as I mentioned to Mr. Isakoff. We always asked for the top company in any transaction that we do. We have done the same thing with Credit Suisse, or Morgan Stanley, or CitiGroup, except the world headquarters of banks like Barclays, where the parent company is on the lease, but we always ask for an indemnity, because the need is to have an uninterrupted cash flow regardless of anything that goes wrong with the tenant.
Q. I am sorry, with whom? You said, "Regardless of anything that goes wrong with..."
A. With the tenant.
Q. Okay. I didn't hear you.
A. We were aware of the Lehmans problems in 1998 with the Asian crisis, with the Russian crisis, so we were a little bit circumspect but it was a very, very good tenant, exceptionally good tenant, and we would not have entered into any, any lease agreement unless we had the parent company indemnity, that they would come through with. And, by the way, I do not recall at any point when anybody in LBHI, be it LBL or LBHI have objected to the meaning of what

SIR GEORGE IACOBESCU

we asked for, of the indemnity.
Q. And you understand when the deal was done that you had obtained what you were seeking?
MR. ISAKOFF: Objection. Leading and calls for a legal conclusion.
A. My understanding is that this is what we asked, this is what we got and, as an additional thing, one of the reasons that we were very strict on this requirements is that because the building also had to be in the securitization, and a 30 years lease in the securitization, when we put Lehman in the securitization, the income from Lehman was matched against bonds that would expire in 2033, so we would not match bonds with something that we didn't think was rock solid.
BY MR. TULCHIN:
Q. I want to ask you, Mr. Iacobescu please, to cast your attention to September 30th 2010 and you recall giving some testimony about the events of that day?
A. Yes.
Q. Okay. What consequences would there be, as far as you understood, for the

246

SIR GEORGE IACOBESCU
A. It says very clear that: "All these points ... will become effective on completion of surrender."
Q. Now, Mr. Iacobescu, a couple of questions if I may, about the economics of what happened in 2010. There came a point when LBL stopped paying rent; is that right?
A. Correct.
Q. What is your recollection as to when that was?
A. End of March 2010.
Q. As of that time, roughly speaking, how many years were left on the LBL lease?
A. 23 years.
Q. What was LBL's total obligation to pay rent and other charges for the duration, the unexpired portion of the lease?
MR. ISAKOFF: Object to form.
BY MR. TULCHIN:
Q. Approximately?
MR. ISAKOFF: The same objection.
A. I cannot do the calculation mentally, because it is all a matter of the rate of discount, but the value of if building in 2010

247

SIR GEORGE IACOBESCU
the value of the rent was 57.5 million. That is the value contracted 57.5 million. At a 5.5% yield that would be about £1 billion 50 in pounds or $1.6 billion in dollars.
BY MR. TULCHIN:
Q. And is that meant to reflect the present value of the stream of income?
A. That would be ----
MR. ISAKOFF: Object to form and leading.
A. That would be the yield that the building would be valued in the company's books and that would be the yield -- a very conservative yield that the building could be sold on that date to an investor, because it was probably the best -- I mean the most valuable leases are the leases with a fixed or an RPI increase, and that is exactly what we had there for the first ten years.
BY MR. TULCHIN:
Q. To borrow a page from the book that was used on direct examination, let me ask you, how does that number of £1 billion 50 million compare to the proceeds of the transaction that you entered into with JP Morgan on or about

248

SIR GEORGE IACOBESCU
December 20th 2010?
MR. ISAKOFF: I am going to object on the ground that this goes beyond the scope of discovery in terms of damages, but go ahead, but I object.
A. I think it is simple arithmetics, the value of the building. The building was valued in our books, which is very important, in our books, in 2007/2008 at 900 million and that valuation was based on the rent payable at the time. Using the same valuation in 2010 would be the £1 billion 50. The recovery, or the part mitigation -- and I think we have done exactly what we were supposed to do. This is a what a responsible company, keeping, looking at our duties to shareholders and to the bond holders, we mitigated as much as we could. And the sale, depending what figures you want to take, if you want to take the 2010 figures, the sale left us with over 550 million short, £550 million short.
MR. TULCHIN: Can I ask the Court Reporter please to mark as exhibit 42 a one page document which is a photocopy of a page from a paper.

249

SIR GEORGE IACOBESCU
(Exhibit 42 was marked for identification)
Q. Mr. Iacobescu take a moment if you will and, when you are ready, just tell me whether you recall ever seeing this before?
A. I probably did in the Financial Times at the time,yes. I would be alerted because it was something that would breach our confidentiality, and the first thought would be to make sure that it does not come from anybody in Canary Wharf.
Q. Do you recall that this article on exhibit 42 about JP Morgan appeared in the Financial Times on Wednesday, November 24, 2010?
A. Yes, that is.
MR. TULCHIN: I have no other questions at this time.
A. Thank you.
MR. ISAKOFF: I have a few.

FURTHER DIRECT QUESTIONS BY MR. ISAKOFF

BY MR. ISAKOFF:
Q. You were asked about what your understanding about what LBHI agreed to do, in