# **EXHIBIT 46**

```
                                                            7/9/2013 Clay, Jeremy

 1                                                       1                    JEREMY CLAY
 2    IN THE UNITED STATES BANKRUPTCY COURT              2                    I N D E X
      SOUTHERN DISTRICT OF NEW YORK                      3
 3                                                       4    Deponent                              Page
 4    ---------------------------)                       5
                                 )                            MR. JEREMY CLAY
 5    In re                      )                       6
                                 )Chapter 11             7
 6                               )                            Direct Examination by Mr. Meade     4
      LEHMAN BROTHERS            )Case No.               8
 7                               )                            ReDirect Examination by Mr. McCarthy  68
      HOLDINGS INC., et al.,     )08-13555 (JMP)         9
 8                               )                            Direct by Mr. Meade                 69
                                 )(Jointly Administered)10
 9              Debtors.         )                            ReDirect by Mr. Cohen               70
                                 )                      11
10                               )                                        - - - - - - - - - -
      ---------------------------)                      12
11                                                      13      Exhibits marked during this deposition
12                                                      14
13          VIDEO DEPOSITION UPON ORAL EXAMINATION              Exhibit                           Page
14                         of                           15
15                    JEREMY CLAY                       16        97                              49
16                                                      17        98                              63
17          On Tuesday, 9th July 2013                   18
18                                                      19
19            Taken at the offices of:                  20
            Mayer Brown International LLP,              21
20                201 Bishopsgate,                      22
                London EC2M 3AF,                        23
21                   England                            24
22                                                      25
23
24
25        Reported by:  Richard Harper

                        1                                                     3


                 7/9/2013 Clay, Jeremy                                 7/9/2013 Clay, Jeremy

 1                                                       1              JEREMY CLAY
 2         A P P E A R A N C E S                         2     (The deposition commenced at 11.03 a.m.)
 3                                                       3              THE VIDEOGRAPHER:  Here begins
         On behalf of the Lehman Brothers Holdings       4    video tape Number 1 in the deposition of Jeremy
 4    Inc:                                               5    Clay, in the matter of In Re: Lehman Brothers
 5       WEIL GOTSHAL & MANGES LLP                       6    Holdings Inc., et al, in the US Bankruptcy Court
         1300 Eye Street NW                              7    Southern District of New York.  Chapter 11 case
 6       Suite 900                                       8    number 08-13555 (JMP).  Today's date is July 9th
         Washington, DC 20005-3314                       9    2013 and the time on the video monitor is 11.03
 7                                                      10    a.m.  The video operator today is Linda Fleet of
         BY:  MR. KEVIN F. MEADE                        11    Marten Walsh Cherer and this video deposition is
 8            MS. ARIELLE GORDON                        12    taking place at Mayer Brown International 201
 9                                                      13    Bishopsgate, London EC2M 3AF, United Kingdom.
         On behalf of the Claimant:                     14    Counsel, please voice identify yourselves and
10                                                      15    state whom you represent.
         SULLIVAN & CROMWELL LLP                        16              MR. MEADE:  Kevin Meade and Arielle
11       125 Broad Street                               17    Gordon form Weil Gotshal & Manges, on behalf of
         New York, New York 10004-2498                  18    Lehman Brothers Holdings Inc, and we have some of
12                                                      19    our colleagues from our Weil London office here as
         BY:  MR. JOHN G. McCARTHY                      20    well.
13                                                      21              MR. COHEN:  Marc Cohen and Tracey
14       On behalf of the witness:                      22    Butcher for Mayer Brown International.  We
15       MAYER BROWN INTERNATIONAL LLP                  23    represent Mr. Clay.
         201 Bishopsgate, London                        24              MR. McCARTHY:  John McCarthy of
16       EC2M 3AF, United Kingdom                       25    Sullivan & Cromwell LLP on behalf of the Canary
17       MR. MARC R. COHEN
         MS. TRACEY BUTCHER
18
      Videographer:  Linda Fleet
19                  Marten Walsh Cherer Ltd.,
                    1st Floor, Quality House,
20                  6-9 Quality Court,
                    Chancery Lane,
21                  London WC2A 1HP.
22
      Court Reporter: Richard Harper
23                   Marten Walsh Cherer Ltd.,
                     1st Floor, Quality House,
24                   6-9 Quality Court,
                     Chancery Lane,
25                   London WC2A 1HP.

                        2                                                     4
```

