# EXHIBIT   47

```
 1            CONFIDENTIAL - L. Rabinowitz

 2   UNITED STATES BANKRUPTCY COURT

 3   SOUTHERN DISTRICT OF NEW YORK

 4   ------------------------------x

 5   In Re:                    Chapter 11 Case No.
                               08-13555(JMP)
 6   LEHMAN BROTHERS HOLDINGS INC., (Jointly Administered)
     et al.,
 7
                  Debtors.
 8   ------------------------------x

 9

10

11          * * * CONFIDENTIAL * * *

12    VIDEOTAPED DEPOSITION OF LAURENCE RABINOWITZ

13              New York, New York

14            September 4, 2013

15

16

17

18

19

20

21

22

23   Reported by:

24   KATHY S. KLEPFER, RMR, RPR, CRR, CLR

25   JOB NO. 65270
```

Page 6

CONFIDENTIAL - L. Rabinowitz

1    reporter please swear in the witness.
2          * * *
3    L A U R E N C E   R A B I N O W I T Z, called as a
4      witness, having been duly sworn by a Notary
5      Public, was examined and testified as
6      follows:
7    EXAMINATION BY
8    MR. ISAKOFF:
9        Q.    Would you please state your full name
10   for the record.
11       A.    Laurence Anton Rabinowitz.
12       Q.    And what is your current business
13   address?
14       A.    One Essex Court, Temple, London, EC4Y
15   9AR.
16       Q.    Have you ever testified before?
17       A.    By way of deposition, no.
18       Q.    Have you ever testified in any
19   proceeding?
20       A.    I've testified in proceedings in
21   London probably ten years ago.
22       Q.    It would help me a great deal if you
23   could keep your voice up a little bit.
24       A.    I'll do my best.

Page 7

CONFIDENTIAL - L. Rabinowitz

1        Q.    I'm only seated about five feet apart
2    and I'm having a very hard time just hearing
3    you.
4        So it was only on one occasion?
5        A.    Correct.
6        Q.    And what was the nature of the
7    proceeding?
8        A.    I had acted for Enron in proceedings
9    that they had brought against other oil and gas
10   companies relating to a power plant.  There was
11   an issue as to whether the proceedings were
12   brought bona fide.
13       I gave evidence as to the legal advice
14   that had been given in order to show that the
15   proceedings had been brought bona fide.  My
16   evidence was accepted and Enron won that
17   particular issue.
18       Q.    All right.  So you testified as a fact
19   witness as to what occurred?
20       A.    Effectively, as a fact witness, yes.
21       Q.    Have you ever testified as an expert
22   witness before?
23       A.    Not by way of deposition.  I gave a
24   witness statement or affidavit in proceedings

Page 8

CONFIDENTIAL - L. Rabinowitz

1    involving Vivende.  Again, I think this was
2    eight or nine years ago.  It was an issue
3    relating to a conflict of laws point and, more
4    particularly, how in England class actions were
5    dealt with, if at all.
6        Q.    Is that the only occasion on which you
7    have provided any evidence as an expert by way
8    of something in writing or orally?
9        A.    To my recollection, yes.
10       Q.    Have you -- have you been made
11   familiar with United States deposition
12   procedure?
13       A.    I have as a result of the lawyers for
14   Canary Wharf explaining the proceedings to me,
15   or the procedures to me.
16       Q.    You understand we have a court
17   reporter taking down everything verbatim; that
18   in order for that to be effective, we should try
19   not to talk over one another.  And I will do my
20   best for that.  If you have not finished
21   answering a question when I start to ask you
22   one, it's because I will have misunderstood and
23   just let me know that you haven't finished.
24       A.    Fine.

Page 9

CONFIDENTIAL - L. Rabinowitz

1        Q.    We're also recording this by video.
2    You're obliged to respond verbally.  Shakes of
3    the head and so forth won't be picked up in the
4    transcript.  If there's something about a
5    question you don't understand, please ask me and
6    I'll do my best to clarify it.
7        A.    Thank you.
8        Q.    If you want a break, just say so.  In
9    terms of consultation, you may not consult with
10   counsel while a question is pending unless it
11   concerns a matter of privilege, but that's
12   unlikely to come up.
13       Is there any reason not to go forward
14   today?
15       A.    Not that I'm aware of.
16       Q.    What, if anything, have you done to
17   prepare for your deposition?
18       A.    I reminded myself of the reports that
19   I had produced and that had been produced by
20   your expert.  I met yesterday with the lawyers
21   for Canary Wharf and we spent some time with
22   them explaining to me the proceedings and what
23   was going to happen today and effectively
24   discussing, in effect, what was at issue.

Page 18

```
 1        CONFIDENTIAL - L. Rabinowitz
 2  then did an LLB, which is the South African law
 3  course, law qualification, before coming to
 4  England on a Rhodes Scholarship, where I did two
 5  further law degrees.
 6     Q.   Two further law degrees?
 7     A.   Two further law degrees.
 8        So, in fact, I have three law degrees.
 9     Q.   All right.  And what are your law
10  degrees in, if that's how they're -- tell me
11  about the --
12     A.   Well, they're in law.
13     Q.   In law, okay.  And what is the
14  difference between the two?
15     A.   Between the two what?
16     Q.   You said you got two law degrees in
17  England, and I guess I'm -- I'm not familiar
18  with that system.
19     A.   Okay.  The basic law degree in England
20  is done as an undergraduate course, certainly at
21  Oxford and indeed I think in most English
22  universities.  That's the BA in jurisprudence
23  that you see referred to in paragraph 7 of my
24  report.
25        That is a degree that covers -- I
```

Page 19

```
 1        CONFIDENTIAL - L. Rabinowitz
 2  think you do 12 subjects.  You then have the
 3  opportunity, if you get a first and you are
 4  selected, to do a BCL, which is I guess roughly
 5  the equivalent of an LLM, although regarded
 6  certainly in England as having a higher status
 7  than that.  So that is a law degree, a
 8  specialist law degree, an advanced law degree
 9  done by a very select group of people.
10        By "select," I mean a small group of
11  people.  You need to qualify for it.
12     Q.   All right.  And how long did each of
13  those degree programs last?
14     A.   The jurisprudence degree is a
15  three-year degree.  I was allowed to take that
16  in two years because I had previously done a
17  three-year law degree in South Africa, so that's
18  five years of law before I did the BCL.
19        The BCL is a degree which you can
20  either do in two years or one year.  I did it in
21  one year.
22     Q.   Okay.  And paragraph 8 refers to the
23  Juta Prize.  What is that?
24     A.   Well, as it says, it's the prize for
25  the best non-graduating law student of the
```

Page 20

```
 1        CONFIDENTIAL - L. Rabinowitz
 2  University of South Africa.  In effect, what
 3  they have at the university, University of
 4  Witwatersrand, is a prize for the top graduating
 5  student and the top non-graduating student.
 6  Juta was a famous, I think, judge in South
 7  African history and he gave his name to this
 8  prize.
 9     Q.   And you won both of them?
10     A.   I won it in both years.
11     Q.   You say that you're the current editor
12  of Weinberg & Blank on takeovers and mergers,
13  and it's the leading text on that subject.
14        Have you done any writing in the field
15  of landlord and tenant law?
16     A.   No, I haven't.
17     Q.   And have you done any writing in the
18  field of law of guarantees?
19     A.   No, I haven't.
20     Q.   What do you think makes you an expert
21  on the subject matter of this case?
22     A.   I have many years' experience
23  practicing in commercial law.  Law of guarantees
24  is a subset of the law of contract, which is my
25  specialist area, if you like, it's what I do.
```

Page 21

```
 1        CONFIDENTIAL - L. Rabinowitz
 2  Commercial law is contract, and contract
 3  includes guarantees.
 4        I have over the years advised on a
 5  number of occasions in relation to guarantees
 6  and indemnities, and I guess, more than that,
 7  the way in which English law works, I suspect
 8  the way in which American, US law works, is that
 9  the law is to be gleaned from decided cases.
10        I have an expertise in understanding
11  and interpreting English law cases and, in
12  particular, English law cases in the commercial
13  law field.
14     Q.   Isn't that what all lawyers do?
15     A.   Well, maybe some lawyers do it better
16  than others, but I guess that is what all
17  lawyers do.  Indeed, I suspect in England a lot
18  of lawyers don't practice in commercial law.  In
19  England, there are subdivisions between
20  commercial law, I guess people do administrative
21  law, they do criminal law, matrimonial law.
22     Q.   Right.  Is there anything that makes
23  you more of an expert in the subject matter of
24  this case than other lawyers practicing
25  commercial law in England?
```

Page 22

CONFIDENTIAL - L. Rabinowitz

1
2     A.   I suppose that there will be lawyers
3  in England who have an equal expertise to me,
4  but there will be some who don't have either my
5  experience or, indeed, I guess my abilities,
6  without trying to be funny about it, in terms of
7  analyzing and understanding commercial law
8  cases.
9     Q.   So what makes you an expert in this
10 field as compared to other commercial lawyers is
11 that you are better at it than they are?
12    A.   I have a great deal of experience in
13 the area and I understand the way English law
14 works.
15    Q.   Do you believe you have more or less
16 experience than Richard Millett in the areas
17 that are the subject matter of this case?
18    A.   Mr. Millett, because he's been
19 involved in a textbook, would certainly have a
20 more general familiarity with the Law of
21 Guarantees, as he calls his book, than I would.
22 However, in relation to the issues that arise in
23 this dispute, I would suggest that I have as
24 much expertise as he does because there is no
25 real dispute between us as to what the law of

Page 23

CONFIDENTIAL - L. Rabinowitz

1
2  guarantees and indemnities is.  It's all about
3  the interpretation of that law to the facts of
4  this case.
5         In terms of that, that is to say the
6  interpretation of the law to the facts of this
7  case, that primarily turns on issues of
8  contractual interpretation.  In that particular
9  area, I would suggest I have at least as much
10 expertise, if not more, than Mr. Millett.
11    Q.   Paragraph 14 on page 4 says, "I have
12 not testified as an expert at trial or by
13 deposition in the last four years," and just to
14 confirm, you have never testified as an expert
15 at trial or by deposition at any time in your
16 career, correct?
17    A.   Correct.
18    Q.   Okay.  And let's go to appendix A,
19 which is your CV.  Did you write this yourself?
20    A.   I think this was written by the clerks
21 in my chambers.  They probably showed bits to
22 me, but I wasn't the primary author of this.  By
23 "this" we're talking about the CV at the end.
24    Q.   Yes, we are.  Appendix A.
25    A.   Yes.

