# EXHIBIT 48

1

IN THE UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------)
                              )
In re                         )
                              ) Chapter 11
                              )
LEHMAN BROTHERS                ) Case No.
                              )
HOLDINGS INC., et al.,         ) 08-13555 (JMP)
                              )
                              ) (Jointly Administered)
         Debtors.              )
                              )
                              )
-----------------------------)


VIDEO DEPOSITION UPON ORAL EXAMINATION
of

PAMELA KENDALL

On Thursday, 20th June 2013

Taken at the offices of:
Weil Gotshal & Manges LLP,
110 Fetter Lane,
London EC4A 1AY,
England


Reported by:   Richard Harper

### 38

```
 1              PAMELA KENDALL
 2         MR. DE LEEUW: Objection. Asked
 3   and answered. Go ahead.
 4      A.    There was no uncertainty in our
 5   minds that LBHI did not want to take up the lease
 6   on the original basis. It was no surprise to us
 7   that LBHI declined that offer to take up a new
 8   lease.
 9   BY MR. ISAKOFF:
10      Q.    Had a formal notice under section
11   7(a) of Schedule 4 of the lease ever even been
12   drafted?
13      A.    I don't know.
14      Q.    Who would know if you do not?
15      A.    I am not aware that one was
16   drafted.
17      Q.    I am handing you the exhibit that
18   was previously marked as exhibit 15. Can you
19   identify that please, Ms. Kendall?
20      A.    This is the agreement with JPM, in
21   relation to the sale of HQ2.
22      Q.    Would you turn please to page 35 of
23   that agreement. At the bottom, section 11.3.2, it
24   begins "The seller". Do you see that?
25      A.    I do.
```

### 39

```
 1              PAMELA KENDALL
 2      Q.    Who was the seller?
 3      A.    The Canary Wharf companies here,
 4   HQCB Investments Limited.
 5      Q.    This provision says: "The Seller
 6   hereby warrants that no notice or demand has been
 7   served on or given to LBHI pursuant to paragraph
 8   7(a) of Schedule 4 to the Lehman Lease." Do you
 9   see that?
10      A.    I do.
11      Q.    Was that warrantee true when made?
12      A.    Yes.
13      Q.    And it is true today too, isn't it?
14      A.    In the sense of a formal notice,
15   yes.
16      Q.    The warranty was true when it was
17   made in this document, correct?
18      A.    Yes, we had no problem giving this
19   warranty, because of the exchange of e-mails. We
20   knew that LBHI had no interest in taking up a new
21   lease so, to us, we were happy to give that
22   warranty.
23      Q.    And the warranty says: "That no
24   notice or demand has been served on or given to
25   LBHI pursuant to paragraph 7(a) of Schedule 4 to
```

### 40

```
 1              PAMELA KENDALL
 2   the Lehman Lease." That statement was a true
 3   statement when made in December 2010, correct?
 4      A.    Correct. I mean, my recollection
 5   is that JPM didn't want anything hanging over the
 6   building as such so, to the extent that
 7   implementation, a formal implementation of 7(a)
 8   could in some way delay proceedings, or mean there
 9   was a possibility that LBHI may take a new lease,
10   even a technical possibility, because we knew that
11   they did not want one, they didn't want that to be
12   a possibility. They wanted it cleared. Since we
13   had had the exchange of e-mails it was perfectly
14   clear to us that LBHI did not want a new lease and
15   we could give the warranty to JPM because there
16   was no need to serve a formal notice as such.
17      Q.    My question was much simpler than
18   the answer you went on to give?
19      A.    I am sorry.
20      Q.    Let me just see if I can get a
21   clean answer, without the commentary that goes
22   well beyond the scope of the question. Is it a
23   true statement that, as of December 20, 2010, as
24   warranted here, no notice or demand has been
25   served on or given to LBHI pursuant to paragraph
```

### 41

```
 1              PAMELA KENDALL
 2   7(a) of Schedule 4 to the Lehman lease. Was that
 3   a true statement when made?
 4      A.    No formal notice had been served.
 5      Q.    So this was a true statement when
 6   made?
 7      A.    Correct.
 8      Q.    It is also true that, since
 9   December 20, 2010, no notice or demand as been
10   served on or given to LBHI pursuant to paragraph
11   7(a) of Schedule 4 to the Lehman lease, correct?
12      A.    Correct.
13      Q.    And It is also true that, at no
14   time in the 180 day period after forfeiture
15   occurred on December 10th 2010, no notice or
16   demand has been served on or given to LBHI
17   pursuant to paragraph 7(a) of Schedule 4 to the
18   Lehman lease, correct?
19         MR. DE LEEUW: Objection to form.
20   You can answer.
21      A.    Sorry, can you repeat that last
22   question again?
23      Q.    It is also true that at no time in
24   the 180 day period after forfeiture occurred on
25   December 10, 2010, that no notice or demand has
```

11 (Pages 38 to 41)

MARTEN WALSH CHERER LTD 1ST FLOOR, 6 - 9 QUALITY COURT, CHANCERY LANE       LONDON, WC2A 1HP
TEL: (020) 7067 2900        E-MAIL: info@martenwalshcherer.com              FAX: (020) 7831 6864

## Page 42

1  PAMELA KENDALL
2  been served on or given to LBHI pursuant to
3  paragraph 7(a) of Schedule 4 to the Lehman lease,
4  correct?
5       MR. DE LEEUW: I withdraw my
6  objection. I have no objection to the question.
7       A.   No formal notice has been served,
8  correct.
9  BY MR. ISAKOFF:
10      Q.   Was anything served on LBHI
11 pursuant to paragraph 7(a) of Schedule 4 to the
12 Lehman lease, formal or informal, in the 180 day
13 period following December 10, 2010 when forfeiture
14 occurred?
15      A.   No.
16      Q.   Was any lease ever drawn or
17 drafted, I guess I should say, that was a
18 counterpart of a new lease of the premises for
19 LBHI's signature at any time in the fall of 2010
20 or later?
21      A.   No.
22      Q.   Did you have anything do with the
23 negotiation of the LBL lease or Schedule 4 of the
24 lease?
25      A.   No.

## Page 43

1  PAMELA KENDALL
2       Q.   Do you know anything about
3  negotiations on those subjects?
4       A.   No.
5  (Exhibit 52 was marked for identification)
6       Q.   Ms. Kendall, I am showing you what
7  has now been marked as exhibit 52, which is Bates
8  stamped CW 0004 to 6. Can you identify this
9  document?
10      A.   This is -- first of all, this is an
11 e-mail Mandy Ridyard at Clifford Chance to
12 Beatrice Taylor at Linklaters and Katie Bradford
13 at Linklaters, cc-ed to myself among others, and
14 it is attaching a letter regarding unpaid sums
15 and, basically, saying that the tenants have gone
16 into administration and that the administrators --
17 acting for the administrators and asking for
18 arrears to be paid ----
19      MR. DE LEEUW: Is the third page
20 supposed to be attached? It may have been
21 attached in error, I don't know.
22      MR. ISAKOFF: No, it is not
23 attached in error. I don't know if there is a
24 connection between these or not. I was going to
25 ask that question.

## Page 44

1  PAMELA KENDALL
2       MR. MEADE: That is the way it was
3  produced.
4       MR. DE LEEUW: Was it attached with
5  a staple?
6       MR. ISAKOFF: I will ask the
7  witness.
8       MR. DE LEEUW: I was trying to deal
9  with what I thought was a technical, bureaucratic
10 issue. Go ahead.
11 BY MR. ISAKOFF:
12      Q.   Have you looked at the third page
13 of this exhibit?
14      A.   I have.
15      Q.   Does that have any connection with
16 the first two pages -- other than ----
17      A.   I do not know, but it appears not,
18 because it is talking about an e-mail from
19 Beatrice Taylor, and you have just given me an
20 e-mail which went to Beatrice Taylor.
21      Q.   Okay. I will ask you a question or
22 two about this third page. Who is Michael Ashley
23 Brown?
24      A.   Michael Ashley Brown was joint head
25 of the legal department at Canary Wharf.

