# EXHIBIT 49

08-13555-mg    Doc 44793-33    Filed 06/19/14    Entered 06/19/14 13:19:09    Exhibit 49
Pg 1 of 10

### Page 1

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------X
In Re:
LEHMAN BROTHERS HOLDINGS INC.,
et al.,
        Debtors.
Chapter 11
CASE NO.: 08-13555(JMP)
(Jointly Administered)
-----------------------------------X

            767 Fifth Avenue
            New York, New York
            June 25, 2013
            9:29 a.m.

        VIDEOTAPED DEPOSITION of RICHARD
    KRASNOW, before Melissa Gilmore, a Notary
    Public of the State of New York.

        ELLEN GRAUER COURT REPORTING CO. LLC
        126 East 56th Street, Fifth Floor
        New York, New York 10022
            212-750-6434
            REF: 104143

### Page 2

1  APPEARANCES:
2
3  SULLIVAN & CROMWELL LLP
4  Attorneys for Canary Wharf Management, Heron
5  Quays (HQ2) T1 Limited and Heron Quays (HQ2) T2
6  Limited
7     125 Broad Street
8     New York, New York 10004-2498
9  BY: DAVID B. TULCHIN, ESQ.
10     JOHN GARRETT McCARTHY, ESQ.
11     PHONE 212-558-3749
12     FAX 212-291-9158
13     E-MAIL tulchind@sullcrom.com
14
15
16  WEIL, GOTSHAL & MANGES LLP
17  Attorneys for Lehman Brothers Holdings Inc. and
18  the Witness
19     1300 Eye Street NW, Suite 900
20     Washington, DC 20005-3314
21  BY: PETER D. ISAKOFF, ESQ.
22     PHONE 202-682-7155
23     FAX 202-857-0940
24     E-MAIL peter.isakoff@weil.com
25

### Page 3

1  APPEARANCES: (Cont'd)
2
3  WEIL, GOTSHAL & MANGES LLP
4  Attorneys for Lehman Brothers Holdings Inc. and
5  the Witness
6     767 Fifth Avenue
7     New York, New York 10153
8  BY: ARIELLE GORDON, ESQ.
9     PHONE 212-310-8000
10    FAX 212-310-8007
11    E-MAIL arielle.gordon@weil.com
12
13
14  ALSO PRESENT:
15    ALEX GRODEN, Summer Associates, Sullivan &
16       Cromwell
17    DAN MACOM, Videographer

### Page 4

1  ------------------ I N D E X ------------------
2  WITNESS           EXAMINATION BY       PAGE
3  RICHARD KRASNOW    MR. TULCHIN         10, 187
4                     MR. ISAKOFF         180
5
6  DIRECTIONS: PAGES 36, 80, 81, 112
7  MOTIONS: PAGES 177, 180, 187
8
9  ---------------- E X H I B I T S ----------------
10 KRASNOW      DESCRIPTION              FOR I.D.
11 Exhibit 57  Summary Sheet Pursuant to    15
12             United States Trustee
13             Guidelines for Reviewing
14             Applications for
15             Compensation and
16             Reimbursement of
17             Expenses, Filed Under 11
18             U.S.C Sections 330 and
19             331
20 Exhibit 58  December 2012                18
21             Post-Effective Operating
22             Report
23 Exhibit 59  Notice of Deposition of      28
24             Lehman Brothers Holdings
25             Inc.

### Page 41

```
 1           KRASNOW
 2   both?
 3       A.   Certainly hard copy.
 4       Q.   And did that include Schedule 4 to
 5   the lease?
 6       A.   Yes.
 7       Q.   Were any others lawyers at Weil
 8   Gotshal in 2010 involved in preparing or
 9   revising the proposed stipulation that was
10   under discussion with Canary Wharf?
11       A.   I'm sorry, could you -- in London
12   did you say?
13       Q.   No. No, I didn't confine to that.
14       A.   Could you repeat the question?
15           MR. TULCHIN: Melissa, would you
16   read it back for us, please?
17           (Record read.)
18       A.   Yes.
19       Q.   Can you tell me who they were, sir?
20       A.   Erika del Nido. I believe she may
21   have been the only one.
22       Q.   Was Ms. Delido --
23       A.   del Nido.
24       Q.   Excuse me?
25       A.   del Nido. del Nido, D-E-L
```

