**Hearing Date and Time: July 16, 2014, at 10:00 a.m. (Prevailing Eastern Time)**
**Objection Date and Time: July 9, 2014, at 4:00 p.m. (Prevailing Eastern Time)**

Jack A. Raisner (JR 6171)
**OUTTEN & GOLDEN LLP**
3 Park Avenue, 29th Floor
New York, New York 10016
Telephone: (212) 245-1000
Fax: 646-509-2070
Email: jar@outtengolden.com

Gary Gwilliam (Bar No. 33430)
Randall E. Strauss (Bar No. 168363)
**GWILLIAM, IVARY, CHIOSSO, CAVALLI & BREWER**
1999 Harrison Street, Suite 1600
Oakland, California 94612-3528
Telephone: (510) 832-5411
Fax: (925) 820-0335
Email: GGwilliam@giccb.com, rstrauss@giccb.com

Mark S. Bostick (Bar No. 111241)
**WENDEL, ROSEN, BLACK & DEAN LLP**
1111 Broadway, 24th Floor
Oakland, California 94607-4036
Telephone: (510) 834-6600
Fax: (510) 834-1928
Email: mbostick@wendel.com

Attorneys for Claimants, Sylvia Vega-Sutfin, Michelle Seymour,
Cheryl McNeil, Linda Howard-James, Isabel Guajardo and
Denise Colombo

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| In re | Chapter 11 |
| LEHMAN BROTHERS HOLDINGS, INC., *et al.*, | Case No. 08-13555 (SCC) |
|  | (Jointly Administered) |
| Debtors. |  |

## MOTION FOR RELIEF FROM STAY
## AND INJUNCTION PROVIDED UNDER PLAN

TO:     THE HONORABLE SHELLY C. CHAPMAN, UNITED STATES BANKRUPTCY
        JUDGE:

Claimants, Sylvia Vega-Sutfin, Michelle Seymour, Cheryl McNeil, Linda (Weeks)

Howard-James, Isabel Guadjardo and Coleen Denise Colombo (collectively, "Claimants"),

holders of Claims Nos. 5222, 5223, 5224, 5225, 5226 and 5227, respectively, (collectively the

"Claims"), hereby submit this Motion (the "Motion") for Relief from Stay and from the Stay in

Paragraph 13.7 of the Debtor's Modified Third Amended Joint Chapter 11 Plan of

Reorganization ("Plan").  In support of the Motion, Claimants submit the Declaration of J. Gary

Gwilliam ("Gwilliam Declaration") attached to this Motion and respectfully represent as follows:

### Preliminary Statement

1.      Claimants are former employees of BNC Mortgage Inc. ("BNC"), a debtor herein,

whose Claims are based on causes of action stated in a complaint (the "Complaint") filed on

November 8, 2005, in the Superior Court of the State of California, County of Sacramento

("Sacramento Superior Court"), Case No. 05AS05161 (the "Action") that was pending at the

time the debtors filed their bankruptcy petitions.  Gwilliam Declaration, ¶ 2.  A true and correct

copy of the Complaint is attached as Exhibit 1 to the Gwilliam Declaration.

2.      The facts underlying the Complaint occurred in California and the causes of

action stated therein are governed by California law and include claims for employment

discrimination, harassment, failure to prevent discrimination, retaliation, intentional infliction of

emotional distress, defamation, wrongful termination, breach of contract and breach of implied

covenant of good faith and fair dealing, as more particularly set forth in the Complaint.

Claimants demanded a jury trial.  A copy of the Complaint was attached to each filed Claim.

Gwilliam Declaration, ¶ 3.

3.      The allegations set forth in the Complaint detail egregious conduct on the part of BNC that precipitated its eventual failure.  When the Claimants complained to their supervisors about fraudulent and illegal lending practices beginning in 2005,  each of them was told by BNC to ignore the fraudulent and illegal lending practices.  When they refused, they were each subjected to intimidation, retaliation and harassment that eventually led to their constructive termination.  If BNC had heeded the warnings from these employees, it might have averted BNC's bankruptcy.  All Claimants have claims for economic damages and non-economic damages, including severe emotional distress.  Gwilliam Declaration, ¶ 4.

4.      At the time that BNC filed its petition for relief, the Action had been pending for over four years. After the Complaint was filed in November 2005, on March 6, 2006, BNC filed a Petition to Compel Arbitration.  The Sacramento Superior Court denied BNC's petition, which BNC appealed.  The Sacramento Superior Court stayed all discovery while BNC appealed the order denying arbitration. On September 26, 2007, the California Court of Appeal affirmed the Sacramento Superior Court's denial of BNC's Petition to Compel Arbitration, and on November 27, 2007, California Court of Appeal issued a Remititur. The Sacramento Superior Court lifted the stay on discovery.  Between November 2007 and January 9, 2009, the parties engaged in extensive discovery, exchanged multiple sets of interrogatories and requests for production of documents, producing over 10,000 documents.  During that period of time the depositions dates for the Claimants were set and the deposition for the Claimant Sylvia Vega-Sutfin was completed.  When BNC commenced its bankruptcy case on January 9, 2009, and the Sacramento Superior Court stayed the entire Action, notwithstanding the fact there are non-debtor defendants, and the Action has been stay since.  The Claimants have been waiting over eight long years for the resolution of their Claims.  Gwilliam Declaration, ¶ 5.

5.      The parties have engaged in ongoing settlement negotiations of the Claims since June 2013.  Since that time, offers and demands have been exchanged, and the parties have discussed the Claims and defenses in this matter.  Gwilliam Declaration, ¶ 6.

