Reply Due:  July 31, 2014
Hearing Date:  TBD

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------- x
    :
In re       :    Chapter 11
    :
LEHMAN BROTHERS HOLDINGS INC. *et al.*,    :    Case No. 08-13555 (SCC)
    :
Debtors.    :    Jointly Administered
    :
-------------------------------------------------------------------- x


### THE CANARY WHARF CLAIMANTS' MEMORANDUM IN FURTHER SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO LEHMAN'S CROSS-MOTION FOR SUMMARY JUDGMENT


David B. Tulchin
Marc De Leeuw
John J. Jerome
Andrew E. Gelfand
John G. McCarthy
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Tel:  (212) 558-4000
Fax:  (212) 558-3588

*Attorneys for Canary Wharf Management
Ltd., Heron Quays (HQ2) T1 Limited and
Heron Quays (HQ2) T2 Limited*

June 26, 2014

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ........................................................................................1

THE FACTS ......................................................................................................................4

    A.    The Undisputed Material Facts ...........................................................4

    B.    The Background Facts Are Undisputed ..............................................5

    C.    Lehman's Misleading Recitation of Events in 2010 Is
          Wrong and, in Any Event, Irrelevant ..............................................9

ARGUMENT ...................................................................................................................10

    I.    Schedule 4 Is an Indemnity That Entitles Canary Wharf to
       Summary Judgment on Liability .......................................................10

        A.    The Clear Language of Paragraph 1 Provides That
            Lehman Will Indemnify Canary Wharf for Its Losses ...............10

        B.    Lehman's Attempts to Avoid the Clear Language of
            Paragraph 1 Are Meritless .........................................................13

            1.    Lehman's New Argument Is Contrary to the
                  Contract and English Law ............................................13

            2.    Paragraph 1 Provides for an Indemnity, Not a Guarantee ...................15

            3.    *Contra Proferentem* Has No Application Here .....................19

            4.    The Parties' Post-Contract Negotiations Are of
                  No Help to Lehman ...................................................20

        C.    Other Provisions of the Lease and Schedule 4
            Further Show That Schedule 4 Is an Indemnity ............................21

    II.    Even If Schedule 4 Were a Guarantee, Lehman
        Would Still Be Liable ........................................................................24

    III.    Lehman's Argument That a Material Variation Discharged
        Its Obligations Fails as a Matter of Law ..........................................28

CONCLUSION ...............................................................................................................30

## <u>TABLE OF AUTHORITIES</u>

Page(s)

### Cases[*]

*ABM Amro Commercial Finance plc* v. *McGinn*,
[2014] EWHC 1674 (Queen's Bench Division (Commercial Court) of the
High Court of England and Wales) .......................................................................................18

*Active Estates Ltd.* v. *Parness*,
[2002] EWHC 893 (Chancery Division of the
High Court of England and Wales).......................................................................................25

*CDV Software Entertainment AG* v. *Gamecock Media Europe Ltd.*,
[2009] EWHC 2965 (Chancery Division of the
High Court of England and Wales) .......................................................................................20

*Clement* v. *Clement*,
(Court of Appeal of England and Wales, Oct. 20, 1995) (unreported) ...................................17

*Goldacre (Offices) Ltd.* v. *Nortel Networks UK Ltd.*,
[2009] EWHC 3389 (Chancery Division of the
High Court of England and Wales) .......................................................................................29

*Gray* v. *Owen*,
[1910] 1 KB 622 (King's Bench Division of the
High Court of England and Wales) .......................................................................................27

*In Re Park Air Services Plc*,
[2000] 2 AC 172 (House of Lords) ........................................................................................26

*Marshall* v. *Mackintosh*,
(1898) 78 LT 750 (Queen's Bench Division of the
High Court of England and Wales).......................................................................................27

*National Carriers* v. *Panalpina (Northern)*,
[1981] AC 675 (House of Lords) ..........................................................................................25

*Rainey Brothers Ltd.* v. *Kearney*,
[1990] NI 18 (Court of Appeal of Northern Ireland).......................................................26, 27

---

[*]  Prior to its replacement in 2009 by the Supreme Court of the United Kingdom, the House of Lords was the highest appellate court for most cases in the United Kingdom.  The House of Lords heard all appeals from, among other courts, (a) the Court of Appeal of England and Wales, and (b) the Court of Appeal of Northern Ireland.  The Court of Appeal of England and Wales hears appeals from decisions of the High Court of England and Wales, including the Queen's/King's Bench Division and the Chancery Division of the High Court.

## TABLE OF AUTHORITIES
### (continued)

Page(s)

*Reichman* v. *Beveridge*,
[2006] EWCA Civ 1659 (Court of Appeal of England and Wales) .......................................26

*Vossloh Aktiengesellschaft* v. *Alpha Trains (UK) Ltd.*,
[2010] EWHC 2443 (Chancery Division of the
High Court of England and Wales) ................................................................................10, 17

### RULES

Fed. R. Civ. P. 30(b)(6)...................................................................................................................6

Fed. R. Civ. P. 44.1 ...............................................................................................................12, 21

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------- x
:
In re                                                          :        Chapter 11
:
LEHMAN BROTHERS HOLDINGS INC. *et al.*,       :        Case No. 08-13555 (SCC)
:
Debtors.                       :        Jointly Administered
:
------------------------------------------------------------------- x

### THE CANARY WHARF CLAIMANTS' MEMORANDUM IN FURTHER SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO LEHMAN'S CROSS-MOTION FOR SUMMARY JUDGMENT

### PRELIMINARY STATEMENT

In 2005, Lehman agreed to be "Surety" on a 30-year Lease of one of the largest

office buildings in London, England (25 Bank Street), a building built by Canary Wharf

specifically for Lehman and which was to be occupied by a Lehman subsidiary as Lehman's

European headquarters.[1]  The "Indemnity by Surety," set forth in Paragraph 1 of Schedule 4 to

the Lease, provides that Lehman "shall indemnify and keep indemnified" Canary Wharf for all

"losses damages liability costs fees and expenses whatsoever sustained by" Canary Wharf "by

reason of or arising directly or indirectly out of any default by" Lehman Sub, the tenant, "in the

performance and observance of any of its obligations or the payment of any rents and other

sums."  Lehman concedes that, in March 2010, Lehman Sub vacated the 25 Bank Street building

and stopped paying rent or any of the amounts due under the Lease.  There is no dispute that this

---

[1]  Unless otherwise noted, all abbreviations used herein are defined in The Canary Wharf Claimants' Memorandum in Support of Their Motion for Summary Judgment on Liability, filed March 14, 2014 (ECF# 43539) ("Canary Wharf Mem.").  Lehman's Memorandum of Law in Opposition to Canary Wharf's Motion for Partial Summary Judgment and in Support of Lehman's Cross-Motion for Partial Summary Judgment, filed May 22, 2014 (ECF# 44406) is referred to herein as "Lehman Mem."

was a "default" by Lehman Sub. That default gave rise to substantial losses for Canary Wharf. This is exactly the situation covered by Paragraph 1 of Schedule 4.

Indeed, the negotiators on both sides have now testified that the deal was for Lehman to be liable no matter what happened to Lehman Sub (including when the Sub could not or would not pay). Frank Bartolotta, Lehman's lead negotiator, testified at his May 2014 deposition that at Canary Wharf's insistence, Lehman agreed during the 2001 negotiations[2] that Lehman would "pay no matter what might happen to the English subsidiary." Bartolotta testified that this was an "absolute promise" by Lehman to pay even if (indeed, especially if) the Sub could not or would not pay. The 2013 deposition testimony of Canary Wharf's CEO, Sir George Iacobescu, is to the same effect.

The parties agree that under governing English law, an indemnitor has a primary obligation to perform and will be liable even when the underlying obligor is not. This is in contrast to a guarantee, where the obligations of the guarantor and the underlying obligor are ordinarily "co-extensive." During the nearly two years since filing the Objection in August 2012, Lehman and its English law expert Richard Millett, in their multiple filings (including two declarations from Mr. Millett totaling more than 50 pages), never disputed that if the Court finds that Paragraph 1 of Schedule 4 -- entitled "Indemnity by Surety" -- is an indemnity, it is liable for the Claims. Instead, Lehman and Millett argued that Lehman was not liable because Paragraph 1 is a guarantee. However, in its most recent brief, Lehman has suddenly switched to a new contention that it had never made before -- that it does not matter whether Schedule 4 is an

---

[2]  Although the Lease was not executed by the parties until 2005 after construction of the 25 Bank Street building, Lehman's obligations were agreed to by the parties in a March 30, 2001 "Agreement for Lease." A draft of the 30-year Lease was attached to the March 2001 Agreement for Lease and contained terms nearly identical to the Lease. Schedule 4 is the exact same in both documents. (*See* Canary Wharf Mem. at 5-6 & documents cited therein.)

indemnity or a guarantee because, after the Lease was forfeited by Canary Wharf in December 2010, Lehman Sub no longer had an obligation to pay rent, and thus Canary Wharf's losses do not arise out of any Lehman Sub default. This new argument comes only after Mr. Bartolotta's May 2014 testimony confirmed that both sides always understood the deal to be a promise by Lehman to pay even if Lehman Sub could not or would not pay. It is also completely wrong. The plain language of Paragraph 1 requires Lehman to indemnify Canary Wharf from all losses and damages "arising directly or indirectly out of any default by" Lehman Sub, and Canary Wharf indisputably suffered "losses" and "damages" arising out of Lehman Sub's March 2010 default. Canary Wharf's forfeiture of the Lease in December 2010 -- to mitigate its damages -- does not permit Lehman to avoid its indemnification obligations.

Further, even if Schedule 4 were a guarantee, Lehman would still be liable under Paragraph 1. Lehman puts much stock in the "centuries-old" English law principle that a tenant does not owe rent after forfeiture. This is irrelevant here because Canary Wharf is not seeking payments of rent as they come due quarter-by-quarter. Rather, Lehman would be liable even if Schedule 4 were a guarantee because when Lehman Sub stopped paying rent in March 2010 -- a "repudiatory breach" under English law -- Canary Wharf could seek damages for all future rent from Lehman Sub. Courts that have decided this issue have concluded that such damages can be recovered under English law, and no case has held to the contrary. Lehman's "centuries-old" principle has no relevance here.

