Reply Due: July 31, 2014
Hearing Date: TBD

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------x
                                                    :
In re                                               :    Chapter 11
                                                    :
LEHMAN BROTHERS HOLDINGS INC. *et al.*,             :    Case No. 08-13555 (SCC)
                                                    :
                              Debtors.              :    Jointly Administered
                                                    :
-------------------------------------------------------------------x

## THE CANARY WHARF CLAIMANTS' RESPONSE TO LEHMAN'S STATEMENT OF UNDISPUTED MATERIAL FACTS PURSUANT TO LOCAL RULE 7056-1

Pursuant to Local Bankruptcy Rule 7056-1(c), Claimants Canary Wharf Management Ltd., Heron Quays (HQ2) T1 Limited and Heron Quays (HQ2) T2 Limited ("Canary Wharf") submit the following response to the Statement of Undisputed Material Facts Pursuant to Local Rule 7056-1, filed May 22, 2014 (ECF# 44407) (the "Statement") by Lehman Brothers Holdings Inc. ("Lehman").

### General Response to the Statement

The Statement contains 89 separately numbered paragraphs that Lehman claims contain material and undisputed facts. No facts other than those set forth in The Canary Wharf Claimants' Statement of Undisputed Facts Pursuant to Local Bankruptcy Rule 7056-1, filed on March 14, 2014 (ECF# 43538-1) ("Canary Wharf's Statement") are undisputed or material to either Canary Wharf's motion for summary judgment or Lehman's cross-motion. Lehman has conceded all of those facts. Rather than repeat its response many times, Canary Wharf sets forth the following response to each and every one of Lehman's 89 numbered paragraphs, which is incorporated into Canary Wharf's responses below:

The only issue to be decided on the parties' motions for summary judgment is the proper interpretation of Schedule 4 to the Lease, which sets forth Lehman's obligations to Canary Wharf as Surety.  Thus, the material facts are those that concern the terms of Schedule 4 and Lehman's liability thereunder.  Those facts are the 11 set forth in Canary Wharf's Statement, all of which Lehman has admitted.  (Lehman's Response to Canary Wharf's Statement of Undisputed Material Facts (ECF# 44407), Response Nos. 1-11.)  The parties' motions will depend on a determination of English law, which both parties agree governs the Lease. (Lehman's Rule 7056-1 Statement at Response No. 4.)  Federal Rule of Civil Procedure 44.1, entitled "Determining Foreign Law," provides, in relevant part, as follows:  "In determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence.  The court's determination must be treated as a ruling on a question of law."

The other "facts" in the Statement are irrelevant and immaterial because they do not bear on a proper interpretation of Schedule 4.  Instead, most of the 89 numbered paragraphs concern alleged events in 2010.  Events that took place in 2010 -- five years after the Lease was executed in 2005 -- cannot affect the proper interpretation of Schedule 4 or the meaning of its terms.  Lehman does not even attempt to say that they do.

Further, Lehman's characterization of the events in 2010 is incorrect.  In discovery in this action, no witness offered a view of the facts even remotely similar to the version that Lehman puts forth.  And Lehman did not seek to take any depositions of the lawyers who represented its subsidiary, Lehman Brothers Limited ("Lehman Sub"), even though those lawyers authored a number of the documents now relied on by Lehman in the Statement.  The

lengthy Statement is instead an attempt by Lehman to distract the Court from the real issues.

Canary Wharf also sets forth the true facts in its specific responses.[1]

### Specific Responses to Numbered Statements of Facts

1.      Canary Wharf Group plc ("Canary Wharf") is the parent company for a group of entities that developed and manage a business complex in London.  *See* Response of Canary Wharf to Objection to Proofs of Claim Numbers 14824 and 14826, filed October 12, 2012, at ¶¶ 1 n.1, 8 (ECF No. 31341) (hereinafter "Canary Wharf's Resp.").

**Response to Lehman Statement of Fact No. 1:**  Admitted but incomplete.

Canary Wharf develops, invests in and manages various properties.  Over the past 20 years,

Canary Wharf has redeveloped an area in London, England into a new business district known as

Canary Wharf by designing, constructing and managing office space and retail facilities.

(Canary Wharf's Resp. ¶¶ 1 n.1, 8.)[2]

2.      One of its buildings is HQ2, a thirty-floor office tower with more than one million square feet located at 25 Bank Street.  *See id.* at ¶ 10.

**Response to Lehman Statement of Fact No. 2:**  Admitted that there is a 30-floor

office tower with more than one million square feet located at 25 Bank Street in London,

England.

3.      Canary Wharf's subsidiaries include Heron Quays (HQ2) T1 Limited and Heron Quays (HQ2) T2 Limited's (collectively, the "Landlord"), which was the landlord for HQ2, and Canary Wharf Management Limited (the "Management Company"), which was the management company for HQ2.  *See id.* at n.1.

**Response to Lehman Statement of Fact No. 3:**  Admitted that Canary Wharf's

subsidiaries include Heron Quays (HQ2) T1 Limited and Heron Quays (HQ2) T2 Limited, which

---

[1] To the extent that Canary Wharf is required to respond to the argumentative and immaterial headings that Lehman has included in the Statement, Canary Wharf disputes those as well.

[2] In this Response, Canary Wharf will interpret the term "Canary Wharf" in the Statement to include Claimants Canary Wharf Management Ltd., Heron Quays (HQ2) T1 Limited and Heron Quays (HQ2) T2 Limited, as well as certain affiliates of Claimants that entered into the other transactions concerning the property subject to the Lease, not just Canary Wharf Group plc.

are defined as "Landlord" in the Lease, and Canary Wharf Management Limited.  (Ex. 9 at

LBHI_CW-9 (Lease Particulars ¶ 3).)  Also admitted that Canary Wharf Management Ltd. is

defined as the "Management Company" in the Lease and provided estate services under the

Lease.  (*Id.*)  Lehman Sub as tenant for the entire building at 25 Bank Street managed the

building itself.

     4.     LBHI was the parent company of Lehman Brother[s] Limited ("LBL"), a
subsidiary located in London.  *See* Facts Stipulation, attached as Ex. 1 to Decl. of Marc De
Leeuw, filed March 14, 2014, at ¶ 1 (ECF No. 43540-1).

     **Response to Lehman Statement of Fact No. 4:**  Admitted.

     5.     On March 16, 2005, LBL, as tenant, entered into a thirty-year lease with the
Landlord, the Management Company, and Canary Wharf Holdings Limited ("CWHL"),
commencing on July 3, 2003 (the "Lease").  *See* De Leeuw Decl. Ex. 1, at ¶¶ 1, 3; Lease,
attached as Ex. 9 to Decl. of Marc De Leeuw, filed March 14, 2014, at Lease Particulars ¶¶ 1, 3,
6 (ECF No. 43540-9).

     **Response to Lehman Statement of Fact No. 5:**  Admitted but incomplete.

Lehman also entered into the Lease with the Landlord, Management Company and CWHL.

(Ex. 9 at LBHI_CW-9 (Lease Particulars ¶ 3).)[3]

     6.     The Lease was governed by English law.  *See* De Leeuw Decl. Ex. 1, at ¶ 2;
De Leeuw Decl. Ex. 9, at § 8.16.

     **Response to Lehman Statement of Fact No. 6:**  Disputed insofar as the use of

the past tense implies that the Lease is not still governed by English law.  Otherwise admitted.

     7.     LBHI signed the Lease as LBL's surety.  *See* De Leeuw Decl. Ex. 9, at Lease
Particulars ¶ 3.  LBHI's obligations are contained in Schedule 4 to the Lease (the "Surety
Agreement").  *See* Lease Sch. 4 (Ex. 1).

---

[3] Unless otherwise noted, references in Canary Wharf's responses to "Exhibit" or "Ex. __" are
to exhibits attached to the Declaration of Marc De Leeuw, executed March 14, 2014, filed with
Canary Wharf's motion (ECF# 43540), or the Supplemental Declaration of Marc De Leeuw,
executed June 26, 2014, being filed herewith.

**Response to Lehman Statement of Fact No. 7:** Disputed. Lehman was a party to and executed the Lease as "Surety" and its obligations are set forth in Section 10 and Schedule 4 thereto. (Ex. 9 at LBHI_CW-9 (Lease Particulars ¶ 3), LBHI_CW-77 (§ 10), LBHI_CW-101 (Schedule 4).) Additionally, "Surety Agreement" is not the title of Schedule 4; Schedule 4's title is "Covenants by the Surety." (Ex. 9 at LBHI_CW-101 (Schedule 4).)

8.     Canary Wharf drafted the Surety Agreement. *See* Iacobescu Dep. 21:12–22:2, June 18, 2013 (Ex. 45); Bartolotta Dep. 15:9–13, May 7, 2014 (Ex. 44).

**Response to Lehman Statement of Fact No. 8:** Immaterial to any issue necessary to decide the parties' summary judgment motions. In addition, disputed as incomplete, insofar as Schedule 4 was subject to lengthy negotiations between the parties and their respective advisors. (*See, e.g.*, Iacobescu Tr. (Ex. 34) 239:25-241:17.) Canary Wharf also hereby incorporates by reference its "General Response" on pp. 1-2, *supra*.

9.     Paragraph 1 of the Surety Agreement provides in relevant part:

The Surety hereby covenants with the Landlord and as a separate covenant with the Management Company as a primary obligation that the Tenant or the Surety shall at all times until the Tenant shall cease to be bound by the Tenant's covenants in the Lease during the Term duly perform and observe all the covenants on the part of the Tenant contained in this Lease including the payment of the rents hereby reserved and all other sums payable under this Lease in the manner and at the times herein specified and the Surety shall indemnify and keep indemnified the Landlord and the Management Company against all claims demands losses damages liability costs fees and expenses whatsoever sustained by the Landlord or the Management Company by reason of or arising directly or indirectly out of any default by the Tenant in the performance and observance of any of its obligations or the payment of any rents and other sums[.]

Ex. 1 at ¶ 1.

**Response to Lehman Statement of Fact No. 9:** Admitted. Canary Wharf refers to Exhibit 9 for the full terms of Paragraph 1 of Schedule 4.

10.     Paragraph 7 of the Surety Agreement, titled "Disclaimer or forfeiture of Lease," provides in relevant part:

(a) The Surety herby further covenants with the Landlord and the Management Company that:- . . .

(ii) if this Lease shall be forfeited . . .

THEN the Surety shall if the Landlord by notice in writing given to the Surety within one hundred and eighty (180) days after such disclaimer or other event so requires accept from and execute and deliver to the Landlord a counterpart of a new lease of [HQ2] . . . for a term commencing on the date of the disclaimer or other event and continuing for the residue then remaining unexpired of the Term such new lease to be at the cost of the Surety and to be at the same rents and subject to the same covenants conditions and provisions as are contained in this Lease[.]

