**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE LEHMAN BROTHERS HOLDINGS INC., *et al.*, Debtors. | Chapter 11 Case No. 08-13555 (SCC)<br><br>(Jointly Administered) |

## DECLARATION OF LAURENCE RABINOWITZ, Q.C.

**Introduction**

1.    I have previously submitted a declaration dated 11 October 2012 and a report dated 17
July 2013 setting out my opinion on certain matters of English law.  I confirm that I have
no change to make to my opinion as set out in those documents.  Lehman is liable to Canary
Wharf for the simple reason that para 1 of Schedule 4 to the Lease provides that Lehman
"*shall indemnify and keep indemnified*" Canary Wharf for its losses, damages, etc "*by
reason of or arising directly or indirectly from any default by the Tenant.*"

2.    In papers recently submitted by Lehman in opposition to Canary Wharf's motion for
summary judgment and in support of Lehman's cross-motion for summary judgment,
Lehman has advanced an entirely new theory, never previously advocated by Lehman or
Lehman's expert Richard Millett.  As a result, I have been requested by counsel for
Canary Wharf to set out my opinion on certain matters of English law that arise in this
dispute, and in particular to address Lehman's new theory, which I have not heretofore
had an opportunity to address.  In this Declaration, I will use the abbreviations and

defined terms used in the Canary Wharf's Memorandum in support of their motion for summary judgment on liability dated 14 March 2014.[1]

3.    The structure of this declaration is as follows:

    (1)    I first address Lehman's new contention that part (ii) of para 1 of Schedule 4 is not sufficiently broad to enable Canary Wharf to recover the amounts sought in the Claims (paras 4 to 13 below).

    (2)    I next explain why Schedule 4 is an indemnity not a guarantee, including that the language used in para 1 is that of indemnity and that the contrast between para 1 and other sections in the contract (14.1 and 4.32) further supports the conclusion that Schedule 4 is an indemnity, and I address Lehman's arguments to the contrary (paras 14 to 46 below).

    (3)    Finally, I address an issue which arises only if (contrary to my view) Schedule 4 is a guarantee rather than an indemnity, namely the measure of damages recoverable where a tenant repudiates a lease (paras 47 to 76 below).

## The meaning of para 1 of Schedule 4

4.    I have previously addressed certain issues concerning the meaning of para 1 of Schedule 4 in my report at paras 77-88.

---

[1]    Below I also refer to several court decisions. The hierarchy of those courts is as follows: Prior to its replacement in 2009 by the Supreme Court of the United Kingdom, the House of Lords was the highest appellate court for most cases in the United Kingdom. The House of Lords heard all appeals from, among other courts, (a) the Court of Appeal of England and Wales, and (b) the Court of Appeal of Northern Ireland. The Court of Appeal of England and Wales hears appeals from the High Court of England and Wales, including from decisions of the Queen's/King's Bench Division and the Chancery Division of the High Court.

5.    Before filing its most recent memorandum, Lehman's and Mr Millett's contention was
      that all of para 1 of Schedule 4, including its second part—referred to below and in my
      report as "part (ii)" (see para 80 of my July 2013 report)—was modified by the language
      "*until the Tenant shall cease to be bound*," a reading that as I previously explained is
      incorrect (see paras 77-88 of my report). Lehman apparently no longer relies on this
      argument. (Lehman's Memorandum of Law dated 22 May 2014 in opposition to the
      Canary Wharf's motion for partial summary judgment and in support of Lehman's cross-
      motion for partial summary judgment ("Lehman Memorandum"), pp. 25-26, 28-29 &
      n.28.)

6.    Lehman now contends that part (ii) of para 1 is too narrowly worded to enable Canary
      Wharf to recover damages for the lost value of the future rent that would have fallen due
      for the unexpired term of the Lease (Lehman Memorandum, pp. 22-23). This point is
      also briefly made in the further declaration of Mr Richard Millett Q.C. dated 22 May
      2014 ("Millett 3rd Decl."), para 27. I address this argument in detail below although I
      might note at the outset that it is perhaps surprising, if this argument had any force, that
      the point is one not previously recognised or advanced by Lehman and Mr Millett.

7.    Part (ii) of para 1 requires Lehman to indemnify Canary Wharf against "*losses damages
      ... whatsoever sustained by [Canary Wharf] by reason of or arising directly or indirectly
      out of any default by the Tenant in the performance and observance of any of its
      obligations or the payment of any rents and other sums ...*". By April 2010, Lehman Sub
      had ceased making payments of rent, and indisputably made clear that it would make no
      further payments under the Lease. By reason of this default, Canary Wharf suffered

3

substantial "*losses.*"  Para 1 plainly states that Lehman must indemnify Canary Wharf for those losses.

8.  Lehman's new argument is that, after forfeiture of the Lease in December 2010, Lehman Sub no longer had any obligation to pay rent and, accordingly, was not capable of defaulting on any such obligation so that the loss by Canary Wharf of post-forfeiture rent was not caused by any default on the part of Lehman Sub.  This is wrong: the default on the part of Lehman Sub is not a post-forfeiture failure to pay rent, but rather Lehman Sub's admitted default in early 2010 when it stopped making payments and made clear that it would make no further payments under the Lease.

9.  The essential question is whether Canary Wharf's "*losses*" or "*damages*" arise "*directly or indirectly out of*" Lehman Sub's refusal to perform its obligations.  The answer is clearly yes.  But for Lehman Sub's default, Canary Wharf would have continued to receive the rent due under the Lease for its remaining term and would not have been constrained to install a new tenant; instead, Canary Wharf stands to receive only the lower amounts received from the JPMorgan transaction.

