# Exhibit 29

[1981] A.C. 675                                                                                           Page 1
1981 WL 188018 (HL), [1981] 1 All E.R. 161, (1982) 43 P. & C.R. 72, [1981] 2 W.L.R. 45, (1981) 125 S.J. 46, 12-17-1980 Times 188,018
**(Cite as: [1981] A.C. 675)**



**\*675** National Carriers Ltd. Respondents v. Panalpina (Northern) Ltd. Appellants

House of Lords

HL

Lord Hailsham of St. Marylebone L.C.Lord Wilberforce , Lord Simon of Glaisdale Lord Russell of Killowen and Lord Roskill

1980 Oct. 6, 7, 8; Dec. 11

Contract--Frustration--Lease--10--year lease of warehouse--Access road closed by local authority for 20 months--Whether lease frustrated--Whether doctrine of frustration applicable to executed lease--Considerations to be taken into account--Likely length of continuance of lease after interruption of user in relation to term granted

A warehouse was demised to the defendants for a period of 10 years from January 1, 1974. By the lease, the defendants covenanted, inter alia, not to use it otherwise than for the purpose of a warehouse without the plaintiffs' consent. The only vehicular access to the warehouse was by a street which the local authority closed on May 16, 1979, because of the dangerous condition of a derelict Victorian warehouse opposite to that demised to the defendants. In the events that subsequently happened, the period between the closure of the street and its reopening after demolition of the Victorian warehouse was likely to be about 20 months. During that period, the demised warehouse was rendered useless for the defendants' purposes. In an action by the plaintiffs for recovery of unpaid rent, the defendants claimed that the lease had been frustrated by the events that had happened. In proceedings by the plaintiffs for summary judgment under R.S.C., Ord. 14, Master Waldman and Sheen J. held themselves bound by the decision of the Court of Appeal in Leighton's Investment Trust Ltd. v. Cricklewood Property and Investment Trust Ltd. [1943] K.B. 493 to hold that a lease could not be the subject of frustration. Judgment was accordingly entered for the plaintiffs, Sheen J. granting the defendants a certificate under section 12 of the Administration of Justice Act 1969 for appeal direct to the House of Lords.

On the defendants' appeal: -

Held, dismissing the appeal, that (per Lord Hailsham of St. Marylebone L.C., Lord Wilberforce, Lord Simon of Glaisdale and Lord Roskill) the doctrine of frustration was in principle applicable to leases; but that in the present case, having regard in particular to the likely length of continuance of the lease after the interruption of user in relation to the term originally granted, on the facts the defendants had failed to raise a triable issue as to its applicability (post, pp. 684C-D,688C-D,690D-E,697A,G - 698B,702A-B,706B-C, 707E-F,709F,717F-G,718A).

Cricklewood Property and Investment Trust Ltd. v. Leighton's Investment Trust Ltd. [1945] A.C. 221, H.L.(E.) considered.

Leighton's Investment Trust Ltd. v. Cricklewood Property and Investment Trust Ltd. [1943] K.B. 493, C.A. overruled.

**\*676** Per Lord Simon of Glaisdale. Executed performance may be a factor to be taken into account in considering whether in all the circumstances, a lease should be held to be frustrated (post, p. 707C-D). Consideration should be given to whether the English doctrine of frustration could be made more flexible (post, p. 707F-G).

Per Lord Russell of Killowen. The termination of a lease may be involved in the frustration of a commercial adventure when, as merely incidental to the overall commercial adventure, and a subordinate factor, a lease has been granted. I would also reserve consideration of cases of physical destruction of flying freeholds and of the total disappearance of a site into the sea. With those minor qualifications, however, I would adhere to the views expressed in the Cricklewood case by Lord Russell of Killowen and Lord Goddard that the doctrine of frustration can never apply to a lease (post, pp. 707H,709B-D).

Decision of Sheen J. affirmed.

The following cases are referred to in their Lordships' opinions:

Admiral Shipping Co. Ltd. v. Weidner, Hopkins & Co. [1916] 1 K.B. 429.

Bank Line Ltd. v. Arthur Capel & Co. [1919] A.C. 435, H.L.(E.).

Blane Steamships Ltd. v. Minister of Transport

Copr. © West 2004 No Claim to Orig. Govt. Works

[1981] A.C. 675                                                                                    Page 2
1981 WL 188018 (HL), [1981] 1 All E.R. 161, (1982) 43 P. & C.R. 72, [1981] 2 W.L.R. 45, (1981) 125 S.J. 46, 12-17-1980 Times 188,018
**(Cite as: [1981] A.C. 675)**

[1951] 2 K.B. 965, C.A.

Cusack-Smith v. London Corporation [1956] 1 W.L.R. 1368.

Davis Contractors Ltd. v. Fareham Urban District Council [1956] A.C. 696; [1956] 3 W.L.R. 37; [1956] 2 All E.R. 145, H.L.(E.).

Denman v. Brise [1949] 1 K.B. 22; [1948] 2 All E.R. 141, C.A.

Denny, Mott & Dickson Ltd. v. James B. Fraser & Co. Ltd. [1944] A.C. 265; [1944] 1 All E.R. 678, H.L.(Sc.).

Embiricos v. Sydney Reid & Co. [1914] 3 K.B. 45.

Firth v. Halloran (1926) 38 C.L.R. 261.

Highway Properties Ltd. v. Kelly, Douglas & Co. Ltd. (1971) 17 D.L.R. (3d) 710.

Hirji Mulji v. Cheong Yue Steamship Co. Ltd. [1926] A.C. 497, P.C.

Jackson v. Union Marine Insurance Co. Ltd. (1874) L.R. 10 C.P. 125.

Krell v. Henry [1903] 2 K.B. 740, C.A.

Leighton's Investment Trust Ltd. v. Cricklewood Property and Investment Trust Ltd. [1942] 2 All E.R. 580; [1943] K.B. 493; [1943] 2 All E.R. 97, C.A.; sub nom. Cricklewood Property and Investment Trust Ltd. v. Leighton's Investment Trust Ltd. [1945] A.C. 221; [1945] 1 All E.R. 252, H.L.(E.).

London and Northern Estates Co. v. Schlesinger [1916] 1 K.B. 20.

Matthey v. Curling [1922] 2 A.C. 180, H.L.(E.).

Paradine v. Jane (1647) Aleyn 26.

Port Line Ltd. v. Ben Line Steamers Ltd. [1958] 2 Q.B. 146; [1958] 2 W.L.R. 551; [1958] 1 All E.R. 787.

Rom Securities Ltd. v. Rogers (Holdings) Ltd. (1967) 205 E.G. 427.

Tamplin (F.A.) Steamship Co. Ltd. v. Anglo-Mexican Petroleum Products Co. Ltd. [1916] 2 A.C. 397, H.L.(E.).

Tatem (W. J.) Ltd. v. Gamboa [1939] 1 K.B. 132; [1938] 3 All E.R. 135.

Tay Salmon Fisheries Co. Ltd. v. Speedie, 1929 S.C. 593.

Taylor v. Caldwell (1863) 3 B. & S. 826.

Tsakiroglou & Co. Ltd. v. Noblee Thorl G.m.b.H. [1962] A.C. 93; [1961] 2 W.L.R. 633; [1961] 2 All E.R. 179, H.L.(E.).

*677 Walsh v. Lonsdale (1882) 21 Ch.D. 9, C.A.

Whitehall Court Ltd. v. Ettlinger [1920] 1 K.B. 680.

The following additional cases were cited in argument:

Constantine (Joseph) Steamship Line Ltd. v. Imperial Smelting Corporation Ltd. [1942] A.C. 154; [1941] 2 All E.R. 165, H.L.(E.).

Mackeson v. Boyd, 1942 S.C. 56.

Total Oil Great Britain Ltd. v. Thompson Garages (Biggin Hill) Ltd. [1972] 1 Q.B. 318; [1971] 3 W.L.R. 979; [1971] 3 All E.R. 1226, C.A.

APPEAL from Sheen J. in chambers.

By their writ issued on July 9, 1979, the plaintiffs, National Carriers Ltd., pleaded that they were the owners of the freehold interest in business premises comprising warehouse no. 2, English Street, Kingston-upon-Hull; that by a lease dated July 12, 1974, they had let the premises to the defendants, Panalpina (Northern) Ltd., for a term of 10 years from January 1, 1974, at the yearly rent of <<PoundsSterling>>6,500 during the first five years and during the remainder at such yearly rent as should be determined in accordance with the provisions of clause 4 (1) of the lease; the yearly rent for the last five years of the term had been duly determined in the sum of <<PoundsSterling>> 13,300; that it was an express term of the lease that the defendants should pay the yearly rent by equal quarterly payments in advance on January 1, April 1, July 1 and October 1 in every year; and that in breach o <<PoundsSterling>> that express term the defendants had failed to pay the sum of << PoundsSterling>>5,115.38 by way of rent notwithstanding the plaintiffs' demands therefor, viz. quarterly payments of rent due on April 1, 1979, and July 1, 1979, at the rate of <<PoundsSterling>>13,300 per annum,

Copr. © West 2004 No Claim to Orig. Govt. Works

[1981] A.C. 675                                                                                                    Page 3
1981 WL 188018 (HL), [1981] 1 All E.R. 161, (1982) 43 P. & C.R. 72, [1981] 2 W.L.R. 45, (1981) 125 S.J. 46, 12-17-1980 Times 188,018
**(Cite as: [1981] A.C. 675)**

<<PoundsSterling>>          6,650,       less
<<PoundsSterling>>1,534.62 paid on May 15,
1979.      They      claimed      payment      of
<<PoundsSterling>>5,115.38. interest and costs.

By their defence, served on July 29, 1979, the
defendants admitted the averments of the statement
of claim and pleaded that at all material times they
had carried on, inter alia, the business of
warehousing and had used the warehouse for the
commercial storage of their goods; that the lease
had further demised to them a right of way for all
purposes connected with the occupation of the
warehouse in common with all others entitled
thereto over and along the road giving access
thereto; that that road was known as Kingston
Street and formed the sole means of access, both
pedestrian and vehicular, to the warehouse; that the
warehouse was a commercial warehouse with a
storage area of 18,677 square feet or thereabouts
provided with a loading bay and large doors at its
entrance on to Kingston Street; that in the premises
the foundation of the lease as contemplated by the
parties thereto was that the defendants would enjoy
the use of the warehouse for the purposes of their
business and further that they would be able to
enjoy that use by gaining access to it over Kingston
Street; and that by reason of the matters thereafter
set out the lease had been discharged by reason of
frustration of the foundation thereof. Those matters
were that in or about April 1978 the Kingston-
upon-Hull City Council as agents for the highway
authority, the county council, had made an order
under section 12 (1) of the Road Traffic Regulation
Act 1967; that on or about May 19, 1979, the city
*678 council had made a further order under
section 12 (1) of the Act of 1967 closing English
Street to use by both pedestrians and vehicles for a
period of three months from that date; that it was
the intention of the city council to seek the
approval of the Secretary of State under section 12
(6) of the Act of 1967 for the extension of the order
for a period of at least one year from its expiry in
October 1979 and there was no immediate prospect
of Kingston Street being reopened after that time;
and that by reason of the foregoing the defendants
had been obliged to cease use of the warehouse on
May 16, 1979, and had had to acquire alternative
warehouse accommodation for the purposes of
their business. In the premises, they denied that the
rent was due to the plaintiffs as alleged or at all.
They counterclaimed for a declaration that by
reason of the closure of Kingston Street the lease
made between the parties had been frustrated and
was thereby discharged.

On the plaintiffs' summons under R.S.C., Ord. 14,
r. 3 for summary judgment, Master Waldman

ordered that judgment be entered for them for <<
PoundsSterling>>5,115.38 with interest to be
assessed and costs. On October 16, 1979, Sheen J.
in chambers by consent, without giving a reasoned
judgment because he held that he was bound, as the
master had held himself to be bound, by the
decision of the Court of Appeal in Leighton's
Investment Trust Ltd. v. Cricklewood Property and
Investment Trust Ltd. [1943] K.B. 493 that as a
matter of law the doctrine of frustration could not
apply to a lease, dismissed an appeal by the
defendants. He certified pursuant to section 12 of
the Administration of Justice Act 1969 that a point
of law of general public importance was involved
in his decision and that the point of law was one in
respect of which he was bound by a decision of the
Court of Appeal in previous proceedings and had
been fully considered in the judgment of the Court
of Appeal in those proceedings and granted the
defendants' application for a certificate for leave to
present a petition of appeal to the House of Lords.
He further ordered that there be a stay of execution
for one month; if within that time a petition of
appeal was presented, the stay to continue until
after the determination of the appeal or further
order.

On December 5, 1979, the Appeal Committee of
the House of Lords (Lord Wilberforce, Lord
Russell of Killowen and Lord Keith of Kinkel)
allowed a petition by the defendants for leave to
appeal.

The defendants appealed.

The facts are set out in the opinion of Lord
Hailsham of St. Marylebone L.C.

*Anthony Scrivener Q.C.* and *Mark Lowe* for the
defendants. There are two points in this appeal: (1)
whether the doctrine of frustration can apply to
leases; (2) if it can, whether the defendants have
shown that there is a triable issue here. Master
Waldman and Sheen J. felt themselves bound by
authority to hold that the doctrine of frustration did
not apply to leases; that was accepted by both sides
before Sheen J.

To summarise the defendants' points on the lease:
(i) it is for a 10- year term; (ii) it purports to demise
not only the warehouse premises themselves but
also the right of way connected with the occupation
of *679 the premises; (iii) the only permitted user
is a warehouse user. Connected with this: (iv) it is
clear from references in the lease that both parties
knew that it was to be a warehouse lease. (v) There
is no right to assign, transfer or underlet. (vi) The
rent to be paid, by clause 4 (1), during the second

Copr. © West 2004 No Claim to Orig. Govt. Works

[1981] A.C. 675                                                                                       Page 4
1981 WL 188018 (HL), [1981] 1 All E.R. 161, (1982) 43 P. & C.R. 72, [1981] 2 W.L.R. 45, (1981) 125 S.J. 46, 12-17-1980 Times 188,018
**(Cite as: [1981] A.C. 675)**

five years of the term is the open market rent for the premises let for the purpose of a warehouse: that is the criterion that the arbitrator would have to apply if there were no agreement. (vii) By clause 4 (2) the parties expressly deal with one situation, where the premises, or part of them, may have been destroyed by fire, but not with any other possibility. This is coupled with the duty to insure against fire risks. (viii) Clause 4 (3), providing for termination of the lease by the landlord in the event of the premises being required for British Railways purposes, goes with clause 4 (2): it is another possible eventuality that could cause frustration of the lease that the parties have dealt with. (ix) The proviso for reentry.

Looking at the lease as a whole, it can be described as an ordinary modern commercial lease.

The defendants advance eight propositions. The first three relate to the general principles applicable to frustration as a whole. (1) The underlying principle of the doctrine of frustration is that it is a device to effect a just and reasonable solution as between the parties in the light of the circumstances that have arisen. (2) It is based on the imposition by the court of an implied term (this is the way in which the courts have most usually viewed the matter). (3) A term will only be implied where the foundation of the contractual arrangement has gone. The remainder of the propositions are specifically with regard to leases. (4) There is no valid reason why the doctrine should not be applied to leases as to all other contractual arrangements. (5) The correct approach to take in the case of a lease is to ascertain the real foundation of the arrangement and see whether it still exists in the light of the terms of the lease, the surrounding circumstances and the special rules that relate to leases. (6) That a lease is a "chattel interest" is a relevant factor to consider, but it is not necessarily conclusive in favour of the proposition that the doctrine of frustration does not apply to leases. (7) In a short business type of lease that contains a restriction on user and a covenant against assignment and subletting, the foundation of the lease is not just the parting with possession by the landlord and the vesting of it in the tenant but is the tenant's commercial purpose. (8) There is in any event a triable issue as to the subject matter of this demise and whether on the facts frustration has occurred.

