# Exhibit 33

# Law of Guarantees

## SIXTH EDITION

By

**Geraldine Mary Andrews, QC**
*LLB, LLM (King's College London) of
Gray's Inn and Lincoln's Inn, Barrister*

**Richard Millett, QC**
*BA (Trinity Hall, Cambridge) of
Lincoln's Inn, Barrister*

SWEET & MAXWELL  THOMSON REUTERS



First edition 1992
Second edition 1995
Third edition 2001
Fourth edition 2005
Fifth edition 2008

*Published in 2011 by*
*Sweet & Maxwell, 100 Avenue Road, London NW3 3PF part of*
*Thomson Reuters (Professional) UK Limited*
*(Registered in England & Wales, Company No 1679046.*
*Registered Office and address for service: Aldgate House, 33 Aldgate High Street,*
*London EC3N 1DL)*
Typeset by LBJ Typesetting Ltd of Kingsclere
Printed and bound by
CPI Group (UK) Ltd, Croydon, CR0 4YY

No natural forests were destroyed to make this product;
only farmed timber was used and re-planted.

A CIP catalogue record for this book is available from the British Library

ISBN 978-0-414-04471-5

Crown copyright material is reproduced with the permission of the
Controller of HMSO and the Queen's Printer for Scotland.
All rights reserved. No part of this publication may be reproduced or transmitted in any
form or by any means, or stored in any retrieval system of any nature without prior
written permission, except for permitted fair dealing under the Copyright, Designs and
Patents Act 1988, or in accordance with the terms of a licence issued by the Copyright
Licensing Agency in respect of photocopying and/or reprographic reproduction.
Application for permission for other use of copyright material including permission to
reproduce extracts in other published works shall be made to the publishers. Full
acknowledgement of author, publisher and source must be given.

Thomson Reuters and the Thomson Reuters logo are trademarks of
Thomson Reuters. Sweet & Maxwell ® is a registered trademark of
Thomson Reuters (Professional) UK Limited.

© Geraldine Andrews and Richard Millett 2011



# Foreword

Debt default is serious. It brought the world financial system to the brink of collapse in 2009 and, as this book goes to press, the risk of debt default threatens the world economy once again. No wonder then that creditors try to protect themselves against that risk. One way of doing so is by taking guarantees. Like so many legal terms the word "guarantee" is used in many different senses, and is often used to describe obligations that are not really guarantees at all. That is why care is needed in understanding what rights and obligations any particular contract creates. This edition of Andrews and Millett's well-known and authoritative work explains clearly and comprehensively the many different forms of contract; and who can sue whom and for what.

The authors' thoughtful discussion of electronic communications and signatures also demonstrates that it is no longer adequate to define a surety as "a fool with a pen."

The reader will find all the up to date authorities discussed and dissected. The recent pronouncement of the Court of Appeal on authorised guarantee agreements and guarantees of authorised guarantee agreement is fully covered, thus for the time being bringing an end to what aficionados call the AGA saga and the GAGA saga.

The international character of commerce is well-reflected in the book; not only in its discussion of where to sue and what legal system governs the contract, but also in their use of authorities from far afield. Where they disagree with decisions of the courts, even at the highest level, they are not afraid to say so forthrightly. Neither the House of Lords nor the High Court of Australia escape. Their prescient criticism of the decision of the majority of the Court of Appeal in *Rainy Sky v Kookmin Bank* has very recently been vindicated by the Supreme Court's reversal of the Court of Appeal. Their dislike of judicial approaches to conclusive evidence clauses is cogently argued, and in that regard they subject at least one of my own decisions to critical scrutiny. If they do not like the outcome of judicial decisions they offer practical advice for circumventing or minimising the consequences. Where the law is doubtful (and it often is) they suggest ways in which it might develop.

It is difficult to imagine a more thorough treatment of the Law of Guarantees. I welcome this latest edition.

Kim Lewison
Royal Courts of Justice
London WC2A 2LL



# Foreword to 5th Edition

*By The Rt. Hon. Lord Neuberger of Abbotsbury*

There are two particular requirements for conscientious solicitors, barristers, and other professionals, who are seeking to ensure they are in a position to advise commercial clients accurately and fully. The first is to be sure that they are thoroughly *au fait* with all modern developments in the area of law in which they are advising. The second requirement is to be sure that they have a full and balanced view of that area of law. In other words, they have to be aware of every tree in the relevant wood, but they must also see the wood and assess it in a balanced way.

These requirements have always been particularly acute in relation to the law of guarantees. It is not merely that guarantees are a topic where the commercial world and the legal world meet. Guarantees are subject to a large quantity of both old and new judge-made law, and they span many other areas of law (e.g. insolvency, landlord and tenant, banking, husband and wife, to take just a few examples). Further, the law of guarantees is liable to develop in accordance with fairly swiftly moving commercial changes, it is a topic on which many different jurisdictions learn from each other, and it is one which often leads to emotionally charged and difficult litigation.

With the significant increase in the volume of both judicial decisions and statutes regulations and the like, in this country and elsewhere, the two requirements I have mentioned have become increasingly difficult to satisfy. The position has been substantially exacerbated by the very substantial increase in the proportion of decided cases and other material which are available electronically. Since I ceased practice eleven years ago, life has got much harder, or to use a current euphemism, much more challenging, for those in legal practice as a result of the ever increasing quantity of available electronic information.

It is these factors which make a reliable, up-to-date, and authoritative text book on the law of guarantees so valuable, indeed indispensable, to a lawyer or other professional who has to advise on, or argue about, any issue in the field. The fifth edition of Geraldine Andrews's and Richard Millett's work on *The Law of Guarantees* is such a text book. Its substantial size indicates the thoroughness of the authors and the fullness of their treatment of the law. Comparison with the size of the first edition shows the extent to which the law in this area has developed over the past 15 years. Many lawyers (including me) have consulted, and benefited from, the earlier editions, and this will no doubt be every bit as true of this edition.



*Foreword to the 5th Edition*                                    vii

The current edition rightly recognises the developments and changes in the law that have occurred since the publication of the fourth edition. In particular, I would draw attention to the new section in Chapter 4, dealing with the effectiveness of clauses permitting variation of the underlying contract, the re-writing of Chapter 17, following the introduction of the Consumer Credit Act 2006, and the discussion of significant new cases, especially in the fields of insolvency and of landlord and tenant. It is not merely changes in the law that are faced up to; Chapter 3 contains a new discussion of the operation of section 4 of the Statute of Frauds 1677 in the electronic age.

As Lord Justice Jacob wrote when introducing the fourth edition, despite their busy practices at the Commercial Bar, the two authors have somehow managed to find time to prepare a properly reconsidered, overhauled, and up-to-date book on the law of guarantees. The legal profession and other interested groups should be grateful to them.

*Lord Neuberger of Abbotsbury*
*November 2007*

# Contents

|  | page |
|---|---|
| *Foreward* | v |
| *Foreward to the 5th Edition* | vi |
| *Preface* | xix |
| *Preface to the 5th Edition* | xxiii |
| *Table of Cases* | xxvii |
| *Table of Statutes* | lxxxvii |
| *Table of Statutory Instruments* | xciii |
| *Table of EC/EU Legislation* | xcv |

**Chapter 1: Definitions and Characteristics**

|  | para. |
|---|---|
| Suretyship | 1–001 |
|   Rights of a surety | 1–002 |
|   Contracts of suretyship | 1–003 |
| Contracts of guarantee |  |
|   Definition | 1–004 |
|   Essential characteristics | 1–005 |
|   Guarantees and insurance | 1–008 |
|   Types of guarantee | 1–009 |
| Contracts of indemnity |  |
|   Definition | 1–012 |
|   Essential characteristics | 1–013 |
|   "Principal debtor" clauses | 1–014 |
| Performance Bonds | 1–015 |

**Chapter 2: Contractual Requirements**

|  |  |
|---|---|
| Introduction | 2–001 |
| Offer and acceptance | 2–002 |
| Revocation by the surety | 2–003 |
|   Revocation before acceptance | 2–004 |
|   Unilateral and bilateral offers | 2–005 |
|   When the offer becomes irrevocable | 2–006 |
|   Prospective consumer credit agreements | 2–007 |
| Privity of contract | 2–008 |
| Consideration | 2–009 |
|   Guarantee in the form of a promissory note | 2–010 |
|   Guarantees of pre-existing liabilities | 2–011 |
|   Nominal consideration | 2–012 |
|   Supplies of goods, credits or services | 2–013 |

## Contents

| | |
|---|---|
| Other means | 2–014 |
| Unlawful consideration | 2–016 |
| Evidence of consideration | 2–020 |
| Contracts under seal | 2–021 |

### Chapter 3: Formal Requirements

| | |
|---|---|
| The Statute of Frauds 1677 | 3–001 |
| Introduction | 3–002 |
| Contracts to which s.4 applies | 3–003 |
| Contract distinctions | 3–006 |
| Contracts outside the scope of s.4 | 3–007 |
| Variations must comply with s.4 | 3–017 |
| Collateral contracts | 3–018 |
| Contracts which fall partly within the Statute of Frauds | 3–019 |
| Achieving enforceability under s.4 | 3–020 |
| Memorandum and agreement | 3–021 |
| Effect of non-compliance | 3–028 |
| The potential impact of EU law | 3–029 |
| Possible ways to circumvent s.4 | 3–030 |
| Rectification and enforcement | 3–033 |
| Indorsers of bills of exchange | 3–034 |
| Other statutory requirements | |
| Consumer protection legislation | 3–035 |
| The Unfair Contract Terms Act 1977 | 3–036 |
| The Unfair Terms in Consumer Contracts Regulations 1999 | 3–037 |

### Chapter 4: Construction

| | |
|---|---|
| Introduction | 4–001 |
| Principles of construction | |
| General approach | 4–002 |
| Construction in accordance with proper law | 4–004 |
| Construction *ut res magis valeat quam pereat* | 4–005 |
| Admissibility of oral and extrinsic evidence | 4–006 |
| The name and form of the document | 4–007 |
| Recitals and side notes | 4–008 |
| The consideration clause as an aid to interpretation | 4–010 |
| Joint and several liability | 4–011 |
| Limitation to liability of the parties named | 4–012 |
| The principle of co-extensiveness | 4–014 |
| Different forms of contract | 4–015 |
| Retrospective and prospective guarantees | 4–016 |
| Specific and continuing guarantees | 4–017 |
| Limited guarantees | 4–018 |
| Guarantees limited in amount | 4–020 |
| Conditional guarantees | 4–022 |



*Contents*                                             xi

Construction of agreements by a surety consenting to
variations to the principal contract                   4–025
Variations outside the purview of the original contract 4–026

**Chapter 5: Vitiating Elements in the Contract**

Introduction                                           5–001
Mistake                                                5–002
  Forms of mistake                                     5–003
  *Non est factum*                                     5–004
Fraud or misrepresentation                             5–005
  Fraud or misrepresentation by the creditor           5–006
  Clauses protecting the creditor from allegations
  of misrepresentation                                 5–007
  Fraud or misrepresentation by the surety             5–008
  Fraud or misrepresentation by the principal          5–009
  Fraud and the commercial surety                      5–012
Concealment and non-disclosure                         5–015
  Unusual features                                     5–016
  Disclosure of fraud or dishonesty of the principal   5–017
  Other unusual facts                                  5–018
  Disclosure obligations and specific types of contract 5–019
  Knowledge of the creditor                            5–021
  Effect of non-disclosure                             5–022
  Is the obligation a continuing one?                  5–023
  Disclosure to whom?                                  5–024
  Express provisions requiring disclosure              5–025
  Disclosure and the duty of confidentiality           5–026
  Exemption clauses and non-disclosure                 5–027
Unconscionable transactions                            5–028
  Duress                                               5–029
  Undue influence                                      5–030
  Notice                                               5–034
  What steps should the creditor take?                 5–038
  The independent solicitor                            5–042
  Limits on the protection of the *Etridge* principle  5–045
  The effect of an *Etridge* defence on subsequent transactions
  with the same lender                                 5–046
  Setting aside on terms                               5–047
  Unconscionable bargains                              5–048
Ultra vires and illegal transactions                   5–049
  Guarantees prohibited by statute                     5–050
  Guarantees made to effect an unlawful purpose        5–051
  Guarantees which offend against public policy        5–052
  Guarantees which are not or cannot be performed in a
  lawful manner                                        5–053



xii                             *Contents*

**Chapter 6: The Liability of the Surety**

The nature of the surety's liability
Secondary nature                                                        6–001
   The co-extensiveness principle                          6–002
Extent of the surety's liability: the provisions of the contract
of guarantee
   Limitations upon liability                               6–003
   Limitations on the amount of principal debt              6–006
   Limitations as to time                                   6–008
   Limitations in respect of the type of principal transaction   6–009
   Designation of the parties                               6–012
   The effect of the terms of the principal contract       6–014
   Extension of the surety's liability by estoppel          6–017
Extent of the surety's liability: defects in the principal obligation
   General principles                                       6–018
   Principal obligations which are illegal                  6–019
   Principal obligations which are void                     6–020
   Principal obligations which are voidable                 6–024
   Principal obligations which are unenforceable            6–026
   Provisions preserving liability where the principal contract
   is defective                                             6–028
Extent of the surety's liability: breach of the principal contract by
the creditor or principal
   Breach of the principal contract by the creditor         6–029
   Breach of the principal contract by the principal        6–030

**Chapter 7: Enforcement of Contracts of Suretyship**

Introduction                                                            7–001
When can the creditor sue the surety?
   Default of the principal                                 7–002
   Demands for payment                                      7–004
   The creditor may pursue the surety first                 7–009
   Preservation of rights against third parties             7–010
   Time of suit is not of the essence                       7–011
   Limitation of actions                                    7–012
Nature of the claim against the surety                                  7–018
Where should the creditor sue the surety?
   Jurisdiction of arbitration clauses                      7–019
   No choice of forum                                       7–022
Parties to the proceedings
   Joint obligors                                           7–026
   Trustees and other representatives                       7–029
   Who may sue on the guarantee?                            7–030
   Assignees                                                7–031

*Contents*                                                                    xiii

Evidence of liability
   Conclusive evidence clauses                                 7–032
   Proof without conclusive evidence clauses                    7–035
   Set-off and counterclaim                                     7–036
Miscellaneous considerations
   Preserving assets for judgment                               7–037
   Counter-securities                                           7–038
   Claims against an insolvent surety                           7–039
   Claims against the surety when the principal
   is insolvent                                                 7–040
   Claims against the estate of a deceased surety               7–041
   Claims by the estate of a deceased creditor                  7–042

