# Exhibit 34

IN THE UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK


----------------------------)
                            )
In re                       )
                            )Chapter 11
                            )
LEHMAN BROTHERS             )Case No.
                            )
HOLDINGS INC., et al.,      )08-13555 (JMP)
                            )
                            )(Jointly Administered)
            Debtors.        )
                            )
                            )
----------------------------)



        VIDEO DEPOSITION UPON ORAL EXAMINATION

                        of

             SIR GEORGE IACOBESCU


         On Tuesday, 18th June 2013


         Taken at the offices of:
         Weil Gotshal & Manges LLP,
             110 Fetter Lane,
             London EC4A 1AY,
                 England




         Reported by:  Richard Harper

LEHMAN BROTHERS v HOLDINGS          18 JUNE 2013 DEPOSITION OF SIR GEORGE IACOBESCU

Page 7

1                    SIR GEORGE IACOBESCU

2    testifying here not only in your individual

3    capacity but as a representative of the claimants?

4         A.    Yes.

5         Q.    Okay and do you know the topics for

6    which you have been designated?

7         A.    Yes.

8         Q.    Okay.  Let's get exhibit 1.  That's

9    already been marked.  We already had one

10   deposition, so we are going to be using a couple

11   of the same exhibits, again.

12                THE COURT REPORTER:  Does that need

13   to be marked for him?

14                Mr. ISAKOFF:  No, this one's

15   already been marked.

16                THE COURT REPORTER:  Okay.

17   BY MR. ISAKOFF:

18        Q.    And if you'll turn to the third

19   page, Schedule A, this is for the record, exhibit

20   1 is the notice of deposition of Canary Wharf,

21   lists a number of topics in Schedule A and you are

22   designated for the first two.

23                The first one is the lease dated

24   March 16th 2005, among Canary Wharf, LBHI, LBL and

25   others.  What, if any, involvement did you have in

LEHMAN BROTHERS v HOLDINGS          18 JUNE 2013 DEPOSITION OF SIR GEORGE IACOBESCU

Page 8

1                    SIR GEORGE IACOBESCU

2      the negotiation of that lease?

3           A.      I had -- I had involvement on that

4      from the day the deal started with Lehman and --

5      but I was not involved in the daily negotiation of

6      the lease, but it followed the agreement for

7      lease.

8           Q.      Can you put a time frame on that,

9      on when your involvement first started?

10          A.      In 2000.

11          Q.      Okay.  Were you -- and topic 2 is

12     Schedule 4 to the lease including all

13     communications and negotiations.  Do you know what

14     Schedule 4 to the lease is?

15          A.      Yes, I do.

16          Q.      And what is it?

17          A.      It is the indemnity that we

18     received from LBHI.

19          Q.      The guarantee?

20          A.      Yes -- no, the indemnity.

21          Q.      What is the difference between a

22     guarantee and an indemnity?

23          A.      I'm not -- I'm not legal and I do

24     not want to pretend to have total legal

25     understanding.  The guarantee -- the indemnity for

LEHMAN BROTHERS v HOLDINGS          18 JUNE 2013 DEPOSITION OF SIR GEORGE IACOBESCU

Page 12

1              SIR GEORGE IACOBESCU

2              MR. ISAKOFF:  By the "guarantee",

3    I am referring to Schedule 4 to the lease.

4              MR. TULCHIN:  Which he has referred

5    to as an indemnity, so I object to the form.

6              MR. ISAKOFF: Yeah, I would

7    appreciate it, Mr. Tulchin, from the outset, if

8    you would confine yourself to objection to form

9    and not coach the witness with respect to any

10   substance, no speaking objections, please.

11             MR. TULCHIN:  Sir, I did object to

12   form and there is no coaching; there wasn't and

13   won't be.

14             MR. ISAKOFF:  Thank you.

15        A.    I think my involvement was to see

16   at the end of the contract when the lease was

17   drawn, to see that it confirms to our

18   instructions.

19   BY MR. ISAKOFF:

20        Q.    Okay.  Do you know whether there

21   were any substantive negotiations over the terms

22   of the guarantee?

23             MR. TULCHIN:  Same objection.

24        A.    I do not know exactly what took

25   place between the lawyers but my assumption is

LEHMAN BROTHERS v HOLDINGS          18 JUNE 2013 DEPOSITION OF SIR GEORGE IACOBESCU

Page 17

```
 1                 SIR GEORGE IACOBESCU

 2   wider than ----

 3        Q.    My interest was wider; I just

 4   hadn't asked you yet?

 5        A.    Okay.  Do you want to ask me or

 6   should I continue?

 7        Q.    You should just continue.

 8        A.    Okay, so in 1979, I joined Olympia

 9   and York in Toronto.

10              THE COURT REPORTER:  I joined,

11   sorry?

12        A.    Olympia and York in 1978 and,

13   practically, I work for 35 years for the same

14   company.  I was -- I started as a construction

15   manager and then I became vice president of

16   developments in Battery Park and I have done for

17   Olympia and York several projects in Boston, in

18   Houston.  I was in charge of the Olympia Centre

19   and the Nieman Marcus development in Chicago and

20   then I was running about 60% of the Battery Park

21   development; namely the two Merrill Lynch

22   buildings, the central plant and the Winter

23   Garden.  In 1987, we were invited by Mrs. Thatcher

24   to develop Canary Wharf and I moved to London in

25   1988 with a team of executives.
```

LEHMAN BROTHERS v HOLDINGS          18 JUNE 2013 DEPOSITION OF SIR GEORGE IACOBESCU

Page 20

1                    SIR GEORGE IACOBESCU

2    just for future reference, as long as we are at

3    the beginning here, it is Mr. Isakoff.

