# Exhibit 40

1                    F. Bartolotta

2          UNITED STATES BANKRUPTCY COURT

3           SOUTHERN DISTRICT OF NEW YORK

4

5

6    ----------------------------x

     IN RE:

7

8    LEHMAN BROTHERS HOLDINGS,        Chapter 11

9    INC., et al.,              Case No. 08-13555 (SCC)

10             Debtors.

11

     ----------------------------x

12

13

14

15      VIDEOTAPED DEPOSITION OF FRANK BARTOLOTTA

16              New York, New York

17            Wednesday, May 7, 2014

18

19

20

21

22

23   Reported by:

24   THOMAS A. FERNICOLA, RPR

25   JOB NO. 73217

1              F. Bartolotta

2

3

4

5

6              May 7, 2014

7              2:04 p.m.

8

9         Videotaped Deposition of FRANK

10   BARTOLOTTA, held at the Law offices of Patterson

11   Belknap Webb & Tyler, LLP, 1133 Avenue of the

12   Americas, New York, New York, before Thomas A.

13   Fernicola, a Registered Professional Reporter

14   and Notary Public of the State of New York.

15

16

17

18

19

20

21

22

23

24

25

1                    F. Bartolotta

2       A P P E A R A N C E S:

3

4              WEIL GOTSHAL & MANGES

5              Attorneys for Lehman parties

6                  1300 Eye Street NW

7                  Washington, D.C.  20005

8              BY:  PETER ISAKOFF, ESQ.

9

10                 ARIELLE GORDON, ESQ.

11

12

13             SULLIVAN & CROMWELL

14             Attorneys for Canary Wharf parties

15                 125 Broad Street

16                 New York, New York  10004

17             BY:  DAVID TULCHIN, ESQ.

18                  JOHN McCARTHY, ESQ.

19

20

21

22

23

24

25

Page 4

1                       F. Bartolotta

2    APPEARANCES   (Continued):

3

4              PATTERSON BELKNAP WEBB & TYLER

5              Attorneys for the Witness

6                   1133 Avenue of the Americas

7                   New York, New York  10036

8         BY:  JAMES MASELLA, ESQ.

9              SHEKAR KRISHNAN, ESQ.

10

11

12

13

14

15

16

17

18   ALSO PRESENT:

19              MANUEL GARCIA, Videographer

20              BRIJESH P. DAVE, Lehman Brothers Holdings

21              RICHARD KATZ, Lehman Brothers Holding.

22

23

24

25

1          F. Bartolotta

2          THE VIDEOGRAPHER:  This is the start

3     tape labeled No. 1 of the videotaped

4     deposition of Frank Bartolotta, in the

5     matter of In Re:  Lehman Brothers, on

6     May 7, 2014 at approximately the 2:04 p.m.

7          My name is Manuel Garcia from TSG

8     Reporting, Inc.  I am the legal video

9     specialist.

10         The court reporter is Tom Fernicola,

11    in association with TSG Reporting.

12         Will counsel please introduce

13    yourself.

14         MR. ISAKOFF:  This is Peter Isakoff

15    and Arielle Gordon of Weil, Gotshal &

16    Manges, LLP, Lehman Brothers Holdings, Inc.

17         MR. TULCHIN:  David Tulchin and John

18    McCarthy from Sullivan & Cromwell, LLP, for

19    the Canary Wharf parties.

20         MR. MASELLA:  James Masella and

21    Shekar Krishnan from Patterson Belknap

22    Webb & Tyler, LLP, on behalf of the

23    witness.

24         THE VIDEOGRAPHER:  Will the court

25    reporter please swear in the witness.

Page 6

1                          F. Bartolotta

2    F R A N K    B A R T O L O T T A,

3         called as a witness, having been duly sworn

4         by a Notary Public, was examined and

5         testified as follows:

6    BY THE REPORTER:

7         Q.    Please state your full name and

8    address for the record.

9         A.    Frank Bartolotta, 5019 Rustic Oaks

10   Circle, Naples, Florida 34105.

11

12   EXAMINATION BY MR. ISAKOFF:

13        Q.    Mr. Bartolotta, how are you currently

14   employed?

15        A.    I'm employed as a consultant by

16   Morgan Stanley.

17        Q.    Have you ever had your deposition

18   taken before?

19        A.    No.

20        Q.    Okay.

21              Just to go over a couple of the

22   ground rules.  Obviously, we have a court

23   reporter and a videographer taking down

24   everything verbatim, so we should try not to

25   talk at the same time so there's a clear

Page 7

                    F. Bartolotta

1
2   record.
3           If there's anything you don't
4   understand about a question, please let me know
5   and I'll do my best to clarify it.
6           If you need a break at any time,
7   that's fine.  You can consult with your counsel
8   but not while a question is pending.
9       A.    Okay.
10      Q.    Do you have any questions before we
11  proceed?
12      A.    No.
13      Q.    We have never met before; correct?
14      A.    No, we have spoken on the phone but
15  never met.
16      Q.    We have.
17          What, if anything, did you do to
18  prepare to testify here today?
19      A.    Not much.  Just talked to my attorney
20  about how to answer the questions truthfully
21  and directly.
22      Q.    Okay.
23          Did you review the affidavit that was
24  recently filed?
25      A.    Yes, I did.

1                         F. Bartolotta

2        Q.      Okay.

3                Did you review anything else?

4        A.      No.  I looked back at the document,

5    the document that was in question that was sent

6    to me and that's it.

7        Q.      What document is that?

8        A.      The indemnity agreement that was in

9    the lease.

10       Q.      You're talking about Schedule 4 to

11   the lease?

12       A.      Yes.  Yes.

13       Q.      Okay.  All right.

14               And could you just briefly sketch

15   your educational background.

16       A.      Yes.

17               I went to Fordham Law School, and

18   after graduating from Williams College and

19   taught school for a brief period of time.

20               Joined White & Case in 1978.  Left

21   White & Case in 1984 to join Morgan Stanley

22   Realty.

23               I left Morgan Stanley Realty after

24   being transferred to London.  I left London in

25   1995 to join Credit Suisse back in New York.

1                    F. Bartolotta

2            And then I left Credit Suisse in 2000

3    to join Lehman Brothers in London.

4            Returned to New York with Lehman

5    Brothers in 2004.

6            Retired, left Lehman Brothers as an

7    employee in 2006, and worked for Lehman

8    Brothers as a consultant from 2006 until just

9    before the bankruptcy.  And then returned to

10   work for Lehman in the bankruptcy in January of

11   2009, and worked for Lehman as a consultant up

12   to August of 2012, and then joined Morgan

13   Stanley as a consultant in May of 2013.

14        Q.    All right.  Thank you very much.

15            What kind of law did you practice at

16   White & Case?

17        A.    Real estate.

18        Q.    How did you come to give an affidavit

19   this last March?

20        A.    I was called by Mr. Iacobescu who

21   asked if I would speak to his attorneys about

22   the litigation.  I said I would.  They called

23   me.  They asked me questions about what

24   happened during the negotiations and my role in

25   it, and asked me if I would be willing to sign

Page 10

F. Bartolotta

1   an affidavit based upon the discussions that we

2   had over the phone.

3       Q.    When was your conversation with

4   Mr. Iacobescu that you just referred to?

5       A.    It would have been some time mid

6   March.

7       Q.    Did he call you or did you call him?

8       A.    I think he called me.

9       Q.    And what -- how long did this

10  conversation last?

11      A.    My recollection it was very short.

12  He just asked me if I would speak to his

13  attorneys.

14      Q.    Okay.

15           Was anybody else on the phone?

16      A.    No, not to my knowledge.

17      Q.    Did he tell you what he wanted you to

18  speak to his attorneys about?

19      A.    No.  I knew it was in regard to

20  litigation, but he didn't say specifically

21  what.

22      Q.    Okay.

23           Did you let anybody from Lehman know

24  or any representative of Lehman know that you

Page 11

1                    F. Bartolotta

2    had been approached --

3         A.    No.

4         Q.    -- with this request?

5         A.    No.

6         Q.    Let's make sure I just finish the

7    question just for the clear record.  Okay.

8             Was there anything else that you can

9    recall about your conversation with

10   Mr. Iacobescu?

11        A.    I had a couple of conversations with

12   him, but that was the one in which he asked me

13   to talk to his attorneys.

14        Q.    Okay.

15             Did you have any other conversations

16   with Mr. Iacobescu in and about March of this

17   year --

18        A.    No.

19        Q.    Hold on a second.  Let me finish the

20   question -- relating at all to the it care

21   would have claims against Lehman Brothers

22   Holdings, Inc.?

23        A.    Yes.  I was in London on a deal for

24   Morgan Stanley and I had lunch with

25   Mr. Iacobescu and we talked about a lot of

Page 12

F. Bartolotta

1
2   things.

3          I asked him -- I actually asked him

4   if what was going on with the litigation.  He

5   said it was still ongoing.  And that was really

6   all we talked about at that lunch, other than

7   the business that I had with Morgan Stanley

8   which he was involved with.

9      Q.   Just to make sure the record is

10  clear.  Do you recall anything else as to what

11  it was he wanted you to talk to his attorneys

12  about?

13     A.   No.  He just asked me to talk to the

14  attorneys.

15     Q.   Okay.

16          MR. ISAKOFF:  Let's mark this.

17          (Bartolotta's Exhibit 1, Affidavit

18          of Frank Bartolotta dated March 27, Bates

19          Nos. CW75982 to 84, was marked for

20          identification.)

