# Exhibit 42

1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK
    ----------------------------------------X
3   In Re:

4   LEHMAN BROTHERS HOLDINGS INC.,

5   et al.,

6                            Debtors.

7   Chapter 11
    CASE NO.: 08-13555(JMP)
8   (Jointly Administered)
    ----------------------------------------X
9

10

                            125 Broad Street
11                          New York, New York

12                          September 12, 2013
                            9:21 a.m.
13

14

15              VIDEOTAPED DEPOSITION of RICHARD

16   MILLETT,  before Melissa Gilmore, a Notary

17   Public of the State of New York.

18

19

20

21

22

23        ELLEN GRAUER COURT REPORTING CO. LLC
             126 East 56th Street, Fifth Floor
24              New York, New York 10022
                      212-750-6434
25                   REF:  104785

```
 1                      MILLETT

 2    were being instructed as a barrister; is that

 3    correct?

 4         A.    Well, I'm still being instructed as

 5    a barrister, but was instructed as an advocate

 6    to fight at the case and advise on the case on

 7    behalf of the client, but not as an expert.

 8         Q.    Thank you.

 9               Do you know Laurence Rabinowitz?

10         A.    Yes.

11         Q.    Do you believe he is a

12    well-respected commercial lawyer?

13         A.    Yes.

14         Q.    In fact, he is very highly regarded

15    in England as a commercial lawyer; is that

16    correct?

17         A.    Yes.

18         Q.    What were you given in connection

19    with drafting your first declaration in this

20    case?

21               MR. ISAKOFF:  I'm going to object to

22          that.  That's outside the scope of

23          discovery.

24               MR. DE LEEUW:  You're not allowing

25          him to answer?
```

1                        MILLETT

2      is a real ambiguity.  And, secondly, the

3      circumstances in which the document is put

4      forward.

5           Q.    Thank you.  You would agree it's not

6      a rigid rule.  It's one aid in construction,

7      according to you; is that fair?

8           A.    It is an aid to construction.

9           Q.    And --

10          A.    It's more than just an aid.  It's a

11     principle of construction.

12          Q.    But it's a principle of construction

13     that's only -- that only comes into play when a

14     court is unable to decide which of two meanings

15     is the right one; isn't that correct?

16          A.    Yes.

17               (Exhibit 117, Portions of Textbook

18          Entitled The Interpretation of Contracts

19          by Sir Kim Lewison, marked for

20          identification.)

21          Q.    I'm going to hand to you what's

22     being marked as Exhibit 117.  It's entitled The

23     Interpretation of Contracts by Sir Kim Lewison.

24          A.    Lewison.

25          Q.    Lewison.  Thank you.

```
 1                      MILLETT

 2    agreements?

 3              MR. ISAKOFF:  Object to form.

 4              Could I have that question read

 5         back, please?

 6              (Record read.)

 7              MR. ISAKOFF:  Objection stands,

 8         "decision."

 9              Go ahead.

10    Q.    I will rephrase it.

11              Mr. Millett, do you disagree with

12    the judge's statement in the CDV Software case

13    that the contra proferentem principle is of

14    uncertain application and little utility in the

15    context of commercially negotiated agreements?

16    A.    Well, there are three elements to

17    that sentence if one is going to analyze it

18    closely.

19              The first is the question of whether

20    the principle is of uncertain application,

21    generally, or whether she means that it's of

22    uncertain application in the context of

23    commercially negotiated agreements.

24              I regard that sentence, I'm afraid,

25    to the naked eye, as a little difficult to
```

1             MILLETT

2    construe.  I don't know whether her reference

3    to the context of commercially negotiated

4    agreements covers both uncertain application

5    and little utility.  I find that a little

6    difficult to break down, but I would not -- I

7    don't think that the rule is of such uncertain

8    application that judges don't know when to use

9    it, when they think it's right to do so.  They

10   do.  It's routinely used.

11             So, although you can certainly say,

12   as Sir Kim does, that it's difficult to predict

13   easily the cases in which the court will find

14   the maxim a useful tool, which I agreed with

15   earlier, and if that is what she means by

16   uncertain application, then I would agree.

17             The question of little utility is a

18   hard one to apply.  It may be of some utility,

19   it may be of great utility, it may be of no

20   utility in the context of commercially

21   negotiated agreements.

