# Exhibit 44

Page 1

IN THE UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
-----------------------------)
                             )
In re                        )
                             )Chapter 11
                             )
LEHMAN BROTHERS              )Case No.
                             )
HOLDINGS INC., et al.,       )08-13555 (JMP)
                             )
                             )(Jointly Administered)
            Debtors.         )
                             )
                             )
-----------------------------)
```

VIDEO DEPOSITION UPON ORAL EXAMINATION

of

PAMELA KENDALL

On Thursday, 20th June 2013

Taken at the offices of:
Weil Gotshal & Manges LLP,
110 Fetter Lane,
London EC4A 1AY,
England

Reported by: Richard Harper

Page 99

```
 1                   PAMELA KENDALL
 2   building and so forth?
 3         A.    Well, on September 30th, LBL had
 4   also agreed that we acknowledged -- without the
 5   wording in front of me I cannot be precise -- that
 6   they were happy with our making a claim of 262,
 7   plus or minus 5%, in the LBHI administration and
 8   those e-mails, the exchange, was made in the
 9   context that LBL recognise the importance of our
10   claim against LBHI and documentation would need to
11   be structured in such a way as to preserve our
12   ability to make that claim.
13         Q.    Why did that involve having to make
14   a claim in that amount against LBL, if you know?
15         A.    Because LBHI were making it a
16   condition of the stipulation.
17         Q.    Do you know why?
18         A.    No, I don't.  Sorry, could I add to
19   that, to say that I understand that there may have
20   been set off issues between LBL and LBHI.
21         Q.    Do you know how much unpaid rent,
22   if any, there was as of September 30, 2010?
23               MR. DE LEEUW:  Objection to form.
24   BY MR. ISAKOFF:
25         Q.    All right, I will change it to, any
```

Page 100

 1                    PAMELA KENDALL
 2   unpaid amounts on the LBL lease?
 3              MR. DE LEEUW:  Still objection to
 4   form.
 5        A.    Unpaid amounts on the LBL lease,
 6   well they had ceased paying their rent, they
 7   ceased in part in January of that year and they
 8   stopped paying the rent entirely as of March.
 9   BY MR. ISAKOFF:
10        Q.    My question is, do you know how
11   much was outstanding in respect of the LBL lease
12   as of September 30, 2010, counting all payments
13   that had been made, whether by LBL itself or by
14   sub-tenants?
15        A.    Well, the amounts that were owed by
16   LBL -- I would have to look at the documents to be
17   precise.  I know that -- I think there is a figure
18   of 18 million on one of PWC's -- but I would have
19   to look.
20        Q.    I am going to direct your attention
21   again to exhibit 33, which is the October 28, 2010
22   memo from Mr. Iacobescu to the Canary Wharf board.
23   Did you play any part in drafting this memo?
24        A.    No, I didn't draft that memo.
25        Q.    Would you turn please to the page

Page 107

