# Exhibit 69

# Lehman Brothers Limited
# In Administration

Joint Administrators' progress report for the period
15 March 2009 to 14 September 2009

13 October 2009

# Section 1  Purpose of the Joint Administrators' progress report

## Introduction

This is the second progress report by the Joint Administrators (the "Administrators") of Lehman Brothers Limited ("LBL" or the "Company").

Creditors will have received the Administrators' proposals dated 5 November 2008 which were approved at the meeting of creditors held on 21 November 2008. Creditors will also have received the Administrators' first progress report dated 14 April 2009.

This report provides an update on the work that the Administrators have undertaken and the progress made since our appointment, with particular focus on the progress made in the six months since 14 March 2009.

## Objectives of the Administration

The Administrators are pursuing the objective of achieving a better result for LBL's creditors as a whole than would be likely if LBL were wound up (without first being in Administration).

The specific aims of this Administration are to:

- Realise all assets of LBL, where value may exist;
- Provide ongoing employee and infrastructure support to the other group companies that are in Administration in exchange for appropriate reimbursement; and
- Mitigate, as far as possible, any further liabilities against LBL by the transfer or termination of contracts.

## Creditors' Committee

Your Creditors' Committee (the "Committee") was elected at the meeting of creditors and its members are:

1. Lehman Brothers Holdings Inc;
2. The Trustees of the Lehman Brothers Pension Scheme;
3. Heron Quays (HQ2) T1 Limited; and
4. Origin HR Consulting Limited.

The Administrators meet with the Committee regularly. To date, six meetings of the Committee have taken place.

The meetings with the Committee provide the Administrators with the opportunity to explain in detail how we are dealing with key aspects of the Administration and to consult the Committee on critical issues.

## Outcome for unsecured creditors

The Administrators are not in a position to give an estimate of the timing or quantum of any dividend to unsecured creditors.

However, creditors should be aware that LBL is a shareholder of Lehman Brothers International (Europe) – in Administration, an unlimited company. LBL is therefore potentially liable for any shortfall to creditors of that estate. Clearly, this could have a significant impact on funds available to other creditors of LBL.

## Extension of the Administration

Further to an application made by the Administrators, the High Court issued an Order extending the period of the Administration to 30 November 2011.

## Future reports

The next progress report to creditors will be in six months time.

Signed:

*[signature]*

MJA Jervis
Joint Administrator
Lehman Brothers Limited

# Section 2.7  Affiliate company relationships

### Background

LBL will continue to provide appropriate levels of professional cooperation with Affiliate company Office Holders, dealing with these relationships on individual bases, governed through appropriate bilateral agreements between the parties. Such agreements will ensure that LBL's costs of supporting such Affiliates are appropriately recovered.

Since the publication of our first report, 30 legal entities across the Americas, Europe and Asia have signed up to the multi-lateral 'Global Protocol' which requires the entities to provide access and information to each other. LBL's position with respect to the Global Protocol continues to be that it is not in the best interests of LBL and its creditors to be bound to such a broad arrangement which could potentially place a very significant burden on LBL, to the detriment of its general body of creditors.

### Progress to date

Due to the nature of LBL as a service company, employing the majority of Lehman staff in the UK, as well as maintaining the IT infrastructure and property arrangements, LBL's support to other Lehman entities has been an ongoing requirement. LBL has sought to ensure that the support required by various Affiliates has been managed in a manner that demonstrates clear benefits to LBL's creditors in its provision. Bilateral discussions were commenced with various Affiliates in late September 2008 with a view to collaborating in areas which would mutually benefit the various estates.

There is open dialogue with a number of Affiliates and a scoping process has been developed by the LBL Data Governance team, in close conjunction with the Affiliate Company Relationships Team, in order to facilitate these conversations. This has improved the efficiency of the dealings with Affiliate companies and has helped inform them of the 'art of the possible'.

As a result of discussions with Affiliate companies, to date, three bilateral agreements have been signed:

1. The Transitional Services Agreement ("TSA") negotiated by LBL and agreed with LBHI and certain of its Affiliates during November 2008;

2. An assignment of the TSA with LBHI was taken by Neuberger Berman Europe following its purchase of Lehman Brothers Asset Management (Europe) on 7 May 2009; and

3. An agreement with Lehman Brothers Treasury Co. BV, the Dutch entity, to provide a specified data set.

**US Affiliates**

Since the TSA was signed in November 2008, considerable support has been provided to LBHI. The payment for this support continues to be recharged according to the terms of the TSA and, significantly, from 15 May 2009 this has allowed for the recharge of 'fully loaded' costs, as well as a prescribed uplift for the benefit of the service provider.

