# Exhibit 71

```
                                                    Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 08-13555-jmp

4    Case No. 08-01420-jmp

5    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

6    In the Matter of:

7    LEHMAN BROTHERS HOLDINGS INC., ET AL,.

8              Debtors.

9    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

10   In the Matter of:

11   LEHMAN BROTHERS INC.

12              Debtor.

13   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

14   LBHI,

15              Plaintiff,

16         v.

17   JPMORGAN CHASE BANK, N.A.,

18              Defendant.

19   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

20

21              U.S. Bankruptcy Court

22              One Bowling Green

23              New York, New York

24

25
```

```
 1                    February 13, 2013

 2                      10:04 AM

 3

 4    B E F O R E :

 5    HON JAMES M. PECK

 6    U.S. BANKRUPTCY JUDGE

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1    Hearing re:  LBHI's Objection to Proofs of Claim Number

2    14824 and 14826 [ECF No. 30055]

3

4    Hearing re:  Debtors' Sixty-Seventh Omnibus Objection to

5    Claims (Value Derivative Claims) [ECF No. 12533]

6

7    Hearing re:  Debtors' Eighty-Fourth Omnibus Objection to

8    Claims (Value Derivative Claims) [ECF No. 13955]

9

10   Hearing re:  Two Hundred Eighty-Second Omnibus Objection to

11   Claims (Late Filed Claims) [ECF No. 27374]

12

13   Hearing re:  Joint Motion of Lehman Brothers Holdings Inc.

14   and Litigation Subcommittee of Creditors' Committee to

15   Extent Stay to Avoidance Actions and Grant Certain Related

16   Relief [ECF No. 33322]

17

18   Hearing re:  One Hundred Eighty-Third Omnibus Objection to

19   Claims (No Liability CMBS Claims) [ECF No. 19407]

20

21   Hearing re:  One Hundred Forty-Third Omnibus Objection to

22   Claims (Late-Filed Claims) [ECF No. 16856]

23

24   Hearing re:  Three Hundred Twenty-Eighth Omnibus Objection

25   to Claims (No Liability claims) [ECF No. 29323]
```

Page 4

1    Hearing re:  LBHI v. JPMorgan Chase Bank, N.A. [Adversary

2    Proceeding No. 10-03266]

3

4    Hearing re:  Motion of Fidelity National Title Insurance

5    Company to Compel Compliance with Requirements of Title

6    Insurance Policies [ECF No. 11513]

7

8    Hearing re:  Motion of Traxis Fund LP and Traxis Emerging

9    Market Opportunities Fund LP to Compel Debtors to Reissue

10   Distribution Checks for Allowed Claims [ECF No. 32163]

11

12   Hearing re:  Cardinal Investment Sub I, L.P. and Oak Hill

13   Strategic Partners, L.P.'s Motion for Limited Intervention

14   in the Contested Matter Concerning the Trustee's

15   Determination of Certain Claims of Lehman Brothers Holdings

16   Inc. and Certain of Its Affiliates [LBI ECF No. 4634]

17

18   Hearing re:  Motion Pursuant to Federal Rule of Bankruptcy

19   Procedure 9019 for Entry of an Order Approving Settlement

20   Agreement [LBI ECF No. 5483]

21

22   Hearing re:  Trustee's Motion Pursuant to Section 105(a) of

23   the Bankruptcy Code and Bankruptcy Rules 3007 and 9016(b)

24   for Approval of General Creditor Claim (I) Objections

25   Procedures and (II) Settlement Procedures [LBI ECF no. 5392]

Page 5

1    Hearing re:  Motion of FirstBank Puerto Rico for (1)

2    Reconsideration, Pursuant to Section 502(j) of the

3    Bankruptcy Code and Bankruptcy Rule 9024, of the SIPA

4    Trustee's Denial of FirstBank's Customer claim, and (2)

5    Limited Intervention, Pursuant to Bankruptcy Rule 7024 and

6    Local Bankruptcy Rule 9014-1, in the Contested Matter

7    Concerning the Trustee's Determination of Certain Claims of

8    Lehman Brothers Holdings Inc. and Certain of Its Affiliates

9    [LBI ECF No. 5197]

