**HEARING DATE: July 16, 2014 @ 10:00 a.m.**

Macauley LLC
300 Delaware Avenue, Suite 760
Wilmington, DE 19801
Telephone: (302) 656-0100
Facsimile: (302) 654-4362
Attorneys for Conway Hospital, Inc.

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re**<br><br>**LEHMAN BROTHERS HOLDINGS INC.** *et al.,*<br><br>**Debtors.** | **Chapter 11**<br><br>**Case No. 08-13555 (SCC)**<br><br>**(Jointly Administered)** |

**AMENDED RESPONSE OF CONWAY HOSPITAL, INC. TO THREE HUNDRED
TWENTY-THIRD OMNIBUS OBJECTION TO CLAIMS (LATE-FILED CLAIMS)**

Conway Hospital, Inc. ("Conway") hereby files its amended response to the Debtors' Three Hundred Twenty-Third Omnibus Objection to Claims (Late-Filed Claims) (the "Objection") with respect to Conway's Claim No. 68076, filed April 18, 2012, asserting a general unsecured claim in the amount of $1,290,795.04 (the "Claim") (annexed as Exhibit A hereto), and represents as follows:

**Background**

1.  Conway operates a 210-bed medical hospital in Conway, South Carolina. Conway is a non-profit corporation whose mission is to improve the overall health of its community. Conway, South Carolina, is a city with an estimated population of 18,688 residents that is located

14 miles to the west of Myrtle Beach, South Carolina. In 2013, Conway provided approximately $16,000,000 of charity care to area residents.

2.    Prior to the commencement of these chapter 11 cases, Conway entered into the Debt Service Reserve Fund Agreement dated as of June 8, 1998 (the "Guaranteed Yield Contract") with Debtor Lehman Brothers Special Financing Inc. ("LBSF") and Bank of New York Mellon Trust Company N.A. as trustee. A copy of the Guaranteed Yield Contract is annexed as Addendum III to the Claim.

3.    The Guaranteed Yield Contract is a type of agreement common in the public finance industry for providing an investment return associated with bond proceeds held in reserve by a trustee for the benefit of bond holder. Under the terms of the agreement, the trustee, at Conway's direction, agreed to purchase a series of "Eligible Securities" from Lehman Brothers Inc. or any other "Qualified Dealer" in Eligible Securities selected by LBSF. The Eligible Securities were require to carry a fixed rate of 5.855% and be scheduled to mature on or before the next Bond payment date (even if yields for comparable securities in the market are at much lower rates). Upon such purchase, the trustee would physically take possession of the Eligible Securities. Sales first occurred on or about July 1, 1998 and were to be repeated semi-annually in relationship to Bond payment dates scheduled each January and July 1.

4.    Twenty-three of LBSF's affiliates, including Lehman Brothers Holdings Inc. (together with LBSF, "Lehman"), filed voluntary petitions for relief under Chapter 11 of the Code on September 15, 2008. Eighteen days later, on October 3, 2008, LBSF commenced its chapter 11 case.

5.    LBSF's bankruptcy filing constituted an Event of Default under Section 6.1(e) of the Guaranteed Yield Contract. This Event of Default gave Conway the contractual right (a) to

2

terminate the Guaranteed Yield Contract pursuant to Section 6.3(b) thereof, and (b) to receive damages from LBSF pursuant to Section 6.3(c) thereof.

6.     Under cover letter dated November 21, 2008, Conway belatedly sought to exercise its right to terminate the Guaranteed Yield Contract as set forth in Exhibit B hereto (the "Attempted Termination").[1]  LBSF never acknowledged or responded to the Attempted Termination.  Accordingly, Conway has treated the Guaranteed Yield Contract as not having been terminated.

7.     On July 2, 2009, the bankruptcy court entered a Bar Date Order (the "2009 Order") which established, among other things, a deadline date of September 22, 2009, for the following types of claims against Lehman[2]: (a) Pre-petition claims; (b) Claims arising under a "Derivative Contract"; (c) Claims arising under a "Guarantee"; and (d) Claims for rejected executory contracts.

