UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 Case No. |
| **Lehman Brothers Holdings Inc., et al.,** | 08-13555 |
| Debtors. | |

## MAY 2014 POST-EFFECTIVE OPERATING REPORT

MAY 2014
SCHEDULE OF CASH RECEIPTS AND DISBURSEMENTS
SCHEDULE OF PROFESSIONAL FEE AND EXPENSE DISBURSEMENTS

DEBTORS' ADDRESS:           LEHMAN BROTHERS HOLDINGS INC.
                            c/o MICHAEL S. LETO
                            CHIEF FINANCIAL OFFICER
                            1271 AVENUE OF THE AMERICAS
                            40th FLOOR
                            NEW YORK, NY 10020

DEBTORS' ATTORNEYS:         WEIL, GOTSHAL & MANGES LLP
                            c/o  JACQUELINE MARCUS, GARRETT A. FAIL
                            767 FIFTH AVENUE
                            NEW YORK, NY 10153

REPORT PREPARER:            LEHMAN BROTHERS HOLDINGS INC., AS PLAN ADMINISTRATOR

Date:  June 30, 2014

**TABLE OF CONTENTS**

Schedule of Debtors ……………………………………………………………………………………    3

Lehman Brothers Holdings Inc. and Other Debtors and Other Controlled Entities
    Basis of Presentation — Schedule of Cash Receipts and Disbursements ……………………………………………    4
    Schedule of Cash Receipts and Disbursements ……………………………………………………………....    7

LBHI
    Basis of Presentation – Schedule of Professional Fee and Expense Disbursements …………………………………    11
    Schedule of Professional Fee and Expense Disbursements …………………………………………………....    12

## SCHEDULE OF DEBTORS

The following entities (the "Debtors") filed for bankruptcy in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") on the dates indicated below.  On December 6, 2011, the Bankruptcy Court confirmed the Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors (the "Plan"). On March 6, 2012, the "Effective Date" (as defined in the Plan) occurred.  The Debtors' Chapter 11 cases remain open as of the date hereof.

|  | Case No. | Date Filed |
|---|---|---|
| Lehman Brothers Holdings Inc. ("LBHI") | 08-13555 | 9/15/2008 |
| LB 745 LLC | 08-13600 | 9/16/2008 |
| PAMI Statler Arms LLC | 08-13664 | 9/23/2008 |
| Lehman Brothers Commodity Services Inc. ("LBCS") | 08-13885 | 10/3/2008 |
| Lehman Brothers Special Financing Inc. ("LBSF") | 08-13888 | 10/3/2008 |
| Lehman Brothers OTC Derivatives Inc. ("LOTC") | 08-13893 | 10/3/2008 |
| Lehman Brothers Derivative Products Inc. ("LBDP") | 08-13899 | 10/5/2008 |
| Lehman Commercial Paper Inc. ("LCPI") | 08-13900 | 10/5/2008 |
| Lehman Brothers Commercial Corporation ("LBCC") | 08-13901 | 10/5/2008 |
| Lehman Brothers Financial Products Inc.("LBFP") | 08-13902 | 10/5/2008 |
| Lehman Scottish Finance L.P. | 08-13904 | 10/5/2008 |
| CES Aviation LLC | 08-13905 | 10/5/2008 |
| CES Aviation V LLC | 08-13906 | 10/5/2008 |
| CES Aviation IX LLC | 08-13907 | 10/5/2008 |
| East Dover Limited | 08-13908 | 10/5/2008 |
| Luxembourg Residential Properties Loan Finance S.a.r.l. | 09-10108 | 1/7/2009 |
| BNC Mortgage LLC | 09-10137 | 1/9/2009 |
| LB Rose Ranch LLC | 09-10560 | 2/9/2009 |
| Structured Asset Securities Corporation | 09-10558 | 2/9/2009 |
| LB 2080 Kalakaua Owners LLC | 09-12516 | 4/23/2009 |
| Merit LLC | 09-17331 | 12/14/2009 |
| LB Somerset LLC | 09-17503 | 12/22/2009 |
| LB Preferred Somerset LLC | 09-17505 | 12/22/2009 |

**The Company has established an email address to receive questions from readers regarding this presentation. The Company plans to review questions received and for those subjects which the Company determines a response would not (i) violate a confidentiality provision, (ii) place the Company in a competitive or negotiation disadvantage, or (iii) be unduly burdensome, the Company shall endeavor to post a response (maintaining the anonymity of the question origination) on the Epiq website maintained for the Company: www.lehman-docket.com. The Company assumes no obligation to respond to e-mail inquiries.  Please email questions in clear language with document references to QUESTIONS@lehmanholdings.com.**

**LEHMAN BROTHERS HOLDINGS INC. AND OTHER DEBTORS AND DEBTOR-CONTROLLED ENTITIES**

**BASIS OF PRESENTATION**
**SCHEDULE OF CASH RECEIPTS AND DISBURSEMENTS**
**MAY 1, 2014 – MAY 31, 2014**

The information and data included in this May 2014 Post-Effective Operating Report (the "Operating Report") are derived from sources available to Lehman Brothers Holdings Inc. ("LBHI"), as Plan Administrator, and its Controlled Entities (collectively, the "Company").  The term "Controlled Entities" refers to those entities that are directly or indirectly controlled by LBHI, and excludes, among others, those entities that are under separate administrations in the United States or abroad.  LBHI and certain of its Controlled Entities filed for protection under Chapter 11 of the Bankruptcy Code, and those entities are referred to herein as the "Debtors".  The Debtors' Chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure.  LBHI has prepared this Operating Report, which includes certain information as required by the Office of the US Trustee, based on the information available to LBHI at this time, but notes that such information may be incomplete and may be materially deficient in certain respects.  This Operating Report is not meant to be relied upon as a complete description of the Debtors, their business, condition (financial or otherwise), results of operations, prospects, assets or liabilities. LBHI reserves all rights to revise this report.

**Other items:**

1.  This Operating Report is not prepared in accordance with U.S. generally accepted accounting principles (GAAP), is not audited and will not be subject to audit or review by the Company's external auditors at any time in the future.  Cash balances and activity denominated in foreign currencies have been converted to US Dollars.

2.  Beginning and ending balances include demand deposits, interest-bearing deposits with banks, U.S. and foreign money-market funds, U.S. government obligations, U.S. government guaranteed securities, investment grade corporate bonds and commercial paper, and AAA-rated asset-backed securities secured by auto loans and credit card receivables.

3.  Beginning and ending cash balances are based on preliminary closing numbers and are subject to adjustment.

4.  Beginning and ending cash and investment balances exclude the following:

    • Cash posted as collateral for hedging activity; and
    • Cash held at real estate owned properties or at third party real estate managers.

5.  Restricted cash balances are based on preliminary estimates and are comprised of the following items as of May 31, 2014:

| ($ in millions) | | Debtors | | | | | Debtor-Controlled Entities | Total Debtors and Debtor-Controlled Entities |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | LBHI | LBSF | LCPI | Other | Total | | | |
| Reserves for Claims: | | | | | | | | |
| Disputed unsecured claims [1] | $ 2,149 | $ 2,340 | $ 23 | $ 1,096 | $ 5,608 | $ - | $ 5,608 | |
| Tax claims [2] | 390 | 117 | - | 4 | 511 | - | 511 | |
| Distributions on Allowed Claims (not remitted) [3] | 105 | 55 | 327 | 7 | 494 | - | 494 | |
| Secured, Admin, Priority Claims and Other [4] | 52 | 13 | 3 | 6 | 75 | - | 75 | |
| Subtotal, Claims Reserves | 2,696 | 2,525 | 353 | 1,113 | 6,688 | - | 6,688 | |
| Cash pledged to JPMorgan (CDA) [5] | 313 | - | - | - | 313 | - | 313 | |
| Citigroup and HSBC [6] | 2,040 | - | - | - | 2,040 | - | 2,040 | |
| Other [7] | 235 | 1 | 61 | 30 | 327 | 133 | 460 | |
| Total | $ 5,285 | $ 2,526 | $ 414 | $ 1,144 | $ 9,368 | $ 133 | $ 9,500 | |

Totals may not foot due to rounding.

