**Hearing Date and Time: August 12, 2014 at 10:00 a.m. (Prevailing Eastern Time)**
**Response Deadline: August 4, 2014 at 4:00 p.m. (Prevailing Eastern Time)**

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Jacqueline Marcus

Attorneys for Lehman Brothers Holdings Inc.
and Certain of Its Affiliates

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------x
|  |  |
|---|---|
| In re | : |
|  | :  Chapter 11 Case No. |
|  | : |
| **LEHMAN BROTHERS HOLDINGS INC.,** *et al.*, | :  08-13555 (SCC) |
|  | : |
| Debtors. | :  (Jointly Administered) |
|  | : |

-------------------------------------------------------------------x

## NOTICE OF HEARING ON PLAN ADMINISTRATOR'S OBJECTION
## TO CLAIM NO. 8470 HELD BY PLAZA HARBOUR MEZZ HOLDINGS LLC

        **PLEASE TAKE NOTICE** that on July 1, 2014, Lehman Brothers Holdings Inc.,

as Plan Administrator under the *Modified Third Amended Joint Chapter 11 Plan of Lehman*

*Brothers Holdings Inc. and its Affiliated Debtors* [ECF No. 22738] for the entities in the above

referenced chapter 11 cases, filed its objection to proof of claim number 8470, held by Plaza

Harbour Mezz Holdings LLC (the "Plaza Harbour Claim Objection"), and that a hearing (the

"Hearing") to consider the Plaza Harbour Claim Objection will be held before the Honorable

Shelley C. Chapman, United States Bankruptcy Judge, in Courtroom 623 of the United States

Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, New

York 10004, on **August 12, 2014 at 10:00 a.m. (Prevailing Eastern Time),** or as soon

thereafter as counsel may be heard.

**PLEASE TAKE FURTHER NOTICE** that any responses to the Plaza Harbour

Claim Objection must be in writing, shall conform to the Federal Rules of Bankruptcy Procedure

and the Local Rules of the Bankruptcy Court, and shall be filed with the Bankruptcy Court

(a) electronically in accordance with General Order M-399 (which can be found at

www.nysb.uscourts.gov) by registered users of the Bankruptcy Court's filing system, and (b) by

all other parties in interest, on a 3.5 inch disk, preferably in Portable Document Format (PDF),

WordPerfect, or any other Windows-based word processing format (with a hard copy delivered

directly to Chambers), in accordance with General Order M-182 (which can be found at

www.nysb.uscourts.gov), and shall be served in accordance with General Order M-399, upon

(i) the chambers of the Honorable Shelley C. Chapman, One Bowling Green, New York, New

York 10004, Courtroom 623; (ii) attorneys for Lehman Brothers Holdings Inc., Weil, Gotshal &

Manges LLP, 767 Fifth Avenue, New York, New York 10153 (Attn: Jacqueline Marcus, Esq.);

and (iii) the Office of the United States Trustee for Region 2, 33 Whitehall Street, 21st Floor,

New York, New York 10004 (Attn: William K. Harrington, Esq., Susan Golden, Esq., and

Andrea B. Schwartz, Esq.), so as to be so filed and received by no later than **August 4, 2014 at**

**4:00 p.m. (Prevailing Eastern Time)** (the "Response Deadline").

**PLEASE TAKE FURTHER NOTICE** that if no responses are timely filed and served with respect to the Plaza Harbour Claim Objection, the Plan Administrator may, on or after the Response Deadline, submit to the Bankruptcy Court an order substantially in the form of the proposed order annexed to the Plaza Harbour Claim Objection, which order may be entered with no further notice or opportunity to be heard offered to any party.

Dated:  July 1, 2014
      New York, New York

/s/ Jacqueline Marcus
Jacqueline Marcus
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Lehman Brothers Holdings Inc.
and Certain of Its Affiliates

# TABLE OF CONTENTS

Preliminary Statement.................................................................................................................... 1

Jurisdiction.................................................................................................................................... 2

Background .................................................................................................................................... 2

Relief Requested ........................................................................................................................... 3

Financing The Plaza Harbour Island Project ............................................................................... 3

The Co-Lending Agreement ......................................................................................................... 4

The Shortfall Agreement................................................................................................................ 5

State Court Action Related to Co-Lending Agreement ................................................................ 6

The Plaza Harbour Claim.............................................................................................................. 8

The Plaza Harbour Claim Should Be Disallowed and Expunged................................................. 8

Reservation of Rights.................................................................................................................. 10

Notice .......................................................................................................................................... 10

EXHIBIT A

EXHIBIT B

PROPOSED ORDER

# TABLE OF AUTHORITIES

## Cases

*In re Adelphia Commc'ns Corp.*, No. 02-41729 (REG),
2007 Bankr. LEXIS 660 at *15 (Bankr. S.D.N.Y. Feb. 20, 2007) ................................................. 8

*In re Oneida, Ltd.*, 400 B.R. 384, 389 (Bankr. S.D.N.Y. 2009) ...................................................... 8

*In re Rockefeller Ctr. Props.*, 272 B.R. 524, 539 (Bankr. S.D.N.Y. 2000) ................................... 8

## Statutes

11 U.S.C. § 502(a) ............................................................................................................................ 8

11 U.S.C. § 502(b) ............................................................................................................................ 3

11 U.S.C. § 502(b)(1) ....................................................................................................................... 9

28 U.S.C. § 157(b) ............................................................................................................................ 2

28 U.S.C. § 157 ................................................................................................................................. 2

28 U.S.C. § 1334 ............................................................................................................................... 2

## Rules

Fed. R. Bank. P. 3007(d) ................................................................................................................... 3

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Jacqueline Marcus

Attorneys for Lehman Brothers Holdings Inc.
and Certain of Its Affiliates

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------x
                                                         :
**In re**                                                :    **Chapter 11 Case No.**
                                                         :
**LEHMAN BROTHERS HOLDINGS INC.,** *et al.*,  :    **08-13555 (JMP)**
                                                         :
                          **Debtors.**              :    **(Jointly Administered)**
                                                         :
------------------------------------------------------------------x

**PLAN ADMINISTRATOR'S OBJECTION TO CLAIM**
**NO.  8470 HELD BY PLAZA HARBOUR MEZZ HOLDINGS LLC**

TO THE HONORABLE SHELLEY C. CHAPMAN
UNITED STATES BANKRUPTCY JUDGE:

              Lehman Brothers Holdings Inc. ("LBHI" or the "Plan Administrator"), as Plan

Administrator pursuant to the *Modified Third Amended Joint Chapter 11 Plan of Lehman*

*Brothers Holdings Inc. and its Affiliated Debtors* (the "Plan") for the entities in the above

referenced chapter 11 cases (together, the "Chapter 11 Estates" and, collectively with their non-

debtor affiliates, "Lehman"), respectfully represents as follows:

**Preliminary Statement**

              1.       The Plan Administrator files this objection seeking to disallow and

expunge the proof of claim [Claim No. 8470] filed by Hegemon Fund I, LLC ("Hegemon") on

August 17, 2009 and subsequently transferred to Plaza Harbour Mezz Holdings LLC ("Plaza

Harbour"), as reflected in the Transfer of Claim Other Than for Security filed in the Chapter 11

Cases on October 28, 2013 [ECF No. 40797].  The Plan Administrator objects to proof of claim

number 8470 (the "Plaza Harbour Claim") on the basis that LBHI's liability for the claims

asserted therein is unsubstantiated and inflated.

2.       The Plaza Harbour Claim asserts an unsecured claim for damages in the

aggregate amount of $2,233,780.28, based on the purported balance of amounts owing under a

note and LBHI's purported obligations under the Shortfall Agreement (as defined below).  The

Plaza Harbour Claim should be disallowed for various reasons.  First, Plaza Harbour's own

actions, which violated its legal obligations under the Co-Lending Agreement (as defined

below), increased the amount of the alleged claim against LBHI.  If Plaza Harbour had complied

with the Co-Lending Agreement, any liability of LBHI under the Shortfall Agreement would

have been minimal.  Second, the Plaza Harbour Claim erroneously calculates LBHI's liability

under the Shortfall Agreement.  Third, the documentation provided by Plaza Harbour does not

substantiate the amount of the Plaza Harbour Claim.  In light of the foregoing and the facts set

forth below in more detail, LBHI is not liable for the excessive amount of damages asserted in

the Plaza Harbour Claim.

## Jurisdiction

3.       This Court has jurisdiction to consider this matter pursuant to 28 U.S.C.

§§ 157 and 1334 and section 14.1(c) of the Plan.  This is a core proceeding pursuant to 28 U.S.C.

§ 157(b).

## Background

4.       Commencing on September 15, 2008 and periodically thereafter, (as

applicable, the "Commencement Date"), LBHI and certain of its subsidiaries commenced with

this Court voluntary cases under chapter 11 of title 11 of the Bankruptcy Code (the "Chapter 11

Cases").

5.      On December 6, 2011, the Court entered the order confirming the Plan [ECF No. 22737].  The Plan became effective on March 6, 2012 (the "Effective Date").  Pursuant to the Plan, the Plan Administrator is authorized to interpose and prosecute objections to claims filed against the Chapter 11 Estates.

## Relief Requested

6.      The Plan Administrator files this objection pursuant to section 502(b) of the Bankruptcy Code and Bankruptcy Rule 3007(d) and seeks to disallow and expunge the Plaza Harbour Claim on the basis that the extent of LBHI's liability for the claims asserted therein is unsubstantiated and inflated.

## Financing The Plaza Harbour Island Project

7.      On or about May 5, 2005, LBHI made a mezzanine loan in the amount of $12,557,977.95 to Harbour Phase I Investments, LLC (the "Junior Mezzanine Loan").  The Junior Mezzanine Loan was one component of the financing for a luxury condominium development project in Tampa, Florida known as The Plaza Harbour Island (the "Plaza Harbour Island Project").  The Junior Mezzanine Loan was divided into two secured promissory notes, both initially held by LBHI:  Note A, in the original principal amount of $4,000,000 ("Note A"), and Note B, in the original principal amount of $8,557,977.95 ("Note B").  The Junior Mezzanine Loan is subordinate to two other loans made on the same day by Fleet National Bank – a construction mortgage loan of $55,858,000.00 (the "Mortgage Loan") and a senior mezzanine loan of $13,377,565.00 (the "Senior Mezzanine Loan").

8.      LBHI sold and assigned its interest in Note A to Hegemon for the principal sum of $4,000,000.  The terms of the  relationship between LBHI and Hegemon with respect to the Junior Mezzanine Loan are governed by the Co-Lending Agreement, dated July

15, 2005 (the "Co-Lending Agreement"),[1] which also reflects Hegemon's acquisition of Note A and LBHI's retention of Note B. On or before October 26, 2006, LBHI assigned Note B and the other Junior Mezzanine Loan Documents to Plaza Harbour and Plaza Harbour replaced LBHI as Agent under the Junior Mezzanine Loan.

9.      The original maturity date for the Mortgage Loan and the Senior Mezzanine Loan was May 31, 2008. The Mortgage Loan was paid off on July 30, 2008 and on or about February 10, 2009, Plaza Harbour, as successor Agent under the Junior Mezzanine Loan, consented to the extension of the original maturity date of the Senior Mezzanine Loan from May 31, 2008 to July 31, 2009. Pursuant to a subsequent loan extension agreement, dated on or about July 24, 2009, the maturity date of the Senior Mezzanine Loan was extended a second time to January 31, 2010. The Borrower fully paid off the Senior Mezzanine Loan by March 9, 2011. Thereafter, net proceeds from the sale of the Plaza Harbour Island Project's condominium units became available to repay the Junior Mezzanine Loan and were held in escrow pending resolution of the 2010 Action (as defined below).

### The Co-Lending Agreement

10.      Pursuant to the Co-Lending Agreement, the rights of Hegemon as the holder of Note A, including, *inter alia*, the right to receive payments of interest, principal and any and all other amounts due under Note A, were superior to the rights of the holder of Note B. *See* Co-Lending Agreement at §§ 1.04, 1.05 and 3.03.

11.      Additionally, the Co-Lending Agreement granted Hegemon the right to compel the holder of Note B to make monetary advances in order to protect the priority, validity and enforceability of the Junior Mezzanine Loan Documents, or to protect the value or the

---

[1] Capitalized terms used herein but not defined shall have the meaning ascribed to them in the Co-Lending Agreement. A copy of the Co-Lending Agreement is attached hereto as Exhibit A.

security of the Junior Mezzanine Collateral ("Protective Advances").  *See* Co-Lending

Agreement at page 11 (Definitions).  Upon a finding that a Protective Advance was necessary,

section 2.05 of the Co-Lending Agreement provides Hegemon, as holder of Note A, with the

following three options:  (i) provide the necessary funds, (ii) elect to provide its Pro Rata Interest

and request that the holder of Note B provide its Pro Rata Interest, or (iii) request that the holder

of Note B provide all necessary funds, repayment of which would be subordinate to full

repayment to Hegemon of all amounts due and owing to it under Note A.  *See* Co-Lending

Agreement at § 2.05.  In the event that Hegemon elected any of the three options, Hegemon was

entitled to repayment of all sums due under Note A *before* the holder of Note B would receive

any reimbursement for Protective Advances that it made.

12.    Although section 3.03 of the Co-Lending Agreement sets forth the priority

of payments due under Note A and Note B (the "Priority of Payments"), and includes a reference

to Protective Advances, it is clear that section 2.05 of the Co-Lending Agreement controls the

treatment of Protective Advances.  Section 2.05 of the Co-Lending Agreement unequivocally

modifies the Priority of Payments and specifies that repayment of any Protective Advances made

by the holder of Note B is subordinate to payment of amounts due under Note A.  *See* Co-

Lending Agreement at § 2.05.

**The Shortfall Agreement**

13.    In connection with the Plaza Harbour Island Project, Hegemon, LBHI and

Plaza Harbour entered into that certain letter agreement, dated January 9, 2007 (the "Shortfall

Agreement"), pursuant to which, LBHI agreed to incur certain contingent obligations in

exchange for Hegemon's consent to various modifications to the Mortgage Loan and the Senior

Mezzanine Loan that were memorialized in the First Loan Modification Agreement dated

5

October 31, 2006 (the "First Loan Modification Agreement").  With respect to the Plaza Harbour

Island Project, LBHI agreed that it would pay Hegemon:

> [T]he amount of any Shortfall (as defined below); provided, however, that [LBHI]'s maximum obligation to pay the Shortfall shall not exceed the amount of (i) $2,000,000.00 plus (ii) the amount of interest accrued on $2,000,000 of principal under the Senior Mezzanine Loan for a period of eighteen months commencing on December 1, 2006.  The term "Shortfall" shall mean the difference, if positive, between the amount owing to the Note A Holder under Note A less the amount actually paid to the Note A Holder under Note A (after final disposition of the Junior Mezzanine Loan and after all distributions pursuant to Section 3.03 of the Agreement are made).

The Shortfall Agreement also provided Hegemon with notice of LBHI's assignment of Note B to

Plaza Harbour.  A copy of the Shortfall Agreement is attached hereto Exhibit B.

14.    The First Loan Modification Agreement was executed over three months

prior to the execution of the Shortfall Agreement.  Further, as of the date of the Shortfall

Agreement, January 9, 2007, LBHI had already assigned its interest in Note B to Plaza Harbour

and no longer served as Agent under the Junior Mezzanine Loan.  Accordingly, LBHI did not

receive any direct benefit in exchange for agreeing to provide Hegemon with a conditional

guaranty in excess of $2 million.

## State Court Action Related to Co-Lending Agreement

15.    On or about September 23, 2008, Hegemon commenced an action against

Plaza Harbour and certain of its affiliates in the Supreme Court of the State of New York,

County of New York (Index No. 650351/2008) (the "2008 Action").  Hegemon's claims in the

2008 Action arise out of Plaza Harbour's alleged refusal to comply with its obligations, as the

successor assignee of Note B, under the Co-Lending Agreement.  Among other things, Hegemon

argued that, pursuant to section 2.05 of the Co-Lending Agreement, Plaza Harbour was required

to either fund certain Protective Advances or repurchase Note A from Hegemon.  On or about

August 26, 2009, the parties to the 2008 Action entered into a stipulation voluntarily discontinuing the 2008 Action.

16.     On or about January 19, 2010, Hegemon commenced a second action against Plaza Harbour and certain of its affiliates in the Supreme Court of the State of New York, County of New York (Index No. 650025/2010) (the "2010 Action").  The 2010 Action involved many of the same claims asserted by Hegemon in the 2008 Action.  However, because the Mortgage Loan and the Senior Mezzanine Loan had been paid in full, the 2010 Action primarily focused on the distribution of proceeds related to the Junior Mezzanine Loan.  In particular, the dispute focused on whether Plaza Harbour, as holder of Note B, was entitled to the amounts it retained as reimbursement of Protective Advances (the "Protective Advance Reimbursement") in advance of payment of amounts owed to Hegemon under Note A.

17.     Hegemon alleged in the 2010 Action that, as of July 7, 2011, Plaza Harbour had made Protective Advances in the aggregate amount of $5,503,203.  Plaza Harbour did not contend that it did not make the alleged Protective Advances or that it did not collect and retain the Protective Advance Reimbursement.  Rather, Plaza Harbour contended that its actions were appropriate under the Co-Lending Agreement.

18.     A judgment on the merits was not rendered in the 2010 Action because Hegemon and Plaza Harbour reached a settlement of all outstanding asserted claims and counterclaims asserted (the "Hegemon/Plaza Harbour Settlement").  A copy of the Hegemon/Plaza Harbour Settlement was not filed in the 2010 Action.  Counsel for each of Hegemon and Plaza Harbour have represented that the terms and conditions of the Hegemon/Plaza Harbour Settlement are confidential.  On January 29, 2012, the parties entered into a stipulation of dismissal regarding the 2010 Action.

7

19.     Subsequent to the execution of the Hegemon/Plaza Harbour Settlement, Plaza Harbour became the holder of Note A and acquired proof of claim number 8470 from Hegemon.   The terms of Plaza Harbour's acquisition of Note A and the Plaza Harbour Claim are not publicly available and are purportedly subject to confidentiality restrictions.  Revenues generated by the Plaza Harbour Island Project were remitted by the Borrower for repayment of the Junior Mezzanine Loan and held in escrow pending resolution of the 2010 Action.

## The Plaza Harbour Claim

20.     On March 2, 2009, Hegemon filed an initial proof of claim in the Chapter 11 Case [Claim No. 3129].  Subsequently, on August 17, 2009, Hegemon filed the Plaza Harbour Claim.  The Plaza Harbour Claim amended and superseded Claim No. 3129 and Claim No. 3129 was disallowed and expunged on May 26, 2010.  *See* ECF No. 9275.  Without any evidentiary support, the Plaza Harbour Claim asserts that an award of damages is warranted because the Shortfall Agreement requires LBHI to pay Plaza Harbour (as successor holder of Note A) the par purchase price of Note A up to $2,000,000, plus interest, in the event that there is an outstanding balance owed under Note A.  The Plan Administrator has not been able to determine whether any payments have ever been made with respect to Note A.

## The Plaza Harbour Claim Should Be Disallowed and Expunged

21.     A filed proof of claim is "deemed allowed, unless a party in interest objects."  11 U.S.C. § 502(a).  If an objection refuting at least one of the claim's essential allegations is asserted, the claimant has the burden to demonstrate the validity of the claim.  *See In re Oneida, Ltd.*, 400 B.R. 384, 389 (Bankr. S.D.N.Y. 2009); *In re Adelphia Commc'ns Corp.*, No. 02-41729 (REG), 2007 Bankr. LEXIS 660 at *15 (Bankr. S.D.N.Y. Feb. 20, 2007); *In re Rockefeller Ctr. Props.*, 272 B.R. 524, 539 (Bankr. S.D.N.Y. 2000).  Section 502(b)(1) of the Bankruptcy Code provides, in relevant part, that a claim may not be allowed to the extent that

8

"such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law." 11 U.S.C. § 502(b)(1). Plaza Harbour has not satisfied its burden to demonstrate that it is entitled to collect the amounts requested under the Plaza Harbour Claim from LBHI.

22.     LBHI's monetary obligation under the Shortfall Agreement is based upon the difference between the outstanding balance *owed* under Note A and all amounts *paid* under Note A after final disposition of the Junior Mezzanine Loan and after all distributions pursuant to the Priority of Payments set forth in section 3.03 of the Co-Lending Agreement. *See* Shortfall Agreement. In calculating the Shortfall, the Priority of Payments requires the parties to include distribution of all amounts received in the form of monthly payments, awards, settlements or otherwise. *See* Co-Lending Agreement at § 3.03. Accordingly, Plaza Harbour *must* account for all amounts, if any, that Hegemon received pursuant to the Hegemon/Plaza Harbour Settlement and include any monetary consideration that Plaza Harbour provided to Hegemon in order to acquire Note A. Failure to account for funds received in connection with the settlement or acquisition of Note A is in direct contravention of the express terms of the Co-Lending Agreement. *See* Co-Lending Agreement at 3.03.

23.     Additionally, as argued by Hegemon in the 2010 Action, pursuant to the Priority of Payment stated in the Co-Lending Agreement, the holder of Note A is to receive all amounts due *before* the holder of Note B is reimbursed for *any* Protective Advance or any interest paid. The parties to the 2010 Action both agreed that, as of July 7, 2011, Plaza Harbor made Protective Advances in the aggregate amount of $5,503,203. *See* 2010 Action ECF No. 39, ¶ 17. Further, Plaza Harbour received reimbursement (including principal and interest) for such advances in contravention of the terms of the Co-Lending Agreement. The funds paid to

Plaza Harbour for the reimbursement of the Protective Advances and any other amounts paid to Plaza Harbour in violation of the Co-Lending Agreement should have been provided to the holder of Note A, which would have reduced LBHI's liability under the Shortfall Agreement.

24.    The correct method of calculating whether LBHI has any liability under the Shortfall Agreement is to start with the aggregate amount due under Note A, and subtract therefrom the sum of:  (1) any payments made by Borrower to Hegemon, (2) the monetary consideration Plaza Harbour paid Hegemon to acquire Note A and/or to settle the 2010 litigation, and (3) the amount of erroneous payments made to Plaza Harbour, including any Protective Advance Reimbursement.  When the correct formula is applied, the Plan Administrator believes it is unlikely that a Shortfall will exist under the Shortfall Agreement.  Absent a Shortfall, LBHI is not liable for the claims asserted in the Plaza Harbour Claim.

25.    Accordingly, the Plan Administrator respectfully requests that the Court enter an order disallowing and expunging the Plaza Harbour Claim in its entirety.

## Reservation of Rights

26.    The Plan Administrator reserves all rights to object on any other basis to the Plaza Harbour Claim in the event that the relief requested herein is not granted.

## Notice

27.    No trustee has been appointed in the Chapter 11 Cases.  Notice of this objection has been provided to (i) the United States Trustee for Region 2; (ii) the Securities and Exchange Commission; (iii) the Internal Revenue Service; (iv) the United States Attorney for the Southern District of New York; (v) Plaza Harbour; and (vi) all other parties entitled to notice in accordance with the procedures set forth in the second amended order entered on June 17, 2010, governing case management and administrative procedures for these cases [ECF No. 9635].  The Plan Administrator submits that no other or further notice need be provided.

10

28.     No previous request for the relief sought herein has been made by the Plan

Administrator or the Chapter 11 Estates to this or any other Court.

WHEREFORE the Plan Administrator respectfully requests entry of an order

granting the relief requested herein and such other and further relief as is just.

Dated: July 1, 2014
       New York, New York

/s/ Jacqueline Marcus
Jacqueline Marcus
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Lehman Brothers Holdings Inc.
and Certain of Its Affiliates

**EXHIBIT A**

Co-Lending Agreement

Exhibit A

## CO-LENDING AGREEMENT

### for

### LOAN AGREEMENT
### DATED AS OF MAY 5, 2005
### LOAN AMOUNT OF $12,557,977.95

**between**

## LEHMAN BROTHERS HOLDINGS INC.

**-and-**

## HEGEMON FUND I, LLC

**Dated:   July __15__, 2005**

## CO-LENDING AGREEMENT

THIS CO-LENDING AGREEMENT (this "**Agreement**") is dated as of July 1S , 2005 by and among **HEGEMON FUND I, LLC**, a Delaware limited liability company, having an address at 101 E. Kennedy Blvd., Suite 2100, Tampa, Florida 33602 (the "**Note A Holder**"), **LEHMAN BROTHERS HOLDINGS INC.**, a Delaware corporation, having an address at 399 Park Avenue, New York, New York 10022 (the "**Note B Holder**") and **LEHMAN BROTHERS HOLDINGS INC.**, a Delaware corporation, having an office at 399 Park Avenue, 8th Floor, New York, New York 10022 (in its capacity as the originator of the Junior Mezzanine Loan, which term is defined herein ("**Lehman**") and the parties (collectively, "**Future Holders**") who after the date hereof execute and deliver a Joinder in substantially the form attached hereto as Exhibit G.   (The Note A Holder, and the Note B Holder and all Future Holders in their capacity as co-lenders pursuant to this Agreement, are sometimes collectively referred to herein as the "**Split Note Holders**" or "**Lender**").   All terms as used in this Agreement shall, unless otherwise defined in the main body of this Agreement, have the meanings given to such terms in the section herein titled "**Definitions**".

