UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x

In re                                                    Chapter 11 Case No.

LEHMAN BROTHERS HOLDINGS INC., *et al.*,    08-13555 (JMP)
                                    Debtors.    Jointly Administered

---------------------------------------------------------------x

## PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW SUBMITTED BY COMPENSATION CLAIMANTS IN OPPOSITION TO DEBTORS' FOURTEEN OMNIBUS OBJECTIONS SEEKING TO RECLASSIFY COMPENSATION CLAIMS AS EQUITY OR ALTERNATIVELY TO SUBORDINATE CLAIMS PURSUANT TO SECTION 510(b) OF THE BANKRUPTCY CODE

STAMELL & SCHAGER, LLP
  Richard J. Schager, Jr.
  Andrew R. Goldenberg
555 Fifth Avenue, 14th Floor
New York, NY  10017
Telephone:  (212) 566-4047
Facsimile:  (212) 566-4061
Email:  schager@ssnyc.com
Email: goldenberg@ssnyc.com


RICH MICHAELSON MAGALIFF
 MOSER LLP
  Howard P. Magaliff, Esq.
  Robert N. Michaelson, Esq.
340 Madison Avenue - 19th Floor
New York, NY  10173
Telephone:  (212) 220-9402
Email:  HMagaliff@R3MLaw.Com
Email:  RMichaelson@R3MLaw.Com


New York, New York
June 6, 2014

LAW OFFICES OF LISA M. SOLOMON
  Lisa M. Solomon
One Grand Central Place
305 Madison Avenue
Suite 4700
New York, NY  10165
Telephone:  (212) 471-0067
Facsimile:  (212) 980-6965
Email:  lisa.solomon@att.net


LAW OFFICE OF A. JAMES BOYAJIAN
  A. James Boyajian
355 S. Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone:  (424) 258-0777
Facsimile:  (424) 298-4377
Email: jamesboyajian@gmail.com


*Attorneys for Compensation Claimant(s)*

**Table of Contents**

I.    FINDINGS OF FACT .............................................................................................. 1

    A.    Lehman's Adoption of the RSU/CSA Compensation Program............................................. 1

    B.    Lehman's Speculation on Employee Motivation is not Credible Evidence ..................... 12

    C.    Lehman Recognized the Claimants' Status as Creditors ................................................... 18

    D.    The RSU Trust ................................................................................................................... 25

    E.    Taxation of RSUs/CSAs ................................................................................................... 27

    F.    Lehman's Bankruptcy ....................................................................................................... 28

    G.    The Subordination Clause ................................................................................................. 29

II.    CONCLUSIONS OF LAW .................................................................................... 30

    A.    The RSUs and CSAs are not Equity Securities under Code § 101(16) ............................ 32

    B.    The RSUs and CSAs are not Equity Securities under Code § 101(49) ............................ 35

    C.    The RSUs and CSAs are not Options under ¶ (xv).......................................................... 38

    D.    The RSUs and CSAs are not Investment Contracts under ¶ (xii) .................................... 44

    E.    The RSUs and CSAs are not Commonly Known as Securities under ¶ (xiv) .................. 50

    F.    The RSUs and CSAs Not Securities under § 101(49)(B)(vii) .......................................... 53

    G.    Lehman Fails to Show any Basis for Subordination under § 510(b) of the Code - The Claims Are Not for "Damages" under § 510(b) .............................................................. 54

    H.    The Legislative History of Section § 510(b) Does Not Support Subordination Here........ 55

    I.    The Claims Are for Enforcement of Lehman's Alternative Performance Obligation to Pay Claimants in Cash when Paying them in the Form of Equity in LBHI Became Impossible ........................................................................................................................ 57

    J.    The Claims are also based upon Various Wage Laws which Lehman violated through its RSU/CSA program ........................................................................................................... 62

K.    Withholdings/Deductions were primarily for the Benefit of Employer Lehman.............. 68

L.    Lack of Informed Written Authorization......................................................................... 69

III.    CONCLUSION................................................................................................................... 72

# **Table of Authorities**

## **Cases**

*Arrez v. Kelly Servcs., Inc.*, 522 F. Supp. 2d 997 (N.D. Ill. 2007) ............................................... 67

*Ashland Oil & Refining Co. v. Cities Serv. Gas Co.*, 462 F.2d 204 (10th Cir. 1972).................. 58

*Bader v. Wells Fargo Home Mortg. Inc.*, 773 F. Supp. 2d 397 (S.D.N.Y. 2011) ........................ 65

*Bauman v. Bish*, 571 F. Supp. 1054 (N.D. W.Va. 1983) ................................................................ 47

*Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723 (1975) .................................................... 31

*Brandon v. Anesthesia & Pain Mgmt Associates, Ltd*., 419 F.3d 594 (7th Cir. 2005) ................ 67

*Camillo v. Wal-Mart Stores, Inc.*, 221 Ill.App.3d 614 (Ill. App. Ct. 1991)................................. 67

*Carlson v. Katonah Capital, L.L.C.*, 2006 WL 273548 (N.Y. Sup. Ct. Jan. 27, 2006) ............... 65

*Carrieri v. Jobs.com*, 393 F.3d 508 (5th Cir. 2004) ...................................................................... 34

*Childers v. Northwest Airlines, Inc.*, 688 F. Supp. 1357 (D. Minn. 1988) ................................... 48

*DeGeer v. Gillis*, 707 F. Supp. 2d 784 (N.D. Ill. 2010).................................................................. 67

*Diamond v. Davis*, 38 N.Y.S.2d 103 (N.Y. Sup. Ct. 1942) ........................................................... 65

*Draken Group, Inc. v. Avondale Resources, Inc.*, 2008 WL 151901 (N. D. Okla. Jan 14, 2008) 58

*Econn v. Barclays Bank PLC*, No. 07 Civ. 2440 (BSJ), 2010 WL 9008868 (S.D.N.Y. May 10,
2010)......................................................................................................................................... 66

*Farrell Matthews & Weir v. Hansen,* [2005] I.R.L.R. 160............................................................. 67

*Fishoff v. Coty Inc.*, 2009 WL 1585769 (S.D.N.Y. June 8, 2009)................................................. 47

*Gennes v. Yellow Book of New York, Inc.*, 23 A.D.3d 520 (2d Dep't. 2005) ............................... 64

*Giuntoli v. Garvin Guybutler Corp.*, 726 F. Supp. 494 (S.D.N.Y. 1989).................................... 67

*Glidden Co. v. Hellenic Lines, Ltd.*, 275 F.2d 253 (2d Cir. 1960)................................................ 58

*Guiry v. Goldman, Sachs & Co.*, 31 A.D.3d 70 (1st Dep't 2006).......................................... 65, 66

*Heyen v.  Safeway Inc.*, 157 Cal.Rptr.3d 280 (Cal. Ct. App. 2013)............................................. 64

*In re Blondheim Real Estate, Inc.*, 91 B.R. 639 (Bankr. D. N.H. 1988)....................................... 54

*In re Einstein/Noah Bagel*, 257 B.R. 499 (Bankr. D. Ariz. 2000)................................................ 34

*In re Granite Partners, L.P.*, 208 B.R. 332 (Bankr. S.D.N.Y. 1997) ........................................... 55

*In re III Enterprises, Inc.*, 163 B.R. 453 (Bankr. E.D.Pa.) ......................................................... 42

*In re LightSquared*, 504 B.R. 321 (Bankr. S.D.N.Y. 2013) ........................................................ 33

*In re MarketXT Holdings Corp.*, 2008 WL 2164572 (Bankr. S.D.N.Y. May 22, 2008), *aff'd* 346
F. App'x 744, 746 (2d Cir. 2009)................................................................................. 55

*In re Mobile Tool Int'l Inc.*, 306 B.R. 778 (Bankr. Del. 2004).................................................... 54

*In re Montgomery Ward Holding Corp.*, 272 B.R. 836 (Bankr. Del. 2001)................................ 54

*In re Primeline Securities, Debtor*, 295 F.3d 1100 (10th Cir. 2002)........................................... 45

*In re Riodizio, Inc.*, 204 B.R. 417 (Bankr. S.D.N.Y. 1997)......................................................... 42

*In re Telegroup, Inc.*, 281 F.3d 133 (3d Cir. 2002) ...................................................................... 56

*In re Tristar Esperanza Props.*, 488 B.R. 394 (B.A.P. 9th Cir. 2013) ........................................ 38

*In re Washington Bancorporation*, 1996 WL 148533 (D. D.C. Mar. 19, 1996) ......................... 54

*In re Wyeth Co.*, 134 B.R. 920 (Bankr. W.D. Miss. 1991) .......................................................... 54

*Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am. v. Daniel*, 439 U.S. 551
(1979) .................................................................................................................. 31, 47, 48, 49

*Kim v. Citigroup, Inc.*, 305 Ill.Dec. 834 (Ill. App. Ct. 2006)...................................................... 70

*Koehl v. Verio, Inc.*, 142 Cal.App.4th 1313 (Cal. Ct. App. 2006)........................................ 64, 70

*Levion v. Societe Generale*, 822 F.Supp.2d 390 (S.D.N.Y. 2011) .............................................. 65

*Marsh v. Prudential Sec. Inc.*, 1 N.Y.3d 146 (N.Y. Ct. App. 2003)............................................ 70

*Matter of Standard Oil & Exploration of Del., Inc.*, 136 B.R. 141 (Bankr. W.D. Mich. 1992)... 34

*Nantahala Capital Partners v. Wash. Mut. (In re Wash. Mut.)*, 464 B.R. 656 (Bankr. D. Del.
2012)....................................................................................................................................... 34

*Neisendorf v. Levi Strauss & Co.*, 143 Cal. App. 4th 509 (Cal. Ct. App. 2006) ......................... 67

*Padilla v. Manlapaz*, 643 F.Supp.2d 302 (E.D.N.Y. 2009)........................................................ 63

*Reilly v. Natwest Markets Group Inc.*, 181 F.3d 253 (2d Cir. 1999)........................................... 65

*Rosen v. Smith Barney, Inc.*, 393 N.J.Super. 578 (N.J. Super. Ct. 2007) .............................. 64, 70

*Ryan v. Kellogg Partners Institutional Servs.*, 19 N.Y. 3d 1 (2012) ........................................... 66

*Schachter v. Citigroup, Inc.*, 47 Cal.4th 610 (Cal. Super. Ct. 2009) ......................................... 67

*Schacter v. Citigroup, Inc.*, 126 Cal. App. 4th 726 (Cal. App. Ct. 2005)................................... 70

*Schunkewitz v. Prudential Sec., Inc.*, 99 F. Appx. 353 (3d Cir. 2004) ....................................... 70

*SEC v. Lauer*, 52 F.3d 667 (7th Cir. 1995) ................................................................................. 46

*SEC v. W. J. Howey Co.*, 328 U.S. 293 (1946)...................................................................... 46, 47

*Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am. v. Daniel*........... 47, 48, 49

*Truelove v. Ne. Capital Advisory*, 95 N.Y.2d 220 (2000) ........................................................... 66

*U.S. Through Agr. Stabilization & Conservation Serv. v. Gerth*, 991 F.2d 1428 (8th Cir. 1993) 55

*United Housing Found., Inc. v. Forman*, 421 U.S. 837 (1975) .............................................. 46, 50

*Ury v. Fruit Belt Service Co.*, 64 Ill.Dec. 613 (Ill. App. Ct. 1982)............................................ 70

*Yankton Sioux Tribe of Indians v. U.S.*, 272 U.S. 351 (1926) ...................................................... 58

*Zabinsky v. Gelber Group, Inc.*, 347 Ill. App. 3d 243 (Ill. App. Ct. 2004) ................................ 67

## Congressional Authorities

H.R. REP. No. 97-420 ........................................................................................................... 44

H.R. REP. No. 95-595 ..................................................................................................... 33, 37

H.R. REP. No. 93-137 ........................................................................................................... 55

S. REP. 95-989........................................................................................................................ 33

S. REP. 95-763........................................................................................................................ 45

## Other Authorities

C. Edgar Adkins, Jr. & Jeffrey A. Martin, *Restricted Stock: The Tax Impact on Employers and Employees*, 107 J. Tax. 224 (2007) ("Adkins & Martin")........................................................... 51

Cal. Op. Att'y Gen. (Nov. 5, 1981) ........................................................................................ 68

*Goldman Sachs Group*, 1998 WL 537884 (Aug. 24, 1998) ..................................................... 49

*ING Groep N.V.*, 2000 WL 1910012 (Dec. 29, 2000) ............................................................. 49

John J. Slain and Homer Kripke, *The Interface Between Securities Regulation and Bankruptcy – Allocating the Risk of Illegal Securities Issuance Between Securityholders and the Issuer's Creditors*, 48 N.Y.U. L. Rev. 261, 299 (1973) ..................................................................... 56, 57

L. Loss et al., 2 *Securities Regulation*, 863 n.19 (4th ed. 2007).................................................. 50

Max J. Schwarz, *A Primer on Stock-Based Compensation and Selected Recent Developments, contained in Hot Issues in Executive Compensation 2004, PLI Tax Law & Estate Planning Course Handbook Series*, 642 PLI/Tax 57 (September 2004) .................................................... 52

*UnionBanCal*, 2010 WL 4472795 (Nov. 8, 2010)......................................................................... 49

*Verint Systems*, 2007 WL 1597334 (May 24, 2007)..................................................................... 49

Weil, Gotshal & Manges LLP, Bankruptcy Blog, *Tightening the Golden Handcuffs: Forfeiture Provision in Stock; Voluntary Plans*, April 5, 2004 .................................................................. 70

*WorleyParsons*, 2008 WL 4635593 (Oct. 17, 2008) .................................................................... 49

**Statutes**

11 U.S.C. § 101 ................................................................................................................ passim

11 U.S.C. 507 ......................................................................................................................... 72

11 U.S.C. § 510 ................................................................................................................ passim

15 U.S.C. § 77 ......................................................................................................................... 37

15 U.S.C. § 78c ....................................................................................................................... 37

15 U.S.C. § 78*lll* .................................................................................................................... 37

26 U.S.C. § 83 ................................................................................................................... 27, 51

Cal. Lab. Code § 222 .............................................................................................................. 70

Cal. Lab. Code § 224 .............................................................................................................. 70

Ill. 820 ILCS § 115/9 ............................................................................................................. 70

N.Y. Lab. Law § 198 .............................................................................................................. 63

N.Y. Labor Law § 193 ............................................................................................................ 68

N.Y. Stat. Law § 321 .............................................................................................................. 64

NY Lab. Law § 193 ................................................................................................................ 70

# I.  FINDINGS OF FACT

## A.  Lehman's Adoption of the RSU/CSA Compensation Program

1.       Between December 7, 2010 and August 24, 2012, Lehman Brothers

Holdings Inc. ("LBHI") and certain affiliated Debtors, as debtors and debtors in possession

herein (collectively, the "Debtors"), and LBHI as Plan Administrator (the "Plan Administrator"),

under the *Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and

Its Affiliated Debtors* (the "Plan") for certain entities in the above-referenced chapter 11 cases,

filed fourteen Omnibus Objections (collectively, the "Omnibus Objections") to Proofs of Claims

for bonus or commission compensation during the years 2003 and 2008 as to which claimants

were granted Restricted Stock Units ("RSUs") and Contingent Stock Awards ("CSAs").[1] The

---

[1]  The Omnibus Objections are: Debtors' Seventy-Third Omnibus Objection to Claims (to Reclassify Proofs of Claim as Equity Interests) [ECF No. 13295]; Debtors' One Hundred Eighteenth Omnibus Objection to Claims (to Reclassify Proofs of Claim as Equity Interests) [ECF No. 15666]; Debtors' One Hundred Thirtieth Omnibus Objection to Claims (to Reclassify Proofs of Claim as Equity Interests) [ECF No. 16115]; Debtors' One Hundred Thirty-First Omnibus Objection to Claims (to Reclassify Proofs of Claim as Equity Interests) [ECF No. 16116]; Debtors' One Hundred Thirty-Third Omnibus Objection to Claims (to Reclassify Proofs of Claim as Equity Interests) [ECF No. 16530]; Debtors' One Hundred Thirty-Fourth Omnibus Objection to Claims (to Reclassify Proofs of Claim as Equity Interests) [ECF No. 16532]; Debtors' One Hundred Thirty-Fifth Omnibus Objection to Claims (to Reclassify Proofs of Claim as Equity Interests) [ECF No. 16808]; Debtors' One Hundred Seventy-Sixth Omnibus Objection to Claims (to Reclassify Proofs of Claim as Equity Interests) [ECF No. 19392]; Debtors' One Hundred Eighty-Fifth Omnibus Objection to Claims (Compound Claims) [ECF No. 19714]; Debtors' Two Hundred Seventh Omnibus Objection to Claims (to Reclassify Proofs of Claim as Equity Interests) [ECF No. 20012]; Three Hundred Thirteenth Omnibus Objection to Claims (to Reclassify Proofs of Claim as Equity Interests) [ECF No. 28433]; Three Hundred Fourteenth Omnibus Objection to Claims (Late-Filed Claims) [ECF No. 28435]; Three Hundred Nineteenth Omnibus Objection to Claims (to Reclassify Proofs of Claim as Equity Interests) [ECF No. 28777]; and the Three Hundred Forty Seventh Omnibus Objection to Claims (to Reclassify Proofs of Claim as Equity Interests) [ECF No. 30357].

Omnibus Objections seek to reclassify these claims as equity interests and/or subordinate them to the claims of general unsecured creditors. The claimants who oppose the Omnibus Objections and have claims that were the subject of this hearing are referred to herein as the "<u>Claimants</u>" and their claims, to the extent subject to the Omnibus Objections, are referred to herein as the "<u>Claims</u>." Fact Stip. Recital A.[2]

2.    Claimants, who were subjected to Lehman's RSU / CSA Program, were employed at Lehman offices located in various jurisdictions, primarily including but not limited to California, Colorado, Illinois, New Jersey, New York, and the United Kingdom. *See*, *e.g.*, Declarations of Antoncic ¶ 14 (New York), Banchetti ¶13 (United Kingdom), Bareggi ¶13 (United Kingdom), Burke ¶ 14 (New York),  Casuple ¶ 2 (New Jersey), Cohen ¶ 2 (California), Das ¶ 14 (New York), Dufournier ¶13 (United Kingdom), Hornick ¶ 14 (New York), Jacobson (California), Langevin ¶ 2 (New York), Lawsky ¶ 14 (New York), Noble (United Kingdom), Parr ¶ 13 (United Kingdom), Primiano ¶ 15 (New York), Sarkar ¶ 2 (United Kingdom), Saronne ¶13 (United Kingdom), Sebiri ¶ 19 (New York), Spero ¶ 14 (New York), Stevens ¶ 2 (Colorado), Sweely ¶ 14 (New York), Wideman ¶ 2 (Colorado).

