Page 1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   Case No. 08-13555(SCC)

4   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5   In the Matter of:

6

7   LEHMAN BROTHERS HOLDINGS INC.,

8

9            Debtor.

10

11   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

12

13                    U.S. Bankruptcy Court

14                    One Bowling Green

15                    New York, New York

16

17                    June 9, 2014

18                    10:06 AM

19

20   B E F O R E :

21   HON SHELLEY C. CHAPMAN

22   U.S. BANKRUPTCY JUDGE

23

24

25

Page 2

1    Hearing re:  Doc# 26882 Debtors' Objection to CMBS Claims

2    and Request for Subordination Pursuant to Sections (510(a)-

3    (c) of the Bankruptcy Code filed by Jonathan S. Henes on

4    behalf of Lehman Brothers Holdings, Inc.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Dawn South

Page 3

1  A P P E A R A N C E S :

2  KIRKLAND & ELLIS LLP

3      Attorneys for the Debtor

4      601 Lexington Avenue

5      New York, NY 10022

6

7  BY:  JOSEPH SERINO, JR., P.C., ESQ.

8      SHIREEN A. BARDAY, ESQ.

9      QUAN HONG, ESQ.

10

11  ROBINS KAPLAN MILLER & CIRESI LLP

12      Attorney for Federal Home Loan Bank of Pittsburgh

13      2800 LaSalle Plaza

14      800 LaSalle Avenue

15      Minneapolis, MN 55402-2015

16

17  BY:  THOMAS P. BERNDT, ESQ.

18

19

20

21

22

23

24

25

1                     P R O C E E D I N G S

2              THE COURT:  Okay.  How is everyone today, Your

3   Honor?

4              MR. SERINO:  Well, Your Honor.  Doing well.

5              THE COURT:  Good.  Why don't I take your

6   appearances and then we can get started.

7              MR. SERINO:  Good morning, Your Honor, may it

8   please the Court, Joe Serino from Kirkland & Ellis for the

9   debtors.  With me at counsel table is Shireen Barday and

10  Quan (ph) Hong from Kirkland as well.

11             THE COURT:  Okay.

12             MR. SERINO:  And just behind them is Martha

13  Salinger (ph), who you probably know, co-general counsel for

14  LBHI.

15             THE COURT:  Okay.  Very good.  Good morning.

16             MR. BERNDT:  Good morning, Your Honor, Tom Berndt

17  from the firm of Robins Kaplan Miller & Ciresi on behalf of

18  the Federal Home Loan Bank of Pittsburgh.

19             THE COURT:  Okay.  All right, so I've read

20  everything a number of times, and I have a couple of

21  preliminary questions for the debtor.

22             So in this particular pool there are three sets of

23  certificate holder claimants, right?  There's Carlisle

24  (ph) --

25             MR. SERINO:  Correct.

Page 5

1           THE COURT:  -- right?  And there's Pittsburgh.

2           MR. SERINO:  Correct.

3           THE COURT:  And there's --

4           MR. SERINO:  And Bow Post (ph).

5           THE COURT:  And --

6           MR. SERINO:  Bow Post is the third.

7           THE COURT:  Right.  Now why aren't they here

8    today?

9           MR. SERINO:  That's a good question.  We settled

10   with Carlisle.

11          THE COURT:  Okay.

12          MR. SERINO:  And I believe -- I'm sure I'll be

13   corrected if I'm wrong -- Bow Post and PHLB Pittsburgh have

14   asked to separate their issues and have them on different

15   schedules -- different briefing schedules because we're

16   going to try to do a mediation with Bow Post to see if we

17   can resolve it without Your Honor having to get involved.

18          THE COURT:  Okay.  So that's helpful.

19          The next question is that to the extent that I

20   then decide the issue with respect to Pittsburgh then that

21   has the law of the case implications, correct, for other

22   similar trusts and pools of certificates, correct?

23          MR. SERINO:  I believe it does, Your Honor.

24          THE COURT:  Okay.

25          MR. SERINO:  I believe it does.  You may get some

Page 6

1    collateral estoppel, res judicata arguments back from other

2    people --

3              THE COURT:  Who aren't here.

4              MR. SERINO:  -- who aren't here and claim --

5              THE COURT:  Right.

6              MR. SERINO:  -- they did not have an opportunity

7    to --

8              THE COURT:  Right.

9              MR. SERINO:  -- litigate the issues, but I believe

10   it has --

11             THE COURT:  Right.

12             MR. SERINO:  -- law of the case implications.

13             THE COURT:  Because this structure, you know, in a

14   schematic sense, has come up but raising different issues,

15   so I've had the case now for maybe four months, and I think

16   that the similar structure, although not this issue, came up

17   with respect to reserves and whether or not it was necessary

18   to essentially double reserve on account of the claim of the

19   trustee and the claim of the certificate holder.  But I --

20   Ms. Lutcus (ph) and I were conferring, because she's my --

21   my institutional --

22             MR. SERINO:  Uh-huh.

23             THE COURT:  -- memory, and we couldn't find that

24   there was any determination of this issue before.

25             MR. SERINO:  You're precisely right.  We -- we

Page 7

1    teed up the issue in the Boilermaker's case for Judge Peck,

2    and --

3                THE COURT:  And he declined to rule.

4                MR. SERINO:  He did not want to rule, and he did

5    not appreciate us teeing up the issue at that point in time

6    because we had a lot of irons in the fire with Fannie Mae --

7                THE COURT:  Sure.

8                MR. SERINO:  -- on the same issue.

9                THE COURT:  Sure.  Okay.

10               MR. SERINO:  And he didn't want the --

11               THE COURT:  Okay.

12               MR. SERINO:  -- the tail to drive the dog.

13               THE COURT:  Okay.

14               MR. SERINO:  So I got that.

15               THE COURT:  All right.  So that just kind of sets

16   the stage for that.

17               Now what about though the claim -- the trust claim

18   itself, the trustee's claim itself?

19               MR. SERINO:  Uh-huh.

20               THE COURT:  Is that a claim that the debtor says

21   ought to be 510(b) subordinated as well?

22               MR. SERINO:  I don't believe so, Your Honor.

23   We're not saying that that should be subordinated.  In fact

24   part of our argument is that the security holders' claim,

25   through the trust, should be subordinated to the trust

Page 8

1    claim.

2            THE COURT:  Well -- so let me -- so let me -- I'm

3    going to wade into this.

4            MR. SERINO:  Please.

5            THE COURT:  Equitable subordination.

6            MR. SERINO:  Yeah.

7            THE COURT:  Okay.  Not applicable.

8            MR. SERINO:  Okay.  I lived through Light Squared,

9    so I'm not surprised that you've come out -- I'm not

10   surprised you've come out that door, but --

11           THE COURT:  So I'm --

12           MR. SERINO:  I'm not going waste my breath arguing

13   it today.

14           THE COURT:  I would appreciate that.

15           MR. SERINO:  But I've got a marker down.  I know

16   that.

17           THE COURT:  Okay.  You have a marker down, I think

18   that if you are at all aware of Light Squared then you know

19   that I have --

20           MR. SERINO:  You're not a big fan.  I know.

21           THE COURT:  -- so -- I've spent a lot of time with

22   equitable subordination --

23           MR. SERINO:  Yeah.

24           THE COURT:  -- and I think I know -- know it when

25   I see it, and I don't think that there are any allegations

Page 9

1    that get you out -- you know, out of the starting gate on

2    equitable subordination.

