WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ralph I. Miller
Robert J. Lemons

Attorneys for Lehman Brothers Holdings Inc.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------x

| | | |
|---|---|---|
| **In re** | **:** | **Chapter 11 Case No.** |
| | **:** | |
| | **:** | |
| **LEHMAN BROTHERS HOLDINGS INC.,** *et al.,* | **:** | **08-13555 (SCC)** |
| | **:** | |
| | **:** | **(Jointly Administered)** |
| **Debtors.** | **:** | |
| | **:** | |

-------------------------------------------------------------------x

**DEBTORS' REPLY TO RSU CLAIMANTS'**
**PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................. 1

ARGUMENT ........................................................................................................................... 4

I.    The Claimants Purchased the RSUs at Issue Within the Meaning of Section 510(b)
      of the Bankruptcy Code Because They Made the Voluntary Choice to Become and
      Remain Lehman Employees Subject to the Terms of the Equity Award Program ............... 4

II.   The RSU Claims Are Not General Creditor Claims for Cash ................................................ 8

      A.  Lehman Does Not Owe Any Alternative Performance Obligations to Claimants .......... 8

      B.  The Program Documents, Including the 1997 Trust, Expressly Distinguish RSU
          Holders From General Unsecured Creditors................................................................. 12

          1.  The Subordination Provisions in the Program Documents ..................................... 12

          2.  The Employee Incentive Plan................................................................................. 13

          3.  The 1997 Trust ...................................................................................................... 15

      C.  The RSU Claims Are Not Executory Contracts............................................................ 16

CONCLUSION........................................................................................................................ 17

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Draken Grp., Inc. v. Avondale Res. Corp.,*
   No. 06–CV–595–SAJ, 2008 WL 151901 (N.D. Okl. Jan. 14, 2008) ........................................9

*Glidden Co. v. Hellenic Lines, Ltd.,*
   275 F.2d 253 (2d Cir. 1960)................................................................................................9

*In re Enron Corp.,*
   341 B.R. 141 (Bankr. S.D.N.Y. 2006).................................................................1, 2, 4, 17

**Statutes**

11 U.S.C. § 101(16) ...........................................................................................................2, 17

11 U.S.C. § 507(a)(4)...............................................................................................................12

11 U.S.C. § 507(a)(5)...............................................................................................................12

11 U.S.C. § 510(a) ...................................................................................................................12

11 U.S.C. § 510(b) ............................................................................................................ *passim*

11 U.S.C. § 1113.......................................................................................................................12

11 U.S.C. § 1114.......................................................................................................................12

TO THE HONORABLE SHELLEY CHAPMAN
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Holdings Inc. ("LBHI"), in its capacity as Plan Administrator (in this capacity, the "Plan Administrator") under the *Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors* (the "Plan"), by its undersigned attorneys, respectfully submits this Reply to RSU Claimants' Proposed Findings of Fact and Conclusions of Law (the "Reply").[1]

## PRELIMINARY STATEMENT

The factual record and legal positions developed in this case confirm that claims arising from restricted stock units and contingent stock awards must be treated and classified as Equity Interests under the Plan.  This is the position that LBHI has consistently asserted for more than three years, and over 3,500 claims arising from restricted stock units or contingent stock awards (collectively, the "RSUs")  have already been reclassified in this way without objection.  Those classified claims are factually and legally indistinguishable from the claims at issue here (the "RSU Claims").

More than two years ago, on December 21, 2011, Judge Peck indicated that he "intended to follow" Judge Gonzalez's reasoning in *In re Enron Corp.,* 341 B.R. 141, 144 (Bankr. S.D.N.Y. 2006), wherein the Court ruled that "claims for damages that arise from the ownership of employee stock options . . . should be subordinated pursuant to section 510(b) [of the Bankruptcy Code]."  Transcript of Hearing at 58:15-59:16, *In re Lehman Bros. Holdings, Inc.,*

---

[1] The Reply collectively responds to the Proposed Findings of Fact and Conclusions of Law Submitted by Compensation Claimants in Opposition to Debtors' Fourteen Omnibus Objections Seeking to Reclassify Compensation Claims as Equity or Alternatively to Subordinate Claims Pursuant to Section 510(b) of the Bankruptcy Code dated June 6, 2014 [ECF No. 44951] (the "Cl. FoF and CoL"), the Neuberger Berman Claimants' Proposed Findings of Fact and Conclusions of Law dated June 6, 2014 [ECF No. 44567] (the "NB FoF and CoL"), and the Letter from Claimant Andrea T. Jao dated June 6, 2014 [ECF No. 44705].

