WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ralph I. Miller
Robert J. Lemons

Attorneys for Lehman Brothers Holdings Inc.


**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------x

| | | |
|---|---|---|
| **In re** | **:** | **Chapter 11 Case No.** |
| | **:** | |
| | **:** | |
| **LEHMAN BROTHERS HOLDINGS INC.,** *et al.,* | **:** | **08-13555 (SCC)** |
| | **:** | |
| | **:** | **(Jointly Administered)** |
| **Debtors.** | **:** | |
| | **:** | |

------------------------------------------------------------------x


## <u>DEBTORS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>

## <u>TABLE OF CONTENTS</u>

**Page**

DEBTORS' PROPOSED FINDINGS OF FACT ............................................................1

I.    Introduction...........................................................................................................1

II.   Lehman's Equity Award Program ........................................................................2

III.  The RSUs in Practice ...........................................................................................4

IV.   The RSU Claimants ..............................................................................................6

V.    The Neuberger Berman Claimants......................................................................18

DEBTORS' PROPOSED CONCLUSIONS OF LAW ..........................................20

I.    The RSUs Are "Equity Securities" Under Section 101(16) of the
      Bankruptcy Code ................................................................................................21

II.   The Claims of the RSU Holders Must Be Subordinated Pursuant to
      Section 510(b) of the Bankruptcy Code..............................................................24

      A.    An RSU Is a "Security" as Defined by Section 101(49) of the
            Bankruptcy Code .......................................................................................26

      B.    The Claimants Purchased the RSUs at Issue ..............................................30

      C.    The RSU Claims Seek Damages Arising from the Purchase of the
            RSUs or Rescission of the RSUs ...............................................................36

            1.    The Claimants Do Not Have Claims for Alternative
                  Performance by Lehman.................................................................36

            2.    The Claimants Do Not Have General Unsecured Claims for
                  Cash................................................................................................39

            3.    The Claimants Do Not Have a "Wage" Claim Under Any
                  Labor Law ......................................................................................39

            4.    The RSU Claims All Arise From the Purchase or Sale of a
                  Security ..........................................................................................43

            5.    Claimants Seek Rescission of the RSU Program......................46

CONCLUSION...................................................................................................47

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Andrews & Kurth LLP v. Family Snacks, Inc. (In re Pro-Snax Distribs.),*
   157 F.3d 414 (5th Cir. 1998) ...............................................24

*Aristeia Capital v. Calpine Corp. (In re Calpine Corp.),*
   No. 05-60200 (BRL), 2007 WL 4326738 (S.D.N.Y. Nov. 21, 2007) ...................................27

*Bader v. Wells Fargo Home Mortg. Inc.,*
   773 F. Supp. 2d 397 (S.D.N.Y. 2011)...................................................40

*Bar-Tur v. Arience Capital Mgt., L.P.,*
   No. 11-864-CV, 2012 WL 3140421 (2d Cir. Aug. 3, 2012) ...............................................40

*Baroda Hill Invs., Ltd. v. Telegroup, Inc. (In re Telegroup, Inc.),*
   281 F.3d 133 (3rd Cir. 2002) ...............................................44

*Callan v. Merrill Lynch & Co. Inc.,*
   No. 09 CV 0566 BEN (BGS), 2010 WL 3452371 (S.D. Cal. Aug. 30, 2010) ......................42

*Cardwell v. Thermo Fischer Scientific,*
   No. 09 Civ. 7809 (DAB), 2010 WL 3825711 (S.D.N.Y. Sept. 23, 2010)..............................35

*Carlson v. Katonah Capital, L.L.C.,*
   10 Misc. 3d 1076(A) (N.Y. Sup. Ct. 2006) ...............................................40

*Carrieri v. Jobs.com, Inc.,*
   393 F.3d 508 (5th Cir. 2004) ...............................................22, 23

*Chase Manhattan Bank v. State of New York,*
   13 A.D. 3d 873 (3d Dept. 2004) ...............................................34

*Chock Full O' Nuts Corp. v. United States,*
   453 F.2d 300 (2d Cir. 1971)...............................................23

*Coors Brewers Ltd v. Adcock and Ors,*
   [2007] I.C.R. 983 (C.A.)...............................................43

*Crown IT Servs., Inc. v. Koval-Olsen,*
   11 A.D.3d 263 (1st Dept. 2004)...............................................35

*Delaney v. Staples (t/a De Montfort Recruitment),*
   [1992] I.C.R. 483 (H.L.) ...............................................43

*DiRose v. PK Mgmt. Corp.*,
    691 F.2d 628, 633 (2d Cir. 1982)..........................................................................34

*Draken Grp., Inc. v. Avondale Res. Corp.*,
    No. 06-CV-595-SAJ, 2008 WL 151901 (N.D. Okl. Jan. 14, 2008) ......................37

*Duvall v. Galt Med. Corp.*,
    No. C-07-03714 JCS, 2007 WL 4207792 (N.D. Cal. Nov. 27, 2007)....................42

*Econn v. Barclays Bank PLC*,
    No. 07 Civ. 2440 (BSJ), 2010 WL 9008868 (S.D.N.Y. May 10, 2010)................40

*Frankum v. Int'l Wireless Commc'ns Holdings, Inc. (In re Int'l Wireless*
    *Commc'ns Holdings, Inc.)*,
    279 B.R. 463 (D. Del. 2002), *aff'd*, 68 Fed. Appx. 275 (3d Cir. 2003).................31

*Glidden Co. v. Hellenic Lines, Ltd.*,
    275 F.2d 253 (2d Cir. 1960)..................................................................................36

*Guiry v. Goldman, Sachs & Co.*,
    31 A.D.3d 70 (1st Dept. 2006)........................................................................40, 41

*In the Matter of Baldwin-United Corp.*,
    52 B.R. 549 (Bankr. S.D. Ohio 1985)...................................................................22

*In re Am. Hous. Found.*,
    No. 09-20232-RLJ-11, 2013 WL 1316723 (Bankr. N.D. Tex. March 30, 2013)..............26, 27

*In re Betacom of Phoenix, Inc.*,
    240 F.3d 823 (9th Cir. 2001) ..........................................................................45, 46

*In re Club Ventures Inv. LLC*,
    No. 11-10891 (ALG), 2012 WL 6139082 (Bankr. S.D.N.Y. Dec. 11, 2012) ..................29, 45

*In re Einstein/Noah Bagel Corp.*,
    257 B.R. 499 (Bankr. D. Ariz. 2000).....................................................................22

*In re Enron Corp.*,
    341 B.R. 141 (Bankr. S.D.N.Y. 2006) .......................................................... *passim*

*In re Granite Partners L.P.*,
    208 B.R. 332 (Bankr. S.D.N.Y. 1997)...................................................................44

*In re KIT digital, Inc.*,
    497 B.R. 170, 181 (Bankr. S.D.N.Y. 2013)......................................................24, 29

*In re Lehman Brothers Inc.*,
    503 B.R. 778 (Bankr. S.D.N.Y. 2014)........................................................24, 25, 45

*In re Med Diversified, Inc.*,
  461 F.3d 251 (2d Cir. 2006)............................................................................ *passim*

*In re Motor Liquidation Co.*,
  No. 11 Civ. 7893 (DLC), 2012 WL 398640 (S.D.N.Y. Feb. 7, 2012) ....................................31

*In re PT-1 Commc'ns, Inc.*,
  304 B.R. 601 (Bankr. E.D.N.Y. 2004)....................................................................44

*In re SeaQuest Diving, LP*,
  579 F.3d 411 (5th Cir. 2009) ............................................................................27

*In re Touch America Holdings, Inc.*,
  381 B.R. 95 (Bankr. D. Del. 2008) ......................................................................32

*In re U.S. Wireless Corp.*,
  384 B.R. 713 (Bankr. Del. 2008)....................................................................31, 40

*In re Worldcom, Inc.*,
  329 B.R. 10 (Bankr. S.D.N.Y. 2005)................................................................43, 44

*International Business Machines Corp. v. Bajorek*,
  191 F.3d 1033 (9th Cir. 1999) ..........................................................................42

*Jurgensen v. Chalmers*,
  248 B.R. 94 (W.D. Mich. 2000) .........................................................................25

*Kim v. Citigroup Inc.*,
  368 Ill. App. 3d 298 (Ill. App. Ct. 1st Dist. 2006)..................................................41

*London v. Sears, Roebuck & Co.*,
  619 F. Supp. 2d 854 (N.D. Cal. 2009) ...................................................................41

*Nantahala Capital Partners, LP v. Wash. Mut., Inc. (In re Wash. Mut., Inc.)*,
  464 B.R. 656 (Bankr. D. Del. 2012) .....................................................................22

*O'Donnell v. Tristar Esperanza Props., LLC (In re Tristar Esperanza Props., LLC)*,
  488 B.R. 394 (9th Cir. 2013) ......................................................................26, 27, 30

*Queen v. Official Comm. Of Unsecured Creditors (In re Response U.S.A., Inc.)*,
  288 B.R. 88 (D.N.J. 2003) ...............................................................................44

*Truelove v. Ne. Capital Advisory*,
  95 N.Y.2d 220 (2000) ...................................................................................40

*VKK Corp. v. NFL*,
  244 F.3d 114 (2d Cir. 2001)......................................................................33, 34, 35, 36

**Statutes**

11 U.S.C. § 101.................................................................................................... *passim*

11 U.S.C. § 510.................................................................................................... *passim*

Cal. Civ. Proc. Code § 338 ........................................................................................41

Employment Rights Act, 1996, § 13(3) ERA (U.K.) ....................................................43

Employment Rights Act, 1996, § 27(1) ERA (U.K.) ....................................................42

**Other Authorities**

S. Rep. No. 95-989, 95th Cong., 2d Sess. (1978) ........................................................23

TO THE HONORABLE SHELLEY CHAPMAN
        UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Holdings Inc. ("LBHI"), in its capacity as Plan Administrator (in this capacity, the "Plan Administrator") under the *Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors* (the "Plan"), by its undersigned attorneys, respectfully submits these proposed Findings of Fact ("FoF") and Conclusions of Law ("CoL").

## DEBTORS' PROPOSED FINDINGS OF FACT

### I.      Introduction

1.      The Claimants are holders of Proofs of Claims for bonus or commission compensation during the years 2003 through 2008 for which Claimants received equity-based awards in the form of restricted stock units or contingent stock awards (collectively, the "RSU Claims").  Restricted stock units were granted to employees based in the United States, and contingent stock awards were granted to employees located overseas.  CL001 (Stipulation), ¶ 1.

2.      In practice, both restricted stock units and contingent stock awards (collectively, the "RSUs") operated the same way – they were granted to both salaried and commissioned employees near the end of each calendar year (the "Grant Date"), and five years after the Grant Date, they resulted in the automatic issuance of unrestricted LBHI common stock upon the fulfillment of certain employment-related conditions, without any further action on the part of employees.  CL001 (Stipulation), ¶¶ 3, 5, 7.  After receiving these shares of LBHI common stock, the employees could dispose of the stock as they saw fit.  *Id*. at ¶ 6 and Exh. 3 (2003 Senior Vice-President Equity Award Program) at LEH-RSU 0015890 ("Once your RSUs convert to common stock, they become freely tradable.").

3.      LBHI commenced its chapter 11 case on September 15, 2008. Therefore, the RSUs at issue in the RSU Claims had not yet led to the issuance of common stock. CL001 (Stipulation), ¶ 5. It is undisputed that if Lehman had avoided the bankruptcy, and if the Claimants had fulfilled the requisite employment-related conditions, all of the RSUs at issue in the RSU Claims would have automatically converted to unrestricted LBHI common stock at the end of the five-year hold period, and the Claimants would have reaped the benefit of any increase in LBHI's common stock price.

4.      Originally there were 3,738 RSU Claims, but over 3,500 of those have been classified as equity because those claimants stopped pursuing RSU Claims.

## II.      Lehman's Equity Award Program

5.      The restricted stock units and contingent stock awards that are at issue in the RSU Claims were granted pursuant to Lehman's Equity Award Program, which was established in 1994 (the "Program"). *Id.* at ¶ 5; CLX 072 (1997 Trust Under LBHI Incentive Plans).

