| | |
|---|---|
| UNITED STATES BANKRUPTCY COURT<br>SOUTHERN DISTRICT OF NEW YORK<br>-------------------------------------------------------------------x<br>In re<br><br>LEHMAN BROTHERS HOLDINGS INC., *et al.*,<br><br>                Debtors.<br>-------------------------------------------------------------------x | FOR PUBLICATION<br><br><br>Chapter 11<br><br>Case No. 08-13555 (SCC)<br><br>Jointly Administered |

**MEMORANDUM DECISION OVERRULING DEBTORS' OBJECTION TO CMBS CLAIMS AND DENYING REQUEST FOR SUBORDINATION PURSUANT TO SECTIONS 510(a)-(c) OF THE BANKRUPTCY CODE**

A P P E A R A N C E S:

KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
By:    Joseph Serino, Jr., P.C., Esq.
          Shireen A. Barday, Esq.
          Quan Hong, Esq.

*Attorneys for Lehman Brothers Holdings Inc.*

ROBINS KAPLAN MILLER & CIRESI LLP
2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, MN 55402
By:    Thomas P. Berndt, Esq.

*Attorneys for Federal Home Loan Bank of Pittsburgh*

**SHELLEY C. CHAPMAN**
**UNITED STATES BANKRUPTCY JUDGE**

This is an issue of first impression that turns on the meaning of the word "of" in section 510(b) of the Bankruptcy Code.  It arises in the Objection to CMBS Claims and Request for Subordination Pursuant to Sections 510(a)-(c) of the Bankruptcy Code (the "Objection")[1] filed by Lehman Brothers Holdings Inc. ("LBHI," and together with its affiliated debtors in the above-referenced chapter 11 cases, the "Debtors") as Plan Administrator under the Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors.  By the Objection, the Plan Administrator seeks to subordinate certain claims (collectively, the "MBS Claims") filed by several holders of the Debtors' collateralized mortgage-backed securities (the "MBS").  While the Objection seeks to subordinate MBS Claims filed by three different groups of claimants,[2] for the reasons discussed at the hearing held on June 9, 2014, this Decision will address only the MBS Claims filed by Federal Home Loan Bank of Pittsburgh ("FHLB").[3]

Between May 2006 and November 2007, FHLB purchased MBS associated with six different non-debtor trusts, each reflecting an unpaid principal balance and a coupon rate, and each representing the right to a share of certain cash flows generated by the residential mortgage loans owned by each trust.  FHLB now claims monetary damages from certain of the Debtors stemming from alleged material misrepresentations and omissions in the registration statements, prospectuses, prospectus supplements, and related offering documents prepared and distributed

---

[1] Docket No. 36882.
[2] The Debtors settled with a second group of claimants and, by a stipulation so-ordered on June 18, 2014, agreed with the third group to adjourn the hearing on the Objection to a date to be agreed upon by the parties and approved by the Court.  *See* Docket No. 44805.
[3] Copies of the MBS Claims filed by FHLB, Claim Numbers 18987 and 18988, are annexed to the Objection as Exhibit B.

by the Debtors in connection with the Debtors' marketing of the MBS, all in violation of various securities laws.[4]

By the Objection, the Debtors assert that the MBS purchased by FHLB are securities "of the debtor" as that phrase is used in section 510(b) of the Bankruptcy Code and, therefore, the MBS Claims filed by FHLB should be subordinated to the claims of LBHI's unsecured creditors pursuant to section 510(b).[5] The Debtors argue that, because Debtor Structured Asset Securities Corporation ("SASCO"), as depositor of the MBS, is considered the "issuer" of the MBS under the federal securities laws, the very laws upon which FHLB's claims are based, the MBS "must be securities 'of' the Debtors." Therefore, because the MBS Claims arise from a purchase or sale of securities of the Debtors or their affiliates, the Debtors assert, section 510(b) mandates their subordination. *See* Objection at ¶ 32.

