WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
David J. Lender
Peter D. Isakoff
Kevin F. Meade
Arielle Gordon

Attorneys for Lehman Brothers Holdings Inc.
and Certain of Its Affiliates

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| ------------------------------------------------------------x | | |
| **In re:** | : | **Chapter 11 Case No.** |
| | : | |
| **LEHMAN BROTHERS HOLDINGS INC.,** *et al.*, | : | **08-13555 (SCC)** |
| | : | |
| **Debtors.** | : | **(Jointly Administered)** |
| ------------------------------------------------------------x | | |

**REPLY MEMORANDUM OF LAW IN FURTHER**
**SUPPORT OF LEHMAN BROTHERS HOLDINGS INC.'S**
**CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page**

I. PRELIMINARY STATEMENT ..................................................................1

II. ARGUMENT .........................................................................................4

    A. CANARY WHARF IS NOT ENTITLED TO RECOVER ALLEGEDLY
    LOST FUTURE RENT AND OTHER AMOUNTS EVEN IF LBL
    COMMITTED A REPUDIATORY BREACH. ..........................................4

        1. The Notion of Repudiatory Breach Changes Nothing. .................5

        2. There is Nothing "New" about LBHI's Arguments. ....................10

    B. PARAGRAPH 1 CONTAINS A GUARANTEE, NOT AN INDEMNITY. ........11

        1. The Language of Paragraph 1. ...............................................12

        2. The "Do It" Guarantee Element. ............................................13

        3. Co-Extensiveness. ................................................................14

        4. The Two Meanings of "Indemnify." .......................................15

        5. Inadmissible and Mischaracterized "Parol Evidence." .............16

    C. THE SURETY AGREEMENT CONSIDERED AS A WHOLE
    CONCLUSIVELY CONFIRMS THAT IT IS A GUARANTEE. ....................18

        1. Paragraph 6. .......................................................................18

        2. Paragraph 2. .......................................................................19

        3. Paragraph 7. .......................................................................20

        4. Paragraph 3. .......................................................................20

        5. Paragraphs 8 and 10. ..........................................................21

    D. "OTHER LEASE PROVISIONS" CONFIRM THAT THE SURETY
    AGREEMENT IS A GUARANTEE. ....................................................21

        1. Section 14. ..........................................................................22

        2. Section 4.32. .......................................................................22

    E. THE *CONTRA PROFERENTEM* PRINCIPLE APPLIES EVEN WHEN
    THE PARTIES ARE SOPHISTICATED. ..............................................24

    F. CANARY WHARF'S CONDUCT DEMONSTRATES ITS LACK OF
    BELIEF IN ITS CURRENT PARAGRAPH 1 ARGUMENT. ......................24

    G. THE FORFEITURE AGREEMENT VITIATED LBHI'S GUARANTEE
    OBLIGATIONS, EVEN FOR PRE-FORFEITURE AMOUNTS. ...................27

III. CONCLUSION ...................................................................................28

i

# TABLE OF AUTHORITIES

**Page(s)**

**UK Cases**

*BHP Petroleum v. British Steel plc*,
[2000] 2 LI Rep 277 ...................................................................................................24

*Birch v. Wright*,
(1786) 1 Term Rep 378 ...............................................................................................6

*Dwr Cymru Cynfyngedig (Welsh Water) v. Corus UK Ltd*,
[2007] EWCA Civ 285 .................................................................................................5

*Franklin v. Carter*,
(1845) 1 CB 750 ...........................................................................................................6

*Holme v. Brunskill*,
[1878] 3 QBD 495 .........................................................................................................4

*Jones v. Carter*,
(1846) 15 M&W 718 ......................................................................................................6

*Oxonica Energy Ltd v. Neuftec Ltd*,
[2008] EWHC 2127 ....................................................................................................17

*In re Park Air Services Plc*,
[2002] 2 A.C. 172 ..................................................................................................2, 6, 7

*Rainey v. Kearney*,
[1990] N.I. 18 ................................................................................................................8

*Reichman v. Beveridge*,
[2006] EWCA Civ 1659 ..........................................................................................2, 6, 9

*Singapore Airlines Ltd v. Buck Consultants Ltd*,
[2011] EWCA Civ 1542 ................................................................................................5

*Sofaer v. Anglo Irish Asset Finance Ltd*,
[2011] EWHC 1480 ....................................................................................................12

*Stadium Finance v. Helm*,
[1965] 109 SJ 471 (CA) .............................................................................................16

*In re Strand Music Hall Ltd*,
(1865) 35 Beav 153 ......................................................................................................5

*Vossloh Aktiengesellschaft v. Alpha Trains (UK) Ltd,*
  [2010] EWHC 2443 ................................................................................2, 15, 18

*Walls v. Atcheson,*
  (1826) 11 Moore CP and Exch. Reports 379 ...................................................2, 6, 9

*West Horndon Industrial Park Ltd v. Phoenix Timber plc,*
  [1995] 29 EG 137...............................................................................................28

*Whitecap Leisure Ltd v. John H Rundel Ltd,*
  [2008] 2 LI Rep 216...........................................................................................24

**Treatises**

ANDREWS & MILLETT, LAW OF GUARANTEES ..............................................................27

HILL & REDMOND, LAW OF LANDLORD AND TENANT...................................................6

O'DONOVAN & PHILLIPS, THE MODERN CONTRACT OF GUARANTEE .......................2, 15

WOODFALL, LANDLORD AND TENANT.............................................................2, 6, 7, 8

LBHI,[1] Plan Administrator under the Modified Third Amended Joint Chapter 11 Plan of

Lehman Brothers Holdings Inc. and Its Affiliated Debtors, submits this reply memorandum in

further support of its cross-motion for partial summary judgment.

## I.    PRELIMINARY STATEMENT

LBHI is not liable for post-forfeiture rent and other amounts, the lion's share of Canary

Wharf's claim, for two principal reasons.  First, under the express terms of Paragraph 1, LBHI is

only liable for losses Canary Wharf suffered as a result of LBL's default on its obligations.  *See*

Ex. 1 ¶ 1.[2]  Under controlling English law, after Canary Wharf forfeited the Lease on December

10, 2010, LBL had no obligations, including to pay rent and other amounts.  Because LBL could

not "default" on obligations that did not exist, no surety obligations with respect to such post-

forfeiture "defaults" could ever arise.

Canary Wharf's entire response to this point is to claim that LBL committed a pre-

forfeiture "repudiatory breach," entitling Canary Wharf to collect damages from LBHI consisting

of twenty-three years' worth of alleged lost rent and other amounts.  That is completely wrong.

In English law, a landlord's right to collect rent payments under a lease is different from the right

to collect payments under a commercial contract, as rent is dependent upon the tenant's

continued right to occupy land under the lease.  Since the lease (and the tenant's right to occupy

thereunder) may terminate before the end of the lease term, as occurred here, English courts

---

[1] Except as provided herein, capitalized terms shall have the same meaning as in LBHI's Memorandum of Law in Opposition to Canary Wharf's Motion for Partial Summary Judgment and in Support of Lehman Brothers Holdings Inc.'s Cross-Motion for Partial Summary Judgment, filed May 22, 2014 (ECF No. 44406) (hereinafter "<u>LBHI's Moving Brief</u>" or "<u>LBHI's Moving Br.</u>")

[2] References to "Ex. __" are exhibits attached to the Declaration of Kevin F. Meade, filed May 22, 2014 (ECF. 44409) and Declaration of Arielle Gordon, dated July 31, 2014, being filed herewith.  References to "Canary Wharf's Ex. __" are exhibits attached to the Declaration of Marc De Leeuw, filed March 14, 2014 (ECF No. 43540) and Supplemental Declaration of Marc De Leeuw, filed June 26, 2014 (ECF No. 44878).

recognize that "[r]ent payable in the future . . . cannot be treated as a series of future debts making up a pure income stream." *In re Park Air Services plc* [2000] 2 A.C.172, 187, ¶ E. That a tenant's breach may be "repudiatory" does not magically transform the established consequences of breach and forfeiture such that a landlord is suddenly allowed to recover damages that have been consistently unavailable under English law for hundreds of years. *See, e.g.*, *id.*; *Reichman v. Beveridge* [2006] EWCA Civ 1659; *Walls v. Atcheson* (1826) 11 Moore CP and Exch. Reports 379. Indeed, WOODFALL, LANDLORD AND TENANT, a leading authoritative treatise on English landlord and tenant law, could not be clearer on this point:

> In principle a repudiatory breach gives the party not in breach a choice whether or not to accept the repudiation. . . . **[I]f a landlord accepts a repudiation by the tenant** (assuming that a lease is capable of repudiation) **he is not entitled to sue for damages representing the loss of future rent**. But the landlord need not accept a repudiatory breach by the tenant and if he does not he is entitled to sue for rent quarter by quarter as it falls due.

