UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK


IN RE LEHMAN BROTHERS HOLDINGS INC *Et al*, Debtors

Chapter 11 Case No 08-13555(JMP)

(Jointly administered)


<u>FOURTH</u> DECLARATION OF RICHARD MILLETT Q.C. IN FURTHER SUPPORT OF LBHI's CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT


RICHARD MILLETT Q.C. hereby declares as follows.


<u>Introduction</u>

1.  I have been asked by Lehman Brothers Holdings Inc ("LBHI") to provide a yet further opinion to respond to the argument set out in Mr Rabinowitz's third report of 25 June 2014 ("Rabinowitz 3") and the further memorandum in support of the landlord's motion for summary judgment on liability dated 26 June 2014 ("the CW further memorandum").

2.  I adopt the abbreviations and expressions that I used in my first, second and third opinions (signed 10 January 2013, 15 July 2013 and 22 May 2014). I can confirm that I have seen nothing since those opinions that would cause me to change my views as expressed therein.

3.  By way of general comment on Rabinowitz 3:

    (i)    I am not conscious that LBHI has advanced any "new theory". It seems that Mr Rabinowitz considers that my views as to the scope of the second part of paragraph 1 of schedule 4 to the lease are new, but they are not. My point is and has always been that the words of indemnity at the centre of the landlord's claim are tied to "default" by the tenant, i.e. breach of an obligation, as opposed to an omission to do something whether or not that engages legal liability. I refer to paragraphs 30 to 33,

1

37(1), 38(4) and 65-72 of my first opinion.

(ii)    I note that Mr Rabinowitz has not put forward answers to many of the points I made in my third opinion about the comparisons to be made between clause 14 (the landlord's guarantee) and paragraph 1 to 6 of schedule 4.  The comparisons serve well as a basis to undermine many of the points now advanced, or re-advanced, by Mr Rabinowitz.

(iii)    Many of Mr Rabinowitz' points are a re-formulation of, or further argument on, the opinions he expressed in his first report.  I will endeavour in this report not to re-argue the case but to identify the key errors which persist throughout Mr Rabinowitz's reasoning and conclusions.

**General overview**

4.  Despite the length and complexity of Rabinowitz 3, there are a short number of simple answers to the points he raises:

(i)    Paragraph 1 of schedule 4 is a guarantee.  That must be true of the first "part" of paragraph 1[1], since it contains clear language of co-extensiveness and is to all intents and purposes identical to cl 14.1 of the lease, which it is common ground is a guarantee.  It is true of the second "part" because liability under the second part is expressly tied to default by the tenant, thus preserving the all-important feature of co-extensiveness that is the defining characteristic of a guarantee as opposed to an indemnity: see *Vossloh* at paragraph 24.  Mr Rabinowitz' attempts to say that "default" by the tenant does not connote liability is not persuasive.

(ii)    Mr Rabinowitz's apparent[2] thesis that both "parts" of paragraph 1 contain indemnities, but that the first "part" is a covenant to perform and the second "part" is a money obligation, is either flawed by superfluity or is merely the flip-side of my

---

[1] In this opinion I use the expression "part" or "limb" of paragraph 1 of schedule 4 to denote the putative division of paragraph 1 of schedule 4 into two distinct parts.  However, I stress that it is Mr Rabinowitz's case that paragraph 1 can be divided up.  My own firm view is that paragraph 1 comprises not two separate sets of obligations but a single set of related obligations. See my first opinion at paragraph 38(4).

[2] I say this because I assume that Mr Rabinowitz is arguing that both "limbs" of paragraph 1 are indemnities, but if that is his argument he has not explained with clarity what the function of having two "limbs" is, each serving the same purpose.

2

own view, which is that the first "part" is a guarantee and the second "part" describes the scope of that liability and relaxes the requirements of foreseeability and remoteness of damage that would otherwise apply such that payment must be made in full of all losses etc suffered by the landlord caused by the tenant's default, but not to make recoverable a loss which in law was never caused to the landlord at all.

(iii)    The remaining paragraphs of schedule 4 do not turn what is a guarantee into an indemnity.  In particular, paragraph 2 of schedule 4 which imposes joint and several liability on LBHI as if it were the tenant, is also present in cl 14 (see cl 14.2) under what is common ground is a guarantee, thus demonstrating that it is merely a procedural provision offering no support for Mr Rabinowitz's views.

(iv)    In any event, whether paragraph 1 is a guarantee or an indemnity, the tenant has no liability for rent after forfeiture in respect of which it can be in "default", and no liability in damages representing such rent, and *ipso facto* nor can LBHI.  The law in England on this point is clear, that the tenant is not liable for damages for repudiatory breach representing the value of the balance of the rent over the rest of the lease after the lease has been terminated by forfeiture.  Forfeiture puts at an end the tenant's proprietary interest in the land in respect of which the promise to pay rent was consideration. Mr Rabinowitz's arguments in this respect are just that, arguments, rather than a statement of English law as it stands. His arguments based on commerciality are wrong because they proceed on the assumption that a lease is just an ordinary commercial contract and rent is just an ordinary instalment of the price, whereas in fact a lease is a special kind of contract that grants not only contractual rights but an interest in land and rent is connected with and "issues out of the land".  That is why a lease is traditionally known as a "chattel real": see Megarry & Wade, The Law of Real Property (8th Edn, 2012 para1-012, page 7.  Mr Rabinowitz has not identified any good reason why the policy of the law, which has stood for centuries, would be changed by the UK Supreme Court so as to depart from a principle which has existed since feudal times and persists today.  It also remains very far from clear whether a lease can be brought to an end by accepted repudiation as opposed to (or as well as) by forfeiture: see Megarry & Wade (ibid) paragraph 18-108.

(v)    Mr Rabinowitz's arguments based on commerciality are also manifestly wrong because they are cured by paragraph 7 of schedule 4, which expressly provides that where the lease has been forfeited the landlord has the option to put a new lease on identical terms onto LBHI. That was the very remedy that the parties expressly agreed in just this situation.  The reason that the landlord has had to strain so hard to make new law out of an obscure and wrongly decided Northern Irish case is because it chose not to exercise its contractual option, for its own commercial reasons.

5.    I propose to address Rabinowitz 3 section by section and paragraph by paragraph.  If I do not address a point specifically in this report, that should not be taken as any kind of indication that I agree with it.

**The meaning of paragraph 1 of schedule 4**

6.    By way of preliminary, it is not and has never been my view that "limb" (ii) of paragraph 1 of schedule 4 is "too narrowly worded to enable [CW] to recover damages for the lost value of the future rent that would have fallen due for the unexpired term of the lease" (Rabinowitz 3, paragraph 6).  Nor is that, in my view, a fair reading of either pp 22-23 of LBHI's memorandum or paragraph 27 of my third opinion, to which Mr Rabinowitz refers.  My point is not merely a linguistic observation on the breadth of the language but rather that "lost" future rent in respect of any periods post-forfeiture is not a loss caused by any tenant default. That is true whether paragraph 1 of schedule 4 is a guarantee or an indemnity:

(i)    "limb (ii)" of paragraph 1 of schedule 4 expressly only provides the landlord with any protection in respect of losses etc "arising directly or indirectly out of any <u>default</u> by the Tenant in the performance and observance of any of its obligations or the payment of any rents and other sums..." (my emphasis); and

(ii)    the Tenant cannot have been in default of any obligation to pay any sum representing post-forfeiture rent because the landlord's act of forfeiture put an end to such an obligation, and it was not replaced with a secondary obligation to pay damages for lost future rent.  The landlord's remedy in respect of future rent was

4

instead to be filled by its option under paragraph 7 of schedule 4 to put a new lease on identical terms onto LBHI.

7. My reference in paragraph 27 of my third report (where I deal with why losses comprising future rent cannot be recovered come what may) to "indemnity in the narrow sense" is simply to what Sir William Blackburne said in *Vossloh*, to distinguish an indemnity from a guarantee: see paragraph 8 of my third opinion. I am surprised that this should need any clarification. I am not arguing that "limb" (ii) is "narrowly worded", unless to emphasise what has always been obvious, that it requires tenant default in order to operate.

8. As to paragraph 7 of Rabinowitz 3, where Mr Rabinowitz says that the cessation of payment of rent was caught by the words he claims are words of indemnity, it is obvious that when the tenant stopped paying rent, it was in default and that LBHI was liable under paragraph 1 of schedule 4 to pay the outstanding accrued but unpaid rent, and would have been liable, had the lease not been forfeited, for the rent for all succeeding quarters as and when the rent fell due for each quarter. However, once the lease had been forfeited, the tenant no longer had any liability to pay rent (save in respect of any due past rent that remained unpaid to date) and therefore could not be in default. Again I fail to see why Mr Rabinowitz says that this is a new argument: it is set out at paragraphs 30 to 33, 37(1), 38(4) and 65-72 of my first opinion.

9. In any event, Mr Rabinowitz's point here appears to be that the tenant's default in ceasing to pay rent and indicating that it would pay no more was a pre-forfeiture default. The critical question is, default in respect of what? It was not a "default" in respect of future rents because they had not fallen due, and if the landlord forfeited in respect of the rent which had accrued and was due and in respect of which the tenant had defaulted, such future rents would never fall due. Mr Rabinowitz' basic error remains the same as before. He treats rent as an obligation *debitum in praesenti solvendum in futuro* (i.e. a present obligation to be discharged in the future). As I pointed out in my first opinion (paragraph 78), it is well established at House of Lords level that rent is not such an obligation:

> " ... rent is not a simple debt. It is the consideration for the right to remain in possession. The tenant's liability to pay future rent is not *debitum in praesenti solvendum in futuro*. Its existence depends on future events. Rent in respect of a future rental period may never become payable at all. Rent payable in future under a subsisting lease cannot be treated as a series of future debts making up a pure income stream."

