# EXHIBIT 87

```
                                                                Page 1
 1             CONFIDENTIAL - L. Rabinowitz

 2   UNITED STATES BANKRUPTCY COURT

 3   SOUTHERN DISTRICT OF NEW YORK

 4   -------------------------------x

 5   In Re:                              Chapter 11 Case No.
                                         08-13555(JMP)
 6   LEHMAN BROTHERS HOLDINGS INC., (Jointly Administered)
     et al.,
 7
                  Debtors.
 8   -------------------------------x

 9

10

11           * * * CONFIDENTIAL * * *

12    VIDEOTAPED DEPOSITION OF LAURENCE RABINOWITZ

13               New York, New York

14               September 4, 2013

15

16

17

18

19

20

21

22

23   Reported by:

24   KATHY S. KLEPFER, RMR, RPR, CRR, CLR

25   JOB NO. 65270
```

Page 114

```
 1         CONFIDENTIAL - L. Rabinowitz
 2   of 1.4 million, constitutes a material variation
 3   within the meaning of Holme v. Brunskill.  I
 4   understand that to be the position.
 5      Q.   Why don't you turn to the forfeiture
 6   letter.  Do you have that?
 7      A.   I have it.
 8      Q.   And I'm particularly interested in
 9   your understanding as -- of what it is that
10   Canary Wharf was giving up and what it retained
11   in terms of claims against LBL.  What is your
12   understanding?
13      A.   It was giving up no claim against LBL
14   under the contract at all.  That's clear from
15   the proviso to paragraph 4.  What it appears to
16   have been giving up is the possibility of a
17   claim for an administrative expense beyond 1.5
18   million.
19      Q.   Okay.
20      A.   I don't know whether there was a claim
21   which went beyond 1.5 million.
22      Q.   All right.  And looking at the proviso
23   that's on the carryover paragraph that's on page
24   5.  It says, "provided that LBL agrees that we
25   and/or CWML" -- I guess that's Canary Wharf in
```

Page 115

```
 1         CONFIDENTIAL - L. Rabinowitz
 2   both cases -- "may claim against LBL as an
 3   unsecured creditor for any unpaid rent and
 4   estate charge and any other sums falling due
 5   under the lease up to the date of forfeiture,"
 6   which you understood to be December 10, 2010,
 7   correct?
 8      A.   Yes, correct.
 9      Q.   Is there any reference to any amounts
10   that might otherwise have fallen due following
11   forfeiture?
12      A.   None of the proviso deals with claims
13   for unpaid rent and estate charges falling due
14   under the lease up to the date of forfeiture.
15      Q.   Do you know why the draftsman of this
16   document did not expressly preserve a claim
17   against LBL for rents or other amounts that
18   would have fallen due after the date of
19   forfeiture?
20      A.   I don't know why the draftsman drafted
21   this in the way that he or she did.
22      Q.   Looking again at Schedule 4 to the
23   lease, which is Exhibit 3, is it fair to
24   characterize the language in 6(g) as a catchall?
25      A.   You could describe it as a catchall.
```

Page 116

```
 1         CONFIDENTIAL - L. Rabinowitz
 2   It's plainly intended to ensure that whatever
 3   might otherwise release the surety should not do
 4   so, say where you have a release under seal.
 5      Q.   I can show you the language of Mr.
 6   Millett's opinion if you want, but -- well, why
 7   don't we do that.
 8          (Exhibit 106, Initial Declaration of
 9       Richard Millet, Q.C., marked for
10       identification, as of this date.)
11   BY MR. ISAKOFF:
12      Q.   We've marked as Exhibit 106 Mr.
13   Millett's first opinion in this case, and I'd
14   ask if you would turn to paragraph 62 on page
15   28, which is where he discusses paragraph 6(g),
16   and he says, "As to paragraph 6(g), this is a
17   very widely drawn catchall," which I think you
18   agree with; is that correct?
19      A.   It's not an unreasonable way of
20   describing it.
21      Q.   It say, "English courts have been very
22   loath to allow creditors to use them to fix
23   guarantors with liability that they otherwise
24   would not have had," and he cites the West
25   Horndon case.  Do you agree with him?
```

