# EXHIBIT  90

[2000] Vol. 2      LLOYD'S LAW REPORTS      277

C.A.]      **BHP v. British Steel**      PART 5

## COURT OF APPEAL

May 4, 5; 7, 2000

BHP PETROLEUM LTD. AND OTHERS
v.
BRITISH STEEL PLC AND
DALMINE SpA

Before Lord Justice EVANS, Lord Justice MAY
and Lord LLOYD of Berwick

**Contract — Exemption and limitation clauses — Construction — Contract for supply of steel for a gas reinjection pipeline — Defects in pipeline two years after delivery — Whether defendants could rely on exemption and limitation clauses in contract.**

*Agreed statement of facts*

The contract was made between BHP (on behalf of the plaintiffs) and British Steel for the supply of steel for a gas reinjection pipeline to be installed offshore as part of the Liverpool Bay Development which was situated about 15/20 miles off the coast of North Wales in relatively shallow tidal waters. The contract provided inter alia:

14.5 Neither the Supplier nor the Purchaser shall bear any liability to the other . . . for loss of production, loss of profits, loss of business or any other indirect loss or consequential damages arising during and/or as a result of the performance or non-performance of this Contract regardless of the cause thereof but not limited to the negligence of the party seeking to rely on this provision.

17.5 The Supplier shall immediately remedy, at the contracted point of delivery, at his expense any defect in the Work due to faulty design, materials or workmanship which shall appear within eighteen (18) months of the date stated in the Purchase Order or such longer period as may be provided in the Purchase Order, but not later than twenty-four months after delivery of the Work to the Purchaser . . . at which time all liability of the Supplier relating to the Works shall terminate . . . The Suppliers [sic] liability hereunder shall not exceed 15% . . . of the Contract Price by Line Item — the payment of which shall fully discharge all liabilities of the Supplier . . .

The pipeline in question was the 12 in. injection gas pipeline which connected the Douglas field production complex with the Lennox field unmanned platform (the pipeline). The purpose of the pipeline was to enable gas which was pumped as part of the production of oil from the Lennox and Douglas fields to be pumped back to the Lennox platform there to be reinjected in the reservoir so as to enable more efficient production of Lennox oil and also to provide a means of postponing the extraction of such gas.

The steel piping or linepipe for the pipeline was supplied by British Steel although the nominated sub-

contractor who actually manufactured the linepipe was an Italian company, the second defendants Dalmine.

The development was built between 1993 and 1996. The coated linepipe was delivered at latest on Feb. 11, 1994. It was then welded together and the pipeline laid between Apr. 30 and June 27, 1994. On the seabed it was filled with seawater which had been treated with corrosion inhibitor and other chemicals and left to await the completion of other aspects of the development. It entered service in April, 1996.

No defects appeared in the pipeline until June, 1996. In that month bubbles were observed on the surface of the Irish Sea indicating that the pipeline was leaking. BHP notified British Steel of the failure of the pipeline in July, 1996. Samples were taken from the pipeline and tested. Six pairs of pipes at six leak sites were tested.

The plaintiffs' case was that cracks found at these sites were caused by the pipe's failure to meet the specification limits for the carbon equivalent value. This value was the measure of the composition of the steel which affected its hardness and the plaintiffs submitted that those pipes were therefore vulnerable to sulphide stress corrosion which led to the cracking and leakage. The plaintiffs pleaded breaches of specification, failures in the operation of quality control procedures and the (negligent) submission of inspection reports which were either inaccurate or related to pipes not included in the batches ("heats") supplied.

The issues for decision were (A) whether on a true construction of cl. 17.5 British Steel ceased to be under any liability in relation to the subject matter of the action 24 months after delivery on Feb. 11, 1996; (B) if the answer was No whether, if the plaintiffs had suffered loss and damage and the same was caused by breach of contract and/or duty of British Steel, British Steel's liability for such loss was limited to 15 per cent. of the relevant contract price by line item by reason of cl. 17.5; (C) if the answer to A was No whether, if the plaintiffs had suffered loss and damage and the same was caused by breach of contract and/or breach of duty of British Steel, British Steel were not liable for such loss, alternatively were not liable for the losses alleged, by reason of cl. 14.5.

————*Held*, by Q.B. (Com. Ct.) (RIX, J.), that (1) the argument that "all" in cl. 17.5 could not mean all, because it must be intended to leave extant beyond two years the liability to remedy a defect which had become patent within two years, even where there was delay in carrying out the rectification works, was neutral because it applied whether or not the liability referred to in the phrase "all liability" was limited to that under the rectification obligation or whether it was broader than that;

(2) "all liability" referred to every obligation under the contract or in negligence;

(3) it would be artificial to suppose that the concluding words of the first sentence of cl. 17.5 would apply to liability under the warranty in cl. 17.1 (that the supplier shall employ good sound technical and engineering procedures, skill care and judgment) without also applying to such liability where it sounded in negligence; "all liability" embraced negligence within cl. 17.1 as well;

BHP v. British Steel                                    [C.A.

(4) cl. 17.5 covered, at any rate so far as defects appearing within 24 months were concerned, every aspect of the cost of remedying such defects; in one form or another all the costs and expenses must be met by the supplier; it must meet the costs of locating and uplifting; it must repair or replace at its expense at the contracted place of delivery or it must meet all the costs and expenses of such remedies being carried out by others; and it must pay for the cost of putting the pipeline back in place; these at least were the obligations of the supplier in cl. 17.5 and it was artificial to suppose that the only one which was the subject of the 15 per cent. limitation was the cost of locating, uplifting and replacement dealt with in the penultimate sentence to the clause;

(5) cl. 17.5 was intended to set out the limits of the supplier's liability for breach of warranty both in terms of time and quantum; the drafting was not immaculate but the intention was clear; the two year period for defects to appear including defects due to negligence, and the limitation by reference to 15 per cent. of price by line item were both intended to apply in general to liabilities of all kinds under cl. 17.0;

(6) cl. 14.5 was to be construed as though it read "for loss of production, loss of profits, loss of business or indirect losses or consequential damages of any other kind", and it would be accepted that the parties might have been in error to permit the inference that the former phrases were examples of indirect or consequential loss; at least in that way each of the phrases was given its authoritative meaning, which is what the parties must be supposed to have given their closest attention to;

(7) the plaintiffs claimed loss in respect of replacement of the whole pipeline; the rectification of defective work was not within cl. 14.5 at all; on the contrary it was within cl. 17.5; it was certainly not indirect or consequential nor was it loss of production profits or business; in as much as it was in dispute whether the replacement went further than it needed, that might involve issues of causation or mitigation but did not alter the nature of the claim or bring the loss or damage within cl. 14.5;

(8) the plaintiffs claimed damages in respect of loss caused by the fact that the rate of extraction of both oil and gas was lower than it would have been leading to the postponement of the exploitation of the field's potential; this was a claim for loss of production; and even if this claim was not in respect of loss of production it seemed to be plainly in respect of loss of profits or business and it was presented as such; profits deferred as to a certain extent would be regarded as lost; if this claim was in respect of indirect or consequential loss in any event that would be another ground of exclusion but no definitive answer could be given since everything depended on knowledge of special circumstances and there was no evidence as to what British Steel knew at the time of the contract;

(9) the plaintiffs claimed that the inability to use the pipeline until it was replaced had serious consequences for the way that field operations were carried out requiring significant expenditure on installing additional facilities or modifying existing equipment or necessitating flaring of gas which would otherwise have

been reinjected; the items claimed were excluded by cl. 14.5 being loss of production, and loss of profits;

(10) the answers to the issues were (A) the first sentence of cl. 17.5 contained a cesser of all liability in respect of any defect including defects caused by negligence which had not appeared within 24 months of delivery; (B) the last sentence of cl. 17.5 contained a cap on the quantum of liability whether or not arising due to negligence by reference to 15 per cent. of the relevant contract price by line items; if the answer to (A) was wrong the plaintiffs' claims were so limited; (C) the pleaded heads of damage were excluded as loss of production or loss of profits or loss of business as the case may be within cl. 14.5.

BHP appealed, the issues for decision being (1) whether the alleged liability was excluded altogether by a time limit contained in cl. 17.5 as amended because the defects appeared more than two years after the pipes were delivered (issue A); (2) whether the liability was limited to a relatively small figure (15 per cent. of the contract price by line item) by the same clause (issue B); (3) whether certain parts of the enormous sums claimed as damages for breach of contract and negligence were excluded by an exemptions clause, cl. 14.5 (issue C).

