# EXHIBIT   91

# Part  1

# REPUDIATION OF LEASES

# BLUNDELL LECTURE

# 26TH JUNE 2000

## THE RIGHT HONOURABLE THE LORD MILLETT

SPEAKS ~~FOR~~ AGAINST THE PROPOSITION  THAT THE DOCTRINE OF REPUDIATION IS AND SHOULD BE PART OF THE ENGLISH LAW OF LANDLORD AND TENANT

### AND

## THE HONOURABLE MR JUSTICE NEUBERGER

SPEAKS AGAINST ~~THE~~ FOR PROPOSTION

## REPUDIATORY BREACH OF CONTRACT AND LEASES.

It is a great honour to be asked to give one of the Blundell Lectures, which have long been acknowledged to be the leading series of lectures on real property law. It is a particular honour to be asked to do so this year, which marks the 25th. anniversary of the foundation of the lectures. To mark the occasion, the usual lecture will be replaced by a debate. The proposition is that the Contractual Doctrine of Repudiatory Breach of Contract forms no part of the law of landlord and tenant. I shall be speaking for that proposition, and Sir David Neuberger will be speaking against it. He is a formidable opponent. I regard David as the leading landlord and tenant lawyer today. He is a worthy successor of Lionel Blundell. He knows far more about the law of landlord and tenant than I do. I have sought to even up the odds by giving him the task of opposing the motion. He will have the difficult, I would say impossible, task of explaining just how a legal estate in land can be brought to a premature end by the acceptance of a repudiatory breach of contract.

The doctrine of accepted repudiation is of general application in the law of contract. There is no reason why it should not apply to an agreement to grant or take a lease. The question this evening is different. It is whether it can be used to bring a subsisting legal estate in land to a premature end. The Australian Courts have said that it can. There is no authority on the question in this country above the level of the County Court, though Court of Appeal has assumed without hearing argument that the contractual doctrine is capable of applying. I suggest that this is conceptually and historically unsound, sits uneasily with established aspects of the law of landlord and tenant, is inconsistent with the basis on

Lord Millett                                                           1

which Parliament has legislated in this field for over two hundred years, and prejudicially affects third parties.

## First: the importation of the contractual doctrine into the law of landlord and tenant is Conceptually Unsound.

It is conceptually unsound because it disregards the fundamental division between property and obligation. The Roman lawyers bequeathed this to us. It is fundamental to the structure of our law. At the most basic jurisprudential level, it is a line which must be held if the law is to have any coherence. At the practical level, it confuses the reciprocal discharge of *future* contractual obligations by accepted repudiation with the termination of *existing* property rights by forfeiture, subject to the availability of relief from forfeiture. The distinction is critically important for two main reasons. The first is that property rights may affect third parties, as contractual rights may not. The second is that equity grants relief from forfeiture of property rights; it has never claimed the right to give relief from the consequences of a repudiatory breach of contract.

Now leases entered into our law as contracts, and for that reason were outside the feudal system. But they have been recognised as property since 1480. They were called chattels real, to show that they were property even if not real property. Page 1.1 of Woodfall describes the relationship of landlord and tenant as "the relationship which exists between the parties to a demise and between their respective assigns. The relation is one of tenure."

I stress that. The relationship is tenurial, not contractual. A lease is not a mixture of contract and property. We must distinguish between the document, which is

08-13555-mg   Doc 45468-6   Filed 07/31/14   Entered 07/31/14 17:14:52   Exhibit 91
Part 1 of 2   Pg 5 of 22

Repudiation of Leases                                    Blundell Lecture 26ᵗʰ June 2000

usually contractual, and the covenants which it contains, which are contractual, at least in origin; and the legal estate which it creates. That is property. It lies in grant. The owner of a legal estate has a right of exclusive possession, a right maintainable against the world. In other words, it is a right *in rem.* The tenant can sue in trespass. Once created, the legal estate has an existence independently of any contract which may have brought it into being. Like other property, it is freely assignable. It cannot be made non-assignable. An assignment in breach of an absolute covenant against assignment has legal effect. It may bring about a forfeiture if the landlord chooses to re-enter, but it is effective to vest the lease in the assignee. This is because the subject-matter of the assignment is the legal estate, ie. property not contract, and while contractual rights can be made inalienable, a legal estate in land cannot.

