**EXHIBIT   96**

26                    QUEEN'S BENCH DIVISION.                **[1962]**

1961

Reg.
*v.*
Hastings
Justices.
*Ex parte*
Pevensey
Levels
Internal
Drainage
Board.

———

" ground in order to be fair from its real basis of £3,800 to what
" it would have been if, like all the other hereditaments, it was a
" Schedule A hereditament." In my view, that is an error of law,
and an error of law on the face of this decision, and I would grant
certiorari to quash the decision.

> *Application dismissed.*
> *By agreement, no order as to costs.*

Solicitors: *Sharpe, Pritchard & Co. for R. W. Fovargue, Battle,
Sussex.*

———————————

1961
*Jan.* 30, 31;
*Feb.* 1, 2, 3,
6, 7, 8, 9,
10, 13, 14,
15, 16, 17,
22.

Salmon J.

C. A.

1961
*Oct.* 30, 31;
*Nov.* 1, 2, 6;
*Dec.* 20.

Sellers,
Upjohn and
Diplock L.JJ.

———

HONGKONG FIR SHIPPING CO. LTD. *v.* KAWASAKI
KISEN KAISHA LTD.

[1957 H. No. 2571.]

*Shipping—Charterparty—Seaworthiness—Condition precedent, whether
—Time charter—Vessel unseaworthy by reason of inadequate engine
room staff—Breakdowns and delays—Vessel off hire for 5 out of 13½
weeks—Further 15 weeks required for repairs—Whether charterers
entitled to rescind—Whether charter frustrated.*

*Contract—Condition or warranty—Intermediate stipulation—Under-
taking, character of depending on nature of breach—Carriage by
sea—Undertaking of seaworthiness.*

*Contract — Frustration — Charterparty — Time charter — Delay —
Time necessary to make vessel seaworthy.*

*Ships' Names—Hongkong Fir.*

By a time charterparty, dated December 26, 1956, shipowners let
and charterers hired the m.v. *Hongkong Fir,* built in 1931, for a
period of 24 calendar months " . . . she being in every way fitted for
" ordinary cargo service. . . ." Clause 3 of the charterparty pro-
vided that the owners should " . . . maintain her in a thoroughly
" efficient state in hull and machinery during service. . . ." The
vessel was delivered to the charterers on February 13, 1957, and on
that day sailed in ballast from Liverpool to Newport News,
Virginia, to pick up a cargo of coal and carry it to Osaka. The
vessel's machinery was in reasonably good condition at Liverpool but
by reason of its age needed to be maintained by an experienced, com-
petent, careful and adequate engine room staff. When she sailed
the chief engineer was inefficient and addicted to drink, and the
engine room complement insufficient, and, chiefly for that reason,
there were many serious breakdowns in the machinery. On the
voyage from Liverpool to Osaka she was at sea eight and a half
weeks, off hire for about five weeks and had about £21,400 spent on
her for repairs. She reached Osaka on May 25 when a further

## 2 Q.B.    QUEEN'S BENCH DIVISION.    27

period of about 15 weeks and an expenditure of £37,500 were
required to make her ready for sea. In June, 1957, the charterers
repudiated the charterparty: they had no reasonable grounds for
thinking that the owners would be unable to make her seaworthy by
mid-September, at the latest, and in fact the vessel sailed from
Osaka on September 15 with an adequate and competent engine room
staff and was then admittedly in all respects seaworthy. In an
action by the owners for damages for wrongful repudiation of the
charterparty in which the charterers contended, inter alia, that they
were entitled to repudiate by reason of a breach by the owners of their
obligation to deliver a seaworthy vessel and that the charterparty
was frustrated by the delays and breakdowns, Salmon J. held that
although the shipowners were in breach of their obligation to deliver
a seaworthy ship, seaworthiness was not a condition precedent to
their rights under the charterparty and, as the charterparty had
not been frustrated, they were entitled to damages. On appeal by
the charterers : —

*Held*, (1) that, although the shipowners were admittedly in
breach of clause 1 of the charterparty, the vessel being unseaworthy
on delivery by reason of an insufficient and incompetent engine
room staff, seaworthiness was not a condition of the charterparty a
breach of which entitled the charterer at once to repudiate (post,
pp. 60, 62, 73).

*Havelock* v. *Geddes* (1809) 10 East 555; *Davidson* v. *Gwynne*
(1810) 12 East 381 ; *Tarrabochia* v. *Hickie* (1856) 1 H. & N. 183
and *Kish* v. *Taylor* [1912] A.C. 604; 28 T.L.R. 425, H.L. applied.

Dictum of Lord Atkinson in *Kish* v. *Taylor*, supra, p. 617
questioned.

Observations of Bramwell B. in *Tarrabochia* v. *Hickie*, supra,
p. 188 considered.

*Per* Diplock L.J. The express or implied obligation of seaworthi-
ness is neither a condition nor a warranty but one of that large class
of contractual undertakings one breach of which might have the
effect ascribed to a breach of " condition " under the Sale of Goods
Act, 1893, and a different breach of which might have only the same
effect as that ascribed to a breach of " warranty " (post, p. 71).

*Jackson* v. *Union Marine Insurance Co. Ltd.* (1874) L.R. 10
C.P. 125 considered.

(2) That the delays caused by the breakdowns and repairs were
not so great as to frustrate the commercial purpose of the charter-
party; and that, accordingly, the charterers' claim failed and the
appeal must be dismissed (post, pp. 60, 65, 73).

*Universal Cargo Carriers Corporation* v. *Citati* [1957] 2 Q.B.
401; [1957] 2 W.L.R. 713; [1957] 2 All E.R. 70 approved and
applied.

*Per* Upjohn L.J. It is open to the parties to a contract to
make a particular stipulation a condition, but where, upon the
true construction of the contract, they have not done so, it would
be unsound and misleading to conclude that, being a warranty,
damages is necessarily a sufficient remedy. The remedies open to an
innocent party for breach of a stipulation which is not a condition
strictly so-called depend entirely upon the nature of the breach and

1961

HONGKONG
FIR SHIPPING
CO. LTD.
*v.*
KAWASAKI
KISEN
KAISHA LTD.

28                          QUEEN'S BENCH DIVISION.                    **[1962]**

1961

HONGKONG
FIR SHIPPING
CO. LTD.
*v.*
KAWASAKI
KISEN
KAISHA LTD.
———

its foreseeable consequences. As the stipulation as to seaworthiness is not a condition in the strict sense, the question is whether the unseaworthiness found by the judge went so much to the root of the contract that the charterers were entitled then and there to treat the charterparty as at an end. It could not be so treated and, accordingly, on that part of the case the charterer failed (post, pp. 63, 64).

Decision of Salmon J., post, p. 32; [1961] 2 W.L.R. 716; [1961] 2 All E.R. 257 affirmed.

ACTION.

In December, 1956, the plaintiff shipowners, the Hongkong Fir Shipping Co. Ltd., a company registered in Hongkong, bought the m.v. *Antrim*, 5,395 tons gross, built in 1931, for £397,500 from the Avon Shipping Company Ltd., a subsidiary of the New Zealand Shipping Company Ltd. In the contract of sale the vessel was described as "classed at Lloyds 100 A1. Special "Survey passed July, 1955," and the contract provided that the vessel was to be delivered with its class maintained and that she should be taken with all faults and errors of description, but subject otherwise to the provisions of the contract. By a Baltime 1939 "uniform" time charter, dated December 26, 1956, the plaintiffs chartered the vessel to the defendants, Kawasaki Kisen Kaisha Ltd., a company registered in Japan. That charter, so far as material, provided: "It is this day mutually agreed between "Hongkong Fir Shipping Co. Ltd., Hongkong, owners of the "Vessel called 'Antrim' to be renamed 'Hongkong Fir' . . . "classed Lloyds 100 A1 and fully loaded capable of steaming about "12½ knots in good weather and smooth water . . . and Messrs. "Kawasaki Kisen Kaisha Ltd., Kobe, Japan:

"1. The owners let, and the charterers hire the vessel for a "period of 24 (with one month more or less at charterers' option) "calendar months from the time . . . the vessel is delivered and "placed at the disposal of the charterers at Liverpool . . . she "being in every way fitted for ordinary cargo service. The vessel "to be delivered not earlier than February 1, 1957 . . . 3. The "owners to provide and pay for all provisions and wages, for "insurance of the vessel, for all deck and engine-room stores and "maintain her in a thoroughly efficient state in hull and machinery "during service . . . 6. The charterers to pay as hire: 47s. per "deadweight ton on vessel's deadweight of 9,131 tons per 30 "days, commencing in accordance with clause 1 until her "redelivery to the owners. . . .

"11. (A) In the event of drydocking or other necessary

**2 Q.B.**    QUEEN'S BENCH DIVISION.    29

" measures to maintain the efficiency of the vessel, deficiency
" of men or owners' stores, breakdown of machinery, damage
" to hull or other accident, either hindering or preventing the
" working of the vessel and continuing for more than 24 con-
" secutive hours, no hire to be paid in respect of any time lost
" thereby during the period in which the vessel is unable to per-
" form the service immediately required.  Any hire paid in
" advance to be adjusted accordingly . . . 12.  Overhauling of
" machinery whenever possible to be done during service, but
" if impossible the charterers to give the owners necessary time
" for overhauling.  Should the vessel be detained beyond 48 hours
" hire to cease until again ready.  13.  The owners only to be
" responsible for delay in delivery of the vessel or for delay
" during the currency of the charter and for loss or damage to
" goods on board, if such delay or loss has been caused by want
" of due diligence on the part of the owners or their manager in
" making the vessel seaworthy and fitted for the voyage or any
" other personal act or omission or default of the owners or their
" manager or their servants . . . 23.  Any dispute arising under
" the charter to be referred to arbitration in London . . . . 32.
" Any off-hire time by reason obtained in clause 11, charterers'
" option to add off-hire time to vessel's period under this charter.
" And such option to be declared one week after vessel is on hire
" again before expiration of this charterparty. . . .  44.  This
" charterparty is also subject to the vessel being taken over by
" Messrs. Hongkong Fir Shipping Co., Ltd, in Liverpool,
" according to purchase agreement."

1961

HONGKONG
FIR SHIPPING
CO. LTD.
v.
KAWASAKI
KISEN
KAISHA LTD.

The vessel was delivered to and placed at the disposal of the
charterers on February 13, 1957, and sailed in ballast from Liver-
pool at 6 p.m. on that day on her intended voyage to Newport
News, Virginia, there to pick up a cargo of coal and carry it to
Osaka, Japan, which she was expected to reach in about two
months, calling on the way at Cristobal in the Panama Canal Zone.
The Atlantic crossing was stormy, but by no means exceptional
for the time of year.  She arrived at Newport News on February
28 where she loaded her cargo, and was off hire for 1 day 19 hours
for repairs to her main engine attached pumps costing £1,180.
She left Newport News on March 6 and arrived at Cristobal on
March 15, having met with two serious accidents on the way.  At
Cristobal she was off hire for about 11 days.  £8,220 was there
spent in repairs, chiefly to No. 5 and No. 8 engines, and also to
the bilge and general service pumps.  The vessel left Cristobal on
March 26 en route for Osaka.  She sustained another accident to

1961

HONGKONG
FIR SHIPPING
Co. LTD.
*v.*
KAWASAKI
KISEN
KAISHA LTD.

one of the engines (No. 5) on March 31, and also had a major breakdown of the scavenge pump on April 2. Temporary repairs were carried out to the scavenge pump at sea, but they would not have enabled her to cross the Pacific safely. Accordingly, she made for San Pedro, near Los Angeles, where she arrived on April 14. There she was off hire for about 22 days 16 hours, and a further £12,000 was spent on repairs. She left San Pedro on April 29 and eventually arrived at Osaka on May 25. It was there discovered that her main engine and auxiliaries were in a very bad state, due chiefly to corrosion. A further £37,500 was spent on repairs and she was not ready to put to sea until September 15. Thus, between Liverpool and Osaka she was at sea for about eight and a half weeks, off hire for about five weeks, and had £21,400 spent upon her for repairs. Whilst at Osaka a further period of about 15 weeks and an expenditure of £37,500 were required to make her ready for sea.

The vessel's machinery was in reasonably good condition at Liverpool but, by reason of its age, needed to be maintained by an experienced, competent, careful and adequate engine room staff. When she sailed from Liverpool the chief engineer was inefficient and the complement of the engine room insufficient. The engine room was undermanned, there being five engineers, three fitters and seven greasers, whereas the previous owners had employed seven engineers and eight ratings, and most of those engineers had been familiar with the machinery while those who sailed from Liverpool were new to it. Had the owners taken proper steps to inform themselves they could and would have discovered that the engine room staff should have included at least seven engineers, and, in fact, when she sailed from Osaka on September 15, 1957, and was admittedly in all respects seaworthy, the chief and second engineers had been replaced and there were in all eight engineers, three fitters and seven greasers on board. Salmon J. found that the right conclusion as to the causes of the breakdowns and delays was that stated by the consulting engineer acting for the owners on taking over the vessel: " The engine room executive appeared to lack the necessary " experience and/or perspicuity normally expected of them and in " consequence the machinery was deprived of the care and atten- " tion which it would otherwise have been afforded . . . the adverse " condition of the machinery disclosed during examination on " the completion of the voyage is attributable in part to heavy

## 2 Q.B.    QUEEN'S BENCH DIVISION.    31

1961

HONGKONG
FIR SHIPPING
Co. LTD.
v.
KAWASAKI
KISEN
KAISHA LTD.

" weather and in part to progressive negligence through a com-
" bination of what appears to have been gross dereliction of duty
" and inexperience on the part of the engine room personnel."

On June 5 and 6 and July 27 the charterers wrote repudiating
the charter and claiming damages for breach of contract; on
August 8 and 12 the owners wrote intimating that they would
treat the contract as cancelled by the charterers' wrongful
repudiation and claim damages. On September 11 the charterers
wrote again repudiating the charter and the owners formally
accepted that repudiation on September 13.

On November 8, 1957, the owners issued a writ against the
charterers claiming damages for wrongful repudiation of the
charterparty. The charterers alleged breaches by the plaintiffs
of clauses 1, 2 and 3 of the charterparty in that, inter alia, the
vessel was unseaworthy by reason of the condition of her machin-
ery, that the owners had failed to exercise due diligence to make
her seaworthy and fitted for the voyage and also that the descrip-
tion in the charterparty of the vessel's steaming capacity was
inaccurate; alternatively, they alleged that the charterparty was
frustrated by reason of the breakdowns and repairs and delays con-
sequent thereon; the charterers also counterclaimed for damages.

*Stephen Chapman Q.C., Michael Kerr* and *C. S. Staughton*
for the shipowners.
*Ashton Roskill Q.C., B. S. Eckersley* and *B. Davenport* for the
charterers.

