# EXHIBIT 98

A   decision of Sir Robert Megarry in *Townsends Carriers Ltd* v *Pfizer Ltd* (1977) 33 P&CR 361*.

There on both sides it would seem (that is, the landlords and the tenants) the handling of matters relating to the lease was in the hands of agents, in the form of associated companies. There was a clause in the lease 4(c) under which:

If either the landlord or tenant shall desire to determine the term hereby granted at any time ... and shall give the other party 12 months previous notice ... and if the tenant shall give such notice ...

So there is an either-way determination clause expressed as exercisable by notices given by landlord or tenant as the case may be. The notice was sent by the tenants' agents, Unicliffe Ltd, not the tenants themselves, who were Pfizer Ltd. It was sent to Wilkinson

B   Transport Ltd. Wilkinson Transport was a wholly-owned subsidiary of the holding company, of which the actual landlord, Townsends Carriers Ltd, was another subsidiary. Therefore, notice was sent to the agents. What the learned Vice-Chancellor held was that:

Since the plaintiff and defendant stood by and let WT Ltd and U Ltd respectively deal with the premises as if WT Ltd and U Ltd were respectively the landlord and tenant there was general agency both as to the landlord and as to the tenant; that where the general control of the property was left by the landlord with an agent a notice to quit given by the agent would be valid even though it was given by the agent in his own name, and an agent who had power to give an effective notice would also have power to receive a notice.

In the course of his judgment, the learned Vice-Chancellor
C   differentiates the case of an agent that merely had authority to collect rents from one that had general authority. This authority seems to cover both the points that I have here: whether the notice can be given to the managing agent by name rather than to the landlord by name and whether the managing agent had authority to receive it.

Mr Reynolds conceded that there was no authority or stipulation in the clause itself that it had to be given to the lessors, although he stressed that clause 8 of the lease did say:

If the lessee shall desire to serve any notice on the lessor hereunder then such notice shall only be validly served if served by recorded delivery or registered post.

He submitted that that clause did contemplate that the notice should be addressed to the lessors.
D   In my judgment, that is putting too much on to that clause. The purpose of this clause is to provide for the mode of service. I cannot collect from this clause that there is a specific requirement that the notice shall be directed to the lessors. Of course, if the lessees do not direct it to the lessors, they run the risk that the person to whom they do direct it may have no authority to receive it, but that is a different matter to whether the notice in proper form has to be directed to the lessors. I would not accept that point.

There remains the question of whether the managing agents had authority to receive the notice. An agent can receive a notice of this sort if he has sufficient authority or if he is held out as having that authority, even though in that particular instance his authority has
E   been restricted. The former would be a case of express authority; the latter would be a case of ostensible authority.

Then if he did not have authority, a further question may arise in the particular case. A notice served on an agent who had not got authority to receive might still be good if it could be shown that the agent was likely to pass it on to the landlord. In the present case, the tenants could not rely on that last point simply because there was not time enough for the notice to have got to the hands of the agents and then be handed on to the landlords, having regard to the fact that the offices of the landlords and their agent were closed on the dates I have already mentioned.

So the question comes to this, whether the company to which this notice was directed did have authority to receive it. The way it is put
F   on behalf of the tenant is that these were general agents. The landlords have expressly said in their evidence that the management of the premises demised by the lease was at all material times carried out by the lessors' agent, Peel (South East) Ltd. Letters have been produced which are consistent with that position and not with some more limited authority of the agents. And also the company structure would seem to underline the control of Peel (South East) Ltd over the plaintiffs' affairs. The plaintiffs have not challenged that in any way. They have put forward Peel (South East) Ltd as managing agents. They have not sought to show that their authority is restricted; and it would seem to me that a managing agent, among other things, would

*Editor's note: Also reported at (1977) 242 EG 813.

have general authority to receive notices relating to the property and  G
receive them in their own name. That accords with the decision of Sir Robert Megarry V-C in *Townsends Carriers Ltd* v *Pfizer Ltd*.

It was sought to distinguish this case on the basis that there the plaintiff and defendant had stood by and let the two other companies deal with the premises as if they were respectively landlord and tenant. That, however, was only the mode in which the learned judge there could draw the inference that there was a general agency as to landlord and tenant. He did not suggest that that was the only material from which the inference could be drawn. It all depends on the evidence in the particular case. In this case, Peel (South East) are held out as charged with the management of a property and therefore it seems to me that there is a general agency in relation to this
property; and it is really on that short ground, without going further  H
into the authorities, I think that Peel (South East) Ltd did have authority to receive this notice by virtue of the general authority to manage the property conferred on them.

I should finally mention that it was stressed that in the lease there were a number of occasions when the agents were specifically referred to. I could not read that as in some way limiting the general authority that Peel (South East) Ltd had in relation to the management of the property.

Some clauses obviously deal with cases where even a general agent might not have authority to deal with a particular matter and the reference is put in to widen it. An example of this is a certificate signed
by the lessors' agents as to the amount of the service charge. There  J
might be a question as to authority on an important matter like that, determining an element in the rent, if the certificate was simply signed by some agent.

In the result, I propose to return affirmative answer to the questions which have been raised by the originating summons. That is to say, whether upon a true construction of clause 5(9)(i) and the events which have happened the notice dated December 20 1990 addressed to Peel (South East) Ltd was valid and effective to determine the term created by the lease at the end of the fifth year of the term. I shall answer affirmatively that it determined it on September 28.

