# EXHIBIT 99

# THE LAW of REAL PROPERTY

BY

THE RT. HON. SIR ROBERT MEGARRY,
M.A., LL.D. (Cantab.), Hon.LL.D. (Hull, Nottingham,
The Law Society of Upper Canada, and London),
Hon. D.U. (Essex), F.B.A.
*A Bencher of Lincoln's Inn; an Honorary Fellow of Trinity Hall, Cambridge;
formerly the Vice-Chancellor of the Supreme Court*

AND

SIR WILLIAM WADE,
Q.C., M.A., LL.D. Hon. Litt.D. (Cantab.), F.B.A.
*Formerly the Master of Gonville and Caius College, Cambridge;
formerly Rouse Ball Professor of English Law in the
University of Cambridge and Professor of English Law in the
University of Oxford; Honorary Bencher of Lincoln's Inn*

EIGHTH EDITION

BY

**CHARLES HARPUM**
LL.D. (Cantab.)
*A Barrister and Bencher of Lincoln's Inn;
Emeritus Fellow of Downing College,
Cambridge; a former Law Commissioner 1994–2001*

**STUART BRIDGE**
M.A. (Cantab.)
*One of Her Majesty's Circuit Judges; Bencher of the Middle Temple;
Life Fellow of Queens' College, Cambridge; Law Commissioner
for England and Wales 2001–2008*

and

**MARTIN DIXON**
M.A. (Oxon.); Ph.D. (Cantab.)
*Fellow of Queens' College, Cambridge;
Reader in the Law of Real Property, University of Cambridge*

LONDON
SWEET & MAXWELL
2012



SWEET & MAXWELL

THOMSON REUTERS

In early law, property was deemed "real" if the courts would restore to a dispossessed owner the thing itself, the *"res"*, and not merely give compensation for the loss. Thus if X forcibly evicted Y from his freehold land, Y could bring a "real" action by which he could obtain an order from the court that X should return the land to him.[14] But if X took Y's sword or glove from him, he could bring only a personal action which gave X the choice of either returning the article to Y or paying him its value. In consequence a distinction was made between real property (or "realty"), which could be specifically recovered, and personal property (or "personalty"), which could not. In making this distinction, English law follows the natural division between immovables (i.e. land) and movables, but with one important exception. In general, all interests in land are real property, except leaseholds (or "terms of years") which are classified as personalty.

This peculiar exception initially arose because leases fell outside the feudal system of landholding by tenure. Originally leases were treated as personal business arrangements under which one party allowed the other the use of his land for a rent.[15] Such personal contracts did not create rights in the land itself which could attract feudal status. Leases helped to supply a useful form of investment at a time when there was little other. Money either might be employed in buying land and letting it out on lease in order to obtain income from the capital, or in buying a lease for a lump sum which could be recovered with interest out of the produce of the land. Such commercial transactions were more in the sphere of money than of land. The classification of leaseholds as personal property was discovered to be advantageous. Leases were immune from feudal burdens and could be bequeathed by will before wills of freeholds were allowed.[16] In this way the illogical position continued until it became too well settled to alter.

Leaseholds are still, therefore, personalty in law. However, having been recognised so long as interests in land and not only contractual rights,[17] they have been classed under the paradoxical heading of "chattels real". "Chattels" indicates their personal nature,[18] "real" shows their connection with the land.[19]

1–012

Although strictly speaking a book on real property should exclude leaseholds, it has long been usual to include them, and this course is adopted here.

1–013

The legislation of 1925 abolished many of the remaining differences between the legal principles applicable to realty and personalty respectively. For example, before 1926, if a person died intestate (i.e. without a will), all his realty passed to his heir, while his personalty was divided between certain of

---

[14] For real actions, see below, paras 4–014 et seq.
[15] Below, para.3–009.
[16] Below, para.3–010.
[17] Below, para.3–015.
[18] Cattle were the most important chattels in early days, hence the name.
[19] See *Smith v Baker* (1737) 1 Atk. 386 at 385; *Ridout v Pain* (1747) 3 Atk. 486 at 492, per Lord Hardwicke L.C. (*"extradictions* out of the real").

of the existing lease which does not.[464] There will be a surrender by operation of law:

> "if the arrangements made between the landlord and the tenant are such as can only be carried out so as to achieve the result which they have in mind if a new tenancy is in fact created."[465]

The issue is whether what the parties had in mind necessitated a new tenancy on different terms from the old one.[466] A lease has been held to have been surrendered by operation of law where either the length of the term has been increased[467] or the area of the holding has been extended.[468] There was no such surrender and re-grant however where:

