# EXHIBIT   100

A.C.    Reg. v. Lester (H.L.(E.))    Lord Cross
of Chelsea    **A.35**

A  the accused was the evidence of the complainant and of an accomplice the judge would be bound to tell the jury that as there was nothing to corroborate the evidence of either witness it would be unsafe for them to convict. Counsel could not produce any authority to this effect. On the other hand, in *Rex* v. *Gregg*, 24 Cr.App.R. 13 it was held that the unsworn evidence of a child of seven who was the complainant could be corroborated by the sworn evidence of a child of nine. It would, indeed,

B  be extraordinary if in the converse case where the complainant gives sworn evidence the unsworn evidence of the younger child should not be capable of corroborating her evidence. No doubt that seems to have been held to be the law by the Court of Criminal Appeal in *Rex* v. *Manser*, 25 Cr.App.R. 18—for I agree with the Court of Appeal that the probabilities are that the evidence of the child Barbara was sworn evidence—but if that be so then *Rex* v. *Manser* was I think wrongly decided. The reason given for

C  the decision was that the argument for the prosecution was an argument in a circle; but that is not so, for it was not a condition precedent to the admission of Barbara's evidence that it should have been corroborated. Her evidence was admissible apart from any question of corroboration and having been admitted it was capable of corroborating the evidence of Doris which in its turn was capable of corroborating Barbara's evidence. In my judgment, therefore, the question of law submitted to the House should

D  be answered in the sense contended for by the appellant. But when one considers the evidence given it is clear that the conviction was unsafe, and I agree that the appeal should be dismissed.

*Appeal dismissed.*

E  Solicitors: *Director of Public Prosecutions; Wedlake Bell for Swinburne & Jackson, Durham.*

M. G.

———————

F  [HOUSE OF LORDS]

MOSCHI  .  .  .  .  .  .  .  .  .  APPELLANT

AND

LEP AIR SERVICES LTD. AND OTHERS .  .  .  . RESPONDENTS

G  [On appeal from LEP AIR SERVICES LTD. v. ROLLOSWIN INVESTMENTS LTD.]

1972 Feb. 28, 29,    Lord Reid, Lord Gardiner, Lord Diplock,
March 1, 2, 6;    Lord Simon of Glaisdale
April 26    and Lord Kilbrandon

H  *Guarantee—Debt—Contract for payment by instalments—Principal debtor's wrongful repudiation of contract—Acceptance of repudiation by creditors—Whether guarantor discharged from liability—Whether creditors' acceptance of repudiation material*

Lep Air Services v. Rolloswin Ltd. (H.L.(E.))                                    **A.35**
[1973]

*variation of guarantee—Whether guarantor liable for instal-*
*ments payable after acceptance of repudiation*                                    A

The respondent creditors were forwarding agents for a
company (the debtor) whose managing director (the guarantor)
held all but one of its shares. By a written contract the
creditors agreed to relinquish their lien over the debtor's goods
in consideration of the debtor agreeing to pay the creditors
£40,000, which was then owed to the creditors for services
rendered, by six weekly instalments of £6,000 plus a final weekly  B
instalment of £4,000. It was also agreed that steps would be
taken to ascertain the exact amount of the debt to the creditors.
The contract contained a guarantee by the guarantor of the
performance by the debtor of its obligations to pay the £40,000
by instalments. The debtor defaulted on its obligations from
the outset and after three weeks had paid only some £10,069
out of a total of £18,000 which had become due. The creditors
treated those breaches by the debtor of its obligations as a  C
wrongful repudiation of the contract and accepted that wrongful
repudiation.

In an action by the creditors against the debtor for
damages and against the guarantor for the full amount of the
weekly instalments of £40,000 less what had been paid, £10,069,
with interest, the official referee held that the guarantor was
liable for the amount of the instalments due and payable at
the date of the acceptance of repudiation, which he held was  D
£24,000 less what had been paid, £10,069, and awarded the
creditors the difference between those two sums of £13,931
which together with interest amounted to £15,811.

The guarantor appealed on the grounds that his liability
was discharged by the creditors' acceptance of the debtor's
repudiation of the contract, alternatively, that it amounted to
a material variation of the contract thus extinguishing his
liability; the creditors cross-appealed on the ground that the  E
guarantor's liability extended to the instalments due and
payable after the date of the acceptance of the repudiation.
The Court of Appeal dismissed the appeal and allowed the
cross-appeal.

On the guarantor's appeal:—

*Held,* dismissing the appeal, (1) that since the creditors'
acceptance of the debtor's wrongful repudiation of the contract
was a right given to the creditors by the law of contract, the  F
exercise of that right did not discharge the guarantor from
liability under the guarantee nor was it a material variation
of the contract which extinguished the guarantor's liability.

*Chatterton* v. *Maclean* [1951] 1 All E.R. 761 approved.

(2) That, accordingly, when the creditors accepted the
debtor's fundamental breach of the terms of the contract, includ-
ing those guaranteed, as a repudiation of the contract, they were
entitled to sue the guarantor in damages for the total sum  G
guaranteed (except in so far as already satisfied by payment
made by the company), and that the measure of damages was
that net sum.

*Per curiam.* When a contract is brought to an end by
repudiation accepted by the other party all the obligations in
the contract come to an end and they are replaced by operation
of law by an obligation to pay damages. The damages are
assessed by reference to the old obligations but the old obliga-  H
tions no longer exist as obligations. Were it otherwise there
would be in existence simultaneously two obligations, one to
perform the contract and the other to pay damages. But that

A.C.    Lep Air Services v. Rollos will (H.L.(E.))    335 **A.35**

A    could not be right. The only legal nexus remaining is the obligation to pay damages (post, pp. 345G—346B, 350G—351A, 352A—B).

Decision of the Court of Appeal [1971] 1 W.L.R. 934; [1971] 3 All E.R. 45 affirmed on different grounds.

The following cases are referred to in their Lordships' opinions:

*Ascherson* v. *Tredegar Dry Dock and Wharf Co. Ltd.* [1909] 2 Ch. 401.
*Chatterton* v. *Maclean* [1951] 1 All E.R. 761.

B    *Creighton* v. *Rankin* (1840) 7 Cl. & F. 325, H.L.(Sc.).
*Frost* v. *Knight* (1872) L.R. 7 Exch. 111.
*Heyman* v. *Darwins Ltd.* [1942] A.C. 356; [1942] 1 All E.R. 337, H.L.(E.).
*Hochster* v. *De la Tour* (1853) 2 E. & B. 678.
*Holme* v. *Brunskill* (1877) 3 Q.B.D. 495, C.A.
*Hongkong Fir Shipping Co.* v. *Kawasaki Kisen Kaisha Ltd.* [1962] 2
   Q.B. 26; [1962] 2 W.L.R. 474; [1962] 1 All E.R. 474, C.A.

C    *Jordan's Case* (1536) Y.B. 27 Hen. 8, Mich. fo. 24, pl. 3.
*Kirkham* v. *Marter* (1819) 2 B. & Ald. 613.
*Lockey, In re* (1845) 1 Ph. 509.
*Mactaggart* v. *Watson* (1835) 3 Cl. & F. 525, H.L.(Sc.).
*Martin* v. *Stout* [1925] A.C. 359, P.C.
*Mines* v. *Sculthorpe* (1809) 2 Camp. 215.
*Prenn* v. *Simmonds* [1971] 1 W.L.R. 1381; [1971] 3 All E.R. 237,

D    H.L.(E.).
*Samuell* v. *Howarth* (1817) 3 Mer. 272.
*Ward (R. V.) Ltd.* v. *Bignall* [1967] 1 Q.B. 534; [1967] 2 W.L.R. 1050;
   [1967] 2 All E.R. 449, C.A.
*Wright* v. *Simpson* (1802) 6 Ves.Jun. 714.

The following additional cases were cited in argument:

E    *Bradley* v. *H. Newsom, Sons & Co.* [1919] A.C. 16, H.L.(E.).
*Darwen and Pearce, In re* [1927] 1 Ch. 176.
*Faber* v. *Earl of Lathom* (1897) 77 L.T. 168.
*Harbutt's " Plasticine " Ltd.* v. *Wayne Tank and Pump Co. Ltd.* [1970] 1
   Q.B. 447; [1970] 2 W.L.R. 198; [1970] 1 All E.R. 225, C.A.
*Hirji Mulji* v. *Cheong Yue SS. Co. Ltd.* [1926] A.C. 497, P.C.
*Howard* v. *Pickford Tool Co. Ltd.* [1951] 1 K.B. 417, C.A.

F    *Johnstone* v. *Milling* (1886) 16 Q.B.D. 460, C.A.
*Midland Motor Showrooms Ltd.* v. *Newman* [1929] 2 K.B. 256, C.A.
*Mihalis Angelos, The* [1971] 1 Q.B. 164; [1970] 3 W.L.R. 601; [1970]
   3 All E.R. 125, C.A.
*National Bank of Nigeria Ltd.* v. *Awolesi* [1964] 1 W.L.R. 1311, P.C.
*Sinason-Teicher Inter-American Grain Corporation* v. *Oilcakes and Oil-
   seeds Trading Co. Ltd.* [1954] 1 W.L.R. 935; [1954] 2 All E.R. 497.

G    *Stacey* v. *Hill* [1901] 1 K.B. 660, C.A.
*Suisse Atlantique Société d'Armement Maritime S.A.* v. *N.V. Rotter-
   damsche Kolen Centrale* [1967] 1 A.C. 361; [1966] 2 W.L.R. 944;
   [1966] 2 All E.R. 61, H.L.(E.).

APPEAL from the Court of Appeal.

This was an appeal, by leave of the House of Lords, from an order
H    of the Court of Appeal (Davies, Karminski and Megaw L.JJ.) dated
March 10, 1971, whereby the order of Sir Walker Carter Q.C., official
referee, dated March 15, 1970, was varied, and it was ordered that judg-
ment be entered for the respondents (plaintiffs in the action), Lep Air

Lep Air Services v. Rolloswin Ltd. (H.L.(E.))                        **A.35**        [1973]

Services Ltd. and Lep Transport Ltd. against the appellant (second
defendant in the action), Gabriel Moschi, for the sum of £29,931 with      A
interest. By his order the official referee had, inter alia, ordered that
judgment be given for the respondents against the appellant for the sum of
£13,931 with interest.

The respondents brought an action in which they claimed damages
against Rolloswin Investments Ltd., a company controlled by the appellant,
for breach of contract and £29,931 with interest against the appellant as      B
moneys due under a guarantee.

The official referee gave judgment against Rolloswin for a total sum,
including interest, of £54,546 and gave judgment against the appellant for
a total, including interest, of £15,811. Both Rolloswin and the appellant
appealed, and the respondents cross-appealed.

