# EXHIBIT 102



Neutral Citation Number: [2011] EWHC 1480 (Ch)

Case No: CH/2011/0009

**IN THE HIGH COURT OF JUSTICE**
**CHANCERY DIVISION**

Royal Courts of Justice
Strand, London, WC2A 2LL

Date: Thursday, 26th May 2011

**Before**:

**MR JUSTICE LEWISON**

- - - - - - - - - - - - - - - - - - - - -

**Between:**

| | |
|---|---|
| **CHARLES SOFAER** | **Appellant** |
| - and - | |
| **ANGLO IRISH ASSET FINANCE PLC** | |
| | **Respondents** |

- - - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - -

**MR C. BOARDMAN** (instructed by **Charles Russell LLP**) for the **Appellant**
**MR R. FISHER** (instructed by **Taylor Wessing LLP**) for the **Respondents**

# Approved Judgment

Digital Transcription by Marten Walsh Cherer Ltd.,
1st Floor, Quality House, 6-9 Quality Court,
Chancery Lane, London WC2Q 1HP
Tel No: 020 7067 2900.  Fax No: 020 7831 6864.  DX: 410 LDE
Email: info@martenwalshcherer.com
Website: www.martenwalshcherer.com
--------------------------------

**MR JUSTICE LEWISON:**

1. Faced with impending bankruptcy, Mr Charles Sofaer put forward proposals for an IVA. The Anglo Irish Bank and related entities are Mr Sofaer's largest creditors by far.

2. Having taken advice from counsel, the chairman of the creditors' meeting considering the proposals for the IVA allowed the bank to vote for the whole of their claimed debt and marked it as "objected to". As a result, the proposals for the IVA were defeated. Mr Sofaer appealed against the chairman's decision, and Chief Registrar Baister struck out his appeal. With the Chief Registrar's permission, Mr Sofaer now appeals again. He has been adjudicated bankrupt since the Chief Registrar's decision, but it is not suggested that his right to appeal has vested in his trustee in bankruptcy.

3. Mr Sofaer's liability arises under a deed of guarantee and indemnity. The background to his entering into that deed was the making of secured loans by the bank to a number of companies of which Mr Sofaer was a director. The liability of those companies was defined in the deed as "Liabilities". Clause 2 of the deed, headed "Guarantee and Indemnity", provided as follows:

    "2.1 *Guarantee*

    The Guarantor:

    (a) guarantees the payment and the discharge of the Liabilities; and

    (b) undertake on demand to pay to the Lender any Liability which is not paid and to perform any Liability which is not performed when due to be paid or performed.

    2.2 *Indemnity*

    As an obligation independent of clause 2.1, the Guarantor jointly and severally agrees to indemnify each Beneficiary on demand against any loss suffered by each Beneficiary as a result of the Unenforceability of any Liability as against the Borrowers and/or any Liability not being discharged or performed by the Borrowers.

    2.3 *Amount of Loss*

    The amount of such loss will be:

    (a) where the Liability arises from the payment obligation, the amount payable by the Borrowers or which would be so payable but for the Unenforceability of that Liability; or

        (b) in any other case, the amount which is payable to the Lender by the Borrowers by way of damages for breach of that Liability or which would be so payable but for the Unenforceability of that Liability,

        together with the cost to the Beneficiary of procuring or attempting to procure the performance of any such Liability."

4. Clause 2.4 stated that the obligations of the guarantor were "undertaken as primary obligor and not merely as surety". Clause 3.1 stated that the deed took effect as a guarantee and indemnity in respect of the whole of the liabilities, but clause 3.3 capped Mr Sofaer's liability as £8.4 million of the principal amount of the loan, together with interest and other specified sums.

5. Clause 6.1 provided:

        "The Lender will not be obliged, before making a demand or taking any other steps to enforce its rights under this deed against the Guarantor:

        (a) to make any demand for repayment, or take any action to recover any Liability;

        (b) to take any proceedings or exhaust any claim, right or remedy against the Borrowers or any other person; or

        (c) to take any action under or enforce any other Security held by it."

6. Clause 8.1 provided that until the liabilities had been irrevocably paid and/or performed in full, the guarantor would not take or receive the benefit of any security from the borrowers; would not be subrogated to any rights of any of the beneficiaries; and would not "receive, claim or take the benefit of any payment from the Borrowers or any other surety or indemnifier for the Borrowers, or exercise any other right, claim or remedy in respect of any Liability".

7. Clause 9.1(b) stated that, until the liabilities had been irrevocably paid or performed in full, the guarantor would not be entitled to the benefit of any other security.

8. Finally, clause 17.3 stated:

        "A certificate by any Beneficiary as to any amount for the time being due to it by the Guarantor will be conclusive evidence of the amount so due in the absence of any manifest error."

