# EXHIBIT   107

## COURT OF APPEAL

30 January–1 February; 28 April 2008

————————

WHITECAP LEISURE LTD

v

JOHN H RUNDLE LTD

[2008] EWCA Civ 429

Before Lord Justice WARD,
Lord Justice WALL and
Lord Justice MOORE-BICK

**Sale of goods — Cable tow system—Certificate of completion issued — System failed to operate properly — Whether system defective — Whether buyer had lost right to reject goods — Whether seller acquiesced in rejection — Whether liability excluded by buyer's failure to comply with notification of defects clause — Principles of construction — Whether seller owed duty of care to supply goods of required quality — Sale of Goods Act 1979, sections 11, 14, 34 and 35.**

Whitecap was the tenant of Willen Lake and an area of surrounding parkland from which it carried on the business of providing leisure facilities to the public. On 23 November 2001 Whitecap entered into a contract with Rundle for the purchase of a cable tow system to enable the provision of waterskiing facilities without the need for powered boats to tow the skiers. The price was £157,000 plus VAT. The contract provided for 30 per cent to be paid on placing the order, a further 20 per cent on completion, which was to take place no later than 15 April 2002, and the balance in equal instalments over the following six months. Clause 12 provided as follows:

12. Defects after delivery

The Seller will make good by repair or supply a replacement defects which under proper use appear in the goods within a period of one year after the goods have been delivered and arise solely from faulty design (other than a design made, finished or specified by the Buyer for which the Seller shall have disclaimed responsibility in writing) materials or workmanship provided always that defective parts have been returned to the Seller which shall refund the cost of carriage on such returned parts and the repairs or new parts shall be delivered back by it free of charge.

Clause 14 provided as follows:

14. Final certificate

After expiry of the defects liability period specified in this agreement the Seller shall be under no further obligation or liability either under the contract or in tort (including but not limited to negligence) unless within 14 days thereafter the Buyer shall have given written notice of any matter in respect of which the Seller remains obliged or liable. The Buyer shall issue a final certificate to the effect that the Seller has fulfilled all obligations and liabili-

ties to the Buyer immediately upon expiry of the said period of 14 days or in the event that the Buyer shall have given notice as aforesaid which the Seller would have not disputed immediately upon it having dealt with the matters specified therein.

Delivery began soon after the contract had been signed. The judge found that by the end of 2001 some of the equipment had been delivered to the site and Rundle's employees had already begun installing it. Further deliveries took place during 2002 and the work of installation continued. A certificate of completion was issued on 14 May and soon afterwards the equipment was in commercial use. Thereafter Whitecap experienced a succession of problems with the equipment which continued on and off throughout that year and the following two seasons. Whitecap withheld payment of the outstanding instalments of the purchase price, and by October 2002 Rundle claimed that £77,317.54 was due. Early in 2003 Whitecap offered to compromise the dispute by withdrawing its claims arising out of the unreliable performance of the equipment in return for Rundle abandoning its claim for the balance of the price, but Rundle did not accept. The equipment was out of use for two weeks in July 2003. In September 2003 Rundle once again demanded payment of the balance of the purchase price.

In January 2004 a meeting took place between the two sides, and this led to the signature of heads of agreement under which Rundle agreed under clause 4 to:

(d) Investigate and provide a workable solution to the cable, pick-up and release mechanism problems with the aim, but without guarantee, of achieving an average efficiency of 90%;

(e) . . . replace all cables within 30 days of the signing of this agreement;

(f) Investigate and provide a workable solution within 30 days of the signing of this agreed [sic] . . . to the known cable degradation and deformation problems with the aim of achieving a minimum service life for the cables of 2 years

in return for the payment in instalments of a reduced balance of the purchase price (clause 6) and agreement by Whitecap "not to make any claim for loss of profits or in relation to their perception that [Rundle] has failed previously to perform its obligations under the original contract . . . " (clause 8). It was also agreed in clause 7 that:

any replacement parts . . . (as part of the rectification of design) shall be fitted by [Rundle] and [Whitecap] shall pay for them at their usual price. Labour costs will not be charged in relation to installation of the said parts. This shall not apply to parts which require replacement as part of ongoing maintenance, for which both labour and parts shall be charged.

Whitecap continued to operate the equipment, but there was another major breakdown during August 2004 as a result of which it was out of operation for a further two weeks. On 12 November Whitecap purported to reject the equipment on the grounds that it was not fit for its purpose or of satisfactory quality. Whitecap dismantled the equipment and Rundle agreed

LLOYD'S LAW REPORTS

CA] **Whitecap Leisure Ltd v John H Rundle Ltd**

to remove it, but after Rundle had removed two lorryloads of machinery Whitecap refused to allow it further access in order to take away what remained.

Whitecap bought a replacement cable tow system from a German manufacturer but continued to make use of certain items of equipment that had been supplied by Rundle, in particular the pontoon and launching platform.

On 31 May 2005 Whitecap brought proceedings against Rundle claiming the right to reject the goods and damages for Rundle's failure to deliver the goods in accordance with the contract, consisting of: the amount it had paid Rundle on account of the price of the goods; loss of profit suffered as a consequence of the two periods during which the equipment had been out of action in July 2003 and August 2004 and various connected costs; and the cost of carrying out various repairs. Rundle denied that the equipment had been faulty and said that the work carried out by Whitecap was either in the nature of routine maintenance or had been necessitated by improper use of the equipment. Alternatively, Rundle relied on the terms of the contract and the heads of agreement as excluding any liability for defects in the goods. In addition Rundle sought to recover from Whitecap the outstanding balance of the purchase price and damages for conversion of that part of the equipment that had been retained by Whitecap.

At the trial, HHJ Foster found that the equipment supplied by Rundle was not of satisfactory quality and was not fit for its purpose, but he also held that by November 2004 Whitecap had accepted the goods and, having lost the right to reject them, was limited to a claim for breach of warranty. He held that Rundle was not protected by clause 14 of the contract, which was too uncertain to be enforced. He also found that Rundle could not rely upon clause 8 of the heads of agreement, because that clause depended upon Rundle fulfilling its obligations under clause 4, which it had not done. Rundle was therefore liable to Whitecap. As for damages, HHJ Foster found that Whitecap had suffered a loss of profits during the periods in July 2003 and August 2004 when the equipment was out of action which he assessed at £67,561. However, because Whitecap had not claimed damages on the basis of breach of warranty, the judge directed that his judgment was to be treated as on liability only, and a further hearing took place at which submissions on damages were made. The judge rejected Rundle's submission that it was too late for a claim for damages for breach of warranty to be entertained, on the basis that he had raised the possibility that Whitecap might be entitled to claim damages on a basis other than that set out in its particulars of claim and that entertaining such a claim was entirely consistent with the modern approach to litigation and with the letter and the spirit of the Civil Procedure Rules. He held that Whitecap was entitled to recover the whole of the cost of the replacement system together with the expenses it had incurred in attempting to rectify defects in the equipment supplied under the contract, but was obliged to give credit for the balance of the price due under the heads of agreement. He dismissed Rundle's counterclaim for damages for conversion on the grounds that it would be fully compensated by receiving credit for the balance of the purchase price.

Rundle obtained permission to appeal on five matters: (i) the meaning and effect of clause 14; (ii) the meaning and effect of the heads of agreement; (iii) whether Rundle was liable in negligence; (iv) the award of damages in respect of the two periods when the equipment was out of action for two weeks; and (v) whether Whitecap was liable to pay Rundle in respect of the work and materials referred to in one particular invoice. A further application was made to the Court of Appeal by Whitecap for permission to appeal against the judge's finding that the goods had not been validly rejected.

————*Held* by CA (WARD, WALL and MOORE-BICK LJJ), that the appeal would be allowed. The existing judgment in favour of Whitecap would be set aside and judgment for the amount Whitecap had paid Rundle in respect of the price would be substituted. Judgment would be entered for Rundle on its counterclaim for damages to be assessed. The matter would be remitted to the High Court for the assessment of damages on the counterclaim and for the determination of Rundle's claim for payment of invoice No 12116.

(1) Rundle was relieved of liability for defects in the equipment by reason of clause 14 of the contract of sale.

(a) Clause 14 was not too uncertain to be effective even though there were many imperfections in its drafting. The conclusion that a contractual provision was so uncertain that it was incapable of being given a meaning of any kind was one which the courts had always been reluctant to accept, since they recognised that the very fact that it was included demonstrates that the parties intended it to have some effect. It was true that it referred to the expiry of "the defects liability period", a concept that was not defined or otherwise identified anywhere in the contract, but there was little doubt that the parties had in mind the provisions of clause 12 under which the seller undertook to make good by repair or replacement defects due to faulty design, materials or workmanship appearing within one year after delivery. Clause 14 was intended to limit Rundle's liability by reference to the period for making good defects set out in clause 12 (*see* para 21).

(b) Clause 14 was a limitation clause rather than a simple exclusion clause and it was to be construed in a less restrictive manner than might otherwise have been the case. Nonetheless, insofar as the words used were found to be equally capable of bearing two different meanings, and were therefore ambiguous, the court should resort to recognised principles of construction, in particular the *contra proferentem* rule, in order to determine the correct meaning (*see* para 22);

————*Photo Production Ltd v Securicor Transport Ltd* [1980] 1 Lloyd's Rep 545, *Investors Compensation Scheme v West Bromwich Building Society* [1998] 1 WLR 896, *Ailsa Craig Fishing Co Ltd v Malvern Fishing Co Ltd* [1983] 1 WLR 964, *George Mitchell (Chesterhall) Ltd v Finney Lock Seeds Ltd* [1983] 2 AC 803, *Mannai Investment Co Ltd v Eagle Star Life Assurance Co Ltd* [1997] AC 749, referred to.

(c) Under clause 14 the buyer was obliged to notify the seller, within 14 days of the expiry of the defects liability period, of any defect which he maintained the seller was still obliged to make good. There was nothing unbusinesslike in providing for a defects liability period of one year, during which the seller would make good any defects as they were notified to it, followed by a requirement that the seller would notify the buyer in writing at the end of that period of all defects said to be outstanding. Clause 14 was concerned with establishing finality by limiting the seller's liability for defects in the goods (*see* paras 24 and 25).

