Page 1

```
 1   UNITED STATES BANKRUPTCY COURT
 2   SOUTHERN DISTRICT OF NEW YORK
 3
 4   - - - - - - - - - - - - - - - - - x
     In the Matter of:              x     Chapter 11
 5                                   x
     LEHMAN BROTHERS HOLDINGS INC.,  x     Case No. 08-13555(SCC)
 6   ET AL.,                         x
                                     x     (Jointly Administered)
 7               Debtors.            x
     - - - - - - - - - - - - - - - - - x
 8   In the Matter of:              x
                                     x
 9   LEHMAN BROTHERS HOLDINGS INC.,  x     Case No. 08-01420(SCC)
                                     x
10               Debtor.             x     (SIPA)
     - - - - - - - - - - - - - - - - - x
11   In the Matter of:              x
                                     x
12   LEHMAN BROTHERS HOLDINGS INC.,  x
     ET AL.                          x
13          v.                       x     Adv. Case No. 13-01554
                                     x
14   GIANTS STADIUM LLC              x
                                     x
15   - - - - - - - - - - - - - - - - - x
     In the Matter of:              x
16                                   x
     MOORE MACRO FUND, ET AL.,       x
17                                   x
18          v.                       x     Adv. Case No. 14-02021
18                                   x
     LEHMAN BROTHERS HOLDINGS INC.,  x
19   ET AL.                          x
                                     x
20   - - - - - - - - - - - - - - - - - x
21
22
23
24
25
```

Page 2

1                    U.S. Bankruptcy Court

2                    One Bowling Green

3                    New York, New York

4

5                    July 16, 2014

6                    10:08 AM

7

8

9    B E F O R E :

10   HON. SHELLY C. CHAPMAN

11   U.S. BANKRUPTCY JUDGE

12

13

14

15

16

17

18

19   HEARING re Trustee's Objection to the General Creditor Proof

20   of claim of Sofia Frankel (Claim No. 4909)[LBI ECF No. 8425]

21

22   HEARING re Debtors' Motion for Alternative Dispute

23   Resolution Procedures Order for Indemnification Claims of

24   the Debtors Against Mortgage Loan Sellers [ECF No. 44450]

25

1    HEARING re Four Hundred Sixty-Sixth Omnibus Objection to

2    Claims (No Liability Claims)[ECF No. 44487]

3

4    HEARING re Debtors' Objection to Proofs of Claim Filed by

5    2138747 Ontario Ltd. and 7895778 Canada Inc. (claim Nos.

6    33583 and 33586)[ECF No. 18397]

7

8    HEARING re Three Hundred Twenty-Third Omnibus Objection to

9    Claims (Late-Filed Claims)[ECF No. 29295]

10

11   HEARING re Lehman Brothers Holdings Inc., et al. v. Giants

12   Stadium LLC [Adversary Proceeding No. 13-01554] Pre-Trial

13   Conference

14

15   HEARING re Moore Macro Fund, et al. v. Lehman Brothers

16   Holdings Inc., et al. [Adversary Proceeding No. 14-02021]

17   Pre-Trial Conference

18

19

20

21

22

23

24

25   Transcribed by:  Dawn South and Nicole Yawn

Page 4

1    A P P E A R A N C E S :

2    WEIL, GOTSHAL & MANGES LLP

3          Attorneys for LBHI

4          767 Fifth Avenue

5          New York, NY 10153-0119

6

7    BY:   RALPH I. MILLER, ESQ.

8          SUNNY SINGH, ESQ.

9          STEPHEN A. YOUNGMAN, ESQ.

10          MAURICE HORWITZ, ESQ.

11          ERIKA DEL NIDO, ESQ.

12          RICHARD W. SLACK, ESQ.

13

14    WOLLMUTH MAHER & DEUTSCH LLP

15          Special Counsel to LBHI

16          One Gateway Center

17          Newark, NJ 07102

18

19    BY:   JAMES N. LAWLOR, ESQ.

20          ADAM M. BIALEK, ESQ.

21

22

23

24

25

1    JONES DAY

2         Attorneys for LBHI

3         222 East 41st Street

4         New York, NY 10017-6702

5

6    BY:  JAYANT W. TAMBE, ESQ.

7         TRACY V. SHAFFER, ESQ.

8

9    HUGHES HUBBARD & REED LLP

10        Attorneys for the SIPA Trustee

11        One Battery Park Plaza

12        New York, NY 1004-1482

13

14   BY:  JORDAN E. PACE, ESQ.

15        ROBERT B. FUNKHOUSER, ESQ.

16

17   SHENWICK & ASSOCIATES

18        Attorney for Sofia Frankel

19        655 Third Avenue

20        20th Floor

21        New York, NY 10017

22

23   BY:  JAMES H. SHENWICK, ESQ.

24

25

Page 6

1   FOLEY & LARDNER LLP

2         Attorney for Sellers

3         90 Park Avenue

4         New York, NY 10016

5

6   BY:  DEREK WRIGHT, ESQ.

7

8   MACAULEY LLC

9         Attorneys for Conway Hospital

10         300 Delaware Avenue

11         Wilmington, DE 19801

12

13   BY:  ANDREW WHITE, ESQ.

14         THOMAS G. MACAULEY, ESQ.

15

16   DICKSTEIN SHAPIRO LLP

17         Attorneys for Claimants

18         1633 Broadway

19         New York, NY 10019-6708

20

21   BY:  SHAYA M. BERGER, ESQ.

22         DEBORAH A. SKAKEL, ESQ.

23

24

25

Page 7

1   BLANK ROME LLP

2        Attorney for Sterns Landing Inc.

3        The Chrysler Building

4        405 Lexington Avenue

5        New York, NY 10174-0208

6

7   BY:  TIMOTHY W. SALTER, ESQ.

8

9   SULLIVAN & CROMWELL LLP

10        Attorneys for Giant Stadium

11        125 Broad Street

12        New York, NY 10004-2498

13

14   BY:  MATTHEW A. SCHWARTZ, ESQ.

15        THOMAS JOHN WRIGHT, ESQ.

16

17   SCHLAM STONE & DOLAN LLP

18        26 Broadway

19        New York, NY 10004

20

21   BY:  JEFFREY M. EILENDER, ESQ.

22        BENNETTE D. KRAMER, ESQ.

23

24

25

1                    P R O C E E D I N G S

2            THE COURT:  Good morning, please have a seat.  How

3    is everyone today?

4            Okay, let's take the agenda in the order in which

5    the items are listed.

6            MR. PACE:  Good morning, Your Honor.

7            THE COURT:  Good morning.

8            MR. PACE:  Jordan Pace of Hughes Hubbard & Reed

9    for the SIPA Trustee for Lehman Brothers Inc.

10           I know Your Honor has a full calendar today,

11   mostly with LBHI materials, and the holdings company has

12   allowed us to go first.

13           We're here today on one contested matter and

14   that's the trustee's objection to the claim of Sofia

15   Frankel.

16           THE COURT:  Okay.

17           MR. PACE:  It's a claim from a former LBI

18   broker --

19           THE COURT:  All right.

20           MR. PACE:  -- for five and a half million dollars

21   of indemnification.

22           Before I get into the substance, because the

23   procedural history is a big complexity I'd just like to go

24   through that.

25           THE COURT:  Okay.

Page 9

1          MR. PACE:  What happened is that we filed an

2     objection back in March.

3          THE COURT:  Right.

4          MR. PACE:  And Ms. Frankel filed a response to

5     that, but she also filed an amended claim --

6          THE COURT:  Right.

7          MR. PACE:  -- before we had a chance to reply.

8          The parties stipulated that Ms. Frankel would

9     withdraw the original claim and in turn we agreed to treat

10    her amended claim as timely.

11         We then filed a supplemental objection and gave

12    Ms. Frankel plenty of time to respond to that.  She did not

13    file a response to that so in reality the supplemental

14    objection itself is uncontested.  But just to be sure we

15    filed our reply and we're here.

16         So to be clear the only live claim and the one

17    that we are seeking to have disallowed is the amended claim,

18    that's number 6430.

19         THE COURT:  Okay.

20         MR. PACE:  So turning to the substance of the

21    claim.  As I mentioned the entire claim is for

22    indemnification.  Five and a half million dollars broken

23    into only two and a half million dollars that is the actual

24    underlying award.

25         THE COURT:  Right.

Page 10

1              MR. PACE:  There's 1.7 million of interest,

2    there's 500,000 of attorneys' fees --

3              THE COURT:  Right.

4              MR. PACE:  -- and then there's an undesignated

5    $844,000 payment.  Now --

6              THE COURT:  It's unclear -- with respect to that

7    payment it's unclear -- the trustee's position that it's

8    unclear whether in fact that application of that capital

9    account actually was even paid over?

10              MR. PACE:  Well, Your Honor, what we understand is

11    that there has been litigation -- much litigation between

12    Ms. Frankel and the underlying claimants, and part of that

13    and the decision we included is that the only value that can

14    be counted towards the payment of the award is cash actually

15    received by the claimants, by --

16              THE COURT:  Right.

17              MR. PACE:  -- Sardis & Jazz (ph).  We understand

18    that they've received about half of what's being claimed

19    here and the rest is likely the value of the account that

20    was turned over, which the Court said isn't what counts, but

21    we also say that's all postpetition interest.

22              So stepping back and looking at the claim from a

23    high level since its only indemnification under both

24    Delaware law and LBI certificate there's no right to

25    indemnification until there's this determination that

Page 11

1    Ms. Frankel acted in good faith and in a manner she

2    reasonably believed to be in the best interest of LBI.

3              Now Ms. Frankel was accused by Sardis & Jazz of

4    fraudulently misrepresenting her qualifications and her past

5    performance and also fraudulently churning their accounts.

6    Those were the allegations in the FINRA arbitration --

7              THE COURT:  Right.

8              MR. PACE:  -- and the FINRA arbitration found

9    Ms. Frankel liable based on those allegations.  So she was

10   found liable based on her own fraudulent conduct.

11             And the subsequent court decisions both in New

12   York State Court on the confirmation of the award and in

13   Federal Court when Ms. Frankel sued her attorney from the

14   arbitration confirmed that fact.

15             And furthermore in Ms. Frankel's response she

16   admits that those subsequent court decisions said that she

17   had committed fraud.  She says that the judges therein erred

18   in finding that she committed fraud, so it's the admission

19   of the finding --

20             THE COURT:  Right.

21             MR. PACE:  -- it's just that essentially she wants

22   to relitigate it for by my count is at least the third time.

23   But thankfully we have collateral estoppel to say that she

24   can't do that.  Because of the arbitration award, because of

25   the court findings Ms. Frankel is collaterally estopped from

Page 12

1    denying that she acted fraudulently, and because she acted

2    fraudulently she cannot get any indemnification under

3    Delaware law or the certificate of incorporation.

4            The fraudulent representations themselves are bad

5    faith per se, it -- there's also no way that Ms. Frankel

6    defrauding her clients was in LBI's best interest.

7            In terms of the fraudulent churning.  Fraudulent

8    churning is a form of federal securities fraud and the

9    Second Circuit has said that one cannot be indemnified for

10   federal securities fraud.

11           So Ms. Frankel cannot meet the standard for

12   indemnification and therefore her claim is unenforceable

13   against LBI and that's why we're seeking to have it

14   disallowed in its entirety.

15           In our papers we also address various other

16   reasons.

17           THE COURT:  Right.

18           MR. PACE:  Chief among those is the fact that as I

19   mentioned there has to be an actual determination that she

20   met that standard, and putting aside for the moment the fact

21   that Ms. Frankel cannot met that standard and a

22   determination cannot be made in her favor no determination

23   has been made.  That's undisputed.  So it's a contingent

24   claim for reimbursement and it's barred under Section

25   502(e)(1)(b) of the Bankruptcy Code.

```
 1              Add to that the fact that most of the amounts have
 2    not been paid at all then it's doubly contingent and again
 3    must be disallowed.
 4              So, Your Honor, I can get into the details of why
 5    each component of the claim --
 6              THE COURT:  Well in addition -- additionally I
 7    think you had a break down of all the attorneys' fees and
 8    pointed out among other things that many of the categories
 9    of those fees had nothing to do with the original
10    litigation.
11              MR. PACE:  That's correct, Your Honor.  That, it's
12    not properly documented, we had to go searching the public
13    record and searching all these court cases to find what
14    these fees related to because there was no documentation to
15    support them as is required under Second Circuit precedent.
16              THE COURT:  Okay.  Why don't I hear from
17    Mr. Shenwick.
18              MR. PACE:  Yes, Your Honor.
19              THE COURT:  Thank you.
20              Good morning.
21              MR. SHENWICK:  Good morning, Your Honor, James
22    Shenwick representing Sofia Frankel.
23              Your Honor, what this case is about is the
24    debtors' failure to honor contractual indemnification.
25              THE COURT:  No, Mr. Shenwick, what this case is
```

Page 14

1   about is a position that in my mind almost certainly

2   violates Rule 11.  That's what this case is about.

3            I find the position that's taken here shocking,

4   just shocking.  You go through it step by step.  There was a

5   FINRA arbitration award that was then confirmed.

6            Your position is that because under the

7   arbitration rules the grounds are not specified therefore

8   the appellate decision confirming the award was wrong

9   because it found that she had committed fraud.

10           There are -- in addition what you're telling me is

11  that Judge Batts when she dismissed the malpractice claim

12  also got it wrong when she said that there was fraud.

13           So out of the box there's been a finding that

14  cannot be collaterally attacked that she engaged in fraud.

15           MR. SHENWICK:  The FINRA award was for

16  compensatory damages, there was no finding of fraud.  If

17  there had been a finding of fraud there would have been --

18           THE COURT:  That's not --

19           MR. SHENWICK:  -- punitive damages --

20           THE COURT:  That's not the way --

21           MR. SHENWICK:  -- awarded, which there were not.

22           THE COURT:  -- arbitration works.  Your remedy

23  would have been to take that further up on appeal.  I am not

24  going to revisit that.  What you're telling me is that I

25  should now have a trial on the issue of her good faith.

Page 15

1   That's essentially what you're telling me, right?  I mean

2   that --

3          MR. SHENWICK:  I think the record is clear that

4   there was good faith based on the arbitrators' 4 years, 37

5   sessions where they found compensatory damages only, no

6   punitive damages and no fraud.

7          THE COURT:  You're making -- Mr. Shenwick, but

8   you're making that up.

9          MR. SHENWICK:  No --

10         THE COURT:  There is a --

11         MR. SHENWICK:  -- I have the FINRA award right

12  here, Your Honor, I'm not making it up.

13         THE COURT:  No.  No, what you're making up is --

14         MR. SHENWICK:  It's right here.

15         THE COURT:  -- the fact that the allegations --

16  the allegations that were the subject of the arbitration

17  were that she engaged in fraudulent conduct and she churned.

18  Okay?  So therefore --

19         MR. SHENWICK:  Those were allegations, not the

20  findings.  It's the kitchen sink pleading.  I defended and

21  commenced securities arbitration actions.  You throw in all

22  the complaints you have, you hope something sticks to the

23  wall.  Three arbitrators, 37 sessions over 4 years paid for

24  by Lehman, Lehman management told her she had done a good

25  job and done nothing wrong.  Mr. McDunna (ph), the attorney

1    who defended her at Drinker Biddle, wrote a letter of

2    recommendation to UBS and said she had done nothing wrong.

3              THE COURT:  I'm not relitigating the FINRA

4    arbitration, I'm not ignoring the findings that were made by

5    three other courts that she engaged in fraudulent conduct

6    and churning.

7              MR. SHENWICK:  Two courts, Your Honor.  And --

8              THE COURT:  And Deborah Batts.  The Supreme Court

9    confirmed the award --

10             MR. SHENWICK:  I said two courts, Your Honor.

11   There were two hearings, State Court and Federal Court.

12             THE COURT:  Right, but there was a confirmation of

13   the award, correct?

14             MR. SHENWICK:  Yes.

15             THE COURT:  By which court?

16             MR. SHENWICK:  State Court.

17             THE COURT:  There are -- which State Court?  New

18   York Supreme, right?

19             MR. SHENWICK:  Yes, correct.

20             THE COURT:  Okay.  And then that went up to the

21   appellate term, right?

22             MR. SHENWICK:  Correct.

23             THE COURT:  Okay.  That's two State Courts.

24             MR. SHENWICK:  Right.

25             THE COURT:  Then there's Deborah Batts in --

Page 17

1            MR. SHENWICK:  Federal.

2            THE COURT:  -- the Federal Court when she sued for

3     malpractice.

4            MR. SHENWICK:  Correct, Your Honor.

5            THE COURT:  Right?  So now you're asking me to

6     number one -- I mean it's an astonishing request, right?

7     She hasn't paid all these amounts, she --

8            MR. SHENWICK:  She has, Your Honor, I'm sorry.

9            THE COURT:  She's paid two and a half million

10    dollars?

11           MR. SHENWICK:  No, she's paid three components of

12    the claim.  Her condominium that was valued at $1 million

13    was sold four weeks ago, I have the sheriff sale papers.

14    The net to Sardis' was $960,000.  She had three brokerage

15    accounts which she turned over and the payment of legal

16    fees.

17           May I approach, Your Honor, I have the sheriff

18    sale papers here?  I have copies for everyone.

19           THE COURT:  Mr. Shenwick, I'm really not

20    interested in them.

21           MR. SHENWICK:  The sheriff sale --

22           THE COURT:  I'm not interested in them.

23           MR. SHENWICK:  Okay.  What are you interested in,

24    Your Honor?

25           THE COURT:  I'm interested in the fact that among

Page 18

1   the things that she claims are attorneys' fees in connection

2   with her asset protection plan.  Attorneys' fees that have

3   nothing to do with the defense of her conduct in the FINRA

4   arbitration, that have nothing to do with her employment

5   with Lehman.

6           MR. SHENWICK:  Your Honor --

7           THE COURT:  Making a claim of that nature

8   implicates Rule 11, also implicates the bankruptcy crime and

9   fraud statute.

10          You don't get to as you say throw in the kitchen

11  sink when you make claims in this court.  That's not the way

12  it works.

13          MR. SHENWICK:  Understood, Your Honor, it was in

14  error and she's correcting that.  She paid substantial

15  amount of legal fees to over four law firms, and I have a

16  spreadsheet with those totals.  Yes, there was some mistakes

17  there.  She's a single woman in Florida and she miscounted.

18  She's paid over 10 law firms here over 498,000.  She may

19  have thought that asset protection planning was related to

20  the -- an indemnification because without the Sardis claim

21  she would not have done the asset protection planning.  Four

22  hundred and ninety-eight thousand give or take.  The

23  condominium sale, I have the sheriff's papers here.  Three

24  brokerage accounts, Barclays, MB Private Funds, and Lehman

25  Private Equity, 844,000.

```
 1              This is not a contingent claim, this is not double

 2    counting.  This is a woman who wants to be indemnified.  She

 3    in good faith has made payment to the Sardis', Lehman has

 4    not.  She wouldn't have taken the job at Lehman without an

 5    indemnification.

 6              THE COURT:  But I --

 7              MR. SHENWICK:  Her boss told her she did nothing

 8    wrong.  McDunna, the attorney who represented her for four

 9    years wrote a letter to UBS, I have that letter here as

10    well, Your Honor, it's Drinker Biddle letterhead and it's

11    signed and executed.

12              She deserves to be reimbursed not a penny more

13    than she's expended.  She had an indemnification, the

14    indemnification should be honored by this Court.

15              THE COURT:  I absolutely agree the indemnification

16    should be honored to the extent that under applicable law by

17    its terms she is entitled to indemnification.  She is not.

18    She was found in a FINRA arbitration liable, the award was

19    confirmed, three courts --

20              MR. SHENWICK:  For compensatory damages.  I have

21    it right here, Your Honor.

22              THE COURT:  There is no distinction -- the

23    distinction between the award of compensatory and punitive

24    damages does not matter.  The allegation --

25              MR. SHENWICK:  There was no finding of fraud.  I'd
```

Page 20

1    like to ask you if --

2              THE COURT:  That's not --

3              MR. SHENWICK:  -- if there were allegations of

4    churning and fraudulent representations why did the three

5    arbitrators who were paid a substantial amount of money not

6    find that?  They found compensatory damages.

7              THE COURT:  Apples and oranges, Mr. Shenwick.

8    That's not the --

9              MR. SHENWICK:  It's not, it's apples and apples

10   and orange and orange, Your Honor.  Compensatory damages.

11   They would have found punitive damages and they would have

12   found fraudulent behavior.

13             THE COURT:  What was -- what was she -- what did

14   the Sardis need to be compensated for?

15             MR. SHENWICK:  Compensatory damages.

16             THE COURT:  That's not -- that's not a -- that's a

17   description of what they got.  They needed to be compensated

18   for the damages that they sustained because she engaged in

19   fraudulent conduct and churning that --

20             MR. SHENWICK:  From the biggest tech meltdown in

21   the history of this country.  The Sardis' were professional

22   day traders as well, they were technology people.  All five

23   cases that were brought, she won four and lost one, all of

24   them involved people that were married or worked for the

25   Sardis', Your Honor.  That's what McDunna said, that's why

Page 21

1    there was the finding of no fraud and finding of no punitive

2    damages.  The Sardis' had losses.

3           Your Honor, she deserves and is entitled to be

4    compensated, she has out-of-pocket damages.  Granted she

5    made a mistake on the legal fees, we're correcting that.

6    I've instructed her, she's working on a revised sheet with

7    invoices, canceled checks, and back up.  She's lost her

8    condominium.  She's lost her life here.  She's paid legal

9    fees.  She's handed over the brokerage fees to the Sardis'.

10   She's acted in good faith.

11          THE COURT:  Do you think an asset protection plan

12   is an indication of somebody who's acting in good faith?

13          MR. SHENWICK:  It was a --

14          THE COURT:  You know what we call an asset --

15          MR. SHENWICK:  -- minimal expense --

16          THE COURT:  You know what we call --

17          MR. SHENWICK:  -- and it's allowed to be done.

18          THE COURT:  Do you know what we call an asset

19   protection plan around here?

20          MR. SHENWICK:  No.

21          THE COURT:  A fraudulent conveyance.

22          MR. SHENWICK:  It's not.  It's not.  She did

23   nothing.  She's turned over her assets as required pursuant

24   to the judgment and New York State law, and I have proof of

25   that here because I have the sheriff sale right here.

```
 1              THE COURT:  Did you think it would have been a

 2    good idea to respond to the trustee's supplemental

 3    objection?

 4              MR. SHENWICK:  No, because I think it was a

 5    rehashing of prior papers and it was filled with mistake and

 6    omissions that I thought I could correct on the record

 7    today.

 8              THE COURT:  Well, thank you, have a seat.

 9              MR. PACE:  Your Honor, just to briefly address

10    some of the points Mr. Shenwick raised.

11              We were caught completely by surprise with a lot

12    of what Mr. Shenwick has raised in terms of the fees and the

13    amounts, and according to what Mr. Shenwick said the sheriff

14    sale, which he was aware of, came before his deadline to

15    respond to the supplemental objection.  So in our view there

16    is no excuse for not including that.

17              I'd also like to address Mr. Shenwick is trying to

18    make this a case about the equities rather than the law.

19    The law is clear that Ms. Frankel cannot get

20    indemnification.

21              But also when Mr. Shenwick said just now that

22    there was no fraudulent conveyance the New York Supreme

23    Court and the appellate division both found specifically

24    that the transfer of Ms. Frankel's condominium to her son

25    was indeed a fraudulent conveyance.
```

Page 23

1          According to what Mr. Shenwick is claiming now

2    she's lost that condominium, but also as part of that asset

3    protection plan she liquidated her cash accounts or her

4    fidelity account and she has a condominium on the beach in

5    Miami.  So it's not as if without indemnification

6    Ms. Frankel would be homeless.

7          THE COURT:  Okay.  But that -- all of that goes to

8    as you say the equities --

9          MR. PACE:  Uh-huh.

10         THE COURT:  -- and it really has nothing to do

11   specifically with the entitlement to indemnification.

