JONES DAY
222 East 41st Street
New York, New York 10017
Telephone: (212) 326-3939
Facsimile: (212) 755-7306
Jayant W. Tambe
Kelly A. Carrero
Benjamin Rosenblum

*Attorneys for the Plaintiffs*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------X
:
In re:                                                        :   Chapter 11
:
LEHMAN BROTHERS HOLDINGS INC., *et al.*,   :   Case No. 08-13555 (SCC)
:
Debtors.                                                 :   (Jointly Administered)
:
--------------------------------------------------------- X
:
LEHMAN BROTHERS HOLDINGS INC.,            :
LEHMAN BROTHERS SPECIAL FINANCING  :   Adv. Proc. No. 14- _____
INC., and WOODLANDS COMMERCIAL           :
CORPORATION f/k/a WOODLANDS                  :
COMMERCIAL BANK f/k/a LEHMAN              :
BROTHERS COMMERCIAL BANK                      :
:
    Plaintiffs,                                          :
:
  -against-                                                :
:
WINCHESTER MEDICAL CENTER, INC.             :
:
    Defendant.                                         :
---------------------------------------------------------------X

**ADVERSARY COMPLAINT AND OBJECTION**

Lehman Brothers Holdings Inc. ("LBHI"), Lehman Brothers Special Financing Inc.

("LBSF"), and Woodlands Commercial Corporation f/k/a/ Woodlands Commercial Bank f/k/a

Lehman Brothers Commercial Bank (collectively, "WCC," and together with LBHI and LBSF,

"Plaintiffs"), by and through their attorneys, Jones Day, for their complaint hereby allege as follows:

## NATURE OF THE ACTION

1. This action arises out of an interest rate swap and the improper calculation by Winchester Medical Center, Inc. ("Winchester") of amounts owed thereunder following termination of the swap agreement.

2. On September 22, 2009, Winchester filed Proofs of Claim Nos. 28038 and 28039 (each a "Claim," and together, the "Claims"), against LBHI and LBSF, respectively, each claiming Winchester was *owed* $8,056,652.50 plus interest and fees in connection with the termination of the swap agreement. In asserting LBSF is liable, Winchester challenges the validity of LBSF's assignment of the swap agreement to non-debtor Lehman Brothers Commercial Bank ("LBCB") n/k/a Woodlands Commercial Corporation ("WCC"). Paradoxically, Winchester asserts LBHI is liable as guarantor of the obligations of non-debtor LBCB n/k/a WCC under the swap agreement.

3. Under the Bar Date Order this Court entered on July 2, 2009 setting forth the procedures and deadlines for filing proofs of claim in these chapter 11 cases (the "Bar Date Order") [ECF No. 4271], Winchester was also required, on or before October 22, 2009 at 5:00 pm (prevailing Eastern Time) (the "Questionnaire Deadline"), to complete the electronic forms attached as Exhibits C and D to the Bar Date Order (the "Derivative Questionnaire" and "Guarantee Questionnaire" respectively). (Bar Date Order at 7–9.) On October 14, 2009, Winchester submitted a Derivative Questionnaire in connection with its Claim against LBSF. Upon information and belief, Winchester has not submitted a Guarantee Questionnaire in connection with its Claim against LBHI.

2

4. Based solely on the facts set forth in the Claims, not only is Winchester not entitled to a single cent from LBSF, as the original counterparty, or LBHI, as the guarantor of LBCB n/k/a WCC under the swap, but it is Winchester instead that owes WCC millions of dollars as a result of Winchester's actual gain upon termination. The Claims have no basis in law, or in the parties' agreement. The Claims are premised on purported valuations and calculations that are commercially unreasonable, divorced from economic reality, and bear no relation to any actual damages or losses suffered by Winchester.

5. Plaintiffs seek redress against Winchester for improperly demanding a termination amount payment under the swap agreement, in direct detriment to the Debtors' estates and its creditors, and hereby bring this action to obtain: (a) the disallowance of the Claims in their entirety, (b) a judgment finding that Winchester is in breach of the swap agreement and awarding WCC the full amount that it is entitled thereunder, (c) declarations of the parties' rights and obligations under the swap agreement and assignment, and (d) attorneys' fees and costs associated with the enforcement of Plaintiffs' rights under the swap agreement.

