WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Richard W. Slack
Robert J. Lemons

Attorneys for Lehman Brothers Holdings Inc.
and Certain of Its Affiliates

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------ x

| | | |
|---|---|---|
| **In re** | : | **Chapter 11 Case No.** |
| | : | |
| **LEHMAN BROTHERS HOLDINGS INC.**, *et al.*, | : | **08-13555 (SCC)** |
| | : | |
| **Debtors.** | : | **(Jointly Administered)** |

------------------------------------------------------------------ x

## <u>OBJECTION TO PROOF OF CLAIM NUMBERS 64070 AND 64071</u>

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...............................................................................................1

JURISDICTION ........................................................................................................................3

BACKGROUND ........................................................................................................................4

    A.   The Chapter 11 Cases ................................................................................................4

    B.   The Bonds ..................................................................................................................6

    C.   The Proofs of Claim ..................................................................................................8

OBJECTION.............................................................................................................................10

    D.   Applicable Standard.................................................................................................10

    E.   Giants Stadium Owes Money to LBSF Under the Swaps ...............................10

    F.   Giants Stadium Materially Breached the Agreements...............................12

         1.   Giants Stadium Denied LBSF the Right to Choose
             Reference Market-makers and Conduct the Market Quotation Process .............13

         2.   Giants Stadium Breached the Agreements by Terminating the
             Swaps in Violation of the Indenture's Minimum Hedging Requirement ...........14

    G.   Giants Stadium's Loss Calculation Is Not Commercially Reasonable...........................16

         1.   Giants Stadium's Loss Calculation Ignores Numerous Contract
             Rights and Significant Contemporaneously Available Information ...................16

             a)   Giants Stadium's Loss Calculation Fails to
                  Account for Both LBSF's Right to Cause a
                  Refinancing or Conversion of the Bonds and the Fact
                  That Giants Stadium Already Had Initiated a Refinancing ......................16

             b)   Giants Stadium's Loss Calculation Fails to
                  Reflect Its Own Contemporaneous Assessments of Loss.........................21

             c)   Giants Stadium's Loss Calculation Fails to Account for
                  Other Structural Limitations on LBSF's Liability Under the Swaps.........21

          2.   Giants Stadium's Loss Calculation Utilizes
             Commercially Unreasonable Methodologies ......................................21

             a)   Giants Stadium's Use of Short-Term
                  Excessively High Auction Rates as a Proxy
                  for Long-Term Financing Costs Is Commercially Unreasonable..............22

             b)   Giants Stadium's Loss Calculation Incorrectly Assumes
                  Payments under the Swaps Would Continue Unabated for 38 Years........23

             c)   Giants Stadium's Loss Calculation Was Flawed in Other Respects..........23

      d)    Giants Stadium's Reliance on Judge Peck's Barclays' Decision is Misplaced ................................................................................................. 24

  H.    Giants Stadium's Proofs of Claim Should Be Equitably Subordinated ......................... 25

RESERVATION OF RIGHTS ................................................................................................. 29

NOTICE .................................................................................................................................... 29

ii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Adelphia Commc'ns Corp.*,
No. 02-41729 (REG), 2007 WL 601452 (Bankr. S.D.N.Y. Feb. 20, 2007) ........................10

*In re Enron Corp.*,
333 B.R. 205 (Bankr. S.D.N.Y. 2005) .....................................................................................27

*Guardian Music Corp. v. James W. Guercio Enters., Inc.*,
459 F. Supp. 2d 216 (S.D.N.Y. 2006), *aff'd*, 271 F. App'x 119 (2d Cir. 2008)....................12

*In re Lehman Bros. Holdings Inc.*,
445 B.R. 137 (S.D.N.Y. 2011)................................................................................................25

*LightSquared LP v. SP Special Opportunities LLC (In re LightSquared Inc.)*,
511 B.R. 253 (Bankr. S.D.N.Y. 2014) ...............................................................................26, 27

*In re Oneida Ltd.*,
400 B.R. 384 (Bankr. S.D.N.Y. 2009) ....................................................................................10

*In re Rockefeller Ctr. Props.*,
272 B.R. 524 (Bankr. S.D.N.Y. 2000) ....................................................................................10

**Statutes and Rules**

11 U.S.C. § 502.......................................................................................................................1, 10

11 U.S.C. § 101(25) .....................................................................................................................4

11 U.S.C. § 101(53B) ..................................................................................................................4

28 U.S.C. § 157...........................................................................................................................3

28 U.S.C. § 1334.........................................................................................................................3

Fed. R. Bankr. P. 7001(8) .........................................................................................................26

Fed. R. Bankr. P. 3007(a) ...........................................................................................................1

**Other Authorities**

23 Samuel Williston & Richard A. Lord, A Treatise on the Law of Contracts § 63:8 (4th ed. 2002) .......................................................................................................................................12

55 N.Y. Jur. 2d Equity § 107 .....................................................................................................12

US_ACTIVE:\44517307\11\58399.0011

TO THE HONORABLE SHELLEY C. CHAPMAN
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Holdings Inc. ("LBHI" and the "Plan Administrator"), as Plan

Administrator under the Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers

Holdings Inc. and Its Affiliated Debtors (the "Plan") for the entities, including Lehman Brothers

Special Financing Inc. ("LBSF," and with LBHI, "Lehman"), in the above-referenced chapter 11

cases (the "Chapter 11 Estates," as applicable), respectfully states as follows:

## PRELIMINARY STATEMENT

1.      The Plan Administrator files this objection, pursuant to section 502(b) and

510(c) of title 11 of the United States Code (the "Bankruptcy Code") and Rule 3007(a) of the

Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), seeking to disallow and

expunge or, to the extent applicable, equitably subordinate, proof of claim number 64071 against

LBHI (the "LBHI Proof of Claim") and proof of claim number 64070 against LBSF (the "LBSF

Proof of Claim," and, together with the LBHI Proof of Claim, the "Proofs of Claim").

2.      Giants Stadium, LLC ("Giants Stadium") filed the Proofs of Claim in

connection with certain derivatives swap transactions between LBSF and Giants Stadium that are

fully described in the adversary proceeding complaint (the "Complaint")[1] filed by the Plan

Administrator against Giants Stadium on October 23, 2013.  *See Lehman Brothers Holdings Inc.

and Lehman Brothers Special Financing Inc. v.  Giants Stadium LLC*, No. 13-01554 (Bankr.

S.D.N.Y. Oct. 23, 2013), ECF No. 1.  The Complaint is expressly incorporated by reference as if

fully set forth herein.

3.      LBSF and Giants Stadium were parties to two interest rate swap

transactions (the "Swaps") that were intended to hedge interest rate risk on securities initially

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Complaint.

issued in auction rate form (the "Bonds") by Giants Stadium and underwritten by Lehman

Brothers Inc. ("LBI").  LBHI guaranteed LBSF's obligations under the Swaps pursuant to two

guarantees (the "Guarantees").  In the Proofs of Claim, Giants Stadium claims amounts of

approximately $301 million each purportedly due under the Swaps and the Guarantees.

       4.      The Chapter 11 Estates do not owe any amount to Giants Stadium.

Rather, Giants Stadium owes approximately $94 million, plus interest, to LBSF under the Swaps.

