**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | **Case No. 1:08-bk-13555 (SCC)** |
| **Lehman Brothers Holdings, Inc., et al.,** | **Chapter 11** |
| **Debtors** | **Jointly Administered** |

**Declaration of James H. Aronoff**

**August 21, 2014**

**ATTORNEY WORK PRODUCT – PRIVILEGED AND CONFIDENTIAL**

## <u>Table of Contents</u>

I.    Scope of Work and Structure of Declaration ..................................................................... 3

II.   Summary Findings and Opinions ..................................................................................... 5

III.  Experience and Qualifications ......................................................................................... 6

    A.   Overview of Qualifications ........................................................................................ 6

    B.   Residential Mortgage-Backed Securities Experience ............................................... 7

    C.   Consulting and Litigation Experience ........................................................................ 9

    D.   Supporting Documentation and Other Matters .......................................................... 9

IV.   Summary of Loan File Review and Findings ................................................................. 10

    A.   Role of Digital Risk ................................................................................................. 10

    B.   Description of Sampling Methodology ..................................................................... 10

    C.   Discussion of Breach Findings ................................................................................ 11

    D.   Borrower Credit Breach Findings ............................................................................ 14

    E.   Borrower Capacity Breach Findings ........................................................................ 14

    F.   Collateral Breach Findings ....................................................................................... 15

    G.   Compliance Breach Findings ................................................................................... 16

V.    The Breach Findings Adversely and Materially Affect the Value of the Covered Loans ................. 17

VI.   Calculation of the RMBS Claim Amount ...................................................................... 19

**ATTORNEY WORK PRODUCT – PRIVILEGED AND CONFIDENTIAL**

## <u>List of Attachments</u>

Exhibit A ..................................................................................................... List of Covered Trusts

Exhibit B ............................................................................................Resume of James H. Aronoff

Exhibit C .................................................................................................... Materials Considered

Exhibit D ....................... Frequency of Breach Findings within Each Category of Breach Finding

Exhibit E  ................................................................. Description of Breach Findings Categories

ATTORNEY WORK PRODUCT – PRIVILEGED AND CONFIDENTIAL

## I. Scope of Work and Structure of Declaration

1.  I am a Managing Director at Duff & Phelps, LLC ("Duff & Phelps") and work as a consultant advising clients on issues relating to asset origination, mortgage banking and due diligence, with a particular emphasis on matters relating to the capital markets and residential mortgage-backed securities ("RMBS"). I have more than 30 years of RMBS industry experience, including positions as Chairman and CEO of a residential mortgage company that originated loans and issued RMBS, as Head of the Fixed Income Structured Finance Group at Nomura Securities International, a broker-dealer and RMBS underwriter, and as a structured finance attorney.

2.  Duff & Phelps has been retained by Alston & Bird LLP, Seward & Kissel LLP, Chapman and Cutler LLP, and Nixon Peabody LLP ("Law Firms"), counsel to Wilmington Trust, National Association, Wilmington Trust Company, Law Debenture Trust Company of New York, U.S. Bank National Association, and Deutsche Bank National Trust Company ("Trustee Group" or "Trustees") to provide analysis with respect to claims made by the Trustees against Lehman Brothers Holdings, Inc. and certain of its affiliates (collectively, "Lehman") and to provide an estimate of the repurchase price liability of Lehman in connection with breaches of certain representations and warranties (the "RMBS Claim").

3.  The engagement involves the allegation that there are breaches of representations and warranties regarding the mortgage loans directly originated by the Lehman or its affiliates included in mortgage loan pools (the "Covered Loans")[1] that were included in 255 RMBS that closed on or after September 15, 2002 (collectively, the "Covered Trusts"). The Covered Trusts are listed in Exhibit A hereto. In connection with this allegation, a forensic re-underwriting of 4,579 loan files was performed on a sample of the Covered Loans to determine whether, and to what extent, breaches of the related representations and warranties existed.

---

[1] Covered Loans from Lehman and Lehman affiliates include loans originated by Aurora Bank, FSB, Aurora Loan Services, Inc., Aurora Loan Services, LLC, BNC Mortgage, LLC, Finance America and Mortgage Lenders Network USA, Inc. for certain trusts where Lehman and Lehman affiliates assumed the liability.

