WEIL, GOTSHAL & MANGES LLP
Christopher J. Cox
201 Redwood Shores Parkway
Redwood Shores, CA 94065
Telephone:  (650) 802-3000
Facsimile:  (650) 802-3100

Jacqueline Marcus
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

Attorneys for Lehman Brothers Holdings Inc.
and Lehman Brothers Special Financing Inc.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>LEHMAN BROTHERS HOLDINGS INC.,<br><br>      Debtor. | Chapter 11 Case<br>No. 08-13555 (SCC)<br><br>(Jointly Administered) |
| Lehman Brothers Holdings Inc., in its capacity as Plan Administrator on behalf of Lehman Brothers Special Financing Inc.,<br><br>      Plaintiff,<br><br>  v.<br><br>Mirabella, and Does 1-10,<br><br>      Defendants. | Adv. Proc. No. 13-_____<br><br>**ADVERSARY PROCEEDING**<br>**COMPLAINT** |

1.    After terminating its swap agreements with Plaintiff, Defendant Mirabella failed to calculate the amount Lehman Brothers Special Financing Inc. ("LBSF") was owed in good faith and refused to pay the approximately $8.1 million it owed LBSF as of the Early Termination Date.  Lehman Brothers Holdings Inc. ("LBHI"), in its capacity as Plan Administrator (in this capacity, the "Plan Administrator" or "Plaintiff") on behalf of LBSF, under the Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors (the "Plan"), alleges the following on knowledge as to LBSF's and LBHI's own acts and upon information and belief as to all other matters against Mirabella and Does 1-10 ("Does 1-10" and together, "Defendants"):

## PRELIMINARY STATEMENT

2.    Plaintiff brings this action to recover at least $8.1 million due in 2008 when Mirabella terminated two transactions, both of which were interest rate swaps (the "First Transaction," and the "Second Transaction," and collectively, the "Transactions") with LBSF, plus contractual interest.  When Mirabella valued the termination payment due to LBSF under the Transactions, it ignored the provisions of the Schedule to the governing ISDA Master Agreement[1] which required Mirabella to value the Transactions on the Early Termination Date using the "Second Method" and the "Market Quotation" measure or, if the Market Quotation process failed, to determine its loss or gain resulting from the termination of the Transactions under the "Loss" measure.  Under Market Quotation, Mirabella as the Non-defaulting Party was required to solicit quotations from Reference Market-makers (*i.e.* "four leading dealers in the relevant market") for replacement transactions "that would have the effect of preserving for

---

[1] Capitalized terms used but not defined herein shall have the meanings given them in the 1992 standard form (Local Currency-Single Jurisdiction) ISDA Master Agreement, dated as of October 26, 2006 (together with all schedules, annexes, and exhibits thereto, the "Master Agreement").

[Mirabella] the economic equivalent of any payment or delivery . . . that would, but for the occurrence of the relevant Early Termination Date, have been required after that date." Master Agreement at § 12 (definition of "Market Quotation" and "Reference Market-makers"). In other words, under Market Quotation, Mirabella was required, as the Non-defaulting Party, to seek quotations from four leading dealers in the relevant market for the amount those dealers would pay, or receive, to step into the Defaulting Party's position in the trade. *Id*.

3.      Instead of soliciting bids from four leading dealers, Mirabella solicited bids from *ten* dealers. Mirabella, thus, failed to comply with the clear terms of the Master Agreement when implementing Market Quotation and thus tainted the process.

4.      The Master Agreement also required that the party using the Market Quotation measure "will request each Reference Market-maker to provide its quotation to the extent reasonably practicable <u>as of the same day and time</u> . . . or as soon as reasonably practicable <u>after</u> the relevant Early Termination Date." *Id*. Mirabella failed to comply with this requirement by soliciting bids on November 19, 2008, *before* even designating the Early Termination Date. Instead of designating an Early Termination Date and soliciting quotations for that date, Mirabella requested bids and then waited until the results of the bids were available to actually designate the Early Termination Date. Thus, Mirabella again failed to comply with the clear terms of the Master Agreement.

