STROOCK & STROOCK & LAVAN LLP
Claude G. Szyfer
Francis C. Healy
180 Maiden Lane
New York, New York 10038
Telephone: (212) 806-5400
Facsimile: (212) 806-6006

*Attorneys for Goldman Sachs Emerging*
*Markets Opportunities Fund, LLC and*
*Goldman Sachs Emerging Markets*
*Opportunities Fund Offshore, LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | : | |
| IN RE: | : | Chapter 11 |
| | : | |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, | : | Case No. 08-13555 (SCC) |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | : | |
| | : | |

**RESPONSE OF GOLDMAN SACHS EMERGING MARKETS OPPORTUNITIES**
**FUND, LLC AND GOLDMAN SACHS EMERGING MARKETS OPPORTUNITIES**
**FUND OFFSHORE, LLC TO DEBTORS' FOUR HUNDRED SEVENTY-NINTH**
**OMNIBUS OBJECTION TO CLAIMS (NO LIABILITY CLAIMS)**

Goldman Sachs Emerging Markets Opportunities Fund, LLC ("GSEMOF") and Goldman

Sachs Emerging Markets Opportunities Fund Offshore, LLC ("GSEMOF Offshore")

(collectively, the "EMO Funds"), by and through their undersigned counsel, hereby file their

response (the "Response") to the Debtors' Four Hundred Seventy-Ninth Omnibus Objection to

Claims (No Liability Claims) (the "Objection") [Docket No. 45448] and represent as follows:

## BACKGROUND

### The EMO Funds' Master Agreements

1.        Prior to the Debtors' commencement of these cases, the EMO Funds and Lehman Brothers Special Financing Inc. ("LBSF") were parties to certain derivative swap transactions (the "Transactions") documented under separate ISDA master agreements, dated February 16, 2006 (as amended, supplemented or modified and together with all schedules, annexes and exhibits thereto, the "Master Agreements").

2.        As set forth in the Master Agreements, LBSF's obligations to the EMO Funds thereunder were specifically guaranteed by Lehman Brothers Holdings Inc. ("LBHI").  The Master Agreements each set forth unequivocally that LBHI is a "Credit Support Provider" in relation to LBSF expected to "irrevocably, absolutely and unconditionally guarantee[s] to [the EMO Funds] the due and punctual payment of all amounts payable by [LBSF] under each Transaction and the Agreement[s]."

### Debtors' Further Inducements to the EMO Funds Relating to the Guarantee of LBSF's Obligations

3.        In addition to the unequivocal provisions in the Master Agreements, on June 9, 2005, the Executive Committee of the Board of Directors of LBHI adopted a resolution by unanimous written consent providing for the full guarantee by LBHI of the payment of all liabilities of LBSF (the "Corporate Resolution").  The Corporate Resolution, a copy of which is annexed hereto as Exhibit A, provides that "[t]he Corporation [LBHI] hereby fully guarantees the payment of all liabilities, obligations and commitments of the subsidiaries set forth on Schedule A hereto [including LBSF], each of which shall be a Guaranteed Subsidiary."  On March 19, 2008, LBHI issued a Certificate of the Assistant Secretary (the "Assistant Secretary Certificate"), certifying that the Corporate Resolution was in full force and effect as of that date.

*See* Exhibit A.  Accordingly, all obligations of LBSF, including those obligations to the EMO Funds under the Master Agreements, are fully guaranteed and payable by LBHI pursuant to the Corporate Resolution.

4.      On December 1, 2006, LBHI issued a Guarantee of LBHI addressed to Standard & Poor's Rating Services (the "<u>S&P Guarantee</u>").  The S&P Guarantee, a copy of which is annexed hereto as Exhibit B, provides that LBHI does "hereby absolutely and unconditionally guarantee the payment by Lehman Brothers Special Financing Inc. ('Affiliate') of all of Affiliate's liabilities, obligations and commitments (the 'Guaranteed Obligations') to any counterparty of Affiliate and such counterparty's successors, endorsees and assigns." Accordingly, all obligations of LBSF, including those obligations to the EMO Funds under the Master Agreements, are fully guaranteed and payable by LBHI pursuant to the S&P Guarantee.

5.      In November 2007, Lehman Brothers Inc. ("<u>LBI</u>") issued a Customer Asset Protection Overiew to the prime brokerage customers of LBI and Lehman Brothers International (Europe) ("<u>LBIE</u>") (the "<u>Protection Overview</u>"). The Protection Overview, a copy of which is annexed hereto as Exhibit C, provides that, with regard to swaps and derivatives transacted with LBSF or LBIE, "[b]oth LBSF and LBIE have the guaranty of LBHI." Accordingly, the Protection Overview confirms that all obligations of LBSF, including those obligations to the EMO Funds under the Master Agreements, are fully guaranteed and payable by LBHI.

6.      On December 10, 2007, Jennifer Geismar of LBI provided the EMO Funds with a copy of the Protection Overview.  *See* Exhibit C.

7.      On March 20, 2008, Debtors provided the EMO Funds with copies of the Corporate Resolution and Assistant Secretary Certificate, certifying that LBHI's guarantee of the

3

payment of all liabilities, obligations and commitments of LBSF was in full force and effect as of

that date.  *See* Exhibit A.  Similarly, on March 18, 2008, Debtors provided the EMO Funds with

a copy of the S&P Guarantee.  *See* Exhibit B.

8.      Despite the financial instability of LBSF and LBHI during the first quarter of

2008, in reliance on the Corporate Resolution, Assistant Secretary Certificate and S&P

Guarantee provided in March 2008, the EMO Funds maintained the Transactions at LBSF,

entered into additional Transactions with LBSF, and continued to post collateral with LBSF

under the Master Agreements.[1]

### The Chapter 11 Proceedings

9.      On September 15, 2008, LBHI commenced a voluntary case under chapter 11 of

the Bankruptcy Code (the "LBHI Filing").  On October 3, 2008, LBSF filed a voluntary petition

for relief pursuant to chapter 11 of the Bankruptcy Code in the Bankruptcy Court.

10.     The LBHI Filing constituted an Event of Default under Section 5(a)(vii) of the

Master Agreements.  By notices dated September 15, 2008, the EMO Funds gave notice of the

occurrence of an Event of Default under the Master Agreements with respect to LBSF (the

"Termination Notices"), and designated September 15, 2008 as the Early Termination Date with

respect to all Transactions under the Master Agreements.

11.     On September 17, 2009, GSEMOF timely filed proofs of claim against LBSF

(Claim 15892) (the "GSEMOF Derivative Claim") and LBHI (Claim 15891) (the "GSEMOF

Guarantee Claim").  On October 21, 2009, GSEMOF timely submitted Derivative and Guarantee

Questionnaires and uploaded voluminous documents in support of its claims, including, but not

---

[1] The trade dates for the Transactions, including those Transactions after March 2008, and the amounts of posted collateral are set forth in the schedules annexed to the Calculation Statements, dated September 17, 2009 (the "Calculation Statements").

limited to, copies of its respective Master Agreement, Termination Notice, Calculation Statement, the Corporate Resolution, the Assistant Secretary Certificate, the S&P Guarantee, the Protection Overview, and a spreadsheet identifying the details of the Transactions and the basis for GSEMOF's claim calculations. GSEMOF asserted claims of $456,738.00, plus interest, costs and fees, against each of LBSF and LBHI resulting from the early termination of the Transactions and LBHI's guarantee.