## Page 17

JEREMY CLAY

2  That's what I said to Clifford Chance, in
3  discussions with Clifford Chance.
4  BY MR. MEADE:
5      Q.   All right. And, just so that the
6  record is clear, in your answer you twice said, "We
7  did not wish them to serve a notice requiring
8  LBI", did you mean LBHI?
9      A.   Sorry, LBHI, yes I do.
10     Q.   And just so that it is clear and
11 just so you don't have to keep repeating in your
12 answer, understanding that you did not have
13 correct communications with Canary Wharf
14 itself ----
15     A.   Sure.
16     Q.   And when I refer to Canary Wharf,
17 you understand I mean them or their counsel?
18     A.   I understand.
19     Q.   You testified that you told Canary
20 Wharf's counsel that you did not wish them to
21 serve a notice requiring LBHI to take a lease
22 under this clause?
23     A.   Following a forfeiture of the --
24 yes.
25     Q.   Do you recall approximately when

## Page 18

JEREMY CLAY

2  that position was first communicated to Clifford
3  Chance?
4      A.   I think that would have been
5  communicated around a week or so prior to closing,
6  which would be around the December 12th or 13th.
7  That was when this clause was -- we were
8  discussing the clause in the SPA, which related to
9  the claim, and that was the point at which this
10 issue was discussed between myself and Clifford
11 Chance.
12     Q.   When was Mayer Brown retained to
13 represent JP Morgan, approximately?
14     A.   The beginning of 2010, February or
15 March time, 2010.
16     Q.   Okay. And now, were there any
17 discussions with Clifford Chance concerning
18 providing notice under this provision that you can
19 recall prior to December 2010?
20     A.   Prior to 2010?
21     Q.   I am sorry, prior to December 2010?
22     A.   Sorry. I couldn't recall any prior
23 to December 2010, but yesterday I was shown an
24 e-mail from Anita Jones to Clifford Chance which
25 indicated we had made a commentary about, or had

## Page 19

JEREMY CLAY

2  given a view about service of notice under this
3  clause at some point in, I think it was May 2010.
4  That was -- I had no recollection of that until
5  I had seen the e-mail yesterday.
6      Q.   Just to follow up, what was
7  communicated to Clifford Chance as to why
8  JP Morgan did not want notice provided to LBHI
9  under paragraph 7 of Schedule 4?
10     A.   I indicated to Clifford Chance that
11 we would not wish JP Morgan to be in a position
12 where it was completing the acquisition of the
13 building and there may exist at that time or
14 subsequently a contractual arrangement between
15 Canary Wharf and LBHI under which LBHI had an
16 entitlement to take a lease of the building, as
17 that would clearly create, in real estate terms,
18 an issue for JP Morgan, who wanted to acquire the
19 building with vacant possession to enable them to
20 take over the building, fit it out and occupy it
21 as their HQ, so that was the message we gave to
22 Clifford Chance.
23     Q.   And did you ever communicate with
24 -- did you ever have any conversations with
25 Clifford Chance as to whether JP Morgan would

## Page 20

JEREMY CLAY

2  complete the transaction if notice were provided
3  to LBHI under this provision, which is paragraph 7
4  of Schedule 4?
5      A.   No.
6      Q.   No, or not that you can recall?
7      A.   Not that I can recall. They,
8  Clifford Chance, in response, put it to me that if
9  a notice were served LBHI would not be in a
10 position to comply with it, so that JP Morgan
11 should be comfortable there wasn't a problem in a
12 notice being served, and that we could live with a
13 notice being served, whilst I -- and my response
14 to that to Clifford Chance was whilst I accepted
15 there was perhaps little risk of LBHI being able
16 to take up a lease, to the extent there was any
17 risk of that happening, I didn't think it was
18 appropriate for JP Morgan to take up that risk.
19 We would simply want to complete with a certainty
20 that this notice had not been served and would not
21 be served.
22     Q.   Was it your -- did anyone from
23 Clifford Chance represent to you that a notice
24 would not be served on LBHI under this provision?
25     A.   They ----

**Page 29**

7/9/2013 Clay, Jeremy

```
                    JEREMY CLAY
 1
 2   about your instructions.
 3   BY MR. MEADE:
 4       Q.   Did you express your instructions
 5   to Canary Wharf?
 6       A.   In finalising this document we
 7   would have sought to document an arrangement which
 8   meant this transaction completed, in terms of both
 9   exchange of agreements and completion of transfer
10   of -- and transfer of legal title on the same
11   date, because that was the discussion that I
12   believe we did have with Clifford Chance about how
13   the deal should be closed.  But that was as far as
14   it would go.
15       Q.   Just so I understand, when you say,
16   the "arrangement which meant this transaction
17   completed, in terms of both exchange of agreements
18   and completion of legal title on the same day", is
19   that what completion of the transaction will take
20   place simultaneously ----
21       A.   I believe it is, yes.
22       Q.   Did you have any -- when you said,
23   "that was the discussion we had with Clifford
24   Chance about how the deal should be closed", did
25   you have any discussions with Clifford Chance
```