Page 24

CONFIDENTIAL - L. Rabinowitz

1
2     Q.   Have you read this?
3     A.   Yes, I have read it.
4     Q.   Is there anything wrong in this CV?
5     A.   Is there anything wrong?  There's
6  nothing wrong in the CV that I'm aware of.  It
7  doesn't identify everything I've ever done
8  because that would be tedious and too lengthy.
9  There may be small errors I haven't spotted, but
10 I think basically it gives the right impression
11 of what I do.
12    Q.   All right.  On page 1 of this, there's
13 a heading toward the bottom that says Scope of
14 Practice.
15    A.   Yes.
16    Q.   And I don't see anything about either
17 real estate litigation or landlord and tenant
18 cases.  Have you done any other than in this
19 case?
20    A.   I have been advised in -- I've been
21 involved in advising on cases relating to
22 guarantees.  That may not have been your
23 question.  I think it may have been related to
24 real estate litigation and?
25    Q.   Landlord and tenant.

Page 25

CONFIDENTIAL - L. Rabinowitz

1
2     A.   Landlord and tenant.
3         I have given advice in relation to
4  landlord and tenant issues insofar as that is
5  advice about the meaning of contractual
6  provisions.
7         Have I been involved in litigation
8  before the courts on that?  I have no -- I don't
9  recollect being involved in any case on landlord
10 and tenant.
11    Q.   Do you know whether Mr. Millett has
12 been involved in any landlord and tenant and real
13 estate litigation in his career?
14    A.   I have no idea whether he's been
15 involved in landlord and tenant or real estate
16 litigation.
17    Q.   Page 2 of your CV, the top, talks
18 about arbitration.  I note that the last bullet
19 under that says you were nominated as a
20 co-arbitrator.  Did you serve?
21    A.   Yes, I did.
22    Q.   Okay.
23    A.   In fact, there were three separate
24 arbitrations.
25    Q.   I believe I asked you -- did I ask you

7 (Pages 22 to 25)

Page 30

CONFIDENTIAL - L. Rabinowitz

1    CONFIDENTIAL - L. Rabinowitz
2    the principle applying as against the party
3    invoking or benefiting from a particular
4    clause." Do you see that?
5        A.   I do.
6        Q.   Do you have a view on that subject as
7    to whether it applies to the draftsperson?
8        A.   As I say there, there are differing
9    views. The view I have on contra preferentem is
10   that it's a largely relevant doctrine, certainly
11   in commercial contracts between two
12   sophisticated commercial parties.
13       So, to the extent I have a view as to
14   when it applies as between those people, I don't
15   have a strong view. I'm very happy to go with
16   what Sir Kim says about there being two views.
17       Q.   Let's just talk about what triggers
18   the contra preferentem rule.
19       A.   Uh-huh.
20       Q.   Do you have a view as to whether or
21   not -- so you don't have a view as to whether it
22   applies with respect to who is the draftsperson;
23   is that correct?
24       A.   I don't have a strong view. To me the
25   key question is whether it applies at all rather

Page 31

1    CONFIDENTIAL - L. Rabinowitz
2    than whether it applies to this person or that
3    person.
4        Q.   All right. And do you agree, as you
5    say here, that it applies against the party
6    either invoking or benefiting from the
7    particular clause?
8        A.   Well, that is one of the two views,
9    and I can see that the contra preferentem
10   doctrine, if it ever applies, may be invoked
11   against the person who seeks to benefit.
12       Q.   Would you agree that whether it's the
13   draftsperson or the party invoking it or the
14   party benefiting from it in this case, it's
15   Canary Wharf in all three?
16       A.   Yes, I would agree.
17       Q.   And your view is that the contra
18   preferentem rule is largely irrelevant, as I
19   understand your testimony; is that correct?
20       A.   That is correct in the context of the
21   case involving Canary Wharf on one side and
22   Lehman on the other side, both very
23   sophisticated parties, who neither of whom need
24   the protection in the way that a consumer might
25   need from rules like the contra preferentem

Page 32

1    CONFIDENTIAL - L. Rabinowitz
2    rule.
3        Q.   All right. Do you have any -- do you
4    cite any case law for the notion that the contra
5    preferentem rule does not apply as between two
6    commercially sophisticated parties?
7        A.   Well, if you look further down
8    paragraph 33, you will see a reference to Mrs.
9    Justice Gloster, now Lady Justice Gloster, "the
10   principle is 'of uncertain application and
11   little utility in the context of commercially
12   negotiated agreements.'"
13       That reflects a long-standing
14   understanding to the effect that, where you're
15   doling with sophisticated parties who can take
16   care of themselves and object to what is being
17   preferred to them, as Lehman would plainly have
18   been able to do, the contra preferentem rule
19   really doesn't help.
20       Q.   Well, would you agree that where a
21   court who is looking at a contract is unable to
22   determine because there are things that point
23   both ways as to its meaning, that it is a rule
24   at least of last resort?
25       A.   It certainly can be a rule of last

Page 33

1    CONFIDENTIAL - L. Rabinowitz
2    resort. As I say, I think the overriding point
3    is the point that Mrs. Justice Gloster makes;
4    that it is of uncertain utility in a case
5    between two sophisticated commercial parties.
6        Q.   So you have said, and I want to put
7    the question maybe a little bit differently.
8        Where a court finds itself scratching
9    its head because there are aspects of the
10   contract that point both ways, would you agree
11   that the contra preferentem principle applies in
12   that circumstance as a matter of last resort?
13       A.   I think I need to unbundle part of
14   what you have said. The fact that there are
15   provisions in the contract which point both ways
16   is not enough to invoke, even as a last resort,
17   the contra preferentem rule because it seems to
18   me before you get to the point of last resort,
19   what the court has to do, even if there are
20   provisions pointing both ways, is to interpret
21   that contract, having regard to all those
22   provisions, and form a view as to what it thinks
23   the parties intended.
24       To my mind, the idea of as a last
25   resort is something that judges occasionally say

Page 34

CONFIDENTIAL - L. Rabinowitz

1             CONFIDENTIAL - L. Rabinowitz
2  they're doing in a sense to buttress a
3  conclusion that they have already reached.
4     Q.  All right.  Would you agree that it is
5  a tie-breaker where a court finds that it
6  literally cannot tell?
7     A.  I would accept that in the, in my
8  view, almost nonexistent circumstances where a
9  court literally cannot tell.  I can't conceive
10  of how that could happen, but were there to be a
11  case in which a court literally cannot tell what
12  the parties intended, it may say as a last
13  resort, well, we will go with the contra
14  proferentem rule.
15       But as I say, I can't conceive of a
16  circumstance in which a court would come to the
17  conclusion that it literally cannot tell what
18  the parties intended.
19     Q.  That just never happens?
20     A.  A court concluding that it literally
21  cannot tell, certainly in an English court, that
22  just won't happen.
23     Q.  Why do they even have such a rule?
24     A.  That's a very good question.  Indeed,
25  that's why people like Mrs. Justice Gloster

Page 35

1             CONFIDENTIAL - L. Rabinowitz
2  doubt the existence of such a rule.
3       Sorry, to be fair, I mean, a contra
4  proferentem rule you might find in a situation
5  where you're dealing with a consumer someone
6  buying a product from some big corporation in
7  terms imposed on them.  The court in those
8  circumstances may say, well, you're dealing with
9  consumers; you have to be clear and we're going
10  to construe this against you.
11     Q.  Would you agree that, wherever it
12  applies, it applies to the interpretation of the
13  contract as a whole?
14     A.  Yes.
15     Q.  Now, if you'll go back to Exhibit 102.
16     A.  That is --
17     Q.  The Millett supplemental report.
18     A.  Thank you.
19     Q.  And starting on page 4, he is treating
20  a subject that was brought up by the testimony
21  of Mr. Briam of Clifford Chance, and his -- are
22  you familiar with this point?
23     A.  I have seen this point, yes.  I am
24  familiar with this point in the sense that I'm
25  familiar with what Mr. Briam said and I'm

Page 36

1             CONFIDENTIAL - L. Rabinowitz
2  familiar with what Mr. Millett has said in
3  response to that.
4     Q.  Okay.  Can you summarize what it is
5  that you understand Mr. Briam to have said and
6  what Mr. Millett said in response?  Maybe that's
7  the quickest way to get at this.
8     A.  What Mr. Briam said is summarized in
9  paragraph 15 of Mr. Millett.  Mr. Briam
10  effectively suggested that, in a situation of
11  forfeiture of the lease by LBL, it was
12  conceivable that an English court, applying the
13  doctrine of relief from forfeiture, might allow
14  LBHI to take over the lease.
15       Mr. Millett says he's done some work
16  and he's not aware of any suggestion that
17  English law would allow that result to arise.
18     Q.  And have you yourself formed a view on
19  that subject?
20     A.  My view is Mr. Millett is right about
21  this.  I understand why Mr. Briam says what he
22  says, but in my view, what Mr. Millett says is
23  correct.
24     Q.  Sir, you would agree that at the point
25  where Canary Wharf has exercised forfeiture,