## Page 45

1  PAMELA KENDALL
2       Q.   No longer?
3       A.   No longer.
4       Q.   Where is he now?
5       A.   He has retired.
6       Q.   Where does he reside?
7       A.   He reside?
8       Q.   Yes, if you know?
9       A.   I believe in Surrey.
10      Q.   Surrey?
11      A.   Yes.
12      Q.   Okay. Who is Paul Stallard?
13      A.   Paul Stallard is an employee of the
14 company and he is -- I believe his title is head
15 of treasury.
16      Q.   Do you know what e-mail that was
17 being requested be deleted or destroyed is being
18 referred to here?
19      A.   I don't.
20      Q.   What was your role, if any, in the
21 JP Morgan transaction with Canary Wharf.
22 (Interruption: Need to evacuate the building)
23      MR. DE LEEUW: We will go off the
24 record because we have been asked to evacuate the
25 building.

12 (Pages 42 to 45)

MARTEN WALSH CHERER LTD 1ST FLOOR, 6 - 9 QUALITY COURT, CHANCERY LANE          LONDON, WC2A 1HP
TEL: (020) 7067 2900          E-MAIL: info@martenwalshcherer.com          FAX: (020) 7831 6864

46

1  PAMELA KENDALL
2  (Off the record at 10.36)
3  (Back on the record at 10.54)
4     MR. ISAKOFF: I am going to
5  withdraw the question that I asked before the
6  break that was not answered. We had a break there
7  was an order to evacuate the building which,
8  fortunately, did not last very long.
9  BY MR. ISAKOFF:
10    Q.   Ms. Kendall, have you ever heard of
11  something called the automatic stay, under US
12  bankruptcy law?
13    A.   Yes, that rings a bell.
14    Q.   Okay. Were you made aware, or were
15  you aware at any time, that service of a notice
16  under section 7(a) of Schedule 4 of the LBL lease
17  on LBHI would have been in violation of the
18  automatic stay of the US Bankruptcy Code, absent
19  court permission?
20    A.   I cannot recall exactly. I have
21  heard mention of the automatic stay, but I cannot
22  answer your question.
23    Q.   Now, you testified before the last
24  break that you are not aware of any notice under
25  section 7(a) having been drafted and you are not

47

1  PAMELA KENDALL
2  aware of any substitute lease for the LBL lease
3  having been drafted. Are you aware of any motion
4  for potential filing in the US bankruptcy court
5  pertaining to serving a notice on LBHI or asking
6  it to assume or reject a lease had been drafted?
7     A.   No.
8     Q.   Are you aware of whether LBHI was
9  ever asked by Canary Wharf or any of its
10  representatives to waive notice under section 7(a)
11  at any time?
12    A.   No.
13    Q.   Who was it who decided not to send
14  a notice under section 7(a) to LBHI?
15    MR. DE LEEUW: Objection to form.
16    A.   I'm not sure that that ever came up
17  as a, you know, "Should we serve a notice?" The
18  exchange of e-mails had already taken place and
19  there just didn't seem a need. I don't believe
20  that huge consideration was given to service of a
21  notice. We knew that LBHI did not want a lease of
22  the premises.
23  BY MR. ISAKOFF:
24    Q.   Did the landlord -- did LBL, as
25  landlord, ever grant a lease of the demised

48

1  PAMELA KENDALL
2  premises to another entity?
3     A.   We, grant a lease to another
4  entity, of HQ2?
5     Q.   Yes?
6     A.   Well, we granted a 999 year lease
7  to JPM by way of sale.
8     Q.   Okay. Were there any interim
9  transactions where the landlord of the LBL lease
10  transferred its leasehold to another entity,
11  whether Canary Wharf or otherwise?
12    A.   I cannot recall specifics, but it
13  would be usual for some title restructuring prior
14  to the sale of the building.
15    Q.   Did all of the restructuring occur
16  on or about December 20th 2010?
17    A.   It would occur prior to the sale,
18  yes.
19    Q.   Did all of the transactions
20  necessary for the sale take place simultaneously
21  or on a single day?
22    A.   Not that I recall, and I believe
23  I mentioned to you earlier that there were still
24  some elements that we sorted out in January the
25  following year.

49

1  PAMELA KENDALL
2     Q.   But is it fair to say that any
3  transfer of title in anticipation of the sale to
4  JP Morgan occurred on or before December 20th
5  2010?
6     A.   Yes, I would expect that to be the
7  case.
8     Q.   Okay. Let's go back to the subject
9  that I started to ask you about before we took
10  this last, asked to evacuate the building, break.
11  What involvement, if any, did you have with
12  respect to the JP Morgan transaction with Canary
13  Wharf relating to HQ2?
14    A.   I was involved in -- with the
15  agreement. I was also initially involved on the
16  lease agreement, but that was actually negotiated
17  and concluded by a colleague of mine. I was
18  involved in ensuring that what had been agreed
19  between the parties was properly reflected in the
20  documentation, to the extent that documentation
21  was under my remit.
22    Q.   Did you, yourself, have any direct
23  interaction with JP Morgan Chase by way of
24  telephone conversations, meetings or
25  correspondence?

13 (Pages 46 to 49)

### 54

1  PAMELA KENDALL
2  anybody other than your client Ms. Jones' point in
3  the first paragraph of her e-mail to Tony Briam
4  that their understanding was that under the US
5  Bankruptcy Code Canary Wharf is prohibited from
6  serving a notice requiring LBHI to take up a new
7  lease?
8      MR. DE LEEUW: When you say "your
9  client", you mean counsel as well? You said,
10 "Other than your client".
11     MR. ISAKOFF: If she had a
12 discussion with counsel yes, I would like to hear
13 that.
14     MR. DE LEEUW: Obviously do not
15 disclose the substance of any communication.
16     MR. ISAKOFF: I was not asking for
17 that.
18     A.   Whether I have been in discussion
19 relating to -- sorry, would you mind repeating the
20 question again?
21 BY MR. ISAKOFF:
22     Q.   The question is can you recall
23 having any discussions with anybody concerning
24 Ms. Jones' point in the first paragraph here that:
25 Under the US Bankruptcy Code CW [Canary Wharf] is

### 55

1  PAMELA KENDALL
2  prohibited from serving a notice requiring LBHI to
3  take up a new lease." I will just ask that as a
4  yes or not question and go from there.
5      A.   No, I cannot recall. I recall
6  reference to the US Bankruptcy Code, as
7  I mentioned to you earlier, but I cannot remember
8  discussion on this particular point.
9      Q.   Have you ever read Canary Wharf's
10 proofs of claim against LBHI?
11     A.   Yes.
12     Q.   Do you know whether they refer to a
13 breach of anticipatory breach of contract as a
14 ground for a claim?
15     A.   I would have to look at them again.
16     Q.   I am handing you the exhibit that
17 was previously marked as exhibit 25, which is CW
18 34681 thru 85. Do you recognise the handwriting?
19     A.   No, I do not.
20     Q.   We have marked as exhibit 53 the
21 document Bates stamped LBHI 4291 to 92. Ms.
22 Kendall, have you ever seen this before?
23     (Exhibit 53 was marked for identification)
24     A.   I have.
25     Q.   And what is it?