### Page 42

```
 1           KRASNOW
 2   N-I-D-O, separate word.
 3       Q.   I know I have seen her name, and I
 4   butchered it. Apologies.
 5           Was Ms. del Nido in the New York
 6   office at the time?
 7       A.   Yes.
 8       Q.   Did you consult with her in any way
 9   in preparation for your deposition?
10       A.   No.
11       Q.   Is she still working at Weil
12   Gotshal?
13       A.   Yes.
14       Q.   And is she in the New York office?
15       A.   Yes.
16       Q.   Am I correct that in 2010 you became
17   aware, Mr. Krasnow, that Canary Wharf was
18   intending to enter into a transaction which
19   would mitigate its losses pertaining to 25 Bank
20   Street?
21           MR. ISAKOFF: Object to the form.
22       A.   I can't speak to Canary Wharf's
23   intent. I can say that, as a result and solely
24   as a result of press reports, we became aware
25   that there was a potential transaction -- we
```

### Page 43

```
 1           KRASNOW
 2   first became aware that there was a potential
 3   transaction.
 4       Q.   Do you remember when that was?
 5       A.   It was the end of November of 2010
 6   when there was an article in an English paper.
 7   It may have been the Financial Times that we
 8   became aware of, so whatever the date of that
 9   article was.
10           MR. TULCHIN: Melissa, could you
11       please mark, as Krasnow Exhibit 61, a
12       one-page document, Friday, 17
13       September 2010, The Independent.
14           (Krasnow Exhibit 61, Article from
15       The Independent, Friday, 17 September
16       2010, marked for identification.)
17       A.   (Perusing.)
18       Q.   Have you had a chance to look at
19   Exhibit 61, sir?
20       A.   I will. (Perusing.)
21           I read it.
22       Q.   Thank you. This is an article from
23   a newspaper in England, correct?
24           MR. ISAKOFF: Object to form.
25       A.   I can't speak to that.
```

### Page 44

```
 1           KRASNOW
 2       Q.   All right. Do you recall ever
 3   seeing this before?
 4       A.   No.
 5       Q.   Do you recall learning in
 6   September 2010, let's say on or around
 7   September 17, 2010, that there were press
 8   reports that JPMorgan was prepared to move into
 9   the Lehman Brothers old skyscraper in the
10   Docklands financial district?
11           MR. ISAKOFF: Object to form.
12       A.   No.
13       Q.   Does this refresh your recollection
14   at all, Mr. Krasnow, that there were press
15   reports, even as September, that JPMorgan might
16   want to occupy 25 Bank Street?
17           MR. ISAKOFF: Object to form.
18       A.   No.
19       Q.   Did you become aware of strong
20   market rumors in September that Canary Wharf
21   was working on a deal to lease or sell 25 Bank
22   Street?
23           MR. ISAKOFF: Object to form.
24       A.   I -- the answer is no, and I don't
25   think, at least as I read a portion of this
```