6.      The Claims were timely and properly filed in the BNC bankruptcy case. While settlement negotiations were pending, on August 20, 2013, Lehman Brothers Holdings, Inc. ("LBHI" or the "Plan Administrator") under the Plan, filed its Four Hundred and Thirty-First Omnibus Objection to Claims Nos. 522, 5223, 5224, 5225, 5226 and 5227 ("Objection") [ECF No. 39569].  The Plan Administrator set a hearing date of September 26, 2013.  Gwilliam Declaration, ¶ 7.

7.      On September 17, 2013, Claimants filed a Response and Opposition to the Objection ("Response") [ECF No. 40127].  In its Response, Claimants requested relief from the Plan injunction or an order transferring the Mediation venue to Northern California because the Claimants could not afford the huge financial burden of traveling to New York to participate in the Mediation and because the Debtors had a list of selected mediators available in Northern California.  Id.

8.      In response to Claimant's Response and Opposition, on September 19, 2013, the Plan Administrator adjourned the hearing on Claimants' Claims, and pursuant to the Notice of Adjournment [ECF No. 40176], would provide notice of the  new date and time of the hearing.  Id.

9.      Throughout the course of settlement negotiations, Claimants requested that the Plan Administrator agree to mediate the Claims in Northern California because the Claimants, could not afford the huge financial burden of traveling to New York City to participate in the Mediation, and because the Debtors selected mediator list had mediators located in the San

Francisco Bay Area at their disposal. Claimants believed that after eight years of pending litigation, mediation was the most efficient manner of bringing these Claims to a successful resolution, and the hardship to the Debtors in mediating in Northern California was slight as opposed to the hardship of forcing the Claimants to mediate in New York.  Gwilliam Declaration, ¶ 7.

10.     On October 31, 2013, the Plan Administrator served the Notice ADR Procedures and Scheduling of Claims Objection Hearing with Respect to Objection to Proof of Claims Nos. 5222, 5223, 5224, 5225, 5226, and 5227 [ECF No. 40923]("ADR Notice").  Pursuant to the ADR Notice, the Plan Administrator set the Claims for a Claims Objection Hearing for the purpose of holding an evidentiary hearing on the merits of the Claims on December 19, 2013, at 10:00 a.m., and scheduled the Claims for Mediation.  Pursuant to the Order Pursuant to Section 105 of the Bankruptcy Code, Bankruptcy Rule 9014, and General Order M-390 Authorizing the Debtor to Implement Claims Hearing Procedures and Alternative Dispute Resolution Procedures for Claims Against Debtor [ECF No. 6664], the Mediation site location was in New York City, New York.

11.     Claimants were unable to reach an agreement with the Plan Administrator as to the site of the mediation, and were prepared to file a motion to move the site of the mediation to Northern California.  At the last minute, as the Claimants were filing their motion to change the venue of the mediation, the Plan Administrator agreed to mediate the Objection  to Claimants Claims in San Francisco, California.  At significant cost to themselves, each of the Claimants, traveled to San Francisco and participated in two days of Mediation.  Gwilliam Declaration, ¶ 8.

12.     The Mediation took place in San Francisco before Lisabeth Hasse, Esq. of Creative Industry Law, on May 5 and May 6, 2014.  Unfortunately, the Mediation was

unproductive.  Gwilliam Declaration, ¶ 9.  Thus, pursuant to the terms of the ADR Notice, the

parties are now required to proceed to a Claims Objection Hearing.  See, ADR Notice, p. 4, ¶ 1.

13.     In addition to the fact that Claimants' Claims have been pending in the

Sacramento Superior Court for eight years, the Claims are "personal injury tort" claims, and,

notwithstanding the broad scope of the ADR Procedures, this Court does not have "jurisdiction"

to hear and determine the Claims pursuant to 28 U.S.C. § 157(b)(5).  For those reasons, as well

as others, Claimants seek relief from the automatic stay provided by 11 U.S.C. § 362(a)(1), for

"cause" pursuant to 11 U.S.C. § 362(d)(1), and relief from the stay provided by Plan Section

13.7, and the Temporary Litigation Injunction provided by the ADR Notice, to return to the

Sacramento Superior Court to liquidate their Claims to trial and judgment.[1]  Relief from Stay is

also warranted, because Northern California is the more appropriate forum under the Second

Circuit *Sonnax*[2] factors.  The Claimants have a right to a jury trial on their Claims in the Action

in the Sacramento Superior Court.  Trial in the Sacramento Superior Court will afford complete

relief to all parties on all issues and the Claims are controlled solely by state law.  All but one

Claimant are located in the Northern California, and the Claimants' witnesses, evidence and

experts are all located in the Northern California.  All of the actions giving rise to Claimants'

Claims took place in Northern California and BNC conducted business in Northern California.

There are additional non-debtor defendants in the pending Action over which this Court has no

jurisdiction.  The Claimants do not have the financial resources to attend a trial in New York,

whereas, it would not be a hardship whatsoever for BNC to attend a trial in Northern California.

---

[1] Claimants do not seek relief to enforce any judgment.  Claimants would amend their respective Claims with the entered judgment, and receive distribution based upon the amended Claims in accordance with the distribution provided for under the Debtors' Plan.

[2] *Sonnax Industries, Inc. v. Tri Component Products Corp. (In re Sonnax Industries)*, 907 F.2d 1280 (2nd Cir. 1990).

Thus, for all of those reasons, Claimants request that relief from stay be granted, and that the

Claims be liquidated by trial in the Action in the Sacramento Superior Court.