Finally, Lehman argues that it should have no liability at all because Canary Wharf's forfeiture of the Lease in December 2010 constitutes a "material variation" under English law that discharged its obligations. Lehman admits, however, that this argument must be rejected if Schedule 4 is an indemnity, which it is. Moreover, (a) Paragraph 6 of Schedule 4

-3-

precludes Lehman's argument, and (b) the forfeiture was in any event not a material variation under English law.

In short, Canary Wharf agreed to construct a large building (over one million square feet) for Lehman on the express condition that Lehman indemnify Canary Wharf for all "losses" that might arise "directly or indirectly out of any default by" the tenant, a Lehman subsidiary.  After Lehman Sub defaulted (by vacating the building in March 2010 and ceasing to pay rent), Canary Wharf suffered large losses, and later mitigated its damages in December 2010 -- to the benefit of both Lehman and Canary Wharf.  This mitigation conduct provides no basis, under English law or common sense, for Lehman to avoid its obligations to indemnify Canary Wharf for its outstanding losses (nearly $780 million).

## THE FACTS

### A.    The Undisputed Material Facts

The facts material to Canary Wharf's motion for summary judgment are set forth in The Canary Wharf Claimants' Statement of Undisputed Material Facts Pursuant to Local Bankruptcy Rule 7056-1, filed on March 14, 2014 (ECF# 43538-1), and are also the only material facts necessary to deny Lehman's cross-motion.  On May 22, 2014, Lehman unambiguously admitted ***all*** of those facts.  (Lehman's Response to Canary Wharf's Statement of Undisputed Material Facts and Statement of Undisputed Material Facts Pursuant to Local Rule 7056-1, filed May 22, 2014 at 1-4 (ECF# 44407) ("Lehman's Rule 7056-1 Statement").)

These facts are briefly summarized as follows:

- In 2005, Lehman, Lehman Sub and Canary Wharf executed a 30-year Lease for the 25 Bank Street property in London.  That Lease included Schedule 4 ("Covenants of Surety") and is governed by the laws of England.  (Lehman's Rule 7056-1 Statement at Response Nos. 1-5.)

-4-

- Lehman filed for bankruptcy in the United States, and Lehman Sub was placed into administration in the United Kingdom, both on September 15, 2008.  (*Id.* at Response No. 6.)

- In March 2010, Lehman Sub vacated 25 Bank Street and stopped paying rent or any of the other amounts due under the Lease.  (*Id.* at Response No. 8.)

- Lehman Sub, its administrators, and Canary Wharf entered into an agreement, dated December 3, 2010, pursuant to which Canary Wharf forfeited the Lease as of December 10, 2010 and took possession of the 25 Bank Street property.  (*Id.* at Response Nos. 9-10.)

- Canary Wharf and JPMorgan executed a 999-year lease, dated December 20, 2010, for the 25 Bank Street property.  (*Id.* at Response No. 11.)

Canary Wharf is entitled to summary judgment on these facts alone.  The sole issue before the Court on both parties' motions is whether Lehman is liable for the Claims under Schedule 4.  Paragraph 1 of Schedule 4 provides for a primary obligation by Lehman to "indemnify" Canary Wharf for its "losses" and "damages" that arise "directly or indirectly out of any default by" Lehman Sub.  In March 2010, Lehman Sub defaulted under the Lease when it vacated 25 Bank Street and stopped paying any amounts due under the Lease.  As a result, Canary Wharf suffered significant losses for which Lehman is liable.

**B.    The Background Facts Are Undisputed.**

Both parties' negotiators now have testified unequivocally that the parties agreed that Lehman would pay Canary Wharf's losses no matter what happened to Lehman Sub -- *i.e.*, that Paragraph 1 is an indemnity, just as it says.

In its March 2014 opening brief on this motion, Canary Wharf recited some of the deposition testimony of Canary Wharf's CEO, Sir George Iacobescu, who negotiated the business terms of the Lease "from the day the deal started" through "when the lease was drawn [in 2001], to see that it confirms to our instructions."  (Iacobescu Tr. (Ex. 34) 8:3-10, 12:15-18;

Canary Wharf Mem. at 5-6, 19.)[3]  Sir George testified at his June 2013 deposition that during the 2001 negotiations between Lehman and Canary Wharf concerning 25 Bank Street, Canary Wharf sought "an uninterrupted cash flow regardless of anything that goes wrong with the tenant." (Iacobescu Tr. (Ex. 34) 239:25-240:11.)  The certainty of such an uninterrupted cash flow was key to Canary Wharf, given that the rental income would be securitized in the form of bonds. (*Id*. 241:8-17.)  Therefore, Canary Wharf "would not have entered into any . . . lease agreement unless we had the parent company indemnity."  (*Id*. 240:20-241:2.)

The testimony of Lehman's negotiator concerning the 2001 negotiations was not available to Canary Wharf on March 14, 2014, when it submitted its opening brief on this motion.  This is because Lehman, in response to Canary Wharf's May 2013 notice of a Rule 30(b)(6) deposition seeking testimony about the negotiations (Ex. 35), did not designate anyone who had knowledge of the negotiations (which is what Rule 30(b)(6) requires).  Instead, in June 2013, Lehman designated a Weil Gotshal lawyer, Richard Krasnow, to testify about the negotiations (Exs. 36, 37) and, as Krasnow testified at deposition later that month, he had no knowledge of the negotiations and had done nothing to prepare himself to testify about them (Transcript of Deposition of Richard Krasnow, taken June 25, 2013 ("Krasnow Tr.") (Ex. 38) at 29:7-34:3, 39:16-40:4).[4]  Canary Wharf was then unaware that Lehman's lawyers had, in February and June 2013, talked to Frank Bartolotta, Lehman's lead negotiator and a former Lehman Senior Vice President, and that the Lehman lawyers thus knew that Bartolotta had

---

[3]  References herein to "Exhibit" or "Ex. __" are to exhibits attached to the Declaration of Marc De Leeuw, executed March 14, 2014, filed with Canary Wharf's opening papers (ECF# 43540), or the Supplemental Declaration of Marc De Leeuw, executed June 26, 2014, being filed herewith.  The June declaration continues the numbering of exhibits from the March declaration.

[4]  At deposition, Krasnow was asked:  "Do you have any knowledge, firsthand or otherwise, with respect to any of the negotiations of the March 16, 2005 lease pertaining to 25 Bank Street?"  His answer was "No."  (Krasnow Tr. (Ex. 38) 30:7-11.)

directly relevant information about the negotiations. (*See* Ex. 39 at LBHI_CW-12607-09; Transcript of Deposition of Frank Bartolotta, taken May 7, 2014 ("Bartolotta Tr.") (Ex. 40) 51:2-5; Affidavit of Frank Bartolotta, executed March 27, 2014 ("Bartolotta Aff.") (ECF# 43804-1) (Ex. 41) ¶¶ 1-2.) Apparently, the reason Lehman designated Krasnow as the Rule 30(b)(6) witness about the negotiations (although Krasnow knew nothing) is that the negotiator (Bartolotta) had information that Lehman did not want Canary Wharf to discover.

In March 2014, Mr. Bartolotta, who was at that point a consultant for Morgan Stanley, was in London for a business deal and met with Sir George Iacobescu. (Bartolotta Tr. (Ex. 40) 6:13-16, 11:15-12:8, 13:8-16.) Bartolotta asked Sir George about the litigation between Lehman and Canary Wharf, and they discussed the subject. (*Id.* 12:3-8.) Later, Sir George telephoned Mr. Bartolotta and asked him whether he would speak to Canary Wharf's lawyers about what he remembered about the Lease negotiations. (*Id.* 9:18-10:3.) Mr. Bartolotta then spoke to Canary Wharf's counsel and said that Lehman had agreed during the 2001 negotiations of the Lease to pay the amounts due under the Lease no matter what happened to Lehman Sub. (*Id.* 55:12-58:6, 63:25-65:3.) In the Affidavit to the Court that he submitted shortly thereafter, Mr. Bartolotta swore that during those Lease negotiations, Canary Wharf "insisted that Lehman would be required to pay the rents and other amounts due regardless of whether [Lehman Sub] remained obligated to pay," and that "[i]n the end, Lehman accepted that position." (Bartolotta Aff. (Ex. 41) ¶¶ 5-7.)

Lehman then requested a deposition of Mr. Bartolotta. At his May 2014 deposition, Mr. Bartolotta confirmed that Canary Wharf negotiated hard for, and Lehman ultimately agreed to give, an "absolute promise . . . to pay no matter what might happen to the English subsidiary." (Bartolotta Tr. (Ex. 40) 74:3-75:3.) He was pressed hard by Weil -- but stuck firmly to his

testimony that Lehman had agreed to pay Canary Wharf's losses regardless of what happened to

Lehman Sub.  This directly contradicts Lehman's position in this proceeding.

As Bartolotta testified, the negotiations of the Lease between Lehman and Canary

Wharf began in late 2000 or in 2001.  (Bartolotta Aff. (Ex. 41) ¶ 2.)  Lehman "fought very hard

to limit liability to the English subsidiary," but Sir George of Canary Wharf refused to agree.

(Bartolotta Aff. (Ex. 41) ¶ 5; *see also* Bartolotta Tr. (Ex. 40) 74:3-14 (parties' agreement to

Schedule 4 was result of "a hard fought negotiation over an extended period of time").)

Sir George "insisted that Lehman would be required to pay the rents and other amounts due

regardless of whether [Lehman Sub] remained obligated to pay."  (Bartolotta Aff. (Ex. 41) ¶ 5.)

Bartolotta testified that after Lehman demanded an escalating number of concessions from

Canary Wharf, Sir George became even more insistent that Canary Wharf "could not do the deal

without a complete backup from the parent," and that Lehman's obligation had to be "absolute

and complete" such that Lehman would "stand in no matter what happened to the subsidiary."

(Bartolotta Tr. (Ex. 40) 37:11-19; 62:3-63:2, 63:25-65:3, 66:7-13; *see also* Bartolotta Aff.

(Ex. 41) ¶¶ 5-7.)[5]  Recognizing that Lehman would be unable to close the deal without agreeing

to the absolute assurance on which Canary Wharf insisted, Bartolotta referred the question of

whether to proceed to Lehman's headquarters in New York.  (Bartolotta Tr. (Ex. 40) 14:15-15:3;

Bartolotta Aff. (Ex. 41) ¶ 3.)