(b) If the Landlord shall not require the Surety to take a new lease the Surety shall nevertheless upon demand pay to the Landlord a sum equal to the Rent and other sums that would have been payable under this Lease but for the disclaimer or other event in respect of the period from and including the date of such disclaimer or other event until the expiration of one hundred and eighty (180) days therefrom or until the Landlord shall have granted a lease of [HQ2] to a third party (whichever shall first occur)[.]

*Id*. at ¶ 7.

**Response to Lehman Statement of Fact No. 10:**  Immaterial, as the parties' motions for summary judgment do not seek relief under Paragraph 7 of Schedule 4.  In addition, disputed as to use of the term "relevant part."  Canary Wharf refers to Exhibit 9 for the full terms of Paragraph 7 of Schedule 4.  Canary Wharf also hereby incorporates by reference its "General Response" on pp. 1-2, *supra*.

11.    Sir George Iacobescu, CEO of Canary Wharf, was not present for any of the negotiations over the Surety Agreement, and does not know what was communicated during those negotiations.  *See* Iacobescu Dep. (Ex. 45) 7:18–8:10; 12:20–13:16.

**Response to Lehman Statement of Fact No. 11:**  Disputed.  Sir George Iacobescu, CEO of Canary Wharf, was involved in the negotiations of the Lease "from the day the deal started" through "when the lease was drawn, to see that it confirm[ed] to [Canary Wharf's] instructions."  (Iacobescu Tr. (Ex. 34) 8:3-10, 12:15-18.)

-6-

12.    Frank Bartolotta, a former Lehman employee who provided an affidavit to Canary Wharf, knows only that LBHI, although initially resistant to taking on any suretyship obligations, ultimately agreed to include the Surety Agreement in the Lease.  *See* Aff. of Frank Bartolotta, filed March 28, 2014 (ECF No. 43804-1); Bartolotta Dep. (Ex. 44) 30:7–32:17; 59:14–60:18.

**Response to Lehman Statement of Fact No. 12:**  Disputed.  Frank Bartolotta, a former Lehman Senior Vice President, was Lehman's lead negotiator of the Lease and testified concerning the negotiations via an affidavit filed with this Court in March 2014 and a deposition taken by Lehman in May 2014.  (Affidavit of Frank Bartolotta, executed March 27, 2014 ("Bartolotta Aff.") (Dkt. No. 43804-1) (Ex. 41) ¶ 2; Transcript of Deposition of Frank Bartolotta, taken May 7, 2014 ("Bartolotta Tr.") (Ex. 40).)  The transcript of Mr. Bartolotta's deposition totals nearly 80 pages and is attached as Exhibit 40 to the De Leeuw Declaration being filed herewith.  Canary Wharf refers to that exhibit for Mr. Bartolotta's full testimony, which shows that Lehman's summary in Statement of Fact No. 12 and Statement of Fact No. 13 (below) is false and misleading.

In short, Mr. Bartolotta testified that Canary Wharf negotiated hard for, and Lehman ultimately agreed to give, an "absolute promise . . . to pay no matter what might happen to the English subsidiary."  (Bartolotta Tr. (Ex. 40) 74:3-75:3.)  He was pressed hard by Weil -- but stuck firmly to his testimony that Lehman had agreed to pay Canary Wharf's losses regardless of what happened to Lehman Sub.

As Bartolotta testified, during the 2001 negotiations, Lehman "fought very hard to limit liability to the English subsidiary," but Sir George of Canary Wharf refused to agree. (Bartolotta Aff. (Ex. 41) ¶¶ 2, 5; *see also* Bartolotta Tr. (Ex. 40) 74:3-14 (parties' agreement to Schedule 4 was result of "a hard fought negotiation over an extended period of time").) Sir George "insisted that Lehman would be required to pay the rents and other amounts due regardless of whether [Lehman Sub] remained obligated to pay."  (Bartolotta Aff. (Ex. 41) ¶ 5.)

Bartolotta testified that after Lehman demanded an escalating number of concessions from Canary Wharf, Sir George became even more insistent that Canary Wharf "could not do the deal without a complete backup from the parent," and that Lehman's obligation had to be "absolute and complete" such that Lehman would "stand in no matter what happened to the subsidiary." (Bartolotta Tr. (Ex. 40) 62:3-63:2, 63:25-65:3, 66:7-13; *see also id.* 37:11-19; Bartolotta Aff. (Ex. 41) ¶¶ 5-7.)  Recognizing that Lehman would be unable to close the deal without agreeing to the absolute assurance on which Canary Wharf insisted, Bartolotta referred the question of whether to proceed to Lehman's headquarters in New York.  (Bartolotta Tr. (Ex. 40) 14:15-15:3; Bartolotta Aff. (Ex. 41) ¶ 3.)

Lehman accepted Canary Wharf's position, and "agreed to stand behind the English subsidiary come hell or high water" and "pay no matter what might happen to the English subsidiary." (Bartolotta Tr. (Ex. 40) 71:9-11, 74:19-75:3; *see also* Bartolotta Aff. (Ex. 41) ¶¶ 5-7.)  As Bartolotta testified, "[w]hether you call it indemnity or guarantee, it didn't matter to me.  The concept is, it's a direct contractual obligation from the parent that could be relied upon no matter what happened to the subsidiary."  (Bartolotta Tr. (Ex. 40) 65:20-25; *see also id.* 62:17-24.)  Schedule 4, which Bartolotta understood as providing for "complete certainty [for Canary Wharf] of the income stream going forward," thus was "ultimately delivered to Canary Wharf's satisfaction and the deal was completed."  (Bartolotta Tr. (Ex. 40) 60:16-18, 77:6-13; *see also id.* 78:8-11.)

13.     Mr. Bartolotta was not involved in the negotiations of the Surety Agreement; did not have any understanding of the distinction between guarantees and indemnities under English law; and knew only that Canary Wharf would not agree to the Lease unless LBHI accepted the Surety Agreement as ultimately drafted.  *See* Bartolotta Dep. (Ex. 44) 15:5–8; 17:9–18:8; 37:24–38:6; 59:14–60:18.

**Response to Lehman Statement of Fact No. 13:** Disputed.  Canary Wharf

hereby incorporates its Response to Lehman Statement of Fact No. 12.

14.    On September 15, 2008, LBHI filed for bankruptcy protection in this Court and
LBL entered insolvency proceedings in the United Kingdom.  *See* De Leeuw Decl. Ex. 1, at ¶ 4.

**Response to Lehman Statement of Fact No. 14:** Admitted.

15.    On September 17, 2009, the Landlord and the Management Company filed proofs
of claim numbers 14826 and 14824 against LBHI in the amounts of $4,280,970,000 and
$195,550,000, respectively.  *See* De Leeuw Decl. Ex. 1, at ¶ 5; Proof of Claim Nos. 14826 &
14824, Exs. 11 & 12 to Decl. of Marc De Leeuw, filed March 14, 2014 (ECF Nos. 43540-12–
13).

**Response to Lehman Statement of Fact No. 15:** Admitted.

16.    Canary Wharf asserted the claims against LBHI under "Clause 10 of the Lease
Agreement pursuant to the terms contained in Schedule 4 of the Lease Agreement (the
'*Guarantee*').  Pursuant to the *Guarantee*, the Debtor, among other things, *guaranteed all of the
Tenant's obligations arising under the Lease Agreement*."  *See* De Leeuw Decl. Ex. 11, at ¶ 1
(emphasis added), De Leeuw Decl. Ex. 12, at ¶ 1 (emphasis added).

**Response to Lehman Statement of Fact No. 16:** Immaterial to any issue

necessary to decide the parties' summary judgment motions.  Also disputed insofar as the quoted

portions of the proofs of claim are taken out of context and without regard to the circumstances

under which the quoted documents were filed.  Among other things, the form for the proofs of

claim submitted by Canary Wharf did not provide a separate category for claims under an

indemnity, such as Schedule 4.  *See* Ex. 11 at 1; Ex. 12 at 1.  Instead, it provided only a binary

option:  to "[c]heck this box if all or part of your claim is based on a Guarantee."  *See* Ex. 11 at

1; Ex. 12 at 1.  Canary Wharf's use of the term "Guarantee" in the proofs of claim simply

adopted the convention called for by the form.

Additionally, in England as well as in the United States, the term "guarantee" is

often used colloquially to include what would be considered an indemnity.  (*See, e.g.*, Millett Tr.

(Ex. 42) 102:10-105:7, 169:7-16 (acknowledging that his treatise, entitled *Law of Guarantees*,

also includes the law on indemnities and conceding that "it is not unusual to find the term

'guarantee' used loosely to describe what is, in reality, an indemnity"); Rabinowitz Tr. (Ex. 43)

13:2-4 (explaining that the law of guarantees includes the law of indemnity); Kendall Tr.

(Ex. 44) 166:11-24.)  Canary Wharf refers to Exhibits 11 and 12 for the full text of the Proofs of

Claim.

Canary Wharf also hereby incorporates by reference its "General Response" on

pp. 1-2, *supra*.

17.   LBL initially remained in HQ2, but, in December 2009, informed Canary Wharf
that it would vacate the premises by March 2010 and subsequently did so.  *See* Letter from
Linklaters LLP, dated December 11, 2009, (Ex. 2) at ¶ 7.1; Iacobescu Dep. (Ex. 45) 49:20–50:2,
246:5–12.

**Response to Lehman Statement of Fact No. 17:**  Admitted that (a) in December

2009, Lehman Sub (which includes its administrators) informed Canary Wharf that it would

vacate the 25 Bank Street building by March 2010; and (b) in March 2010, Lehman Sub did

vacate that building.  (Lehman's Response to Canary Wharf's Statement of Undisputed Material

Facts (ECF# 44407), Response No. 8.)

18.   Nomura International Plc occupied a portion of HQ2 through September 2010 and
Jones Lang LaSalle and the New York Stock Exchange each occupied a portion of the building
through December 2010.  *See* Decl. of Anthony Jordan, filed October 12, 2012, at ¶ 11 (ECF No.
31344); Canary Wharf's Resp. ¶ 27.

**Response to Lehman Statement of Fact No. 18:**  Immaterial to any issue

necessary to decide the parties' summary judgment motions, which solely concern Lehman's

liability.  Also disputed as incomplete.  Lehman Sub's primary subtenant, Nomura International

plc, occupied about 400,000 square feet and vacated at the end of September 2010.  (Iacobescu

Tr. (Ex. 34) 50:11-16, 71:9; Declaration of Anthony Jordan, Vice President of Business

Development at Canary Wharf Group plc, executed Oct. 12, 2012 ("Jordan Decl.")