10.  It is important to stress that this is the result of applying the agreed bargain between Lehman and Canary Wharf as contained in para 1 of Schedule 4 regardless of the distinct question (considered separately below) whether English law affords a damages remedy to a landlord against a tenant after termination of a lease on account of his tenant's repudiatory breach (see paras 47 to 76 below).  More particularly, the "*losses*" sustained by Canary Wharf fall within the express words of part (ii) of para 1 and so, consequent on the bargain expressly made between the parties, are recoverable from Lehman by virtue of the contractual promise conveyed by those words.  This does not in any way depend

4

on whether, as a matter of the common law generally, English law would enable Canary Wharf to make a damages claim against Lehman Sub and it is material to note that there is nothing in the words of part (ii) of para 1 which suggests that Lehman's liability thereunder should be dependent on whether an analogous claim can be maintained at common law against Lehman Sub. In fact (as discussed at paras 14 to 46 below), the words of Schedule 4 have the opposite effect.

11. As noted in para 81 of my July 16, 2013 report, the expression "*by reason of or arising directly or indirectly*" in part (ii) of para 1 imports the widest conceivable nexus between Lehman Sub's default and the losses sustained by Canary Wharf.

12. To argue that Canary Wharf is not entitled to recover its losses after forfeiture would involve saying that Canary Wharf's election to forfeit the Lease broke the chain of causation, such that the loss of rent could no longer be said to arise, directly or indirectly, from Lehman Sub's antecedent default. However, that is plainly wrong. Forfeiture was a perfectly reasonable and foreseeable response to Lehman Sub's default. Indeed, forfeiture of the lease enabled Canary Wharf to mitigate its losses by installing a new tenant through a 999-year lease at the then-prevailing market rate. This is entirely consistent with the proviso to para 1, which required Canary Wharf to take "*all reasonable steps to mitigate*" its losses.

13. In this connection, I note that in interpreting para 1 of Schedule 4 an English court would seek to ensure that its analysis of the words used comports with business common sense (see para 30(6) of my report, which Mr Millett explicitly agreed with at para 20 of his 1st declaration dated 10 January 2013 ("Millett 1st Decl.")). I have already expressed the view that the express words used clearly suggest that Lehman agreed to be liable in the

5

circumstances that have arisen. It might also well be thought that, for Lehman to avoid its obligation in para 1 in the very circumstance in which it would be most needed—the Tenant has vacated the building, stopped paying rent, and made clear that it would no longer pay rent or any other sums due under the Lease, would make little or no business sense. Thus, the words used in para 1 discussed above and business common sense are in accord.

### Schedule 4 is an indemnity not a guarantee

14.     As previously explained, Schedule 4 creates a contract of indemnity, not a guarantee (para 48 of my report). The following amplifies my reasons for this conclusion.

*The labels used by the parties*

15.     Labels are important indicators of what the parties intended, even if they are not necessarily determinative. This is clear from a very recent (23 May 2014) decision of the Queen's Bench Division (Commercial Court) of the High Court of England and Wales in ABM Amro Commercial Finance plc v McGinn [2014] EWHC 1674 (Comm), where Flaux J held that the use in the contract in question of words of indemnification (e.g. "*agree to indemnify*", "*agreement to indemnify*" and the fact that the agreement was described as an "*Indemnity*") "*are indicative of assumption of a primary liability*", even if not conclusive (paras 25 and 36).

*The trigger for the indemnity*

16.     Mr Millett argues that part (ii) of para 1 is a guarantee because the trigger for Lehman's liability is a default by Lehman Sub (Millett 3rd Decl., para 8; Lehman Memorandum,

6

p. 26). Mr Millett describes this as a "*critical point*" to his argument. (Millett 3ʳᵈ Decl., para 8.)

17.     Mr Millett's argument assumes that it is impossible to have an indemnity that is triggered by a default on the part of the underlying obligor. That assumption is wrong. In Vossloh at para 25, Sir William Blackburne said that a contract of indemnity "*denotes a contract where the person who gives the indemnity undertakes his indemnity obligation by way of security for the performance of an obligation by another*". Since the whole point of an indemnity is to act as security for the performance of the underlying obligor, it can, and often will, be triggered by a breach by the underlying obligor of his obligation. Sir William Blackburne went on to say (at para 34) "*There may be little to distinguish ... whether the obligation undertaken is in the nature of a guarantee or an indemnity ... if the latter, [it] may be enforceable merely on demand (as with a performance or demand bond) or conditional on proof of default by the principal*" (emphasis added). In Clement v Clement (unreported, 20 October 1995), the Court of Appeal approved the lower court's five-point summary of the distinction between a guarantee and an indemnity. Point (2) was that a contract of indemnity was a "*contract by which the promisor undertakes to keep the promisee harmless against loss. Such loss may arise from the failure of a third party to perform an obligation owed to the promisee ...*" It is thus settled law that an indemnity may be against loss arising from the failure of the underlying obligor to perform his obligations, i.e. a default. (I note in passing that the Clement case is cited with apparent approval in Mr Millett's treatise (pages 13-14).)

18.     Indeed, the precedent Indemnity for the Fidelity of an Employee annexed to Mr Millett's treatise (at P13-001) provides, by clause 2, that the sureties "*each agree to indemnify the*

7

> *Employer against all loss damage costs and expenses of whatsoever nature which she may incur or sustain by reason of any misconduct (whether criminal or otherwise) or dishonesty or negligence on the part of the Employee ... or by reason of any failure by the Employee duly to fulfil and perform the duties required of him in connection with that office."* Mr Millett's treatise rightly describes this provision as an indemnity, even though the trigger is a default on the part of the employee.

19.  What matters, for a contract to be one of guarantee, is not the triggering event, but whether the recoverability of the loss from the surety is dependent on the underlying obligor also being *liable* for the same loss, i.e. whether the liability of the surety and the underlying obligor are co-extensive. In Clement, the Court of Appeal said (at point (5) of its list of distinctions between a guarantee and an indemnity) that, *"If the person liable under the contract may be liable for a greater amount than the principal debtor, the contract is probably one of indemnity."*

20.  The liability of Lehman under part (ii) of para 1 is not dependent on Lehman Sub also being liable for the same loss. Rather, Lehman's liability is for all claims, demands, losses, damages, etc *"whatsoever ... by reason of or arising directly or indirectly out of any default"* by Lehman Sub.