As to the authorities, Taylor v. Caldwell (1863) 3 B. & S. 826 shows that, so far as the disappearance of the subject matter is concerned, the principle is a wide one. The passage, at p. 832, in which the court said that the contract was inaccurately called a "letting," which it is suggested excludes leases, is ambiguous. Joseph Constantine Steamship Line Ltd. v. Imperial Smelting Corporation Ltd. [1942] A.C. 154 (see p. 171, *per* Viscount Maugham; pp. 184-185, *per* Lord Wright) states the principles that can be deduced from many other cases. In Cricklewood Property and Investment Trust Ltd. v. Leighton's Investment Trust Ltd. [1945]A.C. 221 *680 Viscount Simon L.C. was envisaging that a contract could be frustrated by the frustration of its purpose. That can also apply to leases. It makes the distinction on which the defendants rely: one is dealing here not with a simple lease but with a lease that has a particular purpose. In the Cricklewood case it was a building lease; in the present, it is a commercial lease. There is no difference, on the defendants' case, between a time charter of a ship and this lease. The other point that Viscount Simon makes is, anticipating what the others of their Lordships are going to say, and the importance that they attach to the grant of land by lease, to cite Atkin L.J. in Matthey v. Curling [1922] 2 A.C. 180, 199-200, to the effect that, if a lease can provide for itself to be determined on the happening of specified events, it is not heresy for frustration to do the same (p. 230). Viscount Simon says that there is no authority binding on the House that the doctrine of frustration does not apply to leases. Lord Russell of Killowen says that it is unreal to think that anything of importance attaches to "estate" when it is really no more than a chattel interest. A lease is a "venture or undertaking" in itself; it is also unreal in the context of a commercial lease, where there is no right to assign and a right to carry on only one particular activity. What Lord Wright says is not very different from what Viscount Simon says except in detail. He is at pains to show that there is no D authority binding on the House, and cites authorities to show that by English law the lessee's covenants are generally absolute (p. 239). Lord Porter agrees with Lord Russell. Two points are made in the speeches that are advantageous to the defendants' case: (i) the chattel interest point; (ii) that the foundation of a lease is the parting with possession and the vesting of it in the tenant. It is better nowadays to look at it as a business exercise rather than as a vesting exercise. It is a question of degree whether there is any distinction between business and residential leases.

The doctrine of frustration has now been applied to all types of contract, including contracts of employment. Is there some special feature of a lease so that it is dealt with in some special way? There is no significance in the words "chattel interest": that is purely a label. It means a possessory right, to the exclusion of anyone else.

[1981] A.C. 675                                                                                          Page 5
1981 WL 188018 (HL), [1981] 1 All E.R. 161, (1982) 43 P. & C.R. 72, [1981] 2 W.L.R. 45, (1981) 125 S.J. 46, 12-
17-1980 Times 188,018
(Cite as: [1981] A.C. 675)

Anything in that category, for example, hire purchase, could be called a chattel interest. *Holdsworth, History of English Law*, vol. 3, 5th ed. (1942), p. 131, shows that at that date "chattel interest " was used to denote a class of rights that was a mere right of detainer.

Moving away from the historical position for the position as regards landlord and tenant, see R. G. McElroy and Glanville Williams. "The Coronation Cases - I " (1940-1941) 4 M.L.R. 241, 257 et seq.: the "right in rem" is illusory. Lord Goddard's speech in the Cricklewood case [1945] A.C. 221, 243-245, has been criticised by academic writers on the basis that he was saying that it had a greater meaning than that. It can only be of secondary character. It is subject to the lease. It follows its terms. It is coextensive with its contractual terms. It is controlled by the contractual terms of the lease. It is a creature of the lease. It is appendant to and not the foundation of the lease. It has no separate identity in modern terms. *681 This view has found favour in Canada, Australia and the United States: see Highway Properties Ltd. v. Kelly, Douglas & Co. Ltd. (1971) 17 D.L.R. (3d) 710; *Williston on Contracts*, 3rd ed. (1978), vol. 18, s. 1955; *Corbin, Contracts*, vol. 6 (1951), s. 1356, pp. 383-384, also s. 1355, p. 382, which contains hints pointing in the same direction: that there is no validity in considering the question whether it is a lease or a licence or a pure contract so far as frustration is concerned; Firth v. Halloran (1926) 38 C.L.R. 261; see also Tay Salmon Fisheries Co. Ltd. v. Speedie, 1929 S.C. 593.

There is no distinction between a lease and any other form of contract. The argument the other way, based on Paradine v. Jane (1647) Aleyn 26, forgets the fact that at that time there was no doctrine of frustration: see, again, the Cricklewood case [1945] A.C. 221, 237, *per* Lord Wright. The fact that there is an absolute covenant to pay rent is irrelevant. Lord Wright's approach is therefore the proper one.

As to the application of the doctrine of frustration to the facts, see *per* Lord Radcliffe in Davis Contractors Ltd. v. Fareham Urban District Council [1956] A.C. 696; Embiricos v. Sydney Reid & Co. [1914] 3 K.B. 45, 54, *per* Scrutton J.; Denny, Mott & Dickson Ltd. v. James B. Fraser & Co. Ltd. [1944] A.C. 265, 277-278, *per* Lord Wright. What happened afterwards may be relevant in the sense that Lord Wright suggests, at pp. 277-278.

The relevant matters here are that this was a commercial venture; that the unexpired term was of four and a half years; that the interruption was of a

year to 18 months, and the nature of the business being carried on. There cannot be said to be no triable issue on that. [Reference was made to Doherty v. Monroe Eckstein Brewing Co. (1921) 191 N.Y.S. 59 and the Public Health Act 1961, s. 25.] An interruption of 12 to 20 months, with four and a half years to run, in a commercial lease is capable of amounting to frustration. Investigation of the facts is for the judge. There was a triable issue here.

[LORD HAILSHAM OF ST. MARYLEBONE L.C. Their Lordships do not require the plaintiffs to address them on the question whether there was a triable issue, but they would wish to hear their short submissions on the point of law. They would wish the plaintiffs to give their reasons why the doctrine of frustration cannot in any circumstances apply to leases.]

*Gerald Godfrey Q.C.* and *Edwin Prince* for the plaintiffs. The plaintiffs propose first to look at the English cases leading up to the Cricklewood case [1945] A.C. 221, then to approach the matter a priori as a matter of principle. They make eight propositions. (1) The tenant has received from the landlord full consideration for his covenant to pay rent, viz., a conveyance of the leasehold interest created by the lease, with all the benefits and burdens incident to that interest. (2) The tenant can protect himself by stipulation against supervening events, and he often does, for example, by a provision for the suspension of rent in case of fire or other perils; compare clause 4 (2) of the lease here. He can also protect himself by insurance against such risks. (3) The doctrine of frustration can apply only to obligations that are executory and that can be rendered impossible of performance by subsequent events; in the case of a lease the landlord's whole obligation is executed when he grants the lease and gives *682 possession to the tenant. (4) An obligation to pay money, suck as rent, is never impossible of performance. (5) A basic principle of land law, whether on sale or on lease, is that the risk of accidents passes to the purchaser or lessee. The House should not disturb this basic principle. (6) A lease, because it creates an estate in land, operates in rem as well as inter partes, and third parties, for example, sublessees or mortgagees, may acquire rights in the term that it creates. Applying the doctrine of frustration to a lease would or might destroy the interests of third parties against their wishes. (Propositions 7 and 8 are arguments from expediency rather than of principle.) (7) To apply the doctrine of frustration to leases now, though theoretically possible, would run contrary to all English law for 350 years. (8) If frustration can ever apply to leases, it can only be

[1981] A.C. 675                                                                                              Page 6
1981 WL 188018 (HL), [1981] 1 All E.R. 161, (1982) 43 P. & C.R. 72, [1981] 2 W.L.R. 45, (1981) 125 S.J. 46, 12-17-1980 Times 188,018
**(Cite as: [1981] A.C. 675)**

in the case of catastrophic events such as the destruction or loss of the land itself, in the nature of the civilian rei interitus.

On 1 (that all benefits and burdens pass), supervening events might increase the value of the interest. So, too, it may decrease. In either case, it is not the landlord's concern except as regards his own interest. Quite separately from the tenant, the reversion may benefit or lose by subsequent events.

On 2, the plaintiffs would add that the law should not interfere with property rights more than necessary and should leave parties to make their own bargains as to the events, if any, in which the obligation to pay rent is to be suspended without importing the doctrine of frustration into the law so as to destroy involuntarily a legal estate in land.

The distinction with a long term lease of a chattel is between rights that operate in rem and rights that operate in personam. It is a difference between rights sounding in property and rights sounding in contract. This is of particular importance where the rights of third parties are concerned. The position as regards a lease of land may be very different from rights under the law of contract. It is difficult to say why this should not apply to a tanker. If a house falls into the sea, the purchaser is still bound to pay; why should this not be applicable to leases? [Reference was made to Mackeson v. Boyd, 1942 S.C. 56; and the Cricklewood case [1945] A.C. 221.] Leases are primarily interests in land, with contractual elements or overtones added. [Reference was made to Rom Securities Ltd. v. Rogers (Holdings) Ltd. (1967) 205 E.G. 427.] Dealing with the cases on frustration in chronological order, the foundation is London and Northern Estates Co. v. Schlesinger [1916] 1 K.B. 20. [Reference was made to Whitehall Court Ltd. v. Ettlinger [1920] 1 K.B. 680; Matthey v. Curling [1922] 2 A.C. 180; Megarry and Wade, The Law of Real Property, 4th ed. (1975), pp. 673-674).] Before 1951, there was no authority as to whether a demise charterparty, as opposed to a time charterparty, could be frustrated. In Blane Steamships Ltd. v. Minister of Transport [1951] 2 K.B. 965 it was argued by Roskill K.C., at p. 975, that a demise charterparty was not capable of being frustrated; he said that there was no authority as to whether it could be or not.

Real property is different in nature and kind, not in degree, from a chattel, for example, a ship the subject of a demise charterparty. Land has always been regarded by the law as indestructible (apart from a convulsion of nature); see also Megarry and Wade, 4th ed., pp. 43-47 (esp. 45), **683** 653, 1170.

[Reference was made to Leighton's Investment Trust Ltd. v. Cricklewood Property and Investment Trust Ltd. [1943] K.B. 493 (see the argument of Fortune for the defendants at p. 494); Denman v. Brise [1949] 1 K.B. 22 and Total Oil Great Britain Ltd. v. Thompson Garages (Biggin Hill) Ltd. [1972] 1 Q.B. 318.] The only safe course is to stay with this line of authority and say that the doctrine of frustration does not apply to leases.

The plaintiffs do not propose to deal with the defendants' eight propositions, which are a mirror image of their own. As to the cases relied on by them, the plaintiffs agree that Taylor v. Caldwell, 3 B. & S. 826, operates to mitigate the absolute rule in Paradine v. Jane, Aleyn 26, but its authority is limited. It was dealing with a destructive event, and that was all that was being considered. It rested on an implied term, but that has been recognised over the years as an unfortunate basis, so that the case is vitiated to that extent: it would have been better to have rested on failure of consideration. The theories as to the basis of the doctrine are set out in Cheshire and Fifoot's Law of Contract, 9th ed. (1976), pp. 944-948: there are the implied term theory, the just solution theory (Lord Sumner in Hirji Mulji v. Cheong Yue Steamship Co. Ltd. [1926] A.C. 497, 510), the foundation of the contract theory (W. J. Tatem Ltd. v. Gamboa [1939] 1 K.B. 132) and the construction theory: what is the true meaning of the contract? [Reference was made to Joseph Constantine Steamship Line Ltd. v. Imperial Smelting Corporation Ltd. [1942] A.C. 154.]

As to the Canadian, Australian and United States cases, the plaintiffs accept that these are more favourable to the doctrine of frustration (see, e.g., Highway Properties Ltd. v. Kelly, Douglas & Co. Ltd., 17 D.L.R. (3d) 710), but they would make observations as to the contexts in which the remarks in those cases were made. [Reference was made to Williston on Contracts, 3rd ed.; Corbin, Contracts.] The question is who bears the risk of a temporary cessation. This is a question of policy. As the Full Court said in Firth v. Halloran, 38 C.L.R. 261, 266, the determination of a demise is an extraordinary thing. As to Tay Salmon Fisheries Co. Ltd. v. Speedie, 1929 S.C. 593, Scots law is different from English in this respect. The Tay Salmon case and Matthey v. Curling [1922] 2 A.C. 180 cannot stand together.

*Scrivener Q.C.* in reply. The danger of asking whether there are some special circumstances in which the doctrine of frustration applies to leases is that the question of principle is apt to get confused with what will happen in practice when the

[1981] A.C. 675                                                                                                    Page 7
1981 WL 188018 (HL), [1981] 1 All E.R. 161, (1982) 43 P. & C.R. 72, [1981] 2 W.L.R. 45, (1981) 125 S.J. 46, 12-
17-1980 Times 188,018
**(Cite as: [1981] A.C. 675)**

doctrine is applied to the facts: see Treitel, The Law of Contract, 5th ed. (1979), pp. 669-670. It is the seaside bungalow type of lease to which one can envisage the doctrine of frustration applying. The defendants adopt that. The fact that a principle may be difficult to apply does not necessarily mean that it is wrong.

There are two foundations for the thought that leases are outside the doctrine of frustration. First, there is the dictum of Lush J. in London and Northern Estates Co. v. Schlesinger [1916] 1 K.B. 20, 24. It is clear that in that case the only "adventure" was the giving of possession. Secondly, there is the foundation by analogy with Paradine v. Jane, Aleyn 26. That case went off on an absolute covenant; it is no support for the doctrine that frustration cannot apply to leases. Lush J.'s dictum stood **\*684** on the basis that a lease was an interest in land, albeit a chattel interest. That has, however, no separate status apart from the lease itself. The basis is shown to be illusory. Why, therefore, should leases have been dealt with in a different way? There is no magic in the term "chattel interest" or in the fact that a lease conveys an interest in land, because all that is governed by the contract. Lush J.'s dictum was thus based on unsound foundations. Also, as Lord Wright said in the Cricklewood case [1945] A.C. 221, 241, the doctrine of frustration is modern and flexible and not subject to being constricted by an arbitrary formula. The defendants also pray in aid Firth v. Halloran, 38 C.L.R. 261, *per* Isaacs J.

If the doctrine of frustration can apply to leases, there is no reason why the test should not be the same as in other contract cases: what was the adventure?

Their Lordships took time for consideration. December 11. LORD HAILSHAM OF ST. MARYLEBONE L.C.

My Lords, we are all agreed that this appeal from decisions of Master Waldman and Sheen J. refusing leave to defend under R.S.C., Ord. 14 fails on the facts for the reasons given by my noble and learned friends to which personally I have nothing to add. The appellants have failed to raise a triable issue.

Nevertheless, though they arrive in your Lordships' House by an unusual route, the proceedings do raise an interesting and important general question of principle relating to the extent and nature of the law of frustration which has long been debated and which, since the matter has

reached this stage and has been fully argued, should now be decided by your Lordships' House.

This question is the applicability of the law of frustration to leases and agreements for a lease. The question is discussed at length in Cricklewood Property and Investment Trust Ltd. v. Leighton's Investment Trust Ltd. [1945] A.C. 221 by the decision of which in the Court of Appeal [1943] K.B. 493 Master Waldman and Sheen J. rightly considered themselves bound, with the result that, in dismissing the appeal from Master Waldman, Sheen J. gave his certificate under section 12 of the Administration of Justice Act 1969, and so, for the first time in my experience, an Order 14 summons by-passes the Court of Appeal and "leapfrogs" directly to the Appellate Committee of the House of Lords.