**Chapter 8: Revocation of Contracts of Suretyship**

Introduction                                                                  8–001
Revocation by the surety
   Revocation by express notice                                 8–002
   Revocation in the absence of contractual provision           8–003
   The effect of revocation                                     8–006
   Form of notice                                               8–008
   Liability during notice period                               8–009
   Revocation by co-surety                                      8–010
Revocation by death or insanity
   Death or insanity of the surety                              8–011
   Death or insanity of a co-surety                             8–012
   Death or insanity of the creditor or principal               8–013
Revocation of contracts of indemnity                                          8–014

**Chapter 9: Discharge of the Surety**

Discharge of surety by discharge of the principal                             9–001
   Discharge by payment or performance                          9–002
   Discharge by appropriation                                   9–005
   Discharge arising from set-of                                9–009
   Discharge by agreement or by release                         9–010
   Discharge of surety by breach of contract by creditor        9–017
   Discharge of surety by breach of contract by principal       9–019
   Discharge by operation of law                                9–021
Discharge by alteration of the principal contract
   Material alteration of documents                             9–022
   Material variation of the terms                              9–023
   Exceptions to the rule                                       9–026
   Agreement by creditor to give time to the principal          9–029
   Agreement by creditor to give time to surety                 9–035
   Laches of creditor                                           9–036
   Change in position of parties                                9–037

xiv                              *Contents*

Discharge of surety by loss of rights of recourse
  Loss of co-sureties                                              9–040
  Discharge by loss of securities held by creditor                 9–041

**Chapter 10: Rights of the Surety Against the Principal**

Introduction                                                        10–001
The right to an indemnity                                           10–002
  Independent right of the surety                                  10–003
  Express agreement                                                10–004
  Implied agreement                                                10–006
  Restitutionary right in quasi-contract                           10–008
  Accrual of the surety's right of indemnity                       10–012
Amount of indemnity                                                 10–017
  Principal and interest                                           10–018
  Unenforceable indemnities                                        10–023
Surety's rights before payment                                      10–024
  Quia timet relief                                                10–025
  Right to petition for winding-up                                 10–029
  Right to recover damages                                         10–030

**Chapter 11: Rights of the Surety Against the Creditor**

Nature and origin of rights                                         11–001
Rights of the surety before payment or performance
  Rights of the surety before demand                               11–002
  Rights of the surety upon demand                                 11–005
  Right to marshal securities in the hands of the creditor         11–015
Rights of the surety after payment or performance
  The right of recovery                                            11–016
  The right of subrogation                                         11–017

**Chapter 12: Rights of the Surety Against Co-Sureties**

Nature and origin of rights                                         12–001
The operation of the right of contribution
  When the right to contribution arises                            12–003
  After payment by the surety                                      12–004
  When the right to contribution does not arise                    12–009
  The amount of contribution                                       12–013
  Interest                                                         12–014
  Costs                                                            12–015
  The right of the surety to securities                            12–016
Enforcement to the right of contribution
  Action for contribution                                          12–018
  Defences to claims for lack of contribution                      12–020
  Defences based on the conduct of the creditor                    12–021



*Contents*    xv

Defences based on the conduct of the surety                          12–022
Surety releasing or giving time to a co-surety                       12–023
Surety dealing with counter-securities                              12–024
Death and bankruptcy
    The effect of bankruptcy                                        12–025
    The effect of death                                             12–026

**Chapter 13: Insolvency**

The insolvency of the principal                                     13–001
    The rule against double proof                                   13–002
    Payment in full by the surety                                   13–005
    Suspense accounts and non-competition clauses                   13–011
    Release of the principal by the creditor                        13–013
The insolvency of the surety
    The creditor's right of proof                                   13–014
    Negotiable instruments                                          13–015
The insolvency of both the principal and surety
    The general rule                                                13–016
    Negotiable instruments                                          13–017
The rule in *Ex p. Waring*                                          13–018
The insolvency of the creditor: set-off                            13–019
    Personal covenant for repayment                                 13–020
The insolvency of co-sureties                                       13–021

**Chapter 14: Bank Guarantees and Letters of Comfort**

Introduction                                                        14–001
Duty of care
    Duty in relation to securities held by the bank                 14–002
    Explaining the nature and effect of security documents          14–003
    Expense of such guarantees                                      14–010
Cheque guarantee cards                                              14–011
Letters of comfort                                                  14–012
    Statements of promises and present intention                    14–013

**Chapter 15: International Commerce**

Introduction                                                        15–001
Export credit guarantees                                            15–002
    The powers of the ECGD                                          15–003
    Facilities available from ECGD                                  15–006
    Facilities offered by the ECGD                                  15–008
    Other ECGD facilities                                           15–011
    Obtaining cover from ECGD                                       15–012
Carnets                                                             15–013
    Types of goods                                                  15–014



xvi                         *Contents*

How the ATA carnet system works                              15-015
Obtaining a carnet                                           15-016
P&I Club guarantees and bail bonds
Security for the release of maritime vessels                 15-019
Cases analogous to arrest                                    15-022
Form of Club guarantees                                      15-023
The cost of security or counter-security                     15-024
Indemnities for port agents                                  15-025
Indemnities given to or by cargo receivers                   15-026

**Chapter 16: Performance Bonds**

The nature of performance bonds                              16-001
Performance bond or true guarantee?                          16-002
The commercial role of performance bonds                     16-003
Construction projects                                        16-004
International sales                                           16-005
The advantage of performance bonds
Comparative cost                                             16-006
Obtaining immediate payment                                  16-007
Securing the performance of unenforceable obligations        16-008
Freeing of other assets                                      16-011
The provision of performance bonds                           16-012
The construction of performance bonds                        16-013
Proper law                                                   16-014
Liability without proof of breach                            16-015
Demand                                                       16-016
Stating the basis of the claim                               16-017
Implied terms                                                16-018
The ICC Uniform Rules for Demand Guarantees 2010
(ICC Publication No.758)                                     16-019
Safeguards against wrongful demands or fraud                 16-020
Injunctive relief
Injunction against the beneficiary                           16-025
Freezing injunctions                                         16-029
Standby letters of credit                                    16-033
Duty to account for the proceeds of the bond                 16-035
Repayment when there has been no breach                      16-036
Interest                                                     16-037

**Chapter 17: Consumer Credit Transactions**

Introduction                                                 17-001
The protection of sureties for consumer agreements           17-002
Protected sureties                                           17-003
Formalities                                                  17-004
Sanctions for non-compliance with formal requirements        17-005

*Contents*                                                                                                    XVII

The right of the surety to change his mind                                  17–006
Information to be supplied                                                  17–007
Sanctions for non-compliance with information requirements                 17–008
Termination and enforcement                                                17–009
Realisation and enforcement of securities                                  17–010
Cancelled or unenforceable agreements                                      17–011
Contracts with minors or the incapacitated                                 17–012
Sanctions for wrongful or premature enforcement                            17–013
Unfair relationships between creditors and debtors                         17–014

**Chapter 18: Landlord and Tenant**

Introduction                                                               18–001
    Variations of the lease                                                18–002
    Effect of termination of the lease                                     18–003
    Effect of assignment of the lease                                      18–004
    Effect of transfer of the freehold reversion                           18–005
Rent reviews                                                               18–006
Relief against forfeiture                                                  18–007
The Landlord and the Tenant (Covenants) Act 1995                           18–008
Substitution clauses                                                       18–009
Effect of disclaimer of the lease                                          18–010
    Effect of disclaimer                                                   18–011
    Disclaimer on insolvency of the original tenant                        18–012
    Covenants by the surety to take on a new lease from the
    date of the disclaimer                                                 18–013
    Disclaimer on insolvency of a sub-tenant or assignee of the lease      18–014
    Effect of disclaimer by the Crown                                      18–015
Voluntary arrangements                                                     18–016
Rights of the surety after payment                                         18–017

Precedent 1: Standard Form Bank Guarantee                             *para* P1–001
Precedent 2: Notice of Revocation                                          P2–001
Precedent 3: Deed of Release of Surety from Bank Guarantee                 P3–001
Precedent 4: Letter of Comfort                                             P4–001
Precedent 5: On Demand Unconditional Performance Bond                      P5–001
Precedent 6: Conditional Performance Bond                                  P6–001
Precedent 7: Counter-Indemnity to a Bank Issuing a Performance Bond        P7–001
Precedent 8: P&I Club Letter of Undertaking                                P8–001
Precedent 9: Guarantee of Dividends on Shares                              P9–001
Precedent 10: Guarantee of Ascertained Debt                               P10–001
Precedent 11: Agreement for the Release of a Surety                       P11–001
Precedent 12: Bank Guarantee in Respect of Security for Costs             P12–001
Precedent 13: Indemnity for the Fidelity of an Employee                   P13–001
Precedent 14: Rent Guarantee                                              P14–001
Appendix Legislation                                                  *page* 779

*Index*                                                              *page* 813

*Chapter 1*

# Definitions and Characteristics

## Suretyship

Suretyship is the generic term given to contracts by which one person (the surety) **1–001** agrees to answer for some existing or future liability of another (the principal) to a third person (the creditor), and by which the surety's liability is in addition to, and not in substitution for, that of the principal. In most cases, the contract will involve the assumption by the surety of personal liability to the creditor. However, it may also consist of the provision by the surety of a pledge or security in support of the performance of the principal's obligation, for example, a charge on property.[1]

### Rights of a surety

The obligations of a surety are usually created expressly by contract, but it is **1–002** unnecessary for a person to contract as guarantor in order to acquire the rights of a surety. A person who, on the face of a contract, appears to be under a primary obligation to the creditor, may nevertheless acquire the rights of a surety by giving him notice. For example:

> D and S enter into a contract with C under which they undertake to be jointly liable for the repayment of money advanced by C to D. Subsequently, D and S agree as between themselves that D is to assume the primary responsibility for repayment of C, and S is to be secondarily liable. Once notice of this arrangement has been given to C, he is bound to respect S's position as a surety, even if he does not assent to the modification of the original arrangement and even if, by this time, the debt has fallen due for repayment. This will not prevent C from suing S (rather than D) for the debt but he must respect S's rights as surety, for example, by preserving his rights to other securities.[2]

---

[1] *Smith v Wood* [1929] 1 Ch 14; *Re Conley* [1938] 2 All E.R. 127; and *Deutsche Bank v Ibrahim* [1992] 1 Bank. L.R. 267.
[2] *Rouse v Bradford Banking Co Ltd* [1894] A.C. 586. This case finally decided that the assent of the creditor to a modification of the original position was unnecessary and that, in accordance with the approach taken by the courts of equity, notice was sufficient.

2                    *Definitions and Characteristics*

In certain cases, where there is a primary and secondary liability of two persons for the same debt, they will stand in the relationship to each other of principal and surety even though there is no express contract of suretyship between them.[1] Thus the acceptor of an accommodation bill of exchange is a surety for the payment by the drawer, and the maker of an accommodation note is in the position of a surety, with all the surety's rights.[4] However, the relationship of principal and surety will not always arise in such circumstances. For instance, if property which was subject to a mortgage has been sold and the mortgagor remains under a liability to the mortgagee, he does not become a surety for the purchaser: *Re Errington* [1894] 1 Q.B. 11. Similarly, if a person assigns a lease and the assignee covenants to indemnify him against liability for breaches of covenants in the lease, the assignee thereby undertakes a primary liability as between himself and the assignor, but the assignor does not become a surety for the assignee.[5] A transferor of shares does not become the guarantor of the transferee, though he may be liable by statute to pay calls if the transferee does not.[6]

### Contracts of suretyship

1-003    Contracts of suretyship fall into two main categories: contracts of guarantee and contracts of indemnity. Guarantees and indemnities have many similar characteristics, and similar rights and duties arise between the parties. Consequently, it is not unusual to find the term "guarantee" used loosely to describe a contract which is in reality an indemnity (and vice versa). However, despite the similarities, it is often important to ascertain into which of these two categories a particular agreement falls. This can have a significant bearing on the enforceability of the contract against the surety, and the extent and nature of his liability, in two particular respects.

First, contracts of guarantee, but not contracts of indemnity, are prima facie unenforceable by the creditor if they do not comply with the requirements of s.4 of the Statute of Frauds 1677.[7] Secondly, the liability of a guarantor is normally co-extensive with the liability of the principal. Therefore, if the obligation of the principal to the creditor is unenforceable, or has been discharged, the liability of the surety may depend on whether the contract is a guarantee or an indemnity.[8]

In addition to guarantees and indemnities, there are various types of commercial contract, such as performance bonds (sometimes called "performance guarantees"), export credit guarantees and carnets, which may be described as contracts of suretyship, or which are very closely related to them, and yet have special distinct characteristics which it is more appropriate to consider independently.

---

[1] See *Duncan Fox & Co v North and South Wales Bank* (1880–81) L.R. 6 App. Cas. 1 at 11, discussed in para.1–006.
[4] See, e.g. *Re Acraman, Ex parte Webster* (1847) De G. 414; *Bailey v Edwards* (1864) 4 B. & S. 761; *Yonge, Ex parte* (1814) 3 V. & B. 31 at 40, per Lord Eldon L.C.
[5] *Baynton v Morgan* (1888) L.R. 21 Q.B.D. 101, see also *Allied London Investments Ltd v Hambro Life Assurance Plc* (1984) 269 E.G. 41; *Selous Street Properties v Oronel Fabrics* (1984) 270 E.G. 743.
[5] See *Gore-Browne on Companies*, Vol.2, Ch.23, para.8; *Roberts v Crowe* (1872) L.R. 7 C.P. 629; *Contract Corp* (1871) L.R. 12 Eq. 1; *Helbert v Banner* (1871) L.R. 5 H.L. 28. See Ch.3.
[6] See Chs 6 and 9.



*Suretyship*                                               3

These will therefore be dealt with in detail in Chs 14 to 16 of this book. Chapter 18 will deal with the special considerations which may apply to contracts of guarantee in the context of the relationships between landlord and tenant and their respective assignees.