4                    MR. TULCHIN:  I am sorry.  I beg

5    your pardon.

6                    MR. ISAKOFF:  Not a problem.  Pure

7    guess work on anybody's part how to pronounce it.

8    BY MR. ISAKOFF:

9           Q.    To your knowledge, has Canary Wharf

10   ever made a claim on a document like exhibit 3,

11   with respect to any of its other tenancies?

12          A.    I am hesitating, because the

13   general answer would be no, but it is possible

14   that about 12 years or 13 years ago, we had a

15   small tenant that went bankrupt and we might have

16   had a claim, but to the general question the

17   answer is no.

18          Q.    Do you know as between Canary Wharf

19   on one hand and LBHI, which is Lehman Brothers

20   holdings Inc. on the other, who drafted what has

21   become exhibit 3?

22          A.    We think it has been drafted back

23   and forth between Clifford Chance and Lehman's

24   lawyers and it's -- I know for sure that it's

25   every time there was a draft, it went to New York

LEHMAN BROTHERS v HOLDINGS          18 JUNE 2013 DEPOSITION OF SIR GEORGE IACOBESCU

Page 21

1                    SIR GEORGE IACOBESCU

2    to LBHI's approval.

3          Q.    Do you know whether there was more

4    than one draft?

5          A.    No.

6          Q.    Do you know who did the first

7    draft?

8          A.    Simply no.

9                THE COURT REPORTER:  I'm sorry?

10         A.    No.

11   BY MR. ISAKOFF:

12         Q.    Is it fair to say that this is a

13   Canary Wharf form, since it is similar to other

14   such documents in Canary Wharf leases?

15         A.    Yes.

16               MR. TULCHIN:  Wait until he

17   finishes the question, please.

18   BY MR. ISAKOFF:

19         Q.    Is it fair to infer that Canary

20   Wharf and its counsel did the first draft of this

21   document for that reason?

22         A.    Yes.

23         Q.    Do you know whether there were any

24   substantive changes that were even sought by LBHI

25   with respect to that first draft?

LEHMAN BROTHERS v HOLDINGS          18 JUNE 2013 DEPOSITION OF SIR GEORGE IACOBESCU

Page 32

1                     SIR GEORGE IACOBESCU

2    to ----

3    BY MR. ISAKOFF:

4          Q.    The question is wasn't there some

5    interest being served for Canary Wharf in not

6    following the procedure specified in section 7(a)

7    in not serving, or attempting to serve a notice on

8    LBHI after the forfeiture was effective on

9    December 10, 2010?

10               MR. TULCHIN:  Same objection.

11         A.    Okay.  Let's --  we are in December

12   2010.  The rent that was due from LBHI was £57.5

13   million per year.  The value of that rent was

14   approximately £1 billion 50, to make up in pounds

15   or in dollars?

16   BY MR. ISAKOFF:

17         Q.    I can work with either one, sir.

18         A.    So the value was about 1 billion

19   50.  We were working toward a partial mitigation

20   of our loss by selling the building to JP Morgan,

21   which we had no guarantee.  And I am very happy to

22   elaborate on that but we had no guarantee that

23   that would happen.  Ultimately, we sold the

24   building for -- depends how you look at the

25   numbers -- between £450 million and £470 million.

LEHMAN BROTHERS v HOLDINGS          18 JUNE 2013 DEPOSITION OF SIR GEORGE IACOBESCU

Page 33

 1                SIR GEORGE IACOBESCU

 2    So, would it make sense for anybody to take -- to

 3    have LBHI take the lease worth 1 billion 50 or

 4    sell it for 470?  It does not take a lot of

 5    arithmetic.  We would have been, I repeat We would

 6    have been ecstatic if LBHI, as you know, I don't

 7    know want to go much further but there was no

 8    signed deal with JP Morgan.  And, as you know, the

 9    heads of terms or memoranda of understandings are

10    not legally binding, in any form, and 50% of the

11    cases in UK, people sign heads of terms and then

12    they walk away from the deal.  If we had the

13    opportunity to preserve, because we had the

14    fiduciary duty to ourselves and to the

15    securitization.  And if we could -- get LBHI to

16    take a lease, that would have been worth the 1

17    billion 50; believe me, we would have done it.

18         Q.    Were there at the time -- by the

19    time of the discussions between Sullivan and

20    Cromwell, Clifford Chance and Weil Gotshal to

21    which you have referred, had there been any

22    communications, at all, between Canary Wharf and

23    JP Morgan with respect to the subject of serving a

24    notice under section 7 of the exhibit 3?

25         A.    I think JP Morgan wanted to make

LEHMAN BROTHERS v HOLDINGS          18 JUNE 2013 DEPOSITION OF SIR GEORGE IACOBESCU

Page 34

1               SIR GEORGE IACOBESCU

2    sure that if they are to buy the building, they

3    would not be in competition with LBHI and if LBHI

4    were to take the building, that their agreement

5    would be null and void.

6         Q.    My question, sir, was whether there

7    had been any discussion or communication between

8    anybody on behalf of JP Morgan, on one hand, and

9    Canary Wharf, on the other, of serving a notice

10   under section 7(a) of exhibit 3 at the time of the

11   discussions between Clifford Chance, Sullivan and

12   Cromwell and Weil Gotshal to which you've

13   referred?

14        A.    Yes.  JP Morgan were anxious that

15   that notice not be served ----

16        Q.    And that was ----

17        A.       -- in order so we can agree the

18   deal if there is a deal there.

19        Q.    Okay.  So at the time when you were

20   asking Weil Gotshal whether -- strike that.  Is it

21   not a fact that as of December 10, 2010, when the

22   forfeiture took effect, JP Morgan had told Canary

23   Wharf not to serve the notice under section 7(a)

24   of exhibit 3?