21  BY MR. MASELLA:

22     Q.   Mr. Bartolotta, I'm handing you

23  what's been marked as Exhibit 1, Bartolotta

24  Exhibit 1.

25          Is this affidavit that you signed

Page 13

1                      F. Bartolotta

2      this last March 27th?

3             MR. MASELLA:  Let me know you're done

4         looking it over.

5         A.    (Document review.)

6             Yes.

7         Q.    Okay.

8             Do you recall how much time there was

9      between when you spoke to Mr. Iacobescu and he

10     asked you to speak to his lawyers and when you

11     contacted anybody representing Canary Wharf?

12        A.    I'm sorry, I don't remember how long

13     it was between my conversation, but it would

14     have been short.  Because it was all -- my

15     visit out there and my signing this was all

16     within a two-week time frame in March.

17        Q.    Okay.

18             Did you place a call to any attorneys

19     for Canary Wharf?

20        A.    Subsequent to my first contact from

21     the attorneys at Sullivan & Cromwell, yes.

22        Q.    Okay.

23             So after you spoke to Mr. Iacobescu

24     about speaking to his attorneys, who contacted

25     who?

Page 14

                    F. Bartolotta

1

2       A.     I believe someone contacted me.

3       Q.     Who do you know?

4       A.     It was Mr. Shenker and Mr. Tulchin.

5       Q.     Okay.

6              And what was said in that

7   conversation, if you can recall?

8       A.     They asked me questions about what

9   happened during the negotiations and what my

10  recollection of -- about the negotiations, and

11  in reference specifically to this document that

12  was delivered, how that occurred.

13      Q.     What do you recall you said in the

14  conversation?

15      A.     I told him that I was negotiating the

16  document, the lease documents, and I was trying

17  to avoid delivering this indemnity.  And that

18  it was my understanding that we did not want to

19  deliver this document and that I couldn't close

20  the deal without delivering the document.

21             Canary Wharf, their attorneys and

22  Mr. Iacobescu was insisting that we deliver

23  this, and I basically booted it back to

24  New York because I was involved in many, many

25  other things around the documents and the

1                    F. Bartolotta

2    design of the building, and I wasn't successful

3    in avoiding delivery of the document.

4         Q.    Okay.

5              Did you yourself have any role in

6    negotiating the content of the Surety

7    Agreement?

8         A.    No.

9         Q.    Do you know whether there were any

10   changes to the Surety Agreement -- first of

11   all, do you know that Canary Wharf drafted the

12   Surety Agreement?

13        A.    Oh, yes.

14        Q.    Okay.

15             And do you know whether there were

16   any changes to that draft between the time it

17   was first shown to Lehman Brothers Holdings,

18   Inc. and when it was signed?

19        A.    I don't recall.

20        Q.    Do you know who it was at Lehman

21   Brothers Holdings, Inc. that was dealing with

22   the Surety Agreement?

23        A.    I remember the person's position.  I

24   don't remember their name.

25        Q.    What was the position?

Page 16

1                      F. Bartolotta

2        A.     He was in the Treasury Group.

3        Q.     And you didn't recall that person's

4    name when I asked you about a year ago --

5        A.     Right.

6        Q.     -- correct?

7        A.     Right.

8        Q.     Let's make sure I finish the

9    question.

10       A.     Uh-huh.

11       Q.     I'm sure you'd like to end it sooner

12   rather than later.  It will be a little easier

13   if we can speak one at a time.

14              Can you recall anything else about

15   your conversation that you just talked about

16   with Mr. Tulchin and Mr. Shenker?

17       A.     When we talked over the phone, they

18   just said they were going to send me a document

19   that would reflect what our conversations were.

20              And then we had a couple of

21   conversations about the language that was in

22   there, that I wanted some changes, and then

23   they delivered the document.

24       Q.     Okay.

25              When you had this first

Page 17

1                       F. Bartolotta

2   conversation --

3        A.    Uh-huh.

4        Q.    -- had you -- did you have a copy of

5   the Surety Agreement in front of you?

6        A.    No.

7        Q.    You eventually got a copy; correct?

8        A.    Yes.

9        Q.    In this first conversation, was there

10  any discussion with Mr. Shenker and Mr. Tulchin

11  about the distinction between a guarantee and

12  an indemnity under English law?

13       A.    Yes.  I was told there was a

14  distinction.

15       Q.    And when for the first time did you

16  learn that there was such a distinction in

17  English law?

18       A.    I had some brief understanding of the

19  distinction when I had been there on the Morgan

20  Stanley deal, because an issue came up; but I

21  did not really fully understand what the

22  difference was.

23       Q.    When you say "there on the Morgan

24  Stanley deal," what is the time frame for that?

25       A.    When I was there in London in March.

Page 18

1                        F. Bartolotta

2        Q.      In March of 2014?

3        A.      Yes.

4        Q.      Okay.

5                Had you had any understanding of the

6    distinction between a guarantee and an

7    indemnity under English law prior to that time?

8        A.      No.

9        Q.      Are you aware of -- well, let me ask

10   it this way.

11               Was there any other discussion of

12   English law in the conversation with

13   Mr. Shenker and Mr. Tulchin the first time

14   before you saw the Surety Agreement?

15       A.      I don't recall if it was before or

16   after, but there was a brief discussion about

17   the fact that they were different.

18       Q.      A guarantee and an indemnity are

19   different?

20       A.      Yes.

21       Q.      Okay.

22               Do you recall what the difference is?

23       A.      As I understand it, the indemnity

24   means that the parent would have backed them up

25   in any instance, including bankruptcy, and the

Page 19

1                          F. Bartolotta

2        guarantee might not include a backup when the

3        subsidiary went bankrupt.

4            Q.    Okay.

5                  Are you aware of the rule in English

6        law that when a landlord forfeits a lease or

7        terminates a lease because of the tenant's

8        default that there can be no damages for lost

9        future rent against the tenant?

10           A.    No.

11           Q.    You're not familiar with that rule?

12           A.    No.  No.

13           Q.    Are you familiar with the issues that

14       are in litigation as between Lehman Brothers

15       Holdings, Inc. and Canary Wharf at this time?

16           A.    No.  Other than what I've just said.

17                 (Bartolotta's Exhibit 2, EMail from

18            Mr. Tulchin to Frank Bartolotta, Bates

19            Stamp Nos. CW75954 to 58, was marked for

20            identification.)

21       BY MR. ISAKOFF:

22           Q.    We have marked as Exhibit 2 --

23       Exhibit 1 for the record is Bates stamp CW75982

24       to 84, and this one, No. 2, is CW75954 through

25       58.  And it is an email from Mr. Tulchin to

1                    F. Bartolotta

2    you, Mr. Bartolotta, saying, "Frank, As

3    discussed a few minutes ago, here is Schedule

4    44," and attaching to it a copy of Schedule 44

5    to the lease.

6              Do you see that?

7        A.    Yes.

8              MR. MASELLA:  Now, I don't think the

9        witness has reviewed the document yet, have

10       you?

11             THE WITNESS:  No.

12             MR. MASELLA:  Okay.  Take a moment to

13       review the document and let him know when

14       you're done.

15             MR. ISAKOFF:  Of course.

16       A.    (Document Review.)

17             Okay.

18       Q.    Do you recall receiving this?

19       A.    Yes.

20       Q.    And it says on the first page, "As

21   discussed a few minutes ago."

22             Do you recall whether this was after

23   only a single conversation you had with

24   Mr. Tulchin by this time?

25       A.    I believe this was after the first

Page 21

1                         F. Bartolotta

2       call, I asked to see the document since I

3       didn't really recall what was in the document.

4       And since it seemed to be the point of the

5       whole litigation, I wanted to just take a look

6       at it, so I requested it.

7            Q.    You referred to this a couple of

8       times during this deposition as an indemnity.

9            A.    Uh-huh.

10           Q.    Do you know that it's an indemnity

11      within the meaning of English law?

12           A.    I do not.  I only said that because

13      it says Indemnity.

14           Q.    In the title to Section 1 of this?

15           A.    Yes.

16           Q.    Okay.

17                 Do you see that in Section 10, which

18      is on the last page of this --

19           A.    Uh-huh.

20           Q.    -- it refers to a guarantor?

21           A.    Yes.

22           Q.    Okay.

23                 Did anybody point out that Section 10

24      uses the term "guarantor"?

25           A.    No.

Page 22

1                       F. Bartolotta

2          Q.    And if you look at Section 8, you see

3     that Section 8 refers to "this guarantee and

4     indemnity."

5               Did anybody point that out to you?

6          A.    No.

7          Q.    Do you have a recollection of anybody

8     back in 2001 referring to this as an indemnity

9     as distinguished from a guarantee or a surety

10    agreement?

11         A.    No, I don't.

12         Q.    Now, how about in 2000?

13         A.    No.

14         Q.    Did Mr. Iacobescu refer to it as an

15    indemnity?

16         A.    Oh, I don't recall.

17              (Brijesh P. Dave and Richard Katz

18         enter the deposition proceedings.)

19    BY MR. ISAKOFF:

20         Q.    But I assume Mr. Tulchin did?

21         A.    Yes.

22         Q.    Did anybody discuss with you Section

23    7?  I'm talking about Mr. Tulchin or anybody

24    from Sullivan & Cromwell discuss with you

25    Section 7 which provides what happens in the

Page 23

                    F. Bartolotta

1

2    event there's a forfeiture of the underlying

3    lease?