22             What I read, however, the learned

23   judge is saying in that case is, that where

24   both parties, under equal bargaining power,

25   have sat opposite each other and thrashed out

```
 1                     MILLETT

 2   by commercial negotiation the terms of the

 3   contract, then, as a general proposition, there

 4   is less rather than more room for the

 5   application of the principle.

 6        Q.    You mentioned that the contra

 7   proferentem principle is routinely used.

 8            Is it routinely used in the context

 9   of commercially negotiated agreements?

10            MR. ISAKOFF:  Object to form.

11        A.    That depends on the facts of each

12   individual case.

13        Q.    Would it be fair to say that when

14   you have sophisticated parties that are able to

15   negotiate a commercial agreement, the contra

16   proferentem rule takes on less significance?

17        A.    I think that's putting it too

18   broadly.

19        Q.    Have you ever heard anyone say that?

20        A.    No.

21        Q.    You have never seen references to

22   the contra proferentem principle taking on less

23   significance in commercially negotiated

24   agreements either in textbooks or decisions?

25        A.    Well, it depends what you mean by
```

```
 1                    MILLETT

 2  commercially negotiated.  If they are

 3  commercial agreements negotiated between

 4  businessmen, where both parties have had the

 5  opportunity to negotiate and discuss each term,

 6  then -- then that is a reason why the court may

 7  refuse to use the principle as a guide to

 8  interpreting the contract.

 9            It's a legitimate reason not to do

10  so, but I don't --

11       Q.    Do you --

12            MR. ISAKOFF:  He is not finished

13       speaking.

14       A.    I haven't finished.

15       Q.    I apologize.  I thought you had

16  finished.

17       A.    No.

18            But it is not a hard and fast rule.

19  We don't do tick box like that, and it depends

20  on each case.

21       Q.    Is it your view that Lehman Brothers

22  Holdings Inc. was a sophisticated party?

23       A.    I have no idea.

24       Q.    You don't know?

25       A.    Well, they weren't so sophisticated
```

```
 1                        MILLETT

 2   to avoid going spectacularly bust.

 3        Q.     Would you agree with me that, in

 4   2003, when Lehman Brothers Holdings Inc. signed

 5   as a party to the lease with Canary Wharf, they

 6   were considered to be a highly sophisticated

 7   party?

 8        A.     I don't know.  I can't say.  I don't

 9   know.

10        Q.     Would you agree with me that Lehman

11   Brothers Holdings Inc. was, at that time, one

12   of the largest companies in the world?

13        A.     It's possible.  By what measure, I

14   don't know.  I don't know anything about how

15   big Lehman was or who was there or how

16   sophisticated they were in 2005.

17        Q.     Are you aware that Lehman Brothers

18   Holdings Inc. was one of the largest investment

19   banks in the world as of 2003?

20        A.     I'm aware that that's what people

21   have said about it.  2003?

22        Q.     2003, correct.

23        A.     Right.  I don't know.

24        Q.     You are not basing your opinion in

25   any way on whether Lehman Brothers Holdings
```

1                    MILLETT

2    Inc. was a sophisticated or unsophisticated

3    party as of 2003?

4        A.    No.  I think that's fair.

5        Q.    Do you base your opinion on any

6    evidence whatsoever about the commercial

7    context in which Lehman Brothers Holdings Inc.

8    and Canary Wharf negotiated?

9            MR. ISAKOFF:  Object to form.

10       Q.    The lease and Schedule 4.

11       A.    No.  Other than what I read in the

12   transcripts.

13       Q.    Is there anything in those

14   transcripts that you are relying on in reaching

15   your opinion in this case about the commercial

16   context of the lease and Schedule 4?

17       A.    Yes.  As I referred to in paragraph

18   ten, it was Sir George Iacobescu's evidence

19   that it was the landlord who put forward

20   Schedule 4 to the lease.

21       Q.    Other than that testimony that

22   Mr. Iacobescu, Sir George Iacobescu testified

23   that the landlord put forward the schedule to

24   the lease, are you relying on any other

25   evidence of the commercial context of the lease

1                           MILLETT

2                    (Record read.)

3        A.     No, that's not correct.

4        Q.     Well, you saw in the record that

5    there's some references to people using the

6    term "guarantee" in depositions and in e-mails.