```
 1                     PAMELA KENDALL
 2   in this October 28 memorandum to the board?
 3           A.     I don't know.
 4           Q.     Did you think it was false?
 5           A.     I don't know.  I was not involved
 6   in drafting the memo.
 7           Q.     Did you have any communications
 8   with JP Morgan Chase concerning settlement
 9   discussions with LBHI?
10           A.     They were aware that we were
11   settling with LBHI.
12           Q.     That is not my question.
13           A.     Sorry.
14           Q.     Did you have any communications
15   with JP Morgan Chase -- you, Pamela Kendall ----
16           A.     Me?
17           Q.     -- have any communications with
18   JP Morgan Chase concerning settlement discussions
19   with LBHI?
20           A.     Nothing specific that I can
21   remember.  I have no doubt that at the meetings
22   that took place during the course of negotiations,
23   reference may have been made at some point during
24   those meetings to settlement with LBHI.
25           Q.     When, for the first time, if you
```

Page 108

1                   PAMELA KENDALL
2    recall, did Canary Wharf consider the option of
3    forfeiture rather than surrender in connection
4    with the LBL lease?
5         A.    When negotiations for the surrender
6    broke down ----
7         Q.    When did that --  I am sorry.
8         A.    -- so that was after receipt of the
9    draft stipulation that we got from LBHI and LBL's
10   response to the revised documentation put to them.
11   I cannot give you an exact date, other than to say
12   November?
13        Q.    What is the reason why forfeiture
14   was not considered at an earlier stage, if any?
15             MR. DE LEEUW:  Objection to form.
16   Go ahead.
17        A.    Surrender was the preferred route.
18   It is a consensual arrangement between the parties
19   and forfeiture would also -- I mean, to take
20   forfeiture proceedings against a company in
21   administration you first have to get leave of the
22   court under English law.  It had its additional
23   complications.
24   BY MR. ISAKOFF:
25        Q.    There was a forfeiture agreement

Page 109

1                    PAMELA KENDALL
2    that was consensual between the parties without
3    leave of the court on December 3, 2010?
4         A.    Correct.
5         Q.    Why was that route not considered
6    earlier, if it was not?
7         A.    Because we thought we could come to
8    an agreement with LBL and that is hence the
9    surrender document, is a consensual arrangement
10   between the parties.
11        Q.    Isn't it fair to say that the
12   forfeiture agreement of December 3, 2010 was
13   consensual between the parties?
14        A.    Yes, but generally a forfeiture is
15   a unilateral action taken by the landlord, in the
16   case of tenant default.
17        Q.    Okay.  In this circumstance, where
18   Canary Wharf did not want to take unilateral
19   action, is there a reason why it did not consider
20   a consensual forfeiture, such as was entered into,
21   prior to the time that, as you say, negotiations
22   over a surrender document broke down?
23        A.    No, because there was no need to,
24   if you like, because we thought we could reach an
25   amicable agreement, based on a surrender with LBL,

Page 110

 1                   PAMELA KENDALL
 2   so there was no need to look at alternative ways
 3   of documenting this.
 4        Q.    I am going to show you what was
 5   previously marked as exhibit 34.  For the record,
 6   this is CW 775 to 806, which is an e-mail
 7   enclosing a letter and a draft deed of surrender
 8   from Sarah Dawson, of Clifford Chance, to Beatrice
 9   Taylor, at Linklaters.  Have I accurately
10   characterised the document?
11        A.    I am sorry, could you repeat that
12   again?  I am sure you have but ----
13        Q.    Why don't you just tell me what the
14   document is.  I am trying to move things
15   along ----
16             MR. DE LEEUW:  She was reviewing it
17   while you were asking ----
18             MR. ISAKOFF:  Well, I can only do
19   what I can do.
20   BY MR. ISAKOFF:
21        Q.    Why don't you tell me that the
22   document is?
23        A.    That is an e-mail from Sarah
24   Dawson, of Chance to me, attaching the mark-up of
25   the surrender deed from Clifford Chance to

Page 166

1              PAMELA KENDALL
2    aware at the time that 7.16 had been redacted when
3    it was bing sent to LBHI in January 2011?
4         A.    I think they had told me they had
5    taken it out, but I can't recall exactly.
6              MR. ISAKOFF:  No further questions.
7
8         REDIRECT EXAMINATION BY MR. DE LEEUW
9
10   BY MR. DE LEEUW:
11        Q.    Ms. Kendall, I have only a few
12   questions to follow up with you.  Earlier, I think
13   there was a document where you used the word
14   "guarantee" and Mr. Isakoff asked you if that
15   reference was a reference to Schedule 4 of the
16   Lehman lease.  Do you recall that?
17        A.    Yes.
18        Q.    When you used the word "guarantee"
19   to refer to Schedule 4 of the Lehman lease?
20        A.    Yes, I have used that terminology
21   before.  I'm not making a distinction between an
22   indemnity or a guarantee.  I use the word
23   colloquially, so to my mind it is an indemnity
24   guarantee.
25             MR. DE LEEUW:  Thank you.  Could