In order to account for the application of the fully loaded cost recharge methodology, LBL has implemented an online time recording system covering all LBL employees performing work for the benefit of LBHI, which went live on 15 May 2009. Separate reporting codes have also been set up for PwC employees performing work for the benefit of LBHI. These two systems allow LBL to accurately capture and recharge any time costs incurred as a result of the relationship with LBHI. Similar mechanisms are being implemented for other Affiliate relationships as required.

As a result, from the inception of the TSA to 14 September 2009, the amount invoiced to the LBHI Estate, including Neuberger Berman, totalled £48.2m, including a direct benefit to LBL of £7.5m. In comparison, in the same period, LBHI had invoiced LBL a total of £11.4m with an associated benefit of £1.5m.

A fundamental goal of the team, and the TSA, is the reduction in the level of interdependence between LBL and LBHI. In accordance with this, both parties have made good progress in reducing their mutual dependencies through various business separations and staff transfers. The agreed shared resources in September 2009 consisted of only 17 employees compared with 69 employees in March 2009. This clearly outlines the reduction in interdependence, which should continue as LBHI plan their exit from 25 Bank Street, scheduled for mid-October 2009.

To date, LBL has assisted a number of entities to move out of 25 Bank Street under the provisions of the TSA. The exit of Real Estate Private Equity, scheduled in mid-October will represent the complete separation of the Investment Management Division from the LBL Estate, subject to some continuing, but finite IT support. This separation has consisted of the exit of Private Equity Merchant Banking (Trilantic Capital Partners) in May, Private Equity Euro-Mezzanine Fund in June and Neuberger Berman in August 2009.

**European Affiliates**

The UK Administrators have offered considerable support to various European Affiliates. These efforts have included:

- Active dialogue from the inception of the case, including meetings in the UK and elsewhere;
- The formation of a dedicated team to manage dealings with Affiliates;
- The formation of a dedicated data separation team to deal with the data requests of non-UK office holders;
- The introduction of a formalised data request system, facilitating the proper management and prioritisation of Affiliate requests; and
- Regular update meetings to monitor and prioritise progress over data extraction requests and share updates with Affiliates.

The provision of services to the Affiliates is provided on a cost indemnity basis and can only be provided where there is sufficient, available appropriate human resource and information systems capacity.

As the business models of the individual Affiliate companies vary widely the service needs are different. As outlined in the section on progress to date, tailored bilateral agreements, on commercial terms, are being negotiated with affected Affiliates.

## Issues and challenges

The issue of information sharing is at the centre of the relationship with LBHI and indeed all Affiliates. LBL and LBHI are working closely to find solutions to the complex environment in which they find themselves. Both parties have agreed to set up a working party to define the issues with respect of co-mingled data and explore the potential resolution of these issues.

Risk management remains a vital aspect of Affiliate company relations, not just in terms of data provision and the risks surrounding co-mingled data, but in terms of investing in relationships. LBL remains vulnerable to time invested in scoping, servicing or data separation activities for Affiliates, prior to signature of services agreements. However, LBL remains committed to managing this exposure through the scoping process implemented, which ensures that agreements are only entered into when commercially viable terms can be reached; alternatively, negotiations are terminated if it becomes apparent that this is not the case. As such, an important challenge is to progress the relations with Affiliate companies, identifying where productive relationships exist and executing appropriate bilateral agreements.

Another key challenge facing LBL is the recovery of costs in relation to key areas such as IT and the provision of facilities to both LBHI and Neuberger Berman. With respect to IT support, this is close to an equitable resolution. The payment for provision of facilities remains a bigger issue and there are some fundamental discrepancies in the interpretation of fully loaded costs by the parties involved. Discussions are, however, ongoing with respect to this issue.

# Lehman Brothers Limited
# In Administration

Joint Administrators' progress report for the period
15 September 2009 to 14 March 2010

13 April 2010

# Section 1   Purpose of the Joint Administrators' progress report

## Introduction

This report has been prepared by the Joint Administrators (the "Administrators") of Lehman Brothers Limited ("LBL" or the "Company") under Rule 2.47(3)(a) of the Insolvency Rules 1986 (the "Rules").