10

11   Hearing re:  Motion of Elliott Management Corporation For an

12   Order, Pursuant to 15 U.S.C. §§ 78fff-1(B), 78fff-2(B) and

13   78fff-2(C)(1) and 11 U.S.C. § 105(A), (I) Determining the

14   Method of Distribution on Customer Claims and (II) Directing

15   an Initial Distribution on Allowed Customer Claims [LBI ECF

16   No. 5129]

17

18

19

20

21

22

23

24   Transcribed by:  Dawn South, Nicole Yawn, Sherri Breach,

25   Jamie M. Weeks

Page 6

```
 1   A P P E A R A N C E S :

 2   WEIL, GOTSHAL & MANGES LLP

 3        Attorney for the Debtors

 4        1300 Eye Street NW, Suite 900

 5        Washington, DC 20005-3314

 6

 7   BY:  PETER D. ISAKOFF, ESQ.

 8

 9   WEIL, GOTSHAL & MANGES LLP

10        Attorneys for the Debtors

11        767 Fifth Avenue

12        New York, NY 10153-0119

13

14   BY:  MAURICE HORWITZ, ESQ.

15        JACQUELNE MARCUS, ESQ.

16

17   KIRKLAND & ELLIS LLP

18        Attorney for the Debtors

19        601 Lexington Avenue

20        New York, NY 10022

21

22   BY:  JOSEPH SERINO, JR., ESQ.

23

24

25
```

```
 1   CURTIS, MALLET-PREVOST, COLT & HOSLE LLP
 2       Attorneys for the Debtors
 3       101 Park Avenue
 4       New York, NY 10178-0061
 5
 6   BY:  JOSEPH D. PIZZURRO, ESQ.
 7       MICHAEL MOSCATO, ESQ.
 8
 9   SULLIVAN & CROMWELL LLP
10       Attorneys for Canary Wharf
11       125 Broad Street
12       New York, NY 10004-2498
13
14   BY:  MARC DE LEEUW, ESQ.
15       JOHN J. JEROME, ESQ.
16       DAVID B. TULCHIN, ESQ.
17
18   BRICKER & ECKLER LLP
19       Attorney for Nationwide
20       100 South Third Street
21       Columbus, OH 43215-4291
22
23   BY:  QUINTIN F. LINDSMITH, ESQ.
24
25
```

Page 8

1  LOWENSTEIN SANDLER

2      Attorney for Boilermakers Pension Fund

3      65 Livingston Avenue

4      Roseland, NJ 07068

5

6  BY:  MICHAEL S. ETKIN, ESQ.

7

8  YOUNG CONAWAY STARGATT & TAYOR, LLP

9      Attorneys for CF Midas

10     Rockefeller Center

11     1270 Avenue of the Americas

12     Suite 2210

13     New York, NY 10020

14

15  BY:  DANIEL F.X. GEOGHAN, ESQ.

16      PATRICK JACKSON, ESQ.

17

18  KAYE SCHOLER LLP

19      Attorneys for Spanish Broadcasting

20      425 Park Avenue

21      New York, NY 10022-3596

22

23  BY:  MADLYN GLEICH PRIMOFF, ESQ.

24      JOSEPH OTCHIN, ESQ.

25

Page 9

```
 1   WACHTELL, LIPTON, ROSEN & KATZ
 2        Attorneys for JPMorgan
 3        51 West 52nd Street
 4        New York, NY 10019-6150
 5
 6   BY:  MARC WOLINSKY, ESQ.
 7        HAROLD S. NOVIKOFF, ESQ.
 8        CHRISTOPHER S. SZCZERBAN, ESQ.
 9
10   MILBANK, TWEED, HADLEY & MCCLOY LLP
11        Attorney for the Official Committee
12        One Chase Manhattan Plaza
13        New York, NY 10005-1413
14
15   BY:  DENNIS C. O'DONNELL, ESQ.
16
17   HUGHES HUBBARD
18        Attorney for the SIPA Trustee
19        One Battery Park Plaza
20        New York, NY 10004-1482
21
22   BY:  JEFFREY S. MARGOLIN, ESQ.
23
24
25
```