8.     On December 6, 2011, the bankruptcy court entered its Order Confirming Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors (the "2011 Order") which, among other things, provided that Lehman rejected all executory contracts not previously assumed or to be assumed.  Paragraph 37 of the 2011 Order additionally established a new bar date for claims arising from executory contracts rejected by Lehman pursuant to the Plan.[3]  The Plan's effective date was March 6, 2012 (the "Effective Date").

---

[1] A copy of the Attempted Termination without the cover letter is also included as Addendum V of the Claim.
[2] The court also set November 2, 2009, as a bar date for claims arising from securities issued by a Lehman debtor and listed on the "Lehman Program Securities" website.  Conway's Securities Contact with LBSF was not a Lehman Program Security as defined by the court and therefore this November 2, 2009, bar date does not apply and is not discussed in this Amended Response.
[3] This bar date was the date which was 45 days after the later of (a) entry of an order approving the rejection of the subject executory contract, or (b) the notice of the occurrence of the Effective Date of the Plan, or (c) notice of an amendment to the Plan Supplement affecting the subject executory contract.

3

9. Conway filed its Claim for rejection damages on April 18, 2012, which was within 45 days of the Effective Date as permitted by the 2011 Order.

10. The Objection, dated July 9, 2012, asserts that the Claim was late filed because it was filed after the 2009 Order's September 22, 2009 bar date.

11. Conway initially responded to the Objection on August 8, 2012, and asserted that the Claim was governed by 2011 Order, not the 2009 Order, and therefore was timely filed under the terms of the 2011 Order.

12. Lehman adjourned the Objection *sine die* and took no further action until March 26, 2014, when it filed a notice scheduling the Claim for ADR resolution.

13. On May 29, 2014, the parties met for mediation of the Claim and the Objection, with the Hon. John S. Martin serving as mediator. The parties were unsuccessful in reaching a resolution of the Claim and the Objection.

14. Under the Court-Ordered Claims Hearing Procedures and Alternative Dispute Resolution Procedures in these cases, the next step should be a hearing on the merits of the Claim. Nevertheless, in view of the still-pending Objection, Conway and Lehman have agreed to address the pending Objection first.

15. This Amended Response amends Conway's initial response to the Objection.

### Lehman's Burden

Conway's Claim is prima facie valid. Fed. R. Bankr. P. 3001(f). To shift the burden to Conway to prove the validity of the Claim, Lehman first must come forward with sufficient evidence showing that section 502(b)(9) applies to the Claim. *See In re DJK Residential* LLC, 416 B.R. 100, 104-05 (Bankr. S.D.N.Y. 2009) (requiring objector to produce evidence that would refute one of the allegations essential to the claim's legal sufficiency); *In re Schaefer*, 324

4

B.R. 738, 744 (Bankr. N.D. Iowa 2005) (placing burden on objecting party to show that claim may not be allowed because of one of nine subsections of section 502(b)); *cf. In re RNI Wind Down Corp.*, 369 B.R. 174, 181 (Bankr. D. Del. 2007) (placing burden on objecting party to prove each requirement for disallowance under section 502(e)(1)(B)).

## Argument

**I. The Claim is not subject to the bar date of the 2009 Order.**

LBSF objected to the Claim on the ground that it was not filed on or before the deadline of September 22, 2009, established by 2009 Order. LBSF's objection assumes that the Claim is of a type for which a proof of claim had to be filed on or before September 22, 2009. It is not.

The 2009 Order by its express terms applied only to four types of claims relevant to this dispute: pre-petition claims, Derivative Contract claims, Guarantee claims, and executory contract rejection claims.[4] Each of these types of claims is examined below as to its applicability to the Claim.