(1)  Represents the cash reserve for disputed unsecured claims subsequent to the fifth Plan distribution on April 3, 2014.

(2)  Represents the cash reserve for the Internal Revenue Service ("IRS") amended proof of claim that was filed in December 2013.

(3)  Represents unpaid Plan distributions to holders of Allowed Claims of approximately $342 million primarily related to the unsecured 7th Avenue Claim against LCPI and LBSF as described in the Bankhaus Settlement Agreement included in Exhibit 3 of the Plan and approximately $152 million related to (i) claimants who failed to submit the proper taxpayer identification number forms and/or Office of Foreign Asset Control ("OFAC") forms and (ii) other open items.

(4)  Includes approximately $33 million related to post-petition intercompany payables, $10 million related to disputed secured claims and $32 million related to other administrative activities and other.

(5)  Represents $313 million of cash deposited into accounts by LBHI and pledged to JPMorgan (and its affiliates, "JPM") pursuant to paragraph 6(b) of the Collateral Disposition Agreement ("CDA") with JPM effective March 31, 2010; related to, but not limited to, clearance exposures and derivative exposures pending resolution of these items.

(6)  Represents cash deposited on or prior to September 15, 2008 by the Company in connection with certain requests and/or documents executed by the Company and Citibank N.A. of approximately $2 billion and HSBC Bank PLC of $32 million, including interest earned thereon. The Company is in discussion with HSBC Bank and commenced litigation against Citigroup regarding these deposits, among other things.

(7)  Other includes (i) various pre-petition balances on administrative hold by certain financial institutions of $92 million; (ii) asserted misdirected wires and other cash received by LBHI for the benefit of third parties and Non-Controlled Affiliates of approximately $69 million; (iii) cash collected by LCPI on behalf of a third party of $57 million related to a loan participation agreement; (iv) cash collected by LBHI on behalf of other Debtors and Debtor-Controlled Entities of $30 million, (v) cash not remitted by Debtor-Controlled Entities of $123 million to various Non-Controlled Affiliates, pending settlements on intercompany balances, for their pro rata share of distributions, (vi) the transfer of $15.3 million made by LBHI in May 2014 related to the first payment to the rabbi trust created pursuant to section 9(g) of the LBHI Director Incentive Plan (attached herein as Exhibit A), and (vii) other miscellaneous items of $74 million.

Restricted cash balances herein do not include other cash reserves required for operating expenses, asset preservation and other commitments (e.g. unfunded loans or anticipated investments).

**LEHMAN BROTHERS HOLDINGS INC. and other Debtors and Debtor-Controlled Entities**
**Summary Schedule of Cash Receipts and Disbursements**
**May 1, 2014 - May 31, 2014**

Unaudited ($ in millions, foreign currencies reflected in USD equivalents)

| | Debtors | | | | | Debtor-Controlled Entities | | | Total Debtors and Debtor-Controlled Entities |
|---|---|---|---|---|---|---|---|---|---|
| | LBHI | LBSF | LCPI | Other | Total | LB I Group | Other | Total | |
| Beginning Free Cash and Investments (5/1/14) | $ 354 | $ 70 | $ 135 | $ 357 | $ 917 | $ 28 | $ 1,080 | $ 1,109 | $ 2,026 |
| Restricted Cash | 5,288 | 2,529 | 417 | 1,140 | 9,374 | 3 | 129 | 132 | 9,506 |
| Beginning Total Cash and Investments | 5,643 | 2,599 | 553 | 1,497 | 10,292 | 32 | 1,209 | 1,240 | 11,532 |
| **Sources of Cash** | | | | | | | | | |
| Commercial Real Estate | 85 | - | 5 | - | 89 | - | 84 | 84 | 174 |
| Loans (Corporate and Residential) | 4 | - | 2 | - | 6 | - | (2) | (2) | 3 |
| Private Equity / Principal Investing | 3 | - | 1 | - | 4 | 49 | 0 | 49 | 53 |
| Derivatives | - | 24 | - | 5 | 30 | - | - | - | 30 |
| Receipts from Affiliates | 46 | 2 | 0 | - | 49 | - | - | - | 49 |
| Other | 3 | 1 | 3 | 0 | 7 | 0 | 1 | 1 | 9 |
| **Total Sources of Cash** | 141 | 27 | 11 | 5 | 185 | 49 | 84 | 133 | 317 |
| **Uses of Cash** | | | | | | | | | |
| Non-Operating | | | | | | | | | |
| Commercial Real Estate | - | - | (0) | - | (0) | - | (3) | (3) | (3) |
| Loans (Corporate and Residential) | (0) | - | - | - | (0) | - | - | - | (0) |
| Private Equity / Principal Investing | (0) | - | - | - | (0) | (0) | - | (0) | (0) |
| Derivatives | - | (1) | - | - | (1) | - | - | - | (1) |
| Payments to Creditors | - | - | - | - | - | - | (0) | (0) | (0) |
| Other | (1) | - | - | (0) | (1) | - | (0) | (0) | (1) |
| Operating Expenses | (51) | (0) | (2) | (0) | (53) | (0) | (6) | (6) | (58) |
| **Total Uses of Cash** | (51) | (1) | (2) | (0) | (55) | (0) | (9) | (10) | (64) |
| **Net Cash Flow** | 90 | 26 | 8 | 5 | 130 | 48 | 75 | 123 | 253 |
| Inter-Company Transfers, Net | (9) | (5) | 147 | 11 | 143 | 3 | (147) | (143) | 0 |
| Other | (2) | - | - | (0) | (2) | - | - | - | (2) |
| Loan Agencies, Net | 0 | - | 1 | - | 1 | - | - | - | 1 |
| FX Fluctuation | (1) | (0) | (0) | (0) | (1) | (0) | (0) | (0) | (2) |
| Ending Total Cash and Investments | 5,720 | 2,620 | 708 | 1,513 | 10,562 | 83 | 1,137 | 1,220 | 11,782 |
| Restricted Cash | (5,285) | (2,526) | (414) | (1,144) | (9,368) | (3) | (129) | (133) | (9,500) |
| Ending Free Cash and Investments (5/31/14) | $ 435 | $ 94 | $ 295 | $ 369 | $ 1,194 | $ 80 | $ 1,007 | $ 1,087 | $ 2,281 |

All values that are exactly zero are shown as "-".  Values between zero and $0.5 million appear as "0".
Totals may not foot due to rounding.

**LEHMAN BROTHERS HOLDINGS INC. and other Debtors and Debtor-Controlled Entities**
**Schedule of Cash Receipts and Disbursements**
**May 1, 2014 - May 31, 2014**

Unaudited ($ in millions, foreign currencies reflected in USD equivalents)

| | | LBHI | LBSF | LCPI | Other | Total | LB I Group | Other | Total | Total Debtors and Debtor-Controlled Entities |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | **Debtors** | | | | **Debtor-Controlled Entities** | | |
| **Beginning Free Cash and Investments (5/1/14)** | | $ 354 | $ 70 | $ 135 | $ 357 | $ 917 | $ 28 | $ 1,080 | $ 1,109 | $ 2,026 |
| Restricted Cash | | 5,288 | 2,529 | 417 | 1,140 | **9,374** | 3 | 129 | 132 | 9,506 |
| **Beginning Total Cash and Investments** | | **5,643** | **2,599** | **553** | **1,497** | **10,292** | **32** | **1,209** | **1,240** | **11,532** |
| | | | | | | | | | | |
| **Sources of Cash** | | | | | | | | | | |
| Commercial Real Estate | | | | | | | | | | |
| Principal | (a) | 83 | - | 4 | - | **87** | - | 84 | **84** | **171** |
| Interest | | 2 | - | 0 | - | **2** | - | 0 | **0** | **2** |
| Loans (Corporate and Residential) | | | | | | | | | | |
| Principal | | 4 | - | 1 | - | **5** | - | (2) | **(2)** | **3** |
| Interest | | 0 | - | 0 | - | **0** | - | 0 | **0** | **1** |
| Private Equity / Principal Investing | | | | | | | | | | |
| Principal | | 0 | - | 1 | - | **1** | 49 | 0 | **49** | **50** |
| Interest and Dividends | | 3 | - | 0 | - | **3** | - | - | **-** | **3** |
| Derivatives | | | | | | | | | | |
| Return / (Posting) of Hedging Collateral, net | | - | (12) | - | - | **(12)** | - | - | **-** | **(12)** |
| Collections from Live / Terminated Trades | (b) | - | 43 | - | 5 | **48** | - | - | **-** | **48** |
| Receipts from Affiliates | | | | | | | | | | |
| Distributions from Non-Controlled Affiliates | (c) | 46 | 2 | 0 | - | **49** | - | - | **-** | **49** |
| Other | | | | | | | | | | |
| Other | | 3 | 1 | 3 | 0 | **7** | 0 | 1 | **1** | **9** |
| **Total Sources of Cash** | | **141** | **27** | **11** | **5** | **185** | **49** | **84** | **133** | **317** |

All values that are exactly zero are shown as "-".  Values between zero and $0.5 million appear as "0".
Totals may not foot due to rounding.