## RECITALS

A.     Fleet National Bank, a national banking association (the "**Mortgage Lender**") made a loan (the "**Mortgage Loan**") in the original principal amount of $55,858,000.00 to Harbour Phase I Owners, LLC, a Delaware limited liability company (the "**Mortgage Borrower**").

B.     The Mortgage Loan is evidenced by that certain Promissory Note dated May 5, 2005, made by Mortgage Borrower in favor of Mortgage Lender (the "**Mortgage Note**"). The Mortgage Note, and the obligations thereunder, are secured and/or evidenced by the following documents each made as of May 5, 2005: (1) that certain Construction Mortgage, Security Agreement and Fixture Filing (Securing Present and Future Advances), made by Mortgage Borrower for the benefit of Mortgage Lender (the "**Mortgage**"), encumbering certain real property owned by Mortgage Borrower located in the City of Tampa, Hillsborough County, State of Florida as more particularly described in the Mortgage (the "**Mortgaged Property**"), (2) that certain Assignment of Leases and Rents (the "**Assignment of Leases and Rents**"), (3) that certain Environmental and Hazardous Substance Indemnification Agreement (the "**Environmental Indemnity Agreement**"), (4) that certain Collateral Assignment and Security Agreement in Respect of Contracts, Licenses and Permits (the "**Assignment of Contracts**") (5) that certain Pledge and Security Agreement (the "**Pledge and Security Agreement**"), (6) that certain Bank Deposit Account Control Agreement (the "**Account Agreement**"), (7) that certain Condominium Development Agreement (the "**Condo Agreement**"), (8) that certain Completion and Excess Costs Guaranty (the "**Completion Guaranty**"), (9) that certain Guaranty (re: Certain Specified Matters)(the "**Guaranty**"); collectively with the Completion Guaranty, the Condo Agreement, Account Agreement, the Pledge and Security Agreement, the Assignment of Contracts, the Environmental Indemnity Agreement, the Assignment of Leases and Rents, the Mortgage Loan

Agreement, the Mortgage, the Mortgage Note and all other documents which evidence, relate to, and/or secure, the Mortgage Loan, are sometimes collectively referred to herein as the "**Mortgage Loan Documents**").

C.    Pursuant to that certain Construction Loan Agreement (the "**Senior Mezzanine Loan Agreement**") dated as of May 5, 2005, between Harbour Phase I Owners LLC, a Delaware limited liability company ("**Senior Mezzanine Borrower**"), and Fleet National Bank, a national banking association (the "**Senior Mezzanine Lender**"), Senior Mezzanine Lender made a loan in the original principal amount of $13,377,565.00 to Senior Mezzanine Borrower (the "**Senior Mezzanine Loan**").

D.    The Senior Mezzanine Loan is evidenced by that certain Promissory Note dated May 5, 2005, made by Senior Mezzanine Borrower in favor of Senior Mezzanine Lender (the "**Senior Mezzanine Note**").

E.    The Senior Mezzanine Note, and the obligations thereunder, are secured and/or evidenced by the following documents each made as of May 5, 2005: (1) that certain (Second) Construction Mortgage, Security Agreement and Fixture Filing (Securing Present and Future Advances), made by Mortgage Borrower for the benefit of Mortgage Lender (the "**Second Mortgage**"), encumbering the Mortgaged Property, (2) that certain (Second) Assignment of Leases and Rents (the "**(Second) Assignment of Leases and Rents**"), (3) that certain Environmental and Hazardous Substance Indemnification Agreement (the "**Environmental Indemnity Agreement**"), (4) that certain Collateral Assignment and Security Agreement in Respect of Contracts, Licenses and Permits (the "**Assignment of Contracts**") (5) that certain (Second) Pledge and Security Agreement (the "**Second Pledge Agreement**"), (6) that certain Bank Deposit Account Control Agreement (the "**Account Agreement**"), (7) that certain Control Agreement (the "**Control Agreement**"), (8) that certain Completion and Excess Costs Guaranty (the "**Completion Guaranty**"), (9) that certain Guaranty (re: Certain Specified Matters)(the "**Guaranty**"), and (10) that certain Assignment of Title Insurance Policy and Proceeds (the "**Assignment of Title Insurance**"); collectively with the Assignment of Title Insurance, Guaranty, Completion Guaranty, the Control Agreement, Account Agreement, the Second Pledge Agreement, the Assignment of Contracts, the Environmental Indemnity Agreement, the Assignment of Leases and Rents, the Senior Mezzanine Loan Agreement, the Second Mortgage, the Senior Mezzanine Loan and all other documents which evidence, relate to, and/or secure, the Senior Mezzanine Loan, are sometimes collectively referred to herein as the "**Senior Mezzanine Loan Documents**").

F.    Pursuant to that certain Junior Mezzanine Loan Agreement dated as of May 5, 2005 (the "**Junior Mezzanine Loan Agreement**") between Harbour Phase I Investments, LLC, a Delaware limited liability company ("**Junior Mezzanine Borrower**"), and Lehman, as the junior mezzanine lender, made a loan in the original principal amount of $4,000,000 to Junior Mezzanine Borrower (the "**A Loan**"), and a loan in the original principal amount of $8,557,977.95 to the Junior Mezzanine Borrower (the "**B Loan**"; together with the A Loan, the "**Junior Mezzanine Loan**").

G.     The A Loan is evidenced by that certain Amended and Restated Secured Promissory Note (Note A) dated June 30, 2005, effective as of May 5, 2005, made by Junior Mezzanine Borrower in favor of Lehman (the "**Note A**"), and the B Loan is evidenced by that certain Amended and Restated Secured Promissory Note (Note B) dated June 30, 2005, effective as of May 5, 2005, made by Junior Mezzanine Borrower in favor of Lehman (the "**Note B**"; together with Note A, the "**Junior Mezzanine Note**").

H.     The Junior Mezzanine Note, and the obligations thereunder, are secured and/or evidenced by, among other things, each dated as of May 5, 2005: (1) those certain Junior Mezzanine Pledge Agreements (as defined below), (2) that certain Environmental Indemnity Agreement, made by Junior Mezzanine Borrower and Guarantors (as defined in the Junior Mezzanine Loan Agreement) to Lehman (the "**Junior Mezzanine Environmental Indemnity Agreement**"), (3) the Consent and Agreement of Architect ("**Architect's Consent**"), (4) the Consent and Agreement of the General Contractor ("**GC Consent**"), (5) the Conditional Guaranty (the "**Conditional Guaranty**"), (6) the ADA Indemnity (the "**ADA Indemnity**"), and (7) the Completion Guaranty (the "**Completion Guaranty**"); together with the ADA Indemnity, the Conditional Guaranty, the GC Consent, the Architect's Consent, the Junior Mezzanine Environmental Indemnity Agreement, the Junior Mezzanine Pledge Agreements, the Junior Mezzanine Note, the Junior Mezzanine Loan Agreement and all of the other documents which secure and/or evidence the Junior Mezzanine Loan sometimes collectively referred to herein as the "**Junior Mezzanine Loan Documents**").   The term "**Junior Mezzanine Pledge Agreements**" as used herein shall mean each of those certain Membership Pledge and Security Agreements and that certain Partnership Pledge and Security Agreement, each dated as of May 5, 2005, made by (1) Junior Mezzanine Borrower of its membership interests in Harbour Phase I Holdings, LLC ("**Harbour Holdings**"), (2) Harbour Phase I Mezzanine, LLC ("**Harbour Mezzanine**") of its membership interests in Junior Mezzanine Borrower, (3) Harbour Phase I JV, LLC ("**Harbour JV**") of its membership interests in Harbour Mezzanine, (4) Lindell-Harbour Tower, LLC ("**Lindell-Harbour**") of its membership interests in Harbour Mezzanine, (5) Crimson Harbour Phase I Investment Fund, LP ("**Harbour Phase I LP**") of its partnership interests in Harbour JV, (6) Crimson Harbour Phase I Investment Fund GP, LLC ("**Crimson Phase I GP**") of its membership interests in Harbour Phase I LP, and (7) Crimson Capital, Ltd. of its membership interests in Crimson Phase I GP, each in favor of Lehman, as collateral agent.

I.     As a further condition to the making of the Mortgage Loan, the Senior Mezzanine Loan, and the Junior Mezzanine Loan, Mortgage Lender, Senior Mezzanine Lender and Lehman have entered into that certain Intercreditor Agreement (hereinafter defined), pursuant to which the rights and priorities between Mortgage Lender, Senior Mezzanine Lender and Lehman with respect to the Mortgage Loan, the Senior Mezzanine Loan and the Junior Mezzanine Loan were set forth.   As used herein, "**Intercreditor Agreement**" shall mean: (i) that certain Subordination and Intercreditor Agreement dated May 5, 2005, entered into between Senior Lender and Lehman; (ii) that certain Subordination and Intercreditor Agreement dated May 5, 2005, entered into between Senior Mezzanine

Lender and Lehman; and (iii) the Tri-Lender Agreement dated May 5, 2005, among the Senior Lender, Senior Mezzanine Lender and Lehman.

J.    Note A has been assigned by Lehman in favor of the Note A Holder, pursuant to that certain Allonge dated as of the date hereof and the Note B has been retained by Lehman.

K.    The Split Notes and the obligations of the Junior Mezzanine Borrower contained therein are and shall continue to remain secured by the Junior Mezzanine Pledge Agreements and the other Junior Mezzanine Loan Documents.

L.    It is the intention and desire of the Split Note Holders to enter into this Agreement in order to set forth herein the rights, benefits, priorities, and obligations of the Split Note Holders under the Split Notes and the other mutual understandings of the Split Note Holders.

M.    This Agreement is intended to effectuate a **"true sale"** of the Split Notes contemplated hereby.    In no event shall the transactions contemplated hereby be deemed a financing or other extension of credit.    The parties hereto shall in all respects account for the transactions contemplated hereby in a manner consistent with the preceding sentence.

    **NOW, THEREFORE**, in consideration of the mutual promises herein contained and other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, the parties hereto hereby agree, with respect to the Junior Mezzanine Loan, as follows:

## DEFINITIONS

    (a)    The following terms as used herein shall have the following meanings:

    **"Affiliate"** shall mean as to any Person, (i) any Person that directly or indirectly through one or more intermediaries controls or is controlled by or is under common control with such Person, (ii) any Person (directly or indirectly) owning more than 50% of the outstanding voting securities of or other ownership interests in such Person, or (iii) any entity in which such Person (together with the members of his family if the Person in question is an individual) owns, directly or indirectly through one or more intermediaries an interest in any class of stock (or other beneficial interest in such entity) of more than 50%.    As used in this Agreement, the term **"control"** or **"controlling interest"** means the beneficial ownership in excess of 50% or the possession, directly or indirectly, of the power to direct or cause the direction of the management and policy and/or policies of a Person, whether through ownership of voting securities or other ownership interests, by contract or otherwise.

"**Agent**" shall mean Lehman Brothers Holdings Inc., a Delaware corporation, and its successors and assigns.

"**Assignment and Assumption**" means any assignment and assumption agreement pursuant to which a Split Note Holder acquires its Pro Rata Interest, in the form attached hereto as Exhibit F, together with the Joinder to Co-Lending Agreement in the form attached hereto as Exhibit G.

"**Bankruptcy Action**" means any bankruptcy, insolvency, or similar proceeding relating to the Junior Mezzanine Borrower or the Junior Mezzanine Collateral.

"**Bankruptcy Laws**" shall mean Title 11 of the United States Code, as amended, together with any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization, conservatorship, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to its debts or debtors.

"**Business Day**" shall mean any day other than a Saturday, a Sunday or any other day on which the New York Stock Exchange is not open for business.

"**Cause**" shall mean (a) fraud, gross negligence or willful misconduct by the Agent, (b) the commencement of any proceeding under any Bankruptcy Laws with respect to the Agent (c) any material breach or default by Agent under this Agreement which continues for 15 days after written notice to Agent, or (d) a Loan Default occurs which is not cured pursuant to Section 4.01.

"**Current Split Note Holder**" shall mean each of the Split Note Holders which is not a Defaulting Split Note Holder.

"**Default Interest**" shall mean any and all interest accrued on the Junior Mezzanine Loan at the Default Rate.

"**Default Rate**" shall have the meaning ascribed to it in the Note.

"**Defaulting Split Note Holder**" shall have the meaning ascribed to it in Section 6.01 hereof.

"**Eligibility Requirements**" means, with respect to any Person, that such Person (i) has total assets (in name or under management) in excess of $600,000,000 and (except with respect to a pension advisory firm or similar fiduciary) capital/statutory surplus or shareholder's equity of $250,000,000 and (ii) is regularly engaged in the business of making or owning commercial real estate loans (or interests in commercial real estate loans) or operating commercial properties.

"**Enforcement Action**" means any (i) the exercise of any power of sale, or any other rights and remedies Lender may have as a secured party under the Uniform Commercial Code or the comparable law of any other jurisdiction whose laws are

applicable to the Junior Mezzanine Loan Documents, or the taking of any other enforcement action against the Junior Mezzanine Collateral or Junior Mezzanine Borrower, including, without limitation, the taking of possession or control of any Junior Mezzanine Collateral, (ii) acceleration of, or demand or action taken in order to collect, all or any indebtedness secured by the Junior Mezzanine Collateral (other than giving of notices of default and statements of overdue amounts ), (iii) exercise of any right or remedy available to Lender under the Junior Mezzanine Loan Documents, at law, in equity or otherwise with respect to Junior Mezzanine Borrower and/or the Junior Mezzanine Collateral, or (iv) joining in the commencement of an involuntary bankruptcy proceeding.

"**Guarantor**" shall have the meaning ascribed to it in the Junior Mezzanine Loan Agreement.

"**Indebtedness**" shall mean the sum of principal of and interest due on the Junior Mezzanine Loan, and all other obligations and sums due and payable by the Junior Mezzanine Loan or any other Junior Mezzanine Loan Party to the Split Note Holders and the Agent and incurred pursuant to or evidenced or secured by any of the Junior Mezzanine Loan Documents.

"**Intercreditor Agreement**" shall have the meaning provided in the Recitals hereto.

"**Junior Mezzanine Borrower**" has the meaning set forth in the Recitals hereto.

"**Junior Mezzanine Borrower Related Parties**" has the meaning ascribed to it in Section 2.09.

"**Junior Mezzanine Collateral**" shall mean the direct and indirect ownership interests that have been pledged to Lehman pursuant to the Junior Mezzanine Pledge Agreements and Junior Mezzanine Loan Documents, and any other collateral for the Junior Mezzanine Loan as provided in the Junior Mezzanine Loan Documents and as permitted by the terms of the Intercreditor Agreement, and such collateral as may be provided in the future.

"**Junior Mezzanine Loan**" shall have the meaning provided in the Recitals hereto.

"**Junior Mezzanine Loan Agreement**" shall have the meaning provided in the Recitals hereto.

"**Junior Mezzanine Loan Documents**" shall have the meaning provided in the Recitals hereto.

"**Junior Mezzanine Loan Party**" shall mean the Junior Mezzanine Borrower, any Guarantor, indemnitor or surety of any of the Obligations and any other Person that is a party to any of the Junior Mezzanine Loan Documents, other than any Property Manager that is not an Affiliate of Junior Mezzanine Borrower.

"**LB Mezz Fund Entities**" shall have the meaning provided in Section 8.01(i).

"**Lender**" means the holder of the Junior Mezzanine Loan or any Split Note Holder.

"**Loan Default**" shall mean an Event of Default as defined in the Junior Mezzanine Loan Agreement.

"**Loan Fees**" shall have the meaning ascribed to it in Section 1.09 hereof.

"**Mortgage Borrower**" shall have the meaning provided in the Recitals hereto.

"**Mortgage Lender**" shall have the meaning provided in the Recitals hereto.

"**Mortgage Loan**" shall have the meaning provided in the Recitals hereto.

"**Mortgage Loan Agreement**" shall have the meaning provided in the Recitals hereto.

"**Mortgage Loan Documents**" shall have the meaning provided in the Recitals hereto.

"**Mortgage Note**" shall have the meaning provided in the Recitals hereto.

"**Mortgaged Property**" shall have the meaning provided in the Recitals hereto.

"**Note**" shall mean any of Note A or Note B.

"**Note A**" shall mean Note A, as defined in the Recitals hereto, as the same may be amended, restated, replaced, supplemented, severed into one or more separate notes or otherwise modified from time to time.

"**Note A Controlling Interest**" shall have the meaning set forth in Section 8.01(b).

"**Note A Interest Rate**" shall mean the applicable interest rate in effect from time to time on Note A (including interest at the Default Rate, if applicable).

"**Note A Par Purchase Price**" means, with respect to Note A, a price equal to the sum of (without duplication) (A) 100% of the Note A Principal Balance, plus (B) accrued but unpaid (and not previously added to the Note A Principal Balance) interest thereon at the Note A Interest Rate from the date as to which interest was last paid on Note A to but not including the date of such purchase (including interest at the Default Rate, if applicable; provided, however, that no interest at the Default Rate shall accrue during the period of time that the Note B Holder has cured the Loan Default by the Mortgage Loan Borrower or during the time that interest at the Default Rate does not apply pursuant to Section 4.01), plus (C) any unreimbursed Protective Advances made by the Note A Holder, and plus (D) any and all reasonable fees and costs incurred by the Note A Holder after a Loan Default in the enforcement of its rights and remedies under the Mortgage Loan Documents; provided, however, that the Note A Par Purchase Price shall not include any Prepayment Premium and shall not include any late fees, exit fees, additional fees, yield maintenance fees or similar fee or charges.   Additionally, if such purchase by Note B Holder is pursuant to the exercise by Note B Holder of its Repurchase Option as a result of Note A Holder's refusal to consent and agree as set forth in Section 2.10(a)(i) at a time at which a Loan Default has not occurred and/or is not continuing, then the Note A Par Purchase Price shall also include the Pre-Default Repurchase Premium.

"**Note A Principal Balance**" shall mean, at any time of determination, the outstanding principal balance of Note A.

"**Note A Tag Along Right**" shall have the meaning set forth in Section 8.01(a).

"**Note B Controlling Interest**" shall have the meaning set forth in Section 8.01(a).

"**Note B Interest Rate**" shall mean the applicable interest rate in effect from time to time on Note B (including interest at the Default Rate, if applicable).

"**Note B Principal Balance**" shall mean, at any time of determination, the outstanding principal balance of Note B.

"**Obligations**" shall have the meaning set forth in the Junior Mezzanine Loan Agreement.

"**Patriot Act**" means the United States of America Patriot Act, Pub.L. No. 107-56.

"**Permitted Assignee**" shall have the meaning provided in Section 8.01(i).

"**Permitted Fund Manager**" means any Person that on the date of determination is (i) one of the entities listed on Exhibit C or any other nationally-recognized manager of investment funds investing in debt or equity interests relating to

commercial real estate, (ii) investing through a fund with committed capital of at least $250,000,000 and (iii) not subject to any bankruptcy, insolvency, or similar proceeding.

"**Person**" shall mean any individual, corporation, partnership, joint venture, limited liability company, estate, trust, unincorporated association, any federal, state, county or municipal government or any bureau, department or agency thereof and any fiduciary acting in such capacity on behalf of any of the foregoing.

"**Post-Foreclosure Plan**" shall have the meaning set forth in Section 4.03.

"**Pre-Default Repurchase Premium**" shall mean the amount of interest that would have accrued on the principal amount of Note A outstanding from time to time at an annual rate of 14.5% compounded monthly on the first day of each calendar month from the date of the repurchase of Note A by Note B Holder pursuant to Section 2.10(a) until the earlier to occur of (i) the first anniversary of the date of such repurchase, (ii) the period from the date of such repurchase to the date Note A Holder would have received repayment of all indebtedness under Note A if Note A had not been repurchased, or (iii) after a Loan Default, the date on which Note B Holder takes an Enforcement Action, or enters into a material modification to the Junior Mezzanine Loan Documents or a written waiver of any material provisions thereof, as a result of such Loan Default.   Installments of the Pre-Default Repurchase Premium shall be payable monthly in arrears on the first day of each calendar month until the earliest of any of clauses (i), (ii) or (iii) above.

"**Prepayment Premium**" shall mean any prepayment premium, yield maintenance premium or similar fee required to be paid in connection with a prepayment of the Junior Mezzanine Loan.

"**Prime Rate**" shall mean, for any day, the "**prime rate**" which normally is published in the "**Money Rates**" section of The Wall Street Journal for such day or, in the event such report shall not so appear, in such other nationally recognized publication as Agent may, from time to time, specify.

"**Pro Rata Interest**", with respect to any individual Split Note Holder, or "**Pro Rata Interests**", with respect to each of the Split Note Holders, as the case may be, shall mean the applicable percentage or percentages of the principal balance of Junior Mezzanine Loan, then held by such Person at such time.

"**Prohibited Person**" shall mean any Person:

(i)      listed in the annex to, or who is otherwise subject to the provisions of, Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001, and relating to Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism (the "**Executive Order**");

(ii)    that is owned or controlled by, or acting for or on behalf of, any person or entity that is listed in the annex to, or is otherwise subject to the provisions, of the Executive Order;

(iii)    with whom a Person is prohibited from dealing or otherwise engaging in any transaction by any terrorism or money laundering Law, including the Executive Order;

(iv)    who commits, threatens or conspires to commit or supports "**terrorism**" as defined in the Executive Order;

(v)    that is named as a "**specially designated national and blocked person**" on the most current list published by the U.S. Treasury Department Office of Foreign Assets Control at its official website or at any replacement website or other replacement official publication of such list; or

(vi)    who is an Affiliate of a Person listed in clauses (i) – (v) above.

"**Property Manager**" shall mean the Management Company as such term is defined in the Junior Mezzanine Loan Agreement.

"**Protective Advance**" means all sums expended as reasonably determined by the Agent, in accordance with the Servicing Standard, and/or any Split Note Holder pursuant to this Agreement to be necessary (a) to protect the priority, validity and enforceability of the Junior Mezzanine Loan Documents, including without limitation the lien of the Indebtedness and the instruments evidencing or securing such lien, (b) to protect the value or the security of the Junior Mezzanine Collateral, or (c) to pay real estate taxes (including special payments in lieu of real estate taxes), maintenance costs, insurance premiums or other items (including capital items) reasonably necessary to protect the Mortgaged Property and other collateral for the Mortgage Loan, the collateral for the Senior Mezzanine Loan and/or the Junior Mezzanine Collateral from forfeiture, casualty, loss or waste or material impairment in value in accordance with any cure rights Junior Mezzanine Lender may have under the Intercreditor Agreement.

"**Protective Advance Rate**" shall mean thirteen percent (13%) per annum compounded monthly on the first day of each calendar month.

"**Qualified Servicer**" means (i) Note B Holder or its Affiliate, (ii) TriMont Real Estate Services, Inc., or (iii) any nationally recognized commercial mortgage loan servicer that is reasonably satisfactory to the Note A Holder and the Note B Holder.

"**Qualified Transferee**" means a Person that is not a Prohibited Person for purposes of the Patriot Act and that is (i) Mortgage Lender, Senior Mezzanine Lender, Lehman or the Note A Holder, or any of their respective Affiliates, or (ii) one or more of the following:

(A)    a real estate investment trust, bank, saving and loan association, investment bank, insurance company, trust company, commercial credit corporation, pension plan, pension fund or pension advisory firm, mutual fund, government entity or plan, provided that any such Person referred to in this clause (A) satisfies the Eligibility Requirements;

(B)    an investment company, money management firm or other institution which is a **"qualified institutional buyer"** within the meaning of Rule 144A under the Securities Act of 1933, as amended, or an institutional **"accredited investor"** within the meaning of Regulation D under the Securities Act of 1933, as amended, provided that any such Person referred to in this clause (B) satisfies the Eligibility Requirements;

(C)    an institution substantially similar to any of the foregoing entities described in clauses (ii)(A) or (ii)(B) that satisfies the Eligibility Requirements;

(D)    any entity Controlled by any of the entities described in clause (i) or clauses (ii)(A) or (ii)(C); provided that the entity meeting the Eligibility Requirements shall also become a party to this Agreement;

(E)    a Qualified Trustee in connection with a securitization of, the creation of collateralized debt obligations (**"CDO"**) secured by or financing through an **"owner trust"** (collectively, **"Securitization Vehicles"**), so long as (A) the special servicer or manager of such Securitization Vehicle has the Required Special Servicer Rating and (B) the entire **"controlling class"** of such Securitization Vehicle, other than with respect to a CDO Securitization Vehicle, is held by one or more entities that are otherwise Qualified Transferees under clauses (ii)(A), (B), (C) or (D) of this definition; provided that the operative documents of the related Securitization Vehicle required that (1) in the case of a CDO Securitization Vehicle, the **"equity interest"** in such Securitization Vehicle is owned by one or more entities that are Qualified Transferees under clauses (ii)(A), (B), (C) or (D) of this definition and (2) if any of the relevant trustee, special servicer, manager fails to meet the requirements of this clause (E), such Person must be replaced by a Person meeting the requirements of this clause (E) within thirty (30) days;

(F)    an investment fund, limited liability company, limited partnership or general partnership where a Permitted Fund Manager or an entity that is otherwise a Qualified Transferee under clauses (ii)(A), (B), (C) or (D) of this definition acts as the general partner, managing member or fund manager and at least 50% of the equity interests in such investment vehicle are owned, directly or indirectly, by one or more entities that are otherwise Qualified Transferees under clauses (ii)(A), (B), (C) or (D) of this definition; or

(G)    any entity listed on Exhibit C attached hereto; or

(H)    any entity listed on Exhibit D attached hereto.