3.    The Claims for compensation as to which <u>RSUs</u> and <u>CSAs</u> were granted pertain to the years 2003-2008. For years 2003-2008, bonus eligible (salaried) and production-based (commissioned) Lehman employees in the United States were granted the RSUs, and for

---

[2] Prior to the Evidentiary Hearing from which these Findings of Fact have been developed, the parties negotiated a Stipulation of Facts regarding RSUs and CSAs, Including the Tax and Accounting Treatment of RSUs and CSAs, with Respect to Debtors' Omnibus Objections to Proofs of Claim. This Stipulation of Facts (or "Fact Stip.") was So Ordered by the Hon. James M. Peck on October 2, 2013, Doc. 40263, and introduced at the hearing as LBHI Ex. 1. References in these Findings of Fact to the Stipulation is to Doc. 40263-1, the Stipulation as attached to Judge Peck's October 2, 2013 Order.  Correspondence with the Court indicates that the Stipulation was done at the instigation of Claimants' counsel.  The parties should be commended for this effort to simplify the issues to be addressed at the Evidentiary Hearing.

overseas employees the CSAs, as a portion of the total compensation for services they performed

as employees (the "<u>RSU/CSA Award</u>").

          4.       The 2008 "Guide to Working at Lehman Brothers" ("the <u>U.S. Employee</u>

<u>Handbook</u>") stated:

> At the Firm's option, a portion of [an employee's] total
> compensation (combined base salary, bonus and other
> compensation) may be payable in the form of conditional equity
> awards (restricted stock units ("RSUs"), stock options, or other
> equity awards) pursuant to the Firm's Equity Award Program.

LEH-RSU 0000300.  The Employee Handbook for UK Employees similarly stated:

> At the Firm's discretion a portion of your total compensation under
> any discretionary bonus award may be made in the form of
> Contingent Stock Awards (CSAs) under the appropriate Lehman
> Brothers' Stock Award Program.

LEH-RSU 0001552.  Moreover, in cases where Lehman had an employment contract with a

Claimant, those contracts provide that at Lehman's discretion, a portion of the employee's

compensation may be or will be paid in RSUs or CSAs.  For example, one contract the parties

stipulated to be typical states:

> At the Firm's option, a portion of your total compensation
> (combined base salary, bonus, and other compensation) may be
> payable in the form of restricted stock units pursuant to the Firm's
> employee Stock Award Program.

Fact Stip. ¶ 2.  Another contract states:

> At the Firm's discretion, a portion of your total 2007, 2008 and
> future years' total compensation (combined base salary, bonus and
> other compensation) will be payable in conditional equity awards
> (restricted stock units and/or other equity awards) pursuant to the
> Firm's employee equity award program as then in effect.

*Id.*

3

5.    The parties attached as Exhibit 3 to the Fact Stip. a brochure entitled "2003 Equity Award Program [for] Senior Vice President," which describes the Program for 2003, including the issuance of and the tax treatment of RSUs and Stock Options (the "2003 U.S. SVP Brochure").  The Court refers to the descriptions in this Brochure because the parties stipulated that the terms were not materially changed during the years 2003 through 2008.  *Id.,* ¶ 4.

6.    As stated in this SVP Brochure, a grant of an RSU or CSA "represent[ed] a conditional right" for an employee "to receive one share of Lehman Brothers common stock five years after the RSU [or CSA] is granted, assuming continued employment with the Firm," subject to the terms of the Lehman Brothers Equity Award Program (the "Program").  *Id.,* ¶ 5. The date that an RSU or CSA is granted is referred to in the Stipulation and here as the "Grant Date."  The date that an RSU or CSA converts to LBHI Common Stock is referred to herein as the "Conversion/Issuance Date."  The Conversion/Issuance Date was a fixed date that Lehman employees could neither accelerate nor defer.  None of the Participants' RSUs or CSAs (other than RSUs issued as Neuberger Berman retention bonuses) had reached their Conversion/Issuance Date at the date this proceeding was commenced.

7.    The terms of the RSU/CSA Program were developed by Lehman and approved by the Compensation and Benefits Committee (the "Compensation Committee") of Lehman's Board of Directors (the "Board of Directors"), including any percentage or amount of the employees' compensation that would be paid in RSUs or CSAs (which varied from year to year) and the Grant Date for the related awards.  Employees could not elect to receive cash instead of the awards, and the terms of the Program could not be changed or varied without approval of the Compensation Committee.  *Id.,* ¶ 10.

4

8.      During the years 2003 through 2008, the years at issue in this hearing, any amount of compensation that was to be paid in RSUs and CSAs was communicated to employees via face-to-face communications, and the general terms for grants of such RSU/CSA Awards were communicated to employees firm-wide via face-to-face communications, conference calls, an internal Lehman computer network, electronic mail, preprinted packets of information containing a "Dear Colleague" letter, a summary of the material terms, and a brochure.  *Id.,* ¶ 13.

9.      Lehman employees were required to participate in the Program by virtue of their employment with Lehman and the implementation of Equity Award Programs by the Board.  *Id.*  The RSU and CSA compensation plan was imposed upon employees firm-wide by Lehman acting unilaterally.  Lehman employees had no decisions to make under the RSU/CSA compensation plan.  There were no election or enrollment forms for them to complete. They could not choose or elect to participate, they had no say in the percentage of RSUs or CSAs they would receive and they could not negotiate or vary the terms.  *Id.,* ¶¶ 10, 13.  Lehman promoted the RSU/CSA plan to employees as a form of deferred compensation in consideration of employees' present services on behalf of Lehman.  Fact Stip., ¶ 11; Declarations of Antoncic ¶ 6, Banchetti ¶ 6, Bareggi ¶ 6, Burke ¶ 7, Casuple ¶ 6, Cohen ¶¶ 4, 10, Das ¶ 6, Dufournier ¶ 6, Hornick ¶ 6, Jacobson ¶¶ 4, 7, 10, Langevin ¶¶ 6, 7, 10, Lawsky ¶ 7, Noble ¶ 7, Parr ¶ 6, Primiano ¶ 6, Sarkar ¶¶ 6, 7, Sebiri ¶ 6, Spero ¶¶ 6-7, Stevens ¶¶ 4, 8, 11, Sweely ¶ 7, Wideman ¶¶ 4, 8, 10.

10.     The parties Stipulation of  Facts also supports Claimants' contention that the RSU/CSA Program had the effect of lowering Lehman's "compensation & benefits ratio." Fact Stip. ¶ 39.  Claimants offered unrebutted testimony that this ratio was a key indicator to

5

rating analysts, and that employees were charged with managing expenses to keep the ratio between 49 and 51%. 4-2-14 Hrg. Tr. at 152:16-154:17. Lehman's documents indicate that if employee compensation had not been deferred then the compensation ratio would have been as high as 57%. Fact Stip. ¶ 39 & Exs. 2. 20 & 21 (Doc. 40261-1, pp. 146 & 148 of 148).

11. Claimants presented the testimony of four witnesses. Three of the four Represented Claimants who testified were employed by Lehman before it started the RSU/CSA Program. Each of these three Represented Claimants testified that there was no such Program when they joined Lehman. They all testified that Lehman began to compensate employees using RSUs and CSAs in approximately 1994 or 1995. 4-1-14 Hrg. Tr. 231:13-15 & 246:11-18 (Fleischman); 297:14-16 & 306:1-8 (Howard); & 4-2-14 Hrg. Tr. 141:18-19, 150:24-151:4 (Krieger). (4-1-14 Hrg. Tr. 246:11-18 (Fleischman), 306:1-3 (Howard), 4-2-14 Hrg. Tr. 150:24-151:4 (Krieger).

12. The uncontroverted testimony of these witnesses was that participation in the RSU/CSA Program was not voluntary, the employee could not choose or negotiate what portion of his or her compensation would be awarded in the form of RSUs or CSAs, and the awarded RSUs and CSAs could not be sold, assigned, transferred, or pledged to secure a loan. 4-1-14 Hrg. Tr. 247:1-248:3 (Fleischman) & 306:11-18 (Howard); 4-2-14 Hrg. Tr. 151:5-10 & 152:3-15 (Krieger). The Court finds this testimony consistent with the documents introduced and credible.

13. Declarations submitted by Claimants who did not testify, also not uncontroverted by Lehman, stated that the decision to pay some of their annual compensation in the form of RSUs and CSAs, and the decision on the portion of the compensation to be withheld or deducted for RSU and CSA grants, were made unilaterally by Lehman each year. Employees

6

had no choice in terms of whether to participate or what portion, *if any*, of their compensation Lehman would deduct and withhold for purposes of RSU or CSA grants. [3]  *See* Declarations of Antoncic ¶ 7, Banchetti ¶ 7, Bareggi ¶ 7, Biraschi ¶ 6; Burke ¶ 6; Casuple ¶ 7, Das ¶ 7, DeJesus ¶ 7; Dufournier ¶ 7, Engel ¶ 6;  Fleischman¶ 6;  Gran ¶ 6; Hornick ¶ 7, Iragorri ¶ 5; Jacobson ¶ 10, King ¶ 6; Krieger ¶ 6; Langevin ¶ 7, Lawsky ¶ 6, Noble ¶ 7, Olivier ¶ 6; Parr ¶ 7, Petrucelli ¶ 6; Primiano ¶ 7, Porter ¶ 6; Sarkar ¶¶ 7, 8, Saronne ¶ 6, Sebiri ¶ 7, Shapiro ¶ 6; Saks ¶ 6; Somma ¶ 6; Spero ¶ 7, Stevens ¶ 11, Sweely ¶ 6, Uvino ¶ 7, Wideman ¶ 10.

14.     Some Claimants declared that Lehman did not obtain their written authorization for the specific deductions and withholdings from their compensation for purposes of granting RSUs or CSAs. *E.g.*, Declarations of Burke ¶ 14, Cohen ¶ 6, Das ¶ 14, Jacobson ¶6, Lawsky¶ 14, Stevens ¶ 7, Sarkar ¶ 8, Sebiri ¶ 19, Spero ¶ 14, Sweely ¶ 14, Wideman ¶ 7. Lehman certainly did not provide full disclosure of what would happen to the money withheld from Claimants' earned Total Compensation in the form of RSUs and CSAs in the case of a bankruptcy since Lehman removed a 510(b)-Subordination clause and all references to bankruptcy from the RSU and CSA plan documents since 2005. Declarations of Antoncic ¶ 14, Banchetti ¶ 13, Bareggi ¶ 13, Burke ¶ 14, Casuple ¶ 14, Cohen ¶ 20, Dufournier ¶ 13, Hornick ¶ 14, Jacobson ¶ 19, Langevin ¶ 16, Lawsky ¶ 14, Noble ¶ 13, Parr ¶ 13, Primiano ¶ 15, Sarkar ¶ 16, Saronne ¶ 13, Sebiri ¶ 19, Spero ¶ 14, Sweely ¶ 14.

---

[3] Although at the hearing the Court expressed the view that Declarations by non-appearing witnesses often are "written by lawyers" and "are not the words of claimants," (4-3-14 Hrg. Tr. at 9:19-24), at the same time, the Court recognizes the administrative difficulty of hearing testimony from the hundreds of active Claimants who were grouped together in this multi-omnibus objection litigation by Debtors' counsel and that the Evidentiary Hearing Procedures Order the parties negotiated for this hearing preserved for Lehman the ability to cross examine any Claimant who filed and served a Declaration.  Evidentiary Hearing Procedures Order ¶ 10, Doc. 40291 (entered Jan. 16, 2014).  Lehman did not exercise this reserved right of cross-examination; nor did Lehman present Declarations of Lehman officers competent to offer testimony.  Accordingly the Court finds Claimants' Declarations as unchallenged and credible.

15.     Lehman has argued that Claimants' participation in the RSU/CSA

program was voluntary because they accepted the terms of the program in accepting a job at

Lehman.  *E.g.*, Lehman Reply at 20.  However, of the four witnesses who testified for the

Represented Claimants, three were employed by Lehman prior to the institution of the RSU/CSA

compensation program, so RSUs were not part of the package when these employees joined.  4-

1-14 Hrg. Tr. 246:11-246:25 (Fleischman testified that she was "quite certain" there was no RSU

program at Lehman when she went to work there in 1993, and she was required to participate

when the program was initiated); 4-1-14 Hrg. Tr. 299:14-18, 306:1-7 (Howard joined Lehman in

1993 and the RSU program was commenced around 1996);  4-2-14 Hrg. Tr. 141:18-19; 150:24-

151:4 (Krieger testified that joined Lehman in 1990 and RSUs were first issued to her in 1994);

157:2-158:18 (Krieger testimony:  RSU program was not attractive to her because she felt

handcuffed and because the "decisions around my money were going to be managed by

somebody where I had no control of").

16.     The one witness who was hired after the RSU/CSA compensation program

was instituted was Michael Gran, who had left Lehman Brothers earlier and returned at

Lehman's request, "to set up proprietary asset management because when [he] had left Lehman

Brothers, they didn't have asset management."  Mr. Gran testified that "the sort of compensation

schemes, CSAs or not . . . had no relevance.  It was only about furthering my career."  4-1-14

Hrg. Tr. 224:7-22.

17.     A *pro se* witness, Paul Shotten, testified that he also did not come to work

for Lehman Brothers because of the enticement of the RSU/CSA program or being an equity

holder:

> [H]ad I been given option to be paid in cash I could have used that cash to go out
> and buy Lehman equity how I wanted. It traded freely on the stock exchange

8

every business day.  I didn't uproot my family from England and travel 3,000 miles in order to become a Lehman stockholder, I came for employment reasons, and the fact was that part of my compensation [f]or employment was withheld via this promise to convert it to equity. That promise[,] Lehman failed to deliver on that promise because the firm went bankrupt.

4-2-14 Hrg. Tr. 67:16-25.

18.     Like these five witnesses, in their declarations Claimants uniformly stated that they were not attracted to come to or continue work at Lehman by the RSU/CSA program, but rather to further their career, jobs, and livelihoods.  The RSU/CSA compensation program was always within Lehman's discretion and it was always the employment Claimants were seeking, not an investment opportunity.  Antoncic ¶¶ 10–11, Banchetti ¶¶ 9–10, Bareggi ¶¶ 9–10, Biraschi ¶¶ 7, 9-11, Burke ¶¶ 10–11, Casuple ¶ 9, Cohen ¶¶ 13–14, Das ¶¶ 10–11, D'Amadeo ¶¶ 5-6, 8-10, DeJesus ¶¶ 8, 10–12, Dufournier ¶¶ 9–10, Engel ¶¶ 7, 9-11, Hornick ¶¶ 10–11, Howard ¶¶ 8, 12-14, Iragorri ¶¶ 6-11, Jacobson ¶¶ 12, 13, King ¶¶ 7, 9–11;  Langevin ¶ 10, Lawsky ¶¶ 10–11, McCully ¶¶ 6, 8-10; Noble ¶¶ 9–10, Olivier ¶¶ 6, 11,18, 22, Parr ¶¶ 9–10, Petrucelli ¶¶ 6, 8-10, Porter ¶¶ 6, 9-10, Primiano ¶¶ 10–11, Sarkar ¶¶ 11–12, Saronne ¶¶ 9–10, Sebiri ¶¶ 10–11, Shapiro ¶¶ 6-7, 9-11, Spero ¶¶ 10–11, Somma ¶¶ 6–7, 9–11, Stevens  ¶¶ 14-16, Sweely ¶¶ 10–11, Uvino ¶¶ 8, 10–12, Wideman ¶¶ 12–13.

19.     Claimants also have noted that what they would have lost by leaving Lehman, essentially giving up their deferred compensation because of not meeting the obligation of continued employment and satisfying the employment-related restrictions necessary for conversion, was simply too great a cost.  As witness Howard testified, the withheld compensation deferred through the use of RSUs and CSAs "were very effective handcuffs . . . ." 4-1-14 Hrg. Tr. at 318:5-10.

9

19.1.     Witness Gran stated that he would have had to give up approximately $1.2 million in bonus compensation withheld for Contingent Stock Awards.  4-1-14 Hrg. Tr. at 219:22-220:4.

19.2.     Fleischman said if she had gone to work for a competitor "the deferred compensation I would have left behind" was $3.4 million. It would have been "a difficult option because of the restriction of the good leaver policy over time." 4-1-14 Hrg. Tr. 256:15-17.

19.3.     Howard said he "could have left Lehman and walked away from $1.9 million" and he "could have gone to another firm, but . . . they would have to have come close to matching that otherwise it would have been an uneconomic proposition." 4-1-14 Hrg. Tr. 313:20-314:7.

19.4.     Howard explained how the RSU program worked as a retention device.  When questioned on cross examination that going to another firm "was an option you had, right?" he explained:

> [T]hat was a limited option because another firm would look at that amount of money that I would have to be paid and that would put them off an employee of Lehman Brothers because the -- you know, the money that had been held back that they -- an employee would ask another  alternative employer to match would be very substantial.
>
> And that's why they were effectively hand – they were very effective handcuffs because our competitors knew that if they were going to try and bid away our best people, they were going to have to pay a lot of money to do that. So effectively it became a very effective way of keeping people from leaving the firm.  [4-1-14 Hrg. Tr. 317:20-318:10.]

19.5.     Shotton testified that his "skill set is highly technical [and] quite rare,"  and that there was "a fairly limited demand" for it.  4-2-14 Hrg. Tr. 41:17-20.

> And out of leaving that behind, leaving -- obviously over the -- over the course of the four and a half years my compensation at Lehman

10

accumulated to, you know, four and a half million dollars or so of RSU --
RSUs left on the table, I would have to walk away from that.

The chances of finding another equivalent job as head of market risk
somewhere else pretty small.

The chances that I could persuade another firm to pay out the
compensation that I was leaving on the table at Lehman was -- you know,
was slim to none.

So whilst theoretically it's correct to say I had the option to walk, as a
practical matter I didn't really have an option to walk, and that's why I
stayed at the firm.

4-2-14 Hrg. Tr. 42:4-16.

19.6.    For Krieger there were personal costs.  She was recently widowed
and raising two children.  "I was in no position to go to another firm and try to establish
my credibility and to try and work and build a new future.  Because at that point, I cared
about day-to-day living with my kids, and making sure they had the right caregiver when
I went to work. . . .   [T]he thought of going anywhere was beyond frightening to me."
Aside from the RSU program, the people at Lehman had been supportive.  4-2-14
163:18-164:8.  The cash cost to her to leave Lehman would have been $164,000.  4-2-14
Hrg. Tr. 172:19-173:12.

20.    Based on the foregoing, the Court finds that Lehman's program to
withhold a portion of the bonuses it declared for its employees and to award RSUs and CSAs in
lieu thereof was a program in which participation by Lehman's employees was involuntary,
except to the extent that Claimants sought employment with Lehman and were told that
compensation in the form of RSUs and CSAs was part of the overall employment package.  As
discussed below in the Conclusions of Law, the extent to which courts are to view the act of
accepting employment as voluntary participation is limited and not applicable here.  For Lehman

11

to establish as a fact that employees voluntarily participated in the RSU/CSA program by

continuing to work at the company, Lehman would have had to introduce its own evidence that

the program was not an effectively designed employee retention device.  (*See* Howard and

Shotten testimony cited above.)  Lehman has not introduced evidence for the Court to make that

finding.