3              MR. SERINO:  Uh-huh.

4              THE COURT:  On contractual subordination, right --

5              MR. SERINO:  Yeah.

6              THE COURT:  -- I agree with you insofar as between

7    the trust -- in the trust, the trust documents, the

8    waterfall govern what gets what among the certificate

9    holders and the debtor has nothing to say about that.  So

10   that gets enforced to the extent that it comes anywhere near

11   the plan, me, what have you.  But I don't see that as a

12   reason -- an independent reason for saying that as between

13   the general creditors of LBHI and these certificate holders

14   there's a subordination.  I think that -- the action there

15   is all in 510(b).

16             MR. SERINO:  (b).

17             THE COURT:  Right.

18             MR. SERINO:  Agree 100 percent.

19             THE COURT:  I think the action is in 510(b).

20             MR. SERINO:  I agree 100 percent.

21             THE COURT:  Okay.  So yes, I'm going to uphold the

22   contractual subordination, but I think that that's an issue

23   among the -- in the trust, the trustee and its certificate

24   holders, because the certificate holders are creditors of a

25   creditor, right?

Page 10

```
 1              MR. SERINO:  Yes.

 2              THE COURT:  The trustee is the creditor.

 3              MR. SERINO:  Uh-huh, correct.

 4              THE COURT:  To me, the way I think about it, the

 5   trustee -- it's like an indenture, which may begin to give

 6   you some hints on where I'm going -- but it's like an

 7   indenture --

 8              MR. SERINO:  Uh-huh.

 9              THE COURT:  -- and the bondholders individually,

10   when we're lawyers, we don't trust that the indenture

11   trustee will actually file a proof of claim --

12              MR. SERINO:  Right.

13              THE COURT:  -- that -- timely or that covers all

14   of our particular claims so what happens?  The indenture

15   trustee files a big blanket claim --

16              MR. SERINO:  Right.

17              THE COURT:  -- and all the bondholders file their

18   claims.

19              So I view the certificate holder claims as

20   individual bondholder claims that are in most instances

21   duplicative of the main claim filed by the trustee.

22              So now you wade into what are they actually

23   saying?  It seems like they're alleging breaches of the put

24   back.

25              MR. SERINO:  The trustee is.
```

Page 11

```
1                THE COURT:  The trustee.

2                MR. SERINO:  Yeah.

3                THE COURT:  Right?  And the certificate holders

4    seem to be alleging garden variety type securities fraud

5    claims?

6                MR. SERINO:  No doubt about it.

7                THE COURT:  Right.

8                MR. SERINO:  If you read their proof of claim

9    they're --

10               THE COURT:  It's --

11               MR. SERINO:  -- pointing to the issue as

12   registration statement --

13               THE COURT:  Right.

14               MR. SERINO:  -- with respect to supplements.

15               THE COURT:  Right.  You sold --

16               MR. SERINO:  Misreps and omissions.

17               THE COURT:  Right.  You sold me a pig in a poke --

18               MR. SERINO:  Correct.

19               THE COURT:  -- type -- type arguments, right?

20               MR. SERINO:  No doubt about it.

21               THE COURT:  Okay.  I'm doing good so far, right?

22               MR. SERINO:  You're doing great.  You're making my

23   argument.

24               THE COURT:  I'm very excited.  I'm very excited.

25               MR. SERINO:  I'm almost ready to sit down, you're
```

Page 12

1    doing well.

2            THE COURT:  Okay.  But I'm about to take a turn in

3    the road --

4            MR. SERINO:  Okay.

5            THE COURT:  -- that you're not going to --

6            MR. SERINO:  I didn't think it was going to be

7    this easy.

8            THE COURT:  -- that you're not going to like.

9            MR. SERINO:  Okay.  I didn't think it would be

10   this easy.

11           THE COURT:  Okay.  So -- so you think about

12   510(b), right?

13           MR. SERINO:  Yeah.

14           THE COURT:  And everybody knows, you know, Slane &

15   Kripke (ph) and the ordinary meaning of 510(b).

16           So the ordinary meaning of 510(b) is that a

17   company issues -- let me stay away from the word issues,

18   because I think issues and issuers is where everybody is

19   getting confused.  The company wants to borrow money so it

20   goes out and enters into a loan agreement, right, and it

21   borrows money.  And the lenders then are owed money by the

22   borrower.  I'm just trying to keep it very --

23           MR. SERINO:  Uh-huh.

24           THE COURT:  -- simple.

25           If the lenders then come back and say, you

Page 13

1    borrower defrauded me, your books were cooked, they were

2    made up, I've god a claim against you, because had I known

3    then what I know now I would not have lent you $100 million.

4    Under 510(b) that claim, the you defrauded me, you induced

5    me to lend to you fraudulently, that claim is subordinated

6    to the debt claim, right?

7            MR. SERINO:  Yes.

8            THE COURT:  Straight up, that's the way it

9    works --

10           MR. SERINO:  Correct.

11           THE COURT:  -- because Congress decided that

12   you're going to take -- that's a risk that you and only you

13   agree to undertake and that's not going to be spread across

14   the general unsecured creditors.

15           Similarly with equity, right, you want equity you

16   can't jump -- with debt it's being at the same level, right?

17   With equity claims it's even worse, because -- right --

18           MR. SERINO:  Yeah.

19           THE COURT:  -- you're leaping way up --

20           MR. SERINO:  Sure.

21           THE COURT:  -- you're leaping up out of the equity

22   level into the -- into the debt level and that doesn't work.

23   So that's straight up, that's the way 510(b) works.  That's

24   not this.

25           MR. SERINO:  Okay.

1          THE COURT:  What this is, is Lehman, through these

2     trusts -- and the chart were very helpful --

3          MR. SERINO:  Okay.

4          THE COURT:  -- Lehman collected these mortgages,

5     bundled them up, sliced them up, sold them through SASCO as

6     a securitization.  It's a product.  They sold a product.

7     The product happens to be a security and it has all the

8     characteristics that you say.  The folks who bought them

9     agreed -- thought they were buying -- I don't know what they

10    thought they were buying.  I think as time goes on it

11    becomes clearer that people didn't understand exactly what

12    they were buying, but be that as it may --

13         MR. SERINO:  Uh-huh.

14         THE COURT:  -- but it does seem pretty clear that

15    they were buying these slices of this pool of debt and that

16    the collateral was what they were going to look to for

17    repayment, and they took the risk that the collateral values

18    would not be sufficient to pay them back.  That's the risk

19    that they took.

20         MR. SERINO:  All true.

21         THE COURT:  All true.

22         MR. SERINO:  They took that risk alone.

23         THE COURT:  They took that -- and they took --

24    they took that risk alone.

25         MR. SERINO:  And if that -- if that collateral had

Page 15

1    performed as expected and the general unsecured creditors

2    were trying to hit that collateral they would have raised

3    fully heck.

4              THE COURT:  They would -- no way.

5              MR. SERINO:  Right?  No way.

6              THE COURT:  No way.

7              MR. SERINO:  That's not the bargain we signed up

8    for.

9              THE COURT:  Absolutely not.

10             MR. SERINO:  Okay.

11             THE COURT:  Not the bargain we signed up for.

12             MR. SERINO:  Okay.

13             THE COURT:  So it was -- it was contained in that

14   -- in that trust.

15             MR. SERINO:  Right.

16             THE COURT:  But those are not securities.

17             So now they're saying, wait, you -- hold on.

18             MR. SERINO:  Okay.

19             THE COURT:  Hold on.  We're going to -- we'll have

20   fun.