No. 08-13555-jmp (Bankr. S.D.N.Y. Dec. 21, 2011) [ECF No. 23741]. Instead of issuing any ruling, however, the Court provided each Claimant with ample time and opportunity to develop a factual record in order to have an opportunity, if possible, for the Claimant to distinguish *Enron* and to meaningfully demonstrate the unique nature of his/her claim. Despite more than a year's worth of discovery (which included the production of over 30,000 pages of documents by LBHI and a full-day Rule 30(b)(6) deposition of a representative of LBHI), the execution of a detailed stipulation of facts setting forth the parties' agreed and undisputed facts dated September 13, 2013 [ECF No. 40263] (the "Stipulation"), and an extensive three-day evidentiary hearing, Claimants have utterly failed to prove "what it is about [each RSU Claim] that takes it outside of the reasoning [in *Enron*] and why the RSU Claims should not be classified as equity." *Id.*

After this discovery, three days of hearings, and extensive briefing by Claimants, it is now clear that LBHI's Omnibus Objections[2], and Judge Peck's initial inclination, were correct all along – the RSU Claims must be classified as Equity Interests under the Plan. The evidence is compelling (and undisputed) that, at all relevant times, the Claimants, as holders of RSUs, were only entitled to LBHI common stock (at most) and nothing more. If LBHI's Omnibus Objections are granted, the Claimants will receive all the economic benefits the agreements in the Program documents promised – claims for Equity Interests under the Plan having the same priority as, and no greater priority than, common stock interests in LBHI. None of the testimony or arguments of Claimants change this inescapable conclusion.

Two separate bankruptcy doctrines independently compel the treatment of RSUs as equity: (1) the RSUs are "equity securities" as that term is defined in section 101(16) of the Bankruptcy Code, and (2) the RSU Claims must be subordinated to the claims of those with

---

[2] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in LBHI's opening memorandum of law dated January 28, 2014 [ECF No. 42404].

senior or equal interests under section 510(b) of the Bankruptcy Code because they are claims

for rescission of, or for damages arising from, the purchase or sale of a security of the Debtor.

Despite this straightforward analysis, the Claimants continue to digress into irrelevant issues and

arguments in their Proposed Findings of Fact and Conclusions of Law.  LBHI is confident that

its pre-trial submissions and the factual record have already demonstrated why each of these red

herrings should be rejected and why the RSU Claims must be treated the same as the interests

held by all holders of stock in LBHI – as an Equity Interest under the LBHI Plan.  Given,

however, that certain of Claimants' assertions are plain wrong and/or have no bearing on the

analysis that is at issue in this case, LBHI addresses some of them here.

Specifically, LBHI addresses Claimants' persistent contention that they did not

"purchase" the RSUs for purposes of section 510(b) of the Bankruptcy Code because their

participation in the Equity Award Program was allegedly entirely involuntary.  *See* Cl. FoF and

CoL at ¶¶ 12-20, 87-95, 103-105; NB FoF at ¶¶ 11-19 and CoL at ¶¶ 4-8.  LBHI also addresses

in this Reply Claimants' arguments that their RSU Claims are not for damages arising from the

purchase of a security for purposes of section 510(b) of the Bankruptcy Code but, rather, are

claims for cash owed as a result of (1) LBHI's alleged alternative performance obligations and

(2) LBHI's alleged representations – in certain Program documents, in the 1997 Trust, and in the

preprinted Proof of Claim forms that Claimants received from the Claims Administrator – that

RSU holders are general unsecured creditors of the Estate.   Cl. FoF and CoL at ¶¶ 25-30, 52-55,

64-67, 130-42.  For the reasons below, and as further detailed in LBHI's Proposed Findings of

Fact and Conclusions of Law filed herewith, each of these assertions has no basis in fact and

must be rejected.

## ARGUMENT

I.    **The Claimants Purchased the RSUs at Issue Within the Meaning of Section 510(b) of the Bankruptcy Code Because They Made the Voluntary Choice to Become and Remain Lehman Employees Subject to the Terms of the Equity Award Program**

In fact, Claimants purchased the RSUs through their day-to-day employment. Yet Claimants deny that there was a "purchase" or "sale" of a security as required by section 510(b), asserting that RSUs were mandatorily imposed upon employees, and thus, they did not make a choice to invest in or bargain for LBHI stock. Cl. FoF and CoL at ¶¶ 12-20, 87-95, 103-105; NB FoF at ¶¶ 11-19 and CoL at ¶¶ 4-8. However, as explained in LBHI's pre-trial submissions and the Proposed Findings of Fact and Conclusions of Law filed herewith, courts that have considered the term "purchase" as used in section 510(b) have consistently held that participation in an employee equity award plan, like the RSU Program here, is sufficient to constitute the purchase of a security. That is the right result here.