6.      The Program was administered by the Compensation and Benefits Committee (the "Compensation Committee") of LBHI's Board of Directors. CL001 (Stipulation), ¶ 10. Only the Compensation Committee had the authority to set the terms of the Program from year to year. The terms of the Program could not be changed or varied without approval of the Compensation Committee. *Id.*

7.      Each year, the terms of the Program and the grants of RSUs were communicated to employees firm-wide via face-to-face communications, conference calls, the online bonus system "LehmanLive" (the Firm's internal computer network), and/or electronic mail. CL001 (Stipulation), ¶ 13. During each of these years, pre-printed packets of information containing a "Dear Colleague" letter, a summary of the material terms, and a brochure were distributed to employees. *Id.* The Claimants do not dispute the authenticity of the Program documents and

-2-

employment agreements in evidence.  Claimants do not dispute that they received the Program

documents annually.  (Transcript of Hearing at 260:12-261:12, *In re Lehman Bros. Holdings,*

*Inc.*, No. 08-13555-SCC (Bankr. S.D.N.Y. Apr. 1, 2014)) [ECF. No. 43969] ("Tr. Day 1").

8.     A central purpose of the Equity Award Program was to strengthen LBHI by

giving employees a financial stake in the company, thus giving them a sense of ownership in the

firm and motivating them to secure the firm's success.  *See, e.g.*, CL001 (Stipulation), Exh. 3

(2003 Senior Vice-President Equity Award Program) at LEH-RSU 0015891.  The Equity Award

Program Brochure distributed to employees on a yearly basis reminded them of their personal

stake in the company:  "Given the key role you play in Lehman Brothers' success, it is important

for you to have a significant stake in the firm. . . . The Program provides you with an incentive to

think and act like an owner every day, and allows you to share in the Firm's financial success

over time."  *Id.; see also* CL001 (Stipulation), Exh. 15 (2008 Equity Award Program Questions

and Answers) at LEH-RSU 0000914 ("[A]s in the past, the overall objective of the Firm's Equity

Award Program is to ensure multi-year alignment with shareholders through significant

ownership stakes for employees") and LBHI0118 at LEH-RSU 0000254 ("The purpose of the

Lehman Brothers Holdings Inc. Employee Incentive Plan (the 'Plan') is to strengthen Lehman

Brothers Holdings Inc. (the 'Company') by providing selected employees of the Company with

the *opportunity to acquire a proprietary and vested interest in the growth and performance of*

*the Company . . . .[t]he purposes of the Plan are to be achieved through the grant of various*

*types of stock-based awards."*) (emphasis added)*.*

9.     For example, Ms. Krieger testified that when meeting with the employees under

her supervision, she "presented that the firm wanted us to feel like we were managing this like it

were our own . . .[and] feel like you've got something to gain by doing this, to feel like you put

-3-

your heart and soul in something with the hopes that, ultimately, the firm will be in a better place."  (Transcript of Hearing at 178:22-179:15, *In re Lehman Bros. Holdings, Inc.*, No. 08-13555-SCC (Bankr. S.D.N.Y. Apr. 2, 2014)) ("Tr. Day 2").

10.     Claimants protest that despite the language in the Program documents, they did not feel like owners of the company as a result of the Lehman Equity Award Program.  Cl. FoF and CoL at ¶¶ 21-22, 29.  However, the evidence is clear that Claimants do not dispute that they received the Program documents, nor do they dispute the authenticity of the Program documents in evidence.  Joint Stipulation Regarding Authenticity and Admissibility of Documents and Designated Deposition Testimony in Connection With Debtors' Omnibus Objections to Proofs of Claim [ECF No. 43763] ("Joint Stipulation Regarding Authenticity").

## III.     The RSUs in Practice

11.     The RSUs share many of the key characteristics of an equity interest, including a lack of fixed value, eligibility for any declared dividends, and the privilege of limited shareholder voting rights.  LBHI FoF at ¶¶ 12, 13, and 14.

12.     RSUs did not have a fixed value as cash or debt does.  Rather, during the five-year hold period, the value of the RSUs varied with the value of LBHI's common stock.  The ultimate value of the RSUs – and the amount of income tax liability that RSU holders would ultimately incur – depended on LBHI's stock price after the five-year hold period, at the time of delivery of the LBHI common stock.  (Tr. Day 1, 250:21-251:3); *see* CL001 (Stipulation), Exh. 3 (2003 Senior Vice-President Equity Award Program) at LEH-RSU 0015900 ("As a result, your RSUs appreciate on a pre-tax basis for the five-year restriction period. . . . Upon conversion to common stock, the fair market value of the shares will be taxed as employment income *based on the closing price of Lehman Brothers common stock on the conversion date*.") (emphasis added).

13.     RSU holders, like shareholders, benefited from any dividends that were paid during the five-year hold period.  When the LBHI common stock declared a dividend, the RSUs also paid dividends to the RSU holder in the form of additional RSUs; the number of additional RSUs received as a result of the dividend event was based on the share price of the LBHI common stock at the time of the dividend event.  CL001 (Stipulation), Exh. 3 (2003 Senior Vice-President Equity Award Program) at LEH-RSU 0015902 ("Dividend equivalents accrue quarterly on your RSUs and are reinvested as additional RSUs, without a discount."); CLX 004 (Miller Decl., Exh. C (2005 Equity Award Program For Bonus-Eligible and Production-Based Employees)) at LEH-RSU 0022584 (same); CL001 (Stipulation), ¶ 29.  If the necessary conditions were satisfied, when the RSU holders were issued tradable LBHI common stock, the RSU holder received additional common stock in proportion to the dividend equivalents that had accrued during the five-year period.  CL001 (Stipulation), ¶ 29.

14.     RSU holders also had shareholder voting rights even before the stock was issued. Lehman established a trust and funded it with shares to be issued upon the conversion of RSUs to common stock.  That trust gave RSU holders the ability to direct voting on those shares based on the proportion of the number of RSUs held by the employees. CL001 (Stipulation), Exh. 3 (2003 Senior Vice-President Equity Award Program) at LEH-RSU 0015902 ("You will be able to direct the voting related to shares held in the Trust in proportion to the number of RSUs you hold."); CLX 004 (Miller Decl., Exh. C (2005 Equity Award Program For Bonus-Eligible and Production-Based Employees)) at LEH-RSU 0022584 (same).  Claimants contend that they do not recall being provided with the opportunity to vote their RSUs through a proxy.  Cl. FoF and CoL at ¶¶ 31-33.  However, the evidence is clear that Claimants do not dispute that they received the Program documents, nor do they dispute the authenticity of the Program documents in

evidence. *See* LBHI0131 (February 28, 2003 Notice of 2003 Annual Meeting of Stockholders

with enclosed proxy card); Joint Stipulation Regarding Authenticity.

15.     Program brochures distributed to employees stated that an RSU "represents the

conditional right to receive one share of Lehman Brothers common stock" once certain

employment-related conditions have been satisfied.  CL001 (Stipulation), Exh. 3 (2003 Senior

Vice-President Equity Award Program) at LEH-RSU 0015891.  The Program documents further

advised participants in the Equity Award Program that "*you can consider the RSUs as shares of*

*Lehman Brothers common stock that the firm holds on your behalf for five years*, which you will

be entitled to receive at that time, provided you meet certain terms and conditions."  *Id*.

(emphasis added).

## IV.     The RSU Claimants

16.     At all relevant times, Claimants were informed that Lehman had the option to pay

a portion of employees' Total Compensation in equity-based awards pursuant to the Program.

The employee handbooks distributed in the United States and the United Kingdom provide that

"[a]t the Firm's option, a portion of [an employee's] total compensation . . . may be payable in

the form of conditional equity awards (restricted stock units ('RSUs'), stock options, or other

equity awards) pursuant to the Firm's Equity Award Program."  CL001 (Stipulation), ¶ 2.  In

addition, in each case where Lehman had an employment contract with a Claimant, that contract

provided (with some varying language), that "[a]t the Firm's discretion, a portion of your total

. . . compensation . . . will be [or may be] payable in conditional equity awards (restricted stock

units and/or other equity awards) pursuant to the Firm's employee equity award program . . . ."

*Id*.  The discretion to pay Claimants in the form of equity-based awards belonged solely to

Lehman, and Claimants admit they "could not elect to receive cash instead of the awards."

CL001 (Stipulation), ¶ 10.

17.     Mr. Gran was asked if he "understood that the compensation system at that time included some portion of your compensation in CSAs rather than all cash; is that correct?" to which he responded "Absolutely."  (Tr. Day 1, 223:11-14).  Ms. Jao was asked if she was told that she was getting equity awards as part of her compensation, to which she responded affirmatively.  (Tr. Day 2, 12:5-15; 17:18-18:5).  Ms. Kreiger testified that as part of her supervisory responsibilities, she would attend training sessions with Lehman HR "as to how to explain what that program meant, and then subsequently each year, as compensation was ready to be announced, we had training sessions again with the HR department that required us to ensure that we understand the script that we needed to deliver to our employees so that they would understand their compensation."  (Tr. Day 2, 151:11-152:2).  Ms. Kreiger explained that employees were told ". . . this was the compensation that you were being awarded.  This was your base.  This was your bonus, and that was the breakdown of your bonus and what was actually going to be RSUs."  (Tr. Day 2, 177:16-178:21).

18.     At all relevant times, Claimants were also fully informed that a grant of RSUs entitled them to nothing more than LBHI common stock at the end of the five-year hold period upon the fulfillment of certain conditions.  CLX 073 (LBHI Employee Incentive Plan as amended through Feb. 19, 2003) at Section 8(b); LBHI0026 (Lehman Brothers 2007 Equity Award Program) at Section 5; LBHI0034 (2003 Equity Award Program, Agreement Evidencing a Grant of Restricted Stock Units – Investment Representative) at Section 6; LBHI0035 (2003 Equity Award Program, Agreement Evidencing a Grant of Restricted Stock Units) at Section 6; LBHI0117 (LBHI 1996 Management Ownership Plan as amended through Nov. 8, 2007) at Section 8(b); LBHI0118 (LBHI Employee Incentive Plan as amended through Nov. 8, 2007) at Section 8(b).  Once the RSUs were granted, Lehman's obligations were "limited solely to the

delivery of shares of Common Stock on the date when such shares of Common Stock are due to be delivered under each Agreement, and in no event shall the Company or any Subsidiary become obligated to pay cash in respect of such obligation. . . ." *Id.* Under no circumstances did LBHI have an obligation to deliver cash in lieu of or in exchange for the RSUs. The only place in the Program documents that refers to receiving cash in exchange for RSUs is the section discussing a friendly change of control, which did not happen here. Even in that circumstance, the Program documents are clear that it is Lehman's option or discretion to pay cash or equity in exchange for RSUs. CL001 (Stipulation), Exh. 3 (2003 Senior Vice-President Equity Award Program) at LEH-RSU 0015901; LBHI0117 (LBHI 1996 Management Ownership Plan as amended through Nov. 8, 2007) at Section 8(b).

19.     Claimants admit "they could not elect to receive cash instead of the awards." CL001 (Stipulation), ¶ 10. Ms. Kreiger testified that she sold her RSUs as soon as they vested. When asked whether that was because she "understood [that] you didn't have an option to get money, that's why as soon as you got a share, that's why you tried to sell it?" Ms. Kreiger responded "[t]hat's right." (Tr. Day 2, 190:7-11).

20.     The Claimants were highly sophisticated individuals working at a prestigious investment banking firm. (Tr. Day 2, 30:5-10; 41:17-42:3; 86:22-87:21; 90:12-24). Many Claimants, particularly the Neuberger Berman employees (the "NB Employees"), were receiving multiple millions of dollars a year in cash and multiple millions of dollars a year in stock awards. (Tr. Day 1, 254:16-255:2; Tr. Day 2, 40:11-14). Claimants understood that the value of LBHI common stock could vary even if the market was generally stable, could in fact be worth nothing, and that the value of the RSUs they received varied accordingly. (Tr. Day 1, 257:7-259:6; 319:15-322:5; Tr. Day 2, 62:8-15; 184:24-185:10).

21.    Mr. Shotten testified that he was hired as a managing director to be the global head of marketing risk management at Lehman.  (Tr. Day 2, 30:5-10).  He further testified that he received approximately $1.1 million on account of the work he performed in 2004.  (Tr. Day 2, 40:11-14).  Mr. Shotten also testified that he understood that LBHI common stock price would go up and down.