FHLB disagrees, asserting that the MBS did not provide FHLB with an ownership interest in any of the Debtors (*i.e.*, an equity interest) or a right to repayment by any of the Debtors (*e.g.*, as a lender to or bondholder of LBHI) such that the MBS should be considered securities "of" the Debtors. Rather, FHLB argues, non-debtor trusts actually issued the MBS[6] and were established for the sole purpose of holding title to a pool of underlying residential mortgages backing the MBS; the MBS certificates that FHLB purchased represent rights to certain portions of cash flows generated by the mortgage loans which are the only source of payment on the MBS certificates. Moreover, FHLB asserts, the securities rules and regulations

---

[4] *See* Response of Federal Home Loan Bank of Pittsburgh to Debtors' Objection to CMBS Claims and Request for Subordination Pursuant to Sections 510(a)-(c) of the Bankruptcy Code [Docket No. 39014] (the "Response") at ¶ 4. FHLB also filed the Declaration of Thomas B. Hatch in support of the Response [Docket No. 39014] (the "Hatch Decl.") which attached (i) "true sale" legal opinions issued in connection with the Debtors' preparation and offering of the MBS and (ii) a presentation dated February 2008, prepared by LBHI, and titled "An Overview of the CMBS Business."

[5] Pursuant to the Debtors' confirmed plan, the holders of any claims against the Debtors subordinated pursuant to section 510(b) of the Bankruptcy Code are not entitled to receive any distribution on account of such claims unless and until all other holders of claims against the Debtors are paid in full.

[6] *See* n. 26 *infra*.

3

that characterize one or more of the Debtors as an "issuer" for regulatory purposes do not render the MBS securities "of" the Debtors for purposes of section 510 of the Code. *See* Response at ¶¶ 21-26.

The matter has been fully briefed,[7] and the Court heard oral argument on June 9, 2014 (the "Hearing"). On June 18, 2014, the Court entered an order overruling the Objection and denying the Debtors' request for subordination pursuant to sections 510(a)-(c) of the Bankruptcy Code (the "Order Denying Objection").[8] The bases for the Order Denying Objection are discussed in this Memorandum Decision.

## BACKGROUND

The certificates at issue are mortgage-backed securities,[9] a type of asset-backed security created in a process known as securitization. Securitization of residential mortgage-backed securities, or RMBS, begins with loans secured by mortgages on residential properties. In a securitization, a large number of loans, oftentimes several thousand in the case of residential mortgage-backed securities, are originated or purchased by an originator and grouped into a collateral pool. The originator sells the packaged loans to a trust, which then receives the loans' cash flow – the monthly payments from the mortgage borrowers. The trust pays the originator by selling bonds, usually called certificates, to investors such as FHLB.[10] The originator that creates and indirectly owns the trust owes no debt to the investors; rather, the trust is the legal

---

[7] On April 25, 2013, the Debtors filed the Objection; FHLB filed its Response on July 25, 2013. FHLB filed letters to the Court on May 12, 2014 and June 3, 2014, respectively [Docket Nos. 44285 and 44501]. Per FHLB, the May 12, 2014 letter was filed in order to annex excerpts of prospectus supplements it intended to use as exhibits at the Hearing. The June 3, 2014 letter was filed to "inform the Court about new authority that may simplify the Court's analysis in this matter." *See* Docket No. 44501.

[8] Docket No. 44779.

[9] As Judge Stein observed in his opinion in *In re Citigroup Inc. Sec. Litig.*, mortgage-backed securities are one type of the "gallimaufry of financial instruments" that contributed to the economic crisis of 2008. 753 F. Supp. 2d 206, 214 (S.D.N.Y. 2010).