*Id.* at ¶ 17.315 (emphasis added). Accordingly, Canary Wharf cannot recover any "damages" measured by "lost" future rent as a "loss" arising from a repudiatory breach, since no such "loss" exists in English law. And this truth applies whether LBHI's position as surety is characterized as a guarantor or indemnitor. *See infra* pp. 4−10.

Second, Paragraph 1 and the entirety of the Surety Agreement conclusively establish that the Surety Agreement is a contract of guarantee and not a contract of indemnity, meaning that, by definition, LBHI's liability under Paragraph 1 for any rent ceased at forfeiture when LBL's liability ceased. The language of Paragraph 1 itself makes clear that LBHI's obligations are co-extensive with LBL's, *i.e.*, they exist "until the Tenant shall cease to be bound by the Tenant's covenants in the Lease," and also that LBHI's liability may arise *only* from LBL's default under the Lease. *See* Ex. 1 ¶ 1. These are the hallmarks of a guarantee. *See Vossloh Aktiengesellschaft v. Alpha Trains (UK) Ltd* [2010] EWHC 2443, at ¶ 24; O'DONOVAN &

2

PHILLIPS, THE MODERN CONTRACT OF GUARANTEE ¶ 1-91 (2d ed. 2010). Canary Wharf's

arguments to the contrary are either old arguments that LBHI and its expert, Richard Millett

Q.C.,[3] have already debunked or new ones that are totally illogical and/or refuted by Canary

Wharf's own expert's deposition testimony. *See infra* pp. 11–18 and accompanying Millett

Reply Declaration.

      The Surety Agreement's remaining provisions confirm that Paragraph 1 is a guarantee.

Canary Wharf's arguments, if accepted, would render multiple provisions of the Surety

Agreement virtually meaningless. For example, Paragraph 7, which provides Canary Wharf with

specific limited and conditional post-forfeiture remedies against LBHI, would simply be

superseded surplusage if Paragraph 1 were an indemnity that already obligated LBHI to pay all

"lost" future rent without Paragraph 7's conditions and limitations. And while Canary Wharf's

most recent submission does not acknowledge it, its own expert, Mr. Rabinowitz, conceded at his

deposition that "you would not need" the entirety of Paragraph 6, "if this were a contract of

indemnity." *See* LBHI's Moving Br. 33; Rabinowitz Dep. 86:12–20.[4] In contrast, LBHI's and

---

[3] There is no dispute that Richard Millett Q.C. is a preeminent authority on English guarantee law.
Canary Wharf seems to suggest that Mr. Rabinowitz's opinion is entitled to the same weight as Mr.
Millett's because Mr. Rabinowitz is a commercial litigator, and because guarantee law is an aspect of
commercial law. *See* The Canary Wharf Claimants' Memorandum in Further Support of Their Motion
for Summary Judgment and in Opposition to Lehman's Cross-Motion for Summary, filed June 26, 2014,
p. 12 n.7 (ECF No. 44875) (hereinafter "Canary Wharf's Reply Br."). But to suggest that someone is an
expert in guarantee law simply because he practices commercial law would make every commercial
lawyer in England an expert in guarantee law.

Mr. Rabinowitz makes a number of arguments in his declaration that are scarcely touched upon in Canary
Wharf's Reply Brief. These additional arguments are meritless as Mr. Millett explains in the Fourth
Declaration of Richard Millett in Further Support of LBHI's Cross-Motion for Summary Judgment
(hereinafter "Millett Reply Decl." or "Millett Reply Declaration") attached to this Reply Brief.

[4] That is because its provisions, such as Paragraph 6(d), which permits Canary Wharf and LBL to vary the
terms of the Lease without effect on LBHI, would only have an effect in the context of a guarantee, since
such a variation could have no effect on LBHI if it were an indemnitor. *See infra* pp. 18–19; Millett Decl.
¶ 37(vi).

Mr. Millett's construction makes sense of and harmonizes the entire Surety Agreement. *See*

*infra* pp. 18–21.

As for pre-forfeiture amounts, LBHI is not liable because Canary Wharf and LBL agreed,

without LBHI's consent, to change the nature of Canary Wharf's claims against LBL, from

priority administration expense claims -- that would doubtless have been paid by the LBL estate

-- to general unsecured claims, increasing the risk that LBL would not satisfy its Lease obligation

to LBHI's self-evident prejudice.  Under the rule of *Holme v. Brunskill* [1878] 3 QBD 495, such

a modification of LBL's performance vitiated LBHI's guarantee obligations.  *See* Millett Decl.

¶¶ 44, 47–56; *infra* pp. 27–28.  Canary Wharf's argument that Paragraph 6(d) of the Surety

Agreement counteracts such an effect ignores that provision's plain language, and its reliance on

the general catch-all language of Paragraph 6(g) is unavailing under English law.

Accordingly, as a matter of law, Canary Wharf is not entitled to recover from LBHI, and

its claims for pre- and post- forfeiture rent and other amounts under Paragraph 1 of the Surety

Agreement should be denied.

## II.    ARGUMENT

### A.    CANARY WHARF IS NOT ENTITLED TO RECOVER ALLEGEDLY LOST FUTURE RENT AND OTHER AMOUNTS *EVEN* IF LBL COMMITTED A REPUDIATORY BREACH.

As explained in LBHI's Moving Brief, even if the Surety Agreement were a contract of

indemnity, which it is not, LBHI has no liability for post-forfeiture amounts under the plain

language of Paragraph 1.  *See* LBHI's Moving Br. 22–23.  Rather, LBHI's liability under

Paragraph 1 is limited to losses arising from LBL's defaults on its obligations.  *See* Ex. 1 ¶ 1.

Since, under clearly established English law, LBL had no obligations after the December 10,

2010 forfeiture on which it could default, LBHI's obligations to pay damages for any "lost" post-

forfeiture rent could never arise.  *See* LBHI's Moving Br. 16–23; Millett Reply Decl. ¶ 6.

4

Instead, LBHI's only post-forfeiture obligations are those set forth expressly in Paragraph 7 of

the Surety Agreement, which provides Canary Wharf with specified post-forfeiture remedies

against LBHI, though subject to certain limitations and conditions.  *See* Ex. 1 ¶ 7 ("if this Lease

shall be forfeited . . .").  If, as Canary Wharf claims, LBHI were already unconditionally and

unlimitedly liable for post-forfeiture rent related damages under Paragraph 1, Paragraph 7 would

be unnecessary and essentially rendered meaningless.  But contract construction under English

law, like New York law, is supposed to give meaning to all of the terms of a contract whenever

possible.  *See* LBHI's Moving Br. 24; *In re Strand Music Hall Ltd* (Lord Romilly MR) (1865) 35

Beav 153; *Dwr Cymru Cynfyngedig (Welsh Water) v. Corus UK Ltd* [2007] EWCA Civ 285;

*Singapore Airlines Ltd v. Buck Consultants Ltd* [2011] EWCA Civ 1542, at ¶ 43.

### 1.    The Notion of Repudiatory Breach Changes Nothing.

Canary Wharf argues that its forfeiture of the Lease is not relevant because LBL

committed a "repudiatory breach" in March 2010 by failing to pay rent and later vacating the

premises, and that Canary Wharf's "losses" from this breach consist of the remaining twenty-

three years of rent and other amounts that LBL allegedly would have paid but for the breach.

*See* Declaration of Laurence Rabinowitz, Q.C., dated June 25, 2014, ¶ 9 (ECF No. 44877)

(hereinafter "Rabinowitz Summary Judgment Decl."); *see* Canary Wharf's Reply Br. 14–15.  But

this argument seeks to override centuries of contrary English law merely by re-labeling a

material breach that would entitle a landlord to forfeit a lease as a "repudiatory" breach, as

though the word "repudiatory" magically provides the landlord the right to measure its "loss" by

reference to future rent, which is not recoverable under English law.

To begin with, whether a tenant can repudiate a lease is an open question of English law.