*Re Park Air Services* [2000] 2 AC 172, at 187E-F, per Lord Millett.[3]

10. So the "losses" or "damages" which arise directly or indirectly from the refusal by the tenant to perform its rental obligations thenceforth could not be a default by the tenant in relation to future rent because the tenant has no obligation to pay future rent until the time arrives for doing so. That is exactly what Lord Millett was saying.

11. Mr Rabinowitz says (paragraph 10) that the landlord's claim to damages representing future rent is just a consequence of the language of the contract regardless of the distinct question of whether English law affords a damages remedy to a landlord against a tenant after termination of a lease on account of the tenant's repudiatory breach. But these are not distinct questions. The landlord can only claim losses caused by a "default" by the tenant in his obligation (to pay rent). If the tenant has no obligation to pay the <u>future</u> rent, there is no relevant default and ergo no loss. As I explain further below, it is at best uncertain that a landlord can terminate a lease other than by forfeiture: see <u>Megarry & Wade</u> paragraph 18-108. That strongly supports the notion that a lease is not just like any commercial contract and cannot be terminated in the same way with the same consequences.

12. I agree with Mr Rabinowitz (at paragraph 12 of Rabinowitz 3) that forfeiture would be a perfectly reasonable and foreseeable response to tenant default. But this begs the question as to what "tenant default" means. If Mr Rabinowitz means default by non-payment of rent due or other breach of covenant, I agree.

13. Furthermore, LBHI does not say that the landlord's decision to forfeit broke the chain of causation so that loss of future rent could not arise. That is to attribute LBHI with a false analysis. LBHI does says that the forfeiture permitted the landlord to recover the land and thereby put an end to its ability to provide future consideration (including the right to exclusive possession of the land) in return for future rent. It removed the legal foundation for future rent, not (or not merely) by terminating the contractual obligation to provide exclusive possession but by terminating the tenant's interest in the land out of which the rent would issue, and the tenurial relationship between them. Nor do I accept that the loss of future rent arose from the tenant's "antecedent default". It did not and could not. There

---

[3] He gave the lead judgment, with which all the other members agreed. The appeal post-dated *Rainey v Kearney* by a decade. *Rainey v Kearney* was not cited to the House, notwithstanding the eminence and ability of leading counsel (Jonathan Sumption QC, now a member of the Supreme Court, and Terence Etherton Q.C., later Etherton LJ and now Chancellor (head of the Chancery Division of the High Court)).

is no case I know of, and none that Mr Rabinowitz has cited, where the declaration by the tenant that he was no longer going to pay rent entitled the landlord to terminate and recover the balance of the rent as a lost income stream. And any such decision would have to overcome *Re Park Air Services*. To repeat, *"Rent payable in future under a subsisting lease cannot be treated as a series of future debts making up a pure income stream."* (*Re Park Air Services*, ibid).

14. Mr Rabinowitz considers that this is an uncommercial result (Rabinowitz 3 paragraph 13). There is a simple solution for that. The appeal to business common sense is answered not by distorting the word "default" in its context here (in a lease) and ignoring the particular nature of future rent but simply by the landlord using what paragraph 7 of schedule 4 gives him as the remedy for lost future rent – the option to put a new lease onto LBHI (and create a new tenurial relationship and a new leasehold interest in the land). Where the tenant has stopped paying rent or committed some other breach of covenant and gone out of possession and indicated that it would no longer pay rent in the future (or observe any other covenant), then the landlord simply forfeits and exercises its option under paragraph 7. If Mr Rabinowitz is right, paragraph 7 would be wholly unnecessary.

**Schedule 4 is a guarantee not indemnity**

15. At paragraph 15 of Rabinowitz 3 Mr Rabinowitz says that labels are important and he cites the decision of Flaux J in *ABN Amro Commercial Finance v McGinn* [2014] EWHC 1674. First, this point overlooks the point I made at 37(viii) and 38(1) of my first report and at paragraph 6(a) of my third report that the lease expressly provides at clause 2.7 that *"the title and headings in this Lease are for reference only and shall not affect its construction."* Secondly, it is clear from Flaux J's decision on the point at paragraph 36 that he was basing himself not so much on the labels used in the operative provisions but on their substantive effect read as a whole. That is why he says *"Quite apart from the use of words of indemnification…"*

*Trigger of indemnity*

16. At paragraphs 16 to 20 of Rabinowitz 3 Mr Rabinowitz argues that since an indemnity is always contingent upon default by the primary obligor the fact that the indemnity is triggered by tenant "default" here does not mean that it must be secondary in nature. That argument is wrong and rests on a misreading of my opinions.

17. The first of Mr Rabinowitz's arguments postulates (at paragraph 17 of Rabinowitz 3) an assumption by me that *"it is impossible to have an indemnity that is triggered by a default on the part of the underlying obligor"*, and then proceeds to knock that down. With respect, I make no such assumption, either at paragraph 8 of my third report or elsewhere. My point is that the critical element of "limb (ii)" of paragraph 1 of schedule 4 is that LBHI's liability can only arise from a *"default by the tenant in the performance and observance of any of its obligations or the payment of any rents"*. A guarantor's obligation is always dependent on (or "triggered" by) a default by the principal debtor in his obligations, whereas an indemnity is triggered regardless of whether the principal obligor is in default or not. That is precisely what Sir William Blackburne said at paragraph 24 of *Vossloh* (quoted at paragraph 30 of my first opinion). To repeat, as he said:

> "There is no liability on the guarantor unless and until the principal has failed to perform his obligation."

18. Mr Rabinowitz is seeking to use paragraph 25 of *Vossloh*, where Sir William Blackburne explains that an indemnity is *"security for the performance of an obligation by another"* to catch the default mandated by the language of "limb (ii)" of paragraph 1. However, that is not the end of it. One must read the whole of paragraph 25 and 26 of *Vossloh*, where Sir William Blackburne goes to say:

> "Its essential distinguishing feature is that, unlike a guarantee (strictly so called), a primary liability falls upon the giver of the indemnity. Unless (as it quite possible) he has undertaken his liability jointly with the principal, his liability is wholly independent of any liability which may arise as between the principal and the creditor. ...
> 26. The fact that the obligation to indemnify is primary and independent has the effect that principle of co-extensiveness does not apply to a contract of indemnity."

19. It is not controversial that an indemnity may be against loss from the failure of the underlying obligor to perform his obligations, but the key question is whether LBHI's obligation is primary and "wholly independent of any liability" by the tenant to the landlord such that LBHI's liability is not co-extensive with the tenant's. It plainly is not. If the tenant had committed no default in its obligations, then *ipso facto* LBHI cannot be liable. Mr Rabinowitz seeks to distinguish between loss arising from the tenant's default and loss arising from liability by the tenant for its default. He says that the latter is not within the wording and so LBHI is liable regardless of whether the tenant is liable.

20. I disagree.  First, the word default means what it says, ie a breach of a legal obligation. Breach will always give rise to liability unless there is some legal bar to it such as illegality.

21. If the draftsman had wished to provide for liability on the part of LBHI arising from the tenant's default regardless of whether or not the tenant was liable for that default, then he could easily have done so by use of the words "whether the tenant be liable or not".

22. Moreover, I also note that Mr Rabinowitz has ignored and made no attempt to address *Stadium Finance v Helm* (1965) 109 SJ 471, to which I referred at paragraph 35 of my first opinion.  In that case, the English Court of Appeal ruled that the contract was one of guarantee even though it was headed "indemnity form" and provided as follows:

> "I will indemnify and keep indemnified you, your successors and assigns from all loss and damage suffered and all claims costs and expenses made against or incurred by you in any way arising out of or consequent upon your having entered into such agreement, whether arising out of a breach by the customer of any of the terms and conditions thereof or otherwise including such loss or damage etc aforesaid as may arise from the said agreement being unenforceable against the customer."

23. Those words are not sensibly distinguishable from the words in "limb (ii)" of paragraph 1 of schedule 4; indeed, if anything, they are rather broader that the words in "limb (ii)", and yet the court still held that the instrument was one of guarantee. Mr Rabinowitz has made no attempt to identify or explain the difference between the provision in *Stadium Finance* and "limb (ii)".   Nor are the words in "limb (ii)" easily distinguishable from the words of indemnity at clause 2.1(c) of the guarantee in the *Vossloh* case (see [35]) where the "trigger" was default.

24. The decision of the English Court of Appeal in *Western Credit v Alberry* [1964] 2 All ER 938 (a case referred to at paragraph 32 of my first report) provides further strong support for my view.  In that case the guarantee provided:

> *"In consideration of your having agreed at my request to enter into the annexed agreement with the person named therein as hirer, I, the undersigned, guarantee the payment by the said hirer to you of the instalments in the said agreement agreed to be paid and the performance and observance by the said hirer of the terms of the said agreement: and I will indemnify you against any loss or damage which you may sustain as a result of the act default or negligence of the said hirer (in connexion with or in any way arising out of the said agreement) ....."*

25. I see no distinction between the two limbs of paragraph 1 in this case and the two clauses of the guarantee in that case. As here, the guarantee in that case had a second "limb" (i.e. the words after the colon) containing words of indemnity which are in my view indistinguishable from those in "limb (ii)" of paragraph 1 of schedule 4 relied on by Mr Rabinowitz. The Court of Appeal had no hesitation saying that it was a guarantee. As Sellers LJ said (at page 940A-B): *"The word "indemnity" is used but the sentence is descriptive in its context of the kind of non-performance or non-observance which might arise under the guarantee, following as it does the guarantee of the performance and observance of the hirer under the agreement."*

26. Second, LBHI's liability is plainly not independent of the tenant, hence the obligation in the proviso to paragraph 1 to keep the tenant informed.