Page 117

```
 1         CONFIDENTIAL - L. Rabinowitz
 2      A.   I think he's stating the proposition
 3   very widely.  The West Horndon case is an
 4   example of a case in which the court looked at a
 5   provision which was an anti-discharge provision
 6   which was widely drawn, and concluded that it
 7   had to be interpreted in a way which was limited
 8   in the context of that case, but that was very
 9   much as a result of the other provisions in that
10   case.
11          I don't -- I'm not sure I would infer
12   from that in the way that he does that there's
13   some general proposition that you shouldn't give
14   the words the meaning that they have.  In my
15   view, the English court would give the words the
16   meaning that they have.
17      Q.   I know we -- I asked you, maybe
18   without reference -- well, I know I asked you
19   without reference to the proviso of the
20   forfeiture letter as to whether you were aware
21   of what claims Canary Wharf had asserted against
22   LBL in the administration in the UK.
23          Do you know, putting it more
24   specifically, whether Canary Wharf has asserted
25   any claims against LBL that would be
```

Page 118

```
 1        CONFIDENTIAL - L. Rabinowitz
 2   attributable to damages arising from rent
 3   post-forfeiture?
 4       A.   Against LBL?
 5       Q.   Yes.
 6       A.   I don't have a clear recollection of
 7   that one way or the other, I'm afraid, sitting
 8   here.
 9       Q.   Did you ever know?
10       A.   I probably did know, yes.
11       Q.   What facts would you need to know in
12   order to know whether any of the unpaid rent as
13   of the time of forfeiture would have qualified
14   as an administration expense under English law?
15       A.   I would need to know whether the
16   administrators were occupying and using the --
17   the property which was the subject of the lease
18   agreement.
19       Q.   Would the administrators themselves
20   have to occupy it or could it be through
21   sub-tenants?
22       A.   I think there's some English authority
23   which says that the fact that they are
24   sub-tenants is not relevant to the question of
25   whether they're occupying it for the purposes of
```

Page 119

```
 1        CONFIDENTIAL - L. Rabinowitz
 2   being an administrative expense.
 3       Q.   So there's some authority that it's
 4   not relevant.  Is there any authority that it is
 5   relevant?
 6       A.   I only have in mind the Goldacre case,
 7   which says that it's not relevant.
 8       Q.   And are you aware of any contrary
 9   authority?
10       A.   Sitting here, none springs to mind.
11       Q.   Are you an expert in the field of
12   insolvency proceedings in the UK?
13       A.   I wouldn't say I was an expert.  I
14   have given advice and been involved in giving
15   advice in insolvency proceedings, but I
16   wouldn't -- I don't mark myself as an expert in
17   itself.
18       Q.   Just to put it more specifically, you
19   would not regard yourself as an expert on the
20   subject of what it takes to qualify as an
21   administration expense under English law such as
22   we have just been discussing, correct?
23       A.   I wouldn't regard myself as qualified
24   to claim to be an expert on that area.
25       Q.   Would you turn to page 27 of your
```

Page 120

```
 1        CONFIDENTIAL - L. Rabinowitz
 2   opinion, specifically paragraph 63, and you're
 3   discussing Mr. Millett's contention that the
 4   forfeiture letter is arguably a material
 5   variation within the meaning of Holme v.
 6   Brunskill, and you say in the second sentence of
 7   paragraph 63, "Mr. Millett first contends (on
 8   the basis of two 19th century cases which do not
 9   appear to have been subsequently cited) that a
10   variation to the principal contract imposed by
11   statute will discharge the guarantor."
12            And my question is whether you believe
13   that that is an accurate statement of English
14   law?
15            MR. DeLEEUW:  Objection to form.
16       A.   Just to be clear, you're asking me
17   whether what Mr. Millett says, that a variation
18   to the principal contract imposed by statute
19   will discharge the guarantor, that is an
20   accurate statement of English law.
21       Q.   Thank you.
22       A.   What I would say about -- in answer to
23   that question is, as Mr. Millett indicates,
24   there are two 19th century cases which do
25   suggest that that will be the result of a
```

Page 121

```
 1        CONFIDENTIAL - L. Rabinowitz
 2   variation to the principal contract introduced
 3   by statute.  I'm not aware of any authority
 4   which says that those cases are not good law,
 5   and it would follow that that is likely to be
 6   the position in English law.
 7       Q.   Okay.  19th Century cases can still be
 8   valid under English law, correct?
 9       A.   Well, 19th Century cases, in the
10   general terms you have put it, of course they
11   can be relevant in English law, but it kind of
12   depends on the context of those cases, and in
13   particular, since I know this is the subject
14   we'll come onto, cases about leases and rents,
15   the law has changed a great deal.  So you often
16   find cases which say something in the 19th
17   Century which are no longer applicable today
18   because of shifts in the law, which means that
19   what is said in those cases is no longer
20   accurate.
21       Q.   So you contend.
22            MR. DeLEEUW:  Objection.  Please just
23   ask questions.
24            MR. ISAKOFF:  Well, I move to strike
25   the last as nonresponsive in that case
```