————Held, by C.A. (EVANS and MAY, L.JJ. and Lord LLOYD of BERWICK), that (1) cl. 17.5 was not a model of elegant drafting but read as a whole and in its context its meaning was clear; the first part of the first sentence obliged and entitled British Steel to remedy at their expense at the contracted point of delivery defects in the work due to faulty design, materials or workmanship which appeared within 18 months of the date stated in the purchase order; the obligation depended on the defect appearing within the period; and the words "at which time all liability of the Supplier relating to the Work shall terminate" meant what they clearly said; "All liability . . . relating to the work" embraced all liability arising out of the contract and its performance; and the learned Judge's decision on issue A was correct (see p. 284, col. 2; p. 285, cols. 1 and 2; p. 288, col. 2; p. 289, cols. 1 and 2; p. 291, col. 2);

(2) the scheme of cl. 17.5 was that British Steel's liability relating to the work was limited in time so that it encompassed the rectification at their expense of defects appearing within the 18-month period at the end of which all further liability arising out of the contract and its performance terminated; British Steel's liability to rectify defects which appeared within the 18-month period was not limited; in addition they were obliged to pay BHP's costs of locating, uplifting and replacing up to a limit of 15 per cent. of the contract price by line item; beyond that they had no liability for defective supply however it arose; this was a commercially sensible structure which accorded with the clear meaning of the clause as a whole read in its context (see p. 285, cols. 1 and 2; p. 290, col. 2; p. 291, col. 2);

(3) issue C could not be presently determined for a number of the claimants' pleaded heads of loss without a wider consideration of facts than the pleadings and the statement of agreed facts alone contained; however the claim under par. 31(c) would be excluded by cl. 14.5; the way in which the claimants chose to calculate their claim was a theoretical accountancy

[2000] Vol. 2          LLOYD'S LAW REPORTS          279

C.A.]          **BHP v. British Steel**          [EVANS, L.J.

exercise only in that it calculated a present loss of the capital value of a future income stream; if production ceased or was reduced there was a loss of production even if the production was recovered at a later date; if deferred production resulted in a loss that manifested itself as a loss of profits and there was a loss of business; the appeal would be dismissed (*see* p. 286, col. 2; p. 287, col. 1; p. 291, cols. 1 and 2).

————————

The following cases were referred to in the judgments of Lord Justice Evans and Lord Justice May:

Ailsa Craig Fishing Co. Ltd. v. Malvern Fishing Co. Ltd., (H.L.) [1983] 1 Lloyd's Rep. 183; [1983] 1 W.L.R. 964;

Canada Steamship Lines Ltd. v. The King, (P.C.) [1952] 1 Lloyd's Rep. 1; [1952] A.C. 192;

Hadley v. Baxendale, (1854) 9 Ex. 341;

Hancock v. B. W. Brazier (Anerley) Ltd., (C.A.) [1966] 1 W.L.R. 1317;

Kazakstan Wool Processors v. Nederlandsche Credietverzekering Maatschappij N.V., (C.A.) Feb. 11, 2000, unreported;

Lamport and Holt Lines Ltd. v. Coubro & Scrutton (M&I) Ltd., (C.A.) [1982] 2 Lloyd's Rep. 42;

Mitchell (George) (Chesterhall) Ltd. v. Finney Lock Seeds Ltd., (H.L.) [1983] 2 Lloyd's Rep. 272; [1983] A.C. 803;

*New York Star*, The (P.C.) [1980] 2 Lloyd's Rep. 317; [1981] 1 W.L.R. 138;

Ocean Chemical Transport v. Exnor Craggs Ltd., (C.A.) [2000] 1 Lloyd's Rep. 446;

Pearce & High Ltd. v. Baxter, (C.A.) [1999] B.L.R. 101; [1999] C.L.C. 749.

————————

This was an appeal by the claimants BHP Petroleum Ltd., BHP Petroleum Great Britain Plc., Lasmo (ULX) Ltd., Monument Resources Ltd., Monument Exploration and Production Ltd., Monument (Liverpool Bay) Petroleum Ltd. and Centrica Resources Ltd. from the decision of Mr. Justice Rix ([1999] 2 Lloyd's Rep. 583) given in favour of the defendants British Steel Plc and Dalmine SpA, in the action brought by the plaintiffs under a contract between the parties for the supply of steel for a gas reinjection pipeline, the plaintiffs claiming damages for loss of production due to the pipe being defective.

Mr. Jonathan Sumption, Q.C. and Mr. P. Darling, Q.C. (instructed by Messrs. Herbert Smith) for the plaintiffs; Mr. M. Barnes, Q.C. and Mr. M. Templeman (instructed by Messrs. D. J. Freeman) for the defendants.

The further facts are stated in the judgment of Lord Justice Evans.

Judgment was reserved.

Friday Apr. 7, 2000

————————

## JUDGMENT

**Lord Justice EVANS:** 1. The appellants are the developers and operators of the Liverpool Bay oil and gas production complex. It was built between 1993 and 1996. A plan is attached to the judgment of Mr. Justice Rix reported in [1999] 2 Lloyd's Rep. 583 at p. 605.

2. The development centres on the Douglas Field, where there is a manned production rig which also receives oil and gas from three unmanned satellite rigs at the Lennox Field (oil and gas) and the Hamilton North and the Hamilton Fields (gas only). From the Douglas Field Platform, oil is sent forward to an offshore tanker loading terminal and gas by an undersea pipeline to the Point of Ayr terminal in Flintshire. Also from the Douglas Field platform, gas is returned to the Lennox Field where it is re-injected into the natural reservoirs there. This serves a dual purpose. Injected under pressure into the oil reservoir, the gas takes the place of water which might otherwise be pumped in to drive the oil out. The process therefore assists extraction of the oil. It also means that the gas remains stored underground and is available for re-extraction at some future date. The gas it should be noted is produced in conjunction with oil as a natural by-product of the oil wells. If it cannot be disposed of or stored, then it has to be flared off; and there are legal restrictions for environmental and other reasons on the quantities which may be disposed of in this way.

3. British Steel, the respondents, were the suppliers of coated steel pipeline for the gas re-injection line to the Lennox Field and for much, if not all, of the undersea pipeline and risers for the whole project. An Italian company, Dalmine SpA, were their sub-contractors. They are the second defendants in the action, but agreements have been reached which made it unnecessary for them to be separately represented at the hearing of these preliminary issues.

4. Coated steel pipes for the gas re-injection pipeline were supplied over a period ending on Feb. 11, 1994 under a contract which was made by acceptance of a purchase order dated Sept. 3, 1993, as amended by revision 02, issued on Sept. 30, 1993 and signed by British Steel on Nov. 15, 1993. The contract documents incorporate a detailed specification for lengths of pipe which were to be

**LLOYD'S LAW REPORTS**

EVANS, L.J.]        **BHP v. British Steel**        [C.A.

delivered onshore. The delivery clause reads as follows:

### 3.0 DELIVERY

3.1 The Supplier is to carry out and complete the work and supply to the satisfaction of the Purchaser in accordance with the delivery date(s) and shipping instructions stated in the Purchase Order.

5. The purchase order(s) read: "Delivery Terms: F.C.A. Suppliers Premises Incoterms 1990."

6. The pipes were welded together and laid in the seabed by other contractors, not British Steel, between Apr. 30 and June 27, 1994. The pipeline was filled with seawater treated with a corrosion inhibitor to await its entry into service. This did not occur until April, 1996 which was already more than two years after the pipes were supplied by British Steel.

7. In June, 1996 defects appeared when gas bubbles were observed on the surface of the sea. Investigations were made, and the claimants allege that the cause of the defects was cracking caused by corrosion-related stress, which they attribute to defects in the steel pipes themselves. They allege breaches of specification, failures in the operation of quality control procedures and the negligent submission of certificates and inspection reports as required by the supply contract.

8. These allegations are denied by British Steel and for present purposes it is immaterial whether the alleged breaches of contract and negligence were their responsibility or that of their sub-contractors, Dalmine.

9. The appeal is concerned with preliminary issues arising out of the appellants' Conditions of Supply which were incorporated with amendments in the Supply Contract. British Steel contends that the alleged liability is excluded altogether by a time limit contained in cl. 17.5, as amended, because the defects appeared more than two years after the pipes were delivered. This is issue A. Alternatively, that liability is limited to a relatively small figure (15 per cent. of the contract price by line item) by the same clause (issue B). Thirdly, that certain parts of the enormous sums claimed as damages for breach of contract and negligence are excluded by an exemptions clause, cl. 14.5. This is issue C.