The relationship continues after assignment despite the absence of any privity of contract. It subsists by virtue of privity of estate, ie. because the parties' rights and liabilities are not contractual but property rights and liabilities. The original tenant usually has a contractual liability to pay the rent, which is why it formerly continued after assignment when he was no longer the tenant. But while he remains the tenant he is liable to pay rent even in the absence of a covenant to do so. This is because rent issues out of the land itself, ie. it is payable by the person who is the tenant for the time being. This is, of course, the basis on which a subsequent tenant is liable on any of the covenants. And now it is the only basis on which even the original tenant is liable. The tenant's liability is looking even less contractual today than it once did.

David is, I suggest, going to have to explain how the contractual doctrine of repudiatory breach can possibly apply when there is no contract between the parties. If he cannot do that, he will have to concede that it only applies to the original parties,

which is a severe limitation on the application of the doctrine. And I shall suggest that this is not the only limitation which he may have to concede.

## Secondly: it is Historically Unsound.

The importation of the contractual doctrine into the law of landlord and tenant is certainly historically unsound. In its modern form the contractual doctrine is of relatively recent origin. It cannot be traced back before 1831. It was not fully understood even by common lawyers until the late 19th. Century (1888), or by Chancery lawyers until the late 20th. Century (1980). The law of landlord and tenant of course predated these developments by many centuries.

Of course, it was long recognised that the refusal or inability of one party to perform his obligations should immediately excuse the other from performing his. Before the middle of the 19th. Century, however, this had nothing to do with breach of contract. The common law treated the innocent party as discharged from further performance, not because the other party had committed a repudiatory breach of contract, but because he had failed to perform a condition precedent to his own liability. The critical question was whether the two promises were mutually interdependent or independent. As we shall see, it was settled law that the covenants in a lease were independent.

A lease could, of course, be rescinded *ab initio* for fraud, though not, incidentally, for innocent misrepresentation until the Misrepresentation Act 1967. This did not bring the lease to an end. It meant that there no lease ever came into being. The same result followed if there was a failure of a condition precedent to the grant. This is probably the explanation of the handful of cases which have been relied upon in support of the

doctrine. Take the most recent, **Wilson v Fitch-Hatton** in 1877, a case in the Court of Appeal. The landlord agreed to let a furnished house for three months. Owing to defective drainage, the house was unfit for human habitation. The tenant refused to take the tenancy, or go into occupation, or pay the rent. The landlord's claim for rent failed. There is more than one possible explanation given in the three judgments, though none of them treats the case as a simple breach of covenant, and one of them expressly says that on this basis the result would have been different. But the important thing is that the tenancy failed at the outset. The tenant never went into possession at all. He never became liable for any rent. It was not a case where a valid and subsisting lease was brought to an end by a subsequent breach of covenant. I think the tenancy was rescinded *ab initio*. There never was an effective grant. The defendant never was a tenant.

The contractual doctrine does not work in this way. It does not rescind the contract *ab initio*. It merely discharges both parties from further performance of their reciprocal contractual obligations. But it was established from very early times that the covenants in a lease are independent of each other. Anthony Tanney of Falcon Chambers has traced this rule back to a case in the reign of Charles II, but it is almost certainly much earlier. This meant that neither the landlord nor the tenant was discharged from his obligations under the lease by the other's breach. This was settled law for centuries, long before the emergence of the modern contractual doctrine. It has been repeatedly confirmed in more recent times: **Dawson v Dyer** (1833); **Edge v Boileau** (1885); **Taylor v Webb** (1937); **Yorkbrook v Batten** (1986). These cases decide that the tenant's failure to pay rent does not absolve the landlord from liability under his repairing covenant. How then can the landlord's failure to repair absolve the tenant from his liability to pay rent, still less bring the lease to an end, so

that his breach is irremediable? The independence of the covenants is a two-way affair. So is the contractual doctrine.