The following were among the cases cited in argument:
*Standard Oil Co. of New York* v. *Clan Line Steamers Ltd.*[1]
*Moore* v. *Lunn*[2]; *Rio Tinto Co. Ltd.* v. *Seed Shipping Co.*[3];
*Port Line Ltd.* v. *Ben Line Steamers Ltd.*[4]; *Davis Contractors
Ltd.* v. *Fareham Urban District Council*[5]; *Tynedale Steam
Shipping Co. Ltd.* v. *Anglo-Soviet Shipping Co. Ltd.*[6]; *F. A.
Tamplin S.S. Co. Ltd.* v. *Anglo-Mexican Petroleum Products
Co. Ltd.*[7]; *Admiral Shipping Co. Ltd.* v. *Weidner Hopkins &*

[1] [1924] A.C. 100; 40 T.L.R. 148, H.L.
[2] (1923) 39 T.L.R. 526, C.A.
[3] (1926) 42 T.L.R. 381.
[4] [1958] 2 Q.B. 146; [1958] 2 W.L.R. 551; [1958] 1 All E.R. 787.
[5] [1955] 1 Q.B. 302; [1955] 2 W.L.R. 388; [1955] 1 All E.R. 275, C.A.; [1956] A.C. 696; [1956] 3 W.L.R. 37; [1956] 2 All E.R. 145, H.L.
[6] (1936) 41 Com.Cas. 206; 52 T.L.R. 304; [1936] 1 All E.R. 389, C.A.
[7] [1916] 2 A.C. 397; 32 T.L.R. 677, H.L.

32                    QUEEN'S BENCH DIVISION.        **[1962]**

1961

HONGKONG
FIR SHIPPING
CO. LTD.
*v.*
KAWASAKI
KISEN
KAISHA LTD.

*Co.*[8]; *Bank Line Ltd.* v. *Capel (Arthur) & Co.*[9]; *Blane Steamships Ltd.* v. *Minister of Transport*[10]; *Inverkip Steamship Co. Ltd.* v. *Bunge & Co.*[11]; *The Europa*[12]; *Behn* v. *Burness*[13]; *J. & E. Kish* v. *Charles Taylor, Sons & Co.*[14]; *Atlantic Shipping and Trading Co. Ltd.* v. *Louis Dreyfus & Co. (No. 1)*[15]; *Smeaton Hanscomb & Co. Ltd.* v. *Sassoon I. Setty, Son & Co. (No. 1)*[16]; *Lorentzen* v. *White Shipping Co. Ltd.*[17]; *Tate & Lyle Ltd.* v. *Hain Steamship Co. Ltd.*[18]; *Stanton* v. *Richardson*[19]; *Havelock* v. *Geddes*[20]; *Davidson* v. *Gwynne*[21]; *Freeman* v. *Taylor*[22]; *Clipsam* v. *Vertue*[23]; *Tarrabochia* v. *Hickie*[24]; *MacAndrew* v. *Chapple*[25]; *Tully* v. *Howling*[26]; *Snia Societa Di Navigazione Industria e Commercio* v. *Suzuki & Co.*[27]; *Compania Cantabrica De Navegacion* v. *Anglo-American Oil Co.*[28]; *Universal Cargo Carriers Corporation* v. *Citati*[29]; *McFadden* v. *Blue Star Line*[30]; *W. J. Tatem Ltd.* v. *Gamboa*[31]; *Société Franco-Tunisienne D'Armement* v. *Sidermar S.P.A.*[32]; *Forshaw* v. *Chabert*[33]; *Clifford* v. *Hunter*[34]; *Shore* v. *Bentall*[35]; and *Thames and Mersey Marine Insurance Association* v. *Gunford Ship Co.*[36]

*Cur. adv. vult.*

SALMON J. read the following judgment which, after stating the facts set out above, continued: It has been argued on behalf of the charterers that two letters written on the owners' behalf on September 9 and 10 respectively waived their former acceptance of the charterers' alleged wrongful repudiation. On the other

[8] [1916] 1 K.B. 429; [1917] 1 K.B. 222; 33 T.L.R. 70, C.A.
[9] [1919] A.C. 435; 35 T.L.R. 150, H.L.
[10] [1951] 2 K.B. 965; [1951] 2 T.L.R. 763, C.A.
[11] [1917] 2 K.B. 193, C.A.
[12] [1908] P. 84; 24 T.L.R. 151, D.C.
[13] (1863) 3 B. & S. 751.
[14] [1912] A.C. 604; 28 T.L.R. 425, H.L.
[15] [1922] 2 A.C. 250; 38 T.L.R. 534, H.L.
[16] [1953] 1 W.L.R. 1468; [1953] 2 All E.R. 1471.
[17] (1942) 74 Ll.L.Rep. 161.
[18] (1936) 52 T.L.R. 617; [1936] 2 All E.R. 597; (1936) 55 Ll.L.Rep. 159, H.L.
[19] (1872) L.R. 7 C.P. 421.
[20] (1809) 10 East 555.
[21] (1810) 12 East 381.

[22] (1831) 8 Bing. 124.
[23] (1843) 5 Q.B. 265.
[24] (1856) 1 H. & N. 183.
[25] (1866) L.R. 1 C.P. 643.
[26] (1877) 2 Q.B.D. 182, C.A.
[27] (1924) 29 Com.Cas. 284, C.A.
[28] (1923) 39 T.L.R. 614; 16 Ll.L.Rep. 235.
[29] [1957] 2 Q.B. 401; [1957] 2 W.L.R. 713; [1957] 2 All E.R. 70.
[30] [1905] 1 K.B. 697; 21 T.L.R. 345.
[31] [1939] 1 K.B. 132; [1938] 3 All E.R. 135.
[32] [1961] 2 Q.B. 278; [1960] 3 W.L.R. 701; [1960] 2 All E.R. 529.
[33] (1821) 3 Brod. & Bing. 158.
[34] (1827) 3 C. & P. 16; Mood. & M. 103, N.P.
[35] (Circa. 1828) 7 B. & C. 798n.
[36] [1911] A.C. 529; 27 T.L.R. 518, H.L.

**2 Q.B.**        QUEEN'S BENCH DIVISION.                                    33

hand, it has been argued on behalf of the owners that once          1961
repudiation is accepted the contract is dead, and there can be no   ―――
question of waiver. It is argued that the letters relied on by the  HONGKONG
charterers as a waiver could at the most amount to a fresh offer    FIR SHIPPING
to enter into a new contract on the same terms as the old.         Co. LTD.
Without expressing any concluded view, I am inclined to think        *v.*
that the owners are right on this point. It does not, however,      KAWASAKI
seem to be material since the charterers wrote on September 11      KISEN
again repudiating the charter, and the owners formally accepted     KAISHA LTD.
this repudiation on September 13. The position on June 6 was        ―――
not materially different from that on September 11. In June it      Salmon J.
was known that a very long time would be required to repair         ―――
the vessel, and then presumably a further substantial period for
her trials. By September 11 the repairs and trials had been
virtually completed. If the charterers were entitled to repudiate
on June 6 they were equally entitled to do so on September 11.

The owners now bring this action claiming damages for wrong-
ful repudiation of contract. The charterers' defence is that they
were entitled to throw up the charter because of breaches of the
charter on the part of the owners.

The breaches relied on by the charterers are (1) a breach of
the obligation under clause 1 of the charterparty to deliver a sea-
worthy vessel. The vessel is said to have been unseaworthy in
respect of her machinery and of her engine room staff; (2) a
breach of the obligation under clause 3 of the charterparty to
maintain the vessel properly; and (3) a breach of the obligation
to deliver a vessel capable of making about $12\frac{1}{2}$ knots in good
weather and smooth water.

The charterers contend that any of these breaches would per
se entitle them to throw up the charter. Alternatively, they say
that they were so entitled by the failure of the owners to remedy
the breaches (a) within a reasonable time, or (b) within what has
been referred to in argument as " a frustrating time," that is to
say, they contend that the breaches were such that the delay
involved in remedying them frustrated the commercial purpose
of the charter.

One of the chief issues in this case is whether the vessel was
seaworthy when it left Liverpool on February 13. Mr. Roskill,
relying on the facts outlined at the beginning of this judgment,
says that the owners are on the horns of a dilemma: either the
machinery was in a thoroughly bad condition at the start, or it
was wrecked by the incompetence of the engine room staff during
the course of the voyage. Mr. Chapman says that everything can

1961

HONGKONG
FIR SHIPPING
Co. LTD.
*v.*
KAWASAKI
KISEN
KAISHA LTD.

Salmon J.

be explained on the basis of heavy weather, bad luck and, perhaps, one isolated piece of negligence on the part of the chief engineer.

There is certainly no direct evidence that the vessel was unseaworthy as to her machinery on February 13, 1957. The charterers' case in this regard depends entirely upon the inference to be drawn from the behaviour of the machinery on the voyage to Osaka and its condition when it arrived there. The eminent consulting marine engineers, who have given the most helpful evidence before me, differ in their views. [His Lordship considered the evidence on this issue and continued:] In my judgment the machinery was in a reasonably good condition at Liverpool but, by reason of its age, it needed to be maintained by an experienced, competent, careful and adequate engine room staff.

The next question to be considered is whether the vessel was unseaworthy on February 13 by reason of the incompetence or insufficiency of her engine room staff. The test is: would a reasonably prudent owner, knowing the relevant facts, have allowed this vessel to put to sea with this engine room staff?: see *Clifford* v. *Hunter* [1]; *Rio Tinto Co. Ltd.* v. *Seed Shipping Co.* [2] I have no doubt that the true answer to this question is " No." It is obvious from the owners' associated company's letter of December 28, 1956, to the owners' Hongkong agents that the owners were informed that as the engines were very old it was necessary to engage an engine room staff " of exceptional ability, " experience and dependability."

[His Lordship considered the evidence relating to the breakdowns, reached the conclusion set out above, and continued:] I find, without any doubt, that on February 13, 1957, the engine room staff of this vessel was incompetent and insufficient in numbers. Accordingly, the owners were in breach of their obligation under clause 1 of the charter. There is no escape for them under clause 13, since for the reasons I have already stated the breach was caused by want of due diligence on their part. It is only fair to say that as soon as the troubles caused by this breach came to the owners' attention they took the most energetic steps to remedy it. No money was spared on repairs during the voyage or on the very thorough overhaul which the vessel underwent at Osaka. Moreover, the chief engineer was dismissed and a most competent, experienced and reliable chief engineer engaged

[1] (1827) 3 C. & P. 16; 1 M. & M.
103, N.P.

[2] (1926) 134 L.T. 764; 42 T.L.R.
381.

**2 Q.B.**      QUEEN'S BENCH DIVISION.                                    85

in his place. I am satisfied that by September 15 this vessel had
a thoroughly competent and ample engine room staff. .

It follows from my findings that the owners were also in
breach of their obligation under clause 3 of the charter to main-
tain the vessel in a thoroughly efficient state. Since this failure
to maintain was caused by the negligence of the owners' servants,
that is to say the engine room staff, ex hypothesi clause 13 does
not protect the owners.

The only question of fact remaining to be considered is
whether this vessel, in the ordinary and natural meaning of the
words " fully loaded (was) capable of steaming about 12½ knots in
" good weather and smooth water." Two witnesses, who know
the vessel very well, say that she was so capable when trading for
her former owners. I accept their evidence. Is there any
evidence that could justify me in finding that the vessel was not
so capable on December 26, 1956 (the date of the charterparty)
or on February 13, 1957, when she was handed over to the
charterers? [His Lordship considered this evidence and con-
tinued:] It seems to me impossible to hold that this vessel was
incapable at the material times when fully loaded of steaming at
about 12½ knots in good weather and smooth water.

There remains to be considered the effect in law of the findings
of fact at which I have arrived. Mr. Roskill argues that the
obligation to deliver a seaworthy vessel is a condition precedent
to the charterer's liability under the charterparty, and that the
breach of this obligation is a fundamental breach of contract
which, since it was never waived, per se entitles the charterers to
throw up the charterparty. There is no reported case of a breach
of the owner's obligation to deliver a seaworthy vessel being held
by itself to entitle the charterer to escape from the charterparty.
On the other hand, there is a considerable body of authority over
the last 150 years for the proposition that such a breach does not
allow the charterer to escape unless the delay involved in remedy-
ing the breach would frustrate the commercial purpose of the
charter. Although it is argued by Mr. Roskill that *Havelock* v.
*Geddes* [3] was decided on the basis that the charterers had waived
the term as to seaworthiness, in my view the judgment of Lord
Ellenborough C.J. is clearly based on the ground that the sea-
worthiness clause is not a condition precedent to the owner's
rights under the charterparty. *Tarrabochia* v. *Hickie* [4] is a
decision directly contrary to Mr. Roskill's contention. He seeks

1961

HONGKONG
FIR SHIPPING
CO. LTD.
*v.*
KAWASAKI
KISEN
KAISHA LTD.

Salmon J.

---

[3] (1809) 10 East 555.                  [4] (1856) 1 H. & N. 183.

36                         QUEEN'S BENCH DIVISION.          **[1962]**

1961

HONGKONG
FIR SHIPPING
CO. LTD.
*v.*
KAWASAKI
KISEN
KAISHA LTD.

Salmon J.

to distinguish it on the ground that it concerned a voyage
charter. It is difficult to see why seaworthiness should be a
condition precedent in a time charter if it is not a condition pre-
cedent in a voyage charter. In *Tully* v. *Howling,*[5] where there
was a time charter for 12 months from a certain date, the owners
were unable to deliver their vessel until two months after that date,
the intervening time being necessary to make her seaworthy.
Mellor J. in the court below [6] and Brett J. in the Court of Appeal [7]
found for the charterers on the ground that the time required to
make the vessel seaworthy frustrated the object of the charter-
party. The other judges based their judgment on the ground
that the charterers, having contracted to take the vessel for 12
months, could not be obliged to take her for 10 months. In *Stan-
ton* v. *Richardson* [8] the decision in *Tarrabochia* v. *Hickie* [9] was
approved. Brett J. observed [10] " that the conclusion to be drawn
" from all the cases analogous to this is, that if the breach of con-
" tract by the shipowner be such as to justify the charterer in not
" putting the cargo on board at the moment of the breach, and
" it cannot be remedied within such a time as not to frustrate
" the object of the voyage, this absolves the charterer altogether."
Devlin J. has expressed the view, with which I respectfully agree,
that these authorities are conclusive, see *Universal Cargo Carriers
Corporation* v. *Citati.*[11] If further authority were needed I would
refer to the judgment of Bailhache J. in *Compania Cantabrica de
Navegacion* v. *Anglo-American Oil Co.,*[12] and to the judgments of
Bankes and Scrutton L.JJ. in *Snia Societa di Navigazione Indus-
tria e Commercio* v *Suzuki & Co.*[13] Mr. Roskill, however, relies
on certain dicta of Bucknill J. in *The Europa.*[14] But I think that
these amount to no more than a statement that if a ship is unsea-
worthy at the time of loading the charterer is not obliged to load
whilst she remains so, and not that he may rescind the contract.
Indeed, the very basis of the decision in *The Europa* [14] is that the
term as to seaworthiness is not a condition precedent to the
charterer's obligations under the contract. Mr. Roskill also relies
strongly on the following passage in the speech of Lord Atkinson

[5] (1877) 2 Q.B.D. 182, C.A.
[6] Ibid. 184.
[7] Ibid. 188.
[8] (1872) L.R. 7 C.P. 421; (1874)
L.R. 9 C.P. 390, C.A.
[9] 1 H. & N. 183.
[10] L.R. 2 C.P. 421, 437.