*Declarations accordingly with costs for the defendant.*  K

## County Court Decision

March 5 1992

(Before Mr Stephen SEDLEY QC, sitting as an assistant recorder at the Wood Green Trial Centre)

HUSSEIN AND OTHERS v MEHLMAN

Estates Gazette August 15 1992
[1992] 32 EG 59  L

**Landlord and tenant — Repudiatory breach — Whether a repudiatory breach of a contract of letting is legally possible — Whether tenants accepted landlord's breach of a repairing covenant as putting an end to the lease**

The defendant granted the plaintiffs a three-year assured shorthold tenancy of a dwelling-house from December 14 1989 subject to the covenant implied on the part of the landlord by section 11 of the Landlord and Tenant Act 1985 — From the commencement of the term, the plaintiffs made several complaints to the defendant about the state of
disrepair of the premises and, by March 1991, one of the  M
bedrooms had been made uninhabitable by a ceiling collapse — The defendant refused to carry out these and other repairs — On March 18 1991 the tenants returned the keys and vacated the premises — They brought the present proceedings claiming a declaration that the defendant was in repudiatory breach of the contract of letting and by returning the keys and giving up possession they had accepted that repudiatory breach and the lease was at an end — The plaintiffs also claimed damages for breach of covenant

*Held:* On the evidence there had been severe breaches of the implied covenant by the defendant — One breach in particular

A vitiated the central purpose of the contract of letting — A lease or tenancy can come to an end by repudiation — The breaches of the covenant implied by section 11 of the 1985 Act were repudiatory — By vacating the house and returning the keys, the plaintiffs had accepted the repudiatory conduct of the defendant as putting an end to the contract of letting — The plaintiffs were awarded general damages of £1,250 and £1,280 in respect of want of heating

The following cases are referred to in this report.

Arden v Pullen (1842) 10 M&W 321
Bailey (CH) Ltd v Memorial Enterprises Ltd [1974] 1 WLR 728; [1974] 1 All ER 1003; [1974] EGD 211; (1973) 229 EG 613, CA
Baker v Holtpzapffel (1811) 18 Ves 115; 4 Taunt 45; 128 ER 244; 34 ER 261
Calabar Properties Ltd v Stitcher [1984] 1 WLR 287; [1983] 3 All ER 759; [1983] EGD 578; (1983) 268 EG 697, CA
Collins v Barrow (1831) 1 M&Rob 112
Edwards v Etherington (1825) Ry & M 268
Hammersmith and Fulham London Borough Council v Monk [1991] 3 WLR 1144; [1992] 1 EGLR 65; [1992] 09 EG 135, HL
Hart v Windsor (1843) 12 M&W 68; (1843-60) All ER Rep 681
Izon v Gorton (1839) 5 Bing NC 501
Killick v Roberts [1991] 1 WLR 1146; [1991] 4 All ER 289; [1991] 2 EGLR 100; [1991] 41 EG 133, CA
Liverpool City Council v Irwin [1977] AC 239; [1976] 2 WLR 562; [1976] 2 All ER 39; (1976) 74 LGR 392; [1976] EGD 282; 238 EG 879, HL
Lubren v Lambeth London Borough Council (1987) 20 HLR 165, CA
National Carriers Ltd v Panalpina (Northern) Ltd [1981] AC 675; [1981] 2 WLR 45; [1981] 1 All ER 161, HL
Newham London Borough v Patel (1978) 13 HLR 77, CA
O'Brien v Robinson [1973] AC 912; [1973] 2 WLR 393; [1973] 1 All ER 583; (1973) 25 P&CR 239; [1973] EGD 296; 226 EG 297, HL
Quick v Taff-Ely Borough Council [1986] QB 809; [1985] 3 WLR 981; [1985] 3 All ER 321; (1985) 84 LGR 498; [1985] 2 EGLR 50; 276 EG 452, CA
Smith v Marrable (1843) 11 M&W 5; 12 LJ Ex 223; 7 Jur 70; 63 RR 493
Staves v Leeds City Council [1992] 2 EGLR 37; [1992] 29 EG 119, CA
Total Oil Great Britain Ltd v Thompson Garages (Biggin Hill) Ltd [1972] 1 QB 318; [1971] 3 WLR 979; [1971] 3 All ER 1226, CA
United Scientific Holdings Ltd v Burnley Borough Council [1978] AC 904; [1977] 2 WLR 806; [1977] 2 All ER 62; (1977) 33 P&CR 220; [1977] EGD 195; 243 EG 43 & 127, HL
Walker v Hobbs & Co (1889) 23 QBD 458
Wilson v Finch-Hatton (1877) 2 ExD 336; 46 LJQB 489; 36 LT 473; 25 WR 537
Wycombe Area Health Authority v Barnett (1982) 5 HLR 84

This was an action for damages by the plaintiffs, Ibrahim Hussein, Kawther Hussein and Malcolm Armstrong, in relation to a tenancy granted to them by the defendant, Israel Ben Mehlman, in respect of 27 Kenneth Crescent, Brent, London NW2.

Alan Tunkel (instructed by Hodders) appeared for the plaintiffs; Jonathan Russen (instructed by Ivor Denfield & Co) represented the defendant.

The defendant landlord granted the plaintiffs a three-year assured shorthold tenancy of 27 Kenneth Crescent, Brent, London NW2, at a monthly rent of £520 from December 14 1989 to December 13 1992. The tenancy was subject to a covenant on the part of the landlord implied by section 11 of the Landlord and Tenant Act 1985. On the evidence the assistant recorder found the landlord in breach of the implied covenant in relation to the space heating installation, the plaster ceiling to one of the rooms, the flat roof of a rear extension, the failure of the water pipes and dampness in a hall wall. By the middle of March 1991 Miss Hussein's bedroom had been made uninhabitable by the collapse of its ceiling: cold and dirt were being carried from there into the rest of the house; the sitting-room was letting in rainwater and part of its ceiling was bulging dangerously; the outside toilet was unusable and the hall wall was affected by damp. This situation was not improved by the ill-fitting doors and windows and the effects of the burst pipes. The landlord refused to carry out repairs. On March 18 1991 the plaintiff tenants returned the keys to the landlord's agents and vacated the property. Having found there had been a repudiatory breach by the landlord of the implied covenants to repair, the assistant recorder considered whether a repudiatory breach of contract of letting is legally possible.

Continuing his judgment, STEPHEN SEDLEY QC said: However, everything hangs upon events up to March 18 1991 and nothing of legal consequence now hangs on events after that date. Although certain issues about the construction of the statutory implied covenant have to be addressed, the single most important point in the case is this: is it possible in law for a contract of letting to be terminated by one party's acceptance of the other's repudiatory conduct? At the conclusion of the hearing, because both parties needed to arrange their affairs without delay in accordance with my decision, I gave my principal conclusions in open court, reserving my reasons until the delivery of this judgment. These conclusions were:

(i) A repudiatory breach of a contract of letting is legally possible.
(ii) There was in this case a repudiatory breach by the defendant of the section 11 covenants.
(iii) The plaintiffs by vacating the property and returning the keys on March 18 1991 had accepted the defendant's breach as putting an end to the lease.