(i) an additional party was added to the lease[469];

(ii) one rent was fixed for two parcels of land held under different leases on different terms[470];

(iii) the rent was increased by agreement[471];

(iv) rent was received from a third party (who was trading on the premises under the same name as the tenant had done) in the mistaken belief that he was the tenant[472]; or

(v) a new landlord issued the tenant with a rent book containing terms that were inconsistent with the terms under which he held the property.[473]

**18–088**   (c) *Landlord accepts tenant's giving up possession.* A clear case of surrender by operation of law will arise where:

---

[464] "There must be something in the nature of an agreement and that agreement must amount to more than a mere variation of the terms of an existing tenancy": *Smirk v Lyndale Developments Ltd* [1975] Ch. 317 at 339, per Lawton L.J. For a discussion of whether, in the case of a periodic tenancy, the withdrawal of a notice to quit given by either party amounts to a surrender, see [1994] Conv. 437 (A. Dowling).

[465] *Jenkin R. Lewis & Son Ltd v Kerman* [1971] Ch. 477 at 496 per Russell L.J.

[466] *Take Harvest Ltd v Liu* [1993] A.C. 552 at 565. See, e.g. *Joseph v Joseph* [1967] Ch. 78 (new lease where the parties, rent and term were altered).

[467] *Baker v Merckel* [1960] 1 Q.B. 657; *Jenkin R. Lewis & Son Ltd v Kerman* [1971] Ch. 477 at 496. A landlord may of course grant a tenant a reversionary lease for a further term of years to take effect on the expiry of the existing term, and this does not operate as a surrender.

[468] *Jenkin R. Lewis & Son Ltd v Kerman*, above, at 496.

[469] *Trustees of Saunders dec'd v Ralph* [1993] 1 E.G.L.R. 1.

[470] *J.W. Childers Trustees v Anker* [1996] 1 E.G.L.R. 1.

[471] *Jenkin R. Lewis & Son Ltd v Kerman*, above; *Friends' Provident Life Office v British Railways Board* [1996] 1 All E.R. 336.

[472] *Mattey Securities Ltd v Ervin* [1998] 2 E.G.L.R. 66; *Unicomp Inc v Eurodis Electron Plc* [2004] EWHC 979; [2004] 2 P. & C.R. DG 15.

[473] *Smirk v Lyndale Developments Ltd* [1975] Ch. 317.

    (a) the tenant gives up possession of the premises; and

    (b) the landlord accepts it.

The landlord's acceptance estops him from asserting that the lease continues even though the tenant's act may be in breach of its terms.[474] His acceptance will not be inferred merely because, to protect his interest, he enters the premises and takes steps to secure them.[475] Abandonment of the premises by the tenant without more (even if rent is unpaid) is not a surrender, because the landlord may wish the tenant's liability to continue.[476] Nor is the delivery of the key of the premises to the landlord enough by itself.[477] Even if he accepts it, it must be shown that he did so with the intention of determining the tenancy[478] and not merely because he had no alternative, e.g. because the tenant has left the country.[479] The test is whether the landlord's conduct is so inconsistent with the continuance of the tenancy "that it can only be justified as lawful on the basis that the landlord has accepted the tenant's implied offer to give back possession and that he has taken possession of the premises beneficially for himself."[480] What is normally required to satisfy this test is evidence that the landlord entered into "profitable occupation",[481] in effect taking the premises over and treating them as his own,[482] typically by re-letting them.[483] Even if there is such a surrender, the tenant may remain liable in damages to the landlord, if the premises are re-let at a lower rent than the tenant was himself paying.[484]

Although giving up possession is the clearest indication by the tenant that he no longer intends to be bound by the tenancy, conduct falling short of actually giving up possession may suffice.[485] However, the conduct on the part    **18–089**

---

[474] *Oastler v Henderson* (1877) 2 Q.B.D. 575.

[475] *Bird v Defonvielle* (1846) 2 Car. & K. 415 at 421; *McDougalls Catering Foods Ltd v BSE Trading Ltd* [1997] 2 E.G.L.R. 65 at 69. The onus lies on the tenant to prove that the landlord's conduct went beyond this: *Relvok Properties Ltd v Dixon* (1972) 25 P. & C.R. 1 at 5.

[476] *Preston BC v Fairclough* (1982) 8 H.L.R. 70; aliter if the absence was longer and a substantial sum of rent was owed: ibid. The statement of principle in the text was approved by the Court of Appeal in *Bellcourt Estates Ltd v Adesina* [2005] EWCA Civ 208; [2005] 2 E.G.L.R. 33 at [9].