On the hearing of Rolloswin's appeal, no one having appeared to      C
represent the company, its appeal was dismissed. The Court of Appeal
subsequently dismissed the appellant's appeal and allowed the respondents'
cross-appeal and increased the sum payable by the appellant to £29,931
with interest.

The facts are set out in the opinion of Lord Reid and more fully in the
judgment of the Court of Appeal [1971] 1 W.L.R. 934.

D

*Montague Waters Q.C.* and *William Poulton* for the appellant. The
general problem for determination is: in the case of a contract containing
interdependent obligations on the part of the creditor and the debtor, in-
cluding an obligation by the debtor to pay money by instalments, what is
the effect if the contract is partly executory on both sides and then the
debtor repudiates the contract and the creditor accepts the repudiation?      E
Three further questions arise: (1) What is the effect of repudiation on
future instalments which never fall due for payment? (2) What is the effect
of repudiation on accrued unpaid instalments where rescission could operate
to the detriment of the guarantor? (3) Is he, the guarantor, liable for
damages for the total renunciation of the contract?

The argument on behalf of the appellant is founded on the basic rules
of contract as to what is the effect of repudiation on the contract and it      F
has no such logical consequences as were suggested in the judgment of the
Court of Appeal [1971] 1 W.L.R. 934, 943c.

It is to be borne in mind that these proceedings relate to a contract
partly performed and partly executory, so far as the creditor is concerned,
and so far as the ancillary contract is concerned in clause (XIII) to money
terms alone. There is no dilemma as postulated by the Court of Appeal      G
[1971] 1 W.L.R. 934, 943E–F. When one or more instalments have fallen
into arrear in relation to the obligations in clause (IX) and assuming
that this non-payment went to the root of the contract the creditor could
at his option treat the contract as at an end. There is nothing here to pre-
vent the creditor calling upon the guarantor to honour his obligation.
Three possibilities follow: (i) The guarantor might pay forthwith. (ii) He      H
might ask for time—that is not per se repudiatory—and if the creditor
thereby repudiated the guarantor would be released from future payments.
(iii) The guarantor evinces an intention not to pay. The creditor could

A.C.                    Lep Air Services v. Rollowwin Ltd. (H.L.(E.))

A    accept that repudiation and terminate the contract of guarantee and sue for damages.

The Court of Appeal has proceeded on the principle that the guarantor was automatically in breach if the principal debtor was in breach. But why if the creditor does not call upon the guarantor at all should it be unreasonable that the consequences should flow for which the appellant contends?    The following example elucidates this:

B    Let it be supposed that a ship is to be built for five million pounds with payment on completion. A bank guarantees payment. The company for which the ship is being built states after work has proceeded on it for three months that they will be unable to pay for the ship. The shipbuilder thereupon sells the keel and parts for scrap. The shipbuilder has no recourse against the guarantor in those circumstances for the guarantor is in breach of nothing given those facts. The analysis of the legal situation propounded

C    by the Court of Appeal [1971] 1 W.L.R. 934, 943G–944c is incorrect and is not supported by authority.

As to the first question whether upon the rescission of a contract in the way it was rescinded here obligations in futuro are discharged, it is to be observed that the creditor is doing something inconsistent with obligations which were yet to be performed had the contract survived. The relevant

D    authorities are to be found in the textbooks under the head " Anticipatory Breach ": see, for example, *Johnstone* v. *Milling* (1886) 16 Q.B.D. 460 and *Bradley* v. *H. Newsom, Sons & Co.* [1919] A.C. 16, 51. In *Hirji Mulji* v. *Cheong Yue SS. Co. Ltd.* [1926] A.C. 497, 509, Lord Sumner observed that ". . . Rescission (except by mutual consent or by a competent court) is the right of one party, arising upon conduct by the other, by which he intimates his intention to abide by the contract no longer. It is a right to

E    treat the contract as at an end and to claim damages for its total breach." In the present case there was nothing to prevent the respondents from suing for loss of profits which would have formed part of the total damages. If the reasoning of the court of appeal were right, it would follow that the guarantor would be liable for that loss of profits and this would entail severing clause (IX) from the rest of the agreement.

F    *Heyman* v. *Darwins Ltd.* [1942] A.C. 356, 361 confirms the principle stated by Lord Sumner in the *Hirji Mulji* case [1926] A.C. 497, and it establishes that future performance of the contract is at an end. The contract is at an end and obligations in futuro are at an end and the secondary obligation arises to pay damages. Reliance is placed on the observations of Diplock L.J. in *R. V. Ward Ltd.* v. *Bignall* [1967] 1 Q.B. 534, 548B–E: " Rescission of a contract discharges both parties from any further

G    liability to perform their respective primary obligations under the contract, that is to say, to do thereafter those things which by their contract they had stipulated they would do." This statement is in accord with the earlier statements of principle in the authorities cited above and it cannot be distinguished on the ground that it concerns the Sale of Goods Act. That Act is merely a codification of the common law. In those circumstances,

H    the contract is at an end save for those rights which have accrued. Reliance is also placed on the observations of Lord Reid and Lord Upjohn in *Suisse Atlantique Société d'Armement Maritime S.A.* v. *N.V. Rotterdamsche Kolen Centrale* [1967] 1 A.C. 361, 398c, 419c, 421F–422, 425 and

the observations of Lord Denning M.R. and Cross L.J. in *Harbutt's "Plasticine" Ltd.* v. *Wayne Tank and Pump Co. Ltd.* [1970] 1 Q.B. 447, 464, 465, 475C. See also *The Mihalis Angelos* [1971] 1 Q.B. 164, 196, 202, 209H, where the Court of Appeal there reversed the judgment of Mocatta J. which was based on grounds akin to the observations of the Court of Appeal in the present case [1971] 1 W.L.R. 934, 943H. The above authorities are inconsistent with the reasoning of the Court of Appeal, pp. 943, 944, before one even comes to consider the position of the guarantor. At the moment of rescission there arose a right to damages in the creditor for breach of the agreement as a whole. The respondents' argument ignores the position of the guarantor. Clause (IX) is the only clause in this agreement which creates the obligation to make the payments of £6,000 a week with a final payment of £4,000. Once this contract was rescinded by the creditor and the contract ceases to exist, then the obligation in clause (IX) ceases to exist and the obligation on the guarantor in clause (XIII) also ceases to exist. It is plain that the guarantor's obligation is ancillary from the language of clause (XIII) itself. His obligation is a specific and limited obligation.

It is pertinent to consider the arguments which stem from convenience. In an instalment contract, it should not be predicated that the creditor should always have two persons to fall back on. If there is default on an instalment the creditor can either call upon the guarantor to pay in respect of that instalment or repudiate the contract and sue the principal debtor, in which event the guarantor is no longer liable to pay for payments in futuro. It is submitted that the guarantor's obligation was not tied to the old pre-existing debt, but is confined to the modification of the original agreement in that the principal debtor promised to pay at the rate of £6,000 a week. Contracts of surety and guarantee are to be construed strictly.

As to the effect on accrued unpaid instalments where rescission could operate to the detriment of the guarantor, in *Rowlatt on Principal and Surety*, 3rd ed. (1936), p. 102, it is stated: "A guarantee will only extend to a liability precisely answering the description contained in the guarantee" and at p. 114: "Where the terms of the principal contract are not set forth in the bond or guarantee of the surety, the rule is laid down in *Holme* v. *Brunskill* (1877) 3 Q.B.D. 495, that a material variation in that contract will discharge the surety." Strong reliance is placed upon the judgment of Cotton L.J. in that case at pp. 505, 506. It is necessary to look at the contract and the contract of guarantee and ask the question: is this a contract which could prejudice the guarantor? For if so the interest of the guarantor should be considered.

The prejudice to the guarantor here may be stated thus: The appellant gave his guarantee in consideration of the obligations undertaken by the respondents in the agreement. By rescinding the agreement on December 22, 1967, the respondents, by their own voluntary act, put an end to their obligations to the prejudice or potential prejudice of the appellant. The respondents reasserted their lien upon the principal debtor's goods and refused to make further deliveries thus depriving the principal debtor of potential profit and making it less able to make guaranteed payments or to reimburse the appellant. Thus by their own election, the respondents so altered the contractual position and so interfered with the appellant's

A.C.                    Lep Air Services V. Rolloswin Ltd. (H.L.(E.))

A    right as guarantor as to release him from liability under the agreement.
Reliance is also placed on the second ground given for the decision in *In
re Darwen and Pearce* [1927] 1 Ch. 176, which is applicable here. If *Holme*
v. *Brunskill* (1877) 3 Q.B.D. 495 be applicable then the guarantor is
wholly discharged, that is, in respect of the accrued liability and also in
respect of future payments: see *Midland Motor Showrooms Ltd.* v. *New-
man* [1929] 2 K.B. 256, 260, 263. The official referee in the present case
B    has applied in express terms *Holme* v. *Brunskill* but then went on to hold
that it did not affect the liability of the guarantor to pay for the accrued
payments, but that is to go contrary to the authorities. In the present case,
on December 22, 1967, the accrued payments had not been paid. The
guarantor could at that date have been called upon to pay. But the
creditor repudiated the contract and, therefore, if the guarantor is called
upon to pay after December 22, the guarantor is prejudiced since the action
C    of the creditors in cutting off supplies to the principal debtor was to make
it more difficult for the guarantor subsequently to have any successful re-
course to the principal debtor.
    The contention that the liability under clause (XIII) could survive the
cessation of the contract under clauses (I) to (XII) is not one that has ever
been pleaded or argued hitherto against the appellant.
D    As to *Chatterton* v. *Maclean* [1951] 1 All E.R. 761, 764, 765, the argu-
ment put forward by the defendant there is not one put forward by the
appellant in the present appeal.
    [Reference was also made to *National Bank of Nigeria Ltd.* v. *Awolesi*
[1964] 1 W.L.R. 1311.]
    *Anthony Lloyd Q.C., A. B. R. Hallgarten* and *Martin Moore-Bick*
for the respondents. (1) Where performance of a contract is guaranteed
E    by a third party and the contract is broken, the guarantor is liable whether
or not the time of performance has arrived. This proposition follows
from the ordinary law of anticipatory breach and from the law of principal
and surety. In the present case, Moschi guaranteed the performance of
Rolloswin Ltd. to pay and that obligation was broken by Rolloswin in its en-
tirety. The appellant then and there became liable under his guarantee
F    for the entire breach. (2) If the above submission is held to be too tech-
nical, then: (3) The substance of the contract here was that the appellant
would guarantee payment of the existing debt up to £40,000, and part of
the consideration for that was the respondents' forbearance to sue on the
debt. On acceptance of the repudiation the respondents could thereupon
sue for the original debt, and since the debt had never been paid the appel-
lant was liable on his guarantee. (4) The appellant by December 22, 1967,
G    had evinced an intention not to be bound by his contract.
    As to (3), two questions remain to be answered: (a) What happened
to the debt of £40,000 when the agreement of November 29, 1967, was
made? (b) What is the true construction of clause (XIII) of the agreement?
    As to (a), the debt remained after November 29, 1967, notwithstanding
the agreement of that date. After acceptance of that repudiation, the
H    respondents were entitled to sue for that debt. It is said that this is to
confuse repudiation with rescission. It is conceded that acceptance of
repudiation does not avoid a contract ab initio. On the facts of the present
case, it is improbable that the respondents would abandon a debt of

338                 Lep Air Services v. Rolloswin Ltd. (H.L.(E.))                 [1973]

£40,000 owed by the company on the mere promise to pay by instalments. **A**
Clause (XIII) on its true construction shows that the appellant was guaran-
teeing the debt subject to the terms of repayment.