9. In the statutory demand the bank served on Mr Sofaer they asserted that the principal debtors had failed to make certain payments to the bank, with the consequence that the bank was entitled to declare the whole of the loan due and payable. The amount claimed from Mr Sofaer was £8.347 million plus interest. The additional interest brought the aggregate amount owing to £8.432 million. The bank demanded that sum from Mr Sofaer on 27th November 2009 and certified that sum as due pursuant to clause 7.3.

10. Mr Sofaer applied to set aside the statutory demand, but that application failed, so Mr Sofaer put forward the proposals for an IVA that I have mentioned. The bank, as I have said, wanted to vote against those proposals for the full amount of the sum owing, which by the time of the meeting had risen to £9.2 million. At the meeting on 30th July 2010 the chairman allowed the bank to vote for that figure.

11. Mr Boardman, arguing Mr Sofaer's case on this appeal, says that the chairman was wrong to do so. He says either that the amount owing to the bank was a debt for an unliquidated amount or a debt whose value was not ascertained, or, alternatively, that the bank's claim was secured. If the first argument is right, then Mr Boardman says that the bank's debt should have been valued at £1 under rule 5.21(3) of the Insolvency Rules. If the second argument is correct, then the bank's vote should not have been counted at all because of rule 5.23(3).

12. The first question therefore is: was the bank's debt a debt for a liquidated and ascertained amount? In *McGuinness v. Norwich and Peterborough Building Society* [2011] BPIR 213, Briggs J considered the nature of liabilities arising under contracts of guarantee and indemnity. While a pure guarantee (that is to say, a promise that someone else will comply with his obligations) may give rise to no more than a liability in damages, the contract of indemnity under which the so-called guarantor undertakes obligations as a principal debtor will normally give rise to the debt. In the present case that distinction is reinforced by the terms of the deed itself.

13. Clause 2.1(b) is a contract of indemnity. So is clause 2.2. Those liabilities were undertaken by Mr Sofaer as principal obligor and not in a secondary capacity. Clauses 2.3 and 17.3 quantify the amount of the liability in a way that is conclusive, save in the case of manifest error. No manifest error is alleged in the present case. It follows, in my judgment, that the bank's debt was a debt for a liquidated amount and that the amount of the debt, as at the date of the certificate, was ascertained as a result of the certificate. I therefore reject the first argument.

14. Mr Boardman points out that the amount for which the bank was admitted to vote was greater than the certified amount. In fact the bank put in a proof of debt before the meeting which refers to the increased amount which was accounted for by additional interest. However, the inclusion of additional interest in the amount for which the bank was admitted to vote can have made no difference to the outcome. Even if the bank had only been admitted to vote for the certified amount, the IVA proposals would still have been rejected. There was therefore no material irregularity or prejudice to Mr Sofaer, even if the chairman was wrong to admit the bank's claim in full.

15. Moreover, even if the debt had not been a liquidated and ascertained amount, I do not consider that it follows that the chairman was wrong in admitting the full, or at least the certified, amount for voting purposes. Rule 5.21(3) does not say that an unliquidated debt must be valued at £1: it says that it will be valued at £1 unless the chairman agrees to put a higher value on it. In the present case the chairman did agree to put a higher value on it.

16. As Sir Andrew Morritt C pointed out in *Re Newlands (Seaford) Educational Trust* [2006] BPIR 1230, 1241, if the totality of the evidence leads the chairman to the conclusion that he can safely attribute a minimum value to the claim higher than £1

        then he should do so. In the present case it is, in my judgment, impossible to see how the chairman could have attributed a value to the claimant's claim of less than the amount certified under clause 17.3 of the deed. As I have said, if the chairman had done that, the outcome of the vote would have been the same. Plus any argument about the additional interest is academic because again there has been no material irregularity and no prejudice to Mr Sofaer.

17. Mr Boardman had a subsidiary point on the quantum of the debt. He said that receivers appointed by the bank may have made realisations by selling properties belonging to the various companies, and that any such realisations must go in reduction of the amount due under the guarantee. But the amount recoverable from Mr Sofaer is capped at £8.4 million plus interest; whereas the liability of the companies was, according to the evidence at the date of the meeting, in excess of £59 million.

18. The statement of affairs of the borrower signed by Mr Sofaer himself shows a very large deficiency well in excess of the cap – whether the value of the properties is taken at their estimated realisable value, or their higher book something value. Moreover, where a creditor receives payment from the principal debtor, then whether the payment goes in reduction of the guarantor's liability depends on how that payment is appropriated. A debtor who makes a payment to a creditor is entitled to appropriate the payment to a particular debt, but, if he does not, then the appropriation may be made by the creditor.