(d) The term "delivery" in clause 12 meant the completion of the contract work as verified by an independent engineer. Although it could be argued that delivery meant delivery of the components or the assembly (but not testing) of the equipment, any ambiguity was to be resolved in favour of the buyer. Accordingly, the right course was to prefer the construction which deferred the beginning of the defects liability period to the point at which the equipment was capable of being put into operation (*see* para 29).

(e) The defects liability period began to run when the engineer's certificate was issued on 20 May 2002. It was common ground that Whitecap failed to notify Rundle of any outstanding defects during the 14 days immediately following the expiry of the defects liability period, and as a result Rundle ceased to be liable for defects in the equipment (*see* paras 32 and 33).

(2) The judge had been correct to construe the heads of agreement as meaning that the release contained in clause 8 was conditional on the satisfactory completion of the work described in clause 4. The judge's findings provided a sufficient basis for holding that Rundle failed to provide a workable solution to the cable, pick-up and release mechanism problems as required by clause 4(d) within a reasonable time or at all. That was sufficient to prevent Rundle from claiming payment of the second instalment of the price and, more importantly, from relying on clause 8 in answer to the claim unless it could establish that it had been prevented from completing that task by some improper conduct on Whitecap's part, which had not been alleged (*see* paras 38 and 40).

(3) The goods had been validly rejected by Whitecap.

(a) The judge had in principle been right to hold that by the time Whitecap purported to reject the goods in November 2004 it was deemed to have accepted them in accordance with section 35 of the Sale of Goods Act 1979, both because it had by then done various acts in relation to them which were of such a nature as to be inconsistent with Rundle's ownership and because it had retained and used them for a sufficient period of time without intimating that it had rejected them (*see* para 44).

(i) In conjunction with section 34 section 11(4) provided a statutory affirmation of the contract which prevented the buyer from subsequently treating a breach of condition as grounds for rejecting the goods and treating the contract as

discharged. It was no answer to say, therefore, that the effect of rejecting goods was to treat the contract as discharged by repudiation and that Whitecap was entitled to rely on facts of which it was unaware at the time. By November 2004 Whitecap had no such right. Nor was it an answer to say that a person did not lose his right to treat the contract as discharged simply by calling for proper performance and that even if he had affirmed the contract a subsequent breach of a repudiatory nature would entitle him once again to treat the contract as discharged (*see* para 45).

(ii) The implied terms in sections 14(2) and (3) of the Sale of Goods Act related to the condition of the goods at the time of delivery. It was at that point that compliance with the conditions had to be satisfied. It followed that it was not correct to treat each succeeding breakdown as involving a fresh breach of contract; nor, in the absence of a continuing obligation on Rundle to maintain the equipment in good working order, was there anything that might properly be characterised as a continuing breach (*see* para 45).

(b) However, although Rundle disputed (correctly) Whitecap's right to reject the goods, it acquiesced in its doing so and accepted the return of part of the equipment on that basis. Faced with Whitecap's purported rejection Rundle had a choice: it could have disputed Whitecap's right to reject the equipment and claimed the outstanding balance of the price, or it could have acquiesced in it, accepted redelivery and claimed damages for non-acceptance. Although Rundle initially shaped up to take the former course, the correspondence shows that it ultimately took the latter. Permission to appeal would be given and it would be held that Whitecap had effectively rejected the goods. The result was that property in the goods vested unconditionally in Rundle and Whitecap ceased to be liable for the price (*see* paras 48 and 49).

(4) In the light of the finding that the goods had been rejected, Whitecap was entitled to recover the payments it had made on account of the price of the goods, on the basis of unjust enrichment. Payment of the price was the consideration for the transfer of property in the goods and, if the goods were rejected, property (if it had already passed) reverted to the seller. Therefore, Whitecap was entitled to recover the various amounts it had paid on account of the price. However, Whitecap could not recover damages for breach of contract by reason of clause 14 (*see* paras 50 and 51).

(5) Rundle was not liable in negligence to Whitecap. While it could not be doubted that Rundle owed Whitecap a duty to exercise reasonable skill and care in the design and manufacture of the equipment to avoid causing injury to persons or damage to property as a result of the failure of components or faulty operation, it did not owe Whitecap a duty at common law to take reasonable care not to cause economic loss by supplying equipment that was not of the required contractual quality. If the equipment was defective, Whitecap's cause of action was for breach of contract and it was irrelevant to ask whether the breach was the result of negligence. However, nothing turned on that since the

CA] **Whitecap Leisure Ltd v John H Rundle Ltd** [MOORE-BICK LJ

losses which Whitecap sought to recover could be recovered, if at all, as damages for breach of contract (*see* para 55).

(6) The judge's handling of the trial did not provide sufficient grounds for setting aside his award in Whitecap's favour if it had otherwise been sustainable.

(a) The judge had wide powers to control proceedings and possessed jurisdiction to adjourn a trial if the interests of justice so required (*see* para 62);

————*McPhilemy v Times Newspapers Ltd* [1999] 3 All ER 775, *Blay v Pollard* [1930] 1 KB 628, considered.

(b) It was unfortunate that the judge simply announced in the course of delivering judgment that he had reached the conclusion that Whitecap was entitled to recover damages on a basis different from that set out in its particulars of claim because that was liable to give the impression that he was presenting Whitecap with a gift to which it was not entitled. A better course might have been to limit his judgment to issues of liability and to invite the parties to address him on the directions that he should give for the trial of quantum, including the need for any further pleading. Had he acted in that way, Rundle would not have had any grounds for complaint (*see* para 64).

(c) However, Rundle had not suffered any real injustice as a result of the way in which the matter was handled, other than being deprived of the chance of shutting out a meritorious claim on a technicality (*see* para 66).

(7) Once Rundle acquiesced in Whitecap's rejection of the equipment, Rundle became entitled to recover and dispose of it as it wished. Similarly, Whitecap became obliged to redeliver the equipment to Rundle, which simply meant making it available for Rundle to collect. By refusing Rundle access to its premises to remove the remaining equipment and by making use of it for its own purposes Whitecap appropriated that equipment to itself and thereby converted it. Accordingly, Rundle was entitled to damages for conversion by Whitecap of the equipment that it retained. The matter would be remitted to the High Court for the assessment of damages (*see* paras 69 and 70).

(8) As it was disputed whether the invoice related to maintenance services within clause 7, the claim would be remitted to the High Court for determination (*see* para 73).

————

The following cases were referred to in the judgment:

*Ailsa Craig Fishing Co Ltd v Malvern Fishing Co Ltd* (HL) [1983] 1 Lloyd's Rep 183; [1983] 1 WLR 964;

*Blay v Pollard* (CA) [1930] 1 KB 628;

*George Mitchell (Chesterhall) Ltd v Finney Lock Seeds Ltd* (HL) [1983] 2 Lloyd's Rep 272; [1983] 2 AC 803;

*Investors Compensation Scheme v West Bromwich Building Society* (HL) [1998] 1 WLR 896;

*Mannai Investment Co Ltd v Eagle Star Life Assurance Co Ltd* (HL) [1997] AC 749;

*McPhilemy v Times Newspapers Ltd* (CA) [1999] 3 All ER 775;

*Photo Production Ltd v Securicor Transport Ltd* (HL) [1980] 1 Lloyd's Rep 545.

————

This was an appeal by the sellers, Rundle, against the judgment of HHJ Richard Foster, [2007] EWHC 1352 (QB), in favour of the buyers, Whitecap.

James Ramsden, instructed by O'Gorman & Co, for the claimant; Richard Wilson QC and Christopher Jacobs, instructed by The Ringrose Law Group, for the defendant.

The further facts are stated in the judgment of Moore-Bick LJ.

Monday, 28 April 2008

————

## JUDGMENT

### Lord Justice MOORE-BICK:

1. The respondent to this appeal, Whitecap Leisure Ltd ("Whitecap"), is the tenant of Willen Lake and an area of surrounding parkland near Milton Keynes at which it carries on the business of providing leisure facilities to the public. The appellant, John H Rundle Ltd ("Rundle"), is an engineering company whose business includes the design and manufacture of equipment used by the leisure industry. On 23 November 2001 Whitecap entered into a contract with Rundle for the purchase of a cable tow system to enable it to provide waterskiing facilities at Willen Lake without the need for powered boats to tow the skiers. The price was £157,000 plus VAT. The contract provided for 30 per cent to be paid on placing the order, a further 20 per cent on completion, which was to take place no later than 15 April 2002, and the balance in equal instalments over the following six months.

2. Delivery began soon after the contract had been signed. The judge found that by the end of 2001 some of the equipment had been delivered to the site and Rundle's employees had already begun installing it. Further deliveries took place during 2002 and the work of installation continued. The judge found that a certificate of completion was issued by a company called ASP Engineering on 14 May and that by mid-May 2002 the equipment was in commercial use.

3. Thereafter Whitecap experienced a succession of problems with the equipment which continued

on and off throughout that year and the following two seasons. In an attempt to solve them it engaged a number of experts including a Mr David Bray, who carried out an assessment of the equipment in July 2002 and who subsequently advised Whitecap in connection with the failures which continued to occur, and Professor Richard Chaplin, a leading expert on the manufacture and use of steel cables.

4. Dissatisfaction with the performance of the equipment led Whitecap to withhold payment of the outstanding instalments of the purchase price and by the end of October 2002 Rundle was already claiming that £77,317.54 was due and owing. Proceedings were threatened. Early in 2003 Whitecap offered to compromise the dispute by withdrawing its claims arising out of the unreliable performance of the equipment in return for Rundle's abandoning its claim for the balance of the price, but that was not acceptable to Rundle. After that things went quiet for some months until September 2003 when Rundle once again demanded payment of the balance of the purchase price and drew attention to a retention of title clause in the contract. Meanwhile, in July 2003 the equipment had been out of service for a period of two weeks as a result of a failure of the main cables. As a result, Whitecap instructed Professor Chaplin to investigate the cause and find a solution.