12         MR. PACE:  Yes, Your Honor.

13         THE COURT:  That's a different set of facts that

14   indicate or reflect conduct that's not in good faith, right?

15         MR. PACE:  Yes, Your Honor.

16         THE COURT:  Okay.

17         MR. PACE:  And we believe circumstantial evidence

18   of fraud that has gone on before.

19         THE COURT:  Can you address the -- can you address

20   the point that the compensatory versus punitive?  In other

21   words, Mr. Shenwick would like me to ignore all three

22   statements by other courts that said she engaged in fraud

23   and instead look at the arbitration award and determine that

24   because it awarded only compensatory damages and not

25   punitive damages therefore it must have been based on

```
 1    something other than a finding of fraud and churning?

 2              MR. PACE:  Your Honor, to address that back to

 3    what we said in our papers is that the award has to be based

 4    on the allegations because it's a matter of contract, so

 5    it's only what the parties are going to submit, and there's

 6    no doubt that the compensatory damages award was based on

 7    the findings of fraud as alleged in the statement of claim.

 8              In terms of why there was no award of punitive

 9    damages.  We don't have any basis to make a determination as

10    to what the basis was for that, because as Mr. Shenwick

11    pointed out the award is unreasoned.  So there's no

12    necessary implication about what happened with punitive

13    damages as there is with her liability for fraud.

14              So it's really not an answer, but the effect of

15    what Mr. Shenwick is saying is that Ms. Frankel didn't do

16    anything.  The only allegations were fraud and fraudulent

17    churning, and so if that's not what she was found liable for

18    then she wasn't found liable for anything because she didn't

19    do anything, and that's essentially Ms. Frankel's position,

20    which is totally contrary to everything in the record.

21              THE COURT:  What about the suggestion that in

22    real-time her superiors at Lehman were saying you're going

23    great?

24              MR. PACE:  Sure, Your Honor.  The -- in the

25    response Ms. Frankel points to a meeting that occurred on
```

Page 25

1   October 31st, 2008, which is about a month and a half after

2   Lehman ceased operating, by that point Ms. Frankel was at

3   Barclays.  So that is really irrelevant to anything because

4   that's not about LBI, that's not about what she did at LBI,

5   it's about looking forward at Barclays where she was then.

6          Also I would point out that as I believe it was

7   Judge Batts found when the arbitration was pending the

8   interest of Lehman and Ms. Frankel were aligned.  The

9   interests were to try and prove, despite what the facts

10  turned out to be, that Ms. Frankel did not commit fraud.

11  And so any attorney who's involved in litigation will

12  counsel his client that you're a main witness, you're a co-

13  defendant, you don't want to anger them by telling them that

14  you messed up, you defrauded our clients, and now we're all

15  in hot water for that.

16         Until interest diverge when you're co-litigating,

17  when you are -- have a common interest you work together and

18  you try and make everything as harmonious as possible.

19         It's not in the response, it's not in the standard

20  of claim that there were such statements while LBI was still

21  operating, so it's really conjecture at this point.

22         THE COURT:  Okay, thank you.

23         All right, Mr. Shenwick, briefly, anything more?

24         MR. SHENWICK:  Your Honor, I dispute that and

25  again I would direct --

Page 26

1          THE COURT:  What's the -- what's the that that you

2   dispute?

3          MR. SHENWICK:  That management made self-serving

4   statements.  They could have fired her, they could have said

5   our conflicts are diverse we can't have Drinker Biddle

6   paying your legal fees and defend you, you have to hire your

7   own counsel.  They didn't.  In fact Peter McDunna, the

8   partner of Drinker Biddle, wrote a letter of explanation and

9   indicated that she had done nothing wrong.  The letter is

10  dated September 17th, 2008, it's executed and signed on

11  Drinker Biddle letterhead.  That's -- Drinker Biddle was

12  counsel for Lehman and Ms. Frankel in this arbitration,

13  4 years, 37 hearings.

14          THE COURT:  Okay, you now both have me confused.

15  What -- place this in a time frame, this letter.

16          MR. PACE:  Sure, Your Honor.  That letter I

17  believe was during the pendency of --

18          THE COURT:  During the --

19          MR. PACE:  While Lehman was still operating.

20          THE COURT:  While the --

21          MR. SHENWICK:  No.  Well, it was certainly during

22  the pendency of the arbitrations.

23          THE COURT:  Right, which is -- which was exactly

24  the point.  That during the pendency of the arbitration when

25  you have the kind of situation that you had where an

Page 27

1    employee is accused and there is a need to defend the

2    parties remain aligned.

3              MR. SHENWICK:  That's a rewrite of history, Your

4    Honor.  Oftentimes the employee is fired and escorted out

5    the door by security guards.

6              THE COURT:  Well now we're -- now we're into --

7              MR. SHENWICK:  They kept her for four years, Your

8    Honor.

9              THE COURT:  Now we're into make pretend land.  Now

10   we're into your selective mention or description of things

11   that might or might not happen elsewhere.

12             MR. SHENWICK:  I have a letter from a partner

13   defending her and Lehman, Your Honor.

14             THE COURT:  That's fine.  That's fine.

15             The primary thing that we have here is an

16   arbitration decision which was not reasoned, which was

17   premised on allegations of fraud and churning, and pursuant

18   to which there was an award that was made.  It necessarily

19   implied that Ms. Frankel had in fact committed fraudulent

20   conduct and churning.

21             The confirmation of the award by the Supreme Court

22   and the subsequent Appellate Court that reviewed the

23   confirmation of the award each found that in fact there was

24   fraud and that there was churning.

25             To add one more piece of support to the notion

Page 28

1    that we cannot here revisit whether or not there was fraud

2    or churning that occurred there is the observation of Judge

3    Batts in the Southern District of New York case in which

4    Ms. Frankel sued her attorney for malpractice in which Judge

5    Batts also observed and found that Ms. Frankel had committed

6    fraud and churning.

7              Those findings are entitled to collateral estoppel

8    effect, therefore there would be -- it would be wholly

9    improper to have any sort of a proceeding on this claim in

10   which there would be an open issue, if you will, as to

11   whether or not she acted in good faith and therefore was

12   entitled to indemnification.  That issue has been determined

13   in a way that's entitled to collateral estoppel.  In fact

14   accordingly under the governing documents and applicable law

15   she's not entitled to indemnification.

16             And just to put a fine point on it, but this does

17   not separately form a basis for the opinion, the submission

18   of patently false claims for indemnification and the failure

19   to come forward in a timely fashion with additional points

20   and evidence is really quite inexcusable.  It wastes counsel

21   time, it wastes the Court's time.  But the good news is that

22   I'm not going to impose any sanctions.

23             I would ask that you -- that the trustee prepare

24   an order, share it with Mr. Shenwick, and send it to us for

25   our consideration.

Page 29

```
 1              MR. PACE:  Yes, Your Honor.

 2              THE COURT:  All right?  Thank you.  Thank you,

 3     Mr. Shenwick.

 4              MR. SHENWICK:  Thank you, Your Honor.

 5              MR. PACE:  Your Honor, I believe up next is the

 6     Wollmuth firm --

 7              THE COURT:  Yes.

 8              MR. PACE:  -- for the continuations.

 9              THE COURT:  Very good.  Thank you.

10              MR. PACE:  Thank you.

11         (Pause)

12              THE COURT:  Good morning.  How are you?

13              MR. LAWLOR:  Good morning, Your Honor.  James

14     Lawlor, Wollmuth Maher & Deutsch on behalf of -- as special

15     counsel on behalf of Lehman Brothers Holdings Inc., and with

16     me is my partner, Adam Bialek.

17              MR. SALTER:  Good morning, Your Honor, Timothy

18     Salter, Blank Rome, for Stearns Lending Inc.

19              THE COURT:  Okay, thank you.

20              MR. LAWLOR:  Your Honor, we're here on the

21     continued motion from June 19th --

22              THE COURT:  Right.

23              MR. LAWLOR:  -- on the debtors' indemnification

24     and ADR procedure.

25              THE COURT:  Right.
```

1            MR. LAWLOR:  I'm happy to say that we've resolved

2    several of the objections.

3            THE COURT:  Okay.

4            MR. LAWLOR:  We do have black line copies of

5    orders for Your Honor.  If you wish them I can hand them up

6    now.

7            THE COURT:  That would be -- that would be great.

8            MR. LAWLOR:  All right.  We have three to hand up.

9            THE COURT:  Are we all resolved or do we have one

10   unresolved?

11           MR. LAWLOR:  No, we have -- for purposes of today

12   we have four of the objectors resolved and the rest are

13   adjourned.

14           THE COURT:  Okay.

15           MR. SALTER:  Yeah, we resolved last night, I just

16   came in --

17           THE COURT:  Wonderful.

18           MR. SALTER:  -- to get it on the record.

19           THE COURT:  Okay.  Very good.  Thank you.

20           MR. LAWLOR:  Just briefly, Your Honor.

21           The -- as Your Honor knows on June 19th Your Honor

22   approved the ADR procedure with respect to the non-objecting

23   parties.  We had multiple objections which we agreed to try

24   to resolve consensually.

25           The four that are resolved by those three orders

Page 31

1    involve the Universal mortgage parties, DHI, Mortgage IT,

2    and Stearns Lending.

3            And quickly I'll just outline some of the -- what

4    are substantive I think changes that Your Honor should be

5    aware of.

6            With respect to the universal mortgage and DHI

7    order we had been negotiating with Bills & Sunberg (ph),

8    which is counsel for those parties.  Essentially the

9    substantive change really begins in paragraph 10 of the

10   decretal part, at subparagraph D on page 9.

11           THE COURT:  Okay.

12           MR. LAWLOR:  We've agreed that we will agree to

13   either New York or a mutually agreeable location for

14   purposes of the arbitration -- I'm sorry --

15           THE COURT:  Mediation.

16           MR. LAWLOR:  -- mediation.

17           THE COURT:  Okay.

18           MR. LAWLOR:  I don't want to make it more

19   important than it is, Your Honor.

20           And so we'll -- obviously if we send the notices

21   out we'll agree at that point to what we need to do.

22           We also in paragraph 14 on page 11 we clarified

23   that the right to removal, which is referenced in that

24   paragraph, it's not expanding the right.  If we have the

25   right to remove a case we have the right, we're not

```
 1    suggesting that that order extends that right if one does

 2    not exist.

 3              Paragraph 17, Your Honor, on page 12 of that order

 4    provides that in exchange for the mediation taking place in

 5    New York LBHI will pick up the fees and costs of the

 6    mediator.  If we ultimately agree to have it somewhere else

 7    then it'll remain a shared cost.

 8              And then I believe --

 9              THE COURT:  You have a typo.

10              MR. LAWLOR:  Yes, exastant (sic)?

11              THE COURT:  What's that?

12              MR. LAWLOR:  Exastant.

13              THE COURT:  Yes.

14              MR. LAWLOR:  Thank you, Your Honor.

15              What we're going to do is we're going to -- we'll

16    send down copies of --

17              THE COURT:  Okay.

18              MR. LAWLOR:  -- clean copies of the order as well,

19    Your Honor.

20              THE COURT:  Is that -- does that reflect the

21    concern that New York mediators are more expensive than non-

22    New York mediators?

23              MR. LAWLOR:  I -- well, I think the idea is that,

24    Your Honor, if we're still going to use the same mediators

25    and they're going to have to travel then if that's what the
```

Page 33

1    accommodation that the other party wants to make then that

2    cost is going to go up for them if they have to share that.

3    If we do it here then LBHI will pick up that cost.

4              THE COURT:  Okay.

5              MR. LAWLOR:  It seemed like a fair trade off, Your

6    Honor.

7              THE COURT:  Okay.

8              MR. LAWLOR:  And those are essentially substantive

9    changes I believe --

10             THE COURT:  Okay.

11             MR. LAWLOR:  -- in that order.

12             I think the next order is the Mortgage IT order,

13   Your Honor.

14             THE COURT:  Okay.

15             MR. LAWLOR:  In Mortgage IT there is a reservation

16   in the initial paragraph.

17             As Your Honor is aware Your Honor made findings

18   and conclusions about jurisdiction and parties being in

19   front of her.  What Mortgage IT asked for is that with

20   respect to those findings that they reserve their rights,

21   whatever they may be, with respect to those findings.

22   Obviously if they're consenting to this order they're

23   subject to this order, so you know, we didn't have a problem

24   with that.  I mean obviously we're governed by the terms of

25   the order that's going to be entered, so --

1              THE COURT:  Okay.

2              MR. LAWLOR:  -- they're here voluntarily and I

3      think that was a minor accommodation, Your Honor, but I did

4      want to point that out.

5              In paragraph 10(c) which deals with the mediator,

6      and it's on page I believe 8, Your Honor, of the mark up,

7      we've agreed to choose between two mediators suggested by

8      Mortgage IT.  If for some reason those are not available --

9      those two mediators then we'll try to come up with a

10     mutually agreeable one from the list, and if not we can

11     always ask Your Honor to --

12             THE COURT:  Okay.

13             MR. LAWLOR:  -- to call the coin flip.  Hopefully

14     that will not be necessary and we'll all be able to do that.

15             Paragraph 10(f), which is on the next page, Your

16     Honor, deals with appearances.  MIT -- Mortgage IT asked

17     that we make it clear that in the event that there was some

18     internal governance issue that required them to get board

19     approval of an action, even though we're at mediation in

20     good faith --

21             THE COURT:  Right.

22             MR. LAWLOR:  -- that they have the right to do

23     that.

24             THE COURT:  Okay.

25             MR. LAWLOR:  I think that's always assumed, but

Page 35

```
 1    we're fine with it.  Everybody is going to be there in good
 2    faith and subject to the order so we were fine with that
 3    change.
 4              THE COURT:  Okay.
 5              MR. LAWLOR:  And I believe paragraph 16, which is
 6    the next change, Your Honor, and that's simply a
 7    clarification that -- it's on page 11 -- that participation
 8    in mediation does not waive a jury trial right.
 9              THE COURT:  Right.
10              MR. LAWLOR:  And paragraph 17 deals with the cost
11    of the mediator, and that's on the next page, and again,
12    we'll agree to pick up that cost in exchange for having
13    mediation in New York.
14              THE COURT:  All right.
15              MR. LAWLOR:  And those are the changes of Mortgage
16    IT, Your Honor.
17              THE COURT:  Okay.
18              MR. LAWLOR:  And then the last order is the
19    Stearns Lending order, Your Honor.
20              THE COURT:  Right.
21              MR. LAWLOR:  And Stearns Lending -- many of the
22    changes are the same so I'll try to be quick on that one.
23              Essentially there's some general changes to
24    deadlines but they're not substantive.
25              Really it's paragraph 16 and 17 that are the
```

```
 1    changes, Your Honor.  Again, it's the clarification of the

 2    jury trial language and that LBHI will pick up the cost of

 3    the mediator if -- when we have it in New York.

 4              So I think those are all the changes --

 5              THE COURT:  Okay.

 6              MR. LAWLOR:  -- from Your Honor's prior order.

 7              MR. SALTER:  Didn't we also change that we would

 8    pick the mediator, right?

 9              MR. LAWLOR:  Oh, you know, I could be -- I think

10    you're right, Your Honor.  I think we also allowed them the

11    option of picking from the list of mediators.

12              THE COURT:  Let's see.

13              MR. LAWLOR:  I think that's correct.  Is that

14    correct?

15              THE COURT:  Choice of the mediator.  Yes.

16              MR. LAWLOR:  Yes.  Which is fine, Your Honor.

17    That's obviously from the list that Your Honor approved.

18    It's fine with us.

19              THE COURT:  Okay.  All right.  So then you will

20    send us clean copies of these, we will enter them, and then

21    you have two more to go and then we're done.

22              MR. LAWLOR:  Yeah, we have several on the

23    adjourned list I believe.  There are that some of them are

24    close to being resolved --

25              THE COURT:  Okay.
```

Page 37

1          MR. LAWLOR:  -- some are not so close, but we have

2    an August 12th return date I think for the next omnibus

3    hearing.

4          THE COURT:  Right.  Right.

5          MR. LAWLOR:  And obviously any stipulation that we

6    entered into would just be carried forward to that return

7    date.

8          THE COURT:  Okay.  I mean what you -- what you're

9    welcome to do is, and hopefully now that you have this body

10   of ideas that people can draw on, if you arrive at

11   agreements you can just --

12         MR. LAWLOR:  Submit them?

13         THE COURT:  -- submit them.

14         MR. LAWLOR:  That would be great, Your Honor.

15         THE COURT:  You don't have to make a special trip

16   for that.

17         MR. LAWLOR:  Thank you, very much.

18         THE COURT:  All right?  Okay, thank you.  We have

19   somebody here who wants to be heard.

20         MR. WRIGHT:  Your Honor, I just wanted to put in

21   appearance.  Derek Wright from Foley & Lardner, we represent

22   sort of 15 of the sellers and they're on the adjourned list,

23   so I just wanted to state that on the record.

24         THE COURT:  Okay.  As a group though you're

25   negotiating on a --

Page 38

1           MR. WRIGHT:  As a group, correct.

2           THE COURT:  As a group.  Okay.

3           MR. WRIGHT:  There were four different objections

4    that we filed but those are still being negotiated and all

5    adjourned.

6           THE COURT:  Okay.  Well, I encourage you to read

7    these resolutions and become inspired thereby.

8           MR. WRIGHT:  Absolutely.

9           THE COURT:  Okay?  Thank you.

10          MR. WRIGHT:  Thank you, Your Honor.

11          MR. LAWLOR:  Thank you, Your Honor.

12          THE COURT:  Okay, thank you.

13          Okay.  So the next thing we have I believe is the

14   four hundred and sixty-sixth omnibus objection, it's a

15   claim, specifically the claim of Mr. Matthew Lee.

16          Hello, Mr. Miller, good to see you.

17          MR. MILLER:  Good morning, Your Honor.  May it

18   please the Court I'm Ralph Miller here for the plan

19   administrator, Lehman Brothers Holdings Inc., also called

20   LBHI.

21          As the Court has indicated item number 3 on the

22   agenda is claim number 14073 by Mr. Matthew Lee subject to

23   the four hundred and sixty-sixth omnibus objection.  We're

24   not certain whether Mr. Lee is here on not, Your Honor, we

25   may need -- want to try to determine that.  We do have clear

Page 39

1    evidence that he had notice of the date and the -- and the

2    hearing.  I'd like to put that on the record if he's not

3    here.

4            THE COURT:  Okay.  All right.  Let me ask, the

5    time is now 10:45, is anyone -- is Mr. Matthew Lee present

6    in the courtroom?  Is anyone here appearing on behalf of

7    Mr. Matthew Lee present?  Mr. Lee or anyone on his behalf of

8    the telephone?  Okay, so let the record reflect no response.

9            MR. MILLER:  Thank you, Your Honor.  We do know

10   Mr. Lee was aware of the date because the four hundred and

11   sixty-sixth objection had a notice of the hearing in it and

12   Mr. Lee filed a response in which he acknowledges that he

13   received that objection, in fact discussed it.

14           He was also made aware of this hearing in a

15   telephone call last month on June 30th, with my colleagues,

16   Ms. Erika del Nido, who is here today --

17           THE COURT:  Okay.

18           MR. MILLER:  -- and Mr. Garrett Fail, and he was

19   told that it would proceed on a contested basis and he did

20   not indicate anything about whether he'd be here or not in

21   that call as I understand it.

22           So if I may proceed, Your Honor --

23           THE COURT:  Please.

24           MR. MILLER:  -- I'd like to make a brief record.

25           Briefly there are two parts to the claim.  One

```
1    part should be disallowed the plan administrator believes,
2    and the other should be reclassified as equity.
3              The first component of Mr. Lee's claim deals with
4    two $25,000 bonds that were held in an LBI brokerage
5    account.  We think that should be disallowed.  And the
6    remainder of the claim should be classified as an equity
7    interest under the plan because it admittedly arises from
8    the purchase of $94,950 worth of LBHI stock bought on the
9    last business day before the Chapter 11 was filed.
10             And just to clarify this claim has nothing to do
11   with restricted stock units or contingent stock awards of
12   the kind that are currently before the Court as -- in other
13   omnibus objections.
14             All of the facts to resolve Mr. Lee's claim are
15   contained in the claim itself or his response or are subject
16   to judicial notice.
17             Let me start with the portion of the claim that
18   seeks 50,000 for two $25,000 bonds.  He says that they were
19   risky and were purchased without authorization and were
20   placed initially in an LBI account that he says were for
21   college funds and there are brokerage statements attached to
22   the claim.
23             That part of the claim should be disallowed
24   because all claims related to handling of an LBI brokerage
25   account can be asserted only in the LBI proceeding which of
```

Page 41

1    course was the subject of the hearing this morning and is

2    before this Court.

3           Mr. Lee's only factual or legal allegations that

4    could possibly give rise to any basis to make LBHI

5    responsible for a loss in risky securities or a purchase

6    without authorization by an LBI broker is a vague reference

7    to lack of separation in business affairs between LBI and

8    LBHI.

9           In his response however Mr. Lee seems to disclaim

10   the reliance on an alter ego theory.  Referring to the alter

11   ego discussion in the four hundred and sixty-sixth objection

12   Mr. Lee's one-page June 15th response says, "Amounts to be

13   disallowed 50,000.  Essentially your reason relates to an

14   LBHI v. LBI argument, this argument only."  And only is in

15   block caps.  "Relate to my compensation claim and was never

16   mentioned in this claim 14073."

17          THE COURT:  Right.

18          MR. MILLER:  So that disclaimer would leave

19   Mr. Lee with no legal basis for this part of his claim.

20          But in any event assuming Mr. Lee is making a

21   claim related to his LBI account and a legal theory is some

22   sort of alter ego theory it's the law of the case that Judge

23   Peck has repeatedly ruled and properly ruled that individual

24   employees and shareholders have no standing to pursue these

25   claims.  Those rulings are quoted in the four hundred and

Page 42

1    sixty-sixth objection itself and again in footnote 2 on

2    page 3 of LBHI's reply, and those rulings are consistent

3    with a line of cases that includes the Second Circuit's

4    opinion in Kalb, Voorhis & Co. versus American Financial

5    Corp., 8 3d. 130, which holds that general alter ego claims

6    of a debtor's subsidiary against its corporate parent can

7    only be asserted by the debtor or its trustee and that

8    individual shareholders, claimants, creditors, and others

9    don't have a standing to assert those claims.

10            So in short with regard to these two $25,000 bonds

11   that were held in an LBI account any claims related to them

12   should be addressed to LBHI.

13            I should also add, Your Honor, that Mr. Lee's

14   claim does not state any basis for finding damages.  He now

15   says the bonds are held in a fidelity account, but he's not

16   alleged any loss in value in the bonds.  So other than some

17   perhaps claim that there was a period of time that he wanted

18   to sell them or not, which is speculative.