**PARTIES**

6. Plaintiff WCC, formerly known as Woodlands Commercial Bank ("WCB") and Lehman Brothers Commercial Bank ("LBCB"), is a corporation organized and existing under the laws of the State of Utah, with its principal place of business at 1271 Sixth Avenue, New York, New York 10020. WCC is a wholly-owned non-debtor subsidiary of Lehman Bancorp, Inc., which itself is a debtor subsidiary of LBHI. WCC (through WCB and LBCB) obtained its rights under the swap agreement at issue here by assignment from LBSF.

7. Plaintiff LBHI is a Delaware corporation with its principal place of business at 1271 Sixth Avenue, New York, New York 10020. On September 15, 2008, LBHI commenced

3

with the Court a voluntary case under chapter 11 of the Bankruptcy Code. On December 6, 2011, the Court approved and entered an order confirming the Plan. The Plan became effective on March 6, 2012. Pursuant to the Plan, LBHI, as Plan Administrator, is authorized to prosecute litigation claims on behalf of the estates and interpose and prosecute objections to claims against the estates. Winchester has asserted a proof of claim against LBHI, as guarantor of the obligations of LBCB n/k/a WCC under the swap agreement at issue here.

8.      Plaintiff LBSF is a Delaware corporation with its principal place of business at 1271 Sixth Avenue, New York, New York 10020. On October 3, 2008, LBSF commenced with the Court a voluntary case under chapter 11 of the Bankruptcy Code. LBSF's chapter 11 case has been consolidated with LBHI's chapter 11 case for procedural purposes only, and those cases are being jointly administered pursuant to Bankruptcy Rule 1015(b).

9.      Defendant Winchester is a not-for-profit corporation organized and existing under the laws of Virginia with its principal place of business in Winchester, Virginia. Winchester is a wholly-owned subsidiary of Valley Health System.

## JURISDICTION AND VENUE

10.     The statutory predicates for the relief requested herein are (a) sections 105, 502, and 541 of title 11 of the United States Code (the "Bankruptcy Code"), (b) Rules 3007 and 7001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and (c) sections 2201 and 2202 of title 28 of the United States Code.

11.     This Court has subject matter jurisdiction to consider and determine this matter pursuant to 28 U.S.C. §§ 157(a) and 1334. This proceeding contains both core and non-core matters within the meaning of 28 U.S.C. § 157. This is a civil proceeding related to a bankruptcy case as authorized under 28 U.S.C. § 1334(b). This action is related to a bankruptcy case

4

because it directly affects the Debtors' liabilities and the distribution of property of the bankruptcy estate to creditors.

12. This Court has personal jurisdiction over Winchester due to the filing of Winchester's claims in the Debtors' chapter 11 cases.

13. Venue is proper in this district pursuant to 28 U.S.C. § 1409.

## BACKGROUND

*The Swap Agreement and Transaction Thereunder*

14. This action arises out of an interest rate swap transaction (the "Transaction"), referencing $70 million notional of Industrial Development Authority of Clarke County, Virginia Hospital Facility Revenue Bonds (Winchester Medical Center, Inc.), Series 2000 (the "Bonds"). The Transaction was governed by a single contract between LBSF and Winchester, and that contract consisted of: (i) a 1992 ISDA Master Agreement, dated as of August 24, 2001, as amended (the "Master Agreement"), (ii) a Schedule, dated as of August 24, 2001 (the "Schedule") that amended and supplemented the terms of the Master Agreement, (iii) a Credit Support Annex, dated as of August 24, 2001 (the "CSA"), and (iv) a Confirmation, dated as of August 24, 2001, further documenting the Transaction (the "Confirmation") (collectively, the "Swap Agreement").