       5.      Furthermore, even if, *arguendo*, Giants Stadium were owed money under

the Swaps, Giants Stadium materially breached the swap agreements in multiple respects, and

thus, as a matter of law, is not permitted to enforce the agreements.  Giants Stadium's breach

negates its claims against LBSF under the Swaps and renders moot its claims against LBHI

under the Guarantees.

       6.      Moreover, Giants Stadium's Loss calculations under the Swaps – as set

forth in the Proofs of Claim – are not commercially reasonable because, among many other

things, they disregard certain unambiguous structural limitations (or caps) on Giants Stadium's

calculation of "Loss" in connection with the Swaps.  For example, as discussed below, the swap

agreements provided that LBSF could require Giants Stadium to refinance the underlying Bonds

and pay only the cost to Giants Stadium of the refinancing.  Thus, LBSF (or any other swap

counterparty stepping into its shoes) had the ability to limit its exposure under the Swaps at any

time by exercising its right to cause Giants Stadium to refinance the underlying Bonds.  Yet

Giants Stadium ignored this right entirely in its calculations.  Any commercially reasonable

calculation of Loss, giving correct effect to all structural features of the Swaps, would be capped

at a figure that is a small fraction of Giants Stadium's asserted claims.

2

7.    Giants Stadium has acted in bad faith and inequitably to the detriment of the Chapter 11 Estates and their creditors by filing new proofs of claim on December 6, 2011 – the day the Chapter 11 Estates confirmed their chapter 11 plan – more than two years after the bar date for proofs of claim and more than three years after Giants Stadium purported to terminate the Swaps.  These new proofs of claim doubled the amount Giants Stadium originally sought under the Proofs of Claim – from $301 million to nearly $600 million – and were filed for the purpose of, among other things, making the Chapter 11 Estates reserve significantly higher amounts as bargaining leverage in settlement discussions.  Although these claims have recently been withdrawn, over the prior two-and-a-half years they forced the Chapter 11 Estates to reserve cash that was approximately $94 million in excess of the reserves that they otherwise would have been required to maintain.  As a result, this excess could not be distributed to Lehman's legitimate creditors over that period of time, causing them harm.  Giants Stadium's claims should, therefore be equitably subordinated to the claims of creditors to the extent of the harm caused to the Chapter 11 Estates and their creditors by the new proofs of claim.

## <u>JURISDICTION</u>

8.    This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

3

## BACKGROUND

### A.    The Chapter 11 Cases

9.    Commencing on September 15, 2008, and periodically thereafter, LBHI and certain of its subsidiaries commenced with this Court voluntary cases under chapter 11 of the Bankruptcy Code.

10.    On December 6, 2011, the Court approved and entered an order confirming the Plan [ECF No. 23023] (the "Confirmation Order").  The Plan became effective on March 6, 2012 (the "Effective Date").

11.     Pursuant to the Plan, the Plan Administrator is authorized to interpose and prosecute objections to claims filed against the Chapter 11 Estates.

12.    On July 2, 2009, this Court entered an order setting forth the procedures and deadlines for filing proofs of claim in these chapter 11 cases, including procedures for filing proofs of claim and supporting documentation for claims based on Derivative Contracts[2] and Guarantees[3] (the "Bar Date Order") [ECF No. 4271].  The Bar Date Order established (i) September 22, 2009 (the "Bar Date") as the general deadline for filing proofs of claim and (ii) October 22, 2009 (the "Questionnaire Deadline") as the deadline for completing electronic questionnaires and uploading supporting documentation and evidence of underlying claim amounts in connection with proofs of claim filed against the Chapter 11 Estates based on (a) Derivative Contracts (each a "Derivative Questionnaire") and (b) Guarantees (each a "Guarantee Questionnaire" and, together with the Derivative Questionnaire, the "Questionnaires").

---

[2] "Derivative Contract" is defined in the Bar Date Order as "any contract that is any of (i) a 'swap agreement' as such term is defined in section 101(53B) of the Bankruptcy Code or (ii) a 'forward contract' as such term is defined in section 101(25) of the Bankruptcy Code . . . ."  *See* Bar Date Order at 6.

[3] "Guarantee" is defined in the Bar Date Order as "a promise, representation or agreement to answer for the payment of some debt or the performance of some duty in case of the failure of another person or entity who is liable in the first instance."  *See* Bar Date Order at 7.

4

13.     The Bar Date Order provided that each holder of a claim against a Chapter 11 Estate based on amounts allegedly owed to the holder under any Derivative Contract must complete the electronic Derivative Questionnaire and electronically upload supporting documentation on the website.  *See* Bar Date Order at 7.  The Bar Date Order further provided that each holder of a claim against a Chapter 11 Estate based on amounts allegedly owed to the holder pursuant to a Guarantee must complete the electronic Guarantee Questionnaire and electronically upload supporting documentation on the website.  *Id*. at 7-8.  A copy of the Bar Date Order was made publicly available at http://www.lehman-docket.com.

14.     Exhibit C to the Bar Date Order was a version of the Derivative Questionnaire that required that the claimant provide various information in support of its claim, such as the following:  copies of relevant agreements; a copy of the termination notice; a valuation statement; individual trade-level detail; trade value methodology and quotations; and unpaid amounts, collateral, and other costs associated with the claim pursuant to the Derivative Contract.  Also attached to the Bar Date Order was Exhibit D, a version of the Guarantee Questionnaire setting forth the information forming the basis of the claimant's assertions of a guarantee claim.  Thus, the Questionnaires required counterparties to state the amounts they claimed to be payable by the Chapter 11 Estates and provide details to support such amounts.

15.     The Bar Date and the Questionnaire Deadline gave derivatives counterparties significant time to prepare the Questionnaires.  In fact, the Questionnaire Deadline was approximately one month after the Bar Date.

16.     Thousands of derivatives counterparties properly filled out the Questionnaires and met the Questionnaire Deadline.  The Chapter 11 Estates have relied upon

5

the Questionnaires in evaluating claims by derivatives counterparties, setting reserves, and

projecting creditors' ultimate recoveries.

**B.**    **The Bonds**

17.    The Swaps were an integral part of a project financing transaction to

finance the construction of the New Meadowlands Stadium (the "Stadium") in East Rutherford,

New Jersey.  The owners of the New York Giants football team (the "New York Giants") created

Giants Stadium as a limited liability corporation for their portion of the project financing and

construction of the Stadium.  Giants Stadium issued approximately $650 million of project

financing bonds ("ARS") in total, which initially were issued in the form of auction rate

securities.  $408 million of the ARS were underwritten by LBI (i.e., the Bonds).  The remaining

ARS (the "Goldman Bonds") were underwritten by Goldman, Sachs & Co. (collectively with its

affiliates, "Goldman Sachs").

18.    So long as the ARS (as they originally existed) were in auction mode, the

interest rates on the ARS were set by periodic auctions.  LBI acted as broker-dealer and therefore

conducted the auctions for the Bonds.  Giants Stadium purchased insurance from Financial

Guaranty Insurance Company ("FGIC") and Financial Security Assurance ("FSA," and, together

with FGIC, the "Bond Insurers") to cover its principal and interest payments on the Bonds.