3

**ATTORNEY WORK PRODUCT – PRIVILEGED AND CONFIDENTIAL**

4.  In connection with *The RMBS Trustees' Motion to (I) Increase the Reserve to $12.143 Billion and (II) Estimate and Allow Their Claims for Covered Loans at $12.143 Billion Pursuant to Section 502(c) of the Bankruptcy Code*,  (the "Motion"), I have been asked to prepare this Declaration to provide the Law Firms and Trustees with the following: 1) a summary of the results of the loan file review of the Random Sample (as hereinafter defined), including the number and type of breaches of representations and warranties discovered (each such finding, a "Breach Finding") and the percentage of mortgage loans in the Random Sample  that contain one or more Breach Findings (the "Breach Rate"); 2) an opinion whether or not the Breach Findings adversely and materially affect the value of the mortgage loans underlying Covered Trusts; and, 3) a calculation of the aggregate RMBS Claim amount and the RMBS Claim amount for each related Cohort (as hereinafter defined).

5.  In connection with my analysis herein, I have reviewed the information provided by Digital Risk, LLC ("Digital Risk") that supports their determination of Breach Findings with respect to Covered Loans in the Random Sample. The reports containing the data and analysis supporting each individual Breach Finding by Digital Risk (the "Breach Findings Reports") are attached to the Parekh Declaration (as hereinafter defined) as Attachment V, and are incorporated by reference herein.

6.  In order to rely upon the analysis performed by Digital Risk, I performed an on-site, operational due diligence of Digital Risk at their corporate headquarters. The assessment consisted of a tour of Digital Risk's facility, interviews and meetings with management and key personal and an examination of the protocol and critical systems used to review the loans in the Random Sample and to determine the Breach Findings. In addition, I reviewed the experience and qualifications of the Digital Risk personnel conducting the related loan file reviews. Finally, members of my team at Duff & Phelps and I performed a quality control review on a sample of the loans with Breach Findings to confirm that the information in the related file supported the analysis conducted and conclusions reached by Digital Risk with respect to any such loan. Based upon this due diligence of Digital Risk, it is my opinion that the loan file reviews performed by Digital Risk are of high quality and that the Breach Findings are reasonable and can be relied upon for purposes of my analysis herein.

ATTORNEY WORK PRODUCT – PRIVILEGED AND CONFIDENTIAL

7. I have also reviewed and relied upon the Declaration of Charles A. Parekh, dated August 21, 2014 (the "Parekh Declaration") in connection with my analysis herein. Specifically, in calculating the RMBS Claim amount hereunder, I have relied upon the conclusions in the Parekh Declaration that the Random Sample was selected in such a manner that an unbiased estimate of the Breach Rate can be determined from the Random Sample[2] and that such Breach Rate may be extrapolated to the corresponding Sample Population.[3]

8. This Declaration is structured as follows: this Section I sets forth the Scope of Work and Structure of the Declaration; Section II provides a summary of the findings and opinions contained in this Declaration; Section III sets forth my qualifications and experience; Section IV provides a summary of the results of the forensic loan file review and the Breach Findings; Section V provides an opinion that the Breach Findings adversely and materially affect the value of the related mortgage loans underlying the Covered Trusts; and, Section VI provides the aggregate RMBS Claim amount and the RMBS Claim amount for each Cohort.

## II.    Summary Findings and Opinions

9. Digital Risk determined that 2,612 loans in the Random Sample of 4,579 loans, or 57%, contained one or more breaches ("Breach Findings") of the related representations and warranties[4]. There were 4,940 distinct Breach Findings identified in the sample. These Breach Findings have been divided into four major groupings and 44 subcategories for ease of analysis and exposition.

10. In my opinion, based upon the documents regarding the Covered Trusts provided to me in connection with this matter, the Parekh Declaration, the Breach Findings Reports and my more than 30 years of experience in the residential mortgage loan market, the Breach Findings described herein adversely and materially affect the value of the mortgage loans underlying the Covered Trusts.

---

[2] Parekh Declaration at ¶ 12.
[3] *Id.*
[4] The number of loans with Breach Findings is based upon the Breach Findings Reports attached as Attachment V to the Parekh Declaration.

ATTORNEY WORK PRODUCT – PRIVILEGED AND CONFIDENTIAL

11. According to the Parekh Declaration, the Breach Findings obtained from the Random Sample can be used to determine the Breach Rate for the Sample Population (as hereinafter defined) underlying the Covered Trusts[5]. When the Breach Findings are extrapolated across the Sample Population, the aggregate RMBS Claim is $12.143 billion.

## III.   Experience and Qualifications

### A.  Overview of Qualifications

12. I am a Managing Director at Duff & Phelps, where I am a senior member of the Financial Services Industry Dispute and Litigation Services group.  Duff & Phelps' primary services are complex valuation, dispute consulting, M&A, and restructuring. Within the dispute consulting group, I specialize in advising clients in matters related to specialty finance and capital markets, including asset origination, mortgage banking, structured finance, and due diligence.