5.      Mirabella did not receive any bids. *Thereafter*, Mirabella designated November 24, 2008 as the Early Termination Date. When the Market Quotation process fails to generate at least three quotations from the four dealers, the Master Agreement requires the Non-defaulting Party to apply the Loss measure, under which Mirabella was required to "reasonably determine[] in good faith . . . its total losses and costs (<u>or gain</u>, in which case expressed as a negative

number) . . . ." *Id.* (emphasis added).  Because it did not receive the minimum number of bids for valuation under Market Quotation, Mirabella reverted to the Loss measure.

6.       LBSF was "in the money" under its two Transactions with Mirabella as of the Early Termination Date.  The value of the Transactions as of the Early Termination Date was approximately $8.1 million in LBSF's favor (after accounting for accrued amounts which Mirabella paid to LBSF).  In other words, as of the Early Termination Date, the net present value of the expected payments which Mirabella saved over the remaining term of the Transactions was approximately $8.1 million.  Despite recognizing the value of the Transactions and recording it on its financial statements, Mirabella retained its gain and advised LBSF that the Settlement Amount it owed to LBSF **was zero**, excluding any net accrued but unpaid amounts and interest for the final Calculation Period.  By failing to properly calculate its gain and turn that gain over to LBSF, Mirabella failed to comply with the clear terms of the Master Agreement when implementing Loss.

## THE PARTIES

7.       LBHI is a corporation organized and incorporated under the laws of the state of Delaware, with its current principal business address at 1271 Sixth Avenue, New York, New York 10020.  On December 6, 2011, the Court approved and entered an order confirming the Plan.  The Plan became effective on March 6, 2012.  Pursuant to the Plan, LBHI, as Plan Administrator, is authorized to prosecute actions on behalf of the estate of LBSF.

8.       LBSF is a corporation organized and incorporated under the laws of the state of Delaware, with its current principal business address at 1271 Sixth Avenue, New York, New York 10020.

9.       Mirabella is a retirement community owned and operated by Pacific Retirement

Services, an Oregon non-profit corporation, with locations in Portland, Oregon, and Seattle, Washington.

10.     Does 1-10 are unknown individuals, entities, and/or groups of individuals or entities who may have received distributions from Mirabella.

## JURISDICTION AND VENUE

11.     On September 15, 2008, and periodically thereafter, LBHI and certain of its subsidiaries, including LBSF, commenced in this Court voluntary cases under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases").

12.     This adversary proceeding is filed pursuant to Rules 7001 and 7003 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), as well as sections 105(a), 541(c), and 542(b) of the Bankruptcy Code, and New York law, which governs the Master Agreement pursuant to Part 3(e) of the Schedule.

13.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334.

14.     The Court has personal jurisdiction over Defendant Mirabella.

15.     This adversary proceeding constitutes a core proceeding under 28 U.S.C. § 157(b)(2).

16.     Venue is proper in this Court under 28 U.S.C. § 1409(a) because the Chapter 11 Cases are pending in this district.

## BACKGROUND FACTS

**A.      The Master Agreement and the Transactions**

17.     The Master Agreement provides the basic terms for the parties' contractual relationship.  The parties entered into two interest rate swaps under the Master Agreement, the terms of which were set forth in trade confirmations.

18.     Mirabella originally entered into the Master Agreement and the Transactions with

LBSF in 2006 to partially hedge its 2006 floating rate bond issuances.

19.     Under the First Transaction, LBSF agreed to make monthly payments to

Mirabella at a floating interest rate tied to the One Month London Interbank Offered Rate in U.S.

dollars (the "USD-LIBOR-BBA" rate) and Mirabella agreed to make monthly payments to LBSF

at a fixed rate of 5.115%, each based on the notional amount of $6,000,000.  *See* First

Transaction Confirmation.

20.     Similarly, under the Second Transaction, LBSF agreed to make monthly

payments tied to the USD-LIBOR-BBA rate and Mirabella agreed to make monthly payments to

LBSF at a fixed rate of 3.4537%, each based on an initial notional amount of $250,745,000

(which declined over the life of the Second Transaction).  *See* Second Transaction Confirmation.

**B.     Mirabella Terminates the Transactions**

21.     On September 15, 2008, LBHI filed its chapter 11 petition.  LBSF filed its chapter

11 petition on October 3, 2008.