12. On September 17, 2009, GSEMOF Offshore also timely filed proofs of claim against LBSF (Claim 15825) (the "GSEMOF Offshore Derivative Claim") and LBHI (Claim 15824) (the "GSEMOF Offshore Guarantee Claim") (together, with the GSEMOF Guarantee Claim, the "Guarantee Claims"). On October 21, 2009, GSEMOF Offshore timely submitted Derivative and Guarantee Questionnaires and uploaded voluminous documents in support of its claims, including, but not limited to, copies of its respective Master Agreement, Termination Notice, Calculation Statement, the Corporate Resolution, the Assistant Secretary Certificate, the S&P Guarantee, the Protection Overview, and a spreadsheet identifying the details of the Transactions and the basis for GSEMOF Offshore's claim calculations. GSEMOF Offshore asserted claims of $144,647.00, plus interest, costs and fees, against each of LBSF and LBHI resulting from the early termination of the Transactions and LBHI's guarantee.

13. On or about September 6, 2013, the EMO Funds and Debtors reached a settlement with regard to their respective Derivative Claims whereby Debtors agreed that GSEMOF shall have a single aggregate nonpriority general unsecured derivative claim against LBSF in the fixed amount of $427,365.44 and GSEMOF Offshore shall have a single aggregate nonpriority general unsecured derivative claim against LBSF in the fixed amount of $118,052.57.

## RESPONSE

14.    Pursuant to Rule 3001(f) of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules"), "[a] proof of claim executed and filed in accordance with these rules shall constitute prima facie evidence of the validity and amount of the claim."  Here, the EMO Funds timely filed the Guarantee Claims and provided voluminous documentary support for the validity and amounts thereof, fully complying with the detailed Questionnaire process.  Accordingly, the Guarantee Claims are prima facie valid in the respective asserted amounts.  In order to overcome this prima facie validity, the burden shifts to the Debtors to come forward with "evidence equal in force to the prima facie case ... which, if believed, would refute at least one of the allegations that is essential to the claim's legal sufficiency."  *In re DJK Residential LLC*, 416 B.R. 100, 104 (Bankr. S.D.N.Y. 2009) (quoting *In re Oneida, Ltd.*, 400 B.R. 384 (Bankr. S.D.N.Y. 2009); *see also In re Minbatiwalla*, 424 B.R. 104, 111 (Bankr. S.D.N.Y. 2010).

15.    The Objection fails to provide, nor even attempts to provide, evidence that refutes the prima facie validity of the Guarantee Claims.  Instead, to support its Objection, the Plan Administrator relies solely on generic and conclusory allegations, namely that the Guarantee Claims should be disallowed because: (i) the EMO Funds have "failed to demonstrate that LBHI is liable" on any specific guarantee, and/or (ii) the EMO Funds failed to assert that they knew of and relied upon any general guarantee by LBHI when they entered into the Transactions. (Objection, ¶¶ 16, 17.)   However, even a cursory review of the Questionnaire materials submitted in support of the Guarantee Claims provides evidence contradicting the Plan Administrator's contentions, because: (i) LBHI specifically guaranteed the obligations of LBSF under the Master Agreements; and (ii) the EMO Funds both knew of and relied upon the Corporate Resolution, the Assistant Secretary Certificate and the S&P Guarantee in March 2008

6

when they altered their positions by maintaining the Transactions at LBSF and then entering into additional Transactions and continuing to post collateral with LBSF, the primary obligor.

16.     A valid guarantee is a written instrument "guaranteeing payment of another's debt, describing with precision the obligation to which the person is bound." *Cavendish Traders, Ltd. v. Nice Skate Shoes, Ltd.*, 117 F.Supp.2d 394, 400 (S.D.N.Y. 2000).

17.     Under New York law, the statute of frauds does not require that a particular writing be contained in one document, but may be "pieced together" from several documents. *Weitnauer Trading Co. Ltd. v. Annis*, 516 F.2d 878, 880 (2d Cir. 1975) (citing *Crabtree v. Elizabeth Arden Sales Corp.*, 305 N.Y. 48, 54 (1953).  Where some writings have been signed, and others have not, the signed and unsigned writings may be read together to form a single writing, provided that they refer to the same subject matter or transaction. *Crabtree*, 305 N.Y. at 54-56.  Moreover, "such documents need not be in existence at the time the contract is made but may be supplied at a later date." *Weitnauer Trading Co. Ltd.*, 516 F.2d at 880 (affirming that a guarantee satisfied the statute of frauds where subsequent letters written by the guarantor referred to the challenged guarantee).

18.     Here, though the EMO Funds have not located copies of the guarantees executed by LBHI for their specific benefit under the Master Agreements, the contemporaneous Master Agreement documents—which set forth explicitly that LBHI would guarantee LBSF's obligations to the EMO Funds—and the communications relating to the Corporate Resolution, Assistant Secretary Certificate and S&P Guarantee may be read together to demonstrate that LBSF's obligations under the Master Agreements were, in fact, specifically guaranteed by LBHI.

19.     First, the Schedules to each Master Agreement included as an exhibit the specific guarantee that was intended to be executed and delivered by LBHI.   The form guarantees

7

provided by LBHI reference the respective Master Agreements and the Transactions thereunder, stating explicitly that each guarantee is a "Credit Support Document as contemplated by" the Master Agreements, under which the EMO Funds and LBSF anticipated entering into the Transactions, and that LBHI "irrevocably, absolutely and unconditionally guarantees to [the EMO Funds] the due and punctual payment of all amounts payable by [LBSF] under each Transaction and the Agreement[s]."  The form guarantees also expressly state that LBHI agreed to guarantee the payments of LBSF "in consideration of the financial accommodation accorded" to LBSF by the EMO Funds.

20.    Moreover, provisions of the Master Agreements themselves confirm that LBHI's guarantee of LBSF's obligations thereunder was expressly contemplated by the parties.  Part 3(b) of the Schedule to each Master Agreement confirms that a "guarantee of [LBHI] attached as Exhibit A hereto" was to be delivered to the EMO Funds upon execution of the Master Agreement.  Part 4(f) of the Schedule states unequivocally that the "Credit Support Document" provided by LBSF was a "Guarantee of [LBHI]," and, pursuant to Part 4(g) of the Schedule, LBHI served as the "Credit Support Provider . . . in relation to [LBSF] . . . ."  Similarly, the provisions of each Master Agreement pertaining to counterparty credit risk further demonstrate the importance of LBHI's guarantee to the parties' trading relationship.  The Cross Default clause in Part 1(c) of the Schedule provides that the "Threshold Amount" trigger was based on a default on other indebtedness that exceeded 3% of LBHI's stockholders' equity, and the "Credit Event Upon Merger" clause (Part 1(d)) was similarly based upon the long-term senior unsecured debt rating of LBHI, not LBSF.