**Page 30**

7/9/2013 Clay, Jeremy

```
                    JEREMY CLAY
 1
 2   about why that was how the deal should be closed?
 3       A.   No.
 4       Q.   Do you recall having any
 5   discussions about the reason why JP Morgan wanted
 6   it closed -- why it wanted completion to take
 7   place simultaneously?
 8            MR. COHEN:  Discussions with
 9   Clifford Chance about the reason?
10            MR. MEADE:  Yes.
11            MR. COHEN:  (Unclear).
12       A.   No.
13   BY MR. MEADE:
14       Q.   Would you also look at paragraph
15   12.  "No Disclosure of the Agreement For Lease".
16   It states: "In order to preserve the
17   confidentiality of te Agreement, the Buyer will
18   agree not to apply to the Land Registry to note
19   the Agreement on Canary Wharf's titles whether by
20   way of an agreed or unilateral notice.  Any breach
21   by the Buyer will entitle the Seller to determine
22   the agreement."  Do you remember any discussion
23   with Clifford Chance regarding this provision?
24       A.   We had a discussion regarding the
25   requirement of both parties that the transaction
```

**Page 31**

7/9/2013 Clay, Jeremy

```
                    JEREMY CLAY
 1
 2   should be confidential, and that was reflected in
 3   the MOU.  I do not think there were specific
 4   discussions around Section 12, which would be a
 5   relatively normal consequence of an agreed
 6   condition of confidentiality provision
 7   arrangement.
 8       Q.   Okay.  Was this provision in here
 9   -- sorry, was provision, paragraph 12, in the MOU
10   at Canary Wharf's request?
11       A.   I believe it was.
12       Q.   Do you recall why?
13            MR. COHEN:  Objection as to form.
14   You say "why" meaning did Canary Wharf tell him
15   why?
16            MR. MEADE:  Does he know why Canary
17   Wharf wanted this provision in the MOU.
18            MR. COHEN:  Because they
19   communicated -- he may have that heard from his
20   client, so again I want to make sure we are
21   sticking to the non-privileged area.
22            MR. MEADE:  Let me ask the question
23   again.  I may be able to take care of this.
24   BY MR. MEADE:
25       Q.   Other than communications with your
```

**Page 32**

7/9/2013 Clay, Jeremy

```
                    JEREMY CLAY
 1
 2   client, do you know why Canary Wharf wanted this
 3   in the MOU?
 4            MR. McCARTHY:  Objection to the
 5   form.
 6       A.   I believe, again, my recollection
 7   is they wanted it in simply to ensure
 8   confidentiality, which was the agreed principle.
 9   BY MR. MEADE:
10       Q.   Are you aware of whether -- sorry.
11   Are you aware of any reasons why Canary Wharf did
12   not believe that paragraph 11 was sufficient to
13   satisfy their confidentiality concern?
14            MR. COHEN:  Objection.  Again, are
15   you ----
16            MR. MEADE:  Just so I understand.
17   Are you taking the position that facts that Canary
18   Wharf conveyed to JP Morgan that he is aware of
19   are privileged?
20            MR. COHEN:  You say facts.
21   Communications between him and JP Morgan are
22   privileged.  You know, if they passed a writing
23   that was from someone from Canary Wharf through
24   JP Morgan to him I would say no, that's not
25   privileged, but if someone is describing -- if his
```

**Page 45**

JEREMY CLAY

Q. 12.19. It starts on the bottom of 18402 and continues for the next two pages?

A. No.

Q. I understand that you have not seen the e-mail. I am going to read a little of it, to give you context to the next question. If you could look at 18403, the second paragraph: "Your clients' request, for an acknowledgment of a valid claim of 262.5 million presents LBL and its administrators with a significant problem. Setting aside the fact that this claim was previously agreed at nil (after extensive negotiations) my clients struggle to see how they can acknowledge claims which are currently in the region of 35 million (representing accrued rent and estate charges) at a substantially higher sum." Then, if you can skip down five paragraphs, where it says: "We recognise that your clients..." Do you see where I am?