Page 37

1             CONFIDENTIAL - L. Rabinowitz
2  that unless it exercised its put option under
3  Section 7(a) of Schedule 4, LBHI was not in a
4  position to demand a lease?
5       MR. DeLEEUW:  Objection to form.
6       Go ahead.
7     A.  I would agree that, outside the
8  circumstances of 7, paragraph 7 of Schedule 4,
9  LBHI was not in a position where it would become
10  the leaseholder.
11     Q.  This was -- whether LBHI would have a
12  lease or not was entirely the option of Canary
13  Wharf, you would agree, correct, at the point of
14  forfeiture?
15     A.  Whether or not LBHI would have a lease
16  was dependent upon whether -- well, it was under
17  a contingent obligation to take a lease should
18  Canary Wharf exercise its option.
19     Q.  Both you and Mr. Millett spend a great
20  deal of time on the question as to whether
21  Schedule 4 of the LBL lease is what's called
22  under English law an indemnity versus a
23  guarantee, and we'll go into the subject I
24  imagine in some detail, but what difference does
25  it make whether it's a guarantee or an indemnity

Page 42

1    CONFIDENTIAL - L. Rabinowitz
2  be the law relating to indemnities and
3  guarantees.
4    Q.   And would you agree that this opinion
5  is an excellent summary of the relevant law?
6    A.   I would agree that this is a good and
7  accurate statement of the relevant law.
8    Q.   And would you also agree that the
9  approach of this opinion is how an English court
10  would approach the dispute in this case as to
11  whether Schedule 4 is a guarantee or an
12  indemnity?
13    A.   I think that may be too general.
14  Certainly an English court would look at this
15  case and say this states some of the relevant
16  principles.  It would look at other cases as
17  well and then interpret the contract to see
18  whether it was of the view that it was a
19  contract of indemnity or guarantee.
20    Q.   Okay.  Can we turn to page 311 of this
21  opinion.  And the pages of this are very
22  helpfully lettered along the side to give us an
23  easy reference, and you see right below (c) it
24  says "The Law"?
25    Is that the portion of the opinion

Page 43

1    CONFIDENTIAL - L. Rabinowitz
2  that you regard as the summary?
3    A.   That's the part of the judgment which
4  I take to be where Sir William Blackburne sets
5  out his understanding of the relevant law here.
6    Q.   All right.  And in that paragraph or
7  right opposite (d), one of the first things he
8  does, in addition to citing Chitty on Contracts,
9  is he cites Andrews and Millett on the law of
10  guarantees.  Do you see that?
11    A.   I see that.
12    Q.   And that is Richard Millett who is
13  Lehman's expert in this case, correct?
14    A.   That is Richard Millett.  Sorry, the
15  Andrews and Millett mentioned there, the Millett
16  is Mr. Richard Millett, yes.
17    Q.   All right.  And would you regard that
18  treatise as authoritative?
19    A.   I think I've already said I would
20  regard it as one of the key textbooks.
21    Q.   All right.  If you look then at the
22  paragraph opposite (e), one of the points that
23  this opinion makes is that it's an area of law
24  bedeviled by imprecise terminology, and
25  therefore, it is important not to confuse the

Page 44

1    CONFIDENTIAL - L. Rabinowitz
2  label given by the parties with the substance of
3  the obligation.  Do you see that?
4    A.   I see that.
5    Q.   Do you agree with that?
6    A.   I agree that that is good -- a good
7  warning to have.  Just because someone says this
8  is a guarantee, it doesn't mean it's a
9  guarantee.  What matters is what are the nature
10  of the obligations included in that contract.
11    Q.   And toward the bottom of that same
12  paragraph, he says, "Further, as Ms. Andrews
13  observed, the Court must endeavor to avoid a
14  construction which renders a clause otiose or
15  duplicative."
16    What does that mean?
17    A.   Well, I think what he's saying is if
18  you come up with a construction which results in
19  a provision appearing to have no effect or
20  consequence, that may be an indication that the
21  construction you have come up with or the
22  interpretation you have come up with may need
23  reconsideration.
24    I ought, however, to say that the view
25  that Sir Andrew -- Sir William Blackburne

Page 45

1    CONFIDENTIAL - L. Rabinowitz
2  expresses there is not a universally held view,
3  and there are certainly comments by Lord
4  Hoffman, who is regarded as one of the leading
5  judges in England over the last few decades, to
6  the contrary effect; that is to say the argument
7  that something is otiose he has suggested that
8  it really has very little weight at all.
9    So, as with matters of -- all matters
10  of interpretation of contract, people have a lot
11  of, in a sense, weapons in their armory as to
12  how they might get to a particular conclusion.
13  Not everyone always agrees as to what matters.
14    Q.   We'll test that out a little bit.
15    A.   Okay.
16    Q.   If you'll go toward the bottom of the
17  page, the opinion states, "A contract of
18  guarantee, in the true sense, is a contract
19  whereby the surety (the guarantor) promises the
20  creditor to be responsible for the due
21  performance by the principal of his existing or
22  future obligations to the creditor if the
23  principal fails to perform them or any of them."
24    Do you agree with that?
25    A.   I agree that that is one of the

CONFIDENTIAL - L. Rabinowitz

1  indicia that something is a contract of
2  guarantee, yes.
3
4      Q.   And if you go to the next page, that
5  page 312 -- I guess part of what I read was on
6  312 -- a few lines down, it says, "The surety's
7  liability in such a case is conditional upon the
8  principal's failure to pay the particular debt."
9      Would you agree that that is also an
10 indicia of something being a guarantee where it
11 is contingent upon the principal's failure to
12 perform?
13     A.   I would.  I think what Sir William
14 Blackburne is describing is the fact that a
15 guarantee is, in general, regarded as a
16 secondary obligation, that is to say the primary
17 debtor has the primary obligation and the
18 guarantor has a secondary obligation, and he
19 says that in order to distinguish it from the
20 contract of indemnity where the surety has a
21 primary obligation or undertakes the primary
22 obligation.
23     Q.   Right, and that's the point that is
24 made in the next paragraph where it says, "An
25 essential distinguishing feature of the true

CONFIDENTIAL - L. Rabinowitz

1  contract of guarantee -- but not its only one --
2  is that the liability of the surety (i.e., the
3  guarantor) is always ancillary or secondary to
4  that of the principal, who remains primarily
5  liable to the creditor."
6
7      Is that correct?
8      A.   That's correct.
9      Q.   And what is the co-extensiveness
10 principle?
11     A.   Well, it's what Sir William Blackburne
12 says between (e) and (f).  "...the consequence
13 that there is usually no liability on the part
14 of the guarantor if the underlying obligation is
15 void or unenforceable, or if the obligation
16 ceases to exist (to which principal -- the
17 so-called principal of co-extensiveness -- there
18 are, however, a number of exceptions)."
19     In other words, if the primary debtor
20 is not liable, then nor will the guarantor be
21 liable.
22     Q.   And an indemnity contract, that's not
23 always true, right?
24     A.   An indemnity contract, the liability
25 of the indemnitor does not -- does not depend

CONFIDENTIAL - L. Rabinowitz

1  upon the primary debtor also being liable.
2      Q.   And in fact, the primary debtor might
3  very well have fulfilled his or its obligations
4  and the indemnitor may yet have different
5  obligations for which it's liable anyway?
6      A.   Well, I'm not sure that I quite follow
7  how that arises.  I mean, in the end, the
8  indemnitor and the guarantor are both giving an
9  obligation by way of security for something.
10 It's perfectly possible for the indemnitor to
11 agree to obligations which go beyond what the
12 primary debtor does, but whether he does that as
13 an indemnitor, I'm not sure.
14     Q.   If you go to the next paragraph, this
15 is where the opinion in Vossloh talks about the
16 contract of indemnity.
17     A.   Sorry, when you say -- that's
18 paragraph 25, is it?
19     Q.   Yes.  Where he writes, "In contrast to
20 the contract of guarantee is the contract of
21 indemnity.  In one sense all contracts of
22 guarantee (strictly so called) are contracts of
23 indemnity (as indeed are many contracts of
24 insurance) since, in its widest sense, an

CONFIDENTIAL - L. Rabinowitz

1  indemnity is an obligation imposed by operation
2  of law or by agreement of the parties.  In the
3  narrower sense in which, in the current context,
4  the expression occurs, a contract of indemnity
5  denotes a contract where the person who gives
6  the indemnity undertakes his indemnity
7  obligation by way of security for the
8  performance of an obligation by another.  Its
9  essential distinguishing feature is that, unlike
10 a contract of guarantee (strictly so called), a
11 primary liability falls upon the giver of the
12 indemnity."
13     Now, do you understand that what's
14 being said here is the word "indemnity" in
15 English law is used in two different senses?
16     A.   That seems to be what he's saying.
17 There is a wider sense and a narrower sense.
18     Q.   And the narrower sense where the rule
19 of Holme v. Brunskill does not apply is the
20 narrower sense where you're dealing with a
21 contract of indemnity where you're dealing with
22 a primary obligation, correct?
23     A.   The only situation in which the rule
24 in Holme v. Brunskill -- well, the rule in Holme