### 56

1  PAMELA KENDALL
2      A.   It is an e-mail from me to Daniel
3  Ehrmann of Alvarez and Marsal. Yes, that is what
4  it is.
5      Q.   Did you participate in the meeting
6  that is referenced in the e-mail?
7      A.   No, I didn't.
8      Q.   Do you know what happened in the
9  meeting?
10     A.   I understand that George and Peter
11 met with Daniel Ehrmann, who was open to agreeing
12 a settlement in relation to the LBHI claim, and
13 that settlement to be based on three years' rent
14 and from that, he was looking for information
15 relating to the claim so that, presumably, the
16 settlement could be agreed.
17     Q.   Do you know where the notion of a
18 three year limitation comes from?
19     A.   The three years' rent, I believe,
20 comes from the US Bankruptcy Code.
21     Q.   How do you know that?
22     A.   I have been told at some point. It
23 is my understanding.
24     Q.   So did you have an understanding
25 that the US Bankruptcy Code had some application

### 57

1  PAMELA KENDALL
2  in connection with your claims against LBHI?
3      A.   Well, at this point, Daniel Ehrmann
4  had suggested to George and Peter that the three
5  years' rent would be a way forward to agreeing the
6  claim and, obviously, that was the basis of a
7  compromise we were prepared to look at.
8      Q.   Now, when you learned that
9  Mr. Ehrmann was suggesting that there was a three
10 year limitation on rent claims, under the US
11 Bankruptcy Code what, if anything, did you do to
12 verify that representation?
13     A.   Can I just check with counsel,
14 because I don't know whether this borders on
15 matters of privilege or not.
16 BY MR. ISAKOFF:
17     Q.   Okay.
18         (Off the record at 11.17)
19         (Back on the record at 11.18)
20     A.   In answer to your question, we took
21 legal advice.
22 BY MR. ISAKOFF:
23     Q.   And who did you take legal advice
24 from?
25     A.   Skadden Arps.

15 (Pages 54 to 57)

MARTEN WALSH CHERER LTD 1ST FLOOR, 6 - 9 QUALITY COURT, CHANCERY LANE     LONDON, WC2A 1HP
TEL: (020) 7067 2900          E-MAIL: info@martenwalshcherer.com          FAX: (020) 7831 6864

58

1           PAMELA KENDALL
2   Q.   Of which office?
3   A.   London office.
4   Q.   Did you take the advice of a US
5 lawyer who was in the London office?
6   A.   I cannot recall. I recall that we
7 obtained advice from Skadden Arps.
8   Q.   I am not going to ask you what the
9 advice was but I would like to be able to ask
10 about the subject matter of the advice, if I
11 could.
12       MR. DE LEEUW: That is fine.
13 BY MR. ISAKOFF:
14   Q.   First of all, approximately when
15 was it that you sought advise concerning the US
16 Bankruptcy Code in connection with LBHI from
17 Skadden Arps?
18   A.   Generally, Skadden Arps was
19 retained by us when we filed proof of claim in the
20 Chapter 11 proceedings and we retained Skadden
21 Arps, initially, in relation to the claim.
22   Q.   Okay. Again, I am not going to ask
23 you as to the content of the advice, but did you
24 request advice from Skadden Arps on the subject
25 matter of your claims and there being a three year

59

1           PAMELA KENDALL
2 cap under the Bankruptcy Code, as suggested by
3 Mr. Ehrmann?
4       MR. DE LEEUW: Object to form. Go
5 ahead, you can answer.
6   A.   We certainly obtained advice from
7 Scaddens generally on the claim.
8 BY MR. ISAKOFF:
9   Q.   And did you do that at some time
10 during 2010 when you were in discussions with
11 LBHI?
12   A.   Yes.
13   Q.   Can you tell me whether you had any
14 discussions yourself with anybody from Skadden
15 Arps in 2010 concerning LBHI's claims?
16   A.   Yes.
17   Q.   How many such conversations did you
18 have?
19   A.   I cannot recall.
20   Q.   Approximately?
21   A.   I cannot recall.
22   Q.   Would you say more than one?
23   A.   I cannot be certain but not very
24 many.
25   Q.   Okay. Again, I am not going to ask

60

1           PAMELA KENDALL
2 you for the content of any advice, but I would
3 like to know whether there was discussion
4 concerning whether or not there was some form of
5 durational cap on rent claims?
6   A.   Well, there was discussion over the
7 point that Daniel Ehrmann had raised.
8   Q.   Okay. Was there any discussion
9 with Skadden Arps at any time during 2010, again
10 I am not seeking the content of it, but on the
11 subject of serving a notice under section 7(a) of
12 Schedule 4 of the lease?
13   A.   Not that I recall.
14   Q.   Was there any discussion with your
15 counsel at Skadden Arps on the subject, and again
16 not seeking the content, concerning the automatic
17 stay?
18   A.   I cannot recall.
19   Q.   So there may or may not have, you
20 just don't recall?
21   A.   Yes.
22   Q.   And the same the true for a notice
23 under section 7(a) of Schedule 4, that you do not
24 know one way or the other?
25   A.   There was no discussion with

61

1           PAMELA KENDALL
2 Skaddens on.
3   Q.   Was there a point at which you
4 stopped using Skadden Arps as counsel, with
5 respect to the US Bankruptcy Code?
6   A.   There was.
7   Q.   When was that?
8   A.   I cannot recall.
9   Q.   Was it during 2010?
10   A.   Yes.
11   Q.   Who, if anybody, replaced Skadden
12 Arps as your counsellors for bankruptcy issues?
13   A.   Initially, Clifford Chance and,
14 subsequently, Sullivan and Cromwell.
15   Q.   Okay. And, again, without getting
16 in to the subject matter -- without getting into
17 the content of any discussions that you had with
18 either Clifford Chance or Sullivan and Cromwell,
19 was there any discussion with either one of them
20 concerning section 7(a) of the bankruptcy -- I am
21 sorry -- whether you could serve a notice under
22 section 7(a) consistent with the Bankruptcy Code?
23       MR. DE LEEUW: Objection to form.
24 You can answer.
25 BY MR. ISAKOFF:

16 (Pages 58 to 61)

**Page 66**

1  PAMELA KENDALL
2  concluded deal, so -- and further, there were
3  confidentiality provisions with JPM. There was no
4  decision to take. It was not something that was
5  in the forefront of our minds.
6     Q.  Is it fair to say that Canary Wharf
7  did not advise LBHI, for whatever reason, in
8  August 2010 concerning any aspect of the potential
9  transaction with JP Morgan Chase, whether by name
10 or otherwise?
11    A.  Yes.
12    Q.  Is it fair to say that the same was
13 true in September?
14    A.  Yes.
15    Q.  Is it fair to say that the same was
16 true in October of 2010?
17    A.  Yes, I believe so.
18    Q.  Is it fair to say that the same was
19 true in November, until information concerning the
20 transaction leaked to the press?
21    A.  In November -- there was
22 information in the press as early as September.
23 There was no secret about the JPM transaction in
24 the sense that we were, you know, hiding
25 something. We just had confidentiality provisions

**Page 67**

1  PAMELA KENDALL
2  that we observed and we -- when LBHI asked for
3  details of the JPM transaction we provided those
4  details.
5     Q.  Is it fair to say, and this is my
6  question, that nothing was said to LBHI concerning
7  any aspect of the transaction with JP Morgan Chase
8  prior to the time it appeared in the press
9  identifying JP Morgan by name in late November
10 2010?
11    A.  Well, nothing was provided prior to
12 the date when LBHI asked for further information
13 about JPM.
14    Q.  And that didn't occur until after
15 the information concerning the JP Morgan
16 transaction was leaked to the press by somebody in
17 late November 2010, correct?
18    A.  Yes, but can I add that the
19 transaction, the proposed transaction had already
20 been in the press in September.
21    Q.  Had JP Morgan been identified at
22 that point?
23    A.  In -- yes, the press picked up on
24 rumours.
25    Q.  Do you know who leaked the

**Page 68**

1  PAMELA KENDALL
2  information that went into the press in late
3  November 2010?
4     A.  No.
5     Q.  It wasn't you?
6     A.  No.
7     Q.  If you will return please to
8  exhibit 54, we were looking at this e-mail from
9  Mr. Jervis to you on August 6th. There is a
10 suggestion here in the e-mail that LBHI, Canary
11 Wharf, LBL's administrators and AIG entered into
12 some kind of group discussion surrounding the
13 surrender of the HQ2 lease. Do you see that?
14    A.  I do.
15    Q.  Did that ever happen?
16    A.  Well, there wasn't a group
17 discussion, no.
18    Q.  What, if anything, did you do to
19 bring such a discussion about?
20    A.  I didn't.
21    Q.  Why not?
22    A.  This was raised by Mike Jervis at
23 PWC.
24    Q.  I can see that. Why didn't you try
25 to organise a group discussion on the subject?