11 (Pages 41 to 44)

```
 1           KRASNOW
 2  very similar?
 3       MR. ISAKOFF: Same objection.
 4       A.  Similar but different. I'm not sure
 5  how to answer the question.
 6       Q.  Okay. Substantively, are they
 7  pretty much the same? You have added some
 8  words about affiliates and so on, but --
 9       MR. ISAKOFF: Object to form.
10       A.  That's a substantive change.
11       Q.  Other than that, is the substance
12  pretty much the same?
13       MR. ISAKOFF: Object to form.
14       A.  Other than the changes which are
15  blacklined, the substance is the same.
16       Q.  Okay. In the fourth line of your
17  e-mail on the first page of Exhibit 66, you
18  say, "Please note that we are providing our
19  client and committee counsel with this latest
20  draft."
21       Do you see that?
22       A.  Yes.
23       Q.  To whom were you referring when you
24  referred to "our client"? Was that
25  Mr. Ehrmann?
                                      Page 89
```

```
 1           KRASNOW
 2       A.  I don't recall whether it was
 3  Mr. Ehrmann. It might have included him. It
 4  certainly would have included Ms. Cash.
 5       Q.  And how about committee counsel, to
 6  whom were you referring there?
 7       A.  Who specifically?
 8       Q.  Yes.
 9       A.  It would have been Dennis O'Donnell,
10  at the Milbank Tweed firm.
11       MR. TULCHIN: Can we please mark, as
12       Exhibit 67, Krasnow 67, a document, the
13       first page of which is November 24, 2010,
14       production numbers LBHI_CW6436 through
15       6439.
16       (Krasnow Exhibit 67, Document,
17       Production Numbers LBHI_CW6436 through
18       6439, marked for identification.)
19       A.  (Perusing.) Yes.
20       Q.  Now, Mr. Krasnow, you wrote the
21  e-mail that's on the first page of Exhibit 67;
22  is that right?
23       A.  Yes.
24       Q.  And you did so in the ordinary
25  course of your business at Weil Gotshal,
                                      Page 90
```

```
 1           KRASNOW
 2  correct?
 3       A.  Yes.
 4       Q.  And is this the Financial Times
 5  article that you referred to earlier this
 6  morning?
 7       A.  Yes.
 8       Q.  How did you obtain that article?
 9       A.  I believe it was -- I recall it was
10  provided to us by our London colleagues.
11       Q.  That is lawyers at Weil Gotshal in
12  London?
13       A.  Yes, that's correct.
14       Q.  Am I right, sir, that prior to
15  November 24, 2010, you certainly were aware
16  that Canary Wharf was in discussions to do a
17  deal at 25 Bank Street?
18       MR. ISAKOFF: Object to form.
19       A.  I would take issue with the word
20  "discussions."
21       Q.  Well, Ms. DeMarco had told you --
22       MR. ISAKOFF: I don't think he had
23       finished his answer.
24       Q.  Had you finished your answer, sir?
25       A.  I was about to say, I had been
                                      Page 91
```

```
 1           KRASNOW
 2  apprised by Ms. DeMarco that they were
 3  exploring that. At no point did she, or anyone
 4  on behalf of Canary Wharf, advise me that they
 5  were engaged in discussions or negotiations
 6  with any third party.
 7       Q.  Did she tell you that there was
 8  consideration being given to entering into a
 9  999-year lease?
10       A.  Consideration as a possibility?
11  Yes, or words to that effect.
12       Q.  Did she affirmatively say that there
13  had been no discussions with any third party
14  about entering into such a lease?
15       A.  No.
16       Q.  I'm sorry. Did you answer?
17       A.  Yes, I did. I said no.
18       THE WITNESS: I would like to take a
19       break shortly.
20       MR. ISAKOFF: Why don't we take one
21       now?
22       MR. TULCHIN: Whenever you like.
23       THE VIDEOGRAPHER: We are now off
24       the record. The time is 11:34 a.m.,
25       June 25, 2013.
                                      Page 92
```

23 (Pages 89 to 92)

## Page 137

KRASNOW

for itself.

Q. Looking at it now, in 2013, is there anything in the words that are present that you would interpret or understand to be on the subject of whether or not LBHI wanted a new lease?

A. The only response to that is we did not believe that a condition of getting the documents we require should be a response to that question.

Q. Did you have a meeting with lawyers from Sullivan & Cromwell on or about December 6, 2010?

A. Yes.

Q. Did you take any notes at that meeting?

A. I don't believe I did.

Q. Do you recall who else was present at the meeting?

A. Besides myself?

Q. Yes, sir.

A. Mr. Dietderich was there from Sullivan & Cromwell. There may have been another attorney from Sullivan who attended.

## Page 138

KRASNOW

There was somebody from Canary Wharf, or the parent of Canary Wharf, but someone who was there represented themselves as being there on behalf of Canary Wharf. I don't recall their name. And Erika del Nido.

Q. To your knowledge, did Ms. del Nido take any notes of what was said at that meeting?

A. I don't recall.

Q. In preparing for your deposition here today, both your deposition as a 30(b)(6) witness and your personal deposition, did you come across any notes that were taken of the December 6 meeting?

A. No, I don't recall seeing any.

Q. Where was the meeting held?

A. At our offices.

Q. Was it on the 25th floor here at --

A. Yes.

Q. -- the General Motors Building?

MR. ISAKOFF: Wait until he is finished.

A. Yes.

Q. Sorry, you may have thought I was

## Page 139

KRASNOW

finished.

Do you remember how long the meeting took?