### Jurisdiction

14.     The statutory basis for the relief requested herein are Sections 105(a), 362(d)(1)

and 1109(b) of Title 11 of the United States Code ("Bankruptcy Code"), Rules 4001 and 9014 of

the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules"), and this Court's inherent

powers.

### Background

15.     Lehman Brothers acquired BNC to extend itself into the "sub-prime loan" market.

Because the mortgage-backed security loan were repackaged and sold to other investors, BNC

had little incentive to carefully qualify its borrowers.  Instead, it consistently made loans to

unqualified home buyers based on incomplete or fraudulent applications.  BNC management told

its employees, "don't worry about the qualifications, just write loans."  These practices

ultimately lead to the collapse of the subprime lending market in late 2007, and the Great

Recession of 2007-2009.

16.     Each of the Claimants were highly paid and successful employees in the BNC's

Sacramento, California branch.  Each of them complained to their superiors about BNC's

fraudulent and illegal lending practices as early as 2005.  Each of them was told to look the other

way, and then was subjected to retaliation and harassment that was designed to force them to

quit.  In addition, each of the Claimants were victims of sexual harassment and other forms of

abuse that ultimately lead to their constructive termination.  Subsequent events have vindicated

the Claimants for their whistleblowing activities.  It has been widely reported in the press that lax

and fraudulent underwriting activities similar to the activities that occurred at BNC led to the

collapse of the sub-prime mortgage market, helped precipitate the downfall of the Debtors, and

the economy as a whole.  The Claimants were at the leading edge of the crisis, sounding an alarm

that went unheeded.  Rather than being treated as heroes for reporting the fraud that lead to

financial ruin for thousands of Americans, the Claimants were victimized by the company they

were trying to protect.  Each of these Claimants has been waiting eight years for justice.  It has

been five years since BNC sought protection in the bankruptcy court.  As each year goes by, it

adds to the Claimants distress, and  it is important for the Claimants to have their voices heard

together.

### Coleen Colombo – Claim No. 5227

17.     Claimant Coleen Colombo began working at BNC in 2003 as an underwriter.

Gwilliam Declaration, Exhibit 1, Complaint, ¶ 25.  She did well at her job, and was involved in

training other underwriters.  Ms. Colombo quickly discovered that BNC was engaging in

fraudulent underwriting practices.  Many of the files that she reviewed contained fabricated

paystubs and bank statements.  In some instances, amounts were obviously whited out, with new

information typed in.

18.     Ms. Colombo reported this fraud to manager Joe Pennington.  When he refused to

take action, she escalated her complaints to upper management, as well as BNC's human

resources department.  She reported the fraud to Regional Vice President of Operations Kim

Bugay, Regional Sales Manager Casey Copeland and Regional Account Manager Martha

Stevens.  None of her complaints were taken seriously, and no changes were made as a result.  In

fact, Joe Pennington took her out to lunch and offered to pay her to look the other way and

approve his loans.  She understood that she was being offered a bribe to ignore fraudulent loan

documentation.  Gwilliam Declaration, Exhibit 1, Complaint, ¶¶ 27-28.

19.     This was particularly disheartening to Ms. Colombo, who took her job as an underwriter seriously.  She felt both a responsibility to BNC and to the borrower to make sure that they were qualified for the loans the received, without risking almost certain foreclosure.

20.     Because her complaints were not being taken seriously, Ms. Colombo suffered extreme stress.  Her doctors ordered her to take a short leave in May of 2005.  Gwilliam Declaration, Exhibit 1, Complaint, ¶ 29.  When she returned from the leave, Joe Pennington told her that Nick Murphy wanted her fired for making the fraud complaints.  Gwilliam Declaration, Exhibit 1, Complaint, ¶ 32.

21.     Furthermore, as a result of Ms. Columbo's complaints of fraud, Joe Pennington and upper management ordered co-Claimant Michelle Seymour to not communicate with her.  Gwilliam Declaration, Exhibit 1, Complaint, ¶ 31.  Furthermore, Joe Pennington and Nick Murphy threatened Ms. Colombo to approve loans that were obviously fraudulent.  Ms. Colombo refused. Pennington and Murphy simply repackaged these loans and gave them to other underwriters for approval.  Ms. Colombo reported this to BNC's corporate office.

22.     Like her co-Claimants, once Ms. Colombo began complaining of fraud, she began to be intimidated by sexual harassment by Daniel Keenan.  He rubbed his body against hers, and constantly looked for ways to touch her.  When Daniel Keenan sexually assaulted co-Claimant Linda Howard-James, Ms. Columbo could not take the toxic environment any more, and was forced to resign. She was constructively terminated on September 7, 2005.  Gwilliam Declaration, Exhibit 1, Complaint ¶¶ 23-24, 33-35.

23.     Ms. Colombo is on permanent disability at this time.  Traveling to New York for trial would be a huge financial burden for Ms. Colombo.  Gwilliam Declaration, ¶ 10.

## Isabel Guajardo – Claim No. 5226

24.      Claimant Isabel Guajardo went to work for BNC in April of 2005 with the

promise that she would be trained as an account executive.  Gwilliam Declaration, Exhibit 1,

Complaint, ¶ 39.  This never happened, and she was made the receptionist.  Id.  A few weeks

after she was hired, Daniel Keenan began working at the office as an Account Manager.

Gwilliam Declaration, Exhibit 1, Complaint, ¶ 22.  She noticed that he often would come in on

weekends and copy files.  He began to make racist comments to her about her Hispanic ancestry.