Bartolotta testified that Lehman accepted Canary Wharf's position, and "agreed to

stand behind the English subsidiary come hell or high water" and "pay no matter what might

happen to the English subsidiary."  (Bartolotta Tr. (Ex. 40) 71:9-11, 74:19-75:3; *see also*

---

[5]  Canary Wharf's insistence on having Lehman on the hook is hardly surprising.  Lehman Sub
was a wholly owned subsidiary of Lehman (Lehman's Rule 7056-1 Statement at Response
No. 1), and thus Lehman exercised total control over Lehman Sub and its finances.

Bartolotta Aff. (Ex. 41) ¶¶ 5-7.)  As Bartolotta testified, "[w]hether you call it indemnity or guarantee, it didn't matter to me.  The concept is, it's a direct contractual obligation from the parent that could be relied upon no matter what happened to the subsidiary."  (Bartolotta Tr. (Ex. 40) 65:20-25; *see also id.* 62:17-24.)  Schedule 4, which Bartolotta understood as providing for "complete certainty [for Canary Wharf] of income stream going forward," thus was "ultimately delivered to Canary Wharf's satisfaction and the deal was completed."  (Bartolotta Tr. (Ex. 40) 60:16-18, 77:6-13; *see also id.* 78:8-11.)

Thus, both parties' lead negotiators have testified that the parties agreed that Lehman would remain liable even if (indeed, especially if) Lehman Sub would not or could not pay.  This confirms the clear language of Paragraph 1 of Schedule 4 to the Lease, and is 180° opposite of Lehman's position.

### C.    Lehman's Misleading Recitation of Events in 2010 Is Wrong and, in Any Event, Irrelevant.

Paragraph 1 of Schedule 4 is clear, as is the testimony of the Lease negotiators. Instead of addressing these points, Lehman attempts to distract the Court with an inaccurate and misleading account of irrelevant events in 2010, after Lehman Sub defaulted on the Lease. (*See* Lehman Mem. at 8-14; Lehman's Rule 7056-1 Statement at 8-21.)  Lehman's false recitation of those events cannot affect the proper interpretation of Schedule 4, and thus is irrelevant to deciding either party's motion for summary judgment.  Nevertheless, in order to ensure that the Court has the truth, Canary Wharf sets forth the actual facts in Appendix A hereto.  Those facts show that, faced with massive losses when Lehman Sub vacated the property in March 2010 and stopped paying under the Lease, Canary Wharf took steps to mitigate those losses -- to the benefit of both Lehman and Canary Wharf.  None of this can provide any basis for canceling Lehman's promise to indemnify Canary Wharf for the losses it incurred when Lehman Sub defaulted.

**ARGUMENT**

I.    **Schedule 4 Is an Indemnity That Entitles Canary Wharf to
      Summary Judgment on Liability.**

Both parties agree that, under English law, unlike a guarantor whose obligations

are ordinarily "co-extensive" with those of the underlying obligor, an indemnitor has a primary

obligation that does not depend on whether the underlying obligor is liable.  (Lehman Mem. at

23-25 (citing *Vossloh Aktiengesellschaft* v. *Alpha Trains (UK) Ltd.*, [2010] EWHC 2443

(Chancery Division of the High Court of England and Wales)[6]); Canary Wharf Mem. at 13-14.)

Both parties further agree that whether a contract is an indemnity or guarantee depends on "'the

actual words in which the surety's obligation is expressed'" and involves "'construing the

instrument in its factual and contractual context having regard to its commercial purpose.'"

(Lehman Mem. at 23 (quoting *Vossloh*); *see also* Canary Wharf Mem. at 14; Millett Decl.

(Ex. 22) ¶¶ 20, 32; Rabinowitz Report (Ex. 15) ¶ 30.)

The plain language of Paragraph 1 of Schedule 4, and its "factual and contractual

context," supports only one conclusion:  it is an indemnity.  Under Paragraph 1 -- which is entitled

"Indemnity by Surety" -- Lehman must "indemnify" Canary Wharf for all its "losses" and

"damages" that "aris[e] directly or indirectly out of" Lehman Sub's default, regardless of Lehman

Sub's liability.  None of Lehman's arguments come close to overcoming this plain language.

A.    **The Clear Language of Paragraph 1 Provides That
      Lehman Will Indemnify Canary Wharf for Its Losses.**

Lehman is liable for the Claims under Paragraph 1.  That paragraph, entitled

"Indemnity by Surety," contains two independent "primary" obligations from Lehman separated

by the word "and":

---

[6]  An explanation of the English law authorities cited herein is set forth in the footnote to the
Table of Authorities, *supra*.

1.      **Indemnity by Surety**

The Surety hereby covenants with the Landlord and as a separate covenant with the
Management Company as a primary obligation that the Tenant or the Surety shall at all
times until the Tenant shall cease to be bound by the Tenant's covenants in the Lease
during the Term duly perform and observe all the covenants on the part of the Tenant
contained in this Lease including the payment of the rents hereby reserved and all other
sums payable under this Lease in the manner and at the times herein specified **and** the
Surety shall indemnify and keep indemnified the Landlord and the Management
Company against all claims demands losses damages liability costs fees and expenses
whatsoever sustained by the Landlord or the Management Company by reason of or
arising directly or indirectly out of any default by the Tenant in the performance and
observance of any of its obligations or the payment of any rents and other sums . . .

(Lease (Ex. 9) at LBHI_CW-101 (Schedule 4 ¶ 1) (emphasis added).)

In the first obligation (before the bold and underlined "and" above), the "Tenant

or the Surety," *i.e.*, Lehman or Lehman Sub, agreed to "perform and observe all the covenants on

the part of the Tenant contained in this Lease including the payment of the rents hereby reserved

and all other sums payable under this Lease" until "the Tenant shall cease to be bound by the

Tenant's covenants in the Lease . . . ."

The second obligation provides a clear promise by Lehman to "indemnify and

keep indemnified" Canary Wharf "against all claims demands losses damages" that "aris[e]

directly or indirectly out of any default by the Tenant." (Lease (Ex. 9) at LBHI_CW-101

(Schedule 4 ¶ 1); Canary Wharf Mem. at 15 & Appendix A thereto; Rabinowitz Report (Ex. 15)

¶¶ 77-85.) As Canary Wharf's English law expert Laurence Rabinowitz explains, this second

obligation "involves a promise by [Lehman] to indemnify the Claimants against all losses

sustained 'by reason of or arising directly or indirectly out of any default by the Tenant.' These

words import the widest conceivable causal nexus between the default of the Tenant and the

losses sustained by the Claimants." (Rabinowitz Report (Ex. 15) ¶ 81.)[7]  Under the plain language

of Paragraph 1, Lehman thus is liable for the "damages" and "losses" sought in the Claims.

This is the only conclusion consistent with the "factual context" and "commercial

purpose" of the Lease, which Lehman agrees an English court would take into account in

interpreting the Lease.  (*See* Lehman Mem. at 23; Rabinowitz Report (Ex. 15) ¶ 49; *see also* Fed.

R. Civ. P. 44.1.)[8]  Both parties' representatives have testified unequivocally that in the

negotiations Lehman agreed to be independently obligated to pay all amounts due under the

Lease no matter what happened to Lehman Sub.  Sir George testified at deposition that during

those negotiations Lehman agreed to pay the amounts due under the Lease so that Canary Wharf

would receive "an uninterrupted cash flow regardless of anything that goes wrong with the

tenant." (Iacobescu Tr. (Ex. 34) 7:23-8:7, 239:16-241:17.)  This was especially important to

Canary Wharf given that a promise from a wholly owned subsidiary would carry too much risk;

Lehman as the ultimate parent controlled Lehman Sub's finances and very existence.  (*See id.*

240:2-11.)  Further, with the large rent payments under the Lease (on average about $100 million

per year) to be securitized in the form of bonds, Canary Wharf wanted Lehman's credit behind

the bonds.  (*Id.* 241:8-17; Lease (Ex. 9) at LBHI_CW-10 (Lease Particulars ¶¶ 8-12).)[9]  Frank

---

[7]  Millett acknowledged at deposition that Rabinowitz is "very highly regarded in England as a commercial lawyer." (Millett Tr. (Ex. 42) 27:9-17.)  Commercial law, Rabinowitz's "specialist area," includes the law of guarantees and indemnities.  (Rabinowitz Tr. (Ex. 43) 20:22-23:10.)

[8]  Federal Rule of Civil Procedure 44.1 provides, in relevant part:  "In determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence.  The court's determination must be treated as a ruling on a question of law."

[9]  Rental streams from other properties also were securitized in the bonds, but not all those tenants had a surety.  (Ex. 73.)  Rather, those tenants without a surety were parent companies (or otherwise of sufficient credit quality) or only leased a small amount of space.  (*Id.*)

Bartolotta -- who Lehman calls "a former Lehman employee" but never disputes that he was

Lehman's lead negotiator (Lehman Mem. at 35) -- similarly testified that during the negotiations

Canary Wharf had "insisted that Lehman would be required to pay the rents and other amounts

due regardless of whether [Lehman Sub] remained obligated to pay," and that "[i]n the end,

Lehman accepted that position" (Bartolotta Aff. (Ex. 41) ¶¶ 2, 5-7).  As Bartolotta testified,

Lehman "agreed to stand behind the English subsidiary come hell or high water" and made an

"absolute promise . . . to pay no matter what might happen to the English subsidiary."

(Bartolotta Tr. (Ex. 40) 71:9-11, 74:10-75:3.)

Paragraph 1 is an indemnity that requires Lehman to pay Canary Wharf's losses

regardless of what happened to Lehman Sub, including bankruptcy.  There is no dispute that

Canary Wharf sustained large losses arising from Lehman Sub's default.