(ECF# 31344) ¶ 11.)  The two other subtenants, who subleased about four floors of the 30-story

25 Bank Street building, remained in the building until December 2010.  (Iacobescu Tr. (Ex. 34)

71:9-15; Jordan Decl. ¶ 11.)  Canary Wharf also hereby incorporates by reference its "General

Response" on pp. 1-2, *supra*.

19.    In early 2010, unbeknownst to LBHI, Canary Wharf had begun discussing HQ2
with J.P.Morgan Chase Bank, National Association ("J.P.Morgan").  *See, e.g.*, Letter from G.
Iacobescu, dated January 27, 2010, (Ex. 3) at CW32604; Krasnow Dep. 42:16–43:9, June 25,
2013 (Ex. 49).

**Response to Lehman Statement of Fact No. 19:**  Immaterial to any issue

necessary to decide the parties' summary judgment motions.  Admitted that Canary Wharf began

discussions with JPMorgan that were confidential in early 2010 about the 25 Bank Street

property, in an effort to mitigate its damages -- to the benefit of both Canary Wharf and Lehman.

Canary Wharf also hereby incorporates by reference its "General Response" on pp. 1-2, *supra*.

20.    On August 13, 2010, Canary Wharf signed a Memorandum of Understanding
with J.P.Morgan (the "MOU"), which provided that Canary Wharf would grant a 999-year lease
of HQ2 to J.P.Morgan in exchange for f███████.  *See* MOU (Ex. 4) at §§ 2.1–2.1.1, 3.1.

**Response to Lehman Statement of Fact No. 20:**  Immaterial to any issue

necessary to decide the parties' summary judgment motions.  Also disputed as incomplete.  The

MOU was confidential, was not binding on either party, and provided for net compensation to

Canary Wharf of f███████.  (Ex. 50 §§ 1, 2.1.1, 3.1, 6.1, 11, 16.)  Canary Wharf refers to Ex.

50 for the full terms of the MOU.  Canary Wharf also hereby incorporates by reference its

"General Response" on pp. 1-2, *supra*.

21.    Section 4 of the MOU provided that ████████████████████████████
████████████████████████████████████████████████████████  *See id.* at
§ 4.

**Response to Lehman Statement of Fact No. 21:**  Immaterial to any issue

necessary to decide the parties' summary judgment motions.  Also disputed as incomplete.

Canary Wharf refers to Ex. 50 for the full terms of the MOU.  Although by April 2010 Lehman

Sub had vacated the 25 Bank Street building and stopped paying any of the amounts it owed

under the Lease, it nevertheless retained the legal right under English law to occupy the building.

Of course, Canary Wharf could not re-let the 25 Bank Street building to JPMorgan and mitigate

its damages to the benefit of both Canary Wharf and Lehman if Lehman Sub had a legal right to

be in it.  Canary Wharf also hereby incorporates by reference its "General Response" on pp. 1-2,

*supra*.

22.    As of September 2010, Canary Wharf and LBL were negotiating a consensual
surrender of HQ2.  *See* Email exchange between S. Dawson and K. Bradford, dated September
20-23, 2010 (Ex. 5); Email exchange between B. Taylor, T. Briam, S. Dawson and K. Bradford,
dated September 24-27, 2010 (Ex. 6).

**Response to Lehman Statement of Fact No. 22:**  Immaterial to any issue

necessary to decide the parties' summary judgment motions.  Also disputed because the

negotiations between Canary Wharf and LBL in September 2010 involved discussion of a

surrender of the Lease (not of the 25 Bank Street property).  Canary Wharf also hereby

incorporates by reference its "General Response" on pp. 1-2, *supra*.

23.    Canary Wharf insisted that any surrender be structured so as to preserve its claims
against LBHI.  *See* Ex. 5 at CW0000482; Email from G. Iacobescu to C. Coombe, dated
November 25, 2010, (Ex. 7) at CW0000812.

**Response to Lehman Statement of Fact No. 23:**  Immaterial to any issue

necessary to decide the parties' summary judgment motions.  Admitted that Canary Wharf made

clear to Lehman Sub that Canary Wharf would seek to recover its losses from Lehman as it was

entitled to do under Schedule 4 through a settlement, and otherwise disputed.  (Ex. 51 at CW-

550; Ex. 53 at CW-546; Ex. 54 CW-539-40; Iacobescu Tr. (Ex. 34) 93:24-94:9, 105:4-16, 245:9-

13.)  Canary Wharf also hereby incorporates by reference its "General Response" on pp. 1-2,

*supra*.

24.    LBL's counsel, Katie Bradford of Linklaters LLP, explained in an email to Canary Wharf's representatives that "once the lease is ended by surrender, in law[,] claims under the lease in respect of future rent, must end– whether against the principal (the tenant) or its guarantor.  So, if a surrender is agreed, there is no claim over to be pursued or saved."  *See* Ex. 5 at CW0000482.

**Response to Lehman Statement of Fact No. 24:**  Immaterial to any issue

necessary to decide the parties' summary judgment motions.  Also disputed on the grounds that

the quoted portion reflects a position taken in negotiations by Lehman Sub's lawyer (whether a

truly held opinion or for purposes of negotiation) and refers to the consequences of a surrender

that never transpired and a "guarantor" that did not exist (Lehman was an indemnitor).  Notably,

Lehman sought no discovery of Lehman Sub or of Ms. Bradford.  Moreover, the quoted

statement is inadmissible hearsay.  *See Wojcik* v. *42nd St. Dev. Project*, 386 F. Supp. 2d 442, 448

n.5 (S.D.N.Y. 2005) (disregarding "factual allegations contained in defendants' Rule 56.1

statement but not supported by citations to admissible evidence in the record").  Canary Wharf

also hereby incorporates by reference its "General Response" on pp. 1-2, *supra*.

25.    On September 30, 2010, Canary Wharf and LBL reached an agreement in principle, under which LBL would surrender the Lease and pay Canary Wharf £1.5 million (approximately $2.4 million), and in return Canary Wharf would release all other claims against LBL.  *See* Email exchange between G. Iacobescu and M. Jervis, dated September 30, 2010 (Ex. 8) at 0000539–40; Iacobescu Dep. (Ex. 45) 112:16–113:23.

**Response to Lehman Statement of Fact No. 25:**  Immaterial to any issue

necessary to decide the parties' summary judgment motions.  Also disputed as incomplete.  The

tentative agreement, which covered a number of points other than that mentioned above, was

reached with Lehman Sub only because Lehman Sub, which as tenant still had the legal right

under English law to occupy the building (although it had stopped paying rent), threatened to

shut down the building -- risking great damage to the building's infrastructure and loss of

insurance coverage, and jeopardizing the lives of those still working in the building -- unless

Canary Wharf agreed not to pursue a claim for unpaid amounts due under the Lease against

Lehman Sub in its U.K. administration.  (Ex. 51 at CW-551; Ex. 52 at LBHI_CW-6008;

Iacobescu Tr. (Ex. 34) 69:2-25, 71:14-73:14, 241:24-243:25.)  Faced with these extortion tactics,

Canary Wharf, as a responsible landlord, had no choice but to make an arrangement that would

protect those people who were still working in the building.  (*Id*. 72:10-73:25.)  Further, the

tentative agreement reached with Lehman Sub on September 30 was based on an understanding

that Canary Wharf would seek to recover its losses from Lehman as it was entitled to do under

Schedule 4 through a settlement.  (Ex. 51 at CW-550; Ex. 53 at CW-546; Ex. 54 CW-539-40;

Iacobescu Tr. (Ex. 34) 93:24-94:9, 105:4-16, 245:9-13.)  Canary Wharf also hereby incorporates

by reference its "General Response" on pp. 1-2, *supra*.

26.    Canary Wharf sought to obtain a Court-approved settlement of its claims against
LBHI before any actual surrender of the Lease took place because, without it, Canary Wharf was
concerned about losing those claims.  *See* Ex. 6 at CW0000588; Briam Dep. 67:8–19; 69:6–19;
75:11–16, June 19, 2013 (Ex. 42).

**Response to Lehman Statement of Fact No. 26:**  Immaterial to any issue

necessary to decide the parties' summary judgment motions.  Also disputed as incomplete, false,

and moot.  Canary Wharf understood that Schedule 4 is an indemnity, which obligated Lehman

to pay no matter what happened to Lehman Sub's obligations under the Lease.  As Canary

Wharf's English counsel testified, Canary Wharf was concerned only that Lehman would argue

that a surrender of the Lease might impact the claims, not that this was the proper result under

English law (which it would not be).  (Transcript of Deposition of Tony Briam, taken June 19,

2013 ("Briam Tr.") (Ex. 65) 195:2-197:6.)  In any event, a surrender never occurred.  Canary

Wharf also hereby incorporates by reference its "General Response" on pp. 1-2, *supra*.

27.    In late October 2010, Canary Wharf and LBHI had reached a tentative agreement on the amount of a settlement, but that was subject to agreement on other essential terms and conditions, which never occurred.  *See* Email exchange between D. Cash and P. Kendall, dated October 26–27, 2010 (Ex. 9); Email from D. Cash to P. Kendall attaching a draft settlement agreement, dated November 2, 2010 (Ex. 10); Ehrmann Dep. 148:5–18, June 27, 2013 (Ex. 43); Iacobescu Dep. (Ex. 45) 173:17–174:5.

**Response to Lehman Statement of Fact No. 27:**  Immaterial to any issue

necessary to decide the parties' summary judgment motions.  Also disputed as incomplete and

misleading.  In late September 2010, Lehman and Canary Wharf agreed in principle on a

settlement of Canary Wharf's Claims for about $408 million, and Lehman submitted the agreed

settlement for review and approval by the Creditors' Committee.  (Ex. 55 at CW-32393-94.)



(*See, e.g.*, Ex. 56 at LBHI_CW-5814 (¶ 4); Iacobescu Tr. (Ex. 34) 60:12-61:5.)  The

Creditors' Committee approved the settlement in October 2010, and Lehman drafted a

stipulation to seek the Court's approval.  (Ex. 57 at CW-1182.)

(Deposition of Daniel

Ehrmann, a managing director at Lehman's restructuring firm, Alvarez & Marsal, and Lehman's

lead negotiator in the 2010 settlement discussions with Canary Wharf, taken June 27, 2013

("Ehrmann Tr.") (Ex. 45) 63:4-64:10, 126:3-15; Ex. 56 at LBHI_CW-5814 (Stipulation ¶ 2).)

but to work out with Lehman Sub an alternative agreement that did not release its

rights to pursue such a claim in the administration if Canary Wharf were to further its settlement discussions with Lehman and avoid litigation.  (Kendall Tr. (Ex. 44) 107:25-110:03.)