*Language of indemnity*

21.  The next point I address is Mr Millett's contention that a distinction is to be drawn between (a) an indemnity (in the narrow sense) and (b) a hold harmless obligation. This is the premise for Mr Millett's argument that construing part (ii) as an indemnity requires the Court to go beyond the usage of *"indemnity"* elsewhere in the Lease, which he says just means *"hold harmless"* (Millett 3rd Decl., para 14). The premise is wrong because

8

there is no such distinction: the two expressions are synonymous. This is a long established position under English law. In the decision of the Court of Appeal in Yeoman Credit v Latter [1961] 1 WLR 828 (cited by Mr Millett at para 30 of Millett 1st Decl. and cited seven times in Mr Millett's treatise), Holroyd Pearce LJ said (emphasis added):

> "*In its widest sense a contract of indemnity includes a contract of guarantee. But in the more precise sense used in various cases dealing with section 4 of the Statute of Frauds 1677 (and used in the arguments in this case), a contract of indemnity differs from a guarantee. An indemnity is a contract by one party to* **keep the other harmless against loss**, *but a contract of guarantee is a contract to answer for the debt, default or miscarriage of another who is to be primarily liable to the promisee.*"

22.     The fact that these expressions are synonymous is also clear from point (2) of the five-point summary in Clement v Clement, where the Court of Appeal described an indemnity in the narrow sense as one "*by which the promisor undertakes to keep the promisee harmless against loss*".

23.     Accordingly, it makes no difference whether part (ii) is described as imposing an "*indemnity*" or a "*hold harmless*" obligation. Either description distinguishes it from a mere guarantee.

24.     Mr Millett and Lehman (see Lehman Memorandum at 30-31) also refer to a number of cases, which are said to support the proposition that the use of the language of "*indemnity*" or "*primary obligation*" in the contract carries little or no weight. These cases do not establish that proposition and do not say that the language used is irrelevant to the classification of the contract as an indemnity or a guarantee:

        (1)     MS Fashions v BCCI [1993] Ch 425 (Civ) does not concern the distinction between a guarantee and an indemnity. It is a decision of the Civil Division of the

9

Court of Appeal of England and Wales concerning the effect of a *"principal debtor"* clause (not a *"primary obligation"* clause) on set-off in insolvency.

(2)  Marubeni Hong Kong v Mongolian Government [2005] 1 WLR 2497 (Civ) is a decision by the Civil Division of the Court of Appeal of England and Wales concerning the distinction between a guarantee and a demand bond,[2] not a guarantee and an indemnity (cf Lehman Memorandum, p. 28, fn. 30), and thus concerned a different issue. Indeed, the Court of Appeal held that the letter did contain an indemnity (Marubeni, para 32), but the appellant was precluded for procedural reasons from making that argument (Marubeni, para 35) and that is why the appeal failed.

(3)  Vossloh is a decision of the Chancery Division of the High Court of England and Wales which, like Marubeni, turned on the distinction between a guarantee and a demand bond, not between a guarantee and an indemnity (although the Court also set out the differences between a guarantee and indemnity) (cf Lehman Memorandum, p. 27).

(4)  Carey v Grupo Urvasco [2011] 2 All ER (Comm) 140 (Millett 3rd Decl., para 21 and Lehman Memorandum, p. 31) is a decision by the Queen's Bench Division (Commercial Court) of the High Court of England and Wales where the issue was whether the contract was a demand bond making the distinction between primary and secondary liability not determinative (as Blair J noted at para 22).

---

2   A demand bond is an undertaking to pay a specific sum of money on a mere demand by the creditor, even if the underlying obligor is not in default (Vossloh, para 28). It is a distinct species of contract from the contract of indemnity, although in Vossloh it was described as akin to a *"particularly stringent"* form of indemnity.

10

(5) CIMC Raffles v Schahin [2012] EWHC 1758 (Comm) is a decision by the Queen's Bench Division (Commercial Court) of the High Court of England and Wales in which Blair J held, on summary judgment, that the contract, which contained the language of "*primary obligation*" involved a primary obligation. Although he said that the words "*principal debtor*" (which appeared in the relevant contract) would not automatically convert a guarantee into an indemnity, he did not make the same observation about the language of "*primary obligation*" or in any event suggest that those words were irrelevant.

(6) The decision by the Civil Division of the Court of Appeal of England and Wales in CIMC Raffles [2013] EWCA Civ 644 principally concerned the purview doctrine. Rix LJ accepted (at para 60) that the provision in the contract which imposed a primary obligation on the defendant "*appears on the face of it to be a powerful clause for the purpose of excluding the Holme v Brunskill doctrine*", thus supporting the characterisation of the contract as an indemnity.

25. That para 1 of Schedule 4 is expressed to be a "*primary obligation*" and that section 10 of the Lease – "*The Surety's Covenants*" – is also stated to be a "*primary obligation*" thus further supports the conclusion that Schedule 4 is in the nature of an indemnity, not a guarantee. As I explain in para 46 of my report, an essential feature of a contract of indemnity is that a primary (rather than secondary) liability falls upon the indemnitor. (See also para 48(2) of my report.)

*Other provisions of Schedule 4*

26. As I explain in para 48(5) of my report, the fact that Lehman has undertaken to be liable jointly with Lehman Sub in para 2 of Schedule 4 reinforces the conclusion that Schedule

4 is an indemnity. In <u>Vossloh</u> (para 25), Sir William Blackburne said it was "*quite possible*" for an indemnitor to have undertaken his liability jointly with the underlying obligor. The same point is made in Mr Millett's treatise (p. 12). Mr Millett's treatise also states (p. 60) that, "*If the surety agrees with the creditor to become jointly liable with the principal (whether or not there is a release of the original debt) then he is undertaking a personal liability rather than a liability to answer for the debt of another and his promise falls outside the scope of s. 4 [of the Statute of Frauds Act].*" Here, Lehman has agreed to be jointly liable with Lehman Sub and thus Lehman must be undertaking a primary liability (i.e. an indemnity) rather than a mere liability to answer for Lehman Sub's debt (i.e. a guarantee).