Before I reach a discussion on the point of law it is necessary that I fill in the factual background. This illustrates the curious and sometimes unexpected results which can ensue from the present vogue of listing industrial buildings as part of our national heritage. Kingston Street, Hull, is a continuation of English Street (of which originally it may have been part) and terminates by running perpendicularly into a T-junction with Railway Street. Before it reaches this end, it crosses more or less at right angles an intersection with Commercial Road and Manor House Street. Hereinafter, when I speak of Kingston Street, I shall be referring solely to that section of it between this intersection and the T-junction with Railway Street. Although it is now, it would seem, a public highway for all types of traffic, it may well be that at one time it was the private property of railway company, since otherwise it is difficult to explain **\*685** the "demise" (sic) of a private right of way along it by the lessors of the property about to be described.

Kingston Street is bounded on both sides by warehouses and on part of one side by a railway shed. At one side of it, at the point nearest the intersection, is a derelict and ruinous Victorian warehouse which at some time has become, under the laws for the conservation of our national heritage, a "listed building," which means that it cannot be demolished without the consent of the Secretary of State for the Environment, and that, if the demolition is objected to by local conservationists (as in fact happened), this consent will not be granted without the holding of a public local inquiry. Even assuming a result favourable to demolition the total process is likely to last a year. In the events which have happened, the process is not yet complete, but, on the material before us, is likely to be concluded by the end of December

[1981] A.C. 675                                                                                          Page 8
1981 WL 188018 (HL), [1981] 1 All E.R. 161, (1982) 43 P. & C.R. 72, [1981] 2 W.L.R. 45, (1981) 125 S.J. 46, 12-17-1980 Times 188,018
**(Cite as: [1981] A.C. 675)**

1980 or the beginning of January 1981. By that time, it will have lasted about 20 months.

Since, in course of time, the Victorian warehouse became dangerous as well as derelict it evidently presented problems of safety to the Kingston-upon-Hull City Council. In 1978 they placed a restriction order on Kingston Street, and on May 16, 1979, they closed it altogether to vehicular traffic. It was not made altogether clear to us under what powers they acted, but the closure was subsequently confirmed and continued by the Secretary of State, and, at the present, access to Kingston Street is not merely prohibited to vehicles, but rendered physically impossible, by the erection across it by the local authority of a fenced barrier. This will not be removed until the demolition process is completed at the end of the current year or the beginning of next.

Opposite the ruinous listed building, there is another warehouse, more or less triangular in shape, the only access to which (except perhaps on foot) is via a loading bay in Kingston Street. The consequence of the application for demolition, and the subsequent proceedings, has been that, from May 16, 1979, until the time when the barriers are finally removed and the prohibition order lifted, this triangular warehouse has been rendered totally useless for the one purpose, that of a commercial warehouse, for which alone it is fitted, and for which alone, by the terms of the contract between the parties, it may be lawfully used.

In 1974 the triangular warehouse had become the subject of a demise between the plaintiffs/respondents to these proceedings, the lessors, and the defendants/appellants. This demise was contained in a lease dated July 12, 1974, and was expressed to run for 10 years from January 1, 1974. The terms of the lease, most of which are not unusual in documents of this kind, contained inter alia a covenant to pay an annual rent ( <<PoundsSterling>>6,500 for the first five years, for the second five years subsequently increased by agreement in accordance with a formula contained in clause 4 (1) of the lease to << PoundsSterling>>13,300) payable in advance by four quarterly instalments. The present proceedings, commenced by writ dated July 9, 1979, are for the payment of <<PoundsSterling>>5,115.38 being the two quarterly instalments due on April 1 and July 1, 1979. There is no dispute between the parties as to the amount of this sum, nor, subject to the defence of frustration hereinafter to be mentioned, as to the liability of the defendants/appellants to pay it.

The lease also contained obligations by the tenants to pay rates. to **\*686** repair, to pay a rateable proportion of the expense of cleaning and maintaining the sewers, roads, etc., to insure at full value in the joint names of landlord and tenant, to paint, to yield up in good and substantial repair at the end of the tenancy, not to assign or sublet, alter, or to utilise otherwise than for the purpose of a warehouse without the written consent of the landlord, and other matters. The landlord's covenants included an express covenant of quiet enjoyment. There were special provisions for the suspension of the obligation to pay rent and for the termination of the tenancy at the option of the landlord in case of destruction by fire, and provisions for re- entry by the landlord in case of breach of covenant, or on six months' notice if the premises were required for the proper operation of British Railways (with whom the plaintiffs are associated).

The sole defence raised by the defendants/appellants to their obligation to pay rent was that, by reason of the events described above, the lease had become frustrated and was therefore wholly at an end. By their printed case each party raised two questions for your Lordships' decision. The first is the broad question of principle, viz. whether the doctrine of frustration can ever apply to determine a lease, and the second, of particular application, whether even if the doctrine can on occasion apply there is here a triable issue as to whether it does apply to the lease between the parties in the circumstances described. In the event of both questions being determined in favour of the appellants, your Lordships, if allowing the appeal, would have no option but to return the case for trial at first instance, with the possible result that, after a lapse of two years, it might reappear in your Lordships' list for a second hearing. In any event, unless some guidance is given on the first issue, sooner or later argument would have to be directed to it in some later proceeding. It is therefore perhaps as well that, although dismissing the appeal on the second question, we thought it right to hear the first fully argued on both sides. We are doubly indebted to counsel for the appellants, who, though aware that he had not succeeded, nevertheless stayed to deliver an admirably concise reply to the forceful arguments on the point of principle helpfully presented on behalf of the respondents.

The doctrine of frustration is of comparatively recent development. The general rule of common law, laid down as early as 1647 in Paradine v. Jane, Aleyn 26, is that the performance of absolute promises is not excused by supervening

[1981] A.C. 675                                                                                          Page 9
1981 WL 188018 (HL), [1981] 1 All E.R. 161, (1982) 43 P. & C.R. 72, [1981] 2 W.L.R. 45, (1981) 125 S.J. 46, 12-17-1980 Times 188,018
**(Cite as: [1981] A.C. 675)**

impossibility of performance. Paradine v. Jane itself, a case arising out of the civil war, was, like the present, an action of debt based on a covenant to pay rent contained in a lease. But, since the doctrine of frustration had not at that stage come into existence, the argument turned solely on the absolute and unconditional nature of the promise to pay the rent, and the applicability to the estate in land created by the demise of any such doctrine did not arise.

It is generally accepted that the doctrine of frustration has its roots in the decision of the Court of Queen's Bench given by Blackburn J. in Taylor v. Caldwell (1863) 3 B. & S. 826. In that case, the parties to the contract had used terms appropriate to the relationship of landlord and tenant describing the money payment as "rent" and the transaction as a "letting." But, after analysing the facts, Blackburn J. decided that the true nature of the transaction was not one of landlord and tenant but one **\*687** of licensor and licensee. He then added at p. 832, cryptically, the words: "Nothing, however, in our opinion, depends on this." I am inclined to think that by these words he was in effect taking the view which I myself am about to express, but, as counsel for the respondents firmly pointed out when I put the point to him in argument, they are capable of a more neutral meaning, viz. that since the question of demise did not arise in the case before the court it did not call for decision. I am content to assume, though I am inclined to the contrary view, that this is right.

At least five theories of the basis of the doctrine of frustration have been put forward at various times, and, since the theoretical basis of the doctrine is clearly relevant to the point under discussion, I enumerate them here. The first is the "implied term" or "implied condition" theory on which Blackburn J. plainly relied in Taylor v. Caldwell, as applying to the facts of the case before him. To these it is admirably suited. The weakness, it seems to me, of the implied term theory is that it raises once more the spectral figure of the officious bystander intruding on the parties at the moment of agreement. In the present case, had the officious bystander pointed out to the parties in July 1974 the danger of carrying on the business of a commercial warehouse opposite a listed building of doubtful stability and asked them what they would do in the event of a temporary closure of Kingston Street pending a public local inquiry into a proposal for demolition after the lease had been running for over five years, I have not the least idea what they would have said, or whether either would have entered into the lease at all. In Embiricos v. Sydney Reid & Co. [1914] 3 K.B. 45, 54 Scrutton J.

appears to make the estimate of what constitutes a frustrating event something to be ascertained only at the time when the parties to a contract are called on to make up their minds, and this I would think to be right, both as to the inconclusiveness of hindsight which Scrutton J. had primarily in mind and as to the inappropriateness of the intrusion of an officious bystander immediately prior to the conclusion of the agreement.

Counsel for the respondent sought to argue that Taylor v. Caldwell, 3 B. & S. 826, could as easily have been decided on the basis of a total failure of consideration. This is the second of the five theories. But Taylor v. Caldwell was clearly not so decided, and in any event many, if not most, cases of frustration which have followed Taylor v. Caldwell have occurred during the currency of a contract partly executed on both sides, when no question of total failure of consideration can possibly arise.

In Hirji Mulji v. Cheong Yue Steamship Co. Ltd. [1926] A.C. 497, 510 Lord Sumner seems to have formulated the doctrine as a "... device [sic], by which the rules as to absolute contracts are reconciled with a special exception which justice demands "and Lord Wright in Denny, Mott & Dickson Ltd. v. James B. Fraser & Co. Ltd. [1944] A.C. 265, 275 seems to prefer this formulation to the implied condition view. The weakness of the formulation, however, if the implied condition theory, with which Lord Sumner coupled it, be rejected, is that, though it admirably expresses the purpose of the doctrine, it does not provide it with any theoretical basis at all.

Hirji Mulji v. Cheong Yue Steamship Co. Ltd. is, it seems to me, really an example of the more sophisticated theory of "frustration of the adventure" or "foundation of the contract" formulation, said to have originated **\*688** with Jackson v. Union Marine Insurance Co. Ltd. (1874) L.R. 10 C.P. 125, compare also, for example, *per* Goddard J. in W. J. Tatem Ltd. v. Gamboa [1939] 1 K.B. 132, 138. This, of course, leaves open the question of what is, ill any given case, the foundation of the contract or what is "fundamental" to it, or what is the "adventure." Another theory, of which the parent may have been Earl Loreburn in F. A. Tamplin Steamship Co. Ltd. v. Anglo-Mexican Petroleum Products Co. Ltd. [1916] 2 A.C. 397, is that the doctrine is based on the answer to the question: "What in fact is the true meaning of the contract? ": see p. 404. This is the "construction theory." In Davis Contractors Ltd. v. Fareham Urban District Council [1956] A.C. 696, 729 Lord Radcliffe put the matter thus, and it is the

Copr. © West 2004 No Claim to Orig. Govt. Works

[1981] A.C. 675                                                                                          Page 10
1981 WL 188018 (HL), [1981] 1 All E.R. 161, (1982) 43 P. & C.R. 72, [1981] 2 W.L.R. 45, (1981) 125 S.J. 46, 12-
17-1980 Times 188,018
**(Cite as: [1981] A.C. 675)**

formulation I personally prefer:

"... frustration occurs whenever the law recognises that without default of either party a contractual obligation has become incapable of being performed because the circumstances in which performance is called for would render it a thing radically different from that which was undertaken by the contract. Non haec in foedera veni. It was not this that I promised to do."

Incidentally, it may be partly because I look at frustration from this point of view that I find myself so much in agreement with my noble and learned friends that the appellants here have failed to raise any triable issue as to frustration by the purely temporary, though prolonged, and in 1979 indefinite, interruption, then expected to last about a year, in the access to the demised premises. In all fairness, however, I must say that my approach to the question involves me in the view that whether a supervening event is a frustrating event or not is, in a wide variety of cases, a question of degree, and therefore to some extent at least of fact, whereas in your Lordships' House in Tsakiroglou & Co. Ltd. v. Noblee Thorl G.m.b.H. [1962] A.C. 93 the question is treated as one at least involving a question of law, or, at best, a question of mixed law and fact. For a discussion of the apparent inconsistency of this view with the verdict of the jury in Jackson v. Union Marine Insurance Co. Ltd., L.R. 10 C.P. 125 see Professor Treitel's treatise on *The Law of Contract*, 5th ed. (1979), p. 671, where the author suggests that the reconciliation may lie in the distinction between primary and secondary facts now developing as the result of the disappearance of the civil jury.

This discussion brings me to the central point at issue in this case which, in my view, is whether or not there is anything in the nature of an executed lease which prevents the doctrine of frustration, however formulated, applying to the subsisting relationship between the parties. That the point is open in this House is clear from the difference of opinion expressed in Cricklewood Property and Investment Trust Ltd. v. Leighton's Investment Trust Ltd. [1945] A.C. 221 between the second Lord Russell of Killowen and Lord Goddard on the one hand, who answered the question affirmatively, and Viscount Simon L.C. and Lord Wright on the other, who answered it negatively, with Lord Porter reserving his opinion until the point arose definitively for consideration. The point, though one of principle, is a narrow one. It is the difference immortalised in H.M.S. Pinafore between "never" and "hardly ever," since both Viscount Simon and Lord Wright **\*689** clearly conceded that, though they thought the doctrine applicable in principle to

leases, the cases in which it could properly be applied must be extremely rare.

With the view of Viscount Simon and Lord Wright I respectfully agree. It is clear from what I have said already that, with Lord Radcliffe in the passage I have cited, I regard these cases as a subspecies of the class of case which comes so regularly before the courts, as to which of two innocent parties must bear the loss as the result of circumstances for which neither is at all to blame. Apart from the Law Reform (Frustrated Contracts) Act 1943, the doctrine of frustration brings the whole contract to an end, and in the present case, apart from any adjustment under that Act and any statutory right to compensation under the closure order, the effect of frustration, had it been applicable, would have been to throw the whole burden of interruption for 20 months on the landlord, deprived as he would be of all his rent and imposed as he would have upon his shoulders the whole danger of destruction by fire and the burden of reletting after the interruption. As it is, with the same qualification as to possible compensation, the tenant has to pay the entire rent during the period of interruption without any part of the premises being usable at all, together with the burden (such as it may be) of the performance of the other tenant's covenants which include covenants to insure and repair. These are no light matters.

I approach the question first via the authorities, mainly catalogued in the report of the Cricklewood case at first instance and in the Court of Appeal [1943] K.B. 493. I need not analyse these in detail, but, your Lordships having done so in the course of argument, I must say that, although they all tend in that direction, they did not and they never did afford the court compelling authority for the proposition advanced. The point was not argued at all in front of Asquith J. and in the very short judgment of the Court of Appeal [1943] K.B. 493; the three cases cited, London and Northern Estates Co. v. Schlesinger [1916] 1 K.B. 20, Whitehall Court Ltd. v. Ettlinger [1920] 1 K.B. 680 and Matthey v. Curling [1922] 2 A.C. 180, do not, I believe, on analysis, constitute authority for the proposition. The most that can be said is that, as Lord Goddard said, the view that frustration did not apply to leases was widely held in the profession at the time and that Lord Atkinson in Matthey v. Curling [1922] 2 A.C. 180, 233, 237 gave expression to the view that Whitehall Court Ltd. v. Ettlinger was rightly decided. I agree here with what Viscount Simon L.C. said on this in the Cricklewood case [1945] A.C. 221, 231, and I would add that what was decided both in Whitehall

[1981] A.C. 675                                                                                          Page 11
1981 WL 188018 (HL), [1981] 1 All E.R. 161, (1982) 43 P. & C.R. 72, [1981] 2 W.L.R. 45, (1981) 125 S.J. 46, 12-17-1980 Times 188,018
**(Cite as: [1981] A.C. 675)**

Court Ltd. v. Ettlinger and in London and Northern Estates Co. v. Schlesinger was no more than that the legal estate created by a lease was not destroyed by wartime requisition and that such requisition was not an eviction by title paramount. In the Court of Appeal in Matthey v. Curling I do not find that Bankes L.J., at p. 185, or Younger L.J., at p. 210, were unequivocal on the present point at issue, and I note that Younger L.J. committed himself to the now untenable proposition that the doctrine of frustration was not to be extended. Atkin L.J. (who dissented) gave, at pp. 199, 200, important reasons for rejecting the "never" principle and in the Cricklewood case[1945] A.C. 221 *690 . 230 viscount Simon L.C. expressly approved the crucial paragraph in Atkin L.J.'s judgment in support of the "hardly ever" doctrine. Before us there was some discussion in argument of American cases. especially the liquor saloon cases based on prohibition, in some of which at least the frustration doctrine was applied to leases. We were also referred to the opinion of Laskin J. in Canada in Highway Properties Ltd. v. Kelly, Douglas & Co. Ltd. (1971) 17 D.L.R. (3d) 710, 721 and that of Isaacs J. in the Australian case of Firth v. Halloran (1926) 38 C.L.R. 261, 269 (where. however. he appears to have differed from his colleagues), all of which favour the "hardly ever" doctrine. Reference was also made to textbook authority. *Megarry and Wade, The Law of Real Property*, 4th ed. (1975), tend to the "never" view, but run into fairly heavy weather when they discuss the possible destruction of a flat on the higher floors of a tenement building: see p. 675. Professor Treitel (*The Law of Contract* 5th ed., pp. 669-670), after referring to Cusack-Smith v. London Corporation [1956] 1 W.L.R. 1368 which in turn relied on Denman v. Brise [1949] 1 K.B. 22, especially at p. 26 (the only case where frustration appears to have been advanced on behalf of a landlord), comes to the conclusion that the "never" position is only open to review at the level of the House of Lords but concludes that the "hardly ever " view is intrinsically preferable. This also appears to be the opinion of the American writers Williston (*Williston on Contracts*, 3rd ed. (1978)) and Corbin (*Corbin, Contracts* (1951)) and in England of Cheshire and Fifoot (Cheshire and Fifoot's Law of Contract, 9th ed. (1976)).