# Contracts of guarantee

### Definition

A contract of guarantee, in the true sense, is a contract whereby the surety (or guarantor) promises the creditor to be responsible, in addition to the principal, for the due performance by the principal of his existing or future obligations to the creditor, if the principal fails to perform those obligations. In *Wardens and Commonalty of the Mystery of Mercers of the City of London v New Hampshire Insurance Company* (1991) 3 J.I.B.F.L. 144, Phillips J. cited with approval the following definition of a guarantee which is given in *Halsbury's Laws of England* (5th edn, 2008), para.1013:

> "A guarantee is an accessory contract by which the promisor undertakes to be answerable to the promisee for the debt, default or miscarriage of another person,[9] whose primary liability to the promisee must exist or be contemplated."[10]

In *Vossloh AG v Alpha Trains (UK) Ltd* [2010] EWHC 2443 (Ch), [2011] 2 All E.R. (Comm) 307, Sir William Blackburne gave the following succinct definition at [23]:

> "A contract of guarantee, in the true sense, is a contract whereby the surety (the guarantor) promises the creditor to be responsible for the due performance by the principal of his existing or future obligations to the creditor if the principal fails to perform them or any of them."

Although the expressions "creditor" and "debtor" are often used to denote the underlying obligee and obligor, the liability which is guaranteed may consist of performance of some obligation other than the payment of a debt, and does not have to be a contractual liability, although it usually is.

The liability of the guarantor has been defined as a liability not only to perform himself if the principal fails to do so, but to procure (or "see to it") that the principal performs his obligations.[11] However, given that in practice the guarantor is rarely in a position to compel the principal to perform his obligations, it is probably more accurate to describe the guarantor's promise as a promise that the obli-

1–004

---

[9] The words "debt, default or miscarriage" are taken from the Statute of Frauds (1677) s.4; see Ch.3.
[10] For a list of other definitions of guarantee that have been given in textbooks and treatises from time to time, see *Re Conley* [1938] 2 All E.R. 127 at 130–131.
[11] *Moschi v Lep Air Services Ltd* [1973] A.C. 331 especially per Lord Diplock at 348–349. Cf *General Produce Co v United Bank* [1979] 2 Lloyd's Rep. 255, where Lloyd L.J. at 258 refers to two classes of guarantee: a promise which becomes effective if the debtor fails to perform his obligations; and a promise that the debtor will perform his obligations.



4                            *Definitions and Characteristics*

gation will be performed, in the sense that the guarantor will be personally liable for the debt, default or miscarriage of the principal. This analysis has been preferred in Australia: in *Sunbird Plaza Pty Ltd v Maloney* (1988) 166 C.L.R. 245, Mason C J. went so far as to describe Lord Diplock's definition of the nature of the guarantor's obligation as "fictitious and quite unrealistic" Therefore, even if the guarantor has not in terms guaranteed the payment of damages to the creditor, he will normally be liable in damages to the same extent as the principal for breach of the latter's obligations.[12]

The description of the guarantor's obligation as a promise to answer for the principal's default (or see to it that his obligations are performed) may well be apposite for the majority of guarantees, but it does not prevent a contract of guarantee from providing on its true construction that the guarantor will pay a sum of money to the creditor upon default by the principal, in which case his liability will sound in debt rather than in damages. The nature of the promise made by the guarantor in such a case is "if the principal does not pay the sum that he owes you on the due date, I will pay it." In *Vossloh AG v Alpha Trains (UK) Ltd* (above) at [23], Sir William Blackburne explained the distinction thus:

> "Depending on its true construction, the obligation undertaken by the surety may be no more than to discharge a liability, for example a particular debt, if the principal does not discharge it, so that if for any reason the principal ceases to be liable to pay that debt (it may have been discharged and replaced by some other debt or liability) the surety will not come under any liability to the creditor. The surety's liability in such a case is conditional upon the principal's failure to pay the particular debt so that if the condition is fulfilled the surety's liability will sound in debt. In contrast to that is the more usual case (sometimes referred to as a 'see to it' guarantee) where, on the true construction of the contract, the surety undertakes that the principal will carry out his contract and will answer for his default. In such a case, if for any reason the principal fails to act as required by his contract he not only breaks his own contract, but he also puts the surety in breach of his contract with the creditor, thereby entitling the creditor to sue the surety, not for the unpaid debt, but for damages. The damages are for the loss suffered by the creditor due to the principal having failed to do what the surety undertook that he would do. See Moschi v Lep Air Services Ltd [1973] AC 331 at 344 to 345 (Lord Reid)."

However, a contract which on its true construction gives rise to an *independent* personal liability, on the part of the surety, to pay a sum of money to the creditor on default by the principal will be an indemnity, not a guarantee. There is a danger of the distinction between the two types of contract becoming blurred, in consequence of judges straining to characterise the guarantor's obligation as sounding in debt in order to avoid what may be perceived as unfair or uncommercial results. In *Hampton v Minns* [2002] 1 W.L.R. 1, a contract which not only contained a

---

[12] *Moschi v Lep Air Services*, [1973] AC 331, *Quest 4 Finance Ltd v Maxfield* [2007] EWHC 2313 (QB), and see further paras 6–002 and 7–018.



guarantee of "the payment or discharge    of all monies and liabilities which shall be for the time being be due owing or incurred by the Principal to you" but also an express undertaking that the undersigned would on demand discharge those moneys and liabilities, was construed as giving rise to an obligation in debt A similar approach was taken by Briggs J. in *McGuinness v Peterborough BS* [2011] 1 W.L.R. 613. For a more detailed consideration of those cases, see Ch.6, para.6–002 and Ch.7, para 7–018.

## Essential characteristics

### *Secondary liability*

The essential distinguishing feature of a contract of guarantee is that the liability of the guarantor is always ancillary, or secondary, to that of the principal, who remains primarily liable to the creditor.[13] There is no liability on the guarantor unless and until the principal has failed to perform his obligations.[14] In *Lakeman v Mountstephen* (1874) L.R. 7 H.L. 17, Lord Selborne put the matter succinctly at 24:

> "There can be no suretyship unless there be a principal debtor, who of course may be constituted in the course of the transaction by matters ex post facto and need not be so at the time, but until there is a principal debtor there can be no suretyship. Nor can a man guarantee anybody else's debt unless there is a debt of some other person to be guaranteed."[15]

It follows from the secondary nature of the obligation, that the guarantor is generally only liable to the same extent that the principal is liable to the creditor, and that there is usually no liability on the part of the guarantor if the underlying obligation is void or unenforceable, or if that obligation ceases to exist. This is known as "the principle of co-extensiveness". There are, however, a number of established exceptions to the principle of co-extensiveness under which the guarantor may find himself liable to the creditor, notwithstanding the unenforceability of the principal obligation.[16]

1–005

---

[13] A surety's obligation is secondary where the agreement leaves another person primarily liable for the performance of that obligation: see, e.g. *Mallett v Bateman* (1865) L.R. 1 C.P. 163 (Ex. Chr. *Harburg India Rubber Comb Co v Martin* [1902] 1 K.B. 778 at 784; *Fahey v MSD Spiers Ltd* [1973] 2 N.Z.L.R. 655; *Clipper Maritime Ltd v Shirlstar Container Transport Ltd (The Anemone)* [1987] 1 Lloyd's Rep. 546 at 555. In *Clement v Clement* (1996) 71 P&CRD. 19 (CA) CAT No. 1336 of 1995, October 20, (discussed in para.1–013) Peter Gibson L.J. said (at p.7 of the transcript): "The crucial question is whether by the actual words used, the obligation undertaken is dependent on the continued existence of the liability of [the principal]    ." For a good example of the distinction between a primary obligation and a secondary obligation, see *Birkmyr v Darnell* (1704) 1 Salk. 27, 91 E.R. 27.

[14] Thus, a contract of guarantee has been described as a contract to indemnify the creditor on the occurrence of a contingency, namely the default of the principal debtor: see *Simpson, Assignees of Cook, a Bankrupt v Burton* (1820) 4 Moore C.P. 515, 129 E.R. 891

[15] See also the observations of Donaldson J. in *General Surety & Guarantee Co Ltd v Francis Parker Ltd* (1977) 6 B.L.R. 16 at 21 and Sir William Blackburne in *Vossloh AG v Alpha Trains (UK) Ltd* [2010] EWHC 2443 (Ch), [2011] 2 All E.R. (Comm) 307 at [24].

[16] See further Ch.6.



6                    *Definitions and Characteristics*

A contract under which the liability of the principal debtor is extinguished or replaced by the liability of some other person cannot be a contract of guarantee. In *Re International Life Assurance Society and Hercules Insurance Co Ex p. Blood* (1870) L.R. 9 Eq. 316, the holder of a policy of life assurance was informed that the insurer had been dissolved, and had transferred its business and assets to the H Company. He was offered either a new policy or an indorsement of the old policy by the H Company "guaranteeing its due fulfilment". He opted for the latter. It was held by the Vice-Chancellor that the indorsement constituted a novation and not a contract of guarantee, as it was obvious from the context of the transaction that there was no intention that the original insurer should remain liable on the policy.

See also the decision of the Court of Appeal in *Meritz Fire & Marine Insurance Co Ltd v Jan de Nul NV* [2011] EWCA Civ 827. The buyers of dredgers being built by a Korean shipyard known as HWS were obliged to make advance payments of the price of the vessels to HWS, but obtained an "advance payment guarantee" (APG) from insurers, Meritz, which provided that, in the event of premature termination of the shipbuilding contract for certain specified reasons, the advance payments would be returned with interest. HWS subsequently agreed to merge with another Korean company to form a new company, B. Under Korean law, Meritz had the opportunity to protest about the merger and the transfer of the shipbuilding contracts to B, but they did not do so. A few months later, B's board resolved to partition its shipbuilding business from its other activities and transferred it to a newly incorporated entity, A. Under Korean law, on merger, B succeeded to all the rights and obligations of HWS, and A succeeded to the rights and obligations of B under the shipbuilding contracts. The buyers terminated the shipbuilding contracts for delay and claimed repayment of the price from A. When A did not pay, the buyers sought payment under the APG. They served a signed statement in conformity with the terms of the APG certifying that their demand for refund was made "in conformity with cl.17 of the Contract and that the Builder has failed to make the refund." The main issue for the court was whether there was a novation which discharged Meritz from their obligations under the APG. It was held by Beatson J. and the Court of Appeal that the APG was not a guarantee but a performance bond,[17] and that on its true construction it was intended to operate on the basis that no refund had occurred, and not on the basis that HWG had failed to make the refunds when it was obliged to do so. Accordingly, Meritz was liable to pay.

*Creditor must be a party*

**1–006**    It is essential that the creditor should be a party to a contract of guarantee, because he is the person to whom the guarantor makes the promise to be answerable for the debt, default or miscarriage of the principal. Any contract of suretyship to which the creditor is not a party must be a contract of indemnity.

Thus, in *Duncan Fox & Co v North & South Wales Bank* (1880–81) L.R. 6 App. Cas. 1 at 11, Lord Selborne identified three specific types of contract of suretyship:

---

[17] See 1–015 and Ch.16.



*Contracts of Guarantee* 7

1) those in which there is an agreement to constitute, for a particular purpose, the relation of principal and surety, to which agreement the creditor thereby secured is a party;

2) those in which there is a similar agreement between the principal and surety only, to which the creditor is a stranger;

3) those in which, without any such contract of suretyship, there is a primary and secondary liability of two persons for one and the same debt, the debt being, as between the two, that of one of those persons only, and not equally of both, so that the other, if he should be compelled to pay it, would be entitled to reimbursement from the person by whom (as between the two) it ought to have been paid.

Of these types, only the first category would embrace a true contract of guarantee, the others are illustrations of contracts of indemnity between surety and principal alone. In such cases, the creditor is entitled to treat the surety as a principal. However, as already stated, once the creditor has been given notice of the agreement, he is bound to give effect to the rights of the surety against him and against any co-sureties.[18]

So, for example, if A and B are jointly indebted to C, and A and B agree between themselves that B shall act as surety only, C will retain the right to recover the debt from B as a principal debtor, because he is not a party to the agreement, even if he has notice of it.[19] However, once C has notice of the agreement between A and B, he will be bound to do nothing to prejudice the rights of the surety, B, in his dealings with other securities, or by agreeing to a material variation in C's contract with A (such as giving A more time to pay, without B's assent).[20]

This rule, which is of equitable origin, applies equally whether the agreement between A and B is made before or after they become indebted to C.

However, where the guarantee is embodied in a deed and the creditor is not a party to the deed, the creditor will be entitled to enforce the guarantee if it is plain as a matter of construction of the deed that he was intended to be the beneficiary of the promises made by the surety in the deed: see, e.g. *Moody v Condor Insurance Ltd* [2006] 1 W.L.R. 1847 (discussed in Ch.2, para.2–021). In such a case, the contract is one of guarantee and not indemnity. The creditor, though not a signatory to the deed, is still a party to the guarantee agreement made by the surety which is evidenced by the deed. This is so even if, as in *Moody v Condor Insurance Ltd*, the deed superficially appears to relate to an agreement between the principal and surety only.

*Thomson Fox & Co v North & South Wales Bank* (1880–81) L.R. 6 App. Cas. 1 at 12; *Rouse v Bradford Banking Co* [1894] A.C. 586; *Oriental Finance Corporation v Overend, Gurney & Co* (1871) 7 Ch. App. 142, affd L.R. 7 H.L. 348 at 361.

*Duncan Fox & Co v North and South Wales Bank* (1880–81) 6 L. R. App. Cas. 1 at 11–12, per Lord Selborne; *Nicholas v Ridley* [1904] 1 Ch.192. See also *Esso Petroleum Co Ltd v Alstonbridge Properties Ltd* [1975] 1 W.L.R. 1474.

*Overend Gurney & Co Ltd (Liquidators) v Oriental Financial Corp Ltd (Liquidators)* [1871] L.R. Ch. App. 142, affd L.R. 7 H.L. 348, *Rouse v Bradford Banking Co* [1894] A.C. 586 per Lord Watson at 598, *Goldfarb v Bartlett & Kremer (A Firm)* [1920] 1 K.B. 639 at 647–648.



8                    *Definitions and Characteristics*

*Writing and signature*

**1-007**  A third distinguishing characteristic of a contract of guarantee is that, unlike a contract of indemnity, the essential elements of the agreement are required by s.4 of the Statute of Frauds 1677 to be made or recorded in writing and signed by the guarantor or by someone with his authority This is because the statute applies to contracts under which the surety assumes a secondary rather than a primary liability.

However, not all guarantees fall within the ambit of the Statute of Frauds 1677. Further, the absence of a written agreement or memorandum is not necessarily fatal to the enforcement of a guarantee, and does not affect the underlying validity of the contract.[21] Therefore, although the need for writing is often described as an essential characteristic of a guarantee, it is more accurate to describe it as a normal prerequisite to enforcement.