25        A.    I don't want to exaggerate the pull

LEHMAN BROTHERS v HOLDINGS          18 JUNE 2013 DEPOSITION OF SIR GEORGE IACOBESCU

Page 35

```
 1              SIR GEORGE IACOBESCU

 2   or the power of JP Morgan in that transaction.  We

 3   were guided by our self-interest.  There was no

 4   signed deal.  There was no obligation with JP

 5   Morgan either on their side or on our side; so we

 6   followed what was good for the company.  I repeat

 7   again, if LBHI, there is absolutely no rhyme nor

 8   reason in anybody, I should be fired if I would

 9   give away a £1 billion deal for the sake of a JP

10   Morgan sale, and everybody that works for me.  We

11   are not taking from JP Morgan.  It was one of the

12   deals in waiting.  They could have walked.  We

13   didn't no know that there was a deal with JP

14   Morgan until December 19th.  We didn't know they

15   were going to follow.  We had an aborted deal with

16   building two buildings with them in Canary Wharf.

17   So they could change.  They had several

18   alternatives on what to do.  And there was nothing

19   that would -- I think it was very clear, they said

20   from day 1, "It is not binding we can change our

21   mind" and so did we. If we had an opportunity to

22   get an LBHI lease, that would be our Number 1

23   value, because the duty was to the securitization.

24   As you probably know, the building was in the

25   securitization.
```

MARTEN WALSH CHERER LTD   1ST FLOOR, 6 - 9 QUALITY COURT, CHANCERY LANE          LONDON, WC2A 1HP
TEL: (020) 7067 2900 E-MAIL: info@martenwalshcherer.com FAX: (020) 7831 6864

LEHMAN BROTHERS v HOLDINGS          18 JUNE 2013 DEPOSITION OF SIR GEORGE IACOBESCU

Page 37

1               SIR GEORGE IACOBESCU

2    CW0010443.  This is the letter that's dated

3    December 3.  At the bottom of the first page,

4    there is a reference to when the right will be

5    exercised to forfeit the lease.  Do you see that?

6          A.     Yes.

7          Q.     Does this refresh your recollection

8    that forfeiture took place on December 10, 2010?

9          A.     Yes, it refreshes my memory that it

10   was signed on 3rd December and yes, that is

11   correct.  That is what it says.

12         Q.     So having in mind that you did not

13   yet have a signed deal with JP Morgan on December

14   10, 2010, is it, in fact, the case that it would

15   have been against Canary Wharf's interest to serve

16   LBHI under paragraph 7(a) of what we have been

17   referring to as exhibit 3, because it might have

18   interfered with the pending deal with JP Morgan?

19         A.     No, I do not think so.

20         Q.     Would it have interfered with the

21   deal with JP Morgan if you'd served the notice

22   under 7(a)?

23         A.     If we knew that there is interest

24   from LBHI, we would have served the notice.  If

25   the response from -- on our questions from LBHI

LEHMAN BROTHERS v HOLDINGS          18 JUNE 2013 DEPOSITION OF SIR GEORGE IACOBESCU

Page 38

```
 1              SIR GEORGE IACOBESCU

 2   was a positive response, we would have served the

 3   notice, I assure you.

 4        Q.    Okay.  Is it not, in fact, the case

 5   that JP Morgan didn't want you to serve the

 6   notice?

 7        A.    That's correct.

 8        Q.    And they even went so far as to

 9   include that in the final deal, correct?

10        A.    Correct.

11        Q.    And so isn't it a fact that on

12   December 10, 2010, you had very much in mind that

13   if you had served the notice, it would have fouled

14   the deal with JP Morgan Chase?

15              MR. TULCHIN:  Asked and answered.

16   Go ahead if you can.

17        A.    I think I did.  I'm sorry.  I think

18   the answer is very clear.  If LBHI wanted to take

19   the lease, we would have accepted that gladly and

20   if not, the normal logic is that a company in

21   Chapter 11 would not be able to take a lease worth

22   3 billion or more than 3 billion, close to £4

23   billion in its length and that was strengthened by

24   the fact that Sullivan and Cromwell disclosed the

25   terms of the potential deal with JP Morgan.  It's
```

LEHMAN BROTHERS v HOLDINGS          18 JUNE 2013 DEPOSITION OF SIR GEORGE IACOBESCU

Page 39

1            SIR GEORGE IACOBESCU

2   probably the delta between the value of the

3   building at the time, which was over 1 billion

4   sold on the market versus a sale of 450 or 470

5   that we assumed, or in my understanding, LBHI made

6   the right judgment in saying, "We're not going to

7   take an over-rented or over-valued building at

8   this point, when we know that the market would not

9   be more than half the value of it." It would have

10  been suicidal.  So, I think we followed the proper

11  procedure, but clearly in everybody's mind is that

12  we are dealing with a company in Chapter 11 and

13  would they do it?  The answer as expected was no.

14  BY MR. ISAKOFF:

15          Q.    So if the answer was no, why was it

16  that JP Morgan Chase, in the final deal, precluded

17  you from serving the notice?

18          A.    I think it was purely their -- I am

19  saying it with all due respect -- their paranoia

20  not to have a deal that could be contested by

21  somebody else.  They just wanted to have surety of

22  what they were getting.

23          Q.    Did LBHI, as surety, have a right

24  to take over LBL's position on its own?