4         A.    We didn't even get into the details

5    of this document.  I just asked for this

6    document to look at it, and it was really more

7    about what was the language in my affidavit.

8         Q.    Okay.

9               Did anyone tell you that in English

10   law the word "indemnity" has two different

11   meanings quite different from one another?

12        A.    I don't recall having the specific

13   conversations about the difference.  To me, it

14   was all the same, guarantee, indemnity, it all

15   means the same thing.

16        Q.    Okay.

17        A.    I'm not an English lawyer either.

18        Q.    I appreciate that, sir.

19               (Bartolotta's Exhibit 3, EMail,

20        Bates No. CW75959, was marked for

21        identification.)

22   BY MR. ISAKOFF:

23        Q.    Mr. Bartolotta, we've marked as

24   Exhibit 3, CW75959, and it's just the next item

25   in the chronology of communications between you

Page 24

1                         F. Bartolotta

2       and Sullivan & Cromwell.

3                 Now, this says this is a follow-on to

4       the last email about -- it looks like about 20

5       minutes later, asking do you have time for a

6       quick call.

7                 Do you recall having a telephone

8       conversation?

9           A.   Yes.  We had several conversations

10      over the two or three-day period from when they

11      first contacted me to the time I delivered.

12          Q.   Do you happen to remember what the

13      subject of this was, having just gotten the

14      Surety Agreement?

15          A.   No.  We had several quick calls about

16      the drafts of the document.

17          Q.   Okay.

18                (Bartolotta's Exhibit 4, EMail from

19          Mr. Tulchin, Bates No. CW75960, was

20          marked for identification.)

21      BY MR. ISAKOFF:

22          Q.   We've marked as Exhibit 4, CW75960,

23      which is Mr. Tulchin's email to you two minutes

24      after the last exhibit and saying that he'll

25      call you.  I'm just doing this for

Page 25

1                          F. Bartolotta

2      completeness, really, because this doesn't say

3      much.

4          A.    Okay.

5          Q.    But do you recall that he then called

6      you?

7          A.    Uh-huh.  Yes.

8          Q.    Yes.  Okay.  All right.

9                (Bartolotta's Exhibit 5, EMail from

10               Mr. Tulchin, Bates No. CW75961 to 64, was

11               marked for identification.)

12     BY MR. ISAKOFF:

13         Q.    For the record, we've just marked

14     Exhibit 5 which is CW759961 to 64, which is an

15     email from Mr. Tulchin to you about an hour and

16     18 minutes after the last one, attaching what

17     looks like a draft of your affidavit.

18               Why don't you take whatever time you

19     need to review this and let me know if I've

20     accurately characterized it.

21         A.    (Document Review.)

22               Yes.

23         Q.    Okay.

24               Now, you might want to get out

25     Exhibit 1, which is the final --

Page 26

1                          F. Bartolotta

2        A.     Uh-huh.

3        Q.     -- because we may want to compare

4    different portions of this where there were

5    some changes.

6              Did you actually do any of the

7    drafting of the affidavit in the sense of doing

8    the word processing on it, or did you just

9    comment on drafts that Mr. Tulchin sent you?

10       A.     I commented on drafts.

11       Q.     Okay.

12             Did you dictate any of the affidavit

13    to Mr. Tulchin?

14       A.     No.  I just marked the document for

15    the revisions that I thought were appropriate,

16    or I might have even given it to him over the

17    phone.  I don't recall whether I sent anything

18    or just spoke to him over the phone, but I made

19    revisions to the draft.

20       Q.     Okay.

21             But you didn't draft any of this --

22       A.     No.

23       Q.     -- in the first instance?

24       A.     No.

25       Q.     Okay.

Page 27

1                        F. Bartolotta

2                Now, if you'll look at paragraph 3 of

3       Exhibit 5, it says, the second sentence says,

4       "During the course of negotiations, I reported

5       to Mark Marcucci in New York and all points of

6       a material commercial significance went back to

7       New York."

8                Have I read it accurately?

9       A.      Yes.

10      Q.      Okay.

11               And if you'll notice on paragraph 3

12      of the final takes much of that out.

13               Was that at your request?

14      A.      Yes.

15      Q.      What was it -- what was the reason

16      why you asked for that to be changed?

17      A.      The reason was that I didn't think my

18      reporting to Mr. Marcucci was relevant to the

19      point, because although technically I reported

20      to him, I reported both locally and to him.

21      And he didn't have anything specific in terms

22      of the negotiations of this document and in

23      many ways didn't really involve himself in the

24      negotiation of the documents.

25               I would negotiate things, send them

Page 28

1                        F. Bartolotta

2      back, and say this is where I'm going, but most

3      of the hard business decisions were made

4      jointly with London and New York.

5            Q.      Okay.

6                    In the final Exhibit 1, where it

7      says, "The question of whether Lehman itself,

8      the parent in New York, would extend an

9      indemnity went back to Lehman at its

10     headquarters in New York," was that word

11     "indemnity" your word or Mr. Tulchin's?

12           A.      It was in the draft that was sent to

13     me and I agreed with it because that's what the

14     document said.

15           Q.      And that that's what the word on the

16     heading?

17           A.      Yes.

18           Q.      -- of Section 1 of the --

19           A.      Yes.

20           Q.      Let me finish my question.

21                   That's because the heading of

22     Section 1 of Schedule I used the word

23     "indemnity"; correct?

24           A.      Correct.

25           Q.      And for no other reason; correct?

Page 29

1                         F. Bartolotta

2          A.     Correct.

3                 MR. MASELLA:  Objection.

4                 You may answer.

5      BY MR. ISAKOFF:

6          Q.     Okay.

7                 If you'll turn to the second page of

8      the draft affidavit that is part of Exhibit 5,

9      it begins, "I recall the negotiations around

10     the provisions in the lease dealing with the

11     indemnity to be given by the parent company,

12     Lehman."

13                Is the word "indemnity" there used,

14     so far as you know, for the same reason that it

15     was in the paragraph we just discussed,

16     paragraph 3?

17         A.     Yes.

18         Q.     And that was in the draft as you got

19     it; correct?

20         A.     Yes.

21         Q.     And then that sentence continues,

22     where it says, "The indem -- I recall the

23     negotiations around the provisions in the lease

24     dealing with the indemnity to be given by the

25     parent company, Lehman, because we fought very

Page 30

F. Bartolotta

1

2      hard for several weeks to limit those

3      provisions to those of the guarantor under

4      English law."

5              Do you see that?

6      A.    Yes.

7      Q.    And in the final, looking at the

8      beginning of paragraph 5 of Exhibit 1, it says,

9      "I recall the negotiations around the

10     provisions in the lease dealing with the

11     indemnity to be given by the parent company,

12     Lehman, because we fought very hard to limit

13     liability to the English subsidiary."

14     A.    Uh-huh.

15     Q.    Was that change made at your request?

16     A.    Yes.

17     Q.    Why did you request that change?

18     A.    Because I thought the way it was

19     drafted was leading into the argument of what's

20     an indemnity or a guarantee.  And I wanted to

21     describe it as I understood it, which is

22     basically it's a full obligation of the parent

23     to back up the subsidiary in any event.

24              So I didn't want to get into a legal

25     argument.  I didn't feel I was, you know, I had

Page 31

1                        F. Bartolotta

2     the knowledge to do that.

3          Q.    Right.

4                And, in fact, you had no recollection

5     of there being any fight to limit the

6     provisions to those of the guarantor under

7     English law; correct?

8          A.    No.  I had recollection of their --

9     of us trying to avoid any liability of the

10    parent.

11         Q.    Right.

12               But you recall the point of

13    contention being was whether Lehman would sign

14    the Surety Agreement at all; correct?

15         A.    Yes.

16         Q.    Okay.

17               And so far as you know, there was no

18    fight to limit the provisions of that Surety

19    Agreement to those of the guarantor under

20    English law?

21         A.    The fight was to prevent to limit the

22    liability to the English subsidiary.  Just what

23    I said.

24         Q.    Right.

25               But this sentence that was given to

                        F. Bartolotta

1   you in draft was without basis so far as your

2   knowledge is concerned; correct?

3       A.    No.  You're putting words in my

4   mouth.  I said I didn't like the way it was

5   worded.  I changed it to this way because this

6   was my understanding of what we were trying to

7   do, was trying to avoid the parent having any

8   liability.

9       Q.    Okay.

10          At this point in your discussions

11  with Sullivan & Cromwell, you didn't tell them

12  that Lehman had fought to limit the provisions

13  to those of the guarantor under English law

14  because you didn't even know what that meant

15  back at the time of the negotiations; correct?

16      A.    No, I wouldn't have used those words.

17      Q.    Okay.

18          Now, paragraph 5 goes on to say after

19  Canary Wharf's position was immovable, it says,

20  "George Iacobescu, CEO of Canary Wharf,

21  insisted on a direct contractual obligation

22  from Lehman that" --

23          MR. TULCHIN:  Can I ask you if you're

24          reading from the draft or the final --

Page 33

1                    F. Bartolotta

2             MR. ISAKOFF:  Draft.

3             MR. TULCHIN:  -- because it's not

4        clear from the record.

5             MR. ISAKOFF:  I'm sorry, I'm reading

6        from paragraph 5 of Exhibit 5.  Thank you.