7               Do you recall that?

8        A.     No, I don't think I recall it in

9    e-mails.   In e-mails?   I don't know.

10       Q.     Are you putting any reliance in this

11   case on the references by any of the parties

12   after the fact to Schedule 4 as an indemnity or

13   a guarantee?

14       A.     In forming my opinions, I don't rely

15   on the labels, not least because I believe that

16   the lease says you are not allowed to, but in

17   addressing Mr. Rabinowitz's opinion, because he

18   was interested in the labels, I offered an

19   opinion about them.

20       Q.     I'm also just referring to whether

21   people, in discussions or in e-mails, would

22   refer to Schedule 4 in its entirety as a

23   guarantee or an indemnity.

24               Are you relying on any such

25   reference in forming your opinions in this

```
 1                    MILLETT
 2  case?
 3             MR. ISAKOFF:  Objection.
 4       A.    I'm not sure I see -- I don't know
 5  what documents you are talking about, and I
 6  don't think I have seen any.
 7       Q.    So you are not relying on anything
 8  like that?
 9       A.    Anything extraneous to the document?
10       Q.    Correct.
11       A.    I don't believe so.
12       Q.    You agree with Sir William
13  Blackburne that people often use the term
14  "guarantee" loosely to describe an indemnity,
15  correct?
16             MR. ISAKOFF:  Can I have that
17        question read back, please?
18             (Record read.)
19             MR. ISAKOFF:  Objection,
20        mischaracterizes what the opinion says.
21       A.    The words that Sir William uses at
22  paragraph 22, at letter J, are -- is it is not
23  unusual.  He doesn't use the word "often."  I
24  think there's a difference.
25             And I agree with what Sir William
```

1                          MILLETT

2     says when he says it is not unusual to find the

3     term "guarantee" used loosely to describe what

4     is, in reality, an indemnity.

5              I would add, as I think I did, that

6     it is also not unusual to find the word

7     "surety" used to describe somebody who is, in

8     reality, a guarantor.  Indeed, I think our book

9     does that.

10        Q.    I was going to just ask you about

11    your book.

12             In fact, your book refers to the law

13    of guarantees.  That's the title of the book,

14    correct?

15        A.    Yes.

16        Q.    You didn't mean to exclude the law

17    of indemnities, did you?

18             MR. ISAKOFF:  Object to form.

19        A.    Well, I'm afraid I don't have,

20    because of my -- size of my briefcase, my

21    publication in its entirety with me.

22             MR. ISAKOFF:  I happen to have it.

23        A.    That's a broad question.

24             From recollection, and I'm fairly

25    familiar with it, of course, it is not a book

1                           MILLETT

2    about indemnities.  It's a book about

3    guarantees.  Although, of course, inevitably,

4    chapter one contains an analysis and discussion

5    of the differences between them.

6               So there are -- as does the chapter

7    on the statute of frauds.

8        Q.    So there's a discussion in your book

9    about the law on indemnities as well, correct?

10       A.    Yes.

11       Q.    You would agree that the right way

12   to determine whether a contract is a contract

13   of indemnity or a guarantee is to analyze the

14   context of the contract and the words used in

15   the contract, correct?

16       A.    Yes.  Could you just repeat the

17   first part of that question?

18       Q.    Sure.  You would agree that, in

19   determining whether a contract is an indemnity

20   or a guarantee, you should analyze the context

21   of the contract and the words used in the

22   contract, correct?