This is the third such report and provides an update on the work that the Administrators have undertaken, with particular focus on the progress made during the six months since 15 September 2009.

## Objectives of the Administration

The Administrators are pursuing the objective of achieving a better result for LBL's creditors as a whole than would be likely if LBL were wound up (without first being in Administration).

The specific aims of this Administration are to:

- Realise all assets of LBL, where value may exist;
- Provide ongoing employee and infrastructure support to the other group companies that are in Administration in exchange for appropriate reimbursement; and
- Mitigate, as far as possible, any further liabilities against LBL by the transfer or termination of contracts.

## Creditors' Committee

The Administrators regularly meet with the Creditors' Committee (the "Committee") and, to date, eight meetings of the Committee have taken place.

The meetings with the Committee provide the Administrators with the opportunity to explain in detail how we are dealing with key aspects of the Administration and to consult the Committee on critical issues.

## Outcome for unsecured creditors

The Administrators are not in a position to give an estimate of the timing or quantum of any dividend to unsecured creditors.

However, creditors should be aware that LBL is a shareholder of Lehman Brothers International (Europe) - in Administration ("LBIE"), an unlimited company. LBL is therefore potentially liable for any shortfall to creditors of that estate. Clearly, this could have a significant impact on funds available to other creditors of LBL.

## Additional Joint Administrator Appointed

On 23 November 2009 DA Howell, was appointed as an additional Joint Administrator by order of the Court. DA Howell is licensed in the United Kingdom to act as an insolvency practitioner by the Institute of Chartered Accountants in England and Wales.

AV Lomas, SA Pearson, DY Schwarzmann and MJA Jervis continue to act as Joint Administrators of the Company.

## Change of Address

The Company has relocated from 25 Bank Street and all future correspondence should be addressed to Level 23, 25 Canada Square, London, E14 5LQ, United Kingdom.

## Future reports

The next progress report to creditors will be in six months time.

Signed:

*[signature]*

MJA Jervis
Joint Administrator
Lehman Brothers Limited

# Section 2.1 Infrastructure and Property

## Overview

Infrastructure and Property ("I&P") is a function provided by LBL primarily for the management of the 25 Bank Street premises, and other leased properties and related assets. The continuing provision of the premises at 25 Bank Street was essential to support the Lehman Administration Companies. Costs are recovered by LBL from the various Lehman Brothers entities (mostly LBIE) and subtenants.

The focus of the I&P team has been to:

- Reduce LBL's cost base through relocating the Lehman Administration Companies to premises leased by another Group entity at 25 Canada Square, Canary Wharf;

- Continue essential IT and property services;

- Coordinate the recovery of costs incurred from the various Lehman Administration Companies and subtenants; and

- Realise value for creditors from physical assets.

## Progress

The key highlights for the period were:

- The relocation of the Lehman Administration Companies to 25 Canada Square;

- The generation of additional revenue by hosting a number of external events at Bank Street;

- Negotiation of IT contracts for software and applications on commercial terms with existing and new vendors;

- Delivery of a new, independent, IT infrastructure; and

- Receipt of funds for asset sales and usage.

The I&P team continued to successfully manage essential services for the ongoing operation of the Lehman Administration Companies in addition to:

- Completing the disposal or transfer of the remaining European offices to Nomura Holdings Inc ("Nomura"); and

- Renegotiating contracts for ongoing operations in Bank Street.

## Issues and challenges

The main challenge encountered by the I&P team has been in managing the vacation of 25 Bank Street, including negotiations with third party sub-lessees and arrangements for the provision of continuing building management services for third party sub-lessees.

The second significant challenge has been the negotiation of IT software and application licences. This has been resolved through the relationships established with Linklaters and vendors during the Administration.

The I&P team's main focus going forward will include:

- Managing ongoing issues in relation to 25 Bank Street;

- Managing the ongoing operations in 25 Canada Square; and

- Negotiating required IT software and application licences.

www.pwc.co.uk

# *Lehman Brothers Limited – In Administration*

Joint Administrators' progress report for the period 15 March 2010 to 14 September 2010

12 October 2010



# Section 1  Purpose of the Joint Administrators' progress report

### Introduction

This report has been prepared by the Joint Administrators (the "Administrators") of Lehman Brothers Limited ("LBL" or the "Company") under Rule 2.47(3)(a) of the Insolvency Rules 1986 (the "Rules").