Page 10

1   QUINN ENANUEL URQUHART & SULLIVAN, LLP

2        Attorney for the Creditors' Committee

3        51 Madison Avenue, 22nd Floor

4        New York, NY 10010

5

6   BY:  ANDREW J. ROSSMAN, ESQ.

7

8   WOLLMUTH MAHER & DEUTSCH LLP

9        500 Fifth Avenue

10       New York, NY 10110

11

12  BY:  ADAM M. BIALEK, ESQ.

13

14  WONG FLEMING

15       821 Alexander Rd., #150

16       Princeton Township, NJ 08540

17

18  BY:  JAMES HANEY, ESQ.

19

20  ALSO PRESENT:

21  DAVID WALSH

22

23  ALSO PRESENT TELEPHONICALLY:

24  JOY DORAN

25  PAUL S. JASPER

Page 11

1    MICHAEL NEUMEISTER

2    SARAH SCHINDLER-WILLIAMS

3    MICHAEL ZEKYRGIAS

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2            THE COURT:  Be seated, please.  Good morning.

3    Who's our master of ceremonies today?

4            MR. ISAKOFF:  Well, Your Honor, I'm not

5    necessarily the master of ceremonies for the whole day, but

6    I'm here for the first matter.

7            Peter Isakoff of Weil, Gotshal representing LBHI

8    in connection with the large claims filed by Canary Wharf

9    entities that total $780 million, it's a status conference.

10   The claim numbers are 14824 and 14826.

11           We were last here -- last here on January 16th

12   where we had begun discussions concerning procedures and had

13   a status conference at that time where Your Honor asked that

14   we continue the discussions.

15           We have done so, and I'd like to report on that

16   and state where I think the parties are in disagreement,

17   which is unfortunately the case, but let me walk through a

18   little bit as to what happened and then we can see where we

19   can go from there.

20           THE COURT:  Okay.  I did take a look at the

21   submission that Canary Wharf filed of record so I have their

22   perspective.

23           MR. ISAKOFF:  And I'm here today to give you ours,

24   Your Honor.

25           THE COURT:  Fine.

Page 13

1          MR. ISAKOFF:  On January 23 we met by telephone

2     and they -- we concluded without any -- reminisced anything

3     except that they very much wanted us to specify what

4     discovery it was we were seeking, but we endeavored to do

5     that in a letter of January 29, which was part of the

6     submission given to Your Honor.

7          Basically what we said is that if we could agree

8     on the basic parameters of discovery we would agree that we

9     could do it in phases as they wished to postpone any

10    discovery relating solely to the amount of damages, if any,

11    at a later time, and then we outlined what would be the

12    categories in a document request that expressly would carve

13    out anything concerning the quantum of damages.

14          We did indicate that we had to reserve the right

15    to do any necessary follow up based on what we received,

16    that the tools of discovery would be unlimited in the sense

17    that maybe we'd want to do interrogatories, maybe we'd want

18    to do request for admissions.  We did not say contrary to

19    their submission that discovery would be unlimited, just

20    that the available tools would be the usual ones.

21          The document requests and production would be

22    followed by fact depositions and then expert reports and

23    depositions of them, including the Queen's counsel.  There

24    may not be any other experts, we don't know yet.

25          We said that ADR of some sort might be

Page 14

1    appropriate, but that we were unwilling at least prior to

2    discovery to determine what would be the appropriate ADR

3    procedure to follow.  In our view it may be that mediation

4    in particular would be very fruitful, but after we found out

5    what the factual record would be.

6            They responded on February 1 with an exceedingly

7    limited scope of discovery.  As we read it, and I'm sure

8    they'll correct me if I'm wrong, they promised to produce

9    proof that the Lehman subsidiary stopped paying rent at the

10   end of March 2010.  I don't believe we even asked for that

11   and I don't know that there'd be any contest about that.

12           There was an exchange of emails between counsel

13   for Canary Wharf and for LBHI on December of 2010, around

14   the time of the forfeiture letter, and they offered to

15   produce the exchange of all emails between counsel for the

16   parties, which we undoubtedly already have.  Then they

17   wanted to take depositions of the two counsel in the email

18   exchange, and that was at -- they submitted a short

19   stipulation of a few of the relevant facts.

20           And on the 5th we responded that, you know, given

21   the size of these claims and given the amounts in dispute

22   and the stakes for LBHI and its creditors, that we could not

23   agree to any such truncated discovery, that we --

24           THE COURT:  Can you explain that to me?  Because

25   one of the obvious areas of disagreement between the parties

Page 15

1    at this stage is whether this is a big deal leading up to a

2    limited evidentiary hearing in which two solicitors provide

3    their opinions as to applicable English law or whether or

4    not the is a targeted more limited deal in anticipation of

5    that hearing.