A.   <u>Pre-petition Claims</u>.  The 2009 Order set September 22, 2009, as the deadline for each person or entity to file proofs of claim "based on pre-petition claims (as defined in § 101(5) of the Bankruptcy Code) against the Debtors." 2009 Order at 2.

Section 101(5) of the Bankruptcy Code (the "<u>Code</u>") defines a "Claim" as a right to payment or a right to equitable relief for breach of performance. At the time LBSF commenced its bankruptcy case, the Guaranteed Yield Contract was in existence, and all parties to that agreement had future, mutual performance duties owing under it. Therefore, the Guaranteed Yield Contract was an "executory contract" under the Code. *In re Penn Traffic Co.*, *524 F.3d 373, 379 (2d Cir. 2008).* Under the Code, the claim of a party to a rejected executory contract

---

[4] As noted in footnote 1, above, a fifth type of claim, i.e., claims involving Lehman Programs Securities, are not relevant to the issues in this dispute and are not discussed in this memorandum.

5

arises only after the contract has been rejected. *See In re National Gypsum Co.*, 208 F.3d 498, 505 (5th Cir. 2000); *Southmark Corp. v. Marley*, 62 F.3d 104, 106 (5th Cir. 1995). Indeed, even the United States Supreme Court has recognized that rejection claims arise post-petition:

> *[C]laims arising after bankruptcy filing, such as those resulting from the rejection of an executory contract*, must be presented through the normal administration process by which claims are estimated and classified.

*NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 530 (1984) (emphasis added); *see also National Gypsum*, 208 F.3d at 505 (explaining that the party to a rejected contract is not required to submit a proof of claim by the bar date if the rejection occurred subsequent to the bar date).

There is no dispute that the Guaranteed Yield Contract was an outstanding and viable executory contract as of the commencement of these cases. Accordingly, the Claim arose post-petition and was not a pre-petition claim.[5] The 2009 Order's bar date for pre-petition claims thus has no applicability whatsoever to the Claim filed by Conway.

B.   Derivative Contract Claims. The 2009 Order required all claims arising under "Derivative Contracts" to be filed by September 22, 2009, and the order defined a Derivative Contact is being either a "swap agreement" (as defined by § 101(53B) of the Code) or a "forward contract" (as defined by § 101(25) of the Code), but excluding certain types of specifically identified financial transactions which otherwise would be within those Code definitions of swap agreements and forward contracts. 2009 Order at 7.

---

[5] Section 502(g)'s treatment of rejected or terminated executory contract claims as general unsecured claims does not dictate a different result. That statute provides that a damages claim for a rejected (§ 365) or terminated (§ 562) executory contact shall be allowed or disallowed "as if such claim had arisen pre-petition." Section 502(g) simply prevents rejection and termination claims from being treated as an administrative expense of the estate. *See Bildisco*, 465 U.S. at 530 (explaining that rejection claims relate back); *National Gypsum*, 208 F.3d at 505 (rejection claim is treated as general unsecured claim).

6

The Guaranteed Yield Contract deals with the buying and selling of interest bearing securities, not commodities. Accordingly, the Guaranteed Yield Contract is not a "forward contract" as that term is defined under § 101(25) of the Code.[6]

Nor is the Guaranteed Yield Contract a swap agreement as that term is defined in § 101(53B) of the Code. None of the types of financial agreements enumerated in § 101(53B) describe the nature or purpose of the Guaranteed Yield Contract, which was merely a contract under which LBSF was contractually committed to ensure that a Qualified Dealer sell Conway certain designated types of securities from time to time under the contractual timetable.[7] A contract for the "purchase, sale or loan of a security" such as existed under the Guaranteed Yield Contract is clearly a "securities contract" as that term is defined under § 741(7)(A) of the Code.[8] This conclusion is further strengthened by the "catch all" provisions of § 741(7)(A)(v) which state that a securities contract is "any other agreement or transaction that is similar to an agreement or transaction referred to in this subparagraph."