**LEHMAN BROTHERS HOLDINGS INC. and other Debtors and Debtor-Controlled Entities**
**Schedule of Cash Receipts and Disbursements**
**May 1, 2014 - May 31, 2014**

Unaudited ($ in millions, foreign currencies reflected in USD equivalents)

| | | Debtors | | | | | Debtor-Controlled Entities | | | Total Debtors and Debtor-Controlled Entities |
|---|---|---|---|---|---|---|---|---|---|---|
| | | LBHI | LBSF | LCPI | Other | Total | LB I Group | Other | Total | |
| **Uses of Cash** | | | | | | | | | | |
| Non-Operating | | | | | | | | | | |
| Commercial Real Estate | | | | | | | | | | |
| Preservation of Assets | | - | - | (0) | - | (0) | - | (3) | (3) | (3) |
| Loans (Corporate and Residential) | | | | | | | | | | |
| Preservation of Assets | | (0) | - | - | - | (0) | - | - | - | (0) |
| Private Equity / Principal Investing | | | | | | | | | | |
| Capital Calls | | (0) | - | - | - | (0) | (0) | - | (0) | (0) |
| Derivatives | | | | | | | | | | |
| Payments on Live Trades | | - | (1) | - | - | (1) | - | - | - | (1) |
| Payments to Creditors | | | | | | | | | | |
| Payments to Creditors - Non Controlled Affiliates | | - | - | - | - | - | - | (0) | (0) | (0) |
| Other | | | | | | | | | | |
| Other | | (1) | - | - | (0) | (1) | - | (0) | (0) | (1) |
| Operating Expenses | (d) | | | | | | | | | |
| Compensation and Benefits | (e) | (6) | - | - | - | (6) | - | (1) | (1) | (8) |
| Professional Fees | (f) | (41) | - | (0) | (0) | (42) | (0) | (3) | (3) | (45) |
| Other | (g) | (3) | (0) | (2) | (0) | (5) | (0) | (1) | (1) | (6) |
| **Total Uses of Cash** | | **(51)** | **(1)** | **(2)** | **(0)** | **(55)** | **(0)** | **(9)** | **(10)** | **(64)** |
| **Net Cash Flow** | | **90** | **26** | **8** | **5** | **130** | **48** | **75** | **123** | **253** |
| Inter-Company Receipts | (h) | 19 | 2 | 155 | 12 | 187 | 3 | 25 | 28 | 216 |
| Inter-Company Disbursements | (h) | (28) | (7) | (8) | (1) | (44) | - | (172) | (172) | (216) |
| Other | | (2) | - | - | (0) | (2) | - | - | - | (2) |
| Loan Agencies, Net | | 0 | - | 1 | - | 1 | - | - | - | 1 |
| FX Fluctuation | | (1) | (0) | (0) | (0) | (1) | (0) | (0) | (0) | (2) |
| **Ending Total Cash and Investments** | (i) | 5,720 | 2,620 | 708 | 1,513 | 10,562 | 83 | 1,137 | 1,220 | 11,782 |
| Restricted Cash | | (5,285) | (2,526) | (414) | (1,144) | (9,368) | (3) | (129) | (133) | (9,500) |
| **Ending Free Cash and Investments (5/31/14)** | | $ 435 | $ 94 | $ 295 | $ 369 | $ 1,194 | $ 80 | $ 1,007 | $ 1,087 | $ 2,281 |

All values that are exactly zero are shown as "-".  Values between zero and $0.5 million appear as "0".

**LEHMAN BROTHERS HOLDINGS INC. and other Debtors and Debtor-Controlled Entities**
**Schedule of Cash Receipts and Disbursements**
**May 1, 2014 - May 31, 2014**

Unaudited ($)

## Notes:

(a)  Cash collections primarily include (i) $84 million at LBHI from the Starman loan repayment and (ii) $75 million at Property Asset Management Inc. from the sale of Oak Knoll land.

(b)  Collections from Live / Terminated Trades are shown net of purchases of SPV notes.

(c)  Cash collections at LBHI include a distribution from Lehman Brothers Japan Inc. of approximately $29 million. This amount was transferred to certain Debtors and Debtor-Controlled Entities in June 2014.

(d)  A portion of the Operating Expenses paid by LBHI is subject to allocations to, and reimbursement from, various Controlled Entities.

(e)  Compensation and Benefits includes the Company's employee expenses as well as fees paid to Alvarez & Marsal (A&M).

(f)  Professional Fees include disbursements of approximately $17 million and $3 million for A&M and Houlihan Lokey incentive fees, respectively, related to the Fifth Distribution to holders of Allowed Claims.

(g)  Operating Expenses - Other includes expenses related to outsourced services, IT, occupancy, taxes, insurance and other general administrative items.

(h)  Inter-Company Receipts and Disbursements primarily include partial repayments on intercompany balances and other administrative activities.

(i)  Ending Total Cash and Investments for Debtor-Controlled Entities - Other includes $241 million of cash balances at Debtor-Controlled Entities in Asia.

**LEHMAN BROTHERS HOLDINGS INC. AND OTHER DEBTORS AND DEBTOR-CONTROLLED ENTITIES**

**BASIS OF PRESENTATION**
**SCHEDULE OF PROFESSIONAL FEE AND EXPENSE DISBURSEMENTS**
**MAY 1, 2014 – MAY 31, 2014**

The information and data included in this May 2014 Post-Effective Operating Report (the "Operating Report") are derived from sources available to Lehman Brothers Holdings Inc. ("LBHI"), as Plan Administrator and its Controlled Entities (collectively, the "Company").  The term "Controlled Entities" refers to those entities that are directly or indirectly controlled by LBHI, and excludes, among others, those entities that are under separate administrations in the United States or abroad.  LBHI and certain of its Controlled Entities had filed for protection under Chapter 11 of the Bankruptcy Code, and those entities are referred to herein as the "Debtors".  The Debtors' Chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure.  LBHI has prepared this Operating Report, including certain information as required by the Office of the United States Trustee, based on the information available to LBHI at this time, but note that such information may be incomplete and may be materially deficient in certain respects.  This Operating Report is not meant to be relied upon as a complete description of the Debtors, their business, condition (financial or otherwise), results of operations, prospects, assets or liabilities. LBHI reserves all rights to revise this report.

1.  This Operating Report is not prepared in accordance with U.S. generally accepted accounting principles (GAAP), is not audited and will not be subject to audit or review by the Company's external auditors at any time in the future.

2.  The professional fee disbursements presented in this report reflect the date of actual cash payments to professional service providers.  The Company has incurred additional professional fee expenses during the reporting period that will be reflected in future Operating Reports as cash payments are made to providers.

3.  The professional fee disbursements presented in this report have primarily been paid by LBHI; a portion of these fees have been and will be allocated to Debtors and certain Controlled Entities based on the dedicated costs associated with each entity and an allocation methodology.