"**Qualified Trustee**" means (i) a corporation, national bank, national banking association or a trust company, organized and doing business under the laws of any state or the United States of America, authorized under such laws to exercise corporate trust powers and to accept the trust conferred, having a combined capital and surplus of at least $100,000,000 and subject to supervision or examination by federal or state authority, (ii) an institution insured by the Federal Deposit Insurance Corporation or (iii) an institution whose long-term senior unsecured debt is rated either of the then in effect top two rating categories of each of the Rating Agencies.

"**Rating Agencies**" shall mean each of S&P, Moody's Investors Service, Inc., and Fitch, Inc., or any other nationally-recognized statistical rating agency which has been designated by the Agent.

"**Register**" shall have the meaning set forth in Section 2.01(b) hereof.

"**Repurchase Option**" shall have the meaning set forth in Section 2.10.

"**Required Special Servicer Rating**" means (i) a rating of "CSS1" in the case of Fitch, (ii) on the S&P list of approved special servicers in the case of S&P and (iii) in the case of Moody's, such special servicer is acting as special servicer in a commercial mortgage loan securitization that was rated by Moody's within the twelve (12) month period prior to the date of determination, and Moody's has not downgraded or withdrawn the then-current rating on any class of commercial mortgage securities or placed any class of commercial mortgage securities on watch citing the continuation of such special servicer as special servicer of such commercial mortgage securities.

"**Senior Mezzanine Borrower**" shall have the meaning set forth in the Recitals hereto.

"**Senior Mezzanine Lender**" shall have the meaning set forth in the Recitals hereto.

"**Senior Mezzanine Loan**" shall have the meaning provided in the Recitals hereto.

"**Senior Mezzanine Loan Agreement**" shall have the meaning provided in the Recitals hereto.

"**Senior Mezzanine Loan Documents**" shall have the meaning provided in the Recitals hereto.

"**Servicing Standard**" shall mean the servicing and administration of the Junior Mezzanine Loan or the management of the Junior Mezzanine Collateral, as applicable, by the Agent for the benefit of the Split Note Holders and in accordance with applicable law, the terms of the Junior Mezzanine Loan Documents and this Agreement and in the same manner in which, and with the same care, skill, prudence and diligence

with which it administers mezzanine loans for its own account, but in all events with at least the same level of care as is customarily exercised by servicers of similar commercial mezzanine loans for third parties giving due consideration to customary and usual standards of practice of prudent institutional commercial lenders servicing their own loans, and with a view towards the best interests of the Split Note Holders as a collective whole (subject to the relative priority rights of the Split Note Holders as set forth in this Agreement), but without regard to (i) any relationship that Agent, or any Affiliate of Agent, may have with the Junior Mezzanine Borrower or any Affiliate of the Junior Mezzanine Borrower or any other parties to this Agreement or the Junior Mezzanine Loan Documents; (ii) the existence of any senior loans (including, without limitation, the Mortgage Loan or the Senior Mezzanine Loan) that Agent, or any affiliate of Agent, may service, hold or have an interest in; (iii) the ownership of the Junior Mezzanine Note or any interest or participation therein, or any equity interest in the Junior Mezzanine Collateral, as applicable, by Agent or any Affiliate of Agent, as applicable; and (iv) the sufficiency of any compensation for its services hereunder and/or the Agent's obligation to make any Protective Advances or incur any expenses.

"**Split Note Holders**" shall mean Note A Holder and Note B Holder and each and every entity which holds an interest in all or any portion of the Junior Mezzanine Loan pursuant to an assignment of any of Note A or Note B, but shall not include a participant in Note A or Note B.

"**Transfer**" shall have the meaning set forth in the Junior Mezzanine Loan Agreement.

(b)      all capitalized terms defined in the recitals to this Agreement shall have the meanings ascribed thereto whenever used in this Agreement and the terms defined in this Agreement have the meanings assigned to them in this Agreement, and the use of any gender herein shall be deemed to include the other genders;

(c)      all capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Junior Mezzanine Loan Agreement;

(d)      all references in this Agreement to designated Sections, Subsections, Paragraphs, Articles, Exhibits, Schedules and other subdivisions or addenda without reference to a document are to the designated sections, subsections, paragraphs and articles and all other subdivisions of and exhibits, schedules and all other addenda to this Agreement, unless otherwise specified;

(e)      a reference to a Subsection without further reference to a Section is a reference to such Subsection as contained in the same Section in which the reference appears, and this rule shall apply to Paragraphs and other subdivisions;

(f)      the terms "**includes**" or "**including**" shall mean without limitation by reason of enumeration; and

(g)    the words **"herein," "hereof," "hereunder"** and other words of similar import refer to this Agreement as a whole and not to any particular provision.

## SECTION 1.    PURCHASE, ASSIGNMENT, ASSUMPTION AND AGENT

1.01    <u>Purchase of Notes</u>.    On the date hereof, Note A Holder has purchased Note A from Note B Holder pursuant to the Assignment and Assumption and is now the lawful owner of Note A.    On the date hereof, Note A Holder has paid Note B Holder a purchase price of $3,448,404.68, representing the funded principal amount of Note A, with accrued interest thereon, as of the date hereof.

1.02    <u>Assignment of Junior Mezzanine Loan Documents</u>.

(a)    On the date hereof, Note B Holder hereby assigns (i) Note A to Note A Holder pursuant to the terms of the Assignment and Assumption, (ii) an interest in the Junior Mezzanine Collateral equal to the Note A Pro Rata Interest to the Note A Holder, (iii) an interest in the other Junior Mezzanine Loan Documents to the Note A Holder equal to the Note A Pro Rata Interest.

(b)    Note B Holder agrees to execute and deliver all such further transfers, assignments and conveyances and assurances as may reasonably be requested by the Note A Holder in order to effect the full assignment and assumption of its respective interest contemplated in this Section 1.02 to such Note A Holder.

1.03    <u>Assumption of Junior Mezzanine Loan Documents</u>.

(a)    The Note A Holder hereby assumes and undertakes to perform, pay or discharge, all obligations of Note A Holder under the Junior Mezzanine Loan Documents and the Intercreditor Agreement, to the extent such obligations are to be performed, paid or discharged after the date hereof, including, without limitation, the obligation to make required future advances, if any, under the Junior Mezzanine Loan Agreement based upon its Pro Rata Interest, in accordance with the terms and conditions thereof and in accordance with its Pro Rata Interest.

(b)    Note B Holder, hereby retains and undertakes to perform, pay or discharge all obligations of the lender under the Junior Mezzanine Loan Documents and the Intercreditor Agreement, to the extent such obligations are to be performed, paid or discharged after the date hereof, in accordance with the terms and conditions thereof and in accordance with its Pro Rata Interest.

(c)    Note B Holder hereby retains and undertakes to perform, pay or discharge in accordance with the terms and conditions of the Junior Mezzanine Loan Documents and the Intercreditor Agreement, all of the obligations of the Lender to the extent such obligations arose or accrued prior to the date hereof.

(d)    Each of the Split Note Holders agree to execute and deliver all such further assurances as may reasonably be requested by the other in order to effect the assumption by each of the Split Note Holders of the obligations contemplated herein.

1.04    Rights of Note A Holder.  Note A and the rights of Note A Holder thereunder, including its right to receive payments of interest, principal and any and all other amounts due thereunder, shall be superior to Note B and the right of the Note B Holder to receive payments of interest, principal, and any and all other amounts due thereunder, except as specifically provided herein.

1.05    Subordination of Note B.  Note B and the right of Note B Holder to receive payments of interest, principal and any and all other amounts due thereunder shall at all times be junior, subject and subordinate to Note A and the rights of the Note A Holder to receive payments of interest, principal, and any and all other amounts due thereunder except as otherwise specifically provided herein.   The Note B Holder will not ask, demand, sue for, take or receive from Junior Mezzanine Borrower, by set-off or in any other manner, any payment of the principal balance of Note B which is not permitted by this Agreement (but excluding payments of principal, interest thereon and other amounts which the Note B Holder is entitled to receive in accordance with this Agreement), now or hereafter owing by Junior Mezzanine Borrower to Note B Holder unless and until Note A has been fully paid.   In the event of any distribution, division or application, partial or complete, voluntary or involuntary, by operation of law or otherwise, of all or any part of the assets of Junior Mezzanine Borrower, or the proceeds thereof, to creditors of Junior Mezzanine Borrower, or upon any indebtedness of Junior Mezzanine Borrower, by reason of the liquidation, dissolution or other winding up of Junior Mezzanine Borrower or Junior Mezzanine Borrower's business, or any sale, receivership, insolvency or bankruptcy proceeding, or assignment for the benefit of creditors, or any proceeding by or against Junior Mezzanine Borrower for any relief under any bankruptcy or insolvency law or laws relating to the relief of debtors, readjustment of indebtedness, reorganizations, compositions or extensions, then any payment or distribution of any kind or character, either in cash, securities or other property which shall be payable with respect to any or all indebtedness of Junior Mezzanine Borrower shall be applied in accordance with this Agreement.  Should any payment or distribution or security or proceeds be received by the Note B Holder in contravention of the two preceding sentences, the Note B Holder will forthwith deliver the same to Agent in precisely the form received (except for the endorsement or assignment of the Note B Holder where necessary), for application in accordance with this Agreement.   In the event of the failure of the Note B Holder to make any such endorsement or assignment, Agent, or any of its officers or employees, are hereby irrevocably authorized to make the same.   No Split Note Holder will assign or transfer to others any claim such Split Note Holder has or may have against Junior Mezzanine Borrower while any indebtedness of Junior Mezzanine Borrower to the Split Note Holders remains unpaid, unless such assignment or transfer is made expressly subject to the provisions of this Agreement.

1.06    Appointment.

(a)    Each Split Note Holder hereby confirms the appointment of the Agent, as agent, to administer the Junior Mezzanine Loan and to take action or cause such actions to be taken on its behalf with respect to the Junior Mezzanine Loan Documents under the provisions of this Agreement, the Junior Mezzanine Loan Agreement, the other Junior Mezzanine Loan Documents and the Servicing Standard. The Agent hereby confirms its acceptance of such appointment. The Agent shall carry out its administrative duties to the Split Note Holders in accordance with the applicable terms of the Junior Mezzanine Loan Agreement, the other Junior Mezzanine Loan Documents, the terms and conditions contained herein and the Servicing Standard. The relationship between the Agent and each Split Note Holder is a contractual relationship only, and the Agent shall not have any duties or responsibilities or any fiduciary duty to any Split Note Holder except those expressly set forth in such agreements, and no implied covenants, functions, responsibilities, obligations or liabilities or duties on the part of the Agent shall be read into this Agreement. No Split Note Holder shall have any fiduciary duty or any other implied obligation to any other Split Note Holder and the duties and obligations of the Split Note Holders to each other shall be limited to those expressly set forth in this Agreement.

(b)    The Agent may execute any of its duties under this Agreement, the Junior Mezzanine Loan Agreement or the other Junior Mezzanine Loan Documents by or through agents or attorneys-in-fact and shall be entitled to advice of counsel (including internal counsel) concerning all matters pertaining to such duties. The Agent shall be responsible for the actions of any agents or attorneys-in-fact just as if such actions were taken by Agent.

(c)    At the option of Agent, the Junior Mezzanine Loan may be serviced by a Qualified Servicer ("**Servicer**") selected by Agent and Agent may delegate all or any portion of its responsibilities under this Agreement, the Junior Mezzanine Note, the Junior Mezzanine Loan Agreement, and the Junior Mezzanine Loan Documents to said Servicer; provided, however, no such delegation of responsibilities shall relieve Agent from its responsibilities and obligations hereunder, which shall be direct and primary responsibilities of Agent. The Agent shall be responsible for the actions of such Servicer just as if such actions were taken by Agent. Agent shall be solely responsible for the payment of any fees or other compensation due to the Servicer in excess of any amounts paid to the Servicer by the Junior Mezzanine Loan Borrower and in no event shall either Split Note Holder be liable for any fees of any such Servicer. Expenses incurred by Servicer in accordance with this Agreement and the Junior Mezzanine Loan Documents but which are not paid to Servicer by the Junior Mezzanine Borrower shall be the obligation of the Split Note Holders, in accordance with their Pro Rata Interest.

1.07    Ownership and Possession of Junior Mezzanine Loan Documents. Each of the Split Note Holders shall own an undivided interest in the Junior Mezzanine Loan and the Junior Mezzanine Loan Documents equal to its Pro Rata Interest. The Agent shall hold in its possession, as collateral agent, at such location as the Agent shall

designate in writing to the Split Note Holders, the Junior Mezzanine Loan Documents for the pro rata benefit of the Agent as one of the Split Note Holders and each of the other Split Note Holders, except that each Split Note Holder shall have the right to hold its own Note. The Agent shall keep and maintain complete and accurate files and records of all matters pertaining to the Junior Mezzanine Loan. Upon reasonable prior notice to the Agent by the Split Note Holders, the Agent will make available to the Split Note Holders and their representatives and agents, the files and records relating to the Junior Mezzanine Loan for inspection and copying during normal business hours.

    1.08   <u>Successor Agent</u>.

    (a)   The Agent may resign, in its sole discretion, without the consent of the Split Note Holders or Junior Mezzanine Borrower by giving thirty (30) days prior written notice of such resignation to the Split Note Holders. Upon any such resignation, the retiring Agent shall, on behalf of the Split Note Holders, appoint a successor Agent, which shall be a Qualified Servicer and shall be subject to the reasonable approval of all other Split Note Holders. Any proposed successor Agent shall (i) have demonstrated its capacity, ability and expertise to service commercial mortgage loans with principal balances of at least $50,000,000 each and at least $3,000,000,000 in the aggregate, and (ii) have accepted such appointment within ten (10) days of the offer of appointment.

    (b)   The Note A Holder shall have the right to remove the Agent for Cause and shall have the right to either become a successor Agent hereunder without complying with the requirements set forth in Section 1.08(a) above, or appoint a successor Agent in compliance with the requirements set forth in Section 1.08(a) above.

    (c)   The resignation or termination of the Agent hereunder shall be effective upon the acceptance of any appointment as Agent hereunder by a successor Agent, except that a termination of the Agent for Cause shall be effective immediately upon such a termination. Any such successor Agent shall thereupon succeed to and become vested with all the rights, powers, privileges and duties of the retiring Agent, and the retiring Agent shall be discharged from its duties and obligations under this Agreement accruing thereafter, provided, however, that the retiring Agent shall transfer and deliver to the successor Agent the Register, all of the Junior Mezzanine Loan Documents and any other documents or instruments, including all books and records relating to the Junior Mezzanine Loan in its possession. The retiring Agent shall execute and deliver all instruments and documents reasonably requested to effectuate the transfer of the administration of the Junior Mezzanine Loan. After any retiring Agent's resignation as Agent, the provisions of this Agreement shall inure to its benefit as to any actions taken or omitted to be taken by it while it was the Agent under this Agreement.

    1.09   Other Loan Fees. The Agent shall retain for its own account all servicing and other loan fees referred to in the Junior Mezzanine Loan Agreement or the Junior Mezzanine Loan Documents, if any, payable after the date hereof ("**Loan Fees**"). Agent shall be responsible for any fees or compensation payable to Servicer.

1.10    Agent as Split Note Holder.  Except to the extent its interest in the Junior Mezzanine Loan has been or will be assigned pursuant to one or more assignment and assumption agreements, the term **"Split Note Holder"** or **"Split Note Holders"** shall, unless the context otherwise expressly indicates, include Agent in its individual capacity as holder of a Pro Rata Interest, and Agent may exercise the rights and powers and shall be bound by the obligations of a Split Note Holder without regard to its rights and obligations as Agent hereunder.

## SECTION 2.    ADMINISTRATION OF THE JUNIOR MEZZANINE LOAN.

2.01    Administration.

(a)    The Agent shall administer the Junior Mezzanine Loan Agreement and the other Junior Mezzanine Loan Documents and service the Junior Mezzanine Loan in accordance with the terms and conditions of this Agreement and the Junior Mezzanine Loan Documents and in accordance with the terms of the Servicing Standard; provided, however, that neither the Agent nor any of its directors, officers, agents or employees shall be liable for any error in judgment or for any action taken or omitted to be taken by it or them in good faith and in accordance with this Agreement and the Servicing Standard, except the Agent (but not any of its directors, officers, agents or employees) shall be liable for any breach of this Agreement or the Servicing Standard and for Agent's own gross negligence or willful misconduct and the gross negligence or willful misconduct of its officers, directors, agents or employees.  Without limitation of the generality of the foregoing, the Agent, neither as agent nor as a Split Note Holder (i) shall be responsible in any manner to any Split Note Holder for any recitals, statements, representations or warranties made by the Junior Mezzanine Borrower or other Junior Mezzanine Loan Party contained in the Junior Mezzanine Loan Agreement or any other Junior Mezzanine Loan Document or by the Junior Mezzanine Borrower or any other Junior Mezzanine Loan Party in any certificate, report, statement or other document referred to or provided for in, or received under or in connection with the Junior Mezzanine Loan Agreement or any other Junior Mezzanine Loan Document or for the value, validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement, the Junior Mezzanine Loan Agreement or any other Junior Mezzanine Loan Document or any such certificate, report, statement or other document, or of any Mortgaged Property; (ii) shall be responsible for the performance or observance by the Junior Mezzanine Borrower or any other Junior Mezzanine Loan Party of any of the terms, covenants or conditions of the Junior Mezzanine Loan Documents; (iii) shall have any duty to inspect the Junior Mezzanine Collateral (including the books and records of the Junior Mezzanine Borrower or any other Junior Mezzanine Loan Party, except as may be specifically provided herein); and (iv) shall incur any liability under or with respect to the Junior Mezzanine Loan or under the Junior Mezzanine Loan Documents or with respect to any Junior Mezzanine Collateral by acting in good faith and in accordance with this Agreement and the Servicing Standard upon any notice, resolution, affidavit, letter, statement, consent, certificate or other instrument or writing (which may be by telegram, telecopy, cable or telex) or conversation (including by telephone) believed by it to be genuine and signed or sent by the proper party or parties or by acting in good faith upon

any representation or warranty of the Junior Mezzanine Borrower or any Junior Mezzanine Loan Party made or deemed to be made under any Junior Mezzanine Loan Document. No successor Agent shall be liable for any act or omission of any prior Agent which occurred prior to the date such successor Agent assumed the role of successor Agent.

(b)    The Agent shall maintain a register for the recordation of the names and addresses of the Split Note Holders, the amount of each Split Note Holder's Pro Rata Interest and the name and address of each Split Note Holder's agent for service of process (the "**Register**"). Agent and the Split Note Holders may treat each person or entity whose name is recorded in the Register as a Split Note Holder hereunder for all purposes of this Agreement. The Register shall be available for inspection and copying by Junior Mezzanine Borrower or any Split Note Holder during normal business hours upon reasonable prior notice to the Agent. The Agent shall also maintain a copy of each Assignment and Assumption delivered to Agent.

2.02    Powers of Agent. Except as otherwise expressly provided for in the Junior Mezzanine Loan Documents or this Agreement, the Agent shall have the right, in its commercially reasonable discretion, in each instance subject to the Servicing Standard, (i) to grant or withhold approvals under the Junior Mezzanine Loan Documents; (ii) to consent to any action or failure to act (other than the failure to make payments required under the Junior Mezzanine Loan Documents) by the Junior Mezzanine Borrower or any other Junior Mezzanine Loan Party; and (iii) to exercise or refrain from exercising any rights which the Agent or the Split Note Holders may have with respect to the Junior Mezzanine Loan, the Junior Mezzanine Loan Documents, or with respect to the Junior Mezzanine Collateral, including, without limitation, the right, subject to the limitations of Section 2.03, to:

(a)    receive, review and process all documents, certificates, opinions, insurance policies, reports, requisitions and other materials of every nature and description submitted by, or on behalf of, the Junior Mezzanine Borrower and pursuant to this Agreement, the Junior Mezzanine Loan Agreement, the Junior Mezzanine Pledge Agreements or the other Junior Mezzanine Loan Documents, and to determine whether or not the Junior Mezzanine Borrower or any other Junior Mezzanine Loan Party is in compliance with the requirements of the Junior Mezzanine Note, the Junior Mezzanine Pledge Agreements, the Junior Mezzanine Loan Agreement and the other Junior Mezzanine Loan Documents;

(b)    make Protective Advances in accordance with the provisions of this Agreement and the Junior Mezzanine Loan Documents and subject to the funding and/or reimbursement of Protective Advances determined pursuant to Section 2.05;

(c)    receive all payments of principal, interest, fees and other charges paid by, or on behalf of the Junior Mezzanine Borrower and distribute all such funds to the Split Note Holders as provided for in this Agreement;

(d)    enforce or refrain from enforcing all of the rights, remedies and privileges afforded or available to the respective Split Note Holders under the terms of the Junior Mezzanine Loan Agreement, the Junior Mezzanine Note and the other Junior Mezzanine Loan Documents, or any opinion, certificates, warranties, representations or insurance policies furnished by or on behalf of the Junior Mezzanine Borrower or any other Junior Mezzanine Loan Party;

(e)    in connection with any Enforcement Action, bring such Enforcement Action in the Agent's name, as Agent for all of the Split Note Holders collectively, and retain and direct counsel reasonably acceptable to all Split Note Holders to prosecute such Enforcement Action on behalf of the Agent for all of the Split Note Holders; and

(f)    do or refrain from doing all such other acts as may be reasonably necessary or incident to the implementation, administration and servicing of the Junior Mezzanine Loan and the enforcement of the rights and remedies of the Split Note Holders.

2.03    Limitations on Agent; Note A Holder's Right to Remove Agent.

(a)    The provisions of this Section 2.03 shall govern and control any other inconsistent provision of this Agreement, including, without limitation, Section 2.02 hereof. The Agent shall not in any event, without the consent and agreement of all Split Note Holders, agree to the amendment or modification of any of the terms of (I) the Junior Mezzanine Loan Agreement, the Junior Mezzanine Note, the Junior Mezzanine Pledge Agreements, or the other Junior Mezzanine Loan Documents in Agent's capacity under the Junior Mezzanine Loan, (II) the Senior Mezzanine Loan Agreement or any of the Senior Mezzanine Loan Documents in Agent's capacity under the Junior Mezzanine Loan, or (III) the Mortgage Note or any of the Mortgage Loan Documents in Agent's capacity under the Junior Mezzanine Loan. Additionally, the Agent shall not, in its capacity as Agent under the Junior Mezzanine Loan, (A) consent to any act or omission by the Junior Mezzanine Borrower or any other Junior Mezzanine Loan Party, or (B) exercise any rights or waive any rights which the Agent or the Split Note Holders may have with respect to (1) the Junior Mezzanine Loan, the Junior Mezzanine Loan Agreement, the Junior Mezzanine Note, the Junior Mezzanine Pledge Agreements, or the other Junior Mezzanine Loan Documents, (2) the Senior Mezzanine Loan Agreement or any of the Senior Mezzanine Loan Documents, or (3) the Mortgage Note or any of the Mortgage Loan Documents, unless in each case consented to by all Split Note Holders, if any such agreement, consent, waiver or exercise would:

(i)    change or modify the interest rate provisions set forth in the Junior Mezzanine Loan Documents or change in any respect the monetary obligations of Junior Mezzanine Borrower under the Junior Mezzanine Loan Documents;

(ii)    increase or decrease the principal amount of the Junior Mezzanine Loan, except for Protective Advances;

(iii)    extend the Maturity Date of the Junior Mezzanine Loan;

(iv)    postpone any date for payment or forgive the payment of principal of, or interest on (including interest at the Default Rate), the Junior Mezzanine Loan or the payment of any other sum or fee due under the Junior Mezzanine Loan Documents to which the Split Note Holders are entitled; provided, however, if any Split Note Holder is entitled to any additional amounts described in the Junior Mezzanine Loan Agreement, any such Split Note Holder may forgive the payment of any such sums only due to such Split Note Holder without requiring the consent of any other Split Note Holder;

(v)    amend or modify in any material respect the terms and provisions of this Agreement or the Intercreditor Agreement;

(vi)    enter into, or modify any agreement subordinating any of Note A or Note B to any indebtedness or converting or exchanging the Junior Mezzanine Loan for any other indebtedness;

(vii)    permit or consent to any Transfer or voluntary or involuntary sale or transfer of all or any portion of the Junior Mezzanine Collateral, any collateral for the Senior Mezzanine Loan or Mortgage Loan or direct or indirect interest in Junior Mezzanine Borrower, Senior Mezzanine Borrower or Mortgage Borrower or permit any subordinate financing or additional financing secured by any direct or indirect collateral for the Mortgage Loan, Senior Mezzanine Loan or Junior Mezzanine Loan or direct or indirect interest in Junior Mezzanine Borrower, except to the extent any of the same is expressly permitted by the Junior Mezzanine Loan Agreement without the consent of the holder of the Junior Mezzanine Loan;

(viii)    take any action or make any approval or determination or give any consent that the Junior Mezzanine Loan Agreement or this Agreement specifically requires be taken, made or given by any or all the Split Note Holders;

(ix)    release the Junior Mezzanine Collateral or Junior Mezzanine Loan Documents (including guaranties, pledges, required equity contributions, and recourse obligations) for the Junior Mezzanine Loan, except as expressly permitted by the Junior Mezzanine Loan Agreement, without the consent of the Lenders or modify any terms with respect to the conditions of release of the Junior Mezzanine Collateral or Junior Mezzanine Loan Documents, (including guaranties, pledges, required equity contributions and recourse obligations) in any respect;

(x)    increase or decrease the Pro Rata Interest of any Split Note Holder, except to the extent any such increase or decrease is specifically provided for in this Agreement;

(xi)    waive the requirement for Junior Mezzanine Borrower to maintain any lockbox account or reserve accounts;

(xii)    waive any Loan Default or claim against Junior Mezzanine Borrower for failure to perform, or agree to postpone the time for the Junior Mezzanine Borrower's performance of, any material obligation under the Junior Mezzanine Loan Documents;

(xiii)    make arrangements for or agree to the distribution of any insurance or condemnation proceeds in a manner not required by the Junior Mezzanine Loan Documents;

(xiv)    subject to Section 4.01 hereof, (a) accelerate the Junior Mezzanine Loan, (b) commence or continue any other Enforcement Action, (c) waive any Loan Default, (d) settle any Enforcement Action, (e) determine the bid on behalf of the Split Note Holders at any sale of the Junior Mezzanine Collateral, or (f) determine the manner of taking and holding title to the Junior Mezzanine Collateral, or the sale of the Junior Mezzanine Collateral after a foreclosure;

(xv)    accept any reinstatement of the Junior Mezzanine Loan; or

(xvi)    extend the period during which voluntary prepayments are prohibited or during which prepayments require the payment of a Prepayment Premium or yield maintenance charge or increase the amount of any such Prepayment Premium or yield maintenance charge.