### B.  Lehman's Speculation on Employee Motivation is not Credible Evidence

21.    Lehman has cited to the Court documents stating that the purpose of the

RSU and CSA awards was to provide employees "with a direct ownership interest in the Firm,"

an "incentive to think and act like an owner," and to allow employees to "share in the Firm's

financial success over time . . . ."  Lehman Op. Br. at 17.  While the documents provide evidence

of what Lehman published to its employees and possibly some evidence of Lehman's intention

in promulgating the RSU/CSA program, the arguments of Lehman's counsel as to employee

motivation are unsupported by the documentary evidence and are essentially testimony not based

on first-hand knowledge and not credible.  For example, counsel is not competent to state that the

RSUs and CSAs "served the function of giving employees an incentive . . . and to stay motivated

. . . ."  *Id.*  Lehman's counsel also argued that the RSUs and CSAs "motivated" employees "to

play a significant role in the success – or failure – of Lehman Brothers."  *Id.*  Once again,

however, counsel is not competent to offer testimony on whether employees were motivated.

22.    Claimant Karen Simon Krieger effectively pointed this out by testifying

that she felt and acted like an owner before the RSU program was started because of her work

ethic, and that Lehman's counsel had misquoted her by arguing in its brief that it was the RSUs

that made her think and act that way.  *Compare* 4-2-14 Hrg. Tr. 165:15-166:21 *with* Lehman Op.

Br. at 17.

23.    Lehman also has claimed, through counsel's argument, that Claimants (as well as Lehman) "originally intended" to treat RSUs and CSAs "as equity of the firm."  Lehman Op. Br. at 2.  Once again, Lehman offered no evidentiary support for this proposition.  Lehman had the opportunity to elicit from Claimants' witnesses admissions to the effect that the RSUs and CSAs constituted equity before conversion, and Lehman could have offered testimony or declarations from its own present or former employees.  Instead, the Court has only the Claimants' testimony and declarations that they did not view the RSUs and CSAs as constituting equity before shares were actually issued.  Claimants also point to documents in which Lehman cautioned that they had no rights as stockholders until they became record holders of stock, and that their rights as grantees of RSUs and CSAs were no better than those of a general creditor. Declarations of Antoncic ¶ 9, Banchetti ¶ 8, Bareggi ¶ 8, Biraschi ¶¶ 8, 11, 13, Burke ¶ 9, Capsule ¶ 9–11, Cohen  ¶¶ 11, 12, Das ¶ 9, D'Amadeo ¶¶ 7, 12, DeJesus ¶¶ 9, 12, 14, Dufournier ¶ 8, Engel ¶¶ 10, 11, 13, Fleischman ¶¶ 8, 10-12, Gran ¶¶ 8, 10, 11, Hornick ¶ 9, Iragorri ¶¶ 7, 10, 12, Jacobson ¶¶ 11–12, King ¶¶ 8, 10, 12, Krieger ¶¶ 8, 10, 11, 13, Langevin ¶ 8, Lawsky ¶ 9, Noble ¶ 8, Olivier ¶¶ 8, 10, 11, 13, Parr ¶ 8, Petrucelli ¶¶ 7, 9, 10, 12, Primiano ¶ 9, Porter ¶¶ 8, 9, Sarkar ¶ 10, Saronne ¶ 8, Saks ¶¶ 12-13, Shapiro ¶¶ 8, 11, 13, Sebiri ¶ 9, Somma ¶¶ 8, 10, 13, Spero ¶ 9, Stevens ¶ 12, 18, Sweely ¶ 9, Uvino ¶¶ 9, 12, 14, Wideman ¶¶ 11, 14.

24.    Claimants believed they had no real equity in Lehman by virtue of holding RSUs or CSAs until those instruments converted to actual stock.  *See* Declarations of Casuple ¶ 9, Cohen  ¶¶ 7, 11, 12, 19, Jacobson ¶¶ 7, 11-13, 18, Langevin ¶¶ 11, 13, 14, Stevens ¶¶ 8, 15, 16, 20, Sarkar ¶¶ 12, 14, Wideman ¶¶ 8, 16.

25.    At the time of its Petition, and in later amendments, Lehman did not treat, and in fact told its employees not to treat, their RSUs and CSAs as equity.  To the contrary, the

13

Claimants' testimony, at the hearing and in declarations, was that Lehman provided pre-populated Proof of Claim forms listing the RSU and CSA claims as Schedule G executory contract claims and told its employees to file their RSU and CSA claims as contract claims.  4-1-14 Hrg. Tr. at 233:1-235:19 (Fleischman testimony) & 296:12-297:1 (Howard testimony); 4-2-14 Hrg. Tr. at 31:3-7 (Shotten testimony); Declarations of Casuple ¶ 12, Cohen ¶ 17, DeJesus ¶¶ 15-18, Fleischman ¶¶ 13-14, Jacobson ¶ 17, Krieger ¶¶ 14-15, Langevin ¶ 14, Olivier ¶¶ 14-17, Petrucelli ¶¶ 13-14, Sarkar ¶ 15, Sebiri ¶ 14, Shapiro ¶¶ 14-15, Somma ¶¶ 14-15, Stevens ¶ 19, Wideman ¶ 15.

26.    Lehman does not dispute that Schedule G to its Schedules and Statement of Financial Affairs in this case listed on 413 pages over 22,000 RSU and CSA agreements as executory contracts and listed Claimants as parties to those executory contracts and that these RSU and CSA agreements were never removed in subsequent amendments of the schedules the Debtors filed with the Court.

27.    During closing argument the Court permitted Lehman's principal attorney to "get a lifeline" from Lehman's bankruptcy counsel (4-3-14 Hrg. Tr. 42:23), however, the Court did not anticipate that his lifeline counsel would offer factual testimony on how Lehman handled the preparation of schedules for the Debtors and the proofs of claim for the Claimants and 22,000 other employees.

> MR. LEMONS: So this is just part of the massive administrative effort of trying to sort things into buckets, you know, for the debtors to try to figure out what to deal with that happened early in the case. The proof of claim forms were, as I'm sure Your Honor, you know, can guess, were electronically generated by Epiq, and it was just a computer run, and it printed those. Those were sent out to all of the potential claimants.
>
> THE COURT: Right.
>
> MR. LEMONS: And they –

14

THE COURT: Okay.

MR. LEMONS: -- filled them in. It didn't guarantee them they had a claim, it frankly didn't prejudice them, because these people obviously submitted their claims.

THE COURT: Right.

MR. LEMONS: That's really the sole import and reason why these things ended up marked as, you know, being on Schedule G.

4-3-14 Hrg. Tr. at 43:24-44-16.

28.    Setting aside the unusual circumstances under which this explanation is offered, essentially testifying as to the Debtors action at the time of the Petition (and implicitly later amendments), it does not rebut the plain fact that Lehman told many of the Claimants (indeed counsel's statement suggests Lehman told *all* RSU and CSA holders) that their RSU and CSA claims were contract claims of creditors, not equity.  This clearly contradicts Lehman's claim that over the prior five years at issue here Lehman and Claimants "originally intended" to treat RSUs and CSAs "as equity of the firm."  Lehman Op. Br. at 2.[4]

29.    Lehman also has claimed, once again through the argument of counsel, that the RSUs gave employees "a sense of ownership."  Lehman Op. Br. at 5.  But the only support cited for counsel's view is Lehman's own documents.  No evidence was offered that the

---

[4]  The more likely explanation is that the evolution in Lehman's approach reflects the shift from a debtor v. creditor approach to a creditor v. creditor approach that happens in bankruptcy, with the post-petition Lehman pursing the priorities of its controlling major creditors while the petitioning Lehman acknowledged its responsibility as the employer of 22,000 RSU holders.  *See* E.Warren, *Bankruptcy Policy*, 54 U. Chi. L. Rev. 775 , 785-86 (1987) ("bankruptcy disputes are better characterized as creditor-versus-creditor, with competing creditors struggling to push the losses of default onto others").  Lehman's briefing in fact acknowledges that it is seeking to serve the interests of the creditors of its estate (Lehman Reply at 40), and the change in position from the original petition suggests that the large creditors who now control Lehman are those being served at the expense of smaller creditors like the former employees.  Pro se witness Shotten, a former senior executive at Lehman, expressed a similar view. 4-2-14 Hrg. Tr. 54:6-55:5.

15

employees shared with Lehman this purported understanding of a sense of ownership; nor was any evidence elicited on cross examination.[5]  Objectively viewed, however, Lehman's own documents cannot be said to give employees this sense of ownership.  Plan documents cautioned employees that "[t]he grant of an award shall not be construed as giving a Participant the rights of a stockholder of Common Stock unless and until shares of Common Stock have been issued to Participants pursuant to Awards hereunder."  Employee Incentive Plan amended February 19, 2003, §13(b) (Cl. Ex. 73); *see also* 2005 Stock Incentive Plan § 8 (LBHI Ex. 116); Stock Incentive Plan amended Nov. 8, 2007 ¶ 13(b) (LBHI Ex. 118).   The Incentive Plans further provide in § 16 that "nothing herein contained shall give any Participant any rights that are greater than those of a general creditor of the Company."  *Id.*

30.    Further, a trust established in 1997 to hold some shares for eventual delivery upon conversion of RSUs (the "RSU Trust") qualified any rights employees could make thereunder by stating that "Any rights created under the Plans and this Agreement shall be mere

---

[5] During the hearing the Court asked witness Krieger whether Lehman could have thought that the RSUs were an incentive.  Krieger did not agree:

> THE COURT:   So that it's possible that, you know, . . . that Lehman thought that they could get people to work 18 hours a day like you did naturally, and like I do naturally, that they could get some of those people to work harder and produce, and produce, and produce so that they could get those RSUs and ride that price up and become rich, right?
>
> THE WITNESS:   I would've left it on the table.
>
> THE COURT:   I hear you.
>
> THE WITNESS:   No interest.
>
> THE COURT:   Okay. All right.

4-2-14 Hrg. Tr. 167:22-168:8.

unsecured contractual rights of Participants against the Company."  RSU Trust, ¶ 1(e), Claimants

Exs. 72 & 74; LBHI Ex. 161.

31.    Lehman has represented to the Court that the RSU Trust "gave RSU

holders the ability to direct voting" of shares held in the Trust "based on the proportion of the

number of RSUs held by the employees."  Lehman Op. Br. at 14.  The Court notes that some of

the plan documents describing the RSU Trust only have language that "[t]hrough the Trust,

[claimants] *may be able to* direct the exercise of voting rights."  Cl. Ex. 070, LEH-RSU 0000277

(emphasis added).  Other Lehman documents submitted by Claimants show that there was not

one share held in the Trust for every RSU/CSA outstanding.  *See* Cl. Ex. 71, LEH-RSU 000757

(as of November 2005, there were 60 million RSUs outstanding but only 35 million shares in the

Trust).

32.    The witness testimony was that there was no voting of stock by holders of

RSUs and CSAs.  Michael Gran testified:  "No, I don't remember being asked to vote. . . .  I've

never been given the option to do that on an annual basis.  I would have remembered that."  4-1-

14 Hrg. Tr. at 219:3-13.  Witness Wendy Fleischman similarly had no knowledge of ability to

vote shares through the RSU Trust.  253:13-253:20.   One declarant stated that there were no

voting rights because the exercise of such voting rights would have triggered personal income

tax liability under German law.  Olivier Declaration ¶ 12.  The other declarations submitted by

non-testifying witnesses correctly point out that Lehman has not documented that there was

actually a solicitation of proxies or any procedure for permitting the exercise of voting rights.

Declarations of Biraschi ¶ 10, Cohen ¶ 15, D'Amadeo ¶ 9, DeJesus ¶ 11, Engel ¶ 10,  Gran ¶ 10,

Iragorri ¶ 10, Jacobson ¶ 15, King ¶ 9, Krieger ¶ 10, Langevin ¶ 12, Petrucelli ¶ 9, Porter ¶ 9,

Richman ¶ 10, Shapiro ¶ 10, Somma ¶ 10, Stevens ¶ 17, Uvino ¶ 11.

17

33.     This is another instance where Lehman had an opportunity to present

evidence in response to the declarations or Claimants' Reply, or to elicit testimony on cross-

examination, and did not do so.  The Court cannot give weight to the Lehman's claim that the

holders of RSUs and CSAs *in fact* could exercise voting rights.

34.     These documents did not provide Claimants with any reason to believe

that they should have the "sense of ownership" Lehman claims they had.  In fact, Claimants

uniformly rejected Lehman's effort to impute this intent to them, basing their understanding on

Lehman's prior statements that they had no rights as a stockholder before stock was actually

issued, and further stated that they viewed the RSUs and CSAs as providing "nothing but

Lehman's contract promise to pay us the balance of the bonus Lehman had previously declared. .

. ." Declarations of Biraschi ¶ 12; Cohen ¶ 15; D'Amadeo ¶ 11; DeJesus ¶ 13; Engel ¶ 12;  Gran

¶ 12; Iragorri ¶ 11; King ¶ 11; Krieger ¶ 12; Olivier ¶ 11; Petrucelli ¶ 11; Porter ¶ 11; Shapiro ¶

12; Somma ¶ 12; Uvino ¶ 13.

**C.  <u>Lehman Recognized the Claimants' Status as Creditors</u>**

35.     Awards of RSUs and CSAs were made to employees pursuant to the

Lehman employee incentive plan then in effect.  For the subject years, the incentive plans were

the Lehman Brothers Holdings Inc. Employee Incentive Plan as amended through February 19,

2003 (Cl. Ex.  73), Lehman Brothers Holdings Inc. 2005 Stock Incentive Plan (LBHI Ex. 116)

and  Lehman Brothers Holdings Inc. Employee Incentive Plan dated November 8, 2007 (LBHI

Ex. 118), each of which were incorporated into the corresponding RSU/CSA grant agreements.

36.     The terms of the awards provided that, at a date five years after the grant

(the "Grant Date"), subject to their employment related conditions, the RSUs and CSAs would

be converted into LBHI common stock (the "Common Stock") of Lehman's publicly-traded

18

holding company parent. Before conversion, the RSUs and CSAs could not be "sold, traded, pledged, or assigned before conversion," except to heirs upon death. Fact Stip., Ex. 3 at 1 & 10; (p. 34 & 45 of 148). Following conversion, the Common Stock delivered to holders of RSUs/CSAs was freely tradable. *Id.* at 1 (p. 34 of 148). *See also,* Anoncic ¶ 9, Bareggi ¶ 8, Burke ¶ 9, Cohen ¶ 11, Das ¶ 9, Dufournier ¶ 8, Jacobson ¶ 11, Langevin ¶ 8, Parr ¶ 8, Banchetti ¶ 8, Lawsky ¶ 9, Noble ¶ 8, Primiano ¶ 9, Sarkar ¶ 10, Saronne ¶ 8, Sebiri ¶ 9, Spero ¶ 9, Stevens ¶ 12, Sweely ¶ 9, Wideman ¶ 11.

37.    Witness Gran, as an employee who had left Lehman to start his own business and later was hired back by Lehman, testified that in the market among investment banks and financial institutions the withheld compensation was treated as a cash obligation until conversion. Gran also testified that, based on his experience as "someone who received the stock one point and later did not," the RSU and CSA awards were not treated as equity. When employees changed jobs the awards were "all negotiable based on cash values . . . ." 4-1-14 Hrg. Tr. 225:18.

> I understand also the way the other organizations treated this value[.]  [M]any people were moving from bank to bank.  I can tell you it was not treated as equity at any point in time.  *It was treated as deferred compensation, which somebody would be losing.*  Or even in an organization like Lehman Brothers, if the stock cost went down after giving an award like that, in most cases, they would try to make adjustments for compensation.  In the year that happened, they already make up for that.  Because when you (sic) do that, everyone thought of it as deferred compensation.

4-1-14 Hrg. Tr. 225:18-226:7 (emphasis added).

38.    Based on a review of the witness testimony and declarations, most of the Claimants were Lehman employees who were compensated with an annual salary (in biweekly installments) and an annual bonus (referred to here as "salaried employees").  (Employees compensated on a commission or production basis are considered below.)  The testimony

19

presented to the Court was that the bonus portion of an employee's compensation could range

from 80% for senior employees to 10% for lower-ranking employees.  4-1-14 Hrg. Tr. at 214:13-

24 (Gran) & 237:8-237:24 (Fleischman); 4-2-14 Hrg. Tr. 173:2-12 (Krieger); *see also*

Declarations of Antoncic ¶ 3, Banchetti ¶ 3, Bareggi ¶ 3, Burke ¶ 3,  Casuple ¶ 3, Das ¶ 3,

Dufournier ¶ 3, Hornick ¶ 3, Langevin ¶ 3, Lawsky ¶ 3, Noble ¶ 3, Parr ¶ 3, Primiano ¶ 3, Sarkar

¶ 3, Saronne ¶ 3, Sebiri ¶ 3, Spero ¶ 3, Sweely ¶ 3.

39.    Bonuses were declared to salaried employees in December of each year,

shortly after the end of Lehman's November 30 fiscal year.  The bonus was presented to the

employee as compensation for the employee's services rendered in the fiscal year just ended.

Lehman and the Represented Claimants have stipulated that employees were paid on a "total

compensation" basis, and that the employee's total compensation included base salary, overtime,

bonus payments, and compensation in the form of RSUs and CSA (referred to as "conditional

equity awards").  Fact Stip. ¶ 15.

40.    Typically, a salaried employee based in the United States was given at or

near year-end a standard form document prepared by LBHI entitled "200X Total Compensation

Statement" (with the X being the year for which the bonus was declared).  In these statements

Lehman set forth the employee's total compensation for that year, which was stated to include a

salary and the amount that had been declared as a bonus, and also stated the portion of the

declared bonus to be paid in RSUs or CSAs.  The following is an example of the information

contained in a Total Compensation Statement issued for an employee in the United States during

the years 2003 through 2008.  The line items listed under "Compensation Type" were:

| | |
|---|---|
| Annualized Salary | $200,000 |
| Bonus | $900,000 |
| TOTAL COMPENSATION | $1,100,000 |

Lower on the page, the employees were provided with a "Payment Schedule" showing the

amount of the bonus for which RSUs were to be allocated.  The parties stipulated to the

following as a typical presentation for salaried employees (Fact Stip. ¶ 15.)

| | |
|---|---|
| Bonus | $900,000 |
| Less RSUs | ($235,000) |
| | |
| Total Cash Payment (Before Taxes) | $665,000 |

Based on the testimony presented to the Court, the RSU portion of an employee's declared bonus

was between 20 to 40% for senior employees and 15 to 20% for lower-ranking employees. ((4-1-

14 Hrg. Tr. at 238:1-238:21 (Fleischman); 4-2-14 Hrg. Tr. at 173:5-9 (Krieger)).

      41.    These annual compensation statements described the value of the withheld

compensation in cash.  Documents entitled equity award statements provided to employees also

described their cumulative awards in dollar terms, measuring the value of the award by reference

to the dollar amount withheld from the employee's bonus at the time of the grant.  4-1-14 Hrg.