21             MR. SERINO:  All right.

22             THE COURT:  If -- if the -- without any wrong

23   doing by LBI or LBHI or any other debtor, if the collateral

24   were destroyed, an earthquake happened, there would be no

25   claim over -- those certificate holders would have

Page 16

1    absolutely no claim over against anyone outside of anyone,

2    against LBI, against LBHI.  They agreed to look to the

3    collateral, the collateral turned out to not be worth as

4    much as they thought, right?

5            But what they're -- so what they're saying is you

6    defrauded me when you sold me this stuff, it's not -- wasn't

7    as good as you said it was --

8            MR. SERINO:  Right.

9            THE COURT:  -- right?

10           MR. SERINO:  Uh-huh.

11           THE COURT:  The same kind of claim that would be

12   if Lehman had sold them cars.  Sold me cars.  They actually

13   didn't have engines, I've got a claim.  It's the same thing.

14   These securitizations were a product, they were not the type

15   of securities that frankly you have -- in my mind -- have

16   anything to do with 510(b) claims.

17           Let me give you another example.  The focus in

18   your papers is on the fact that SASCO issued the notes, but

19   a couple of problems with that.  One is the statute doesn't

20   talk in terms of issuer, right?  So issuer for the

21   securities laws and issuer for bankruptcy -- under the

22   Bankruptcy Code are two different things.  It doesn't talk

23   about the issuer.

24           MR. SERINO:  Uh-huh.

25           THE COURT:  And second under your argument if

Page 17

1    Lehman, for example, on its proprietary desk had owned

2    blocks of stock, blue chips, utilities, whatever, and

3    contracted with a third party to sell them a block of that

4    stock and then breached that agreement under your argument

5    those would be securities of the debtor, because the debtor

6    owned them.  But that's not right.  That's not right.

7              So when I -- when I spent my weekend with this --

8              MR. SERINO:  Okay.

9              THE COURT:  -- you know, I went through all those

10   permutations and I come back to the very simple language of

11   the statute and what I believe 510(b) was intended to do,

12   which was to limit the risk that the general creditor pool

13   is exposed to when the debtor lends money someone or when

14   the debtor gives stock in itself to someone, and neither of

15   those is this situation.

16             So that's my --

17             MR. SERINO:  Okay.

18             THE COURT:  -- my view --

19             MR. SERINO:  All right, so --

20             THE COURT:  -- tentatively, subject obviously to

21   your right to --

22             MR. SERINO:  I've got some wood to chop it sounds

23   like then to --

24             THE COURT:  Well, I'm happy to --

25             MR. SERINO:  -- change your mind.

Page 18

```
 1                THE COURT:  Go right --

 2                MR. SERINO:  May I try?

 3                THE COURT:  Sure.

 4                MR. SERINO:  Okay.  So --

 5                THE COURT:  Absolutely.

 6                MR. SERINO:  So our point is -- and most of what

 7      you said we agree with -- our point is this, they have to be

 8      securities of somebody, and I don't think that's a

 9      controversial point.  So whose securities are they?  And

10      you're absolutely right, the --

11                THE COURT:  But let me stop -- let me --

12                MR. SERINO:  Yeah.

13                THE COURT:  -- stop you there.  Why -- yes, in a

14      metaphysical sense they have to be securities of somebody.

15      I totally agree.  But in the 510(b) sense there -- the

16      question is, are they securities of --

17                MR. SERINO:  Of the debtor.

18                THE COURT:  -- the debtor?

19                MR. SERINO:  Yes.

20                THE COURT:  All right.

21                MR. SERINO:  I'm going get there and I'm going to

22      try to build you a bridge between 510(b)'s use of securities

23      of the debtor on the one hand and issuer on the other hand,

24      because I'm going show you that SASCO is the issuer.

25      There's no debate about that.
```

1

2            THE COURT:  I agree.

3            MR. SERINO:  Okay.  So SASCO is the issuer.  So

4    why -- why is that significant?

5            Well first if you saw Judge Bernstein's decision

6    in Granite Partners he said -- and it was in a footnote --

7    he said if you have a claim, a securities claim based on

8    misreps or omissions that the issuer made --

9            THE COURT:  Uh-huh.

10           MR. SERINO:  -- in its registration statement, the

11   result is you have a subordinated securities claim in -- and

12   this is the punch line -- the issuer's bankruptcy.

13           THE COURT:  Right.

14           MR. SERINO:  So if I can show -- if I show that

15   SASCO as the depositor is the issuer it should follow that

16   FHLB has a subordinated claim in SASCO's bankruptcy.

17           THE COURT:  And I would say to you that if I

18   brought -- have you ever seen the movie Annie Hall?

19           MR. SERINO:  Parts of it.  That's the Woody Allen?

20           THE COURT:  Yeah.

21           MR. SERINO:  Yeah.

22           THE COURT:  Woody Allen where he's standing in

23   line at the Beacman Theater --

24           MR. SERINO:  Uh-huh.

25           THE COURT:  -- and someone is pontificating about

Page 20

1      Marshall McLuhan --

2              MR. SERINO:  Uh-huh.

3              THE COURT:  -- and Marshall McLuhan himself is in

4      line and he walks in and says, you know, you have no idea

5      what my theories are all about.

6              If I could bring Judge Bernstein in here Marshall

7      McLuhan Annie Hall style I don't think that Judge Bernstein

8      would say that that's what he meant by that statement.  I

9      think by that statement he was attempting to describe the

10     plain meaning of 510(b).

11             MR. SERINO:  All right.  Well let me --

12             THE COURT:  I just don't --

13             MR. SERINO:  All right.

14             THE COURT:  -- I read that and I just -- I don't

15     think that that really gets you there.

16             MR. SERINO:  Let me tell you why I think Judge

17     Bernstein was exactly right, and I don't --

18             THE COURT:  Okay.

19             MR. SERINO:  -- pretend to know what he meant, but

20     I think -- why I think he was right to focus on the issuer

21     and to say that if you have a claim against the issuer

22     you're going to have a subordinated securities claim in the

23     issuer's bankruptcy.

24             The reason is we can't ignore the fact that

25     there's a very unique federal securities law framework here

Page 21

1   that was really designed to protect the FHLBs of the world

2   so they weren't left with remedies, and they rely on this

3   framework in order to file their proof of claim.  Okay?

4           The federal securities law framework says that in

5   asset back securities transactions the depositor is the

6   issuer, not the trust.  Why did they do that?  Because they

7   didn't want the depositor to be able to give the Heisman to

8   the securities purchasers and say don't look at me, look at

9   that empty vehicle over there.

10          THE COURT:  Right.

11          MR. SERINO:  And so but for that wrinkle of

12  federal securities law FHLB couldn't be here.  They couldn't

13  file a proof of claim --

14          THE COURT:  Uh-huh.

15          MR. SERINO:  -- against us, they'd be stuck with

16  the trust.  But now that they're allowed to file a proof of

17  claim against us as the issuer and the registrant and it

18  comes to the treatment of their claim now they want to say

19  whoa, these aren't the securities of the issuer, these

20  aren't the securities of the registrant, these are the

21  securities of the trust.  And our point is you can't have

22  your cake and eat it too.  Either you have securities of the

23  trust, in which case your recourse is against the trust or

24  you have securities of the debtor, in which case you have a

25  securities claim against us, but it's a subordinated one.