Indeed, the claimants in *Enron* similarly tried to maintain that they did not "purchase" the stock options issued as part of their compensation, arguing that there was no voluntary exchange of goods, services, or currency, but rather, that they were "required to take a minimum percentage of their annual bonus in stock option form." 341 B.R. at 150-151. Judge Gonzalez rejected this very argument in *Enron* as flawed, reasoning that,

> [a]lthough implicit, there is nonetheless a bargain and exchange of value. Here, the exchange is made not at the time of payment but prior to employment. If these Claimants were required to receive a portion of their compensation as options, *that was a condition of employment the Claimants willingly accepted in return for their labor.* These Claimants, thus, "purchased" the stock options with their labor.

341 B.R. at 151 (emphasis added).

This holding from Judge Gonzalez directly addresses Claimants' central argument, including those advanced by the Neuberger Berman employees (the "NB Employees") – namely,

-4-

that they did not make a meaningful choice to receive a portion of their Total Compensation in

RSUs.  Contrary to Claimants' assertions, their participation in Lehman's Equity Award Program

was entirely voluntary.  Every witness who testified at the evidentiary hearing in this matter

confirmed that at all relevant times, they understood that they would be compensated both with

cash and with rights to become shareholders of LBHI common stock via RSUs.  *See, e.g.*,

Transcript of Hearing at 223:11-18, *In re Lehman Bros. Holdings, Inc.*, No. 08-13555-SCC

(Bankr. S.D.N.Y. Apr. 1, 2014) [ECF. No. 43969] ("Tr. Day 1"), (Testimony of Michael Gran,

testifying that he "absolutely" understood that some portion of his compensation was to be paid

in CSAs rather than all cash when he voluntarily elected to return to employment at Lehman

after several years of employment elsewhere); Transcript of Hearing at 12:5-15; 17:18-18:5, *In*

*re Lehman Bros. Holdings, Inc.*, No. 08-13555-SCC (Bankr. S.D.N.Y. Apr. 2, 2014) ("Tr. Day

2"), (Testimony of Andrea Jao, testifying that she was told upfront that some of her

compensation may be paid in equity awards at Lehman's option).

Moreover, the Claimants were sophisticated individuals who understood that the value of

the RSUs varied with the price of the LBHI common stock, and that the ultimate value of the

RSUs – and the amount of common stock that RSU holders would ultimately receive – depended

on LBHI's stock price after the required five-year hold period, at the time of delivery of the

LBHI common stock.  *See, e.g.* Tr. Day 2, 62:8-15 (Testimony of Paul Shotten: "I understood

that this promise to convert the RSUs into equities after five . . . years after the grant date would

happen and that had those conversions taken place that the equity when delivered would be

worth whatever it is now worth with a higher or lower or whatever"); Tr. Day 1, 257:7-259:6

(Testimony of Sandy Fleishman, testifying that she understood that the stock that she would

ultimately receive may be worth a very small fraction of the figures on her monthly Total

Compensation Statements and that in her 15 years at Lehman, there were times when the market price of the stock at the date of conversion was lower than the market price at the date of the grant); Tr. Day 1, 319:15-322:5 (Testimony of Nicholas Howard, testifying that RSUs with a grant value of $362,000 may be worth more or less at the end of the five-year hold period when the LBHI common stock was issued depending upon what the Lehman share price did in those ensuing years). Indeed, many of the Claimants were long-term employees of Lehman and had enjoyed a rise in their fortunes via Lehman's success specifically because of the Equity Award Program.