> Q: Did you understand that you would receive the benefit of stock appreciation at the end of the five years if you met the conditions and remained with Lehman for five years?
>
> A: I understood that this promise to convert the RSUs into equities after five . . . years after the grant date would happen and that had those conversions taken place that the equity when delivered would be worth whatever it is now worth with a higher or lower or whatever.
>
> (Tr. Day 2, 62:8-15).

22.    Ms. Fleishman (who is also known as Ms. Richmond) testified that her total cash compensation for 2006 "would have been that year 1.8 million with 200 being the salary." (Tr. Day 1, 254:16-22).  The Court questioned Ms. Fleishman about her understanding of the RSU program:

> The Court: So let me ask you a question.  When you look at this statement that's dated as of September 12th, 2008, which as it turned out was three days before the filing, though had events unfolded differently, for example, and the government had decided to bail Lehman out, it might have been the case that Lehman continued and that as these cliffs arrived, your stock was worth a very small fraction of the numbers on this page, right?
>
> A: Yes.
>
> The Court: And you understood that, right?
>
> A: Yes.
>
> The Court: Okay. . . . My point simply was that had Lehman continued and we were – as a functioning business and the RSUs continued and time marched on and we got to the cliffs, then these would have been – they would have converted into stock as the previous ones had done after the

five years and it was possible that the value might have been much lower because the stock price could have – it could have become a penny stock out of bankruptcy.  And that – I asked Ms. Richmond and she responded that she understood that she had a downside risk with respect to the stock price, as I would expect her, frankly, to understand given that she worked for Lehman for 15 years. . . .

Mr. Schager: Ms. Richmond, in the years that you received a conversion of your RSUs into stock, were there ever years in which the market price of the stock at the date of conversion was lower than the market price at the date of the grant?

A: I believe so. Yes . . . . It went up and down.

(Tr. Day 1, 257:7-259:5).

23.     Mr. Howard was also questioned by the Court regarding his understanding of the

fluctuations of common stock.

The Court:  Then what would happen if the Lehman stock price went down, all right, after that date? . . . Would you still be entitled to $362,000 of Lehman stock or did you get a grant of Lehman stock in the amount of $362,000 on that date and you would follow the stock price as it went down?

A: From my memory, Your Honor, what I would look at would be at the end of, for example, '08, if the firm had still been . . . in business . . . there was going to be $362,000 worth of cash would be translated into so many units.  Those units – I would be eligible for those units in five years' time.

The Court: At what price? How many – how would you calculate the number of units? . . .

A: You will see the same that's referred to as the  . . . grant price and the grant value.  The grant price would be, from memory what it was when . . . you received the . . . strike. . . .

The Court: Right. But then – then later on if all had gone – if Lehman had continued in business, that block of stock that had a value of 362 at the time of the grant would be worth more or less depending upon . . . what the Lehman share price did in those ensuing years, right?

A: Correct. Yes.

(Tr. Day 1, 319:24-322:4).

-10-

24.     Finally, Ms. Kreiger testified that she also understood that the price of LBHI

common stock fluctuated and that the value of the RSUs fluctuated accordingly.

> The Court: Does "skin in the game" include a risk of losing something if
> the game is lost?
>
> A: Sure. . . . can you lose money – absolutely; the difference is I didn't
> want that risk.
>
> Court: And that's why you sold those shares the day you could?
>
> A: The day I could.
>
> (Tr. Day 2, 184:24-185:10).

25.     At all relevant times, Claimants, including the NB Employees, were at-will

employees and had a choice as to whether or not to accept and continue employment at Lehman.

(Tr. Day 1, 223:11-24; 255:24-256:17; 313:20-314:7; Tr. Day 2 114:6-9; 215:15-22).  At all

relevant times, Claimants, including the NB Employees, voluntarily and continuously accepted

as a condition of their employment that part of their Total Compensation was to be paid in RSUs,

whose value varied with the value of the LBHI common stock.  (Tr. Day 1, 316:25-317:23; Tr.

Day 2, 14:15-18:5; 116:8-17).  At all relevant times, Claimants, including the NB Employees,

had the option to leave employment at Lehman, but they voluntarily elected not to because of the

high cost of doing so – leaving unvested equity awards on the table.  (Tr. Day 1, 313:20-314:7;

Tr. Day 2, 13:23-14:9; 123:21-124:16; 220:17-221:2).  At all relevant times, Claimants,

including the NB Employees, had the option to stop working at Lehman but chose not to leave

because they could not make nearly as much money anywhere else. (Tr. Day 2, 40:17-42:16;

97:17-98:5; 137:10-20; 201:14-23; 212:18-213:12).

26.     Mr. Gran testified that he understood that the compensation structure at the time

included "some portion of your compensation in CSAs rather than all cash."   Mr. Gran testified

that he still chose to recommence working at Lehman after understanding how the CSA system

worked.  In fact, Mr. Gran testified that "all banks have similar ideas" and that "any organization you would join would have a compensation plan which would incorporate some kind of deferred compensation which would somehow be tried to tie into a level of the price." (Tr. Day 1, 223:11-24).

27.    Ms. Fleishman testified that she could have marketed her skills to Barclays or to Morgan Stanley, or Goldman Sachs, or a similar institution, and that if one of those companies had made her an offer, she would have "balance[d] it against what you would be giving up, which was your five years of deferred compensation."  Ms. Fleishman testified that the "deferred compensation" she would have left behind amounted to roughly $3.4 million and that leaving Lehman was "a difficult option because of the restriction of the good leaver policy over time." (Tr. Day 1, 255:24-256:17).

28.    Mr. Howard testified that if he had left to work for another bank, it would have cost him $1.9 million in RSUs.  When asked if leaving Lehman was "really an option at that expense," Mr. Howard responded, "[w]ell, I could have left Lehman, but I would have – I could have left Lehman and walked away from the 1.9 million or I could have gone to another firm, but, you know, they would have to have come close to matching that otherwise it would have been an uneconomic proposition."  (Tr. Day 1, 314:1-7). Mr. Howard further testified that he understood every month that part of his commission was being put into an "equity calculated accrual category" and that understanding this, he chose to continue to work for Lehman.

> Q: And you understood you were an at will employee in the sense that if you wanted to quit you didn't have a contractual obligation to work for a certain number of months; is that true?
>
> A: I was certainly an at will employee.  I don't know whether I would have any contractual obligation to be there another month.  But it was – it would be a limited period.

-12-

Q: All right.  And you did understand that one of your options personally was that you could go to another firm and say, I have – I am valuable and if, assuming you met, whatever restricting covenants you could try to get that firm to compensate you for any deferred awards that you might have at Lehman as an inducement to get you to change firms.  That was an option you had, right?

A: That was an option I had.

(Tr. Day 1, 317:7-21).

29.    Ms. Steifel similarly testified that she chose not to leave because there was a high cost to doing so and she could not make nearly as much money anywhere else:

Q: All right.  Did you go back and look at Exhibit D and try to figure out what are my options at this point, or did you just decide it just wasn't really something that you needed to consider seriously to leave, because there was going to be some deferred compensation?

A: I didn't consider leaving because there was a cost to leaving that was too great . . . .

Q:  Did you consider whether these restrictions would allow you to go to work for an accounting firm, not as an accountant, but to use, for example, your training capabilities, your management capabilities to organize groups and perhaps get them to try to provide say, accounting services to somebody?

A:  And that's worth a million dollars a year?

(Tr. Day 2, 124:8-15; 137:14-20).

30.    Mr. Ramallo was asked whether he could have gone to work at Sanford Bernstein.  Mr. Ramallo answered "[t]o be a chief cook and bottle washer in this industry is very tough, but under your hypothetical scenario, maybe." (Tr. Day 2, 215:15-22).  He also testified, "I wasn't going to go back to engineering.  I wasn't going to go back to accounting.  The only place I feel that would continue to give me the opportunity at that time to pursue a portfolio management degree was Neuberger Berman." (Tr. Day 2, 221:15-19).

31.    Ms. Jao similarly testified that she chose not to leave Lehman:

-13-

A:  Yes, there is a choice hypothetically, but I don't know if the right term is punitive  . . . it's a very – it's an extreme choice.

The Court: But it is a choice.

A:  Yes . . .

The Court: [Y]ou were told up front at the firm's option we're going to pay some of this compensation – we may pay some of this compensation in this other form.  So going into at the first moment in time you had the choice of saying, I don't like that, I want to know exactly what I'm going to be paid and in what form and I'm not going to work here. . . . When you go to work . . . at any firm like this before you agree to walk through the door and sit down at a desk and give your labor, that's the bargain, right?

A: Right.

(Tr. Day 2, 13:25-14:7; 17:18-18:5).

32.    Mr. Shotten testified "I had already waited . . . for a considerable part of that period to make the next step in my career progression. . . . And out of leaving that behind, leaving – obviously over the – over the course of the four and a half years my compensation at Lehman accumulated to, you know, four and a half million dollars or so of RSU – RSUs left on the table, I would have to walk away from that.  The chances of finding another equivalent job as head of market risk somewhere else [*sic*: was?] pretty small.  The chances that I could persuade another firm to pay out the compensation that I was leaving on the table at Lehman was – you know, was slim to none.  So whilst theoretically it's correct to say I had the option to walk, as a practical matter I didn't really have an option to walk, and that's why I stayed at the firm." (Tr. Day 2, 41:20-42:16).

33.    Many of the Claimants were long-term employees of Lehman.  (Tr. Day 1, 231:13-232:3; 297:14-21; Tr. Day 2, 7:7-10; 141:12-19).  From the inception of the Equity Awards Program and for years thereafter, Lehman employees, including many of the Claimants, enjoyed a rise in their fortunes via Lehman's success.  (Tr. Day 1, 218:14-17; 248:20-25; 250:2-

-14-

6; 264:11-21).  For many of these Claimants who were long-term employees of Lehman, at the

moment of the chapter 11 filing, they had LBHI common stock that had been classified as equity

and/or cash from the sale of LBHI common stock that had been issued through the Program after

the five-year hold period, as well as RSUs that are the subject of the RSU Claims, all pursuant to

the same Program.  (Tr. Day 1, 217:14-218:4).

34.    Contrary to Claimants' assertions, there is not any language in the Program

documents indicating to Claimants that RSU holders would have general unsecured claims in the

event of insolvency.  Cl. FoF and CoL at ¶¶ 52-55, 64-67.  Language in select Program

documents for the years 2003 and 2004 Program referenced Section 510(a) of the Bankruptcy

Code (the "Subordination Provisions").  LBHI0034 (2003 Equity Award Program, Agreement

Evidencing a Grant of Restricted Stock Units – Investment Representatives) and LBHI0035

(2003 Equity Award Program, Agreement Evidencing a Grant of Restricted Stock Units) at

Section 10.  The Subordination Provisions do not appear in the Program Documents after 2004.

See LBHI0047 (2005 Equity Award Program, Agreement Evidencing a Grant of Restricted

Stock Units).  There is no evidence of why the Subordination Provisions are not contained in the

Program Documents after 2004.  (Tr. Day 1, 81:10-14.)  There is no evidence that the decision to

stop including the Subordination Provisions in the Program documents arose from any intent by

LBHI to declare that claims for RSUs would cease to be subject to subordination pursuant to

section 510(b) of the Bankruptcy Code if a chapter 11 proceeding should ever arise.  Further,

there is no evidence that any Claimant relied upon the removal of the Subordination Provisions

when making the choice to continue employment at Lehman.

35.    The Lehman Brothers Employee Incentive Plan as amended through November 8,

2007, LBHI0118 (the "Employee Incentive Plan"), also does not have any language indicating to

-15-

Claimants that RSU holders are general unsecured creditors of the company.  The relevant

language from the Employee Incentive Plan states:

> Section 8(b): With respect to any restricted stock units granted under the Plan, the
> obligations of the Company or any Subsidiary are limited solely to the delivery of shares
> of Common Stock on the date when such shares of Common Stock are due to be
> delivered under each Agreement, and in no event shall the Company or any Subsidiary
> become obligated to pay cash in respect of such obligation (except that the Company or
> any Subsidiary *may pay* to Participants amounts in cash in respect of a restricted stock
> unit equal to cash dividends paid to a holder of shares of Common Stock, for fractional
> shares or for any amounts payable in cash upon the occurrence of a Change in Control).