[10] In collateralized mortgage-backed securities, "[t]he [trust's] sole purpose is to receive those mortgages and issue securities . . . that are collateralized by the mortgages the entity owns." *Id.*

4

owner of the pool of mortgages, known as the "collateral." Each certificate entitles its holder to an agreed part of the cash flow from the mortgage loans in the collateral pool. *See Fed. Home Loan Bank of San Francisco v. Deutsche Bank Sec.*, 2010 U.S. Dist. LEXIS 138564 (N.D. Cal. Dec. 20, 2010) (citations omitted). The principal amount of a mortgage-backed security is not paid back as a single payment to the certificateholder at maturity. Rather, it is paid along with the interest in each periodic payment due on the mortgages. As borrowers (*i.e.*, homeowners) make payments on the mortgages, the trust uses the payments to pay the investors, the holders of the mortgage-backed securities. "Thus, the [trust's] ability to continue making payments to the . . . investor depends on the entity's continuing receipt of mortgage payments from the homeowners. If the mortgages are not paid, the [trust's] income stream decreases, undermining the entity's ability to pay the . . . investors." *In re Citigroup Inc. Sec. Litig.*, 753 F. Supp. 2d 206, 214 (S.D.N.Y. 2010).

Here, the MBS were packaged, "issued," marketed, and sold by the Debtors through a securitization process in which LBHI assembled collections of mortgage loans for sale to investors[11] and then transferred the pooled mortgages to SASCO. Although the collections of pooled mortgages ultimately were deposited in non-debtor securitization trusts (the "Trusts") by SASCO, because the Trusts were vehicles with no reporting obligations, employees, officers, or directors, they were referred to under federal securities rules and regulations only as "issuing entities." *See* Objection at ¶¶ 9-10. The Trusts provided MBS certificates to SASCO, which served as the "depositor" for the MBS and, under the federal securities laws, also was considered the "issuer" of the MBS.[12] SASCO then sold the certificates to investors through underwriters.

---

[11] LBHI either originated the mortgage loans or purchased them from third-party originators. *See*, *e.g.*, SASCO Prospectus Supplement (Jan. 8, 2008), filed as Exhibit E to the Objection, at S-15, S-62-66 (describing the pooled mortgage loans).

[12] The actual issuers, however, are the Trusts. *See* n. 26, *infra*.

5

Lehman Brothers Inc. ("LBI"), an affiliate, served as underwriter for the MBS at issue here. *Id.* at ¶ 9. Each certificate, also referred to as a bond, was rated "AAA" at the time of issuance by at least two credit rating agencies,[13] but later sustained substantial losses. Between May 2006 and November 2007, FHLB purchased MBS issued by six of the Trusts. *See* Response at ¶ 4.

On September 18, 2009, FHLB timely filed two claims in the Debtors' cases: (i) its proof of claim against LBHI, Claim Number 18987, and (ii) its proof of claim against SASCO, Claim Number 18988 (together, the "FHLB Claims"). By the FHLB Claims, FHLB seeks damages in an undetermined amount stemming from alleged material misrepresentations and omissions in the registration statements, prospectuses, prospectus supplements, and related offering documents prepared and distributed by the Debtors in connection with their marketing of the MBS, all in purported violation of various provisions of the Securities Act of 1933, the Securities Exchange Act of 1934, and various applicable rules and regulations promulgated thereunder. *See* Response at ¶¶ 3-4. Specifically, Claim Number 18988 seeks damages stemming from FHLB's purchase of five MBS, for which the Prospectus Supplements, which are substantially identical, list LBHI as the Sponsor and Seller, Aurora Loan Services LLC as Master Servicer, SASCO as Depositor, and a non-debtor trust as the Issuing Entity for the relevant MBS. The Prospectus Supplements state that the "certificates will represent interests in the issuing entity only and will not represent interests in or obligations of the sponsor, the depositor or any of their affiliates or any other party."[14] Claim Number 18987 seeks damages arising from FHLB's purchase of the five MBS referenced in Claim Number 18988 plus a sixth MBS for which all of the parties were non-Lehman entities with the exception of LBI, who acted as co-underwriter for

---

[13] Nationally-recognized ratings agencies assign credit ratings to the MBS certificates, often ranging from AAA to below investment grade. Investors are thus able to determine which certificates to purchase based on their desired level of risk.