*See* Millett Reply Decl. ¶¶ 68–70; LBHI's Moving Br. 17 n.21 (citing *Reichman*).  But even

assuming that a tenant can repudiate a lease, the landlord's remedies remain the same as for any

5

other material breach: it could either (i) hold the tenant to the lease and continue collecting rent as it becomes due or (ii) terminate the lease, reclaim the premises and lease it to a new tenant. *See* Millett Decl. ¶¶ 73–74, 80, 87; *see also* Millett Reply Decl. ¶¶ 63, 68(iii)–69.  There is nothing about calling a material breach "repudiatory" that warrants turning it into a "super" material breach providing the landlord with superior post-termination remedies that have never been held to be available by English courts.  Moreover, even if a landlord could terminate a lease by accepting a repudiation, this Lease was terminated by forfeiture *not* an accepted repudiation. *See* Millett Reply Decl. ¶ 78; *see also id.* at ¶ 68(i).  Therefore, repudiation actually has nothing to do with Canary Wharf's claim.

Simply stated, under English law, absent a statutory exception -- and there is none that applies here -- a landlord has *never* had a right to collect future rent from a tenant.  *See In re Park Air Services Plc* [2002] 2 A.C. 172, 185, ¶ B; *Reichman v. Beveridge* [2006] EWCA Civ 1659, ¶ 26; *Jones v. Carter* (1846) 15 M&W 718; *Franklin v. Carter* (1845) 1 CB 750; *Walls v. Atcheson* (1826) 11 Moore CP and Exch. Reports 379; *Birch v. Wright* (1786) 1 Term Rep 378; WOODFALL, LANDLORD AND TENANT ¶ 17.315; HILL & REDMOND, LAW OF LANDLORD AND TENANT ¶ 1543.  Instead, a tenant's obligation to pay rent arises from its right to possess property, and the landlord is entitled to collect rent only as and when the obligation to pay arises. *See In re Park Air Services Plc*, at 187, ¶¶ D-F.  This distinguishes both rent from other installment payments and a lease from ordinary commercial contracts.  *See* LBHI's Moving Br. 19–20; Millett Reply Decl. ¶¶ 58−60; Millett Decl. ¶¶ 77–80.  Since the tenant's right to possess the land may terminate before the end of the lease term (as happened here), future rent may never become due.  *See In re Park Air Services Plc*, at 187, ¶¶ D-F (explaining that because rent may never become due, it "cannot be treated as a series of future debts making up a pure

6

income stream").

Merely labeling a breach "repudiatory" does not change this fundamental and well-established rule of English law.  Put another way, whether a tenant's breach is "repudiatory" or otherwise, Canary Wharf cannot be said to suffer any "loss" of future rent.  *See* Millett Reply Decl. ¶¶ 9−13, 55−60.  Its only "loss" was any rent and other amounts that were accrued, owed and unpaid while the Lease remained in effect.  *See id.* at ¶ 8.  Because Canary Wharf chose to forfeit the Lease, it cut off any further rent from ever coming due thereafter.  *See id.*

LBHI does not "confuse" two assertedly separate principles, (1) the right to collect rent after forfeiture and (2) the right to damages measured by "lost" rent after a tenant's repudiatory breach of a lease.  *See* Canary Wharf's Reply Br. 25.  Rather, it is Canary Wharf that is seeking to inject confusion by suggesting that a tenant's material breach and intent not to perform in the future warrants a radical change in the remedies heretofore available to the landlord, such that future rent, even though it might never fall due, is suddenly to be treated as certain to fall due and also "lost."  Canary Wharf, however, simply invents this second "principle," which does not exist under English law.  *See* Millett Reply Decl. ¶ 57.  What is clear is that rent is "consideration for the right to remain in possession," and because LBL was not in possession of HQ2 after the December 10, 2010 forfeiture, there are no grounds under English law for Canary Wharf to claim "lost" rent after that time.  *See In re Park Air Services Plc*, at 187, ¶¶ D-F; Millett Reply Decl. ¶¶ 9, 13, 59−60.

The excerpt from WOODFALL, LANDLORD AND TENANT quoted in LBHI's Moving Brief at page 18 -- which Canary Wharf ignores despite its expert's testimony conceding the authoritative nature of this treatise, *see* Rabinowitz Dep. 146:23–147:24 -- could not be clearer

on this point:

> In principle a repudiatory breach gives the party not in breach a choice whether or not to accept the repudiation. . . . **[I]f a landlord accepts a repudiation by the tenant** (assuming that a lease is capable of repudiation) **he is not entitled to sue for damages representing the loss of future rent**.  But the landlord need not accept a repudiatory breach by the tenant and if he does not he is entitled to sue for rent quarter by quarter as it falls due.

*Id.* at ¶ 17.315 (emphasis added); *see also* Millett Reply Decl. ¶ 63.

Canary Wharf was acutely aware of this very principle when, in the wake of LBL's notice to Canary Wharf that it intended to vacate the premises, Canary Wharf told J.P.Morgan -- its eventual replacement tenant -- that it was prepared to forfeit the Lease even though "[t]his action would result in the loss of our substantial claims against [LBL]."  Ex. 3 at CW0032605. This legal truism was confirmed when Katie Bradford, head of Linklaters LLP's Property Litigation Unit and counsel to LBL, advised Canary Wharf, without contradiction by Canary Wharf, that it was not entitled to any claim based upon lost future rent from either LBL or LBHI under English law. *See* LBHI's SUF ¶¶ 43–45; LBHI's Moving Br. 9 n.9, 10–11.  In sum, when LBL allegedly repudiated the Lease, Canary Wharf had a choice: it could have kept the Lease on foot and claimed for rent as it fell due, or it could have terminated the Lease.  It chose the latter.

Mr. Rabinowitz concedes that no English court has ever held that a landlord is entitled to damages based upon "lost" future rent after a tenant's repudiatory breach, the remedy Canary Wharf seeks here.  *See* Rabinowitz Summary Judgment Decl. ¶ 57; *see also* Millett Reply Decl. ¶ 13.  Instead, Canary Wharf (Reply Br. at 26−27) once again relies on the Northern Ireland case of *Rainey v. Kearney* [1990] N.I. 18, which, as LBHI has explained, is not controlling precedent in any English Court (as Mr. Rabinowitz has acknowledged) and does not accurately reflect English law.  *See* LBHI's Moving Br. 19–21; Rabinowitz Dep. 134:17–20; Millett Reply Decl. ¶¶ 6 n.3, 61, 72−73.  Canary Wharf is not asking this Court to apply English law.  Rather, it is

asking this Court to anticipate that there will be a *change* in established English law.[5]  *See*

LBHI's Moving Br. 21.

Canary Wharf tries to dismiss *Reichman v. Beveridge* [2006] EWCA Civ 1659, on the

basis that it did not involve a claim for lost future rent following a repudiatory breach.  *See*

Canary Wharf's Reply Br. 26; Rabinowitz Summary Judgment Decl. ¶¶ 58–62.  Canary Wharf

argues that, because *Reichman* expressly left open the issue whether a lease can be repudiated at

all, it necessarily could not have decided whether a landlord who terminates a lease based on a

repudiatory breach is entitled to "claim damages for the lost value of future rent[.]"  *See*

Rabinowitz Summary Judgment Decl. ¶ 58.  This is incorrect.  While *Reichman* left undecided

whether a lease can be repudiated at all, it directly addressed whether a landlord can sue a tenant

for damages based on lost future rent following lease termination.  *See* Millett Reply Decl.

¶¶ 63−67.

The issue presented in *Reichman* was whether the landlord had acted reasonably in

keeping a lease in effect (rather than forfeiting and re-letting the property) following the tenant's

failure to pay.  *Reichman* ¶¶ 1, 30, 40–42.  The tenant argued that the landlord had acted

unreasonably by not forfeiting and re-letting the premises so as to mitigate damages.  *See id.* at

¶ 1.  In concluding that the landlord had acted reasonably in not forfeiting the lease, the Court of

Appeal stated that "*Walls v Atcheson* is authority for the proposition that . . . a landlord cannot

recover damages from the tenant for loss of rent after he has re-entered so as to bring the lease to

an end . . . There is no English authority which decides otherwise[.]"  *Id.* at ¶ 26; *see id.* at

---

[5] Mr. Rabinowitz sets forth policy reasons as to why he believes English law should change.  *See* Rabinowitz Summary Judgment Decl. ¶ 75.  But changing English law is the province of English courts, not this Court.  And parties have options if they do not wish to be bound by English law.  *See* Millett Reply Decl. ¶ 81; *see also id.* at ¶ 14.  For example, parties can include provisions in their agreements that expressly provide post-forfeiture remedies, which is precisely what the parties did here by including the limited and conditional remedies set forth in Paragraph 7 of the Surety Agreement.  *See id.*

9

¶¶ 28, 30, 42.  Therefore, contrary to Canary Wharf's assertion, *Reichman* expressly reaffirmed the long-standing rule that a landlord who forfeits cannot sue to collect damages predicated on lost post-forfeiture rent.  *See* Millett Reply Decl. ¶¶ 63−67.