27. Third, the words "until the Tenant shall cease to be bound by the Tenant's covenants in the Lease" govern all parts of paragraph 1 and not merely the words down to "herein specified". Mr Rabinowitz's argument assumes that paragraph 1 comprises two separate and self-contained sets of obligations, separated by the "and" in the sixth line. I disagree with that assumption.

28. Fourth, if Mr Rabinowitz were right it would make paragraph 2 wholly redundant and meaningless since the landlord would have everything it needed out of paragraph 1. As I said in my first opinion (paragraph 38(5)), this provision works if paragraph 1 is a guarantee in that it is a procedural stipulation which entitles the landlord to pursue LBHI <u>as if</u> it were the tenant named in the lease without suing the tenant first, and it thereby limits the landlord's claims to that for which the tenant would be liable itself. This serves to reinforce the co-extensive nature of LBHI's obligations and contra-indicate that they are primary and independent of the tenant but instead indicate that LBHI's obligations are in the nature of a guarantee.

29. Mr Rabinowitz's reliance on employee's fidelity policies (paragraph 18) and our book on guarantees is misplaced. The provision in the precedent he relies on is plucked from a draft contract headed "Indemnity", but there is no text that says that the particular provision is itself an indemnity, and we do not say that that clause is capable of being lifted from one precedent and transplanted into a totally different kind of document such as a guarantee of a lease. It all depends on the context and the particular document.

30. So far as concerns *Clement* (Rabinowitz 3 paragraphs 17 and 19), this is of course good law. The point is that the language of "limb (ii)" of paragraph 1 of schedule 4 does not envisage

10

any circumstances in which LBHI would or could be liable for a greater amount than the tenant or be liable independently of the tenant.

31. At paragraphs 19 and 20 of Rabinowitz 3, Mr Rabinowitz also appears to contend that the tenant has no primary obligation to indemnify the landlord against "losses" etc, and therefore LBHI's obligations are not co-extensive with those of the tenant but wider. This is also wrong. The fact is (as I pointed out at paragraph 9(iv) of my third report), the tenant has, under clause 4.32 of the lease, given the landlord its own indemnity of like scope to the words of "limb (ii)" of paragraph 1 of schedule 4, and therefore the co-extensiveness of liability as between the tenant and LBHI is preserved.

*Language of indemnity*

32. I agree that an indemnity is a contract by one party to keep the other harmless against loss, as Mr Rabinowitz says at paragraphs 21 and 22 of Rabinowitz 3. Where we part company is his argument at paragraph 23 that either description (indemnity or hold harmless) distinguishes it from a mere guarantee. He has oversimplified the point and in doing so he has failed to address the point at paragraph 9(iv) of my third report. My point is that it is quite possible to have hold harmless words within a guarantee properly so called, the function of which is to describe precisely what it is that the guarantor (in his capacity as such) must pay, namely to pay in full all losses caused by the default of the principal debtor. Mr Rabinowitz seeks to turn that on its head and to say that just because hold harmless words are there within the agreement, therefore the whole agreement must be an indemnity. That is wrong and a *non sequitur*. My point in making the comparison with cl 4.32 is simply that one finds wide, hold harmless provisions in the context of ordinary bilateral contracts, where their purpose is to delimit and describe the parameters of liability. Just as the purpose of the words in clause 4.32 cannot be to distinguish itself from a guarantee, so the same must be true in "limb (ii)" of paragraph 1.

33. At paragraph 24 of Rabinowitz 3 he seeks to undermine my references to the many cases which make it plain that the use of "primary obligor" or "principal debtor" language does not convert a guarantee into an indemnity. He says that the cases establish no point of principle and do not say that the language is irrelevant to classification of whether the contract is one of guarantee or indemnity. However, the starting point is that Mr Rabinowitz has not addressed the point that even though, on CW's own case in its memorandum, clause 14 is a

guarantee properly so called, it nonetheless expressly says that the landlord's guarantor covenants "as a primary obligation". Those are the identical words used at the beginning of paragraph 1 of schedule 4 on which Mr Rabinowitz relies to say that it is an indemnity. Since on CW's case the presence of those words in clause 14 cannot turn the landlord's guarantee into an indemnity, the same must also be true of paragraph 1 of schedule 4. This comparison provides a simple answer to a simple point.

34. In any event, Mr Rabinowitz is wrong that these cases establish no point of principle. His points of distinction that he seeks to make on each case are superficial. The key point is that in none of them was the fact that the parties had used words of primary obligation (whether "principal debtor" or "primary obligor" or "primary obligation: it makes no difference[4]) sufficient to turn what is otherwise a guarantee into an indemnity. Furthermore, the fact that some of the cases were about performance or demand bonds as opposed to indemnities is not a legitimate point of distinction – the issue was whether they were bonds (to which the rule in *Holme v Brunskill* does not apply) or guarantees (to which it does). There is no difference for this purpose between an indemnity and a bond.

35. The same is true of Mr. Rabinowitz's attempt in paragraph 24 of Rabinowitz 3 to distinguish *Vossloh* and *Marubeni Hong Kong v Govt of Mongolia*, two cases that clearly demonstrate that words of indemnity are commonly found within guarantees. Further, as I have said above already, Mr. Rabinowitz does not even attempt to distinguish *Stadium Finance*.

*Other provisions of schedule 4*

36. As to paragraph 2 of schedule 4 (which Mr Rabinowitz addresses at paragraph 27 of Rabinowitz 3), I have already addressed this point at paragraph 37(ii) and 38(5) of my first report. The short point is that, set in its context, and particularly in the context of paragraph 1, paragraph 2 does not expand LBHI's liabilities, but rather confirms that it is liable for that which the tenant would be liable for, and for no greater liability (as one can clearly see from the "as if" language). Paragraph 2 is a procedural provision that entitles the landlord to pursue LBHI without first pursuing the tenant. Read in its context it cannot turn a guarantee into an indemnity. In particular, paragraph 2 of schedule 4, which is a separate covenant which imposes joint and several liability on LBHI as if it were the tenant, is also present in cl 14 (see cl 14.2) under what is common ground is a guarantee, thus

---

[4] See our book at paragraph 1-014 which treats these expressions as broadly having the same effect. If there were a difference between them discernible from the cases we would have pointed it out.

demonstrating that it is merely a procedural provision offering no support for Mr Rabinowitz's views. Just as clause 14.2 of the landlord's guarantee does not turn it into an indemnity, neither does paragraph 2 of schedule 4 turn the tenant's guarantee into an indemnity.

37. I disagree that paragraph 3 of schedule 4 is neutral or surplus (Rabinowitz 3 paragraph 27). As I said in my first opinion (paragraph 37(iii)), it would be quite unnecessary if the contract were one of indemnity. I quite agree that it is not a condition or prerequisite of the guarantor's liability that the creditor should first pursue the principal debtor. However, as we say at paragraph 11-002 of our book, there is long standing authority (analysed at some length at pages 477-481) which suggests that the guarantor (not an indemnitor) has a right in equity to compel the creditor to pursue the principal debtor, and that the question as to whether the guarantor has such a right has never been finally settled[5]. It is for that reason that I say at paragraph 27 of my first opinion that the purpose of paragraph 3 of schedule 4 is to make it plain that the guarantor has no such right. As I say (in my third report at paragraph 9(ii), as supported by the cases I have cited there), courts tend to give words in commercial contracts meaning if they can rather than too readily consigning them to superfluity.

38. At paragraph 28 of Rabinowitz 3, Mr Rabinowitz addresses the relevance of paragraph 6 of schedule 4, which comprises the anti-avoidance provisions. As I said in my first report, this is usually an indication that the instrument is intended to be a guarantee (see *Vossloh* at [27]). Mr Rabinowitz argues that in the *CIMC Raffles* case Blair J suggested that it was not clearly established that the rule in *Holme v Brunskill* does not apply to indemnities. He is wrong about that, and his error rests on a misreading of my quotation from Blair J's judgment in the *CIMC Raffles* case (at paragraph 18 of my third report). Blair J did not say that it is not clearly established on the authorities that the rule in *Holme v Brunskill* does not apply to indemnities. It clearly does not apply to indemnities: see for example *ABN Amro Commercial Finance v McGinn* [2014] EWHC 1674 (on which Mr Rabinowitz himself relies) at [24] and [37]. What in *CIMC Raffles* Blair J was saying was not clearly established was whether *"an instrument imposes primary as well as secondary liability in itself negatives the rule in Holme v Brunskill"*. That is quite different. Further, the context for this dictum was the previous paragraph of his judgment ([26]) in which he said that a principal debtor clause will not

---

[5] This is not quite the same question as the question of whether the <u>creditor</u> needs to go first against the guarantor, for which he relies on *Moschi* and <u>The Modern Law of Guarantee</u> in support.

automatically convert a guarantee into an indemnity, and the case remains good authority (among many others) for that proposition. Since there is no doubt that the rule in *Holme v Brunskill* does not apply to an indemnities, a point I made at footnote 8 of my first opinion and which has never been disputed by Mr Rabinowitz[6], he is wrong to say that clause 6 would "guard against any argument that *Holme v Brunskill* applies even to an indemnity". Quite simply, there is no such argument. The *CIMC Raffles* case does not suggest that there is, and nor do I.