10. I then set out the relevant contract terms. Definition of "Work":

"Work" means all or any plant machinery materials or equipment to be manufactured and supplied or serviced and/or personnel to be provided by the Supplier under the Contract.

11. Clause 14:

### 14.0 LIABILITY AND INSURANCE

... 14.2 The Supplier shall defend indemnify and hold the Purchaser free and harmless from and against any loss, liability, damage or claim in respect of: —

(i) personal injury to or sickness or death of the Supplier's and/or its subcontractors' employees and servants, and

(ii) damage to or loss of the property of the Supplier, its subcontractors and/or its and their employees and servants including the Work arising during and/or as a result of the performance or non-performance of this Contract from any cause whatsoever including but not limited to negligence on the part of the Purchaser, the Companies, its or their contractors or its or their respective employees or servants.

...

14.5 Neither the Supplier nor the Purchaser shall bear any liability to the other (and each party hereby agrees to indemnify the party relying on this provision) for loss of production, loss of profits, loss of business or any other indirect losses or consequential damages arising during and/or as a result of the performance or non-performance of this Contract regardless of the cause thereof including but not limited to the negligence of the party seeking to rely on this provision.

12. Clauses 17 and 18:

### 17.0 WARRANTY

17.1 The Supplier warrants and guarantees that the Work shall conform to and perform as set forth in and meet all requirements of the Contract, be fit and sufficient for the purposes for which it is intended, meet all performance guarantees set forth or implied in the Contract, be of high quality and be electrically, mechanically, structurally and functionally sound. The Supplier shall employ good sound technical and engineering procedures, skill, care and judgement. ...

...

17.5 The Supplier shall immediately remedy, at the contracted point of delivery, at his expense any defect in the Work due to faulty design, materials or workmanship which shall appear within eighteen (18) months of the date stated in the Purchase Order or such longer period as may be provided in the Purchaser Order, but not later than twenty-four months, the delivery of the Work to the Purchaser (whichever shall first occur), at which time all liability of the Supplier relating to the Work shall terminate. If the date for the commencement of this Period is not stated in the Purchaser [sic] Order it shall commence from the date of the delivery. If the Supplier fails

[2000] Vol. 2      LLOYD'S LAW REPORTS      281

to take immediate steps to remedy any defects in the Work then the Purchaser shall be entitled after giving prior written notice to the Supplier to order the Work to be rectified by others or carry out such rectification itself at the Supplier's risk and all costs and expenses incurred therein shall be borne by the Supplier, Provided — The obligations of the Supplier, in addition to the remedying of the Purchaser of repair or replacement at the contracted point of delivery shall also extend to include payment to the Purchaser of cost and expense directly and necessarily incurred by the Purchaser in the location, uplifting and replacement, of any Work proved not to comply with the requirements of the Contract. The Suppliers [sic] liability hereunder shall not exceed 15% (fifteen per cent) of the Contract Price by Line Item — the payment of which shall fully discharge all liabilities of the Supplier howsoever arising out of the supply of work that does not comply with the requirements of the Contract.

. . .

17.8 The Warranties given by the Supplier hereunder shall be without prejudice to all other rights and remedies of the Purchaser in respect of any failure by the Supplier to comply with the obligations imposed by the Contract.

18. PERFORMANCE SECURITY

18.1 Within ten (10) days of the award of the Contract the Supplier shall present to the Purchaser a Performance Security in the form of an irrevocable unconditional, divisible Bank Bond in the amount indicated in the Purchase Order, issued by an approved bank and in a format acceptable to the Purchaser.

. . .

18.4 The Bank Bond shall be valid and shall be retained until completion of the Warranty Period as described in Clause 17.0 and, except where claims are outstanding within the Contract or where previously drawn by the Purchaser, shall be returned to the Supplier within seven (7) days after the end of the Warranty Period.

13. Mr. Justice Rix defined the issues as follows:

Issue A: Does the first sentence of clause 17.5 contain a cesser of all liability under the contract for latent defects which have not appeared within 2 years of delivery?

Issue B: Is British Steel's liability in any event limited by reason of the last sentence of clause 17.5 to 15% of the relevant contract price by line item?

Issue C: Does clause 14.5 in any event provide British Steel with a defence in respect of all or some of the heads of loss and damage claimed by the plaintiffs?

14. *Construction — issues A and B*

15. *Judgment*

16. The Judge heard separate submissions on issues A and B from both parties, and he considered them separately in his judgment. But before reaching his final conclusions he had regard to the relationship between them, and in my judgment he was correct to do so. They arise under the first and last sentences respectively of the same clause, and they both depend upon the interpretation of words added by the respondents to the appellants' standard conditions of supply.

17. To this limited extent, I would disagree with the Judge's preliminary observation that he doubted whether he should take account of the history of the drafting of the clause when construing the wording which the parties finally agreed. I agree of course that the task of the Court is to construe the final wording, but I do not think it is right wholly to exclude the drafting history.

18. Mr. Sumption, Q.C. for the appellants, began with cl. 17.5 in its unamended form and then asked us to consider the amendments introduced at British Steel's request. That this is a proper approach is borne out by the first of the Judge's reasons for deciding issue A in the respondents' favour. It is common ground that the rule of construction known as contra proferentum operates against the respondents for two reasons. First, they rely upon the clause to exclude or to limit the liability alleged against them, and secondly, they were responsible for introducing during the negotiating process the particular parts of the clause on which they now rely. This therefore is the first reason why the meaning of the words should be scrutinized with particular care before holding that they achieve either of these results.

19. Secondly, the Judge acknowledged that cl. 17.5 is a "rectification" clause, meaning that it gives the purchaser the right to require the supplier to remedy defects to which the clause applies, and also gives the supplier a corresponding right, which may be valuable for him, to insist upon doing so. He referred to *Hancock v. B. W. Brazier (Anerley) Ltd.*, [1966] 1 W.L.R. 1317 and *Pearce & High Ltd. v. Baxter*, [1999] B.L.R. 101; [1999] C.L.C. 749 where it was held that clauses of that kind create additional rights but they do not exclude the contractor's liability for breaches of other terms of the contract. He distinguished those cases, however, because the clauses with which they were concerned did not contain any words of exclusion, whereas in the present case words of that kind were added to the clause and the question is how

LLOYD'S LAW REPORTS

EVANS, L.J.]                    **BHP v. British Steel**                    [C.A.

they should be construed in their particular context. In my judgment, the Judge was right to approach the matter in this way.

20. Thirdly, he had regard to cl. 17.5 within the context of the conditions as a whole. It is axiomatic that the Court should do this, but Mr. Sumption submits, as will appear below, that the Judge paid excessive regard to the provisions of cll. 17.1 and 18.0 which refer to a "Warranty Period" and to the time-limited performance bond which was returnable to British Steel when (seven days after) the supposed two-year period expired.

21. Fourthly, the Judge referred to the "*Canada Steamship Co.* line of authority" and held that a time limitation clause, as the final words of the first sentence of cl. 17.5 are, should be construed in accordance with the same principles as a clause imposing a monetary limit. The House of Lords has held that a limitation clause of that kind may be regarded differently from an exemption clause which excludes liability altogether, and that a less exacting standard of construction may be applied to such clause, particularly in relation to references to negligence which the House considered in the context of an exclusion clause in *Canada Steamship Lines Ltd. v. The King*, [1952] 1 Lloyd's Rep. 1; [1952] A.C. 192. The authority for that proposition is *Ailsa Craig Fishing Co. Ltd. v. Malvern Fishing Co. Ltd.*, [1983] 1 Lloyd's Rep. 183; [1983] 1 W.L.R. 964. These authorities were carefully reviewed by Counsel in their submissions before us and I shall revert to them below.

22. The Judge then reached his provisional conclusion on issue A that the first sentence of cl. 17.5 was sufficiently clear and unambiguous to protect the respondents from the liability alleged against them, including the allegations of negligence contained in the amended points of claim.