### Thirdly: it sits uneasily with other aspects of the law of landlord and tenant.

For centuries, therefore, and long before the emergence of the doctrine of repudiatory breach of contract, the law of landlord and tenant developed on the footing that the parties' respective obligations were independent of each other, with the result that neither was absolved from performance by the non-performance of the other. This is inconsistent with the contractual doctrine. Conveyancers responded by including in the lease a proviso for re-entry, allowing the landlord to bring the lease to an end for non-payment of rent or breach of covenant on the part of the tenant. But since they acted for the landlord they resisted any attempt to include a proviso to allow the tenant to bring the lease to an end for breach on the part of the landlord. No such clause can be found in any precedent book.

So the law developed that a lease could not be determined by the landlord for breach of the tenant's covenants, no matter how serious, in the absence of an express proviso for re-entry, and none was to be implied. This rule can be traced back to 1824, but is almost certainly far older. The trouble with the importation of the contractual doctrine is that it sits uneasily with the need for an express proviso for re-entry, allows the landlord to bring the lease to an end without re-entering and without any prospect of relief from forfeiture, and operates in favour of the tenant as well as the landlord, contrary to the intentions of the original parties.

**Fourthly: it is inconsistent with the basis on which Parliament has legislated in this field.**

Parliament has continuously intervened to protect the tenant from forfeiture. It has done so on the basis that the only way a landlord can determine a lease for breach of covenant is by exercising his right of re-entry. Section 146 of the Law of Property Act 1925 expressly restricts the exercise of "a right of re-entry or forfeiture". It does not apply to a right to bring the lease to an end simply by accepting the tenant's repudiatory breach of contract. If Parliament (or Benjamin Cherry) had thought for a moment that the landlord had such a right, Section 146 would have been expressed very differently. Likewise, the Leasehold Property (Repairs) Act 1938 applies only where the tenant serves a counter-notice, and he can only serve a counter-notice if the landlord has served a Section 146 notice. A tenant who persistently refuses to carry out repairs during the currency of the lease is clearly evincing an intention not to comply with his obligations. If the landlord can bring the lease to an end by invoking the contractual doctrine, and is prepared to forego his claim for damages, he can deny the tenant the main protection of the 1938 Act.

David, I suggest, will have to explain how the doctrine can be invoked by the landlord consistently with the existing law which protects tenants, or he will have to concede that the doctrine is available only to tenants. That would be only half the contractual doctrine. And, oddly enough, the Australian cases are all cases where the doctrine was invoked by the landlord who insisted that he was not exercising his right of re-entry.

### Fifthly: it is Unnecessary.

It is not as if the importation of the contractual doctrine would meet a long felt want. The parties to a lease have adequate alternative remedies. The landlord can take an express proviso for re-entry for breach of covenant. He should not be allowed to circumvent the tenant's right to apply for relief from forfeiture. The tenant, for his part, enjoys a right of recoupment. If the landlord is in breach of his repairing covenant, the tenant can do the work and recoup himself out of the rent. This right was recognised as early as 1591. It is not actually inconsistent with a right on the part of the tenant to bring the lease to an end for breach of the landlord's repairing covenants. But if the landlord cannot bring the lease to an end for breach of the tenant's repairing obligations and without complying with the statutory requirements (LPA Section 146 etc.), why should the tenant be allowed to bring it to an end for breach of the landlord's repairing covenants when he can do the work himself and withhold the rent to pay for it? In practice, he can simply walk away and leave the premises empty. The landlord is in no position to bring an action for the rent, since he will be met with a cross-claim.