[11] [1957] 2 Q.B. 401, 433; [1957]
2 W.L.R. 713; [1957] 2 All E.R. 70.
[12] (1923) 16 Ll.L.Rep. 235, 236;
39 T.L.R. 614.
[13] (1924) 29 Com.Cas. 284, 289, 294,
C.A.
[14] [1908] P. 84, 93; 24 T.L.R. 151,
D.C.

**2 Q.B.**    QUEEN'S BENCH DIVISION.    37

in *J. & E. Kish* v. *Charles Taylor, Sons & Co.*[15]: " The fact that
" a ship is . . . from any cause unseaworthy when about to start
" on her voyage, will justify the charterer . . . in repudiating his
" contract and refusing to be bound by it." But the House of
Lords in *J. & E. Kish* v. *Charles Taylor, Sons & Co.*[15] expressly
affirmed and followed *The Europa.*[16] Indeed, Lord Atkinson
said [17]: " It was held by Bucknill and Bargreave Dean L.JJ., on
" a line of reasoning which appears to me convincing, that the
" charterparty, notwithstanding this unseaworthiness, was not
" displaced." I cannot think that Lord Atkinson intended the
passage on which Mr. Roskill relies to be read in the wide sense
for which Mr. Roskill contends. If he did, it was obiter and in-
consistent with the authorities including the decision in *J. & E.
Kish* v. *Charles Taylor, Sons & Co.*[18] itself. I think, however,
that Lord Atkinson meant to refer only to the charterer's obligation
to load. Mr. Roskill next relies on the following passage in the
speech of Lord Sumner in *Atlantic Shipping and Trading Co. Ltd.
v. Louis Dreyfus & Co.*[19]: " Underlying the whole contract of
" affreightment there is an implied condition upon the operation
" of the usual exceptions from liability—namely, that the ship-
" owners shall have provided a seaworthy ship." It is argued
that this passage is in effect a statement that the term as to
seaworthiness goes to the whole root of the contract and that,
therefore, any breach of this term must entitle the charterers to
rescind. Lord Sumner, however, was, in my judgment, consider-
ing no such problem. The point before him was whether an
exception clause governed the implied term as to seaworthiness,
and the perhaps strange rule of construction was reaffirmed that,
whilst an express term as to seaworthiness must be read in the
light of the exception clause, an implied term as to seaworthiness
because it underlies the whole contract of affreightment is un-
affected by the exception clause.

Mr. Roskill finally relied on *Tate & Lyle Ltd.* v. *Hain Steamship
Co. Ltd.*,[20] where Lord Atkin stated [21] that any departure from
the voyage contracted, however slight the deviation, is of such a
serious character that the other party to the contract is entitled
to treat it as going to the root of the contract and to declare

1961

HONGKONG
FIR SHIPPING
CO. LTD.
*v.*
KAWASAKI
KISEN
KAISHA LTD.

Salmon J.

---

[15] [1912] A.C. 604, 617; 28 T.L.R.
425, H.L.
[16] [1908] P. 84; 24 T.L.R. 151,
D.C.
[17] [1912] A.C. 604, 616, H.L.

[18] [1912] A.C. 604.
[19] [1922] 2 A.C. 250, 260; 38
T.L.R. 534, H.L.
[20] (1936) 55 Ll.L.Rep. 159, H.L.
[21] Ibid. 173.

38                          QUEEN'S BENCH DIVISION.              **[1962]**

1961

HONGKONG
FIR SHIPPING
CO. LTD.
*v.*
KAWASAKI
KISEN
KAISHA LTD.

Salmon J.

himself no longer bound by it. Mr. Roskill says that unsea-
worthiness is at least as important as deviation and accordingly
by analogy must have the same result. I do not accept this
contention. Lord Atkin was dealing solely with deviation, and
analogies are sometimes dangerous—not least in this branch of
the law.

It may be that on principle it is difficult, as Mr. Roskill
contends, to see why any breach of so important an obligation as
that relating to seaworthiness should not by itself give the char-
terers the right to rescind as soon as they become aware of it.
On the other hand, it would be strange if, for example, a charterer
after receiving satisfactory service from a vessel could repudiate
the charterparty on learning that she was in fact unseaworthy
in some minor particular and had been so at the date of delivery
under the time charter notwithstanding that she could easily
and speedily be rendered seaworthy. However this may be, the
authorities which I have reviewed, and by which I am bound, in
my judgment clearly establish that unseaworthiness by itself
gives the charterers no right to rescind, and I accordingly so hold.
A fortiori a breach of the condition to maintain the vessel in a
thoroughly efficient state cannot by itself entitle the charterers
to rescind.

It follows that the charterers cannot succeed in their defence
unless the delay in making the vessel seaworthy was or appeared
likely at the date of the repudiation to be so great as to frustrate
the commercial purpose of the charter. Mr. Roskill argues that
the delay must be judged by whether it was reasonable or un-
reasonable and that it is not necessary for him to show that it
would frustrate the contract. If he means that a reasonable time
may be shorter than a time that works frustration, I do not agree
with him. For this purpose, there can be no real difference
between the " reasonable time " yardstick and the " frustrating
" time " yardstick. As Devlin J. observed in the *Citati* case [22]:
" The truth is that there is nothing wrong with using a reasonable
" time as a yardstick provided you determine what is reasonable by
" considering whether or not there has been unreasonable delay
" in the light of the object which the parties had in mind. It
" is only when the two yardsticks have in effect been shown
" to be the same that the courts have accepted the test of
" reasonableness. Where they have been contrasted . . . the
" test of reasonable time has been rejected."

[22] [1957] 2 Q.B. 401, 434.

**2 Q.B.**          QUEEN'S BENCH DIVISION.                    39

I have every sympathy with the charterers in the natural irrita-
tion they must have felt at the inconvenience and possible hard-
ship caused to them by this vessel's halting voyage to Osaka and
the prospect of the vessel being detained there some months
for further substantial repairs.  Nevertheless, as Lord Radcliffe
pointed out in *Davis Contractors Ltd.* v. *Fareham Urban District
Council*,[23]: " . . . it is not hardship or inconvenience or material
" loss itself which calls the principle of frustration into play.
" There must be as well such a change in the significance of the
" obligation that the thing undertaken would, if performed, be a
" different thing from that contracted for."  I appreciate also
that there was a catastrophic fall in the freight market between
February and June, 1957, and that it would only be natural in
these circumstances for the charterers to wish to escape from the
charterparty if they lawfully may.  I do not think, however, that
in considering the issue of frustration the fall in the market can
be material.  Neither, on the other hand, are the clauses dealing
with off-hire of particular materiality.  It is true that they show
that some substantial periods for repairs and overhaul during the
currency of the charter were contemplated and that these off-hire
periods might, at the charterer's option, be added on to the
charter time, but they do not mean that the parties intended
the contract to bind, no matter how long the off-hire periods
might last.  These clauses would not have prevented the charter-
party from being frustrated if, for example, the vessel had been
out of commission for the whole of 1957.  I am not sure whether
it is permissible to equate time lost for repair on account of the
owner's breach of contract with time lost through some super-
vening cause such as requisition for which the owner is blameless.
The authorities are not very helpful on this point.  It might be
thought that an owner should be in a better position if the delay
is in no way attributable to him than if it is wholly his fault.  On
the other hand, it is perhaps difficult to see why logically there
should be any difference qua frustration between the two cases.
Apart from the *Snia* v. *Suzuki* case [24] there does not appear to
to be any reported case where a charter has been held to be
frustrated on account of unseaworthiness after the charterers have
received some service under it.  The facts in that case were
exceptional.  The charterers, after the failure of repeated efforts
of the owners to make the vessel seaworthy, had good reason to

1961

HONGKONG
FIR SHIPPING
CO. LTD.
*v.*
KAWASAKI
KISEN
KAISHA LTD.

Salmon J.

[23] [1956] A.C. 696, 729; [1956] 3      [24] 29 Com.Cas. 284.
W.L.R. 87; [1956] 2 All E.R. 145,
H.L.

40                          QUEEN'S BENCH DIVISION.          **[1962]**

1961

HONGKONG
FIR SHIPPING
CO. LTD.
*v.*
KAWASAKI
KISEN
KAISHA LTD.

Salmon J.

believe that the shipowners would never be able to do so. If in
this case the engine room crew engaged at Osaka had proved to
be incompetent and as a result the engine had again suffered
serious breakdown, this case would have been much more analo-
gous to the *Snia* v. *Suzuki* case,[24] for then there would have been
reasonable grounds to suppose that the shipowners could never
make the vessel seaworthy and that accordingly for the remaining
period of the charterparty the charterers would receive no sub-
stantial benefit under it. As it is, the vessel was being repaired
and undergoing sea trials for over three months at Osaka, but on
September 15 she was admittedly in every respect seaworthy and
was then still available for about 17 months under the charter-
party. In my view the charterers had no reasonable grounds in
June for thinking that the owners would be unable to make the
vessel seaworthy at the latest by mid-September. That they had
in fact elected not to exercise their option under clause 32 to add
on the off-hire periods is of no significance, since obviously they
would, in no circumstances, have done so, having regard to the
then state of the freight market. Like Diplock J. in *Port Line
Ltd.* v. *Ben Line Steamers Ltd.*,[25] I shrink from adding to what
Lord Radcliffe [26] described as an anthology of phrases by attempt-
ing any restatement of the principle of frustration.

Whether one applies the test enunciated by Lord Loreburn
in *F. A. Tamplin Steamship Co. Ltd.* v. *Anglo-Mexican Petro-
leum Products Co. Ltd.*,[27] or that by Lord Dunedin in *Metro-
politan Water Board* v. *Dick, Kerr & Co. Ltd.*,[28] or the test of
the implied term, the basic idea is the same. In the end the
problem is to look at the delay and the events that have occurred
against the period and other terms of the charterparty and decide
whether in truth the circumstances in which performance is called
for would render it a thing radically different from that which was
undertaken. I reach the conclusion that they do not and that,
accordingly, the charterparty has not been frustrated.

It follows that the charterers had no legal right to repudiate
the charterparty. They would, however, be entitled to such
damage as they suffered by reason of delay caused by the owners'
breaches of the charterparty, but the counterclaim under this head

[24] 29 Com.Cas. 284.
[25] [1958] 2 Q.B. 146; [1958] 2
W.L.R. 551; [1958] 1 All E.R. 787.
[26] In *Davis Contractors Ltd.* v.
*Fareham Urban District Council*
[1956] A.C. 696, 727.

[27] [1916] 2 A.C. 397, 402; 32
T.L.R. 677, H.L.
[28] [1918] A.C. 119, 127; 34 T.L.R.
113, H.L.

**2 Q.B.**    QUEEN'S BENCH DIVISION.    41

has been abandoned. There must accordingly be judgment for
the owners for the agreed sum of £158,729 with interest as agreed
at 6 per cent. from May 31, 1958, and the counterclaim must be
dismissed.

The charterers appealed.

*Ashton Roskill* Q.C., *Basil Eckersley* and *Brian Davenport*
for the charterers. The appeal raises two main issues of general
importance. (1) Whether the obligation of seaworthiness in this
charterparty is a condition, the breach of which entitles the
charterers, in the circumstances of this case, to treat the contract
as repudiated; (2) where, in breach of contract, a party fails to
perform it, by what standard does the ensuing delay fall to be
measured for the purposes of determining whether the innocent
party is entitled to treat the contract as repudiated? Is that
standard, as the judge held, such delay as is necessary to frustrate
the contract, or is it, as the charterers contend, unreasonable
delay from the point of view of the charterers who are, in this
case, the party not in breach?

As to (2), Salmon J. has taken as the test for delay that
applicable where the doctrine of frustration applies, whereas this
is not a frustration case at all. The doctrine of frustration is
quite independent of the rights arising out of breach of contract.
Its basis is to be found in *Jackson* v. *Union Marine Insurance
Co. Ltd.*[1] The earlier case of *Geipel* v. *Smith*[2] is probably not
a frustration case at all. Over the years the courts have empha-
sised that the doctrine of frustration is not to be lightly invoked:
*Davis Contractors Ltd.* v. *Fareham Urban District Council*,[3] per
Lord Radcliffe.[4] The authorities do not support the view that
where delay is caused by breach of contract by one party the
innocent party cannot treat the contract as at an end until the
delay is such as to cause frustration. In such a case the proper
test is whether the delay is such that it defeats the object of the
innocent party to the contract. That was the test laid down by
Tindal C.J. in *Freeman* v. *Taylor*,[5] and it is fair, just and logical.

[SELLERS L.J. referred to *Mount* v. *Larkins*.[6]]

[DIPLOCK L.J. In *Freeman* v. *Taylor*[7] Tindal C.J. was
following the principle laid down in that case.]

The principle in *Freeman* v. *Taylor*[7] appears in later cases

[1] (1874) L.R. 10 C.P. 125.
[2] (1872) L.R. 7 Q.B. 404.
[3] [1956]  A.C.  696;  [1956]  3
W.L.R. 37; [1956] 2 All E.R. 145,
H.L.

[4] [1956] A.C. 696, 727.
[5] (1831) 8 Bing. 124, 138.
[6] (1831) 8 Bing. 108.
[7] 8 Bing. 124.

C. A.

1961

HONGKONG
FIR SHIPPING
Co. LTD.
*v.*
KAWASAKI
KISEN
KAISHA LTD.

42                    QUEEN'S BENCH DIVISION.          **[1962]**

C. A.

1961

HONGKONG
FIR SHIPPING
CO. LTD.
*v.*
KAWASAKI
KISEN
KAISHA LTD.

although it is sometimes blurred. *Clipsham* v. *Vertue* [8] in no way detracts from the principle. *Tarrabochia* v. *Hickie*,[9] which contains the first reference to frustration by a judge, concerned unseaworthiness on an approach voyage, but it was rectified by the time the ship reached the loading port so that it was not surprising that the court held that the charterer was not allowed to throw up the charter. That case lays down no principle. *MacAndrew* v. *Chapple* [10] was another approach voyage case, but it concerned deviation: the judgment of Willes J.[11] is in the present appellant's favour. In *Stanton* v. *Richardson* [12] Bovill C.J.[13] was misstating what Tindal C.J. had said in *Freeman* v. *Taylor*,[14] but Brett J.[15] fully supports Tindal C.J.'s statement. Nothing was said either in the Exchequer Chamber [16] or in the House of Lords [17] which throws any further light on this matter. In *Tully* v. *Howling* [18] the majority of the judges came down squarely for the conclusion that they could not foist upon a charterer a 10 months' charter when he had contracted for one of 12 months because the two results were completely different. Only Brett J.[19] thought otherwise. Reliance is placed on the judgments of Cockburn C.J.,[20] Mellor [20] and Lush JJ.[21] and Mellish L.J.[22] There is nothing in the dictum of Scrutton L.J. in *Inverkip Steamship Co.* v. *Bunge*,[23] which is always treated as obiter, but on which the shipowners here rely, to suggest that where a party not in breach of contract seeks to put an end to it by reason of delay arising from the other party's breach of contract, he can only do so if the delay is so great as to frustrate the contract: see Scrutton on Charterparties, 9th ed. (1919), p. 311, and contrast 16th ed. (1955), p. 350. It is admitted that the decision of Devlin J. in *Universal Cargo Carriers Corporation* v. *Citati* [24] is against this argument, but that was not a case where seaworthiness was an issue.