*Repudiation of a lease*

Although a contract of letting, whether for a term of years certain or for a periodic "springing" term, differs from other contracts in creating an estate in land, it is nevertheless a contract: see *United Scientific Holdings Ltd v Burnley Borough Council* [1978] AC 904*, at pp 929E, 935B, 944B, 947B-C, 956F-H, 962A and 963H-964B, approving *C H Bailey Ltd v Memorial Enterprises Ltd* [1974] 1 WLR 728†; and, most recently, *Hammersmith and Fulham London Borough Council v Monk* [1991] 3 WLR 1144‡, at pp 1147C, G, and 1156C, G-H. Since, in the ordinary way, any contract may be brought to an end by one party's repudiatory conduct, the question to be answered is whether a contract of letting is an exception to the rule.

In *C H Bailey Ltd v Memorial Enterprises Ltd* at p 732C, Lord Denning MR said:

It is time to get away from the medieval concept of rent. That appears from a passage in *Holdsworth, A History of English Law*, vol. VII (1900), p 262 . . .:
. . . in modern law, rent is not conceived of as a thing, but rather as a payment which a tenant is bound by his contract to make to his landlord for the use of the land.
The time and manner of the payment is to be ascertained according to the true construction of the contract, and not by reference to out-dated relics of medieval law.

Sir Eric Sachs at p 735E said:

. . . Whatever the position last century, the word "rent" today can often simply refer to any contractual sum to which a landlord becomes entitled for the use of his land.

He endorsed the following passage in *Foa, General Law of Landlord and Tenant* (8th ed, 1957) at p 101:

There has been a considerable development from the medieval conception of rent as a "thing" or proprietary interest to the modern conception of rent as a contractual obligation to pay for the use of property let, and the notion that "rent" must have the quality that it can be distrained for is more appropriate to the medieval than the modern conception. Accordingly, the question in each case is to determine what in substance is the subject-matter of the tenancy granted to the tenant by the contract: *prima facie* rent is the monetary compensation payable by the tenant in consideration for the grant, however it be described or allocated . . .

It seems clear, then, that, although the modern law of landlord and tenant has not made obsolete the availability of distress for rent or the concept of an estate in land arising out of the relationship, these are no longer the foundation of the relationship but are its incidents: its foundation is the contract to pay money or give other consideration in return for the exclusive right to occupy land. (It may or may not be that the rent-free tenancy is an anomaly in this context, but that rare species cannot swim very far against the tide of the general law.)

The anchor by which Mr Russen, in his able argument, seeks to secure his client's boat against this tide is the decision of the Court of Appeal in *Total Oil Great Britain Ltd v Thompson Garages (Biggin Hill) Ltd* [1972] 1 QB 318. It is important to see exactly what this case was about. The defendants held a lease from the plaintiffs of a garage, the lease containing a solus-site agreement, preventing the defendants from selling any petrol but the plaintiffs' and requiring the defendants to pay for petrol on delivery. The defendants fell down on two payments and the plaintiffs in response demanded payment in advance. Both sides were therefore in serious breach of the contractual arrangements. The defendants found another supplier, whom they continued to use even when the plaintiffs offered to resume cash on delivery. When the plaintiffs sued for an injunction to enforce the solus-site agreement, the defendants claimed that the plaintiffs had repudiated by demanding payment in advance and that they had accepted the repudiation by going to other suppliers. But — and this was the important thing in the case — the

---

*Editor's note: Also reported at (1977) 243 EG 43 & 127.
†Editor's note: Also reported at (1973) 229 EG 613.
‡Editor's note: Also reported at [1992] 1 EGLR 65.

08-13555-mg    Doc 45468-14    Filed 07/31/14    Entered 07/31/14 17:14:52    Exhibit 98
Pg 4 of 8

A  defendants were trying to approbate and reprobate, because they were trying to keep the lease but to get rid of the solus-site covenant. The case was not actually about the repudiation of a lease, since neither party contended that this had occurred.

Lord Denning MR accepted that the plaintiffs' demand for advance payment was repudiatory and that the defendants "had a good deal of justification" for finding another supplier. But the question was whether this by itself had put an end to the solus-site covenant by acceptance of repudiatory conduct or whether, when the plaintiffs offered to go back to the contractual arrangement, they were still in a position to put themselves in the right. The Court of Appeal held that they were, at p 323D:

B  Mr Thompson for the dealer says that the oil company have repudiated their contract by insisting on the new stipulation of payment before delivery. He says that the dealer accepted that repudiation. He treated the agreement as at an end and got deliveries elsewhere. Seeing that the repudiation was accepted, the oil company can no longer insist on the agreement being performed.

The difficulty which faces Mr Thompson, however — and he faces it quite frankly — is this. The agreement is contained in the lease. If the lease is at an end, as well as the agreement, then the dealer is in a parlous position. He has got to go out. That is the last thing he wants. He wants to keep the lease.

Lord Denning held that the covenant was not severable from the rest of the lease and went on at p 324A:

C  The second point is: what is the effect of the repudiation by the oil company which was accepted by the dealer? Does it put an end to the lease? I think not. A lease is a demise. It conveys an interest in land. It does not come to an end like an ordinary contract on repudiation and acceptance. There is no authority on the point, but there is one case which points that way. It is *Leighton's Investment Trust Ltd* v *Cricklewood Property & Investment Trust Ltd* [1943] KB 493 . . . [1945] AC 221. Lord Russell of Killowen and Lord Goddard at pp 234 and 244 were both of opinion that frustration does not bring a lease to an end. Nor I think does repudiation and acceptance.

Edmund Davies LJ, concurring, put his own reasons on a narrower basis: the elements of the lease were not severable and must stand or fall together. He said at p 325C:

Despite the repudiation by the Plaintiffs of part of the lease and the defendants' acceptance thereof, I cannot accept that, as to the latter's occupancy during the remainder of the 14-year term, they would be able to say, "We are entitled to remain in possession without regard being paid to

D  where we obtain our petrol supplies."

This reasoning limits itself to the impossibility of approbating and reprobating at the same time and fixes the defendants with their continuance in possession under the lease. The third judgment, that of Stephenson LJ, agreed with both the previous judgments and went on at p 325D:

This complex of lease and trading agreement has not been repudiated . . .

not "cannot be repudiated".