[477] *Cannan v Hartley* (1850) 9 C.B. 634; *Oastler v Henderson*, above; *Proudreed Ltd v Microgen Holdings Plc* (1995) 72 P. & C.R. 388 at 393; *Laine v Cadwallader* (2000) 33 H.L.R. 36.

[478] *Bolnore Properties Ltd v Cobb* (1996) 75 P. & C.R. 127 (clear evidence of intention to surrender by tenant and acceptance by landlord pursuant to a written agreement).

[479] *Oastler v Henderson* (1877) 2 Q.B.D. 575.

[480] *Artworld Financial Corporation v Safaryan*, above, per H.H. Judge Marshall Q.C. at first instance, and approved by the Court of Appeal at [29].

[481] *Bird v Defonvielle*, above, at 421, per Erle J.

[482] *Artworld Financial Corporation v Safaryan*, above at [25] (trustee landlord allowed a beneficiary to occupy the premises for his own benefit, and not merely as caretaker, in place of the tenant.)

[483] *Hall v Burgess* (1826) 5 B. & C. 332. Merely advertising the premises does not suffice: *Oastler v Henderson*, above.

[484] *Gray v Owen* [1910] 1 K.B. 622.

[485] *Brent LBC v Sharma* (1992) 25 H.L.R. 257 at 260.

render performance of the obligation impossible.[578] For similar reasons tenants are not relieved of liability under a covenant to repair if a building is accidentally destroyed by fire[579] or by enemy action,[580] for it is still possible to repair it, at whatever cost. Even legislation which prohibits the effecting of repairs without a licence does not relieve a tenant who is sued for damages for failure to repair; should a licence be refused, he is not excused by the legislation from paying damages.[581] But all these instances are subject to the reservation that in an exceptional case the court may hold the whole transaction to be frustrated.

### Section 9. By Termination for Breach

**1. Application to leases.** One result of the emphasis on the contractual nature of a lease[582] is the recognition, both in this country[583] and in other jurisdictions in the Commonwealth,[584] that in appropriate circumstances, a party to a lease may terminate it following breach of its terms by the other party.[585] Although there was authority against this view,[586] it was based on the now discredited assumption that a lease could not be frustrated; and there was in any event an earlier body of authority in which it had been accepted that a lease could be terminated for breach.[587] A lease may be terminated for breach if a party to the lease:   **18–106**

> "evinces an intention not to be bound by the contract or . . . intends to fulfil the contract in a manner substantially inconsistent with his obligations and not in any other way".[588]

---

[578] "Inability to perform a contract because of impecuniosity does not make performance impossible." *Graves v Graves* [2007] EWCA Civ 660, [2008] H.L.R. 10, at [40], per Thomas L.J. (although the court held that there was an implied condition that if the tenant could not obtain housing benefit the tenancy would come to an end): see further [2008] Conv. 70 (J.Brown).

[579] *Matthey v Curling*, above; and see para.18–103 above.

[580] *Redmond v Dainton* [1920] 2 K.B. 256. But for the possibility of disclaimer under statute, see above, para.18–098.

[581] *Maud v Sandars* [1943] 2 All E.R. 783; *Eyre v Johnson* [1946] K.B. 481. These cases appear to interpret the covenant as imposing an alternative obligation- either to repair or to pay compensation.

[582] Above, paras 17–006 and 18–101.

[583] *Hussein v Mehlman* [1992] 2 E.G.L.R. 87; *Nynehead Developments Ltd v R.H. Fibreboard Containers Ltd* [1999] 1 E.G.L.R. 7 at 12. See too *National Carriers Ltd v Panalpina (Northern) Ltd* [1981] A.C. 675 at 696.

[584] See *Highway Properties Ltd v Kelly, Douglas & Co Ltd* (1971) 17 D.L.R. (3d) 710 (Supreme Court of Canada); *Proprietary Mailing House Pty Ltd v Tabali Pty Ltd* (1985) 157 C.L.R. 17 (High Court of Australia).

[585] Above, para.18–007. See [1993] Conv. 71 (S. Bright); [1993] C.L.J. 212 (C.H.); [1995] Conv. 379 (M. Pawlowski). It should be noted that there is as yet no Court of Appeal decision holding definitively that a lease may end by the tenant's acceptance of the landlord's repudiatory breach: *Reichman v Beveridge* [2006] EWCA Civ 1659 at [10].