In determining the object of the contract, the House is entitled to look
at the surrounding circumstances. If any question of ambiguity in clause
(XIII) arises, it should be construed contra proferentem the appellant.
Contracts of guarantee are to be construed in the same manner as other
contracts and not strictly in favour of the guarantor: see *Rowlatt on Prin-* **B**
*cipal and Surety,* 3rd ed., p. 60.

The agreement of November 29 did not extinguish the underlying
debt; it merely provided for payment by instalments and the respondents
were entitled to sue for the whole debt on December 22, and not merely
for the instalments. The appellant guaranteed the whole debt and not
merely the instalments. The fact that the guarantee comprised the whole
debt is strongly supported by clause (XI). If that approach be correct, **C**
then that is the end of these proceedings.

The broad effect of the appellant's submission is that acceptance of
the repudiation automatically discharges the guarantor from future obli-
gations. It was said that even if acceptance of repudiation does not auto-
matically discharge the guarantor, he is discharged if there is injury to
the guarantor. As to this argument, there is no case that so decides and **D**
*Chatterton* v. *Maclean* [1951] 1 All E.R. 761, so far as it goes, negatives
that contention. It is against common sense that a guarantor should be
discharged in those circumstances for it is the repudiation of the agreement
against which the creditor is guaranteed. Acceptance of repudiation al-
though it discharges further performance does not destroy the underlying
obligation. On an accepted repudiation, the obligation is the same, but
the law provides for discharge by judgment, or accord and satisfaction. **E**

If the guarantor has agreed to answer for the repudiation of a contract,
he must have agreed to answer for all the normal consequences of the repu-
diation, namely, that the innocent party is entitled to damages for total
breach of the contract. If the law were otherwise, it would lead to very
grave difficulties for business men who have to deal with guarantees. For
the circumstances in which the court has considered the surety has been **F**
discharged, see the cases referred to in *Halsbury's Laws of England,* 3rd
ed., Vol. 18 (1957), p. 502 and *Chitty on Contracts,* 23rd ed., Vol. 2 (1968),
paras. 1681 et seq. The grounds are: (a) Where there has been discharge
of the principal debtor by performance. (b) Where the principal debtor
is released by the creditors. It is plain that the guarantor is then dis-
charged, because otherwise it would be a fraud on the debtor if the creditor
could then go against the guarantor and the guarantor could then go against **G**
the debtor. This does not apply here. (c) Where the creditor agrees to
give time to the principal debtor. The guarantor is discharged because
the guarantor might have chosen to pay off the debt and go in the creditor's
name against the principal debtor: *Midland Motor Showrooms Ltd.* v.
*Newman* [1929] 2 K.B. 256. This is not this case. (d) Where the debtor
has been released by operation of law. It is to be noted that this does **H**
not apply to a discharge from bankruptcy. (e) Where the creditor releases
securities which otherwise the guarantor would have been entitled to. This
is the second ground of decision in *In re Darwen and Pearce* [1927] 1 Ch.

**A.35**

A.C.                    Lep Air Services v. Rolloswin Ltd. (H.L.(E.))                    339

A    176. (f) Where the principal contract has been varied between creditor and
debtor without the consent of the guarantor: *Holme* v. *Brunskill*, 3 Q.B.D.
495. This is not this case because the acceptance of a repudiation is not
a variation of the contract, but a first step in enforcing the contract. This
is the first ground of the decision in *In re Darwen and Pearce* [1927] 1 Ch.
176. (g) Release by a co-surety.

The appellant is attempting to add another ground to the above, namely,
B    that the obligation is extinguished by acceptance of the repudiation. This
last ground cannot be supported for two reasons: (a) The acceptance of
the repudiation does not extinguish the guaranteed obligation and (b) even
if it did, it would not affect the appellant's obligation under the guarantee.

As to (a): see *Heyman* v. *Darwins Ltd.* [1942] A.C. 356, *per* Lord
Macmillan and Lord Porter.

C    As to (b): there are three reasons: (i) If the original obligation is extin-
guished, it is clear that another obligation takes its place. (ii) If the dis-
appearance of the original obligation discharges the guarantor, then the
guarantor could never be liable after judgment against the principal debtor.
(iii) If the original obligation is extinguished, it is extinguished because
the obligation has been broken by the debtor and this is the very thing
against which the plaintiff has been guaranteed.

D    The true analysis of the facts here is that on December 22, 1967, Rollo-
swin became liable for breach of the entire obligation, and since the appel-
lant was a guarantor for the entire obligation, he was liable on December
22 for the entire breach. What the guarantor guarantees is performance,
and if therefore the principal debtor completely fails in performance, the
guarantor is at once liable for the breach. It is emphasised that the true
analysis of a contract of guarantee is that the guarantor will perform the
E    contract if the principal debtor does not. It is to be observed that the
guarantor cannot be sued in debt. It was originally an action on a special
assumpsit. This has been established since the Year Books: see *Jordan's
Case* (1536) Y.B. 27 Hen. 8, Mich. fo. 24, pl. 3.

In *Mines* v. *Sculthorpe* (1809) 2 Camp. 215 it was held that the guaran-
tor was in breach of his contract for future instalments from the moment
F    that the principal debtor was in breach. That the surety is immediately
liable in default of the principal debtor is clearly stated in *Rowlatt on
Principal and Surety*, 3rd ed., pp. 143, 152. The surety's obligation is to
see that the principal debtor will perform his contract.

*In re Lockey* (1845) 1 Ph. 509 contains a general statement of the duty
of a guarantor. In the present case the appellant was liable up to £40,000
G    for everything that Rolloswin was liable for and since on the doctrine of
anticipatory breach Rolloswin was liable for future instalments, so was
the appellant. See *Wright* v. *Simpson* (1802) 6 Ves.Jun. 714, 734. As to
the example of a building of a piece of special machinery where the builder
ceases his work on it before completion, the surety becomes immediately
liable for the breach of the contract. The obligation is to answer for the
H    default of the principal debtor and it matters not whether it be a breach
of condition or warranty. In *Guest, The Law of Hire Purchase* (1966),
para. 430, p. 187, it is stated: "Upon repudiation by the hirer, the guar-
antor . . . incurs the full liability of the hirer under the agreement, including

**A.35**

Lep Air Services v. Rolloswin Ltd. (H.L.(E.) )                    [1973]

à liability to pay damages to the owner in respect of his loss of profit on     A
the transaction." The same principle applies here.

It is emphasised that the guarantor is not liable in debt, but is liable
in damages in respect of the breach. This is borne out by the precedent
to be found in *Bullen and Leake's Precedents of Pleading*, 3rd ed. (1868),
p. 163. The footnote to that precedent is of interest with its reference to
section 25 of the Common Law Procedure Act 1854.

The Court of Appeal was correct in holding that as soon as Rolloswin's     B
conduct was accepted by the respondents as a repudiation of the contract,
Rolloswin was then and there in breach of its obligation to pay each
future instalment of money as it fell due week by week. That submission
is supported by the authority of *Hochster* v. *De la Tour* (1853) 2 E. & B.
678. As to the measure of damages, see *Frost* v. *Knight* (1872) L.R. 7
Exch. 111. Rolloswin thereby became liable to the respondents in damages
for the present breaches of those obligations of which performance lay     C
in the future. Accordingly, the appellant also became liable to the respon-
dents in damages since he was thereby in breach of his undertaking that
Rolloswin would perform. The appellant contended that his obligation
to pay for future instalments was extinguished, but that submission is
wrong for the reasons given by Lord Macmillan and Lord Porter in *Hey-*
*man* v. *Darwins Ltd.* [1942] A.C. 356.                                    D

*Hallgarten* following on the issue of repudiation. It is the respondents'
contention that not only Rolloswin but also the appellant were in repudia-
tion of the agreement. Three questions arise: (1) Was the appellant in
repudiation at all? (2) If he was, was that repudiation accepted? (3) If
technically there was no acceptance, does that make any difference?

As to (1), the official referee made no finding on this issue. The acts     E
of an individual where he is an officer of the company are his acts as well
as those of the company. If this were wrong, it would mean that the House
was creating a new doctrine of vicarious immunity. The appellant's repu-
diation consisted in the fact that on the three occasions when the company
failed to pay the instalments, the appellant himself failed to pay those
sums. By failing to tender the £6,000 or balance this went to the root of
the contract. The appellant was in breach of a fundamental term. Alter-     F
natively, one can look at the appellant's conduct as a whole and from this
it can be seen that the appellant evinced an intention to tear up the agree-
ment as a whole. It is to be remembered that the guarantee was not a
separate document, but an integral part of the agreement as a whole.

As to (2), the guarantee was an integral part of the agreement and there-
fore an implied acceptance of Rolloswin's repudiation is ipso facto an
implied acceptance of the appellant's repudiation. Any other position     G
would be logically impossible, for the creditor would not without extreme
financial danger to himself accept repudiation by the principal debtor
before acceptance of repudiation by the guarantor.

As to (3), there is only need to accept repudiation if there is something
still capable of performance. Where a repudiation by the guarantor leads
to destruction of the guarantee, there is no need to communicate accept-     H
ance. Here the conduct of the guarantor was one of the causes of the
respondents' putting to an end the contract of the principal debtor; the
appellant's repudiation had the effect of waiving further performance by

A  the respondents: see *Sinason-Teicher Inter-American Grain Corporation* v. *Oilcakes and Oilseeds Trading Co. Ltd.* [1954] 1 W.L.R. 935, 943, 944, *per* Devlin J. In these circumstances it does not lie in the appellant's mouth to complain of the respondents' acceptance of Rolloswin's repudiation.