19. In the present case there is nothing to suggest that the realisations made will reduce the amount owed by the companies to a sum below the limit of the guarantee or that the companies have made any particular appropriation. In addition, clause 3.1 made Mr Sofaer a guarantor for the whole of the companies' debts and, as I have said, clause 8.1 precluded him from taking the benefit of any repayment until the companies' liabilities have been repaid in full. Thus Mr Sofaer, in effect, agreed that he would not be entitled to the benefit of realisations until the companies had discharged their debts. So this subsidiary point thus carries the appeal no further.

20. The second argument turns on rule 5.23(3), which provides that in a number of cases there is to be left out of account the creditor's vote in respect of any claim or part of a claim. The relevant case is "where the claim or part is secured". The claim upon which the bank relies is a claim against Mr Sofaer: not a claim against the companies. So the question is whether the claim against Mr Sofaer is secured. Mr Fisher submits that whether a claim is secured is to be decided by applying the definition of "security" in section 383(2) of the Insolvency Act 1986 which provides:

> "Subject to the next two subsections and any provision of the rules requiring the creditor to give up his security for the purposes of proving a debt, a debt is secured for the purposes of this Group of Parts to the extent that the person to whom the debt is owed holds any security for the debt (whether a mortgage, charge, lien or other security) over any property of the person by whom the debt is owed."

21. As Mr Fisher correctly points out, there are two components of this definition. The first is that the person to whom the debt is owed must hold security for that debt rather

than some other debt; and the second is that the security must be over the property of the person who owes a debt.

22. If this definition is applied, then it is clear that, as at the date of the meeting, there was no security over any property of Mr Sofaer as opposed to property owned by the various companies. I did not understand Mr Boardman to challenge this. What he said was that some three and a half months after the meeting Mr Sofaer took an assignment of the equity of redemption in each of the companies' properties comprised within the bank's security, with the result that the bank's claim became secured.

23. In my judgment there are three flaws in this argument. The first is that events subsequent to the meeting cannot affect the bank's entitlement to vote at the meeting itself. I decided this in *Power v. Petrus Estates Limited* [2009] BPIR 141. In paragraph 16 I said:

> "In an appropriate case resolution of the issue may turn upon oral evidence and cross-examination: *Re Assico Engineering Ltd* [2002] BPIR 15. It is, however, important to be clear on what 'the issue' is. As Blackburne J pointed out, the issue is whether, on balance, the claim against the company is established, and, if so, in what amount. Necessarily, the question whether the claim against the company is established will be judged as at the date of the meeting at which the chairman made the impugned decision."

24. That paragraph was quoted and expressly approved by the Court of Appeal in *HMRC v. Maxwell* [2010] EWCA (Civ) 1379. In the following paragraph of my judgment in *Power v. Petrus Estates Limited* I said:

> "In my judgment therefore, events subsequent to the meeting will not lead to an appeal against the chairman's decision being allowed."

It is true that that particular paragraph was not expressly referred to by the Court of Appeal in *HMRC v. Maxwell*, but nothing in the judgment of the court in that case leads me to suppose that they expressed any disapproval of it.

25. The second flaw in the argument is that what Mr Sofaer acquired was the equity of redemption in the charged properties. The equity of redemption is in effect the residual rights of the mortgagor in the mortgaged property after the mortgage has been satisfied and after the mortgagee has exercised his remedies. The bank, almost by definition, has no security over the equity of redemption because that is what remains after the security has been given effect.

26. The further flaw is that, in my judgment, the acquisition of the equity of redemption did not alter the nature of the liabilities that were secured on the properties. If the liabilities secured on the properties were the companies' liabilities rather than Mr Sofaer's (as indeed they were), I do not see how a change of ownership of the property had enlarged the scope of the security.

27. I am conscious that in *Fagg v. Rushton* [2007] BPIR 1059 Evans-Lombe J appears to have decided the contrary, but I regret to say that I do not understand the principle on which he based his decision and I decline to follow him. In addition, rule 5.21(2) makes it clear that the debt in respect of which a creditor is entitled to vote is the amount of the debt owed to him at a date which is either that of the meeting or an anterior date. Subsequent changes do not affect either the characterisation or the nature of the debt.

28. In my judgment, what goes for the amount of the debt also goes to its character and, in particular, whether it is or is not a secured debt. There must be a cut-off point for determining the validity of the vote at a meeting and that must be the date of the meeting itself. This seems to me to be entirely consistent with what the Master of the Rolls said in paragraphs 51 and 52 of *HMRC v. Maxwell*.

29. Lastly, Mr Boardman said that Mr Sofaer's appeal should not be struck out because there might be claims he could make against the receivers. I cannot see how the existence or non-existence of such claims can or could have affected the vote. If there were any such claims, or if there are any such claims now, it will be for Mr Sofaer's trustee in bankruptcy to enforce them.

30. In my judgment, the Chief Registrar came to the right decision and the appeal must be dismissed.

-----------------------------------------------