5. In January 2004 a meeting took place between the two sides and their legal advisers which was also attended by Mr Bray and Professor Chaplin. It led in due course to the signature of heads of agreement under which Rundle agreed to use its best endeavours to improve the performance and reliability of the equipment in return for the payment in instalments of a reduced balance of the purchase price and an agreement on the part of Whitecap not to pursue any claims for breach of the original contract. It will be necessary to return to those heads of agreement in some detail at a later stage, but it is sufficient for present purposes to say that they did not lead to a final resolution of what had already become a long-running dispute. Rundle says that Whitecap prevented it from carrying out its various undertakings in the heads of agreement and so cannot deny that the restriction on making any further claims has become effective. Whitecap says that Rundle simply failed to carry out its part of the bargain.

6. Whitecap continued to operate the equipment, but there was another major breakdown during August 2004 as a result of which it was out of operation for a further two weeks. By the end of the year Whitecap's patience had run out and on 12 November it purported to reject the equipment altogether on the grounds that it was not fit for its purpose or of satisfactory quality. At first Rundle refused to accept that Whitecap was entitled to take

that course, but Whitecap proceeded to dismantle the equipment and in the end Rundle agreed to remove it. However, even at that stage the parties were unable to accommodate each other and after Rundle had removed two lorryloads of machinery Whitecap refused to allow it further access in order to take away what remained. Whitecap bought a replacement cable tow system from a German manufacturer, Rixen Seilbahnen, but continued to make use of certain items of equipment that had been supplied by Rundle, in particular the pontoon and launching platform.

7. On 31 May 2005 Whitecap brought proceedings against Rundle claiming damages for its failure to deliver the goods in accordance with the contract. It claimed to recover: (i) the amount it had paid Rundle on account of the price of the goods; (ii) the loss of profit suffered as a consequence of the two periods during which the equipment had been out of action in July 2003 and August 2004 and various costs incurred in connection with them; and (iii) the cost of carrying out various repairs undertaken during the period it had been operating the equipment. Rundle denied that the equipment had been faulty; it said that the work carried out by Whitecap was either in the nature of routine maintenance or had been necessitated by improper use of the equipment. It also relied on the terms of the contract and the heads of agreement as excluding any liability for defects in the goods. In addition Rundle sought to recover from Whitecap the outstanding balance of the purchase price and damages for conversion of that part of the equipment that had been retained by Whitecap. It will be necessary at a later stage to examine a little more closely the way in which the parties set out their respective cases, since they have a bearing on some of the issues that arise on the appeal.

8. The matter came on for trial before His Honour Judge Richard Foster sitting as a deputy judge of the High Court in March 2007. In his judgment delivered on 13 June 2007 the judge found that the equipment supplied by Rundle was not of satisfactory quality and was not fit for its purpose. However, he held that by November 2004 Whitecap had accepted the goods and, having lost the right to reject them, was limited to a claim for breach of warranty. He held that Rundle was not protected by the terms of the contract or the heads of agreement and was therefore liable to Whitecap. That brought him to the question of damages. He was satisfied that Whitecap had suffered a loss of profits during the periods in July 2003 and August 2004 when the equipment was out of action which he assessed at £67,561. He was also able to deal with some of the claims relating to repairs and maintenance. However, when it came to the claim for damages for breach of contract generally the

CA]        **Whitecap Leisure Ltd v John H Rundle Ltd**        [Moore-Bick LJ

judge was faced with a difficulty. Whitecap had advanced its claim solely on the basis that it was entitled to reject the goods, but he had held that it was not, and it was an inevitable consequence of that decision that Whitecap was confined to a claim for damages for breach of warranty under section 53 of the Sale of Goods Act 1979. The judge expressed his view that that was the proper basis on which to award damages, noted that it was not Whitecap's primary case, expressed his preliminary view that Whitecap was entitled to recover the cost of the replacement system, and directed that for those purposes his judgment was to be treated as a judgment on liability only. He also considered that in the light of the conclusions he had reached he had not heard sufficient argument in relation to Rundle's claims for the balance of the price and conversion of its goods (though he expressed a preliminary view that the parts retained by Whitecap were of little, if any, value) and at the end of his judgment invited further submissions from the parties on those aspects of the case. After hearing the parties the judge gave directions for the service of further statements of case relating to damages.

9. A further hearing took place on 19 July 2007 at which the parties made submissions on all outstanding matters. At that hearing Rundle submitted that the judge should not entertain a claim by Whitecap for damages for breach of warranty because it had not formed part of its original claim. No application to amend the claim had been made even at that stage and in any event it was far too late in the proceedings to allow a radical amendment of that kind. Rundle also submitted that it was wrong for the judge to descend into the arena to rescue Whitecap by introducing a new head of claim of his own motion.

10. On 21 December the judge delivered a written judgment dealing with damages. He held that for him to have raised the possibility that Whitecap might be entitled to claim damages on a basis other than that set out in its particulars of claim and subsequently to entertain such a claim was entirely consistent with the modern approach to litigation and with the letter and the spirit of the Civil Procedure Rules. He held that Whitecap was entitled to recover the whole of the cost of the replacement system together with the expenses it had incurred in attempting to rectify defects in the equipment supplied under the contract, but was obliged to give credit for the balance of the price due under the heads of agreement. He dismissed Rundle's counterclaim for damages for conversion on the grounds that it would be fully compensated by receiving credit for the balance of the purchase price. Finally, the judge dealt with claims for various items of expenditure, to only one of which

it will be necessary to refer at a later stage, before dealing with matters relating to costs.

*The first appeal*

11. Rundle's notice of appeal contains 23 separate grounds, but permission was granted in relation to a limited number of them which, in summary, relate to the following five areas of dispute: (i) the meaning and effect of clause 14 of the sale contract which is said to limit Rundle's liability for defects in the goods; (ii) the meaning and effect of the heads of agreement; (iii) whether Rundle was liable in negligence; (iv) the judge's award of damages in respect of the two periods when the equipment was out of action for two weeks; and (v) whether Whitecap was liable to pay Rundle in respect of the work and materials referred to in one particular invoice. Whitecap applied for permission to appeal against the judge's decision that it had not been entitled to reject the equipment. Rix LJ refused permission on paper and directed that any renewed application should be made on the hearing of the appeal. At the opening of the appeal we indicated that we wished to hear argument on that question in the context of the appeal and that we would give our decision on the application at the time of giving judgment.

*The second appeal*

12. Following the delivery of judgment on damages Rundle applied for permission to appeal on five grounds. We gave permission to appeal on four of them, all of which arose out of, or were closely connected to, the grounds in relation to which permission had been granted in the first appeal. We deferred consideration of the fifth ground, which related to the judge's order for costs, until after we had delivered judgment on the other matters raised by the appeal.

*The sale contract*

13. The contract for the sale of the equipment was contained in a document emanating from Rundle which appears to have been designed for a simple sale of goods but which the parties adapted in manuscript to meet the requirements of the particular case. As a result it extended to the assembly and commissioning of the equipment and the provision of training for the buyer's employees. The printed document, in which Whitecap is referred to as "the Buyer" and Rundle as "the Seller", provided as follows:

    1. Definitions

    1.3 "Delivery Date" means the date specified by the Seller when the goods are to be delivered.

. . .

1.7 "The Specification" shall be in accordance with the specifications annexed hereto.

. . .

9. Delivery

Unless otherwise specified in the tender the price quoted includes the delivery to the address on or before the delivery date. The Seller shall promptly notify the Buyer that the goods have been delivered. The risk in the goods shall pass to the Buyer upon such delivery being effected.

No claim for damaged goods for shortages or for undelivery shall be accepted by the Seller unless written notice of such damaged [*sic*] shortage is received by the Seller within 14 days of receipt of the goods by the Buyer or within 14 days of the defect being discovered where the defect could not reasonably have been discovered earlier or (in the case of undelivered) 14 days after the date on which the goods could in normal course of events have been expected to be received by the Buyer.

. . .

12. Defects after delivery

The Seller will make good by repair or supply a replacement defects which under proper use appear in the goods within a period of one year after the goods have been delivered and arise solely from faulty design (other than a design made, finished or specified by the Buyer for which the Seller shall have disclaimed responsibility in writing) materials or workmanship provided always that defective parts have been returned to the Seller which shall refund the cost of carriage on such returned parts and the repairs or new parts shall be delivered back by it free of charge.

13. Limitation on contractors' liability on site

If the Seller its agents or subcontractors are on site for the purpose of the contract then notwithstanding the provisions hereof it will indemnify the Buyer against direct damage or injury to its property or person or that of others occurring caused by its subcontractors or agents but not otherwise by making good such damage to property or compensating personal injury . . .

14. Final certificate

After expiry of the defects liability period specified in this agreement the Seller shall be under no further obligation or liability either under the contract or in tort (including but not limited to negligence) unless within 14 days thereafter the Buyer shall have given written notice of any matter in respect of which the Seller remains obliged or liable. The Buyer shall

issue a final certificate to the effect that the Seller has fulfilled all obligations and liabilities to the Buyer immediately upon expiry of the said period of 14 days or in the event that the Buyer shall have given notice as aforesaid which the Seller would have not disputed immediately upon it having dealt with the matters specified therein.

. . .

18. Retention of Title

(i) Title to all property supplied to any intending purchaser shall remain with the Company until payment in full of all monies outstanding from that intending purchaser to the Company under any transaction. At any time before payment in full of all such monies the Company may repossess the goods and the intending purchaser grants it permission to enter upon property in his or its control to collect them.

14. At the foot of clause 1 (the definitions clause) there were added the following words in manuscript:

Definition — Completion: Full installation of cable tow and accompanying infrastructure including training and pontooning and slalom course as verified by an independent engineer.

and immediately below the parties' signatures there were added the following words:

Description of Goods and services being purchased is described within Appendix "A".

15. Clause 10 dealing with terms of payment provided (with manuscript amendments) as follows:

Payment shall be made as follows:

30% on the placing of the order.

20% — on Completion — no later than 15th April 2002.

50% on completion that is to say assembly and construction of the goods to the Seller's satisfaction equally over 6 months in six equal payment[s]. If payment is received in full at completion a discount of £3,000 is available.