19            It's also true to these are said to be college

20   investment accounts, Your Honor, so there's no indication of

21   liquidity.  So we believe there's a separate basis in

22   addition to the fact that he couldn't claim against LBI, he

23   hadn't shown any damages.

24            Moving to the second component of this claim

25   Mr. Lee admits that he directed the purchase of 25,000

Page 43

1   shares of LBH stock on the last business day before LBHI

2   filed for Chapter 11 protection, but he stresses in his

3   response that his claim is for fraud because he says the

4   management of LBHI failed to disclose the dire financial

5   condition of the company and he contends the management of

6   LBHI "should not have allowed those on LBI payroll to

7   purchase the stock without disclosing in advance of the

8   purchase to those on the LBI payroll the severe

9   circumstances and conditions facing the company at that

10  time."

11          Mr. Lee then says, "My claim is to decay this

12  trade and replace it in my account with the related cash

13  amounting to $94,950 (25,000 shares at 3.75)."

14          That's from page 3 of his September 12, 2009

15  letter that came with the claim.

16          Now, I'm sure Your Honor knows the initials DK are

17  slang in the brokerage business for don't know and they

18  refer to a situation which one party to the trade asserts

19  that it didn't know enough about the trade or it was in some

20  way not authorizing the trade, and it is what we would

21  legally call rescission.

22          And so this fact pattern fits precisely within the

23  definition of Section 510(b) of the Bankruptcy Code of "a

24  claim arising from the rescission of a purchase or sale of a

25  security of the debtor or an affiliate of the debtor" or

Page 44

1    "for damages arising from the purchase or sale of such

2    security."

3           As the Court knows there's a long line of cases,

4    some of which are cited in our reply that apply to 510(b) to

5    fraud claims related to the purchase of shares of the

6    debtor.  And because the security was common stock under

7    510(b) it should have the same priority as common stock, and

8    the proposed order would classify the 94,950 claim for

9    alleged damages as an equity interest at the plan -- under

10   the plan which has the same priorities as common stock.

11          And for reasons I explained earlier the order

12   would disallow the $50,000 claim for the two bonds that were

13   originally in an LBI brokerage account and are now

14   apparently in a fidelity account.

15          I'm happy to take any questions Your Honor.

16          THE COURT:  I agree with you right down the line,

17   Mr. Miller, I don't think I could add anything more to your

18   recitation of the facts or the reasons why these claims

19   should be disallowed and reclassified as you indicated.

20          So perhaps if Mr. Lee had attended I would have

21   been able to ask him some questions I had about these --

22   about the letter -- the June 15th letter that I paid

23   particular attention to, but I found nothing in that letter

24   that indicated that there was any meritorious basis for

25   either part of his claim.

Page 45

```
 1              So if you would please submit an order I would be

 2    grateful.

 3              MR. MILLER:  We have, Your Honor.  I'm advised

 4    that the CD that was originally submitted has some

 5    corrections in other orders on it, not this order.

 6              THE COURT:  Okay.

 7              MR. MILLER:  So if we may have leave to resubmit

 8    the CD with corrections --

 9              THE COURT:  Either resubmit the CD --

10              MR. MILLER:  -- to other orders --

11              THE COURT:  -- or just email it to chambers so we

12    don't get confused.

13              MR. MILLER:  Thank you, Your Honor.

14              THE COURT:  All right.

15              MR. MILLER:  May I be excused?

16              THE COURT:  Yes.  Thank you.

17              MR. MILLER:  Thank you.

18              THE COURT:  Thank you for coming down, Mr. Miller.

19              All right, I believe the next matter is the

20    SkyPower matter.

21         (Pause)

22              THE COURT:  Good morning.  How are you?

23              MR. YOUNGMAN:  Good morning, Your Honor.  Stephen

24    Youngman, Weil, Gotshal & Manges for LBHI as plan

25    administrator.
```

1              Before the Court with respect to this matter are

2       four pleadings.  First the objection of Lehman Brothers

3       Holdings Inc. to the proofs of claim filed by 2138747

4       Ontario Ltd. and 6785778 Canada Inc., which I'll refer to

5       either as the claimants or the minority shareholders.

6              THE COURT:  Okay.

7              MR. YOUNGMAN:  Those were claim numbers 33583 and

8       33586.

9              On August 17th, 2011 the minority shareholders

10      filed their opposition to the debtors' objection to proofs

11      of claim, which I'll refer to as the response.  And on

12      June 3, 2014 Lehman Brothers Holdings Inc. as plan

13      administrator filed its reply in support of its objection

14      and in opposition to the minority shareholders' response.

15      And as we had previously advised the Court that it would be

16      coming on July 9, 2014, the minority shareholders filed a

17      surreply.

18             It is important when reviewing this matter to keep

19      in mind the various entities that are involved, and as I go

20      through the presentation I'll be referring to certain

21      specific entities.

22             THE COURT:  Okay.

23             MR. YOUNGMAN:  First SkyPower Corp. was the

24      renewable energy company that was the subject of the

25      transaction.

Page 47

1                    THE COURT:  Right.

2                    MR. YOUNGMAN:  LB SkyPower was the entity that was

3       a direct holder -- direct equity holder of SkyPower Corp.

4       and indirectly owned through the chain ultimately to LBHI.

5                    The minority shareholders, as I have said, are the

6       claimants here and they were also equity holders of SkyPower

7       Corp.  LBI or Lehman Brothers Inc. is one of the transaction

8       parties and of course LBHI or Lehman Brothers Holdings Inc.

9                    This transaction was an investment in a renewable

10      energy developer in Canada.  This transaction closed in June

11      2007 resulting in LB SkyPower acquiring a controlling

12      interest in SkyPower Corp. and the minority shareholders

13      receiving 87 and a half million dollars.

14                   Subsequent to the closing through the corporate

15      structure of LBHI there was invested over $388 million

16      before the Chapter 11 filings and over $59 million after the

17      Chapter 11 filings of which LBHI recovered about $28 million

18      for a net postpetition outlay of 31.6.

19                   This claim objection, pursuant to the Court's

20      claim procedures order, is a sufficiency hearing, so we are

21      going to analyze this on the same standards as a motion to

22      dismiss.

23                   So what is for the Court to consider in this

24      context pursuant to Rule 10(c) of the Federal Rules of Civil

25      Procedure adopted by Bankruptcy Rule 7010 the Court can

Page 48

1    consider a copy of any written instrument which is an

2    exhibit to a pleading and it's considered as part of the

3    pleading for all purposes.

4        If we consider the proof of claim as the complaint

5    and the reply, the original opposition to the minority

6    shareholders as I think they elude to in their papers as

7    supplementing the proof of claim, we can and the Court can

8    consider the various exhibits filed to the minority

9    shareholders' opposition.

10        Moreover the claimants were obviously aware of the

11   Canadian proceedings as they say in their papers and there

12   are additional exhibits which were attached to LBHI's reply

13   with respect to the Canadian proceedings, and under Second

14   Circuit authority, since claimants either had knowledge of

15   those or obviously they were in their possession, we submit

16   that the Court can also consider the four additional

17   exhibits that are in the -- LBHI's reply as part of the

18   record for considering this in the context of a motion to

19   dismiss.

20        Reviewing those exhibits as a predicate for coming

21   to this Exhibit A, which is also Exhibit 1 to the

22   opposition, is a letter of intent.  That is a letter of

23   intent that was executed by Lehman Brothers Inc. or LBI.

24        Exhibit B or Exhibit 2 dated June 11, 2007 as well

25   is what is being referred to in the papers as the Goodman

Page 49

1      Steps (ph) memo.  That was a memorandum prepared by Canadian

2      counsel preclosing to describe the transaction between

3      Lehman Brothers Inc., which was defined through that

4      document as Lehman, for acquisition of indirectly through LB

5      SkyPower Inc. of the interest in SkyPower Corp.  Neither the

6      letter of intent nor the Goodman Steps memo contain any

7      reference to LBHI as to whom the claim is being asserted.

8           Exhibit C or Exhibit 3 is the stock purchase

9      agreement.  That agreement is between LB SkyPower, SkyPower

10     Corp., and the minority shareholders.  Again, LBHI is not a

11     party or referenced in that agreement.

12          Exhibit D or exhibit 4 is a unanimous

13     shareholders' agreement also dated June 11, 2007.  Again,

14     LBHI is not a party to that document.

15          Exhibit E referred to in the papers as a September

16     memo dated September 5, 2007 after closing.  There's also a

17     memorandum from LBI, Lehman Brothers Inc. to the SkyPower

18     board of directors discussing anticipated equity

19     contributions and also a reference to LBHI as having been --

20     having given a guarantee with respect to a specific --

21     what's referenced as a frame agreement.

22          Exhibit F, that is the equity contribution

23     agreement.  LBHI is a party to that agreement.  The other

24     parties are SkyPower Corp. and HSM Nordbank, which was the

25     collateral agent for a group of lenders with respect to a

Page 50

1    transaction involving the acquisition of certain wind

2    turbines.

3            THE COURT:  So if any -- if anywhere there were

4    going to be a mention -- a specific mention of a third-party

5    beneficiary this would have been a good place, right?

6            MR. YOUNGMAN:  That would have been a place -- the

7    place, probably the better way to say it.  It would have

8    been in there.

9            THE COURT:  But it's not.

10           MR. YOUNGMAN:  No.  The original equity

11   contribution agreement was entered into December 28, 2007,

12   that was in connection with a prior credit agreement.  What

13   is referred to in the papers is the amended and restated

14   equity contribution agreement dated February 22.

15           Again, the minority shareholders are not a party

16   to that agreement, there's nothing on the face of that

17   agreement that indicates any intent to give third-party

18   beneficiary status to any party, and in fact that agreement

19   contains a specific provision giving enforcement rights or

20   third-party status to the bank lenders.  That is in

21   Section 10.01 of the equity contribution agreement.

22           To set the framework for further discussion this

23   Court has recently addressed a similar third-party

24   beneficiary argument.  That was in the Court's memorandum

25   decision on the four hundred and eighty-eighth omnibus

Page 51

1    objection that was dated June 18, 2014 and found at ECF

2    44782.

3            The minority shareholders are arguing here that

4    they have direct claims against LBHI as a result of -- they

5    call it a multifaceted transaction and is in effect trying

6    to construe all the documents together to create a right.

7    What they have identified to try to get there is the letter

8    of intent, the Goodman Steps memo, the stock purchase

9    agreement, and the shareholders' agreement.

10           Going to the Court's guidance from the June 18th

11   memorandum opinion New York law requires that a party's

12   intent to benefit a third party be shown on the face of the

13   agreement or in the four corners of the agreement.

14           Secondly, if a contract contains an integration

15   clause and there's no provision specifically conferring any

16   benefit on a party claiming third-party beneficiary status

17   it does not evidence an intent to create none where it is

18   not stated.

19           And the Court went on to cite cases holding that a

20   deafening silence, quotes, demonstrates there's a lack of

21   intent to confer benefits.

22           As an initial matter the letter of intent and the

23   Goodman Steps memorandum are irrelevant to any of the

24   Court's analysis to whether there's a third-party

25   beneficiary intent implied in any of these agreements.

1           Both the stock purchase agreement and the

2   shareholders' agreements have integration clauses,

3   specifically providing not only is it a standard integration

4   clause, but each goes on to provide that the letter of

5   intent specifically is not included or should not be

6   considered in any analysis.  That is found at the stock

7   purchase agreement at Section 15.02 and the shareholders'

8   agreement at Section 11.7.

9           The equity contribution agreement originally

10  entered into in December of 2007, over six months after the

11  stock purchase agreement, was entered into in connection

12  with SkyPower Corp.'s credit agreement with various lenders

13  with respect to specific transactions.

14          The only parties to the equity contribution

15  agreement are SkyPower Corp., LBHI, Lehman brothers holdings

16  Inc., and HSM Nordbank as collateral agent for the various

17  bank lenders.  There's no mention, there's nothing within

18  the four corners of that document of the minority

19  shareholders having any rights under the equity contribution

20  agreement.

21          As to any reference to the rights of third parties

22  to enforce that agreement that is found in Section 10.01 and

23  lends only to the secured parties, and that is the lenders

24  under SkyPower Corp.'s credit agreement.

25          There's no mention of the minority shareholders as

Page 53

1    having any rights under the equity contribution agreement,

2    there's no reference to the shareholders' agreement or the

3    stock purchase agreement within the equity contribution

4    agreement, and the equity contribution agreement is, to

5    borrow the Court's words, deafeningly silent with respect to

6    any intent to benefit the minority shareholders.

7            The hook that the minority shareholders are trying

8    to rely on to establish a third-party beneficiary status

9    under the equity contribution agreement is their statement

10   that this was a "multifaceted" transaction that closed on

11   June 11, and the equity contribution agreement amplifies the

12   nexus between all these agreements.  That tie does not work.

13           As noted both the stock purchase agreement and the

14   shareholder agreement contain integration clauses and the

15   only cognizable legal rights of the minority shareholders

16   can only come from the four corners of the documents.

17           The minority shareholders do try to make an

18   argument that affiliates of SkyPower Corp., which would run

19   the chain to LBHI, are by the terms of the shareholders --

20   of the stockholders' agreement liable contractually.

21           As we've noted in our papers their use of the word

22   "affiliate" as trying to establish liability under that

23   document is simply misplaced.  And also misplaced is just

24   referring to an amorphous obligation of Lehman by trying to

25   scrunch all of the companies together to establish liability

Page 54

1     is also misplaced.

2              As we put in our reply we have laid out the

3     specific contractual provisions of the stockholders'

4     agreement where liability is established for what has been

5     defined as Lehman in that agreement.

6              For example, Section 6.2(c) of the stockholders'

7     agreement, it reads, "Lehman may at any time elect to

8     reinvest all or part of the proceeds in the form of

9     subscription."

10             Studying that document however Lehman used as a

11    defined term in those provisions means LB SkyPower.  It is

12    specific, it does not mean any of the other Lehman overall

13    entities.

14             There are similar provisions as we've cited in our

15    papers under Section 8.1 as and when determined by Lehman to

16    be necessary to fund expenditures, but there is no hook by

17    these contractual provisions and to LBHI.  Again, Lehman

18    specifically defined to mean LB SkyPower.

19             And there's another section reference 8.2 that

20    they rely upon, Lehman will as appropriate either provide

21    reasonable assistance or use commercial efforts to provide a

22    keep well guarantee or other credit enhancement.  Again,

23    Lehman reading the documents as LB SkyPower.

24             Affiliate is used in the shareholders' agreement

25    and the specific term -- defined term affiliate is used but

Page 55

1    not in a way that creates any liability, and we have

2    referenced those at -- in our papers citing to Section 8.4.

3            There are certain approval requirements if goods

4    or services are going to be provided for by Lehman, which

5    again with LB SkyPower or an affiliate.

6            There were additional rights found in

7    Section 10.1(a) through (b) dealing with -- specifically

8    with affiliates, the rights of Lehman or its affiliates to

9    transfer or sell shares, notice requirements if shares are

10   being sold to a Lehman affiliate, or a Lehman affiliate may

11   act as an investment banker.

12           Again, those are specific contractual provisions,

13   they do not establish any kind of liability for the

14   obligations that are specifically imposed upon LB SkyPower.

15           And as we've cited in our papers it's well

16   established under New York law if the parties to a multi-

17   party contract define different rights and obligations of

18   the parties you don't mix those together into one whole.

19           Your Honor, there's nothing on the face of the

20   agreements, the operative agreements that establish any kind

21   of intent to provide third-party beneficiary status from

22   LBHI to the minority shareholders.

23           As we have cited in our cases where contractual

24   obligations are specific they should be enforced as such and

25   should not be implied to other parties.

Page 56

1          THE COURT:  But can I just stop you to ask a

2     question conceptually though?

3          When you make a first stop at the issue of

4     standing, in other words, that this has been dealt with

5     already in the SkyPower settlement, right, that LB -- this

6     is an LBHI claim and that it was dealt with, do I even get

7     to the third-party beneficiary analysis?  Or in other words

8     is their argument basically, well, even if you find that

9     some of the claims were derivative I should find that there

10    may be others that they have as third-party beneficiaries?

11         MR. YOUNGMAN:  Their argument is ignore standing

12    because minority shareholders have direct claims.  That's

13    partly why I was going first with arguing to the Court that

14    there are no direct claims.

15         THE COURT:  Okay.  But your argument also is don't

16    ignore standing.  In other words you're saying don't ignore

17    standing, but even -- but there are no direct claims so it

18    doesn't matter.

19         MR. YOUNGMAN:  Exactly.  And Your Honor has given

20    me a segway to --

21         THE COURT:  Okay.

22         MR. YOUNGMAN:  -- with no direct claims the

23    minority shareholders' remaining arguments necessarily fall.

24         THE COURT:  Okay, I see.  It was set up slightly

25    differently in your papers, you've reordered things.

Page 57

1          MR. YOUNGMAN:  I was reordering to try to hit

2     the --

3          THE COURT:  Okay.  Very good.

4          MR. YOUNGMAN:  -- surreply.

5          THE COURT:  Okay.

6          MR. YOUNGMAN:  But you hit it exactly.

7          THE COURT:  Okay.

8          MR. YOUNGMAN:  With no direct claims all that is

9     left, if any claims at all, are claims that are derivative

10    of SkyPower Corp., and as we have set forth in the

11    chronology of this transaction in our papers SkyPower Corp.

12    did go into a Canadian insolvency proceeding and a receiver

13    was appointed, PWC.  PWC settled that claim.

14          THE COURT:  Right.

15          MR. YOUNGMAN:  And that settlement was approved by

16    both the Canadian court as well as recognized the in the

17    pending Chapter 15 proceedings in Delaware by the U.S.

18    courts.

19          The SkyPower settlement I'm calling it that was

20    approved by Canadian court and the Delaware courts

21    specifically resolved the SkyPower claim and brought an end

22    to the equity contribution agreement.  As such there is no

23    further claim to pursue under the equity contribution

24    agreement.

25          And as we have noted to the Court and attached as

Page 58

1    exhibits in our reply the minority shareholders were

2    notified of these proceedings and --

3            THE COURT:  Did not object.

4            MR. YOUNGMAN:  -- did not object.

5            THE COURT:  Nor did they object at the recognition

6    hearing in Delaware.

7            MR. YOUNGMAN:  Correct.

8            THE COURT:  Okay.

9            MR. YOUNGMAN:  Therefore we submit that the

10   minority shareholders are barred from seeking to reopen

11   these issues that have already been approved by the Canadian

12   courts, and the Canadian court as well as the Delaware court

13   also is taking into consideration if there were these claims

14   there are substantial unpaid creditors in the Canadian

15   proceedings, and if you're going to respect the priorities

16   of distributions one -- one could suppose that giving the

17   minority shareholders a claim for those same things would be

18   the antithesis of honoring the priority structure --

19           THE COURT:  Okay.

20           MR. YOUNGMAN:  -- that the Canadian court

21   approved.

22           As to the corporate veil piercing.  Again, with no

23   direct claims to pursue veil piercing belonged to the

24   corporation SkyPower Corp.  The minority shareholders'

25   claims, if any, for that we submit are derivative of those

Page 59

1    of SkyPower Corp. under both Canadian law and U.S. law --

2            THE COURT:  Well in any event at least with

3    respect to veil piercing as between LBHI and LBI Judge Peck

4    has rather definitively dealt with that issue I would say.

5            MR. YOUNGMAN:  Yes.

6            In sum, Your Honor, there is no direct claim, it's

7    not evident from the face of any of the documents.  LB

8    SkyPower was not a guarantor of the minority shareholders'

9    investment.  They were like any other shareholder in a

10   corporation, the fates of the corporation dictates to some

11   extent their fate as well.  You cannot simply create

12   liability where none exists by just saying Lehman in sort of

13   a muddled up package and trying to create liability against

14   LBHI.

15           THE COURT:  Okay, thank you.

16           MR. YOUNGMAN:  Thank you.

17           MR. BERGER:  Good morning, Your Honor.

18           THE COURT:  Good morning.  How are you?

19           MR. BERGER:  I am well.  Thank you.  Shaya Berger,

20   and with me is Debbie Skakel from Dickstein Shapiro, and we

21   represent what has been termed the minority shareholders,

22   and I just wanted to notify the Court also that Mr. Kerry

23   Adler (ph), who was also referenced in the papers, is also

24   -- came from Canada here for this hearing --

25           THE COURT:  Okay, welcome.

1            MR. BERGER:  -- on behalf of the minority

2    shareholders.

3            It's not surprising that the entire context of the

4    transaction that lead eventually to the equity contribution

5    agreement has been given very short attention, because if

6    you just focus on the equity contribution agreement and you

7    put your blinders on I can understand the presentation to

8    the Court of why these claims don't exist or aren't

9    derivative, but that can't be done, particularly that the

10   claims being asserted depend on the intent of the parties,

11   both whether it's the single transaction theory and both

12   whether it's the third-party beneficiary theory, all go to

13   the intent of the parties, and it's impossible to consider

14   the intent of the parties when you just look at one

15   agreement and not how that agreement came about.

16           THE COURT:  But let me -- let me -- and I promise

17   you I'll let you make your full argument, all right, but

18   here's the problem, and I did just a couple weeks ago issue

19   a decision rather on point, and the problem with this

20   concept of intent and you know looking at the whole picture

21   is that the law, as it's developed on third-party

22   beneficiaries, recognizes that after the fact of course a

23   wronged or disappointed party is going to come in and say

24   but it was the intent that I was the third-party beneficiary

25   and therefore the law developed to say that that intent

Page 61

1   needs to be reflected on the face of the document.  And

2   lawyers actually know how to do that.  You could do that

3   right now if I handed you a piece of paper without breaking

4   a sweat.

5           MR. BERGER:  Uh-huh.

6           THE COURT:  So I don't have any documents, putting

7   aside your threshold statement, which I don't necessarily

8   disagree with look at all the documents, but I do have to

9   say notwithstanding the fact that they have integration

10  clauses and all those other things that lawyers put in

11  documents, but there's nothing.  There is literally nothing

12  other than what you're now telling me was or is the

13  subjective intent.

14          So I'm going need something very powerful and

15  specific from you to get me past that and to get me in

16  essence to contradict what I just wrote three weeks ago in a

17  context in which a third party was very much hurt by

18  Lehman's conduct or things that happened to Lehman.  So

19  that's kind of the heavy lift that you have that you're

20  facing.

21          MR. BERGER:  Your Honor, it is my intent and hope

22  that I do give a very powerful --

23          THE COURT:  Okay.

24          MR. BERGER:  -- argument and response, and I

25  believe there is one.

Page 62

1              THE COURT:  Okay.

2              MR. BERGER:  I also would just note that we did

3    see Your Honor's opinion and we addressed it in our

4    surreply.

5              THE COURT:  Okay.

6              MR. BERGER:  But before -- in order for me to

7    adequately address it I think I do need to give the Court a

8    context --

9              THE COURT:  Go ahead.

10             MR. BERGER:  -- and it's in our papers but I think

11   it's very important so I promise to be short.

12             THE COURT:  Doesn't -- you don't have to promise

13   that.