15. Part 3(e) of the Schedule specified that the Swap Agreement "will be governed by and construed in accordance with the laws of the State of New York (without reference to choice of law doctrine)." Section 11 of the Master Agreement, in turn, specified "…each party irrevocably (i) submits to the . . . non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City, if this Agreement is expressed to be governed by the laws of the State of New York."

16. Under the Transaction, Winchester ("Party B") was required to make monthly

5

fixed-rate payments of 4.44% per annum to LBSF ("Party A"), in exchange for Party A's obligation to make monthly floating-rate payments to Party B. The floating rate could change based on the occurrence of certain enumerated events set forth in the Confirmation.

17. LBSF's rights, duties and obligations under the Swap Agreement, as Party A, were subsequently assigned to LBCB n/k/a WCC through the Assignment and Amendment Agreement, dated as of October 5, 2005 (the "Assignment"), between Winchester, LBSF and LBCB.

18. Under the Swap Agreement, LBHI had served as Credit Support Provider[1] to LBSF. In this capacity, LBHI issued a guarantee, dated as of August 24, 2001, guaranteeing LBSF's obligations under the Swap Agreement (the "LBSF Guarantee"). At the time of the Assignment, LBHI also issued a restated guarantee, dated as of October 5, 2005, under which it guaranteed payment of all liabilities, obligations and commitments of LBCB under the Swap Agreement (the "LBCB Guarantee"). A copy of the LBCB Guarantee was delivered to Winchester before it executed the Assignment.

19. LBCB subsequently changed its name to Woodlands Commercial Bank and later to Woodlands Commercial Corporation. WCC retains all rights and duties under the Swap Agreement and any and all transactions thereunder.

*Overview of Relevant Contractual Provisions*

20. On September 15, 2008, LBHI, the Credit Support Provider under the Swap Agreement, filed a voluntary petition for relief under the United States Bankruptcy Code, 11 U.S.C. §§ 101 et seq. This was an Event of Default under Section 5(a) of the Master Agreement,

---

[1] All capitalized terms not expressly defined herein shall have the meaning ascribed to them in the respective agreements governing the Transaction.

whereby an Early Termination Date could be designated pursuant to Section 6(a) of the Master Agreement.

21. Section 6(c)(ii) of the Master Agreement provided that "[u]pon the occurrence or effective designation of an Early Termination Date . . . [t]he amount, if any, payable in respect of an Early Termination Date shall be determined pursuant to Section 6(e) [of the Master Agreement]."

22. The parties also agreed in Section 6(d)(i) of the Master Agreement that "[o]n or as soon as reasonably practicable following the occurrence of an Early Termination Date," the Non-defaulting Party would make calculations according to Section 6(e) of the Master Agreement and would provide to the other party a statement "showing, in reasonable detail, such calculations (including all relevant quotations and specifying any amount payable under Section 6(e))."

23. Section 6(e) of the Master Agreement included a menu of methodologies for calculating termination payments upon the occurrence of an Early Termination Date. In Part 1(f) of the Schedule, the parties elected and agreed upon Second Method and Market Quotation as the methodology for calculating termination payments upon the occurrence of an Early Termination Date (the "Early Termination Payment").

24. Section 6(e)(i)(3) of the Master Agreement set out the equation for calculating the Early Termination Payment where Second Method and Market Quotation apply:

> . . . an amount will be payable equal to (A) the sum of the Settlement Amount (determined by the Non-defaulting Party) in respect of the Terminated Transactions and the Unpaid Amounts owing to the Non-defaulting Party less (B) the Unpaid Amounts owing to the Defaulting Party. . . if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

In other words, if upon the Early Termination the Non-defaulting Party enjoyed a gain, it would be required to pay the amount of the gain to the Defaulting Party.

7

25. Settlement Amount was defined in Section 12 of the Master Agreement as an amount equal to the sum of the Market Quotations procured by the Non-defaulting Party for each of the Transactions outstanding as of the Early Termination Date, in instances where a Market Quotation can be determined. Unpaid Amounts, in turn, was defined in Section 12 of the Master Agreement as amounts owing to any party that "became payable . . . on or prior to [the] Early Termination Date and which remain unpaid as at [the] Early Termination Date."