19.    The indenture governing the ARS (the "Indenture") required that at least

67% of the ARS be hedged for 15 years following their issuance and that 40% of the ARS

remain hedged for the following 25 years through their maturity (the "Minimum Hedging

Requirement").  See Indenture § 609(nn).  Accordingly, in order to hedge its interest rate risk

associated with the ARS, Giants Stadium entered into interest rate swap transactions with both

LBSF and Goldman Sachs.  Under the swap with Goldman Sachs, Giants Stadium paid a fixed

rate of interest and Goldman Sachs paid a floating rate based on LIBOR.  Under the two

6

substantively identical Swaps with LBSF, LBSF agreed to pay Giants Stadium under some circumstances a floating rate known as the "Actual Bond Rate" – an amount that was identical to the interest rate set on the Bonds – in return for which Giants Stadium agreed to pay LBSF interest at a fixed rate of 6.1885%.  In other circumstances, LBSF agreed to pay Giants Stadium a floating rate based on LIBOR.

20.    The Swaps had a combined notional amount of $408,325,000 (the same principal amount as the Bonds) and maturity dates of April 1, 2047.  The Swaps were subject to two separate standard 1992 form ISDA Master Agreements (the "Master Agreements"), the Schedules and annexes thereto, and the Confirmations thereunder (along with the Master Agreements and the Schedules, the "Agreements"), which are governed by New York law.  Each of the Swaps was documented by a separate and substantially identical Confirmation dated August 16, 2007, and each was subject to the terms of one of the two Master Agreements.

21.    Under the Master Agreements, if the Swaps were terminated prior to maturity, whichever party was in-the-money at the time of termination (regardless of which party was the Defaulting Party) was entitled to receive a Settlement Amount from the other party.

22.    On September 18, 2008, Giants Stadium delivered notices of termination to LBSF.  Giants Stadium sought to terminate the Swaps on the basis of LBHI's bankruptcy, and designated the same date, September 18, 2008, as the Early Termination Date with respect to the Swaps.  On October 2, 2008, Giants Stadium sent Calculation Statements to LBSF asserting total Settlement Amounts for the two Swaps of $301,025,197.12 payable to Giants Stadium.

C.    **The Proofs of Claim**

23.    On October 17, 2008, Giants Stadium filed proof of claim numbers 315 and 316 against LBSF and LBHI, respectively, in the amount of $301,828,087.35.[4]

24.    On September 22, 2009, Giants Stadium filed proof of claim numbers 33561 and 33562 against LBHI and LBSF, respectively, again in the amount of $301,828,087.35.[5]

25.    On October 22, 2009, Giants Stadium also submitted a Derivative Questionnaire and a Guarantee Questionnaire, in which Giants Stadium asserted claims against LBSF and LBHI, each in the amount of $301,804,617.14, reflecting the same principal amount set forth in the Calculation Statements and amending the interest amount owed under each Swap.

26.    On October 29, 2009, Giants Stadium filed the Proofs of Claim against LBSF and LBHI, each in the same amount of $301,804,617.14.  The Proofs of Claim superseded proof of claim numbers 33561 and 33562.

27.    On December 6, 2011 – more than three years after having served the Calculation Statements in which it claimed a total payment of approximately $301 million from LBSF, two years after the Bar Date, and on the eve of the parties' mediation – Giants Stadium filed two new proofs of claim:  proof of claim number 67782 against LBSF and proof of claim number 68103 against LBHI ("New Proofs of Claim").[6]  These New Proofs of Claim improperly inflated the amounts asserted in the Proofs of Claim with new hypothetical "credit" and "capital"

---

[4] Also on October 17, 2008, Giants Stadium filed proof of claim numbers 216 and 219 against LBHI and LBSF, respectively, in the same amount.  These proofs of claim were withdrawn.

[5] These proofs of claim superseded proof of claim numbers 315 and 316.

[6] The claims register indicates that Giants Stadium filed proof of claim number 68103 on May 14, 2012.  Giants Stadium alleges that it filed this proof of claim on December 6, 2011, but that, due to a clerical error, this proof of claim was not reflected on the claims register on that date.

8

charges in order to force Lehman to increase reserves and pressure Lehman to enter into an unfair settlement.  In each of these New Proofs of Claim, Giants Stadium purported to claim an amount – $585,210,327.94 – that is more than the face value of Bonds and nearly double the amount Giants Stadium claimed in the Proofs of Claim.  This Court has expressed some skepticism about the near-doubling of the claim amounts, asking: "[I]sn't the first question that somebody sitting down to the negotiating table would ask given this fact pattern, how on earth can you justify an increase from $301 million to $585 million, what's that about?  Isn't that the first question?  Perhaps not expressed in that way, but I think there would be an element of huge exasperation built in the question."  *See* Tr. of Hr'g, Nov. 14, 2012, at 27:7-13 [ECF No. 32541].[7]

28.    Lehman filed an objection to proof of claim numbers 67782, 68103, and 64071[8] on May 8, 2014.  By stipulation dated July 7, 2014, and so-ordered on July 8, 2014 [Dkt. No. 32], among other agreements between the parties, Giants Stadium agreed to withdraw the New Proofs of Claim, and the parties agreed to reinstate proof of claim number 64070 and update the official claims register to show the Proofs of Claim (claim nos. 64070 and 64071) as filed and pending.  This objection expressly supersedes the objection Lehman filed on May 8, 2014.

---

[7] The Court later denied a motion to prevent discovery into the New Proofs of Claim, stating: "I don't know that there is a classic definition of a harassing subpoena in the context of a valuation dispute in which a claim jumps from approximately 300 million to approximately 600 million.  And to the extent that your client has knowledge concerning that valuation shift I think you should be turning over whatever you have that's non-privileged with respect to that."  *See* Tr. of Hr'g, Oct. 23, 2013, at 11:20-12.2 [ECF No. 40996].

[8] Proof of claim number 64071 – the LBHI Proof of Claim – had never been properly stricken from the official claim register.

US_ACTIVE:\44517307\11\58399.0011

**OBJECTION**

**D.    Applicable Standard**

29.    A filed proof of claim is "deemed allowed, unless a party in interest . . . objects." 11 U.S.C. § 502(a).  If an objection refuting at least one of the claim's essential allegations is asserted, the claimant has the burden to demonstrate the validity of the claim.  *See In re Oneida Ltd.*, 400 B.R. 384, 389 (Bankr. S.D.N.Y. 2009); *In re Adelphia Commc'ns Corp.*, No. 02-41729(REG), 2007 WL 601452, at *5 (Bankr. S.D.N.Y. Feb. 20, 2007); *In re Rockefeller Ctr. Props.*, 272 B.R. 524, 539 (Bankr. S.D.N.Y. 2000).

30.    The Chapter 11 Estates do not owe any amounts to Giants Stadium.  As set forth in the Complaint and herein, the Agreements and the Guarantees do not entitle Giants Stadium to any of the amounts it claims for the following reasons:  (i) Giants Stadium owes money to LBSF under the Swaps, not vice versa; (ii) Giants Stadium materially breached the Agreements and, therefore, can enforce neither the Agreements against LBSF nor the Guarantees against LBHI; and (iii) Giants Stadium's calculation of Loss under the Swaps is not commercially reasonable.  Because this Objection denies that any amounts are due to Giants Stadium under the Proofs of Claim, Giants Stadium has the burden of demonstrating the validity of the Proofs of Claim.  Giants Stadium cannot meet its burden.