13. Immediately prior to joining Duff & Phelps, I was Managing Director of FCS Advisors, a consulting firm providing financial and strategic advisory services for clients in the United States, Canada, and Europe.  I hold a Bachelor of Arts from Yale College, where I majored in Economics and Political Science.  I also received my Juris Doctorate from Cornell Law School.

14. I began my professional career as a structured finance attorney, drafting and negotiating documents relating to public and private structured transactions on behalf of issuers, securities underwriters, and investors.  I worked on developing some of the first private label securitizations and form documents that enabled large institutions to buy whole loans on a regular basis from multiple sellers and aggregate those loans into private and public securities.  Since leaving the practice of law, I have worked for numerous financial institutions and other firms that engaged in the business of issuing, insuring, underwriting, or investing in RMBS.  A copy of my resume, which is not intended to be an exhaustive representation of my professional and industry

---

[5] Parekh Declaration at ¶ 12.

ATTORNEY WORK PRODUCT – PRIVILEGED AND CONFIDENTIAL

experience, is attached hereto as Exhibit B. The summary below provides additional details regarding my experience with RMBS.

## B. Residential Mortgage-Backed Securities Experience

15. I have more than 30 years of experience in the structured finance industry, and RMBS in particular. During those years, I have gained considerable experience and knowledge in all aspects of RMBS, including mortgage origination, acquisition, finance, securitization, and investments. My experience in these areas comes from having participated at almost every level and in varying roles in the RMBS process, including senior management, strategic planning, product development, trading, structuring, due diligence, sales, and negotiation of transactions.

16. From 1989 to 1993, I was the Managing Director and Co-Head of the residential group at Financial Security Assurance ("FSA"), a leading financial guaranty insurer. FSA provided credit enhancement and financial guaranty insurance in connection with asset-backed securities, including RMBS. I had direct responsibility for sourcing billions of dollars of RMBS. My responsibilities included identifying transactions to insure, marketing transactions, and underwriting transactions. These responsibilities involved qualifying clients, evaluating risks embedded in proposed transactions, and working with issuers, rating agencies, and investment bankers regarding, among other things, predictive loss and cash flow modeling, credit enhancement, structuring and collateral pool formation.

17. From 1993 to 1997, I served as Managing Director of the Fixed Income Structured Finance Group at Nomura Securities International, a large securities firm, where I managed the group responsible for the underwriting and securitization of residential and consumer assets, including RMBS. My responsibilities included participation and oversight of the design, implementation, and maintenance of asset-specific predictive loss models, cash flow models, and pricing models. While at Nomura, I obtained FINRA Series 7, 12, 24, and 63 licenses. The Series 24 license qualified me as a General Securities Principal. As such, I was ultimately responsible for the supervision of all securities underwriting activity performed on our desks, including final sign-off authority with respect to prospectuses, prospectus supplements, and

**ATTORNEY WORK PRODUCT – PRIVILEGED AND CONFIDENTIAL**

other offering materials prepared in connection with the issuance of asset-backed securities, including RMBS.

18. I was the founding Chairman and CEO of FC Capital Corporation, a residential mortgage origination, acquisition, and servicing company. During my tenure there, FC Capital originated or acquired close to $1 billion of residential whole loans and sponsored over $500 million in RMBS between 1997 and 2000. From 1996 to 1998, I served on the Board of the National Home Equity Mortgage Association, where I frequently spoke at industry conferences on topics related to buying and selling residential mortgage loans and the securitization of pools of loans.

19. As founder and Managing Partner of MTGX, LLC, I have provided advice to financial institutions in the areas of risk assessment and management strategies, portfolio valuation, capital raising, distressed portfolio resolution, and operational due diligence. I have worked for and consulted with numerous bank and non-bank institutions that are engaged in various aspects of the RMBS industry, including originators, sponsors, warehouse lenders, investment banks, and investors. In 2003, I founded Portfolio Reconnaissance Services ("Recon"), a company dedicated to providing investors and portfolio managers with the insights necessary to proactively manage broad portfolios of asset-backed bonds, including RMBS. My work at Recon required the creation and utilization of proprietary bond analytic and collateral performance models and extensive interaction and consulting with investors in RMBS, including pension funds, investment banks, insurance companies, and hedge funds, among others. In 2005 and 2006, I served as a Managing Director at Garnet Capital Advisors, leading the Structured Finance Group. In that capacity, I advised investors and other financial services clients with respect to the management, purchase, and sale of distressed assets and securities, including RMBS. Additionally, in 2001, I helped found CDC IXIS Financial Guaranty, a de novo, Triple-A rated financial guaranty insurer, where I served as a Senior Advisor to the CEO, as the initial head of the structured finance group, and as a Director on the original Board of Directors.