22.     On November 19, 2008, Mirabella sent LBSF a notice that LBSF's chapter 11

petition constituted an Event of Default under section 5(a)(vii) of the Master Agreement and that,

accordingly, Mirabella "intend[ed] to designate an Early Termination Date . . . on and as of

November 24, 2008" with respect to all transactions between the parties.  Notably, although the

notice mentioned November 24, 2008, the notice explicitly stated that Mirabella was not actually

declaring an Early Termination Date.  Instead, Mirabella stated that it "intend[ed]" to designate

an Early Termination Date, thereby attempting improperly to reserve for itself the option of

choosing another date more favorable to it or deciding not to proceed with termination.

23.     On November 24, 2008, Mirabella sent LBSF a termination notice (the "Early

Termination Notice") citing LBSF's bankruptcy filing and LBHI's credit downgrading as Events

of Default and designating November 24, 2008 as the "Early Termination Date" under the

Master Agreement.

**C.     The Master Agreement Required Mirabella to Use the "Second Method" and the Market Quotation Process to Determine the Transactions' Value**

24.     The Schedule to the Master Agreement provides that the payment owed upon

early termination will be calculated based upon the "Second Method" or "full two-way payment"

method, meaning that a payment would be made to the "in-the-money" party upon termination,

regardless of whether it was the Defaulting Party.  *See* Master Agreement § 6(e)(i); Schedule

§ 1(f)(i)(A)-(B).  In other words, the party that is "in the money" on the Early Termination Date

– here LBSF – has a right to an early termination payment even if it is the Defaulting Party.

Thus, by selecting Second Method, the parties elected not to punish the Defaulting Party or

deprive it of the benefits accrued under the Transactions.  Rather, the Master Agreement was

designed to preserve the benefit of the bargain upon Early Termination and put the parties in the

same position as if there had been no termination.

25.     The Settlement Amount is defined in the Master Agreement as "the sum of . . . the

Market Quotations (whether positive or negative) for each Terminated Transaction or group of

Terminated Transactions for which a Market Quotation is determined" and the "Loss (whether

positive or negative and without reference to any Unpaid Amounts) for each Terminated

Transaction or group of Terminated Transactions for which a Market Quotation cannot be

determined or would not . . . produce a commercially reasonable result."  Master Agreement § 12

(definition of "Settlement Amount").

26.     Accordingly, to arrive at the amount due, the Non-defaulting Party was required

in the first instance to calculate the Termination Payment in accordance with the "Market

Quotation" measure detailed in section 6 of the ISDA Master Agreement.  *See Id.* at § 6(e)(i)(3).

Under the Market Quotation measure, the determining party is instructed to seek Market Quotations from "Reference Market-makers" (specifically, "four leading dealers in the relevant market"). *Id.* at § 12 (definition of "Market Quotation" and "Reference Market-makers"). Each quotation is intended to reflect "an amount . . . that would have the effect of preserving for such party the economic equivalent of any payment or delivery . . . by the parties under Section 2(a)(1) . . . that would, but for the occurrence of the relevant Early Termination Date, have been required after that date." *Id.*

27.     The Master Agreement specifies that the party using the Market Quotation measure "will request each Reference Market-maker to provide its quotation to the extent reasonably practicable <u>as of the same day and time</u> . . . or as soon as reasonably practicable after the relevant Early Termination Date." *Id.* (emphasis added).

28.     If four quotations are received, the party receiving the quotations is required to exclude the highest and lowest quotations, and average the remaining quotations. *Id.* If three quotations are received, the highest and lowest quotations are excluded and the middle quotation is used. *Id.* In the event that fewer than three market quotations are received (or if the result of the Market Quotation process is not commercially reasonable), then the Master Agreement requires that the Loss measure be used to value the transaction. *Id.* "Loss" is defined in the Master Agreements in relevant part as: "an amount that party reasonably determines in good faith to be its total losses and costs (*or gain*, in which case expressed as a negative number) in connection with this Agreement or . . . [the] Terminated Transactions . . . ." *Id.* (emphasis added).