21.    Subsequently, Debtors provided the EMO Funds with copies of the S&P Guarantee, the Corporate Resolution and the Assistant Secretary Certificate, all of which were

8

executed by LBHI and provide further evidence of LBHI's guarantee of LBSF's obligations. *See* Exhibits A through C.

22.     Accordingly, the Master Agreements and the Debtor's emails to the EMO Funds attaching copies of the Corporate Resolution, Assistant Secretary Certificate and S&P Guarantee, all of which relate to LBSF's obligations in connection with the Transactions under the Master Agreements and LBHI's guarantee thereof, can be "pieced together" to form a single writing in satisfaction of the statute of frauds, which writing demonstrates LBHI's liability to the EMO Funds under specific guarantees. *See Weitnauer Trading Co. Ltd.*, 516 F.2d at 880.

23.     Furthermore, having provided the Corporate Resolution, Assistant Secretary Certificate and S&P Guarantee in March 2008 in order to induce the EMO Funds to alter their positions by continuing to trade and post collateral with LBSF, Debtors should not be permitted to avail themselves now of the statute of frauds by arguing that the EMO Funds have failed to produce the specific guarantees executed by LBHI. *See M.H. Metal Products Corp. v. April*, 251 N.Y. 146, 150 (1929) (holding that the statute of frauds does not protect a guarantor who, by his subsequent "agreement, acts and conduct, has induced another to incur expense and alter his position to his damage"). Debtors themselves, in the Disclosure Statement for the Plan (as defined in the Objection), admit that a fact "support[ing] the argument that creditors relied on the Lehman enterprise operating as a single unit" included the fact that LBHI guaranteed the derivative contracts of subsidiaries "as a matter of course and did not need to be requested or negotiated." Disclosure Statement, § X(B)(1)(c)(ii) at p. 65 (emphasis added). It would strain credulity, and be unconscionable, to permit Debtors to affirm in the Disclosure Statement that LBHI's guarantees "were given as a matter of course and did not need to be requested or negotiated," yet now contend that the Guarantee Claims should be disallowed because executed

9

versions of the specific guarantees cannot be located.  Indeed, based on this statement alone, the burden should be on LBHI to prove that this was the rare occasion upon which it did *not* actually issue a specific guarantee in favor of LBSF's counterparty.

24.      Even without the benefit of executed copies of the LBHI specific guarantees, however, the Guarantee Claims should be allowed because the EMO Funds both knew of and relied upon the general guarantees contained in the Corporate Resolution, Assistant Secretary Certificate and S&P Guarantee when they chose to maintain the Transactions, enter into additional Transactions, and continue to post collateral with LBSF under the Master Agreements.

25.      As the Plan Administrator admits, a general guarantee is an offer than can be accepted and enforced by anyone to whom it is presented if that person so acting had knowledge of the existence of the guarantee and acted in reliance on it.  *See* Objection, ¶¶ 10-11, *citing* 38 AM. JUR. 2D Guaranty § 14.  Here, the record clearly demonstrates that the EMO Funds satisfy both prongs of that test.

26.      On March 20, 2008, Debtors provided the EMO Funds with copies of the Corporate Resolution and the Assistant Secretary Certificate, which certified that LBHI guaranteed the payment of all of LBSF's liabilities, obligations and commitments, including LBSF's performance obligations under the Master Agreements.  *See* Exhibit A.  Similarly, on March 18, 2008, Debtors provided the EMO Funds with a copy of the S&P Guarantee.  *See* Exhibit B.

27.      In reliance on LBHI's general guarantee of LBSF's obligations, as expressly set forth in the Corporate Resolution, Assistant Secretary Certificate and S&P Guarantee, the EMO Funds altered their positions (ultimately to their detriment) by not only to keeping all current

Transactions with LBSF, but also by entering into additional Transactions and continuing to post collateral with LBSF under the Master Agreements.

28.    Accordingly, contrary to the Plan Administrator's conclusory allegation, there can be no dispute that the EMO Funds both knew of and acted in reliance upon the LBHI general guarantees contained in the Corporate Resolution, Assistant Secretary Certificate and S&P Guarantee in March 2008.  *See Philip Carey Co. v. Duffy*, 10 N.Y.S. 876 (N.Y. App. Div. 1939) (affirming judgment on general letter of credit where plaintiff sold materials to the primary obligor "in reliance upon the letter and promise of credit" of defendant).

29.    Moreover, because the Corporate Resolution and S&P Guarantee make clear that LBHI guaranteed the payment of "**all**" of LBSF's liabilities, obligations and commitments, said guarantees also extend to LBSF's then existing payment obligations relating to Transactions into which the parties had already entered as of March 2008.  *See Farmers' State Bank of York v. Brock*, 234 N.W. 92, 93 (Neb. 1931) (dismissing defendants' contention that a guarantee was executed with the understanding that it guaranteed only payments of futures obligations where it expressly guaranteed "the payment when due of any and all indebtedness … to the amount of $25,000, now or hereafter owing").

30.    Accordingly, because (i) LBHI specifically guaranteed the obligations of LBSF under the Master Agreements; and (ii) the EMO Funds both knew of and relied upon the Corporate Resolution, Assistant Secretary Certificate and S&P Guarantee when they maintained and entered into additional Transactions with LBSF, the Objection should be overruled and the Guarantee Claims against LBHI should be allowed.

31.    The EMO Funds reserve all of their rights, claims and defenses, including without limitation the right to discovery in connection with the Debtors' Objection.

11

WHEREFORE, the EMO Funds respectfully request that the Court (i) overrule the Objection with respect to Claims 15824 and 15891; (ii) allow Claims 15824 and 15891 as filed**,** and (iii) grant such other and further relief as this Court deems just and proper under the circumstances.

Dated:    August 29, 2014
       New York, New York

STROOCK & STROOCK & LAVAN LLP

/s/ Claude G. Szyfer
Claude G. Szyfer
Francis C. Healy
180 Maiden Lane
New York, New York 10038
Telephone: (212) 806-5400
Facsimile: (212) 806-6006

*Attorneys for Goldman Sachs Emerging Markets Opportunities Fund, LLC and Goldman Sachs Emerging Markets Opportunities Fund Offshore, LLC*

12

# **EXHIBIT A**



"Yun, Wendy"
<Wendy.Yun@gs.com>

11 October 2009  07:25
PM

To   daman@cgsh.com

cc

bcc

Subject   FW: LBSF/LBIE Assistant Secretary Certificates


fyi


-----Original Message-----
From: Eicher, Meghan [mailto:meghan.eicher@lehman.com]
Sent: Thursday, March 20, 2008 6:27 PM
To: Yun, Wendy
Subject: LBSF/LBIE Assistant Secretary Certifcates

Wendy,

As discussed, enclosed for your files please find the LBSF and
LBIE
Assistant Secretary Certificates.  Please don't hesitate to
contact me
should you have any questions or need further assistance.