A. Yes.

Q. "We recognise that your clients wish to amend the deal with LBL in order to reach agreement with LBHI and in particular to be able to provide the requested stipulation numbered 2 in

**Page 46**

JEREMY CLAY

the draft agreement. However, and forgive us if this is something that you have previously debated and rejected, a different route occurs to us which will enable your clients to reach agreement with LBHI, but would not necessitate any claim against LBL. Our suggestion is as follows: your client now and/or in the future would be in a position to forfeit the Lease and on doing so would be required to require LBHI to enter into a new lease on the same terms. In the circumstances of Agreement 3 in the draft settlement with LBHI (namely that your client does not currently anticipate entering into a lease for all or substantially all of the premises within 12 months of the court ratifying the LBHI settlement) it appears to us that your client can make a claim against LBHI if it refuses to accept a new lease. We note that this independent right of your client against LBHI is not currently referred to in the draft Settlement Agreement with LBHI but it would seem to present a solution to the deadlock which your clients have reached. We hope that this suggestion would be regarded as helpful. It seems to resolve the tension between our respective

**Page 47**

JEREMY CLAY

clients and so if you cannot adopt it, it would be helpful to know why that is."

Okay, now do you recall any communications with Clifford Chance, in which you were informed that counsel for LBL had suggested that Canary Wharf should serve a notice on LBHI, under paragraph 7 of Schedule 4 of the LBL lease?

MR. McCARTHY: Object to the form.

A. No.

BY MR. MEADE:

Q. So just to be clear, you also -- are you aware of any reason that would -- are you aware, from your communications with Clifford Chance, of any reason that may have been expressed to LBL as to why that could not be done?

A. I am sorry, can you repeat the question?

Q. From your communications with Clifford Chance, are you aware of any reason that Canary Wharf expressed to LBL as to why it could not provide such a notice?

A. No.

Q. The court reporter will be handing you in a moment a document that has just been

**Page 48**

JEREMY CLAY

marked as exhibit 97. It is Bates stamped MB0001167. This is an e-mail from yourself to Tony Briam, dated Thursday December 2nd 2010, at 9.54 a.m.

(Exhibit JC 97 was marked for identification)

Q. Just take a look. Have you seen this before?

A. Yes.

Q. It says: "Tony, I refer to your call earlier in the week. As mentioned JPM wishes to simultaneously exchange and complete on December 16th." Do you recall, or do you remember any call with Mr. Briam that you would be referring to here, where it says: "Tony, I refer to our call earlier in the week."?

A. No. I mean, there were so many calls at this point.

Q. Then you wrote: "As mentioned JPM wishes to simultaneously exchange and complete on 16th December." Do you recall any discussions with Mr. Briam, or anybody else at Clifford Chance at about this time, as to why JP Morgan wanted to simultaneously exchange and complete on that date?

A. We would have explained that, I

7/9/2013 Clay, Jeremy

## Page 49

JEREMY CLAY

think did explain to them, that JP Morgan wished to complete prior to the end of the year and, in essence, that meant before December 20, which is when things start closing down. So in terms of lawyers being around and people being there to complete, so we aimed for -- were looking for a date before then. The reason they wanted to complete then, and I communicated with Clifford Chance, was the wish that we would then be in a position to take possession of the building and commence the fit-out of the building early in the New Year. December 16 was picked, I believe, and we informed Clifford Chance, just in terms of availability of Bill Viets and availability of signatories for documents. It was a logistics -- driven by logistics.

Q. Did you ever communicate to Clifford Chance that, if the deal did not simultaneously exchange and complete by December 20th, that it would not be able to be completed in 2010?

A. No. This is a wished-for date rather than -- I didn't express it to Clifford Chance as being a cut-off.

## Page 51

JEREMY CLAY

Q. Do you see where it says: "The Seller shall use reasonable endeavours to satisfy the Conditions Precedent by 15th December 2010 (the 'Expiry Date')." Again, I apologise if this is what you just testified to, but do you recall any discussion regarding a date by which the transaction had to close -- strike that. Do you recall any discussion regarding what you would refer to as a cut-off date?

MR. COHEN: With Clifford Chance?
BY MR. MEADE:
Q. With Clifford Chance?
MR. COHEN: Discussion at any time?
MR. MEADE: Correct.
MR. COHEN: Okay.
BY MR. MEADE:
Q. At any time?
A. No, I don't believe we did have a discussion.
Q. Do you recall any discussion regarding the provision in the MOU we just read which refers to an expiry date, again with Canary Wharf, including its counsel?
A. No, I don't believe there was --

## Page 50

7/9/2013 Clay, Jeremy

JEREMY CLAY

Q. Was there any communication with Clifford Chance that the deal had to close in 2010?

A. I believe I would have informed Clifford Chance that they needed to close in 2010 for the reason that JP Morgan needed to take possession at the start of 2011, in terms of their overall timing, for fitting out and taking occupation of the building.