1          CONFIDENTIAL - L. Rabinowitz
2    v. Brunskill applies to guarantees. It doesn't
3    apply to contracts of indemnity. So if you have
4    a contract of guarantee, the rule in Holme v.
5    Brunskill would apply. If you don't, it
6    doesn't.
7        Q.   Right. And the context for making
8    that statement, that it doesn't apply to
9    contracts of indemnity, is through use of the
10   term "contracts of indemnity" in the narrower
11   sense as described here in Vossloh, correct?
12       A.   I think if what you're saying, arising
13   from what Sir William Blackburne says, is a
14   contract of indemnity might, in a broader sense,
15   include a contract of guarantee. The rule --
16   the non-application of the rule in Holme and
17   Brunskill applies not to a broader category of
18   contract of indemnity since that can include a
19   contract of guarantee; it would only apply to a
20   contract of indemnity which is not a contract --
21       Sorry. The rule in Holme v. Brunskill
22   would only apply to a contract of guarantee and
23   not a contract of indemnity. I'm not sure I
24   could put it any other way.
25       Q.   Okay. But the term "indemnity," an

1          CONFIDENTIAL - L. Rabinowitz
2    obligation imposed by agreement of the parties,
3    is in one sense the same as a contract of
4    guarantee, correct?
5        A.   I think what he's saying is that it
6    can, in a broader sense, include a contract of
7    guarantee.
8        Q.   The point is that the label
9    "indemnity" is confusing precisely because it's
10   used in two different ways in English law,
11   correct?
12       A.   He is warning that it can be
13   confusing.
14       Q.   And in fact, that may account for why,
15   in certain cases, you see they're dealing with a
16   contract that talks about indemnity in the
17   language of the contract and yet they hold that
18   it's a contract of guarantee, not a contract of
19   indemnity, correct?
20       A.   You say in cases they say that.
21       Q.   I'll show you some examples if you
22   would like. I'm sure you're familiar with them.
23       A.   I think it follows --
24          MR. DeLEEUW: Objection. Just ask
25   questions, please.

1          CONFIDENTIAL - L. Rabinowitz
2       Can we have the question read back?
3    Because I think I've lost the track.
4    BY MR. ISAKOFF:
5        Q.   Okay. And in fact, that may account
6    for why, in certain case, you see them dealing
7    with language of the contract -- an indemnity in
8    the language of the contract and yet hold that
9    it's a contract of guarantee, not a contract of
10   indemnity?
11          MR. DeLEEUW: I'm going to object to
12   form.
13       A.   There will be cases where, despite the
14   label used by the party, "indemnity," the court
15   concludes that what is being talked about is a
16   guarantee.
17       Q.   And not just the label on the top of
18   the clause, but the use of the word "indemnity"
19   in the very terms of the clause?
20       A.   That is also possible, if in fact the
21   nature of the obligation which is being set out
22   is in fact a secondary rather than a primary
23   obligation.
24       Q.   Okay. Would you turn, please, to page
25   313 of Vossloh, and I'd like to turn your

1          CONFIDENTIAL - L. Rabinowitz
2    attention to paragraph 27, where Sir William
3    Blackburne says, "Whether a particular contract
4    of suretyship is of the one kind or the other
5    or, indeed, a combination of the two turns on
6    its true construction. A contract which
7    contains a provision preserving liability in
8    circumstances where a guarantor would otherwise
9    be discharged (for example, the granting of time
10   by the creditor to the principal or a material
11   variation of the underlying contract between the
12   principal and the creditor, without (in either
13   case) the guarantor's consent) will usually
14   indicate that the contract is one of guarantee
15   because such a provision would be unnecessary if
16   the contract were one of indemnity."
17       Do you agree with that?
18       A.   Well, to my mind you have to read -- I
19   don't disagree with this, but in order to
20   understand what Sir William Blackburne is
21   saying, you have to read what he goes on to say,
22   which is that, "On the other hand, a provision
23   stating that the surety is to be liable in
24   circumstances where the principal has ceased to
25   be liable may be indicative either of guarantee

CONFIDENTIAL - L. Rabinowitz
1
2   guarantee and indemnity, that is right. But the
3   key provision in the schedule, the key operative
4   provision in the schedule is paragraph 1, which
5   is headed Indemnity by the Surety, and that to
6   my mind does carry some weight. It's not
7   conclusive, I've never suggested it was
8   conclusive, but it carries weight.
9       Q.   And in fact, there are cases where the
10  term "indemnity" used in the terms -- I may have
11  asked you this already -- is nonetheless still
12  construed by courts as a contract of guarantee,
13  not a contract of indemnity, correct?
14      A.   You have asked me that already, and
15  the answer is still correct.
16      Q.   Okay. Now, in paragraph 2 you focus
17  on the fact that the term "primary obligation"
18  appears, those words appear in paragraph 1 of
19  Schedule 4, correct?
20      A.   In paragraph 2, I make the point that
21  paragraph 1 of Schedule 4 makes it expressly
22  clear that what is intended of the surety is
23  that he give a primary obligation. I refer also
24  to Section 10 of the lease, which again reflects
25  the fact that what is intended here is that this

CONFIDENTIAL - L. Rabinowitz
1
2   obligation be a primary obligation.
3       Q.   Okay. Let's just focus on paragraph
4   1. What is it about -- what is it about the
5   words "primary obligation" as used in paragraph
6   1 which makes it an indemnity rather than a
7   guaranty, if anything?
8       A.   Well, referring back to the VAG case,
9   the William Blackburne decision, you will recall
10  that what Sir William does is to identify that
11  perhaps the key distinguishing feature between
12  contracts of guarantee and contracts of
13  indemnity relates to whether the obligation
14  being undertaken is a primary or secondary
15  obligation.
16      It seems to me, therefore, that where
17  the parties go out of their way expressly to
18  state that the obligation is a primary
19  obligation, although that may not be of itself
20  conclusive, it is again a strong indicator that
21  what the parties intended here was a contract of
22  indemnity and not a contract of guarantee.
23      Q.   Because they used the words "primary
24  obligation"?
25      A.   Because they intend that this should

CONFIDENTIAL - L. Rabinowitz
1
2   be a primary obligation.
3       Q.   Well, you're -- that's the conclusion
4   you're reaching is that that's what they
5   intended. Is it -- but that's based upon, in
6   part, their use of the words "primary
7   obligation," in your opinion, correct?
8       A.   Well, contractual interpretation is
9   intended to find the intention of the parties.
10  If the parties use the words "primary
11  obligation," that is an indication that that is
12  what they intended.
13      Q.   But it's by no means conclusive,
14  correct?
15      A.   Of itself, there are cases which say
16  that simply because you use the word "primary
17  obligation" you cannot term what would otherwise
18  be a guarantee into a contract of indemnity, but
19  again, the fact that it's not of itself
20  conclusive doesn't mean that it's not of some
21  substantial relevance.
22      Q.   Do you know of any cases that have
23  rejected the idea that a term using the words
24  "primary obligation" is nonetheless a contract
25  of guarantee?

CONFIDENTIAL - L. Rabinowitz
1
2       A.   There is certainly a case cited either
3   by myself or Mr. Millett. I can't off the top
4   my head remember what it was. I think it was
5   Mr. Justice Blair, and one of the decisions
6   refers to this, that the fact that you use
7   "primary obligation" doesn't term what would
8   otherwise be a contract of guarantee into a
9   contract of indemnity.
10      Q.   Let's turn back, if you would, to
11  Vossloh, Exhibit 103, and I would like you to
12  turn your attention to page 322, paragraph 44
13  and 45. 45 -- 44, the middle of the paragraph,
14  he says, subclauses (d) and (e) are worded as
15  primary obligations, and then at the beginning
16  of paragraph 45, he writes, "I do not consider
17  that the opening words of clause 2 are effective
18  to convert into purely primary obligations which
19  are otherwise secondary in nature."
20      Is this an example of a circumstance
21  in which an obligation expressed to be a primary
22  obligation is in fact deemed secondary?
23      MR. DeLEEUW: Objection to form.
24      Go ahead.
25      A.   Sorry. Can you repeat the question?

Page 66

CONFIDENTIAL - L. Rabinowitz

1
2     Q.    All right.  Let's maybe ask a couple
3  of questions about it.  First of all, the Moschi
4  case, M-O-S-C-H-I, correct?
5     A.    Correct.
6     Q.    That is not a lease case, correct?
7     A.    That is not a lease case.
8     Q.    It's a commercial contract not
9  involving any interest in land, correct?
10    A.    Correct.
11    Q.    All right.  And just to go back to the
12  question I asked, it is the case, is it not,
13  that LBHI can only be liable for something that
14  occurred before -- that arises out of something
15  that occurred before the lease terminated?
16    A.    LBHI can only be liable for something
17  that arises out of something done or not done by
18  LBL during the period of the tenancy.
19    Q.    Right.  And the dispute here is
20  whether, among other things, the Rainey case,
21  R-A-I-N-E-Y, is the law of England or whether
22  the authorities cited by Mr. Millett on the law
23  of England as to whether a default by the tenant
24  before the lease terminates can give rise to
25  damages that are measured in part by rent that

Page 67

CONFIDENTIAL - L. Rabinowitz

1
2  would have been due had the lease not
3  terminated?
4     MR. DeLEEUW:  Objection to form.
5     Go ahead.
6     Q.    Correct?
7     A.    No, I would not characterize that as
8  the dispute that arises here.  It is part of the
9  dispute that arises here, but as you know from
10  my report, in my view, the proper interpretation
11  of paragraph 1 is that there are two parts to
12  paragraph 1.  There's the first part, which ends
13  about six lines down, before the provision
14  starts looking at "the surety shall indemnify,"
15  et cetera.  The point that you make about Rainey
16  and Reichman is relevant only to the first part
17  of paragraph 1.
18     If I am right in the view I express
19  about the scope of paragraph 1, that's to say it
20  contains two parts, then Reichman and Rainey are
21  completely irrelevant to whether or not Canary
22  Wharf are entitled to an indemnity under the
23  second part of paragraph 1.  It simply doesn't
24  arise.
25     Q.    Okay.  Let's focus on the second part