**Page 69**

1  PAMELA KENDALL
2     A.  Well, he was raising point and he
3  had talked to Daniel Ehrmann, and the response was
4  that Daniel Ehrmann was supportive.
5     Q.  Okay. What, if anything, did you
6  do to further that idea?
7     A.  I cannot recall.
8     Q.  Is it fair to say that you didn't
9  do anything?
10    A.  I cannot recall.
11    Q.  On the first page at the bottom
12 there is another e-mail from Mr. Jervis to you and
13 he says in the second line that: "There is an
14 impasse at present between lehman and canary."
15 Do you know what he is talking about there?
16    A.  I cannot be certain.
17    Q.  Do you recall that there was some
18 impasse concerning what would happen at the time
19 Nomura vacated the building -- strike that. Do
20 you recall that there was some impasse about what
21 would happen on September 30th 2010?
22    A.  I do.
23    Q.  What is your recollection?
24    A.  I recall that LBL, in
25 administration, wanted to lock up and leave the

18 (Pages 66 to 69)

70

1  PAMELA KENDALL
2  building and that, obviously, caused us concern,
3  in terms of management and maintenance and
4  security relating to HQ2, not least because there
5  were sub-tenants in the building.
6      Q.   Do you know whether LBHI had
7  anything to do with that issue?
8      A.   No, they didn't.
9      Q.   I am handing you what was
10 previously marked as exhibit 46, which is CW 1546
11 to 55, which is a cover letter in the MOU between
12 Canary Wharf and JP Morgan Chase on August 13th
13 2010. Have I accurately described the document?
14     A.   It is a cover letter to Jeremy
15 Clay, Mayer Brown, JPM's counsel, and it is in the
16 memo of understanding.
17     Q.   If you will turn please to page 3
18 of the MOU, there is a paragraph a little bit down
19 which has a small (b) next to it, called:
20 "'Lehman condition' being the valid termination of
21 the Lehman Lease (whether by surrender, forfeiture
22 or disclaimer)." Then going on. Had there been a
23 determination as at the time of this MOU as to how
24 the Lehman lease would be validly terminated?
25     A.   I believe that we were talking in

71

1  PAMELA KENDALL
2  terms of a surrender.
3      Q.   Now, there is a reference in the
4  last line there to the "Expiry Date". When was
5  that? I believe it is defined on the next page at
6  paragraph 4.4?
7      A.   15th December 2010.
8      Q.   What reason was there, if you can
9  recall, for there being an expiry date in December
10 2010?
11     A.   That was something that was driven
12 by JP Morgan. We were all very conscious that
13 there was a window to do the deal with them and
14 I cannot recall, and I don't know what that reason
15 was.
16     Q.   Was it JP Morgan's consistent
17 position through 2010 that the deal had to be
18 completed in 2010?
19          MR. DE LEEUW: Objection to form.
20     A.   That is my recollection.
21 BY MR. ISAKOFF:
22     Q.   If you will go down to paragraph
23 5.1 on that same page under the heading
24 "Completion" it says in 5.1: "Completion of the
25 Transaction [('Completion')] will take place

72

1  PAMELA KENDALL
2  simultaneously on the date [(the 'Completion
3  Date')] which shall be the tenth working day
4  following the date of satisfaction of the last of
5  the Conditions Precedent to be fulfilled or (in
6  the case of the AIG condition only) the date of
7  waiver by the Seller (to the extent permitted)."
8  Do you see that?
9      A.   I do.
10     Q.   Would this effectively require that
11 completion take place during calendar year 2010 as
12 being within ten working days of the expiry date
13 of December 15th?
14          MR. DE LEEUW: Objection to form.
15     A.   Yes. I am looking at 4.4 and I see
16 that it was a "reasonable endeavours" to satisfy
17 everything by the expiry date.
18 BY MR. ISAKOFF:
19     Q.   Okay, the concept of a long stop?
20     A.   Yes, there is the concept of a long
21 stop date.
22     Q.   Okay, and the concept of a long
23 stop date being December 31 was clear by the time
24 of Mr. Iacobescu's memorandum to the board of
25 October 28th that we looked at earlier, correct?

73

1  PAMELA KENDALL
2      A.   Yes.
3      Q.   You are -- you have been practising
4  in the field of real estate transactions, correct?
5      A.   Correct.
6      Q.   What does it mean in section 5.1,
7  from a practical standpoint, for completion of the
8  transaction to take place simultaneously; what
9  does that mean?
10     A.   At the same time.
11     Q.   The same time as what?
12     A.   Well, whatever is to be
13 simultaneous with -- are you asking me this on a
14 general basis or what exactly it says ----
15     Q.   What does it mean for completion to
16 occur simultaneously in UK real estate legal
17 parlance?
18     A.   At the same time.
19     Q.   In other words, all of the steps
20 needed to close the transaction and effectuate
21 payment would occur on a single day?
22          MR. DE LEEUW: Objection to form.
23     A.   Yes. I mean, it does not matter
24 that the steps have not taken place -- sorry, it
25 does not require all the steps to take place if

19 (Pages 70 to 73)

MARTEN WALSH CHERER LTD 1ST FLOOR, 6 - 9 QUALITY COURT, CHANCERY LANE        LONDON, WC2A 1HP
TEL: (020) 7067 2900        E-MAIL: info@martenwalshcherer.com        FAX: (020) 7831 6864

**98**

1  PAMELA KENDALL
2  MR. DE LEEUW: Objection.
3  A. That the claim would be zero,
4  correct.
5  BY MR. ISAKOFF:
6  Q. Did Canary Wharf seek to change
7  that term of the deal at some point?
8  A. As negotiations progressed, we
9  became caught, if you like, between LBHI and LBL
10 and, in seeking to resolve settlement with LBHI,
11 we were asked to sign a stipulation which,
12 effectively, stated that we had not agreed a claim
13 in the LBL administration of less than the figure
14 that we were seeking to settle with LBHI. So at
15 that point we showed LBL the stipulation and we
16 put the claim amount that we were seeking against
17 LBHI in the documentation with LBL.
18 Q. And when you put that figure in the
19 documentation with LBL, that was asking them to
20 agree to a claim in approximately £262.5 million,
21 correct?
22 A. Correct.
23 Q. You did recognise that that was a
24 change in what had been agreed on September 30th,
25 the day you say they were threatening to lock the

**99**

1  PAMELA KENDALL
2  building and so forth?
3  A. Well, on September 30th, LBL had
4  also agreed that we acknowledged -- without the
5  wording in front of me I cannot be precise -- that
6  they were happy with our making a claim of 262,
7  plus or minus 5%, in the LBHI administration and
8  those e-mails, the exchange, was made in the
9  context that LBL recognise the importance of our
10 claim against LBHI and documentation would need to
11 be structured in such a way as to preserve our
12 ability to make that claim.
13 Q. Why did that involve having to make
14 a claim in that amount against LBL, if you know?
15 A. Because LBHI were making it a
16 condition of the stipulation.
17 Q. Do you know why?
18 A. No, I don't. Sorry, could I add to
19 that, to say that I understand that there may have
20 been set off issues between LBL and LBHI.
21 Q. Do you know how much unpaid rent,
22 if any, there was as of September 30, 2010?
23 MR. DE LEEUW: Objection to form.
24 BY MR. ISAKOFF:
25 Q. All right, I will change it to, any