A. No.

Q. What's your best recollection of what was said to you at that meeting and what you said?

A. I believe I tried to understand why we were meeting with Sullivan & Cromwell, and I'm not sure whether that conversation occurred at that meeting or prior to that meeting perhaps with Mr. Dietderich. It's kind of both gelled somewhat in my mind.

The meeting clearly was in response to our request to find out what was going on with respect to JPM. I seem to remember Mr. Dietderich indicating that JPM was very concerned about there being any disclosure as to their actually being involved in a transaction, that it was them, notwithstanding the articles in the press.

I remember that there was a discussion about the need for a confidentiality agreement before we would be provided with a

## Page 140

KRASNOW

copy of the lease.

I certainly remember discussing with them the importance of our finding out about the transaction, and it's my recollection that Mr. Dietderich indicated a desire that they know whether or not we would take the lease in the context of JPM doing the transaction with Canary Wharf, and that somehow after that occurred we would have the ability and exercise that ability to then try to take the lease.

Something that didn't quite make a lot of sense to me, but that was the context, as I recall, that Mr. Dietderich explained why they wanted to know if we would be interested in the leasehold premises, assuming we had the ability to do that.

I don't recall exactly how the meeting ended, other than I guess there was discussion about the confidentiality agreement.

Q. Anything else you recall?

A. My reaction was that they were very anxious to proceed with the JPM transaction. There may have been some discussion, I don't recall specifically, with respect to our

35 (Pages 137 to 140)

**Page 157**

```
 1              KRASNOW
 2    is this:
 3         Did you prepare and send that e-mail
 4    in the ordinary course of your business at Weil
 5    Gotshal?
 6        A.   Yes.
 7        Q.   And you sent it to Mr. Dietderich
 8    and other people as indicated on December 8 of
 9    2010; is that correct?
10        A.   That's what the e-mail reflects.
11        Q.   Okay. Now, your e-mail says, and
12    I'm going to read a large portion of it,
13    forgive the time that it will take, "Your
14    statement regarding the reason for the request
15    is inaccurate. We found out about a potential
16    transaction as a result of press reports. We
17    then contacted Clifford Chance about that
18    transaction and advised that we needed to know
19    the specifics of any transaction in order to
20    evaluate the proposed settlement and CW's
21    asserted claims. That's it. LBHI is not
22    seeking that information in order to evaluate
23    whether or not to assume or enter into a
24    lease."
25         Now, was all of that correct and
```

**Page 158**

```
 1              KRASNOW
 2    accurate at the time you sent this e-mail to
 3    Mr. Dietderich?
 4        A.   Yes.
 5        Q.   And when you wrote that LBHI "is not
 6    seeking that information in order to evaluate
 7    whether or not to assume or enter into a
 8    lease," that was consistent with what you had
 9    said to Mr. Dietderich on December 6, right?
10         MR. ISAKOFF: Object to form.
11        A.   The reason why we wanted to see the
12    lease? I don't specifically recall, but I
13    think that's generally correct.
14        Q.   And was it not true, Mr. Krasnow,
15    that you were communicating to Mr. Dietderich
16    on December 6 and December 8 that LBHI was not
17    interested in taking a lease for 25 Bank
18    Street?
19         MR. ISAKOFF: Object to the form.
20        A.   That's not what the e-mail says.
21        Q.   I didn't ask you whether it says
22    that. I asked you a different question. So if
23    we could just go back.
24        A.   Okay. Then --
25         MR. ISAKOFF: Wait until he asks.
```

**Page 159**

```
 1              KRASNOW
 2         THE WITNESS: Yeah, yeah.
 3        Q.   Let me try it again.
 4        A.   Yes.
 5        Q.   I wasn't asking you with respect to
 6    the e-mail.
 7        A.   Okay.
 8        Q.   I'm going to try to ask you the same
 9    question. It might be slightly different
10    because I don't remember it exactly.
11         Is it not correct that on around
12    December 6 and December 8 of 2010, you were
13    communicating to Mr. Dietderich that LBHI was
14    not interested in taking a lease for 25 Bank
15    Street?
16         MR. ISAKOFF: Object to form.
17        A.   I don't recall. I think you have
18    asked this question before. I don't recall
19    having that specific discussion, and I don't
20    believe that, at that point in time, in any
21    event, LBHI had the ability to take the lease.
22        Q.   And why was that, sir?
23        A.   Because we didn't have a call on the
24    lease. We didn't have the ability to demand
25    that we would take a lease.
```