He also intimidated her through sexual harassment.  He would simulate masturbation, look down

her blouse, rub his body against her and make lewd comments.  Gwilliam Declaration, Exhibit 1,

Complaint, ¶ 43-44.  She complained about this to Manager Joe Pennington, who refused to do

anything, laughing this behavior off as that of "Chester the Molester."  Gwilliam Declaration,

Exhibit 1, Complaint, ¶¶ 24, 46.

25.      During her employment, Ms. Guajardo came across loan files that had clearly

fraudulent documentation.  She reported these incidents to management, but like her co-

Claimants, was rebuffed.

26.      The final straw for Ms. Guajardo, was when co- Claimant Linda Howard-James

told her about her sexual assault by Daniel Keenan.  Ms. Guajardo was constructively terminated

on September 7, 2005.  Gwilliam Declaration, Exhibit 1, Complaint, ¶ 47.

27.      Ms. Guajardo is currently unemployed, and living in Utah.  Traveling to New

York for trial would be a huge financial burden for Ms. Guajardo.  Gwilliam Declaration, ¶ 11.

## Linda Howard-James – Claim No. 5225

28.      Claimant Linda Howard-James began working at BNC in 2004 as an underwriter.

Gwilliam Declaration, Exhibit 1, Complaint, ¶ 51.  Shortly thereafter, she began to notice that

loan files contained suspicious information.  Furthermore, she heard other underwriters coaching

loan officers on how to falsify loan documents.  Ms. Howard-James refused to participate in these activities, and actively investigated all suspicious loan files.  Gwilliam Declaration, Exhibit 1, Complaint, ¶ 53.

29.    Ms. Howard-James complained to her superiors about these fraudulent loan files. Thereafter, these files were routed to other underwriters, and nothing was done regarding her complaints.  Instead, BNC instituted a campaign to force her out of the company.  Gwilliam Declaration, Exhibit 1, Complaint, ¶ 53.

30.    Thereafter, Daniel Keenan came on the scene and began a campaign of egregious intimidation by sexual harassment.  He pushed his body against hers, he made lewd sexual proposals, he simulated masturbation in front of her, among a litany of disgusting an illegal behavior.  In addition, Mr. Keenan subjected Ms. Howard-James to a torrent of racist remarks. Gwilliam Declaration, Exhibit 1, Complaint, ¶ 54-55.

31.    Ms. Howard-James reported all of this to the office manager, Joe Pennington, who essentially ignored her.  In addition, she complained to BNC management and Human Resources about the fraudulent activities and the harassment by Daniel Keenan. BNC essentially ignored her complaints, and allowed the retaliation and harassment to continue unchecked.

32.    On September 2, 2005, Daniel Keenan suddenly appeared behind Ms. Howard-James, pushed his body against hers, breathed down her neck, and pressed his genitals against her.  This sexual assault precipitated a panic attack that forced Ms. Howard-James to flee the office.  Because management at BNC refused to protect her from this intimidation and harassment, which actually escalated to a sexual assault, Ms. Howard-James had no choice but to resign her employment on September 7, 2005.  Gwilliam Declaration, Exhibit 1, Complaint, ¶¶ 56-59.

33.      Ms. Howard-James is currently employed, but fears that taking time off to travel to New York for a trial will jeopardize her job security in addition to posing a large financial burden.  Gwilliam Declaration, ¶ 12.

### Cheryl McNeil – Claim No. 5224

34.      Claimant Cheryl McNeil began working for BNC in 2004 as an account manager. In late 2004, she began reporting to Loan Officer Nick Murphy.  Gwilliam Declaration, Exhibit 1, Complaint, ¶ 62.  Shortly thereafter, she discovered that many of Mr. Murphy's loan files revealed fraudulent activities, including falsified tax returns and bank statements, obviously false pay stubs, and other efforts to force through loans that should never have been approved. Gwilliam Declaration, Exhibit 1, Complaint, ¶ 64.

35.      When Ms. McNeil began asking questions about the legitimacy of these loan files, Mr. Murphy pulled his loan files from her, and began to micro-manager her. Ms. McNeil brought her discoveries to the attention of her Regional Management, to no avail.  Ms. McNeil specifically complained of illegal and fraudulent activity to Regional Account Manager Martha Stephens.  After these complaints, the harassment increased.  Eventually, all of her accounts were taken away from her, and Ms. McNeil was written up for poor production.  Because of this ongoing pressure, Ms. McNeil was placed on a two week stress leave by her doctor.  When she returned, Ms. McNeil found that she had no files to work on.  Gwilliam Declaration, Exhibit 1, Complaint, ¶ 64.

36.      During this same time period, Ms. McNeil was intimidated through sexual harassment and racially harassed by BNC manager Daniel Keenan.  Mr. Keenan made a series of sexually suggestive comments to her, and continuously contrived to rub his body against hers. He also made offensive comments about her being African American.  Ms. McNeil's complaints about this behavior to office manager Joe Pennington were simply laughed off.  Mr. Pennington

told her it was just "fun and games," and referred to Mr. Keenan as "Chester the Molester."

Gwilliam Declaration, Exhibit 1, Complaint, ¶¶ 22, 65-66.

37.     On July 22, 2005, the day that Ms. McNeil returned from her stress leave, she was

called into a meeting with Martha Stephens, and told that corporate Human Resources wanted to

speak with her.  It was clear that Ms. McNeil was about to be terminated.  Rather than face this

final humiliation, and with no choice under the circumstances, Ms. McNeil resigned.  Her

constructive termination was effective July 22, 2005.  Gwilliam Declaration, Exhibit 1,

Complaint, ¶ 68.