### B. Lehman's Attempts to Avoid the Clear Language of Paragraph 1 Are Meritless.

#### 1. Lehman's New Argument Is Contrary to the Contract and English Law.

From the time Lehman filed the Objection in August 2012 until May 22, 2014,

Lehman did not dispute that it is liable for the Claims if Schedule 4 is an indemnity.  Lehman

and its expert Millett had instead argued that Schedule 4 was a guarantee because the phrase

"until the Tenant shall cease to be bound" in the first obligation in Paragraph 1 of Schedule 4

somehow should be read to apply to the second obligation as well.  (Objection ¶ 21; Reply ¶¶ 4,

25(i), 27-28; Millett Decl. (Ex. 22) ¶¶ 38(4), 65, 68-72 ("Paragraph 1 is a single covenant

comprising a single obligation."); Millett Tr. (Ex. 42) 147:4-23.)[10]  Now, faced with testimony

---

[10]  Indeed, in Millett's January 2013 declaration, he devoted more than nine pages to explain his opinion that Schedule 4 is a guarantee.  (*See*, *e.g.*, Millett Decl. (Ex. 22) at 6, 14-19, 30-31 (¶¶ 19(ii), 37-38, 68-72).)

from its own negotiator, Bartolotta, that is completely at odds with its old position, Lehman

creates a new principal argument that it had never before made.  (Lehman Mem. at 22-23.)  Had

there been any merit to this argument -- and there is not -- Lehman and Millett would surely have

raised it before.  They never did; and they never explain their drastic change in position.[11]

        Lehman argues that because Lehman Sub "had no obligation to pay rent to

Canary Wharf following the forfeiture," Lehman Sub "could not be in 'default' on any such

obligation, and [Lehman]'s surety obligations with respect to such post-forfeiture 'defaults'

never arose."  (Lehman Mem. at 22.)  But this is not what Paragraph 1 of Schedule 4 requires.

Paragraph 1 provides that Lehman will pay Canary Wharf's "losses" and "damages" "by reason

of or arising directly or indirectly out of any default by" Lehman Sub.  (Lease (Ex. 9) at

LBHI_CW-101 (Schedule 4 ¶ 1).)  When Lehman Sub vacated 25 Bank Street and stopped

paying rent or any of the other amounts due under the Lease, Canary Wharf suffered losses.

Schedule 4 does not require that Lehman Sub also be liable for those "losses" and "damages";

indeed, that was the point of agreeing to a "hell or high water" obligation to pay regardless of

what happened to Lehman Sub.  Under the language actually used in Schedule 4, Lehman is

liable.  (Declaration of Laurence Rabinowitz, executed June 25, 2014 ("Rabinowitz Summary

Judgment Decl.") ¶¶ 6-13, 77(1); *see also* Rabinowitz Report (Ex. 15) ¶¶ 87-88.)[12]

        Lehman's argument also is based on its false assertion that the amounts sought by

Canary Wharf are for "post-forfeiture rent."  (*See* Rabinowitz Summary Judgment Decl. ¶ 8.)

---

[11]  Millett never explains why he never thought to mention the new argument before.  (*See* Declaration of Richard Millett, executed May 22, 2014 (ECF# 44408) ("Millett Summary Judgment Decl.") ¶ 27.)  The argument was apparently developed by Lehman after the testimony by Bartolotta -- and Canary Wharf's opening brief -- showed the old argument to be meritless.

[12]  Because Lehman and Millett only recently raised this new theory, Canary Wharf's English law expert, Rabinowitz, did not have an opportunity to address it in his July 2013 expert report (Exhibit 15).  Canary Wharf files herewith a Declaration from Rabinowitz addressing this new theory and several other new contentions by Millett and Lehman.

Lehman's liability under Paragraph 1 here arises out of Lehman Sub's pre-forfeiture default. (Rabinowitz Report (Ex. 15) ¶ 87.)  Lehman does not dispute that Lehman Sub's default occurred in March 2010 when Lehman Sub vacated the property and refused to pay any amounts due under the Lease.  (*See* Lehman's Rule 7056-1 Statement at Response No. 8.)  The indemnity obligation arose from that time -- Lehman agreed to pay all losses and damages arising directly or indirectly out of that default.  (Rabinowitz Summary Judgment Decl. ¶¶ 7-11.)  Lehman's reliance on the Lease's forfeiture in December 2010 is thus meritless.  The forfeiture in December 2010 -- which was necessary for Canary Wharf to mitigate its damages for the benefit of it and Lehman -- does not break the chain of causation between Lehman Sub's default and the amounts sought by Canary Wharf.  But for the default, Canary Wharf would not have suffered the losses and damages sought in the Claims.  (Rabinowitz Summary Judgment Decl. ¶¶ 12-13.)

### 2.    Paragraph 1 Provides for an Indemnity, Not a Guarantee.

Perhaps in recognition that its newly developed argument (never mentioned by Lehman or Millett in all the time in which Lehman has been fighting Canary Wharf's Claims) cannot succeed, Lehman also sets forth its old argument:  Paragraph 1 should be construed as a guarantee.  However, the plain text of the provision, its title, and the testimony of the negotiators all say otherwise.

Even in making its old argument that Schedule 4 is a guarantee, Lehman retreats from its prior contentions and instead relies on a new ground.  In its August 15, 2012 Objection and its January 10, 2013 Reply in Support of the Objection, Lehman argued that its obligations are co-extensive with Lehman Sub's because the phrase "until the Tenant shall cease to be bound" applies to, and modifies, the second obligation in Paragraph 1 ("the Surety shall indemnify and keep indemnified . . .").  (Objection ¶ 21; Reply ¶¶ 4, 25(i), 27-28; Millett Decl. (Ex. 22) ¶¶ 38(4), 65, 68-72 ("Paragraph 1 is a single covenant comprising a single obligation.");

-15-

Millett Tr. (Ex. 42) 147:4-23.)  Even Millett conceded at deposition that "[t]here are no express words in paragraph one or Schedule 4 or to the extent that I have reread it again, which is not much, the lease, which tells you that you have to read paragraph one in the way that I believe it should be read." (Millett Tr. (Ex. 42) at 163:9-164:4.)

Lehman no longer asserts that Paragraph 1 is a single obligation, in effect conceding that Paragraph 1 provides for two separate, independent obligations.  Lehman claims instead that whether Paragraph 1 is "deemed to comprise one obligation or two," both portions of Paragraph 1 "are substantively the same." (Lehman Mem. at 26 n.28, 28-29.)  This new contention is also wrong.  In the Lease, Lehman agreed (i) to perform the covenants in the Lease so long as Lehman Sub is bound by the Lease (the first obligation) *and* (ii) to pay the losses arising directly or indirectly from any Lehman Sub default whether Lehman Sub is still bound or not (the second). (Lease (Ex. 9) at LBHI_CW-101 (Schedule 4 ¶ 1); *see also* Rabinowitz Summary Judgment Decl. ¶ 39.)  Lehman's argument would render the second obligation superfluous, which Lehman admits is "an outcome that English courts avoid." (Lehman Mem. at 29.)

That Paragraph 1 is an indemnity, not a guarantee, is clear for other reasons as well.  *First*, the first obligation in Paragraph 1 provides that either "the Tenant *or* the Surety shall" perform the covenants in the Lease until the Tenant shall cease to be bound. (Lease (Ex. 9) at LBHI_CW-101 (Schedule 4 ¶ 1) (emphasis added).)  Lehman agreed to perform the covenants of the Lease itself; even the first obligation of Paragraph 1 is not limited, as Lehman argues (Lehman Mem. at 25-26), to the situation where Lehman will perform only "if LBL [*i.e.*, Lehman Sub] does not." (Rabinowitz Report (Ex. 15) ¶ 48(3).)  Thus, Lehman's obligation is primary, the hallmark of an indemnity. (*Id.* ¶ 46; *see also* Millett Tr. (Ex. 42) 109:21-110:8.)

-16-

*Second*, Lehman agreed in the second obligation to pay as "a primary obligation" the "losses" and "damages" "whatsoever sustained" by Canary Wharf "by reason of or arising directly or indirectly out of any default by the Tenant." No language in Paragraph 1 requires that Lehman Sub fail to pay those "losses" or "damages"; Lehman thus must pay *regardless* of whether Lehman Sub fails to do so. This is an indemnity. (Rabinowitz Summary Judgment Decl. ¶¶ 16-20; *see also* Millett Decl. (Ex. 22) at 13 (an indemnity "'makes clear that the liability of the surety was intended to continue regardless of the liability of the principal'" (quoting *Vossloh*)).) That the triggering event occurs on Lehman Sub's default (Lehman Mem. at 26) is irrelevant for purposes of determining whether it is an indemnity or guarantee. What is indicative of a guarantee is when "the recoverability of the loss from the surety is dependent on the underlying obligor also being *liable* for the same loss, i.e. whether the liability of the surety and the underlying obligor are co-extensive." (Rabinowitz Summary Judgment Decl. ¶ 19 (citing *Clement* v. *Clement* (Court of Appeal of England and Wales, Oct. 20, 1995) (unreported) (Ex. 26)); Rabinowitz Tr. (Ex. 43) 46:9-22.) That is not what Paragraph 1 provides.

*Third*, the parties' chosen title for Paragraph 1 could not be clearer: "Indemnity by Surety." Similar wording is then included in the second obligation of Paragraph 1: "the Surety shall indemnify and shall keep indemnified." Millett admitted in his declaration that the "labels that the parties use can be a useful guide, particularly if they are repeated." (Millett Decl. (Ex. 22) ¶ 32.) Lehman now, however, asks the Court to ignore Paragraph 1's title by claiming that the Lease states that titles "are for reference only and shall not affect its construction." (Lehman Mem. at 27 (citing Lease § 2.7).) This is misleading. The Lease actually states that titles may be considered and affect construction where "context otherwise requires." (Ex. 9 at

LBHI_CW-20-21 (§§ 2, 2.7).)[13]   Further, as Rabinowitz explains, recent English cases confirm

that labels "are important indicators of what the parties intended." (Rabinowitz Summary

Judgment Decl. ¶ 15 (citing *ABM Amro Commercial Finance plc* v. *McGinn* [2014] EWHC 1674

(Queen's Bench Division (Commercial Court) of the High Court of England and Wales)

(Ex. 27)).)  Here, the parties' intent could not be clearer:  Paragraph 1 of Schedule 4 is an

"Indemnity by Surety."[14]

       Lehman also argues that "indemnity" has two meanings:  "pay in full, *i.e.* hold

harmless" or "a contract of indemnity." (Lehman Mem. at 27; Millett Summary Judgment Decl.

¶ 14.)  The title, "Indemnity by Surety," does not make sense unless it means "a contract of

indemnity."[15]   Further, whether the terms "indemnify" and "indemnified" in the second

obligation of Paragraph 1 mean "pay in full" or "a contract of indemnity" matters not at all.