The agreement reached with Lehman Sub was the December 3, 2010 Forfeiture Letter between Lehman Sub, its administrators and Canary Wharf, pursuant to which Canary Wharf agreed to forfeit the Lease before 11:59 p.m. on December 10, 2010.  (Ex. 16 § 2.) Lehman Sub agreed to pay Canary Wharf "£1.5m on the date of forfeiture" in exchange for Lehman Sub being "unconditionally and irrevocably released and discharged from any claims as an administration expense for" (i) "unpaid rent" and (ii) "any estate service charge and other sums that fell due and were payable under the Lease" before forfeiture.  (*Id.* §§ 4(a), 4(c).) Canary Wharf explicitly conditioned these releases on Lehman Sub's agreement that Canary Wharf "may claim against LBL [*i.e.*, Lehman Sub] as an unsecured creditor for any unpaid rent and estate charge and any other sums falling due under the Lease up to the date of forfeiture." (*Id.* § 4.)

Canary Wharf also hereby incorporates by reference its "General Response" on pp. 1-2, *supra*.

28.    Paragraph 2 of the draft settlement agreement required Canary Wharf to ██████████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████ *See* Ex. 10, at LBHI_CW0005814, ¶ 2; *see* Ehrmann Dep. (Ex. 43) 63:4–64:10.

**Response to Lehman Statement of Fact No. 28:**  Immaterial to any issue necessary to decide the parties' summary judgment motions.  Also disputed as incomplete. Canary Wharf hereby incorporates its Response to Lehman Statement of Fact No. 27.  Canary Wharf also hereby incorporates by reference its "General Response" on pp. 1-2, *supra*.

29.    This requirement, which █████████████████████████████████████
██████████████████████████████████████████████████████████████
████████████████████████ *See* Ehrmann Dep. (Ex. 43) 148:19–
149:12; *see also id.* at 149:2–3 (████████████████████████████████████
████████████).

**Response to Lehman Statement of Fact No. 29:**  Immaterial to any issue

necessary to decide the parties' summary judgment motions.  ████████████████████
████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████ Further disputed because Lehman is

an indemnitor with primary obligations, not a "guarantor" under the Lease.  Canary Wharf also

hereby incorporates by reference its "General Response" on pp. 1-2, *supra.*

30.    On October 28, 2010, Mr. Iacobescu sent a memorandum to Canary Wharf's
Board of Directors ████████████████████████████████████ *See* Email
from G. Iacobescu attaching Memorandum to Canary Wharf's Board of Directors, dated October
28, 2010 (Ex. 11).

**Response to Lehman Statement of Fact No. 30:**  Immaterial to any issue

necessary to decide the parties' summary judgment motions.  Canary Wharf refers to Exhibit 11

of the Meade Declaration for the full terms of that document.  Canary Wharf also hereby

incorporates by reference its "General Response" on pp. 1-2, *supra.*

31.    J.P.Morgan would ██████████████████████████████████████
███████████████████████████████████████ *See id.* at CW0019137,
CW0019142; Iacobescu Dep. (Ex. 45) 144:20–146:6.

**Response to Lehman Statement of Fact No. 31:**  Immaterial to any issue

necessary to decide the parties' summary judgment motions.  Also disputed as incomplete and

incorrect. ████████████████████████████████████████████████████

███████  (*See* Ex. 11 of the Meade Declaration at CW-19142.)  Canary Wharf also hereby

incorporates by reference its "General Response" on pp. 1-2, *supra*.

32.    The deal would also ████████████████████████████

████████████████████████████████████████████████

████████████████████████████  *See* Ex. 11 at CW0019137.

**Response to Lehman Statement of Fact No. 32:**  Immaterial to any issue

necessary to decide the parties' summary judgment motions.  Also disputed as incomplete and

incorrect.  Canary Wharf refers to Exhibit 11 of the Meade Declaration for the full terms of that

document.  Canary Wharf also hereby incorporates by reference its "General Response" on pp.

1-2, *supra*.

33.    At his deposition, Mr. Iacobescu explained that it was "by a miracle in a way
[that] J.P.Morgan" was looking for a building like HQ2, "because there [was] no other tenant."
*See* Iacobescu Dep. (Ex. 45) 126:2–19.

**Response to Lehman Statement of Fact No. 33:**  Immaterial to any issue

necessary to decide the parties' summary judgment motions.  Canary Wharf hereby incorporates

by reference its "General Response" on pp. 1-2, *supra*.

34.    On November 12, 2010, Canary Wharf sent LBL a revised draft surrender
agreement that provided for an acknowledged claim against LBL in the amount of £262.5
million.  *See* Email from S. Dawson to B. Taylor attaching cover letter and draft surrender
agreement, dated November 12, 2010, (Ex. 12) at CW0000776, CW0000788 § 11.1.2.

**Response to Lehman Statement of Fact No. 34:**  Immaterial to any issue

necessary to decide the parties' summary judgment motions.  Canary Wharf hereby incorporates

by reference its "General Response" on pp. 1-2, *supra*.

35.    The new term providing for an acknowledged claim against LBL was "based on
the stip from LBHI."  Iacobescu Dep. (Ex. 45) 191:4–192:6; *see also* Ex. 12 at CW0000776;
Briam Dep. (Ex. 42) 205:17–206:17; Kendall Dep. 98:6–22, 120:15–25, June 20, 2013 (Ex. 48).

**Response to Lehman Statement of Fact No. 35:**  Immaterial to any issue

necessary to decide the parties' summary judgment motions.  Canary Wharf hereby incorporates

by reference its "General Response" on pp. 1-2, *supra*.

36.    Mr. Iacobescu knew that LBL was "not likely" to accept the new term.  *See*
Iacobescu Dep. (Ex. 45) at 192:17–24.

**Response to Lehman Statement of Fact No. 36:**  Immaterial to any issue

necessary to decide the parties' summary judgment motions.  Also disputed as incomplete and

incorrect.  Sir George and Canary Wharf "figured that for the sake of achieving the settlement

[Lehman Sub] would agree to" the term.  (Iacobescu Tr. (Ex. 34) 192:17-24.)  Additionally,

Lehman Sub agreed to preservation of all unsecured claims by Canary Wharf.  (*See* Ex. 16 § 4.)

Canary Wharf also hereby incorporates by reference its "General Response" on pp. 1-2, *supra*.

37.    Pamela Kendall, Canary Wharf's in-house counsel was uncertain whether LBL
would accept the new term but did not disclose her uncertainty to LBHI.  *See* Kendall Dep. (Ex.
48) 119:10–20.

**Response to Lehman Statement of Fact No. 37:**  Immaterial to any issue

necessary to decide the parties' summary judgment motions.  Also disputed to the extent that it

suggests Ms. Kendall did anything other than inform Lehman that there was a proposed draft

surrender agreement that had been sent to Lehman Sub.  Canary Wharf also hereby incorporates

by reference its "General Response" on pp. 1-2, *supra*.

38.    Yet, one minute after sending the draft surrender agreement to LBL, Ms. Kendall
e-mailed Daniel Ehrmann of LBHI that the draft agreement with LBL "provides for
acknowledgement/preservation of our claim in the sum of £262.5m."  *See* Email from P. Kendall
to D. Ehrmann and J. DeMarco, dated November 12, 2010 (Ex. 13) at CW0011679–80.

**Response to Lehman Statement of Fact No. 38:**  Immaterial to any issue

necessary to decide the parties' summary judgment motions.  Also disputed because Ms. Kendall

did not send the draft surrender agreement with Lehman Sub to Lehman.  Further disputed as

incomplete because, as is clear from the face of the document cited by Lehman, Lehman knew

that Lehman Sub and Canary Wharf had not agreed to a deal on surrender when Ms. Kendall sent

the email cited and Canary Wharf never represented otherwise.  Lehman Sub ultimately agreed

to preservation of all unsecured claims by Canary Wharf.  (*See* Ex. 16 § 4.)  Canary Wharf also

hereby incorporates by reference its "General Response" on pp. 1-2, *supra*.

39.    Ms. Kendall repeated that statement to LBHI two weeks later.  *See* Email from P.
Kendall to D. Ehrmann and D. Cash, dated November 24, 2010 (Ex. 14) at CW0016742.

**Response to Lehman Statement of Fact No. 39:**  Immaterial to any issue

necessary to decide the parties' summary judgment motions.  Also disputed as vague.  Further

disputed as incomplete because, as is clear from the face of the document cited, Lehman knew

that Lehman Sub and Canary Wharf had not agreed to a deal on surrender when Ms. Kendall sent

the e-mail cited and Canary Wharf never represented otherwise.  Lehman Sub ultimately agreed

to preservation of all unsecured claims by Canary Wharf.  (*See* Ex. 16 § 4.)  Canary Wharf also

hereby incorporates by reference its "General Response" on pp. 1-2, *supra*.

40.    On November 24, 2010, LBHI learned for the first time through a Financial
Times article that Canary Wharf had been negotiating with J.P.Morgan.  *See* Email from R.
Krasnow to J. DeMarco, dated November 24, 2010 (Ex. 15); Krasnow Dep. (Ex. 49) 42:16–43:9,
90:11–92:6; Kendall Dep. (Ex. 48) 66:6–67:20 (Canary Wharf did not tell LBHI about the
proposed transaction).

**Response to Lehman Statement of Fact No. 40:**  Immaterial to any issue

necessary to decide the parties' summary judgment motions.  Also disputed as unsupported by

the documents cited and because the negotiations between Canary Wharf and JPMorgan had

been publicized at least as early as September 2010.  (Ex. 66.)  Canary Wharf also hereby

incorporates by reference its "General Response" on pp. 1-2, *supra*.

41.    LBHI's counsel, Richard Krasnow of Weil, Gotshal & Manges LLP, immediately
advised Canary Wharf that LBHI needed to understand the impact of the J.P.Morgan transaction

on Canary Wharf's claims against LBHI and requested further information for due diligence purposes. *See* Ex. 15 at LBHI_CW0006436; Email from R. Krasnow to J. DeMarco, dated November 30, 2010, (Ex. 16) at CW0010419–20; *see also* Email exchange between R. Krasnow and A. Dietderich, dated December 8, 2010, (Ex. 17) at CW0018462; Krasnow Dep. (Ex. 49) 178:20–179:14.