27. The inclusion of para 3 of Schedule 4 sheds no light on whether the contract is an indemnity or a guarantee. This is because para 3 (which waives any right Lehman may have to require Canary Wharf to proceed first against Lehman Sub) is superfluous not only if Schedule 4 were an indemnity (Lehman Memorandum, p. 32), but also if Schedule 4 were a guarantee. Mr Millett's treatise (p. 326) says "*there is no obligation on the part of the creditor to commence proceedings against the principal, whether criminal or civil, or to commence arbitration against him, unless there is an express term in the contract requiring him to do so*". The same view is expressed in <u>The Modern Law of Guarantee</u> (p. 609), which says it is "*clear*" from the House of Lords' decision in <u>Moschi</u> v <u>Lep Air Services</u> [1973] AC 331 that a creditor is under no obligation to proceed first against the underlying obligor before suing the guarantor.

28. Although a provision with terms similar to para 6 of Schedule 4 (which preserves Lehman's liability in various events) would preserve liability in circumstances in which a

12

guarantor would otherwise be discharged, it is not superfluous in the context of the indemnity in Schedule 4 as Mr Millett argues (Millett 3rd Decl., para 10). Rather, a prudent draftsman should have included this provision. First, although Mr Millett has previously accepted that the Holme v Brunskill rule does not apply to an indemnity (Millett 1st Decl., fn. 8) and Lehman correctly accepts that well-founded concession as well in its memorandum (Lehman Memorandum, p. 24 fn. 27), he also refers to a suggestion by Blair J in the CIMC Raffles case to the effect that this is not yet "*clearly established on the authorities*" (Millett 3rd Decl., para 18). The inclusion of para 6 would guard against any argument that the Holme v Brunskill rule applies even to an indemnity. Secondly, the Encyclopedia of Forms and Precedents contains, in its volume on guarantees and indemnities, a checklist of points to consider when drafting a guarantee or indemnity, which states (para 1.2), "*A contract of indemnity may need to contain provisions analogous to those in guarantees, eg provisions under which the indemnifier's liability is maintained despite any variation of or release under the principal contract.*" Thus, the inclusion of provisions like para 6 of Schedule 4 is standard practice, even in indemnities.

29.   Mr Millett also seeks to rely on para 7 of Schedule 4 to support his contention that Schedule 4 is a guarantee. That is wrong, for the reasons explained at paras 91-101 of my report.

*The covenants by the Landlord's Guarantor*

30.   There is a key distinction between the obligations of the Landlord's Guarantor under section 14.1 of the Lease and Lehman's obligations under Schedule 4. By section 14.1, the Landlord's Guarantor covenants that "*the Landlord*" shall perform the covenants in

the Lease. By contrast, in part (i) of para 1, Lehman covenanted that "*the Tenant or the Surety*" would perform (emphasis added). The distinction is thus that, under section 14.1, the Landlord's Guarantor is promising only that the underlying obligor, i.e. the Landlord, will perform, whereas under part (i) of para 1, Lehman is promising that either Lehman Sub or Lehman itself will perform. Thus, under part (i), Lehman is undertaking from the outset a primary obligation that it will perform the Lease.

31.   In his original January 2013 declaration (Millett 1st Decl., para 37(i)(b)), Mr Millett sought to deal with this point by suggesting that para 1 of Schedule 4 was "*a composite form of guarantee which comprises both a "see to it" element and a "do it" element.*" Later in his original declaration (para 38(3)), Mr Millett may be suggesting that part (i) of para 1 is solely a "*do it*" guarantee: he says "*a guarantee can comprise either an obligation to "see to it" that the principal debtor performs or an obligation to perform if the principal debtor defaults, [i.e., a "do it" obligation]. This is simply a guarantee of the latter kind.*"

32.   The "*do it*" type of contract was described by Lord Reid in <u>Moschi</u> at 344G as follows:

> "A person might undertake no more than that if the principal debtor fails to pay any instalment he will pay it. That would be a conditional agreement. There would be no prestable obligation unless and until the debtor failed to pay."

33.   Accordingly, a "*do it*" guarantee exists only where the guarantor's obligation is "*conditional*" on the underlying obligor's default.

34.   Part (i) of para 1, however, has no such conditionality; Mr Millett has misread the text of the provision. As I explained in my July 2013 report at para 48(3), part (i) of para 1 of Schedule 4 imposes at the outset a concurrent obligation to perform the Lease that sits alongside the obligations of Lehman Sub, and that is not contingent upon action/inaction

14

of any other party. Part (i) does not say (as it easily could have done) that Lehman covenants that it will perform the Lease "*if the Tenant fails to do so*". It provides from the outset for Lehman to have a concurrent obligation to perform the Lease, alongside the obligation of Lehman Sub. Lehman's obligation exists independently of any default by Lehman Sub.

35.    Although I have previously explained this in my report, Mr Millett offers no answer, but merely re-asserts, wrongly, that Lehman's obligation is conditional (Millett 3rd Decl., paras 6(c) and 9(i)).

36.    Lehman's obligation under part (i) is thus materially different from that of the Landlord's Guarantor under section 14.1.

37.    Although academic in light of the above, I will address Mr Millett's suggested explanation as to why section 14.1 differs in this respect from part (i) of para 1. He suggests that the difference arises because the Landlord's Guarantor "*could not himself perform all of the landlord's covenants*" (Millett 3rd Decl., para 6(c)). However, the same was equally true for Lehman, which could not itself have performed all of Lehman Sub's covenants. For example, since Lehman was not in possession of the premises, it could not have performed the covenant to keep them in good repair (section 4.5 of the Lease) or to "*wash down all washable surfaces*" (section 4.7 of the Lease). Mr Millett's explanation for the distinction does not, therefore, stand up. The only remaining explanation is that the parties intended to impose a primary obligation on Lehman, in contrast with the secondary obligation assumed by the Landlord's Guarantor.