I conclude that the matter is not decided by authority and that the question is open to your Lordships to decide on principle. In my view your Lordships ought now so to decide it. Is there anything in principle which ought to prevent a lease from ever being frustrated? I think there is not. In favour of the opposite opinion, the difference in principle between real and chattel

property was strongly urged. But I find it difficult to accept this, once it has been decided, as has long been the case, that time and demise charters even of the largest ships and of considerable duration can in principle be frustrated. This was sufficiently well established by 1943 to make these charters worthy of an express exception upon an exception in the Law Reform (Frustrated Contracts) Act 1943, section 2 (5), and since then the Suez cases have supervened. There would be something anomalous in the light of what has been going on recently in the Shatt al Arab to draw a distinction between a leased oil tank and a demise - chartered oil tanker. Other anomalies would follow if the absolute principle were to be applied to leases. Goff J. appears to have found difficulty in applying frustration to an agreement for a lease (which creates an equitable estate in the land capable of being specifically enforced and thereby converted into a legal estate operating as from the beginning of the equitable interest): see Rom Securities Ltd. v. Rogers (Holdings) Ltd. (1967) 205 E.G. 427. Personally I find the absurdities postulated by Megarry and Wade, The Law of Real Property, 4th ed., in the case of the destruction by fire of the upper flat of a tenement building (already referred to, at p. 675) unacceptable if the "never" doctrine were rigidly applied, and I am attracted by Professor Treitel's argument (at p. 669 of the current edition of his work on contracts, *691 *The Law of Contract*, 5th ed.) of the inequitable contrast between a contract for the provision of holiday accommodation which amounted to a licence, and was thus subject to the rule in Taylor v. Caldwell, 3 B. & S. 826, and a similar contract amounting to a short lease. Clearly the contrast would be accentuated if Goff J.'s view were accepted as to the applicability of the doctrine to agreements for a lease (see above).

I accept of course that systems of developed land law draw a vital distinction between land, which is relatively permanent, and other types of property which are relatively perishable. But one can overdo the contrast. Coastal erosion as well as the "vast convulsion of nature" postulated by Viscount Simon L.C. in the Cricklewood case [1945] A.C. 221, 229 can, even in this island, cause houses, gardens, even villages and their churches, to fall into the North Sea, and, although the law of property in Scotland is different, as may be seen from Tay Salmon Fisheries Co. Ltd. v. Speedie, 1929 S.C. 593, whole estates can there, as Lord President Clyde points out, at p. 600, be overblown with sand for centuries and so fall subject to the rei interitus doctrine of the civil law. In Taylor v. Caldwell, 3 B. & S. 826, itself Blackburn J., after referring to the *Digest*, lib. XLV, tit. 1, on the

[1981] A.C. 675                                                                    Page 12
1981 WL 188018 (HL), [1981] 1 All E.R. 161, (1982) 43 P. & C.R. 72, [1981] 2 W.L.R. 45, (1981) 125 S.J. 46, 12-17-1980 Times 188,018
**(Cite as: [1981] A.C. 675)**

subject of "obligatio de certo corpore" on which in part he founds his new doctrine, expressly says, at p. 834:

"... no doubt the propriety, one might almost say necessity, of the implied condition is more obvious when the contract relates to a living animal, whether man or brute, than when it relates to some inanimate thing (*such as in the present case a theatre*) [emphasis mine] the existence of which is not so obviously precarious as that of the live animal, but the principle is adopted in the civil law as applicable to every obligation of which the subject is a certain thing."

He then refers to *Pothier, Traite des Obligations*, partie 3, ch. 6, art. 3, s. 668, in support of his contention.

No doubt a long lease, say for example one for 999 years, is almost exactly identical with the freehold for this purpose, and therefore subject to the ordinary law regarding the incidence of risk (recognised as regards chattels in section 7 of the former Sale of Goods Act 1893). But there is no difference between chattels in this respect and real property except in degree. Long term speculations and investments are in general less easily frustrated than short term adventures and a lease for 999 years must be in the longer class. I find myself persuaded by the argument presented by Atkin L.J. in his dissenting judgment in Matthey v. Curling [1922] 2 A.C. 180, 199-200 and quoted with approval by Viscount Simon in the Cricklewood case [1945] A.C. 221, 230. In that passage Atkin L.J. said:

"... it does not appear to me conclusive against the application to a lease of the doctrine of frustration that the lease, in addition to containing contractual terms, grants a term of years. Seeing that the instrument as a rule expressly provides for the lease being determined at the option of the lessor upon the happening of certain specified events, I see no logical absurdity in implying a term that it shall be determined absolutely on the happening of other events - namely, those which in an ordinary contract work a frustration."

**\*692** I pause here only to observe that, in the instant case, the lease gave the lessor a contingent right of determination in case of destruction by fire or in case of a need for the use of the premises in connection with the railways, and to point out that in the War Damage Acts the lessee was given a statutory right, albeit different in kind from the doctrine of frustration, to disclaim a current lease on the happening of other events as the result of enemy action.

In the result, I come down on the side of the "hardly ever" school of thought. No doubt the circumstances in which the doctrine can apply to leases are, to quote Viscount Simon L.C. in the Cricklewood case, at p. 231, "exceedingly rare." Lord Wright appears to have thought the same, whilst adhering to the view that there are cases in which frustration can apply, at p. 241. But, as he said in the same passage: "... the doctrine of frustration is modern and flexible and is not subject to being constricted by an arbitrary formula." To this school of thought I respectfully adhere. Like Lord Wright, I am struck by the fact that there appears to be no reported English case where a lease has ever been held to have been frustrated. I hope this fact will act as a suitable deterrent to the litigious, eager to make legal history by being first in this field. But I am comforted by the implications of the well known passage in the *Compleat Angler* (pt. i, ch. 5) on the subject of strawberries: "Doubtless God could have made a better berry, but doubtless God never did." I only append to this observation of nature the comment that it does not follow from these premises that He never will, and if it does not follow, an assumption that He never will becomes exceedingly rash.

In the event my opinion is that the appeal should be dismissed with costs.


LORD WILBERFORCE.


My Lords, there are two questions for decision in this appeal: (a) whether the doctrine of frustration can apply to a lease so as to bring it to an end if a frustrating event occurs; (b) whether, if so, in the circumstances the existing lease between the respondent and the appellant has been determined.

The lease was dated July 12, 1974. The respondent as landlord let to the appellant as tenant a purpose-built warehouse in Hull for a term of 10 years from January 1, 1974. The rent was <<PoundsSterling>>6,500 a year during the first five years, and for the remainder was to be the open market rent of the demised premises let as a warehouse. In fact this was fixed at << PoundsSterling>>13.300.

There was a covenant by the tenant not without the landlord's consent to use the premises for any purpose other than that of warehousing in connection with the tenant's business, or to assign, underlet, or part with possession.

There was only one access to the warehouse - along a street called Kingston Street. This would appear to be a public highway, but the landlord

[1981] A.C. 675                                                                          Page 13
1981 WL 188018 (HL), [1981] 1 All E.R. 161, (1982) 43 P. & C.R. 72, [1981] 2 W.L.R. 45, (1981) 125 S.J. 46, 12-
17-1980 Times 188,018
**(Cite as: [1981] A.C. 675)**

purported to grant a right of way along it for all purposes connected with the occupation of the premises. On May 16, 1979, the city council made an order under section 12 (1) of the Road Traffic Regulation Act 1967 closing Kingston Street for use with or without a **\*693** vehicle. This was done because another warehouse, of the Victorian period and style, abutting on the street was in a dangerous condition. Because it was a listed building there were conservationist objections against its demolition. The order was, it appears, renewed by the Secretary of State, under the same Act on August 15, 1979, ar d again. purportedly, but with questionable validity, by the council's engineer under section 25 of the Public Health Act 1961. We must assume, at this stage, that all these acts of closure were valid and legal. I shall refer further to this matter when dealing with the second question.

Because of this closure, which made the warehouse unusable for the only purpose for which it could be used under the lease, the appellant contended that the lease was frustrated, so that rent ceased to be payable. In an action for rent due, followed by a summons for summary judgment under R.S.C., Ord. 14, the master, upheld by the judge, held that the defence of frustration was not available as a matter of law. That the doctrine of frustration was not available to determine a lease had in fact been decided by the Court of Appeal in Leighton's Investment Trust Ltd. v. Cricklewood Property and Investment Trust Ltd. ("the Cricklewood case") [1943] K.B. 493. An appeal was brought to this House [1945] A.C. 221 but, on the question of law, their Lordships were divided, two Lords holding that the doctrine could be applied, two that it could not, and the fifth expressing no opinion. The House unanimously held, on the facts, that frustration had not occurred. The point is therefore open for decision.

My Lords, the arguments for and against application of this doctrine are fully and cogently put in the rival speeches in the Cricklewood case, for its possible application by Viscount Simon L.C. and Lord Wright, against by Lord Russell of Killowen and Lord Goddard. I can therefore give fairly briefly the reasons which have persuaded me, on the whole, that the former ought to be preferred.

1. The doctrine of frustration of contracts made its appearance in English law in answer to the proposition, which since Paradine v. Jane, Aleyn 26, had held the field, that an obligation expressed in absolute and unqualified terms, such as an obligation to pay rent, had to be performed and could not be excused by supervening circumstances. Since Taylor v. Caldwell, 3 B. & S.

826, it has been applied generally over the whole field of contract.

2. Various theories have been expressed as to its justification in law: as a device by which the rules as to absolute contracts are reconciled with a special exception which justice demands, as an implied term, as a matter of construction of the contract, as related to removal of the foundation of the contract, as a total failure of consideration. It is not necessary to attempt selection of any one of these as the true basis: my own view would be that they shade into one another and that a choice between them is a choice of what is most appropriate to the particular contract under consideration. One could see, in relation to the present contract, that it could provisionally be said to be appropriate to refer to an implied term, in view of the grant of the right of way, or to removal of the foundation of the contract - viz. use as a warehouse. **\*694** In any event, the doctrine can now be stated generally as part of the law of contract; as all judicially evolved doctrines it is, and ought to be, flexible and capable of new applications.

3. In view of this generality, the onus, in my opinion, lies on those who assert that the doctrine can never apply to leases. They have at once to face the argument that it has been held to apply to demise charters of ships (and presumably by analogy could apply to hirings of other chattels), and to licences for use: Krell v. Henry [1903] 2 K.B. 740 and other Coronation cases. So why not to leases of land? To place leases of land beyond a firm line of exclusion seems to involve anomalies, to invite fine distinctions, or at least to produce perplexities. How, for example, is one to deal with agreement for leases? Refusal ever to apply the doctrine to leases of land must be based upon some firm legal principle which cannot be departed from: compare article 62 of the Vienna Convention on the Law of Treaties (1969) (Cmnd. 4140) which excludes boundary disputes from the analogous doctrine in international law.

4. Two arguments only by way of principle have been suggested. The first is that a lease is more than a contract: it conveys an estate in land. This must be linked to the fact that the English law of frustration, unlike its continental counterparts, requires, when it applies, not merely adjustment of the contract, but its termination. But this argument, by itself, is incomplete as a justification for denying that frustration is possible. The argument must continue by a proposition that an estate in land once granted cannot be divested - which, as Viscount Simon L.C. pointed out in the

[1981] A.C. 675                                                                                         Page 14
1981 WL 188018 (HL), [1981] 1 All E.R. 161, (1982) 43 P. & C.R. 72, [1981] 2 W.L.R. 45, (1981) 125 S.J. 46, 12-
17-1980 Times 188,018
**(Cite as: [1981] A.C. 675)**

Cricklewood case [1945] A.C. 221, 229, begs the whole question.

It was pointed out, however, by Atkin L.J. in Matthey v. Curling [1922] 2 A.C. 180, 200, in a passage later approved by Viscount Simon [1945] A.C. 221, 230, that as a lease can be determined, according to its terms, upon the happening of certain specified events, there is nothing illogical in implying a term that it should be determined on the happening of other events - namely, those which in an ordinary contract work a frustration. It has indeed been held, with reference to an agreement for a lease, that this can be put an end to through implication of a term: Rom Securities Ltd. v. Rogers (Holdings) Ltd., 205 E.G. 427, per Goff J. So why, in the present case, for example, should an actual lease not be determinable by implication of a term? If so, it could hardly be suggested that a lease was not capable of frustration even though the theory of frustration had shifted to another basis.

In the second place, if the argument is to have any reality, it must be possible to say that frustration of leases cannot occur because in any event the tenant will have that which he bargained for, namely, the leasehold estate. Certainly this may be so in many cases - let us say most cases. Examples are London and Northern Estates Co. v. Schlesinger [1916] 1 K.B. 20, where what was frustrated (viz. the right of personal occupation) was not at the root of the contract, and requisitioning cases, for example, Whitehall Court Ltd. v. Ettlinger [1920] 1 K.B. 680, where again the tenant was left with something he could use. But there may also be cases where this is not so. A man may desire possession and use of land or *695 buildings for, and only for, some purpose in view and mutually contemplated. Why is it an answer, when he claims that this purpose is "frustrated," to say that he has an estate if that estate is unusable and unsaleable? In such a case the lease, or the conferring of an estate, is a subsidiary means to an end, not an aim or end of itself. This possible situation is figured, in fact, by Viscount Simon L.C. in the Cricklewood case [1945] A.C. 221, 229.

The second argument of principle is that on a lease the risk passes to the lessee, as on a sale it passes to the purchaser (see *per* Lord Goddard in the Cricklewood case). But the two situations are not parallel. Whether the risk - or any risk - passes to the lessee depends on the terms of the lease: it is not uncommon, indeed, for some risks - of fire or destruction - to be specifically allocated. So in the case of unspecified risks, which may be thought to have been mutually contemplated, or capable of being contemplated by reasonable men, why should

not the court decide on whom the risks are to lie? and if it can do this and find that a particular risk falls upon the lessor, the consequence may follow that upon the risk eventuating the lessee is released from his obligation.

To provide examples, as of a 999 year lease during which a frustrating event occurs, or of those in decided cases (see above), to show that in such cases frustration will not occur, is insufficient as argument. These examples may be correct: they may cover most, at least most normal, cases. But the proposition is that there can be no case outside them and that I am unable to accept.