## Guarantees and insurance

**1-008**  Contracts of insurance and contracts of guarantee are both examples of contracts which protect the creditor from loss. However, the scope of a contract of guarantee is narrower than the potential scope of a contract of insurance, which may protect the insured against contingencies other than the non-performance by another person of obligations or duties owed to the insured. A contract of insurance is a contract whereby the insurer agrees, in consideration of the payment to him of a premium, to pay a specified sum to the insured on the occurrence of a specified event.[22] His liability does not depend on the existence of a principal, or even on default; for example, the contract may provide for payment simply in the event that the principal does not pay (albeit that he may be justified in withholding payment). An underwriter is not a surety. He is under a primary obligation to make payment, not a collateral liability to answer for the obligations of the principal. He will normally have no influence at all over the principal's performance of those obligations. Consequently, an event which might discharge a surety will not discharge the insurer from his liability.[23]

One context in which this distinction may prove to be of some importance is where an insurance company provides a mortgage protection policy to the creditor by way of additional security for a loan secured by a mortgage. The premium for such a policy is often paid by the mortgagor. The answer to the question whether the contract with the insurance company is a contract of guarantee or a contract of insurance could, in certain circumstances, have a significant effect on the rights and obligations of the issuer of the policy, the creditor and the mortgagor or other sureties. The following two cases illustrate the type of difficulties which can arise.

In *Re Denton's Estate* [1904] 2 Ch. 178, the late Mr Denton was a party to a joint and several covenant with the mortgagor in which he agreed to pay on

---

[21] See further Ch.3.
[22] See *Prudential Insurance Co v Inland Revenue Commissioners* [1904] 2 K.B. 658 at 663, per Channell J.
[23] See, e.g. *Dane v Mortgage Insurance Corp Ltd* [1894] 1 Q.B. 54; *Finlay v Mexican Investment Corp* [1897] 1 Q.B. 517



*Contracts of Guarantee*                    9

demand the principal and the interest subject to a limit of £1,000. The deed expressly provided that although as between Mr Denton and the mortgagor he was to be regarded as a surety only, as between Mr Denton and the bank, he was to be considered a principal debtor for the whole mortgage debt. The bank had effected a "mortgage insurance policy" with the plaintiff. In due course the mortgagor defaulted, the plaintiff paid under the policy and sued Mr Denton's estate. It was argued that the "policy" was not one of insurance, but of guarantee, and that the plaintiffs stood in the position of co-sureties with Mr Denton and therefore had to contribute to the loss. The Court of Appeal held (Vaughan Williams L.J. expressing considerable hesitation) that despite the form of the "policy" being that of a policy of insurance, in substance it was a guarantee. However, since the guarantee extended to covering Mr Denton's own obligations to the bank as well as those of the mortgagor, there was no right of contribution.[24]

In *Woolwich Building Society v Brown* [1996] C.L.C. 625, the mortgagor claimed that the creditor, a building society, was obliged to give credit, in computing its claim against him, for money received by it under what was described as an "indemnity guarantee" issued by an insurance company (the premiums for which were paid by the mortgagor). Under the terms of the contract, the insurers were liable to pay a sum which was calculated not by reference to what the mortgagor owed, but by reference to a formula, on the occurrence of three specific events:

(1)  the building society exercising its right of sale of the mortgaged house;

(2)  the mortgagor failing to make any payment;

(3)  the proceeds of sale being less than the outstanding debt.

In the light of these factors, Waller J. held that the contract was a contract of insurance and that, accordingly, the insurers were entitled to pursue their subrogated claim in the name of the building society for the full indebtedness, without giving credit for the sum which they had paid. He also expressed the view that even if the contract had been a guarantee, the same result would have been reached.

Sometimes it will be just as easy for the creditor to insure against the default of the principal as it will be for him to obtain a guarantee, and the premium may be a comparatively small price to pay for the relative security of insurance provided by a large commercial institution. On the other hand, the creditor may prefer to dictate the precise terms of the contract which protects him against the anticipated loss, and he may be in such a strong bargaining position with the principal that he can require and obtain the protection of a guarantee without having to make any payment.

The fact that the doctrine of utmost good faith applies to all contracts of insurance may be another matter which the creditor will take into consideration. Contracts of guarantee are not generally subject to this doctrine, although there is a limited duty of disclosure.[25] However, a contract of guarantee may be expressed

---

[24] Applying *Craythorne v Swinburne* (1807) 4 Ves. 160, and see generally Chs 11 and 12.

[25] *North Shore Ventures Ltd v Anstead Holdings Inc* [2011] EWCA Civ 230, and the line of authorities referred to therein, see further Ch.5, paras 5-015-5-027

10                                    *Definitions and Characteristics*

in the form of a contract of insurance.[26] It has been said that many contracts may be described by either term, and that the question whether a contract is one of the utmost good faith depends on its true character: see *Seaton v Heath* [1899] 1 Q.B. 782 at 792, per Romer L.J.[27] Accordingly, the question whether the doctrine of the utmost good faith applies may turn on the true construction of the contract and there is no reason why the duty of disclosure of material facts should not be expressly incorporated into a contract of guarantee. Certain types of export credit guarantee have this feature.[28]

### Types of guarantee

1–009   There is a considerable variety in the types of guarantee into which parties may enter. They may be very specific, relating to a particular defined obligation of the principal and to no other obligation, or very widely drawn, covering any present and future obligations of the principal to the creditor, whatsoever and howsoever arising. Similarly, the guarantee may be for a limited period or completely open ended. Some of the different types of guarantee are identified below.

#### *Bipartite and tripartite guarantees*
The simplest form of guarantee is the one in which the creditor, principal and surety are all parties to the contract and all three agree that the principal is to be primarily liable and that the guarantor's liability is secondary. However, although the creditor is an essential party to a contract of guarantee, it is by no means unusual for the contract to be made between the guarantor and the creditor alone.

For example, the surety may be induced to give the guarantee by some person other than the principal (e.g. the principal's spouse) and may not enter into any contractual relationship with the principal.[29] The contract may also be entered into at the express or implied request of the surety, as when a person who purchases goods manufactured by the principal persuades the creditor to supply the principal with raw materials on advantageous credit terms, by offering him a guarantee of the indebtedness which arises on the underlying trading account. In such a situation, the principal need not even know of the arrangements made between the creditor and the guarantor, though he usually would be aware of them.

#### *Continuing and limited guarantees*
1–010   Although it is common for a guarantee to be limited in duration, a guarantee may also be entered into for an indefinite period. A continuing guarantee is one which extends to a series of transactions, whether or not over a limited period. Guarantees of overdraft facilities afforded by a bank to a trading company are often both continuing and of unlimited duration, though it is common in such contracts to include a provision enabling the guarantor to give a specific period of notice to the creditor to determine his future liability. If there is no express period of notice,

---

[26] See, e.g. *Re Denton's Estate* [1904] 2 Ch. 178, above.
[27] Revised without affecting this point [1900] A.C. 135.
[28] See Ch.15.
[29] See, e.g. *Brown Shipley & Co Ltd v Amalgamated Investment (Europe) BV* [1979] 1 Lloyd's Rep. 488 (guarantee of a loan to a subsidiary at the request of the parent company).



*Contracts of Guarantee*    11

the question whether the guarantor can terminate his liability (in the absence of a
repudiation by the creditor, or frustrating event) will depend on the construction
of the particular contract and on the nature of the principal debtor's underlying
obligation.[10]

A guarantee may in terms refer only to the obligations arising under an identi-
fied contract or even to a specific obligation, for example the obligation to pay
the purchase price under a particular contract of sale. At the other extreme, the
guarantee may cover "liability in respect of any loss, damage, claims, costs,
charges and expenses (including interest) and any other liability whatsoever and
howsoever arising" which the principal may incur to the creditor.

*Guarantees payable on demand*

A guarantee may contain an express stipulation that the surety is to be liable to    1–011
make payment to the creditor "on demand".[11] In such event, the obligation of the
guarantor to pay does not arise until the demand has been made on him, though his
underlying liability arises at the date of the principal's default. The demand will
usually be construed as a procedural requirement included for the guarantor's
protection, which he may waive, rather than as a condition precedent to liability,
which he may not. The demand marks the time from which the surety's liability can
be enforced, see *Stimpson v Smith* [1999] 2 W.L.R. 1292 at 1304, per Tuckey L.J.

The fact that the obligation of the principal is to pay on demand will not
automatically mean that the creditor is obliged to make a demand on the surety as
well. The guarantee may contain an express provision requiring such a demand to
be made on the principal before a demand is made on the surety; it may also
contain a provision requiring the creditor to give the surety notice of default by
the principal before he takes proceedings against the surety.[12] It is more common,
however, for a modern guarantee to contain a provision expressly negating any
obligation on the part of the creditor to make a demand on the principal, to notify
the surety of his default, or to take any other step before enforcing the guarantee.
Indeed, even a guarantee obliging the surety to make a payment "on demand" may
be construed as not requiring the creditor to make a demand on the surety before
instituting proceedings against him, if there is clause entitling the creditor to treat
him as a principal debtor or primary obligor.[13] Whilst a demand will often be
made an express prerequisite to bringing a claim under a normal guarantee, the
expression "demand guarantee" is apt to cause confusion, because in certain
contexts it is synonymous with a performance bond (see para.1–015 and Ch.16).
For example, that is the meaning which the expression bears under the *ICC
Uniform Rules for Demand Guarantees* (ICC publication No.758), and its prede-
cessor (ICC publication No.458) discussed in Ch.16.

---

[10] See Ch.8.

[11] See, e.g. *Ramsan and Wolfson v Scuba TV Ltd* [1997] Q.B. 887; *Sicklemore v Thistleton* (1817) 6 M.
& S. 9; *Bradford Old Bank v Sutcliffe* [1918] 2 K.B. 833; *Re Brown's Estate* [1893] 2 Ch. 300;
*General Financial Corporation of Canada v Le Jeune* [1918] 1 W.W.R. 372 (Can).

[12] *Bache & Co (London) Ltd v Banque Vernes et Commerciale de Paris SA* [1973] 2 Lloyd's Rep. 437;
*Phillips v Foxhwe* (1779) 2 Chit. 676, see also *Bonithrone v Paterson* (1898) 35 Sc. L.R. 344;
*Britannia Steamship Insurance Association Ltd v Duff* [1909] S.C. 1261 (Scot).

[13] See paras 1–014 and 7–006.



12      *Definitions and Characteristics*

## Contracts of indemnity

### Definition

1–012   An indemnity, in its widest sense, comprises an obligation imposed by operation of law or by contract on one person to make good a loss suffered by another. Thus most contracts of insurance and all contracts of guarantee fall within the broad definition. However, the expression "contract of indemnity" is more often used to denote a contract where the person giving the indemnity does so by way of security for the performance of an obligation by another. It is this type of contract with which this book is concerned.

### Essential characteristics

1–013   In a contract of indemnity, unlike a contract of guarantee, a primary liability falls upon the surety, and that liability is wholly independent of any liability which may arise as between the principal and the creditor (unless the indemnifier undertakes a joint liability with the principal). Of course, it is usually implicit in such an arrangement that as between the principal and the surety, the principal is to be primarily liable, so that if the surety has to pay first, he has a right of recourse against the principal.[14] Indeed when two parties are primarily liable to the creditor they may enter into an express agreement that, as between themselves, one is to be treated as surety. For an example of a case in which it was held that there was no such right of recourse in the absence of an express agreement, see *Berghoff Trading v Swinbrook Developments* [2009] 2 Lloyd's Rep. 233, discussed in Ch.10, para.10–006.

     The fact that the obligation to indemnify is primary and independent has the effect that the principle of co-extensiveness and the requirements of s.4 of the Statute of Frauds 1677 do not apply to contracts of indemnity. Thus an indemnity not only effectively shifts the burden of the principal's insolvency onto the surety, but also potentially safeguards the creditor against the possibility that his underlying transaction with the principal is void or otherwise unenforceable.[15] Further, the discharge of the principal or any variation or compromise of the creditor's claims against him will not necessarily affect the liability of the surety under a contract of indemnity.[16] Otherwise, the rights and duties of the parties to a contract of indemnity are generally the same as those of the parties to a contract of guarantee.

     The question whether a particular contract happens to be a guarantee or an indemnity, and whether the normal incidents of a contract of that class have been modified, is a matter of construction in each case, and is often very difficult to

[14] See *Chitty on Contracts*, 30th edn, (London: Sweet & Maxwell, 2008), Vol.2, para.44–003, approved by Rix L.J in *Berghoff Trading Ltd v Swinbrook Developments Ltd* [2009] 2 Lloyd's Rep. 233 at [25]; *Vossloh AG v Alpha Trains (UK) Ltd* [2010] EWHC 2443 (Ch), [2011] 2 All E.R. (Comm) 307, at [25].
[15] See, e.g. *Yeoman Credit v Latter* [1961] 1 W.L.R. 828; *Goulston Discount Co v Clark* [1967] 2 Q.B. 493. Cf. *Bentworth v Lubert* [1968] 1 Q.B. 680; *Vossloh AG v Alpha Trains (UK) Ltd* (above), at [26].
[16] See Ch.6.



resolve. A contract of suretyship which contains a provision preserving liability in circumstances in which a guarantor would otherwise be discharged (such as the granting of time to the principal or a material variation of the underlying contract without the surety's consent) will usually be construed as a guarantee, because such a provision would be unnecessary if the contract was an indemnity.

The contract may also contain a provision to the effect that the surety is to be liable in circumstances in which the principal debtor has ceased to be liable, e.g. on the release of the principal debtor by the creditor. Although it may be argued, by parity of reasoning, that this tends to indicate that the contract is a guarantee, such a provision may point towards the opposite conclusion because it may show that it was intended that the liability of the obligor should continue regardless of what might happen to the principal debtor. A good illustration of this is to be found in the Court of Appeal case of *Clement v Clement* (CAT No.1336 of 1995, October 20), (1996) 71 P&CR (D) 10.

A dispute between a husband, his wife and their son about the running of a family-owned company was settled on terms that the parents sold their shares and retired from the company. In return the company agreed that it would pay the father a pension during his lifetime and, if he died before his wife, the company would pay her a reduced pension from the date of his death for the rest of her life. Both pensions were index linked. The son sent his parents a letter in the following terms:

> "By an agreement of even date ('the Agreement') between First Fashions Ltd ('the Company') and yourselves the Company covenanted to pay certain retirement benefits. Now I undertake that if the Company . . . fail(s) to pay the sums covenanted to be paid by it I or my personal representatives will pay such sums or so much of them as shall not be paid. This guarantee shall continue in force until the death of the survivor of you . . ."