25          A.    I think they had plenty of

LEHMAN BROTHERS v HOLDINGS          18 JUNE 2013 DEPOSITION OF SIR GEORGE IACOBESCU

Page 49

1                    SIR GEORGE IACOBESCU

2    are still working on it and they're building the

3    basement.  The second alternative was to refurbish

4    all the offices, and keep in mind we are in a

5    collapsing world, the world was falling down

6    around us.  The other alternative was to redevelop

7    and refurbish their existing offices.  The third

8    one was to look for new premises and in that

9    context I asked him "Would you be interested in

10   that building?  Would you take a lease on that

11   building?  After a lot of thinking they said, "We

12   would consider it.  We have not made a decision.

13   We'll consider it" and as you probably know

14   optionality is the Number 1 mantra of JP Morgan.

15   They always want to have optionality.  One of the

16   strengths was to purchase.  They said "We'll not

17   take a lease but we'll consider a purchase.  That

18   is how the discussion of the purchase of the

19   building started.

20        Q.    Okay.  At that time, was there any

21   default in the lease with LBL?

22        A.    Yes, LBL stopped paying rent, or we

23   knew -- I cannot point exactly the days, but we

24   have been told by LBL and end of March they

25   stopped paying rent.  So they defaulted on that

LEHMAN BROTHERS v HOLDINGS          18 JUNE 2013 DEPOSITION OF SIR GEORGE IACOBESCU

Page 50

1                    SIR GEORGE IACOBESCU

2     point.

3          Q.     Okay.  Do you know whether the

4     discussions that you were having with JP Morgan

5     Chase concerning offering JP Morgan an interest in

6     the building or a sale of the building, whether

7     that predated the end of March?

8          A.     I don't know exactly, but we knew

9     that -- can I add something to it?

10         Q.     Sure.

11         A.     We knew that Nomura's lease will

12    come to an end and Nomura will move out of the

13    building, because Nomura was a tenant for about

14    400,000 square feet.

15         Q.     Is that 400,000 square feet?

16         A.     Nomura, yes.  But we knew that

17    their lease was -- we tried very, very hard to

18    make a deal with Nomura to stay there, but then we

19    realised that we were losing Nomura too, so we

20    contemplated an empty building.

21         Q.     The effort to retain Nomura, did

22    you realise that that was not going to succeed

23    before or after LBL stopped paying rent at the end

24    of March 2010?

25         A.     We tried -- we pretty much knew --

LEHMAN BROTHERS v HOLDINGS          18 JUNE 2013 DEPOSITION OF SIR GEORGE IACOBESCU

Page 53

1                    SIR GEORGE IACOBESCU

2      ████████████████████████████████████

3         (Exhibit 23 was marked for identification)

4              Q.      We have marked, as exhibit 23, a

5      letter from Canary Wharf to JP Morgan Chase dated

6      5 March, 2010 Bates Stamp CW10412 to 18.  Have you

7      ever seen this before, Mr. Iacobescu?

8              A.      Yes, since I signed it, of course,

9      I have seen it.

10             Q.      That is your signature on page 7?

11             A.      Correct.

12             Q.      What is this?

13             A.      It's the correspondence with

14     JP Morgan where we made them available data about

15     the building on the Strand that we were pursuing

16     there for them to purchase a building.

17             Q.      Does this refresh your recollection

18     that discussions concerning their interest in

19     acquiring 25 Bank street, which is the building

20     that we have been discussing that LBL was in some

21     time prior to March 5, 2010?

22             A.      Correct, yes.

23         (Exhibit 24 was marked for identification)

24             Q.      We have marked as exhibit 24 an

25     e-mail chain bearing Bates number CW19076 to 79.

LEHMAN BROTHERS v HOLDINGS          18 JUNE 2013 DEPOSITION OF SIR GEORGE IACOBESCU

Page 60

1                    SIR GEORGE IACOBESCU

2     BY MR. ISAKOFF:

3          Q.     I had come close enough to

4     finishing.  Why don't you finish your answer?

5          A.     Can you repeat the question,

6     please?

7          Q.     The question is whether you revised

8     your claims as a consequence of this discussion

9     with Mr. Ehrmann concerning the cap?

10         A.     Yes, we did.

11         Q.     Okay.  When did you do that?

12         A.     We did it several times and I think

13    the last time we had a meeting with him in London,

14    some time in October.  We had a meeting with him

15    in October at which we practically got to the

16    nitty-gritty of the claim.  We had a claim which

17    we worked out with Daniel that came to about 407

18    million.

19         Q.     Pounds or dollars?

20         A.     Dollars.  And then he -- I had a

21    conversation with him where he said it has to be

22    under 4.  So it became just a pure negotiation and

23    we ended up with 399.  We reduced it by 8 million

24    purely not to have a 4 in front of it, I don't

25    know the logic or the reason of it, but the amount

LEHMAN BROTHERS v HOLDINGS          18 JUNE 2013 DEPOSITION OF SIR GEORGE IACOBESCU

Page 61

                    SIR GEORGE IACOBESCU

1

2   was, we were very eager to come to a conclusion.

3          Q.     But you never revised your claim to

4   reflect that, did you?

5          A.     Yes, we did.

6          Q.     So, the current total of the claims

7   on record you believe currently is 399 million?

8          A.     The claim that we thought that we

9   agreed -- we agreed, not that we thought we agreed

10  -- we agreed with Daniel was 399 million and then

11  we had correspondence from Deborah Cash, who

12  worked for him, saying that it has gone to the

13  unsecure creditor committee.  It has been approved

14  and now it will go to court and it will be

15  approved with within the next 3 to 10 days, but we

16  had confirmation of that claim being agreed.

17         Q.     Do you know whether you had ever

18  revised the claim documents at any time from when

19  they were first filed at over $4 billion and the

20  fall of 2010?

21         A.     Your question is did we file again?

22         Q.     Yes.

23         A.     No, we worked to the route of the

24  person or the lawyers in charge with that.