7    BY MR. ISAKOFF:

8        Q.   It says, George Iacobescu, CEO of

9    Canary Wharf, insisted on a direct contractual

10   obligation from Lehman that could be relied on

11   whatever happened to LBL and have certainty

12   that Lehman would be required to pay the rents

13   and other amounts due regardless of

14   enforceability against LBL or LBL's condition

15   or status."

16           Are those words that you used in your

17   conversations with Mr. Tulchin?

18       A.   I don't recall if those were my

19   direct -- those are my exact words.  We had an

20   open conversation about what was the setting of

21   what happened.  I don't recall if those were my

22   exact words.

23       Q.   Okay.

24           Now, if you look at paragraph 5 in

25   Exhibit 1, which is the final version, it says,

Page 34

F. Bartolotta

1    "After, however, Canary Wharf's position was

2    immovable," it says, "George Iacobescu, CEO of

3    Canary Wharf, insisted on a full indemnity."

4    Let me just stop there.

5         Do you have a recollection of him

6    using those words back in 2000 or 2001?

7    A.    No.  My use of the word is simply

8    because when I saw the document it said

9    "indemnity," and so that's what I called it.

10   Q.    Okay.

11        Then it adds, "I.e., a direct

12   contractual obligation from the parent, Lehman,

13   that could be relied on no matter what happened

14   to LBL, the English subsidiary."

15        Were those words you used with

16   Mr. Tulchin?

17   A.    Yes.  Because that was my

18   understanding.  There was an absolute

19   obligation of the parent, whether you called it

20   guarantee or indemnity, that's what it really

21   was, a direct full obligation of the parent to

22   back up the subsidiary.

23   Q.    Okay.

24        Now, do you know whether, in the

Page 35

                    F. Bartolotta

1    event a landlord forfeits a lease and the

2    tenant is no longer obligated to pay rents,

3    whether the guarantor, a guarantor is obligated

4    to pay those rents?

5        A.    Under --

6            MR. MASELLA:  I'm going to object to

7        the hypothetical.

8            You may answer.

9        A.    Under English law?

10       Q.    Yes.

11       A.    No, I'm not an English lawyer.  I

12   don't.

13       Q.    Okay.

14           Now if you'll compare paragraph 6 of

15   Exhibit 5 with paragraph 6 of Exhibit 1, there

16   are some figures that appear in the Exhibit 5,

17   which is the draft, but don't appear in the

18   final.

19           Was it your idea to take those out?

20       A.    Yes.

21       Q.    And what was the reason for that?

22       A.    Because I couldn't recall the exact

23   numbers myself.  I had a good idea what they

24   were, but I couldn't recall and I didn't want

Page 36

F. Bartolotta

1    to go back and read the lease documents again

2    to see if the numbers were accurate.

3            The only one I really remembered was

4    the rent-free period.

5        Q.    There's a sentence at the end of

6    paragraph 6 in Exhibit 1, the final, which does

7    not appear at least in those exact words in

8    Exhibit 5.  And they say, "These upfront

9    payments and obligations assumed by Canary

10   Wharf appeared to make Canary Wharf even more

11   determined to obtain the indemnity."

12           First of all, is the word "indemnity"

13   used there for the same reason it was in

14   paragraphs --

15       A.    Everywhere in this --

16       Q.    -- 3 and 5?

17       A.    Sorry.  Everywhere in this document I

18   used the word because that's what the document

19   said.  To make it easy to go back and forth.

20       Q.    And was this something that you, this

21   sentence that I just read from Exhibit 1, is

22   that something that you recall saying to

23   Mr. Tulchin?

24       A.    Yes.

25

1                      F. Bartolotta

2        Q.    Okay.

3             So the point being that because

4    Canary Wharf was making various commitments on

5    its side, it wanted to get the Surety Agreement

6    that it had drafted signed by Lehman Brothers

7    Holdings, Inc.; correct?

8        A.    Well, that's not what this sentence

9    is saying.  What this sentence says, okay, is

10   during the course of the negotiations we were

11   asking for more and more and more.  And my

12   discussions with George Iacobescu was, it was

13   getting to the point where we were asking for

14   much more than we had started with.  And he was

15   becoming more insistent that there was no way

16   this deal could go through without this

17   indemnity being delivered because we were

18   asking for much, much more than we had started

19   negotiations on.

20       Q.    Okay.

21             When you refer to the indemnity,

22   you're referring to Schedule 4?

23       A.    Yes.

24       Q.    And so far as you know, there was

25   nothing about the terms of Schedule 4 that

Page 38

1                    F. Bartolotta

2    changed during the negotiations, even while

3    Canary Wharf was making other concessions;

4    correct?

5        A.    I wouldn't know because I wasn't

6    involved in the negotiation of the document.

7        Q.    Okay.

8             (Bartolotta's Exhibit 6, EMail from

9        Mr. Tulchin, Bates No. CW75965 to 68, was

10        marked for identification.)

11   BY MR. ISAKOFF:

12        Q.    We've marked, Mr. Bartolotta, as

13   Exhibit 6, CW75965 to 68, which is another

14   email from Mr. Tulchin to you on March 27th,

15   which is the day after Exhibit 5 that we just

16   looked at, attaching a new version of the

17   affidavit; correct?

18        A.    Yes.

19        Q.    If you'll turn back to Exhibit 5, I'd

20   like to compare that with this one, if we

21   could.

22             Exhibit 5, we already looked at this

23   language in paragraph 3 which in that draft

24   says, "During the course of negotiations, I

25   reported to Mark Marcucci in New York and all

Page 39

1                          F. Bartolotta

2      points of a material commercial significance

3      went back to Lehman in New York."

4              Do you see that?

5      A.    Yes.

6      Q.    And then in this version, it says,

7      "During the course of negotiations Lehman

8      people in London were involved in the decisions

9      on most issues but the question of whether

10     Lehman itself, the parent in New York, would

11     extend an indemnity went back to Lehman at its

12     headquarters in New York."

13             MR. MASELLA:  I'm sorry, you've lost

14        me.  Which exhibit are we talking about?

15             MR. ISAKOFF:  6.

16             MR. MASELLA:  You want to compare 1

17        and 6 or 1 and 5?

18             MR. ISAKOFF:  5 and 6.

19             MR. MASELLA:  5 and 6.

20             MR. ISAKOFF:  I apologize.

21             MR. MASELLA:  That's fine.  Okay.  So

22        paragraph 3 in 5 and 6.

23     BY MR. ISAKOFF:

24     Q.    And the question is, is this a change

25     that you requested between 5 and 6?

Page 40

1                    F. Bartolotta

2        A.    Okay.

3              MR. MASELLA:  So take a look at

4        paragraph 3 in 5 and 6.

5        A.    Yes.

6        Q.    And why did you request this?

7        A.    Simply because it seemed to me that

8    it made it sound -- the first draft made it

9    sound like Mark Marcucci was the

10   decision-maker.  And, in reality, he was not

11   really the decision-maker.  It was a

12   combination of local London people that I

13   reported to, other people in New York, and

14   Mr. Marcucci, to my knowledge, had nothing to

15   do with the document, the negotiation of the

16   indemnity.

17              (Bartolotta's Exhibit 7, EMail from

18        Mr. Tulchin, Bates No. CW75969 to 72, was

19        marked for identification.)

20   BY MR. ISAKOFF:

21        Q.    We've marked as Exhibit 7, CW75969 to

22   72, which is also an email to you from

23   Mr. Tulchin on March 27 attaching a new version

24   of the affidavit saying he -- that "I've made

25   the one change you requested and the final

Page 41

1                    F. Bartolotta

2    version is attached."

3             And the one -- I would just ask you

4    to compare the very last line of Exhibits 6 and

5    7.

6             MR. MASELLA:  6 and 7.  That's one.

7             THE WITNESS:  That's 7.

8             MR. MASELLA:  This is 6.  So you want

9       him to compare the last line of 6 and 7;

10      correct?

11      A.    Yes, got it.

12            MR. TULCHIN:  The last line of the

13      last paragraph?

14            MR. ISAKOFF:  Yes.

15            MR. MASELLA:  The last paragraph or

16      the last line?

17            MR. ISAKOFF:  I'm looking at the last

18      line of the last paragraph.

19            MR. MASELLA:  So this one with this

20      one.

21      A.    Okay.

22      Q.    And in 6, it says, "In the end, Mark

23   Marcucci, the Lehman executive in New York

24   responsible for this decision, accepted that

25   position and the lease included the indemnity

Page 42

F. Bartolotta

1
2    from Lehman that George Iacobescu of Canary
3    Wharf demanded," and in Exhibit 7 that sentence
4    is shortened to say, "In the end Lehman
5    accepted that position and the lease included
6    the indemnity from Lehman."
7          And I would ask, was that a change
8    you requested?
9    A.    Yes.
10   Q.    And what was the reason you requested
11   the change?
12   A.    The same reason I said before in the
13   other paragraph, and that is that Mark
14   Marcucci, to my knowledge, was not making the
15   decision on the delivery of this document.
16   This was made at a much senior, more senior
17   level.
18   Q.    At Lehman Treasury?
19   A.    Yes.
20   Q.    Okay.
21          And the term "indemnity" here is the
22   same as used throughout, is for convenience
23   because that's what the section heading of
24   paragraph 1 said?
25   A.    Yes.