23               MR. ISAKOFF:  Object to form.

24       A.    Yes, I think so.

25       Q.    Is it also true that, ultimately,

```
 1                        MILLETT
 2        A.    Yes.
 3        Q.    So, even if the court were to
 4   determine that there was a material variation
 5   in schedule -- to Schedule 4, if it also
 6   determined that Schedule 4 was a contract of an
 7   indemnity, that would not discharge the
 8   obligations of the surety, correct?
 9             MR. ISAKOFF:  Object to form.
10        A.    I will answer it this way.  If the
11   court were to determine that Schedule 4
12   comprised an indemnity agreement, and not a
13   guarantee, then the rule in Holme and Brunskill
14   would have no application.
15        Q.    Let me ask you to turn back to the
16   Vossloh decision, which is Exhibit 103.
17        A.    Yes.
18        Q.    If I could ask you to turn to
19   paragraph 24 on page 312.
20        A.    Yes.
21        Q.    Do you see the discussion there
22   begins the discussion of how to distinguish
23   contract of guarantee to a contract of
24   indemnity; is that true?
25        A.    Can I just read the paragraph?
```

```
 1                          MILLETT
 2          Q.    Do you agree that?
 3          A.    Yes.  Interestingly, just picking
 4     up, he says, at the end, which actually harks
 5     back to a point I made before, "It is this
 6     feature which leads to the person giving the
 7     indemnity to be described as a surety,
 8     although, strictly, the contract of indemnity
 9     cannot, itself, be a contract of suretyship."
10               MR. ISAKOFF:  She couldn't take it
11          down that fast.
12          A.    I'm so sorry.
13               The words he uses, "It is this
14     feature which leads to the person giving the
15     indemnity to be described as a 'surety,'
16     although, strictly, the contract of indemnity
17     cannot itself be a contract of suretyship."
18               That is really what I was referring
19     to earlier when I was referring to the word
20     "suretyship" and its use.
21          Q.    Do you agree with Sir William
22     Blackburne's conclusion in the Vossloh decision
23     that an essential feature of an indemnity is
24     that the indemnitor has a primary liability?
25          A.    Yes.
```

1                    MILLETT

2         Q.     And what is a primary liability?

3         A.     He is liable for the performance of

4    the obligation in question, regardless of

5    whether somebody else is liable or not.

6         Q.     And that's also referred to as a

7    primary obligation; is that correct?

8         A.     Yes.

9         Q.     And would you agree that the

10   distinction between a primary obligation and a

11   secondary obligation is critical to determining

12   whether a contract is one of indemnity or

13   guarantee?

14        A.     Can I just back -- go back a little

15   bit?  I may have skated over perhaps what could

16   be a subtle difference.

17               We speak of obligations.  We speak

18   of liabilities.  In reality, what happens is

19   that parties assume obligations.  They don't

20   necessarily assume liabilities.  They assume

21   liabilities for the performance of that

22   obligation, and liabilities, whatever they are

23   in law, where those obligations are not

24   performed.

25               The word that he uses is a primary

1                        MILLETT

2        A.     (Perusing.)   Yes, I see that.

3        Q.    You see that, in section ten of the

4   lease, there is a reference to the surety

5   having a primary obligation in the terms

6   contained in Schedule 4.

7               Do you see that?

8        A.    I do.   I don't think you have quite

9   phrased it right.   You paraphrased it, and not,

10  I think, accurately, I'm afraid.

11              What it says is, "In consideration

12  of this demise having been made at its request,

13  the surety hereby covenants with the landlord,

14  and as a separate covenant with the management

15  company, as a primary obligation, in the terms

16  contained in Schedule 4."

17              That's what it says.   I see it says

18  that.

19       Q.    Do you think that it's irrelevant

20  that the parties chose to use the words

21  "primary obligation" when referring to Schedule

22  4?

23       A.    Well, I doubt that it was

24  irrelevant, because one has to assume that when

25  the parties chose to use the words, they did so

1                          MILLETT

2      with some kind of purpose in mind.

3           Q.   Do you have any explanation for why

4      they used the words "primary obligation"?

5           A.   Well, the first question is whether

6      the words "as a primary obligation" in clause

7      ten, which you are showing me, refer to the

8      surety covenanting with the landlord, or

9      whether they refer to the separate covenant

10     with the management company.

11               That ambiguity, to my mind, carries

12     through to paragraph one of Schedule 4 as well.

13               So picking those words, as you have,

14     is very interesting, but I'm not sure -- I

15     personally -- personally not completely clear

16     whether that's describing the covenant with the

17     management company or the covenant with the

18     landlord.

19          Q.   Are you saying that you believe that

20     the words "as a primary obligation" are only

21     referring to the covenant with the management

22     company as opposed to the covenant with the

23     landlord?

24          A.   No, I'm not going that far.  I'm

25     saying that it's arguable, at the very least,

**MILLETT**

1

2 of guarantee or indemnity?

3            MR. ISAKOFF:  Object to form.

4      A.    I personally would ignore the labels

5 used by the parties unless I really had to have

6 recourse to them.  I don't believe you do.

7            I'm also looking at the lease

8 because I believe, and I'm sure I quoted it in

9 my first opinion, there is a provision in the

10 lease which says that you aren't allowed to

11 look at the labels.