This is the fourth such report and provides an update on the work that the Administrators have undertaken, with particular focus on the progress made during the six months since 15 March 2010.

### Objectives of the Administration

The Administrators are pursuing the objective of achieving a better result for LBL's creditors as a whole than would be likely if LBL were wound up (without first being in Administration).

The specific aims of this Administration are to:

- Realise all assets of LBL, where value may exist;

- Provide ongoing employee and infrastructure support to the other Group companies that are in Administration in exchange for appropriate reimbursement; and

- Mitigate, as far as possible, any further liabilities against LBL by the transfer or termination of contracts.

### Creditors' Committee

The Administrators regularly meet with the Creditors' Committee (the "Committee") and, to date, ten meetings of the Committee have taken place.

The meetings with the Committee provide the Administrators with the opportunity to explain in detail how we are dealing with key aspects of the Administration and to consult the Committee on critical issues.

### Outcome for unsecured creditors

The Administrators are not in a position to give an estimate of the timing or quantum of any dividend to unsecured creditors.

However, creditors should be aware that LBL is a shareholder of Lehman Brothers International (Europe) - in Administration ("LBIE"), an unlimited company. LBL is therefore potentially liable for any shortfall to creditors of that estate. Clearly, this could have a significant impact on funds available to other creditors of LBL.

### Future reports

The next progress report to creditors will be in six months time.

Signed:

*[signature]*

MJA Jervis
Joint Administrator
Lehman Brothers Limited

# Section 2  Joint Administrators' actions to date

LBL was pivotal to the operations of the Lehman Brothers Group of companies (the "Group"), as it held most of the UK Groups' service contracts and employee contracts.  LBL also maintained IT and general infrastructure to support the needs of the Group.  It is also the head lessee of the former European headquarters at 25 Bank Street, Canary Wharf.

In Administration, LBL has continued to provide services to other UK-based Lehman Brothers Companies in Administration (the "Lehman Administration Companies") and to receive cash from other Group entities to cover these costs.  LBL has been able to reduce the number, and value, of creditor claims it will receive.

Since their appointment, the Administrators have used specialist teams from within PricewaterhouseCoopers LLP ("PwC"), working with retained LBL employees, to ensure that the operations of LBL are properly coordinated and the objective of the Administration is met.  The teams are formed around the following activities:

- Infrastructure and property;
- Information technology;
- Human resources;
- Pensions;
- Corporation Tax and VAT;
- Intercompany;
- Affiliate company relationships; and
- Recharges.

We comment in more detail on the activities of the teams in the following pages of this report.

The teams are coordinated and managed by a central Project Management Office ("PMO"), which is responsible for agreeing the overall team structures and objectives, monitoring their progress and ensuring that they have appropriate resources.

Key progress since 15 March 2010 includes:

- Continued retention of the core employee group and completion of 95 new hires in the Report period with performance management and incentive arrangements agreed to support the retention of employees;
- The continued implementation of the Information Technology ("IT") change program to rationalise the technology footprint and reduce costs;
- The successful execution of complex IT projects, enabling separation from Barclays Capital and Nomura;
- The establishment of a mechanism for securing tax repayments in the Group is now in the final stages of being agreed with all stakeholders.  To date LBL has received £62m in tax repayments on behalf of the Group Companies; and
- Substantial progress in defining arrangements for ceasing to manage 25 Bank Street.

A cost recharge agreement has been implemented to enable LBL to recover costs from other Lehman Administration Companies to the extent they are not recovered from other entities, or attributable to LBL's activities on its own behalf.

In addition to ensuring delivery of services to other Lehman Administration Companies, and to recharging and recovering costs incurred, LBL has its own assets, comprising primarily fixtures, fittings, IT assets and tax refunds, as well as inter-company receivables.  The teams' responsibilities include the management and realisation of these assets for the benefit of the creditors of LBL, and minimising of obligations to creditors.

## *2.1 Infrastructure and Property*

### Overview

The role of Infrastructure and Property ("I&P") is to manage the premises of 25 Canada Square to support the Lehman Administration Companies and continue to manage the premises of 25 Bank Street for the subtenants. The majority of the costs incurred for the continued management of 25 Bank Street are recovered by LBL from the various subtenants.

The focus of the I&P team has been to:

- Reduce LBL's cost base through relocating the Lehman Administration Companies to premises leased by another Group entity at 25 Canada Square, Canary Wharf;
- Continue to manage 25 Bank Street for the subtenants;
- Continue essential IT and property services;
- Coordinate the recovery of costs incurred from subtenants; and
- Realise value for creditors from physical assets.