6              And what I gather is that the debtors' perspective

7    is that there should be very broad discovery leading up to

8    that hearing, and it is Canary Wharf's position, if I'm

9    understanding it correctly, that they're inclined to be more

10   targeted.  Am I right on that?

11             MR. ISAKOFF:  I would disagree certainly with the

12   view that what they're looking for is something targeted.  I

13   think what they're doing is putting the target behind a

14   black box and not letting us into it.

15             I've just described the discovery that they say

16   they'd be willing to give us and it just is essentially

17   nothing.

18             What we are looking for -- and I can go through it

19   chapter and verse on this, Your Honor, go through the

20   categories in our January 29 letter and explain why we need

21   it --

22             THE COURT:  We can -- we can do that if necessary,

23   but maybe before we get to that it would be helpful to

24   understand what we're really talking about.

25             MR. ISAKOFF:  Okay.  And I will do that.

```
 1              THE COURT:  Because it's my understanding that

 2     we're dealing with what is in effect a bifurcated process in

 3     which damage issues will be put to one side and in effect

 4     it's a bifurcated trial as to liability with damages to

 5     follow only if there is liability.  And as to the liability

 6     phase the parties agree that the issue is totally driven by

 7     how English law is interpreted here and how it applies to

 8     the documents.

 9              MR. ISAKOFF:  Well, I would amend that, Your

10     Honor, by saying that how it applies to the documents may

11     very well depend on a variety of facts, and I'd like to

12     explain a little bit why.

13              THE COURT:  Okay.

14              MR. ISAKOFF:  All right.

15              THE COURT:  But just if you'll bear with me.  What

16     I'm trying to figure out, and I think you're about to tell

17     me, is how broader-based discovery plays into that inasmuch

18     as my understanding is that the real legal issue is driven

19     by what some solicitors say, and in my simplistic way of

20     looking at this it's a little bit like expert discovery with

21     expert reports and depositions of the expert and with the

22     discovery being perhaps limited to what the experts relied

23     upon, took into consideration, and how they informed

24     themselves to the point that they're able to express an

25     opinion.
```

1          And it seems to me -- and I may be overly narrow

2     in my view and I may appear to be -- prepared to be

3     influenced by your comments -- but it seems to me that

4     that's what we're talking about here, and I think you're

5     thinking that this is a bigger deal.

6          MR. ISAKOFF:  Well, first of all what the QCs have

7     said is based upon what was available to them, and of course

8     at some time it would be appropriate to depose them and

9     perhaps have them testify before Your Honor as to their

10    opinions and what they base it on, but the record is not

11    closed, the record has not even begun to open, and there are

12    a number of things which I can go through here --

13         THE COURT:  Well, why don't you --

14         MR. ISAKOFF:  -- which could very well have been

15    influenced on what they --

16         THE COURT:  -- why don't you tell me what it is

17    that you think you need in order to prepare for this hearing

18    and I'll hear from Canary Wharf's counsel as to whether they

19    agree or disagree with that.

20         It's highly unusual in this case for experienced

21    and competent attorneys such as are involved here not to be

22    able to reconcile a discovery plan in anticipation of what I

23    think everybody recognizes is a hearing that has a narrow

24    focus or at least a liability only focus, which will be

25    driven by incredibly my interpretation of English law

Page 18

1    documents and my interpretation and application of English

2    law to those documents.  It's one of the reasons why I

3    thought London-based arbitration might not be a bad approach

4    here.

5              MR. ISAKOFF:  And perhaps one day once we've seen

6    what the record is and what's in their files we'll come to

7    the same conclusion, Your Honor, but let me just talk a

8    little bit about what's involved here and why it is we need

9    discovery.

10             First of all there are two basic groups of issues.

11   One issue concerns whether the settlement or the agreement

12   reached between Canary Wharf and LBL to effectively waive

13   Canary Wharf's administration expense claim of about

14   30 million pounds in exchange for a payment of one and a

15   half million pounds from LBL.  And the as between the two

16   QCs is whether or not (a), this is a guarantee, which is

17   what we said, or an indemnity, which is what they say, and

18   then whether this was a material alteration of the -- LBHI's

19   risk.