Since the Guaranteed Yield Contract is a securities contract under § 741(7) of the Code, it is not a swap agreement. A swap agreement under the Code is a different type of financial agreement from a securities contract. *See In re Kaiser Steel Corp.*, 952 F.2d 1230, 1239 & n.9 (10th Cir. 1991) (recognizing that the Code covers "five different types of financial transactions," one type being securities contracts and another type being swap agreements). Moreover, the two types of agreements are treated separately under the various provisions of the Code. For example, in providing termination rights for certain non-debtor parties to executory financial

---

[6] Forward contracts involve commodities regulated by the Commodity Exchange Act. *See* 11 U.S.C. §§ 101(25), 761(1), (8); *In re Borden Chems. and Plastics Operating Ltd.*, 336 B.R. 214, 218-19 (Bankr. D. Del. 2006).
[7] Indeed, the terms "swap" or "forward agreement" do not even appear in the Guaranteed Yield Contract.
[8] Jeffrey S. Klein, a principal of Kensington Capital Advisors LLC, will be present at the July 16, 2014, hearing and can provide testimony as to the classification of the Guaranteed Yield Contract as a securities contract, not a swap agreement, under the Code.

7

contracts, § 561(1) grants that termination right to parties to a securities contract, whereas § 561(5) grants that same right to parties to a swap agreement. Other examples showing the Code's intentional differentiation of security contracts and swap agreements are: (i) § 546(g) which was added in 1990 to extend to swap agreements the same preference avoidance protection that the Code previously had given to securities contracts;[9] (ii) § 362(b)(17) which was amended in 2005 to extend to swap agreements the automatic stay exemptions that the Code already had given to securities contracts under § 362(b)(6). Accordingly, because the terms "securities contract" and "swap agreement" are mutually exclusive under the Code and because the Guaranteed Yield Contract is a securities contract, it cannot be a swap agreement as well.

Even if the Code contemplated some overlap between the two defined terms, the Guaranteed Yield Contract is still not a swap agreement. Section 101(53B)(A)(i) lists ten separate types of financial transaction agreements as being swap agreements, and none of these types apply to the Guaranteed Yield Contract. Nor does subsection (A)(ii) expand the scope of subsection (A)(i) to include financial transactions beyond the ten listed therein; subsection (A)(ii)'s use of the phrase "similar to any other agreement or transaction referred to in this paragraph" is a reference to the ten groups of agreements listed in subsection (A)(i). *See In re National Gas Distributors, LLC*, 369 B.R. 884, 889 (Bankr. E.D.N.C. 2007) ("The word 'similar,' rather than expanding the universe of agreements that come within the universe of agreements that come within the umbrella of swap agreements, actually limits the agreements to those that 'bear[] a family resemblance' to the other agreements and transactions that enjoy the

---

[9] "The legislative history of section 546(g) indicates that the purpose of the section is to ensure that the swap financial market remains stabilized and protected…. This section was intended to extend to swap agreements the same type of protection from avoidance powers that was afforded to similar types of financial agreements, including forward, commodity and securities contracts." *In re Enron Corp.*, 323 B.R. 857, 878 (Bankr. S.D.N.Y. 2005).

8

protection of the Bankruptcy Code.") (citation omitted), *rev'd on other grounds*, 556 F.3d 247 (4th Cir. 2009).

The 2009 Order by its terms applied to forward contracts and swap agreements, but not to securities contracts like the Guaranteed Yield Contract. The Guaranteed Yield Contract is neither a forward contract nor a swap agreement and, therefore, is not a Derivative Contract.