**LEHMAN BROTHERS HOLDINGS INC. and Other Debtors and Debtor-Controlled Entities**
**Schedule of Professional Fee and Expense Disbursements**
**May 2014 (a)**

Unaudited ($ in thousands)

| | | May-2014 | | Year-to-date | |
|---|---|---:|---|---:|---|
| Alvarez & Marsal LLC | Interim Management | $ 2,737 | | $ 17,198 | (e) |
| **Professional Fees** | | | | | |
| Akerman Senterfitt & Eidson PA | Special Counsel | 44 | (b) | 282 | |
| Arnold & Porter, LLP | Special Counsel | 235 | | 1,608 | |
| Bickel & Brewer | Special Counsel - Real Estate | 2 | | 1,008 | |
| Bingham McCutchen LLP | Special Counsel - Tax | - | | 811 | |
| Curtis, Mallet-Prevost, Colt & Mosle LLP | Conflicts and Litigation Counsel | 1,023 | | 4,134 | |
| Dechert LLP | Special Counsel - Real Estate | 20 | | 109 | |
| Epiq Bankruptcy Solutions LLC | Claims Management and Noticing Agent | - | | 1,353 | |
| FTI Consulting Inc. | Financial Advisor - Creditors & Tax | - | | 291 | |
| Jones Day | Special Counsel - Asia and Domestic Litigation | 1,672 | (b) | 5,039 | |
| Milbank Tweed Hadley & McCloy LLP | UCC Litigation Committee and Litigation Counsel | 786 | (b) | 2,339 | |
| Pachulski Stang Ziehl & Jones | Special Counsel - Real Estate | 172 | (b) | 468 | |
| Paul, Hastings, Janofsky & Walker LLP | Special Counsel - Real Estate | 194 | | 317 | |
| Quinn Emanuel Urquhart Oliver & Hedges LLP | UCC Litigation Committee and Litigation Counsel | 5,130 | (b) | 7,756 | |
| Reilly Pozner LLP | Special Counsel - Mortgage Litigation and Claims | 70 | | 392 | |
| Skadden, Arps, Slate, Meagher & Flom LLP | Board of Directors Counsel | 31 | | 794 | |
| Weil Gotshal & Manges LLP | Lead Counsel - Debtors | 6,570 | (b) | 28,384 | |
| Wollmuth Maher & Deutsch LLP | Special Counsel - Derivatives | 288 | | 990 | |
| Paul Weiss Rifkind Wharton & Garrison | Special Counsel | 1,464 | | 1,518 | |
| US Trustee Quarterly Fees | | - | | 600 | |
| Other Professionals - Legal | Various | 4,853 | (c) | 17,887 | |
| Other Professionals - Non-Legal | Various | 1,329 | (c) | 5,609 | |
| Other Professionals - Asia | Various | 123 | (c) | 831 | |
| Sub-total Professional Fees | | 24,005 | | 82,519 | |
| **Total Professional Fees (including A&M)** | | **26,741** | | **99,717** | |
| Alvarez & Marsal LLC | Incentive fees | 17,136 | (d) | 17,136 | |
| Houlihan Lokey Howard & Zukin Capital Inc. | Incentive fees | 3,443 | (d) | 3,443 | |
| **Total Incentive Fees** | | **20,579** | | **20,579** | |
| **Total Professional and Incentive Fees** | | $ **47,321** | | $ **120,296** | |

(a) The Company has incurred additional professional fee expenses that will be reflected in future Operating Reports.

(b) ` Reflects professional fees incurred for multiple months.

(c) Other Professionals reflect disbursements, including expert witnesses fees, to over 100 vendors.

(d) Reflects incentive fees related to the Fifth Distribution to holders of Allowed Claims. Refer to Docket No. 32470 and Docket No. 32155 for additional information on Alvarez & Marsal and Houlihan Lokey incentive fees, respectively.

(e) Reflects payments to Alvarez & Marsal for six months of invoices.

**Exhibit A**

## LEHMAN BROTHERS HOLDINGS INC.
### DIRECTOR INCENTIVE COMPENSATION PLAN

1.    <u>Purpose</u>.    The purpose of this Lehman Brothers Holdings Inc. Director Incentive Compensation Plan is to encourage the Participants to optimize the value and speed of the distributions to be made by the Debtor Entities to the holders of unsecured third party claims at the Debtor Entities, while reducing the amount of invalid claims against the Debtor Entities.

2.    <u>Definitions</u>.    Capitalized terms used but not otherwise defined herein shall have the meanings set forth in this Section 2.

"Advances" shall mean the payments described in Section 5 hereof.

"Allowed Claims" shall mean the sum of the value of (A) the total allowed third party unsecured claims at the Company and the other Debtor Entities through the Final Allowed Claims Valuation Date, (B) the third party unsecured claims (if any) at the Company and the other Debtor Entities that have not yet been allowed as of the Final Allowed Claims Valuation Date but that are allowed on or before December 31, 2018, and (C) as estimated by the Claims Appraiser reasonably in advance of the close of business on December 31, 2018 but estimated as of such date, the third party unsecured claims (if any) at the Company and the other Debtor Entities that have not yet been allowed as of December 31, 2018 but that, in the considered estimate of the Claims Appraiser, are likely to be allowed after December 31, 2018.  Notwithstanding the foregoing, Allowed Claims shall exclude any claim that is not against a Debtor Entity set forth on Exhibit A hereto or that is not within one of the classes of claims set forth on Exhibit A hereto.

"Award" shall mean an incentive compensation award granted pursuant to the Plan.

"Beneficiary" shall mean the Participant's beneficiary as determined pursuant to Section 9(j) hereof.

"Board" shall mean the Board of Directors of the Company.

"Cause" shall have the meaning ascribed to such term under applicable Delaware law.

"Chapter 11 Cases" shall mean the voluntary cases commenced under chapter 11 of the Bankruptcy Code, jointly administered in the bankruptcy court for the Southern District of New York, styled as *In re Lehman Brothers Holdings Inc., et al.,* Chapter 11 Case No. 08-13555 (JMP).

"Claims Appraiser" shall mean one or more recognized, reputable, qualified professional firms that are selected by the Board and reasonably acceptable to a majority of the Participants living at the time of selection.

"Claims Benchmark" shall mean the sum of the amounts shown on Exhibit A hereto, which total $299.755 billion.

"Claims Resolution Adjustment" shall mean the amount determined pursuant to Section 6(b) hereof, subject to Section 3(c) hereof.

"Code" shall mean the Internal Revenue Code of 1986, as amended.

"Company" shall mean Lehman Brothers Holdings Inc., a Delaware corporation, or any successor thereto.

"Debtor-Controlled Entity" shall have the meaning ascribed to such term in the Plan of Reorganization.

"Debtor Entity" shall mean the Company and each of its direct or indirect subsidiaries that were debtors in the Chapter 11 Cases.

"Disability" shall mean in the case of any Participant a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months and in either event by reason of which the Participant is unable to perform his services as a member of the Board.

"Effective Date" shall mean March 18, 2012, the date of the Plan's approval by the Board.

"Final Allowed Claims Valuation Date" shall mean the latest reasonable date in 2018 as of which the value of Allowed Claims practicably can be determined so as to ensure timely payment in accordance with Section 7(b) hereof.

"Final Unsecured Recovery Valuation Date" shall mean the latest reasonable date in 2018 as of which the value of Unsecured Recovery practicably can be determined so as to ensure timely payment in accordance with Section 7(b) hereof.

"Good Reason" shall mean in the case of any Participant the termination of the Participant's service on the Board by reason of death, Disability or not being re-elected to the Board upon the expiration of an existing term.

"ICP Benchmark Formula Amount" shall mean, as of any date, an amount equal to 0.0132% of the amount of all Unsecured Recovery as of such date that is in the First Recovery Band, 0.17% of the amount of all Unsecured Recovery as of such date that is in the Second Recovery Band, 0.44% of the amount of all Unsecured Recovery as of such date that is in the Third Recovery Band, 0.48% of the amount of all Unsecured Recovery as of such date that is in the Fourth Recovery Band, and 0.50% of the amount of all Unsecured Recovery as of such date that is in the Fifth Recovery Band.

"ICP Participation" shall mean, in respect of each Participant for each Realization of Recovery, the product of (A) one seventh of the Incentive Pool for such Realization of Recovery multiplied by (B) the Participant's Vested Percentage applicable to such Realization of Recovery.