(b)    Notwithstanding the foregoing, if there is a continuing Loan Default which is not being cured by Note B Holder, whether or not Note A Holder elects to remove the Agent after such Loan Default, the matters described in clauses (xi) – (xvi) above shall not require the consent of Note B Holder.

(c)    In the event of a continuing Loan Default, which is not being cured by Note B Holder, whether or not Note A Holder removes Agent as a result of such Loan Default, if any dispute exists over any of the matters described in clauses (i) – (x) above for 30 days after written notice from Note A Holder, unless Note B Holder exercises the Repurchase Option, the Agent (or if Note A Holder has removed Agent, any successor Agent) shall proceed with respect to such matter as directed by Note A Holder.

(d)    Notwithstanding anything to the contrary herein, each Split Note Holder shall have the sole right to waive any provisions of the Junior Mezzanine Loan Documents relating to the payment of interest at the Default Rate on any amounts due and owing with respect to the Junior Mezzanine Note held by such Split Note Holder.

(e)    Agent shall deliver to each Split Note Holder copies of any and all modifications, amendments, extensions, consolidations, spreaders, restatements, alterations, changes or revisions to any one or more of the Junior Mezzanine Loan Documents (including, without limitation, any material side letters, waivers or consents entered into, executed or delivered by or to Agent) promptly after any of such instruments have been executed by or delivered to or by Agent.

(f)    As to any matters which are subject to the consent or direction of all Split Note Holders, the Agent shall not be permitted or required to exercise any discretion or take any action except upon the instructions of all the Split Note Holders, which instructions shall be binding upon all Split Note Holders.  The Agent and its directors, officers, agents and employees shall be fully protected in acting or in refraining from action upon such instructions or direction.  In no event shall the Agent be required to take any action which exposes the directors, officers, agents or employees of the Agent to personal liability or which is contrary to the Junior Mezzanine Loan Documents or applicable law.  As to any matters not expressly provided for by the Junior Mezzanine Loan Documents or this Agreement, the Agent shall not be required to exercise any discretion or take any action, unless such inaction on the part of the Agent exposes the Agent or its directors, officers, agents or employees to personal liability or is contrary to applicable law.  In acting hereunder as Agent, the Agent shall be acting for its own account as one of the Split Note Holders, and for the account of the other Split Note Holders, to the extent of their respective Pro Rata Interests in the Junior Mezzanine Loan.

2.04    Agent's Request for Approval of Split Note Holders.    All communications from the Agent to the Split Note Holders requesting the Split Note Holders' determination, consent, approval or disapproval (i) shall be given in the form of a written notice to each of the Split Note Holders, (ii) shall be accompanied by a description of the matter or thing as to which such determination, approval, consent or disapproval is requested, and shall advise each of the Split Note Holders where such matter or thing may be inspected, or shall otherwise adequately describe the matter or issue to be resolved, (iii) shall include, to the extent not previously provided to the Split Note Holders, all written materials (to the extent necessary to make an informed decision) and a description of all oral information (to the extent necessary to make an informed decision) provided to the Agent in respect of the matter or issue to be resolved, and (iv) shall include the Agent's recommended course of action or determination in respect thereof.

2.05    Enforcement Actions; Protective Advances.    Each of the Split Note Holders acknowledges and agrees that no individual Split Note Holder may, except as otherwise specifically permitted by this Agreement, (i) separately enforce or exercise any of the provisions of any of the Junior Mezzanine Loan Documents (including, without limitation, the Notes) other than with the unanimous consent of the Split Note Holders and through the Agent, (ii) separately appear, submit or file any claim, vote, or take any other action in any Bankruptcy Action other than through the Agent, except that each Split Note Holder shall have the right to file its own proof of claim in any Bankruptcy Action, or (iii) amend or modify its Split Note or any of the other Junior Mezzanine Loan

Documents, or (iv) commence or join in the commencement of any involuntary Bankruptcy Action against Junior Mezzanine Borrower or any Junior Mezzanine Loan Party. The Agent shall advise the Lenders of all material actions which the Agent takes in accordance with the provisions of this Section 2.05.

Upon the need for a Protective Advance or a request for reimbursement by the Agent for a Protective Advance previously made by the Agent, Note A Holder may (i) provide the necessary funds, (ii) elect to provide its Pro Rata Interest and request that Note B Holder provide its Pro Rata Interest, or (iii) request that Note B Holder provide all necessary funds, repayment of which funds to Note B Holder shall, notwithstanding anything in this Agreement to the contrary, be subordinate to full repayment to Note A Holder of all amounts due and owing to Note A Holder under Note A. If Note A Holder elects clause (ii), and Note B Holder fails to provide its Pro Rata Interest of the necessary Protective Advance, notwithstanding anything in this Agreement to the contrary, Note A Holder shall have all control rights associated with a Loan Default which remains uncured as are provided in Section 1.08(b) and Sections 2.03(b) and 2.03(c). If Note A Holder elects clause (iii), Note B Holder may provide such funds, the repayment of which shall be subordinate to full repayment of Note A, or if Note B Holder does not wish to provide the necessary funds for the Protective Advance, Note B Holder must exercise its Repurchase Option as set forth in Section 2.10 and repurchase Note A pursuant thereto. Except as otherwise specifically provided in clause (iii), all Protective Advances provided hereunder shall be repaid in accordance with the priorities set forth in Section 3.03 hereof.

2.06   Copies of Documents to Split Note Holders. The Agent shall promptly provide each Split Note Holder with copies of all financial statements delivered by the Junior Mezzanine Borrower or any other Junior Mezzanine Loan Party to the Agent pursuant to the Junior Mezzanine Loan Agreement. Each Split Note Holder agrees to keep such financial statements confidential to the same extent that Lender is obligated to the Junior Mezzanine Borrower to keep such statements confidential as provided in the Junior Mezzanine Loan Agreement. The Agent shall promptly deliver to the Split Note Holders all material information regarding the Junior Mezzanine Collateral (including without limitation, quarterly and annual officer's certificates, comfort letters, operating statements, and management and operating reports delivered pursuant to the Junior Mezzanine Loan Agreement), the Junior Mezzanine Borrower or any Junior Mezzanine Loan Party, and any other holder of any of the ownership interests of either of the Junior Mezzanine Borrower or any Junior Mezzanine Loan Party furnished to or obtained by the Agent, as Agent or as one of the Split Note Holders, with respect to the Junior Mezzanine Loan. The Agent shall also promptly deliver to the Split Note Holders copies of all notices (including, without limitation, notices of a default) and other communications of a material nature relating to the Junior Mezzanine Loan which are sent or received by the Agent. The Agent shall promptly notify the Split Note Holders of any notice of prepayment received from the Junior Mezzanine Borrower.

2.07   Hazard Insurance and Condemnation Award. If any Split Note Holder becomes aware of any damage to the Mortgaged Property, or of any actual or potential condemnation affecting the Mortgaged Property or the security for the Junior Mezzanine

Loan, it will promptly notify the Agent and the other Split Note Holders of the occurrence and nature thereof. The Agent shall promptly notify each of the Split Note Holders thereof, and, shall have the authority to adjust, compromise or settle hazard insurance or condemnation claims in accordance with the provisions of the Junior Mezzanine Loan Documents, if the Junior Mezzanine Loan Documents so provide. Under the terms of the Mortgage Loan Agreement, the net proceeds of any insurance or condemnation award, after payment of fees, expenses and costs of collection, shall be made available to the Mortgage Borrower to restore or replace the Mortgaged Property or be applied to the principal amount of the Mortgage Loan, the Senior Mezzanine Loan, or the Junior Mezzanine Loan in accordance with the provisions of the applicable loan documents, intercreditor agreements and this Agreement and in accordance with the applicable provisions of law. To the extent permitted by applicable law and not otherwise provided for in the Mortgage Loan Documents, Senior Mezzanine Loan Documents or the Junior Mezzanine Loan Documents, the proceeds of any insurance recovery or condemnation award received by the Agent and not immediately disbursed or immediately applied to the Indebtedness or not otherwise distributed by the Agent, shall be deposited in an interest-bearing account for the benefit of the Split Note Holders, which account shall provide for interest at then prevailing market rates, provided that nothing herein shall require that interest be earned at the highest prevailing rates. The income, if any, received by the Agent from such account and not payable to others shall be shared by the Split Note Holders in accordance with their respective Pro Rata Interests.

2.08    Inspection. The Agent shall use its reasonable efforts to notify each Split Note Holder of any inspection of the Mortgaged Property made by Agent, and each Split Note Holder or its representative shall have the right to accompany the Agent on such inspection.

2.09    Business Activities of Each Split Note Holder. Each Split Note Holder acknowledges that the other Split Note Holder and its respective Affiliates may make loans or otherwise extend credit to and generally engage in any kind of business with any Affiliate of the Junior Mezzanine Borrower ("Junior Mezzanine Borrower Related Parties"), and receive payments on such other loans or extensions of credit to Junior Mezzanine Borrower Related Parties and otherwise act with respect thereto freely and without accountability in the same manner as if this Agreement and the transactions contemplated hereby were not in effect.

No Split Note Holder shall, however, assign its Junior Mezzanine Note or any interest therein or any rights hereunder to the Junior Mezzanine Borrower or any Junior Mezzanine Borrower Related Parties. Notwithstanding the preceding sentence, the Agent and each Split Note Holder agree to act fairly and without discrimination with respect to the Junior Mezzanine Loan notwithstanding any other transactions or business each may have with the Junior Mezzanine Borrower or any Junior Mezzanine Loan Party or Junior Mezzanine Borrower Related Parties and any Person who may do business with or own securities of the Junior Mezzanine Borrower or any Junior Mezzanine Loan Party or Junior Mezzanine Borrower Related Parties. If any property (other than the Junior

Mezzanine Collateral) is taken by the Agent or any Split Note Holder as collateral for any other loans or extensions of credit made by the Agent or any Split Note Holder, to or for the Junior Mezzanine Borrower or any Junior Mezzanine Loan Party or Junior Mezzanine Borrower Related Parties, or any property is in the possession or control of Agent or any Split Note Holder, or any deposit is held or other indebtedness is owing to the Agent or any Split Note Holder, and that property (other than the Junior Mezzanine Collateral), deposit or indebtedness, or the proceeds thereof, may be or become collateral for or otherwise available for payment in connection with the Junior Mezzanine Loan by reason of the general description of secured obligations contained in any security agreement or other agreement or instrument held by the Agent or any Split Note Holder or by reason of a right of set off, counterclaim or otherwise, no other Person shall have any interest in that property, deposit or indebtedness, or the proceeds thereof, except that if the property, deposit or indebtedness, or the proceeds thereof, shall be applied in reduction of amounts outstanding in connection with the Junior Mezzanine Loan, then subject to Section 3.08 hereof, the other Split Note Holders shall be entitled to the amount provided in this Agreement with respect to such payment.

2.10    Repurchase Right of Note B Holder.

(a)    If (i) the Split Note Holders at any time fail to agree to any action which requires unanimous approval of the Split Note Holders pursuant to the provisions of Section 2.03 or otherwise pursuant to this Agreement, or (ii) the Note B Holder, at any time after a Loan Default shall have occurred under the terms of the Junior Mezzanine Loan Documents, fails to consent to any proposed action under Section 2.03(i)-(x), then the Note B Holder shall have the right (but not the obligation) to purchase (the "**Repurchase Option**") Note A and all rights of Note A Holder under the Junior Mezzanine Loan Documents upon the payment to the Note A Holder of the Note A Par Purchase Price. Note B Holder may exercise the Repurchase Option by delivering written notice to the Note A Holder of Note B Holder's intention to do so and making payment of the Note A Par Purchase Price to the Note A Holder, within thirty (30) days thereafter, and in any event prior to the foreclosure of the Junior Mezzanine Collateral. Simultaneously with the payment to the Note A Holder of the Note A Par Purchase Price, the Note A Holder will execute and deliver to the Note B Holder assignment documents to assign Note A and all rights of Note A Holder under the Junior Mezzanine Loan Documents, this Agreement and the Intercreditor Agreement to the Note B Holder or its designee, without recourse, representation or warranty, except for representations as to the outstanding balance of Note A, the amount of the Note A Par Purchase Price and that the Note A Holder has not assigned its rights in Note A and that there are no outstanding encumbrances on Note A, Note A Holder shall also deliver the original executed Note A appropriately endorsed to Note B Holder.

(b)    In the event that conditions giving rise to the Repurchase Option as set forth in Section 2.10(a)(i) occur but the Note B Holder elects not to exercise the Repurchase Option, then the Note A Holder's position with respect to such action shall be deemed to be accepted.

2.11    Junior Mezzanine Loan Documents.    To the extent of any conflict between the Junior Mezzanine Loan Documents and this Agreement, the terms and conditions of this Agreement shall prevail and control as among the parties hereto.    To the extent not addressed in this Agreement, the terms and conditions of the Junior Mezzanine Loan Agreement shall govern and control.

2.12    Modifications to Transaction Terms.    The non-economic terms of Note A and Note B shall be subject to modifications which may be required (i) by Note B Holder in connection with a sale by Note B Holder of Note B to a third party, or (ii) by Note A Holder in connection with a sale by Note A Holder of Note A to a third party, provided that any such modifications shall be reasonable and of a nature which are customarily required in transactions for the sale of mezzanine loan participation interests with parties acting in good faith.

### SECTION 3.    PAYMENTS, INCREASED COSTS, PERMITTED TRANSACTIONS

3.01    Method of Payment.    Upon receipt of any payments of principal of, interest on and other amounts due with respect to the Junior Mezzanine Loan, the Agent shall promptly, but in no event later than the Business Day following the collection in immediately available funds of any such payment by the Agent distribute, in immediately available funds, to each Split Note Holder entitled to payment in accordance with this Agreement, the amount to which such Split Note Holder is entitled.    Any amount not timely remitted by Agent shall bear interest at the overnight rate for federal funds transactions between member banks of the Federal Reserve System as published by the Federal Reserve Bank of New York.    The distribution to each Split Note Holder hereunder shall be to the account specified in Exhibit B unless otherwise specified in writing to the Agent.    Each payment to the Agent under this Section 3.01 shall constitute a payment by the Junior Mezzanine Borrower to the Split Note Holders in the amount of such payment, and any portion of the Junior Mezzanine Loan paid by any such payment to the Agent by or on behalf of the Junior Mezzanine Borrower shall not be considered outstanding for any purpose after the date of its receipt by the Agent.

3.02    Intentionally Deleted.

3.03    Payments.    All amounts tendered by the Junior Mezzanine Borrower or any other Person or otherwise available for payment of the Junior Mezzanine Loan (including amounts received by any Servicer), whether received in the form of monthly payments, proceeds under insurance policies, awards, settlements or otherwise (other than (i) proceeds, awards or settlements to be applied to the restoration or repair of the Mortgaged Property or released to the Mortgage Borrower in accordance with the Mortgage Loan Documents), and (ii) amounts collected on the Junior Mezzanine Loan that are then due and payable to the Servicer) and any proceeds of a foreclosure or subsequent sale of the Junior Mezzanine Collateral shall, except as otherwise specifically provided in this Agreement, be applied in the following order of priority:

(a)     first, to the Agent or Servicer to reimburse them for expenses permitted pursuant to this Agreement and which have been incurred and remain unpaid;

(b)     second, to the Note A Holder to reimburse the amount of any Protective Advances made only by Note A Holder or made by both Note A Holder and Note B Holder, together with interest calculated at the Protective Advance Rate;

(c)     third, to Note B Holder, to reimburse Note B Holder for the amount of any Protective Advances made by Note B Holder together with interest calculated at the Protective Advance Rate;

(d)     fourth, to the Note A Holder in an amount equal to the interest then due and payable under Note A;

(e)     fifth, to the Note A Holder in an amount equal to any interest previously accrued and unpaid under Note A;

(f)     sixth, to the Note A Holder for the repayment of any outstanding principal under Note A until Note A is satisfied in full; and

(g)     seventh, to the Note B Holder in an amount equal to all amounts due under Note B until Note B is satisfied in full.

3.04    <u>Increased Cost of the Junior Mezzanine Loan</u>.  If any Split Note Holder is entitled to and decides to require payment of any additional amounts described in the Junior Mezzanine Loan Documents, such Split Note Holder shall: (a) give written notice thereof to the Agent, who shall notify the Junior Mezzanine Borrower, and such sums shall be payable to such Split Note Holder at the rate and place indicated in such notice subject to the terms of this Agreement and the Junior Mezzanine Loan Documents; and (b) simultaneously with the giving of such notice, furnish to the Agent (who may, but is not obligated to, furnish to the Junior Mezzanine Borrower) at least ten (10) Business Days prior to each date on which such additional amounts are payable, a certificate of an officer of such Split Note Holder setting forth the amount to which such Split Note Holder is then entitled pursuant to the Junior Mezzanine Loan Documents.  Such Split Note Holder's certificate shall be consistent with such Split Note Holder's good faith determination of the costs incurred, directly or indirectly, by it with respect to the related reserve amounts and shall be accompanied by such other supporting documentation and evidence as the Agent or the Junior Mezzanine Borrower shall reasonably require.  The Agent shall remit to such Split Note Holder the Split Note Holder's interest in such additional amounts to the extent collected and in accordance with the terms and conditions of Section 3.01 hereof.

3.05    <u>Taxes</u>.  All taxes due and payable on any payments to be made to a Split Note Holder in respect of the Junior Mezzanine Loan or under the Junior Mezzanine Loan Agreement shall be such Split Note Holder's sole responsibility.  All payments payable to the Split Note Holders hereunder or with respect to the Junior Mezzanine Loan

shall be made to the Split Note Holders without deduction for any taxes, charges, levies or withholdings except to the extent, if any, that such amounts are required to be withheld by the Agent under the laws, rules and regulations of the United States of America and any other applicable taxing authority. If a Lender is organized or is existing under the laws of another jurisdiction outside the United States, such Split Note Holder shall provide to the Agent upon the execution of this Agreement and, from time to time thereafter, completed and signed copies of any form that may be required by the United States Internal Revenue Service in order to certify such Split Note Holder's exemptions from United States withholding taxes with respect to payments to be made to such Split Note Holder in respect of the Junior Mezzanine Loan or under the Junior Mezzanine Loan Agreement or such other documents as are necessary to indicate that all such payments are exempt from or subject to such taxes at a rate reduced by an applicable tax treaty.

3.06    Excess Payments. If any Split Note Holder or the Agent in its capacity as a Split Note Holder shall obtain any payment (whether voluntary, involuntary, through the exercise of any right of set-off or otherwise) on account of its interest in the Junior Mezzanine Loan in excess of the amount to which it is entitled pursuant to this Agreement, such excess shall be distributed among all Split Note Holders in accordance with Sections 3.02 and 3.03. However, if all or any portion of such excess payment is thereafter recovered by the Junior Mezzanine Borrower or other party entitled thereto through legal action or otherwise, each Split Note Holder shall reimburse the party required to refund such payment to the Junior Mezzanine Borrower or other party entitled thereto in an amount equal to the amount such Split Note Holder so received. Within three (3) Business Days of obtaining any such payment, the Split Note Holder agrees to notify the Agent of such excess payment.

3.07    Recaptured Payments. If Agent or any Servicer holding or having distributed any amount received or collected in respect of Note A or Note B reasonably determines, or a court of competent jurisdiction orders, at any time that any amount received or collected in respect of Note A or Note B must, pursuant to any insolvency, bankruptcy, fraudulent conveyance, preference or similar law, be returned to the Junior Mezzanine Borrower or paid to the Note A Holder, the Note B Holder or Agent or any Servicer or paid to any other Person, then, notwithstanding any other provision of this Agreement, neither Agent nor any Servicer shall be required to distribute any portion thereof to the Note A Holder or the Note B Holder, as applicable, and the Note A Holder or the Note B Holder, as applicable, will promptly on demand repay the portion thereof which shall have been theretofore distributed to the Note A Holder or the Note B Holder, as applicable, together with interest thereon at such rate, if any, as shall have been required to be paid to the Junior Mezzanine Borrower, the Note A Holder, the Note B Holder, Servicer, or such other person or entity with respect thereto. The return of any funds pursuant to the foregoing sentence shall be allocated as between the Note A Holder and the Note B Holder so that any losses are allocated in accordance with Sections 3.02 and 3.03. The Note A Holder and the Note B Holder agree that if at any time it shall receive from any sources whatsoever any payment on account of the Junior Mezzanine

Loan in excess of its distributable share thereof, it will promptly remit such excess to the Agent and Agent shall hold such payment in trust for the other Split Note Holders. The Agent shall have the right to offset any amounts due hereunder from any of the Note A Holder or the Note B Holder with respect to the Junior Mezzanine Loan against any future payments due to the Note A Holder or the Note B Holder, as applicable, under the Junior Mezzanine Loan, provided, that the obligations of each of the Note A Holder and the Note B Holder under this Section 3.07 are separate and distinct obligations from one another and in no event shall Agent or Servicer enforce the obligations of the Note A Holder against the Note B Holder or the obligations of the Note B Holder against the Note A Holder. The obligations of the Note A Holder and the Note B Holder under this Section 3.07 constitute absolute, unconditional and continuing obligations and Agent and Servicer shall be deemed a third party beneficiary of these provisions.

3.08    Return of Payments.    If, for any reason, the Agent makes any payment to any Split Note Holder before the Agent has received or applied that corresponding payment on the Junior Mezzanine Loan (it being understood that the Agent is under no obligation to do so), and, thereafter, the Agent does not receive the corresponding payment within five (5) Business Days of the date the Agent made such payment to such Split Note Holder, such Split Note Holder shall, at the Agent's request, return that payment to the Agent within three (3) Business Days following such request. In addition, such Split Note Holder shall simultaneously remit interest on that payment at the overnight rate for federal funds transactions between member banks of the Federal Reserve System, as published by the Federal Reserve Bank of New York, for each day from the making of that payment to such Split Note Holder until its return to the Agent. If the Agent has received or applied any payment in respect of the Junior Mezzanine Loan and has paid any Split Note Holder on account of such payment and, thereafter, that payment or application is rescinded or must otherwise be returned or paid over by the Agent, whether or not required pursuant to any bankruptcy or insolvency law, the sharing of payments clause of any loan agreement or otherwise, such Split Note Holder will, at the Agent's request, return the amount so received to the Agent within three (3) Business Days following such request. In addition, such Split Note Holder shall simultaneously remit any interest or other amount required to be paid by the Agent with respect to that payment or application. All requests pursuant to this Section 3.08 shall be promptly confirmed in writing, and such confirmation shall include an explanation of the circumstances giving rise to such request.

3.09    First Interest Payment Proration.    Notwithstanding anything to the contrary contained herein, the parties hereto hereby acknowledge and agree that the payment of interest due on August 1, 2005, under Note A shall be prorated and disbursed as follows:

(a)    to the Note A Holder in an amount equal to the accrued and unpaid interest on Note A at the Note A Interest Rate, for the period commencing on the date of this Agreement through and including July 31, 2005; and

(b)    to Note B Holder, an amount equal to all accrued and unpaid interest on Note A at the Note A Interest Rate, for the period July 1, 2005, through the date immediately preceding the date of this Agreement.

3.10    Permitted Transactions with Junior Mezzanine Borrower or Any Other Junior Mezzanine Loan Party.  The Agent, the Split Note Holders and their Affiliates may accept deposits from, lend money to, act as trustee under indentures of, and generally engage in any kind of business with the Junior Mezzanine Borrower or any Junior Mezzanine Loan Party or any Junior Mezzanine Borrower Related Party, and any Person who may do business with or own securities of the Junior Mezzanine Borrower or any Junior Mezzanine Loan Party or any Junior Mezzanine Borrower Related Party, all as if the Agent, and the Split Note Holders were not acting as lenders, and the Agent was not acting as Agent in respect of the Junior Mezzanine Loan, and without any duty to account therefor, but subject to this Agreement, the Junior Mezzanine Loan Documents, and the Servicing Standard.