Tr. at 245:13-245:23 (Fleischman), discussing Fleischman Decl., Exh. A, Doc. 43472, at p. 10 of

11.

      42.    Salaried employees stationed overseas during the years 2003 through 2008

were provided the similar information in a "Total Compensation Statement," but in a slightly

different format.  Those compensation statements contained a "Total Compensation Summary"

with the following information:

| | GBP |
|---|---|
| Paid Salary | 100,000 |
| Total Bonus | 134,600 |
| Total Compensation | 234,600 |
| Total Bonus | 134,600 |
| Total Equity Award | 31,953 |
| Net Bonus Award | 102,647 |

Fact Stip. ¶ 16.  The testimony provided to the Court by claimant Michael Gran, who was

employed by Lehman in London, was that his salary was about 36% of his total compensation

(4-1-14 Hrg. Tr. 216:17-22), and that of his total compensation of 377,325 British Pounds,

65,089 British Pounds were described as equity awards, about 17.25 percent of his total

compensation.  4-1-14 Hrg. Tr. 227:3-24; CLX 089,  p. 3 of 4 (Gran's Proof of Claim).

           43.      A Lehman employee who was compensated on a commission or

production basis ("production-based employees") had a portion of his/her Total Sales

Compensation (based on gross commissions) allocated to a future grant of RSUs.  Typically,

each production-based employee was either given a compensation statement monthly (4-1-14

Hrg. Tr. 298:14-22 (Howard)) or could access the statement on an internal Lehman website

called "LehmanLive" (Fact Stip. ¶ 17).  As witness Nicholas P. Howard testified, explaining his

own compensation statement as attached to his Proof of Claim, the compensation statement

identified the employee's total "Gross Production" per month (4-1-14 Hrg. Tr. 298:24-299:6),

the percentage of the Gross Production that was to be paid to the production-based employee

(299:7-12), and the dollar amount of this portion of Gross Production that was declared as the

employee's "Total Sales Compensation" (4-1-14 Hrg. Tr. 299:18-21).  Mr. Howard further

testified that the Total Sales Compensation number then was divided into two elements, the first

being "what I received at the end of each month on a gross basis before taxes," and the second

being "the cash that was held back that would be held for the next five years and would then be

used to buy the restricted stock units, which would then convert into stock."  (4-1-14 Hrg. Tr.

299:13-300:4.)

           44.      In explaining the way Lehman handled the cash commissions earned by

production-based employee (in this case himself), Mr. Howard testified:

> The way this worked was that . . . in that month I received 13 percent of the total production . . . . I would generate 719,000 of commissions for Lehman. Lehman would pay me 13 percent of that, which totaled the cash -- which was the cash commissions and also the line which is known as equity accrual calculated. That was also cash commissions, but it was being held over for the next five years until conversion date. But it was . . . real cash . . . that came to Lehman and then I got a percentage of it. . . . And then Lehman held a smaller percentage of that for the five-year period.

Testimony of Nicholas P. Howard, 4-1-14 Hrg. Tr. 300:6-22. Mr. Howard's testimony was that approximately 30% of his cash commissions was denominated "equity accrual calculated" and reserved for later purchase of RSUs and. 4-1-14 Hrg. Tr. 313:4-11. Mr. Howard's explanation of Lehman's form of Compensation Statement for production-based employees was consistent with the parties' stipulated facts. Fact Stip.¶ 17. The declaration testimony of Claimants who were production-based employees was consistent with Mr. Howard's testimony. *E.g.*, Cohen ¶ 3, D'Amadeo ¶¶ 3–6; Jacobson ¶¶ 3–5, Petrucelli ¶¶ 3–6, Stevens ¶¶ 3–5, Wideman ¶¶ 3–5.

45.    Near the end of each fiscal year through and including 2007 (but excluding fiscal year 2008), the total amount of the Equity Accrual Calculated for each of the pay periods in that fiscal year was typically awarded to the employee in the form of RSUs, with the number of RSUs based on the total Equity Accrual Calculated divided by the price of the RSUs on the Grant Date. Fact Stip. ¶ 18.

46.    In fiscal year 2008, for all monthly pay periods prior to September 2008, a portion of the compensation for production-based employees accrued as part of the Equity Accrual Calculated line item on the compensation statement. No "Equity Accrual" was calculated for the months September through November of that fiscal year due to Lehman's Petition being filed in September.

47.    The terms of the awards under the RSU and CSA compensation plan provided that, if the grantee of the RSUs and CSAs continued to be employed and satisfied

various employment-related conditions, five years after the grant date the RSUs and CSAs would

be "converted" to stock that would be issued by LBHI, Lehman's publicly-traded holding

company parent.  As previously noted, before conversion, the RSUs and CSAs could not be

"sold, traded, pledged, or assigned before conversion," except to heirs upon death.  Fact Stip.,

Ex. 3 at 1 & 10; (p. 34 & 45 of 148).  Following conversion, the Common Stock delivered to

holders of RSUs/CSAs was freely tradable.  *Id.* at 1 (p. 34 of 148); Fact Stip. ¶ 6.

48.     The conversion of RSUs and CSAs and receipt of LBHI common stock

(other than RSUs issued as Neuberger Berman retention bonuses) was subject to the RSU/CSA

grantee's fulfillment of certain employment-related conditions during this five-year period.

Lehman employees were advised that if these conditions were not fulfilled, the RSUs or CSAs

would be forfeited and canceled.  The parties have stipulated to ample grant agreements from

2003 through 2007 identifying the employment-related conditions applicable to those grants.

Fact Stip. Ex. 4 at LEH-RSU 0015051-54, Ex. 5 at LEH-RSU 0014329-32, Ex. 6 at LEH-RSU

0000108-111, Ex. 7 at LEH-RSU 0017757-61, Ex. 8 at LEH-RSU 0000278-82, Ex. 9 at LEH-

RSU 0007228-31, Ex. 10 at LEH-RSU 0001054-57, Ex. 11 at LEH-RSU 0001082-85, Ex. 12 at

LEH-RSU 0019153-58 and Ex. 13 at LEH-RSU 0000263-68.

49.     The Court notes that employment agreements and employee handbooks

did not provide that Lehman's Total Compensation obligation to employees was fully satisfied

for any year upon the grant or delivery of RSUs/CSAs, or that Lehman's alternative contractual

obligation for payment of a portion of Total Compensation in cash was released or extinguished

upon the grant or delivery of RSUs/CSAs.  Fact Stip., ¶ 2.  Nor did Lehman provide declarations

or testimony at the hearing to support such an interpretation of its compensation plan.  It appears

to the Court that grants of RSUs/CSAs represented a promise of payment of compensation in the

24

future, upon "Conversion" to LBHI Common Stock.  *Id.*, ¶ 5.

50.    Lehman employees were advised that, as a condition to the conversion of their RSUs and CSAs, they had to fulfill certain employment related conditions (not performance based) set forth in the RSUs/CSAs, and if the conditions of the RSUs/CSAs were not fulfilled, the RSUs or CSAs would be forfeited and cancelled.  Fact Stip., ¶ 7. *See also* Casuple ¶ 8, Cohen  ¶ 11, Stevens ¶ 12, Langevin ¶ 8, Sarkar ¶ 10, Wideman ¶¶ 9, 11. As of the Petition Date, none of the Claimant Participants had forfeited their RSUs or CSAs granted to them during the years 2003-2008 and they remained outstanding.  Fact Stip., ¶ 8.   As of the Petition Date, there had been no breach by Lehman in its performance obligations under the RSUs/CSAs for years 2003-2008.  As of the Petition Date, none of Claimants' RSUs or CSAs granted during years 2003 through 2008 had reached their Conversion and there had been no payment of LBHI Common Stock to any Claimants with respect to the services for which the RSUs/CSAs for years 2003 through 2008 had been granted.  *Id.*, ¶ 1.

51.    The unfairness of the mandatory "handcuffing" of employees was exacerbated in 2006 when Lehman unilaterally changed the terms of the RSU and CSA programs, removing the Competitive Activity requirement for forfeiture, such that any departure from the firm for competitive activity or otherwise (for example, to work for a charity, travel the world, or retire completely) would result in a loss of the RSUs or CSAs and effectively a forfeiture of the wage amounts.  4-1-14 Hrg. Tr. at 256: 9-257:7 (Fleischman Test'y); *see also* Declaration of Sarkar ¶ 11.

### D.  The RSU Trust

52.    As noted earlier, Lehman has provided documents describing the establishment of a trust in 1997 to hold some shares for eventual delivery upon conversion of

RSUs (the "RSU Trust").  RSU Trust, ¶ 1(e), LBHI Ex. 161.

53.    The payment mechanism under the RSU Trust was effectuated through share payments of LBHI publicly traded Common Stock, or cash from the RSU Trust to Participants, including Claimants, conditioned on Lehman giving an instruction schedule to the Trustee.  Payment through conversion to shares of LBHI Common Stock or cash was not self-effectuating.  Section 2 of the RSU Trust was entitled "Payments to Participants," and "Payment" was defined as "a payment from the Trust to a Participant."

54.    The RSU Trust, which was an unfunded arrangement, recognized Lehman's "liability" to Participants as general unsecured creditors based upon its unsecured promise of compensation.  RSU Trust, p. 1.  According to the RSU Trust, the Participants held "unsecured contractual rights" against Lehman, and trust assets were "subject to the claims of the Company's general creditors in the event the Company becomes insolvent."  In the event of insolvency of the Company, the RSU Trust provided "the Trustee shall discontinue Payments and shall hold the assets for the Trust for the benefit of the Company's general creditors. Nothing in this Agreement shall in any way diminish any rights of Participants to pursue their rights as general creditors of the Company with respect to benefits due under the Plans or otherwise."  RSU Trust, ¶ 3(b)(3).  Participants had no ownership interest in or better rights to the assets of the RSU Trust: "Participants shall have no preferred claim on, or any beneficial ownership interest, in, any assets of the Trust.  *Id.* ¶ (1)(e).  The Trust assets were held subject to the claims of all of the Company's general creditors.

55.    The RSU Trust assets remained property of Lehman.  As with all of the RSUs and CSAs, Participants were not taxed until assets within the RSU Trust were used upon conversion and the issuance of shares to Claimants.  Fact Stip., ¶¶ 20-24.

26

### E.  Taxation of RSUs/CSAs

56.     Lehman employees were not taxed on the value of the RSUs at the time
of the grant.  The income that was reported to tax authorities was the market value of the shares
into which the RSUs and CSAs were converted at a date the parties have called the
"conversion/issuance date," which is the date on which the RSUs were converted to shares of
stock and the date that those shares were issued.  Fact Stip. ¶¶ 5 & 20; 4-1-14 Hrg. Tr. at 244:9-
244:18 (Fleischman).  All of the tax was calculated at ordinary income rates, not capital gains
rates.  It was taxed like salary.  Fact Stip. Ex. 3 at 11 (Doc. 40263-1, p.45 of 148); 4-1-14 Hrg.
Tr. at 250:7-250:11; 251:5-251:7 (Fleischman test'y).  If the value of the stock increased the tax
at ordinary income rates would be higher.  *Id.*  If the value of the stock declined, the tax at
ordinary income rates would be less, but there was no deduction for the loss.  4-2-14 Hrg. Tr. at
174:13-24 (Krieger Test'y).  *See also* Declarations of Casuple ¶¶ 4, 9, Cohen  ¶ 9, Jacobson ¶ 9,
Langevin ¶¶ 5, 6, Stevens ¶ 10, Sarkar ¶¶ 5, 13.

57.     An election under § 83(b) of the Internal Revenue Code, to pay tax on the
property received as compensation without regard to the restrictions and risks of forfeiture
imposed on the recipient in order to pay tax on the post-grant gain at capital gain rates, was not
available for RSUs and CSAs.  4-1-14 Hrg. Tr. 251:13-252:5 (Fleischman test'y);

58.     The tax treatment for overseas employees awarded CSAs was not
materially different.  *See* Fact Stip. ¶ 21.  Michael Gran testified that he paid income tax in the
United Kingdom on his salary and his bonus paid in cash, but that no tax was paid on the grant of
CSAs "because we didn't actually receive anything."  4-1-14 Hrg. Tr. 216:22-217:13.  As in the
United States, the tax was paid at ordinary income rates.  *Id.*, 218:5-219:2.

27

59.    The conversion/issuance date was a date employees could neither accelerate nor defer, and the RSUs and CSAs that are the subject of this dispute had not reached their conversion/issuance date at the time of Lehman's bankruptcy filings.  Fact Stip. ¶ 5.

60.    The parties have stipulated to a description of the tax treatment of RSUs and CSAs.  Employees paid no tax upon the grant, and no tax upon the occurrence of any event prior to the conversion, such as amortization or vesting.  *Id.* ¶¶ 22-23.  Similarly, for purposes of calculating its own deduction for compensation expenses, Lehman took no deduction for compensation expense upon the grant of RSUs and CSAs; it was only "once an RSU or CSA converted to common stock, [that] LBHI was entitled to, and did in fact claim, a U.S. federal income tax deduction as compensation expense . . . ."  *Id.* ¶ 24.

61.    The dividend equivalent amounts that Lehman claims were indicia of stock ownership were accrued and reinvested as RSUs.  Upon conversion of the RSUs into shares that were taxed at ordinary income rates, the dividend equivalents also were treated by Lehman as deductible compensation.  *Id.,* Ex. 3 at 11 & 13 (Doc. 40263-1, pp. 46 & 48 of 148).

62.    The parties do not dispute that, at the time Lehman's bankruptcy petitions were filed, no shares of stock had ever been issued for the RSUs and CSAs at issue here, no Lehman employee was required to report the grant of these RSUs or CSAs to any tax authority as compensation for income tax purposes, Lehman was not entitled to report the grants, and Lehman never took a deduction for compensation expense at the time these RSUs and CSAs were granted.  *Id.,* ¶¶ 26-28.

## F.  Lehman's Bankruptcy

63.    As of the Petition Date, Lehman embarked upon a liquidation of its businesses and divisions.  In connection with its bankruptcy filing, Lehman involuntarily

terminated employment of most of the Claimants.  As of the Petition Date, Lehman employees

could no longer perform the services for which they had been hired.  Pursuant to ¶ 4.17 of the

Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated

Debtors (the "Plan"), the Common Stock of LBHI was cancelled as of the Plan's effective date.

The Plan Administrator filed with the Securities and Exchange Commission the required form

for the purpose of terminating the registration of any of LBHI's publicly traded securities,

including the Common Stock.

### G.  The Subordination Clause

64.     In the annual brochures distributed to employees, Lehman addressed the

tax treatment of RSUs/CSAs and advised employees to "Consult your personal tax advisor

concerning the application of all federal/state/local or foreign tax laws on your RSUs."   Fact

Stip., ¶ 4.  In November 2007, in materials distributed to employees, Lehman addressed the

treatment of RSUs/CSAs in the event of a bankruptcy of Lehman, explaining to employees that

the "changes to operative language" of RSU/CSAs would "Clarify those types of bankruptcies"

that might impact Claimants' rights with respect to the RSUs/CSAs through the "acceleration of

delivery of shares."  *Id.,* ¶11.

65.     In years 2003 and 2004, Lehman included in the RSU/CSA grant

agreements a clause (the "Subordination Clause") providing as follows:: "All of your claims

arising from, in connection with, or in any way relating to, any failure of Holdings to deliver to

you, or to a subsidiary for delivery by such subsidiary to you, shares of Common Stock on the

date when such shares are due to be delivered under this Agreement in satisfaction of each Unit

granted to you shall be deemed, in the event of a bankruptcy of Holdings, to be claims for

damages arising from the purchase or sale of Common Stock of Holdings, within the meaning of

29

section 510(b) of the Bankruptcy Code and shall have in such bankruptcy the same priority as, and no greater priority than, common stock interests in Holdings." *Id.*, Exs. 4-5 (pgs. 50 & 53 of 148).

66.     The Court notes that the Subordination Clause contained within the RSU/CSA agreements conflicted with the terms of the Employee Incentive Plans, which governed in the event of any such conflict. *See* Fact Stip. (p. 49 of 148) ("In the event of any conflict or ambiguity between this [RSU Agreement] and the [Employee Incentive Plan], the terms of the [Employee Incentive Plan] shall govern." The Employee Incentive Plans as previously noted provided that the grant of an Award would not be construed as giving a Participant the rights of a stockholder of Common Stock unless shares of stock were issued to Participants pursuant to Awards thereunder. The Subordination Clause also conflicted with the terms of the Trust that recognized the rights of Participants as those of general unsecured creditors.

67.     In 2005, Lehman removed the Subordination Clause from all RSU and CSA Agreements thereby resolving the internal inconsistency within the RSU/CSA Program Documents. Lehman did not restore the Subordination Claus in any subsequent years. In all RSU/CSA agreements in 2005 and thereafter, "bankruptcy" did not appear in any of the grant agreements.

## II.    CONCLUSIONS OF LAW

68.     Lehman's Omnibus Objections seek either to reclassify Claimants' compensation claims as equity under 11 U.S.C. § 501(a) or to subordinate their claims under 11

U.S.C. § 510(b), quoted in the margin.[6]  The Supreme Court has repeatedly recognized, to the point of calling it axiomatic, that "the starting point in every case involving construction of a statute is the language itself."[7]  Accordingly, in construing sections 501(a) and 510(b), the starting point is the statutory language itself, including the definitions set forth in the statute.

69.    The Second Circuit has cautioned courts to "guard[ ] against attempts by a bankruptcy debtor to clothe a general creditor in the garb of a shareholder."  *In re Med Diversified*, 461 F.3d 251, 258 (2d Cir. 2006).  Following the injunctions of the Supreme Court and the Second Circuit, it is incumbent on the Court to find that the RSUs and CSAs are either within the definitions of "equity security" or "security."  For the reasons stated below, the Court finds that Lehman has not demonstrated that RSUs and CSAs are within the Code's definitions.

---

[6] Sections of Title 11 of the United States Code are sometime cited here as sections of "the Bankruptcy Code" or simply "the Code."  11 U.S.C. § 501(a) reads:

> A creditor or an indenture trustee may file a proof of claim.  An equity security holder may file a proof of interest.

11 U.S.C. § 510(b) reads:

> For the purpose of distribution under this title, a claim arising from rescission of a purchase or sale of a security of the debtor or of an affiliate of the debtor, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under section 502 on account of such a claim, shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security, except that if such security is common stock, such claim has the same priority as common stock.

[7] *Landreth Timber Co. v. Landreth*, 471 U.S. 681 685 (1985), quoting *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 756 (Powell, J., concurring)(1975); accord, *Teamsters v. Daniel*, 439 U.S.551, 558 (1979).  As shown below, *Landreth* is of significance here because it construes elements of the definition of "security" that were carried over into the new Bankruptcy Code in 1978.