Page 22

1          Now here's another point and it's controversial.

2     The WAMU case --

3               THE COURT:  Right.

4               MR. SERINO:  -- Judge Walrath.

5               THE COURT:  Uh-huh.

6               MR. SERINO:  And everybody thinks that's a bad

7     case for us.  I think it's a good case for us, because what

8     Judge Walrath did is in her search to figure -- she started

9     with I need to know who the issuer is to see if 510(b)

10    applies, because I think securities of the debtor are

11    securities of the issuer.  So she started with the question

12    who's the issuer?  And -- now she came to the conclusion

13    that the trust was the issuer because nobody in the case in

14    the first instance argued that it was the --

15              THE COURT:  Right.

16              MR. SERINO:  -- depositor.

17         On motion for reconsideration she final saw the

18    federal securities law that said depositor equals issuer and

19    she said, okay, my prior ruling was not law of the case, it

20    was not final.

21         But in that case everybody seemed to agree the

22    trust was the issuer, and the question was whether the trust

23    was operated via an operating agreement by and with the

24    debtor such that the trust could be affiliate of the debtor,

25    and you could satisfy 510(b) that way.

Page 23

```
 1              But she agreed that you got to start with who's

 2      the issuer.  You got to start with who's the issuer, because

 3      they have to be securities of the issuer.

 4              And here it's undisputed, SASCO, under the federal

 5      securities law as the depositor is the issuer.  It's

 6      undisputed that SASCO is a debtor.  And so now you've got

 7      securities of a debtor under 510(b).

 8              And there's not really a good -- there's not

 9      really a good claim that these aren't securities.  They've

10      made the argument that well 510(b) only applies to debt

11      securities not equity.  It's not what the statute says, it's

12      not what 10149 says, it's not what the case law says.

13      There's not any argument that their claims don't arise out

14      of the purchaser's sale of the security.

15              THE COURT:  Right.

16              MR. SERINO:  The battle is over whose securities

17      they are, and they've got to be someone's, and the federal

18      securities laws say they are the securities of the depositor

19      because the depositor is the issuer.  The issuer is the one

20      where the buck stops.  They're on the hook.  If you have a

21      claim you have a claim against them.  The issuer is not

22      going to be able to point to the trust.

23              The trust under the securities laws is called the

24      issuing entity, it's just another player in the daisy chain

25      of how the issuer gets its certificates out to the public.
```

Page 24

1    The certificates come from the trust, the depositor/issuer

2    takes them, it gives it to the underwriters, the

3    underwriters market them to the public.

4            And so that is -- you know, that's always been our

5    argument, and to us that's perfectly consistent with the

6    Slane Kripke, what's the primary purpose of 510(b)?

7    Whosever securities FHLB bought -- let's say you set aside

8    for the sake of the argument whether they were the debtors

9    -- whosever securities they bought they and they alone

10   assumed the risk of fraud in connection with the issuance of

11   those securities.

12           The general unsecured creditors never assumed that

13   risk, and the law is crystal clear that the security holders

14   alone assume the risk of fraud in connection with the

15   issuance.

16           But if they're not subordinated and they're

17   allowed to share pari passu with the general unsecured

18   creditors now they have shifted that risk to the general

19   unsecured creditors.  That is precisely what 510(b) was

20   designed to protect against.

21           THE COURT:  No, what 510(b) was designed to

22   protect against was -- well first of all I have a lot of

23   kind of metaphysical issues with taking a provision that was

24   written which was not in contemplation of this particular

25   structure.  All of this was made up after.  I mean Slane &

Page 25

1    Kripke was what 1973?

2              MR. SERINO:  Uh-huh.  Around there, yeah.

3              THE COURT:  Right.  So to me we're try to go

4    retrofit a square peg into a round hole.  So that -- that

5    really doesn't do it for me, and that's why it's so

6    important to go back to first principals, which is to look

7    at what they were doing at the time, what the provision was

8    intended to accomplish at the time, and it's not this.

9              MR. SERINO:  It's not --

10             THE COURT:  It's not --

11             MR. SERINO:  -- it's not people changing their

12   bets once we know how the movie ends?  Because that's what's

13   happened here.

14             THE COURT:  No, it's not -- it's not people

15   changing their bets, it's that -- that an affiliate of the

16   debtor sold a product.  They sold a product.  It was

17   pursuant to a securitization.  And if the people who bought

18   the -- if the entities who bought that product were

19   defrauded or there's a contractual breach in connection with

20   the sale of that product by LBHI or by LBI it doesn't offend

21   me at all the notion that the general you are secured

22   creditors shared in that -- share in that risk.

23             I mean if --

24             MR. SERINO:  But you can't come there if you

25   accept the fact that the CMBS and the RMBS are securities.

Page 26

1    You can't get there because the case law from Granite

2    Partners to Travel Group in the Third Circuit says that when

3    it comes to fraud in connection with the issuance of a

4    security holders alone bear that risk.

5              General unsecured creditors didn't sign up for

6    that risk, and that's why I think Judge Bernstein said in

7    Granite Partners that were it otherwise you've completely

8    eviscerated the absolute priority rule and you've passed the

9    risk that the security holders alone were to shoulder and

10   you've made the general unsecured creditors share that.  And

11   here that was not the deal.

12             There was -- we all agree that the security

13   holders accepted the risk of fraud in connection with the

14   issuance and they were compensated for that risk.  How were

15   they compensated?  This pool was segregated for them and

16   only them.

17             THE COURT:  Right.

18             MR. SERINO:  And --

19             THE COURT:  But what if there were no -- what if

20   -- if you only look at SASCO, right?

21             MR. SERINO:  Yes.

22             THE COURT:  And if the -- do you distinguish

23   between 510(b) solely with respect to the claims asserted

24   against SASCO as opposed to the other debtors?

25             MR. SERINO:  No, because they would be -- they

Page 27

1    would be securities of the debtor or an affiliate of the

2    debtor.  These are SASCO securities.

3                    THE COURT:  Right.

4                    MR. SERINO:  As the issuer.

5                    THE COURT:  Right.

6                    MR. SERINO:  So if the claim were against LBHI I

7    would still have the three things I need under 510(b).  I'd

8    have a security, I'd have a claim that arises under the

9    purchase or sale of that security, and the security -- the

10   underlying security would be a security of the debtor, LBHI

11   or its affiliate, SASCO.  So I'd still have a 510(b)

12   argument.

13                   THE COURT:  But you -- you are -- you're making

14   the leap from the fact that there has to be an issuer.

15                   MR. SERINO:  No there is an issuer.  There's no

16   doubt about that.

17                   THE COURT:  Right, but --

18                   MR. SERINO:  There's a registration statement

19   filed --

20                   THE COURT:  Yes, there is an issuer.

21                   MR. SERINO:  -- and that's the basis of their

22   lawsuit.

23                   THE COURT:  Right.  But you're making -- you're

24   asking me to equate -- you're asking me to write into the

25   statute securities of the issuer as opposed to securities

 1    of --

 2            MR. SERINO:  Right.

 3            THE COURT:  -- the debtor.

 4            MR. SERINO:  And what I'm asking -- you're right.

 5            THE COURT:  And that's where -- and that's where

 6    there's a disconnect.

 7            MR. SERINO:  And I would reframe it a little bit

 8    to what I'm ask you to do is to hold that the statutory

 9    phrase securities of the debtor means or at least

10    includes --

11            THE COURT:  Right.

12            MR. SERINO:  -- securities of an issuer.

13            THE COURT:  Right.

14            MR. SERINO:  That they have to be.  Securities

15    have to be the securities of the entity that issues them and

16    is on the hook for any liability that flows from them.