Fully informed and armed with this knowledge, every Claimant, including the NB Employees, made the choice to enter employment voluntarily at Lehman and to remain with the business subject to the terms of the Equity Award Program. The Claimants do not allege they were threatened with unlawful punishment if they chose to work elsewhere. Nor do they allege they were illiterate employees working in poor conditions for below minimum wage. Each and every Claimant, including the NB Employees, was a bright, educated and highly-compensated individual who made a deliberate and voluntary decision to work for a lot of money at a prominent investment bank. While leaving Lehman and leaving unvested RSUs on the table would have been an expensive choice for the Claimants, it was nonetheless a meaningful choice that every Claimant voluntarily chose not to make. *See, e.g.* Tr. Day 2, 13:11-14:9 (Testimony of Andrea Jao, testifying that she made the choice, albeit an "extreme" choice, to walk through the door and give her labor to Lehman); Tr. Day 2, 215:12-22 and 221:14-19 (Testimony of Henry Ramallo, testifying that he "wasn't going to go back to engineering . . . [and] wasn't going to go back to accounting" and that he hypothetically may have been able to try to get a job in the same line of business, as he desired, at Sanford Bernstein if he had tried); Tr. Day 1, 255:24-

256:17 (Testimony of Sandy Fleishman, testifying that she could have marketed her skills to Barclays or to Morgan Stanley, or Goldman Sachs, or a similar institution, and leaving Lehman and roughly $3.4 million was "a difficult option because of the restriction of the good leaver policy over time"); Tr. Day 1, 313:20-314:10, 316:25-317:23 (Testimony of Nicholas Howard, testifying that he understood he was an at-will employee who had the option to seek employment at another firm and try to get that firm to compensate him for any deferred award he may leave at Lehman: "Well, I could have left Lehman, but I would have – I could have left Lehman and walked away from the 1.9 million or I could have gone to another firm, but, you know, they would have to have come close to matching that otherwise it would have been an uneconomic proposition"); Tr. Day 2, 123:21-124:16, 137:10-20 (Testimony of Stephanie Stiefel, testifying "I didn't consider leaving because there was a cost to leaving that was too great . . . .", and stating, in response to a question whether she had considered whether the restrictions of the Lehman equity programs would allow her to go work for an accounting firm if she chose to leave Lehman, "[a]nd that's worth a million dollars a year?"); Tr. Day 2, 42:11-16 (Testimony of Paul Shotton: "The chances that I could persuade another firm to pay out the compensation that I was leaving on the table at Lehman was – you  know, was slim to none.  So whilst theoretically it's correct to say I had the option to walk, as a practical matter I didn't really have an option to walk, and that's why I stayed at the firm.")

The evidence is indisputable that each and every Claimant made the voluntary choice to enter and remain subject to the Lehman Equity Awards Program.  Accordingly, all the Claimants, including the NB Employees, "purchased" the RSUs for purposes of section 510(b) of the Bankruptcy Code.

II.    **The RSU Claims Are Not General Creditor Claims for Cash**

As discussed extensively in LBHI's pre-trial submissions, at the evidentiary hearing in this matter, and in the Proposed Findings of Fact and Conclusions of Law filed herewith, the evidence is unambiguous that under the Program documents (which Claimants do not dispute they received), LBHI's sole obligation to the RSU holders was the delivery of LBHI common stock and under no circumstances was LBHI obligated to deliver cash in lieu of LBHI common stock. There is no basis in law or fact to support any of the theories that Claimants have raised that they are somehow general unsecured creditors entitled to cash.

A.    Lehman Does Not Owe Any Alternative Performance Obligations to Claimants

Claimants argue that their RSU Claims are not for damages but for enforcement of Lehman's alternative performance obligation to pay them in cash when paying them in the form of equity allegedly became impossible. Cl. FoF and CoL at ¶¶ 130-142. The "alternative performance" arguments of Claimants must be rejected for at least two independent reasons. First, there are no such obligations under the terms of the Equity Award Program in issue. Second, even if an alternative performance obligation could somehow be implied (which it cannot), LBHI's Omnibus Objections will provide the only alternative form of performance that could have any rational basis – namely, the classification of the RSU Claims as Equity Interests under the Plan, having the same priority as, and no greater priority than, common stock interests in LBHI.

Claimants have failed to present any evidence that Lehman was ever under any alternative performance obligation to pay Claimants in cash. It is undisputed that, at all relevant times, Lehman had the option to pay a portion of employees' Total Compensation in equity-based awards:

> *At the Firm's option*, a portion of your total compensation (combined base salary, bonus and other compensation) may be payable in the form of restricted stock units pursuant to the Firm's Employee Stock Award Program. Please understand that the grant of restricted stock units is subject to the standard terms and provisions of the Program. CL0001 (Stipulation) at Exh. 1 (1999 Employment Agreement) at 000005 (emphasis added).

> *At the Firm's option*, a portion of your total compensation (combined base salary, bonus and other compensation) may be payable in the form of conditional equity awards (restricted stock units ("RSUs"), stock options, or other equity awards) pursuant to the Firm's Equity Award Program. The grant of RSUs is subject to the applicable controlling plan documents . . . ." CL0002 (Guide to Working at Lehman Brothers) at LEH-RSU 0000300 (emphasis added).