> Section 16: The Plan is intended to constitute an "unfunded" plan for long-term incentive
> compensation. With respect to any *payments* not yet made to a Participant, including any
> Participant optionee, by the Company, nothing herein contained shall give any Participant
> any rights that are greater than those of a general creditor of the Company.  In its sole
> discretion, the Committee may authorize the creation of trusts or other arrangements to
> meet the obligations created under the Plan to deliver Common Stock *or payments in lieu
> thereof* . . . .

LBHI0118 (Employee Incentive Plan) (emphasis added).

36.    Section 8(b) of the Employee Incentive Plan states that there are limited situations

in which Lehman could issue *payments* in cash in lieu of the restricted stock units, not one of

which is applicable here.  Section 16 states that Lehman's obligations to (1) deliver Common

Stock or (2) deliver payments in lieu thereof, are mutually exclusive obligations.  Thus, the

language in Section 16 of the Employee Incentive Plan – stating that Participants who are

entitled to *payments* do not have right greater than those of a general creditor – is limited to

Participants entitled to payments of cash in lieu of equity awards and is inapplicable to the

Claimants here.

Section 13(b) of the Employee Incentive Plan, which states that "the grant of an Award

shall not be construed as giving a Participant the rights of a stockholder of Common Stock"

merely clarifies that RSU holders are not active shareholders and therefore do not have all the

rights of stockholders; RSU holders cannot bring shareholder's derivative actions, for example.

-16-

*Id*.  It does not, as Claimants contend, reasonably lead to the conclusion that Lehman intended

RSU holders to have general unsecured creditor status in the event of bankruptcy.  Cl. FoF and

CoL at ¶ 29.

37.    The 1997 Trust Under Lehman Brothers Holdings Inc. Incentive Plans, CLX 072

(the "1997 Trust"), similarly does not have any language indicating to Claimants that RSU

holders are general unsecured creditors of the company.  The relevant language from the 1997

Trust states as follows:

> WHEREAS, the Company wishes to establish a trust (the "Trust") and to contribute
> and/or sell to the Trust assets including Shares, that shall be held therein, *subject to the
> claims of the Company's general creditors* in the event the Company becomes insolvent
> (as hereinafter defined), until paid to Participants (as hereinafter defined) in such manner
> and at such times as the Company may specify to fulfill the Company's obligations under
> the Plans.
>
> Section 1(e). The principal of the Trust, and any earnings thereon, shall be held separate
> and apart from other funds of the Company and shall be used exclusively for the uses and
> purposes of *Participants and general creditors* as herein set forth.  Participants shall have
> no preferred claim on, or any beneficial ownership interest in, any assets of the Trust.
> Any rights created under the Plans and this Agreement shall be mere unsecured
> contractual rights of Participants against the Company.
>
> Section 3(b).  At all times during the continuance of this Trust, as provided in Section
> 1(e) hereof, the principal and income of the Trust shall be subject to claims of general
> creditors of the Company under federal and state law as set forth below . . ."

CLX 072 (1997 Trust) (emphasis added).

The 1997 Trust sets forth in the third "Whereas" clause and in Section 1(e) that

Participants, defined as individuals holding Eligible Awards, are separate and distinct from

general creditors of the company.  Specifically, the principal of the Trust, and any earnings

thereon, shall be used exclusively for the uses and purposes of two different groups of

individuals: (1) Participants, *and* (2) general creditors.  1997 Trust, Section 1(e).  The shares in

the Trust will be held to be paid to one group of individuals, the Participants, but will be subject

to the claims of the second group of individuals, general creditors, in the event of insolvency.  *Id*.

-17-

at third "Whereas" provision.  The language in Section 1(e) of the 1997 Trust stating that "any

rights created under the Plans and this Agreement shall be mere unsecured contractual rights of

Participants against the Company" does not contain any grant of rights as an unsecured creditor

and its plain meaning is that no right as a secured creditor is created by anything in the Trust.  *Id*.

It does not, as Claimants contend, reasonably lead to the conclusion that Lehman intended RSU

holders to have general unsecured creditor status in the event of bankruptcy.  Cl. FoF and CoL at

¶ 30.

38.     Claimants received pre-printed Proof of Claim forms from the Claims

Administrator which were used to submit the RSU Claims.  The Claims Administrator printed

the Proof of Claim forms based on over 500 pages of fine-print schedules identifying executory

contracts.  These schedules were prepared by the Debtor filed on June 15, 2009 and specifically

and unequivocally state that "inclusion of a contract, lease or other agreement on Schedule G

does not constitute an admission that such contract, lease or other agreement is an executory

contract, was in effect on the applicable Petition Date, or is valid or enforceable."  Schedules of

Assets and Liabilities of Lehman Brothers Holdings Inc., filed June 15, 2009, Note 18(i) [ECF

No. 3918].

## V.     The Neuberger Berman Claimants

39.     There is no evidence that any of the NB Employees promptly claimed that they

were under duress when they entered into employment with Lehman in 2003.  (Tr. Day 2,

212:18-213:12.)  The first evidence in the record of the NB Employees making this claim was

when they filed their sur-reply in further opposition to the Objections on February 14, 2012,

nearly 10 years after they became Lehman employees.  Claimants' Sur-Reply In Further

Opposition To Debtors' Seventy Third, One Hundred Eighteenth And Two Hundred Seventh

Omnibus Objections to Claims (To Reclassify Proofs Of Claim As Equity Interests) [ECF No. 25715].

40.    At no time did the NB Employees formally complain in a legal proceeding or otherwise about the imposition of restrictive covenants while they were employed at Neuberger Berman or at Lehman.  (Tr. Day 2, 95:16-96:13; 123:2-15).  Rather, the NB Employees agreed that the terms of their non-compete agreements with Lehman were "reasonable and necessary for Lehman and its affiliates to enjoy the full benefit of the business acquired in connection with the Merger." NB FoF at ¶ 10.

41.    Ms. Steifel testified:

Q: When you learned that some of your compensation under the Lehman system was going to be deferred, were you aware of the fact that this was consistent with the way Lehman did pay the people who were generally higher levels in the organization, that there was some deferred compensation?

A: I learned it at that time.

Q: All right.  Did you complain about that and say you didn't know you were getting into this, and you think you were being – that this was inappropriate or unfair to you?

A: I wasn't happy about it, but no, I'm not someone . . . that's very vocal or a nuisance to management.

(Tr. Day 2, 123:21-124:7).

42.    In January 2009, the NB Employees were paid cash for the RSUs they were granted in 2008 pursuant to a memorandum dated November 17, 2008 written by Neuberger Berman management on Neuberger Berman letterhead and addressed to Neuberger Berman employees (the "November 17 Memo").  NB N (Nov. 17, 2008 Memorandum from G. Walker and H. Zuckerman to U.S. Employees of Neuberger Berman Holdings and certain of its affiliates) and NB O (Neuberger Investment Management U.S. Employee Q&A).  At the time the

-19-

November 17 Memo was distributed, LBHI was in bankruptcy but Neuberger Berman was not; at that time Neuberger Berman was a Lehman asset being sold out of the bankruptcy.  (Tr. Day 2, 101:17-103:9).  The November 17 Memo explains to Neuberger Berman employees what was happening to them as a result of LBHI's bankruptcy.  *See generally,* NB N (Nov. 17, 2008 Memorandum from G. Walker and H. Zuckerman to U.S. Employees of Neuberger Berman Holdings and certain of its affiliates) and NB O (Neuberger Investment Management U.S. Employee Q&A).  The November 17 Memo was written by Neuberger Berman management, not by the former management of Lehman that had set up the Equity Award Program pursuant to which the NB Employees received the RSUs that are the subject of the RSU Claims.  (Tr. Day 2, 105:12-106:8).

## DEBTORS' PROPOSED CONCLUSIONS OF LAW

I.    **The RSUs Are "Equity Securities" Under Section 101(16) of the Bankruptcy Code**

43.    Section 101(16) of the Bankruptcy Code provides:

The term "equity security" means –

(A)    share in a corporation, whether or not transferable or denominated "stock", or similar security;

(B)    interest of a limited partner in a limited partnership; or

(C)    warrant or right, other than a right to convert, to purchase, sell, or subscribe to a share, security, or interest of a kind specified in subparagraph (A) or (B) of this paragraph.

44.    Here, the RSUs constitute shares in the corporation – and thus equity securities – for purposes of 101(16)(A). The Court determined that the value of the RSUs was not fixed but, rather, shifted based on the movements of the LBHI common stock. When the LBHI common stock declared a dividend, the RSUs also paid dividends to the RSU holder in the form of additional RSUs; the number of additional RSUs received as a result of the dividend event was based on the share price of the LBHI common stock at the time of the dividend event. RSU holders also had the ability to vote a proportionate share of their RSUs by way of a trust and proxy. The Court found that in these ways, the RSUs were almost identical to common stock. Indeed, the Program documents advised participants in the Equity Award Program that "you can consider the RSUs as shares of Lehman Brothers common stock that the firm holds on your behalf for five years, which you will be entitled to receive at that time, provided you meet certain terms and conditions." CL0001 (Stipulation), Exh. 3 (2003 Senior Vice-President Equity Award Program) at LEH-RSU 0015891. Further, the Court determined that if Lehman had not filed for bankruptcy and the Claimants had fulfilled the requisite employment-related conditions, all of the RSUs at issue in the RSU Claims would have automatically converted to unrestricted LBHI

-21-

common stock by now. Given these attributes of the RSUs, it is of no import that RSUs were not

transferable and were not denominated "stock", as section 101(16)(A) specifically states that

transferability and denomination as "stock" are not necessary for shares of a corporation to be

treated as an equity security. *See In the Matter of Baldwin-United Corp.*, 52 B.R. 549, 552

(Bankr. S.D. Ohio 1985) (holding that claims to exercise the stock option portion of a stock

option plan are properly classified as equity security interests, where stock option portion of plan

consisted of five-year right, vested in full from date of option, to purchase fixed amount of stock

in debtor).

45.    In the alternative, the RSUs are a "warrant or right, other than a right to convert,

to purchase, sell, or subscribe to a share, security, or interest of a kind specified in subparagraph

(A)" and are therefore "equity securities" under section 101(16)(C) of the Bankruptcy Code.

Courts have interpreted the definition of equity security under section 101(16)(C) to include a

range of stock-based transactions. *See, e.g., Nantahala Capital Partners, LP v. Wash. Mut., Inc.

(In re Wash. Mut., Inc.)*, 464 B.R. 656 (Bankr. D. Del. 2012) (holding that litigation tracking

warrants were equity securities because such warrants entitled the holders only to common stock,

not cash); *Carrieri v. Jobs.com, Inc.*, 393 F.3d 508 (5th Cir. 2004) (holding that claimant's right

to redeem stock was an equity security); *In re Einstein/Noah Bagel Corp.*, 257 B.R. 499, 506

(Bankr. D. Ariz. 2000) (holding that a nontransferable, non-assignable put right "falls squarely

within the contours of section 101(16)" because such put right does not include a "right to

payment" in cash). Here, there is no dispute that the common stock of LBHI was a share in a

corporation within the definition of section 101(16)(A) of the Bankruptcy Code. The RSUs,

which provided Claimants with a nontransferable, non-assignable right to common stock in

LBHI at a specified future time upon the satisfaction of certain conditions, fall squarely within the definition of "equity security" under section 101(16)(C) of the Bankruptcy Code.

46.    Claimants assert that the language in section 101(16) of the Bankruptcy Code of "warrant or right, other than a right to convert" serves to exclude the RSUs from the definition. Cl. FoF and CoL ¶¶ 70-77.  Contrary to such arguments, the legislative history of this statute shows that the phrase "other than a right to convert" was intended to carve out instruments where the holder has the option to change it from one instrument to something else, such as a convertible debenture, and to make sure that a convertible debenture was not an equity security but was a debt security:

> Paragraph (16) defines "Equity Security."  The term includes a share or stock in a corporation, a limited partner's interest in a limited partnership, and a warrant or right to subscribe to an equity security.  The term does not include a security, *such as a convertible debenture*, that is convertible into equity security, but has not been converted.