[14] *See* May 12, 2014 Letter to Court from Thomas F. Berndt, counsel to FHLB, annexing excerpts of relevant Prospectus Supplements for the FHLB Claims [Docket No. 44285].

6

the relevant MBS. The Prospectus Supplement for the sixth MBS that is part of Claim Number 18987 states that the "certificates represent obligations of the issuing entity only."[15]

## DISCUSSION[16]

Section 510(b) of the Bankruptcy Code provides, in pertinent part, that

> (b) For the purpose of distribution under this title, a claim arising from rescission of a purchase or sale of a security of the debtor or of an affiliate of the debtor, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under section 502 on account of such a claim, shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security, except that if such security is common stock, such claim has the same priority as common stock.

11 U.S.C. § 510(b). Prior to the enactment of section 510(b), Professors John Slain and Homer Kripke authored a law review article in which they argued compellingly for mandatory subordination of claims alleging fraud or other violations of the law in the issuance of a debtor's securities; this article motivated the addition of section 510(b) to the Code. *See* John J. Slain & Homer Kripke, *The Interface Between Securities Regulation and Bankruptcy -- Allocating the Risk of Illegal Securities Issuance Between Securityholders and the Issuer's Creditors*, 48 N.Y.U. L. Rev. 261 (1973) ("*Slain & Kripke*"). Shareholders disappointed with the failure of an issuer's business, argued Slain and Kripke, should not be able to file a proof of claim in a bankruptcy case predicated on the issuer's alleged unlawful conduct at the time of issuance and thereby elevate such a claim to unsecured creditor status when such shareholders, by investing in equity rather than debt instruments, assumed the risk of the entity's business failure. *See Slain & Kripke* at 267 (framing the problem in terms of "a disaffected stockholder's efforts to recapture his investment from the corporation"); *see also id.* at 268 ("Investors in stock or in subordinated

---

[15] *See id.*
[16] This Decision only addresses the Debtors' request for subordination of the FHLB Claims pursuant to section 510(b) of the Bankruptcy Code. The Objection also seeks subordination pursuant to sections 510(a) and (c) of the Code; for the reasons discussed at the Hearing, such requests were denied on the record of the Hearing and in the Order Denying Objection. *See* June 9, 2014 Hr'g Tr. [Docket No. 45015].

debentures may be able to bootstrap their way to parity with, or preference over, general creditors even in the absence of express contractual rights."). In Slain and Kripke's view, favorable treatment of shareholder fraud claims provided investors with "a windfall by giving them an opportunity to reap the benefits of a profitable entity and by allowing them to share with creditors in the event the enterprise [is] forced to reorganize or liquidate." *Rombro v. Dufrayne (In re Med Diversified, Inc.)*, 461 F.3d 251, 255-56 (2d Cir. 2006) (citing *In re PT-1 Communs., Inc.*, 304 B.R. 601, 609 (Bankr. E.D.N.Y. 2004) (citing *Slain & Kripke* at 286-91)). Slain and Kripke observed that, while creditors expect a fixed return on their investment, shareholders expect to bear the risks of a corporation's failure but also will participate in any of its profits; accordingly, "[i]t is difficult to conceive of any reason for shifting even a small portion of the risk of illegality from the stockholder, since it is to the stockholder, and not to the creditor, that the stock is offered." *Slain & Kripke* at 288.