### 2.    There is Nothing "New" about LBHI's Arguments.

Unable to overcome LBHI's argument that because LBL could not be in default on post-forfeiture rent obligations that did not exist, LBHI is not liable for "lost" post-forfeiture rent under Paragraph 1 -- regardless of whether the Court construes it to be a guarantee or indemnity -- Canary Wharf complains that this is a "new" argument that LBHI supposedly invented to rebut Mr. Bartolotta's March 27, 2014 affidavit.  *See* Canary Wharf's Reply Br. 2–3, 13–15.  Indeed, Canary Wharf spends a substantial portion of its Reply Brief discussing, quoting and citing Mr. Bartolotta's deposition testimony and affidavit.  *See* Canary Wharf's Reply Br. 2, 6−9, 13−14, 19.  Perhaps Canary Wharf relies so heavily on Mr. Bartolotta and less on the actual text of the Surety Agreement because the Surety Agreement's plain language together with established English law supports LBHI's positions.  In any event, as explained at pages 16−18 below and as stated in LBHI's Moving Brief at pages 35–37, Mr. Bartolotta's affidavit and deposition testimony, like Mr. Iacobescu's deposition testimony, are entirely irrelevant, add nothing and must be disregarded as a matter of law.  Neither Mr. Bartolotta nor Mr. Iacobescu actually negotiated the Surety Agreement and both have no knowledge as to what the parties discussed in relation to the Surety Agreement, other than that Canary Wharf wanted it and LBHI eventually signed on to it.  Most significantly, it is well-settled, as Canary Wharf's own expert, Mr. Rabinowitz, testified, that what a party thinks a document meant and what his subjective intentions were are completely irrelevant and inadmissible under English law.  *See infra* pp. 16–17; Rabinowitz Dep. 71:2–14.

Moreover, LBHI makes no "new" argument at all.  Contrary to Canary Wharf's assertion,

LBHI made this point about Paragraph 1's language multiple times *before* learning of Mr.

Bartolotta's March 27, 2014 affidavit and taking his deposition testimony on May 7, 2014,

including in Mr. Millett's original January 2013 declaration.[6]

LBHI's liability under Paragraph 1 of the Surety Agreement is plainly limited by its own

terms to those losses cognizable under English law resulting from LBL's defaults on its

obligations.  Since LBL had no obligation to pay rent or other amounts post-forfeiture, and a

landlord is not entitled to damages measured by any "lost" post-forfeiture rent -- an oxymoron

under English law -- LBHI has no contractual obligation to pay such amounts to Canary Wharf

under Paragraph 1.  And that is true regardless of whether the Surety Agreement is construed to

be a guarantee or an indemnity.

### B.    PARAGRAPH 1 CONTAINS A GUARANTEE, NOT AN INDEMNITY.

As LBHI explained in its moving brief, LBHI's obligations under Paragraph 1 are co-

extensive with LBL's and LBHI's liability is dependent on LBL's default -- the hallmarks of a

guarantee -- which means that LBHI's liability thereunder is limited to what LBL could be liable

for, which does not include "lost" post-forfeiture rent.  *See* LBHI's Moving Br. 25–26.

---

[6] *See* Millett Decl. ¶¶ 37, 38, 65, 70–71 (concluding "there is no loss or damage arising out of LBL's default on which the words of indemnity can bite"); *see also* LBHI's Moving Brief at 22–23 (citing Millett Decl.); Millett Reply Decl. ¶¶ 3(i), 8.  Indeed, on February 25, 2014, in open court, counsel for LBHI made this exact point, that even if Paragraph 1 were construed to be an indemnity, its very language precluded recovery of anything beyond what the tenant was obligated to pay:

> I suspect that we will certainly oppose the summary judgment motion on the ground that they're wrong in the way they're reading the surety agreement.  *It's not true that it's simply a matter of is it a guaranty versus an indemnity.*  And as I was starting to say, the -- *while an indemnity need not necessarily be coextensive with the underlying obligation,* in this case, a tenant's obligation, *in fact this one is, just on the language of the section that they're relying on[.]*

Hr'g Tr. 13:2–11, Feb. 25, 2014 (Ex. 86) (emphasis added).

### 1.    The Language of Paragraph 1.

Canary Wharf claims that LBHI has conceded that Paragraph 1 contains two separate, independent obligations.  *See* Canary Wharf's Reply Br. 16.  That is not what we said at all.  As LBHI has explained, Paragraph 1 contains two clauses, which are logically interrelated.  *See* LBHI's Moving Br. 28–29.  Under the first clause in Paragraph 1, LBHI must ensure that LBL's covenants in the Lease are performed and under the second clause, if LBL defaults on those covenants, LBHI must pay damages (*i.e.*, hold Canary Wharf harmless).  *See* Ex. 1 ¶ 1; *see also* Millett Reply Decl. ¶¶ 46−51.  These clauses are not separate and independent obligations.  Rather, they are consistent with one another and, indeed, interlinked, because LBL cannot default on its obligations once it has "cease[d] to be bound" to them.[7]  *See* Ex. 1 ¶ 1; LBHI's Moving Br. 28–29.  And both parts are in substance secondary, not primary, obligations, which, as Canary Wharf agrees, is the principal distinction between a contract of guarantee and a contract of indemnity.  *See* LBHI's Moving Br. 25–26; Canary Wharf's Reply Br. 2.  What we said was that, as a result of their parallel nature, whether these two parts of Paragraph 1 are considered to be one composite obligation or two separate ones makes no difference, since in substance they amount to the same thing.  *See* LBHI's Moving Br. 26 n.28.[8]

---

[7] Canary Wharf argues that the phrase "until the Tenant shall cease to be bound" applies only to the first clause in Paragraph 1, *see* Canary Wharf's Br. 16; Canary Wharf's Reply Br. 15−16, yet claims that the phrase "primary obligation," which appears one line earlier, applies to the entire paragraph, *see* Canary Wharf's Reply Br. 17 ("Lehman agreed in the second obligation to pay as 'a primary obligation . . .").  Canary Wharf cannot have it both ways.

[8] It would make no commercial sense for Paragraph 1 to contain both a guarantee and a separate indemnity in the "narrow" sense with respect to the exact same obligation, because one or the other would be unnecessary and superfluous.  *See* LBHI's Moving Br. 29; *see also* Millett Reply Decl. ¶¶ 47−48.  In response, Mr. Rabinowitz argues that *Sofaer v. Anglo Irish Asset Finance Ltd* [2011] EWHC 1480, involved completely overlapping guarantee and indemnity obligations.  *See* Rabinowitz Summary Judgment Decl. ¶ 41.  That case is inapposite, however.  Among other reasons, the provisions at issue were materially different from Paragraph 1, and also noticeably absent in *Sofaer* were provisions like Paragraph 6 that serve to confirm that the document as a whole is a guarantee.  *See* Millett Reply Decl.

Likewise, Mr. Millett did not "concede," as Canary Wharf misleadingly implies by unfairly cropping his testimony, that nothing in Paragraph 1, the Surety Agreement or the Lease supports his reading of Paragraph 1.  *See* Canary Wharf's Reply Br. 16.  Quite the contrary, Mr. Millett's full, uncropped, response to an objectionably vague question, was as follows:

> Q. Is there any provision in Schedule 4 or the lease that specifies that what you have circled as the second part of paragraph one of Schedule 4 can only be read as the extent and manner of performance of the first part of paragraph one of Schedule 4?
>
> MR. ISAKOFF:  Object to form.
>
> A.  There are no express words in paragraph one or Schedule 4 or to the extent that I have reread it again, which is not much, the lease, which tells you that you have to read paragraph one in the way that I believe it should be read.  *But to finish the answer, that takes you nowhere.  In order to characterize a commercial document, you don't look for - -you're not going to start by looking at express provisions where the parties tell you how to read it.  If the parties were going to do that, they would have that in the definitions clause.*

Millett Dep. 163:9–164:4 (Canary Wharf's Ex. 42) (portions of response not included in Canary Wharf Reply Br. 16 italicized).  As Mr. Millett has explained at length, the plain language of Paragraph 1, the Surety Agreement as a whole, and provisions of the Lease, on their own demonstrate that the Surety Agreement is a contract of guarantee.