39. I should add at this point that CW's contention at page 23 of the CW further memorandum that "paragraph 6 confirms that certain events will not "release discharge or in any way lessen or affect" Lehman's liability, consistent with the principle that Lehman's and the tenant's obligations are not co-extensive" is wrong. It is circular. The reason why paragraph 6 is there is precisely because without it LBHI would be discharged by the identified matters and events. That is in turn because the rule in *Holme v Brunskill* applies to schedule 4, and that is because it is a guarantee. It would not apply if it were an indemnity (see above, and e.g. the *ABN Amro* case) in which case paragraph 6 would be unnecessary.

40. I note the reference to checklist in the <u>Encyclopaedia of Forms and Precedents</u> that suggests that a contract of indemnity should contain an anti-avoidance provision. I am not sure why that is recommended practice, and if it really were standard or good practice, then Sir William Blackburne would not have said, as he did in *Vossloh*, that the presence of such a provision usually indicates a guarantee.[7]

*The covenants by the Landlord's Guarantor*

41. At paragraph 30 of Rabinowitz 3, Mr Rabinowitz seeks to draw a distinction between the landlord's guarantee, under which the landlord's guarantor covenanted that the landlord would perform, and paragraph 1 of schedule 4, under which LBHI covenanted that the tenant or itself would perform the tenant's covenants. From that, Mr Rabinowitz reasons, LBHI was undertaking a primary obligation. I note he has not commented on the use of the expression "as a primary obligation" which is present in both clause 14.1 and paragraph 1 of schedule 4.

---

[6] Indeed, it was a point with which he agreed during his oral testimony: see page 40 lines 9-19; page 49 line 19 to page 50 line 6.

[7] He is a Chancery Judge of many years' experience, and leading counsel arguing the case included my co-author, Geraldine Andrews Q.C. (now Mrs Justice Andrews DBE, a High Court Judge).

42. As I said in my first report (paragraph 38(3)), the guarantee in paragraph 1 contains both a "see to it" element (that the tenant would perform) and a "do it" element (that LBHI would perform). Mr Rabinowitz has read the words "or the Surety" as meaning that LBHI was required to perform regardless of whether the tenant has performed, and that is how he removes the element of conditionality. I am not sure that Mr Rabinowitz's first report made this point[8]. In my opinion the words "the Tenant or the Surety" means the Tenant, and if the Tenant does not, the Surety. That is why the word "or" is there. They are not both concurrently liable. If that were the draftsman's intention, he would have put "and". Accordingly, the conditionality necessary for a "do it" guarantee obligation as per *Moschi* is present.

43. The point goes further. If the Surety really was intended to be concurrently and primarily liable for the obligations undertaken by the tenant, then there would not be any need even for the indemnity for which Mr Rabinowitz argues. Indeed, it would not be necessary to have the words "the Tenant or" in the expression "the Tenant or the Surety" on which Mr Rabinowitz relies. The draftsman could simply have provided that "as a primary obligation that the Surety shall …" The reference to the tenant makes it plain that LBHI is undertaking both that the tenant will perform and also that it will perform if the tenant does not. Furthermore, the covenants are expressed to be the tenant's covenants, not LBHI's own covenants. With respect, it is Mr Rabinowitz who has misread the provision, not I. What is more, my reading is entirely consistent with the second "part" of paragraph 1 since under that part LBHI's liability is clearly and expressly conditional on the default by the tenant. It would be asymmetrical and if under the first "part" of paragraph 1 LBHI was taking on unconditional liability <u>itself</u> to perform the tenant's covenants but under the second part to pay damages only arising out of the <u>tenant's</u> default (and so conditional on that default. Indeed, it would make the second "part" of paragraph 1 wholly redundant. It makes far better sense that all parts of paragraph 1 are conditional on the tenant's default.

44. The point goes further still. In paragraph 34 of Rabinowitz 3 he argues that LBHI had a concurrent obligation to perform the lease, "alongside" the obligation of the tenant. However, at paragraph 37, only two short paragraphs later, he says that LBHI could not perform all of the tenant's obligations, such as the covenant to repair. He cannot have it

---

[8] Paragraph 39(3) merely stated, wrongly, that a guarantee "involves only a promise to see to it that someone else will perform his obligations": as Mr Rabinowitz now accepts, that is contrary to the House of Lords' decision in *Moschi*. This argument is either new or at best an expansion of an argument that was only hinted at by Mr Rabinowitz in the past.

both ways. One or other of his arguments in these paragraphs must be bad on their own terms.

45. In fact I disagree with Mr Rabinowitz at paragraph 37 of Rabinowitz 3. There is no reason why LBHI could not perform the tenant's covenants, even those which required it to have physical access to the premises. After all, the tenant was a subsidiary controlled by LBHI. That is why LBHI was able to promise to perform the covenants if the tenant did not, and presumably CW felt able to accept that promise and why LBHI was a suitable guarantor in the first place. Nor do I agree with Mr Rabinowitz's conclusion in the last sentence of his paragraph 37 that because (he says) LBHI could not perform the tenant's covenants, therefore it must have assumed a primary obligation. I do not see how that follows at all. Indeed, if LBHI cannot perform the tenant's obligations itself, then its only obligation is to see to it that the tenant performs them which is a classic "see to it" guarantee obligation. Mr Rabinowitz's argument is self-contradictory. This is supported by the comparison with clause 14.1 of the lease, which does not say "the Landlord or the Landlord's Guarantor" (and which is therefore a "see to it" guarantee with no "do it" element). That is because, unlike LBHI, the Landlord's Guarantor could not perform the Landlord's covenants, such as the covenant of quiet enjoyment. Furthermore, his example of washing down washable surfaces (section 4.7 of the lease), which he says LBHI could not do, is to my mind trivial and in any event something that could in reality have been done by LBHI. It is not remotely comparable to the notion of the Landlord's Guarantor providing a grant of exclusive possession of the land to the tenant, something that the landlord was required to do under the lease but which the Landlord's Guarantor could not do because it had no legal interest in the land.

46. At paragraphs 38-44 of Rabinowitz 3, Mr Rabinowitz addresses the issue of surplusage and how the two supposed limbs of paragraph 1 of schedule 4 are to work together. The parties agree, as I understand Mr Rabinowitz's argument, that "part (i)" of paragraph 1 obliges LBHI to perform the tenant's lease obligations (by seeing to it that the tenant does so or by doing so itself (on LBHI's case, if the tenant does not)) and "part (ii)" obliges LBHI to hold harmless Canary Wharf for all losses, damages, etc. arising directly or indirectly from the tenant's default on those lease obligations. We differ as to whether "part (ii)" is or is not a stand-alone obligation independent from "part (i)". In my view it is not, although it would not make much difference if it were. The point is that the "part (ii)" qualifies the guarantee obligations in "part (i)" in order to capture, for example, damages which would ordinarily be

16

regarded as too remote, such as costs of enforcement or lost management time but does not extend to make LBHI liable for damages which <u>are not caused at all</u> such as damages for lost future rent.

47. Mr Rabinowitz has suggested (paragraph 39) that "part (ii)" could still be an indemnity if "part (i)" is a guarantee. However, that being so, there is no need to have a separate independent indemnity against loss. Mr Rabinowitz says that these separate obligations "might have distinct value depending on the circumstances", but he offers no instance of what circumstances he has in mind or how the supposed indemnity might offer "value" distinct from the promises in "part (i)".

48. To the extent that Mr Rabinowitz is arguing that the tenant had a lease obligation to pay rent following the 10 December 2010 forfeiture (which, under English law, it did not), then any claim under "part (ii)" of paragraph 1 is duplicative because it would already be encompassed by the "part (i)." Mr Rabinowitz does not claim that my citation of *Re Strand Music Hall Co Ltd* (1865) 35 Beav 153 is wrong or that I have the principles of construction wrong at paragraph 9(ii) of my third report. All he says, by reference to the *Tea Trade Properties* case, is that there is often redundancy in leases. That is correct, but the key point is that courts in England strive to make sense of the whole document and all the words if they can, and leases are no exception. In this case "limb (ii)" qualifies and expands the kinds of losses recoverable on enforcement of the guarantee promises in "limb (i)". That avoids any redundancy. Mr Rabinowitz's argument seems to be that one must accept the redundancies which result from his interpretation even though they can be avoided. That is not the law.

49. As to overlap, Mr Rabinowitz is correct, citing from our book at paragraph 1-014 (page 15) that often guarantee and indemnity provisions are found in the same document and sometimes overlap. In fact, if one reads on in the passage he cites, we are offering a commentary on the *Vossloh* case, where they did overlap, and we go on to say that *"The possibility of overlap and duplication did not matter provided that all possibilities were covered. If the issue in the case had been whether the contract had been an indemnity or a guarantee, it appears from this analysis that the judge would have found that it was the latter."*[9] In any event, one must be cautious about drawing any hard and fast principles from the language of particular documents in particular cases. Indeed, if one examines closely the

---

[9] The issue was whether it was a guarantee or a demand bond.

decision of Lewison J referred to by Mr Rabinowitz, namely *Sofaer v Anglo Irish Asset Finance Ltd* [2011] EWHC 1480[10], it provides little support for Mr Rabinowitz's argument. First, there was no argument or discussion of the question of redundancy: Lewison J did not therefore consider it. Secondly, it would probably not have assisted anyway. The guarantee and indemnity in that case was clearly divided up as between the so-called guarantee and the indemnity, and one of the two provisions of the so-called guarantee was, the Judge found, an indemnity anyway. Moreover, the instrument did not contain an anti-avoidance clause. The Judge had little trouble concluding that the instrument was in substance an indemnity. Furthermore, as I said at paragraph 38(7) of my first report, the provisions in the *Sofaer* case were utterly different from the provisions of schedule 4 in this case.