23. He proceeded to consider issue B, the monetary limitation imposed by the proviso added to cl. 17.5. He observed that the two sentences which constitute the proviso appeared in the agreed statement of facts as a separate paragraph, but in other documents they were included in cl. 17.5 as a single paragraph. There was an issue as to whether the two sentences should be regarded as separate provisos and the layout could have some relevance to this. I will content myself with saying that the true construction of the relevant words should reflect their intended meaning in the context of the amended clause as a whole and that the precise layout of the different sentences in the printed forms cannot affect their meaning, at least in the present case.

24. The Judge agreed with the parties' submission that the critical word as regards issue B was "hereunder". He summarized the issue, accurately, in these terms:

Does ["hereunder"] apply solely to the additional obligation to be found in the immediately preceding sentence? Or does it apply to the contract as a whole?

25. The appellants' submission in relation to both issues is that the words of limitation as regards time (issue A) and the monetary limit (issue B) are concerned exclusively with liability arising out of the obligations contained in cl. 17.5 itself. The words do not impinge, it is submitted, on the suppliers' alleged liability for breaches of other terms of the contract, especially their express duties to exercise skill and care in the performance of the contract, including quality control and certification of the pipes supplied. Both parties suggest that there would be anomalous or unacceptable consequences if the opposing construction was adopted. After referring to one of these suggested anomalies, the Judge concluded this:

This factor to my mind supports the view I have formed for more semantic reasons that the limitation of liability at the end of cl. 17.5 is intended to cover all liabilities and obligations at least arising out of cl. 17.0.

26. His overall conclusion on issues A and B was this:

It seems to me that consideration of issue B confirms rather than undermines my provisional views as to issue A. In my judgment, cl. 17.5 in its amended form is intended to set out the limits of the supplier's liability for breach of warranty both in terms of times and quantum. The drafting is not immaculate, but the intention in my view is clear. The two year period for defects to appear, including defects due to negligence, and the limitation by reference to 15 per cent. of price by line item, are both intended to apply in general to liabilities of all kinds under cl. 17.0. I am inclined to be agnostic as to whether these limitations apply to every obligation under the contract, or only those under cl. 17.0, but seeing that neither party contended for such a half-way house, that I have rejected Mr. Sumption's submissions, and that it has not been suggested in any event that for all relevant purposes the obligations within cl. 17.0 do not encapsulate the obligations sued upon, I am prepared to hold that the limitations cover all matters of breach of contract or duty relied upon.

27. *Submissions*

28. Mr. Sumption, for the appellants, adopted the Judge's approach by inviting to us consider issues A and B together and to decide each issue by construing the words relied upon in the context of the whole of the amended clause. Indeed he went further, because he gave primary emphasis to his

[2000] Vol. 2        LLOYD'S LAW REPORTS        283

C.A.]        **BHP v. British Steel**        [EVANS, L.J.

contention that the Judge was wrong on issue B. This enabled him to submit that, if the monetary limit in the final sentence does apply only to the rectification obligation created by 17.5 itself, then there is even greater force in his argument that the time limit in the opening sentences is similarly confined and is not of general application, as the respondents contend.

29. His central submission on the monetary limit (issue B) is that the second sentence of the proviso imposes a limit on the "supplier's liability here-under" and that the liability referred to is identified in the first sentence, namely, "payment to the Purchaser of costs and expense directly and necessarily incurred by the Purchaser in the locating, uplifting and replacement" of defective or non-compliant pipeline. Similarly, the closing words "shall fully discharge all liabilities of the Supplier howsoever arising out of the supply of work that does not comply with the requirements of the Contract" do not apply in a case where defects became apparent after the expiry of the 24-month period because those defects for that reason are wholly outside the scope of the clause.

30. In relation to issue A, the time limit expressed in the first sentence of the clause, "at which time all liability of the Supplier relating to the Work shall terminate" applies only, he submits, to the supplier's liability under cl. 17.5 to remedy "at the contractual point of delivery" any defects which appear during the 24-month period. Thereafter, he submits, the clause has no application, and the purchaser's remedies or branches of other terms of the contact are unaffected by it.

31. Mr. Sumption did not press before us his submission, referred to by the Judge, that if the words "all liabilities . . . shall terminate" refer to all liabilities under the contract, as the respondents contend, then it would seem that even the obligation under cl. 17.5, to remedy a defect which does appear during the period, would cease at the end of the period, whether the process of remedying that defect had been completed or not. Neither party contends that the cl. 17.5 obligation is cut short in that way (the obligation as expressed is to remedy "immediately") and I agree with the Judge that this factor is neutral (p. 590).

32. The "*Canada Steamship* line of authorities", as the Judge described it, is relevant in two ways. First, the dictum of Lord Morton of Henryton in *Canada Steamship* is now established authority for the correct approach to construction when it is argued that a clause does not exclude liability for negligence or negligent breaches of contract, though it may be effective in relation to other kinds of breach. Lord Morton's threefold test is set out in Chitty on Contracts (28th ed.) par. 14–011 and I

need not quote it here. The third step, which involves identifying a kind of liability other than negligence and which is not fanciful or remote or merely a "technical alternative" (per Lord Justice May in *Lamport and Holt Lines Ltd. v. Coubro & Scrutton (M. & I.) Ltd.*, [1982] 2 Lloyd's Rep. 42 at p. 50) and then considering whether the clause was intended to apply only to that other liability, is discussed in par. 14–013.

33. Mr. Sumption relies on this distinction in the present case. He emphasizes the "due skill and care" obligations in the contract with regard to the contract work and to the certification procedures, which he submits in practical terms are crucial to the due performance of the supply contract in the present case. Because the certificates are intended for the benefit of the purchasers and their other contractors who install the pipeline in the seabed, the alleged breaches of contract in relation to the certificates have their own consequences, independently of any defects that there were in the pipes themselves as delivered under this contract.

34. The second aspect of the same line of authorities is whether a test of the same stringency is applied to limitation clauses as to exclusion clauses under *Canada Steamship* itself. The House of Lords has held in two judgments that there is some difference of approach: *Ailsa Craig v. Malvern* and *George Mitchell (Chesterhall) Ltd. v. Finney Lock Seeds Ltd.*, [1983] 2 Lloyd's Rep. 272; [1983] A.C. 803 (the relevant passages are quoted by the Judge). Mr. Sumption submits that no clear distinction can be made, for example, between an exclusion clause which exempts from all liability and a limitation clause which imposes an unreasonably short time limit or a negligible amount as the upper limit of liability.

35. In response to these arguments, Mr. Mark Barnes, Q.C., for the respondents, submits that the Judge was correct to hold, for the reasons which he gave, that both limits apply to all liabilities under the contract, not limited to those rising under the terms of cl. 17.5 itself. "All liability" in the first sentence means what it says (cf. Lord Wilberforce in *The New York Star*, [1980] 2 Lloyd's Rep. 317, at p. 322; [1981] 1 W.L.R. 138 at p. 145) and the words imposing a time limit are superfluous if only the rectification obligation which has a finite life was intended to be referred to. (Mr. Sumption responds that any presumption against surplusage is notoriously weak in construing contracts such as this.)

36. The Judge therefore, Mr. Barnes submits, was correct as regards issue A. Similarly with regard to the monetary limit (issue B) the reference to "liability hereunder" meant under the contract as a whole,

| Evans, L.J.] | **BHP v. British Steel** | [C.A. |
|---|---|---|

not limited to the rectification and indemnity obligations imposed by cl. 17.5, and likewise the concluding words "all liabilities ... howsoever arising" were clearly intended to have the same wide effect. He submitted that the relatively small monetary limit applied cumulatively to all claims for defects arising during the 18 or 24-month period, and that liability for any defects appearing thereafter was excluded by the time limit in the first part of the clause.

37. He accepted that clauses which create the rectification obligation, and the contractor or supplier's corresponding right to rectify defects, and which do not contain words of exclusion, cannot be treated as exclusion or limitation clauses, as in *Hancock v. Brazier* and *Pearce and High v. Baxter.* Clause 17.8 emphasizes this, but such words do appear in cl. 17.5, as amended, and the question of construction is whether they apply generally to breaches of other obligations in the present case. He submitted that the situation was such that the respondents, as suppliers of pipeline to be installed by others and not otherwise involved in the construction of the development, could reasonably require that their liability for defects should come to an end after a period which was not unreasonably short (cf. *Pearce and High v. Baxter* at par. 16).

38. As regards the alternative argument based on *Canada Steamships,* to the effect that in any event the respondents' liability for the negligence alleged against them was not excluded or limited by the clause, he submitted that the more recent House of Lords' judgments (cited above) do require the Court to adopt a less stringent approach when limitation clauses, whether time or monetary, rather than exclusion clauses are construed.