Again, if the landlord evicts the tenant, the tenant's obligation to pay rent is suspended while he is out of possession. This is an adequate remedy, particularly when he can also have damages for trespass and an injunction to obtain reinstatement. It is not strictly inconsistent with giving the tenant the alternative remedy of treating the lease as at an end, but why should he have this? The existing remedies are surely the appropriate way of dealing with the situation bearing in mind (i) that the lease is a property interest (ii) that there

may be no privity of contract between the parties and (iii) that others such as subtenants and mortgagees may be affected.

[I suppose the clearest possible repudiatory breach must occur if the tenant denies his landlord's title. It is true that, under the feudal law, this gave the landlord the right to forfeit the lease. No proviso for re-entry was necessary. Forfeiture was automatic without hope of relief. In **Warner v Sampson** in 1958 Lord Denning explained the basis of this rule. It had nothing to do with breach of contract. Denial of title was repugnant to the feudal obligations of a tenant. Lord Denning suggested that the rule is obsolete. I must say I agree with him. The landlord is sufficiently protected by saying that the tenant is estopped from denying his landlord's title. We would surely say that a tenant cannot at one and the same time deny his landlord's title and rely on a grant by the landlord or his predecessor].

### Finally: it affects third parties.

If the contractual doctrine is imported into the law of landlord and tenant, then the problem of subtenants and mortgagees has to be faced. This problem arises precisely because the lease is property, not contract. It is the practical consequence of the fundamental distinction between property and obligation.

There are three possibilities. One is that the destruction of the lease automatically destroys any subtenancy and the subject-matter of any mortgage. This would certainly be the position at common law and in the absence of statutory provision to the contrary. The injustice arises because, as the contractual doctrine is relatively modern, and it has only very recently been suggested that it can be used to bring a lease to an end, the relevant statutes have all been enacted on the assumption that the landlord can only bring a

Lord Millett

lease to an end by forfeiture. Section 146(4) of the Law of Property Act 1925, which preserves subtenancies and other derivative interests, applies only where the landlord is proceeding by action or otherwise to enforce a right of re-entry or forfeiture.

The second possibility is that the lease is destroyed but any subtenancy or mortgage continues, exactly as it would if the tenant had surrendered the term to the landlord. The difficulty with this solution is that, at common law, the extinguishment of the lease by surrender also extinguished the reversion to any subtenancy, with the result that the subtenant could remain in possession without any obligation to pay rent or perform the covenants in the subtenancy. The common law rule was reversed by statute in the 18th. Century: (see now Sections 139 and 150 of the Law of Property Act 1925). But these Sections apply only where the head lease is surrendered. That is because no one ever thought that it could be brought to an end simply by breach of contract.

A third possibility has been suggested: that a tenant who has granted a derivative interest will not be allowed to invoke the contractual doctrine to bring the lease to an end. This solution invokes the doctrine only to depart from it. It is born of the unnatural marriage of property and contract. But it is only half a solution. There is nothing to stop the *landlord* treating the *tenant's* breach of covenant as repudiatory. The Court has no discretion to disapply the contractual doctrine or to give relief from its consequences. It is difficult to see how the *landlord* can lose his right to invoke it because the *tenant* has granted a subtenancy.

But the problem is not merely that the doctrine causes injustice. It is that all these statutory provisions have been enacted on the assumption that a lease can be brought to a premature end only by surrender or forfeiture. They are inconsistent with the availability of the contractual machinery.

Blundell Lecture 26th June 2000

It is not as if the Australian decisions are without their problems. In the first of the cases (in 1981) the High Court held that a tenant's persistent late payment of rent and payment by cheques which were repeatedly dishonoured did not amount to a repudiatory breach. The Court drew a distinction between a party's unwillingness to comply with his contractual obligations and his inability (though willing) to do so. That is unorthodox, to say the least. The Court also seems to have suggested that the obligation to pay rent is not an essential term of the lease, quite contrary to the ordinary contractual rule. In the next case (in 1984) the High Court held that a bona fide refusal to pay rent on mistaken grounds did amount to a repudiatory breach of contract. That is also contrary to the contractual rule.