It would be highly anomalous and unjust if an innocent party, before being allowed to treat a contract as at an end, should have to wait for so long as is necessary for the contract to be brought to an end by the operation of the doctrine of frustration. That

8  (1843) 5 Q.B. 265.
9  (1856) 1 H. & N. 183.
10 (1866) L.R. 1 C.P. 643.
11 Ibid. 648.
12 (1872) L.R. 7 C.P. 421.
13 Ibid. 433.
14 8 Bing. 124, 138.
15 L.R. 7 C.P. 421, 436.
16 (1874) L.R. 9 C.P. 390.

17 (1875) 45 L.J.Q.B. 78.
18 (1877) 2 Q.B.D. 182, C.A.
19 Ibid. 188.
20 Ibid. 184.
21 Ibid. 185.
22 Ibid. 188.
23 [1917] 2 K.B. 193, 201, C.A.
24 [1957] 2 Q.B. 401; [1957] 2
W.L.R. 713; [1957] 2 All E.R. 70.

**2 Q.B.**      QUEEN'S BENCH DIVISION.                                    43

was never in the minds of the nineteenth century judges, nor does
their language support it.  The true approach should be that the
court should have regard to the object of the party not in breach.
If Salmon J.'s approach be the law, a measure of inflexibility has
been introduced into the law of contract which is detrimental to
the fair resolution of quite a number of disputes.  That is to be
avoided unless it is clearly the law.  It introduces a measurement
of time to the disadvantage of the innocent party which has
nothing to do with the law of contract.  The older cases and no
less than 12 editions of Scrutton on Charterparties show that the
true burden is to ascertain in each case in the light of the facts
whether the delay is unreasonable.  Where no time is specified
in the ordinary way in which a party is to perform an act the law
imports a reasonable time.  There is nothing unreasonable about
that concept.

[SELLERS L.J.  That is leaving it to the unilateral decision
of the charterer who has to decide whether his object has been
defeated.]

On any view of the law either party is entitled to bring the
contract to an end if the delay is so great as to frustrate the
purpose of the venture, so that whichever alternative be correct
in law, there is bound to be a unilateral decision.  [Reference was
made to *Compania Cantabrica de Navegacion* v. *Anglo-American
Oil Co.*[25] and " *Snia* " *Societa di Navigazione Industria e
Commercio* v. *Suzuki & Co.*[26]]

As to (1), there is an overriding obligation on a shipowner to
provide a seaworthy ship: *Lyon* v. *Mells*,[27] *per* Lord Ellen-
borough.[28]  In those circumstances it would be strange if sea-
worthiness were not a condition of the charterparty.  It is
submitted that it is.

[DIPLOCK L.J.  *Lyon* v. *Mells*[29] was an action in assumpsit
for breach of warranty.  How does the judgment of Lord Ellen-
borough assist us in deciding whether seaworthiness is a condition
or a warranty?]

He regarded seaworthiness as the very substratum of the
contract.  Breach of a condition affords ground for treating a
contract as repudiated: see section 11 (1) (*b*) of the Sale of
Goods Act, 1893.  The right may be contractually excluded.  As
to the cases where the right of rescission for breach of condition
may be lost, see Chalmers' Sale of Goods, 13th ed. (1957), p. 46.

C. A.

1961

HONGKONG
FIR SHIPPING
CO. LTD.
*v.*
KAWASAKI
KISEN
KAISHA LTD.

---

[25] (1923) 39 T.L.R. 614; 16 Ll.L.
Rep. 235.
[26] (1924) 29 Com.Cas. 284, C.A.

[27] (1804) 5 East 428.
[28] Ibid. 437.
[29] 5 East 428.

44                    QUEEN'S BENCH DIVISION.        **[1962]**

C. A.

1961

HONGKONG
FIR SHIPPING
CO. LTD.
*v.*
KAWASAKI
KISEN
KAISHA LTD.

As to their application to charterparties, see Scrutton on Charter-parties, 16th ed. (1955), p. 85. In many cases the right of rescission for breach of initial seaworthiness may be lost because it is unlikely to manifest itself until after the cargo has been loaded.

Admittedly, an act or omission of a trivial nature is sufficient to constitute a breach of the seaworthiness obligation, but the mere fact that the act or omission is in itself trivial does not alter the fundamental character of the obligation. A trivial act or omission could have disastrous results. If a shipowner delivers to a charterer a ship which is unseaworthy, the charterer is not in law compelled to put his goods in her and rely on a claim for damages. Here the fact that the vessel had an insufficient and incompetent engine room crew when she arrived at Liverpool entitled the charterers to rescind. The cases do not support the judge in so far as he found to the contrary. The basis of the decision in *Havelock* v. *Geddes* [30] was that the charterer waived the breach of the condition precedent by taking the vessel and employing her in an unimpaired state after the initial unsea-worthiness had been made good. The fact that a ship is not sea-worthy on the approach voyage is not a condition precedent a breach of which entitles the charterer to throw up the charter because he has nothing to do with the ship before she arrives at the loading port: *The Lisette* [31]; *Tarrabochia* v. *Hickie*. [32] [Reference was also made to *Stanton* v. *Richardson*. [33]]

The authorities may not here be conclusive, but the principle is clear. In *Tully* v. *Howling* [34] the point did not specifically arise. *New York and Cuba Mail Steamship Co.* v. *Erikson and Christensen*, [35] referred to in Scrutton on Charter-parties, 16th ed., p. 100, assists the argument here, but is not conclusive, because it concerned a voyage charter. There is a distinction between voyage and time charters. Under the latter the charterer's only protection is that the ship should be sea-worthy on delivery. *Compania Cantabrica de Navegacion* v. *Anglo-American Oil Co.* [36] affords no authority against my sub-mission: it does not decide that there is no unconditional right of cancellation for unseaworthiness as that question was never raised. In "*Snia*" *Societa di Navigazione Industria e Commercio*

[30] (1809) 10 East 555.
[31] (1807) 6 C.Rob. 387.
[32] 1 H. & N. 183.
[33] (1872) L.R. 7 C.P. 421; L.R. 9 C.P. 390.
[34] 2 Q.B.D. 182.
[35] (1922) 27 Com.Cas. 330.
[36] (1923) 39 T.L.R. 614; 16 Ll.L. Rep. 235.

**2 Q.B.**        QUEEN'S BENCH DIVISION.                    45

C. A.

1961

HONGKONG
FIR SHIPPING
CO. LTD.
v.
KAWASAKI
KISEN
KAISHA LTD.

v. *Suzuki & Co.*[37] the charterers' case was squarely based on the
contention that there was an unconditional right to rescind for
unseaworthiness, and breach of the maintenance obligation was
raised in the alternative: Greer J.[38] proceeded on the basis that
breach of seaworthiness was a condition but could not be treated
as giving a right to rescind after the charterers had proceeded
with knowledge of the breach. It is submitted that that is the
law. The principles to be deduced from the case are that sea-
worthiness is a condition of the charterparty and so is the main-
tenance obligation. The shipowner is obliged to take reasonable
steps within a reasonable time to remedy a breach of either, and
a contravention of either justifies the charterer in repudiating.
The judgments in the Court of Appeal[39] are not of assistance,
because the appeal was really as to damages only. The respon-
dents were not called upon with regard to the right to cancel.

[SELLERS L.J. How do you relate what Scrutton J. had said
in *Embiricos* v. *Sydney Reid & Co.?*[40]]

That was a frustration case. This is not. If seaworthiness
were a mere warranty, it is inconceivable that there could have
been the argument there has been in the cases on the question
whether a breach of it displaces the exceptions clause. It does
not do so any more than deviation does, but it can be accepted
as repudiation in the absence of waiver in the event of the defect
not being remedied within a reasonable time. Reliance is placed
on the observations of Lord Atkinson in *J. & E. Kish* v. *Charles
Taylor & Sons.*[41] [Reference was also made to *The Europa*[42]
and *Atlantic Shipping and Trading Co.* v. *Louis Dreyfus & Co.*[43]]
It may be that if not a condition it is a fundamental term.
Devlin J. distinguishes between the two in *Smeaton Hanscomb &
Co. Ltd.* v. *Sassoon I. Setty, Son & Co.*[44] It is accepted that
" fundamental term " is slightly narrower than a condition but
the difference is very difficult to define.

[DIPLOCK L.J. Can a fundamental term be anything more
than something which goes to the basis of the contract?] [Refer-
ence was made to *Pordage* v. *Cole.*[45]]

I am content to call it a condition. The fundamental character
of a term of a contract can be decided by the consequences flowing

[37] 17 Ll.L.Rep. 78.
[38] Ibid. 88.
[39] (1924) 29 Com.Cas. 284.
[40] [1914] 3 K.B. 45, 54; 30 T.L.R.
451.
[41] [1912] A.C. 604, 617; 28 T.L.R.
425, H.L.

[42] [1908] P. 84; 24 T.L.R. 151,
D.C.
[43] [1922] A.C. 250; 38 T.L.R. 534,
H.L.
[44] [1953] 1 W.L.R. 1468; [1953]
2 All E.R. 1471.
[45] (1669) 1 Wms.Saund. 319.

46                        QUEEN'S BENCH DIVISION.        **[1962]**

C. A.

1961

HONGKONG
FIR SHIPPING
Co. LTD.
v.
KAWASAKI
KISEN
KAISHA LTD.

from a breach of it.  It is submitted that seaworthiness is analogous to deviation.  Both produce the same sort of results.  In *Hain Steamship Co.* v. *Tate & Lyle Ltd.*[46] the House of Lords were not regarding deviation as bearing the label "fundamental" in the way Devlin J. was using it in *Smeaton Hanscomb & Co. Ltd.* v. *Sassoon I. Setty, Son & Co.*[47]  It did not displace the exceptions clause but it did entitle the innocent party to treat the contract as at an end.

In this charterparty there is an express obligation of seaworthiness which is quite unqualified.  There is no principle of construction which justifies the court in reading that express obligation as meaning an obligation which is fulfilled by delivering an unseaworthy ship provided it is made seaworthy within a time which does not frustrate the charterparty or even within a reasonable time.  Seaworthiness is a condition, and if broken, unless waived, it can be accepted as repudiation bringing the contract to an end.  That is clear law and anybody doing business within the ambit of the English common law knows of the principle.  A party can contract out of it if he so wishes or can qualify his obligation, but if he does not, and he breaks his obligation, the consequences submitted necessarily follow.  If that is wrong, the proper yardstick to be applied in measuring the delay entitling the innocent party to repudiate for breach of contract is such delay which in the light of the object of the innocent party is reasonable.  In those circumstances, all the facts have to be considered, namely, the cause, extent, occasion and consequences of the delay.  If that be the wrong test, then this charterparty was frustrated because the charterers had no proper service from this ship in the commercial sense of the word.  In the light of the facts found by the judge, it is asking too much that the charterers should assume that after the repairs had been carried out they could look forward to receiving the sort of service they had bargained for.  As reasonable charterers they were entitled to take the action they took.

*Stephen Chapman Q.C., Michael Kerr Q.C.* and *C. S. Staughton* for the shipowners.  The judgment of Salmon J. so far as the law is concerned is wholly right.  It is submitted: (1) The express stipulation as to initial seaworthiness is not a condition in the sense that any breach however trivial may be treated as repudiation relieving the other party of all obligations under the charterparty.  It is a warranty, a breach of which gives rise

[46] (1936) 52 T.L.R. 617; [1936] 2    [47] [1953] 1 W.L.R. 1468.
All E.R. 597; 55 Ll.L.Rep. 159, H.L.

**2 Q.B.**          QUEEN'S BENCH DIVISION.                    47

ordinarily to a right to damages. It would probably be right to
say that a breach, even of a warranty, might in certain circum-
stances be treated as repudiation relieving the other party of all
obligations, but only if the breach were so serious as to destroy
the commercial purpose of the contract. So far as this case is
concerned, this express stipulation is not a condition: *Havelock*
v. *Geddes*.[48] In a time charter the only material date is the date
of delivery. If the charterers' argument is right, the consequence
would be that if the charterer discovers at the date of the delivery
of the ship that there is unseaworthiness, however trivial, he has
the right to treat it there and then as repudiation of the whole
contract and to regard the contract as at an end, even though the
unseaworthiness could be remedied in one second. That would
be a startling result which has been ruled out by the authorities.
None of the discussion which has been embarked on in the cases
as to the consequences of a breach of the obligation of seaworthi-
ness need have been embarked on if it were a condition with those
consequences. The court is not here concerned with the novel
doctrine relating to fundamental terms which occur in considering
whether a party can rely on the exceptions clause. They occur
in hire-purchase contracts for motor-cars: see *Karsales (Harrow)
Ltd.* v. *Wallis* [49] and *Yeoman Credit* v. *Apps*.[50]   (2) Even if the
stipulation as to seaworthiness is a condition, once the contract
has ceased to be executory it can only be treated as a warranty.
Reliance is placed on section 11 (1) (c) of the Sale of Goods Act,
1893, which comes into the Act from the common law where the
rule was not confined to sales of goods. It is submitted that it
extends to this field as well.   (3) If the first submission (supra)
be right, it is a fortiori as regards the maintenance clause in this
contract. The judgment of Salmon J. on that matter is adopted.
If the maintenance clause were a condition, any trivial thing
which went wrong during the voyage would give the charterers a
right at any time to put an end to the whole contract. From any
commercial point of view it is quite impossible to say that the
obligation under either clause 1 or clause 3 of this charterparty is
a condition.   (4) The proper yardstick for measuring whether a
contract has been repudiated by delay is whether the commercial
purpose of the contract has been frustrated. That must be the
correct test. It is to be preferred to the test of reasonable time

C. A.

1961

HONGKONG
FIR SHIPPING
CO. LTD.
*v.*
KAWASAKI
KISEN
KAISHA LTD.

[48] 10 East 555.
[49] [1956] 1 W.L.R. 936; [1956] 2
All E.R. 866, C.A.
[50] [1961] 3 W.L.R. 94; [1961] 2
All E.R. 251, C.A.

48                         QUEEN'S BENCH DIVISION.              **[1962]**

C. A.

1961

HONGKONG
FIR SHIPPING
CO. LTD.
*v.*
KAWASAKI
KISEN
KAISHA LTD.

viewed from the point of view of the innocent party, in this case the charterers. What has to be determined is whether there has been conduct on the part of the shipowner which demonstrates that he will not or cannot perform his obligations under the contract. If the stage is reached that the shipowner is offering to fulfil an agreement which is in substance entirely different from that which he contracted to perform, the other party can refuse to accept it as performance of the original contract. (5) In the present case the commercial purposes of the charterparty were not frustrated. (6) If there was repudiation on the part of the shipowners, the charterers elected to affirm the contract.

As to (1), the foundation of the modern development of the law of contract was laid down by Lord Mansfield in *Boon* v. *Eyre.*[51] The whole modern doctrine as to total failure of consideration and the distinction between conditions and warranties stems from that case.