The *Total Oil* decision, at its fullest, is therefore to be found in the judgment of Lord Denning. If it stood by itself it would, at this level, be binding authority for the proposition that because of the special

E  character of a demise of land a lease is not terminable by frustration nor, therefore, by repudiation and acceptance.

However, since the *Total Oil* case was decided in 1971, both the major and the minor premises upon which Lord Denning's second holding was based appear to have been destroyed by decisions of the House of Lords. As I have already indicated, the major premise that a lease of land is in its essence different from other contracts has been overset, in particular by the decision of the House of Lords in *United Scientific Holdings Ltd* v *Burnley Borough Council*. The minor premise that a lease cannot be determined by frustration has been overset by the decision of the House of Lords in *National Carriers Ltd* v *Panalpina (Northern) Ltd* [1981] AC 675, in which a demised warehouse became unusable because of a street closure, and the

F  tenants withheld rent, claiming that the lease had been frustrated. The House of Lords (Lord Russell of Killowen dissenting) held that the doctrine of frustration was in principle applicable to leases but that it did not operate on the facts of the instant case. Their lordships declined to follow the *dicta* in the *Cricklewood* case. The *Total Oil* case was cited but was not referred to in the speeches. Lord Hailsham, at p 690D, said:

I conclude that the matter is not decided by authority and that the question is open to your Lordships to decide on principle. In my view your Lordships ought now so to decide it. Is there anything in principle which ought to prevent a lease from ever being frustrated? I think there is not. In favour of the opposite opinion, the difference in principle between real and chattel property was strongly urged. But I find it difficult to accept this, once it has been decided, as has long been the case, that time and demise charters even of the largest ships and of considerable duration can in principle be frustrated.

Lord Wilberforce at p 694E said:

It was pointed out, however, by Atkin LJ in *Matthey* v *Curling* [1922] 2 AC 180 200, in a passage later approved by Viscount Simon [1945] AC 221, 230 that as a lease can be determined, according to its terms, upon the happening of certain specified events, there is nothing illogical in implying a term that it should be determined on the happening of other events — namely, those which in an ordinary contract work a frustration . . .

A man may desire possession and use of land or buildings for, and only for, some purpose in view and mutually contemplated. Why is it an answer, when he claims that this purpose is "frustrated", to say that he has an estate if that estate is unusable and unsaleable? In such a case the lease, or the conferring of an estate, is a subsidiary means to an end, not an aim or end of itself.

He concluded at p 696G:

It was not until the *Cricklewood* case that the argument was put on principle and fully explored. The governing decision (of the Court of Appeal) was summary, unargued, and based upon previous cases which will not bear the weight of a generalisation. I think that the movement of the law of contract is away from a rigid theory of autonomy towards the discovery — or I do not hesitate to say imposition — by the Courts of just solutions, which can be ascribed to reasonable men in the position of the parties.

This reasoning, it seems to me, not only takes away the minor premise of the *Total Oil* judgment but has fundamental implications for its major premise: it continues the process, to which I have referred, of assimilating leases to other contracts. It follows, in my judgment, that unless some special exception can be established for acts of repudiation, not only has *Total Oil* ceased to be authority for the proposition that a lease cannot be repudiated: the decisions which have rendered it obsolete point powerfully in the direction of repudiation being a legitimate ground for termination of a lease. I bear in mind, however, that the House of Lords was extremely cautious about the range of situations in which it would allow the doctrine of frustration to operate on a lease and that Lord Hailsham posed the choice, in the language of *HMS Pinafore*, as lying only between "never" and "hardly ever", coming down in favour of the latter.

Very recently the Court of Appeal has held, apparently without argument to the contrary and without any citation of authority, that a tenancy agreement which one party is induced to enter into by the fraud of the other can be rescinded at the innocent party's election: *Killick* v *Roberts* [1991] 4 All ER 289*, at p 292d. This seems another step down the same road.

It is perhaps a relief that the *Total Oil* case is no longer good law, because it appears to have silently overruled an important line of cases (not cited in argument) in which, throughout the 19th century, the courts took it as axiomatic that a contract of letting could be terminated by the innocent party without notice if the other party failed to fulfil a fundamental term of the contract. I will refer to them because they are of assistance in deciding the next question, namely what breaches of a lessor's covenant are of a sufficiently fundamental character to amount to repudiation.

In *Edwards* v *Etherington* (1825) Ry&M 268 an action for use and occupation failed by the jury's verdict. The defendant was tenant from year to year of a house, the walls of which were so dilapidated that it became unsafe to live in. The defendant vacated a few days after the rent day and returned the key to the plaintiff. His defence to the action for rent was — very much as Mr Hussein's initially was — that there had been a surrender, but, if not, that the plaintiff was not entitled to rent for "premises utterly useless to the defendant". The Chief Justice told the jury:

Slight circumstances will not suffice but such serious reasons may exist, as will justify a tenant in quitting at any time, and it is for you to say whether in this case any such exist. . . . It is for you to say whether such serious reasons for quitting, existed in this case, as will exempt the defendant from this demand, on the ground of his having had no beneficial use and occupation of these premises; and that, through no default of his own, but through the fault of a person (the Plaintiff) who ought to have taken care, that the premises should have been in such a state, as to continue useful to the defendant.

In *Collins* v *Barrow* (1831) 1 M&Rob 112 the defendant had a three-year lease with a covenant to keep the premises in tenantable repair. He left without notice after nine months and was sued for the rent accruing thereafter. His defence was that the house had become uninhabitable for want of sufficient drainage. Bayley B directed the jury:

---

*Editor's note: Also reported at [1991] 2 EGLR 100; [1991] 41 EG 133.

In any case, the tenant is bound to pay rent during the time for which he has contracted, unless he satisfies the jury that, under the circumstances, he was justified in quitting. I think however that in point of law he will be freed from his obligation to reside on the premises, if he makes out, to the satisfaction of the jury, that the premises were noxious and unwholesome to reside in, and that this state arose from no default or neglect of his own, but from something over which he had no control, or none, except at an extravagant and unreasonable expense. Thus, he could not be bound to make a sewer; and if nothing else could keep the house wholesome, I think he was justified in quitting. The expense of making a sewer may be heavy; but if the Plaintiff would not make it, he cannot, I think, call upon his tenant to continue in a house which requires it.