[586] *Total Oil Great Britain Ltd v Thompson Garages (Biggin Hill) Ltd* [1972] Ch. 318 at 324.

[587] See below.

[588] *Proprietary Mailing House Pty Ltd v Tabali Pty Ltd*, above, at 33, per Mason J.

To have this result, the breach must probably be one which vitiates "the central purpose of the contract of letting".[589] Clearly both the length and the terms of the lease will be relevant to whether there has been a breach that will justify treating it as terminated. The longer the lease, the more artificial it is to regard it other than as an estate in land. It is therefore only in relation to shorter lettings that an allegation that a breach justifies termination is normally likely to be successful.[590]

18–107    **2. Examples.** The application of the principles of termination for breach to leases has yet to be fully worked out in this country. For instance, the relationship between termination for breach and the analogous doctrines of forfeiture for denial of title and non-derogation from grant is still uncertain. To date, the right to terminate a lease for breach of its terms has been recognised in a range of circumstances,[591] which include the following:

(i) where a landlord let a furnished property in breach of the implied condition that it was fit for human habitation[592]

(ii) where a tenant purported to terminate the lease pursuant to a break clause in circumstances in which he was not entitled to do so[593]

(iii) where a landlord's breach of a repairing covenant rendered the property uninhabitable[594]

(iv) where a tenant denied his landlord's title[595]

(v) where a landlord purported to forfeit a lease for breach of covenant when the tenant was not in breach[596]; and

(vi) where a landlord failed to restrain a nuisance by one tenant of a shopping mall which was seriously impeding the business of another.[597]

---

[589] *Hussein v Mehlman*, above, at 91, per Sedley Q.C. See too *Nynehead Developments Ltd v R.H. Fibreboard Containers Ltd*, above, at 12.

[590] It has therefore been suggested that it would be rare to find that a long lease granted at a small ground rent had been repudiated by the tenant unless he had abandoned the premises: *Proprietary Mailing House Pty Ltd v Tabali Pty Ltd*, above, at 34, 53. See [1993] Conv. 71 at 73 (S. Bright).

[591] Most of the cases concerned short lettings of three years or less.

[592] *Wilson v Finch Hatton* (1877) 2 Ex.D. 336; see below, para.19–030.

[593] *Gray v Owen* [1910] 1 K.B. 622 (landlord entitled to claim damages from tenant for his loss when he re-let at a lower rental); above, para.18–088.

[594] *Hussein v Mehlman* [1992] 2 E.G.L.R. 87 (which contains a valuable analysis of the earlier authorities).

[595] *W. G. Clarke (Properties) Ltd v Dupre Properties Ltd*, above, at 302; *Abidogun v Frolan Health Care Ltd* [2001] EWCA Civ 1821; [2002] L. & T.R. 16. See above, para.18–007.

[596] *G.S. Fashions Ltd v B. & Q. Plc* [1995] 1 W.L.R. 1088, 1093 (*obiter*).

[597] *Chartered Trust Plc v Davies* [1997] 2 E.G.L.R. 83. The case was decided on the basis that the landlord was in breach of its implied covenant not to derogate from its grant: see below, para.19–024.

**3. Termination for breach and forfeiture.** One particular difficulty about the application of the doctrine of repudiation for breach to leases lies in its uncertain relationship with the landlord's right of forfeiture.[598] It has been suggested that the right to terminate may be limited or modified by the express terms of the letting, including in particular any forfeiture clause, so that the landlord could terminate for breach only if he complied with the requirements[599] for forfeiture.[600] Indeed, the right to forfeit a lease under an express right of re-entry and the right to terminate the lease for breach have been equated, so that the latter may in any event be subject to the same statutory requirements as the former.[601] Where a lease is forfeited, the tenant ceases to be liable to pay rent.[602] As part of its proposals for the termination of tenancies,[603] the Law Commission has recommended that it should not be possible for the landlord to circumvent the scheme by having recourse to repudiatory breach.[604]

**18–108**

---

[598] For forfeiture, see above, paras 18–006 et seq.
[599] Including the statutory requirements: see LPA 1925 s.146; above, para.18–051.
[600] *Hussein v Mehlman*, above, at 90.
[601] This is the approach that has been taken in relation to forfeiture for denial of title: *W.G. Clark (Properties) Ltd v Dupre Properties Ltd*, above, at 309; above, paras 18–007, 18–051. cf. *G.S. Fashions Ltd v B. & Q. Plc*, above, at 1093.
[602] Above, para.18–017.
[603] Above, para.18–082.
[604] (2006) Law Com. No.303, draft Bill, cl.1.