    *Waters Q.C.* in reply. As to the ambit of the guarantee in clause (XIII) it was contended that clause (XIII) extended in some way beyond the guar-
B  antee of specific money payments on particular dates. But the appellant had no obligation to the respondents until he entered into this guarantee. The language of clause (XIII) is plain. The consideration given to the appellant is the promises of the two Lep companies. The words " hereinbefore set out " can only refer to clause (IX). The obligation, therefore, of the appellant is that Rolloswin will make payments as set out in clause (IX). It is particular amounts as they fall due which the appellant guarantees.
C  The contract having been determined on December 22, 1967, the instalments which were payable after that date never fell due for payment and therefore the appellant's guarantee had no subject-matter on which to fasten.

    It was said that there was no authority for the proposition that future instalments ceased to be payable and that *Chatterton* v. *Maclean* [1951]
D  1 All E.R. 761 was the only case on this question and that it was a decision to the contrary. In so far as *Chatterton* v. *Maclean* is a relevant authority, it shows that Parker J. was accepting the proposition that in so far as future liabilities were concerned, the guarantor would be relieved: see [1951] 1 All E.R. 761, 764, 765. This case is not against the appellant.

    As to *Guest, The Law of Hire Purchase*, see para. 429, p. 187, and the form of indemnity on pp. 632, 633. The statement in para. 430, p. 187, is
E  too wide if it is meant to apply to all contracts of guarantee irrespective of the language used therein.

    There is no case which establishes or asserts that in the law of *Landlord and Tenant* a guarantor is liable after the forfeiture of a lease: see, for example, *Stacey* v. *Hill* [1901] 1 K.B. 660.

    A promise to answer for the debt or default of another person is the
F  definition of a guarantee in the Statute of Frauds. It is said that the debt refers to an existing debt and default. The obligation of the guarantor is to answer for the default and the obligation is to answer for the default to pay a sum of money on a particular day. If the date for payment arrives and the debtor does not pay, the liability of the guarantor arises at the moment of default. The guarantor must then pay not damages, but payment of a liquidated sum. Alternatively, where the guarantor guarantees
G  an obligation to pay instalments of money as they fall due, it involves an undertaking on the guarantor's part to pay them if the debtor does not and that is the full measure of his obligation. It then falls upon him to pay and he pays that sum and not liquidated damages. The guarantor does not bind himself that the debtor will pay, nor is he liable in damages if the debtor does not pay. It is an ancillary obligation.

    *Jordan's Case*, Y.B. 27 Hen. 8, Mich. fo. 24, pl. 3 is in no sense against
H  the appellant for it is not directed to the question: is a claim against the guarantor one for a liquidated sum or is it a claim for unliquidated damages?

**A.35**

342        Lep Air Services v. Rolloswin Ltd. (H.L.(E.))        [1973]

The guarantor does not guarantee that the principal debtor will perform    A
his contract; the promise is to discharge the debtor's obligation if he does
not. Contrast a contract of indemnity: see *Anson's Law of Contract*, 22nd
ed. (1964), p. 69, which is cited in *Guest on Hire Purchase*, para. 414,
p. 179.

Reliance was placed on *Bullen and Leake*, 3rd ed., p. 163 and foot-
note, but if this note and its references are examined, it is wholly against
the appellant. Further, as to the precedents in *Bullen and Leake* on    B
p. 162 et seq., if there was no obligation on the guarantor to pay the price,
the averment would not be in the form it is. It is pertinent to consider
the precedents in the current edition (11th) of *Bullen and Leake*, pp. 218
to 222. For example, if the appellant's argument be correct, Precedent
no. 176, p. 221, would have to be framed as a claim in damages.

As to *Wright* v. *Simpson*, 6 Ves.Jun. 714, this does not assist the
appellant. *In re Lockey*, 1 Ph. 509 turns on the construction of the bond    C
in question.

The precedents to be found in the *Encyclopaedia of Forms and Prece-
dents*, 4th ed., Vol. 9 (1968), forms 4: 5, 4: 6, pp. 805, 806, forms 5: 1, 5: 2,
pp. 821, 822, do not support the appellant's first proposition. The present
case is an example of the release or discharge of the principal debtor: see
the statement in *Halsbury's Laws of England*, 3rd ed., Vol. 18, p. 520,    D
which is supported by *Faber* v. *Earl of Lathom* (1897) 77 L.T. 168, 170.

The fact that in bankruptcy the surety is not discharged on the dis-
charge of the bankrupt is because there is a special statutory provision to
that effect. See section 30 (3) of the Bankruptcy Act 1914.

If the above be rejected, then it was said that from the moment of
rescission the guarantor is in breach as regards outstanding instalments.
Prima facie he must be given an opportunity to perform, that is, to see    E
that the debtor pays on those future dates. It is said that it was impossible
for the principal debtor to perform after December 22, 1967. The question
arises, why is this so? (1) It may be because he has evinced an intention
not to be bound: see *Howard* v. *Pickford Tool Co. Ltd.* [1951] 1 K.B. 417.
(2) The creditor at his election has determined to break the contract.
(3) By consensus the primary obligations have gone and a new or sub-    F
stituted agreement arises that the principal debtor must pay.

As to the subsidiary argument in relation to repudiation, it was said
that the appellant must be treated as being in breach of his contract of
guarantee. The official referee made no finding on this fact although
pressed so to do. Junior counsel for the respondents has not distinguished
between the acts and omissions of the appellant as an officer of the com-
pany and his acts and omissions in his personal capacity. This is a vital    G
distinction. In those circumstances, it was impossible for the official
referee to hold that the appellant was in repudiation of his contract of
guarantee. The mere fact that there was non-payment when the appellant
was never called upon to pay makes this contention nigh impossible.

Their Lordships took time for consideration.    H

April 26, 1972. LORD REID. My Lords, the respondents acted as
forwarding agents for goods imported by a company Rolloswin which was

A.C.                Lep Air Services (Rollswin) 22 (H.L.(E.))                Lord Reid    **A-35**

A    controlled by the appellant. The company was in debt to the respondents
who were exercising a lien. In order that the goods should be released
and that the debt should be paid by instalments the respondents, the com-
pany and the appellant made a tripartite agreement on November 29, 1967.
Its objects were that the amount of the debt should be ascertained, that
meanwhile the respondents should release the goods, and that the company
should pay weekly instalments of £6,000 each. The appellant gave a
B    personal guarantee the meaning and effect of which is the subject of this
appeal.

I need not set out the whole of the agreement. It provided for the
immediate release of the company's goods, for the ascertainment within six
weeks of the amount of the company's existing indebtedness which mean-
while should be deemed not to exceed £40,000 and for prompt payment of
C    any future debts incurred. Then it was provided:

" (IX) We will further pay to one of you for the benefit of both of
you or as you may direct, partly to one of you and partly to the other
sums amounting in all to an overall payment at the rate of not less
than £6,000 a week commencing on November 27, 1967—on account
of which you have already received the sum of approximately £3,820
on November 28—until such payments shall have totalled £36,000
D    whereafter we shall pay a further sum of £4,000 one week after the
said sum of £36,000 shall have been paid this, of course, is an addition
to sums currently being paid for further deliveries referred to in
paragraph (VII).

" (X) If our indebtedness to be agreed as hereinbefore set out (in
(IV) above) shall not amount to £40,000 the difference between that
sum and the amount of the payments made under (IX) above, shall be
E    held in credit for us and may be appropriated by us to the discharge
of any future indebtedness we may have to you or either of you in
such proportions as we shall elect. We will make or confirm any
such election in writing for your records.

" (XI) If and in so far as the agreed indebtedness to date referred
to in (IV) above shall amount to more than £40,000 we will continue
to discharge such indebtedness at the rate of £6,000 per week and for
F    the figures of £36,000 and £4,000 set out in paragraph (IX) hereof
there shall be read in substitution such figure part of the total agreed
indebtedness as shall be a multiple of £6,000 and such figures as shall
be required to discharge the indebtedness thereafter being a sum less
than £6,000.

" (XII) In further consideration of the above you have agreed that
G    you will not and do not claim the right to exercise any lien over any
goods consigned to us or to our customers.

" (XIII) In further consideration of the above Mr. Moschi has
personally guaranteed the performance by Rolloswin Investments
Limited of its obligation to make the payments at the rate of £6,000
per week together with the final payment of £4,000 as hereinbefore
H    set out so however that Mr. Moschi's total obligation under this
guarantee shall not exceed the total sum of £40,000 of which approxi-
mately £3,820 has already been paid as aforesaid."

**A.35**

Lord Reid        Lep Air Services v. Rolloswin Ltd. (H.L.(E.))        [1973]

The company failed to carry out the terms of this agreement. By
December 22 it had only paid £10,060. It is in dispute whether three or    A
four instalments had then become payable. Agreeing with your Lordships
I think four amounting to £24,000 were then due. And there were other
matters as regards which the company was then in breach of this agreement.

On December 22 the respondents claimed that these breaches were
fundamental breaches which they were entitled to treat as bringing the
contract to an end. I think that they were right and that the contract was    B
lawfully brought to an end by them on that day. I agree that apart from
any other breaches the failure to pay more than £10,060 of the £24,000
due was by itself in the circumstances a fundamental breach.

The company is now in liquidation and the respondents sue the
appellant in respect of the guarantee set out in clause (XIII).

The official referee held that the total debt of the company at the date
of the agreement was £48,000, and found that the appellant was liable to    C
the respondents for £13,930 with interest. The Court of Appeal found the
appellant liable to pay £29,930 with interest. That represents the whole
£40,000 referred to in clause (XIII) of the agreement less the sums paid by
the company before December 22, 1967.

The first contention of the appellant is that he is under no liability to
pay anything because his obligation under clause (XIII) was discharged by    D
the action of the respondents in accepting the company's repudiation and
so bringing the contract to an end. He supports this startling contention
by relying on the principle that if a creditor agrees to a variation of the
debtor's contract he thereby discharges a guarantor from liability. He
argues that acceptance of a repudiation should be regarded as equivalent
to a variation of the contract. I agree with your Lordships that there is no    E
substance in this argument and I reject it.

His next argument is more formidable. He says, look at clause (XIII).
It merely guarantees that each instalment of £6,000 shall be duly paid.
But by reason of the accepted repudiation the contract was brought to an
end before the later instalments became payable. So they never did
become payable. All that remained after the contract was terminated was
a claim for damages. But I never guaranteed to pay damages. If the    F
creditor chooses to act so that future instalments are not payable by the
debtor he cannot recover them from me.

To meet that argument I think that it is necessary to see what in fact
the appellant did undertake to do. I would not proceed by saying this is a
contract of guarantee and there is a general rule applicable to all guarantees.
Parties are free to make any agreement they like and we must I think    G
determine just what this agreement means.