16. Appendix A was headed "Specifications" and contained a description of the various pieces of equipment to be supplied. It also contained the following provision:

Delivery

4 months manufacture from receipt of order

6–8 weeks assembly.

*The effect of clause 14*

17. Before the judge Mr Wilson QC submitted that clause 14 of the contract is a time-bar clause, the effect of which, read together with clause 12,

LLOYD'S LAW REPORTS

CA] **Whitecap Leisure Ltd v John H Rundle Ltd** [Moore-Bick LJ

was to relieve Rundle of liability for any defects in the equipment other than those that had appeared during the year following delivery and had been notified as outstanding during the 14 days immediately following the expiry of that period. Mr Ramsden for Whitecap submitted that the clause was too uncertain in its meaning to be capable of being given any sensible meaning, or at any rate that its terms were not sufficiently clear and unambiguous for it to have the effect of excluding liability for breaches of the contract.

18. In his judgment the judge pointed to various difficulties in the language and interpretation of clause 14. He recognised that it was a form of exclusion clause, but, having reminded himself of what was said by Lord Diplock in *Photo Production Ltd v Securicor Transport Ltd* [1980] 1 Lloyd's Rep 545, he accepted that the court was not entitled to reject it on that ground if the words were clear and susceptible of one meaning only. However, he did not think that that was the case with clause 14, which he thought was uncertain in its meaning and lacked clarity and for that reason he held that Rundle could not take advantage of it. In reaching that conclusion it is apparent that he had considered whether the clause could be saved by the application of the approach to the construction of commercial documents required by *Investors Compensation Scheme v West Bromwich Building Society* [1998] 1 WLR 896, but considered that there was no relevant material which would enable him to decide when the defects liability period to which clause 14 refers began and ended. He therefore concluded that the clause as a whole was incapable of interpretation.

19. Before us the parties made broadly the same submissions as they had made to the judge. Although he recognised that clause 14 is imperfectly worded, Mr Wilson submitted that its meaning is clear and that the court should give effect to it. He also submitted that it was not strictly speaking an exclusion clause (although that was ultimately its effect in this case), but more in the nature of a limitation clause and therefore was not to be construed in accordance with the particularly exacting standards generally applied to clauses of that kind: see *Ailsa Craig Fishing Co Ltd v Malvern Fishing Co Ltd* [1983] 1 WLR 964, page 968 per Lord Wilberforce and page 970 per Lord Fraser; *George Mitchell (Chesterhall) Ltd v Finney Lock Seeds Ltd* [1983] 2 AC 803, page 814 per Lord Bridge. Mr Ramsden submitted (though with limited enthusiasm) that the clause was too uncertain to be given any sensible meaning; alternatively, he submitted that its meaning was at best ambiguous and incapable of achieving the result for which Mr Wilson contended.

20. One can find in the authorities many statements to the effect that exclusion clauses must be clear and unambiguous if they are to operate effectively, many of which date from a period when courts took a more literal approach to the construction of commercial documents in general than is now generally the case. The modern approach to construction, which applies as much to exclusion and limitation clauses as to other contractual terms, is to ascertain the objective intention of the parties from the words used and the context in which they are found, including the document as a whole and the background to it: see *Mannai Investment Co Ltd v Eagle Star Life Assurance Co Ltd* [1997] AC 749, and *Investors Compensation Scheme v West Bromwich Building Society*. However, in cases where there is uncertainty about the parties' intention, and therefore about the meaning of the clause, such uncertainty will be resolved against the person relying on the clause and the more significant the departure is said to be from what are accepted to be the obligations ordinarily assumed under a contract of the kind in question, the more difficult it will be to persuade the court that the parties intended that result. As Lord Diplock observed in *Photo Production v Securicor*:

> Since the presumption is that the parties by entering into the contract intended to accept the implied obligations exclusion clauses are to be construed strictly and the degree of strictness appropriate to be applied to their construction may properly depend upon the extent to which they involve departure from the implied obligations. Since the obligations implied by law in a commercial contract are those which, by judicial consensus over the years or by Parliament in passing a statute, have been regarded as obligations which a reasonable businessman would realise that he was accepting when he entered into a contract of a particular kind, the court's view of the reasonableness of any departure from the implied obligations which would be involved in construing the express words of an exclusion clause in one sense that they are capable of bearing rather than another, is a relevant consideration in deciding what meaning the words were intended by the parties to bear. But this does not entitle the court to reject the exclusion clause, however unreasonable the court itself may think it is, if the words are clear and fairly susceptible of one meaning only.

21. The conclusion that a contractual provision is so uncertain that it is incapable of being given a meaning of any kind is one which the courts have always been reluctant to accept, since they recognise that the very fact that it was included demonstrates that the parties intended it to have some effect. Although there are many imperfections in the drafting of clause 14, I do not think that it is incapable of being given any sensible meaning. It is

08-13555-mg    Doc 45468-23    Filed 07/31/14    Entered 07/31/14 17:14:52    Exhibit 107
Pg 10 of 21
224                              LLOYD'S LAW REPORTS                    [2008] Vol 2

Moore-Bick LJ]              **Whitecap Leisure Ltd v John H Rundle Ltd**              [CA

true that it refers to the expiry of "the defects liability period", a concept that is not defined or otherwise identified anywhere in the contract, but to reject the clause altogether on these grounds would be to allow a literal approach to construction to defeat the parties' intentions. If one sets the clause in the context of the rest of the document, I think there can be little doubt that when referring to the defects liability period the parties had in mind the provisions of clause 12 under which the seller undertook to make good by repair or replacement defects due to faulty design, materials or workmanship appearing within one year after delivery. Mr Ramsden submitted that clause 12 does not limit the seller's liability as such; it merely defines the period during which the seller is obliged to make good defects by repair or replacement. That is true as it stands, but clauses 12 and 14 form part of the same document and must be read in conjunction with each other. If that is done, I think it is clear that clause 14 was intended to limit Rundle's liability by reference to the period for making good defects set out in clause 12. Contrary to Mr Ramsden's submission, the parties cannot have intended to refer either to clause 9 or to clause 13. Clause 9 does not deal with defects or their rectification but with delivery, the passing of risk and loss or damage to the goods in transit. It does not contain anything that could properly be referred to as a defects liability period. Clause 13 deals with the liability of the seller and its contractors for damage caused to persons or property in the course of the work. Likewise, it is not dealing with defects in the goods themselves or their rectification.

22. Nor, in my view, is the remainder of clause 14 too uncertain to be effective, although its construction undoubtedly presents certain difficulties. In my view the correct course is to approach it on the basis that the parties intended it to bear a meaning and to ascertain, if possible, what that meaning is by applying the principles to be found in the authorities to which I have referred. Insofar as it may affect the approach to its construction, I think Mr Wilson was right in saying that clause 14 is a limitation clause rather than a simple exclusion clause and that it may be construed in a less restrictive manner than might otherwise have been the case. Nonetheless, insofar as the words used are found to be equally capable of bearing two different meanings, and are therefore ambiguous, the court should resort to recognised principles of construction, in particular the *contra proferentem* rule, in order to determine the correct meaning.

23. The part of clause 14 which gave rise to most controversy reads:

> . . . unless within 14 days thereafter the Buyer shall have given written notice of any matter in

respect of which the Seller remains obliged or liable.

Mr Ramsden submitted that the buyer will have complied with this requirement in relation to any defect of which notice has been given to the seller at any time before the expiry of 14 days from the end of the year following delivery. Although the judge had already rejected the clause altogether on the grounds that it was incapable of interpretation, he expressed the view (*obiter*) that the words "shall have given" made it clear that it was sufficient for Rundle to have been put on notice of any defects by the end of the 14-day period, whether notice was given in the course of the year following delivery or during the 14 days immediately following its expiry. He also thought that accorded with business common sense because it would enable the parties to have some finality in connection with their liability.

24. For my own part I do not think that the words "shall have given" do point to that conclusion. They merely look forward from the date of the contract to the point of time by which notice must have been given and tell one nothing about when the period for giving the relevant notice begins. More important, in my view, are the words "within" and "thereafter", to which the construction put forward by Mr Ramsden fails to give any real meaning. On the face of it, the word "thereafter" refers back to the expiry of the defects liability period, thereby indicating that the written notice to which the clause refers must be given within the 14 days following the end of that period. On that view of the matter the buyer was obliged to notify the seller, within 14 days of the expiry of the defects liability period, of any defect which he maintained the seller was still obliged to make good, which is how Mr Wilson submitted the clause was to be understood.

25. Mr Ramsden suggested in argument that since the buyer can be expected to have notified the seller of defects as they occurred during the course of the year following delivery, to require him to submit a list of outstanding defects during the 14 days following the expiry of that period was unnecessary and uncommercial and cannot have been what the parties intended. Such a construction, he submitted, should be adopted only if it was clearly required and in this case it was not. I am unable to accept that argument. There is nothing unbusinesslike in providing for a defects liability period of one year, during which the seller will make good any defects as they are notified to it, followed by a requirement that the seller shall notify the buyer in writing at the end of that period of all defects said to be outstanding. Clause 14 is concerned with establishing finality by limiting the seller's liability for defects in the goods. It is headed "Final

LLOYD'S LAW REPORTS

CA] **Whitecap Leisure Ltd v John H Rundle Ltd** [Moore-Bick LJ]

certificate" and in the second sentence provides for the buyer to issue a final certificate confirming that the seller has fulfilled all its obligations. That sentence is worded somewhat obscurely, but its purpose is fairly clear, namely, to provide for formal confirmation that the seller has no outstanding obligations or liabilities in respect of the goods. It provides for the certificate to be issued on expiry of the 14-day period referred to in the first sentence (if the buyer has not given notice of outstanding defects) or (if the buyer has given such a notice) immediately upon the rectification of the defects referred to in the notice. In my view it serves to reinforce the conclusion that all outstanding defects were to be collected in a written notice given during the 14 days following the expiry of the defects liability period.