14             MR. BERGER:  Oh, okay.

15             THE COURT:  Take as much time as you'd like.

16             MR. BERGER:  Okay.  Thank you, Your Honor.

17             So what we have here are -- is -- or is a company

18   called SkyPower, and SkyPower was owned by a group of

19   shareholders at one point in time and that was in 2007, and

20   Lehman, through the letter of intent through Lehman Brothers

21   Inc., but with and on behalf of Lehman Brothers Inc. and its

22   affiliates, approached these minority shareholders and

23   offered to buy the company.  And the way they structured

24   this transaction was that they would first initially buy a

25   controlling interest, a minimal -- or at the very minimum

Page 63

1    controlling interest of approximately 51 percent of

2    SkyPower, but in a -- and pay cash for that, but in addition

3    to that they agree that they would provide ongoing funding,

4    because in order for the company to not only retain its

5    value but to grow that funding was vital.

6            So SkyPower -- so excuse me -- so Lehman's

7    structured this transaction to initially buy minority

8    interest, continue to purchase and acquire additional

9    interest -- continue to acquire more interest from the

10   minority shareholders through equity funding to SkyPower.

11           And it is true under these agreements the company

12   that it was obligated to perform these acts or these

13   obligations to the minority shareholders was an entity

14   called LB SkyPower, which was an entity specifically created

15   to perform under these transaction documents, to acquire the

16   majority interest and to be the funding source.

17           And what's not disputed at all is that number one,

18   this concept that there be ongoing funding was a concept

19   that all the parties intended to be there from day one.  So

20   this is not something that the minority shareholders are

21   looking back at and saying, oh, why don't we wedge our way

22   into these agreements or into this particular agreement,

23   this is something from day one before the equity

24   contribution agreement was actually entered into.

25           THE COURT:  Sure, but the obligation are to

Page 64

1    continue to put in funding.  Again, that's an obligation to

2    the -- the distinction we have to get is to the entity

3    versus an obligation undertaking to the individual

4    shareholders, right?

5              MR. BERGER:  That is correct.

6              THE COURT:  Right?

7              MR. BERGER:  Yes, Your Honor.

8              So -- but this initial obligation that we're --

9    and you know, this initial obligation that we're talking

10   about or that was initially contemplated was a promise or

11   contractual obligation that went directly to the minority

12   shareholders.

13             THE COURT:  Where does that -- where is that?

14             MR. BERGER:  That is in the shareholder agreement.

15             THE COURT:  Okay.

16             MR. BERGER:  In Section 6.02.

17             THE COURT:  So that would be exhibit?

18             MR. BERGER:  Exhibit 4.  No, I'm sorry.  Sorry,

19   6.1 of the --

20             THE COURT:  Let me -- let me get there.  I am in

21   -- I'm looking at the exhibits that are attached to your

22   opposition, right?

23             MR. BERGER:  Yes, correct.

24             THE COURT:  Okay.

25             MR. BERGER:  Exhibit 4.

1              THE COURT:  All right.

2              MR. BERGER:  Section 6.1.

3              THE COURT:  Okay.  Give me a moment to get there.

4              MR. BERGER:  Sure.

5              THE COURT:  The -- not the -- the -- your exhibits

6     are lettered.  Am I in the wrong place?

7              MR. BERGER:  No, our exhibits are numbered.  No. 4

8     to the opposition, which I think is the same as Exhibit D to

9     the plan administrator's reply.

10             THE COURT:  Give me a moment, I'm suffering from a

11    lack of tabs.

12        (Pause)

13             MS. SKAKEL:  Your Honor, do you want to borrow my

14    tabbed version of this document?

15             THE COURT:  I think I'm getting bailed out over

16    here.

17             MS. SKAKEL:  Okay.

18             THE COURT:  Okay.  So it's 6.?

19             MR. BERGER:  Section 6.1 and then Section 8.1.

20             THE COURT:  And what am I looking at in

21    Section 6.1?

22             MR. BERGER:  So in Section 6.1 I'll read it into

23    the record.

24             THE COURT:  Okay.

25             MR. BERGER:  "Lehman shall have the exclusive

1   right to make all equity investments in the corporation

2   after the initial closing of the acquisition."

3          THE COURT:  Right.

4          MR. BERGER:  "After the initial pre-money

5   valuation."  And then it says -- it has certain expectations

6   which do not apply here.  And then it says:

7          "All equity investments by Lehman shall take the

8   form of subscriptions of Class A shares at a price reflected

9   by the initial pre-money valuation or in convertible

10  preferred shares as contemplated by the third defined

11  paragraph of section 7.1 by exercising their rights."

12         And what this is basically saying is that Lehman

13  is the exclusive party that has the right to invest equity

14  into this company and the way they're going to invest equity

15  is that they will continue to purchase additional shares of

16  SkyPower.

17         THE COURT:  Okay.  But you stopped short of the

18  punch line.  I thought you were going to show me something

19  that then said that and this undertaking is for the benefit

20  of the shareholders.  This is for the corporation.  It says

21  the corporation.

22         MR. BERGER:  Well by its terms -- by the term of

23  this agreement and by the terms of this provision what is

24  happening here is there's an acquisition of additional

25  shares from the minority shareholders, that's what the

Page 67

1    rights are and that's a defined term and that's what it's

2    referring to.  That all equity investments by Lehman shall

3    take the form of subscriptions for Class A shares.

4              So the equity investment -- the purpose of the

5    equity investment is not only to fund the company but to

6    then buy additional shares from the minority shareholders.

7              And number two, the minority shareholders are

8    parties to this agreement.

9              So by -- (a) by virtue of the fact that the equity

10   contributions would be going to purchase to exercise the

11   rights to purchase shares from the minority shareholders'

12   agreement from the minority shareholders that makes this a

13   contractual obligation that runs directly to the minority

14   shareholders.  It may also run to the company, but it's also

15   a promise that runs directly to the minority shareholders.

16   And in fact the minority --

17             THE COURT:  So --

18             MR. BERGER:  Sure.

19             THE COURT:  -- just let me -- just let me stick

20   with you here for a membership.

21             So Article IV -- and titles don't count of course

22   -- but we're in something that's called "Exclusive Lehman

23   right to invest," right?

24             MR. BERGER:  Uh-huh.

25             THE COURT:  So the whole tenor of this paragraph

Page 68

1    actually is Lehman's exclusive right as opposed to Lehman's

2    obligation, right?  Where is the description of Lehman's

3    obligation?

4              MR. BERGER:  So that's in Section 8.1.

5              THE COURT:  Okay.

6              MR. BERGER:  And that's in Article VIII, referred

7    to as Lehman's support and third-party project equity.

8              THE COURT:  Okay.

9              MR. BERGER:  And that's titled, "The rights" --

10   subtitled the rights:

11             "As and when determined by Lehman to be necessary

12   to fund expenditures contemplated by an approved annual

13   operating budget for the operating plan Lehman will exercise

14   the rights."

15             And again tying into that section 6.1 Lehman will,

16   so that's the obligation to exercise the rights to buy the

17   additional shares from the minority shareholders and the

18   form that that purchase would take would be VI equity

19   funding and for SkyPower.

20             THE COURT:  Okay.  Okay, in the sense that I'm

21   hearing you.

22             MR. BERGER:  Okay, understood.

23             And again -- and it's important to remember the

24   context of how this transaction took place in that the

25   minority shareholders had full control of SkyPower at the

Page 69

1    time and they were entering into an agreement with Lehman

2    that was basically handing over the reigns giving them

3    control of the company.  And part of the consideration

4    that's being given for that is that Lehman is promising them

5    that we'll buy the rest of your shares too by providing

6    equity to SkyPower, and in that sense that's what makes this

7    contractual obligation direct to the minority shareholders.

8             THE COURT:  It would have been better through for

9    it there at the end for there to be a provision that's

10   entitled third-party beneficiary and that says that the

11   minority shareholders are the third-party beneficiaries.

12            MR. BERGER:  In the equity contribution agreement,

13   that's what Your Honor is referring to?

14            THE COURT:  Anywhere.

15            MR. BERGER:  Well --

16            THE COURT:  There isn't one --

17            MR. BERGER:  Well --

18            THE COURT:  I mean you're telling me that this

19   unanimous shareholder agreement I should take this as either

20   one of the documents or the document that establishes the --

21   the separate right, and again, there's -- it's a reading

22   between the lines exercise as opposed to a specific all

23   lawyers know how to say it these are the folks who are the

24   third-party beneficiaries of this agreement.  There isn't

25   that, right?

Page 70

1          MR. BERGER:  Well, I'll admit that corporate

2     lawyers have always confused me, but that being said --

3          THE COURT:  Me too.

4          MR. BERGER:  Okay.  So we're on the same page with

5     that.  And whether it would have been better or not been

6     better I don't think is the question at this hearing.

7          The question is whether this provision, which is

8     titled rights, and by its terms that means buying something

9     from the minority shareholders, whether that creates an

10    obligation directly to the minority shareholders, and I

11    believe that that's what this accomplishes.

12         THE COURT:  Well you could also say though that

13    the obligation to contribute the equity ran to the company

14    and that the means for implementation of that was going to

15    be through the purchases of the shares.

16         MR. BERGER:  You could say that, but that doesn't

17    change the fact --

18         THE COURT:  Well where would the -- if the equity

19    contribution had gone in where would -- where would the

20    money -- the money would have gone into the company, right?

21         MR. BERGER:  The money would have gone into the

22    company and then by continuing to own shares in the company

23    down the line there would have been (a), dividends

24    potentially --

25         THE COURT:  Right.  But it wasn't a transaction

Page 71

1    here's the money you give me your shares.

2              MR. BERGER:  No.

3              THE COURT:  It was an equity contribution into the

4    company, right?

5              MR. BERGER:  But the fact that the minority

6    shareholders chose that that's the way that they would

7    receive their compensation for their relinquishment of

8    rights should not change -- should not matter.  If that's

9    the way that they chose the payment to happen then that's

10   the way they chose it and that doesn't change a direct

11   contractual obligation into an indirect contractual

12   obligation.

13             THE COURT:  Okay.  Okay.  Why don't I let you keep

14   going.

15             MR. BERGER:  Okay.  And as has been mentioned

16   there is this Goodman Steps memo which lays out -- it's

17   basically a game plan of -- or a Steps plan --

18             THE COURT:  Okay.  So let's --

19             MR. BERGER:  -- of how --

20             THE COURT:  -- let's look at the Steps memo.

21             MR. BERGER:  Okay.

22             THE COURT:  If I can find it.

23             MR. BERGER:  I believe that's Exhibit 2 to our --

24   to the minority shareholders' opposition.  Or Exhibit B to

25   the plan administrator's reply.

Page 72

1          THE COURT:  B or D?

2          MR. BERGER:  B.  I'm sorry.

3          THE COURT:  Okay.

4          MR. BERGER:  And I'm on page 5 and it's number 21.

5   Future equity comes -- I'll wait for Your Honor.

6          THE COURT:  Okay.

7          MR. BERGER:  Future -- and this is in the -- in

8   the section called post-closing transactions.

9          "Future equity contributions by Lehman will be

10  made -- sorry -- will be made in consideration for

11  additional class A common shares of Acquisition Co."

12  Acquisition Co. would be the ultimate that holds all the

13  shares --

14         THE COURT:  Right.

15         MR. BERGER:  -- to which both Lehman and the

16  minority shareholders will own the shares of Acquisition Co.

17  pursuant to the rights.

18         THE COURT:  Right.

19         MR. BERGER:  So again we have a clear

20  contemplation by the parties that there's going to be future

21  equity contributions by Lehman.

22         THE COURT:  Okay.  We all agree on that.

23         MR. BERGER:  We all agree --

24         THE COURT:  However, now in this step if I were

25  with you on your theory then this step would have said

Page 73

1    future equity contributions by Lehman will be made in

2    exchange for -- to the Class A shareholders in exchange for

3    the tender of their shares.  And it doesn't say that.

4            MR. BERGER:  Perhaps if I was writing -- if I was

5    -- asked for me to I didn't it maybe that's how I would

6    write it, maybe not, but the fact is it says will be made in

7    consideration for additional Class A common shares.  Well

8    who owns those Class A common shares and who's providing

9    that consideration?  It's the minority shareholders.

10           So even if it's not written perfectly like that

11   but by its very terms what this means is that Lehman is

12   making equity contributions in consideration for the

13   minority shareholders to give up their -- some of their

14   minority shares.

15           And I think here it's important to pause and just

16   think about what is happening here in that Lehman here as

17   the plan administrator --

18           THE COURT:  But see you're recharacterizing this

19   as a deal in which Lehman was buying the shares of

20   individuals, and that's -- it's an equity contribution, it's

21   not a share purchase program.  I mean you -- in order for me

22   to go with you down this path I have to recharacterize,

23   rethink the whole transaction as an obligation of Lehman

24   specifically to buy the shares of these folks.

25           MR. BERGER:  Well, first of all I would get to the

Page 74

1  -- which one is Lehman in a second.

2          THE COURT:  Okay.

3          MR. BERGER:  I just want to address that.

4          But to address Your Honor's question, if there was

5  -- the Goodman's memory was just number 21 or if there was

6  just an equity contribution agreement I would agree with

7  Your Honor, but the way Your Honor characterized it as not

8  being that's exactly what it is.

9          The -- Lehman wasn't coming to SkyPower and saying

10  I want to fund you, Lehman was coming to the owners of

11  SkyPower and saying I want to buy your company and this is

12  how I'm going to buy your company, and part of the

13  compensation of me buying your company in the future for

14  future shares is going to be I'm not going to give you the

15  cash but I'm first going to give the cash to the company.

16  That's -- it is exactly in this context because that's what

17  we're talking about here.

18          Certainly at this stage in the game in June 2007

19  we're only talking about a share purchase agreement and yet

20  we're contemplating --

21          THE COURT:  But there's such a big difference

22  between agreeing to infuse equity into a company, for

23  example, and making a tender for shares, going out to

24  somebody and saying you have those shares, sell me your

25  shares.  There's a huge difference between that, and you are

Page 75

1    -- we're mushing to use the technical legal term.

2             MR. BERGER:  Well -- well both of these is -- both

3    of those points or both of those ways of purchasing is

4    exactly what happened, there were two components to it.

5    There's one component I'm going buy your shares and a second

6    -- with cash right now, and then there's the second

7    component I agree on buying them myself, I'm going to

8    continue to buy your shares but that cash -- the way we're

9    going to structure that part of it is going to be by

10   infusing equity into the company.  But that's not an

11   independent and it should not be separated from the

12   agreement that there -- that these contents are both

13   contained in, which is the stock purchase agreement, and

14   it's coming -- you're coming from the perspective of --

15   again, not of Lehman coming I want to infuse equity into

16   your company, I want to work that particular arrangement,

17   but rather I want to buy your company and this is how we're

18   going to do it and this is one part of how we will do it.

19             And I'm not the one that's mushing it together,

20   it's the parties that mushed it together.  And again, I'll

21   just -- I know I'm repeating myself -- but the minority

22   shareholders should not be punished or their claim doesn't

23   magically turn into an indirect claim because that's the way

24   they agreed to structure that part of the deal.

25             And one thing --

Page 76

1          THE COURT:  But the minority shareholders didn't

2    object to the SkyPower settlement in the Canadian

3    proceeding.

4          MR. BERGER:  Correct.

5          THE COURT:  Why was that?

6          MR. BERGER:  Well, I'll put aside whatever notice

7    issues and whether there was proper issue.

8          THE COURT:  Uh-huh.

9          MR. BERGER:  But the fact of the matter is the

10   minority shareholders alleged -- or asserted direct claims

11   in this Bankruptcy Court and there was a pending objection

12   in the Bankruptcy Court.  The fact that SkyPower also filed

13   its own claim and that claim was being settled.  I mean if

14   someone would have invited us to the party maybe to share in

15   that settlement no doubt we would have at least listened.

16   But that was a separate issue, it's a separate claim, it's

17   SkyPower's own claim.  Granted it might relate to the same

18   facts, but the minority shareholders' claim was their own

19   claim and that's one of the cases that the plan

20   administrator himself actually cites and we then cite it

21   back in our surreply, it's the (indiscernible - 01:27:19)

22   case would have these exact facts where there is two

23   separate claims.  There was claims -- direct claims by the

24   shareholders and then there was claims by the debtor in a

25   Bankruptcy Court, that was actually a U.S. Bankruptcy Court.

Page 77

1          THE COURT:  Uh-huh.

2          MR. BERGER:  And the court specifically said -- it

3   happens to be their -- the shareholder did object -- but his

4   objection was overruled and the court said what I'm settling

5   here today, the debtor's claim, that's -- you're still going

6   to have to deal with the shareholder on his individual

7   claim.

8          And there was -- and I'll just mention in terms of

9   equity, to have our claim pending for three years in the

10  middle of those three years sneaking off to another

11  jurisdiction to resolve our claim it just doesn't -- that

12  doesn't seem fair to me at all, number one.

13         And number two, obviously --

14         THE COURT:  I don't think you could say they

15  exactly sneaked off to Canada.

16         MR. BERGER:  Well, okay, I won't say -- you're

17  right, not sneak off.

18         THE COURT:  With PWC and the Canadian court.

19  They're not really known as sneaky types --

20         MR. BERGER:  Correct.

21         THE COURT:  -- you know.

22         MR. BERGER:  I was getting a little excited, no

23  doubt about that.

24         But the bottom line is if there's a pending

25  objection in this court which has the jurisdiction to -- to

Page 78

1    resolve claims against Lehman it should --

2              THE COURT:  Okay.

3              MR. BERGER:  And again, and one final point.

4              THE COURT:  All right.

5              MR. BERGER:  There's nothing in the settlement

6    agreement that bars direct claims --

7              THE COURT:  Okay.  So can we --

8              MR. BERGER:  -- so it's really much to do about

9    nothing.

10             THE COURT:  -- can we go to -- we've been in a lot

11   of the ancillary documents, so now can we go to the equity

12   contribution agreement which --

13             MR. BERGER:  Yes, absolutely.

14             THE COURT:  -- is the biggy, right?  That's the

15   big one.

16             MR. BERGER:  That's the big one.

17             THE COURT:  Okay.

18             MR. BERGER:  And then there's this point I want to

19   make.  The funding obligations that we've been talking about

20   (indiscernible - 01:28:44) are LB SkyPower, and the company

21   that increased its ownership in SkyPower was LB SkyPower,

22   and yet there's no dispute that the company that actually

23   funded those equity contributions was LBHI.

24             So we have this question facing us.  On the one

25   hand in the shareholder agreement there's this right --

1   there's this rights to purchase new shares by way of equity

2   infusions and LB SkyPower does in fact exercise those rights

3   and quote/unquote miraculously increases its equity

4   contributions without paying a penny, and yet it's LBHI

5   that's actually making all the funding, and that's something

6   that is not disputed.

7            So I think in that context -- now we can in fact

8   turn to the equity contribution agreement.

9            THE COURT:  Okay.

10           MR. BERGER:  And there's been -- and because

11  there's been a point raised regarding the timing I guess

12  before we go to that if I could just turn to -- let's see --

13  it's Exhibit 6 to the opposition, which I believe is

14  Exhibit F --

15           THE COURT:  Right.

16           MR. BERGER:  -- to the reply.  And that is the

17  Lehman Brothers' memorandum.  And this is a memo dated

18  already September 2007, and it's not -- it's actually not

19  written entirely clear in --

20           THE COURT:  I'm sorry, I thought we were in the

21  equity contribution agreement.

22           MR. BERGER:  Yes, but -- I'm sorry -- just before

23  I got to that because --

24           THE COURT:  Yeah.

25           MR. BERGER:  -- a point has been raised regarding

1   the timing of the date of --

2           THE COURT:  Oh, okay.

3           MR. BERGER:  -- the equity contribution agreement,

4   I'm just pointing to this memo, which is September 5th,

5   2007, which is three -- less than three months after the

6   shareholder agreement, and in it it's already -- it's

7   already referencing equity contributions that have been

8   made.  In fact on page 1 on the third line it says, "As of

9   the date of this memorandum U.S. $19 million cash was

10  invested by Lehman Brothers into SkyPower."  And the line

11  above that just to be clear says:

12          "All actual and deemed equity investments by

13  Lehman shall take the form for -- of subscriptions for Class

14  A shares at a price reflective of the initial pre-money

15  valuation."

16          THE COURT:  So at the time that this occurred,

17  right, were the Class A shares all issued and outstanding?

18          MR. BERGER:  They were all issued and outstanding,

19  but during this time the ownership of those Class A shares

20  shifted, vis-à-vis, the equity contributions that were being

21  made at the time.

22          THE COURT:  What do you mean by that?

23          MR. BERGER:  Meaning that the equity contribution

24  was not a stand-alone equity contribution in that here's

25  your money, it's here's your equity contribution please give

1      me your Class A shares.

2                  So there were equity contributions during this

3      time, and during that time in exchange for those equity

4      contributions the minority shareholders had to relinquish

5      some of their Class A shares.

6                  THE COURT:  So what was the -- I mean how -- what

7      was the mechanic, right?  I mean how did it -- literally how

8      did it work?  I mean -- and you know, I'm making you be a

9      corporate lawyer now, right, you're in -- like the money

10     comes in, they've got those things with all the papers

11     standing up, like literally how did it -- how did it work?

12     Because on the face of this, you know, there's nothing that

13     doesn't indicate that, you know, the shares would be issued.

14                 MR. BERGER:  Well --

15                 THE COURT:  Again, what -- I sound like a little

16     bit of a broken record, but -- but this is because

17     everywhere it says equity investment you want me to read

18     that as saying share purchase.

19                 MR. BERGER:  Right, and I do that because of the

20     terms of the shareholder agreement and I do that because of

21     the way it's written, an equity investment shall take the

22     form of subscriptions for Class A shares, and I'll just

23     point to the next paragraph which says -- which references

24     the prior --

25                 THE COURT:  Right.  But it says -- again, I'm

Page 82

1    going to take this back against you, "The form of

2    subscriptions for Class A shares."  In other words I make

3    the equity contribution, right, and in return you company

4    better give me some Class A shares.  It doesn't say where

5    they're going to come from, right?

6            MR. BERGER:  Correct, Your Honor.

7            THE COURT:  I mean the company could issue them,

8    the company could --

9            MR. BERGER:  Correct, Your Honor.  But number one,

10   if you look back -- again, this is a memo which yes we are

11   relying on -- but the operative documents by which this

12   transaction referenced in the memo took place is the

13   shareholder agreement which clearly tie the equity

14   contribution to the rights, i.e., the rights to buy more

15   shares from the minority shareholders.  Point number one.

16           Point number two, if you look at the next

17   paragraph which says, "As of this date $19 million in cash

18   was invested by Lehman Brothers."  And then the last

19   sentence says, "(indiscernible - 01:33:38) has been computed

20   on this amount."  And I believe that reflects the exact

21   structure that I've been talking about, which is the

22   minority holders' shares have been diluted as a result of

23   the $19 million invested by Lehman to that date.

24           THE COURT:  Okay.  But now finally let's go into

25   the --

1          MR. BERGER:  Uh-huh.

2          THE COURT:  -- amended and restated equity

3   contribution agreement, because again, you go back to it's

4   got an entire agreement clause, right, which specifically

5   says:

6          "This agreement supersedes all prior agreements

7   understandings, negotiations, and discussions whether oral

8   or written of the parties relating to the subject matter

9   hereof and entered into prior to the date of this

10  agreement."