26. Market Quotation likewise was expressly defined in Section 12 of the Master Agreement. The Master Agreement also specifically contemplated in Sections 6(e)(iv) and 12 the possibility that Market Quotations could not be determined or that they might not, in certain circumstances, serve as a "reasonable pre-estimate of loss" or "produce a commercially reasonably result." In such circumstances, in the definition of Settlement Amount in Section 12, the Master Agreement provided that the Settlement Amount would be equal to the Non-Defaulting Party's Loss.

27. Loss similarly was expressly defined in Section 12 of the Master Agreement. In calculating Loss, the Non-defaulting Party was required not only to calculate its total losses and costs in connection with the Terminated Transaction; its calculation also had to include what it "reasonably determine[d] in good faith to be its total … gain, in which case expressed as a negative number . . . ."

***Winchester's Termination and Calculation Under the Swap Agreement***

28. Winchester delivered a letter dated November 13, 2008 to LBCB designating November 17, 2008 as the Early Termination Date.

29. Subsequently, in a letter dated December 2, 2008, Winchester incorrectly asserted that the Early Termination Payment due to Winchester under the Swap Agreement was $8,046,218.29 plus potential default interest purportedly in accordance with the Master

8

Agreement. To arrive at its Early Termination Payment, Winchester calculated the Settlement Amount to be $7,931,025 and the Unpaid Amounts to be $115,193.89, both amounts purportedly owing from LBCB to Winchester.

30. Further, in the December 2, 2008 letter, Winchester admitted it did not calculate the Settlement Amount in accordance with Market Quotation, the method elected by the parties, but instead reverted to a Loss calculation. Winchester provided no evidence that it attempted to retrieve Market Quotations or that they would not produce a commercially reasonable result.

31. In ostensible compliance with Section 6(d)(i) of the Master Agreement, Winchester enclosed with the December 2, 2008 letter a calculation statement from its financial adviser, Ponder & Co. The statement not only failed to provide "reasonable detail" of Winchester's Loss calculation, as required under Section 6(d)(i) of the Master Agreement, but also made no assertion that Winchester actually incurred any losses or damages as a result of the Early Termination.

***Winchester Incorrectly Calculated the Early Termination Payment Without Regard to Contract Damages or Actual Loss***

32. Winchester improperly calculated the Early Termination Payment for at least the following reasons.

33. *First*, Winchester's alleged Loss calculation disregards the strictures of the Master Agreement and well-settled principles of New York contract law. Winchester's Loss calculation must be based on gains or losses and costs that Winchester has actually incurred. Winchester's Loss calculation does not accurately reflect its actual "losses and costs (or gain. . . ) … incurred" as of the Early Termination Date. Because Winchester's calculation bears no reasonable relationship to the actual economic effect of the terminated Transaction, Winchester breached the Swap Agreement and determined its Early Termination Payment in bad faith.

9

34. *Second*, upon information and belief, Winchester's alleged Unpaid Amounts calculation, which is not set out in reasonable detail, disregards unpaid amounts owed by Winchester and was calculated using the incorrect floating rate determination option.

35. For at least these reasons, Winchester's Early Termination Payment calculation is defective and WCC is entitled to an Early Termination Payment under the Swap Agreement of over $6 million, not including interest. Sections 6(d)(ii) and 12 of the Master Agreement also require Winchester to pay interest to WCC on the portion of the Early Termination Payment that Winchester has not paid to WCC, at the Applicable Rate specified in the Master Agreement, from and after the Early Termination Date up to (but excluding) the date on which the Early Termination Payment is paid in full.

36. Furthermore, the Claims should be disallowed and expunged. Neither LBSF nor LBHI can have any liability because there is no payment owing to Winchester as a result of the swap termination.

## FIRST CAUSE OF ACTION

**(Breach of Contract by WCC)**

37. WCC hereby incorporates the foregoing paragraphs as if fully restated herein.

38. The Swap Agreement constituted a valid contract between Winchester and LBSF, and the Assignment by LBSF to LBCB n/k/a WCC was valid.