**E.    Giants Stadium Owes Money to LBSF Under the Swaps**

31.    Giants Stadium sought to terminate the Swaps on September 18, 2008.  As fully set forth in the Complaint, Giants Stadium thereafter improperly calculated the Settlement Amounts by, among other things:  (i) ignoring various critical bargained-for rights of LBSF created by the plain terms of the transaction documents, including, but not limited to, LBSF's rights to be informed of and consent to any amendment of the Indenture that materially and adversely affected LBSF and to select and solicit bids from financial institutions under the

10

"Market Quotation" measure upon any early termination of the Swaps; (ii) attempting to apply a prohibited *ipso facto* provision in the Agreements that purported to modify the methodology for calculating Settlement Amounts; (iii) ignoring then-current facts vital to valuing the Swaps, such as the impending termination and replacement of LBI as broker-dealer for the Bonds and the fact that LBSF was paying a LIBOR-based floating rate (not an interest rate generated by auctions on the Bonds) at the time of termination; and (iv) making erroneous, unreasonable, and inconsistent assumptions about future facts, such as assuming that short-term auction rates generated at the height of the financial crisis on the Goldman Bonds would be applicable to the Lehman bonds and continue for the 38 years remaining on the Swaps and that LBSF, or any counterparty standing in LBSF's shoes, would not at some point exercise its explicit and unambiguous right under the Swaps to cause a refinancing or conversion of the Bonds (even though Giants Stadium already had begun exactly such a refinancing process, contemporaneously expecting much lower new interest rates).  If Giants Stadium properly had calculated the Settlement Amounts, it would have determined that as of September 18, 2008, the Early Termination Date, Giants Stadium owed LBSF approximately $94 million, and no amount would be due to Giants Stadium under the Agreements.  Because the Chapter 11 Estates do not owe Giants Stadium any amount under the Agreements or the Guarantees, the Proofs of Claim do not constitute valid *prima facie* claims.

32.    Because a fair, accurate, and reasonable valuation of the Swaps demonstrates that the Chapter 11 Estates do not owe Giants Stadium money and that Giants Stadium, in fact, owes LBSF money, the Plan Administrator requests that the Court disallow and expunge in their entirety the Proofs of Claim.

11

**F.**    **Giants Stadium Materially Breached the Agreements**

33.    As an alternative basis for the relief requested, the Plan Administrator also requests that the Court disallow and expunge the Proofs of Claim in their entirety because, as discussed below, Giants Stadium materially breached the Agreements by (i) denying LBSF its critical rights under the Agreements to choose Reference Market-makers and conduct the Market Quotation process and (ii) improperly terminating the Swaps in violation of the Minimum Hedging Requirement, as set forth in the Indenture and expressly incorporated into the Swaps as a condition precedent to termination.

34.    Under principles of law and equity, Giants Stadium cannot seek to enforce a contract that it materially breached in order to collect amounts asserted in the Proofs of Claim. *See* 55 N.Y. Jur. 2d Equity § 107 ("A party to a contract who fails to perform a material obligation of the contract . . . may not seek the aid of a court of equity in the protection of alleged rights arising out of or connected with the contract.  Equity will not find grounds for granting relief to a party previously in default  nor will equity open its doors to one who seeks to enforce alleged rights arising from a contract which the petitioner has breached or violated."); *Guardian Music Corp. v. James W. Guercio Enters., Inc.*, 459 F. Supp. 2d 216, 223 (S.D.N.Y. 2006), *aff'd*, 271 F. App'x 119 (2d Cir. 2008) ("It is black-letter law that '[a] party to a contract who is already personally in default cannot, as a general principle . . . maintain a suit for its breach, even if the other party subsequently breaches the contract as well [because] a contracting party cannot benefit from its own breach.'  This rule is valid whether one seeks recovery at law or in equity.") (quoting 23 Samuel Williston & Richard A. Lord, A Treatise on the Law of Contracts § 63:8 (4th ed. 2002)).

12

1.    **Giants Stadium Denied LBSF the Right to Choose
Reference Market-makers and Conduct the Market Quotation Process**

35.    Giants Stadium and LBSF agreed to a modified process for calculating

Settlement Amounts under the Swaps.  In virtually all situations other than a Lehman bankruptcy

filing, the Swaps were to be valued upon termination as if the Swaps' floating rate payments

were set at LIBOR+0.38%, rather than at the Actual Bond Rate.  LBSF specifically negotiated

for this formulation because the Swaps were extremely atypical instruments whose valuation

would otherwise rely on subjective determinations that could be abused to LBSF's detriment.  At

the time the Swaps were entered into, LIBOR+0.38% was considered a reasonable proxy for the

Actual Bond Rate, one that would permit a less controversial, and more fair valuation.  Pursuant

to any valuation using LIBOR+0.38% to calculate the floating rate payments, LBSF

unquestionably is the in-the-money party.  The Swaps, however, provide that if the Event of

Default that triggers termination is a Lehman bankruptcy filing, then a modified Market

Quotation measure applies.  Putting aside for the moment that this change in LBSF's rights is a

classic *ipso facto* clause, which is invalid, and assuming, *arguendo*, that the modified Market

Quotation measure applied here, Giants Stadium breached the Agreements by strategically

shutting LBSF out of the Market Quotation process.  The parties agreed that rather than follow

the Market Quotation process as set forth in the standard 1992 form ISDA Master Agreement,[9]

LBSF – even if it were the Defaulting Party – would have the right to select two of the four

Reference Market-makers and to solicit quotations from all Reference Market-makers.  This

highly unusual and specifically negotiated provision was of material benefit to LBSF because,

---

[9] Market Quotation is one of the two measures to calculate the Settlement Amount due to the "in-the-money" party upon the early termination of a swap transaction provided for in the standard 1992 form ISDA Master Agreement. As defined therein, Market Quotation typically requires that, upon early termination of a swap, the Non-defaulting Party select four leading dealers, or "Reference Market-makers," and solicit quotations from them for the amount that they would pay or accept as payment to step into the shoes of the Defaulting Party.

13

among other things, as the party soliciting quotations from the Reference Market-makers, LBSF

would have the right to explain the material economic terms of the Swaps, including the unusual

and valuable protections the Swaps would provide to a party assuming LBSF's position.  LBSF

understood that absent clear direction, the valuation of the bespoke Swaps would be open to

manipulation and abuse – both of which are unfortunately evident in the current claims.

36.    After terminating the Swaps, Giants Stadium did not allow LBSF to select

two Reference Market-makers, nor did it allow LBSF to solicit quotations from any Reference

Market-maker.  Instead, disregarding clear and unambiguous language in the Confirmations

giving LBSF the exclusive right to perform those tasks, Giants Stadium undertook those tasks on

its own.  In violation of the Agreements, Giants Stadium selected all of the Reference Market-

makers and sought quotations from them without obtaining a contractually required written

waiver from LBSF of its rights with respect to the Market Quotation process.  Giants Stadium

then improperly determined that the Market Quotation process had failed and utilized a "Loss"

methodology for valuing the Swaps.  Thus, Giants Stadium materially breached the Agreements;

it cannot now enforce the Agreements against LBSF and LBHI.

### 2.    Giants Stadium Breached the Agreements by Terminating the Swaps in Violation of the Indenture's Minimum Hedging Requirement

37.    Giants Stadium also breached the Agreements by terminating the Swaps in

violation of the Minimum Hedging Requirement set forth in the Indenture (which requirement

expressly was incorporated into the Swaps as a condition precedent to termination).  Giants

Stadium's termination of the Swaps violated the Minimum Hedging Requirement because after

taking the termination of the Swaps into account, it left more than 33% of the ARS without

hedges.