ATTORNEY WORK PRODUCT – PRIVILEGED AND CONFIDENTIAL

## C.  Consulting and Litigation Experience

20. As of the date of this Declaration, within the last four (4) years, I have testified in three cases: *MBIA Insurance Corporation v. Countrywide Home Loans*, No. 08/602825 (N.Y. Sup. Ct.), *MBIA Insurance Corp. v. J.P. Morgan Securities LLC (f/k/a as Bear, Stearns & Co. Inc.)*, No. 12/64676 (N.Y. Sup. Ct.), and *Massachusetts Mutual Life Insurance Company v. Countrywide Financial Corporation, et al.*, Case No. 11-ML-2265-MRP (MANx) (C.D. Cal.).

## D.  Supporting Documentation and Other Matters

21. In undertaking this assignment, I have considered the Parekh Declaration, the Breach Findings Reports, the governing documents for the Covered Trusts and the Motion, and the materials that I have considered to perform the analysis and to formulate the opinions described herein are listed in Exhibit C hereof.  If additional information becomes available to me, I reserve the right to supplement and/or amend the opinions set forth herein.

22. This Declaration, and its content, is not to be reproduced, distributed, disclosed, or used for any purposes other than in connection with the Motion without the prior written approval of the author.

23. I am independent of the Trustees, the Law Firms, Lehman, and any other party with an interest in this matter.  Duff & Phelps is being compensated for my work on this matter at an hourly rate of $915.  This compensation does not depend in any way upon the opinions I express in this matter or upon the outcome of any related litigation.

ATTORNEY WORK PRODUCT – PRIVILEGED AND CONFIDENTIAL

## IV.    Summary of Loan File Review and Findings

### A.  Role of Digital Risk

24. Digital Risk re-underwrote the Random Sample selected by Cowen & Company[6].
Digital Risk reviewed the loan file for each available loan in the Random Sample to
determine if a breach of the related representations and warranties existed for any
such loan.[7] When making a Breach Finding determination with respect to any loan in
the Random Sample, Digital Risk applied a materiality threshold, excluding any
deviation from guidelines or other defect that was not deemed to be material and
adverse to the value of the related loan.

### B.  Description of Sampling Methodology

25.  The Covered Loans represent 416,091 mortgage loans underlying 255 Covered
Trusts.[8] Of this population, 149,568 loans were identified, as of the June 2012
remittance data, as Covered Loans that had been previously modified, loans that were
delinquent or loans with a realized loss (the "Sample Population")[9]. A random sample
of 5000 Covered Loans was then selected from the Sample Population (the "Random
Sample").[10] Digital Risk received and reviewed 4579 of the 5000 loans in the
Random Sample.[11]

26. The Sample Population was classified into twelve cohorts by product type and date of
issuance (each such classification, a "Cohort"). These classifications were chosen to
account for potential variations in breach rates among different product types and
vintages, or issue dates, of the related Covered Trusts[12]. The product type Cohorts
included three groups identified as Prime, Alt-A, and Subprime, and the issue dates
were  classified into four Cohorts identified as securities issued in 2004 & prior,

---

[6] Parekh Declaration at ¶ 17.
[7] *Id.*
[8] *Id* at ¶ 14.
[9] *Id.*
[10] Parekh Declaration at ¶ 15.
[11] The inability of Digital Risk to review 421 loans in the Random Sample that were never delivered to them does
not affect the determination of the Breach Rate or the effectiveness of extrapolating the Breach Rate to the Sample
Population. *See*, Parekh Declaration at ¶ 30, 36.
[12] Parekh Declaration at ¶ 16.

ATTORNEY WORK PRODUCT – PRIVILEGED AND CONFIDENTIAL

2005, 2006, and 2007 & later, for a total of twelve Cohorts.[13] The number of loans
from the Random Sample in each Cohort is shown in the Table 1, below.

**Table 1: Loan Count by Cohort**

| *($ in millions)* | | |
| Product Type | Issue Date | Loan Count by Cohort |
|---|---|---|
| **Prime** | 2004 & Prior | 337 |
| | 2005 | 360 |
| | 2006 | 239 |
| | 2007-2008 | 200 |
| **Alt-A** | 2004 & Prior | 355 |
| | 2005 | 370 |
| | 2006 | 567 |
| | 2007-2008 | 610 |
| **Subprime** | 2004 & Prior | 303 |
| | 2005 | 257 |
| | 2006 | 492 |
| | 2007-2008 | 489 |
| **Total** | | **4,579** |

## C. Discussion of Breach Findings

27. Digital Risk determined that 2,612 loans in the Random Sample of 4,579 loans,
spread among the various Cohorts, contained one or more breaches of the related
representations and warranties. Table 2, below contains the loans with Breach
Findings and the related Breach Rate, by Cohort.