**D.     <u>Mirabella Improperly Conducts the Market Quotation Process and Then Defaults to Loss</u>**

29.     Mirabella did not comply with the unambiguous procedures set forth in the

Master Agreement.  Mirabella retained Cain Brothers & Co., LLC ("Cain Brothers") as its

financial advisor.  Then, prior to designating the Early Termination Date, Cain Brothers solicited

bids on November 19, 2008 from *ten* dealers, rather than four as required by the Master

Agreement, with a pricing date of November 24, 2008 at 1:00 pm Eastern.

30.     Mirabella did not receive any bids.  Thus, the flawed Market Quotation process

failed and Mirabella was required to revert to Loss.  Thereafter, Mirabella sent correspondence to

LBSF designating November 24, 2008 as the Early Termination Date.

**E.      Mirabella's Calculation Statement Ignored the Projected Future Payments Owed to LBSF**

31.     LBSF received a Calculation Statement from Mirabella pertaining to both

Transactions (the "Calculation Statement") on December 9, 2008.  According to Mirabella's

Calculation Statement, the Settlement Amount due to LBSF was $0 under the Loss method

because "no Reference Market-makers were willing to provide quotations for replacement

transactions on the same terms as the Terminated Transactions (either with the existing fixed

interest rates set forth in the Confirmations or with at-market fixed interest rates)."  Essentially,

Mirabella contended that its "Loss," *i.e.,* its "total losses and costs (*or gain*, in which case

expressed as a negative number) in connection with this Agreement," was zero.  Master

Agreement § 12 (emphasis added).

32.     Mirabella's termination of the Transactions resulted in a gain to Mirabella equal

to the present value of the projected future payments it would have made to LBSF.  As of the

Early Termination Date, based on the industry standard mid-market value of the Transactions,

the present value of Mirabella's projected future payments under these Transactions was

approximately $8.1 million.  This amount represents an undisputed "gain" that should have been

factored into Mirabella's calculation of Loss and turned over to LBSF.  In fact, Mirabella

recognized the value of the Transactions on its financial statements.

33.     Rather than turn over its gain, Mirabella claimed its total obligation to LBSF was

$758,714.97 under § 6(e) of the ISDA Master Agreement, reflecting the amounts due to LBSF

but remaining unpaid as of the Early Termination Date, but including nothing for the value of

future payments it avoided making to LBSF.  In reaching this final number, Mirabella also

subtracted $97,600 in alleged "termination-related expenses," which it supported by attaching

non-itemized bills from its legal counsel and Cain Brothers.

**F.      Mirabella Owes Interest to LBSF**

34.     Upon early termination, section 6(d) of the Master Agreement required Mirabella

to promptly calculate the termination amount as of the Early Termination Date and pay such

amount.  Mirabella has defaulted on its obligations under section 6(d) of the Master Agreement.

Section 12 of the Master Agreement defines four Applicable Rates of interest (in subsections (a)-

(d)), which accrue on amounts owed.  *See* Master Agreement § 12.  Section 12 of the Master

Agreement provides that the Applicable Rate is the "Default Rate" on any sums calculated

pursuant to section 6(e) from the date on which such sums become payable under section

6(d)(ii), which is the date on which the calculation statement is delivered.  *Id.* § 12.  Prior to that

date, the "Termination Rate" applies to the amount owed.  *Id.*  The Default Rate for Mirabella is

based the USD-LIBOR-BBA rate plus 1% as defined in section 3(g)(iv) of the Schedule to the

Master Agreement.  The Termination Rate is the average cost of funds of the two parties.

35.     Mirabella designated November 24, 2008 as the Early Termination Date and

delivered its calculation statement on December 9, 2008.  Accordingly, the Termination Rate

applied from November 24, 2008 to December 9, 2008.  The Default Rate applies from

9

December 9, 2008 to the present, with interest continuing to accrue until LBSF receives payment in full from Mirabella.

**G.      The Failed Mediation**

36.      LBSF and Mirabella engaged in settlement discussions without success.  Part of those efforts included a mediation between the parties pursuant to this Court's Alternative Dispute Resolution Procedures Order for Affirmative Claims of Debtors Under Derivatives Contracts, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Sept. 17, 2009) [ECF No. 5207], which occurred on September 9, 2011 and which has now been terminated.

<u>COUNT I</u>

**Breach of the Master Agreement**

(*Against Defendant Mirabella*)

37.      Plaintiff repeats, realleges, and incorporates by reference the allegations contained in Paragraphs 1-36 of this Complaint as though fully set forth in this cause of action.