Kind regards,
Meghan


 <<LBSF Asst Secretary's Certificate.pdf>>  <<LBIE Asst
Secretary's
Certificate.pdf>>

Note: New Contact (Effective: February 25th, 2008)

Meghan Eicher
Lehman Brothers Inc.
Capital Markets Contracts - Legal
1271 Avenue of the Americas, 43rd Floor
New York, NY 10020
(646) 333-9508 (t)
(646) 758-5056 (f)
meicher@lehman.com


- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
- - -
- - - - - - - -

This message is intended only for the personal and confidential
use of
the designated recipient(s) named above.  If you are not the
intended
recipient of this message you are hereby notified that any review,
dissemination, distribution or copying of this message is strictly
prohibited.  This communication is for information purposes only
and
should not be regarded as an offer to sell or as a solicitation of
an
offer to buy any financial product, an official confirmation of
any
transaction, or as an official statement of Lehman Brothers.
Email
transmission cannot be guaranteed to be secure or error-free.
Therefore, we do not represent that this information is complete

or
accurate and it should not be relied upon as such.  All
information is
subject to change without notice.


--------
IRS Circular 230 Disclosure:
Please be advised that any discussion of U.S. tax matters
contained
within this communication (including any attachments) is not
intended or
written to be used and cannot be used for the purpose of (i)
avoiding
U.S. tax related penalties or (ii) promoting, marketing or
recommending
to another party any transaction or matter addressed herein.



LBSF Asst Secretary's Certificate.pdf  LBIE Asst Secretary's Certificate.pdf

## ASSISTANT SECRETARY'S CERTIFICATE

The undersigned, a duly elected and qualified Assistant Secretary of Lehman Brothers Holdings Inc., a Delaware corporation (the "Corporation"), does hereby certify that pursuant to Resolutions of the Executive Committee of the Board of Directors of the Corporation dated June 9, 2005, the Corporation resolved to fully guarantee the payment of all liabilities, obligations and commitments of its subsidiary, Lehman Brothers Special Financing Inc. ("LBSF") and that such Resolutions are in full force and effect as of the date hereof.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed the Corporation's seal on this 19th day of March , 2008 .

SEAL                                    LEHMAN BROTHERS HOLDINGS INC.

By: _____
        Cindy Buckholz
        Assistant Secretary

# UNANIMOUS WRITTEN CONSENT OF THE

## EXECUTIVE COMMITTEE OF THE

## BOARD OF DIRECTORS OF

## LEHMAN BROTHERS HOLDINGS INC.

The undersigned, being both members of the Executive Committee of the Board of Directors of Lehman Brothers Holdings Inc., a Delaware corporation (the "Corporation"), do hereby adopt the following resolutions by unanimous written consent in lieu of a meeting in accordance with Section 141(f) of the General Corporation Law of the State of Delaware:

**WHEREAS,** the Corporation has previously authorized by specific resolution, which authority has not been revoked (the "Outstanding Guarantee Resolutions"), the guarantee of all or specified obligations and liabilities of certain direct and indirect subsidiaries of the Corporation, each of which is a "Guaranteed Subsidiary" as such term is used in the Corporation's Code of Authorities as currently in effect (the "Code"),

**WHEREAS,** certain of the Guaranteed Subsidiaries presently enjoy full guarantees while others have only partial guarantees, and the Corporation now wishes to expand such partial guarantees to full guarantees,

**WHEREAS,** due to the passage of time the names of certain of the Guaranteed Subsidiaries have changed, rendering the Outstanding Guarantee Resolutions out of date to that extent,

**WHEREAS,** the Corporation wishes to clarify that its guarantee of any Guaranteed Subsidiary with respect to any given transaction is not contingent upon the issuance of a signed guarantee pertaining to such transaction,

**WHEREAS,** Management wishes to establish additional Guaranteed Subsidiaries,

**WHEREAS,** Management wishes to specify that to the extent lawful and allowable, guarantees issued by the Corporation concerning certain of the Guaranteed Subsidiaries should originate with the branch of the Corporation located in London, England, so as to secure certain tax and accounting benefits, and

**WHEREAS,** Management believes that it would facilitate the conduct of the business of the Corporation to supersede and replace the various Outstanding Guarantee Resolutions in their entirety with this single document,

**NOW THEREFORE BE IT,**

**RESOLVED**, that the Corporation hereby fully guarantees the payment of all liabilities, obligations and commitments of the subsidiaries set forth on Schedule A hereto, each of which shall be a Guaranteed Subsidiary for purposes of the Code;

**RESOLVED**, that the Outstanding Guarantee Resolutions are hereby superseded and replaced in their entirety with this single document, provided that any guarantees provided pursuant to the Outstanding Guarantee Resolutions and outstanding on the date hereof, whether in the form of a separately executed individual guarantee or otherwise, shall remain issued, outstanding and valid for all purposes;

**RESOLVED**, that guarantees provided by the Corporation concerning certain of the Guaranteed Subsidiaries should originate with the branch of the Corporation located in London, England, to the extent lawful and allowable, as specified on Schedule A hereto;

**RESOLVED**, that each of the persons listed in the Code (as it may be amended from time to time) as being authorized to approve individual guarantees issued by the Corporation with respect to Guaranteed Subsidiaries, or any proper delegee thereof (collectively, "Authorized Persons"), are hereby authorized, in the name and on behalf of the Corporation, to execute such guarantees in such form as is approved by an attorney of the Corporation and such Authorized Person, subject to any limitations specified herein, his or her execution of each such guarantee to be conclusive evidence of approval thereof; and to do such other acts and things as may be advisable or necessary in order to effect the purposes and intent of these resolutions; and

**FURTHER RESOLVED**, that any and all actions contemplated by the foregoing resolutions and taken by such Authorized Persons prior to the date hereof are hereby ratified, confirmed and approved in all respects.

Dated: June 7, 2005

Richard S. Fuld, Jr.

John D. Macomber

2

Schedule A
to LBHI Unanimous Written Consent
dated June 9 , 2005

| | Name of Subsidiary | Issue Corporation guarantee from branch located in London, England, to the extent lawful and allowable? |
|---|---|---|
| 1. | Lehman Brothers Asia Holdings Limited | No |
| 2. | Lehman Brothers Bankhaus A.G. | Yes (London branch of such subsidiary only) |
| 3. | Lehman Brothers Commercial Bank | No |
| 4. | Lehman Brothers Commercial Corporation | No |
| 5. | Lehman Brothers Commercial Corporation Asia Limited | No |
| 6. | Lehman Brothers Equity Finance (Cayman) Limited | No |
| 7. | Lehman Brothers Finance S.A. | No |
| 8. | Lehman Brothers Holdings Plc | Yes |
| 9. | Lehman Brothers International (Europe) | Yes |
| 10. | Lehman Brothers Japan Inc. | No |
| 11. | Lehman Brothers (Luxembourg) Equity Finance S.A. | No |
| 12. | Lehman Brothers (Luxembourg) S.A. | No |
| 13. | Lehman Brothers OTC Derivatives Inc. | No |
| 14. | Lehman Brothers Securities Asia Limited | No |
| 15. | Lehman Brothers Securities N.V. | No |
| 16. | Lehman Brothers Special Financing Inc. | No |
| 17. | Lehman Brothers Treasury Co. B.V. | No |
| 18. | Lehman Re Limited | No |

3

# **EXHIBIT B**



"Yun, Wendy"
<Wendy.Yun@gs.com>

11 October 2009  06:51
PM

To      daman@cgsh.com

cc

bcc

Subject    FW: Lehman Brothers Holdings Guarantee of
LBIE/LBSF

David,

Attached are the guarantees for LBSF and LBIE.