Q. Was there any communication as to what would occur with respect to the deal if it could not close in 2010?

MR. COHEN: Asked and answered.
BY MR. MEADE:
Q. You can answer.
A. No, it was not expressed as, in some sense a cut-off, that the deal would not happen if it wasn't done in 2010. I don't think it was -- I don't believe I expressed it in those terms. It was simply the wished-for timetable.

Q. Briefly, if you can look back at the MOU, which is exhibit 26, I would like you to look at page 1550 again, paragraph 4.4?
A. Yes.

## Page 52

7/9/2013 Clay, Jeremy

JEREMY CLAY

that we had any discussion with Clifford Chance about that date. It was ----

Q. You said "it was just", sorry, and then you ----

A. It was a date that we -- I can't really recall, to be frank. It was probably a date that we were given, but I don't think that there was any discussion with Clifford Chance about it.

Q. But you expressed to Clifford Chance that it was important for JP Morgan that the deal close in 2010?

MR. COHEN: Asked and answered.
A. Yes, certainly that, in the discussions as the deal progressed, and the timing was worked out for JP Morgan's move to the new building it became important that we closed in 2010 to meet that timetable.
BY MR. MEADE:
Q. You can -- exhibit 97, just keep it available. I may go back to it. I don't want you to have to rifle through the stack. I am handing you what has been previously marked exhibit 9. I will be asking you about two e-mails. For the

**7/9/2013 Clay, Jeremy**

```
                  JEREMY CLAY
 2  2010?
 3       A.    Well, I can't recall it, but it
 4  would appear from the e-mail that it must have
 5  been, yes.  I cannot recall doing it, but in terms
 6  of the timing -- I can't recall the dates well
 7  enough but this suggests to me that we must have
 8  done it before this date, yes.
 9       Q.    When you say:  "As I made clear on
10  the telephone..."  Do you recall having a phone
11  conversation regarding the issue of -- that Canary
12  Wharf was asking LBHI for confirmation as to
13  whether it wanted to take a new lease ----
14             MR. COHEN:  I am sorry, can you
15  repeat ----
16  BY MR. MEADE:
17       Q.    Yes.  In your response, December
18  3rd 2010 ----
19       A.    Yes.
20       Q.    You said:  "As I made clear on the
21  telephone..."  Do you remember having a telephone
22  conversation about the issues being discussed in
23  this e-mail?
24       A.    Not specifically, no.
25       Q.    Okay.  Generally?
```
                                                                57

**7/9/2013 Clay, Jeremy**

```
                  JEREMY CLAY
 2       A.    Generally, my message would have
 3  been delivered -- that I was delivering to
 4  Clifford Chance was, "You must not serve a notice
 5  and if you do serve a notice and provide me with
 6  some confirmation from LBHI that it is not going
 7  to take up a new lease, that won't, in itself, be
 8  acceptable for me to recommend JP Morgan proceed
 9  to complete".  That was a message I was giving to
10  Clifford Chance and this e-mail is, in my view,
11  confirming what I was saying on the telephone to
12  Clifford Chance.
13       Q.    Okay. So what this e-mail is say is
14  if you get e-mail confirmation from -- just so
15  I understand?
16       A.    Yes.
17       Q.    What this e-mail is saying is if
18  you get e-mail confirmation from LBHI, or if you
19  get confirmation however confirmation comes, that
20  they don't want to take up a new lease, that will
21  not be sufficient for JP Morgan if Canary Wharf
22  has provided Lehman with notice under what you
23  call the Lehman lease guarantee?
24       A.    It is difficult for me to be
25  absolutely -- to absolutely recall this.  What
```
                                                                58

**7/9/2013 Clay, Jeremy**

```
                  JEREMY CLAY
 2  I believe I was responding to here was a
 3  suggestion that some e-mail confirmation would be
 4  obtained from LBHI, and I was expressing our
 5  position on the view to Clifford Chance that
 6  simply obtaining an e-mail from LBHI was not in
 7  itself going to be enough.  It clearly would be
 8  possible for them to come back perhaps with
 9  something that was enough, but that -- at this
10  stage, that appeared to be what I was being -- as
11  my recollection is, that's what was being
12  proposed, and I was saying that is not going to be
13  enough.
14       Q.    Did you inform them of what would
15  be enough?
16       A.    No.
17       Q.    I will show you what has been
18  previously marked as exhibit 15.  For the record,
19  this is the agreement relating to the grant of a
20  lease of 25 Bank Street, Canary Wharf, London E14
21  5LE, Bates stamped CW 0005282.  Have you seen this
22  document before?
23       A.    Yes.
24       Q.    Now, the deal with -- the
25  transaction between JP Morgan and Canary Wharf
```
                                                                59