Page 68

CONFIDENTIAL - L. Rabinowitz

1
2  of paragraph 1 and see if we can understand what
3  you're saying.  You are saying that if a default
4  by the tenant before the lease terminates
5  results in damages, LBHI as well as the tenant
6  are liable for those damages, correct?
7     A.    I'm saying that if the landlord
8  suffers loss, damage, costs or anything else as
9  a -- by reason of or arising directly out of any
10  default by the tenant in the performance of
11  obligations -- of its obligations, then the
12  landlord, that's to say Canary Wharf, is
13  entitled to be indemnified by LBHI in respect of
14  those losses, and that's what this provision
15  says.
16     Q.    Right.  And so LBHI would be liable
17  for the same losses, in your view, that the
18  tenant would be liable for as a result of the
19  default of the tenant, correct?
20     A.    Not necessarily.  There's nothing in
21  the second part of this paragraph which suggests
22  that the tenant would have to be liable for
23  those losses.  In fact, there is nothing at all
24  which leads one to that conclusion.  They may or
25  may not be liable for those losses.

Page 69

CONFIDENTIAL - L. Rabinowitz

1
2     Q.    What is there in this that suggests
3  that the landlord would be liable -- that LBHI
4  would be liable where the tenant is not equally
5  liable?
6     A.    I can't see anything in this language
7  which suggests that LBHI would be liable only
8  when the tenant is liable.
9     Q.    That's not the question I asked you.
10  The question is what -- what is there in this
11  language that suggests that the tenant would not
12  be liable to the same extent as any liability of
13  LBHI?
14     MR. DeLEEUW:  Objection, and the
15     answer was responsive.
16     A.    Well, I can repeat my answer.  The
17  words here say that the tenant -- sorry, "LBHI
18  will be liable to indemnify the landlord against
19  all claims demands, losses," whatever,
20  "sustained by the landlord by reason of or
21  arising indirectly out of any default by the
22  tenant in the performance or observance of any
23  of its obligations of the payment of any rents."
24     There is nothing there which requires
25  that the tenant should be liable.

Page 70

1      CONFIDENTIAL - L. Rabinowitz
2      Q.    And in your view, that's true even if
3    Rainey is wrong as to what the law of England
4    is?
5      A.    In my view, the second part of that
6    paragraph applies regardless of who is right as
7    between Rainey and Reichman.
8      Q.    So --
9      A.    It has nothing to do with it.
10     Q.    So even if, on the default of the
11   tenant and an exercise of the right of
12   forfeiture by the landlord, the tenant is not
13   liable for any damages as to rent following
14   forfeiture, LBHI would be liable?
15     A.    That's what the provision says.
16     Q.    That's what you say it says?
17     A.    Well, plainly that is my opinion as to
18   what it means.
19     Q.    Are you aware of any case that has
20   held so on any remotely similar facts?
21     A.    Cases tend to turn on facts and on
22   particular provisions.  I'm not aware of any
23   case which has had a provision identical to this
24   which has had to consider the question one way
25   or the other.

Page 71

1      CONFIDENTIAL - L. Rabinowitz
2      Q.    Are you aware of anything that would
3    have suggested to LBHI at the time of the
4    negotiations that it could be liable for rent
5    following the termination of the lease even if
6    LBL would not be so liable?
7      MR. DeLEEUW:  Objection to form.
8      A.    In the first place, at the time of
9    negotiations and what occurred to them at the
10   time of negotiations is, as a matter of English
11   interpretation of contracts, completely
12   irrelevant.  What matters here are the words
13   that the parties used in the contract as
14   construed against the factual background.
15       I have no basis at all for thinking
16   that there was anything which meant that LBHI
17   should not have understood that these words
18   would be given their ordinary meaning and
19   effect.
20     Q.    Doesn't clause 2 of this agreement
21   suggest exactly the opposite, which is that
22   LBHI, looking at this agreement, including
23   Section 1, would understand that its liability
24   would be the same as LBL's?
25     A.    I don't see that it does say that.  It

Page 72

1      CONFIDENTIAL - L. Rabinowitz
2    simply says that they will be jointly -- the
3    surety, just looking at words, the surety hereby
4    further covenants with the landlord and has a
5    separate covenant with the management company
6    that the surety is jointly and severally liable
7    with the tenant for the fulfillment of all its
8    obligations of the tenant under this lease and
9    agrees that the landlord of the management --
10   or, the management company in the enforcement of
11   its rights hereunder may proceed against the
12   surety if the surety was named as the tenant in
13   this lease.
14       That suggests to me fairly strongly
15   that what was intended here was an indemnity
16   rather than a guarantee.
17     Q.    Well, now we're getting to a separate
18   subject.  I'm saying that just looking at it
19   wouldn't that suggest that the limits of LBHI's
20   liability would be as if it were the tenant;
21   isn't that what it says?
22     A.    It doesn't intend to limit paragraph 1
23   in that way.  It's a further provision.  There's
24   nothing there which suggests that it was
25   intended to limit what is said in paragraph 1.

Page 73

1      CONFIDENTIAL - L. Rabinowitz
2      Q.    Does the question -- does your opinion
3    that Section 1 would put a liability on LBHI
4    beyond LBL's liability in the event of a default
5    by LBL depend on the distinction between a
6    contract of indemnity and a contract of
7    guarantee?
8      A.    No, it doesn't.  I'm looking at the
9    words that the parties have used.  The words
10   that they have used suggest to me that LBHI's
11   liability does not depend on a liability --
12   being able to establish a liability with regard
13   to the tenant.  That leads to the conclusion
14   that this is an indemnity, not a guarantee
15   rather than the analysis being the other way
16   around.
17     Q.    And if -- if you were to have
18   concluded that this is a contract of guarantee
19   rather than indemnity, would you agree that
20   LBHI's liability would be no greater than LBL's
21   in the event of a default?
22     A.    With respect, I don't understand the
23   logic of the question.  It seems to me you
24   conclude whether something is a guarantee or an
25   indemnity by construing the words of the

1          CONFIDENTIAL - L. Rabinowitz
2    contract to see what way you arrive at. You
3    can't conclude that it's a guarantee and then
4    come back and reinterpret the words. The
5    process is the other way around.
6        Q.   Well, then maybe I have just asked the
7    question inartfully.
8            If one were to conclude that this is a
9    contract of a guarantee, would that necessarily
10   also mean that LBHI's liability is no greater
11   than LBL's would be?
12       A.   If the conclusion that you have
13   reached is that this is a contract of guarantee,
14   then as part of the analysis which enables you
15   to reach that conclusion, you would have had to
16   conclude that LBHI's liability was secondary,
17   and it would follow from that that what you have
18   concluded was that LBHI could not be liable,
19   saving circumstances where LBL was also liable.
20       Q.   Okay.
21       A.   Indeed, it was also primarily liable
22   as opposed to LBHI being secondarily liable.
23       Q.   In terms of LBHI being primarily as
24   opposed to secondarily liable, is there any
25   circumstance under which LBHI could be liable

1          CONFIDENTIAL - L. Rabinowitz
2    without there having been a default by LBL under
3    this Schedule 4?
4        A.   I don't think that there is such a
5    circumstance, no, because even the second part
6    of this depends on the company having been in
7    default -- sorry, the tenant having been in
8    default. That is not an indication, obviously,
9    as to whether it's a guarantee or an indemnity
10   because in both cases the surety's acting as a
11   security to ensure that the obligations are
12   performed.
13       Q.   So, just to clarify, given what you
14   have just added to what you have previously
15   answered, there is no circumstance under which
16   LBHI could be liable unless LBL had committed a
17   default and was also liable, correct?
18       A.   No, that's not what I said.
19       Q.   Well, tell me whether --
20       A.   That's completely inconsistent with
21   what I said.
22       Q.   Is there any --
23       A.   You asked --
24       Q.   Then let me rephrase the question.
25           Is there any circumstance under which

1          CONFIDENTIAL - L. Rabinowitz
2    LBHI could be liable under this guarantee where
3    there has not been a default by LBL for which
4    LBL is liable?
5        MR. DeLEEUW: Objection to form.
6        A.   Yes. As I have already explained,
7    under the second part of paragraph 1, there is
8    no requirement for LBHI's liability that the --
9    well, that Canary Wharf able to establish
10   that LBL would also be liable.
11       Q.   Maybe my question was inartful again.
12           Is there any circumstance in which
13   LBHI could be liable to Canary Wharf where LBL
14   has not committed a default?
15       MR. DeLEEUW: Objection. Asked and
16   answered.
17       A.   That has been asked and answered and
18   my answer is the same. In order for LBHI to be
19   liable, LBL will have to have committed a
20   default in the terms, for example, identified in
21   the second part of paragraph 1.
22           But just to be clear, again, so
23   there's no doubt between us, it doesn't follow
24   from that that that is a default for which LBL
25   needs to be liable in order for LBHI to be