**100**

1  PAMELA KENDALL
2  unpaid amounts on the LBL lease?
3  MR. DE LEEUW: Still objection to
4  form.
5  A. Unpaid amounts on the LBL lease,
6  well they had ceased paying their rent, they
7  ceased in part in January of that year and they
8  stopped paying the rent entirely as of March.
9  BY MR. ISAKOFF:
10 Q. My question is, do you know how
11 much was outstanding in respect of the LBL lease
12 as of September 30, 2010, counting all payments
13 that had been made, whether by LBL itself or by
14 sub-tenants?
15 A. Well, the amounts that were owed by
16 LBL -- I would have to look at the documents to be
17 precise. I know that -- I think there is a figure
18 of 18 million on one of PWC's -- but I would have
19 to look.
20 Q. I am going to direct your attention
21 again to exhibit 33, which is the October 28, 2010
22 memo from Mr. Iacobescu to the Canary Wharf board.
23 Did you play any part in drafting this memo?
24 A. No, I didn't draft that memo.
25 

**101**

1  PAMELA KENDALL



26 (Pages 98 to 101)

MARTEN WALSH CHERER LTD 1ST FLOOR, 6 - 9 QUALITY COURT, CHANCERY LANE    LONDON, WC2A 1HP
TEL: (020) 7067 2900    E-MAIL: info@martenwalshcherer.com    FAX: (020) 7831 6864

### 118

1    PAMELA KENDALL
2    A.   Yes.
3    Q.   In this e-mail that appears right
4    below the top, which is from you to Daniel Ehrmann
5    and Deborah Cash of November 24th 2010; do you see
6    that?
7    A.   Yes.
8    Q.   Here, again, you state: "...as
9    previously stated this" -- in reference to the
10   draft surrender documentation -- "provides for
11   preservation of the claim in the sum of £262.5m so
12   it has no impact on the guarantee." Do you see
13   that?
14   A.   I do.
15   Q.   Is there any reference here as to
16   the doubt that it will be accepted by LBL?
17       MR. DE LEEUW: Objection to form.
18   A.   Well, we hadn't got the response
19   from LBL at that point.
20   BY MR. ISAKOFF:
21   Q.   Is it fair to say that you didn't
22   know one way or the other whether this would be
23   acceptable to LBL?
24   A.   Correct. Because we had the e-mail
25   exchange at the end of September which suggested

### 119

1    PAMELA KENDALL
2    that -- well, we understood that LBL were happy
3    with our settling a claim in the sum of 262
4    providing that the threshold of plus or minus 5%,
5    so that level of claim was acceptable to them and
6    I do believe that LBL's thinking may have been
7    changing over this time and we got caught in the
8    middle of all of it.
9    BY MR. ISAKOFF:
10   Q.   Let me put the question to you
11   simply. Is it fair to say that Canary Wharf did
12   not know one way or the other as of November 24,
13   2010 whether LBL found it acceptable that it would
14   agree to a claim against it in the amount of
15   £262.5 million?
16   A.   Correct.
17   Q.   Is it fair to say that you nowhere
18   disclose that uncertainty in your e-mail to
19   Mr. Ermine and Miss Cash, correct?
20   A.   Correct.
21   Q.   You say that: "This provides for
22   preservation of the claim in the sum of £262.5m so
23   [that] it has no impact on the guarantee." What
24   did you mean by that?
25   A.   Well, we had been provided with the

### 120

1    PAMELA KENDALL
2    stipulation, which we were required to sign as
3    part of the settlement of the surety claim. And
4    that stipulation required us to agree in the LBL
5    administration for a figure no less than the
6    amount of the settlement claim. So the
7    documentation provided to LBL met that
8    requirement, meaning that we could be comfortable
9    in signing the stipulation and moving forward to
10   settlement of the claim.
11   Q.   I notice that your answer you did
12   not reference the term "guarantee", as you do in
13   your e-mail?
14   A.   Yes.
15   Q.   What is it about inserting a claim
16   for £262.5 million against LBL in the draft
17   surrender agreement makes it such that there is no
18   impact on the guarantee?
19   A.   Well, the surety settlement that we
20   had agreed in terms of the settlement with Alvarez
21   and Marsal, as I said before, the -- it required
22   documentation by way of the stipulation. So in
23   order to arrive at a settlement, we needed to sign
24   the stipulation, which contained the requirement
25   for the 262.5 figure.

### 121

1    PAMELA KENDALL
2    Q.   Let me ask you a different
3    question. When the word "guarantee" that appears
4    in your e-mail ----
5    A.   Yes.
6    Q.   -- you were referencing LBHI's
7    guarantee under Schedule 4 of the ----
8    A.   I was referring to Schedule 4.
9    Q.   Thank you. I will show you what
10   has been previously marked as exhibit 37, which is
11   Bates stamped CW 812 to 813. And I would like to
12   turn your attention to -- first of all, does it
13   appear that you got a copy of this?
14   A.   I did. I can see I did.
15   Q.   Okay. And if you'll look at the
16   second page, the bottom e-mail from Tony Briam to
17   Beatrice Taylor and Katie Bradford he says:
18   "Following voicemail you left for me last night,
19   and given the meeting tomorrow with PWC, I would
20   be grateful if we could have a response by close
21   of play today as to whether the draft Surrender
22   Agreement is approved in terms of an acknowledged
23   claim of £262.5m." Do you see that?
24   A.   I do.
25   Q.   And do you know whether you got a

31 (Pages 118 to 121)

MARTEN WALSH CHERER LTD 1ST FLOOR, 6 - 9 QUALITY COURT, CHANCERY LANE    LONDON, WC2A 1HP
TEL: (020) 7067 2900    E-MAIL: info@martenwalshcherer.com    FAX: (020) 7831 6864

## Page 122

1   PAMELA KENDALL
2   response that day?
3   A.   I cannot recall. I can see from
4   the e-mail exchange there was a response.
5   Q.   I am showing you what has been
6   previously marked as exhibit 4, which is CW18402,
7   to 05. Again, would you agree that you are shown
8   as having received this?
9   MR. ISAKOFF: I will wait for any
10  substantive questions until you have got it.
11  MR. DE LEEUW: That is all right.
12  A.   Yes.
13  BY MR. ISAKOFF:
14  Q.   Okay. Do you have any recollection
15  of receiving this e-mail? If you would like to
16  read it, feel free.
17  A.   I can't recall receiving this
18  e-mail.
19  Q.   Is it fair to say that Ms. Bradford
20  was rejecting the notion of changing the deal from
21  a zero pound claim against LBL and refusing to
22  accept an agreed claim of £262.5 million against
23  LBL?
24  A.   That seems to be what paragraph 2
25  is saying.

## Page 123

1   PAMELA KENDALL
2   Q.   Paragraph 2 where?
3   A.   Sorry, actually in the e-mail from
4   Katie Bradford to Tony Briam, paragraph 3, she is
5   saying that the acknowledgement of a valid claim
6   of 262.5 million presented LBL and its
7   administrators with a significant problem.
8   Q.   When, if ever, do you recall
9   telling LBHI that LBL had rejected the suggestion
10  that it agreed to a claim in the amount of
11  £262.5 million against LBL?
12  A.   Well, LBHI had -- I believe the
13  stipulation was with us to return to LBHI and we
14  weren't in a position to sign the stipulation. So
15  I cannot -- it was the fact that we could not go
16  back and confirm the documentation with LBHI,
17  because of this issue and I don't know what the
18  timing on that was when they were expecting us to
19  reply.
20  Q.   Here is my question to you. You
21  had twice communicated to LBHI that you had sent
22  draft documentation of a surrender agreement to
23  LBL that included an agreed claim against LBL in
24  the amount of £262.5 million?
25  A.   Yes.