**Page 160**

```
 1              KRASNOW
 2        Q.   Had you ever heard anyone at Alvarez
 3    & Marsal, up until December 9, 2010, indicate
 4    that LBHI might be interested in taking office
 5    space in London?
 6         MR. ISAKOFF: I guess that's a yes
 7    or no question. It certainly calls for
 8    privileged information, and I think you
 9    asked it besides.
10        A.   That question was asked of me, I
11    believe, before the lunch break, 12 different
12    ways.
13        Q.   What was your answer?
14        A.   I suggest you check the transcript.
15        Q.   Well, if you don't mind, let me just
16    ask this question. I hope it's not overly
17    repetitive.
18         Up until December 9, 2010, had you
19    ever heard anyone at Alvarez & Marsal indicate
20    that LBHI might want to take a lease on office
21    space in London?
22         MR. ISAKOFF: Object to form.
23         Go ahead.
24        A.   I don't recall any discussion.
25        Q.   Mr. Krasnow, if you look at the
```

40 (Pages 157 to 160)

### Page 173

1  KRASNOW
2  MR. TULCHIN: Objection, leading.
3  MR. ISAKOFF: She didn't hear the
4  answer. I will withdraw the question in
5  light of the objection.
6  Q. What, if any, information does LBHI
7  have at this juncture available to it with
8  respect to topics one, two and eight, beyond
9  the documents that have been produced by the
10 parties in this case?
11 MR. TULCHIN: Same objection.
12 A. It's my understanding that there is
13 no information beyond that which is contained
14 in the documents you referred to, Mr. Isakoff.
15 Q. Now, I believe -- do you have
16 Exhibit 76 in front of you? That's the
17 December 22 e-mail to Mr. Dietderich.
18 A. What was the number again?
19 Q. 76.
20 A. I want to keep these in order.
21    I have that document in front of me.
22 Q. Let me get it in front of me.
23 Turning your attention to the carryover
24 paragraph from the third page of this document
25 to the fourth, I believe Mr. Tulchin asked you

### Page 174

1  KRASNOW
2  whether this was the first time that you
3  indicated to any representative of Canary Wharf
4  that LBHI might be unwilling to proceed with
5  the settlement that had previously been the
6  subject of discussions in October and November.
7    Do you recall that?
8  A. Yes.
9  Q. I would like to show you what's been
10 previously marked in this proceeding as
11 Exhibit 13. And I would just like to turn your
12 attention to the first e-mail that appears on
13 the first page of this exhibit, which you sent
14 to Mr. Dietderich on Feb- -- I'm sorry,
15 December 10, 2010.
16    Do you see that?
17 A. Yes, I do.
18 Q. Okay. Does this refresh your
19 recollection that, in fact, you had indicated
20 to Mr. Dietderich that LBHI might well be
21 unwilling to proceed with the previously
22 discussed terms well before December 22?
23 A. Yes.
24 MR. TULCHIN: Objection, leading.
25 Q. What, if anything -- what, if

### Page 175

1  KRASNOW
2  anything, does Exhibit 13 -- strike that.
3    When, for the first time, do you
4  recall, now that you have seen Exhibit 13, do
5  you recall telling Mr. Dietderich, or any other
6  representative of Canary Wharf, that LBHI might
7  be unwilling to proceed with the settlement on
8  the terms previously discussed?
9  MR. TULCHIN: Same objection.
10 A. This does refresh my recollection
11 that we advised Mr. Dietderich, prior to my
12 e-mail of December 22 and on or about
13 December 10, that there was -- there were
14 questions that were being raised as to whether
15 or not we would be in a position to pursue the
16 settlement that had previously been discussed.
17 Q. Now, at one point you said in your
18 direct testimony under Mr. Tulchin's
19 examination with respect to Mr. Dietderich's
20 asking you concerning LBHI's interest in taking
21 a new lease, that LBHI had no call on such a
22 lease.
23    Do you recall giving that testimony?
24 A. Yes, I do.
25 Q. What, if anything, did you mean by