38.     Ms. McNeil is currently employed but is considered during her probationary

employment period, and cannot take time off to travel to New York for trial without jeopardizing

her employment. Gwilliam Declaration, ¶ 13.

### Michelle Seymour – Claim No. 5222

39.     Claimant, Michelle Seymour started working for BNC in July of 2005 as an

underwriter reporting to Joe Pennington.  Gwilliam Declaration, Exhibit 1, Complaint, ¶ 71.

Shortly after starting work, Mr. Pennington and his brother, Nick Murphy, began to pressure Ms.

Seymour to approve loans that contained fraudulent documentation.  She noticed that the files

contained altered and falsified documents.  It was obvious that income stated in the files could

not be generated by the employment of the applicant.  When she attempted to make calls to

verify the figures, she was unable to.  Despite this, Mr. Pennington and Mr. Murphy ordered her

to approve the loans.  Ms. Seymour protested to Mr. Pennington, but he insisted that she continue

these illegal activities.  Eventually, Ms. Seymour complained up through her chain of command

to the BNC corporate office in Irvine, California.  Gwilliam Declaration, Exhibit 1,

Complaint, ¶ 73.

40.    Ms. Seymour never gave in to the pressure to approve obviously fraudulent loans, but the situation in the workplace became extremely stressful.  Rather than deal with her complaints honestly and ethically, BNC management simply pulled her files form her and repackaged them with other underwriters.  In some instances, loans were pulled from her control, and actually approved by the corporate office in Irvine.

41.    As her stress increased, Ms. Seymour started to talk to her co-workers.  She learned that co-Claimants Ms. Howard-James and Ms. Colombo were having similar negative experiences.

42.    Once she started complaining of fraudulent loan activity, Ms. Seymour began to be intimidated through sexual harassment by Daniel Keenan, just like her co-Claimants.  He would trap her in her office, close the door, and try to touch her.  He often blocked her path and rubbed against her. Under the guise of consoling her over her father's illness, Mr. Keenan, hugged her, kissed her, asked her personal questions, and professed his love for her.  Ms. Seymour complained to Joe Pennington about this sexual harassment.  Nothing was done about it.  Gwilliam Declaration, Exhibit 1, Complaint, ¶¶ 73-74.

43.    When Ms. Seymour caught Mr. Keenan removing files from the office, she reported this to Joe Pennington.  Nothing was done about it.

44.    Mr. Pennington, Mr. Murphy, Daniel Keenan and Linda Harris would often enter Ms. Seymour's office, close the door, and pressure her to approve bad loans.  This added greatly to her stress level, causing her anxiety and apprehension.  Eventually, the stress became too much for her.  She felt she could no longer work in an atmosphere of fraud, coercion, retaliation and harassment.  Ms. Seymour was constructively discharged on September 7, 2005.  Gwilliam Declaration, Exhibit 1, Complaint, ¶ 77.

45.     Ms. Seymour is currently employed, but has limited personal time off and vacation time, and fears that taking time off to travel to New York for a trial will jeopardize her job security in addition to posing a large financial burden.  Gwilliam Declaration, ¶ 14.

### Sylvia Vega-Suftin – Claim No. 5223

46.     Claimant Sylvia Vega-Suftin started working at BNC in July of 2004 as an Account Executive.  Gwilliam Declaration, Exhibit 1, Complaint, ¶ 80.  Like her co-Claimants, Ms. Vega-Suftin complained of fraudulent lending activities.  She also complained of violations of BNC's "protected broker" policy.  Gwilliam Declaration, Exhibit 1, Complaint, ¶¶ 82-83.

47.     After her first branch manager resigned, his accounts were divided up among the remaining account managers. Ms. Vega-Suftin was assigned some of these accounts. Unfortunately, the new branch manager, Bill Smalley, allowed Kim Tualla to poach these accounts from Ms. Vega-Suftin.  This was a clear violation of BNC's Territory Management Policy 60 Day Rule.  Ms. Vega-Suftin bitterly complained about this, to no avail. Nick Murphy was her next branch manager, and he continued to allow Kim Tualla to steal Ms. Vega-Suftin's accounts.  Ms. Tualla would actively interfere with Ms. Vega-Suftin's sales efforts, actually showing up unannounced at meetings with Ms. Vega-Suftin's clients, again in clear violation of BNC rules.  BNC management condoned these activities, actually calling Ms. Vega-Suftin's clients to tell them she was no longer their account manager.  This had the effect of destroying Ms. Vega-Suftin's reputation with her clients.  Accounts were taken from her, in violation of her protected broker list.  When Ms. Vega-Suftin continued to complain about this situation, Kim Tualla physically threatened her.  Once again, BNC did nothing to remedy this hostile work environment.  In fact, Ms. Vega-Suftin brought her complaints to Regional Sales Vice President Casey Copeland.  Mr. Copeland sent out a mass email discouraging violations of the protected broker list.  The very next day, Nick Murphy retaliated against Ms. Vega-Suftin by taking away

her account manager, disrupting her pending loan closings.  Gwilliam Declaration, Exhibit 1,

Complaint, ¶ 84.  Ms. Vega-Suftin became persona non-grata at the branch.  She was alternately

shunned and yelled at by management.  Nick Murphy began referring to her as "that bitch," and

made it known that he hated her.  Gwilliam Declaration, Exhibit 1, Complaint, ¶ 85.