(Rabinowitz Summary Judgment Decl. ¶¶ 21-23.)  These terms are understood by English courts to

mean the same thing under English law.  (*Id*. ¶¶ 21-22.)  And in any event, the contract says that

Lehman has a primary obligation to pay Canary Wharf's losses.

---

[13]  Section 2.7 of the Lease states:  "UNLESS the context otherwise requires:  . . . the titles and headings appearing in this Lease are for reference only and shall not affect its construction." (Ex. 9 at LBHI_CW-20-21 (§§ 2, 2.7).)

[14]  Post-contract references to Schedule 4 as a "Guarantee" (*see* Lehman Mem. at 27) are irrelevant in construing the Lease or Schedule 4.  In any event, the terms "Guarantor" and "Guarantee" are often used colloquially to include both guarantees and indemnities without regard to any legal significance.  (*See, e.g.*, Millett Tr. (Ex. 42) 102:10-105:7, 169:7-16 (acknowledging that his treatise, entitled *Law of Guarantees*, also includes the law on indemnities and conceding that "[i]t's not unusual to find the term 'guarantee' used loosely to describe what is, in reality, an indemnity"); Rabinowitz Tr. (Ex. 43) 13:2-4 (explaining that the law of guarantees includes the law of indemnity); Kendall Tr. (Ex. 44) 166:11-24.)

[15]  The fact that the parties entitled Section 14.1 of the Lease "Covenant by Landlord's Guarantor" further shows that Paragraph 1 of Schedule 4 is (as its title says) a "contract of indemnity."  (*Cf.* Lehman Mem. at 27-28.)

*Fourth*, the testimony is clear that Lehman agreed to remain liable regardless of what happened to Lehman Sub. *See* pp. 5-9, *supra*. Lehman asks the Court to disregard this unequivocal testimony by claiming that neither Sir George nor Mr. Bartolotta "participated in the negotiations over the Surety Agreement and both have no knowledge as to what the parties discussed in relation to the Surety Agreement." (Lehman Mem. at 35; *see also id.* at 8.) This is nonsense. Sir George on behalf of Canary Wharf and Mr. Bartolotta on behalf of Lehman negotiated the commercial terms of the deal between Canary Wharf and Lehman (*see* pp. 5-9, *supra*) and Lehman does not dispute that fact. Lehman has no evidence that the lawyers who drafted the Lease changed the business arrangement to which the parties had agreed. Indeed, in response to Canary Wharf's Rule 30(b)(6) notice, Lehman produced Krasnow, a Weil lawyer, who said that he knew nothing about the negotiations. (Krasnow Tr. (Ex. 38) 29:4-30:11.) The "commercial background" thus is wholly consistent with, and confirms, the clear language of the Lease: Schedule 4 is an indemnity by Lehman in which it agreed to pay Canary Wharf's "losses" no matter what happened to Lehman Sub.[16]

### 3. *Contra Proferentem* Has No Application Here.

In a further effort to avoid the clear terms of Paragraph 1, Lehman argues that the *contra proferentem* principle, which Lehman concedes is relevant only if the terms of a contract are ambiguous, should be applied against Canary Wharf. (Lehman Mem. at 37-38; Millett Tr. (Ex. 42) 46:12-16 (*contra proferentem* "only comes into play when a court is unable to decide which

---

[16] Lehman implies that Mr. Bartolotta's testimony should be discounted because he has known Sir George professionally and socially. (Lehman Mem. at 37 n.38.) Lehman took the deposition of Mr. Bartolotta and crossed him extensively, and developed no evidence that Bartolotta, a member of the Bar of the State of New York, was influenced in any way, shape or form by his social interactions with Sir George or received any sort of *quid pro quo* for his testimony. (*See, e.g.*, Bartolotta Tr. (Ex. 40) 52:17-54:18, 55:12-58:13, 68:12-69:2, 69:21-70:6, 72:5-73:11.)

of two meanings is the right one"); Rabinowitz Report (Ex. 15) ¶ 33.)  But Paragraph 1 (or more

broadly, Schedule 4) is not ambiguous; it clearly provides that Lehman indemnified Canary Wharf.

In any event, as Rabinowitz explains, *contra proferentem* is "a largely irrelevant

doctrine [under English law], certainly in commercial contracts between two sophisticated

commercial parties."  (Rabinowitz Tr. (Ex. 43) 30:6-16, 31:17-32:2; *see also* Rabinowitz Report

(Ex. 15) ¶ 33 (explaining that *contra proferentem* "is 'of uncertain application and little utility in

the context of commercially negotiated agreements'" (quoting *CDV Software Entertainment AG*

v. *Gamecock Media Europe Ltd.*, [2009] EWHC 2965 (Chancery Division of the High Court of

England and Wales) (Ex. 28)); Millett Tr. (Ex. 42) 63:10-65:5 ("[W]here both parties, under

equal bargaining power, have sat opposite each other and thrashed out by commercial

negotiation the terms of the contract, then, as a general proposition, there is less rather than more

room for the application of the [*contra proferentem*] principle.").)  Here, Lehman and Canary

Wharf were undeniably sophisticated parties and negotiated the terms of the Lease with the

assistance of experienced counsel.  (*See*, *e.g.*, Millett Tr. (Ex. 42) 66:21-68:4, 180:7-8;

Rabinowitz Tr. (Ex. 43) 31:17-32:1; Iacobescu Tr. (Ex. 34) 20:18-21:2, 251:4-7.)

4.      **The Parties' Post-Contract Negotiations Are of No Help to Lehman.**

Lehman also argues (Lehman Mem. at 38-39) that Canary Wharf does not believe

Paragraph 1 is an indemnity because Canary Wharf pursued an alternative ground for its Claims

in 2010.  This also makes no sense.  By sending several emails in December 2010 (Ex. 18),

Canary Wharf made sure that it had a second ground for its Claims -- adding a belt to the

existing suspenders -- when Lehman confirmed that it would not and could not enter a new lease

under Paragraph 7 of Schedule 4 (Ex. 18 at LBHI_CW-1; *see also* Deposition of Daniel Ehrmann,

managing director at Lehman's restructuring firm, Alvarez & Marsal, and Lehman's lead

negotiator in the 2010 settlement discussions with Canary Wharf, taken June 27, 2013

-20-

("Ehrmann Tr.") (Ex. 45) 134:24-136:3).  *See also* Appendix A at A-5.[17]  Lehman itself now

offers alternative arguments in its cross-motion for summary judgment (Lehman Mem. at 22-34),

but would probably not concede that such an approach shows that it believes the first argument

to be a loser.  In any event, the parties' negotiations about a possible settlement of the Claims in

2010 -- more than five years after the Lease was executed -- do not bear on a proper

interpretation of Schedule 4.

      If anything, it is Lehman's 2013 conduct that demonstrates the weakness of its

position under English law.  At Judge James M. Peck's suggestion, Canary Wharf proposed to

Lehman on February 1, 2013 that the parties resolve the liability issues in this litigation by

arbitration in London before an English law expert.  (January 16, 2013 Transcript (Ex. 46) at

17:7-14; Ex. 47.)  Lehman rejected Canary Wharf's proposal on February 5, 2013 (Ex. 48),

perhaps because it recognized that its confusing and inconsistent arguments about English law

would not pass scrutiny before a neutral English law expert.[18]

### C.    Other Provisions of the Lease and Schedule 4 Further Show That Schedule 4 Is an Indemnity.

      In its March 2014 opening brief, Canary Wharf demonstrated that multiple other

provisions of the Lease and Schedule 4 provide additional clear evidence that Lehman agreed to

---

[17]  Had Lehman agreed in December 2010 to enter the new lease, Lehman would have been on the hook for all the amounts due under the Lease.  *See* Appendix A at A-5.  Lehman instead repudiated that obligation in a December 9, 2010 email saying that Lehman "would not elect to enter into a lease for the premises on the same terms as the current CW/LBL lease [*i.e.*, the Lease]."  (Ex. 18 at LBHI_CW-1; Rabinowitz Report (Ex. 15) ¶¶ 102-12.)

[18]  Here, of course, the Court may determine English law.  Federal Rule of Civil Procedure 44.1 provides, in relevant part:  "In determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence.  The court's determination must be treated as a ruling on a question of law."

a primary obligation to indemnify Canary Wharf.  (Canary Wharf Mem. at 17-18.)  Lehman

misreads these provisions and cites others (Lehman Mem. at 28-29, 31-34), but none of them

help Lehman in any way.

*Other Lease Provisions.*  Most fundamentally, Section 10 of the Lease -- entitled

"THE SURETY'S COVENANTS" -- states that Lehman agrees to "Schedule 4" as "a primary

obligation."  (Lease (Ex. 9) at LBHI_CW-77 (§ 10).)  Lehman provides no reason why the Court

should ignore this clear statement that Schedule 4 is an indemnity.  (Lehman Mem. at 31 n.33.)[19]

Section 14 of the Lease (*see* Lehman Mem. at 29-30) is also instructive.  Section

14 sets forth the obligations of Canary Wharf's "Guarantor" (a Canary Wharf affiliate) and

Section 14.1 is entitled "Covenant by Landlord's Guarantor."  (Lease (Ex. 9) at LBHI_CW-79

(§ 14.1).)  Of course, Paragraph 1 of Schedule 4 is -- in contrast -- entitled "Indemnity by

Surety."  It is also noteworthy that the indemnity says that Lehman "shall indemnify and keep

indemnified . . ." and that the guarantee (Section 14) contains no such language.  (*Compare*

Lease (Ex. 9) at LBHI_CW-79 (§ 14.1) *with id.* at LBHI_CW-101 (Schedule 4 ¶ 1).)  Lehman

provides no reason for ignoring those key additional words in Paragraph 1 of Schedule 4.  (*See*

Rabinowitz Summary Judgment Decl. ¶¶ 30-44.)[20]

---

[19]  As Rabinowitz explains, the case law that Millett cites in his most recent declaration to argue
that the term "primary obligation" does not change "a guarantor into an indemnitor" (Millett
Summary Judgment Decl. ¶¶ 16-25) is entirely inapposite (Rabinowitz Summary Judgment Decl.
¶¶ 24-25).  Indeed, Millett conceded at deposition that the use of the term "primary obligation" is
relevant, explaining that "one has to assume that when the parties chose to use the words, they
did so with some kind of purpose in mind."  (Millett Tr. (Ex. 42) 116:19-117:2.)