**Response to Lehman Statement of Fact No. 41:** Immaterial to any issue necessary to decide the parties' summary judgment motions. Also disputed as unsupported. Lehman sought information concerning the JPMorgan transaction to determine the extent to which it mitigated Canary Wharf's damages such that the proposed settlement was for a proper amount, as well as whether the building did not have some unexpected market value (Ex. 62; Krasnow Tr. (Ex. 38) 163:17-23). Canary Wharf also hereby incorporates by reference its "General Response" on pp. 1-2, *supra*.

42.    On November 26, 2010, LBL flatly rejected Canary Wharf's proposal to add the new term to the settlement agreement preserving Canary Wharf's claims against LBL. *See* Email from K. Bradford to T. Briam and S. Dawson, dated November 26, 2010, (Ex. 18) at CW0018403.

**Response to Lehman Statement of Fact No. 42:** Immaterial to any issue necessary to decide the parties' summary judgment motions. Also disputed as unsupported by any admissible evidence. The cited email is inadmissible hearsay. *See* Response to Lehman Statement of Fact No. 24, *supra*. Also disputed on the grounds that this reflects a position taken in negotiations by Lehman Sub's lawyer (whether a truly held opinion or for purposes of negotiation). Notably, Lehman sought no discovery of Lehman Sub or of Ms. Bradford. Further disputed because the document cited does not support Lehman's claim that Lehman Sub "flatly rejected" Canary Wharf's proposal. Canary Wharf also hereby incorporates by reference its "General Response" on pp. 1-2, *supra*.

43.    Ms. Bradford, LBL's counsel, wrote in an email to Canary Wharf's representatives:

Setting aside the fact that this claim was previously agreed at nil (after extensive negotiations) my clients struggle to see how they can acknowledge claims which are currently in the region of c.£35 million (representing accrued rent and estate charges) at a substantially higher sum.

*See id.*

**Response to Lehman Statement of Fact No. 43:** Immaterial to any issue necessary to decide the parties' summary judgment motions. Also disputed for the reasons set forth in Response to Lehman Statement of Fact No. 42, which Canary Wharf hereby incorporates by reference. Canary Wharf also hereby incorporates by reference its "General Response" on pp. 1-2, *supra*.

44.    Ms. Bradford explained that Canary Wharf is "entitled to make formal claims (when the LBL administration reaches that stage) for the rent accruing quarterly. It will take some years before that sum exceeds £200 million." *See id.*

**Response to Lehman Statement of Fact No. 44:** Immaterial to any issue necessary to decide the parties' summary judgment motions. Also disputed for the reasons set forth in Response to Lehman Statement of Fact No. 42, which Canary Wharf hereby incorporates by reference. Canary Wharf also hereby incorporates by reference its "General Response" on pp. 1-2, *supra*.

45.    Ms. Bradford further explained:

Alternatively, your clients can take steps to bring the lease to an end, either consensually through a surrender, or through forfeiture. In either case, a line is drawn under the amount of rent accruing. And in either case, your clients would have no damages claim for loss of future rent.

*Id.*

**Response to Lehman Statement of Fact No. 45:** Immaterial to any issue necessary to decide the parties' summary judgment motions. Also disputed for the reasons set forth in Response to Lehman Statement of Fact No. 42, which Canary Wharf hereby incorporates

Pg 23 of 42

by reference.  Canary Wharf also hereby incorporates by reference its "General Response" on pp.

1-2, *supra*.

46.     Ms. Bradford suggested that Canary Wharf could (1) forfeit the Lease, (2) serve LBHI with written notice under Paragraph 7(a) of the Surety Agreement requiring it to take a replacement lease, and (3) bring a claim against LBHI for breach if it refused to perform.  *See id.*

**Response to Lehman Statement of Fact No. 46:**  Immaterial to any issue

necessary to decide the parties' summary judgment motions.  Also disputed for the reasons set

forth in Response to Lehman Statement of Fact No. 42, which Canary Wharf hereby incorporates

by reference.  Canary Wharf also hereby incorporates by reference its "General Response" on pp.

1-2, *supra*.

47.     Canary Wharf never told LBHI that LBL rejected Canary Wharf's new proposed term.  *See* Ehrmann Dep. (Ex. 43) 146:15–147:21; Kendall Dep. (Ex. 48) 123:8–124:16.

**Response to Lehman Statement of Fact No. 47:**  Immaterial to any issue

necessary to decide the parties' summary judgment motions.  Also disputed as unsupported by

any admissible evidence.  Mr. Ehrmann testified that he could not remember whether or when he

personally had ever been told, and said nothing about Lehman more generally.  (*See* Ehrmann Tr.

(Ex. 45) 147:24-148:4.)  And Ms. Kendall testified that she herself did not provide further

updates to Lehman after Lehman Sub rejected the provision, but said nothing about anyone else

at Canary Wharf, or their representatives.  Canary Wharf also hereby incorporates by reference

its "General Response" on pp. 1-2, *supra*.

48.     On November 30, 2010, Canary Wharf refused to agree to paragraph 2 of the draft settlement agreement with LBHI.  *See* Ex. 16, at CW0010421.  Canary Wharf's counsel wrote that "[t]he situation might be different if LBHI were willing to step in and assume the lease in accordance with its terms, but we assume that LBHI has no interest in doing so, and therefore the client must proceed."  *See id.*

**Response to Lehman Statement of Fact No. 48:**  Immaterial to any issue

necessary to decide the parties' summary judgment motions.  Also disputed as unclear with

respect to the phrase "the draft settlement agreement with LBHI." Insofar as this phrase refers to

the draft settlement agreement described in Statement of Fact No. 28, Statement of Fact No. 28 is

incorrect, because the version of the settlement agreement had been substantially revised,

including with respect to paragraph 2. Further disputed as incomplete with respect to the quoted

portion of the cited document. Canary Wharf also hereby incorporates by reference its "General

Response" on pp. 1-2, *supra*.

49.    On December 1, 2010, Tony Briam of Clifford Chance, Canary Wharf's counsel, sought confirmation from LBHI's counsel that LBHI had no interest in taking over the existing Lease or taking on a new Lease. *See* Email from T. Briam to R. Jones, dated December 1, 2010, (Ex. 19) at CW0022960.

**Response to Lehman Statement of Fact No. 49:**   Immaterial to any issue

necessary to decide the parties' summary judgment motions. Also disputed as incomplete. With

forfeiture imminent, and as Lehman has conceded (*see* Lehman's Rule 7056-1 Statement Nos.

49-54), Canary Wharf sought to confirm in early December 2010 that Lehman would not enter a

new lease on the same terms as the Lease. Under Paragraph 7(a) of Schedule 4 of the Lease, in

the event the Lease was forfeited, Canary Wharf could demand that Lehman enter into a new

lease "at the same rents and subject to the same covenants conditions and provisions as are

contained in this Lease." (Lease (Ex. 9) at LBHI_CW-103 (Schedule 4 ¶ 7(a)).) Of course, the

rents in the 2005 Lease were significantly above-market in 2010. (*See*, *e.g.*, Ehrmann Tr.

(Ex. 45) 67:16-68:13.) Thus, if Lehman had entered a new lease on the same terms as the (old)

Lease pursuant to Paragraph 7(a) of Schedule 4, Canary Wharf would have obtained a superior

financial return as compared to a deal with JPMorgan. (*Compare* Lease (Ex. 9) at LBHI-CW-10

*with* Ex. 58 at CW-32289-90; Iacobescu Tr. (Ex. 34) 38:18-39:5.) However, it was clear that

Lehman would not -- and could not -- take a new lease because, as Lehman's witnesses

explained at deposition: (i) Lehman was in Chapter 11 bankruptcy, was winding up operations,

and had no use for a large office building in London; (ii) Lehman was not going into the real

estate business and had no interest in re-letting the property at the old rent (which was far above

2010 market price); and (iii) Lehman would have had to pay the amounts due under the new

lease in full as an administrative, priority expense pursuant to the U.S. Bankruptcy Code.  (*See*,

*e.g.*, Ehrmann Tr. (Ex. 45) 134:24-136:25; Krasnow Tr. (Ex. 38) 114:2-117:6; 11 U.S.C.

§ 503(b).)

       Given the imminence of the JPMorgan deal, Canary Wharf sought to confirm that,

as it assumed, Lehman would not enter a new lease.  From December 1 through December 6,

2010, counsel for Canary Wharf (Andrew Dietderich of Sullivan & Cromwell LLP and Tony

Briam of Clifford Chance LLP) asked counsel for Lehman (Richard Krasnow and Rupert Jones

of Weil) whether Lehman would take a new lease.  (Exs. 59-61.)  Lehman had no intention of

entering the new lease (Ehrmann Tr. (Ex. 45) 134:5-15; Ex. 61), but wanted to make sure (by

finding out the terms of the JPMorgan transaction) that the building did not have some

unexpected market value (Ex. 62; Krasnow Tr. (Ex. 38) 163:17-23).

       Canary Wharf also hereby incorporates by reference its "General Response" on

pp. 1-2, *supra*.

    50.    On December 3, 2010, Mr. Briam again sought confirmation that LBHI had no
intention of taking a lease of HQ2.  *See* Email from T. Briam to R. Krasnow, dated December 3,
2010, (Ex. 20) at CW0010424.

    **Response to Lehman Statement of Fact No. 50:**  Immaterial to any issue

necessary to decide the parties' summary judgment motions.  Also disputed as incomplete.

Canary Wharf hereby incorporates its Response to Lehman Statement of Fact No. 49, and its

"General Response" on pp. 1-2, *supra*.

51.    On December 5, 2010, Mr. Briam asked for an update on LBHI's position on taking a new lease of HQ2.  *See* Email from T. Briam to R. Krasnow, dated December 5, 2010, (Ex. 21) at CW0010432.

**Response to Lehman Statement of Fact No. 51:**  Immaterial to any issue

necessary to decide the parties' summary judgment motions.  Also disputed as incomplete.

Canary Wharf hereby incorporates its Response to Lehman Statement of Fact No. 49, and its

"General Response" on pp. 1-2, *supra*.

52.    On December 6, 2010, Andrew Dietderich, of Sullivan & Cromwell LLP, Canary Wharf's counsel, informed LBHI's counsel that Canary Wharf was waiting to provide information on the J.P.Morgan deal until LBHI confirmed that it was not interested in taking a lease of HQ2.  *See* Email from A. Dietderich to R. Krasnow and D. Ehrmann, dated December 6, 2010, (Ex. 22) at CW0010436.

**Response to Lehman Statement of Fact No. 52:**  Immaterial to any issue

necessary to decide the parties' summary judgment motions.  Also disputed as incomplete.

Mr. Dietderich informed Messrs. Krasnow and Ehrmann that Canary Wharf was "waiting to give

you the information you requested on the JPM deal until the confidentiality agreement is signed,

and you can confirm to us you are not interested in taking the lease yourself."  (Ex. 67 at

CW-10436.)  Canary Wharf also hereby incorporates by reference its "General Response" on pp.