15

38.    Mr Millett also argues that, assuming part (i) of para 1 to be a guarantee, it would be
       superfluous if part (ii) confers an indemnity.  Mr Millett infers from this that part (ii)
       cannot be an indemnity.  I disagree with both propositions.

39.    Even accepting the faulty premise that part (i) of para is a guarantee, construing part (ii)
       as an indemnity does not render part (i) superfluous.  Part (i) imposes an obligation on
       Lehman actually to perform the covenants in the Lease, whereas part (ii) imposes a
       purely pecuniary obligation to indemnify Canary Wharf against loss.  These are different
       obligations, which might have distinct value depending on the circumstances.

40.    And even assuming (for the sake of argument) that there is redundancy, this does not
       mean that part (ii) should be construed as something other than an indemnity.  As
       Hoffmann J said (in *dicta* that have been oft-repeated in the appellate courts) in Tea
       Trade Properties v CIN Properties Ltd [1990] 1 EGLR 155 (Ch), a decision by the
       Chancery Division of the High Court of England and Wales, draftsmen of leases
       "*traditionally employ linguistic overkill and try to obliterate the conceptual target by
       using a number of phrases expressing more or less the same idea.*"  The torrential style is
       readily apparent in Schedule 4, e.g. the reference in para 1 to "*all claims demands losses
       damages liability costs fees and expenses*".

41.    Furthermore, as noted at para 48(7) of my report, Mr Millett's own treatise (at pages 15-
       16) says that standard form contracts often include indemnity provisions which "*overlap
       with the guarantee obligation completely*" and which "*may result in the guarantee
       aspects of the contract being redundant*".  Mr Millett's treatise cites a 2011 decision of
       the English High Court concerning a clause which did precisely that, i.e. it contained both
       a guarantee and an entirely overlapping indemnity provision.  The judge (Lewison J, now

16

Lord Justice Lewison, who is the author of a celebrated treatise on contractual interpretation) expressed no concern about surplusage and certainly did not rely on the presumption of surplusage as a ground for declining to give the indemnity its full effect.

42.     It is therefore entirely commonplace to find guarantee and indemnity provisions which entirely overlap with one another and such provisions are nevertheless given full effect. Accordingly, even assuming (incorrectly) that part (i) is a guarantee and that there would be overlap between parts (i) and (ii), there is no force in the argument that part (ii) should be construed as something other than an indemnity, merely to avoid rendering part (i) redundant.

43.     In any event, Mr Millett himself runs into a surplusage problem, because on his case nothing meaningful is added to part (i) by part (ii). He seeks to answer this point by suggesting that the wide words of part (ii) are intended to ensure that Lehman should hold Canary Wharf harmless to the same extent as Lehman Sub's obligation under the indemnity provision in section 4.32 of the Lease (to which I refer further below). However, that object would already be achieved by part (i) of para 1, since this requires Lehman to perform all of Lehman Sub's obligations under the Lease, including section 4.32. Mr Millett's suggestion does not, therefore, identify any additional territory covered by part (ii).

44.     Mr Millett's suggested explanation for the difference between part (ii) of para 1 and section 14.1 is also unpersuasive (Millett 3rd Decl., para 9(v)). He says that part (ii) was included to ensure that Lehman would be required to pay interest on the tenant's unperformed pecuniary obligations. If this were a good point, it would have applied equally to the Landlord's Guarantor, given that the landlord owed a pecuniary obligation

17

under section 6.8 of the Lease. In any event, Mr Millett's suggestion is based on the alleged uncertainty under English law about whether interest could be recovered as damages prior to the decision of the House of Lords in <u>Sempra Metals v Commissioners of Inland Revenue</u> [2008] 1 AC 561 (a case in which I acted for the successful appellants). However, there was never any uncertainty in English law about the enforceability of an express contractual obligation to pay interest and, in the present case, section 4.2 of the Lease expressly provides for interest to run on any unpaid sums. Consequently, it is not plausible to explain the inclusion of part (ii) as having been driven by a concern about the accrual of interest. Moreover, if that had been the concern, there would have been no reason to draft part (ii) in such wide terms.

*The "Indemnity" by Lehman Sub*

45.   Part (ii) of para 1 of Schedule 4 may be compared with the narrower indemnity given by Lehman Sub (in section 4.32 of the Lease), which does not use the word "*whatsoever*" and is confined to losses "*arising*" from Lehman Sub's breach (rather than losses "*by reason of or arising directly or indirectly*") and includes a broader mitigation obligation on Lehman Sub. Although Mr Millett suggests that the indemnity in section 4.32 and in part (ii) are co-extensive, it is plain from the language that Lehman's liability was intended to extend more widely than that of Lehman Sub. This supports my view that Schedule 4 is an indemnity.

46.   Even if one were to go along with Mr Millett's suggestion that Lehman's obligation under part (ii) was intended to echo Lehman Sub's obligation under section 4.32, this supports the conclusion that part (ii) creates a primary obligation, which is an essential feature of an indemnity. It goes without saying that Lehman Sub's obligation under

18

section 4.32 was primary in nature and, accordingly, to the extent the language of part (ii)
echoes section 4.32, part (ii) must also be primary in nature.

### Damages recoverable from a tenant upon forfeiture of a lease

47. There is an issue between the parties about whether a landlord who forfeits a lease by
reason of the tenant's repudiatory breach is entitled to damages from the tenant for the
lost value of the future rental stream that would have fallen due under the lease. I have
addressed this issue in my report at para 89 and make some further observations below.