5. I find the experience in the United States of America instructive. It is clear that in the common law jurisdictions of that country the doctrine of frustration has developed and is still developing. It has been applied, inter alia in connection with prohibition and leases of liquor saloons, to leases. Yet neither of the well known commentators, Williston (Williston on Contracts, 3rd ed.), or Corbin (*Corbin, Contracts*) sees any doctrinal objection to this. I quote one passage from *Corbin*, vol. 6 (1951), s. 1356, at p. 388:

"In modern cases, there has been a tendency to treat a lease as a F contract instead of a conveyance, although in fact it is both at once. The older allocation of risks does not now always seem just. Many short-term leases have been made, in which the purpose of the lessee was to conduct a liquor saloon, a purpose known to the lessor and one which gave to the premises a large part of its rental value. Then followed the enactment of a ... prohibitory law preventing the use of the premises for the expected purpose. The prohibition law does not make it impossible or illegal for the lessee to keep his promise to pay the rent ... but it frustrates his purpose of using the premises for a liquor saloon in the reasonable hope of pecuniary profit. If the terms of the lease are such that the lessee is restricted to this one use, it has been held in a considerable number of cases that his duty to pay rent is discharged."

*Williston* is to a similar effect, where it is pointed out that termination of a lease by frustration is more difficult to establish than termination of a mere contract (3rd ed., vol. 18 (1978), s. 1955).

**\*696** There is a similar indication in Canada. The Supreme Court had to consider in 1971 the extent to which the contractual doctrine of wrongful repudiation could be applied to a lease - the argument being that the landlord was limited to remedies given by the law of property. In an instructive judgment Laskin J. said:

"It is no longer sensible to pretend that a

[1981] A.C. 675                                                                                           Page 15
1981 WL 188018 (HL), [1981] 1 All E.R. 161, (1982) 43 P. & C.R. 72, [1981] 2 W.L.R. 45, (1981) 125 S.J. 46, 12-
17-1980 Times 188,018
**(Cite as: [1981] A.C. 675)**

commercial lease, such as the one before this court, is simply a conveyance and not also a contract. It is equally untenable to persist in denying resort to the full armoury of remedies ordinarily available to redress repudiation of covenants, merely because the covenants may be associated with an estate in land." Highway Properties Ltd. v. Kelly, Douglas & Co. Ltd., 17 D.L.R. (3d) 710. 721.

So, here is a route opened by common law jurisdictions, by which the result of frustration of leases may be attained. This may be wide, or narrow, or indeed very narrow: that we need not decide in advance. But it would be wrong to erect a total barrier inscribed "You shall not pass."

6. I can deal briefly with the authorities: they are one way (against application of the doctrine); they are partial. They decide that particular sets of facts do not amount to frustrating events. A judgment often quoted is that of Lush J. in London and Northern Estates Co. v. Schlesinger [1916] 1 K.B. 20, 24 where a lessee was unable to occupy the rented premises because he was an alien enemy:

"As the contract could be performed without his personal residence, the fact that his personal residence was prohibited by the [Aliens Restriction (Consolidation) Order 1914] did not make the performance of the contract impossible. But there is, I think, a further answer to the contention. It is not correct to speak of this tenancy agreement as a contract and nothing more. A term of years was created by it and vested in the appellant, and I can see no reason for saying that because this Order disqualified him from personally residing in the flat it affected the chattel interest which was vested in him by virtue of the agreement."

There is nothing to disagree with here - the argument may indeed be valid in many or most cases of leases. It is not expressed as one which must apply to all.

The reasoning of this House in Matthey v. Curling [1922] 2 A.C. 180 is not "clear" or any authority that the doctrine of frustration does not apply to a lease (see per Viscount Simon L.C. in the Cricklewood case [1945] A.C. 221, 230). It was not until the Cricklewood case that the argument was put on principle and fully explored. The governing decision (of the Court of Appeal) was summary, unargued, and based upon previous cases which will not bear the weight of a generalisation. I think that the movement of the law of contract is away from a rigid theory of autonomy towards the discovery - or I do not hesitate to say imposition - by the courts of just solutions, which can be ascribed to reasonable men in the position of the

parties.

It is said that to admit the possibility of frustration of leases will lead to increased litigation. Be it so, if that is the route to justice, But even **\*697** if the principle is admitted, hopeless claims can always be stopped at an early stage, if the facts manifestly cannot support a case of frustration. The present may be an example. In my opinion, therefore, though such cases may be rare, the doctrine of frustration is capable of application to leases of land. It must be so applied with proper regard to the fact that a lease, that is, a grant of a legal estate, is involved. The court must consider whether any term is to be implied which would determine the lease in the event which has happened and/or ascertain the foundation of the agreement and decide whether this still exists in the light of the terms of the lease, the surrounding circumstances and any special rules which apply to leases or to the particular lease in question. If the "frustrating event" occurs during the currency of the lease it will be appropriate to consider the Law Reform (Frustrated Contracts) Act 1943.

I now come to the second question which is whether on the facts of the case the appellant should be given leave to defend the action: can it establish that there is a triable issue? I have already summarised the terms of the lease. At first sight, it would appear to my mind that the case might be one for possible frustration. But examination of the facts leads to a negative conclusion. The circumstances which it is claimed amount to a frustrating event are proved by affidavit evidence supplemented and brought up to date by other documents. They are as follows. The first order closing Kingston Street was made on May 16, 1979, to take effect from May 18. The lease had then four years and six and a half months to run. In his affidavit sworn on September 20, 1979, the appellant's solicitor stated that it was likely that "well over a year" would have elapsed before a decision could be made as regarded the listed Victorian warehouse opposite the appellant's premises, the condition of which made the closure necessary. The town clerk of the city of Kingston-upon-Hull had written on August 7 that it was probably unlikely that the matter could be resolved "within the next year." It appears that a local inquiry was held into the future of the listed warehouse, and the Secretary of State on March 20, 1980, approved the inspector's report and granted consent for its demolition. On September 30, 1980, the town clerk informed the lessors that the estimated date for completion of the demolition was "some time in late December 1980 or early January 1981." I think it is accepted that the

Copr. © West 2004 No Claim to Orig. Govt. Works

[1981] A.C. 675                                                                                    Page 16
1981 WL 188018 (HL), [1981] 1 All E.R. 161, (1982) 43 P. & C.R. 72, [1981] 2 W.L.R. 45, (1981) 125 S.J. 46, 12-17-1980 Times 188,018
**(Cite as: [1981] A.C. 675)**

reopening of Kingston Street would immediately follow.

So the position is that the parties to the lease contemplated, when Kingston Street was first closed, that the closure would probably last for a year or a little longer. In fact it seems likely to have lasted for just over 18 months. Assuming that the street is reopened in January 1981, the lease will have three more years to run.

My Lords, no doubt, even with this limited interruption the appellant's business will have been severely dislocated. It will have had to move goods from the warehouse before the closure and to acquire alternative accommodation. After reopening the reverse process must take place. But this does not approach the gravity of a frustrating event. Out of 10 years it will have lost under two years of use: there will be nearly three years left after the interruption has ceased. This is a case, similar to **\*698** others, where the likely continuance of the term after the interruption makes it impossible for the lessee to contend that the lease has been brought to an end. The obligation to pay rent under the lease is unconditional, with a sole exception for the case of fire, as to which the lease provides for a suspension of the obligation. No provision is made for suspension in any other case: the obligation remains. I am of opinion therefore that the lessee has no defence to the action for rent, that leave to defend should not be given and that the appeal must be dismissed.

LORD SIMON OF GLAISDALE.

My Lords, by a lease dated July 12, 1974, the respondents as landlord let to the appellants (who carry on the business of warehousing) as tenant premises which were described in the lease as "warehouse premises ... comprising warehouse no. 2." Included in the demise was "a right of way for purposes connected with the occupation of the said premises ...": this was along a road called Kingston Street, the only road giving access to the premises. The lease was for 10 years as from January 1, 1974, at a rent of    <<PoundsSterling>>6,500 during the first five years of the term: as for the remainder, a rent review clause provided: "The yearly rent payable during the last five years of the said term ... shall be the fair yearly rent of the said premises let in the open market for the purpose of a warehouse at the commencement of such period, " being determinable by arbitration in default of agreement. The landlord's reservation of services

was subject to compensation to the tenant for disturbance of the tenant's business. Amongst other tenant's covenants (mostly common form) were the following:

"(5) To insure and keep insured the said premises to the full value thereof ... in the joint names of the landlord and the tenant against loss or damage by fire and such other risks as may from time to time be required by the landlord. ... (13) Not to do or omit to do or suffer to be done or omitted to be done in or upon the said premises any act or thing which will render any increased or extra premium payable for the insurance of the said premises or any adjoining property of the landlord ... provided always that the tenant's business of warehousing to be carried on upon the premises shall not constitute any such act or thing as is referred to in this clause and the tenant shall not be liable in respect of any increased premiums by virtue of activities in accordance with the ordinary course of such business. (15) Not without the consent in writing of the landlord to use the said premises or any part thereof or permit or suffer the same to be used for any other purpose than that of warehousing in connection with the tenant's business and in particular that they shall not be used for residential purposes or for any person to sleep thereon or in any manner which would constitute a change of use under the Town and Country Planning Acts. (17) That no act or thing which shall or may be or become a nuisance [etc.] to the landlord or the landlord's tenants [etc.] shall be done upon the said premises or any part thereof save that any activities properly carried on in the ordinary course of the tenant's business shall not constitute a breach of this **\*699** clause. (20) Not to use or permit or suffer to be used the said premises or any part thereof as a factory or workshop. ..."

By clause 3 the landlord covenanted in usual terms for the tenant's quiet enjoyment of the premises during the term.

Clause 4 (1) is the rent review clause. Clause 4 (2) deals with destruction or damage by fire. It provides for abatement of the rent pending reinstatement, and for the landlord's right to determine the tenancy in the event of complete destruction or substantial damage by fire of the demised premises or the landlord's adjoining property. Clause 4 (3) provides for the landlord's right to determine in the event of the premises being "required in connection with the proper operation of the British Railways undertaking and Part III of the Landlord and Tenant Act 1954 shall not apply."

The rent review clause was in fact operated so that

Copr. © West 2004 No Claim to Orig. Govt. Works

[1981] A.C. 675                                                                                                  Page 17
1981 WL 188018 (HL), [1981] 1 All E.R. 161, (1982) 43 P. & C.R. 72, [1981] 2 W.L.R. 45, (1981) 125 S.J. 46, 12-17-1980 Times 188,018
**(Cite as: [1981] A.C. 675)**

the yearly rent for the last five years of the term was agreed to be <<PoundsSterling>>13,300.

The lease makes it clear that the parties contemplated that the demised premises, which were purpose-built as a warehouse, should be used as such throughout the term; rent is geared to this use; and no other use was contemplated.

The demised warehouse has a loading bay and large doors at the entrance from Kingston Street. Immediately opposite stood a large derelict Victorian warehouse, a building listed by the Department of the Environment. The Kingston-upon-Hull City Council believed that building to be a dangerous warehouse, and they applied to the Secretary of State for the Environment for listed building consent to demolish it: this must have been some time between April 1978 and July 1979. Demolition was opposed by a number of conservation groups; and at the time the evidence was filed (September 1979) the Secretary of State was to appoint a public inquiry into the matter. In April 1978 the city council made an order under section 12 (1) of the Road Traffic Regulation Act 1967, as amended, restricting the passage of vehicular and pedestrian traffic in Kingston Street. On May 16, 1979, the city council made a further order, this time closing Kingston Street to all vehicular and pedestrian traffic from May 18, 1979. The order of May 16, 1979, was continued by order of the Secretary of State for the Environment and it was still effective when the evidence was filed. No question turns on the vires of these orders. There being no other form of access to the demised premises than along Kingston Street, the closure of that street made it impossible for the appellants to continue to use the demised premises as a warehouse; nor have they used it for any other purpose.

An affidavit sworn on behalf of the appellants deposed the opinion that in those circumstances well over a year would elapse between application for listed building consent and the ministerial decision. An exhibited letter from the town clerk of August 7, 1979, stated that "it is probably unlikely that the matter can be resolved within the next year." From evidence placed before your Lordships it appears that a public inquiry had been held in the meantime, that demolition of the derelict warehouse was sanctioned and that on September 30, 1980, the town clerk informed the respondents that the estimated date for demolition *700 was late December 1980 or early January 1981. The appellants apparently accept that Kingston Street would thereupon be again open to all traffic.

The appellants ceased to pay rent to the respondents as from May 18, 1979, the date of total closure of the highway. By a writ issued on July 9, 1979, the respondents demanded the rent which would have been due under the lease in the sum of <<PoundsSterling>>5,115.38. On July 27, 1979, the appellants filed a defence claiming that by reason of the closure of Kingston Street the lease had been frustrated on May 18, 1979, and they counterclaimed a declaration that the lease had been discharged by frustration. On September 20, 1979, Master Waldman heard the respondents' summons for summary judgment under R.S.C., Ord. 14. He was bound by authority (Leighton's Investment Trust Ltd. v. Cricklewood Property and Investment Trust Ltd. [1943] 1 K.B. 493; Denman v. Brise [1949] 1 K.B. 22) to hold that the submission that a lease could be discharged by frustration was not open to the appellants to argue to any court below your Lordships' House (see Cricklewood Property and Investment Trust Ltd. v. Leighton's Investment Trust Ltd. [1945] A.C. 221). The appellants appealed from the order of the learned master. Sheen J., being similarly bound by such authority, by consent dismissed the appeal; and, since the Court of Appeal would also be similarly bound, he granted the appellants a certificate under section 12 of the Administration of Justice Act 1969 (leapfrogging). An Appeal Committee of your Lordships' House in due course gave leave to appeal.

The appeal raises three questions: (1) Is the doctrine of frustration inherently incapable of application to a lease? (2) If not inherently and generally inapplicable to leases, is the doctrine of frustration capable of applying to this lease in particular? (3) If yes, have the appellants demonstrated a triable issue that this lease has been discharged by frustration?

Unless the appellants can demonstrate that the answer to (1) is 'No,' and to (2) and (3) 'Yes,' the respondents are entitled to summary judgment, and the appeal must be dismissed.

I. Frustration of a contract takes place when there supervenes an event (without default of either party and for which the contract makes no sufficient provision) which so significantly changes the nature (not merely the expense or onerousness) of the outstanding contractual rights and/or obligations from what the parties could reasonably have contemplated at the time of its execution that it would be unjust to hold them to the literal sense of its stipulations in the new circumstances; in such case the law declares both parties to be discharged from further performance.

[1981] A.C. 675                                                                                                    Page 18
1981 WL 188018 (HL), [1981] 1 All E.R. 161, (1982) 43 P. & C.R. 72, [1981] 2 W.L.R. 45, (1981) 125 S.J. 46, 12-
17-1980 Times 188,018
**(Cite as: [1981] A.C. 675)**

Whether the doctrine can apply to a lease is of more than academic interest, considerable though that is. In the Cricklewood Property case [1945] A.C. 221, 229 Viscount Simon L.C., who favoured the extension of the doctrine to leaseholds, nevertheless considered it likely to be limited to cases where "some vast convulsion of nature swallowed up the property altogether, or buried it in the depths of the sea." But I think this puts the matter too catastrophically, even in the case of a long lease. There **\*701** are several places on the coast of England where sea erosion has undermined a cliff causing property on the top of the cliff to be totally lost for occupation: obviously occupation of a dwelling house is something significantly different in nature from its aqualung contemplation after it has suffered a sea change. and in the case of a short lease something other than such natural disaster - the sort of occurrence, for example, that has been held to be the frustrating event in a charterparty - might in practice have a similar effect on parties to a lease. Take the case of a demise-chartered oil tanker lying alongside an oil storage tank leased for a similar term, and an explosion destroying both together.

The question is entirely open in your Lordships' House, as was recognised in the Cricklewood Property case. In my view a lease is not inherently unsusceptible to the application of the doctrine of frustration.