The Company subsequently went into voluntary liquidation and the liquidator disclaimed the pension contract. On the law as it then stood, it was believed that the disclaimer determined both the liability of the Company and the liability of any guarantor.[37] The son therefore sought to argue that the letter was a guarantee. Warner J. and the Court of Appeal held that despite the fact that the letter described itself as a "guarantee" it was an indemnity. On the true construction of the contract, the obligation to pay the pension until the death of the surviving parent arose regardless of what might happen in the meantime to the Company or to its liabilities. It did not depend on the continued existence of the liability of the Company.

If the contract provides that the surety is to be liable in circumstances in which the principal debtor was never liable (e.g. because the principal debtor lacked the capacity to contract), it may indicate that the contract is an indemnity.[38] A contract which provides for the surety to be liable in circumstances in which the principal debtor has rescinded or avoided the underlying contract may prove exceptionally

---

[37] Following *Stacey v Hill* [1901] 1 Q.B. 660, which was subsequently overruled by the House of Lords in *Hindcustle Ltd v Barbara Attenborough Associates Ltd* [1997] A.C. 70, see Ch.18.
[38] See, e.g. *Alliance Acceptance Co v Hinton* [1964] 1 D.C.R. (NSW) 5.

14          *Definitions and Characteristics*

difficult to classify. Indeed, it is possible that a clause which purports to preserve the guarantor's liability in the event that the underlying transaction is void or avoided will be ineffective, because the guarantee as a whole never comes into effect: this could occur, for example, if the consideration for the guarantee is expressed to be the entry into the principal contract.

### "Principal debtor" clauses

1–014  It is common for standard form bank guarantees and similar documents to contain a provision that the surety is to be liable "as principal debtor" or that the creditor may treat him as a principal debtor or "primary obligor" in certain circumstances. A provision of this kind is typically found at the end of a clause which expressly preserves the guarantor's liability in circumstances in which he would otherwise be released. An example is the clause in *National Westminster Bank v Riley* [1986] B.C.L.C. 268 which provided that "this guarantee shall not be discharged nor shall the Guarantor's liability under it be affected by anything which would not have discharged or affected the Guarantor's liability if the Guarantor had been a principal debtor to the Bank instead of a Guarantor". The Court of Appeal held that this precluded the guarantor from raising an argument by way of defence that he had been discharged from liability by virtue of a fundamental breach of the contract with the borrower by the bank. However, even as a self-standing provision it may be construed as having that effect: see, e.g. *Heald v O'Connor* [1971] 1 W.L.R. 497.[39] The prevailing view appears to be that the incorporation of a "principal debtor" clause will not usually suffice in itself to determine the nature of the contract: it will not automatically convert a guarantee into an indemnity.[40] In *MS Fashions Ltd v Bank of Credit and Commerce International A (In Liquidation)* [1993] Ch. 425, Dillon L.J. explained that the purpose of including such a clause in a guarantee is to dispense with the requirement of a demand on the surety as a prerequisite to taking steps to enforce the guarantee against him.[41]

Similarly, the contract may include a separate provision by which the surety contracts in terms to indemnify the creditor against loss or damage suffered by him arising out of, or consequential upon, his having entered into the agreement with the principal. The question whether this provision will affect the nature of the contract as a whole, or whether it will give rise to independent obligations, is one of construction. If the obligation to indemnify is couched in terms which make it

[39] See also *Fletcher Organisation Pty Ltd v Crocus Investments Pty Ltd* [1988] Qd. R. 517; *Orme v DeBoyette* [1981] 1 N.Z.L.R. 576, but cf. *Dunlop New Zealand Ltd v Dumbleton* [1968] N.Z.L.R. 1092 and *Payton v SG Brookes & Sons Pty Ltd* [1977] W.A.R. 91.

[40] This statement was cited with approval by Blair J. in *Carey Value Added SL (formerly Lasan Hotels World Value Added I SL) v Grupo Urvasco SA* [2010] EWHC 1905, [2011] 2 All E.R. (Comm) 140 at [22]; see also, to like effect, J. O'Donovan and J. Phillips, *The Modern Contract of Guarantee*, 2nd edn (London: Sweet & Maxwell, 2010), para.1–104. See further *Heald v O'Connor* [1971] 1 W.L.R. 497, per Fisher J. at 503; *General Produce Co v United Bank* [1979] 2 Lloyd's Rep. 255 per Lloyd J. at 259; *Brown Brothers Motor Lease Canada Ltd v Ganapahi* [1982] 139 D.L.R. (3d) 227; *Credit Suisse v Borough Council of Allerdale* [1995] 1 Lloyd's Rep. 315 per Colman J. at 366–367; *Habibullah Hohamed Yousef v Indian Bank* [1999] 3 SLR 650; *P.T Jaya Sumpiles Indonesia v Kristle Trading* [2009] 1 SLR. 945 at [52]–[57].

[41] See further *TS&S Global Ltd v Fithian-Franks* [2007] EWHC 1401 (Ch) [2008] 1 B.C.L.C. 277 and the discussion in para.7–006.





*Contracts of Indemnity* 15

plain that it is predicated upon there being an underlying liability of the principal, the contract will remain a guarantee. This may explain the decision of the Court of Appeal in *Stadium Finance Co v Helm* (1965) 109 S.J. 471 to the effect that a contract was a guarantee, notwithstanding that it was headed "indemnity form" and containing the following term:

> "I will indemnify and keep indemnified you, your successors and assigns from all loss and damage suffered and all claims costs and expenses made against or incurred by you in any way arising out of or consequent upon your having entered into such agreement, whether arising out of a breach by the customer of any of the terms and conditions thereof or otherwise including any such loss or damage etc. aforesaid as may arise from the said agreement being (for whatever reason) unenforceable against the customer."

A more common approach, if the language of the contract permits it, is to treat the contract as giving rise to separate enforceable obligations of indemnity and guarantee: see, e.g. the Australian case of *Citicorp Australia Ltd v Hendry* [1985] 4 N.S.W.L.R. 1 where the contract was treated as a guarantee which contained an additional liability under the indemnity clause. However, the language of the indemnity clause is all-important; in that particular case the indemnity provision did not preserve the liability of the guarantor when the sums payable under the principal contract were irrecoverable by the creditor because they were in the nature of a penalty.

A more recent example of a guarantee containing separate indemnity obligations is to be found in *Vossloh AG v Alpha Trains (UK) Ltd* [2010] EWHC 2443 (Ch); [2011] 2 All E.R. (Comm) 307 (discussed in detail in para.1–015) where the clause setting out the obligations of the surety, cl.2, contained various sub-clauses, some of which were couched in the language of secondary obligation and some in the language of primary obligation. The definitions section specified that references to obligations "guaranteed" were to include a reference to indemnified obligations. Although the opening words of cl.2 referred to "the Guarantor hereby unconditionally and irrevocably as a continuing obligation and as principal debtor and not merely as surety, as a separate continuing and primary obligation" performing the various obligations set out in the following sub-clauses, the judge, Sir William Blackburne, held that in context those words were ineffective to convert into purely primary obligations, obligations which were otherwise secondary in nature. The opening words were more consistent with an intention to set out in what followed a mixture of primary and secondary obligations, and the sub-clauses that followed showed all the signs of an intention to subject the surety to an obligation to answer for every kind of default that could arise under, or in connection with, what was referred to in the definition of "Secured Obligations" as a "Relevant Document". The possibility of overlap and duplication did not matter provided that all possibilities were covered. If the issue in the case had been whether the contract was an indemnity or a guarantee, it appears from this analysis that the judge would have found it was the latter.

Indemnity provisions in a standard guarantee form range from, at one end of the scale, a clause which requires the surety to indemnify the creditor in respect of costs

16                          *Definitions and Characteristics*

and other expenses incurred by him in consequence of the principal's default, even
if they are irrecoverable from the principal, to, at the other end of the scale, clauses
which appear to overlap with the guarantee obligation completely. The latter type
of clause may result in the guarantee aspects of the contract being redundant, since
the creditor is almost invariably going to be better off enforcing the primary obliga-
tions undertaken in an indemnity. An example is the contract in *Sofaer v Anglo Irish
Asset Finance Plc* [2011] EWHC 1480 (Ch), which contained a clause entitled
"guarantee and indemnity". The "guarantee" in cl.2.1, provided that:

> "[T]he Guarantor (a) guarantees the payment and the discharge of the
> Liabilities and (b) undertakes on demand to pay to the Lender any Liability
> which is not paid and to perform any Liability which is not performed when
> due to be paid or performed."

The "indemnity" in cl.2.2 provided that as an obligation independent of [the
guarantee]:

> "[T]he Guarantor . . . agrees to indemnify each Beneficiary on demand
> against any loss suffered by each Beneficiary as a result of the Unenforceability
> of any Liability as against the Borrowers and/or any Liability not being
> discharged or performed by the Borrowers."

The Clause went on to state that the amount of the loss, where the Liability arises
from the payment obligations, was the amount payable by the Borrowers or which
would be so payable but for the unenforceability of that Liability and in any other
case the amount which is payable to the Lender by the Borrowers by way of
damages for breach of that Liability or would be so payable but for the unenforce-
ability of that Liability, in each case together with the cost to the Beneficiary of
procuring or attempting to procure the performance of such Liability.

Lewison J. held that cl.2.1(b) and the whole of cl.2.2 were contracts of
indemnity, undertaken by the surety as a primary obligor and not in a secondary
capacity by virtue of a separate provision to that effect in cl.2.4. In consequence,
his obligations under those provisions sounded in debt and the lender was entitled
to issue bankruptcy proceedings against him without first obtaining a judgment.[42]
Whilst the finding in relation to cl.2.1(b) is open to debate, as the obligations of
the surety were still clearly premised upon a default by the principal, there can be
no such doubt about the nature of cl.2.2. That clause was so wide in its ambit that
there was probably no need for cl.2.1 to have been included in the agreement.

## Performance bonds

1–015    Bonds are simple covenants by one person to pay another, either conditionally or
unconditionally. A performance bond, also commonly called a "performance

---

[42] Following *McGuinness v Norwich and Peterborough BS* [2010] EWHC 2989. See further the
discussion in Ch.6–002 of the circumstances in which a guarantor's liability sounds in debt rather
than in damages.

60                          *Formal Requirements*

not have been made to the creditor, i.e. to the firm as a whole, because a man
cannot make a promise to himself and others, and the case is therefore often cited
as an example falling within this exception. However, the reasoning of Bowen
L.J. is at least questionable, and it may be that a court faced with the same issue
nowadays would find a different route to reach the conclusion that the agreement
was an indemnity.

### Promises made to third parties

3–010    A promise made to someone who is not a party to the contract between the prin-
cipal and the creditor, that the principal will perform the contract, is not within s.4:
*Hargreaves v Parsons* (1844) 13 M. & W. 561. So, for example, an oral promise
made by a charterer to the shipowner's agent at the port of discharge that if the
shipowner does not pay the agent's fees, the charterer will, is an indemnity and
not a guarantee. Similarly, a promise made by S to a bailiff executing judgment
that S will pay the amount of the judgment debt owed by D, in consideration of
the bailiff forbearing to proceed with execution, is outside the Statute of Frauds.[25]

### Novation

3–011    An agreement under which the creditor agrees to release the principal from
liability in substitution for a new agreement under which either the principal and
the surety are both liable (jointly or severally) or under which the surety alone is
liable, is not within s.4 of the Statute of Frauds. In such circumstances the surety
is not agreeing to be liable for the debt of another because that debt has been
released; instead he is undertaking a fresh, independent liability of his own.[26]
   The release of the principal may be, and often is, effected by his discharge from
execution of a judgment debt.[27] However the release or discharge must be abso-
lute, unconditional and effective. If the creditor simply agrees to forbear to sue the
principal, or makes an agreement to release the principal with the surety alone, it
is possible that the principal's underlying liability has not been replaced by the
arrangements with the surety and the promise by the surety might then amount to
a promise to pay the debts of another.[28]

### Joint liabilities

3–012    If the surety agrees with the creditor to become jointly liable with the principal
(whether or not there is a release of the original debt) then he is undertaking a
personal liability rather than a liability to answer for the debt of another and his
promise falls outside the scope of s.4.[29] That position is unaffected by whatever

[25] *Reader v Kingham* (1862) 13 C.B. N.S. 344; see also *Love's case* (1706) 1 Salk. 28 and *Cripps v Hartnoll* (1863) 4 B. & S. 414.
[26] See, e.g. *Browning, Assignees of Morgan, a Bankrupt v Stallard* (1814) 5 Taunt. 450; *Goodman v Chase* (1818) 1 B. & Ald. 297; *Re London and London Ex p. Lane* (1846) De G. 300; *Commercial Bank of Tasmania v Jones* [1893] A.C. 313. Cf. *Mertz Fire & Marine Insurance Co Ltd. v Jan De Nul NV* [2011] EWCA Civ 827 where the contract was held to be an indemnity operating regardless of the novation of the underlying obligations on merger of the principal obligor.
[27] *Goodman v Chase* (1818) 1 B. & Ald. 297; *Bird v Gammon* (1837) 3 Bing. N.C. 883; *Lane v Burghart* (1841) 1 Q.B. 933; *Butcher v George Drummond Stewart* (1843) 11 M. & W. 857
[28] See, e.g. *King v Wilson* (1875) 2 Stra. 873; *Fish v Hutchinson* (1759) 2 Wils. K.B. 94.
[29] See, e.g. *Thomas v Cook* (1828) 8 B. & C. 728; *Wildes v Dudlow* (1874) L.R. 19 Eq. 198.

private arrangements the principal and surety may have entered into, e.g. if they agree that as between themselves the principal is to be primarily liable. An example illustrates this:

A is a small manufacturer of garments made from natural fibres coloured with organic dyes. A enters into a joint venture arrangement with B, a large retail company which will use its chain of shops to sell the garments. In order to promote the products A and B approach C, an advertising agency. A cannot afford to finance suitably glossy advertisements. A and B enter into an oral contract with C whereby they agree jointly to pay C for the advertisements. However, they agree between themselves that B will pay C, and A will reimburse B out of the profits of the joint venture. The agreement between A, B and C is one under which A and B are each under an original liability to C and the Statute of Frauds need not be complied with.