25         Q.     You don't know that your claims

LEHMAN BROTHERS v HOLDINGS          18 JUNE 2013 DEPOSITION OF SIR GEORGE IACOBESCU

Page 69

```
 1              SIR GEORGE IACOBESCU

 2              The second and this is probably the

 3    thing that probably damaged the whole process, was

 4    that it included a condition that the claim

 5    against LBHI should be replicated in any

 6    settlement with LBL.  So that was the situation.

 7    LBL did not -- can I continue?

 8         Q.    Sure.

 9         A.    LBL were enormously concerned that

10    any settlement with LBHI would flow back into them

11    as a claim, but the fact is that they had the

12    building; they had the goods.  LBL said, "We're

13    not going to do a surrender or anything else

14    unless we know what the claim -- unless our claim,

15    Canary Wharf claim against LBL is zero and unless

16    we know the claim you -- the settlement that you

17    make with LBHI."  And they were pretty clear in

18    saying, "We don't want to see a huge settlement

19    with LBHI but" -- and I put in brackets -- by

20    telepathy, they said, this is LBL, "We'll agree,

21    we feel very comfortable with a claim of £250

22    million", and that happened in September.  And

23    I remember very well the date, because it was

24    September 30th when they abandoned the building,

25    and locked the tenants in.
```

LEHMAN BROTHERS v HOLDINGS          18 JUNE 2013 DEPOSITION OF SIR GEORGE IACOBESCU

Page 70

1                SIR GEORGE IACOBESCU

2        Q.      And did what?

3        A.      Locked the tenants in and out.  So

4   based on that, it was just coincidental that we

5   had an agreement with Daniel Ehrmann for 399

6   million, which really translates into about £250

7   million and that's the settlement that we thought

8   we having an agreement with Alvarez and Marsal.

9   When the "stip" came, LBHI knew very well that we

10  need to make a deal with LBL to get the building

11  back but they put that condition, which

12  practically prevented us from doing the deal with

13  LBL, because we went back to LBL and LBL said

14  absolutely nothing.  "It is either zero or you

15  can't get the building back."  So put yourself in

16  our situation.

17       Q.      So, is it your recollection that

18  the draft stipulation that included these terms

19  predated September 30th of 2010?

20       A.      No, actually it post-dated.  It

21  post-dated, because we got approval.  The deal

22  with Daniel Ehrmann was at the beginning of

23  October.  The notice that its been approved, it

24  was at the end of October.

25       Q.      But by that time, LBL had already

LEHMAN BROTHERS v HOLDINGS        18 JUNE 2013 DEPOSITION OF SIR GEORGE IACOBESCU

                                                              Page 71

   1              SIR GEORGE IACOBESCU

   2    left the building and you had taken it over,

   3    correct?

   4         A.     Not really.  Not really.  What

   5    happened -- can I tell you?

   6         Q.     I am asking, because it surprises

   7    me.

   8         A.     Yeah, well, join the club.

   9    September 30th, LBL, Nomura moved out.  We as a

  10    sub-tenant, we had four floors occupied by Jones

  11    Lang Lasalle, by your Euronext and the New York

  12    Stock Exchange, so we were a sub-tenant.

  13         Q.     "We" Canary Wharf?

  14         A.     Yes, we, Canary Wharf were a

  15    sub-tenant and we had four floors occupied.  On

  16    30th September -- and I remember very well that

  17    date because we thought that we were losing or

  18    mind -- they decided to, when Lehman -- sorry,

  19    when Nomura vacated the building, they decided to

  20    fire every single person in the building,

  21    including the mechanical people, the elevator

  22    people and worse than anything, the fire alarm

  23    people.  So, they fired everybody and they

  24    padlocked the building.

  25         Q.     When you say "they", who are you

LEHMAN BROTHERS v HOLDINGS          18 JUNE 2013 DEPOSITION OF SIR GEORGE IACOBESCU

Page 72

1              SIR GEORGE IACOBESCU

2    referring to?

3           A.     LBL.

4           Q.     Not LBHI?

5           A.     No. No, no.  They were clean -- so

6    LBL, these are strong-arm tactics.  They padlocked

7    the building and they said "That's it".  Ans we

8    -- there was a flurry of arguments and e-mails and

9    they said, "You want the building, do a surrender,

10   otherwise you don't get the building back."  We

11   said, "What?  You cannot damage enormous value

12   even if it's -- the building, it's empty, the VP

13   value of the building, you're wall-to-wall to

14   Morgan Stanley.  You are wall-to-wall to the next

15   building.  You do enormous damage if the building

16   is left with no fire alarm.  What happens if there

17   is a fire overnight?"  And they said, "So be it".

18   We called the insurance and the insurance said,

19   "We will discontinue the insurance on the building

20   if there is no maintenance.  What happens if there

21   is a fire and what happens if the fire propagates

22   on the other buildings in Canary Wharf."  "We

23   don't care."  So that was -- at that point we, at

24   10 o'clock at night and between 10 o'clock and

25   midnight, ultimately, what we asked them is to

LEHMAN BROTHERS v HOLDINGS          18 JUNE 2013 DEPOSITION OF SIR GEORGE IACOBESCU

Page 73

1                    SIR GEORGE IACOBESCU

2     allow us, we backed begged to be left -- to be let

3     inside our own building, to allow us as a

4     sub-tenant to go and maintain the building in

5     order to preserve the life safety and not to

6     destroy the value of the building and that's what

7     happened.  That's the time when we agreed,

8     I agreed with LBL that our claim against -- in our

9     mind LBL and LBHI were not linked at all, but they

10    created the linkage.  LBL said, "You have to claim

11    against us zero, in order to get your building

12    back and you're comfortable with a 250 million

13    claim against LBHI.  We don't want more, because

14    we know all these claims are coming back to us."