Page 43

F. Bartolotta

1
2       Q.   I'd ask you to hang on to Exhibit 7
3    while we look at Exhibit 8.
4       A.   Okay.
5            (Bartolotta's Exhibit 8, EMail from
6       Mr. Tulchin, Bates No. CW75973 to 76, was
7       marked for identification.)
8    BY MR. ISAKOFF:
9       Q.   Marked as Exhibit 8, CW75973 to 76,
10   another email from Mr. Tulchin to you on
11   March 27, 2014, attaching another version of
12   the affidavit.
13           And I would ask you, again, to turn
14   to the last page of Exhibit 7 and the last page
15   of Exhibit 8 where the word "absolute" seems to
16   be substituted for "bullet proof."
17           Was that a change that you requested?
18      A.   Yes.
19      Q.   Why?
20      A.   I just didn't like "bullet proof" in
21   quotes.
22      Q.   Okay.
23           And do you recall whether there were
24   any further changes after this?
25      A.   I don't think so.

Page 44

1               F. Bartolotta

2               (Bartolotta's Exhibit 9, EMail from

3          Mr. Tulchin, Bates No. CW75977, was

4          marked for identification.)

5     BY MR. ISAKOFF:

6          Q.    Exhibit 9 is CW75977, which is

7     another email from Mr. Tulchin to you telling

8     you who the notary is going to be.

9               Do you see that?

10         A.    Yes.

11         Q.    And saying that the notary is going

12    to be there at around 3:00 o'clock that

13    afternoon, if you look down to the --

14         A.    Yes.

15         Q.    And did the notary show up then?

16         A.    I'm not sure exactly the time, but he

17    did show up that afternoon, yes.

18         Q.    Did you ever find out whether there

19    was any urgency about your signing this

20    affidavit?

21         A.    No, I didn't ask.

22         Q.    Did you ever think about calling

23    Lehman or any of its representatives before you

24    signed this?

25         A.    No.

1          F. Bartolotta

2          (Bartolotta's Exhibit 10, EMail

3          dated March 27, 2014, Bates No. CW75979,

4          was marked for identification.)

5    BY MR. ISAKOFF:

6          Q.    Exhibit 10 is CW75979.  It's an email

7    from you to Mr. Iacobescu on March 27, 2014 at

8    3:02 p.m. where you say in the second

9    paragraph, "With regard to the Lehman

10   litigation, I will be signing the affidavit

11   this afternoon and delivering it to S&C."

12          Do you see that?

13          A.    Yes.

14          Q.    Do you recall how much after this you

15   signed the affidavit?

16          A.    No, I don't.

17          Q.    Okay.

18          It starts off, it says, "Thanks again

19   for your assistance on the Heintz transaction.

20   It looks like we're done but for the signatures

21   on the document."

22          What was that in reference to?

23          A.    Morgan Stanley was selling its

24   building in Canary Wharf to Heintz, and there

25   were two deeds of release that Canary Wharf

1                          F. Bartolotta

2      needed to deliver in connection with the

3      transaction.  And we were trying to close very

4      quickly, and I asked George if he could get his

5      attorney to act on it quickly as we wanted to

6      deliver the documents to Heintz in Texas that

7      day or the day after.  And his attorney just

8      couldn't get a hold of him.  So I had called

9      George and said could you please try and get

10     your attorney to sign these.  They were already

11     agreed to.  It was just a matter of getting

12     them signed and delivered.

13          Q.    Is this the same transaction you were

14     discussing with Mr. Iacobescu when you first

15     spoke with him about speaking to Sullivan &

16     Cromwell lawyers?

17          A.    No.  They're two different things.

18                When I went to London, I had lunch

19     with George, talked to him about the Morgan

20     Stanley deal.  We mentioned the Lehman

21     litigation, but they were two unrelated,

22     completely unrelated things.

23          Q.    Okay.

24                Last line of this -- actually, before

25     we get there.

Page 47

1                         F. Bartolotta

2       A.      Uh-huh.

3       Q.      You say, "Small world.  I hadn't

4   worked with Joe Shenker since 1982 when we did

5   the first commercial paper financing of real

6   estate."

7               Had you spoken with Mr. Shenker since

8   1982?

9       A.      I don't think so, no.  In fact, I

10  didn't even remember who he was when he first

11  called me.

12      Q.      Okay.

13              And then the next paragraph says,

14  "Hopefully, the next time I come to London we

15  can enjoy some time together with our wives at

16  Harry's Bar without having to discuss business

17  issues."

18      A.      Yes.

19      Q.      Had you met Mr. Iacobescu's wife

20  before?

21      A.      Oh, yes.  Yes.

22      Q.      On how many occasions?

23      A.      Over the -- from 1990 to 2005,

24  numerous times, you know, we went out socially.

25      Q.      Okay.

Page 48

1                         F. Bartolotta

2              So he's a social friend of yours?

3       A.    Yes, I would call him a friend.

4       Q.    Okay.

5              (Bartolotta's Exhibit 11, Series of

6       EMails, Bates Nos. CW75980 to 81, was

7       marked for identification.)

8   BY MR. ISAKOFF:

9       Q.    Mr. Bartolotta, Exhibit 11 is CW75980

10   to 81, which is an email chain also on

11   March 27th between you and Sullivan & Cromwell

12   lawyers, including Mr. Tulchin and Mr. Shenker.

13             Have I correctly characterized the

14   document?

15      A.    Yes.

16      Q.    Did you ever get together with

17   Mr. Shenker?

18      A.    No.

19             MR. ISAKOFF:  All right.  Why don't

20      we take a break?

21             THE WITNESS:  Okay.

22             THE VIDEOGRAPHER:  The time is 2:52.

23      We're going off the record.

24             (Recess taken from 2:52 p.m. to

25      3:09 p.m.)

Page 49

1                          F. Bartolotta

2                THE VIDEOGRAPHER:  The time is 3:09.

3        We're back on the record.

4    BY MR. ISAKOFF:

5        Q.    Mr. Bartolotta, do you still have

6    Exhibit 10 in front of you.  It's the email

7    from you to Mr. Iacobescu dated March 27th.

8                MR. MASELLA:  There it is.

9    BY MR. ISAKOFF:

10       Q.    I know I asked you about this before

11   the break and I may have misunderstood your

12   answer.  The question I have is, the Heintz

13   transaction that this refers to, is that

14   something that you had been talking to

15   Mr. Iacobescu about in mid March of this year

16   in London?

17       A.    I had spoken to him about it before

18   that time and then again when I went to London,

19   I talked to him about it, yes.

20       Q.    Okay.

21             Were there any other things connected

22   to Morgan Stanley that you were talking to

23   Mr. Iacobescu about in and about March of this

24   year?

25       A.    We talked about things that we did

Page 50

1                    F. Bartolotta

2    together when I was with Morgan Stanley, we

3    talked about business associates that were

4    looking for jobs, we talked about a lot of

5    different things.

6        Q.    Is there any connection that you know

7    of between Morgan Stanley and Canary Wharf in

8    terms of direct or indirect ownership or board

9    seats?

10       A.    Yes.  Morgan Stanley has some

11   interest in Canary Wharf, and I don't recall

12   what exactly it was, but there was an interest

13   in Canary Wharf through Morgan Stanley.

14       Q.    Does Morgan Stanley have anybody on

15   Canary Wharf's board?

16       A.    I don't know.

17       Q.    Do you know whether Canary Wharf has

18   any members on the Songbird board?

19       A.    I don't know.

20       Q.    Okay.

21             Do you know who Songbird is?

22       A.    I know the name, yes.

23       Q.    Do you know that Songbird has an

24   ownership interest in Canary Wharf?

25       A.    Yes.

Page 51

F. Bartolotta

1

2      Q.    You recall that you and I spoke on

3      the telephone a few times, a couple of times

4      last year?

5      A.    Yes.

6      Q.    Okay.

7            Do you recall telling me that the

8      word "indemnity" as it relates to the Surety

9      Agreement didn't ring a bell?

10     A.    No, I don't recall that.

11     Q.    Are you bearing the costs of your own

12     counsel here today?

13     A.    I signed an engagement letter, yes.

14     Unless you want to pay for it.

15     Q.    I don't think so.

16           MR. MASELLA:  We'll take all

17           reasonable offers.

18           MR. ISAKOFF:  Well, I don't have any

19           further questions at this time.

20

21     EXAMINATION BY MR. TULCHIN:

22     Q.    Mr. Bartolotta, hi, I'm David

23     Tulchin.  As you know, I represent Canary Wharf

24     and I do have some questions for you, if I may.

25           I'm going to ask you first, sir, if

Page 52

1                      F. Bartolotta

2      you would, to please try to find Exhibit 1, the

3      affidavit that you executed.

4               Do you have that, sir?

5          A.    Yes.

6          Q.    And could you first look at the third

7      page of Exhibit No. 1.

8          A.    Yes.

9          Q.    Do you see a signature there?

10         A.    Yes.

11         Q.    Above the typed words "Frank

12     Bartolotta," is that your signature?

13         A.    Yes.

14         Q.    Did you sign this affidavit in front

15     of a Notary Public on March 27, 2014?

16         A.    Yes.

17         Q.    Now, looking at the first page of

18     Exhibit 1, the first sentence of paragraph 1

19     starts by saying, "I am a retired nonpracticing

20     member of the bar of the State of New York."

21              Do you see that, sir?

22         A.    Yes.

23         Q.    That was true on the day you signed

24     this?