12            So, in forming my views, I don't

13 look at the labels, but it is right to say that

14 when I address Mr. Rabinowitz's opinions,

15 because he did look at the labels, I had to

16 form a view about them.

17      Q.    Well, beyond the label of paragraph

18 one, you recognize, do you not, that paragraph

19 one repeatedly uses the word "indemnify" or

20 "indemnified," correct?

21      A.    Well, paragraph one uses the word

22 "indemnify" and "keep indemnified."  You say

23 repeatedly.  We can read it.  It uses it seven

24 lines down.

25      Q.    Yes.  Okay.  So the fact of the use

1                        **MILLETT**

2    of the word "indemnify" and "indemnified,"

3    would you agree with me that that's relevant,

4    but not dispositive, in considering whether a

5    contract is one of indemnity versus guarantee?

6              MR. ISAKOFF:   Object to form.

7         A.    Yes.   I mean, I can't sit here and

8    say that it's utterly irrelevant to the

9    question before an English court was, what is

10   Schedule 4 as a matter of its true

11   characteristics, properly interpreted,

12   nobody -- of course, you would look at all the

13   words, and included in the words are the words

14   "shall indemnify and keep indemnified."  I'm

15   not going to pretend it's irrelevant.

16        Q.    Use of those words would tend to

17   support an argument that the contract is one of

18   indemnity, but, in your view, you would need to

19   look at all the rest of the words in context,

20   correct?

21        A.    No, I don't think it tends to

22   support the argument one way or the other.

23   There is part -- hang on.

24        Q.    I apologize.   I saw you were

25   continuing, so I stopped.

1                        **MILLETT**

2    works and what the words "indemnify" and "keep

3    indemnified" mean.

4         Q.    And is it your view that the words

5    being used in Schedule 4 are not referring to

6    an obligation that is being given by way of

7    security for the performance of an obligation

8    by another?

9              MR. ISAKOFF:   Object to form.

10        A.    I do not believe that the words "the

11   surety shall indemnify and keep indemnified the

12   landlord and the management company," are -- et

13   cetera, are words which -- or under which

14   security is being provided for the performance

15   of an obligation.

16             My opinion is that paragraph one is

17   a single composite obligation, and that the

18   second element of it, following the words "and

19   the surety shall indemnify" are descriptors,

20   they describe the extent of the surety's

21   obligation to make payment, which is imposed

22   upon him or it under the first part of

23   paragraph one.

24        Q.    If I could ask you to take a look at

25   paragraph one of Schedule 4, which is marked as

```
 1                     MILLETT
 2    It can actually be used as "or."  It can also
 3    be used, and is very commonly used, as a
 4    serializing particle.
 5         Q.    In either one of those three
 6    different possibilities, conjunctive,
 7    disjunctive or serial, there are multiple
 8    items, at least two, correct?
 9              MR. ISAKOFF:  Object to form.
10         A.    I think the use of the word "and"
11    isn't going to get you anywhere.  You've got to
12    look at what's being connected.
13         Q.    That's my question.  What's being
14    connected?
15              MR. ISAKOFF:  Object to form, asked
16         and answered.
17         Q.    What's being connected with that
18    word "and"?
19         A.    What's your question?
20         Q.    What are the two things or more that
21    are being connected by the word "and" on the
22    sixth line of paragraph one of Schedule 4?
23              MR. ISAKOFF:  Object to form and
24         asked and answered.
25         A.    What's being connected is the
```

1                    MILLETT

2    assumption of obligation with the promise, as

3    it were, as to the extent and manner of

4    performance of that obligation.

5              Wash the car and don't use the red

6    soap.

7         Q.    So let's take those two pieces.  You

8    said the first is the assumption of the

9    obligation.

10             What words in paragraph one are the

11   assumption of obligation?

12        A.    The surety hereby covenants.  These

13   are the operative words of assumption of

14   obligation.

15        Q.    I'm sorry.  Are you saying that the

16   words "the surety hereby covenants" all the way

17   up to the word "specified" before and or --

18        A.    It's a slightly sort of an arid

19   question.  I'm sorry to be too critical.

20             But what's the word in that clause

21   that imposes the obligation on the surety?

22   Well, it's his promise, and that's the word

23   "covenant," but what he's covenanting to do is

24   the whole of it.