### Progress

The key highlights for the period were:

- The smooth transition of the Lehman Administration Companies to 25 Canada Square, effective 31 March and significantly reducing costs;
- From 31 March, minimising landlord services at 25 Bank Street, reducing management costs to a minimum;
- Preparation for the removal of all ties from 25 Bank Street including disconnecting all IT infrastructure and the termination of all supplier obligations relating to 25 Bank Street with effect from the termination of subleases to Nomura on 30 September 2010;
- Discussions with Canary Wharf Group regarding the future of the head lease of 25 Bank Street;
- Initiated future data centre provisioning discussions with Global Switch; and
- The continued negotiation of IT contracts for software and applications on commercial terms with existing and new vendors.

The I&P team continued to successfully manage essential services for the ongoing operation of the Lehman Administration Companies at 25 Canada Square in addition to:

- Managing the reduced services for subtenants at 25 Bank Street; and
- Preparing for the auction of the art collection (substantially completed in late September 2010, after the end of the report period).

### Issues and challenges

The main challenge encountered by the I&P team has been in managing the transition of the Lehman Administration Companies to 25 Canada Square, including the reduction of service levels at 25 Bank Street and the termination of all related supplier obligations.

The second significant challenge has been the negotiation of IT software and application licenses. This has been resolved through the relationships established with vendors during the Administration.

In the next six months, the key challenges are:

- Surrender of the head lease of 25 Bank Street; and
- Completion of negotiations with Global Switch for the future provision of data centre facilities.

www.pwc.co.uk

# *Lehman Brothers Limited –*
# *In Administration*

Joint Administrators' progress report for the period 15 September 2010 to 14 March 2011

13 April 2011



# Section 1  Purpose of the Joint Administrators' progress report

## Introduction

This report has been prepared by the Joint Administrators (the "Administrators") of Lehman Brothers Limited ("LBL" or the "Company") under Rule 2.47(3)(a) of the Insolvency Rules 1986 (the "Rules").

This is the fifth such report and provides an update on the work that the Administrators have undertaken, with particular focus on the progress made during the six months since 15 September 2010.

## Objectives of the Administration

The Administrators are pursuing the objective of achieving a better result for LBL's creditors as a whole than would be likely if LBL were wound up (without first being in Administration).

The specific aims of this Administration are to:

- Realise all assets of LBL, where value may exist;
- Provide ongoing employee and infrastructure support to the other Group companies that are in Administration in exchange for appropriate reimbursement; and
- Mitigate, as far as possible, any further liabilities against LBL by the transfer or termination of contracts.

## Creditors' Committee

The Administrators regularly meet with the Creditors' Committee (the "Committee") and, to date, twelve meetings of the Committee have taken place.

The meetings with the Committee provide the Administrators with the opportunity to explain in detail how we are dealing with key aspects of the Administration and to consult the Committee on critical issues.

## Outcome for unsecured creditors

The Administrators are not in a position to give an estimate of the timing or quantum of any dividend to unsecured creditors.

However, creditors should be aware that LBL is a shareholder of Lehman Brothers International (Europe) - in Administration ("LBIE"), an unlimited company. LBL is therefore potentially liable for any shortfall to creditors of that estate. Clearly, this could have a significant impact on funds available to other creditors of LBL.

## Future reports

The next progress report to creditors will be in six months time.

Signed:

*[signature]*

**MJA Jervis**
Joint Administrator
Lehman Brothers Limited

# *Section 2  Joint Administrators' actions to date*

LBL was pivotal to the operations of the Lehman Brothers Group of companies (the "Group"), as it held most of the UK Groups' service contracts and employee contracts.  LBL also maintained IT and general infrastructure to support the needs of the Group.  It was also the head lessee of the former European headquarters at 25 Bank Street, Canary Wharf.

In Administration, LBL has continued to provide services to other UK-based Lehman Brothers Companies in Administration (the "Lehman Administration Companies") and to receive cash from other Group entities to cover these costs.  LBL has been able to reduce the number, and value, of creditor claims it will receive.  Over time, LBL is reducing the level of services provided by either discontinuing specific services or passing service provision to end users.