20             Their position is, well, the QCs don't rely on

21   parole evidence therefore why do you need it?

22             Now, we've sought, and we do this in our January

23   29 letter, the negotiation documents leading up to the lease

24   and the guarantee that's part of lease, that's Schedule 4,

25   including drafts, notes, and communications, and so forth.

1              And why are we seeking that parole evidence?

2       Because it may be that although we take the position that --

3       and our QC does -- that this guarantee is a guarantee not an

4       indemnity, and they take the position based on the contract

5       that it's an indemnity not a guarantee, that Your Honor may

6       feel that there's an ambiguity as to which parole evidence

7       would be admissible, similar to what we did in the Bank of

8       America case where we had -- you know, where the parole

9       evidence turns out to be very informative.  So that's those

10      categories, that's one and two.

11             Category three is documents that they contend

12      support or that they're going to use in support of their

13      claims.  That's just a question of, you know, getting notice

14      of what it is that they're planning on using.

15             Then we get into the JPMorgan transaction, and

16      that's a little bit different issue from the guarantee

17      versus indemnity.  Because if we're right that it's a

18      guarantee and we're right that this deal that they made

19      vitiated the guarantee completely then the case is over, but

20      we're not litigating it -- that claim first and then the

21      others, we're litigating them all at once.

22             And the next one really has to do with their claim

23      that an email exchange between one of my partners and

24      somebody at Sullivan & Cromwell was an anticipatory

25      repudiation of an obligation to take a substitute lease that

Page 20

1     an email exchange took place before the forfeiture, whereas

2     the lease document and the guarantee document.  Section 7 of

3     the guarantee says that one of two things happens.  If

4     there's a forfeiture, which there was on December 10th,

5     either LBHI is liable for rent until a new tenant comes in

6     -- which happened in this case 10 days later -- or 180 days,

7     whichever is earlier.  So we're saying we're only liable for

8     ten days rent beginning December 10th to December 20th.

9           They say but wait a minute, Richard Cransnell (ph)

10    that, well, we're not inclined to take the lease.  Okay?

11    But they hadn't tendered it and their -- and so they didn't

12    comply with the obligation.  In other words they could have

13    after forfeiture gone to LBHI and said, you take a

14    substitute lease.  They never did that.

15          They're relying on this email exchange.  And what

16    we're saying is the following.  There's something funny

17    going on.  Because this is a transaction for I believe it

18    was a million square feet of space between Canary Wharf and

19    JPMorgan.  We are told, although we have never seen it, that

20    there was a memorandum of understanding in August of 2010,

21    four months before this email exchange.  They never told us

22    about it, we've never seen it.  They didn't consult us

23    concerning the forfeiture letter transaction, they -- we

24    learned almost through the grapevine that there's some

25    transaction going on while we're in the midst of trying to

1    do settlement discussions with them.  We don't learn about

2    it from them.  And they turn to us and say, well, if you

3    want to see the JPMorgan transaction you tell us that you're

4    not interested in taking the lease.

5           And why do they do that?  Is it is it because

6    JPMorgan insists that there be no delay?  Is it because they

7    don't want to have to comply with the automatic stay?  Is it

8    because if they tender the lease to us maybe we're going to

9    see with the JP Morgan transaction maybe we can do better

10   than simply declining it and take it and maybe do our own

11   deal?  We weren't given any of those opportunities.

12          What they did was that, you know, quickly put

13   pressure, if we want to see this transaction to say okay we

14   don't really want the lease and then try to use that to have

15   their cake and eat it to.  They do their transaction, they

16   try to stick us as if they had complied with the transaction

17   documents.

18          Now, we think we're entitled to see not just their

19   internal communications, which are probably privileged, but

20   we would like to see their communications between them and

21   JPMorgan and see whether this was a concerted strategy, at

22   least on Canary Wharf's part.  If so that may suggest that

23   the basis for their anticipatory repudiation is not in good

24   faith, that they're not entitled to some extraordinary

25   relief from not having complied with the agreement, which is

1    what they did.  They did not comply with it, and they're

2    seeking to use this email exchange as a substitute.  And we

3    think we're entitled to explore the answers to these

4    questions.