C.     Guarantee Claims. The 2009 Order also required all claims arising under Guarantees to be filed by September 22, 2009. A Guarantee claim is "a claim against a Debtor based on amounts owed pursuant to a promise, representation or agreement to answer for the payment of some debt or the performance of some duty in the case of the failure of another person or entity who is liable in the first instance." 2009 Order at 7. The Guaranteed Yield Contract in no way involved LBSF's agreement to guaranty or "answer for" the obligations of another person or entity. It was a direct contract between Conway and LBSF under which LBSF had obligations to Conway. Therefore, the Claim does not arise from a Guarantee and the September 22, 2009, bar date for Guarantee claims is inapplicable to the Claim of Conway.

D.     Rejection Claims. The 2009 Order required all claims arising from rejected executory contracts be filed on the date which is the later of September 22, 2009, or 45 days following the effective date of rejection. Under § 365 of the Code, the trustee/bankruptcy debtor is the only party which has the right to seek rejection of an executory contract. Therefore, claims arising from the rejection of executory contracts can exist only after the debtor-in-possession has sought to reject the contracts and the court has entered an order approving rejecting the contracts.

LBSF did not reject the Guaranteed Yield Contract until it was deemed rejected on the Effective Date as provided in the 2011 Order, and Conway filed its Claim within 45 days of the Effective Date. Prior to that date, LBSF took no steps to reject the Guaranteed Yield Contract

9

under §365(a). Accordingly, Conway's rejection claim is timely under the terms of both the 2009 Order and the 2011 Order.

For LBSF to assert that the Claim is untimely, LBSF must assume either that the 2009 Order applies to terminated securities contracts or that a terminated securities contract is the same thing as a rejected executory contract. LBSF is wrong under either assumption.

A termination of a securities contract by a counter-party (permitted by § 561(a)(1) of the Code) is not a "rejection" of the contract. A *rejected* executory contract is one where the debtor, with court approval, rejected the contract under § 365. In contrast, a *terminated* securities contract is one where the non-debtor terminated the contact, without court approval, under § 561. Section 562(a) of the Code recognizes the distinction between a rejected executory contract and a terminated securities contract with respect to what date to use when measuring damages. The wording of that subsection separately notes two instances where such damages may arise: a rejection of the securities contract by the trustee, and a termination of the securities contract by the other contract party. Likewise, § 562(c) refers separately to a "rejection" and to a "termination" of the securities contract. Finally, § 502(g)(1) applies to rejected executory contracts under § 365, whereas § 502(g)(2) applies to contracts terminated under § 562.[10]

It therefore is clear that claims arising from the termination of a securities contract or rejection of an executory contract are distinct and different types of claims which arise from distinct and different factual circumstances. Although the 2009 Order established a bar date for executory contracts rejected by the debtor, it did not establish a bar date for securities contracts that were *terminated* by the non-debtor party. Accordingly, the 2009 Order's September 22, 2009 bar date did not apply to Conway had the Attempted Termination been effective.

---

[10] Similarly, the rejection of an executory contract does not mean that it has been terminated. *See In re Austin Dev. Co.*, 19 F.3d 1077, 1082-83 (5th Cir. 1994); *In re DBSI, Inc.*, 409 B.R. 720, 731 (Bankr. D. Del. 2009); *In re Ames Dep't Stores*, 148 B.R. 756, 758 (Bankr. S.D.N.Y. 1993).

E.     Due Process

If the Court were to find that the 2009 Order applies to the Claim, the Court would still have to determine whether the application of the September 22, 2009 bar date to the Claim is constitutionally permissible under principles of due process since the 2009 Order made no mention of either termination claims or securities contracts. "[T]he content of the notice 'must be of such nature as reasonably to convey the required information.'" *Brody v. Village of Port Chester*, 434 F.3d 121, 130 (2d Cir. 2005) (quoting *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306 (1950)). As explained by the Second Circuit:

> The law further demands that, ordinarily, a "bar date in a bankruptcy case should be prominently announced and accompanied by an explanation of its significance." [citing *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380 (1993)]; *see also In re Herd,* 840 F.2d 757, 759-60 (10th Cir. 1988) ("Written notice of the bar date for filing claims should be clear and definite, not abstract and ambiguous.").