"Incentive Amount" shall mean, in respect of each Participant, the sum of (A) the sum of the amount of such Participant's ICP Participations for all Realizations of Recovery and (B) the Claims Resolution Adjustment.

"Incentive Pool" for each Realization of Recovery shall mean the product of (A) the excess, if any, of (i) the ICP Benchmark Formula Amount, determined based on the amount of all Realizations of Recovery including and prior to such Realization of Recovery over (ii) the ICP Benchmark Formula Amount, determined based on only prior Realizations of Recovery and (B) the applicable Speed of Distributions Multiplier.

"Participant" shall mean each member of the Board on the Effective Date.

"Plan" shall mean this Lehman Brothers Holdings Inc. Director Incentive Compensation Plan.

"Plan of Reorganization" shall mean the Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. And Its Affiliated Debtors (dated December 5, 2011), as confirmed on December 6, 2011 by the United States Bankruptcy Court for the Southern District of New York.

"Plan Year" shall mean the period from the Effective Date through and including December 31, 2012 and each successive calendar year (such that, for example, the "second Plan Year" shall mean calendar year 2013) ending with calendar year 2018.

"Recovery Band" shall mean each of the "First Recovery Band" (the first $53.043 billion of Unsecured Recovery), the "Second Recovery Band" (the next $10 billion of Unsecured Recovery), the "Third Recovery Band" (the next $5 billion of Unsecured Recovery), the "Fourth Recovery Band" (the next $5 billion of Unsecured Recovery) and the "Fifth Recovery Band" (Unsecured Recovery in excess of $73.043 billion).

"Realization of Recovery" shall mean any respective amount described in clause (A), (B) or (C) of the definition below of Unsecured Recovery.

"Speed of Distributions Multiplier" shall mean the percentage determined pursuant to Section 6(a) hereof.

"Trust" shall have the meaning ascribed thereto in Section 9(g) hereof.

"Unsecured Recovery" shall mean the sum of (A) the Value of any consideration or distribution of any kind or in any form whatsoever (without double-counting any reallocations or distributions within or among the Debtor Entities as provided for in the Plan of Reorganization) paid by the Company or any of the other Debtor Entities to, or received or retained by, any unsecured creditor of any Debtor Entity (exclusive of distributions to Debtor-Controlled Entities) at any time from the Effective Date through the Final Unsecured Recovery Valuation Date, (B) the Value of any consideration or distribution of any kind or in any form whatsoever (without double-counting any reallocations or distributions within or among the Debtor Entities as provided for in the Plan of Reorganization) paid by the Company or any of the other Debtor Entities to, or received or retained by, any unsecured creditor of any Debtor Entity (exclusive of distributions to Debtor-Controlled Entities) at any time from the Final Unsecured Recovery Valuation Date through December 31, 2018 and (C) as estimated by the Value Appraiser reasonably in advance of the close of business on December 31, 2018 but estimated as of such date, to the extent not taken into account under either clause (A) or (B) above, the Value of any remaining assets (including cash and cash equivalents; contingent claims; and receivables from Debtor-Controlled Entities, non-controlled affiliates, and other third parties) then held or receivable by any of the Debtor Entities.

"Value" shall mean, for purposes of determining the amount of Unsecured Recovery, the amount determined in accordance with Section 3(b) hereof.

"Value Appraiser" shall mean one or more recognized, reputable investment banking or appraisal firms that are selected by the Board and reasonably acceptable to a majority of the Participants living at the time of selection.

"Vested Percentage" shall mean as to any Participant at any applicable time, the applicable percentage(s) determined from time to time in accordance with Section 4 hereof.

"Years of Service" shall mean in the case of any Participant the number of consecutive Plan Years commencing on or after the Effective Date during the entirety of which the Participant serves as a member of the Board.

3.    Administration and Valuation.

(a)    Administration. The Plan shall be administered by the Board. The Board shall have the authority, subject to and not inconsistent with the express provisions of the Plan, to administer the Plan and to exercise all the powers and authorities either specifically granted to it under the Plan or necessary or advisable in the administration of the Plan. All decisions, determinations and interpretations of the Board shall be final and binding on all persons, including the Company and the Participants (or any person claiming any rights under the Plan from or through any Participant). Except as otherwise required for compliance with applicable law, the Board may delegate all or any part of its authority under the Plan to a committee of the Board, to one or more employees of the Company, or to a committee of employees. The Company shall indemnify and hold harmless the members of the Board (and any person or entity to whom authority is delegated in accordance with the preceding sentence) against any and all claims, losses, damages, expenses, or liabilities arising from any action or failure to act with respect to this Plan, except in the case of gross negligence or willful misconduct by the Board or any of its members (or such other person or entity). All costs of Plan administration, including but not limited to the fees and expenses related to the Trust shall be paid directly by the Company when due and shall not be paid out of the Trust. Before selecting either a Claims Appraiser or a Value Appraiser, the Board shall consult with, and receive written confirmation from, Participants to determine that the Claims Appraiser or Value Appraiser, as the case may be, is reasonably acceptable to a majority of the Participants living at the time of selection. Following such selections, the Board shall provide all Participants (or their Beneficiaries, as the case may be) with contact information for the Claims Appraiser and Value Appraiser, as the case may be.

(b)    Valuation With Respect to Unsecured Recovery. The Value of Unsecured Recovery shall be: (i) cash or cash equivalents, at face value; (ii) in the case of any publicly-traded debt, equity or commodity securities, the volume weighted average sales price for the twenty (20) trading days immediately prior to the date such securities are distributed by the Debtor Entities or, if earlier, for the twenty (20) trading days immediately prior to the Company (or other Debtor Entity) providing notice or otherwise announcing its intention to distribute such securities (or, in the case of any such securities not yet distributed as of December 31, 2018, for the twenty (20) trading days immediately preceding such date); or (iii) in the case of assets (including receivables or contingent claims held or receivable by any of the Debtor Entities) that cannot be valued under Section 3(b)(ii) hereof, as reasonably estimated, using appropriate analyses, by the Value Appraiser. In preparing and finalizing the analyses related to any estimated valuation, the Value Appraiser shall seek input from and consult with, and the Company shall provide the Value Appraiser with reasonable access to, the executive management of the Company, the then-living Participants, and any employees, consultants or advisors of the Debtor Entities that the Value Appraiser believes may provide helpful input with respect to the valuation. The final valuations prepared by the Value Appraiser shall be conclusive and binding for all purposes under the Plan. The Company shall take all steps necessary and appropriate to engage the Value Appraiser with sufficient advance notice to enable the Value Appraiser to responsibly perform its role as required to effect the terms of the Plan (including as required so as to ensure timely payment in accordance with Section 7(b) hereof and to determine required contributions to the Trust in accordance with Section 9(g) hereof).

(c)    Valuation With Respect to Allowed Claims. In preparing and finalizing its analysis of the value of third party unsecured claims (if any) at the Company and the other Debtor Entities that have not yet been allowed as of the Final Allowed Claims Valuation Date but that in its considered estimate are likely to be allowed after the Final Allowed Claims Valuation Date, the Claims Appraiser shall seek input

4

from and consult with, and the Company shall provide the Claims Appraiser with reasonable access to, the executive management of the Company, the then-living Participants, and any employees, consultants or advisors of the Debtor Entities that the Claims Appraiser believes may provide helpful input with respect to its analysis. The final analysis prepared by the Claims Appraiser shall be conclusive and binding for all purposes under the Plan. The Company shall take all steps necessary and appropriate to engage the Claims Appraiser with sufficient advance notice to enable the Claims Appraiser to responsibly perform its role as required to effect the terms of the Plan (including as required so as to ensure timely payment in accordance with Section 7(b) hereof and to determine required contributions to the Trust in accordance with Section 9(g) hereof).