## SECTION 4.    DEFAULT BY JUNIOR MEZZANINE BORROWER

4.01    Note B Holder's Right to Cure.

(a)    Upon the occurrence of a Loan Default and upon notice from Agent (a "**Cure Option Notice**") of the occurrence of such Loan Default, the Note B Holder will have the right, exercisable by Note B Holder giving written notice to Note A Holder of its intent to cure such default within, in the case of a monetary default, five (5) Business Days after receipt of the Cure Option Notice and, in the case of a non-monetary default, fifteen (15) Business Days after receipt of the Cure Option Notice, to cure such default; provided, in the event that Note B Holder has elected to cure any default, the default must be cured by Note B Holder within, in the case of a monetary default, five (5) Business Days after the later to occur of (i) the cure period provided to the Junior Mezzanine Borrower or (ii) receipt of such Cure Option Notice and, in the case of a non-monetary default the later to occur of (i) the cure period provided to the Junior Mezzanine Borrower or (ii) ninety (90) days after receipt of such Cure Option Notice, or if such default is not reasonably susceptible of cure within such 90-day period, such additional period of time as is reasonably necessary to cure such default in the exercise of reasonable diligence (so long as Note B Holder makes or causes to be made timely payment of the Junior Mezzanine Borrower's regularly scheduled monthly principal and interest payments under the Junior Mezzanine Loan and any other amounts due under the Junior Mezzanine Loan Documents (the above being the "**Cure Period**")).

(b)    Additionally, Note B Holder shall not be required, in order to effect a cure under Section 4.01(a) as to any default, to cure any Loan Default that is personal to the Junior Mezzanine Borrower and that does not relate to the Junior Mezzanine Collateral; and Note B Holder shall not be required, in order to effect a cure under Section 4.01(a) for a default that is of a non-monetary nature (i.e., a default that cannot be cured solely by the payment of a liquidated sum of money), to pay any interest calculated at the Default Rate to the extent the same is in excess of the rate of interest

which would have been payable by Junior Mezzanine Borrower in the absence of such default; and, solely with respect to defaults of a non-monetary nature, no interest shall accrue at the Default Rate for such period. If the Note B Holder cures any such default (or is not required to cure such default pursuant to the preceding sentence), interest shall not accrue at the Default Rate so long as such cure continues.

(c)     If a Loan Default occurs which Note B Holder does not elect to cure under Section 4.01(a) or which is otherwise not timely cured or undertaken to be cured, then the Split Note Holders hereby agree to consult with each other during the ninety (90) day period immediately following such occurrence with respect to the exercise of any rights and remedies the Split Note Holders may have under the Junior Mezzanine Loan Documents or the commencement of any Enforcement Action against the Junior Mezzanine Collateral. During such ninety (90) day period, no Enforcement Action shall be taken unless agreed by all Split Note Holders. If at the end of such ninety (90) day period, the Loan Default has not been cured or waived in accordance with the terms of this Agreement and such agreement of the Split Note Holders has not been reached, then Note A Holder shall have the sole right to direct Agent as to how to proceed with respect to any Enforcement Action (provided, however, that if Agent determines in good faith that such action shall expose Agent to any liability and does not commence Enforcement Action on that basis, then (i) Agent must also determine in good faith that such liability is not covered by the indemnification in Section 6 of this Agreement, and (ii) Agent will proceed notwithstanding such determination of risk of liability and lack of availability of indemnification if the Split Note Holders shall specifically jointly direct Agent in writing to take such action and jointly and severally indemnify Agent with respect to such risk); and such Loan Default shall constitute a material non-monetary Loan Default or a monetary Loan Default. If after commencing such Enforcement Action, Agent is directed to cease such Enforcement Action or to take another course of action by Note A Holder under the terms of this Agreement, Agent shall follow such direction. Agent shall at all times keep all Split Note Holders informed as to the status of any Enforcement Action.

(d)     Notwithstanding anything to the contrary contained herein, during any period that Note B Holder is curing in accordance with this Section, it shall be deemed for all purposes of this Agreement that no Loan Default exists.

4.02    Intentionally Deleted.

4.03    Title to Property.  In the event that all or any portion of the Junior Mezzanine Collateral is acquired by the Agent as the result of a foreclosure, or is retained in satisfaction of all or any part of Junior Mezzanine Borrower's obligations, title to any such Junior Mezzanine Collateral or any portion thereof shall be held in the name of the Agent or a nominee or subsidiary of the Agent, in any case as agent, for the ratable benefit of the Agent and the Split Note Holders.  The Agent shall promptly after the taking of title prepare a recommended course of action for such Junior Mezzanine Collateral (the "Post-Foreclosure Plan"), which shall be subject to the approval of all Split Note Holders in accordance with the procedure set forth in Section 2.03 hereof.

The Agent shall manage, operate, or otherwise deal with the Junior Mezzanine Collateral so acquired in accordance with the Servicing Standard and the Post-Foreclosure Plan and administer all transactions relating thereto, including, without limitation, employing a managing agent and other agents, contractors and employees, including agents for the sale of such Junior Mezzanine Collateral, or any portion thereof, and the collecting of rent and other sums from such Junior Mezzanine Collateral, and paying expenses of such Junior Mezzanine Collateral. The Agent shall render, or cause to be rendered by the managing agent, to each of the Split Note Holders, monthly, an income and expense statement for such Junior Mezzanine Collateral. In such event, each of the Split Note Holders shall contribute its Pro Rata Interest of any operating loss for such Junior Mezzanine Collateral, and such other expenses and operating reserves as the Agent shall deem reasonably necessary within five (5) Business Days following notice thereof. To the extent there is net operating income from such Junior Mezzanine Collateral, the Agent shall determine the amount and timing of distributions to the Split Note Holders. All such distributions shall be made to the Split Note Holders in accordance with this Agreement. The Agent shall undertake to sell such Junior Mezzanine Collateral, at such price and upon such terms and conditions as may be determined by Note A Holder.

SECTION 5.    ACQUISITIONS OF SENIOR LOANS AND COLLATERAL

    5.01    Restrictions on Acquisition of the Senior Loan and Collateral.

        (a)    Each Split Note Holder hereby covenants and agrees that it shall not cause, or allow any of its Affiliates, to purchase the Mortgage Loan or Senior Mezzanine Loan (or any interest therein) or the collateral for either, such loan (or any interest therein) except as set forth and as permitted in this Section 5.

        (b)    If either Split Note Holder concludes that the Mortgage Loan or Senior Mezzanine Loan must be acquired to protect their respective interests in the Junior Mezzanine Loan (including, without limitation, by reason of the exercise of the rights under the Intercreditor Agreement), such party shall give notice thereof (a "**Purchase Request Notice**") to the other party. The Purchase Request Notice shall specify the terms of such acquisition in reasonable detail, provide any other information reasonably deemed relevant thereto, and request that the recipient of the Purchase Request Notice consent to do so. If the Split Note Holders approve the acquisition of the Mortgage Loan or Senior Mezzanine Loan, the Mortgage Loan or Senior Mezzanine Loan shall be purchased by Agent for the benefit of the Split Note Holders proportionate to their Pro Rata Interests and each Split Note Holder shall irrevocably be committed to contribute its Pro Rata Interest of the purchase price for the Mortgage Loan or Senior Mezzanine Loan. If the Split Note Holders do not approve the acquisition thereof by Agent as aforesaid within ten (10) Business Days of the Purchase Request Notice (or such lesser time period as may be specified as necessary to avoid a possible deed or assignment in lieu of foreclosure being delivered by Mortgage Borrower or Senior Mezzanine Borrower in accordance with the terms of the Intercreditor Agreement), such request shall be deemed to have been denied and no party shall be obligated to contribute as aforesaid.

(c)    If a purchase of the Mortgage Loan or Senior Mezzanine Loan as described in Section 5.01(b) does not occur following a Purchase Request Notice, either because a Split Note Holder does not approve such purchase or fails to fund its Pro Rata Interest of the purchase price of the Mortgage Loan or Senior Mezzanine Loan within the time period specified therein, the other party (or any Affiliate of such other party) shall have the right, but not the obligation, to acquire the Mortgage Loan or Senior Mezzanine Loan for its own account, on the terms and conditions specified in the Purchase Request Notice at any time within ten (10) Business Days after the request in the Purchase Request Notice shall have been deemed to have been denied or the other party shall have failed to so fund its share of the purchase price.  Any purchase of the Mortgage Loan or Senior Mezzanine Loan, or any interest therein, following any such denial or failure to fund by the other party shall be solely for the account of the party electing to purchase the Mortgage Loan or Senior Mezzanine Loan, as the case may be; provided, however, that the Intercreditor Agreement and any and all other agreements between Mortgage Lender, Senior Mezzanine Lender and the holder of the Junior Mezzanine Loan shall remain in full force and effect following such purchase.  In addition to the foregoing, following any such denial or failure to fund by Note A Holder, Note B Holder shall have the right to exercise the Re-Purchase Option provided that Note B Holder purchases Note A hereunder for the Note A Par Purchase Price on the earlier to occur of the date established for such purchase hereunder or the date that Note B Holder acquires the Mortgage Loan.

(d)    Either Split Note Holder, or any Affiliate thereof, may purchase the Mortgaged Property or the collateral for the Senior Mezzanine Loan at any time upon notice to, but without requiring the consent of, the other party, only if the Junior Mezzanine Loan is paid in full in connection with such purchase.  Pursuant to Section 2.03(a)(vii), any other purchase of the Mortgaged Property by either Split Note Holder or any participant or Affiliate of either Split Note Holder or participant shall require unanimous approval, except as otherwise provided in this Agreement.  The provisions of this Section shall not impair any prohibition, if any, on prepayment of the Junior Mezzanine Loan contained in the Mezzanine Loan Documents.

(e)    Should Agent acquire the Mortgage Loan or Senior Mezzanine Loan pursuant to the exercise of its rights under the Intercreditor Agreement or otherwise for the benefit of the Split Note Holders as set forth in this Section following the delivery of and approval pursuant to a Purchase Request Notice, then Agent shall administer, enforce and service same in the same manner as Agent is authorized and obligated, pursuant to this Agreement, to administer, enforce and service the Junior Mezzanine Loan, and all relevant provisions of this Agreement shall apply, _mutatis mutandis_, to the administration and servicing thereof.

## SECTION 6.   INDEMNIFICATION

6.01    Indemnification of Agent.  Each Split Note Holder agrees to indemnify, defend, reimburse and hold the Agent harmless (to the extent not reimbursed by the Junior Mezzanine Borrower or any other Junior Mezzanine Loan Party), in accordance with its Pro Rata Interest, for any and all liabilities, obligations, losses, damages,

penalties, actions, judgments, suits, and reasonable costs, expenses or disbursements which may be imposed on, incurred by, or asserted against the Agent, as agent, in any way relating to or arising out of the Junior Mezzanine Loan, or any action taken or omitted by the Agent under this Agreement or the Junior Mezzanine Loan Documents and shall make payment with respect thereto within ten (10) Business Days of a request therefor, provided that the Split Note Holders shall not be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from, related to or arising from the breach of the Servicing Standard or from breach of this Agreement or from the gross negligence or willful misconduct of the Agent or its officers, directors, servicers, agents or employees. In addition, but subject to and except as otherwise provided in Section 2.05, each Split Note Holder agrees to reimburse the Agent promptly upon demand for its Pro Rata Interest in all Protective Advances made by the Agent in accordance with the terms of this Agreement.  The Agent shall be entitled to deduct from any payments to be made to the Split Note Holders under this Agreement, and to retain, amounts due the Agent as reimbursement hereunder provided that the Agent shall have first delivered to the Split Note Holders thirty (30) days prior written notice of such amounts and the circumstances giving rise thereto, and the Split Note Holders have not paid such amounts.  The Agent shall make reasonable attempts to collect such amounts from the Junior Mezzanine Borrower and the other Junior Mezzanine Loan Parties.  If the Agent receives payment of any amount referred to in this Section 6.01 from the Junior Mezzanine Borrower or any third party after a Split Note Holder has reimbursed the Agent for such amount, the Agent shall promptly return the amount of the reimbursement to such Split Note Holder. Any loss, cost, liability or expense occasioned solely by the conduct of any one of the Split Note Holders shall be borne solely by such party causing such loss, cost, liability or expense and such party shall indemnify, defend and hold the other Split Note Holder harmless against any and all such losses, costs and liabilities and expenses (including, but not limited to, reasonable attorneys' fees) sustained or incurred by the other Split Note Holders as a result thereof.

6.02    Indemnification on Default.  Each Split Note Holder in default of its obligations under this Agreement (a "**Defaulting Split Note Holder**") shall indemnify, defend and hold the Agent and each of the other Split Note Holders harmless from and against any and all losses, damages, liabilities or expenses (including, but not limited to, reasonable attorneys' fees and interest at the Default Rate) which they may sustain or incur by reason of or in consequence of the Defaulting Split Note Holder's failure or refusal to abide by its obligations under the Junior Mezzanine Loan Documents or this Agreement.  The Agent shall set-off against principal and interest payments due to the Defaulting Split Note Holders for losses actually incurred by Agent and the other Split Note Holders as a result of such Defaulting Split Note Holder's failure or refusal to abide by its obligations under this Agreement.  The exercise of the above remedies shall not reduce, diminish or liquidate the Defaulting Split Note Holder's Pro Rata Interest or the obligations for the sharing of losses and reimbursement for costs, liabilities and expenses under the Junior Mezzanine Loan Agreement and this Agreement.

SECTION 7.    REPRESENTATION, WARRANTIES AND ACKNOWLEDGMENTS

7.01    Split Note Holder's Representations and Warranties.    (a) Each Split Note Holder hereby represents and warrants to the other parties to this Agreement, as of the date hereof:

(i)    The Split Note Holder is duly organized and validly existing and has all necessary corporate power and authority to own its Pro Rata Interest in the Junior Mezzanine Loan, and has all necessary corporate power and authority to perform all its obligations with respect to this Agreement, the related Assignment and Assumption, if applicable, the Junior Mezzanine Loan Agreement and the Junior Mezzanine Loan Documents;

(ii)    The execution and delivery of this Agreement, the related Assignment and Assumption, if applicable, the Junior Mezzanine Loan Agreement and all other instruments and documents executed in connection therewith have been duly authorized by all requisite corporate action of the Split Note Holder;

(iii)    Neither the execution and delivery of this Agreement, the related Assignment and Assumption, if applicable, or the Junior Mezzanine Loan Agreement nor performance by the Split Note Holder thereunder will conflict with or result in a breach of any of the provisions of, or constitute a default under the organizational documents of the Split Note Holder, as amended, or any agreement, mortgage, indenture or other instrument to which the Split Note Holder is a party, or result in the violation of any law, rule, regulation, order, judgment or decree to which the Split Note Holder is subject;

(iv)    There is no litigation or governmental proceeding pending, or to the best of the Split Note Holder's knowledge, threatened which, if determined adversely to the Split Note Holder, would materially adversely affect the enforceability of this Agreement, the related Assignment and Assumption, if applicable, the Junior Mezzanine Loan Agreement or any other document or instrument executed in connection herewith;

(v)    No approval, authorization, order, license or consent of, or registration or filing with, any governmental authority or other person is required in connection with this Agreement, the related Assignment and Assumption, if applicable, or the Junior Mezzanine Loan Agreement;

(b)    Note B Holder hereby represents and warrants to the other parties to this Agreement, as of the date hereof:

(i)    To the knowledge of the Note B Holder, there is no Loan Default nor has Note B Holder given the Junior Mezzanine Borrower any written notice of a Loan Default;

(ii)    The outstanding principal amount of the Junior Mezzanine Loan is $10,589,203.83, and the accrued interest is $327,957.57.

(iii)    True, correct and complete copies of the Junior Mezzanine Loan Documents, Senior Mezzanine Loan Documents and Mortgage Loan Documents have been delivered by Note B Holder to Note A Holder; and

(iv)    Note B Holder has not granted Junior Mezzanine Borrower any written waiver of any material terms or conditions of the Junior Mezzanine Loan Agreement.

(c)    Note A Holder hereby represents and warrants to the other parties to this Agreement as of the date hereof that Note A Holder is an investment fund with total committed investments in an amount equal to or greater than $75,000,000.00.

7.02    ERISA Representations.    Neither the execution nor delivery of this Agreement, the Junior Mezzanine Loan Agreement or the Junior Mezzanine Loan Documents or any subsequent Assignment and Assumption nor the exercise of any remedy or enforcement of any right with respect thereto will constitute a prohibited transaction within the meaning of section 406 of the Employee Retirement Income Security Act of 1974, as amended, or section 4975 of the Internal Revenue Code of 1986, as amended, for which an exemption is not available, and if such execution, delivery, purchase, exercise or enforcement constitutes such a prohibited transaction, the Split Note Holders will cooperate with the Department of Labor, Internal Revenue Service and other affected parties in obtaining an exemption therefor.    The Split Note Holders will not sell, assign, transfer, participate or otherwise dispose of its interest in the Junior Mezzanine Loan Agreement and the Junior Mezzanine Loan Documents to any entity other than Agent unless the prospective purchaser, assignee, participant or transferee provides Agent and the other Split Note Holder with a certification or opinion of counsel reasonably satisfactory to such other parties that such sale, assignment, transfer or other disposition will not constitute, and will not cause the exercise of any remedy or enforcement of any right with respect to this Agreement or the Junior Mezzanine Loan Documents to be, such a prohibited transaction.

7.03    Agent's Representations and Warranties.    The Agent hereby represents and warrants, as of the date hereof:

(a)    The Agent has all necessary corporate power and authority to own its Pro Rata Interest in the Junior Mezzanine Loan, and has all necessary corporate power and authority to perform all its obligations with respect to this Agreement, the Junior Mezzanine Loan Agreement and the other Junior Mezzanine Loan Documents;

(b)    The execution and delivery of this Agreement and all other instruments and documents executed in connection therewith have been duly authorized by all requisite corporate action of the Agent;

(c)    Neither the execution and delivery of this Agreement, nor performance by the Agent thereunder will conflict with or result in a breach of any of the provisions of, or constitute a default under the organizational documents of the Agent, as amended, or any agreement, mortgage, indenture or other instrument to which the Agent is a party, or result in the violation of any law, rule, regulation, order, judgment or decree to which the Agent is subject;

(d)    There is no litigation or governmental proceeding pending, or to the best of the Agent's knowledge, threatened which, if determined adversely to the Agent, would adversely affect the enforceability of this Agreement, or any other document or instrument executed in connection herewith; and

(e)    No approval, authorization, order, license or consent of, or registration or filing with, any governmental authority or other person, and approval, authorization or consent of the Junior Mezzanine Borrower or any Junior Mezzanine Loan Party is required in connection with this Agreement.

    7.04    Examination of Junior Mezzanine Loan.

(a)    Each Split Note Holder hereby acknowledges that the Agent has furnished each Split Note Holder with copies of the Junior Mezzanine Loan Documents and financial statements, certificates, instruments, documents, affidavits, resolutions and agreements as such Split Note Holder deemed necessary to make its own credit analysis and decision in respect of the Junior Mezzanine Loan.  Each Split Note Holder acknowledges that it has, independently and, except as set forth herein, in the Junior Mezzanine Loan Documents or in the Assignment and Assumption, if applicable, without reliance upon the Agent or any other Split Note Holder and based on such other documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement and to extend credit to the Junior Mezzanine Borrower.

(b)    Each Split Note Holder hereby acknowledges that, except as specifically set forth herein or in the Junior Mezzanine Loan Agreement or in the Assignment and Assumption, if applicable, neither the Agent nor any other Split Note Holder makes any warranty or representation to the Split Note Holders and neither the Agent nor any other Split Note Holder (i) shall be responsible to any Split Note Holder for any statements, warranties or representations (written or otherwise) made in or in connection with the Junior Mezzanine Loan or the Junior Mezzanine Loan Documents or for the financial condition of the Junior Mezzanine Borrower or any Junior Mezzanine Loan Party or for the value of any of the Junior Mezzanine Collateral; and (ii) shall not be responsible to any Split Note Holder for the due execution, legality, validity, enforceability, genuineness, sufficiency or collectibility of any of the Junior Mezzanine Loan Documents or any other instrument or document furnished pursuant thereto or in connection with the Junior Mezzanine Loan or the legality, validity, enforceability, genuineness, sufficiency, perfection or priority of any rights in the Junior Mezzanine Collateral.

SECTION 8.   ASSIGNMENTS AND PARTICIPATIONS

8.01   Assignments and Participations.

(a)   Note B Holder shall be permitted to transfer or assign all or any interest in Note B to one or more Persons at any time without the consent of Note A Holder, provided that (i) such Person is a Qualified Transferee, (ii) in the event that Note B Holder seeks to transfer or assign a controlling interest in Note B (a "Note B Controlling Interest") to a third party which is not an Affiliate of the Note B Holder, Note A Holder shall have a right of first offer to purchase the Note B Controlling Interest pursuant to Section 8.01(e), and (iii) Note A Holder shall have the right to require Note B Holder to cause the transferee or assignee of a controlling interest in Note B to acquire Note A at the Note A Par Purchase Price (the "Note A Tag Along Right").   If Note A Holder elects to exercise the Note A Tag Along Right, Note A Holder must notify Note B Holder of such election within five (5) Business Days of receiving notice from Note B Holder of Note B Holder's intent to transfer or assign a controlling interest in Note B, which notice Note B Holder shall timely give to Note A Holder.   In such event, the closing of the purchase of the Note A shall close simultaneously with the close of the acquisition of the Note B.

(b)   Note A Holder shall be permitted to transfer or assign all or any interest in Note A at any time without the consent of Note B Holder, provided that (i) the transferee or assignee is a Qualified Transferee, (ii) in the event that Note A Holder seeks to transfer or assign a controlling interest in Note A (a "Note A Controlling Interest") to a third party which is not an Affiliate of the Note A Holder, Note B Holder shall have a right of first offer to purchase the Note A Controlling Interest upon the same terms and conditions set forth in Section 8.01(e), except with respect to price which shall be the Note A Par Purchase Price.

(c)   Any Split Note Holder may grant a participation interest in its respective Split Note to one or more Persons (provided such Person is a Qualified Transferee).   Each such grant of a participation interest must be in accordance with and subject to the terms and conditions of this Agreement and can be made without the consent of Agent or any other Split Note Holder; provided, however, that (i) such Split Note Holder provides written notice of any such participation to Agent and the other Split Note Holder, (ii) such Split Note Holder shall remain solely responsible to the other parties hereto for the performance of its obligations under this Agreement, (iii) the Agent and the other Split Note Holders shall continue to deal solely and directly with such Split Note Holder in connection with such Split Note Holder's rights and obligations under this Agreement and with regard to any and all payments to be made under this Agreement, and (iv) the holder of any such participation shall not be entitled to voting rights under this Agreement.   Any transfer or assignment by a Split Note Holder of any interest in its Split Note (other than a participation interest permitted by the preceding sentence) shall be subject to the limitations of this Section 8.

(d)    In no event shall any Split Note Holder transfer or assign any interest in its Split Note other than a transfer or assignment of such Split Note Holder's entire interest in the Split Note in accordance with this Section 8.  Additionally, any transfer or assignment by a Split Note Holder of any interest in its Split Note (other than a participation interest permitted by Section 8.01(c)) to any Person that is not an Affiliate of an existing Split Note Holder shall be either (a) to a Qualified Transferee or (b) subject to prior written approval of all other Split Note Holders.

(e)    If at any time either Split Note Holder proposes to assign or transfer a controlling interest in its Split Note, other than to an Affiliate of such Split Note Holder, then such Split Note Holder shall give written notice (a "**Sale Notice**") to the other Split Note Holder, which notice shall state the proposed sales price ("**Sale Price**") and all other material terms and conditions pursuant to which such Split Note Holder proposes to sell such controlling interest in its Split Note.  The Split Note Holder receiving such Sale Notice shall have fifteen (15) Business Days from the date of the Sale Notice ("**Sale Response Date**") to provide written notice ("**Sale Response Notice**") to the other Split Note Holder of the election of such Split Note Holder to purchase such interest for the Sales Price.  If The Split Note Holder receiving such Sale Notice elects to purchase such interest as described above, then the closing of such sale shall take place within 30 days after such election.  At such closing, simultaneously with the payment to the selling Split Note Holder of the purchase price, the selling Split Note Holder will execute and deliver to the purchasing Split Note Holder assignment documents to assign such interest and all rights of the selling Split Note Holder with respect to such interest under the Junior Mezzanine Loan Documents, this Agreement and the Intercreditor Agreement to the purchasing Split Note Holder or its designee, without recourse, representation or warranty, except for representations as to the outstanding balance of its Split Note and that the selling Split Note Holder has not assigned such interest in its Split Note and that there are no outstanding encumbrances on its Split Note.  The selling Split Note Holder shall also deliver the original executed Split Note appropriately endorsed to the purchasing Split Note Holder.  If the Split Note Holder receiving the Sale Notice either (i) fails to respond to the Sale Notice by the Sale Response Date, or (ii) notifies the other Split Note Holder that the Split Note Holder receiving the Sale Notice does not wish to purchase such interest, then the Split Note Holder delivering the Sale Notice shall be entitled to transfer or assign such interest for a purchase price not less than 98% of the Sales Price within one hundred eighty (180) days after the date of the Sale Response Notice, but any such sale or transfer shall be subject to the other limitations of this Section 8.  If the Split Note Holder delivering the Sale Notice desires to sell such interest for less than such percentage of the price set forth in the Sale Notice or after such 180 day period, the Split Note Holder delivering the Sale Notice shall not do so without again offering such interest to other Split Note Holder.