### A. The RSUs and CSAs are not Equity Securities under Code § 101(16)

70.     Section 101(16) of the Code defines the term "equity security" to include

(A) shares in a corporation and (B) interests of a limited partner in a limited partnership, neither

of which are at issue here.  Lehman contends, however, that the RSUs and CSAs are within

paragraph (C) of section 101(16), which reads:  (16) The term "equity security" means –

> . . .
> (C) warrant or right, *other than a right to convert*, to purchase, sell, or subscribe
> to a share, security, or interest of a kind specified in subparagraph (A) [shares in a
> corporation] or (B) [limited partnership interests] of this paragraph.

11 U.S.C. § 101(16)(C) (emphasis added).

71.     Lehman argued in its pre-hearing briefs that the definition of equity

security has been interpreted "to include a range of stock-based transactions" (Lehman Op. Br. at

28; Lehman Reply at 38), and because the RSUs and CSAs "provided Claimants with a

nontransferable, non-assignable right to common stock" they should be deemed within the

definition of equity security."  *Id.* at 28.

72.     In their Opening Brief Claimants focused on the emphasized language in

subparagraph (C) quoted above ("other than a right to convert"), and argued that "Congress was

careful to exclude convertible instruments like RSUs and CSAs from the definition of equity

security, and the statute of course governs."  Clmts. Op. Br. at 10.  While Claimants argue that

the statute is unambiguous, they also point to the legislative history, in which Congress

emphasized that even a security that is convertible into an equity security is not within the

definition of equity security until it is converted.

> The term ["equity security"] includes a share or stock in a
> corporation, a limited partner's interest in a limited partnership,
> and a warrant or right to subscribe in an equity security.  The term
> does not include a security, such as a convertible debenture, that is
> convertible into equity security, but has not been converted.

32

H.R. REP. 95-595, 311, 1978 U.S.C.C.A.N., 5963, 6268; S. REP. 95-989, 24, 1978

U.S.C.C.A.N. 5787, 5810.[8]  While Congress used as an example a debt security, there is no

support in the Reports for Lehman's argument at the hearing (4-2-14 Hrg. Tr. at 37) that

Congress only intended to cover debt securities in the "other than a right to convert" clause.  In

any event, the statutory language says nothing about restricting § 101(16) to debt securities.[9]

73.    In their Replies, (i) Claimants pointed out that the parties Stipulation of

Facts describes the RSUs and CSAs as instruments that "convert" (Clmts. Reply at 9), and (ii)

Lehman quoted a program document stating that "RSUs cannot be sold, traded, pledged, or

assigned *before conversion*" (Lehman Reply at 29).

74.    In oral argument Lehman presented an additional argument, not made in

its brief, that while the RSUs "converted," they were not *a right* to convert because conversion is

automatic rather than at the holder's discretion.  Lehman offered no support for this crabbed

reading of the statute; nor is there any support in the legislative history, which refers in the

passive voice simply to an instrument "that is convertible into equity security."  Further,

Lehman's claim at oral argument is at odds with the claim in its brief that the RSUs were equity

securities because "the RSUs . . . gave [the Claimants] *a warrant or right to acquire* common

stock upon the fulfillment of employment-related conditions."  Lehman Op.Br. at 28 (emphasis

added).  The claim also is at odds with the parties' stipulation that the RSU was "a conditional

right" to receive stock "assuming continued employment with the firm," the conversion "was

subject to the grantee's fulfillment of certain employment-related conditions," and "if these

---

[8] These Reports were the final House and Senate Reports that accompanied H.R. 8200 and
H.R.S. 2266, the bills that became the Bankruptcy Code.

[9] *In re LightSquared*, 504 B.R. 321, 339 (Bankr. S.D.N.Y. 2013) (warning of the "perils of
reliance on the tea leaves of legislative history, especially . . . [where] the statutory language is
express and clear on its face.").

conditions were not fulfilled, the RSUs or CSAs would be forfeited and canceled." Stip. of Facts

¶¶ 5-7. Lehman conceded as much at oral argument by admitting that the employees "could

have flunked the conditions I guess" or they could have "go[ne] out and disparage[d] the

company . . . ." 4-2-14 Hrg. Tr. at 38.) But these concessions reinforce what the Stipulation of

Facts states without ambiguity, which is that "the conversion of RSUs and CSAs . . . was subject

to the RSU/CSA grantee's fulfillment of certain employment-related conditions . . . , [and] if

these conditions were not fulfilled, the RSUs or CSAs would be forfeited or cancelled." Fact

Stip., ¶ 7. The RSUs and CSAs were not converted until the grantee fulfilled his or her

conditions.

75.    Lehman cites to *Matter of Standard Oil & Exploration of Del., Inc.*, 136

B.R. 141 (Bankr. W.D. Mich. 1992), but the court's holding there supports the view that a

security that is convertible into an equity security is not an equity security, and there is no equity

security until conversion. Lehman's other authorities, like its two pre-hearing briefs, fail to take

into account the exclusion from the definition provided for convertible instruments. *Carrieri v.

Jobs.com*, 393 F.3d 508 (5th Cir. 2004) (instruments called warrants, which provided that the

holder "may demand repurchase of the warrant" after a specified date, were not "rights" under §

101(16)(C) subject to the exclusion for the right to convert"); *Nantahala Capital Partners v.

Wash. Mut. (In re Wash. Mut.)*, 464 B.R, 656, 659, 665-66 (Bankr. D. Del. 2012) (warrants

called "litigation tracking warrants" were issued to existing shareholders because new investors

discounted the value of a pending litigation; warrants were "*a right to buy stock*" if the litigation

was successful, not a conversion right); *In re Einstein/Noah Bagel*, 257 B.R. 499, 506 (Bankr.

D. Ariz. 2000) (a "Put Right" provided a holder of equity with the right "to require that its equity

interest be repurchased," not a conversion right); *Matter of Baldwin-United*, 52 B.R. 549, 552

34

(Bankr. S.D.Ohio 1985) (options provided rights to purchase shares, once again not a conversion right).

76.    Finally, Lehman's own plan documents indicate that employees awarded RSUs and CSAs were not considered to hold equity securities until they were converted into actual shares – as stated in one Plan document, "unless shares of stock have been issued to Participants pursuant to the Awards hereunder."  LEH-RSU 0000003.  This is fully consistent with the statutory approach in § 101(16)(C) of the Code.  Further, the Court's findings above note that Lehman has not produced evidence supporting its allegations that the RSU/CSA program was intended to make employees feel like owners.  *See* ¶¶ 21-26 above & testimony and declarations cited.

77.    None of the parties has found a case where convertible instruments such as RSUs and CSAs have been treated as equity securities as defined in § 101(16)(C) of the Code. Congress's careful exclusion of convertible instruments from the definition does not present a dramatic change in the meaning – the exclusion simply states that instruments that are convertible into equity securities are not equity securities until that conversion occurs.  The statute language is clear and unambiguous.  RSUs and CSAs are not equity securities under § 101(16)(C).

B.    **The RSUs and CSAs are not Equity Securities under Code § 101(49)**

78.    Section 510(b) calls for the subordination of claims (i) for rescission of a purchase or sale of a security, (ii) for damages arising from the purchase or sale of a security, or (iii) for reimbursement or contribution allowed under § 502 of the Code on account of such a claim.  Each element of this subordination provision deals with a security, which is separately defined in § 101(49)(A) of the Code.

79.     Section 101(49)(A) defines the term "security" to include fifteen different instruments.[10]  The parties have focused on three of these instruments as set forth in the following subparagraphs of § 101(49)(A), and two exclusions found in § 101(49)(B):

> The term "security" –
>
> (A)  includes –
>> . . .
>>> (xii) investment contract or certificate of interest or participation in a profit-sharing agreement or in an oil, gas, or mineral royalty or lease, if such contract or interest is required to be the subject of a registration statement filed with the Securities and Exchange Commission under the provisions of the Securities Act of 1933, or is exempt under section 3(b) of such Act from the requirement to file such a statement;
>>> . . .
>>> (xiv) other claim or interest commonly known as "security"; and

---

[10] Section 101(49)(A) provides that the term "security" includes:

> (i) note: (ii) stock: (iii) treasury stock; (iv) bond; (v) debenture; (vi) collateral trust certificate: (vii) pre-organization certificate or subscription; (vii) transferable share; (ix) voting-trust certificate; (x) certificate of deposit; (xi) certificate of deposit for security; (xii) investment contract or certificate of interest or participation in a profit sharing agreement or in an oil, gas or mineral royalty or lease, if such contract or interest is required to be the subject of a registration statement filed with the Securities and Exchange Commission under the provisions of the Securities Act of 1933, or is exempt under section 3(b) of such Act from the requirement to file such a statement; (xiii) interest of a limited partner in a limited partnership; (xiv) other claim or interest commonly known as "security"; and (xv) certificate of interest or participation in, temporary or interim certificate for, receipt for, or warrant or right to subscribe to or purchase or sell, a security . . . .

Even if an instrument qualifies as a "security" under Section 101(49)(A), the analysis does not end there because Section 101(49)(B) provides a number of specific exclusion from the definition of "security." Section 101(B)(49)(vi) mirrors subsection 101(49)(A)(xii) on investment contracts by stating that the term "security" does not include a:

> contract or certificate of a kind specified in subparagraph A(xii) of this paragraph that is not required to be the subject of a registration statement filed with the Securities and Exchange Commission and is not exempt under section 3(b) of the Securities Act of 1933 from the requirement to file such a statement . . . .

        (xv) certificate of interest or participation in, temporary or interim certificate for, receipt for, or warrant or right to subscribe to or purchase or sell, a security; but

(B) does not include –

        . . .

        (vi) contract or certificate of a kind specified in subparagraph (A)(xii) that is not required to be the subject of a registration statement filed with the Securities and exchange Commission and is not exempt under section 3(b) of the Securities Act of 1933 from the requirement to file such a statement; or

        (vii) debt or evidence of indebtedness for goods sold and delivered or services rendered.

11 U.S.C. § 101(49)(A)&(B).

        80.    While the obligation of this Court is to administer the Bankruptcy Code, the Court cannot ignore that the words defining these instruments as securities have a long history in the United States Code, tracing back to § 2(a)(1) of the Securities Act of 1933, § 3(a)(10) of the Securities Exchange Act of 1934, and § 16(15) of the Securities Investor Protection Act of 1970, respectively 15 U.S.C. §§ 77(b)(a)(1), 78c(a)(10) & 78*lll*(14).[11]  The exclusion from the definition of security for *unregistered* investment contracts is also of significance because of parallel language in SIPA, and because this Court also is responsible for administering estates under SIPA it must construe comparable definitions in a consistent manner. Further, the explicit references in the Code definition to registration under the Securities Act of

---

[11] This language was incorporated into the Bankruptcy Code late in the drafting of the bankruptcy reform legislation in the 1970's.  House Judiciary Committee, *Bankruptcy Law Revision*, H.R.Rep. 95-595 (Sept. 8, 1977) (hereafter "H.R.Rep. 95-595") at 313 (explaining that the definition of security "is new and is modeled on the most recent draft of the American Law Institute's proposed securities code, with some exceptions."); *see* H.R. 31, 94th Conf., 1st Sess., Jan. 14, 1975 (the definition of security in this earlier draft of the Bankruptcy Code stated only: "The term 'securities' includes both debt and equity securities.").

1933 in the subparagraph for investment contracts warrants deference to the way that term has

been construed by Courts and the Securities Exchange Commission.

81.     Accordingly, the first issue the Court must address is not whether the

RSUs and CSAs would have converted into a security in accordance with their terms, but

whether standing alone the RSUs and CSAs constituted a security.  In *In re Enron Corp.*, 341

B.R. 141, 163-64 (S.D.N.Y. Bankr. 2006), Judge Gonzalez addressed this issue by finding that

the stock options were securities under Code § 101(49)(A)(xv).  *Enron*, 341 B.R. at 149-50.[12]

As discussed below, the RSUs and CSAs are both legally and factually not comparable to stock

options.  The question, accordingly, is whether the RSUs and CSAs are a security under some

other subparagraph of § 101(49)(A).  Lehman has argued that § 101(49) should be "construed

broadly."  Lehman Op. Br. at 3-4 & 5.  However, even those Courts that permit a "broad

construction" of the definition "look for an analogous entry on the list."  *In re Tristar Esperanza*

*Props.*, 488 B.R. 394, 399 (B.A.P. 9th Cir. 2013) (LLC membership interest is analogous to a

limted partnership interest).

82.     The Court will consider each of the provisions the parties find applicable,

looking first at whether the RSUs and CSAs are included in the option language of ¶ (xv), then

the investment contract language under ¶ (xii), and finally the catch-all provision of ¶ (xiv).

**C.  The RSUs and CSAs are not Options under ¶ (xv)**

83.     As noted above, in *Enron* Judge Gonzalez addressed a claim that stock

options were not securities for purposes of § 510(b), and he relied specifically on ¶ (xv) in

---

[12] As stated in *Enron*:  "Section 101(49)(A)(xv) defines a security as including a 'warrant or right
to subscribe to or purchase or sell, a security,' and as section 101(49)(A)(ii) makes plain, a stock
is a security.  11 U.S.C. § 101(49)(A)(ii), (xv)(2006).  Therefore, the Bankruptcy Code is clear
that a stock option is a 'security' as that term is used in section 510(b)."  341 B.R. at 150.

concluding that "the Bankruptcy Code is clear that a stock option is a 'security' as that term is used in section 510(b)." *Id.,* 341 B.R. at 150.

84.    The parties do not dispute that the stock options at issue in *Enron*, like the RSUs and CSAs at issue here, were granted as compensation for the grantees' labor – in Judge Gonzalez's phrasing, that the employees "exchanged value for the options: here, their labor." *Id.*, 341 B.R. at 151.  The fact that labor was exchanged, however, relates to whether there was a *purchase*, not whether the instrument granted was a *security*.  *Id.* ("Such exchange [of value of labor for the options] falls under a broad reading of the term 'purchase.'").   RSUs and CSAs do not share the kinds of investment decision-making required by stock options.

85.    Judge Gonzalez described in detail the kind of investment decision-making holders of stock options made:

85.1.    The options "granted employees the right to purchase" Enron shares at a future vesting point, a grant of the right to make a purchase decision.

85.2.    After vesting "the employee could then exercise the option and sell," to capture the difference between the option price and the market price at the time of exercise, a timing decision to exercise the option and sell the underlying shares taking into account the market price and the trading profit opportunity.

85.3.    After vesting, the employee also could "exercise the option and retain the stock," the quintessential investment decision.

85.4.    The employee could also "retain the option to exercise at a later time," likely when the employee believer the market price would go higher.

39

*Id.,* 341 B.R. at 146. Judge Gonzalez also noted that "[i]f the trading price is less than the option

price, the stock option is practically valueless . . . ," and the employee bore that risk in making an

investment decision not to exercise the option and sell the shares. *Id.*

86.     This description of how employee stock options work is not novel.

Lehman in fact issued stock options to some of the Claimants here, but their claims do not

include any stock option claims such as those at issue in *Enron.* Judge Gonzalez's factual

analysis is noted here to call attention to the fact that an employee to whom options have been

granted has at least four investment decisions to make.

87.     Claimants argue factually that RSUs and CSAs provided for none of these

investment decisions, and the parties' Stipulation of Facts in fact confirms that the employee did

not receive with the grant of an RSU or CSA any opportunity to make any of the investment

decisions such as those described by Judge Gonzalez in *Enron.* Employees received the RSUs

and CSAs "as a portion of their total compensation" in an amount determined at Lehman's

discretion, but there was no further cost to employees (such as an option exercise price)

associated with the RSU awards. There was no election as to how many shares of stock to

accept (such as the exercising an option for a specified number of shares). The employee made

no decision affected by a comparison of the market price on the exercise date compared with the

market price on the date of the grant – the employee had no ability to accelerate or defer the

conversion date or otherwise to time an investment decision. Fact Stip. ¶¶ 4-7. Employees never

elected to participate in the program and did not even complete any kind of enrollment forms.

Lehman simply required its employees to participate in the Program. *Id.* ¶ 13.

88.     Lehman has argued that RSU/CSA grantees were given a "contingent right

to participate in, receive and/or purchase common stock of LBHI", and therefore, the

RSUs/CSAs should be treated as a security under ¶ (xv).  Lehman Op. Br. at 12-13.  Lehman

also claims RSUs/CSAs "bear the hallmarks of a security" and ¶ (xv) applies.  *Id.* at 14-15.

However, a right to purchase a security requires that there be an investment decision and Lehman

has not demonstrated that holders of RSUs and CSAs made any of the investment decisions

Judge Gonzalez described in *Enron*.

89.     Section 101(49)(A)(xv) defines a "security" as including a "right to . . .

purchase or sell, a security."  Lehman previously argued this section applies since RSU and CSA

grantees were given a "right to acquire" LBHI stock "similar to stock options or the right to

exercise stock options."  *See, e.g.,* 313th Omnibus Obj., ¶ 13.  As already noted, the broad and

inclusive term "right to acquire" does not appear in the statute.  The statute refers only to the

more limited to "purchase."

90.     The Court concludes that Lehman is asking for an unwarranted expansion

of Judge Gonzalez's ruling in *Enron*, which did not address any instrument comparable to RSUs

and CSAs.  *Enron*, 341 B.R. at 144 n.3.  Judge Gonzales specifically limited his holding to

"stock options similar to those presented here."  *Id.*  A right to purchase a security requires that

there be an "investment decision."  Unlike the stock options in *Enron*, there was no investment

decision relating to the RSUs and CSAs.  *Enron* option holders were able to make decisions with

regard to the purchase and sale of Enron stock by exercising the stock options and selling the

stock, or alternatively retaining them to exercise at a later time in the hope of an increase to their

trading profits.  In contrast, RSU and CSA holders were not able to sell or hedge their interest in

the RSUs or CSAs even after vesting.  With respect to the conversion to stock upon the

expiration of the five-year term, while holders were required to be employed and to comply with

employment-related restrictions, the services were what they were required to do as employees

41

and did not involve an investment decision.  Fact Stip. ¶¶ 3, 5-7, 9.  Conversion from RSUs or

CSAs to Lehman stock simply involved Lehman fulfilling its compensation promise.  *Id.*, ¶¶ 3-5,

Ex. 3.

91.     Moreover, Claimants did not have a right to purchase a security under the

RSUs or CSAs, i.e., Lehman stock, because there was no guaranty that stock would be delivered

to the RSU or CSA holder at the conversion date.  Under the RSU and CSA agreements, it was

solely within Lehman's discretion to modify the terms in any manner it deemed appropriate.

Lehman maintained the discretion to pay RSU and CSA holders in cash rather than through

stock.

92.     An option is an enforceable promise to sell stock at a fixed exercise price.

*In re Riodizio, Inc.*, 204 B.R. 417, 422 (Bankr. S.D.N.Y. 1997) (citing *In re III Enterprises, Inc.