17            And I still think it's odd that you're right,

18    asset back securities weren't on the board when Slane &

19    Kripke were typing their article up.

20            THE COURT:  Uh-huh.

21            MR. SERINO:  But they are now.  And I think it's

22    old that FHLB can rely on this -- this fiction that the

23    federal securities law framework creates and says if you've

24    been defrauded we're going to let you look through that

25    trust even though you -- and go after the depositor --

Page 29

```
 1              THE COURT:  So -- but you --

 2              MR. SERINO:  -- even though you don't have

 3      privity.

 4              THE COURT:  But what you're doing is you come at

 5      it the other way.  If you go -- if you buy into my

 6      formulation, which is that these securitizations were

 7      products that were sold.  Yes, they're securities, yes,

 8      they're issued by SASCO, I agree with all of that, but

 9      fundamentally they are products.

10              MR. SERINO:  They're products.

11              THE COURT:  Right.

12              MR. SERINO:  Just like that car.

13              THE COURT:  Just like a car, right?

14              MR. SERINO:  And SASCO is GM.  They made the

15      product.

16              THE COURT:  Exactly.  And therefore if there was

17      fraud or misdealings in connection with the sale of that

18      product to the people who bought them and somehow there's a

19      basis to assert a claim with respect to that against

20      affiliate debtors they -- it's just like any other situation

21      where the general creditors of the company assume the risk

22      that they will be in the same pool as breach of contract

23      claims, fraud claims, et cetera.

24              MR. SERINO:  But that's not what we're dealing

25      with here.  We're dealing with securities claims, claims
```

Page 30

1   arising out of the purchase or sale of a security.

2           THE COURT:  Yes, but they're not securities of the

3   debtor, they are securities issued by a debtor.  Securities

4   of --

5           MR. SERINO:  Whose securities are they then?  I

6   mean this is -- GM creates the product, the product is a

7   security, it is a product/security of GM.

8           THE COURT:  Security --

9           MR. SERINO:  The sponsor/seller depositor is the

10  GM in this situation.

11          THE COURT:  Right.  But in the classic 510(b)

12  framework you have -- I use Adelphia, a case I'm very

13  comfortable with citing -- Aldelphia, you know, borrowed

14  several billion dollars.

15          MR. SERINO:  Uh-huh.

16          THE COURT:  Okay.  That's debt of the company.

17  Adelphia had stock, that's stock -- that's equity securities

18  of the company.  That's not this.  These folks -- if 2008

19  hadn't happened --

20          MR. SERINO:  Uh-huh.

21          THE COURT:  -- right?

22          MR. SERINO:  Uh-huh.

23          THE COURT:  These folks just -- the bookend to

24  your example, if their collateral had soared, right, the

25  general creditors of Lehman or the equity holders of Lehman

Page 31

1      wouldn't have been able to dip into that pot.

2              MR. SERINO:  Right.

3              THE COURT:  So too if Lehman had soared these

4      folks wouldn't get to dip into that pot.  So that's kind of

5      a --

6              MR. SERINO:  But now they are by -- if we don't

7      subordinate them --

8              THE COURT:  No, no, no, on an equity basis.

9              MR. SERINO:  Okay.

10             THE COURT:  On an equity basis.

11             I mean I think that -- I have no idea whether on

12     the merits these claims have legs, on the merits, right?  I

13     mean what Lehman would like to do is just say you know what

14     they're 510(b) claims, they're all the way down here so we

15     don't have to deal with them.

16             MR. SERINO:  Right.

17             THE COURT:  I think there are serious questions

18     about the claims on the merits because of what people

19     undertook to do, but that's -- but the merits are before me

20     today.

21             MR. SERINO:  Uh-huh.  How do we deal with Judge

22     Walrath's conclusion that securities under 510(b) include

23     securities of the issuer?  And hence she conducted a search

24     to find out who the issuer was.  And she got it wrong, and

25     we now know there's no controversy that the depositor is the

Page 32

1      issuer.

2            THE COURT:  I get -- I -- my response to that is

3      that the word issuer is not in 510(b) and that the

4      independent operation of the securities laws and the

5      requirement that there be an issuer doesn't change what

6      510(b) says, and that that does not change the fact that

7      these are not in the 510(b) sense securities of the debtor.

8      They do not represent a debt obligation of the debtor

9      whereby the debtor owes money to repay.  They do not

10     represent an equity interest in the debtor in which the

11     holder of that interest gets to share in the upside profits

12     of the company.

13           So I totally agree with you and I think I

14     harmonize those by -- you know, that was one of the

15     interesting things about these papers is that there's 95

16     percent agreement --

17           MR. SERINO:  Right.

18           THE COURT:  -- between the two sides.  These are

19     securities, there was a purchase and sale, SASCO was the

20     issuer, but it does not -- that last inch it does not get me

21     there on 510(b).

22           MR. SERINO:  Well, you know, by the same token I

23     think staying with the strict textual analysis of 510(a) it

24     says security of the debtors.  It doesn't say an equity

25     interest in the debtor, it doesn't say an obligation of the

```
 1    debtor.

 2              THE COURT:  Did you say 510(b) or 510(a)?

 3              MR. SERINO:  510(b) as in boy --

 4              THE COURT:  Right.

 5              MR. SERINO:  -- talks about security of the

 6    debtor.

 7              THE COURT:  Okay, you just said (a).  Okay.

 8              MR. SERINO:  I misspoke.

 9              THE COURT:  It does.  Right.

10              MR. SERINO:  It doesn't say interest in or

11    obligation of, and when we go to see what the definition of

12    security is --

13              THE COURT:  Right.

14              MR. SERINO:  -- under 10149 it doesn't say that

15    either.

16              THE COURT:  Right.

17              MR. SERINO:  And so I think --

18              THE COURT:  Right.  So go back --

19              MR. SERINO:  -- we got to work with the statute --

20              THE COURT:  Okay.  So let's work with the --

21              MR. SERINO:  -- the lower case is, securities.

22              THE COURT:  -- statute.  Go back to my proprietary

23    desk owns hundreds of millions of dollars in stock and sells

24    them like you sell cars or lemonade.

25              MR. SERINO:  Okay.
```

 1                THE COURT:  Right?  Breaches and obligation, you

 2      know, enters into a trade for stock at a certain --

 3                MR. SERINO:  Right.

 4                THE COURT:  -- price and then breaches.

 5                MR. SERINO:  Right.

 6                THE COURT:  Looks like a security of the debtor.

 7                MR. SERINO:  Well in that case I think -- let's

 8      say the security happened to be Apple.

 9                THE COURT:  Right.

10                MR. SERINO:  Okay?  So I got a claim -- I got a

11      securities claim against the desk --

12                THE COURT:  Right.

13                MR. SERINO:  -- under maybe Section 12 of the 33

14      Act for improper sales.

15                THE COURT:  You would know better than I --

16                MR. SERINO:  Right.

17                THE COURT:  -- but okay.

18                MR. SERINO:  Right.  And then I want to go after

19      Apple.  How do it go after Apple?  I say oh, you're the

20      issuer, you're the registrant, you're the guy that made all

21      these misreps and omissions so I'm going to go after you

22      too, Mr. Issuer, because these are your securities, Apple.

23      You're the issuer, you're the registrant.

24                THE COURT:  Yes.

25                MR. SERINO:  It's the same thing here.  The LBIs

Page 35

1   of the world, the underwriters were pushing out the

2   securities.  You could sue them under the 33 Act,

3   Section 12.  But if you want to get the issuer that's under

4   11 or 10 of the Exchange Act, now you've got to go to the

5   registration statement.  And who's the issuer?  The issuer

6   is the person whose securities they are.