The discretion to pay Claimants in the form of equity-based awards belonged solely to Lehman, and Claimants admit they "could not elect to receive cash instead of the awards." CL0001 (Stipulation) at ¶ 10.

Claimants, however, argue that the above-referenced contractual language, providing that Lehman had the option to pay the Claimants in equity awards, imposed an alternative performance obligation on Lehman to pay Claimants in *either* cash *or* equity-based awards. Cl. FoF and CL at ¶ 131. But, as demonstrated in the very cases that Claimants repeatedly rely upon to try to support their alternative performance argument, an alternative obligation cannot be implied; it must be specifically referenced. *See Glidden Co. v. Hellenic Lines, Ltd.*, 275 F.2d 253, 255 (2d Cir. 1960) (finding that a ship owner had an alternative obligation to carry cargo through an alternative route when the Suez Canal was closed because the alternative routes were *specifically referred to in the agreements*); *Draken Grp., Inc. v. Avondale Res. Corp.*, No. 06–CV–595–SAJ, 2008 WL 151901, at *1 (N.D. Okl. Jan. 14, 2008) (finding that defendant had an alternative obligation to compensate plaintiff in cash where the contract provided that at the discretion of defendant, an acquisition fee "*may be paid in cash, or, in whole or in part, in the equivalent percentage of working interests in acquired oil & gas fields,*" and payment in the

-9-

form of working interest in the fields became impossible) (emphasis added).  Here, Claimants

cannot point to a single document that expressly imposed upon Lehman an alternative

performance obligation to pay Claimants in either *cash* or equity awards.  Claimants ask this

Court to create an alternative performance obligation to pay Claimants in cash where one does

not exist.

Moreover, even assuming *arguendo* that the contracts set forth an implied alternative

performance obligation to pay Claimants in *either* cash *or* equity-based awards, Lehman fully

performed – and discharged any alternative performance obligations – when it paid the RSUs to

the Claimants.  The contracts between the parties set forth that Lehman had the option to pay

Claimants "in the form of restricted stock units" and "in the form of conditional equity awards

(restricted stock units ("RSUs"), stock options, or other equity awards)."  CL0001 (Stipulation)

at Exh. 1 (1999 Employment Agreement) at 000005; CL0002 (Guide to Working at Lehman

Brothers) at LEH-RSU 0000300.  There is no dispute that each of the RSU Claimants received

RSUs.  Once those RSUs were paid, Claimants had no right whatsoever to other "modes" of

performance in the form of cash or otherwise.  The documents are unequivocal that once the

RSUs were granted, Lehman's sole obligation to Claimants (if certain employment-related

conditions were satisfied) was the delivery of the common stock:

> With respect to any restricted stock units granted under the Plan, *the obligations of the Company or any Subsidiary are limited solely to the delivery of shares of Common Stock* on the date when such shares of Common Stock are due to be delivered under each Agreement, *and in no event shall the Company or any Subsidiary become obligated to pay cash in respect of such obligation . . . .*" LBHI0117 (LBHI 1996 Management Ownership Plan as amended through Nov. 8, 2007) at Section 8(b) and LBHI0118 (LBHI Employee Incentive Plan as amended through Nov. 8, 2007) at Section 8(b) (emphasis added).
>
> With respect to any RSUs granted under the Plan, *the obligations of the Company are limited solely to the delivery of shares of Common Stock* on the date when such shares of Common Stock are due to be delivered under each Award

agreement, *and in no event will the Company become obligated to pay cash in respect of such obligation . . . ."* LBHI0116 (LBHI 2005 Stock Incentive Plan, 95,000,000 Shares of Common Stock dated Nov. 15, 2007) at LEH-RSU 0000176 (emphasis added).

LIMITATION ON OBLIGATIONS. *Holdings' and any subsidiary's obligation with respect to the Units granted hereunder is limited solely to the delivery to you of shares of Common Stock* on the date when such shares are due to be delivered hereunder, and *in no way shall Holdings or any subsidiary become obligated to pay cash in respect of such obligation . . . ."* CL0001 (Stipulation) at Exh. 4 (2003 Management Director Equity Award Program, Agreement Evidencing a Grant of Restricted Stock Units) at ¶ 6 (emphasis added).