S. Rep. No. 95-989, at 24, 95th Cong., 2d Sess. (1978) (emphasis added).  Courts have interpreted the legislative history to mean that Congress did not intend to exclude anything from the definition of "equity security" other than instruments that are convertible at the option of the instrument holder.  *See Carrieri v. Jobs.com, Inc.*, 393 F.3d at 519-520 (holding that claimant's right to redeem stock was an equity security, that "[t]he phrase 'other than a right to convert' restricts only the word 'right' and not the rest of the section," and that Congress did not intend to exclude anything else other than convertible instruments from the definition of "equity security" because "it did not explicitly list any other restricted terms.").  Here, the Court determined that RSU holders did not have the option to either convert the RSUs to LBHI common stock or continue to hold the instruments in the form of RSUs or elect to receive cash in exchange for their RSUs; the conversion from RSU to LBHI common stock was automatic when certain employment-related conditions and the five-year hold period were met.  *See generally, Chock*

*Full O' Nuts Corp. v. United States*, 453 F.2d 300, 304 (2d Cir. 1971) (finding that the holder of

a convertible debenture has two mutually exclusive options to choose from: (1) to convert the

debenture into stock, and therefore surrender the debenture and the right to redeem the debenture

at maturity, or (2) to redeem the debenture at maturity, at which point the option to convert

expires.).  As such, the phrase "other than a right to convert" does not operate to exclude the

RSUs from the definition of equity security under section 101(16)(C).

## II.    The Claims of the RSU Holders Must Be Subordinated Pursuant to Section 510(b) of the Bankruptcy Code

47.    Section 510(b) of the Bankruptcy Code states:

> For the purpose of distribution under this title, a claim *arising from rescission of a purchase or sale of a security* of the debtor or of an affiliate of the debtor, *for damages arising from the purchase or sale of such a security*, or for reimbursement or contribution allowed under 502 on account of such a claim, *shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security*, except that if such security is common stock, such claim has the same priority as common stock.

11 U.S.C. § 510(b) (emphasis added).  It is well-established in the Second Circuit that section

510(b) is to be interpreted broadly.  *See In re Lehman Brothers Inc.*, 503 B.R. 778, 782 (Bankr.

S.D.N.Y. 2014) (quoting *In re Med Diversified, Inc.*, 461 F.3d 251, 255 (2d Cir. 2006)).

48.    It is also well-established in the Second Circuit that because, with the

"accumulation of precedents," "the broad applicability of section 510(b) is . . . quite settled," *In*

*re Enron Corp.*, 341 B.R. 141, 163 (Bankr. S.D.N.Y. 2006); *see also In re KIT digital, Inc.*, 497

B.R. 170, 181 (Bankr. S.D.N.Y. 2013) (stating that the Second Circuit, along with bankruptcy

and district court judges in the Second Circuit, have construed section 510(b) broadly),  it is "no

longer necessary" to consider in detail the history and background of section 510(b), nor is it

necessary to harmonize section 510(b) with the federal securities fraud statutes.  *Enron*, at 158-

159 and 163; *see also Andrews & Kurth LLP v. Family Snacks, Inc. (In re Pro-Snax Distribs.)*,

-24-

157 F.3d 414, 425 (5th Cir. 1998) ("'In the absence of any ambiguity, our examination is confined to the words of the statute, which are assumed to carry their ordinary meaning.' Recourse to the legislative history is unnecessary in light of the plain meaning of [the statute].") (internal citations omitted); *Jurgensen v. Chalmers,* 248 B.R. 94 (W.D. Mich. 2000) (finding that because the statute in question was unambiguous, a comparison to other statutes was unnecessary and that when presented with text that is clear and unambiguous, a court will not look to legislative history to contravene the plain language of the statute). The claimants in *Enron*, like the Claimants here, argued that section 510(b) should be read in light of similar federal statutes concerning securities fraud, specifically the Securities Act of 1933 and the Securities Exchange Act of 1934. *Enron*, 341 B.R. at 152; Cl. FoF and CoL at ¶¶ 78-118. The Court rejected those attempts to subject section 510(b) to a "detailed and rigorous textual analysis," holding that given the "clear trend in the case law is to interpret section 510(b) broadly," "a comparative analysis of Rule 10(b)-5 and the Securities Act does not appear fruitful here." *Enron*, 341 B.R. at 158-159. The Court further held that there is no evidence to indicate that section 510(b) and the federal securities fraud statutes must be interpreted in harmony: "[T]here is nothing to suggest that the Securities Acts and section 510(b) were intended to constitute a complementary whole . . .: the Bankruptcy Code and the Securities Acts create two distinct regulatory schemes." *Id*. at 159. For the same reasons, this Court similarly rejects any attempted analogies to the federal securities fraud statutes.

49.     Here, the RSU Claims – which all arise from the voluntary exchange of labor for the right to receive stock – must be subordinated to the claims of general unsecured creditors pursuant to section 510(b) of the Bankruptcy Code as claims "arising from rescission of . . . [or] for damages arising from the purchase or sale of . . . a security." *See In re Lehman Brothers Inc.,*

503 B.R. 778, 783 (holding "subordination for claims meeting the criteria set forth in [section 510(b)]" is mandatory).

A.    **An RSU Is a "Security" as Defined by Section 101(49) of the Bankruptcy Code**

50.    Section 101(49)(A)(xv) defines "security" to include a "certificate of interest or participation in, temporary or interim certificate for, receipt for, or warrant or right to subscribe to or purchase or sell, a security," and as section 101(49)(A)(ii) makes plain, a stock is a security. As stated in Lehman Brothers Equity Award Program brochures distributed to employees, an RSU "represents the conditional right to receive one share of Lehman Brothers common stock" once certain employment-related conditions have been satisfied. *See, e.g.*, CL0001 (Stipulation), Exh. 3 (2003 Senior Vice-President Equity Award Program) at LEH-RSU 0015890; CLX 004 (Miller Decl., Exh. C (2005 Equity Award Program For Bonus-Eligible and Production-Based Employees)) at LEH-RSU 0022574.  Thus, a grant of an RSU constitutes a contingent right to participate in, receive and/or purchase common stock of LBHI, consistent with section 101(49) of the Bankruptcy Code.  As such, each of the RSUs must be treated as a "security" as that term is defined by the Bankruptcy Code.

51.    Even when interests do not precisely match the specific labels enumerated in section 101(49) of the Bankruptcy Code, courts have repeatedly held that the fifteen-item list of examples of securities in section 101(49) is not exhaustive and that an interest may fall within the definition of a security if, among other things, the interest owner expects to share in any increases in value in the enterprise to the exclusion of ordinary creditors. *See O'Donnell v. Tristar Esperanza Props., LLC (In re Tristar Esperanza Props., LLC)*, 488 B.R. 394, 399 (9th Cir. 2013) (finding that the fifteen-item list of what constitutes a "security" in section 101(49) is non-exclusive and holding that a membership interest in an LLC is a "security"); *In re Am. Hous.*

*Found.*, No. 09-20232-RLJ-11, 2013 WL 1316723, at *18 (Bankr. N.D. Tex. March 30, 2013)

(finding that the list in section 101(49) is not exhaustive and that securities are not limited to the

items specifically identified).  Similarly, the Fifth Circuit concluded that section

101(49)(A)(xiv), which includes in the definition of security "other claim[s] or interest[s]

commonly known as 'security,'" is a "broad residual category." *In re Am. Hous. Found.*, 2013

WL 1316723, at *18, citing to *In re SeaQuest Diving, LP*, 579 F.3d 411 (5th Cir. 2009).  Courts

have held that various interests not specifically identified in section 101(49) of the Bankruptcy

Code, such as membership interests in limited liability companies and investments in a limited

partnership with guarantees of repayment of the amount of the investment, are "securities"

within the meaning of that provision. *In re Tristar Esperanza Props., LLC*, 488 B.R. at 399; *In*

*re Am. Hous. Found.*, 2013 WL 1316723, at *18.  As such, contrary to Claimants' assertions, to

constitute a "security" under section 101(49)(A) of the Code, the RSUs need not fall within the

definition of an "investment contract," an instrument "commonly known as a security," or a

"right to purchase."  Cl. FoF and CoL ¶¶ 83-118.

52.     Nor is it necessary that RSU holders share *all* of the same characteristics as actual

shareholders to be subject to mandatory subordination under section 510(b) of the Bankruptcy

Code.  The RSUs at issue in this case bear key hallmark characteristics of a security and should

be treated as such.

53.     The Court determined that RSUs did not have a fixed value as cash or a debt does.

Rather, during the five-year hold period, the value of the RSUs varied with the value of LBHI's

common stock, which is synonymous with an equity interest. *See Aristeia Capital v. Calpine*

*Corp. (In re Calpine Corp.)*, No. 05-60200 (BRL), 2007 WL 4326738, at *13 (S.D.N.Y. Nov.

21, 2007) ("The value of the [convertible notes] vary with the value of the common stock of [the

debtor], and therefore resemble an equity interest to which Section 510(b) is applicable").  The fact that RSUs were not taxed as ordinary income until the end of the five-year hold period, based on the market value when the common stock was issued, confirms that RSUs were equity interests without a fixed value.  The tax practice does not, as Claimants allege, lead to the conclusion that the RSUs were merely contractual promises to deliver stock in five years.  Cl. FoF and CoL at ¶¶ 56-62, 113-121.   At the end of the five-year hold period, RSUs automatically resulted in the issuance of freely tradable LBHI common stock, once conditions were met, without any further action on the part of the employee.  Indeed, Lehman equated RSUs to common stock, expressly informing its employees that they should "consider the RSUs as *shares of Lehman Brothers common stock* that the Firm holds on your behalf for five years . . . ."  *See, e.g.*, CL0001 (Stipulation), Exh. 3 (2003 Senior Vice-President Equity Award Program) at LEH-RSU 0015891 (emphasis added); CLX 004 (Miller Decl., Exh. C (2005 Equity Award Program For Bonus-Eligible and Production-Based Employees)) at LEH-RSU 0022574 (emphasis added).

54.     The Court also found that RSU recipients were repeatedly reminded that one of the key purposes of the RSU awards was to allow employees to share in the financial success of Lehman Brothers over time.  *See, e.g.*, CLX 004 (Miller Decl., Exh. C (2005 Equity Award Program For Bonus-Eligible and Production-Based Employees)) at LEH-RSU 0022574; *see also* CL0001 (Stipulation), Exh. 3 (2003 Senior Vice-President Equity Award Program) at LEH-RSU 0015891 ("Given the key role you play in Lehman Brothers' success, it is important for you to have a significant stake in the Firm . . . . The Program provides you with an incentive to think and act like an owner every day, and allows you to share in the Firm's financial success over time.").  RSU recipients repeatedly were reminded that the awards, whose ultimate value depended on the firm's overall financial success and not on the employee's personal

-28-

productivity, served the function of giving employees an incentive to stay with the firm and to

stay motivated to help maximize the value of the firm's business:

> The purpose of the Lehman Brothers Holdings Inc. Employee
> Incentive Plan (the "Plan") is to strengthen Lehman Brothers
> Holdings Inc. (the "Company") by providing selected employees
> of the Company with the *opportunity to acquire a proprietary and
> vested interest in the growth and performance of the Company*,
> *thus generating an increased incentive to contribute to the
> Company's future success and prosperity, enhancing the value of
> the Company for the benefit of stockholders,* and enhancing the
> Company's ability to attract and retain individuals of exceptional
> talent. *The purposes of the Plan are to be achieved through the
> grant of various types of stock-based awards.*

LBHI0118 (LBHI Employee Incentive Plan as amended through Nov. 8, 2007) at LEH-RSU

0000254 (emphasis added). RSUs thus gave employees a direct stake in the company and

motivated them to play a significant role in the success – or failure – of Lehman Brothers. As

such, the Claimants had "greater financial expectations than the creditor. The creditor can only

recoup her investment; the [Claimants] expect[ed] to participate in firm profits." *In re Med

Diversified, Inc.,* 461 F.3d at 257. This direct financial interest in the firm's overall success is

the quintessential hallmark of a common stock holder. *See In re KIT digital, Inc.*, 497 B.R. 170,

183 (Bankr. S.D.N.Y. 2013) (subordinating a claim under section 510(b), holding that "by

agreeing to accept stock instead of cash . . . [the claimant] subjected itself to the greater risk that

the price of the stock it would then receive might go down" and that "[the claimant] would also

get the benefits if the price of the stock went up."); *In re Club Ventures Inv. LLC*, No. 11-10891

(ALG), 2012 WL 6139082, at *5 (Bankr. S.D.N.Y. Dec. 11, 2012) (holding that unissued

membership units that represented a future interest in an LLC after certain conditions were met

were "securities" subject to section 510(b) because the units "would have given [claimant]

certain rights to share in the Debtor's profits, and he would have had the risk and reward

expectations of an equity holder."). RSU holders expected – and did – share in any increases

-29-

(and obviously, decreases) in the value of the enterprise to the exclusion of ordinary creditors, which is sufficient to bring RSUs within the definition of "security" under section 101(49)(A) of the Bankruptcy Code. *See Tristar*, 488 B.R. at 399 (holding that a membership interest in an LLC is a "security" because it shares in net revenue and increases in value).