  Focusing on this problem and the proposed solution offered by Slain and Kripke, Congress enacted section 510(b) of the Code, which has been described as "a Congressional judgment that, as between shareholders and general unsecured creditors, it is shareholders who should bear the risk of illegality in the issuance of stock in the event the issuer enters bankruptcy." *Baroda Hill Invs., Inc. v. Telegroup, Inc. (In re Telegroup, Inc.)*, 281 F.3d 133, 140-141 (3d Cir. 2002) (citing H.R. Doc. No. 93-137, pt. 1, at 22 (1973) (recommending "that claims by stockholders of a corporate debtor for rescission or damages, which if allowed will promote them to the status of creditors, be subordinated to the claims of the real creditors")); *see also American Broad. Sys. v. Nugent (In re Betacom of Phoenix, Inc.)*, 240 F.3d 823, 830 (9th Cir. 2001) (citing H. Rep. 95-595 at 195) ("The general creditors have not had the potential benefit of the proceeds of the enterprise deriving from ownership of the securities and it is

8

inequitable to permit shareholders that have had this potential benefit to shift the loss to general creditors."). In practice, section 510(b) operates to prevent claimants from leapfrogging up the capital structure of a debtor.

Examining the language of section 510(b), the Debtors argue that section 510(b) should be applied to the FHLB Claims because such claims (i) involve a "security,"[17] (ii) are for "damages arising from the purchase or sale of a security;" and (iii) concern a security "of the debtor or of an affiliate of the debtor." Response at ¶ 19. While there is little dispute between the parties as to subsections (i) and (ii), there is intense disagreement as to whether the MBS are securities "of" one of the Debtors for purposes of section 510(b).

The Debtors urge the Court to focus on the term "issuer," arguing that, because SASCO is considered the issuer of the MBS pursuant to the federal securities laws, "the CMBS must be securities 'of' the Debtors." *Id*. at ¶ 32. Alternatively, the Debtors argue that, even if the MBS are not found to be direct securities of the Debtors but rather are deemed securities of the Trusts, because the Trusts are affiliates of a Debtor, the MBS are securities "of an affiliate" of the Debtors, thus still mandating subordination of the FHLB Claims pursuant to section 510(b). *See id*. at n.12. Subordinating the FHLB Claims, the Debtors submit, comports with section 510(b)'s policy of preventing holders of securities of a debtor from "bootstrapping their way to parity with general unsecured creditors," as it will preclude FHLB's efforts to receive a recovery not only from the pool of segregated collateral for which it bargained and to which it is entitled, but

---

[17] The Debtors state the MBS are "securities" because "[a]t their core, the CMBS are bonds, which are specifically included in [s]ection 101(49) of the Bankruptcy Code." Objection at ¶ 20 (citing 11 .U.S.C. § 101(49)(A)(i), (iv) (defining "security" to include, among other things, a "note" and a "bond")).

9

also from the Debtors' unsegregated assets from which unsecured creditors will seek a recovery.[18]

FLHB responds that its claims should not be subordinated because the MBS should be treated as debt and not equity. FHLB cites to decisions in which courts have observed that mortgage-backed securities are similar in form and structure to bonds under an indenture. *See* Response at ¶¶ 29-32. Notwithstanding that the MBS can be considered debt securities, FHLB argues, they are neither equity nor debt securities *of* any of the *Debtors*, rather "they are more typically characterized as debt securities issued by the Trusts,"[19] and as "products" marketed by the Debtors. *Id*. at ¶ 32.

The Court finds that, while the MBS are debt securities, they are not securities "of the debtor or of an affiliate of the debtor" as such phrase is used in section 510(b) of the Bankruptcy Code. The debt obligations under the MBS represent claims to the cash flows from pools of mortgage loans. The risk underlying the MBS obligations is tied not to the financial wherewithal of one of the Debtors, but rather to the wherewithal of the borrowers on the loans in the pools of mortgages. The holders of the MBS certificates possess a right to receive a stream of payments that originates not from any Debtor, but rather from the borrowers who owe principal and interest payments on the mortgage loans in the collateral pool. The Trusts, represented by their

---

[18]    *See* Objection at ¶¶ 34-37, 45 ("absent subordination of the CMBS Claims here, the actual risks of illegality that [FHLB] should have assumed as securities purchaser[] will have been unilaterally foisted upon the Debtors [sic] general, unsecured creditors.").