### 2.    The "Do It" Guarantee Element.

Canary Wharf repeats its argument that the language, "the Tenant or the Surety shall perform, indicates that LBHI is an indemnitor.  *See* Canary Wharf's Reply Br. 17.  As LBHI has already explained in its Moving Brief, it simply agreed to a guarantee with "see to it" and "do it" elements, both of which are common in guarantees.  *See* LBHI's Moving Br. 26.  Canary Wharf offers a new twist on its argument, *i.e.*, that Paragraph 1 does not contain a "do it" guarantee, because a "do it" guarantee must be conditional on the underlying obligor's default and there is

---

¶ 49.  Further, counsel in *Sofaer* did not argue that the indemnity provisions rendered the guarantee provisions redundant, and thus the issue was not considered by the court.  *See id.*

no such conditionality in Paragraph 1.  *See* Canary Wharf's Reply Br. 16; Rabinowitz Summary

Judgment Decl. ¶¶ 31–35.  But Canary Wharf's new twist is wrong.  As Mr. Rabinowitz rightly

acknowledged at his deposition, LBHI's liability under Paragraph 1 *is* conditional on LBHI's

default.  *See* Rabinowitz Dep. 76:12–77:9; *see also* Millett Reply Decl. ¶ 42.

### 3.    Co-Extensiveness.

Canary Wharf argues that LBHI agreed as a "primary obligation"[9] to pay losses or

damages sustained by Canary Wharf.  *See* Canary Wharf's Reply Br. 17.  Canary Wharf claims

that nothing in Paragraph 1 indicates that LBL has a similar obligation, and if the surety and

primary obligor do not have parallel obligations, the Surety Agreement must be an indemnity.

*See id.*  But Canary Wharf's argument fails from its beginning premise, because LBL *does* have

a parallel contractual obligation to pay Canary Wharf's losses and damages arising out of its

default on the Lease.  *See* Lease § 4.32 (Canary Wharf's Ex. 9); *infra* pp. 22−23.  Additionally,

as LBHI had already shown, the language in the second clause of Paragraph 1 demonstrates that

LBHI's obligations are secondary as dependent on LBL's default, and are not primary in nature.

*See supra* pp. 12.  Contrary to Canary Wharf's assertions, that the triggering event for LBHI's

liability is LBL's default is *not* irrelevant, *see* Canary Wharf's Reply Br. 17, as Mr. Rabinowitz

testified at his deposition:

> Q. . . . Would you agree that that is also an indicia of something being a guarantee
> where it is contingent upon the principal's failure to perform?
>
> A. I would. I think what Sir William Blackburne [in *Vossloh*] is describing is the
> fact that a guarantee is, in general, regarded as a secondary obligation, that is to
> say the primary debtor has the primary obligation and the guarantor has a

---

[9] In England, "primary obligor" or "primary debtor" clauses are common in guarantees, and courts have
routinely held surety contracts containing the words "primary obligor" to be guarantees rather than
indemnities.  *See* LBHI's Moving Br. 30–31; *infra* n.18.  Indeed, even Section 14.1 of the Lease, which
Canary Wharf correctly argues is a guarantee, uses the same "as a primary obligation" phraseology.  *See
id.*

secondary obligation, and he says that in order to distinguish it from the contract of indemnity where the surety has a primary obligation or undertakes the primary obligation.

*See* Rabinowitz Dep. 46:9–22; *see also id.* 76:12–77:9; LBHI's Moving Br. 26; THE MODERN CONTRACT OF GUARANTEE ¶ 1-91. Tellingly, Canary Wharf's Reply Brief wholly ignores this point that its own expert conceded, and which is also confirmed as hornbook law. There is nothing in Paragraph 1 that even begins to suggest that LBHI's obligations thereunder are somehow greater than LBL's. *See supra* p. 12; *see also* Millett Reply Decl. ¶¶ 16–31, 55.

### 4. The Two Meanings of "Indemnify."

Canary Wharf superficially focuses on the words "indemnity" and "indemnify" in Paragraph 1's heading and text, but, as LBHI has already explained, the Lease itself and English courts reject over-reliance on labels. *See* LBHI's Moving Br. 26–27; Millett Reply Decl. ¶ 15.[10] And the words "indemnity" and "indemnify" have two quite different meanings in English law, *Vossloh*, at ¶ 25, and are commonly found in surety contracts construed to be guarantees, *see* LBHI's Moving Br. 27–28.

Incredibly, Canary Wharf argues for the first time that the two meanings of the word "indemnity," the "wide sense" and narrow sense," are synonymous, that in fact they "mean the same thing under English law." *See* Canary Wharf's Reply Br. 18. But that cannot be so. *See* Millett Reply Decl. ¶¶ 32, 35. How could there be both a "wide" sense and a "narrow" sense of the word "indemnity" if both senses mean the exact same thing? *See Vossloh*, at ¶ 25; LBHI's

---

[10] To the extent that labels matter at all, Canary Wharf wholly ignores the multiple references to LBHI as "guarantor" and as giving a "guarantee" in both the Lease and the Surety Agreement, as well as Canary Wharf's own references to LBHI in publicly-filed bond prospectuses as a "Guarantor" that "guarantees [LBL's] obligations." *See* Canary Wharf's Br. 18 n.14; LBHI's Moving Br. 27, 33–34; Ex. 34 at p. 156; Ex. 35 at p. 145. Although Canary Wharf now suggests that it used the terms "guarantee" and "guarantor" colloquially to include both guarantees and indemnities, it offers nothing in support beyond its own *ipse dixit*. *See* Canary Wharf's Br. 18 n.14.

Moving Br. 27.  Under Canary Wharf's understanding of English law, every contract using the word "indemnity" would be a contract of indemnity in the "narrow" sense (meaning that the surety assumed primary obligations), which is clearly not the case.  *See* LBHI's Moving Br. 28 n.30 (citing cases); *see also id.* at 27 (citing form lease guarantees).  Indeed, Canary Wharf also does not dispute that the Lease itself uses the term "indemnify" in the "wider" hold-harmless sense in Section 4.32 of the Lease**,** specifying the tenant's "indemnity" obligation, a provision where the "narrow" sense would obviously be completely inapposite.  *See* Canary Wharf's Reply Br. 23; *infra* pp. 22–23.

Notably, Canary Wharf does not even attempt to distinguish *Stadium Finance v. Helm* [1965] 109 SJ 471 (CA), in which the Court of Appeal held that a contract containing the words "indemnify and keep indemnified" to be a guarantee, which means that those words could not have been used therein in the "narrow" sense, and demonstrates that the "narrow" and "wide" senses of "indemnify" are necessarily quite different.  *See* Canary Wharf's Reply Br. 23; Rabinowitz Summary Judgment Decl. ¶ 24; LBHI's Moving Br. 28 n.30.[11]

### 5.    Inadmissible and Mischaracterized "Parol Evidence."

Canary Wharf erroneously argues that Mr. Iacobescu's and Mr. Bartolotta's deposition testimony demonstrates that LBHI agreed to an indemnity.  *See* Canary Wharf's Reply Br. 19. Not only is this argument founded on a complete mischaracterization of that testimony, but it directly conflicts with Mr. Rabinowitz's unequivocal testimony, with which Mr. Millett agrees, that what occurred "at the time of negotiations and what occurred to [the parties] at the time of negotiations is, as a matter of English interpretation of contracts, completely irrelevant." *See*

---

[11] Canary Wharf attempts to distinguish the *other* cases LBHI cites by focusing on meaningless differences, including arguing that the cases distinguish between guarantees and demand bonds, which are simply a *type* of indemnity.  *See* Rabinowitz Summary Judgment Decl. ¶ 24.  Even if those cases have some factual differences, their legal holdings are still on point.  *See* Millett Reply Decl. ¶¶ 34−35.