50. Mr Rabinowitz maintains (Rabinowitz 3 paragraph 43) that on my analysis there is also a surplusage problem and that I have not identified any additional territory covered by "limb (ii)". That is not the case. At footnote 8 of my third report I dealt with exactly this issue. I have already explained what "limb (ii)" does which "limb (i)" does not, namely to quantify LBHI's payment obligations which flow from the matters guaranteed by LBHI in "limb (i)".

51. Mr Rabinowitz also says (Rabinowitz 3 paragraph 44) that my explanation of the differences between limbs (i) and (ii) of paragraph 1 is "unpersuasive". He claims, by reference to para 9(v) of my third report, that I say that "part (ii) was included to ensure that Lehman would be required to pay interest on the tenant's unperformed pecuniary obligations." With respect, that is a gross misstatement of my point. I do not mention interest, and it is self-evident that the landlord could have recovered interest on its claims against LBHI. My point was rather broader, namely (as I say at paragraph 9(v) of my third report) that the purpose of "limb (ii)" was to ensure that the tenant and LBHI could not avail themselves of the rules of English law on remoteness of damage and in particular those that might otherwise enable the tenant to escape liability for damages for non-payment of money. The reference to *Sempra Metals* (in footnote 10 in my third report) was self-evidently only to make the point that, at the time that the lease was drafted, the law about whether one could recover damages for late payment of money was not completely settled. Mr Rabinowitz would know that, since he was, as he says, counsel in the case, and he does not and cannot dispute it. The fact that *Sempra Metals* happened to be about a claim for an equivalent to interest does not mean that my point is about interest. So Mr Rabinowitz has, again, set up a "straw man" point only to knock it down.

---

[10] To which we refer in our book at pp 15-15, paragraph 1-014.

*The indemnity by the tenant*

52. At paragraphs 45 and 46 of Rabinowitz 3, Mr Rabinowitz seeks to suggest that the tenant's express indemnity obligation was narrower than LBHI's obligation under "limb (ii)" of paragraph 1 of schedule 4 and therefore there was no co-extensiveness, and that in any event "limb (ii)" creates a primary obligation. He is wrong on both points.

53. As to paragraph 45 of Rabinowitz 3, I disagree that the differences in wording between the tenant's indemnity in cl 4.32 of the lease and the supposed indemnity in "limb (ii)" of paragraph 1 show that the scope of LBHI's promise was wider and that therefore LBHI was an indemnitor as opposed to a guarantor. The differences are negligible. If one was going to be pedantic one could point to the fact that the tenant's indemnity at clause 4.32 covered "actions" and "proceedings", which LBHI's promise at "limb (ii)" of paragraph 1 did not, which on Mr Rabinowitz's view would make the tenant's indemnity broader in terms of subject matter, not narrower. I doubt an English court would be impressed by any of these points of difference. I also do not understand why Mr Rabinowitz concludes that the supposed differences mean that schedule 4 is an indemnity.

54. As to paragraph 46, this is also a *non sequitur*. Clause 4.32 is of course a primary obligation. Its purpose, as I explained at paragraph 9(iv) of my third report, was to expand the scope of the tenant's covenants beyond the specific express covenants and ensures that the tenant is liable for all of the landlord's losses caused by any breach of its covenants, even if otherwise they would be too remote in law to be recoverable for damages for breach of contract. Mr Rabinowitz does not appear to dispute that. That being so, my point is simply that the purpose of "limb (ii)" is the same, namely to expand the scope of the promise. But it does not alter the <u>capacity</u> in which the promise is given by LBHI, namely as guarantor. The fact that the guarantor promises that, as guarantor, he will hold the creditor harmless against loss flowing from the breach by the principal debtor, cannot turn him into an indemnitor, at least provided that he is not undertaking any liability wider than that of the principal debtor. The so-called indemnity provision under "limb (ii)" is no wider in scope than the tenant's own liability for its own default. Indeed, the tenant's indemnity under clause 4.32 ensures that the scope of its liability is the same as that of LBHI under "limb (ii)". The fact that the tenant undertakes that obligation as principal obligor (as a tenant's covenant) does not mean that LBHI undertakes a like obligation under "limb (ii)" in a like capacity. This is a key

19

flaw in Mr Rabinowitz's reasoning.  "Limb (ii)" of paragraph 1 is in this case just like the second part of the guarantee in *Western Credit v Alberry* cited above: it is "descriptive".

**Damages recoverable from a tenant upon forfeiture of a lease**

55. Mr Rabinowitz starts (paragraph 48) by saying that the question of whether the tenant is liable for post-forfeiture future rent is academic because the landlord can recover its losses from LBHI under the indemnity regardless of whether it could have recovered them from the tenant.  If anything is academic, it is the issue of whether paragraph 1 is an indemnity or a guarantee, since even if it is an indemnity the landlord must still show that it has suffered losses arising directly or indirectly from default by the tenant.  Even if the supposed indemnity were to bite regardless of whether the tenant was liable for his default, it would still not assist the landlord.  As an irreducible minimum, the landlord must be able to show he has suffered loss caused in some way by the tenant's breach of its obligations.

56. The short answer to the landlord is that the losses it claims do not arise from the tenant's default, since the tenant was under no present obligation to pay future rent.  Indeed, Lord Millett's dictum in *Re Park Air Services* that *"the tenant's liability to pay future rent is not debitum in praesenti solvendum in futuro"* is a complete answer to the landlord's claim for damages for the lost future rental income.

57. At paragraph 50 of Rabinowitz 3 Mr Rabinowitz asserts that "the fact that the obligation to pay rent is terminated upon forfeiture does not preclude the bringing of a claim in damages for the lost value of the future rent under English law.  Mr Rabinowitz assumes his conclusion, and in doing so he makes a fundamental error.  There is no such thing as "lost value of future rent" in English law.  That is exactly what Lord Millett was saying.  The significance of forfeiture is that it was the terminating event, but the point would be the same had the landlord purported to terminate the lease by accepting the tenant's repudiatory breach without forfeiting, if that were possible in law (as to which see below).  There is no *non sequitur*.

58. Mr Rabinowitz says at paragraph 51 (by reference to paragraph 89(2) of his second report) that where a contract is terminated for repudiatory breach, the contractual obligations that have yet to be performed are converted by operation of law into an obligation to pay damages, including the present value of any future instalments, as in *Moschi* itself.  Mr

20

Rabinowitz is right about the holding in *Moschi*. However, *Moschi* was a case where the future instalments payable by the principal debtor were in respect of past services already rendered by the creditor and in respect of which there was an existing indebtedness which the principal contract and the guarantee were to cover.[11] That was without question a case of *debitum in praesenti solvendum in futuro*. The creditor had already provided the services and was already owed the outstanding debt, and the agreement the subject of the guarantee simply postponed the dates for payment. That is why on termination for repudiatory breach in *Moschi*, the damages were the lost value of the unpaid future instalments due in respect of past services. Nor is *Moschi* a case about leases or rent.

59.  With a lease, by contrast, the landlord has not provided past services or benefits for which future rent is ever due. Rent is due in consideration of the landlord's continuing grant of exclusive possession for the period for which it is payable. Mr Rabinowitz's mistake is to assume that a lease is like any ordinary contract where one buys goods or services but agrees to pay for them in future instalments. Rent is special: it is a periodical sum, paid in return for the occupation of the land and which issues out of the land: see paragraphs 77 of my first report, and *Escalus Properties Ltd v Robinson* [1996] QB 231, at 233 (Nourse LJ); and see also paragraph 77 of my first report and *United Scientific Holdings v Burnley BC* [1978] AC 904, at 935 (per Lord Diplock). Accordingly, paragraph 52 of Rabinowitz 3 is wrong.

60.  Mr Rabinowitz argues that leases are not exceptional and can be repudiated like any other contract. Even assuming that this is settled law in England (which it is not: see paragraph 67), it is irrelevant. The point in issue is not whether and how a lease can be terminated for breach (as to which see below) but what monetary remedy the landlord has upon termination. The reason why future rent is irrecoverable as damages is not because leases are incapable of being terminated for repudiatory breach, but because a landlord has no right of any kind, whether accrued or contingent, to future rent. There is no post-forfeiture (or if one will, post-termination) rent payable at all, even contingently, which forms part of the lost bargain. Since rent issues out of the land and is periodic consideration in return for current occupation (or possession) of the land, it is necessarily of the former type. That is why Lord Millett said that rent is not *debitum in praesenti solvendum in futuro*. It has nothing to do with whether leases can be terminated for repudiatory breach but rather with the nature of the lease as a contract and rent as consideration.

---

[11] As Mr Rabinowitz expressly recognises at paragraph 89(2) of his second report. See *Moschi* at p 343A-C (Lord Reid) and p 349D-E (Lord Diplock).