### 39. Conclusion

40. I find it helpful to set out cl. 17.5 in its final (amended) form, with the words that were added to the standard form underlined:

> 17.5 The Supplier shall immediately remedy, at the contracted point of delivery, at his expense any defect in the Work due to faulty design, materials or workmanship which shall appear within eighteen (18) months of the date stated in the Purchase Order or such longer period as may be provided in the Purchaser Order, but not later than twenty-four months, the delivery of the Work to the Purchaser (whichever shall first occur), at which time all liability of the Supplier relating to the Work shall terminate. If the date for the commencement of this Period is not stated in the Purchaser [sic] Order it shall commence from the date of the delivery. If the Supplier fails to take immediate steps to remedy any defects in the Work then the Purchaser shall be entitled

after giving prior written notice to the Supplier to order the Work to be rectified by others or carry out such rectification itself at the Supplier's risk and all costs and expenses incurred therein shall be borne by the Supplier. Provided — The obligations of the Supplier, in addition to the remedying of the Purchaser of repair or replacement at the contracted point of delivery shall also extend to include payment to the Purchaser of cost and expense directly and necessarily incurred by the Purchaser in the location, uplifting and replacement, of any Work proved not to comply with the requirements of the Contract. The Suppliers [sic] liability hereunder shall not exceed 15% (fifteen percent) of the Contract Price by Line Item — the payment of which shall fully discharge all liabilities of the Supplier howsoever arising out of the supply of work that does not comply with the requirements of the Contract.

41. The first addition is "at the contracted point of delivery". This is easily explained. The contract was for the supply of pipes at a point of delivery onshore, where it was to be taken over for installation in the seabed by others. The undertaking to remedy defective pipeline therefore was dependent upon the pipeline in question being redelivered there (unless the defect was discovered before the pipeline was moved).

42. If the pipeline had been moved, and particularly if it had been installed in the seabed, then the need would arise to retrieve and return it to the supplier, and the costs of doing so would prima facie be recoverable by the purchasers as damages for any breach of contract for which the suppliers were responsible. The second sentence of the clause, before the proviso, refers to these costs only in the context of a failure by the supplier to remedy defects as he should. But the proviso spells out the supplier's obligation to indemnify the purchaser against the costs and expense of "location, uplifting and replacement" of defective work, and this is followed by the limit of 15 per cent. of the contract price by line item. This obligation is "in addition to the remedying", words which are followed by "of the Purchaser of repair or replacement" which on any view are ungrammatical and their meaning obscure. The point does not arise for decision, but I would be inclined to hold that the reference is to remedying the defective pipeline either by the supplier or by the purchaser at the suppliers' expense.

43. It seems to me that the monetary limit was or may well have been intended to refer to this head of liability only, and it would follow that "liability hereunder" means "under this clause" or "under this proviso". But it does not follow that the concluding words "all liabilities of the Supplier

[2000] Vol. 2                LLOYD'S LAW REPORTS                     285

C.A.]                          **BHP v. British Steel**                       [Evans, L.J.

howsoever arising out of the supply of work . . . " is also limited to the liability or liabilities arising under the clause. These were clearly and unambiguously intended, in my view, to exempt the suppliers from any further liability for non-compliant work, although it may be fully arguable that the exclusion of further liability relates only to the defect in question. If this is correct, the use of lower case "work" rather than "the Work" as contractually defined may be significant, but again, it is unnecessary for to us decide this issue here.

44. If the first sentence frees the suppliers from "all liability", meaning any liability in respect of defects arising after the 18 or 24-month period has expired, then no such claim can arise for the purposes of the proviso and the monetary limit which it provides for. If it does not have this effect, then the extraordinary result would be that the supplier has the benefit of cl. 17.5 in relation to defects arising during the initial period (the right to remedy at the point of delivery and to limit his liability to whatever figure for the purchaser's costs in location, etc.) but he is exposed to unlimited liability and is without the right to remedy at the point of delivery when defects arise after that period. There is no apparent explanation for this, whereas the contrary view that the supplier is freed from all liability at that time can readily be justified by the commercial reasonableness, as both parties might see it, of drawing a line under the contract when the period has passed.

45. The question of construction, however, (issue A) is whether "all liability" in the first sentence of cl. 17.5 is limited to liability for breaches of the obligation imposed by the clause. As I have indicated above, I consider that there is some force in Mr. Sumption's submission that "arising hereunder" in the proviso is so limited, or at least it refers to a particular kind of loss, whether expressed as the indemnity provided for by the clause or as damages for the associated breach of contract. But I do not think it follows that the reference to "all liability" is limited in the same way. The wording of the proviso may throw some light on the meaning of the first sentence. The proviso shows that the parties recognized the importance of adding "howsoever arising" in order to emphasize that the effect was to be comprehensive, and these words do not appear in the first sentence. But the proviso also shows that the parties used "liability hereunder" in one context, referring broadly in my judgment to liability under the proviso or even the clause, and "all liabilities" in another context, where the provision was not so limited. There is every indication, in my judgment, that "all liability" in the first sentence was intended to be comprehensive, and the omission of liability

"hereunder" from this provision supports this view.

46. There remains Mr. Sumption's alternative submission that even on this construction the clause does not exclude (time limit) liability for the alleged negligent breaches of contract — the *Canada Steamships* issue. I would agree with Mr. Barnes' submission that existing House of Lords' authority permits the Courts to adopt a less stringent approach when construing what are in substance limitation rather than exclusion clauses, particularly with regard to liability for negligent breaches of contract. I would also accept Mr. Sumption's submission that the two types of clause should be characterized by reference to the substance of their provisions rather than the particular wording used. But there is no evidence that the 18 or 24-month period, taken from BHP's own conditions of sale, was unreasonably short, nor even that the 15 per cent. monetary limit was negligible.

47. I think it is unfortunate if the present authorities cannot be reconciled on the basis that no categorization is necessary and of a general rule that the more extreme the consequences are, in terms of excluding or modifying the liability which would otherwise arise, then the more stringent the Court's approach should be in requiring that the exclusion or limit should be clearly and unambiguously expressed. Indeed, if the requirement is of a clear and unambiguous provision, then it is not easy to see why degrees of clarity and lack of unambiguity should be recognized. In the present case, therefore, the Judge was correct to approach the issue of construction in the way he did, relying on *Ailsa Craig v. Malvern* and *George Mitchell v. Finney.* But I would add that if some more exacting standard of complete clarity and lack of ambiguity is applied, then in my judgment the provisions of the first sentence "at which time all liability of the Supplier relating to the Work shall terminate" do satisfy that standard. The words mean what they say. The reason for inserting the provision is clear. Far from being an "inhospitable context" (the appellants' phrase), the warranty provisions of cl. 17.0, and in particular cl. 17.5, provide the appropriate home for this provision that "all liability" shall end with what is called elsewhere the warranty period.

48. *Issue C*

39. If I am correct as regards the Judge's answer to issue A, then the further question raised by issue C does not arise. I should, however, indicate shortly what the issues and the relevant facts are and express my provisional views upon them.

**LLOYD'S LAW REPORTS** [2000] Vol. 2

| | | |
|---|---|---|
| EVANS, L.J.] | **BHP v. British Steel** | [C.A. |

50. The issues arise under cl. 14.5, which it may be noted is in its unamended form taken from the appellant' standard conditions of supply:

> 14.5 Neither the Supplier nor the Purchaser shall bear any liability to the other (and each party hereby agrees to indemnify the party relying on this provision) for loss of production, loss of profits, loss of business or any other indirect losses or consequential damages arising during and/or as a result of the performance or non-performance of this Contract regardless of the cause thereof including but not limited to the negligence of the party seeking to rely on this provision.

51. The claim for damages is made under three heads, set out in the draft re-amended points of claim, par. 31. These are:

52. (a) The costs of replacing the pipeline. We are not concerned with this head.

53. (b) Costs incurred by the claimants in pursuing various alternatives when they were unable to continue re-injecting gas into the Lennox Field and when, because they were uncertain whether the defects were caused by pumping "sour" gas through the respondents' pipelines, they obtained further supplies of "sweet" gas in its place.

54. (c) Costs incurred because the developers were required — "to defer the extraction of oil and gas from the Development and to delay the attainment of maximum production levels, as a result of which the revenues expected from the Development have been and will be deferred."