Both cases were concerned with breach of the tenant's obligation to pay rent. In both cases the lease contained a proviso for re-entry and the landlord claimed that the lease had determined without re-entry. In neither case did the tenant seek relief from forfeiture. It is a pity that he did not, because that might have concentrated minds. The problem was that the property market had collapsed, with the result that the passing rent was temporarily higher than the current rental value of the property. The landlord wanted damages as well as possession, and he could not have damages for loss flowing from his own act in re-entering. The landlord had to choose between re-entering and foregoing any claim to damages, or keeping the lease on foot and suing or proving for the rent quarter by quarter. What is wrong with that? It causes problems when the tenant is in liquidation, because it hinders the completion of the winding up. This difficulty was met by extending the disclaimer provisions to insolvent companies in 1929. But in the century or more before 1929, no one supposed that the landlord could eat his cake and have it by accepting the tenant's liquidation as a repudiatory breach of contract, regaining possession and proving for damages for the loss of the lease which he has himself brought about.

And this causes another problem, for the tenant's bankruptcy is the plainest possible repudiatory breach of contract. In the interests of the other creditors, Parliament has restricted the landlord's right of re-entry in these circumstances. Allowing the landlord to invoke the contractual doctrine will destroy the protection which Parliament has enacted for the protection of the tenant's creditors, as well as his subtenants and mortgagees. If it is thought appropriate, the solution to the problem in the Australian cases is to allow a landlord to forfeit and claim damages, subject to relief from forfeiture; not to bring the lease to an end without forfeiture.

## Panalpina.

You may have noticed that I have said nothing about the **Panalpina** case. That is because it has nothing to do with the question we are debating. In that case the House of Lords decided that the doctrine of frustration is, in theory at least, capable of applying to a lease, though it will hardly ever do so in practice. That is obviously right. A lease would be frustrated if, for example, the land demised falls into the sea. So the case involved a question of degree, not of principle. The question was: what can amount to frustration in the case of a lease? There are four points of difference between frustration and repudiatory breach:

(i)     Frustration applies to transactions, not just to contracts;

(ii)    the *tenant* may claim that the lease has been frustrated; it will never be in the *landlord's* interest to do so;

(iii)   if there is a subtenancy it will be the subtenant who alleges frustration, so it will never operate to the disadvantage of a subtenant; and

(iv)      the argument in **Panalpina** was about the allocation of risk,
which may be just as relevant where there is a property
transaction as where there is a contract.

So you cannot simply extrapolate from frustration to repudiatory breach.

## Conclusion.

So I summarise. The doctrine is conceptually and historically unsound.
It is inconsistent with other aspects of the law of landlord and tenant. It is unnecessary.  It is
inconsistent with the basis on which Parliament has legislated in this field for more than three
hundred years. And it prejudices third parties such as subtenants and mortgagees. The House
of Lords did not have to face these problems in **Panalpina.**

David will have to restrict the doctrine to the original parties to the
lease, to the case where the tenant is invoking the doctrine and not the landlord, and where
the tenant has not created any subtenancy or other derivative interest. And all because, when
the property market collapsed, a couple of Australian landlords with perfectly good forfeiture
clauses wanted to bring the lease to an end without exercising their powers of re-entry so that
they could claim damages as well.

**Lord Millett**

## BLUNDELL LECTURE

## WHY LEASES ARE DETERMINABLE BY AN ACCEPTED REPUDIATION

### SIR DAVID NEUBERGER

### 26th June 2000

Introduction

Although the doctrine of determination of a contract by an accepted repudiation
caused the courts some difficulty during the 18th and 19th centuries,[1] the principle
is now well established. A contract can be determined by repudiation on the part
of one party ("the repudiating party") if, but only if, the other party ("the accepting
party") accepts the repudiation. So far as the repudiating party is concerned, his
repudiation can come in one of two forms. The first is by committing a breach of
the contract which is so grave as to go to the root of the contract, or to take away
from the other party virtually all the benefit which the contract was intended to
give him. Alternatively, the repudiating party can renounce the contract, that is, he
can unequivocally state that he is not bound by the contract, without any apparent
justification. In either case, however grave the breach, or however unequivocal the
renunciation, the contract will not come to an end, unless and until the other party
accepts the repudiation. In the first case, that of a very serious breach, the other
party, instead of accepting the repudiation, can elect to treat the contract as
subsisting, and simply sue for any loss he has suffered as a result of the breach. In

---

[1] e.g. Frost -v- Knight LR 5 Exch. 322 at 326-7 per Kelly CB.