[DIPLOCK L.J. referred to *Pordage* v. *Cole.*[52]]

That case went some way towards it, but Lord Mansfield[53] established it. *Ritchie* v. *Atkinson*[54] followed *Boon* v. *Eyre,*[55] and that was one of the cases cited and followed in *MacAndrew* v. *Chapple,*[56] where Lord Ellenborough puts the yardstick on the basis of frustration. The charterers' interpretation of *Havelock* v. *Geddes*[57] is not correct. The shipowners are entitled to rely on it as showing (1) that the stipulation as to initial seaworthiness is not a condition precedent; (2) if it is, once the contract has ceased to be executory by operation of law it can only be treated as a warranty; and (3) that the maintenance obligation is not a condition. The principle in *Boon* v. *Eyre*[58] was applied in *Davidson* v. *Gwynne,*[59] where it was held that a stipulation to sail with the first convoy was not a condition precedent. Lord Ellenborough's judgment was the first adumbration of one of the classic distinctions between condition and warranty. The test by which he looks at the contract is the object of the contract itself. As to *Freeman* v. *Taylor,*[60] it would be wrong to put too much stress on the words " deprive the freighter " used by Tindal C.J.,[61] because in a contract of affreightment both shipowner and freighter have a mutual interest in the performance of the voyage. The charterers cannot rely on that case as in any way altering the

[51] (1789) 1 H.Bl. 273.
[52] 1 Wms.Saund. 319.
[53] 1 H.Bl. 273.
[54] (1808) 10 East 295.
[55] 1 H.Bl. 273.
[56] L.R. 1 C.P. 643.
[57] 10 East 555.
[58] 1 H.Bl. 273.
[59] (1810) 12 East 381.
[60] 8 Bing. 124.
[61] Ibid. 138.

**2 Q.B.**    QUEEN'S BENCH DIVISION.    49

C. A.

1961

HONGKONG
FIR SHIPPING
CO. LTD.
v.
KAWASAKI
KISEN
KAISHA LTD.

principle laid down in earlier cases. It also supports the proposition that the frustration yardstick is the appropriate one: see also *Clipsham* v. *Vertue*.[62] In *Tarrabochia* v. *Hickie* [63] Pollock C.B. applied the rule laid down in *Davidson* v. *Gwynne*.[64] In *Mac-Andrew* v. *Chapple* [65] the question was whether the stipulation that a vessel should proceed with all convenient speed when ready was a condition precedent. Erle C.J. held that it was a question of construction depending on the intention of the parties. That case falls into line with the other cases and does not help the charterers. *Stanton* v. *Richardson* [66] is direct authority for the proposition that although a charterer, if tendered a vessel which is not fit to take his cargo, is not under an obligation to put his cargo into it, he is not entitled there and then to say that by reason of the unfitness the shipowner has repudiated the contract. He is under an obligation to give the shipowner time to repair the defect, and it is only if it cannot be remedied within the frustrating time that the shipowner's conduct can be treated as repudiation of the whole contract. That is more plainly brought out in *The Europa*.[67] An important fact in *Stanton* v. *Richardson*,[68] the " wet sugar " case, was that the necessary pumps could only be obtained from Manila, which would have meant a delay of six or seven months. Had they been obtainable in a few weeks it might have made a difference to the decision. *Stanton* v. *Richardson* [68] also supports the shipowners' submission that even if seaworthiness is a condition, once the contract has ceased to be executory it can only be treated as a warranty: see *per* Brett J.[69] See also *Heilbutt* v. *Hickson*, *per* Bovill C.J.[70] *Jackson* v. *Union Marine Insurance Co. Ltd.*[71] seems to be entirely in accord with the shipowners' submission.

[DIPLOCK L.J. That case is the foundation of the doctrine of frustration. What it is seeking to do is to apply to frustrating events which have arisen without fault of either party to the contract the same standard as where it has arisen by a breach by one of them.]

Yes. As to the distinction between conditions and warranties, see *Bettini* v. *Gye* [72] and *Poussard* v. *Spiers & Ponds Ltd.*,[73] both

[62] 5 Q.B. 265.
[63] 1 H. & N. 183.
[64] 12 East 381.
[65] L.R. 1 C.P. 643.
[66] L.R. 7 C.P. 421; L.R. 9 C.P. 390.
[67] [1908] P. 84.

[68] L.R. 7 C.P. 421; L.R. 9 C.P. 390.
[69] L.R. 9 C.P. 390, 436.
[70] (1872) L.R. 7 C.P. 438, 450.
[71] L.R. 10 C.P. 125.
[72] (1876) 1 Q.B.D. 183.
[73] (1876) 1 Q.B.D. 410.

50                    QUEEN'S BENCH DIVISION.        **[1962]**

C. A.

1961

HONGKONG
FIR SHIPPING
CO. LTD.
v.
KAWASAKI
KISEN
KAISHA LTD.

of which related to contracts of personal services. *Tully* v. *Howling* [74] does not assist the court: it is in no way inconsistent with the other authorities: so far as the majority of the court was concerned, the case was put entirely on the basis that a contract for 12 months was not satisfied by providing a contract for 10 months. Brett J.[75] put it on a different ground—whether the vessel could not be made fit within any time which would not frustrate the object of the venture.

[SELLERS L.J. In strict contract even if it was only a fortnight short it would be something different. The reason given by Brett J.[76] seems the better basis for the decision.]

[UPJOHN L.J. The comment in Scrutton on Charterparties, 16th ed. (1955), p. 105, is that it would seem that Brett J. was more in line with authority. One does not know how long that comment has been there.]

[SELLERS L.J. In the 9th edition (1919), p. 88, it is " reason- " able time."]

*Inman Steamship Co. Ltd.* v. *Bischof* [76] is a very special case, but the speeches accord entirely with the shipowners' submission. See also *Bentsen* v. *Taylor, Sons & Co. (2).*[77] It has been recognised ever since *Havelock* v. *Geddes* [78] that unseaworthiness covers a multiplicity of things some of which may be extremely trivial. It then becomes impossible to say that the parties would have contemplated that for any breach of any one of those things, however trivial, the contract could immediatey be thrown up without giving an opportunity to the shipowner to put right a small detail. One must come to the conclusion that seaworthiness is not a condition but no more than a warranty sounding in damages. *Kish* v. *Taylor* [79] is not of assistance to the charterers; the substance of the case is entirely in the shipowners' favour. The passage in the speech of Lord Atkinson [80] on which the charterers rely is inconsistent with the decision in the case. As to *Inverkip Steamship Co. Ltd.* v. *Bunge,*[81] admittedly the passage in the judgment of Scrutton L.J.[82] is obiter, but it carries great weight. Scrutton on Charterparties, 16th ed. (1955), p. 49, note (d), is not completely inconsistent with the passage in Scrutton L.J.'s judgment.

[74] 2 Q.B.D. 182.
[75] Ibid. 188.
[76] (1882) 7 App.Cas. 670, H.L.
[77] [1893] 2 Q.B. 274; 9 T.L.R. 552, C.A.
[76] 10 East 555.
[79] [1912] A.C. 604.
[80] Ibid. 617.
[81] [1917] 2 K.B. 193.
[82] Ibid. 201.

**2 Q.B.**      QUEEN'S BENCH DIVISION.                    51

C. A.

1961

HONGKONG
FIR SHIPPING
CO. LTD.
v.
KAWASAKI
KISEN
KAISHA LTD.

[DIPLOCK L.J.  What Mr. Roskill submits is that the editions edited by Scrutton L.J. himself were more favourable to him.]

There cannot be any difference between undertakings implied by law and express undertakings.  Reliance is placed on Scrutton on Charterparties, 16th ed., p. 95, art. 28, which is in exactly the same language, so far as the relevant sentence is concerned, as it was in the 11th edition (1923), p. 95, when Scrutton L.J. was editor.  Carver's Carriage of Goods by Sea has been consistent in saying that seaworthiness was not a condition: see 2nd ed. (1891), p. 152, s. 145; 5th ed. (1909), p. 201, s. 145 and 8th ed. (1938), p. 21, s. 17.  In the 9th edition (1952), p. 81, it is stated that although seaworthiness is not generally a condition a breach of which entitles the aggrieved party to rescind the contract on discovering it, there is high authority for the proposition that it may sometimes be regarded as a condition.  *The Europa* [83] and the speech of Lord Atkinson in *Kish* v. *Taylor* [84] are cited in support of that proposition.

As to *Atlantic Shipping and Trading Co.* v. *Louis Dreyfus & Co.*,[85] that was dealt with by Salmon J. in his judgment.[86]  That passage is adopted as part of this argument.  *Compania Cantabrica de Navegacion* v. *Anglo-American Oil Co.*[87] is entirely in the shipowners' favour.  As to " *Snia* " *Societa di Navigazione e Commercio* v. *Suzuki & Co.*,[88] what Greer J. said [89] is against the shipowners, but on appeal the court was at pains to alter what he had said in terms, namely, that both initial seaworthiness and the maintenance clauses were conditions.  It has to be admitted, however, that the authorities were not cited to the Court of Appeal,[90] where both judgments were put on the ground of frustration.  *Embiricos* v. *Sydney Reid & Co.*[91] was a pure frustration case.  *Universal Cargoes Corporation* v. *Citati* [92] is entirely in the shipowners' favour.  Devlin J. was right in feeling compelled by the authorities to decide the way he did.

As to (4), the proper test for delay, reliance is placed on *Davis Contractors Ltd.* v. *Fareham Urban District Council*,[93] which was relied on before Salmon J. and is the latest case dealing with delay from the frustration point of view.

[SELLERS L.J.  Is this a frustration case?]

[83] [1908] P. 84.
[84] [1912] A.C. 604, 617.
[85] [1922] 2 A.C. 250.
[86] Ante, p. 37; [1961] 2 W.L.R. 716.
[87] 16 Ll.L.Rep. 235.
[88] 17 Ll.L.Rep. 78.
[89] Ibid. 88.
[90] 29 Com.Cas. 284.
[91] [1914] 3 K.B. 45.
[92] [1957] 2 Q.B. 401.
[93] [1956] A.C. 696.

52                QUEEN'S BENCH DIVISION.        **[1962]**

C. A.

1961

HONGKONG
FIR SHIPPING
CO. LTD.
*v.*
KAWASAKI
KISEN
KAISHA LTD.

Delay sufficient to amount to repudiation must be such as to
produce such a change in the nature of the obligation that the
things undertaken if performed would be different from those
contracted for.  There must be an objective standard which both
sides and their advisers can ascertain and understand.   If the
charterers' test be applicable, it would be impossible to advise
when the time had come when a charterparty could be repudiated.
If one accepts the principle that a contract can be repudiated only
when the delay caused by a breach has become so great as to
frustrate the performance of the charterparty, one has an objec-
tive standard although it may not always be easy to apply, but
it is submitted that that is the right test.  *Port Line Ltd.* v.
*Ben Line Steamers Ltd.*[94] has a bearing on the question of time.
On the authority of that case this is an a fortiori case.

No one disagrees with the charterers' submission that the
doctrine of frustration is independent of the rights arising out of
breach of contract because it arises independently of the acts of
the parties, putting an end as a matter of law to the contract,
but it is submitted that frustration and repudiation have this in
common, that there must be something which has gone to the
root of the contract.  In frustration the contract is undermined
by some outside event, in repudiation by an act of one of the
parties, but the quality of the event is the same; it must be
sufficient to go to the root of the whole contract.  It is not sur-
prising that there should be that common element in the two
conceptions when it is seen that it was out of repudiation that
the law derived the concept of frustration: *Jackson* v. *Union
Marine Insurance Co. Ltd.*[95]  If that be right, it follows that the
conclusion sought to be drawn from the charterers' submission
is erroneous.  It is not unjust or anomalous that the party not
in breach has to wait until an event has happened which will
frustrate the contract.  It is only then that there has been
repudiation.

As to (5), in the present case the commercial purpose of the
contract was not frustrated.  The judge's summary of the situa-
tion in regard to that matter is adopted.   The charterers are
putting it too high to say that they obtained no service out of
the vessel at all in a commercial sense.

As to (6), the question raised in the cross-notice, it is sub-
mitted that the charterers elected to affirm the contract because

**2 Q.B.**    QUEEN'S BENCH DIVISION.    53

they knew of the unseaworthiness but continued with the charter.    C. A.
It was not necessary for the shipowners to establish that the
charterers knew of the cause of the breakdowns. Nobody could    HONGKONG
know that until the judge had given his decision in the case.    FIR SHIPPING

*Roskill Q.C.* in reply. As to the nature of the seaworthiness
obligation, it is not sought to challenge the old cases, but it is
submitted that those cases, with their emphasis on conditions
precedent, afford no useful assistance where the question is
whether an obligation to deliver a seaworthy ship is a condition or
a warranty. *Bradford v. Williams*,[96] which was contemporaneous
with *Stanton v. Richardson*,[97] is helpful with regard to conditions
precedent. " Condition " is not defined in the Sale of Goods Act,
1893, but warranty is defined as something collateral to the main
purpose of the contract: see section 62. If seaworthiness were
merely a warranty, the law would never import such an obligation
into a charterparty where it was not expressed. The very fact that
the law does so import it shows its vital or essential character,
which is the language used with reference to conditions in Anson's
Law of Contract, 19th ed. (1959), p. 109. Seaworthiness is a
vital obligation because even if there is only a minor breach it
may carry with it the seeds of disaster. [Reference was made
to *Bentsen v. Taylor, Sons & Co.* (2)[98] and *Steel v. State Line
Steamship Co.*[99]]

It is submitted that this question is free from authority. *Kish
v. Taylor*[100] is not authority for the view that seaworthiness is
not a condition. It falls into line with *Havelock v. Geddes*.[101]
The observation of Lord Atkinson in *Kish v. Taylor*[102] is not
inconsistent with the decision in the case. He is treating
seaworthiness as a condition but not in the way in which the
argument had been advanced in the case.

As to the argument that even if seaworthiness starts as a
condition it must be treated as a warranty as soon as the charter-
party starts, and the support therefor derived from the Sale of
Goods Act, 1893, that does apply in some respect in sale of goods
but it is linked with the fact that the buyer exercises some act
of dominion over the goods: *Cammell Laird & Co. v. Manganese
Bronze and Brass Co.*[103] The Sale of Goods Act affords no
assistance in relation to a time charter. That is purely a contract

C. A.

1961

HONGKONG
FIR SHIPPING
CO. LTD.
*v.*
KAWASAKI
KISEN
KAISHA LTD.

---

[96] (1872) L.R. 7 Ex. 259.
[97] L.R. 9 C.P. 390.
[98] [1893] 2 Q.B. 274.
[99] (1877) 3 App.Cas. 72, H.L.
[100] [1912] A.C. 604.

[101] 10 East 555.
[102] [1912] A.C. 604, 617.
[103] [1934] A.C. 402; 50 T.L.R.
350, H.L.

QUEEN'S BENCH DIVISION.          **[1962]**

C. A.

1961

HONGKONG
FIR SHIPPING
CO. LTD.
*v.*
KAWASAKI
KISEN
KAISHA LTD.

for services.  The charterer has no dominion over or property in the ship.  He enjoys no authority outside his limited field.  Not only has no authority been cited in support of the shipowners' argument, but the germs of its own destruction are in it.  It is on delivery and not prior to delivery that this ship has to be seaworthy.  It is a wholly erroneous proposition to say that at the moment the contractual obligation arises the condition is to be treated as a warranty.