The issue of fact, on which the jury gave a verdict for the plaintiff, was whether the sewage could reasonably have been pumped away by the defendant without need of a sewer. There was evidently no lessor's covenant to repair.

In *Izon* v *Gorton* (1839) 5 Bing NC 501 Tindal CJ held that the tenant continued to be liable for rent where the premises were destroyed by an accidental fire. The court was bound by authority to that effect (*Baker* v *Holtzapffel* (1811) 4 Taunt 45) on this point, but the Chief Justice also said at p 507:

The cases referred to in the argument, in which the tenant has been allowed to withdraw himself from the tenancy, and to refuse payment of rent, will be found to be cases where there has been either error or fraudulent misdescription of the premises which were the subject of the letting, or where the premises have been found to be uninhabitable by the wrongful act or default of the landlord himself; neither of which circumstances occur in this case.

(Thus it seems that *Killick* v *Roberts*, above, did have precedents.)

In *Arden* v *Pullen* (1842) 10 M&W 321, the tenant had entered into a repairing covenant but left the house because subsidence had caused it to become flooded. The Court of Exchequer held him liable to pay rent notwithstanding. Lord Abinger CB said:

I am of opinion that, unless there has been some fraud or improper concealment on the part of the Plaintiff, which is not suggested, the contract for letting this house was perfectly good. The Defendant was, therefore, bound to perform it so long as the Plaintiff performed her part of it . . .

Alderson B said:

The rule laid down by Tindal, CJ, in *Izon* v *Gorton*, is the correct one, that in order to enable a tenant to avoid his lease, there must be a default on the part of the landlord.

It was this well-established line of authority that the Court of Exchequer followed in the celebrated case of *Smith* v *Marrable* (1843) 11 M&W 5. The defendant had taken a furnished house for his family, who found it infested with bugs and left. On an action for the rent for the remainder of the term of five weeks, Lord Abinger CB directed the jury that:

in point of law every house must be taken to be let upon the implied condition that there was nothing about it so noxious as to render it uninhabitable.

Parke B, giving the leading judgment on a motion for a new trial, cited a number of the authorities to which I have referred and concluded:

These authorities appear to me fully to warrant the position, that if the demised premises are incumbered with a nuisance of so serious a nature that no person can reasonably be expected to live in them, the tenant is at liberty to throw them up.

Lord Abinger CB, sitting as was the custom on the appeal against his own direction to the jury, expressed relief that authorities supported what he had taken to be a proposition of common sense and concluded:

I entertain no doubt whatever on the subject, and think the defendant was fully justified in leaving these premises as he did: indeed, I only wonder that he remained so long, and gave the landlord so much opportunity of remedying the evil.

It will be seen that this case is authority not only for the proposition for which it is known, that there is an implied covenant of fitness for habitation in a letting of a furnished house, but also for the proposition that a contract of tenancy may be repudiated by a breach of such a condition, and — incidentally — that it is not to be held against the tenant that he has endured the breach for longer than he needed to.

Although the vocabulary of repudiation is not consistently used in these cases — the earliest, for example, speaks of "exempting" the defendant from the demand for rent and others speak of the tenant being allowed to "throw up" the letting or "to withdraw", by 1842 Lord Abinger is using the phrase "the contract of letting" and Alderson B is speaking about the tenant "avoiding" the lease for the landlord's default. When in 1877 the Exchequer division decided *Wilson* v *Finch-Hatton* (1877) 2 Ex D 336 and followed *Smith* v *Marrable*, all three barons used the language of repudiation and Pollock B sought to cut away furnished lettings from the doctrine that rent issues out of the realty and to hold instead that this was simply "a sum paid for the accommodation afforded by the use of the house". (The divergent patch which Parke B charted in relation to demises of real property in *Hart* v *Windsor* (1843) 12 M&W 68, shortly after he decided *Smith* v *Marrable*, has now, it appears, all but converged again with the path of contract, at least since the decision in *C H Bailey Ltd* v *Memorial Enterprises Ltd*.)

It follows, if the foregoing is right, that the passage at present to be found in chapter 17 of *Woodfall's Law of Landlord and Tenant*, para 1-1836, which says, in terms, that a lease or tenancy does not come to an end by repudiation, citing the *Total Oil* case, is wrong. So is the final sentence of para 420 of vol 27 of *Halsbury's Laws of England* (4th ed), which advances the same proposition in relation to leases, citing not only *Total Oil* but *Panalpina* in the footnote, but treating the latter, apparently, as confined to the doctrine of frustration.

I recognise that the proposition that a contract of tenancy can be repudiated like any other contract has a number of important implications, which it is not appropriate to explore on the facts of this case. For example, if the obligation to pay rent is as fundamental as the obligation to keep the house habitable, it will follow that a default in rent payments is a repudiatory act on the tenant's part. That this may follow is not, however, a reason for going back on what appears to me to be the inexorable effect of binding authority. It will, however, have effect subject not only to all the statutory provisions which now hedge the right to recover possession but also, I would think, to the provisions contained in the contract of letting itself in relation to forfeiture (where there is a term certain): in other words, the right to terminate by acceptance of repudiatory conduct may itself be modified by further contractual provisions which lay down conditions, supported by statute, for the exercise of the right.

*Section 11 covenant*

Section 11 of the Landlord and Tenant Act 1985 provides:

(1) In a lease to which this section applies . . . there is implied a covenant by the lessor —
  (a) to keep in repair the structure and exterior of the dwelling-house (including drains, gutters and external pipes)
  (b) to keep in repair and proper working order the installations in the dwelling-house for the supply of water, gas and electricity . . . and
  (c) to keep in repair and proper working order the installations in the dwelling-house for space heating and heating water.

. . .

(3) In determining the standard of repair required by the lessor's repairing covenant, regard shall be had to the age, character and prospective life of the dwelling-house and the locality in which it is situated.

It is common ground that this is a lease to which section 11 applies. There is no issue that the gas heaters were installations for space heating, nor that the incursion of rainwater into the sitting-room and the damage to its ceiling were the result of disrepair of the structure or exterior of the dwelling-house. It remains the defendant's contention, however, that the ceiling of the bedroom was not part of the structure within the meaning of section 11(1)(*a*). Mr Russen has, wisely, taken his stand on this proposition without seeking actively to defend it. In my judgment it is untenable.