With regard to making good to the creditor payments of instalments
by the principal debtor there are at least two possible forms of agreement.
A person might undertake no more than that if the principal debtor fails
to pay any instalment he will pay it. That would be a conditional agree-
ment. There would be no prestable obligation unless and until the debtor    H
failed to pay. There would then on the debtor's failure arise an obligation
to pay. If for any reason the debtor ceased to have any obligation to pay
the instalment on the due date then he could not fail to pay it on that date.

A.C.                     Lep Air Services v. Rollowswin Ltd. (H.L.(E.))              Lord Reid

**A**    The condition attached to the undertaking would never be purified and the
subsidiary obligation would never arise.

     On the other hand, the guarantor's obligation might be of a different
kind. He might undertake that the principal debtor will carry out his
contract. Then if at any time and for any reason the principal debtor
acts or fails to act as required by his contract, he not only breaks his
own contract but he also puts the guarantor in breach of his contract of
**B**    guarantee. Then the creditor can sue the guarantor, not for the unpaid
instalment but for damages. His contract being that the principal debtor
would carry out the principal contract, the damages payable by the
guarantor must then be the loss suffered by the creditor due to the principal
debtor having failed to do what the guarantor undertook that he would
do.

     In my view, the appellant's contract is of the latter type. He
**C**    " personally guaranteed the performance " by the company " of its obliga-
tion to make the payments at the rate of £6,000 per week." The rest of
the clause does not alter that obligation. So he was in breach of his
contract as soon as the company fell into arrears with its payment of the
instalments. The guarantor, the appellant, then became liable to the
creditor, the respondents, in damages. Those damages were the loss
**D**    suffered by the creditor by reason of the company's breach. It is not and
could not be suggested that by accepting the company's repudiation the
creditor in any way increased his loss. The creditor lost more than
the maximum which the appellant guaranteed and it appears to me that the
whole loss was caused by the debtor having failed to carry out his contract.
That being so, the appellant became liable to pay as damages for his
breach of contract of guarantee the whole loss up to the maximum of
**E**    £40,000.

     I do not get much assistance from the authorities such as they are. I
go by the terms of the appellant's contract. I find nothing in the autho-
rities which in any way prevents me from reaching what appears to me to
be the natural meaning and effect of this contract. It seems never to have
been necessary to make a full analysis of the position in a contract of this
**F**    kind, and I shall not refer in detail to such indications as there are in the
cases, beyond saying that there is no magic in the word guarantee but that
the authorities appear to recognise that at least most contracts of guarantee
are of this nature.

     The Court of Appeal reached the same result by a different route. I
am unable to accept some of their reasoning as to what happens when a
contract is broken. In particular I cannot agree that after accepted
**G**    repudiation the contractual obligations still exist as obligations. For the
breach of any contract the normal remedy is damages in money. The
contract may have been to deliver, say, 100 tons of wheat. If the party
fails to deliver somehow that obligation disappears and by operation of law
is replaced by an obligation to pay money. So it appears to me that when
a contract is brought to an end by repudiation accepted by the other party
**H**    all the obligations in the contract come to an end and they are replaced by
operation of law by an obligation to pay money damages. The damages
are assessed by reference to the old obligations but the old obligations no
longer exist as obligations. Were it otherwise there would be in existence

**A.35**

Lord Reid                Lep Air Services v. Rollosin Ltd. (H.L.(E.))                [1973]

simultaneously two obligations, one to perform the contract and the other
to pay damages. But that could not be right. The only legal nexus remain-
ing is the obligation to pay the damages; so here when the respondents
elected to end the company's contract by treating their fundamental breach
as a repudiation and accepting it, their right against the company became a
right to get damages. The respondents did not recover these damages
from the company so they were part of the loss suffered by the respondents
as a result of the company's breaches of contract. The appellant as
guarantor had undertaken that the company would carry out its contract
so the damages which the company have not paid were part of the loss
flowing from the appellant's breach of contract for which the appellant is
liable.

It is unnecessary to deal with the other questions argued.

I would dismiss this appeal.

LORD GARDINER. My Lords, I have had the advantage of reading the
opinions of my noble and learned friends, and I agree that this appeal
should be dismissed.

LORD DIPLOCK. My Lords, the terms of the contract which has given
rise to this appeal and what happened after it was made are set out in the
judgment of the Court of Appeal. I agree with the reasons given by my
noble and learned friend, Lord Simon of Glaisdale, for holding that upon the
true construction of clause (IX) of the contract when read in the light of
what had occurred immediately before its execution four instalments of not
less than £6,000 each had become due from the debtor (the defendant
company) to the creditor (the plaintiff companies) by December 22, 1967,
when the creditor elected to treat the contract as rescinded by the previous
repudiatory breaches by the debtor; and also that the debtor's failure to
pay those instalments entitled the creditor so to do. But as there has
been no previous case upon the effect that the rescission of a contract has
upon the liability of a guarantor in respect of the obligations of the principal
debtor of which performance had not fallen due at the date of the rescission,
I propose to make some observations about the general principles of the
law of guarantee which, in my view, govern this situation.

The law of guarantee is part of the law of contract. The law of contract
is part of the law of obligations. The English law of obligations is about
their sources and the remedies which the court can grant to the obligee for
a failure by the obligor to perform his obligation voluntarily. Obligations
which are performed voluntarily require no intervention by a court of law.
They do not give rise to any cause of action.

English law is thus concerned with contracts as a source of obligations.
The basic principle which the law of contract seeks to enforce is that a
person who makes a promise to another ought to keep his promise. This
basic principle is subject to an historical exception that English law does
not give the promisee a remedy for the failure by a promisor to perform
his promise unless either the promise was made in a particular form, e.g.,
under seal, or the promisee in return promises to do something for the
promisor which he would not otherwise be obliged to do, i.e., gives con-
sideration for the promise. The contract which gives rise to the instant

A.C.                    Lep Air Services V. Rolloswin Ltd. (H.L.(E.))          Lord Diplock

A appeal does not fall within this exception. In return for the guarantor's promise to the creditor the latter promised to extend credit to the debtor and to release his lien upon the debtor's goods.

Each promise that a promisor makes to a promisee by entering into a contract with him creates an obligation to perform it owed by the promisor as obligor to the promisee as obligee. If he does not do so voluntarily there are two kinds of remedies which the court can grant to the promisee.

B It can compel the obligor to pay to the obligee a sum of money to compensate him for the loss that he has sustained as a result of the obligee's failure to perform his obligation. This is the remedy at common law in damages for breach of contract. But there are some kinds of obligation which the court is able to compel the obligor actually to perform. In some cases, such as obligations to transfer title or possession of property to the obligee or to refrain from doing something to the detriment of the

C obligee, a remedy to compel performance by a decree of specific performance or by injunction is also available. It was formerly obtainable only in a court of equity. In these cases it was an alternative remedy to that of damages for breach of contract obtainable only in a court of common law. But, since a court of common law could make and enforce orders for payment of a sum of money, where the obligation was itself an

D obligation to pay a sum of money, even a court of common law could compel the obligor to perform it. Historically this was the only remedy which the court would grant at common law when an obligor failed to perform this kind of obligation. The remedy of damages for non-performance of the obligation was not available as an alternative.

It ceased to be important to identify an obligation which the obligor had failed to perform as being an obligation to pay a sum of money after

E the Judicature Act of 1875 had abolished the necessity for a plaintiff to select the form of action appropriate to his claim. But before the Common Law Procedure Acts 1852 to 1860 there were important procedural differences between an action brought to compel performance of the obligation arising from a promise to pay a sum of money for which the form of action was indebitatus assumpsit, and an action brought to recover

F compensation for the loss sustained as a result of the obligor's failure to perform any other kind of obligation arising out of contractual promises—for which the form of action was a special assumpsit.

In the absence of modern authority it becomes necessary to go back a century or more to see whether a contractual promise by the guarantor to guarantee to the creditor that the debtor would perform his own obligations to the creditor to pay a sum of money to him was itself classified as giving

G rise to an obligation on the part of the guarantor to pay that sum of money to the creditor if the debtor did not do so, or as an obligation to see to it that the debtor did perform his own obligations to the creditor.

In section 4 of the Statute of Frauds 1677 a contract of guarantee is described in the language of the 17th century as " any special promise to answer for the debt, default or miscarriage of another person." Translated

H into modern legal terminology " to answer for " is " to accept liability for," and " debt, default or miscarriage " is descriptive of failure to perform legal obligations, existing and future, arising from any source, not only from contractual promises but in any other factual situations capable

**A.35**

348

**Lord Diplock    Lep Air Services v. Rolloswin Ltd. (H.L.(E.))    [1973]**

of giving rise to legal obligations such as those resulting from bailment, tort, or unsatisfied judgments. These words were so construed by Abbott C.J. in *Kirkham* v. *Marter* (1819) 2 B. & Ald. 613, 616.    A

By the beginning of the 19th century it appears to have been taken for granted, without need for any citation of authority, that the contractual promise of a guarantor to guarantee the performance by a debtor of his obligations to a creditor arising out of contract gave rise to an obligation on the part of the guarantor to see to it that the debtor performed his    B own obligations to the creditor. Statements to this effect are to be found in *Wright* v. *Simpson* (1802) 6 Ves.Jun. 714, 734, *per* Lord Eldon and in *In re Lockey* (1845) 1 Ph. 509, 511, *per* Lord Lyndhurst. These are the two cases which are cited as authority for this proposition by Sir Sidney Rowlatt in his authoritative work on *Principal and Surety*. They can be supplemented by other similar statements, including one in your Lordships' House, which confirm that it was taken for granted that this was the legal    C nature of the guarantor's obligation arising out of a contract of guarantee: *Mactaggart* v. *Watson* (1835) 3 Cl. & F. 525, 540, *per* Lord Brougham.

It is because the obligation of the guarantor is to see to it that the debtor performed his own obligations to the creditor that the guarantor is not entitled to notice from the creditor of the debtor's failure to perform an obligation which is the subject of the guarantee, and that the creditor's    D cause of action against the guarantor arises at the moment of the debtor's default and the limitation period then starts to run. It is also why, where the contract of guarantee was entered into by the guarantor at the debtor's request, the guarantor has a right in equity to compel the debtor to perform his own obligation to the creditor if it is of a kind in which a court of equity is able to compel performance: see *Ascherson* v. *Tredegar Dry Dock and Wharf Co. Ltd.* [1909] 2 Ch. 401. It is the existence of this    E right on the part of the guarantor that accounts for the rule laid down by Lord Eldon in *Samuell* v. *Howarth* (1817) 3 Mer. 272, 278 and approved by your Lordships' House in *Creighton* v. *Rankin* (1840) 7 Cl. & F. 325, 346 that where the creditor, after the guarantee has been entered into, gives a contractual promise to the debtor to allow him time to pay the guaranteed debt, the guarantor is discharged from his obligation to the creditor. This is    F because the creditor by altering the debtor's obligation to him has deprived the guarantor of his equitable right to compel the debtor to perform his original obligation to the creditor, which was all that the guarantor had guaranteed. In contrast, the guarantor *is* not discharged by the mere voluntary forbearance of the creditor to take steps to obtain timeous performance by the debtor of the obligation which is the subject of the guarantee; for this does not affect the guarantor's equitable right to compel the debtor    G to perform it.