26. The debate does not end there, however. Clause 12 provided that the seller was to make good defects that appeared in the goods within a period of one year after they had been delivered, but when did delivery take place for these purposes? At one point Mr Ramsden sought to argue that, since Whitecap had agreed to buy goods which were of satisfactory quality and fit for their purpose, delivery of goods conforming to the contract had never taken place, so that the defects liability period never began to run. However, the very presence in the contract of clauses 12 and 14 is sufficient in my view to demonstrate that that is not what the parties had in mind. Nonetheless, the meaning to be attached to the word "delivery" in the context of this contract is not entirely straightforward.

27. The judge raised some of the questions to which this part of clause 12 gives rise in para 71 of his judgment, but he did so mainly in order to explain why he thought that the clause was too uncertain to support the limitation provisions in clause 14 and did not seek to answer them. Mr Ramsden sought to support the judge's conclusion by identifying a large variety of possible meanings which he said might be given to the word "delivery". Some of them can be discounted without difficulty, however, since it is clear, in my view, that it is directed to actual delivery of the contract goods rather than to any of the provisions of the contract dealing with the date when delivery was to be made.

28. As I have already observed, the contract in this case appears to have been an adaptation of a standard form designed primarily for a simple sale of goods, though clause 13 contemplates that the seller's agents or subcontractors may be on site, presumably for the erection of equipment. Clause 12 provides for making good defects which *under proper use* appear in the goods within a period of one year after they have been delivered and to that extent appears to contemplate that use will begin

soon after delivery, or at any rate that the goods will be available for use immediately following delivery.

29. In the present case the contract provided for the equipment to be assembled by Rundle, or at any rate under its supervision, and it could not be used until it had been assembled and tested. An addition was made to the definitions clause to define "completion" in terms of the full installation of the equipment and accompanying infrastructure, including training and also the delivery of pontoons and a slalom course. It was necessary for the parties to define what they meant by completion if they wished to give it a special meaning for the purposes of this contract because it was a term used in clause 10 of the printed wording in connection with payment, where it was defined as "assembly and construction of the goods to the seller's satisfaction". Having done so, I have no doubt that they intended the manuscript definition to prevail and that they used the term "delivery" in clause 12 to mean the completion of the contract work as verified by an independent engineer. Moreover, although it can be argued that delivery means delivery of the components or the assembly (but not testing) of the equipment, for reasons given earlier any ambiguity should be resolved in favour of the buyer. Accordingly, the right course in my view is to prefer the construction which defers the beginning of the defects liability period to the point at which the equipment should be capable of being put into operation. That tends to favour Whitecap and thus, if necessary, gives effect to the *contra proferentem* rule of construction.

30. It therefore becomes necessary to consider whether delivery within the meaning of clause 12 occurred and if so when. The judge found that components were delivered and assembled during the latter part of 2001 and early 2002. He accepted the evidence of Mr Rollason, Whitecap's principal shareholder and the person who had overall management of the project, that the first paying customers were able to use the equipment by 14 May and that appears to have been the foundation for his finding that it was in commercial use by mid-May. He also found that a completion certificate had been issued by ASP Engineering on 20 May 2002, but apart from observing that Whitecap disputed its provenance he made no findings about the circumstances in which it came to be issued, nor did he consider its relevance to the operation of clause 12. It is fair to say that the judge did not need to do that once he had concluded that clauses 12 and 14 were in any event too uncertain in their effect to exclude Rundle's liability, but the omission is unfortunate, given the fact that Whitecap had specifically pleaded that clause 14 was ineffective because the

absence of the necessary certificate prevented time running under clause 12.

31. In my view the contract required no more than verification of completion by an independent engineer to start the defects liability period running under clause 12. It does not say who was to appoint the engineer or how, nor what would amount to verification for this purpose, and neither party sought to advance argument on any of those questions, either before the judge or before this court. The only ground on which Whitecap sought to impugn the certificate issued by ASP Engineering was that it had not been supplied with the original or a copy of it, but the contract is silent about that. What appears to have happened in practice is that both parties treated the equipment as having been delivered by the end of May at the latest and did not pay much, if any, attention to the terms of clauses 12 and 14. If the absence of a completion certificate of some kind had led Whitecap into thinking that the defects liability period had not started to run, and if it had acted in some way on the basis of that understanding, there might have been room for the argument that Rundle could not rely on the certificate whose existence it had kept secret, but that was never part of Whitecap's case. On the contrary, it appears to have acted on the basis that the equipment had been delivered because it paid the instalment of the price that became due on completion. In my view any formal confirmation by an independent engineer appointed for the purpose by one or other of the parties that the equipment had been installed in accordance with the contract was sufficient to amount to verification. In those circumstances I think that the defects liability period began to run when the engineer's certificate was issued on 20 May 2002.

32. The judge held that the heads of agreement themselves constituted a recognition by Rundle that it was not entitled to rely on clause 14 since, if it were under no liability, it would have been incapable of providing consideration for that agreement. I shall come to consider the heads of agreement in a moment, but in my view that is wrong for a number of reasons which do not depend on the details of its terms. Whether clause 14 operated to relieve Rundle of liability for defects in the equipment depended on its true construction and upon events that had occurred long before the date on which the heads of agreement were signed. If Rundle had ceased to be under any liability by virtue of clause 14 and if its continued liability had been essential in order for it to be capable of providing consideration of any kind for that agreement, the heads of agreement would simply have been unenforceable for want of consideration. That document, however, contains no reference to clause 14 or its effect, so it is difficult to see that the parties

were directing their minds to it or that they intended to alter their position in relation to it, whatever that was. Nor are the heads of agreement on their true construction necessarily inconsistent with the continued operation of clause 14. There was already a lively dispute between the parties about the condition of the equipment and Rundle's responsibility for it and it is well established that mutual promises to abandon disputed claims and defences provide sufficient consideration for a compromise of the kind embodied in them.

33. The judge found that by reason of three fundamental flaws in its design the equipment was not of satisfactory quality or fit for its purpose. It was common ground that during 2002 Whitecap had notified Rundle of the various failures and breakdowns that had occurred, but it was also common ground that the parties had not been in communication at all between March and September 2003. It inevitably follows, therefore, that Whitecap failed to notify Rundle of any outstanding defects during the 14 days immediately following the expiry of the defects liability period and as a result Rundle ceased to be liable for defects in the equipment.

*The heads of agreement*

34. Although Whitecap had paid the second of the two instalments of the price following delivery, its dissatisfaction with the performance of the equipment led it to withhold any further payments, with the result that by September 2003 a sum of approximately £92,000 remained outstanding. On 8 September Rundle's solicitors wrote to Whitecap seeking payment of that amount and drawing its attention to the retention of title clause in the contract. The ensuing exchange of correspondence led in due course to a series of meetings between the parties and a resumption of a working relationship which culminated in the heads of agreement signed by Whitecap on 29 April and Rundle on 4 May 2004. The terms of that document have given rise to some important issues between the parties. The material parts provided as follows:

2. This Agreement has been reached with reference to modification work to the Water-ski Cable Tow at Willen Lake, Milton Keynes and the aim of the said modification work is to achieve increased operational efficiency, complete the CE marking and produce a revised maintenance schedule and maintenance contract. Save where the context demands otherwise, it is additional to and does not supercede [*sic*] the previous agreement between the parties.

3. The system was designed and installed by JHR [Rundle]. Although operational efficiency guarantees have never been given in the past by

LLOYD'S LAW REPORTS

CA] **Whitecap Leisure Ltd v John H Rundle Ltd** [Moore-Bick LJ

JHR (and are not given now, apart from the life of the main cables), it has been agreed . . . that operational efficiency ought to be capable of significant improvement. It was agreed that the said experts and JHR should work together with a view to achieving that aim.

4. It had been agreed that JHR will . . . use its best endeavours to perform (and in some cases has performed) the following tasks:

. . .

(d) Investigate and provide a workable solution to the cable, pick-up and release mechanism problems with the aim, but without guarantee, of achieving an average efficiency of 90%;

(e) Subject to the commercial availability of any solution suggested by [Professor Chaplin] replace all cables within 30 days of the signing of this agreement;

(f) Investigate and provide a workable solution within 30 days of the signing of this agreed [sic] . . . to the known cable degradation and deformation problems with the aim of achieving a minimum service life for the cables of 2 years.

. . .

6. WL [Whitecap] agrees to pay £42,553.20 plus VAT of £7,446.80 (a total of £50,000) in settlement of the balance due to JHR. The said sum of £50,000 is to be paid as follows:

(a) As to the first instalment of £10,000, (a cheque for which has been tendered) without condition.

(b) As to the second instalment of £20,000. The said sum is to be placed immediately in a joint escrow account with [the parties' solicitors] with irrevocable instructions having been given to release the money upon confirmation by DB [David Bray, Whitecap's engineer] that JHR have performed the tasks as a result of 4 above to his satisfaction.

(c) As to the final instalment of the £50,000 — to be paid on or before 30th September 2004.

. . .

7. The parties further agree that any replacement parts that shall be said to be required by DB (as part of the rectification of design) shall be fitted by JHR and WL shall pay for them at their usual price. Labour costs will not be charged in relation to installation of the said parts. This shall not apply to parts which require replacement as part of ongoing maintenance, for which both labour and parts shall be charged.

8. In return for the above and the satisfactory completion of the work described, WL agrees not to make any claim for loss of profits or in relation to their perception that JHR has failed previously to perform its obligations under the original contract.

35. Mr Wilson submitted that clause 8 precluded Whitecap from pursuing the present claim. That argument was rejected by the judge who held that Whitecap's agreement not to pursue a claim for breach of contract was conditional upon the satisfactory completion or performance of the tasks described in clause 4, which never occurred. Mr Wilson submitted that in reaching that conclusion the judge had failed to have sufficient regard to other parts of the agreement, in particular clause 3 and the opening lines of clause 4, which together made it clear that Rundle was undertaking to use its best endeavours to perform the tasks set out in the individual paragraphs of clause 4 but was not giving any guarantee of the equipment's future performance.