11         Bam, right, the biggy.

12         And then the very next section it says, "Equity

13  contributions.  The sponsor agrees to make one or more cash

14  equity contributions to the borrower."  It's kind of

15  problematic.

16         MR. BERGER:  Yes, Your Honor, I will address this

17  issue.

18         THE COURT:  Okay.

19         MR. BERGER:  First of all the question is the

20  intent of the parties, and there's no doubt that an

21  integration clause may reflect or may be used to reflect

22  intent of the parties, but there's no case law that says if

23  there's an integration clause you're done.

24         In the -- in the context of the agreement with an

25  integration clause it certainly adds to that.  That's my

Page 84

1    first point.

2              And to that although it was in the context of our

3    other argument, which is that all the transaction documents

4    should be read together, I would also point to the second

5    Circuit case, And This Is Me -- And This Is Me, the one

6    agreement that had --

7              THE COURT:  Great case name, you have to admit,

8    right?

9              MR. BERGER:  It's a great case.  I would have

10   loved to have been the lawyer in that case or maybe not, I

11   don't know.

12             But in any event the one agreement that actually

13   had the guaranteed $750,000 payment specifically had an

14   integration clause.

15             But again, given the circumstances of everything

16   that -- of the various agreements that are involved and

17   given the context of the transaction -- although under a

18   different theory, not third-party beneficiary -- but under

19   similar standard of the intent of the parties to effectuate

20   a common purpose the court didn't let that integration

21   clause block other defendants from being responsible for

22   that guaranteed payment.

23             So I would also go -- go back for a second -- and

24   I know we're talking about the equity contribution

25   agreement, but it's important in this context.  I'm sorry to

Page 85

1    go back and forth.

2            In the unanimous shareholder agreement, which is

3    Exhibit 4 or Exhibit D?  No, I'm sorry, excuse me.

4            THE COURT:  That's okay.

5            MR. BERGER:  I actually want the stock purchase

6    agreement, which is Exhibit 3 or Exhibit C.  In

7    Section 14.01, this contains defined terms, to be defined

8    terms called operative agreements, and the definition goes:

9            "Operative agreements means this agreement, the

10    employment agreements, the rights agreement, the

11    shareholders' agreement, the amended acquisition

12    (indiscernible - 01:36:59), and any other support or other

13    agreement to be entered into in connection with the

14    transaction.  Each such agreement in the form agreed upon by

15    the parties."

16            So that operative agreement number one clearly

17    contemplates that this is part of a multiparty transaction.

18    But number two specifically contemplates potential

19    agreements of support to be entered into later on.

20            And then if you turn to Section 15.02, that's the

21    integrational clause on the stock purchase agreements, when

22    it says the entire agreement the agreement says, "This

23    agreement and the operative agreements supersede all prior

24    discussions and agreements."  So that's the integration

25    clause for the share purchase agreement.

Page 86

1          And again contemplating that there's going to be

2     future agreements and that's what should all be read

3     together.

4          THE COURT:  So let me -- let me ask you and maybe

5     with can try to move this along a little bit.  So this is a

6     sufficiency hearing, 12(b)(6) standard, et cetera.  If I

7     were to agree to let you out of the starting gate ,so to

8     speak, right, then we would go to a trial.  And so if you

9     try to envision what that trial would look like we have all

10    these documents, right, and the proof, if you will, would be

11    I would circumstantially piece together all of these

12    statements and you would be asking me to find intent, and

13    presumably you would also introduce testimony of intent.

14          MR. BERGER:  Uh-huh.  Yes.

15          THE COURT:  And that's where I get into kind of a

16    quandary, because then on the other side so I'm going have

17    people come in and they're going to say that wasn't the

18    intent, you know, if that had been the intent we would have

19    put them in the document.

20          So I get back to where we started, which is that's

21    why the reason the law has developed that the intent needs

22    to be so clear from the face of the document because

23    otherwise you're in this very subjective territory where of

24    course one party is going to say this was the intent and

25    this wasn't the intent.

Page 87

1          And the other thing, you know, to get back to kind

2     of a law school type question, the slippery slope argument,

3     right?  So if I agree with you that the minority

4     shareholders were third-party beneficiaries, well maybe the

5     employees of SkyPower were also third-party beneficiaries,

6     because then, you know, the money was going to come in and

7     there was going to be this company and they were going to

8     have employment.  So how do I stop -- how do I stop?

9          MR. BERGER:  I think the answer to both questions

10    is one answer, and that is you have very unique facts that

11    make this claim different and make it obvious from the face

12    of the agreement in considering it in the context of what's

13    -- of the surrounding circumstances of what the intent of

14    the parties was.  And that is because on the one hand you

15    have under the stock purchase agreement LB SkyPower

16    obligations to exercise rights by making equity

17    contributions.

18          Step two you have no equity contributions from LB

19    SkyPower.

20          And then step three you have -- I'm sorry comma

21    -- step three you have LB SkyPower increasing its shares

22    because it's exercising its rights.

23          And then step four you have an equity contribution

24    signed by LBHI making those very equity contributions that

25    resulted in the exercise of those shares.

Page 88

1          So what you have here is -- I don't have to search

2      and come up with theories, for example, in the Newport case

3      of how I would have benefited from this if Lehman would have

4      done the right thing to the part of that agreement.  That's

5      not what with we have.  We actually have a direct line and

6      it's a simple connecting of the dots in that you had rights

7      going directly to the minority shareholders that were

8      performed -- that were obligated to be performed by one

9      Lehman entity but instead were performed by LBHI under this

10     other agreement and yet the result was the same in that

11     other Lehman entity increased its share holdings.  And to

12     that that's where you get to if you look at the face of this

13     document with the surrounding circumstances.  You go, ah ha,

14     I see this was intended to benefit the minority shareholders

15     as a third-party beneficiary.

16          And, you know, we cited also it's out of the

17     District of -- District Court in D.C., a Bank of New York

18     case which made a point, you know, that you can look to

19     outside -- and then again this in the context and they are

20     very similar to the single transaction theory -- that said

21     you can look to other agreements not only the transaction

22     unanimous agreements.  There they were looking to an

23     offering memorandum, they were looking to attorney's

24     letters, and they said, Bank of New York why -- if the other

25     party was -- if the FDIC was saying look at the intent of

Page 89

1    the parties why didn't you come back and say no, this is not

2    the intent of the parties?  And I agree at a sufficiency

3    hearing we can -- we can come in and we can battle that out

4    so to speak, but at this point in time we've certainly

5    presented facts that when looked at as a whole and then when

6    you look at that the equity contribution agreement was

7    accomplishing and what it did accomplish it would lead to

8    the result that the minority shareholders were the third-

9    party beneficiaries.

10            And I believe this ties -- this is what makes both

11    points a flip side of the same coin.  I don't think there's

12    a dispute as to the law.  Everyone agrees that a direct

13    claims means that there's a direct right or a direct

14    relationship between a defendant or the debtor and a

15    claimant or the plaintiff, call it debtor and claimant in

16    this context, if there's a direct right that runs to the

17    shareholder and whether that's a tort or whether that's a

18    contract -- a contractual right and you reaching that was a

19    harm that they suffered uniquely not -- and it might have

20    also hurt the corporation, but it also harmed them, then you

21    have a direct claim.  And given our theories of how you have

22    that direct contractual relationship that easily connects

23    the dots to make this a direct claim.

24            THE COURT:  Okay.  And that addresses -- and

25    therefore if I agree with you on that then the standing

1     issue becomes irrelevant.

2          MR. BERGER:  Just goes away.

3          THE COURT:  Okay.

4          MR. BERGER:  I'm not sure, I can go to the alter

5     ego quickly.  I don't know if Your Honor has anymore

6     questions on this.

7          THE COURT:  No, why don't we give Lehman's

8     counsel --

9          MR. BERGER:  Can I just make one point on the

10    alter ego?

11         THE COURT:  Of course.

12         MR. BERGER:  Under New York law there is a series

13    of cases on alter ego that says if you create an entity

14    specifically for a transaction you can't -- and then you use

15    that entity to breach a contract or to inflict a tort that

16    is an alter ego claim, and that's what makes -- I know Judge

17    Peck's decision has been mentioned here.  First of all

18    that's between LBI and LBHI.

19         THE COURT:  Right.

20         MR. BERGER:  We're going straight from LB SkyPower

21    to LBHI, but this context is different, this is not a

22    derivative claim of LB SkyPower, this is actually a direct

23    claim specific to minority shareholders in that LBHI created

24    an entity specifically to enter into this transaction, used

25    that entity to reach its obligations, and yet the whole time

Page 91

1    was holdings itself out as we're the one that's really

2    making this acquisition, and that's what makes this alter

3    ego claim viable.

4              THE COURT:  Okay.

5              MR. BERGER:  Thank you, Your Honor.

6              THE COURT:  Thank you very much.  Okay.

7              MR. YOUNGMAN:  Okay.  Your Honor, I don't remember

8    the case but I think it's fairly black letter law that the

9    intent of the parties is to be gleaned from the four corners

10   of the documents.

11             Also black letter law is that corporate structure

12   and separateness have legal effects and transaction

13   documents have legal effects.

14             As you said those have developed over the years to

15   avoid the he said, she said arguments that go perpetually

16   nowhere in court.  So people know how to draft documents and

17   these documents were carefully drafted.

18             Now in response to counsel's arguments on the

19   shareholders' agreement.  Again one cannot just say Lehman

20   and use that to appreciate the legal effect of these

21   documents.  For example, the shareholders' agreement, the

22   sections that were cited by counsel 6.1 and 8.1 use the

23   defined term Lehman as setting up those obligations.  On

24   page 1 of the shareholders' agreement Lehman is defined as

25   LB SkyPower.  That is the party with legal rights and

Page 92

1    obligations under that document.

2              THE COURT:  So wait, so where you're going with

3    this is that if I agree with Mr. Berger about the existence

4    of the rights of the minority shareholders that we then hit

5    the speed bump of the fact that Lehman is not LBHI it's

6    Lehman SkyPower.

7              MR. YOUNGMAN:  Exactly.

8              THE COURT:  Okay.

9              MR. YOUNGMAN:  Again, corporate structure and

10   separateness have legal ramifications and this is LB

11   SkyPower's rights and obligations.

12             The stock purchase agreement is the same.  Again,

13   Lehman in that context is LB SkyPower.

14             Let's turn to the equity contribution agreement.

15   As an initial matter the equity contribution agreement is

16   structured for a specific transaction, that is LBHI who is

17   definitely a party to that agreement, will make

18   contributions to cover any shortfalls that may be owing

19   under the bank credit agreement.

20             Let's accept for just a moment -- I'm disputing it

21   -- but let's accept for a moment that these equity

22   contributions were somehow meant to be a direct purchase of

23   the minority shareholder stock.

24             THE COURT:  Right.

25             MR. YOUNGMAN:  That's not how the transaction was

Page 93

1   structured.  As the September 5 memo, which by the way was a

2   memo from Lehman Brothers Inc., LBI, again, staying away

3   from this overall Lehman concept, noted that these equity

4   contributions would be dilutive to the minority

5   shareholders.

6            Let's say you and I have a company.  You have

7   $10 --

8            THE COURT:  Okay.

9            MR. YOUNGMAN:  -- of stock, I have $10 of stock.

10  We each have stock worth $10.  I'm going to put in another

11  10 so now I have $20 of stock, you have 10.

12           THE COURT:  Right.

13           MR. YOUNGMAN:  I have two-thirds, one-third --

14           THE COURT:  Right.

15           MR. YOUNGMAN:  -- instead of one-half, one-half,

16  you still have $10 of stock, you know, assuming relative

17  values.

18           THE COURT:  Right.

19           MR. YOUNGMAN:  It was diluted, there was no

20  transaction that was saying I'm going buy your $5 of your 10

21  to maintain that -- or to develop that dilution.

22           Again, the intent of the parties is to be gleaned

23  from the four corners of the documents.  There is nothing

24  within those documents that evidence any intent that LBHI,

25  the debtor, and it gets to when the claim was made had any

Page 94

1   obligation or intended to create any obligation from LBHI to

2   the minority shareholders.  In essence is they're arguing to

3   guarantee the value of their investment.

4             THE COURT:  Okay.

5             MR. YOUNGMAN:  As I said their fortunes rose and

6   fell with the fortunes of SkyPower Corp. and any claims for

7   the fall part of that is derivative of their interest in

8   SkyPower Corp.

9             As to the stock purchase agreement and the

10  definition of operative agreements, I guess a transactional

11  lawyer would read that as the agreements in existence at

12  that time.  Let's assume that it was contemplating any

13  document that was going to be executed in the future.  As

14  the Court noted the equity contribution agreement does have

15  an integration clause in and of itself which would belie any

16  intent that is not expressed in the equity contribution

17  agreement that would purport around from LBHI to minority

18  shareholders if you could craft that all of the stock

19  purchase agreement.

20            Nothing further, Your Honor.

21            THE COURT:  Okay.  Very good.  All right, thank

22  you both very much.

23            MR. BERGER:  May I just make one more point?

24            THE COURT:  Yes.

25            MR. BERGER:  Thank you.  Actually two more points.

Page 95

1          Point number one is the -- I don't think it's a

2     corporate lawyer, I think it's just the way the agreement is

3     written it says -- and this is going to the defined terms of

4     operative agreements -- it's and agreements to be entered.

5          But point number two I just would like to cite in

6     the Second Circuit case that was cited and relied on by the

7     plan administrator, it's Central Hudson Gas & Electric

8     versus Empresa Naviera, it's 56 F.3d 359 and it's a Second

9     Circuit case, the jump cite is 371 and this is what the

10    court said.

11         "In other words, Empresa was a third-party

12    beneficiary only if it establishes a right to performance

13    under the agreement and if the surrounding circumstances

14    indicate that Central Hudson intended to provide Empresa

15    with the benefit of such performance."

16         So there's certainly second -- there's other

17    precedent, but certainly this case is Second Circuit

18    precedent that under New York law you look at the

19    surrounding circumstances.  And in that context -- and I

20    know this is a point we already made -- but why was Lehman

21    agreeing -- why was LBHI agreeing to enter into the equity

22    contribution agreement?  Was it some -- and why did it

23    provide funding before actually signing it?  Was it some out

24    of the goodness of their heart or was it actually connected

25    to something they had already agreed to?  And that's our

Page 96

1   position, that it's something that they had already agreed

2   to.

3           THE COURT:  All right.  Well, I don't disagree

4   with you.  I mean far be it for me to disagree with the

5   Second Circuit, but I've also written recently in another

6   case where of course you have to look at contractual

7   language in context.  I mean if you didn't then, you know, I

8   would be out of a job because you would just have a machine,

9   you know, reading the words --

10          MR. BERGER:  Right.

11          THE COURT:  -- of the contract.

12          So I don't disagree with you that you have to look

13  at the surrounding circumstances and the context, but first

14  and foremost you have to look at the words in the document.

15          So you've given us a lot to think about --

16          MR. BERGER:  Thank you, Your Honor.

17          THE COURT:  -- and I appreciate your thoughtful

18  arguments, and we will take this under submission and get

19  back to you in due course.  All right?

20          MR. YOUNGMAN:  Thank you, Your Honor.

21          MR. BERGER:  Thank you, Your Honor.

22          THE COURT:  Thank you very much.

23          Okay.  Next we have the Conway Hospital matter.

24  It's still good morning.

25          MR. HORWITZ:  I was checking my watch to make

Page 97

1   sure.

2              THE COURT:  Checking your watch to be sure?

3              MR. HORWITZ:  So good morning, Your Honor.

4              THE COURT:  Do we have someone else here?  Yes.

5              MR. HORWITZ:  Yes.  Okay.  Maurice Horwitz, Weil,

6    Gotshal & Manges on behalf of the plan administrator.

7              So the last item on the agenda for this morning is

8    one claim on the three hundred and twenty-third omnibus

9    objection to claims which was filed on July 9th, 2012.  It's

10   ECF number --

11             THE COURT:  Right.

12             MR. HORWITZ:  -- 29295.

13             The objection requests that the Court expunge

14   certain claims because they were filed after the applicable

15   bar date in these cases.

16             Today the plan administrator is proceeding with

17   respect to proof of claim number 68076, which was filed

18   against Lehman Brothers Special Financing Inc. or LBS Inc.

19   by Conway Hospital, Inc. on April 18th, 2012, which is years

20   after the September 22nd, 2009 bar date.

21             THE COURT:  Right.  Right.

22             MR. HORWITZ:  The claim is based on a forward

23   purchase agreement between LBSF and Conway dated June 8th,

24   1998.  Conway has referred to this as a securities contract.

25   LBSF does not dispute that it's a securities contract.  LBSF

Page 98

1    also views this as a swap.  Conway may dispute that, but

2    both parties agree that this is the type of contract that

3    falls within the safe harbors and entitles Conway to

4    terminate the contract --

5              THE COURT:  Upon the filing, right?

6              MR. HORWITZ:  -- because of a condition.  I'm

7    sorry?

8              THE COURT:  Upon the filing.

9              MR. HORWITZ:  Upon the filing --

10             THE COURT:  Right.

11             MR. HORWITZ:  -- upon LBSF's filing or because of

12    -- because of LBSF's filing.

13             THE COURT:  Right.

14             MR. HORWITZ:  Conway did terminate this contract

15    on November 21st, 2008, it sent a termination notice to

16    LBSF, their termination notice states that it is being sent

17    because of LBSF's filing on October 3rd, 2008.

18             THE COURT:  But they say they did it wrong.  They

19    say we tried to terminate but we got it wrong --

20             MR. HORWITZ:  They say it now.

21             THE COURT:  -- and therefore it wasn't terminated.

22             MR. HORWITZ:  Correct.  Now they say that they did

23    that wrong.  They also did not file a proof of claim by the

24    bar date which was set as September 22nd by this Court's

25    July 2nd, 2009 order.

1            So they challenge -- they attempt to challenge

2    their own termination now arguing that the contract is still

3    executory at the effective date and that therefore they were

4    filing within the 45-day deadline for contracts that were

5    rejected on the effective date.

6            THE COURT:  And then they say they're metavante.

7            MR. HORWITZ:  They rely upon metavante in which

8    their counterparty waited for a full year and still hadn't

9    terminated, and so this Court -- Judge Peck held that that

10   counter party had waived its right to terminate.  LBSF has

11   never asserted that Conway waived its right or that the

12   termination was invalid.

13           Conway also tries to argue that the bar date order

14   does not apply to -- specifically apply to terminated

15   securities contracts.  Conway characterizes the bar date

16   order as applying to only four types of contracts,

17   prepetition claims, guarantee claims, derivative contracts,

18   and rejection claims.

19           The bar date order in fact in its second ordered

20   paragraph states it applies to all prepetition claims.  It's

21   a very misspoken complicated bar date order and has special

22   provisions for what it defines as derivatives contracts and

23   for executory contracts and guarantee claims, but those

24   special provisions just require -- at least for derivatives

25   contracts and guarantee claims -- require claimants to

Page 100

1    submit an additional information do not exempt any other

2    parties from filing any prepetition claims that they may

3    have as of that date.

4            Conway had, you know, at the -- because they had

5    terminated before the bar date they had a claim they could

6    have asserted, they didn't assert it by the bar date so the

7    plan administrator filed its objection.

8            THE COURT:  Okay.  All right.  Thank you.

9            Let me hear from Conway.  Now it's good afternoon.

10           MR. WHITE:  May it please the Court.  I'm Andrew

11   White.  This is Tom Macauley.  We represent Conway Hospital.

12           THE COURT:  Very good.  So you folks were not

13   involved in 2008 or in 2009?

14           MR. WHITE:  By not involved?

15           THE COURT:  You, as counsel.

16           MR. WHITE:  Oh, correct, Your Honor.

17           THE COURT:  Okay.  Then, I will say what I'm going

18   to say with full bluntness.  There are so many things that

19   are troubling about this entire picture.  Okay?

20           Number one, it would seem that somebody at Conway

21   tried at the time when there was a lot of chaos -- and there

22   were certainly a lot of counterparties who didn't exactly

23   know what to do with this instrument they had in their

24   files.  Somebody sent a letter terminating it, and they sent

25   it to the wrong place, but nobody at Lehman, Alvarez &

Page 101

1    Marsal, Weil, Gotshal, anybody ever said this doesn't work,

2    it didn't terminate.  And there was no follow-up.

3            So, as far as to draw the analogy to kind of the

4    metavante facts, it was terminated.  It was terminated.

5            Then, the next thing that happens in the important

6    timeline is the bar date notice.  So everybody on the planet

7    knew that Lehman was in bankruptcy.

8            The bar date order, as counsel indicated, was, in

9    one sense, bespoke (sic), meaning had very specific

10   provisions about types of information that needed to apply,

11   but, like all bar date orders that any first-year associate

12   would read, when there's a bar date order, the immediate

13   reaction is, "Oh, my goodness, there is a bar date order.

14   Let's put this date down in 16 different places.  Let's tell

15   every client we have that, if they conceivably, possibly

16   have any claim remotely related to Lehman Brothers, we need

17   to file it now."

18           And what you're suggesting now at this point is

19   that now you're saying, "Oh, the bar date order didn't apply

20   to us."  What you're not saying, though, is that, at the

21   time, somebody thoughtfully sat down, read the bar date

22   order, did an analysis, and came to the conclusion

23   erroneously that it didn't apply.  You're not saying that,

24   and I think the reason that you're not saying that is

25   because it didn't happen.

Page 102

1          Somebody missed it.  They missed it, whether it

2     was in-house counsel or predecessor counsel.  They just

3     missed it, and now, you've been tasked with helping your

4     client -- and I understand that -- figure out a way to still

5     lodge a claim, because it's a substantial claim.

6          So now we're kind of going back and saying oh,

7     look, that bar date order, to which I don't even know the

8     numbers, but I would suspect tens, if not hundreds of

9     trillions of dollars of claims were filed somehow did not

10    apply to this, and you dropped this very curious footnote on

11    page six of your amended response that talks about 502(g).

12    I frankly don't follow it at all in terms of 502(g)'s

13    treatment of terminated contracts as general unsecured

14    claims as opposed to administrative claims.

15         You know, once again, you know, a very basic is

16    that, when a contract is terminated, groups' contract is

17    terminated it gives rise to a prepetition claim.  So then,

18    somehow, when the confirmation came about, somebody had an

19    oh, my goodness moment and then decided we have to come up

20    with a theory on why we didn't file it before, and it just

21    doesn't work.

22         So what you're asking is well, let's do an

23    excusable neglect analysis.  Let's go down the excusable

24    neglect path, but, because there's an absence of kind of the

25    scenario of somebody looked at the bar date order, somebody

Page 103

1    looked at our contract and, you know, they were

2    inexperienced, or the person who had to do that was out sick

3    that day.

4           You then have the problem of dealing with the

5    period of time between the bar date order and the

6    confirmation hearing, where the Lehman case was still open

7    and notoriously going on.  And, if that had occurred,

8    somebody would have filed a late claim and said, "Oh, my

9    gosh, we messed up excusable neglect."  So we have none of

10   that.  We have none of that, and we kind of have all of

11   these after-the-fact revisionist history looks at the notice

12   itself.  You know, we made a mistake.  Therefore, we waived

13   our own rights.

14          I'm having a hard time with it, and it's not my

15   favorite thing to do to tell a creditor that you're entirely

16   out of luck.  Believe me, it's not, but I have a

17   responsibility to the creditor body at large to enforce the

18   rules, you know, on an even and fair and consistent basis.