39. Winchester breached the Swap Agreement by failing to calculate the Early Termination Payment in accordance with the procedures set forth in the Swap Agreement and failing to set out its calculation "in reasonable detail" as required under Section 6(d)(i) of the Master Agreement.

40. Winchester breached the Swap Agreement by calculating Loss in bad faith and in a manner that was both commercially unreasonable and wholly unrelated to its actual economic damages.

41. Under the Swap Agreement, Winchester was required to pay WCC for any gains it enjoyed as a result of termination. This payment owed by Winchester to WCC was never made and has been outstanding since December 2, 2008.

42. As a direct and proximate result of Winchester's breach of the Swap Agreement, WCC has been deprived of a substantial sum of money in an amount to be determined at trial not less than $6 million.

## SECOND CAUSE OF ACTION

**(Declaratory Judgment by WCC)**

43. WCC hereby incorporates the foregoing paragraphs as if fully restated herein.

44. The parties to this action are the parties who have or who may claim to have an interest that may be affected by the declaration requested.

45. This action is within the jurisdiction of this Court and WCC is entitled to declaratory judgment under 28 U.S.C. §§ 2201 and 2202.

46. An actual controversy exists between WCC and Winchester, which is justiciable in character, and speedy relief is necessary to preserve the parties' respective rights.

47. WCC is a true party in interest, because LBSF's rights, duties and obligations under the Swap Agreement, as Party A, were validly assigned to LBCB n/k/a WCC pursuant to the Assignment.

48. Winchester's calculation of the Early Termination Payment was not in compliance with the Swap Agreement, nor did it have any legitimate commercial or economic basis.

49. The Early Termination Payment, when calculated properly under the Swap Agreement, is an amount owing from Winchester to WCC in an amount to be determined at trial not less than $6 million.

50. Unless this Court makes a declaration of the rights and obligations of the parties under the Swap Agreement, WCC will continue to suffer substantial harm.

51. A declaratory judgment will resolve the entire dispute between WCC and Winchester and save the parties substantial costs and expenses.

### THIRD CAUSE OF ACTION

**(Declaratory Judgment by LBHI)**

52. LBHI hereby incorporates the foregoing paragraphs as if fully restated herein.

53. The parties to this action are the parties who have or who may claim to have an interest that may be affected by the declaration requested.

54. This action is within the jurisdiction of this Court and LBHI is entitled to declaratory judgment under 28 U.S.C. §§ 2201 and 2202.

55. An actual controversy exists between LBHI and Winchester, which is justiciable in character, and speedy relief is necessary to preserve the parties' respective rights.

56. Winchester's calculation of the Early Termination Payment was not in compliance with the Swap Agreement, nor did it have any legitimate commercial or economic basis.

57. The Early Termination Payment, when calculated properly under the Swap Agreement, is an amount owing from Winchester to WCC. Accordingly, Winchester has no claim against LBHI pursuant to the LBCB Guarantee and Winchester's Claim should be disallowed and expunged.

58. Moreover, Winchester's failure to submit a Guarantee Questionnaire in accordance with the Bar Date Order forever bars, estops and enjoins Winchester from asserting such a claim against LBHI.

59. Unless this Court makes a declaration of the rights and obligations of the parties under the Swap Agreement, LBHI will continue to suffer substantial harm, including but not limited to requiring LBHI to continue to maintain a cash reserve in connection with Winchester's invalid claim.

60. A declaratory judgment will resolve the entire dispute between LBHI and Winchester and save the parties substantial costs and expenses.

## FOURTH CAUSE OF ACTION

**(Declaratory Judgment by LBSF)**

61. LBSF hereby incorporates the foregoing paragraphs as if fully restated herein.

62. The parties to this action are the parties who have or who may claim to have an interest that may be affected by the declaration requested.

63. This action is within the jurisdiction of this Court and LBSF is entitled to declaratory judgment under 28 U.S.C. §§ 2201 and 2202.