14

38.     Part 1(*l*)(i) of the Schedules states that Giants Stadium cannot declare an
Early Termination Date if doing so would violate the Minimum Hedging Requirement set forth
in Section 609(nn) of the Indenture.  Given this restriction, Giants Stadium needed to amend the
provision in the Indenture (or execute replacement hedges) before terminating.  Sections
1101(a)(viii) and 1102(a)(7) of the Indenture provide that any amendment to the Indenture that
materially prejudices a Qualified Swap Provider (*i.e.*, LBSF) or materially affects the rights or
obligations of a Qualified Swap Provider is not permitted unless the Qualified Swap Provider
consents.  Any removal of the Minimum Hedging Requirement absent LBSF's consent
materially and adversely affected LBSF because LBSF obtained the right, as an express term of
the Agreements, that the Swaps not be terminated if doing so would violate the Minimum
Hedging Requirement.  This contractual right would be illusory if Giants Stadium unilaterally
could change the Minimum Hedging Requirement without LBSF's consent.  Thus, Giants
Stadium breached the Agreements and the Indenture by purporting to amend the Minimum
Hedging Requirement without LBSF's consent.

39.     Nonetheless, without LBSF's knowledge or consent, Giants Stadium
executed a Third Supplemental Indenture, dated as of September 18, 2008 (the "Third
Supplemental Indenture"), by which it purported to amend the Minimum Hedging Requirement
so that Giants Stadium would be able to terminate the Swaps without violating the Indenture.
Giants Stadium's failure to obtain LBSF's consent to amend the Indenture rendered the Third
Supplemental Indenture invalid.  Consequently, Giants Stadium's termination of the Swaps
breached Part 1(l)(i) of the Schedules, and Giants Stadium cannot enforce the Agreements
against LBSF or the Guarantees against LBHI.

15

**G.     Giants Stadium's Loss Calculation Is Not Commercially Reasonable**

40.     As set forth in the Complaint, Giants Stadium's calculation of the Settlement Amounts using the Loss methodology is not commercially reasonable because it failed to properly calculate the Settlement Amounts as a receivable to LBSF.  Giants Stadium's calculation of the Settlement Amounts is also not commercially reasonable because it (i) failed to account for certain contractual features serving to maximize LBSF's value under the Swaps (and cap its liability), including LBSF's right to cause Giants Stadium to refinance or convert the Bonds, (ii) ignored significant contemporaneously-available information, and (iii) valued the Swaps employing improper assumptions.  Such calculation of Loss does not comport with the Agreements' definition of "Loss" as the "amount [the Non-defaulting Party] reasonably determines in good faith to be its total losses and costs (or gain . . .)" incurred in connection with the terminated transactions.  Master Agreement § 14 (definition of "Loss").

**1.     Giants Stadium's Loss Calculation Ignores Numerous Contract
Rights and Significant Contemporaneously Available Information**

**a)     Giants Stadium's Loss Calculation Fails to
Account for Both LBSF's Right to Cause a
Refinancing or Conversion of the Bonds and the Fact
That Giants Stadium Already Had Initiated a Refinancing**

41.     A commercially reasonable calculation of Loss must take into account all of the provisions of the Swaps, including LBSF's right, pursuant to paragraph 4 of the Confirmations, to cause Giants Stadium to refinance or convert the Bonds, provided that LBSF paid the costs and expenses associated therewith.[10]  LBSF's right to request that Giants Stadium

---

[10] Paragraph 4 of the Confirmations provides:  "[LBSF] may, at any time, request that [Giants Stadium] . . . (b) refinance, remarket or replace the [Bonds] with another series of securities of identical maturity, with all costs and expenses of any conversion, refinancing, remarketing or replacement being for the account of [LBSF].  [Giants Stadium] shall consider any request in good faith and not withhold its consent unreasonably, it being understood that it will be deemed reasonable, without limitation, for [Giants Stadium] to withhold its consent if it concludes that such conversion, refinancing, remarketing or replacement will (i) result in any additional cost, risk or loss of financial or business flexibility or (ii) require the preparation of disclosure materials during a period of time when

16

refinance or convert the Bonds – a request that could not be unreasonably denied – was crucial to LBSF's ability to maximize its value under the Swaps.

42.     Under paragraph 4 of the Confirmations, LBSF (or any party stepping into its shoes) could have requested that Giants Stadium refinance the Bonds with, or convert the Bonds into, a bond paying the same fixed interest rate that Giants Stadium was paying under the Swaps with LBSF (or such party) paying "all costs and expenses" of the refinancing or conversion.  Under such circumstances, Giants Stadium would have suffered *no* loss, and any loss that LBSF (or such party), which would then have resold the refinanced or converted instruments into the market, would have suffered would have been limited to the difference between the cost of acquiring all of the Bonds and the market value of the much more saleable refinanced or converted bonds.  Because of the ability of LBSF (or any party stepping into its shoes) to cause a refinancing or conversion, a commercially reasonable valuation of the Swaps cannot be divorced from the cost of simply refinancing or converting the Bonds.  Given that the cost of a refinancing or conversion of the Bonds as set forth above would be a small fraction of Giants Stadium's claim amounts, the claim amounts are commercially unreasonable and untenable.

43.     Moreover, the terms of the First Supplemental Indenture dated as of August 1, 2007 (the "First Supplemental Indenture") specifically contemplate a refinancing or conversion – Section 2.11 of the First Supplemental Indenture permits Giants Stadium to convert the interest rate of the Bonds from an auction rate to a fixed or floating rate without amending the Indenture.   This type of built-in flexibility, which is not typical in bond indentures, shows that before the first auction for the Bonds even was conducted, the parties had built in a simple,

---

[Giants Stadium] concludes in its sole discretion that the preparation of disclosure materials is inappropriate or inconvenient (which the issuer may determine for a period of no more than 180 days in any 360 day period)."

17

low-cost mechanism to remove the Bonds from the auction market if that market proved to be an inefficient financing source. Giants Stadium's assumptions in its calculation of Settlement Amounts that the temporarily inflated, short-term interest rates of 9.90-10.65% per annum would apply for the next 38 years, and that, even if such high rates were in place, LBSF would never require Giants Stadium to refinance or convert the Bonds, are neither realistic nor reasonable.

44.    In fact, Giants Stadium had no expectation that it would be paying high short-term rates for an extended period of time. This is because a refinancing was not merely a theoretical possibility; rather, it already was anticipated. At around the same time that it was calculating its Loss under the Swaps, Giants Stadium, together with Goldman Sachs, already had mapped out an actionable plan to refinance the Bonds to be effective mere months after the date of the Calculation Statements. The cost of that refinancing, as determined contemporaneously, would have been a small fraction of Giants Stadium's claim amounts.

45.    There are many factors that would have caused the cost of a refinancing or conversion of the Bonds to a fixed-rate instrument to be very low. Despite being a special purpose vehicle, Giants Stadium had substantial assets and was a creditworthy borrower. The resultant credit profile of the Bonds dramatically would have reduced the interest rate associated with any refinancing or conversion. On September 17, 2008 – one day before termination of the Swaps and two days after LBHI commenced its chapter 11 case – Moody's published an investment grade rating for the Bonds, based on the underlying creditworthiness of Giants Stadium, without giving any effect to the credit enhancement provided by the Bond Insurers. This rating reflects the market perception (and reality) that a purchaser of the Bonds was investing in an entity with long-term creditworthiness. In fact, contemporaneous reports provided to the indenture trustee of the Bonds, the National Football League (the "NFL"),

18

Goldman Sachs, and bond insurer FSA show that construction of the Stadium was ahead of schedule and that Giants Stadium financially was in excellent standing.