---

[13] *Id.*

11

**ATTORNEY WORK PRODUCT – PRIVILEGED AND CONFIDENTIAL**

**Table 2: Breach Findings and Breach Rates by Cohort**

| Product Type | Issue Date | Loan Count by Cohort | Loan Count with Breach Findings | Breach Rate |
|---|---|---|---|---|
| *($ in millions)* | | | | |
| **Prime** | 2004 & Prior | 337 | 183 | 54.3% |
| | 2005 | 360 | 165 | 45.8% |
| | 2006 | 239 | 132 | 55.2% |
| | 2007-2008 | 200 | 117 | 58.5% |
| | | | | |
| **Alt-A** | 2004 & Prior | 355 | 184 | 51.8% |
| | 2005 | 370 | 254 | 68.6% |
| | 2006 | 567 | 337 | 59.4% |
| | 2007-2008 | 610 | 356 | 58.4% |
| | | | | |
| **Subprime** | 2004 & Prior | 303 | 216 | 71.3% |
| | 2005 | 257 | 156 | 60.7% |
| | 2006 | 492 | 253 | 51.4% |
| | 2007-2008 | 489 | 259 | 53.0% |
| | | | | |
| **Total** | | **4,579** | **2,612** | **57.0%** |

28. While 2,612 loan files were found to contain one or more Breach Findings of the related representations and warranties, Digital Risk identified 4,940 distinct Breach Findings in the Random Sample. The following bar graph, Table 3, illustrates the number of loans in the Random Sample with a Breach Finding and the number of Breach Findings per loan.

ATTORNEY WORK PRODUCT – PRIVILEGED AND CONFIDENTIAL

**Table 3: Number of Breach Findings per Loan[14]**



29. For purposes of discussion and analysis herein, the Breach Findings have been divided into four major groupings and 44 subcategories. A table summarizing the frequency of each Breach Finding within each subcategory of Breach Finding is attached hereto as Exhibit D and a detailed description of each subcategory of Breach Finding is attached hereto as Exhibit E. Dividing the Breach Findings into groups facilitates an understanding of how each such Breach Finding adversely and materially affects the value of the related Covered Loans. The four  primary categories utilized herein are: (a) Borrower Credit Breach Findings (i.e. findings related to the credit history of a borrower); (b) Borrower Capacity Breach Findings (i.e. findings regarding the ability of a borrower to fulfill financial obligations); (c) Collateral Breach Findings (i.e. findings that relate to the property securing the mortgage loan); and, (d) Compliance Breach Findings (i.e. findings regarding a failure to comply with the related legal and regulatory requirements pertaining to the origination of a mortgage loan).

---

[14] This chart only includes the loans from the Random Sample with one or more Breach Findings.  It excludes 1,967 loans in the Random Sample with no Breach Findings.

ATTORNEY WORK PRODUCT – PRIVILEGED AND CONFIDENTIAL

## D. Borrower Credit Breach Findings

30. Breach Findings with respect to the credit of a borrower pertain primarily to issues regarding a borrower's historical willingness to pay financial obligations when due. The representations and warranties related to this type of Breach Finding pertain to underwriting procedures designed to ascertain whether a borrower has satisfied prior financial obligations in a timely manner. The most well-known measure of a borrower's credit risk is the FICO score. Breach Findings in this category indicate deficiencies in process and/or a lack of reliable documentary support that would call into question the original assessment of a borrower's credit status.

31. Deficiencies identified in this category will, at best, hamper and, at worst, prevent a mortgage loan underwriter from properly assessing the likelihood that a borrower will default on the related mortgage loan. Adherence to underwriting guidelines and the availability of accurate information concerning the credit of borrowers on mortgage loan pools underlying RMBS are critical factors when making a determination as to whether or not a borrower will comply with the terms of a mortgage loan and make monthly payments as required.

## E. Borrower Capacity Breach Findings

32. Breach Findings with respect to borrower capacity pertain to a borrower's ability to pay. The higher a borrower's income, and the lower the ratio of a borrower's debt obligations to the income received by such borrower, the greater the likelihood that the borrower will not default on a mortgage loan. Breach Findings in this category reflect deficiencies with respect to verification of the borrower's income at the time a loan was originated. If, at the time of origination, mortgage loan underwriters do not verify a borrower's income, or at the very least, determine that the income claimed by a borrower is reasonable given the borrower's occupation, the likelihood that such borrower will default is increased. One well-known measure of capacity is the borrower's debt-to-income, or DTI, ratio.