38.      The Master Agreement is an enforceable contract, and LBSF has performed all of its obligations in connection with the Master Agreement.  Further, any conditions precedent have been performed, have occurred, or have been waived.

39.      On the Early Termination Date, LBSF was the party "in-the-money" and thus entitled to receive a substantial termination payment from Mirabella.

40.      Mirabella breached the Master Agreement by failing to comply with the express terms of the Master Agreement in employing the Market Quotation measure, failing to turn over its gain after reverting to the Loss measure, and otherwise failing to follow reasonable, good faith, and commercially reasonable valuation practices.  As a result, LBSF has been damaged in an amount to be proven at trial, but at least $8.1 million, representing Mirabella's gain as of the Early Termination Date which Mirabella failed to pay to LBSF, plus interest which has accrued

since the Early Termination Date and which will continue to accrue at the Default Rate until final payment is made to LBSF.

## COUNT II

### Breach of the Master Agreement Based on Mirabella's Breach of the Implied Covenant of Good Faith and Fair Dealing

*(Against Defendant Mirabella)*

41.     Plaintiff repeats, realleges, and incorporates by reference the allegations contained in paragraphs 1-40 of this Complaint as though fully set forth in this cause of action.

42.     On the Early Termination Date, LBSF was the party "in-the-money" and thus entitled to receive a substantial termination payment from Mirabella.

43.     Mirabella manipulated its valuations of the Transactions to achieve a windfall when it improperly calculated the early termination payment under Loss. Mirabella knew that the Transactions were "in-the-money" to LBSF by approximately $8.1 million and derived a gain in that amount when Mirabella was relieved of its future payment obligations under the Transactions, but still claimed its gain was zero under the Loss measure. Indeed, even though Mirabella recognized the value of the Transactions and recorded it on its financial statements, it still did not figure its gain into its calculation of the early termination payment. By refusing to pay LBSF a properly calculated, commercially reasonable termination payment in accordance with the Loss measure in the Master Agreement, Mirabella violated the covenant of good faith and fair dealing implicit in all contracts governed by New York law.

44.     As a result of this breach, LBSF has been damaged in an amount to be proven at trial, but at least $8.1 million, representing Mirabella's gain as of the Early Termination Date which Mirabella failed to pay to LBSF, plus interest which has accrued since the Early Termination Date and which will continue to accrue at the Default Rate until final payment is

made to LBSF.

## COUNT III

### Turnover of LBSF's Property Interest in the Properly Calculated Termination Payment Pursuant to Section 542(b) of the Bankruptcy Code

*(Against Defendant Mirabella)*

45.       Plaintiff repeats, realleges, and incorporates by reference the allegations contained in paragraphs 1-44 of this Complaint as though fully set forth in this cause of action.

46.       Section 542(b) of the Bankruptcy Code expressly provides that ". . . an entity that owes a debt that is property of the estate and that is matured, payable on demand, or payable on order, shall pay such debt to, or on the order of, the trustee, except to the extent that such debt may be offset under section 553 of this title against a claim against the debtor."  11 U.S.C. § 542(b).

47.       As fully alleged above, Mirabella was obligated to pay LBSF a properly calculated early termination payment under the Master Agreement, plus interest.  The amount due to LBSF from Mirabella as of November 24, 2008, the Early Termination Date, is property of LBSF's estate under section 541(a) of the Bankruptcy Code.

48.       The termination value of the Transactions on the Early Termination Date (after accounting for accrued amounts which Mirabella paid to LBSF) represents the payment Mirabella owed to LBSF as of that date.

49.       Mirabella has failed to pay LBSF that amount and continues to do so, making the early termination payment a matured debt.

50.       Accordingly, pursuant to section 542(b) of the Bankruptcy Code, Plaintiff requests an order compelling and directing Mirabella to turn over to LBSF the value of the Transactions on the Early Termination Date (after accounting for accrued amounts which

Mirabella paid to LBSF), plus interest which has accrued since the Early Termination Date and which will continue to accrue at the Default Rate until final payment is made to LBSF.