Thanks and kind regards.
Wendy

---

Goldman, Sachs & Co.

One New York Plaza | 37th Floor | New York, NY 10004
Tel:  212.902.9958 | Fax:  212.256.6329
e-mail:  wendy.yun@gs.com

**Goldman            Sachs**

**Wendy Yun**

Vice President & Associate General Counsel

---

**From:** Prince, Phil
**Sent:** Tuesday, March 18, 2008 7:07 AM
**To:** Yun, Wendy
**Subject:** FW: Lehman Brothers Holdings Guarantee of LBIE/LBSF

**From:** Nelson, Ryan W [mailto:ryan.nelson@lehman.com]
**Sent:** Tuesday, March 18, 2008 6:44 AM
**To:** Wianecki, Karl; Prince, Phil
**Cc:** Kapadia, Sujal J
**Subject:** Lehman Brothers Holdings Guarantee of LBIE/LBSF

Karl/Phil-  Please see the attached and let me know if you have any
questions.

Cheers!

Ryan

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

This message is intended only for the personal and confidential use of the designated recipient(s) named above. If you are not the intended recipient of this message you are hereby notified that any review, dissemination, distribution or copying of this message is strictly prohibited. This communication is for information purposes only and should not be regarded as an offer to sell or as a solicitation of an offer to buy any financial product, an official confirmation of any transaction, or as an official statement of Lehman Brothers. Email transmission cannot be guaranteed to be secure or error-free. Therefore, we do not represent that this information is complete or accurate and it should not be relied upon as such. All information is subject to change without notice. -------- IRS Circular 230 Disclosure: Please be advised that any discussion of U.S. tax matters contained within this communication (including any attachments) is not intended or written to be used and cannot be used for the purpose of (i) avoiding U.S. tax related penalties or (ii) promoting, marketing or recommending to another party any transaction or matter

addressed herein.  Document.pdf  Document.pdf

## GUARANTEE OF LEHMAN BROTHERS HOLDINGS INC.

To:    **Standard & Poor's Rating Services**
       **55 Water Street**
       **New York, NY 10041**

We, Lehman Brothers Holdings Inc., do hereby absolutely and unconditionally guarantee the payment by Lehman Brothers Special Financing Inc. ("Affiliate") of all of Affiliate's liabilities, obligations and commitments (the "Guaranteed Obligations") to any counterparty of Affiliate and such counterparty's successors, endorsees and assigns (collectively, the "Beneficiaries"), as the same shall respectively become due, together with accrued interest and charges, if any, and we agree to reimburse each Beneficiary for all expenses including reasonable attorneys' fees of enforcing or obtaining or endeavoring to enforce or obtain payment thereof.

This Guarantee is absolute and unconditional without limitation as to monetary amount or duration, irrespective of the validity, regularity or enforceability of any agreement or document setting forth a Guaranteed Obligation (each a "Borrower Agreement") against Affiliate (other than as a result of the unenforceability of the applicable Borrower Agreement against the Beneficiary), any waiver or consent by any Beneficiary with respect to any provisions thereof or any other circumstance which might otherwise constitute a legal or equitable discharge or defense of a guarantor (excluding the defenses of payment and statute of limitations, neither of which is waived); provided, however, that we shall be entitled to exercise any right that Affiliate could have exercised under the applicable Borrower Agreement to cure any default in respect of its obligations under the Borrower Agreement or to setoff, counterclaim or withhold payment in respect of any event of default or similar event in respect of a Beneficiary, but only to the extent such right is provided to Affiliate under the Borrower Agreement. We shall have no right of subrogation with respect to any payments we make under this Guarantee in connection with a Borrower Agreement until all Guaranteed Obligations of Affiliate under that Borrower Agreement are paid in full.

This Guarantee is a guarantee of payment, and not of collection, and each Beneficiary may exercise its rights hereunder against us without first having to take any action against Affiliate, or any other guarantor. We hereby waive diligence, presentment, protest, demand of any kind in connection with the delivery, acceptance, performance, default or enforcement of this Guarantee.

Our obligations under this Guarantee shall rank *pari passu* with all of our other present and future unsecured unsubordinated obligations.

This Guarantee shall be binding upon us, our successors and assigns.

We further agree that this Guarantee shall continue to be effective or be reinstated, as the case may be, if at any time payment, or any part thereof, of any Guaranteed Obligation or interest thereon is rescinded or must otherwise be restored by or is recovered from a

Beneficiary as a preference or fraudulent transfer under the federal Bankruptcy Code or any similar applicable state or foreign law.

Any notice hereunder will be sufficiently given if given in the manner provided under the applicable Borrower Agreement and will be effective as set forth therein. All notices hereunder to us shall be to Lehman Brothers Holdings Inc., Attention: Treasurer, at 745 Seventh Avenue, New York, New York (Facsimile No. 646-758-3334).

This Guarantee shall be governed by and construed in accordance with the laws of the State of New York without giving effect to the conflicts of laws principles thereof.

**IN WITNESS WHEREOF,** I have hereunto set my hand on December 1, 2006.

LEHMAN BROTHERS HOLDINGS INC.

By:

Name: James J. Killerlane III
Title: Vice President

2

# **EXHIBIT C**



"Yun, Wendy"
<Wendy.Yun@gs.com>

11 October 2009  08:16
PM

To   daman@cgsh.com

cc

bcc

Subject   FW: CustomerAsset Overview 2007

---

**From:** Geismar, Jennifer [mailto:jennifer.geismar@lehman.com]
**Sent:** Monday, December 10, 2007 6:17 PM
**To:** Yun, Wendy
**Subject:** CustomerAsset Overview 2007

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - This message is intended only for the personal and confidential use of the designated recipient(s) named above. If you are not the intended recipient of this message you are hereby notified that any review, dissemination, distribution or copying of this message is strictly prohibited. This communication is for information purposes only and should not be regarded as an offer to sell or as a solicitation of an offer to buy any financial product, an official confirmation of any transaction, or as an official statement of Lehman Brothers. Email transmission cannot be guaranteed to be secure or error-free. Therefore, we do not represent that this information is complete or accurate and it should not be relied upon as such. All information is subject to change without notice. -------- IRS Circular 230 Disclosure: Please be advised that any discussion of U.S. tax matters contained within this communication (including any attachments) is not intended or written to be used and cannot be used for the purpose of (i) avoiding U.S. tax related penalties or (ii) promoting, marketing or recommending to another party any transaction or matter addressed

herein.   CustomerAsset Overview 2007 MIFID 10 30 07 CLN (2).doc

| Capital Markets Prime Services



## Customer Asset Protection Overview

**November 2007**

LEHMAN BROTHERS

# LEHMAN BROTHERS

# Capital Markets Prime Services



This document summarizes the regulatory, surety bond and other protections available to prime brokerage customers of Lehman Brothers Inc. (LBI) and Lehman Brothers International (Europe) (LBIE), for their prime brokerage accounts and trading done with Lehman Brothers entities.  As this is a summary, it does not purport to be a complete discussion of the rules and arrangements that are mentioned here.  Any complete discussion will depend on the facts and circumstances of each customer's account and its relationship to Lehman Brothers.  This summary is not intended as legal advice; please consult your own legal advisors.