**7/9/2013 Clay, Jeremy**

```
                  JEREMY CLAY
 2  closed on December 20th?
 3       A.    I believe so.
 4       Q.    Is that correct?
 5       A.    I believe so.
 6       Q.    This is dated 20th December 2010,
 7  does that refresh your recollection?
 8       A.    Yes, it does.
 9       Q.    If you could take a look -- I just
10  want you to look at two provisions.  The first is
11  on Bates stamp 5310, it is provision 7.16.4.
12       A.    Yes.
13       Q.    You can read that to yourself.  The
14  other provision which I am just going to be asking
15  you about quickly is on 5319, it is 11.3.2.
16       A.    Yes.
17       Q.    When you said that the e-mail
18  confirmation that was being proposed wouldn't be
19  enough, is this what the parties agreed that would
20  be enough, these provisions that were inserted
21  into the final version of the SPA?
22             MR. COHEN:  Objection as to form.
23  You can answer, go ahead.
24       A.    The discussions continued from --
25  through December to with Clifford Chance and, in
```
                                                                60

*7/9/2013 Clay, Jeremy*

```
1              JEREMY CLAY
2    finalising the document, I reiterated the
3    JP Morgan position that, in order that JP Morgan
4    to close, we would need clear confirmation that no
5    notice had been served and an express obligation
6    not to serve a notice.
7    BY MR. MEADE:
8         Q.    And?
9         A.    I was not aware of any alternative
10   solutions at that point, beyond the e-mails that
11   you have just seen.
12        Q.    Is the alternative solution e-mail
13   confirmation from LBHI?
14        A.    Yes, beyond that, that's ----
15        Q.    When you say, "In order for
16   JP Morgan to close we would need clear
17   confirmation no notice had been served and an
18   express obligation not to serve a notice."
19        A.    Yes.
20        Q.    Just so that I understand, is that
21   what is being represented in 7.16.4 and 11.3.2?
22        A.    Yes, I believe they achieved that.
23        Q.    You have just been handed a
24   document which is Bates stamped MB0000654. It has
25   been marked as exhibit 98 in this case.
```

61

*7/9/2013 Clay, Jeremy*

```
1              JEREMY CLAY
2    (Exhibit JC 98 was marked for identification)
3         Q.    This is an e-mail chain which
4    starts off with an e-mail from Anita Jones to
5    Justin Turner of Clifford Chance dated December
6    13th 2010, at 8.32 and continues on to an e-mail
7    from Tony Briam to yourself, to Jeremy Clay, on
8    Wednesday, December 15th at 9.35. Have you seen
9    this e-mail chain before?
10        A.    Yes, and I was shown this
11   yesterday.
12        Q.    In connection -- if you see in
13   Ms. Jones' original e-mail, the initial e-mail in
14   the chain, she says: "In relation to your
15   deletion of clause 11.3.2 of the Main Spa of the
16   reference to para 7(b) of schedule 4 to the Lehman
17   Lease, can you please confirm as a reply to
18   enquiry that no notice or demand under that
19   paragraph has been nor will be served on LBHI
20   prior to completion of the purchase by JPM." Do
21   you see that?
22        A.    Yes.
23        Q.    Now, Ms. Jones follows up on
24   December 14th, saying that you -- she had not yet
25   received the confirmation that was being sought,
```

62

*7/9/2013 Clay, Jeremy*

```
1              JEREMY CLAY
2    correct? Do you see that? She again follows up
3    again on December 15th, it looks like, if I am
4    reading it correctly, it looks like 12.36 in the
5    morning?
6         A.    All right.
7         Q.    Was this when the transaction was
8    winding down at that December 15th?
9         A.    No, it was fully -- it was pushing
10   to closing, so we were in the sort of period just
11   prior to closing, so there was a lot going on at
12   this point.
13        Q.    This is my noncorporate lawyer
14   understanding of deals. On December 15th at 9.06
15   a.m. you respond: "Tony, Justin can you confirm
16   please asap as we need to confirm position to
17   David and Bill re Lehmans." Just so I
18   understand, can you explain why you were asking
19   them to confirm that no notice or demand, under
20   paragraph 7(b) of Schedule 4, had been served or
21   would be served -- strike that. I might be able
22   to make this easier. Were you simply seeking the
23   confirmation that you expressed earlier, that the
24   notice had not and would not be served?
25        MR. COHEN:   Objection to form. Go
```