1          CONFIDENTIAL - L. Rabinowitz
2    liable.
3        Q.   But there can be no liability unless
4    LBL has -- on LBHI unless LBL has committed a
5    default, correct?
6        MR. DeLEEUW: Objection to form.
7        A.   My answer is the same, correct.
8        Q.   That is correct?
9        A.   That is correct.
10       Q.   But your view under Rainey, if Rainey
11   were the law of England, is that if LBL is in
12   default, it would be liable to the same extent
13   that you're saying LBHI is liable, correct?
14       A.   I find the question a little bit
15   confusing. You're asking me about my view about
16   Rainey. I've already explained that in the
17   second part of paragraph 1, the position with
18   regard to Rainey is irrelevant. It simply
19   doesn't arise. It is -- it's just not a point
20   which arises.
21       Q.   If you were correct that Rainey is the
22   law of England --
23       A.   Uh-huh.
24       Q.   -- then LBL's liability for its
25   default would be the same as LBHI's, in your

CONFIDENTIAL - L. Rabinowitz

1  on which I base is my ability as a result of a
2  great deal of experience in interpreting
3  commercial contracts.
4     Q.  Have you ever seen the words "for the
5  avoidance of doubt" in any of the contracts that
6  you have interpreted?
7     A.  I have, and I've also seen contracts
8  which don't have the words "for the avoidance of
9  doubt" but which are construed as including
10  those words "for the avoidance of doubt."
11    Q.  But you would agree that, other than
12  for the avoidance of doubt, that 6(d) is
13  superfluous were this a contract of indemnity,
14  correct?
15       MR. DeLEEUW:  Objection.
16    A.  My answer remains the same.  I agree
17  that if this were a contract of indemnity, you
18  would not need those words.  You would not need
19  I think any part of paragraph 6.
20    Q.  And in fact, a provision such as 6(d)
21  is very common to see in commercial contracts of
22  guarantee, correct?
23    A.  Provisions like 6(d) are common in
24  contracts which are intended to ensure that

*Note: line numbering above begins at 1.*

CONFIDENTIAL - L. Rabinowitz

1  someone cannot, by arguing that the contract is
2  a contract of guarantee, find a liability
3  discharged.
4     Q.  And in fact, it's very common in
5  contracts that are construed to be contracts of
6  guarantee, correct, in order to avoid the very
7  technical rules of Holme v. Brunskill?
8     A.  I'm not sure that that question is
9  different to the question you have just asked.
10       In my opinion, including provisions
11  like this in a contract are common in order to
12  ensure that someone cannot, by arguing that the
13  contract is one of guarantee, discharge
14  themselves from liability by reliance on the
15  rule in Holme and Brunskill.  Regardless of
16  whether the contract is in fact one of guarantee
17  or indemnity, they are for the avoidance of
18  doubt.
19    Q.  Would Section 7 -- Section 18 of the
20  Landlord and Tenant Covenants Act of 1995 which
21  appears in 6(d) have any application if this
22  were a contract of indemnity?
23    A.  No.
24    Q.  So it would only have meaning in the

CONFIDENTIAL - L. Rabinowitz

1  context of a contract of guarantee, correct?
2     A.  It would only be relevant in the
3  context of a contract of guarantee.
4        (Exhibit 105, Western Credit, Ltd. v.
5        Alberry, marked for identification, as of
6        this date.)
7  BY MR. ISAKOFF:
8     Q.  I've marked as Exhibit 105 a case that
9  Mr. Millett discusses, Western Credit, Ltd. v.
10  Alberry.  Are you familiar with this case?
11    A.  I would have read it as an exhibit to
12  Mr. Millett's report, but I don't recall the
13  precise details relating to this case.
14    Q.  Okay.  Well, I would turn your
15  attention to page 940, and the first paragraph
16  begins, "The word 'indemnity' is used but the
17  sentence is descriptive in its context of the
18  kind of non-performance or non-observance which
19  might arise under the guarantee following, as it
20  does the guarantee of the performance and
21  observance by the higher of the agreement.  I
22  cannot read it as an indemnity," et cetera, and
23  then the other judge at the bottom of the page
24  where it also refers to -- the second part

CONFIDENTIAL - L. Rabinowitz

1  commences, "I will indemnify you," and, "The
2  final sentence reverts the word 'guarantee'
3  and expressly provides that it shall not be
4  affected by the giving of time and to the
5  higher, a provision which would, of course, be
6  apt in the case of a guarantee but wholly inapt
7  in the case of an indemnity," and this -- they
8  construe this as a guarantee, not an indemnity?
9     A.  Uh-huh.
10    Q.  How would you square this case with
11  your analysis?
12    A.  Every case depends upon the precise
13  words that were used in the contract.  I don't
14  see anything in this case which undermines my
15  analysis.  I don't think I have suggested, for
16  example, that just because you use the word
17  "guarantee" -- "indemnity," it means that it's
18  an indemnity, which seems to be the point
19  they're making.  Although, as we see, the point
20  that they're making is in the context of a
21  provision which referred both to indemnity and a
22  guarantee.
23       As is also made clear in one of the
24  two passages that you have taken me to, the

Page 102

```
 1        CONFIDENTIAL - L. Rabinowitz
 2     A.    A particular amount of over 200
 3  million being considered as what would be paid.
 4     Q.    All right.  And in fact, that's not
 5  what was agreed to, correct?  That what was
 6  agreed to in the December 3, 2010 letter was
 7  that there would be a payment by LBL of one and
 8  a half million pounds in exchange for a release
 9  of all administrative claims, and then there
10  would be a preservation of an ability to make an
11  unsecured claim in some amount, and I'm asking
12  if you know what that claim was?
13     A.    No, I don't know what that claim was.
14     Q.    Would you agree that if the -- this
15  contract is construed, "the contract" referring
16  to Schedule 4, as a contract of guarantee and
17  also that Rainey does not accurately reflect the
18  law of England, that LBHI's liability would be,
19  at most, rent, et cetera, through December 20,
20  2002 when the JPM lease took effect?
21        MR. DeLEEUW:  Objection to form.
22     A.    Can you ask that question again?  I
23  don't think I followed it.
24     Q.    Would you agree -- well, let's put
25  aside the whole anticipatory repudiation point.
```

Page 103

```
 1        CONFIDENTIAL - L. Rabinowitz
 2  Let's just assume that this excludes that.
 3        If the court were to conclude that
 4  this is a contract of guarantee, not a contract
 5  of indemnity, and reject your argument on those
 6  points, and also conclude that Rainey does not
 7  correctly state the law but that liability for
 8  damages arising from lost rent following a
 9  termination is not recoverable against the
10  tenant, that LBHI's -- LBHI would not be liable
11  for any post-forfeiture rent?
12     A.    No, I don't think I would agree with
13  that.  Even if this is a contract of guarantee
14  rather than an indemnity, you would still have
15  the second part of paragraph 2, under the words
16  of which the landlord would have suffered a loss
17  as a result of a default on the part of the
18  tenant, and under paragraph 2, they could claim
19  for that loss.
20     Q.    Okay.  Let me -- let me test that a
21  little bit.
22        MR. DeLEEUW:  Just for clarity, I
23  think the transcript refers to paragraph 2.
24        THE WITNESS:  It's the second part of
25  paragraph 1.
```

Page 104

```
 1        CONFIDENTIAL - L. Rabinowitz
 2        MR. DeLEEUW:  Thank you.
 3        MR. ISAKOFF:  Okay.
 4  BY MR. ISAKOFF:
 5     Q.    Just to test that a little bit, in the
 6  event that it's a contract of guarantee and that
 7  Rainey is incorrect as to the law of England,
 8  you would agree that the tenant would not be
 9  liable for any damages arising from loss of
10  post-forfeiture rent, correct?
11     A.    I agree that if Rainey is wrong, the
12  effect of that would be that Canary Wharf could
13  not claim damages in respect of lost rent from
14  the tenant.
15     Q.    Okay.  And isn't it a general rule
16  that in the cases of contracts of guarantee, the
17  guarantor's liability is co-extensive with that
18  of the tenant?
19     A.    As a general rule, that is right.
20     Q.    And so if the general rule applied and
21  this is a contract of guarantee and the tenant
22  is not liable because Rainey is wrong for any
23  post-forfeiture rent-related damages, then LBHI
24  would not be liable for any such post-forfeiture
25  rent-related damages either putting Section 7
```

Page 105

```
 1        CONFIDENTIAL - L. Rabinowitz
 2  and its applicability to one side?
 3     A.    I -- I see what you're saying, and I
 4  guess that's why I have some problem with the
 5  question because the question rather depends on
 6  ignoring, in my view, the second part of
 7  paragraph 1, and I find it hard to see how you
 8  can have regard to paragraph 1 and still
 9  conclude that this is a contract of guarantee.
10     Q.    Well, I'm asking you to assume for
11  purposes of the question, and I would like to
12  get a clear answer, putting Section 7 and
13  anticipatory repudiation and all of that to one
14  side, and assuming that it's a contract of
15  guarantee, and assuming that Rainey is
16  inaccurate in reading the law of England, isn't
17  it a fact that LBHI could not be liable for
18  anything post-forfeiture?
19     A.    Assuming Rainey is wrong and assuming
20  this is not an indemnity --
21     Q.    And assuming it's a contract?
22     A.    -- and assuming it's a guarantee --
23     Q.    Yes.
24     A.    -- and assuming, therefore, that the
25  principle of co-extensiveness applies, it would
```

27 (Pages 102 to 105)