## Page 124

1   PAMELA KENDALL
2   Q.   My question to you is: Now that
3   that had been rejected, when, if ever, did you
4   advise LBHI?
5   A.   Well, the -- we couldn't move
6   forward with the discussions with LBHI, because of
7   the stipulation. So, I can't recall exactly what
8   was said to them but we couldn't confirm or sign
9   off on the stipulation.
10  Q.   Is it fair to say that you have no
11  recollection of making clear to LBHI that your
12  prior statement that the draft that included the
13  £262.5 million claim against LBL had been
14  rejected?
15  A.   I did not send LBHI any follow-up
16  as to how negotiations were progressing with LBL.
17  Q.   If you go down the page five
18  paragraphs, Katie Bradford writes: "We recognise
19  that your clients wish to amend the deal with LBL
20  in order to reach agreement with LBHI and in
21  particular to be able to provide the requested
22  stipulation numbered 2 in the draft agreement."
23  Do you see that?
24  A.   I do.
25  Q.   Was that true?

## Page 125

1   PAMELA KENDALL
2   A.   Well, she talks about amending the
3   deal with LBL but it had always been made clear,
4   right in the beginning at the time of exchange of
5   e-mails September, that our priority was our claim
6   against LBHI and LBL were happy that we should
7   make a claim in the sum set out in the e-mail, the
8   262, against LBHI and they perfectly understood
9   that we would need to structure documentation in
10  such a way that we could go forward and complete
11  on the settlement with LBHI. So she says, "amend
12  the deal", I would take issue with that.
13  Q.   So are you seriously suggesting
14  that even though it was part of the deal in
15  September, on September 30 that the claim would be
16  zero pounds against LBL that it is not an
17  amendment to the deal that there be an agreed
18  claim for £262.5 million against LBL?
19  MR. DE LEEUW: Sir, hold on.
20  I object that type of question is totally
21  improper, the tone is improper, the words you used
22  and it is disrespectful to the witness. Now, with
23  that objection, you can answer.
24  MR. ISAKOFF: That's an outrageous
25  objection, outrageous. Please, answer the

32 (Pages 122 to 125)

MARTEN WALSH CHERER LTD 1ST FLOOR, 6 - 9 QUALITY COURT, CHANCERY LANE     LONDON, WC2A 1HP
TEL: (020) 7067 2900     E-MAIL: info@martenwalshcherer.com     FAX: (020) 7831 6864

### 146

PAMELA KENDALL

confirmation, they would want to know that we had received that confirmation and we know that they didn't want us to serve notice, because I know that, you know, right at the last minute in the negotiations we had to put that warranty in the agreement.

Q. Isn't it ----
A. But I can't comment more than that. I cannot recall more than that.
Q. Isn't it a fact that Canary Wharf knew no later than December 3, from this e-mail, that JP Morgan Chase did not want notice under section 7(a), to be served on LBHI?
A. They did not want a notice to be served on LBHI. I don't know what when that was raised with Canary Wharf.
Q. It was certainly raised no later than December 3, correct?
A. I can't answer you that, because this is all very colloquial. I don't know, he could quite well be referring to the confirmation that we had not yet had a reply on.
THE VIDEOGRAPHER: Sorry, there are two minutes of tape left.

### 147

PAMELA KENDALL

BY MR. ISAKOFF:
Q. Isn't he saying here that confirmation is not sufficient if there has been a notice served by Canary Wharf under the Lehman lease guarantee?
MR. DE LEEUW: Objection. Go ahead.
A. I can't confirm that.
MR. ISAKOFF: We will take a break.
(Off the record at 2.29)
(Back on the record at 2.47)
BY MR. ISAKOFF:
Q. Would you turn again to exhibit 9, at the same e-mail we have been looking at on page 2 with the Bates number 714?
A. I have that.
Q. I would like you to turn to the page that has the e-mail we have been looking at. This e-mail of December 3, from Jeremy Clay, where he says: "I note CW are still pushing for the confirmation." -- referring to Mr. Turner's statement that "...CW are still pushing for confirmation that LBHI have no interest in taking up a new Lease following forfeiture of the

### 148

PAMELA KENDALL

existing Lehman lease."
A. Yes.
Q. He says: "As I made clear on the telephone whilst this may be a step forward this will not be sufficient for JPM to proceed to a simultaneous exchange and completion where notice has been served by CW under the Lehman lease guarantee." Do you see that?
A. I do.
Q. Did that precede what, I believe, you have characterised as an e-mail confirmation that LBHI would not elect to take a new lease?
A. I believe it did.
Q. And when did you ever tell LBHI that JP Morgan was raising an objection to Canary Wharf's serving a notice under section 7(a) of Schedule 4 of the LBL lease?
MR. DE LEEUW: Objection to form.
A. There was no reason to discuss that with LBHI.
BY MR. ISAKOFF:
Q. Is it fair to say that you never discussed it with LBHI?
A. No.

### 149

PAMELA KENDALL

Q. Sorry, I didn't hear the answer.
A. No -- yes, it is fair.
Q. Is it fair to say that at least one of your purposes in engaging in these repeated e-mails asking -- well, let me withdraw that. Is it fair to say that in and about early December 2010, after the fact of the JP Morgan Canary Wharf transaction had received a lot of press at the end of November 2010, that LBHI was asking to review documentation relating to the Canary Wharf JP Morgan transaction?
A. Yes. LBHI asked to review documentation. They wanted to understand the financial basis of the deal.
Q. They wanted to see the documentation, correct?
A. Correct.
Q. Is it fair to say that Canary Wharf took the position with LBHI that it would not share that information unless, 1, LBHI agreed to confidentiality, and 2, confirm that it would not take a lease in place of LBL?
A. That's right.
Q. Is it fair to say that in seeking

38 (Pages 146 to 149)

MARTEN WALSH CHERER LTD 1ST FLOOR, 6 - 9 QUALITY COURT, CHANCERY LANE     LONDON, WC2A 1HP
TEL: (020) 7067 2900     E-MAIL: info@martenwalshcherer.com     FAX: (020) 7831 6864

### Page 150

          PAMELA KENDALL
2   what you have described as confirmation, that LBHI
3   wouldn't elect to take a lease were one tendered,
4   that you were seeking to gain an advantage in
5   terms of your claim against LBHI?
6           MR. DE LEEUW: Objection to form.
7       A.   Not an advantage. We had a claim
8   against LBHI and the e-mail exchange only served
9   to assist in the making of that claim.
10  BY MR. ISAKOFF:
11      Q.   Isn't it fair to say that you were
12  relying on that e-mail exchange as the basis of
13  what you were claiming is anticipatory repudiation
14  of an obligation to assume a lease had one been
15  tendered?
16      A.   It was clear to us that LBHI would
17  not have taken the lease and they didn't want one.
18      Q.   Is it fair to say that you were and
19  are relying on that e-mail exchange as the basis
20  for what you are claiming is anticipatory
21  repudiation of an obligation to assume a lease had
22  one been tendered?
23      A.   Yes, correct.
24      Q.   Is it fair to say that at the time
25  that you were using LBHI's desire to see the