### Page 176

1  KRASNOW
2  that?
3  A. It was and is my understanding that
4  LBHI had no legal entitlement to demand that
5  Canary Wharf enter into a new lease or
6  replacement lease with it with respect to the
7  premises at 25 Bank Street, that that was not
8  consistent with the structure of the
9  transaction or the structure of the guarantee,
10 as set forth in Schedule 4 -- 4 of the Canary
11 Wharf lease.
12 Q. Is there -- to your recollection --
13 well, what, if any, recollection do you have
14 with respect to whether LBHI had any right
15 to -- had any obligation to take on a new lease
16 in the absence of a written notice following
17 forfeiture or some other event like that?
18 MR. TULCHIN: Objection, leading,
19 and also as to form.
20 A. It is -- it was and is my
21 understanding that there were numerous steps
22 that had to occur both under the terms of the
23 governing agreement and in light of the pending
24 Chapter 11 before any obligation that LBHI
25 might have with respect to a new lease would be

|  | KRASNOW |
|---|---|
| 1 | |
| 2 | crystallized. |
| 3 | Basically, under the agreement, |
| 4 | Canary Wharf had to, in the first instance, |
| 5 | put, if you will, the lease by giving a notice |
| 6 | to that effect to LBHI. |
| 7 | In order to be able to do that, in |
| 8 | light of the Chapter 11, Canary Wharf would |
| 9 | have had to have taken certain steps in |
| 10 | connection with the Chapter 11 proceeding |
| 11 | before the bankruptcy court. |
| 12 | MO    MR. TULCHIN: Move to strike. I'm |
| 13 | sorry. |
| 14 | A.    Only after all of those steps |
| 15 | occurred, would there arguably be an obligation |
| 16 | on LBHI's behalf to consider whether or not it, |
| 17 | in fact, was going to take a lease. |
| 18 | MO    MR. TULCHIN: I move to strike the |
| 19 | answer as expressing a legal opinion and |
| 20 | particularly in view of some of the |
| 21 | objections and instructions earlier in the |
| 22 | deposition where questions of mine |
| 23 | supposedly called for legal opinions. |
| 24 | Q.    Okay. What, if any, notice under |
| 25 | Schedule 4 of the lease has ever been served on |

Page 177

1   KRASNOW
2   LBHI, to your knowledge?
3       MR. TULCHIN: Object, calls for a
4       legal conclusion.
5       A.    I'm not aware of any notice that was
6   sent or purported to be sent by Canary Wharf
7   seeking to put the lease, if you will, to LBHI.
8       Q.    All right. And putting aside
9   whether any steps were required to be taken by
10  Canary Wharf in the United States Bankruptcy
11  Court, in order to legally serve a notice under
12  Section 4 of the lease, are you aware of Canary
13  Wharf actually having -- having taken any steps
14  before the Bankruptcy Court seeking the ability
15  to serve a notice under Schedule 4 of the
16  lease?
17      MR. TULCHIN: Same objection, and
18      also on the ground that it's leading.
19      A.    No steps were taken.
20      Q.    In view of your -- what was your
21  reaction, if any, to the repeated requests that
22  you advise whether LBHI had any desire to take
23  up a new lease?
24      A.    A number of reactions. First, is
25  they were frustrating -- inasmuch as they were

Page 178

1   KRASNOW
2   saying that they would not provide us with a
3   copy of even drafts of the lease until we made
4   some sort of commitment, we were frustrated
5   because, as we had advised them, we needed to
6   undertake our due diligence with respect to the
7   proposed settlement in order to make a
8   determination whether or not to proceed with
9   any such settlement.
10      And so it was almost as if they were
11  trying to leverage the situation where -- and
12  frustrating our ability to pursue our fiduciary
13  duties, and for that matter, the committee's as
14  well.
15      Secondly, we found it a little
16  bewildering because the reasons they gave us
17  for wanting this, we just didn't quite
18  understand the reasons that I previously
19  testified to in terms of LBHI exercising some
20  right to take a lease after the JPM Chase deal
21  had closed.
22      Lastly, and one might say firstly,
23  we didn't understand that LBHI had a right to
24  demand a lease. It didn't have an obligation,
25  as we understood it, to even consider the issue