48.     While these issues were ongoing, Ms. Vega-Suftin was intimidated through

sexual harassment by co-worker Lisa Savioni, who exposed herself to Ms. Vega-Suftin.  When

Ms. Vega-Suftin complained to branch manager Nick Murphy about this, he refused to even

make a report of sexual harassment, complaining about the paper work involved.  Nothing

further was done by BNC management.  Ms. Vega-Suftin complained to BNC's Human

Resources department about this sexual harassment, but nothing was done.

49.     The intimidation through sexual harassment continued when Daniel Keenan

began working at the Sacramento branch in the spring of 2005.  He pressed his body against

hers, breathed on her neck and made gross sexually offensive comments to her.  Ms. Vega-Suftin

complained to branch manager Joe Pennington, who merely laughed in response.  At one point,

Nick Murphy physically accosted her and told her to "behave if you know what's good for you."

Gwilliam Declaration, Exhibit 1, Complaint, ¶¶ 22, 87.

50.     On March 9, 2005, Ms. Vega-Suftin flew to Irvine, California to meet with BNC

vice president Gary Vanderhagen about the hostile work environment.  An Human Resources

representative was present during the meeting.  Mr. Vandertaken told her that he would protect

her because she was writing so much business for the company.

51.     When Ms. Vega-Suftin returned to work in Sacramento, she was told by a co-

worker that Nick Murphy, Joe Pennington and Case Copeland had decided to "make her pay" for

escalating her complaints.

52.     When Ms. Vega-Suftin could not stand the harassment any longer, she requested a transfer to BNC's Santa Rosa office.  Instead, she was transferred to the Concord office.  There, the harassment continued.  Her files were continuously "lost", causing her to lose loan opportunities.  Her customers deemed her unreliable, and took their business elsewhere.  Ms. Vega-Suftin complained to Casey Copeland, hoping for assistance in locating her files.  He refused.  In fact, she was advised by her Concord branch manager that Copeland wanted her "out" of the company.  Gwilliam Declaration, Exhibit 1, Complaint, ¶¶ 89-90.

53.     Meanwhile, Ms. Vega-Suftin spoke out against the harassment suffered by co-Claimant Linda Howard-James.  Casey Copeland told her that he was not happy with her for making this complaint.  Gwilliam Declaration, Exhibit 1, Complaint, ¶ 91.

54.     By September, 2005, the harassment was so severe that Ms. Vega-Suftin was forced to leave her employment at BNC.  She resigned on September 7, 2005.  Gwilliam Declaration, Exhibit 1, Complaint, ¶ 92.

55.     Ms. Vega-Suftin is unemployed, and traveling to New York for trial would be a huge financial burden.  Gwilliam Declaration, Complaint, ¶ 15.

### LBHI Bankruptcy Filing and the Claims Procedures

56.     On September 15, 2008  LBHI and several affiliates filed voluntary petitions for relief under Chapter 11 in this Court.  BNC subsequently filed its voluntary petition for relief under Chapter 11 on January 9, 2009.

57.     On April 19, 2010, the Court entered the Claims Procedure Order.  The Claims Procedure Order Authorizes the Debtors' Estates to implement Certain Claims Hearing Procedures and ADR Procedures (as defined in the Claims Procedure Order) that govern most claims litigation in these cases.

58.     The Claims Procedures Order, among other things, enjoins Claimants from

attempting to establish their Claims in any other judicial forum.  See, Claims Procedures Order,

2-3; Exhibit A to Order, Court Ordered Claims Hearing Procedures and Alternative Dispute

Resolution Procedures, ¶ 8.  Furthermore, the Alternative Dispute Resolution Procedures require

that a Claimant served with a ADR Notice, among other things, must submit to mandatory non-

binding mediation.  Id. at ¶ 5.

59.     The Claimants and BNC participated in the non-binding mandatory mediation on

May 5 and May 6, 2014.  The mediation was unsuccessful, and now, pursuant to the terms of the

ADR Notice, the parties are now required to proceed to a Claims Objection Hearing.  See, ADR

Notice, p. 4, ¶ 1.

## Relief Requested

60.     The Claimants request an order for relief from the automatic stay provided by 11

U.S.C. § 362(a), for "cause" pursuant to 11 U.S.C. § 362(d)(1), as well as relief from the stay

provided by Section 13.7 of the Plan, and the stays provided by the Claims Procedure Order, and

the ADR Notice, to permit the Claimants to liquidate their Claims in the Action to judgment in

the Sacramento Superior Court.

## The Basis for Relief

61.     Section 362(d)(1) provides that, the court shall grant relief from the stay provided

under Section 362(a), on the request of  a party in interest, after notice and a hearing, for "cause."

The Code, however, does not define "cause," "leaving courts to consider what constitutes cause

based on the totality of the circumstances of each particular case."  *In re Mid-Atlantic Handling*

*Systems, LLC*, 304 B.R. 111, 129-130 (Bankr. D.N.J. 2003) (internal citations omitted).  In

resolving a motion for relief from stay in connection with determining whether pending litigation

should be permitted to proceed in a non-bankruptcy forum, the Second Circuit evaluates twelve

factors to determine whether "cause" exists:

1.  Whether relief would result in partial or complete resolution of issues;

2.  Lack of connection or interference with the bankruptcy case;

3.  Whether the other proceeding involves the debtor as a fiduciary;

4.  Whether a specialized tribunal (with necessary expertise) has been established to hear the cause of action;

5.  Whether the debtor's insurer has assumed full responsibility for defending it;

6.  Whether the action primarily involves third parties;

7.  Whether litigation in another forum would prejudice the interests of other creditors;

8.  Whether the judgment claim arising from the other action is subject to equitable subordination;

9.  Whether movant's success in the proceeding would result in a judicial lien avoidable by the debtor;

10. The interests of judicial economy and expeditious and economical resolution of litigation;

11. Whether the parties are ready for trial in the other proceeding; and

12. Impact of the stay on the parties and the balance of the harms.

*In re Ice Cream Liquidation*, Inc., 281 B.R. 154, 165 (Bankr. D. Conn. 2002), *citing*, *In re*