[20]  Lehman argues that the differences between Section 14.1 and Paragraph 1 of Schedule 4
simply reflect that Lehman Sub "assumed numerous, substantial obligations to pay money to
Canary Wharf" (Lehman Mem. at 30), but this further supports Canary Wharf's position.  It is
exactly because of these "numerous, substantial obligations" that Canary Wharf sought and
obtained a primary obligation from Lehman to indemnify it.

Lehman also seeks to rely on Section 4.32, entitled "Indemnity," which requires Lehman Sub "[t]o keep [Canary Wharf] fully indemnified from and against all actions proceedings claims demands losses costs expenses damages and liability arising from any breach of the Tenant's covenants or other obligations contained in or ancillary to this Lease . . . ." (Lehman Mem. at 28; Lease (Ex. 9) at LBHI_CW-24, LBHI_CW-49.)  It is notable that Section 4.32 requires indemnification only for damages "arising from" the Tenant's breach -- while Paragraph 1 of Schedule 4 contains the broader phrase "by reason of or arising directly or indirectly."  Additionally, in contrast to Section 4.32, Paragraph 1 provides indemnification for "all claims demands losses damages liability costs fees and expenses *whatsoever*."  (Lease (Ex. 9) at LBHI_CW-101 (Schedule 4 ¶ 1) (emphasis added).)  This broader language of Paragraph 1 emphasizes that it is an indemnity (Rabinowitz Summary Judgment Decl. ¶ 45), and requires more than just the narrower form of indemnification that Lehman argues applies to Section 4.32 (Lehman Mem. at 28).

**Other Provisions in Schedule 4.**  None of the other paragraphs of Schedule 4 help Lehman at all, and several of them show that Schedule 4 is an indemnity.  (Lease (Ex. 9) at LBHI_CW-101-03 (Schedule 4 ¶¶ 2-10).)  For example:

- Paragraph 6 confirms that certain events will not "release discharge or in any way lessen or affect" Lehman's liability, consistent with the principle that Lehman's and the tenant's obligations are not co-extensive.  (Rabinowitz Summary Judgment Decl. ¶ 28; Rabinowitz Report (Ex. 15) ¶ 48(6).)

- Paragraph 2 provides that Lehman is "jointly and severally liable" for Lehman Sub's obligations (in other words, Lehman is a primary obligor), and English courts have held that an indemnitor may have joint liability with an underlying obligor.  (Rabinowitz Summary Judgment Decl. ¶ 26.)  Millett's treatise recognizes this same point.  (*Law of Guarantees* (Ex. 33) at 12.)

- Paragraph 7, which allows Canary Wharf to demand that Lehman enter into a new lease "at the same rents and subject to the same covenants conditions and provisions as are contained in this Lease" in the event of a forfeiture -- contains primary obligations that are not co-extensive with Lehman Sub's, as Lehman

admits: "[T]he guarantor's liability is co-extensive with and no greater than the primary obligor's unless specifically otherwise provided by contract, as for example in Paragraph 7" of Schedule 4.  (Lehman Mem. at 24.)[21]

- Paragraph 3 (which waives any right Lehman may have to require Canary Wharf first to bring suit against Lehman Sub) says nothing about whether Schedule 4 is a guarantee or an indemnity because it is superfluous in either case under English law.  (Rabinowitz Summary Judgment Decl. ¶ 27.)

- Paragraph 8's title "Benefit of guarantee and indemnity" at most indicates "that the contract contained *both* a guarantee *and* an indemnity."  (Rabinowitz Report (Ex. 15) ¶ 48(7).)

- Paragraph 10's reference to a "Guarantor" refers to a "guarantor" obligation found in Clause 4.21.2(b)(i) and thus a different set of obligations than those found for the Surety in Schedule 4.  (Lease (Ex. 9) at LBHI_CW-42.)

Schedule 4 thus provides for several obligations by Lehman that are not co-extensive with Lehman Sub's liability.  Schedule 4 is an indemnity.

## II.    Even If Schedule 4 Were a Guarantee, Lehman Would Still Be Liable.

Lehman is also liable for the Claims for a separate and independent reason.  As Lehman concedes, Lehman Sub vacated the building and stopped paying the amounts due under the Lease as of March 2010.  (Lehman's Rule 7056-1 Statement at Response No. 8.)  This constituted a repudiatory breach of the Lease under English law and gives rise to a claim for damages against Lehman Sub.

Lehman does not dispute that under English law, an obligor's failure to make installment payments constitutes a repudiatory breach of its obligations under a contract.

---

[21]  Lehman argues that Paragraph 7 would be superfluous if Paragraph 1 were an indemnity. (Lehman Mem. at 33.)  This is incorrect.  The additional remedies provided to Canary Wharf in Paragraph 7 are different from those in Paragraph 1.  For example, by giving Canary Wharf the right to require Lehman to enter into a new lease on the same terms as the Lease, Paragraph 7 allows Canary Wharf not to have to market the property and try to attract prospective tenants. Another example is that Paragraph 7(b) provides Canary Wharf with liquidated damages without the need to prove damages or take any steps to mitigate as required by Paragraph 1.  *See also* Rabinowitz Report (Ex. 15) ¶¶ 91-101.

(*Compare* Canary Wharf Mem. at 20 *with* Lehman Mem. at 16-21.)  Lehman also does not

dispute that upon a repudiatory breach, the wronged party may terminate the contract and

recover the remaining value of the unperformed portions of the contract from both the breaching

party and its surety.  (*See*, *e.g.*, Millett Decl. (Ex. 22) ¶ 78.)  The 1981 decision of the House of

Lords (then England's highest court) in *National Carriers* v. *Panalpina (Northern)*, [1981] AC

675 (Ex. 29), decisively rejected the proposition that a lease for property is not a commercial

contract under English law.  (Rabinowitz Summary Judgment Decl. ¶ 54.)  Indeed, Millett

admits that "the modern view is that the doctrine of repudiation does apply to leases."  (Millett

Decl. (Ex. 22) at 29 n.30.)  And "once it is accepted that a lease <u>is</u> a contract, there is no reason

why damages should not accrue upon forfeiture in the same way as they do upon termination of

any other contract for repudiatory breach."  (Rabinowitz Summary Judgment Decl. ¶ 55.)

       Much of Lehman's argument to the contrary derives from its effort to confuse two

separate principles:  (i) a landlord's ability to collect rent from a tenant on an ongoing basis (*e.g.*,

the first of every month) after it has terminated the lease for nonpayment (*e.g.*, by forfeiture); and

(ii) a landlord's right to recover damages from a tenant after the tenant's repudiatory breach of a

lease. (Rabinowitz Summary Judgment Decl. ¶ 50.)[22]  The former -- the so-called "centuries-

old" principle of English law (Lehman Mem. at 16-18) -- is not at issue here.  Canary Wharf is

not contending that rent can be collected on an ongoing basis from a tenant after forfeiture.

---

[22]  Lehman also argues in a footnote that "when a lease is terminated by forfeiture, the tenant's *and surety's* obligations thereupon cease" (Lehman Mem. at 16 (emphasis added)), citing a single case for support (*id.* at 19 n.25).  To the extent Lehman is arguing that the forfeiture terminated all of its obligations, it is wrong.  The case cited by Lehman -- *Active Estates Ltd.* v. *Parness*, [2002] EWHC 893 (Chancery Division of the High Court of England and Wales) (Lehman Mem. at 19 n.25) -- did not concern a repudiatory breach by the tenant for which the landlord sought damages for lost future rent, and it concerned a guarantor, not an indemnitor, trying to enforce a provision that is not at all similar to Paragraph 1.  (Rabinowitz Summary Judgment Decl. ¶ 76.)

Rather, it is the second principle -- the right to damages (calculated after any mitigation

transaction) -- that is at issue.  No English court has rejected a landlord's right to recover for

damages resulting from a tenant's repudiatory breach of a lease.

The decision of the Court of Appeal of England and Wales in *Reichman* v.

*Beveridge*, [2006] EWCA Civ 1659 (Ex. 24), the case relied on by Lehman and Millett (Lehman

Mem. at 17, 20), held only that it was not "wholly unreasonable" for a landlord to decide that it

would *not* forfeit a lease as a result of a tenant's default.  *Reichman* (Ex. 24) ¶ 42.  (Here, of

course, Canary Wharf did forfeit the Lease.)  In dicta, the *Reichman* court questioned whether "a

landlord can recover damages from a former tenant in respect of loss of future rent after termination,"

but made clear that it would "not decide" the question of whether a tenant may repudiate a lease

-- let alone the question of the damages available to the landlord from a repudiatory breach --

because it was "not directly in issue."  *Reichman* (Ex. 24) ¶ 42; Rabinowitz Summary Judgment

Decl. ¶¶ 58-62.[23]

By contrast, the case relying on English law that directly decides the question is

*Rainey Brothers Ltd.* v. *Kearney*, [1990] NI 18 (Northern Ireland Court of Appeal) (Hutton, C.J.)