1-2, *supra*.

53.    On the same day, at an in person meeting, Mr. Dietderich asked LBHI's counsel to confirm that LBHI was not interested in taking a new lease of HQ2.  *See* Krasnow Dep. (Ex. 49) 137:12–140:20; Dietderich Dep. 57:9–16, June 11, 2013 (Ex. 41).

**Response to Lehman Statement of Fact No. 53:**  Immaterial to any issue

necessary to decide the parties' summary judgment motions.  Also disputed as incomplete.

Canary Wharf hereby incorporates its Response to Lehman Statement of Fact No. 49, and its

"General Response" on pp. 1-2, *supra*.

54.    On December 8, 2010, Mr. Dietderich asked LBHI's counsel four separate times to confirm that LBHI did not want a new lease or that LBHI intended to review the J.P.Morgan

documents only in order to confirm that it did not want a new lease.  *See* Email from A. Dietderich to R. Krasnow, R. Jones and E. Del Nido, dated December 8, 2010 (Ex. 23); Ex. 17 at CW0018461–63.

**Response to Lehman Statement of Fact No. 54:**  Immaterial to any issue necessary to decide the parties' summary judgment motions.  Also disputed as incomplete. Canary Wharf hereby incorporates its Response to Lehman Statement of Fact No. 49, and its "General Response" on pp. 1-2, *supra*.

55.    Canary Wharf's requests made no sense to LBHI since, under the plain terms of the Surety Agreement, LBHI had no right to demand a lease.  *See* Krasnow Dep. (Ex. 49) 159:11–25; 175:17–177:17; 178:20–180:8.

**Response to Lehman Statement of Fact No. 55:**  Immaterial to any issue necessary to decide the parties' summary judgment motions.  Also disputed as false.  In their requests to Lehman's counsel, Canary Wharf's counsel specifically referenced Lehman's obligation under Schedule 4.  Specifically, Canary Wharf's counsel asked Lehman to "confirm our understanding that you do not want a new lease (to defease surety obligation upon forfeiture or otherwise), SUBJECT to review of the third party [JPMorgan] lease (to confirm it is consistent with our verbal disclosure [December 6])."  (Ex. 63.)  Further, the assertions about confusion are refuted by the proclamation of Weil's website that it is "the 'gold standard' of bankruptcy practices."  *See Business Finance & Restructuring*, Weil, Gotshal & Manges LLP, http://www.weil.com/business-finance-restructuring (last visited June 24, 2014).

Also disputed because the phrase "LBHI had no right to demand a lease" constitutes an improper legal conclusion.  "Where [a summary judgment movant] assert[s] legal conclusions in the guise of an undisputed statement of fact, [the court] shall not consider those legal conclusions admitted."  *Wojcik*, 386 F. Supp. 2d at 448 n.5; *see also Rivera* v. *Nat'l R.R. Passenger Corp.*, 152 F.R.D. 479, 485 (S.D.N.Y. 1993) (refusing to consider statement that party

had no notice of hazardous condition because statement constituted improper legal conclusion

that "cannot be utilized on a summary judgment motion").

Canary Wharf also hereby incorporates by reference its "General Response" on

pp. 1-2, *supra*.

56.    On December 9, 2010, solely in order to break the logjam so that it could obtain
the due diligence information, LBHI's counsel advised Canary Wharf that LBHI "would not
elect" to take a lease.  *See* Ex. 17 at CW0018461; Krasnow Dep. (Ex. 49) 182:19–183:2.

**Response to Lehman Statement of Fact No. 56:**  Immaterial to any issue

necessary to decide the parties' summary judgment motions.  Further disputed as unsupported by

any admissible evidence with respect to the phrase "solely in order to break the logjam so that it

could obtain the due diligence information."  Also disputed for the same reasons set forth in

Responses to Lehman Statement of Fact Nos. 49-55.  Also disputed as incomplete.  Mr. Krasnow

replied that:

> We have consulted with our client and, on the assum ption that the
> economic terms of the proposed transaction [with JPMorgan] are
> as  was described to us at th   e  December 6, 2010 m eeting,  then
> LBHI would not elect to enter into  a lease for the prem ises on the
> same terms as the current CW/LBL lease.

(Ex. 18 at CW-1.)

Canary Wharf also hereby incorporates by reference its "General Response" on

pp. 1-2, *supra*.

57.    In his email correspondence with LBHI's counsel, Mr. Dietderich told LBHI's
representatives that J.P.Morgan would not permit Canary Wharf to provide any information
about the deal unless LBHI first represented that it was not interested in taking a lease of HQ2.
*See* Ex. 23; Ex. 17 at CW0018461–63; *see also* Dietderich Dep. (Ex. 41) 60:20–63:14; Kendall
Dep. (Ex. 48) 155:20–157:25.

**Response to Lehman Statement of Fact No. 57:**  Immaterial to any issue

necessary to decide the parties' summary judgment motions.  Canary Wharf hereby incorporates

its Response to Lehman Statement of Fact No. 49, and its "General Response" on pp. 1-2, *supra*.

     58.     J.P. Morgan's counsel, Jeremy Clay of Mayer Brown, never saw LBHI's
December 9 email to Canary Wharf.  *See* Clay Dep. 68:21–69:10, July 9, 2013 (Ex. 46).

**Response to Lehman Statement of Fact No. 58:**  Immaterial to any issue

necessary to decide the parties' summary judgment motions.  Canary Wharf hereby incorporates

by reference its "General Response" on pp. 1-2, *supra*.

     59.     J.P.Morgan's only concern was that Canary Wharf not serve a Paragraph 7(a)
notice on LBHI at all, so that no issue of whether LBHI's taking a new lease for the premises
could arise.  *See id.* at 19:6–22; 70:22–71:18.

**Response to Lehman Statement of Fact No. 59:**  Immaterial to any issue

necessary to decide the parties' summary judgment motions.  Also disputed as unsupported by

any admissible evidence with respect to the phrase "J.P.Morgan's only concern was that Canary

Wharf not serve a Paragraph 7(a) notice on LBHI at all."  Canary Wharf also hereby incorporates

by reference its "General Response" on pp. 1-2, *supra*.

     60.     On December 3, 2010, Justin Turner of Clifford Chance LLP, Canary Wharf's
counsel, informed Mr. Clay, J.P.Morgan's counsel, that Canary Wharf was seeking confirmation
from LBHI that it had no interest in taking up a new lease after forfeiture of the Lease.  *See*
Email exchange between J. Turner and J. Clay, dated December 3, 2010, (Ex. 9) at CW0029714.

**Response to Lehman Statement of Fact No. 60:**  Immaterial to any issue

necessary to decide the parties' summary judgment motions.  Canary Wharf hereby incorporates

by reference its "General Response" on pp. 1-2, *supra*.

     61.     That same day, Mr. Clay, J.P.Morgan's counsel, wrote in response:

I note CW are still pushing for the confirmation.  As I made clear on the
telephone whilst this maybe a step forward this will not be sufficient for JPM to

proceed to a simultaneous exchange and completion where notice has been served by CW under the Lehman lease guarantee.

*See id.*

**Response to Lehman Statement of Fact No. 61:**  Immaterial to any issue

necessary to decide the parties' summary judgment motions.  Canary Wharf hereby incorporates

by reference its "General Response" on pp. 1-2, *supra*.

62.    In sending the December 3 email, Mr. Clay was stating J.P.Morgan's previously expressed position that Canary Wharf "must not serve a notice" on LBHI and J.P.Morgan would not "complete," *i.e.*, close, the transaction if a notice was served.  *See* Clay Dep. (Ex. 46) 57:20–58:12; 69:17–70:8.

**Response to Lehman Statement of Fact No. 62:**  Immaterial to any issue

necessary to decide the parties' summary judgment motions.  Canary Wharf hereby incorporates

by reference its "General Response" on pp. 1-2, *supra*.

63.    Mr. Briam, Canary Wharf's counsel, believed that message was clear from Mr. Clay's December 3 email.  *See* Briam Dep. (Ex. 42) 185:21–186:4.

**Response to Lehman Statement of Fact No. 63:**  Immaterial to any issue

necessary to decide the parties' summary judgment motions.  Canary Wharf hereby incorporates

by reference its "General Response" on pp. 1-2, *supra*.

64.    Mr. Iacobescu admitted that he too knew that J.P.Morgan did not want Canary Wharf to serve a Paragraph 7(a) notice on LBHI.  *See* Iacobescu Dep. (Ex. 45) 38:4–10.

**Response to Lehman Statement of Fact No. 64:**  Immaterial to any issue

necessary to decide the parties' summary judgment motions.  Also disputed as incomplete.

Canary Wharf hereby incorporates its Response to Lehman Statement of Fact No. 49, and its

"General Response" on pp. 1-2, *supra*.

65.    Moreover, Canary Wharf would have been "wary" of serving such a notice if it risked not meeting J.P.Morgan's timetable.  *See* Kendall Dep. (Ex. 48) 152:9–19.

**Response to Lehman Statement of Fact No. 65:** Immaterial to any issue

necessary to decide the parties' summary judgment motions. Also disputed as false and

incomplete. Canary Wharf hereby incorporates its Response to Lehman Statement of Fact Nos.

49-56, and its "General Response" on pp. 1-2, *supra*.

66.    Canary Wharf knew that J.P.Morgan wanted to complete the deal by year-end of
2010. *See* Ex. 11 at CW0019138; Kendall Dep. (Ex. 48) 72:19–73:2; *see also* Clay Dep. (Ex.
46) 29:4–21; 48:19–49:17.

**Response to Lehman Statement of Fact No. 66:** Immaterial to any issue

necessary to decide the parties' summary judgment motions. Canary Wharf hereby incorporates

by reference its "General Response" on pp. 1-2, *supra*.

67.    This prohibition was so important to J.P.Morgan that, as part of the final executed
transaction documents, J.P.Morgan formally required Canary Wharf to ███████████████████

*See* Clay Dep. (Ex. 46) 60:17–61:6; Agreement Relating to the Grant of a Lease, dated
December 20, 2010, (Ex. 25) at §§ 7.16.4, 11.3.2.

**Response to Lehman Statement of Fact No. 67:** Immaterial to any issue

necessary to decide the parties' summary judgment motions. Also disputed as unsupported by

any evidence with respect to the phrase "[t]his prohibition was so important to J.P.Morgan."

Also disputed as vague with respect to the phrase "this prohibition." Further disputed as

incomplete. On December 9, 2010, Lehman anticipatorily breached its agreement to take a new

lease under Paragraph 7 of Schedule 4, making service of notice under Paragraph 7 unnecessary.