48. This issue is academic in the present case, because, as explained above, in para 1 of
Schedule 4 Lehman confers an express indemnity on Canary Wharf in respect of (*inter
alia*) losses arising from Lehman Sub's default. Accordingly, Canary Wharf is entitled
under that indemnity to recover such losses from Lehman, regardless of whether it could
have claimed those losses as damages from Lehman Sub for repudiation of the Lease.

49. Subject to that proviso, I will next address the points made by Lehman.

50. Lehman says it is a "*centuries-old principle of English law*" that forfeiture of the Lease
terminated Lehman Sub's obligations thereunder, including the obligation to pay rent
(Lehman Memorandum, p. 1). Lehman contends that it would therefore be contrary to
that principle to hold that Canary Wharf are entitled to claim damages for the lost value
of the rent that would have accrued due after forfeiture. This is a *non sequitur*: the fact
that the obligation to pay rent is terminated upon forfeiture does not preclude the bringing
of a claim in damages for the lost value of the future rent under English law.

51. As explained in para 89(4) of my report, when a contract is terminated for a repudiatory
breach, the contractual obligations that have yet to be performed are converted by

19

operation of law into an obligation on the part of the contract-breaker to pay damages for the loss sustained by the innocent party. Thus, in the case of a contract to pay money in instalments, the termination of the contract means that no debt will fall due on the contractual payment debts, but a claim in damages will accrue for the present value of the future instalments (which was the position in Moschi, cited at para 89(4) of my report).

52. Applied to a lease, this would mean that, upon forfeiture, the defaulting tenant's obligation to pay rent would indeed come to an end, but it would be converted into an obligation to pay damages to the landlord for the lost value of the future rent.

53. Lehman argues that leases fall into an exceptional category, such that, in contrast with the undoubted position in relation to contracts generally, termination of a lease for repudiatory breach does not give rise to any damages claim against the tenant for the lost value of future performance. This involves a confusion on the part of Lehman.

54. As acknowledged in Millett's original January 2013 declaration (fn. 30), the "*modern view is that the doctrine of repudiation does apply to leases*". More particularly, and to similar effect, in holding that the contractual doctrine of frustration also applies to leases, the view that leases are not contractual in nature was decisively rejected by the House of Lords in National Carriers v Panalpina (Northern) [1981] AC 675 (HL).

55. This has material implications for the incorrect argument Lehman seeks to advance that leases fall into an exceptional category, such that the normal rules applicable to contracts that are terminated following a repudiatory breach should not apply. In particular, following on from the key decision in Panalpina: (a) it is necessary to treat pre-1981 cases with caution, since they are likely to be based on the (now-exposed) fallacy that a lease is not a contract; and (b) once it is accepted that a lease is a contract, there is no

20

reason why damages should not accrue upon forfeiture in the same way as they do upon termination of any other contract for repudiatory breach.

56.    Point (a) is, of course, important because of the substantial emphasis that Lehman places on a number of 18th and 19th century cases in its recitation of "*centuries-old*" English law (Lehman Memorandum, p. 17). However, it was not argued in any of those 18th and 19th century cases that the lease had been repudiated. These cases do not, therefore, purport to address the measure of damages available to a landlord where a lease has been repudiated.

57.    Turning to point (b), i.e. whether, once the contractual nature of a lease is appreciated, there is any reason why the damages for repudiation by the tenant should be any different from those applicable to any other contract, no English court has had to decide this question. The Court of Appeal of Northern Ireland, however, relying on English cases, has done so in Rainey Brothers v Kearney [1990] NI 18. That decision is a correct statement of English law.

58.    Lehman is simply wrong to argue that the Court of Appeal in Reichman v Beveridge decided that damages could not be claimed by a landlord upon repudiation of a lease (Lehman Memorandum, p. 17, fn. 21). As Lehman acknowledges, the Court of Appeal did not even reach a firm conclusion on the logically prior question of whether the doctrine of repudiation was applicable to leases in the first place, noting that it was unnecessary to decide this. *A fortiori*, the Court of Appeal could not therefore have decided whether a landlord who forfeits on the basis of a repudiatory breach is entitled to claim damages for the lost value of future rent (a question which arises only if the doctrine of repudiation applies to leases).

59.   The reason why the Court of Appeal did not need to reach either issue was because the
      landlord in Reichman had not actually forfeited the lease. Although the tenant had
      defaulted, the landlord elected to keep the lease on foot and to continue claiming rent as it
      fell due. Reichman is not a case, therefore, where the court was faced with a claim by a
      landlord for damages in respect of lost future rent.

60.   The issue in Reichman was different and arose as follows. Where one party repudiates a
      contract, the general rule is that the innocent party has an unfettered right to elect whether
      to keep the contract on foot and sue for sums falling due thereunder, or to terminate it and
      claim damages. There is, however, a very limited category of cases where the innocent
      party is not allowed to maintain the contract in force, namely where it would be "*wholly
      unreasonable*" do so and damages would be an adequate remedy (Reichman, para 17).
      The tenant's argument in Reichman was that this was such a case.

61.   Because of the "*wholly unreasonable*" threshold, the tenant had a very high bar to meet.
      The Court of Appeal was able to reject the tenant's contention on the basis that, if the
      landlord had terminated the lease, it was unclear whether he would thereupon have
      become entitled to damages for the lost value of future rent. Having referred to Walls v
      Atcheson, Lloyd LJ pointed out that no repudiation argument had been advanced in that
      case. The Court of Appeal in Reichman did not need to consider the impact of
      subsequent developments in the law, because "*the uncertainty of the position at law*" was
      sufficient to reject the suggestion that the landlord had behaved wholly unreasonably
      (Reichman, para 28).

62.   Insofar as there are *dicta* in Reichman regarding the availability of a damages claim, no English court would be bound to follow those *dicta* since they form no part of the *ratio decidendi*: Cornelius v Phillips [1918] AC 199 at 211 (House of Lords).