In the first place, the doctrine has been developed by the law as an expedient to escape from injustice where such would result from enforcement of a contract in its literal terms after a significant change in circumstances. As Lord Sumner said, giving the opinion of a strong Privy Council in Hirji Mulji v. Cheong Yue Steamship Co. Ltd. [1926] A.C. 497, 510: "It is really a device, by which the rules as to absolute contracts are reconciled with a special exception which justice demands." Justice might make a similar demand as to the absolute terms of a lease.

Secondly, in the words of Lord Wright in the Cricklewood Property case, at p. 241: "... the doctrine of frustration is modern and flexible and is not subject to being constricted by an arbitrary formula." It is therefore on the face of it apt to vindicate justice wherever owing to relevant supervening circumstances the enforcement of any contractual arrangement in its literal terms would produce injustice.

Thirdly, the law should if possible be founded on comprehensive principles: compartmentalism,

particularly if producing anomaly, leads to the injustice of different results in fundamentally analogous circumstances. To deny the extension of the doctrine of frustration to leaseholds produces a number of undesirable anomalies. It is true that theoretically it would create an anomalous distinction between the conveyance of a freehold interest and of a leasehold of, say, 999 years. But it would be only in exceptional circumstances that a lease for as long as 999 years would in fact be susceptible of frustration. On the other hand, to deny the application of the doctrine would create an anomalous distinction between the charter of a ship by demise (see Blane Steamships Ltd. v. Minister of Transport [1951] 2 K.B. 965; Law Reform (Frustrated Contracts) Act 1943, section 2 (5) (a)) and a demise of land: compare, for example, a short lease of an oil storage tank and a demise charter for the same term of an oil tanker of a peculiar class to serve such a storage tank, and a supervening event then frustrating the demise charter and equally affecting the use of the oil storage tank. Again, a time charter has much in common with a service tenancy of furnished accommodation. Then there would be the distinction between a lease and other chattel interests - say, under a hire-purchase agreement. But most striking of all is the fact that the doctrine of frustration undoubtedly applies to a licence to occupy land: see, for example, Krell v. Henry [1903] 2 K.B. 740 **\*702** and the other Coronation cases. However, the distinction between a licence and a lease is notoriously difficult to draw, and, when it comes to the application of a doctrine imported to secure justice, even more difficult to justify. The point is well put by Treitel, The Law of Contract, 5th ed., pp. 669-670. I am clearly of opinion that the balance of anomaly indicates that the doctrine of frustration should be applied to a lease. Moreover, I shall venture to refer later to the effect of an agreement to grant a lease operating to create an equitable term of years: if, as would seem to be the case, the doctrine of frustration applies to such an agreement, there would be yet another anomaly.

Fourthly, a number of theories have been advanced to clothe the doctrine of frustration in juristic respectability, the two most in favour being the "implied term theory" (which was potent in the development of the doctrine and which still provides a satisfactory explanation of many cases) and the "theory of a radical change in obligation" or "construction theory" (which appears to be the one most generally accepted today). My noble and learned friends who have preceded me have enumerated the various theories; and the matter is discussed in Chitty on Contracts, 24th ed. (1977), vol. I, paras. 1401-1411, pp. 656-663. Of all the

Copr. © West 2004 No Claim to Orig. Govt. Works

[1981] A.C. 675                                                                                                    Page 19
1981 WL 188018 (HL), [1981] 1 All E.R. 161, (1982) 43 P. & C.R. 72, [1981] 2 W.L.R. 45, (1981) 125 S.J. 46, 12-
17-1980 Times 188,018
(Cite as: [1981] A.C. 675)

theories put forward the only one, I think, incompatible with the application of the doctrine to a lease is that which explains it as based on a total failure of consideration. Though such may be a feature of some cases of frustration, it is plainly inadequate as an exhaustive explanation: there are many cases of frustration where the contract has been partly executed. (I shall deal later with the argument that "the foundation of the contract" in a lease is the conveyance of the term of years, which is accomplished once for all and can never be destroyed.)

Fifthly, a lease may be prematurely determined in a considerable variety of circumstances. Perhaps forfeiture by denial of title is the most relevant (though now largely of historical interest), since it depended on a rule of law extraneous to any term of the lease or to agreement of the parties whereby the lease was prematurely discharged. I can see no reason why a rule of law should not similarly declare that a lease is automatically discharged on the happening of a frustrating event.

Sixthly, it seems that authorities in some other common law jurisdictions have felt no inherent difficulty in applying the doctrine of frustration to a lease. This appears especially in the American cases on the frustration of leases of premises to sell liquor by the advent of constitutional prohibition (see *Corbin, Contracts*, vol. 6, pp. 336 et seq. for a general discussion and pp. 388-390 for a discussion of the prohibition cases in particular). *Corbin's* summary, at p. 391, has relevance to such a lease as is under your Lordships' instant consideration:

"If there was one principal use contemplated by the lessee, known to the lessor, and one that played a large part in fixing rental value, a governmental prohibition or prevention of that use has been held to discharge the lessee from his duty to pay the rent. It is other vise if other substantial uses, permitted by the lease and in the contemplation of the parties, remain possible to the lessee."
**\*703** (See also the passage quoted by my noble and learned friend, Lord Wilberforce.) Then there is the judgment of Isaacs J. in Firth v. Halloran. 38 C.L.R. 261, 269. Less directly in point, but important and relevant for its general reasoning, is the judgment of the Canadian Supreme Court delivered by Laskin J. in Highway Properties Ltd. v. Kelly, Douglas & Co. Ltd., 17 D.L.R. (3d) 710, holding that the contractual doctrine of repudiation, with its remedies independent of the landlord/tenant relationship, is applicable to a lease.

Lastly, then, from Laskin J.'s judgment, at p. 721: "It is no longer sensible to pretend that a

commercial lease ... is simply a conveyance and not also a contract." The doctrine of frustration, no less than the doctrine of repudiation, is applicable to a contract. It must therefore be determined whether there is anything in a lease-as-conveyance which repels the doctrine of frustration inherent in the lease-as-contract - outweighing the demands of justice, of consistency, of juristic theory accounting for the doctrine, of analogy and of authoritative opinion in other common law jurisdictions.

I therefore turn to consider the arguments to the contrary. Counsel for the respondents advanced six arguments of principle against the extension of the doctrine of frustration to a lease. I shall not here set them out: they will, I trust, appear when this appeal is fully reported. Several would, it seems to me, apply equally to a licence to occupy land and/or to the charter of a ship, both unquestionably susceptible of frustration. I shall consider the others along with the arguments collected from the speeches of Lord Russell of Killowen and Lord Goddard in the Cricklewood Property case [1945] A.C. 221. The arguments are, I think, fourfold:

1. The lease itself is the "venture" or "undertaking" on which the parties have embarked. In so far as the lease is contractual, the "foundation" of the contract is the transfer of the landlord's possession of the demised property for a term of years in return for rent; that happens once for all on the execution of the lease; so that its contractual "foundation" is never destroyed.

2. The lease is more than a contract: it creates a legal estate or interest in land, and, added counsel for the respondents, it operates in rem.

3. The contractual obligations in a lease are merely incidental to the relationship of landlord and tenant.

4. On the conveyance the "risk" of unforeseen events passes to the lessee, as it does to the purchaser of land.

I presume to think that the third proposition adds nothing to the first two, from which it necessarily follows if they are valid. As for the lease itself being the "venture" or "undertaking" the same might be said of a licence or of a demise charter. So, too, it may be said that the "foundation" of a demise charter is that the shipowner parts with his possession of the demised property for a term of years in return for hire. In truth, "venture," "undertaking" and "foundation" are picturesque or metaphorical terms: though useful in illuminating the doctrine, they are too vague to be safe for

[1981] A.C. 675                                                                                           Page 20
1981 WL 188018 (HL), [1981] 1 All E.R. 161, (1982) 43 P. & C.R. 72, [1981] 2 W.L.R. 45, (1981) 125 S.J. 46, 12-
17-1980 Times 188,018
(Cite as: [1981] A.C. 675)

juristic analysis. The real questions, in my respectful submission, are the second and fourth - namely, whether the fact that a legal estate or interest in land has been created makes a lease **\*704** inherently unsusceptible of the application of the doctrine of frustration, and that the risk of what might otherwise be a frustrating event passes irrevocably to the lessee on execution of the lease.

As for the significance of the creation of a legal estate or interest in land, it is convenient to note at this stage the case of an agreement to grant a lease. This can operate to create an equitable term of years (Walsh v. Lonsdale (1882) 21 Ch.D. 9). *Cheshire's Modern Law of Real Property*, 12th ed. (1976), p. 388, states specifically: "An equitable term of years may pass to the person who holds under a contract for a lease" (book's italics): see also *Megarry and Wade, The Law of Real Property*, 4th ed., pp. 625 et seq. So take the case of an agreement to grant a lease of a house on a cliff-top which, before execution of any lease, collapses into the sea. It was conceded that equity would not grant specific performance at the suit of the prospective lessor, the subject matter having disappeared. Nor, since the subject matter of the agreement cannot now be delivered, could he recover damages for breach of contract. Nor could any obligation to pay rent be enforced, since rent is payable under the lease, which will not now be decreed. Faced with this situation, counsel for the respondents gave two alternative answers: first, the doctrine of frustration is not applicable to an agreement for a lease; and, secondly, if it is, it does not apply after the conveyance. But in the postulated case no conveyance follows; and in any case the second answer is a mere reiteration of the general conclusion (which is in question) that the doctrine of frustration does not apply to a lease. As for the first alternative, the situation involves that the agreement for a lease has been frustrated de facto - it cannot be further performed, and neither party has any obligation to or remedy against the other. It would be ridiculous for the law to close its eyes to the reality of this situation or to refuse it its proper name. Moreover, an agreement to grant a lease is certainly an interest in land; it is registrable as an estate contract class C (iv): see Land Charges Act 1925, section 10; Land Charges Act 1972, section 2 (4). So here we have the case of an agreement being effectually discharged by frustration notwithstanding that it has created an estate or interest in land, albeit equitable. The rule can hardly depend on whether the estate or interest in land is legal or equitable: no one has so suggested; and it would constitute an even more absurd anomaly than those to which I have ventured already to refer.

I cite Denny, Mott & Dickson Ltd. v. James B. Fraser & Co. Ltd. [1944] A.C. 265 with some hesitation, since your Lordships did not have the benefit of adversary argument on it. But it was a case where both a contract to grant a lease (which may have operated as a lease) and an option to purchase land were held to be frustrated. It is true that they were part of a larger agreement including trading arrangements which had been frustrated; but I do not think that this can affect the force of the decision as regards the frustration of the contract for a lease (or the lease) and of the option. It is also true that it was a Scottish appeal; but Lord Macmillan, at pp. 271-272, stated that the incidence of the Scots doctrine of frustration was the same as the English (though the consequences might be different); and none of their Lordships indicated that the decision depended on any peculiar rule of Scots land law.

**\*705** Again, although Rom Securities Ltd. v. Rogers (Holdings) Ltd., 205 E.G. 427 was cited to your Lordships, no argument was developed on it. Goff J. was faced with an agreement for a lease entered into on the unexpressed assumption that relevant planning permission would be granted, whereas in the event it was refused. Though the learned judge "was far from satisfied that the doctrine of frustration could not be applied to an agreement for a lease" (p. 427), at least before entry into possession, in fact he held that the agreement was discharged under an implied term that this should be the effect if planning permission was refused - that is, he applied a similar line of reasoning to that of Blackburn J., giving the judgment of the Court of Queen's Bench, in Taylor v. Caldwell (1863) 3 B. & S. 826, the fons et origo of the modern doctrine of frustration. In my view Rom Securities was a case of frustration.

I can for myself see nothing about the fact of creation of an estate or interest in land which repels the doctrine of frustration. It cannot be that land, being relatively indestructible, is different from other subject matter of agreement: that would perhaps make a lease so much the less likely to be frustrated in fact, but would not constitute inherent repugnance to the doctrine. In any case, we are concerned with legal interests in the land rather than the land itself. It cannot be because a lease operates in rem: so, for example, does a contract for seamen's wages, since that gives rise to a maritime lien, yet can presumably like other contracts for personal services be frustrated by ill health or death. Moreover, the criterion of operation in rem hardly matches counsel's first submission on agreements for a lease, which

[1981] A.C. 675                                                                                           Page 21
1981 WL 188018 (HL), [1981] 1 All E.R. 161, (1982) 43 P. & C.R. 72, [1981] 2 W.L.R. 45, (1981) 125 S.J. 46, 12-
17-1980 Times 188,018
(Cite as: [1981] A.C. 675)

operate in personam. It cannot be because, once vested, a lease cannot be divested except by agreement of the parties. That would be to beg the question: if frustration applies, it can be so divested. Moreover, as I have tried to demonstrate, quite apart from frustration it can be so divested by operation of law in the doctrine of denial of title. And, as my noble and learned friend, Lord Wilberforce, has pointed out, there is nothing illogical in implying a term in a lease that it shall be discharged on the occurrence of a frustrating event. Nor, finally, is it realistic to argue that on execution of the lease the lessee got all that he bargained for. The reality is that this lessee, for example, bargained, not for a term of years, but for the use of a warehouse owned by the lessor - just as a demise charterer bargains for the use of the ship.

I turn, then, to the second main contention - namely, that the risk of unforeseen mischance passes irrevocably to the lessee at the moment of conveyance. This, too, begs the question whether the doctrine of frustration applies to leaseholds. If it does, such risk does not pass in all circumstances. Moreover, the sale of land is a false analogy. A fully executed contract cannot be frustrated; and a sale of land is characteristically such a contract. But a lease is partly executory: rights and obligations remain outstanding on both sides throughout its currency. Even a partly executed contract is susceptible of frustration in so far as it remains executory: there are many such cases in the books.

As for the authorities, I have had the advantage of reading in draft the speeches of my noble and learned friends who have preceded me and of my noble and learned friend, Lord Roskill. I agree with, and beg to adopt, *706 their analyses and conclusions. I would only add a comment on Paradine v. Jane, Aleyn 26, since that seems to be the starting point of those who deny the applicability of the doctrine of frustration to leases. But it did not turn at all on the fact that a leasehold was in question. It went on the then prevalent rule of the law of contract that if a party

"by his own contract creates a duty or charge upon himself, he is bound to make it good, if he may, notwithstanding any accident by inevitable necessity, because he might have provided against it by his contract" (p. 27).

A rule in such terms can hardly stand since the development of the doctrine of frustration.

My conclusion on the first issue is therefore that the doctrine of frustration is in principle applicable to leases.

II. Counsel for the appellants claimed that this was a "commercial lease," a class at any rate to which the doctrine of frustration is applicable. In a sense every lease is commercial in so far as it is a matter of business between landlord and tenant. On the other hand, a lease and its subject matter may be more or less closely connected with commerce, trade or industry. The answer which I ventured to propose to the first issue facing your Lordships indicates my view that there is no class of lease to which the doctrine is inherently inapplicable. But, as with any other agreement, the terms and subject matter of a lease will affect the circumstances in which it might be frustrated. The more commercial the character of an agreement, the more various are the circumstances in which it is liable to frustration.

In a lease, as in a licence or a demise charter, the length of the unexpired term will be a potent factor. So too, as the American cases show, will be any stipulations about, particularly restrictions on, user. In the instant case the lease was for a short term, and had only about four and a half years to run at the time of the alleged frustrating event - the closure of Kingston Street. The demised premises were a purpose-built warehouse, and both parties contemplated its use as a warehouse throughout the term. This use, in Corbin's words (*Corbin, Contracts*, vol. 6, p. 391), "played a large part in fixing rental value," as the rent review clause shows. After the closure of Kingston Street it could no longer be used as a warehouse. No "other substantial uses, permitted by the lease and in the contemplation of the parties," remained possible to the lessee.

Therefore, although I do not think that there is any definable class of lease which is specifically susceptible of frustration, the facts of the case as I have summarised them in the previous paragraph indicate that this lease is very much the sort that might be frustrated in the circumstances that have occurred.