### Lack of co-extensiveness

If the liability of the surety is greater than that of the principal, the contract is an    **3–013** indemnity and falls outside s.4. So, for example, an agreement in which S agrees to indemnify C against "any loss you might suffer by reason of the fact that D for any reason does not repay the loan . . ." is not a guarantee because S's liability is not necessarily the same as D's. Thus, recourse agreements taken by hire purchase companies from a car dealer providing for payment by the car dealer in the event of the default of the hirer would normally be outside the Statute of Frauds even if they were made orally. The finance company may not be able to recover the full hire-purchase price from the defaulting hirer, but the dealer would normally be liable under the recourse agreement to pay for all losses, and his liability would therefore be different and independent from the hirer's.[30]

Similarly, if the surety agrees to pay regardless of whether the principal is liable, or in circumstances in which there is considerable doubt as to the principal's liability, he is not undertaking to pay in respect of the "debt, default or miscarriage of another". Accordingly, if it is clear from the nature of the contract that it was entered into specifically to safeguard against the possibility that the principal would not be liable to the creditor, the contract does not fall within the statute: *Lakeman v Mountstephen* (1874) L.R. 7 H.L. 17.

### Incidental guarantees

Even if the promise by the surety is plainly a promise to answer for the debt    **3–014** default or miscarriage of another, the contract will not fall within s.4 of the Statute of Frauds unless the main or immediate object of the contract is to secure the payment of the debt or the fulfilment of a duty by another person: *Harburg India Rubber Comb Co Ltd v Martin* [1902] 1 K.B. 778.[31] The rule was summarised by Vaughan Williams L.J. in that case at 786:

---

[30] See, e.g. *Goulston Discount Co v Clark* [1967] 2 Q.B. 493; *Yeoman Credit Ltd v Latter* [1961] 1 W.L.R. 828. See also Consumer Credit Act 1974, s.113(7) as amended by the Minors Contracts Act 1987, s.4(1).

[31] And see the cases cited in *Halsbury's Laws*, (5th edn, 2008), Vol.49, para.1061, fn.4.

326                    *Enforcement of Contracts of Suretyship*

### The creditor may pursue the surety first

7–009   Just as there is generally no requirement to make a demand on the principal
before proceeding against the surety, there is no obligation on the part of the
creditor to commence proceedings against the principal, whether criminal or civil,
or to commence arbitration against him, unless there is an express term in the
contract requiring him to do so, or his cause of action does not arise until he
obtains a judgment or arbitral award, e.g. if the guarantee is confined to payment
of a sum awarded by the arbitrators.[36] Likewise, there is no rule that the creditor
must avail himself of other securities which the debtor may have given himself or
sue a co-surety, before looking to the surety for payment, unless the contract states
that he must do so, or he is obliged to do so by a relevant statutory provision.[37] In
general terms the creditor has a completely unfettered choice as to how, and
against whom, he should proceed to recover the debt or damages to which he is
entitled. The creditor may simultaneously bring winding-up proceedings against
the principal and sue on the guarantee in separate proceedings: *Permanent
Custodians Ltd.v Digital Enterprises Pty Ltd* (1992) 8 A.C.S.R. 542.

Thus, in the absence of any condition precedent in the contract, all that the
creditor needs to establish to complete his cause of action against the guarantor is
that the principal has defaulted: for example, that the last day for repayment of a
loan has passed without payment, or that the principal has committed a rele-
vant breach of contract. Whether or not a default has occurred will depend on the
nature of the contract and the circumstances of each particular case.[38]

The general rule that the creditor may proceed directly against the surety
has been endorsed by the House of Lords. In *Moschi v Lep Air Services Ltd*
[1973] A.C. 331 at 356, Lord Simon cited with approval a passage from *Rowlatt
on the Law of Principal and Surety* which formulated the rule thus:

> "On default of the principal promisor causing damage to the promisee the surety
> is, apart from special stipulation, immediately liable to the full extent of his obli-
> gation, without being entitled to require either notice of the default, or previous
> recourse against the principal, or simultaneous recourse against co-sureties."

Lord Simon observed that the rule had not been questioned in the course of argu-
ment in the case then under consideration. He also approved the reason given by
Rowlatt for the rule, which is that it is the obligation of the guarantor, rather than

---

[36] *Wright v Simpson* (1802) 6 Ves. Jr. 714; *Barber v Mackrell* (1892) 68 L.T. 29; *Lawrence v Walmsley*
(1862) 12 C.B.N.S. 799; *Lee v Bayes and Robinson* (1856) 18 C.B. 599; *Palmer v Sheridan-Vickers,
The Times*, July 20, 1910; *Bank of Nova Scotia v Vancouver Associated Contractors* Ltd [1954] 3
D.L.R. 72; *Themistocles Navegacion SA v Langton ("The Queen Frederica")* [1978] 2 Lloyd's Rep.
164. See further Ch.11, paras 11–002–11–004.

[37] See the discussion in Ch.11. See also *Wilks v Heeley* (1832) 1 Cr. & M. 249; *Gwynne v Burnell* (1840)
6 Bing. N.C. 453, reversing (1835) 2 Bing. N.C. 7, sub nom. *Collins v Gwynne*. Unless he can exercise
his right in equity to have the securities marshalled (as to which, see Ch.11, para.11–015) the surety has
no right to those securities until after he has paid the debt himself: *Re Howe Ex p. Brett* (1871) L.R. 6
Ch. App. 838 at 841. For an example of an express obligation see *Musket v Rogers* (1839) 8 Scott 51.

[38] For an example of the difficulties which may arise, see the cases discussed in *Rowlatt on the Law of
Principal and Surety* (5th edn, 1999), pp.110–111 and in O'Donovan and Phillips, *The Modern
Contract of Guarantee* (2nd English edn, 2010) at paras 10–147–10–151.



*Chapter 9*

# Discharge of the Surety

## Discharge of surety by discharge of the principal

Since the purpose of a guarantee is to secure the performance of the principal's
obligations towards the creditor, the surety will be discharged from his liability
under the guarantee if the principal pays the debt or performs the obligation which
the surety has guaranteed, or if the principal's liability is forgiven. This is an
aspect of the principle of co-extensiveness of liability, discussed elsewhere in this
work.[1] The position is different where the contract is on its true construction one
of indemnity, under which the surety assumes an independent liability from that
of the principal which may often be greater in scope. Accordingly he may not
necessarily be discharged by reason of the performance by the principal of his
obligations, or otherwise by his discharge.[2]

9–001

## Discharge by payment or performance

### *Payment or performance by the principal*

Payment of the principal debt by the principal will discharge the surety. In *Western
Credit v Alberry* [1964] 1 W.L.R. 945, where a surety guaranteed due performance
by a hirer (the principal) of his obligations under a hire-purchase contract, the
surety was held to be discharged where the hirer had terminated the hire purchase
contract in accordance with its terms and had paid the full amount due under the
contract, even though the creditor did not receive the full amounts that it was
entitled to receive had the hire-purchase contract run to expiry. This case can be
contrasted with *Goulston Discount Co v Clark* [1967] 2 Q.B. 493, where the facts
were similar to those in the *Western Credit* case, but because the contract was one

9–002

---

[1] See Ch.6, para 6–002 In *Canadian Permanent Trust Co v King Art Developments Ltd* [1984] 4
W.W.R. 587, CA, Laycraft J.A. stated, at 643–634: "Prima facie a guarantor's obligations are
co-extensive with the principal debtor but the starting point must always be to analyse the nature of
the guarantor's undertaking. Depending upon the terms of the guarantor's contract with the debtor,
his obligation may persist even though the creditor is temporarily or even permanently disabled
from pursuing the debtor to collect the debt. It is also important to an analysis of the problem to
remember that although the obligations of the surety and the principal debtor are often co-extensive
they are, nevertheless, separate and distinct obligations. Though co-extensiveness of the obligations
of the debtor and the surety may be varied by the surety's contract with the creditor, I have difficulty
in envisioning the commercial term which would hold a surety liable when the debt guaranteed has
been paid. The essence of suretyship contracts is to see that the obligations between debtor and
creditor are satisfied."
[2] *Goulston Discount Co Ltd v Clark* [1967] 2 Q.B. 493; cf. *Bentworth Finance v Lubert* [1968] 1
Q.B. 680. But now see Consumer Credit Act 1974, s.113.

404                                    *Discharge of the Surety*

surety, but to whether there was the potential for prejudice (see 116). The Court of
Appeal firmly rejected the introduction into English law of a flexible rule based
on the actual significance and effect of any particular alteration.[121]

Sometimes the physical nature of the alteration is relevant. In *Cooperative
Bank Plc v Tipper* [1996] 4 All E.R. 366, Judge Roger Cooke had to consider
the effect of the alteration, by the creditor bank, of the names of the sureties. The
guarantee had erroneously described the sureties as "the customer" (i.e. the
borrower) and as the sureties. The guarantee was altered in pencil by the bank,
following execution, to delete the reference to "customer". The borrower went
into liquidation and the bank claimed rectification of the guarantee in order to
enforce it. The sureties claimed that, rectification or no rectification, they had
been discharged by the alteration. The judge held that since the alteration had
been made in pencil, the most natural inference was that it was not intended to be
a final and operative alteration: it was "deliberative", and not "final and absolute"
as would have been the case if it were in pen (ink or biro). Had it been in ink, the
judge held that the alteration would most certainly have been material.[122]

**Material variation of the terms**

*The rule in Holme v Brunskill*

9-023    Any material variation of the terms of the principal contract (i.e. between the creditor
and the principal) will discharge the surety. This is known as the rule in *Holme v
Brunskill* (1878) L.R. 3 Q.B.D. 495. The facts of the case were that the creditor let a
farm with sheep on it to the principal, the surety guaranteeing the redelivery of the
flock in good condition at the end of the term. During the course of the term the agree-
ment was varied between the creditor and the principal whereby the principal surren-
dered one of the fields up to the creditor in return for a reduction in rent of £10,
without the knowledge or assent of the surety. The Court of Appeal held (Brett L.J.
dissenting) that even though the variation made no substantial difference to the
tenancy agreement, the surety was discharged from liability. Cotton L.J. said (at 505):

> "The true rule in my opinion is that if there is any agreement between the
> principals with reference to the contract guaranteed, the surety ought to be
> consulted, and if he has not consented to the alteration, although in cases
> where it is without enquiry evident that the alteration is unsubstantial, or that
> it cannot otherwise be beneficial to the surety, the surety may not be
> discharged; yet that if it is not self-evident that the alteration is unsubstantial,

---

[121] As expressed in *Canada in CIBC v Skender* [1986] 1 W.W.R. 284, per Lambert J.A. at 288; though
of the current approach in Canada set out in McGuinness, *The Law of Guarantees* (2nd edn, 1996)
at 10.12 - 10.13, which is in line with the approach of the CA in *Raiffeisen Zentralbank Osterreich
v Crosseas Shipping Ltd*. The rejection of a flexible result-based test was justified on the grounds
that the rule in *Pigot's Case* is designed to avoid fraud, and should be rigorously applied. It is to be
contrasted with the approach of the English court to the application of the test of materiality to the
avoidance of insurance contracts on the grounds of breach of the duty of utmost good faith,
following *Pan Atlantic Insurance Co v Pine Top Insurance Co* [1995] 1 A.C. 501, which intro-
duced a requirement of reliance.

[122] His view was obiter, and in any event would be unlikely to withstand scrutiny after *Raiffeisen
Zentralbank Osterreich v Crosseas Shipping Ltd* [2000] 1 W.L.R. 1135.




*Discharge by Alteration of the Principal Contract*          405

> or one which cannot be prejudicial to the surety, the Court . . . will hold that
> in such a case the surety himself must be the sole judge whether or not he
> will consent to remain liable notwithstanding the alteration, and that if he has
> not so consented he will be discharged."

Therefore in general terms the surety is entitled to require that his position
shall not be altered by any agreement between the creditor and the principal from
that in which he stood at the time of his contract.[123]

### Materiality

A variation of the principal contract is material for the purposes of the rule in          **9-024**
*Holme v Brunskill* where it is not necessarily beneficial to the surety or otherwise
prejudices him, and where any lack of prejudice or benefit is not evident without
enquiry.[124] If the benefit or lack of prejudice is not self-evident, then the court will
not embark on an enquiry as to whether the variation was indeed beneficial to the
surety or otherwise unprejudicial.[125]

In *Ankhar Pty Ltd v National Westminster Finance (Australia) Ltd* (1987) 162
C.L.R. 549 (at 559) the High Court of Australia formulated the rule as follows:

> "According to the English cases, the principle applies so as to discharge the
> surety when conduct on the part of the creditor has the effect of altering the
> surety's rights, unless the alteration is unsubstantial and not prejudicial to
> the surety. The rule does not permit the courts to enquire into the effect of the
> alteration. The consequence is that, to hold the surety to its bargain, the creditor
> must show that the nature of the alteration can be beneficial to the surety only
> or that by its nature it cannot in any circumstances increase the surety's risk."[126]

Thus, the question of whether a variation is material is answered objectively,
without reference to what the parties thought. A surety may be discharged, there-
fore, if the variation is potentially prejudicial when made, even though it ulti-
mately has little effect on the surety's risk.[127] Accordingly, whenever a creditor
seeks a variation in the terms of his contract with the principal without the

[123] *Polak v Everett* (1876) L.R. 1 Q.B.D. 669. *Bank of Montreal v Wilder* [1986] 8 B.C.L.R. (2d) 282 at 293 per Wilson J.
[124] *Egbert v National Crown Bank* [1918] A.C. 903, where it was held that the surety remained liable even though the creditor increased the rate of interest charged to the principal to eight per cent, the increase being illegal and ineffective; cf. *Holland-Can Mortgage Co v Hutchings* [1936] S.C.R. 165. See also *Manulife Bank of Canada v Conlin* [1996] 3 SCR 416, affirming (1994) 120, D.L.R. (4th) 234.
[125] (1878) 3 Q.B.D. at 505; *Croydon Gas Co v Dickinson* (1876) 2 C.P.D. 46, *Bank of Baroda v Patel* [1996] 1 Ll. Rep. 391 at 396. See also *Re Darwen and Pearce* [1927] 1 Ch. 176.
[126] See also *Corumo Holdings Pty Ltd v C Itoh Ltd* (1991) 5 A.C.S.R. 720, at 729 and 753. These principles were restated by Cresswell J in *Marubeni Hong Kong & South China Ltd v Mongolia* [2004] 2 Lloyd's Rep. 198 at [206]–[209].
[127] In *Credit Suisse v Allerdale BC* [1995] 1 Lloyd's Rep. 315 Colman J (at 365–366) applied the rule in *Holme v Brunskill* where the variation might have been, but would not inevitably have been, beneficial to the surety, in holding that the variation was material. See also *The Kalma* [1999] 2 Lloyd's Rep. 374 at 378 col. 1. This is entirely consistent with the approach of the Court of Appeal to the materiality of an alteration of the document embodying the guarantee in *Raiffeisen Zentralbank Osterreich AG v Crossseas Shipping* [2000] 1 W.L.R. 1135.