15                    THE VIDEOGRAPHER: Sorry, I was just

16    going to say there is five minutes of tape.

17    BY MR. ISAKOFF:

18          Q.    Okay.  Well, let's finish off this.

19    Thank you.  So you agreed --

20          A.    So ----

21          Q.    Let me ask the question.  So you

22    agreed with their request that there be only a

23    zero claim against LBL on September 30th as a

24    condition for getting back in the building?

25          A.    Correct.

LEHMAN BROTHERS v HOLDINGS          18 JUNE 2013 DEPOSITION OF SIR GEORGE IACOBESCU

Page 93

1                    SIR GEORGE IACOBESCU

2          Q.     We have marked as exhibit 28 an

3    e-mail chain Bates stamped CW 480 to 83.  It

4    starts at the bottom of page 482, with an e-mail

5    from Sarah Dawson to Katie Bradford dated

6    September 20, 2010.  Do you see that,

7    Mr. Iacobescu?

8          A.     Yes.

9          Q.     Who is Katie Bradford, if you know?

10         A.     She was one of the lawyers and

11   I assume she was one of the litigation lawyers at

12   Linklaters representing LBL.

13         Q.     And Sarah Dawson was at Clifford

14   Chance representing Canary Wharf?

15         A.     Correct.

16         Q.     There is -- in her second paragraph

17   she says:  "We understand that our clients have

18   been assured by Mike Jervis that any surrender

19   would be structured in such a way as to preserve

20   our client's claims against the US guarantor."

21   Do you see that?

22         A.     Yes.

23         Q.     Do you know what that reference is?

24         A.     That reference is to discussions

25   that we had with Mike Jervis where we made it

LEHMAN BROTHERS v HOLDINGS          18 JUNE 2013 DEPOSITION OF SIR GEORGE IACOBESCU

Page 94

1                   SIR GEORGE IACOBESCU

2    clear that LBHI claim and LBL claims are totally

3    separate things, and it refers again to the

4    interlinking of between LBL and LBHI, where LBL

5    were concerned that a big settlement with LBHI

6    would flow back to them as a claim and the

7    discussion was -- that's why he came later on and

8    he said that he would agree, he would be

9    comfortable with the 50 million claim.

10         Q.    She goes on to say:  "This is not

11   reflected in the draft agreement that has been

12   provided..."  Do you understand what it was about

13   the draft agreement that we just looked at that

14   did not reflect what you had been assured by

15   Mike Jervis?

16         A.    That they would accept -- they

17   would also take a 250 million claim on their -- on

18   the LBL side.

19         Q.    Who said that?

20         A.    This was our understanding that the

21   settlement, the surrender will reflect the claim

22   with LBHI.

23         Q.    Do you recall being specifically

24   told by anybody at LBL that it would accept a

25   claim of in the range of 250 million?

Page 105

1                    SIR GEORGE IACOBESCU

2           A.     Okay.  Because what happened is

3    that the way it turned out, but I inversed the

4    times here, I inversed the times.  Because the

5    problem at that time was that we didn't have the

6    claim settled with Daniel Ehrmann, and that is the

7    trouble that he has mentioned here.  Then we had

8    the agreement with LBHI which, that is what

9    I mentioned, they had the leverage in saying, "You

10   have to agree the same, to have the same

11   settlement with LBL" and LBL in turn used their

12   leverage in having the building by saying, "We are

13   not going to agree to anything".  So that is why

14   indirectly I am saying we got caught in the

15   crossfire between what the internal side arguments

16   between the two parties.

17                    MR. ISAKOFF:  I would just like to

18   record to reflect that one of my London colleagues

19   has entered the room to observe.

20                    MR. TULCHIN:  Good afternoon.

21                    A SPEAKER:  Hi, good afternoon.

22   BY MR. ISAKOFF:

23           Q.     The next paragraph, he says, Mike

24   Jervis says to you:  "Further, you wish to press

25   on with a claim against LBHI (which they may seek

LEHMAN BROTHERS v HOLDINGS          18 JUNE 2013 DEPOSITION OF SIR GEORGE IACOBESCU

Page 125

1              SIR GEORGE IACOBESCU

2     two tier building, a building where the main

3     tenant has practically all the -- call it all the

4     juice of the building and all the others would

5     become second class citizens.  That is why we were

6     so eager to know we have a 30 year lease and that,

7     come hell or high water, the rent will flow for 30

8     years, because we knew that that is not a building

9     that then you can chop in pieces.

10         Q.     Okay.  So at this point, in October

11    2010, where LBL has abandoned the building and so

12    forth, were you saying here that the fact that

13    there were no potential tenants for the entire

14    building a disadvantage, as compared with selling

15    the building as a whole?

16         A.     Correct.  It was -- JP Morgan was

17    the only potential customer, call it, not tenant

18    but buyer in the market that would take that kind

19    of building and since -- if I can add, since,

20    there was not a single deal of that size in the

21    whole of London and there is not a single

22    1 million square feet building in London, except

23    five or six in Canary Wharf, so that gives you --

24    this is not New York, it gives you the sizing of

25    the tenancy and customising of the buildings.

LEHMAN BROTHERS v HOLDINGS          18 JUNE 2013 DEPOSITION OF SIR GEORGE IACOBESCU

Page 192

1                    SIR GEORGE IACOBESCU

2          A.      Absolutely not.  We went back and

3     we put it in based on the stip from LBHI, at which

4     point LBL said, "Absolutely not, you want the

5     asset, it is zero", so that is the conundrum for

6     us.

7          Q.      When you tendered this, when you,

8     meaning Canary Wharf, tendered this to LBL you

9     knew that it was unacceptable, correct?