25         A.    Yes.

Page 53

1                        F. Bartolotta

2        Q.    It's still true today?

3        A.    Yes.

4        Q.    When you signed Exhibit 1, your

5   affidavit, on March 27th, did you appreciate

6   the significance of swearing to facts in an

7   affidavit?

8              MR. ISAKOFF:  Objection to form.

9        A.    Yes.

10       Q.    Could you answer, please, sir.

11       A.    Yes.

12       Q.    Did you understand that the affidavit

13   might be used in a lawsuit?

14       A.    Yes.

15       Q.    Did you understand at the time, on

16   the day you signed this, the importance of

17   being sure that the facts that you set forth in

18   the affidavit were correct?

19       A.    Yes.

20             MR. ISAKOFF:  Objection to form.

21             MR. MASELLA:  You may answer.

22       A.    Yes.

23       Q.    Did you understand at the time you

24   signed on March 27th that you were sworn to

25   tell the truth?

Page 54

1              F. Bartolotta

2     A.    Yes.

3     Q.    Did you understand that the affidavit

4  might be used as evidence in a legal

5  proceeding?

6     A.    Yes.

7     Q.    At the time you signed on March 27th,

8  were you confident that everything in this

9  affidavit is truthful?

10         MR. ISAKOFF:  Object to form.

11         MR. MASELLA:  You may answer.

12    A.    Yes.

13    Q.    As of today, May 7, 2014, are you

14  confident that everything in Exhibit 1 is the

15  truth?

16         MR. ISAKOFF:  Object to form.

17         MR. MASELLA:  You may answer.

18    A.    Yes.

19    Q.    Now, let me ask you -- we'll come

20  back to Exhibit 1, but I know you have all

21  these papers in front of you.  But if it isn't

22  too much trouble, can I ask you,

23  Mr. Bartolotta, to find Exhibit 5.

24    A.    Yes.

25    Q.    And I think you said during your

Page 55

                        F. Bartolotta

1    direct examination that this was the first

2    draft that you received of what became your

3    affidavit; is that right, the attachment to the

4    first page of Exhibit 5?

5            MR. MASELLA:  So the question is, is

6        this -- is Exhibit 5 the first draft that

7        you received.  Is that the question, sir?

8            MR. TULCHIN:  Yes.

9    A.    Yes.

10   Q.    All right.

11           Now, on the first page of Exhibit 5,

12   Mr. Bartolotta, the email starts by saying

13   this, "Dear Frank, this is what I prepared

14   based upon our discussion.  And then it says,

15   "You should, of course, feel free to make any

16   changes.  We, of course, want something that is

17   completely accurate."

18           Do you see that?

19   A.    Yes.

20   Q.    Did you understand when you received

21   this on March 26, 2014, that the lawyers from

22   Sullivan & Cromwell wanted to be sure that any

23   affidavit that you signed was in your judgment

24   and based on your recollection, completely

Page 56

                    F. Bartolotta

1

2   accurate?

3            MR. ISAKOFF:  Objection.  Leading and

4       calls for speculation.

5            MR. MASELLA:  You may answer.

6       A.    Yes.

7       Q.    Now, as far as you know,

8   Mr. Bartolotta, did this first draft come as a

9   result of a discussion that you and I had in

10  which you provided me with your recollection of

11  the facts?

12           MR. ISAKOFF:  I object to the form.

13           MR. MASELLA:  You may answer.

14      A.    Yes.

15      Q.    Was there anything in this first

16  draft that appeared to you to be some effort by

17  me or anyone else at the firm of Sullivan &

18  Cromwell, LLP, to try to put words in your

19  mouth?

20           MR. ISAKOFF:  Objection.

21           MR. MASELLA:  You may answer.

22      A.    Can you ask that question again --

23      Q.    Sure.

24      A.    -- because that's making me try to

25  think of what you were thinking.

Page 57

1                    F. Bartolotta

2        Q.     Okay.

3        A.     And I don't think I can do that.

4        Q.     I understand.  Let me go back.

5               When you got this first draft,

6    Bartolotta Exhibit 5, you under -- sorry,

7    withdraw that.

8               The first draft, Exhibit 5, came

9    after you and I had a discussion; correct?

10       A.     Yes.

11       Q.     And is it true that that discussion

12   went on for some time?

13       A.     Yes.

14       Q.     Do you recall that I asked you to

15   provide me with your recollection of what

16   happened?

17       A.     Yes.

18       Q.     Do you recall that in the

19   conversation you did your best to provide me

20   with your recollection?

21       A.     Yes.

22       Q.     When you got this draft, did it

23   appear to you to come out of left field or did

24   it appear to be an effort to reflect what you

25   and I had talked about?

Page 58

1                    F. Bartolotta

2         MR. ISAKOFF:  Object to form.  It

3    assumes there is only two possibilities.

4         MR. MASELLA:  You may answer.

5    A.    It appeared to me to be a reflection

6    of our discussion.

7    Q.    Now, with respect to the drafts that

8    followed this, did the changes that were made

9    on the successive drafts, including the changes

10   that Mr. Isakoff pointed out to you on direct

11   examination, did those changes get made because

12   you asked for them to be made?

13   A.    Yes.

14   Q.    Now, can I ask you, Mr. Bartolotta,

15   to go back to Exhibit 1.  This is the executed

16   affidavit.

17        And could you look, please, sir, on

18   the paragraph 5 on the second page.  I'm just

19   going to read it and then I want to ask you

20   some questions.

21        Paragraph 5 says this, I recall the

22   negotiations around the provisions in the lease

23   dealing with the indemnity to be given by the

24   parent company Lehman because we fought very

25   hard to limit liability to the English

1                          F. Bartolotta

2    subsidiary.  However Canary Wharf's position

3    was immovable.  George Iacobescu, CEO of Canary

4    Wharf, insisted on a full indemnity, i.e., a

5    direct contractual obligation from the parent,

6    Lehman, that could be relied on no matter what

7    happened to LBL (the English subsidiary).  He

8    insisted that Lehman would be required to pay

9    the rents and other amounts due regardless of

10   whether LBL remained obligated to pay."

11              Now that's the full paragraph 5;

12   correct?

13       A.    Yes.

14       Q.    Can you tell me, sitting here today

15   May 7, 2014, what you remember about the

16   negotiations that pertain to what's said in

17   paragraph 5?

18              MR. ISAKOFF:  Objection.  Lack of

19         foundation.

20              MR. MASELLA:  You may answer.

21       A.    During the negotiations, this

22   indemnity, as it's called, was on the table and

23   I objected to it because I did not want to have

24   the U.S. entity be responsible.

25              Canary Wharf insisted that they would

Page 60

1                    F. Bartolotta

2    not complete the deal without this document.

3    At that point, because I was working on many

4    things and was not going to be my decision I

5    was booted back to New York for consideration

6    on the premise that Canary Wharf would not

7    complete the transaction without delivery of

8    that document.

9         It was then negotiated in New York

10   and delivered back and slipped into the

11   documents as is.  So that reflects my

12   understanding, I could not complete the deal

13   without that document being delivered.

14        Whether the words were changed or

15   not, I do not know because I did not negotiate

16   the document, but the document was ultimately

17   delivered to Canary Wharf's satisfaction and

18   the deal was completed.

19        Q.    Do you recall Mr. Iacobescu -- well,

20   strike that.

21             Let me start with this.  Did you

22   speak directly to Mr. Iacobescu about this

23   subject?

24        A.    Yes.

25        Q.    And you recall those conversations?

Page 61

1                        F. Bartolotta

2        A.    Yes.

3        Q.    Do you recall Mr. Iacobescu saying to

4    you, in words or substance, that Canary Wharf

5    would not do the deal without a direct

6    contractual obligation from the parent in

7    New York --

8        A.    Yes.

9             MR. ISAKOFF:  Wait a minute.  Let him

10            finish the question.  Then let me object.

11   BY MR. TULCHIN:

12        Q.    -- that could be relied on, no matter

13    what happened to the English subsidiary?

14             MR. ISAKOFF:  I object to the form.

15             MR. MASELLA:  You may answer.

16        A.    Can you ask the question again

17    because I lost track when I answered.

18        Q.    Sure.

19             Do you recall Mr. Iacobescu in your

20    conversation saying that Canary Wharf would not

21    do the deal unless the parent in New York was

22    on the hook to pay the rent no matter what

23    happened to the English subsidiary?

24             MR. ISAKOFF:  I object to the form.

25             MR. MASELLA:  You may answer.

Page 62

                    F. Bartolotta

1

2      A.    Yes.

3      Q.    Do you recall Mr. Iacobescu saying

4   that Canary Wharf would only do the deal if it

5   had complete and absolute assurance from the

6   parent in New York that it would pay no matter

7   what might become of the sub in England?

8           MR. ISAKOFF:  I object to the form.

9           MR. MASELLA:  You may answer.

10     A.    Yes.

11     Q.    What, if anything, do you recall him

12  saying along those lines?

13     A.    You're killing me with this deal.  I

14  can't give you anymore.  I have to have a

15  guarantee from the parent that's absolute and

16  complete.

17     Q.    Do you remember the word "guarantee"

18  as opposed to "indemnity"?

19     A.    You know, to me -- I'm not an English

20  lawyer to me it means the same thing; all

21  right?  To me, all I know is that the parent

22  was being asked to back up the subsidiary

23  whether the subsidiary was paying, in existence

24  or anything.  It was an absolute hell or high

25  water and, again, I'll say it, guarantee, that

Page 63

1              F. Bartolotta

2    the parent was going to be there if the

3    subsidiary was not.