25        Q.    All of it up to the word

```
 1                      MILLETT

 2              MR. ISAKOFF:  Objection.

 3              MR. DE LEEUW:  I will restate it,

 4        because either it got mistranscribed or I

 5        misstated it, so I will say it again.

 6        A.    It sounded like that Groucho Marx

 7   thing from Night at the Opera, party of the

 8   first party saying do your best.

 9        Q.    Is there any provision in Schedule 4

10   or the lease that specifies that what you have

11   circled as the second part of paragraph one of

12   Schedule 4 can only be read as the extent and

13   manner of performance of the first part of

14   paragraph one of Schedule 4?

15              MR. ISAKOFF:  Object to form.

16        A.    There are no express words in

17   paragraph one or Schedule 4 or to the extent

18   that I have reread it again, which is not much,

19   the lease, which tells you that you have to

20   read paragraph one in the way that I believe it

21   should be read.  But to finish the answer, that

22   takes you nowhere.

23              In order to characterize a

24   commercial document, you don't look for --

25   you're not going to start by looking at express
```

1                        MILLETT

2    provisions where the parties tell you how to

3    read it.  If the parties were going to do that,

4    they would have that in the definitions clause.

5              MR. ISAKOFF:  Are you ready for a

6         break?  We have been going for about an

7         hour and 20 minutes.

8              THE WITNESS:  Sure.

9              MR. DE LEEUW:  That's fine.  Why

10        don't we take lunch now.

11             THE VIDEOGRAPHER:  We are now off

12        the record at 12:37 p.m., September 12,

13        2013.

14             (Luncheon recess taken at

15        12:37 p.m.)

16

17

18

19

20

21

22

23

24

25

1              MILLETT

2    to copy as much as I could without killing too

3    many trees, but if ever you believe you need to

4    actually look at the treatise itself, we have a

5    copy of it here.

6         A.    All right.  Thank you very much.

7         Q.    Now, can I ask you to turn to page

8    15 of Exhibit 121?

9         A.    Okay.

10        Q.    And I'm going to refer to a portion

11   of this treatise that starts with the very,

12   very bottom of page 15, the paragraph that

13   starts, "Indemnity provisions," over in the

14   last carryover paragraph.

15             Do you see that?

16        A.    Yes, I see that.

17        Q.    Okay.  And you see in the passage

18   from page 15 to 16, and read any of it you

19   like, you are referring to a case, Sofaer

20   versus Anglo Irish Asset Finance.

21             Do you see that?

22        A.    Yeah.  Yes, I do.

23        Q.    And if I can ask you to focus for a

24   moment on the second clause that's at issue in

25   the Sofaer decision, which is about the middle

                        **MILLETT**

1

2   commercially absurd for there to be

3   coextensivity in the way I've just suggested,

4   then the answer to that is it's not for me to

5   say, but guarantees which carry coextensivity

6   with them are routinely used, as opposed to

7   indemnities, and if parties, sophisticated

8   parties like certainly your clients were,

9   wanted an indemnity, there are plenty of forms

10  in the book you could reach for to use.

11          Q.    Let me give you a hypothetical,

12  because you've said you haven't looked at the

13  facts about the commercial context.

14              Hypothetically, if Canary Wharf

15  negotiated the lease and Schedule 4 with

16  executives of Lehman in New York, Lehman

17  Brothers Holdings Inc., and built the building

18  in Canary Wharf, England, at Lehman Brothers

19  Holding Inc.'s request, and agreed to enter

20  into a lease whereby the tenant was named as

21  LBL, as a convenience for the Lehman group of

22  companies, would that shape your opinion in any

23  way whatsoever about what would be the most

24  commercially sensible reading of paragraph one

25  of Schedule 4?

```
 1                      MILLETT
 2   points to it being a guarantee, but that isn't
 3   to say that that's always the case, as the next
 4   paragraph goes on to explain.
 5        Q.    Right.  And the next paragraph goes
 6   on to explain that the presence of these type
 7   of clauses may very well point towards the
 8   opposite conclusion?
 9        A.    When you say may very well, where
10   did I say that?
11        Q.    You say, "Such a provision may point
12   towards the opposite conclusion, because it may
13   show that it was intended that the liability of
14   the obligor should continue regardless of what
15   might happen to the principal debtor."
16        A.    That's what the text says, yes.  The
17   words very well don't appear in there.  They
18   appeared in your question, but not in my text.
19        Q.    You would agree with me that the
20   presence of paragraph 6(d) and 6(g) may show
21   that it was intended that the liability of the
22   obligor should continue regardless of what
23   might happen to the principal debtor.
24        A.    Well, you can't discount that, no.
25        Q.    Could I ask you to turn to paragraph
```

                              MILLETT

1

2    for what period, and which of those were for

3    administrative expense versus just an unsecured

4    claim?