Since their appointment, the Administrators have used specialist teams from within PricewaterhouseCoopers LLP ("PwC"), working with retained LBL employees, to ensure that the operations of LBL are properly coordinated and the objective of the Administration is met.  The teams are formed around the following activities:

- Information technology and property;
- Human resources;
- Pensions;
- Corporation Tax and VAT;
- Intercompany;
- Affiliate company relationships; and
- Recharges.

We comment in more detail on the activities of the teams in the following pages of this report.

The teams are coordinated and managed by a central Project Management Office ("PMO"), which is responsible for agreeing the overall team structures and objectives, monitoring their progress and ensuring that they have appropriate resources.

Key progress since 15 September 2010 includes:

- Ceasing to manage the building at 25 Bank Street, and accepting a forfeiture of the lease in December 2010;
- The successful implementation of complex IT projects to complete separation from Nomura and significantly reduce the IT infrastructure footprint, leading to an agreement of terms for the surrender of part, and assignment of the remainder of leases for data centre space to LBIE;
- Selection of an outsource provider to support the transition to a fully outsourced delivery model for Information Technology ("IT") Infrastructure, contracted to LBIE;
- Agreement with all stakeholders of a mechanism for securing tax repayments in the Group.  LBL has received £143m in tax repayments on behalf of Group Companies;
- The sale of the Lehman art assets, realising £1.6m for creditors; and
- An active recruitment program has been continued to maintain staffing levels at c. 495 employees and contractors, with performance management and incentive arrangements to support retention.

A cost recharge agreement was implemented to enable LBL to recover costs from other Lehman Administration Companies to the extent they are not recovered from other entities, or attributable to LBL's activities on its own behalf.

Since the move from 25 Bank Street into 25 Canada Square, liability for most building, occupancy and operational costs has been transferred from LBL to LBIE.  As a result of LBIE now paying these costs direct, the cost recharge mechanism is only applied to payroll costs.

LBL has its own assets, comprising primarily fixtures, fittings, IT assets and tax refunds, as well as inter-company receivables.  The teams' responsibilities include the management and realisation of these assets for the benefit of the creditors of LBL, and minimising of obligations to creditors.

## 2.1 Information Technology and Property

### Overview

The objectives of the Information Technology ("IT") and Property groups are to minimise the need for LBL to act as a service provider to other Lehman entities; dispose of surplus assets, realising value for creditors; and to ensure an appropriate, cost effective operating platform is in place to respond to the needs and wind down activities of the Administration.

The focus of the Property team has been to:

- Reduce LBL's cost base by surrendering surplus data centre space held with Global Switch;
- Remove LBL's obligations to supply property to other Lehman entities;
- Continue to realise value for creditors from physical assets;
- Stabilise the operation of 25 Canada Square as an office environment; and
- Remove LBL's contractual obligations for other Lehman Administration Companies.

The Property programme has effectively completed its goals for the reporting period, with the acceptance of forfeiture of the lease on 25 Bank Street and the resolution of various issues with the Global Switch data centre. The Property team have also arranged for the disposal of surplus data centre assets, which will realise £500k for LBL creditors, and for the sale of certain assets to LBIE for a further £400k.

The focus of the IT team has been to:

- Achieve separation and independence from Nomura and Barclays Capital while simplifying and reducing the IT footprint;
- Develop and maintain business applications to support the core objectives of the LBIE and other Administrations;
- Decommission assets no longer required;
- Provide long term data protection, and ongoing management of data; and
- Select an outsource provider for IT Infrastructure.

In the reporting period, the IT team has become fully independent of the service provision from Barclays Capital and Nomura, and all open commercial items with Barclays Capital have been closed out. To facilitate the realisation of data centre assets mentioned above, the IT assets have been decommissioned and forensically cleansed. Additionally, the IT Infrastructure team has begun to transfer to a service based cost model in preparation for the move to outsourced infrastructure services.

### Progress

Specific progress in this period includes:

**Property**

- Building management of 25 Bank street ceased from 30 September 2010;
- Forfeiture of lease of 25 Bank Street accepted on 10 December 2010;
- Agreement signed to surrender surplus data centre space at Global Switch;
- Agreement signed to assign lease of required long term data centre space to LBIE;
- A revised fixed asset register has been built for all retained assets, after regaining control of data centre space from Nomura and vacation of surplus data centre space;
- Sale of Lehman art assets completed, realising £1.6m for creditors;
- Substantially completed the transfer of ownership of IT contracts from LBL to LBIE; and
- Completed the Environment Agency Carbon Reduction Commitment Application process for relevant properties.