5          We don't think that it's a tremendous amount of

6    discovery, we don't think it's wide-ranging.  How long it

7    takes to do it is frankly dependent on them.  We would serve

8    a discovery request if Your Honor permitted this week.  I

9    suspect we're going to wind up here in disputes based upon

10   the positions that they've taken in their letters and Your

11   Honor may have to resolve them.

12         THE COURT:  You know how I love discovery

13   disputes.

14         MR. ISAKOFF:  I know you don't, Your Honor, and I

15   would love to avoid it, but where I'm being told that what

16   we'll give you is the exchanges that you already have

17   between counsel, you know, and no discovery concerning

18   things that I think the QCs would have to explain and take

19   into account in a more full way in doing an opinion that's

20   not preliminary but it's based upon an evidentiary record.

21   That's what we're looking for, Your Honor.

22         THE COURT:  Let me -- let me hear from counsel for

23   Canary Wharf, recognizing that I have a pretty good

24   understanding of their position as a result of what I read.

25   I now have a pretty good understanding of your position as a

Page 23

1    result of what you've said.

2         MR. ISAKOFF:  Thank you, Your Honor.

3         THE COURT:  And I have an inclination, which I'm

4    going to mention even before I hear from Canary Wharf's

5    counsel, which is this status report turns out to be more in

6    the nature of a discovery dispute already, and we have a

7    fairly full courtroom and we have a fairly congested morning

8    calendar as well as a 2 o'clock calendar.

9         It occurs to me that the parties still need to do

10   more work to -- excuse me -- narrow the issues, and --

11   excuse me -- I'm going to need to excuse myself and have

12   some water.  In fact that's what I'm going to do.  I'm going

13   to take a minute, nobody move, nobody get up.

14      (Laughter)

15         THE COURT:  I'm going to go in there, I'm going to

16   come back.

17      (Recess at 10:23 a.m.)

18         THE COURT:  I will pick up not exactly where I

19   left off.

20         It seems to me that more time needs to be spent

21   seeking accommodation with respect to scope.  To the extent

22   that you achieve that you should endeavor to develop an

23   agreed order.  To the extent you are unable to achieve that

24   we should have a discovery conference.  It does not need to

25   be on an omnibus hearing date, and it probably should be in

Page 24

1    chambers rather than just on the phone.  That will give the

2    parties an opportunity, to the extent they can't work things

3    out, to provide me with a clearer and more detailed

4    understanding as to just exactly why you can't get along on

5    this subject.

6             I understand from what you're saying, Mr. Isakoff,

7    that from Lehman's perspective you're not trying to expand

8    the scope but you are trying to understand more about

9    conduct and motivation.  I understand that from Canary

10   Wharf's perspective they view this as a fairly

11   straightforward question of applying law to facts.  I

12   suspect that's what the problem lies.

13            MR. ISAKOFF:  I suspect so too, Your Honor, and

14   certainly we would endeavor to try to reach agreement and to

15   limit discovery to whatever it is that we feel is essential.

16            THE COURT:  Okay.  I'm not trying to squelch

17   comments from Canary Wharf's counsel, so this is an

18   opportunity for counsel to be heard.

19            MR. LEEUW:  Thank you very much, Your Honor.  Marc

20   De Leeuw from Sullivan & Cromwell, counsel to Canary Wharf.

21            Your Honor, I appreciate your guidance at the end

22   of Mr. Isakoff's comments, and we'll obviously follow your

23   direction.

24            If I could I'd like to just give a little bit of

25   an overview of why I think -- I think Your Honor's

Page 25

1   observation of the issue that's separating the parties is

2   absolutely correct and then give us -- give just a little

3   bit of a general explanation of our position on this, which

4   I think Your Honor now understands from having read our

5   submission.

6             I think Your Honor's observation that what's going

7   on here for the liability phase, for the evidentiary hearing

8   where the two Queen's counsel would testify is absolutely

9   right.  It's really a question of interpretation of

10  documents, specifically agreements, the LBL agreement and

11  the indemnity agreement, which is attached to the lease, and

12  the application of English law principals to those

13  documents.  And in fact that's actually what the two Queen's

14  counsels did.  Both of them rendered opinions on liability

15  solely by reference to those documents and to those English

16  law principals.