*In re Wireless U.S. Data, Inc.*, 547 F.3d 484, 492 (2d Cir. 2007).

When a bar date or other notice fails to apprise creditors of the need to take action to avoid a forfeiture of claims or rights, courts will invoke the Due Process Clause to prevent such forfeiture. *See, e.g.*, *In re ATD Corp.*, 352 F.3d 1062, 1066 (6th Cir. 2003) (holding that application of bar date order to creditors would violate due process because bar date notice provided no indication that bar date applied to their claims); *In re Linkous*, 990 F.3d 160, 162-63 (4th Cir. 1993) (holding that notice violated due process because it did not provide notice to secured creditor of valuation hearing).

The 2009 Order and the accompanying notice did not inform Conway that the September 22, 2009 bar date applied to securities contracts or termination claims if it did. Accordingly, Conway's due process rights would be violated if the Court were to apply the 2009 Order to the Claim.

11

**II.     The Claim is subject to the bar date of the 2011 Order.**

The Attempted Termination was not effective and did not terminate the Guaranteed Yield Contract, thereby keeping it in existence until rejected by LBSF pursuant to the 2011 Order. The Attempted Termination was not legally effective for two reasons. First, Conway did not exercise the termination right fairly contemporaneously with the bankruptcy filing, thereby waiving its termination right. Second, Conway's notice was defective because it was not in compliance with the procedures set forth in the Guaranteed Yield Contract.

(i)   <u>Waiver of Termination Right</u>.  § 561 grants a party to a securities contract the right to terminate the contract in the event of the other party's bankruptcy filing if the contract so allows, notwithstanding the automatic stay of § 362. Nevertheless, Judge Peck previously held in these cases that a party waives such a termination right unless exercised fairly contemporaneously with the filing of the bankruptcy case.[11] *See In re Lehman Holdings Co., Inc. et al.*, Case No. 08-13555 (JMP), Hearing Tr. at 111 (Bankr. S.D.N.Y. Sept. 15, 2009) (referred to as the *Metavante* ruling) (annexed as Exhibit C hereto). Judge Peck cited with approval *In re Enron Corp.*, 2005 WL 3874285, at *4, as a case noting that a counterparty's safe harbor termination right under § 560 "must be made fairly contemporaneously with the bankruptcy filing, less [sic] the contract be rendered just another ordinary executory contract." Transcript at 111.

Judge Peck in his *Metavante* ruling did not define what time period would be considered fairly contemporaneous with the bankruptcy filing in order for the termination notice to be effective, nor has Conway found any other court decision that defines the time limit. In *Lehman Bros. Special Fin. v. Ballyrock ABS CDO-2007-1 Ltd.*, 452 B.R. 31, 41 n.29 (Bankr. S.D.N.Y.

---

[11] Judge Peck in *Metavante* was dealing with § 560 of the Code, which addresses a termination of a swap agreement. However, the operative intent and wording of § 560 is essentially identical to § 561 except that § 561 deals with securities contracts. In fact, § 562 treats a termination under § 560 the same as one under § 561 for purposes of measuring damages. Likewise § 502(g)(2) also treats termination claims under §§ 560 and 561 claims identically. Therefore, Judge Peck's reasoning would apply with equal force to the Attempted Termination under § 561.

12

2011), for instance, the counter-party terminating a swap under § 560 gave its termination notice the very day after LBSF filed its bankruptcy petition, and LBSF did not challenge the timeliness of the notice.

In contrast, Conway did not give its termination notice until 67 days after the initial commencement of the Lehman cases and 49 days after filing of LBSF's petition. With other acts required in bankruptcy practice, 30 days is usually the outside limit. *See, e.g.*, 28 U.S.C. § 1447(c) (30 days to file remand motion); Fed. R. Bankr. P. 3007(a) (30 days notice of hearing on claims objection); Fed. R. Bankr. P. 7012(a) (30 days to respond to complaint); Fed. R. Bankr. P. 9027(a)(3) (30 days to remove case initiated after case commencement).