(d)    Adjustment for Unusual Items. Subject to Section 9(m) hereof, the Board shall have the authority to adopt specific adjustments to the calculations under the ICP, including with respect to Unsecured Recovery and Allowed Claims, to account for unusual items or cases ("Unusual Items") where, in the judgment of the Board, the application of rules and formulas otherwise provided in the ICP formulas would produce a result inconsistent with the intent of the ICP, particularly the ICP's alignment with the interests of unsecured creditors. The Board shall analyze each Unusual Item on a case-by-case basis and shall keep a detailed record of its analyses with respect to each Unusual Item. The Board shall be responsible for (i) determining the appropriate adjustments that shall be made under the ICP with respect to each Unusual Item, (ii) determining the appropriate timing and process for such adjustment and (iii) causing such adjustments to be appropriately reflected in the periodic reports sent by the Company to Participants pursuant to Section 9(n) hereof. Once adopted, any such adjustment shall become a part of the ICP, as if fully set forth herein, and shall be final and binding on all persons. Notwithstanding the provisions of Section 3(a) hereof, only the Board shall be empowered to make any adjustment under this Section 3(d), and the Board may not make any adjustment under this Section 3(d) without the express, written approval of a majority of the Participants then living; provided that any Participant who is a member of the Board at the time the Board makes any such adjustment and who votes in favor of such adjustment as a member of the Board shall be deemed to have given such express written approval of such adjustment.

(e)    Payment Responsibility. Liability for payment of all amounts due under the ICP shall be shared by all the Debtor Entities, with specific allocation procedures as determined by the Board.

4.    Vested Percentage. The Vested Percentage(s) of a Participant shall be determined in accordance with this Section 4.

(a)    In General. Subject to the following provisions of this Section 4, a Participant's Vested Percentage applicable to all Realizations of Recovery and Advances shall be determined as follows:

| Years of Service | Vested Percentage |
| --- | --- |
| One | 20% |
| Two | 60% |
| Three | 100% |

provided that if such Participant's service as a member of the Board terminates before the end of the third Plan Year by the Participant other than for Good Reason, the increment in the Participant's Vested Percentage attributable to the Plan Year of such termination shall be pro-rated for the number of full months of service (based on calendar date) during such Plan Year (for this purpose treating the first Plan Year as if it had commenced January 1, 2012 and treating each Participant as if his service had commenced on January 1, 2012).

(b)    Accelerated Vesting.

(i)    Good Reason. If a Participant's service as a member of the Board is terminated before the end of the third Plan Year by the Participant for Good Reason, such Participant's Vested Percentage applicable to all Realizations of Recovery and Advances shall be determined in accordance with the following table in lieu of that set forth in Section 4(a) hereof, with the increment in the Participant's Vested Percentage attributable to the Plan Year of such termination pro-rated for the number of full months of service (based on calendar date) during such Plan Year (for this purpose treating the first Plan Year as if it had commenced January 1, 2012 and treating each Participant as if his service had commenced on January 1, 2012):

| Years of Service | Vested Percentage |
|---|---|
| One | 40% |
| Two | 80% |
| Three | 100% |

(ii)    Completion. Notwithstanding the other provisions of this Section 4, a Participant's Vested Percentage applicable to all Realizations of Recovery and Advances shall be 100% if the Participant's service as a member of the Board terminates before the commencement of the fourth Plan Year by reason of the Participant not being re-elected to the Board upon expiration of an existing term and, during the twelve-month period beginning on the date of such termination, the Company, with the approval of its stockholder, converts its governance model to a liquidating trust or other more streamlined structure.

(c)    Voluntary Resignation. If a Participant's service as a member of the Board terminates at any time after the third Plan Year for any reason other than Good Reason or Cause, such Participant's Vested Percentage applicable to (i) each Realization of Recovery after the date of such termination and (ii) any Advances paid after the date of such termination, shall be equal to the amount determined under the table below. The percentage determined under the table below shall be pro-rated for the number of full months of service (based on calendar date) during the Plan Year of such termination:

| Date of Termination | Vested Percentage |
|---|---|
| December 31, 2014 | 50% |
| December 31, 2015 | 70% |
| December 31, 2016 | 90% |
| December 31, 2017 | 100% |

For example, if the date of termination is June 30, 2015, the Participant's Vested Percentage applicable to Realizations of Recovery on and after July 1, 2015 shall be 60% (i.e., the midpoint between 50% and 70%), or if the date of termination is September 30, 2016, the Participant's Vested Percentage applicable to Realizations of Recovery on and after October 1, 2016 shall be 85% (i.e., three-fourths (3/4) of the way from 70% to 90%).

Notwithstanding the foregoing, if after the third Plan Year the Company, with the approval of its stockholder, converts its governance model to a liquidating trust or other more streamlined structure and a Participant's service as a member of the Board terminates thereafter for any reason other than Good Reason or Cause, the Participant's Vested Percentage with respect to (i) the ICP Participations attributable to Realizations of Recovery after the date of such termination and (ii) any Advances paid after the date of such termination, shall be equal to 70%.

(d)    Cause Termination. Notwithstanding the prior provisions of this Section 4, if a Participant's service as a member of the Board terminates for Cause, the Participant (i) shall have a

Vested Percentage with respect to all Realizations of Recovery and all Advances of 0% (regardless of whether his Vested Percentage previously had been greater than 0%) and (ii) shall be required to repay to the Company within 10 days thereafter the amount of any payments previously made to such Participant under the Plan.

     5.    <u>Advances</u>.  On the first business day of each of the fourth, fifth and sixth Plan Years (or as soon as practicable thereafter but in any event during January of such Plan Year), the Company shall pay to each Participant (or his Beneficiary, as the case may be), in a cash lump-sum, an amount equal to his Vested Percentage applicable to such Advance at the time of payment multiplied by the applicable amount below:

| Plan Year | Amount |
|---|---|
| Fourth | $750,000 |
| Fifth | $125,000 |
| Sixth | $125,000 |

If the Advance in the fourth Plan Year is paid to a Participant (or his Beneficiary, as the case may be) who had a Vested Percentage applicable to such Advance of less than 100% at the time of payment and such Participant's Vested Percentage subsequently is adjusted to 100% in accordance with Section 4(b)(ii) hereof, the Company shall pay to the Participant (or his Beneficiary, as the case may be) in a cash lump-sum, as soon as practicable thereafter and in any event prior to April 30th of the fourth Plan Year, the excess of $750,000 over the amount of the Advance previously paid to the Participant (or his Beneficiary, as the case may be) during the fourth Plan Year.

     6.    <u>Speed of Distributions Multiplier; Claims Resolution Adjustment</u>.  The Speed of Distributions Multiplier and the Claims Resolution Adjustment shall be determined as follows:

     (a)    <u>Speed of Distributions Multiplier</u>.  The Speed of Distributions Multiplier shall be the percentage determined under the following table based upon the Plan Year during which each respective Realization of Recovery occurs, as follows:

| Plan Year | Applicable Percentage |
|---|---|
| First | 130% |
| Second | 120% |
| Third | 110% |
| Fourth | 90% |
| Fifth | 80% |
| Sixth | 70% |
| Seventh | 70% |

provided that if and when the aggregate Unsecured Recovery becomes at least $53.043 billion ("POR Threshold"), the applicable percentage for the fourth, fifth, sixth and seventh Plan Years shall then and thereafter instead be determined as follows, effective as of the date of Realization of Recovery at which POR Threshold is reached:

| Plan Year | Applicable Percentage |
|---|---|
| Fourth | 105% |
| Fifth | 95% |
| Sixth | 85% |
| Seventh | 85% |

7

For example, if POR Threshold is reached as part of a Realization of Recovery that occurs on September 30, 2015, the Speed of Distributions Multiplier applicable to such Realization of Recovery would be 105%.

(b)    Claims Resolution Adjustment.  The Claims Resolution Adjustment in respect of each Participant shall be equal to the product of (i) the sum of such Participant's ICP Participations for all Realizations of Recovery and (ii) (A) if the Allowed Claims are less than the Claims Benchmark, a percentage equal to the sum of (w) 50% of the first 3 percentage points by which the Allowed Claims are less than the Claims Benchmark, (x) 100% of the next 3 percentage points by which the Allowed Claims are less than the Claims Benchmark, (y) 200% of the next 3 percentage points by which the Allowed Claims are less than the Claims Benchmark and (z) 250% of the number of percentage points above 9% by which the Allowed Claims are less than the Claims Benchmark or (B) if the Allowed Claims exceed the Claims Benchmark, a percentage equal to the product of (x) negative two (-2) and (y) the percentage by which the Allowed Claims exceed the Claims Benchmark.