(f)    In the case of any transfer or assignment of any interest in a Split Note in accordance with this Agreement, the assigning Split Note Holder will give notice of such assignment to the Agent, and the Agent will give notice of such assignment to the other Split Note Holders.  Upon the effectiveness of any such transfer or assignment, the

transferee or assignee of a controlling interest in such Split Note shall become a "**Split Note Holder**" for all purposes of this Agreement and the Junior Mezzanine Loan Documents and, except as otherwise provided in Section 8.01(i), to the extent of such assignment, the assigning Split Note Holder shall be relieved of its obligations hereunder to the extent of the Note being assigned, and in connection therewith, the Agent shall be authorized to amend Exhibit A of this Agreement to reflect Pro Rata Interests of each of the Split Note Holders to take into account such assignment. By executing and delivering an assignment agreement in accordance with this Section 8.01, the assigning Lender thereunder and the assignee thereunder shall be deemed to confirm to and agree with each other and the other parties hereto as follows: (i) such assigning Split Note Holder warrants that it is the legal and beneficial owner of the interest being assigned thereby free and clear of any adverse claim; (ii) except as set forth in clause (i) above, such assigning Split Note Holder makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with this Agreement, any of the Junior Mezzanine Loan Documents or any other instrument or document furnished pursuant hereto or thereto, or the execution, legality, validity, enforceability, genuineness, sufficiency or value of this Agreement, any of the Junior Mezzanine Loan Documents or any other instrument or document furnished pursuant hereto or thereto or the financial condition of the Junior Mezzanine Borrower or the performance or observance by the Junior Mezzanine Borrower of any of its obligations under the Junior Mezzanine Loan Documents or any other instrument or document furnished pursuant hereto or thereto; (iii) such assignee represents and warrants that it is legally authorized to enter into such assignment agreement; (iv) such assignee confirms that it has received a copy of this Agreement, the Junior Mezzanine Loan Documents and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into such assignment agreement; (v) such assignee will independently and without reliance upon the Agent, such assigning Lender or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement and the Junior Mezzanine Loan Documents; (vi) such assignee appoints and authorizes the Agent to take such action on its behalf and to exercise such powers under this Agreement or the Junior Mezzanine Loan Documents as are delegated to the Agent by the terms hereof or thereof, together with such powers as are reasonably incidental thereto; and (vii) such assignee agrees that it will perform in accordance with their terms all the obligations which by the terms of this Agreement and the Junior Mezzanine Loan Documents are required to be performed by it as a Lender or Split Note Holder.

(g)     Agent shall maintain a copy of each Assignment and Assumption delivered to and accepted by it and shall record in its records the names and address of each Split Note Holder and its Pro Rata Interest.

(h)     Upon receipt of an Assignment and Assumption executed by an assigning Lender and an assignee, Agent shall, if such Assignment and Assumption has

been properly completed and consented to if required herein, accept such Assignment and Assumption, and record the information contained therein in Agent's records.

(i)    In the event of any transfer or assignment of any interest in a Split Note in accordance with this Agreement to any Qualified Transferee which does not meet the Eligibility Requirements, the transferring or assigning Split Note Holder shall not be relieved of, or released from, but shall retain all of, its obligations under this Agreement to the extent of such transferred or assigned interest.  Notwithstanding the preceding sentence, Note A Holder consents and agrees to the transfer or assignment by Note B Holder of any interest in Note B to a limited liability company wholly-owned by Lehman Brothers Real Estate Mezzanine Partners, L.P., Lehman Brothers Real Estate Mezzanine Capital Partners , L.P. and/or Lehman Brothers Offshore Real Estate Mezzanine Partners (NorBan), L.P. (collectively, the "**LB Mezz Fund Entities**") and that such limited liability company wholly-owned by the LB Mezz Fund Entities (the "**Permitted Assignee**") is hereby deemed to meet the Eligibility Requirements, subject to paragraph (j) below.

(j)    Upon such transfer or assignment in accordance with this Agreement to the Permitted Assignee as described in paragraph (i) above, (A) the Permitted Assignee and the LB Mezz Fund Entities shall become jointly and severally responsible for the obligations of Note B Holder under this Agreement to the extent of such transferred or assigned interest, and (B) in the event of any further transfer or assignment by any of the LB Mezz Fund Entities or by the Permitted Assignee of any interest in Note B in accordance with this Agreement to any Qualified Transferee which does not meet the Eligibility Requirements, the LB Mezz Fund Entities shall not be relieved of, or released from, their obligations under clause "(A)" above to the extent of such transferred or assigned interest, and all of the LB Mezz Fund Entities shall jointly and severally retain and be responsible for the performance of all such obligations.  In the event of a transfer to a Permitted Assignee, each of the LB Mezz Fund Entities hereby covenants and agrees to be bound by and to perform and observe all obligations in the preceding sentence.  Note B Holder represents that Lehman Brothers Holdings Inc. controls or will control and shall remain in control of the LB Mezz Fund Entities.

8.02    <u>Not a Security</u>.  The Split Notes shall not be deemed to be securities within the meaning of the Securities Act of 1933 or the Securities Exchange Act of 1934. Each of the Split Note Holders acknowledges that it is (i) (a) a substantial, sophisticated investor having such knowledge and experience in financial and business matters, and, in particular, in such matters related to securities similar to the Split Notes, such that it is capable of evaluating the merits and risks of investment in the Split Notes, (b) able to bear the economic risks of such an investment and (c) an "**accredited investor**" within the meaning of Rule 501(a) promulgated pursuant to Securities Act of 1933; or (ii) a "**qualified institutional buyer**" as defined in Rule 144A under the Securities Act of 1933.

SECTION 9.    FINANCING.

Each Split Note Holder (a "**Loan Pledgor**") shall have the right to pledge (a "**Pledge**") such Split Note Holder's Split Note to any Person which has extended a credit facility, including, without limitation, credit in the form of a repurchase agreement facility, to such Loan Pledgor and would otherwise satisfy the requirements of a Qualified Transferee (a "**Loan Pledgee**"), on the terms and conditions set forth in this Section. Upon written notice by the Loan Pledgor to Agent and the other Split Note Holder that the Pledge has been effected and the address for notice purposes of the Loan Pledgee, Agent agrees to acknowledge receipt of such notice and thereafter agrees:    (i) to give Loan Pledgee written notice of any default by Loan Pledgor under this Agreement of which default Agent has actual knowledge; (ii) to allow Loan Pledgee to cure such default within the same period afforded to the Split Note Holder, but Loan Pledgee shall not be obligated to cure any such default; (iii) that no amendment or modification of this Agreement that adversely affects the rights or obligations of the Loan Pledgor, and no waiver or termination of Loan Pledgor's rights under this Agreement, shall be effective against Loan Pledgee without the written consent of Loan Pledgee, which consent shall not be unreasonably withheld; provided, however, the consent of the Loan Pledgee shall not be required unless Loan Pledgor's consent was required pursuant to the terms of this Agreement to effect such modification, waiver or termination; and (iv) that, upon written notice (a "**Redirection Notice**") to Agent and the other Split Note Holder by Loan Pledgee that Loan Pledgor is in default beyond applicable cure periods under its obligations to Loan Pledgee pursuant to the applicable credit agreement between Loan Pledgor and Loan Pledgee (which notice need not be joined in or confirmed by Loan Pledgor), and until such Redirection Notice is withdrawn or rescinded by Loan Pledgee, Agent shall remit to the applicable Loan Pledgee and not to the applicable Loan Pledgor, any payments that Agent would otherwise be obligated to pay to such Loan Pledgor from time to time pursuant to this Agreement, any Junior Mezzanine Loan Document, or any other agreement among the Split Note Holders that related to the Junior Mezzanine Loan or Loan Pledgor.  Split Note Holders hereby unconditionally and absolutely release Agent from any liability to such Split Note Holder on account of Agent's compliance with any Redirection Notice believed by Agent to have been delivered by such Split Note Holder's Loan Pledgee.  Loan Pledgee shall be permitted to fully exercise its rights and remedies against Loan Pledgor, and realize on all collateral granted by Loan Pledgor to Loan Pledgee (and accept an assignment in lieu of foreclosure as to such collateral), in accordance with applicable law.  In such event, Agent shall recognize Loan Pledgee (and any transferee which is also a Qualified Transferee at any foreclosure or similar sale held by Loan Pledgee or any transfer in lieu of such foreclosure), and its successors and assigns, as the successor to Loan Pledgor's rights, remedies and obligations under this Agreement, and any such Loan Pledgee or Qualified Transferee shall assume in the writing the obligations of Loan Pledgor hereunder accruing from and after such Transfer and agrees to be bound by the terms and provisions hereof.  The rights of Loan Pledgee under this Section shall remain effective unless and until Loan Pledgee shall have notified the Agent and the other Split Note Holder in writing that its interest in the applicable Split Note And this Agreement has terminated.

## SECTION 10.  MISCELLANEOUS

10.01  Further Assurances.   The Agent and each Split Note Holder shall cooperate fully with each other in order to carry out promptly and fully the terms and provisions of this Agreement.  Each party hereto shall from time to time execute and deliver such other agreements, documents or instruments and take such other actions as may be reasonably necessary or desirable to effectuate the terms of this Agreement.   The Agent and the Split Note Holders shall each be solely responsible for all costs and expenses (including their respective attorneys' fees and disbursements) incurred by them in connection with the execution and delivery of this Agreement and otherwise incurred by them in entering into the transactions contemplated herein.

10.02  No Waiver, etc.  No failure or delay on the part of any party hereto in exercising any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right, power or remedy preclude any other or further exercise thereof or the exercise of any other right, power or remedy hereunder.

10.03  Notice.   Except as otherwise expressly provided herein, all notices, requests and demands to or upon the respective parties hereto to be effective shall be in writing (including by facsimile, telex, or cable communication), and shall be deemed to have been duly given or made when delivered by hand, or two Business Days after being sent by Federal Express or similar overnight courier, addressed, in the case of each Split Note Holder and Agent at the addresses specified on Exhibit E attached hereto, or to such other addresses as may be designated by any party in a written notice to the other parties hereto, provided that notices and communications sent in any other manner shall not be effective until received by the party to whom they are addressed.

10.04  Conflict With Other Agreements.  This Agreement contains additional terms and conditions relating to the administration of the Junior Mezzanine Loan.  In the event of any conflict between the provisions of this Agreement and the provisions of the Junior Mezzanine Loan Agreement or any of the other Junior Mezzanine Loan Documents in respect of the administration of the Junior Mezzanine Loan, the provisions of this Agreement shall control as between Agent and the Split Note Holders. Notwithstanding the foregoing, the Agent shall not be required to take any action or refrain from any action in violation of the terms of the Junior Mezzanine Loan Documents.

10.05  No Third Party Beneficiaries.  No person, other than the parties hereto and their permitted successors and assigns pursuant to the Junior Mezzanine Loan Agreement shall have any rights under this Agreement.

10.06  Counterparts.   This Agreement may be executed in two or more counterparts each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

10.07  <u>No Amendments</u>.  No amendment, supplement or modification of this Agreement shall be effective against a party against whom the enforcement of such amendment, supplement or other modification would be asserted, unless such amendment, supplement or modification was made in a writing signed by such party.

10.08  <u>Severability</u>.  In case any one or more of the provisions contained in this Agreement, or any application thereof, shall be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein, and any other application thereof, shall not in any way be affected or impaired thereby.

10.09  <u>Governing Law</u>.  This Agreement shall be construed in accordance with and governed by the laws of the State of New York, excluding its rules of conflict of laws.

10.10  <u>Headings, etc</u>.  The headings and captions of various paragraphs of this Agreement are for convenience of reference only and are not to be construed as defining or limiting, in any way, the scope or intent of the provisions hereof.

10.11  <u>No Partnership or Joint Venture</u>.  Neither the execution of this Agreement nor the purchase of an interest in the Junior Mezzanine Loan or in the Junior Mezzanine Loan Documents, or any agreement to share in profits or losses arising out of this transaction, is intended to be, nor shall it be construed to be, the formation of a partnership or joint venture among the Split Note Holders and the Agent, and neither the Agent nor any Split Note Holder shall be liable to any other person or entity for the liability in tort or contract of the Agent or any other Split Note Holder arising in connection with the Junior Mezzanine Loan or any transaction connected herewith or therewith nor shall the Agent have any fiduciary obligations to any Split Note Holder. The Agent shall have and may exercise such powers as are specifically delegated to the Agent under this Agreement.

10.12  <u>Submission to Jurisdiction</u>.  With respect to any claim arising out of this Agreement, the Junior Mezzanine Loan Agreement or any other Junior Mezzanine Loan Documents, each party hereto irrevocably submits to the nonexclusive jurisdiction of the courts of the State of New York and the United States District Court located in the City of New York, and each party hereto (i) irrevocably waives any objection which it may have at any time to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement, the Junior Mezzanine Loan Agreement or any other Junior Mezzanine Loan Documents brought in any such court, (ii) irrevocably waives any claim that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum and further (iii) irrevocably waives the right to object, with respect to such claim, suit, action or proceeding brought in any such court, that such court does not have jurisdiction over such party.   Nothing in this Agreement will be deemed to preclude the Agent or the Split Note Holders from bringing an action or proceeding in respect of this Agreement in any other jurisdiction if necessary in order to enforce its rights under

this Agreement or the Junior Mezzanine Loan Documents and the foregoing courts do not have the necessary jurisdiction.

10.13   Expenses. Each Split Note Holder agrees to pay to the other within fifteen (15) days of demand the amount of any and all reasonable expenses, including, without limitation, the reasonable fees and expenses of its counsel and of any experts or agents, which the other Split Note Holder may incur in connection with the (i) exercise or enforcement of any of the rights of the paying Split Note Holder hereunder to the extent that the other Split Note Holder is the prevailing party in any dispute with respect thereto or (ii) failure by such Split Note Holder to perform or observe any of the provisions hereof; provided, however, that No Split Note Holder shall be required to pay any such fees or expenses to the extent any such fees or expenses have previously been paid by Junior Mezzanine Borrower or have been recovered by such Split Note Holder out of or from the Mortgaged Property.

10.14   Injunction. Each party hereto acknowledges (and waives any defense based on a claim) that monetary damages are not an adequate remedy to redress a breach by the other hereunder and that a breach by either Split Note Holder or Agent hereunder would cause irreparable harm to the others. Accordingly, each party hereto agrees that upon a breach of this Agreement by any other party, the remedies of injunction, declaratory judgment and specific performance shall be available to such non-breaching party.

10.15   WAIVER OF JURY TRIAL. THE NOTE B HOLDER AND THE NOTE A HOLDER HEREBY KNOWINGLY, VOLUNTARILY, AND INTENTIONALLY FOREVER WAIVE THE RIGHT TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED ON THIS AGREEMENT OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY COURSE OF CONDUCT, COURSE OF DEALINGS, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF ANY PARTY OR THE EXERCISE BY ANY PARTY OF ITS RIGHTS UNDER THIS AGREEMENT IN ANY WAY ARISING OUT OF OR RELATED IN ANY MANNER WITH THE SUBJECT MATTER HEREOF OR THEREOF.

**[Signature page follows]**

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

**NOTE A HOLDER:**

**HEGEMON FUND I, LLC**

By:

Name: BRIAN F. PRINCE

Title: Authorized Signatory

**NOTE B HOLDER:**

**LEHMAN BROTHERS HOLDINGS INC.**

By:_____

    Name:

    Title:

**AGENT:**

**LEHMAN BROTHERS HOLDINGS INC.**

By:_____

    Name:

    Title:

SIGNATURE PAGE TO CO-LENDING AGREEMENT

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

**NOTE A HOLDER:**

**HEGEMON FUND I, LLC**

By:_____
    Name:
    Title:

**NOTE B HOLDER:**

**LEHMAN BROTHERS HOLDINGS INC.**

By:_____
    Name:   David S. Broderick
    Title:    Authorized Signatory

**AGENT:**

**LEHMAN BROTHERS HOLDINGS INC.**

By:_____
    Name:   David S. Broderick
    Title:    Authorized Signatory

SIGNATURE PAGE TO CO-LENDING AGREEMENT

The following entities are signing to acknowledge their agreement to the penultimate sentence in Section 8.01(j) only:

**LB MEZZ FUND ENTITIES:**

**LEHMAN BROTHERS REAL ESTATE MEZZANINE PARTNERS, L.P.**

By:_____
    Name: Rodolpho Amboss
    Title: Authorized Signatory

**LEHMAN BROTHERS REAL ESTATE MEZZANINE CAPITAL PARTNERS, L.P.**

By:_____
    Name: Rodolpho Amboss
    Title: Authorized Signatory

**LEHMAN BROTHERS OFFSHORE REAL ESTATE MEZZANINE PARTNERS (NORBAN), L.P.**

By:_____
    Name: Rodolpho Amboss
    Title: Authorized Signatory

## EXHIBIT A

### PRO RATA INTERESTS

Note A Holder:        31.85%

Note B Holder:        68.15%

## EXHIBIT B

## ACCOUNT INFORMATION – SPLIT NOTE HOLDER PAYMENT

**NOTE A HOLDER:**

**By Check**
Made payable to Hegemon Fund I, LLC
Hegemon Fund I, LLC
Bank of America Plaza
101 E. Kennedy Blvd.
Suite 2100
Tampa, Florida 33602
813-221-7170

**By Wire**
JPMorgan Private Bank – DE
500 Stanton Christiana Road
Newark, Delaware 19713

For the account of Hegemon Fund I LLC
Reference: Harbour Phase I Investments Mezz Loan

**NOTE B HOLDER**

**By Check**
Made payable to Lehman Brothers Holdings Inc.
C/O TriMont Real Estate Advisors, Inc.
3424 Peachtree Road, NE
Monarch Tower, Suite 2200
Atlanta, GA    30326
404-420-5600

**By Wire**
Wachovia Bank, NA
3414 Peachtree Road
Atlanta, GA    30326

Reference: Harbour Phase I Investments, LLC

## EXHIBIT C

### PERMITTED FUND MANAGERS

Apollo Real Estate Advisors
Archon Capital, L.P.
BlackRock, Inc.
Clarion Partners
Colony Capital, Inc.
DLJ Real Estate Capital Partners
Fortress Investment Group, LLC
iStar Financial Inc.
J.E. Roberts Companies
Lend-Lease Real Estate Investments
Lonestar Opportunity Fund
Praedium Group
Starwood Financial Trust
The Blackstone Group International Ltd.
Westbrook Partners
Whitehall Street Real Estate Fund, L.P.

## EXHIBIT D

### QUALIFIED TRANSFEREE

AEW Capital Management
Angelo Gordon & Company
Apollo Real Estate Advisors
Arbor Financial
ARCap
Arden Realty
Barrow Street Capital
Blackacre Capital Group, L.P.
Blackstone Real Estate Partners
Boston Properties
Capital Trust
Carlyle Group
CarrAmerica Realty Corporation
Colony Investors (Colony Capital)
Crescent Real Estate
CW Capital
Emmes & Company
Fleet National Bank and its Tri-Sail Funds
Grammercy Capital
Hartford Life Insurance Company (and affiliated insurance companies)
Hegemon Fund I, LLC
Heitman Financial
IStar Financial
JE Roberts Cos.
Legg Mason Real Estate
Lend Lease & Company
Lone Star Funds
Lupert Adler Partners
Mack Cali Realty
MassMutual (DL Babson and affiliated funds)
Meadowbrook Real Estate Fund
Metropolitan Life
Mony Realty Capital
New York Life (and affiliated funds)
Northstar Capital Investment Corp.
Oaktree Capital Management
Olympus Real Estate Fund (Hicks Muse)
Pacific Life
Praedium Group
Prentiss Properties
Reckson Associates/Reckson Operating Partnership

RREEF
Rockport Group
Starwood Opportunity Fund (Starwood Capital)
Sterling Equities
TrizecHahn Corp
Vornado Realty
Wells Fargo
Westbrook Real Estate Fund

**EXHIBIT E**

**(NOTICE ADDRESSES)**

**If to Agent:**

Lehman Brothers Holdings Inc.
399 Park Avenue, 8th Floor
New York, New York 10022
Attention: David Broderick, Esq.
MTS # VQ19/ Asset # 111401
Phone: (212) 526-7000
Fax No.: (646) 758-5311

With a copy to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York    10153
Attn:    W. Michael Bond, Esq.
Phone:    (212) 310-8035
Fax No.:    (212) 310-8007

And a copy to:

TriMont Real Estate Advisors, Inc.
Monarch Tower
3424 Peachtree Road, N.E.
Suite 2200
Atlanta, Georgia 30326
MTS # VQ19/ Asset # 111401
Attention: J. Gregory Winchester
Phone: (404) 420-5600
Fax No.: (404) 230-6646

**If to Note A Holder:**

Hegemon Fund I, LLC
Bank of America Plaza
101 E. Kennedy Blvd.
Suite 2100
Tampa, Florida 33602
Attention: David P. Leve
Phone: (813) 221-7173
Fax No: (813) 221-7171

With a copy to:

Skadden, Arps
4 Times Square
New York, NY 10036
Attention: Marco P. Caffuzzi, Esq.
Phone: (212) 735-2661
Fax No: (917) 777-2661


**If to Note B Holder:**

Lehman Brothers Holdings Inc.
399 Park Avenue, 8th Floor
New York, New York 10022
Attention: David Broderick, Esq.
MTS # VQ19/ Asset # 111401
Phone: (212) 526-7000
Fax No.: (646) 758-5311

With a copy to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York   10153
Attn:   W. Michael Bond, Esq.
Phone:   (212) 310-8035
Fax No.:   (212) 310-8007

And a copy to:

TriMont Real Estate Advisors, Inc.
Monarch Tower
3424 Peachtree Road, N.E.
Suite 2200
Atlanta, Georgia 30326
MTS # VQ19/ Asset # 111401
Attention: J. Gregory Winchester
Phone: (404) 420-5600
Fax No.: (404) 230-6646

With a copy to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York   10022

Attn:   W. Michael Bond, Esq.
Phone:   (212) 310-8035
Fax No.:   (212) 310-8007

**EXHIBIT F**

**ASSIGNMENT AND ASSUMPTION AGREEMENT**

Reference is made to that certain Loan Agreement described in Annex I hereto (as such Loan Agreement may hereafter be amended, modified or supplemented from time to time, the "**Junior Mezzanine Loan Agreement**") and that certain Co-Lending Agreement (herein so called) dated as of _____, 2005. Unless defined herein or in any Annex attached hereto, terms defined in the Co Lending Agreement are used herein as therein defined.

_____, a _____ (the "**Assignor**"), and _____, a _____ (the "**Assignee**"), hereby agree as follows:

1. The Assignor hereby sells and assigns to the Assignee without recourse and without representation or warranty (other than as expressly provided herein or in the Co-Lending Agreement), and the Assignee hereby purchases and assumes from the Assignor, Note [A][B] and the associated rights under the Junior Mezzanine Loan Documents. Subject to the terms and conditions of the Co-Lending Agreement, Assignee hereby assumes and undertakes to perform, pay or discharge, in accordance with the terms and conditions of the Junior Mezzanine Loan Documents, and in accordance with its Pro Rata Interest, all obligations of Assignor under the Junior Mezzanine Loan Documents, to the extent such obligations are to be performed, paid or discharged after the date hereof.

2. The Assignor (i) represents and warrants that it is duly authorized to enter into and perform the terms of this Assignment and Assumption Agreement ("**Assignment Agreement**"); (ii) represents and warrants that it is the legal and beneficial owner of the interest being assigned by it hereunder and that such interest is free and clear of any liens or security interests; and (iii) makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with the Junior Mezzanine Loan Agreement, the other Junior Mezzanine Loan Documents, or the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Junior Mezzanine Loan Agreement, the other Junior Mezzanine Loan Documents, or any other instrument or document furnished pursuant thereto except as set forth in the Co-Lending Agreement.

3. The Assignee represents and warrants that it is duly authorized to enter into and perform the terms of this Assignment Agreement.

4. The effective date of this Assignment Agreement shall be _____, 200_ (the "**Settlement Date**").

5. As of the Settlement Date the Assignor shall, with respect to that portion of its interest assigned hereby and subject to the terms and conditions of the Co-

Lending Agreement, relinquish its future rights and be released from its future obligations under the Junior Mezzanine Loan Documents, but shall remain liable for all of its obligations that arose prior to the Settlement Date.

6. This Assignment Agreement may be executed in any number of counterparts which, when taken together, shall be deemed to constitute one and the same instrument.

7. Assignor will, do, execute, acknowledge and deliver all and every such further acts, deeds, conveyances, assignments, notices of assignments, transfers and assurances as Assignee shall, from time to time, reasonably require, for the better assuring, conveying, assigning, transferring and confirming unto Assignee the property and rights hereby given, granted, bargained, sold, conveyed, and/or assigned or intended now or hereafter.

8. THIS ASSIGNMENT AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

**[SIGNATURES APPEAR ON THE FOLLOWING PAGE]**

IN WITNESS WHEREOF, the parties hereto have caused this Assignment Agreement to be executed by their respective officers thereunto duly authorized, as of the date first above written.