V,* 163 B.R. 453, 460–61 (Bankr. E.D.Pa.)).  "It is a unilateral contract until exercised; upon

exercise, it becomes a bilateral contract." *Id.* (citations omitted).  As noted in Exhibit 3 to the

Fact Stip., to receive the benefit of Stock Options an "exercise" is required, with the payment at

the time of exercise of "the option exercise price." Fact Stip., Ex. 3 (p. 44 of 148).  No such

payment is required at the time of "conversion" of an RSU or CSA.  *Id.*  The RSUs and CSAs

were simply "a portion of [the employee's] total compensation" for services rendered in the year

of the grant and as a function of LBHI's profitability that year.  *Id.* (p. 34 of 148); *see also* Fact

Stip. ¶¶ 1, 3, 15-17, 34.  Conversion from RSUs or CSAs to Lehman stock simply involved

Lehman performing its contract promise.  *Id.*, ¶¶ 3-5, Ex. 3.  Unlike stock options providing a

buyer with a right to purchase at a fixed price, RSU and CSA grantees made no payment and

made no decision based on the price of the stock.  *Id.* ¶ 10.

42

93.    Unlike the holders of stock options in *Enron*, Claimants did not have a right to make an investment decision to purchase a security under the RSUs or CSAs, and were not able to sell or hedge their interest in the RSUs or CSAs, even after vesting.  Moreover, fluctuations of the Lehman stock price during the RSU/CSA term period were not significant to the RSU/CSA holders because they had no rights to exercise.  The RSUs and CSAs did not constitute an issued security under ¶ 15, but only a contract promise to issue a security in the future – in the words of the parties' Stipulation of Facts, "a conditional right to receive one share of Lehman Brothers common stock five years after the RSU is granted, assuming continued employment . . . ."  *Id.*, ¶ 5 & Ex. 3 (at p. 34 of 148).  The employment related contingencies tied to the RSUs/CSAs were not the contingencies that shareholders faced; nor were they based upon the price of Lehman stock.

94.    The only appellate authority Claimants have located on the issue of what rights are provided with RSUs and CSAs is *Fleet Boston Financial v. Alt*, 668 F. Supp.2d 277 (D. Mass 2009), *aff'd*, 638 F.3d 70 (1st Cir. 2011).  The District Court held there that holders of RSUs had no standing under corporate law, because RSUs were not corporate stock and holders of RSUs "never acquired stockholder status."  668 F. Supp.2d at 279-80.  Even the fact that the issuer recorded the RSU holders as putative stockholders did not give them standing as stockholders.  *Id.* at 281.  The court also rejected the argument that the plaintiffs were "equitable stockholders."  *Id.* at 282.

95.    Finally, Lehman argues RSUs/CSAs should be considered securities because the purported "purpose" of the RSU/CSA plan was to give Lehman employees an "opportunity to acquire a proprietary and vested interest" in Lehman.  Lehman Op. Br. at 17.  However, as stated above, Lehman cites only to documents containing its own statements, and

43

provides no evidence that employees shared with Lehman this purported understanding of a

financial stake or how a sense of ownership might be imputed.  The testimony and declarations

do not indicate that Lehman's employees shared in this purpose.  *See* ¶¶ 21-26 above.

### D.  The RSUs and CSAs are not Investment Contracts under ¶ (xii)

96.    If the RSUs and CSAs are not analogous to stock options addressed in

*Enron*, then the Court must consider whether they fit within some other element of the definition

of a security in the Code.  The Court next considers whether the RSUs and CSAs are investment

contracts.

97.    The definition of security in the Code includes in § 101(49)(xii) an

> investment contract if such contract is required to be the subject of a registration
> statement filed with the Securities and Exchange Commission [the "SEC"] under
> the . . . Securities Act of 1933, or is exempt under section 3(b) of such Act from
> the requirement to file such a statement.

11 U.S.C. § 101(49)(A)(xii).

98.    The term "investment contract" is not defined in the Code, but it was part

of the definition of security that Congress drew from the American Law Institute's proposed

model securities code, and can be traced back to the Securities Act of 1933.   H.R.Rep. 95-595.

Amendments to this section in 1982 added the "required to be" language to clarify that an

investment contract is security for Code purposes "if it is *required to be* the subject of a

Securities Act registration statement whether or not such a registration statement has been filed."

House Judiciary Committee, *Bankruptcy Act Amendments (Pub. L. 97-222)*, H.R. Rep. No. 97-

420 (Jan. 25, 1982)(hereafter "H.R.Rep. 97-222")(emphasis added).[13]

---

[13] Prior to the 1982 amendment the exclusion was for investment contracts that were not "the
subject of a registration statement" filed with the SEC, rather than "required to be the subject of a
registration statement."  The original 1978 language was drawn from the Securities Investor
Protection Act's definition of security, which included (and still includes) "the subject of a

99.    The Court must first consider whether the Claimants RSUs and CSAs are investment contracts under the traditional securities laws definition.  The Court's conclusion is that they are not, because an employee's interest in a benefit plan constitutes a security only where the plan is voluntary and contributory.  The Court then assumes the contrary, that the RSUs and CSAs were securities, and considers whether they were required to be registered.  The position of the SEC is that even if RSUs and CSAs are securities they are not required to be registered.  The Court's conclusion, therefore, is that while the RSUs and CSAs may be investment contracts (and therefore securities) under the securities laws, they are not securities under the Code because of the exclusion for investment contracts that are not required to be registered.

100.    Chief Judge Posner of the Seventh Circuit has described "investment contract" as a term of art under the securities laws intended to cover "an interest that is not a conventional security like a bond or a share of common stock but that, having the essential

---

registration statement" phrase in the investment contract element of the definition of security. The Tenth Circuit Court of Appeals explained the development of this registration exclusion.

> The SIPA definition of "security" was modeled after the definition of security found in the Securities [Exchange] Act of 1934, 15 U.S.C. § 78a et seq.  The purpose of each Act, however, is significantly different.  Congress' purpose in enacting the securities laws was to regulate investments in whatever form they are made and by whatever name they are called.  In contrast, SIPA provides much more limited protection to a specified category of investors.  SIPA expressly excludes from the definition of a "security" certain investment vehicles covered by the securities acts including unregistered investment contracts . . . .  SIPA's legislative history indicates Congress intentionally narrowed SIPA's coverage.

*In re Primeline Securities, Debtor*, 295 F.3d 1100, 1108-09 & n.7 (10th Cir. 2002), citing S.Rep. 95-763 (Senate Banking Committee, *Securities Investor Protection Act Amendments of 1978*, S.Rep. 95-763, 1978 WL 8748, at *17 (Apr. 25, 1978)).  As the Tenth Circuit concluded, certain investment contracts may be considered securities for purposes of applying the Securities Act and the Securities Exchange Act but not be securities under the narrower definition of SIPA. The Bankruptcy Code followed that narrower definition and the 1982 amendment narrowed it further.

properties of a security . . . is treated as one for purposes of these [securities] laws." *SEC v. Lauer*, 52 F.3d 667, 670 (7th Cir. 1995).

101.    In the leading case construing the term, the Supreme Court developed a 3-part test for determining whether a particular instrument is an "investment contract" (and therefore a security): an instrument is within the definition if it "involves [i] an investment of money [ii] in a common enterprise [ii] with profits to come solely from the efforts of others." *SEC v. W. J. Howey Co.,* 328 U.S. 293, 301 (1946).[14]

102.    The Court's focus is on the first prong of the test – "an investment of money" – which of necessity requires there be a decision to invest.  *Howey,* 328 U.S. at 301. The Supreme Court has emphasized that employees seeking to enforce employers' liability related to employment benefit plans do not find relief under the securities laws unless the benefits at issue are voluntary and contributory – because only in those circumstances are the benefits securities.  In other words, in the context of employee compensation and benefit plans the employee must have made an investment decision to be deemed a purchaser of securities.

---

[14] The Court later considers whether RSUs and CSAs should be deemed securities under § 101(49)(A)(xiv) of the Code, the "commonly known as a security" element of the definition of security.  In this first mention of *Howey*, however, the Court notes that the Supreme Court also found the 3-part *Howey* test to be applicable in construing the "commonly known as a security" provision as well.

> We perceive no distinction, for present purposes, between an 'investment contract' and an 'instrument commonly known as a security.'' In either case, the basic test for distinguishing the transaction from other commercial dealings is [the *Howey* test]. This test, in shorthand form, embodies the essential attributes that run through all of the Court's decisions defining a security.

*United Housing Found. v. Forman*, 421 U.S. 837, 852 (1975); *see Landreth Timber Co. v. Landreth,* 471 U.S. 681, 691&n.5 (1985) (same).

> In order to determine whether respondent invested in the
> Fund by accepting and remaining in covered employment,
> it is necessary to look at the entire transaction through
> which he obtained a chance to receive pension benefits. In
> every decision of this Court recognizing the presence of a
> 'security' under the Securities Acts, the person found to
> have been an investor *chose* to give up a specific
> consideration in return for a separable financial interest
> with the characteristics of a security.

*Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am. v. Daniel*, 439 U.S. 551,

559 (1979) (hereafter "*Daniel*") (internal citations omitted).

103.    The parties here have stipulated that Claimants participation was

compulsory and not voluntary -- they "were required to participate in the Program by virtue of

their employment with Lehman . . . ." Fact Stip. ¶¶ 10, 13. In testimony and in declarations,

Claimants uniformly testified that they had no investment choice regarding whether they would

participate in the program, the portion of their total compensation that would be withheld, the

amount of RSUs or CSAs that Lehman granted to them, or when the RSUs or CSAs would

become convertible. All of these decisions were made exclusively by Lehman. *Id.,* ¶¶ 10-14,

32.

104.    The guidance from *Daniel* is that in these circumstances, where

participation is either compulsory rather than voluntary or noncontributory, there is no

"investment decision" that satisfies the first prong of the *Howey* test, and no investment contract

that constitutes a security. *See, e.g.*, *Bauman v. Bish*, 571 F. Supp. 1054, 1064 (N.D. W.Va.

1983) ("Participation in the ESOP for employees of the proposed company is not voluntary, and

is, in a sense compulsory. . . . Thus, there is no affirmative investment decision."); *Fishoff v.

Coty*, 2009 WL 1585769 at *5 (S.D.N.Y. June 8, 2009) (only voluntary, contributory plans have

investment characteristics that render them securities; long-term incentive plan that was

47

voluntary but non-contributory was not an investment contract and thus not a security); *Childers v. Northwest Airlines*, 688 F. Supp. 1357, 1363 (D. Minn. 1988) (participation in the ESOP was compulsory and not an individual affirmative decision where modifications in the collective bargaining agreements bound all union members regardless of whether they supported modifications).

105.    Lehman's briefing prior to the evidentiary hearing emphasized that the Claimants had participated in a "voluntary exchange of labor for the right to receive stock" (Lehman Op. Br. at 9).  In determining that only voluntary, contributory pension plans can be "investment contracts," *Daniel,* 439 U.S. at 556, the Supreme Court also concluded that where an employee exchanges his labor to earn a livelihood and not to make an investment, it was wrong to impute to the employee an investment decision that satisfied the *Howey* test.  *Id.* at 560.

> Only in the most abstract sense may it be said that an employee "exchanges" some portion of his labor in return for these possible benefits. He surrenders his labor as a whole, and in return receives a compensation package that is substantially devoid of aspects resembling a security. His decision to accept and retain covered employment may have only an attenuated relationship, if any, to perceived investment possibilities of a future pension. Looking at the economic realities, it seems clear that an employee is selling his labor primarily to obtain a livelihood, not making an investment.

*Id.* at 560 (footnote omitted).  Claimants uniformly testified that they had accepted employment at Lehman to earn a livelihood, not to become investors in Lehman stock.  To say, as Lehman does now, that the Claimants and other employees decisions to seek a livelihood as a Lehman employee were tantamount to making an investment decision to become holders of Lehman "securities" is directly contrary to the Supreme Court's analysis in *Daniel*.

106.    However, even assuming that the Claimants here have "purchased" the RSUs and CSAs with their labor (*see Enron*, 341 B.R. at 150-51), this does not resolve the issue

of whether the instruments they purchased with their labor, the RSUs and CSAs, are securities.
The conclusion of the Court is that they are not.

107.    At the hearing none of the parties focused on the qualifying phrase in the
investment contract element of the definition of security, stating that an instrument may be an
investment contract that would be a security under the securities laws but is not a security under
the Code and SIPA because it is not required to be registered.

108.    After the Supreme Court's decision in *Daniel*, the Securities and
Exchange Commission issued a release under the Securities Act of 1933 entitled *Employee
Benefit Plans*. SEC Release No. 33-6188, 19 S.E.C. Docket 465, 1980 WL 29482 (Feb. 1, 1980).
Following the guidance from *Daniel*, the SEC concluded that "[s]tock bonus plans . . . under
which an employer awards shares of its stock to covered employees" can be securities, as that
term is defined in the Securities Act of 1933, but generally are not required to be registered
because they are deemed to be granted in transactions that are not purchases or sales.  *Id.* at *14-
15.

109.    Since Release No. 33-6188, the SEC has issued a number of no-action
letters confirming that compensation plans involving grants of RSUs and CSAs are not required
to be registered under the Securities Act.  *E.g.*, *Goldman Sachs Group*, 1998 WL 537884 (Aug.
24, 1998); *ING Groep N.V.*, 2000 WL 1910012 (Dec. 29, 2000); *Verint Systems*, 2007 WL
1597334 (May 24, 2007); *WorleyParsons*, 2008 WL 4635593 (Oct. 17, 2008); *UnionBanCal*,
2010 WL 4472795 (Nov. 8, 2010).

110.    The narrow issue under § 101(49)(A)(xii) addressed here arises only if the
RSUs and CSAs are investment contracts, an assumption the Court believes is unwarranted
because of the lack of an investment decision.  However, even assuming that the RSUs and

49

CSAs are investment contracts, based on the SEC Release No. 33-6188 and the SEC no-action

letters that follow, the Court concludes they would have been investment contracts that were not

required to be registered under the Securities Act of 1933.

111.    Based on the foregoing, the Court concludes that the RSUs and CSAs are

not securities under § 101(49)(A)(xii) of the Code.

### E.  The RSUs and CSAs are not Commonly Known as Securities under ¶ (xiv)

112.    Paragraph (xiv) of § 101(49)(A) includes in the definition of a "security" a

claim or interest "commonly known as" a security.  The Supreme Court has indicated that

instruments argued to be within this element of the definition of security must also satisfy the 3-

part *Howey* test developed in the context of construing "investment contracts."  *United Housing*

*Found., Inc. v. Forman,* 421 U.S. 837, 852 (1975) ("[w]e perceive no distinction, for present

purposes, between an 'investment contract' and an 'instrument' commonly known as a

'security.' In either case, the basic test for finding a security is 'whether the scheme involves an

investment of money in a common enterprise with profits to come solely from the efforts of

others.'"); *see also Landreth,* 471 U.S. at 691 n. 5 (same); L. Loss et al., 2 *Securities Regulation*,

863 n.19 (4th ed. 2007) ("…every statute's definition of *security* closes with the broad phrase,

'or any interest or instrument commonly known as a 'security'…There has been surprisingly

little judicial or administrative construction of the phrase, perhaps because other phrases,

especially *investment contract*, normally satisfy any reasonable plaintiff.) (emphasis in original).

113.    The Court refers to the findings of fact at ¶¶ 21-29 above, referring to

documents Lehman provided to RSU and CSA holders and the understanding reported by

Claimants to the effect that they understood from Lehman that they had no rights as stockholders

until they became record holders of stock, and that their rights as grantees of RSUs and CSAs

were no better than those of a general creditor.  The Court also notes that instruments commonly

known as securities that are provided for the performance of services and subject to restrictions

and substantial risks of forfeiture can be the subject of a taxpayer election to be taxed as

compensation before the restrictions and forfeiture risks are lifted in order to have any increase

in value during the restricted period to be taxed at capital gain rates.  *See* ¶¶ 56-58 above.

114.    Under § 101(49)(A)(ii), grants of Restricted Stock would be considered

grants of securities.  Under § 83 of the Internal Revenue Code, such grants of Restricted Stock

are not taxable until the restrictions are lifted.  These restrictions could be the same as the

restrictions for which RSUs and CSAs provide.  Under § 83(b) of the Internal Revenue Code,

however, the grantee of Restricted Stock can elect to pay tax on the value of the shares granted

as if the restrictions did not exist.  There is no tax at the time the restrictions are lifted, and

increase in value *after the grant* (not simply after the lifting of the restrictions) will be taxed at

capital gain rates, not ordinary income rates.  However, this "Section 83(b) election" is not

available to the grantee of RSUs or CSAs, because there is no property transferred that would be

subject to tax.  All the grantee of RSUs and CSAs receives is a promise to deliver stock in the

future.

> An employee can report the gross income associated with
> restricted stock in the year the stock is granted (i.e., transferred),
> rather than waiting until the year in which the stock vests.  This
> "Section 83(b) election" is available for restricted stock *but not for*
> *restricted stock units*, because typically the stock is not transferred
> until it vests.

C. Edgar Adkins, Jr. & Jeffrey A. Martin, *Restricted Stock: The Tax Impact on Employers and*

*Employees*, 107 J. Tax. 224, 226-27 (2007) ("Adkins & Martin") (emphasis added).

115.    No right of election is available for RSU/CSAs under § 83(b) of the

Internal Revenue Code because "with restricted stock the stock itself is transferred," while an

51

RSU or CSA is only "a promise from the employer to transfer the stock" at a future date. *Id.* at

224. Lehman essentially conceded this in oral argument. 4-1-14 Hrg. Tr. 38:11-14 ("the IRS

didn't get money from the employees, . . . and there wasn't a deduction to LBHI, as we'll see at

the end until it became unrestricted common stock.").

116.    As the holders of contract obligations, not equity securities, the person

receiving a grant of RSUs or CSAs is "merely an unsecured creditor of the company." *E.g.*, Max

J. Schwarz, *A Primer on Stock-Based Compensation and Selected Recent Developments,*

*contained in Hot Issues in Executive Compensation 2004*, PLI Tax Law & Estate Planning

Course Handbook Series, 642 PLI/Tax 57, at *81 (September 2004). Lehman criticizes

Claimants reliance on the Schwarz article as not placing its unsecured creditor analysis in the

context of the Bankruptcy Code. Lehman Op. Br. at 12 n.7. Whether a party is an unsecured

creditor, however, is not determined strictly by reference to the Code.

117.    This analysis of the § 83(b) election is beyond the normal purview of this

Court. Claimants properly note, however, that an instrument commonly known as a security

transferred for the payment of services is normally taxable compensation when transferred, and

that if restrictions are imposed that defer the taxation, such as those restrictions that accompanied

the RSUs and CSAs, the taxpayer has options to avoid tax at ordinary income rates on the

increase in value during the restriction period. The fact that this option is not available to the

holders of RSUs and CSAs simply provides another indication that they are not instruments

"commonly known as securities."