7           THE COURT:  But if we just --

8           MR. SERINO:  It's the Apple in this case.

9           THE COURT:  -- look at -- if we just look at

10  SASCO, right?

11          MR. SERINO:  Yeah.

12          THE COURT:  If that were the -- if that were the

13  only debtor in the room --

14          MR. SERINO:  Okay.

15          THE COURT:  -- and you might be doing better

16  there, because then you would say, okay, just like in a

17  classic 510(b) first you -- you assert your claim for the

18  money that you're owed, then you have your damages claim.

19  But the trick of course is that there's no -- there are no

20  other creditors because the trust just has what it has.  So

21  that would be -- that would be meaningless.

22          But if the world just ended at the four corners of

23  SASCO you would be right, but here it's not the Apple

24  analogy you gave.  I want to sue LBHI or the broker/dealer,

25  I want to sue LBI --

```
 1              MR. SERINO:  Okay.

 2              THE COURT:  -- for the -- you didn't deliver the

 3     shares.  You told me you were going to sell me --

 4              MR. SERINO:  Right.

 5              THE COURT:  -- 1,000 shares at $100 a share, you

 6     breached, the stock price went up, I'm damaged.

 7              MR. SERINO:  Okay.

 8              THE COURT:  Under your theory of securities of the

 9     debtor the claim that I have for those damages would be

10     subordinated because those Apple securities were owned by a

11     debtor who contracted to sell them, they breached the

12     obligation, those are securities of the debtor.  That's not

13     what 510(b) is about.

14              MR. SERINO:  Yeah, but I don't think I would say

15     that there.  I would say those are securities of Apple.  And

16     I would say you can have a claim against the debtor, a

17     securities claim for failing to honor a contract to sell

18     securities or for improper underwriting, you could have a

19     securities claim against them.  Those would be different

20     securities.

21              Just like their second supplemental letter in this

22     case, for which they didn't have leave of court to file.

23     They say certain of our securities are the depositor/issuer

24     was IndyMac.  I say, well that doesn't disprove that these

25     claims should be subordinated, that just proves they filed
```

Page 37

1    in the wrong bankruptcy.  If you want to sue IndyMac as the

2    issuer, you want to sue Apple sue IndyMac, sue Apple.  If

3    you want to sue LBI as the underwriter you can have a

4    securities claim against LBI, it doesn't belong in this

5    bankruptcy because this is LBHI and SASCO.

6              THE COURT:  But the -- but the other --

7              MR. SERINO:  So I wouldn't disagree.

8              THE COURT:  -- the other hole in it is that when

9    -- in the 510(b) sense the securities of -- they're not --

10   it's not this type of -- this is a certificate, right?  This

11   is a -- you're --

12             MR. SERINO:  It could be a note, a bond, a

13   debenture, all of which are listed in 10149.  It's a

14   certificate, but is it different than the note or a bond or

15   a debenture?  Who --

16             THE COURT:  Who's the payor?

17             MR. SERINO:  The payor?

18             THE COURT:  Where do they get the money from?

19             MR. SERINO:  The money comes -- well --

20             THE COURT:  When the certificate --

21             MR. SERINO:  -- where the purchasers get the

22   money?

23             THE COURT:  Yeah.

24             MR. SERINO:  From the master servicer.  When the

25   loans pay off the money goes into the master servicer, never

```
1    goes to the trust, and the master servicer pays off the

2    certificate holders.  The trust -- the trust has very little

3    -- they're just a complete passive vehicle.

4              THE COURT:  Right, but that's an argument against

5    yourself because that -- 510(b) was focused on real

6    companies with -- who issued their own debt to fund their

7    own operations, who issued equity in themselves.

8              MR. SERINO:  Yeah, and I'm saying that's not the

9    trust.

10             THE COURT:  That's not the trust.

11             MR. SERINO:  That's SASCO or LBHI is the

12   sponsor/seller depositor.  That's who I'm saying their

13   securities belong to.

14             THE COURT:  What -- how does LBHI figure in?

15             MR. SERINO:  Their the sponsor/seller of the whole

16   arrangement.

17             THE COURT:  But it's not -- LBHI has no obligation

18   to repay.

19             MR. SERINO:  No.

20             THE COURT:  LBHI and the certificate holders don't

21   share in the profit that LBHI would make if these -- if

22   LBHI --

23             MR. SERINO:  Right.

24             THE COURT:  -- did well.  That's not --

25             MR. SERINO:  Yeah.  Well no, in this example --
```

Page 39

1    there are some examples where LBHI is the depositor/issuer

2    for the securities, but in the example -- you're right -- in

3    the example where LBHI is just a sponsor/seller and SASCO is

4    the issuer, then our position is that they are securities of

5    SASCO, because they have to be securities of somebody, and

6    they're certainly not securities of trust.

7            And but for that wrinkle these -- FHLB doesn't

8    even have a proof of claim here.  They can't -- they can't

9    get after -- they have a lack of privity with SASCO.  They

10   can't --

11           THE COURT:  Well but I -- but now -- but now I

12   agree with you, because I -- you know, in -- a certificate

13   holder -- the certificate holder is not a creditor of the

14   debtor, it's a credit of a creditor.  The certificate holder

15   is a creditor of the trust.

16           MR. SERINO:  Right.

17           THE COURT:  They're not a creditor.

18           MR. SERINO:  So then -- when he will how do they

19   file a proof of claim in the debtor's bankruptcy?  It should

20   be gone, right?

21           THE COURT:  That's for another day.

22           MR. SERINO:  That'll be the fight down the road.

23           THE COURT:  That's my point.  That's my point.

24   They -- a certificate holder is not a creditor of the

25   debtor.  In fact I've actually held that they don't have

Page 40

1    standing in the case because they're a creditor of a

2    creditor.

3                MR. SERINO:  Of a creditor.

4                They're going to -- they're going to rely on this

5    federal securities law, because we've seen it in their proof

6    of claim already, that says I get to look through the trust.

7    I'm a creditor of the trust, but I get to look through the

8    trust and I get to go after the depositor.  And so they're

9    going to rely on that law, they're going to say these are --

10   for purposes of filing their proof of claim these are

11   securities of the depositor/SASCO, but for purposes of

12   treatment of the claim they're going to say these are

13   securities of the trust.

14               THE COURT:  Right.  But if -- if you -- if you

15   look at the claim against LBHI --

16               MR. SERINO:  Uh-huh.

17               THE COURT:  -- they file a claim against LBHI,

18   right?

19               MR. SERINO:  Uh-huh.

20               THE COURT:  LBHI in its role as the architect of

21   the trust, they collected all the mortgages, they put it

22   them into the pool, they created this whole structure,

23   right?  So now we get back to the selling of product.  If

24   their claim is against LBHI for having done that in a

25   fraudulent way, right?

Page 41

1          MR. SERINO:  Uh-huh.

2          THE COURT:  Then I get back to your point, who are

3    you?  You bought your certificates from the trustee.  You --

4    how can you assert a claim against LBHI for the -- for the

5    -- you know, let's take it as a given for the sake of the

6    argument -- for its faulty construction of these pools of

7    assets.  I don't know how they get there from that.  They

8    are a creditor of a creditor.  Their rights would seem to

9    stop with their collateral pool.  But if LBHI did something

10   that's actionable towards them, even though there's no

11   privity, I don't know what they're relying on --

12         MR. SERINO:  Uh-huh.

13         THE COURT:  -- et cetera, et cetera, then it seems

14   to me that the general creditors of LBHI should as much

15   share in that risk as if, you know, people were tripping in

16   the halls at, you know, in the 7th Avenue building.