Claimants, however, argue that Lehman had a continuing obligation after the RSUs were granted to pay Claimants in either cash or common stock.  Cl. FoF and CoL at ¶¶ 132, 135.  Again Claimants seek to read language – and obligations – into the contract that simply does not exist.  Lehman's only alternative performance obligation, if any, was to pay Claimants in either cash or equity based awards.  Once Claimants were compensated by Lehman in the form of equity based awards, Claimants' rights were solely limited to the delivery of LBHI common stock.

Because Lehman's alternative performance obligations, if any, were extinguished upon the payment of the RSUs to the Claimants, the debate as to whether delivery of LBHI common stock to Claimants is possible or impossible is beside the point. Regardless, in the Omnibus Objections, Lehman seeks to characterize Claimants' RSU Claims as Equity Interests in LBHI, as that term is defined in the Plan.  If the Motions are granted, the RSU Claimants will have the equivalent of the maximum they were entitled to receive under the Equity Award Program.  *See* Section 4.17(c) of the Plan.  Thus, if the RSU Claims are characterized in accordance with the Omnibus Objections, they will have the same economic value to which the RSU Claimants would have been entitled,

-11-

assuming the employment-related conditions had been satisfied[3], absent the

commencement of LBHI's chapter 11 case.

B.  The Program Documents, Including the 1997 Trust, Expressly Distinguish RSU
    Holders From General Unsecured Creditors

The express language of the Program documents and the 1997 Trust Under Lehman

Brothers Holdings Inc. Incentive Plans, CLX 072 (the "1997 Trust") directly contradict

Claimants' assertions that Lehman intended to grant to RSU holders the status of general

unsecured creditors in the event of insolvency.  Cl. FoF and CoL at ¶¶ 52-55, 64-67.  In fact,

what these documents demonstrate is that Lehman carefully and expressly excluded equity award

holders from discussions involving the rights of general unsecured creditors.

1.  The Subordination Provisions in the Program Documents

As demonstrated *supra,* there is no basis for Claimants' position that they are now

entitled to cash or anything other than RSUs from Lehman as consideration for their labor.

LBHI's bankruptcy filing does not transform a claim for equity into a claim for cash.[4]

Claimants, however, bring this Court's attention to select Program documents for the

years 2003 and 2004 Program that contained language referencing section 510(a) of the

Bankruptcy Code (the "Subordination Provisions").  Cl. FoF and CoL at ¶¶ 64-67.  The

Subordination Provisions do not appear in the Program Documents after 2004.  There is no

evidence of why the Subordination Provisions are not contained in the Program Documents after

---

[3] Notably, LBHI is not seeking to enforce any of the conditions on holders of RSUs and CSAs related to continued
employment or activity restrictions in order for the RSU Claims to be considered Equity Interests under the Plan that
would have the same distribution priority as holders of LBHI common stock.  In that sense, treatment as Equity
Interests under the Plan could be viewed as a form of "alternative performance" by LBHI that provides all the
economic benefits that were promised in the Program documents, despite the chapter 11 filing that has made
performance of certain conditions by the Claimants impossible.

[4] To be sure, the Bankruptcy Code provides employees with certain protections.  *See, e.g.,* 11 U.S.C. §§ 507(a)(4)
and (5), § 1113, and § 1114, among others.  But the right to convert stock into general unsecured claims against a
former employer is not one of them.

2004. Tr. Day 1, 81:10-14. In any event, the Subordination Provisions were a correct statement of the law – that the claims of employees holding RSUs would be deemed, in the event of a bankruptcy of LBHI, to be claims for damages arising from the purchase or sale of common stock of LBHI within the meaning of section 510(b) of the Bankruptcy Code, and that all RSU holders would have in such a bankruptcy would be the same priority as, and no greater priority than, the common stock interest in LBHI. There is no evidence that the decision to stop including the Subordination Provisions in the Program documents arose from any intent by Lehman to declare that claims for RSUs would cease to be subject to subordination pursuant to section 510(b) of the Bankruptcy Code if a chapter 11 proceeding should ever arise. Nor is there any evidence in the record that any Claimant noticed and expressly relied upon the removal of the Subordination Provisions when making the choice to continue to be an employee at Lehman.