55.     In addition, the Court determined that RSU holders had shareholder voting rights even before the stock was issued.  Specifically, Lehman established a trust and funded it with shares to be issued upon the conversion of RSUs to common stock.  That trust gave RSU holders the ability to direct voting on those shares based on the proportion of the number of RSUs held by the employees. *See, e.g.*, CL0001 (Stipulation), Exh. 3 (2003 Senior Vice-President Equity Award Program) at LEH-RSU 0015902; CLX 004 (Miller Decl., Exh. C (2005 Equity Award Program For Bonus-Eligible and Production-Based Employees)) at LEH-RSU 0022584.

56.     Finally, the Court found that RSU holders, like shareholders, also benefited from any dividends that were paid during the five-year hold period.  Dividend equivalents accrued quarterly on RSUs and were reinvested as additional RSUs during that time. *Id.*; CL0001 (Stipulation), ¶ 29.  If the necessary conditions were satisfied, when the RSU holders were issued tradable LBHI common stock, the RSU holder received additional common stock in proportion to the dividend equivalents that had accrued during the five-year period. *Id*. at ¶ 29.  Any additional RSUs awarded for dividend equivalents were not treated as income by LBHI or accounted for as a compensation expense of LBHI. *Id*. at ¶¶ 29, 30.

57.     Accordingly, each of the RSUs must be treated as a "security" as that term is defined by the Bankruptcy Code.

## B.     The Claimants Purchased the RSUs at Issue

58.     The law is well-settled that the grant of an equity award as a form of compensation is a "purchase or sale" that brings section 510(b) into play.  The courts in *Enron*,

*Motor Liquidation*, and *U.S. Wireless* have each held that employees who received equity awards as part of their compensation purchased those securities with their labor, thus satisfying the purchase requirement of section 510(b) of the Bankruptcy Code. Thus, by working for Lehman, Claimants purchased the RSUs with their labor.

59.     Claimants argue that the grant of equity awards as a form of compensation cannot constitute a "purchase" for purposes of section 510(b) because the RSUs were mandatorily imposed upon employees, and thus, they did not make a choice to invest in or bargain for LBHI common stock. Cl. FoF and CoL at ¶¶ 12-20, 87-95, 102-105; NB FoF at ¶¶ 11-19 and CoL at ¶¶ 4-8. However, courts that have considered the term "purchase" as used in section 510(b) have consistently held that participation in an employee equity award plan, like the RSU Program here, is sufficient to constitute the purchase of a security. *See Enron*, 341 B.R. at 151 ("While it is true that the Claimants did not purchase the stock options on the open market, they nonetheless exchanged value for the options: here, their labor. Such exchange falls under broad reading of the term 'purchase.'"); *In re Motor Liquidation Co.*, No. 11 Civ. 7893 (DLC), 2012 WL 398640, at *4 (S.D.N.Y. Feb. 7, 2012) ("Section 510(b) mandates subordination when an individual receives equity securities in exchange for labor even when there is 'no actual sale or purchase' of securities") (citing *In re Med Diversified*, 461 F.3d at 258); *In re U.S. Wireless Corp.*, 384 B.R. 713, 719 (Bankr. Del. 2008) ("Therefore, under established law, the Equity Package Wax received as a portion of his compensation, *i.e.*, in exchange for his labor, constitutes a purchase and sale of a security for the purpose of section 510(b) of the Bankruptcy Code."); *Frankum v. Int'l Wireless Commc'ns Holdings, Inc. (In re Int'l Wireless Commc'ns Holdings, Inc.)*, 279 B.R. 463, 467 (D. Del. 2002), *aff'd*, 68 Fed. Appx. 275 (3d Cir. 2003) ("That Appellants received the Debtors' stock as part of a compensation package does not preclude the transfer from being

characterized as a purchase/sale of the Debtors' stock."); *In re Touch America Holdings, Inc.*, 381 B.R. 95, 104 (Bankr. D. Del. 2008) (adopting a broad reading of the term "purchase" and noting that "stock given to an employee as compensation nonetheless involves a 'bargain and exchange of value'").

60.     Here, Claimants' participation in Lehman's Equity Award Program was entirely voluntary.   The Court found that employee handbooks expressly provided that "[a]t the Firm's option, a portion of [an employee's] total compensation . . . may be payable in the form of conditional equity awards (restricted stock units ("RSUs"), stock options, or other equity awards) pursuant to the Firm's equity award program."  CL0001 (Stipulation), ¶ 2.  And in cases where Lehman had an employment contract with a Claimant, those contracts also provided that at Lehman's option, a portion of the employee's compensation "will be" or "may be" payable in conditional equity awards. *Id.*  At all relevant times, Claimants understood they would be compensated both with cash and with rights to become holders of LBHI common stock.   At all relevant times, Claimants had a bargaining position and a choice as to whether or not to accept and continue employment at Lehman.  By accepting employment for Lehman and going to work every day, Claimants voluntarily and continuously accepted as a condition of their employment that part of their total compensation was to be paid in RSUs, and they voluntarily and continuously accepted the attendant benefits and risks, since the value of the RSUs varied with the value of the LBHI common stock.  At all times, Claimants could essentially "vote with their feet" against the terms of the Program by leaving Lehman.  Instead, Claimants made the voluntary choice to stay in the business that they voluntarily entered as employees.

61.     Indeed, the claimants in *Enron* similarly tried to maintain that they did not "purchase" the stock options issued as part of their compensation, arguing that there was no

voluntary exchange of goods, services, or currency, but rather, that they were "required to take a minimum percentage of their annual bonus in stock option form." 341 B.R. at 150-151. Judge Gonzalez rejected this very argument in *Enron* as flawed, reasoning that,

> [a]lthough implicit, there is nonetheless a bargain and exchange of value. Here, the exchange is made not at the time of payment but prior to employment. If these Claimants were required to receive a portion of their compensation as options, *that was a condition of employment the Claimants willingly accepted in return for their labor*. These Claimants, thus, "purchased" the stock options with their labor.

341 B.R. at 151 (emphasis added).

62. The Neuberger Berman employees (the "<u>NB Employees</u>") argue that they are distinguishable from the other Claimants because they "truly" had no choice but to accept the terms of Lehman's Equity Award Program when their employer, Neuberger Berman, elected to merge with Lehman. NB FoF at ¶¶ 3-19, CoL at ¶¶ 1, 4-10, 17, 19. The NB Employees argue that their hands were tied and they had to accept and continue employment with Lehman or risk throwing away their careers because of the conditions of their non-compete agreements with Neuberger Berman. *Id.* These arguments are unavailing.

63. At all times, beginning with the merger and every day after, the NB Employees, like the Claimants, had the choice to "vote with their feet" against the terms of the Program by leaving Lehman. Like every other Claimant, the NB Employees elected to remain Lehman employees subject to the Program.

64. There is no evidence that the NB Employees' non-compete agreements were unconscionable and entered into under economic duress, and that therefore their employment at Lehman – and participation in the Equity Award Program – was involuntary. Under New York law, parties who attempt to set aside a contract due to economic duress, here the NB Employees, face a heavy burden. As the Second Circuit in *VKK Corp. v. NFL* explained, some element of

economic duress is present when many contracts are formed because it is not unusual for one

commercial party to have "a decided economic advantage over the other." 244 F.3d 114 at 123

(2d Cir. 2001). As such, successful claims of duress are "reserved for extreme and extraordinary

cases." *Id*. In order to prevail, a plaintiff claiming economic duress must show (1) threats of an

*unlawful act* by one party which (2) compels performance by the other party of an act which it

had a legal right to abstain from performing. *Chase Manhattan Bank v. State of New York,* 13

A.D. 3d 873 (3d Dept. 2004). In addition, the party claiming duress must act *promptly* or be

deemed to have ratified the agreement; courts in New York have found that delays as short as six

months constituted waivers of claims for duress. *VKK Corp.*, 244 F.3d at 122-123 (holding that

waiting 30 months before challenging a contract was too long and plaintiff forfeited any right to

assert duress) and *citing to DiRose v. PK Mgmt. Corp.*, 691 F.2d 628, 633 (2d Cir. 1982)

(collecting cases in which delays ranging from six months to two years constituted a forfeiture).

65. Here, the Court determined there are no facts to support the NB Employees'

contention that they acquiesced to employment at Lehman under economic duress. All of the

Claimants, including the NB Employees, made a meaningful and voluntary choice to become

and remain Lehman employees subject to the terms of the Program. Though the NB Employees

claim they were faced with a "Hobson's choice," their choice was anything but – there was

nothing unconscionable about giving the NB Employees the choice between accepting

employment at Lehman in exchange for millions of dollars in both cash and RSUs or seeking

employment elsewhere. The Court determined that the NB Employees could have sought

employment elsewhere but did not because they would have great difficulty finding any other

employer who would pay them as much as they could receive by remaining with Lehman. It was

an economic choice they made based on rational self-interest.

66.     In addition, the terms of the NB Employees' non-compete agreements with Lehman, which had limited one-to-three year restriction periods and were narrowly restricted to Lehman's market, were not unlawful.  NB FoF and CoL at ¶¶ 4-6, 9-10.   Non-compete agreements of this very nature have been upheld by Courts as lawful.   *See Cardwell v. Thermo Fischer Scientific*, No. 09 Civ. 7809 (DAB), 2010 WL 3825711 (S.D.N.Y. Sept. 23, 2010) (holding that a one-year non-compete covenant was reasonable where plaintiff was a project manager and employed for over four years with the defendant, and stating that "New York Court have held restrictions of up to five years to be reasonable depending on the circumstances"); *Crown IT Servs., Inc. v. Koval-Olsen*, 11 A.D.3d 263 (1st Dept. 2004) (finding a non-compete covenant to be reasonable in time and area where the clause prohibited a consultant from servicing the firm's former clients for one year).  The law does not recognize a claim for economic duress where there was no unlawful conduct by LBHI compelling performance by the Claimants.

67.     Finally, there is not one shred of evidence that any of the NB Employees *promptly* claimed that they entered into employment with Lehman under duress in 2003.  Instead the NB Employees agreed that the terms of their non-compete agreements with Lehman were "reasonable and necessary for Lehman and its affiliates to enjoy the full benefit of the business acquired in connection with the Merger" and that covenants and restrictions therein would not unreasonably restrict the NB Employees' professional opportunities should they no longer be employed by Neuberger Berman or Lehman.  NB FoF and CoL at ¶¶ 4-10.   For decades, the NB Employees did not seek to repudiate the terms of their employment at Neuberger Berman or Lehman, but rather voluntarily accepted them, and were paid handsomely under these arrangements.  The Second Circuit in *VKK Corp.*, which the NB Employees cited in support of

their argument, cautioned against finding duress where parties like the NB Employees have

employed a "wait and see" approach:

> The requirement that the party claiming duress disclaim the contract or release about
> which he is complaining promptly or be held to have forfeited his right to do so protects
> the stability and reliability of such agreements by denying the weaker party the "heads I
> win, tails you lose" option of waiting to see how the arrangement works out and then
> deciding whether to seek to undo it. . . . [T]he requirement of prompt disavowal after
> execution is fair to the disadvantaged party, who will ordinarily know at the time he
> executes the instrument that he is being economically coerced.

244 F.3d at 123-124.  Now, more than ten years after the merger, the NB Employees have

forfeited the right to complain of economic duress.  Rather, by their behavior, the NB Employees

ratified the terms of the Equity Award Program and confirmed their reasonableness.

Accordingly, all the Claimants, including the NB Employees, are deemed to have purchased the

RSUs for purposes of section 510(b) of the Bankruptcy Code.