[19]    Contrary to the Debtors' passing suggestion at footnote 12 of the Objection, the Trusts are not "affiliates" of a Debtor under section 101(2)(C) of the Bankruptcy Code and, accordingly, the "of an affiliate" language in section 510(b) is inapplicable. *See In re Wash. Mut., Inc.*, 462 B.R. 137, 145-146 (Bankr. D. Del. 2011) ("[t]he Court finds that the Debtors have not adequately proven that the Pooling and Servicing Agreements constitute an operating agreement under the plain meaning of the statute."). Moreover, the statement in the Prospectus Supplements for the MBS that the "certificates will represent interests in the issuing entity only and will not represent interests in or obligations of the sponsor, the depositor, or any of their affiliates or any other party" can fairly be read as an acknowledgement that the Trusts are not affiliates of the Debtors.

agent servicers,[20] serve merely as the conduit vehicles through which to pass payments of third-party mortgagees to the certificateholders.

By purchasing the MBS, investors such as FHLB purchased a securitized product – a pool of mortgage obligations packaged by LBHI, marketed by LBI, and sold by SASCO – but legally owned by the Trusts – non-debtor, non-operating special purpose entities. Payment on the certificates of the cash flow from the collateral was limited to such collateral; payment was not owed by and did not come from the business or assets of any of the Debtors. In fact, in order to make clear to potential investors that they would have no right to look to any of the Debtors for payment, the offering documents utilized in marketing the MBS explicitly stated that "certificates will represent interests in the issuing entity only and will not represent interests in or obligations of the sponsor, the depositor or any of their affiliates or any other party." *See*, *e.g.*, Prospectus Supplement annexed to letter at Docket No. 44285.[21] As such, the relationship between the Debtors and FHLB with respect to the MBS is not one of a traditional debt securityholder and the company borrower to which it looks for payment on its debt claim, but rather one arising from the role two Debtors played in connection with the creation and sale of a mortgage product; the claims asserted by FHLB pursuant to the securities laws allege misrepresentations and omissions by the Debtors in connection with its sale.[22] It is clear that unsecured creditors of a company assume the risk that they will be in the same creditor pool as parties asserting breach of contract claims or tort claims arising from the sale of faulty products

---

[20]   A trust holding mortgage-backed securities employs an agent, referred to as a "servicer," appointed pursuant to a servicing agreement, to perform administrative functions such as directing the flow of payments to the holders of the certificates.

[21]   FHLB also points to "true sale" opinions issued in connection with each of the MBS providing that neither LBHI nor any other sponsor/depositor retained any right to the mortgage loans or the cash flows generated from those loans and that the mortgage loans and associated cash flows had been transferred to the Trusts. *See* Hatch Decl. at Exs. A and B.

[22]   The issue of whether or not the FHLB Claims are meritorious is not before the Court, and the Court expresses no views on the issue.

sold by such company if it files for bankruptcy. While the product sold here happens to be a financial product and a "security" under the federal securities laws, its unique characteristics and lack of relationship to the Debtors' capital structure lead the Court to conclude that the MBS should not be considered a security "of" the debtor as such phrase is used in section 510(b).