Rabinowitz Dep. 71:2–14; Rabinowitz Decl. ¶ 24(3); *Oxonica Energy Ltd v. Neuftec Ltd* [2008] EWHC 2127, at ¶ 9 (stating that relevant factual background "does not include any knowledge of the parties' subjective intentions," including "what a party thought an agreement meant when he signed it" and "what he was negotiating to get"); Millett Reply Decl. ¶ 84. Put another way, whatever the parties' intentions may have been, English courts will only enforce the words of the written contract as they appear therein. Thus, even if there were any evidence as to the Surety Agreement's negotiating history, which there is not -- other than the single fact that Canary Wharf wanted it and LBHI eventually agreed to it -- it would be both inadmissible and irrelevant.

Moreover, the record is undisputed that neither Mr. Bartolotta nor Mr. Iacobescu was involved in negotiating the content of the Surety Agreement or knows what, if anything, was said between those negotiating its language.[12] Although Canary Wharf states at least nine times in its Reply Brief that Mr. Bartolotta and Mr. Iacobescu testified as to what the parties agreed or understood with respect to the Surety Agreement, the evidence evinces that neither of them had any knowledge on that issue.[13] *See* Canary Wharf's Reply Br. at 2–3, 5–9, 13; *supra* p. 10. *Cf.*

---

[12] *See* Bartolotta Dep. 15:5–8 ("Q. Did you yourself have any role in negotiating the content of the Surety Agreement? A. No."), 21:7–13 (conceding that he does not know whether the Surety Agreement is an indemnity under English law and that he "only said [indemnity in his affidavit] because it says Indemnity" in Paragraph 1's heading), 29:21–32:17 (testifying that he asked Canary Wharf's attorneys to delete the statement from a draft of his affidavit, that LBHI "fought very hard for several weeks to limit those provisions to those of the guarantor under English law," because he "wouldn't have used those words" and did not have that "knowledge"), 60:3–18 (explaining that the document was negotiated by Lehman employees in New York and "[w]hether the words were changed or not, I do not know because I did not negotiate the document . . ."); Canary Wharf's Ex. 39 at LBHI_CW0012608 (Bartolotta e-mail response to LBHI's attorneys' request to speak with him about the negotiations of the Surety Agreement, stating, "[n]ot sure I can add much"); Iacobescu Dep. 12:20–13:16 (conceding that he "do[es] not know exactly what took place between the lawyers," including whether there were any substantive negotiations over the terms of the Surety Agreement or whether the negotiators discussed whether it was an indemnity or a guarantee).

[13] Canary Wharf's Reply Brief also suggests that there was an agreed "business arrangement" and that the "lawyers" drafted the Surety Agreement to embody it, but there is not a shred of evidence to support that. *See* Canary Wharf's Reply Br. 19.

*id.* at 2, 5–7, 9, 13–14 (referring to Mr. Bartolotta as a "negotiator," the "Lehman negotiator" and a "lead negotiator," even though Mr. Bartolotta had no involvement in the negotiations of the Surety Agreement). The only evidence in the record is that Canary Wharf wanted LBHI to stand as LBL's surety, and that LBHI initially resisted but eventually agreed to sign the Surety Agreement in its final form. There is no evidence, admissible or otherwise, as to the agreed-upon nature of the Surety Agreement apart from the language of the Surety Agreement itself.[14]

\*        \*        \*        \*        \*

In sum, the plain language of Paragraph 1 and English case law together establish that it contains a guarantee and not an indemnity. Nothing in Canary Wharf's Reply Brief, including the deposition testimony of Mssrs. Iacobescu and Bartolotta, demonstrates otherwise.

### C.    THE SURETY AGREEMENT CONSIDERED AS A WHOLE CONCLUSIVELY CONFIRMS THAT IT IS A GUARANTEE.

As LBHI explained in its Moving Brief, English courts look to the entirety of the Agreement to construe its terms. *See Vossloh*, at ¶ 20 (quoting *Gold Coast Ltd v. Caja de Ahorros del Mediterraneo* [2001] EWCA Civ 1806 at [11] and [15], [2002] 1 All ER (Comm) 142 at [11] and [15]); Millett Dep. 143:3–144:5. Here, the entirety of the Surety Agreement confirms that it is a guarantee.

### 1.    Paragraph 6.

Canary Wharf argues that Paragraph 6 shows that the Surety Agreement is an indemnity by providing that certain events will not "release discharge or in any way lessen or affect"

---

[14] Canary Wharf's insinuation that LBHI tried to prevent Canary Wharf from obtaining information from Mr. Bartolotta "that Lehman did not want Canary Wharf to discover" borders on the absurd. *See* Canary Wharf's Reply Br. 6–7. Putting aside that Mr. Bartolotta was not involved in negotiating of the Surety Agreement, Mr. Bartolotta and Mr. Iacobescu know each other both "professionally and socially," and indeed they are personal friends. *See id.* at 19 n.16; Bartolotta Dep. 47:13–48:3. In fact, Messrs. Iacobescu and Bartolotta directly communicated about the status of Canary Wharf's guarantee claims in 2011, *even while Mr. Bartolotta was still employed by Lehman. See* Ex. 37. Thus, Canary Wharf could have easily chosen to depose Mr. Bartolotta during fact discovery had it wanted to.

LBHI's liability, thereby demonstrating that LBHI's and LBL's obligations are not co-extensive. *See* Canary Wharf's Reply Br. 23.  But this argument turns Paragraph 6 on its head.  Paragraph 6's provisions counteract legal or equitable principles that might otherwise discharge a *guarantor*.  They would have no effect at all if LBHI were an indemnitor.  *See* Rabinowitz Summary Judgment Decl. ¶ 28 (Paragraph 6 "would preserve liability in circumstances in which a guarantor would otherwise be discharged."); *see also* Millett Reply Decl. ¶¶ 38−39.  Indeed, in testimony from Canary Wharf's own expert that LBHI quoted in its Moving Brief at 33 -- and that Canary Wharf's Reply Brief totally ignores -- Mr. Rabinowitz conceded that Paragraph 6 would be completely unnecessary if the Surety Agreement were an indemnity.  *See* Rabinowitz Dep. 86:12–20 ("if this were a contract of indemnity, . . . [y]ou would not need I think any part of paragraph 6").  Canary Wharf likewise ignores Mr. Rabinowitz's admission that Paragraph 6(d)'s reference to Section 18 of the Landlord and Tenant (Covenants) Act 1995 "would only be relevant in the context of a contract of guarantee."  *See* Rabinowitz Dep. 87:20–88:4; LBHI's Moving Br. 33 n.35.

## 2.    Paragraph 2.

Canary Wharf next argues that because Paragraph 2 of the Surety Agreement provides that LBHI is "jointly and severally liable," it suggests that the Surety Agreement is an indemnity. But that cannot be true, given Canary Wharf's correct position that Section 14 of the Lease, the Landlord's Guarantor provisions, is a guarantee, *see* Canary Wharf's Br. 8, 18; Canary Wharf's Reply Br. 22, since Section 14.2 contains the identical "jointly and severally liable" language, *see* Millett Reply Decl. ¶ 36.  Indeed, other language in Paragraph 2 that permits Canary Wharf to proceed against LBHI "as if" it were the tenant, if anything, underscores the co-extensive, guarantee-type relationship between LBHI and LBL.  *See id.*; LBHI's Moving Br. 32.

### 3.      Paragraph 7.

Canary Wharf argues for the first time that because Paragraph 7 provides for remedies only against LBHI in the event of forfeiture -- for example, Canary Wharf can put a new lease to LBHI, but not to LBL -- that somehow suggests that LBHI's obligations under Paragraph 1 are not co-extensive with LBL's obligations under the Lease.  *See* Canary Wharf's Reply Br. 23–24. But this has it exactly backward.  It is precisely *because* LBHI's liability under Paragraph 1 *is* co-extensive with LBL's, and *because* LBL has no liability for any "loss" based on future rent, that there is any *need* to give Canary Wharf certain expressly limited and conditional post-forfeiture remedies against LBHI as Paragraph 7 does.  *See* LBHI's Moving Br. 33; *see also* Millett Reply Decl. ¶¶ 14, 81.  If Paragraph 1 contained broad, unconditional and unlimited indemnity rights embracing future rent and other amounts, as Canary Wharf contends, Paragraph 7 would be commercially unnecessary and its conditions and limitations would be rendered virtually meaningless.  *See* LBHI's Moving Br. 33.