61. Turning to *Rainey Bros v Kearney*, the sole case relied on by Mr Rabinowitz, I have already explained why in my view it does not represent English law and should not or would not be followed: see paragraphs 74 to 87 of my first opinion. I add the following:

(i)     It is notable that in *Rainey* Hutton LCJ pointed out (at page 19F-H) that counsel for the tenant had been unable to cite any authority to support his proposition that damages were not recoverable as compensation for lost future rent.   That is regrettable because it means that the court did not have the opportunity to consider all the relevant authorities.   One such authority was *Walls v Atcheson* (1826) 11 Moore CP, which stands as authority for the proposition that, subject to an exception (irrelevant here), a landlord cannot recover damages from the tenant for loss of rent after he has re-entered so as to bring a lease to an end, and there is no English case which decides otherwise.[12]   Other authorities not considered in Rainey v Kearney are the cases referred to by Lord Millett in *Re Park Air Services* to the effect that the landlord cannot have both rent and possession and cannot recover damages for the consequences of his own action in forfeiting the lease (see page 185A-D).  Accordingly, *Rainey v Kearney* is *per incuriam* and unreliable.

(ii)    It is also *per incuriam* the cases I referred to at paragraph 76 of my first opinion, which Mr Rabinowitz has not addressed.

(iii)   There was no discussion in *Rainey v Kearney* of the nature of rent or the fact that it is not a debt *debitum in praesenti solvendum in futuro*.  Mr Rabinowitz has made no attempt to justify the decision in *Rainey v Kearney* by reference to this question, or to try to reconcile Lord Millett's judgment in *Re Park Air Services* with *Rainey v Kearney*.

(iv)    *Rainey v Kearney* is not cited in any of the standard Landlord and Tenant practitioner works and the only reference I could find on the main legal networks was in a short article in 2006 (Landlord & Tenant Review L. & T. Review (2006) Vol.10 No.1 Pages 12-14).  The case has lain obscure for decades, such that even the eminent leading

---

[12] See *Reichman v Beveridge*, paragraph 26, Lloyd LJ. He did point out that the case (decided in 1826) was not argued on the basis of acceptance and repudiation and damages.  However, that is not surprising since the doctrine of repudiation is of more recent origin, culminating with the decision of the Court of Appeal in *Hong Kong Fir v Shipping Inc v Kawasaki Kisen Kaisha* [1962] 2 QB 26.  See Diplock LJ's survey of the historical development of the doctrine through the nineteenth century at pp 66-71.

counsel in *Re Park Air Services* failed to find it or the cases it relies on. Indeed, even Lord Neuberger, when arguing the Blundell debates referred to by the Court of Appeal in *Reichman v Beveridge*, did not refer to *Rainey v Kearney*. Lord Neuberger is one of the foremost landlord and tenant lawyers of his generation.

(v)     Mr Rabinowitz's attempt to support *Rainey* by reference to the three first instance cases on which the court relied is consigned to a footnote and is not persuasive. Critically, in none of these cases was *Walls v Atcheson* cited. Furthermore:

> (a)     as to *Marshall v Mackintosh* (1898) 78 LT 750, there is a substantive difference between a lease and an agreement for a lease, in that the former grants an interest in land and the latter does not. The non-performance of a building contract, which performance itself was to be the precursor to the contemplated lease, is completely different from the non-performance of a tenant's covenant in a lease and the non-payment of rent, which issues out of the land. The defendant in that case cannot have been in possession under the lease because the lease had not been granted. As I said at paragraph 83(i) of my first opinion, the Court of Appeal in *Rainey v Kearney* brushed aside the differences between a building agreement and a lease without analysis or authority to support them.

> (b)     As to *Gray v Owen* 1910] 1 KB 622, that was a case of termination by surrender rather than repudiatory breach of a lease, and so there was no discussion about repudiation. In any event the court did not award damages for the whole of the rest of the term. It is correct that the court awarded damages for a period after the end of the term of the lease, but there was no discussion as to the basis on which that was permissible and no authority was cited in support of it.

> (c)     As to *Williams v Lewis* [1915] 3 KB 493, as I said in my first opinion, this was not a case of forfeiture for breach of covenant but a case where the damage to the landlord's reversionary interest caused by the tenant's failure to leave the premises as he had found them was measured by reference to impaired marketability. That is a very different kind of case.

62. Rather than explaining or offering solid support for *Rainey*, Mr Rabinowitz attacks my reliance on *Reichman v Beveridge* (at Rabinowitz 3 paragraphs 58 to 68). His attack is misplaced.

63. Woodfall on Landlord and Tenant Law, one of the most authoritative practitioner textbooks on the subject, says in its updated form as at October 2012 (citing *Reichman v Beveridge*) (at paragraph 17-315) that

> "if a landlord accepts a repudiation by the tenant (assuming that a lease is capable of repudiation) he is not entitled to sue for damages representing the loss of future rent. But the landlord need not accept a repudiatory breach by the tenant and if he does not he is entitled to sue for rent quarter by quarter."

As I said in my first opinion (paragraph 74), this paragraph of Woodfall was amended after *Reichman v Beveridge* to reflect the Court of Appeal's decision in that case, without commentary or criticism from the editors.[13]

64. It is correct that in *Reichman v Beveridge* the court was not faced with a claim for damages for future rent following a forfeiture, but I do not think it matters. The question was whether the landlord, who was claiming arrears of rent due, was required to mitigate his loss by forfeiting and re-letting: the tenant was complaining that the landlord had not forfeited but was acting unreasonably by keeping the loss on foot. The tenant's claim was that he should not have to pay the arrears because the landlord could have forfeited the lease and claimed the net lost rent by way of damages, and should have done so and acted unreasonably in not doing so (see Lloyd LJ at paragraphs 1, 2, 12, 18). The landlord's response was that it could not do so, or alternatively the law was too uncertain for it to be reasonable for it to do so.

65. The Court of Appeal agreed. It was therefore central to the issues in the case that the Court should decide whether as a matter of law future rent could be recovered as damages for breach of contract post-forfeiture, since that was the landlord's primary case. Lloyd LJ held that rent could not be so recovered: see paragraphs 26 and 27, where he said that, although there were Commonwealth authorities to that effect[14], English law had not yet reached that

---

[13] The present editors of this standard work include Lord Justice Lewison and Mr Justice Morgan, who practised landlord and tenant law at the highest level for many years before their appointments to the Bench.
[14] These were referred to by Lloyd LJ at paras 20 and 21. He declined to adopt them.

stage.  At paragraph 28, Lloyd LJ said in terms[15] it was "still the law of England that damages for the loss of future rent cannot be recovered after the landlord has taken back possession of the premises following a tenant's default" and therefore damages cannot be an adequate remedy for the landlord so as to preclude him from holding the tenant to the lease.  So he decided it.  He then went on to say that "even if it is not clear that this is the position under English law", then the uncertainty of the position at law would relevant to the reasonableness of the landlord's conduct.

66. Accordingly, Mr Rabinowitz is wrong to say (at Rabinowitz paragraph 61) that the uncertainty of the position was enough to decide the case in the landlord's favour.  As can be seen from paragraphs 28 and 42, the uncertainty was the <u>alternative</u> basis for Lloyd LJ's decision; the <u>primary</u> basis was that it was not the law that the landlord could recover.  It was the ratio of the decision.  That is why the editors of <u>Woodfall</u> cite it as the law and paragraph 61 of Rabinowitz 3 is wrong.

67. Mr Rabinowitz is nearer the mark on the question of whether leases can be terminated by repudiation.  It is correct that the Court of Appeal declined to decide <u>that</u> issue: see Lloyd LJ at paragraph 42.  There are two questions: the first is whether a lease can be brought to an end by repudiation <u>at all</u>.  The second is, even if it can, is the landlord entitled to sue for future rent as damages.  *Reichman v Beveridge* does not decide the first question and left it open, but then answered the second question in the negative (see Lloyd LJ at paragraph 28 and 42).  As I say, the decision to that effect in *Reichman v Beveridge* is entirely consistent with the dictum of Lord Millett in *Re Park Air Services* that rent is not *debitum in praesenti solvendum in futuro*.  This demonstrates that the question of recoverability is not dependent on whether or not leases can be terminated for repudiatory breach (although if they cannot then the question of damages for lost future rent cannot arise) but on the nature of the promise to pay rent itself.  What Mr Rabinowitz has done (especially at paragraph 58 of Rabinowitz 3) is to reason across from the fact that the Court of Appeal left the "repudiation question" open that they also left the "recoverability of future rent issue" open.  That is faulty reasoning and a misreading of the case.

68. I should note in passing that Mr Rabinowitz has not taken any account of the fact that, as is clear from *Reichman v Beveridge*, the repudiation question <u>does</u> remain an open one in

---

[15] He said "as seems to me to be the case."

England, at least at Court of Appeal level and higher[16]. His approach is to say that leases are just like any other contract (after the House of Lords' decision in *National Carriers v Panalpina* [1981] AC 675[17]) and the point was decided in *Rainey v Kearney*: see Rabinowitz 3 paragraphs 54, 55, 57. The fact remains that the issue has <u>not</u> been finally settled, and in my opinion Mr Rabinowitz is not justified in proceeding as if it had. In addition to the fact that the point has been left expressly open in the Court of Appeal in *Reichman v Beveridge*, the textbooks also continue to identify serious ramifications if the common law of repudiation of contracts is applied wholesale to leases.

(i)     The normal response of a landlord to a breach by the tenant is his rights of forfeiture against which the tenant has statutory right to relief under s 146 of the Law of Property Act 1925. If a landlord were to terminate the lease by accepting a repudiatory breach he could deprive the tenant of his statutory rights of relief from forfeiture. It is not a good answer that the tenant has, by repudiating, deprived himself of the statutory protection and this would be seen as a new departure (see <u>Hill & Redman, Law of Landlord and Tenant</u>, Ch 14, paragraph 5107). The editors' suggested solution to that is that where the lease contains a provision for forfeiture, then the landlord has elected to give up his common law right to terminate for repudiatory breach, which would otherwise prevent the tenant from seeking relief (*ibid*)[18]. This problem is also highlighted by <u>Megarry and Wade</u> at paragraph 18-108.