55. The Judge held that the claim under head (c) was barred by the exclusion "loss of production, loss of profits, loss of business or any other indirect losses or consequential damages . . . " in cl. 14.5, primarily because what is described as deferral of production was, he held, a loss of production within the clause.

56. I would agree with this conclusion. Mr. Sumption's argument to the contrary is that there was no loss of production, meaning the total output of oil and gas from the whole of the development, because the whole of the reserves will be produced from the fields in due course, notwithstanding the period when no production or only limited production was possible because of the breakdown of the gas pipeline. The total reserves, he submits, are finite, and in due course they will all be produced. Therefore, no part of the production has been lost.

57. The claim for £136 m. represents the accountants' calculation of the present value of the loss which the claimants have suffered, by reason of this delay. I would agree with Mr. Sumption that the method of calculation does not signify the character of the loss and that the issue raised is whether the alleged loss is within the exclusion of liability for loss of production, etc.

58. I would query whether it is correct to assume that the quantity of oil and gas available for extraction from the natural reservoirs is truly finite, meaning an absolute quantity which either has been or will in future be produced. Techniques of production will change and there must be many other variables in any calculation of what the total output over, say, a 15-year period will be. However, I will assume for present purposes that there is a finite quantity as Mr. Sumption asserts.

59. Even so, it seems to me that "loss of production" can be measured by reference to a period during which no oil or gas is produced. I think it is inevitable that any loss of output must be so measured, just as loss of profits can only be calculated by reference to accounting periods. Even if there is a finite quantity of oil and gas which will eventually be produced, the fact remains that for a period no oil or gas was produced. That production was lost, and in my judgment the exception "loss of production" would apply.

60. Reverting to head (b) of the claim, the Judge described each category of loss as best he could on the limited information available to him, and he concluded that in some cases, but not others, the sums claimed represented the cost of mitigating other losses which, had they been suffered, would have been excluded by loss of production et cetera in cl. 14.5. Therefore:

> It seems to me that this is a mitigation or purported mitigation of the loss of production of such gas . . . It is therefore excluded.

61. He also considered the meaning of "any other indirect losses or consequential damages" in the light of authorities decided by this Court which give the words a narrower meaning, the respondents submits, than is intended by businessmen who are parties to a contract such as this. By agreement between the parties, we have not been asked to rule on this issue because the established authorities are binding on us. Nor have we been asked to consider the Judge's conclusions on whether that part of cl. 14.5 may or may not apply to the various heads of damage claimed.

62. In relation to those claims which the Judge held were the costs of mitigating losses which, had they occurred, would have been excluded by cl. 14.5, Mr. Sumption's essential submission is that the Judge's analysis was wrong. The heads of loss are recoverable in their own right, he submits, as damages for the alleged breaches of contract, and no reference to mitigation or loss of production et cetera is necessary.

63. Had it been necessary for us to decide this issue, I would have held that the claims under

[2000] Vol. 2                    LLOYD'S LAW REPORTS                              287

C.A.]                                   **BHP v. British Steel**                              [MAY, L.J.

paragraph (b) should not be ruled upon as a matter of law at this stage. No evidence has been given and the agreed statement of facts, as the Judge found, is far from sufficient for relevant questions to be answered. It is not apparent why the Judge was wrong in law to hold that the cost of mitigating losses which had they occurred would not have been recoverable as damages for breach of contract. But I would hold simply that these claims should go forward for consideration at the trial.

64. For those reasons, I would dismiss this appeal.

**Lord Justice MAY:** 65. I agree that Mr. Justice Rix decided the main substance of this appeal correctly. I gratefully adopt my Lord, Lord Justice Evans', account of the facts, which are also set out in the judgment of Mr. Justice Rix at [1999] Lloyd's Rep. 583 at pp. 585–587. I shall not set out again in full the terms of clauses of the contract which this Court has to consider.

66. Mr. Justice Rix considered three preliminary issues. Issues A and B concern the meaning of cl. 17.5 of the conditions of contract agreed between BHP Petroleum Ltd. and British Steel Plc. Issue A asks whether the first sentence of cl. 17.5 contains a cesser of all liability under the contract for latent defects which have not appeared within two years of delivery. If that issue is determined, as the Judge determined it, in favour of British Steel, the other issues do not arise, since the defects which are the subject of these proceedings appeared more than two years after delivery. Issue B asks whether British Steel's liability is in any event limited by the last sentence of cl. 17.5 to 15 per cent. of the relevant contract price by line item. These are distinct issues, but the meaning of cl. 17.5 has to be determined as a whole and it is necessary to consider them together.

67. The general shape and structure of the contract between BHP and British Steel, and the background circumstances in which it was made, are apparent from the facts which have been referred to. British Steel were to supply a large quantity of high quality steel piping (and associated equipment) for an offshore oil and gas production development of the claimants. The pipes which failed were to carry gas between the Lennox Field and the Douglas Field. They were to be submerged in the sea. They were to be subjected to severe conditions and were accordingly designed to an exacting specification. Their production required careful and, no doubt, rigorous testing, inspection and certification. They were to be delivered onshore and installed for the claimants by others. They were a relatively small part of a massive development. If the pipes failed, there was a clear possibility that the financial consequences might be enormous. Mr.

Sumption, Q.C. emphasizes an interest of the claimants in being able to recover losses of this kind. From British Steel's standpoint, there was an obvious possibility that losses of this kind could be out of all proportion to any profit which they might hope to make out of the contract. It would be entirely understandable that they might want to limit their potential liability.

68. The claimants' standard conditions of contract for use where there was to be no installation by the supplier defined "Work." as meaning "all or any plant machinery, materials or equipment to be manufactured and supplied, all services . . . to be provided by the Supplier under the contract". Clause 3 required British Steel to carry out and complete the work and supply to the satisfaction of BHP. Clause 5 contained obligations of British Steel in relation to testing and inspection and gave BHP rights of inspection and testing. Clause 13 contained provisions essentially enabling BHP to take over and finish British Steel's work if British Steel failed to do it themselves in accordance with the contract. Clause 14 contained provisions for mutual indemnity and limitation of liability for personal injury and damage to property and for losses described in cl. 14.5, which is the subject of issue C in these proceedings. Whatever the exact ambit of cl. 14.5, there was express limitation of some of the more far-reaching potential consequences of either party's breach of contract. The limitation expressly included, but was not limited to, losses caused by the negligence of the party seeking to rely on cl. 14.5. Clause 18 required British Steel to provide a performance bond to remain in force until seven days after the end of what is referred to as the warranty period. This is evidently a reference to the defects liability period in cl. 17.5. Some reliance was placed on this as an aid to determine the meaning of cl. 17.5, but I am persuaded by Mr. Sumption that cl. 18 is neutral in this respect.

69. Clause 17.1 contained warranties by British Steel that (put shortly) the Work shall meet all requirements of the contract and that British Steel will employ "good sound technical and engineering procedures, skill, care and judgement". Clause 17.4 contained requirements for correcting Work which did not comply with the contract. As Mr. Sumption said, this clause reads as if it was intended to apply generally during the currency of the engineering contract. Clause 17.8 provided that the warranties given by British Steel under cl. 17 were without prejudice to all other rights and remedies of BHP for failure by British Steel to comply with their obligations under the contract. I do not consider that cl. 17.8 indicates any particular construction of cl. 17.5. Clause 17.8 uses the word "hereunder" which in its context is an obvious reference to cl. 17

288                     LLOYD'S LAW REPORTS                [2000] Vol. 2

MAY, L.J.]                    **BHP v. British Steel**                    [C.A.

as a whole. But I do not consider that this or other uses of the word help to determine its meaning when it appears in the different context of cl. 17.5.

70. Clause 17.5 in its standard unamended form was an orthodox defects liability clause of the kind considered in *Hancock v. B. W. Brazier (Anerley) Ltd.*, [1966] 1 W.L.R. 1317 and *Pearce and High Ltd. v. Baxter*, [1999] B.L.R. 101; [1999] C.L.C. 749. Clauses of this kind do not limit or exclude liability. Typically they confer additional rights and obligations requiring the contractor or supplier to undertake additional work to rectify defects which appear within a defined time after completion usually without additional payment. They may be seen as benefiting both parties. The employer is entitled to have the defects rectified without having to engage and pay another contractor to carry out the rectification: the contractor or supplier is entitled to carry out the rectification himself which may normally be expected to be less expensive for him than having to reimburse the cost to the employer of having it done by others. Without a clause of this kind, the contractor or supplier would normally have no right to do work after completion, although an employer faced with defects after completion would need to mitigate his loss, if he wished to claim damages, and mitigation would often lead to inviting the contractor or supplier to do the work.