---

the latter case, the renunciation of itself achieves nothing, and cannot found the basis of any claim: it is "writ in water".

"The doctrine of accepted repudiation is of general application in the law of contract". So said Lord Millett very recently in Hurst -v- Bryk[2]. Why should this doctrine, which applies to contracts generally, not apply to leases? Various arguments have been put forward. Let me consider them in turn.

## The assumption argument

The first is that, at least until recently, it had always been assumed that it did not apply. That will not do. The law reports are littered with decisions of the courts which show that accepted notions are either based on outdated ideas or simply do not bear analysis once they are subjected to scrutiny. As with any notion, the idea that leases cannot be determined by accepted repudiation must be tested by reference to principle, authorities, and consequences.

## The estate in land argument and connected points

The second argument is that a lease is an estate in land. However, it is also a contract. As was said by Lord Browne-Wilkinson recently, a lease is "a legal

---

[2] [2000] 2 All ER 193 at 199a.

hybrid, part contract part property"[3]. That a lease is normally an estate in land cannot possibly be gainsaid: see Section 1(1)(b) of the Law of Property Act 1925. However, the first problem with this argument is that it is not right to say that a lease always creates an estate. As was said by Lord Hoffmann in Bruton -v- London & Quadrant Housing Trust[4]:

"[T]he term "lease"... describes a relationship between two parties of a designated landlord and tenant.    It is not concerned with the question of whether the agreement creates an estate... which may be binding upon third parties. A lease may, and usually does, create a proprietary interest called a leasehold estate. ...But it is the fact that the agreement is a lease which creates the proprietary interest. It is putting the cart before the horse to say that whether the agreement is a lease depends upon whether it creates a proprietary interest."

Accordingly, the simple argument that leases cannot be determined by an accepted repudiation because they are always estates in land is based on an oversimplification.

Reverting to the usual case, when the original parties ("the lessor" and "the lessee") execute a lease, they create a contract and an estate. On the basis that determination by accepted repudiation is of general application to contracts, why

---

[3] Linden Garden Trusts Ltd -v- Lenesta Disposals Ltd [1994] 1 AC 85, at 108H.
[4] [1999] 3 WLR 150 at 156H to 157A.

should the mere fact that the lease creates an estate as well as a contract prevent the doctrine applying to leases?

Consider first the case where there has been no assignment of term or reversion, i.e. where the reversion and term remain vested in the lessor and the lessee respectively. The fact that a lease is an estate in land does not alter the fact that it is also a contract. Furthermore, the fact that the lease is an estate does not mean that it is incapable of coming to an end. Quite the contrary. It is of the essence that a leasehold estate will determine or is capable of determination; a purported lease is invalid if it has no contractual term date and is incapable of determination[5]. In that sense, a lease is not merely different from, but is effectively opposite to, the only other estate in land which can now exist, namely a freehold. Whereas a leasehold estate must be determinable, a freehold estate cannot be determinable. Indeed, a lease can determine early - e.g. by forfeiture, surrender or disclaimer.

Additionally, it is of the essence of a lease that it involves two parties, who have rights and obligations against each other, namely the lessor and the lessee. The only other type of estate, a freehold does not involve two parties: there is simply the freehold. Of course, freeholds are often subject to third party rights, in that they can be subject to restrictive covenants or rent charges, but unlike the landlord's interest under a lease, they are not of the essence of freehold estates; they are merely incidental thereto.

---

[5] Prudential Assurance Co. Ltd -v- London Residuary Body [1992] 2 AC 386.