It has never been contended that a single breach of the maintenance obligation is a breach of condition.

As to the cross-notice, there can only be election to affirm or waiver on the part of the party seeking to bring the contract to an end if the other party has established that he continued to accept service with knowledge of the breach.  That has not been established in this case.  Finally, it is the law that if a party decides to treat a contract as repudiated he is not bound by the reasons for so doing that he gives at the time: *British and Beningtons* v. *N. W. Cachar Tea Co.*[104]

[Reference was also made to *F. A. Tamplin Steamship Co. Ltd.* v. *Anglo-Mexican Petroleum Products Ltd.*[105] and *Reardon Smith Line Ltd.* v. *Ministry of Agriculture, Fisheries and Food.*[106]]

*Cur. adv. vult.*

Dec. 20.  The following judgments were read.

SELLERS L.J. stated the facts and continued: During the currency of the charterparty the freight market had fallen steeply with the result that the judgment awarded the shipowners £184,743 damages.

There is no doubt that there were prolonged and aggravating delays due to breaches of contract by the shipowners, and at the outset of his argument counsel for the charterers relied strongly on the judge's findings of fact, which he submitted clearly showed the extent and the nature of the shipowners' breaches of contract and justified the charterers in terminating the charterparty.

The judge did not accept the charterers' allegations that the vessel's machinery was inefficient and defective and that the vessel was in that respect unseaworthy on delivery at Liverpool.  From that finding there is no appeal, but it has been emphasised that

[104] [1923] A.C. 48, H.L.
[105] [1916] 2 A.C. 397: 32 T.L.R. 677, H.L.
[106] [1962] 1 Q.B. 42; [1961] 3 W.L.R. 110; [1961] 2 All E.R. 577, C.A.

**2 Q.B.**          QUEEN'S BENCH DIVISION.                    55

although Salmon J. held that the diesel engines and other
machinery were in reasonably good condition on February 13, 1957,
he found that by reason of their age the engines needed to be
maintained by an experienced, competent, careful and adequate
engine room staff. It was held, however, and this has been
unchallenged by the shipowners in this appeal, that the engine
room staff was incompetent and insufficient and in this respect the
vessel was unseaworthy when handed over and on leaving Liver-
pool and throughout the voyage to Osaka where she was re-staffed
so as to fulfil completely her requirements. She had on delivery
five engineers, three fitters and seven greasers. The previous
owners had employed seven engineers and eight ratings, and the
judgment finds the complement of the engine room staff insuffi-
cient. If they had all been competent and efficient all might
have been well notwithstanding the numerical deficiency of officers,
but the chief engineer was addicted to drink and repeatedly
neglected his duties. Incompetence stands out conspicuously in
the events in the engine room which led to delays, and it is not
surprising that the judgment finds that the owners were in breach
of the obligations under clause 1 of the charter. The same facts
and findings, it was held, established a breach of the obligation
under clause 3 of the charter to maintain the vessel in a thoroughly
efficient state in hull and machinery. Although the judge recog-
nised the difficulty of obtaining skilled officers and men for the
engine room he found that the shipowners had not exercised due
diligence and that they could not escape liability under clause 13
of the charterparty.

The charterers' position was alleviated somewhat by the vessel
becoming off-hire under clause 11A from time to time and the
duration of the charterparty could have been extended by the char-
terers under clause 32 by adding the off-hire time to the period of
the charter.

The judgment found against the charterers' contention that the
delays frustrated the commercial purpose of the contract and
this contention was not pressed before us. This is not a case
of frustration of contract but it was submitted that the delay
due to breach of contract by the shipowners was sufficient to
entitle the charterers as innocent parties, that is, in no way to
blame for what had happened, to have regard to their interests
under the contract and that it was just in all the circumstances
that they should be held free to terminate as they did.

The two main issues of law arising on the findings, formulated

C. A.

1961

HONGKONG
FIR SHIPPING
CO. LTD.
*v.*
KAWASAKI
KISEN
KAISHA LTD.

Sellers L.J.

56                    QUEEN'S BENCH DIVISION.        **[1962]**

C. A.

1961

HONGKONG
FIR SHIPPING
CO. LTD.
*v.*
KAWASAKI
KISEN
KAISHA LTD.

Sellers L.J.

by Mr. Ashton Roskill for the charterers, were: (1) Is the sea-worthiness obligation a condition the breach of which entitles the charterers to treat the contract as repudiated? (2) Where in breach of contract a party fails to perform it, by what standard does the ensuing delay fall to be measured for the purpose of deciding whether the innocent party is entitled to treat the contract as repudiated? Is that standard (as the judgment holds) such delay as is necessary to frustrate the contract or is it, as the charterers contend, unreasonable delay, that is, longer time than it would be reasonable in all the circumstances for a charterer to wait?

By clause 1 of the charterparty the shipowners contracted to deliver the vessel at Liverpool "*she being in every way fitted "for ordinary cargo service.*" She was not fit for ordinary cargo service when delivered because the engine room staff was incompetent and inadequate and this became apparent as the voyage proceeded. It is commonplace language to say that the vessel was unseaworthy by reason of this inefficiency in the engine room.

Ships have been held to be unseaworthy in a variety of ways and those who have been put to loss by reason thereof (in the absence of any protecting clause in favour of a shipowner) have been able to recover damages as for a breach of warranty. It would be unthinkable that all the relatively trivial matters which have been held to be unseaworthiness could be regarded as conditions of the contract or conditions precedent to a charterer's liability and justify in themselves a cancellation or refusal to perform on the part of the charterer. If, in the present case, the inadequacy and incompetence of the engine room staff had been known to them, the charterers could have complained of the failure by the shipowners to deliver the vessel at Liverpool in accordance with clause 1 of the charterparty and could have refused to take her in that condition. The vessel was to be delivered not earlier than February 1, 1957, and not later than March 31, 1957, apparently. No evidence was directed to the provision "to be "narrowed to twenty days within the month of January 1957," but even that clause, if invoked, would have given the shipowners a week in which to bring the engine room staff into suitable strength and competency for the vessel's "ordinary cargo service." If the shipowners had refused or failed so to do, their conduct and not the unseaworthiness would have amounted to a repudiation of the charterparty and entitled the charterers to accept it and treat the contract as at an end. The time of delivery is clearly a condition of the contract and has often been held to be so. Unless a shipowner could in those circumstances have

**2 Q.B.**        QUEEN'S BENCH DIVISION.                    57

relied on clause 13, a charterer in addition to cancellation would
be entitled to damages, if any were suffered, which would not
have been so apparently in this case as the freight market had
fallen about that time.

If what is done or not done in breach of the contractual
obligation does not make the performance a totally different
performance of the contract from that intended by the parties,
it is not so fundamental as to undermine the whole contract.
Many existing conditions of unseaworthiness can be remedied by
attention or repairs, many are intended to be rectified as the
voyage proceeds, so that the vessel becomes seaworthy; and, as
the judgment points out, the breach of a shipowner's obligation
to deliver a seaworthy vessel has not been held by itself to entitle
a charterer to escape from the charterparty. The charterer may
rightly terminate the engagement if the delay in remedying any
breach is so long in fact, or likely to be so long in reasonable
anticipation, that the commercial purpose of the contract would
be frustrated.

Mr. Roskill recognised the weight of authority against him in
seeking to make seaworthiness a condition of the contract the
breach of which, in itself, was to be regarded as fundamental so
as to entitle a charterer to accept it as a repudiation of the charter-
party and to regard the charterparty as terminated, and he relied
more strongly on his second argument.

We were referred to the whole range of authorities from the
early 19th century to the present day in support of both con-
tentions, and the judgment in my opinion very clearly and fairly
deals with many of them, applying some and distinguishing others.
In *Bradford* v. *Williams*,[1] a case in which a ship's captain refused
to load at the place stipulated for the month of September, 1871,
but was willing to load at a port he was permitted to select prior
to that month and in which it was held that the breach of the
charterparty by the shipowner went to the root of the contract
and the charterer was right in his refusal to load, Martin B. said [2]
with much point: " Contracts are so various in their terms that it
" is really impossible to argue from the letter of one to the letter
" of another. All we can do is to apply the spirit of the law to the
" facts of each particular case. Now I think the words ' conditions
" ' precedent ' unfortunate. The real question, apart from all
" technical expressions, is: what in each instance is the substance
" of the contract." Some 90 years later those words seem as

C. A.

1961

HONGKONG
FIR SHIPPING
CO. LTD.
*v.*
KAWASAKI
KISEN
KAISHA LTD.

Sellers L.J.

[1] (1872) L.R. 7 Ex. 259.          [2] Ibid. 261.

QUEEN'S BENCH DIVISION.        **[1962]**

C. A.

1961

HONGKONG
FIR SHIPPING
CO. LTD.
*v.*
KAWASAKI
KISEN
KAISHA LTD.

Sellers L.J.

apt as they then were when the authorities relied on were but a fraction of those which have accumulated in the ensuing years.

This case calls for consideration of the charterparty obligations and the respective rights of the parties only where the vessel has been accepted and used. Here the charterers had in fact, though with much delay, taken the vessel in ballast across the Atlantic, collected the contemplated cargo and carried it to the intended destination, Osaka, where it was discharged commencing on May 29, 1957. In these circumstances it is not open to the charterers to rely on the obligation of seaworthiness as a condition precedent to an obligation on the charterers to pay freight or hire.

In the early part of the last century, before a counterclaim could be raised against a plaintiff's claim, sustained efforts were made, in the problems which arose in the increasing overseas trade, to resist a shipowner's claim by alleging a condition precedent unfulfilled. In *Ritchie* v. *Atkinson* [3] it failed. Lord Ellenborough C.J. held that the delivery of a complete cargo was not a condition precedent to the recovery of freight and relied on the reasoning of Lord Mansfield in the well-known decision in *Boone* v. *Eyre*. [4] Just as the shortage of one negro could not defeat the whole contract which stipulated for a fixed number of negroes to be transferred, no more would the shortage of some cargo defeat a claim for freight.

The same principle was applied in respect of seaworthiness in *Havelock* v. *Geddes* [5] where Lord Ellenborough C.J. pointed out [6] that if the obligation of seaworthiness were a condition precedent the neglect of putting in a single nail after the ship ought to have been made tight, staunch, etc., would be a breach of the condition and a defence to the whole of the plaintiff's demand.

By 1810, in *Davidson* v. *Gwynne* [7] Lord Ellenborough C.J. was saying that it was useless to go over the same subject again " which has so often been discussed of late " and held the sailing with the first convoy was not a condition precedent, the object of the contract was the performance of the voyage and that had been performed.

*Tarrabochia* v. *Hickie* [8] emphasises the same principle and I think is of no less effect because it relates to a voyage charter. Pollock C.B., whose succinct judgment [9] provides a complete

[3] (1808) 10 East 295.
[4] (1789) 1 H.Bl. 273.
[5] (1809) 10 East 555.
[6] Ibid. 563.

[7] (1810) 12 East 381.
[8] (1856) 1 H. & N. 183.
[9] Ibid. 187.

**2 Q.B.**        QUEEN'S BENCH DIVISION.                    59

answer to the appellants' case, cites Lord Ellenborough C.J. in *Davidson* v. *Gwynne* [10] " that unless the non-performance alleged " goes to the whole root and consideration of it, the covenant " broken is not to be considered as a condition precedent, but as a " distinct covenant, for the breach of which the party injured may " be compensated in damages " unless by the breach of the stipulation of the fitness of the vessel the object of the voyage is wholly frustrated.

This decision was approved in *Stanton* v. *Richardson* [11] where the shipowner had undertaken to carry a cargo of wet sugar and the ship was not fit to carry it and, as the jury had found, could not be made fit in such time as not to frustrate the object of the voyage. The molasses had drained from the wet sugar into the hold in large quantities and the ship's pumps were unable to deal with it. The cargo was unloaded and the charterers were held entitled to refuse to reload it or to provide any other cargo. If the defect had been or could have been remedied within a reasonable time so as not to frustrate the adventure it would seem that the charterer's right would not have been to terminate the charterparty but to have claimed damages for any loss occasioned by the delay.

*Kish* v. *Taylor* [12] affirms that a contract of affreightment, in that case a voyage charter, is not put an end to by a breach of the stipulation of seaworthiness. The passage in Lord Atkinson's speech [13] on which the appellants relied—" The fact that a ship " is not in a fit condition to receive her cargo, or is from any cause " unseaworthy when about to start on her voyage, will justify the " charterer or holder of the bill of lading in repudiating his contract " and refusing to be bound by it "—does not undermine the principle applied in the case. It applies in terms to the commencement of the voyage and it was not relevant to the case to consider the extent and nature of the unfitness or the time and circumstances in which it could be rectified.

*Tully* v. *Howling,* [14] although in favour of the charterer, gives no support to the appellants here whether it was decided on the ground of the majority that time was the essence of the contract and that the charterer who had a contract for 12 months' service was not bound to 10 months' service, or, as Brett J. held on

C. A.

1961

HONGKONG
FIR SHIPPING
CO. LTD.
*v.*
KAWASAKI
KISEN
KAISHA LTD.

Sellers L.J.

[10] 12 East 381.
[11] (1872) L.R. 7 C.P. 421; (1874) L.R. 9 C.P. 390, C.A.
[12] [1912] A.C. 604; 28 T.L.R. 425, H.L.
[13] [1912] A.C. 604, 617.
[14] (1877) 2 Q.B.D. 182, C.A.

60                          QUEEN'S BENCH DIVISION.            **[1962]**

C. A.

1961

HONGKONG
FIR SHIPPING
CO. LTD.
*v.*
KAWASAKI
KISEN
KAISHA LTD.

Sellers L.J.

appeal,[15] that the ship was not fit for the purpose for which she was chartered and could not be made fit within any time which would not have frustrated the object of the adventure.

The argument for the appellants contrasted the decisions on deviation with those on unseaworthiness and submitted that the latter was at least as grave as the former. But deviation amounts to a stepping out of the contract, or may do, and as such it is a repudiation of it and a substitution of a different voyage or engagement.

The formula for deciding whether a stipulation is a condition or a warranty is well recognised; the difficulty is in its application. It is put in a practical way by Bowen L.J. in *Bentsen* v. *Taylor, Sons & Co.* (2) [16]: "There is no way of deciding that question " except by looking at the contract in the light of the surrounding " circumstances, and then making up one's mind whether the " intention of the parties, as gathered from the instrument itself, " will best be carried out by treating the promise as a warranty " sounding only in damages, or as a condition precedent by the " failure to perform which the other party is relieved of his " liability."

In my judgment authority over many decades and reason support the conclusion in this case that there was no breach of a condition which entitled the charterers to accept it as a repudiation and to withdraw from the charter. It was not contended that the maintenance clause is so fundamental a matter as to amount to a condition of the contract. It is a warranty which sounds in damages.

The appellants' argument on the second submission in my judgment equally fails and is to be rejected on many of the authorities already cited.