The object of section 11(1)(*a*) is to place upon the lessor the obligation to maintain the fabric of the building in a safe and habitable condition. A house — at least a 1930s London suburban semi-detached house — without plaster on its ceiling is not a complete house and is certainly not safe or habitable. In *Staves* v *Leeds City Council* (Court of Appeal, October 4 1990, unreported*) Ewbank J recorded:

It has been conceded in this case, as in earlier cases, that the internal plasterwork is part of the structure of the house.

(Counsel for the local authority was Mr John Stuart Colyer QC, whose experience in this field of law was unrivalled.) Lloyd LJ concluded his judgment:

Once it was conceded, as it was, that the plaster was part of the structure it follows that there was a breach of the condition implied by section 11(1)(*a*) of the Landlord and Tenant Act 1985 . . .

As to the precedent in *Hill and Redman* which Ivor Denfield & Co

---

*Editor's note: Also reported at [1992] 2 EGLR 37.

A  insisted gave support to the defendant's position, the following observations may be in place. First, this is a page from the text of a draft form of a lease, not a source of law at all. Second, the precedent defines "the interior" as "the systems and components . . . *forming part of the building* which are enclosed by the exterior but are not part of the structure, including . . . plaster or other surface material applied to and the internal skins, linings and finishes of and to the structure and exterior; . . . ceiling systems . . ." (emphasis supplied). Thus, it is perfectly plain that even this precedent, while distinguishing for its own particular purposes between the structure and the interior of the building, treats ceilings and their plaster as "part of the building".

B  I want to express my concern at what seems to me the use of the authority which a solicitor understandably enjoys in the community to make assertions of law which fly in the face of common sense but are given a spurious authority by the use of partial and misleading citations of this kind. It is one thing to advance a client's case vigorously; it is another to use ill-founded arguments against lay persons who are trying conscientiously to ascertain their own and their landlord's true legal position.

While the evidence of the environmental health officer, Mr Wallace, is helpful in confirming the general state of the premises, the test which he had to apply for his statutory purposes was different from the test of breach of the section 11 covenant. The environmental health officer was concerned under the Housing Act 1985 about

C  fitness for human habitation. This is tested by section 604(1) by deeming premises to be unfit if they are so far defective in one or more of 10 broad factors, including repair and freedom from damp, that they are not reasonably suitable for occupation in that condition. It is plain, however, that section 189, which compels a local authority to serve a repair notice wherever they are satisfied that a house is unfit within the meaning of section 604, unless the house is beyond repair, may result in the lawful service of notices in relation to defects which fall short of breaches of the section 11 covenant: see *Newham London Borough* v *Patel* (1978) 13 HLR 77. I do not therefore place reliance upon the notice or the grounds upon which it was given in deciding whether there was a breach of the section 11 covenant. I do, however, give weight to the fact that the defendant's notice of appeal,

D  which dropped his original ground that the works required were unnecessary and instead sought to place some or all of the liability to repair on the tenants, was not pursued to a hearing but served an evident purpose in deferring any action which would have resulted in compliance, among other things, with the section 11 covenant.

*Breaches of covenant*

The initial breach of the covenant contained in section 11(1)(*c*) was eventually cured, but it did not, in my judgment, cease to have a bearing. It had taken the whole of the first winter, over Mr Mehlman's strident attempts to evade compliance, to get three

E  working gas heaters installed as they should have been at the start of the letting. This not only sounds in damages: it colours the attitude which it was reasonable for the tenants to take to the succeeding breaches. The same is true of the burst pipes in February 1991. The plaintiffs themselves had them fixed, but the defendant's solicitors' reaction, which was to tell the plaintiffs to do it themselves, again colours the ongoing breaches. These, so far as the present part of my judgment is concerned, were the collapsed bedroom ceiling, which had been there since August 1990 and which the defendant was expressly refusing to repair, and the collapsing and leaky sitting-room ceiling, which the defendant had been admitting his liability to repair but by March 1991 had still done nothing about.

In my judgment, the defendant was making it as plain as was

F  possible that he was not going to comply with his covenant to keep the structure and exterior of the premises in repair. His previous conduct in relation to other breaches amply demonstrated that this was not due to a bona fide mistake of law or to logistical difficulties with builders: it was due to the determination of the defendant and his son to put not a penny back into the house and, if necessary, to let the tenants suffer hardship in consequence. I find, too, that the two plaintiffs who were living in the house did suffer real hardship, and that the breaches deprived all three of the essential part of what they had contracted for — a house in which all rooms were usable, in which ceilings were not either collapsed or collapsing and into which rain, wind and cold did not penetrate through the associated defects in the structure. In *Walker* v *Hobbs & Co* (1889) 23 QBD 458 an action on the term implied by the Housing of the Working Classes Act 1885, section 12, into contracts of letting that the house should be

G  reasonably fit for human habitation, Lord Coleridge CJ said:

> It is admitted that the ceilings were in a dangerous condition, and therefore that the rooms were not, speaking in a broad sense, fit for human habitation.

I hold, likewise, that the defects in the ceilings were such as to render the house as a whole unfit to be lived in and that the defendant's conduct, in the classic language, evinced an intention not to be bound by the implied covenant to repair. The breach, in my judgment, vitiated the central purpose of the contract of letting.

Mr Tunkel has also relied on the near-certainty that come the next freeze the pipes would still be unlagged and the loft uninsulated and that there would consequently be another flood. Had he been free to argue the point, and had I been free to decide it, I would have held

H  that this, too, represented a breach of the covenant implied by section 11(1)(*b*) to keep in repair (which means *put and keep* in repair: see *Liverpool City Council* v *Irwin* [1977] AC 239*) and proper working order the installations in the dwelling-house for the supply of water. But the Court of Appeal has held otherwise: see *Wycombe Area Health Authority* v *Barnett* (1982) 5 HLR 84. The reasoning of the Court of Appeal in that case leaves no room for Mr Tunkel's contention that a special duty arose under the covenant after the burst of February 1991. The only duty that arose, given the authorities, was a duty to repair the bursts — which, as I have held, the defendant made the plaintiffs discharge. It may well be that in this already poorly heated house the collapse of the bedroom ceiling was

J  making it even harder to retain warmth in the building and so contributed to the freezing of the pipes in the loft; but, if so, this was a function of the section 11(1)(*a*) covenant to keep the structure in repair, not of the section 11(1)(*b*) covenant.