It follows from the legal nature of the obligation of the guarantor to which a contract of guarantee gives rise that it is not an obligation himself to pay a sum of money to the creditor, but an obligation to see to it that another person, the debtor, does something; and that the creditor's remedy for the guarantor's failure to perform it lies in damages for breach of    H contract only. That this was so, even where the debtor's own obligation that was the subject of the guarantee was to pay a sum of money, is clear from the fact that formerly the form of action against the guarantor which

A.C.                    Lep Air Services v. Rolloswin Ltd. (H.L.(E.))                    Lord Diplock

A    was available to the creditor was in special assumpsit and not in indebitatus assumpsit: *Mines* v. *Sculthorpe* (1809) 2 Camp. 215.

The legal consequence of this is that whenever the debtor has failed voluntarily to perform an obligation which is the subject of the guarantee the creditor can recover from the guarantor as damages for breach of his contract of guarantee whatever sum the creditor could have recovered from the debtor himself as a consequence of that failure. The debtor's

B    liability to the creditor is also the measure of the guarantor's.

Whether any particular contractual promise is to be classified as a guarantee so as to attract all or any of the legal consequences to which I have referred depends upon the words in which the parties have expressed the promise. Even the use of the word " guarantee " is not in itself conclusive. It is often used loosely in commercial dealings to mean an ordinary warranty. It is sometimes used to mis-describe what is in law

C    a contract of indemnity and not of guarantee. Where the contractual promise can be correctly classified as a guarantee it is open to the parties expressly to exclude or vary any of their mutual rights or obligations which would otherwise result from its being classifiable as a guarantee. Every case must depend upon the true construction of the actual words in which the promise is expressed.

D    In the instant appeal, however, the actual words used are simple, unambiguous, and contain no qualification except to impose a limit upon the guarantor's maximum liability under the guarantee.

The particular obligation of the debtor of which performance was guaranteed was to satisfy an existing debt to the creditor by instalments to be paid in the future. It arose from one of a number of inter-related mutual promises made by the debtor to the creditor and by the creditor

E    to the debtor all of which were contained in a single contract; but the guarantor did not guarantee performance by the debtor of any obligations arising from any of his other promises. As between the debtor and the creditor all their obligations to one another to which their mutual promises gave rise, including the particular obligation of which performance was guaranteed by the guarantor, possessed the characteristics which the law

F    ascribes to obligations whose common source is the same contract.

The debtor failed to perform voluntarily many of his obligations under the contract—both the obligation of which performance was guaranteed and other obligations. The cumulative effect of these failures by December 22, 1967, was to deprive the creditor of substantially the whole benefit which it was the intention of the parties that he should obtain from the contract. The creditor accordingly became entitled, although not bound,

G    to treat the contract as rescinded: see *Hongkong Fir Shipping Co.* v. *Kawasaki Kisen Kaisha Ltd.* [1962] 2 Q.B. 26. He elected to do so on that date. It was held by the official referee and by the Court of Appeal, in my view rightly, that the debtor's failures to pay the instalments of the existing debt were in themselves sufficient to deprive the creditor of substantially the whole benefit which it was the intention of the parties that

H    he should obtain from the contract, even if his failures to perform other obligations were left out of account.

My Lords, it has become usual to speak of the exercise by one party to a contract of his right to treat the contract as rescinded in circumstances

Lord Diplock        Lep Air Services v. Rolloswin Ltd. (H.L.(E.))        [1973]

such as these, as an "acceptance" of the wrongful repudiation of the contract by the other party as a rescission of the contract. But it would be quite erroneous to suppose that any fresh agreement between the parties or any variation of the terms of the original contract is involved when the party who is not in default elects to exercise his right to treat the contract as rescinded because of a repudiatory breach of the contract by the other party. He is exercising a right conferred upon him by law of which the sole source is the original contract. He is not varying that contract; he is enforcing it.

It is no doubt convenient to speak of a contract as being terminated or coming to an end when the party who is not in default exercises his right to treat it as rescinded. But the law is concerned with the effect of that election upon those obligations of the parties of which the contract was the source, and this depends upon the nature of the particular obligation and upon which party promised to perform it.

Generally speaking, the rescission of the contract puts an end to the primary obligations of the party not in default to perform any of his contractual promises which he has not already performed by the time of the rescission. It deprives him of any right as against the other party to continue to perform them. It does not give rise to any secondary obligation in substitution for a primary obligation which has come to an end. The primary obligations of the party in default to perform any of the promises made by him and remaining unperformed likewise come to an end as does his right to continue to perform them. But for his primary obligations there is substituted by operation of law a secondary obligation to pay to the other party a sum of money to compensate him for the loss he has sustained as a result of the failure to perform the primary obligations. This secondary obligation is just as much an obligation arising from the contract as are the primary obligations that it replaces: see *R. V. Ward Ltd.* v. *Bignall* [1967] 1 Q.B. 534, 548.

Although this is the general rule as to the effect of rescission of the contract upon obligations of which it was the source, there may be exceptional primary obligations which continue to exist notwithstanding that the contract has been rescinded. These are obligations that are ancillary to the main purpose of the contract—which is, of course, that the parties should perform their primary obligations voluntarily. Mutual promises to submit to arbitration disputes arising as to the performance by the parties of their other obligations arising from the contract may be expressed in terms which make it clear that it was the common intention of the parties that their primary obligation to continue to perform these promises should continue notwithstanding that their other primary obligations had come to an end: *Heyman* v. *Darwins Ltd.* [1942] A.C. 356.

But this is the exception. Although in the instant appeal the Court of Appeal came to the right decision, I cannot accept entirely that part of their reasoning in support of it in which they suggest that the primary obligation of the debtor to continue to pay the instalments which he had promised under clause (IX) of the contract was not ended by the rescission of the contract but remained in existence although the law no longer permitted him to pay them. A legal obligation to continue to perform is inconsistent with the withdrawal of any legal right to do so. The better explanation is

**A.35**

A.C.                    Lep Air Services v. Rolloswin Ltd. (H.L.(E.))            Lord Diplock

A    that which I have already given, viz., that upon rescission of the contract the
primary obligation of the debtor to pay the instalments was converted by
operation of law into a secondary obligation either to pay damages for
failure to perform it; or, as these were instalments of a debt existing at the
date of the contract, it may be a revived obligation to pay the balance of
the whole debt immediately.

The guarantor's obligation under his contract of guarantee does not, as
B    the Court of Appeal appear to suggest, depend upon the debtor's primary
obligation continuing to exist after the contract had been rescinded. Nor
is it affected by whether the debtor's secondary obligation which was sub-
stituted for it by operation of law is classified as an obligation to pay
damages or as an obligation to pay the debt. It was the debtor's failure to
perform his primary obligation to pay the instalments in circumstances
which put an end to it that constituted a failure by the guarantor to perform
C    his own primary obligation to the creditor to see that the instalments were
paid by the debtor, and substituted for it a secondary obligation of the
guarantor to pay to the creditor a sum of money for the loss he thereby
sustained. It is the guarantor's own secondary obligation, not that of the
debtor, that the creditor is enforcing in his claim for damages for breach
of his contract of guarantee.

D    It is unnecessary for the decision of the instant appeal to consider what
would have been the liability of the guarantor if the debtor had paid the
guaranteed instalments punctually, but had failed to perform his other
contractual obligations which were not the subject of the guarantee. It may
well be that the effect of such breaches alone would not be such as to
deprive the creditor of substantially the whole benefit which it was the
intention of the parties that he should obtain from the contract so that no
E    right to treat the contract as rescinded would have arisen. Or it may
be that the mutual promises as to the existing debt should be regarded as
severable from the other promises so as to attract the legal characteristics
of a separate contract although incorporated in the same document as the
other mutual promises. In fact, however, the debtor's breaches in relation
to the payment of the guaranteed instalments would have been sufficiently
F    serious in themselves to entitle the creditor to rescind the whole contract
even if they had not been accompanied by breaches of its other terms.

My Lords, this analysis of the legal characteristics of the respective
obligations of the guarantor, the creditor and the debtor is sufficient to
dispose of the arguments advanced on behalf of the guarantor in this
appeal. The first was based upon a false analogy between an agreement
between the creditor and the debtor to determine or to vary the terms of
G    a contract, and the exercise by the creditor of his right under the contract
itself to treat it as rescinded by a repudiatory breach of it by the debtor.
The second was based upon the false assumption that the primary obligation
of the guarantor was to pay the instalments if the debtor did not do so
and that it came to an end when the debtor ceased to be obliged or entitled
to pay them as a result of the rescission of the contract.

H    My noble and learned friend, Lord Simon of Glaisdale, deals with both
in greater detail in his speech. I agree with and adopt his reasons for
rejecting them.

I would dismiss this appeal.

LORD SIMON OF GLAISDALE. My Lords, the facts of this case and the
relevant terms of the letter of November 29, 1967, accepted as embodying
the contract finally agreed between the principal debtor (" the company,"
Rolloswin), the principal creditor (the respondents) and the guarantee (the
appellant) are set out in the judgment of the Court of Appeal [1971]
1 W.L.R. 934. I have had the advantage of reading the speeches prepared
by my noble and learned friends, Lord Reid and Lord Diplock; and I agree
with their comments on the judgment of the Court of Appeal. I also agree
with the historical analysis made by my noble and learned friend, Lord
Diplock: it is important as showing that the liability of a surety at common
law always sounded in damages rather than in debt, even when he was
guaranteeing a debt.

A subsidiary point was raised in this appeal, relating to £5,000 in a
joint account of the parties' respective solicitors. The appeal on this part
of the case was abandoned during argument; and it is sufficient for me
to say that I entirely agree with the judgment of the Court of Appeal at
pp. 946 et seq, on this point.