36. The heads of agreement is by no means an easy document to construe. Clause 3 makes it clear that Rundle was not providing a guarantee of the equipment's operational efficiency and it is entirely consistent with that approach that it did not enter into an unqualified obligation in clause 4 to achieve any stipulated outcome but merely to exercise its best endeavours. The obligation to use best endeavours was directed to eight separate objectives or "tasks" which no doubt both parties intended and expected could and would be achieved. However, I think there can be little doubt that the obligation undertaken by Rundle was simply to do its best to achieve them. It is when one comes to clause 6 that difficulties begin. The first and third instalments of the reduced balance of the price were payable on specific dates unrelated to the performance of the tasks, but the second instalment, which was to have been paid into an escrow account, was expressed to be released on performance of the tasks to Mr Bray's satisfaction. Similarly, Whitecap's undertaking in clause 8 not to make a claim was expressed to be given in return for the satisfactory completion of the work, which can only mean the work described in clause 4. Thus, Mr Ramsden was able to submit that although Rundle was only obliged to do its best to carry out the various tasks described in clause 4, satisfactory performance of those tasks was required to earn the right to receive the second payment and the future freedom from suit. In other words, he submitted that the heads of agreement contain a conditional compromise: if the tasks were performed, Rundle would receive the balance of a reduced price and be discharged from any further liability; if it failed to do so, it would receive £30,000 on account of the outstanding balance of the price, but no more, and would

continue to be exposed to a claim by Whitecap for damages.

37. Mr Wilson submitted that the expression "satisfactory completion of the work described" in clause 8 was to be read in conjunction with clause 4 so as to import the concept of best endeavours. Similarly, he submitted that the expression "JHR have performed the tasks as a result of 4 above to [Mr Bray's] satisfaction" must be read subject to the obligation to use best endeavours. To construe the clause in that way would certainly provide an additional degree of consistency to the agreement as a whole because it would make Whitecap's obligations to Rundle depend solely on the exercise of best endeavours, but it is not altogether easy to reconcile that construction with the language the parties have used. Clause 6(b) refers to satisfactory performance of "the tasks", picking up the language used to describe the outcomes set out in clause 4(a)–(h). They include providing a workable solution to the cable, pick-up and release mechanism problems (para (d)), providing a workable solution to the known cable degradation and deformation problems (para (f)) and completion of the annual service within 30 days (para (g)). Clause 8 speaks of the "satisfactory completion of the work" described in clause 4. It is difficult to read either of these clauses as referring merely to the exercise of best endeavours; on the face of it they refer to the accomplishment of the tasks or work in question.

38. In this case one obtains little help from the wider commercial context. The heads of agreement were clearly intended to lead to a final compromise of the dispute, but the language of clause 8 in particular suggests that the compromise was to be conditional on the achievement of certain results and there is nothing to indicate that that is not what the parties intended. Nor can it be said that such an agreement would be inherently unbusinesslike. If Rundle were successful in rectifying the main defects, it would obtain payment of a reduced balance of £50,000 and be released from any further claims. If it were unsuccessful, it would receive £30,000 in return for its efforts, but would continue to face a claim for breach of contract which would no doubt be hotly contested. Such an agreement no doubt favours Whitecap, since it limits the amount recoverable by Rundle in respect of the outstanding balance of the price to £50,000 in any event and leaves Whitecap free to pursue its claims if the defects are not rectified. The alternative is that Rundle obtained payment of £50,000 and a release from any further claims in return for simply doing its best to cure the problems. That, however, might be said to be somewhat generous to Rundle. In any event, neither construction is inherently absurd and in the absence of any clear indication that it is not what the parties intended I

think the right course is to give the words their ordinary meaning. For these reasons I accept the construction put forward by Whitecap and accepted by the judge, namely, that the release contained in clause 8 was conditional on the satisfactory completion of the work described in clause 4.

39. In its particulars of claim Whitecap alleged that Rundle had failed to comply with the requirements of clause 4((f)–(h) of the heads of agreement. Rundle disputed that and accordingly issues of fact arose that called for consideration at trial insofar as Rundle sought to rely on clause 8 of the heads of agreement in answer to the claim. Unfortunately, however, the judge dealt with this part of the case very briefly; he simply made findings in para 89 of his judgment that there were further shortcomings and failures in the performance of the cable tow system during the 2004 season and that the obligation to complete the work described in clause 4 was not carried out.

40. Mr Wilson submitted that it was implicit in clause 6(b), which called for Mr Bray to confirm that the tasks set out in clause 4 had been performed to his satisfaction before the second instalment of the price became payable, that his confirmation would not be unreasonably withheld and he criticised the judge for failing to decide that question. In my view, however, if the judge is open to criticism it is in failing to find the cases on which these various questions turn. The pleadings do not properly draw out the distinction between the competing cases as to the nature of Rundle's obligations under clause 6 and clause 8, but they do give rise to issues of fact as to what was achieved. The judge should therefore have made findings about what Rundle did, whether it exercised its best endeavours, what it achieved and, if Mr Bray did not signify his satisfaction, whether it was unreasonable of him not to do so. Mr Wilson sought to argue that Whitecap had prevented Rundle from performing some of the tasks described in clause 4, but the argument was directed mainly, if not entirely, to the exercise of best endeavours by Rundle and to the unreasonable withholding of Mr Bray's consent. I can see that there was room for a good deal of argument about some of those matters, but ultimately the only relevant questions were whether Rundle had performed the tasks set out in clause 4 and if not, whether it had been prevented from doing so by Whitecap and on these questions the judge failed to make findings. Whatever may be said about other matters, however, I think that the judge's findings in paras 89 and 92 provide a sufficient basis for holding that Rundle failed to provide a workable solution to the cable, pick-up and release mechanism problems as required by clause 4(d) within a reasonable time or at all. That was sufficient to prevent it from claiming payment of the second

instalment of the price and, more importantly, from relying on clause 8 in answer to the claim unless it could establish that it had been prevented from completing that task by some improper conduct on Whitecap's part. No such allegation was made in the defence (though allegations of a broadly similar kind were made in relation to the performance of the tasks set out in clause 4(f) and (h)) and Mr Wilson was able to point to little in the evidence, beyond bare assertions by Rundle that it had followed the agreement as far as it had been allowed to, that would support the conclusion that Whitecap had prevented it from completing the task described in clause 4(d). In those circumstances I do not think that there is any basis for holding that the conditions in clauses 6 and 8 can be disregarded because Whitecap wrongfully prevented their fulfilment.

*Rejection of the goods*

41. It is convenient to consider next the issue in respect of which Whitecap seeks permission to appeal, namely, whether it was entitled to, and did, reject the goods in November 2004.

42. The equipment was delivered and in commercial operation by the end of May 2002. Although it suffered from various defects, Whitecap operated it throughout the 2002, 2003 and 2004 seasons, repairing and replacing parts as necessary and in some cases making alterations to the system in an attempt to achieve a permanent solution to the various problems that were encountered. The judge found that following the rebuilding of the business relationship between the two companies in the early months of 2004 Rundle carried out substantial rectification and maintenance work, but despite that breakdowns continued to occur during 2004, one of which led to the equipment's being out of action for two weeks. Eventually, in November 2004, Whitecap purported to reject it in its entirety and pursued a claim for damages for non-delivery. The judge found that the equipment was not of satisfactory quality or fit for its purpose, but he held that by the 2003 season Whitecap had accepted it despite its shortcomings.

43. The terms implied by section 14(2) and (3) of the Sale of Goods Act 1979 to the effect that the goods will be of satisfactory quality and fit for their purpose are conditions, but if the buyer has accepted the goods he is compelled by virtue of section 11(4) to treat a breach of condition as a breach of warranty and cannot treat it as a ground for rejecting them, unless there is an express or implied term of the contract to that effect. Acceptance is governed by section 35 of the Act which provides (so far as material) as follows:

35. Acceptance.

(1) The buyer is deemed to have accepted the goods . . .

(a) when he intimates to the seller that he has accepted them, or

(b) when the goods have been delivered to him and he does any act in relation to them which is inconsistent with the ownership of the seller.

. . .

(4) The buyer is also deemed to have accepted the goods when after the lapse of a reasonable time he retains the goods without intimating to the seller that he has rejected them.

44. In principle I think the judge was right to hold that by the time Whitecap purported to reject the goods in November 2004 it must be deemed to have accepted them in accordance with section 35, both because it had by then done various acts in relation to them which were of such a nature as to be inconsistent with Rundle's ownership and because it had retained and used them for a sufficient period of time without intimating that it had rejected them. As to the first of these, it is necessary to bear in mind that after the relationship between the parties broke down in March 2003 there was no further communication between them until September 2003 and that during that summer season Whitecap set about rectifying the system for itself as best it could. What is a reasonable time for the purposes of section 35(4) is a question of fact to be determined primarily by reference to all the circumstances of the case. However, given the nature of the equipment and the terms of the contract (in particular clauses 12 and 14), I find it impossible to say that a reasonable time had not elapsed by the end of the 2004 season.

45. In conjunction with section 34 section 11(4) provides a statutory affirmation of the contract which prevents the buyer from subsequently treating a breach of condition as grounds for rejecting the goods and treating the contract as discharged. It is no answer to say, therefore, as Mr Ramsden did, that the effect of rejecting goods is to treat the contract as discharged by repudiation and that in support of its right to do so Whitecap was entitled to rely on facts of which it was unaware at the time. By November 2004 Whitecap had no such right. Nor is it an answer to say that a person does not lose his right to treat the contract as discharged simply by calling for proper performance and that even if he has affirmed the contract a subsequent breach of a repudiatory nature will entitle him once again to treat the contract as discharged. Stated in general terms these propositions are not controversial, but in this case they have to be considered in the context of a contract for the sale of goods. Subject to any agreement to the contrary, the implied terms

in sections 14(2) and (3) of the Sale of Goods Act relate to the condition of the goods at the time of delivery. It is at that point that compliance with the conditions must be satisfied. Although a breach of condition may be reflected in failures which occur over the days, weeks or months following delivery, the breach itself occurs at the date of delivery. It follows that it is not correct to treat each succeeding breakdown as involving a fresh breach of contract; nor, in the absence of a continuing obligation on Rundle to maintain the equipment in good working order, was there anything that might properly be characterised as a continuing breach. Nothing in the heads of agreement preserved or revived Whitecap's right to reject the goods if Rundle's attempts to solve the problems were unsuccessful, although such a provision could have been included. In my view by November 2004 Whitecap had lost its right to reject the goods.