19          So, having said all of that, I'm happy to give you

20   an opportunity to respond.

21          MR. WHITE:  Thank you, Your Honor.  I perceive

22   perhaps an uphill battle.

23          No, but, Your Honor, you know, I'm not going to

24   disagree with your overall view that somebody missed the

25   ship, that somebody is looking for a reason why --

Page 104

1                THE COURT:  Yeah.

2                MR. WHITE:  -- it should be allowed.

3                THE COURT:  Right.

4                MR. WHITE:  And let me explain to you, at least of

5        the rational view, why, in fact, I think such a case exists.

6                THE COURT:  Okay.

7                MR. WHITE:  Okay?  Lehman Brothers -- first of

8        all, let me first say that the designation claim is a

9        forward (sic) purchase agreement versus our guaranteed (sic)

10       yield (sic) contract.  We don't agree with that designation.

11       It probably doesn't matter, but, just for purposes, we're

12       not contending anything, other than it was a security

13       structuring.

14               THE COURT:  Well, it was designated as such on the

15       proof of claim form that was sent, is that what you're

16       saying?

17               MR. WHITE:  The document itself doesn't mention

18       forward (sic) agreement or anything like that.  I'm only

19       saying that to preserve our rights.  We're not admitting

20       that it's a forward agreement.

21               THE COURT:  Okay, but --

22               MR. WHITE:  That's --

23               THE COURT:  But go back to -- so you would have

24       received -- what document are you referring to?  The --

25               MR. WHITE:  Oh, I'm sorry, Your Honor.  In our

Page 105

1     amended response to the objection, we referred to the

2     document as a guaranteed yield agreement.  Lehman refers to

3     it in its amended objection --

4               THE COURT:  Oh, I see.  Okay.

5               MR. WHITE:  -- as a guaranteed yield contract.

6     I'm just saying right now --

7               THE COURT:  Okay.

8               MR. WHITE:  I don't want to get into labels,

9     because I don't think it has anything to do with anything

10    now.

11              THE COURT:  That's fine.  Okay.

12              MR. WHITE:  Okay.  So here's where I'm coming

13    from, Judge.  We filed a proof of claim, obviously, and

14    Lehman has the burden of proof of -- because it's objected

15    -- to find a reason why the claim should not be allowed, and

16    the reason is, you know, untimeliness of the bar date brief

17    (sic).  Well, if Lehman is going to figuratively hold up the

18    bar date order as the reason why our claims shouldn't be

19    allowed, it's incumbent upon Lehman to explain what in the

20    bar date order bars our claim.

21              Now, that doesn't mean that we couldn't have done

22    it better, or I should say we, because, as I said, I wasn't

23    involved.  I sure am glad I wasn't, Judge, after hearing

24    from you, but the fact is Lehman has the burden of proof of

25    showing why the claim is untimely, and, if they're going to

Page 106

1    rely on the bar date order as the reason why the claim was

2    untimely, then it has to be something in the bar date order

3    that makes the claim untimely.

4              THE COURT:  I agree.

5              MR. WHITE:  Okay.  Now, what is our claim?  Okay.

6    We do have one of those unusual contracts, unusual being in

7    the sense that the ever-day executory contract, the non-

8    debtor party has no right to cancel it.  Only the debtor can

9    reject it.  All right?

10             THE COURT:  Uh-huh.

11             MR. WHITE:  So we do have one of those special

12   situations under the code.

13             THE COURT:  Safe harbors, right.

14             MR. WHITE:  Safe harbors, exactly, where we can

15   elect to terminate.  Part of our argument was, Judge, I was

16   going to say let's assume for the purposes of argument that,

17   in fact, that doesn't apply.  The contract was effectively

18   terminated --

19             THE COURT:  Okay.

20             MR. WHITE:  -- in 2008, and, on top of that, there

21   was no informal proof of claim.  So again, I'm back to if

22   they're going to hold up the bar date order as the basis for

23   denying our claim, then let's find out whether the bar date

24   order is there.

25             THE COURT:  Okay.

Page 107

1              MR. WHITE:  All right?

2              THE COURT:  That's fair.

3              MR. WHITE:  Okay.  Now, so the bar date order

4    refers to four types of claims that it applies to, that

5    applies to that September 2009 bar date.  One was a --

6              THE COURT:  Why don't we look at the actual --

7              MR. WHITE:  Yes, yes.

8              THE COURT:  Let's look at the actual bar date

9    order.

10        (Pause)

11             THE COURT:  I'm not sure --

12             MR. WHITE:  You sort of have to jump around to

13   find the forwards (sic).

14             THE COURT:  Yeah.

15             MR. WHITE:  In addition to prepetition claims.

16             THE COURT:  I'm sorry?

17             MR. WHITE:  In addition to prepetition claims

18   noted in the bar date order that must be filed by the bar

19   date, because the bar date order specified prepetition

20   claims must be filed by the bar date.

21             THE COURT:  Yes.  Okay.  So you just said the

22   words which are exactly the point.

23             MR. WHITE:  Okay.

24             THE COURT:  Okay?  In general terms, the bar order

25   says prepetition claims must be filed by the bar date.

Page 108

1    That's what you have, a prepetition claim, period, full

2    stop.  That's what you have, and that's where your footnote

3    related to 502(g) so baffled me.

4            You have a contract that was a prepetition

5    contract that was terminated, and the termination gives rise

6    to a prepetition claim.  The bar order required the filing

7    of prepetition claims.  That's why the bar order applies to

8    your claim, and that's why it's a late filed claim and

9    therefore, cannot be allowed.  So that's the daisy chain

10   that gets us there.

11           MR. WHITE:  Well, I understand, and I've thought

12   about this a lot.

13           THE COURT:  Okay.

14           MR. WHITE:  I'd like to share my thoughts with

15   you.

16           THE COURT:  Okay.

17           MR. WHITE:  Okay?  And you might disagree with me.

18           THE COURT:  Okay.

19           MR. WHITE:  Of course, you're the judge, so you

20   get to disagree with me.  The bankruptcy code doesn't define

21   prepetition claim, does it?  I wish it did.  We wouldn't

22   maybe be having this argument today.

23           THE COURT:  You think that there's an actual

24   dispute over whether or not the termination --

25           MR. WHITE:  Yes.

Page 109

1          THE COURT:  -- of a prepetition contract gives

2     rise to a prepetition claim or a post-petition claim?

3          MR. WHITE:  Yes.

4          THE COURT:  You do?

5          MR. WHITE:  Yes, Your Honor, I do.  I do.

6          THE COURT:  Okay.

7          MR. WHITE:  Because of the fact the -- first of

8     all, the only basis for making that conclusion, I believe,

9     is the provision --

10          THE COURT:  Wow, so all the other folks who

11     terminated their safe harbored contracts had admin. claims

12     and --

13          MR. WHITE:  We don't --

14          THE COURT:  -- failed to notice that and should

15     have gone to Lehman and said, under existing law, we had a

16     prepetition derivative contract.  We terminated it post-

17     petition, pursuant to the safe harbor.  Lucky for us, now we

18     have an admin. claim.  Please pay us --

19          MR. WHITE:  No.

20          THE COURT:  -- in hundred-cent dollars.

21          MR. WHITE:  You can't do that because of 502(g).

22          THE COURT:  Okay.  So explain your 502(g).  So

23     what is 502?

24          MR. WHITE:  Well, 502(g) says that it first --

25     when it applies to executory contracts that are rejected by

Page 110

1   the debtor -- that's part 1, and then, sub-part 2 applies to

2   terminated contracts that are terminated by the non-bankers

3   or counterparty.

4           THE COURT:  Okay.

5           MR. WHITE:  And both of those say that the claim

6   shall be allowed or disallowed as though it was a claim that

7   arose prior to the filing of the petition.

8           THE COURT:  Right.

9           MR. WHITE:  Okay?  It doesn't mean the claim was a

10  prepetition claim.

11          THE COURT:  Well, what does it mean, if not that?

12          MR. WHITE:  It's for the allowance of the claim.

13          THE COURT:  Right.

14          MR. WHITE:  As to -- I mean, the --

15          THE COURT:  Right.  There's only two

16  possibilities.  There is prepetition, and there is post-

17  petition.  So first cut this would suggest that it's on the

18  prepetition side.  Second issue is on the post-petition side

19  if something -- and this is, you know, just a little

20  bankruptcy, you know, extra.  On the post-petition side,

21  just the fact that it's post-petition doesn't mean that it

22  gets treated as an admin. claim.  There's got to be a

23  benefit to the estate.

24          MR. WHITE:  I agree with that, Your Honor, yes.

25          THE COURT:  Okay.  But, just for the purposes of

Page 111

1    your argument, we're dividing the world into pre and post,

2    and this 502(g) on that point says rejected, terminated is

3    pre.

4              MR. WHITE:  Let me ask the Court this question,

5    though.

6              THE COURT:  Okay.

7              MR. WHITE:  If, as Your Honor is inclined to,

8    let's say, rule that a rejected -- excuse me -- the Supreme

9    (sic) Court would say terminated --

10             THE COURT:  Right, terminated.

11             MR. WHITE:  -- contract is a prepetition claim

12   because of 502(g)'s wording, then would not the same

13   rationale apply to executory contractors that are rejected

14   by the debtor?  Because those likewise were allowed or

15   disallowed as though they arose prior to filing the petition

16   under part one.

17             THE COURT:  Right, and they are.

18             MR. WHITE:  Right.  Now, but, if you look at the

19   bar date order, Your Honor, that we pulled out and am

20   looking at, --

21             THE COURT:  Yeah.

22             MR. WHITE:  -- it specifically also enumerates as

23   one of those four categories, in addition to prepetition

24   claims, guaranteed claims, and derivative claims a fourth

25   claim of executory contract rejections.  Well, if executory

Page 112

1    contract rejections are nothing more than prepetition

2    claims, as Lehman has contended and as, I'm afraid,

3    Your Honor is agreeing with, which I don't agree with, then

4    why does the Court put in there that rejected executory

5    claimants are also subject to the bar date order includes

6    the entire little section of the order that deals with

7    rejected executory claims?  Because, under the logic,

8    Your Honor, that 502(g) makes these claims all prepetition,

9    why even mention executory contract claims?

10           THE COURT:  Well, you know, I can't speculate.  I

11   didn't draft the bar order.  I've seen a million of them in

12   my day.

13           MR. WHITE:  Right.

14           THE COURT:  Okay?  And I think it's not a big

15   stretch to say that the intent of any bar order, the intent

16   of the Lehman bar order was to encompass all prepetition

17   claims, and what lawyers sometimes do in bar orders is add

18   bells and whistles because you want to give particular

19   parties particular types of notice, but you could

20   effectively have had a bar notice in the Lehman case that

21   was far less specific than you did.

22           As counsel indicated, because of the volume of

23   claims and the volume of information that Lehman was

24   obligated to process, the bar date order was more bespoke

25   than what you might see in another case in order to aid in

Page 113

1    the collection of that materials, but there is no doubt that

2    the bar date order entered in this case obligated anybody

3    who had a prepetition claim to file a claim.  There is no

4    doubt.

5          MR. WHITE:  We do not at all disagree with that

6    statement, Your Honor.  We simply disagree with our claim

7    being classified as a prepetition claim.

8          THE COURT:  Well, if that's --

9          MR. WHITE:  And I understand Your Court's

10   reasoning.

11         THE COURT:  But, if that's the case -- again, if

12   the world is divided into pre and post, then, if you believe

13   you have a post-petition claim, then you would file it as

14   with a request for payment of an administrative claim, and

15   it's not covered by the bar date.  I, off the top, don't

16   know whether there was an administrative claim bar order.

17   Sometimes there is.  Sometimes there's not.

18         Sometimes the administrative claim bar order only

19   applies to certain types of administrative claims, not -- or

20   administrative claims in the ordinary course.  I don't know

21   the answer to that, frankly, but, if it's not a prepetition

22   claim and it's not covered by the bar order, you ought to

23   file something else and ask the estate to pay that, but, as

24   far as this goes -- and I commend you for it -- you haven't

25   attempted to paint a picture of, you know, real-time,

```
 1    somebody went through the analysis that you're doing now,

 2    and I think that's fatal.

 3           Real-time, nobody looked at this, and that's a

 4    shame, and, you know, you've made a really good yeoman's try

 5    of trying to come up with a theory, and I'd love there to be

 6    a theory, but it would be wrong for me to do that, because

 7    the boat was missed several times, and no action was taken

 8    all these years, you know, from the time of the filing, then

 9    the bar date notice, and then until confirmation until

10    fortunately or unfortunately at that point, somebody

11    realized -- and we won't know the context whether it was an

12    audit or what have you -- that there was this, quote,

13    unquote, "claim."

14           MR. WHITE:  Judge, thank you.  I feel like I've

15    had my own moot competition with you today.

16           THE COURT:  It was delightful.

17           MR. WHITE:  And I enjoyed that.  Thank you.

18           THE COURT:  Your --

19           MR. WHITE:  I'm sorry you don't agree with us.

20           THE COURT:  -- colleague wants to tell you you

21    didn't make another point.

22           MR. WHITE:  Yes.

23        (Pause)

24           MR. WHITE:  That's a good point, at least -- it's

25    referring again to the bar date order, Your Honor.
```

Page 115

```
 1                    THE COURT:  Okay.

 2                    MR. WHITE:  If you look down at the --

 3                    UNIDENTIFIED SPEAKER:  That's the notice.

 4                    MR. WHITE:  Excuse me.  I'm sorry.  The bar date

 5      notice.  This is the notice that accompanied the order.

 6                    THE COURT:  Uh-huh.

 7                    MR. WHITE:  Okay.  Probably the thing that most

 8      people read on the order, but anyway, on the first page of

 9      the bar date notice, --

10                    THE COURT:  Uh-huh.

11                    MR. WHITE:  I don't know if Your Honor has this

12      document.  It's usually highlighted.

13                    THE COURT:  Uh-huh.

14                    MR. WHITE:  But it doesn't even use the term

15      prepetition claim.  It says when the claim arose.

16                    THE COURT:  Right, and that's where

17                    MR. WHITE:  So we're jumping (sic) down our due

18      process rights (sic) a little bit here that, you know, the

19      wording wasn't clear so far as claimants whose claims arose

20      after the filing of the petition.  They're not being told to

21      file a claim.

22                    THE COURT:  Okay.

23                    MR. WHITE:  And it's inartful (sic), and, to

24      paraphrase the Court, maybe someone should have done it

25      differently at the time, but they didn't, but that's what
```

Page 116

1   creditors would have seen, and again, if Lehman objecting to

2   our claim is going to rely on these documents, it has to

3   show that they effectively disallow our claim.

4           THE COURT:  Okay, but this is directly where your

5   -- the reason that the language is written that way is not

6   accidental, because that ties into 502(g), because the

7   effect of terminating or rejecting a contract is -- I mean,

8   there are many ways that a claim can arise before the

9   commencement date, right?  I delivered stuff to Lehman.

10  Lehman didn't pay for it.  I mean, I could go on and on, and

11  the reason 502(g) is in there is to make clear -- and I

12  remember learning this as a new bankruptcy lawyer, because

13  it was not intuitive that, when there was the termination or

14  a rejection of a contract post-petition, it gives rise to a

15  prepetition claim.  That wasn't intuitive to me at the time.

16          But this language, in the hands of thousands and

17  thousands of creditors and contract counterparties, just

18  like your client, reacted by sending in a proof of claim,

19  and I think it would be wrong to construe the bar order in

20  any other way now, and I will tell you that, you know,

21  thousands and thousands of counterparties' clients, lawyers

22  sent in thousands and thousands of proofs of claim that

23  weren't covered by the bar order just because you never take

24  a chance.  And again, I don't think, to your credit, you're

25  telling me that, at the time, somebody at Conway or on their

Page 117

1    behalf read this and said -- and did that analysis and said,

2    "It doesn't cover us."

3            Because I think, if they did, you certainly would

4    have picked up the phone to Weil, Gotshal and gotten someone

5    on the phone and said, "Huh, do I have to file a proof of

6    claim"?  And they would have said, "I can't give you legal

7    advice.  You'd better just protect your clients' rights."

8            And unfortunately, it didn't happen.  It didn't

9    happen in a lot of instances.  There are a good number of

10   late filed claims, and again, I think it would be a

11   derogation of my duty to make an exception, even though I'm

12   not really that happy about telling Conway that I can't

13   allow it to file its claim.

14           So thank you very much, and I would ask that

15   counsel circulate an order sustaining the objection for the

16   reasons that I have articulated here today.  All right?

17   Thank you very much, and I apologize for the long wait

18   through the morning.

19           MR. WHITE:  I had no place else to be.

20           THE COURT:  Okay.  Thank you.

21           All right.  I think that concludes our morning

22   session; is that correct?

23           MR. HORWITZ:  Yes.

24           THE COURT:  All right.  I may see some of you at

25   2:00.  Thank you.

1          MR. YOUNGMAN:  Your Honor, I ask for the Court's

2    indulgence for a couple of moments.

3          THE COURT:  Sure.

4          MR. YOUNGMAN:  We have visiting with us this

5    summer some --

6          THE COURT:  Of course.

7          MR. YOUNGMAN:  -- summer associates.  And, if I

8    could give them a chance to talk in court, perhaps they

9    could introduce themselves.

10         THE COURT:  I would be delighted.

11         Come on up.

12      (Pause)

13         THE COURT:  We're going to be off the record.

14         Hi, guys.

15      (Recess at 12:27 p.m.)

16      (Reconvened at 2:03 p.m.)

17         THE COURT:  Good afternoon.  Please have a seat.

18         How is everyone today?

19         UNIDENTIFIED SPEAKER:  Good afternoon, Your Honor.

20         THE COURT:  Let me clear off this morning's

21    binder.

22         Thanks.

23         Okay.  So we have two matters, correct?

24         MR. SLACK:  We do, today, have two matters.

25         THE COURT:  Okay.

Page 119

1              MR. SLACK:  So, Your Honor, Richard Slack, for the

2     debtors, and the first matter on is the Giants Stadium

3     matter, which is an adversary proceeding 13-01554, and this

4     matter has been before this Court for a number of years,

5     chiefly dealing with 2004 discovery.

6              THE COURT:  Right.

7              MR. SLACK:  This is the first time we've been in

8     front of Your Honor on it.

9              THE COURT:  Okay.

10             MR. SLACK:  And we now have an adversary

11    proceeding filed.  So I wanted, in the first instance, to

12    perhaps take just a couple of minutes to tell you a little

13    bit about the case.

14             THE COURT:  Sure.

15             MR. SLACK:  So --

16             THE COURT:  I do know that count one has gone away

17    as a --

18             MR. SLACK:  Count one has been dismissed for the

19    reasons set forth in the mystery (sic) decision --

20             THE COURT:  Right.

21             MR. SLACK:  -- retaining all the appeal rights

22    that we have.

23             THE COURT:  Right.

24             MR. SLACK:  That's right, Your Honor.  So LBSF and

25    Giants Stadium were parties to two interest rate swap

Page 120

1   transactions -- and I'll just refer to them as the swaps --

2   that were intended to hedge interest rate risk on auction

3   rate securities issued by Giants Stadium to finance the new

4   Giants Stadium.

5         The auction rate securities were underwritten by

6   Lehman Brothers, Inc., LBI, at that time, an affiliate of

7   LBSF.  LBHI guaranteed LBSF's obligations under the swaps,

8   as it did with many of the swaps that Your Honor, I'm sure,

9   has dealt with already.

10        Now, under the swaps, under certain circumstances,

11  LBSF agreed to pay Giants Stadium a floating rate, which was

12  identical to the interest rate set on the auction rate

13  securities.  These auction rate securities would be

14  auctioned periodically.  Whatever that rate was, that would

15  be the rate that LBSF would pay, and Giants Stadium agreed

16  to pay a fixed rate.

17        Under other circumstances under the swaps, LBSF

18  agreed to pay Giants Stadium a floating rate based on LIBOR,

19  just a different measure, instead of the actual bond rate,

20  and again, in return, Giants Stadium would pay the same

21  fixed rate.  And, to mitigate the risks that contracting to

22  pay a floating rate based on the actual rates imposed under

23  certain circumstances, LBSF bargained for a number of

24  provisions, and we talk about these in our complaint,

25  obviously, but two that I want to highlight in particular.

Page 121

1              The first was to have a Lehman affiliate, in this

2     case, LBI, act as the auction agent for the auction rate

3     securities, and, of course, the reason for that is is that

4     -- at least we allege in the complaint -- is that, by having

5     an affiliate of LBSF control the auctions, they could

6     control, in many respects, Lehman's risk in paying an actual

7     rate.

8              So, if the rates were getting too high, it would

9     be in control of the process.  It could buy themselves --

10    there are a lot of things that, as the auction agent, it

11    could do to limit LBSF's risks.

12             THE COURT:  But that wouldn't -- you know, I think

13    if you push in one place, it pops out another, but doing

14    that for the benefit of limiting LBSF's risk -- did that

15    necessarily entail a cost to the counterparty, or --

16             MR. SLACK:  Well, in this instance -- so there's a

17    lot of different things that could happen in order to limit

18    the risk.  So one of the things is it controlled, obviously,

19    going out, whether it was --

20             THE COURT:  Right.

21             MR. SLACK:  -- more aggressive, less aggressive,

22    et cetera.

23             THE COURT:  Right.

24             MR. SLACK:  Obviously, the lower the rate that --

25             THE COURT:  Right.

Page 122

1           MR. SLACK:  -- it was being paid in the market.

2           THE COURT:  Right.

3           MR. SLACK:  The other thing that it could do -- if

4    the rate ever got too high, it would have the ability -- and

5    it would know that -- to, in fact, buy the auction rate

6    securities in.  Because, if they bought the auction rate

7    securities in, what happened at that point is that there

8    would be what is called the all-hold rate.  So you'd pay

9    whatever you'd have to pay for the bond.

10          THE COURT:  Got it.

11          MR. SLACK:  But, at that point, you'd be paying

12   essentially a LIBOR rate.

13          THE COURT:  Got it.  Okay.

14          MR. SLACK:  And, under the swap, you'd have not

15   only eliminated your risk.  You'd actually be in the money

16   in most circumstances, because the LIBOR rate was lower than

17   the fixed rate.  So again, this was an important protection

18   for LBSF in that.

19          The second protection -- and let me just finish

20   that first protection.  What it said was if there was ever a

21   time when LBI was terminated or replaced in that role, that

22   the swap would change automatically to a LIBOR-based.  So

23   the idea, of course, being if we're not going to have the

24   protection, --

25          THE COURT:  Right.

Page 123

1            MR. SLACK:  -- then we weren't going to have the

2       --

3            THE COURT:  Okay.

4            MR. SLACK:  -- actual rate risk.

5            THE COURT:  Okay.

6            MR. SLACK:  The second protection -- and again,

7       there --

8            THE COURT:  I'll note that your opponent behind

9       you is very subtly shaking his head no.  So I'm anticipating

10      that your recitation of this is not entirely going to be

11      agreed to.

12           MR. SLACK:  Well, let me say that I think that

13      what I'm saying is --

14           THE COURT:  I'm just trying to figure out whether

15      I'm in background or I'm in dispute.  So I'm guessing I'm in

16      dispute.

17           MR. SLACK:  Well, let me say this, and we're

18      trying to tell you what our claims are.