64. An actual controversy exists between LBSF and Winchester, which is justiciable in character, and speedy relief is necessary to preserve the parties' respective rights.

65. LBSF has no liability to Winchester because all of LBSF's rights, duties and obligations under the Swap Agreement, as Party A, were validly assigned to LBCB n/k/a WCC pursuant to the Assignment. Accordingly, Proof of Claim No. 28039 should be disallowed and expunged.

66. Unless this Court makes a declaration of the rights and obligations of the parties under the Swap Agreement and Assignment, LBSF will continue to suffer substantial harm, including but not limited to requiring LBSF to continue to maintain a cash reserve in connection with Winchester's invalid claim.

67. A declaratory judgment will resolve the entire dispute between LBSF and Winchester and save the parties substantial costs and expenses.

## FIFTH CAUSE OF ACTION

**(Declaratory Judgment by LBSF)**

68. LBSF hereby incorporates the foregoing paragraphs as if fully restated herein.

69. The parties to this action are the parties who have or who may claim to have an interest that may be affected by the declaration requested.

70. This action is within the jurisdiction of this Court and LBSF is entitled to declaratory judgment under 28 U.S.C. §§ 2201 and 2202.

71. If the Assignment were found to be invalid, an actual controversy continues to exist between LBSF and Winchester, which is justiciable in character, and speedy relief is necessary to preserve the parties' respective rights.

72. Winchester's calculation of the Early Termination Payment was not in compliance with the Swap Agreement, nor did it have any legitimate commercial or economic basis.

73. The Early Termination Payment, when calculated properly under the Swap Agreement, is an amount owing by Winchester. Accordingly, if the Assignment were found to be invalid, Proof of Claim No. 28039 should be disallowed and expunged and LBSF found to have a claim for a substantial sum of money in an amount to be determined at trial not less than $6 million.

74. Unless this Court makes a declaration of the rights and obligations of the parties under the Swap Agreement, LBSF will continue to suffer substantial harm, including but not limited to requiring LBSF to continue to maintain a cash reserve in connection with Winchester's invalid claim.

75. A declaratory judgment will resolve the entire dispute between LBSF and Winchester and save the parties substantial costs and expenses.

## SIXTH CAUSE OF ACTION

**(Attorneys' Fees, Costs and Litigation Expenses by Plaintiffs)**

76. Plaintiffs hereby incorporate the foregoing paragraphs as if fully restated herein.

77. The Swap Agreement is valid and enforceable against Winchester as a matter of law.

78. The Swap Agreement provides that Winchester's failure to abide by its terms entitles Plaintiffs to an award of attorney's fees and reasonable expenses.

79. Winchester's egregious calculation of the Early Termination Payment constitutes a material breach of the Swap Agreement.

80. Plaintiffs have been forced to incur attorney's fees and expenses because of Winchester's failure to abide by the terms of the Swap Agreement and its failure to calculate the Early Termination Payment in good faith.

15

81. Plaintiffs are thus entitled to an award of attorney's fees, costs and litigation expenses.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully requests that judgment be entered against Winchester as follows:

(1) Sustaining objections to the Claims and disallowing and expunging the Claims in their entirety as set forth herein;

(2) Determining Winchester has breached the Swap Agreement and owes WCC damages and applicable interest in an amount to be determined at trial;

(3) Awarding declaratory judgments in favor of WCC, LBHI and LBSF;

(4) Awarding Plaintiffs reasonable attorneys' fees, costs, and expenses; and

(5) Granting such further relief as the Court deems just and proper.

Dated: August 8, 2014
New York, New York

/s/ *Jayant W. Tambe*
Jayant W. Tambe
Kelly A. Carrero
Benjamin Rosenblum
JONES DAY
222 East 41st Street
New York, New York 10017
Telephone: (212) 326-3939
Facsimile: (212) 755-7306

*Attorneys for Plaintiffs
Lehman Brothers Holdings Inc., Lehman
Brothers Special Financing Inc., and
Woodlands Commercial Corporation*