46.    One key reason Giants Stadium was viewed as a creditworthy entity is that it had promises from the New York Giants football team and the NFL that made it virtually certain that the Stadium would be completed and would be used by the team.  First, the New York Giants signed a Non-relocation Agreement with the indenture trustee of the Bonds, which prohibited the New York Giants from playing home football games anywhere other than at the Stadium.  This agreement distinguishes the Bonds from other construction debt financing, where the project can be abandoned in times of economic distress.  Giants Stadium was ensured a steady stream of income from the Stadium lease with the New York Giants, as long as the New York Giants were not in bankruptcy.  Second, along with the issuance of the Bonds, Giants Stadium entered into a credit agreement with the NFL (the "Credit Agreement") pursuant to which Giants Stadium was provided with a $150 million line of credit.

47.    Third, the NFL, through a side letter agreement (the "NFL Side Letter Agreement") with Giants Stadium, had the contractual ability to cure any default by Giants Stadium with respect to the Bonds, as well as any default of the New York Giants' bank debt.  In the event of a default of either the bank debt or the Bonds, the NFL had various rights to remedy adverse credit events, among them the right to foreclose on both debts and effectively "rebundle" the team and Giants Stadium.  The NFL routinely negotiates for and obtains these types of provisions, among other things, to prevent a default that would divide ownership of a team from its stadium.  Given the high value of the New York Giants franchise, if Giants Stadium defaulted, the NFL likely would have exercised its rights and taken the necessary steps to complete the Stadium, as it previously had done when faced with potential debt defaults of other

19

NFL franchises.  According to Forbes, the New York Giants franchise was worth $1.178 billion in 2008 and $1.183 billion in 2009  – both of which amounts exceeded the aggregate amount of the debt of Giants Stadium and the franchise (without even giving effect to the substantial increase in value of an NFL franchise once it has opened a new stadium).  Thus, even if Giants Stadium defaulted, the Bonds' holders would suffer no loss whatsoever.

48.    The credit quality underlying the Bonds and the various agreements entered into by the New York Giants and the NFL, including the Non-relocation Agreement, the Credit Agreement, and the NFL Side Letter Agreement, taken together, made the possibility of a default highly improbable, and also created a strong credit profile that would have made the Bonds attractive to refinance or convert (thus reducing any cost of refinancing or conversion under paragraph 4 of the Confirmations).

49.    The substantial value of the Bonds, supported by Giants Stadium's rights in the Non-relocation Agreement and the Credit Agreement, was borne out in reality after the early termination of the Swaps.  Although Barclays Capital Inc. ("Barclays") purchased the Bonds for pennies on the dollar as part of the sale of LBI's assets in the week of LBHI's chapter 11 filing, Barclays marked them up to near par within 60 days.  In early 2009, Goldman Sachs provided a bridge loan for the Bonds at an 8% interest rate, and in 2010, Giants Stadium refinanced the Bonds and the Goldman Bonds with new long-term bonds at a 7.10% fixed interest rate and term loans at LIBOR+2.25% (*i.e.*, far less than the rates of 9.90-10.65% assumed in the Calculation Statements).  The cost of this refinancing was a small fraction of Giants Stadium's claim amounts.

50.    In short, Giants Stadium's asserted Loss completely ignores contract rights to refinance and contemporaneously available information and is even more egregious when

20

viewed in the context of the far smaller costs that Giants Stadium incurred in the refinancing

beginning the following year.

### b) Giants Stadium's Loss Calculation Fails to Reflect Its Own Contemporaneous Assessments of Loss

51.     Communications at the time of Giants Stadium's termination of the Swaps

reveal the extent of Giants Stadium's post-hoc inflation of its claims.  In an effort to obtain

consent to amend the Indenture and terminate the Swaps, Giants Stadium provided the NFL and

the Bond Insurers with its expected claim amounts.  These communications recognize that the

amounts owed on the Swaps could be a receivable to LBSF and also expose the

unreasonableness of Giants Stadium's later calculations of Loss.  Giants Stadium ultimately

submitted claims that were wildly inconsistent with what it told the NFL and the Bond Insurers.

### c) Giants Stadium's Loss Calculation Fails to Account for Other Structural Limitations on LBSF's Liability Under the Swaps

52.     Any commercially reasonable Loss calculation must take into account

LBSF's option to purchase the Bonds, a vital structural limitation of LBSF's potential

liability.  Under the Agreements, any commercially reasonable valuation is unquestionably

capped at the amount that it would cost a counterparty to purchase the Bonds, less any residual

value of the Bonds.  Because of the auction feature of the Bonds, they could easily be acquired

for par through the auction process.  And due to dysfunction in the auction rate securities market,

the Bonds almost certainly could have been purchased at a price much lower than par.  Based on

those Bond prices and Giants Stadium's contemporaneous expectation of refinancing rates, the

Swaps would have been very valuable to any party considering stepping into LBSF's shoes, a

benefit that would have accrued to Giants Stadium.

### 2. Giants Stadium's Loss Calculation Utilizes Commercially Unreasonable Methodologies

US_ACTIVE:\44517307\11\58399.0011

53.    Giants Stadium's Loss calculation also is commercially unreasonable because it improperly (i) used short-term auction rates from the Goldman Bonds to project the interest rate that Giants Stadium would pay for the next 38 years and (ii) relied on faulty assumptions regarding how long payments on the Swaps would continue.  Correcting either of these flawed assumptions would have led to at best for Giants Stadium a Loss calculation that is a small fraction of the amount of Giants Stadium's claim.

   a)    **Giants Stadium's Use of Short-Term**
          **Excessively High Auction Rates as a Proxy**
          **<u>for Long-Term Financing Costs Is Commercially Unreasonable</u>**

54.    As set forth in the Complaint, Giants Stadium sought to project the interest rate it would pay over the remaining stated life of the Swaps (*i.e.*, the next 38 years) by using as a proxy the short-term interest rate that had been set in the most recent auction for the Goldman Bonds.  This is not a reasonable assumption.

55.    The use of short-term interest rates as a proxy for long-term interest rates is flawed on many levels.  First, as a general matter in financial markets, long-term rates are always distinct from short-term rates, as the former incorporate numerous pricing factors that the latter do not.  Second, the failure of the auction rate securities market caused the Goldman Bonds to be auctioned at artificially high rates that were completely divorced from Giants Stadium's long-term credit quality and its access to the fixed-rate debt market (a market that did not share the dysfunction of the auction rate securities market).  Third, the assumption is inconsistent with contemporaneous information, *i.e.*, the advice Goldman Sachs was providing to Giants Stadium that the long-term rate for Giants Stadium debt would be much lower than the prevailing auction rates, and that its financing costs would revert to historically normal levels within mere months.

22

56.     Giants Stadium already had been provided with Goldman Sachs' view of Giants Stadium's long-term borrowing rate but inappropriately ignored such rate, choosing instead to use a short-term rate designed to improperly inflate the amount of its claims.