33. Accurate information regarding a borrower's ability to pay is essential if a mortgage loan underwriter desires to make a reasonable assessment of the credit risk (i.e. the

**ATTORNEY WORK PRODUCT – PRIVILEGED AND CONFIDENTIAL**

risk of default) for any loan. If the DTI calculation is incorrectly calculated to appear lower than it really is, or if the income used to qualify a borrower is overstated, then the probability of default with respect to any such loan will be greater than otherwise believed. Breach Findings in this category generally reflect deficiencies with respect to the sufficiency of supporting information or documentation used by the original mortgage loan underwriter to provide evidence of the borrower's employment status and/or to verify the borrower's income.

### F.  Collateral Breach Findings

34. Breach Findings with respect to collateral relate to the value and quality of the property securing the mortgage loan. The ratio of the outstanding balance of a mortgage loan to the value of the collateral securing such mortgage loan, expressed as a percentage, is called the Loan to Value Ratio, or LTV.[15] It is well established within the residential mortgage industry that a mortgage loan with a high LTV has a greater loss expectation than does a loan with a low LTV, all other things being equal.[16]

35. Breach Findings in this category generally relate to deficiencies in the origination process or analysis (e.g. a failure to review the appraisal report regarding the property used to secure the loan) that result in an overstatement of the value of the property securing the mortgage loan. An overstatement of collateral value at origination would mean that the LTV is incorrect and the actual LTV of the related loan is higher than was presented.

36. There are two primary reasons a high LTV loan has greater credit risk and is more likely to default than does a low LTV loan.  First, the amount of equity a borrower has in the property directly relates to the borrower's willingness to make payments as required with respect to a mortgage loan.[17]   Loans which are financed with little or no equity from the borrower (i.e., have a high LTV) historically have a higher

---

[15] For example, if the original loan balance is $75,000 and the property securing the loan is worth $100,000, then the LTV is 75%.

[16] Andrew Davidson, Anthony Sanders, Lan-Ling Wolff & Anne Ching, *Securitization Structuring and Investment Analysis*, 305-308 (John Wiley & Sons, Inc. 2003; *see also* Gene Amromin & Anna L. Paulson, *Comparing Patterns of Default Among Prime and Subprime Mortgages* 26 Economic Perspectives (2Q/2009).

[17] Office of the Comptroller of the Currency, *Interagency Guidance on Nontraditional Mortgage Product Risks* 4 (2006).

ATTORNEY WORK PRODUCT – PRIVILEGED AND CONFIDENTIAL

foreclosure frequency, all other things being equal, than do loans made to borrowers who have significant equity in the related property (i.e., a low LTV). [18] Consequently, the credit risk to investors in RMBS is higher if property values are overstated, masking the fact that the borrower has less equity in the related property.

37. Second, as the LTV increases for any given loan, the loss severity for that loan increases.[19]   In the event of default, a mortgage loan with a high LTV and a smaller "equity cushion" (i.e., the amount by which the collateral value exceeds the loan balance) is more likely to incur a loss than is a loan with a low LTV, as the recovery value received for the property in a liquidation sale will likely be lower.[20]   Thus, if the values of the properties securing the mortgage loans supporting a RMBS are overstated, then the LTV ratios disclosed to investors will be understated, adversely affecting the credit quality of RMBS and increasing the actual credit risk to the investors in such RMBS.

## G. Compliance Breach Findings

38. Breach Findings in this category pertain to the failure of the originator of a mortgage loan to comply with the applicable local, state and Federal laws and regulations regarding the origination of residential mortgage loans. Breach Findings of this type increase the credit risk of the related loan because non-compliance with applicable laws and regulations can delay, impair and, in drastic circumstances, eliminate the ability to foreclose on the related property securing the mortgage loan in the event of default.   Thus, the expected loss with respect to mortgage loans with this type of deficiency would increase as the ability of investors to mitigate the loss on a defaulted loan by means of foreclosure would be diminished, and the costs of doing so would be meaningfully increased.

---

[18] *Id* at 4.
[19] Deepika Kothari & Yehudah Forster, Moody's Investors Service, *Moody's Approach to Rating US Residential Mortgage-Backed Securities* 13 (2008).
[20] *Id*.