## COUNT IV

### Unjust Enrichment

*(Against Defendant Mirabella and Does 1-10)*

51.     Plaintiff repeats, realleges, and incorporates by reference the allegations contained in paragraphs 1-50 of this Complaint as though fully set forth in this cause of action.

52.     As a result of Mirabella's breach of its obligations to LBSF under the Master Agreement and Mirabella's failure to pay LBSF a termination payment representing the amount LBSF was "in the money" under the Transactions, Mirabella and Does 1-10 obtained an unjust windfall at the expense of LBSF.

53.     Mirabella has been improperly and unjustly enriched at LBSF's expense as a result of Mirabella's actions.  To the extent Mirabella distributed any of the funds to Does 1-10, Does 1-10 have been improperly and unjustly enriched at LBSF's expense.  LBSF received almost nothing, despite being the party "in the money" on the Transactions, because of Mirabella's bad faith calculation under the Loss measure.  Equity and good conscience require that Mirabella and Does 1-10 return to LBSF at least $8.1 million, plus prejudgment interest.

## COUNT V

### Interest

*(Against Defendant Mirabella)*

54.     Plaintiff repeats, realleges, and incorporates by reference the allegations contained in paragraphs 1-53 of this Complaint as though fully set forth in this cause of action.

55.     Mirabella not only owes LBSF a termination payment of at least $8.1 million, but also interest thereon.

13

56.    By failing to properly value the Transactions and make the payment due to LBSF, Mirabella breached the Master Agreement and, therefore, must pay accrued interest on the amount it owes to LBSF, which interest continues to accrue until payment to LBSF in full.

57.    The Master Agreement explicitly provides that the Applicable Rate is the "Default Rate" on sums calculated pursuant to section 6(e) of the Master Agreement from the date the calculation statement is delivered.  Master Agreement § 12.  The "Termination Rate" applies to the amount owed prior to that date.  *Id.*  The Default Rate for Mirabella is based the USD-LIBOR-BBA rate plus 1% as defined in section 3(g)(iv) of the Schedule to the Master Agreement.  The Termination Rate is the average cost of funds of the two parties.

58.    Consequently, the interest owed on the $8.1 million early termination payment to which LBSF is entitled began to accrue (i) at the Termination Rate from and including November 24, 2008, to but excluding December 9, 2008, and (ii) at the Default Rate from and including December 9, 2008 to the present, with interest continuing to accrue at the Default Rate until payment to LBSF in full.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that judgment be entered:

(1)    Against Defendant Mirabella as follows:

A.    As to Counts I and II, awarding LBSF damages from Mirabella in an amount to be determined at trial, but in all events, at least $8.1 million, representing Mirabella's gain which Mirabella failed to pay to LBSF, plus interest which has accrued since the Early Termination Date and which will continue to accrue at the Default Rate until final payment is made to LBSF;

B.    As to Count III, an order compelling and directing Mirabella to turn over the properly-calculated termination payment to LBSF, which is the value of the Transaction on the

Early Termination Date (after accounting for accrued amounts which Mirabella paid to LBSF),
plus prejudgment interest;

      (2)     <u>Against Defendants Mirabella and Does 1–10 as follows</u>:

      C.     As to Count IV, awarding LBSF damages from Mirabella and Does 1–10 in an
amount to be determined at trial, but in all events, at least $8.1 million, representing the value of
Mirabella's gain which Mirabella failed to pay to LBSF, plus prejudgment interest;

      D.     Pre-judgment and post-judgment interest; and

      E.     Such other and further relief, including interest, costs, and attorneys' fees, as the
Court deems just and proper.

Dated: August 22, 2014
      Redwood Shores, CA

            By: <u>/s/ Christopher J. Cox</u>
            Christopher J. Cox

            WEIL, GOTSHAL & MANGES LLP
            201 Redwood Shores Parkway
            Redwood Shores, CA 94065
            Telephone: (650) 802-3000
            Facsimile: (650) 802-3100

            Jacqueline Marcus
            WEIL, GOTSHAL & MANGES LLP
            767 Fifth Avenue
             New York, New York 10153
            Telephone: (212) 310-8000
            Facsimile: (212) 310-8007

            *Attorneys for Lehman Brothers Holdings Inc.*
            *and Lehman Brothers Special Financing Inc.*