## Overview

This summary of the  protections provided to prime brokerage customers is divided into three categories: (1) those available only to customers of LBI as a registered U.S. broker-dealer regulated by the  Securities and Exchange Commission (SEC) with respect to its customer activity, (2) those available to customers of LBIE, a company authorized and regulated by the Financial Services Authority (FSA) of the U.K. with respect to its customer activity, and (3) those applicable to other transactions that are considered to be outside the traditional scope of customer activity.

## General Creditworthiness of Lehman Brothers – Available Information

As of the date of this publication LBI's long term senior debt has credit ratings of AA- by Fitch, Aa3 by Moody's and AA- by Standard & Poor's (S&P).  Its parent, Lehman Brothers Holdings Inc. (LBHI), currently has long term senior debt credit ratings of AA-  by Fitch, A1 by Moody's, and A by Standard & Poor's (S&P).  These ratings may change from to time and you are encouraged to review them periodically.  Please see the following websites for current rating information: www.fitchratings.com; www.moodys.com; and www.standardandpoors.com.  LBHI is a reporting company under the Securities Exchange Act of 1934 (1934 Act) and files periodic reports with the SEC, including an annual report on Form10-K and quarterly reports on Form10-Q, which are available for review on EDGAR at the SEC's website *www.sec.gov.*  LBHI also operates under the SEC's rules governing Consolidated Supervised Entities.  LBI also makes periodic filings of its financial condition by means of FOCUS reports that are filed with the SEC and available, in part, to the public.  LBI is examined by the FINRA (the successor to the NYSE and NASD regulatory functions) at least annually and by the SEC periodically.

## Applicable Rules and Regulations for LBI Customer Activity

LBI is subject to various SEC and FINRA rules and regulations that protect customer assets held with LBI in the unlikely event of a credit problem associated with LBI.  The descriptions below are summaries of some of the relevant rules and regulations and do not constitute a full analysis.  Please consult your own legal advisors as to how these rules would apply to your situation.

## Customer Protection Rules

Rule 15c3-3 of the 1934 Act details the procedures that a broker-dealer must observe to protect customer assets that the broker-dealer holds. There are two main principles of customer asset protection: (1) the required segregation of customer cash balances in a special reserve bank account, and (2) possession and control of customer securities by the broker-dealer.

### *Cash Reserve Account*

Under Rule 15c3-3, broker-dealers are required to deposit unencumbered cash with a bank (or banks) in a "Special Reserve Bank Account for the Exclusive Benefit of Customers".  These accounts are required to be separate from any other bank account of the broker-dealer.  Under the Rule, the broker-dealer must perform a weekly calculation and deposit in the reserve account an amount of cash and/or "qualified securities" (e.g.: a security issued by the United States, or a

2

# Capital Markets Prime Services



security in which the principal and interest are guaranteed by the United States) equal to the amount required under the reserve formula specified in the Rule.

The principal calculation under the reserve formula is the determination of the consolidated customer cash balance across all customer accounts of the broker-dealer. This amount is the difference between the aggregate indebtedness of customers' accounts to the broker-dealer (including securities borrowed for the account of customers) (Total Debits) and the aggregate customer free credit balances held in customer accounts at the broker-dealer (including money received from the broker-dealer from using customer securities) (Total Credits). If Total Credits exceed Total Debits, then not less than that net amount must be held in the reserve account. LBI Prime Brokerage customers, as well as other customers of LBI, are covered by this protective calculation.

*Possession and Control of Securities*

Under Rule15c3-3, fully paid customer securities and "excess margin securities" may not be rehypothecated or otherwise used by the broker-dealer in its business. Pursuant to Rule 15c3-3 the broker-dealer must physically possess or otherwise control such fully-paid and excess margin securities.

## Rehypothecation Rules

Rules 8c-1 and 15c2-1 of the 1934 Act require that a broker-dealer must have customer consent to commingle with other customer assets the customer securities that the broker-dealer is permitted to rehypothecate (e.g.: those in the margin account) and may not pledge or otherwise use customer assets for a sum greater than the aggregate indebtedness owed to the broker-dealer by all of its customers. These rules also prohibit a broker-dealer from commingling customer securities with the broker-dealer's own securities.

In general the LBI Prime Brokerage margin agreements grant LBI the right to rehypothecate customer securities when the customer pledges or hypothecates their securities to the broker-dealer to support a margin debit. Under Rule 15c3-3, LBI may use an amount up to 140% of the customer's debit balance. Money received from the rehypothecation of customer securities will require additional deposits to be made to the reserve account as required by the reserve formula.

Rehypothecation of a client's securities (as described above) is not a factor in determining that customer's net equity claim, or its recovery (full or pro rata) on its claim in a SIPA proceeding.

The above described rules are designed to ensure that the broker-dealer always has enough protected assets to make all customers whole with respect to their net equity claims against the broker-dealer.

## Net Capital and Broker-Dealer Notification Rules

A key protection to customers is the "net capital rule" or Rule 15c3-1 of the 1934 Act, which requires that a broker-dealer maintain a minimum level of net capital in order to continue operations. A broker-dealer must calculate its net capital in accordance with the Rule and must file reports regarding its capital levels with the SEC and NASD regularly (i.e.: the FOCUS reports described above). In determining net capital, assets must be valued conservatively, with most financial assets having their value discounted.

LBI has elected to calculate minimum net capital in accordance to Appendix E of the net capital rule which establishes alternative net capital requirements for broker-dealers that are part of a

LEHMAN BROTHERS

# Capital Markets Prime Services



consolidated supervised entity ("CSE"). For regulatory purposes, LBHI and its subsidiaries are collectively a CSE. CSEs are supervised and examined by the SEC, which requires minimum capital standards on a consolidated basis. In addition to meeting the alternative net capital requirements, LBI is required to maintain tentative net capital in excess of $1 billion and net capital in excess of $500 million. LBI is also required to notify the SEC in the event that its tentative net capital is less than $5 billion. As of August 31, 2007, LBI had tentative net capital in excess of $6.1 billion, and had net capital of $3.1 billion, which exceeded the minimum net capital requirement by $2.6 billion.