63

*7/9/2013 Clay, Jeremy*

```
1              JEREMY CLAY
2    ahead if you can.
3         A.    There were two notices. There is
4    the notice about taking up a lease, which is 7(a),
5    and 7(b) is a different situation which is, if you
6    do not require to serve a notice under 7(a), you
7    can pursue rent. There is a claim that can be
8    brought under 7(b) and basically, in diligence
9    terms, I was wanting to know the position under
10   7(b), as to whether steps had been taken under
11   7(b). So it was in the nature of a diligence
12   inquiry.
13   BY MR. MEADE:
14        Q.    I am handing you what has been
15   previously marked as exhibit 40. This is an
16   e-mail chain, Bates stamped CW 0020707. I am
17   going to be asking you a question about Ms. Jones'
18   e-mail on December 3rd at 6.26p.m. It is on the
19   bottom of 20708. I have a pretty specific
20   question about the paragraph that starts:
21   "I understand that you do not yet have
22   instructions..." Do you see where I am referring
23   to?
24        A.    Yes.
25        Q.    It states: "I understand that you
```

64

7/9/2013 Clay, Jeremy

```
            JEREMY CLAY
1
2    do not yet have instructions from Canary Wharf in
3    relation to the proposed $10 million(sic) loan
4    from JPM to CW."  -- Canary Wharf ----
5            MR. COHEN:  Objection as to form.
6    " 10 million."
7            MR. MEADE:  Pounds?  Did I say
8    dollars? Even better.
9            MR. COHEN:  Yes.
10   BY MR. MEADE:
11       Q.   "In relation to the proposed
12   10 million loan from JPM to CW.  We will need to
13   document this next week so if you could come in
14   relation to this we can then progress this
15   aspect."  Do you recall a proposed
16   $10 million(sic) loan from JP Morgan to Canary
17   Wharf?
18       A.   I really do not, no.
19           MR. MEADE:  If you give me five
20   minutes we may be able to wrap up soon.
21           MR. COHEN:  Sure.
22           (Off the record at 12.28)
23           (Back on the record at 12.41)
24   BY MR. MEADE:
25       Q.   Mr. Clay, do you recall any
```

65

7/9/2013 Clay, Jeremy

```
1            JEREMY CLAY
2    conversations with Clifford Chance concerning
3    whether LBHI would have the right to try to take
4    back the lease after the transaction with
5    JP Morgan closed?
6            MR. COHEN:  Okay, just an objection
7    here, conversations before the closing?  Because
8    after the closing we get into another potential
9    privilege issue, as you know.
10           MR. MEADE:  I understand.
11           MR. COHEN:  I want to make sure
12   what you are asking.
13           MR. MEADE:  Okay.
14   BY MR. MEADE:
15       Q.   Prior to the closing, do you recall
16   any discussions between Mayer Brown and Clifford
17   Chance concerning whether LBHI would have the
18   right to try to take back the lease from
19   JP Morgan?
20           MR. COHEN:  Objection as to form.
21   Go ahead.
22       A.   Only in the context of the
23   nonservice of the notice, i.e. on the basis they
24   would not serve a notice, following closing we
25   were -- that was our requirement, and there were
```

66

7/9/2013 Clay, Jeremy

```
1            JEREMY CLAY
2    no further conversations about any other right or
3    entitlement to take back the lease -- to take a
4    lease.
5    BY MR. MEADE:
6        Q.   Did you express to -- other than
7    not serving the notice, did you ever express to
8    Clifford Chance any concerns that JP Morgan had
9    about LBHI's ability to try to take back the
10   lease?
11       A.   No.
12           MR. MEADE:  I have no further
13   questions.
```