Page 106

CONFIDENTIAL - L. Rabinowitz

1  follow from the principle of co-extensiveness
2  that the surety could not be liable for anything
3  that the tenant could not be liable for.
4      Q.    And if -- another hypothetical --
5  assuming that Rainey is wrong, and putting
6  Section 7 to one side, even if it's an
7  indemnity, LBHI would still not be liable for
8  post-forfeiture rent unless the court construes
9  Section 1 in the way that you construe it as
10 imposing liability on LBHI beyond what LBL might
11 be liable for, correct?
12          MR. DeLEEUW:  Let me -- give me a
13 second.
14          Objection to form.
15     A.    Can you repeat the question?
16     Q.    Yes.  Putting Section 7 and
17 anticipatory repudiation to one side, and
18 assuming that Rainey is incorrectly decided and
19 that the tenant would not be liable for any
20 post-forfeiture rent-related damages, even if
21 Schedule 4 is construed to be a contract of
22 indemnity, LBHI would still not be liable for
23 any forfeiture, post-forfeiture rent-related
24 damages unless the court were to agree with your

Page 107

CONFIDENTIAL - L. Rabinowitz

1  construction under which LBHI might be liable
2  for damages beyond what LBL could be liable for,
3  correct?
4          MR. DeLEEUW:  Objection to form.
5          You can answer.
6      A.    Even assuming -- if this is an
7  indemnity and if Rainey -- regardless of Rainey,
8  as I think I have already said, the effect of
9  the second part of paragraph 1 is that the
10 landlord has a claim against the surety
11 regardless of whether it could have a claim
12 against LBL, regardless of whether LBL would be
13 liable.
14     Q.    Mr. Rabinowitz, I'm showing you what
15 has been marked as, previously, as Exhibit 20,
16 and I'm going to focus your attention on what
17 begins a couple of pages into it as what I have
18 referred to as the forfeiture agreement, which
19 is the letter of December 3, 2010 as between
20 Canary Wharf and LBL.
21          Are you familiar with the document?
22     A.    I have seen this document, yes.
23     Q.    And one of the questions that comes up
24 is whether, by this document, LBHI is absolved,

Page 108

CONFIDENTIAL - L. Rabinowitz

1  in whole or in part, from its obligations under
2  Schedule 4 of the LBL lease.  You understand
3  that to be an issue?
4      A.    Yes.
5      Q.    And one of the questions concerns
6  whether Section 6(d) of Schedule 4 precludes
7  consideration of Exhibit 20 as a material
8  variation.  Do you understand that to be true?
9          MR. DeLEEUW:  Objection to form.
10         You can answer.
11     A.    I understand that one of the issues
12 that arises is if, contrary to my view, this is
13 a contract of guarantee, then there is a
14 question as to whether, given the provisions of
15 6(d), even if there was a material variation as
16 a result of clause 4, that would matter, it
17 being my view, as I have explained in my report,
18 that there is nothing in this letter which
19 constitutes a material variation.
20     Q.    Okay.  And first of all, would you
21 agree that there's nothing in the forfeiture
22 letter that purports to vary the terms of the
23 LBL lease?
24     A.    I agree there's nothing in the

Page 109

CONFIDENTIAL - L. Rabinowitz

1  forfeiture letter which purports to vary the
2  terms of the LBL lease, yes.
3      Q.    Do you know whether -- how much was
4  outstanding in terms of amounts due Canary Wharf
5  from LBL as of the time of the forfeiture
6  letter?
7      A.    I think you need to be a bit clearer
8  about your question.  Are you asking about
9  amounts -- I know there was a dispute as to how
10 much was outstanding by way of an administrative
11 expense.  I don't know the precise figures
12 involved.  And it's fairly obvious, although I
13 don't know the precise figures, that there was
14 also an amount outstanding in respect of rent
15 incurred prior to the date of this forfeiture or
16 the date of the forfeiture, although I don't
17 know the precise quantum of that figure.
18     Q.    Would you need -- well, I think I know
19 the answer, but in terms of materiality,
20 wouldn't you need to know what that figure was?
21     A.    No.
22     Q.    Why?
23     A.    Because it's irrelevant.  There
24 plainly had been a breach of obligation in terms

Page 126

CONFIDENTIAL - L. Rabinowitz

1  liable for damages in the form of rent which
2  would have been due but for the forfeiture, we
3  probably wouldn't be here today.
4      Q.   Why not?
5      A.   Because if they had agreed, if LBL had
6  agreed that they would be liable for such
7  damages, then the kind of arguments that LBL and
8  LBHI are making would simply be disposed of on
9  the basis that the parties had agreed that LBL
10 and LBHI -- LBL and, therefore, LBHI would be
11 liable for those amounts.
12     Q.   That would be true even if LBL was
13 wrong as to the law and LBHI didn't agree?
14     A.   Well, if LBL had actually agreed by
15 way of a contract that it was liable, then it
16 just seems to me to be difficult to be running
17 with the kind of points that are being run by
18 LBHI.
19     Q.   And can you -- I guess the question I
20 asked when you answered the question, I don't
21 think you actually addressed, which is, is there
22 any advantage to Canary Wharf in not expressly
23 preserving a claim for damages based on lost
24 future rent following forfeiture?
25

Page 127

CONFIDENTIAL - L. Rabinowitz

1      A.   I'm not aware of any advantage to
2  LBL -- to Canary Wharf.
3      Q.   Would you turn, please, to page 35 of
4  your report.  You are quoting here paragraph 1
5  of Schedule 4 of the LBL lease, correct?
6      A.   Yes, that's what's set out here.
7      Q.   But you have inserted two small --
8  well, Roman i and Roman ii in brackets that do
9  not appear in the original document, correct?
10     A.   Correct.  As I explain in my report, I
11 have inserted the little [i] and the little [ii]
12 in order to show what is, in my view, the
13 correct grammatical and, indeed, legal meaning
14 of paragraph 1 of Schedule 4.  It enables
15 analysis and that's why I put them in.
16     Q.   All right.  But the parties themselves
17 did not insert any kind of division into parts
18 [i] and [ii] of paragraph 1, correct?
19     A.   The parties did not have the little
20 [i] and little [ii], no.
21     Q.   Okay.  Starting on page 41, you
22 discuss a case that we had discussed briefly
23 before, the Moschi case, M-O-S-C-H-I; that's
24 right?
25

Page 128

CONFIDENTIAL - L. Rabinowitz

1      A.   I'm just checking that it just starts
2  on page 41.  Yes, that appears to be where it
3  starts.
4      Q.   And I think we had established that
5  this is not a landlord-tenant or a lease case,
6  correct?
7      A.   Correct.
8      Q.   And on page 43, you give your opinion
9  in the middle of paragraph (6).
10     A.   Uh-huh.
11     Q.   "In principle, and as a matter of
12 logic, one would expect the consequences of a
13 forfeiture on the account of the tenant's breach
14 to be the same as for the termination of a
15 (non-lease) contract on account of repudiatory
16 breach," and so forth.  Do you see that?
17     A.   I see that.
18     Q.   Other than Rainey and other non-UK
19 cases, what case law do you have to support
20 that?
21     A.   The point that is being made here is
22 that, in principle, it would be odd for there to
23 be a difference between the consequences of a
24 repudiatory breach and a termination of contract
25

Page 129

CONFIDENTIAL - L. Rabinowitz

1  arising in a lease case from any other
2  contractual case, including a case, for example,
3  for payment under installments.
4      In terms of the specific question you
5  ask and the reason I make that point is because
6  what I am saying is that, in principal, you
7  would expect the position to be the same.
8      So far as authority is concerned,
9  plainly Rainey would support that, although
10 that's a Northern Ireland case, as I'm sure you
11 have well in mind.  There are, again, you say
12 other than non-English cases, but in terms of
13 the non-English cases, it's pretty clear, for
14 example, in Australia and in Canada that they
15 decide this point in line with what I have
16 identified as, in principal, a matter of logic.
17     I can't identify any English case.
18 This is the point which is made in Reichman,
19 which is in line with the law as it is in
20 Australia, the law as it is in Canada, and
21 indeed, as the statement of the law was put
22 forward in Reichman.
23     Q.   And you would agree as an expert
24 practitioner in commercial litigation that the
25

Page 130

CONFIDENTIAL - L. Rabinowitz

1  law sometimes contains anomalies, correct?
2      A.    The law sometimes contains anomalies
3  where there is some principle or matter of logic
4  which explains those anomalies.  Equally,
5  however, where there is some anomaly in the law
6  by virtue of some very old case which says
7  something, and the rest of the law has moved on,
8  I don't think it's accurate to treat English law
9  as if it is reflected by that anomalous case
10  which is out of line with logic, with principle,
11  and with movements in the law.
12      Q.    And yet sometimes courts will adhere
13  to law that has a historical basis because
14  that's just what they sometimes do, correct?
15      A.    Well, you say sometimes they do that.
16  Sometimes courts are bound to do that because of
17  the system of precedent.  But usually what they
18  do is, where you have an anomalous case which is
19  neither in line with what they regard as
20  principle or logic or other movements in the
21  law, they treat that case as no longer
22  representing the law.
23      Q.    Now, are you aware of any logic at all
24  that would account for why a termination of the

Page 131

CONFIDENTIAL - L. Rabinowitz

1  lease has been treated in the cases differently
2  from the termination of a commercial contract
3  calling for the payment of future installments?
4      A.    I understand historically why cases of
5  lease were treated differently from cases which
6  didn't involve property as regards the
7  consequence -- as regards, for example, whether
8  you could repudiate such a case or accept
9  repudiation in such a case at all.
10      That -- I'm not sure it's logic, but
11  the reason for that was what is now a slightly
12  archaic historical view, which was that, by
13  virtue of this being a contract relating to
14  land, it had to be treated differently.  That is
15  consistent with a number of other earlier cases
16  which have now been surpassed or overruled or
17  not applied.
18      For example, there used to be a view
19  that you couldn't have a frustration of a case
20  of a contract of lease because it involved land.
21  There used to be -- it used to be understood
22  that you couldn't have a repudiation of a
23  contract of lease because it involved land.
24  That I think, it's probably common ground

Page 132

CONFIDENTIAL - L. Rabinowitz

1  between myself and Mr. Millett, no longer
2  represents the position in English law.
3      So if there ever was a principle basis
4  for the view that you couldn't be able to
5  repudiate, accept repudiation of a contract of
6  lease and sue for damages, that basis has long
7  disappeared, in my view.
8      (Exhibit 107, Rainey Brothers Ltd. v.
9  Kearney, marked for identification, as of
10  this date.)
11  BY MR. ISAKOFF:
12      Q.    We have marked as Exhibit 107 the case
13  of Rainey Brothers Limited v. Kearney,
14  K-E-A-R-N-E-Y.
15      Are you familiar with this case?
16      A.    I am familiar with this case.
17      Q.    When did you first come across it?
18      A.    As I think we discussed at the
19  beginning of my testimony, I came across it in
20  the context of preparing my first report.
21      Q.    Are you aware of Rainey having ever
22  been cited in any English court?
23      A.    I'm not aware of any English court
24  which has thus far cited Rainey.