### Page 151

          PAMELA KENDALL
2   JP Morgan transaction documents as leverage to
3   obtain this "confirmation" that you had no
4   intention of serving any such notice under
5   Schedule 4 of the LBL lease?
6           MR. DE LEEUW: Objection to form.
7       A.   Sorry. I am going to have to ask
8   you to repeat the question.
9   BY MR. ISAKOFF:
10      Q.   Is it fair to say that at the time
11  you were using LBL's desire to see the JP Morgan
12  documents as leverage to obtain this
13  "confirmation" that you had no intention of
14  serving any such notice under Schedule 4 of the
15  LBL lease?
16          MR. DE LEEUW: Objection to form.
17      A.   Dealing with the first part of your
18  question, it seemed an appropriate time to raise
19  the issue of a new lease with LBHI, because if
20  they had wanted to take a lease -- the slim chance
21  they had wanted to take a lease -- you know, we
22  would have been happy to agree that with them and
23  obviously, if they had wanted to do that, that
24  would have prohibited and made impossible the deal
25  with JPM. So, it was something that would happen

### Page 152

          PAMELA KENDALL
2   and take precedence over the JPM transaction and,
3   therefore, it would be something that you would
4   want cleared off before you introduced JPM and
5   gave them the documentation on JPM. It was
6   totally discrete if you like, because of the deal
7   that LBHI was being offered was not the JPM deal
8   but it was the Lehman's original transaction.
9       Q.   Isn't it fair to say that at the
10  time you were seeking the e-mail confirmation,
11  during this week following the December 3, 2010
12  e-mail from Jeremy Clay that Canary Wharf had no
13  intention of serving a section 7(a) notice under
14  Schedule 4 of the LBL lease?
15          MR. DE LEEUW: Objection to form.
16      A.   I can't recall exactly but I think
17  we would have been wary of serving a notice if
18  that delayed matters, given that there was a
19  window of opportunity with JPM.
20  BY MR. ISAKOFF:
21      Q.   So when you say "wary" ----
22      A.   Yes.
23      Q.   -- isn't it true that you had
24  determined that you would not serve such a notice?
25      A.   I can't recall.

### Page 153

          PAMELA KENDALL
2       Q.   It would be unwariness ----
3           MR. DE LEEUW: Excuse me, stop
4   right there. Just stop, go on and ask another
5   question. I am not going to have you debate with
6   this witness. Go and ask another question.
7           MR. ISAKOFF: That's incredible.
8           MR. DE LEEUW: I'm tired of hearing
9   you debate. The witness has just given her
10  recollection of the events. Now you just want to
11  debate with her. I'm trying to keep it away from
12  privilege, but now I'm trying to keep it away from
13  you just debating with her. She is not an expert
14  being offered for the opinions in this case. Just
15  move on to the next question.
16          MR. ISAKOFF: I'm not asking expert
17  opinion at all.
18          MR. DE LEEUW: Just move on to the
19  next question, sir.
20  BY MR. ISAKOFF:
21      Q.   What do you mean by "wary"?
22      A.   Well, in serving a notice, it's a
23  formal procedure. It's going to take time in
24  respect of the response -- it's formalities.
25      Q.   And in addition, no notice had even

39 (Pages 150 to 153)

MARTEN WALSH CHERER LTD 1ST FLOOR, 6 - 9 QUALITY COURT, CHANCERY LANE    LONDON, WC2A 1HP
TEL: (020) 7067 2900    E-MAIL: info@martenwalshcherer.com    FAX: (020) 7831 6864

## 154

1   PAMELA KENDALL
2   been drafted, correct?
3   MR. DE LEEUW: Objection. Asked
4   and answered.
5   A.   As far as I'm aware.
6   BY MR. ISAKOFF:
7   Q.   And you're also aware that in order
8   to serve such a notice on LBHI, which was in
9   bankruptcy proceedings in the US, that you would
10  have to seek permission of the court or serving
11  such a notice would have violate the automatic
12  stay of the US bankruptcy ----
13  MR. DE LEEUW: Objection. Asked
14  and answered. You asked her about this subject
15  and she already testified that she recalled,
16  generally, that there might have been some
17  discussions with lawyers about the subject. She
18  doesn't recall what they are. And now you're
19  asking her, "Isn't it true that all the things
20  that you have testified to that you don't recall
21  and you would have discussed with lawyers is in
22  fact true, because I, Mr. Peter Mr. Isakoff
23  believe them." So, just move on to the next
24  question. I am tired of the debate. Let's just
25  move on to question. This witness can tell you

## 155

1   PAMELA KENDALL
2   her recollection of events. You shouldn't just
3   debate with her a subject that she has testified
4   already.
5   MR. ISAKOFF: You know, I really
6   would have thought they taught you deposition
7   procedure at law school and particularly one as
8   fine as the one I went to but I'm shocked ----
9   MR. DE LEEUW: Sir, please stop
10  your extremely disrespectful tone. Just move on.
11  MR. ISAKOFF: I'm just shocked that
12  you would proceed to try to defend a deposition in
13  this fashion.
14  MR. DE LEEUW: I have no concern
15  about your shock, sir, go on.
16  MR. ISAKOFF: I can see that,
17  otherwise you may conduct yourself a little
18  differently.
19  BY MR. ISAKOFF:
20  Q.   Isn't it true, Ms. Kendall, given
21  your wariness as a result of what Mr. Clay
22  expressed in terms of JP Morgan's concern over you
23  serving a section 7(a) notice and the fact that no
24  such notice had at that point been drafted, and
25  that, without getting into the substance of it,

## 156

1   PAMELA KENDALL
2   you were being advised at this point by Clifford
3   Chance or Sullivan and Cromwell concerning issues
4   relating to the US Bankruptcy Code that you had no
5   intention at the very time you were seeking
6   confirmation that LBHI would not elect to accept a
7   lease were one tendered, that you had no
8   intention, that Canary Wharf had no intention of
9   serving a section 7(a) notice?
10  MR. DE LEEUW: Objection to form.
11  Mischaracterises prior testimony; you can answer
12  if you can.
13  A.   I can't recall. I can't recall.
14  BY MR. ISAKOFF:
15  Q.   Isn't it a fact that you were
16  trying to set up a claim for anticipatory
17  repudiation for an obligation to accept a lease
18  that would have been triggered upon a notice that
19  you had no intention of serving?
20  A.   Well, the e-mail was sent certainly
21  with paragraph 4 of the schedule in mind, and we
22  believed that we had done sufficient to give us
23  any additional right that that paragraph afforded
24  us.
25  Q.   And that was one of your purposes

## 157

1   PAMELA KENDALL
2   behind sending these e-mails to Mr. Krasnow and
3   Mr. Rupert Jones at my law firm, correct?
4   A.   Yes.
5   Q.   Once forfeiture took place on
6   December 10th 2010, was one of the reasons why you
7   did not, thereafter, at any time within the 180
8   days following forfeiture, serve a notice under
9   section 7(a) of Schedule 4 of the LBL lease that
10  you were concerned that that might spoil the JPM
11  transaction?
12  A.   Sorry, that we didn't serve the
13  notice? The notice pursuant to paragraph ----
14  Q.   Section 7(a)?
15  A.   Section 7(a) notice ----
16  Q.   Of Schedule 4 of the LBL lease.
17  A.   We had to ----
18  Q.   Was one of the factors that you
19  were concerned that serving such a notice would
20  spoil a JPM transaction?
21  A.   At some point in December, we had
22  agreed with JPM that we would not be serving
23  notice. So that had gone into the deal. So we
24  would have been in breach of what we had agreed
25  once the deal had concluded.