Page 179

1   KRASNOW
2   unless and until Canary Wharf sent the
3   requisite notice to LBHI, which it never did.
4       So it seemed to be a very
5   hypothetical speculative issue, which, in part,
6   was dependent upon whether or not Canary Wharf
7   was prepared to send a notice. So it was
8   bizarre, confusing and very frustrating.
9       MO    MR. TULCHIN: Move to strike on all
10      the same grounds previously.
11      Q.    Would you turn to Krasnow 75? Do
12  you have that in front of you? I think it's
13  right here.
14      A.    Yes.
15      Q.    And you were questioned by
16  Mr. Tulchin about this document, and I think
17  one of the questions he asked you was whether
18  you chose your words carefully.
19      Do you recall that?
20      A.    Yes.
21      Q.    And what was your answer to that
22  question?
23      A.    My answer was yes.
24      Q.    And what is it about Krasnow 75,
25  particularly the e-mail at the top of the first

Page 180

45 (Pages 177 to 180)

### Page 181

KRASNOW

1  page, that leads you to testify that you chose
2  your words carefully?
3      MR. TULCHIN: Objection, leading.
4      A.  We were very careful to phrase the
5  e-mail in the manner in which we did, which, in
6  particular, if I can just use the words that
7  are here, it says, "LBHI would not elect to
8  enter into a lease." That's conditional.
9      We used those words because various
10 conditions had to be satisfied before the
11 question would really be put to LBHI, and those
12 are the ones which I alluded to before.
13     In putting aside bankruptcy
14 considerations, our understanding was that they
15 had to give the requisite notice. So first,
16 Canary Wharf had to determine whether or not it
17 was going to give the notice and then give the
18 notice.
19     There were certain other steps we
20 thought they needed to take in light of the
21 pending Chapter 11, but just the governing
22 documents themselves, required those steps to
23 be taken.
24     Q.  To what extent, if at all, was LBHI,

### Page 182

KRASNOW

1  through this e-mail, waiving any of the steps
2  that you have just outlined?
3      MR. TULCHIN: Object to the
4  question, calls for a legal conclusion.
5  It's also argumentative and leading.
6      MR. ISAKOFF: All right. I will
7  change the question.
8      Q.  To what extent was it LBHI's
9  intention, by this e-mail, to be waiving any of
10 the steps you have just described?
11     MR. TULCHIN: Same objections.
12     A.  They were not intending to waive
13 anything. As I noted, the word "would," as I
14 understand it, is conditional, and it
15 presupposed that all of the steps that Canary
16 Wharf would have been required to take would be
17 taken.
18     Q.  In light of your testimony that --
19 that you have just given, what reason, if any,
20 did you have for sending this e-mail?
21     A.  We wanted the documents.
22     Q.  I would like to turn your
23 attention -- referring to what documents?
24     A.  We wanted the JPM/Canary Wharf

### Page 183

KRASNOW

1  transactional documents.
2      Q.  Okay. Would you turn to Krasnow 73?
3      A.  I have it.
4      Q.  If you look at the second paragraph
5  of Mr. Dietderich's e-mail to you and Mr. Jones
6  of December 7, Mr. Tulchin drew your attention
7  to the sentence that reads, "The settlement
8  agreement," which refers to the attachment
9  dated December 3, 2010, between Canary Wharf
10 and LBL, "The settlement agreement involves a
11 voluntary extinguishment of the LBL's further
12 obligations in return for possession of the
13 building and the preservation of and smaller
14 unsecured claim (see end of paragraph four)."
15     By smaller unsecured claim, do you
16 understand that to mean less than the
17 ███████ that had been part of the draft
18 stipulations?
19     A.  Yes.
20     Q.  And what, if any -- what, if any,
21 consideration did you and LBHI give to the --
22 to this disclosure?
23     A.  At the time that we received this,
24 it was in the letter and it was subject to

### Page 184

KRASNOW

1  further review. It was a factor that was taken
2  into account in the context of the
3  determination that ultimately was made not to
4  proceed with the settlement, but it was a -- I
5  shouldn't use the word "but".
6      It was a factor in the context of
7  the totality of factors that related to, among
8  other things, the forbearance agreement itself,
9  not simply the fact that this would result in
10 them being unable to make the representation
11 that was called for in the stipulation, but it
12 was a factor.
13     Q.  Okay. I would like to show you --
14 do you have Exhibit 18 there? It's the big fat
15 one that's got some redactions in it of the
16 final agreement. Yeah?
17     A.  Yes, I have it in front of me.
18     Q.  And Mr. Tulchin drew your attention
19 to pages 24 and 28 as containing redactions of
20 various provisions, correct?
21     A.  Yes.
22     Q.  I would like to draw your
23 attention --
24     A.  Excuse me, I think it was through