*Sonnax Industries, Inc.*, 907 F.2d 1280, 1285-1286 (2d Cir. 1990). Not all of the factors are

relevant in every case, and "cause" is a broad and flexible concept that must be determined on a

case-by-case basis. *In re MF Global Holdings Ltd.*, 469 B.R. 177 (Bankr. S.D.N.Y. 2012). Of

the foregoing factors, factors 1, 2, 4, 7, 10, 11 and 12 are relevant here. Weighing all of the

circumstances, the scale tips heavily in favor of granting relief from stay to permit the Action to

go forward and to allow Claimants to liquidate their Claims in the Sacramento Superior Court.

62.    <u>Whether Relief Would Result in a Partial or Complete Resolution of the Issues</u> –

Claimants' Claims are quintessential state law claims for employment discrimination,

intimidation, harassment, failure to prevent discrimination, retaliation, intentional infliction of

emotional distress, defamation, wrongful termination, breach of contract and breach of implied

covenant of good faith and fair dealing. Claimants have a jury trial right in the Action in the

Sacramento Superior Court, and have demanded a jury trial.  As such, Claimants' Claims are

"personal injury tort" claims and the bankruptcy court does not have "jurisdiction" under to 28

U.S.C. § 157(b)(5) to conduct an evidentiary hearing or trial on the Claims.  *In re Ice Cream*

*Liquidation, Inc.*, 281 B.R. 154, 162-165 (Bankr. D. Conn. 2002) (Sexual harassment claims are

"personal injury tort claims" within 28 U.S.C. §157(b)(5)); *In re Erickson*, 330 B.R. 346, 349

(Bankr. D. Conn. 2005)("personal injury tort" claims include civil rights claims based on

discrimination).  But see, *In re Cohen*, 107 B.R. 453, 455 (S.D.N.Y. 1989) (Antidiscrimination

claim not a personal injury tort claim.)[3]  Claimants' Claims must be tried in a court other than the

bankruptcy court in any event.  Therefore, granting relief and proceeding to trial in the

Sacramento Superior Court is warranted, particularly in light of preservation of Claimants' jury

trial right.

63.    Equally important, granting relief will result in complete resolution of Claimants'

Claims in the Action in the Sacramento Superior Court.  Claimants' Claims for employment

discrimination, intimidation, harassment, wrongful termination and retaliation can be resolved all

---

[3]  There are two interpretations of what constitutes a "personal injury tort" under Section 157(b)(5).  Older cases, such as *Cohen* limit personal injury tort to only those torts involving bodily injury.  More recent cases, and the majority of courts facing this issue, interpret the term more broadly to include civil rights actions.  *In re Redondo Construction Corp.*, 2006 Bankr. LEXIS 3831, 2-3 (Bankr. D. Puerto Rico 2006).

in one forum, the Sacramento Superior Court, against all defendants, BNC and non-debtor

defendants.  On the other hand, because there are non-debtor defendants, Joe Pennington and

Daniel Keegan, and Nick Murphy, over whom this court has no jurisdiction, if relief from stay is

not granted, Claimants would have to litigate their Claims twice:  once against BNC in the

bankruptcy court, and then against the non-debtor defendants in the Action in the Sacramento

Superior Court.  Relief from stay to permit pending litigation in an alternative forum is warranted

where the suit involves multiple parties.  *In re Mid-Atlantic Handling Systems, LLC*, 304 B.R.

114, 130 (Bankr. D.N.J. 2003).  Hence, relief is appropriate here since it would be onerous to

require the individual Claimants, all of whom are of limited financial resources, to try their

Claims twice in these circumstances where granting relief would permit them to resolve all

Claims against all defendants once.

64.     <u>The Lack of Connection or Interference with the Bankruptcy Case</u> – Granting

relief from stay to Claimants, and liquidation of their Claims in the Action in the Sacramento

Superior Court will not interfere with the bankruptcy case at all.  The Debtors confirmed a Plan

in December 2011 and the administration of the cases is focused on the claims process.

Claimants believe that the Debtors have already made several interim distributions to creditors.

Thus, granting the relief requested and the liquidation of Claimants' Claims in the Action in the

Sacramento Superior Court will not interfere in anyway in the bankruptcy cases.  This is

particularly true because Claimants are not seeking relief to enforce a judgment, but will simply

amend their Claims to reflect any judgment entered, and will receive their distribution as any

other creditor in the case.

65.     <u>Whether a Specialized Tribunal (with Necessary Expertise) Has Been Established</u>

<u>to Hear the Cause of Action</u> – All of the Claims are governed by California law on employment

claims for discrimination, harassment, wrongful termination and retaliation, and California Superior Courts are well versed in applying its own law. California public policy has a strong interest in ensuring that employment claims for discrimination are decided by California courts. Nothing in the liquidation of the Claims requires the specialized knowledge of the bankruptcy court. Where state law controls the issues to be decided in pending litigation in an alternative forum, relief from stay is warranted, because the specialized knowledge of the bankruptcy court is unnecessary. *Kadlecek v. Schwank USA, Inc.*, 486 B.R. 336, 341-342 (Bankr. M.D.N.C. 2013).