(Ex. 25).  In *Rainey Brothers*, the Northern Ireland Court of Appeal held that "a lessor who

terminates a lease for non-payment of rent may recover damages to compensate him for the loss

of rent which would have been payable under the lease," and concluded that the landlord could

---

[23]  *In Re Park Air Services Plc*, [2000] 2 AC 172 (House of Lords) (*see* Lehman Mem. at 18-19)
did not consider the question of whether a landlord is entitled to damages upon forfeiture of a
lease for repudiatory breach.  Rather, the issue in *Park Air Services* involved whether, under a
statute, future rent was due to a landlord as compensation for a disclaimer of a lease after
insolvency.  Unless the lease says otherwise, insolvency does not constitute a repudiatory breach
of the lease under English law at all.  Thus, discussion of termination after insolvency like that in
*Park Air Services* says nothing on the issue of whether future rent is available in the form of
damages after a repudiatory breach.  (Rabinowitz Summary Judgment Decl. ¶¶ 69-74.)

recover damages for the loss of rent between termination and the granting of the new lease as well as the difference between the new and old leases' rent. *Id.* at 19-20; *see also* Canary Wharf Mem. at 21-22; Rabinowitz Summary Judgment Decl. ¶¶ 57, 63-67. In so holding, the *Rainey Brothers* court relied on clear English law authority going back more than a century. In particular, the King's Bench Division of the High Court of England and Wales in *Gray* v. *Owen*, [1910] 1 KB 622 (Ex. 30) squarely decided -- based on what it described even in 1910 as "ordinary principles" -- that upon a breach by a tenant, a landlord may terminate the lease and recover damages for the rent that would have been collected but for the termination. (*See* Rabinowitz Summary Judgment Decl. ¶ 65 n.4.) Similarly, the Queen's Bench Division of the High Court of England and Wales in 1898 awarded a landlord damages for rent lost as a result of a tenant's breach. *Marshall* v. *Mackintosh*, (1898) 78 LT 750 (Ex. 31); *see also* Rabinowitz Summary Judgment Decl. ¶ 65 n.4. Lehman does not dispute that *Rainey Brothers* applied English law and relied on English law cases, that its holding is consistent with the law in other common-law jurisdictions, and that English courts give great deference to the courts of Northern Ireland.[24]

Under English law, a tenant's failure to pay rent constitutes a repudiatory breach of a lease that gives rise to the same consequences that -- as both parties agree -- apply to other commercial contracts. Canary Wharf thus may recover as damages from Lehman the difference between the rent which would have been payable under the Lease and the amounts it has received through mitigation. (Rabinowitz Summary Judgment Decl. ¶¶ 57, 63-67, 75(3).)

---

[24] Further, the fact that Lord Hutton, the author of the *Rainey Brothers* decision, was later elevated in 1997 to England's then-highest court (the House of Lords) would "undoubtedly enhance the authority of his judgment in <u>Rainey</u> in the eyes of any English court." (Rabinowitz Summary Judgment Decl. ¶ 64.)

### III.    Lehman's Argument That a Material Variation Discharged Its Obligations Fails as a Matter of Law.

Lehman also argues that it should not owe Canary Wharf anything because releases of Lehman Sub in the December 2010 Forfeiture Letter between Lehman Sub, its administrators and Canary Wharf (Ex. 16) constitute a "material variation" of the Lease (Lehman Mem. at 39-41).  The parties agree that a material variation does not discharge the obligations of an indemnitor.  (Lehman Mem. at 24 n.27; Millett Decl. (Ex. 22) at 11 n.8; Millett Tr. (Ex. 42) 107:3-14.)

Further, even if Lehman were merely a guarantor, Paragraph 6 of Schedule 4 forecloses Lehman from its "material variation" argument.  Paragraph 6(d) states that, subject to a statute not applicable here, "any variation of the terms of this Lease" does not "release discharge or in any way lessen or affect the liability" of Lehman.  (Lease (Ex. 9) at LBHI_CW-101 (Schedule 4 ¶ 6(d)).)  Additionally, Paragraph 6(g) adds that no "other act omission matter or thing whatsoever" does not release or otherwise discharge Lehman.  (*Id.* ¶ 6(g).)  Millett concedes that Paragraph 6 "may show that it was intended that the liability of the obligor should continue regardless of what might happen to the principal debtor."  (Millett Tr. (Ex. 42) 196:19-24.)

Lehman nevertheless now argues that Paragraph 6(d) does not apply because the Forfeiture Letter allegedly varied Lehman Sub's "obligation to perform" without modifying the Lease's "terms," and that Paragraph 6(g) does not apply because "English courts resist reliance on catch-all provisions, such as paragraph 6(g), . . . unless the provision contains sufficiently clear and unambiguous language to that effect."  (Lehman Mem. at 40.)  This interpretation of Paragraph 6(d) would be rejected by an English court as wholly "illogical and uncommercial." That provision is unambiguous and should be applied as written.  (Rabinowitz Report (Ex. 15)

¶¶ 51-57.)  Paragraph 6(g) is clear that no "other act omission matter or thing whatsoever" can release Lehman from its obligations under Schedule 4.  (Lease (Ex. 9) at LBHI_CW-101 (Schedule 4 ¶ 6(g).)  Indeed, at deposition, Millett conceded that a material variation would not discharge Lehman based on the plain terms of Paragraph 6(g).  (Millett Tr. (Ex. 42) 259:16-260:14.)

Moreover, there is no "material variation" under English law at all.  Lehman argues that the December 2010 Forfeiture Letter "materially increased [Lehman's] exposure" by "foisting" a portion of the rent owed to Canary Wharf as an administrative expense by Lehman Sub onto Lehman.  (Lehman Mem. at 39-40.)  This plainly contradicts the law as stated in Millett's own treatise:  "[A] variation which merely affects the amount of the surety's ultimate liability, but which leaves the risk of default by the principal unchanged . . . will not be material."  (*Law of Guarantees* (Ex. 33) at 407.)  Further, the Forfeiture Letter merely settled a claim estimated in 2010 to be £2.6 million (Ex. 49 at CW-18843; Appendix A at A-4)[25] for £1.5 million (Ex. 16 at 1-2), and such a *de minimis* difference cannot amount to the "prejudice" that Lehman claims.[26]

---

[25]  Under *Goldacre (Offices) Ltd.* v. *Nortel Networks UK Ltd.*, rent is payable as an administrative expense only during the period when the administrators, not their subtenants, are occupying the premises.  [2009] EWHC 3389 (Chancery Division of the High Court of England and Wales) (Ex. 32) ¶ 2; Rabinowitz Report (Ex. 15) ¶ 59.  Therefore, Canary Wharf could seek from Lehman Sub the amounts due as an administrative expense only through March 31, 2010, the end of the period when the administrator occupied the premises.  (Lehman's 7056-1 Statement of Facts at Response No. 7.)  Lehman Sub disputed that any of the amounts were recoverable as an administrative expense.  (Ex. 49 at CW-18843.)

[26]  Millett also concedes that "if [a] release is only of a portion of the entire debt outstanding under the principal contract, then there will not be a full discharge of the surety."  (Millett Tr. (Ex. 42) 251:21-252:5.)

## CONCLUSION

This Court should grant summary judgment to Canary Wharf and deny Lehman's cross-motion. At its core, Lehman's position is that Canary Wharf's mitigation conduct in December 2010 -- conduct that was to the benefit of both sides -- should cancel Lehman's promise to indemnify Canary Wharf for its losses arising from Lehman Sub's default. Neither the contract nor English law nor common sense provides any support for that position.

Dated:   June 26, 2014

Respectfully submitted,

/s/ David B. Tulchin
David B. Tulchin
Marc De Leeuw
John J. Jerome
Andrew E. Gelfand
John G. McCarthy
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Tel:  (212) 558-4000
Fax:  (212) 558-3588

*Attorneys for Canary Wharf Management Ltd.,
Heron Quays (HQ2) T1 Limited and Heron Quays
(HQ2) T2 Limited*

-30-

### APPENDIX A -- THE UNDISPUTED (AND IMMATERIAL) FACTS CONCERNING CANARY WHARF'S MITIGATION EFFORTS IN 2010

To correct the false record set forth by Lehman concerning events in 2010 after Lehman Sub defaulted on the Lease (Lehman Mem. at 8-14; Lehman's Rule 7056-1 Statement at 8-21), Canary Wharf sets forth the true facts below.  Those undisputed facts show that, faced with massive losses when Lehman Sub defaulted in early 2010, Canary Wharf substantially mitigated its losses in late 2010 to the benefit of both Lehman and Canary Wharf.

It is undisputed that as of March 31, 2010, Lehman Sub vacated the 25 Bank Street building and stopped paying any of the amounts it owed under the Lease.  (*See*, *e.g.*, Lehman's Rule 7056-1 Statement at Response No. 8.)  Lehman Sub's subtenants continued to occupy about half of the building and pay some of the amounts due under the Lease.  (Iacobescu Tr. (Ex. 34) 50:11-16, 71:9-15; Declaration of Anthony Jordan, Vice President of Business Development at Canary Wharf Group plc, executed Oct. 12, 2012 ("Jordan Decl.") (ECF# 31344) ¶ 11.)  Because those subtenancies were soon to end, Canary Wharf was faced with the prospect of a soon-to-be fully vacant building.  (Iacobescu Tr. (Ex. 34) 50:11-20.)[1]

At more than one million square feet, the soon-to-be-vacant building was one of the largest in London.  (Ex. 8 at 70; Iacobescu Tr. (Ex. 34) 125:19-25 (London, unlike New York, has only a few buildings of one million square feet or larger).)  25 Bank Street had been constructed at the expense of Canary Wharf in response to a 2001 request from Lehman.  (*See*

---

[1]  Lehman Sub's primary subtenant, Nomura International plc, occupied about 400,000 square feet and vacated at the end of September 2010.  (Iacobescu Tr. (Ex. 34) 50:11-16, 71:9; Jordan Decl. ¶ 11.)  The two other subtenants, who subleased about four floors of the 30-story 25 Bank Street building, remained in the building until December 2010.  (Iacobescu Tr. (Ex. 34) 71:9-15; Jordan Decl. ¶ 11.)

A-1

Ex. 6 at CW-8636 (§ 1.11), CW-8663 (§ 4.3), CW-8667-70 (§§ 6.1, 7).)[2]  Canary Wharf thus

indisputably faced massive losses from Lehman Sub's default.

       As Lehman concedes (*see* Lehman's Rule 7056-1 Statement No. 19), in early

2010, Canary Wharf began discussions with JPMorgan for JPMorgan to become the new tenant

for 25 Bank Street and negotiations ensued.  (*See also* Iacobescu Tr. (Ex. 34) 50:3-20, 53:17-22.)

In August 2010, JPMorgan and Canary Wharf signed a confidential, non-binding memorandum

of understanding ("MOU") pursuant to which JPMorgan would purchase the 25 Bank Street

building for £        by way of a 999-year lease.  (Ex. 50 §§ 1, 2.1.1, 3.1, 6.1, 16.)  In order

for Canary Wharf to complete this transaction and deliver vacant possession of the building to

JPMorgan, thereby mitigating its losses, Canary Wharf needed to terminate the Lease.

(Rabinowitz Report (Ex. 15) ¶¶ 20, 87; *see also* Lehman's Rule 7056-1 Statement No. 21.)