(*See* Ex. 18 at LBHI_CW-1; Rabinowitz Report (Ex. 15) ¶¶ 102-12.) Canary Wharf also hereby

incorporates its Response to Lehman Statement of Fact No. 56, and its "General Response" on

pp. 1-2, *supra*.

68.    Section 7.16.4 of the principal agreement with J.P.Morgan provides:

███████████████████████████████████████████████████████



Ex. 25 at § 7.16.4.

**Response to Lehman Statement of Fact No. 68:**  Immaterial to any issue
necessary to decide the parties' summary judgment motions.  Also disputed as incomplete.  The
quoted portion is merely one provision in one of numerous interrelated documents that
memorialized the agreement between Canary Wharf and JPMorgan for 25 Bank Street, the effect
of which was to mitigate greatly the losses and damages that arose out of Lehman Sub's default,
to the benefit of both Lehman and Canary Wharf.  Further disputed insofar as the quoted portion
incorrectly alters the phrase "Lehman Lease," which is defined in the cited agreement as "the
lease of the Building dated 16 March 2005 between (1) Heron Quays (HQ2) Tl Limited and
Heron Quays (HQ2) T2 Limited, (2) CWML, (3) CWHL, (4) Lehman and (5) Lehman Brothers
Holdings Inc . . . ."  (Ex. 68 at CW0005293.)

Canary Wharf also hereby incorporates by reference its "General Response" on
pp. 1-2, *supra*.

69.    Section 11.3.2 provides:



*Id.* at § 11.3.2.

**Response to Lehman Statement of Fact No. 69:**  Immaterial to any issue
necessary to decide the parties' summary judgment motions.  Also disputed for the reasons set
forth in Response to Lehman Statement of Fact No. 68, which Canary Wharf hereby incorporates

by reference.  Canary Wharf also hereby incorporates by reference its "General Response" on pp.

1-2, *supra*.

70.    The parties agreed in principle to these provisions over the phone on Friday, December 10, 2010.  *See* Email from J. Clay to T. Briam, dated December 11, 2010, (Ex. 26) at MB0003093; Briam Dep. (Ex. 42) 185:9–20; *see also* Clay Dep. (Ex. 46) 60:13–61:22; Kendall Dep. (Ex. 48) 148:15–149:3.

**Response to Lehman Statement of Fact No. 70:**  Immaterial to any issue

necessary to decide the parties' summary judgment motions.  Also disputed as vague with

respect to the phrase "these provisions."  Further disputed as incomplete.  On December 9, 2010,

the day before this exchange, Lehman had anticipatorily breached its agreement to take a new

lease under Paragraph 7 of Schedule 4, making service of notice under Paragraph 7 unnecessary.

(*See* Ex. 18 at LBHI_CW-1; Rabinowitz Report (Ex. 15) ¶¶ 102-12.)  Canary Wharf also hereby

incorporates its Response to Lehman Statement of Fact No. 56, and its "General Response" on

pp. 1-2, *supra*.

71.    The language was negotiated over the weekend and agreed upon in almost final form by Monday, December 13, 2010.  *See* Email from T. Briam to P. Kendall, dated December 13, 2010, (Ex. 27) at CW0030796.

**Response to Lehman Statement of Fact No. 71:**  Immaterial to any issue

necessary to decide the parties' summary judgment motions.  Also disputed as vague with

respect to the phrase "[t]he language."  Further disputed as unsupported by the document cited,

insofar as it (i) does not set forth the language from the agreement between Canary Wharf and

JPMorgan; (ii) does not refer to section 11.3.2 thereof; and (iii) does not state that the language

of the agreement was "in almost final form."  Canary Wharf also hereby incorporates by

reference its "General Response" on pp. 1-2, *supra*.

72.    On December 20, 2010, Canary Wharf and J.P.Morgan closed on their transaction.  *See* Ex. 25.

**Response to Lehman Statement of Fact No. 72:**  Admitted.

73.    Canary Wharf witnesses confirmed that the warranty in Section 11.3.2 was true when made and continues to remain true.  *See* Iacobescu Dep. (Ex. 45) 238:11–23; Kendall Dep. (Ex. 48) 38:22–39:12; 40:22–42:15; Briam Dep. (Ex. 42) 191:4–192:12.

**Response to Lehman Statement of Fact No. 73:**  Immaterial to any issue

necessary to decide the parties' summary judgment motions.  Also disputed as incomplete.

Canary Wharf hereby incorporates its Responses to Lehman Statement of Fact Nos. 49-56, and

its "General Response" on pp. 1-2, *supra*.

74.    Canary Wharf never prepared either a draft Paragraph 7(a) notice or a substitute lease.  *See* Iacobescu Dep. (Ex. 45) 44:21–45:5; Kendall Dep. (Ex. 48) 38:10–16, 42:16–21; Briam Dep. (Ex. 42) 22:6–25.

**Response to Lehman Statement of Fact No. 74:**  Immaterial to any issue

necessary to decide the parties' summary judgment motions.  Also disputed as incomplete.

Canary Wharf hereby incorporates its Response to Lehman Statement of Fact No. 70, and its

"General Response" on pp. 1-2, *supra*.

75.    It also did not prepare any form of request for relief from the automatic stay in order to serve the notice.  *See* Iacobescu Dep. (Ex. 45) 46:23–47:4; Kendall Dep. (Ex. 48) 46:23–47:7; Briam Dep. (Ex. 42) 22:6–25.

**Response to Lehman Statement of Fact No. 75:**  Immaterial to any issue

necessary to decide the parties' summary judgment motions.  Also disputed for the reasons set

forth in Response to Lehman Statement of Fact No. 56, which Canary Wharf hereby incorporates

by reference.  Further disputed as an incorrect legal conclusion insofar as it implies that relief

from the automatic stay would have been necessary to serve a notice under Paragraph 7 of

Schedule 4.  *See supra*, Response to Lehman Statement of Fact No. 55.  Canary Wharf also

hereby incorporates by reference its "General Response" on pp. 1-2, *supra*.

76.    Throughout 2010, Canary Wharf obtained advice concerning the United States Bankruptcy Code as regards its claims against LBHI from Skadden, Arps, Slate, Meagher & Flom LLP, Clifford Chance LLP, and Sullivan & Cromwell LLP.  *See* Kendall Dep. (Ex. 48) 57:8–61:14.

**Response to Lehman Statement of Fact No. 76:**  Immaterial to any issue

necessary to decide the parties' summary judgment motions.  Also disputed as incorrect as

insofar as it implies that all three law firms advised Canary Wharf through the entirety of 2010.

77.    With regard to Canary Wharf's intentions in seeking LBHI's confirmation that it would not want a new lease under Paragraph 7(a) of the Surety Agreement, Ms. Kendall testified:

> Q. Isn't it a fact that you were trying to set up a claim for anticipatory repudiation for an obligation to accept a lease that would have been triggered upon a notice that you had no intention of serving?

> A. Well, the e-mail was certainly with paragraph 4 [should be Paragraph 7(a) of Schedule 4] in mind, and we believe that we had done sufficient to give us any additional right that that paragraph afforded us.

> Q. And that was one of your purposes behind sending these e-mails to Mr. Krasnow and Mr. Rupert Jones at my law firm, correct?

> A. Yes.

Kendall Dep. (Ex. 48) 156:15–157:4.

**Response to Lehman Statement of Fact No. 77:**  Immaterial to any issue

necessary to decide the parties' summary judgment motions.  Also disputed as incomplete.

Canary Wharf hereby incorporates its Responses to Lehman Statement of Fact Nos. 49-56, and

its "General Response" on pp. 1-2, *supra*.

78.    Canary Wharf also did not ███████████████████████████ *See* Email exchange between T. Briam and J. Clay, dated December 15, 2010, (Ex. 28) at MB0000654.

**Response to Lehman Statement of Fact No. 78:**  Immaterial to any issue

necessary to decide the parties' summary judgment motions.  Also disputed as incomplete.

Canary Wharf hereby incorporates its Responses to Lehman Statement of Fact Nos. 49-56, and

its "General Response" on pp. 1-2, *supra*.

79.    On December 3, 2010, without LBHI's consent, LBL and Canary Wharf signed a
letter agreement under which (1) Canary Wharf agreed to forfeit the lease by 11:59 pm on
December 10, 2010, (2) Canary Wharf would release any administration expense claim for
unpaid amounts up to the date of forfeiture, and (3) LBL would pay Canary Wharf £1.5 million
($2.4 million). *See* Ex. 16 to Decl. of Marc De Leeuw, filed March 14, 2014, at ¶ ¶ 2; 4(a) & (c);
Iacobescu Dep. (Ex. 45) 90:3–91:5; Email from A. Dietderich to R. Krasnow, R. Jones and E.
Del Nido attaching the forfeiture agreement, dated December 7, 2010, (Ex. 29) at LBHI
_CW0006531–32.

**Response to Lehman Statement of Fact No. 79:**  Admitted that Lehman Sub, its

administrators, and Canary Wharf entered into an agreement, dated December 3, 2010, pursuant

to which Canary Wharf would forfeit the Lease.

Also disputed as incomplete, particularly insofar as Lehman Sub agreed to

preservation of all unsecured claims by Canary Wharf.  (*See* Ex. 16 § 4.)  Canary Wharf refers to

Exhibit 16 (Forfeiture Letter) for the full terms of the December 3, 2010 forfeiture agreement.

Further disputed as incorrect and as unsupported by any evidence with respect to

the phrase "without LBHI's consent."  On the contrary, Lehman was fully aware of the

negotiations to terminate the Lease and the eventual forfeiture thereof.  Lehman served on the

Creditors' Committee for Lehman Sub, and "[t]he issue of information sharing is at the centre of

[LBL's] relationship with LBHI."  (Ex. 69 (Oct. 13, 2009 Lehman Sub Administrators' Progress

Report at 1, 12).)  Indeed, there was a high "level of interdependence between [Lehman Sub] and

[Lehman]," which was furthered as "[Lehman] plan[ned] their exit from 25 Bank Street."