63.   In contrast, in the decision of the Court of Appeal of Northern Ireland in Rainey, it was essential to determine whether a landlord could claim damages for the lost value of future rent. The lower court in Rainey had actually awarded such damages to the landlord. In upholding that award, the Court of Appeal decided as part of its *ratio decidendi* that such damages were available.

64.   As explained in my report, the decision in Rainey was decided by a judge who subsequently became a member of the House of Lords. The fact Lord Hutton was later elevated to England's court of final appeal would undoubtedly enhance the authority of his judgment in Rainey in the eyes of any English court.

65.   While querying the significance of Lord Hutton's involvement in Rainey (Lehman Memorandum, fn. 26), Lehman goes on to say that Lord Neuberger is the current President of the Supreme Court, implying that his views should be given greater weight than those of Lord Hutton. Lord Neuberger has not commented in his judicial capacity on the issue with which we are presently concerned.[3] However, as noted in Reichman, para 27, Sir David Neuberger (as he then was) spoke in a 2000 debate against Lord Millett (the father of Lehman's expert, Richard Millett) in favour of the view that the doctrine of repudiation is and should be part of the English law of landlord and tenant. He said that "*it would be positively just that a landlord should be entitled to damages for*

---

[3]   As I explain at para 96 below, the issue in the Active Estates case was different.

*premature determination of the lease, as with any other contract.*" This strongly suggests that Lord Neuberger would (like Lord Hutton) adopt the reasoning in <u>Rainey</u>.

66.     Further, as also explained in my report, <u>Rainey</u> was founded on a consideration of three English (not Northern Irish) cases. Those cases amply support the conclusion reached by the Northern Irish Court of Appeal (cf Lehman Memorandum, p. 20).[4] Regrettably, none of these three cases (or <u>Rainey</u> itself) was drawn to the attention of the English Court of Appeal in <u>Reichman</u>. This would further detract from any weight that might otherwise be given to any *dicta* in <u>Reichman</u>.

67.     If the question of damages for repudiation of a lease were now to arise in litigation in England, an English court (at any level of hierarchy) would, in my view, follow <u>Rainey</u>, and there is no English decision to the contrary. Accordingly, <u>Rainey</u> represents the current state of English law, not a "*change*" in English law (cf Lehman Memorandum, p. 21).

---

[4]     Lehman's argument that the <u>Mackintosh</u> case concerned a building contract not a lease is, in this context, a distinction without a difference, and was considered and rejected as lacking in any substance by Lord Hutton in <u>Rainey</u>. Indeed, in <u>Mackintosh</u> itself, Kennedy J described the contract as a "*building lease*" and described its termination as involving its "*forfeiture*". As for <u>Gray v Owen</u> [1910] 1 KB 622 and <u>William v Lewis</u> [1915] 3 KB 493, they each involve the award of damages for future rent that would have accrued after the termination of the lease and are, therefore, inconsistent with Lehman's contention that such damages are incapable of being awarded. Mr Millett incorrectly states (para 83(ii)) of his original declaration that in <u>Gray</u>, "[*The Court only awarded damages] in respect of the rent accruing in the interval between the surrender and the re-letting.*" In fact, the plaintiff had not succeeded in re-letting the property when he instituted proceedings: as the court explained, "*If the plaintiff had succeeded in letting the house at the same or a higher rent, of course he would have only been entitled to nominal damages, but as he did not succeed in letting or selling it he is entitled to recover the amount of the rent which he has lost.*" By parity of reasoning, the Court would also have awarded damages for the reduction in rent, had the landlord-plaintiff re-let the property at a lower rent, which is Canary Wharf's situation. In any event, even Mr Millett acknowledges the key point, i.e. that damages were held to be recoverable for periods after the end of the lease.

68.     Lehman places weight on the fact that Rainey has not subsequently been cited by any
        English court (Lehman Memorandum, p. 20). There is no force in this point. Rainey was
        decided in 1990 and, so far as I am aware, the only subsequent English case which gives
        any consideration to the issue is Reichman itself.[5]   Accordingly, no occasion has arisen
        since 1990 (apart from Reichman) in which it would have been relevant for an English
        court to cite Rainey.   For comparison purposes, in the seven-and-a-half years since
        Reichman was decided in 2006, it seems to have been cited in only a single decision, at
        first-instance, and which had nothing to do with leases but rather with the scope of the
        "*wholly unreasonable*" exception in the general law of contract law described at para 60
        above.

69.     In addition to relying on Reichman, Lehman suggests that the decision of the House of
        Lords in In re Park Air Services plc [2000] 2 AC 172 addressed the landlord's
        entitlement to damages upon forfeiture of a lease for repudiatory breach. This is not
        correct.  Park Air concerned the statutory power of a liquidator to disclaim an onerous
        lease, and the corresponding statutory entitlement on the part of a landlord to
        compensation in the event that the power of disclaimer is exercised.[6]  The ability of a
        landlord to claim damages where a lease was brought to an end, not by a statutory
        disclaimer, but by forfeiture for repudiatory breach, was not before the House of Lords.

---

[5]     As noted in para 89(8) of my report, both parties in Reichman were unrepresented and the
        advocate to the Court seems to have overlooked Rainey.
[6]     The issue was the exceedingly narrow one of whether, under the Insolvency Rules (a
        form of secondary legislation), a landlord who claims statutory compensation upon
        disclaimer must give credit for accelerated payment of the future rent or whether he is
        entitled to the future rental stream, without a discount.

70.     Lehman emphasises a passing observation (at page 185B of the Park Air decision) by
        Lord Millett (not Lehman's expert, Richard Millett) to the effect that, before the
        disclaimer legislation was introduced, well-drawn leases gave the landlord the right to
        forfeit in the event of the tenant's insolvency, but the landlord faced the difficulty that, if
        he exercised that right, he "*could not obtain compensation for the consequences of his
        own action in forfeiting the lease*" (Lehman Memorandum, p. 18). This was not dealing
        with the damages recoverable in the event of a repudiatory breach by the tenant. Lehman
        has made the error of assuming that an event (such as insolvency) which entitles a party
        to terminate is to be equated with a repudiatory breach. This is not correct.