III. The question therefore arises whether the appellants have demonstrated a triable issue that the lease has been frustrated. The matter must be considered as it appeared at the time when the frustrating event is alleged to have happened. Commercial men must be entitled to act on reasonable commercial probabilities at the time when they are called upon to make up their minds (Scrutton J. in Embiricos v. Sydney Reid & Co.[1914] 3 K.B. 45 *707 , 54). What we know has in fact happened is, however, available as an aid to determine the reasonable probabilities at the time when decision was called for (Lord Wright in Denny, Mott & Dickson Ltd. v. James B. Fraser &

Copr. © West 2004 No Claim to Orig. Govt. Works

[1981] A.C. 675                                                                                                          Page 22
1981 WL 188018 (HL), [1981] 1 All E.R. 161, (1982) 43 P. & C.R. 72, [1981] 2 W.L.R. 45, (1981) 125 S.J. 46, 12-
17-1980 Times 188,018
**(Cite as: [1981] A.C. 675)**

Co. Ltd. [1944] A.C. 265, 277, 278).

Favourably to the appellants' case, the road would remain closed for "well over a year" from application for listed building consent to demolition. Still more favourable is that it will in fact remain closed for some 20 months.

The appellants were undoubtedly put to considerable expense and inconvenience. But that is not enough. Whenever the performance of a contract is interrupted by a supervening event, the initial judgment is quantitative - what relation does the likely period of interruption bear to the outstanding period for performance? But this must ultimately be translated into qualitative terms: in the light of the quantitative computation and of all other relevant factors (from which I would not entirely exclude executed performance) would outstanding performance in accordance with the literal terms of the contract differ so significantly from what the parties reasonably contemplated at the time of execution that it would be unjust to insist on compliance with those literal terms? In the instant case, at the most favourable to the appellants' contention, they could, at the time when the road was closed, look forward to pristine enjoyment of the warehouse for about two thirds of the remaining currency of the lease. The interruption would be only one sixth of the total term. Judging by the drastic increase in rent under the rent review clause (more than doubled), it seems likely that the appellants' occupation towards the end of the first quinquennium must have been on terms very favourable to them. The parties can hardly have contemplated that the expressly-provided-for fire risk was the only possible source of interruption of the business of the warehouse - some possible interruption from some cause or other cannot have been beyond the reasonable contemplation of the parties. Weighing all the relevant factors, I do not think that the appellants have demonstrated a triable issue that the closure of the road so significantly changed the nature of the outstanding rights and obligations under the lease from what the parties could reasonably have contemplated at the time of its execution that it would be unjust to hold them to the literal sense of its stipulations.

It follows that in my judgment the appellants fail on the third issue; and I would therefore dismiss the appeal.

I would, however, presume to suggest that consideration should be given to whether the English doctrine of frustration could be made more flexible in relation to leases. The Act of 1943 seems unlikely to vouchsafe justice in all cases. As often as not there will be an all-or-nothing situation, the entire loss caused by the frustrating event falling exclusively on one party, whereas justice might require the burden to be shared. Nor is this situation confined to leases.

LORD RUSSELL OF KILLOWEN.

My Lords, I am prepared to accept that the termination of a lease may be involved in the frustration of a commercial adventure when, as merely incidental to the overall commercial adventure, and a subordinate factor, a lease has been granted. To that extent at least I accept that there may be frustration of a lease, *708 and that the second answer of the Pinafore's captain on the subject of mal de mer is to be preferred to his first.

But the instant case is in no way such a case. It is simply a lease of the land with the building on it. I cannot accept that it is to the point to say that the use to which it was assumed and intended that the building on the demised land was to be put was commercial. That does not bring the lease into the field of a commercial adventure, so as for that reason to bring it within the scope of frustration. The only adventure was the granting and acceptance of a demise of the land, as in the case of any lease, at a rent.

Land is of its nature different from a chattel, however small the plot and however large the chattel. A leasehold interest is described as a chattel real, but that distinction touched only on questions of descent and inheritance. Originally perhaps sounding only in contract or covenant it has long since come to man's estate as a legal estate in land - indeed now one of the only two.

Land has in general a quality of indestructibility lacking in any chattel. Under a grant of the freehold estate in the fee simple the land passes as to its surface and below its surface, and the airspace above, subject to exclusions, for example of minerals: though "flying" freeholds require special consideration. Under the grant of the leasehold interest the land similarly passes for its duration, subject to the ability to determine that duration by either the lessor or the lessee according to the terms of the lease. and I remark at this stage that I cannot see the force in the suggestion that, because according to its terms the lease may in certain circumstances be determined otherwise than by the expiry of its term, there can be no objection to its determination by application of the doctrine of

[1981] A.C. 675                                                                                                   Page 23
1981 WL 188018 (HL), [1981] 1 All E.R. 161, (1982) 43 P. & C.R. 72, [1981] 2 W.L.R. 45, (1981) 125 S.J. 46, 12-
17-1980 Times 188,018
**(Cite as: [1981] A.C. 675)**

frustration.

Another distinction between the nature of land and of chattels is that in certain situations - riparian or by the seashore - there may be accretion to the land and therefore to the site comprised in the lease. A vessel under a so- called time charter demise can only acquire barnacles.

It is my understanding of the law that the purchaser of land, whether for a freehold or a leasehold interest, takes the risk that it may be or may turn out to be less suitable or quite unsuitable for the purpose he has in mind, unless the vendor or lessor has taken upon himself by warranty or otherwise some liability in that event. A freehold purchaser cannot in that event, after completion, return the land and ask for his money back: though in an appropriate case he might be able to resist specific performance while the contract remained outstanding. So also in the case of a lease for which a premium has been paid in addition to rent: the lessee cannot require repayment of the premium and refuse to pay the rent: nor where there is no premium can he refuse to pay the covenanted rent.

Under the bargain between lessor and lessee the land for the term has passed from the lessor to the lessee, with all its advantages and disadvantages. In the instant case a disadvantage existed, or rather supervened, in that access to the building preventing its use for any purpose was blocked by administrative action which we must assume was **\*709** legally permitted, and for which we were not told that any compensation could be claimed. If a principle of achieving justice be anywhere at the root of the principle of frustration, I ask myself why should justice require that a useless site be returned to the lessor rather than remain the property of the lessee? (It is not suggested that a just solution can be achieved by somehow sharing the bad luck between lessor and lessee by, for example, a reduction of rent.)

I would reserve consideration of cases of physical destruction of flying leaseholds: and of the total disappearance of the site comprised in the lease into the sea so that it no longer existed in the form of a piece of terra firma and could not be the subject of re-entry or forfeiture. In that last case I would not need the intervention of any court to say that the term of years could not outlast the disappearance of its subject matter: the site would no longer have a freeholder lessor, and the obligation to pay rent, which issues out of the land, could not survive its substitution by the waves of the North Sea.

It will be sufficiently seen from what I have said that I am not able to go so far as do your Lordships on the potential applicability of the doctrine of frustration to leases, and would with minor qualification adhere to the views expressed in the Cricklewood case in this House (Cricklewood Property and Investment Trust Ltd. v. Leighton's Investment Trust Ltd. [1945] A.C. 221) by Lord Russell of Killowen and Lord Goddard. These views expressed, as Lord Goddard said, the general view taken of the law by the profession, and there has been some statutory recognition of that view in giving relief to lessees where war damage had made the building on the leased site useless for its purpose as a dwelling-house. In the instant case I would have denied a case of frustration even if the closing of the access to the site had followed only a year after the commencement of the lease and were to last for the whole of its remaining duration.

Having regard to the powerful expressions of opinion of the others of your Lordships, I do not think that any useful purpose would be served by elaboration on my part.

I am, on the assumption that in general your Lordships are correct, entirely in agreement with the view that on the facts of this case, as now known, the appellant does not establish a triable issue of frustration, and accordingly I concur in the view that this appeal must be dismissed. I trust that those advising lessees will mark well the "hardly ever" approach, and that litigation will be little encouraged by this cautious departure from what may previously have been thought to be the law.

LORD ROSKILL.

My Lords, the appellants are the lessees of a warehouse in Kingston Street, Hull, of which the respondents are the lessors. Their lease was dated July 12, 1974, and its term was 10 years from January 1, 1974. It therefore expires on December 31, 1983. It is beyond question that since May 18, 1979, the appellants have been deprived of the beneficial use of the warehouse by the closure of Kingston Street both for vehicles and pedestrians, but their possession of the warehouse under the demise from the respondents has in no way been **\*710** disturbed. It is not necessary in this appeal to consider precisely the powers under which the closure order was finally made, upon which the information before your Lordships' House was regrettably sparse. It can be assumed that that order was lawfully made and is still in force. The cause of the closure was the unsafe condition of a derelict

[1981] A.C. 675                                                                                                          Page 24
1981 WL 188018 (HL), [1981] 1 All E.R. 161, (1982) 43 P. & C.R. 72, [1981] 2 W.L.R. 45, (1981) 125 S.J. 46, 12-
17-1980 Times 188,018
**(Cite as: [1981] A.C. 675)**

Victorian warehouse opposite. That warehouse is now being demolished with permission and the recent correspondence placed before your Lordships shows that that demolition should be complete by the end of this year or the beginning of next. If this prediction proves accurate, the appellants will once again have the necessary access to their warehouse and its beneficial use will once again be available to them. Upon the basis of those dates the appellants will have lost their beneficial use for about 20 months. There was at the time of the first closure order just over four and a half years of the term of 10 years unexpired and there will be some three years remaining when the beneficial use is likely to be restored.

The respondents have claimed rent throughout the period of closure. The obligation to pay rent is, it is said, absolute and unqualified and the risk of loss of beneficial use falls on the lessee. The appellants refused to pay. They claimed that their obligation to pay rent had come to an end because of frustration brought about by the closure of Kingston Street and the denial to them of the beneficial use of the warehouse. The respondents issued a writ on July 9, 1979, in respect of rent due on April 1, and July 1, 1979. Your Lordships were told that there was no dispute on figures and if the appellants are liable the sum due is that claimed. I would only observe that on any view of this case I find it difficult to see what defence there could be to the claim for rent due on April 1, 1979, since the event relied upon for excusing liability, namely the street closure order, did not take effect until May 18, 1979, and under the lease rent was payable in advance. But if the appellants are right they would have a defence to the claim for rent for the quarter beginning July 1, 1979.

The respondents sought judgment under Order 14. The learned master gave judgment for the amount claimed. The appellants appealed to the judge in chambers, Sheen J. That learned judge rightly dismissed the F appeal on October 16, 1979. Your Lordships were told that he did so without giving a reasoned judgment because he was bound by the decision of the Court of Appeal in Leighton's Investment Trust Ltd. v. Cricklewood Property and Investment Trust Ltd. [1943] K.B. 493 that as a matter of law the doctrine of frustration could not apply to a lease. Accordingly there could be no defence to the respondents' claim. The learned judge was clearly bound by that decision as the Court of Appeal would have been had the present appeal first proceeded to that court.

The learned judge then certified under section 12 of the Administration of Justice Act 1969 that a point of law of general public importance was involved in respect of which he was bound by a decision of the Court of Appeal and accordingly gave the appellants a certificate for leave to present a petition of appeal to your Lordships' House. That petition your Lordships subsequently granted. The course so adopted, very naturally in the circumstances, has had the result that this important and long *711 debated question of law - can a lease ever be frustrated? - comes before your Lordships for decision in Order 14 proceedings without your Lordships having the benefit of judgments of the trial judge or of the Court of Appeal and on facts the supply of which has certainly been economical.

My Lords, this question was last before your Lordships' House some 35 years ago on appeal in the Cricklewood case [1945] A.C. 221. There were then sitting in your Lordships' House Viscount Simon L.C., the second Lord Russell of Killowen, Lord Wright, Lord Porter and Lord Goddard. All their Lordships were agreed that if the doctrine of frustration could apply to a lease it did not apply to the building lease in question. But upon the issue now before your Lordships there was a sharp division of opinion, Viscount Simon L.C. and Lord Wright taking the view that the doctrine could apply to a lease, albeit extremely rarely, and the second Lord Russell of Killowen and Lord Goddard emphatically taking the view that it could never apply to a lease. Lord Porter declined to express a view, leaving the point to be decided when it arose for decision. My Lords, some 35 years later the point does arise for decision. In the interval there has been much debate and much learning as to which view should prevail.

One thing at least is plain. This question has never yet been the subject of direct decision in your Lordships' House. My Lords, what is now called the doctrine of frustration was first evolved during the 19th century when notwithstanding the express language in which the parties had concluded their bargain the courts declined in the event which occurred to hold them to the strict letter of that bargain. Taylor v. Caldwell, 3 B. & S. 826, is perhaps the most famous mid-19th century case, in which the relevant principle was laid down by Blackburn J. (as he then was) giving the judgment of the Court of Queen's Bench. The dispute in that case arose under a document which was expressed in the language of the lease but which was held to be a licence. There was no demise of the premises. But the licensee was relieved of his obligation to pay "rent" because of the fire which destroyed the premises and so made performance impossible. One can find what might be called anticipatory traces of the doctrine enunciated in Taylor v.

[1981] A.C. 675                                                                                                          Page 25
1981 WL 188018 (HL), [1981] 1 All E.R. 161, (1982) 43 P. & C.R. 72, [1981] 2 W.L.R. 45, (1981) 125 S.J. 46, 12-17-1980 Times 188,018
(Cite as: [1981] A.C. 675)

Caldwell in some of the earlier 19th century cases, principally in relation to contracts of personal service made impossible of performance by death or illness, but no useful purpose would be presently served by reviewing them. What is important is not what happened before Taylor v. Caldwell but what happened thereafter.

The doctrine evolved slowly especially in the field of commercial law. It was invoked in the Coronation cases. As late as Matthey v. Curling [1922] 2 A.C. 180, Younger L.J. (as he then was) said in the Court of Appeal, at p. 210, that the doctrine of frustration was not one to be extended, a view much falsified in the event. It is interesting to observe, in view of the respondents' insistence that the doctrine had no application to a lease, that for a while it was thought that the doctrine had no application to the ordinary form of time charterparty under which no possession passes to the time charterer. In Admiral Shipping Co. Ltd. v. Weidner, Hopkins & Co. [1916] 1 K.B. 429 as experienced a judge as Bailhache J. expressed the view that this was so and some support for *712 his view can be found in the speech of Lord Parker of Waddington in F. A. Tamplin Steamship Co. Ltd. v. Anglo-Mexican Petroleum Products Co. Ltd. [1916] 2 A.C. 397, 424-425. But your Lordships' House in Bank Line Ltd. v. Arthur Capel & Co. [1919] A.C. 435 determined the law beyond all doubt - that such a time charterparty could be determined by frustration if the facts of the particular case justified that conclusion. That decision did not. however, expressly at least, embrace a charter by demise where possession passes to the demise charterer and Mr. Godfrey for the respondents was able to show that as recently as Blane Steamships Ltd. v. Minister of Transport [1951] 2 K.B. 965 counsel for the appellants were able - see p. 975 - on the strength of the Cricklewood case [1945] A.C. 221 to argue (albeit wholly unsuccessfully) that the doctrine had no application to a charter by demise. It is now clear beyond question that the doctrine applies to time charters by demise as well as to other forms of time or voyage charterparties.