406                          *Discharge of the Surety*

knowledge or consent of the surety, he does so at his own risk, and unless the
benefit or lack of prejudice to the surety is obvious, or there is obviously no possi-
bility of prejudice, the surety will be entitled to be discharged. It is a matter for the
surety as to whether he wishes to continue to be bound by the guarantee in the
circumstances of the variation of the principal contract, and if the creditor wishes
to avoid the risk that the surety will seek to avoid liability under the guarantee, he
should obtain the surety's prior consent to the variation.[128]

In *Lloyd's Bank TSB v Shorney* [2001] All E.R. (D) 277, a husband had given a
guarantee for the liabilities of a company of up to £150,000, and he and his wife
had mortgaged their home in respect of that liability. The mortgage was limited to
£150,000. Clause 21 of the mortgage contained a provision which prevented the
wife from enforcing any claim against her husband or the bank, or exercising any
subrogation rights, until all moneys owed to the bank had been paid off. The bank
then lent further sums which were covered by the husband's guarantee. He
defaulted, and the bank obtained judgment against the husband for £238,000 and
sought a charging order on the home for the balance. The wife paid the £150,000
and claimed to be entitled to be subrogated to the bank's charge. The Court of
Appeal held that the bank was not entitled to rely on the "all moneys" nature of
clause 21 in shutting the wife out of her subrogation rights, among other reasons
because its conduct in increasing the husband's liability under his guarantee had
materially prejudiced the wife's position as mortgagor.[129]

A startling illustration of the operation of the rule in *Holme v Brunskill* was
provided by the decision of Morland J. in *Howard de Walden Estates Ltd v Pasta
Place Ltd* [1995] 22 E.G. 143. There, the use provision in a lease of a delicatessen
was progressively released, to permit sale of wine to customers taking meals, and
off-licence use. The sureties were not parties to the variations, but when they were
sued for rent after the assignee went into receivership, they successfully pleaded
discharge by reason of the variations,[130] on the basis that the variations were not
obviously insubstantial or beneficial.

In *Unicomp Inc v Eurodis Electron Plc* [2004] EWHC 979, Evans-Lombe J., the
landlord, Fortwilliam, had let commercial premises on a long lease to a subsidiary of
the claimant, who had guaranteed the payment of the rent under the lease and the due
performance of the covenants in it. The guarantee contained a clause by which the
claimant agreed that any "neglect or forbearance" by Fortwilliam in endeavouring to

---

[128] See *National Bank of Nigeria v Awolesi* [1964] 1 W.L.R. 1311, [1965] 2 Lloyd's Rep. 389, where
the bank took a guarantee over an existing overdrawn bank account, and then opened a new account
on which the bank then dealt with the principal; it was held that the opening of the new account was
a variation which, without the consent of the surety, discharged him. See also *Bank of New Zealand
v West* [1977] 1 N.Z.L.R. 31.

[129] The Court of Appeal primarily based its reasoning on the fact that the wife had contemplated that
her husband would undertake no liability greater than £150,000, and took the view that clause 16
of the mortgage, which permitted the bank to "renew vary increase or determine any advances
accommodation or facilities given or to be given to the Customer or to any other person" without
the husband or wife's consent did not catch the taking of further guarantees (from the husband) for
those advances.

[130] See also *West Horndon Industrial Park v Phoenix Timber* [1995] 20 E.G. 137, also [1995] Conv.
289, where it is suggested that in order to avoid the harsh effects of the rule, landlords should obtain
the consent of all sureties for the obligations under leases. See the detailed discussion in Ch.18,
para.18-002.

obtain payment or to enforce the covenants would not release or exonerate the claim-ant's liability under the guarantee. The tenant went into liquidation and assigned the lease to an asssignee, who took occupation and began to pay rent. Fortwilliam did not attempt to forfeit or to take the initiative to vary the lease, but simply accepted rent from the assignee on the same terms. Evans-Lombe J. held that Fortwilliam's conduct constituted a forbearance within the meaning of the guarantee and that the claimant was not released by operation of the rule in *Holme v Brunskill*.

A variation is material so as to entitle a surety to full discharge, however, only if it is an act by the creditor which affects the risk of default by the principal, and consequently the risk of the surety being called upon to honour the guarantee. [131] Such a variation alters the basis on which the surety agreed to become liable under the guarantee, and not to release the surety in those circumstances would be to allow the creditor and the principal to impose a new bargain upon the surety. In those circumstances, the surety cannot necessarily be compensated by a reduction in the creditor's right to recover against him. An example of this is provided by *Bank of Baroda v Patel* [1996] 1 Lloyd's Rep. 391, where the bank made available a facility to the principal, guaranteed by the surety, which related to import and export transactions to be undertaken by the principal with the benefit of ECGD cover, as required by the terms of the facility. The bank operated the facility in relation to a number of foreign bill transactions without there being ECGD cover in place (as the bank knew). Potter J. held that this amounted to a variation of the terms of the facility which seriously prejudiced the surety. Although he did not spell out the reason, it is clear that the failure on the part of the bank to obtain ECGD cover increased the risk of default by the principal. The result is analogous to the result where the creditor deals with securities to the detriment of the sure-ty's interests.[132] This type of variation must be contrasted with a variation which merely affects the amount of the surety's ultimate liability, but which leaves the risk of default by the principal unchanged; this variation will not be material.[133]

In *Davenham Trust plc v Homegold Ltd* (Manchester Mercantile Court, 22 April 2009, Judge Hegarty QC), the court had to consider whether the principle in *Holme v Brunskill* applied in the case of a guarantee containing a very wide all monies clause. The Judge noted that the application of principle by Potter J. in *Bank of Baroda v Patel* was based on a concession by counsel and that where there was a material variation to one of the subsisting facilities, it was not at all obvious that the principal debtor's liability to repay would not fall within the ambit of the guarantee. The issue has been regarded as an open one, and that the better view is that if the creditor and the principal debtor are free to conclude a new agreement on different terms which would ordinarily lie within the scope of the guarantee, then by parity of reasoning a variation of an already concluded agreement should not discharge the surety[134].

---

[131] Thus the taking of increased security, which is clearly beneficial to the surety, will not discharge the guarantee.
[132] See paras 9–041 and following.
[133] See the analysis in McGuinness, *The Law of Guarantee* Ch. 10, especially at 10.25–10.30.
[134] See O'Donovan and Phillips *The Modern Contract of Guarantee* (2nd English edn, 2010), para 7–11.

408                                    *Discharge of the Surety*

In *Wittmann (UK) Ltd v Willdav Engineering SA* [2007] EWCA Civ 824 (2007)
B.L.R. 509, the principal debtor renegotiated its liability to the creditor for the
supply of goods to the extent that the creditor obtained the right to payment of a
proportion of the purchase price from various finance companies. This involved a
reduction of the principal debtor's liability to the creditor to take account of the
obligations assumed by the finance companies. Whilst accepting that the guar-
antee provided by the surety did not extend to cover the new financing arrange-
ments, the Court of Appeal held that the guarantee continued to apply to the
residual liability of the principal debtor. As Moore-Bick L.J. stated at [28]:

> "I am satisfied that, notwithstanding the changes to the original contract
> brought about by the financing arrangements, Willdav remained liable under
> the guarantee in respect of Automold's residual liability in respect of the
> purchase price of the goods and I would therefore dismiss the appeal."

### *Scope of the rule*

9–025   The rule in *Holme v Brunskill* is not confined to cases in which the surety and
principal have entered into a binding agreement to vary the principal contract. The
surety may also be discharged by variation of the principal's liability arising out
of an exercise of a right by the creditor,[135] or by an arrangement which removes a
security on which the surety is entitled to rely as against the principal.[136] In
*Mayhew v Boyes* (1910) 103 L.T. 1 the surety on a composition was discharged
from liability to a particular creditor where that creditor (without the knowledge
or consent of the surety) obtained an agreement from the principal to be paid all
the debts owing to that creditor in full.

The surety may also be discharged by any variation in the performance of the
principal contract.[137] In *ST Microelectronics NV v Condor Insurance Ltd* [2006] 2
Lloyd's Rep.525, the defendant guaranteed payments of sums due under
certain supply agreements, which provided for a period of credit of 55 days from
the end of each month of supply. An application by the supplier for summary
judgment on the guarantee was refused by Christopher Clarke J. on the basis
that the guarantor had a reasonable prospect of establishing at trial that the
supplier and the principal had reached a legally binding agreement under which
the principal agreed to make two substantial payments earlier than it was contrac-
tually bound to, and that this variation discharged the guarantor. A debtor who
was entitled to a period of credit was not bound to wait until the period had
elapsed before making payment, and any voluntary payment made within that
period would not involve a variation of the underlying contract. However, if the
debtor undertook a binding obligation to pay early, he would no longer be free to
choose whether to pay at the end of the period of credit, and the contract would
be varied. A variation of the contract whereby the debtor is bound to pay earlier
will discharge the guarantor, unless such an agreement is, on the facts, obviously

---

[135] *Re Darwen and Pearce* [1927] 1 Ch. 176.
[136] *General Steam Navigation Co v Rolt* (1858) 6 C.B. (N.S.) 575.
[137] *Bellingham v Freer* (1837) Moo. P.C.C. 333; *General Steam Navigation Co v Rolt* (above); *Calvert
v London Dock Co* (1838) 2 Keen 638; *Warre v Calvert* (1837) 7 Ad. & El. 143.





*Discharge by Alteration of the Principal Contract*      409

incapable of prejudicing him. Alternatively, even if there was no binding agreement, but the premature payments had been made in response to a threat by the supplier to breach his contract by insisting upon receiving cash with each future order, that was at least arguably a dealing with the principal in a manner at variance with the contract, the performance of which the surety had guaranteed, and sufficient to discharge the guarantor. Likewise, a surety for the redemption of an annuity or for shares in a company is discharged by any variation in the mode of redemption.[138]

However, variations to collateral arrangements that may exist outside the scope of the guaranteed contract do not affect the liability of the surety, unless those variations in some way impact on the surety's risk. In *Sanderson v Aston* (1873) L.R. Ex. 73 the guarantee was for the good conduct of the servant, whose term of employment was varied to provide for three months' instead of one month's notice. It was held that the term as to notice was not part of the servant's contract, and the variation did not materially add to the surety's risk.[139]

Further, variations which are agreed to or authorised by the surety or expressly contemplated by the principal contract[140] will not discharge the surety, and nor will those authorised within the guarantee.[141] Provided that the new terms fall within the "matrix or general ambit" of the obligation guaranteed the guarantor will continue to be bound if he has assented to them: per Buxton L.J. in *Witmann (UK) v Willdav Engineering SA* [2007] EWCA Civ 824, (2007) B.L.R. 509 at [33]. The circumstances in which such consent may extend to a variation of the guarantee itself, and the limit to which standard form clauses containing the surety's prior consent to variations of the principal contract will protect the creditor, are discussed in detail in Ch.4, paras 4–025 and 4–026.

In *Triodos Bank NV v Dobbs* [2005] EWCA Civ 630, [2005] 2 Lloyd's Rep. 588 the question was whether a guarantee to pay moneys due "under or pursuant to" a specified loan agreement, which entitled the creditor to agree to any amendment or variation of that agreement without reference to the surety, covered sums due under subsequent agreement made between the creditor and principal debtor. The Court of Appeal approached the question as a matter of construction. Longmore L.J. stated (at [9]) that "anything rightly termed a variation or an amendment is a matter which can be agreed without reference to the guarantor." This required an analysis of each subsequent agreement to decide whether it was an amendment or variation or replacement of the original agreement. On the facts, and having completed this comparison, the Court of Appeal was unanimous in concluding that the subsequent agreements fell outside the terms of the guarantee. They imposed new and different obligations which could not be said to be by way of variation

---

[138] *Eyre v Bartrop* (1818) 3 Madd. 221; *Polak v Everett* (1876) L.R. 1 Q.B.D. 669. Cf. *Nicholson v Burt* (1882) 10 R. 121.

[139] There is some suggestion in the speech of Pollock B that the surety would not be discharged, even though the variation was potentially prejudicial to him, if he could not show actual damage to his position. Any such rule was disapproved in *Holme v Brunskill* and does not represent the law.

[140] See, e.g. *Stewart v McKean* (1855) 10 Ex. 675, where the creditor was given a discretion as the mode of accounting between himself and the principal.

[141] *British Motor Trust Co v Hyams* (1934) 50 T.L.R. 230. This will often be a question of the correct construction of the particular guarantee.

410                        *Discharge of the Surety*

or amendment of any obligation under or pursuant to the original loan agreement
(per Carnwarth L.J. at [35]). Longmore L.J. also referred to *British Motor
Trust Co v Hyams*. Whilst not questioning the correctness of the decision on its
facts, adverted to the wide interpretation given by Branson J. to the power
of the creditor to vary the terms of the original loan agreement with the principal
debtor without discharge of the surety. He considered (at [16]) that the wide inter-
pretation in *British Motor Trust Co* was a function of the fact that the surety in that
case had the benefit of a proviso to the guarantee ensuring that she was never to be
liable for a sum greater than she would have been if the guarantee had been in its
un-amended form. As Longmore L.J. stated at [16], "The tightness of the proviso
would, no doubt, be one justification for giving a wide construction to the varia-
tion provision and enabling the new arrangement to be regarded as a variation of
the old one." There is further discussion of this case in Ch.4, para.4–026.

Plainly, where the surety plays a part in the variation transaction, he will not be
discharged, for example where he prepares his own documents,[142] or where he
allows the creditor to think that he has consented.[143] However, the surety is not
bound to enquire as to whether a variation is to take place, nor is he bound to warn
the creditor against carrying it out because of some prejudice he may suffer.[144] In
*Credit Suisse v Allerdale BC* [1995] 1 Lloyd's Rep. 315, the distinction was drawn
between mere knowledge of the proposed variation on the part of the surety, and
his consent to it (at 361–362) echoing the remarks of Blackburn J. in *Polak v
Everett* (1876) L.R. 1 Q.B.D. 669 at 673. It follows that the consent of the surety
must probably be communicated to the creditor in order to be effective: see
*Witmann UK Ltd v Willdav Engineering SA* (above) at [27].