10         A.      Not 100%.  Not 100%, because they

11    said that they are comfortable with a claim of

12    250 million.  But then we thought that if they are

13    comfortable with a claim for 250 million against

14    LBHI they will be comfortable with a repeat of the

15    same claim in that document and obviously they

16    said, "No, absolutely not".

17         Q.      But you knew at the time -- you,

18    Canary Wharf, knew at the time that this draft was

19    sent to LBL and its administrators for its

20    consideration, that this was not likely to be

21    accepted by LBL, correct?

22         A.      It was not likely but we figured

23    that for the sake of achieving the settlement they

24    would agree to it.  Obviously which they did not,

25    and we have done that as a result of the LBHI

Page 239

 1                SIR GEORGE IACOBESCU

 2                REDIRECT BY MR. TULCHIN

 3    By MR. TULCHIN:

 4        Q.    Mr. Iacobescu, I am going to have a

 5    few questions.

 6        A.    Yes.

 7        Q.    Going back to the time when the

 8    lease was entered into, the lease with LBL, what

 9    did you understand, as the CEO of Canary Wharf,

10    that LBHI had agreed to do in connection with the

11    obligations of LBL in the lease?

12                MR. ISAKOFF:  Objection.  Calls for

13    legal conclusion.

14    BY MR. TULCHIN:

15        Q.    You can go ahead and answer.

16        A.    What I asked from day one, from the

17    first day that we started negotiating the deal

18    with Jeremy Isaac, who is the chief executive of

19    LBL, Frank Bartolotta , who was LBHI, and Mark

20    Marcucci, who is the global head of real estate,

21    is that we should have an absolute solid

22    guarantee, come hell or high water, that the rent

23    will flow over the next 30 years and, as a matter

24    of fact, we always thought that we are dealing

25    with LBHI.  We needed -- we always asked for the

LEHMAN BROTHERS v HOLDINGS          18 JUNE 2013 DEPOSITION OF SIR GEORGE IACOBESCU

Page 240

1                SIR GEORGE IACOBESCU

2    top company, as I mentioned to Mr. Isakoff.  We

3    always asked for the top company in any

4    transaction that we do.  We have done the same

5    thing with Credit Suisse, or Morgan Stanley, or

6    CitiGroup, except the world headquarters of banks

7    like Barclays, where the parent company is on the

8    lease, but we always ask for an indemnity, because

9    the need is to have an uninterrupted cash flow

10   regardless of anything that goes wrong with the

11   tenant.

12          Q.     I am sorry, with whom? You said,

13   "Regardless of anything that goes wrong with..."

14          A.     With the tenant.

15          Q.     Okay.  I didn't hear you.

16          A.     We were aware of the Lehmans

17   problems in 1998 with the Asian crisis, with the

18   Russian crisis, so we were a little bit

19   circumspect but it was a very, very good tenant,

20   exceptionally good tenant, and we would not have

21   entered into any, any lease agreement unless we

22   had the parent company indemnity, that they would

23   come through with.  And, by the way, I do not

24   recall at any point when anybody in LBHI, be it

25   LBL or LBHI have objected to the meaning of what

LEHMAN BROTHERS v HOLDINGS                18 JUNE 2013 DEPOSITION OF SIR GEORGE IACOBESCU

                                                           Page 241

 1                  SIR GEORGE IACOBESCU

 2    we asked for, of the indemnity.

 3          Q.      And you understand when the deal

 4    was done that you had obtained what you were

 5    seeking?

 6                  MR. ISAKOFF:  Objection.  Leading

 7    and calls for a legal conclusion.

 8          A.      My understanding is that this is

 9    what we asked, this is what we got and, as an

10    additional thing, one of the reasons that we were

11    very strict on this requirements is that because

12    the building also had to be in the securitization,

13    and a 30 years lease in the securitization, when

14    we put Lehman in the securitization, the income

15    from Lehman was matched against bonds that would

16    expire in 2033, so we would not match bonds with

17    something that we didn't think was rock solid.

18    BY MR. TULCHIN:

19          Q.      I want to ask you, Mr. Iacobescu

20    please, to cast your attention to September 30th

21    2010 and you recall giving some testimony about

22    the events of that day?

23          A.      Yes.

24          Q.      Okay.  What consequences would

25    there be, as far as you understood, for the

LEHMAN BROTHERS v HOLDINGS          18 JUNE 2013 DEPOSITION OF SIR GEORGE IACOBESCU

                                                        Page 242

   1             SIR GEORGE IACOBESCU

   2   tenants, including Jones Lang Lasalle and New York

   3   Stock Exchange Euronext, if the building had been

   4   padlocked?

   5        A.    I -- you know, to measure my words,

   6   these were strong arm tactics used by the

   7   administrators to force us into a surrender.

   8   I mean, this is -- I never heard of anything like

   9   that, I have never seen anything done to take --

  10   shut down a building, shut down all the services,

  11   with 100,000 square feet of tenants in the

  12   building.  100,000 square feet of tenants

  13   translates, if you look at the density of about

  14   120, 125 square feet per person you are talking

  15   about 800 people.  800 people is a train, that is

  16   a full train of people.  And to have them shut

  17   down in the building with no services, with no

  18   fire alarm, it is totally, totally -- it is beyond

  19   belief.  This is not -- it is irresponsible for

  20   anybody to do that.  Nevertheless, with the nicest

  21   words, this is what LBL has done, in trying to

  22   force us, when we made an offer to take over the

  23   maintenance of the building as a sub-tenant, not

  24   as the landlord, because we did not have a right

  25   at that point, the building was not ours.  So we

LEHMAN BROTHERS v HOLDINGS          18 JUNE 2013 DEPOSITION OF SIR GEORGE IACOBESCU

Page 243

1                SIR GEORGE IACOBESCU

2    were extremely concerned.  We called the press, it

3    didn't appear in the press because by midnight

4    there was a kind of agreement.  We called the

5    insurance company and the effect of something like

6    that would have been catastrophic.  You do not

7    necessarily expect things to happen, but it is

8    irresponsible when you are not only the landlord,

9    the ultimate landlord, but you manage the whole

10   estate, an the estate with 100,000 people, to let

11   a building, you know, at the risk of being damaged

12   or under fire, plus the fact that, you know, you

13   have padlocked tenants in and out of the building

14   at will.