4        Q.    Do you recall any discussion between

5    you and Mr. Iacobescu about whether the parent

6    had to be obligated even if the sub went

7    bankrupt?

8            MR. ISAKOFF:  I object to the form.

9        Calls for a legal conclusion.

10           MR. MASELLA:  You may answer.

11       A.    I don't recall specifically that.

12   What I do recall is that I could not complete

13   the deal without delivery of this document,

14   which meant a full backup of the English

15   subsidiary.  I don't remember whether we

16   actually used the term "bankrupt" or not.

17       Q.    When you say "full backup of the

18   English subsidiary," I think those were your

19   words a minute ago.

20       A.    Right.

21       Q.    The full backup was coming from who?

22       A.    From LBHI, the parent.

23       Q.    The parent in New York?

24       A.    Yes.

25       Q.    Now, could I ask you to look again at

Page 64

1                    F. Bartolotta

2    paragraph 5 of Exhibit 1.  And I want to just

3    concentrate on the third sentence of the four

4    sentences in that paragraph.  It's the one that

5    starts, "George Iacobescu, CEO of Canary

6    Wharf."

7              Do you see that?

8    A.    Yes.

9    Q.    It goes on to say, "Insisted on a

10   full indemnity-i.e., a direct contractual

11   obligation from the parent, Lehman, that could

12   be relied on no matter what happened to LBL,

13   the English subsidiary."

14             Do you see that?

15   A.    Yes.

16   Q.    In the very first conversation that

17   you and I had, do you recall saying in words or

18   substance what appears in that sentence?

19             MR. ISAKOFF:  Objection.  Leading and

20        vague.

21             MR. MASELLA:  You may answer.

22   A.    Yes.  This reflects the spirit of

23   what I said.  What I said was we could not go

24   ahead without getting delivery of that

25   document, and that he expected the parent to be

Page 65

1                        F. Bartolotta

2    able to stand in no matter what happened to the

3    subsidiary.

4        Q.    So in Exhibit 1 when you used the

5    word "indemnity," and you'll see it in the

6    sentence we were just looking at the third

7    sentence of paragraph 5, did you mean that word

8    "indemnity" to be defined by what follows it

9    after the dash, i.e., what you say there?

10            MR. ISAKOFF:  Objection.  Form.

11       Leading -- misleading and mischaracterizes

12       all of his testimony.

13            MR. MASELLA:  You may answer.

14       A.    Again, the word "indemnity" I

15   continued to use because that's what the

16   document was called.  The that is describes to

17   me what the intent was, that there be a

18   complete contractual obligation to back up the

19   subsidiary.

20            Whether you call it indemnity or

21   guarantee, it didn't matter to me.  The concept

22   is, it's a direct contractual obligation from

23   the parent that could be relied upon no matter

24   what happened to the subsidiary.

25       Q.    In the first conversation that you

Page 66

1                       F. Bartolotta

2       and I ever had, did you say that to me in words

3       or substance?

4               MR. ISAKOFF:  Objection.  Vague.

5               MR. MASELLA:  You may answer.

6       A.    I don't recall the exact words I used

7       with you, but I can tell you that I'm clear

8       that I said that we could not do the deal

9       without a complete backup from the parent.

10      Q.    And that's your recollection of what

11      Mr. Iacobescu told you in the negotiations; is

12      that right?

13      A.    Yes.

14              MR. ISAKOFF:  Objection.  Leading.

15  BY MR. TULCHIN:

16      Q.    Now, could you look, sir, at

17      paragraph 7.  Again --

18              MR. MASELLA:  Did you get his answer?

19      I'm sorry.  Go ahead.  My apologies.

20  BY MR. TULCHIN:

21      Q.    We're looking at paragraph 7 of

22      Exhibit 1.  It starts at the bottom of page 2

23      and it goes on to the top of page 3.

24              Do you have it, sir?

25      A.    Yes.

Page 67

1                    F. Bartolotta

2        Q.    And you see the words there, you

3    start by saying, "It is my distinct

4    recollection that the position of Canary Wharf

5    was that Canary Wharf would not do the deal

6    unless they had complete certainty of income

7    stream going forward and, thus, that Canary

8    Wharf required the absolute protection of an

9    indemnity from Lehman."

10             Do you see that?

11       A.    Yes.

12       Q.    On March 27, 2014, was it true to say

13   that you had such a distinct recollection?

14       A.    Yes.

15       Q.    And who was it from Canary Wharf who

16   said that to you during the negotiations?

17       A.    Mr. Iacobescu and all of his

18   attorneys.

19       Q.    What is your recollection on that

20   subject today, May 7?

21       A.    I'm sorry, I didn't understand the

22   question.

23       Q.    With respect to the sentence in

24   paragraph 7 that I read you --

25       A.    Right.

Page 68

1                        F. Bartolotta

2        Q.    -- do you recall this, sitting here

3    today, that is, do you recall this -- the

4    position of Canary Wharf was that Canary Wharf

5    wouldn't do the deal without complete certainty

6    of income stream?

7        A.    Yes, that's what I said.

8        Q.    Now, by the way, Mr. Bartolotta,

9    prior to March 2014, as far as you can recall,

10   had you and I ever spoken?

11       A.    No.

12       Q.    Did you sign this affidavit as a

13   favor in some way to Canary Wharf for George

14   Iacobescu without regard for the truth?

15       A.    I signed it because it was the truth.

16       Q.    Was any pressure put on you to sign

17   something that you believed was not a

18   hundred percent truthful?

19       A.    None.

20       Q.    Was any favor offered you if you were

21   to sign something that Canary Wharf needed and

22   regardless of its truth?

23       A.    No.

24       Q.    Did you do this for some quid pro

25   quo?

Page 69

1                    F. Bartolotta

2       A.    No.

3       Q.    Why did you sign Exhibit 1?

4       A.    Because it was the truth.  And you

5    asked me if I would sign an affidavit to what I

6    had told you in the conversation, and I said I

7    would because it's simply the truth.

8       Q.    Now, could I ask you, sir, see if you

9    can find Exhibit 6 which you were shown on

10   direct.

11      A.    Yes.

12      Q.    The first page of Exhibit 6 is an

13   email from me to you on March 27 at 12:04 p.m.

14            Do you see that, sir?

15      A.    Yes.

16      Q.    And it says, "Frank, Here is the next

17   draft revised to reflect our discussion this

18   morning.  Please make sure that the facts are

19   correct, including the new sentence at the very

20   end of the affidavit.  Thanks again, David."

21            Now with respect to each draft that

22   you got, did you read it carefully?

23      A.    Yes.

24      Q.    Did you do everything you could to

25   assure yourself that it said what you wanted it

Page 70

F. Bartolotta

1
2      to say?

3          A.    Yes.

4          Q.    Were the changes made changes that

5      you had requested me to make?

6          A.    Yes.

7          Q.    Could you look, sir, at Exhibit 3.

8      This is the email, you were shown this on

9      direct, there's an email from me to you on

10     March 26 at 2:47 p.m.  And then 18 minutes

11     later at 3:05, you send me back an email.  You

12     say, "David, Do you have time for a quick call?

13     Frank."

14         A.    Yes.

15         Q.    Do you remember whether we had a call

16     that afternoon?

17         A.    Yes.

18         Q.    Do you remember --

19         A.    It may not have been that afternoon,

20     but it was -- I think it was.  It may have been

21     that afternoon or the next morning.

22         Q.    Do you remember what you said about

23     Schedule 4 in the conversation that we had?

24         A.    No, I don't recall.

25         Q.    Do you remember saying to me, either

1                        F. Bartolotta

2      in that conversation or beforehand, that it was

3      your distinct recollection that the parent in

4      New York had agreed to pay the rent no matter

5      what might happen to the English subsidary?

6                 MR. ISAKOFF:  I object to the form.

7          Leading.

8                 MR. MASELLA:  You may answer.

9      A.    Yes.  My understanding was the parent

10     had agreed to stand behind the English

11     subsidary come hell or high water, yes.

12     Q.    Could you look, sir, please, at

13     Bartolotta Exhibit 8.

14                You'll see that there's an email from

15     me to you on March 29 at 2:29 p.m. and then an

16     attached draft of an affidavit; right?

17     A.    Yes.

18     Q.    Okay.

19                And the email starts by saying, "Here

20     is the new version Frank containing the word

21     'absolute' instead of 'bullet proof' in the

22     very last paragraph."

23                Do you have any recollection as to

24     whose idea it was to change "bullet proof" to

25     "absolute"?

Page 72

1                      F. Bartolotta

2          A.    Yes.

3          Q.    Whose was it?

4          A.    Mine.

5          Q.    When you signed the affidavit,

6     Exhibit 1, was there anything in there that you

7     believed was not completely true?

8          A.    No.

9          Q.    Are you today an employee of Canary

10    Wharf?

11         A.    No.

12         Q.    Have you ever worked for Canary

13    Wharf?

14         A.    No.

15         Q.    Are you an employee of Morgan

16    Stanley?

17         A.    No.

18         Q.    You said earlier you were a

19    consultant; is that correct?

20         A.    Yes.

21         Q.    Do you have a consulting agreement

22    with Morgan Stanley?