5         A.    That is correct.  That's what I said

6    before, and I'm proceeding on a number of

7    different assumptions or hypotheses as to what

8    those were.

9         Q.    You don't read what O'Donovan and

10   Phillips say in their treatise, which has been

11   marked as Exhibit 122, as saying that -- excuse

12   me.

13        A.    122 is right.

14        Q.    122.  You don't read that paragraph

15   688 as saying that if you release a portion of

16   the entire debt outstanding on the principal

17   contract, that does not operate as a full

18   discharge of the surety?

19             MR. ISAKOFF:  Object to form.

20        There's too many negatives.

21        Q.    Do you read the O'Donovan and

22   Phillips treatise, which has been marked as

23   Exhibit 122, paragraph 688, as saying that if

24   the release is only of a portion of the entire

25   debt outstanding under the principal contract,

```
 1                         MILLETT
 2    then there will not be a full discharge of the
 3    surety?
 4         A.    Well, I can see what it says.  I
 5    don't disagree with -- I don't disagree, in the
 6    short time you have given me to look at it,
 7    necessarily with its conclusions, although I
 8    have to go and look at the cases which are
 9    referred to.  They're Australian.
10              And, of course, as I said before,
11    this is an English edition of what is actually
12    an Australian publication.  This bit of it
13    seems to be highly Australian, if you look at
14    it, if you look at footnote 209, but it seems
15    to me that's a million miles away from this
16    case, not only because there was no release of
17    a portion of a debt anyway under the forfeiture
18    letter, but, secondly, and perhaps more
19    importantly for the purposes of answering your
20    question, the release in the forfeiture letter
21    wasn't a complete release.
22              The forfeiture letter did not say to
23    LBL, oh, don't worry, you don't have to pay any
24    rent at all during the time when the
25    administrators were in occupation.  The
```

```
 1              MILLETT
 2   you have to read the beginning of the paragraph
 3   together, is that -- that "any other act,
 4   omission, matter or thing whatsoever, but for
 5   this provision, the surety would be exonerated,
 6   either wholly in part" --
 7              MR. ISAKOFF:  It says it "or in
 8       part."
 9       Q.   Excuse me, "other than release, as
10   set forth in that parenthetical, shall release,
11   discharge or any way lessen or affect the
12   liability of the surety under this lease,"
13   correct?
14       A.   Right.  That's what the words, with
15   that correction, say.
16       Q.   Read, as the words appear on the
17   page, you would agree that the material
18   variation to which you point to in the
19   forfeiture letter would not release, discharge
20   or in any way lessen or affect the liability of
21   LBHI?
22              MR. ISAKOFF:  Object to form.
23       A.   Well, the words on the page do do
24   that, but I would ask -- I think an English
25   judge would look at these, and following the
```

1              MILLETT
2    West Horndon, example of the case in West
3    Horndon, say, well, none of -- say this is very
4    strange, none of the following or any
5    combination shall release, discharge or in any
6    way lessen or affect the liability of the
7    surety, anything, dot, dot, dot, any other act
8    or omission or thing whatsoever.
9              In other words, carte blanche,
10   anything and everything which you could ever
11   think of by which the surety would be
12   exonerated, either wholly or in part, isn't
13   going to run.  Now, that's, to my mind -- it
14   makes sense as a matter of grammar.  The court
15   could apply it as a matter of grammar, but my
16   point is that, as a matter of law, courts -- or
17   approach, courts don't, because they say that's
18   carte blanche, you can't have carte blanche.
19        Q.    Wouldn't the carte blanche that
20   you're referring to mean that if, in fact,
21   Schedule 4 was a guarantee, paragraph 6(g)
22   would, in effect, make it an indemnity with
23   respect to any variation of the underlying
24   obligation?
25              MR. ISAKOFF:  Object to form.