17            THE COURT:  But here's the problem.  This would be

18  true even if we were dealing with the application of New

19  York law.  The fact that two reputable and well-informed

20  solicitors review the same documents and come to opposite

21  legal conclusions suggests that somebody is wrong, that

22  somebody is clearly wrong.  And that raises a question as to

23  how that could be.  And in a setting like that one might

24  need to drill down a little bit as to what led to those

25  curiously contrary positions.

1            MR. LEEUW:  And, Your Honor, I think Your Honor

2    mentioned drilling down with respect to potentially

3    depositions of the two Queen's counsel.  That's really not I

4    think the primary debate between the parties here.  If

5    that's the issue of course we can speak about that question,

6    and I understand that, but the question about whether the

7    two solicitors have a difference of opinion about the law is

8    really -- you're right, no different than if Mr. Isakoff and

9    I had a disagreement about New York law.  We'd both be

10   putting in briefs, we'd both be citing different cases or

11   statutes or applies law to specify documents.  That wouldn't

12   mean that it's a question that needs discovery, it wouldn't

13   mean that somebody, Your Honor in this case, would be

14   deciding what is the right view of New York law in that

15   circumstance.  And that's really what we have.

16            To give just an example Mr. Isakoff said there's

17   really sort of two buckets here.  He said the first bucket

18   is whether there -- whether the releases in the agreement

19   between Canary Wharf and LBL discharges LBHI of its

20   obligations, and it says there's a whole bunch of buckets.

21   And then it says, well, maybe there's some discovery.

22            That's exactly the issue that when we were here

23   last month Mr. Isakoff stood up before Your Honor and Your

24   Honor said, what can we have an oral argument on without the

25   need for any discovery?  And Mr. Isakoff said explicitly,

1     that issue, the issue that he just said a moment ago

2     requires discovery requires no discovery because the facts

3     are effectively undisputed, it is just an issue of English

4     law.  That's exactly what he said.  It's on page 12 of the

5     transcript.

6              Lehman has argued -- the debtors have argued that

7     these are issues -- that issue could be resolved by Your

8     Honor, but Your Honor, we're mindful of your guidance.

9              I think the real dispute between the parties

10    that's been framed in these letters is exactly what Your

11    Honor pointed out.  There's a narrow dispute here about the

12    application of documents to English law.

13             What we did in our submission was specify what are

14    the issue ins dispute.  We numbered them as three,

15    Mr. Isakoff had grouped two together, but three issues,

16    three issues of English law.  They're issues of English law

17    that can be resolved without any discovery.  Both Queen's

18    counsel have rendered their opinions on that by reference to

19    the documents and to English law, and neither one said in

20    any way, shape, or form that there were some facts that were

21    necessary, some more information that was necessary to

22    render an opinion on those three liability issues.

23             On the damages issues of course there may be facts

24    and there may be discovery, that's a different question.

25             And so what we tried to do both in our letter to

Page 28

1   Mr. Isakoff and in our submission was identify what those

2   three issues are and then specify what documents, what

3   discovery might be needed.  We don't think really any is

4   necessary, and I think given Mr. Isakoff's concession as to

5   the first point that really doesn't -- it's probably not

6   even disputed, then much of the discovery doesn't, if any,

7   needs to be done.  These are really questions of English

8   law.

9           So we think the real question is when you go

10  through each issue, and we've gone through the three issues

11  in our submission, each one is a matter of English law, each

12  one -- on each one the two Queen's counsels rendered their

13  opinion as a strict matter of English law, and then each one

14  of them say no further information is necessary.

15          So we think that's the issue that we should have a

16  liability phase hearing on.  And what we've suggested to

17  Your Honor is that we could do a relatively short period of

18  discovery, we suggested 60 days.  We could produce the

19  documents that are relevant to those very narrow issues in

20  which LBHI says its needs discovery on those three

21  identified issues, have depositions of the two people that

22  are the source of the anticipatory repudiation, and then

23  have submissions and a hearing with Your Honor.  And we had

24  suggested early June, Your Honor, but obviously it'll be

25  subject to Your Honor's schedule.

1             THE COURT:  Okay.  I was hoping to suppress that

2     whole argument, but I guess I failed.

3             MR. LEEUW:  I apologize, Your Honor, for going too

4     far.

5             THE COURT:  And I was giving you the chance to

6     express Your Honor because you gave me your whole argument.

7     And what I was really encouraging was that a less polarized

8     approach to the discovery dispute in the context of a meet

9     and confer session focused upon some compromise would be

10    useful.  Because this isn't going to be all your way and

11    it's not going to be all Lehman's way, it's going to be my

12    way.