Judge Peck's use of the phrase fairly contemporaneous may very well have been an analogy to Section 547(c)(1) – the only Code section that contains the word contemporaneous. Section 547(c)(1)(B) uses the similarly undefined phrase "substantially contemporaneous" in the context of a whether an exchange for new value was substantially contemporaneous with an alleged preferential transfer. In that context, the courts of this District do not view substantially contemporaneous as exceeding 30 days. *See In re Coco*, 67 B.R. 365, 371 (Bankr. S.D.N.Y. 1986) (34 days not substantially contemporaneous); *In re Candor Diamond Corp.*, 44 B.R. 195, 198 (Bankr. S.D.N.Y. 1984) (48 days not substantially contemporaneous).

Also, a 30-day limit also would prevent a securities contract from, in Judge Peck's words, "being rendered just another ordinary executory contract." To that end, Section 365(d)(1) of the Code provides chapter 7 trustees with 60 days to assume or reject executory contracts; otherwise, they are deemed rejected. If a termination notice could be sent after 60 days, then in a chapter 7 case a securities contract may well have already been rejected. Based on Judge Peck's

13

comments, one would surmise that Judge Peck envisioned a deadline of less than 60 days, more likely 30 days.

A 30-day limit on termination notices would give counterparties sufficient time to make an informed decision whether to terminate an agreement and to send the appropriate termination notice. This is especially the case here, where September 15, 2008 was a momentous day in American history, with the Lehman chapter 11 filing monopolizing the headlines. Conway did not send its notice until 67 days afterwards. That was too late.

For all these reasons, Conway's termination notice was not given "fairly contemporaneously" with the bankruptcy filing. Under the rulings in *Metavante* and *Enron*, Conway had waived its right as of November 21, 2008, to terminate the Guaranteed Yield Contract under § 561.

(ii) <u>Termination Notice Was Defective</u>. In the event of a default, Section 6.3(b) of the Guaranteed Yield Contract permitted Conway "to immediately terminate [the Guaranteed Yield Contract] by written notice thereof to the Trustee and [LBSF]." Section 7.1 of the Guaranteed Yield Contract governed the giving of notices and provided in its relevant part:

> Section 7.1. <u>Notices</u>. All notices, demands or other communications hereunder shall be given or made in written and shall be delivered personally, or sent by certified or registered mail, postage prepaid, return receipt requested, or overnight delivery service, telex or telecopy to the party to whom they are directed at the following addresses, or at such other addresses as may be designated by notice from such party to all other parties:
>
> > <u>To Lehman</u>:
> > Lehman Brothers Special Financing
> > 3 World Financial Center, 7th Floor
> > New York, NY 10285
> > Attention: Municipal Swaps and Investment Products- Middle Office …

The above notice provision by its plain terms is mandatory. No other means of giving notice is permissible under the Guaranteed Yield Contract. Both the means of giving

14

notice (certified mail, overnight delivery service, etc.) as well the addresses to use are expressly enumerated.

When Conway gave its termination notice, the notice went to the following address:

> Mr. Locke R. McMurray
> Managing Director
> Capital Markets Contracts Legal
> Lehman Brothers
> 1271 Avenue of the Americas, 43rd Floor
> New York, New York 10020

It is self-evident that the address to which the termination notice was sent was not the address specified as the notice address for LBSF under the Guaranteed Yield Contract. Further, Conway's records disclose no change of address notice sent by LBSF.