7.    Final Incentive Payments.

(a)    The Company shall pay to each Participant (or his Beneficiary, as the case may be) in a cash lump-sum on January 31, 2018 an amount equal to the excess (if any) of (i) the Participant's Incentive Amount (determined based on the Participant's ICP Participations through the sixth Plan Year but without regard to the Claims Resolution Adjustment) over (ii) any Advances actually paid to the Participant (or his Beneficiary, as the case may be).

(b)    The Company shall pay to each Participant (or his Beneficiary, as the case may be) in a cash lump sum on December 31, 2018 an amount equal to the excess (if any) of (i) the Participant's Incentive Amount (determined based on all of the Participant's ICP Participations through the seventh Plan Year and after giving effect to the Claims Resolution Adjustment) over (ii) the sum of any Advances actually paid to the Participant (or his Beneficiary, as the case may be) and the amount actually paid to the Participant (or his Beneficiary, as the case may be) in accordance with Section 7(a) hereof.

8.    Repayment Obligation.  If the sum of the amount of Advances actually paid to a Participant (or his Beneficiary, as the case may be) and the amount actually paid to him (or his Beneficiary, as the case may be) pursuant to Section 7(a) hereof exceeds the amount determined under Section 7(b)(i) hereof, the Participant (or his Beneficiary, as the case may be) shall repay such excess amount to the Company, without interest, in two equal installments on December 31, 2019 and December 31, 2020, provided that the Participant (or his Beneficiary, as the case may be) may elect to prepay all or any portion of such amount at any time without penalty.

9.    General Provisions.

(a)    Compliance with Legal Requirements.  The Plan and the granting and payment of Awards and the other obligations of the Company under the Plan shall be subject to all applicable federal and state laws, rules and regulations, and to such approvals by any regulatory or governmental agency as may be required.

(b)    Permitted Transfers.  An Award shall not be transferable by a Participant except that all or a portion of an Award may be transferred (i) in accordance with any beneficiary designation made by the Participant in accordance with Section 9(j) hereof or, in the absence thereof, by will or the laws of descent and distribution, or (ii) directly or indirectly, in a single transaction or a series of transactions, to his child, stepchild, grandchild, parent, stepparent, grandparent, spouse, sibling, mother-in-law, father-in-law, son-in-law, daughter-in-law, brother-in-law or sister-in-law or any of them (including

8

adoptive relationships), one or more trusts for the benefit of some or all of such individuals and/or the Participant, or one or more partnerships or limited liability companies in which some or all of such individuals and/or the Participant are the only partners or members.

(c)    No Right To Continued Service. Nothing in the Plan or in any Award granted pursuant hereto shall confer upon any Participant the right to continue in the service of the Company or any of its affiliates or to be entitled to any remuneration or benefits not set forth in the Plan or to interfere with or limit in any way whatever rights otherwise exist of the Company's stockholder to terminate the Participant's service as provided under the Plan of Reorganization.

(d)    Severability. In case any provision of the Plan shall be illegal or invalid for any reason, such illegality or invalidity shall not affect the remaining parts hereof, but the Plan shall be construed and enforced as if such illegal or invalid provision had never been inserted herein.

(e)    Amendment and Termination of the Plan. The Board may amend or terminate the Plan, provided that (i) no amendment may adversely affect any Participant (or, following the Participant's death, his Beneficiary) without the express written consent of such Participant (or his Beneficiary, as the case may be), (ii) the Plan may not be terminated without the express written consent of each Participant (or his Beneficiary, as the case may be), (iii) no amendment may increase the amount of benefits otherwise payable under the Plan unless the Board determines that such an amendment is necessary to properly effectuate the intent of the Plan or is necessary due to unexpected, adverse changes in regulatory requirements, tax laws, or other circumstances not within the reasonable control of the Company, in each case occurring after the Effective Date, which prevent the Plan as originally established from serving its intended purpose, and (iv) this Section 9(e) itself may not be amended under any circumstances.

(f)    Unfunded Status of Awards. The Plan is intended to constitute an unfunded plan for incentive and deferred compensation. With respect to any payments not yet made to a Participant (or his Beneficiary, as the case may be) pursuant to an Award, nothing contained in the Plan or any Award shall give any such Participant (or Beneficiary) any rights that are greater than those of a general unsecured creditor of the Company.

(g)    The Trust. As soon as practicable following the Effective Date, the Company shall establish a grantor ("rabbi") trust (the "Trust") that, subject to the claims of the general unsecured creditors of the Company, shall pay any benefits under the Plan that are not paid by the Company directly to Participants (or their Beneficiaries, as the case may be). As soon as practicable (and in any event within two business days) following the establishment of the Trust and following any later Realizations of Recovery, the Company shall contribute to the Trust an amount in cash such that, after giving effect to such contribution, the value of the assets of the Trust is equal to the excess, if any, of (i) the sum of all ICP Participations of all Participants, including the ICP Participations for the Plan Year during which such Realization of Recovery occurs (determined, in the case of a Participant who terminated service on the Board before the end of the third Plan Year by reason of not being re-elected to the Board upon expiration of an existing term, but only for the first twelve months following such termination, as if the Participant's Vested Percentage was at all times equal to 100%) over (ii) the sum of any Advances actually paid to the Participant (or his Beneficiary, as the case may be) and any amount actually paid to the Participant (or his Beneficiary, as the case may be) in accordance with Section 7(a) hereof. Notwithstanding the foregoing, the Board at any time and from time to time may determine to contribute additional amounts to the Trust. Notwithstanding anything in the Plan or the Trust to the contrary, the Company shall pay directly to Participants (or their Beneficiaries, as the case may be), in a timely manner consistent with the Plan's requirements, all benefits under the Plan that are not paid by the Trust.

9

(h)    <u>Governing Law</u>. The Plan and all determinations made and actions taken pursuant hereto shall be governed by the laws of the State of Delaware without giving effect to the conflict of laws principles thereof.

(i)    <u>Effective Date</u>. The Plan shall be effective as of the Effective Date.

(j)    <u>Beneficiary</u>. A Participant may file with the Board a written designation of a beneficiary on such form as may be prescribed by the Board and may, from time to time, amend or revoke such designation. Any amount otherwise payable to the Participant after his death shall, if such designation is then in effect, be paid to the beneficiary. If no beneficiary is designated or no designated beneficiary survives the Participant and an amount becomes payable to the Participant after his death, the Participant's estate shall be deemed to be the Participant's beneficiary.

(k)    <u>Interpretation</u>. The captions of the sections of the Plan are for convenience only, do not form a part of the Plan, and shall not control or affect the meaning or construction of any of its provisions. Whenever any words are used herein in the singular or in the plural, they shall be construed as though they were used in the plural or the singular, as the case may be, in all cases where they would so apply. The masculine pronoun shall be deemed to include the feminine and vice versa, unless the context clearly indicates otherwise. Whenever the word "including" is used in the Plan, it shall be deemed to be followed by the words "without limitation."

(l)    <u>Successors</u>. The provisions of the Plan shall bind and inure to the benefit of the Company and its successors and assigns and each Participant, any beneficiary designated by a Participant hereunder, and their respective permitted successors and assigns.

(m)    <u>Section 409A</u>. It is intended that the payments and benefits under the Plan comply with the provisions of Section 409A of the Code and that each amount to be paid to a Participant (or his Beneficiary, as the case may be) pursuant to the Plan that constitutes deferred compensation subject to Section 409A of the Code shall be construed as a separate identified payment for purposes of Section 409A of the Code. The Plan will be administered and interpreted in a manner consistent with this intent, and any provision that would cause the Plan to fail to satisfy the requirements of Section 409A of the Code will have no force or effect until amended to comply therewith (which amendment may be retroactive to the extent permitted by Section 409A of the Code). The Company shall indemnify and hold harmless each Participant (or his Beneficiary, as the case may be) on an after-tax basis from (i) any taxes, penalties, interest owed to the Internal Revenue Service or state or local or other taxing authorities imposed by reason of the Plan failing to satisfy the requirements of Section 409A of the Code or a state or local or other law of substantially similar effect and (ii) all legal or other professional fees and expenses incurred by the Participant (or his Beneficiary, as the case may be) as a result of such failure. Such payments shall be made within thirty (30) days of the Participant's written request therefore, which request shall be accompanied by reasonable supporting documentation.