**ASSIGNOR:**

[INSERT NAME], a _____

By: _____
Name: _____
Title: _____


**ASSIGNEE:**

[INSERT NAME], a _____

By: _____
Name: _____
Title: _____

**ANNEX FOR ASSIGNMENT AND ASSUMPTION AGREEMENT**

**ANNEX I**

1.    The Borrower:   [_____] (**"Borrower"**).

2.    Name and Date of Loan Agreement:   Loan Agreement dated as of May 5, 2005 between Borrower and Lehman Brothers Holdings Inc., as collateral agent for the benefit of the holder of the A Note and the holder of the B Note.

3.    Settlement Date:   [_____, 200__]

## EXHIBIT G

## JOINDER

Reference is made to that certain Loan Agreement (as such Loan Agreement may hereafter be amended, modified or supplemented from time to time, the "**Loan Agreement**") dated as of _____, between _____, a _____ ("**Borrower**") and _____, a _____ ("**Lender**") and that certain Co-Lending Agreement (herein so called) dated as of _____ entered into by and among _____, _____ and _____ as Split Note Holders. Unless defined herein, terms defined in the Co-Lending Agreement are used herein as therein defined. The effective date of this Joinder shall be _____, 200__ (the "**Effective Date**").

The undersigned is executing below to evidence its consent and agreement to be bound by the terms, conditions and provisions of the Co-Lending Agreement. In addition, the undersigned, _____, hereby represents and warrants to the Agent and the Split Note Holders as follows: (i) it is duly authorized to enter into this Joinder; (ii) it has received a copy of the Co-Lending Agreement, the Loan Agreement and the other Junior Mezzanine Loan Documents (the "**Loan Documents**"), together with the other documents and information referred to therein as it has deemed appropriate to make its own credit analysis and decision to enter into this Joinder and to purchase an interest in [Note A] [Note B], and has not relied on any statements or representations made by the Split Note Holders in connection with the undersigned's decision to purchase the Pro Rata Interest in [Note A] [Note B] other than as set forth in any written agreement between the undersigned and its transferor; (iii) it will, independently and without reliance upon the assigning Split Note Holder and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Loan Agreement and the Co-Lending Agreement; and (iv) the interest being assigned to the undersigned is being acquired by it for its own account, for investment purposes only and not with a view to the public distribution thereof and without any present intention of its resale in either case that would be in violation of applicable securities laws.

As of the Effective Date, and subject to the terms and conditions of the Co-Lending Agreement, the undersigned hereby assumes and undertakes to perform, pay or discharge, in accordance with the terms and conditions of the Loan Documents and in accordance with its Pro Rata Interest, all obligations of the assigning Split Note Holder under the Co-Lending Agreement and the Loan Documents, to the extent such obligations are to be performed, paid or discharged after the date hereof, including, without limitation, the obligation to make required future advances under the Loan Agreement based upon its Pro Rata Interest and in accordance with the Co-Lending Agreement.

This Joinder may be executed in any number of counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same instrument.

_____

By:_____
Name:_____
Title:_____

Address for Notices:

By:_____
Name:_____
Title:_____

**EXHIBIT B**

Shortfall Agreement

**LEHMAN BROTHERS HOLDINGS INC.**
**399 Park Avenue, 8th Floor**
**New York, New York 10022**

January 9, 2007

Hegemon Fund I, LLC
Bank of America Plaza
101 E. Kennedy Blvd.
Suite 2100
Tampa, Florida 33602

Ladies and Gentlemen:

Reference is made to that certain Co-Lending Agreement dated July 15, 2005 (the "**Agreement**") between Lehman Brothers Holdings Inc. ("**Lehman**") and Hegemon Fund I, LLC ("**Hegemon**") regarding the Loan Agreement dated as of May 5, 2005 in the original aggregate amount of $12,557,977.95. Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the Agreement.

The Borrower has requested that the Junior Mezzanine Lender consent to the execution and delivery of, and the transactions contemplated under, the (i) the First Loan Modification Agreement dated October 31, 2006 between Mortgage Borrower and Mortgage Lender, and (ii) the First Loan Modification Agreement dated October 31, 2006 between Senior Mezzanine Borrower and Senior Mezzanine Lender (the "**Modification Agreements**"), copies of which are attached hereto as <u>Exhibit A</u>. Lehman's interest pursuant to the Agreement is now held by "Plaza Harbour Mezz Holdings LLC" (the "**Fund**").

In consideration for Hegemon's consent to the Modification Agreements, the parties hereto agree that Lehman shall pay to Hegemon the amount of any Shortfall (as defined below); provided, however, that Lehman's maximum obligation to pay the Shortfall shall not exceed the amount of (i) $2,000,000.00 plus (ii) the amount of interest accrued on $2,000,000 of principal under the Senior Mezzanine Loan for a period of eighteen months commencing on December 1, 2006. The term "**Shortfall**" shall mean the difference, if positive, between the amount owing to the Note A Holder under Note A less the amount actually paid to the Note A Holder under Note A (after final disposition of the Junior Mezzanine Loan and after all distributions pursuant to Section 3.03 of the Agreement are made).

In addition, Lehman agrees that if (i) Note A Holder denies its consent or fails to fund in accordance with the provisions of Section 5.01(c) of the Agreement, and (ii) Note B Holder or Lehman or any Affiliate of Lehman actually acquires the Mortgage Loan or the Senior Mezzanine Loan, then contemporaneously with such acquisition, Lehman shall purchase, or cause Note B Holder to purchase, Note A from Note A Holder for the Note A Par Purchase Price, and Note A Holder agrees to thereupon execute and deliver to the Note B Holder or Lehman or such Affiliate of Lehman, as the case may be, assignment documents to assign Note A and all rights of Note A Holder under the Junior Mezzanine Loan Documents, the Agreement and the Intercreditor Agreement to the Note B Holder or Lehman or such Affiliate of Lehman, as

the case may be, without recourse, representation or warranty, except for representations as to the outstanding balance of Note A, the amount of the Note A Par Purchase Price and that the Note A Holder has not assigned its rights in Note A and that there are no outstanding encumbrances on Note A.  Note A Holder shall also deliver the original executed Note A appropriately endorsed to Note B Holder or Lehman or such Affiliate of Lehman, as the case may be.

By signing a counterpart of this letter agreement, (i) the parties agree to the above terms and, (ii) Hegemon and the Fund consent to the execution and delivery of, and the transactions contemplated by, the Modification Agreements.

This letter agreement shall be governed by and construed in accordance with the laws of the State of New York.  This letter agreement may be executed in counterparts, each of which shall be deemed an original, and all counterparts shall constitute one and the same instrument. Each party hereto irrevocably waives all right to trial by jury in any action, proceeding or counterclaim (whether based on contract, tort or otherwise) arising out of or relating to this letter agreement or the transactions contemplated hereby.

**[SIGNATURES ON THE FOLLOWING PAGE]**

If you agree with the terms described above, please countersign a copy of this Agreement in the space below and return it to us.

Sincerely yours,

**LEHMAN BROTHERS HOLDINGS INC.**

By: _____

Name:

Title:   Authorized Signatory

**AGREED**:

**HEGEMON FUND I, LLC**

By: _____

Name:

Title:   BRIAN F PRINCE

Authorized Signatory

**PLAZA HARBOUR MEZZ HOLDINGS LLC**

By: _____

Name:  Yon Cho

Title:  Authorized Signatory

If you agree with the terms described above, please countersign a copy of this Agreement in the space below and return it to us.

Sincerely yours,

**LEHMAN BROTHERS HOLDINGS INC.**

By:_____

Name:

Title:   Authorized Signatory

**AGREED:**

**HEGEMON FUND I, LLC**

By: _____

Name:  Brian F. Prince

Title:  Authorized Signatory

**PLAZA HARBOUR MEZZ HOLDINGS LLC**

By: _____

Name:  Yon Cho

Title:  Authorized Signatory

Exhibit A

# FIRST LOAN MODIFICATION AGREEMENT

as of October *31*, 2006

Harbour Phase I Owners, LLC
c/o Crimson Capital, Ltd.
7401 Wisconsin Avenue
Suite 400
Bethesda, Maryland 20814

Re:   $55,858,000 construction loan dated as of May 5, 2005 (the "Loan") to
Harbour Phase I Owners, LLC, a Delaware limited liability company (the
"Borrower")

Ladies and Gentlemen:

Reference is hereby made to the following documents executed and delivered in connection with the Loan:

(a)   Construction Loan Agreement dated as of May 5, 2005 (the "Original Closing Date") by and among the Borrower, Bank of America, N.A. (successor by merger to Fleet National Bank), as "Agent" and as "Lender" and any other "Lenders" now or hereafter party thereto (the "Loan Agreement");

(b)   Substitution Agreement dated as of May 16, 2005 by and among (i) National City Bank, a national association, (ii) Webster Bank, National Association, a national banking association, (iii) MidFirst Bank, a Federally Chartered Savings Association, (iv) Bank of America, N.A., a national banking association (successor by merger to Fleet National Bank), as selling lender and as Agent for itself in its individual capacity and for each of the Borrower and the other Lenders;

(c)   $55,858,000 Promissory Note dated as of the Original Closing Date executed by the Borrower in favor of Agent and evidencing the Loan (the "Note");

(d)   Construction Mortgage, Security Agreement and Fixture Filing dated as of the Original Closing Date ("Mortgage") executed by the Borrower for the benefit of Agent with respect to certain property located in the City of Tampa, County of Hillsborough, State of Florida (the "Property");

(e)   Assignment of Leases and Rents dated as of the Original Closing Date from the Borrower to Agent, with respect to the Property (the "Assignment of Leases and Rents");

(f)     Collateral Assignment and Security Agreement in Respect of Contracts, Licenses and Permits dated as of the Original Closing Date executed by the Borrower in favor of Agent (the "Assignment of Contracts");

(g)     Completion and Excess Costs Guaranty and Guaranty (re: Certain Specified Matters), each dated as of the Original Closing Date (singly and collectively, the "Guaranty") executed by Crimson Capital, Ltd., a Texas limited partnership (the "Guarantor") in favor of Agent and Lenders.

(h)     Environmental Indemnity Agreement dated as of the Original Closing Date executed by Borrower in favor of Agent and Lenders (the "Environmental Indemnity Agreement");

(i)     Condominium Development Agreement dated as of the Original Closing Date (the "Condominium Development Agreement") by and among Borrower, Agent and Bank of America, N.A., national association (successor by merger to Fleet National Bank), as agent for the Subordinated Lenders ("Mezzanine Agent");

(j)     Pledge and Security Agreement dated as of the Original Closing Date executed by the Borrower in favor of the Agent ("Pledge and Security Agreement");

(k)     Agreement of Subordination of Deferred Payment dated as of the Original Closing Date (the "Agreement of Subordination") by and among Lindell-Harbour, LLC, a Florida limited liability company, as seller, Borrower and Agent; and

(l)     Bank Deposit Account Control Agreement dated as of the Original Closing Date executed by the Borrower in favor of Agent (the "Control Agreement").

All of the above documents, together with all other documents executed and/or delivered by the Borrower and/or the Guarantor in connection with the Loan, as the same may have been amended in writing prior to the date hereof, are hereinafter singly and collectively referred to as the "Loan Documents".

Bank of America, N.A., a national banking association is the successor by merger to Fleet National Bank and is the holder of all of the Loan Documents.

Capitalized terms used in this agreement and not otherwise defined herein shall have the meaning assigned to such terms in the Loan Agreement.

Borrower has requested that the Loan Documents be amended as hereinafter set forth. Agent and Lenders are willing to modify the Loan Documents as hereinafter set forth upon the terms and conditions hereinafter set forth.

In consideration of the mutual covenants herein contained and other good and valuable consideration, receipt of which is hereby acknowledged, Agent, Lenders and the Borrower agree as follows:

#749847 v2 (Senior Loan Modification Agreement)

1.    LOAN MODIFICATIONS

1.1    Notwithstanding anything to the contrary in the Loan Agreement or in any of the other Loan Documents, the parties agree as follows:

a)    Subject to satisfaction of all of the conditions that are set forth in the Loan Agreement with respect to the making of Loan Advances, upon Borrower's request, Lender shall make a special Loan Advance in the amount of $5,000,000 (the "Special Loan Advance"), the proceeds of which Special Loan Advance shall be applied as follows:

   i)    $3,000,000 shall be paid to Subordinated Lender #1 and applied against the outstanding principal balance of Subordinated Loan #1; and

   ii)    $2,000,000 shall be advanced to Borrower for payment of real estate brokerage commissions in connection with the sale of condominium units, which commissions are not included in the Project Budget but which are currently due and payable; provided, however, such disbursement shall be subject to receipt by Agent of such back-up information as it may reasonably require with respect to such brokerage commissions.

b)    The next $5,000,000 of Hard Costs that are incurred by Borrower after the date hereof shall be paid from the Additional Condominium Deposits that are currently pledged to Agent and deposited in the Additional Condominium Deposit Account. No further Loan Advances shall be made for Hard Costs until such $5,000,000 of Additional Condominium Deposits have been fully expended for payment of Hard Costs but Lenders shall continue to make Loan Advances for Soft Costs in accordance with and subject to the terms and conditions that are set forth in the Loan Agreement. Disbursement by Agent of any such Additional Condominium Deposits for payment of Hard Costs shall be subject to all of the terms and conditions that are set forth in the Loan Agreement. Once such $5,000,000 of Additional Condominium Deposits has been expended by Borrower for payment of Hard Costs, Lenders shall again make Loan Advances for payment of Hard Costs in accordance with and subject to the terms set forth in the Loan Agreement.

1.2    All references to Fleet National Bank in the Loan Agreement and any of the other Loan Documents are hereby amended to refer to "Bank of America, N.A. (successor by merger to Fleet National Bank)".

1.3    The notice address for the Lender and Lender's Counsel that is set forth in <u>Section 17</u> of the Loan Agreement and in any of the other Loan Documents is hereby amended to provide as follows:

    Bank of America, N.A.
    Suite 800
    111 Westminster Street
    Mail Stop: RI 1-102-08-01
    Providence, Rhode Island 02903
    Fax No. (401) 278-3616
    Attention: Commercial Real Estate Loan Administration

    Hinckley, Allen & Snyder, LLP
    50 Kennedy Plaza, Suite 1500
    Providence, Rhode Island  02903
    Fax:    (401) 277-9600
    Attention: Joseph P. Curran, Esq.

1.4    <u>Exhibit K</u> to the Loan Agreement is hereby deleted in its entirety and <u>Exhibit K</u> which is attached hereto is substituted therefor.

2.    REPRESENTATIONS AND WARRANTIES

The Borrower represents and warrants to Agent and Lenders that:

2.1    Borrower and Guarantor each is duly organized, validly existing and in good standing under the laws of the State of its organization and each has the power to own all of its properties and assets and to carry on its business as it is now being conducted and each is duly authorized to execute and perform this agreement;

2.2    All actions or authorizations necessary to authorize the execution and delivery of this agreement and all other documents to be executed by Borrower or Guarantor in connection herewith (if any) have been obtained; the execution and delivery of this agreement does not violate any law, agreement or other restriction to which Borrower or Guarantor is subject; and this agreement and the Loan Documents, as amended hereby, constitute the legal, valid and binding obligations of Borrower and Guarantor (as applicable) and are enforceable against Borrower and Guarantor (as applicable) in accordance with their respective terms; and

2.3    All of the representations and warranties made by the Borrower and the Guarantor in the Loan Documents remain true and correct in all material respects as of the date hereof.

3.    MISCELLANEOUS

3.1    The Borrower shall pay all fees and expenses incurred by Agent in connection with the modification of the Loan evidenced by this agreement including, without limitation, all reasonable attorneys' fees and expenses.

3.2    All of the terms and provisions of this agreement are hereby incorporated in the Loan Documents and the Loan Documents are amended accordingly.  Solely in the event that any term or condition contained in this agreement conflicts with, or is inconsistent with, any provision of the Loan Documents, the terms and conditions of this agreement shall supersede and control.  In all other respects, the provisions of the Loan Documents shall remain in full force and effect, including, without limitation, any and all additional terms and conditions therein which are not in conflict with the provisions of this agreement.

3.3    All references in any of the Loan Documents to any other Loan Document(s) shall be deemed to be a reference to such other Loan Document(s), as previously amended in writing and as further amended by this agreement.

3.4    The Loan Documents, as amended by this agreement, are ratified and confirmed in all respects and the Loan Documents, as amended hereby, remain in full force and effect.

3.5    The Borrower and the Guarantor acknowledge that there is no offset or defense to the payment and performance of the obligations of the Borrower or the Guarantor under any of the Loan Documents and there is no claim, counterclaim or cause of action of any kind which may be asserted by the Borrower or the Guarantor against Agent or Lenders.

3.6    The Borrower and the Guarantor shall execute, acknowledge and deliver any and all further documents reasonably requested by Agent to evidence or confirm the agreements set forth in this agreement.

3.7    The execution of this agreement by Agent and Lenders shall not constitute a waiver of any of their rights and remedies pursuant to any of the Loan Documents and applicable law, and Agent and Lenders hereby expressly confirm their retention of all rights pursuant to the Loan Documents and applicable law.  The execution of this agreement by Agent and Lenders shall not constitute a waiver of any Default or Event of Default that may now or hereafter exist under any of the Loan Documents.

3.8    In the event that any term or provision of this agreement or of any document executed in connection herewith, or the application thereof to any person or circumstance shall, to any extent, be held invalid or unenforceable, the remainder of this agreement and all such documents, or the application of such term or provision to

persons or circumstances other than those to which it is held invalid or unenforceable, shall be valid and enforceable to the fullest extent permitted by law.

3.9   Each of the documents to be executed in connection herewith (if any) and the obligations of the Borrower and the Guarantor thereunder are in addition to and not in substitution for any other obligations or security interests now or hereafter held by Agent or any Lender in connection with the Loan and shall not operate as a novation or merger of any contract or debt or suspend the fulfillment of or affect the rights, remedies, powers or privileges of Agent or any Lender with respect to any obligations or other security interest held by them.

3.10   This agreement supersedes any prior or contemporaneous discussions or agreements concerning the modification of the Loan evidenced hereby and not contained herein.  The Loan Documents, as amended hereby, constitute all of our agreements at the present time with respect to the Loan.

3.11   The Loan Documents, as amended hereby, shall continue to be fully secured by all of the Security Documents.

3.12   This agreement may be executed in counterparts.

3.13   This agreement shall be governed by the internal laws of the State of Rhode Island.

3.14   This agreement shall become effective upon (a) execution by Borrower of the Acceptance by Borrower which is attached hereto, (b) execution by Guarantor of the Consent and Agreement of Guarantor which is attached hereto, (c) execution by Subordinated Lender #1 of the Consent and Agreement of Subordinated Lender #1 which is attached hereto, and (d) execution by Subordinated Lender #2 of the Consent and Agreement of Subordinated Lender #2 which is attached hereto.

If all of the foregoing is acceptable to the Borrower, the Guarantor, Subordinated Lender #1 and Subordinated Lender #2, please indicate your approval by signing below.

Very truly yours,

BANK OF AMERICA, N.A., as Agent and as Lender

By: _Susan M. Caruso_
    Name: _Susan Caruso_
    Title: _Vice President_

NATIONAL CITY BANK

By:_____
    Name:_____
    Title:_____

WEBSTER BANK, NATIONAL ASSOCIATION

By:_____
Name: _____
Title: _____

MIDFIRST BANK, a Federally Chartered Savings Association

By:_____
Name: _____
Title: _____

If all of the foregoing is acceptable to the Borrower, the Guarantor, Subordinated Lender #1 and Subordinated Lender #2, please indicate your approval by signing below.

Very truly yours,

BANK OF AMERICA, N.A., as Agent and as Lender

By:_____
    Name:_____
    Title:_____

NATIONAL CITY BANK

By:_____
    Name: _John Osberg_____
    Title: _Senior Vice President_____

WEBSTER BANK, NATIONAL ASSOCIATION

By:_____
Name: _____
Title: _____

MIDFIRST BANK, a Federally Chartered Savings Association

By:_____
Name: _____
Title: _____

If all of the foregoing is acceptable to the Borrower, the Guarantor, Subordinated Lender #1 and Subordinated Lender #2, please indicate your approval by signing below.

Very truly yours,

BANK OF AMERICA, N.A., as Agent and as Lender

By:_____
    Name:_____
    Title:_____

NATIONAL CITY BANK

By:_____
    Name:_____
    Title:_____

WEBSTER BANK, NATIONAL ASSOCIATION

By:_____
Name: ___William E Wynne III_____
Title: ___Sr. Vice President_____

MIDFIRST BANK, a Federally Chartered Savings Association

By:_____
Name: _____
Title: _____

#749847 v2 (Senior Loan Modification Agreement)

7

If all of the foregoing is acceptable to the Borrower, the Guarantor, Subordinated Lender #1 and Subordinated Lender #2, please indicate your approval by signing below.

Very truly yours,

BANK OF AMERICA, N.A., as Agent and as Lender

By:_____
    Name:_____
    Title:_____

NATIONAL CITY BANK

By:_____
    Name:_____
    Title:_____

WEBSTER BANK, NATIONAL ASSOCIATION

By:_____
Name: _____
Title: _____

MIDFIRST BANK, a Federally Chartered Savings Association

By:_____
Name:  Todd G. Wright
Title:  Vice Presiident

### ACCEPTANCE BY BORROWER

The Borrower hereby accepts and agrees to all of the terms and conditions of the above agreement.

HARBOUR PHASE I OWNERS, LLC, a
Delaware limited liability company

By: _____
C. Dean Patrinely, President

## CONSENT AND AGREEMENT OF GUARANTOR

WHEREAS, the payment and performance by the above-referenced Borrower of certain of its obligations under the Loan Documents were guaranteed by the undersigned Guarantor pursuant to the above-referenced Guaranty; and

WHEREAS, as a condition to the closing of the Loan modification contemplated by the above agreement, Agent and Lenders have required that the Guarantor execute this Consent and Agreement.

NOW, THEREFORE, in consideration of and as an inducement to Agent and Lenders entering into the above agreement and any other documents to be executed in connection therewith (collectively, the "Amendments"), the Guarantor does hereby:

(a)    Consent to the execution by Borrower of the above agreement and any other Amendments;

(b)    Accept and agree to all of the terms and conditions of the above agreement;

(c)    Agree that the payment and performance of certain of the Borrower's obligations under the Loan Documents, as amended by the above agreement and any other Amendments, are guaranteed by and covered under the Guaranty and further agree that all references in the Guaranty to the Loan Documents shall be deemed to refer to such documents, as so amended;

(d)    Agree that all representations and warranties given to Agent and Lenders by the Guarantor in the Guaranty and any other Loan Documents executed by Guarantor are hereby repeated and reconfirmed as of the date hereof; and

(e)    Acknowledge and agree that (i) the Guaranty is in full force and effect and evidences the valid and binding obligation of the Guarantor, and is enforceable in accordance with its terms, and (ii) there are no defenses or offsets to the enforcement of the Guaranty and there are no claims, counterclaims or causes of action which may be asserted by the Guarantor against Agent or any Lender.

IN WITNESS WHEREOF, the undersigned Guarantor has executed this Consent and Agreement as of the 01 day of October, 2006.

GUARANTOR:

CRIMSON CAPITAL, LTD.,
a Texas limited partnership

By:    Crimson Ventures, LLC, a Texas limited
       liability company, its General Partner

By: _____
       C. Dean Patrinely, Chief
       Executive Officer

## CONSENT AND AGREEMENT OF SUBORDINATED LENDER #1

Re:    $55,858,000 Construction Loan Agreement dated as of May 5, 2005 by and
among Harbour Phase I Owners, LLC, a Delaware limited liability company (the
"Borrower"), Bank of America, N.A. (successor by merger to Fleet National
Bank), as "Agent" and any other "Lenders" now or hereafter party thereto (the
"Loan Agreement")

The undersigned, Bank of America, N.A. (formerly known as Fleet National
Bank), a national association ("Subordinated Lender #1") hereby consents to all of the
terms and provisions of the foregoing Loan Modification Agreement amending and
modifying the Loan Agreement with respect to the therein defined $5,000,000 "Special
Loan Advance".

BANK OF AMERICA, N.A. (successor by
merger to Fleet National Bank)

By: _____

Name: _____

Title: _____

## CONSENT AND AGREEMENT OF SUBORDINATED LENDER #2

Re:   $55,858,000 Construction Loan Agreement dated as of May 5, 2005 by and among Harbour Phase I Owners, LLC, a Delaware limited liability company (the "Borrower"), Bank of America, N.A. (successor by merger to Fleet National Bank), as "Agent" and any other "Lenders" now or hereafter party thereto (the "Loan Agreement")

The undersigned, Lehman Brothers Holdings Inc., doing business as Lehman Capital, a division of Lehman Brothers Holdings Inc., a Delaware corporation ("Subordinated Lender #2") hereby consents to all of the terms and provisions of the foregoing Loan Modification Agreement amending and modifying the Loan Agreement with respect to the therein defined $5,000,000 "Special Loan Advance".