118.    The Court's conclusion is that RSUs and CSAs are not claims or interests

commonly known as securities under paragraph (xiv) of Code § 101(49)(A).

### F.  The RSUs and CSAs Not Securities under § 101(49)(B)(vii)

119.    Even if RSUs and CSAs did meet one or more of the definitions under

section 101(49)(A), they are ultimately excluded from the definition of a security under Section

101(49)(B)(vii) of the Code which states, "(49) The term 'security'— . . . (B) does not include

— . . . (vii) debt or evidence of indebtedness for goods sold and delivered or services rendered."

120.    It is uncontested that all services required were duly performed by

Claimants.  Yet Claimants did not receive consideration for the entire amount of Total

Compensation promised for their services.  Based on the Court's findings of fact that

RSUs/CSAs were not real equity and could not be sold, traded, or pledged until conversion to

actual Lehman stock, the money deducted and withheld from Total Compensation in the form of

RSUs/CSAs instruments remained a "debt" payable in either stock or cash (the only two forms

of alternative consideration possible under the employment contracts).  Because Lehman stock

became impossible to deliver due to bankruptcy, Lehman still owes a "debt" for "services

rendered" in the balance of the Total Compensation promised. Such consideration or wages that

remain unpaid on the balance of Total Compensation due for services rendered by Claimants are

an outstanding "debt" under section 101(49)(B)(vii).

121.    Moreover, Lehman's RSUs and CSAs are merely an "evidence of

indebtedness" (i.e., an "I.O.U.") under section 101(49)(B)(vii) for services rendered until they

convert to Lehman stock five (5) years after they are granted. The outstanding RSUs and CSAs

at bar could not be converted for payment in real equity (i.e., common stock) due to the

bankruptcy petition, and remain at most evidence of the balance of Total Compensation

consideration or wages that Lehman still owes to Claimants for their labor.

### G.  Lehman Fails to Show any Basis for Subordination under § 510(b) of the Code - The Claims Are Not for "Damages" under § 510(b)

122.    Claims based upon an unpaid debt are not for "damages" within the meaning of § 510(b).  *See In re Montgomery Ward Holding Corp.*, 272 B.R. 836, 842 (Bankr. Del. 2001) ("damages" in § 510(b) "connotes a recovery broader than a simple claim on an unpaid debt."); *In re Washington Bancorporation*, 1996 WL 148533, at *20 (D. D.C. Mar. 19, 1996) (subordination denied where creditor sought to recover solely on debtor's debt obligations under commercial paper rather than on tort claim).

123.    "The use of the term 'damages' implies more than a simple debt, but at minimum, there must be a claim for damages resulting from some defect with reference to such a purchase or sale."  *In re Wyeth Co.*, 134 B.R. 920, 921 (Bankr. W.D. Miss. 1991); *see also In re Blondheim Real Estate, Inc.*, 91 B.R. 639, 642 (Bankr. D. N.H. 1988) (court refused to subordinate claims of creditors who invested in debtors' notes even though they constituted a security because debt was for a fixed amount).  Consistent with the foregoing, a former shareholder can divest itself of a debtor's shares in exchange for a contractual payment obligation under a note without being subject to subordination under § 510(b), although the note transaction was derived from an equity interest.  *In re Mobile Tool Int'l Inc.*, 306 B.R. 778, 782 (Bankr. Del. 2004) (stock redemption noteholder claims not subject to subordination).

124.    Claimants have Claims for Lehman's alternative performance obligations and for payments due under the U.S. and foreign wage laws, which are not for damages as that terms used in § 510(b), but are for debt claims.

125.    Claimants were general creditors long before the Petition Date based upon Lehman's alternative performance obligations that gave rise to a contingent but liquidated claim for payment in cash and based upon their statutory wage law rights.  The Claims for alternative

performance and the wage laws arise out of Lehman's promise to pay Claimants their

compensation.  Lehman's bankruptcy filing, post-petition termination of Claimants' employment

and its post-petition cancellation of its stock did not give rise to the claim for alternative

performance or to the wage laws.  Such a reading would fly in the face of Code §§ 101(5) and

502(e)(1)(B), which defines the term claim to include claims that are contingent.  *See e.g., U.S.*

*Through Agr. Stabilization & Conservation Serv. v. Gerth*, 991 F.2d 1428, 1433-34 (8th Cir.

1993) (observing how "dependency on a post-petition event does not prevent a debt from arising

prepetition," since "debt can be absolutely owing prepetition even though that debt would never

have come into existence except for post-petition event").

### H.  The Legislative History of Section § 510(b) Does not Support Subordination Here

126.    The parties have not produced for the Court, and the Court has not found

in its own research, other cases in which instruments such as RSUs and CSAs were subordinated

under § 510(b).  As other Courts have done, this Court also has sought guidance from the

legislative history in examining the intent and purpose of § 510(b).  *See, e.g.,  In re MarketXT*

*Holdings Corp.*, 2008 WL 2164572, at *2 (Bankr. S.D.N.Y. May 22, 2008), *aff'd* 346 F. App'x

744, 746 (2d Cir.2009) (Circuit court examined both the "plain meaning" of the statute and the

"policy rationales cited . . . in *In re Med Diversified*.").  The Court has found helpful one piece of

legislative history, the Report of the Commission on Bankruptcy Laws of the United States (H.R.

Doc. No. 93-137, Pts. I & II (1973) (Commission Report)),which contained proposed language

very similar to § 510(b)'s final language.  *See In re Granite Partners, L.P.*, 208 B.R. 332, 336

n.8 (Bankr. S.D.N.Y. 1997).

127.    According to the accompanying explanation, the proposed provision was

"intended to reach claims by holders of the debtor's securities that were based on 'federal and

state securities legislation, rule pursuant thereto, and similar laws,' *but would not affect any other*

*claim (e.g., a wage claim) which the investor also held*." *Id.* (quoting Commission Report, pt. II,

at 116) (emphasis added).  If the same intent is attributed to the Congress that later adopted the

same statutory language, it is strong evidence that § 510(b) was not intended to apply to wage

claims, such as those here.

128.    Professors Slain and Kripke were completely consistent in the study cited

by Congress in adopting § 510(b), stating that "the reliance interests of *laborers*, lenders and

trade creditors" deserved greater protection than securities fraud claimants.  John J. Slain and

Homer Kripke, *The Interface Between Securities Regulation and Bankruptcy – Allocating the*

*Risk of Illegal Securities Issuance Between Securityholders and the Issuer's Creditors*, 48

N.Y.U. L. Rev. 261, 299 (1973) ("Slain & Kripke") (emphasis added).[15]  Their focus was on

*fraud* claims, which they criticized as an unwarranted exception carved out from the absolute

priority rule.

> The exception does not acknowledge the fact that the general creditor relies on the
> existence of an equity cushion in the case of his debtor's bankruptcy . . . . In sum,
> the exception [for securities fraud claims]gives full recognition to the interests of
> shareholders, but neglects the interests and expectations of *laborers*, lenders and
> trade creditors.

*Id.* at 298 (emphasis added).

---

[15] In *Enron*, Judge Gonzalez recognized the Slain & Kripke article as "the journal article that
motivated the promulgation of" § 510(b), and noted that Congress had "broadly adopted the legal
principles articulated by Slain and Kripke" in drafting the statute.  341 B.R. at 163.  On the
Appellate level, the Second and Third Circuits both have noted the influence of the Slain &
Kripke article.  *In re Med Diversified, Inc.*, 461 F.3d 251, 255-56 (2d Cir. 2006));  *In re
Telegroup, Inc.*, 281 F.3d 133, 139 (3d Cir. 2002).

129.    The purpose of § 510(b) was to remove the exception to the absolute priority rule for securities fraud claims, of which Slain and Kripke were critical because "purchasers of stock and subordinated debt have by their investments invited reliance by others who deal with the issuer." *Id.* at 299. To apply a rule to eliminate an exception benefiting fraud claimants to these employees' compensation claims is contrary to their explicit statement ("neglects the interests and expectations of *laborers*") and completely upends the Slain/Kripke analysis.

**I.    The Claims Are for Enforcement of Lehman's Alternative Performance Obligation to Pay Claimants in Cash when Paying them in the Form of Equity in LBHI Became Impossible**

130.    Lehman was contractually obligated to pay the entire Total Compensation it promised in employment letters in exchange for services rendered by Claimants.

131.    Prior to the Petition Date, under its employment arrangement with Claimants, Lehman made contingent alternative promises to Claimants with respect to a portion of their Total Compensation, payment of cash or performance under RSUs/CSAs pursuant to the RSU/CSA plan. Prior to the Petition Date, as to a portion of Total Compensation, Lehman had awarded bonuses to salaried employees for services rendered in prior years starting for year 2003 in a liquidated and certain sum. Prior to the Petition Date, as to a portion of their Total Compensation, commission employees had Equity Accrual Calculated for commissions on product sold in years 2003 through 2008 in a liquidated and certain sum.

132.    Prior to the Petition Date, Lehman started performance with respect to a portion of its Total Compensation obligation to Claimants for services rendered in years 2003 through 2008 through the grants of RSUs/CSAs which were outstanding as of the Petition Date. Prior to the Petition Date, Claimants did not agree with Lehman that its Total Compensation

57

obligation would be fully satisfied to them for services rendered in prior years upon the mere

grant of an RSU or CSA.  Claimants did not accept Lehman's executory promise to issue LBHI

Common Stock, subject to Claimants' satisfaction of the employment related conditions under

the RSUs/CSAs, as an immediate discharge of Lehman's debt to Claimants for its contingent

alternative promise for payment in cash.  Prior to the Petition Date, Lehman owed a contingent

debt to Claimants for payment in cash for services rendered during years 2003 through 2008 in

the event it did not perform under the RSUs/CSAs.

133.    Where a contract provides for one of two alternative modes of

performance and one mode of performance becomes impossible to perform, the promisor is

required to perform the other.  *Yankton Sioux Tribe of Indians v. U.S.*, 272 U.S. 351, 358 (1926)

(where "the undertaking of the Government is in the alternative" in default of one alternative

Government must perform the other); *Ashland Oil & Refining Co. v. Cities Serv. Gas Co.*, 462

F.2d 204 (10th Cir. 1972) (alternative undertaking to pay for deficiency was activated where

performance of other promise was impossible.).

134.    Impossibility of performing one of the promised alternative means of

performance under a contract does not discharge the duty of the promisor if by the terms of the

contract he had the privilege of choice but merely destroys the promisor's choice.  *Glidden Co. v.

Hellenic Lines, Ltd.*, 275 F.2d 253 (2d Cir. 1960) (where charter agreement provided for

alternative routes at owner's option and Suez Canal was closed owner required to take alternative

route); *Draken Group, Inc. v. Avondale Resources, Inc.*, 2008 WL 151901 at *1 (N. D. Okla. Jan

14, 2008) (at issue was contract providing "at the discretion of Avondale, this fee may be paid in

cash or, in whole or in part, in the equivalent percentage of working interests in acquired oil and

gas fields.").  Under the contractual employment arrangement Lehman had with Claimants, it

58

was within Lehman's discretion whether to compensate its employees in any year through the RSU/CSA plan or payment in cash; however, Lehman's ability to choose the mode of performance of compensation, payment in cash or equity through the RSU plan, was destroyed when performance of delivering equity in Lehman under the RSUs/CSAs was rendered impossible.

135.    Lehman's bankruptcy rendered impossible payment of Total Compensation under the alternative method of delivering real equity (i.e., actual stock in Lehman) through the RSU/CSA plan as Claimants could no longer perform under the RSUs/CSAs following the Petition Date, and could no longer satisfy the conditions thereunder.

136.    Lehman also could no longer perform under the RSUs/CSAs upon its bankruptcy because it could not provide a workplace for Claimants to provide the required services under the RSUs/CSAs and it could not deliver the Common Stock promised under the RSUs/CSAs once the LBHI Common Stock was cancelled under the Plan.  Payment of Total Compensation through the RSU/CSA alternative could no longer be properly complied with. Moreover, with the liquidation of Lehman's business, whether the RSUs/CSAs served as a retention device as asserted by Claimants or as a motivating factor in the business as asserted by Lehman, is not of any significance.  Where employees remained with Lehman through the Petition Date and where Lehman would no longer be operating as an active business but was in an orderly liquidation, there was no longer any purpose to be served by the RSU/CSA plan.

137.    Lehman is required to render its alternative performance, to pay Claimants their compensation in cash, which was a liquidated and certain amount as of the Petition Date.

138.    Pursuant to ¶ 4.17 of the Plan entitled "LBHI Cass 12 – Equity Interests in LBHI," and in particular subsection (b) entitled "Stock Exchange," the LBHI Common Stock

59

was cancelled and Plan Trust Stock was issued to the Plan Trust to hold such shares for the

benefit of former holders of LBHI Common Stock outstanding on the Effective Date.   Under the

Plan, Plan Trust Stock means one new share of LBHI common stock to be issued to the Plan

Trust.   Under the Plan, in the event all Allowed Claims have been satisfied in full, each holder of

Plan Trust Stock may receive its share of any remaining assets of LBHI.   On the date LBHI's

case is closed, the Plan Trust Stock shall be deemed cancelled.   The interests of holders of Plan

Trust Stock are nontransferable.

139.    Lehman argues that for purposes of the analysis under §510(b), Claimants

should be deemed to have received full performance under the RSUs/CSAs through Lehman's

proposal for the delivery of  Plan Trust Stock to Claimants, and that performance of its Total

Compensation obligation under the RSU alternative has not been rendered impossible.

140.    Lehman's argument fails for two reasons.   First, Claimants must be the

holder of a LBHI Class 12 Equity Interest and in particular the holder of former LBHI Stock as

of the effective date of the Plan in order to qualify for distribution of the New Common Stock

under the Plan.   Claimants are neither.   Claimants held the RSUs/CSAs as of the Petition Date

which entitled Claimants to receive LBHI publicly traded Common Stock at a date in the future,

but which RSUs/CSAs themselves this Court has found are not equity within the definition of

equity security under 101(16).   As of the Petition Date, Claimants' RSUs/CSAS had not reached

their Conversion and there had been no payment of LBHI Common Stock to any Claimants on

account of the services rendered for which they had received such RSUs/CSAs. The RSU/CSA

plan documents provided that until conversion Claimants did not have the rights of a

shareholder.   Claimants were creditors with alternative performance rights to cash and not equity

holders.   There is no basis to treat Claimants as equity holders and to thereby make a distribution

60

of New Common Stock to Claimants in performance of LBHI's compensation obligation under the RSU/CSA alternative when Claimants are creditors.

141.    Nor had or have Claimants ever agreed to accept New Common Stock created under Lehman's Plan in satisfaction of Lehman's alternative performance obligation. Lehman cannot now make a better contract that what it provided for under its employment arrangement.  The contract with employees provided for two alternatives, performance under RSUs/CSAs calling for conversion to Lehman's publicly traded Common Stock, and payment in cash.  Before conversion occurred and before Claimants received Common Stock, the LBHI Common Stock was cancelled. Stock in the bankrupt entity is not the same as the stock they were alternatively promised. The only remaining alternative performance obligation is payment in cash.  Issuance of newly created common stock under the Plan to Claimants that is not transferable, that is not LBHI Common Stock (as defined in the grants and Lehman's employee incentive plans) that will receive no distribution, that will be cancelled upon the closing of the Lehman case, and which is issued by a defunct shell and not by an actively operating company, was not one of the modes of performance agreed upon under the employment arrangement. Lehman cannot now create a new and third alternative because it is dissatisfied with the terms of the contract that it imposed upon its employees.

142.    There is no evidence that Claimants agreed to excuse Lehman's alternative performance (payment in cash) if Lehman could not perform under the RSUs or CSAs.  In fact, in 2005, Lehman itself purposely and intentionally removed from the RSU agreements themselves the Subordination Clause and all references to bankruptcy, thereby suggesting to the Court Lehman's intention that employees' claims for unpaid compensation that had or might receive RSUs/CSAs should be viewed as general creditor claims.  *See, e.g.*, Fact Stip., Ex. 6

(pgs. 58-61 of 148).  Any ambiguity in the drafting or removal of language should be construed

against the drafter. In this case, it is concluded that the ambiguity regarding the removal of the

Subordination Clause is construed against LBHI and in favor of Compensation Claimants'

argument that Lehman intended to treat them as unsecured creditors until the RSUs/CSAs

converted to actual common stock. This reading is consistent with other language in plan

documents and RSU Trust document which evidence Lehman's intent that Creditors be treated

as general unsecured creditors until the common stock is delivered five (5) years after issuance

of the RSUs/CSAs.

**J.    The Claims are also based upon Various Wage Laws which Lehman violated
        through its RSU/CSA program**

143.    Lehman was also statutorily obligated to pay the entire Total

Compensation it promised in employment letters in exchange for services rendered by

Claimants.

144.    Section 510(b) of the Code is also inapplicable because Claimants have

asserted statutory claims for the full payment of their respective Total Compensations under

various wage laws.  Claimants are not seeking "damages" based on breach of contract, fraud, or

any other tort, loss, or injury as Lehman assumes.  Nor are they seeking "rescission" of contract

based on mistake, fraud or otherwise, as Lehman speculated at the evidentiary hearing.  For the

following reasons, Lehman's RSU/CSA plan agreements that were imposed upon Claimants are

void as a matter of law because they violated one or more wage law statutes prohibiting unlawful

deductions or withholdings.

145.    Wage laws of the jurisdiction where an employee worked generally apply

despite any choice of law contractual provision to the contrary when there is a strong public

policy designed to protect local employees working in the particular jurisdiction.  Because

Lehman had offices world-wide, the wage laws and public policies of various jurisdictions where

Compensation Claimants worked apply, including New York, New Jersey, California, Illinois,

and the United Kingdom among others.

146.    Wages are not ordinary debts; they are required to be paid by statute.  The

wage statutes do not involve causes of action which generate unliquidated and uncertain

damages; nor even use the term "damages."  Rather, they provide their own statutory causes of

actions and remedies. *See, e.g.*, N.Y. Lab. Law § 198(3).  Lehman provides no authority to

support its argument that wage law claims must be treated as "damages" under section 510(b).

Instead, Lehman improperly hides the word "damages" with ellipses when citing section 510(b)

in its opening and opposition briefs: "First, a state law claim for payment in the form of RSUs

for services provided to Lehman is still a claim 'arising from the purchase or sale of a . . .

security' and thus must be subordinated under section 510(b). *U.S. Wireless*, 384 B.R. at 719."

LBHI Opening Br. p. 30; *see also* LBHI Opposition Br. at 30.

147.    An employee may not be forced to waive labor law protections.  *Padilla v.

Manlapaz*, 643 F.Supp.2d 302 (E.D.N.Y. 2009).  Pro se claimant Andrea Jao stated on record:

"[I]t's my humble opinion that labor law should protect employees from having to walk away

from compensation for which they've already rendered labor." 4-2-14 Hrg. Tr. 14:11-13.