17         MR. SERINO:  And that's where I disagree.  I just

18   think if -- if the risk we're talking about is risk of

19   securities fraud in connection with the issuance of

20   securities I think the law is crystal clear that the

21   security holders alone bear that risk, and one of the

22   purposes of 510(b) and the absolute priority rule was to

23   make sure that after the fact the security holders cannot

24   shift that risk to the general unsecured creditors.

25             In other context, contract claims, stuff like

Page 42

1    that, personal liability, products maybe, but securities is

2    a unique animal here and the law seems to be -- I'd direct

3    you to Travel Group, that Third Circuit case, I'd look at

4    Granite Partners from Judge Bernstein, I'd look a Slane &

5    Kripke.  It seemed pretty clear that that risk of securities

6    fraud in connection with the issuance of a security is borne

7    alone by the security holders, and it was intended that

8    general unsecured creditor does not bear that risk.  And the

9    compensation they get for that is a segregated pool of

10   mortgages that are not available to the general unsecured

11   creditors.

12           And like I say, if things had turned out

13   differently you can bet FHLB --

14           THE COURT:  But in a world where there was no --

15   where this was just a SASCO operation from start to finish I

16   think you would be right and it would be a moot point

17   because there's nobody else there.  But in a world in which

18   you have other players -- which is different from the

19   classic 510(b) set up -- in the classic 510(b) set up you've

20   got a company that borrows money and institutions lending

21   money and they get told if I'm defrauding you at this moment

22   too bad, that claim gets subordinated.

23           MR. SERINO:  Right.

24           THE COURT:  Right?  But in this situation you've

25   got a configuration that's different from that -- that's

Page 43

1   different from that, and that's where I'm getting into the

2   square peg and the round hole.  I hear you.  If this were

3   easy --

4              MR. SERINO:  Uh-huh.

5              THE COURT:  -- we wouldn't be here.

6              MR. SERINO:  Right.

7              THE COURT:  Right?  So why don't -- why don't I

8   have hear from Mr. Berndt.

9              MR. SERINO:  Thank you, Your Honor.

10             THE COURT:  Thank you.

11             MR. SERINO:  Thanks.

12             THE COURT:  So why isn't he right?

13             MR. BERNDT:  Well, I think Your Honor made many of

14   my arguments for me.

15             THE COURT:  I know, I can see you smiling, but why

16   -- but I thought Mr. Serino made -- made some powerful

17   points about the general concept of not shifting the risk in

18   connection with the purchase of securities to somebody else.

19             MR. BERNDT:  Uh-huh.  I think that Your Honor

20   perhaps answered that when you said, but if LBHI did

21   something actionable as to us, breached a contract or did

22   some other actionable conduct towards my client why

23   shouldn't we be on the same footing at general unsecured

24   creditors?

25             When we bought the certificates, if you look at

Page 44

```
 1    the prospectus supplements -- and I have them as exhibits

 2    here --

 3              THE COURT:  Uh-huh.

 4              MR. BERNDT:  -- the risks that are outlined for

 5    the certificates were risks relating to the collateral, the

 6    loans.  There wasn't risk regarding SASCO's solvency or

 7    SASCO going bankruptcy, it wasn't even disclosed.  And in

 8    fact those prospectus supplements are very clear to disclaim

 9    any affiliation between SASCO and the trust.  They say that

10    these are issued by the trust.

11              I think that in response to counsel's question,

12    who are these securities of?  I think the answer is the

13    trust.  But under the securities laws, because LBI or LBHI

14    did separate independent conduct, just like if they would

15    have made misrepresentations in selling us Apple stock, we

16    have a claim against them under the securities laws and we

17    should stand on the same level as the general unsecured

18    creditors.  We didn't get any of the upside of Lehman's

19    profitability.

20              If profits -- if Lehman's profits would have

21    soared we don't recover that.  We're just -- we're just a

22    creditor.

23              THE COURT:  But when you bought -- when your

24    clients bought the certificates there was no question that

25    they were undertaking -- that they were aware that their
```

```
 1    recovery was going to depend on the value of a collateral in

 2    the pool, right?

 3              MR. BERNDT:  Correct.

 4              THE COURT:  And therefore they had no expectation

 5    that if under my hypothetical there was an earthquake and

 6    all of the collateral were destroyed or significantly

 7    impaired, in that scenario they certainly had no claim

 8    outside the four corners of the collateral pool, right?

 9              MR. BERNDT:  I think that this would be -- I would

10    suggest that this is a little bit different situation.

11              I think this situation would be like if LBI or

12    LBHI knew that there was going to be an earthquake and sold

13    it to us saying we have no reason to think there's going to

14    be an earthquake and then the earthquake happened, even

15    though our interest was in the trust LBHI and LBI made

16    separate independent actionable misstatements.

17              THE COURT:  In the nature of a fraudulent

18    inducement, if you will.

19              MR. BERNDT:  Absolutely, under the 33 Act and the

20    34 Act.

21              THE COURT:  But if I -- to go back to my Adelphia

22    example, which is a real life example -- if I'm Adelphia and

23    I say to the consortium of lenders we need $100 million, you

24    know, to operate the business, we're neglecting to tell you

25    that our accounting system is a complete fraud, right?  And
```

Page 46

1    a consortium of lenders lends Adelphia $100 million, 3 years

2    later the fraud is discovered, the claims that the banks had

3    no wrongful lending, if you will, are subordinated.  Why

4    isn't that exactly the same as the hypothetical that you

5    just gave me?  You -- Lehman induced you to buy the

6    certificates by telling you the collateral is great, you

7    bought the certificates, you took that risk, any claim you

8    have --

9              MR. BERNDT:  Isn't the key difference in Your

10   Honor's Adelphia example that Adelphia was borrowing money

11   for itself.

12             THE COURT:  Yes.

13             MR. BERNDT:  It was its own debt obligation.

14   There 510(b) applied because those were securities of the

15   debtor.

16             THE COURT:  Of the debtor.

17             MR. BERNDT:  Here we don't have that situation.

18   These aren't -- as the prospectus supplements state over and

19   over again these are only -- represent an interest in the

20   underlying trust and collateral, they're not equity interest

21   in or an obligation of the debtors or any of their

22   affiliates.  The prospectus supplements are very clear.  So

23   I think that's a critical distinction there.

24             THE COURT:  Okay.  Thank you.

25             MR. BERNDT:  Thank you.

Page 47

```
 1              THE COURT:  So I'm a little bit troubled by -- not
 2    quite at the level of Judge Peck not wanting to decide --
 3    but I'm just a little bit troubled at the magnitude of the
 4    issue that -- or not even fully understanding the magnitude
 5    of the issue and having other -- undoubtedly other
 6    certificate holders who are going -- if I -- if I were to
 7    rule say, what?  Why wasn't I -- why wasn't I there?
 8              So, you know, I mean I think you can tell
 9    tentatively where I'm going, but I'm just questioning
10    whether I ought to actually rule or whether we ought to
11    explore ways to make this a more inclusive process.
12              MR. SERINO:  If I may, Your Honor, I don't -- I
13    don't think anybody was expecting a ruling from the bench
14    today.  These are complicated issue, they take a lot of time
15    for the Court to analyze and chew on.  I do think obviously
16    a ruling one way or another is going to have a real trickle
17    down impact.
18              I think the biggest issues are behind the debtors
19    because they've made their peace with Fannie Mae, but this
20    purports to be a $600 million claim --
21              THE COURT:  Right.
22              MR. SERINO:  -- Bow Post is another 9 figure
23    claim, and who knows what kind of can of worms we open up if
24    there's an adverse ruling at the time.
25              So I guess that's a long-handed way of saying I'm
```

Page 48

1    not going to be overly disappointed if you don't rule from

2    the bench or rule any time soon.  I'd be more than happy to

3    engage in negotiations with FHLB and see if we can work

4    something out in the absence of a ruling.  I don't know if I

5    can force that upon them, but I'd be happy to do that.