2.    The Employee Incentive Plan

There is also no evidence to support Claimants' contention that Section 13(b) and Section 16 of the Employee Incentive Plan as amended through November 8, 2007, LBHI0118 (the "Employee Incentive Plan"), demonstrate that RSU holders are general unsecured creditors of LBHI. Cl. FoF and CoL at ¶ 29. To the contrary, Section 16 of the Employee Incentive Plan, when read in conjunction with Section 8(b), clarifies that LBHI considered the Claimants to be wholly distinguishable from general unsecured creditors:

> Section 8(b): With respect to any restricted stock units granted under the Plan, the obligations of the Company or any Subsidiary are limited solely to the delivery of shares of Common Stock on the date when such shares of Common Stock are due to be delivered under each Agreement, and in no event shall the Company or any Subsidiary become obligated to pay cash in respect of such obligation (except that the Company or any Subsidiary *may pay* to Participants amounts in cash in respect of a restricted stock unit equal to cash dividends paid to a holder of shares of Common Stock, for fractional shares or for any amounts payable in cash upon the occurrence of a Change in Control).

Section 16: The Plan is intended to constitute an "unfunded" plan for long-term incentive compensation. With respect to any *payments* not yet made to a Participant, including any Participant optionee, by the Company, nothing herein contained shall give any Participant any rights that are greater than those of a general creditor of the Company.  In its sole discretion, the Committee may authorize the creation of trusts or other arrangements to meet the obligations created under the Plan to deliver Common Stock *or payments in lieu thereof* . . . . LBHI0118 (Employee Incentive Plan) (emphasis added).

A correct reading of Section 8(b) of the Employee Incentive Plan demonstrates that the parties intended that there be limited situations in which Lehman could issue *payments* in cash in lieu of the restricted stock units, not one of which is applicable here.  Moreover, Lehman's obligations to (1) deliver Common Stock or (2) deliver payments in lieu thereof, are mutually exclusive obligations, as seen in Section 16.  Employee Incentive Plan at Section 16 (". . . the Committee may authorize the creation of trusts . . . to deliver Common Stock *or payments in lieu thereof* . . . .") (emphasis added).  Thus, the language in Section 16 of the Employee Incentive Plan – stating that Participants who are entitled to *payments* do not have any rights greater than those of a general creditor – is limited to Participants entitled to payments of cash in lieu of equity awards and is inapplicable to the Claimants here.

Section 13(b) of the Employee Incentive Plan, which states that "the grant of an Award shall not be construed as giving a Participant the rights of a stockholder of Common Stock" does not alter this conclusion.  Section 13(b) merely clarifies that RSU holders are not active shareholders and therefore do not have all the rights of stockholders; RSU holders cannot bring shareholders' derivative actions, for example.  It does not, as Claimants contend, reasonably lead to the conclusion that Lehman intended RSU holders to have general unsecured creditor status in the event of bankruptcy.  Cl. FoF and CoL at ¶ 29.[5]

---

[5] Claimants also rely upon Section 13(b) of CLX 073 (Employee Incentive Plan as amended through Feb. 19, 2003). Cl. FoF and CoL at ¶ 29.  The language therein is identical to the relevant provisions in the Employee Incentive Plan and therefore the same arguments apply.

3.    The 1997 Trust

The 1997 Trust similarly demonstrates that Lehman intended RSU holders not to be

general creditors in the event of insolvency, in direct contrast to Claimants' assertions.  Cl. FoF

and CoL at ¶ 30.  The relevant provisions of the 1997 Trust state as follows:

> WHEREAS, the Company wishes to establish a trust (the "Trust") and to contribute
> and/or sell to the Trust assets including Shares, that shall be held therein, *subject to the
> claims of the Company's general creditors* in the event the Company becomes insolvent
> (as hereinafter defined), until paid to Participants (as hereinafter defined) in such manner
> and at such times as the Company may specify to fulfill the Company's obligations under
> the Plans.
>
> Section 1(e). The principal of the Trust, and any earnings thereon, shall be held separate
> and apart from other funds of the Company and shall be used exclusively for the uses and
> purposes of *Participants and general creditors* as herein set forth.  Participants shall have
> no preferred claim on, or any beneficial ownership interest in, any assets of the Trust.
> Any rights created under the Plans and this Agreement shall be mere unsecured
> contractual rights of Participants against the Company.
>
> Section 3(b).  At all times during the continuance of this Trust, as provided in Section
> 1(e) hereof, the principal and income of the Trust shall be subject to *claims of general
> creditors* of the Company under federal and state law as set forth below . . . CLX 072
> (1997 Trust) (emphasis added).