### C.    The RSU Claims Seek Damages Arising from the Purchase of the RSUs or Rescission of the RSUs

68.    Claimants argue that their claims are not subject to section 510(b) because their

claims are not for damages but, rather, for unpaid debt or services rendered.  As such, they

contend to be creditors entitled to cash, not shareholders.  Claimants assert a variety of theories

for the liability of LBHI relating to the RSUs ranging from LBHI's alleged alternative

performance obligations, to claims that LBHI expressly stated that RSU holders are general

unsecured creditors, to claims for withheld wages under the labor laws of various jurisdictions.

Cl. FoF and CoL at ¶¶ 25-30, 52-55, 122-125, 130-169.  Each of these theories is rejected.

#### 1.    The Claimants Do Not Have Claims for Alternative Performance by Lehman

69.    LBHI was not under any alternative performance obligations under the terms of

the Program.  An alternative obligation cannot be implied, it must be specifically referenced.  *See*

*Glidden Co. v. Hellenic Lines, Ltd.*, 275 F.2d 253, 255 (2d Cir. 1960) (finding that a ship owner

had an alternative obligation to carry cargo through an alternative route when the Suez Canal

was closed because the alternative routes were *specifically referred to in the agreements*);

*Draken Grp., Inc. v. Avondale Res. Corp.*, No. 06-CV-595-SAJ, 2008 WL 151901, at *1 (N.D.

Okl. Jan. 14, 2008) (finding that defendant had an alternative obligation to compensate plaintiff

in cash where the contract provided that at the discretion of defendant, an acquisition fee "*may*

*be paid in cash or, in whole or in part, in the equivalent percentage of working interests in*

*acquired oil & gas fields*", and payment in the form of working interest in the fields became

impossible) (emphasis added).  Here, the Court determined that there is not a single document

that expressly imposed upon Lehman an alternative performance obligation to pay Claimants in

either *cash* or equity awards.  Rather, the Court found that at all relevant times, Lehman had the

sole discretion to pay a portion of employees' Total Compensation in equity-based awards:

> *At the Firm's option*, a portion of your total compensation (combined base salary,
> bonus and other compensation) may be payable in the form of restricted stock
> units pursuant to the Firm's Employee Stock Award Program.  Please understand
> that the grant of restricted stock units is subject to the standard terms and
> provisions of the Program.  CL001 (Stipulation) at Exh. 1 (1999 Employment
> Agreement) (emphasis added).

> *At the Firm's option*, a portion of your total compensation (combined base salary,
> bonus and other compensation) may be payable in the form of conditional equity
> awards (restricted stock units ("RSUs"), stock options, or other equity awards)
> pursuant to the Firm's Equity Award Program.  The grant of RSUs is subject to
> the applicable controlling plan documents . . . ."  CL002 (Guide to Working at
> Lehman Brothers) at LEH-RSU 0000300 (emphasis added).

The discretion to pay Claimants in the form of equity-based awards did not impose an alternative

performance obligation on Lehman to pay Claimants in *either* cash *or* equity-based awards.

Indeed, Claimants admit they "could not elect to receive cash instead of the awards."  CL0001

(Stipulation), ¶ 10.

    70.    Even assuming *arguendo* that the contracts set forth an implied alternative

performance obligation to pay Claimants in *either* cash *or* equity-based awards, Lehman fully

performed – and discharged any alternative performance obligations – when it paid the RSUs to

the Claimants.  The Court found that the contracts between the parties set forth that Lehman had

the option to pay Claimants "in the form of restricted stock units" and "in the form of conditional

equity awards (restricted stock units ("RSUs"), stock options, or other equity awards)."  CL001

(Stipulation) at Exh. 1 (1999 Employment Agreement); CL002 (Guide to Working at Lehman

Brothers) at LEH-RSU 0000300.  There is no dispute that each of the RSU Claimants received

RSUs.  Once those RSUs were paid, Claimants had no right whatsoever to other "modes" of

performance in the form of cash or otherwise.  The documents are unequivocal that once the

RSUs were granted, Lehman's sole obligation to Claimants was the delivery of the common

stock:

> With respect to any restricted stock units granted under the Plan, *the obligations of the Company or any Subsidiary are limited solely to the delivery of shares of Common Stock* on the date when such shares of Common Stock are due to be delivered under each Agreement, *and in no event shall the Company or any Subsidiary become obligated to pay cash in respect of such obligation . . . ."* LBHI0117 (LBHI 1996 Management Ownership Plan as amended through Nov. 8, 2007) at Section 8(b) and LBHI0118 (LBHI Employee Incentive Plan as amended through Nov. 8, 2007) at Section 8(b).

> With respect to any RSUs granted under the Plan, *the obligations of the Company are limited solely to the delivery of shares of Common Stock* on the date when such shares of Common Stock are due to be delivered under each Award agreement, *and in no event will the Company become obligated to pay cash in respect of such obligation . . . ."* LBHI0116 (LBHI 2005 Stock Incentive Plan, 95,000,000 Shares of Common Stock dated Nov. 15, 2007) at LEH-RSU 0000176.

> LIMITATION ON OBLIGATIONS. Holdings' and any subsidiary's obligation with respect to the Units granted hereunder is limited solely to the delivery to you of shares of Common Stock on the date when such shares are due to be delivered hereunder, and in no way shall Holdings or any subsidiary become obligated to pay cash in respect of such obligation . . . ." CL001 (Stipulation) at Exh. 4 (2003 Management Director Equity Award Program, Agreement Evidencing a Grant of Restricted Stock Units) at ¶ 6 (emphasis added).

-38-

2.      The Claimants Do Not Have General Unsecured Claims for Cash

71.     There is no basis for Claimants' position that they are now entitled to cash or anything other than RSUs from Lehman as consideration for their labor.  Claimants admit they "could not elect to receive cash instead of the awards."  CL0001 (Stipulation), ¶ 10.  In addition, at no point did Claimants bargain for the right to receive, and under no circumstances that existed for these Claimants did LBHI have an obligation to deliver, cash in lieu of or in exchange for the RSUs.  LBHI0116 (LBHI 2005 Stock Incentive Plan) at LEH-RSU 0000176; LBHI0117 (LBHI 1996 Management Ownership Plan) at Section 8(b); LBHI0118 (LBHI Employee Incentive Plan as amended through Nov. 8, 2007) at Section 8(b); CL001 (Stipulation) at Exh. 4 (2003 Management Director Equity Award Program, Agreement Evidencing a Grant of Restricted Stock Units) at ¶ 6.   LBHI's bankruptcy filing does not transform a claim for equity into a claim for cash.

72.     The Court determined that nothing in the Program documents, including the Employee Incentive Plan and the 1997 Trust, supports Claimants' contention that Lehman intended to grant to RSU holders the status of general unsecured creditors in the event of insolvency.

73.     The Subordination Provisions in the 2003 and 2004 Program documents are correct statements of the law, and their removal from the Program documents in subsequent years did not alter any rights under the Program documents.

74.     The RSU Claims are not executory contract claims.

3.      The Claimants Do Not Have a "Wage" Claim Under Any Labor Law

75.     Claimants allege that the RSU Claims are claims for unpaid wages under the labor laws of New York, Illinois, California and the U.K.  Cl. FoF and CoL ¶¶ 143-169.  However, no earned compensation (whether characterized as wages, or otherwise) remains unpaid in this

matter: the RSUs were paid to the Claimants.  Additionally, regardless of which jurisdictions' labor laws Claimants choose to rely upon, any claims for compensation owed in the form of RSUs would still be claims "arising from the purchase or sale of a . . . security" that must be subordinated under section 510(b) of the Bankruptcy Code.  *U.S. Wireless*, 384 B.R. at 719.

76.    The RSU Claims are not claims for "wages" under New York law because the RSUs were incentive compensation whose ultimate value depended on the price of LBHI's common stock at the time of delivery.  *See Econn v. Barclays Bank PLC*, No. 07 Civ. 2440 (BSJ), 2010 WL 9008868, at \*5 (S.D.N.Y. May 10, 2010) (quoting *Guiry v. Goldman, Sachs & Co.*, 31 A.D.3d 70, 71-72 (1st Dept. 2006) ("'[U]nvested, contingent rights' to company stock" are not "wages" because "'the ultimate value of such equity-based compensation [depends] on [the employer's] stock price after the rights vested, at the time of delivery.'"); *see also Bader v. Wells Fargo Home Mortg. Inc.*, 773 F. Supp. 2d 397, 417 (S.D.N.Y. 2011) (explaining that compensation whose ultimate value remains subject to factors outside of an employee's performance of services or left to the discretion of the employer is not "wages"); *Carlson v. Katonah Capital, L.L.C.*, 10 Misc. 3d 1076(A), at \*2 (N.Y. Sup. Ct. 2006) (explaining that incentive compensation does not constitute earned wages until its value and payment are no longer *conditioned upon some occurrence*" or left to the employer's discretion) (emphasis added).  It is well-settled in New York that "wages" exclude discretionary, equity-based incentive compensation that are "more in the nature of a profit-sharing arrangement and are both contingent and dependent, at least in part, on the financial success of the business" or other factors outside the employee's control.  *See Truelove v. Ne. Capital Advisory*, 95 N.Y.2d 220, 223-24 (2000); *see also Bar-Tur v. Arience Capital Mgt., L.P.*, No. 11-864-CV, 2012 WL 3140421, at \*1 (2d Cir. Aug. 3, 2012) (where incentive compensation was contingent and "tied

-40-

to [the company's financial success]," the compensation was not "wages" covered by the New
York Labor Law).  Indeed, in *Guiry*, the court concluded that a commission-based employee's
equity-based compensation in the form of *restricted stock units* was not "wages" because the
value of that compensation depended on the defendant's stock price after the restricted stock
units vested, and not "simply on the employee's personal productivity."  31 A.D. 3d at 72-73.
The court reasoned that it was "always possible that a deferred award of stock or a stock option
ultimately will turn out to have no value," and "wages" was not intended to include
"supplemental income that may prove worthless when ultimately received." *Id* at 73.  The court
further explained that "[d]eferred awards of stock options, like those at issue here, constitute
incentive compensation, since they plainly serve the function of giving employees an incentive to
stay with the firm and to maximize the value of the firm's business."  *Id.*

77.    Claimants' RSU claims fail under Illinois law because the Claimants were fully
notified of the terms of the Program through their employment agreements, employee
handbooks, and program brochures, among other things – including the fact that they would be
paid partially in RSUs – and they accepted such payment by voluntarily agreeing to be employed
with (and remain employed by) Lehman.  In *Kim v. Citigroup Inc.*, 368 Ill. App. 3d 298 (Ill.
App. Ct. 1st Dist. 2006), the court held that the forfeiture provision in a compensation program
which allowed employees to be paid partially in restricted stock was lawful in part because the
deductions were made with the plaintiff's voluntary consent.

78.    Claimants' "wage" claims under California law are untimely and also fail on the
merits.  Under the California Labor Code, actions for unpaid wages must be filed within three
years from the date that the employee was allegedly not paid his/her wages.  Cal. Civ. Proc.
Code § 338; *London v. Sears, Roebuck & Co.*, 619 F. Supp. 2d 854, 863 (N.D. Cal. 2009) ("The

statute of limitations for wage claims under § 201 is three years" from the date plaintiff "claims she was not paid").   Here, the purported "wages" that Claimants assert were withheld from their bonus or commission checks were allegedly withheld between 2003 and 2008.  Thus, the RSU Claims arising from paychecks issued prior to September 15, 2005 (three years prior to LBHI's chapter 11 filing, which tolled the statute of limitations) are barred by California law.  Moreover, under the California Labor Code, unvested, contingent incentive compensation also has been found to fall outside the definition of "wages."  *See Callan v. Merrill Lynch & Co. Inc.*, No. 09 CV 0566 BEN (BGS), 2010 WL 3452371 (S.D. Cal. Aug. 30, 2010) (holding that equity awards made under a *mandatory* equity plan and subject to a cliff-vesting schedule were not "wages"); *International Business Machines Corp. v. Bajorek*, 191 F.3d 1033, 1039 (9th Cir. 1999) (distinguishing stock options from wages because "[t]he value of the stock awarded in options may be as much affected by the fortuities of stock market behavior as by the profitability of the company," so "unlike wages, the value that [the plaintiff] obtained from them depended largely on the vagaries of stock market valuations" on the vesting or award dates of the options); *Duvall v. Galt Med. Corp.*, No. C-07-03714 JCS, 2007 WL 4207792, at *10 (N.D. Cal. Nov. 27, 2007) (rejecting the plaintiff's claim that the defendant failed to pay him "wages" because his stock options for 100,000 shares did not constitute "wages," citing to *Bajorek*).