The plain language of section 510(b) does not include the term "issuer," nor does it refer to securities "issued by" or "sold by" the debtor or an affiliate of the debtor; the Court is unwilling to read such terms, or any ambiguity, into the statute. In a recent decision, Judge Peck subordinated two groups of claims pursuant to section 510(b), both of which asserted claims against LBI based on transactions relating to bonds issued by LBHI, an affiliate of LBI. *See In re Lehman Brothers Inc.*, 503 B.R. 778 (Bankr. S.D.N.Y. 2014).[23] Arguing against subordination of its claim, one of the claimants argued that section 510(b) is ambiguous when applied to a claim arising from the purchase or sale of a security of a debtor affiliate and, as such, further inquiry was required to consider whether subordination of its claim was appropriate. *Id.* at 783. The court disagreed, finding that a claim represented by the securities of affiliate LBHI was an unsecured claim for damages that fits squarely within the statutory framework of section 510(b). *Id.* at 787. Because the statutory language was unambiguous, Judge Peck declined to consult the legislative history of section 510(b), instead relying solely on the statute's plain language because, in the court's words, "[i]t is well established that when the statute's language is plain, the sole function of the courts . . . is to enforce it according to its terms." *Id.* (citing *Lamie v. U.S. Trustee*, 540 U.S. 526, 534 (2000) (citations omitted)). Here, the Court finds that

---

[23] LBI is the subject of its own liquidation proceeding under the Securities Investor Protection Act ("SIPA"). *See* Adv. No. 08-1420 (SCC). While the decision rendered in *In re Lehman Brothers Inc.*, 503 B.R. 778 (Bankr. S.D.N.Y. 2014) was decided under SIPA, SIPA makes section 510(b) of the Bankruptcy Code applicable to SIPA cases, and LBI is considered "the debtor" for purposes of the analysis. *See* 15 U.S.C. § 78fff(b) ("[t]o the extent consistent with the provisions of this chapter, a liquidation proceeding shall be conducted in accordance with, and as though it were being conducted under chapters 1, 3, and 5 and subchapters I and II of chapter 7 of [the Bankruptcy Code]").

if Congress had intended to include the terms "issuer" or "issued by" in section 510(b), it would have done so explicitly. Stated differently, the Court declines to conclude that the word "of" means "issued by."

Although not compelled to do so, even when the Court examines the stated purpose of section 510(b), it reaches the same conclusion. Section 510(b) was added to the Code to ensure that shareholders, who have bargained to receive the benefit of the proceeds of a company in exchange for bearing the corresponding risk of loss, cannot, upon the company's bankruptcy filing, elevate their claims for illegality in the issuance of the company's stock to the level of unsecured creditors. Here, FHLB received no beneficial interest in the profits of a Debtor which would derive from ownership of the Debtors' equity securities, took no risk arising from purchase of stock of the Debtors, and is not an equityholder. While the Court recognizes that section 510(b) also has been applied to claims of *debt* securities of a debtor,[24] it declines to subordinate the FHLB Claims under that reasoning either. Return on the MBS was not tied to the performance of any Debtor, but rather to the performance of the underlying loans owned by the Trusts. FHLB cannot bootstrap from one position in the Debtors' capital structure to another because it holds no position at all within the Debtors' capital structure.

Further, even when the MBS are viewed as debt securities, a point on which the parties agree, the fact that federal securities regulations required SASCO (the depositor) to perform regulatory functions usually associated with an issuer, and thus deemed SASCO the "issuer" of the MBS for regulatory purposes, is irrelevant and does not render the MBS securities "of" a

---

[24] *See*, *e.g.*, *Levine v. Resolution Trust Corp. (In re Coronet Capital Co.)*, 1995 U.S. Dist. LEXIS 10175 *24-25 (S.D.N.Y. July 12, 1995) (finding that promissory notes are within the meaning of section 510(b) and explicitly rejecting the argument that section 510(b) should be restricted to equity securities).