### 4.      Paragraph 3.

Canary Wharf argues that Paragraph 3, which dispenses with any need to pursue the principal debtor before proceeding against the Surety, would be superfluous in both a guarantee and an indemnity, such that it provides no evidence either way as to the nature of the Surety Agreement.  *See* Canary Wharf's Reply Br. 24.  That is incorrect.  It remains an open question under English law as to whether a guarantor has the right to compel the creditor to pursue the principal debtor first.  *See* Millett Reply Decl. ¶ 37.  By contrast, it is well-established that an indemnitor has *no* such right.  *See id.*  Paragraph 3, which expressly provides that LBHI has no such right, would be entirely superfluous if Paragraph 1 were an indemnity (because no such right exists), but not if it were a guarantee, as it would then resolve an otherwise open issue. *See id.*  Thus, Paragraph 3 supports LBHI's argument that it is a guarantor, not an indemnitor.

### 5.    Paragraphs 8 and 10.

Canary Wharf retreats from Mr. Rabinowitz's prior opinion that the words "guarantee"

and a "guarantor" in Paragraphs 8 and 10 are either expressions "carried across in error from an

earlier precedent" or an "obvious error."  *See* Rabinowitz Decl. ¶ 39(7)–(8).  It now argues that

Paragraph 8's title indicates that the contract contains both a guarantee and an indemnity.  But

that would be illogical, because providing for a guarantee that covers the exact same obligation

that is also fully covered by an indemnity would be literally superfluous.  *See* Canary Wharf's

Reply Br. 24; LBHI's Moving Br. 29.  Canary Wharf also now argues that the Court should

ignore the word "guarantor" in Paragraph 10 because it refers to a "guarantor" obligation found

in Section 4.21.2(b)(i) of the Lease, which contains a different set of obligations.  *See* Canary

Wharf's Reply Br. 24.  This is a distinction without a difference.  It is of no import that Section

4.21.2(b)(i) may refer to a different set of obligations.  The fact is that Canary Wharf referred to

LBHI as "guarantor" in the Surety Agreement that it drafted itself.[15]

*        *        *        *        *

In sum, when the Surety Agreement is looked at as a whole, it confirms that Paragraph 1

is a guarantee.

### D.    "OTHER LEASE PROVISIONS" CONFIRM THAT THE SURETY AGREEMENT IS A GUARANTEE.

Canary Wharf argues that "other lease provisions" support its interpretation of Paragraph

1 as an indemnity.  *See* Canary Wharf's Reply Br. 22.  On the contrary, these very same Lease

provisions demonstrate that the Surety Agreement is a guarantee.

---

[15] Paragraphs 5 and 6 of Schedule 8, which LBHI would have been required to execute had the Lease been assigned, also clearly refer to LBHI as a guarantor.  *See* Lease Sch. 8 (Canary Wharf's Ex. 9); LBHI's Moving Br. 34 n.36.

1.    **Section 14.**

Much of Section 14, which Canary Wharf contends is a guarantee, *see* Canary Wharf's

Br. 8, 18; Canary Wharf's Reply Br. 22, is word for word identical to the Surety Agreement,

underscoring that the Surety Agreement is also a guarantee, *see* LBHI's Moving Br. 29 n.31.

Canary Wharf focuses on a few minor differences between Section 14.1 and Paragraph 1 to

argue that Paragraph 1 is an indemnity. *See* Canary Wharf's Reply Br. 22. But most of Canary

Wharf's arguments here are based on superficial references to headings and labels. *See id.*; *see*

LBHI's Moving Br. 29–30 (explaining that Canary Wharf is improperly relying on headings and

that LBHI is referred to as a "Surety," a common word used for a guarantor, rather than the

"Tenant's Guarantor"). Canary Wharf also asserts that LBHI does not explain why Paragraph 1

includes the words "shall indemnify and keep indemnified" and Section 14 contains no such

language. *See* Canary Wharf's Reply Br. 22. That is incorrect. As LBHI explained on page 30

of its Moving Brief, the Landlord primarily covenanted to provide LBL with quiet enjoyment of

HQ2 and provide related services, and not to pay money. So, the notion of a different Canary

Wharf entity "indemnify[ing]" LBL is not really germane. *See* LBHI's Moving Br. at 30. In

contrast, because LBL assumed numerous, substantial obligations to pay money to Canary

Wharf, the hold harmless language contained in Paragraph 1 is at least pertinent.[16] *See id.*; *see*

*also* Millett's Reply Decl. ¶ 51.

2.    **Section 4.32.**

Canary Wharf does not dispute that Section 4.32 of the Lease, titled "Indemnity," which

---

[16] Canary Wharf argues that "[i]t is exactly because of these 'numerous, substantial obligations' that Canary Wharf sought and obtained a primary obligation from [LBHI] to indemnify it." Canary Wharf's Reply Br. 22 n.20. But that does not rebut the point that the words "indemnify and keep indemnified" make sense in Paragraph 1 of the Surety Agreement and not in Section 14.1 of the Lease because LBL had many, substantial obligations to "pay money" unlike the Landlord.

sets forth the obligation of the tenant itself to keep the landlord "indemnified" against loss, uses the term in the "wider" hold-harmless sense. *See* LBHI's Moving Br. 28; Canary Wharf's Reply Br. 23. Canary Wharf argues, however, that because Paragraph 1 contains a few additional words -- "by reason of," "directly or indirectly" and "whatsoever" -- these words somehow change the meaning of "indemnify" from the "wide" to the "narrow" sense. *See* Canary Wharf's Reply Br. 23. That is totally implausible. The provisions are almost word for word identical. *Compare* Lease § 4.32 (Canary Wharf's Ex. 9) *with* Ex. 1 § 1. One would expect that if the parties intended that the concepts embraced by the verb "indemnif[y]" in Section 4.32 of the Lease and Paragraph 1 of the Surety Agreement to be so fundamentally different, they would have indicated that intention in some far less subtle way than the few vague words to which Canary Wharf points.[17]  *See* Millett Reply Decl. ¶ 53.

Canary Wharf further argues that by relying on Section 4.32, LBHI acknowledges that the second clause of Paragraph 1 contains a primary obligation because the same language -- "indemnif[ying]" Canary Wharf against "losses" sustained as a result of LBL's default -- appears in both. *See* Rabinowitz Summary Judgment Decl. ¶ 46. Again, this is backwards. Although Section 4.32 does contain a primary obligation of the Tenant, it is obviously not a contract of indemnity, as it does not concern a surety of any type. *See* Millett Reply Decl. ¶ 54. And since Section 14.1 of the Lease, which Canary Wharf concedes to be a guarantee, not an indemnity, likewise uses the words "primary obligation," the words "primary obligation" in Paragraph 1 plainly do not create or signify a contract of indemnity there either. *See* Canary Wharf's Reply

---

[17] Moreover, Canary Wharf's explanation of Section 4.32, in which it effectively concedes that the Lease uses "indemnify" in a "wider" hold harmless sense, Canary Wharf's Reply Br. 23; Rabinowitz Summary Judgment Decl. 45–46, cannot be reconciled with its newly expressed position that the two meanings of "indemnity" are synonymous. *See supra* pp. 15–16.

Br. 22; Millett Reply Decl. ¶ 41.[18]

### E.    THE *CONTRA PROFERENTEM* PRINCIPLE APPLIES EVEN WHEN THE PARTIES ARE SOPHISTICATED.

As LBHI explained, to the extent that the Court concludes there is ambiguity as to whether the Surety Agreement is a guarantee or an indemnity or whether, if an indemnity, it embraces an obligation to pay damages based upon "lost" post-forfeiture amounts, any such ambiguity must be resolved against Canary Wharf as the Surety Agreement's drafter, profferor and beneficiary under the *contra proferentum* principle.  *See* LBHI's Moving Br. 37–38.  Canary Wharf argues that this principle is irrelevant where two sophisticated parties negotiate an agreement with the assistance of counsel.  *See* Canary Wharf's Reply Br. 20.  That is incorrect, as English courts have applied the principle in just such circumstances.  *See* Millett Reply Decl. ¶ 85; *BHP Petroleum v. British Steel plc* [2000] 2LI Rep 277, 281, ¶ 18, *Whitecap Leisure Ltd v. John H Rundel Ltd* [2008] 2 LI Rep 216, at ¶¶ 22, 29; *see also* Millett Report ¶¶ 9–10; Millett Dep. 63:11–64:10 (Canary Wharf's Ex. 42) (the principle is "routinely used" by English courts).