(ii)    It remains doubtful, or at least undecided, whether non-payment of rent could ever be a serious enough breach so as to entitle the landlord to treat the lease as repudiated. The instances in the reported cases where leases have been terminated in that way are very few and do not include a case of non-payment of rent, still less a case based on an assertion by the tenant that he will not pay any rent in the future (because he is insolvent): see <u>Hill and Redman</u> paragraph 5109. As <u>Megarry and Wade</u> say at paragraph 18-106, to constitute a terminating breach, the breach must be one which vitiates the central purpose of the letting, such as in *Hussain v Mehlman* [1992] EGLR 87, which was the first case to decide that a lease could be terminated by repudiatory breach. In that case, which was decided by a deputy High

---

[16] See *Reichman v Beveridge*, per Lloyd LJ at [10], [42], where he said *"I do not decide whether or not repudiation plays any, and if so what, part in the English law of landlord and tenant."*

[17] A case not about damages for non-payment of future rent, or indeed about repudiatory breach, but about frustration.

[18] This would doom the landlord's case here because the lease contains a right of forfeiture at clause 8.1.

Court Judge (ie the lowest tier of the senior English judiciary), the landlord was in repudiatory breach for very serious breaches of the repairing covenants. No issue of forfeiture arose because it was the landlord in breach, not the tenant. It was not a case of tenant breach at all.

(iii)    As <u>Megarry and Wade</u> say at paragraph 18-107, the application of the principles of repudiatory breach to leases *"has yet to be fully worked out in [England]"*. Of the six cases they list in which the doctrine has been applied to leases, only two were cases where the tenant had breached the terms of the lease, one of which is *Gray v Owen* itself, where the breach was wrongfully exercising a break clause (and which the editors anyway treat as a case of surrender[19]). *Gray v Owen* pre-dated the statutory relief under s 146 of the Law of Property Act 1925, and so the issue of the interplay between termination for repudiation (if that was what the case was about at all) and relief from forfeiture did not arise.[20] *Rainey v Kearney* is not mentioned anywhere in <u>Megarry and Wade</u>. The only other instance in the modern case law where a tenant has been held to have repudiated the lease listed in <u>Megarry and Wade</u> are two cases in which the tenant has denied the landlord's title, and where the court held that the tenant who had repudiated the lease was entitled to relief from forfeiture under s 146 of the Law of Property Act 1925 (see *W G Clarke (Properties) Ltd v Dupre Properties Ltd* [1992] Ch 297 and *Abidogun v Frolan Health Care Ltd* [2001] EWCA Civ 1821). In the latter case, Buxton LJ said:

> "I can well accept the first point in [counsel's] argument that relations between a landlord and his tenant, under a lease, are governed by the ordinary law of contract as well as by the more specific doctrines of the law of landlord and tenant. It does not, however, follow from the interaction of those two parts of the law that the protection for a tenant, as has been provided by Parliament in section 146, can be avoided by recourse to a purely contractual doctrine such as that of repudiatory breach."

In other words, even if a lease can be repudiated for tenant default (which is, as I say, an open question in the higher courts in England), the landlord's remedy lies in forfeiture (with the statutory protection given to the tenant) as opposed to termination of the lease by the landlord simply accepting the repudiation. See also <u>Hill and Redman</u> paragraphs 5107, 5109, cited above.

---

[19] See <u>Megarry and Wade</u>, paragraph 18-088.

[20] In any event, *Gray v Owen* is distinguishable for the reasons set out at paragraph 83(ii) of my first report, and above, namely that it was not a case in which the landlord was awarded damages for lost future rent for the period of the remainder of the lease.

69. To summarise, my point here is that Mr Rabinowitz has oversimplified matters when he says that the doctrine of repudiation applies to leases, and has glossed over the fact that the issue remains controversial. The issue is at very best still controversial, as the 2000 Blundell debate between Lords Millett and Neuberger attest. The debate was about whether leases can be repudiated, to which Mr Rabinowitz has referred, were before the Court of Appeal in *Reichman v Beveridge* (see Lloyd LJ paragraph 27), who considered that there was much to be said each way.[21] The true position is that its application in cases of tenant breach raises serious difficulties which have yet to be worked out, and there is no case in which non-payment of rent has ever justified termination for repudiatory breach (other than *Rainey*). The landlord's uncontroversial remedy is forfeiture, or to keep the lease alive and claim the rent as it falls due.

70. As to Rabinowitz 3 paragraphs 64 and 65, I accept that the fact that Lord Hutton was later elevated to the House of Lords would give *Rainey* some forensic respectability before an English court (particularly a lower court), but the real question here is how persuasive the decision is as a matter of jurisprudence, not personalities. As to the debates, these are not judicial decisions or extra-judicial writings, but positions advocated each way by powerful voices in a staged setting where each was given a position to adopt. There is no ground on which Mr Rabinowitz can say that the positions taken by Lord Millett and Lord Neuberger represents their genuinely held views. Even if they do, Mr Rabinowitz would need to analyse why Lord Neuberger's position is to be preferred to that adopted by Lord Millett, and that includes addressing the powerful arguments raised by Lord Millett. I attach the debates so that the court can see the points Lord Millett was making. Instead, Mr Rabinowitz has uncritically adopted Lord Neuberger's debate position. However, as I have already pointed out, even Lord Neuberger did not mention *Rainey v Kearney*. If that decision really does represent the state of English law on the subject, as Mr Rabinowitz maintains, Lord Neuberger would have relied on it and there would have been little to debate.

71. As to paragraph 66 of Rabinowitz 3, it is also clear from Lloyd LJ's judgment in *Reichman v Beveridge* that the Court of Appeal had before it some cases from Canada and Australia which supported the recoverability of damages for lost future rent, but the Court of Appeal did not adopt them, as it could have done. In those circumstances it is inconceivable that

---

[21] This is a further reason why Mr Rabinowitz's views are wrong on this point.

the Court of Appeal in *Reichman v Beveridge* would have taken any different approach had it seen the three old English cases on which *Rainey* was based. That is not least because they were decided at a time before the doctrine of repudiation of contracts was fully developed in the English common law and before s 146 of the 1925 Law of Property Act had been enacted. None of those three English cases is decisive (or even persuasive) on the issue and as first instance decisions they would not have been binding on the Court of Appeal in *Reichman v Beveridge*.

72. As to paragraph 67 of Rabinowitz 3, *Rainey* does not represent English law. In my view it is at best controversial on the issue of whether a lease can be terminated for repudiation, and wrong on the issue as to whether damages for lost future rent can be recovered. On that latter point, *Reichman v Beveridge* is the law in England. On the former point, the law is not settled and *Rainey* would not settle it.

73. As to paragraph 68, I disagree with Mr Rabinowitz' view that the only occasion since 1990 on which *Rainey v Kearney* was a relevant citation was in *Reichman v Beveridge* itself. First, that is simply incorrect: it could have been cited in *Re Park Air Services*, or in *Abidogun*, or in *Reichman v Beveridge*, being the major appellate cases where *Rainey v Kearney* would have been relevant. But more pertinently, if *Rainey v Kearney* represented the law in England as it has always been understood to be, it would appear in the textbooks and would be cited in courts up and down the country every day. After all, it is not an unusual occurrence for a tenant to stop paying rent, or to become insolvent and thereby become unable to pay rent. If Mr Rabinowitz were right, then damages claims such as the present would be common currency in any falling property market (and there have been several property market downturns in the UK since 1990). Lord Neuberger would have known that and used it in the Blundell debate. Lloyd LJ, himself an eminent property lawyer, would have known that and referred to it in *Reichman v Beveridge*.

74. Mr Rabinowitz's attempt to explain away *Re Park Air Services* (Rabinowitz 3 paragraph 69) is similarly unpersuasive. He says that it "was not dealing with damages recoverable in the event of a repudiatory breach by the tenant." He assumes his own conclusion that such damages are recoverable. The point about *Re Park Air Services*, over and above the *debitum in praesenti* point I have referred to above, is that if a landlord could recover damages representing lost rent whenever a tenant fails to pay rent by reason of its insolvency, it would be completely unnecessary to have a statutory scheme which gave that

29

compensation to the landlord in the event (and only in the event) of a disclaimer by the liquidator, since he could recover it (or prove for it) anyway: see paragraph 84 of my first report, which Mr Rabinowitz has not addressed.

75. Furthermore, Mr Rabinowitz's reliance at paragraphs 72 and 73 of Rabinowitz 3 on the decision in *Financings Ltd v Baldock* [1963] 2 QB 104 is a point against him. He says that the repudiatory breach in question here is not the insolvency of the tenant but the failure to pay rent. But that is always the case with insolvency: the tenant stops paying and is in breach of the lease. The non-payment of rent was a mere by-product of the insolvency. So on *Financings v Baldock*, cited by Mr Rabinowitz at paragraph 72, by becoming insolvent the tenant in this case has not "done something which the law regards as a wrongful repudiation of the contract."

76. Furthermore, it would be anomalous if the law regarded the non-payment of rent as a wrongful repudiation where the non-payment was caused by the insolvency and nothing else (as here). It would introduce confusion and complexity if, in addition to its right to forfeit the lease, the landlord had a separate right at common law to terminate it for repudiatory breach by reason of non-payment of rent due to insolvency. It would mean that the landlord, by resorting to repudiation rather than forfeiture, could deprive the tenant of its section 146 rights to relief. I consider that the arguments at paragraph in Hill and Redman (paragraphs 5107, 5109, cited above) on this point are authoritative, and Mr Rabinowitz has made no attempt to counter them. In my view, there is no such separate right of termination of a lease known to the law.