71. Clause 17.5 was amended by the purchase order dated Sept. 3, 1993 and the amendments were carried forward into later purchase orders, including that which included the line items which failed. The clause as amended is set out on p. 586 of Mr. Justice Rix's judgment and my Lord, Lord Justice Evans, has quoted it in his judgment. It is agreed that the amended version of the clause was put forward by British Steel. It was plainly for their benefit and it is they who rely on it in these proceedings. If there are ambiguities which are not fanciful, these are to be resolved in favour of BHP. The amended clause was no longer only a defects liability clause. Whatever its precise meaning, it contained limitations of liability. It was not a clause which purported to exclude all liability. It is to be construed in accordance with the principles which Lord Justice Evans has referred to and which I adopt. I would in particular refer to two passages in the opinions in the House of Lords in *Ailsa Craig Fishing Co. Ltd. v. Malvern Fishing Co. Ltd.*, [1983] 1 Lloyd's Rep. 183; [1983] 1 W.L.R. 964. At p. 184, col. 1; p. 966F, Lord Wilberforce said:

Whether a clause limiting liability is effective or not is a question of construction of that clause in the context of the contract as a whole. If it is to exclude liability for negligence, it must be most clearly and unambiguously expressed, and in such a contract as this, must be construed

contra proferentem. I do not think that there is any doubt so far. But I venture to add one further qualification, or at least clarification: one must not strive to create ambiguities by strained construction, as I think that the appellants have striven to do. The relevant words must be given, if possible, their natural, plain meaning. Clauses of limitation are not regarded by the Courts with the same hostility as clauses of exclusion: this is because they must be related to other contractual terms, in particular to the risks to which the defending party may be exposed, the remuneration which he receives, and possibly also the opportunity of the other party to insure.

72. Then at p. 186, col. 2; p. 970C, Lord Fraser of Tullybelton said:

There are later authorities which lay down very strict principles to be applied when considering the effect of clauses of exclusion or of indemnity: see particularly the Privy Council case of *Canada Steamship Lines Ltd. v. The King*, [1952] 1 Lloyd's Rep. 1, at p. 8; [1952] A.C. 192, 208, where Lord Morton of Henryton, delivering the advice of the Board, summarized the principles in terms which have recently been applied by this House in *Smith v. UMB Chrysler (Scotland) Ltd.*, 1978 S.C.(H.L.) 1. In my opinion these principles are not applicable in their full rigour when considering the effects of clauses merely limiting liability. Such clauses will of course be read contra proferentum and must be clearly expressed, but there is no reason why they should be judged by the specially exacting standards which are applied to exclusion and indemnity clauses. The reason for imposing such standards on these clauses is the inherent improbability that the other party to a contract including such a clause intended to release the proferens from a liability that would otherwise fall upon him. But there is no such high degree of improbability that he would agree to a limitation of the liability of the proferens, especially when, as explained in condition 4(i) of the present contract, the potential losses that might be caused by the negligence of the proferens or its servants are so great in proportion to the sums that can reasonably be charged for the services contracted for. It is enough in the present case that the clause must be clear and unambiguous.

73. I agree with Mr. Sumption that cl. 17.5 is not a model of elegant drafting and that there are rough edges. But in my judgment, read as a whole and in its context, its meaning is clear. This is subject to one qualification, which is not material on the facts of this case and whose existence does not, in my view affect the clear meaning of the clause as a whole.

[2000] Vol. 2                    LLOYD'S LAW REPORTS                    289

C.A.]                              **BHP v. British Steel**                              [MAY, L.J.

74. In my judgment, the meaning of cl. 17.5 is as follows. The first part of the first sentence obliged and entitled British Steel to remedy, at their expense at the contracted point of delivery, defects in the Work due to faulty design, materials or workmanship which appeared within (as it now appears) 18 months of the date stated in the Purchase Order. (The difference between 18 months and two years — as Mr. Justice Rix was led to think it was — is immaterial, since (a) 18 months is, for the general purpose of construing the clause as a whole, quite a long period, and (b) the relevant defects appeared more than two years after the relevant date.) The obligation to remedy defects so appearing did not depend on notice being given to British Steel requiring them to do the remedial work, as is common in other clauses of this general kind. The obligation depended on the defect appearing within the period, which would be a question of fact. The obligation to remedy a defect so appearing would not, by virtue of the subsequent limitation provision, cease if the remedial work were not accomplished until after the 18-month period had expired. The Judge's insertion of the word "further" before the word "liability" in the last part of the sentence is scarcely needed, but, if it is needed, it is obviously correct. The words "at which time all liability of the Supplier relating to the Work shall terminate" mean what they clearly say. "All liability . . . relating to the Work" embraces all liability arising out of the contract and its performance. It is true that the words appear in a sentence dealing with the supplier's obligation to remedy defects and that the next sentence deals with the same subject matter. But they are part of a clause whose evident purpose is to limit British Steel's liability within commercially acceptable bounds. The words themselves are not apt to limit only the liability imposed on British Steel by cl. 17.5 itself, which is limited in time anyway without them. Nor are these clear words to be tortured so as not to apply to exclude liabilities of British Steel which might be framed in negligence. The certification and testing obligations to which Mr. Sumption referred in this context were all contractual obligations or, in so far as they might be classified as duties arising in tort, were co-extensive with the contractual obligations. More importantly, perhaps, liability arising out of these and similar obligations to take due care would be liability "relating to the Work" which, by definition, included "all services . . . to be provided by the Supplier under the contract".

75. The construction of the last part of the first sentence of cl. 17.5 which I have given accords with the construction of a broadly similar time bar clause considered by the Privy Council in *The New York Star*, [1980] 2 Lloyd's Rep. 317; [1981] 1

W.L.R. 138. It was contended that the clause in that case applied in that case applied at most to actions for breach of contract and not to an action in tort. Lord Wilberforce, giving the opinion of the Board, said at p. 322, col. 1; p. 145A:

Their Lordships' opinion upon these arguments is clear. However adroitly presented, they are unsound and indeed unreal. Clause 17 is drafted in general and all-embracing terms:

In any event the carrier and the ship shall be discharged from all liability in respect of loss or damage unless suit is brought within one year after delivery of the goods or the date when the goods should have been delivered. . . .

The reference to delivery of the goods shows clearly that the clause is directed towards the carrier's obligations as bailee of the goods. It cannot be supposed that it admits of a distinction between obligations in contract and liability in tort — "all liability" means what it says.

76. I would also refer to the opinion of Lord Bridge of Harwich in *George Mitchell (Chesterhall) Ltd. v. Finney Lock Seeds Ltd.*, [1983] 2 Lloyd's Rep. 272; [1983] 2 A.C. 803 where, at p. 277; p. 814, he considered a submission based on the principles stated in *Canada Steamship Lines Ltd. v. The King*, [1952] 1 Lloyd's Rep. 1; [1952] A.C. 192 at p. 8; p. 208. Lord Bridge said that the very strict principles laid down in that case as applicable to exclusion and indemnity clauses could not be applied with their full rigour to limitation clauses. He then said:

. . . Having once reached a conclusion in the instant case that the relevant condition unambiguously limited the appellants' liability, I know of no principle of construction which can properly be applied to confine the effect of the limitation to breaches of contract arising without negligence on the part of the appellants.

77. Reference may also usefully be made on this topic to recent decisions of this Court in *Ocean Chemical Transport v. Exnor Craggs Ltd.* [2000] 1 Lloyd's Rep. 446; and *Kazakstan Wool Processors v. Nederlandsche Credietverzekering Maatschappij N.V.* (Feb. 11, 2000).

78. For these reasons which accord with those of Mr. Justice Rix, I agree that his decision on issue A was correct. A decision on issue A in favour of British Steel would mean that it was strictly unnecessary to proceed to decide issues B or C. I shall therefore consider these issues more briefly, although I emphasize that my conclusion on issue A takes account of my view as to the meaning of the whole of cl. 17, including that which relates to issue B.

LLOYD'S LAW REPORTS

MAY, L.J.]                     **BHP v. British Steel**                     [C.A.