Accordingly, the contention that, because a lease is an estate as well as a contract, it cannot be determined by a method applicable to contracts, gets no assistance from considering the position of the only other estate which can now exist in English law, namely a freehold. A freehold is merely an estate in land; unlike a lease, it has no inherent contractual aspect. Contrary to a lease, it is necessarily perpetual in nature. Indeed, historically, unlike a freehold, a lease was not technically real property. Neither was it personal property. It was classified as a chattel real, a sort of legal duck billed platypus. As between lessor and lessee, there is a contractual relationship, to which one would expect normal contractual principles apply. That would include determination by accepted repudiation. Why should that not put an end to the estate?

The contention that, because it is an estate, a lease cannot be determined by accepted repudiation merely states the proposition we are discussing: it does not answer it. In the National Carriers case, in 1980[6], Lord Wilberforce made the same point about an argument that a lease could not be determined by frustration:

"The argument must continue by a proposition that an estate in land once granted cannot be divested - which... begs the whole question." [7].

To the same effect, Lord Simon of Glaisdale said[8] that the argument "cannot be because, once vested, a lease cannot be divested without the agreement of the

---

[6] National Carriers Ltd -v- Panalpina Northern Ltd [1981] AC 675.
[7] [1981] AC 675 at 694D.
[8] [1981] AC 675 at 705D-E.

parties. That would be to beg the question: if frustration, applies it can be so divested".

I turn to the case where the reversion and the term have been transferred. In that case, the relationship between the persons in whom the reversion and the lease are vested ("the landlord" and "the tenant" as I shall call them) is based on a privity of estate rather than privity of contract. At first sight, perhaps, the contention that a doctrine, which applies to contractual relationships, cannot continue to apply, has a little more force. On the other hand, it would be startling if an incident of a lease (namely its ability to be determined by a repudiation) disappeared as soon as the term or the reversion was assigned Analysis shows that this latter view is indeed correct. While the relationship between the landlord and the tenant is based on privity of estate, the rights and obligations as between the landlord and the tenant are entirely rooted in the terms of the contract agreed between the lessor and the lessee. Effectively, the entire bundle of rights and obligations created by the lessor and the lessee passes to their respective successors in title. An example is the right of a lessor to sue a guarantor of the lessee's liability to pay rent: the right passes to the successor landlord[9]. There is no reason why the benefit (and indeed the burden) of the application of the law of repudiation should not similarly be relied on by (or enforceable against) successors in title of the lessor and the lessee.

In this connection, it is also worth remembering that, if and when the lease and/or the reversion are transferred, the contract still survives, although only as between

---

[9] P&A Swift Instruments -v- Combined English Stores plc [1989] AC 643.

the lessor and the lessee. Accordingly, when the lease and reversion have been transferred, methods of determination by forfeiture, surrender, or notice to quit are operable only between the landlord and the tenant, that is the parties with privity of estate, but if and when determination is effected by one of those means, not only does the estate come to end. The contractual relationship between the lessor and the lessee also ends, although nothing they have done has caused this to happen. The idea that the lease can be determined by acts or omissions of successors in title to the original parties, thereby putting an end both to the estate and to the original contract, is therefore entirely in keeping with very well established principles of leasehold law.

The other conceptual arguments raised against repudiation applying to leases are equally uncompromising. The fact that a lease grants exclusive possession takes matters no further. The tenant's right to exclusive possession continues until the lease expires, and if the lease expires as a result of an accepted repudiation, then his right to exclusive possession goes. The fact that the law treats the rent as issuing out of the land is also irrelevant: if the rent issues out of the land so long as the lease continues, and if the lease determines by an accepted repudiation or otherwise, the rent no doubt stops issuing. So too with the covenants: they continue until the lease expires. In any event the notion of rent issuing out of the land was rightly characterised by Lord Denning as one of the "outdated relics of medieval law"[10].

---

[10] CH Bailey Ltd -v- Memorial Enterprises Ltd [1974] 1 WLR 728 at 732.