It was submitted that the doctrine of frustration is quite independent of rights arising out of a breach of contract. If a party by his breach induces delay he cannot claim frustration which would have been self-induced. It was said that a delay which would frustrate a contract was not in the minds of the nineteenth-century judges and that their language permits of a lesser period of delay being sufficient to justify an innocent party from continuing with his bargain after a reasonable delay due to the breach of contract. Reliance was placed on the judgment of Tindal C.J. in *Freeman* v. *Taylor* [17] which upheld the verdict of a

15 2 Q.B.D. 182, 188.                  17 (1831) 8 Bing. 124.
16 [1893]  2  Q.B.  274,  281;  9
T.L.R. 552, C.A.

**2 Q.B.**     QUEEN'S BENCH DIVISION.                    61

jury in a deviation case where the jury had answered in the affirma-
tive the question whether the deviation was of such a nature and
description as to deprive the freighter of the benefit of the contract
into which he had entered. It was submitted that that should be
the question here and that it should be answered in favour of the
charterers.

In *Universal Cargo Carriers Corporation* v. *Citati* [18] a similar
argument was advanced by Mr. Ashton Roskill (then appearing
for shipowners who had cancelled a voyage charterparty because
no cargo had been provided), and he relied on passages in the line
of cases which he cited to us here and the statement in Scrutton
on Charterparties in the earlier editions. After reviewing the
authorities, including *Clipsham* v. *Vertue*,[19] to which I have not
previously referred, Devlin J. said that those authorities were con-
clusive, and with that I respectfully agree and with the opinion
which they support stated by the judge [20]: " But a party to a
" contract may not purchase indefinite delay by paying damages.
" . . . When the delay becomes so prolonged that the breach
" assumes a character so grave as to go to the root of the contract,
" the aggrieved party is entitled to rescind. What is the yard-
" stick by which this length of delay is to be measured? Those
" considered in the arbitration can now be reduced to two: "
(as in the present appeal) " first, the conception of a reasonable
" time, and secondly, such delay as would frustrate the charter-
" party . . . in my opinion the second has been settled as the
" correct one by a long line of authorities."

In my judgment Salmon J. was clearly right in the answers
he gave to both of the contentions of the charterers relied on in
this court, supported as the answers were by established authority
and good commercial reason.

I would dismiss the appeal.

UPJOHN L.J. I agree entirely with the judgment which has
just been delivered. I shall not recite any of the facts, and pro-
pose only to add a few words upon the two main submissions so
meticulously argued before us by Mr. Ashton Roskill for the
appellants.

Logically his first submission, as he recognised, was that the
obligation to provide a seaworthy vessel was a condition for breach
of which the charterer was at once entitled to treat the contract
as repudiated.

C. A.

1961

HONGKONG
FIR SHIPPING
Co. LTD.
*v.*
KAWASAKI
KISEN
KAISHA LTD.

Sellers L.J.

[18] [1957] 2 Q.B. 401; [1957] 2       [19] (1843) 5 Q.B. 265.
W.L.R. 713; [1957] 2 All E.R. 70.      [20] [1957] 2 Q.B. 401, 430.

62                    QUEEN'S BENCH DIVISION.          **[1962]**

C. A.

1961

HONGKONG
FIR SHIPPING
Co. LTD.
*v.*
KAWASAKI
KISEN
KAISHA LTD.

Upjohn L.J.

The charterparty (which, incidentally, was dated December 26, 1956, though it is common ground that it must in fact have been executed some weeks later for the plaintiff company was not incorporated at that date) contained the seaworthiness clause in these terms: " She being in every way fitted for ordinary " cargo service." At first sight that would seem to be a basic term underlying the whole of the charterparty, for how could the vessel perform the tasks which the owners warranted that she was fit to perform unless she was in fact fit to meet the perils of the sea? So basic is this obligation in a charterparty that unless there is an express clause of exclusion, it will be implied where not expressed.

Yet with all respect to Mr. Roskill's argument, it seems to me quite clear that the seaworthiness clause is not in general treated as a condition for breach of which the charterer is at once entitled to repudiate. This is established by a number of authorities over a long period of years and I mention them without quoting from them: *Havelock* v. *Geddes* [21]; *Tarrabochia* v. *Hickie* [22]; *Kish* v. *Taylor*.[23]

With regard to the last-mentioned case, Sellers L.J. has referred to certain observations in the speech of Lord Atkinson.[24] These words were, of course, strongly relied upon by Mr. Roskill to support his argument. In my judgment, either they must be regarded as made per incuriam, for they are quite inconsistent with the plain decision of the House in that case and with the speech of the same noble Lord on the previous page; or it is possible that his speech may have been misreported and that the phrase " will justify " should have read " *may* justify," a suggestion made by Diplock L.J. during the course of the argument.

Why is this apparently basic and underlying condition of seaworthiness not, in fact, treated as a condition? It is for the simple reason that the seaworthiness clause is breached by the slightest failure to be fitted " in every way " for service. Thus, to take examples from the judgments in some of the cases I have mentioned above, if a nail is missing from one of the timbers of a wooden vessel or if proper medical supplies or two anchors are not on board at the time of sailing, the owners are in breach of the seaworthiness stipulation. It is contrary to common sense to suppose that in such circumstances the parties contemplated that

[21] 10 East 555.                    [23] [1912] A.C. 604.
[22] 1 H. & N. 183.                   [24] Ibid. 617.

**2 Q.B.**    QUEEN'S BENCH DIVISION.    63

C. A.

1961

HONGKONG
FIR SHIPPING
Co. LTD.
*v.*
KAWASAKI
KISEN
KAISHA LTD.

Upjohn L.J.

the charterer should at once be entitled to treat the contract as
at an end for such trifling breaches.

The classification of stipulations in a contract into conditions
and warranties is familiar, and in connection with the sale of
goods these phrases have statutory definition. These phrases,
however, came into being in connection with the ancient system
of pleadings before the Common Law Procedure Act, 1852, and
when considering the remedies to which one party may be entitled
today for breach of a stipulation by the other the decision whether
the stipulation is a condition or warranty may not provide a
complete answer.

A condition, or a condition precedent, to give it its proper
title under the old system of pleading, was a condition performance
of which had to be averred by the plaintiff in the declaration in
order to establish his claim against the defendant. It was decided
in the great plantation case of *Boone* v. *Eyre*,[25] however, that it
was only necessary to aver as a condition precedent a condition
which went to the whole consideration of both sides. The rule
is, I think, best stated by Lord Ellenborough C.J. in *Davidson* v.
*Gwynne*[26]: " The principle laid down in *Boone* v. *Eyre*[27] has
" been recognised in all the subsequent cases, that unless the non-
" performance alleged in breach of the contract goes to the whole
" root and consideration of it, the covenant broken is not to be
" considered as a condition precedent, but as a distinct covenant,
" for the breach of which the party injured may be compensated in
" damages."

It is open to the parties to a contract to make it clear either
expressly or by necessary implication that a particular stipulation
is to be regarded as a condition which goes to the root of the
contract, so that it is clear that the parties contemplate that *any*
breach of it entitles the other party at once to treat the contract
as at an end. That matter has to be determined as a question of
the proper interpretation of the contract. Bramwell B. in *Tarra-
bochia* v. *Hickie*[28] has warned against the dangers of too ready
an implication of such a condition. He said[29]: " No doubt it is
" competent for the parties, if they think fit, to declare in express
" terms that any matter shall be a condition precedent, but when
" they have not so expressed themselves, it is necessary for those
" who construe the instrument to see whether they intended to
" do it. Since, however, they could have done it, those who

25 1 H.Bl. 273.                          28 1 H. & N. 183.
26 12 East 380, 389.                     29 Ibid. 183.
27 1 H.Bl. 273.

64                    QUEEN'S BENCH DIVISION.        **[1962]**

C. A.

1961

HONGKONG
FIR SHIPPING
Co. LTD.
*v.*
KAWASAKI
KISEN
KAISHA LTD.

Upjohn L.J.

" construe the instrument should be chary in doing for them that
" which they might, but have not done for themselves." Where,
however, upon the true construction of the contract, the parties
have not made a particular stipulation a condition, it would in
my judgment be unsound and misleading to conclude that, being
a warranty, damages is necessarily a sufficient remedy.

In my judgment the remedies open to the innocent party for
breach of a stipulation which is not a condition strictly so called,
depend entirely upon the nature of the breach and its foreseeable
consequences. Breaches of stipulation fall, naturally, into two
classes. First there is the case where the owner by his conduct
indicates that he considers himself no longer bound to perform his
part of the contract; in that case, of course, the charterer may
accept the repudiation and treat the contract as at an end. The
second class of case is, of course, the more usual one and that
is where, due to misfortune such as the perils of the sea, engine
failures, incompetence of the crew and so on, the owner is unable
to perform a particular stipulation precisely in accordance with
the terms of the contract try he never so hard to remedy it. In that
case the question to be answered is, does the breach of the stipula-
tion go so much to the root of the contract that it makes further
commercial performance of the contract impossible, or in other
words is the whole contract frustrated? If yea, the innocent
party may treat the contract as at an end. If nay, his claim
sounds in damages only.

If I have correctly stated the principles, then as the stipula-
tion as to the seaworthiness is not a condition in the strict sense
the question to be answered is, did the initial unseaworthiness as
found by the judge, and from which there has been no appeal, go
so much to the root of the contract that the charterers were then
and there entitled to treat the charterparty as at an end? The
only unseaworthiness alleged, serious though it was, was the
insufficiency and incompetence of the crew, but that surely cannot
be treated as going to the root of the contract for the parties must
have contemplated that in such an event the crew could be changed
and augmented. In my judgment, on this part of his case Mr.
Roskill necessarily fails.

I turn therefore to the second point: where there have been
serious and repeated delays due to the inability of the owner to
perform his part of the contract, is the charterer entitled to treat
the contract as repudiated after a reasonable time or can he do
so only if delays are such as to amount to a frustration of the

**2 Q.B.**        QUEEN'S BENCH DIVISION.        65

contract? Some of my earlier observations on the remedy avail-
able for breach of contract are relevant here so I do not repeat
them.

I agree with the conclusions reached by the judge and by my
Lord. I think that Devlin J. came to clearly the right conclusion
after an exhaustive review of the authorities in *Universal Cargo
Carriers Corporation* v. *Citati*.[30] See also for a much earlier and
very clear case *Clipsham* v. *Vertue*.[31] I only desire to add this.
Apart altogether from authority, it would seem to be wrong to
introduce the idea that the innocent party can treat the contract
as at an end for delays which, however, fall short of a frustration
of the contract. Subject to the terms of the contract, of course,
neither contracting party can unilaterally withdraw from the con-
tract. If, however, one party by his conduct frustrates the
contract, the law says that the other party may treat the contract
as at an end. For breaches of stipulation which fall short of that,
the innocent party can only sue for damages. I do not see on
principle how he can have some unilateral right to withdraw from
the contract when the conduct of the other falls short of frustrating
the contract. References in some of the earlier cases to reason-
able time and so forth are readily explained by the fact that those
words were used as synonymous with a frustrating time, that is
to say, a time by which the further commercial performance of
the contract became impossible.

Mr. Roskill has not seriously urged that in the circumstances
of this case the delays, serious though they were, were such as
to amount to a frustration of the contract. I think, therefore,
that his argument fails on this point also.

Accordingly, I agree that this appeal must be dismissed.

DIPLOCK L.J. The contract, the familiar " Baltime 1939 "
charter, and the facts upon which this case turns have been already
stated in the judgment of Sellers L.J., who has also referred to
many of the relevant cases. With his analysis of the cases, as
with the clear and careful judgment of Salmon J., I am in agree-
ment, and I desire to add only some general observations upon
the legal questions which this case involves.

Every synallagmatic contract contains in it the seeds of the
problem: in what event will a party be relieved of his undertaking
to do that which he has agreed to do but has not yet done?
The contract may itself expressly define some of these events,

C. A.

1961

HONGKONG
FIR SHIPPING
CO. LTD.
*v.*
KAWASAKI
KISEN
KAISHA LTD.

Upjohn L.J.

[30] [1957] 2 Q.B. 401.        [31] 5 Q.B. 265.

66                    QUEEN'S BENCH DIVISION.         **[1962]**

C. A.

1961

HONGKONG
FIR SHIPPING
Co. LTD.
*v.*
KAWASAKI
KISEN
KAISHA LTD.

Diplock L.J.

as in the cancellation clause in a charterparty; but, human pre-science being limited, it seldom does so exhaustively and often fails to do so at all. In some classes of contracts such as sale of goods, marine insurance, contracts of affreightment evidenced by bills of lading and those between parties to bills of exchange, Parliament has defined by statute some of the events not provided for expressly in individual contracts of that class; but where an event occurs the occurrence of which neither the parties nor Parliament have expressly stated will discharge one of the parties from further performance of his undertakings, it is for the court to determine whether the event has this effect or not.

The test whether an event has this effect or not has been stated in a number of metaphors all of which I think amount to the same thing: does the occurrence of the event deprive the party who has further undertakings still to perform of substantially the whole benefit which it was the intention of the parties as expressed in the contract that he should obtain as the consideration for performing those undertakings?

This test is applicable whether or not the event occurs as a result of the default of one of the parties to the contract, but the consequences of the event are different in the two cases. Where the event occurs as a result of the default of one party, the party in default cannot rely upon it as relieving himself of the perform-ance of any further undertakings on his part, and the innocent party, although entitled to, need not treat the event as relieving him of the further performance of his own undertakings. This is only a specific application of the fundamental legal and moral rule that a man should not be allowed to take advantage of his own wrong. Where the event occurs as a result of the default of neither party, each is relieved of the further performance of his own undertakings, and their rights in respect of undertakings previously performed are now regulated by the Law Reform (Frustrated Contracts) Act, 1943.

This branch of the common law has reached its present stage by the normal process of historical growth, and the fallacy in Mr. Ashton Roskill's contention that a different test is applicable when the event occurs as a result of the default of one party from that applicable in cases of frustration where the event occurs as a result of the default of neither party lies, in my view, from a failure to view the cases in their historical context. The problem: in what event will a party to a contract be relieved of his under-taking to do that which he has agreed to do but has not yet done? has exercised the English courts for centuries, probably ever since

**2 Q.B.**    QUEEN'S BENCH DIVISION.    67

assumpsit emerged as a form of action distinct from covenant and
debt and long before even the earliest cases which we have been
invited to examine; but until the rigour of the rule in *Paradine* v.
*Jane*[32] was mitigated in the middle of the last century by the
classic judgments of Blackburn J. in *Taylor* v. *Caldwell*[33] and
Bramwell B. in *Jackson* v. *Union Marine Insurance Co. Ltd.*,[34] it
was in general only events resulting from one party's failure to per-
form his contractual obligations which were regarded as capable of
relieving the other party from continuing to perform that which he
had undertaken to do.