The plaintiffs are, however, entitled to rely on the state of the doors, both that of the outside toilet and those in the house, which did not fit their frames. By themselves these defects, however long persisted in, could not have rendered the house uninhabitable, but, given the major defects to which I have referred, I consider that the state of the various doors amounted to a further series of breaches of the section 11(1)(*a*) covenant which added to the difficulties of continuing to live in the house.

The damp patch in the hall made things no better, but on the evidence I cannot allocate it to any breach of covenant on the lessor's

K  part.

As to the problems with the windows and the ventilation of the house to which the environmental health officer's notice related in part, these seem to me to be faults of design and construction related to the age of the house, and so probably outside the statutory repairing covenant: see *Quick* v *Taff-Ely Borough Council* [1985] 3 All ER 321†. But again, these deficiencies tended to aggravate the misery caused by the breaches of covenant which I have found.

*Notice to the lessor*

It has been established since the House of Lords' decision in *O'Brien* v *Robinson* [1973] AC 912§ that the liability of the lessor to

L  repair structural defects under section 32 of the Housing Act 1961 (the predecessor of section 11 of the 1985 Act) arises only when the lessor has knowledge of the defect. It is worth observing in passing that *O'Brien* v *Robinson* was a case of the collapse of a bedroom ceiling and, although it went to the House of Lords on the question of knowledge, there appears to have been no dispute at any stage, and no point taken by their lordships, as to the ceiling's being part of the structure of the house and so within the covenant.

In the present case I do not find any evidence that the defendant had knowledge of the risk that the bedroom ceiling might collapse before it actually did so. His breach of covenant in this regard is therefore limited to his deliberate failure to repair once the collapse had occurred and been brought, as it promptly was, to his notice.

M  The state of the sitting-room ceiling was, however, perfectly visible and, I find, must have been known to him before the letting was entered into. In my judgment, it is a matter of common sense:

(a) that a bulging ceiling may collapse; and
(b) that such a bulge in a single-storey extension is likely to be due to rain penetration.

Early in this judgment I mentioned the surveyor's report bespoken by Mr Mehlman in 1987 in relation to repairing liabilities under the previous tenancy. It contained this paragraph:

---

*Editor's note: Also reported at (1976) 238 EG 879.
†Editor's note: Also reported at [1985] 2 EGLR 50.
§Editor's note: Also reported at (1973) 226 EG 297.

A  The bituminous felt covering to the roof of the single-storey back addition is in poor condition and needs to be stripped off and renewed with proper detailing provided at the edges, particularly at the junction with the main rear wall. Works of repair may also prove to be necessary to the underlying structure of this roof due to defects resulting from water penetration.

It is clear from the state of the extension ceiling in November 1989 that this advice was ignored.

I do not understand the decision in *O'Brien* v *Robinson* to require formal notice: it reflects the common-sense proposition that a person cannot take steps to remedy a defect of which he knows nothing. This in turn requires that he should not be permitted to claim to be ignorant of things to which he has shut his eyes where a prudent property owner would have taken notice. In practice, however, little

B  now hangs on this, since no real damage accrued until the rain came through at Christmas 1990 and the defendant was put on express notice shortly thereafter.

The question of knowledge is important, however, in relation to the gas fires. Mr Mehlman has denied any knowledge that the gas fires were defective until the latter part of the winter of 1989 to 1990. I reject his denial. It is clear from the documents that Mr Mehlman had had all the fires disconnected before the commencement of the tenancy: on November 1 1989 he wrote to the gas board that two fires had been disconnected and asking for the third to be disconnected. This was the very time at which the house was on the market and the agents taking up references on prospective tenants. I accept Mr Tunkel's submission that Mr Mehlman must have been told by the

C  gas board, probably during October 1989, that the gas fires were not serviceable and that in consequence he not only had the mains supply turned off but had the fires disconnected to stop the tenants using them. I find, therefore, that the defendant, whether in person or through his son, knew that the installations for space heating in the house which were scheduled to the lease were not in working order from the start of the tenancy.

*Termination of the lease*

Accordingly, I hold that when on March 18 1991 the plaintiffs vacated the house and returned the keys they were accepting the repudiatory conduct of the defendant as putting an end to the contract of letting. That they were entitled to do this at any date, not

D  merely on a rent day, and that their forbearance to do it sooner should not count against them is established by the 19th-century authorities to which I have referred. From that date, therefore, they were relieved of the obligation to pay rent, and both parties were relieved of their other obligations under the lease. The defendant was free to re-enter the premises.

*Damages*

Accordingly the plaintiffs are entitled to damages for the following:

(a) The want of heating during the winter of 1989 to 1990 caused by the absence of working gas fires in the three rooms where they should have been.

E  (b) The effects of the collapse of the bedroom ceiling from the point of time at which the defendant had notice of it.

(c) The effects of rain penetration and the bulging plaster in the sitting-room.

(d) The ill-fitting doors.

The damages will be awarded to the plaintiffs jointly, since I am not asked to make an apportionment; but it will be clear that some elements of them in fact fall to be apportioned to an individual plaintiff, and I give liberty to the plaintiffs to apply to this court if — unthinkably — they find themselves at odds about the proper division of the award among themselves.

(a) *Space heating*

F  Judge Rowntree, in the award which the defendant had set aside, awarded £300 for the effects of the lack of heating. He did so after a brief hearing and, while I treat his award with the greatest possible respect, it cannot bind me. I bear in mind that the three gas fires were not enough to keep the house fully warmed on any view, but they were, in my view, an irreducible minimum for enabling the house to be properly warmed during the winter. The lack of them reduced the occupancy of the house to a condition of misery. Because of it, only Miss Hussein, who had nowhere else to go, lived in the house during this period, although the attempts to get things remedied caused endless trouble, upset and loss of working time to Mr Hussein as well.

I award £600 damages for Miss Hussein's ordeal.