The common law has framed certain general rules regulating the relation-
ship of principal and surety. These will often govern the relationship in
particular cases—for example, if a surety merely subscribes a contract
between the principal contracting parties with the word " guaranteed "
followed by his signature, it is the common law rules which are likely to
be largely significant. But common law rules will frequently be modified
by the terms of the contract of guarantee, which will then pro tanto govern
the relationship of the parties. It follows that I must not be taken to be
propounding hereafter propositions which would be universally applicable.
The first step then, in my view, is to resolve three problems of construction
that arise on this particular contract.

The letter of November 29, 1967, states that the contract had been
previously concluded, and that the letter was setting out its terms. In fact
the letter itself introduced amendments to the terms apparently agreed
previously. But there has been no claim for rectification; and, as I have
indicated, the letter of November 29, 1967, has been throughout taken as
setting out the relevant contractual terms. The letter of November 29,
1967, was signed by the appellant on behalf of the company as principal
debtor and on his own behalf as guarantor of some of its terms.

*Construction of the contract*

(1) The first, and most important, question of construction is to
determine what it was that the appellant was guaranteeing. This was,
expressly, the *performance* by the company of certain of its obligations
under the contract: it is only convenient shorthand to say that he was
guaranteeing payments by the company. In thus guaranteeing *performance*
of obligations, the contract of guarantee was, as will appear, endorsing the
common law obligation and liability of a surety, whereas the contract could
have modified such common law obligation and liability and substituted
some other.

(2) It was argued for the appellant that the words " obligation to make
the payments " and " as hereinbefore set out " in clause (XIII) (the
guarantee clause) refer exclusively to the company's obligations under

**A.35**

353

A.C.                    Lep Air Services (Rolloswin Ltd. (H.L.(E.))                    Lord Simon of
                                                                                      Glaisdale

A    clause (IX) of the contract (to pay £40,000 by instalments). But this is not
so: the guarantee clearly also extends to clause (IX) (obligation to pay by
instalments such additional sum as was ascertained to be due). For
example, if the total indebtedness was finally agreed at £60,000, and the
company discharged this sum in accordance with the terms of the contract
by weekly payments amounting to £42,000, and then defaulted as to the
residue (which would arise only under clause (IX)), the appellant would be

B    liable on his guarantee for such residue, since it would be less than the
sum of £40,000 which was the limit of his guarantee. This goes to
reinforce the consideration that what the appellant was guaranteeing
(subject to a total liability of £40,000) was *performance* of those contractual
obligations of the company as related to the discharge of its indebtedness
outstanding at November 29, 1967.

C    (3) It was common ground before your Lordships that by December
22, 1967, the company was in fundamental breach of its obligations under
the contract including obligations which were not the subject of the
appellant's guarantee, so as to have evinced a repudiation of the contract;
and that such repudiation was on December 22 accepted by the respondents.
The result was that the contract was rescinded; and a secondary obligation
became incumbent on the company (imposed by law, not by contract)—

D    namely, to pay damages—in substitution for the primary (contractual)
obligations: see *R. V. Ward Ltd.* v. *Bignall* [1967] 1 Q.B. 534, 548 by
Diplock L.J. It was in issue before your Lordships how far the company
was in default on those obligations which were the subject of the guarantee
—i.e., how many instalments had by then fallen due. The learned official
referee held that four instalments had by then fallen due, and that the short-
fall in payment thereon was "a breach which went to the root of the

E    contract." The Court of Appeal held that only three instalments were due;
though they had "no doubt that an identical conclusion should be reached
as to the existence of a wrongful repudiation even if only three instalments
had become due by December 22." The appellant supported the finding of
the Court of Appeal that only three instalments were due; but argued on
this basis that any breach of the guaranteed terms was not so fundamental

F    as to amount to a repudiation. How many instalments had become due
depends on when, on the proper construction of clause (IX), the first
payment of £6,000 became payable. The crucial words are "payment at
the rate of not less than £6,000 a week commencing on November 27,
1967." The natural meaning of these words is that the first £6,000 became
due on November 27, 1967. If this were so, four instalments were due by
December 22—i.e., a total of £24,000, of which no more than £10,060

G    had been paid. But then there is the odd feature that the words in the
letter of November 29, 1967, "on account of which you have already
received the sum of approx. £3,820 on November 28" apparently recited
neutrally a breach of the contract at the very moment of its execution. I
do not doubt that it was this consideration which caused the Court of
Appeal to prefer their construction. But a scrutiny of the exchange of

H    letters between the company and the respondents that took place
immediately before the letter of November 29, which itself referred to that
exchange of letters and purported (though at variance with fact) to be doing
no more than recording the terms agreed therein, and a scrutiny of the

354    **Lep Air Services v. Rollowin Ltd. (H.L.(E.))**    [1973]

Lord Simon of
Glaisdale

original document of November 29 (with its manuscript amendments) fully
explain why the figures £3,820 appear in clause (IX) where one might    **A**
expect the figures £6,000. It is not permissible to construe a contract by
reference to the negotiations leading thereto, for reasons explained most
recently by my noble and learned friend, Lord Wilberforce, in *Prenn* v.
*Simmonds* [1971] 1 W.L.R. 1381, 1384, 1385. However, in order to
ascertain what a promisee had a right to expect from the words used it is
permissible to look not merely to the words used but to all the circum-    **B**
stances. As Lord Wilberforce said in *Prenn* v. *Simmonds* (at pp. 1383H,
1384A): " The time [has] long passed when agreements, even those under seal,
were isolated from the matrix of facts in which they were set and interpreted
purely on internal linguistic considerations." The circumstances explain
beyond doubt how it was that by manuscript amendment the words " the sum
of approx. £3,820 " appear in clause (IX) of the letter of November 29, 1967,
and that this affords no reason for reading the words of this clause in other    **C**
than the sense they would naturally bear; with the result that four instal-
ments were due by December 22. But even if only three instalments had
been due by this date, I would agree with the Court of Appeal that the
shortfall in guaranteed performance was itself a breach going to the root
of the contract, so amounting to a repudiation thereof.

**D**

*The accrued instalments*

It was argued for the appellant that when, on December 22, 1967, the
respondents accepted the company's repudiation of its contractual obliga-
tions, the appellant was discharged from his liability as guarantor, not only
in respect of instalments due after December 22 but also in respect of
any liability arising from the company's failure to meet its contractual
obligations as regards the instalments payable theretofore. The appellant    **E**
relied on *Holme* v. *Brunskill* (1877) 3 Q.B.D. 495, and in particular
on a passage from the reserved judgment of Cotton L.J., at pp. 505, 506:

> " The true rule in my opinion is, that if there is any agreement
> between the principals with reference to the contract guaranteed, the
> surety ought to be consulted, and that if he has not consented to the
> alteration, although in cases where it is without inquiry evident that    **F**
> the alteration is unsubstantial, or that it cannot be otherwise than
> beneficial to the surety, the surety may not be discharged; yet, that if
> it is not self-evident that the alteration is unsubstantial, or one which
> cannot be prejudicial to the surety, the court will not, in an action
> against the surety, go into an inquiry as to the effect of the alteration,
> or allow the question, whether the surety is discharged or not, to be    **G**
> determined by the finding of a jury as to the materiality of the altera-
> tion or on the question whether it is to the prejudice of the surety,
> but will hold that in such a case the surety himself must be the sole
> judge whether or not he will consent to remain liable notwithstanding
> the alteration, and that if he has not so consented he will be
> discharged."

**H**

It was argued for the appellant that the respondents' acceptance of the
company's repudiation effected a substantial alteration in the contractual
relationship of the parties; that this was clearly prejudicial to the appellant's

A.C.                     Lep Air Services *v.* Rock (H.L.(E.))                Lord Simon of
                                                                            Glaisdale

A    interest as guarantor; that he should, therefore, have been consulted before,
     and his consent obtained to, the alteration; and that, since he was not so
     consulted and never consented, he was discharged from liability.

         This seems to me to be, with all respect, an impossible argument. It is
     only in the jurisprudence of Humpty-Dumpty that the rescission of a
     contract can be equated with its variation. The acceptance of the repudia-
     tion of an agreement does not alter its terms in any way—it merely
B    transmutes the primary obligation of the promisor to perform the terms
     contractually into a secondary obligation, imposed by law, to pay damages
     for their breach.

         Moreover, the suggested rule would make nonsense of the whole
     commercial purpose of suretyship: you would lose your guarantor at the
     very moment you most need him—namely, at the moment of fundamental
C    breach by the principal promisor. Take a usual case giving rise to
     suretyship—that of a trader with a bank overdraft. The bank forbears to
     close the account (so as to put the trader into bankruptcy or liquidation)
     in consideration of the trader finding a guarantor of the overdraft and
     agreeing to pay it off by instalments. The trader thereafter repudiates his
     obligation to pay off the overdraft by instalments; whereupon the bank
     closes the account, so terminating the contractual relationship of banker
D    and customer. It would be absurd to suppose that the guarantor of the
     overdraft was thereby discharged from his liability as surety.

         Finally, if authority were needed *Chatterton* v. *Maclean* [1951] 1 All
     E.R. 761 is against the appellant's proposition (see the passage from
     Parker J.'s judgment cited below.)

E    *The outstanding instalments*

         It was on this part of the case that counsel for the appellant mounted
     his most formidable argument. In outline this ran as follows. What the
     appellant was guaranteeing was that the company would make weekly
     payments on dates most of which fell after December 22, 1967. When,
     on December 22, the respondents accepted the company's repudiation, the
F    contract was rescinded by agreement between them; and the company had
     thereafter no duty (or, indeed, right) to make the stipulated payments which
     the appellant had guaranteed. It follows that the subject-matter of the
     appellant's guarantee entirely disappeared after December 22, so that he
     was pro tanto exonerated from all liability in relation thereto. The
     company admittedly became immediately liable to pay damages for breach
     of its contract to make payments; but the appellant had guaranteed the
G    later payments, not the immediate damages.

         It was argued for the respondents, on the other hand, that the contractual
     duty assumed by the appellant was to ensure the performance by the
     company of such of its contractual obligations as were guaranteed; and
     that, when the company evinced an intention not to perform its guaranteed
     contractual obligations, and when such repudiation was accepted by the
     respondents, the appellant became in breach of his own obligation, so as
H    himself to be liable in damages.