46. However, that is not the end of the story. On 12 November 2004 Whitecap's solicitors wrote to Rundle's solicitors informing them that Whitecap rejected the equipment in its entirety, were proceeding to dismantle it and intended to replace it in due course. Rundle's solicitors responded on 15 November disputing Whitecap's right to reject the equipment or to dismantle it. They said that Rundle intended to rely on the retention of title clause in the contract and expected Whitecap to make payment. They also confirmed that Rundle intended to rely on the exclusion clause in response to any claim for damages. On 19 January 2005 Whitecap's solicitors wrote again, stating that their client had completed dismantling the machinery and demanding that Rundle collect it within 21 days, failing which Whitecap would charge for its storage. On 21 January Rundle's solicitors responded confirming that their client would collect the equipment, but saying that it might take more than one visit to do so.

47. The judge found that Rundle had attended at Whitecap's premises by arrangement over two days in order to collect the majority of the equipment but that it was refused further access in order to collect the remainder. In particular, Whitecap retained the launching platform and pontoons, which it used in conjunction with the new cable tow system supplied by Rixen. The retention of that equipment led Rundle to make a claim in these proceedings for damages for conversion of what in terms of its value it contends was the major part of the equipment.

48. Despite the return of what the judge found to be the majority of the equipment pursuant to the exchange of correspondence to which I have referred, at the trial no one seems to have considered the legal implications of what had taken place. I think it is clear that although Rundle

disputed (correctly) Whitecap's right to reject the goods, it acquiesced in its doing so and accepted the return of part of the equipment on that basis. Mr Wilson submitted that in practice Rundle was not free to take any other course because Whitecap had threatened to charge it for storing the equipment if it failed to remove it. He also submitted that Rundle was doing no more than was reasonable to protect the equipment in which it retained title, part of the purchase price still being outstanding. However, in my view neither of these arguments meets the point. Faced with Whitecap's purported rejection Rundle had a choice: it could dispute Whitecap's right to reject the equipment and claim the outstanding balance of the price, or it could acquiesce in it, accept redelivery and claim damages for non-acceptance. Although Rundle initially shaped up to take the former course, the correspondence shows that it ultimately took the latter.

49. In view of the way in which these proceedings have been conducted, and particularly in the light of some of the issues dealt with later in this judgment, I have felt some concern about whether it is appropriate for this court to hold on this basis that Whitecap effectively rejected the equipment, since the case was not argued before the judge in this way, nor does the argument appear in quite this form in the respondent's notice. However, the substance of the cross-appeal is that Whitecap did effectively reject the equipment and was therefore entitled to recover damages for non-delivery rather than damages for breach of warranty and it is difficult to see what other evidence could have had a bearing on the question. Similarly, apart from making findings about the terms of the correspondence passing between the parties' solicitors, it is difficult to see what other facts the judge might have been asked to find which would have been of relevance. The matter was fully canvassed at the hearing of the appeal and in these circumstances I have come to the conclusion that in justice to both parties the court should determine the question. I would therefore give permission to appeal and hold that Whitecap did effectively reject the equipment. The result is that property in the goods vested unconditionally in Rundle and Whitecap ceased to be liable for the price.

50. Two consequences follow from that conclusion. The first is that Whitecap is entitled to recover the payments it has made on account of the price of the goods. Although the claim to recover the price formed part of its wider claim for damages for breach of contract, Mr Ramsden also submitted that if Whitecap was entitled to reject the equipment it was entitled to recover the price on the basis of unjust enrichment. In my view that must be right, because payment of the price is the consideration for the transfer of property in the goods and if the

LLOYD'S LAW REPORTS

CA] **Whitecap Leisure Ltd v John H Rundle Ltd** [MOORE-BICK LJ

goods are rejected, property (if it has already passed) reverts to the seller. In my view, therefore, Whitecap is entitled to recover the various amounts it has paid on account of the price. Since that formed part of its pleaded claim, there can be no objection to this court's making an order which has that effect.

51. The question then arises whether Whitecap is also entitled to recover damages in respect of losses caused by the defects in the equipment prior to its rejection. But for the operation of clause 14 it would be, but, for the reasons given earlier, I am of the opinion that that clause relieves Rundle of liability for any defects other than those which appeared during the first year after delivery and were notified in writing within a period of 14 days thereafter as still requiring rectification. In their letter of 15 November 2004 which preceded Rundle's eventual acquiescence in the rejection of the goods its solicitors made it clear that their client was relying on clause 14 and nothing was said after that to alter the position. I think it is impossible, therefore, to find within that exchange of correspondence an agreement on Rundle's part to accept liability for defects other than as provided for by clause 14. In my view, therefore, Whitecap is not entitled to recover damages for breach of contract.

52. The second consequence is that Whitecap became obliged to redeliver the whole of the equipment to Rundle and risked becoming liable in conversion if it retained any part of it for its own purposes. That is an aspect of the matter which it is more convenient to deal with when I come to the grounds of appeal against the judgment on damages.

*Negligence*

53. Before turning to the issues relating to damages it is necessary to deal with one aspect of the case which did not feature prominently at the trial but has nonetheless given rise to a ground of appeal. In its particulars of claim Whitecap made the following allegation:

The defendant owed to the claimant a concurrent and co-extensive duty of care to design, manufacture and install the ski tow equipment ordered by the claimant with the skill and care to be expected of an expert manufacturing company holding itself out as competent to construct equipment of that kind.

The claimant's primary case was that the equipment was not of satisfactory quality or fit for its purpose contrary to sections 14(2) and (3) of the Sale of Goods Act 1979 and that was supported by detailed allegations of breakdowns and failures between May 2002 and September 2004. No particulars of

negligence were given other than the criticisms of the manufacturing process that appeared in two experts' reports annexed to the particulars of claim. All the damage suffered by Whitecap that was alleged to have been caused by Rundle's breach of contract was also alleged to have been caused by its negligence, but no further particulars were given.

54. The judge clearly thought in the circumstances of this case that if there had been a breach of contract Rundle must also have been negligent and since he later found that there were three fundamental flaws in the design of the equipment or its components it is perhaps not surprising that he held that Rundle was liable to Whitecap on this alternative ground as well. Mr Wilson challenged that conclusion on the ground that facts constituting a breach of contract of the kind alleged in this case do not necessarily establish negligence. In principle that may be right, but the judge's observation is to be understood in the context of a contract under which Rundle was responsible for the design and manufacture of the equipment and all its components. The criticisms made by the metallurgist of the choice of materials and the quality of some of the castings makes it difficult to argue that the equipment was designed and manufactured with reasonable skill and care.

55. However, in my view the real criticism of this part of the judgment lies in the failure to consider with sufficient care the nature of the duty said to have been owed by Rundle to Whitecap, for which the parties are primarily at fault. If Whitecap had been asked to provide further information identifying the nature of the duty of care that was said to exist at common law and the loss that was said to have been caused by its breach, I think it would have become clear that the common law tort of negligence had no part to play in this case. I do not doubt that Rundle did owe Whitecap a duty to exercise reasonable skill and care in the design and manufacture of the equipment to avoid causing injury to persons or damage to property as a result of the failure of components or faulty operation, but that is a different matter altogether. It did not owe Whitecap a duty at common law to take reasonable care not to cause economic loss by supplying equipment that was not of the required contractual quality. If the equipment was defective, Whitecap's cause of action was for breach of contract and it was irrelevant for these purposes to ask whether the breach was the result of negligence. The judge was therefore wrong, in my view, to hold that Rundle was liable in negligence, but nothing turns on that since the losses which Whitecap seeks to recover can be recovered, if at all, as damages for breach of contract.

*Damages*

56. A number of grounds of appeal relate directly or indirectly to various awards of damages made by the judge in favour of Whitecap, but in view of the decision to which I have come on the operation of clause 14 of the contract most of these no longer arise and I do not think that anything is to be gained by discussing them. One, however, raises questions of wider importance. It arises out of the judge's conclusion that Whitecap was entitled to recover damages for breach of warranty and his subsequent adjournment of the trial to enable both parties to put forward their respective cases in greater detail. The other two matters that must be considered are Rundle's appeal against the judge's rejection of its claim for conversion of those parts of the equipment that remained in Whitecap's possession and its appeal against the judge's rejection of its claim for payment of one particular invoice.

*(a) The adjournment of the trial*

57. Mr Wilson's primary ground of appeal under this head was that the judge had acted improperly and unfairly in adjourning the trial of damages following the delivery of his first judgment in order to enable Whitecap to advance a different case from that which it had been making up to that point. In order to understand how that came about it is necessary to return for a moment to the statements of case.

58. In its particulars of claim Whitecap pleaded that it had rejected the equipment and confined itself to a claim for damages for non-delivery and consequential damages in the form of the costs of repairs and loss of profit during periods when it had been out of action. In its defence Rundle denied that the equipment had been defective and took issue with para 17 of the particulars of claim, which contained the allegation that Whitecap had rejected the goods. Whitecap did not seek to amend its statement of case to put forward an alternative claim for damages for breach of warranty, so the matter went to trial on the basis that the only claim being made was for damages for non-delivery.

59. Although there was a dispute over Whitecap's right to reject the goods, it does not appear that the consequences of its failing to succeed on that issue were canvassed very fully, if at all, in argument. In particular, the possibility that Whitecap might be entitled to recover damages for breach of warranty does not seem to have arisen. However, when the judge came to write his judgment the consequences of his decision did not escape him, but he was concerned that a claim for breach of warranty had not been fully particularised or argued. He therefore confined himself to holding that Whitecap was entitled to recover damages on

that basis, expressing a preliminary view as to what was the appropriate measure of damages and adjourning the matter to enable further submissions to be made at a later date. He directed the exchange of further statements of case to clarify the issues between the parties.