19           THE COURT:  Sure.

20           MR. SLACK:  And I think everything I've said is,

21      in fact, accurate background.

22           THE COURT:  Okay.

23           MR. SLACK:  I know the parties are going to argue

24      at some point whether or not the valuation of the swap was

25      appropriate based on the, you know, --

Page 124

1          THE COURT:  Right.  You're just trying to tell me

2     mechanics now, right?

3          MR. SLACK:  And, frankly, what's important to us.

4          THE COURT:  Okay.

5          MR. SLACK:  I mean, I'm sure there's a lot of

6     things in the complaint.

7          THE COURT:  Sure.

8          MR. SLACK:  And there are other provisions, but

9     this is --

10         THE COURT:  Okay.

11         MR. SLACK:  These are things that are alleged in

12    the complaint and important to us.

13         The swaps also included explicit and unambiguous

14    writing for LBSF to require Giants Stadium to refinance the

15    auction rate securities.  What this ensured is -- let's say

16    that there was a long-term dislocation in the auction rate

17    market where it was very, very high.  What Lehman had the

18    right to do was to essentially require Giants to refinance

19    that and, by refinancing, it would have to pay whatever

20    costs were incurred by Giants Stadium, but it could limit

21    its risks in a huge dislocation market, and again, that was

22    a very important protection for Lehman.

23         So now, fast forward to the Lehman bankruptcy, and

24    again, just before the bankruptcy, Lehman had sent Giants

25    Stadium statements showing that the value of the swaps was,

Page 125

1    just before the bankruptcy, 60 million, roughly, in favor of

2    LBSF, and, when LBHI filed its Chapter 11 petition, Giants

3    Stadium was -- and, you know, we allege this, and we think

4    we can support this -- apparently informed by a contact at

5    Lehman that LBI, which again, was the auction rate agent,

6    was going into a SIPC proceeding, which it, in fact, did a

7    few days later, which would have required, under the rules,

8    LBI's termination and ultimate replacement as auction agent,

9    thus triggering the change in the swap to a LIBOR-based

10   swap.

11           And again, I don't think there's any disagreement

12   -- if there is, I haven't heard it yet -- that, if the swap

13   was valued as a LIBOR-based swap, Lehman's in the money.  We

14   made dicker about how much it's in the money or not, but, if

15   it's a LIBOR-based swap, I think it's pretty clear that

16   Lehman was in the money.

17           Giants Stadium moved very quickly to terminate the

18   swap, and what we allege -- and this is our allegation -- is

19   that Giants knowingly disregarded our rights under the swaps

20   and that, knowing that LBI was going to go into the SIPC

21   proceeding, they essentially tried to freeze time by beating

22   LBI's SIPC proceeding.

23           So a day before the SIPC proceeding, Giants

24   Stadium terminated the swap, and again, what we allege,

25   based on emails -- and there are some very specific ones we

Page 126

1    have in our complaint -- that they understood that, in their

2    mind -- and we don't think they're right -- that, if they

3    didn't terminate before the SIPC proceeding, that this would

4    end up being a receivable for the estate.  It would be in

5    the money to the estate.

6              THE COURT:  What was the basis on which they

7    terminated before the LBI filing?

8              MR. SLACK:  The LBHI's filing.

9              THE COURT:  The LBHI filing.

10             MR. SLACK:  So, before LBSF's filing, they filed

11   based on the LBHI filing.  As is typical in almost all of

12   the swaps, --

13             THE COURT:  Right.

14             MR. SLACK:  -- the LBHI filing was --

15             THE COURT:  Triggered the --

16             MR. SLACK:  -- an event of default --

17             THE COURT:  -- default.  Right.

18             MR. SLACK:  -- under almost all of the swaps that

19   we had.

20             THE COURT:  And so, that is a fact so that the

21   LBHI filing did create an event of default.

22             MR. SLACK:  Yes.

23             THE COURT:  So what is your allegation as to why

24   -- even if we accept as true that they knew what was coming

25   and wanted to avoid that, why is it that they weren't

Page 127

1    permitted to terminate?

2            MR. SLACK:  They were permitted to terminate, you

3    know, and had they --

4            THE COURT:  Okay.

5            MR. SLACK:  -- terminated, you know, properly --

6    they were -- and, you know, went through the -- they were

7    entitled to terminate.

8            THE COURT:  Okay.

9            MR. SLACK:  This is really a valuation dispute,

10   Your Honor, --

11           THE COURT:  Okay.

12           MR. SLACK:  -- about once they terminated, what's

13   the value of the swap and who's in the money.

14           THE COURT:  Got it.

15           MR. SLACK:  And, as you'll hear, there's a big gap

16   in that valuation dispute.  So what we allege is that a

17   proper way to value this -- and this is sort of a big

18   picture.  I know Your Honor's had some valuation disputes,

19   and this is not easy stuff, but essentially, the world isn't

20   static.  So, when you have a swap -- okay?  Let's take a

21   plain interest rate swap.

22           You don't look at the interest rate today and

23   apply that if the life of the swap was 36 years, what the

24   interest rate is today.  You have swap curves and say here

25   is what we think the interest rate's going to be over time.

Page 128

1            THE COURT:  Right.

2            MR. SLACK:  Essentially, it's a projection over

3    time --

4            THE COURT:  Right.

5            MR. SLACK:  -- of what's going to take place.

6    What Giants Stadium did here is they looked at the displaced

7    auction rate market.  They took the prices that went off

8    right after Lehman's bankruptcy, and they applied those for

9    36 years.  What we say should have been done is you can't

10   just freeze time and say okay, we beat the clock.

11           You have to look -- if you knew, for example, that

12   LBI was going to go to its SIPC proceeding and therefore,

13   that this was going to change from an actual rate swap to a

14   LIBOR-based swap, then you'd have to take that into account,

15   and we expect that Giants is going to disagree with that,

16   and that's going to be a very big dispute that we're going

17   to have.  But we think that that's fundamentally how swaps

18   get valued.

19           So what Giants did is that, two weeks after they

20   terminated, they filed a calculation statement saying they

21   were owed 300 million.  They filed proofs of claim with

22   respect to those saying that they were owed 300 million, and

23   let me back up one second.  You know, so that's sort of

24   where we are in the complaints.

25           Procedurally, as I said, we had --

Page 129

1          THE COURT:  So the bid in the ask (sic) is 300

2    going this way, 100 going the other way?

3          MR. SLACK:  Essentially, you know, with some small

4    variation.

5          THE COURT:  Okay.

6          MR. SLACK:  I think that's essentially right.  So

7    we took 2004 discovery not too long after the bankruptcy.

8    At some point during that process, Giants Stadium asked to

9    take discovery, and that process ended up with a discovery

10   protocol that we agreed to with Giants Stadium where we

11   provided information to them and they provided information

12   to us, and together the parties have produced over a half a

13   million pages of documents already.

14          There were third party subpoenas that were issued

15   to people like the Monoline (ph) insurers that insured these

16   instruments as well as the NFL and others, but again, there

17   has already been about 400,000 pages of documents produced

18   from third parties.  So there's been today, up to today

19   really a great deal of document discovery.  I mean, while

20   there may be some disputes that have not yet gone to the

21   Court, I would say the large majority, if not really the

22   overcoming vast majority of the documents discovery, has

23   been completed.

24          So, in October of 2013, we filed our adversary

25   proceeding.  At some time prior to that, Giants had filed,

Page 130

1    as I said, their claims for 301 million.  We have filed and

2    had filed -- or I should say -- let me -- I missed a step.

3             Giants Stadium, after they had filed the 300

4    million claim, about three years later filed an amended

5    claim.  We filed our objection to that amended claim, which

6    had raised the amount they sought from 300 to approximately

7    600 million.

8             We filed our adversary proceeding.  They filed a

9    motion to dismiss.  As you pointed out, Your Honor, we

10   presented the Court with a stip a couple of weeks ago that

11   dealt with sort of both of these issues, and that is, as we

12   said, the motion to dismiss was resolved the way Your Honor

13   had said, but we also resolved in that that Giants Stadium

14   agreed to withdraw their amended claims and essentially

15   reinstate the original claims of 300 million, which is why

16   we're still at the 100 to 300 million.

17            So the good news is at the status conference,

18   Your Honor, is that we have worked out -- and I think we

19   have actually worked cooperatively together with Giants.  So

20   we've worked out a proposed scheduling order for Your Honor,

21   which I'd like to hand up.

22            THE COURT:  Please.

23            Thank you.

24            MR. SLACK:  Just to walk you through it,

25   Your Honor, we've agreed on a couple of things.  The first

Page 131

1    thing is is there's a -- consistent with the stipulation

2    from a couple of weeks ago, we've embedded in here the

3    timing -- if you look to paragraphs five and six.  We've

4    embedded the timing for the filing and serving of new

5    objections to their original proofs of claim.

6            Essentially, that should skinny down what we filed

7    the last time, because they'd withdrawn the amendment.  So

8    the hope is that that will skinny that down a bit, and then,

9    Giants has 45 days from there to reply to that objection.

10           At the same time, Giants -- now that the motion to

11   dismiss is resolved, Giants will file an answer by

12   September 8th, 2014 and additional disclosures by

13   November 3rd and --

14           THE COURT:  Let me stop you on the answer, because

15   it says answer, defense, or counterclaim.  The counterclaim

16   is simply the proof of claim, right?

17           MR. SLACK:  Well, you're asking the wrong person,

18   but I would imagine that that's what we're talking about.  I

19   know we've had some discussion, which is why it says

20   appropriate defense or counterclaim, because it's certainly

21   our view that there can't be a new counterclaim here.

22           THE COURT:  Well, that's what I'm trying to figure

23   out.  I mean, that's why I asked the bid and ask question.

24           MR. SLACK:  Right.  So I think you're asking the

25   wrong person.

1          THE COURT:  Okay.

2          MR. SLACK:  But that's certainly --

3          THE COURT:  Okay.

4          MR. SLACK:  -- the view that we have.

5          THE COURT:  Okay.

6          MR. SLACK:  The next really salient date here is

7    the April 1st, 2015 date, which would be the conclusion of

8    fact discovery.  What I expect is going to happen over the

9    period of discovery is we're going to take depositions,

10   which can commence here by December 8th, but also finish up

11   any document discovery with third parties and each other.

12   There may be some discovery motions.  Again, we worked

13   cooperatively, and maybe we'll get rid of those, but we do

14   have some disputes that are bubbling right now.

15          We then have a period for expert discovery, which

16   I think is again pretty standard kinds of timing there,

17   which are 12, 13, and 14.  The one piece that we left blank

18   for Your Honor was to set a conference so that, after we get

19   expert discovery, I think the idea would be to have a

20   conference with Your Honor where we would discuss whether

21   the parties are going to make summary judgment motions and

22   setting a trial date at that time.

23          So, you know, obviously from our standpoint, we

24   would be prepared to meet essentially any time after the

25   expert witness date here that's convenient for the Court in

Page 133

1   order to have that conference.  One other point --

2          THE COURT:  Well, it might be premature,

3   especially since I haven't heard from counsel for Giants

4   yet, but I'll say it anyway.  The likelihood that this is

5   going to be amenable to summary disposition, I would say, is

6   pretty minimal.

7          MR. SLACK:  Well, that's why I said if any at the

8   time.

9          THE COURT:  Right.

10          MR. SLACK:  And I think we'll have to see.  There

11   may be -- you know, not speaking out of turn, but, you know,

12   there may be discrete issues that, in fact, we can have

13   summary judgment on or not.

14          THE COURT:  Right.

15          MR. SLACK:  So I think, you know, that's something

16   that the parties will have to think about.

17          THE COURT:  Right.  Or, to the extent that you can

18   -- you know, you would agree to certain stipulated facts,

19   and then, there would be trial on at least a partially

20   stipulated record or something like that.

21          MR. SLACK:  Right.  One more thing which we've

22   agreed to and I think, frankly, makes some sense is we've

23   agreed that, even though this is in the adversary

24   proceeding, that we will take discovery that'll apply both

25   to obviously the claims and the adversary proceeding.

Page 134

1          THE COURT:  Sure, right.

2          MR. SLACK:  And I would think that the parties

3    will continue to talk about them, whether these will be

4    tried together or not, but that's something that will be

5    down the road.  But, at least for discovery purposes, I

6    think we all agree that it makes complete sense to take the

7    discovery together.

8          THE COURT:  Right, right.  I mean, not to make a

9    bad pun about goal posts, but it seems to me that we would

10   want to do it in one proceeding to determine, you know,

11   which goal post or if there's a scenario -- I'm not smart

12   enough on the issues yet to know if there's going to be --

13   if there's possibility of something in between as there

14   might be in a normal valuation trial, which this, you know,

15   is anything but.

16         MR. SLACK:  And again, I think that reaction is a

17   common sense one that, you know, after we get a chance to

18   look at the discovery and the depositions, --

19         THE COURT:  Right.

20         MR. SLACK:  -- will probably crystallize.

21         THE COURT:  Okay.  Okay.  I would say --

22         MR. SLACK:  So, with that, I think that's --

23         THE COURT:  Yes.

24         MR. SLACK:  -- really where I think we are, and I

25   think the good news, again, is that we've been able to work

1   out this discovery schedule and work out some of the

2   intricacies of --

3          THE COURT:  Okay.

4          MR. SLACK:  -- discovery that are in here and --

5          THE COURT:  Okay.  So what I would suggest to you

6   -- and then, I'll hear from counsel for Giants -- is that,

7   rather than give you a date now when it's a year away and

8   who knows what other conferences and what not or trials I

9   might have, why don't we leave it that a year from now, when

10  we're at the completion of the experts -- why don't you

11  contact chambers, and we'll just give you a date at that

12  time when our calendar is more settled?

13         MR. SLACK:  Perfectly acceptable.  Thank you,

14  Your Honor.

15         THE COURT:  All right.  And obviously, in the

16  meantime, if there's something on which you need our

17  assistance, we'd be happy to hear from you.

18         MR. SLACK:  Great.  Thank you.

19         THE COURT:  Okay.  Thank you.

20         MR. SLACK:  By the way, I have a disk.  Can I hand

21  the disk up as well?

22         THE COURT:  Sure.  Shall we -- then we'll just

23  amend paragraph 16 to say subsequent to the completion of

24  the discovery of expert witnesses, the Court shall set a

25  mutually convenient time for a conference or something like

1   that.

2           MR. SLACK:  Thank you.  Thanks.

3           MR. SCHWARTZ:  Good afternoon, Your Honor.

4           THE COURT:  Good afternoon.

5           MR. SCHWARTZ:  Matthew Schwartz, for Giants

6   Stadium.

7           THE COURT:  How are you, Mr. Schwartz?

8           MR. SCHWARTZ:  Well, thank you, Your Honor.  Thank

9   you.

10          Your Honor, I don't have any disagreements with

11  what Mr. Slack said as to the scheduling order that we've

12  proposed.

13          THE COURT:  Okay.

14          MR. SCHWARTZ:  You won't be surprised, as you get

15  from my reaction, that I found his background statement to

16  be more in the venue of an opening statement.  I think it is

17  important, since this case is new to Your Honor, to give a

18  little more context and a little more background to the

19  transactions here.

20          THE COURT:  Okay.

21          MR. SCHWARTZ:  Giants Stadium was originally

22  looking to finance its half, and the Jets would finance

23  their half of the new Meadowlands Stadiums back in the

24  summer of 2007.  Giants Stadium originally was going to do

25  the entire financing through Goldman Sachs, and it was going

Page 137

1    to issue floating rate notes, and it was going to have a

2    swap on those notes to hedge Giants Stadium's risk that

3    interest rates spiked in the near future.

4         Not just in the near future, Your Honor.  These

5    were 40-year notes.  So the financing was done over four

6    decades.

7         THE COURT:  Okay.

8         MR. SCHWARTZ:  What happened is Goldman Sachs

9    offered Giants Stadium a partial tenant sheet (sic).  It

10   said we are not going to sort of insure you for the entire

11   amount that the interest rate rises on these bonds.

12        THE COURT:  Uh-huh.

13        MR. SCHWARTZ:  But we'll simply give you a hedge

14   where you pay us a fixed rate, and we will pay you a

15   floating rate based off of LIBOR, and the thought was, at

16   the time, that, if the LIBOR rate went up, then the interest

17   rates would go up somewhat intangibly.

18        Lehman Brothers had been sort of advising Giants

19   Stadium on the side, and literally, the day before the

20   financing went into effect, it swooped in, and it told

21   Giants Stadium we will give you exactly what you are looking

22   for, a complete hedge on your interest rate risk.  So

23   whatever the interest rate is on the auction rate bonds that

24   you issued, we will pay you that rate, not just LIBOR, but

25   that rate.

1              Giants Stadium said great, and it financed $408

2      million of the over $600 million with Lehman Brothers

3      because of that promise.  And what did Lehman Brothers get

4      in return?  What Giants Stadium paid to Lehman Brothers for

5      that additional protection beyond what Goldman Sachs was

6      going to pay Giants Stadium -- it paid Lehman Brothers a

7      premium of $31 million for that protection.

8              What happened is, of course, as Your Honor knows,

9      the 2007 financial crisis starts to develop.  Auction rate

10     securities, interest rates spike immediately.  Lehman

11     Brothers -- from discovery, we know that they recognize this

12     as a crisis for them immediately, especially in regards to

13     the Giants Stadium bonds, and they did everything that they

14     could to figure out a way to get themselves out of the

15     situation and out of the incredible payments that they had

16     to make to Giants Stadium because of those spiking interest

17     rates.  In other words, almost within a few months, Giants

18     Stadium was getting exactly the protection for which it paid

19     Lehman the $31 million premium.

20             Since then, Lehman -- and, since the bankruptcy,

21     Lehman has been looking for every single possible way to get

22     out of the fact that this was a business deal that moved

23     significantly in Giants Stadium's favor, and I'll just

24     address a couple of the points that Mr. Slack made.

25             The first is this idea that, if anything happened

Page 139

1   to Lehman Brothers, Inc. as the broker/dealer and they were

2   no longer the broker/dealer, that, all of a sudden, the swap

3   would transfer from an actual bond rate swap in which Giants

4   Stadium was significantly in the money to a LIBOR rate swap

5   in which Lehman claims to have been in the money.  A few

6   things.

7            The language of that entire paragraph says

8   specifically that Giants Stadium is not allowed to terminate

9   Lehman Brothers, Inc. as the broker/dealer, but, if Lehman

10  Brothers, Inc. is terminated or replaced as broker/dealer,

11  then the swap transfers from an actual rate swap in which

12  Giants are in the money to a LIBOR rate swap.  The concept

13  that terminated or replaced that language, especially within

14  the provision, the entire provision of the contract, means

15  that a voluntary resignation on Lehman Brothers, Inc.'s part

16  as broker/dealer on the bonds somehow transfers the swap

17  from one that is dramatically in the money to Giants Stadium

18  to a LIBOR rate swap is not only wrong based off of the

19  clear language -- terminated or replaced clearly means if

20  Giants Stadium is terminating or replacing LBI.  LBI is the

21  object of that termination or replacement, not the subject.

22           It goes completely against the intent of the

23  parties, and we know that from discovery, and we know --

24  and, frankly, I'm surprised, because I think that Lehman

25  knows that its own people who negotiated the swaps and the

Page 140

1    terms of its swaps agree with Giants Stadium's legal

2    position on this, and it would make absolutely no sense in

3    the business context of this swap.  Because what it would do

4    is, as soon as Giants Stadium went in the money and Lehman

5    Brothers started losing money on this swap, it would give

6    Lehman, as an overall organization, the unilateral right to

7    convert this swap from one in which Giants Stadium is

8    dramatically in the money and paid $31 million for that

9    protection to one in which Lehman supposedly is in the

10   money, simply by having LBI resign as broker/dealer.

11          The text, the intent, and the overall context

12   makes absolutely no sense that LBI's voluntary resignation

13   or even if it was forced to resign as part of the SIPC

14   liquidation could affect Giants Stadium so materially is

15   completely wrong, and it's one of the unfortunate arguments

16   that we've been dealing with throughout this litigation.

17          One of the things he talked about is the

18   valuation, and he said look, Lehman had the right to force

19   Giants Stadium to refinance from auction rate securities

20   into fixed rate securities, and I want to talk about that

21   for just a second.  The first thing is that Lehman Brothers

22   tried for a long time to arrange -- and they had the

23   obligation to make that arrangement -- to have Giants

24   Stadium refinance from ARS into some other form, and they

25   were unable to find the liquidity that they needed to

Page 141

1    effectuate that change.

2            Worse for them, Your Honor, this argument has

3    already been made before this Court when Judge Peck was

4    presiding over this case.  What happened is is, upon Lehman

5    Brothers' bankruptcy, LBI held the Giants Stadium bonds on

6    its books.  It held $408 million worth of Giants Stadium

7    bonds, and it sold those bonds to Barclays for about $50

8    million.

9            Lehman Brothers challenged that sale as

10   commercially unreasonable, and Judge Peck ruled against

11   Lehman Brothers and found that that $50 million price on

12   those bonds at that point in time was a commercially

13   reasonable amount, and he refused to have any sort of

14   rescission on that transaction.  That $50 million, when you

15   do the valuation and you consider their idea that Giants

16   Stadium should have had to refinance into a long-term, 40-

17   year bonds effectively means that Giants Stadium's value on

18   the swaps was not $301 million, like we had claimed, but, in

19   fact, was about $350 million, and that was simply something

20   that Judge Peck found as a commercially reasonable number.

21           It could have been a much lower number and still

22   been commercially reasonable.  So we have numerous

23   disagreements, Your Honor.

24           Another disagreement that we've dealt with, which

25   you'll see in the papers -- and unfortunately, of course,

Page 142

1    you have their papers, but we're having this conversation

2    with you before you have our papers.  So I just want to

3    preview one or two other arguments that we've been dealing

4    with.

5           Because Lehman, obviously, was a sophisticated

6    broker/dealer and Giants Stadium is a family-run sports

7    enterprise, part of the contracts in the swaps said that,

8    upon a termination of the swaps, each side would provide two

9    names of reference market makers, effectively large

10   financial institutions, and Lehman Brothers would go out,

11   and it would get the quotes and would use those quotes to

12   value the swaps.  What happened upon the bankruptcy of

13   Lehman Brothers, when Giants Stadium sent in its termination

14   notice, is Giants Stadium also contacted their primary

15   contact at Lehman, and they said here are two names, and we

16   would like you to go out and fulfill your contractual

17   obligations.

18          The response they got was it is chaos here because

19   of the bankruptcy.  There is nobody who can do this.  Go out

20   and do it yourself.

21          So Giants Stadium went out -- and, for purposes

22   not of fulfilling anybody's contractual obligations under

23   the swaps, but for purposes of trying to get some rough

24   value of the what the swaps were at that time, it went out,

25   and it sought valuations from people, and it got laughed at.

1    People refused to give them any kind of valuation on these

2    swaps, given how unique and how potentially risky they were

3    from any counterparty stepping into Lehman's shoes.

4            Lehman's response, if you read its adversary

5    complaint in its objections is, by doing that, Giants

6    Stadium denied Lehman its contractual right to go out and to

7    seek those market quotations from the other -- from the

8    reference market makers.  It's an absurd response,

9    Your Honor.  Not only has giants Stadium tried to get Lehman

10   to do that, not only did Lehman say it wasn't able to do it,

11   but Giants Stadium never prevented Lehman Brothers from

12   doing anything, and it's --

13           THE COURT:  Is the statement that -- and I don't

14   know if I'm mixing apples and oranges, but, when you talk

15   about the swap curve over 36 years or what have you, is the

16   statement true that you took those points and you -- so we

17   have chaos, right?