**b)     Giants Stadium's Loss Calculation Incorrectly Assumes
Payments under the Swaps Would Continue Unabated for 38 Years**

57.     Giants Stadium's Loss calculation is also flawed because it assumes payments on the Swaps would continue unabated for the next 38 years.  This assumption is entirely inconsistent with – and belied by – the high short-term interest rate used by Giants Stadium to calculate Loss.

58.     Giants Stadium's assumption that it would continue to pay Bond interest rates of 9.90-10.65% is itself inconsistent with that 38-year time frame because such a high rate implies substantial credit risk, *i.e.*, a high probability that Giants Stadium would default long before the 2047 maturity.  Upon any such default and acceleration, LBSF (or a replacement counterparty) would have the right to terminate the Swaps using a valuation methodology favorable to it, and its obligation to make further payments under the Swaps would cease forever, sharply reducing the calculated Loss.  Giants Stadium's valuation never comes to grips with the inherent inconsistency between the high interest rate used in its calculation and the assumption that cash flows based on this high interest rate would continue without fail for the next 38 years.

59.     The assumption that payments on the Swaps would continue for 38 years is also inconsistent with Giants Stadium's own expectations at the time that it sent the notice of early termination that it would make prepayments on the Bonds.  Such prepayments would have materially reduced LBSF's obligations (or those of a replacement counterparty) under the Swaps.

**c)     Giants Stadium's Loss Calculation Was Flawed in Other Respects**

23

60.     Giants Stadium's Loss calculation also incorrectly uses the LIBOR curve as its discount rate for the projected cash flows on the Swaps.  The LIBOR curve assumes essentially no risk of an early termination of those payments.  This discount rate is inconsistent with the nature of the projected cash flows, which are driven by a higher interest rate. That higher rate in the Loss calculation is indicative of a higher probability that the dealer's large swap payments will cease early.

61.     In addition, Giants Stadium itself admitted that there were mathematical errors in the Loss calculation underlying its claim amounts.  Specifically, in the supplemental statements submitted with its New Proofs of Claim, Giants Stadium stated that it had "identified . . . mathematical error[s] in its original submission[s] . . . . relate[d] to the inclusion of principal payments in the floating rate payments to be made [two to four decades into the future]."  *See* Claim Nos. 67782 and 68103 at "Revisions to Base Calculation."  Giants Stadium conceded that the correction of such mathematical errors would result in the "reduc[tion of] the Termination Amount in the Base Calculation by $2,405,397.03" in the FGIC-Insured Transaction and $9,688,980.46 in the FSA-Insured Transaction.  *Id.*  These concessions represent a total reduction of $12,094,377.49 to Giants Loss calculation.

62.     In short, Giants Stadium's Loss calculation, by ignoring myriad contractual rights, known facts, and proper valuation methodologies, cannot meet any standard of commercial reasonableness.

**d)     Giants Stadium's Reliance on Judge Peck's Barclays' Decision is Misplaced**

63.     At the July 16, 2014 Conference, Giants Stadium asserted that Judge Peck somehow had ruled on the value of the Bonds as part of the approval of the Barclays' sale.  *See* Tr. of Hr'g, July 16, 2014, at 141:10-13 [ECF No. 45622].  Any such argument is disingenuous

24

and wrong.  The Bonds were a small part of the "most expedited and probably the most dramatic

asset sale that has ever occurred in bankruptcy history—the sale to Barclays by [Lehman] of

assets collectively comprising the bulk of Lehman's North American investment banking and

capital markets business." *In re Lehman Bros. Holdings Inc.*, 445 B.R. 143, 148-49 (Bankr.

S.D.N.Y. 2011).  While Judge Peck ruled that the value of the assets as a whole was consistent

with Barclays' position that mark-downs taken on the basket of assets it purchased were

reasonable under the circumstances, Judge Peck expressly stated that he was not making any

finding on the value of specific assets: "[T]he Court made no findings of specific valuations, and

could not have made any such findings given the character and description of the assets and the

emergency nature of the hearing."  *Id.* at 179.  Thus, Judge Peck did not and could not have

made any findings with respect to the specific valuation of the Bonds.  Indeed, Judge Peck ruled

that the Bonds were part of a pool of assets that Barclays "discount[ed] the value of . . . before

the Sale Hearing for purposes of lowering the values assigned to various classes of assets and

increasing the so-called 'haircut' applicable to these assets," "but [that] the Court does not find

that Barclays received assets that collectively were worth any more in the market than it paid for

them."  *Id.* at 159.

        64.    Moreover, Giants Stadium's reliance on Barclays' valuation of the Bonds

in the Barclays sale (reflecting a discount to face value) ignores that Barclays wrote the value of

the Bonds up by a factor of six within weeks of their purchase.

**H.**      **Giants Stadium's Proofs of Claim Should Be Equitably Subordinated**

        65.    Giants Stadium's bad faith and inequitable conduct in filing the New

Proofs of Claim, coupled with the resulting harm to holders of allowed claims of LBSF and

US_ACTIVE:\44517307\11\58399.0011

LBHI, warrants the equitable subordination of the Proofs of Claim.[11]  Giants Stadium filed the

untimely and improper New Proofs of Claim as a tactical maneuver to maximize Giants

Stadium's leverage in, and influence over, settlement negotiations by forcing the Chapter 11

Estates to reserve significantly higher amounts of cash.  Giants Stadium filed the New Proofs of

Claim on the date of the Plan confirmation hearing and at the same time that the parties were

mediating their disputes.  The New Proofs of Claim sought nearly double the amounts Giants

Stadium originally sought under the Swaps when it first filed the Proofs of Claim more than two

years earlier (and served the Calculation Statements more than three years earlier).  Moreover,

Giants Stadium's asserted Loss in the New Proofs of Claim ($585 million) vastly exceeded the

face value of the Bonds ($408 million), a result which cannot be justified on *any* good-faith basis

whatsoever.  Had Giants Stadium received a $585 million termination payment, it could have

redeemed the $408 million of Bonds at par and pocketed $177 million of cash – thereby

converting a large liability into a large asset.  As facially ridiculous as that is, this is the outcome

that for over two-and-a-half years Giants Stadium insisted was somehow reasonable.  As

discussed below, Giants Stadium's abuse of the claims filing process to seek negotiating leverage

damaged holders of allowed claims of LBHI and LBSF.

66.    Giants Stadium's filing of the New Proofs of Claims satisfies the three

prongs required for equitable subordination of the Proofs of Claim: (i) Giants Stadium engaged

in inequitable conduct; (ii) Giants Stadium's misconduct conferred an unfair advantage upon it

and resulted in injury to the Chapter 11 Estates' creditors; and (iii) the equitable subordination of

the Proofs of Claim is consistent with the provisions of the Bankruptcy Code.  *See LightSquared*

---

[11] The Plan Administrator need not commence an adversary proceeding with respect to equitable subordination of
the Proofs of Claim because the Proofs of Claim are not yet "allowed."  *See* Fed. R. Bankr. P. 7001(8) ("The
following are adversary proceedings… (8) a proceeding to subordinate any *allowed* claim or interest . . .") (emphasis
added).

*LP v. SP Special Opportunities LLC (In re LightSquared Inc.)*, 511 B.R. 253, 347 (Bankr.