ATTORNEY WORK PRODUCT – PRIVILEGED AND CONFIDENTIAL

## V.   The Breach Findings Adversely and Materially Affect the Value of the Covered Loans

39. With respect to the Covered Trusts, the general standard required to put-back Covered Loans to Lehman is that the Breach Finding must adversely and materially affect the value of the related mortgage loan.[21] As described above, I have relied upon Digital Risk to determine whether a Breach Finding exists. For the reasons expressed below, it is my opinion that each Breach Finding described herein adversely and materially affects the value of the related Covered Loans. It is important to note that deviations from underwriting guidelines or other deficiencies with respect to the mortgage loans in the Random Sample that were not determined to adversely and materially affect the value of such loans were not included in the determination of the Breach Rate, and have been excluded as Breach Findings herein.

40. Unlike municipal bonds or corporate bonds, the primary source of funds available to pay RMBS investors are the monthly payments made in connection with the mortgage loans underlying the related RMBS.  In my experience, the single most important factor to an RMBS investor is the certainty of the cash flow produced by the related, underlying mortgage pool.  Accordingly, the credit quality of the mortgage loans supporting the related RMBS is a fundamental focus of both an investor's analysis and this Declaration.[22]

41. In order to gauge the relative stability of the cash flow from a mortgage loan pool underlying a RMBS, investors evaluate the credit quality and risk of loss inherent in the related loan pool to assess the likelihood that such cash flow will be disrupted (i.e. delayed or discontinued).[23]  The stability of cash flow from the underlying mortgage loan pool is critical to RMBS investors because if the mortgage loan cash flow is impaired, the cash flow available to pay RMBS investors will also be impaired.

---

[21] This standard is essentially the same for all of the Covered Trusts. E.g., the Trust Agreement, dated May 1, 2006, for SARM, Series 2006-4 states a put-back is permitted "[u]pon discovery…of a breach…that adversely and materially affects the value of the related Mortgage Loan…" Section 2.04. The Trust Agreement, dated February 1, 2007, SAS Series 2007-BC2 contains identical language in Section 2.04.

[22] Asset-Backed Securities, Exchange Act Release Nos. 33-8518, 34-50905, 84 SEC Docket 1624, at *4 (Dec. 22, 2004)

[23] *Id*. at *10-11.

**ATTORNEY WORK PRODUCT – PRIVILEGED AND CONFIDENTIAL**

42. The expected loss with respect to any given mortgage loan is simply the product of the probability that a loan will default (the "Foreclosure Frequency") times the severity of loss (the "Loss Severity") in the event of a default, multiplied by the unpaid principal balance ("UPB") of the loan[24].  The formulaic expression of this analysis is:

$$\textit{(Foreclosure Frequency} \ \text{x} \ \textit{Loss Severity)} \ \text{x} \ \textit{Loan UPB = Expected Loss.}$$

43. Foreclosure Frequency is simply the probability or likelihood that a loan will default. Loss Severity for any mortgage loan that defaults is the amount of the deficiency, if any, between the principal balance of such loan at liquidation and the net realized proceeds received in connection with the sale of the property securing such loan.[25] This amount is expressed over the principal balance of such loan and expressed as a percentage. For example, if a loan with a $100 principal balance defaults and the net proceeds (after sale of property, costs and expenses) are $60, then the loss on the loan is $40, and the Loss Severity is 40%.  In addition to any deficiency in connection with the related property disposition, loss severity also includes accrued and unpaid interest and fees and expenses related to the disposition, restoration, and/or protection of the related collateral.[26] As can be observed by reference to the formulaic expression of Expected Loss noted above, if either the Foreclosure Frequency or Loss Severity increase, the Expected Loss will also increase.

44. In my opinion, based upon my more than 30 years of experience in the RMBS industry, each type of Breach Finding, as determined by Digital Risk and described herein, would increase the Foreclosure Frequency, the Loss Severity or both. As a result of these increases, the Expected Loss with respect to any related mortgage loan would, by definition, increase also. For this reason, it is my opinion that each Breach Finding adversely and materially affects the value of each related mortgage loan.

---

[24] James Watkins, Fitch Ratings, *ResiLogic: U.S. Residential Mortgage Loss Model Technical Document* 2 (2007); *see also* Andrew Davidson, Anthony Sanders, Lan-Ling Wolff & Anne Ching, *Securitization Structuring and Investment Analysis* 294 (John Wiley & Sons, Inc. 2003).
[25] Sharad Chaudhary, *A Primer on Residential Mortgage Credit* 32 (2008).
[26] *Id* at 32-33.