Under Rule 17a-11 of the 1934 Act, a broker-dealer must provide both the SEC and FINRA with same-day notice if its capital level drops below the level mandated by the Rule and it must notify both within 24 hours of a net capital decrease to the "early warning level". The "early warning level" is intended to act as that, an early warning of stress, and it is significantly above the level at which a broker-dealer would be out of business. The SEC and FINRA are required by law to alert SIPC to any situation in which a broker-dealer is in or approaching financial difficulty. The SEC is also authorized to apply for an order requiring SIPC to act under SIPA.

## Customer Activity with LBI

Protections available to Prime Brokerage customers of LBI differ depending on whether the customer carries its accounts on the books of LBI, as well as whether the customer is a "customer" under the Securities Investor Protection Act of 1970 (SIPA). In general, the protections described below relate to traditional customer activity, such as purchases and sales of securities (long and short) and margin loans and not to securities lending, repurchase transactions or other creditor relationships that may exist between a customer and LBI.

## Definition of a Customer

Under SIPA, a "customer" is defined as any person who has a claim on account of securities received, acquired, or held by a debtor broker-dealer in ordinary course of its business as a SEC registered broker-dealer from, or for the securities accounts of, such person for safekeeping, with a view to sale, to cover consummated sales, pursuant to purchases, as collateral security, or for purposes of effecting transfer. It does not cover all possible activities between the customer and LBI.

## Securities Investor Protection Act of 1970

SIPA sets out the way by which a Securities Investor Protection Corporation ("SIPC") trustee would administer the liquidation of SIPC member, such as LBI. SIPC is a non-profit corporation established to protect investors in the event that a broker-dealer becomes unable to comply with the Rule 15c3-1 or is insolvent.

• The SIPC trustee generally seeks to sell or transfer accounts to another SIPC member, or grant a customer's request that the SIPC trustee approve a transfer of their customer accounts to another firm.

• Unless sold or transferred, the SIPC trustee will return all "customer name securities" (i.e.: physical certificates registered in customer name for which the broker-dealer holds no stock or bond power) to the customer. There is no dollar limit as to the amount of customer name securities that can be returned to a customer. Note, however, that the definition of customer name securities is intended to be very narrow.

4

**LEHMAN BROTHERS**

# Capital Markets Prime Services



• "Customer property" is the next source of customer satisfaction of customer claims and generally reflects the pool of customer assets held in the name of the broker-dealer or other securities intermediary's name. The distribution from this asset pool will be based on the customer's net equity claim (i.e.: the difference between the obligations owed by the customer to the broker-dealer and what the broker-dealer owes the customer (in cash and securities)) if all positions had been liquidated on the "filing date".

  – This "filing date" is generally the date when SIPC (upon notice to the broker-dealer) files an application for a protective decree with any court of competent jurisdiction. The "filing date" could be adjusted in the event of other forms of litigation.

• Rehypothecation of a customer's securities (as described above) is not a factor in determining that customer's net equity claim, or its recovery (full or pro rata) on its claim in a SIPA proceeding. General unsecured creditors of the liquidating broker-dealer cannot access customer assets until customers' net equity claims are paid in full, that is customer claims are senior to the claims of all other general unsecured creditors. In the event the broker-dealer does not have sufficient assets to meet customers' net equity claims, SIPC will pay from its own SIPC Fund (i.e.: customer protection funds) to meet any shortfall, to a maximum of $500,000 per customer ($100,000 limit for cash).

Not all investments held in customer accounts are protected by SIPC. In general, SIPC covers notes, stocks, bonds, mutual funds and other investment company shares, and other SEC registered securities. It does not cover instruments such as unregistered investment contracts (such as limited partnership interests), fixed annuity contracts that are not registered with the SEC, foreign exchange, interests in precious metals (either in physical or futures contract form), or other commodity futures contracts or commodity options on futures. Note, however, that under the Commodities Exchange Act and the rules thereunder the assets of a customer of a futures contract merchant (FCM) must be segregated and may not be used in the FCM's business. Note also that cash held at any bank affiliate of LBI, including any segregated cash, is not covered by SIPC.

Please see the SIPC website, www.sipc.org for additional information regarding the SIPA, SIPC, a list of SIPC member firms, frequently asked questions, claim forms and resources for protection against fraud.

### CAPCO Surety Bond– Excess SIPC Coverage

LBI maintains a surety bond issued by the Customer Asset Protection Company ("CAPCO"), an insurance company licensed by the State of Vermont. It was formed in late 2003 to provide institutional and individual brokerage accounts of certain securities firms with protection in excess of the protection limits currently provided by SIPC. CAPCO was capitalized by its original fifteen member firms, and has a reinsurance program consisting of two monoline financial guaranty reinsurers, each of which is currently rated AAA by Standard & Poor's.

The same persons that would be considered "customers" under SIPA are eligible for protection under CAPCO's bond which, with certain limitations, covers the full amount of the unsatisfied portion of the customer's net equity claim not otherwise provided by LBI's assets and SIPC coverage. The CAPCO surety bond has no aggregate limit except the full amount of a customer's unsatisfied net equity claim. Note that the types of assets that are not protected under SIPA are also not covered by the CAPCO surety bond. CAPCO is currently rated an A+ for financial strength by S&P, and this rating must be reaffirmed annually subject to a full review by S&P. There have not been any Excess SIPC claims made against CAPCO to date.

**LEHMAN BROTHERS**

# Capital Markets Prime Services



Each CAPCO surety bond has a one-year term, and requires an annual underwriting review.  A confirmation letter from CAPCO for LBI's Surety Bond can be obtained upon request.

As a newly formed company, CAPCO has no experience responding to Excess SIPC protections claims.  Accordingly, CAPCO retains service providers with claims experience in many other lines of insurance to assist in the event a claim is incurred.  In order to facilitate an orderly and timely claims process in the event of a claim, CAPCO and its advisors have designed a comprehensive claim form, available for customer review on its website.

Claims filed under the surety bond may be submitted as late as six months after the underlying SIPC proceeding is closed.  CAPCO will make payment or deliver replacement securities promptly after all distributions are made by the SIPC trustee and by the broker-dealer in connection with the SIPA proceeding, subject to satisfaction of all terms and conditions of the Surety Bond.

More information about CAPCO can be found on its website:

www.capcoexcess.com/USA/index.html.

This website includes a CAPCO Excess SIPC Surety Bond example and the CAPCO Excess SIPC Surety Bond Claim Form, as well as frequently asked questions and a list of participant firms.

### Customer Activity with Lehman Brothers International (Europe)

Lehman Brothers provides certain margin financing, clearing, settlement, stock borrowing and foreign exchange facilities under Prime Brokerage margin agreements between customers and LBIE, as arranged by LBI.  LBI may also utilize LBIE, other members of the Lehman Brothers group of companies and other brokers and dealers for the purpose of executing transactions for a customer.  LBIE is a company incorporated in England and is authorized and regulated by the FSA.