67

7/9/2013 Clay, Jeremy

```
1            JEREMY CLAY
2        (DIRECT QUESTIONS BY MR. McCARTHY)
3            MR. McCARTHY:  I have questions.
4    Would you like me to put a Mike on?
5            MR. MEADE:  Just yell really loud!
6    BY MR. MCCARTHY:
7        Q.   Mr. Clay, you were shown earlier
8    exhibit 9.  Do you have that in front of you?
9            MR. MEADE:  What is the date on
10   that?
11           MR. McCARTHY:  29713.
12           MR. MEADE:  I had in mind the date.
13           MR. McCARTHY:  The date, I am
14   sorry.  The date in the top e-mail is 6th
15   December.
16   BY MR. McCARTHY:
17           Mr. Clay, you discussed with
18   Mr. Meade e-mails at the end of this document from
19   December 3rd.  Do you remember that discussion?
20       A.   Yes.
21       Q.   Prior to the closing of the deal
22   between JP Morgan and Canary Wharf, did you see
23   any e-mails from LBHI or from it counsel
24   indicating that LBHI would not take a lease?
25           MR. MEADE:  Object to the form.
```

68

## Page 69

7/9/2013 Clay, Jeremy

JEREMY CLAY

1  
2       THE COURT REPORTER: I am sorry, I  
3  did not hear you. "Would not..."  
4       MR. McCARTHY: "...take a lease."  
5       A.   No.  
6  BY MR. MCCARTHY:  
7       Q.   Did you see any e-mails at all from  
8  LBHI or from its counsel prior to the closing of  
9  the deal between JP Morgan and Canary Wharf?  
10      A.   I don't believe we did, no.  
11      MR. McCARTHY: Okay. That's all.  
12      MR. MEADE: I just have one follow  
13 up question.  
14  
15      (FURTHER DIRECT BY MR. MEADE)  
16 BY MR. MEADE:  
17      Q.   Regardless of whether you saw any  
18 e-mails between JP Morgan -- sorry, between  
19 counsel for LBHI and counsel for Canary Wharf, the  
20 position that you expressed was that e-mail  
21 confirmation from LBHI would be insufficient for  
22 you to recommend to your client that it proceed to  
23 completion of this transaction?  
24      MR. McCARTHY: Object to the form  
25 of the question.  

## Page 70

7/9/2013 Clay, Jeremy

JEREMY CLAY

1  
2       A.   I can't specifically recall that  
3  conversation, but that e-mail chain that you  
4  showed me indicates to me that that was the  
5  discussion I was having with Clifford Chance, and  
6  it was certainly consistent with discussions we  
7  had been having and with the e-mail, so that  
8  appears to me to be what we were doing, yes.  
9       MR. MEADE: No further questions.  
10 Okay, are we off the record?  
11      MR. COHEN: No, I have one  
12 question.  
13      MR. MEADE: Do you want to go off  
14 first?  
15      MR. COHEN: No.  
16      MR. MEADE: I was going to say  
17 thank you.  
18      MR. COHEN: You can say that on the  
19 record.  
20      (REDIRECT BY MR. COHEN)  
21 BY MR. COHEN:  
22      Q.   Mr. Clay, in your conversations  
23 with Clifford Chance, did you inform them why you  
24 were taking the position that you thought you did  
25 not want notice to be provided to LBHI?  

## Page 71

7/9/2013 Clay, Jeremy

JEREMY CLAY

1  
2       A.   Yes. In the discussions we had in  
3  relation to the SPA we were clear that what was  
4  important to JP Morgan was to be able to close,  
5  have vacant possession of the building, and be  
6  able to fit-out and occupy the building in  
7  accordance with its required timetable, and that  
8  what was not acceptable was the possibility of the  
9  creation of some contractual arrangement between  
10 Canary Wharf and LBHI which would give LBHI an  
11 entitlement to a lease of the building which could  
12 therefore, in some way, interfere with JP Morgan's  
13 occupancy post closing, or at all.  
14      Q.   Other than what you just said, was  
15 there any other reason that you articulated to  
16 Clifford Chance as to why you did not want notice  
17 served on LBHI?  
18      A.   No.  
19      MR. COHEN: That's it for me.  
20      MR. MEADE: No further questions.  
21      THE VIDEOGRAPHER: Going off the  
22 record. The time is 12.47.  
23      (Off the record at 12.47 p.m.)  
24      (The deposition concluded at 12.47 p.m.)  
25  

## Page 72

7/9/2013 Clay, Jeremy

1  
2       CERTIFICATE OF WITNESS  
3  
4       I, JEREMY CLAY, am the witness in  
5  the foregoing statement under oath. I have read  
6  the foregoing statement and, having made such  
7  changes and corrections as I desired, I certify  
8  that the transcript is a true and accurate record  
9  of my responses to the questions put to me on  
10 Tuesday, 5th July 2013.  
11  
12  
13  
14  
15  
16      Signed ....................  
17           JEREMY CLAY  
18      Dated this ........ day of ......... 2013