Page 133

CONFIDENTIAL - L. Rabinowitz

1      Q.    Are you aware of any authoritative
2  textbook on the law of landlord and tenant in
3  England citing Rainey favorably?
4      A.    I'm not aware of any English textbooks
5  which cites Rainey on the basis that it
6  represents English law, but that, if I can
7  explain it, is in part because this is a subject
8  which is not treated with, in great detail, by
9  any English textbook.  And indeed, it appears to
10  be, as you know from the Reichman case, a
11  subject which has been largely overlooked in the
12  case law for some time.  Reichman appears to be
13  the first case in which the issue really came up
14  since the 1800s.
15      Q.    Is that because people simply accepted
16  the law as it was?
17      A.    It may be because they didn't think it
18  possible that that really could have been the
19  law and people simply accepted that they were
20  liable for damages.  I don't know why that was.
21      Q.    You don't know one way or the other,
22  do you?
23      A.    What don't I know one way or the
24  other?

34  (Pages 130 to 133)

Page 134

1      CONFIDENTIAL - L. Rabinowitz
2      Q.   Why it is that the cases that are
3  contrary to Rainey have never been challenged in
4  an English court?
5      A.   You said the cases that are contrary
6  to Rainey. There is one case in the 1800s which
7  is contrary to Rainey, a single case. There are
8  a number of case in foreign jurisdictions which
9  are consistent with Rainey.
10         You are asking me why it hasn't
11  been -- if I know whether it hasn't been
12  challenged, and plainly, I don't know the
13  motivations behind anyone who gets involved in
14  these disputes, nor am I aware of the basis of
15  any settlements or resolutions of the disputes
16  which arise between them.
17     Q.   Would you agree that Rainey is not
18  binding in any English court?
19     A.   I agree that Rainey is very persuasive
20  but not binding. I have explained, I think in
21  my report, that it's particularly persuasive
22  because it's a judgment given by Chief Justice
23  Hutton, Lord Chief Justice Hutton, who
24  subsequently became a judge in the House of
25  Lords in England, and therefore, I would suggest

Page 135

1      CONFIDENTIAL - L. Rabinowitz
2  he's particularly entitled to respect.
3      Q.   Now, I believe you have testified a
4  few moments ago that you thought it was common
5  ground between you and Mr. Millett that the
6  doctrine of anticipatory repudiation applies in
7  the courts of England now to leases; is that
8  what you said?
9      A.   The doctrine of repudiation. Mr.
10  Millett is somewhat -- he doesn't come down
11  certainly one way or the other about
12  repudiation. There is a difference between
13  anticipatory repudiation and repudiation. I
14  think he is slightly equivocal about his view.
15     Q.   Well, in fact that issue was expressly
16  left open in the Reichman case, correct?
17     A.   It was expressly left open in the
18  Reichman case, but my recollection is that there
19  is a fair amount of textbook support which makes
20  clear that the view in England is that you can
21  have a repudiation of a lease contract. And I
22  think Mr. Millett indeed acknowledges that.
23         MR. ISAKOFF: Okay. Why don't we take
24  a break. I'll see whether lunch is coming
25  around or on its way. Okay?

Page 136

1      CONFIDENTIAL - L. Rabinowitz
2      THE WITNESS: Thank you.
3      THE VIDEOGRAPHER: The time is 11:45
4  A.M. This is the end of tape number 3.
5  We're off the record.
6      (Luncheon Recess.)

Page 137

1      CONFIDENTIAL - L. Rabinowitz
2         AFTERNOON SESSION
3  L A U R E N C E  R A B I N O W I T Z, resumed and
4    testified further as follows:
5         THE VIDEOGRAPHER: The time is 12:30
6  P.M. This is the start of tape number 4.
7  We're on the record.
8         (Exhibit 108, Robert Reichman and
9    Monica Dunn v. Sarah Beveridge and Matthew
10    Gauntlett, marked for identification, as of
11    this date.)
12  EXAMINATION BY (Cont'd.)
13  BY MR. ISAKOFF:
14     Q.   We have marked as Exhibit 108 the
15  Reichman case. Are you familiar with this?
16     A.   Yes.
17     Q.   In your report at page 46 to 47 --
18     A.   Uh-huh.
19     Q.   -- you say, "While the case law makes
20  clear that a claim for future rent as such
21  cannot accrue due after forfeiture, the question
22  of whether a damages claim accrues is the
23  question explicitly left open by Reichman and
24  decided affirmatively in Rainey."
25         And I would ask you where it is in

Page 146

CONFIDENTIAL - L. Rabinowitz

1  cases cited in Rainey all reflect the fact that
2  you can claim damages in those circumstances.
3  Q.   Well, we'll turn to Rainey in a
4  moment, but -- and whether those cases are
5  really contrary, but we'll return to that.  And
6  he says there is at least one English case to
7  the contrary but is of some antiquity.
8       Are you aware not only of the one case
9  discussed here, but of any others?
10 A.   Of one case discussed here to what
11 effect?
12 Q.   The Walls case, are you aware --
13 A.   I am aware of the Walls case.
14 Q.   Are you aware of any cases beyond that
15 that are consistent with Walls' holding that you
16 cannot -- that a landlord cannot recover damages
17 for lost future rent following termination of a
18 lease?
19 A.   So far as I'm aware, Lord Justice
20 Lloyd's statement that the only case which says
21 that is Walls is correct.
22 Q.   Okay.  You spoke in your long answer
23 about, paragraph 26, Woodfall on Landlord and
24 Tenant.  What is Woodfall on Landlord and

Page 147

CONFIDENTIAL - L. Rabinowitz

1  Tenant?
2  A.   It's a textbook on landlord and
3  tenant.
4  Q.   Is it -- is it like the Andrews and
5  Millett textbook is on law of guarantees, or
6  it's about landlord and tenant or what?
7       MR. DeLEEUW:  Objection to form.
8  A.   It's a textbook on landlord and tenant
9  which is used by practitioners and is regarded
10 as being reputable.
11 Q.   Okay.  Is it fair to say that the --
12 that Woodfall is more expert in the area of
13 landlord and tenant than you are?
14      MR. DeLEEUW:  Woodford?
15 Q.   Woodfall?
16 A.   The textbook.
17      MR. DeLEEUW:  I'm sorry.  Woodfall on
18 Landlord and Tenant?
19      MR. ISAKOFF:  Yes.
20      MR. DeLEEUW:  Thank you.
21      THE WITNESS:  It's fair to say that
22 Woodfall on Landlord and Tenant is more
23 expert.  It's not at all clear whether
24 Woodfall on Landlord and Tenant or the

Page 148

CONFIDENTIAL - L. Rabinowitz

1  current author of Woodfall, whoever that is,
2  has had Rainey drawn to his attention or,
3  indeed, all of the authorities which are
4  cited in Rainey drawn to his attention.
5       It is certainly also the position that
6  you will not find in Woodfall any analysis
7  of Rainey or, indeed, the cases cited.  It
8  appears, therefore, that Woodfall, like Lord
9  Justice Lloyd, was not taken to all the
10 relevant authorities.
11 BY MR. ISAKOFF:
12 Q.   Is it fair to say that the current
13 edition of Woodfall reads Reichman as supporting
14 the view that Rainey is incorrectly decided?
15 A.   It's fair to say that the current
16 edition of Woodfall refers to Reichman in
17 support of that proposition.
18 Q.   That a landlord may not recover
19 damages for lost future rent once it has
20 terminated a lease?
21 A.   That's right.  What appears to have
22 happened is that the editor of Woodfall has seen
23 Reichman and put it in as an authority which
24 supports that proposition.

Page 149

CONFIDENTIAL - L. Rabinowitz

1       What is also clear, as I've said, is
2  that the editor of Reichman, the current editor
3  of Reichman, has not looked at Rainey or indeed
4  the other cases supporting them.  It's one of
5  those situations where the editor of a textbook
6  simply takes a decision and puts it in for a
7  proposition without any real analysis or further
8  investigation.
9  Q.   All right.  And reads it quite
10 differently than you have just described, where
11 you say that the issue of whether such damages
12 are recoverable was left open, whereas he reads
13 Reichman as saying that the issue was decided?
14 A.   He says it supports that propos- -- he
15 cites it in support of that proposition.  I
16 don't think he goes into an analysis and says to
17 say that what I've said is wrong.  There's no
18 indication at all that he went into that sort of
19 analysis.
20 Q.   Okay.  And then paragraph 27, there's
21 a reference to a debate?
22 A.   Uh-huh.
23 Q.   But before that, it says, "It may be a
24 logical development to hold that a landlord,