40 (Pages 154 to 157)

MARTEN WALSH CHERER LTD 1ST FLOOR, 6 - 9 QUALITY COURT, CHANCERY LANE      LONDON, WC2A 1HP
TEL: (020) 7067 2900        E-MAIL: info@martenwalshcherer.com              FAX: (020) 7831 6864

### Page 162

PAMELA KENDALL

  A. I don't know. I'm not aware that they were.
  Q. These provisions include on page 26, 7.16.4, which prohibits Canary Wharf from serving a section 7(a) notice on LBHI, correct?
  A. Correct.
  Q. But it allows Canary Wharf to seek payment under paragraph 7(b), correct?
  A. Yes.
  Q. Do you think that LBHI would have been interested in seeing that provision?
     MR. DE LEEUW: Objection to form.
  A. It had no bearing on the settlement with LBHI. So, to our mind, it did not have a relevance.
BY MR. ISAKOFF:
  Q. Was it privileged in any way, in any kind of legal sense?
     MR. DE LEEUW: Objection. That calls for a legal conclusion. Come on ask a question ----
     MR. ISAKOFF: All right. Let's take a few minutes break. We will see if we are done.

### Page 163

PAMELA KENDALL
     (Off the record at 3.10)
     (On the record at 3.18)
BY MR. ISAKOFF:
  Q. Ms. Kendall, I would like to show you what has been previously marked as exhibits 17 and 18. Exhibit 17 is a cover letter from Andrew Dietderich to my now retired partner Mr. Krasnow. Do you know who Mr. Dietderich is?
  A. Yes, he is a lawyer at Sullivan & Cromwell.
  Q. He was representing Canary Wharf, correct?
  A. He was.
  Q. In this letter, he was sending some information that LBL had been requesting relating to its claims, correct?
  A. Yes.
  Q. Exhibit 18, which I represent to you as one of the documents that came with this letter, is a version of a final SPA that we've been looking at as exhibit 15, correct?
  A. Correct.
  Q. If you'll turn to page 24 of exhibit 18, which we begins with Bates number

### Page 164

PAMELA KENDALL
LBHI-CW0013667, a portion of that page and the -- all of the next three pages have been redacted. Do you see that?
  A. I do.
  Q. Do you see that essentially what has been redacted is all of the provisions under 7.16?
  A. I do.
  Q. I'd like you to look at Mr. Dietderich's cover letter, where he says at the conclusion of the second paragraph: "Additionally, certain portions of the enclosed documents have been redacted to prevent disclosure of privileged legal advice in which the parties share a common legal interest." Do you see that?
  A. I do.
  Q. What about 7.16 of the SPA consists of privileged legal advice, if anything?
     MR. DE LEEUW: You shouldn't be giving your legal opinion. If you have an understanding from other sources, you can but I do not see how you could.
  A. I'm relying on my external counsel to tell me what is privileged and what is not and

### Page 165

PAMELA KENDALL
deal with it appropriately.
BY MR. ISAKOFF:
  Q. Let me just ask you this question. Are you aware of contract provisions in a business document being privileged legal advice?
     MR. DE LEEUW: You shouldn't be giving your legal opinion on that. Just tell if you have an awareness one way or the other.
  A. I don't. I would rely on external counsel to advise me when it comes to matters of privilege.
BY MR. ISAKOFF:
  Q. Isn't it a fact that Canary Wharf and it counsel were just covering up the existence of these provisions and hoping never to have to reveal them to LBHI?
     MR. DE LEEUW: Objection to form. You can answer if you know.
  A. These provisions were removed by Sullivan & Cromwell and I took to be a perfectly proper way of dealing with these things and sending the document on to LBHI.
BY MR. ISAKOFF:
  Q. Are you suggesting that you were

42 (Pages 162 to 165)

MARTEN WALSH CHERER LTD 1ST FLOOR, 6 - 9 QUALITY COURT, CHANCERY LANE      LONDON, WC2A 1HP
TEL: (020) 7067 2900      E-MAIL: info@martenwalshcherer.com      FAX: (020) 7831 6864

### Page 166

1  PAMELA KENDALL
2  aware at the time that 7.16 had been redacted when
3  it was bing sent to LBHI in January 2011?
4  A.  I think they had told me they had
5  taken it out, but I can't recall exactly.
6  MR. ISAKOFF:  No further questions.
7
8  REDIRECT EXAMINATION BY MR. DE LEEUW
9
10 BY MR. DE LEEUW:
11 Q.  Ms. Kendall, I have only a few
12 questions to follow up with you.  Earlier, I think
13 there was a document where you used the word
14 "guarantee" and Mr. Isakoff asked you if that
15 reference was a reference to Schedule 4 of the
16 Lehman lease.  Do you recall that?
17 A.  Yes.
18 Q.  When you used the word "guarantee"
19 to refer to Schedule 4 of the Lehman lease?
20 A.  Yes, I have used that terminology
21 before.  I'm not making a distinction between an
22 indemnity or a guarantee.  I use the word
23 colloquially, so to my mind it is an indemnity
24 guarantee.
25 MR. DE LEEUW:  Thank you.  Could

### Page 167

1  PAMELA KENDALL
2  I ask the court reporter to mark this next
3  exhibit, exhibit 56?
4  (Exhibit 56 was marked for identification)
5  Q.  It's a document bearing LBHI-CW5810
6  through 5817.  Do you have that document in front
7  of you Ms. Kendall?
8  A.  I do.
9  Q.  You see this is an e-mail from
10 Deborah Cash at Alvarez and Marsal to yourself at
11 dated November 2nd 2010 at 1.36 p.m.; is that
12 right?
13 A.  Correct.
14 Q.  Did you receive exhibit 56 in the
15 ordinary course of your business?
16 A.  I did.
17 Q.  Were you conducting the ordinary
18 course of your business when you received exhibit
19 56?
20 A.  Sorry?
21 Q.  Were you engaging in your business
22 activities at Canary Wharf when you received 56?
23 A.  Yes, I was.
24 Q.  Do you believe that a copy of
25 exhibit 56 was maintained in the ordinary course

### Page 168

1  PAMELA KENDALL
2  of Canary Wharf's business?
3  MR. ISAKOFF:  Object to form.
4  BY MR. DE LEEUW:
5  Q.  Let me ask you:  Do you know what
6  the document is that is attached to Miss Cash's
7  e-mail which is exhibit 56?
8  A.  I do.  This was the document that
9  was sent to us pending the confirmation we
10 expected to get from the unsecured creditors
11 committee and in order to maintain momentum
12 Deborah Cash sent us a stipulation and told us
13 that we would be required to sign this as part and
14 parcel of agreeing the 399 settlement.
15 Q.  So are you saying a stipulation for
16 what; what are you referring to?
17 A.  This stipulation related to the 399
18 settlement.
19 Q.  With LBHI?
20 A.  With LBHI.
21 Q.  This was a draft settlement for
22 your review?
23 A.  Yes.
24 Q.  Miss Cash, who does she represent?
25 A.  Alvarez & Marsal.

### Page 169

1  PAMELA KENDALL
2  Q.  What party were they representing?
3  A.  LBHI.
4  Q.  Okay.  Could I ask you to turn to
5  page with Bates number 5814 of exhibit 56.  Do you
6  have that?
7  A.  I do.
8  Q.  Do you see paragraph 2 states that:
9  "The Management Company and the Landlord represent
10 that their respective claims against the Tenant
11 arising under or relating to the Lease have not
12 been disallowed or expunged in the Tenant
13 Proceeding, nor allowed, recognized, or
14 acknowledged in the Tenant Proceeding in an amount
15 less than the amounts set forth in paragraph 4
16 hereof."  Have I read that correctly?
17 A.  Yes.
18 Q.  "Paragraph 4, hereof" refers to
19 what?
20 A.  That sets out the settlement
21 amounts, which were the allowed claims and the
22 figure there amounts to -- it's just over $399
23 million.
24 Q.  Do you know what paragraph 2 is
25 referring to or did you -- strike that.  What was

43 (Pages 166 to 169)

MARTEN WALSH CHERER LTD 1ST FLOOR, 6 - 9 QUALITY COURT, CHANCERY LANE        LONDON, WC2A 1HP
TEL: (020) 7067 2900        E-MAIL: info@martenwalshcherer.com        FAX: (020) 7831 6864