### Page 185

```
 1              KRASNOW
 2   27.
 3       Q.   Through 27, excuse me.
 4           I would like to -- do you see also
 5   that on page 35 of this document, bearing Bates
 6   number LBHI_CW13678, that there is yet another
 7   redaction that Mr. Tulchin did not mention?
 8       A.   Yes, I see that on page 35 and on
 9   page 36.
10       Q.   Okay. Let's look at Exhibit 15. I
11   don't believe you were shown the unredacted
12   version today. Exhibit 15, for the record is
13   Bates stamped CW5282 through 5400.
14           And first of all, if you will turn
15   to page -- pages 24 to 27, do you see that this
16   is the unredacted versions in which -- version
17   in which all of the provisions of 7.16 are
18   here?
19       A.   Yes.
20       Q.   Okay. And if you will turn to page
21   35 and 36, do you see that here is, in the
22   unredacted version, is a [REDACTED]
23   [REDACTED]
24   [REDACTED]
25   [REDACTED]
```

### Page 186

```
 1              KRASNOW
 2           Do you see that?
 3       A.   Yes, I do.
 4       Q.   Is it fair to say that at no time up
 5   until 2013 were these provisions available to
 6   LBHI or Weil Gotshal?
 7       A.   That's my understanding, yes.
 8       Q.   If you will turn to Exhibit 17,
 9   which is the cover letter, Mr. Dietderich, in
10   sending you the materials which included
11   Exhibit 18 in the next to last paragraph,
12   states at the end, "Additionally, certain
13   portions of the enclosed documents have been
14   redacted to prevent disclosure of privileged
15   legal advice in which the parties share a
16   common legal interest."
17           Do you see that?
18       A.   Yes.
19       Q.   Does that make any sense to you at
20   all?
21           MR. TULCHIN: Objection, calls for a
22       legal conclusion. Also argumentative and
23       leading.
24       A.   As it relates certainly to the
25   section of the agreement in Exhibit 15
```

### Page 187

```
 1              KRASNOW
 2   regarding [REDACTED]
 3   [REDACTED]
 4       Q.   Page 35.
 5       A.   Page 35? Thank you. That seems to
 6   be a factual point, and so that, in my mind,
 7   doesn't comport with the representation that
 8   Mr. Dietderich made.
 9   MO      MR. TULCHIN: Move to strike.
10           MR. ISAKOFF: No further questions.
11   FURTHER EXAMINATION
12   BY MR. TULCHIN:
13       Q.   Mr. Krasnow, you had an opportunity,
14   during the break that commenced at about 2:09,
15   to discuss with Mr. Isakoff the testimony that
16   you were going to give on cross; is that right?
17           MR. ISAKOFF: You can answer that
18       yes or no.
19       A.   Yes.
20       Q.   Now, during that break or subsequent
21   to it, have you come to the conclusion that
22   anything you said on direct examination today
23   was misleading or incomplete or inaccurate?
24           MR. ISAKOFF: Object to form, vague
25       and compound.
```

### Page 188

```
 1              KRASNOW
 2       A.   There are -- there are three or four
 3   things you have asked.
 4       Q.   All right. Let's take them one at a
 5   time, if it's hard.
 6           Sitting here right now at about
 7   2:50 p.m., do you believe that any of the
 8   testimony you gave on cross -- on direct
 9   examination today was misleading?
10       A.   No.
11       Q.   Was any of it false?
12       A.   No.
13       Q.   Was any of it inaccurate?
14       A.   I don't believe so.
15       Q.   As best you know it, did you get any
16   of the facts wrong?
17       A.   As best I know, to my best
18   recollection, no.
19       Q.   On cross, you were shown Exhibit 75,
20   and I just have a question or two about this.
21       A.   I have it.
22       Q.   Your e-mail at the top of the first
23   page of Exhibit 75 responds to the e-mail just
24   below it, correct, Mr. Dietderich's e-mail to
25   you of December 9 at 10:32 a.m.?
```