66.     Whether Litigation in Another Forum Would Prejudice the Interests of the Other Creditors - Nor would granting relief from stay prejudice the interests of the other creditors in the case. As indicated above, Claimants seek only relief from stay to prosecute and liquidate their Claims to judgment in the Action in the Sacramento Superior Court. There can be no prejudice to other creditors because Claimants are not seeking relief to enforce any judgment they obtain in the Action. The liquidation of Claimants' Claims, when complete, will provide them with general unsecured claim just as all other creditors and they will be paid on their allowed claims just all other general unsecured creditors. Moreover, if there is any prejudice, it is not from the relief request by Claimants, or granting the relief requested by Claimants, it is as a direct result of application of 28 U.S.C. § 157(b)(5), which prohibits the bankruptcy court from resolving Claimants' Claims.

67.     The Interests of Judicial Economy and the Expeditious and Economical Resolution of Litigation - Claimants have been waiting over eight long years to resolve their Claims against BNC and the non-debtor defendants, Joe Pennington and Daniel Keegan, and Nick Murphy, defendants over whom the Court has no jurisdiction. Full relief cannot be

afforded to the Claimants in the absence of the non-debtor defendants, and granting relief will

permit a full resolution of all issues against all defendants in the Action and promote judicial

economy and the economical use of judicial resources and the expeditious resolution of

litigation.  The Action is pending in Northern California, Sacramento Superior Court, and the

Claims are governed by California law.  Because the Court is precluded from conducting a trial

on the Claims under 28 U.S.C. § 157(b)(5), judicial economy favors a trial in the court where the

Action was commenced.  Equally important, granting relief will allow Claimants to preserve

their right to a jury trial.

68.     <u>Whether the Parties Are Ready for Trial in the Other Proceeding</u> – Neither

proceeding is ready for trial, but the Action is the Sacramento Superior Court has progressed

through one appeal, remittitur and a number of discovery matters.  Over 10,000 pages of

discovery have already been produced, and one of the Claimants deposition has already been

completed.  No discovery has taken place in the bankruptcy case, and Claimants will be sorely

disadvantaged, since many witnesses will be beyond the subpoena power of this Court.

69.     <u>The Impact of the Stay on the Parties and the Balance of the Harms</u> - The Court

should consider other crucial factors as well.  Traveling to New York for a trial is a severe

financial hardship for each of the Claimants, and a risk to the current employment positions for

those Claimants who are employed.  The Claims are among the Claimants' most valuable assets.

All of the trial counsel and key evidence and witnesses in the Action are (or were) located in

Northern California.  Most importantly, the relative financial burden of conducting a trial in the

Sacramento Superior Court is de minimis to BNC (or the Debtors), which holds perhaps billions

of dollars available for payment of attorneys' fees and expenses as opposed to the Claimants who

cannot financially afford to travel to New York City for a trial on their prospective claims.

70.     On balance, the foregoing factors point toward granting Claimants' relief from the automatic stay to liquidate their Claims to judgment in the Action in the Sacramento Superior Court.

71.     The Claims Procedures Order enjoins creditors from seeking to establish or otherwise proceed with their claims outside the specific Claims Procedures Orders.  See, Claims Procedures Order, 2-3.  Given the volume of claims in the Debtors' cases that is understandable. However, given that the Debtors' have already long ago confirmed a Plan, Claimants request that the Court grant relief from the Claims Procedures Order to the extent necessary to provide this requested relief.

### Notice

72.     Notice of this Motion has been provided in accordance with the procedures set forth in the order entered on June 17, 2010 governing case management and administration procedures for these cases [Docket No. 9635] on (i) counsel to the Lehman Estates; (ii) counsel to the Official Committee of Unsecured Creditors; and (iii) Office of the United States Trustee for Region 2; (iv) all parties who have requested notice.  Claimants submit that no other or further notice is required.

WHEREFORE, for the reasons stated, Claimants respectfully request that the Court enter an order, substantially in the form attached as Exhibit A, granting the Claimants relief from stay pursuant to Bankruptcy Code § 362(d)(1) permitting them to liquidate their Claims to judgment in the Action in the Sacramento Superior Court; and granting relief from the Injunction or Stay of Section 13.7 of the Plan and the ADR Notice; and granting the relief necessary from the Claims Procedures Order to permit the relief requested herein and such other and further relief as the Court deems appropriate.

DATED:  June 24, 2014                    OUTTEN & GOLDEN LLP

                                         By:  /s/ Jack A. Raisner
                                             Jack A. Raisner
                                             Attorneys for Claimants, Sylvia Vega-
                                             Sutfin, Michelle Seymour, Cheryl McNeil,
                                             Linda Howard-James, Isabel Guajardo and
                                             Denise Colombo


DATED June 23, 2014                      GWILLIAM, IVARY, CHIOSSO,
                                         CAVALLI & BREWER

                                         By:  /s/ Gary Gwilliam
                                             Gary Gwilliam
                                             Attorneys for Claimants, Sylvia Vega-
                                             Sutfin, Michelle Seymour, Cheryl McNeil,
                                             Linda Howard-James, Isabel Guajardo and
                                             Denise Colombo


DATED:  June 24, 2014                    WENDEL, ROSEN, BLACK & DEAN LLP

                                         By:  /s/ Mark S. Bostick
                                             Mark S. Bostick
                                             Attorneys for Claimants, Sylvia Vega-
                                             Sutfin, Michelle Seymour, Cheryl McNeil,
                                             Linda Howard-James, Isabel Guajardo and
                                             Denise Colombo