       In September 2010, Lehman Sub, which as tenant still had the legal right under

English law to occupy the building (although it had stopped paying rent), threatened to shut

down the building unless Canary Wharf agreed not to pursue a claim for unpaid amounts due

under the Lease against Lehman Sub in its U.K. administration.  (Ex. 51 at CW-551; Ex. 52 at

LBHI_CW-6008; Iacobescu Tr. (Ex. 34) 69:2-25, 72:5-73:14.)  This is not disputed.  Lehman

Sub went so far as to discharge the building employees who operated and maintained the

mechanical systems, elevators and life-safety systems (including fire alarms), and Lehman Sub

threatened to padlock the building's doors.  (Iacobescu Tr. (Ex. 34) 71:14-72:7.)  This risked

great damage to the building's infrastructure and loss of insurance coverage, and jeopardized the

lives of those still working in the building, including the subtenants' employees.  (*Id.* 241:24-

---

[2]  Further, the rental income from the building had been securitized by Canary Wharf in the form
of bonds.  (*See* Iacobescu Tr. (Ex. 34) 241:8-17.)

243:25.)  Faced with these extortion tactics, Canary Wharf, as a responsible landlord, had no

choice but to make a deal that would protect those people still working in the building.  (*Id.*

72:10-73:25.)  As a result, Canary Wharf reached a tentative agreement with Lehman Sub on

September 30 not to pursue any claim against Lehman Sub, it being understood that Canary

Wharf would continue to pursue recovering its losses from Lehman as it was entitled to do under

Schedule 4.  (Ex. 51 at CW-550; Ex. 53 at CW-546; Ex. 54 at CW-539-40; Iacobescu Tr.

(Ex. 34) 70:3-16, 72:10-73:25, 243:4-245:13.)

　　　　Also in late September 2010, after months of negotiations, Lehman and Canary

Wharf agreed in principle on a settlement of Canary Wharf's Claims for about $408 million, and

Lehman submitted the agreed-upon settlement for review and approval by the Creditors'

Committee.  (Ex. 55 at CW-32393-94.)  ███████████████████████████

███████████████████████████████████████████████████████

███████████████████████████  (*See, e.g.*, Ex. 56 at LBHI_CW-5814 (¶ 4);

Iacobescu Tr. (Ex. 34) 60:12-61:5.)  The Creditors' Committee approved the settlement in October

2010, and Lehman drafted a stipulation to seek the Court's approval.  (Ex. 57 at CW-1182.)

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

██████  (Ehrmann Tr. (Ex. 45) 12:9-11, 63:4-64:10, 126:3-15; Ex. 56 at LBHI_CW-5814 (¶ 2).)

Faced with this new Lehman demand -- which was inconsistent with Lehman Sub's insistence in

September 2010 that Canary Wharf agree to a zero claim -- Canary Wharf had no practical

alternative but to work out with Lehman Sub an alternative agreement that did not release its

rights to pursue such a claim in the administration if Canary Wharf were to further its settlement

discussions with Lehman and avoid litigation.  (*See, e.g.*, Kendall Tr. (Ex. 44) 107:25-110:03.)[3]

      The alternative agreement reached with Lehman Sub was the December 3, 2010

Forfeiture Letter between Lehman Sub, its administrators and Canary Wharf, pursuant to which

Canary Wharf agreed to forfeit the Lease before 11:59 p.m. on December 10, 2010.  (Ex. 16 § 2.)

Lehman Sub agreed to pay Canary Wharf "£1.5m on the date of forfeiture" in exchange for

Lehman Sub being "unconditionally and irrevocably released and discharged from any claims as

an administration expense for" (i) "unpaid rent" and (ii) "any estate service charge and other

sums that fell due and were payable under the Lease" before forfeiture.  (*Id.* §§ 4(a), 4(c).)[4]

Canary Wharf explicitly conditioned these releases on Lehman Sub's agreement that Canary

Wharf "may claim against LBL [*i.e.*, Lehman Sub] as an unsecured creditor for any unpaid rent

and estate charge and any other sums falling due under the Lease up to the date of forfeiture."

(*Id.* § 4.)

      With forfeiture imminent, and as Lehman has conceded (*see* Lehman's Rule

7056-1 Statement Nos. 49-54), Canary Wharf sought to confirm in early December 2010 that

Lehman would not enter a new lease on the same terms as the Lease.  Under Paragraph 7(a) of

Schedule 4 of the Lease, in the event the Lease was forfeited, Canary Wharf could demand that

---

[3]  During the negotiations with Lehman Sub that followed in late 2010, emails from Lehman Sub's counsel, Katie Bradford of Linklaters, contended that Canary Wharf's claims were small and would terminate on forfeiture.  (*See, e.g.*, Lehman Mem. at 10-11.)  That Lehman Sub took this litigation position is not surprising; it was in Lehman Sub's interest to keep Canary Wharf's claims as small as possible.  It is telling that in this proceeding Lehman sought no discovery from Lehman Sub or its lawyers, including Ms. Bradford, concerning any of these issues.

[4]  The amount of unpaid rent and estate service charges for the time that Lehman Sub occupied any portion of the building (through March 31, 2010) was estimated in 2010 to be £2.6 million.  (Ex. 49 at CW-18843.)  Canary Wharf claimed that this amount was recoverable as an administrative expense, which Lehman Sub disputed.  (*Id.*)  *See also* p. 29, *supra*.

Lehman enter into a new lease "at the same rents and subject to the same covenants conditions and provisions as are contained in this Lease." (Lease (Ex. 9) at LBHI_CW-103 (Schedule 4 ¶ 7(a)).) Of course, the rents in the 2005 Lease were significantly above-market in 2010. (*See*, *e.g.*, Ehrmann Tr. (Ex. 45) 67:16-68:13.) Thus, if Lehman had entered a new lease on the same terms as the (old) Lease pursuant to Paragraph 7(a) of Schedule 4, Canary Wharf would have obtained a superior financial return as compared to a deal with JPMorgan. (*Compare* Lease (Ex. 9) at LBHI_CW-10 *with* Ex. 58 at CW-32289-90; Iacobescu Tr. (Ex. 34) 38:18-39:5.) However, it was clear that Lehman would not -- and could not -- take a new lease because, as Lehman's witnesses explained at deposition: (i) Lehman was in Chapter 11 bankruptcy, was winding up operations, and had no use for a large office building in London; (ii) Lehman was not going into the real estate business and had no interest in re-letting the property at the old rent (which was far above 2010 market price); and (iii) Lehman would have had to pay the amounts due under the new lease in full as an administrative, priority expense pursuant to the U.S. Bankruptcy Code. (*See*, *e.g.*, Ehrmann Tr. (Ex. 45) 134:24-136:25; Krasnow Tr. (Ex. 38) 114:2-117:6; 11 U.S.C. § 503(b).)

From December 1 through December 6, 2010, counsel for Canary Wharf[5] asked counsel for Lehman[6] whether Lehman would take a new lease. (Exs. 59-61.) Lehman had no intention of entering the new lease (Ehrmann Tr. (Ex. 45) 134:5-15; Ex. 61), but wanted to make sure (by finding out the terms of the JPMorgan transaction) that the building did not have some unexpected market value (Ex. 62; Krasnow Tr. (Ex. 38) 163:17-23). On December 6, the parties

---

[5]  Andrew Dietderich of Sullivan & Cromwell LLP and Tony Briam of Clifford Chance LLP.

[6]  Richard Krasnow and Rupert Jones of Weil. This is the same Krasnow who was Lehman's 30(b)(6) witness about the negotiations of the Lease.

met at Weil's New York offices, and Canary Wharf's representatives described the terms of the

JPMorgan transaction.  (*See* Krasnow Tr. (Ex. 38) 137:12-141:25.)

On December 8, as Lehman has conceded (*see* Lehman's Rule 7056-1 Statement

No. 54), Canary Wharf's counsel asked Lehman again to "confirm our understanding that you do

not want a new lease (to defease surety obligation upon forfeiture or otherwise), SUBJECT to

review of the third party [JPMorgan] lease (to confirm it is consistent with our verbal disclosure

[December 6])."  (Ex. 63.)  After additional emails, Canary Wharf's counsel again asked that day

"whether you want a new lease on initial terms.  It is important to know this so we can do a

mitigation deal that is in everyone's interest."  (Ex. 18 at LBHI_CW-1-2.)  On December 9,

Lehman's counsel responded to Canary Wharf's requests:

> We have consulted with our client and, on the assumption that the economic terms
> of the proposed transaction [with JPMorgan] are as was described to us at the
> December 6, 2010 meeting, then LBHI [*i.e.*, Lehman] would not elect to enter
> into a lease for the premises on the same terms as the current CW/LBL lease [*i.e.*,
> the Lease].

(*Id*. at CW-1.)

After receiving Lehman's confirmation, Canary Wharf forfeited the Lease (*i.e.*,

brought the Lease to an end) on December 10 and took possession of the 25 Bank Street property

that day.  (Lehman's Rule 7056-1 Statement at Response No. 9.)  JPMorgan (and certain of its

affiliates) and Canary Wharf then executed the 999-year lease.  (*Id*. at Response No. 10.)

Krasnow admitted at deposition that the "economic terms that Mr. Dietderich described [at the

December 6 meeting] were consistent with those provisions of the [JPMorgan] lease that refer to

those economic terms."  (Krasnow Tr. (Ex. 38) 142:18-144:17.)

Over the next several months, Lehman and Canary Wharf continued to pursue a

settlement of the Claims.  (*See*, *e.g.*, Ex. 64 at LBHI_CW-11276-77.)  Throughout those

discussions, no one from, or on behalf of, Lehman (or anyone else) ever said that the terms of the

Forfeiture Letter, which Canary Wharf's counsel had sent to Lehman's lawyers on December 7, 2010 (Ex. 17), or the forfeiture of the Lease itself, terminated Lehman's pre-existing obligations under the Indemnity in Schedule 4 to pay Canary Wharf.  Those obligations were not terminated.

In sum, faced with massive losses when Lehman Sub vacated the property in March 2010 and stopped paying under the Lease, Canary Wharf took steps to mitigate its losses by finding a new tenant for 25 Bank Street.  In December 2010, Canary Wharf retook possession of 25 Bank Street through a forfeiture of the Lease and leased the property to JPMorgan, substantially mitigating its losses to the benefit of both Lehman and Canary Wharf.  Lehman's attempt now to use that mitigation transaction as a basis for nullifying its obligations to indemnify Canary Wharf should be rejected.

*    *    *    *    *

A-7