(Ex. 69 (Oct. 13, 2009 Lehman Sub Administrators' Progress Report at 11).)  Throughout 2010,

"[t]he [LBL] Administrators regularly [met] with the Creditors' Committee," and at those

meetings the LBL Administrators would "explain in detail how [they were] dealing with key

aspects of the Administration and . . . consult the Committee on critical issues."  (Ex. 69 (April

13, 2010 Lehman Sub Administrators' Progress Report at 1; Oct. 12, 2010 Lehman Sub

Administrators' Progress Report at 2; April 13, 2011 Lehman Sub Administrators' Progress

Report at 3).)  This would have included negotiations for termination of the Lease, as "[t]he main

challenge encountered by [LBL's Infrastructure and Property] team [was] in managing the

vacation of 25 Bank Street."  (Ex. 69 (April 13, 2010 Lehman Sub Administrators' Progress

Report at 4; *see also* Oct. 12, 2010 Lehman Sub Administrators' Progress Report at 5).)  Indeed,

one of the LBL Administrators' "key highlights for the period" of 2010 was the "[d]iscussions

with Canary Wharf Group regarding the future of the head lease of 25 Bank Street," and a "key"

accomplishment was "accepting a forfeiture of the [Lease] in December 2010."  (Ex. 69 (Oct. 12,

2010 Lehman Sub Administrators' Progress Report at 4, 5; April 13, 2011 Lehman Sub

Administrators' Progress Report at 4, 5).)  In any event, Canary Wharf's counsel sent a copy of

the Forfeiture Letter to Lehman's lawyers on December 7, 2010.  (*See* Ex. 17.)

Canary Wharf also hereby incorporates by reference its "General Response" on

pp. 1-2, *supra*.

80.    On December 10, 2010, Canary Wharf forfeited the Lease.  *See* Canary Wharf's
Statement of Undisputed Material Facts, filed March 14, 2014, at ¶ 10 (ECF No. 43538-1);
Iacobescu Dep. (Ex. 45) 37:7-11.

**Response to Lehman Statement of Fact No. 80:**  Admitted.

81.    That same day, LBHI signed a confidentiality agreement with Canary Wharf to
gain access to information about the proposed J.P.Morgan transaction.  *See* Ex. 17 at
CW0018457.

**Response to Lehman Statement of Fact No. 81:**  Immaterial to any issue

necessary to decide the parties' summary judgment motions.  Canary Wharf hereby incorporates

by reference its "General Response" on pp. 1-2, *supra*.

82.    Canary Wharf sent LBHI a draft of its principal agreement with J.P.Morgan. *See* Email from A. Dietderich to R. Krasnow, E. Del Nido, D. Cash, R. Jones and D. O'Donnell, dated December 10, 2010, attaching draft agreement (Ex. 30). ███████████████████████ ████████████████████████████████████    *See id.*

**Response to Lehman Statement of Fact No. 82:**  Immaterial to any issue

necessary to decide the parties' summary judgment motions.  Also disputed as to the use of

"guarantee claims" because Lehman was an indemnitor, not a guarantor under the Lease.  Canary

Wharf also hereby incorporates by reference its Response to Lehman Statement of Fact No. 70,

and its "General Response" on pp. 1-2, *supra*.

83.    On December 22, 2010, LBHI advised Canary Wharf that it could not proceed with a settlement of Canary Wharf's guarantee claims absent, among other things, a review of the final, executed agreement with J.P.Morgan. *See* Ex. 17 at CW0018456–57.

**Response to Lehman Statement of Fact No. 83:**  Immaterial to any issue

necessary to decide the parties' summary judgment motions.  Also disputed as to the use of

"guarantee claims" because Lehman was an indemnitor, not a guarantor under the Lease.  Also

disputed because Lehman was an indemnitor, not a "guarantor" under the Lease.  Further

disputed as incomplete.  This is consistent with Lehman having sought information concerning

the JPMorgan transaction to determine the extent to which it mitigated Canary Wharf's damages

such that the proposed settlement was for a proper amount.  (*See* Ex. 62.)  Canary Wharf also

hereby incorporates by reference its "General Response" on pp. 1-2, *supra*.

84.    On January 27, 2011, Canary Wharf responded with documents and a cover letter from Mr. Dietderich informing LBHI that redactions had been made "to prevent disclosure of privileged legal advice in which the parties share a common legal interest." *See* Letter from A. Dietderich to R. Krasnow, dated January 27, 2011 (Ex. 31).

**Response to Lehman Statement of Fact No. 84:**  Immaterial to any issue

necessary to decide the parties' summary judgment motions.  Canary Wharf hereby incorporates

by reference its "General Response" on pp. 1-2, *supra*.

85.    But in all of the 152 documents to LBHI's counsel, the only redactions were of Sections 7.16 and 11.3.2, the ███████████████████████████████████ ██████ *See* Redacted Agreement Relating to the Grant of a Lease, dated December 20, 2010, (Ex. 32) at LBHI_CW0013667–70; LBHI_CW0013678–79.

**Response to Lehman Statement of Fact No. 85:**  Immaterial to any issue

necessary to decide the parties' summary judgment motions.  Also disputed as incomplete.

Canary Wharf hereby incorporates its Response to Lehman Statement of Fact Nos. 49-56 & 70,

and its "General Response" on pp. 1-2, *supra*.

86.    Neither Mr. Dietderich, the author of the cover letter, nor Ms. Kendall, Canary Wharf's in-house counsel, took responsibility for making the redactions or tried to defend them. *See* Dietderich Dep. (Ex. 41) 77:12–80:13; Kendall Dep. (Ex. 48) 163:19–166:5.

**Response to Lehman Statement of Fact No. 86:**  Immaterial to any issue

necessary to decide the parties' summary judgment motions.  Also disputed as inappropriately

argumentative and unsupported by the testimony cited with respect to the phrase "took

responsibility for making the redactions or tried to defend them."  *See Teall* v. *City of Chicago*,

986 F. Supp. 1098, 1100-01 (N.D. Ill. 1997) (striking eight paragraphs of argumentative material).

Canary Wharf also hereby incorporates by reference its "General Response" on pp. 1-2, *supra*.

87.    Canary Wharf then tried to limit discovery in this action to just (i) emails between Canary Wharf's and LBHI's counsel, which LBHI already had in its possession, (ii) deposition testimony from Mr. Dietderich, who was not involved in and had no knowledge of the J.P.Morgan transaction, and (iii) documents showing the uncontested fact that LBL stopped paying rent during 2010.  *See* Canary Wharf's Submission in Advance of the February 13, Status Conference (Proofs of Claim Numbers 14824 and 14826), filed February 11, 2013 (ECF No. 34533) ¶¶ 14–21; Letter from Canary Wharf, filed February 11, 2013 (ECF No. 34533-3); Hr'g Tr. 27:13–28:14, February 13, 2013 (Ex. 33).

**Response to Lehman Statement of Fact No. 87:**  Immaterial to any issue

necessary to decide the parties' summary judgment motions.

Also disputed as incomplete and incorrect.  Following briefing on the Objection,

in response to Canary Wharf's suggestion that the Court "resolve English law questions at the

outset" through a brief evidentiary hearing consisting of testimony from the parties' English-law experts, Judge James M. Peck agreed at a January 16, 2013 conference that "some form of evidentiary hearing" at which the English-law experts would testify "would be desirable," and asked the parties to meet and confer to reach a "broader understanding" on "prehearing procedures." (Ex. 46 at 14:8-18; 16:17-17:6.)[4]

The parties subsequently met and conferred, and exchanged written proposals on pre-hearing procedures. During that process, Lehman sought an open-ended and wide-ranging discovery program that would not be restricted in any way. For example, despite the fact that Lehman's counsel had specifically noted in open court at the January 2013 conference that it "believe[d] the facts are effectively undisputed" on the issue of whether releases in the Forfeiture Letter discharged Lehman's obligations such that the issue "is effectively a question of English law, which we could argue to Your Honor" (Ex. 46 12:1-24), Lehman nevertheless made a broad request for all documents related to the negotiation and execution of the Forfeiture Letter (*see* Ex. 70).

This proposed discovery program was wholly inappropriate for resolution of the issue of whether Lehman is liable for Canary Wharf's claims. As Judge Peck had stated in the January 2013 conference, many of the issues in dispute were "susceptible to a stipulation of facts, rather than the burdens of depositions or formal discovery." (Ex. 46 at 18:21-24.) Nevertheless, in response to Judge Peck's request at a February 2013 conference that the parties meet and confer to "endeavor to develop an agreed order" on the scope of discovery (Ex. 71 at

_____

[4] At Judge Peck's suggestion, Canary Wharf proposed to Lehman on February 1, 2013 that the parties resolve the liability issues in this litigation by arbitration in London before an English law expert. (January 16, 2013 Tr. (Ex. 46) 17:7-14; Ex. 47.) Lehman rejected Canary Wharf's proposal on February 5, 2013 (Ex. 48), perhaps because it recognized that its confusing and inconsistent arguments about English law would not pass scrutiny before an English lawyer.

23:20-23), Canary Wharf consented to Lehman's requested discovery proposal (*see* ECF#

35844).  This resulted in Canary Wharf producing nearly 80,000 pages of documents and

Lehman taking nine depositions.  Despite this protracted discovery program, Lehman's expert

declared that "nothing I have seen in the new material [i.e., the fact discovery in this case] I have

read has caused me to change the opinions that I expressed in my first opinion."  (Ex. 72 at 1.)

       Canary Wharf also hereby incorporates by reference its "General Response" on

pp. 1-2, *supra*.

    88.     Canary Wharf produced an unredacted copy of the Lease only after the Court
overruled its objections to discovery.  *See* Ex. 25; Hr'g Tr. (Ex. 33) at 29:14–30:4.

       **Response to Lehman Statement of Fact No. 88:**  Immaterial to any issue

necessary to decide the parties' summary judgment motions.  Also disputed as incomplete and

incorrect.  Canary Wharf hereby incorporates its Response to Lehman Statement of Fact No. 87,

and its "General Response" on pp. 1-2, *supra*.

89.    It was the first time that LBHI saw the provisions prohibiting Canary Wharf from serving a notice on LBHI under Paragraph 7(a) of the Surety Agreement and warranting that Canary Wharf had not done so.  *See* Krasnow Dep. (Ex. 49) 185:10–186:7.

**Response to Lehman Statement of Fact No. 89:**  Immaterial to any issue necessary to decide the parties' summary judgment motions.  Also disputed as unsupported with respect to the phrase "[i]t was the first time that LBHI saw the provisions" because Mr. Krasnow is incompetent to testify for all of Lehman on this topic.  Canary Wharf hereby incorporates its Response to Lehman Statement of Fact No. 70, and its "General Response" on pp. 1-2, *supra*.

Dated:    June 26, 2014

Respectfully submitted,

/s/ David B. Tulchin
David B. Tulchin
Marc De Leeuw
John J. Jerome
Andrew E. Gelfand
John G. McCarthy
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Tel:  (212) 558-4000
Fax:  (212) 558-3588

*Attorneys for Canary Wharf Management Ltd.,
Heron Quays (HQ2) T1 Limited and Heron Quays
(HQ2) T2 Limited*