71.     Contracts frequently give either or both parties an option to terminate in defined
        circumstances which are not in themselves wrongful. Insolvency is a good example:
        unless the tenant has undertaken to remain solvent, insolvency (without more) may not
        involve a breach of contract at all, still less a repudiation; even an insolvent tenant may
        continue performing its obligations, at least for a time. Of course, insolvency is
        frequently accompanied by a failure to make the payments due under the contract, but it
        is the failure to pay that constitutes the breach of contract, not the insolvency.

72.     The Court of Appeal decision of Financings Ltd v Baldock [1963] 2 QB 104 explained
        that the termination of a contract in reliance on an express option to terminate does not
        (absent a repudiation) entitle the terminating party to claim damages for the lost value of
        future performance. As Diplock LJ said at page 123:

        "... where one party has done something which the law (which "is the perfection
        of reason") regards as a wrongful repudiation of the contract and the other party
        has thereupon determined the contract, whether under an express power contained
        in the contract or in the exercise of his right to do so under the common law, he is
        entitled to damages for non-performance of the contract during the period that it
        has still to run; but that if that party has not done something which the law regards

26

> as a wrongful repudiation of the contract, the other party, although he may be entitled under an express power to determine the contract, is not entitled to damages for non-performance of the contract during the period for which it would have continued to run but for such determination."

73.     Lord Denning MR noted (at pages 110-111) that the same reasoning applied to leases, if terminated pursuant to an express power of re-entry (absent a repudiatory breach).

74.     In Park Air, the court was merely observing that a landlord who exercised an express option to terminate in the event of insolvency did not (absent a repudiatory breach) accrue any right to compensation for the lost right to future rent. This does not bear on the question of whether such compensation accrues, where there is a repudiatory breach.

75.     I would add that it would be anomalous if a landlord could not recover damages upon terminating a lease for repudiatory breach, for two reasons. First, this would mean that a landlord, who had suffered an undoubted loss as a result of the tenant's repudiation of his obligations, would be unable to recover that loss. This would be manifestly unjust. English law would not countenance such an outcome, if it could reasonably be avoided. Given that the question is an open one on the authorities, an English court would instead prefer an outcome which enabled the landlord to recover compensation for the loss which he has undoubtedly suffered, not least where this seems both logical and in accordance with general contractual principles, but where this also has support not only from Lord Hutton, but also (albeit extra-judicially) from Lord Neuberger, the current President of the Supreme Court. Secondly, in the converse situation, i.e. where a landlord wrongfully evicts a tenant from a lease, the tenant is entitled to damages for the "*value of the unexpired term at the date of wrongful eviction, calculated by reference to the rental value of the premises, less the contractual rent payable under the lease*": Ahmed v Jaura [2002] EWCA Civ 210 at para 9 (Court of Appeal). In my view, the English courts

27

would avoid creating an arbitrary distinction between the rights of a landlord upon forfeiture and the rights of a tenant upon eviction. This is a further reason why the English courts would follow <u>Rainey</u>.

76.    Lastly, Lehman says that, if the landlord is not entitled to post-forfeiture rent from the tenant, this applies equally as against the surety, citing <u>Active Estates v Parness</u> [2002] EWHC 893 (Ch), a decision by the Chancery Division of the High Court of England and Wales (Lehman Memorandum, p. 19, fn. 25). However, in the passage cited by Lehman, the judge was considering a provision of a guarantee (clause 8.1), which provided that, "*if the Tenant shall make any default at any time during the term in payment of rent, ... the Guarantor will pay the rent ...*", i.e. a "*do it*" form of guarantee. In stating that, following forfeiture, the landlord could claim rent neither from the tenant nor the guarantor, the judge was merely summarising the effect of clause 8.1. There was no issue in <u>Active Estates</u> about the effect of forfeiture on a claim for damages arising by virtue of the tenant's repudiatory breach.

**Summary of conclusions**

77.    My views may be summarised as follows:

(1)    Lehman Sub's default as of April 2010, in ceasing to make payments due under the Lease and evincing an intention not to make any such payments in the future, caused Canary Wharf "losses" or damages "*arising directly or indirectly out of [Lehman Sub's] default*" within the meaning of part (ii) of para 1 of Schedule 4. Therefore, and in accordance with the terms of that provision, Lehman is responsible to indemnify Canary Wharf for those losses.

28

(2)     Para 1 of Schedule 4 is an indemnity, not a guarantee, for the reasons given
        above, including (a) the language used is that of indemnity, (b) Lehman
        undertaking liability jointly with Lehman Sub, which is indicative of an
        indemnity, (c) the language of para 1 contrasts with the guarantee of the
        Landlord's Guarantor in section 14.1 of the Lease, and (d) Lehman's liability
        under para 1 is wider than that of Lehman Sub under section 4.32 of the Lease
        and stated as a primary obligation. Lehman's arguments based on surplusage and
        the supposed distinction between an indemnity and a "*hold harmless*" obligation
        are simply wrong.

(3)     As a matter of English law, a landlord who forfeits a lease on account of the
        repudiatory breach of the tenant is entitled to claim damages against the tenant for
        the lost value of future rent, less mitigation. There is no English case that decides
        otherwise as part of its *ratio decidendi*. The decision of the Court of Appeal of
        Northern Ireland in Rainey is one of considerable authority, is consistent with
        earlier English case-law and is correct as a matter of principle. Thus, even if
        (contrary to my view) Schedule 4 is a contract of guarantee, Canary Wharf may
        recover from Lehman its damages for the lost value of future rent, less mitigation.

I declare under penalty of perjury under the laws of the United States of America that the
foregoing is true and correct.

Executed on 25 June 2014

Laurence Rabinowitz Q.C.

29