My Lords, I mention these matters for three purposes: first to show how gradually but also how extensively the doctrine has developed; secondly to show, how, whenever attempts have been made to exclude the application of the doctrine to particular classes of contract, such attempts, though sometimes initially successful, have in the end uniformly failed and thirdly, albeit I hope without unnecessary reference to a mass of decided cases - many in your Lordships' House - the doctrine has at any rate in the last half century and indeed during

and since the first World War been flexible, to be applied whenever the inherent justice of a particular case requires its application. The extension in recent years of government interference in ordinary business affairs, inflation, sudden outbreaks of war in different parts of the world, are all recent examples of circumstances in which the doctrine has been invoked, sometimes with success, sometimes without. Indeed the doctrine has been described as a "device" for doing justice between the parties when they themselves have failed either wholly or sufficiently to provide for the particular event or events which have happened. The doctrine is principally concerned with the incidence of risk - who must take the risk of the happening of a particular event especially when the parties have not made any or any sufficient provision for the happening of that event? When the doctrine is successfully invoked it is because in the event which has happened the law imposes a solution, casting the incidence of that risk on one party or the other as the circumstances of the particular case may require, having regard to the express provisions of the contract into which the parties have entered. The doctrine is no arbitrary dispensing power to be exercised at the subjective whim of the judge by whom the issue has to be determined. Frustration if it occurs operates automatically. Its operation does not depend on the action or inaction of the parties. It is to be invoked or not to be invoked by reference only to the particular contract before the court and the facts of the particular case said to justify the invocation of the doctrine.

My Lords, I think it can at the present time be safely said that, leases and tenancy agreements apart, there is no class of contract in relation to which the doctrine could not be successfully invoked if the particular case justified its implication, however slow and however hesitant *713 the common law may have been in developing the doctrine thus far. Clearly it is likely to be able to be more successfully invoked in some classes of case than others, for example, where the requisition of a ship under time charter is likely to outlast the remaining period of the charter - e.g. Bank Line Ltd. v. Arthur Capel & Co. [1919] A.C. 435, though not if the requisition is likely to be short in its duration - Port Line Ltd. v. Ben Line Steamers Ltd. [1958] 2 Q.B. 146. It will not often (if at all) be able to be successfully invoked by a seller of goods who is likely to invoke it on a rising market merely because the mode of performance contemplated when the contract was made proves impossible but some other and, according to the tribunal of fact, not fundamentally different but more expensive mode of performance remains

[1981] A.C. 675                                                                                                              Page 26
1981 WL 188018 (HL), [1981] 1 All E.R. 161, (1982) 43 P. & C.R. 72, [1981] 2 W.L.R. 45, (1981) 125 S.J. 46, 12-17-1980 Times 188,018
**(Cite as: [1981] A.C. 675)**

available - Tsakiroglou & Co. Ltd. v. Noblee Thorl G.m.b.H. [1962] A.C. 93 and the other Suez cases.

If, therefore, this doctrine, developed as it has pragmatically and empirically, has advanced thus far by the last quarter of the 20th century, I ask what the reasons are in principle why it should not now be held capable of embracing leases and tenancy agreements. Some of the reasons are certainly formidable and have undoubtedly attracted weighty support in your Lordships' House from the second Lord Russell of Killowen and Lord Goddard (Cricklewood Property and Investment Trust Ltd. v. Leighton's Investment Trust Ltd. [1945] A.C. 221). First, it is said that the lessee has secured full consideration for his covenant to pay rent, namely the conveyance of the leasehold interest for the relevant term of years with all the attendant benefits and burdens. Then it is said that it is a basic principle of land law not now to be disturbed in your Lordships' House which has prevailed in relation to the conveyance of both freeholds and leases that the incidence of the risk of accidents passes to the purchaser or lessee. Then it is said, quite correctly, that a lease creates an estate in land and third parties may acquire rights thereunder so that to apply the doctrine of frustration would or might destroy the interests of third parties against their wishes. It is also said that it is the lease and therefore the estate in land which is the adventure and that the attached contractual conditions are but ancillary provisions to that estate in land.

But there are also formidable arguments the other way. The law should not be compartmentalised. In principle a common law doctrine ought not to be held capable of applying only in one field of contract and not in another. To preserve the dichotomy between leases on the one hand and other types of contract on the other can undoubtedly create anomalies. Thus if a ship is demise-chartered for the purpose of storing oil and explodes without fault of either party, the demise charter would clearly be frustrated. If the same demise charterer also leases an adjacent shore installation for the same purpose and the same explosion destroys that installation along with the demise-chartered ship, rent for that storage installation would remain payable in full for the unexpired period of the lease though liability for demise charter hire had ceased upon the frustration of the demise charterparty.

My Lords, another consideration is surely this. There are many reported cases in recent years, especially in connection with attempts **714** to avoid the operation of the Rent Acts, where disputes have arisen whether a particular agreement is a lease or tenancy agreement on the one hand or a licence on the other. Such cases often turn on narrow distinctions. But it is difficult to justify a state of the law which would uphold the application of the doctrine of frustration where the agreement is held to be a licence but would deny the application of that doctrine where the agreement is held to be a lease or tenancy agreement. In so stating I have not lost sight of the contrary anomaly to which my noble and learned friend Lord Russell of Killowen drew attention during the argument and which could in theory arise if the appellants' submissions are allowed to prevail; for their submission would deny the invocation of the doctrine where the conveyance was of a freehold but would allow its invocation, at least in legal theory if not in reality, if the conveyance were only of a lease for 999 years. Yet another consideration which is relevant is this. However much weight one may give to the fact that a lease creates an estate in land in favour of the lessee, in truth it is by no means always in that estate in land that the lessee is interested. In many cases he is interested only in the accompanying contractual right to use that which is demised to him by the lease and the estate in land which he acquires has little or no meaning for him. In Professor Treitel's book on *The Law of Contract*, 5th ed., pp. 669-670. the learned author mentions the case of a cottage leased for a period as a holiday home. In many such cases the holiday-maker's rights are not only a licence to use but include a demise with the concomitant right to exclusive possession. The holiday-maker acquires an estate in land. But that, my Lords, has little meaning for him. He acquires that estate in land, it is true, but only in order to enjoy for a while that exclusive right to the demised premises for his holiday. I find it difficult to see why in principle such a lease should be incapable of being frustrated if the facts justify that result, especially as the doctrine would clearly be applicable had the holiday-maker's rights derived from a licence and not from a lease.

My Lords, if your Lordships are now to say that a lease can never be frustrated, it must be for some reason of policy. I unreservedly accept that hitherto whenever the argument that a lease can be frustrated has been advanced that argument has failed. In passing it is interesting to note that, although all members of your Lordships' House thought otherwise, Asquith J. (as he then was), the trial judge in the Cricklewood case [1943] K.B. 493, would have held the building lease there in question to be frustrated had he felt free to hold that the doctrine was capable of application to leases.

[1981] A.C. 675                                                                                         Page 27
1981 WL 188018 (HL), [1981] 1 All E.R. 161, (1982) 43 P. & C.R. 72, [1981] 2 W.L.R. 45, (1981) 125 S.J. 46, 12-
17-1980 Times 188,018
**(Cite as: [1981] A.C. 675)**

My Lords, in a matter of this kind while it is right for your Lordships to look back to the past, it is surely more important to look forward and consider what rule of law should henceforth prevail. Historic considerations alone cannot justify the preservation of a rule if that rule has ceased to serve any useful purpose and is unlikely to serve any useful purpose in the years immediately ahead.

One submission in favour of preserving the old rule was that to hold that the doctrine is applicable to leases would encourage unmeritorious litigation by lessees denying liability for rent which was plainly due. This *715 is the not unfamiliar "floodgates" argument invariably advanced whenever it is suggested that the law might be changed. My Lords, such an argument should have little appeal. If a defence of frustration be plainly unarguable, it will always be open to the master or judge in chambers so to hold and to give summary judgment for the lessors on the ground that the lessees have failed to show any arguable defence. I respectfully agree with Viscount Simon L.C. and Lord Wright in the Cricklewood case that the cases in which the doctrine will be able to be successfully invoked are likely to be rare, most frequently though not necessarily exclusively where the alleged frustrating event is of a catastrophic character. If that be so the "floodgates" argument ceases to have any weight.

Your Lordships were referred to a decision of Goff J. (as he then was) in Rom Securities Ltd. v. Rogers (Holdings) Ltd., 205 E.G. 427, in which that learned judge expressed himself as far from satisfied that the doctrine of frustration could not be applied to an agreement for a lease. My Lords, if that view be right, as I think it is, and the doctrine is applicable to an agreement for a lease, I find it difficult to see why a different view should apply in the case of a lease because in the latter case there has been a demise whereas in the former there has not; equity presumes that to have been done which should be done.

Thus, far, my Lords, I have sought to examine the crucial question on principle and without detailed regard to the many authorities to which your Lordships have referred. The three principal English cases relied upon by the respondents are London and Northern Estates Co. v. Schlesinger [1916] 1 K.B. 20, Whitehall Court Ltd. v. Ettlinger [1920] 1 K.B. 680 and Matthey v. Curling [1922] 2 A.C. 180. In the first of these cases Lush J., at p. 24, stated as a ground for denying the applicability of the doctrine that a term of years had been created by the agreement in question, but the decision was

plainly right upon the true construction of the lease and the facts of that case. The lease properly construed did not contemplate only personal residence by the defendant. Similarly Whitehall Court Ltd. v. Ettlinger was rightly decided on the true construction of the lease and the particular facts of that case. Like Lord Wright in the Cricklewood case [1945] A.C. 221, 238 I do not regard the passage in the judgment of Lord Reading C.J. - be it noted that it was an extempore judgment - at p. 685 as holding that a lease is incapable of frustration.

My Lords, I think Mr. Godfrey was right in saying that the genesis of the suggestion that a lease is capable of frustration lies in the dissenting judgment of Atkin L.J. (as he then was) in the Court of Appeal in Matthey v. Curling [1922] 2 A.C. 180, 199-200. I have read and re-read the speeches in your Lordships' House. I am clearly of the view that the majority of your Lordships' House though disagreeing with that dissenting judgment were deciding that case (a singularly harsh decision from the tenant's point of view) by reference to the particular lease and the particular facts of the case. I do not think that decision in any way assists the determination of the present question. Nor, with respect, is any assistance to be gained from the Scottish case of Tay Salmon Fisheries Co. Ltd. v. Speedie, 1929 S.C. 593 which was decided *716 under a system of law different in the crucial respect from that applicable to Matthey v. Curling. In my judgment the Court of Appeal in the Cricklewood case [1943] K.B. 493 was wrong in asserting categorically that those three English cases to which I have referred were decisive in favour of the proposition that the doctrine of frustration had no application to a lease, even though in the first there is a dictum to that effect. I find myself in respectful agreement with what Viscount Simon L.C. and Lord Wright [1945] A.C. 221 said with regard to those three cases.

Your Lordships were referred to certain United States authorities collected in *Williston on Contracts*, 3rd ed., vol. 18. s. 1955. Clearly there are United States decisions - none it seems of the highest authority - both ways. Many of these cases arose from the Eighteenth Amendment and its effect upon leases of premises entered into solely for the sale of liquor. I respectfully doubt whether much help is to be gained from such decisions. It is however interesting to observe that Professor Corbin in his work on *Contracts*, vol. 6, s. 1356, takes the view, at p. 387. that the argument in favour of the non- applicability of the doctrine of frustration based upon the view that the lessee had assumed the risk "has long since ceased to be

[1981] A.C. 675                                                                                   Page 28
1981 WL 188018 (HL), [1981] 1 All E.R. 161, (1982) 43 P. & C.R. 72, [1981] 2 W.L.R. 45, (1981) 125 S.J. 46, 12-
17-1980 Times 188,018
**(Cite as: [1981] A.C. 675)**

convincing" adding:

"Whether the frustration of the tenant's purposes operates in discharge of his duty depends upon all the circumstances, especially upon the extent of that frustration and the prevailing practices of men in like cases."

Your Lordships were helpfully referred to one Canadian and one Australian decision, the former of the Supreme Court of Canada, the latter of the High Court of Australia. In the former, Highway Properties Ltd. v. Kelly, Douglas & Co. Ltd., 17 D.L.R. (3d) 710, Laskin J. (as he then was) delivering the judgment of the Supreme Court said, at p. 721:

"There are some general considerations that support the view that I would take. It is no longer sensible to pretend that a commercial lease, such as the one before this court, is simply a conveyance and not also a contract. It is equally untenable to persist in denying resort to the full armoury of remedies ordinarily available to redress repudiation of covenants, merely because the covenants may be associated with an estate in land."

In the latter case, Firth v. Halloran, 38 C.L.R. 261, Isaacs J. (as he then was), though agreeing with other members of the court in holding that in a particular case there was no frustration, said, at p. 269:

"I do not agree that, because the contractual obligation relied on by the plaintiff is created by an instrument of lease, the doctrine of frustration is necessarily excluded. The nature of the relation of landlord and tenant, the history of the doctrine of frustration, its inherent meaning and the judicial determination of relevant cases would lead me to reject so sweeping a rule. Nor do I think the consequences of terminating the relation of landlord and tenant any more extraordinary than that of terminating any other legal relation which by hypothesis is expressly and impliedly created on a mutual *717 and fundamental basis of existence or continuance which fails at a given point. ..."

It is, however, right to say that he alone of the members of the High Court of Australia took that view and certainly two other members of that court agreed with the court below in holding that the doctrine had no application to a lease.

My Lords, I do not find anything in these writings and decisions which affords a compelling reason for maintaining the view that the doctrine is inapplicable to leases. The inclination of these writings and decisions is to my mind the other way. The learned authors of Megarry and Wade, The Law of Real Property, 4th ed., p. 674, not

surprisingly in view of the difference of opinion in the Cricklewood case [1945] A.C. 221, treat the question as open.

My Lords, I do not find it necessary to examine in detail the jurisprudential foundation upon which the doctrine of frustration supposedly rests. At least five theories have been advanced at different times. At one time without doubt the implied term theory found most favour, and there is high authority in its support. But weighty judicial opinion has since moved away from that view. What is sometimes called the construction theory has found greater favour. But, my Lords, if I may respectfully say so, I think the most satisfactory explanation of the doctrine is that given by Lord Radcliffe in Davis Contractors Ltd. v. Fareham Urban District Council [1956] A.C. 696, 728. There must have been by reason of some supervening event some such fundamental change of circumstances as to enable the court to say: "this was not the bargain which these parties made and their bargain must be treated as at an end" - a view which Lord Radcliffe himself tersely summarised in a quotation of five words from the *Aeneid*: "non haec in foedera veni." Since in such a case the crucial question must be answered as one of law - see the decision of your Lordships' House in Tsakiroglou & Co. Ltd. v. Noblee Thorl G.m.b.H. [1962] A.C. 93 - by reference to the particular contract which the parties made and to the particular facts of the case in question, there is, I venture to think, little difference between Lord Radcliffe's view and the so-called construction theory.

My Lords, it follows that on the question of principle I find it impossible to justify compartmentalisation of the law or to agree that the doctrine of frustration applies to every type of contract save a lease. I can see no logical difference between frustration of a demise charterparty and frustration of a lease. In principle the doctrine should be equally capable of universal application in all contractual arrangements. I therefore find myself in respectful agreement with the reasoning of Viscount Simon L.C. and Lord Wright and in respectful disagreement with the views of the second Lord Russell of Killowen and Lord Goddard in the Cricklewood case.

But to hold that the doctrine is capable of applying to leases does not mean that it should be readily applied. Viscount Simon L.C. and Lord Wright both indicated in the Cricklewood case some of the limitations to which the invocation of the doctrine would be subject. I respectfully agree with what was there said but I do not think any useful purpose *718 would presently be served by

1981 WL 188018 (HL), [1981] 1 All E.R. 161, (1982) 43 P. & C.R. 72, [1981] 2 W.L.R. 45, (1981) 125 S.J. 46, 12-17-1980 Times 188,018
**(Cite as: [1981] A.C. 675)**

attempting to categorise those cases where the doctrine might be successfully invoked and those where it might not. Circumstances must always vary infinitely. I am, however, clearly of the view in common with all your Lordships that the doctrine cannot possibly be invoked in the present case for the reasons given by my noble and learned friend Lord Wilberforce. I would therefore dismiss this appeal with costs.


**Representation**


Solicitors: Samuel Tonkin & Co. for Carrick, Carr & Garwood, Hull; Bower, Cotton & Bower for Simpson, Curtis & Co., Leeds.


Appeal dismissed with costs. (M. G. )


(c) Incorporated Council of Law Reporting For England & Wales

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. Govt. Works