There is a distinction, so far as the application of the rule is concerned, between a
guarantee of a specific contract and a future course of dealing, so that it will be open
to the creditor, without discharging the surety, to vary the terms applicable to the
future course of dealing so long as it remains within the scope of the guarantee.[145]

Where the surety gives his consent to the variation, that is sufficient to continue
to bind him to the guarantee even in the absence of fresh consideration.[146] There
is authority that "principal debtor" clauses in guarantees are effective to preclude
the surety from being discharged in the event of a variation to the principal

---

[142] *Woodcock v Oxford & Worcester Ry* (1853) 1 Drew. 521.
[143] *Hollier v Eyre* (1840) 9 C. & F. 52, followed by Beatson J. in *Meritz Fire & Marine Insurance Co
v Jan de Nul NV* [2010] EWHC 3262. at [87] and [88])
[144] *Polak v Everett* (1876) L.R. 1 Q.B.D. 669 at 673.
[145] *City of London v New Hampshire Insurance Co* (January 18, 1991, Phillips J.), summarised at
(1991) 3 J.I.B.F.L. 144; reversed on other grounds sub nom. *Wardens and Commonalty of the
Mystery of Mercers of the City of London v New Hampshire Insurance Co Ltd* [1992] 1 W.L.R. 792.
[146] *Mayhew v Crickett* (1918) 2 Swanst. 185, per Lord Eldon L.C.; *Smith v Winter* (1834) 4 M. & W.
454; *Phillips v Foxall* (1872) L.R. 7 Q.B. 666 at 676–677. The basis for this rule is that considera-
tion is not necessary since the consent simply revives an old obligation rather than creates a new
one. This is a peculiar application of the doctrine of consideration, but the rule (perhaps to be
limited to principal and surety cases) is now enshrined in the law, and can be explained, it is
suggested, on the basis that the surety would be estopped from objecting to the variation, the other
parties having relied on his consent in going ahead. See *Credit Suisse v Allerdale BC* [1995] 1
Lloyd's Rep. 315



*Discharge by Alteration of the Principal Contract*     411

contract.[147] However, "principal debtor" clauses have been scrutinised carefully by the courts, and rarely provide the protection the creditor seeks.[148]

Acceptance or ratification by the creditor of conduct that amounts to a repudiatory breach of the principal contract by the principal does not discharge the surety,[149] and nor do any changes in the relationship between the creditor and the surety which alter their relationship in a way which does not impact upon the surety's risk. While novation of the principal contract will discharge the surety,[150] a mere assignment by the creditor of his rights thereunder will not.[151] A failure of the creditor to exercise a legal right which he has against the principal, or a simple omission, does not amount to a variation of the principal contract sufficient to discharge the surety.[152] When the surety is discharged, he is entitled to be released from any security which he has given in respect of the guaranteed obligation.[153]

### Exceptions to the rule

The rule in *Holme v Brunskill* will not apply notwithstanding that the surety is   9–026
prejudiced by the variation in two circumstances as described below.

#### (1) Unenforceability of the variation
Where the variation is unenforceable on the grounds of illegality, the surety   9–027
will not be discharged. In *Egbert v National Crown Bank* [1918] A.C. 903 the variation of the interest rate from 7 per cent to 8 per cent was illegal, and so the surety remained liable on the guarantee to the bank. Further, where the variation is obtained by fraud of the principal, the surety is not entitled to be discharged.[154]

---

[147] *General Produce Co Ltd v United Bank* [1979] 2 Lloyd's Rep. 255; *Byblos Bank SAL v Al-Khudhairy* [1987] B.C.L.C. 232. In *Marubeni Hong Kong & South China Ltd v Mongolia* [2004] 2 Lloyd's Rep. 198, Cresswell J. analysed whether the liability assumed by the defendant surety was as primary obligor or not and concluded that it was not. However, he said (at [142]) that even if the defendant had undertaken a primary liability, it did not follow that the rule in *Holme v Brunskill* had no application. However, he appears to have based himself on the terms of the documents in that case rather than any authority in support of that proposition. On appeal, the Court of Appeal upheld the judge's characterisation of the contract as a guarantee. They expressed no view on his alternative approach [2005] 2 Lloyd's Rep. 231.
[148] In both *Manulife Bank of Canada v Conlin* (1996) and *Credit Suisse v Allerdale BC* [1995] 1 Lloyd's Rep. 315, principal debtor clauses failed to prevent variations from discharging the sureties. See further, McGuinness (2nd edn, 1996) at paras 7.37-7.38.
[149] *Moschi v Lep Air Services* [1973] A.C. 331.
[150] *Commercial Bank of Tasmania v Jones* [1893] A.C. 313.
[151] *Bradford Old Bank Ltd v Sutcliffe* [1918] 2 K.B. 833, per Pickford L.J. at 841; *Wheatley v Bastow* (1855) 7 De M. & G. 261 at 279. See *First National Corpn v Goodman* [1983] B.C.L.C. 203 at 210; followed in *Walker Crips Stockbrokers v Savill* [2007] EWHC 2598.
[152] *Kingston Upon Hull Corp v Harding* [1892] 2 Q.B. 494. Thus is not the case where the omission relates to something which the creditor has contracted with the surety to do.
[153] *Bolton v Salmon* [1891] 2 Ch. 48; *Smith v Wood* [1929] 1 Ch. 14.
[154] *Bramley Union Guardians v Guarantee Society* (1900) 64 J.P. 308. It is not clear what the position would be where the variation is obtained by the fraud of the creditor. It is submitted that the surety would be entitled to his discharge, since the creditor could not plead his own fraud in making a claim against the surety.

*Chapter 13*

# Insolvency

## The insolvency of the principal

When the principal becomes insolvent, a number of matters may arise for consid-    **13–001**
eration, such as whether payments to the creditor made by the principal which
would normally discharge the surety are impugnable by the liquidator or trustee-
in-bankruptcy as preferences,[1] or as transfers at an undervalue, or whether
security given by the principal during the period prior to insolvency can be
avoided. These questions raise issues of general insolvency law applicable not
only to guarantee cases but to all commercial relationships, and are therefore
outside the scope of this work.[2] The main area of concern in the context of
contracts of suretyship is the question of whether and in what circumstances the
surety has a right of proof in the insolvency of the principal for his indemnity.

### The rule against double proof

*The general rule*

The respective rights of the creditor and the surety to prove in the insolvency    **13–002**
of the principal are governed by the rule against double proof. The essence of this
rule is that the insolvent estate should not be compelled to entertain more than one
proof in respect of the same debt, for to do so would unfairly distort the pari passu
principle of distribution in insolvency. It prevents two creditors from proving in
the insolvency of the principal in respect of what is in effect the same debt, so that
there is no doubling-up of dividends.[3]

The rule was recently described in pithy terms as follows:

"This is the rule under which, where a debtor is subject to insolvency
proceedings, if a creditor proves in those proceedings for the debt, a guar-
antor of the debt, though in principle entitled to a right of contribution against
the debtor to the extent that he has paid the creditor, is not allowed to prove
against the debtor unless and until he has paid the creditor in full. He cannot

---

[1] See Ch.9, para.9–002 and fn.10.
[2] For a useful review of the problems that arise in guarantee cases where the principal is insolvent,
see *Goode on Legal Problems of Credit and Security*, (4th edn. 2008), paras 8.16–8.34.
[3] See *Re Oriental Commercial Bank* (1871) L.R. 7 Ch. App. 99; *Re Moss Ex p. Hallett* [1905] 2 K.B.
307; *Re Fenton Ex p. Fenton Textile Association Ltd (No.1)* [1931] 1 Ch. 85; *Barclays Bank Ltd v
TOSG Trust Fund Ltd* [1984] 1 All E.R. 628, CA; *Stotter v Equiticorp Australia Ltd* [2002] 2
N.Z.L.R. 686 at [48], and the comprehensive review of the authorities by Lord Walker in The matter
of *Kaupthing Singer and Friedlander Ltd (in administration)* [2011] UKSC 48 (judgment handed
down on October 19, 2011).

to the letter, but making no mention of the Italian proceedings which were already on foot. Some years later, having obtained judgment in Italy against the owners (who did not appear to contest the proceedings), the claimants' Italian lawyers wrote again to the Club enclosing a copy of the judgment and demanding payment under the LOU. The Club defended the claim on a number of bases, chief among which was the contention that it was an implied term of the LOU that the owners should have been given adequate notice of the Italian proceedings and that any judgment obtained by the claimants would be properly obtained and on proper notice to the Club. The Club also alleged that the deliberate failure by the claimants to inform it of the existence of the proceedings constituted sharp practice. The judge, Judge Mackie QC, whilst deprecating the behaviour of the claimants' Italian lawyers (he said that if the litigation had been conducted in London he would have placed it "towards the bottom of the range of acceptable conduct") was not prepared to imply the terms contended for. He said it was not obvious to the parties to the LOU that it was intended that notice would be given to the Club or its lawyers of proceedings being taken against the owners, although if the LOU had contained a nomination of lawyers provision, the position might well have been different. As for sharp practice, he rightly held that this did not give rise to any independent defence to a claim on a guarantee. Thus a P&I Club which wishes to keep an eye on foreign proceedings which could lead to a claim on a guarantee would be well-advised to make specific provision in the guarantee obliging the beneficiary to keep it informed of any proceedings against its members which could give rise to a claim on the guarantee in due course.

The situation often occurs in which the vessel arrested or threatened with arrest is chartered. In such a case, the cargo claimant may have claims against both owner and charterer, or the owner may have a claim against the charterer for an indemnity or contribution in respect of the cargo claim. If the owner and charterer are entered in the same P&I Club, problems are unlikely to arise. However when they are entered in different clubs it is important for the owners, or their Club, to ensure that any corresponding security which is obtained from the charterers' Club is couched in appropriate terms and, in particular, that there is an adequate mechanism for dispute resolution.

The case of *Newcastle Protection and Indemnity Association Ltd v Assurance Foreningen Gard Gjensidig* [1998] 2 Lloyd's Rep. 387 provides an illustration of the kind of problems which might arise in this situation. A cargo claim was made in respect of some fishmeal which had overheated and caught fire while it was being discharged. Damage was caused by the fire and the seawater which was used to extinguish it. The cargo receivers threatened to arrest the vessel and demanded security in excess of US$1 million from the owners and charterers. The owners' Club, Newcastle, put up a guarantee on behalf of the owners. After further discussion it agreed with the charterers' Club, Gard, that the guarantee would be extended to cover charterers' liability on condition that Gard provided counter-security. Gard provided a letter of guarantee agreeing to indemnify Newcastle in respect of all sums payable under the terms of its guarantee which were agreed or found "in accordance with the arbitration clause contained in the charter party" to be the direct and sole liability of the charterers. The letter required Newcastle to inform Gard immediately of any proposed terms of settlement of the cargo claim.

*Precedent 13*

# Indemnity for the Fidelity of an Employee

THIS AGREEMENT is made this 1st day of December 1992 BETWEEN:    **P13–001**

The COUNTESS OLIVIA of GRIEF of Willow Mansion, Love Lane, Illyria (herein referred to as 'the Employer')

and

SIR TOBIAS BELCH also of Willow Mansion, Love Lane, Illyria and SIR ANDREW AGUECHEEK lately of Castle Adamant, Arden and temporarily of The Plough Inn, Illyria (herein referred to as 'the Sureties')

In consideration of the Employer having at our request agreed to employ one MALVOLIO PROUD ('the Employee') in the office of Steward with effect from 7 December 1992, we the Sureties hereby jointly and severally agree as follows:

(1) The Sureties hereby undertake that they will be answerable to the Employer for the honest, due and faithful fulfilment by the Employee of such duties as the Employer may reasonably call upon and require him to perform in connection with the said office, and for his faithful and honest conduct during his service in that office, for so long as he shall be in her service and employed by her in that office, and in particular (without prejudice to the generality of the foregoing) that he will:

    (a) timeously and satisfactorily account for and pay over and deliver to the Employer all monies and securities for money, goods and other property whatsoever which the Employee shall receive for the use of the Employer or which shall at any time or times be entrusted to the care of the Employee by the Employer or by any other persons to whom the Employer is or may be liable or accountable therefor; and

    (b) not steal, embezzle, or otherwise convert to his own use any monies or other property of whatsoever nature of the Employer or of any other persons to whom the Employer is or may be liable or accountable for the safe custody or keeping of the said property.

(2) Without prejudice to Clause 1 above, the Sureties each agree to indemnify the Employer against all loss damage costs and expenses of whatsoever nature which she may incur or sustain by reason of any misconduct (whether criminal or otherwise) or dishonesty or negligence on the part of the Employee during the course of his employment in that office or by reason of any failure by the Employee duly to fulfil and perform the duties required of him in connection with that office.

(3) The maximum liability of each of the Sureties individually and the total amount recoverable from both of the Sureties together under Clauses 1 and 2 above in respect of all defaults of the Employee shall not exceed £1,000 and shall not exceed £250 in respect of any one act or omission.[1] Subject to these limits, the Sureties shall be liable to indemnify the Employer in respect of all sums which she may lose and all loss and damage which she may sustain by reason of any act, omission or default of the

776                          *Precedent 13*

Employee in the course of his employment in the office aforesaid, and not merely those amounts for which the Employee might be liable to the Employer.

(4) The agreements liabilities and obligations on behalf of the Sureties contained herein shall take effect as joint and several agreements, liabilities and obligations and neither of the Sureties shall be released from liability hereunder by reason of this Indemnity not binding or ceasing for any reason to bind the other of them (whether by agreement with the Employer or otherwise).

(5) This Indemnity shall be a continuing contract and shall remain in operation until the dismissal of the Employee from the office or until his contract of employment has otherwise terminated or until the Sureties have received notice in writing of his death in service, provided that:

   (a) each of the Sureties shall be at liberty to give to the Employer one month's written notice of revocation of this Indemnity with respect to his future liabilities hereunder;

   (b) the obligations of the Sureties under Clauses 1 and 2 herein and this Indemnity shall continue in effect after termination of the contract of employment or the death of the Employee or the time at which any notice of revocation of this Indemnity takes effect, and the Sureties shall remain liable in respect of all acts omissions defaults or liabilities which have occurred or arisen prior to such termination, death or revocation.

(6) The Sureties hereby acknowledge and accept that their liabilities and obligations hereunder are undertaken as principal obligors and shall not be diminished, prejudiced, impaired or discharged by reason of any dealings between the Employer and Employee of whatsoever nature or treated as co-extensive with any liabilities of the Employee to the Employer.

*Signed*
Sir Tobias Belch, Knight                          Sir Andrew Aguecheek, Knight

In the presence of


Maria Scullion
*(Occupation)* Lady's Maid
At Willow Mansion, Love Lane, Illyria

**Note**

P13–002    [1] This is intended to stop one of the sureties from arguing that if the limit is £100, he is only liable for £50, and to stop the employer from arguing that he is entitled to recover £100 from each surety.