15          Q.     You testified earlier, if I recall

16   correctly, that at one point on that day you sent

17   security guards to 25 Bank Street; is that right?

18          A.     Yes.  At between 9 o'clock and

19   11 o'clock we surrounded the building with

20   security, with our security guards, to make sure

21   that the building is protected.

22          Q.     Was it your understanding that in

23   that time period there were still employees of

24   tenants who were present in the building?

25          A.     Yes.

LEHMAN BROTHERS v HOLDINGS          18 JUNE 2013 DEPOSITION OF SIR GEORGE IACOBESCU

Page 244

1              SIR GEORGE IACOBESCU

2         Q.    To your understanding, did your

3    security guards enter the building that night?

4         A.    No, they guarded the doors.  They

5    did not enter the building because it wasn't our

6    building.

7         Q.    Can I ask you to please see if you

8    can find exhibit 32 in the pile of exhibits in

9    front of you.  It is down the stack a little ways?

10             MR. ISAKOFF:  Can you give us the

11   date?

12             MR. TULCHIN:  If you let me find

13   it.

14             MR. ISAKOFF:  Okay, I will let you

15   find it.

16        A.    I have it.

17             MR. ISAKOFF:  Maybe you can give us

18   the date.

19   BY MR. TULCHIN:

20        Q.    On the first page of exhibit 32

21   there are some e-mails dated 30th September 2010.

22   Do you see that?

23        A.    Yes.

24             MR. ISAKOFF:  Can you give me a

25   chance to get to it, now that I know what I am

LEHMAN BROTHERS v HOLDINGS          18 JUNE 2013 DEPOSITION OF SIR GEORGE IACOBESCU

                                                      Page 245

 1                    SIR GEORGE IACOBESCU

 2     looking for.  Okay.  I am with you.

 3     BY MR. TULCHIN:

 4             Q.    Do you recall being asked some

 5     questions on direct examination about your e-mail

 6     that appears in the middle of the page, roughly,

 7     of the first page of exhibit 32?

 8             A.    Yes.

 9             Q.    Was your agreement with Mike Jervis

10     conditioned upon anything?

11             A.    Well, everything that you see here

12     is a condition on the surrender taking place and

13     the surrender -- and on our agreement with LBHI.

14             Q.    Did you tell him that in your

15     e-mail?

16             A.    This is ----

17                   MR. ISAKOFF:  Objection, leading.

18             A.    Sorry.  Should I answer?

19     BY MR. TULCHIN:

20             Q.    You can answer.

21             A.    It is all subject to the surrender,

22     to a satisfactory surrender taking place.

23             Q.    Could you read into the record,

24     sir, your sentence in your e-mail which makes that

25     clear, the same e-mail?

LEHMAN BROTHERS v HOLDINGS          18 JUNE 2013 DEPOSITION OF SIR GEORGE IACOBESCU

                                                        Page 246

 1                    SIR GEORGE IACOBESCU

 2          A.      It says very clear that:  "All

 3    these points ... will become effective on

 4    completion of surrender."

 5          Q.      Now, Mr. Iacobescu, a couple of

 6    questions if I may, about the economics of what

 7    happened in 2010.  There came a point when LBL

 8    stopped paying rent; is that right?

 9          A.      Correct.

10          Q.      What is your recollection as to

11    when that was?

12          A.      End of March 2010.

13          Q.      As of that time, roughly speaking,

14    how many years were left on the LBL lease?

15          A.      23 years.

16          Q.      What was LBL's total obligation to

17    pay rent and other charges for the duration, the

18    unexpired portion of the lease?

19                  MR. ISAKOFF:  Object to form.

20    BY MR. TULCHIN:

21          Q.      Approximately?

22                  MR. ISAKOFF:  The same objection.

23          A.      I cannot do the calculation

24    mentally, because it is all a matter of the rate

25    of discount, but the value of if building in 2010

LEHMAN BROTHERS v HOLDINGS                18 JUNE 2013 DEPOSITION OF SIR GEORGE IACOBESCU

Page 251

1                    SIR GEORGE IACOBESCU

2    changed from £40 to £10 I would be the first one

3    to be told.

4          Q.    What you know is that your lawyers

5    drafted what became Schedule 4 of the lease and

6    that that was tendered to Lehman, correct?

7          A.    Yes.

8          Q.    And you do not know whether there

9    were any discussions or issues pertaining to it,

10   but that Lehman agreed to the what is written in

11   the lease?

12         A.    So far as -- yes.  And I don't know

13   if that and adds anything to the argument, but we

14   were told in one of the meetings, when executives

15   from LBHI came to London, that they regarded the

16   lease as a capital lease, which means that it was

17   in their book, as opposed to an operating lease.

18         Q.    You were asked about the events of

19   September 30th, about the strong arm tactics that

20   you attribute to LBL.  You are not attributing

21   anything of what you are complaining about there

22   to LBHI, are you?

23         A.    Not at all.  I think it is, to add

24   to that, it is pretty clear to me that LBL were

25   following their own interest.