23         A.    No, I have a consulting agreement

24    with Pritech, who is an outsourcer for Morgan

25    Stanley.

Page 73

F. Bartolotta

1

2      Q.    Is there anything about the

3  consulting agreement or any understanding you

4  have with anybody that would provide for extra

5  compensation for you if you were to do

6  something to help Canary Wharf in this lawsuit?

7      A.    No.

8      Q.    Did you sign the affidavit,

9  Exhibit 1, as a way of trying to gain any favor

10  from Canary Wharf?

11      A.    No.

12      Q.    With respect to your recollection of

13  the negotiations that are described in your

14  affidavit, is there one key thing that stands

15  out in your mind, even today in 2014, about

16  what was said by Mr. Iacobescu or anyone else

17  on behalf of Canary Wharf?

18      A.    You'll have to ask that one again.

19  I'm not sure I follow.

20      Q.    Sitting here today in 2014 and

21  thinking about the negotiations that you

22  described in your affidavit, is there one key

23  thing that stands out as being important with

24  respect to those negotiations?

25          MR. ISAKOFF:  I object to the form.

Page 74

1                    F. Bartolotta

2          MR. MASELLA:  You may answer.

3     A.    I don't understand when you say

4  what's important.  What -- to me, the thing

5  that I remember the most about the transaction,

6  as it relates to what we're talking about here,

7  is that I could not complete the transaction

8  without signing the document called Indemnity

9  in the Schedule 4.

10         That's the one thing that really

11  sticks out, because it was a hard fought

12  negotiation over an extended period of time and

13  the document was the last thing that we had to

14  get through to get the deal complete.

15         And so it stands out to me that we

16  were -- we were -- the deal was heavily

17  negotiated and this is last point of the whole

18  thing was delivering this agreement.

19     Q.    And did you understand at the time

20  that what Lehman would be required to deliver

21  was this absolute promise from the New York

22  parent to pay no matter what might happen to

23  the English subsidiary?

24         MR. ISAKOFF:  I object to form and

25         calls for a legal conclusion.

Page 75

1                      F. Bartolotta

2              MR. MASELLA:  You may answer.

3        A.    That was my understanding.

4              MR. TULCHIN:  Nothing else.

5              MR. ISAKOFF:  All right.  Let's take

6        a break and we'll have a few more

7        questions.

8              MR. MASELLA:  We don't need a break.

9              MR. ISAKOFF:  I need a break.  I need

10       to consult with my client for a minute.

11             THE VIDEOGRAPHER:  The time is 3:39.

12       We're going off the record.

13             (Recess taken from 3:39 p.m. to

14       3:45 p.m.)

15             THE VIDEOGRAPHER:  The time is 3:45.

16       We're back on the record.

17

18   EXAMINATION BY MR. ISAKOFF:

19        Q.    Mr. Bartolotta, I appreciate you

20     making yourself available to us for this and I

21     just have another couple of questions.

22             If you'll look at Exhibit 1, which is

23     the --

24        A.    Yes.

25        Q.    -- this is the final of your

Page 76

1                       F. Bartolotta

2     affidavit.  And on Mr. Tulchin's examination,

3     he pointed you to paragraph 7 and he pointed

4     the words "complete certainty of income stream

5     going forward."

6              Do you see that?

7     A.    Yes.

8     Q.    Now, is it your testimony that

9     Mr. Iacobescu told you that Canary Wharf would

10    not go forward with the deal unless LBHI,

11    Lehman Brothers Holdings, Inc., agreed to sign

12    on the Schedule 4?

13    A.    Yes.

14             MR. MASELLA:  Objection.  Misstates

15    the testimony.

16             You may answer.

17    A.    Yes.

18    Q.    And do you have enough expertise in

19    English law to know whether Schedule 4 provides

20    for complete certainty of income stream going

21    forward from LBHI under any and all

22    circumstances, including where Canary Wharf

23    terminated the LBL lease and did not serve a

24    notice under Section 7 of the Surety Agreement

25    requiring Lehman Brothers Holdings, Inc. to

1                    F. Bartolotta

2    accept a substitute lease?

3        A.    I'm not an English lawyer.  I did not

4    understand the difference.

5        Q.    Okay.

6              So you don't know whether Schedule 4

7    itself unconditionally provided for complete

8    certainty of income stream going forward;

9    correct?

10       A.    It was my understanding that's what

11   it did.  I don't know for sure under English

12   law, but my understanding, that's what that

13   document accomplished.

14       Q.    Okay.

15             But you don't have any independent

16   expertise of your own?

17       A.    No.

18       Q.    Okay.

19             And I know that Mr. Tulchin asked you

20   whether you believed everything that's factual

21   in the affidavit to be true and you testified

22   that you thought it was.

23       A.    Uh-huh.

24       Q.    Are you aware of all of the legal

25   implications of some of the terms that are

Page 78

1                       F. Bartolotta

2     sprinkled throughout the affidavit, including

3     the use of the word "indemnity"?

4         A.    I used the word "indemnity" because

5     that's what document was called.  My

6     understanding, I'm not an English lawyer, I

7     don't know the real difference, I didn't know

8     the difference at the time, all my

9     understanding was is that the parent was going

10    to stand behind the subsidiary in all

11    instances.

12        Q.    Okay.

13              So it's fair to say you think the

14    document is true -- that the affidavit is true

15    as a factual matter, but you may not be aware

16    of all the legal implications of what it

17    actually says; is that correct?

18        A.    Correct.

19              MR. ISAKOFF:  Nothing further.

20              MR. TULCHIN:  Nothing from me.

21              MR. MASELLA:  Just before we go off

22        the record, the witness would like the

23        opportunity to review the transcript and

24        prepare an errata.

25              And thank you very much, everyone,

1              F. Bartolotta

2     for your courtesy here today.

3            THE VIDEOGRAPHER:  The time is 3:48.

4     This is the completion of today's

5     deposition, May 7, 2014.

6            (The deposition was concluded at

7     3:48 p.m.)

8

9

10

11

12

13

14

15                        _____

16                        FRANK BARTOLOTTA

17

18    Subscribed and sworn to before me

19    this    day of            2014.

20

21    _____

22

23

24

25

Page 80

1           F. Bartolotta

2

3           C E R T I F I C A T E

4

5    STATE OF NEW YORK   )

6                        ) ss.:

7    COUNTY OF NEW YORK )

8

9         I, THOMAS A. FERNICOLA, Registered

10   Reporter and Notary Public within and for

11   the State of New York, do hereby certify

12   that the within is a true and accurate

13   transcript of the proceedings held on May

14   7, 2014.

15        That I am not related to any of the

16   parties to this action by blood or

17   marriage; and that I am in no way

18   interested in the outcome of this matter.

19        IN WITNESS WHEREOF, I have hereunto

20   set my hand this 7th day of May, 2014.

21

22        _____

23           THOMAS A. FERNICOLA, RPR

24

25

1                         F. Bartolotta

2       ----------------------- INDEX --------------------

3       ATTORNEY                                      PAGE

4       Ms. Isakoff                                    6

5       Mr. Tulchin                                   51

6       Mr. Isakoff                                   75

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    F. Bartolotta

2      ----------------------- EXHIBITS ------------------

3      BARTOLOTTA'S

4      DESCRIPTION                              PAGE   LINE

5       Exhibit 1 Affidavit of Frank            12     17

6      Bartolotta dated March 27, Bates

7      Nos. CW75982 to 84,

8       Exhibit 2 EMail from Mr. Tulchin        19     17

9      to Frank Bartolotta, Bates Stamp

10     Nos. CW75954 to 58,

11      Exhibit 3 EMail, Bates No.              23     19

12     CW75959,

13      Exhibit 4 EMail from Mr. Tulchin,       24     18

14     Bates No. CW75960,

15      Exhibit 5 EMail from Mr. Tulchin,       25      9

16     Bates No. CW75961 to 64,

17      Exhibit 6 EMail from Mr. Tulchin,       38      8

18     Bates No. CW75965 to 68,

19      Exhibit 7 EMail from Mr. Tulchin,       40     17

20     Bates No. CW75969 to 72,

21      Exhibit 8 EMail from Mr. Tulchin,       43      5

22     Bates No. CW75973 to 76,

23      Exhibit 9 EMail from Mr. Tulchin,       44      2

24     Bates No. CW75977,

25

1                      F. Bartolotta

2     ---------------- EXHIBITS (Cont'd)-----------------

3     BARTOLOTTA'S

4     DESCRIPTION                          PAGE   LINE

5      Exhibit 10 EMail dated March 27,     45      2

6     2014, Bates No. CW75979,

7      Exhibit 11 Series of EMails, Bates   48      5

8     Nos. CW75980 to 81

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        F. Bartolotta

2        ERRATA SHEET FOR THE TRANSCRIPT OF:

3   Case Name:  In Re: Lehman Brothers

4   Dep. Date:  May 7, 2014

5   Deponent:   FRANK BARTOLOTTA

6   Reason codes:

7        1. To clarify the record.

         2. To conform to the facts.

8        3. To correct transcription errors.

9   Page _____ Line _____ Reason _____

10  From _____ to _____

11  Page _____ Line _____ Reason _____

12  From _____ to _____

13  Page _____ Line _____ Reason _____

14  From _____ to _____

15  Page _____ Line _____ Reason _____

16  From _____ to _____

17  Page _____ Line _____ Reason _____

18  From _____ to _____

19

20                          _____

21                          FRANK BARTOLOTTA

22

23       Subscribed and sworn to before me

24       this    day of                 2014.

25       _____