13            MR. LEEUW:  We understand that, Your Honor.

14            THE COURT:  And I would like my way to be

15    appropriate to allow me to have the benefit of a fully

16    informed record with respect to issues that the parties

17    themselves may be familiar with, but I'm not familiar with

18    at all except from what I've heard in the last couple

19    hearings.

20            The fact that we are dealing with a big ticket

21    dispute in reference to a trophy piece of London real estate

22    that has a storied history in bankruptcy, completely

23    unrelated to Lehman, makes me curious as to why the parties

24    are jockeying for a position preemptively with respect to

25    this.  So inquiring minds want to know.

Page 30

1          That suggests that I will be more inclined in the

2     event of a dispute to be liberal rather than restrictive

3     with respect to discovery, so long as the discovery is in

4     fact relevant to the legal issues in dispute.

5          And so in that spirit I suggest that you proceed

6     to try to work this out with the understanding that if you

7     can't you shouldn't continue fruitlessly disagreeing with

8     one another, you should contact my chambers and schedule an

9     in-person settlement conference with respect to the

10    discovery.

11          I believe that it is premature to set a hearing

12    date until after we resolve what the discovery schedule will

13    look like.

14          Now, having said what I said, I would also like to

15    make clear, I do not want this discovery program to be

16    unduly extensive or burdensome.  I would like it to be

17    focused.

18          With that I think I've given you each a little bit

19    of something, and I hope you're successful in working this

20    out.

21          MR. ISAKOFF:  Your Honor, could I have just one

22    word?

23          THE COURT:  Sure.

24          MR. ISAKOFF:  The comment that the first issue

25    concerning whether it's a guarantee or an indemnity that I

Page 31

1    made some kind of concession that there are no relevant

2    discovery or facts to be discovered.  If we were to prevail

3    on the papers (indiscernible - 00:30:25) summary judgment I

4    would say, yes; however, as we've said in our reply papers

5    and as I thought I made clear, that if we were not

6    successful then we would need to take discovery.

7           Now maybe then in discussions we can decide that

8    with respect to that issue that perhaps discovery can be --

9    can await a ruling, and if Your Honor is concerned that the

10   issue is ambiguous and at that point might benefit from

11   parole evidence maybe we'd take discovery at that point.

12   It's not the efficient way to go, but it is a possibility.

13          THE COURT:  That's exactly how we proceeded in the

14   Bank of America litigation.  My recollection is that we were

15   having summary judgment argument and I determined that I

16   wanted to hear from witnesses.

17          MR. ISAKOFF:  Right.  And at that point -- by that

18   time discovery -- fact discovery was full and there had been

19   complete document discovery and extensive depositions of all

20   of the relevant witnesses, and that's, you know, obviously

21   on the focus matters here that we're looking for the

22   opportunity to develop the evidentiary record.

23          Thank you.

24          THE COURT:  Okay.  Nobody is going to win on the

25   basis of the discovery protocol.  You're going to win on the

Page 32

1    merits or lose on the merits.  So go forth and be

2    productive.

3         (Laughter)

4              MR. ISAKOFF:  Thank you, Your Honor.

5              MR. LEEUW:  Thank you, Your Honor.

6              MR. HORWITZ:  Good morning, Your Honor, Maurice

7    Horwitz, Weil, Gotshal & Manges on behalf of Lehman Brothers

8    Holdings Inc. and certain of its affiliates.

9              We have now three items that are uncontested on

10   this morning's agenda that we'll try to go through quickly

11   because it is a busy morning.

12             The first two items are related.  The debtors'

13   sixty-seventh omnibus objection to claims and the debtors'

14   eighty-fourth omnibus objection to claims.  Both were

15   objections seeking to reduce the amount of certain

16   derivative claims -- derivative-based claims filed against

17   the debtors.

18             Four claims -- as to four claims, two on the

19   sixty-seventh and two on the eighty-fourth omnibus objection

20   the responses filed by SPC Group, LLC have been resolved,

21   the allowed amounts that would be on the attached exhibit to

22   these two orders have been modified.  We have black lines of

23   those exhibits to provide to the Court and we have

24   supplemental orders that would allow these two objections

25   with respect to these four claims, which we would request