Conway's notice, sent to an address different than that specified and required under the Guaranteed Yield Contract, was defective and rendered the notice ineffective to terminate the agreement. Under Section 7.4 of the Guaranteed Yield Contract, New York law governs. Where a party to a contract gives a notice which does not comply with the mandatory notice provisions of the contract, such notice is ineffective and inoperative. *See Luxottica Group S.p.A. v. Bausch & Lomb, Inc.*, 160 F. Supp. 2d 545, 550-51 (S.D.N.Y. 2001) (finding notice ineffective under New York law); *see also Prudential Carolinas Realty v. Cambridge Dev. Corp.*, 872 F. Supp. 256, 261-62 (D.S.C. 1994) (finding that notice "was not made in compliance with the Contract and was therefore ineffective").

For this additional reason, therefore, the Attempted Termination was defective and did not terminate the Guaranteed Yield Contract.

15

**III.  The Claim was timely filed even if the 2008 termination notice was effective.**

Even if Conway effectively terminated the Guaranteed Yield Agreement in 2008, the only effect of such termination would be on Conway's damages.  Compare Exhibit B (calculating damages as of November 18, 2008) with Exhibit A, Addendum II (calculating damages as of the Effective Date).[12]

As discussed above, the 2009 Order did not apply to the claims arising from a party's termination of its securities contract with LBSF.  The 2011 Order likewise did not address such termination claims.  It appears that no bar date has ever been set for termination claims arising under §§ 560 or 561 that did not involve forward contracts or swap agreements.  Under these circumstances, Conway's filing of the Claim on April 18, 2012, was not untimely inasmuch as other Lehman creditors were still able to file claims (e.g., rejection claims for executory contracts rejected pursuant to the 2011 Order).  Considering all the circumstances, it was fair and reasonable for Conway to file the Claim on April 18, 2012, and such filing could not have disrupted or otherwise compromised the claims process then in place.

**IV.  Conway's informal proof of claim, if necessary, should be accepted by this Court.**

Even if the 2009 Order's September 22, 2009 bar date applied to the Claim, and even if the Attempted Termination was effective, Conway would still have a valid claim for the amount asserted in the Attempted Termination as an informal proof of claim that subsequently was amended by the Claim.  Under the informal proof of claim doctrine, an untimely formal proof of claim can amend an informal and timely assertion of the claim if the creditor's document states an explicit demand showing the nature and the amount of the claim against the estate and

---

[12] Pursuant to § 562, damages for a terminated securities contract under § 561 are measured as of the effective date of termination.

16

evidences an intent to hold the debtor liable. *See In re WT Grant Co.*, 53 B.R. 417, 421 (Bankr. S.D.N.Y. 1985). Conway's termination notice certainly satisfies these requirements.

LBSF certainly will argue that the termination notice does not suffice as an informal proof of claim because it was not filed with the Court on or before September 22, 2009. Although a number of bankruptcy courts take this view, it is directly contrary to the Second Circuit's binding decision in *In re Gibraltor Amusements Ltd.*, 315 F.2d 210, 213 (2d Cir. 1963), which upheld the filing of an informal proof of claim with a receiver who later became the trustee. *See also In re Anderson-Walker Indus., Inc.*, 798 F.2d 1285, 1287-88 (9th Cir. 1986) (holding letter to trustee to constitute informal proof of claim). Although *Gibraltor* is a pre-Code decision, nothing in the Code suggests that pre-Code practice in this regard has changed, and courts do not presume that Congress amended pre-Code practice absent some indication in the statute or legislative history. *Dewsnup v. Timm*, 502 U.S. 410, 419-20 (1992).

WHEREFORE, Conway respectfully requests that the Court enter an Order denying the Objection with respect to the timeliness of the Claim, reserving all parties' rights as to the amount of the Claim, and granting to Conway such other and further relief as is just.

Dated: June 20, 2014

MACAULEY LLC

/s/ Thomas G. Macauley
Thomas G. Macauley (Del Bar No. 3411)
(admitted pro hac vice)
300 Delaware Avenue, Suite 760
Wilmington, DE 19801
Telephone: (302) 656-0100
Facsimile: (302) 654-4362

Attorneys for Conway Hospital, Inc.