(n)    <u>Company Reporting Requirement</u>. No later than June 15 and December 15 of each Plan Year commencing with the 2013 Plan Year, the Company shall deliver to each Participant (or his Beneficiary, as the case may be) a report that sets forth the information required by, and substantially in the form of, Exhibit B-1 hereto. The Company shall deliver to each Participant (or his Beneficiary, as the case may be), as soon as practicable after 2018 and in any event not after January 2019, two respective reports that set forth the information required by, and substantially in the form of, Exhibit B-1 and Exhibit B-2 hereto. The Board may modify the content and format of the aforementioned reports only with the express written approval of a majority of the Participants then living; provided that any Participant who is a member of the Board at the time the Board makes any such modification and who votes in favor of such modification as a member of the Board shall be deemed to have given such express written approval of

10

such modification. As soon as practicable after 2018 and in any event not after January 2019, the Company shall deliver to each Participant (or his Beneficiary, as the case may be), the final valuation reports prepared by the Value Appraiser in accordance with Section 3(b) hereof and the final reports prepared by the Claims Appraiser in accordance with Section 3(c) hereof.

**Exhibit A**

### COMPONENTS OF CLAIMS BENCHMARK

| Debtor Entity (a) | Class of Claim (b) | Estimated Allowed Claims ($ Millions) |
|---|---|---|
| LBHI | 3-12 (c) | $270,420 |
| LCPI | 4A | 2,752 |
| LBCS | 4 | 2,371 |
| LBSF | 4A | 22,685 |
| LOTC | 4 | 590 |
| LBCC | 4 | 609 |
| LBDP | 3 | 76 |
| LBFP | 3 | 60 |
| LB 745 | 3 | 2 |
| BNC | 3 | 13 |
| LB Rose Ranch | 3 | 6 |
| SASCO | 3 | 162 |
| LB 2080 | 3 | 9 |
| Total | | **$299,755** |

(a)   The identity of the Debtor Entities is as defined in the Plan of Reorganization.

(b)   Represents relevant classes of claims for each respective Debtor Entity as designated in Exhibit 4 to the Disclosure Statement (within the meaning of the Plan of Reorganization).

(c)   Represents all classes of LBHI claims, except for classes 1 and 2 (priority non-tax and secured claims, respectively).

12

EXHIBIT B-1

Illustrative Report Format (a)
ICP PARTICIPATIONS HISTORY FOR: {Director Name}

| | | | | A | B | | C/7=D | | E | D x E = F |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Total Board Incentive Pool ('000) | | Incentive Pool Per-Director(g) | | Vesting-Adjusted ICP Participation for: {Name} | |
| Distribution Number | Plan Year | Value Distributed(b) | Value Distributed As Adjusted (c) | Speed Multiplier(d) | Pre-Multiplier(e) | Post-Multiplier(f) | Post-Multiplier | Vested %(h) | Vested %: As Adjusted (i) | ICP Participation(j) |
| Math: | | | | | | | | | | |
| 1 | One | $14,696 | | 130% | $1,939 | $2,522 | $360 | 100% | 100% | $360 |
| 2 | One | | | 130% | | | | | | |
| 3 | Two | | | 120% | | | | | | |
| 4 | Two | | | 120% | | | | | | |
| 5 | Three | | | 110% | | | | | | |
| 6 | Three | | | 110% | | | | | | |
| 7 | Four | | | | | | | | | |
| 8 | Four | | | | | | | | | |
| 9 | Five | | | | | | | | | |
| 10 | Five | | | | | | | | | |
| 11 | Six | | | | | | | | | |
| 12 | Six | | | | | | | | | |
| 13 | Seven | | | | | | | | | |
| 14 | Seven | | | | | | | | | |
| 15 | Seven | | | | | | | | | |
| Total | | $____ | | | $____ | $____ | $____ | | % | $____ |

Less: Advances Paid (k)
*January 2015 ($750K)                                                                   $(          )
*January 2016 ($125K)
*January 2017 ($125K)
Total, Net of Advances                                                                   $____

(a) Per ICP, Section 9(n). All capitalized terms in these footnotes are as defined in the ICP. This report format is for illustrative purposes only. In the event of any perceived conflict between this illustration and the ICP terms, the ICP terms shall govern.
(b) Total value (in millions) of each realization of Unsecured Recovery. Final distribution (Distribution #15 in this chart) shall equal remaining asset value as of 12/31/18, as estimated by Value Appraiser.
(c) Total Value Distributed, per prior column, as adjusted for Unusual Items (if any) pursuant to Section 3(d) of the ICP. Summary descriptions of specific Unusual Items and adjustments to be included as notes to this report.
(d) The applicable Speed of Distributions Multiplier for Years 4 and later shall be as determined based on Section 6(a) of the ICP.
(e) Represents the total incremental ICP Benchmark Formula Amount (or "BFA") applicable to each respective distribution, excluding any impact from the Speed of Distributions Multiplier.
(f) Represents the incremental Board Incentive Pool corresponding to each respective distribution (Speed Multiplier multiplied by incremental BFA).
(g) Total Board Incentive Pool divided by 7, excluding any adjustments due to specific-director As-Adjusted Vested Percentages. Dollars in thousands.
(h) The Vested Percentage applicable to each respective distribution for the relevant individual director, prior to adjustments made (if any) pursuant to Section 4 of the ICP.
(i) Vested Percentage, as adjusted (where appropriate) pursuant to Section 4 of the ICP, applicable to each respective distribution for the relevant individual director.
(j) ICP Participation corresponding to each respective distribution, as calculated using the respective As-Adjusted Vested Percentages for the relevant director.
(k) Reflects scheduled advances under ICP. Number in parentheses indicates scheduled size at 100% Vested Percentage. Actual As-Adjusted Vested Percentage (reflecting adjustments made, if any, pursuant to Sections 4 and 5 of the ICP) to be applied in report.

13

EXHIBIT B-2

Illustrative Report Format (a)
CLAIMS RESOLUTION ADJUSTMENT SUMMARY

**Math:**

**1. CLAIMS BENCHMARK (mm)**

A    Claims Benchmark (POR):    $299,785

B    [Adjustments, if any, per ICP Section 3(d)] (b)

A +/- B = C    Adjusted Claims Benchmark:    $ ═══

**2. ALLOWED CLAIMS (mm)**

Allowed Claims (c):

D    *As of FACVD    $

E    *Between FACVD and 12/31/18

F    *Estimated for after 12/31/18

D+E+F = G    Total Allowed Claims:    $ ═══

H    [Adjustments, if any, per ICP Section 3(d)] (b)

G +/- H = I    Adjusted Allowed Claims:    $ ═══

**3. CALCULATION OF DIFFERENCE**

I    Adjusted Allowed Claims    $

C    Less: Adjusted Claims Benchmark

I-C = J    Net Claims Difference:    $ ═══

**4. NET CLAIMS DIFFERENCE AS PERCENTAGE**

J    Net Claims Difference:    $

C    Divided by: Adjusted Claims Benchmark    $

J/C = K    Net Claims Difference as a Percentage:    % ══

**5. IMPLIED CLAIMS ADJUSTMENT PERCENTAGE (d):**    % ══

---

(a) Per ICP, Section 9(n). All capitalized terms in these footnotes are as defined in the ICP. This report format is for illustrative purposes only. In the event of any perceived conflict between this illustration and the ICP terms, the ICP terms shall govern.

(b) Reflects adjustments for Unusual Items, if any, as adopted by the Board pursuant to Section 3(d) of the ICP.

(c) Per the Allowed Claims definition in the ICP. "FACVD" is "Final Allowed Claims Valuation Date." "Estimated for after 12/31/18" is per Claims Appraiser.

(d) Based on the percentage difference in Part 4 above, the Claims Resolution Adjustment formula described in Section 6(b) of the ICP is applied here to derive the claims adjustment percentage.

14

I018031.28-WASSR02A - MSW