LEHMAN BROTHERS HOLDINGS INC.,
a Delaware corporation

By: _____
Name: CHRISTOPHER McKENNA
Title: AUTHORIZED SIGNATORY

## EXHIBIT K

## PROJECT BUDGET

**HARBOUR PHASE I OWNERS, LLC**
**PLAZA AT HARBOUR ISLAND**

| DESCRIPTION | APPROVED BUDGET 4/29/2005 | REALLOCATIONS | REVISED BUDGET 9/30/2006 |
|---|---|---|---|
| Site Acquisition | $ 5,293,638.00 | $ (42,839.00) | $ 5,250,799.00 |
| Architect & Engineering | $ 3,880,000.00 | $ (255,345.00) | $ 3,624,655.00 |
| Construction Costs | $61,972,350.00 | $ 2,089,495.00 | $64,061,845.00 |
| Interior Construction (Buyer Upgrades) | $          - | $ (697,414.00) | $  (697,414.00) |
| Taxes,. Insurance & Fees | $ 4,585,000.00 | $ (131,843.00) | $ 4,453,157.00 |
| Financing Costs | $ 4,101,617.00 | $ 364,515.00 | $ 4,466,132.00 |
| Sales Commissions | $          - | $ 2,000,000.00 | $ 2,000,000.00 |
| Marketing | $ 2,724,100.00 | $ 12,673.00 | $ 2,736,773.00 |
| General & Overhead | $ 1,524,000.00 | $ (152,380.00) | $ 1,371,620.00 |
| Contingency | $ 1,490,771.00 | $ (1,186,862.00) | $ 303,909.00 |
| Deficit Operations | $ 364,438.00 | $          - | $ 364,438.00 |
| TOTAL | $85,935,914.00 | $ 2,000,000.00 | $87,935,914.00 |

| SOURCES OF FUNDS | | | |
|---|---|---|---|
| Bank of America | $55,858,000.00 | $          - | $55,858,000.00 |
| TriSail Capital Corp | $13,377,565.00 | $ (3,000,000.00) | $10,377,565.00 |
| Leham Brothers Holdings-Equity | $12,200,349.00 | $          - | $12,200,349.00 |
| Crimson Harbour Phase I | $ 4,500,000.00 | $          - | $ 4,500,000.00 |
| Additional Condominium Deposits | $          - | $ 5,000,000.00 | $ 5,000,000.00 |
| TOTAL | $85,935,914.00 | $ 2,000,000.00 | $87,935,914.00 |

## FIRST LOAN MODIFICATION AGREEMENT

as of October _31_, 2006

Harbour Phase I Owners, LLC
c/o Crimson Capital, Ltd.
7401 Wisconsin Avenue
Suite 400
Bethesda, Maryland 20814

      Re:    $13,377,565 mezzanine construction loan dated as of May 5, 2005 (the "Loan") to Harbour Phase I Owners, LLC, a Delaware limited liability company (the "Borrower")

Ladies and Gentlemen:

Reference is hereby made to the following documents executed and delivered in connection with the Loan:

(a)    Construction Loan Agreement dated as of May 5, 2005 (the "Original Closing Date") by and among the Borrower, Bank of America, N.A. (successor by merger to Fleet National Bank), as "Agent" and as "Lender" and any other "Lenders" now or hereafter party thereto (the "Loan Agreement");

(b)    $13,377,565 Promissory Note dated as of the Original Closing Date executed by the Borrower in favor of Agent and evidencing the Loan (the "Note");

(c)    Second Construction Mortgage, Security Agreement and Fixture Filing dated as of the Original Closing Date ("Mortgage") executed by the Borrower for the benefit of Agent with respect to certain property located in the City of Tampa, County of Hillsborough, State of Florida (the "Property");

(d)    Second Assignment of Leases and Rents dated as of the Original Closing Date from the Borrower to Agent, with respect to the Property (the "Assignment of Leases and Rents");

(e)    Collateral Assignment and Security Agreement in Respect of Contracts, Licenses and Permits dated as of the Original Closing Date executed by the Borrower in favor of Agent (the "Assignment of Contracts");

(f)    Completion and Excess Costs Guaranty and Guaranty (re: Certain Specified Matters), each dated as of the Original Closing Date (singly and collectively,

the "Guaranty") executed by Crimson Capital, Ltd., a Texas limited partnership (the "Guarantor") in favor of Agent and Lenders.

(g)     Environmental Indemnity Agreement dated as of the Original Closing Date executed by Borrower in favor of Agent and Lenders (the "Environmental Indemnity Agreement");

(h)     Condominium Development Agreement dated as of the Original Closing Date (the "Condominium Development Agreement") by and among Borrower, Agent and Bank of America, N.A., national association (successor by merger to Fleet National Bank), as agent for the Senior Lenders ("Senior Agent");

(i)     Second Pledge and Security Agreement dated as of the Original Closing Date executed by the Borrower in favor of the Agent ("Pledge and Security Agreement");

(j)     Bank Deposit Account Control Agreement dated as of the Original Closing Date executed by the Borrower in favor of Agent (the "Control Agreement"); and

(k)     Pledge Agreement (re: Limited Liability Company Membership Interests) dated as of the Original Closing Date executed by Borrower's member, Harbour Phase I Holdings, LLC (the "Member"), in favor of Agent (the "Membership Interests Pledge Agreement").

All of the above documents, together with all other documents executed and/or delivered by the Borrower and/or the Member and/or the Guarantor in connection with the Loan, as the same may have been amended in writing prior to the date hereof, are hereinafter singly and collectively referred to as the "Loan Documents".

Bank of America, N.A., a national banking association is the successor by merger to Fleet National Bank and is the holder of all of the Loan Documents.

Capitalized terms used in this agreement and not otherwise defined herein shall have the meaning assigned to such terms in the Loan Agreement.

Pursuant to <u>Section 16</u> of the Senior Loan Agreement and that certain Substitution Agreement dated as of May 16, 2005, the following lenders became parties to the Senior Loan Agreement:  (i) National City Bank, a national banking association ("National"), (ii) Webster Bank, National Association, a national banking association ("Webster") and (iii) MidFirst Bank, a Federally Chartered Savings Association ("MidFirst").  Senior Agent, National, Webster and MidFirst are hereinafter jointly and collectively referred to as "Senior Lenders".

Borrower has requested that the Loan Documents be amended as hereinafter set forth.  Agent and Lenders are willing to modify the Loan Documents as hereinafter set forth upon the terms and conditions hereinafter set forth.

#752525 v2 (Mezzanine Loan Modification Agreement)

2

In consideration of the mutual covenants herein contained and other good and valuable consideration, receipt of which is hereby acknowledged, Agent, Lenders and the Borrower agree as follows:

1.    LOAN MODIFICATIONS

1.1    Notwithstanding anything to the contrary in the Loan Agreement or in any of the other Loan Documents, the parties agree as follows:

a)    Subject to satisfaction of all of the conditions that are set forth in the Loan Agreement with respect to the making of Loan Advances, upon Borrower's request, Senior Lenders shall make a special Loan Advance in the amount of $5,000,000 (the "Special Loan Advance"), the proceeds of which Special Loan Advance shall be applied as follows:

   i)    $3,000,000 shall be paid to Agent and applied against the outstanding principal balance of the Loan (it being agreed that Lenders have no obligation to re-advance any of such $3,000,000 under the Loan Agreement); and

   ii)    $2,000,000 shall be advanced to Borrower for payment of real estate brokerage commissions in connection with the sale of condominium units, which commissions are not included in the Project Budget but which are currently due and payable; provided, however, such disbursement shall be subject to receipt by Agent of such back-up information as it may reasonably require with respect to such brokerage commissions.

b)    The next $5,000,000 of Hard Costs that are incurred by Borrower after the date hereof shall be paid from the Additional Condominium Deposits that are currently pledged to Senior Lender and to Agent and deposited in the Additional Condominium Deposit Account. No further Senior Loan advances shall be made for Hard Costs until such $5,000,000 of Additional Condominium Deposits have been fully expended for payment of Hard Costs but Senior Lenders shall continue to make Senior Loan advances for Soft Costs in accordance with and subject to the terms and conditions that are set forth in the Senior Credit Agreement. Disbursement by Senior Lenders of any such Additional Condominium Deposits for payment of Hard Costs shall be subject to all of the terms and conditions that are set forth in the Senior Credit Agreement. Once such $5,000,000 of Additional Condominium Deposits has been expended by Borrower for payment of Hard Costs, Senior Lenders shall again make Senior Loan advances for payment of Hard Costs in accordance with and subject to the terms set forth in the Senior Credit Agreement.

1.2    All references to Fleet National Bank in the Loan Agreement and any of the other Loan Documents are hereby amended to refer to "Bank of America, N.A. (successor by merger to Fleet National Bank)".

1.3    The notice address for the Lender and Lender's Counsel that is set forth in Section 17 of the Loan Agreement and in any of the other Loan Documents is hereby amended to provide as follows:

> Bank of America, N.A.
> c/o Trisail Capital Corporation
> One Federal Street
> Mail Stop: MA5-503-04-16
> Boston, Massachusetts 02110
> Fax No. (617) 346-4672
> Attention:  Commercial Real Estate Loan Administration
>
> Hinckley, Allen & Snyder, LLP
> 50 Kennedy Plaza, Suite 1500
> Providence, Rhode Island 02903
> Fax:    (401) 277-9600
> Attention:  Joseph P. Curran, Esq.

1.4    Exhibit K to the Loan Agreement is hereby deleted in its entirety and Exhibit K which is attached hereto is substituted therefor.

2.    REPRESENTATIONS AND WARRANTIES

The Borrower represents and warrants to Agent and Lenders that:

2.1    Borrower, Member and Guarantor each are duly organized, validly existing and in good standing under the laws of the State of its organization and each has the power to own all of its properties and assets and to carry on its business as it is now being conducted and each is duly authorized to execute and perform this agreement;

2.2    All actions or authorizations necessary to authorize the execution and delivery of this agreement and all other documents to be executed by Borrower or Member or Guarantor in connection herewith (if any) have been obtained; the execution and delivery of this agreement does not violate any law, agreement or other restriction to which Borrower or Member or Guarantor is subject; and this agreement and the Loan Documents, as amended hereby, constitute the legal, valid and binding obligations of Borrower, Member and Guarantor (as applicable) and are enforceable against Borrower, Member and Guarantor (as applicable) in accordance with their respective terms; and

2.3     All of the representations and warranties made by the Borrower, the Member and the Guarantor in the Loan Documents remain true and correct in all material respects as of the date hereof.

3.     MISCELLANEOUS

3.1     The Borrower shall pay all fees and expenses incurred by Agent in connection with the modification of the Loan evidenced by this agreement including, without limitation, all reasonable attorneys' fees and expenses.

3.2     All of the terms and provisions of this agreement are hereby incorporated in the Loan Documents and the Loan Documents are amended accordingly.  Solely in the event that any term or condition contained in this agreement conflicts with, or is inconsistent with, any provision of the Loan Documents, the terms and conditions of this agreement shall supersede and control.  In all other respects, the provisions of the Loan Documents shall remain in full force and effect, including, without limitation, any and all additional terms and conditions therein which are not in conflict with the provisions of this agreement.

3.3     All references in any of the Loan Documents to any other Loan Document(s) shall be deemed to be a reference to such other Loan Document(s), as previously amended in writing and as further amended by this agreement.

3.4     The Loan Documents, as amended by this agreement, are ratified and confirmed in all respects and the Loan Documents, as amended hereby, remain in full force and effect.

3.5     The Borrower, the Member and the Guarantor acknowledge that there is no offset or defense to the payment and performance of the obligations of the Borrower or the Member or the Guarantor under any of the Loan Documents and there is no claim, counterclaim or cause of action of any kind which may be asserted by the Borrower or the Member or the Guarantor against Agent or Lenders.

3.6     The Borrower, the Member and the Guarantor shall execute, acknowledge and deliver any and all further documents reasonably requested by Agent to evidence or confirm the agreements set forth in this agreement.

3.7     The execution of this agreement by Agent and Lenders shall not constitute a waiver of any of their rights and remedies pursuant to any of the Loan Documents and applicable law, and Agent and Lenders hereby expressly confirm their retention of all rights pursuant to the Loan Documents and applicable law.  The execution of this agreement by Agent and Lenders shall not constitute a waiver of any Default or Event of Default that may now or hereafter exist under any of the Loan Documents.

3.8     In the event that any term or provision of this agreement or of any document executed in connection herewith, or the application thereof to any person or circumstance shall, to any extent, be held invalid or unenforceable, the remainder of this agreement and all such documents, or the application of such term or provision to persons or circumstances other than those to which it is held invalid or unenforceable, shall be valid and enforceable to the fullest extent permitted by law.

3.9     Each of the documents to be executed in connection herewith (if any) and the obligations of the Borrower, the Member and the Guarantor thereunder are in addition to and not in substitution for any other obligations or security interests now or hereafter held by Agent or any Lender in connection with the Loan and shall not operate as a novation or merger of any contract or debt or suspend the fulfillment of or affect the rights, remedies, powers or privileges of Agent or any Lender with respect to any obligations or other security interest held by them.

3.10    This agreement supersedes any prior or contemporaneous discussions or agreements concerning the modification of the Loan evidenced hereby and not contained herein.  The Loan Documents, as amended hereby, constitute all of our agreements at the present time with respect to the Loan.

3.11    The Loan Documents, as amended hereby, shall continue to be fully secured by all of the Security Documents.

3.12    This agreement may be executed in counterparts.

3.13    This agreement shall be governed by the internal laws of the State of Rhode Island.

3.14    This agreement shall become effective upon (a) execution by Borrower of the Acceptance by Borrower which is attached hereto, (b) execution by Guarantor and Member of the Consent and Agreement of Guarantor and Member which is attached hereto, (c) execution by Senior Agent of the Consent and Agreement of Senior Agent which is attached hereto, (d) execution by National of the Consent and Agreement of National City Bank which is attached hereto, (e) execution by Webster of the Consent and Agreement of Webster Bank, National Association which is attached hereto, (f) execution by MidFirst of the Consent and Agreement of MidFirst Bank which is attached hereto and (g) execution by Subordinated Lender of the Consent and Agreement of Subordinated Lender which is attached hereto.

If all of the foregoing is acceptable to the Borrower, the Guarantor and Senior Lenders please indicate your approval by signing below.

Very truly yours,

BANK OF AMERICA, N.A. (successor by merger to Fleet National Bank), as Agent and as Lender

By: _____

Name: _____

Title: _sup_____

## ACCEPTANCE BY BORROWER

The Borrower hereby accepts and agrees to all of the terms and conditions of the above agreement.

HARBOUR PHASE I OWNERS, LLC, a
Delaware limited liability company

By:_____
C. Dean Patrinely, President

## CONSENT AND AGREEMENT OF GUARANTOR AND MEMBER

WHEREAS, the payment and performance by the above-referenced Borrower of certain of its obligations under the Loan Documents were guaranteed by the undersigned Guarantor pursuant to the above-referenced Guaranty; and

WHEREAS, the Obligations are secured, in part, by the above-referenced Membership Interests Pledge Agreement executed by the Member; and

WHEREAS, as a condition to the closing of the Loan modification contemplated by the above agreement, Agent and Lenders have required that the Guarantor and the Member execute this Consent and Agreement.

NOW, THEREFORE, in consideration of and as an inducement to Agent and Lenders entering into the above agreement and any other documents to be executed in connection therewith (collectively, the "Amendments"), the Guarantor and the Member hereby:

(a)     Consent to the execution by Borrower of the above agreement and any other Amendments;

(b)     Accept and agree to all of the terms and conditions of the above agreement;

(c)     Agree that the payment and performance of certain of the Borrower's obligations under the Loan Documents, as amended by the above agreement and any other Amendments, are guaranteed by and covered under the Guaranty and secured by the Membership Interests Pledge Agreement and further agree that all references in the Guaranty or in the Membership Interests Pledge Agreement to the Loan Documents shall be deemed to refer to such documents, as so amended;

(d)     Agree that all representations and warranties given to Agent and Lenders by the Guarantor in the Guaranty and any other Loan Documents executed by Guarantor are hereby repeated and reconfirmed as of the date hereof;

(e)     Agree that all representations and warranties given to Agent and Lenders by the Member in the Membership Interests Pledge Agreement and any other Loan Documents executed by the Member are hereby repeated and reconfirmed as of the date hereof;

(f)     Acknowledge and agree that (i) the Guaranty is in full force and effect and evidences the valid and binding obligation of the Guarantor, and is enforceable in accordance with its terms, and (ii) there are no defenses or offsets to the enforcement of the Guaranty and there are no claims, counterclaims or causes of action which may be asserted by the Guarantor against Agent or any Lender; and

(g)     Acknowledge and agree that (i) the Membership Interests Pledge Agreement is in full force and effect and evidences the valid and binding obligation of the Member, and is enforceable in accordance with its terms, and (ii) there are no defenses or offsets to the enforcement of the Membership Interests Pledge Agreement and there are no claims or counterclaims or causes of action which may be asserted by the Member against Agent or any Lender.

IN WITNESS WHEREOF, the undersigned Guarantor has executed this Consent and Agreement as of the 21st day of October, 2006.

GUARANTOR:

CRIMSON CAPITAL, LTD.,
a Texas limited partnership

By:    Crimson Ventures, LLC, a Texas limited
       liability company, its General Partner

       By:_____
              C. Dean Patrinely, Chief
              Executive Officer


MEMBER:

HARBOUR PHASE I HOLDINGS, LLC,
a Delaware limited liability company

By:_____
       C. Dean Patrinely, President

## CONSENT AND AGREEMENT OF SENIOR AGENT

Re:    $13,577,565 Construction Loan Agreement dated as of May 5, 2005 by and among Harbour Phase I Owners, LLC, a Delaware limited liability company (the "Borrower"), Bank of America, N.A. (successor by merger to Fleet National Bank), as "Agent" and any other "Lenders" now or hereafter party thereto (the "Loan Agreement")

The undersigned, Bank of America, N.A. (formerly known as Fleet National Bank), a national association ("Senior Agent") hereby consents to all of the terms and provisions of the foregoing Loan Modification Agreement amending and modifying the Loan Agreement with respect to the therein defined $5,000,000 "Special Loan Advance".

BANK OF AMERICA, N.A. (successor by merger to Fleet National Bank)

By: _Susan M. Caruso_
Name: _Susan Caruso_
Title: _Vice President_

## CONSENT AND AGREEMENT OF NATIONAL CITY BANK

Re:   $13,577,565 Construction Loan Agreement dated as of May 5, 2005 by and
among Harbour Phase I Owners, LLC, a Delaware limited liability company (the
"Borrower"), Bank of America, N.A. (successor by merger to Fleet National
Bank), as "Agent" and any other "Lenders" now or hereafter party thereto (the
"Loan Agreement")

The undersigned, National City Bank, a national bank ("National") hereby
consents to all of the terms and provisions of the foregoing Loan Modification
Agreement amending and modifying the Loan Agreement with respect to the therein
defined $5,000,000 "Special Loan Advance".

NATIONAL CITY BANK

By: _____
Name: _John Osberg_
Title: _Senior Vice President_

## CONSENT AND AGREEMENT OF WEBSTER BANK, NATIONAL ASSOCIATION

Re:    $13,577,565 Construction Loan Agreement dated as of May 5, 2005 by and among Harbour Phase I Owners, LLC, a Delaware limited liability company (the "Borrower"), Bank of America, N.A. (successor by merger to Fleet National Bank), as "Agent" and any other "Lenders" now or hereafter party thereto (the "Loan Agreement")

The undersigned, Webster Bank, National Association ("Webster") hereby consents to all of the terms and provisions of the foregoing Loan Modification Agreement amending and modifying the Loan Agreement with respect to the therein defined $5,000,000 "Special Loan Advance".

WEBSTER BANK, NATIONAL ASSOCIATION

By:_____

Name:    _William E. Wray, III_

Title:    _Sr. Vice President_

## CONSENT AND AGREEMENT OF MIDFIRST BANK

Re:  $13,577,565 Construction Loan Agreement dated as of May 5, 2005 by and among Harbour Phase I Owners, LLC, a Delaware limited liability company (the "Borrower"), Bank of America, N.A. (successor by merger to Fleet National Bank), as "Agent" and any other "Lenders" now or hereafter party thereto (the "Loan Agreement")

The undersigned, MidFirst Bank, a federally chartered savings association ("MidFirst") hereby consents to all of the terms and provisions of the foregoing Loan Modification Agreement amending and modifying the Loan Agreement with respect to the therein defined $5,000,000 "Special Loan Advance".

MIDFIRST BANK, a Federally Chartered
Savings Association

By:_____
Name: Todd G. Wright
Title:  Vice President

## CONSENT AND AGREEMENT OF SUBORDINATED LENDER

Re:    $13,577,565 Construction Loan Agreement dated as of May 5, 2005 by and among Harbour Phase I Owners, LLC, a Delaware limited liability company (the "Borrower"), Bank of America, N.A. (successor by merger to Fleet National Bank), as "Agent" and any other "Lenders" now or hereafter party thereto (the "Loan Agreement")

The undersigned, Lehman Brothers Holdings Inc., doing business as Lehman Capital, a division of Lehman Brothers Holdings Inc., a Delaware corporation ("Subordinated Lender") hereby consents to all of the terms and provisions of the foregoing Loan Modification Agreement amending and modifying the Loan Agreement with respect to the therein defined $5,000,000 "Special Loan Advance".

LEHMAN BROTHERS HOLDINGS INC.,
a Delaware corporation

By: _____
Name:    CHRISTOPHER McKENNA
Title:    AUTHORIZED SIGNATORY

## EXHIBIT K

## PROJECT BUDGET

### HARBOUR PHASE I OWNERS, LLC
### PLAZA AT HARBOUR ISLAND

| DESCRIPTION | APPROVED BUDGET 4/29/2005 | REALLOCATIONS | REVISED BUDGET 9/30/2006 |
|---|---|---|---|
| Site Acquisition | $ 5,293,638.00 | $ (42,839.00) | $ 5,250,799.00 |
| Architect & Engineering | $ 3,880,000.00 | $ (255,345.00) | $ 3,624,655.00 |
| Construction Costs | $61,972,350.00 | $ 2,089,495.00 | $64,061,845.00 |
| Interior Construction (Buyer Upgrades) | $          - | $ (697,414.00) | $ (697,414.00) |
| Taxes,. Insurance & Fees | $ 4,585,000.00 | $ (131,843.00) | $ 4,453,157.00 |
| Financing Costs | $ 4,101,617.00 | $ 364,515.00 | $ 4,466,132.00 |
| Sales Commissions | $          - | $ 2,000,000.00 | $ 2,000,000.00 |
| Marketing | $ 2,724,100.00 | $ 12,673.00 | $ 2,736,773.00 |
| General & Overhead | $ 1,524,000.00 | $ (152,380.00) | $ 1,371,620.00 |
| Contingency | $ 1,490,771.00 | $ (1,186,862.00) | $ 303,909.00 |
| Deficit Operations | $ 364,438.00 | $          - | $ 364,438.00 |
| TOTAL | $85,935,914.00 | $ 2,000,000.00 | $87,935,914.00 |

| SOURCES OF FUNDS | | | |
|---|---|---|---|
| Bank of America | $55,858,000.00 | $          - | $55,858,000.00 |
| TriSail Capital Corp | $13,377,565.00 | $ (3,000,000.00) | $10,377,565.00 |
| Leham Brothers Holdings-Equity | $12,200,349.00 | $          - | $12,200,349.00 |
| Crimson Harbour Phase I | $ 4,500,000.00 | $          - | $ 4,500,000.00 |
| Additional Condominium Deposits | $          - | $ 5,000,000.00 | $ 5,000,000.00 |
| TOTAL | $85,935,914.00 | $ 2,000,000.00 | $87,935,914.00 |

**PROPOSED ORDER**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------x

| | | |
|---|---|---|
| In re | : | **Chapter 11 Case No.** |
| | : | |
| **LEHMAN BROTHERS HOLDINGS INC.**, *et al.*, | : | **08-13555 (JMP)** |
| | : | |
| Debtors. | : | **(Jointly Administered)** |

-------------------------------------------------------------------x

### ORDER GRANTING PLAN ADMINISTRATOR'S OBJECTION TO CLAIM NO. 8470 HELD BY PLAZA HARBOUR MEZZ HOLDINGS LLC

Upon the objection, dated July 1, 2014 (the "Objection"),[1] of Lehman Brothers

Holdings Inc. ("LBHI or the "Plan Administrator") as Plan Administrator pursuant to the

*Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its*

*Affiliated Debtors* for the entities in the above referenced chapter 11 cases, pursuant to section

502 of title 11 of the United States Code (the "Bankruptcy Code") and Rule 3007 of the Federal

Rules of Bankruptcy Procedure, seeking disallowance and expungement of the Plaza Harbour

Claim, all as more fully described in the Objection; and due and proper notice of the Objection

having been provided, and it appearing that no other or further notice need be provided; and the

Court having found and determined that the relief sought in the Objection is in the best interests

of LBHI and all parties in interest in the above referenced chapter 11 cases and that the legal and

factual bases set forth in the Objection establish just cause for the relief granted herein; and after

due deliberation and sufficient cause appearing therefor, it is

ORDERED that the relief requested in the Objection is granted; and it is further

---

[1] Capitalized terms not defined herein shall have the same meaning ascribed to them in the Objection to the Plaza Harbour Claim.

ORDERED that pursuant to section 502(b) of the Bankruptcy Code, the Plaza

Harbour Claim, which has been assigned claim number 8407 by the Court-appointed claims

agent, is disallowed and expunged in its entirety with prejudice; and it is further

ORDERED that this Court shall retain jurisdiction to hear and determine all

matters arising from or related to this Order.

Dated: _____, 2014
      New York, New York
                                        _____

                                        UNITED STATES BANKRUPTCY JUDGE

2