Indeed, Lehman employees cannot be forced to waive or forfeit their right to payment of the

Total Compensation they were promised after undisputedly having performed the services for

which they were employed.

148.    Lehman's outstanding RSUs fail to serve as an adequate form of payment

towards the Total Compensation when the only real consideration to be transferred in satisfaction

of the Total Compensation promise – i.e., the common stock (actual equity in the company) – becomes impossible to deliver.

149.    As remedial legislation intended to ensure employees receive the fruits of their labor, the wage laws must be construed liberally.  *See* N.Y. Stat. Law § 321 ("Generally, remedial statutes are liberally construed to carry out the reforms intended and to promote justice"); *Rosen v. Smith Barney, Inc.*, 393 N.J.Super. 578, 586 (N.J. Super. Ct. 2007) (Intent of the wage law is to protect employees and to guarantee receipt of the fruits of their labor by prohibiting employers from withholding or diverting any portion of the employee's wages unless expressly provided by the wage law.); *Heyen v.  Safeway Inc.*, 157 Cal.Rptr.3d 280 (Cal. Ct. App. 2013) (Statutory provisions regulating wages that are enacted to protect employees are liberally construed with an eye to promoting such protection, while exemptions are narrowly construed and, as affirmative defenses, must be proved by the employer.).

150.    Commissions like those earned by many of the Claimants here are protected as "wages" under any jurisdiction.  All of the commissions claimed by Claimants were "wages" that were already declared in fixed amounts reflected as deducted and withheld on their "Lehman-Live" online accounts at the time of monthly withholdings by Lehman.  *See, e.g., Gennes v. Yellow Book of New York, Inc.*, 23 A.D.3d 520 (2d Dep't. 2005) (Commissions were "wages," within meaning of Labor Law provision proscribing unauthorized deductions from wages); *Koehl v. Verio, Inc.*, 142 Cal.App.4th 1313 (Cal. Ct. App. 2006) (Commissions are "wages" under the Cal. Labor Code). Lehman offers no authority contrary to the laws holding that earned commissions which are already declared in fixed amounts are "wages."

151.    Bonuses claimed by the Compensation Claimants here, are likewise "wages" since they were either guaranteed-bonuses and/or, in the case of so-called

64

"discretionary"-bonuses, were already declared in a fixed amount.  *See, e.g.*, *Diamond v. Davis*,

38 N.Y.S.2d 103 (N.Y. Sup. Ct. 1942) (every benefit firmly offered or authoritatively fixed for

an employee, which in the course of fair dealing and reasonable conduct should rightfully be

expected, may be regarded as part of a just increment to the compensation payable for the work).

Under New York law, "bonuses and similar incentive compensation become vested either by

contract or when an employer otherwise awards a specified amount of compensation to the

employee." *Carlson v. Katonah Capital, L.L.C.*, 2006 WL 273548 (N.Y. Sup. Ct. Jan. 27, 2006);

*See, also, Levion v. Societe Generale*, 822 F.Supp.2d 390 (S.D.N.Y. 2011) (guaranteed bonuses

would be considered 'wages' under NY Labor Law); *Reilly v. Natwest Markets Group Inc.*, 181

F.3d 253, 264-65 (2d Cir. 1999) (employee's bonus constituted wages where it was guaranteed

to be a percentage of employee's revenues); *Bader v. Wells Fargo Home Mortg. Inc.*, 773 F.

Supp. 2d 397 (S.D.N.Y. 2011) ("Wages" does not include bonus, profit-sharing, and other forms

of incentive compensation unless the incentive compensation is already earned by the employee;

a bonus is earned when the employee acquires a vested interest in the award and its payment is

not conditioned upon some occurrence or left to the discretion of the employer.).

      152.    Lehman argues that the claims here are not for "wages" under New York

labor law because claimants merely have a contingent claim to equity-based compensation. It

further argues that "Claimants do not have a claim under New York Labor Law because

unvested and unexercised RSUs do not constitute 'wages.'"  Lehman Opening Br. at 30.

Lehman largely relies on the *Guiry* case which held that restricted stock units themselves are not

"wages."

> "'[U]nvested, contingent rights' to company stock" – such as RSUs – are not
> "wages" because "'the ultimate value of such equity-based compensation
> [depends] on [the employer's] stock price after the rights vested, at the time of
> delivery.'"  *See Econn v. Barclays Bank PLC*, No. 07 Civ. 2440 (BSJ), 2010 WL

9008868, *5 (S.D.N.Y. May 10, 2010) (quoting *Guiry v. Goldman, Sachs & Co.*, 31 A.D.3d 70, 71-72 (1st Dept. 2006)).

Lehman's argument misses the point. Compensation Claimants did not argue that the RSUs and CSAs themselves are "wages," or that the incentive compensation plan itself gives them a right to wages. Rather, these are statutory claims for unpaid wages in fixed amounts arising from Lehman's mandatory withholdings effectuated through its unilaterally imposed RSU / CSA plans wherein it failed to disclose to Claimants the consequences of what would happen to their total compensation promised in a bankruptcy and its failure in many instances to obtain written signed authorizations for the deductions made. *See, e.g.*, Burke Aff. ¶ 14. Cases cited in Lehman's briefs do not address the issue of whether improperly withheld amounts from earned wages without full disclosure of material terms (such as what would happen in a bankruptcy situation) and without obtaining the employee's express written authorization give rise to a wage claim. The amounts improperly withheld in violation of various state wage claims are the wages asserted here.

153. Moreover, Lehman's reliance on the *Truelove* case is misplaced. There, the bonus payment was based "solely upon his employer's overall financial success." *Truelove v. Ne. Capital Advisory*, 95 N.Y.2d 220, 224 (2000). Also, that case did not involve a situation such as here where employees did not have a chance to give informed authorization (with full disclosure about the risks in a bankruptcy event) before the withholding of their wages. Moreover, *Truelove* was distinguished in *Ryan v. Kellogg Partners Institutional Servs.*, 19 N.Y. 3d 1, 968 N.E.2d 947 (2012) (bonus constituted "wages" within meaning of Labor Law, so that employer's neglect to pay bonus violated Labor Law provision prohibiting employer from making deductions from wages of employees); *see also*, *Giuntoli v. Garvin Guybutler Corp.*, 726

66

F. Supp. 494, 509 (S.D.N.Y. 1989) ("bonus payments, already due and vested . . . fall within the definition of wages in § 190").

154.    Under Illinois law, bonuses have to be guaranteed or earned to be a "wage," and earned bonuses are earned pro rata. *DeGeer v. Gillis*, 707 F.Supp.2d 784 (N.D. Ill. 2010) (Bonuses are among the forms of compensation recoverable under the Illinois Wage Payment and Collection Act); *Arrez v. Kelly Servcs., Inc.*, 522 F. Supp. 2d 997 (N.D. Ill. 2007); *Camillo v. Wal-Mart Stores, Inc.,* 221 Ill.App.3d 614 (Ill. App. Ct. 1991); *Brandon v. Anesthesia & Pain Mgmt Associates, Ltd*., 419 F.3d 594, 597 (7th Cir. 2005); *Zabinsky v. Gelber Group, Inc*., 347 Ill. App. 3d 243 (Ill. App. Ct. 2004). As discussed earlier, all of Claimant's bonuses at issue here had already been earned and must be considered "wages."

155.    California law broadly considers incentive compensation like bonuses to be "wages." Because Lehman's RSU contracts with their employees are in violation of one or more wage law statutes, they are void as a matter of law. *Schachter v. Citigroup, Inc.*, 47 Cal.4th 610 (Cal. Super. Ct. 2009); *Neisendorf v. Levi Strauss & Co.*, 143 Cal. App. 4th 509 (Cal. Ct. App. 2006). California law even goes so far as to prohibit employers from conditioning employment on taking an equity interest in the business as part of the total compensation. Cal. Lab. Code §§ 407, 408. Lehman's RSU / CSA program clearly violates these California statutes.

156.    In the U.K., once a bonus is declared in a certain quantity it becomes the legal obligation of the employer that cannot be withdrawn, and falls within meaning of wages. *Farrell Matthews & Weir v. Hansen,* [2005] I.R.L.R. 160. Here, the bonuses and commissions were declared in fixed quantities before a portion was deduction and withheld in the form of CSAs. But there is no question the earned portion was fixed and quantified.

67

157.    Each Claimant with a guaranteed or fixed bonus claim or a fixed commission claim for services already rendered therefore has a right to full payment of wages, in this case their Total Compensation due for services rendered.  To the extent these due wages were unlawfully withheld under Lehman's RSU/CSA plan, or to the extent they were not or could not be paid in full, that employee necessarily has an outstanding statutory debt claim for the respective fixed amount still withheld as unpaid "wages."

### K.  Withholdings/Deductions were primarily for the Benefit of Employer Lehman

158.    Lehman's RSU/CSA Plans violate wage laws requiring deductions or withholdings be for the employee's benefit.  Wage withholdings in certain jurisdictions also must be for the benefit of the employee, not the employer.  *See, e.g.,* N.Y. Labor Law § 193; Cal. Op. Att'y Gen. (Nov. 5, 1981) (deduction must be for the benefit of the employee, not the benefit of the employer.).

159.    Here, there is no question Lehman deducted and withheld employee wages primarily for its own benefit.  Lehman's implementation of the RSU/CSA plan allowed it to retain cash for itself by deducting and withholding earned compensation from thousands of its employees' paychecks.  By doing so, Lehman was able to (1) retain top employee talent with the threat of making them mandatorily forfeit wages if they left Lehman, (2) prevent top talent from taking offers with its competitors, (3) avoid paying employees the full dollar amount of Total Compensation wages if they left the company before the 5 year conversion date of RSUs or CSAs converted into common stock, (4) keep more cash for its own general use, and (5) inflate its financial value to present a healthier picture to shareholders, rating agencies, clients, and potential target clients than was truly the case in the years leading up to the Chapter 11 petition.

160.    That the RSU/CSA plan was not for the benefit of employees is further evidenced by Lehman's foreclosing employees from making the decision whether or not to participate in the RSU/CSA plan or purchase company stock through options at the discretion of the employees, and instead making the decision for them.

161.    Lehman enjoyed the benefits of the retained cash at (what it now hopes will be) the ultimate expense of employees.  Lehman's briefs and oral arguments did not offer any evidence proving the RSUs were not for the benefit of Lehman and were rather for the benefit of its employees.

**L.    Lack of Informed Written Authorization**

162.    Lehman's RSU/CSA contracts also violate wage laws which require voluntary (informed) written authorization from the employee for any withdrawals or deductions.

163.    Portions withheld from each Compensation Claimant's paycheck were at Lehman's sole discretion and lacked their requisite prior informed, written authorization as required by wage laws of various jurisdictions.

164.    Acceptance and continuation of employment with Lehman subject to the terms of the RSU/CSA plan was not done with informed knowledge with knowledge of the risks and rewards attendant to their participation in the plan and with respect to employees' unpaid commissions and bonuses that were statutory wages, including subordination under § 510(b).

165.    In its opening brief, Lehman states that, "Here, the purported 'wages' that were withheld from Claimants are those amounts that were withheld from their bonus or commission checks and allocated to RSUs.  As such, the RSU Claims accrued the day Claimants received notice on their pay stubs that a portion of their 'total compensation' was being attributed to RSUs." LBHI Opening Br. at p. 32.  Such deductions or withholdings from wages

69

are unlawful unless they are expressly authorized in writing by the employee with full prior

notice of all terms and conditions of the payment and/or its benefits and the details of the manner

in which deductions will be made.  NY Lab. Law § 193. *Schunkewitz v. Prudential Sec., Inc.*, 99

F. Appx. 353 (3d Cir. 2004) (terms of plan valid where contract was entered into on informed

and voluntary basis); *Rosen v. Smith Barney, Inc.,* 925 A.2d 205 (N.J. 2008) (Deductions from

wages for deferred stock compensation plan was permissible given that the plan was in writing

and fully disclosed all the terms prior to a participant enrolling, participation was optional and

risk of forfeiture was unambiguously disclosed); *Schacter v. Citigroup, Inc.*, 126 Cal. App. 4th

726, 740 (Cal. App. Ct. 2005) (compensation plan upheld where all terms and conditions were

disclosed to participants); *Marsh v. Prudential Sec. Inc.*, 1 N.Y.3d 146 (N.Y. Ct. App. 2003)

(deductions lawful where employee gave written and informed authorization to defer wages

under plan ); Weil, Gotshal & Manges LLP, Bankruptcy Blog, *Tightening the Golden Handcuffs:*

*Forfeiture Provision in Stock; Voluntary Plans*, April 5, 2004 ("Marsh provides that . . . plan

participants should, as a condition to participation, sign a written authorization acknowledging

that they were given notice of and understand the risks associated with participation in the

plan."), www.weil.com/news/pubdetail.aspx?pub=3428.  *See also*, Cal. Lab. Code §§ 222 and

224; *see also Koehl v. Verio, Inc.*, 142 Cal.App.4th 1313 (Cal. Ct. App. 2006) (Deductions

lawful because the "[employees] all testified that they received and read the plans, had the

opportunity to ask questions about them, understood them, and signed them."), *review denied*.

Ill. 820 ILCS § 115/9; *Kim v. Citigroup, Inc.*, 305 Ill.Dec. 834, 368 (Ill. App. Ct. 2006), appeal

denied (wage deductions not unlawful because voluntarily allowed with the express written

consent of the employee); *Ury v. Fruit Belt Service Co.*, 64 Ill.Dec. 613 (Ill. App. Ct. 1982)

(unlawful for employer to withhold a portion of employee's income and place it in reserve

70

account for employer benefit.).  Col. Rev. Stat. § 8-4-105.  Lehman did not provide sufficient

evidence proving that each one of the Compensation Claimants expressly authorized in writing

the specific deductions to be made monthly or yearly from their paychecks.

166.    Compensation Claims are distinguishable from voluntary written

authorization cases because the claimants here: (1) were given no choice but to participate in the

RSU/CSA plan if they wanted to obtain or keep their job; (2) many employees did not sign

written authorizations for deductions from their wages and where given they were not informed

authorization; and (3) acceptance and continuation of employment with Lehman subject to the

terms of the RSU/CSA plan was not done with knowledge of the risks and rewards, specifically

with respect to possible subordination under § 510(b).

167.    There could be no informed and voluntary written authorization to

Lehman's unilateral wage deductions because Lehman did not provide any disclosure with

respect to the possible application of § 510(b).  In fact, Lehman removed the Subordination

Clause in all RSU/CSA plan documents after 2004.  If this deletion does not evidence Lehman's

intent that the claims be treated on par with other general creditors, then the risks of § 510(b)

must have been disclosed in a notice to employees so that the employees could make informed

written authorizations to the wage withholdings.  Lehman knowingly and purposely removed the

subordination language and this should be construed strictly against the drafter.  Disclosure to

employees of the risks attendant to a bankruptcy was imperative for the further reason that the

contingency that could cause a loss of their wages, a possible bankruptcy, was an event wholly

outside employees' control, as distinguished from the other conditions stated in the RSU/CSA

plan that could cause a forfeiture of their wages.

71

168.    Lehman cannot pretend to have fulfilled its obligation to "pay" compensation in the form of RSUs or CSAs since no actual consideration was exchanged to the employees by allowing them to hold RSUs or CSAs that became impossible to convert to stock. Since the equity became impossible to deliver, it means Claimants did not receive the full wages due to them under the Total Compensation plan and now have wage claims.

169.    Claimants have allowable statutory claims to their full wages, which could not be paid in any part through the RSUs or CSAs which lack any value whatsoever due to the bankruptcy, and such claims are entitled to priority status under section 507(a)(4)(A) of the Code which aims to protect employees in a bankruptcy.

## III.    CONCLUSION

170.    For the foregoing reasons, the Omnibus Objections are denied in their entirety.

Dated:  June 6, 2014
          New York, New York

LAW OFFICES OF LISA M. SOLOMON              STAMELL & SCHAGER, LLP


By: _____/s/_____            By: _____/s/_____
      Lisa M. Solomon                             Richard J. Schager, Jr.
One Grand Central Place                           Andrew R. Goldenberg
305 Madison Avenue, Suite 4700             555 Fifth Avenue, 14/F
New York, New York 10165                   New York, NY  10017
Tel: (212) 471-0067                        Tel.:  (212) 566-4047
Fax: (212) 980-6965                        Fax:  (212) 566-4061

*Counsel to Claimants:  Madelyn Antoncic, Peter Hornick, Vincent Primiano, Charles Spero, Gordon Sweely, Timothy A. Burke, Jonathan Sebiri, Riccardo Banchetti, Michele Bareggi, Philippe Dufournier, Anke Parr, Giancarlo Saronne, Harsh Shah, Richard Noble, Michael Lawsky, Nikki Marshall, Nachiketa Das*

*Counsel to Claimants:  Jennifer Adler, Ian Anderson, Craig Benson, Paola Biraschi, Karen Brewer, William Broadbent, David Brooks, Patrick Cremin, Michael Collier, Joseph D'Amadeo, John Dmuchowski, Nestor De Jesus, Steven Engel, Louise Goldberg, Michael Gran, Anshuman Goyal Adrian Graves, Sandra Hahn-Colbert,*

*Nicholas Howard, Julian Iragorri,
Harriet Chan King, Karen Krieger,
Tal Lev Ari, Yeruchim Levilev, Sarah Lewis,
Patricia Luken, Lawrence McCarthy,
Michael McCully, Hugh McGee,
Estate of Michael Mullen, Ian Neville,
Thomas, O'Sullivan, Helmut Olivier, Martin
Patterson, Michael Petrucelli, Sandy
Fleischman Richman, Barry Porter, Jack
Rivkin, Alvaro Santodomingo, Brian
Seward, Ross Shapiro, Margaret Smith,
Stephen Snelling, Gregg Somma, Andrea
Sullivan, Milan Veleba, Pierluigi Volini,
Jeffrey Wecker, Peter Ward, Timothy
Wilkinson, Judith Winchester, Jennifer
Becker, Guillemette Callies, Gregg Hawes,
Christine Schuster, Wendy Uvino, Colin
Welch, Luigi Zeppetelli*

RICH MICHAELSON MAGALIFF
 MOSER LLP
   Howard P. Magaliff, Esq.
   Robert N. Michaelson, Esq.
340 Madison Avenue - 19th Floor
New York, NY  10173
Tel.:  (212) 220-9402

*Counsel to Claimants:  Roger Saks, Donald
Boughrum, Brian Monahan, Nicole Lawrence,
H. Morgan Lawrence, III*

LAW OFFICE OF A. JAMES
BOYAJIAN
   A. James Boyajian, Esq.
355 S. Grand Avenue, Suite 2450
Los Angeles, CA 90071
Tel: (424) 258-0777
Fax: (424) 298-4377

*Counsel to Claimants: Virgilio Casuple,
Darian J. Cohen, Lars P. Jacobson, Mary
Langevin, Amit K. Sarkar, Christian E.
Steven, Andrew Wideman*