6            MR. BERNDT:  Your Honor, if I may just answer --

7    or respond to do your question.  I think a ruling today

8    would be completely appropriate.  We briefed this issue

9    almost a year ago.  Our --

10            THE COURT:  Well, I don't take responsibility for

11    things that didn't happen on my watch.  So I take full

12    responsibility for the time on my watch.  And the reason

13    that I -- rulings that -- matters that go under advisement

14    at this point are going into a queue that I was fraudulently

15    induced by Judge Peck who told me that there's really not

16    much going on in Lehman.

17            MR. BERNDT:  Right.

18            THE COURT:  That is a -- turned out to be an

19    actionable misstatement and that, you know, there's actually

20    a lot of Lehman litigation that is -- that's happening.

21            I think that notwithstanding what you're hearing

22    as my inclinations, when there's an issue like this that

23    appears to not have been written on --

24            MR. BERNDT:  Uh-huh.

25            THE COURT:  -- I think at some level I need to

1    write on it, but it's going to take a really long time.

2    There's no two ways about it.  It's just going to -- it's

3    going to go into just the Lehman queue which is growing all

4    the time.  So --

5            MR. BERNDT:  Understood.

6            MR. SERINO:  Your Honor, could I just make one

7    last quick point --

8            THE COURT:  Sure.

9            MR. SERINO:  -- because I think --

10           THE COURT:  Why don't you have a seat.

11           MR. BERNDT:  Sure.

12           THE COURT:  I'll give you another shot,

13   Mr. Berndt.

14           MR. BERNDT:  Thank you.  Okay.

15           MR. SERINO:  I think there was an admission today

16   that may make the Court's job easier, and that is I think

17   FHLB counsel's said these are securities of the trust, and

18   if that's the case recall that 510(b) applies not only to

19   securities of the debtor but to securities of the debtor or

20   an affiliate.

21           THE COURT:  Right.

22           MR. SERINO:  No disagreement there.

23           THE COURT:  Yeah.

24           MR. SERINO:  Now under 11 U.S.C. 1012(c) a person

25   whose property or business is operated under an operating

Page 50

1      agreement with a debtor is an affiliate of the debtor.

2                THE COURT:  You see I -- I don't disagree.

3                MR. SERINO:  Okay.

4                THE COURT:  But the problem that I get to is you

5      can go along and you can connect all these dots, right?  And

6      you can say, oh, well there has to be an issuer, so this is

7      the issuer.  So that -- and it leads to what appears to be a

8      logical connection of the dots that gets you to the place

9      that you want to be, but it's inconsistent with what I think

10     510(b) was designed to do and is supposed to be about.

11               MR. SERINO:  And I get that, and that's why I'm

12     trying to work with your framework of 510(b) --

13               THE COURT:  Right.

14               MR. SERINO:  -- and I'm moving past who's the

15     issuer.

16               THE COURT:  Right.

17               MR. SERINO:  Because I don't think I'm doing well

18     on that one.  I'm moving past that.  And I thought they said

19     these are securities of the trust.

20               THE COURT:  Right.

21               MR. SERINO:  And so my point would be then they

22     are securities of the debtor or an affiliate.

23               THE COURT:  But they're not -- but they're

24     securities -- when the statute says securities of --

25               MR. SERINO:  Yes.

1           THE COURT:  -- with respect to debt securities it

2      means the borrower who's now the debtor owes the money.

3      That's not this case.  With respect to equity securities it

4      means it's the stock, its interest in the debtor.  That's

5      not this case.  So neither of those things, which 510(b) in

6      my view was crafted in the simplest of language to do, fits

7      into the scenario that we have.

8           So then you get to -- and this is not about

9      getting to the legislative history, right?  So, you know,

10     Judge Peck I think it was quoted to me admonished the

11     parties about not having to resort to the legislative

12     history when the statute is clear.  Yes, the statute is

13     clear, but the problem is that the statute was written at a

14     time when this stuff didn't exist.  It's just true.

15          It's like we could -- we would spend the day

16     having this kind of a debate about the constitution, right?

17     Because when the constitution was written there wasn't an

18     internet, right?  So what would they have thought?

19          So this -- 510B -- when 510(b) was written there

20     weren't these products that the folks on Wall Street had

21     created.  So what do I do with that now?  And the only thing

22     that's giving me pause is the notion that when these folks

23     bought these certificates they clearly understood that their

24     right to recover was limited to the collateral pool.  And

25     what they're saying is, but wait, LBHI, you defrauded me,

1    you did these bad things in connection with selling me, I

2    say this product, you say this security, and therefore that

3    makes it a security of the debtor, and I don't believe that

4    it is.

5           So I think that's a ruling.  I think that's a

6    ruling.  And I think that it's got enough meat on the bones

7    that if -- if there were to be an appeal that there would be

8    -- it would provide a sufficient predicate on which the

9    District Court could understand the basis of the ruling.

10   Because at the end of the day it's complex, but it's not

11   that complicated.

12          MR. SERINO:  And just so I'm clear, Your Honor, do

13   you find that the RMBS or the CMBS are securities, they're

14   just not securities of the debtor or an affiliate?

15          THE COURT:  They're not securities of the debtor

16   or an affiliate as used in Section 510(b) of the Bankruptcy

17   Code.

18          MR. SERINO:  Okay.  Thank you, Your Honor.

19          MR. BERNDT:  Your Honor, just so I can clarify.

20   Is your ruling to deny debtor's objection?

21          THE COURT:  Yes.  That -- that's the vessel in

22   which this sits.

23          MR. BERNDT:  Thank you.

24          THE COURT:  So -- all right?

25          MR. SERINO:  Thank you, Your Honor.

Page 53

```
1              THE COURT:  Thank you.

2              MR. SERINO:  Appreciate the time today.

3              THE COURT:  Thank you.

4         (Whereupon these proceedings were concluded at 11:02

5    AM)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                          I N D E X

2

3                          RULINGS

4                                        Page      Line

5   Doc# 26882 Debtors' Objection to CMBS Claims

6   and Request for Subordination Pursuant to

7   Sections (510(a)-(c) of the Bankruptcy Code

8   filed by Jonathan S. Henes on behalf of

9   Lehman Brothers Holdings, Inc.           51         1

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 55

1              C E R T I F I C A T I O N

2

3    I, Dawn South, certify that the foregoing transcript is a

4    true and accurate record of the proceedings.

5        Dawn    Digitally signed by Dawn South
              DN: cn=Dawn South, o, ou,
6        South   email=digital1@veritext.com,
              c=US
              Date: 2014.06.13 12:10:47
7              -04'00'

8    AAERT Certified Electronic Transcriber CET**D-408

9

10   Veritext

11   330 Old Country Road

12   Suite 300

13   Mineola, NY 11501

14

15   Date:  June 13, 2014

16

17

18

19

20

21

22

23

24

25