Consistent with the language in the Program documents, the 1997 Trust sets forth in the

third "Whereas" clause and in Section 1(e) that Participants, defined as individuals holding

Eligible Awards, are separate and distinct from general creditors of the company.  Specifically,

the principal of the Trust, and any earnings thereon, was to be used exclusively for the uses and

purposes of two *different* groups of individuals: (1) Participants, and (2) general creditors.  CLX

072 (1997 Trust) at Section 1(e).  The shares in the Trust were held to be paid to one group of

individuals, the Participants, but were subject to the claims of the second group of individuals,

general creditors, in the event of insolvency.  *Id*. at third "Whereas" provision.  Therefore, the

1997 Trust reinforces that Participants in Lehman's Equity Award Program, including RSU

holders (*e.g.*, the RSU Claimants), were *not* intended to be treated as general creditors of the

Company in the event of insolvency. The language in Section 1(e) of the 1997 Trust stating that "any rights created under the Plans and this Agreement shall be mere unsecured contractual rights of Participants against the Company" merely clarifies that any common stock held in the Trust is not secured by a stock certificate, for example, and does not alter the conclusion that the 1997 Trust intended the RSU holders and general creditors of the company to be two mutually exclusive groups of individuals.  *Id*. at Section 1(e).

C.    The RSU Claims Are Not Executory Contracts

Finally, Claimants' argument that the RSU Claims are not Equity Interests under the Plan because they are "executory contracts" must fail.  Cl. FoF and CoL at ¶¶ 25-28.  It is true that the Debtors' schedules list hundreds of claimants who were seeking payment as a result of having been issued RSUs, and the Claims Administrator provided pre-printed Proof of Claim forms to the Claimants based on those schedules.  However, that list of claimants makes up just a few of more than 500 pages of the Debtors' fine-print schedules listing counterparties to thousands of different contracts.  Moreover, those schedules were filed on June 15, 2009, well before the Debtors had sufficient opportunity to assess whether all of the contracts listed thereon were, in fact, executory contracts or unexpired leases, and well before the Debtors and the Court were required to make such a determination.  *See* Schedules of Assets and Liabilities of Lehman Brothers Holdings Inc., filed June 15, 2009, Note 18(i) [ECF No. 3918].  In fact, Claimants ignore the critical fact that LBHI's schedules specifically and unequivocally state that "inclusion of a contract, lease or other agreement on Schedule G *does not constitute an admission* that such contract, lease or other agreement is an executory contract, was in effect on the applicable Petition Date, or is valid or enforceable."  *Id*. (emphasis added).

-16-

Moreover, even if the RSUs were executory contracts (which LBHI does not concede),

any claims for rejection damages would, at most, entitle Claimants to that which they were

allegedly owed pursuant to the RSUs (*i.e.*, equity in LBHI) – precisely the relief that LBHI is

seeking in the Omnibus Objections.  The presence of an executory contract (if one existed) does

not necessarily mean that Claimants have anything more than claims for equity and/or damages

resulting from the purchase or sale of a security subject to mandatory subordination pursuant to

section 510(b) of the Bankruptcy Code.  The mere fact that a contract is for the purchase or sale

of a security means that it is subject to subordination pursuant to section 510(b), and Claimants

have not articulated any reason why executory contracts are somehow exempt from this plain

rule.

## CONCLUSION

For the reasons set forth in more detail in LBHI's pre-trial submissions and LBHI's

Proposed Findings of Fact and Conclusions of Law filed herewith, the RSU Claims meet each

and every criteria set forth in section 510(b) of the Bankruptcy Code and therefore subordination

is mandated.  The RSU Claims separately must be classified as Equity Interests under the Plan

because they are "equity securities" as that term is defined in section 101(16) of the Bankruptcy

Code.  Claimants, in a desperate attempt to distinguish their claims from this otherwise

straightforward analysis, have barraged this Court with largely irrelevant testimony, documents

and arguments that are neither here nor there, many of which are plainly wrong and a number of

which were previously addressed and rejected by Judge Gonzalez in *Enron*.  Regardless of

Claimants' efforts to characterize the RSU Claims with various labels, it is indisputable that the

RSU Claims are all either equity or all arise from a purchase (or a claim for rescission of a

purchase) of securities in the debtor, and thus all must be classified under section 510(b) as

Equity Interests under the Plan.

The Plan Administrator respectfully requests that the Court grant the relief requested

herein and such other and further relief as it deems just and proper.

Dated:  New York, New York
July 7, 2014

/s/ Ralph I. Miller
Ralph I. Miller
Robert J. Lemons

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile:  (212) 310-8007

*Attorneys for Lehman Brothers Holdings Inc. and
Certain of Its Affiliates*