79.    Claimants' "wage" claims under U.K. law also fail on the merits because the RSUs are contingent, equity-based incentive compensation awards whose value is incapable of quantification. Part II of the Employment Rights Act of 1996 ("ERA") addresses the protection of wages of U.K. employees.  Section 27(1) ERA defines "wages" as "any sums payable to the worker in connection with his employment . . ." including "any fee, bonus, commission, holiday pay or other emolument referable to his employment, whether payable under his contract or

otherwise."  Wages must also be "properly payable" as provided for under Section 13(3) ERA,

which states:

> [w]here the total amount of wages paid on any occasion by an employer to
> a worker employed by him is less than the total amount of the wages
> **properly payable** by him to the worker on that occasion (after
> deductions), the amount of the deficiency shall be treated for the purposes
> of this Part [II] as a deduction made by the employer from the worker's
> wages on that occasion.

§ 13(3) ERA (emphasis added).  The U.K. House of Lords held in the case of *Delaney v. Staples*

*(t/a De Montfort Recruitment)*, [1992] I.C.R. 483 (H.L.), that in order to be "properly payable" as

wages, the payment allegedly owed must be capable of quantification. This position was

confirmed by the U.K. Court of Appeal in *Coors Brewers Ltd v. Adcock and Ors*, [2007] I.C.R.

983 (C.A.), where the court held that Part II ERA was designed for "straight forward claims

where the employee can point to a quantified loss."  Thus, in order for any amount to be properly

payable as "wages" (and subject to an unlawful deduction claim) under U.K. law, it must be

quantifiable, which requires the claim to be of a straightforward nature.

80.     Because Claimants do not have valid wage claims in any jurisdiction – and further

because, as explained more fully below, even if there were wage claims, they would be claims

for damages arising from the purchase of LBHI securities and thus subject to subordination

under section 510(b) of the Bankruptcy Code – the Court does not need to determine whether

Lehman satisfied the written authorization requirements of the wage laws of any jurisdiction.

For the same reasons, it is also unnecessary for the Court to determine whether the Program

conferred any accounting or other benefits on Lehman.

### 4.     The RSU Claims All Arise From the Purchase or Sale of a Security

81.     The Courts in *Enron* and *Worldcom* and the Second Circuit in *In re Med*

*Diversified*, among other courts, have embraced the broad interpretation of "arising from" in

-43-

section 510(b) and have subordinated claims if there is any nexus or causal relationship between the purchase of the securities and the damages that are being claimed.

82.      Here, regardless of how Claimants attempt to characterize their right to receive stock, the bottom line is that the RSU Claims are all governed by section 510(b) because the alleged damages to each Claimant would not have been incurred but for Claimants' purchase of the RSUs in the first place.  *See Baroda Hill Invs., Ltd. v. Telegroup, Inc. (In re Telegroup, Inc.)*, 281 F.3d 133, 135 (3rd Cir. 2002), citing to *In re Granite Partners L.P.*, 208 B.R. 332 (Bankr. S.D.N.Y. 1997) (holding that section 510(b) should be read broadly so that claims which would not have arisen but for the purchase of the securities, may arise from that purchase, even though the actionable conduct occurred after the transaction was completed.)  At the core, each claim seeks to recover damages arising from the purchase of the RSUs and as such, is squarely within the scope of section 510(b).  *See In re Worldcom, Inc.*, 329 B.R. 10, 14 (Bankr. S.D.N.Y. 2005) ("So long as the nature of the damage or harm complained of by a shareholder can be said to result as a consequence of his having purchased or sold shares of stock or other securities of the debtor, the claimant falls within the scope of Section 510(b) . . . ."); *Queen v. Official Comm. Of Unsecured Creditors (In re Response U.S.A., Inc.)*, 288 B.R. 88, 94 (D.N.J. 2003) (affirming the bankruptcy court's holding that claims seeking cash compensation under the terms of a stock purchase agreement for the decline in value of stock were damage claims that fit within the scope of section 510(b) rather than claims for a contractual right to payment); *In re PT-1 Commc'ns, Inc.*, 304 B.R. 601, 608 (Bankr. E.D.N.Y. 2004) (holding that "the claim need not flow directly from the securities transaction, but can be viewed as 'arising from' the transaction if the transaction is part of the causal link leading to the injury.")

83.     The claims of commission-based employees who did not receive RSUs in 2008

are no different.   Approximately ten employees claim that cash was set aside from their pay

checks for the purchase of RSUs, for which no RSUs were granted in fiscal year 2008.   They

assert that because they have not received anything in exchange for their labor, their claims for

2008 compensation amount to claims for payment under relevant labor laws.   It is indisputable,

however, that these employees did not have the ability to access the funds that were allocated

from their paychecks to RSUs, and that the money that was set aside could only be used to

acquire RSUs.   As such, these Claimants are no different from their salaried counterparts, as they

never had any right to receive payment in cash.   At best, they have a claim for RSUs that were

not issued, which arises from the purchase of a security and therefore is subject to section 510(b)

of the Bankruptcy Code.

84.     Indeed, courts have extended section 510(b) to claims relating to a failure to issue

equity.   *See In re Med Diversified Inc.,* 461 F. 3d at 256 (holding that section 510(b) covers a

claim based on a debtor's failure to issue common stock pursuant to the terms of an agreement

between the parties, where claimant made the choice "to trade the relative safety of cash

compensation for the upside potential of shareholder status"); *In re Lehman Brothers Inc.,* 503

B.R. 778 (subordinating claim for unissued bonds under section 510(b))*; In re Club Ventures,*

*2*012 WL 6139082 (holding that claims for membership units, which are not specifically

enumerated in section 101(49)(A), were subject to section 510(b) even though the membership

units were never issued, since the units would have given claimant certain rights to share in the

debtor's profits, and he would have had the risk and reward expectations of an equity holder).

The Ninth Circuit has specifically held that "nothing in §510(b)'s text requires a subordinated

claimant to be a shareholder." *In re Betacom of Phoenix, Inc.*, 240 F.3d 823, 829 (9th Cir. 2001).

Rather, a deciding factor for the court in *Betacom of Phoenix* was that the security holder

decided to enter into the transaction for a chance at greater earnings with the understanding that

there was a risk of failure and bankruptcy.  *See id*. at 830; *see also In re Med Diversified*, 461

F.3d at 257 (holding that section 510(b) includes claims predicated on the failure to issue stock

because claimants "'entered into the investment with greater financial expectations than the

creditor.  The creditor can only recoup her investment; the [Claimants] expect to participate in

firm profits.'").  That is precisely what happened in this case with respect to all Claimants – they

were experienced businesspeople who accepted the tradeoff of the relative safety of cash

compensation for a chance at greater earnings, while understanding that they faced the risk that

they may not receive the equity portion of their bonus or commission compensation.  *In re Med

Diversified*, 461 F.3d at 256-57.  The few Claimants who are still seeking cash based on

commission withholdings for which RSUs were never issued in 2008, are, at most, entitled to

RSUs, which must, in turn then be subordinated – like all other RSUs – as equity interests.

     5.     Claimants Seek Rescission of the RSU Program

     85.     At bottom, the Claimants seek to rescind a contract that they entered voluntarily,

under which Claimants agreed to be paid partially in RSUs.  Because the deal they entered into

resulted in worthless stock, Claimants seek to rescind their agreement to the RSU program and

seek, instead, cash (and only cash) for the services they provided to Lehman.  Claimants assert a

number of allegations sounding in fraud as grounds for rescission, ranging from allegations of

non-disclosure, to allegations of economic duress, to allegations that Claimants were misled

about how RSUs would be classified in the event of Lehman's insolvency.  *See generally*, Cl.

FoF and CoL; NB FoF and CoL.  Putting aside that there is no evidence to support any of these

allegations, a claim for the rescission of RSUs is still subject to mandatory subordination under

section 510(b) of the Bankruptcy Code. ("A claim arising from rescission of a purchase or sale of

a security of the debtor . . . shall be subordinated to all claims or interests that are senior to or

equal the claim or interest represented by such security . . . .")

## **CONCLUSION**

86.     The RSU Claims are hereby reclassified as Equity Interests under the Plan having

the same priority as, and no greater priority than, common stock interests in LBHI.

Dated: New York, New York
        July 7, 2014

                                    /s/ Ralph I. Miller
                                    Ralph I. Miller
                                    Robert J. Lemons

                                    WEIL, GOTSHAL & MANGES LLP
                                    767 Fifth Avenue
                                    New York, New York 10153
                                    Telephone: (212) 310-8000
                                    Facsimile: (212) 310-8007

                                    *Attorneys for Lehman Brothers Holdings Inc.*
                                    *and Certain of Its Affiliates*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------x

In re                        :       **Chapter 11 Case No.**

                            :

**LEHMAN BROTHERS HOLDINGS INC.,** *et al.,*  :      **08-13555 (SCC)**

                            :

             **Debtors.**        :      **(Jointly Administered)**

-----------------------------------------------------------------x

### [PROPOSED] ORDER GRANTING OMNIBUS OBJECTIONS TO RSU CLAIMS
### (TO RECLASSIFY PROOFS OF CLAIM AS EQUITY INTERESTS)

Upon the fourteen omnibus objections to Proofs of Claim (the "Omnibus Objections")[1]

for bonus or commission compensation during the years 2003 through 2008 for which claimants

received or were to receive restricted stock units or contingent stock awards (collectively, the

"RSU Claims"), of Lehman Brothers Holdings Inc. and its affiliated debtors in the above-

referenced chapter 11 cases (the "Chapter 11 Estates"), pursuant to section 502 of the

Bankruptcy Code, Rule 3007 of the Federal Rules of Bankruptcy Procedure, and this Court's

order approving procedures for the filing of omnibus objections to proofs of claim [ECF No.

6664]; and due and proper notice of the Omnibus Objections having been provided, and it

appearing that no other or further notice need be provided; and opposition to the Omnibus

Objections having been interposed from time to time (collectively, the "Responses") by certain

claimants listed on the Omnibus Objections; and an initial hearing having been held on

December 21, 2011 (the "2011 Hearing"); and a three-day evidentiary hearing (the "Evidentiary

Hearing") regarding the Omnibus Objections having been held on April 1, 2, and 3, 2014; and

post-hearing briefing having been submitted by the RSU Claimants [ECF Nos. 44951, 44567 and

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Debtors'
Reply to RSU Claimants' Proposed Findings of Fact and Conclusions of Law, and the Debtors' Proposed Findings
of Fact and Conclusions of Law, dated July 7, 2014, [ECF Nos.___ and ___ ].

44705] and by LBHI [ECF Nos. _____ and _____ ] (collectively, the "Post-Hearing Briefing");

and the Court having reviewed the Omnibus Objections, the Responses thereto, the records of the

2011 Hearing and the Evidentiary Hearing, and the Post-Hearing Briefing; and upon all of the

proceedings had before the Court; and the Court having determined that the legal and factual

bases set forth in the Omnibus Objections and LBHI's supplemental briefing (the "LBHI

Pleadings"), and as set forth at the Evidentiary Hearing, establish just cause for the ruling herein;

and the Court having determined that the relief requested in the Omnibus Objections and the

LBHI Pleadings and granted herein is in the best interests of the Chapter 11 Estates, their

creditors, and all parties in interest; and based upon the reasoning and the rulings set forth in the

Court's Findings of Fact and Conclusions of Law filed together with this Order; and after due

deliberation and sufficient cause appearing therefor, it is hereby

        ORDERED that the Responses are overruled; and it is further

        ORDERED that the relief requested in the Omnibus Objections and the LBHI

Pleadings is granted to the extent provided herein; and it is further

        ORDERED the RSU Claims listed on Exhibit 1 annexed hereto are hereby

reclassified as Equity Interests (as such term is defined in the Modified Third Amended Joint

Chapter 11 Plan of LBHI and its Affiliated Debtors [ECF No. 23023]) having the same priority

as, and no greater priority than, common stock interests in LBHI; and it is further

        ORDERED that this Court shall retain jurisdiction to hear and determine all

matters arising from or related to this Order.

Dated: _____, 2014
      New York, New York

                              _____
                              UNITED STATES BANKRUPTCY JUDGE

**Exhibit 1**

**[To be submitted separately]**