13

debtor under section 510(b).[25] A security considered to have been "issued by" an entity for regulatory purposes[26] does not mean it is "of" that entity such that creditors can look to that entity for repayment. Here, in fact, it is just the opposite. MBS certificateholders are not permitted to look to SASCO or to any Debtor for payment on their certificates as shareholders or bondholders would in seeking payment on an equity interest or a debt obligation of a debtor. Application of section 510(b) to the MBS would thus be at odds with both the plain language and the purpose of section 510(b) of the Code.[27]

## CONCLUSION

The Court cannot overemphasize the challenge inherent in applying a statutory provision to complex financial products that were barely in existence at the time of enactment of the provision.[28] Indeed, as Judge Peck observed, mortgage-backed securities are "unique creatures of Wall Street . . . and it is the rare ordinary human being who understands them."[29] Slain and

---

[25] The fact that SASCO, as depositor, is considered the issuer of the MBS under the federal securities laws has no bearing on the analysis under section 510(b). As noted by FHLB, because each Trust has no employees, officers, or directors, "the burden of compliance with applicable regulatory and disclosure requirements of the Securities and Exchange Act must necessarily be placed on other parties in the process of creating and marketing an issue of asset-backed securities." Response at ¶ 26. For that reason, while the Trusts actually "issued" the MBS and hold title to the pools of mortgages backing them, they only may be considered "issuing entities" under the federal securities laws. For regulatory purposes, "the depositor for the asset-backed securities acting solely in its capacity as depositor to the issuing entity is [deemed] the 'issuer' for purposes of the asset-backed securities of that issuing entity." *Id.* (citing 17 C.F.R. § 240.3b-19(a)).

[26] Notably, the legislative history of section 2(a)(4) of the Securities Act of 1933 recognizes that the trust is the actual issuing entity of the mortgage-back securities. *See* H.R. Rep. No. 83, 73d Cong., 1st Sess. 13 (1933) ("although the actual issuer is the trustee, the depositor is the person responsible for the flotation of the issue. Consequently, information relative to the depositor and to the basic securities is what chiefly concerns the investor—information respecting the assets and liabilities of the trust rather than of the trustee. For these reasons the duty of furnishing this information is placed upon the actual manager of the trust and not the passive trustee, and this purpose is accomplished by defining 'issuer' in such instances referring to the depositor or manager.").

[27] The purpose of section 510(b) would similarly be twisted beyond its intent if, for example, claims relating to a debtor's sale of the stock of a third party could be subordinated. In simple terms, if LBHI here were accused of breaching a contract for the sale of a block of Apple securities it owned, surely such securities would not be considered securities "of" LBHI for purposes of section 510(b); it would be nonsensical to say that the Apple stock is "of" LBHI simply because it marketed and sold the stock to a claimant, just as LBHI marketed and sold the MBS here. Instead, a tort or breach of contract claim asserted by the claimant would be a general unsecured claim against LBHI, not subject to mandatory subordination. *See In re Wash. Mut., Inc.*, 462 B.R. at 147.

[28] *See, e.g.*, FRANK J. FABOZZI AND FRANCO MODIGLIANI, MORTGAGE AND MORTGAGE-BACKED SECURITIES MARKETS 23 (Harv. Bus. School Press 1992) (Fannie Mae issued its first mortgage-backed security in 1981).

[29] *See* February 13, 2013 Hr'g Tr. [Docket No. 34990] at 81:25-82:2.

Kripke published their seminal article in 1973, when "securities" were decidedly more boring: stocks and bonds, rather than ABS, CDOs, CDO-squareds, MBS, and CMOs, to name a few of the tens of trillions of dollars of securitized products that exist today.  Simply put, when Congress enacted section 510(b) in 1978, it was thinking about stocks and bonds, not mortgage-backed securities.  Accordingly, the Court has endeavored here to retrofit a square peg (mortgage-backed securities) into a round hole (section 510(b)).  The Court concludes that either under a plain reading of the statute or resorting to the stated purpose for enacting section 510(b) set forth in its legislative history, the MBS are not securities "of the debtor or of an affiliate of the debtor" under section 510(b) of the Bankruptcy Code.

For the reasons stated, the Objection is overruled and the request for subordination of the FHLB Claims is denied.

Dated:  July 28, 2014
New York, New York

/s/ Shelley C. Chapman
UNITED STATES BANKRUPTCY JUDGE