### F.    CANARY WHARF'S CONDUCT DEMONSTRATES ITS LACK OF BELIEF IN ITS CURRENT PARAGRAPH 1 ARGUMENT.

Canary Wharf concedes that it repeatedly emailed LBHI's counsel to disclaim that LBHI had any interest in a new lease in an express attempt to manufacture a claim under Paragraph 7.  *See* Canary Wharf's Reply Br. 20.  Canary Wharf has consistently tried to hide how it manufactured this claim, and it was only after Judge Peck permitted LBHI to take discovery that the facts came to light.  *See* LBHI's Moving Br. 38–39.  It now seeks to excuse its course of

---

[18] As LBHI explained in its Moving Brief, "primary obligor" clauses are common in guarantees.  *See* LBHI's Moving Br. 30–31; *supra* n.9; *see also* Lease § 14.1 (Canary Wharf's Ex. 9).  Canary Wharf attempts to distinguish the case law LBHI relies upon, but the points of distinction are superficial and insubstantial.  *See* Millett Reply Decl. ¶¶ 33–34.  It is plain under English law that use of "primary obligor" or "principal debtor" clauses do not convert a guarantee into an indemnity.  *See id.*

conduct, which is completely inconsistent with allegedly holding an iron-clad indemnity, as merely "adding a belt to the existing suspenders." *See* Canary Wharf's Reply Br. 20. But this was not some innocuous shoring up of a legal position. Rather, this conduct is relevant evidence of Canary Wharf's knowledge that is had no legitimate argument for post-forfeiture related damages under Paragraph 1.

Canary Wharf's argument and factual recitation -- like its attempt to cover up its conduct through false claims of privilege for unprivileged redactions and then its wholesale but unsuccessful attempt to block discovery -- ignores the crucial facts that demonstrate the true nature of Canary Wharf's conduct. *See* LBHI's Moving Br. 14, 39. For example, Canary Wharf's Reply Brief conspicuously neglects to mention Jeremy Clay's December 3, 2010 e-mail on behalf of J.P.Morgan -- right at the beginning of Canary Wharf's email campaign -- telling Canary Wharf that if it served a Paragraph 7(a) notice on LBHI, J.P.Morgan would not proceed with their transaction. *See* Ex. 24. What Canary Wharf was doing was trying to get LBHI to disclaim acceptance of a lease that Canary Wharf had already determined *not* to put to LBHI, solely in order to try to set up a claim that LBHI repudiated an obligation that in fact would never arise. *See* LBHI's Moving Br. 5, 12–13. This attempt was revealed only after Judge Peck overruled Canary Wharf's strenuous efforts to block meaningful discovery. *See id.* at 14, 39.

What Canary Wharf's extraordinary conduct shows is that Canary Wharf understood, consistent with the uncontradicted position expressed to it by LBL's counsel, that it had no claim based on "lost" post-forfeiture amounts either against LBL or under Paragraph 1 against LBHI. That was why it was trying so hard to create one under Paragraph 7, even though -- having determined not to serve a Paragraph 7(a) notice -- it could not legitimately do so. *See* LBHI's Moving Br. 38. The facts that Canary Wharf resorted to misrepresentation and then

subsequently covered up its attempt to manufacture its Paragraph 7 claim, if anything, serve to

*underscore* its lack of confidence in its Paragraph 1 arguments.  If it truly believed that English

law and Paragraph 1 provided it with a right to damages from LBHI based on lost post-forfeiture

rent, it would not have engaged in the machinations it did to try to manufacture a Paragraph 7

claim, but simply would have forfeited the Lease, signed a lease with J.P.Morgan and enforced

its supposed indemnity rights under Paragraph 1 against LBHI for any resulting shortfall.  *See id.*

Eager to deflect attention from its own conduct, Canary Wharf alleges that LBHI's

"rejection" of arbitration in England to resolve this dispute demonstrates the weakness of LBHI's

position under English law.  *See* Canary Wharf's Reply Br. 21.  First, LBHI's position is not at

all weak, but is supported by hundreds of years of English precedent, unlike Canary Wharf's

position, which is founded upon a non-binding decision from Northern Ireland.  *See supra* p. 4–

9.  Second, LBHI did not reject arbitration at all, but just rejected the notion that any arbitration

take place before it could take adequate discovery of Canary Wharf.

> THE COURT: . . . It's one of the reasons why I thought London-based arbitration
> might not be a bad approach here.
>
> MR ISAKOFF: And perhaps one day once we've seen what the record is and
> what's in their files we'll come to the same conclusion, Your Honor, but let me
> just talk a little bit about what's involved here and why it is we need discovery. . .

*See* Hr'g Tr. 18:2–9, Feb. 13, 2013 (Canary Wharf's Ex. 71).  LBHI's position was well taken, as

the discovery that Judge Peck permitted revealed Canary Wharf's manipulative behavior and the

meritless nature of its Paragraph 7 claim.  *See* LBHI's Moving Br. 12–14, 38–39.  LBHI's choice

to postpone any decision as to a change of forum until an adequate record could be developed is

in no way comparable to Canary Wharf's conduct that serves to demonstrate its lack of faith in

its own Paragraph 1 argument.

### G.    THE FORFEITURE AGREEMENT VITIATED LBHI'S GUARANTEE OBLIGATIONS, EVEN FOR PRE-FORFEITURE AMOUNTS.

As LBHI has already explained, the Forfeiture Agreement, which was agreed to without LBHI's consent,[19] was a material variation that vitiated LBHI's guarantee obligations entirely. *See* LBHI's Moving Br. 39–40.  Canary Wharf now argues that there was no material variation because a variation "which merely affects the amount of the surety's ultimate liability, but which leaves the risk of default by the principal unchanged . . . will not be material."  Canary Wharf's Br. 29 (quoting *Law of Guarantees* (Canary Wharf's Ex. 33) at 407).  But that misstates LBHI's position, which is not that there was a change in the amount it potentially owes as a result of the Forfeiture Agreement, but instead that the Forfeiture Agreement increased the risk that LBL would not satisfy its Lease obligation by demoting Canary Wharf's claims from administration expense claims to general unsecured claims, to LBHI's obvious prejudice.  *See* LBHI's Moving Br. 39–40; *see also* Millett's Reply Decl. ¶ 86.

Paragraph 6 of the Surety Agreement is of no help to Canary Wharf.  Paragraph 6(d) applies only where there has been a "variation of the terms of this Lease," and as Mr. Rabinowitz agrees, "there's nothing in the forfeiture letter which purports to vary the terms of the LBL lease[.]"  *See* Ex. 1 ¶ 6(d); Rabinowitz Dep. 108:21–109:3; LBHI's Moving Br. 40.  Paragraph 6(g) similarly does not help Canary Wharf here, because English courts resist relying on such catch-all provisions to avoid discharging a guarantor's liability unless the provision contains

---

[19] Canary Wharf appears to contest that LBHI did not consent to the Forfeiture Agreement.  *See* The Canary Wharf Claimants' Response to Lehman's Statement of Undisputed Material Facts Pursuant to Local Rule 7056-1, filed June 26, 2014, ¶ 79 (ECF No. 44876).  There is no issue of disputed fact, however.  Canary Wharf admits that only "[LBL], its administrators and Canary Wharf" entered into the Forfeiture Agreement.  *See id.*  In any event, if this fact were disputed, the Court should hold a trial on whether LBHI consented to the Forfeiture Agreement to decide whether LBHI has any pre-forfeiture liability, but otherwise grant summary judgment to LBHI with respect to any post-forfeiture damages under Paragraph 1.

sufficiently clear and unambiguous language to that effect.  *See* LBHI's Moving Br. 40; *see also* Rabinowitz Dep. 117:3-8 (Ex. 87) (conceding that *West Horndon Industrial Park Ltd v. Phoenix Timber plc* [1995] 29 EG 137, is an example where an English court limited an "anti-discharge provision which was widely drawn").

### III.    CONCLUSION

For the foregoing reasons, and those set forth in LBHI's Moving Brief and the opinions of Richard Millett, dated January 10, 2013, July 15, 2013, May 22, 2014 and July 31, 2014, LBHI's cross-motion for partial summary judgment should be granted on the basis that it has no liability under Paragraph 1 of the Surety Agreement, as a matter of law.

Dated:  July 31, 2014

Respectfully submitted,

_____/s/ Peter D. Isakoff_____
David J. Lender
Peter D. Isakoff
Kevin F. Meade
Arielle Gordon
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Attorneys for Lehman Brothers Holdings Inc. and Certain of Its Affiliates*