77. In addition, the parties to this lease expressly agreed that on the tenant's insolvency the landlord would have the right to forfeit the lease (clause 8.1(c)), so the question of whether any breach of covenant committed by the tenant by reason of its insolvency was a repudiatory breach of the lease would never need to arise since the insolvency was itself a terminating event. The law does not need to accord the landlord an additional and separate right to terminate for repudiatory breach and certainly does not or would not do so merely as a platform for giving him a right to damages for "lost future rent" (a concept anyway not known to English law, at least outside the operation of s. 178 of the Insolvency Act 1986).

78. Mr Rabinowitz's argument that there is a separate right to terminate a lease for repudiatory breach leads to a further problem for his case. It is well established that in order to

terminate a contract for repudiatory breach, the party not in breach must accept that repudiation clearly and unequivocally: see <u>Chitty on Contracts</u> (31st Edn) Vol 1, paragraph 24-013.  It is also well established that *"an unaccepted repudiation is a thing writ in water"*: *Howard v Pickford Tool Co* [1951] 1 KB 417, at 421.  The landlord in this case did not purport to accept the tenant's repudiatory breach of the lease, either unequivocally or at all.  Instead, it relied on its right of forfeiture.  Even if Mr Rabinowitz is right that a lease can be terminated by a landlord not only by the exercise of his right of forfeiture but also by his separate right to accept a repudiatory breach by his tenant (a matter which, as I say, remains highly controversial: see the passage from *Abidogun* I have quoted above) then it is clear in this case that the landlord elected <u>not</u> to accept the repudiatory breach but to treat the lease on foot and to forfeit it instead, with the consent of the tenant's administrators .  The 3 December 2010 letter from the landlord to the administrators of the tenant is consistent only with the lease remaining on foot at that point.  There is no decision in English law which says that a forfeiture amounts *per se* to an acceptance of a repudiatory breach (and *Abidogun* and <u>Megarry and Wade</u> strongly suggest that the contrary is the case).  Accordingly, in this case the lease terminated not by accepted repudiation, but by forfeiture.  The consequence is that there was no repudiatory breach from which any damages could flow even if they were otherwise ever recoverable in law (which they are not).

79. Finally, Mr Rabinowitz (at Rabinowitz 3 paragraph 74) says that in *Re Park Air Services* the House of Lords was "merely observing that a landlord who exercises an express option to terminate in the event of insolvency did not (absent a repudiatory breach) accrue any right to compensation for the lost right to future rent".  Mr Rabinowitz places two glosses on what the House of Lords was saying in *Re Park Air Services*.  First, the House made no mention of repudiatory breach of a lease.  Had it done so it would have been well aware of the controversy in that area.  Second, there was no assumption or acceptance that there were <u>any</u> circumstances under which a landlord <u>could</u> accrue any right to compensation for lost right to future rent.  As I have said, the House said the exact opposite.

80. Even if Mr Rabinowitz's supposed distinction were valid, it still misses the point.  *Re Park Air Services* serves to confirm that landlords are not entitled to sue for lost future rent but for the intervention of Parliament, by way of section 178(6) of the Insolvency Act 1986.  This statute was created to allow a landlord to sue for future rent when a liquidator of a tenant disclaims a lease (which is not the situation here here).  Parliament has made no similar

exception for when the tenant commits a "repudiatory breach" because of non-payment of rent after insolvency, or even in the case of forfeiture. The point remains, as Lord Millett said, that *"[r]ent payable in the future under a subsisting lease cannot be treated as a series of future debts making up a pure income stream."* That is exactly how Mr Rabinowitz is treating rent in attempting to collect "damages" or "losses" measured by future rent. That is impermissible as a matter of English law.

81. Mr Rabinowitz's assertion at Rabinowitz 3 paragraph 75 that it would be anomalous if a landlord could not recover damages for repudiatory breach of a lease is also misplaced. First, it falls foul of the assumption that future rent is *debitum in praesenti solvendum in futuro*, which it is not. There is no injustice in the landlord not being compensated for losing something he was not entitled to. Secondly, the distinction which Mr Rabinowitz seeks to draw between the rights of the landlord upon forfeiture and the rights of the tenant upon unlawful eviction has never been considered by any court, to my knowledge. In any event, it is not arbitrary. They both stand in different and opposite positions. Critically, if the landlord forfeits, he puts at an end the tenant's interest in the land and thereby the legal basis for any future rent to accrue in the future. As Lord Millett said in *Re Park Air Services* (above, and see p 187-F), rent payable in future under a subsisting lease does not make up *"a series of future debts making up a pure income stream."* Accordingly, landlords are exposed to a degree of risk if the tenant breaches its covenants in a declining market. However, the way that landlords usually mitigate that risk is by negotiating for the kinds of provision such as paragraph 7 of schedule 4, by which the landlord has an option to put a new lease onto the guarantor on the same terms as the original lease.

82. Finally, my reference to the *Active Estates* case at paragraph 79 of my first report was apposite. Neuberger J was not just citing the effect of the provision in the lease in that case, but stating a well-known proposition: that forfeiture extinguishes the landlord's right to rent thereafter (see *Re Park Air Services* at page 185B-CContrary to the CW further memorandum at page 25, footnote 22, whether LBHI is a guarantor or an indemnitor is an irrelevance since, on either view, what the landlord must show is that its loss of future rent is caused by the tenant's default. The issue is whether the tenant was ever liable for post-forfeiture rent. The point about the dictum of Neuberger J in *Active Estates* is that it is clear authority for the proposition that he is not. That is why I cited it.

83. Moreover, I disagree with Mr Rabinowitz (Rabinowitz 3 paragraph 76) that it makes a difference that the guarantee in that case was a "do it" guarantee, since so in part is paragraph 1 of schedule 4. I also disagree with him that all that Neuberger J was doing in *Active Estates* was recording the effect of the provisions of the lease. He was recording the general position at law. Indeed, the particular provision in question did not say that there should be no rent payable after forfeiture (and it would be very surprising if it had, since that would be unnecessary).

**Further miscellaneous points**

84. There are three short further points which arise from the CW further memorandum. The first is to clear away CW's misconception that somehow the parties' subjective intent, or one party's subjective knowledge of the other party's subjective intention, is at all relevant as part of the process of construction of contracts, as seems to be suggested in the CW further memorandum at page 19. I agree with what Mr Rabinowitz said in his deposition testimony, namely that what occurred "at the time of negotiations and what occurred to [the parties] at the time of the negotiations is, as a matter of English interpretation of contracts, completely irrelevant." (Rabinowitz Dep. 71:2–14; Rabinowitz Decl. paragraph 24(3)). This is a correct statement of English law: see for example *Oxonica Energy Ltd. v. Neuftec Ltd.* [2008] EWHC 2127, at [9] (in which the court said that that relevant background knowledge for the purposes of contract interpretation "does not include any knowledge of the parties' subjective intentions," and certainly does not include "what a party thought an agreement meant when he signed it" and "what he was negotiating to get").

85. Secondly, it appears from pages 19-20 of the CW further memorandum that CW is contending that if parties are sophisticated and negotiate a commercial document with the assistance of experienced lawyers, then somehow the doctrine of contra *proferentem* does not apply. I disagree. Such an extreme proposition is not supported by the case law. Although in the *Gamecock Media* case cited by CW and Mr Rabinowitz, it is correct that Gloster J said that the principle had uncertain application and little utility in the context of commercially negotiated agreements, it is certainly not the law that where agreements are commercially negotiated it does not apply at all. Nor is it the law that there is some sort of sliding scale of sophistication whereby the more sophisticated the parties the less the maxim can operate. There are many cases where the maxim was held to apply between professionally advised and sophisticated commercial parties: see e.g. *BHP Petroleum v*

33

*British Steel plc* [2000] 2 Ll Rep 277, at 281, per Evans LJ at paragraph 18[22]; *Whitecap Leisure Ltd v John H Rundle Ltd* [2008] 2 Ll Rep 216, at [22], [29], per Moore-Bick LJ.

86. Thirdly, in CW's' further memorandum (page 29) CW suggest that the rule in <u>Holme v Brunskill</u> does not apply, by reference to page 407 of our book, where we say that *"a variation which merely affects the amount of the surety's ultimate liability, but leaves the risk of default by the principal unchanged … will not be material."* The question is always whether the variation prejudices the surety. Although in the case the default in payment of rent had already occurred prior to the forfeiture letter, the effect of the forfeiture letter was retrospectively to relieve the tenant from its continuing obligation to pay <u>past</u> accrued rent as an expense of the administration and instead assume a liability to pay it as an ordinary unsecured non-preferential debt. That did alter the risk of default by the tenant because it created a situation in which it stopped paying in full, at the expense of LBHI. The tenant had a continuing liability to pay past accrued rent, but was liable to do so as an expense of the administration. The change to the basis on which the tenant was to discharge that ongoing obligation altered the risk of default, or was a further default, because its continuing obligation was no longer to pay 100 cents in the dollar.

RICHARD MILLETT Q.C.

Essex Court Chambers,

24 Lincoln's Inn Fields,

London WC2A 3EG

<u>31 July 2014</u>

---

[22] In which he noted that it was common ground that the maxim operated. The parties were plainly huge sophisticated commercial organisations.