79. The second sentence of cl. 17.5 defined the start of the 18-month or two-year defects liability period. The meaning of the third sentence of cl. 17.5 is not, I think, by itself controversial. If British Steel failed to remedy defects which the first part of the first sentence required them to remedy, BHP became entitled to have them rectified at British Steel's expense. The fourth sentence (beginning with the word "Provided") is textually corrupt, but its meaning is, I think, nevertheless sufficiently clear. It recognized that defects might appear within the 18-month period but after the relevant line item had been put in place beneath the sea. The item would, or might, need to be located, uplifted, taken to the contracted place of delivery for rectification and replaced in position after it had been rectified. In addition to remedying the defect, British Steel were obliged to pay BHP their costs of locating, uplifting and replacing. The first part of the fifth sentence, in my view, limited British Steel's liability to pay BHP's costs as provided by the fourth sentence to 15 per cent. of the contract price for the line item which required rectification. The word "hereunder", in my view, refers to the immediately preceding provision, and not to cl. 17 as a whole nor to the contract as a whole. The final part of the fifth sentence, in my view, means in substance that the limit of "all liability" of British Steel "howsoever arising out of the supply of work that does not comply with the requirements of the Contract" is that which cl. 17.5 as a whole provided. Thus, put shortly, British Steel had to rectify defects which appeared within the 18-month period and pay the costs of locating, uplifting and replacing up to a limit of 15 per cent. of the contract price of the relevant line items. Once they had done that they were discharged from liability for defective work "howsoever arising". The use of the word "work", without an initial capital letter and without the definite article, indicates that this part of the clause (as distinct from the last part of the first sentence) did not extend to obligations other than those relating to the supply of the physical work. It would not, for instance, by itself extend to time obligations or to indemnities against injury to persons or property. It seems to me that the fourth sentence probably did not envisage that any line item might need to be rectified more than once. I am inclined, therefore, to think that the 15 per cent. was to be applied to each line item once only. I can, however, see a possibility that the 15 per cent. might apply to each occasion when a line item had to be rectified for defects. It is not necessary to resolve this point on the facts of this case.

80. Each party contended that the first and second part of the fifth sentence had to be construed consistently the one with the other. Mr. Sumption in effect submitted that the narrowness of the first part

diminished the ambit of the second part. Mr. Barnes submitted that the width of the second part amplified the ambit of the first part. Each points to unsatisfactory consequences of the other's submission. It will be seen that I am not persuaded by either of them. In my view, the discharge to which the second part of the fifth sentence refers occurs upon the payment of costs of location, uplifting and replacement subject to a limit of 15 per cent. by line item upon the assumption that, by this stage, the preceding obligations of British Steel to rectify defects appearing within the 18-month period have been performed.

81. Thus in my judgment, the scheme of cl. 17.5 was that British Steel's liability relating to the Work was limited in time, so that it encompassed the rectification at their expense of defects appearing within the 18-month period, at the end of which all further liability arising out of the contract and its performance terminated. British Steel's liability to rectify defects which appeared within the 18-month period was not limited. In addition, they were obliged to pay BHP's costs of locating, uplifting and replacing up to a limit of 15 per cent. of the contract price by line item. Beyond that, they had no liability for defective supply however it arose. In my view, this is a commercially sensible structure which accords with the clear meaning of the clause as a whole read in its context.

82. I do not therefore, agree with Mr. Justice Rix's conclusion on issue B that the reference to 15 per cent. by line item applied to liabilities of all kinds under cl. 17.0. It did not, in my view, apply to limit British Steel's obligation to rectify at their expense defects which appeared within the 18-month period. Nor did it apply to British Steel's obligation to pay BHP's costs of rectifying those defects, if British Steel failed to do so themselves. But it did apply to limit British Steel's obligation to pay BHP their costs of locating, uplifting and replacing. But my conclusion in relation to the extent of the 15 per cent. limitation does not affect, as Mr. Sumption submitted that it should, the meaning and extent of the last part of the first sentence of cl. 17.5.

83. Mr. Sumption submitted in relation to cl. 17.5 generally that it did not apply to the facts of the present case at all because the defective pipeline was not rectified at all because it was not economic to do so. It was abandoned and a second pipeline installed in its place. I do not accept this submission. Firstly, the defects appeared after the 18-month period and at that time "all liability of the supplier relating to the Work shall terminate". The fact that defects appearing after the period were not rectified does not affect that conclusion. Secondly, if the defects had appeared within the 18-month period, it was British Steel's contractual entitlement

to be enabled to rectify them at the contracted point of delivery. BHP could, no doubt, choose not do things that way, but not so as to increase the cost to British Steel of rectifying the defects in accordance with their contractual obligation and entitlement. If rectification of pipes which had been supplied was not possible even if they were taken to the contracted point of delivery, then no doubt British Steel's obligation would have been to supply replacement pipes at their own expense. In that event, it may have been sensible to leave the original pipes where they were. But British Steel's obligation to supply replacement pipes would have arisen under the first part of the first sentence of cl. 17.5 and not outside cl. 17. And a decision to leave the original pipes where they were would have depended on the fact that they could not be rectified even if they were taken to the contracted point of delivery, not on the mere fact that it was not economic to uplift them.

84. Issue C concerns the meaning of cl. 14.5 of the conditions, but also concerns the impact of that meaning on the claimants' pleaded heads of loss. The extent to which this Court has been asked to consider issue C has reduced since Mr. Justice Rix made his decision. The question is whether the claimants' pleaded heads of loss, or any of them are excluded because they are "loss of production, loss or profits, loss of business or any other indirect losses or consequential damages . . . ". The Judge considered the meaning and application of the expression "indirect losses or consequential damages". He concluded, notwithstanding conceptual difficulties which he had, that he was bound by authority to hold that this expression referred to losses within the second limb of *Hadley v. Baxendale*. The issue therefore required findings about the defendants' state of knowledge which the Judge was not in a position to make. So no interim determination was possible. The parties do not seek to take this further before this Court.

85. Apart from this, it was conceded or the Judge determined that some of the heads of loss were not excluded by cl. 14.5. The Judge held that others were excluded. But it is, in my view, clear that issue C cannot presently be determined for a number of those heads of loss without a wider consideration of facts than the pleading and the statement of agreed facts alone contain. In particular, I agree with Lord Justice Evans that this Court cannot at present conclude that some of the heads of loss in par. 31(b) of the re-amended points of claim are excluded by cl. 14.5 as being loss of production, loss of profits or loss of business, because they were incurred in mitigation of losses which, had they been incurred, would have been loss of production, profits or

business. To this extent, I would modify Mr. Justice Rix's conclusion.

86. The modification does not, however, extend to the head of loss in par. 31(c) of the re-amended points of claim, which we are told is the largest single head of claim. The claim is that, because of the breaches alleged, the claimants had to:

. . . defer the extraction of oil and gas from the Development and to delay the attainment of maximum production levels, as a result of which the revenues expected from the Development have been and will be deferred.

87. The claim is particularized as the product of an accountancy exercise which seeks to calculate the difference between the present capital value of the future income from the development as it would have been received apart from the alleged breaches, and the value of the income as it will be received at later dates because of the breaches. It is the same income (subject to inflation and price fluctuation which are said to be irrelevant for the purpose of the calculation). But its present calculated value is less because it will be received at a more distant future date. BHP's essential submission is that this is not loss of production, profits or business, because the oil and gas have not been lost. The claimants' ability to sell them has only been deferred. When they are sold, the production, profits and business will be the same.

88. The Judge rejected this submission for the reasons which he gave on pp. 600–601 of his judgment. I agree with those reasons. I put the main reasons shortly in my own words. The way in which the claimants choose to calculate their claim is not decisive. The calculation is in any event a theoretical accountancy exercise only, in that it calculates a present loss of the capital value of a future income stream. The main (and perhaps only) purpose of this calculation outside this litigation would be if the claimants were to want to sell the development as a going concern. I agree with the Judge that, in ordinary understanding, if production ceases or is reduced, there is a loss of production even if the production is recovered at a later date. I agree with the Judge, that, if deferred production results in a loss, that manifests itself as a loss of profits and there is a loss of business. I accordingly consider that the head of loss in par. 31(c) of the re-amended points of claim would be excluded by cl. 14.5 of the conditions, if it had not already been excluded under cl. 17.5.

**Lord LLOYD:** I agree with both judgments that issue A should be decided in favour of the respondents and the appeal dismissed. I agree also with what my Lords have said on issues B and C.