In the earlier cases before the Common Law Procedure Act,
1852, the problem tends to be obscured to modern readers by the
rules of pleading peculiar to the relevant forms of action—cove-
nant, debt and assumpsit—and the nomenclature adopted in the
judgments, which were mainly on demurrer, reflects this. It was
early recognised that contractual undertakings were of two
different kinds: those collateral to the main purpose of the parties
as expressed in the contract and those which were mutually
dependent so that the non-performance by one party of an
undertaking of this class was an event which excused the
other party from the performance of his corresponding under-
taking. In the nomenclature of the eighteenth and early
nineteenth centuries undertakings of the latter class were
called "conditions precedent" and a plaintiff under the rules
of pleading had to aver specially in his declaration his per-
formance or readiness and willingness to perform all those
contractual undertakings on his part which constituted conditions
precedent to the defendant's undertaking for non-performance
of which the action was brought. In the earliest cases such as
*Pordage* v. *Cole*[35] and *Thorpe* v. *Thorpe*[36] the question whether
an undertaking was a condition precedent appears to have turned
upon the verbal niceties of the particular phrases used in the
written contract and it was not until 1773 that Lord Mansfield,
in the case which is a legal landmark, *Boone* v. *Eyre*,[37] swept
away these arid technicalities. "The distinction," he said,[38] "is
"very clear, *where mutual covenants go to the whole of the con-*
"*sideration on both sides, they are mutual conditions, the one*
"*precedent to the other.* But where they go only to a part, where

C. A.

1961

HONGKONG
FIR SHIPPING
CO. LTD.
*v.*
KAWASAKI
KISEN
KAISHA LTD.

Diplock L.J.

[32] (1647) Aleyn 26.
[33] (1863) 3 B. & S. 826.
[34] (1874) L.R. 10 C.P. 125.
[35] (1669) 1 Wms.Saund. 319; 1
Sid. 423.
[36] (1701) 12 Mod. 455.
[37] 1 H.Bl. 273.
[38] Ibid.

C. A.

1961

HONGKONG
FIR SHIPPING
CO. LTD.
*v.*
KAWASAKI
KISEN
KAISHA LTD.

Diplock L.J.

" a breach may be paid for in damages, there the defendant has a
" remedy on his covenant, and shall not plead it as a condition
" precedent."

This, too, was a judgment on demurrer, but the principle was
the same when the substance of the matter was in issue. Other
phrases expressing the same idea were used by other judges in
the cases which have already been cited by Sellers L.J., and
I would only add to his comments upon them that when it is
borne in mind that until the latter half of the nineteenth century
the only event that could be relied upon to excuse performance
by one party of his undertakings was a default by the other party,
no importance can be attached to the fact that in occasional cases,
and there may be others besides *Freeman* v. *Taylor*,[39] the court has
referred to the object or purpose of the party not in default rather
than to the object or purpose of the contract, for the relevant
object or purpose of the party not in default is that upon which
there has been a consensus ad idem of both parties as expressed
in the words which they have used in their contract construed in
the light of the surrounding circumstances.

The fact that the emphasis in the earlier cases was upon the
breach by one party to the contract of his contractual undertakings,
for this was the commonest circumstance in which the question
arose, tended to obscure the fact that it was really the event result-
ing from the breach which relieved the other party of further
performance of his obligations; but the principle was applied early
in the nineteenth century and without analysis to cases where the
event relied upon was one brought about by a party to a contract
before the time for performance of his undertakings arose but
which would make it impossible to perform those obligations when
the time to do so did arrive: for example, *Short* v. *Stone*[40]; *Ford*
v. *Tiley*[41]; *Bowdell* v. *Parsons*.[42] It was not, however, until
*Jackson* v. *Union Marine Insurance Co. Ltd.*[43] that it was recog-
nised that it was the happening of the event and not the fact that
the event was the result of a breach by one party of his contractual
obligations that relieved the other party from further performance
of his obligations.

" There are the cases," said Bramwell B.,[44] " which hold that,
" where the shipowner has not merely broken his contract, but
" has so broken it that the condition precedent is not performed,
" the charterer is discharged: . . .  Why?  Not merely because

---

[39] 8 Bing. 124.
[40] (1846) 8 Q.B. 358.
[41] (1827) 6 B. & C. 325.

[42] (1808) 10 East 359.
[43] L.R. 10 C.P. 125.
[44] Ibid. 147.

**2 Q.B.**     QUEEN'S BENCH DIVISION.                    69

" the contract is broken. If it is not a condition precedent,     C. A.
" what matters it whether it is unperformed with or without       1961
" excuse? Not arriving with due diligence, or at a day named,   ————
" is the subject of a cross-action only. But not arriving in time   HONGKONG
" for the voyage contemplated, but at such a time that it is   FIR SHIPPING
" frustrated, is not only a breach of contract, but discharges the   CO. LTD.
" charterer. And so it should, though he has such an excuse that   KAWASAKI
" no action lies."                                                 KISEN
                                                               KAISHA LTD.

Once it is appreciated that it is the event and not the fact     Diplock L.J.
that the event is a result of a breach of contract which relieves   ————
the party not in default of further performance of his obliga-
tions, two consequences follow. (1) The test whether the event
relied upon has this consequence is the same whether the event
is the result of the other party's breach of contract or not, as
Devlin J. pointed out in *Universal Cargo Carriers Corporation* v.
*Citati*.[45] (2) The question whether an event which is the result
of the other party's breach of contract has this consequence
cannot be answered by treating all contractual undertakings as
falling into one of two separate categories: " conditions " the
breach of which gives rise to an event which relieves the party
not in default of further performance of his obligations, and
" warranties " the breach of which does not give rise to such an
event.

Lawyers tend to speak of this classification as if it were
comprehensive, partly for the historical reasons which I have
already mentioned and partly because Parliament itself adopted
it in the Sale of Goods Act, 1893, as respects a number of implied
terms in contracts for the sale of goods and has in that Act used
the expressions " condition " and " warranty " in that meaning.
But it is by no means true of contractual undertakings in
general at common law.

No doubt there are many simple contractual undertakings,
sometimes express but more often because of their very simplicity
(" It goes without saying ") to be implied, of which it can be
predicated that every breach of such an undertaking must give
rise to an event which will deprive the party not in default of
substantially the whole benefit which it was intended that he
should obtain from the contract. And such a stipulation, unless
the parties have agreed that breach of it shall not entitle the
non-defaulting party to treat the contract as repudiated, is a

[45] [1957] 2 Q.B. 401, 434.

C. A.

1961

HONGKONG
FIR SHIPPING
CO. LTD.
*v.*
KAWASAKI
KISEN
KAISHA LTD.

Diplock L.J.

" condition." So too there may be other simple contractual under-
takings of which it can be predicated that *no* breach can give
rise to an event which will deprive the party not in default of
substantially the whole benefit which it was intended that he
should obtain from the contract; and such a stipulation, unless
the parties have agreed that breach of it shall entitle the non-
defaulting party to treat the contract as repudiated, is a
" warranty."

There are, however, many contractual undertakings of a more
complex character which cannot be categorised as being " condi-
" tions " or " warranties," if the late nineteenth-century meaning
adopted in the Sale of Goods Act, 1893, and used by Bowen L.J.
in *Bentsen* v. *Taylor, Sons & Co.*[46] be given to those terms. Of
such undertakings all that can be predicated is that some breaches
will and others will not give rise to an event which will deprive
the party not in default of substantially the whole benefit which
it was intended that he should obtain from the contract; and the
legal consequences of a breach of such an undertaking, unless
provided for expressly in the contract, depend upon the nature of
the event to which the breach gives rise and do not follow auto-
matically from a prior classification of the undertaking as a
" condition " or a " warranty." For instance, to take Bramwell
B.'s example in *Jackson* v. *Union Marine Insurance Co. Ltd.*[47]
itself, breach of an undertaking by a shipowner to sail with all
possible dispatch to a named port does not necessarily relieve the
charterer of further performance of his obligation under the
charterparty, but if the breach is so prolonged that the contem-
plated voyage is frustrated it does have this effect.

In 1874 when the doctrine of frustration was being foaled by
" impossibility of performance " out of " condition precedent "
it is not surprising that the explanation given by Bramwell B.
should give full credit to the dam by suggesting that in addition
to the express *warranty* to sail with all possible dispatch there
was an implied *condition precedent* that the ship should arrive at
the named port in time for the voyage contemplated. In *Jackson*
v. *Union Marine Insurance Co. Ltd.*[47] there was no breach of
the express warranty; but if there had been, to engraft the implied
condition upon the express warranty would have been merely a
more complicated way of saying that a breach of a shipowner's
undertaking to sail with all possible dispatch may, but will not
necessarily, give rise to an event which will deprive the charterer

[46] [1893] 2 Q.B. 274, 280; 9 T.L.R.    [47] L.R. 10 C.P. 125, 142.
552, C.A.

**2 Q.B.**      QUEEN'S BENCH DIVISION.                            71

of substantially the whole benefit which it was intended that he
should obtain from the charter. Now that the doctrine of frustra-
tion has matured and flourished for nearly a century and the old
technicalities of pleading "conditions precedent" are more than
a century out of date, it does not clarify, but on the contrary
obscures, the modern principle of law where such an event *has*
occurred as a *result* of a breach of an express stipulation in a
contract, to continue to add the now unnecessary colophon "There-
"fore it was an implied *condition* of the contract that a particular
"kind of breach of an express *warranty* should not occur." The
common law evolves not merely by breeding new principles but
also, when they are fully grown, by burying their progenitors.

As my brethren have already pointed out, the shipowners'
undertaking to tender a seaworthy ship has, as a result of numerous
decisions as to what can amount to "unseaworthiness," become
one of the most complex of contractual undertakings. It embraces
obligations with respect to every part of the hull and machinery,
stores and equipment and the crew itself. It can be broken by
the presence of trivial defects easily and rapidly remediable as
well as by defects which must inevitably result in a total loss of
the vessel.

Consequently the problem in this case is, in my view, neither
solved nor soluble by debating whether the shipowner's express
or implied undertaking to tender a seaworthy ship is a "condition"
or a "warranty." It is like so many other contractual terms an
undertaking one breach of which may give rise to an event which
relieves the charterer of further performance of his undertakings
if he so elects and another breach of which may not give rise to
such an event but entitle him only to monetary compensation in
the form of damages. It is, with all deference to Mr. Ashton
Roskill's skilful argument, by no means surprising that among the
many hundreds of previous cases about the shipowner's under-
taking to deliver a seaworthy ship there is none where it was found
profitable to discuss in the judgments the question whether that
undertaking is a "condition" or a "warranty"; for the true
answer, as I have already indicated, is that it is neither, but one
of that large class of contractual undertakings one breach of
which may have the same effect as that ascribed to a breach of
"condition" under the Sale of Goods Act, 1893, and a different
breach of which may have only the same effect as that ascribed
to a breach of "warranty" under that Act. The cases referred
to by Sellers L.J. illustrate this and I would only add that in the

C. A.

1961

HONGKONG
FIR SHIPPING
CO. LTD.
*v.*
KAWASAKI
KISEN
KAISHA LTD.

Diplock L.J.

72                    QUEEN'S BENCH DIVISION.        **[1962]**

C. A.

1961

HONGKONG
FIR SHIPPING
CO. LTD.
*v.*
KAWASAKI
KISEN
KAISHA LTD.

Diplock L.J.

dictum which he cites from *Kish* v. *Taylor* [48] it seems to me, from
the sentence which immediately follows it as from the actual
decision in the case and the whole tenor of Lord Atkinson's speech
itself, that the word " will " was intended to be " may."

What the judge had to do in the present case, as in any other
case where one party to a contract relies upon a breach by the
other party as giving him a right to elect to rescind the contract,
and the contract itself makes no express provision as to this,
was to look at the events which had occurred as a result of the
breach at the time at which the charterers purported to rescind
the charterparty and to decide whether the occurrence of those
events deprived the charterers of substantially the whole benefit
which it was the intention of the parties as expressed in the
charterparty that the charterers should obtain from the further
performance of their own contractual undertakings.

One turns therefore to the contract, the Baltime 1939 charter,
of which Sellers L.J. has already cited the relevant terms. Clause
13, the " due diligence " clause, which exempts the shipowners
from responsibility for delay or loss or damage to goods on board
due to unseaworthiness, unless such delay or loss or damage has
been caused by want of due diligence of the owners in making
the vessel seaworthy and fitted for the voyage, is in itself sufficient
to show that the mere occurrence of the events that the vessel
was in some respect unseaworthy when tendered or that such
unseaworthiness had caused some delay in performance of the
charterparty would not deprive the charterer of the whole benefit
which it was the intention of the parties he should obtain from
the performance of his obligations under the contract—for he
undertakes to continue to perform his obligations notwithstanding
the occurrence of such events if they fall short of frustration of
the contract and even deprives himself of any remedy in damages
unless such events are the consequence of want of due diligence
on the part of the shipowner.

The question which the judge had to ask himself was, as he
rightly decided, whether or not at the date when the charterers
purported to rescind the contract, namely, June 6, 1957, or when
the shipowners purported to accept such rescission, namely,
August 8, 1957, the delay which had already occurred as a result
of the incompetence of the engine-room staff, and the delay which
was likely to occur in repairing the engines of the vessel and the
conduct of the shipowners by that date in taking steps to remedy

[48] [1912] A.C. 604, 617.

**2 Q.B.**      QUEEN'S BENCH DIVISION.                          73

these two matters, were, when taken together, such as to deprive    C. A.
the charterers of substantially the whole benefit which it was the   1961
intention of the parties they should obtain from further use of   ───────
the vessel under the charterparty.                                HONGKONG
                                                                  FIR SHIPPING
  In my view, in his judgment—on which I would not seek to        CO. LTD.
improve—the judge took into account and gave due weight to all       v.
the relevant considerations and arrived at the right answer for   KAWASAKI
the right reasons.                                                KISEN
                                                                  KAISHA LTD.

> *Appeal dismissed with costs.*
> *No order on plaintiffs' cross-notice.*
> *Leave to appeal to House of Lords*
>   *refused.*
> *Stay of execution until January 19, 1962,*
>   *to enable defendants to apply to House*
>   *of Lords for leave to appeal.*
> *Provided petition lodged within the*
>   *appropriate time, stay continued until*
>   *the hearing of the application.*

Solicitors: *Constant & Constant; William A. Crump & Son.*

                                              E. M. W.

───────────

IRVING *v.* NATIONAL PROVINCIAL BANK LTD.          C. A.

              [Plaint No. R. 994.]                      1961
                                                   *Nov.* 29, 30.

*Police—Police (Property) Act—Burden of proof—Money seized by police*   Holroyd
  *from plaintiff—Exhibited at trial for bank robbery—Order under*       Pearce,
  *Act for delivery up of money to bank—Plaintiff's claim to money—*     Willmer and
  *No proof that plaintiff lawful owner—No proof that notes were*        Davies L.JJ.
  *those stolen from bank—Presumption of previous possession—*
  *Whether plaintiff entitled to money—Police (Property) Act, 1897*
  *(60 & 61 Vict. c. 30), s. 1.*
*Chattel—Possessory title—Police (Property) Act—Effect of order—Bank-*
  *notes found in plaintiff's possession—Claim to notes by bank—Order*
  *by magistrates in bank's favour—Action by plaintiff for notes—*
  *Burden of proof of title—Police (Property) Act, 1897, s. 1.*

  Branches of the W. Bank and the N. P. Bank were broken into
and substantial sums of money in notes were stolen. The police
arrested the plaintiff and seized certain bundles of notes which

───────────

[Reported by EVERARD COBBALLY, Esq., Barrister-at-Law.]