Because he was not reasonably able to take up occupancy of the

house, Mr Hussein stayed, somewhat uncomfortably, in the flat of  G
his newsagent partner Mr Williamson above the shop at 90 St John's Avenue. He paid him "about £30 per week" from November 14 1989 to April 2 1990, when the gas heaters were replaced. I accept his evidence, but I allow for the fact that the approximation means that there may have been weeks when he paid Mr Williamson less. The difference, I think, sufficiently represents the quite serious trouble to which Mr Hussein was constantly put in attending so far as he could to his sister's needs and in going to the house every time a builder, a gas fitter or some other workman had to attend. (Miss Hussein and Mr Armstrong both had daily jobs to go to.) This was a period pleaded as 16 weeks (I make it rather more) and I award £480 accordingly under this head.

To these damages must be added a figure representing the net cost  H
of substitute heating. The Calor gas heater with two gas bottles cost £139, but the equipment will have had some residual value apart from its use in the absence of working gas fires. Equally, the cost of refills at £9.99 was in substitution for mains gas, which would also have cost money. Each gas bottle was used only in the evenings for a couple of hours (because without a ventilated flue it became unpleasant after that point), but even so lasted no more than 10 days in use. Clearly this was a cumbersome and expensive form of gas heating by comparison with a properly fitted gas fire. Assuming, therefore, that something like £150 was spent on bottled gas in addition to the cost of the equipment, and discounting the sums spent for the reasons I have indicated, I awarded £200 for the additional trouble and expense  J
caused by having to introduce a Calor gas heater into the house.

(b) *The bedroom ceiling*

From the middle of August 1990 until the plaintiffs left, the rear-right bedroom was uninhabitable because its ceiling had fallen down. The collapse left the laths open to the uninsulated loft and wind constantly blew through the space, carrying cold and dirt into the rest of the house past the badly fitting bedroom door. Mr Armstrong, whose evidence I accept as truthful, described how one could look through the hole in the ceiling and see daylight between the tiles of the roof. He said:

This made it necessary to clean up daily. The wind was carrying soot from the loft and other debris through the house.                                                     K

Grave inconvenience was caused by this serious breach of covenant, which continued for the last seven months of the plaintiffs' occupancy, including the winters of 1990 and 1991. The damages will be part of a single sum for breach of the covenant to keep the structure in repair.

(c) *The sitting-room*

The incursion of rain at and after Christmas 1990 made it dangerous to sit anywhere near the bulging plaster. Contrary to what had been suggested to Mr Hussein when he was cross-examined (and I do not doubt for a moment that Mr Russen did so on instructions) the defendant's surveyor, Mr Chapman, gave evidence that when he  L
went to the house Mr Hussein and his friends were gathered round the fire on the party wall, at a point remote from the bulge in the ceiling. I accept the evidence of Mr Hussein that the sitting-room could be used in this extraordinary fashion throughout the latter part of the plaintiffs' occupancy. This disrepair, too, was a serious breach.

(d) I have described the poor state and fitting of some of the doors.

*General damages for structural disrepair*

There is no "tariff" as there is in most personal injury cases, for awards of this kind, but a line of recent cases has given some indication of the proper range. In particular I have had regard to *Lubren* v *Lambeth London Borough Council* (1987) 20 HLR 165, in which the Court of Appeal indicated broad approval of a median  M
figure of £1,000 a year for a five-year deterioration of premises from habitable to "appalling". But there is no principle, any more than there is in false imprisonment cases, by which a single multiplier or divisor can be applied to such a figure to reflect greater or lesser periods of time. In general, the passage of time produces a "taper" effect in damages and I consider, therefore, that I am justified today, having in mind all the circumstances and effects of the breaches of the lessor's section 11(1)(a) covenant, in awarding £1,250 general damages.

*Other special damage*

For reasons which I have given, the damage to furniture caused by the collapse of the bedroom ceiling and by the burst pipes is not

A  recoverable. Nor, it seems to me, is the cost of accommodation for the plaintiffs since the date when they terminated the lease, except in so far as it might have exceeded (as it has not done) what they would otherwise have been paying to the defendant for the remainder of the original term.

There is also a claim for storage charges and removal costs on and after March 18 1991. These, it seems to me, are not shown to be consequent on the defendant's breaches of covenant: they are the consequences of the coming to an end of the letting and I am not satisfied on the evidence that they are any greater than they would have been had the term run its course and the plaintiffs then vacated.

The plaintiffs are, however, entitled to recover what they paid the plumber to repair the burst pipes, namely £195.

B  *Rent thrown away*

Para 6 of the reamended particulars of claim concludes:

Further, or alternatively, the Plaintiffs are entitled to a refund of the whole or part of the rent paid or payable during the contractual term or damages representing the same.

Head (2) of the prayer as reamended reads:

A refund of the whole or part of the rent and deposit of £750 paid to the Defendant or which may be held to be payable to the Defendant.

Are the plaintiffs entitled, in relation to the time before they put an end to the lease, to extinguish or diminish the rent due because of the various failures of consideration? It seems to me that there are two

C  problems. First, the doctrine that the covenant for the payment of rent is independent of the performance of the other covenants is still, as I understand it, the law.

D  Second, there is a potential element of double-counting in awarding damages for breach and then denying the lessor some or all of the payment due for the occupancy of the premises. On balance, although the contrary is certainly arguable, I do not think that the law permits me to award what is in effect a rebate on the rent in the circumstances of a case like this. The proper approach is laid down by the Court of Appeal in *Calabar Properties* v *Stitcher* [1983] 3 All ER 759, especially at pp 766g, 769j-770b. Its effect is to limit damages in a case like the present to the inconvenience of occupying a house in a condition in which it would not have been but for the breach of covenant. The rent is paid for the occupancy, the damages for the inconvenience. To them will be added, of course, any recoverable special damages.

*The counterclaim*

The defendant is entitled to the rent remaining unpaid under the lease. By his "further amended" defence and counterclaim he seeks £2,280 rent arrears and rent at £520 per month from January 31 1991 until the date of trial and thereafter. I hold, for the reasons which I have given, that the defendant's entitlement to rent came to an end on March 18 1991 and I give judgment on his counterclaim for £2,834.20 accordingly.

*Interest*

Both parties will have interest on their awards. I should welcome counsel's help as to the appropriate calculations.

*Judgment for the plaintiff with costs.*

**For further cases on this subject see p 231**