         In my judgment, the argument for the respondents is the correct legal
     analysis, for the following reasons:—

Lord Simon of
Glaisdale           Lep Air Services & Rollowski (H.L.)       [1973]

    (1) The contention of the appellant is, in my view, both in principle and
in practice impossible to reconcile with the rule in *Hochster* v. *De la Tour*       A
(1853) 2 E. & B. 678—namely, that if a promisor under a contract, even
before the time for its performance has arrived, evinces an intention not to
perform it, the promisee may treat this as an immediate breach of contract
and bring his action accordingly.  Logical objections have been advanced
against this rule, mainly on the ground that the promisor has a locus
poenitentiae, and may decide, and put himself in a position, to perform his       B
promise before its time for performance has arrived.  But the rule is firmly
established in the law, having been consistently followed, and been approved
in *Martin* v. *Stout* [1925] A.C. 359, 363, 364.  Whatever theoretical
criticism can be advanced, the rule is really the only one which is
practicable: as Sir Frederick Pollock pointed out (*Principles of Contract*,
13th ed. (1950) p. 218), the alternative would be to hold the promisee to
an election either to rescind the contract, thereby renouncing any claim for       C
damages, or to ignore the promisor's refusal and to await the time for
performance, thereby remaining bound to show himself ready and willing
to perform at that time although he knows the promisor will not be.  In
the instant case, therefore, it was accepted that the respondents could, on
December 22, treat the company's conduct as a refusal to perform the
executory part of the contract, and sue the company at once for damages       D
for breach of contract, notwithstanding that the company might notionally
have changed its mind before the time for performance had arrived and
decided to comply with its executory obligations.  The measure of damages
in such an action would be the totality of the outstanding debt with a
discount for accelerated payment: cf. *Frost* v. *Knight* (1872) L.R. 7
Exch. 111, 117.  It would be very strange and hardly workable if the       E
promisee had to wait until the time for the promisor's performance had
arrived before having his remedy against the surety.  Indeed, it is difficult to
see how the promisee would even then have any remedy against the surety
unless he had himself in the meantime performed his own obligations under
the contract or (if those obligations were still executory) held himself ready
and willing to perform them.  The instant case provides a striking example
of the absurdity of any such requirement.  Both conceptually and practically,       F
I find it impossible to reconcile the appellant's proposition with the policy
of the law exemplified in the doctrine of what is conveniently though
perhaps misleadingly called acceptance of anticipatory breach.  If the
appellant is right, the promisee is still, vis-à-vis the surety, impaled on that
same Morton's fork from which the rule in *Hochster* v. *De la Tour*,
2 E. & B. 678 enabled him to escape vis-à-vis the principal promisor.
    (2) The appellant's contention becomes even more unworkable if the       G
obligation the performance of which is guaranteed is not one to pay money,
but to deliver goods or to perform services.
    (3) The appellant's argument, again in this part of the case, involves
that the promisee would lose the benefit of the guarantee at the very
moment he most needs it—namely, on a repudiation by the principal
*promisor of his obligations under the contract.*       H
    (4) The respondents' proposition is supported by the high authority of
Rowlatt, *The Law of Principal and Surety*, 3rd ed. (1936), p. 144.  The
learned author was discussing the rule that on default of the principal

**A.C.**    Lep Air Services v. Rolloswin Ltd. (H.L.(E.))    Lord Simon of Glaisdale

357    **A.35**

A    promisor causing damage to the promisee the surety is, apart from special
stipulation, immediately liable to the full extent of his obligation, without
being entitled to require either notice of the default, or previous recourse
against the principal, or simultaneous recourse against co-sureties.   " The
reason for the rule," wrote Rowlatt, " is that it is the surety's duty to see that
the principal pays or performs his duty as the case may be. . . ."   No other
reason for the rule was proposed in argument before your Lordships, nor

B    was the rule itself questioned; which suggests that Rowlatt's proposed
reason is the correct one, which his own high standing would in any case
vouch.   It is true that the authorities which Rowlatt cited for the proposi-
tion: *Wright* v. *Simpson* (1802) 6 Ves.Jun. 714 and *In re Lockey* (1845)
1 Ph. 509 are not direct decisions on the point, in the sense of its being
their ratio decidendi.   But, more significantly, both Lord Eldon in the
former case and Lord Lyndhurst in the latter seem to assume without

C    question that the law is as stated by Rowlatt.

        (5) That it is the surety's duty to see that the principal pays, or performs
his other duty, as the case may be (so that non-payment or other non-
performance by the principal is a breach of the surety's contract, sounding
in damages), is further suggested by the wording of section 4 of the Statute
of Frauds 1677: " any special promise to answer for the debt, default or

D    miscarriages of another person."   The teutonic " answer for " is used here
in a sense more accurately connoted in modern English by its romance
equivalent " be responsible for " (see *Oxford English Dictionary*, S.V.
*answer*, v. I. 3).   A further shade of meaning as indicating the nature of
the surety's common law obligation may be seen in Shakespeare's " Let his
neck answer for it, if there be any martial law."

E        (6) The point is still further reinforced by the historical analysis of my
noble and learned friend, Lord Diplock, which shows that the liability of
the surety gave rise to an action of special assumpsit not of indebitatus
assumpsit, breach therefore sounding in damages and not in debt, even if
it was a debt which was guaranteed.   (And see also *Jordan's Case* (1536)
Y.B. 27 Hen. 8, Mich. fo. 24, pl. 3, *per* FitzJames C.J.; translated Fifoot,
*History and Sources of the Common Law Tort and Contract* (1949),

F    pp. 353, 355; but for the correct date and citation (as above) see Simpson in
74 *Law Quarterly Review* at p. 384, Cheshire and Fifoot, *The Law of
Contract*, 7th ed. (1969), p. 10.)   This is only consistent with the surety's
obligation, even when guaranteeing a payment, being not to pay a sum of
money in default but to ensure performance of the principal promisor's
obligation.

G        (7) Although not a direct decision on the point, *Chatterton* v. *Maclean*
[1951] 1 All E.R. 761 supports the respondents' proposition.   Parker J.
is reported as saying, at pp. 764–765:

        " Counsel for the defendant urges, first, that the very acceptance, the
    very treating of the hirer's conduct as a repudiation of the contract,
    amounts to a new contract.   That leads to the rather startling conclu-

H    sion that a guarantor of the performance of a contract is always released
    where the creditor does what he is lawfully entitled to do, namely, to
    treat the principal debtor's breach as a repudiation.   It would mean
    that whenever a creditor exercised his ordinary rights a guarantor was

**A35**

released, not merely in respect of future liabilities, but in respect of accrued liabilities."

Parker J. treats it as self-evident that, where the principal creditor lawfully accepts the principal debtor's breach as a repudiation of the contract, the surety is *not* released either in respect of accrued or of future liabilities.

It follows, in my judgment, therefore, that when on December 22, 1967, the respondents accepted the company's fundamental breach of the terms of the contract, including those guaranteed, as a repudiation of the contract, the respondents were entitled to sue the appellant for the total sum guaranteed (except in so far as already satisfied by payment made by the company), and that the measure of damages would be such net sum with an appropriate discount for accelerated payment (though in the instant case there is no question of any discount). I would therefore dismiss the appeal on this ground.

That being so, I do not find it necessary to discuss the interesting argument by junior counsel for the respondents—namely, that the appellant had himself by December 22 repudiated his own contractual obligations as surety; and that either the respondents accepted the appellant's repudiation or it was unnecessary for them to do so as a preliminary to suing him for breach of contract. But I feel bound to say that there seemed to me to be formidable difficulties, both in fact and in law, in this way of putting the case.

LORD KILBRANDON. My Lords, the background of the agreement dated November 29, 1967, the construction of which is the subject-matter of this appeal, was as follows. Rolloswin had become indebted to the respondents in the sum, unascertained with accuracy at the date of the agreement, of about £40,000. In order that that debt might be liquidated, and that Rolloswin might continue to enjoy the services provided by the respondents in relation to the importation of their merchandise, it was agreed that the sum owing should be paid off by instalments, future clearances should be against cash, and the respondents were not to claim a lien on any goods consigned through them to the respondents and their customers. The agreement contained a guarantee by the appellant, managing director and principal shareholder in Rolloswin, in the following terms:

"In further consideration of the above Mr. Moschi has personally guaranteed the performance by Rolloswin Investments Ltd. of its obligation to make the payments at the rate of £6,000 per week together with the final payment of £4,000 as hereinbefore set out so however that Mr. Moschi's total obligation under this guarantee shall not exceed the total sum of £40,000 of which *approximately £3,820* has already been paid as aforesaid."

By December 22, 1967, Rolloswin were in breach of the agreement inasmuch as they had failed to pay the instalments as they fell due, and the official referee has held that this breach went to the root of the contract. Rolloswin having repudiated the contract, the respondents were entitled to accept repudiation and treat the contract as at an end. The question is, what was then the position under the guarantee?

The appellant argued that the repudiation of the contract had the effect

**A.C.**    **Lep Air Services v. Rolloswin Ltd. (H.L.(E.))**    359    **Lord Kilbrandon**    **A.35**

A  of discharging the guarantor. But this position is inconsistent with what was said in *Chatterton* v. *Maclean* [1951] 1 All E.R. 761. It appears to depend on a misunderstanding of *Holme* v. *Brunskill*, 3 Q.B.D. 495, in which it was held that an agreement between the principals to vary the terms of the contract guaranteed may discharge the guarantor. But repudiation is not variation.

B     In the present case what the appellant guaranteed was " the performance by Rolloswin Investments Ltd. of its obligations to make payments at the rate of £6,000 per week." This is the class of undertaking referred to in *Rowlatt on the Law of Principal and Surety,* 3rd ed. (1936) at p. 143. The learned author points out that as soon as a breach is committed of the duty, performance of which is guaranteed, the surety is immediately liable to the full extent of his obligation, and gives as " the reason for the rule that it is the surety's duty to see that the principal pays or performs C  his duty as the case may be." This would be very clear where A had undertaken to deliver a valuable object to B twelve months thence, the performance being guaranteed by C. B having on the following day sold the object to D, he immediately (see *Hochster* v. *De la Tour,* 2 E. & B. 678) becomes liable in damages to B (specific performance being impossible) and C becomes liable under the guarantee accordingly. It is D  satisfactory that the law of Scotland seems for long to have been the same : " Cautionry is that obligation by which one becomes engaged for a debtor, who hath bound himself to pay a sum or perform a deed, that he shall truly fulfil it "—*Erskine's Institute* (1838) III iii 61, p. 717. Non-performance sounds in damages for which the guarantor is liable with recourse. In the present case the damages for repudiating the obligation to pay the sum due are equal to the whole sum, since in the circumstances E  it is not suggested that a discount would be appropriate.

     It is not necessary to consider the further question whether, on the facts, the appellant's conduct should be construed as a repudiation of his contract of surety, and I therefore express no opinion on it. As regards the question, which on the view I have taken does not arise, whether as at the repudiation Rolloswin was owing three or four instalments, I would F  agree with the official referee rather than with the Court of Appeal.

     I would, accordingly, dismiss this appeal.

*Appeal dismissed.*

Solicitors : *Randall, Rose & Co.; Constant & Constant.*

J. A. G.

G