60. At the resumed hearing the judge allowed Mr Wilson to address him on the propriety of the course he had already taken and intended to pursue. Mr Wilson submitted that following his findings on liability the judge had no jurisdiction to entertain submissions from Whitecap in support of a case on damages that had not been pleaded, or at any rate that it would be inappropriate to do so. The judge, however, roundly rejected that submission, which he considered to be at odds with the modern approach to case management. He also expressed the view that the right to recover damages for breach of warranty arose by operation of law, which he said was the principal reason for his decision to allow further submissions on the question of damages.

61. Before us Mr Wilson made submissions similar to those he had made to the judge. He pointed out that there had been no order severing the trial, so that both parties had come to court expecting the judge to determine all issues relating to both liability and quantum. The parties' respective cases were set out in their statements of case and they were each entitled to assume that at the end of the trial the judge would decide all matters in dispute. Instead, without any warning he had delivered a judgment in which he had held that Whitecap was entitled to damages on a basis different from that which it had pleaded and had adjourned the hearing in order to allow it an opportunity to put its new case in order. He submitted that a judge should not enter the arena in support of one party in that way, but in general should allow each party to stand or fall by reference to the case it has chosen to put forward.

62. Although Mr Wilson put his argument in terms of jurisdiction, I do not think that it can be sustained on that narrow ground. Judges have always had wide powers to control proceedings before them and I doubt whether there was ever a time at which the court did not have jurisdiction to adjourn a trial, either on the application of one of the parties or of its own motion, if the interests of justice so required. Certainly, since the introduction of the Civil Procedure Rules judges have been given more generous powers to control proceedings and have been encouraged to make full use of them. Mr Wilson relied on a dictum of Lord Woolf in *McPhilemy v Times Newspapers Ltd* [1999] 3 All ER 775 at page 793 that statements of case "mark out the parameters of the case that is being advanced by each party", and so they do, but

# LLOYD'S LAW REPORTS

CA]                **Whitecap Leisure Ltd v John H Rundle Ltd**                [Moore-Bick LJ

statements of case are capable of being amended even at a late stage when that is necessary in the interests of justice. He also relied on a dictum of Scrutton LJ in *Blay v Pollard* [1930] 1 KB 628 at page 634 that "cases must be decided on the issues on the record", but in substance that does not take matters any farther. The real question, in my view, is whether the judge exercised his jurisdiction wrongly in the circumstances of this case.

63. Although judges are nowadays expected to take a more active role in managing and controlling proceedings than was once the case, it is important that they should remain, and be seen to remain, scrupulously impartial. It is true, as the judge observed, that the overriding objective of the CPR is to enable the court to deal with cases justly, but, as Rules 1.1(2) and 1.4 make clear, that does not always mean reaching the correct answer in law, come what may. Other factors may have to be taken into consideration and the preservation of judicial impartiality is of fundamental importance. However, that does not mean that the judge is invariably condemned to leave a party floundering in a mess of his own making, even when that party is legally represented. Reaching a just decision according to law is the whole purpose of a trial and the judge should do what he reasonably can to achieve that end. The critical question, in my view, is whether the judge has acted fairly and that usually means asking whether he has given both parties a proper opportunity to deal with the issues that actually arise in the proceedings.

64. I think it was unfortunate that the judge simply announced in the course of delivering judgment that he had reached the conclusion that Whitecap was entitled to recover damages on a basis different from that set out in its particulars of claim because it was liable to give the impression that he was presenting it with a gift to which it was not entitled. Certainly, the fact that (as he saw it) a right to recover damages arose by operation of law did not of itself justify that step in a case where no claim to recover on that basis had been made. A better course (and one which in my view was well within his case management powers) might have been to limit his judgment to issues of liability and to invite the parties to address him on the directions that he should give for the trial of quantum, including the need for any further pleading. That would inevitably have led to an application by Whitecap to amend its particulars of claim on which Rundle would have had an opportunity to be heard. For reasons to which I shall come in a moment, I should have been surprised if such an application had been refused, despite the late stage in the proceedings that had been reached, but the judge might have imposed certain terms, including

terms as to costs. Had he acted in that way, I do not think that Rundle would have had any grounds for complaint.

65. When considering the judge's response to the situation two things must be borne in mind. The first is that although as a matter of legal analysis a breach of warranty gives rise to a different basis of claim, in this case Whitecap was asserting that the equipment was useless, and so would inevitably have sought to recover in damages an amount at least equal to the whole of the price it had paid, as well as the consequential losses set out in its particulars of claim. In practical terms, therefore, the shape of the case was not materially affected by the change in the basis of claim, so it is hard to see in what respect the evidence would have differed if the alternative case had been pleaded well in advance of the trial. That is one reason why I think it unlikely that the judge would have refused permission to make the necessary amendment, if it had been sought. Any additional costs caused by the need for a separate trial of damages could have been dealt with after judgment in the usual way, but it should be noted that another reason the judge gave for severing the trial was to enable Rundle to provide fuller argument in relation to its counterclaim.

66. Looking at the matter in the round, I am not persuaded that Rundle has suffered any real injustice as a result of the way in which this matter was handled. Indeed, Mr Wilson was unable to identify any real prejudice to his client, other than that of being deprived of the chance of shutting out a meritorious claim on a technicality. I do not find that a very attractive result and it is not one which in the circumstances of this case sits very happily with the overriding objective. For the reasons given earlier I have come to the view that Whitecap is not entitled to recover damages in this case, but in my view the judge's handling of the trial did not provide sufficient grounds for setting aside his award in its favour if it had otherwise been sustainable.

### (b) Damages for conversion

67. Rundle's claim in conversion was originally advanced on the assumption that Whitecap was not entitled to reject the equipment and had not done so. Mr Wilson submitted that Rundle had retained title in the goods by virtue of clause 18 of the contract and that, by retaining the goods and continuing to use parts of them while withholding part of the price, Whitecap had converted them. He submitted that Rundle was entitled to elect between taking a judgment for the balance of the price and a

judgment for damages for conversion in the light of the judge's findings as to the value of the goods. The judge, he said, had erred in failing to make a finding about the value of the equipment retained by Whitecap and in failing to give Rundle the opportunity to elect between these different remedies.

68. In my view, that argument was never sound because by delivering the goods under the contract Rundle necessarily authorised Whitecap to retain and use them for the purposes for which they had been sold. If, as the judge held, Whitecap had not rejected the goods, it would have retained and made use of them in the manner contemplated by, or at any rate consistent with, the contract. There would have been no question of choosing between inconsistent rights or remedies: Rundle's only remedy would have been to sue for the balance of the price, unless it exercised its right to repossess the equipment under clause 18, a course which it never sought to take. On the view the judge took of the matter, therefore, the judge was right to hold that credit for the outstanding balance of the price was all that Rundle was entitled to receive.

69. In fact, however, once Rundle acquiesced in Whitecap's rejection of the equipment, Rundle became entitled to recover and dispose of it as it wished. Similarly, Whitecap became obliged to redeliver the equipment to Rundle, which simply meant making it available for Rundle to collect. In my view the judge's findings lead inevitably to the conclusion that by refusing Rundle access to its premises to remove the remaining equipment and by making use of it for its own purposes Whitecap appropriated that equipment to itself and thereby converted it. Accordingly, Rundle is entitled to damages for conversion by Whitecap of the equipment that it retained.

70. In the schedule of damages served for the purposes of the trial of damages Rundle set out in some detail the equipment that it alleged Whitecap had converted and its value. Somewhat surprisingly, given that the total purchase price of the equipment was only £184,475 (inclusive of VAT) and it had been in use for almost three years, the value of the parts retained by Whitecap when the system was dismantled at the end of 2004 is said to have been £184,734, but however that may be, the value of the goods is clearly in dispute and cannot be determined on this appeal. Regrettably, therefore, unless the parties can reach agreement in the matter, the case will have to be remitted to the High Court for the assessment of this head of damages.

*(c) Invoice No 12116*

71. As part of its counterclaim Rundle sought payment of the sum of £12,672.56 covered by its invoice No 12116 dated 21 June 2004 in respect of certain work and materials supplied in connection with the repair or maintenance of the equipment. Mr Wilson submitted that the work and materials in question had been supplied pursuant to the heads of agreement, clause 7 of which governed Whitecap's liability to pay for them.

72. In its counterclaim Rundle sought to recover payment for the work and materials covered by this invoice on the grounds that they constituted maintenance services. If they did, and if they were supplied pursuant to the heads of agreement, it was entitled to do so. Whitecap does not appear to have denied that the work was carried out, but it contended that it constituted repair and rectification of defects and was in any event of no value. The judge held that since Rundle was in breach of contract in supplying defective equipment it had no right to recover the cost of labour or parts covered by that invoice. It may be that what the judge meant was that since the equipment was and remained fundamentally defective throughout, Whitecap was entitled to recover in damages any amounts it had paid Rundle in respect of it, including any expense it incurred in seeking to make it work properly. That would be consistent with the preliminary view he had expressed in para 95 that Whitecap was entitled to recover as damages for breach of warranty any costs it had reasonably and properly incurred in trying to rectify the system, though simple maintenance might be a different matter.

73. That view can no longer be sustained, however, once it is accepted that Rundle is not liable for damages for defects in the equipment. Under clause 7 of the heads of agreement Whitecap agreed to pay for replacement parts required to make good defects in design, installation of which was to be carried out by Rundle free of charge. However, where the work was in the nature of maintenance, Whitecap was to pay for both parts and labour. Unfortunately, the parties were unable to agree whether clause 7 applied to the work covered by this invoice, if so, into which category the work fell, and whether any of the parts or the workmanship itself were defective. In those circumstances I can see no alternative but to remit this claim to the High Court for determination.

*Conclusion*

74. For these reasons I would allow the appeal, set aside the existing judgment in favour of White-

LLOYD'S LAW REPORTS

CA] **Whitecap Leisure Ltd v John H Rundle Ltd** [Ward LJ

cap and substitute judgment for the amount it has paid Rundle in respect of the price, enter judgment for Rundle on its counterclaim for damages to be assessed and remit the matter to the High Court for the assessment of damages on the counterclaim and for the determination of Rundle's claim for payment of invoice No 12116.

**Lord Justice WALL:**

75. I agree and although we are differing from the conclusion reached by the judge I do not think there is anything I can usefully add.

**Lord Justice WARD:**

76. I also agree.