18           MR. SCHWARTZ:  Right.

19           THE COURT:  So, as a matter of common sense and

20   fully admitting that I'm not educated on these issues yet,

21   it would seem to me that you wouldn't want to take those

22   chaotic days of chaos numbers and roll them out over a swap

23   curve, because inevitably, the chaos is going to abate.  So

24   is what I was told -- that you did take those numbers and

25   roll them out and that's how you got your valuation?

1          MR. SCHWARTZ:  So what happened is Lehman had not

2     been putting the swaps out to market because the numbers

3     that they were getting were so terrible for them that they

4     had kept them themselves.

5          THE COURT:  Okay.

6          MR. SCHWARTZ:  Goldman Sachs had been putting the

7     bonds out to market.  Some of those bonds were insured by a

8     company called Fidget (ph), and some of them were insured by

9     a company called FSA, which has now assured guarantee.

10         Goldman Sachs had been getting numbers

11    consistently on those bonds in the about ten percent range.

12    They had been getting slightly higher numbers for Fidget

13    because Fidget was worse (sic) credit than FSA.  All of the

14    Lehman bonds were insured by Fidget.

15         So what Giants Stadium did at the time with no

16    idea about whether the auction rate securities market would

17    ever come back -- because again, you have to value it at the

18    time, and, in fact, I think there's good evidence that the

19    auction rate securities markets, especially for the Giants

20    Stadium bonds, haven't come back, Your Honor.  It took the

21    Goldman Sachs numbers and it applied a small premium, a very

22    conservative premium for the fact that Fidget had a much

23    worse credit rating than FSA.

24         I think, Your Honor, that this was a very

25    conservative number.  It's showed by the fact that

Page 145

1    Judge Peck found that $50 million to be a commercially

2    reasonable number.  It was done at the time when there was

3    no understanding whatsoever about whether or not auction

4    rate markets for 40-year covenant-like (sic) bonds for a

5    project finance would ever come back, and it was done also

6    with consideration for if Giants Stadium had to issue new

7    debt at that time, 40-year debt, covenant-like for a project

8    finance fixed rate, what type of rates would it get, and

9    we're quite convinced obviously all this is going to be

10   subject to a lot of expert valuation.

11            THE COURT:  Right.

12            MR. SCHWARTZ:  As, of course, was the valuation

13   that was done in the Barclay's/Lehman matter, but we're

14   quite convinced that this is a conservative estimate and

15   that we have internal -- you know, Mr. Slack referred to the

16   fact that Lehman was showing $60 million in their --

17            THE COURT:  Mr. Slack has a big smile on his face.

18            MR. SCHWARTZ:  I doubt I hear it.

19            THE COURT:  Just as a counterpoint to your nodding

20   and --

21            MR. SCHWARTZ:  But we have internal Lehman

22   documents that show that Lehman acknowledged months before

23   Lehman Brothers went bankrupt that this swap was saving

24   Giants Stadium hundreds of millions of dollars, Your Honor.

25   So Mr. Slack and his experts can, after the fact, try to

Page 146

1    challenge Judge Peck's decision and kind of try to challenge

2    what Lehman Brothers was acknowledging internally, but

3    that's the basic facts, and I think that they'll be shown

4    quite clearly, both with fact discovery and through expert

5    discovery, Your Honor.

6              THE COURT:  Well, I feel like we've gone from

7    opening arguments to closing arguments in a matter of 20

8    minutes.

9              MR. SCHWARTZ:  Fair, Your Honor.

10             THE COURT:  So this is --

11             MR. SCHWARTZ:  I was just here for a scheduling

12   conference, Your Honor.

13             THE COURT:  It's extremely, extremely fascinating.

14             Let me just ask one question to you both, and

15   you'll excuse my ignorance if you already had this

16   conversation with Judge Peck or between each other, but I

17   know, given we're on a path.  I'm happy to go down that

18   path.  Happy to have summary judgment and/or trial, you

19   know, a year or so from now.  But is there any point or

20   utility in talking about any sort of a mediation process?

21             MR. SCHWARTZ:  So, Your Honor, the parties have

22   gone through a formal mediation process.

23             THE COURT:  You have?

24             MR. SCHWARTZ:  And they also have gone through

25   informal discussions.

```
 1                THE COURT:  Okay.

 2                MR. SCHWARTZ:  The principals know how to reach

 3     each other.

 4                THE COURT:  Okay.

 5                MR. SCHWARTZ:  And they are in contact, as

 6     appropriate.  Of course, we'll always take guidance from the

 7     Court, and we are always looking for ways to resolve this on

 8     what we think are proper terms.

 9                THE COURT:  Okay.

10                MR. SCHWARTZ:  But that is the history behind it.

11     We held a one-day mediation with Judge Mabey under the ADR

12     process.

13                THE COURT:  You did?

14                MR. SCHWARTZ:  Yes.

15                THE COURT:  Okay.

16                You agree with that, Mr. Slack?

17                MR. SLACK:  I didn't hear it.

18                MR. SCHWARTZ:  We held a one-day --

19                THE COURT:  A one-day mediation with --

20                MR. SCHWARTZ:  -- mediation with Judge Mabey --

21                THE COURT:  -- Judge Mabey.

22                MR. SCHWARTZ:  -- that involved formal

23     submissions.  Without going into any of the details of the

24     medication, obviously, we're still here with you.

25                MR. SLACK:  I completely agree that the parties
```

Page 148

 1   have mediated and have talked to each other, know how to

 2   reach each other.

 3                  THE COURT:  Okay.

 4                  MR. SLACK:  I would say that it doesn't mean that,

 5   as discovery goes forward, my client --

 6                  THE COURT:  Sure.

 7                  MR. SLACK:  -- wouldn't be willing to go back and

 8   try again.

 9                  THE COURT:  Okay.

10                  MR. SLACK:  But, you know, I think Mr. Schwartz is

11   right that there have been attempts to -- and I think both

12   parties have tried to at least talk to each other.

13                  THE COURT:  Okay.  All right.  So we'll enter the

14   scheduling order.  We'll look forward to seeing you in a

15   year or so, if not earlier.

16                  MR. SCHWARTZ:  I'm afraid you might hear from us

17   earlier, Your Honor.  You never know.

18                  THE COURT:  Okay.

19                  MR. SLACK:  I would like to make a comment, and,

20   you know, obviously, that was a long argument there, but the

21   answer to your question about whether they took a number and

22   applied it over time, --

23                  THE COURT:  Yes, which Mr. Schwartz very cleverly

24   did not answer.

25                  MR. SLACK:  -- was yes.

Page 149

1              MR. SCHWARTZ:  No, that is what Giants Stadium

2    did, Your Honor.

3              THE COURT:  Okay.

4              MR. SCHWARTZ:  That is correct.  Okay.  Thank you.

5              THE COURT:  All right.  Thank you both very much.

6              All right.  So that brings us to finally Moore

7    Macro Fund.

8              MR. EILENDER:  Good afternoon, Your Honor.

9              Your Honor, do you have a preference as to where

10   you would like --

11             THE COURT:  I don't.  Wherever you're comfortable

12   is fine with me.

13             MR. EILENDER:  Do you want the trustee's

14   representative to speak first or plaintiff?  Typically, it's

15   the plaintiff, but --

16             THE COURT:  I'm very flexible.

17             MR. EILENDER:  Would you like to go first?

18             UNIDENTIFIED SPEAKER:  Sure, go ahead.

19             MR. EILENDER:  I'll try not to give an opening

20   statement.  I know this is a scheduling conference.

21             THE COURT:  right.

22             MR. EILENDER:  Your Honor, good afternoon.

23             THE COURT:  Good afternoon.

24             MR. EILENDER:  Jeffrey Eilender, from Schlam Stone

25   & Dolan.  I have with me my partner Bennette Kramer, from

Page 150

1        Schlam Stone & Dolan.

2                THE COURT:  Okay.

3                MR. EILENDER:  I'll start with the most important

4        thing for today.  The parties have agreed to a scheduling

5        order.

6                THE COURT:  Okay.

7                MR. EILENDER:  And I have a copy of it.  It's my

8        own copy.  If you allow me to approach, Your Honor.

9                THE COURT:  That would be great.  Thank you.

10       Thank you.

11               MR. EILENDER:  Thank you.

12               I'll start with the schedule first, and then, I'll

13       do a background.  We've agreed that we will get fact

14       discovery resolved in less than six months, January 2015.  I

15       think this is a case where there will be a lot of expert

16       discovery.  So the expert discovery will be proceeding in

17       the spring 2015, and we have agreed the case basically

18       should be ready, I think, by May of 2015.  So I don't think

19       there's going to be a lot of issues about the schedule.

20               We've agreed that we're going to start propounding

21       requests to each other by the end of this month, including

22       automatic disclosures, and we've agreed that we're going to

23       start taking depositions even without document production.

24               THE COURT:  Okay.

25               MR. EILENDER:  This was a request by the trustee's

1    counsel.  You know, we've also agreed -- this a point very

2    important for me -- that, if depositions do occur before

3    document production is complete, absent some misconduct

4    relating to depositions, witnesses are not going to be

5    produced again.

6              THE COURT:  Again?  Okay.

7              MR. EILENDER:  I mean, the fact that someone's

8    documents were not produced -- if you're going to take that

9    witness, you're doing it at your own risk.

10             THE COURT:  Okay.

11             MR. EILENDER:  So, in terms of the discovery, I

12   think we're set.  One thing Your Honor should know -- we've

13   made a motion to withdraw reference.

14             THE COURT:  I do know that.

15             MR. EILENDER:  The case was assigned to

16   Judge Pauley.  I think we made a motion two or three weeks

17   ago.  I, frankly, don't remember when the opposition is due.

18             THE COURT:  Okay.

19             MR. EILENDER:  And I don't know how fast

20   Judge Pauley is.  My guess is that the earliest that would

21   be resolved would be the fall.

22             THE COURT:  But, in any event, you folks are just

23   going to keep going?

24             MR. EILENDER:  Yes.

25             THE COURT:  Pursuant to the schedule, while

Page 152

1   Judge Pauley considers what to do?

2            MR. EILENDER:  Yes.  I mean, unless Judge Pauley

3   tells us something else, yes, Your Honor.

4            THE COURT:  Right.  Okay.

5            MR. EILENDER:  The other thing Your Honor should

6   know -- and I'm not committing to anything, but we are

7   considering making a motion to dismiss the counterclaims.

8   We're exploring that, and I think currently our motion or

9   our response, I think, is due at the end of August.  We may

10  try to get --

11           THE COURT:  Okay.

12           MR. EILENDER:  -- a little more time after Labor

13  Day, because I would like to go to Cape Cod at the end of

14  August.

15           THE COURT:  Who wouldn't?

16           MR. EILENDER:  So --

17           THE COURT:  Okay.  All right.

18           MR. EILENDER:  So, in terms of logistics, I think

19  we're set.  I don't know --

20           THE COURT:  Just let me observe that paragraph

21  five, as I said in the earlier conference, if you were

22  listening.  It says dispositive motions to be filed no later

23  than July 24th.  That should not be read to reflect my

24  agreement that, in fact, you'll be filing dispositive

25  motions.  So we can talk about it at that point, if I still

Page 153

1   have the case.

2          MR. EILENDER:  Now, there is another issue which I

3   do not believe is an issue, and I'm going to assume it's not

4   an issue.  The way this thing began is the trustee, through

5   the various debtors, was trying to take 2004 discovery from

6   the plaintiffs before they were plaintiffs.  We filed a

7   declaratory judgment action.  Our position is that that

8   trumps the 2004 discovery.  Discovery should be taken

9   through the litigation.

10          There was some disagreement about that at one

11   point, but, given that we have this scheduling order, I'm

12   assuming there is no more disagreement.  Whatever discovery

13   will be taken will be taken pursuant to the federal rules ad

14   not through 2004.

15          THE COURT:  I would think so.

16          Is there any disagreement in that regard?

17          MR. TAMBE:  There's no disagreement.  It's just

18   our preference would certainly have been that they responded

19   to the 2004 discovery in a timely manner.  They didn't.

20   They sued.  We are where we are, and we'll proceed with

21   discovery.

22          THE COURT:  Okay.  Okay.

23          MR. EILENDER:  And I don't want to be pedantic,

24   but we did respond to 2004 in a timely manner.

25          THE COURT:  Okay.  We're --

Page 154

1            MR. EILENDER:  We objected, and that's a response.

2            THE COURT:  All right.  So it's water under the

3     bridge.

4            MR. EILENDER:  Yes, Your Honor.

5            THE COURT:  We are where we are.

6            MR. EILENDER:  Look, I don't want to take up your

7     time.  It's the afternoon.  It's the summer.

8            THE COURT:  It's fine.

9            MR. EILENDER:  So I don't know how much --

10           THE COURT:  This is my job.

11           MR. EILENDER:  Okay.  Well, I don't know how much

12    you want to know, and, you know, I don't want to give a long

13    speech, but, in essence, what the case is about -- the

14    entities that I represent are funds.  They engaged in swap

15    agreements with the Lehman entities, primarily special

16    financing and LBCC.  Holdings was guarantor under the swap

17    agreements.  These were ISDA master agreements.

18           When Holdings filed for bankruptcy in September of

19    2008, that was an event of default.  My clients elected to

20    terminate the agreements, which caused a cascade of events.

21    The cascade was then transactions were terminated.  They

22    have to be valued.

23           Some of my clients were in the money.  Some of

24    them were not.  Before, you know, LBSF filed for bankruptcy

25    at just the beginning of October of 2008, my clients engaged

Page 155

1   in agreements with each other where, as the clients who were

2   in the money, assigned their rights to the clients who were

3   not in the money, and then, they asserted setoffs against

4   LBSF and, to a certain extent, LBCC.

5           For years -- and after doing that process and

6   after determining what they owed, they paid LBSF $60 million

7    or a smidge less than $60 million.  Basically, for years,

8   nothing happened.  I mean, that's a slight exaggeration, but

9   I don't think it's too great of an exaggeration.

10          You know, there's some noises from Lehman.  Well,

11  we may have some problems with your valuations of the

12  margins, but, I mean, nothing substantive was said to our

13  clients.

14          THE COURT:  Meaning nothing substantive with

15  respect to the transactions that created the setoff rights?

16          MR. EILENDER:  Right, that's correct, and then,

17  fairly recently, you know, suddenly, it's your assignments

18  are invalid, the setoffs are invalid, your math is way

19  wrong, your math is unconscionable, it violates this, it

20  violates that, and plus, we're going to charge you a default

21  interest rate of 13 percent because you are the defaulting

22  party on the agreement.  And, needless to say, my clients

23  object to all that, and, needless to say, they just don't

24  want to sit around waiting to figure out if they enormous

25  liability or if they don't.

Page 156

1           I mean, under Lehman's view of the world, at least

2      before they filed their counterclaims --

3           THE COURT:  Right.

4           MR. EILENDER:  And we were told my clients owed

5      them something like $20 million, and the number may now be

6      higher.  I haven't done the math since they filed their

7      pleading.

8           THE COURT:  Then, why is it that you want to leave

9      this Court where you get a speedy disposition?

10          MR. EILENDER:  Because I'm a commercial litigator.

11     I want to be where --

12          THE COURT:  I have commercial litigators who

13     appear here and win here and sometimes lose here all the

14     time.

15          MR. EILENDER:  You know, --

16          THE COURT:  We love commercial litigators here.

17          MR. EILENDER:  Your Honor, I like to be where I'm

18     familiar.  But look, who knows what will happen?  We may end

19     up here one way or the other.  Obviously, nothing personal.

20          THE COURT:  Nothing personal taken.

21          MR. EILENDER:  Okay.  So --

22          THE COURT:  There are many, many dozens of

23     lawsuits just like yours who were taken care of right here.

24     So --

25          MR. EILENDER:  Or elsewhere or wherever they're

Page 157

1    taken care of.  Ultimately, everything's taken care of, one

2    way or another.

3            THE COURT:  Correct.

4            MR. EILENDER:  We have filed a declaratory

5    judgment action.  We're seeking a declaratory judgment that

6    the assignments were valid, the setoffs were valid, and the

7    calculations are correct.  Primarily we were dealing with

8    LBSF, but, for some reason, Holdings, who was just a

9    guarantor, wanted us to sign a tolling (sic) agreement with

10   them, and then, they ultimately filed the counterclaim.

11   It's not clear what Holdings' claim could be, but we're also

12   looking for declaratory judgment action that none of these

13   Lehman entities have any other kind of claims.  Let me get

14   this resolved and get closure.

15           Without getting too much into the weeds, the

16   Lehman -- the trustee's arguments are basically that the

17   assignments and setoffs violate the ISDA contracts, that

18   supposedly we represented we didn't have affiliates and

19   because we purport that we made that representation.

20   Therefore, we could not enter into agreements with

21   affiliates.

22           They argue that the assignments and setoffs

23   somehow violated the bankruptcy code, even though there's a

24   carve-out for the assignments with regard to these kinds of

25   agreements.  I mean, you know, conceivably there's some

Page 158

1    issues that, you know, do involve the code.  There are other

2    issues that are basically, you know, garden variety

3    contracts, which is really looking at the ISDA agreements

4    and determining what they say.

5              THE COURT:  Okay.

6              MR. EILENDER:  I mean, that is basically it.  I

7    mean, there's more to say, but, as I said, I don't want to

8    belabor this, Your Honor.

9              THE COURT:  Okay.  Thank you very much.

10             MR. EILENDER:  Anything else?

11             THE COURT:  That's it.

12             MR. TAMBE:  Good afternoon, Your Honor.

13             THE COURT:  Good afternoon.

14             MR. TAMBE:  Jayant Tambe, Jones Day, for the

15   debtors.  While I disagree with some of the words used, I

16   don't disagree with the fact we have a conflict.  We have a

17   dispute.  We have a dispute about valuation, and we have a

18   dispute about the effectiveness of the purported

19   assignments.

20             We'll has that out.  There'll be discovery.

21             THE COURT:  Okay.

22             MR. TAMBE:  There'll be legal argument.  They have

23   said now that they might move to dismiss, and we'll see

24   their arguments, and we'll brief that.

25             THE COURT:  Okay.

Page 159

1            MR. TAMBE:  One other point that we have discussed

2      with them is mediation.  This counterparty has not been

3      through mediation with Lehman, and so, I think we're in

4      agreement that we would like to try mediation.

5            THE COURT:  Is that so --

6            MR. TAMBE:  We need to discuss the mechanics of

7      it.

8            THE COURT:  Is that true?

9            MR. EILENDER:  We agree that we want to do

10     mediation where sort of agreement around issues is staying

11     or not staying.  I think what we would like to do is we

12     would like --

13           THE COURT:  Staying meaning staying your schedule?

14           MR. EILENDER:  Exactly.  I think what we would

15     like to do is we're happy to engage in mediation, but we

16     want to proceed on the schedule.

17           MR. TAMBE:  Yeah, there's agreement on that as

18     well, yeah.

19           THE COURT:  Okay, okay.  So do you have an

20     agreement on how to pick a mediator?

21           MR. TAMBE:  No, we don't.  So we have to talk

22     through those issues, and we'll do that.  I know there's a

23     couple of standing orders in place.  Whether this fits into

24     one of those is unclear, but we can --

25           THE COURT:  I'd be happy to help you in that

Page 160

1    regard.

2              MR. TAMBE:  Right, Your Honor, and we may take you

3    up on that, if we have any trouble basically (sic) here

4    (sic).

5              MR. EILENDER:  No issue with that, Your Honor.

6              THE COURT:  Okay.  All right.  I think it's -- I

7    mean, the way the issues have been described to me, it

8    sounds like it might be a good candidate for mediation.

9    Whether it be successful or not, who knows, but I'm a fan of

10   mediation.  So --

11             MR. TAMBE:  So are we, Your Honor.

12             THE COURT:  Okay.

13             So just let me quickly glance at the scheduling

14   order to see if there's anything that jumps out.  I would

15   simply add, in that paragraph five -- well, I just would

16   like to have some clarifying language that this is not

17   giving you permission to file dispositive motions.

18             So why don't I say subject to compliance with

19   Local Rule 7056(1), dispositive motions, if any, shall be

20   filed no later than July 24th?

21             Is that all right with you?

22             MR. TAMBE:  That's great, Your Honor.

23             THE COURT:  Is that all right with you?

24             MR. EILENDER:  That's fine.  And, Your Honor,

25   typically do you only allow one dispositive motion?

Page 161

1           THE COURT:  Typically, people don't -- are you

2      counting a motion to dismiss as a --

3           MR. EILENDER:  No, I'm not, Your Honor.

4           THE COURT:  -- dispositive motion?

5           MR. EILENDER:  I am not, Your Honor.

6           THE COURT:  I'm not.  So no, I mean, any -- I

7      don't know quite how to answer your question.  If it's

8      multiple summary judgment motions, any summary judgment

9      motion is subject to that rule, but, if you believe you have

10     more than one, you can ask more than once.  Does that make

11     sense?

12          MR. EILENDER:  Yes, Your Honor.

13          THE COURT:  Okay.

14          All right.  So we'll make that slight change, and

15     then, we'll enter this on the docket.

16          MR. EILENDER:  Would you like a disk, Your Honor?

17     I don't have one here, but --

18          THE COURT:  If we don't have it by email, if it's

19     easier just to send it to our chambers, email, okay.

20          MR. EILENDER:  We'll just email it.  Okay.

21          THE COURT:  Okay.  And, if you want to then make

22     that change for us, then that would be lovely.

23          MR. EILENDER:  Yeah, we'll do that.

24          THE COURT:  Okay.  All right.  Thank you for

25     coming in.

Page 162

1               MR. EILENDER:  Thank you.  We were shorter.

2               THE COURT:  Have a -- enjoy the rest of your

3      afternoon.

4               MR. EILENDER:  Thank you.

5          (Whereupon these proceedings were concluded at 2:53 PM)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 163

1                          I N D E X

2

3                          RULINGS

4                                        Page        Line

5   Trustee's Objection to the General Creditor

6   Proof of claim of Sofia Frankel (Claim No.

7   4909)[LBI ECF No. 8425]                27          15

8

9   Debtors' Motion for Alternative Dispute

10  Resolution Procedures Order for

11  Indemnification Claims of the Debtors Against

12  Mortgage Loan Sellers [ECF No. 44450]   36          19

13

14  Four Hundred Sixty-Sixth Omnibus Objection

15  to Claims (No Liability Claims)[ECF No.

16  44487]                                 44          16

17

18

19

20

21

22

23

24

25

Page 164

1                  C E R T I F I C A T I O N

2

3    We, Dawn South and Nicole Yawn, certify that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6    Dawn South    Digitally signed by Dawn South
                   DN: cn=Dawn South, o, ou,
                   email=digital1@veritext.com, c=US
                   Date: 2014.07.18 11:48:42 -04'00'
     _____

7    Dawn South

     AAERT Certified Electronic Transcriber CET**D-408

8

9

10

11

12   Nicole Yawn

13

     Veritext

14

     330 Old Country Road

15

     Suite 300

16

     Mineola, NY 11501

17

18

     Date:  July 18, 2014

19

20

21

22

23

24

25