S.D.N.Y. 2014) (citing *Benjamin v. Diamond (In re Mobile Steel Corp.)*, 563 F.2d 692, 700 (5th

Cir. 1977)).  Inequitable conduct that justifies equitable subordination includes a claimant's

breach of an "existing, legally recognized duty arising under contract, tort or other area of law,"

and courts will look to the circumstances surrounding the claim to ensure that "injustice or

unfairness is not done in administration of the bankrupt estate."  *Id.* at 348; *In re Enron Corp.*,

333 B.R. 205, 220 (Bankr. S.D.N.Y. 2005).  This Court has held that a claimant's failure to act in

a manner consistent with the "basic concepts of good faith that are fairly to be expected of

chapter 11 creditors" is the type of inequitable conduct that gives rise to equitable subordination

and that inequitable interference with "the chapter 11 process itself . . . provides an appropriate

predicate for equitable subordination."  *LightSquared*, 333 B.R. at 349, 360.

   67. The nature and timing of Giants Stadium's filing of the New Proofs of

Claim reveal its improper purpose:  to force the Chapter 11 Estates to reserve higher amounts of

cash and other assets on account of the higher claim amounts and thereby increase the pressure

on the Chapter 11 Estates to agree to an unfair settlement at the expense of holders of allowed

claims of LBHI and LBSF.  Pursuant to section 8.4 of the Plan,[12] LBSF and LBHI were each

required to establish reserves for the New Proofs of Claim based on the new claim amounts of

approximately $585 million, instead of the original claim amounts of approximately $301

---

[12] Section 8.4 of the Plan ("Disputed Claims Holdback") provides, in pertinent part:  "From and after the Effective Date, and until such time as all Disputed Claims have been compromised and settled or determined by Final Order, the Plan Administrator shall, consistent with and subject to section 1123(a)(4) of the Bankruptcy Code, retain from Available Cash an aggregate amount equal to the Pro Rata Share of the Distributions that would have been made to each holder of a Disputed Claim if such Disputed Claim were an Allowed Claim against such Debtor in an amount equal to . . . the filed amount of such Disputed Claim . . . ."  Pursuant to the Order Authorizing Use of Non-Cash Assets In Lieu of Available Cash as Reserves for Disputed Claims Pursuant to Section 8.4 of the Debtors' Confirmed Joint Plan [ECF No. 25641] (the "Non-Cash Asset Reserve Order"), the Plan Administrator is authorized to substitute non-cash assets for a portion of Available Cash for the reserves required on account of certain Disputed Claims.  Notably, the Chapter 11 Estates did not file the motion seeking the Non-Cash Asset Reserve Order until after Giants Stadium filed the New Proofs of Claim; when Giants Stadium filed the New Proofs of Claim, the Chapter 11 Estates were required to reserve cash exclusively on account of the inflated New Proofs of Claim.

27

million.  Thus, until Giants Stadium withdrew the New Proofs of Claim on July 8, 2014, LBSF

and LBHI were prevented from distributing, in cash, approximately $94 million (or

approximately $80 million from the LBSF estate and approximately $14 million from the LBHI

estate) to holders of allowed claims.[13]  Giants Stadium's blatant attempt to misuse provisions of

the Plan for its own pecuniary gain is precisely the sort of inequitable conduct that the doctrine

of equitable subordination is intended to remedy.

68.    Giants Stadium's bad faith and inequitable conduct harmed holders of

allowed claims of LBSF and LBHI.  Holders of allowed claims were denied access to the

approximately $94 million in reserves that would have been distributed *in cash* to them – and

thus been available for reinvestment – had Giants Stadium not wrongfully filed the New Proofs

of Claim.[14]  In addition, the respective recoveries of holders of allowed claims were further

diluted by the additional professional fees and expenses incurred by the Chapter 11 Estates in

responding to the filing of the New Proofs of Claim.

69.    Finally, the equitable subordination of the Proofs of Claim would neither

violate any provision of the Bankruptcy Code nor operate as an impermissible penalty, satisfying

the final prong of the equitable subordination analysis.  Rather, the equitable subordination of

---

[13] The amounts in the body of the text are calculated by multiplying $284 million (the excess of the $585 million asserted in the New Proofs of Claim over the $301 million asserted originally) by the respective LBSF Class 4A and LBHI Class 9A *pro rata* distribution percentages and then multiplying the resulting products by the percentage of reserves required to be held in cash per the Order authorizing use of non-cash assets in lieu of available cash as reserves for disputed claims [ECF No. 25641].  *See* Notice Regarding Fifth Distribution Pursuant to the Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors [ECF No. 43745].

[14] Quantifying the damage that Giants Stadium inflicted on Lehman's creditors requires a determination of what reinvestment rate those creditors would have enjoyed if the distributions had in fact been made to them.  Baupost Group Securities, L.L.C. ("Baupost"), which, like a large portion of Lehman's creditors, is a hedge fund and which purchased Giants Stadium's rights under the Proofs of Claim filed a pleading in this Court on August 15, 2014 in another dispute with Lehman that claims that Baupost's cost of funds is 14% compounded daily.  *See Bania Brothers, L.L.C. et al. v Lehman Brothers OTC Derivatives Inc. et at.*, 14-02095-SCC [ECF No. 1].  Accordingly, Baupost itself apparently would claim that the reinvestment rate applicable to Lehman's creditors would be 14%.

Giants Stadium's Proofs of Claim would merely remedy the harm caused by Giants Stadium's own misconduct.

70.     Accordingly, Giants Stadium's Proofs of Claim should be equitably subordinated to the full extent of the harm caused to holders of allowed claims of LBHI and LBSF, including the loss of their ability to reinvest unnecessarily reserved cash distributions and the additional fees and expenses incurred by the Chapter 11 Estates in responding to Giants Stadium's bad faith filing of the New Proofs of Claim.

## RESERVATION OF RIGHTS

71.     The Plan Administrator reserves all rights to object to the Proofs of Claim on any other basis to the extent that the relief requested herein is not granted.  The Plan Administrator reserves the right to conduct discovery regarding the Proofs of Claim and to supplement this filing as a result thereof.

## NOTICE

72.     No trustee has been appointed in these chapter 11 cases.  Notice of this Objection has been provided to (i) the United States Trustee for Region 2, (ii) the Securities and Exchange Commission, (iii) the Internal Revenue Service, (iv) the United States Attorney for the Southern District of New York, (v) Giants Stadium, and (vi) all other parties entitled to notice in accordance with the procedures set forth in the second amended order entered on June 17, 2010, governing case management and administrative procedures for these cases [ECF No. 9635].  The Plan Administrator submits that no other or further notice need be provided.

73.     No previous request for the relief sought herein has been made by the Plan Administrator or the Chapter 11 Estates to this or any other Court.  As explained in paragraph 28, Lehman's Objection to Proof of Claim Numbers 67782, 68103 and 64071, filed on May 8, 2014 is expressly superseded by this filing.

29

WHEREFORE the Plan Administrator respectfully requests entry of an order granting the

relief requested herein and such other and further relief as is just.

Dated:    August 22, 2014
         New York, New York

                        /s/ Richard W. Slack
                        Richard W. Slack
                        Robert J. Lemons

                        WEIL, GOTSHAL & MANGES LLP
                        767 Fifth Avenue
                        New York, New York 10153
                        Telephone: (212) 310-8000
                        Facsimile: (212) 310-8007

                        Attorneys for Lehman Brothers Holdings Inc.
                        and Certain of Its Affiliates

US_ACTIVE:\44517307\11\58399.0011