ATTORNEY WORK PRODUCT – PRIVILEGED AND CONFIDENTIAL

## VI.    Calculation of the RMBS Claim Amount

45. In order to calculate the aggregate RMBS Claim I have relied upon the information provided in Parekh Declaration and have extrapolated the results of the review of the Random Sample, and the corresponding Breach Rate, to the Sample Population. Specifically, since a Cohort sampling approach was used and Breach Rates by Cohort were determined, these Breach Rates can be extrapolated to the population of the related Cohort[27].   Table 4 below shows the Breach Rate for each Cohort and the statistical confidence interval that each Breach Rate implies with respect to the extrapolation of the Breach Findings to the Sample Population of Covered Loans.[28]  For example, the Breach Rate for the Cohort of Prime 2004 & Prior loans within the Sample Population is between 49.4% and 59.2%, to a 95% confidence level.[29]

**Table 4: Breach Rate and Confidence Interval for each Cohort**

| Product Type | Issue Date | Breach Rate | Breach Rate Range at 95% Confidence Interval |
|---|---|---|---|
| **Prime** | 2004 & Prior | 54.3% | 49.4% - 59.2% |
| | 2005 | 45.8% | 40.8% - 50.8% |
| | 2006 | 55.2% | 49.8% - 60.6% |
| | 2007-2008 | 58.5% | 53.6% - 63.4% |
| **Alt-A** | 2004 & Prior | 51.8% | 46.9% - 56.7% |
| | 2005 | 68.6% | 64.0% - 73.2% |
| | 2006 | 59.4% | 55.5% - 63.3% |
| | 2007-2008 | 58.4% | 54.5% - 62.3% |
| **Subprime** | 2004 & Prior | 71.3% | 66.8% - 75.8% |
| | 2005 | 60.7% | 55.8% - 65.6% |
| | 2006 | 51.4% | 47.5% - 55.3% |
| | 2007-2008 | 53.0% | 49.1% - 56.9% |

46. The aggregate RMBS Claim Amount calculation is presented in Table 5 below. To calculate the aggregate RMBS Claim Amount, the Breach Rate for each Cohort was

---

[27] Parekh Declaration at ¶ 30-37.
[28] Parekh Declaration at ¶ 30.
[29] *Id*.

19

ATTORNEY WORK PRODUCT – PRIVILEGED AND CONFIDENTIAL

multiplied by the Total Losses (i.e. Covered Loan Realized Losses plus Covered Loan Projected Losses)[30] for such Cohort. For example, the RMBS Claim Amount for the cohort of Prime 2004 & Prior loans is 54.3% times the Total Loss of $347.9 million, or $188.9 million.   The aggregate RMBS Claim amount of all of the Cohorts is $12,143 billion.

### Table 5: Calculation of RMBS Claim Amount

| *($ in millions)* | | | | | | |
|---|---|---|---|---|---|---|
| **Product Type** | **Issue Date** | **Realized Loss** | **Projected Loss** | **Total Losses** | **Breach Rate by Loan Count** | **Principal Balance** |
| **Prime** | 2004 & Prior | $        208.4 | $        139.5 | $        347.9 | 54.3% | $        188.9 |
| | 2005 | 503.6 | 203.1 | 706.7 | 45.8% | 323.7 |
| | 2006 | 92.8 | 36.0 | 128.7 | 55.2% | 71.1 |
| | 2007-2008 | 60.7 | 24.1 | 84.8 | 58.5% | 49.6 |
| **Alt-A** | 2004 & Prior | 157.7 | 56.7 | 214.5 | 51.8% | 111.1 |
| | 2005 | 1,045.7 | 369.9 | 1,415.6 | 68.6% | 971.1 |
| | 2006 | 4,065.8 | 989.2 | 5,054.9 | 59.4% | 3,002.6 |
| | 2007-2008 | 4,927.2 | 1,812.0 | 6,739.2 | 58.4% | 3,935.7 |
| **Subprime** | 2004 & Prior | 48.7 | 20.7 | 69.3 | 71.3% | 49.4 |
| | 2005 | 524.1 | 81.2 | 605.3 | 60.7% | 367.4 |
| | 2006 | 1,564.0 | 559.2 | 2,123.2 | 51.4% | 1,091.3 |
| | 2007-2008 | 2,481.7 | 1,256.6 | 3,738.3 | 53.0% | 1,981.3 |
| **Total** | | **15,680.2** | **5,548.2** | **21,228.4** | | **12,143.2** |

Respectfully Submitted,

James H. Aronoff

August 21, 2014

---

[30] The determination of Total Losses, Realized Losses and Projected Losses is explained in the Parekh Declaration at ¶ 38-45, 54.