When a customer holds assets with LBIE pursuant to a Prime Brokerage margin agreement, its assets are segregated from those of LBIE, unless and until LBIE rehypothecates the customer's assets.  The level of rehypothecation may be subject to a regulatory or contractually agreed limit.  While assets are segregated they are held by LBIE as custodian.  To the extent that LBIE rehypothecates a customer's assets, LBIE may use the assets freely

Irrespective of which choice the customer makes, LBIE must maintain adequate records of the cash or investments received from or held on behalf of the customer, in order to verify the value of equivalent assets that are returnable to the customer.

With respect to a customer's investments held in the custody of LBIE through an affiliated or third-party nominee or a third-party sub-custodian, LBIE must require that such nominee or sub-custodian identify in its books and records that the right, title and interest in and to the custodied investments belong to a customer of LBIE.  The nominee or sub-custodian must ensure that such investments can be identified at any time as belonging to a customer of LBIE and are separately identifiable from LBIE's own investments.  Such investments should therefore be unavailable to creditors of LBIE.

LEHMAN BROTHERS

# Capital Markets Prime Services



Generally, the majority of customers for whom LBIE holds or receives cash choose that their cash is treated as collateral against their obligations to LBIE.  Any cash held in this way is not held separately from LBIE's and will be used by LBIE in the course of its investment business. Customers will therefore rank as unsecured creditors in relation to this cash.

If a customer has opted not to provide cash collateral but instead to provide cash that is to be treated as "client money" under the FSA rules, the amount of cash in excess of that required by LBIE for margin purposes (calculated in compliance with FSA rules) is segregated on a daily basis by LBIE either in a bank account away from LBIE or in a "qualifying money market fund," as defined in FSA rules.  Interest paid on protected balances will differ from that paid on monies not protected.  Cash placed in bank accounts away from LBIE is held on statutory trust for the benefit of all customers who have client money placed with LBIE.  On any insolvency of LBIE, proceeds from the trust would be distributed in ratable amounts to such customers. Cash placed in a qualifying money market fund in effect becomes a customer asset that LBIE must hold under the FSA custody rules.

As security for the payment and discharge of a customer's liabilities to LBIE, LBIE will have a security interest over all investments and cash held in custody or segregation by LBIE.  Subject to applicable law or regulation, a customer's investments may be rehypothecated by LBIE for its own purposes.  A customer has the right to request the recall of securities which have been rehypothecated by LBIE.  In the event that a customer does recall such securities, LBIE will be obligated to promptly return such securities to a customer.  Any claim against LBIE for return of securities which have been rehypothecated will be an unsecured claim against LBIE.

The FSA rules relating to collateral, custody and client money can be found at http://fsahandbook.info/FSA/html/handbook/CASS.   (The relevant chapters collateral, custody and client money are 3, 6 and 7, respectively.) As part of the annual review and audit of LBIE's financial statements, Ernst & Young are required to review LBIE's compliance with these FSA rules and make a direct report to the FSA.

*LBHI Guarantee*

LBIE has the benefit of a full parent guarantee from LBHI.

*CAPCO*

As with LBI, LBIE also maintains a surety bond issued by CAPCO.  As SIPA coverage is not available to customers of LBIE, the CAPCO bond does not provide SIPA excess coverage but instead covers the unsatisfied portion of a customer's net equity claim not otherwise provided by LBIE's assets or the LBHI guarantee. Each CAPCO surety bond has a one-year term, and requires an annual underwriting review.  A confirmation letter from CAPCO for LBIE's Surety Bond can be obtained upon request.

More information can be found on the CAPCO website:

http://www.capcoexcess.com/UK/aboutCAPCO.html

7

**LEHMAN BROTHERS**

# Capital Markets Prime Services



### Other Customer Activity with Lehman Brothers Entities
With respect to transactions other than traditional customer activity with LBI or LBIE, the availability of any protection will depend on the nature of the transaction and the Lehman Brothers entity with which the customer is contracting or through whom the customer is executing. The examples below attempt to address many common products, but there may be different transactions in which prime brokerage customers are engaged that are not discussed. Please consult your legal advisors for a discussion of the examples and for transactions in which you may have engaged that are not discussed herein

### Equity Swaps, on U.S. and non-U.S. Securities and Credit Default and other Fixed Income Swaps
Swap contracts and activity generally are not executed with SEC registered broker-dealers; therefore, collateral pledged by the customer to the Lehman Brothers entity as counterparty would not be customer property and not covered by SIPC or the CAPCO surety bond.  Lehman Brothers counterparties for swaps and derivatives activity include Lehman Brothers Special Finance, (LBSF) and LBIE.  Both LBSF and LBIE have the guaranty of LBHI.  The close-out and netting rights for a customer for these products are generally contained in a governing ISDA Master Agreement, which may benefit from certain protections under relevant bankruptcy regimes.

### Listed Options on U.S. Securities
U.S. listed and NASDAQ options held through LBI in a Prime Brokerage account are considered securities and thus customer property covered by SIPC and the CAPCO surety bond.

LBI is required to post collateral for short option positions with the Options Clearing Corporation and/or option exchanges in relation to listed option customer activity.  Customer assets may be posted to these entities as collateral for margin.

### Foreign Exchange Spots and Forwards
Foreign exchange spots and forward contracts are not securities, and therefore not considered customer property covered by SIPC.

### Futures Contracts
Futures contracts on indices, commodities, and other underlying instruments are not subject to customer property protection under the 1934 Act or the rules discussed above. While executed with LBI, in its FCM capacity, futures is a product type excluded from SIPC and CAPCO surety bond protection. Customer assets are required to be segregated under the Commodity Exchange Act and the rules thereunder.

### Repurchase Agreements (Repos) and Stock Loan Agreements
Repos are specifically excluded from coverage under the CAPCO surety bond.  SIPC takes the view that a repo counterparty is not a "customer" for SIPA purposes and that any securities underlying the repo are not subject to SIPA coverage. SIPC has taken a similar position with respect to securities lending transactions.

### Money Market shares
Money market shares held at LBI and for which LBI is the intermediary between the customer and the fund will be considered securities of the customer held at LBI for SIPC and CAPCO purposes and not as cash, thus entitling them to SIPC coverage of up to $500,000.

8

# Capital Markets Prime Services



If the customer may redeem the fund by direct contact with the issuer, carrier, distributor, transfer agent or other third party (other than LBI), the fund shares would not be covered under SIPC or


Excess SIPC.  In this instance, the customer could recover the asset directly from the fund in the event of LBI's insolvency.

*DISCLAIMER:*
*This document is based on information from sources believed to be reliable, but no representation is made that it is accurate or complete. Lehman Brothers disclaims any and all liability relating to this information, including, without limitation, any express or implied representations or warranties for statements or errors contained in, or omissions from, these materials. The foregoing has been prepared solely for informational purposes and is subject to change without notice. This document is not an offer to buy or sell or a solicitation of an offer to buy or sell any security or instrument or to participate in any particular trading strategy, nor is it legal advice. You should consult with your own tax, legal, and investment adviser for guidance.*