B 210A (Form 210A) (12/09)

# UNITED STATES BANKRUPTCY COURT

### Southern District of New York

In re  Lehman Brothers Holdings, Inc., et al., Debtors ,     Case No.  08-13555 (JMP)

(Jointly Administered)

## TRANSFER OF CLAIM OTHER THAN FOR SECURITY

A CLAIM HAS BEEN FILED IN THIS CASE or deemed filed under 11 U.S.C. § 1111(a). Transferee hereby gives evidence and notice pursuant to Rule 3001(e)(2), Fed. R. Bankr. P., of the transfer, other than for security, of the claim referenced in this evidence and notice.

| Wilmington Trust N.A., as Bond Trustee | Wells Fargo, N.A., as Indenture Trustee |
|---|---|
| Name of Transferee | Name of Transferor |

Name and Address where notices to transferee should be sent:

    Wilmington Trust N.A., as Bond Trustee
    c/o Daniel S. Bleck, Esq. - Mintz Levin
    One Financial Center, Boston, MA 02111

Phone:  617-542-6000

Last Four Digits of Acct #: _____

Court Claim # (if known): 0000014822
Amount of Claim: $814,696.92
Date Claim Filed:  09/17/2009

Phone: _____
Last Four Digits of Acct. #: _____

Name and Address where transferee payments should be sent (if different from above):

Wilmington Trust N.A., as Bond Trustee - Attn: Jay Smith, CCTS, Vice President
25 South Charles Street, 11th Floor - Mail Stop MD2-CS58
Baltimore, MD 21201

Phone:  410-545-2193

Last Four Digits of Acct #: _____

I declare under penalty of perjury that the information provided in this notice is true and correct to the best of my knowledge and belief.

By: _____     Date:  8/29/14
    Transferee/Transferee's Agent

    Jay Smith, CCTS, Vice President

*Penalty for making a false statement:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 & 3571.

**SO ORDERED: October 11, 2013.**

**Robyn L. Moberly**
**United States Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| In re: | ) |
| | ) |
| The Estelle Peabody Memorial Home | ) Case No. 13-06976-RLM-11 |
| of the Synod of Lincoln Trails of the | ) |
| Presbyterian Church (U.S.A.), | ) |
| EIN: 35-0883511 | ) |
| | ) |
| Debtor. | ) |

**ORDER CONFIRMING AMENDED DEBTOR'S**
**CHAPTER 11 PLAN OF REORGANIZATION, AS IMMATERIALLY MODIFIED**

The Court, having considered the Amended Debtor's Chapter 11 Plan of Reorganization

as immaterially modified at the Confirmation Hearing, dated July 31, 2013, and all amendments,

modifications, and supplements thereto (collectively, the "Plan"), a copy of which is attached

hereto as <u>Exhibit A</u>[1] and incorporated herein by reference, filed by The Estelle Peabody

Memorial Home of the Synod of Lincoln Trails of the Presbyterian Church (U.S.A.) (the

---

[1] Capitalized terms not defined in this Confirmation Order have the meanings ascribed to them in the Plan. If a capitalized term is not defined in either this Confirmation Order or the Plan, then it shall have the meaning ascribed to it in the Bankruptcy Code or Bankruptcy Rules, whichever is applicable. In the event of a direct conflict between the terms of the Plan and the terms of this Confirmation Order, the terms of this Confirmation Order control.

"Debtor").[2] The Plan came before the Court for hearing on confirmation on October 8, 2013 (the "Confirmation Hearing"). Notice of the Confirmation Hearing was transmitted to all creditors, parties in interest and interest holders as required by the *Order Approving Disclosure Statement* [Case No. 13-06952-RLM-11; Docket No. 85], *Order Establishing Notice, Case Management and Administrative Procedures* [Case No. 13-06976-RLM-11; Docket No. 46], the Bankruptcy Code, the Federal and Local Rules of Bankruptcy Procedure, and solicitation of the Plan was conducted in good faith and in compliance with sections 1125 and 1126 of the Bankruptcy Code, Federal Rules of Bankruptcy Procedure 3017 and 3018, and the Order Approving Disclosure Statement. The Court notes that the only objection to the Plan was a Letter/Correspondence from the Norman Ring Trust & Beatrice Ring Trust [Case No. 13-06976-RLM-11, Docket No. 65], which Letter/Correspondence has been considered as set forth herein. Based on the evidence presented (including proffers of testimony, declarations and affidavits, and the entire record in this chapter 11 case) and the arguments and representations of counsel, the *Declaration of Robert Stevens of Globic Advisors, Inc. Regarding the Tabulation of Ballots Accepting or Rejecting the Amended Chapter 11 Plan of Reorganization of The Estelle Peabody Memorial Home of the Synod of Lincoln Trails of the Presbyterian Church (U.S.A.)* [Case No. 13-06952-RLM-11; Docket No. 127], and the *Brief in Support of Confirmation of Debtor's Amended Chapter 11 Plan of Reorganization* filed in support hereof [Case No. 13-06952-RLM-11; Docket No. 130], the Court has determined that any objections to the Plan are overruled, the Plan satisfies all applicable provisions of the Bankruptcy Code, and should therefore be confirmed. Accordingly, it is ORDERED, ADJUDGED AND DECREED as follows:

---

[2] References to Debtor in this Confirmation Order shall be deemed to refer to Debtor in this Case to the extent the context of such reference applies to a time period prior to the Effective Date, and shall refer to Debtor, as reorganized, to the extent the context of such reference applies to a time period on or after the Effective Date.

A.   Jurisdiction

1.   The Court has jurisdiction over the Plan and the matters connected therewith pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (N).  Venue in this district is proper under 28 U.S.C. §§ 1408 and 1409.

B.   Objections

2.   The Court has received and reviewed the letter from Norman Ring Trust & Beatrice Ring Trust and to the extent that the same was considered an objection to confirmation of the Plan, such objection is overruled.

C.   Confirmation of the Plan and Approval of Plan Documents

3.   The Plan, as immaterially modified herein, is CONFIRMED in its entirety pursuant to section 1129 of the Bankruptcy Code, and all of the terms and conditions contained in the Plan are APPROVED, including each of the Plan Transaction Documents (as defined below).

4.   The Plan reflects the terms and conditions of a settlement and compromise by and among Debtor, holders of the Series 2002 Bond Claims, and all Creditors regarding Claims asserted against Debtor. The Plan constitutes a motion to compromise a controversy under Bankruptcy Rule 9019, is within the range of reasonableness, is fair and equitable and in the best interests of Debtor and the estate and is therefore APPROVED.

5.   The Plan, and each of its provisions, terms and conditions, and all documents and agreements related thereto, once finalized and executed, including the Plan Transaction Documents, are incorporated by reference herein and shall, when executed by the parties thereto, constitute legal, valid, binding, and authorized  obligations enforceable in accordance with their terms as of the Effective Date.

D.    Immaterial Modifications to Plan

6.    The Plan is hereby immaterially modified to provide that Section 4.25 of the
Series 2013 Master Trust Indenture, which is one of the Series 2013 Bond Documents to be
executed in connection with the exchange of the Series 2002 Bonds for the Series 2013 Bonds,
shall be amended to add the language in 4.25(b) and shall read as follows:

> (b)  For the purposes of calculating the Occupancy Requirement for each of the
> Occupancy Quarters ending  March 31, 2014, June 30, 2014, September 30, 2014 and
> December 31, 2014, with respect to the measurement of Skilled Nursing Units Occupied,
> provided that the Obligated Group has entered into a lease contract with Visiting Nurse
> and Hospice Home, Inc. (the "Hospice Contract") on or before January 1, 2014, which is
> in effect and otherwise fully enforceable and binding during the entirety of the applicable
> Occupancy Quarter, such Hospice Contract shall count as three (3) Skilled Nursing Units
> Occupied for such applicable Occupancy Quarter; provided that the amount payable
> under such Hospice Contract is not less than $18,000.00 per month.

E.    Effectuation of the Plan and Approval of Plan Documents

7.    Debtor and relevant non-debtor parties are authorized to execute and deliver such
certificates, documents, and instruments that may be necessary or appropriate to effectuate the
Plan and transactions contemplated thereby (including but not limited to the Series 2013 Bond
Documents, copies of which are attached to the Plan as Exhibit 3.2.3 and the New Management
Agreement with LifeCare Services, LLC ("LCS") upon those terms set forth in the Plan
(including, but not limited to, subordination of 50% of its management fee to the obligations
owed to the 2013 Master Trustee, all to which LCS has consented and agreed shall include fees
no greater than that currently in place, and all in form satisfactory to the 2002 Bond Trustee and
the 2013 Bond Trustee and Debtor) (collectively, the "Plan Transaction Documents")); and the
terms and conditions thereof, are APPROVED. Debtor and non-debtor parties to the Plan
Transaction Documents are authorized to modify the Plan Transaction Documents without
further order of the Court to the extent necessary to correct typographical, grammatical, and

other non-material errors and, to make any changes required or appropriate to implement, effectuate, and consummate the Plan, the Plan Transaction Documents, the terms of this Confirmation Order and the transactions respectively contemplated thereby, in each case subject to the approval of Debtor and the 2002 Bond Trustee and the 2013 Bond Trustee. On and after the Effective Date, and as executed by Debtor, the terms and conditions of the Plan Transaction Documents shall be effective and enforceable as provided for therein.

8.    Upon entry of this Confirmation Order, Debtor and its directors, officers, agents, and attorneys, along with the parties to the Plan Transaction Documents, are authorized to (a) effect any and all transactions contemplated or required by the Plan, and (b) on and after the Effective Date, take all necessary and appropriate steps and corporate action to implement the terms of the Plan and the Plan Transaction Documents, regardless of whether such actions are specifically referred to in the Plan or the Plan Transaction Documents, without the need for further director, officer, or any other corporate approvals or further order of the Court.

E.    Releases, Discharges and Injunctions

9.    Except as otherwise provided by the Plan or this Confirmation Order, the rights granted in the Plan and the treatment of Claims and Interests are in exchange for, and in complete satisfaction, discharge, and release of, all Claims of any nature whatsoever against Debtor, the estate, and the estate property (including retained assets), whether such Claims arose before or during the Bankruptcy Case or in connection with implementation of the Plan.

10.    Subject to and upon the occurrence of the Effective Date and except as otherwise provided for in the Plan (including the Plan Transaction Documents) or this Confirmation Order, and in accordance with the Bankruptcy Code, Debtor is discharged and released from any and all Claims or other debts, including demands or liabilities, which arose before the Effective Date,

including any and all debts of a kind specified in subsections 502(d), (g), (h), and (i) of the

Bankruptcy Code, whether or not: (i) a proof of claim based upon such Claim or debt has been

filed or deemed filed under section 501 of the Bankruptcy Code; (ii) such Claim is listed in

Debtor's schedules and lists heretofore filed with the Court; (iii) a Claim based on such debt is

allowed under section 502; or (iv) the holder of such Claim has accepted the Plan; provided,

however, that such discharge and release shall not adversely affect the rights of any holder of an

Allowed Claim against or Allowed Interest in Debtor from receiving distributions pursuant to the

Plan based upon such Allowed Claim or Allowed Interest.

11.    Except as expressly provided in the Plan (including the Plan Transaction

Documents) or this Confirmation Order, this Confirmation Order is a judicial determination of a

discharge of all Claims against, and other liabilities of, Debtor arising before the Effective Date.

In accordance with 11 U.S.C. § 524, except as otherwise provided in this Confirmation Order,

the discharge in this Confirmation Order voids any judgment rendered against Debtor at any time

obtained (to the extent it relates to a discharged Claim), and operates as an injunction against the

prosecution of any action, against Debtor, the retained assets, and/or the estate property (to the

extent such action related to a discharged Claim). Any other orders entered in this Chapter 11

Case respecting the transfer of property free and clear and any injunctions related thereto remain

enforceable.

12.    Except as otherwise provided in the Plan, this Confirmation Order, or a separate

final order, any and all injunctions or automatic stays provided for in the Bankruptcy Case under

11 U.S.C. §§ 105 and 362, or otherwise, and in existence on the Confirmation Date, shall remain

in full force and effect through the Effective Date.

13.     Except as otherwise provided in the Plan (including the Plan Transaction Documents) or this Confirmation Order, on and after the Effective Date, all entities that have held, currently hold or may hold a Claim or other debt or liability that is discharged, or an Interest or other right of an interest holder that is terminated under the Plan, are permanently enjoined from taking any of the following actions on account of any such discharged Claims, debts, liabilities, Interests or rights:

(a)     commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind against Debtor, the estate, the Reorganized Debtor, estate property, and/or the retained assets (including, all suits, actions, and proceedings that are pending on the Effective Date, which shall be deemed withdrawn and dismissed with prejudice);

(b)     enforcing, levying, attaching, collecting, or otherwise recovering by any manner or means, directly or indirectly, any judgment, award, decree, or order against Debtor, the Reorganized Debtor, the estate property, and/or the retained assets;

(c)     creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any lien against Debtor, the estate, the Reorganized Debtor, estate property, and/or the retained assets;

(d)     asserting any subrogation or recoupment right of any kind, whether directly or indirectly, against any obligation due Debtor, the estate, the Reorganized Debtor, the estate property, and/or the retained assets; and

(e)     commencing or continuing any action, in any manner, in any place, that does not comply with or is inconsistent with the provisions of the Plan or the Bankruptcy Code.

14.     Subject to the occurrence of the Effective Date and as set forth in the Plan and section 524 of the Bankruptcy Code, all creditors and interest holders of Debtor whose Claims or Interests are discharged or whose rights and interests are terminated by the Plan and this Confirmation Order are hereby jointly and severally restrained and enjoined from commencing or continuing any action, employment of process, or act to collect or recover from or offset against Debtor or any property of Debtor to the extent any such Claim or Interest is discharged,

waived, or released hereunder, under the Plan, under any orders of this Court, and/or the Bankruptcy Code, subject to the Claims resolution provisions of the Plan. Furthermore, all judgments at any time obtained, to the extent that such judgment is determination of a liability discharged hereunder, are void.

15.    The releases, exculpations and injunctions contained in the Plan, including without limitation those set forth in Sections 12.1, 12.2, 12.3, 12.4, 12.5 and 12.6 of the Plan (the "Release and Injunction Provisions"), are an integral part of the Plan and constitute a part of the global resolution of the issues between Debtor's various constituencies. The ability of Debtor to reorganize is dependent upon the Release and Injunction Provisions, without which the adverse effects likely would occur:

a)    the Plan would not be confirmed and this Chapter 11 Case might be converted to one under chapter 7;

b)    a piecemeal dismemberment of estate assets, reduction in distributions of property of the estate, and increased costs to creditors and interest holders due to litigation would occur; and

c)    additional funds not otherwise available for distribution would be lost.

16.    The Court finds that the Release and Injunction Provisions promote paramount policies underlying the Bankruptcy Code, such as reorganization, equality of distribution to similarly situated creditors and interest holders, finality, and a fresh start for Debtor. These provisions enhance the reorganization of Debtor, feasibility of the Plan, and the value of the bankruptcy estate for equitable distribution to creditors and others. The Release and Injunction Provisions confer material benefits upon Debtor's estate, its creditors and Interest holders and are material and essential to the implementation and consummation of the Plan and the recoveries to creditors. Thus, the Plan, and the Release and Injunction Provisions contained therein, are in the best interests of Debtor's estate and its creditors and are well within the range of reasonableness.

As such, in addition to any releases and/or injunctions provided herein or pursuant to section 524 and 1141 of the Bankruptcy Code, the Release and Injunction Provisions set forth in the Plan, specifically under sections 12.1, 12.2, 12.3, 12.4, 12.5 and 12.6, are hereby approved and incorporated as part of this Confirmation Order and made enforceable hereby.

G.    Effect of Plan

17.    Subject to the occurrence of the Effective Date and in accordance with section 1141(a) of the Bankruptcy Code and the Plan, this Confirmation Order shall be binding upon: (i) Debtor; (ii) any entity acquiring, receiving, or retaining property under the Plan; (iii) any party to an executory contract or unexpired lease of Debtor, including all residents and LCS; (iv) any creditor or interest holder of Debtor, whether or not the Claim or Interest of such creditor or interest holder is impaired under the Plan and whether or not such creditor or interest holder has accepted the Plan; and (v) all others who have appeared in this chapter 11 case and/or who have received notice hereof, including any other Person and their respective agents, heirs, successors, and assigns of each of the foregoing, regardless of whether such party voted to accept the Plan

18.    Notwithstanding the provisions in the Plan otherwise, on the Effective Date, all property comprising the estate of Debtor shall revest in Debtor as reorganized subject to the liens and claims set forth in the Plan and the Plan Transaction Documents, including but not limited to the First Lien and the Second Lien granted to the 2013 Master Trustee; provided however, that this revesting shall not occur unless and until the closing on the Series 2013 Bonds has been consummated.

19.    All conditions to confirmation set forth in section 9.2 of the Plan have either been satisfied, waived or will be satisfied to the satisfaction of the necessary parties prior to the Effective Date.

20.     Subject to the occurrence of the Effective Date and in accordance with the Plan, Debtor, as reorganized, may operate its business and use, acquire, and dispose of property without supervision of this Court, free of any restrictions in the Bankruptcy Code or Bankruptcy Rules, other than those restrictions imposed by the Plan, Plan Transaction Documents and this Confirmation Order.

21.     Subject to the occurrence of the Effective Date and in accordance with section 1141(c) of the Bankruptcy Code and except as provided for under the Plan (including any liens granted to the 2013 Bond Trustee or the 2013 Master Trustee under the Plan and the Plan Transaction Documents, including the First Lien and the Second Lien), all property of Debtor shall be free and clear of all Claims, liens, charges, encumbrances, escrow or set aside arrangements, and interests of creditors and interest holders arising before the Confirmation Date and shall be turned over to the possession, custody, or control of reorganized Debtor in accordance with the Plan.

I.      Solicitation of Acceptance of Plan

22.     Based on the record before the Court and the record of the Chapter 11 Case, the 2002 Master Trustee, the 2002 Bond Trustee, the Consenting Holders, and Debtor (and all of their respective officers, directors, members, partners, employees, representatives, advisors, attorneys, professionals, affiliates, and agents) (i) have been acting and will continue to act in good faith within the meaning of section 1125(e) in compliance with applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules and any applicable non-bankruptcy law, rule, or regulation governing their respective activities relating to the solicitation of acceptances to the Plan and their participation in the activities described in section 1125 of the Bankruptcy Code, and (ii) shall be deemed to have participated in good faith and in compliance

with the applicable provisions of the Bankruptcy Code in the offer and issuance of any securities under the Plan, and therefore are not, and on account of such offer, issuance and solicitation will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or the offer and issuance of the securities under the Plan, and are entitled to the protections afforded by section 1125(e) of the Bankruptcy Code, to the extent such parties are listed in the Plan and except as to any creditor who elected to "opt-out" of the applicable release, exculpation and related Plan provisions set forth in Sections 12.5 and 12.6 of the Plan, if and so long as such parties proceed to: (a) consummate the Plan and the agreements, settlements, transactions, and transfers contemplated thereby; and (b) take the actions authorized and directed by this Confirmation Order.

K.    Entrance Fees

23.    Pursuant to the *Order Authorizing Debtor to Escrow Entrance Fee Deposits* (the "Escrow Order") [Case No. 13-06976-RLM-11, Docket No. 52], entry of this Order shall constitute a Trigger Event (as defined in the Escrow Order by reference to the motion requesting such relief) and the Escrow Agent (as defined in the Escrow Order) shall disburse all amounts subject to the Escrow Order to Debtor to be used as contemplated under the Plan and/or the Series 2013 Bond Documents.

24.    Subject to the occurrence of the Effective Date, upon the Effective Date, all amounts held by the 2002 Bond Trustee or the 2002 Master Trustee relating to the Series 2002 Bonds, after payment of all fees and expenses of the 2002 Bond Trustee, 2002 Master Trustee, 2013 Bond Trustee and 2013 Master Trustee (including any fees of their respective professionals), shall be transferred to the 2013 Bond Trustee or 2013 Master Trustee, as applicable, and as contemplated by the Series 2013 Bond Documents. For the avoidance of

doubt, and notwithstanding any other provision of this Confirmation Order or the Plan, the above
referenced fees and expenses shall be paid solely from funds held by the 2002 Bond Trustee
and/or the 2002 Master Trustee and, to the extent the payment of such fees and expenses could
be considered a claim of the Debtor that is subject to the Debtor's discharge, such obligation of
the Debtor to pay such fees and expenses shall not be discharged.

L.      Executory Contracts

        25.      With the exception of the existing management contract between Debtor and LCS
(the "Existing Management Contract") and subject to the occurrence of the Effective Date, all
Executory Contracts that have not been assumed by Debtor and/or that are not the subject of a
pending motion to reject as of the date hereof shall be assumed by Debtor and such Executory
Contracts shall represent binding obligations of Debtor from and after the Effective Date and in
accordance with sections 6.1 and 6.2 of the Plan. Such Executory Contracts include those
Executory Contracts set forth in Schedule 6.2 to the Plan and those set forth in Exhibit 1 to
*Debtor's Motion to Assume Unexpired Leases (Resident Agreements)* [Case No. 13-06952-RLM-
11; Docket No. 103], which Motion was approved on September 26, 2013 [Case No. 13-06952-
RLM-11; Docket No. 123].  Additionally, the Court finds that no other or further cure amounts
and/or adequate assurance has been requested by any counter-party to any of the Executory
Contracts and further finds that such adequate assurance and/or cure amounts as set forth in
Schedule 6.2 of the Plan and/or Exhibit 1 to the *Resident Agreement Assumption Debtor's
Motion to Assume Unexpired Leases (Resident Agreements)* are hereby approved.  Assumption
of the Executory Contracts shall be effective only upon occurrence of the Effective Date and if
and to the extent necessary in order to effectuate such assumption, the fourteen (14) day
automatic stay provided for under Bankruptcy Rule 6006 shall be and hereby is deemed waived.

26.    Subject to occurrence of the Effective Date, Debtor shall assume the New Management Contract in form satisfactory to the 2002 Bond Trustee and the 2013 Bond Trustee, and consistent with the provisions contained in the Plan to which principal terms LCS has agreed (including, but not limited to, subordination of 50% of its management fee to the obligations owed to the 2013 Master Trustee) and has further agreed and represented in open court shall not obligate Debtor financially in any amounts greater than the Existing Management Contract.

M.    Miscellaneous Confirmation Provisions

27.    All actions not otherwise previously approved by the Court that Debtor took or effectuated (a) during the pendency or in the administration of the Chapter 11 Case, or (b) in the formulation, negotiation, prosecution, or implementation of the Plan are ratified and approved.

28.    This Confirmation Order is in recordable form, and shall be accepted by any filing or recording officer or authority of any applicable governmental unit for filing and recording purposes without further or additional orders, certifications, or other supporting documents.

29.    Debtor and any other Person having duties or responsibilities under the Plan or this Confirmation Order, and their respective directors, officers, general partners, agents, trustees, representatives, and attorneys are specifically authorized, empowered, and directed to take any and all actions necessary or appropriate to implement, effectuate, and consummate the Plan, the terms of this Confirmation Order and the transactions respectively contemplated in those documents, all in accordance with the terms hereof and thereof.

30.    Pursuant to section 1146(a) of the Bankruptcy Code, any post-Confirmation transfer from Debtor to the Reorganized Debtor pursuant to, in contemplation of, or in connection with the Plan or pursuant to: (a) the issuance, distribution, transfer, or exchange of any debt or other interest in Debtor; (b) the creation, modification, consolidation, or recording of

13

any mortgage, deed of trust, or other security interest; (c) the making, assignment, or recording

of any lease or sublease; or (d) the making, delivery, or recording of any deed or other

instrument of transfer under, in furtherance of, or in connection with, the Plan, including any

deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any

transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject

to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage

tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or

recording fee, or other similar tax or governmental assessment, in each case to the extent

permitted by applicable bankruptcy law, and the appropriate state or local governmental officials

or agents shall forego the collection of any such tax or governmental assessment and accept for

filing and recordation any of the foregoing instruments or other documents without the payment

of any such tax or governmental assessment.

31.     To the extent that, under applicable nonbankruptcy law, any of the actions

contemplated in the Plan would otherwise require the consent or approval of the holders of

Interests in Debtor, or directors, managing members, partners (as applicable) or counter-parties

to Executory Contracts, this Confirmation Order shall constitute such consent or approval, and

such actions shall be, and are deemed to have been, taken by unanimous action of the holders of

Interests in Debtor or directors, managing members, partners (as applicable) or counter-parties to

Executory Contracts.

32.     The Plan contemplates that the Issuer will issue the Series 2013 Bonds in

exchange for the Series 2002 Bonds.  Such solicitation and exchange by the Issuer are exempt

from the registration requirements of the Securities Act of 1933 (as now in effect or hereafter

amended) pursuant to section 3(a)(2) thereof and are exempt from qualification under the state

securities or "blue sky" laws of every state.  Section 3(a)(2) exempts from registration under the Securities Act "any securities issued . . . by any State of the United States . . . or by any public instrumentality of one or more States or territories . . ." 15 U.S.C. § 77(c).

33.     For the avoidance of doubt, satisfaction of the conditions of Section 9.2, and the occurrence of the Effective Date, shall not occur prior to the issuance of the Series 2013 Bonds. On the Effective Date, the Series 2013 Bonds shall be issued and, immediately upon such issuance, the Series 2002 Bonds shall be deemed exchanged for Series 2013 Bonds as set forth in the Plan and the Series 2013 Bond Documents.  Upon such exchange, the Series 2002 Bonds will be deemed cancelled on the Effective Date.

34.     The Series 2013A Bonds issued by the Issuer on the Effective Date shall be in the approximate original aggregate principal amount of $23,400,000, and the Series 2013B Bonds so issued shall be in the approximate original aggregate principal amount of $20,150,000.  The Series 2013 Bonds shall be issued under the Series 2013 Bond Indenture. Pursuant to the terms of the Plan and the Series 2013 Bond Documents, each holder of the Series 2002 Bonds shall receive a percentage of the aggregate principal amount of the Series 2013A Bonds and Series 2013B Bonds, respectively, that corresponds to such holder's percentage of the aggregate principal amount of the Series 2002 Bonds exchanged for Series 2013 Bonds.

35.     The Distribution Release Date shall be the Effective Date, or, if it is not feasible under the practices and procedures of The Depository Trust Company for the Distribution Release Date to be the Effective Date, the closest date thereto as is practicable so as to enable the Debtor, the Issuer and their respective agents to comply with the practices and procedures of The Depository Trust Company.

36. Notwithstanding anything herein to the contrary, to the extent any provision of the Disclosure Statement, Plan, or this Confirmation Order conflicts with or is in any way inconsistent with the Plan Transaction Documents, the Plan Transaction Documents shall control.

37. All utilities, including Person who received a deposit or other form of adequate assurance of performance pursuant to section 366 of the Bankruptcy Code during the Chapter 11 Case (collectively, the "Deposits"), including without limitation, gas, electric, telephone, trash and sewer services, shall return such Deposits to the Reorganized Debtor, as applicable, either by setoff against postpetition indebtedness or by cash refund, within forty-five (45) days following the Effective Date. As of the Effective Date, such utilities are not entitled to make request for or receive Deposits.

38. Each of the conditions to consummation must be satisfied or duly waived pursuant to the Plan and consummation must occur on or before December 9, 2013. If consummation has not occurred by such date, then upon motion by a party in interest made before consummation and a hearing, this Confirmation Order may be vacated by the Court; provided that, notwithstanding the filing of such motion to vacate, this Confirmation Order may not be vacated if consummation occurs before the Court enters an order granting such motion. If this Confirmation Order is vacated for any reason, then except as provided in any order of the Court vacating this Confirmation Order, the Plan will be null and void in all respects, including the treatment of Claims and Interests pursuant to the Plan and the assumptions, assumptions and assignments, or rejections of any contracts or leases, and nothing contained in the Plan or Disclosure Statement shall (a) constitute a waiver or release of any Claims or Interests: (b)

prejudice in any manner the rights of any party; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by any party.

39.     The Court shall retain full jurisdiction of the Chapter 11 Case and estate property until entry of a final decree, at which time the Court shall retain jurisdiction over this Chapter 11 Case to the fullest extent possible pursuant to 28 U.S.C. § 1334 and the provisions of the Plan.

40.     Pursuant to 11 U.S.C. §§ 1123(a) and 1142(a), the provisions of this Confirmation Order, the Plan, the other Plan Transaction Documents and all other agreements and documents executed and delivered pursuant to the Plan shall apply and be enforceable notwithstanding any otherwise applicable non-bankruptcy law.

41.     If any or all of the provisions of this Confirmation Order are hereafter reversed, modified, or vacated by subsequent order of this Court or any other court, such reversal, modification, or vacatur shall not affect the validity of the acts or obligations incurred or undertaken under or in connection with the Plan before Debtor's receipt of written notice of any such order; nor shall such reversal, modification, or vacatur of this Confirmation Order affect the validity or enforceability of such act or obligation.

42.     Notwithstanding any such reversal, modification, or vacatur of this Confirmation Order, any such act or obligation incurred or undertaken pursuant to, and in reliance on, this Confirmation Order before the effective date of such reversal, modification, or vacatur shall be governed in all respects by the provisions of this Confirmation Order, the Plan, and all documents, instruments and agreements related thereto or any amendments or modifications thereto.

43.     This Court hereby retains jurisdiction of this Chapter 11 Case (a) pursuant to and for the purposes of sections 105(a) and 1127 of the Bankruptcy Code; (b) for such purposes as

may be necessary or useful to aid the confirmation, consummation, and implementation of the Plan as to Debtor; and (c) as set forth in the Plan, which is incorporated herein by reference.

44.     Except for any injunctions preserved or contemplated in the Plan or this Confirmation Order, all injunctions and stays provided for in this Chapter 11 Case pursuant to section 105 or 362 of the Bankruptcy Code or otherwise and extant on the Confirmation Date shall remain in full force and effect until the Effective Date.

45.     The Clerk of the Court is directed to serve a notice of entry of this Confirmation Order, as provided in Bankruptcy Rule 2002(f)(7), to all creditors and interest holders of Debtor as of the date hereof within <u>ten (10) business</u> days from the date of entry of this Confirmation Order.

46.     The Court finds that there is no just reason for delay and this Confirmation Order shall be deemed a final order pursuant to Fed. R. Civ. Pro. 54 and Bankruptcy Rule 7054, as made applicable by Bankruptcy Rule 9014.

<div align="center">###</div>

# Exhibit A

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

In re:                                              )
                                                    )
The Estelle Peabody Memorial Home                   )   Case No. 13-06976-RLM-11
of the Synod of Lincoln Trails of the               )
Presbyterian Church (U.S.A.),                       )
            EIN: 35-0883511                          )
                                                    )
            Debtor.                                 )

### AMENDED DEBTOR'S CHAPTER 11 PLAN OF REORGANIZATION

The Estelle Peabody Memorial Home of the Synod of Lincoln Trails of the Presbyterian

Church (U.S.A.) ("Peabody" or "Debtor") proposes this Amended Chapter 11 Plan of

Reorganization pursuant to 11 U.S.C. §1121.

### ARTICLE I

### DEFINITIONS

For purposes of this Amended Plan, the following definitions shall apply unless the

context otherwise requires:

"2002 Bond Trustee" means Wells Fargo Bank, N.A. successor by merger to Wells Fargo

Bank Indiana, N.A., in its capacity as indenture trustee under the Series 2002 Bond Indenture.

"2013 Bond Trustee" " means Wells Fargo Bank, N.A., in its capacity as indenture

trustee under the Series 2013 Bond Indenture, and any successor trustee in such capacity.

"2002 Master Trustee" means Wells Fargo Bank, N.A. successor by merger to Wells

Fargo Bank Indiana, N.A., as master trustee under the Series 2002 Master Indenture.

"2013 Master Trustee" means Wells Fargo Bank, N.A., in its capacity as master trustee

under the Series 2013 Master Indenture, and any successor trustee in such capacity.

"<u>Administrative Expense</u>" means any cost or expense of administration of the Chapter 11 Case allowed in subsections 503(b) and 507(a)(1) of the Bankruptcy Code.

"<u>Affiliate</u>" means an "<u>affiliate</u>" within the meaning of Section 101(2) of the Bankruptcy Code.

"<u>Allowed</u>" means:

    a)    with respect to a Claim or Interest,

        i)    a Claim or Interest which has been or hereafter is included in the Debtor's Schedules (other than one actually or potentially based upon or arising from the rejection of an executory contract or unexpired lease) or lists of equity security holders filed pursuant to Bankruptcy Rule 1007, and which is not identified therein as being disputed, contingent, and/or unliquidated, and as to which Claim or Interest no objection to the allowance thereof has been interposed within the period of time therefore fixed by an order of the Bankruptcy Court, or as to which any objection thereto has been determined by a Final Order to the extent such objection is determined in favor of the holder thereof;

        ii)    a Claim or Interest for which a proof of claim or proof of interest was timely filed, and as to which no objection to the allowance thereof has been interposed within the period of time therefore fixed by an order of the Bankruptcy Court, or as to which any objection thereto has been determined by a Final Order to the extent such objection is determined in favor of the holder thereof; or

iii)    a Claim or Interest which is allowed pursuant to the terms of this Plan.

b)    with respect to an Administrative Expense, an Administrative Expense as to which no objection to the allowance thereof has been interposed within any period of time therefore that may be fixed by an order of the Bankruptcy Court, or as to which any objection thereto has been determined by a Final Order to the extent such objection is determined in favor of the holder thereof.

Unless otherwise specified herein or by order of the Bankruptcy Court, "Allowed Administrative Expense," "Allowed Claim" or "Allowed Interest" shall not, for purposes of computation of distributions under this Plan, include post-Petition Date interest on such Administrative Expense, Claim or Interest, except by Final Order of the Bankruptcy Court.

"Bankruptcy Code" means Title 11 of the United States Code as enacted by the Bankruptcy Reform Act of 1978, as amended.

"Bankruptcy Court" means the United States Bankruptcy Court for the Southern District of Indiana or such other Court with jurisdiction over this Chapter 11 Case.

"Bar Date" means the date established by a Final Order of the Bankruptcy Court as the last date by which proofs of Claims or Interests and applications for allowance of any Administrative Expense, may be filed in this Chapter 11 Case, each as may be established by the Bankruptcy Court.

"Business Day" means any day except a Saturday, Sunday or "legal holiday" as defined in Bankruptcy Rule 9006(a).

"Cash" means cash and cash equivalents, including but not limited to bank deposits, checks, and other similar terms.

"Chapter 11 Case" means the Chapter 11 Case filed by the Debtor on June 28, 2013, and pending in the Bankruptcy Court.

"Claim" means a "claim" (as that term is defined in section 101(5) of the Bankruptcy Code) against the Debtor.

"Confirmation Date" means the date on which the Confirmation Order is signed by the Bankruptcy Court.

"Confirmation Order" means the order entered by the Clerk of the Bankruptcy Court confirming this Plan in the Chapter 11 Case in accordance with provisions of Chapter 11 of the Bankruptcy Code.

"Consenting Holder" means certain holders of the Series 2002 Bonds constituting more than 50% of the holders of the Series 2002 Bonds, who executed the Restructuring Support Agreement pursuant to which such holders commit, among other things, to bind themselves under certain conditions to vote for this Plan.

"Creditor" means a "creditor" of the Debtor, as the case may be, within the meaning of Section 101(10) of the Bankruptcy Code.

"Deficiency Claim" means that portion of an Allowed Claim secured by a lien on property in which the Debtor's estate has an interest, or that is subject to setoff under Section 553 of the Bankruptcy Code, that is not an Allowed Secured Claim and is not entitled to a priority under 11 U.S.C. §§ 503 or 507, or otherwise.

"Disallowed Claim" means any Claim or portion thereof which has been disallowed by a Final Order and includes any Claim which is not an Allowed Claim for any other reason.

"Disclosure Statement" means the Debtor's Disclosure Statement and the exhibits thereto when filed with the Bankruptcy Court, as filed or as it may be altered, amended or modified from time to time.

"Disputed" means, with respect to any Claim or Interest, any Claim or Interest that is not yet Allowed and is subject to a claims objection filed before any deadline set by the Bankruptcy Court.

"Distribution Release Date" means the Effective Date or such other date as may be determined by the Confirmation Order as the record date for holders of Series 2002 Bonds to participate in the distribution/exchange for the Series 2013 Bonds as set forth in this Plan

"Distribution Date" respecting a Claim or Interest, means the later of: (a) the Effective Date; (b) another date that an applicable distribution is designated to be made under the Plan; or (c) ten (10) Business Days after the date the Claim or Interest becomes an Allowed Claim or Allowed Interest.

"Effective Date" means that date selected by the Debtor which is after the date that each condition precedent to implementation of the Plan set forth in section 9.2 of the Plan has been duly satisfied or waived pursuant to section 9.2 of the Plan, but no later than December 2, 2013.

"Exculpated Claims" means any claim related to any act or omission in connection with, relating to or arising out of the Debtor's in or out of court restructuring efforts, the Chapter 11 Case, formulation, preparation, dissemination, negotiation or filing of the Disclosure Statement or this Plan or any contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement or this Plan, the filing of the Chapter 11 Case, the pursuit of confirmation of this Plan, the administration and implementation of this Plan, the issuance of the Series 2013 Bonds or Series 2013 Notes, the execution and delivery of

5

the 2013 Bond Documents, or the distribution of property under the Plan or any other related agreement; ***provided, however***, that Exculpated Claims shall not include any act or omission that is determined in a Final Order to have constituted gross negligence, willful misconduct or fraud to the extent imposed by applicable non-bankruptcy law.

"Exculpated Party" means each of: (i) the Debtor and the members of its Board of Trustees, (ii) the Reorganized Debtor and the members of its Board of Trustees, (iii) the Manager in any capacity, (iv) each Consenting Holder in any capacity, (v) the Issuer, (vi) the 2002 Bond Trustee in any capacity, (vii) the 2002 Master Trustee in any capacity, (viii) the 2013 Bond Trustee in any capacity, (ix) the 2013 Master Trustee in any capacity, and (x) the current and former officers, directors, members, managers, employees, council members, attorneys and advisors, each in their respective capacities as such, of each of the foregoing.

"Final Order" means an order or judgment of the Bankruptcy Court as entered on the docket of such court which order has not been reversed, stayed, modified, or amended, and as to which: (a) the time to appeal, seek review or rehearing, or petition for certiorari has expired and no timely-filed appeal or petition for review, rehearing remand, or certiorari is pending; or (b) any motion for review or rehearing filed, appeal taken, or petition for certiorari filed has been resolved by the highest court to which the order or judgment was or may be appealed or from which certiorari was or may be sought.

"First Lien" means the lien granted to the 2013 Master Trustee pursuant to the Series 2013 Senior Mortgage and Security Agreement.

"Interest" means with respect to the Debtor, the equity securities (as that term is defined in Section 101(16) of the Bankruptcy Code) of such Debtor, including in the case of an Indiana not-for-profit corporation, the membership of such Debtor.

"Issuer" means the Town of North Manchester, Indiana.

"Manager" means Life Care Services, LLC.

"New Management Contract" means that certain Amended and Restated Management Agreement (as such agreement may be further amended, supplemented or modified from time to time) to be entered into by and between Manager and the Reorganized Debtor, pursuant to this Plan on or after the Effective Date.

"Other Priority Claims" means a Claim of the kind specified in subsection 507(a) of the Bankruptcy Code other than Section 507(a)(8) of the Bankruptcy Code.

"Person" means an individual, corporation, partnership, limited liability company, joint venture, association, joint stock company, trust, estate, unincorporated organization, governmental unit, government (or agency or political subdivision thereof), or other entity, including, without limitation, the Debtor.

"Petition Date" means June 28, 2013, the date the Debtor filed its voluntary petitions for relief under Chapter 11.

"Plan" means this Chapter 11 Plan of Reorganization proposed by the Debtor and the exhibits and schedules hereto, either in its present form or as it may be altered, amended or modified from time to time, subject to the conditions stated herein.

"Priority Tax Claim" means a Claim of the kind specified in subsection 507(a)(8) of the Bankruptcy Code.

"Pro Rata Share" means in the case of any distribution or apportionment of property, the distribution or portion, as the case may be, calculated by multiplying the aggregate amount of the property available for distribution or apportionment by the fraction where the denominator is the sum of all Allowed Claims against, or Allowed Interests in, the Debtor, as the case may be,

entitled to receive such distribution and the numerator is the particular Allowed Claims against, or Allowed Interests in, the Debtor, as the case may be, entitled to receive such distribution.

"Record Date" means that date established by the Court as the date upon which the record holder of any Series 2002 Bonds on such date is permitted to vote for or against the Plan.

"Reorganized Debtor" means Peabody or any successor thereto, by merger, consolidation or otherwise, on or after the Effective Date, after giving effect to the restructuring transactions occurring on the Effective Date in accordance with this Plan.

"Released Parties" means each of: (i) the Debtor and the members of its Board of Trustees, (ii) the Reorganized Debtor and the members of its Board of Trustees, (iii) the Manager in any capacity, (iv) each Consenting Holder in any capacity, (v) the Issuer, (vi) the 2002 Bond Trustee in any capacity, (vii) the 2002 Master Trustee in any capacity, (viii) the 2013 Bond Trustee in any capacity, (ix) the 2013 Master Trustee in any capacity, and (x) the current and former officers, directors, members, managers, employees, council members, attorneys and advisors, each in their respective capacities as such, of each of the foregoing.

"Releasing Parties" means all Persons who have held, hold or may hold Claims or Interests that have been released, waived or discharged or are subject to exculpation pursuant to Sections 12.1 through 12.6 of the Plan.

"Restructuring Support Agreement" means that Agreement, dated as of June 21, 2013, by and between the Debtor and Consenting Holders pursuant to which such holders commit, among other things, to bind themselves under certain conditions to vote for this Plan.

"Second Lien" means the lien granted to the Master Trustee pursuant to the Series 2013 Junior Mortgage and Security Agreement.

"Secured Claim" means a Claim secured by a lien on property in which the Debtor's estate has an interest, or which is subject to set off under Section 553 of the Bankruptcy Code, to the extent of the value of such Creditor's interest in the Debtor's interest in such property or to the extent of the amount subject to such set off, as the case may be.

"Series 2002 Bond Claim" means the aggregate of:

(i)     Unpaid principal on the Series 2002 Bonds in the amount of $45.070 Million;

(ii)    Accrued but unpaid interest on the Series 2002 Bonds in the amount of $10,538,548.60; and

(iii)   unliquidated, accrued and unpaid fees and expenses of the 2002 Bond Trustee and 2002 Master Trustee, and their professionals incurred through the Petition Date.

"Series 2002 Bond Indenture" means that certain Bond Trust Indenture, dated as of August 15, 2002 by and between the 2002 Bond Trustee and the Issuer.

"Series 2002 Bonds" means, collectively, the following bonds issued by the Town of North Manchester, Indiana:

a)      the $41,900,000 Revenue Bonds (Peabody Retirement Community Project) Series 2002A;

b)      the $3,500,000 Revenue Bonds (Peabody Retirement Community Project) Series 2002B-1 Extendable Rate Adjustable Securities$^{SM}$ (EXTRAS$^{SM}$); and

c)      the $1,500,000 Revenue Bonds (Peabody Retirement Community Project) Series 2002B-2 Extendable Rate Adjustable Securities$^{SM}$ (EXTRAS$^{SM}$).

"Series 2002 DSRF" means the debt service reserve fund established under the Series 2002 Bond Indenture.

"Series 2002 Master Indenture" means that certain Master Trust Indenture, dated as of August 15, 2002, by and between the 2002 Master Trustee and the Debtor.

"Series 2013 Bond Indenture" means the Amended Trust Indenture substantially in the form attached hereto as part of Schedule 3.2.3, to be entered into by the Issuer and the Series 2013 Bond Trustee pursuant to this Plan on or after the Effective Date in connection with the issuance of the Series 2013 Bonds.

"Series 2013 Loan Agreement" means the Amended Loan Agreement substantially in the form attached hereto as part of Schedule 3.2.3, to be entered into by the Reorganized Debtor pursuant to this Plan on or after the Effective Date in connection with the issuance of the Series 2013 Bonds.

"Series 2013 Master Indenture" means the Amended Master Indenture substantially in the form attached hereto as part of Schedule 3.2.3, to be entered into by the Reorganized Debtor pursuant to this Plan on or after the Effective Date in connection with the issuance of the Series 2013 Bonds.

Series 2013 Bond Documents" means the Series 2013 Bond Indenture, the Series 2013 Master Indenture, the Series 2013 Loan Agreement, the Series 2013 Senior Mortgage and Security Agreement, the Series 2013 Junior Mortgage and Security Agreement, the Series 2013 Notes, and all other documents related to the Series 2013 Bonds, all substantially in the form as attached hereto as Schedule 3.2.3.

"Series 2013 DSRF" means the debt service reserve fund established under the Series 2013 Bond Indenture.

"Series 2013 Bonds" means the Series 2013A Bonds and Series 2013B Bonds collectively.

"Series 2013A Bonds" means the bonds of such name issued pursuant to this Plan and the Series 2013 Bond Documents.

10

"Series 2013B Bonds" means the bonds of such name issued pursuant to this Plan and the Series 2013 Bond Documents.

"Series 2013 Junior Mortgage and Security Agreement" means the Mortgage and Security Agreement substantially in the form attached hereto as part of Schedule 3.2.3, to be entered into by the Reorganized Debtor and the 2013 Master Trustee pursuant to this Plan on or after the Effective Date in connection with the issuance of the Series 2013B Bonds.

"Series 2013 Notes" means the promissory notes substantially in the form attached hereto as part of Schedule 3.2.3 , to be entered into by the Reorganized Debtor pursuant to this Plan on or after the Effective Date in connection with the issuance of the Series 2013 Bonds.

"Series 2013 Senior Mortgage and Security Agreement" means the Mortgage and Security Agreement substantially in the form attached hereto as part of Schedule 3.2.3, to be entered into by the Reorganized Debtor and the 2013 Master Trustee pursuant to this Plan on or after the Effective Date in connection with the issuance of the Series 2013 Bonds.

"Trade Creditors" means holders of Unsecured Claims against the Debtor that arise from the operation of the Debtor's business other than a Series 2002 Bond Deficiency Claim.

"U.S. Trustee Fees" means all fees and charges assessed against the estate of the Debtor under 28 U.S.C. § 1930 of the United States Code.

"Unsecured Claim" means a Claim or any portion thereof that is not a Secured Claim and is not entitled to a priority under 11 U.S.C. §§ 503 or 507, or otherwise.

"Unsecured Creditors" means holders of Unsecured Claims.

11

# ARTICLE II

## TREATMENT OF ADMINISTRATIVE EXPENSE CLAIMS, PRIORITY TAX CLAIMS, AND U.S. TRUSTEE FEES

2.1    Administrative Expense Claims.    Administrative Expense Claims consist of expenses of administration incurred by the Debtor's estates, including the Claims of those professionals whose employment has been authorized by the Bankruptcy Court, Allowed and ordered paid by the Bankruptcy Court.  In accordance with Bankruptcy Code section 1123(a)(1), Administrative Expense Claims have not been classified and are treated as described in this Section 2.1 of the Plan.  Except as otherwise ordered by the Bankruptcy Court or by written agreement with the holder of such Administrative Expense Claim, each holder of an Allowed Administrative Expense Claim shall be paid in Cash in full on the Effective Date or as soon thereafter as is practicable, or by the date when such Administrative Expense Claim is payable by its terms, consistent under past practice and in accordance with past terms.

2.2    Priority Tax Claims.  In accordance with Bankruptcy Code 1123(a)(1), Priority Tax Claims have not been classified and are treated as described in this Section 2.2 of the Plan. Unless otherwise agreed by the holder of an Allowed Priority Tax Claim, any Person holding an Allowed Priority Tax Claim will receive in full satisfaction of such Allowed Priority Tax Claim: (a) Cash in the full amount of such Allowed Claim on the later of the Effective Date or as soon thereafter as is practicable or the date such Claim becomes an Allowed Claim; or (b) deferred Cash payments over a period of five (5) years from the Petition Date, of a value, as of the Effective Date equal to such Allowed Priority Tax Claim.

2.3    U.S. Trustee Fees.  U.S. Trustee Fees include all fees and charges assessed against the Debtor's estate under section 1930 of Title 28 of the United States Code.  All U.S. Trustee

Fees will be paid in full by the Debtor or Reorganized Debtor, as applicable, as they become due and owing.

## ARTICLE III

CLASSIFICATION AND TREATMENT OF CLASSES OF CLAIMS AND INTERESTS

3.1     Classification and Specification of Treatment of Claims.  All Claims, except those described in Article II, are placed in the following classes of Claims, pursuant to Bankruptcy Code section 1123(a)(1), which section specifies the treatment of such classes of Claims and of their impaired or unimpaired status, pursuant to Bankruptcy Code sections 1123(a)(2) and 1123(a)(3).  A Claim is classified in a particular class only to the extent that the claim qualifies within the description of the class and is classified in a different class to the extent that the Claim qualifies within the description of that different class.  A Claim is in a particular class only to the extent that the Claim is an Allowed Claim in that class and has not been paid, released, withdrawn, waived, or otherwise satisfied under this Plan.  Except to the extent the holder of an Allowed Claim or Allowed Interest against the Debtor agrees to accept different but lesser treatment, the treatment of Allowed Claims and Allowed Interests shall be as follows:

3.2     Classes of Claims.

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| 1 | Other Priority Claims | Unimpaired | Deemed to Accept the Plan |
| 2 | Secured Claims Other than the Series 2002 Bond Claims | Unimpaired | Deemed to Accept the Plan |
| 3 | Secured Claims of Holders of Series 2002 Bond Claims | Impaired | Entitled to Vote |
| 4 | Deficiency Unsecured Claims of Holders of Series 2002 Bond Claims | Impaired | Entitled to Vote |
| 5 | General Unsecured Claims - Trade | Impaired | Entitled to Vote |

13

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| 6 | Allowed First Class Interests | Unimpaired | Deemed to Accept the Plan |
| 7 | Allowed Second Class Interests | Unimpaired | Deemed to Accept the Plan |

3.2.1   Class 1:  Other Priority Claims.  This class consists of all Allowed Other Priority Claims.  Unless otherwise agreed by the holder of any Claim in this class, each Allowed Other Priority Claim under Bankruptcy Code section 507(a) that has not been satisfied as of the Effective Date will receive in full and final satisfaction and discharge of and in exchange for each Allowed Other Priority Claim: (i) deferred Cash payment of a value, as of the Effective Date, equal to the holder's Allowed Other Priority Claim, or (ii) payment in Cash in full on the later of: (a) the fourteenth (14th) day after the Effective Date or as soon as reasonably practicable thereafter as determined by the Reorganized Debtor; and (b) the fourteenth (14th) day after the date on which there is a Final Order allowing such Claim.  Holders of Claims in Class 1 are unimpaired and not entitled to vote on the Plan.

3.2.2   Class 2:  Secured Claims Other than the Series 2002 Bond Claims.  Each holder of an Allowed Class 2 Claim, on the Effective Date, or as soon thereafter as practicable, shall receive treatment, as applicable, pursuant to Section 1124(1) or (2) of the Bankruptcy Code; provided, however, that treatment pursuant to Section 1124(1) may, in the Debtor's sole discretion, include the return of the claimant's collateral with any Deficiency Claim or Unsecured Claim resulting from the disposition of such returned collateral in accord with applicable law to be treated as a Class 5 general Unsecured Claim; provided further, however, that the Debtor may elect, in the Debtor's sole discretion, the treatment hereunder for each such Allowed Class 2 Claim on or before the later of a) sixty (60) days after the Effective Date, or b)

14

determination by Final Order of the allowed amount of such Class 2 Claim. The Debtor's surrender of the remaining collateral of such holder of Allowed Class 2 Claim shall be deemed to be an election of 1124(a)(1) treatment hereunder with any Deficiency Claim to be treated as a Class 5 Claim. If the debt instrument and any related mortgages and other documents under which the Class 2 Claim is based are reinstated, reinstatement only shall be for the amount of the Allowed Secured Claim and any Deficiency Claim remaining shall be treated as a Class 5 Claim. The Debtor shall execute any and all documents necessary to effectuate the terms of this paragraph. Class 2 is unimpaired and is not entitled to vote on the Plan.

3.2.3   **Class 3:  Secured Claims of Holders of Series 2002 Bond Claims.**  Class 3 consists of all of the Series 2002 Bond Claims, which Claims shall be deemed Allowed pursuant to this Plan in the aggregate principal amount of $55,608,548.00 plus unliquidated accrued and unpaid fees and expenses of the 2002 Bond Trustee and 2002 Master Trustee, and their professionals incurred through the Petition Date; with $23,400,000.00 as an Allowed Secured Claim voted and treated pursuant to this Class 3 of the Plan and the remainder as a Deficiency Unsecured Claim voted and treated pursuant to Class 4 of the Plan. Each Holder of a Series 2002A Bond and/or Series 2002B Bond shall receive its Pro Rata Share of both Series 2013A Bonds and Series 2013B Bonds solely as set forth below. Upon the terms and conditions set forth in this Plan, on the Effective Date, in full and final satisfaction and discharge of and in exchange for each Allowed Series 2002 Bond Claim:

Each holder of an outstanding Series 2002 Bond Claim as of the Distribution Release Date will receive:

o  Series 2013A Bonds in an aggregate principal amount equal to such holder's allocable share of the aggregate amount of $23.40 million of par amount of Series 2013A Bonds, (A) bearing interest at a rate of 5.13% during the first year after the Effective Date (only interest, in the aggregate amount of $1.200 million, shall be due

15

and payable during such first year); and at a rate of 6.05% per annum in year two after the Effective Date and thereafter(subject to any default rate or tax gross-up rate which may be applicable) (only interest, in the aggregate amount of $1.4157 million shall be due and payable in year two); and (B) amortizing through mandatory sinking fund payments commencing in year three through the maturity date of the Series 2013A Bonds.   Scheduled interest payments shall be made semi-annually and scheduled principal payments shall be made annually to the holders of the Series 2013A Bonds.

- The Series 2013A Bonds shall be secured by a First Lien on all the assets of the Reorganized Debtor and the Series 2013A Bonds shall be senior in payment to the Series 2013B Bonds.

- The 2002 Bond Trustee will receive payment for all of its unpaid reasonable fees and expenses from the Series 2002 DSRF.  The balance of funds held in the Series 2002 DSRF shall be transferred to the Series 2013 DSRF.

- The other rights and obligations of the Reorganized Debtor, the 2013 Bond Trustee and the 2013 Master Trustee, and the holders of the Series 2013 Bonds will be governed by the terms of the Series 2013 Bond Documents, which are attached to this Plan as Schedule 3.2.3.

o An Allowed Deficiency Unsecured Claim in an amount equal to the difference between the Allowed Series 2002 Bond Claim and the Allowed Class 3 Secured Claim, which shall be voted and treated as a Class 4 Claim.

The holders of the Class 3 Claims are impaired and entitled to vote on the Plan.

3.2.4    Class 4.  Deficiency Unsecured Claims of Holders of Series 2002 Bond Claim.

Each holder of an outstanding Series 2002 Bond Claim as of the Distribution Release Date will receive Series 2013B Bonds in an aggregate initial principal amount equal to such holder's allocable share of the aggregate amount $20.15 million of par amount of the Series 2013B Bonds.  Interest shall accrue and be payable semi-annually from excess cash flow in accordance with the distribution waterfall described more fully in the Series 2013 Master Trust Indenture. Any accrued interest that cannot be paid on a semi-annual interest payment date shall be added to the principal amount of the Series 2013B Bonds.  The Series 2013B Bonds are secured by a Second Lien on all assets of the Debtor.  Principal on the Series 2013B Bonds to the holders of the Series 2013B Bonds shall be payable semi-annually from excess cash in accordance with the

Case 13-55000-KG   Doc 901   Filed 01/14/14   Entered 01/14/14 13:15:23   Page 500 of 503

distribution waterfall described more fully in the Series 2013 Master Trust Indenture to the extent funds are available, and any unpaid principal of and interest shall be due and payable on the maturity date of the Series 2013B Bonds. The other rights and obligations of the Reorganized Debtor, the 2013 Bond Trustee and the 2013 Master Trustee, and the holders of the Series 2013 Bonds will be governed by the terms of the Series 2013 Bond Documents, which are attached to this Plan as Schedule 3.2.3. The holders of the Class 4 Claims are impaired and entitled to vote on the Plan.

     3.2.5  <u>Class 5: General Unsecured Claims - Trade</u>. This class consists of all general Unsecured Claims not otherwise classified in Class 4. Class 5 consists primarily, if not exclusively, of the Claims of Trade Creditors and others that arise from the Debtor's operations. Except to the extent that a holder of an Allowed Unsecured Claim agrees to a less favorable treatment, in full and final satisfaction and discharge of and in exchange for each general unsecured claim, each holder of an Allowed Unsecured Claim in Class 5 will receive payment in full in Cash of the unpaid portion of such Allowed Unsecured Claim on the latest of (i) the Effective Date, or as soon thereafter as is practicable, (ii) the fourteenth (14th) day after the date on which there is a Final Order allowing such Claim, (iii) pursuant to the ordinary and customary business terms respecting such claim, or (iv) as otherwise agreed to by the Reorganized Debtor and the holder of such Claim. **Holders of Class 5 Unsecured Claims shall not receive any post-Petition Date interest on account of their Claims, and to the extent any holder of a Class 5 Unsecured Claim asserts a claim for interest, that portion of the Claim is a Disallowed Claim, except as otherwise ordered by the Bankruptcy Court.** Holders of Class 5 Unsecured Claims are impaired and entitled to vote on the Plan.

17

3.2.6    <u>Class 6:  Allowed First Class Interests</u>.  Class 6 consists of the holders of Debtor's Interests that are of the class of members permitted generally to vote for the members of the Board of Trustees.  This class consists of those persons who from time to time serve as members of the Board of Directors of the Synod of Lincoln Trails of the Presbyterian Church (U.S.A.). Each holder of an Allowed Class 6 Interest shall retain its Allowed Interest, which does not include any economic benefit or distribution.  Class 6 is unimpaired and is not entitled to vote on the Plan.

3.2.7    <u>Class 7:  Allowed Second Class Interests</u>.  Class 7 consists of the holders of Debtor's Interests that are of the class of members not permitted generally to vote for members of the Board of Trustees.  Each holder of an Allowed Class 7 Interest shall retain its Allowed Interest, which does not include any economic benefit or distribution.  Class 7 is unimpaired and is not entitled to vote on the Plan.

## ARTICLE IV

<u>ACCEPTANCE OR REJECTION OF PLAN</u>

4.1    <u>Acceptance by an Impaired Class</u>.  In accordance with section 1126(c) of the Bankruptcy Code and except as provided in section 1126(e) of the Bankruptcy Code, an impaired class of Claims shall have accepted this Plan if this Plan is accepted by the holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims of such Class that have timely and properly voted to accept or reject this Plan.   In accordance with section 1126(d) of the Bankruptcy Code and except as provided in section 1126(e) of the Bankruptcy Code, an impaired Class of Interests shall have accepted this Plan if this Plan is accepted by the holders of at least two-thirds (2/3) in amount of the Allowed Interests of such Class that have timely and properly voted to accept or reject this Plan.

18

4.2     Voting Classes.  Classes 3, 4, and 5 are impaired under this Plan and the holders of Claims in such classes shall be entitled to vote to accept or reject this Plan.

4.3     Presumed Acceptance of Plan.  Classes 1, 2, 6 and 7 are unimpaired under this Plan and, therefore, are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code, or otherwise are not deemed to be receiving a distribution under the Plan in respect of such holder's membership in an Indiana not-for-profit corporation.

## ARTICLE V

## FUNDING AND IMPLEMENTATION OF PLAN

5.1     EPH Assistance Corporation Case.  Upon the Effective Date, the Reorganized Debtor, as the sole owner of EPH Assistance Corporation shares of stock, is authorized in its sole discretion to prosecute or to seek dismissal of EPH Assistance Corporation's chapter 11 case or to take all other actions it deems appropriate respecting the EPH Assistance Corporation chapter 11 case.

5.2     Debtor Continues to Operate to Fulfill Plan Terms.  On the Effective Date, the Reorganized Debtor shall continue to operate as an Indiana not-for-profit corporation pursuant to its organizational documents.  The Reorganized Debtor shall continue to operate as The Estelle Peabody Memorial Home of the Synod of Lincoln Trails of the Presbyterian Church (U.S.A.).  The Reorganized Debtor shall have all powers set forth in its restated organizational documents and all other authorization and power necessary or required to implement the Plan without further corporate action or approval.  After the Effective Date, the Reorganized Debtor may amend or modify its organic documents in any manner consistent with the Plan, the Series 2013 Bond Documents, and any agreements and documents executed in connection with either of the foregoing documents, or as permitted under applicable law.

19

5.3    Post-Effective Date Management of Reorganized Debtor.  Upon the Effective Date, the existing trustees shall retain their seats as trustees of the Reorganized Debtor.  The Reorganized Debtor shall have all power under law to manage its affairs after the Effective Date in accord with its organic documents and this Plan.

5.4    Corporate Authorizations.

(a)    Governance Action.  Any action under the Plan to be taken by or required of the Debtor prior to the Effective Date shall be taken through the Debtor's officers, trustees, or managers as set forth in such Debtor's extant organic documents, and after the Effective Date, through the Board of Trustees of the Reorganized Debtor, its Manager or its officers and/or authorized designees, as the case may be, including, without limitation, the negotiation and execution of agreements or to take any other corporate action it deems necessary to implement the Plan and/or operate the Reorganized Debtor.

(b)    Effectuating Documents and Further Transactions.  The Debtor, prior to the Effective Date through its officers, trustees, and/or managers, as the case may be, and after the Effective Date, the Reorganized Debtor, through the Board of Trustees or their officers and/or designees, shall be authorized to execute, deliver, file, or record such documents, contracts, instruments, releases, and other agreements and take such other action as may be necessary to effectuate and further evidence the terms and conditions of the Plan.

5.5    Plan Funding.

(a)    Cash.  The Cash payments under the Plan shall be funded from the Debtor's Cash reserves and revenues from operations going forward.  Subject to the terms of the Series 2013 Bond Documents, the Reorganized Debtor also is authorized to borrow funds on an unsecured basis as it deems necessary to fund the Effective Date payments.  In addition, the Reorganized

20

Debtor may use funds from grants and other contributions to make such payments. The Reorganized Debtor is authorized to accept such grants and/or contributions and to operate in accord with any grant or gift source restrictions respecting the use thereof.

(b)    Cancellation of Series 2002 Bonds.    Subject to receipt of the consideration provided in sections 3.2.3 and 3.2.4 hereof, the Series 2002 Bonds will be deemed cancelled on the Effective Date.

(c)    Issuance of the Series 2013 Bonds, Series 2013 Notes and Execution of Series 2013 Bond Documents.    On the Effective Date or as soon as reasonably practicable thereafter, the Issuer will issue, in accordance with the terms of this Plan and pursuant to the Series 2013 Amended Bond Indenture, the Series 2013 Bonds, which Series 2013 Bonds shall be exchanged through the Depository Trust Company to the holders of the Series 2002 Bonds of record as of the Distribution Release Date.    On the Effective Date, the Reorganized Debtor will issue, in accordance with the terms of the Plan and pursuant to the Series 2013 Loan Agreement, the Series 2013 Notes issued under the Series 2013 Master Indenture.    In connection with the foregoing matters described in this section 5.5(c), on the Effective Date, the Issuer and the 2013 Bond Trustee will enter into the Series 2013 Bond Indenture, and the Reorganized Debtor, the Issuer, the 2013 Bond Trustee and the 2013 Master Trustee, as applicable, will enter into the Series 2013 Loan Agreement, the Series 2013 Master Indenture, the Series 2013 Senior Mortgage and Security Agreement, the Series 2013 Junior Mortgage and Security Agreement, and the other Series 2013 Bond Documents.    The Series 2013 Bonds shall be secured by liens against all of the assets of the Reorganized Debtor; provided, however, the lien on the Series 2013A Bonds shall be senior to the lien on the Series 2013B Bonds and the Series 2013A Bonds shall be senior in payment to the Senior 2013B Bonds.

21

5.6     New Management Contract.  To the extent not entered into prior thereto, on the Effective Date, the Reorganized Debtor and Manager will enter into the New Management Contract which, unless already assumed by the Debtor as Amended and Restated, shall be deemed assumed as Amended and Restated by this Plan and all Claims, if any, including Claims of the Manager for Cure and for adequate assurance of future performance, or both under the prior contract and/or the New Management Contract, as assumed, shall be discharged and released hereby.

5.7     Miscellaneous Distribution Provisions Relating to Claims Other than the Series 2002 Bond Claim.  This section is not applicable to the Series 2002 Bonds.

(a)     Unclaimed Property.  If a distribution under the Plan remains unclaimed six months following the date of such distribution, then the holder of the applicable Allowed Claim or Allowed Interest shall cease to be entitled to such distribution and such distribution shall be retained by the Debtor.

(b)     Method of Cash Distributions.  Any Cash payment to be made pursuant to the Plan may be made by draft, check, wire transfer, or as otherwise required or provided in any relevant agreement or applicable law.

(c)     Distributions on Non-Business Days.  Any payment or distribution due on a day other than a Business Day shall be made, without interest, on the next Business Day.

(d)     No Distribution in Excess of Allowed Amount of Claim.  Notwithstanding anything to the contrary herein, no holder of an Allowed Claim shall receive respecting such Claim any distribution (of a value set forth herein) in excess of the allowed amount of such Claim.  Except as provided herein or in a Final Order, no Claim shall be allowed to the extent that it is for post petition interest.

22

(e)    <u>Mathematical Calculations</u>.  If any formula in the Plan cannot be mathematically calculated because one or more of the variables in such formula is a fraction containing a denominator having a value of zero or zero dollars, such variable shall be deemed to have a value of zero or zero dollars, as the case may be.

(f)    <u>Disputed Payments</u>.  If any dispute arises as to the identity of the holder of an Allowed Claim or an Allowed Interest entitled to receive any distribution under the Plan, the Debtor may retain such distribution until its disposition is determined by a Final Order or written agreement among the interested parties to such dispute and withhold from such distribution an amount equal to the fees and costs incurred by the Debtor in resolving such dispute.

(g)    <u>Withholding Taxes</u>.  Any federal or state withholding taxes or other amounts required to be withheld under any applicable law shall be deducted and withheld from any Plan distributions.

5.8    <u>Cancellation and Surrender of Outstanding Securities other than the Series 2002 Bonds Which Exchange is Governed by Section 5.5 (b) and (c) of this Plan</u>.  This section will not be applicable to the holders of the Series 2002 Bonds.  Except as otherwise provided herein, upon the Effective Date, all outstanding Securities of the Debtor excluding the Debtor's Interests shall be canceled and of no further force and effect.  Except as otherwise provided herein, each holder of an instrument or other document evidencing an Allowed Claim against the Debtor (other than an Allowed Secured Claim which is reinstated or amended and restated under the Plan) shall surrender to Debtor such instrument respecting such Allowed Claim with a duly executed letter of transmittal.  No Plan distribution shall be made to or on behalf of any holder of such Claim unless and until such instrument or document is received by or the non-availability of such instrument or certificated security is established to the satisfaction of the Debtor.  The

Debtor may reasonably require security and/or indemnity from the purported holder of such instrument or certificated security to hold the Debtor and the Reorganized Debtor harmless respecting such instrument or certificated security and any distributions made in respect thereof. Any such holder that fails to surrender such instrument or satisfactorily explain its unavailability to the Debtor (within six months of the Effective Date shall be deemed to have no further Claim against in the Debtor, or its property respecting such Claim and shall not participate in any distribution under the Plan respecting such Claim.

5.9    <u>Revesting of Property in the Reorganized Debtor</u>.  On the Effective Date, all of the Debtor's property including any property transferred to it by this Plan shall revest in the Reorganized Debtor free and clear of all liens, claims and encumbrances except as specifically set forth in the Plan, including that the 2013 Master Trustee shall be granted a First Lien pursuant to the Series 2013 Senior Mortgage and Security Agreement, and a Second Lien pursuant to the Series 2013 Junior Mortgage and Security Agreement, each of which shall encumber all of the assets of the Reorganized Debtor and secure the obligations related to the Series 2013 Bonds.

5.10    <u>Section 1145 Exemption</u>.  Pursuant to section 1145 of the Bankruptcy Code, the offering, issuance, and distribution of any securities pursuant to the Plan and any and all settlement agreements incorporated herein shall be exempt from, among other things, the registration requirements of section 5 of the Securities Act of 1933, 15 U.S.C. § 77a – 77aa, to the maximum extent permitted thereunder and any other applicable law requiring registration prior to the offering, issuance, distribution or sale of securities.

5.11    <u>Section 1146 Exemption from Certain Taxes</u>.  Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property in contemplation of, in connection with, or pursuant to this Plan, shall not be subject to any stamp tax or other similar tax or governmental assessment

08-13555-scc    Doc 452    Filed 08/29/14    Entered 08/29/14 14:34:43    Main Document
Pg 45 of 409

in the United States, and the Confirmation Order shall direct and be deemed to direct the appropriate state or local governmental officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such tax or governmental assessment.  Such exemption specifically applies, without limitation, to (1) the creation and recordation of any mortgage, deed of trust, lien or other security interest; (2) the making or assignment of any lease or sublease; (3) any restructuring transaction authorized by this Plan; or (4) the making or delivery of any deed or other instrument of transfer under, in furtherance of or in connection with this Plan, including: (a) any merger agreements; (b) agreements of consolidation, restructuring, disposition, liquidation or dissolution; (c) deeds; or (d) assignments executed in connection with any transaction occurring under this Plan.

## ARTICLE VI

## ASSUMPTION AND REJECTION OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES

6.1     Rejection.

(a)     Leases and Contracts to be Rejected.  On the Confirmation Date, but subject to the occurrence of the Effective Date, the Debtor, pursuant to section 365 of the Bankruptcy Code, shall reject only those executory contracts and unexpired leases that (i) are listed on Schedule 6.1 hereto; (ii) are the subject of motions to reject pending on the Confirmation Date subject to the entry of a Final Order respecting such pending motion; or (iii) become the subject of a dispute over the amount or manner of cure and for which the Debtor makes a motion, at any time, to reject such contract or lease based upon the existence of such dispute also conditioned upon the entry of a Final Order respecting such rejection motion; provided, however, that the Debtor shall not be required to assume or reject any executory contract or unexpired lease with

25

any party that is a debtor under the Bankruptcy Code unless and until such contract or lease has been assumed or rejected by such other party. All contracts or leases not rejected or reserved hereby shall be deemed assumed pursuant to Section 6.2 of the Plan.

(b)    <u>Effect of Post confirmation Rejection</u>. The entry by the Bankruptcy Court after the Confirmation Date of an order authorizing the rejection of an executory contract or unexpired lease shall result in such rejection being a pre-petition breach under sections 365(g) and 502(g) of the Bankruptcy Code.

(c)    <u>Deadline to File Rejection Damage Claims</u>. Each Person who is a party to a contract or lease rejected under the Plan must file, not later than thirty (30) days after the Confirmation Date, a proof of Claim for damages alleged to arise from the rejection of the applicable contract or lease or be forever barred from filing a Claim, or sharing in distributions under the Plan, related to such alleged rejection damages.

6.2    <u>Assumption</u>.

(a)    <u>Leases and Contracts to be Assumed</u>. All executory contracts and unexpired leases not previously assumed and/or the subject of Section 6.1 of this Plan shall be assumed on the Confirmation Date but subject to the occurrence of the Effective Date. Attached hereto as <u>Schedule 6.2</u> is a non-exclusive list of the executory contracts and unexpired leases that shall be assumed by the Debtor under the Plan as of the Confirmation Date (but subject to the occurrence of the Effective Date) pursuant to section 365 of the Bankruptcy Code, and the cure amounts necessary for such assumption and the adequate assurance of future performance provided by the Debtor.

(b)    <u>Deadline to Object to Cure Amounts</u>. If prior to the Confirmation Date or such other date as the Bankruptcy Court may fix, a party to such an executory contract or unexpired

Case 1:363669 Pow 492    Document     filed 04/14/20    110/29/14 14:34:43:76 Mg    Pg 2000/13

lease listed on Schedule 6.2 fails to file with the Bankruptcy Court and serve upon the attorneys for the Debtor an objection to the applicable cure amount listed on Schedule 6.2 or object to the adequate assurance proposed, then such party shall be forever barred from asserting any additional or other amounts against the Debtor respecting such cure amount or require additional adequate assurance.

(c)     Method of Cure.  At the election of the Reorganized Debtor, any monetary defaults under each executory contract and unexpired lease to be assumed under this Plan shall be satisfied pursuant to section 365(b)(1) of the Bankruptcy Code, in one of the following ways: (a) by payment of the default amount in Cash before the first anniversary of the Effective Date or such lesser period ordered by the Bankruptcy Court; or (b) on such other terms as may be agreed to by the parties to such executory contract or unexpired lease.  If a dispute occurs regarding:  (x) the cure amount; (y) the ability of the Debtor to provide adequate assurance of future performance under the contract or lease to be assumed; or (z) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order resolving the dispute and approving assumption. Pursuant to Section 6.1 of this Plan, the Debtor reserves the right to reject any such executory contract or lease as to which a dispute arises hereunder.  If an executory contract or lease is not specifically rejected by the Plan under Section 6.1 and is not specifically assumed by being set forth on Schedule 6.2, it shall be deemed assumed subject to the Debtor's option to reject it pending resolution of cure amounts and adequate assurance of further performance.

# ARTICLE VII

## REQUEST FOR CONFIRMATION UNDER 11 U.S.C. § 1129(B)

In the event any impaired class of Claims or Interests does not accept the Plan, the Debtor requests that the Court nevertheless confirm its Plan under the provisions of 11 U.S.C. § 1129(b).

# ARTICLE VIII

## ADMINISTRATIVE PROVISIONS

8.1    Retention of Jurisdiction.    Notwithstanding confirmation of the Plan or occurrence of the Effective Date, the Bankruptcy Court shall retain jurisdiction for the following purposes:

(a)    Determination of the allowability of Claims against and Interests in the Debtor (except those Claims that are Allowed Claims pursuant to the Plan), upon objection by the Debtor or any other party in interest and the validity, extent, priority, and non-avoid ability of consensual and non consensual liens and other encumbrances;

(b)    Determination of tax liability pursuant to section 505 of the Bankruptcy Code;

(c)    Approval, pursuant to section 365 of the Bankruptcy Code, of all matters related to the assumption, assumption and assignment, or rejection of any executory contract or unexpired lease of the Debtor;

(d)    Determination of requests for payment of administrative expenses entitled to priority under section 507(a)(1) of the Bankruptcy Code;

(e)    Resolution of controversies and disputes regarding the interpretation of the Plan, the Confirmation Order, or the Bankruptcy Court's orders that survive Confirmation of the Plan pursuant to the Plan or other applicable law;

(f)    Implementation of the provisions of the Plan, and entry of orders in aid of confirmation and consummation of the Plan and enforcing settlements or orders entered during the case or as part of the Plan, including, without limitation, appropriate orders to protect the Debtor and its successors from actions by Creditors and/or Interest holders of the Debtor and resolution of disputes and controversies regarding property that was property of the estate;

(g)    Modification of the Plan pursuant to section 1127 of the Bankruptcy Code;

(h)    Adjudication of any causes of action that arose pre-confirmation or in connection with the implementation of the Plan, including avoidance actions, brought or to be brought by the Debtor, the successor of the Debtor and/or others as the representative of the Debtor's estate;

(i)    Entry of a Final Order closing the Chapter 11 Case;

(j)    Resolution of disputes concerning the reserve established for any Claims that are Disputed (or its administration) and Claims for disputed distributions;

(k)    The resolution of any disputes concerning any release under the Plan of a non-debtor or the injunction under the Plan, or in the Confirmation Order against acts, employment of process, or actions against such non-debtor;

(l)    Resolution of any disputes concerning whether a Person had sufficient notice of the Chapter 11 Case, the applicable Claims Bar Date, the hearing on the approval of the Disclosure Statement as containing adequate information, the hearing on the confirmation of the Plan for the purpose of determining whether a Claim is discharged or an Interest terminated hereunder, or for any other purpose;

(m)    Issuance of injunctions, grant and implementation of other orders, or taking such other actions as may be necessary or appropriate to restrain interference by any Person with consummation or enforcement of the Plan;

(n)     Resolution of controversies and disputes regarding settlement agreements, orders, injunctions, judgments, and other matters entered or approved by the Bankruptcy Court in connection with any adversary proceeding, discovery, or contested matter in the Chapter 11 Case;

(o)     Adjudication of any pending adversary proceeding, or other controversy or dispute, in the Debtor's Chapter 11 Case, which arose pre confirmation and over which the Bankruptcy Court had jurisdiction prior to confirmation of the Plan;

(p)     Entry and implementation of such orders as may become necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated; and

(q)     Determination of any other matters that may arise in connection with or relating to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, or other agreement or document created in connection with the Plan or Disclosure Statement.

8.2     <u>Successors and Assigns</u>.  The right, benefits, and obligations of any person named or referred to in the Plan shall be binding upon, and shall inure to the benefit of, the heir, executor, administrator, successor, or assign of such person.

8.3     <u>Severability</u>.  Should any provision in the Plan be determined to be unenforceable following the Confirmation Date, such determination shall in no way limit or affect the enforceability and operative effect of any and all other provisions of the Plan; provided that the Plan, as modified, meets the requirements of the Bankruptcy Code, including without limitation, section 1127 of the Bankruptcy Code.

8.4    <u>Rules of Construction</u>.

(a)    <u>Undefined Terms</u>.  Any capitalized term used but not otherwise defined in the Plan shall have the meaning given to that term in the Bankruptcy Code and/or the Bankruptcy Rules.

(b)    <u>Miscellaneous Rules</u>.  When interpreting the Plan:  (i) the words "herein," "hereof," "hereunder," and other words of similar import shall refer to the Plan as a whole, not to any particular article, section, subsection, or clause, unless the context requires otherwise; (ii) whenever it appears appropriate from the context, each term stated in the singular or the plural shall include the singular and the plural, and each pronoun stated in the masculine, feminine, or neuter shall include the masculine, feminine, and the neuter; (iii) captions and headings to articles, sections, and subsections of the Plan (inserted for convenience or reference only) shall not be a part of or affect the interpretation of the Plan; and (iv) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply, unless superseded by the Plan or the Confirmation Order.

(c)    <u>Governing Law</u>.  Except to the extent the Bankruptcy Code, Bankruptcy Rules, or other federal laws, and except for Allowed Secured Claims reinstated under the Plan that are governed by another jurisdiction's law, the rights and obligations arising under the Plan shall be governed by the laws of the State of Indiana, without giving effect to principles of conflicts of law.

8.5    <u>Continuation of Injunctions and Stays</u>.  Unless otherwise provided, all injunctions or stays ordered in the Chapter 11 Case, pursuant to section 105 of the Bankruptcy Code or otherwise, and extant on the Confirmation Date shall remain in full force and effect through the Effective Date unless or until subsequently modified or terminated.

# ARTICLE IX

## CONDITIONS TO THE PLAN

9.1    <u>Conditions Precedent to Confirmation of the Plan</u>.  The Confirmation of this Plan is subject to the requirement that the following conditions shall have been satisfied or waived by the Debtor:

(a)    The Confirmation Order shall (i) be in form and substance, reasonably acceptable to the Debtor and the Series 2002 Bond Trustee, and (ii) include a finding by the Bankruptcy Court that the Series 2013 Bonds to be issued on the Effective Date will be authorized; and

(b)    the Plan, including any schedules, documents, supplements and exhibits thereto, including but not limited to the Series 2013 Bond Documents, shall be, in form and substance reasonably acceptable to the Debtor and the 2002 Bond Trustee.

9.2    <u>Conditions Precedent to Implementation of the Plan</u>.  The implementation of the Plan is subject to the requirement that, and the Effective Date shall not be deemed to occur until, each and all of the following conditions shall have been satisfied or waived by the Debtor:

(a)    The Bankruptcy Court shall have entered the Confirmation Order in form and substance satisfactory to the Debtor and the Series 2002 Bond Trustee, and such Confirmation Order shall have become a Final Order and shall not be subject to an unresolved request for revocation under section 1144 of the Bankruptcy Code;

(b)    The Confirmation Order shall contain provisions approving the discharge, release and injunction as set forth in sections 12.1, 12.2, 12.3, 12.4, 12.5 and 12.6 of this Plan;

(c)    Subject to and in accordance with the Plan, all of the Debtor's right, title and interest in the assets shall vest in the Reorganized Debtor free and clear of all liens, claims and encumbrances or as otherwise provided in this Plan;

(d)    The Series 2013 Bond Documents are in form and substance satisfactory to the Debtor and the 2002 Bond Trustee;

(e)    All of the schedules, documents, supplements and exhibits to the Plan, including but not limited to the Series 2013 Bond Documents, shall be, in form and substance reasonably acceptable to the Debtor and the 2002 Bond Trustee;

(f)    The Debtor shall have sufficient Cash on hand to make necessary Effective Date Cash distributions; and

(g)    In connection with the issuance of the Series 2013 Bonds, the Reorganized Debtor shall have obtained an opinion from bond counsel that the interest on the Series 2013 Bonds will be excluded from gross income for federal tax purposes.

(h)    The Debtor and the Manager shall have executed the New Management Contract in a form acceptable to the Debtor and the 2002 Bond Trustee.

(i)    The Confirmation Order shall contain provisions assuming the New Management Contract and implementing Section 5.6 of this Plan.

## ARTICLE X

## RESERVATION OF RIGHTS

10.1    <u>Retain Causes of Action</u>.  Notwithstanding the entry of a Confirmation Order, except for those Claims expressly released or Allowed under the Plan, the Reorganized Debtor shall retain and remain in possession of all causes of action as the Debtor may have under the Bankruptcy Code or under otherwise applicable federal or state law, and shall be authorized to prosecute such actions if the Reorganized Debtor determines that such action should be taken.

10.2    <u>Retain Right to Dispute Validity of Liens and Claims</u>.  Notwithstanding the entry of the Confirmation Order, the Reorganized Debtor shall retain the right to dispute the validity,

33

priority, extent, and amount of any alleged Claim or Interest, unless specifically Allowed/Disallowed in the Plan, and shall retain the right to litigate and/or dispute the extent and validity of the Claims of any Creditor, except as such Claim has become an Allowed Claim as provided in the Plan.  Except for those Claims expressly released or Allowed under the Plan, the Reorganized Debtor reserves all rights to litigate and or settle all pending or future litigation issues in its sole discretion.

## ARTICLE XI

### MODIFICATION OF THIS PLAN

11.1    <u>Modification Prior to Confirmation</u>.  The Debtor may modify this Plan at any time before the Confirmation Date, but may not modify this Plan so that this Plan as modified fails to meet the requirements of Sections 1122 and 1123 of the Bankruptcy Code; provided, however, that prior to the termination of the Restructuring Support Agreement, and except with the prior written consent by each of the 2002 Bond Trustee, and the Consenting Holders, the Debtor may not alter amend, or modify this Plan in any manner that (a) alters or affects the rights or interests of the 2002 Bond Trustee, the 2002 Master Trustee, or the holders of the Series 2002 Bonds; (b) alters or affects the treatment of the Series 2002 Bond Claims under this Plan; (c) alters or affects the terms or characteristics of the Series 2013 Bonds, the Series 2013 Notes, or the Series 2013 Bond Documents as set forth in this Plan prior to such alteration, amendment or modification, or (d) is inconsistent with the terms of the Restructuring Support Agreement, in each case in clauses (a) through (d) in a manner adverse to the 2002 Bond Trustee, the 2002 Master Trustee, or the holders of the Series 2002 Bonds.

11.2    <u>Modification After Confirmation</u>.  The Debtor may modify this Plan at any time after the Confirmation Date and before the Effective Date of this Plan, but it may not modify this

Plan so that this Plan as modified fails to meet the requirements of the Bankruptcy Code; provided, however, that prior to the termination of the Restructuring Support Agreement, and except with the prior written consent by each of the 2002 Bond Trustee, and the Consenting Holders, the Debtor may not alter amend, or modify this Plan in any manner that (a) alters or affects the rights or interests of the 2002 Bond Trustee, the 2002 Master Trustee, or the holders of the Series 2002 Bonds; (b) alters or affects the treatment of the Series 2002 Bond Claims under this Plan; (c) alters or affects the terms or characteristics of the Series 2013 Bonds, the Series 2013 Notes, or the Series 2013 Bond Documents as set forth in this Plan prior to such alteration, amendment or modification, or (d) is inconsistent with the terms of the Restructuring Support Agreement, in each case in clauses (a) through (d) in a manner adverse to the 2002 Bond Trustee, the 2002 Master Trustee, or the holders of the Series 2002 Bonds.

## ARTICLE XII

## DISCHARGE, RELEASE AND INJUNCTION

12.1   <u>Discharge of Debt</u>.   Upon the Effective Date, the Debtor shall be fully and completely discharged to the fullest extent permitted by Sections 1141 and 524 of the Bankruptcy Code, from all Claims, debts and liabilities against the Debtor arising before the Effective Date, except as specifically provided for by the Plan.

12.2   <u>Injunction</u>.   FROM AND AFTER THE EFFECTIVE DATE, ALL PERSONS ARE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER, ANY CAUSE OF ACTION RELEASED, DISCHARGED OR WAIVED OR TO BE RELEASED, DISCHARGED OR WAIVED PURSUANT TO THIS PLAN OR THE CONFIRMATION ORDER.

FROM AND AFTER THE EFFECTIVE DATE, TO THE EXTENT OF THE
RELEASES AND EXCULPATION GRANTED IN THE PLAN, THE RELEASING PARTIES
SHALL BE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN
ANY MANNER AGAINST THE RELEASED PARTIES AND THE EXCULPATED PARTIES
AND THEIR ASSETS AND PROPERTIES, AS THE CASE MAY BE, ANY SUIT, ACTION
OR OTHER PROCEEDING, ON ACCOUNT OF OR RESPECTING ANY CLAIM,
DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION, INTEREST
OR REMEDY RELEASED, DISCHARGED OR WAIVED OR TO BE RELEASED,
DISCHARGED OR WAIVED PURSUANT TO THE PLAN.  EXCEPT AS OTHERWISE
EXPRESSLY PROVIDED IN THE PLAN, OR RELATED DOCUMENTS, OR FOR
OBLIGATIONS ISSUED PURSUANT TO THE PLAN, ALL PERSONS WHO HAVE HELD,
HOLD OR MAY HOLD CLAIMS OR INTERESTS THAT HAVE BEEN RELEASED,
DISCHARGED OR WAIVED, OR ARE SUBJECT TO EXCULPATION, ARE
PERMANENTLY ENJOINED, FROM AND AFTER THE EFFECTIVE DATE, FROM
TAKING ANY OF THE FOLLOWING ACTIONS:  (1) COMMENCING OR CONTINUING
IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON
ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS
OR INTERESTS; (2) ENFORCING, ATTACHING, COLLECTING OR RECOVERING BY
ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE OR ORDER AGAINST
SUCH PERSONS ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO
ANY SUCH CLAIMS OR INTERESTS; (3) CREATING, PERFECTING OR ENFORCING
ANY ENCUMBRANCE OF ANY KIND AGAINST SUCH PERSONS OR THE PROPERTY
OR ESTATE OF SUCH PERSONS ON ACCOUNT OF OR IN CONNECTION WITH OR

WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; AND (4) COMMENCING OR

CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY

KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY

SUCH CLAIMS OR INTERESTS RELEASED, DISCHARGED OR WAIVED PURSUANT

TO THE PLAN.

THE RIGHTS AFFORDED IN THE PLAN AND THE TREATMENT OF ALL

CLAIMS AND INTERESTS THE PLAN SHALL BE IN EXCHANGE FOR AND IN

COMPLETE SATISFACTION OF ALL CLAIMS AND INTERESTS OF ANY NATURE

WHATSOEVER, INCLUDING ANY INTEREST ACCRUED ON CLAIMS FROM AND

AFTER THE PETITION DATE, AGAINST THE DEBTOR OR ANY OF ITS ASSETS,

PROPERTY OR ESTATES. ON THE EFFECTIVE DATE, ALL SUCH CLAIMS AGAINST

THE DEBTOR SHALL BE FULLY RELEASED AND DISCHARGED, AND THE

INTERESTS SHALL BE CANCELLED (EXCEPT AS OTHERWISE EXPRESSLY

PROVIDED IN THE PLAN).

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED FOR IN THIS PLAN OR IN

OBLIGATIONS ISSUED PURSUANT TO THE PLAN FROM AND AFTER THE

EFFECTIVE DATE, ALL CLAIMS AGAINST THE DEBTOR SHALL BE FULLY

RELEASED AND DISCHARGED, AND ALL INTERESTS SHALL BE CANCELLED, AND

THE DEBTOR'S LIABILITY WITH RESPECT THERETO SHALL BE EXTINGUISHED

COMPLETELY, INCLUDING ANY LIABILITY OF THE KIND SPECIFIED UNDER

SECTION 502(G) OF THE BANKRUPTCY CODE.

ALL PERSONS SHALL BE PRECLUDED FROM ASSERTING AGAINST THE

DEBTOR, THE DEBTOR'S ESTATE, THE REORGANIZED DEBTOR, EACH OF THEIR

RESPECTIVE SUCCESSORS AND ASSIGNS, AND EACH OF THEIR ASSETS AND PROPERTIES, ANY OTHER CLAIMS OR INTERESTS BASED UPON ANY DOCUMENTS, INSTRUMENTS OR ANY ACT OR OMISSION, TRANSACTION OR OTHER ACTIVITY OF ANY KIND OR NATURE THAT OCCURRED BEFORE THE EFFECTIVE DATE.

12.3    Exculpation.    Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is released and exculpated from, any Exculpated Claim, obligation, cause of action or liability for any Exculpated Claim, except for gross negligence or willful misconduct (to the extent such duty is imposed by applicable non bankruptcy law), but in all respects such Persons shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Debtor and the Reorganized Debtor (and each of their respective affiliates, agents, directors, members, officers, employees, advisors and attorneys) have, and upon confirmation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code and applicable non-bankruptcy law with regard to the solicitation and distribution of securities pursuant to the Plan, and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

The Debtor, the Issuer, the 2002 Bond Trustee, the 2002 Master Trustee, the Consenting Holders, any of their respective managers, trustees, members, officers, directors, general partners, employees, council members, or agents (acting in such capacity), and any professional Persons employed by any of them respecting this Chapter 11 Case shall not have or incur any liability to any person for any action taken or omitted to be taken in connection with or related to

38

the formulation, preparation, dissemination, implementation, confirmation, or consummation of

the Plan, Disclosure Statement, any contract, release, or other agreement or document created or

entered into, or any other action taken or omitted to be taken in connection with the Plan or the

transactions contemplated therein, pre-Chapter 11 Case negotiations or the Chapter 11 Case, and

all Claims based upon or arising out of such actions or omissions are forever waived, released,

and discharged under the Plan.

12.4    Mutual Release between the Debtor and Its Estate and Certain Other Released

Parties. Effective upon the occurrence of the Effective Date, except as specifically set forth in

the Plan, and/or in, or relating to, an executory contract assumed by the Debtor, the Debtor, on its

own behalf and on behalf of its bankruptcy estate, shall be deemed to forever release and

discharge each Consenting Holder in any capacity, the 2002 Bond Trustee in any capacity, the

2002 Master Trustee in any capacity, the 2013 Bond Trustee in any capacity, the 2013 Master

Trustee in any capacity, and the current and former officers, directors, members, managers,

employees, attorneys and advisors, each in their respective capacities as such, of each of the

foregoing (the "Bondholder Released Parties") of and from any and all claims, demands, causes

of action and the like, arising from any act, omission, event, or other occurrence related in any

way to the Series 2002 Bonds that occurred on or prior to the Effective Date, whether direct or

derivative, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or

undisputed, known or unknown, foreseen or unforeseen, at law, in equity or otherwise

(collectively, the "Mutually Released Claims"). Likewise, effective upon the occurrence of the

Effective Date, except for the obligations arising under and related to the Plan (including the

rights, duties and obligations under the 2013 Bond Documents) as specifically set forth in the

Plan, the Bondholder Released Parties shall be deemed to forever release and discharge the

Debtor and the members of its Board of Trustees, the Reorganized Debtor and the members of its Board of Trustees, the Manager in any capacity, the Issuer, and the current and former officers, directors, members, managers, employees, council members, attorneys and advisors, each in their respective capacities as such, of each of the foregoing of the Mutually Released Claims.

12.5    Consensual Releases By Holders of Claims.  Except as specifically set forth in the Plan respecting the treatment and payment of an Allowed Claim, Allowed Interest and/or the rights and obligations of a Person under an assumed executory contract or unexpired lease, a holder of an Allowed Series 2002 Bond Claim that votes to accept the Plan shall be deemed to forever release and discharge the Released Parties of and from any and all claims, demands, causes of action and the like, existing as of the Effective Date or thereafter arising from any act, omission, event, or other occurrence that occurred on or prior to the Effective Date, whether direct or derivative, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, known or unknown, foreseen or unforeseen, at law, in equity or otherwise that is based on, relates to, or in any manner arises from, in whole or in part, the prepetition and postpetition restructuring efforts, negotiation and preparation of the Plan or any related document, confirmation of the Plan, implementation of the Plan or any related document, the restructuring of the Series 2002 Bonds, the issuance of the Series 2013 Bonds, the transactions or occurrences giving rise to any Claim or Interest of the releasing entity, or any business or contractual arrangements between such entity and the Debtor.  Notwithstanding the foregoing, (a) in the event that the Plan is not confirmed, no party shall be deemed to have released or shall release any claims or be released hereby, and (b) Section 12.5 of the Plan shall not apply to any entity that, on its ballot accepting the Plan, checks the box next to the words:

"The entity submitting this ballot elects not to give or accept a release pursuant to Sections 12.5 or 12.6 of the Plan".

    12.6   <u>Reciprocal Release by Debtor</u>.  Except as specifically set forth in the Plan respecting the treatment and payment of an Allowed Claim, Allowed Interest and/or rights and obligations of a Person under an assumed executory contract or unexpired lease, each holder of an Allowed Series 2002 Bond Claim that grants a release to the Released Parties pursuant to Section 12.5 of the Plan (each a "Releasing Holder") shall be deemed released by the Debtor solely to the extent that, effective upon occurrence of the Effective Date, the Debtor shall be deemed to forever release and discharge each such Releasing Holder, solely in each Releasing Holder's capacity as a holder of an Allowed Series 2002 Bond Claim (and all current and former directors, officers, employees, agents, attorneys, advisors, investment bankers, other professionals, lenders, investors, members, owners, shareholders, subsidiaries, other affiliates, heirs, successors and assigns, solely to the extent that such entity or individual served such Releasing Holder in the capacity as a holder of an Allowed Series 2002 Bond Claim) of and from any and all Claims, demands, causes of action and the like, existing as of the Effective Date or thereafter arising from any act, omission, event, or other occurrence that occurred on or prior to the Effective Date solely related to the Series 2002 Bond Claim, whether direct or derivative, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, known or unknown, foreseen or unforeseen, at law, in equity or otherwise.

Dated:  July 31, 2013

THE ESTELLE PEABODY MEMORIAL HOME
OF THE SYNOD OF LINCOLN TRAILS OF THE
PRESBYTERIAN CHURCH (U.S.A.)
Debtor in Possession

By: */s/  Steven E. Zahn*
　　　　Authorized Signatory

ATTORNEYS FOR THE DEBTOR
AND DEBTOR IN POSSESSION
Katz & Korin, P.C.
334 North Senate Avenue
Indianapolis, IN  46204
(317) 464-1100

By: */s/ Michael W. Hile*
　　　Michael W. Hile,

**Schedule 3.2.3**

**Series 2013 Bond Documents**

**AMENDED AND RESTATED MASTER TRUST INDENTURE**

between

**THE ESTELLE PEABODY MEMORIAL HOME OF THE SYNOD OF LINCOLN TRAILS OF THE PRESBYTERIAN CHURCH (U.S.A.)**

a n d

_____,

as Master Trustee

**DATED AS OF _____ 1, 2013**

## TABLE OF CONTENTS

**Page**

Parties ..........................................................................................................................................1
Granting Clauses ..........................................................................................................................3

### ARTICLE I
### DEFINITIONS; RULES OF CONSTRUCTION

Section 101    Definitions of Certain Words and Terms ............................................................. I - 1
Section 102    Rules of Construction ........................................................................................... I - 23

### ARTICLE II
### THE OBLIGATIONS

Section 201    Series, Designation, and Amount of Obligations.................................................. II - 1
Section 202    Payment of Obligations........................................................................................ II - 1
Section 203    Execution .............................................................................................................. II - 1
Section 204    Authentication....................................................................................................... II - 1
Section 205    Form of Obligations and Temporary Obligations ............................................... II - 2
Section 206    Mutilated, Lost, Stolen, or Destroyed Obligations.............................................. II - 2
Section 207    Registration; Negotiability; Cancellation upon Surrender; Exchange of Obligations.............. II - 2
Section 208    Issuance of Series 2013 Obligations .................................................................... II - 3
Section 209    Conditions Precedent to Delivery of Series 2013 Obligations ............................ II - 5
Section 210    Security for Obligations ....................................................................................... II - 6
Section 211    Issuance of Obligations in Forms Other Than Notes; Interest Rate Agreements.................... II - 6
Section 212    Appointment of Obligated Group Agent .............................................................. II - 7
Section 213    Book Entry............................................................................................................. II - 7

### ARTICLE III
### PREPAYMENT OR REDEMPTION OF OBLIGATIONS

Section 301    Prepayment or Redemption Dates and Prices ..................................................... III - 1
Section 302    Notice of Prepayment or Redemption .................................................................. III - 1
Section 303    Partial Prepayment or Redemption of Obligations .............................................. III - 2
Section 304    Effect of Call for Prepayment or Redemption ..................................................... III - 2

### ARTICLE IV
### REPRESENTATIONS AND WARRANTIES; GENERAL COVENANTS

Section 401    Payment of Principal, Premium, If Any, and Interest .......................................... IV - 1
Section 402    Performance of Covenants .................................................................................... IV - 1
Section 403    Representations and Warranties by the Initial Member ....................................... IV - 1
Section 404    Entrance into the Obligated Group....................................................................... IV - 3
Section 405    Cessation of Status as a Member of the Obligated Group ................................... IV - 4
Section 406    Covenants as to Corporate Existence, Maintenance of Properties, and Similar
               Matters; Right of Contest..................................................................................... IV - 5
Section 407    Insurance................................................................................................................ IV - 7

Section 408    Right to Perform Members' Covenants; Advances...................................... IV - 10
Section 409    Annual Budget .................................................................................................... IV - 10
Section 410    Rates and Charges.............................................................................................. IV - 10
Section 411    Damage or Destruction ..................................................................................... IV - 11
Section 412    Condemnation ..................................................................................................... IV - 13
Section 413    Other Provisions with Respect to Net Proceeds ........................................... IV - 14
Section 414    Merger, Consolidation, Sale, or Conveyance................................................ IV - 14
Section 415    Financial Statements, Etc. ................................................................................ IV - 15
Section 416    Permitted Additional Indebtedness ............................................................... IV - 17
Section 417    Calculation of Debt Service and Debt Service Coverage............................. IV - 18
Section 418    Sale, Lease, or Other Disposition of Property............................................... IV - 19
Section 419    Residency Agreements; Pricing ...................................................................... IV - 20
Section 420    Obligation Register ........................................................................................... IV - 20
Section 421    Designation of Additional Paying Agents..................................................... IV - 20
Section 422    Further Assurances; Additional Property ...................................................... IV - 20
Section 423    Indemnity ........................................................................................................... IV - 21
Section 424    Days' Cash on Hand Covenant ....................................................................... IV - 22
Section 425    Occupancy Covenant ....................................................................................... IV - 23
Section 426    Operating Ratio Covenant ............................................................................... IV - 24
Section 427    Gross Revenue Fund ......................................................................................... IV - 25
Section 428    Operating Reserve Account ............................................................................. IV - 27
Section 429    Repair and Replacement Fund ........................................................................ IV - 27
Section 430    Insurance and Condemnation Award Fund .................................................. IV - 28
Section 431    Costs of Issuance Fund ..................................................................................... IV - 28
Section 432    Entrance Fees Fund............................................................................................ IV - 28
Section 433    Investment of the Gross Revenue Fund, the Operating Reserve Account, the Repair and
               Replacement Fund, the Insurance and Condemnation Award Fund, the Costs of Issuance
               Fund, and the Entrance Fee Fund................................................................... IV - 29
Section 434    Notice of Material Adverse Effect ................................................................... IV - 29
Section 435    Actuarial Study ................................................................................................. IV - 29
Section 436    Governmental Filings ....................................................................................... IV - 30
Section 437    Insurance Consultant Certification ................................................................. IV - 30
Section 438    Other Information .............................................................................................. IV - 30
Section 439    Notices ................................................................................................................ IV - 30
Section 440    Preservation of Liens; Recordation of Interest.............................................. IV - 30
Section 441    Right of Entry .................................................................................................... IV - 31
Section 442    Licensure ............................................................................................................ IV - 31
Section 443    Preservation of Corporate Existence; 501(c)(3) Status ................................. IV - 31
Section 444    Management........................................................................................................ IV - 31
Section 445    ERISA Compliance............................................................................................. IV - 32
Section 446    Compliance with Laws ..................................................................................... IV - 32
Section 447    Collection of Gross Revenues .......................................................................... IV - 32
Section 448    Compliance with Other Agreements .............................................................. IV - 32
Section 449    Environmental Report Update ........................................................................ IV - 32
Section 450    Single Purpose Entity....................................................................................... IV - 32
Section 451    Compliance with Anti-Money Laundering, Anti-Terrorism, and OFAC Laws ...................... IV - 33
Section 452    Disposition of Excess Land .............................................................................. IV - 34
Section 453    Capital Expenditure Projections...................................................................... IV - 35
Section 454    Deposits .............................................................................................................. IV - 35

**ARTICLE V**

**EVENTS OF DEFAULT; REMEDIES**

Section 501    [Reserved] ......................................................................................................... V - 1
Section 502    Events of Default............................................................................................... V - 1

| | | |
|---|---|---|
| Section 503 | Acceleration | V - 2 |
| Section 504 | Remedies; Rights of Obligation Holders | V - 3 |
| Section 505 | Direction of Proceedings by Obligation Holders | V - 3 |
| Section 506 | Appointment of Receivers | V - 3 |
| Section 507 | Application of Moneys | V - 3 |
| Section 508 | Remedies Vested in Master Trustee | V - 5 |
| Section 509 | Rights and Remedies of Obligation Holders | V - 5 |
| Section 510 | Termination of Proceedings | V - 5 |
| Section 511 | Waiver of Events of Default | V - 5 |
| Section 512 | Members' Rights of Possession and Use of Property | V - 6 |
| Section 513 | Related Bond Trustee or Bondholders Deemed to Be Obligation Holders | V - 6 |
| Section 514 | Lock-Box Provisions | V - 6 |

## ARTICLE VI
### THE MASTER TRUSTEE

| | | |
|---|---|---|
| Section 601 | Acceptance of the Trusts | VI - 1 |
| Section 602 | Fees, Charges, and Expenses of Master Trustee and Any Additional Paying Agent | VI - 3 |
| Section 603 | Notice to Obligation Holders If an Event of Default Occurs | VI - 3 |
| Section 604 | Intervention by Master Trustee | VI - 3 |
| Section 605 | Successor Master Trustee | VI - 4 |
| Section 606 | Corporate Master Trustee Required; Eligibility | VI - 4 |
| Section 607 | Resignation by the Master Trustee | VI - 4 |
| Section 608 | Removal of the Master Trustee | VI - 4 |
| Section 609 | Appointment of Successor Master Trustee by the Obligation Holders; Temporary Master Trustee | VI - 4 |
| Section 610 | Concerning Any Successor Master Trustee | VI - 5 |
| Section 611 | Master Trustee Protected in Relying upon Resolutions, Etc. | VI - 5 |
| Section 612 | Successor Master Trustee as Trustee of Funds, Paying Agent and Obligation Registrar | VI - 5 |
| Section 613 | Maintenance of Records | VI - 5 |

## ARTICLE VII
### SUPPLEMENTAL MASTER INDENTURES AND AMENDMENTS TO THE MORTGAGES
### AND SECURITY AGREEMENTS

| | | |
|---|---|---|
| Section 701 | Supplemental Master Indentures and Amendments to the Mortgages and Security Agreements Not Requiring Consent of Obligation Holders | VII - 1 |
| Section 702 | Supplemental Master Indentures and Amendment of the Mortgages and Security Agreements Requiring Consent of Obligation Holders | VII - 2 |

## ARTICLE VIII
### SATISFACTION OF THIS MASTER INDENTURE

| | | |
|---|---|---|
| Section 801 | Defeasance | VIII - 1 |
| Section 802 | Provision for Payment of a Particular Series of Obligations or Portion Thereof | VIII - 2 |
| Section 803 | Satisfaction of Related Bonds | VIII - 2 |

## ARTICLE IX
### MANNER OF EVIDENCING OWNERSHIP OF OBLIGATIONS

Section 901   Proof of Ownership ................................................................................................... IX - 1
Section 902   Reserved ...................................................................................................................... IX - 1

## ARTICLE X
### ADMINISTRATIVE AGENT

Reserved .................................................................................................................................... X - 1

## ARTICLE XI
### MISCELLANEOUS

Section 1101 Limitation of Rights ..................................................................................................... XI - 1
Section 1102 Unclaimed Moneys ...................................................................................................... XI - 1
Section 1103 Severability ................................................................................................................... XI - 1
Section 1104 Notices .......................................................................................................................... XI - 1
Section 1105 Master Trustee as Paying Agent and Registrar .......................................................... XI - 1
Section 1106 Counterparts ................................................................................................................. XI - 2
Section 1107 Applicable Law ............................................................................................................ XI - 2
Section 1108 Immunity of Officers, Directors, Employees, and Members of Members ................. XI - 2
Section 1109 Holidays ........................................................................................................................ XI - 2
Section 1110 UCC Financing Statements .......................................................................................... XI - 2
Section 1111 Nature of Amendments ................................................................................................. XI - 2

**EXECUTION BY THE CORPORATION**.................................................................................... XI - 3
**EXECUTION BY THE MASTER TRUSTEE** .......................................................................... XI - 4

## EXHIBITS
**EXHIBIT "A" DESCRIPTION OF LAND** ................................................................................. A - 1
**EXHIBIT "B-1" FORM OF SERIES 2013A OBLIGATION** ..................................................... B-1-1
**EXHIBIT "B-2" FORM OF SERIES 2013B SUBORDINATE OBLIGATION** ...................... B-2-1
**EXHIBIT "C" LIST OF EXCEPTIONS** ..................................................................................... C - 1
**EXHIBIT "D" LIST OF OBLIGATED GROUP MEMBERS** ................................................... D - 1
**EXHIBIT "E" PERMITTED ENCUMBRANCES** ..................................................................... E - 1
**EXHIBIT "F" FORM OF REQUISITION FROM THE INSURANCE AND CONDEMNATION
        AWARD FUND** ...................................................................................................... F - 1
**EXHIBIT "G" FORM OF REQUISITION FROM THE COSTS OF ISSUANCE FUND** ....... G - 1
**EXHIBIT "H" FORM OF LOCK-BOX NOTICE** ...................................................................... H - 1

---

### Amended and Restated Master Trust Indenture

---

      This **Amended and Restated Master Trust Indenture** (the "*Master Indenture*") dated as of \_\_\_\_ _____, 2013, is by and between **The Estelle Peabody Memorial Home of the Synod of Lincoln Trails of The Presbyterian Church (U.S.A.)**, an Indiana nonprofit corporation (the "*Corporation*" or the "*Initial Member*"), as the initial member of the Obligated Group hereinafter referred to, and _____, a _____ duly organized and existing under the laws of _____, and duly authorized to accept and administer trusts of the character hereinafter set forth, as Master Trustee (together with its successors and assigns, the "*Master Trustee*").

### W I T N E S S E T H :

      **Whereas**, on August 15, 2002, the Initial Member and the Master Trustee entered into a Master Trust Indenture, as supplemented and amended by a Supplemental Indenture Number 2002A and a Supplemental Indenture Number 2002B (collectively, the "*Original Master Indenture*"), pursuant to which the Initial Member was authorized to issue Master Notes (as defined therein) and other evidences of indebtedness (collectively, the "*Obligations*") of several series thereunder in order to obtain financing or refinancing for the acquisition or betterment of housing facilities, nursing home, health care or related facilities, or other facilities, and for other lawful and proper corporate purposes; and

      **Whereas**, the Original Master Indenture also provided for other legal entities to join with the Initial Member in pooling credit resources in order to achieve lower borrowing costs and to become jointly and severally liable with the Initial Member and such other entities for the payment of the Obligations and the performance of all covenants contained therein; and

      **Whereas**, the Initial Member and each legal entity incurring such joint and several liability in accordance with the terms of the Original Master Indenture, each therein an "*Obligated Member*", and this Master Indenture are herein referred to individually as a "*Member*" and collectively as the "*Members*" or the "*Obligated Group*"; and

      **Whereas**, since the date of the Original Master Indenture and as of the date of this Master Indenture, there have been and are no Members other than the Corporation; and

      **Whereas**, on August 29, 2002 the Town of North Manchester, Indiana (the "*Town*"), under and pursuant to a Bond Trust Indenture (the "*Series 2002 Bond Indenture*") dated as of August 15, 2002, between the Town and Wells Fargo Bank, N.A., successor to Wells Fargo Bank Indiana, NA, as bond trustee (in such capacity, the "*Series 2002 Bond Trustee*"), issued $41,900,000 original principal amount of Town of North Manchester, Indiana Revenue Bonds (Peabody Retirement Community Project) Series 2002A (the "*Series 2002A Bonds*"), $3,500,000 original principal amount of Town of North Manchester, Indiana Revenue Bonds (Peabody Retirement Community Project) Series 2002B-1 Extendable Rate Adjustable Securities$^{SM}$ (EXTRAS$^{SM}$) (the "*Series 2002B-1 Bonds*") and $1,500,000 original principal amount of Town of North Manchester, Indiana Revenue Bonds (Peabody Retirement Community Project) Series 2002B-2 Extendable Rate Adjustable Securities$^{SM}$ (EXTRAS$^{SM}$) (the "*Series 2002B-2 Bonds*", and collectively with the Series 2002B-1 Bonds, the "*Series 2002B Bonds*"); and

      **Whereas**, the proceeds of the Series 2002A Bonds and the Series 2002B Bonds (collectively, the "*Series 2002 Bonds*") were loaned by the Town to the Corporation pursuant to a Loan Agreement (the "*Series 2002 Loan Agreement*") dated as of August 15, 2002, between the Town and the Corporation, for the purpose of providing funds to the Corporation to pay, *inter alia*, a portion of the costs of the construction and equipping of 73 assisted living units and 48 Alzheimer/dementia units, renovation of various commons areas, demolition of a portion of the then existing residential living facilities, and construction and equipping of a 144-bed replacement nursing facility (collectively, the "*Project*"); and

      **Whereas**, as collateral security for the Series 2002 Bonds, pursuant to, and concurrently with the execution and delivery of, the Original Master Indenture, the Corporation issued the following Obligations (collectively, the "*Series 2002 Obligations*") to the Series 2002 Bond Trustee: (i) $41,900,000 Series 2002A Note

(the "*Series 2002A Obligation*"), (ii) $3,500,000 Series 2002B-1 Note (the "*Series 2002B-1 Obligation*") and (iii) $1,500,000 Series 2002B-2 Note (the "*Series 2002B-2 Obligation*", collectively with the Series 2002B-1 Obligation, the "*Series 2002B Obligation*"); and

WHEREAS, subsequent to the issuance of the Series 2002 Bonds, the Corporation defaulted on certain of its obligations in connection with the Series 2002A Obligation and the Series 2002B Obligation (collectively, the "*Series 2002 Obligations*"), including its obligations under the Original Master Indenture, the Series 2002 Bond Indenture and the Series 2002 Bonds, and entered into negotiations with certain holders of the Series 2002 Bonds to restructure the Series 2002 Bonds and the Series 2002 Obligations; and

WHEREAS, on June [28], 2013 the Corporation filed its Petition under Chapter 11 of the Bankruptcy Code, including its pre-arranged reorganization plan which included the restructuring of the Series 2002 Bonds and the Series 2002 Obligations (the "*Plan*"); and

WHEREAS, on _____, 2013, the Bankruptcy Court issued its order (the "*Order*") confirming the Plan; and

WHEREAS, in accordance with the Order and the Plan, all of the payment obligations of the Town under the Series 2002 Bonds will be restructured by having the owners of all of the Series 2002 Bonds exchange such Series 2002 Bonds for a ratable share of $23,400,000 Town of North Manchester, Indiana Economic Development Refunding Revenue Bonds (Peabody Retirement Community Project) Series 2013A (the "*Series 2013A Bonds*") and $20,150,000 Town of North Manchester, Indiana Subordinate Economic Development Refunding Revenue Bonds (Peabody Retirement Community Project) Series 2013B (the "*Series 2013B Subordinate Bonds*" and, together with the Series 2013A Bonds, the "*Series 2013 Bonds*") (the "*Bond Exchange*"), and the payment obligations of the Corporation under the Series 2002 Obligations will be restructured by the issuance of new Obligations to the Town under this Master Indenture as security for the Series 2013 Bonds; and

WHEREAS, as a result of the Bond Exchange, the Series 2002 Bonds and Series 2002 Obligations will no longer be outstanding under the Series 2002 Indenture or the Original Master Indenture, respectively; and

WHEREAS, the Series 2013 Bonds have been issued under the Bond Trust Indenture (the "*Series 2013 Bond Indenture*") of even date herewith between the Town and _____, as bond trustee (in such capacity, the "*Series 2013 Bond Trustee*"); and

WHEREAS, in connection with the Bond Exchange, all of the funds held under the Series 2002 Bond Indenture have been released and pursuant to the Plan, such funds, less the portion thereof applied to the payment of the fees and expenses of the Series 2002 Bond Trustee and the Series 2002 Master Trustee, will be deposited in the 2013 Debt Service Reserve Fund (as defined herein) on the date of the execution and delivery of this Master Indenture (the "*Closing Date*"); and

WHEREAS, on the Closing Date, the Corporation will deposit $250,000 of its funds in the Repair and Replacement Fund established hereunder and will deposit all other funds (DEFINE) in the General Revenue Fund established hereunder; and

WHEREAS, in order to effect and carry out the Bond Exchange, the Corporation and the Master Trustee are entering into this Master Indenture amending and restating the Original Master Indenture in its entirety; and

WHEREAS, all acts and things necessary to make the Series 2013 Obligations (as such term is hereinafter defined), when authorized and executed by the Corporation and authenticated and delivered by the Master Trustee as in this Master Indenture provided, the valid, binding, and legal obligations of the Obligated Group, and to constitute these presents a valid indenture and agreement according to its terms, have been done and performed, and the execution of this Master Indenture and the issuance hereunder of the following Obligations (collectively, the "*Series 2013 Obligations*"): (i) Series 2013A Note (the "*Series 2013A Obligation*") in the original principal amount of $23,400,000 and (ii) Subordinate Series 2013B Note (the "*Series 2013B Subordinate Obligation*") in the original principal amount of $20,150,000, have in all respects been duly

authorized, and the Corporation, in the exercise of the legal right and power vested in it, executes this Master Indenture and proposes to make, execute, issue, and deliver the Series 2013 Obligations,

NOW, THEREFORE, in order to declare the terms and conditions upon which Obligations of each series are authenticated, issued, and delivered, and in consideration of the premises, of the acceptance by the Master Trustee of the trusts hereby created, the purchase and acceptance of Obligations of each series by the Holders thereof and the sum of One Dollar to them duly paid by the Master Trustee at the execution of these presents and of other good and lawful consideration, the receipt of which is hereby acknowledged, the Members covenant and agree with the Master Trustee, for the equal and proportionate benefit of the respective Holders from time to time of Obligations of each series, as follows:

### GRANTING CLAUSES

That each Member of the Obligated Group in consideration of the premises and of the purchase of the Obligations and of other good and lawful consideration, the receipt of which is hereby acknowledged, and to secure the payment of the principal of, premium, if any, and interest on the Obligations and the performance and observance of all of the covenants and conditions herein or therein contained, has executed and delivered this Master Indenture and has conveyed, mortgaged, granted, assigned, transferred, pledged, set over and confirmed and granted a security interest in, and by these presents does hereby convey, mortgage, grant, assign, transfer, pledge, set over and confirm and grant a security interest in, unto the Master Trustee, its successor or successors and its or their assigns forever, with power of sale, all and singular the property, real and personal, hereinafter described (said property being herein sometimes referred to as the "*Indenture Trust Estate*") to wit:

### I

All Gross Revenues of the Obligated Group Members; and

### II

All the right, title, and interest of the Members of the Obligated Group in and to all cash proceeds and receipts arising out of or in connection with the sale of the Obligations and all moneys held by the Master Trustee in the funds created hereunder, including the Gross Revenue Fund, the Operating Reserve Account, the Repair and Replacement Fund, the Insurance and Condemnation Award Fund, and the Entrance Fees Fund (to the extent provided herein) created hereunder, or held by the Master Trustee as special trust funds derived from insurance proceeds, condemnation awards, payments on contractors' performance or payment bonds or other surety bonds, or any other source; and

### III

Any and all other property of every kind and nature from time to time hereafter, by delivery or by writing of any kind, conveyed, pledged, assigned, or transferred as and for additional security hereunder by any Member or by anyone on its behalf to the Master Trustee, including without limitation, funds of any Member held by the Master Trustee as security for the Obligations;

TO HAVE AND TO HOLD, all and singular, the properties, the rights and privileges hereby conveyed, assigned and pledged by the Members or intended so to be, unto the Master Trustee its successors and assigns forever, in trust, nevertheless, with power of sale and, except as herein otherwise expressly provided, for the equal and *pro rata* benefit and security of all Obligations issued hereunder, without preference, priority, or distinction as to participation in the lien, benefit and protection hereof of one Obligation over or from the others, by reason of priority in the issue or negotiation or maturity thereof, or for any other reason whatsoever, so that each and all of such Obligations shall, except as herein otherwise expressly provided, have the same right, lien and privilege under this Master Indenture and shall be equally secured hereby with the same effect as if the same had all been made, issued, and negotiated simultaneously with the delivery hereof and were expressed to mature on one and the same date;

3

**PROVIDED, NEVERTHELESS**, and these presents are upon the express condition, that if the Members or their successors or assigns shall well and truly pay or cause to be paid the principal of such Obligations with interest, according to the provisions set forth in the Obligations and each of them or shall provide for the payment or redemption of such Obligations by depositing or causing to be deposited with the Master Trustee the entire amount of funds or securities requisite for payment or redemption thereof when and as authorized by the provisions of Article VIII hereof, and shall also pay or cause to be paid all other sums payable hereunder by the Members, then these presents and the estate and rights hereby granted shall cease, determine, and become void, and thereupon the Master Trustee, on payment of its lawful charges and disbursements then unpaid, on demand of the Members and upon the payment of the cost and expenses thereof, shall duly execute, acknowledge, and deliver to the Members such instruments of satisfaction or release as may be necessary or proper to discharge this Master Indenture of record, and if necessary shall grant, reassign, and deliver to the Members, their successors or assigns, all and singular the property, rights, privileges, and interests by them hereby granted, conveyed, and assigned, and all substitutes therefor, or any part thereof, not previously disposed of or released as herein provided; otherwise this Master Indenture shall be and remain in full force and effect.

<div align="center">

\*              \*              \*

</div>

### ARTICLE I
### DEFINITIONS; RULES OF CONSTRUCTION

**Section 101. Definitions of Certain Words and Terms.** In addition to the words and terms elsewhere defined in this Master Indenture, the following words and terms as used in this Master Indenture shall have the following meanings unless the context or use indicates another or different meaning or intent:

"*2013 Bond Sinking Fund*" means the "Bond Sinking Fund" created under Section 404 of the Series 2013 Bond Indenture.

"*2013A Bond Sinking Fund Account*" means the "2013A Account" of the 2013 Bond Sinking Fund created under Section 404 of the Series 2013 Bond Indenture.

"*2013B Bond Sinking Fund Account*" means the "2013B Account" of the 2013 Bond Sinking Fund created under Section 404 of the Series 2013 Bond Indenture.

"*2013 Debt Service Fund*" means the "Debt Service Fund" created under Section 402 of the Series 2013 Bond Indenture.

"*2013 Debt Service Reserve Fund*" means the Debt Service Reserve Fund created under Section 406 of the Series 2013 Bond Indenture.

"*2013 Debt Service Reserve Fund Requirement*" means the "Debt Service Reserve Fund Requirement," as defined in the Series 2013 Bond Indenture.

"*2013A Interest Fund Account*" means the "2013A Interest Fund Account" created under Section 403 of the Series 2013 Bond Indenture.

"*2013B Interest Fund Account*" means the "2013B Interest Fund Account" created under Section 403 of the Series 2013 Bond Indenture

"*Accelerable Instrument*" means (i) any Senior Obligation, or with respect to any Senior Obligation, any Related Bond Indenture or Related Loan Document under which there has been issued or incurred, or by which there is secured, any Indebtedness which Senior Obligation, Related Bond Indenture, or Related Loan Document provides that, upon the occurrence of an event of default thereunder, the holder thereof may request that the Master Trustee declare such Senior Obligation due and payable prior to the date on which it would otherwise become due and payable and (ii) any Subordinate Obligation securing, or with respect to any Subordinate Obligation, any Related Bond Indenture or Related Loan Document under which there has been issued or incurred, or by which there is secured, any Indebtedness evidenced or secured by a Subordinate Obligation, which Subordinate Obligation or instrument provides that, if there are no Senior Obligations Outstanding hereunder, upon the occurrence of an event of default thereunder, the holder thereof may request that the Master Trustee declare such Subordinate Obligation due and payable prior to the date on which it would otherwise become due and payable.

"*Accreted Value*" means, with respect to any Obligation constituting Capital Appreciation Indebtedness, (i) as of any Valuation Date, the amount set forth for such Valuation Date in such Obligation, this Master Indenture, or the Supplemental Master Indenture creating such Obligation and, (ii) as of any date other than a Valuation Date, the sum of (a) the Accreted Value of such Obligation as of the immediately preceding Valuation Date and (b) the product of (1) a fraction, the numerator of which is the number of days elapsed from such preceding Valuation Date and the denominator of which is the number of days from such preceding Valuation Date to the immediately succeeding Valuation Date and (2) the difference between (A) the Accreted Value of such Obligation as of such succeeding Valuation Date and (B) the Accreted Value of such Obligation as of such preceding Valuation Date.

"*Act*" means Indiana Code, Title 36, Article 7, Chapters 11.9 and 12 and Indiana Code, Title 5, Article 1, Chapter 5, each as amended.

"*Additional Indebtedness*" means Indebtedness incurred by any Member subsequent to the issuance of the Series 2013 Obligations.

"*Additional Obligations*" means any obligation issued hereunder to evidence or secure Indebtedness or to evidence or secure any repayment obligation under any Interest Rate Agreement issued after the issuance of the Series 2013 Obligations authorized to be issued by a Member pursuant to this Master Indenture that has been authenticated by the Master Trustee pursuant to Section 204 hereof.

"*Adequate Reserve*" means a cash deposit (which may be invested in Permitted Investments) in an amount equal to, or a payment bond of a corporate surety in the face amount equal to, the total amount in controversy, in each case reasonably satisfactory to the Master Trustee, furnished by the Obligated Group to the Master Trustee through the establishment of a segregated account within the Gross Revenue Fund.

"*Affiliate*" means a corporation, partnership, joint venture, association, business trust, or similar entity (i) that controls, is controlled by, or is under common control with, directly or indirectly, a Member; or (ii) a majority of the members of the Directing Body of which are members of the Directing Body of a Member. For the purposes of this definition, control means with respect to: (a) a corporation having stock, the ownership, directly or indirectly, of more than fifty percent (50%) of the securities (as defined in Section 2(a)(1) of the Securities Act of 1933, as amended) of any class or classes, the holders of which are ordinarily, in the absence of contingencies, entitled to elect a majority of the directors of such corporation; (b) a non-profit corporation not having stock, having the power to elect or appoint, directly or indirectly, a majority of the members of the Directing Body of such corporation; or (c) any other entity, the power to direct the management of such entity through the ownership of at least a majority of its voting securities or the right to designate or elect at least a majority of the members of its Directing Body, by contract or otherwise. For the purposes of this definition, "*Directing Body*" means with respect to: (x) a corporation having stock, such corporation's board of directors and the owners, directly or indirectly, of more than fifty percent (50%) of the securities (as defined in Section 2(a)(1) of the Securities Act of 1933, as amended) of any class or classes, the holders of which are ordinarily, in the absence of contingencies, entitled to elect a majority of the corporation's directors (both of which groups shall be considered a Directing Body); (y) a non-profit corporation not having stock, such corporation's members if the members have complete discretion to elect the corporation's directors, or the corporation's directors if the corporation's members do not have such discretion; and (z) any other entity, its governing board or body. For the purposes of this definition, all references to directors and members shall be deemed to include all entities performing the function of directors or members however denominated.

"*Amended and Restated Mortgage*" means the Amended and Restated First Mortgage, Security Agreement, and Fixture Financing Statement (Wabash County) of even date herewith by the Corporation in favor of the Master Trustee, and as the same may be further modified, supplemented, amended, and/or restated from time to time.

"*Anniversaries*", means, collectively, the date that is one (1) year after the date of the execution and delivery hereof and each successive date that is one (1) year after the previous such date (each, an "*Anniversary*").

"*Annual Budget*" means the Annual Budget as defined in Section 409 hereof.

"*Anti-Money Laundering Laws*" means any laws or regulations relating to money laundering or terrorist financing, including, without limitation, the Bank Secrecy Act, 31 U.S.C. sections 5301 et seq.; the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Pub. L. 107-56 (a/k/a the USA Patriot Act); Laundering of Monetary Instruments, 18 U.S.C. section 1956; Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity, 18 U.S.C. section 1957; the Financial Recordkeeping and Reporting of Currency and Foreign Transactions Regulations, 31 C.F.R. Part 103; and any similar laws or regulations currently in force or hereafter enacted.

"*Applicable Law*" means all applicable provisions of all present and future laws, ordinances, constitutions, statutes, rules, regulations, requirements, orders, judgments, injunctions, and decrees of any Governmental Authority having jurisdiction over the Facilities.

"*Applicable Rating Agencies*" means any two Rating Agencies, or, if only one Rating Agency maintains an applicable rating, such Rating Agency (each, an "*Applicable Rating Agency*").

"*Assisted Living Units*" means the assisted living units that are part of the Facilities.

"*Authorized Officer*" means any officer at the time designated to act on behalf of a Member by written certificate furnished to the Master Trustee, containing the specimen signature of such person and signed on behalf of such Member by the President or Chairman of the Board of Trustees of such Member. Such certificate or any subsequent or supplemental certificate so executed may designate an alternate or alternates.

"*Bondholder*," "*Holder*" or "*Owner of the Bonds*" means the registered owner of any Related Bond.

"*Book Value*," when used with respect to Property of a Member, means the value of such Property, net of accumulated depreciation and amortization, as reflected in the most recent audited financial statements of such Member that have been prepared in accordance with GAAP, and, when used with respect to Property of all Members, means the aggregate of the values of such Property, net of accumulated depreciation and amortization, as reflected in the most recent audited combined or consolidated financial statements of the Obligated Group prepared in accordance with GAAP, provided that such aggregate shall be calculated in such a manner that no portion of the value of any Property of any Member is included more than once.

"*Budgeted Capital Expenditures*" means budgeted capital expenditures set forth in the Annual Budget not exceeding Three Hundred Fifty Thousand Dollars ($350,000) in any Fiscal Year.

"*Business Day*" means any day other than a Saturday, Sunday, or other day on which The New York Stock Exchange or banks are authorized or required to close in New York, New York, or in the city in which the designated corporate trust office of the Master Trustee is located.

"*Capital Appreciation Indebtedness*" means Indebtedness (i) the interest on which is payable only at the maturity thereof or upon the redemption thereof prior to maturity and (ii) issued, in the case of Indebtedness evidenced or secured by an Obligation, pursuant to a Supplemental Master Indenture and specifying in such Supplemental Master Indenture or such Obligation the Valuation Dates thereof and the Accreted Value thereof on each such Valuation Date and the Maturity Value thereof.

"*Capitalized Lease*" means any lease of real or personal property that, in accordance with GAAP as in effect on the date of this Master Indenture, is required to be capitalized on the balance sheet of the lessee.

"*Capitalized Rentals*" means, as of the date of determination, the amount at which the aggregate Net Rentals due and to become due under a Capitalized Lease under which a Person is a lessee would be reflected as a liability on a balance sheet of such Person in accordance with GAAP as in effect on the date of this Master Indenture.

"*Cash and Investments*" means the sum of unrestricted or board-designated cash, cash equivalents and marketable securities, and, without duplication, amounts, if any, on deposit in the Operating Account, the Operating Reserve Account, the Repair and Replacement Fund, the Gross Revenue Fund (and in excess of the amounts required to be applied on the first (1st) Business Day of the immediately succeeding calendar month in accordance with the provisions of Section 427 hereof for any purpose other than a transfer to the Operating Account, the Operating Reserve Account or the Repair and Replacement Fund), and the Entrance Fee Fund (to the extent, and solely to the extent, the conditions of Section 432 for the transfer of amounts from the Entrance Fee Fund to the Gross Revenue Fund have been satisfied. For avoidance of doubt, the term "*Cash and Investments*" does not include (i) trustee-held funds other than those otherwise described in the first sentence of this definition, (ii) donor-restricted funds, (iii) any funds pledged or otherwise subject to a security interest for debt other than the Obligations, as shown on the most recent audited or unaudited financial statements of the Obligated Group, or (iv) any amounts on deposit in a Debt Service Reserve Fund created under the Series 2013 Bond Indenture, or any other debt service reserve fund created under a Related Bond Indenture. For purposes of calculations hereunder, an Unrestricted Contribution from an Affiliate to the Gross Revenue Fund shall be treated as being made during the period of such

calculation so long as the Unrestricted Contribution is made prior to and remains unexpended on the date the applicable Officer's Certificate is required to be delivered with respect to such calculation.

"**Closing Date**" means _____, 2013, the date of the execution and delivery of this Master Indenture.

"**Code**" means the Internal Revenue Code of 1986, as amended from time to time. Each reference to a section of the Code shall be deemed to include the United States Treasury Regulations, including temporary and proposed regulations, relating to such section.

"**Construction Index**" means the most recent issue of the "Dodge Construction Index for U.S. and Canadian Cities" with reference to the city in which the subject property is located (or, if such index is not available for such city, with reference to the city located closest geographically to the city in which the subject property is located), or, if such index is no longer published or used by the federal government in measuring costs under Medicare or Medicaid programs, such other index that is certified to be comparable and appropriate by the Obligated Group Agent in an Officer's Certificate delivered to the Master Trustee and which other index is not objected to by the Master Trustee.

"**Consultant**" means a professional management consulting, accounting, investment banking, or commercial banking firm selected by the Obligated Group Agent with the consent of the Master Trustee, acting at the direction of the Majority of the Senior Bond Holders, having the skill and experience necessary to render the particular report required and having a favorable reputation for such skill and experience, which firm is not a Member of the Obligated Group, does not control any Member of the Obligated Group or any Affiliate thereof, and is not controlled by or under common control with any Member of the Obligated Group or an Affiliate thereof.

"**Contributions**" means the aggregate amount of all contributions, grants, gifts, bequests, and devises actually received in cash or marketable securities by any Person in the applicable fiscal year of such Person and any such contributions, grants, gifts, bequests, and devises originally received in a form other than cash or marketable securities by any Person that are converted in such fiscal year to cash or marketable securities. Contributions shall include amounts, other than loans or payments for goods or services, received from any Affiliate of an Obligated Group Member.

"**Control Agreement**" means an Account Control Agreement among the Obligated Group, the Master Trustee and the applicable bank or financial institution with which the Operating Account, the Operating Reserve Account or any other account subject to such an agreement pursuant to this Master Indenture or a Security Agreement is established, in form and substance satisfactory to the Master Trustee, pursuant to which the Master Trustee has "control" (within the meaning of Section 8-106 of the Uniform Commercial Code and Section 9-104(a)(2) of the Uniform Commercial Code), and exclusive dominion and control upon the occurrence of an Event of Default, of the applicable account and all cash, cash equivalents and other investment property from time to time deposited or carried therein or credited thereto, as amended, restated, amended and restated, supplemented or otherwise modified from time to time with the consent of the Master Trustee.

"**Corporation**" means The Estelle Peabody Memorial Home of the Synod of Lincoln Trails of the Presbyterian Church (U.S.A.), an Indiana nonprofit corporation, and its successors and assigns and any surviving, resulting, or transferee corporation.

"**Costs of Issuance**," with respect to a series of Obligations, means and includes the legal fees and expenses of Bond Counsel, counsel to the Corporation, and, except in the case of the Series 2013 Obligations, counsel to the Master Trustee, counsel to the Related Bond Trustee, and counsel to any purchaser of such Obligation; feasibility consultant's fees and expenses; financing costs; financial advisor's fees and expenses; accounting fees and expenses; consulting fees; Master Trustee's fees; Bond Trustee's fees; paying agent and certifying and authenticating agent fees; dissemination agent fees; publication costs; title insurance premiums; and printing and engraving costs incurred in connection with the authorization, sale, and issuance of such series of Obligations and any Related Bonds, and the expenses to the Corporation in connection with any Interest Rate Agreement with respect to such Obligation, any Related Bonds, or any Related Notes.

"**Costs of Issuance Fund**" means the Fund created under Section 431 hereof.

"**Credit Facility**" means any letter of credit, standby bond purchase agreement, or similar credit facility issued to secure any series of Related Bonds.

"**Current Value**" means (i) with respect to Property, Plant, and Equipment (a) the aggregate fair market value of such Property, Plant, and Equipment as reflected in the most recent written report of an appraiser selected by the Obligated Group Agent with the consent of the Master Trustee and, in the case of real property, who is a member of the American Institute of Real Estate Appraisers (MAI), delivered to the Master Trustee (which report shall be dated not more than six months prior to the date as of which Current Value is to be calculated) minus (b) the fair market value (as reflected in such most recent appraiser's report) of any Property, Plant, and Equipment included in such report but disposed of since the last such report plus (c) the Book Value of any Property, Plant, and Equipment acquired since the last such report minus (d) the Book Value of any such Property, Plant, and Equipment acquired since the last such report but disposed of and (ii) with respect to any other Property, the fair market value of such Property, which fair market value shall be evidenced in a manner satisfactory to the Master Trustee.

"**Days' Cash on Hand**" means, as of the last day of the period with respect to which the applicable calculation is made, the amount determined by dividing (A) Total Cash on Hand by (B) (i) total operating expenses for the Fiscal Year or other four (4) fiscal quarter period, as applicable, ending on the date of calculation, excluding fund development expenses, community outreach expenses, and other expenses (including amortization, depreciation, and non-recurring professional fees, to the extent not otherwise excluded from operating expenses) divided by (ii) 365.

"**Days' Cash on Hand Requirement**" shall have the meaning set forth in Section 424(a) hereof.

"**Debt Service Requirements**" means, with respect to the period of time for which calculated, the aggregate of the payments required to be made during such period in respect of principal of (whether at maturity, as a result of mandatory sinking fund redemption, mandatory prepayment, or otherwise) and interest on Outstanding Funded Indebtedness of each Person or a group of Persons with respect to which calculated; provided that: (i) the amount of such payments for a future period shall be calculated in accordance with the assumptions contained in Section 417 hereof; (ii) interest shall be excluded from the determination of the Debt Service Requirements to the extent that Funded Interest is available to pay such interest; (iii) principal of Indebtedness shall be excluded from the determination of Debt Service Requirements to the extent that amounts are on deposit in an irrevocable escrow and such amounts (including, where appropriate, the earnings or other increment to accrue thereon) are required to be applied to pay such principal and such amounts so required to be applied are sufficient to pay such principal; (iv) any annual fees payable in respect of a Credit Facility (other than annual fees to be paid from proceeds of a bond issue escrowed for such purpose) shall be included in the determination of Debt Service Requirements; and (v) with respect to any Funded Indebtedness for which the number of actual payments of principal in any Fiscal Year is greater than those in the immediately preceding and/or succeeding Fiscal Years solely by reason of the fact that such principal payments are scheduled to occur other than on a specified date or dates, the first or last principal payment in such Fiscal Year, as the case may be, for which the number of payments is higher shall be deemed to be required to be made in the immediately preceding or succeeding Fiscal Year, as appropriate, so as to have an equal number of principal payments in each Fiscal Year.  For the avoidance of doubt, for purposes of calculating Debt Service Requirements, no principal shall be deemed required to be paid with respect to the Series 2013B Bonds except on the maturity date or acceleration thereof, provided that nothing herein shall affect the obligation of the Obligated Group to make payments of principal of or interest with respect to the Series 2013B Bonds from Excess Cash as provided herein.

"**Default Condition**" means the occurrence or existence of an event or condition that, upon the giving of notice or the passage of time, or both, would constitute an Event of Default.

"**Defaulted Interest**" means interest on any Related Bond of a particular series that is payable but not duly paid on the date due.

"***Deposit***" means any amount paid by a prospective Resident that is required to be held in escrow by Applicable Law or under the applicable Residency Agreement, but only during such time as such amount is required to be held in escrow (collectively, the "***Deposits***").

"***Disclosure Statement***" means the Disclosure Statement for Debtor's Chapter 11 Plan of Reorganization, dated June 17, 2013 relating to the Bankruptcy Plan and the exchange of the Series 2013 Bonds for the Series 2002 Bonds, as approved by the Bankruptcy Court on _____, 2013, including any supplements thereto.

"***Distribution Waterfall***" shall have the meaning set forth in Section 427(b) hereof.

"***DTC***" means The Depository Trust Company, New York, New York, and its successors and assigns appointed pursuant to Section 213 hereof.

"***DTC Participants***" means those broker dealers, banks, and other financial institutions reflected on the books of DTC.

"***DTC System***" means the securities depository system with DTC.

"***Early Redemption Amount***" means an amount equal to (i) $27,000,000 plus (ii) accrued but unpaid interest on the Series 2013A Bonds through the applicable Early Redemption Deposit Date.

"***Early Redemption Deposit Date***" means the Business Day on which the Corporation makes the deposit required pursuant to Section 405(a) of the Bond Indenture in connection with an optional redemption of the Bonds described in Section 501(a) of the Bond Indenture, provided that such deposit shall be made no later than 11 a.m. Eastern time.

"***EMMA***" means the Municipal Securities Rulemaking Board (through its Electronic Municipal Market Access (EMMA) System) or any other repository designated by the United States Securities and Exchange Commission as a central repository.

"***Encumbered***" means, with respect to Property, subject to a Lien; provided that any amounts on deposit in a construction fund created in connection with the issuance of an Obligation that are held as security for the payment of such Obligation or any Indebtedness incurred to purchase such Obligation or the proceeds of which are advanced or otherwise made available in connection with the issuance of such Obligation, shall not be deemed to be Encumbered if the amounts are to be applied to construct or otherwise acquire Property that is not subject to a Lien.

"***Entrance Fees***" means fees, other than security deposits, monthly rentals or monthly service charges, paid to a Member by prospective or actual residents of units of the Facilities for the purpose of obtaining the right to reside in those units or to obtain a parking space, including any refundable resident deposits described in any lease, residency agreement, or similar agreement with respect to those units or parking spaces, but shall not include any such amounts held in escrow pursuant to the requirements of any such agreement or a reservation agreement prior to the occupancy of the unit or parking space covered by such lease, residency agreement, or similar agreement (which amounts shall be included if and when released to the Member from escrow under the applicable contracts and in accordance with Applicable Law) (each, an "***Entrance Fee***").

"***Entrance Fees Fund***" means the Fund created under Section 432 hereof.

"***ERISA***" means the Employee Retirement Income Security Act of 1974, as amended, and any successor statute of similar import, and regulations thereunder, in each case as in effect from time to time. References to sections of ERISA shall be construed also to refer to any successor sections.

"***ERISA Affiliate***" means any Person who for purposes of Title IV of ERISA is a member of a controlled group, of which the Obligated Group is a member, is under common control with the Obligated Group, or is a member of an affiliated service group of which any Member of the Obligated Group is a member in accordance with the provisions of Section 414(b), (c), (m), or (o) of the Code.

"***ERISA Event***" means (i) a "Reportable Event" described in Section 4043 of ERISA and the regulations issued thereunder, excluding, however, such events as to which the PBGC by regulation has waived the requirement of Section 4043(a) of ERISA that the PBGC be notified within thirty (30) days of the occurrence of such event; (ii) the withdrawal of any Member of the Obligated Group or any ERISA Affiliate from an ERISA Plan during a plan year in which it was a "substantial employer" as defined in Section 4001(a)(2) of ERISA; (iii) the filing of a notice of intent to terminate an ERISA Plan or the treatment of an ERISA Plan amendment as a termination under Section 4041 of ERISA; (iv) the institution of proceedings to terminate an ERISA Plan by the PBGC; (v) the complete or partial withdrawal of any Member of the Obligated Group or any ERISA Affiliate from a Multiemployer Plan or notification that such Multiemployer Plan is in reorganization; (vi) the failure to make required contributions to an ERISA Plan; or (vii) any other event or condition that might constitute grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any ERISA Plan.

"***ERISA Plan***" means an employee pension benefit plan as defined in Section 3(2) of ERISA, that (i) is currently or hereafter sponsored, maintained, or contributed to by any Member of the Obligated Group or an ERISA Affiliate or (ii) was at any time during the last six (6) calendar years preceding the date of this Master Indenture, sponsored, maintained or contributed to by any Member of the Obligated Group or an ERISA Affiliate (collectively, "***ERISA Plans***").

"***Escrow Obligations***" means, (i) with respect to any Obligation that secures a series of Related Bonds, the obligations permitted to be used under the defeasance provisions for such series of Related Bonds under the Related Bond Indenture, or (ii) in all other cases (a) Government Obligations, (b) obligations of any agency or instrumentality of the United States Government, (c) certificates of deposit issued by a bank or trust company that are (1) fully insured by the Federal Deposit Insurance Corporation, or a similar corporation chartered by the United States or (2) secured by a pledge of any United States Government Obligations having an aggregate market value, exclusive of accrued interest, equal at least to the principal amount of the certificates so secured, which security is held in a custody account by a custodian satisfactory to the Master Trustee, or (d) obligations issued by any state of the United States or any political subdivision, public instrumentality, or public authority of any state, which obligations are not callable before the date the principal thereof will be required and which obligations are fully secured by and payable solely from Government Obligations, which securities are held pursuant to an agreement in form and substance not objected to by the Master Trustee (each, an "***Escrow Obligation***").

"***Event of Default***" means each of the events or conditions specified in Section 502(a) hereof.

"***Excess Cash***" shall have the meaning set forth in Section 427(b)(viii) hereof.

"***Excess Land***" means approximately 90 acres of real property owned by the Obligated Group and unused in connection with the primary operations of the Members as described in Exhibit "**A**" hereto, together with all buildings, improvements, and fixtures located thereon.

"***Excluded Property***" means (i) any assets of "employee pension benefit plans" as defined in the Employee Retirement Income Security Act of 1974, as amended, and (ii) any moneys and securities held in escrow as an entrance fee deposit or security deposit for any resident of any Facility of a Member, or in a resident trust fund, unless and until released from such escrow or trust fund and available free of restriction to the Obligated Group.

"***Expenses***" means, for any period, the aggregate of all expenses calculated under GAAP, including without limitation any taxes, incurred by the Person or group of Persons involved during such period, minus (i) interest on Funded Indebtedness (taking into account any Interest Rate Agreement as provided in Section 417 hereof), (ii) depreciation and amortization, (iii) extraordinary expenses, losses on the sale, disposal, or abandonment of assets other than in the ordinary course of business and losses on the extinguishment of debt or termination of pension plans, (iv) any expenses resulting from a forgiveness of or the establishment of reserves against Indebtedness of an Affiliate that does not constitute an extraordinary expense, (v) losses resulting from any reappraisal, revaluation, or write-down of assets other than bad debts, (vi) any losses from the sale or other disposition of fixed or capital assets, (vii) any losses resulting from changes in the valuation of investment securities and unrealized changes in the value of derivative instruments or resulting from the temporary impairment of investment securities, (viii) any other non-cash expenses, and (ix) any rent, development, marketing, operating, or other subordinated fees that have been deferred from the year in which they were originally due and that were not paid during such period. If such calculation is

being made with respect to the Obligated Group, any such expenses attributable to transactions between any Member and any other Member shall be excluded.

"*Facilities*" means all land, leasehold interests, and buildings and all fixtures and equipment (as defined in the Uniform Commercial Code or equivalent statute in effect in the state where such fixtures or equipment are located) of any Member of the Obligated Group. As of the date of issuance of the Series 2013 Bonds, the Facilities include, without limitation, 57 Independent Living Units, 124 Assisted Living Units and 192 Skilled Nursing Units (including 48 memory care units).

"*Fiscal Year*" means any twelve (12) month period beginning on January 1 of any calendar year and ending on December 31 of the same calendar year or such other consecutive twelve (12) month period selected by the Obligated Group Agent as the fiscal year for the Members.

"*Fitch*" means Fitch Ratings Inc., a corporation organized and existing under the laws of the State of New York, its successors and assigns, and if such corporation shall be dissolved or liquidated or shall no longer perform the functions of a securities rating agency, "*Fitch*" shall be deemed to refer to any other nationally recognized securities rating agency designated by the Master Trustee at the written direction of the Obligated Group Agent.

"*Funded Indebtedness*" means, subject to the provisions of Section 404 and 416, the Series 2013 Obligations.

"*Funded Interest*" means amounts irrevocably deposited in an escrow or other trust account to pay interest on Funded Indebtedness or Related Bonds and interest earned on amounts irrevocably deposited in an escrow or other trust account, to the extent such amounts so deposited are required to be applied to pay interest on Funded Indebtedness or Related Bonds.

"*GAAP*" means generally accepted accounting principles.

"*Governing Body*" means, with respect to a Member, the board of directors, the board of trustees, or similar group in which the right to exercise the powers of corporate directors or trustees is vested.

"*Government Obligations*" means securities that consist of (i) United States Government Obligations or (ii) evidences of a direct ownership in future interest or principal payments on United States Government Obligations, which obligations are held in a custody account by a bank or trust company organized and existing under the laws of the United States of America or any state thereof in the capacity of a custodian satisfactory to the Master Trustee pursuant to the terms of a custody agreement satisfactory to the Master Trustee.

"*Governmental Authority*" means any government or political subdivision, or any agency, authority, board, bureau, commission, department, or instrumentality of either, or any court, tribunal, central bank or arbitrator.

"*Gross Revenue Fund*" means the Fund created under Section 427 hereof.

"*Gross Revenues*" means all receipts, revenues, rentals, income, business interruption or similar insurance proceeds (including, without limitation, all Entrance Fees (but only upon satisfaction of the conditions for release to the Corporation or the Master Trustee from the Entrance Fees Fund) and all Medicaid, Medicare, and other third-party payments), condemnation awards, investment income and investment proceeds distributed in cash, and other moneys received or receivable by or on behalf of any Obligated Group Member (including, without limitation, revenues derived from (i) the ownership, operation, or leasing of any portion of the Facilities (including, without limitation, fees payable by or on behalf of residents of the Facilities) and all rights to receive the same, whether in the form of accounts, general intangibles, or other rights, and the proceeds of such accounts, general intangibles, and other rights, whether now existing or hereafter coming into existence or whether now owned or held or hereafter acquired, and (ii) gifts, grants, bequests, donations, and contributions heretofore or hereafter made that are legally available to meet any of the obligations of the Obligated Group Member incurred in the financing, operation, maintenance, or repair of any portion of the Facilities); provided, however, that there shall be excluded from Gross Revenues (a) any amounts received by an Obligated Group Member as a billing agent for another entity, except for fees received for serving as billing agent, (b) gifts, grants, bequests, donations, and contributions

to an Obligated Group Member heretofore or hereafter made, and the income and gains derived therefrom, that are specifically restricted by the donor or grantor to a particular purpose that is inconsistent with their use for payments required under this Master Indenture, (c) any moneys received by any Obligated Group Member from prospective residents or commercial tenants in order to pay for customized improvements to those Independent Living Units or other areas of the Facilities to be occupied or leased to such residents or tenants, (d) Deposits until the conditions for the release of such Deposits to the Corporation shall have been satisfied, and (e) any insurance proceeds or condemnation awards required to be deposited into the Insurance and Condemnation Award Fund by the provisions of Sections 411 and 412 hereof.

"*Guaranty*" means all obligations of a Person guaranteeing, or in effect guaranteeing, any Indebtedness, dividend or other obligation of any Primary Obligor in any manner, whether directly or indirectly, including but not limited to obligations incurred through an agreement, contingent or otherwise, by such Person: (i) to purchase such Indebtedness or obligation or any Property constituting security therefor; (ii) to advance or supply funds: (a) for the purchase or payment of such Indebtedness or obligation, or (b) to maintain working capital or other balance sheet condition; (c) to purchase securities or other Property or services primarily for the purpose of assuring the owner of such Indebtedness or obligation of the ability of the Primary Obligor to make payment of the Indebtedness or obligation; or (d) otherwise to assure the owner of such Indebtedness or obligation against loss in respect thereof.

"*Historical Debt Service Coverage Ratio*" means, for the period of four fiscal quarters ending on the last day of the applicable fiscal quarter or Fiscal Year, the ratio of Income Available for Debt Service to the Debt Service Requirements; provided, however, that in calculating the Debt Service Requirements for such period, the principal amount of any Indebtedness included in such calculation that is paid during such period shall be excluded to the extent such principal amount is paid from the proceeds of other Indebtedness incurred in accordance with the provisions of this Master Indenture.

"*Holder*," "*Obligation Holder*," or "*Owner*" means the registered owner of any fully registered or book entry Obligation unless alternative provision is made in the Supplemental Master Indenture pursuant to which such Obligation is issued for establishing ownership of such Obligation in which case such alternative provision shall control.

"*Income Available for Debt Service*" means for any period, total operating revenue, excluding fund development revenue and other income (including amortization, gifts, Foundation grants, gain or loss on the sale of assets, and unrealized gain or losses on investments), plus interest income and net entrance fees less total operating expenses, excluding fund development expenses, community outreach expenses, and other expenses (including amortization, depreciation interest expense, and non-recurring professional fees), as reported in the Obligated Group's financial statements for the applicable period.

"*Indebtedness*" means, for any Person, (i) all Guaranties by such Person, (ii) all liabilities (exclusive of reserves such as those established for deferred taxes or litigation) recorded or required to be recorded as such on the audited financial statements of such Person in accordance with GAAP, and (iii) all obligations for the payment of money incurred or assumed by such Person (a) due and payable in all events or (b) if incurred or assumed primarily to assure the repayment of money borrowed or credit extended, due and payable upon the occurrence of a condition precedent or upon the performance of work, possession of Property as lessee, rendering of services by others, or otherwise; provided that Indebtedness shall not include Indebtedness of one Member to another Member, any Guaranty by any Member of Indebtedness of any other Member, the joint and several liability of any Member on Indebtedness issued by another Member, Interest Rate Agreements, or any obligation to repay moneys deposited by patients or others with a Member as security for or as prepayment of the cost of patient care or any rights of residents of life care, elderly housing, or similar facilities to Entrance Fees (whether amortized into income or not), endowment or similar funds deposited by or on behalf of such residents including but not limited to any deferred obligations for the refund or repayment of Entrance Fees, any rent, development, marketing, operating, or other fees that have been deferred from the year in which they were originally due as a result of deferral or subordination.

"*Indenture Trust Estate*" has the meaning given to that term in the Granting Clauses hereof.

"*Independent Architect*" means an architect, engineer, or firm of architects or engineers selected by the Obligated Group Agent, acceptable to the Master Trustee and licensed by, or permitted to practice in, the state where

the construction involved is located, which architect, engineer, or firm of architects or engineers shall have no interest, direct or indirect, in any member of the Obligated Group or any Affiliate thereof and, in the case of an individual, shall not be a partner, member, director, officer, controlling shareholder, or employee of any member of the Obligated Group or any Affiliate thereof and, in the case of a firm, shall not have a partner, member, director, officer, or employee who is a partner, member, director, officer, controlling shareholder, or employee of any member of the Obligated Group or any Affiliate thereof; it being understood that an arm's-length contract with a member of the Obligated Group for the performance of architectural or engineering services shall not in and of itself be regarded as creating an interest in or an employee relationship with such entity and that the term Independent Architect may include an architect or engineer or a firm of architects or engineers who otherwise meet the requirements of this definition and who also are under contract to construct the facility that they have designed.

"*Independent Counsel*" means an attorney duly admitted to practice law before the highest court of any state who is not an employee of any Member or of an Affiliate of any Member and, without limitation, may include independent legal counsel for any Related Issuer, any Member, the Master Trustee, or any Related Bond Trustee.

"*Independent Living Units*" means the independent living units that are part of the Facilities.

"*Initial Entrance Fees*" means Entrance Fees received upon the initial occupancy of any Independent Living Unit (including any such fees collected for the purpose of obtaining a parking space) not previously occupied.

"*Insurance and Condemnation Award Fund*" means the Fund created under Section 430 hereof.

"*Insurance Consultant*" means a person or firm who in the case of an individual is not an employee or officer of any Member or any Related Issuer and that, in the case of a firm, does not control any Member of the Obligated Group or any Affiliate thereof and is not controlled by or under common control with any Member of the Obligated Group or an Affiliate thereof, appointed by the Obligated Group Agent and not objected to by the Master Trustee, qualified to survey risks and to recommend insurance coverage for nursing homes or health care facilities and services of the type involved, and having a favorable reputation for skill and experience in such surveys and such recommendations, and which may include a broker or agent with whom any Member transacts business.

"*Interest Payment Date*," (i) with respect to the Series 2013 Obligations, means January 1 and July 1 of each year, commencing January 1, 2014 and (ii) with respect to any Obligation, the maturity date thereof.

"*Interest Rate Agreement*" means an interest rate exchange, hedge, or similar agreements, expressly identified in an Officer's Certificate of the Obligated Group Agent delivered to the Master Trustee as being entered into in order to hedge the interest payable on all or a portion of any Indebtedness, which agreement is with a Qualified Hedge Provider and may include, without limitation, an interest rate swap, a forward or futures contract or an option (e.g. a call, put, cap, floor or collar) and which agreement does not constitute an obligation to repay money borrowed, credit extended, or the equivalent thereof. An Interest Rate Agreement shall not constitute Indebtedness hereunder.

"*IRS*" means the United States Internal Revenue Service.

"*Junior Security Agreement*" means the Junior Security Agreement dated as of _____ 1, 2013, from the Corporation in favor of the Master Trustee.

"*Land*" means (i) the Excess Land and (ii) the real Property owned or leased by the Obligated Group upon which the primary operations of the Members are conducted, as described in Exhibit "A" hereto, as amended as provided herein from time to time, together with all buildings, improvements, and fixtures located thereon, but excluding therefrom the Excluded Property.

"*Lien*" means any mortgage, pledge, or lease of, security interest in, or lien, charge, restriction, or encumbrance on any Property of the Person involved in favor of, or that secures any obligation to, any Person other than any Member, and any Capitalized Lease under which any Member is lessee and the lessor is not another Member.

"***Lock-Box Budget***" shall have the meaning set forth in Section 514 hereof.

"***Lock-Box Notice***" shall have the meaning set forth in Section 514 hereof.

"***Long-Term Indebtedness***" means Indebtedness having an original stated maturity or term greater than one year (and that is not payable upon demand of the holder of such Indebtedness within one year of the date of original issuance) or renewable at the option of the debtor for a period greater than one year from the date of original issuance.

"***Majority of the Applicable Holders***" means the Holders of more than fifty percent (50%) in aggregate principal amount of the Senior Obligations that are then Outstanding; provided, however, if there are no Senior Obligations Outstanding hereunder, the term "***Majority of the Applicable Holders***" means the Holders of more than fifty percent (50%) in aggregate principal amount of the Subordinate Obligations that are then Outstanding. The determination of who is the Holder of an Obligation held by a Related Bond Trustee shall be made in the manner provided in Section 513 hereof.

"***Majority of the Holders***" means (i) the Holders of more than fifty percent (50%) in aggregate principal amount of the Senior Bonds that then Outstanding and (ii) a Majority of the Subordinate Bond Holders. The determination of who is the Holder of an Obligation held by a Related Bond Trustee shall be made in the manner provided in Section 513 hereof.

"***Majority of the Senior Bond Holders***" means the Holders of more than fifty percent (50%) in aggregate principal amount of the Series 2013A Obligations that are then outstanding.  The determination of who is the Holder of an Obligation held by a Related Bond Trustee shall be made in the manner provided in Section 513 hereof.

"***Majority of the Series 2013 Bond Holders***" means the Holders of more than fifty percent (50%) in aggregate principal amount of the Series 2013 Bond Obligations that are then outstanding.  The determination of who is the Holder of an Obligation held by a Related Bond Trustee shall be made in the manner provided in Section 513 hereof.

"***Majority of the Subordinate Bond Holders***" means the Holders of more than fifty percent (50%) in aggregate principal amount of the Subordinate Obligations that are then outstanding.  The determination of who is the Holder of an Obligation held by a Related Bond Trustee shall be made in the manner provided in Section 513 hereof.

"***Management Agreement***" means initially, the Management Agreement dated December ?, 2010, between the Corporation and Life Care Services, LLC ("LCS"),, as thereafter amended and restated, and thereafter, any management agreement between a successor Manager and the Corporation.

"***Manager***" means LCS, and its successors and assigns, and any surviving, resulting, or transferee entity, or any other manager of the Facilities retained by the Corporation.

"***Master Indenture***" means this Amended and Restated Master Trust Indenture dated as of _____ _____, 2013, between the Corporation and the Master Trustee, as it may from time to time be amended or supplemented in accordance with the terms hereof.

"***Master Trustee***" means _____, its successors and assigns, or any successor trustee under this Master Indenture.

"***Material Adverse Effect***" means an event or occurrence that adversely affects in a material manner (i) the assets, liabilities, condition (financial or otherwise), business or operations of any Obligated Group Member (or other named party) including, without limitation, the Facilities or any part thereof, (ii) the ability of any Obligated Group Member (or other named party) to carry out its business as of the date of this Master Indenture or as proposed herein to be conducted or to meet or perform its covenants and obligations under this Master Indenture or any

Obligation issued hereunder on a timely basis or (iii) any Obligated Group Member's status as an organization described in Section 501(c)(3) of the Code.

"**Matters Contested in Good Faith**" means matters (i) then being contested in good faith by appropriate proceedings diligently and continuously pursued; (ii) of which the Master Trustee has been notified in writing and is being kept informed in such detail as the Master Trustee may from time to time reasonably request; (iii) the enforcement of which is effectively stayed during the period of the contest; and (iv) with respect to which, if so requested by the Master Trustee, an Adequate Reserve shall have been established.

"**Maturity Value**" means, for any Obligation issued to evidence Capital Appreciation Indebtedness, the Accreted Value as of final maturity of such Obligation.

"**Member**" or "**Member of the Obligated Group**" means any Person who is listed on Exhibit "D" hereto after designation as a Member of the Obligated Group pursuant to the terms of this Master Indenture (collectively, the "**Members**" or the "**Members of the Obligated Group**").

"**Moody's**" means Moody's Investors Service, Inc., a corporation organized and existing under the laws of the State of Delaware, its successors and assigns, and, if such corporation shall be dissolved or liquidated or shall no longer perform the functions of a securities rating agency, "**Moody's**" shall be deemed to refer to any other nationally recognized securities rating agency designated by the Master Trustee at the written direction of the Obligated Group Agent.

"**Mortgages**" means the Original Mortgage, as amended and restated by the Amended and Restated Mortgage, and the Second Mortgage, as the same may be further modified, supplemented, amended, and/or restated from time to time.

"**Mortgaged Property**" means the real property and personal property of the Corporation that is subject to the Lien and security interest of the Mortgages.

"**Multiemployer Plan**" means an ERISA Plan that is a "multiemployer plan" as defined in Section 3(37) or 4001(a)(3) of ERISA.

"**Net Proceeds**" means, when used with respect to any insurance or condemnation award or sale consummated under threat of condemnation, the gross proceeds from the insurance or condemnation award or sale with respect to which that term is used less all expenses (including attorney's fees, adjuster's fees, and any expenses of the Obligated Group or the Master Trustee) incurred in the collection of such gross proceeds.

"**Net Rentals**" means all fixed rents (including as such all payments that the lessee is obligated to make to the lessor on termination of the lease or surrender of the Property other than upon termination of the lease for a default thereunder) payable under a lease or sublease of real or personal Property excluding any amounts required to be paid by the lessee (whether or not designated as rents or additional rents) on account of maintenance, repairs, insurance, taxes, and similar charges.  Net Rentals for any future period under any so-called "**percentage lease**" shall be computed on the basis of the amount reasonably estimated to be payable thereunder for such period, but in any event not less than the amount paid or payable thereunder during the immediately preceding period of the same duration as such future period; provided that the amount estimated to be payable under any such percentage lease shall in all cases recognize any change in the applicable percentage called for by the terms of such lease.

"**Non-Recourse Indebtedness**" means any Indebtedness the liability for which is effectively limited to Property, Plant, and Equipment (other than the Land) financed by the applicable Indebtedness and the income therefrom, with no recourse, directly or indirectly, to any other Property of any Member.

"**Obligated Group**" means the Corporation and any other Person that has fulfilled the requirements for entry into the Obligated Group set forth in Section 404 hereof and that has not ceased such status pursuant to Section 405 hereof.

"***Obligated Group Agent***" means the Corporation or such other Member as may be designated from time to time pursuant to written notice to the Master Trustee, executed by the President or Chairman of the Governing Body of the Corporation or, if the Corporation is no longer a Member of the Obligated Group, of each Member of the Obligated Group.

"***Obligated Group Member***" means any Person who is listed on Exhibit "D" hereto after designation as a Member of the Obligated Group pursuant to the terms of this Master Indenture (collectively, the "***Obligated Group Members***").

"***Obligation Holder***," "***Holder***," or "***Owner***" means the registered owner of any fully registered or book entry Obligation unless alternative provision is made in the Supplemental Master Indenture pursuant to which such Obligation is issued for establishing ownership of such Obligation in which case such alternative provision shall control.

"***Obligation Register***" means the registration books of the Obligated Group kept by the Master Trustee as Obligation Registrar in the Office of the Master Trustee together with the list of the names and addresses of the last known Holders of all Obligations and the serial numbers of such Obligations held by each of such Holders.

"***Obligation Registrar***" means the Master Trustee in its capacity is the keeper of the Obligation Register.

"***Obligations***" means, collectively, the Series 2013 Obligations and any Additional Obligations, and any obligation or obligations issued in exchange therefor (each, an "***Obligation***").

"***Occupancy Requirements***" shall have the meaning set forth in Section 425 hereof.

"***Occupied***" means (i) with respect to any Independent Living Unit, any unit for which a Residency Agreement has been executed and for which physical possession of such unit has been taken by a resident or (ii) with respect to any other type of living unit, physical possession of such unit by a resident.

"***OFAC***" means the United States Department of Treasury Office of Foreign Assets Control.

"***OFAC Laws***" means any laws, regulations, and Executive Orders relating to the economic sanctions programs administered by OFAC, including without limitation, the International Emergency Economic Powers Act, 50 U.S.C. sections 1701 et seq.; the Trading with the Enemy Act, 50 App. U.S.C. sections 1 et seq.; and the Office of Foreign Assets Control, Department of the Treasury Regulations, 31 C.F.R. Parts 500 et seq. (implementing the economic sanctions programs administered by OFAC).

"***OFAC SDN List***" means the list of "Specially Designated Nationals and Blocked Persons" maintained by OFAC.

"***OFAC Violation***" has the meaning assigned to such term in Section 451(e) of this Master Indenture.

"***Office of the Master Trustee***" means the designated or principal corporate trust office of the Master Trustee in _____, currently located at _____, or such other location as may be designated by it to the Corporation, the Issuer, and each Related Bond Trustee in writing, or the designated or principal corporate trust office designated to the Corporation, the Issuer, and each Related Bond Trustee in writing by, any successor or temporary Master Trustee hereunder.

"***Officer's Certificate***" means a certificate signed, in the case of a certificate delivered by a Member of the Obligated Group, by the President, any Vice President, Executive Director, Chief Financial Officer or any other officer or agent authorized to sign by resolution of the Governing Body of any Member of the Obligated Group or in the case of a certificate delivered by any other corporation, by the President, any Vice President, the Executive Director, Director of Finance or any other officer or agent authorized to sign by resolution of the Governing Body of such corporation or, in the case of a certificate delivered by any other Person, the chief executive or chief financial officer of such other Person, in either case whose authority to execute such certificate shall be evidenced to the satisfaction of the Master Trustee.

"*Operating Account*" means the account established by the Obligated Group to be funded from transfers from the Gross Revenue Fund as set forth in Section 427(ii) and (v) hereof for the payment of Operating Expenses and Budgeted Capital Expenditures, which account shall at all times be subject to a Control Agreement. The initial Operating Account shall be held with _____.

"*Operating Reserve Account*" means the account established by the Obligated Group pursuant to Section 428 hereof in which that portion of Excess Cash transferred to the Obligated Group from the Gross Revenue Fund for the establishment of a reserve for application as set forth in Section 428 shall be held, which account shall at all times be subject to a Control Agreement. The initial Operating Reserve Account shall be held with Bippus State Bank.

"*Operating Reserve Account Requirement*" means an amount equal to 150 Days' Cash on Hand, as calculated as of the end of the most recent fiscal quarter for which such calculation has been provided by the Obligated Group.

"*Operating Expenses*" means, for any period, all amounts required to be paid by any Obligated Group Member in connection with the operation and management of the Facilities, including, without limitation, any management fees, marketing expenses, insurance costs, and any taxes incurred by the Obligated Group Member during such period, provided that (i) "Operating Expenses" shall exclude capital expenditures, any interest or principal payments on Funded Indebtedness, any Entrance Fees due to be refunded to Residents, depreciation and amortization, and other non-cash expenses, and (ii) for purposes of Section 427(b)(ii) hereof, "Operating Expenses" shall exclude 50% of the fees payable to LCS under the Management Agreement.

"*Operating Ratio*" means, for the two (2) fiscal quarter period ended as of the last day of the applicable fiscal quarter, the amount determined by dividing (i) total operating expenses excluding fund development expenses, community outreach expenses, and other expenses (including amortization, depreciation, interest expense and non-recurring professional fees) by (ii) total operating revenues excluding fund development revenue, and other income (including amortization, gifts, foundation grants, interest income, gain or loss on the sale of assets, and unrealized gain or losses on investments).

"*Operating Ratio Requirement*" shall have the meaning set forth in Section 426 hereof.

"*Operating Revenues*" means, for any period, all receipts, revenues, rentals, and income received or receivable by or on behalf of any Obligated Group Member, including (without limitation) revenues derived from the ownership, operation, or leasing of any portion of the Facilities, but excluding (i) all Entrance Fees and (ii) fund development revenue and other income (including amortization, gifts, foundation grants, interest income, gain or loss on the sale of assets, and unrealized gain or losses on investments).

"*Opinion of Bond Counsel*" means a written opinion of nationally recognized municipal bond counsel addressed to the Master Trustee and each Related Bond Trustee, which opinion, including the scope, form, substance and other aspects thereof, is not objected to by the Master Trustee, and which opinion may be based upon a ruling or rulings of the Internal Revenue Service.

"*Original Master Indenture*" means the Master Trust Indenture dated as of August 15, 2002, between the Corporation and the Master Trustee, as supplemented by the Supplemental Indenture Number 2002A and the Supplemental Indenture Number 2002B, each dated as of August 15, 2002 and between the Corporation and the Master Trustee.

"*Original Mortgage*" means the Mortgage, Security Agreement, and Fixture Financing Statement (Wabash County) dated as of August 15, 2002, by the Corporation in favor of the Master Trustee.

"*Outstanding*" means, in the case of Indebtedness of a Person other than Related Bonds or Obligations, all such Indebtedness of such Person that has been issued except any such portion thereof canceled after purchase or surrendered for cancellation or because of payment at or redemption prior to maturity, any such Indebtedness in lieu of which other Indebtedness has been duly incurred and any such Indebtedness that is no longer deemed Outstanding under its terms and with respect to which such Person is no longer liable under the terms of such Indebtedness.

"**Outstanding Obligations**" or "**Obligations Outstanding**" means all Obligations that have been duly authenticated and delivered by the Master Trustee under this Master Indenture, except:

(i)   Obligations canceled after purchase or because of payment at or prepayment or redemption prior to maturity;

(ii)   (a) Obligations for the payment or redemption of which cash or Escrow Obligations shall have been theretofore deposited with the Master Trustee (whether upon or prior to the maturity or redemption date of any such Obligations); provided that if such Obligations are to be prepaid or redeemed prior to the maturity thereof, notice of such prepayment or redemption shall have been given or irrevocable arrangements satisfactory to the Master Trustee shall have been made therefor, or waiver of such notice satisfactory in form to the Master Trustee shall have been filed with the Master Trustee and (b) Obligations securing Related Bonds for the payment or redemption of which cash or Escrow Obligations shall have been theretofore deposited with the Related Bond Trustee (whether upon or prior to the maturity or redemption date of any such Related Bonds); provided that if such Obligations are to be redeemed prior to the maturity thereof, notice of such redemption shall have been given or arrangements satisfactory to the Related Bond Trustee shall have been made therefor, or waiver of notice satisfactory in form to the Related Bond Trustee shall have been filed with the Related Bond Trustee;

(iii)   Obligations in lieu of which others have been authenticated hereunder; and

(iv)   Obligations held by a Member.

Notwithstanding the foregoing, any Obligation securing Related Bonds shall be deemed Outstanding if such Related Bonds are Outstanding.

"**Outstanding Related Bonds**" or "**Related Bonds Outstanding**" means all Related Bonds that have been duly authenticated and delivered by the Related Bond Trustee under the Related Bond Indenture and are deemed Outstanding under the terms of such Related Bond Indenture or, if such Related Bond Indenture does not specify when Related Bonds are deemed Outstanding thereunder, all such Related Bonds that have been so authenticated and delivered, except:

(i)   Related Bonds canceled after purchase in the open market or because of payment at or redemption prior to maturity;

(ii)   Related Bonds for the payment or redemption of which cash or Escrow Obligations of the type described in clause (ii)(a) of the definition thereof shall have been theretofore deposited with the Related Bond Trustee (whether upon or prior to the maturity or redemption date of any such Bonds) in accordance with the Related Bond Indenture; provided that if such Bonds are to be redeemed prior to the maturity thereof, notice of such redemption shall have been given or arrangements satisfactory to the Related Bond Trustee shall have been made therefor, or waiver of such notice satisfactory in form to the Related Bond Trustee shall have been filed with the Related Bond Trustee;

(iii)   Related Bonds in lieu of which others have been authenticated under the Related Bond Indenture; and

(iv)   For the purposes of all covenants, approvals, waivers, and notices required to be obtained or given under the Related Bond Indenture, Related Bonds held or owned by a Member.

"**Owner**," "**Obligation Holder**," or "**Holder**" means the registered owner of any fully registered or book entry Obligation unless alternative provision is made in the Supplemental Master Indenture pursuant to which such Obligation is issued for establishing ownership of such Obligation in which case such alternative provision shall control.

"***Paying Agent***" means the bank or banks, if any, designated pursuant to a Related Bond Indenture to receive and disburse the principal of and interest on any Related Bonds or designated pursuant to this Master Indenture and named in an Obligation to receive and disburse the principal of and interest on such Obligation.

"***PBGC***" means the Pension Benefit Guaranty Corporation or any successor thereto.

"***Permits***" means, collectively, all consent, licenses permits, order or other approvals required for occupancy and operation of the Project and the Facilities in accordance with all Applicable Law effecting the Project and the Facilities (each, a "***Permit***").

"***Permitted Encumbrances***" means any Lien arising under this Master Indenture and, as of any particular time:

(i)    Liens arising by reason of good faith deposits with a Member in connection with tenders, leases of real estate, bids, or contracts (other than contracts for the payment of money), deposits by any Member to secure public or statutory obligations, or to secure the payment of taxes or assessments or other similar charges; any Lien arising by reason of deposits with, or the giving of any form of security to, any governmental agency or any body created or approved by law or governmental regulation for any purpose at any time as required by law or governmental regulation as a condition to the transaction of any business or the exercise of any privilege or license, or to enable any Member to maintain self-insurance or to participate in any funds established to cover any insurance risks or in connection with workers' compensation, unemployment insurance, pensions, or profit sharing plans or other social security plans or programs, or to share in the privileges or benefits required for corporations participating in such arrangements;

(ii)    any Lien on the Property of any Member permitted under the provisions of Section 419 hereof;

(iii)    the Mortgages and any other security agreement or document securing the Master Trustee in connection with the issuance of the Series 2013 Obligations, and any other Lien on Property if such Lien secures the Obligations (subject to the priorities of payment set forth herein with respect to Senior Obligations and Subordinate Obligations) and only the Obligations;

(iv)    Residency Agreements and leases that relate to Property of the Obligated Group that is of a type and amount of space that is customarily the subject of such leases, such as office space for physicians and educational institutions, food service facilities, gift shops, beauty shop, banking, parking for residents, other similar specialty services, pharmacy and similar departments or employee rental apartments; sale/saleback or lease/leaseback or similar arrangements in connection with the issuance of Related Bonds; and any leases, licenses, or similar rights to use Property whereunder a Member is lessee, licensee, or the equivalent thereof upon fair and reasonable terms no less favorable to the lessee or licensee than would obtain in a comparable arm's-length transaction, provided in each case that such Lien is subject and junior to the Lien of the Mortgages;

(v)    Liens for taxes and special assessments that are not then delinquent, or if then delinquent are being contested in accordance with Section 406 hereof;

(vi)    utility, access and other easements and rights-of-way, restrictions, encumbrances, and exceptions that do not materially interfere with or materially impair the operation of the Property affected thereby (or, if such Property is not being then operated, the operation for which it was designed or last modified);

(vii)    any mechanic's, laborer's, materialman's, supplier's, or vendor's Lien or right in respect thereof if payment is not yet due under the contract in question or has been due for less than sixty (60) days, or if such Lien is being contested in accordance with the provisions of this Master Indenture;

(viii)    such Liens, defects, irregularities of title, and encroachments on adjoining property as normally exist with respect to property similar in character to the Property involved and that do not materially adversely affect the value of, or materially impair, the Property affected thereby for the purpose for which it was acquired or is held by the owner thereof;

(ix)  statutory liens granted to banks or other financial institutions, which liens have not been specifically granted to secure Indebtedness and that do not apply to Property that has been deposited as part of a plan to secure Indebtedness;

(x)  zoning laws and similar restrictions that are not violated by the Property affected thereby;

(xi)  statutory rights under Section 291, Title 42 of the United States Code, as a result of what are commonly known as Hill-Burton grants, and similar rights under other federal statutes or statutes of the state in which the Property involved is located;

(xii)  all right, title, and interest of the state where the Property involved is located, municipalities and the public in and to tunnels, bridges, and passageways over, under or upon a public way;

(xiii)  Liens on or in Property given, granted, bequeathed, or devised by the owner thereof existing at the time of such gift, grant, bequest, or devise, provided that (a) such Liens consist solely of restrictions on the use thereof or the income therefrom, or (b) such Liens secure Indebtedness that is not assumed by any Member and such Liens attach solely to the Property (including the income therefrom) that is the subject of such gift, grant, bequest, or devise;

(xiv)  Liens of or resulting from any judgment or award, the time for the appeal or petition for rehearing of which shall not have expired, or in respect of which any Member shall at any time in good faith be prosecuting an appeal or proceeding for a review and in respect of which a stay of execution pending such appeal or proceeding for review shall be in existence;

(xv)  Liens in favor of a resident or other depositor on Deposits or other moneys deposited by residents or others with a Member as a security deposit or prepayment of the cost of resident or patient care;

(xvi)  Liens on Excluded Property;

(xvii)  Liens on payments from a third party payor due to rights of third party payors for recoupment of excess reimbursement paid;

(xviii)  any security interest in a rebate fund for the payment of arbitrage rebate payments under the Code, any depreciation reserve, debt service, or interest reserve, debt service, construction fund or any similar fund established pursuant to the terms of any Supplemental Master Indenture, any Related Bond Indenture, or any Related Loan Document in favor of the Master Trustee, the applicable Related Bond Trustee, the applicable Related Issuer, or the Holder of the Indebtedness issued pursuant to such Supplemental Master Indenture, Related Bond Indenture, or Related Loan Document;

(xix)  any Lien on Property acquired by a Member which Lien secures Indebtedness issued, incurred, or assumed by any Member, in connection with and to effect such acquisition or existing Indebtedness that will remain Outstanding after such acquisition which Lien encumbers Property other than Land, buildings, or other improvements, if in any such case the aggregate principal amount of such Indebtedness does not exceed the fair market value subject to such Lien as determined in good faith by the Governing Body of the Member;

(xx)  such Liens, covenants, conditions, and restrictions, if any, that do not secure Indebtedness and that are other than those of the type referred to above, as are set forth in Exhibit "E" to this Master Indenture, and that (a) in the case of Property owned by the Obligated Group on the date of execution of this Master Indenture, do not and will not, so far as can reasonably be foreseen, materially adversely affect the value of the Property currently affected thereby or materially impair the same, and (b) in the case of any other Property, do not materially impair or materially interfere with the value, operation, or usefulness thereof for the purpose for which such Property was acquired or is held by a Member; and

(xx)  the items set forth on Schedule B to the title insurance policy delivered in connection with the issuance of the Series 2013 Obligations and which items are also listed in Exhibit "C" attached hereto.

"**_Permitted Investments_**" means and includes any of the following:

(i)  Government Obligations;

(ii)  debt obligations that are (a) at the time of purchase, issued by any state or political subdivision thereof or any agency or instrumentality of such state or political subdivision, and (b) at the time of purchase, rated in one of the highest rating categories (without regard to any refinement or gradation of rating category by numerical modifier or otherwise) assigned by each Applicable Rating Agency;

(iii)  any bond, debenture, note, participation certificate or other similar obligation issued by a government sponsored agency (such as the Federal National Mortgage Association, the Federal Home Loan Bank System, the Federal Home Loan Mortgage Corporation, the Federal Farm Credit Bank or the Student Loan Marketing Association) that is either (a) rated in the highest rating category by each Applicable Rating Agency, or (b) backed by the full faith and credit of the United States of America;

(iv)  U.S. denominated deposit accounts, certificates of deposit and banker's acceptances of any bank, trust company, or savings and loan association, including the Master Trustee or its affiliates, that have a rating on their short-term certificates of deposit on the date of purchase in one of the two highest short-term rating categories (without regard to any refinement or gradation of rating category by numerical modifier or otherwise) assigned by each Applicable Rating Agency, and that mature not more than three hundred sixty (360) days after the date of purchase;

(v)  commercial paper that is rated at the time of purchase in one of the two highest short-term rating categories (without regard to any refinement or gradation of rating category by numerical modifier or otherwise) assigned by each Applicable Rating Agency, and that matures not more than two hundred seventy (270) days after the date of purchase;

(vi)  bonds, notes, debentures, or other evidences of indebtedness issued or guaranteed by a corporation that are, at the time of purchase, rated by each Applicable Rating Agency in any of the three highest rating categories (without regard to any refinement or gradation of rating category by numerical modifier or otherwise);

(vii) repurchase agreements with respect to and secured by Government Obligations or by obligations described in clause (iii) above, which agreements may be entered into with a bank (including without limitation the Related Bond Trustee or the Master Trustee), a trust company, financial services firm or a broker dealer that is a member of the Securities Investors Protection Corporation, provided that (a) the Master Trustee or a custodial agent of the Master Trustee has possession of the collateral and that the collateral is, to the knowledge of the Master Trustee, free and clear of third-party liens or claims, (b) a master repurchase agreement or specific written repurchase agreement governs the transaction, (c) the collateral securities are valued no less frequently than weekly, and (d) the fair market value of the collateral securities in relation to the amount of the repurchase obligation, including principal and interest, is equal to at least one hundred three percent (103%);

(viii)    investments in a money market fund, which may be funds of the Related Bond Trustee or the Master Trustee or an affiliate thereof, rated (at the time of purchase) in the highest rating category for this type of investment by each Applicable Rating Agency; and

(ix)    any other investment approved by a Majority of the Applicable Holders.

The Related Bond Trustee and the Master Trustee shall not be obligated to determine whether an investment that at the time of purchase is a Permitted Investment remains a Permitted Investment thereafter and shall be under no obligation to sell or a liquidate an investment unless instructed to do so by the Corporation.

For the purposes of this definition, obligations issued or held in the name of the Related Bond Trustee or the Master Trustee (or in the name of the Related Issuer and payable to the Related Bond Trustee or the Master Trustee) in book-entry form on the books of the Department of Treasury of the United States shall be deemed to be deposited with the Related Bond Trustee or the Master Trustee, as applicable.

"***Person***" means any natural person, firm, joint venture, association, partnership, business trust, corporation, limited liability company, public body, agency, or political subdivision thereof or any other similar entity.

"***Plan***" has the meaning set forth in the Whereas clauses.

"***Pricing Schedule***" means the schedule for Entrance Fees and Resident Service Fees as of the Closing Date provided to the Master Trustee on the Closing Date.

"***Primary Obligor***" means the Person who is primarily obligated on an obligation that is guaranteed by another Person.

"***Project***" means the Facilities originally financed with the proceeds of the Series 2002 Bonds as described in the Whereas clauses hereof.

"***Project Certificate***" means the Arbitrage Certificate regarding the Project and the Expenditure of Funds delivered by the Corporation and the Town pursuant to the terms of the Series 2002 Bond Indenture.

"***Projected Rate***" means the projected yield at par of an obligation as set forth in the report of a Consultant (which Consultant and report are not objected to by the Master Trustee). Such report shall state that in determining the Projected Rate such Consultant reviewed the yield evaluations at par of not less than three obligations selected by such Consultant, which obligations such Consultant states in its report are reasonable comparators for utilizing in developing such Projected Rate and which obligations: (i) were outstanding on a date selected by the Consultant which date so selected occurred during the ninety (90) day period preceding the date of the calculation utilizing the Projected Rate in question, (ii) to the extent practicable, are obligations of Persons engaged in operations similar to those of the Obligated Group and having a credit rating similar to that of the Obligated Group, (iii) are not entitled to the benefits of any credit enhancement, including without limitation any letter or line of credit or insurance policy (unless the Indebtedness for which the Projected Rate is being calculated has similar enhancement), and (iv) to the extent practicable, have a remaining term and amortization schedule substantially the same as the obligation with respect to which such Projected Rate is being developed.

"***Property***" means any and all rights, titles, and interests in and to any and all property, whether real or personal, tangible (including cash) or intangible, wherever situated and whether now owned or hereafter acquired, other than Excluded Property.

"***Property, Plant, and Equipment***" means all Property of each Member that is classified as Property, Plant, and Equipment under GAAP.

"***Put Indebtedness***" means Indebtedness that is (i) payable or required to be purchased or redeemed by or on behalf of the underlying obligor, at the option of the owner thereof, prior to its stated maturity date or (ii) payable or required to be purchased or redeemed from the owner by or on behalf of the underlying obligor (other than at the option of the owner) prior to its stated maturity date, other than pursuant to any mandatory sinking fund or other similar fund, other than by reason of an event of taxability with respect to any Related Bond or other than by reason of acceleration upon the occurrence of an event of default.

"***Qualified Hedge Provider***" shall mean a counterparty under an interest rate swap, forward or futures contract or option (e.g. a call, put, cap, floor or collar), or similar hedging agreement which, at the relevant time, has, or the obligations of which under the applicable agreement are guaranteed by a parent company that has, a long-term rating of at least A- on its unsecured and unenhanced long-term debt from at least one Rating Agency and from each Rating Agency that rates such counterparty or parent company.

"***Rating Agency***" means Moody's, Standard & Poor's, or Fitch, and their respective successors and assigns.

"***Rebate Fund***" means any Rebate Fund created by a Related Bond Indenture.

"**Related Bond Indenture**" means the Series 2013 Bond Indenture and any indenture, bond resolution or similar instrument pursuant to which any series of Related Bonds is issued (collectively, the "**Related Bond Indentures**").

"**Related Bond Trustee**" means the Series 2013 Bond Trustee and any other trustee under any Related Bond Indenture and any successor trustee thereunder or, if no trustee is appointed under a Related Bond Indenture, the Related Issuer.

"**Related Bonds**" means the Series 2013 Bonds and any other revenue bonds or similar obligations the proceeds of which are loaned or otherwise made available to any Member in consideration, whether in whole or in part, of the execution, authentication and delivery of an Obligation or Obligations.

"**Related Issuer**" means the Town and any other issuer of a series of Related Bonds.

"**Related Loan Document**" means the Series 2013 Bond Loan Agreement and any other document or documents (including without limitation any loan or credit agreement, lease, sublease, or installment sales contract) pursuant to which any proceeds of any Related Bonds are advanced to any Member (or any Property financed or refinanced with such proceeds is leased, subleased, or sold to a Member) (collectively, the "**Related Loan Documents**").

"**Repair and Replacement Fund**" means the Fund created under Section 429 hereof.

"**Repair and Replacement Fund Maximum**" means  Two Hundred Fifty Thousand Dollars ($250,000).

"**Required Information Recipients**" means the Master Trustee and each Related Bond Trustee, the Town and all beneficial owners of Five Hundred Thousand Dollars ($500,000) or more in aggregate principal or original principal amount, as applicable, of a series of Related Bonds who shall request any applicable information in writing (which written request shall include a certification as to such ownership).

"**Residency Agreement**" means any written agreement or contract, as amended from time to time, between a Member and a Resident giving the Resident certain rights of occupancy in the Facilities, including without limitation, independent living units, assisted living units, memory support units, skilled nursing beds, or specialty care beds and providing for certain services to such Resident (collectively, the "**Residency Agreements**").

"**Resident**" means the occupant or prospective occupant of a unit at the Facilities pursuant to a Residency Agreement (collectively, the "**Residents**").

"**Resident Service Fees**" means all fees and charges, other than Entrance Fees, received by the Corporation from Residents, including those monthly rental, second person, *per diem* and amenity service fees paid by Residents pursuant to the Residency Agreements.

"**Revenue Fund Maximum**," means in any Fiscal Year, Budgeted Capital Expenditures paid from the Operating Account in an aggregate amount not exceeding One Hundred Thousand Dollars ($100,000).

"**Revenues**" means, for any period, in the case of any Person providing health care services and/or senior living services, (i) the sum of (a) resident service revenues **plus** (b) other operating revenues **plus** (c) non-operating revenues (other than Contributions, income derived from the sale or other disposition of assets not in the ordinary course of business, any gain from the extinguishment of debt or other extraordinary item or earnings that constitute Funded Interest, earnings on amounts that are irrevocably deposited in escrow to pay the principal of or interest on Indebtedness or earnings not available to pay Expenses or debt service on Indebtedness of the Obligated Group) **plus** (d) Unrestricted Contributions **plus** (e) Entrance Fees received **minus** (ii) the sum of (a) Entrance Fees amortized during such period **plus** (b) Entrance Fees refunded to residents **plus** (c) Entrance Fees refunds payable irrespective of reoccupancy within twelve (12) months of the date of calculation with respect to units that are unoccupied as of the date of calculation. In the case of any other Person, "Revenues" means, for any period, gross revenues less sale discounts and sale returns and allowances, as determined in accordance with GAAP; but excluding in either case (a) any unrealized gain or loss resulting from changes in the valuation of investment

securities or unrealized changes in the value of derivative instruments, (b) any gains on the sale or other disposition of fixed or capital assets not in the ordinary course, (c) earnings resulting from any reappraisal, revaluation or write-up of fixed or capital assets, (d) any revenues recognized from deferred revenues related to Entrance Fees, or (e) insurance (other than business interruption) and condemnation proceeds; provided, however, that if such calculation is being made with respect to the Obligated Group, such calculation shall be made in such a manner so as to exclude any revenues attributable to transactions between any Member and any other Member. For purposes of calculations hereunder, an Unrestricted Contribution from an Affiliate shall be treated as being made during the period of such calculation so long as the Unrestricted Contribution is made prior to the date the applicable Officer's Certificate is required to be delivered with respect to such calculation. For purposes of any calculation hereunder that is made with reference to both Revenues and Expenses, any deduction from gross resident service revenues otherwise required by this definition shall not be made if and to the extent that the amount of such deduction is included in Expenses.

"*Second Mortgage*" means the Junior Mortgage, Security Agreement, and Fixture Financing Statement (Wabash County) of even date herewith by the Corporation in favor of the Master Trustee, and as the same may be further modified, supplemented, amended, and/or restated from time to time.

"*Security Agreements*" means the Junior Security Agreement and the Senior Security Agreement.

"*Senior Obligations*" means, collectively, (i) the Series 2013A Obligation, (ii) any Obligations issued on a parity with the Series 2013A Obligation, and (iii) any Obligation issued to refund or refinance any of the foregoing unless such Obligation shall be declared to be a "*Junior Obligation*" upon the issuance thereof (each, a "*Senior Obligation*").

"*Senior Security Agreement*" means the Senior Security Agreement dated as of _____ 1, 2013, from the Corporation in favor of the Master Trustee.

"*Series 2002 Bond Indenture*" means the Bond Trust Indenture dated as of August 15, 2002, between the Town and the Series 2002 Bond Trustee pursuant to which the Series 2002A Bonds and the Series 2002B Bonds were issued.

"*Series 2002 Bond Trustee*" means Wells Fargo Bank, N.A., successor to Wells Fargo Bank Indiana, NA, or any successor thereto under the Series 2002 Bond Indenture.

"*Series 2002 Bonds*" means, collectively, the Series 2002A Bonds and the Series 2002B Bonds.

"*Series 2002 Obligations*" means, collectively, the Series 2002A Obligation and the Series 2002B Obligation.

"*Series 2002 Loan Agreement*" means the Loan Agreement dated as of August 15, 2002, between the Corporation and the Town providing for the loan of the proceeds of the Series 2002A Bonds and the Series 2002B Bonds to the Corporation.

"*Series 2002 Master Trustee*" means Wells Fargo Bank, N.A., successor to Wells Fargo Bank Indiana, NA, or any successor thereto under the master trust indenture pursuant to which the Series 2002 Obligations were issued.

"*Series 2002A Bonds*" means the $41,900,000 aggregate principal amount of Town of North Manchester, Indiana Revenue Bonds (Peabody Retirement Community Project) Series 2002A issued pursuant to the terms and conditions of the Series 2002 Bond Indenture.

"*Series 2002A Obligation*" means the Corporation's $41,900,000 Series 2002A Note issued under the Original Master Indenture as security for the Series 2002A Bonds.

"*Series 2002B Bonds*" means collectively the Series 2002B-1 Bonds and the Series 2002B-2 Bonds.

"*Series 2002B-1 Bonds*" the $3,500,000 Town of North Manchester, Indiana Revenue Bonds (Peabody Retirement Community Project) Series 2002B-1 Extendable Rate Adjustable Securities$^{SM}$ (EXTRAS$^{SM}$) issued pursuant to the terms and conditions of the Series 2002 Bond Indenture.

"*Series 2002B-2 Bonds*" the $1,500,000 Town of North Manchester, Indiana Revenue Bonds (Peabody Retirement Community Project) Series 2002B-2 Extendable Rate Adjustable Securities$^{SM}$ (EXTRAS$^{SM}$) issued pursuant to the terms and conditions of the Series 2002 Bond Indenture.

"*Series 2002B Obligation*" means collectively the Series 2002B-1 Obligation and the Series 2002 B-2 Obligation.

"*Series 2002B-1 Obligation*" means the Corporation's $3,500,000 Direct Series 2002B-1 Note, issued under the Original Master Indenture as security for the Series 2002B-1 Bonds.

"*Series 2002B-2 Obligation*" means the Corporation's $1,500,000 Direct Series 2002B-2 Note, issued under the Original Master Indenture as security for the Series 2002B-2 Bonds.

"*Series 2013 Bond Indenture*" means the Bond Trust Indenture of even date herewith between the Town and the Series 2013 Bond Trustee pursuant to which the Series 2013 Bonds were issued.

"*Series 2013 Bond Obligations*" means, collectively, the Series 2013A Obligation and the Series 2013B Subordinate Obligation (each, a "*Series 2013 Bond Obligation*").

"*Series 2013 Bond Trustee*" means _____, or any successor thereto under the Series 2013 Bond Indenture.

"*Series 2013 Bond Loan Agreement*" means the Loan Agreement of even date herewith between the Corporation and the Town relating to the Series 2013 Bonds.

"*Series 2013 Obligations*" means the Series 2013 Bond Obligations.

"*Series 2013 Subordinate Obligations*" means the Series 2013B Subordinate Obligation.

"*Series 2013 Tax Agreement*" means the Arbitrage Certificate and Tax Compliance Agreement dated _____ _____, 2013, between the Town and the Corporation.

"*Series 2013A Bonds*" means the $23,400,000 principal amount of Town of North Manchester, Indiana Economic Development Refunding Revenue Bonds (Peabody Retirement Community Project) Series 2013A authorized to be issued pursuant to the terms and conditions of the Series 2013 Bond Indenture.

"*Series 2013A Obligation*" means the Corporation's $23,400,000 Series 2013A Note issued under this Master Indenture in substantially the form attached hereto as Exhibit "B-1" as security for the Series 2013A Bonds.

"*Series 2013B Bonds*" means the $20,150,000 original principal amount of Town of North Manchester, Indiana Subordinate Economic Development Refunding Revenue Bonds (Peabody Retirement Community Project) Series 2013B authorized to be issued pursuant to the terms and conditions of the Series 2013 Bond Indenture.

"*Series 2013B Subordinate Obligation*" means the Corporation's $20,150,000 Subordinate Series 2013B Note issued under this Master Indenture in substantially the form attached hereto as Exhibit "B-2" as security for the Series 2013B Bonds.

"*Skilled Nursing Units*" means the skilled nursing units included as part of the Facilities, including memory care units.

"**Sources and Uses**" means the schedule of funds, bond proceeds, and other amounts available to the Corporation, and the uses thereof, in each case as of the Closing Date as provided to the Master Trustee and the Bank on the Closing Date.

"**Standard & Poor's**" or "**S&P**" means Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies Inc., a corporation organized and existing under the laws of the State of New York, its successors and assigns, and, if such corporation shall be dissolved or liquidated or shall no longer perform the functions of a securities rating agency, "**Standard & Poor's**" or "**S&P**" shall be deemed to refer to any other nationally recognized securities rating agency designated by the Master Trustee, at the direction of the Obligated Group Agent.

"**Subordinate Obligations**" means (i) the Series 2013B Subordinate Obligation, (ii) any Obligation issued on a parity with the Series 2013B Subordinate Obligation, (iii) any Obligation declared to be a "**Subordinate Obligation**" upon the issuance thereof, and (iv) any Obligation issued to refund or refinance any of the foregoing (each, a "**Subordinate Obligation**").

"**Supplemental Master Indenture**" means an indenture amending or supplementing this Master Indenture entered into pursuant to Article VII hereof.

"**Tax-Exempt Organization**" means a Person organized under the laws of the United States of America or any state thereof that is an organization described in Section 501(c)(3) of the Code, that is exempt from federal income taxes under Section 501(a) of the Code, and is not a "private foundation" within the meaning of Section 509(a) of the Code, or corresponding provisions of federal income tax laws from time to time in effect.

"**Total Cash on Hand**" means Cash and Investments.

"**Town**" means the Town of North Manchester, Indiana, a municipal corporation organized and existing under the laws of the State, and its successors and assigns.

"**Trust Estate**" means the Indenture Trust Estate and all of the right, title, and interest of the Master Trustee in and to any Property on or in which the Master Trustee has been granted a Lien to secure the payment of the Obligations pursuant to any agreement, document, or instrument executed by any Member, including, without limitation, the Mortgages and the Security Agreements.

"**United States Government Obligations**" means non-callable direct obligations of, or obligations the timely payment of the principal of and interest on which is fully guaranteed by, the United States of America, including obligations issued or held in book entry form on the books of the Department of Treasury of the United States of America.

"**Unrestricted Contributions**" means Contributions, including any payment received from an Affiliate of an Obligated Group Member, that are not restricted in any way that would prevent their application to the payment of debt service on Indebtedness of the Person receiving such Contributions.

"**Valuation Date**" means, with respect to any Master Note constituting Capital Appreciation Indebtedness, the date or dates specified in such Master Note or in the supplemental Master Indenture creating such Master Note on which specific Accreted Values are assigned to such Capital Appreciation Indebtedness.

"**Written Request**" means with reference to a Related Issuer, a request in writing signed by the Chairman, Vice Chairman, Mayor, Clerk, President, Vice President, Executive Director, Associate Executive Director, Secretary or Assistant Secretary of the Related Issuer and with reference to any Member means a request in writing signed by the President, any Vice President, Chief Executive Officer, Executive Director, Chief Financial Officer or Treasurer of such Member, or any other officers designated by the Related Issuer or such Member, as the case may be.

**Section 102. Rules of Construction**. The following rules shall apply to the construction of this Master Indenture unless the context otherwise requires:

(a)   Singular words shall connote the plural number as well as the singular and vice versa.

(b)   Unless the context shall otherwise indicate, words importing the singular number shall include the plural and vice versa.

(c)   All accounting terms not otherwise defined herein have the meanings assigned to them in accordance with GAAP. Without limiting the foregoing, all lower case accounting terms set forth in the definitions hereof relating to financial covenants reference line items in the Obligated Group's financial statements, which line items have the meanings assigned to them in accordance with GAAP.  In the event future changes in GAAP require changes in terminology to such line items, the Obligated Group shall provide to the Master Trustee, and the Master Trustee upon receipt thereof shall post or cause to be posted on EMMA, its proposed revision of the applicable definition to make the calculations thereunder, using specified revised line items in the Obligated Group's financial statements, correspond as closely as possible to the intended calculations under the terminology previously in effect, and absent objection from a Majority of the Applicable Holders to the use of such revised line items, calculations performed after the effective date of the applicable change in GAAP and in the Obligated Group's financial statements in accordance with the proposed revision to the applicable definition shall be deemed to be in compliance with the applicable definition.

(d)   Where the character or amount of any asset, liability, or item of income or expense is required to be determined or any consolidation, combination, or other accounting computation is required to be made for the purposes hereof or of any agreement, document, or certificate executed and delivered in connection with or pursuant to this Master Indenture, the same shall be done in accordance with GAAP as then in effect, unless otherwise expressly provided in this Master Indenture or in such other agreement, document, or certificate.

(e)   Words importing the redemption or calling for redemption of Obligations shall not be deemed to refer to or connote the payment of Obligations at their stated maturity.

(f)   All references herein to particular Articles or Sections are references to Articles or Sections of this Master Indenture unless otherwise stated.

(g)   The headings and Table of Contents herein are solely for convenience of reference and shall not constitute a part of this Master Indenture nor shall they affect its meaning, construction or effect.

(h)   All references herein to the payment of Obligations are references to payment of principal of and premium, if any, and interest on Obligations.

(i)   Any reference herein to an officer or member of the Governing Body of a Member shall include those succeeding to their functions, duties or responsibilities pursuant to or by operation of law or who are lawfully performing their functions.

(j)   Provisions calling for or referring to the delivery by each Member of financial statements for any given period shall be deemed satisfied if the combined or consolidated financial statements for such period, prepared in accordance with GAAP, of such entities are so delivered.

<div align="center">*          *          *</div>

Case 13-00076-KCM-11    Doc 00-0    Filed 00/00/00    Entered 00/00/00 00:00:00    Pg 39 of
1 of 1

ARTICLE II

THE OBLIGATIONS

**Section 201. Series, Designation, and Amount of Obligations.** No additional Obligations may be issued after the date hereof under the provisions of this Master Indenture except in accordance with this Article. The total principal amount of Obligations, the number of Obligations, and the series of Obligations that may be created under this Master Indenture are not limited except with respect to the Series 2013 Obligations in Section 208 hereof and as shall be set forth with respect to any other series of Obligations in the Supplemental Master Indenture providing for the issuance thereof. Each series of Obligations, other than the Series 2013 Obligations, shall be issued pursuant to a Supplemental Master Indenture. Each series of Obligations shall be designated so as to differentiate the Obligations of such series from the Obligations of any other series. Unless provided to the contrary in a Supplemental Master Indenture, Obligations shall be issued as fully registered Obligations with the Obligations of each series to be lettered and numbered R-1 and upward.

**Section 202. Payment of Obligations.** The principal of, including Accreted Value, and premium, if any, and interest or other payments on, the Obligations shall be payable in any currency of the United States of America that, at the respective dates of payment thereof, is legal tender for the payment of public and private debts, and such principal, including Accreted Value, premium, if any, and interest shall be payable at the Office of the Master Trustee, or at the office of any alternate Paying Agent or agents named in any such Obligations or in a Related Bond Indenture. Unless contrary provision is made herein or in the Supplemental Master Indenture pursuant to which an Obligation is issued, payment of the interest on the Obligations shall be made to the Person appearing on the Obligation Register as the registered owner thereof and shall be paid by check or draft mailed to the Holder at his, her, or its address as it appears on the Obligation Register or at such other address as is furnished to the Master Trustee in writing by such Holder or, to the extent written wire transfer instructions shall be filed with the Master Trustee prior to the close of business on the fifteenth (15th) day prior to the applicable Interest Payment Date, by wire transfer; provided, however, that any Supplemental Master Indenture creating any Additional Obligation may provide that interest on such Additional Obligation may be paid, upon the request of the Holder of such Additional Obligation, by wire transfer. The Members agree to deposit with the Master Trustee prior to each due date of the principal of, premium, if any, or interest on any of the Obligations a sum sufficient to pay such principal, including Accreted Value, premium, if any, or interest so becoming due. Any such moneys shall upon Written Request and direction of the Obligated Group Agent be invested in Permitted Investments. The Master Trustee shall not be liable or responsible for any loss resulting from any such investments. Supplemental Master Indentures may create such security including debt service reserve funds and other funds as are necessary to provide for payment or to hold moneys deposited for payment or as security for a related series of Additional Obligations.

**Section 203. Execution.** Obligations shall be executed on behalf of a Member by the manual or, if permitted by law, facsimile signature of the Chairman of its Governing Body, its President, or any of its Vice Presidents and shall have impressed or printed by facsimile thereon the corporate seal of such Member, if required by law, which shall be attested by the manual or, to the extent permitted by law, facsimile signature of its Secretary or any of its Assistant Secretaries. In case any officer whose signature or facsimile of whose signature shall appear on the Obligations shall cease to be such officer before the delivery of such Obligations, such signature or such facsimile shall nevertheless be valid and sufficient for all purposes, the same as if he had remained in office until delivery.

**Section 204. Authentication.** No Obligation shall be valid or obligatory for any purpose or entitled to any security or benefit under this Master Indenture unless and until a certificate of authentication on such Obligation substantially in the form set forth below shall have been duly executed by the Master Trustee, and such executed certificate of the Master Trustee upon any such Obligation shall be conclusive evidence that such Obligation has been authenticated and delivered under this Master Indenture. The Master Trustee's certificate of authentication on any Obligation shall be deemed to have been executed by it if signed by an authorized officer or signer of the Master Trustee, but it shall not be necessary that the same officer or signer sign the certificate of authentication on all of the Obligations issued hereunder.

The Master Trustee's authentication certificate shall be in substantially the following form:

## MASTER TRUSTEE'S AUTHENTICATION CERTIFICATE

This _____ - Obligation is one of the Obligations described in the within-mentioned Master Indenture.

_____, as Master Trustee

By : _____
Authorized Officer

**Section 205. Form of Obligations and Temporary Obligations**.

(a) The Series 2013 Obligations shall be substantially in the respective forms set forth in Exhibit "B" hereto. Additional Obligations issued under this Master Indenture shall be substantially in the form set forth in the Supplemental Master Indenture relating to such Additional Obligations, in each case with such appropriate variations, omissions, and insertions as are permitted or required by this Master Indenture or deemed necessary by the Master Trustee to reflect the terms and conditions thereof as established hereby and by such Supplemental Master Indenture. Unless Obligations of a series have been registered under the Securities Act of 1933, as amended, each Obligation of such series shall be endorsed with a legend that shall read substantially as follows: "This Obligation has not been registered under the Securities Act of 1933, as amended."

(b) Obligations of any series may be initially issued in temporary form exchangeable for definitive Obligations of the same series when ready for delivery. The temporary Obligations shall be of such denomination or denominations as may be determined by the Member executing the same, and may contain such reference to any of the provisions of this Master Indenture as may be appropriate. Every temporary Obligation shall be executed by a Member and be authenticated by the Master Trustee upon the same conditions and in substantially the same manner as the definitive Obligations. If any Member issues temporary Obligations, it will execute and furnish definitive Obligations without delay and thereupon the temporary Obligations may be surrendered for cancellation in exchange therefor at the Office of the Master Trustee, and the Master Trustee shall authenticate and deliver in exchange for such temporary Obligations an equal aggregate principal amount of definitive Obligations of the same series and maturity of authorized denominations. Until so exchanged, the temporary Obligations shall be entitled to the same benefits under this Master Indenture as definitive Obligations authenticated and delivered hereunder.

**Section 206. Mutilated, Lost, Stolen, or Destroyed Obligations**. In the event any temporary or definitive Obligation is mutilated, lost, stolen, or destroyed, the Member issuing such Obligation may execute and the Master Trustee may authenticate a new Obligation of like form, date, maturity, and denomination as that mutilated, lost, stolen, or destroyed; provided that, in the case of any mutilated Obligation, such mutilated Obligation shall first be surrendered to the Master Trustee, and in the case of any lost, stolen, or destroyed Obligation, there shall be first furnished to such Member and the Master Trustee evidence of such loss, theft, or destruction satisfactory to such Member and the Master Trustee, together with indemnity satisfactory to them. In the event any such Obligation shall have matured, instead of issuing a duplicate Obligation the Obligated Group may pay the same without surrender thereof. The Obligated Group and the Master Trustee may charge the Holder of such Obligation with their reasonable fees and expenses in this connection.

**Section 207. Registration; Negotiability; Cancellation upon Surrender; Exchange of Obligations**.

(a) Upon surrender for transfer of any Obligation at the Office of the Master Trustee, the Member issuing such Obligation shall execute and the Master Trustee shall authenticate and deliver in the name of the transferee or transferees a new fully registered Obligation or Obligations of the same series, designation, and maturity without coupons for a like aggregate principal amount.

(b) The execution by a Member of any Obligation of any denomination shall constitute full and due authorization of such denomination and the Master Trustee shall thereby be authorized to authenticate and deliver such Obligation.

(c)  The Master Trustee shall not be required to transfer or exchange any Obligation during the period of fifteen (15) days immediately preceding any interest payment date of such Obligation or to transfer or exchange any Obligation after the notice calling such Obligation or portion thereof for redemption has been given as herein provided, or during the period of fifteen (15) days immediately preceding the mailing of such notice of redemption with respect to any Obligation of the same series and maturity.

(d)  As to any Obligation, the Person in whose name the same shall be registered shall be deemed and regarded as the absolute owner thereof for all purposes, and payment of or on account of the principal of any such Obligation shall be made only to or upon the order of the Holder thereof or his, her, or its legal representative, but such registration may be changed as herein provided.  All such payments shall be valid and effectual to satisfy and discharge the liability upon such Obligation to the extent of the sum or sums so paid.

(e)  Any Obligation surrendered for the purpose of payment or retirement or for replacement pursuant to Section 206 hereof shall be canceled upon surrender thereof to the Master Trustee or any Paying Agent.  Unless contrary provision is made in the Supplemental Master Indenture pursuant to which such Obligation is issued, if any Member shall acquire any of the Obligations, such Member shall deliver such Obligations to the Master Trustee for cancellation and the Master Trustee shall cancel the same. Any such Obligations canceled by any Paying Agent other than the Master Trustee shall be promptly transmitted by such Paying Agent to the Master Trustee. Certification of Obligations canceled by the Master Trustee and Obligations canceled by a Paying Agent other than the Master Trustee that are transmitted to the Master Trustee shall be made to the Obligated Group Agent.  Canceled Obligations may be destroyed by the Master Trustee unless instructions to the contrary are received from the Obligated Group Agent.

(f)  The Obligated Group and the Master Trustee may charge each Obligation Holder requesting an exchange, registration, change in registration or transfer of an Obligation any tax, fee or other governmental charge required to be paid with respect to such exchange, registration or transfer.

**Section 208. Issuance of Series 2013 Obligations**. There are hereby authorized to be issued two (2) series of Obligations:

(a) The Obligations to be issued hereunder shall include the Series 2013A Obligation, which shall be designated "The Estelle Peabody Memorial Home of the Synod of Lincoln Trails of the Presbyterian Church (U.S.A.) Series 2013A Note."

(i)  The Series 2013A Obligation is hereby expressly limited to the principal amount of $23,400,000.  The Series 2013A Obligation shall be in the form of a fully registered Note Obligation without coupons, shall be numbered R-1, and shall be dated as of the date of original issuance thereof. The Series 2013A Obligation shall bear interest from its date at a rate or rates equal to the interest accruing on and payable with respect to the Series 2013A Bonds, shall mature on the maturity date of the Series 2013A Bonds and shall be subject to mandatory payment, prepayment, or redemption on each date on which Series 2013A Bonds mature or are required to be paid by mandatory redemption or mandatory purchase, in the amount of the applicable payment required on the applicable Series 2013A Bonds.

(ii)  The Members of the Obligated Group shall have the right to prepay all or a portion of the Series 2013A Obligation as shall be necessary to effect the payment, prepayment, redemption, refunding, or advance refunding of the Series 2013A Bonds secured by the Series 2013A Obligation or any portion thereof in the manner provided in the Series 2013 Bond Indenture.  If called for prepayment or redemption in such events, the Series 2013A Obligation shall be subject to prepayment or redemption in such amount, and at such times, in the manner, and with the premium necessary to effect the refunding, advance refunding, or redemption of all or a portion of the Series 2013A Bonds to be refunded, advance refunded, or redeemed.

(iii)  The Corporation hereby elects to have the Series 2013A Obligation be issuable as a separate series of Obligations only in fully registered form exchangeable solely for another fully registered Obligation of such series.

(iv)   The Series 2013A Obligation shall not be issued until all conditions precedent to the issuance thereof set forth herein shall have been satisfied or waived by the proper party or parties.

(v)      The Corporation shall receive certain credits against its required payments of principal of and interest on the Series 2013A Obligation to the extent set forth in the Series 2013 Bond Loan Agreement.

(vi)     The Series 2013A Obligation shall be an Accelerable Instrument.

(b) The Obligations to be issued hereunder shall include the Series 2013B Subordinate Obligation, which shall be designated "The Estelle Peabody Memorial Home of the Synod of Lincoln Trails of the Presbyterian Church (U.S.A.) Subordinate Series 2013B Note."

(i)      The Series 2013B Subordinate Obligation shall be issued in the original principal amount of $20,150,000. The outstanding principal amount of the Series 2013B Subordinate Obligation shall automatically be increased on the date of any increase in the outstanding principal amount of the Series 2013B Bonds in accordance with the terms hereof and thereof.  Upon request of the Holder of the Series 2013B Subordinate Obligation, the Master Trustee shall reflect the then current outstanding principal amount of the Series 2013B Subordinate Obligation by making an entry on Schedule A thereto.  The Series 2013B Subordinate Obligation shall be in the form of a fully registered Note Obligation without coupons, shall be numbered R-1, and shall be dated as of the date of original issuance thereof.  The Series 2013B Subordinate Obligation shall bear interest from its date at a rate or rates equal to the interest accruing on and payable with respect to the Series 2013B Bonds, shall mature on the maturity date of the Series 2013B Bonds and shall be subject to mandatory payment, prepayment, or redemption on each date on which Series 2013B Bonds mature or are required to be paid by mandatory redemption, in the amount of the applicable payment required on the applicable Series 2013B Bonds.  To the extent that under the terms thereof interest is permitted to accrete to and be added to the principal amount of the Series 2013B Bonds on an interest payment date, such unpaid interest shall accrete to and be added to the principal amount of the Series 2013B Subordinate Obligation and shall bear interest at the rate due on the Series 2013B Subordinate Obligation, all in the same manner and with like effect as the Series 2013B Bonds.

(ii)     The Members of the Obligated Group shall have the right to prepay all or a portion of the Series 2013B Subordinate Obligation as shall be necessary to effect the payment, prepayment, redemption, refunding, or advance refunding of the Series 2013B Bonds secured by the Series 2013B Subordinate Obligation or any portion thereof in the manner provided in the Series 2013 Bond Indenture. If called for prepayment or redemption in such events, the Series 2013B Subordinate Obligation shall be subject to prepayment or redemption in such amount, and at such times, in the manner, and with the premium necessary to effect the refunding, advance refunding, or redemption of all or a portion of the Series 2013B Bonds to be refunded, advance refunded, or redeemed.

(iii)    The Corporation hereby elects to have the Series 2013B Subordinate Obligation be issuable as a separate series of Obligations only in fully registered form exchangeable solely for another fully registered Obligation of such series.

(iv)     The Series 2013B Subordinate Obligation shall not be issued until all conditions precedent to the issuance thereof set forth herein shall have been satisfied or waived by the proper party or parties.

(v)      The Corporation shall receive certain credits against its required payments of principal of and interest on the Series 2013B Subordinate Obligation to the extent set forth in the Series 2013 Bond Loan Agreement.

(vi)     The Series 2013B Subordinate Obligation shall be an Accelerable Instrument; however the circumstances under which the payment of the principal of and/or the interest on the Series 2013B Subordinate Obligation are required are limited in the manner set forth herein and therein.

(c)    Provided that no uncured payment default shall have occurred and be continuing with respect to the Series 2013 Obligations prior to such prepayment, the Corporation shall have the right to prepay all of the Series 2013 Obligations by causing the Early Redemption Amount to be delivered to the Series 2013 Bond Trustee within three (3) calendar years from the Closing Date (such three-year anniversary, the "*Early Redemption Deadline*").  In the event the Corporation shall exercise its right to pay the Early Redemption Amount, the Series 2013 Obligations shall be deemed prepaid in full upon receipt by the Series 2013 Bond Trustee of the Early Redemption Amount. There shall be credited to the Early Redemption Amount the amount of any funds held by the Series 2013 Bond Trustee or the Master Trustee on the Early Redemption Deposit Date (other than amounts, if any, in the Rebate Fund), provided that all funds held by the Master Trustee that are so credited shall be transferred by the Master Trustee to the Series 2013 Bond Trustee on the Early Redemption Deposit Date for the redemption of the Series 2013 Bonds.  The Early Redemption Amount, including all amounts in any Funds held by the Series 2013 Bond Trustee or Master Trustee credited thereto, shall be applied to prepay the Series 2013A Obligation in full at a price equal to 100% of the principal amount thereof, plus accrued interest to the prepayment date, and to prepay the Series 2013B Subordinate Obligation in full at a price equal to the Early Redemption Amount minus the amount necessary to prepay the Series 2013A Obligation, and thereafter no Series 2013 Obligations or Series 2013 Bonds shall remain Outstanding.  After the Early Redemption Deadline through and including the date that is ten (10) years from the Closing Date, the Corporation shall have the right to prepay the Series 2013 Obligations at any time, at a price of 103% of the principal amount thereof (including any accreted interest added to such principal), plus accrued and unpaid interest to the date of prepayment. Thereafter until Maturity, the Corporation shall have the right to prepay the Series 2013 Obligations at any time, at a price of 100% of the principal amount thereof (including any accreted interest added to such principal), plus accrued and unpaid interest to the date of redemption. Notwithstanding the foregoing, in the event of any such prepayment, the amount payable by the Corporation shall be sufficient to effect the redemption of the Bonds in accordance with the terms of the Bond Indenture.

**Section 209. Conditions Precedent to Delivery of Series 2013 Obligations**. The Series 2013 Bond Obligations shall be executed by the Corporation for issuance and delivery to the Master Trustee and thereupon shall be authenticated by the Master Trustee and delivered to the Series 2013 Bond Trustee upon the Corporation's order, but only upon satisfaction of the conditions precedent to the delivery of the Series 2013 Bonds in Section 206 of the Series 2013 Bond Indenture and receipt by the Master Trustee of the following:

(i)    an original Disclosure Statement and an executed original or counterpart of the Series 2013 Bond Indenture, the Series 2013 Bond Loan Agreement and the Series 2013 Tax Agreement;

(ii)    a copy of the Order and the Plan;

(iii)    a copy of the Original Mortgage and an executed original or counterpart of the Amended and Restated Mortgage;

(iv)    an executed original or counterpart of the Second Mortgage;

(v)    evidence of the recording of the Mortgages;

(vi)    an executed original or counterpart of the Security Agreements;

(vii)    evidence of the filing of UCC Filing Statements showing the Corporation as debtor and the Master Trustee as secured party;

(viii)    insurance certificates describing all insurance policies currently in effect with respect to the Facilities and a letter from an Insurance Consultant to the effect that such insurance meets the requirements of Section 407 hereof as of the Closing Date;

(ix)    title policy delivered in connection with the execution and delivery of this Master Indenture satisfactory in form and substance to the Master Trustee;

(x)    [intentionally omitted];

(xi)   the sum of $250,000, for deposit to the Repair and Replacement Fund;

(xii)  a written order as to the delivery of the Series 2013 Bond Obligations to the Series 2013 Bond Trustee signed by an Authorized Officer;

(xiii) a certificate of an Authorized Officer stating that the Corporation is not in default in the performance of any of the covenants, conditions, agreements, or provisions contained in this Master Indenture;

(xiv) a copy of the Management Agreement, including all amendments thereto;

(xv)  an opinion of Bond Counsel in form and substance satisfactory to the Master Trustee and the Corporation;

(xvi) an opinion of Counsel for the Corporation in form and substance satisfactory to the Master Trustee (which opinion shall, without limitation, address the matters described in Section 3.2 of the Series 2013 Bond Loan Agreement);

(xv)  an opinion of Independent Counsel not objected to by the Master Trustee and the Corporation to the effect that registration of the Series 2013 Bond Obligations under the Securities Act of 1933, as amended, is not required; and

(xvi) such further documents, agreement, instruments, or certificates as may be required by the Master Trustee.

**Section 210. Security for Obligations**. Any one or more series of additional Obligations issued hereunder may, so long as any Liens created in connection therewith constitute Permitted Encumbrances, be secured by additional security (including without limitation letters or lines of credit, insurance or Liens on Property, including health care and senior living Facilities of the Obligated Group, or security interests in depreciation reserve, debt service, or interest reserve or debt service or similar funds).  Such additional security need not extend to any other Indebtedness (including any other Obligations or series of Obligations).  Consequently, the Supplemental Master Indenture pursuant to which any one or more series of additional Obligations is issued may provide for such supplements or amendments to the provisions hereof, including without limitation Articles II and V hereof, as are necessary to provide for such additional security and to permit realization upon such security solely for the benefit of the Obligations entitled thereto.

**Section 211. Issuance of Obligations in Forms Other Than Notes; Interest Rate Agreements**.

(a) To the extent that any Indebtedness that is permitted or required to be issued pursuant to this Master Indenture is not evidenced by a promissory note, an Obligation in the form of a promissory note may be issued hereunder and pledged as security for the payment of such Indebtedness in lieu of directly issuing such Indebtedness as an Obligation hereunder.  Nevertheless, the parties hereto agree that Obligations may be issued hereunder to evidence any type of Indebtedness, including without limitation any Indebtedness in a form other than a promissory note.  In addition, any Interest Rate Agreement may be authenticated as an Obligation hereunder.  Consequently, the Supplemental Master Indenture pursuant to which any Obligation is issued may provide for such supplements or amendments to the provisions hereof, including without limitation Articles II and V hereof, as are necessary to permit the issuance of such Obligation hereunder and as are not inconsistent with the intent hereof that, except as otherwise expressly provided herein, all Obligations issued hereunder shall be equally and ratably secured by any Lien created hereunder.

(b) Any Interest Rate Agreement that is authenticated as an Obligation hereunder or any Obligation issued to secure an Interest Rate Agreement shall be equally and ratably secured by any Lien created hereunder with all other Obligations issued hereunder except as otherwise expressly provided herein; provided, however, that any such Obligation shall be deemed Outstanding hereunder solely for the purpose of receiving payment hereunder and shall not be entitled to any other rights hereunder.

**Section 212. Appointment of Obligated Group Agent.** Each Member, by becoming a Member of the Obligated Group, irrevocably appoints The Estelle Peabody Memorial Home of the Synod of Lincoln Trails of the Presbyterian Church (U.S.A.) as its Obligated Group Agent and true and lawful attorney in fact, and grants to such Obligated Group Agent (a) full and exclusive power to execute and deliver such consents, certifications, instruments, and other documents as may be required hereby, including the full and exclusive power to execute and deliver on behalf of the Obligated Group and each Member thereof all Obligations and Supplemental Master Indentures; and (b) full power to take all actions, prepare, authorize, and execute all documents and instruments reasonably and ordinarily necessary or by the Obligated Group Agent deemed desirable in connection with the issuance of any Obligations. The Obligated Group Agent shall designate a person authorized, or persons either of whom shall be authorized, to act on behalf of the Obligated Group Agent by written certificate furnished to the Master Trustee, containing the specimen signature or signatures of such person or persons and signed on behalf of the Obligated Group Agent by the President or Chairman of the Board of Directors of the Obligated Group Agent. Such certificate or any subsequent or supplemental certificate so executed may designate an alternate or alternates.

**Section 213. Book Entry.** Reserved.

<div align="center">*      *      *</div>

Case 13-00976-KM Doc 46200 Filed 08/29/14 Entered 08/29/14 14:34:43 Main Document
Pg 104 of 409

## ARTICLE III

### PREPAYMENT OR REDEMPTION OF OBLIGATIONS

**Section 301. Prepayment or Redemption Dates and Prices**.

(a) Obligations shall be subject to optional and mandatory prepayment or redemption in whole or in part and may be prepaid or redeemed prior to maturity at the times and upon the terms as provided therein, in this Master Indenture, or in the Supplemental Master Indenture pertaining to the series of Obligations to be prepaid or redeemed, but not otherwise.

(b) Unless contrary provision is made in the Supplemental Master Indenture pursuant to which a series of Obligations is issued, the Obligations are prepayable prior to maturity in the event of damage to or destruction of the Facilities of any Member of the Obligated Group or any part thereof or condemnation or sale consummated under threat of condemnation of such Facilities or any part thereof, from the Net Proceeds of insurance (other than Net Proceeds of business interruption or similar insurance), condemnation, or sale received in connection therewith permitted or required to be applied to such prepayment pursuant to Section 411 or Section 412 hereof, to the extent of available funds in the following order of priority to:

    *(i)* ***First***, to the prepayment or redemption of the Senior Obligations *pari passu*, with the amount paid by the Corporation for the prepayment or redemption of the Senior Obligations applied *pro rata* based on the principal amounts of the Senior Obligations then Outstanding until the Senior Obligations are no longer Outstanding; and

    *(ii)* ***Second***, to the prepayment of redemption of the Subordinate Obligations *pari passu*, with the amount paid by the Corporation for the prepayment of the Subordinate Obligations applied pro rata based on the principal amount, including Accreted Value, of the Subordinate Obligations then Outstanding.

Any such prepayment shall occur upon direction of the Obligated Group to the Master Trustee, which direction shall be provided no later than the date specified in Section 411 or 412 hereof, as applicable, on which the application of the applicable Net Proceeds to such redemption is required, at the principal amount thereof, plus accrued interest to the date fixed for redemption and without premium.

(c) To the extent not otherwise provided herein or in a Supplemental Master Indenture, the Obligated Group shall have the right to prepay or redeem all or such portion of the Obligations of any particular series as shall be necessary to effect the payment, prepayment, redemption, refunding, or advance refunding of the series of Related Bonds secured by such Obligations or any portion thereof in the manner provided in the Related Bond Indenture. If called for prepayment or redemption in such events, the Obligations of such series shall be subject to prepayment or redemption in such amount, and at such times, in the manner and with the premium necessary to effect the refunding, advance refunding or redemption of all or the portion of the series of Related Bonds to be refunded, advance refunded or redeemed.

(d)    As set forth in Section 208(c), the Series 2013 Bond Obligations are subject to prepayment in accordance with the terms of such Section 208(c) and as further provided in the Bond Indenture in respect of the Series 2013 Bonds.

**Section 302. Notice of Prepayment or Redemption**. Except as permitted by Section 301 above or unless contrary provision is made with respect to a particular series of Additional Obligations in the Supplemental Master Indenture pursuant to which such Obligations are issued, notice of the call for any such prepayment or redemption identifying the Obligations to be prepaid or redeemed shall be given by mailing a copy of such notice by first class mail, postage prepaid to the Holder of Obligations to be prepaid or redeemed to the address shown on the Obligation Register not less than thirty (30) days prior to the prepayment or redemption date; provided, however, that (i)_in the case of a prepayment prior to the Early Redemption Deadline described in Section 208(c), such notice shall be given by telephone communication from the Corporation to the Master Trustee and the Series 2013 Bond Trustee at least fourteen (14) days prior to the Early Redemption Deposit Date, and followed up by email notice to the Master Trustee and Series 2013 Bond Trustee on the same day as telephone notice is given  and by mailing on the same day a copy of

such notice by first class mail, postage prepaid to the Series 2013 Bond Trustee and (ii) failure to give any notice required in this Section 302 by mailing or a defect in the notice or the mailing to any particular Obligation Holder will not affect the validity of the prepayment or redemption of any other Obligation and that no notice shall be required in connection with any prepayment or redemption of an Obligation corresponding to a mandatory payment, purchase, or redemption of Related Bonds secured by the applicable Obligation or to an optional redemption of Related Bonds for which a redemption notice has been given in accordance with the applicable Related Bond Indenture.

**Section 303. Partial Prepayment or Redemption of Obligations.** (a) Upon surrender of any Obligation for prepayment or redemption in part only, the Member issuing such Obligation shall execute and the Master Trustee shall authenticate and deliver to the Holder thereof, at the expense of the Obligated Group, a new registered Obligation or Obligations of the same series and maturity of authorized denominations in aggregate principal amount equal to the unpaid portion of the Obligation surrendered. Such Member and the Master Trustee may agree with any Holder of any Obligation that such Holder may, in lieu of surrendering the same for a new registered Obligation, endorse on such Obligation a notice of such partial prepayment or redemption to be made on the following form which shall be typed or printed on the reverse side of, or attached to, such Obligation:

PAYMENTS ON ACCOUNT OF PRINCIPAL OR ACCRETED VALUE

| Payment Date | Balance of Principal Amount or Accreted Value | Amount Outstanding Remaining | Signature |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

(b) Such partial prepayment or redemption shall be valid upon payment of the amount thereof to the Holder of any such registered Obligation and the Obligated Group and the Master Trustee shall be fully released and discharged from all liability to the extent of such payment irrespective of whether such endorsement shall or shall not have been made upon the reverse of such Obligation by the Holder thereof and irrespective of any error or omission in such endorsement.

**Section 304. Effect of Call for Prepayment or Redemption.** On the date designated for prepayment or redemption by notice given as herein provided, the Obligations so called for prepayment or redemption shall become and be due and payable at the prepayment or redemption price provided for prepayment or redemption of such Obligations on such date. If on the date fixed for prepayment or redemption moneys for payment of the prepayment or redemption price and accrued interest are held by the Master Trustee or any other Paying Agent as provided herein, interest on such Obligations so called for prepayment or redemption shall cease to accrue, such Obligations shall cease to be entitled to any benefit or security hereunder except the right to receive payment from the moneys held by the Master Trustee or the Paying Agents, and the amount of such Obligations so called for prepayment or redemption shall be deemed paid and no longer Outstanding.

<center>*     *     *</center>

<center>III-2</center>

## ARTICLE IV

### REPRESENTATIONS AND WARRANTIES; GENERAL COVENANTS

**Section 401. Payment of Principal, Premium, If Any, and Interest**. Each Member unconditionally and irrevocably (subject to the right of such Member to cease its status as a Member of the Obligated Group pursuant to the terms and conditions of Section 405 hereof), jointly, and severally covenants that it will promptly pay the principal, including Accreted Value, of, premium, if any, and interest on, every Obligation issued under this Master Indenture at the place, on the dates, and in the manner provided herein and in said Obligations according to the true intent and meaning thereof. Notwithstanding any schedule of payments upon the Obligations set forth herein or in the Obligations, each Member unconditionally and irrevocably (subject to the right of such Member to cease its status as a Member of the Obligated Group pursuant to the terms and conditions of Section 405 hereof), jointly and severally agrees to make payments upon each Obligation and be liable therefor at the times and in the amounts (including principal, including Accreted Value, interest, and premium, if any) equal to the amounts to be paid as interest, principal at maturity or by mandatory sinking fund redemption, or premium, if any, upon any Related Bonds from time to time Outstanding.

**Section 402. Performance of Covenants**. Each Member covenants that it will faithfully perform at all times any and all covenants, undertakings, stipulations, and provisions contained in this Master Indenture and in each and every Obligation executed, authenticated, and delivered hereunder.

**Section 403. Representations and Warranties by the Initial Member**. The Initial Member makes the following representations and warranties as the basis for its covenants herein:

(a) It is a non-profit corporation duly incorporated under the laws of the State of Indiana, duly authorized to conduct its business and affairs in the State of Indiana, is duly authorized and has full power under the laws of the State of Indiana and all other applicable provisions of law and its articles of incorporation and by-laws to create, issue, enter into, execute, and deliver or approve, to the extent it is a party thereto as applicable, this Master Indenture, the Series 2013 Obligations, the Security Agreements and the Mortgages and all action on its part necessary for the valid execution and delivery of this Master Indenture, the Security Agreements and the Mortgages, and the valid creation, issuance, and delivery of the Series 2013 Obligations, has been duly and effectively taken; and the Series 2013 Obligations in the hands of the Holders thereof will be the legal and valid obligations of the Members of the Obligated Group.

(b) The execution and delivery of the Series 2013 Obligations, the Security Agreements, the Mortgages, and this Master Indenture, the consummation of the transactions contemplated hereby, and the fulfillment of the terms and conditions hereof do not and will not conflict with or result in a breach of any of the terms or conditions of any corporate restriction or of any agreement or instrument to which it is now a party, and do not and will not constitute a default under any of the foregoing, or result in the creation or imposition of any Lien of any nature upon any of its Property except for Permitted Encumbrances. It has good and marketable fee simple title to all of its Property constituting real property other than that which it leases in which case it has a valid leasehold estate in the real property demised by each such lease and good and marketable title to all of its other Property, in all cases, free and clear of all Liens except for Permitted Encumbrances. The easements, rights-of-way, liens, encumbrances, covenants, conditions, restrictions, exceptions, minor defects, irregularities of title, and encroachments on adjoining real estate, if any, now existing with respect to its Property do not and will not in the aggregate materially adversely affect the value of the Property currently affected thereby, materially impair the same, or materially impair or materially interfere with the operation and usefulness thereof for the purpose for which it was acquired or is held by it. Its Property (including the Project) does not violate, in any material respect, any applicable zoning, land use, environmental, or similar law or restriction. The recitals of fact and statements contained in this Master Indenture and in each Related Loan Document are or, in the case of Related Loan Documents entered into in the future, will be true.

(c) It has all necessary licenses and permits required to occupy and operate its Facilities (including the Project) in accordance with its current uses.

(d)  It is a Tax-Exempt Organization, and it does not have any "unrelated business taxable income" as defined in Section 512 of the Code that could have a material adverse effect on its status as a Tax-Exempt Organization or that, if such income were subject to federal income taxation, would have a material adverse effect on its condition, financial or otherwise.

(e)  It has not heretofore engaged in, and the consummation of the transactions herein provided for and compliance by it with the provisions of this Master Indenture and the Obligations issued hereunder will not involve, to the extent applicable, any prohibited transaction within the meaning of ERISA or Section 4975 of the Code.  No ERISA Plans maintained by it, if any, and no trusts created thereunder, have incurred any "accumulated funding deficiency" as defined in Section 302 of ERISA and the present value of all benefits vested under all ERISA Plans, if any, did not exceed, as of the last annual valuation date the value of the assets of the ERISA Plans allocable to such vested benefits.

(f)  The Corporation has full power and lawful authority to enter into and maintain a security agreement under the Uniform Commercial Code of the state in which it operates and grant a security interest to the Master Trustee in the Indenture Trust Estate, and will preserve, warrant, and defend the same unto the Master Trustee against the claims of all persons and parties.

(g)  There is no pending litigation, action, proceeding, or investigation before any government or political subdivision, or any agency, authority, commission, department or instrumentality of either, or any court, tribunal, central bank or arbitrator against or directly involving any Obligated Group Member, and, to the best of the Obligated Group Agent's knowledge, there is no threatened action, proceeding, or investigation affecting any Obligated Group Member before any such Governmental Authority that, in any case, may materially and adversely affect (i) the financial condition or operations of any Obligated Group Member or the Facilities or (ii) the validity or enforceability of any of this Master Indenture or any of the Obligation issued hereunder.

(h)  Each Member of the Obligated Group:

(i)  will be operated solely for the purpose of directly acquiring, holding, developing, using, operating, and financing, refinancing, managing, leasing, or selling the Facilities or any part thereof;

(ii)  does not engage in any business unrelated to the Facilities and the activities set forth in subparagraph (i) above;

(iii)  does not and will not have any assets other than those related to its ownership interest in the Facilities or the operation, management, and financing thereof;

(iv)  maintains its own separate books and records and its own accounts, in each case that are separate and apart from the books and records and accounts of any other Person, including any other Obligated Group Member or Affiliate thereof;

(v)  holds itself out as being an entity, separate and apart from any other Person, including any other Obligated Group Member or any Affiliate thereof;

(vi)  does not commingle its funds or assets with those of any Person, including any other Obligated Group Member or any Affiliate thereof;

(vii)  conducts its own business in its own name or under the name "Peabody Retirement Community;"

(viii)  maintains separate tax returns and financial statements, or if part of a consolidated group, then (A) the Corporation is shown as a separate member of such group and (B) the consolidated financial statements are appropriately footnoted to show that the Corporation is not liable or responsible in any manner for the debts or liabilities of any other Obligated Group Member or any Affiliate thereof;

(ix)  pays its own liabilities out of its own funds;

(x)    observes all applicable corporate formalities, including holding regular meetings of its board of directors;

(xi)    pays the salaries of its own employees, if any, and maintains a sufficient number of employees, if any, in light of its contemplated business operations;

(xii)    does not guarantee or otherwise obligate itself with respect to the debts of any other Person or hold out its credit as being available to satisfy the obligations of any other Person, including any other Obligated Group Member or any Affiliate thereof;

(xiii)    allocates fairly and reasonably shared expenses, including, without limitation, any overhead for shared office space, if any;

(xiv)    uses separate stationery, invoices, and checks;

(xv)    does not (A) pledge its assets for the benefit of any other Person, including any other Member of Obligated Group or any Affiliate or (B) make any loans or advances to any other such Person;

(xvi)    maintains adequate capital in light of its contemplated business operations; and

(xvii)    maintains its assets in such a manner that it is not more costly or difficult to segregate, identify or ascertain such assets.

(i)    No Obligated Group Member, nor, to the best of the Obligated Group Agent's knowledge (after due inquiry and investigation), any Persons holding any legal or beneficial interest whatsoever in any Obligated Group Member (whether directly or indirectly) (i) appear on the OFAC SDN List; (ii) are included in, owned by, controlled by, acting for or on behalf of, providing assistance, support, sponsorship, or services of any kind to, or otherwise associated with any of the Persons referred to or described in the OFAC SDN List; or (iii) have conducted business with or engaged in any transaction with any Person named on any OFAC SDN List or any Person included in, owned by, controlled by, acting for or on behalf of, providing assistance, support, sponsorship, or services of any kind to, or otherwise associated with any of the Persons referred to or described in the OFAC SDN List.

(j)    Since the most current date on which the any Obligated Group Member has supplied information, financial or otherwise, to any Required Information Recipient:

(i)    there has been no change in the assets, liabilities, financial position, marketing position, or results of operations of any Obligated Group Member that constitute a Material Adverse Effect;

(ii)    except for the Series 2013 Obligations, no Obligated Group Member has incurred any obligations or liabilities that would have a Material Adverse Effect; and

(iii)    except for the Series 2013 Obligations, Permitted Indebtedness or trade accounts payable arising in the ordinary course of any Obligated Group Member's business that are not, based upon commercial terms customary for the Obligated Group Member, overdue, no Obligated Group Member has incurred any material Indebtedness, and has not guaranteed the obligations of any other Person.

## Section 404. Entrance into the Obligated Group.

(a)    As of the date of execution of this Master Indenture, the Corporation is the only Member of the Obligated Group.  Any other Person may become a Member of the Obligated Group if:

(i)    Such Person shall execute and deliver to the Master Trustee a Supplemental Master Indenture not objected to by the Master Trustee that shall be executed by the Master Trustee and the Obligated Group Agent, containing (A) the agreement of such Person (1) to become a Member of the Obligated Group and thereby to become subject to compliance with all provisions of this Master Indenture and (2) unconditionally and irrevocably (subject to the right of such Person to cease its status

as a Member of the Obligated Group pursuant to the terms and conditions of Section 405 hereof) to jointly and severally make payments upon each Obligation at the times and in the amounts provided in each such Obligation and (B) representations and warranties by such Person substantially similar to those set forth in Section 403 hereof other than those contained in Section 403(d) hereof if such Person is not a Tax-Exempt Organization;

(ii)    The Obligated Group Agent, by appropriate action of its Governing Body, shall have approved the admission of such Person to the Obligated Group, and each of the other Members shall have taken such action, if any, required to approve the admission of such Person to the Obligated Group;

(iii)   The Master Trustee shall have received (A) the consent of a Majority of the Holders, (B) an opinion of Independent Counsel in form and substance not objected to by the Master Trustee to the effect that (1) the instrument described in paragraph (i) above has been duly authorized, executed, and delivered and constitutes a legal, valid, and binding agreement of such Person, enforceable in accordance with its terms, subject to customary exceptions for bankruptcy, insolvency and other laws generally affecting enforcement of creditors' rights and application of general principles of equity and to the exceptions set forth in Exhibit "C" hereto and (2) the addition of such Person to the Obligated Group will not adversely affect the status as a Tax-Exempt Organization of any Member that otherwise has such status, and (C) if all amounts due or to become due on all Related Bonds have not been paid to the Holders thereof and provision for such payment has not been made in such manner as to have resulted in the defeasance of all Related Bond Indentures, an Opinion of Bond Counsel to the effect that under then existing law the addition of such Person to the Obligated Group, whether or not contemplated on the date of delivery of any such Related Bond, would not adversely affect the validity of any Related Bond or any exemption from federal or state income taxation of interest payable on such Bond otherwise entitled to such exemption; and

(iv)   (A) Exhibit "A" to this Master Indenture is amended to include a description of the real property of the Person becoming a Member upon which the primary operations of such Person are conducted and a description of any Permitted Encumbrances of the type described in paragraph (xx)(b) of the definition thereof, (B) the definition of Excluded Property is amended to include a description of the Property of the Person becoming a Member that is to be considered Excluded Property (provided that such Property may be treated as Excluded Property only if such Property is real or tangible personal property and the primary operations of such Person are not conducted upon such real property), (C) Exhibit "D" is amended to add such Person as a Member, and (D) the definition of Funded Indebtedness shall have been amended to include Indebtedness of such Person and/or any other Indebtedness if and as required to obtain the consent of a Majority of the Holders under subsection (iii)(A) hereof; and

(b) Each successor, assignee, surviving, resulting, or transferee corporation of a Member must agree to become, and satisfy the above-described conditions to becoming, a Member of the Obligated Group prior to any such succession, assignment, or other change in such Member's corporate status.

**Section 405. Cessation of Status as a Member of the Obligated Group.** (a) Each Member covenants that it will not take any action, corporate or otherwise, that would cause it or any successor thereto into which it is merged or consolidated under the terms of this Master Indenture to cease to be a Member of the Obligated Group unless:

(i)    the Member proposing to withdraw from the Obligated Group is not a party to any Related Loan Documents with respect to Related Bonds that remain Outstanding;

(ii)   prior to cessation of such status, there is delivered to the Master Trustee an Opinion of Bond Counsel to the effect that, under then existing law, the cessation by the Member of its status as a Member will not adversely affect the validity of any Related Bond or any exemption from federal or state income taxation of interest payable thereon to which such Bond would otherwise be entitled;

(iii)  the Master Trustee shall have received the consent of a Majority of the Holders to the cessation of such status;

(iv) prior to such cessation there is delivered to the Master Trustee an opinion of Independent Counsel (which Independent Counsel and opinion are not objected to by the Master Trustee) to the effect that the cessation by such Member of its status as a Member will not adversely affect the status as a Tax-Exempt Organization of any Member that otherwise has such status; and

(v) prior to cessation of such status, the Obligated Group Agent consents in writing to the withdrawal by such Member.

(b) Upon such cessation in accordance with the foregoing provisions, (i) Exhibit "A" hereto shall be amended to delete therefrom the description of any real property and of any Permitted Encumbrances of the type described in paragraphs (xx) and (xxi) of the definition of Permitted Encumbrances of the Member that has ceased being a Member of the Obligated Group, (ii) the definition of Excluded Property shall be amended to delete therefrom any Property of the Member that has ceased being a Member, (iii) Exhibit "D" shall be amended to delete therefrom the name of such Person, and (iv) the Master Trustee shall be authorized to release any mortgage held by the Master Trustee upon the Property of such Member that has ceased being a Member of the Obligated Group.

**Section 406. Covenants as to Corporate Existence, Maintenance of Properties, and Similar Matters; Right of Contest**.

(a) Each Member hereby covenants to:

(i) Except as otherwise expressly provided herein (A) preserve its corporate or other separate legal existence, (B) preserve all its rights and licenses to the extent necessary or desirable in the operation of its business and affairs, and (C) be qualified to do business and conduct its affairs in each jurisdiction where its ownership of Property or the conduct of its business or affairs requires such qualification; provided, however, that nothing in this Master Indenture contained shall be construed to obligate such Member to retain, preserve or keep in effect the rights, licenses, or qualifications no longer used or, in the judgment of its Governing Body, useful in the conduct of its business.

(ii) With respect to any Member that is, on the date it becomes a Member, a non-profit corporation, maintain its status as a non-profit corporation throughout the term of this Master Indenture unless (A) the Governing Body determines that such status is not necessary or useful, and (B) prior to the cessation of such status there is delivered to the Master Trustee (1) an Opinion of Bond Counsel addressed to the Master Trustee and each Related Bond Trustee to the effect that such change in status will not have an adverse effect on the exemption of interest on any Related Bond from federal income taxation to which such Bond is otherwise entitled or the validity or enforceability of any Related Bond, and (2) an opinion of Independent Counsel not objected to by the Master Trustee to the effect that registration of the Obligations under the Securities Act of 1933, as amended, is not required or that such Obligations have been so registered.

(iii) At all times use its Facilities only in furtherance of its lawful corporate purposes and cause its business to be carried on and conducted and its Property and each part thereof to be maintained, preserved, and kept in good repair, working order, and condition and in as safe condition as its operations will permit and make all necessary and proper repairs (interior and exterior, structural and non-structural, ordinary as well as extraordinary and foreseen as well as unforeseen), renewals, and replacements thereof so that its operations and business shall at all times be conducted in an efficient, proper, and advantageous manner; provided, however, that nothing herein contained shall be construed (A) to prevent it from ceasing to operate any portion of its Property, if in its reasonable judgment (evidenced, in the case of such a cessation other than in the ordinary course of business, by a determination by its Governing Body) it is advisable not to operate the same, or if it intends to sell or otherwise dispose of the same and within a reasonable time endeavors to effect such sale or other disposition, or (B) to obligate it to retain, preserve, repair, renew, or replace any Property, leases, rights, privileges, or licenses no longer used or, in the judgment of its Governing Body, useful in the conduct of its business, provided that the loss of such Property, leases, rights, privileges, or licenses will not materially impair the value of the Facilities. Notwithstanding the foregoing, the Obligated Group may make such replacements, additions, modifications, and improvements to the Facilities subject to the conditions that no building or buildings shall be demolished or removed nor

IV-5

shall any alteration to the Facilities be made that would substantially impair the structural strength, utility, or market value thereof without in each case the prior written consent of the Master Trustee and that all alterations to the Facilities shall be located wholly within the boundary lines of the Land and shall become a part of the Mortgaged Property.

(iv)  Pay or cause to be paid: (A) all taxes, levies, assessments and charges on account of the use, occupancy or operation of its Property, including but not limited to all sales, use, occupation, real and personal property taxes, all permit and inspection fees, occupation and license fees and all water, gas, electric, light, power or other utility charges assessed or charged on or against its Property or on account of its use or occupancy thereof or the activities conducted thereon or therein; and (B) all taxes, assessments, and impositions, general and special, ordinary and extraordinary, of every name and kind, that shall be taxed, levied, imposed, or assessed during the term of this Master Indenture upon all or any part of its Property, or its interest or the interest of any Related Issuer or either of them in and to its Property, or upon its interest or the interest of any Related Issuer or the interest of either of them in this Master Indenture or the amounts payable hereunder or under the Obligations. If under Applicable Law any such tax, levy, charge, fee, rate, imposition or assessment may at the option of the taxpayer be paid in installments, any Member may exercise such option.

(v)  Not create or permit to be created or remain and, at its cost and expense, promptly discharge or terminate all Liens on its Property or any part thereof which are not Permitted Encumbrances.

(vi)  At its sole cost and expense, promptly comply with all present and future laws, ordinances, orders, decrees, decisions, rules, regulations, and requirements of every duly constituted Governmental Authority and the officers thereof that may be applicable to it or any of its affairs, business, operations, and Property, any part thereof, any of the streets, alleys, passageways, sidewalks, curbs, gutters, vaults, and vault spaces adjoining any of its Property or any part thereof or to the use or manner of use, occupancy, or condition of any of its Property or any part thereof.

(vii)  Promptly pay or otherwise satisfy and discharge all of its obligations and Indebtedness and all demands and claims against it as and when the same become due and payable that if not so paid, satisfied or discharged would constitute an Event of Default under Section 502(a)(v) hereof.

(viii)  At all times comply with all terms, covenants, and provisions of any Liens at such time existing upon its Property or any part thereof or securing any of its Indebtedness.

(ix)  Procure and maintain all necessary licenses and permits and use its best efforts to maintain the status of its health care Facilities (other than those not currently having such status or not having such status on the date a Person becomes a Member hereunder) as providers of health care services eligible for payment under those third-party payment programs that its Governing Body determines are appropriate.

(x)  In the case of the Corporation and each Member that is a Tax-Exempt Organization at the time it becomes a Member, so long as this Master Indenture shall remain in force and effect and so long as all amounts due or to become due on all Related Bonds shall not have been fully paid to the Holders thereof or provision for such payment shall not have been made, to take no action or suffer any action to be taken by others, including any action that would result in the alteration or loss of its status as a Tax-Exempt Organization, that could result in any such Related Bond being declared invalid or result in the interest on any Related Bond, that is otherwise exempt from federal or state income taxation, becoming subject to such taxation.

(xi)  Operate all of its Facilities so as not to discriminate on a legally impermissible basis.

(xii)  In the case of the Corporation and each Member that is a Tax-Exempt Organization at the time it becomes a Member, not distribute any of its revenues, income, or profits, whether realized or unrealized, to any of its members, directors, or officers or allow the same to inure to the benefit of any private Person, other than for the lawful corporate purposes of such Member, as the case may be; provided, further, that no

such distribution shall be made that is not permitted by the legislation pursuant to which such Member is governed or that would result in the loss or alteration of its status as a Tax-Exempt Organization.

(b)  The foregoing notwithstanding, any Member may (i) cease to be a non-profit corporation, (ii) take actions that could result in the alteration or loss of its status as a Tax-Exempt Organization or (iii) distribute its revenues, income, or profits to any of its members, directors, or officers or allow the same to inure to the benefit of a private Person if (A) prior thereto there is delivered to the Master Trustee an Opinion of Bond Counsel to the effect that such actions would not adversely affect the validity of any Related Bond, the exemption from federal or state income taxation of interest payable on any Related Bond otherwise entitled to such exemption, or adversely affect the enforceability in accordance with its terms of this Master Indenture against any Member and (B) after such action the Obligated Group could meet the conditions described in Section 416(a)(i) hereof for the incurrence of one dollar of additional Funded Indebtedness.

(c)  For the purposes of this Section 406 (other than paragraph (a)(v) hereof), the terms Property and Facilities shall be deemed to include Excluded Property.

(d)  No Member shall be required to pay any tax, levy, charge, fee, rate, assessment, or imposition referred to herein above, to remove any Lien required to be removed under this Section, pay or otherwise satisfy and discharge its obligations, Indebtedness (other than Indebtedness evidenced or secured by Obligations), demands and claims against it or to comply with any Lien, law, ordinance, rule, order, decree, decision, regulation, or requirement referred to in this Section, so long as such Member shall contest, in good faith and at its cost and expense, in its own name and behalf, the amount or validity thereof, in an appropriate manner or by appropriate proceedings that shall operate during the pendency thereof to prevent the collection of or other realization upon the tax, levy, charge, fee, rate, assessment, imposition, obligation, Indebtedness, demand, claim, or Lien so contested, and the sale, forfeiture, or loss of its Property or any part thereof, provided, that (i) no such contest shall subject any Related Issuer, any Obligation Holder or the Master Trustee to the risk of any liability and (ii) if so requested by the Master Trustee, as a condition to the deferral of any such payment during such contest, the Member shall cause to be provided to the Master Trustee an Adequate Reserve. While any such matters are pending, such Member shall not be required to pay, remove or cause to be discharged the tax, levy, charge, fee, rate, assessment, imposition, obligation, Indebtedness, demand, claim, or Lien being contested, unless such Member agrees to settle such contest and payments under such settlement agreement are deemed to be due and payable. Each such contest shall be promptly prosecuted to final conclusion (subject to the right of such Member engaging in such a contest to settle such contest), and in any event the Member will save all Related Issuers, all Related Bond Trustees, all Obligation Holders, and the Master Trustee harmless from and against all losses, judgments, decrees, and costs (including attorneys' fees and expenses in connection therewith) as a result of such contest and will, promptly after the final determination of such contest or settlement thereof, pay and discharge the amounts that shall be levied, assessed, or imposed or determined to be payable therein, together with all penalties, fines, interests, costs, and expenses thereon or incurred in connection therewith. The Member engaging in such a contest shall give the Master Trustee prompt written notice of any such contest. Each Member hereby waives, to the extent permitted by law, any right that it may have to contest (i) any Obligation issued for the benefit of another Member or (ii) any Obligation issued to secure or in connection with Related Bonds.

(e)  If the Master Trustee shall notify such Member that, in the opinion of Independent Counsel, by nonpayment of any of the foregoing items the Property of such Member or any substantial part thereof will be subject to imminent loss or forfeiture, then such Member shall promptly pay all such unpaid items and cause them to be satisfied and discharged.

**Section 407. Insurance**.

(a)  *Required Coverage*. The Obligated Group shall maintain, or cause to be maintained, insurance under policies issued on an occurrence basis and otherwise of such type and in such amounts or in excess of such amounts as are customarily carried by, and insure against such risks as are customarily insured against by, businesses of like size and character to the Members; provided that in no case is such insurance coverage to be in an amount less than that specified below:

(i)    "All Risk" or "Special form" insurance against loss and/or damage to the Mortgaged Property under a policy or policies covering such risks as are ordinarily insured against with respect to similar facilities, including without limiting the generality of the foregoing, fire, lightning, windstorm, hail, flood (if required under subparagraph (ix) below), earthquake, explosion, riot, riot attending a strike, civil commotion, damage from aircraft, vehicle, or smoke and uniform standard extended coverage and vandalism, malicious mischief, and ordinance law endorsements including boiler coverages and machinery coverage. Such insurance shall be in an amount not less than the full insurable replacement value of the Mortgaged Property, with a deductible amount of not more than $100,000. No policy of insurance shall be so written that the proceeds thereof will produce less than the minimum coverage required by the preceding sentence, by reason of co-insurance provisions or otherwise, without the prior written consent of the Master Trustee. The term "full insurable replacement value" means the actual replacement cost of the Mortgaged Property, including demolition that is required to rebuild and increased cost of construction endorsements. During construction, this coverage may be provided as part of the builder's all risk coverage required under subparagraph (viii) below.

(ii)    Use and occupancy (or business interruption) insurance, covering interruption of the Obligated Group's operations in whole or in part by reason of the total or partial suspension of, or interruption in, the operation of the Mortgaged Property, including its construction or rental of buildings, caused by the damage to or destruction of any part of the Mortgaged Property caused by any of the perils described in subparagraph (i) above, with such exceptions as are customarily imposed by insurers, in an amount sufficient to pay the interest component of debt service, taxes (or payments in lieu of taxes), and other fixed charges and other necessary continuing expenses for a period of at least twelve (12) months.

(iii)    Commercial general public liability insurance (excluding professional liability coverage as provided in subparagraph (viii) below), including blanket contractual liability and bodily injury liability and automobile liability insurance, in an occurrence form, protecting the Obligated Group against liability for injuries to persons and property with a combined single limit of liability coverage not less than $1,000,000 per occurrence and $1,500,000 annual aggregate with a deductible not to exceed $100,000.

(iv)    Automobile liability insurance, including hired and non-owned coverage, in an occurrence form, in the minimum amount of $1,000,000 bodily injury and property damage combined single limit and aggregate where applicable, with a deductible not to exceed $100,000.

(v)    Excess liability coverage in the amount of at least either straight excess or umbrella excess, covering excess of subparagraphs (iii), (iv), and (x) of this subsection to be maintained in force so that the total coverage available under each of the aforementioned subsections, including this subsection, is not less than $5,000,000 per occurrence and in the aggregate, where applicable, as excess of employer's liability, general liability, professional liability and automobile liability coverage, provided that the Obligated Group need not maintain such coverage if an Insurance Consultant states in writing that such coverage is not available, not available at reasonable rates, or is unfeasible for some other reason, but states that the insurance the Obligated Group is maintaining is customary in the case of corporations engaged in the same or similar activities and similarly situated and is adequate to protect the Obligated Group's Property and operations.

(vi)    Workers' compensation insurance or qualification as a self-insurer under the laws of the State respecting all employees of the Obligated Group and all persons engaged in work on the Mortgaged Property, in such amount as is customarily carried by like organizations engaged in like activities of comparable size and liability exposure.

(vii)    Fidelity insurance or bonds in an amount not less than $250,000 on those of its officers, managers, and employees (including leased or temporary employees) who handle funds of the Obligated Group.

(viii)    Commencing on the date of execution of a construction contract with respect to any additions to or restorations, replacements or modifications of the Mortgaged Property, until the completion date of such other construction, carry, or cause the contractor to carry, builder's all risk completed value

insurance to the extent of the full replacement value of such portions of the Mortgaged Property, in non-reporting form for and with extended coverage endorsement then in use in the State, and covering all physical loss or damage, including by vandalism and malicious mischief for the following: soft costs, delayed completion, loss of earnings/rents and physical damage for "all risks of physical loss" affecting the building or structure; materials and supplies owned by the insured with a full installation floater; foundations; temporary structures (scaffolding, construction forms, etc.); fixtures, materials and equipment to service the building or intended to become a permanent part of the building.

(ix)    Either (A) flood insurance in the lesser amount of (1) the aggregate outstanding principal amount of the Obligations and (2) the maximum amount of flood insurance available, or (B) a certification from the Insurance Consultant that no portion of the Mortgaged Property is located in an area having "Special Flood Hazards" as that term is used in the Flood Disaster Protection Act of 1973, as amended.

(x)    Professional liability insurance with limits of liability not less than $1,000,000 annually per occurrence and $3,000,000 annual aggregate, and with a deductible not to exceed $100,000.

*(b)   Carriers*. All policies of insurance shall be issued by responsible insurance companies or associations selected by the Obligated Group permitted under the laws of the State to assume the risks covered thereby and rated at least "A-" by A.M. Best or a comparable rating agency.

*(c)   Policies*. All policies of insurance shall provide that they may not be canceled nor the coverages reduced, the deductibles increased or otherwise modified adversely to the interests of the Holders without at least thirty (30) days' prior written notice to the Master Trustee.  The insurance required by subparagraphs (iii), (iv), and (v) of subsection (a) of this Section shall name the Master Trustee as an additional insured, as its interests may appear. The insurance required by subparagraphs (i), (ii), (vii), (viii), and (ix) of subsection (a) of this Section shall name the Master Trustee as an "additional insured" in accordance with the so-called "standard mortgagee subparagraph" and/or "loss payable clause" and require that all insurance proceeds resulting from any claim be paid to the Master Trustee for the benefit of the Holders.  All policies of property insurance required hereunder, by naming the Master Trustee as mortgagee, shall contain an endorsement or agreement by the insurer that any loss will be payable in accordance with the terms of said policy, notwithstanding any act of the owner of the property that might otherwise result in forfeiture of said insurance.

*(d)   Certificates*. Originals or certified copies of the original policies, including all endorsements of all such policies, shall be deposited with the Master Trustee, provided that in lieu of such policies there may be deposited with the Master Trustee an original certificate or certificates of the respective insurers originally executed by the authorized agent(s) attesting the fact that the insurance required by this Section is in full force and effect and clearly reflecting all coverages, amounts and deductibles.  At least five (5) days prior to the expiration of any such policy, the Obligated Group shall furnish the Master Trustee evidence satisfactory to the Master Trustee that the policy has been renewed or replaced or is no longer required hereby.

*(e)   Blanket Policies*. In lieu of separate policies, the Obligated Group may maintain blanket or umbrella policies if such policies provide the same coverage required by this Section with protection against each risk and meeting all the other requirements stated herein and the Obligated Group deposits with the Master Trustee a certificate or certificates of the respective insurers evidencing such coverage and otherwise meeting the requirements stated herein.

*(f)   Unexpired Policies*. To the extent so provided in any unexpired insurance policy applicable to the Mortgaged Property, the Obligated Group's rights, if any, to all unexpired insurance policies, including any right to unearned premiums applicable to the Mortgaged Property and all proceeds thereof, shall inure to the benefit of, and pass to the purchaser of, the Mortgaged Property at any foreclosure or trustee's sale conducted pursuant to the terms of the Mortgages.

*(g)   Substitute Coverage*. If any insurance required by this Section shall be commercially unavailable at a reasonable cost or shall have been otherwise provided, as evidenced by a certificate of the Insurance Consultant, the Master Trustee may, in its reasonable judgment, accept such substitute coverage or other modification as shall be recommended by the Insurance Consultant; provided, however, no Event of Default shall occur if substitute coverage

IV-9

shall not be available at a reasonable cost and the Obligated Group shall make a continuing good faith effort to secure the insurance or such substitute coverage, including self-insurance, as shall be recommended by the Insurance Consultant. If the insurance shall become commercially available at a reasonable cost after substitute insurance shall have been acquired, the Obligated Group shall acquire such insurance upon expiration of such substitute insurance or as otherwise recommended by the Insurance Consultant and approved by the Master Trustee.

**Section 408. Right to Perform Members' Covenants; Advances**. In the event any Member shall fail to (a) pay any tax, charge, assessment, or imposition to the extent required hereunder, (b) remove any Lien or terminate any lease to the extent required hereunder, (c) maintain its Property in repair to the extent required hereunder, (d) procure the insurance required hereby, in the manner herein described, or (e) fail to make any other payment or perform any other act required to be performed hereunder, and is not contesting the same in accordance with Section 406 hereof, then and in each such case the Master Trustee may (but shall not be obligated to) remedy such failure for the account of such Member and make advances for that purpose. No such performance or advance shall operate to release such Member from any such failure and any sums so advanced by the Master Trustee shall be repayable by such Member on demand and shall bear interest at the Master Trustee's announced prime rate per annum from time to time in effect, from the date of the advance until repaid. The Master Trustee shall have the right of entry on such Member's Property or any portion thereof, in order to effectuate the purposes of this Section, subject to the permission of a court of competent jurisdiction, if required by law.

**Section 409. Annual Budget**. The Obligated Group shall prepare and adopt an annual operating and capital budget for each Fiscal Year covering the operation of the Facilities (each, an "*Annual Budget*"). Each Annual Budget shall be prepared and submitted to the Governing Body of each Member of the Obligated Group at least sixty (60) days prior to the commencement of the Fiscal Year to which it is intended to apply and shall be approved and adopted by the Governing Body of each Member of the Obligated Group prior to the commencement of such Fiscal Year. If an Annual Budget shall not be adopted for any new Fiscal Year prior to the commencement thereof, then the Annual Budget in effect as of the end of the previous Fiscal Year shall be used for such new Fiscal Year until replaced by the Annual Budget adopted in accordance with this Section 409. The Obligated Group shall also submit each Annual Budget to the Master Trustee at least thirty (30) days prior to the commencement of the Fiscal Year to which it is intended to apply accompanied by an Officer's Certificate and a certificate signed by an authorized officer of the Manager that, to the best of such Person's knowledge, the proposed Annual Budget will enable the Obligated Group to comply with the requirements of Sections 424, 425, 426, and 427. The Annual Budget shall set forth projected cash flows, cash and investment account balances, revenues and expenses, and monthly Operating Expenses and Budgeted Capital Expenditures by category in reasonable detail and include projected occupancy.

**Section 410. Rates and Charges**.

(a) Each Member covenants and agrees to use its best efforts to operate all of its Facilities on a revenue-producing basis and to charge such fees and rates for its Facilities and services and to exercise such skill and diligence, including obtaining payment for services provided, as to provide income from its Property together with other available funds sufficient to pay promptly all payments of principal and interest on its Indebtedness, all expenses of operation, maintenance, and repair of its Property and all other payments required to be made by it hereunder to the extent permitted by law. Each Member further covenants and agrees that it will from time to time as often as necessary and to the extent permitted by law, review and to the extent necessary, revise its rates, fees, and charges in such manner as may be effective to comply with the provisions of this Section. This Section shall not be construed to prohibit any Member from serving indigent patients or residents to the extent required for such Member to continue its qualification as a Tax-Exempt Organization or from serving any other class or classes of patients or residents without charge or at reduced rates so long as such service does not prevent the Obligated Group from satisfying the other requirements of this Section.

(b)      Historical Debt Service Coverage Ratio.

(i)      The Members covenant and agree that the Obligated Group Agent will calculate the Historical Debt Service Coverage Ratio of the Obligated Group as of the end of each fiscal quarter (based on unaudited financial statements) and Fiscal Year (based on audited financial statements) and will deliver

a copy of such calculation to the Persons to whom such calculations are required to be delivered under, and within the timeframe required by, Section 415(b) hereof.

(ii)    The Members further covenant to maintain a Historical Debt Service Coverage Ratio of the Obligated Group as of the end of each fiscal quarter and Fiscal Year ending on or after March 31, 2014 of at least 1.10:1.

(iii)    If the Historical Debt Service Coverage Ratio of the Obligated Group as of the end of any fiscal quarter or Fiscal Year ending on or after September 30, 2014 is less than 1.05:1, the Obligated Group, at its own expense, shall retain a Consultant within thirty (30) days following the delivery set forth in (b)(i) above to make recommendations with respect to the rates, fees, and charges of the Members, the Obligated Group's methods of operation, and other factors affecting its financial condition in order to increase the Historical Debt Service Coverage Ratio to at least 1.10 for the four fiscal quarters following the quarter in which such recommendations are delivered .

(iv)    A copy of the Consultant's report shall be filed with each Required Information Recipient, and the Master Trustee, which, upon receipt, shall post or cause to be posted the report on EMMA.

(v)    Notwithstanding any other provisions of this Master Indenture, failure of the Obligated Group to achieve the required Historical Debt Service Coverage Ratio for any measurement period shall not constitute an Event of Default if the Obligated Group takes all action necessary to comply with the procedures set forth above and adopts a plan and follows the recommendations contained in such report to the extent feasible (as determined by the Governing Body of the Obligated Group Agent) and permitted by law; provided however, the failure of the Obligated Group to achieve a Historical Debt Service Coverage Ratio of at least 1.00:1 for any two (2) consecutive measurement periods shall constitute an Event of Default.  In such event, in addition to the remedies available to the Master Trustee hereunder, the Obligated Group shall terminate the Management Agreement with the Manager and enter into a new Management Agreement with a new Manager within sixty (60) days of delivery of the applicable calculation to the Master Trustee, all as reasonably acceptable to a Majority of the Applicable Holders.

**Section 411. Damage or Destruction**.

(a) Each Member agrees to notify the Master Trustee immediately in the case of the destruction of its Facilities or any portion thereof as a result of fire or other casualty, or any damage to such Facilities or portion thereof as a result of fire or other casualty, the Net Proceeds (other than Net Proceeds of business interruption or similar insurance) of which are estimated to exceed One Million Dollars ($1,000,000).

(b) Each Member hereby irrevocably assigns to the Master Trustee, as its interests may appear, all right, title, and interest of such Member in and to any Net Proceeds relating to such damage or destruction and agrees to pay or transfer, or cause to be paid or transferred, all such Net Proceeds to the Master Trustee for deposit to the Insurance and Condemnation Award Fund.

(c) If such Net Proceeds do not exceed One Million Dollars ($1,000,000), such Net Proceeds may be requisitioned from the Insurance and Condemnation Award Fund by the Corporation for itself or the Member suffering such casualty or loss to repair or replace the affected Property, provided such requisition shall specifically describe the nature of the expenditures being made pursuant to such requisition and the specific location of the Property to which such expenditures relate.  The Members covenant that they will expend or contract to expend an amount not less than the amount of any such Net Proceeds within twenty-four (24) months after receipt thereof to (i) repair, replace. or restore the damaged or destroyed facilities, (ii) acquire or construct additional capital assets subject to the Lien of the Mortgages (to the same extent that the damaged facilities were subject to the Lien of the Mortgages), or (iii) prepay Obligations in accordance with the provisions of Section 301(b) hereof.

(d) In the event such Net Proceeds exceed One Million Dollars ($1,000,000), the Member suffering such casualty or loss shall within the period ending on the later of the date that is twelve (12) months after the date on

which the applicable damage or destruction shall occur or one (1) month after the receipt by the Obligated Group of such Net Proceeds, elect by written notice to the Master Trustee one of the following three options:

(i) Option 1 - Repair and Restoration. Such Member may elect to replace, repair, reconstruct, restore, or improve any of the Facilities of the Obligated Group or acquire additional Facilities for the Obligated Group or repay Indebtedness incurred for any such purpose pending the receipt of such Net Proceeds. Any such election shall be conditioned on the delivery to the Master Trustee and the Series 2013 Bond Trustee by the Obligated Group Agent of a written notice that the Obligated Group intends to make an election to replace, repair, reconstruct, restore, or improve the Facilities under this subparagraph (i) and either (A) the expiration of forty-five (45) days without objection to such election by the Master Trustee or the Series 2013 Bond Trustee or (B) the receipt by the Obligated Group Agent of a written consent of a Majority of the Applicable Holders to such replacement, repair, restoration, reconstruction, restoration, or improvement. In such event such Member shall proceed forthwith to replace, repair, reconstruct, restore, or improve Facilities of the Obligated Group or to acquire additional Facilities and will apply the Net Proceeds of any insurance relating to such damage or destruction (other than Net Proceeds of business interruption or similar insurance) received from the Master Trustee to the payment or reimbursement of the costs of such replacement, repair, reconstruction, restoration, improvement, or acquisition or to the repayment of such Indebtedness. So long as no Event of Default has occurred and is continuing, any Net Proceeds of insurance relating to such damage or destruction (other than Net Proceeds of business interruption or similar insurance) received by the Master Trustee shall be released from time to time by the Master Trustee to such Member upon the receipt by the Master Trustee of:

(A) the Written Request of such Member specifying the expenditures made or to be made or the Indebtedness incurred in connection with such replacement, repair, reconstruction, restoration, improvement, or acquisition and stating that such Net Proceeds, together with any other moneys legally available for such purposes, will be sufficient to complete such replacement, repair, reconstruction, restoration, improvement, or acquisition; and

(B) if such expenditures were or are to be made or such Indebtedness was incurred for the construction or renovation of Facilities, the written approval of such Written Request by an Independent Architect.

It is further understood and agreed that in the event such Member shall elect this Option 1, such Member shall complete the replacement, repair, reconstruction, restoration, improvement, and acquisition of the Facilities, whether or not such Net Proceeds of insurance received for such purposes are sufficient to pay for the same.

(ii) Option 2 - Prepayment of Obligations. Subject to the obligations of the Members under Section 406 hereof, such Member may elect (or shall be obligated to if the requirements of Option 1 shall not have been satisfied) to have all of the Net Proceeds payable as a result of such damage or destruction (other than Net Proceeds of business interruption or similar insurance) applied to the prepayment of the Obligations. In such event such Member shall, in its notice of election to the Master Trustee, direct the Master Trustee to apply such Net Proceeds, when and as received, to the prepayment of Obligations in accordance with the provisions of Section 301(b) hereof.

(iii) Option 3 - Partial Restoration and Partial Prepayment of Obligations. Such Member may, upon satisfaction of the requirements with respect thereof set forth in Option 1 above, elect to have a portion of such Net Proceeds applied to the replacement, repair, reconstruction, restoration, and improvement of the Facilities of the Obligated Group or the acquisition of additional Facilities for the Obligated Group or the repayment of Indebtedness incurred for any such purpose pending the receipt of such Net Proceeds with the remainder of such Net Proceeds to be applied to prepay Obligations, in which event such Net Proceeds to be used for replacement, repair, reconstruction, restoration, improvement and acquisition shall be applied as set forth in subparagraph (e)(i) of this Section and such Net Proceeds to be used for prepayment of the Obligations shall be applied as set forth in subparagraph (e)(ii) of this Section.

**Section 412. Condemnation**.

(a) The Master Trustee shall cooperate fully with the Members in the handling and conduct of any prospective or pending condemnation proceedings with respect to their Facilities or any part thereof.

(b) Each Member hereby irrevocably assigns to the Master Trustee, as its interests may appear, all right, title, and interest of such Member in and to any Net Proceeds of any award, compensation, or damages payable in connection with any such condemnation or taking, or payment received in a sale transaction consummated under threat of condemnation (any such award, compensation, damages, or payment being hereinafter referred to as an **"award"**) and agrees to pay or transfer, or cause to be paid or transferred, any such award to the Master Trustee for deposit to the Insurance and Condemnation Award Fund.

(c) If such Net Proceeds do not exceed One Million Dollars ($1,000,000), such Net Proceeds may be requisitioned from the Insurance and Condemnation Award Fund by the Corporation for itself or the Member in question to repair or replace the affected Property, provided such requisition shall specifically describe the nature of the expenditures being made pursuant to such requisition and the specific location of the Property to which such expenditures relate. The Members covenant that they will expend or contract to expend an amount not less than the amount of any such Net Proceeds within twenty-four (24) months of the receipt thereof to (i) restore, replace, or repair the condemned Facilities, (ii) acquire or construct additional capital assets subject to the Lien of the Mortgages (to the same extent that the condemned facilities were subject to the Lien of the Mortgages), or (iii) prepay Obligations in accordance with the provisions of Section 301(b) hereof.

(d) In the event such Net Proceeds exceed One Million Dollars ($1,000,000), the Member in question shall within the period ending on the later of the date that is twelve (12) months after the date on which the applicable damage or destruction occurs or one (1) month after receipt by the Obligated Group of such Net Proceeds, elect by written notice of such election to the Master Trustee one of the following three options:

(i) Option 1 - Repairs and Improvements. The Member may elect to use the Net Proceeds of the award for restoration or replacement of or repairs and improvements to the Facilities of the Obligated Group or the acquisition of additional Facilities for the Obligated Group or the repayment of Indebtedness incurred for any such purpose pending the receipt of such Net Proceeds. Any such election shall be conditioned on the delivery to the Master Trustee, the Series 2013 Bond Trustee, and the Series 2013 Bank Holders by the Obligated Group Agent of a written notice that the Obligated Group intends to make an election to restore, replace, repair, or improve the Facilities under this subparagraph (i) and either (A) the expiration of forty-five (45) days without objection to such election by the Master Trustee or the Series 2013 Bond Trustee or (B) the receipt by the Obligated Group Agent of a written consent of a Majority of the Applicable Holders to such restoration, replacement, repair, or improvement. In such event, so long as no Event of Default has occurred and is continuing, such Member shall have the right to receive such Net Proceeds from the Master Trustee from time to time upon the receipt by the Master Trustee of:

(A) the Written Request of such Member specifying the expenditures made or to be made or the Indebtedness incurred in connection with such restoration, replacement, repairs, improvements, and acquisitions and stating that such Net Proceeds, together with any other moneys legally available for such purposes, will be sufficient to complete such restoration, replacement, repairs, improvements, and acquisition; and

(B) if such expenditures were or are to be made or such Indebtedness was incurred for the construction or renovation of Facilities, the written approval of such Written Request by an Independent Architect.

(ii) Option 2 - Prepayment of Obligations. Subject to the obligation of such Member under Section 406 hereof, such Member may elect (or shall be obligated to if the requirements of Option 1 shall not have been satisfied) to have such Net Proceeds of the award applied to the prepayment of the Obligations.  In such event such Member shall, in its notice of election to the Master Trustee, direct the Master Trustee to apply such Net Proceeds, when and as received, to the prepayment of Obligations in accordance with the provisions of Section 301(b) hereof.

(iii) Option 3 - Partial Restoration and Partial Prepayment of Obligations. Such Member may, upon satisfaction of the requirements with respect thereof set forth in Option 1 above, elect to have a portion of such Net Proceeds of the award applied to the repair, replacement, restoration and improvement of the Facilities of the Obligated Group or the acquisition of additional Facilities for the Obligated Group or the repayment of Indebtedness incurred for any such purpose pending the receipt of such Net Proceeds, with the remainder of such Net Proceeds to be applied to the prepayment of Obligations, in which event such Net Proceeds to be used for repair, replacement, restoration, improvement and acquisition shall be applied as set forth in subparagraph (d)(i) of this Section and such Net Proceeds to be used for prepayment of the Obligations shall be applied as set forth in subparagraph (d)(ii) of this Section.

**Section 413. Other Provisions with Respect to Net Proceeds**. Any Net Proceeds described in Section 411 or 412 shall be deposited upon receipt with or by the Master Trustee in the Insurance and Condemnation Award Fund and be invested or reinvested by the Master Trustee as directed in writing by the Obligated Group Agent in Permitted Investments subject to any Member's right to requisition the same pursuant to Sections 411 and 412 hereof.  The form of requisition from the Insurance and Condemnation Fund is attached as Exhibit "F" to this Master Indenture.  If any Member elects to proceed under either Section 411(e)(i) or (iii) or 412(d)(i) or (iii), any amounts in respect of such Net Proceeds not so paid to such Member shall be used to prepay Obligations in accordance with the provisions of Section 301(b) hereof.

**Section 414. Merger, Consolidation, Sale, or Conveyance**.

(a) Each Member agrees that it will not merge into, or consolidate with, one or more corporations that are not Members, or allow one or more of such corporations to merge into it, or sell or convey all or substantially all of its Property to any Person who is not a Member, unless:

(i)    Any successor corporation to such Member (including without limitation any purchaser of all or substantially all the Property of such Member) is a Person (other than a natural person) organized and existing under the laws of the United States of America or a state thereof and shall execute and deliver to the Master Trustee an appropriate instrument, satisfactory to the Master Trustee, containing the agreement of such successor corporation to assume, jointly and severally, the due and punctual payment of the principal of, premium, if any, and interest on all Obligations according to their tenor and the due and punctual performance and observance of all the covenants and conditions of this Master Indenture, the Security Agreements and the Mortgages to be kept and performed by such Member;

(ii)   Immediately after such merger or consolidation, or such sale or conveyance, no Member would be in default in the performance or observance of any covenant or condition of any Related Loan Document or this Master Indenture;

(iii)  If all amounts due or to become due on all Related Bonds the interest on which is excluded from the gross income of the holders thereof for federal income tax purposes have not been fully paid to the Holders thereof or fully provided for, there shall be delivered to the Master Trustee an Opinion of Bond Counsel to the effect that under then existing law the consummation of such merger, consolidation, sale or conveyance would not adversely affect the validity of such Related Bonds or the exemption otherwise available from federal or state income taxation of interest payable on such Related Bonds;

(iv)   The Master Trustee shall have received the written consent of a Majority of the Applicable Holders to such transaction; and

(v)  The definition of Funded Indebtedness shall have been amended to include Indebtedness assumed by any Member as a result of such transaction and/or any other Indebtedness if and as required to obtain the consent of a Majority of the Applicable Holders under subsection (iv) hereof.

(b) In case of any such consolidation, merger, sale or conveyance and upon any such assumption by the successor corporation, such successor corporation shall succeed to and be substituted for its predecessor, with the same effect as if it had been named herein as such Member.  Each successor, assignee, surviving, resulting or transferee corporation of a Member must agree to become, and satisfy the conditions described in Section 404 hereof to becoming, a Member of the Obligated Group prior to any such succession, assignment or other change in such Member's corporate status.  Any successor corporation to such Member thereupon may cause to be signed and may issue in its own name Obligations hereunder and the predecessor corporation shall be released from its obligations hereunder and under any Obligations, if such predecessor corporation shall have conveyed all Property owned by it (or all such Property shall be deemed conveyed by operation of law) to such successor corporation.  All Obligations so issued by such successor corporation hereunder shall in all respects have the same legal rank and benefit under this Master Indenture as Obligations theretofore or thereafter issued in accordance with the terms of this Master Indenture as though all of such Obligations had been issued hereunder by such prior Member without any such consolidation, merger, sale or conveyance having occurred.

(c)  In case of any such consolidation, merger, sale or conveyance such changes in phraseology and form (but not in substance) may be made in Obligations thereafter to be issued as may be appropriate.

(d)  The Master Trustee may rely upon an opinion of Independent Counsel as conclusive evidence that any such consolidation, merger, sale or conveyance, and any such assumption, complies with the provisions of this Section and that it is proper for the Master Trustee under the provisions of Article VII and of this Section to join in the execution of any instrument required to be executed and delivered by this Section.

### Section 415. Financial Statements, Etc.

(a) The Members covenant that they will keep or cause to be kept proper books of records and accounts in which full, true, and correct entries will be made of all dealings or transactions of or in relation to the business and affairs of the Obligated Group in accordance with GAAP consistently applied except as may be disclosed in the notes to the audited financial statements referred to in subsection (b) below.  To the extent that GAAP would require consolidation of certain financial information of entities that are not Members of the Obligated Group with financial information of one or more Members, consolidated financial statements prepared in accordance with GAAP that include information with respect to entities that are not Members of the Obligated Group may be delivered in satisfaction of the requirements of this Section 415 so long as (i) supplemental information in sufficient detail to separately identify the information with respect to the Members of the Obligated Group is delivered to the Master Trustee with the audited financial statements; (ii) such supplemental information has been subjected to the auditing procedures applied in the audit of the consolidated financial statements delivered to the Master Trustee and, in the opinion of the accountant, is fairly stated in all material respects in relation to the consolidated financial statements taken as a whole; and (iii) such supplemental information is used for the purposes hereof or for any agreement, document or certificate executed and delivered in connection or pursuant to this Master Indenture.

(b) The Obligated Group Agent shall furnish or cause to be furnished to the Required Information Recipients (provided that the Town shall be provided only the items set forth in subparagraph (v) and (vi) below unless the Town shall request other information being provided in accordance with the Section 415), and upon receipt the Master Trustee shall post or cause to be posted on EMMA, the following:

(i)  a monthly statement of the Obligated Group as soon as practicable after the information is available but subject, in the case of the information specified in (A)(2), to the proviso therein, in no event more than twenty (20) days after the completion of such month, including:

(A)  (1) unaudited statement of revenues and expenses and statement of cash flows of the Obligated Group for such month and an unaudited balance sheet of the Obligated Group as of the end of such month; (2) statements of the balances for each fund and account required to be established hereunder (including without limitation the Operating Account) or any Related Bond Indenture as of

IV-15

the end of such month (provided that the same are provided by the Trustee, the Master Trustee and the depository at which the Operating Account is maintained on or before the 15th day of each month), all in reasonable detail and certified by an officer of the Obligated Group Agent and (4) a comparison of actual results of operations to budget (along with an explanation of any variances of more than ten percent (10%)).

(B)   Following the third anniversary of the Closing Date, the information described in (A) above will only need to be delivered on a quarterly basis.

(ii)   No more than twenty (20) days after the completion of the most recent applicable fiscal quarter, (1) a statement of the Obligated Group stating the Number of Units Occupied (as defined in Section 425 hereof) together with an Officer's Certificate of the Obligated Group Agent stating whether the Obligated Group is in compliance with the Occupancy Covenant contained in Section 425 hereof, and (2) each calculated based on unaudited financial statements, a calculation of Days' Cash on Hand as of the last day of such quarter, the Historical Debt Service Coverage Ratio as of the last day of such quarter and the Operating Ratio as of the last day of such quarter, all certified by an officer of the Obligated Group Agent, which Officer's Certificate shall state that the Obligated Group is in compliance with all of the terms, provisions, and conditions of this Master Indenture or if not, specifying all such Event of Defaults or Default Conditions and the nature thereof, and commencing with the Fiscal Year beginning January 1, 2014, attaching a copy of the Obligated Group's Annual Budget for such Fiscal Year.

(iii)   No later than the date such report is filed with any regulator, but in any event within one hundred fifty (150) days of the end of each Fiscal Year commencing with the Fiscal Year ending December 31, 2013, an annual audited financial report of the Obligated Group prepared by a firm of certified public accountants, including a combined and combining balance sheet as of the end of such Fiscal Year and a combined and combining statement of changes in fund balances for such Fiscal Year, a combined and combining statement of revenues and expenses for such Fiscal Year, and a statement of cash flows of the Obligated Group for such Fiscal Year, showing in each case in comparative form the financial figures for the preceding Fiscal Year, together with a separate written statement of the accountants preparing such report containing calculations of the Obligated Group's Historical Debt Service Coverage Ratio for said Fiscal Year and the Days' Cash on Hand and Operating Ratio as of the last day of such Fiscal Year and a statement that such accountants have no knowledge of any Event of Default or Default Condition, or if such accountants shall have obtained knowledge of any such Default Condition or Event of Default, they shall disclose in such statement the Event of Default or Default Condition and the nature thereof.

(iv)   Copies of (A) any board-approved revisions to the Annual Budget provided pursuant to subsection (ii) above, or (B) any correspondence to or from the IRS questioning or contesting the status of a Member as a Tax-Exempt Organization or with respect to the tax-exempt status of the Series 2013 Bonds, or any Related Bonds the interest on which is excludable from the gross income of the owners thereof for federal income tax purposes, promptly upon receipt.

(c)   The Obligated Group Agent shall furnish or cause to be furnished to the Master Trustee or any Related Bond Trustee such additional information as the Master Trustee or any Related Bond Trustee may reasonably request concerning any Member in order to enable the Master Trustee or such Related Bond Trustee to determine whether the covenants, terms, and provisions of this Master Indenture have been complied with by the Members and for that purpose. all pertinent books, documents, and vouchers relating to the business, affairs, and Property (other than patient, donor, and personnel records and other records the disclosure of which is precluded by Applicable Law) of the Members shall, to the extent permitted by law, at all times during regular business hours be open to the inspection of such accountant or other agent (who may make copies of all or any part thereof) as shall from time to time be designated by the Master Trustee or such Related Bond Trustee. Each Member shall furnish all information necessary to comply with such a request to the Obligated Group Agent

(d)  The Members also agree that, within ten (10) days after its receipt thereof, the Obligated Group Agent will file with each Required Information Recipient, a copy of each Consultant's report required to be prepared under the terms of this Master Indenture.  Upon receipt thereof, the Master Trustee shall post or cause to be posted such report on EMMA.

(e)  The Obligated Group Agent shall give prompt written notice of a change of accountants by the Obligated Group to the Master Trustee and each Related Bond Trustee.  The notice shall state (i) the effective date of such change; (ii) whether there were any unresolved disagreements with the former accountants on any matter of accounting principles or practices, financial statement disclosure, or auditing scope or procedure, that the accountants claimed would have caused them to refer to the disagreement in a report on the disputed matter, if it was not resolved to their satisfaction; and (iii) such additional information relating thereto as such Related Bond Trustee or the Master Trustee may reasonably request.

(f)  Without limiting the foregoing, each Member will permit, upon reasonable notice, the Master Trustee or any such Related Bond Trustee (or such persons as they may designate) to visit and inspect, at the expense of such Person, its Property and to discuss the affairs, finances, and accounts of the Obligated Group with its officers and independent accountants, all at such reasonable times and locations and as often as the Master Trustee or such Related Bond Trustee may reasonably desire.

(g)  The Obligated Group Agent may designate a different Fiscal Year for the Members of the Obligated Group by delivering a notice to the Master Trustee designating the first and last day of such new Fiscal Year and whether or not there will be any interim fiscal period (the "*Interim Period*") of a duration of greater than or less than twelve (12) months preceding such new Fiscal Year. The Members covenant that they will furnish to the Master Trustee and each Related Bond Trustee, as soon as practicable after they are available, but in no event more than one hundred fifty (150) days after the last day of such Interim Period, a financial report for such Interim Period certified by a firm of independent certified public accountants selected by the Obligated Group Agent covering the operations of the Obligated Group for such Interim Period and containing a combined balance sheet as of the end of such Interim Period and a combined statement of changes in fund balances and changes in financial position for such Interim Period and a combined statement of revenues and expenses for such Interim Period, showing in each case in comparative form the financial figures for the comparable period in the preceding Fiscal Year, together with a separate written statement of the accountants preparing such report containing a calculation of the Obligated Group's Historical Debt Service Coverage Ratio for the Interim Period and a statement that such accountants have obtained no knowledge of any Event of Default or Default Condition, or if such accountants shall have obtained knowledge of any such Event of Default or Default Condition, they shall disclose in such statement the Event of Default or Default Condition and the nature thereof (but such accountants shall not be liable directly or indirectly to anyone for failure to obtain knowledge of any Event of Default or Default Condition).

(h)  The Obligated Group Agent shall arrange for and conduct disclosure calls not less frequently than quarterly during the first three (3) years after the Closing Date and no less frequently than semi-annually thereafter with beneficial owners of the Bonds, the Series 2013 Bond Trustee, the Master Trustee and other interested Persons, and the Master Trustee shall post or cause to be posted notice of the date and time of such calls on EMMA at least fourteen (14) Business Days before each such call, which shall be scheduled no earlier than five (5) Business Days after the delivery of the quarterly financial statements for the fiscal quarter immediately preceding the fiscal quarter in which the applicable disclosure call occurs.  The Obligated Group Agent's appropriate officials and employees shall participate on such calls, and shall address the financial results set forth in the applicable financial statements. Discuss any operating issues and answer any questions from any other participants on the applicable disclosure call.

**Section 416. Permitted Additional Indebtedness**.  The Obligated Group shall not incur any Additional Indebtedness (whether or not incurred through the issuance of Additional Obligations) other than:

(a)  Indebtedness incurred with the written consent of a Majority of the Applicable Holders; provided that (i) no such Indebtedness evidenced or secured by a Senior Obligation shall be incurred without the written consent of a Majority of the Senior Bond Holders, (ii) no such Indebtedness evidenced or secured by a Senior Obligation shall be incurred without the written consent of a Majority of the Subordinate Bond Holders and (iii) the definition of Funded Indebtedness shall have been amended to include such Indebtedness and/or any other Indebtedness if and as required to obtain the consent of a Majority of the Applicable Holders;

(b)  Indebtedness for the purpose of refunding all of the Series 2013A Obligation incurred with the written consent of a Majority of the Subordinate Bond Holders, provided that the definition of Funded Indebtedness shall have been amended to include such Indebtedness and/or any other Indebtedness if and as required to obtain the consent of a Majority of the Subordinate Bond Holders;

(c)  Indebtedness for the purpose of refunding all of the Series 2013B Subordinate Obligation incurred with the written consent of a Majority of the Senior Bond Holders; provided that the definition of Funded Indebtedness shall have been amended to include such Indebtedness and/or any other Indebtedness if and as required to obtain the consent of a Majority of the Senior Bond Holders;

(d)  Indebtedness for the purpose of refunding any Obligation if (A) both the principal amount, including Accreted Value,  and the aggregate annual debt service on the refunding Indebtedness is no greater than the principal amount, including Accreted Value, and the aggregate annual debt service that would be payable on the refunded Obligation, (B) if the refunded Obligation (1) is a Senior Obligation, the refunding Indebtedness is evidenced or secured by an Obligation that is a Senior Obligation or a Subordinate Obligation or (2) is a Subordinate Obligation, the refunding Indebtedness is evidenced or secured by an Obligation that is a Subordinate Obligation, (C) the other terms and conditions of the refunding are not materially less favorable to the Members of the Obligated Group and the Holders of the Outstanding Obligations; for purposes of this provision, in the case of the refunding of any outstanding Put Indebtedness that has become due prior to the maturity date thereof as a result of a tender feature the aggregate annual debt service that would be payable on the refunded Obligation shall be calculated as though such tender feature had not been exercised, and in the case of the refunding of any Indebtedness with Put Indebtedness, the aggregate annual debt service that would be payable on the refunding Obligation shall be calculated as though such tender feature will be exercised; and (D) if any Series 2013 Obligations remain Outstanding, the definition of Funded Indebtedness shall have been amended to include such Indebtedness and/or any other Indebtedness if and as required by a Majority of the Holders;

(e)  Indebtedness (other than Obligations) for contributions to self-insurance or shared or pooled-risk insurance programs required or permitted to be maintained under this Master Indenture;

(f)  Indebtedness (other than Obligations) consisting of accounts payable incurred in the ordinary course of business or other Indebtedness not incurred or assumed primarily to assure the repayment of money borrowed or credit extended which Indebtedness is incurred in the ordinary course of business, including but not limited to deferred obligations for the refund or repayment of Entrance Fees;

(g)  Indebtedness (other than Obligations), including without limitation Capitalized Leases, incurred in connection with the purchase or acquisition of equipment or other personal Property, provided that the principal amount of such Indebtedness together with the aggregate principal amount of all other Indebtedness then outstanding and incurred pursuant to this subsection (i) shall not exceed Two Hundred Fifty Thousand Dollars ($250,000); and

(h)  Indebtedness (other than Obligations) which is non-recourse to the Obligated Group and payable solely from restricted Contributions that are not available to pay Obligations.

**Section 417. Calculation of Debt Service and Debt Service Coverage**.

(a) The various calculations of the amount of Indebtedness of a Person, the amortization schedule of such Indebtedness, and the debt service payable with respect to such Indebtedness required under certain provisions of this Master Indenture shall be made in a manner consistent with that adopted in Section 416 and in this Section 417.

(b)  In determining the amount of debt service payable on Indebtedness in the course of the various calculations required under certain provisions of this Master Indenture, if the terms of the Indebtedness being considered are such that interest thereon for any future period of time is expressed to be calculated at a varying rate per annum, a formula rate or a fixed rate per annum based on a varying index, then for the purpose of making such determination of debt service, interest on such Indebtedness for such period (the "***Determination Period***") shall be computed by assuming that the rate of interest applicable to the Determination Period is equal to the average of the rate of interest (calculated in the manner in which the rate of interest for the Determination Period is expressed to be

calculated) that was in effect on the last date of each of the twelve (12) full calendar months immediately preceding the month in which such calculation is made; provided that if the index or other basis for calculating such interest was not in existence for at least twelve (12) full calendar months immediately preceding the date of calculation, the rate of interest for such period shall be deemed to be the average rate of interest that was in effect on the last day of each full calendar month immediately preceding the date of calculation; and if the average rate of interest borne by such Indebtedness for such shorter period cannot be calculated, the rate of interest for such period shall be deemed to be the Projected Rate.

(c)  Obligations issued to secure Indebtedness permitted to be incurred under Section 416 shall not be treated as Additional Indebtedness in a manner that would require such Indebtedness to be included more than one time in the calculations performed under this Master Indenture.

(d)  For all purposes under this Master Indenture, it shall be assumed that one hundred percent (100%) of Indebtedness that is guaranteed is Funded Indebtedness of the guarantor under such Guaranty.

(e)  For purposes of the various calculations required under this Master Indenture for Capitalized Leases, the Capitalized Rentals under a Capitalized Lease at the time of such calculation shall be deemed to be the principal payable thereon.

(f)  Anything herein to the contrary notwithstanding, any portion of any Indebtedness of any Member for which an Interest Rate Agreement has been obtained by such Member shall be deemed to bear interest for the period of time that such Interest Rate Agreement is in effect at a net rate that takes into account the interest payments made by such Member on such Indebtedness and the payments made or received by such Member on such Interest Rate Agreement; provided that the long-term credit rating of the provider of such Interest Rate Agreement (or any guarantor thereof) is in one of the three (3) highest rating categories of each Rating Agency maintaining a rating on such provider or guarantor (without regard to any refinements of gradation of rating category by numerical modifier or otherwise). For the purposes of determining the Debt Service Requirements for any future period of time with respect to any Indebtedness subject to an Interest Rate Agreement satisfying the requirements of the preceding sentence (i) if the Member is required to pay a fixed rate of interest under the Interest Rate Agreement, such Indebtedness shall be deemed to bear interest at such fixed rates and (ii) if the Member is required to pay interest at a variable rate under the Interest Rate Agreement, Debt Service Requirements on such Indebtedness shall be calculated in accordance with subsection (b) of this Section. In addition, so long as any Indebtedness is deemed to bear interest at a rate taking into account an Interest Rate Agreement, any payments made by a Member on such Interest Rate Agreement shall be excluded from Expenses and any payments received by a Member on such Interest Rate Agreement shall be excluded from Revenues, in each case, for all purposes of this Master Indenture.

**Section 418. Sale, Lease, or Other Disposition of Property**.

(a) Except as otherwise permitted with respect to the Excess Land, each Member agrees that it will not, in any consecutive twelve (12) month period, sell, lease, or otherwise dispose (including without limitation any involuntary disposition) of Property (either real or personal property, including cash and investments) unless the Property is transferred in one or more of the following transfers or other dispositions of Property:

(i)  Except in the case of Real Property, in return for other Property of equal or greater value and usefulness;

(ii)  in the ordinary course of business upon fair and reasonable terms;

(iii)  to any Person, if prior to such sale, lease, or other disposition there is delivered to the Master Trustee an Officer's Certificate of a Member stating that, in the judgment of the signer, such Property has, or within the immediately succeeding twenty-four (24) calendar months is reasonably expected to, become inadequate, obsolete, worn out, unsuitable, unprofitable, undesirable, or unnecessary and the sale, lease, or other disposition thereof will not impair the structural soundness, efficiency, or economic value of the remaining Property;

(iv)  from a Member to another Member; provided, however that none of the Land or any other Property financed with the proceeds of the any Related Bonds shall be transferred by the Corporation to any other Member unless the Related Bond Trustee shall have received an Opinion of Bond Counsel to the effect that such transfer will not adversely affect the validity of such Related Bonds or any exemption from federal income taxation to which such Related Bonds would otherwise be entitled;

(v) the Property sold, leased or otherwise disposed of does not, for any consecutive twelve (12) month period, exceed three percent (3%) of the total Book Value or, at the option of the Obligated Group Agent, the Current Value of all Property of the Obligated Group and the Historical Debt Service Coverage Ratio was not less than 1.30:1 for the last Fiscal Year for which audited financial statements have been delivered to the Master Trustee, and as of the end of the last fiscal quarter for which financial statements have been delivered to the Master Trustee as required under Section 415 hereof, the Obligated Group had not less than two hundred twenty-five (225) Days' Cash on Hand after giving effect to the transaction. If the Historical Debt Service Coverage Ratio is not less than 1.30:1, the foregoing percentage of the total Book Value or Current Value may be increased as follows under the following conditions:

(A) to five percent (5%), if Days' Cash on Hand would not be less than three hundred (300) after the effect of such sale, lease or disposition of assets; or

(B) to ten percent (10%), if Days' Cash on Hand would not be less than four hundred (400) after the effect of such sale, lease or disposition of assets; or

(C) to fifteen percent (15%), if Days' Cash on Hand would not be less than five hundred (500) after the effect of such sale, lease, or disposition of assets;

(vi) to any Person, if such Property consists solely of assets that are specifically restricted by the donor or grantor to a particular purpose that is inconsistent with their use for payment on the Obligations; and

(vii) if the amount of such Property sold, leased or otherwise disposed of does not, for any consecutive twelve (12) month period, exceed one percent (1%) of the total Book Value (or Current Value if the Obligated Group Agent so elects) of all Property of the Obligated Group.

(b) If the Property to be disposed in accordance with this Section is Mortgaged Property, the Master Trustee shall, upon the request of the Obligated Group Agent, release such Mortgaged Property from the Mortgage pursuant to the terms of the Mortgages; provided, however, that no Land or Buildings shall be released from the Mortgaged Property without the written consent of a Majority of the Holders.  Except as otherwise expressly provided herein with respect to sale of the Excess Land, any proceeds of such disposition shall constitute Gross Revenues and be deposited to the Gross Revenue Fund upon receipt.

### Section 419. Residency Agreements; Pricing.

(a) From and after the Closing Date, Obligated Group Members shall contract with Residents and prospective Residents on the basis of a the forms of Residency Agreements substantially similar to that provided to the Master Trustee on the Closing Date.  A form of Residency Agreement shall not be amended or modified in any material respect unless the Obligated Group Agent shall provide written notice to the Master Trustee and the Series 2013 Bond Trustee of such modification, which notice shall contain a description of the proposed changes to be made to the form of the Residency Agreement and the basis therefor and a certification by the Obligated Group Agent that either (i) the proposed changes are not expected to have any material adverse effect on aggregate Revenues or aggregate Expenses or (ii) if a material adverse effect on aggregate Revenues or Expenses is expected, that that such modifications are not expected to decrease future Excess Cash over the remaining term of the Series 2013 Obligations from what it would be without such modifications.

(b) The Obligated Group shall make refunds of Entrance Fees to Residents only in accordance with Applicable Law and the refund provisions contained in the Residency Agreement, except as otherwise approved in writing by the Master Trustee.

Section 420. Obligation Register. The Master Trustee will keep the Obligation Register at the Office of the Master Trustee.  At reasonable times and under reasonable regulations established by the Master Trustee, the list of last known Holders held as part of the Obligation Register may be inspected and copied by any Member, any Obligation Holder, or the authorized representative thereof, provided that the ownership of such Holder and the Town of any such designated representative shall be evidenced to the satisfaction of the Master Trustee.

Section 421. Designation of Additional Paying Agents. The Obligated Group Agent may, in its discretion, cause the necessary arrangements to be made through the Master Trustee and to be thereafter continued for the designation of alternate Paying Agents, if any, and for the making available of funds hereunder for the payment of such of the Obligations as shall be presented when due at the Office of the Master Trustee, or at the designated or principal corporate trust office of said alternate Paying Agents.

Section 422. Further Assurances; Additional Property. (a) The Members will do, execute, acknowledge, and deliver, or cause to be done, executed, acknowledged, and delivered, all such further acts, deeds, conveyances, mortgages, assignments, transfers, and assurances as the Master Trustee reasonably may require for the better assuring, assigning and confirming unto the Master Trustee, its successors and assigns, all and singular the security granted hereunder, if any.

(b) All right, title, and interest of the Members in and to all improvements, betterments, renewals, substitutions and replacements of the Property constituting the Trust Estate or any part thereof, hereafter acquired by a Member, immediately upon such acquisition, and without any further mortgaging, conveyance or assignment, shall become and be part of the Trust Estate and shall be subject, if applicable to Property of such type, to the security interest of this Master Indenture and/or any subsequently created liens and security interest securing the Obligations as fully and completely and with the same effect as though owned by the Members at the time this Master Indenture was executed or any and all such other liens and security interests were created, but at any and all times the Members will execute and deliver to the Master Trustee any and all such further assurances, mortgages, conveyances or assignments thereof and other instruments with respect thereto as the Master Trustee may reasonably require for the purpose of expressly and specifically subjecting the same to the security interest of this Master Indenture or such other subsequently created liens and security interests.

Section 423. Indemnity. (a) Each Member shall pay, and shall protect, indemnify, and save the Master Trustee and any holder or beneficial owner of Obligations or Related Bonds harmless from and against any and all liabilities, losses, damages, costs, and expenses (including attorneys' fees and expenses of such Member and the Master Trustee), causes of action, suits, claims, demands, and judgments of whatsoever kind and nature (including those arising or resulting from any injury to or death of any person or damage to Property) arising from or in any manner directly or indirectly growing out of or connected with the following:

(i)    the use, non-use, condition, or occupancy of any of the Property of any Member, any repairs, construction, alterations, renovation, relocation, remodeling, and equipping thereof or thereto or the condition of any of such Property including adjoining sidewalks, streets, or alleys and any equipment or Facilities at any time located on such Property or used in connection therewith but which are not the result of the negligence or willful misconduct of the Master Trustee;

(ii)    violation of any agreement, warranty, covenant, or condition of this Master Indenture, except by the Master Trustee;

(iii)    violation of any contract, agreement, or restriction by any Member relating to its Property;

(iv)    violation of any law, ordinance, regulation, or court order affecting any Property of any Member or the ownership, occupancy, or use thereof;

(v)    any statement or information concerning any Member or its officers and members or its Property, contained in the Disclosure Statement or in any official statement or other offering document furnished to the Master Trustee or the purchaser of any Obligations or any Related Bonds, that is untrue or incorrect in any material respect, and any omission from such official statement or other offering document of any statement or information that should be contained therein for the purpose for which the

IV-21

same is to be used or that is necessary to make the statements therein concerning any Member, its officers and members and its Property not misleading in any material respect, provided that the Disclosure Statement, official statement or other offering document has been approved by the Obligated Group Agent and the indemnified party did not have knowledge of the omission or misstatement or did not use the Disclosure Statement, official statement or other offering document with reckless disregard of or negligence in regard to the accuracy or completeness of the Disclosure Statement, official statement or other offering document; and

(vi)  the exercise and performance of any of the Master Trustee's powers and duties hereunder except to the extent that such loss, liability, or damage, including reasonable attorneys' fees, is incurred by reason of the Master Trustee's negligence or willful misconduct.

(b)  Such indemnity shall extend to each Person, if any, who "controls" the Master Trustee as that term is defined in Section 15 of the Securities Act of 1933, as amended.

(c)  In the event of settlement of any litigation commenced or threatened, such indemnity shall be limited to the aggregate amount paid under a settlement effected with the written consent of the Obligated Group Agent and the expenses of the indemnified person(s).

(d)  The Master Trustee shall promptly notify the Obligated Group Agent in writing of any claim or action brought against the Master Trustee or any controlling Person, as the case may be, in respect of which indemnity may be sought against any Member, setting forth the particulars of such claim or action, and the Obligated Group will assume the defense thereof, including the employment of counsel satisfactory to the Master Trustee or such controlling Person, as the case may be, and the payment of all expenses.  The Master Trustee or any such controlling Person, as the case may be, may employ separate counsel in any such action and participate in the defense thereof, and the reasonable fees and expenses of such counsel shall not be payable by the Obligated Group unless such employment has been specifically authorized by the Obligated Group Agent.  The obligations of the Obligated Group set forth in this Section shall survive the assignment or termination of this Master Indenture and the resignation or removal of the Master Trustee.

**Section 424. Days' Cash on Hand Covenant**.  (a) The Obligated Group covenants that, commencing on June 30, 2014 and thereafter as of each December 31 and June 30 (each a "***Days' Cash on Hand Testing Date***"), it will maintain not less than the Days Cash on Hand required as of each such date, (the "***Days' Cash on Hand Requirement***"), as set forth in the chart below (the "***Days' Cash on Hand Requirement Chart***"):

| Period Ending | Column 1<br>Days' Cash on Hand Requirement | Column 2<br>Days' Cash on Hand Requirement | Column 3<br>Days' Cash on Hand Requirement |
|---|---|---|---|
|  |  |  |  |
| June 30, 2014 | 52.00 | 48.00 | 40.00 |
| December 31, 2014 | 55.00 | 51.00 | 43.00 |
| June 30, 2015 | 55.75 | 51.75 | 44.00 |
| December 31, 2015 | 57.75 | 53.75 | 46.00 |
| June 30, 2016 | 60.50 | 56.50 | 49.00 |
| December 31, 2016 | 65.50 | 61.50 | 51.50 |
| June 30, 2017 | 70.25 | 66.00 | 54.00 |
| December 31, 2017 | 76.00 | 71.50 | 57.50 |
| June 30, 2018 | 80.50 | 76.00 | 60.00 |
| December 31, 2018 and thereafter | 85.00 | 80.00 | 60.00 |

(b) If the actual Days' Cash on Hand as of any Days' Cash on Hand Testing Date is less than the Days' Cash on Hand Requirement in Column 1 of the Days' Cash on Hand Requirement Chart, the Obligated Group Agent shall retain a Consultant to make recommendations with respect to the rates, fees, and charges of the Obligated Group and the Obligated Group's methods of operation and other factors affecting its financial condition in order to increase the Days' Cash on Hand to the Days' Cash on Hand Requirement for future periods as set forth in Column

1 of the Days' Cash on Hand Requirement Chart. A copy of the Consultant's report and recommendations, if any, shall be filed by the Obligated Group Agent with the Master Trustee, which shall cause the same to be posted on EMMA within sixty (60) days after the date such Consultant is retained. Each Member of the Obligated Group shall follow the recommendation of the Consultant applicable to it to the extent feasible (as determined in the reasonable judgment of the Governing Body of the Member) and permitted by law.

(c) If the actual Days' Cash on Hand as of any Days' Cash on Hand Testing Date is less than the Days' Cash on Hand Requirement in Column 2 of the Days' Cash on Hand Requirement Chart, the Obligated Group Agent shall terminate the Management Agreement and shall enter into a new Management Agreement with a new Manager within sixty (60) days after the Officer's Certificate setting forth the calculation of the Day's Cash on Hand calculation has been delivered to the Master Trustee.

(d) Notwithstanding any other provision of this Master Indenture, failure of the Obligated Group to achieve the Days' Cash on Hand Requirement in Column 1 or Column 2 of the Day's Cash on Hand Requirement Chart for any Days' Cash on Hand Testing Date shall not constitute an Event of Default if the Obligated Group takes all action necessary to comply with the procedures set forth in (b) and/or in (c), as applicable.

(e) If the actual Days' Cash on Hand as of any Days' Cash on Hand Testing Date is less than the Days' Cash on Hand Requirement in Column 3 of the Days' Cash on Hand Requirement Chart, such event shall constitute an Event of Default. In such event, the Obligated Group Agent shall terminate the Management Agreement and shall enter into a new Management Agreement with a new Manager within sixty (60) days after the Officer's Certificate setting forth the calculation of the Day's Cash on Hand calculation has been delivered to the Master Trustee, provided that neither the existence of such obligation nor the Obligated Group's compliance therewith shall affect the Master Trustee's right to exercise any other remedies hereunder with respect to such Event of Default.

(f) The Obligated Group covenants that, commencing with the fiscal quarter ending on September 30, 2014 and thereafter for each fiscal quarter ending on March 31 and September 30 (each a "***Days' Cash on Hand Reporting Date***"), it will deliver to the Master Trustee no later than twenty (20) days after the applicable Days' Cash on Hand Reporting Date an Officer's Certificate setting forth such calculation as of such Days' Cash on Hand Reporting Date based on unaudited financial statements, and if the reported Days Cash on Hand as of any such date is below the applicable Days Cash on Hand Target set forth in the chart below, a plan of the Obligated Group for attaining the applicable Days' Cash on Hand Requirement by the next Cash on Hand Testing Date:

| Quarter Ending | Column 1 Days' Cash on Hand Target |
|---|---|
| September 30, 2014 | 53.00 |
| March 31, 2015 | 54.75 |
| September 30, 2015 | 56.75 |
| March 31, 2016 | 58.50 |
| September 30, 2016 | 63.50 |
| March 31, 2017 | 66.25 |
| September 30, 2017 | 73.25 |
| March 31, 2018 | 77.75 |
| September 30, 2018 | 84.25 |
| March 31, 2018 and thereafter | 85.00 |

<u>**Section 425. Occupancy Covenant**</u>.

(a) The Obligated Group covenants that as of the last day of the applicable Occupancy Quarter commencing with the fiscal quarter ending on December 31, 2013 and continuing thereafter, the Obligated Group shall cause to have Occupied the total number of all Independent Living Units, all Assisted Living Units, and all Skilled Nursing Units (as respectively applicable, the "***Number of Units Occupied***") at or above the applicable requirement set forth below (each an "***Occupancy Requirement***"):

| | Occupancy Requirement | | |
|---|---|---|---|
| Occupancy Quarter Ending | Independent Living Units | Assisted Living Units | Skilled Nursing Units |
| December 31, 2013 | 40.0 | 84.0 | 150.3 |
| March 31, 2014 | 41.0 | 84.0 | 151.2 |
| June 30, 2014 | 41.0 | 85.0 | 152.1 |
| September 30, 2014 | 42.0 | 85.0 | 153.0 |
| December 31, 2014 | 42.0 | 86.0 | 153.9 |
| March 31, 2015 | 42.0 | 86.0 | 155.0 |
| June 30, 2015 | 42.0 | 86.0 | 156.2 |
| September 30, 2015 | 43.0 | 87.0 | 157.3 |
| December 31, 2015 | 43.0 | 87.0 | 158.4 |
| March 31, 2016 | 44.0 | 88.0 | 159.3 |
| June 30, 2016 | 44.0 | 88.0 | 160.2 |
| September 30, 2016 | 44.0 | 89.0 | 161.1 |
| December 31, 2016, and each quarter thereafter | 44.0 | 89.0 | 162.0 |

(b)  If the Number of Units Occupied for Independent Living Units, Assisted Living Units, or Skilled Nursing Units in any Occupancy Quarter is less than the applicable Occupancy Requirement for such Occupancy Quarter, the Obligated Group Agent shall retain a Consultant to make recommendations regarding the actions to be taken to increase the Number of Units Occupied to at least the applicable Occupancy Requirement set forth above on the earliest date practicable. Each Member shall follow each recommendation of the Consultant to the extent feasible (as determined in the reasonable judgment of the Governing Body of such Member) and permitted by law. The Consultant shall be retained by the Obligated Group Agent within thirty (30) days of reporting the Number of Units Occupied for such Occupancy Quarter to the Master Trustee.

(c)  If the Number of Units Occupied for Independent Living Units for any two (2) consecutive Occupancy Quarters is less than the applicable Independent Living Units Occupancy Requirement for such Occupancy Quarters, then the Obligated Group Agent shall, upon request of the Master Trustee, retain a sales and marketing firm reasonably acceptable to the Master Trustee acting at the direction of the Majority of the Senior Bond Holders within thirty (30) days of such request, to take actions designed to increase the Number of Units Occupied for Independent Living Units to at least the Independent Living Units Occupancy Requirement set forth above on the earliest date practicable.. Each Member shall permit such firm to engage in the sales and marketing activities recommended by such firm to the extent feasible (as determined in the reasonable judgment of the Governing Body of such Member) and permitted by law.

(d)  If, for any two (2) consecutive Occupancy Quarters, the Number of Units Occupied for Assisted Living Units or Skilled Nursing Units is less than the applicable Assisted Living Units Occupancy Requirement or the Skilled Nursing Units Occupancy Requirement for such Occupancy Quarters, then the Obligated Group Agent shall, upon request of the Master Trustee, terminate the existing Management Agreement and enter into a new Management Agreement with a new Manager within sixty (60) days of such request.

(e)  Notwithstanding any other provision of this Master Indenture, failure of the Obligated Group to achieve the Occupancy Requirement shall not constitute an Event of Default if the Obligated Group takes all action necessary to comply with the applicable procedures set forth above.

**Section 426. Operating Ratio Covenant**. (a) The Obligated Group covenants that as of the end of each fiscal quarter commencing with the fiscal quarter ending on December 31, 2013 and thereafter, the Obligated Group shall maintain an Operating Ratio of not more than 1.10, measured as of the last day of the applicable fiscal quarter (the "***Operating Ratio Requirement***").

(b) If the Operating Ratio as of the end of any fiscal quarter is more than the Operating Ratio Requirement, the Obligated Group Agent shall retain a Consultant to make recommendations regarding the actions to be taken to decrease the Operating Ratio to at least the Operating Ratio Requirement set forth above on the earliest date

IV-24

practicable. Each Member shall follow each recommendation of the Consultant to the extent feasible (as determined in the reasonable judgment of the Governing Body of such Member) and permitted by law. Such Consultant shall be retained within thirty (30) days of the Obligated Group Agent's reporting of the Operating Ratio for such quarter to the Master Trustee.

(c) If the Operating Ratio as of the end of any two (2) consecutive fiscal quarters is more than the Operating Ratio Requirement, the Obligated Group Agent shall terminate its Management Agreement with LCS and shall enter into a new Management Agreement with a new Manager within sixty (60) days of the Obligated Group Agent's reporting of the applicable Operating Ratio triggering such requirement to the Master Trustee.

(d) Notwithstanding any other provision of this Master Indenture, failure of the Obligated Group to achieve the Operating Ratio Requirement shall not constitute an Event of Default if the Obligated Group takes all action necessary to comply with the procedures set forth above.

**Section 427. Gross Revenue Fund**.

(a) The Master Trustee shall establish and maintain a separate Fund to be known as the "Gross Revenue Fund - The Estelle Peabody Memorial Home of the Synod of Lincoln Trails of the Presbyterian Church (U.S.A.)" (the "***Gross Revenue Fund***") into which the Obligated Group shall deposit, or cause to be deposited, on a daily basis, all Gross Revenues received by it in the form of cash, checks, or negotiable instruments, including Entrance Fees released to the Gross Revenue Fund from the Entrance Fees Fund as set forth in Section 432.

(b) On the first (1st) Business Day of each calendar month, amounts in the Gross Revenue Fund shall be transferred or deposited, as applicable, by the Master Trustee in the following order of priority (the "***Distribution Waterfall***"):

(i)    FIRST: to the Corporation, an amount set forth in an Officer's Certificate necessary to pay any refunds required by the terms of the Residency Agreements and Applicable Law; and

(ii)    SECOND: to the Operating Account (A) prior to the application of the Lock-Box Budget provisions of Section 514 hereof and after any suspension of such provisions of Section 514 hereof, (x) 120% of the amount certified by the Corporation (in an Officer's Certificate setting forth in reasonable detail the projected application of the amount so certified) as necessary to pay anticipated Operating Expenses for the upcoming month (taking into account any unapplied amount withdrawn for such purpose in a prior month) plus (y) 100% of the amount certified by the Corporation (in an Officer's Certificate setting forth in reasonable detail the projected application of the amount so certified) as necessary to pay Budgeted Capital Expenditures for the upcoming month (subject to the further provisions of this paragraph and taking into account any unapplied amount withdrawn for such purpose in a prior month), or (B) during any period during which the Lock-Box Budget provisions of Section 514 hereof shall be applicable, (x) 120% of the amount set forth in the Lock-Box Budget as Operating Expenses for such upcoming month (taking into account any unapplied amount withdrawn for such purpose in a prior month) plus (y) 100% of the amount set forth in the Lock-Box Budget as Budgeted Capital Expenditures for such upcoming month (subject to the further provisions of this paragraph and taking into account any unapplied amount withdrawn for such purpose in a prior month); provided that the aggregate amount so transferred to the Operating Account for Budgeted Capital Expenditures in any Fiscal Year shall not exceed the Revenue Fund Maximum, and

(iii)    THIRD: to the Series 2013 Bond Trustee for deposit to the 2013 Debt Service Fund and in respect of the Series 2013A Bond Obligations, in the following order of priority: (1) if prior to January 1, 2014, an amount equal to the lesser of (x) one-___(1/__) of the interest payable on the Series 2013A Bonds on January 1, 2014, or (y) taking into account all amounts in the 2013A Interest Fund Account available to pay interest on the Series 2013A Bonds, such lesser sum as shall be required to pay the interest payable on the Series 2013A Bonds on January 1, 2014, (2) if after January 1, 2014, an amount equal to the lesser of (x) one-sixth (1/6th) of the interest payable on the Series 2013A Bonds on the immediately succeeding Interest Payment Date or (y) taking into account all amounts in the 2013A Interest Fund available to pay interest on the Series 2013A Bonds, such lesser sum as shall be required to pay the interest payable on the Series 2013A Bonds on the immediately succeeding Interest Payment Date, (3) if after [date that is 2 years from the Closing Date], an amount equal to the lesser of (x) one-twelfth (1/12th) of the

principal payable with respect to the Series 2013A Bonds on the immediately succeeding July 1 by maturity or mandatory bond sinking fund redemption pursuant to Section 502 of the Series 2013 Bond Indenture or (y) taking into account all amounts in the 2013A Bond Sinking Fund Account of the 2013 Bond Sinking Fund available to pay principal of the Series 2013A Bonds, such lesser sum as shall be required to pay the principal payable with respect to the Series 2013A Bonds on the immediately succeeding July 1 by maturity or mandatory bond sinking fund redemption pursuant to Section 502 of the Series 2013 Bond Indenture (as such amounts shall be certified to the Master Trustee by the Series 2013 Bond Trustee), and (4) any past due amounts under this subparagraph (iii),; and

    **(iv)**    **FOURTH**: to the Repair and Replacement Fund an amount equal to the lesser of (1) $75,000 or (2) the amount, if any, required to cause the balance in the Repair and Replacement Fund to equal $250,000; and

    **(v)**    **FIFTH**: to the Operating Account to pay the remaining one-half of monthly fees due to the Manager under the terms of the Management Agreement; and

    **(vi)**    **SIXTH**: to the Series 2013 Bond Trustee to be deposited to the 2013 Debt Service Reserve Fund the amount, if any, required to cause the balance in the 2013 Debt Service Reserve Fund to equal the 2013 Debt Service Reserve Fund Requirement; and

    **(vii)**    **SEVENTH:** to the Repair and Replacement Fund the amount, if any, required to cause the balance in the Repair and Replacement Fund to equal $250,000; and

    **(viii)**    **EIGHTH**: the amount remaining after application of the preceding subparagraphs (i) through (vii) above (such amount, the "***Excess Cash***") to the Series 2013 Bond Trustee to be applied as follows:

    (1) 75% of such Excess Cash shall be transferred in the following priority: (I)(a) if prior to January 1, 2014, to the Debt Service Fund, an amount equal to the lesser of (1) one-___ (1/___) of the interest payable on the Series 2013B Bonds on January 1, 2014 plus the amount of any remaining deficiency in the amounts available for any such required transfer in any prior month, (2) taking into account all amounts in the 2013B Interest Fund Account available to pay interest on the Series 2013B Bonds, such sum as shall be required to pay the interest payable on the Series 2013B Bonds on January 1, 2014 or (3) the amount of such Excess Cash available for such transfer, (b) after January 1, 2014, to the Debt Service Fund an amount equal to the lesser of (1) one-sixth (1/6th) of the interest payable on the Series 2013B Bonds on the immediately succeeding Interest Payment Date plus the amount of any remaining deficiency in the amounts available for any such required transfer in any prior month, (2) taking into account all amounts in the 2013B Interest Fund available to pay interest on the Series 2013B Bonds, such sum as shall be required to pay the interest payable on the Series 2013B Bonds on the immediately succeeding Interest Payment Date, or (3) the amount of such Excess Cash available for such transfer, and (c) on or after July 1, 2044, to the Debt Service Fund an amount equal to the lesser of (1) one-twelfth (1/12th) of the principal, if any, payable with respect to the Series 2013B Bonds on the maturity date thereof or (2) taking into account all amounts in the 2013 Debt Service Reserve Fund available to pay the principal of the Series 2013B Bonds, such sum as shall be required to pay the principal payable on the maturity date with respect to the Series 2013B Bonds, and (II), if any such Excess Cash remains after payment of the foregoing, for deposit to the 2013B Optional Redemption Account in the Optional Redemption Fund for the redemption of Series 2013B Bonds, and

    (2) 25% of such Excess Cash (25%) shall be transferred (a) to the Operating Reserve Account upon certification by the Corporation in an Officer's Certificate to the Master Trustee that such transfer, or the transfer of a lesser amount specified in such Officer's Certificate, shall not cause the balance therein to exceed the Operating Reserve Account Requirement, and (b) to the Bond Trustee for application as provided in (1) above, in the case of any amount for which the Master Trustee does not receive an Officer's Certificate described in clause (a); and

    (3) if no Series 2013B Bonds remain Outstanding, to the Corporation.

    (c) With respect to any amount transferred to a Related Bond Trustee pursuant to the provisions of this Section, the Master Trustee shall identify the subsection, subparagraph, or item of this Section directing such transfer, and, if applicable, the fund or account to which such transfer should be deposited.

(d) Notwithstanding the foregoing, upon the occurrence and during the continuance of an Event of Default, a Majority of the Applicable Holders may direct the Master Trustee to reorder the priority of the subparagraphs contained in the Distribution Waterfall, and in such event, the Distribution Waterfall shall be deemed revised accordingly.

### Section 428. Operating Reserve Account.

(a) The Corporation shall establish and maintain a separate Operating Reserve Account. All moneys held in the Operating Reserve Account shall be subject to a Control Agreement in favor of the Master Trustee and to the extent received or applied by the Master Trustee shall be trust funds held under the terms of this Master Indenture for the benefit of all of the Outstanding Obligations (except as otherwise provided) and shall not be subject to lien or attachment of any other creditor of any Member of the Obligated Group. The balance in the Operating Reserve Account shall not exceed the Operating Reserve Account Requirement

(b) Moneys in the Operating Reserve Account shall be disbursed as follows, without priority:

(i) to or for the account of the Corporation for the payment of Operating Expenses, in which event the Corporation shall provide to the Master Trustee monthly written notice specifying the amount of such moneys applied in the preceding month to pay Operating Expenses specifically itemized in such notice, including the amount applied for each specific use; or

(ii) for deposit in the Revenue Fund and application in accordance with Section 427(b)(iii) to pay the principal of, and interest on, the Senior Obligations to the extent that there are insufficient funds available therefor under this Master Trust Indenture or under the Related Bond Indenture (other than in any applicable debt service reserve fund or in the Repair and Replacement Fund); provided that, if the amounts available in the Operating Reserve Account are less than the aggregate amount of such insufficiency, such payments shall be applied to the respective Senior Obligations on a *pro rata* basis in accordance with the respective principal amounts of the applicable Obligations Pursuant to the Control Agreement, the Master Trustee shall be authorized to make any such withdrawals from the Operating Reserve Account; or

(iii) to or for the account of the Corporation for the payment of Budgeted Capital Expenditures, but only if so authorized by a Majority of the Applicable Holders.

### Section 429. Repair and Replacement Fund.

(a) The Master Trustee shall establish and maintain a separate Fund to be known as the "Repair and Replacement Fund - The Estelle Peabody Memorial Home of the Synod of Lincoln Trails of the Presbyterian Church (U.S.A.)" (the "***Repair and Replacement Fund***"). On the Closing Date, the Corporation shall deposit $250,000 from available Cash to the Repair and Replacement Fund. The balance in the Repair and Replacement Fund shall not exceed $250,000.

(b) Amounts on deposit in the Repair and Replacement Fund may be used by the Corporation for the purpose of:

(i) funding Budgeted Capital Expenditures following receipt by the Master Trustee of a Written Request to the Master Trustee that describes the specific uses for which such moneys are needed and the amount needed for each such specific use and that such expenses have not been paid from, and that no moneys are available for the payment of such expenses in the Operating Account; or

(ii) to pay the principal of, and interest on, the Senior Obligations to the extent that there are insufficient funds available therefor under this Master Trust Indenture or under the Related Bond Indenture (other than in any applicable debt service reserve fund); provided that, if the amounts available in the Repair and Replacement Fund are less than the aggregate amount of such insufficiency, such payments shall be applied to the respective Senior Obligations on a *pro rata* basis in accordance with the respective principal amounts of the applicable Obligations. The Corporation hereby authorizes and directs

the Master Trustee to withdraw funds from the Repair and Replacement Fund to pay the principal of, and interest on, the Senior Obligations to the extent that there are insufficient funds available therefor under this Master Trust Indenture or under the Related Bond Indenture (other than in any applicable debt service reserve fund).

(c) Notwithstanding the provisions of subsection (b)(i) of this Section, if a draw from the Repair and Replacement Fund would result in more than the Repair and Replacement Fund Maximum being drawn therefrom in any one Fiscal Year, the Master Trustee shall not fund such draw unless the Master Trustee shall have received the written consent of a Majority of the Senior Holders. The Master Trustee shall forward written notice of any such requested withdrawal to the Holders of the Obligations promptly, and in any event, no less than two (2) Business Days after receipt of the applicable Written Request from the Corporation. The Master Trustee shall notify the Corporation within 15 days after forwarding such written notice whether the Master Trustee has or has not received such consent or does not yet have sufficient input to provide a response.

**Section 430. Insurance and Condemnation Award Fund**. Reference is hereby made to Section 411 and 412 hereof whereunder it is provided that under certain circumstances the Net Proceeds of insurance and condemnation awards are to be paid to the Master Trustee and deposited into the Insurance and Condemnation Award Fund, and are to be disbursed and paid out as therein provided. The Master Trustee hereby accepts and agrees to perform the duties and obligations as therein specified. The Master Trustee shall establish and maintain a separate trust fund to be known as the "Insurance and Condemnation Award Fund - The Estelle Peabody Memorial Home of the Synod of Lincoln Trails of the Presbyterian Church (U.S.A.)" (the "***Insurance and Condemnation Award Fund***") which shall be opened only if funds are required to be deposited therein as provided in such Sections 411 and 412. The Master Trustee shall also establish and maintain a separate account within the Insurance Fund and Condemnation Award Fund with respect to each event or occurrence giving rise to a deposit therein. Funds held in the Insurance and Condemnation Award Fund shall be disbursed in accordance with Sections 411 and 412 hereof upon receipt of a requisition for payment substantially in the form attached as Exhibit "F" to this Master Indenture, and the Master Trustee is hereby authorized and directed to issue its checks or wires for each disbursement upon receipt of such a requisition. Notwithstanding anything contained herein to the contrary, any amounts required to be deposited in the Insurance and Condemnation Award Fund in accordance with the provisions of this Master Indenture shall be deposited in the applicable account thereof, and, prior to the occurrence of an Event of Default, any amounts in an account of the Insurance and Condemnation Award Fund may be used as described in Sections 411 and/or 412 hereof.

**Section 431. Costs of Issuance Fund**.

(a) The Master Trustee shall establish and maintain a separate trust fund to be known as the "Costs of Issuance Fund - The Estelle Peabody Memorial Home of the Synod of Lincoln Trails of the Presbyterian Church (U.S.A.)" (the "***Costs of Issuance Fund***"). There shall be deposited into the Costs of Issuance Fund, the amounts described in the recitals to this Master Indenture. Moneys in the Costs of Issuance Fund shall be disbursed upon receipt of a requisition for payment substantially in the form attached as Exhibit "G" to this Master Indenture, and the Master Trustee is hereby authorized and directed to so disburse funds upon receipt of such a requisition. If any funds remain in the Costs of Issuance Fund on _____, 2013, the Master Trustee shall transfer any funds remaining therein to the Gross Revenue Fund.

(b) The Master Trustee shall keep and maintain adequate records pertaining to the Costs of Issuance Fund and all disbursements therefrom, and after all amounts are disbursed from the Costs of Issuance Fund, the Master Trustee shall, if requested by the Corporation, file an accounting thereof with the Corporation and the Series 2013 Bond Trustee.

**Section 432. Entrance Fees Fund**.

(a) The Master Trustee shall establish and maintain a separate trust fund to be known as the "Entrance Fees Fund - The Estelle Peabody Memorial Home of the Synod of Lincoln Trails of the Presbyterian Church (U.S.A.)" (the "***Entrance Fees Fund***"). There shall be deposited into the Entrance Fees Fund all Entrance Fees received by the Obligated Group, and such Entrance Fees shall be held by the Master Trustee, subject to and in accordance with the Applicable Laws.

IV-28

(b) Subject to an in accordance with the Applicable Laws, Entrance Fees held in the Entrance Fee Fund shall flow to the Gross Revenue Fund only after the later of, for each Entrance Fee, (i) occupancy by a Resident of a unit at the Facilities pursuant to a Residency Agreement or (ii) the expiration of any applicable rescission rights under a Residency Agreement (a "*Release Event*"). The Obligated Group shall notify the Master Trustee promptly (and in any event at least on a monthly basis) of the occurrence of a Release Event with respect to an Entrance Fee, which notice shall include the amount of the applicable Entrance Fee. Upon receipt of notice of a Release Event, the Master Trustee shall transfer an amount equal to the applicable Entrance Fee to the Gross Revenue Fund.

(c) The lien of the Master Trustee on the Entrance Fee Fund shall at all times be subject to Applicable Laws and in no event shall Entrance Fees in the Entrance Fee Fund be applied in a manner that is contrary to any Applicable Law in effect at the time.

**Section 433. Investment of the Gross Revenue Fund, the Operating Reserve Account, the Repair and Replacement Fund, the Insurance and Condemnation Award Fund, the Costs of Issuance Fund and the Entrance Fee Fund.**

(a) Any moneys held by the Master Trustee in the Gross Revenue Fund, the Operating Reserve Account, the Repair and Replacement Fund, the Insurance and Condemnation Award Fund, the Costs of Issuance Fund and the Entrance Fee Fund shall be invested by the Master Trustee, upon the written direction of the Obligated Group Agent, in Permitted Investments. Such investments shall mature or be available for withdrawal at par without penalty on or prior to the date or dates that moneys therefrom are anticipated to be required. The Master Trustee, unless specifically prohibited by the Obligated Group Agent in writing, may trade with itself, or any bank affiliated with it, in the purchase and sale of such investments and may charge and collect its or their customary fees and expenses. The Master Trustee shall not be liable or responsible for any loss resulting from such investments. Any investment income or other gain from any investment of moneys on deposit in the Gross Revenue Fund, the Operating Reserve Account, the Repair and Replacement Fund, the Insurance and Condemnation Award Fund, the Costs of Issuance Fund and the Entrance Fee Fund shall, except as otherwise provided herein, be retained therein. Any loss resulting from such investments shall be charged to the Gross Revenue Fund, the Operating Reserve Account, the Repair and Replacement Fund, the Insurance and Condemnation Award Fund, the Costs of Issuance Fund and the Entrance Fee Fund, as the case may be.

(b) The Master Trustee shall be entitled to presume that any investments made at the direction of the Obligated Group Agent will not cause any Related Bonds to be "arbitrage bonds" and that such investments, if Permitted Investments, are otherwise permitted by the terms of this Master Indenture and Applicable Law. Notwithstanding any provision of this Master Indenture to the contrary, the Master Trustee shall not be liable or responsible for any calculation or determination that may be required in connection with or for the purpose of complying with Section 148 of the Code including, without limitation, the calculation of amounts required to be paid to the United States under the provisions of Section 148 of the Code, and shall be entitled to rely on the directions or absence of directions of the Obligated Group Agent and any rebate analyst.

**Section 434. Notice of Material Adverse Effect**. Promptly after becoming aware thereof, the Obligated Group Agent shall provide the Required Information Recipients, and the Master Trustee shall post or cause to be posted on EMMA, written notice of any event that has had, or any Obligated Group Member reasonably anticipates will have, a Material Adverse Effect.

**Section 435. Actuarial Study**. If the audited financial statements of the Obligated Group shall show any unfunded future service obligations, at the Master Trustee's request, the Obligated Group shall furnish an actuarial study, prepared by an actuary acceptable to the Master Trustee, with respect to the Residents in the Facilities and the pricing of Entrance Fees and Resident Service Fees, which shall set forth any recommendations necessary to meet such unfunded service obligations in a timely fashion. The Obligated Group shall take any action necessary to implement the recommendations made in such actuarial study.

**Section 436. Governmental Filings**. The Obligated Group Agent shall, to the extent permitted by law, promptly upon the filing or sending or receipt thereof, furnish to the Required Information Recipients, and upon receipt thereof the Master Trustee shall post or cause to be posted on EMMA, (i) a copy of any filing made by the

Obligated Group Agent or any Member of the Obligated Group with any Governmental Authority relating to the Facilities; (ii) copies of each annual licensure or other inspection report of the Facilities by any Governmental Authority; and (iii) any correspondence to or from the Internal Revenue Service concerning the status of any Obligated Group Member as an organization described in Section 501(c)(3) of the Code or with respect to the tax-exempt status of any Related Bonds.

**Section 437. Insurance Consultant Certification**. At least once during each twelve (12) month period each Fiscal Year, the Obligated Group Agent shall retain an Insurance Consultant who shall review the Obligated Group's insurance and shall certify that the Obligated Group's insurance meets or exceeds the requirements of Section 407 hereof and shall file such certification with the Master Trustee. The Obligated Group Agent shall promptly notify the Master Trustee of any decreases in the amount of any such coverage. A signed copy of the report of the Insurance Consultant shall be filed with each Required Information Recipient, and the Master Trustee upon receipt shall post or cause to be posted such report on EMMA, and the insurance requirements specified hereunder shall be deemed modified or superseded as necessary to conform with the recommendations contained in said report. The Master Trustee shall be entitled to rely upon such certifications of the Insurance Consultant in determining compliance by the Obligated Group with the insurance requirement set forth herein, it being understood and agreed that the Master Trustee has made no representation as to, and shall have no responsibility for, the sufficiency or adequacy of any insurance obtained by an Member of the Obligated Group.

**Section 438. Other Information**. The Obligated Group Agent shall furnish to each Required Information Recipient, and the Master Trustee upon receipt shall post or cause to be posted on EMMA, such other information respecting the business, properties, or the condition or operations, financial or otherwise, of the Obligated Group and the Facilities as the Master Trustee or any Required Information Recipient may from time to time reasonably request.

**Section 439. Notices**. The Obligated Group Agent shall provide to each Required Information Recipient, and the Master Trustee upon receipt shall post or cause to be posted on EMMA:

_(a) Notice of Default._ Immediately upon becoming aware thereof, notice by telephone, promptly confirmed in writing, of any event, action or failure to take any action that constitutes an Event of Default or a Default Condition.

_(b) ERISA._ Promptly after becoming aware of the occurrence of any ERISA Event or of any "prohibited transaction" (as defined in Section 4975 of the Code or Section 406 of ERISA) in connection with any ERISA Plan or any trust created thereunder, a written notice signed by an Authorized Officer specifying the nature thereof, what action the Obligated Group is taking or proposes to take with respect thereto and, when known, any action proposed to be taken by any Governmental Authority with respect thereto.

_(c) Litigation; Arbitration._ Prompt written notice of all actions, suits, and proceedings before any Governmental Authority, domestic or foreign, or any arbitration body or authority, against or involving the any Obligated Group Member or any Affiliate, or the Facilities that involve claims equal to or in excess of $100,000.

_(d) Claimed Default._ Promptly upon receipt of any notice from, or the taking of any action by, the holder of any Indebtedness of the Obligated Group with respect to a claimed default, copies of such notice or a report of such action.

**Section 440. Preservation of Liens; Recordation of Interest**. The Obligated Group shall take all necessary action to maintain and preserve the lien and security interest of the Mortgages and the Security Agreements. The Obligated Group shall cause to be filed, registered, and recorded all necessary financing statements or other instruments, and any amendments or continuation statements relating thereto, necessary to be kept and filed in such manner and in such places as may be required by law to fully preserve and protect the lien and security interest in, and all rights of the Master Trustee and the Obligation Holders with respect to, the Trust Estate. The Obligated Group shall, upon the request of the Master Trustee, from time to time, execute and deliver and, if necessary, file such further instruments and take such further action as may be reasonably necessary to effectuate the provisions of this Master Indenture or to protect the interests of the Master Trustee and the Obligation Holders in the Mortgaged Property and the remainder of the Trust Estate. Except to the extent it is exempt therefrom, the

Obligated Group shall pay or cause to be paid all filing, registration, and recording fees incident to such filing, registration, and recording, and all expenses incident to the preparation, execution, and acknowledgment of such instruments of further assurance, and all federal or state fees and other similar fees, duties, imposts, assessments and charges arising out of or in connection with the execution and delivery of Master Indenture and such instruments of further assurance.

**Section 441. Right of Entry**. Upon prior written notice, the Obligated Group shall permit the Master Trustee or the duly authorized representatives of the Obligation Holders to enter the Facilities, or any parts thereof, during normal business hours to examine and copy the Obligated Group's financial and corporate books, records, and accounts, and to discuss the affairs, finances, business, project status, and accounts of the Obligated Group with the Obligated Group's officers, directors, and employees to monitor compliance with the provisions of the Master Indenture.

**Section 442. Licensure**. Upon any failure to obtain any Permit or any subsequent loss of any Permit, the Obligated Group Agent shall immediately send to each Required Information Recipient, and the Master Trustee upon receipt shall post or cause to be posted on EMMA, a statement setting forth the reasons given by the Governmental Authority and the actions taken or proposed to be taken to obtain or restore the permit.

**Section 443. Preservation of Corporate Existence; 501(c)(3) Status**.

(a) Each Member shall preserve and maintain its corporate existence, right (charter and statutory), and franchises and licenses; provided that no Member shall be required to preserve any right or franchise or license if the Governing Body of the Member shall determine that the preservation thereof shall no longer be desirable in the conduct of the business of the Member and that the loss thereof will not have a Material Adverse Effect.

(b) The Corporation and any Member that is a Tax-Exempt Organization at the time such entity becomes a Member shall preserve and maintain its status as a Tax-Exempt Organization and shall timely and properly file with the IRS all annual reports, tax returns and other matters required to be filed by the Corporation or other Member with the IRS.

**Section 444. Management**.

(a) Life Care Services, LLC, shall serve as the initial Manager of the Facilities under the Management Agreement, subject to replacement in accordance with the terms hereof. Any successor or replacement Manager selected by the Obligated Group Agent shall be approved by a Majority of the Senior Bond Holders and a Majority of the Applicable Holders. Notwithstanding anything herein to the contrary, the effective date of the Corporation's removal of a Manager shall not occur until either (i) a successor Manager has been so approved or (ii) a Majority of the Senior Bond Holders and a Majority of the Applicable Holders have approved self-management by the Corporation. If a Manager resigns, becomes insolvent or otherwise ceases to provide services to the Facilities, the Corporation shall retain a successor or replacement Manager within 90 days after such cessation of services unless a Majority of the Senior Bond Holders and a Majority of the Applicable Holders have approved self-management by the Corporation, provided that if despite the Corporation's exercise of reasonable best efforts, in consultation with the Senior Bond Holders and the Applicable Holders, the Corporation has been unable to identify a successor or replacement Manager acceptable to a Majority of the Senior Bond Holders and a Majority of the Applicable Holders, such 90 day period shall be extended for such additional period as the Corporation continues its reasonable best efforts to identify and obtain the required approvals of a successor or replacement Manager.

(b) The fees of the Manager shall not be payable more frequently than monthly, and the fees of the Manager shall be payable only under the Management Agreement.

(c) Any Management Agreement shall be subject to the prior review and approval by a Majority of the Senior Bond Holders and a Majority of the Applicable Holders.

(d) Unless such a requirement is waived in writing by a Majority of the Senior Bold Holders, any new Management Agreement shall provide for termination without penalty if a report of a Consultant pursuant to Section 424, 425 or 426 hereof recommends that the Obligated Group Agent replace the Manager or if pursuant to any of

IV-31

such Sections the Obligated Group is required to terminate the Manager. If such a report of a Consultant so recommends, unless the Master Trustee shall state otherwise in writing, the Obligated Group agrees to take immediate action to retain another Manager or to retain another Person to provide certain specialized services such as marketing services, as specified in such recommendations. Any such provider of specialized services shall be approved in writing by a Majority of the Senior Bondholders and a Majority of the Applicable Holders. Nothing herein in this Section 444 shall require any Member of the Obligated Group to breach any Management Agreement.

     **Section 445. ERISA Compliance**. The Obligated Group shall, and shall use its best efforts to cause its ERISA Affiliates, to comply, in a timely fashion, with all requirements of ERISA and the Code, including, but not limited to, paying all contributions required to meet the minimum funding standards set forth in ERISA and the Code with respect to each ERISA Plan and to file all annual reports and other disclosures required to be filed pursuant to ERISA or the Code in connection with each ERISA Plan. The Obligated Group shall not terminate or take any other action with respect to, or permit any Affiliate to terminate or take any other action with respect to, any ERISA Plan so as to result in any material liability of the Obligated Group to the PBGC.

     **Section 446. Compliance with Laws**. The Obligated Group shall comply in all material respects with all Applicable Law except for Matters Contested in Good Faith, provided that any such contest shall not have a Material Adverse Effect.

     **Section 447. Collection of Gross Revenues**. Within one Business Day of receipt, the Obligated Group shall remit to the Master Trustee all Gross Revenues for deposit into the Gross Revenue Fund.

     **Section 448. Compliance with Other Agreements**. The Obligated Group shall comply in all material respects with the terms and conditions of this Master Indenture and all other instruments, agreements, and other documents delivered by or on behalf of the Obligated Group in connection with issuance of the Series 2013 Obligations.

     **Section 449. Environmental Report Update**. From time to time, upon the written request of the Master Trustee (but not more than once each year unless required by any Governmental Authority), which request is based on new information that forms the basis for a reasonable belief that a new environmental audit is necessary to evaluate a problem affecting the Land of material concern to the Master Trustee, the Obligated Group Agent shall deliver to the Master Trustee a report prepared by an independent engineering firm or environmental consultant (appropriately licensed and insured) acceptable to the Master Trustee, which report is complete and free of qualification and states that, after due investigation of the Facilities and the Site, (a) there is no evidence that there is any hazardous waste, toxic substance, pollutant, or other contaminant contained in or under the Facilities or the Site (except in accordance with Applicable Law) or (b) any such substances have been removed and disposed of in compliance with all Applicable Law.

     **Section 450. Single Purpose Entity**.

     (a) Each Member shall continue to maintain with commercial banking institutions its own deposit account or accounts separate from those of any Affiliate. Except as provided herein (including in Section 418 hereof), the funds of the Member shall not be diverted to any other Person, including any Affiliate, other than payment of the management fees and expenses under the Management Agreement, or for other business uses of the Obligated Group, nor shall such funds be commingled with the funds of any Affiliate.

     (b) To the extent that any Member shall share the same officers or other employees as any of its Affiliates, the salaries of and the expenses relating to providing benefits to such officers and the employees shall be fairly allocated among such entities, and each such entity shall bear its fair share of the salary and benefit costs associated with all such common officers and employees.

     (c) To the extent that any Member jointly contracts with any of its Affiliates or to do business with vendors or service providers or to share overhead expenses, the costs incurred in so doing shall be allocated fairly among such entities, and each such entity shall bear its fair share of such costs. To the extent that any Member contracts or does business with vendors or service providers where the goods and services provided are partially for the benefit of any other Person, including any of its Affiliates, the costs incurred in so doing shall be fairly allocated to or among such

entities for whose benefit the goods and services are provided, and each such entity shall bear its fair share of such costs.

(d)  To the extent that any Member or any of its Affiliates have offices in the same location, there shall be a fair and appropriate allocation of overhead costs among them, and each such entity shall bear its fair share of such expenses.

(e)  Each Member of the Obligated Group shall:

(i)  maintain books and records separate from those of any other Person, including any of its Affiliate;

(ii)  maintain its assets in such a manner that it is not more costly or difficult to segregate, identify or ascertain such assets;

(iii)  hold regular meetings of its Governing Body and observe all other corporate formalities;

(iv)  hold itself out to creditors and the public as a legal entity separate and distinct from any other Person, including any of its the Affiliates;

(v)  prepare separate tax returns and financial statements, or if part of a consolidated group, then (A) the Member shall be shown as a separate member of such group and (B) the consolidated financial statements shall be appropriately footnoted to show that the Member is not liable or responsible in any manner for the debts or liabilities of any of its Affiliate;

(vi)  conduct business in its name and use separate stationery, invoices and checks;

(vii)  not commingle its assets or funds with those of any other Person, including any of its Affiliates;

(viii) not assume, guarantee or pay the debts or obligations of or hold out its credit as being available to satisfy the obligations of any other Person, including any of its;

(ix)  not engage in any business unrelated to the Facilities and the activities to directly acquire, hold, develop, use, operate and finance, refinance, manage, lease or sell the Facilities or any part thereof;

(x)  not have any assets other than those related to its interest in the Facilities or the operation, management and financing thereof;

(xi)  not pledge its assets for the benefit of any other Person, including any of its Affiliate, or make any loans or advances to any other Person, including any of its Affiliate;

(xii)  maintain adequate capital in light of its contemplated business operation; and

(xiii) make no investments other than Permitted Investments.

### Section 451. Compliance with Anti-Money Laundering, Anti-Terrorism, and OFAC Laws.

(a) The Obligated Group shall comply at all times with the requirements of all Anti-Money Laundering Laws and Anti-Terrorism Laws.

(b)  The Obligated Group Agent shall provide the Master Trustee any information regarding the Obligated Group and its Affiliates necessary for the Master Trustee or any Holder to comply with all Anti-Money Laundering Laws and Anti-Terrorism Laws.

(c)  The Obligated Group shall comply at all times with the requirements of all OFAC Laws.

(d)  The Obligated Group shall not, and shall cause its Affiliates and Persons holding any legal or beneficial interest whatsoever in any Member (whether directly or indirectly) not to, conduct business with or engage in any transaction with any Person named in the OFAC SDN List or any Person included in, owned by, controlled by, acting for or on behalf of, providing assistance, support, sponsorship, or services of any kind to, or otherwise associated with any of the Persons referred to or described in the OFAC SDN List.

(e)  If any Member of the Obligated Group obtains actual knowledge or receives any written notice that any Member of the Obligated Group, any Affiliate, or any Person holding any legal or beneficial interest whatsoever in any Member (whether directly or indirectly) is named on the OFAC SDN List (such occurrence, an "**OFAC Violation**"), such Member shall immediately (i) give written notice to the Master Trustee and the Series 2013 Bank Holders of such OFAC Violation, and (ii) comply with all Applicable Law with respect to such OFAC Violation (regardless of whether the party included on the OFAC SDN List is located within the jurisdiction of the United States of America), including the OFAC Laws, and each Member hereby authorizes and consents to the Master Trustee and the Series 2013 Bank Holders taking any and all steps the Master Trustee or the Series 2013 Bank Holders deem necessary, in its sole discretion, to comply with all Applicable Law with respect to any such OFAC Violation, including the requirements of the OFAC Laws (including the "freezing" and/or "blocking" of assets and reporting such action to OFAC).

(f)  Upon the Master Trustee's request from time to time, the Obligated Group Agent shall deliver a certification confirming its compliance with the covenants set forth in this Section.

**Section 452. Disposition of Excess Land.**  (a) A deed to the Excess Land has been provided to _____ (the "**Escrow Agent**") to be held in escrow and be released as provided by the terms of this Section 452. Commencing one year from the Closing Date, the Corporation will list the Excess Land with a broker reasonably acceptable to the Master Trustee (the "**Approved Broker**"). Any such Approved Broker will conduct a sale process reasonably acceptable to the Master Trustee for the sale of the Excess Land.  The Corporation agrees to accept any offer approved by the Master Trustee acting at the direction of a Majority of the Applicable Holders.  Upon any sale of the Excess Land, the deed to the Excess Land will be released from escrow and the proceeds of such sale, after costs and expenses (including any commissions) relating to the sale, shall be paid over to the Bond Trustee for deposit to the 2013B Optional Redemption Account of the Bond Indenture and used to redeem Series 2013B Bonds. If such sale occurs prior to any exercise by the Corporation of its right of Early Redemption as provided in Section 208(c), there shall be credited against the Early Redemption Amount a portion of the amount so transferred to the 2013B Optional Redemption Account and applied to the optional redemption of the Series 2013B Bonds equal to the lesser of (i) 50% of the net proceeds received from the sale of the Excess Land or (ii) $250,000.  If the Excess Land is not sold within five (5) years from the Closing Date, the Corporation shall have the option to pay to the Master Trustee, from sources other than Gross Revenues, Cash and Investments or funds held by the Master Trustee hereunder, an amount equal to the fair market value of the Excess Land (the "**FMV Election**"), whereupon the deed to the Excess Land will be released from escrow to the Corporation or its designee and, if the owner of the Excess Land will be a party other than the Corporation, released from the Mortgages and the amount so paid transferred by the Master Trustee to the Bond Trustee upon receipt for deposit to the 2013B Optional Redemption Account of the Bond Indenture for application to the optional redemption of Series 2013B Bonds.  If the Corporation does not exercise the FMV Election and pay the required amount to the Master Trustee by the date that is five (5) years and six months after the Closing Date, at the option of the Master Trustee, the Master Trustee shall, at any time thereafter, be entitled to sell or cause the sale of the Excess Land, whereupon the deed to the Excess Land shall be delivered from escrow to the Master Trustee or its designee, and the net proceeds of such sale transferred by the Master Trustee to the Bond Trustee upon receipt for deposit to the 2013B Optional Redemption Account of the Bond Indenture for application to the optional redemption of Series 2013B Bonds.  In addition, in connection with any foreclosure or other exercise of remedies by the Master Trustee pursuant to the Mortgages, the deed to the Excess Land shall be released from escrow to the Master Trustee or its designee.  If at such time as all Obligations relating to the Series 2013 Bonds have been satisfied in full, the Excess Land has not been sold or transferred pursuant to the provisions hereof, the deed to the Excess Land shall be released from escrow to the Corporation.  For purposes of the FMV Election, the fair market value of the Excess Land shall be determined as follows:  the Master Trustee, with the approval of a Majority of the Series 2013B Bond Holders, and the Corporation shall each retain an appraiser to deliver an appraisal of the Excess Land, and shall submit the two appraisals to a different appraiser reasonably acceptable to the Master Trustee, acting with the approval of a Majority of the Series 2013B Bond

Holders, and the Corporation, which shall provide a fair market value of the Excess Land based on its review of such appraisals.

(b) Unless such requirement is waived in writing by a Majority of the Series 2013B Bond Holders, as a condition to the transfer of the Excess Land, the Corporation shall obtain from the transferee and provide to the Master Trustee a written agreement, enforceable by the Master Trustee, providing that while the Series 2013 Bonds or any debt issued to refund the Series 2013 Bonds remain Outstanding, such purchaser shall not, and shall require any immediate or subsequent transferee or mortgagee of the Excess Land to provide a written agreement to the Master Trustee that it shall not, use or permit any transferee or mortgagee to use the Excess Land, or transfer such land to a transferee that does not execute such an agreement not to use the Excess Land, as elderly housing or as an assisted living, nursing home or similar facility providing any of the ,material services provided at the Facilities.

**Section 453. Capital Expenditure Projections**. The Trustee shall not be required to disburse funds to the Corporation to pay capital expenditures pursuant to Section 427(b)(ii) hereof in any Fiscal Year in amounts in excess of the Budgeted Capital Expenditures for such Fiscal Year without the prior written consent of a Majority of the Applicable Bond Holders. The Obligated Group shall provide to the Master Trustee, on or before January 20 of each year, an Officer's Certificate to the effect that amounts disbursed to the Obligated Group pursuant to Section 427(b)(ii) hereof in respect of Budgeted Capital Expenditures for the immediately preceding Fiscal Year did not exceed the Budgeted Capital Expenditures for such Fiscal Year except to the extent approved in writing by a Majority of the Applicable Bond Holders.

**Section 454. Deposits**. When all conditions for the release of any Deposit or any portion thereof shall have been satisfied, the Obligated Group Agent shall transfer such Deposit or portion thereof to the Master Trustee for deposit to the to the Gross Revenue Fund or shall return such Deposit or portion thereof to the applicable depositor, as appropriate.

<div align="center">*          *          *</div>

08-13555-mg    Doc 46200    Filed 08/29/14    Entered 08/29/14 14:34:43    Main Document
Pg 141 of 409

<div align="center">

**ARTICLE V**

**EVENTS OF DEFAULT; REMEDIES**

</div>

**Section 501. [Reserved]**

**Section 502. Events of Default.** (a) Each of the following events is hereby declared an "*Event of Default*":

(i)    failure of the Obligated Group to pay any installment of principal of, or premium or interest on, any Senior Obligation when the same shall become due and payable, whether at maturity, upon mandatory tender, on any date fixed for prepayment, by acceleration, or otherwise; or

(ii)    failure of the Obligated Group to pay any installment of principal of, or premium or interest on any Subordinate Obligation when the same shall become due and payable, whether at maturity, upon any date fixed for prepayment, by acceleration, or otherwise; provided that interest on the Series 2013B Subordinate Obligation shall not be due and payable on any scheduled Interest Payment Date prior to maturity to the extent on the applicable Interest Payment Date the Obligated Group shall have complied with all requirements hereunder relating to the transfer of Excess Cash and any other amounts to the Debt Service Fund under the Bond Indenture and the amounts on deposit in the 2013B Interest Fund Account are insufficient to pay such interest, and that, in such event, any such unpaid interest shall accrete and be added to the principal amount of the Series 2013B Subordinate Obligation on such Interest Payment Date and that no principal or installment of principal on the Series 2013B Subordinate Obligation shall be due and payable prior to 12 months before the maturity date thereof to the extent that the Obligated Group shall have complied with all requirements hereunder relating to the transfer of Excess Cash and the amounts on deposit in the 2013B Optional Redemption Account are insufficient to pay such principal; or

(iii)    (A) Except as otherwise set forth in Sections 410, 424, 425 and 426 hereof, failure of any Member to comply with, observe, or perform any of the covenants, conditions, agreements, or provisions hereof relating to compliance with financial covenants hereunder (including without limitation applicable reporting deadlines) within five (5) Business Days after written notice thereof to such Member and the Obligated Group Agent from the Master Trustee or a Majority of the Applicable Holders or (B) failure of any Member to comply with, observe, or perform any of the covenants, conditions, agreements, or provisions hereof (other than the covenants and agreements described in subsection (A) or in any other provision of this Section 502(a)) and to remedy such failure within thirty (30) days after written notice thereof to such Member and the Obligated Group Agent from the Master Trustee or a Majority of the Applicable Holders, provided that, if in the judgment of the Master Trustee, acting at the direction of a Majority of the Applicable Holders, such failure cannot with due diligence and dispatch be wholly cured so that such failure no longer constitutes an Event of Default within thirty (30) days, but can be wholly cured, the failure of the Member to remedy such failure within such thirty (30) day period shall not constitute an Event of Default if the Member shall immediately upon receipt of such notice commence with due diligence and dispatch the curing of such failure and, having so commenced the curing of such failure shall thereafter prosecute and complete the same with due diligence and dispatch by the deadline established by the Master Trustee, acting at the direction of a Majority of the Applicable Holders; or

(iv)    any representation or warranty made by any Member herein or in any statement or certificate furnished to the Master Trustee or the purchaser of any Obligation in connection with the sale of any Obligation or furnished by any Member pursuant hereto shall prove untrue in any material respect as of the date of the issuance or making thereof; or

(v)    failure of any Member to pay the principal or tender price of, premium, if any, or interest on any Indebtedness for borrowed money of any Member, including without limitation any Indebtedness created by any Related Loan Document, as and when the same shall become due, or an event of default as defined in any mortgage, indenture, loan agreement or other instrument under or pursuant to which there was issued or incurred, or by which there is evidenced or secured, any such Indebtedness (including any Obligation) of any Member, and which failure or event of default entitles the holder thereof to declare or,

<div align="center">V-1</div>

in the case of any Obligation, to request that the Master Trustee declare, such Indebtedness due and payable prior to the date on which it would otherwise become due and payable; provided, however, that if such Indebtedness is not evidenced or secured by an Obligation or issued, incurred, evidenced, or secured by or under a Related Loan Document, a failure to pay thereunder shall not constitute an Event of Default unless the unpaid principal amount of such Indebtedness, together with the unpaid principal amount of all other Indebtedness so in default, exceeds $250,000; or

(vi)   any judgment, writ, or warrant of attachment or of any similar process shall be entered or filed against any Member or against any Property of any Member and remains unvacated, unpaid, unbonded, unstayed, or uncontested in good faith for a period of ninety (90) days; provided, however, that none of the foregoing shall constitute an Event of Default unless the amount of such judgment, writ, warrant of attachment, or similar process, together with the amount of all other such judgments, writs, warrants, or similar processes so unvacated, unpaid, unbonded, unstayed, or uncontested, exceeds $500,000; or

(vii)   any Member admits insolvency or bankruptcy or its inability to pay its debts as they mature, or is generally not paying its debts as such debts become due, or makes an assignment for the benefit of creditors or applies for or consents to the appointment of a trustee, custodian, or receiver for such Member, or for the major part of its Property; or

(viii)   a trustee, custodian, or receiver is appointed for any Member or for the major part of its Property and is not discharged within sixty (60) days after such appointment; or

(ix)   bankruptcy, dissolution, reorganization, arrangement, insolvency, or liquidation proceedings, proceedings under Title 11 of the United States Code, as amended, or other proceedings for relief under any bankruptcy law or similar law for the relief of debtors are instituted by or against any Member (other than bankruptcy proceedings instituted by any Member against third parties), and if instituted against any Member are allowed against such Member or are consented to or are not dismissed, stayed, or otherwise nullified within sixty (60) days after such institution; or

(x)   payment of any installment of principal of, or interest or premium, on any Related Bond shall not be made when the same shall become due and payable under the provisions of any Related Bond Indenture; or

(xi)   an Event of Default specified in Section 410(b)(v) hereof; or

(xii)   an Event of Default specified in Section 424(e) hereof; or

(xiii)   [intentionally omitted]; or

(xiv)   any event of default shall occur under either of the Security Agreements; or

(xv)   the Facilities or any portion thereof shall be subject to any material condemnation or similar proceeding; or

(xvi)   any event of default shall occur under either of the Mortgages or any mortgage executed pursuant to the last paragraph of Section 416 hereof; or

(xvii)   any event of default shall occur under a Related Bond Indenture or a Related Loan Document.

(b)   Upon the occurrence and during the continuance of an Event of Default, the Master Trustee shall give the Obligated Group Agent the Lock Box Notice described in the first sentence of Section 514 hereof.

**Section 503. Acceleration**. If an Event of Default has occurred and is continuing, the Master Trustee may, and if requested by a Majority of the Applicable Holders, shall, by notice in writing delivered to the Obligated Group Agent, declare the entire principal amount of all Obligations then Outstanding and the interest accrued thereon immediately due and payable, and the entire principal and such interest shall thereupon become

immediately due and payable, subject, however, to the provisions of Section 511 hereof with respect to waivers of Events of Default.

**Section 504. Remedies; Rights of Obligation Holders.** (a) Upon the occurrence of any Event of Default, the Master Trustee may pursue any available remedy including a suit, action, or proceeding at law or in equity to enforce the payment of the principal of, and premium, if any, and interest on, the Outstanding Obligations and any other sums due hereunder and may collect such sums in the manner provided by law out of the Property or the Excluded Property of any Member wherever situated.

(b)   If an Event of Default shall have occurred, and if it shall have been requested so to do by a Majority of the Applicable Holders and if it shall have been indemnified as provided in Section 601(k) hereof, the Master Trustee shall be obligated to exercise such one or more of the rights and powers conferred by this Section or under the Mortgages or the Security Agreements as the Master Trustee shall be so directed to exercise or which it shall deem most expedient in the interests of the Holders of Obligations; provided, however, that the Master Trustee shall have the right to decline to comply with any such request if the Master Trustee shall be advised by counsel (who may be its own counsel) that the action so requested may not lawfully be taken or may subject the Master Trustee to liability under any applicable environmental law or regulation.

(c)   No remedy by the terms of this Master Indenture conferred upon or reserved to the Master Trustee (or to the Holders of Obligations) is intended to be exclusive of any other remedy, but each and every such remedy shall be cumulative and shall be in addition to any other remedy given to the Master Trustee or to the Holders of Obligations hereunder now or hereafter existing at law or in equity or by statute.

(d)   No delay or omission to exercise any right or power accruing upon any Event of Default shall impair any such right or power or shall be construed to be a waiver of any such Event of Default, or acquiescence therein; and every such right and power may be exercised from time to time and as often as may be deemed expedient.

(e)   No waiver of any Event of Default, whether by the Master Trustee or by the Holders of Obligations, shall extend to or shall affect any subsequent Event of Default or shall impair any rights or remedies consequent thereon.

**Section 505. Direction of Proceedings by Obligation Holders.** A Majority of the Applicable Holders shall have the right, at any time, by an instrument or instruments in writing executed and delivered to the Master Trustee, to direct the method and place of conducting all proceedings to be taken in connection with the enforcement of the terms and conditions of this Master Indenture, the Mortgages and the Security Agreements, or for the appointment of a receiver or any other proceedings hereunder; provided, that such direction shall not be otherwise than in accordance with the provisions of law and of this Master Indenture, and that the Master Trustee shall have the right to decline to comply with any such request if the Master Trustee shall be advised by counsel (who may be its own counsel) that the action so directed may not lawfully be taken or may subject the Master Trustee to liability under any applicable environmental law or regulation.

**Section 506. Appointment of Receivers.** Upon the occurrence of an Event of Default, and upon the filing of a suit or other commencement of judicial proceedings to enforce the rights of the Master Trustee and the Holders of Obligations under this Master Indenture, the Master Trustee shall be entitled, as a matter of right, to the appointment of a receiver or receivers of the rights and properties pledged hereunder and of the revenues, issues, payments, and profits thereof, pending such proceedings, with such powers as the court making such appointment shall confer.

**Section 507. Application of Moneys.** (a) All moneys received by the Master Trustee pursuant to any right given or action taken under the provisions of this Article (except moneys held for the payment of Obligations called for prepayment or redemption that have become due and payable) shall, after payment of the cost and expenses of the proceedings resulting in the collection of such moneys and of the fees of, expenses, liabilities, and advances incurred or made by the Master Trustee, any Related Issuers, and any Related Bond Trustees, be applied as follows:

(i) Unless the principal of all the Obligations shall have become or shall have been declared due and payable, all such moneys shall be applied:

FIRST: To the payment to the Persons entitled thereto of all installments of interest then due on the Senior Obligations, in the order of the maturity of the installments of such interest, and, if the amount available shall not be sufficient to pay in full any particular installment, then to the payment ratably, according to the amounts due on such installment, to the Persons entitled thereto, without any discrimination or privilege; and

SECOND: To the payment to the Persons entitled thereto of the unpaid principal and premium, if any, on the Senior Obligations that shall have become due (other than Senior Obligations called for redemption or payment for payment of which moneys are held pursuant to the provisions of this Master Indenture), in the order of the scheduled dates of their payment, and, if the amount available shall not be sufficient to pay in full the Senior Obligations due on any particular date, then to the payment ratably, according to the amount of principal and premium due on such date, to the Persons entitled thereto without any discrimination or privilege;

THIRD: To the payment to the Persons entitled thereto of all installments of interest then due on the Subordinate Obligations, in the order of the maturity of the installments of such interest, and, if the amount available shall not be sufficient to pay in full any particular installment, then to the payment ratably, according to the amounts due on such installment, to the Persons entitled thereto, without any discrimination or privilege; and

FOURTH: To the payment to the Persons entitled thereto of the unpaid principal of, and premium, if any, on, the Subordinate Obligations that shall have become due (other than Subordinate Obligations called for redemption or payment for payment of which moneys are held pursuant to the provisions of this Master Indenture), in the order of the scheduled dates of their payment, and, if the amount available shall not be sufficient to pay in full the Subordinate Obligations due on any particular date, then to the payment ratably, according to the amount of principal of, and premium due on, such date, to the Persons entitled thereto without any discrimination or privilege.

(ii) If the principal of all the Obligations shall have become due or shall have been declared due and payable, all such moneys shall be applied *first*, to the payment of the principal, premium, if any, and interest then due and unpaid upon the Senior Obligations without preference or priority of principal, premium or interest over the others, or of any installment of interest over any other installment of interest, or of any Senior Obligation over any other Senior Obligation, ratably, according to the amounts due respectively for principal, premium, if any, and interest to the Persons entitled thereto without any discrimination or privilege; *second*, to the payment of the principal, premium, if any, and interest then due and unpaid upon the Subordinate Obligations without preference or priority of principal, premium, or interest over the others, or of any installment of interest over any other installment of interest, or of any Subordinate Obligation over any other Subordinate Obligation, ratably, according to the amounts due respectively for principal, premium, if any, and interest to the Persons entitled thereto without any discrimination or privilege; and

(iii) If the principal of all the Obligations shall have been declared due and payable, and if such declaration shall thereafter have been rescinded and annulled under the provisions of this Article, then, subject to the provisions of item (ii) of this subsection in the event that the principal of all the Obligations shall later become due or be declared due and payable, the moneys shall be applied in accordance with the provisions of item (i) of this subsection.

(b) Whenever moneys are to be applied by the Master Trustee pursuant to the provisions of this Section, such moneys shall be applied by it at such times, and from time to time, as the Master Trustee shall determine in its sole discretion, having due regard for the amount of such moneys available for application and the likelihood of additional moneys becoming available for such application in the future. Whenever the Master Trustee shall apply such moneys, it shall fix the date (which shall be an interest payment date unless it shall deem another date more suitable) upon which such application is to be made and upon such date interest on the amounts of principal to be paid on such date shall cease to accrue. The Master Trustee shall give such notice as it may deem appropriate of the

deposit with it of any such moneys and of the fixing of any such date, and shall not be required to make payment to the Holder of any unpaid Obligation until such Obligation shall be presented to the Master Trustee for appropriate endorsement or for cancellation if fully paid.

(c)  Notwithstanding the foregoing, upon written direction to the Master Trustee by a Majority of the Applicable Holders, the Master Trustee shall transfer to the Corporation for payment of Operating Expenses any amount specified in any such written direction at any priority level specified in such written direction.

(d)  Whenever all Obligations and interest thereon have been paid under the provisions of this Section 507 and all expenses and charges of the Master Trustee have been paid, any balance remaining shall be paid to the Person entitled to receive the same; if no other Person shall be entitled thereto, then the balance shall be paid to the Obligated Group Agent on behalf of the Members.

**Section 508. Remedies Vested in Master Trustee**. All rights of action including the right to file proof of claims under this Master Indenture or under any of the Obligations may be enforced by the Master Trustee without the possession of any of the Obligations or the production thereof in any trial or other proceedings relating thereto and any such suit or proceeding instituted by the Master Trustee shall be brought in its name as Master Trustee without the necessity of joining as plaintiffs or defendants any Holders of the Obligations, and any recovery of judgment shall be for the equal benefit of the Holders of the Outstanding Obligations.

**Section 509. Rights and Remedies of Obligation Holders**. No Holder of any Obligation shall have any right to institute any suit, action, or proceeding in equity or at law for the enforcement of this Master Indenture or for the execution of any trust hereof or for the appointment of a receiver or any other remedy hereunder, unless an action, event, or condition shall have become an Event of Default and (a) the a Majority of the Applicable Holders, shall have made written request to the Master Trustee and shall have offered it reasonable opportunity either to proceed to exercise the powers hereinbefore granted or to institute such action, suit or proceeding in its own name, and unless also, in each case, such Holders shall have offered to the Master Trustee indemnity as provided in Section 601(k) hereof, and unless the Master Trustee shall thereafter fail or refuse to exercise the powers hereinbefore granted, or to institute such action, suit, or proceeding in its own name; and such notification, request, and offer of indemnity are hereby declared in every case at the option of the Master Trustee to be conditions precedent to the execution of the powers and trusts of this Master Indenture and to any action or cause of action for the enforcement of this Master Indenture, or for the appointment of a receiver or for any other remedy hereunder; it being understood and intended that no one or more Holders of the Obligations shall have any right in any manner whatsoever to affect, disturb, or prejudice the lien of this Master Indenture by his, her, its, or their action or to enforce any right hereunder except in the manner herein provided, and that all proceedings at law or in equity shall be instituted, had and maintained in the manner herein provided and for the benefit of the Holders of Obligations as herein provided. Nothing in this Master Indenture contained shall, however, affect or impair the right of any Holder of Obligations to enforce the payment of the principal of, or premium, if any, and interest on, any Obligation at and after the maturity thereof, or the obligation of the Members to pay the principal of, and premium, if any, and interest on, each of the Obligations issued hereunder to the respective Holders thereof at the time and place, from the source and in the manner in said Obligations expressed.

**Section 510. Termination of Proceedings**. In case the Master Trustee shall have proceeded to enforce any right under this Master Indenture by the appointment of a receiver, or otherwise, and such proceedings shall have been discontinued or abandoned for any reason, or shall have been determined adversely to the Master Trustee, then and in every case the Members and the Master Trustee shall, subject to any determination in such proceeding, be restored to their former positions and rights hereunder with respect to the Property pledged and assigned hereunder, and all rights, remedies, and powers of the Master Trustee shall continue as if no such proceedings had been taken.

**Section 511. Waiver of Events of Default**. If, at any time after the principal of all Obligations shall have been so declared due and payable, and before any judgment or decree for the payment of the moneys due shall have been obtained or entered as hereinafter provided and before the acceleration or upon deacceleration of any Related Bond, any Member shall pay or shall deposit with the Master Trustee a sum sufficient to pay all matured installments of interest upon all such Obligations and the principal and premium, if any, of all such Obligations that shall have become due otherwise than by acceleration (with interest on overdue installments of interest and on such principal

and premium, if any, at the rate borne by such Obligations to the date of such payment or deposit, to the extent permitted by law) and the expenses of the Master Trustee, and any and all Events of Default, other than the nonpayment of principal of and premium, if any, and accrued interest on such Obligations that shall have become due by acceleration, shall have been remedied, then and in every such case a Majority of the Applicable Holders, by written notice to the Obligated Group Agent and to the Master Trustee, may waive all Events of Default and rescind and annul such declaration and its consequences; but no such waiver or rescission and annulment shall extend to or affect any subsequent Event of Default, or shall impair any right consequent thereon.

**Section 512. Members' Rights of Possession and Use of Property**. So long as each Member is in full compliance with the terms and provisions of this Master Indenture, each Member shall be suffered and permitted to possess, use and enjoy its Property and appurtenances thereto free of claims of the Master Trustee.

**Section 513. Related Bond Trustee or Bondholders Deemed to Be Obligation Holders**. For the purposes of this Master Indenture, unless a Related Bond Trustee shall elect to the contrary or contrary provision shall be made in a Related Bond Indenture, each Related Bond Trustee shall be deemed the Holder of the Obligation or Obligations pledged to secure the Related Bonds with respect to which such Related Bond Trustee is acting as trustee. If such a Related Bond Trustee shall so elect or the Related Bond Indenture shall so provide, the registered owners of each series of Related Bonds shall be deemed the Obligation Holders to the extent of the principal amount of the Obligations to which their Related Bonds relate.

**Section 514. Lock-Box Provisions**.

(a) Upon the occurrence and during the continuance of an Event of Default, the Master Trustee shall give to the Obligated Group Agent a notice (the "**Lock-Box Notice**") referring to this Section 514 of this Master Indenture, in the form attached as Exhibit "H" to this Master Indenture. Upon receipt of a Lock-Box Notice, the Obligated Group Agent shall engage a Consultant (which Consultant is approved by the Master Trustee) to review the Annual Budget of the Obligated Group. Upon review of the Annual Budget, the Consultant will be required to notify the Obligated Group Agent and the Master Trustee whether such Annual Budget is approved as submitted or whether the Consultant recommends any changes to the Annual Budget. A copy of the Annual Budget, as approved or modified shall be sent by the Consultant to the Obligated Group Agent and the Master Trustee, the Obligated Group Agent , such budget shall constitute the "**Lock-Box Budget"**, for purposes of Section 427 hereof. If the Obligated Group Agent objects to such Lock-Box Budget, it may so notify the Consultant and the Master Trustee and the Consultant and Obligated Group Agent shall discuss such objection in good faith, but unless and until the Consultant approves an amendment or modification thereof such budget shall constitute the Lock-Box Budget. The Lock-Box Budget may be amended and modified by the Consultant at any time and from time to time as the Consultant in its discretion determines is necessary or appropriate under the then existing circumstances. A copy of any amendment or modification to the Lock-Box Budget will be required to be sent by the Consultant to the Obligated Group Agent and the Master Trustee.

(b) If at any time following a Lock-Box Notice all amounts due to the Master Trustee shall have been paid in full, the Master Trustee shall notify the Obligated Group Agent in writing that the provisions of this Section 514 are suspended. Additionally, the Master Trustee may in its discretion at any time agree to suspend such provisions by so notifying the Obligated Group Agent in writing.

\*   \*   \*

V-6

Case 15-00976-KMS    Doc 80-9    Entered 12/20/16 14:34:43    Page 89 of
720

## ARTICLE VI

### THE MASTER TRUSTEE

**Section 601. Acceptance of the Trusts.** The Master Trustee accepts and agrees to execute the trusts imposed upon it by this Master Indenture, but only upon the terms and conditions set forth herein. The Master Trustee, prior to the occurrence of an Event of Default and after the curing of all Events of Default that may have occurred, undertakes to perform such duties and only such duties as are specifically set forth in this Master Indenture, and no implied covenants or obligations should be read into this Master Indenture against the Master Trustee. If an Event of Default under this Master Indenture shall have occurred and be continuing, the Master Trustee shall exercise such of the rights and powers vested in it by this Master Indenture and shall use the same degree of care as a prudent corporate trustee would exercise or use in the circumstances. The Master Trustee agrees to perform such trusts only upon and subject to the following express terms and conditions:

(a)  The Master Trustee may execute any of the trusts or powers hereof and perform any of its duties by or through attorneys, agents, or receivers, but shall be answerable for the conduct of the same in accordance with the standard specified above, and shall be entitled to advice of counsel concerning all matters of trusts hereof and duties hereunder, and may in all cases pay such reasonable compensation to any attorney, agent, or receiver retained or employed by it in connection herewith. The Master Trustee may act upon the opinion or advice of an attorney, surveyor, engineer, or accountant selected by it in the exercise of reasonable care or, if selected or retained by any Member, approved by the Master Trustee in the exercise of such care. The Master Trustee shall not be responsible for any loss or damage resulting from any action or nonaction based on its good faith reliance upon such opinion or advice.

(b)  The Master Trustee shall not be responsible for any recital herein, or in the Obligations (except with respect to the certificate of the Master Trustee endorsed on the Obligations), or for the investment of moneys as herein provided, or for the recording or re-recording, filing or re-filing of this Master Indenture, or any supplement or amendment thereto, or the filing of financing statements, or for the validity of the execution by the Corporation of this Master Indenture or by any Member of any supplemental indentures or instruments of further assurance, or for the sufficiency of the security for the Obligations issued hereunder or intended to be evidenced or secured hereby, or for the value or title of the Property herein conveyed or otherwise as to the maintenance of the security hereof. The Master Trustee may (but shall be under no duty to) require of any Member full information and advice as to the performance of the covenants, conditions, and agreements in this Master Indenture and may, but without any obligation, advise the Members of any impending Event of Default known to the Master Trustee. The Master Trustee shall have no obligation to perform any of the duties of the Obligated Group hereunder.

(c)  The Master Trustee shall not be accountable for the use or application by the Obligated Group of any of the Obligations or the proceeds thereof or for the use or application of any money paid over by the Master Trustee in accordance with the provisions of this Master Indenture or for the use and application of money received by any Paying Agent. The Master Trustee may become the Holder of Obligations evidenced or secured hereby with the same rights it would have if it were not Master Trustee.

(d)  The Master Trustee shall be protected in acting upon any notice, order, requisition, request, consent, certificate, order, opinion (including an opinion of Independent Counsel), affidavit, letter, telegram, or other paper or document in good faith deemed by it to be genuine and to have been signed or sent by the proper Person or Persons. Any action taken by the Master Trustee pursuant to this Master Indenture upon the request or authority or consent of any Person who at the time of making such request or giving such authority or consent is the Holder of any Obligation shall be conclusive and binding upon all future Holders of the same Obligation and upon Obligations issued in exchange therefor or in place thereof.

(e)  As to the existence or non-existence of any fact or as to the sufficiency or validity of any instrument, paper or proceeding, the Master Trustee shall be entitled to rely upon a certificate signed on behalf of any Member by an Authorized Officer thereof as sufficient evidence of the facts therein contained and, prior to the occurrence of an Event of Default or Default Condition of which the Master Trustee has been notified as provided in subsection (g) of this Section, or of which by said subsection it is deemed to have notice, shall also be at liberty to accept a similar certificate to the effect that any particular dealing, transaction, or action is necessary or expedient, but may at

its discretion secure such further evidence deemed necessary or advisable, but shall in no case be bound to secure the same. The Master Trustee may accept a certificate of an Authorized Officer of any Member to the effect that a resolution in the form therein set forth has been adopted by such Member as conclusive evidence that such resolution has been duly adopted, and is in full force and effect.

(f) The permissive right of the Master Trustee to do things enumerated in this Master Indenture shall not be construed as a duty and the Master Trustee shall not be answerable for other than its negligence or willful misconduct. The Master Trustee shall be fully protected, and shall have no liability to the Holder of any Obligation or any other party, if it refrains from acting without prior direction from a Majority of the Applicable Holders or a Majority of the Holders on any matter under this Master Indenture involving a permissive or discretionary act by the Master Trustee that does not specify that a direction from a specified group of Holders is required.

(g) The Master Trustee shall not be required to take notice or be deemed to have notice of any Event of Default or Default Condition except failure by the Obligated Group to cause to be made any of the payments to the Master Trustee required to be made by Section 202 or Section 401 unless the Master Trustee shall be specifically notified in writing of such Event of Default or Default Condition by a Member, by the written report of certified public accountants required by Section 415(b)(v) hereof, by any Related Bond Trustee, or by a Majority of the Applicable Holders, and all notices or other instruments required by this Master Indenture to be delivered to the Master Trustee must, in order to be effective, be delivered at the Office of the Master Trustee, and in the absence of such notice so delivered, the Master Trustee may conclusively assume there is no Event of Default or Default Condition except as aforesaid.

(h) At any and all reasonable times, the Master Trustee, and its duly authorized agents, attorneys, experts, engineers, accountants, and representatives, shall have the right fully to inspect any and all books, papers, and records of any Member pertaining to the Obligations, and to take such memoranda from and in regard thereto as may be reasonably desired.

(i) The Master Trustee shall not be required to give any bond or surety in respect of the execution of the said trusts and powers or otherwise in respect of the premises.

(j) Notwithstanding anything contained elsewhere in this Master Indenture, the Master Trustee shall have the right, but shall not be required, to demand, in respect of the authentication of any Obligation, the withdrawal of any cash, the release of any property, or any action whatsoever within the purview of this Master Indenture, any showings, certificates, opinions, appraisals, or other information, or corporate action or evidence thereof, in addition to that by the terms hereof required as a condition of such action by the Master Trustee reasonably requested by the Master Trustee to discharge its duties, for the purpose of establishing the right of any Member to the authentication of any Obligations, the withdrawal of any cash, the release of any property or the taking of any other action by the Master Trustee.

(k) Before taking any action under this Master Indenture other than making payments of principal and interest on the Obligations as they become due and causing an acceleration of the Obligations when required hereby, the Master Trustee may require that a satisfactory indemnity be furnished for the reimbursement of all expenses to which it may be put and to protect it against all liability, including, but not limited to, any liability arising directly or indirectly under any federal, state or local statute, rule, law, or ordinance related to the protection of the environment or hazardous substances, and except liability that is adjudicated to have resulted from its negligence or willful misconduct in connection with any action so taken.

(l) All moneys received by the Master Trustee or any Paying Agent shall, until used or applied or invested as herein provided, be held in trust for the purposes for which they were received but need not be segregated from other funds except to the extent required by law or by this Master Indenture. Neither the Master Trustee nor any Paying Agent shall be under any liability for interest on any moneys received hereunder except such as may be agreed upon.

(m) The Master Trustee shall not be required to give any bond or surety with respect to the performance of its duties or the exercise of its powers under this Master Indenture, the Mortgages or the Security Agreements.

(n) In the event the Master Trustee shall, pursuant to the provisions of this Master Indenture, the Mortgages or the Security Agreements, receive inconsistent or conflicting requests and indemnity from two or more groups of Holders of Obligations, each representing less than the amount of Holders of Obligations whose direction the Master Trustee is required to follow under the terms hereof, the Master Trustee, in its sole discretion, may determine what action, if any, shall be taken.

(o) The Master Trustee's immunities and protections from liability and its right to indemnification in connection with the performance of its duties under this Master Indenture, the Mortgages and the Security Agreements, shall extend to the Master Trustee's officers, directors, agents, attorneys, and employees. Such immunities and protections and right to indemnification, together with the Master Trustee's right to compensation for the period in which it serves as Master Trustee, shall survive the Master Trustee's resignation or removal, the defeasance or discharge of this Master Indenture, and final payment of the Obligations.

(p) Except for information provided by the Master Trustee concerning the Master Trustee, the Master Trustee shall have no responsibility for any information in any offering memorandum or other disclosure material distributed with respect to the Obligations, and the Master Trustee shall have no responsibility for compliance with any state or federal securities laws in connection with the Obligations.

(q) The Master Trustee shall have no obligation to monitor or confirm (i) the accuracy or completeness of any insurance required by this Master Indenture; (ii) the quality of the Pledged Assets or any real or personal property encumbered by the Mortgages or the Security Agreements; or (iii) the legal sufficiency of any liens, and the perfection thereof, granted or purported to be granted to the Master Trustee pursuant to this Master Indenture, the Mortgages or the Security Agreements.

(r) Whenever there is a reference in this Master Indenture to an act, document, or other matter being satisfactory to the Master Trustee, acceptable to the Master Trustee, not objected to by the Master Trustee, consented to by the Master Trustee, or otherwise subject to discretionary approval or non-approval by the Master Trustee, the Master Trustee may, but shall not be obligated to, refrain from exercising such discretion unless directed to exercise such discretion by a Majority of the Applicable Holders, and, if so directed, shall exercise such discretion in accordance with the direction of a Majority of the Applicable Holders.

**Section 602. Fees, Charges, and Expenses of Master Trustee and Any Additional Paying Agent**. The Master Trustee shall be entitled to payment and/or reimbursement for reasonable fees and for its services rendered hereunder and all advances, counsel fees, and other expenses reasonably made or incurred by the Master Trustee in connection with such services. The Master Trustee shall be entitled to payment and reimbursement for the reasonable fees and charges of the Master Trustee as Paying Agent and Obligation Registrar for the Obligations as hereinabove provided. Any additional Paying Agent shall be entitled to payment and reimbursement for its reasonable fees and charges as additional Paying Agent for the Obligations. The Master Trustee and any additional Paying Agent shall have a right of payment prior to payment on account of principal of, or premium, if any, or interest on, any Obligation for the foregoing advances, fees, costs, and expenses incurred and shall have a lien and right of setoff on all funds and accounts held hereunder with respect to such payment and reimbursement that is senior and superior to the rights of the Holders of the Obligations.

**Section 603. Notice to Obligation Holders If an Event of Default Occurs**. If an Event of Default or Default Condition occurs of which the Master Trustee is by subsection (g) of Section 601 hereof required to take notice or if notice of an Event of Default or Default Condition be given as in said subsection (g) provided, then the Master Trustee shall give written notice thereof by mail to the last known Holders of all Obligations then Outstanding shown by the list of Obligation Holders required by the terms of this Master Indenture to be kept at the Office of the Master Trustee.

**Section 604. Intervention by Master Trustee**. In any judicial proceeding to which any Member is a party and that in the opinion of the Master Trustee and its counsel has a substantial bearing on the interests of Holders of the Obligations, the Master Trustee may intervene on behalf of Obligation Holders and, subject to the provisions of Section 601(k), shall do so if requested in writing by the owner of an Accelerable Instrument or the Holders of at least twenty-five percent (25%) in aggregate principal amount of all Obligations then

Outstanding. The rights and obligations of the Master Trustee under this Section are subject to the approval of a court of competent jurisdiction.

**Section 605. Successor Master Trustee**. Any corporation or association into which the Master Trustee may be converted or merged, or with which it may be consolidated, or to which it may sell or transfer its corporate trust business and assets as a whole or substantially as a whole, or any corporation or association resulting from any such conversion, sale, merger, consolidation, or transfer to which it is a party, *ipso facto*, shall be and become successor Master Trustee hereunder and vested with all of the title to the whole property or Trust Estate and all the trusts, powers, discretions, immunities, privileges, and all other matters as was its predecessor, without the execution or filing of any instrument or any further act, deed, or conveyance on the part of and of the parties hereto, anything herein to the contrary notwithstanding.

**Section 606. Corporate Master Trustee Required; Eligibility**. There shall at all times be a Master Trustee hereunder that shall be a bank or trust company organized under the laws of the United States of America, any state thereof, or the District of Columbia, authorized to exercise corporate trust powers, subject to supervision or examination by federal or state authorities, and (except for the Master Trustee initially appointed under this Master Indenture and its successors under Section 605) having a reported combined capital and surplus and undivided profits of at least Fifty Million Dollars ($50,000,000). If at any time the Master Trustee shall cease to be eligible in accordance with the provisions of this Section, it shall resign immediately in the manner provided in Section 607. No resignation or removal of the Master Trustee and no appointment of a successor Trustee shall become effective until the successor Master Trustee shall have accepted its appointment under Section 610 hereof.

**Section 607. Resignation by the Master Trustee**. The Master Trustee and any successor Master Trustee may at any time resign from the trusts hereby created by giving thirty (30) days' written notice to the Obligated Group Agent and each Holder of Obligations then Outstanding as shown by the list of Obligation Holders required by this Master Indenture to be kept at the Office of the Master Trustee. Such resignation shall take effect at the end of such thirty (30) days or when a successor Master Trustee has been appointed and has assumed the trusts created hereby, whichever is later, or upon the earlier appointment of a successor Master Trustee by the Obligation Holders or by the Obligated Group. If a successor Master Trustee has not accepted its appointment within such thirty (30) day period, the current Master Trustee may apply to a court of competent jurisdiction to appoint a successor Master Trustee to act until such time, if any, as a successor shall have so accepted its appointment. Such notice to the Obligated Group Agent may be served personally or sent by registered or certified mail.

**Section 608. Removal of the Master Trustee**. The Master Trustee may be removed at any time, by an instrument or concurrent instruments in writing delivered to the Master Trustee and to the Obligated Group Agent, and signed by a Majority of the Applicable Holders. So long as no Event of Default or Default Condition shall have occurred and be continuing, the Master Trustee may be removed at any time by an instrument in writing signed by the Obligated Group Agent and delivered to the Master Trustee. The foregoing notwithstanding, the Master Trustee may not be removed by the Obligated Group Agent unless written notice of the delivery of such instrument or instruments signed by the Obligated Group Agent is mailed to the Holders of all Outstanding Obligations, which notice indicates the Master Trustee will be removed and replaced by the successor trustee named in such notice, such removal and replacement to become effective on the sixtieth (60th) day immediately succeeding the date of such notice, unless the Holders of not less than ten percent (10%) in aggregate principal amount of such Obligations then Outstanding under this Master Indenture shall object in writing to such removal and replacement.

**Section 609. Appointment of Successor Master Trustee by the Obligation Holders; Temporary Master Trustee**. In case the Master Trustee hereunder shall resign or be removed, or be dissolved, or shall be in the process of dissolution or liquidation, or otherwise becomes incapable of acting hereunder, or in case it shall be taken under the control of any public officer or officers, or of a receiver appointed by a court, a successor may be appointed by a Majority of the Holders, by an instrument or concurrent instruments in writing signed by such Holders, or by their attorneys in fact, duly authorized, and, so long as no Event of Default or Default Condition shall have occurred and be continuing, with the approval of the Obligated Group. If a successor trustee shall not have been appointed within thirty (30) days after notice of resignation by or removal of the Master Trustee, the Obligated

Group or any Holder of an Obligation may apply to any court of competent jurisdiction to appoint a successor to act until such time, if any, as a successor shall have been appointed as above provided. The successor so appointed by such court shall immediately and without further act be superseded by any successor appointed as above provided. Every such successor Master Trustee appointed pursuant to the provisions of this Section shall be a trust company or bank in good standing under the law of the jurisdiction in which it was created and by which it exists, have corporate trust powers, be subject to examination by federal or state authorities, and have a reported capital and surplus of not less than Fifty Million Dollars ($50,000,000).

**Section 610. Concerning Any Successor Master Trustee.** Every successor Master Trustee appointed hereunder shall execute, acknowledge, and deliver to its predecessor and also to the Obligated Group Agent an instrument in writing accepting such appointment hereunder, and thereupon such successor, without any further act, deed, or conveyance, shall become fully vested with all the estates, properties, rights, powers, trusts, duties, and obligations of its predecessor; but such predecessor shall, nevertheless, on the written request of the Obligated Group Agent, or of its successor, execute and deliver an instrument transferring to such successor Master Trustee all the estates, properties, rights, powers, and trusts of such predecessor hereunder; and every predecessor Master Trustee shall deliver all securities and moneys held by it as Master Trustee hereunder to its successor. Should any instrument in writing from any Member be required by any successor Master Trustee for more fully and certainly vesting in such successor the estate, rights, powers, and duties hereby vested or intended to be vested in the predecessor, any and all such instruments in writing shall, on request, be executed, acknowledged, and delivered by such Member. The resignation of any Master Trustee and the instrument or instruments removing any Master Trustee and appointing a successor hereunder, together with all other instruments provided for in this Article shall be filed and/or recorded by the successor Master Trustee in each recording office, if any, where this Master Indenture shall have been filed and/or recorded.

**Section 611. Master Trustee Protected in Relying upon Resolutions, Etc.** The resolutions, opinions, certificates and other instruments provided for in this Master Indenture may be accepted by the Master Trustee as conclusive evidence of the facts and conclusions stated therein and shall be full warrant, protection and authority to the Master Trustee for the release of property and the withdrawal of cash hereunder.

**Section 612. Successor Master Trustee as Trustee of Funds, Paying Agent and Obligation Registrar.** In the event of a change in the Master Trustee, the predecessor Master Trustee that has resigned or been removed shall cease to be trustee of any funds provided hereunder and Obligation Registrar and Paying Agent for principal of, premium, if any, and interest on the Obligations, and the successor Master Trustee shall become such Master Trustee, Obligation Registrar, and Paying Agent unless a separate Paying Agent or Agents are appointed by the Obligated Group Agent in connection with the appointment of any successor Master Trustee.

**Section 613. Maintenance of Records.** The Master Trustee agrees to maintain such records with respect to any and all moneys or investments held by the Master Trustee pursuant to the provisions hereof as are reasonably requested by the Obligated Group Agent. The Master Trustee shall be entitled to reasonable compensation for its maintenance of any such records.

<center>*            *            *</center>

<center>VI-5</center>

## ARTICLE VII

### SUPPLEMENTAL MASTER INDENTURES AND AMENDMENTS TO THE MORTGAGE AND SECURITY AGREEMENTS

**Section 701. Supplemental Master Indentures and Amendments to the Mortgages and Security Agreements Not Requiring Consent of Obligation Holders.** (a) Subject to the limitations set forth in Section 702 hereof with respect to this Section 701, the Members and the Master Trustee may, without the consent of, but with prior notice to, the Obligation Holders amend or supplement this Master Indenture, the Mortgages or the Security Agreements for any one or more of the following purposes:

(i)    to cure any ambiguity or defective provision in or omission from this Master Indenture, the Mortgages or the Security Agreements in such manner as does not impair the security of this Master Indenture, the Mortgages or the Security Agreements or adversely affect the Holder of any Obligation;

(ii)    to grant to or confer upon the Master Trustee for the benefit of the Obligation Holders any additional rights, remedies, powers or authority that may lawfully be granted to or conferred upon the Obligation Holders and the Master Trustee, or either of them, to add to the covenants of the Members for the benefit of the Obligation Holders or to surrender any right or power conferred hereunder or under the Mortgages or Security Agreements upon any Member;

(iii)    to assign and pledge under this Master Indenture, the Mortgages or the Security Agreements any additional revenues, properties or collateral;

(iv)    to evidence the succession of another corporation to a Member or the Master Trustee, or the successor of any thereof hereunder;

(v)    to permit the qualification of this Master Indenture under the Trust Indenture Act of 1939, as then amended, or under any similar federal statute hereafter in effect or to permit the qualification of any Obligations for sale under the securities laws of any state of the United States;

(vi)    to provide for the refunding or advance refunding of any Obligation in accordance with the provisions hereof;

(vii)    to provide for the issuance of Additional Obligations in accordance with the provisions hereof;

(viii)    to reflect the addition to or withdrawal of a Member from the Obligated Group in accordance with the provisions hereof;

(viii)    to provide for the issuance of Obligations with original issue discount in accordance with the provisions hereof, provided the provisions relating to the treatment of such Obligations would not materially adversely affect the Holders of Outstanding Obligations;

(ix)    to permit an Obligation to be evidenced or secured in accordance with the provisions hereof by security that is not extended to all Obligation Holders;

(x)    to permit the issuance of Obligations in accordance with the provisions hereof that are not in the form of a promissory note;

(xi)    to provide for the release in accordance with the provisions of the Mortgages or the Security Agreements of any Property subject to the lien of such Mortgages or Security Agreements; and

(xii)    to make any other change that, in the opinion of the Master Trustee, does not materially adversely affect the Holders of any of the Obligations and, in the opinion of each Related Bond Trustee, does not materially adversely affect the Holders of the Related Bonds with respect to which it acts as

trustee, including without limitation any modification, amendment, or supplement to this Master Indenture or any indenture supplemental hereto or the Mortgages or any amendment thereto in such a manner as to establish or maintain exemption of interest on any Related Bonds under a Related Bond Indenture from federal income taxation under applicable provisions of the Code.

(b) Any Supplemental Master Indenture providing for the issuance of Additional Obligations shall set forth the date thereof, the date or dates upon which principal of, premium, if any, and interest on such Obligations shall be payable, the other terms and conditions of such Obligations, the form of such Obligations and the conditions precedent to the delivery of such Obligations which shall include, among other things:

(i)  delivery to the Master Trustee of all materials required to be delivered as a condition precedent to the incurrence of the Additional Indebtedness evidenced or secured by such Obligations;

(ii)  delivery to the Master Trustee of an opinion of Independent Counsel not objected to by the Master Trustee to the effect that all requirements and conditions to the issuance of such Obligations, if any, set forth herein and in the Supplemental Master Indenture have been complied with and satisfied; and

(iii)  delivery to the Master Trustee of an opinion of Independent Counsel not objected to by the Master Trustee to the effect that registration of such Obligations under the Securities Act of 1933, as amended, is not required, or, if such registration is required, that the Obligated Group has complied with all applicable provisions of said Act.

(c)  If at any time the Obligated Group Agent shall request the Master Trustee to enter into any Supplemental Master Indenture pursuant to subsection (a)(xii) above, the Master Trustee shall cause notice of the proposed execution of such Supplemental Master Indenture to be given to each Rating Agency then maintaining a rating on any Obligations or Related Bonds, in the manner provided in Section 1104 hereof at least fifteen (15) days prior to the execution of such Supplemental Master Indenture, which notice shall include a copy of the proposed Supplemental Master Indenture.

**Section 702. Supplemental Master Indentures and Amendment of the Mortgages and Security Agreements Requiring Consent of Obligation Holders.** (a) In addition to Supplemental Master Indentures covered by Section 701 hereof and subject to the terms and provisions contained in this Section, a Majority of the Holders or, in case less than all of the several series of Outstanding Obligations are affected thereby, the Holders of not less than majority in aggregate principal amount of the Obligations of the series affected thereby that are Outstanding hereunder at the time of the execution of such Supplemental Master Indenture or amendment to the Mortgages, shall have the right, from time to time, anything contained in this Master Indenture, in the Mortgages or in the Security Agreements to the contrary notwithstanding, to consent to and approve the execution by the Members and the Master Trustee of such Supplemental Master Indentures or amendment of the Mortgages or Security Agreements as shall be deemed necessary and desirable by the Members for the purpose of modifying, altering, amending, adding to, or rescinding, in any particular, any of the terms or provisions contained in this Master Indenture or in any Supplemental Master Indenture or in the Mortgages or Security Agreements; provided, however, that nothing contained in this Section or in Section 701 hereof shall permit, or be construed as permitting, (i) an extension of the stated maturity or reduction in the principal amount of or reduction in the rate or extension of the time of paying of interest on or reduction of any premium payable on the redemption of, any Obligation, without the consent of the Holder of such Obligation, (ii) a reduction in the aforesaid aggregate principal amount of Obligations the Holders of which are required to consent to any such Supplemental Master Indenture or amendment to the Mortgages or Security Agreements or any such amending or supplementing instruments, without the consent of the Holders of all the Obligations at the time Outstanding that would be affected by the action to be taken, or (iii) modification of the rights, duties, or immunities of the Master Trustee, without the written consent of the Master Trustee; provided further that no such modification shall be made if it materially adversely affects the provisions of this Master Indenture concerning the conditions precedent to a Person becoming a Member, the conditions precedent to cessation of status as a Member, the maintenance of the Obligated Group's Property free and clear of Liens other than Permitted Encumbrances, the definition of Permitted Encumbrances, or transactions with or transfers to Members and other entities without the written approval or consent of the Holders of not less than a majority in aggregate principal amount of the Obligations of each series affected thereby.

(b) If at any time the Obligated Group Agent shall request the Master Trustee to enter into any such Supplemental Master Indenture for any of the purposes of this Section, the Master Trustee shall, upon being satisfactorily indemnified with respect to expenses, cause notice of the proposed execution of such Supplemental Master Indenture to be mailed by first class mail postage prepaid to each Holder of an Obligation or, in case less than all of the series of Obligations are affected thereby, of an Obligation of the series affected thereby. Such notice shall briefly set forth the nature of the proposed Supplemental Master Indenture and shall state that copies thereof are on file at the Office of the Master Trustee for inspection by all Obligation Holders. The Master Trustee shall not, however, be subject to any liability to any Obligation Holder by reason of its failure to mail such notice, and any such failure shall not affect the validity of such Supplemental Master Indenture when consented to and approved as provided in this Section. If the Holders required to consent thereto under subsection (a) above shall have consented to and approved the execution thereof as herein provided, no Holder of any Obligation shall have any right to object to any of the terms and provisions contained therein, or the operation thereof, or in any manner to question the propriety of the execution thereof, or to enjoin or restrain the Master Trustee or the Members from executing the same or from taking any action pursuant to the provisions thereof. Upon the execution of any such Supplemental Master Indenture as in this Section permitted and provided, this Master Indenture shall be and be deemed to be modified and amended in accordance therewith.

(c) For the purpose of obtaining the foregoing consents, the determination of who is deemed the Holder of an Obligation held by a Related Bond Trustee shall be made in the manner provided in Section 901 hereof.

<div align="center">*       *       *</div>

## ARTICLE VIII

### SATISFACTION OF THIS MASTER INDENTURE

**Section 801. Defeasance.** (a) If the Members shall pay or provide for the payment of the entire indebtedness on all Obligations (including, for the purposes of this Section 801, any Obligations owned by a Member) Outstanding in any one or more of the following ways:

(i) by paying or causing to be paid the principal of (including redemption premium, if any) and interest on all Outstanding Obligations, as and when the same become due and payable;

(ii) by depositing with the Master Trustee, in trust, at or before maturity, moneys in an amount as the Master Trustee shall determine sufficient to pay or redeem (when redeemable) all Outstanding Obligations (including the payment of premium, if any, and interest payable on such Obligations to the maturity or redemption date thereof), provided that such moneys, if invested, shall be invested at the direction of the Obligated Group Agent in Escrow Obligations, in an amount, without consideration of any income or increment to accrue thereon, sufficient to pay or redeem (when redeemable) and discharge the indebtedness on all Outstanding Obligations at or before their respective maturity dates; it being understood that the investment income on such Escrow Obligations may be used at the direction of the Obligated Group Agent for any other purpose permitted by law;

(iii) by delivering to the Master Trustee, for cancellation by it, all Outstanding Obligations; or

(iv) by depositing with the Master Trustee, in trust, before maturity, Escrow Obligations in such amount as the Master Trustee shall determine (which determination may be based upon a report of a firm of independent certified public accountants) will, together with the income or increment to accrue thereon, without consideration of any reinvestment thereof, be fully sufficient to pay or redeem (when redeemable) and discharge the indebtedness on all Outstanding Obligations at or before their respective maturity dates;

and if the Obligated Group shall also pay or cause to be paid all other sums payable hereunder by the Obligated Group and, if any such Obligations are to be redeemed prior to the maturity thereof, notice of such redemption shall have been given in accordance with the requirements of this Master Indenture or provisions satisfactory to the Master Trustee shall have been made for the giving of such notice, then and in that case (but subject to the provisions of Section 803 hereof) this Master Indenture and the estate and rights granted hereunder shall cease, determine, and become null and void, and thereupon the Master Trustee shall, upon Written Request of the Obligated Group Agent, and upon receipt by the Master Trustee of an Officer's Certificate from the Obligated Group Agent and an opinion of Independent Counsel not objected to by the Master Trustee, each stating that in the opinion of the signers all conditions precedent to the satisfaction and discharge of this Master Indenture have been complied with, forthwith execute proper instruments acknowledging satisfaction of and discharging this Master Indenture and the lien hereof. The satisfaction and discharge of this Master Indenture shall be without prejudice to the rights of the Master Trustee to charge and be reimbursed by the Obligated Group for any expenditures that it may thereafter incur in connection herewith. The foregoing notwithstanding, the liability of the Obligated Group in respect of the Obligations shall continue, but the Holders thereof shall thereafter be entitled to payment only out of the moneys or Escrow Obligations deposited with the Master Trustee as aforesaid.

(b) Any moneys, funds, securities, or other property remaining on deposit under this Master Indenture (other than said Escrow Obligations or other moneys deposited in trust as above provided) shall, upon the full satisfaction of this Master Indenture, forthwith be transferred, paid over and distributed to the Obligated Group.

(c) The Obligated Group may at any time surrender to the Master Trustee for cancellation by it any Obligations previously authenticated and delivered that the Obligated Group may have acquired in any manner whatsoever, and such Obligations, upon such surrender and cancellation, shall be deemed to be paid and retired.

**Section 802. Provision for Payment of a Particular Series of Obligations or Portion Thereof**. If the Obligated Group shall pay or provide for the payment of the entire indebtedness on all Obligations of a particular series or a portion of such a series (including, for the purpose of this Section 802, any such Obligations owned by a Member) in one of the following ways:

(a)  by paying or causing to be paid the principal of (including redemption premium, if any) and interest on all Obligations of such series or portion thereof Outstanding, as and when the same shall become due and payable;

(b)  by depositing with the Master Trustee, in trust, at or before maturity, moneys in an amount as the Master Trustee shall determine sufficient to pay or redeem (when redeemable) all Obligations of such series or portion thereof Outstanding (including the payment of premium, if any, and interest payable on such Obligations to the maturity or redemption date), provided that such moneys, if invested, shall be invested at the direction of the Obligated Group Agent in Escrow Obligations in an amount, without consideration of any income or increment to accrue thereon, sufficient to pay or redeem (when redeemable) and discharge the indebtedness on all Obligations of such series or portion thereof Outstanding at or before their respective maturity dates; it being understood that the investment income on such Escrow Obligations may be used at the direction of the Obligated Group Agent for any other purpose permitted by law;

(c)  by delivering to the Master Trustee, for cancellation by it, all Obligations of such series or portion thereof Outstanding; or

(d)  by depositing with the Master Trustee, in trust, Escrow Obligations in such amount as the Master Trustee shall determine (which determination may be based upon a report of a firm of independent certified public accountants) will, together with the income or increment to accrue thereon without consideration of any reinvestment thereof, be fully sufficient to pay or redeem (when redeemable) and discharge the indebtedness on all Obligations of such series or portion thereof at or before their respective maturity dates;

and if the Obligated Group shall also pay or cause to be paid all other sums payable hereunder by the Obligated Group with respect to such series of Obligations or portion thereof, and, if any such Obligations of such series or portion thereof are to be redeemed prior to the maturity thereof, notice of such redemption shall have been given in accordance with the requirements of this Master Indenture or provisions satisfactory to the Master Trustee shall have been made for the giving of such notice, then in that case (but subject to the provisions of Section 803 hereof) such Obligations shall cease to be entitled to any lien, benefit, or security under this Master Indenture.  The liability of the Obligated Group in respect of such Obligations shall continue but the Holders thereof shall thereafter be entitled to payment (to the exclusion of all other Obligation Holders) only out of the moneys or Escrow Obligations deposited with the Master Trustee as aforesaid.

**Section 803. Satisfaction of Related Bonds**. The provisions of Section 801 and Section 802 of this Master Indenture notwithstanding, any Obligation that secures a Related Bond (a) shall be deemed paid and shall cease to be entitled to the lien, benefit, and security under this Master Indenture in the circumstances described in subsection (ii)(b) of the definition of "**Outstanding Obligations**" contained in Article I; and (b) shall not be deemed paid and shall continue to be entitled to the lien, benefit, and security under this Master Indenture unless and until such Related Bond shall cease to be entitled to any lien, benefit or security under the Related Bond Indenture pursuant to the provisions thereof.

<div align="center">*       *       *</div>

## ARTICLE IX

### MANNER OF EVIDENCING OWNERSHIP OF OBLIGATIONS

**Section 901. Proof of Ownership.** (a) Any request, direction, consent, or other instrument provided by this Master Indenture to be signed and executed by the Obligation Holders may be in any number of concurrent writings of similar tenor and may be signed or executed by such Obligation Holders in person or by an agent appointed in writing. Proof of the execution of any such request, direction, or other instrument or of the writing appointing any such agent and of the ownership of Obligations, if made in the following manner, shall be sufficient for any of the purposes of this Master Indenture and shall be conclusive in favor of the Master Trustee and the Obligated Group, with regard to any action taken by them, or either of them, under such request or other instrument, namely:

(i)    The fact and date of the execution by any Person of any such writing may be proved by the certificate of any officer in any jurisdiction who by law has power to take acknowledgments in such jurisdiction, that the Person signing such writing acknowledged before such officer the execution thereof, or by the affidavit of a witness of such execution; and

(ii)    The ownership of Obligations shall be proved by the Obligation Register.

(b) Any action taken or suffered by the Master Trustee pursuant to any provision of this Master Indenture, upon the request or with the assent of any Person who at the time is the Holder of any Obligation or Obligations, shall be conclusive and binding upon all future Holders of the same Obligation or Obligations or any Obligation or Obligations issued in exchange therefor.

**Section 902. Treatment of Capital Appreciation Indebtedness.** For the purposes of consents, approvals, waivers of defaults, direction of remedies, or appointment or removal of the Master Trustee under this Master Indenture, the outstanding principal amount of any Master Note constituting Capital Appreciation Indebtedness shall be deemed to be the Accreted Value thereof at the time of determination.

\*                    \*                    \*

## ARTICLE X

## RESERVED

*                    *                    *

## ARTICLE XI

### MISCELLANEOUS

**Section 1101. Limitation of Rights.** With the exception of rights herein expressly conferred, nothing expressed or mentioned in or to be implied from this Master Indenture or the Obligations is intended or shall be construed to give to any Person other than the parties hereto, and the Holders of the Obligations, any legal or equitable right, remedy, or claim under or in respect to this Master Indenture or any covenants, conditions, and provisions herein contained; this Master Indenture and all of the covenants, conditions, and provisions hereof being intended to be and being for the sole and exclusive benefit of the parties hereto and the Holders of the Obligations as herein provided.

**Section 1102. Unclaimed Moneys.** Any moneys deposited with the Master Trustee by the Obligated Group in accordance with the terms and covenants of this Master Indenture, in order to redeem or pay any Obligation in accordance with the provisions of this Master Indenture, and remaining unclaimed by the Holders of the Obligation for two (2) years after the date fixed for redemption or of maturity, as the case may be, shall, if no Event of Default or Default Condition shall have occurred and be continuing, be repaid by the Master Trustee to the Obligated Group Agent upon its written request therefor on behalf of the Members; and thereafter the Holders of the Obligations shall be entitled to look only to the Obligated Group for payment thereof. The Obligated Group hereby covenants and agrees to indemnify and save the Master Trustee harmless from any and all losses, costs, liability, and expense suffered or incurred by the Master Trustee by reason of having returned any such moneys to the Members as herein provided.

**Section 1103. Severability.** (a) If any provision of this Master Indenture shall be held or deemed to be or shall, in fact, be inoperative or unenforceable as applied in any particular case in any jurisdiction or jurisdictions or in all jurisdictions, or in all cases because it conflicts with any other provision or provisions or any constitution or statute or rule of public policy, or for any other reason, such circumstances shall not have the effect of rendering the provision in question inoperative or unenforceable in any other case or circumstance, or of rendering any other provision or provisions herein contained invalid, inoperative, or unenforceable to any extent whatever.

(b) The invalidity of any one or more phrases, sentences, clauses, or Sections in this Master Indenture contained, shall not affect the remaining portions of this Master Indenture, or any part thereof.

**Section 1104. Notices.** It shall be sufficient service of any notice, complaint, demand, or other paper if the same shall be delivered in person or duly mailed by registered or certified mail addressed to the appropriate party as follows:

| | |
|---|---|
| If to the Members of the Obligated Group: | The Estelle Peabody Memorial Home of the Synod of Lincoln Trails of the Presbyterian Church (U.S.A.) 400 West Seventh Street North Manchester, Indiana 46962 Attention: President of Board of Trustees Telephone: (260) 982-8616 |
| With a copy to: | The Estelle Peabody Memorial Home of the Synod of Lincoln Trails of the Presbyterian Church (U.S.A.) 400 West Seventh Street North Manchester, Indiana 46962 Attention: Executive Director Telephone: (260) 982-8616 |
| If to the Master Trustee: | _____ _____ _____ Attention: Corporate Trust Services |

XI-1

Telephone: (____) ____-_____

Facsimile: (____) ____-_____

**Section 1105. Master Trustee as Paying Agent and Registrar**. The Master Trustee is hereby designated and agrees to act as principal Paying Agent and Obligation Registrar for and in respect to the Obligations. The Obligated Group may also appoint one or more other banks as Paying Agent.

**Section 1106. Counterparts**. This Master Indenture may be simultaneously executed in several counterparts, each of which shall be an original and all of which shall constitute but one and the same instrument.

**Section 1107. Applicable Law**. This Master Indenture shall be governed exclusively by the applicable laws of the State of Indiana (excluding the principles thereof governing conflicts of law).

**Section 1108. Immunity of Officers, Directors, Employees, and Members of Members**. No recourse shall be had for the payment of the principal of or premium or interest on any of the Obligations or for any claim based thereon or upon any obligation, covenant, or agreement in this Master Indenture contained against any past, present or future officer, director, employee, member, or agent of any Member, or of any successor corporation, as such, either directly or through any Member or any successor corporation, under any rule of law or equity, statute, or constitution or by the enforcement of any assessment or penalty or otherwise, and all such liability of any such officers, directors, employees, members, or agents as such is hereby expressly waived and released as a condition of and consideration for the execution of this Master Indenture and the issuance of such Obligations.

**Section 1109. Holidays**. If the date for making any payment or the date for performance of any act or the exercising of any right, as provided in this Master Indenture, is not a Business Day, such payment may be made or act performed or right exercised on the immediately succeeding Business Day with the same force and effect as if done on the nominal date provided in this Master Indenture.

**Section 1110. UCC Financing Statements**. The Members of the Obligated Group shall file or cause to be filed, and shall deliver, or cause to be delivered to the Master Trustee evidence of the filing of, Uniform Commercial Code financing statements that perfect the security interest granted by the Obligated Group to the Master Trustee pursuant to this Master Indenture, the Mortgages and the Security Agreements (the "***Original Financing Statements***"). The Members of the Obligated Group hereby expressly grant to the Master Trustee the full right and authority, and hereby direct the Master Trustee, to file any continuation that may be required by law or is necessary to maintain the security interest perfected by the Original Financing Statements.

IN WITNESS WHEREOF, **THE ESTELLE PEABODY MEMORIAL HOME OF THE SYNOD OF LINCOLN TRAILS OF THE PRESBYTERIAN CHURCH (U.S.A.)** has caused these presents to be signed in its name and on its behalf by an authorized officer and attested by an authorized officer, and to evidence its acceptance of the trusts hereby created, _____ has caused these presents to be signed in its name and on its behalf by one of its authorized officers, all as of the day and year first above written.

> **THE ESTELLE PEABODY MEMORIAL HOME OF THE SYNOD OF LINCOLN TRAILS OF THE PRESBYTERIAN CHURCH (U.S.A.)**
>
> By _____
>     President

[The remainder of this page is intentionally left blank.]

_____, as Master Trustee

By _____
President

[The remainder of this page is intentionally left blank.]

EXHIBIT "A"

DESCRIPTION OF LAND

Part of the West Half of the Southwest Quarter of Section 32, Township 30
North, Range 7 East, being more particularly described as follows:

Beginning at the northwest corner of said Southwest Quarter, marked by an iron
rebar stake; thence North 88 degrees 42 minutes 20 seconds East, along the
north line of said Southwest Quarter, 1289.13 feet, to a masonry nail with a
washer stamped LS80040428; thence South 00 degrees 02 minutes 49 seconds
West, along the westerly right of way line of Maple Street, 1318.19 feet to a
masonry nail with a washer stamped LS80040428; thence South 89 degrees 38
minutes 31 seconds West, along the northerly line of Sixth Street, 380.34 feet to
an iron rebar stake with a plastic cap stamped LS80040428; thence South 00
degrees 02 minutes 24 seconds West, along the westerly line of Buffalo Street,
25.00 feet to an iron rebar stake with a plastic cap stamped LS80040428; thence
South 89 degrees 38 minutes 31 seconds West, along the northerly line of
August C. Mills Addition, 445.45 feet to an iron rebar stake with a plastic cap
stamped LS80040428; thence North 00 degrees 00 minutes 00 seconds East,
547.65 feet to a chiseled "x"; thence South 88 degrees 42 minutes 20 seconds
West, 462.50 feet to the west line of said Southwest Quarter; thence North 00
degrees 00 minutes 00 seconds East, along said west line, 782.02 feet to the
POINT OF BEGINNING.

Containing 33.43 acres, more or less.

## Excess Land

Lot Number Sixteen (16) in August C. Mills Addition to the Town of North Manchester, Indiana, together with
the North 9.0 feet of the East 60.0 feet of Lot Number Thirteen (13) in said August C. Mills Addition.

Also

Lot Number Thirteen (13) in August C. Mills Addition to the Town of North Manchester, except the North 9.0
feet of the East 60.0 feet of said Lot Number Thirteen (13).

Also Lots Numbered Twenty-seven (27) and Twenty-eight (28) in A.C. Mills Addition to the Town of North
Manchester.

Also

A part of Lot Numbered Seventeen (17) and a Part of Vacated Streets, all in August Mill's Addition to the Town
of North Manchester, Wabash County, Indiana, bounded and described as follows, to-wit:

Beginning at the Southeast corner of said Lot Numbered Seventeen (17); thence West along the South line of said
Lot and said South line extended Two Hundred Eight (208) feet to a point in the center of vacated street
(Reference: Miscellaneous Record 15, page 499); thence North parallel with the West line of said Lot Seventy-
four and Three Hundredths (74.03) feet to an iron stake set Nine Tenths (0.9) of a foot South from the South
fence of the Estelle Peabody Memorial Home Grounds; thence East parallel with the Nine Tenths (0.9) of a foot
South from said fence Two Hundred Eight (208) feet to a point in the West line of Buffalo Street; thence South
Seventy-eight and Eighty-seven Hundredths (78.87) feet to the place of beginning.

Also

Lot Numbered Eighteen (18) and part of a vacated street, all in August Mill's Addition to the Town of North Manchester, Wabash County, Indiana, bounded and described as follows, to wit:

Beginning at the Southeast corner of said Lot Numbered Eighteen (18); thence West along the South line of said Lot and the North line of a public alley Two Hundred Eight (208) feet to an iron stake set in the center of a vacated street: (Reference: Miscellaneous Record 15, page 499); thence North along the center of said vacated street Fifty-three and Eighty-seven Hundredths (53.87) feet; thence East parallel with said North line of said alley Two Hundred Eight (208) feet to the Northeast corner of said Lot; thence South Fifty-three and Eighty-seven Hundredths (53.87) feet to the place of beginning.

Also

That portion of Sixth Street (sometimes known as Half Street) extending from Buffalo Street on the East and going thence Westward to Washington Street, being bounded on the South by Lots 17 and 28 in August C. Mills Addition to the Town of North Manchester and on the North by the lands of The Estelle Peabody Memorial Home.

ALSO THE WEST HALF OF THE FOLLOWING DESCRIBED REAL ESTATE:

That portion of a street lying between Lots 17 and 18 in August C. Mills Addition to said town and Lots 27 and 28 in said addition, described as follows:

Beginning at the Northeast corner of said Lot 28 in said addition; thence East to the Northwest corner of Lot 17 in said addition; thence South to the Southeast corner of said Lot 18 in said addition; thence West to the Northeast corner of said Lot 27; thence North to the place of beginning.

**EXHIBIT B-1**

**FORM OF SERIES 2013A OBLIGATION**

**THIS NOTE OBLIGATION HAS NOT BEEN REGISTERED
UNDER THE SECURITIES ACT OF 1933, AS AMENDED**

**THE ESTELLE PEABODY MEMORIAL HOME OF THE SYNOD OF LINCOLN TRAILS OF THE PRESBYTERIAN
CHURCH (U.S.A.)**

**SERIES 2013A NOTE**

No. R-1                                                                                    $23,400,000

        **THE ESTELLE PEABODY MEMORIAL HOME OF THE SYNOD OF LINCOLN TRAILS OF THE PRESBYTERIAN
CHURCH (U.S.A.)**, an Indiana nonprofit corporation (the "***Corporation***"), **FOR VALUE RECEIVED**, hereby promises
to pay to the **TOWN OF NORTH MANCHESTER, INDIANA** (the "***Town***"), or assigns, the principal sum of **TWENTY
THREE MILLION AND FOUR HUNDRED THOUSAND 00/100 DOLLARS ($23,400,000)** in monthly installments in the
amounts and years set forth below and to pay interest thereon in monthly installments in the amounts and years set
forth below:

| For Year Ending July 1 | Monthly Installment of Principal | Monthly Installment of Interest* |
|---|---|---|
| 2014 | - | $100,000.00/month to and including _____, 2014 $_____/month thereafter |
| 2015 | - | $ |
| 2016 | - | |
| 2017 | - | |
| 2018 | - | |
| 2019 | - | |
| 2020 | $ | |
| 2021 | | |
| 2022 | | |
| 2023 | | |
| 2024 | | |
| 2025 | | |
| 2026 | | |
| 2027 | | |
| 2028 | | |
| 2029 | | |
| 2030 | | |
| 2031 | | |
| 2032 | | |
| 2033 | | |
| 2034 | | |
| 2035 | | |
| 2036 | | |
| 2037 | | |
| 2038 | | |
| 2039 | | |
| 2040 | | |
| 2041 | | |
| 2042 | | |

| For Year Ending July 1 | Monthly Installment of Principal | Monthly Installment of Interest |
|---|---|---|
| 2043 | $ | $ |
| 2044 | | |
| 2045 | | |

Monthly installments of interest are payable on the first day of each month, commencing _____, 2013.  Monthly installments of principal are payable on the first day of each month, commencing two (2) years from the Closing Date (as defined in the Bond Indenture).  Upon the occurrence of a Determination of Taxability, as defined in the Bond Indenture (defined below), the interest rate payable hereunder may be increased to the Gross-Up Rate (as defined in the Bond Indenture) until redemption of the Series 2013A Bonds (defined below) in accordance with the terms thereof.  The Corporation shall receive credit against payments required to be made herein to the extent provided in Section 6.3 of the Loan Agreement (the "**Bond Loan Agreement**") dated as of _____ 1, 2013, between the Town and the Corporation.

Notwithstanding anything to the contrary herein or in the Bond Loan Agreement, including the above schedule of payments, the Corporation agrees to pay all amounts due and owing on the Town's $23,400,000 Economic Development Refunding Revenue Bonds (Peabody Retirement Community Project) Series 2013A (the "**Series 2013A Bonds**") as they become due.

The principal of and interest on this Series 2013A Obligation (as hereinafter defined) and the premium, if any, payable upon redemption, are payable at the designated corporate trust office of _____, as Bond Trustee (in such capacity, the "**Bond Trustee**") under that certain Bond Trust Indenture (as the same may be amended or supplemented from time to time, the "**Bond Indenture**") dated as of _____ 1, 2013, between the Town and the Bond Trustee, currently in _____, for the Series 2013A Bonds, by check or draft hand delivered to the Bond Trustee or, to the extent written wire transfer instructions shall be filed with the Master Trustee prior to the close of business on the fifteenth (15th) day prior to the applicable Interest Payment Date (as defined in the Master Indenture hereinafter defined), by wire transfer, in either case delivered on the date such payment is due.

This Series 2013A Obligation is issued in the principal amount of $23,400,000 and is designated as the "The Estelle Peabody Memorial Home of the Synod of Lincoln Trails of the Presbyterian Church (U.S.A.) d/b/a Peabody Retirement Community Series 2013A Note" (the "**Series 2013A Obligation**" and, together with all other Obligations issued under the Original Master Indenture hereinafter defined or the Master Indenture, the "**Obligations**") and is issued under and secured by and entitled to the security of an Amended and Restated Master Trust Indenture (the "**Master Indenture**") dated as of _____ 1, 2013, between the Corporation, as the initial member of an Obligated Group (the "**Obligated Group**"), and _____, as Master Trustee (in such capacity, the "**Master Trustee**"), as amended and supplemented from time to time.  Pursuant to the Master Indenture each Member of the Obligated Group (as defined in the Master Indenture) and each future Member of the Obligated Group are jointly and severally liable on all Obligations (including this Series 2013A Obligation) issued under the Master Indenture.  It is provided in the Master Indenture that the Corporation and any future Members of the Obligated Group may hereafter issue Additional Obligations (as defined in the Master Indenture), subject to the conditions set forth in the Master Indenture, from time to time, and if issued, such Additional Obligations may rank *pari passu* with this Series 2013A Obligation and all other Senior Obligations (as defined in the Master Indenture) theretofore or thereafter issued under the Master Indenture or may be subordinate to the Senior Obligations, all as otherwise provided in the Master Indenture.  Reference is made to the Master Indenture and to all indentures supplemental thereto for the provisions, among others, with respect to the nature and extent of the security for the Obligations, the rights, duties, and obligations of the Corporation, the other Members of the Obligated Group and the Master Trustee and the rights of the holders of the Obligations, and to all the provisions of which the holder hereof by the acceptance of this Series 2013A Obligation assents.

This Series 2013A Obligation is issued to secure a portion of the loan made by the Town to the Corporation pursuant to the Bond Loan Agreement.  Reference is made to the Bond Loan Agreement for its provisions, including the provisions for the payment of principal and interest on this Series 2013A Obligation, to which the holder hereof, by acceptance of this Series 2013A Obligation, assents.

This Series 2013A Obligation is transferable by the registered holder hereof in person or by duly authorized attorney at the designated corporate trust office of the Master Trustee, currently in _____, but only in the manner, subject to the limitations and upon payment of the charges provided in the Master Indenture, and upon surrender and cancellation of this Series 2013A Obligation.  Upon such transfer a new registered Series 2013A Obligation without coupons of the same series and maturity and of authorized denomination or denominations, for the same aggregate principal amount will be issued to the transferee in exchange therefor.  The Master Trustee may deem and treat the registered holder hereof as the absolute owner hereof for the purpose of receiving payment of or on account of principal hereof and premium, if any, hereon and interest due hereon and for all other purposes and the Master Trustee shall not be affected by any notice to the contrary.

This Series 2013A Obligation is issuable as a single fully registered Obligation without coupons in the amount of $23,400,000.  This Series 2013A Obligation may not be exchanged for a coupon Obligation.

This Series 2013A Obligation may be prepaid in whole or in part by paying the amount necessary to provide for the payment, prepayment, redemption, refunding, or advance refunding of the Series 2013A Bonds or any portion of the Series 2013A Bonds in the manner provided in the Bond Indenture.  Upon prepayment in full of amounts necessary under the Bond Indenture for the Series 2013A Bonds to be paid or deemed paid in full, this Series 2013A Obligation or portion of this Series 2013A Obligation shall be deemed paid and shall cease to be entitled to any lien, benefit, or security under the Master Indenture.  Other Obligations are also subject to advance defeasance, and the Members may pay or provide for the payment of all or a part of the indebtedness on all Obligations of a particular series as described in the Master Indenture.  The foregoing notwithstanding, this Series 2013A Obligation shall not be deemed paid and shall continue to be entitled to the lien, benefit, and security of the Master Indenture unless and until the Series 2013A Bonds cease to be entitled to any lien, benefit, or security under the Bond Indenture pursuant to the provisions thereof.

In the event this Series 2013A Obligation is prepaid as aforesaid, notice thereof identifying the portion of this Series 2013A Obligation to be prepaid will be given by mailing a copy of the prepayment notice by first class mail, postage prepaid, to the registered owner or owners hereof, at their addresses shown on the registration books, not less than thirty (30) days prior to the date fixed for prepayment, or such lesser period as shall be acceptable to such registered owner or owners.  On such date as under the Bond Indenture the Obligated Group shall have been fully discharged from any further obligation with respect to the payment of the principal amount of and interest on any Series 2013A Bonds paid or deemed paid as a result of the applicable prepayment hereunder, this Series 2013A Obligation or the portion hereof so prepaid will cease to bear interest, and this Series 2013A Obligation shall not be deemed to be outstanding under the provisions of the Master Indenture.

The holder of this Series 2013A Obligation shall have no right to enforce the provisions of the Master Indenture or to institute action to enforce the covenants therein, or to take any action with respect to any Event of Default under the Master Indenture, or to institute, appear in or defend any suit or other proceedings with respect thereto, except as provided in the Master Indenture.

This Series 2013A Obligation is an Accelerable Instrument (as defined in the Master Indenture) and, subject to the terms of the Master Indenture, the holder hereof has the right under the Master Indenture to request an acceleration of this Series 2013A Obligation upon the occurrence of an Event of Default described in Section 502 of the Master Indenture.

In certain events (including without limitation the occurrence of an "Event of Default," as defined in the Master Indenture), on the conditions, in the manner and with the effect set forth in the Master Indenture, the outstanding principal of this Series 2013A Obligation may become or may be declared due and payable before the stated maturity thereof, together with interest accrued thereon. Modifications or alterations of the Master Indenture, or of any supplements thereto, may be made only to the extent and in the circumstances permitted by the Master Indenture.

It is hereby certified by the Corporation that all conditions, acts, and things required to exist, happen and be performed under the Master Indenture precedent to and in the issuance of this Series 2013A Obligation, exist, have happened, and have been performed, and that the issuance, authentication, and delivery of this Series 2013A Obligation have been duly authorized by resolution of the Corporation duly adopted.

No recourse shall be had for the payment of the principal of or premium or interest on this Series 2013A Obligation or for any claim based thereon or upon any obligation, covenant or agreement in the Master Indenture contained against any past, present or future officer, director, employee, member or agent of any Member, or of any successor corporation, as such, either directly or through any Member or any successor corporation, under any rule of law or equity, statute or constitution or by the enforcement of any assessment or penalty or otherwise, and all such liability of any such officers, directors, employees, members, or agents as such is hereby expressly waived and released as a condition of and consideration for the execution of the Master Indenture and the issuance of this 2013A Obligation.

The Corporation, on behalf of itself and the other Members, hereby waives presentment for payment, demand, protest, notice of protest, notice of dishonor, and all defenses on the grounds of extension of time of payment for the payment hereof which may be given (other than in writing) by the Master Trustee to the Members.

This Series 2013A Obligation shall not be valid or become obligatory for any purpose or be entitled to any security or benefit under the Master Indenture until the certificate of authentication hereon shall have been duly executed by the Master Trustee.

The Town hereby acknowledges that it has, pursuant to the Bond Indenture, conveyed, granted, assigned, transferred, pledged, set over, and confirmed and granted a security interest in this Series 2013A Obligation to the Bond Trustee, its successor or successors and its or their assigns forever, with power of sale.

[The remainder of this page is intentionally left blank.]

B-1-4

**IN WITNESS WHEREOF**, **THE ESTELLE PEABODY MEMORIAL HOME OF THE SYNOD OF LINCOLN TRAILS OF THE PRESBYTERIAN CHURCH (U.S.A.)** has caused this Series 2013A Obligation to be executed in its name and on its behalf by the manual signature of its President, as of _____, 2013.

<div style="margin-left: 40%;">

**THE ESTELLE PEABODY MEMORIAL HOME OF THE SYNOD OF LINCOLN TRAILS OF THE PRESBYTERIAN CHURCH (U.S.A.)**

By _____

_____, President

</div>

<div align="center">

**CERTIFICATE OF AUTHENTICATION**

</div>

This Series 2013A Obligation is one of the Obligations described in the within-mentioned Master Indenture.

<div style="margin-left: 40%;">

_____, as Master Trustee

By _____

Authorized Officer

</div>

EXHIBIT B-2

FORM OF SERIES 2013B SUBORDINATE OBLIGATION

THIS NOTE OBLIGATION HAS NOT BEEN REGISTERED
UNDER THE SECURITIES ACT OF 1933, AS AMENDED

THE ESTELLE PEABODY MEMORIAL HOME OF THE SYNOD OF LINCOLN TRAILS OF THE PRESBYTERIAN
CHURCH (U.S.A.)

SUBORDINATE SERIES 2013B NOTE

No. R-1                                   Original Principal Amount: $20,150,000

THE ESTELLE PEABODY MEMORIAL HOME OF THE SYNOD OF LINCOLN TRAILS OF THE PRESBYTERIAN CHURCH (U.S.A.), an Indiana nonprofit corporation (the "*Corporation*"), FOR VALUE RECEIVED, hereby promises to pay to the TOWN OF NORTH MANCHESTER, INDIANA (the "*Authority*"), or assigns, the principal sum of TWENTY MILLION AND 00/100 DOLLARS ($20,150,000), as it may be increased from time to time in accordance with the provisions of the Master Indenture (defined below) as reflected in the attached Schedule A, and to pay interest thereon at an interest rate of 1% per annum, subject to the provisions of the Master Indenture.  The unpaid principal sum hereof, including any such increases thereto, shall be payable at maturity of this Series 2013B Subordinate Obligation (as hereinafter defined) on [July 1, 2045].

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

**To the extent interest is not paid on this Series 2013B Subordinate Obligation (as hereinafter defined) on an interest payment date, such unpaid interest shall thereafter accrete to and be added as principal on this Series 2013B Subordinate Obligation and shall bear interest at the rate due on the Series 2013B Subordinate Obligation, all in the same manner and with like effect as the Series 2013B Bonds. Any such accretion of interest to the principal amount of this Series 2013B Subordinate Obligation shall be reflected by the Master Trustee on Schedule A hereto. In certain circumstances as provided in the Master Indenture (as hereinafter defined), it is not an Event of Default if interest due on this Series 2013B Subordinate Obligation is not paid on an interest payment date and in such instance such unpaid interest shall accrete to and be added to the principal of this Series 2013B Subordinate Obligation. Notwithstanding any provision of this Series 2013B Subordinate Obligation to the contrary, any reference to the principal of this Series 2013B Subordinate Obligation shall include any unpaid interest on such Series 2013B Subordinate Obligation which has accreted to and shall be treated as principal thereon.**

Monthly installments of interest are payable on the first day of each month, commencing _____, 2013. Monthly installments of principal are payable on the first day of each month, commencing _____, 201__. Upon the occurrence of a Determination of Taxability, as defined in the Bond Indenture (defined below), the interest rate payable hereunder may be increased to the Gross-Up Rate (as defined in the Bond Indenture) until redemption of the Series 2013A Bonds (defined below) in accordance with the terms thereof. The Corporation shall receive credit against payments required to be made herein to the extent provided in Section 6.3 of the Loan Agreement (the "**Bond Loan Agreement**") dated as of _____ 1, 2013, between the Town and the Corporation.

Notwithstanding anything to the contrary herein or in the Bond Loan Agreement, including the above schedule of payments, the Corporation agrees to pay all amounts due and owing on the Town's $20,150,000 Subordinate Economic Development Refunding Revenue Bonds (Peabody Retirement Community Project) Series 2013B (the "**Series 2013B Bonds**") as they become due.

The principal of and interest on this Series 2013B Subordinate Obligation and the premium, if any, payable upon redemption, are payable at the designated corporate trust office of _____, as Bond Trustee (in such capacity, the "**Bond Trustee**") under that certain Bond Trust Indenture (as the same may be amended or supplemented from time to time, the "**Bond Indenture**") dated as of _____ 1, 2013, between the Town and the Bond Trustee, currently in _____, for the Series 2013B Bonds, by check or draft hand delivered to the Bond Trustee or, to the extent written wire transfer instructions shall be filed with the Master Trustee prior to the close of business on the fifteenth (15th) day prior to the applicable Interest Payment Date (as defined in the Master Indenture hereinafter defined), by wire transfer, in either case delivered on the date such payment is due.

This Series 2013B Subordinate Obligation is issued in the original principal amount of $20,150,000 and is designated as the "The Estelle Peabody Memorial Home of the Synod of Lincoln Trails of the Presbyterian Church (U.S.A.) d/b/a Peabody Retirement Community Subordinate Series 2013B Note" (the "**Series 2013B Subordinate Obligation**" and, together with all other Obligations issued under the Original Master Indenture hereinafter defined or the Master Indenture, the "**Obligations**") and is issued under and secured by and entitled to the security of an Amended and Restated Master Trust Indenture (the "**Master Indenture**") dated as of _____ 1, 2013, between the Corporation, as the initial member of an Obligated Group (the "**Obligated Group**"), and _____, as Master Trustee (in such capacity, the "**Master Trustee**"), as amended and supplemented from time to time. Pursuant to the Master Indenture each Member of the Obligated Group (as defined in the Master Indenture) and each future Member of the Obligated Group are jointly and severally liable on all Obligations (including this Series 2013B Subordinate Obligation) issued under the Master Indenture. This Series 2013B Subordinate Obligation is subordinate to the Series 2013A Obligation (as defined in the Master Indenture) issued simultaneously herewith under the Master Indenture. It is provided in the Master Indenture that the Corporation and any future Members of the Obligated Group may hereafter issue Additional Obligations (as defined in the Master Indenture), subject to the conditions set forth in the Master Indenture, from time to time, and if issued, such Additional Obligations may rank *pari passu* with this Series 2013B Subordinate Obligation and all other Subordinate Obligations (as defined in the Master Indenture) theretofore or thereafter issued under the Master Indenture or may rank *pari passu* with the Series 2013A Obligation and all other Senior Obligations (as defined in the Master Indenture) theretofore or thereafter issued under the Master Indenture, all as otherwise provided in the Master Indenture. Reference is made to the Master Indenture and to all indentures supplemental thereto for the provisions, among others, with respect to the nature and extent of the security for the Obligations, the rights, duties, and obligations of the Corporation, the other

Members of the Obligated Group and the Master Trustee and the rights of the holders of the Obligations, and to all the provisions of which the holder hereof by the acceptance of this Series 2013B Subordinate Obligation assents.

This Series 2013B Subordinate Obligation is issued to secure a portion of the loan made by the Town to the Corporation pursuant to the Bond Loan Agreement.  Reference is made to the Bond Loan Agreement for its provisions, including the provisions for the payment of principal and interest on this Series 2013B Subordinate Obligation, to which the holder hereof, by acceptance of this Series 2013B Subordinate Obligation, assents.

This Series 2013B Subordinate Obligation is transferable by the registered holder hereof in person or by duly authorized attorney at the designated corporate trust office of the Master Trustee, currently in _____, but only in the manner, subject to the limitations and upon payment of the charges provided in the Master Indenture, and upon surrender and cancellation of this Series 2013B Subordinate Obligation.  Upon such transfer a new registered Series 2013B Subordinate Obligation without coupons of the same series and maturity and of authorized denomination or denominations, for the same aggregate principal amount will be issued to the transferee in exchange therefor.  The Master Trustee may deem and treat the registered holder hereof as the absolute owner hereof for the purpose of receiving payment of or on account of principal hereof and premium, if any, hereon and interest due hereon and for all other purposes and the Master Trustee shall not be affected by any notice to the contrary.

This Series 2013B Subordinate Obligation is issuable as a single fully registered Obligation without coupons in the original principal amount of $20,150,000.  This Series 2013B Subordinate Obligation may not be exchanged for a coupon Obligation.

This Series 2013B Subordinate Obligation may be prepaid in whole or in part by paying the amount necessary to provide for the payment, prepayment, redemption, refunding, or advance refunding of the Series 2013B Bonds or any portion of the Series 2013B Bonds in the manner provided in the Bond Indenture.  Upon prepayment in full of amounts necessary under the Bond Indenture for the Series 2013B Bonds to be paid or deemed paid in full, this Series 2013B Subordinate Obligation or portion of this Series 2013B Subordinate Obligation shall be deemed paid and shall cease to be entitled to any lien, benefit, or security under the Master Indenture.  The Members shall remain the obligors on this Series 2013B Subordinate Obligation but the holders thereof shall be entitled to payment (to the exclusion of all other Obligation holders) solely out of funds received from such Escrow Obligations.  Other Obligations are also subject to advance defeasance, and the Members may pay or provide for the payment of all or a part of the indebtedness on all Obligations of a particular series as described in the Master Indenture.  The foregoing notwithstanding, this Series 2013B Subordinate Obligation shall not be deemed paid and shall continue to be entitled to the lien, benefit, and security of the Master Indenture unless and until the Series 2013B Bonds cease to be entitled to any lien, benefit, or security under the Bond Indenture pursuant to the provisions thereof.

As provided in the Master Indenture, the Series 2013A Obligation and this Series 2013B Subordinate Obligation are subject to prepayment by the Corporation on or before [_____, 2016][insert date that is three (3) year anniversary of the Closing Date]  (the "*Early Redemption*").  In the event the Corporation exercises its right of Early Redemption, this Series 2013B Subordinate Obligation would be redeemed in the amount of (i) Twenty-Seven Million and no/100 Dollars ($27,000,000) plus accrued but unpaid interest on the Series 2013A Obligation through the Early Redemption Deposit Date (as defined in the Master Indenture), minus (ii) the amount required to redeem in full on the date of Early Redemption the Series 2013A Obligation at a redemption price equal to 100% of the principal amount thereof plus accrued but unpaid interest thereon through the applicable redemption date.  **Exercise by the Corporation of its right of Early Redemption would result in the extinguishment of this Series 2013B Subordinate Obligation and all claims for payment hereon in exchange for the receipt by the holder of this Series 2013B Subordinate Obligation of an amount substantially less than the principal amount hereof and any accreted or accrued interest hereon.**

In the event this Series 2013B Subordinate Obligation is prepaid as aforesaid, notice thereof identifying the portion of this Series 2013B Subordinate Obligation to be prepaid will be given by mailing a copy of the prepayment notice by first class mail, postage prepaid, to the registered owner or owners hereof, at their addresses shown on the registration books, not less than thirty (30) days prior to the date fixed for prepayment, or such lesser period as shall be acceptable to such registered owner or owners, provided that notice of Early Redemption shall be given as provided in the Master Indenture .  On such date as under the Bond Indenture the Obligated Group shall have been

fully discharged from any further obligation with respect to the payment of the principal amount of and interest on any Series 2013B Bonds paid or deemed paid as a result of the applicable prepayment hereunder will cease to bear interest, and this Series 2013B Subordinate Obligation or such portion thereof so prepaid shall not be deemed to be outstanding under the provisions of the Master Indenture.

The holder of this Series 2013B Subordinate Obligation shall have no right to enforce the provisions of the Master Indenture or to institute action to enforce the covenants therein, or to take any action with respect to any Event of Default under the Master Indenture, or to institute, appear in or defend any suit or other proceedings with respect thereto, except as provided in the Master Indenture.

This Series 2013B Subordinate Obligation is an Accelerable Instrument (as defined in the Master Indenture) and, subject to the terms of the Master Indenture, the holder hereof has the right under the Master Indenture to request an acceleration of this Series 2013B Subordinate Obligation upon the occurrence of an Event of Default described in Section 502 of the Master Indenture.

In certain events (including without limitation the occurrence of an "Event of Default," as defined in the Master Indenture), on the conditions, in the manner and with the effect set forth in the Master Indenture, the outstanding principal of this Series 2013B Subordinate Obligation may become or may be declared due and payable before the stated maturity thereof, together with interest accrued thereon. Modifications or alterations of the Master Indenture, or of any supplements thereto, may be made only to the extent and in the circumstances permitted by the Master Indenture.

It is hereby certified by the Corporation that all conditions, acts, and things required to exist, happen and be performed under the Master Indenture precedent to and in the issuance of this Series 2013B Subordinate Obligation, exist, have happened, and have been performed, and that the issuance, authentication, and delivery of this Series 2013B Subordinate Obligation have been duly authorized by resolution of the Corporation duly adopted.

No recourse shall be had for the payment of the principal of or premium or interest on this Series 2013B Subordinate Obligation or for any claim based thereon or upon any obligation, covenant or agreement in the Master Indenture contained against any past, present or future officer, director, employee, member or agent of any Member, or of any successor corporation, as such, either directly or through any Member or any successor corporation, under any rule of law or equity, statute or constitution or by the enforcement of any assessment or penalty or otherwise, and all such liability of any such officers, directors, employees, members, or agents as such is hereby expressly waived and released as a condition of and consideration for the execution of the Master Indenture and the issuance of this 2013B Obligation.

The Corporation, on behalf of itself and the other Members, hereby waives presentment for payment, demand, protest, notice of protest, notice of dishonor, and all defenses on the grounds of extension of time of payment for the payment hereof which may be given (other than in writing) by the Master Trustee to the Members.

This Series 2013B Subordinate Obligation shall not be valid or become obligatory for any purpose or be entitled to any security or benefit under the Master Indenture until the certificate of authentication hereon shall have been duly executed by the Master Trustee.

The Town hereby acknowledges that it has, pursuant to the Bond Indenture, conveyed, granted, assigned, transferred, pledged, set over, and confirmed and granted a security interest in this Series 2013B Subordinate Obligation to the Bond Trustee, its successor or successors and its or their assigns forever, with power of sale.

[The remainder of this page is intentionally left blank.]

**IN WITNESS WHEREOF**, **THE ESTELLE PEABODY MEMORIAL HOME OF THE SYNOD OF LINCOLN TRAILS OF THE PRESBYTERIAN CHURCH (U.S.A.)** has caused this Series 2013B Subordinate Obligation to be executed in its name and on its behalf by the manual signature of its President, as of _____, 2013.

> **THE ESTELLE PEABODY MEMORIAL HOME OF THE SYNOD OF LINCOLN TRAILS OF THE PRESBYTERIAN CHURCH (U.S.A.)**
>
> By _____
>
> _____, President

**CERTIFICATE OF AUTHENTICATION**

This Series 2013B Subordinate Obligation is one of the Obligations described in the within-mentioned Master Indenture.

> _____, as Master Trustee
>
> By _____
>
> Authorized Officer

SCHEDULE A

AGGREGATE PRINCIPAL AMOUNT OF SUBORDINATE SERIES 2013B NOTE

| Date of Accretion of Interest | Amount of increase in Principal Amount | Principal Amount of Subordinate Series 2013B Note prior to such increase (taking into account any prior redemptions) | Principal Amount of Subordinate Series 2013B Note after such increase | Signature of authorized officer of Master Trustee or Custodian |
|---|---|---|---|---|

Case 13-00976-RLM-11  Doc 60-2  Filed 07/24/15  EOD 07/24/15 13:20:21  Pg 115 of
720

**Exhibit "C"**

**List of Exceptions**

The provisions of the Master Indenture pursuant to which each Member of the Obligated Group covenants to pay any Obligation issued by a Member other than itself may not be enforceable if such payment:

(i)    is to be made on any such Obligation that was issued for a purpose that is not consistent with the charitable purposes of the Member from which such payment is requested or that was issued for the benefit of any entity other than a non-profit corporation that is exempt from federal income taxes under Sections 501(a) and 501(c)(3) of the Code;

(ii)    is to be made from any moneys or assets that are donor restricted or that are subject to a direct or express trust that does not permit the use of such moneys or assets for such a payment;

(iii)    would result in the cessation or discontinuation of any material portion of the health care or related services previously provided by the Member from which such payment is requested; or

(iv)    is to be made pursuant to any loan violating applicable usury laws.

**EXHIBIT "D"**

**LIST OF OBLIGATED GROUP MEMBERS**

| Obligated Group Member | Address |
|---|---|
| The Estelle Peabody Memorial Home of the Synod of Lincoln Trails of the Presbyterian Church (U.S.A.) d/b/a Peabody Retirement Community | 400 West Seventh Street<br>North Manchester, Indiana 46962 |

EXHIBIT "E"

<u>PERMITTED ENCUMBRANCES</u>

**EXHIBIT "F"**

**FORM OF REQUISITION FROM THE INSURANCE AND CONDEMNATION AWARD FUND**

**INSURANCE AND CONDEMNATION AWARD FUND**
**CERTIFICATE AND REQUISITION FOR PAYMENT**

Date: [month] _____, [year]

Draw Request #_____

THE ESTELLE PEABODY MEMORIAL HOME OF THE SYNOD OF LINCOLN TRAILS OF THE PRESBYTERIAN CHURCH (U.S.A.) (the "*Corporation*") hereby requests, pursuant to the Master Trust Indenture (the "*Master Indenture*") dated as of _____ 1, 2013, by and between the Corporation and _____, as Master Trustee (the "*Master Trustee*"), that the following amounts be disbursed to the following parties for the account of [the Corporation/ ] from the Insurance and Condemnation Award Fund (the "*Insurance and Condemnation Award Fund*") created under Section 430 of the Master Indenture for the payment of the costs of [restoration, repair, or rebuilding] of the Facilities (as defined in the Master Indenture) as described in Section [411/412] of the Master Indenture:

| Name of Payee | Nature of Disbursement | Amount |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

The Corporation does hereby certify to the Master Trustee that, as of the date hereof, (1) the representations and warranties of the Obligated Group in the Master Indenture are hereby ratified and confirmed, (2) no Event of Default has occurred and is continuing under the Master Indenture, and (3) the above-listed items are properly payable from the Insurance and Condemnation Award Fund pursuant to the provisions of Section [411/412] of the Master Indenture.

The expenditures being made pursuant to this requisition consist of the following _____
_____
_____ [specifically describe the nature of the expenditures being made pursuant to this requisition and the specific location of the Property to which such expenditures relate].

THE ESTELLE PEABODY MEMORIAL HOME OF THE
SYNOD OF LINCOLN TRAILS OF THE PRESBYTERIAN
CHURCH (U.S.A.)


By _____

**Exhibit "G"**

**Form of Requisition from the Costs of Issuance Fund**

**Costs of Issuance Fund**
**Certificate and Requisition for Payment**

Date: [month] _____, [year]

Draw Request #_____

      **The Estelle Peabody Memorial Home of The Synod of Lincoln Trails of The Presbyterian Church (U.S.A.)** (the "*Corporation*") hereby requests, pursuant to the Master Trust Indenture (the "*Master Indenture*") dated as of _____ 1, 2013, by and between the Corporation and _____, as Master Trustee (the "*Master Trustee*"), that the following amounts be disbursed to the following parties for the account of [the Corporation/ ] from the Costs of Issuance Fund (the "*Costs of Issuance Fund*") created under Section 431 of the Master Indenture for the payment of Costs of Issuance (as defined in the Master Indenture) as described in Section 431 of the Master Indenture:

| Name of Payee | Nature of Disbursement | Amount |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

      The Corporation does hereby certify to the Master Trustee that, as of the date hereof, (1) the representations and warranties of the Obligated Group in the Master Indenture are hereby ratified and confirmed, (2) no Event of Default has occurred and is continuing under the Master Indenture, and (3) the above-listed items are properly included within the definition of "Costs of Issuance" in the Master Indenture.

                              **The Estelle Peabody Memorial Home of The Synod of Lincoln Trails of The Presbyterian Church (U.S.A.)**

                              By _____

EXHIBIT "H"

FORM OF LOCK-BOX NOTICE

**Lock Box Notice**

The Estelle Peabody Memorial Home of the Synod of Lincoln Trails of the Presbyterian Church (U.S.A.)

_____

_____

Attention: President


     This letter constitutes the "Lock Box Notice" referred to in Section 514 of the Amended and Restated Master Trust Indenture (the "***Master Indenture***") dated as of _____ 1, 2013, between The Estelle Peabody Memorial Home of the Synod of Lincoln Trails of the Presbyterian Church (U.S.A.) and _____, as Master Trustee. Please refer to such Section of the Master Indenture to see the provisions applicable upon your receipt hereof.


                                      _____, as Master Trustee

                                  By _____
                                        Authorized Officer

2375172v2

**BOND TRUST INDENTURE**

---

between

**TOWN OF NORTH MANCHESTER, INDIANA**

and

_____,

as Bond Trustee

---

**$23,400,000**

**Town of North Manchester, Indiana**

**Economic Development Refunding Revenue Bonds**

**(Peabody Retirement Community Project)**

**Series 2013A**

and

**$20,150,000**

**Town of North Manchester, Indiana**

**Subordinate Economic Development Refunding Revenue Bonds**

**(Peabody Retirement Community Project)**

**Series 2013B**

**DATED AS OF _____ 1, 2013**

---

## TABLE OF CONTENTS

                                                                                    **Page**

Parties ..................................................................................................................1
Recitals ...............................................................................................................1
Granting Clauses ...............................................................................................2
Excepted Property.............................................................................................3

### ARTICLE I
#### DEFINITIONS; RULES OF CONSTRUCTION

Section 101    Definitions of Certain Words and Terms ................................ I - 1
Section 102    Rules of Construction ..............................................................I - 12

### ARTICLE II
#### THE BONDS

Section 201    Authorized Amount of Bonds ................................................. II - 1
Section 202    Issuance of Bonds .................................................................. II - 1
Section 203    Execution; Limited Obligation; No Liability of State ............... II - 2
Section 204    Authentication......................................................................... II - 3
Section 205    Form of Bonds and Temporary Bonds ................................... II - 3
Section 206    Delivery of Bonds ................................................................... II - 3
Section 207    Mutilated, Lost, Stolen, or Destroyed Bonds......................... II - 4
Section 208    Transfer and Exchange of Bonds; Persons Treated as Owners........ II - 5
Section 209    Cancellation ........................................................................... II - 5
Section 210    Book-Entry Only System......................................................... II - 5
Section 211    Payments and Notices to Cede & Co .................................... II - 6
Section 212    Successor Securities Depository; Transfers Outside Book-Entry Only System ........ II - 6

### ARTICLE III
#### CLOSING TRANSFERS

Section 301    Closing Transfers; LB Claim ................................................. III - 1

### ARTICLE IV
#### REVENUES AND FUNDS

Section 401    Source of Payment of Bonds ................................................. IV - 1
Section 402    Debt Service Fund ................................................................. IV - 1
Section 403    Interest Fund .......................................................................... IV - 1
Section 404    Bond Sinking Fund ................................................................. IV - 2
Section 405    Optional Redemption Fund..................................................... IV - 4
Section 406    Debt Service Reserve Fund.................................................... IV - 4
Section 407    Investment of Funds............................................................... IV - 5
Section 408    Trust Funds ............................................................................ IV - 6
Section 409    Excluded Fund; Transfers to Rebate Fund ............................ IV - 6

### ARTICLE V
#### REDEMPTION OF BONDS

Section 501    Optional Redemption Dates and Prices.................................. V - 1
Section 502    Bond Sinking Fund Deposits - Mandatory Deposits ............... V - 2

Section 503    Mandatory Redemption Upon the Occurrence of a Determination of Taxability .................. V - 2
Section 504    Notice of Redemption .............................................................................................. V – 3

## ARTICLE VI
### GENERAL COVENANTS

Section 601    Payment of Principal, Premium, if any, and Interest .............................................. VI - 1
Section 602    Performance of Covenants; Legal Authorization .................................................... VI - 1
Section 603    Ownership; Instruments of Further Assurance ....................................................... VI - 1
Section 604    Recording and Filing .............................................................................................. VI - 1
Section 605    Required Reporting to the Town ............................................................................. VI - 2
Section 606    Bond Register ......................................................................................................... VI - 2
Section 607    Rights Under the Loan Agreement and the Series 2013 Bond Obligations; Bond
               Trustee as Owner of the Series 2013 Bond Obligations ......................................... VI - 3
Section 608    Designation of Additional Paying Agents .............................................................. VI - 3
Section 609    Arbitrage; Compliance with Tax Agreement .......................................................... VI - 3
Section 610    Prohibited Activities .............................................................................................. VI - 3

## ARTICLE VII
### EVENTS OF DEFAULT; REMEDIES

Section 701    Events of Default ................................................................................................... VII - 1
Section 702    Acceleration ........................................................................................................... VII - 2
Section 703    Remedies; Rights of Bondholders .......................................................................... VII - 2
Section 704    Direction of Proceedings by Bondholders .............................................................. VII - 3
Section 705    Appointment of Receivers ...................................................................................... VII - 3
Section 706    Application of Moneys ........................................................................................... VII - 3
Section 707    Remedies Vested in Bond Trustee .......................................................................... VII - 4
Section 708    Rights and Remedies of Bondholders ..................................................................... VII - 5
Section 709    Termination of Proceedings .................................................................................... VII - 5
Section 710    Waiver of Events of Default .................................................................................... VII - 5
Section 711    Corporation's Right of Possession and Use of Its Property .................................... VII - 5
Section 712    Waiver of Redemption; Effect of Sale of the Corporation's Property ..................... VII - 6
Section 713    Notice of Event of Default; Endorsement of the Series 2013 Bond Obligations ..... VII - 6

## ARTICLE VIII
### THE BOND TRUSTEE

Section 801    Acceptance of the Trusts ........................................................................................ VIII - 1
Section 802    Fees, Charges, and Expenses of the Bond Trustee, the Bond Registrar, and
               the Town ................................................................................................................. VIII - 3
Section 803    Notice to the Town and the Bondholders if an Event of Default Occurs ................. VIII - 4
Section 804    Intervention by Bond Trustee ................................................................................. VIII - 4
Section 805    Successor Bond Trustee ......................................................................................... VIII - 4
Section 806    Bond Trustee Required; Eligibility ......................................................................... VIII - 4
Section 807    Resignation by the Bond Trustee ............................................................................ VIII - 4
Section 808    Removal of the Bond Trustee ................................................................................. VIII - 4
Section 809    Appointment of Successor Bond Trustee by the Bondholders; Temporary
               Bond Trustee .......................................................................................................... VIII - 5
Section 810    Judicial Appointment of Successor Trustee ............................................................ VIII - 5
Section 811    Concerning Any Successor Bond Trustees .............................................................. VIII - 5
Section 812    Bond Trustee Protected in Relying Upon Resolution, Etc. ...................................... VIII - 6
Section 813    Successor Bond Trustee as Bond Trustee of Funds, Paying Agent, and Bond Registrar ...... VIII - 6
Section 814    Paying Agents; Appointment and Acceptance of Duties; Removal ......................... VIII - 6

Section 815    Trust Estate May Be Vested in Separate or Co-Trustee .......................................... VIII - 6
Section 816    Representations, Warranties, and Covenants of the Bond Trustee ........................ VIII - 7

ARTICLE IX

SUPPLEMENTAL BOND INDENTURES

Section 901    Supplemental Indentures Not Requiring Consent of the Bondholders .................................. IX - 1
Section 902    Supplemental Indentures Requiring Consent of the Bondholders ........................................ IX - 1
Section 903    Consent of the Corporation ........................................................................................ IX - 2
Section 904    Opinion of Bond Counsel ........................................................................................... IX - 2

ARTICLE X

AMENDMENTS TO THE LOAN AGREEMENT

Section 1001 Amendments to Loan Agreement Not Requiring Consent of the Bondholders .......................... X - 1
Section 1002 Amendments to Loan Agreement Requiring Consent of the Bondholders ................................ X - 1
Section 1003 No Amendment May Alter the Series 2013 Bond Obligations ................................................ X - 2
Section 1004 Opinion of Bond Counsel ........................................................................................... X - 2

ARTICLE XI

SATISFACTION OF THIS BOND INDENTURE

Section 1101 Defeasance ................................................................................................................. XI - 1
Section 1102 Liability of Authority Not Discharged ............................................................................ XI - 2
Section 1103 Provision for Payment of a Particular Series of Bonds or any Portion Thereof ....................... XI - 2
Section 1104 When Refunding is Not Permitted ................................................................................. XI - 3

ARTICLE XII

MANNER OF EVIDENCING OWNERSHIP OF BONDS; BONDS HELD BY CORPORATION

Section 1201 Proof of Ownership ....................................................................................................  XII - 1

ARTICLE XIII

RESERVED

Section 1301 Reserved ...................................................................................................................XIII - 1

ARTICLE XIV

MISCELLANEOUS

Section 1401 Limitation of Rights .....................................................................................................XIV - 1
Section 1402 Unclaimed Moneys.......................................................................................................XIV - 1
Section 1403 Severability.................................................................................................................XIV - 1
Section 1404 Notices......................................................................................................................XIV - 1
Section 1405 Bond Trustee as Paying Agent and Registrar .................................................................XIV - 2
Section 1406 Counterparts ..............................................................................................................XIV - 2
Section 1407 Applicable Law ...........................................................................................................XIV - 2
Section 1408 Provisions for Payment of Expenses .............................................................................XIV - 2
Section 1409 Immunity of Officers, Employees, and Members of the Town and
         the Town Council..................................................................................................XIV -2

Section 1410 Payments Due on Non-Business Days ..................................................................................XIV - 2

**EXECUTION BY THE ISSUER**................................................................................................................. XIV - 3
**EXECUTION BY THE BOND TRUSTEE** .................................................................................................XIV -4

**EXHIBIT "A" FORM OF SERIES 2013A BOND** ................................................................................. A - 1
**EXHIBIT "B" FORM OF SERIES 2013B BOND**.................................................................................. B - 1

---

### BOND INDENTURE

---

This **BOND TRUST INDENTURE** (the "**Bond Indenture**") dated as of _____ 1, 2013, between the **TOWN OF NORTH MANCHESTER, INDIANA** (the "**Town**"), a municipal corporation organized and existing under the laws of the State of Indiana (the "**State**"), and _____, a _____ duly organized and existing under the laws of _____, and duly authorized to accept and administer trusts of the character hereinafter set forth, as Bond Trustee (in such capacity, together with its successors and assigns, the "**Bond Trustee**").

### W I T N E S S E T H :

**WHEREAS**, Indiana Code, Title 36, Article 7, Chapters 11.9 and 12 and Indiana Code, Title 5, Article 1, Chapter 5 (collectively, the "**Act**"), have been enacted by the General Assembly of the State; and

**WHEREAS**, the Act declares that the financing and refinancing of economic development facilities constitutes a public purpose; and

**WHEREAS**, the Act provides that an issuer, pursuant to the Act, may issue revenue bonds and lend the proceeds thereof to a corporation for the purpose of financing and refinancing the costs of acquisition, improvement, expansion, construction and installation of facilities, including real and personal property, for diversification of economic development and promotion and retention of job opportunities in or near such issuer; and

**WHEREAS**, the Act provides that such bonds may be secured by a trust indenture between the issuer and a corporate trustee; and

**WHEREAS**, pursuant to the Act, the Town previously issued three series of revenue bonds consisting of $41,900,000 in principal amount of its Town of North Manchester, Indiana Revenue Bonds (Peabody Retirement Community Project) Series 2002A (the "**Series 2002A Bonds**"), $3,500,000 in principal amount of its Town of North Manchester, Indiana Revenue Bonds (Peabody Retirement Community Project) Series 2002B-1 Extendable Rate Adjustable Securities$^{SM}$ (EXTRAS$^{SM}$) (the "**Series 2002B-1 Bonds**") and $1,500,000 in principal amount of its Town of North Manchester, Indiana Revenue Bonds (Peabody Retirement Community Project) Series 2002B-2 Extendable Rate Adjustable Securities$^{SM}$ (EXTRAS$^{SM}$) (the "**Series 2002B-2 Bonds**", collectively with the Series 2002B-1 Bonds, the "**Series 2002B Bonds**") under and pursuant to that certain Bond Trust Indenture (the "**Series 2002 Bond Indenture**") dated as of August 15, 2002, between the Town and Wells Fargo Bank, N.A., successor to Wells Fargo Bank Indiana, NA, as bond trustee (the "**Series 2002 Bond Trustee**") for the purpose of providing funds to lend to The Estelle Peabody Memorial Home of the Synod of Lincoln Trails of the Presbyterian Church (U.S.A.), an Indiana nonprofit corporation (the "**Corporation**"), to (i) finance a portion of the costs of the construction and equipping of 73 assisted living units and 48 Alzheimer/dementia units, renovation of various common areas, demolition of a portion of the then existing residential living facilities, and construction and equipping of a 144-bed replacement nursing facility (collectively, the "**Project**"); (ii) fund a debt service reserve fund; (iii) pay a portion of the interest on the Series 2002A Bonds and the Series 2002B Bonds (collectively, the "**Series 2002 Bonds**"); and (iv) pay certain expenses incurred in connection with the issuance of the Series 2002 Bonds; and

**WHEREAS**, the Corporation has requested that the Town issue: $23,400,000 Economic Development Refunding Revenue Bonds (Peabody Retirement Community Project) Series 2013A (the "**Series 2013A Bonds**") and $20,150,000 Subordinate Economic Development Revenue Bonds (Peabody Retirement Community Project), Series 2013B (the "**Series 2013B Bonds**" and, together with the Series 2013A Bonds, the "**Bonds**") and exchange the Bonds ratably for all of the outstanding Series 2002 Bonds (the "**Bond Exchange**"), which upon such Bond Exchange will no longer be outstanding under the Series 2002 Indenture; and

**WHEREAS**, the Bond Exchange has been approved by order of the Bankruptcy Court, dated _____, 2013, which approved the plan of restructuring the Series 2002 Bonds through the ratable exchange with the Bonds; and

WHEREAS, the Town is authorized under the Act to issue its bonds for the purposes aforesaid and the Town has determined that the public interest will be best served and that the purposes of the Act can be more advantageously obtained by the Town's issuance of Bonds for the foregoing purposes; and

WHEREAS, the execution and delivery of this Bond Indenture and the issuance of the Bonds under the Act have been in all respects duly and validly authorized by ordinance duly passed and approved by the Town; and

WHEREAS, the Town will issue the Bonds upon the Corporation's execution and delivery of a Loan Agreement (the "*Loan Agreement*") dated as of _____ 1, 2013, between the Corporation and the Town, pursuant to which the Corporation will covenant to make payments at such times and in such amounts (including principal, interest and premium, if any) so as to provide for the payment of the principal of, premium, if any, and interest on the Bonds outstanding under this Bond Indenture; and

WHEREAS, in order to secure the repayment of (i) the Series 2013A Bonds, the Corporation will issue to the Bond Trustee its Series 2013A Note (the "*Series 2013A Obligation*") in the principal amount of $23,400,000 and (ii) the Series 2013B Bonds, the Corporation will issue to the Bond Trustee its Subordinate Series 2013B Note (the "*Series 2013B Obligation*" and, together with the Series 2013A Obligation, the "*Series 2013 Bond Obligations*") in the original principal amount of $20,150,000 pursuant to an Amended and Restated Master Trust Indenture (the "*Master Indenture*") dated as of _____ 1, 2013, between the Corporation, as the initial Member of the Obligated Group, and _____, as Master Trustee (in such capacity, the "*Master Trustee*"); and

WHEREAS, the Bonds and the Bond Trustee's certificate of authentication to be endorsed thereon, are to be in substantially the forms set forth as Exhibit "A" and Exhibit "B" hereto, with necessary and appropriate variations, omissions, and insertions as permitted or required by this Bond Indenture; and

WHEREAS, all things necessary to make the Bonds, when authenticated by the Bond Trustee and issued as in this Bond Indenture provided, the valid, binding, and legal obligations of the Town according to the import thereof, and to constitute this Bond Indenture a valid assignment and pledge of the payments and prepayments upon the Series 2013 Bond Obligations to be applied to the payment of the principal of, and premium, if any, and interest on, the Bonds and a valid assignment of the right, title, and interest of the Town under the Loan Agreement and amounts payable under the Loan Agreement (except Unassigned Rights, as hereinafter defined), have been done and performed, and the creation, execution, and delivery of this Bond Indenture, and the creation, execution, and issuance of the Bonds, subject to the terms hereof, have in all respects been duly authorized:

NOW, THEREFORE, this Bond Indenture Witnesseth:

That the Town in consideration of the premises and of the purchase of the Bonds and of other good and lawful consideration, the receipt of which is hereby acknowledged, and to secure the payment of the principal of, and premium, if any, and interest on, the Bonds and the performance and observance of all of the covenants and conditions herein or therein contained, has executed and delivered this Bond Indenture and has conveyed, granted, assigned, transferred, pledged, set over, and confirmed and granted a security interest in and by these presents does hereby convey, grant, assign, transfer, pledge, set over, and confirm and grant a security interest in, unto the Bond Trustee, its successor or successors and its or their assigns forever, with power of sale, all and singular the property hereinafter described (collectively, the "*Trust Estate*") to wit:

### GRANTING CLAUSES

### I

All right, title, and interest of the Town in and to the Series 2013 Bond Obligations and all sums payable in respect of the indebtedness evidenced thereby;

**II**

All right, title, and interest of the Town in and to the Loan Agreement and the amounts payable to the Town under the Loan Agreement (excluding Unassigned Rights);

**III**

All right, title, and interest of the Town in and to the funds and accounts established hereunder; and

**IV**

Any and all other property of every kind and nature from time to time hereafter, by delivery or by writing of any kind, conveyed, pledged, assigned, or transferred as and for additional security hereunder by the Town, the Corporation, any other Member of the Obligated Group or by anyone on their behalf to the Bond Trustee, including without limitation funds of the Corporation held by the Bond Trustee as security for the Bonds;

**EXCEPTED PROPERTY**

There is, however, expressly excepted and excluded from the lien and operation of this Bond Indenture amounts held in the Rebate Fund established by the Tax Agreement (as such terms are hereinafter defined);

**TO HAVE AND TO HOLD**, all and singular, the properties and the rights and privileges hereby conveyed, assigned, and pledged by the Town or intended so to be, unto the Bond Trustee and its successors and assigns forever, in trust, nevertheless, with power of sale for the equal and *pro rata* benefit and security of each and every owner of the Bonds issued and to be issued hereunder, without preference, priority, or distinction as to participation in the benefit and protection hereof of one Bond over or from the others, by reason of priority in the issue or negotiation or maturity thereof, or for any other reason whatsoever, except that the Series 2013B Bonds shall be subordinated to the Series 2013A Bonds as herein provided, and except as herein otherwise expressly provided, so that, subject to such exceptions, each and all of such Bonds shall have the same right, lien, and privilege under this Bond Indenture and shall be equally secured hereby;

**PROVIDED, NEVERTHELESS**, and these presents are upon the express condition, that if the Town or its successors or assigns shall well and truly pay or cause to be paid the principal of such Bonds with interest according to the provisions set forth in the Bonds or shall provide for the payment or redemption of such Bonds by depositing or causing to be deposited with the Bond Trustee the entire amount of funds or securities required for payment or redemption thereof when and as authorized by the provisions hereof, and shall also pay or cause to be paid all other sums payable hereunder by the Town, then these presents and the estate and rights hereby granted shall cease, determine and become void, and thereupon the Bond Trustee, on payment of its lawful charges and disbursements then unpaid, on demand of the Town and upon the payment of the cost and expenses thereof, shall duly execute, acknowledge, and deliver to the Town and the Corporation such instruments of satisfaction or release as may be necessary or proper to discharge this Bond Indenture, including if appropriate any required discharge of record, and if necessary shall grant, reassign, and deliver to the Town, its successors or assigns, all and singular the property, rights, privileges, and interests by it hereby granted, conveyed, and assigned, and all substitutes therefor, or any part thereof, not previously disposed of or released as herein provided; otherwise this Bond Indenture shall be and remain in full force.

**AND IT IS HEREBY COVENANTED, DECLARED AND AGREED** by and between the parties hereto that all Bonds are to be issued, authenticated, and delivered, and that all the trust estate is to be held and applied, subject to the further covenants, conditions, releases, uses, and trusts hereinafter set forth, and the Town, for itself and its successors, does hereby covenant and agree to and with the Bond Trustee and its respective successors in said trust, for the benefit of those who shall own the Bonds, or any of them as follows:

<div align="center">

ARTICLE I

DEFINITIONS; RULES OF CONSTRUCTION

</div>

**Section 101. Definitions of Certain Words and Terms**. Except as hereinafter provided, the terms used in this Bond Indenture shall have the same meanings as set forth in the Master Indenture. In addition to the words and terms elsewhere defined in the Master Indenture or elsewhere in this Bond Indenture, the following words and terms as used in this Bond Indenture shall have the following meanings unless the context or use indicates another or different meaning or intent:

"*2013A Bond Sinking Fund Account*" means the separate Account in the Bond Sinking Fund of that name that is created and established therein pursuant to Section 404(a) hereof.

"*2013B Bond Sinking Fund Account*" means the separate Account in the Bond Sinking Fund of that name that is created and established therein pursuant to Section 404(a) hereof.

"*2013A Optional Redemption Account*" means the separate Account in the Optional Redemption Fund of that name that is created and established therein pursuant to Section 405(a) hereof.

"*2013B Optional Redemption Account*" means the separate Account in the Optional Redemption Fund of that name that is created and established therein pursuant to Section 405(a) hereof.

"*Accounts*" means, collectively, all of the accounts within the Funds established pursuant hereto (each, an "*Account*").

"*Act*" means Indiana Code, Title 36, Article 7, Chapters 11.9 and 12, and Indiana Code, Title 5, Article 1, Chapter 5, each as amended.

"*Affiliate*" means a corporation, partnership, joint venture, association, business trust, or similar entity (i) that controls, is controlled by, or is under common control with, directly or indirectly, a Member; or (ii) a majority of the members of the Directing Body of which are members of the Directing Body of a Member. For the purposes of this definition, control means with respect to: (a) a corporation having stock, the ownership, directly or indirectly, of more than fifty percent (50%) of the securities (as defined in Section 2(a)(1) of the Securities Act of 1933, as amended) of any class or classes, the holders of which are ordinarily, in the absence of contingencies, entitled to elect a majority of the directors of such corporation; (b) a non-profit corporation not having stock, having the power to elect or appoint, directly or indirectly, a majority of the members of the Directing Body of such corporation; or (c) any other entity, the power to direct the management of such entity through the ownership of at least a majority of its voting securities or the right to designate or elect at least a majority of the members of its Directing Body, by contract or otherwise. For the purposes of this definition, "*Directing Body*" means with respect to: (x) a corporation having stock, such corporation's board of directors and the owners, directly or indirectly, of more than fifty percent (50%) of the securities (as defined in Section 2(a)(1) of the Securities Act of 1933, as amended) of any class or classes, the holders of which are ordinarily, in the absence of contingencies, entitled to elect a majority of the corporation's directors (both of which groups shall be considered a Directing Body); (y) a non-profit corporation not having stock, such corporation's members if the members have complete discretion to elect the corporation's directors, or the corporation's directors if the corporation's members do not have such discretion; and (z) any other entity, its governing board or body. For the purposes of this definition, all references to directors and members shall be deemed to include all entities performing the function of directors or members however denominated.

"*Amended and Restated Mortgage*" means the Amended and Restated Mortgage, Security Agreement, and Fixture Financing Statement (Wabash County) dated as of _____ 1, 2013, between the Corporation and the Master Trustee.

"*Annual Debt Service*" means the amount required to pay all principal of and interest on a series of the Bonds in any Bond Year. For purposes of calculating the Annual Debt Service on a series of Bonds the interest rate borne by which is not fixed to Maturity on any date, for any period during which an interest swap or similar

<div align="center">

I-1

</div>

agreement shall be in effect with a swap provider rated, or the obligations of which under the applicable agreement are guaranteed by an entity rated, at least A by the Applicable Rating Agencies. whereunder the Corporation pays a fixed rate and the swap provider pays a floating rate that, in the judgment of the Authorized Corporation Representative (as evidenced by a certificate delivered to the Bond Trustee), approximates the variable rate payable on such series of Bonds, the interest rate on such series of Bonds shall be deemed to be equal to the fixed rate payable by the Corporation under such interest swap or similar agreement and for any period during which such an agreement shall not be in effect such series of Bonds shall be treated as if it bears interest at the higher of the SIFMA Municipal Index plus 30 basis points or the average rate during the 12-month period preceding the calculation date calculated under the methodology used to determine the variable rate on the applicable series of Bonds. For the avoidance of doubt, for purposes of calculating Annual Debt Service, no principal shall be deemed required to be paid with respect to the Series 2013B Bonds except during the period commencing 12 months prior to their Maturity or upon acceleration thereof, provided that nothing herein shall affect the obligation of the Obligated Group to make payments of principal of or interest with respect to the Series 2013B Bonds from Excess Cash as provided herein.

"*Applicable Rating Agencies*" means any two Rating Agencies, or, if only one Rating Agency maintains an applicable rating, such Rating Agency (each, an "*Applicable Rating Agency*").

"*Authorized Corporation Representative*" means any person at the time designated to act on behalf of the Corporation by written certificate furnished to the Town and the Bond Trustee, containing the specimen signature of such person and signed on behalf of the Corporation by the President of the Board of Trustees of the Corporation. Such certificate or any subsequent or supplemental certificate so executed may designate an alternate or alternates.

"*Authorized Denomination*" means, (i) with respect to the Series 2013A Bonds, $2,500 or any multiple of $1 in excess thereof, provided that a Series 2013A Bond that, following a partial redemption, has a remaining principal amount of less than $2,500 shall be deemed to be in an Authorized Denomination and (ii) with respect to the Series 2013B Bonds, $2,000 or any multiple of $1 in excess thereof, provided that a Series 2013B Bond that, following a partial redemption, has a remaining principal amount of less than $2,000 shall be deemed to be in an Authorized Denomination (collectively, the "*Authorized Denominations*").  To the extent that a partial redemption would result in an Owner owning a Series 2013 Bond in an amount not constituting an Authorized Denomination, the amount of such Owner's Series 2013 Bond shall be rounded to the nearest dollar.

"*Bankruptcy Court*" means the United States Bankruptcy Court, Southern District of Indiana, Indianapolis Division.

"*Bankruptcy Plan*" means Debtor's Chapter 11 Plan of Reorganization confirmed by the Bankruptcy Court on _____, 2013.

"*Beneficial Owner*" means a Person owning a Beneficial Ownership Interest in the Series 2013A Bonds or the Series 2013B Bonds, as applicable, that has provided written notice to the Trustee of its Beneficial Ownership Interest in such Bonds.

"*Beneficial Ownership Interest*" means the right of the owner to receive for its own account, held directly or indirectly with a Participant or Indirect Participant, payments made by the Issuer with respect to a specified principal amount of Bonds with a specified CUSIP held by the Depository under a Book-Entry System.

"*Bond Counsel*" means independent counsel nationally recognized as experienced in matters relating to tax-exempt bonds and reasonably acceptable to the Town, the Corporation, and the Bond Trustee.

"*Bond Financed Property*" means all of the property of the Corporation financed or refinanced with the proceeds of the Bonds.

"*Bond Indenture*" means this Bond Trust Indenture dated as of _____ 1, 2013, between the Town and the Bond Trustee, as it may from time to time be amended or supplemented.

"*Bond Ordinance*" means Ordinance No. 4, 2013 adopted by the Town Council on July 10, 2013 authorizing the issuance of the Bonds.

"***Bond Register***" means the registration books of the Town kept by the Bond Trustee to evidence the registration and transfer of the Bonds.

"***Bond Registrar***" means the Bond Trustee, as keeper of the Bond Register.

"***Bond Sinking Fund***" means the Fund of that name that is established and maintained pursuant to Section 404(a) hereof.

"***Bond Sinking Fund Accounts***" means, collectively, the 2013A Bond Sinking Fund Account and the 2013B Bond Sinking Fund Account (each, a "***Bond Sinking Fund Account***").

"***Bond Trustee***" means _____, its successors and assigns, or any successor trustee under this Bond Indenture.

"***Bond Year***" means the period of twelve (12) consecutive months ending on July 1 of any year in which Bonds are Outstanding, except for the first Bond Year which shall commence on the Closing Date and end on July 1, 2014.

"***Bondholder***," "***Holder***," or "***Owner***" each means the registered owner of any Bond.

"***Bonds***" means, collectively, the Series 2013A Bonds and the Series 2013B Bonds (each, a "***Bond***").

"***Business Day***" means any day other than (i) a Saturday, a Sunday, a legal holiday, or a day on which banks in the State, or in any city in which the Office of the Bond Trustee is located are required or authorized by law to remain closed, or (ii) a day on which the New York Stock Exchange is closed.

"***Cash and Investments***" shall have the meaning set forth in the Master Indenture.

"***Clerk-Treasurer***" means the Clerk-Treasurer of the Town. The term shall include the Deputy Clerk-Treasurer or the Acting Clerk-Treasurer of the Town whenever, by reason of absence, illness, or other reason, the Clerk-Treasurer of the Town is unable to act.

"***Closing Date***" means _____, 2013, the date of original issuance of the Bonds.

"***Code***" means the Internal Revenue Code of 1986, as amended. Reference herein to any specific provision of the Code shall be deemed to include a reference to any successor provision or provisions to such provision and to any Regulations issued or proposed under or with respect to such provision or under or with respect to any predecessor provision of the Internal Revenue Code of 1954, as amended, to the extent any of the foregoing is applicable to the Bonds.

"***Corporation***" means The Estelle Peabody Memorial Home of the Synod of Lincoln Trails of the Presbyterian Church (U.S.A.), an Indiana nonprofit corporation, and its successors and assigns and any surviving, resulting or transferee corporation.

"***Days' Cash on Hand***" shall have the meaning set forth in the Master Indenture.

"***Debt Service Fund***" means the Fund of that name that is established and maintained pursuant to Section 402 hereof.

"***Debt Service Reserve Fund***" means the Fund of that name that is established and maintained pursuant to Section 406(a) hereof.

"***Debt Service Reserve Fund Requirement***," means the Annual Debt Service on the Series 2013A Bonds during the Bond Year immediately following the Bond Year in which the applicable calculation is made; provided that, after the date when no Series 2013A Bonds remain Outstanding, the Debt Service Reserve Fund Requirement

shall be the same as the Debt Service Reserve Fund Requirement in the Bond Year immediately preceding the Bond Year in which the Series 2013A Bonds ceased to be Outstanding.

"*Default Condition*" means the occurrence or existence of an event or condition that, upon the giving of notice or the passage of time, or both, would constitute an Event of Default.

"*Defaulted Interest*" means interest on any Bond that is payable but not duly paid on the date due.

"*Determination of Taxability*" means the issuance by the IRS of a written determination, private ruling, technical advice memorandum or any other written communication, or the issuance of any determination, decision or decree by any court of competent jurisdiction, to the effect that an Event of Taxability shall have occurred. A Determination of Taxability also shall be deemed to have occurred on the first to occur of the following: (i) the date on which the Corporation files any statement, supplemental statement, or other tax schedule, return, or document that discloses that an Event of Taxability shall have occurred; (ii) the effective date of any federal legislation enacted after the date of this Bond Indenture or promulgation of any income tax regulation or ruling by the IRS that causes an Event of Taxability after the date of this Bond Indenture; or (iii) upon the sale, lease, or other deliberate action taken with respect to the Project within the meaning of Treas. Reg. §1.141-2(d), the failure of the Corporation to provide to the Bond Trustee an unqualified opinion of Bond Counsel addressed to the Bond Trustee to the effect that such deliberate action will not cause the interest payable on the Bonds to become includable in the gross income of the recipient.

"*Disclosure Statement*" means Debtor's Disclosure Statement for Chapter 11 Plan of Reorganization, dated June 17, 2013 relating to the Bankruptcy Plan and the exchange of the Bonds for the Series 2002 Bonds, as approved by the Bankruptcy Court on _____, 2013, including any supplements thereto.

"*DTC*" means The Depository Trust Company, New York, New York, and its successors and assigns appointed pursuant to Section 210 hereof.

"*DTC Participants*" means those broker-dealers, banks, and other financial institutions reflected on the books of DTC relating to ownership of the Bonds.

"*DTC System*" means the securities depository system with DTC.

"*Early Redemption*" means an optional redemption of all of the Series 2013 Bonds pursuant to Section 501(a) hereof.

"*Early Redemption Amount*" means an amount equal to (i) $27,000,000 plus (ii) accrued but unpaid interest on the Series 2013A Bonds through the Early Redemption Deposit Date.

"*Early Redemption Amount Balance*" means an amount equal to (i) the Early Redemption Amount minus (ii)(a) the amount on deposit in the 2013A Interest Fund Account on the Early Redemption Deposit Date plus (b) the amount of other monies held under this Bond Indenture and transferred to the Optional Redemption Fund on the Early Redemption Deposit Date and credited to the Early Redemption Amount pursuant to Section 405(a) hereof plus (c) the amount of monies held in the funds and accounts under the Master Indenture and transferred to the Optional Redemption Fund on the Early Redemption Deposit Date and credited to the Early Redemption Amount pursuant to Section 405(a) hereof.

"*Early Redemption Date*" means the date, if any, on which an Early Redemption occurs.

"*Early Redemption Deposit Date*" means the Business Day on which the Corporation makes the deposit required pursuant to Section 405(a) hereof in connection with an optional redemption of the Bonds described in Section 501(a) hereof, provided that such deposit shall be made no later than 11 a.m. Eastern time.

"*Event of Default*" means each of the events or conditions specified in Section 701 hereof.

"***Event of Taxability***" means if as the result of any act, failure to act, the use of the proceeds of the Bonds, change in use of the Project, any misrepresentation or inaccuracy in any of the representations, warranties, or covenants contained in this Bond Indenture or the Tax Agreement by the Town or the Corporation, or noncompliance with any of the requirements relating to the tax-exemption of the Bonds, or of the enactment of any federal legislation after the date of this Bond Indenture or the promulgation of any income tax regulation or ruling by the IRS after the date of this Bond Indenture, interest on the Bonds is or becomes includable in the gross income of the recipient.

"***Excess Cash***" shall have the meaning set forth in Section 427(b)(viii) of the Master Indenture.

"***First Fill Date***" shall have the meaning set forth in Section 406 hereof.

"***Fiscal Year***" means the twelve (12) month period commencing on January 1 of each calendar year and ending on December 31 of such calendar year.

"***Fitch***" means Fitch Ratings, Inc., a corporation organized and existing under the laws of the State of New York, its successors and assigns, and, if such corporation shall be dissolved or liquidated or shall no longer perform the functions of a securities rating agency, "***Fitch***" shall be deemed to refer to any other nationally recognized securities rating agency designated by the Corporation by notice to the Bond Trustee and the Town.

"***Funds***" means, collectively, all of the funds established hereunder (each, a "***Fund***").

"***Governing Body***" means the board of directors, the board of trustees or similar group in which the right to exercise the powers of corporate directors or trustees is vested.

"***Government Obligations***" means securities that consist of (i) United States Government Obligations, or (ii) evidences of a direct ownership in future interest or principal payments on United States Government Obligations, which obligations are held in a custody account by a custodian satisfactory to the Bond Trustee pursuant to the terms of a custody agreement satisfactory to the Bond Trustee.

"***Gross-Up Rate***" means the interest rate necessary, assuming payment of federal income taxes (at the highest marginal tax rate in effect at the time of payment) on interest paid at such interest rate, such that the return to the Holders of the Series 2013A Bonds or Series 2013B Bonds, as applicable, shall be the same as if the interest rate otherwise payable on the applicable Bonds were not subject to federal income taxes.

"***Holder***," "***Bondholder***," or "***Owner***" each means the registered owner of any Bond.

"***Immediate Notice***" means notice by telephone, telex, facsimile, or electronic mail to such address as the addressee shall have directed in writing, promptly followed by written notice by first class mail, postage prepaid; provided, however, that if any Person required to give an Immediate Notice shall not have been provided with and cannot reasonably obtain the necessary information as to the telephone, telex, or facsimile number or electronic mail address of an addressee, Immediate Notice shall mean written notice by first class mail, postage prepaid.

"***Independent Architect***" means an architect, engineer, or firm of architects or engineers selected by the Corporation, acceptable to the Town and the Bond Trustee and licensed by, or permitted to practice in, the state where the construction involved is located, which architect, engineer, or firm of architects or engineers shall have no interest, direct or indirect, in any member of the Obligated Group or any Affiliate thereof and, in the case of an individual, shall not be a partner, member, director, officer, controlling shareholder, or employee of any member of the Obligated Group or any Affiliate thereof and, in the case of a firm, shall not have a partner, member, director, officer, or employee who is a partner, member, director, officer, controlling shareholder, or employee of any member of the Obligated Group or any Affiliate thereof; it being understood that an arm's-length contract with a member of the Obligated Group for the performance of architectural or engineering services shall not in and of itself be regarded as creating an interest in or an employee relationship with such entity.

"*Independent Counsel*" means an attorney duly admitted to practice law before the highest court of any state and, without limitation, may include independent legal counsel for the Town, the Corporation, any other Member of the Obligated Group, the Bond Trustee, or the Master Trustee.

"*Indirect Participant*" means a person on behalf of whom a DTC Participant directly or indirectly holds an interest in the Bonds.

"*Interest Fund*" means the Fund of that name that is established and maintained pursuant to Section 403 hereof.

"*Interest Payment Date*," means each January 1 and July 1, commencing [January 1, 2014], and any redemption date or other date on which interest is payable on the Bonds hereunder.  If any date so specified is not a Business Day, the Interest Payment Date shall be the immediately succeeding Business Day.

"*IRS*" means the United States Internal Revenue Service.

"*Junior Security Agreement*" means the Junior Security Agreement dated as of _____ 1, 2013, from the Corporation in favor of the Master Trustee.

"*Loan Agreement*" means the Loan Agreement dated as of _____ 1, 2013, between the Town and the Corporation relating to the Bonds, as it may from time to time be amended and supplemented.

"*Majority of the Applicable Bondholders*," means, while any Series 2013A Bonds are Outstanding, a Majority of the Series 2013A Bondholders and, if no Series 2013A Bonds are Outstanding, a Majority of the Series 2013B Bondholders.

"*Majority of the Bondholders*," at any point in time, means the registered owners or Beneficial Owners of more than fifty percent (50%) in aggregate principal amount of the Bonds then Outstanding, exclusive of Bonds then known by the Bond Trustee to be owned by the Town or any Member or any Affiliate of a Member.

"*Majority of the Series 2013A Bondholders*," at any point in time, means the registered owners or Beneficial Owners of more than fifty percent (50%) in aggregate principal amount of the Series 2013A Bonds then Outstanding, exclusive of Bonds then known by the Bond Trustee to owned by the Town or any Member or any Affiliate of a Member.

"*Majority of the Series 2013B Bondholders*," at any point in time, means the registered owners or Beneficial Owners of more than fifty percent (50%) in aggregate of the Series 2013B Bonds then Outstanding, exclusive of Bonds then known by the Bond Trustee to owned by the Town or any Member or any Affiliate of a Member.

"*Master Indenture*" means the Amended and Restated Master Trust Indenture dated as of _____ 1, 2013, between the Corporation, as the initial Member of the Obligated Group, and the Master Trustee, as it may from time to time be supplemented and amended in accordance with the terms thereof.

"*Master Trustee*" means _____, its successors and assigns, or any successor trustee under the Master Indenture.

"*Maturity*" means the maturity date of a Bond.

"*Member*" or "*Member of the Obligated Group*" means any Person who is designated as a Member of the Obligated Group pursuant to the terms and conditions of the Master Indenture.

"*Moody's*" means Moody's Investors Service, Inc., a corporation organized and existing under the laws of the State of Delaware, its successors and assigns, and, if such corporation shall be dissolved or liquidated or shall no longer perform the functions of a securities rating agency, "*Moody's*" shall be deemed to refer to any

other nationally recognized securities rating agency designated by the Corporation by notice to the Bond Trustee and the Town.

"***Mortgages***" means the Original Mortgage, as amended and restated by the Amended and Restated Mortgage, and the Second Mortgage, as the same may be further supplemented, amended, and/or restated from time to time.

"***Obligated Group***" means the Corporation and the other Members under the Master Indenture.

"***Obligated Group Agent***" means the Corporation or such other Member of the Obligated Group as may be designated from time to time pursuant to written notice to the Master Trustee and the Town executed by the President or Chairman of the Governing Body of the Corporation or, if the Corporation is no longer a Member of the Obligated Group, of each Member of the Obligated Group.

"***Obligations***" means the obligations of the Obligated Group issued under the Master Indenture.

"***Office of the Bond Trustee***" means the designated or principal corporate trust office of the Bond Trustee in _____, currently located at _____, or such other location as may be designated by it to the Corporation, the Issuer, and the Master Trustee in writing, or the designated or principal corporate trust office designated to the Corporation, the Issuer, and the Master Trustee in writing by, any successor or temporary Bond Trustee hereunder.

"***Officer's Certificate***" means a certificate signed, in the case of a certificate delivered by a corporation, by the President, any Vice-President or any other officer or agent authorized to sign by resolution of the Governing Body of such corporation or, in the case of a certificate delivered by any other Person, the chief executive or chief financial officer of such other Person, in either case whose authority to execute such Certificate shall be evidenced to the satisfaction of the Bond Trustee.

"***Opinion of Bond Counsel***" means an opinion of nationally recognized municipal bond counsel, which opinion may be based upon a ruling or rulings of the IRS, and which counsel and opinion, including the scope, form, substance and other aspects thereof, are acceptable to the Town and the Bond Trustee.

"***Optional Redemption Accounts***" means, collectively, the 2013A Optional Redemption Account and the 2013B Optional Redemption Account (each, an "***Optional Redemption Account***").

"***Optional Redemption Fund***" means the Fund of that name that is established and maintained pursuant to Section 405(a) hereof.

"***Original Master Indenture***" means the Master Trust Indenture dated as of August 15, 2002, between the Corporation and the Master Trustee.

"***Original Mortgage***" means the Mortgage, Security Agreement, and Fixture Financing Statement (Wabash County) dated as of August 15, 2002, by the Corporation in favor of the Master Trustee.

"***Outstanding Bonds***" or "***Bonds Outstanding***" means all Bonds that have been duly authenticated and delivered by the Bond Trustee hereunder, except:

(i)   Bonds canceled after purchase in the open market or because of payment at or redemption prior to Maturity;

(ii)   Bonds for the payment or redemption of which cash or Government Obligations shall have been theretofore deposited with the Bond Trustee (whether upon or prior to Maturity or redemption date of any such Bonds) in accordance with Article XI hereof; provided that if such Bonds are to be redeemed prior to Maturity thereof, notice of such redemption shall have been given or arrangements satisfactory to the Bond Trustee shall have been made therefor, or waiver of such notice satisfactory in form to the Bond Trustee shall have been filed with the Bond Trustee;

(iii)  Bonds in lieu of which others have been authenticated under Section 204, 205, 207, or 208 hereof; and

(iv)  For the purpose of determining whether the Owners of a requisite aggregate principal amount of outstanding Bonds have concurred in any request, demand, authorization, direction, notice, consent or waiver under the provisions of this Bond Indenture, Bonds that are owned or held by a Member or an Affiliate of a Member.  In determining whether the Bond Trustee shall be protected in relying upon any such request, demand, authorization, direction, notice, consent or waiver only Bonds (a) that are registered in the name of a Member or (b) that the Bond Trustee knows to be so owned shall be disregarded.

"*Owner*," "*Bondholder*," or "*Holder*" each means the registered owner of any Bond.

"*Paying Agent*" means the bank or banks, if any, designated pursuant to this Bond Indenture to receive and disburse the principal of and interest on the Bonds. The Paying Agent is initially the Bond Trustee.

"*Permitted Investments*" means dollar denominated investments in any of the following:

(i)  Government Obligations;

(ii)  debt obligations that are (a) issued by any state or political subdivision thereof or any agency or instrumentality of such state or political subdivision, and (b) at the time of purchase, rated in one of the two highest rating categories (without regard to any refinement or gradation of rating category by numerical modifier or otherwise) assigned by each Applicable Rating Agency;

(iii)  any bond, debenture, note, participation certificate, or other similar obligation issued by a government sponsored agency (such as the Federal National Mortgage Association, the Federal Home Loan Bank System, the Federal Home Loan Mortgage Corporation, the Federal Farm Credit Bank, or the Student Loan Marketing Association) that is either (a) at the time of purchase, rated in the highest rating category by any Rating Agency, or (b) backed by the full faith and credit of the United States of America;

(iv)  U.S. denominated deposit accounts, certificates of deposit, and banker's acceptances of any bank, trust company, or savings and loan association, including the Master Trustee or Bond Trustee or its Affiliates, that have a rating on their short-term certificates of deposit on the date of purchase in one of the two highest short-term rating categories (without regard to any refinement or gradation of rating category by numerical modifier or otherwise) assigned by each Applicable Rating Agency, and that mature not more than three hundred sixty (360) days after the date of purchase;

(v)  commercial paper that is rated at the time of purchase in one of the two highest short-term rating categories (without regard to any refinement or gradation of rating category by numerical modifier or otherwise) assigned by each Applicable Rating Agency, and that matures not more than two hundred seventy (270) days after the date of purchase;

(vi)  bonds, notes, debentures, or other evidences of indebtedness issued or guaranteed by a corporation that are, at the time of purchase, rated by each Applicable Rating Agency in any of the three highest rating categories (without regard to any refinement or gradation of rating category by numerical modifier or otherwise);

(vii)  repurchase agreements with respect to and secured by Government Obligations or by obligations described in clause (iii) above, which agreements may be entered into with a bank (including without limitation the Bond Trustee or the Master Trustee), a trust company, financial services firm or a broker dealer that is a member of the Securities Investors Protection Corporation, provided that (a) the Bond Trustee or a custodial agent of the Bond Trustee has possession of the collateral and that the collateral is represented to be free and clear of third-party liens or claims, (b) a master repurchase agreement or specific written repurchase agreement governs the transaction, (c) the collateral securities are valued no less frequently than weekly, and (d) the fair market value of the collateral securities in relation to

the amount of the repurchase obligation, including principal and interest, is equal to at least one hundred three percent (103%);

   (viii) investments in a money market fund, which may be funds of the Bond Trustee or an Affiliate of the Bond Trustee, rated (at the time of purchase) in the highest rating category for this type of investment by each Applicable Rating Agency; and

   (ix) any other investment approved by a Majority of the Applicable Bondholders.

The Bond Trustee shall not be obligated to determine whether an investment that at the time of purchase is a Permitted Investment remains a Permitted Investment thereafter and shall be under no obligation to sell or a liquidate an investment unless instructed to do so by the Corporation or, following an Event of Default, by a Majority of the Applicable Bondholders.

For the purposes of this definition, obligations issued or held in the name of the Bond Trustee in book-entry form on the books of the Department of Treasury of the United States shall be deemed to be deposited with the Bond Trustee.

"***Person***" means any natural person, firm, joint venture, association, partnership, business trust, corporation, limited liability company, public body, agency or political subdivision thereof or any other similar entity.

"***Plans and Specifications***" means the plans and specifications for the construction of the Project, that have been prepared by an Independent Architect and approved by the Corporation, together with such modifications and additions thereto as are made by the Corporation in accordance with the provisions of the Loan Agreement.

"***President***" means the President of the Town Council. The term shall include the Vice President or the Acting President of the Town Council whenever, by reason of absence, illness, or other reason, the President of the Town Council is unable to act.

"***Project***" means the construction and equipping of 73 assisted living units and 48 Alzheimer/dementia units, renovation of various common areas, demolition of a portion of certain residential living facilities, and construction and equipping of a 144-bed replacement nursing facility, owned and operated by the Corporation.

"***Rating Agency***" means Moody's, Standard & Poor's, or Fitch and their respective successors and assigns.

"***Rebate Fund***" means the Rebate Fund created by the Tax Agreement to comply with Section 148(f) of the Code.

"***Record Date***" means, with respect to Bonds, the fifteenth day of the calendar month (whether or not a Business Day) immediately preceding an Interest Payment Date.

"***Regulations***" means the applicable treasury regulations promulgated under the Code or under §103 of the Internal Revenue Code of 1954, as amended, whether at the time temporary, or final.  Reference herein to any specific provision of the Regulations shall be deemed to include a reference to any successor provision or provisions to such provision.

"***Representation Letter***" means the Blanket DTC Letter of Representations dated _____, 2013 from the Town accepted by DTC.

"***Second Mortgage***" means the Junior Mortgage, Security Agreement, and Fixture Financing Statement (Wabash County) dated as of _____ 1, 2013, between the Corporation and the Master Trustee.

"***Security Agreements***" means the Senior Security Agreement and the Junior Security Agreement.

"***Senior Security Agreement***" means the Senior Security Agreement dated as of _____ 1, 2013, from the Corporation in favor of the Master Trustee.

"***Series 2002 Bonds***" means, collectively, Series 2002A Bonds and the Series 2002B Bonds (each, a "***Series 2002 Bond***").

"***Series 2002 Obligations***" means collectively, the Series 2002A Obligation and the Series 2002B Obligation.

"***Series 2002A Bonds***" means the $41,900,000 principal amount of Town of North Manchester, Indiana Revenue Bonds (Peabody Retirement Community Project) Series 2002A issued pursuant to the terms and conditions of the Series 2002 Bond Indenture.

"***Series 2002A Obligation***" means the $41,900,000 principal amount Series 2002A Note of the Corporation issued under the Original Master Indenture as security for the Series 2002A Bonds.

"***Series 2002B Bonds***" means, collectively, the Series 2002B-1 Bonds and the Series 2002B-2 Bonds.

"***Series 2002B-1 Bonds***" means the $3,500,000 principal amount of Town of North Manchester, Indiana Revenue Bonds (Peabody Retirement Community Project) Series 2002B-1 Extendable Rate Adjustable Securities[SM] (EXTRAS[SM]) issued pursuant to the terms and conditions of the Series 2002 Bond Indenture.

"***Series 2002B-2 Bonds***" means the $1,500,000 principal amount of Town of North Manchester, Indiana Revenue Bonds (Peabody Retirement Community Project) Series 2002B-2 Extendable Rate Adjustable Securities[SM] (EXTRAS[SM]) issued pursuant to the terms and conditions of the Series 2002 Bond Indenture.

"***Series 2002B Obligations***" means, collectively, the Series 2002B-1 Obligation and the Series 2002B-2 Obligation.

"***Series 2002B-1 Obligation***" means the $3,500,000 principal amount Series 2002B-1 Note of the Corporation issued under the Original Master Indenture as security for the Series 2002B-1 Bonds.

"***Series 2002B-2 Obligation***" means the $1,500,000 principal amount Series 2002B-2 Note of the Corporation issued under the Original Master Indenture as security for the Series 2002B-2 Bonds.

"***Series 2002 Bond Indenture***" means the Bond Trust Indenture dated as of August 15, 2002, between the Town and the Series 2002 Bond Trustee pursuant to which the Series 2002A Bonds and the Series 2002B Bonds were issued.

"***Series 2002 Bond Trustee***" means Wells Fargo Bank, N.A., or any successor thereto under the Series 2002 Bond Indenture.

"***Series 2002 Loan Agreement***" means the Loan Agreement dated as of August 15, 2002, between the Corporation and the Town providing for the loan of the proceeds of the Series 2002A Bonds and the Series 2002B Bonds to the Corporation.

"***Series 2013 Bond Obligations***" means, collectively, the Series 2013A Obligation and the Series 2013B Obligation (each, a "***Series 2013 Bond Obligation***").

"***Series 2013A Bonds***" means the $23,400,000 principal amount of Town of North Manchester, Indiana Economic Development Refunding Revenue Bonds (Peabody Retirement Community Project) Series 2013A authorized to be issued pursuant to the terms and conditions of this Bond Indenture.

"***Series 2013A Obligation***" means the Corporation's $23,400,000 principal amount Series 2013A Note issued under the Master Indenture as security for the Series 2013A Bonds.

"*Series 2013B Bonds*" means the $20,150,000 original principal amount of Town of North Manchester, Indiana Subordinate Economic Development Refunding Revenue Bonds (Peabody Retirement Community Project) Series 2013B authorized to be issued pursuant to the terms and conditions of this Bond Indenture.

"*Series 2013B Subordinate Obligation*" means the Corporation's $20,150,000 original principal amount Subordinate Series 2013B Note issued under the Master Indenture as security for the Series 2013B Bonds.

"*SIFMA Municipal Index*" means The Securities Industry and Financial Markets Association Municipal Swap Index as of the most recent date for which such index was published or any successor index comprised of seven-day, tax-exempt variable rate demand notes produced by Municipal Market Data, Inc., or its successor, or otherwise designated as a successor index by The Securities Industry and Financial Markets Association; provided, however, that, if such index is no longer produced by Municipal Market Data, Inc. or its successor or designated by The Securities Industry and Financial Markets Association, then "*SIFMA Municipal Index*" shall mean such other reasonably comparable index selected by the Corporation.

"*Special Record Date*" means the date fixed by the Bond Trustee pursuant to Section 202 hereof for the payment of Defaulted Interest.

"*Standard & Poor's*" means Standard & Poor's Rating Service, a division of The McGraw-Hill Companies, Inc., a corporation organized and existing under the laws of the State of New York, its successors and assigns, and, if such corporation shall be dissolved or liquidated or shall no longer perform the functions of a securities rating agency, "*Standard & Poor's*" shall be deemed to refer to any other nationally recognized securities rating agency designated by the Corporation by notice to the Bond Trustee and the Town, and approved by the Credit Facility Issuer.

"*State*" means the State of Indiana.

"*Tax Agreement*" means the Arbitrage Certificate and Tax Compliance Agreement dated as of the Closing Date by and between the Town and the Corporation.

"*Tax-Exempt Organization*" means a Person organized under the laws of the United States of America or any state thereof that is an organization described in Section 501(c)(3) of the Code, that is exempt from federal income taxes under Section 501(a) of the Code, and that is not a "private foundation" within the meaning of Section 509(a) of the Code, or corresponding provisions of federal income tax laws from time to time in effect.

"*Town*" means the Town of North Manchester, Indiana, a municipal corporation organized and existing under the laws of the State, and its successors and assigns.

"*Town Council*" means the Town Council of the Town.

"*Unassigned Rights*" means the right of the Town to receive payment of its fees and expenses, the Town's right to indemnification in certain circumstances and the Town's right to execute and deliver supplements and amendments to the Loan Agreement.

"*United States Government Obligations*" means noncallable direct obligations of, or obligations the timely payment of the principal of and interest on which is fully guaranteed by, the United States of America, including obligations issued or held in book entry form on the books of the Department of the Treasury of the United States of America.

"*Unrelated Trade or Business*" means an activity that constitutes an "unrelated trade or business" within the meaning of Section 513(a) of the Code without regard to whether such activity results in unrelated trade or business income subject to taxation under Section 512(a) of the Code.

"*Value*," with respect to Permitted Investments, means (i) as to investments, the bid and asked prices of which are published on a regular basis in *The Wall Street Journal* (or, if not there, then in *The New York Times*): the average of the bid and asked prices for such investment so published on or most recently prior to such time of

determination; (ii) as to investments the bid and asked prices of which are not published on a regular basis in *The Wall Street Journal* or *The New York Times*: the average bid price at such time of determination for such investment by any two (2) nationally recognized government securities dealers (selected by the Bond Trustee in its absolute discretion) at the time making a market in such investments or the bid price published by a nationally recognized pricing service; (iii) with respect to agreements described in items (vii) and (viii) of the definition of Permitted Investments, the amount available to be withdrawn therefrom on the date of determination; and (iv) with respect to any investment not specified above, means the value thereof established by prior agreement between the Master Trustee and the Corporation.  For all Permitted Investments, Value shall take into account any accrued and unpaid interest.

"*Valuation Date*" means any date on which the Bond Trustee values the investments on deposit in the Debt Service Reserve Fund pursuant to Section 406(b) hereof.

"*Written Request*" with reference to the Town means a request in writing (which may be by electronic means acceptable to the Bond Trustee) signed by the President or the Clerk-Treasurer, and with reference to the Corporation means a request in writing signed by the President, a Vice President, a Secretary, or an Assistant Secretary of the Corporation, or any other officers designated by the Town or the Corporation, as the case may be.

**Section 102. Rules of Construction**. Unless the context shall otherwise require,

(a)  an accounting term not otherwise defined herein shall have the meaning assigned to it in accordance with generally accepted accounting principles;

(b)  references to Articles and Sections are to the Articles and Sections of this Bond Indenture;

(c)  words of the neuter gender shall be deemed and construed to include correlative words of the feminine and masculine genders;

(d)  unless the context shall otherwise indicate, words importing the singular number shall include the plural and vice versa;

(e)  headings of Articles and Sections herein and the table of contents hereof are solely for convenience of reference, do not constitute a part hereof and shall not affect the meaning, construction or effect hereof; and

(f)  all references in this instrument to designated "Articles," "Sections," and other subdivisions are to the designated Articles, Sections, and other subdivisions of this instrument as originally executed. The words "herein," "hereof," and "hereunder" and other words of similar import refer to this Bond Indenture as a whole and not to any particular Article, Section, or other subdivision unless the context indicates otherwise.

<div align="center">*          *          *</div>

Case 08-13555-mg Doc 46200 Filed 08/29/14 Entered 08/29/14 14:34:43 Main Document
Pg 21 of 34

## ARTICLE II

## THE BONDS

**Section 201. Authorized Amount of Bonds**. No Bonds may be issued under the provisions of this Bond Indenture except in accordance with this Article. The total principal amount of Series 2013A Bonds that may be issued is hereby expressly limited to $23,400,000. The total original principal amount of Series 2013B Bonds that may be issued is hereby expressly limited to $20,150,000.

**Section 202. Issuance of Bonds**.

(a) *Issuance of Series 2013A Bonds*. The Series 2013A Bonds shall be designated "Town of North Manchester, Indiana Economic Development Refunding Revenue Bonds (Peabody Retirement Community Project) Series 2013A" and shall be issued in the aggregate principal amount of $23,400,000. The Series 2013A Bonds shall bear interest from their dated date and shall be issuable as registered bonds in Authorized Denominations. Unless the Town shall otherwise direct, the Series 2013A Bonds shall be numbered from R-l upward. The Series 2013A Bonds, as initially issued, shall be dated _____, 2013. Except as described in the next sentence, subsequently issued Series 2013A Bonds shall be dated the later of _____, 2013, or the most recent preceding Interest Payment Date to which interest has been paid thereon. Series 2013A Bonds issued on an Interest Payment Date to which interest has been paid shall be dated as of such date. Interest on the Series 2013A Bonds will be payable on January 1 and July 1 of each year, commencing January 1, 2014. The Series 2013A Bonds shall bear interest (based on a 360-day year of twelve 30-day months) at the rate of (i) 5.13% per annum from the Closing Date to the one-year anniversary of the Closing Date and (ii) 6.05% per annum thereafter; provided that commencing one hundred fifty (150) days following a Determination of Taxability, such interest rate shall increase to the Gross-Up Rate.[ The Series 2013A Bonds shall mature on _____, 2046 [closest Interest Payment Date to 32 years after Closing Date].

(b) *Issuance of Series 2013B Bonds*. The Series 2013B Bonds shall be designated "Town of North Manchester, Indiana Subordinate Economic Development Refunding Revenue Bonds (Peabody Retirement Community Project) Series 2013B." The Series 2013B Bonds shall be issued in the original principal amount of $20,150,000. The Series 2013B Bonds shall bear interest from their dated date and shall be issuable as registered bonds in Authorized Denominations. Unless the Town shall otherwise direct, the Series 2013B Bonds shall be numbered from R-l upward. The Series 2013B Bonds, as initially issued, shall be dated _____, 2013. Except as described in the next sentence, subsequently issued Series 2013B Bonds shall be dated the later of _____, 2013, or the most recent preceding Interest Payment Date to which interest has been paid thereon. Series 2013B Bonds issued on an Interest Payment Date to which interest has been paid shall be dated as of such date. Interest on the Series 2013B Bonds will be payable on January 1 and July 1 of each year, commencing January 1, 2014, to the extent Excess Cash is available for such payment in the 2013B Interest Account. The Series 2013B Bonds shall bear interest (based on a 360-day year of twelve 30-day months) at the rate of 1.00% per annum on the principal amount thereof (as it may be increased from time to time hereunder); provided that commencing one hundred fifty (150) days following a Determination of Taxability, such interest rate shall increase to the Gross-Up Rate. The Series 2013B Bonds shall mature on _____, 2046 [closest Interest Payment Date to 32 years after Closing Date].

To the extent available Excess Cash is insufficient to pay interest on the Series 2013B Bonds on any scheduled Interest Payment Date, the amount of such unpaid interest shall accrete and be added to the principal amount of the Series 2013B Bonds on the applicable Interest Payment Date and thereafter shall bear interest at the interest rate due on the Series 2013B Bonds. Notwithstanding any provision of this Bond Indenture to the contrary, any reference to the principal of the Series 2013B Bonds shall include any unpaid interest on such Series 2013B Bond which has accreted and been added to the principal amount thereof. The Trustee shall reflect any increase in the principal amount of the Series 2013B Bonds held in the DTC System by making an entry on Schedule A of the global Series 2013B Bond certificate, provided that the principal amount thereof shall increase in accordance with the provisions hereof irrespective of whether the Trustee has reflected such increase on such Schedule A.

*(c) Payment of Principal and Interest.*

(i) The principal of, and premium, if any, and interest on, the Bonds shall be payable when due in any currency of the United States of America that, at the respective dates of payment thereof, is legal tender for the payment of public and private debts, and such principal, and premium, if any, shall be payable (A) subject to Section 205 hereof, upon presentment at the Office of the Bond Trustee or its agent or successor as Bond Trustee, or at the office of any alternate Paying Agent named in any such Bond or (B) subject to Section 205 hereof, as to any Owner of Five Hundred Thousand Dollars ($500,000) or more in aggregate principal amount and/or original principal amount of Bonds who so elects by wire transfer of funds to such wire transfer address within the continental United States as such Owner shall have furnished to the Bond Trustee in writing on or prior to the Record Date and upon compliance with the reasonable requirements of the Bond Trustee.

(ii) Except as provided below with respect to Defaulted Interest, payment of the interest on the Series 2013 Bonds shall be made to the person appearing on the Bond Register as the Owner thereof as of the close of business of the Bond Trustee on the Record Date for such interest payment and shall be paid (A) by check or draft mailed to such registered owner on the applicable Interest Payment Date at such owner's address as it appears on the Bond Register or at such other address as is furnished to the Bond Trustee in writing by the Record Date by such owner, or (B) as to any registered owner of Five Hundred Thousand Dollars ($500,000) or more in aggregate principal amount and/or original principal amount of Bonds who so elects, by wire transfer of funds to such wire transfer address within the continental United States as such registered owner shall have furnished to the Bond Trustee in writing by the Record Date and upon compliance with the reasonable requirements of the Bond Trustee.

*(d) Defaulted Interest.* Defaulted Interest with respect to any Series 2013A Bond shall cease to be payable to the Owner thereof on the relevant Record Date and, except as hereinafter provided, shall be payable to the Owner in whose name such Series 2013A Bond is registered at the close of business on the Special Record Date for the payment of such Defaulted Interest, which Special Record Date shall be established by the Bond Trustee and shall be not more than fifteen (15) nor less than ten (10) days prior to the date of the proposed payment. The Bond Trustee shall promptly notify the Corporation of such Special Record Date and, in the name and at the expense of the Corporation, shall cause notice of the proposed payment of such Defaulted Interest and the Special Record Date therefor to be mailed, first-class postage prepaid, not less than ten (10) days prior to such Special Record Date, to each Owner of a Series 2013A Bond at the address of such Owner as it appears on the Bond Register. Such Defaulted Interest shall be paid to the Owners in whose names the Series 2013A Bonds on which such Defaulted Interest is to be paid are registered on such Special Record Date.

**Section 203. Execution; Limited Obligation; No Liability of State.**

(a) The Bonds shall be executed on behalf of the Town with the manual or facsimile signature of the President, attested by the Clerk-Treasurer, and shall have impressed or imprinted thereon the official seal of the Town or a facsimile thereof. All authorized facsimile signatures shall have the same force and effect as if manually signed. In case any official whose signature or a facsimile of whose signature shall appear on the Bonds shall cease to be such official before the delivery of such Bonds, such signature or such facsimile shall nevertheless be valid and sufficient for all purposes, the same as if such official had remained in office until delivery. The Bonds may be signed on behalf of the Town by such person who, at the time of the execution of such Bonds, is duly authorized or hold the appropriate office of the Town, although on the date of the Bonds such person was not so authorized or did not hold such office.

(b) The Bonds shall not be general obligations of the Town. The Bonds shall be limited obligations of the Town, the principal and redemption price of, and the premium, if any, and interest on, which shall be payable solely from the revenues and income derived from the Loan Agreement and the Series 2013 Bond Obligations (except to the extent paid out of moneys attributable to proceeds of the Bonds, the income from the temporary investment thereof or payments made pursuant to or derived from a mortgage or assignment of leases and rents or credit enhancement device), all as described in and subject to the limitations set forth herein for the equal and ratable benefit of the Owners, from time to time, of the Bonds. The Bonds, and the redemption price thereof, and the

interest thereon do not and shall never constitute a general obligation or indebtedness of the Town, the State or any political subdivision thereof within the meaning of any constitutional provision or statutory limitation and do not and shall never constitute or give rise to a pecuniary liability of the Town, the State or any political subdivision thereof, or a charge against the general credit of the Town, the State, or any political subdivision thereof or the taxing powers of the Town, the State or any political subdivision thereof.  The Bonds do not grant the Owners any right to have the Town, the State or any political subdivision thereof levy any taxes or appropriate any funds for the payment of the principal and redemption price of, and the premium, if any, and interest on the Bonds.  Neither the members of the Town Council nor any person executing the Bonds shall be liable personally on the Bonds by reason of the issuance thereof.

**Section 204. Authentication**.  No Bond shall be valid or obligatory for any purpose or entitled to any security or benefit under this Bond Indenture unless and until a certificate of authentication on such Bond substantially in the form attached to Exhibit "A" or Exhibit "B" hereto, shall have been duly executed by the Bond Trustee, and such executed certificate of the Bond Trustee upon any such Bond shall be conclusive evidence that such Bond has been authenticated and delivered under this Bond Indenture.  The Bond Trustee's certificate of authentication on any Bond shall be deemed to have been executed by it if signed by an authorized officer of the Bond Trustee, but it shall not be necessary that the same officer sign the certificate of authentication on all of the Bonds issued hereunder.

**Section 205. Form of Bonds and Temporary Bonds**.

(a) The Bonds shall be substantially in the forms set forth in Exhibit "A" and Exhibit "B" hereto, with such appropriate variations, omissions, and insertions as are permitted or required by this Bond Indenture or deemed necessary by the Bond Trustee and the Town.

(b) Bonds of any series may be initially issued in temporary form exchangeable for definitive Bonds of the same series when ready for delivery.  The temporary Bonds shall be of such Authorized Denomination or Authorized Denominations as may be determined by the Town and may contain such reference to any of the provisions of this Bond Indenture as may be appropriate.  Every temporary Bond shall be executed by the Town and be authenticated by the Bond Trustee upon the same conditions and in substantially the same manner as the definitive Bonds.  If the Town issues temporary Bonds, it shall execute and furnish definitive Bonds without delay and thereupon the temporary Bonds may be surrendered for cancellation in exchange therefor at the Office of the Bond Trustee, and the Bond Trustee shall authenticate and deliver in exchange for such temporary Bonds an equal aggregate principal amount or original principal amount, as applicable, of definitive Bonds of the same series and Maturity of Authorized Denominations.  Until so exchanged, the temporary Bonds shall be entitled to the same benefits under this Bond Indenture as definitive Bonds authenticated and delivered hereunder.

**Section 206. Delivery of Bonds**.

(a) Upon the execution and delivery of this Bond Indenture, the Town shall execute and deliver to the Bond Trustee and the Bond Trustee shall authenticate the Series 2013A Bonds to be issued in the aggregate principal amount of $23,400,000 and the Series 2013B Bonds to be issued in the aggregate original principal amount of $20,150,000 and deliver such Bonds to the purchasers as may be directed by the Town as hereinafter in this Section 206 provided.

(b) Prior to the delivery by the Bond Trustee of any of the Bonds, there shall be filed with or delivered to the Bond Trustee and the Town:

(i) a copy, duly certified by the President or the Clerk-Treasurer, of the Bond Ordinance adopted and approved by the Town authorizing the execution and delivery of the Loan Agreement, the Tax Agreement, and this Bond Indenture and the issuance and sale of the Bonds;

(ii) copies, duly certified by the Secretary or Assistant Secretary of the Corporation, of the resolutions adopted and approved by the Corporation (a) authorizing the filing of the Bankruptcy Plan or (b) authorizing the execution and delivery of the Series 2013 Bond Obligations, the Master Indenture, the

Tax Agreement, the Loan Agreement, the Disclosure Statement, the Security Agreements and the Mortgages, and approving this Bond Indenture and the issuance and sale of the Bonds;

(iii)  the original executed and authenticated Series 2013 Bond Obligations (all of which shall be retained by the Bond Trustee); original executed counterparts of this Bond Indenture, the Master Indenture, the Loan Agreement, the Tax Agreement, the Amended and Restated Mortgage, the Second Mortgage, the Security Agreements, the Disclosure Statement; and a copy, certified by the Secretary or Assistant Secretary of the Corporation, of the form of the Original Mortgage as in effect immediately prior to its amendment and restatement by the Amended and Restated Mortgage;

(iv)  evidence of the recording of the Amended and Restated Mortgage and the Second Mortgage;

(v)  evidence of the Master Trustee's receipt of a title endorsement to the title policy delivered to the Master Trustee in connection with the execution and delivery of the Original Master Indenture extending the coverage of such title policy to the Series 2013 Obligations in an aggregate amount at least equal to the principal amount of such Series 2013 Obligations;

(vi)  a request and authorization to the Bond Trustee on behalf of the Town and signed by the President or the Clerk-Treasurer to authenticate and deliver the Bonds in an aggregate principal and original principal amount not exceeding $43,550,000 (consisting of $23,400,000 of the Series 2013A Bonds and $20,150,000 of the Series 2013B Bonds) to the holders of the Prior Bonds therein identified upon delivery to the Bond Trustee, but for the account of the Town, of the Prior Bonds;

(vii)  any funds held in the 2002 Debt Service Reserve Fund for deposit to the Debt Service Reserve Fund;

(viii)  a written opinion of Bond Counsel in form and substance satisfactory to the Town and a Majority of the Applicable Bondholders, such satisfaction to be conclusively evidenced by the delivery of the Bonds by the Town;

(ix)  a written opinion of Counsel for the Town in form and substance satisfactory to the Town and a Majority of the Applicable Bondholders, such satisfaction to be conclusively evidenced by the delivery of the Bonds by the Town;

(x)  a written opinion of Counsel for the Corporation in form and substance satisfactory to the Town and a Majority of the Applicable Bondholders, such satisfaction to be conclusively evidenced by the delivery of the Bonds by the Town; and

(xi)  such other closing documents and opinions of counsel as the Bond Trustee or the Town may reasonably specify in writing (which may be done through the inclusion of such items on the final closing agenda prepared in connection with the issuance of the Bonds).

**Section 207. Mutilated, Lost, Stolen, or Destroyed Bonds**. In the event any temporary or definitive Bond is mutilated, lost, stolen, or destroyed, the Town may execute and the Bond Trustee may authenticate a new Bond of like form, date, and denomination as that mutilated, lost, stolen, or destroyed; provided that, in the case of any mutilated Bond, such mutilated Bond shall first be surrendered to the Town, and in the case of any lost, stolen, or destroyed Bond, there shall be first furnished to the Town and the Bond Trustee evidence of such loss, theft, or destruction satisfactory to the Town and the Bond Trustee, together with indemnity satisfactory to them. In the event any such Bond shall have matured, instead of issuing a duplicate Bond the Town may pay the same without surrender thereof.  The Town and the Bond Trustee may charge the Owner of such Bond with their reasonable fees and expenses in this connection.

**Section 208. Transfer and Exchange of Bonds; Persons Treated as Owners**.

(a) The Town shall cause the Bond Register to be kept at the Office of the Bond Trustee, as Bond Registrar, which is hereby constituted and appointed the registrar of the Town.  Upon surrender for transfer of any Bond at the Office of the Bond Trustee, duly endorsed by, or accompanied by a written instrument or instruments of transfer in form satisfactory to the Bond Trustee and duly executed by, the Owner or the attorney of such Owner duly authorized in writing, the Town shall execute and the Bond Trustee shall authenticate, date, and deliver in the name of the transferee or transferees a new fully registered Bond or Bonds of the same series, Maturity, interest rate, and Authorized Denomination which the Owner is entitled to receive.  Any Bond or Bonds may be exchanged at the Office of the Bond Trustee for the same aggregate principal amount of a Bond or Bonds of the same series, Maturity, and interest rate of other Authorized Denominations.  The execution by the Town of any Bond shall constitute full and due authorization of such Bond, and the Bond Trustee shall thereby be authorized to authenticate, date, and deliver such Bond.

(b) The Bond Trustee shall not be required to register the transfer of or exchange any Bond after the mailing of notice calling such Bond or portion thereof for redemption as herein provided, or during the period of fifteen (15) days immediately preceding the giving of notice calling any Bond or Bonds for redemption.

(c) The Person in whose name any Bond shall be registered shall be deemed and regarded as the absolute owner thereof for the purpose of receiving payment of or on account of principal thereof and premium, if any, thereon and interest due thereon and for all other purposes, and payment of or on account of the principal of, premium, if any, and neither the Town nor the Bond Trustee shall be affected by any notice to the contrary, but such registration shall be changed as herein provided.  All such payments shall be valid and effectual to satisfy and discharge the liability upon such Bond to the extent of the sum or sums so paid.

(d) Any Bond surrendered for the purpose of payment or retirement or for exchange or transfer or for replacement pursuant to Section 207 or 208 hereof, shall be canceled upon surrender thereof to the Bond Trustee or any Paying Agent.  Any such Bonds canceled by any Paying Agent other than the Bond Trustee shall be promptly transmitted by such Paying Agent to the Bond Trustee.  Certification of Bonds canceled by the Bond Trustee and Bonds canceled by a Paying Agent other than the Bond Trustee that are transmitted to the Bond Trustee shall be made to the Town and to the Corporation.

(e) The Town and the Bond Trustee may charge each Bondholder requesting an exchange, change in registration, or registration of transfer a sum not exceeding the actual cost of any tax, fee, or other governmental charge required to be paid with respect to such exchange, registration, or transfer, except in the case of the issuance of a definitive Bond for a temporary Bond and except in the case of the issuance of a Bond or Bonds for the unredeemed portion of a Bond surrendered for redemption.

**Section 209.  Cancellation**.  Any Bond surrendered for the purpose of payment or retirement or for exchange or transfer or for replacement pursuant to Section 208 hereof, shall be cancelled upon surrender thereof to the Bond Trustee.  If the Town shall acquire any of the Bonds, the Town shall deliver such Bonds to the Bond Trustee for cancellation and the Bond Trustee shall cancel the same.  Certification of Bonds cancelled by the Bond Trustee shall be made to the Town and to the Corporation.  Cancelled Bonds may be destroyed by the Bond Trustee unless instructions to the contrary are received from the Town or the Corporation.  Upon the Maturity or redemption of all Bonds, the Bond Trustee shall destroy any inventory of unissued certificates.

**Section 210. Book-Entry Only System**.

(a) It is intended that the Bonds be registered so as to participate in the DTC System as set forth herein.  The Bonds of each series and Maturity shall be issued in the form of a single fully registered Bond and the ownership of such Bonds shall be registered in the Bond Register in the name of Cede & Co., as nominee of DTC.  The Town and the Bond Trustee are authorized to execute and deliver such letters to or agreements with DTC as shall be necessary to effectuate the DTC System.  DTC may exercise the rights of a Bondholder only in accordance with the terms hereof applicable to the exercise of such rights.

II-5

(b) With respect to Bonds registered in the Bond Register in the name of Cede & Co., as nominee of DTC, the Town, the Bond Trustee, and the Corporation shall have no responsibility or obligation to any DTC Participant or to any Indirect Participant or, unless expressly provided herein, any Beneficial Owner. Without limiting the immediately preceding sentence, the Town, the Bond Trustee, and the Corporation shall have no responsibility or obligation with respect to (i) the accuracy of the records of DTC, Cede & Co., or any DTC Participant with respect to any ownership interest in the Bonds, (ii) the delivery to any DTC Participant or any Indirect Participant or any other Person, other than a Bondholder, as shown in the Bond Register, of any notice with respect to the Bonds, including any notice of redemption, (iii) the payment to any DTC Participant or Indirect Participant or any other Person, other than a Bondholder, as shown in the Bond Register, of any amount with respect to principal of, or premium, if any, or interest on, the Bonds, or (iv) any consent given by DTC as Owner.

(c) So long as certificates for the Bonds are not issued pursuant to Section 212 hereof, the Town, the Corporation, and the Bond Trustee may treat DTC or any successor securities depository as, and deem DTC or any successor securities depository to be, the absolute owner of the Bonds for all purposes whatsoever, including without limitation (i) the payment of principal, and interest on the Bonds and the purchase price with respect to any Bonds tendered for purchase, (ii) giving notice of redemption and other matters with respect to the Bonds, (iii) registering transfers with respect to the Bonds, and (iv) the selection of Bonds for redemption. While in the DTC System, no Person other than Cede & Co., or any successor thereto, as nominee for DTC, shall receive a Bond certificate with respect to any Bond. Upon delivery by DTC to the Bond Trustee of written notice to the effect that DTC has determined to substitute a new nominee in place of Cede & Co., and subject to the provisions in this Bond Indenture with respect to interest checks or drafts being mailed to the Owner at the close of business on the Record Date applicable to any Interest Payment Date, the name "*Cede & Co.*" in this Bond Indenture shall refer to such new nominee of DTC.

**Section 211. Payments and Notices to Cede & Co.** Notwithstanding any other provision of this Bond Indenture to the contrary, so long as any of the Bonds is registered in the name of Cede & Co., as nominee of DTC, all payments with respect to principal of, premium, if any, and interest on such Bond and all notices with respect to such Bond shall be made and given, respectively, in the manner provided in the Representation Letter.

**Section 212. Successor Securities Depository; Transfers Outside Book-Entry Only System**. In the event that (a) a Majority of the Series 2013A Bondholders shall determine in writing that DTC is incapable of discharging its responsibilities described herein with respect to the Series 2013A Bonds, (b) a Majority of the Series 2013B Bondholders shall determine in writing that DTC is incapable of discharging its responsibilities described herein with respect to the Series 2013B Bonds, (c) the agreement between the Town and DTC shall be terminated for any reason, (d) a Majority of the Series 2013A Bondholders shall determine in writing that it is in the best interest of the beneficial owners of the Bonds that they be able to obtain certificated Bonds or (e) a Majority of the Series 2013B Bondholders shall determine in writing that it is in the best interest of the beneficial owners of the Series 2013B Bonds that they be able to obtain certificated Bonds, the Town shall so notify DTC. Upon receipt of such notice DTC will notify the DTC Participants of such request and such DTC Participants may utilize DTC's withdrawal procedure to withdraw their Series 2013A Bonds and/or Series 2013B Bonds, as applicable, from DTC. In the event a DTC Participant utilizes such process, certificated Series 2013A Bonds and/or Series 2013B Bonds, as applicable, shall be prepared. Alternatively, upon the written request of a Majority of the Series 2013A Bondholders, the Town or the Bond Trustee may appoint a successor securities depository for the Series 2013A Bonds, and upon the written request of a Majority of the Series 2013B Bondholders, the Town or the Bond Trustee may appoint a successor securities depository for the Series 2013B Bonds, which successor securities depository shall in either case be qualified to act as such under Section 17(a) of the Securities and Exchange Act of 1934, as amended, notify DTC and DTC Participants of the appointment of such successor securities depository and transfer one or more separate Bond certificates to such successor securities depository. In either such event, the applicable Bonds shall no longer be restricted to being registered in the Bond Register in the name of Cede & Co., as nominee of DTC, but may be registered in the name of the successor securities depository, or its nominee, or in whatever name or names Bondholders transferring or exchanging Bonds shall designate, in accordance with the provisions of this Bond Indenture.

*            *            *

Case 3:5066996-RUM-19    Doc ded 2    Filed 07/31/13    CO/3 08/31:13 19:26:26    Pg 27 of 34

### ARTICLE III

### CLOSING TRANSFERS

**Section 301. Closing Transfers; LB Claim.** On the Closing Date, the Bond Trustee shall deposit all funds released or transferred to the Bond Trustee by the Series 2002 Bond Trustee from funds and accounts held by the Series 2002 Bond Trustee, including without limitation, any debt service reserve fund established under the Series 2002 Bond Indenture, into the Debt Service Reserve Fund established under Section 406 hereof. As of the Closing Date, the Series 2002 Bond Trustee shall have assigned to the Bond Trustee the claim in the Lehman Brothers bankruptcy proceeding (the "*LB Claim*") with respect to a Reserve Fund Agreement, dated September 16, 2002, between the Series 2002 Bond Trustee, Lehman Brothers Special Financing Inc., and the Corporation relating to an investment agreement securities held as an investment of the debt service reserve fund for the Series 2002 Bonds. To the extent funds are received by the Bond Trustee, in its capacity as such assignee, as payment or settlement on the LB Claim such funds shall, subject to any amounts required to be deposited to the Rebate Fund in accordance with the provisions of the Tax Agreement, be first deposited to the Debt Service Reserve Fund established under Section 406 hereof up to an amount which, when added with funds already on deposit therein, equals the Debt Service Reserve Fund Requirement, with any excess funds being deposited to the 2013B Optional Redemption Account for the redemption of the Series 2013B Bonds on the first practicable date following such receipt.

<div align="center">*      *      *</div>

<div align="center">

**ARTICLE IV**

**REVENUES AND FUNDS**

</div>

**Section 401. Source of Payment of Bonds**. The Bonds herein authorized and all payments to be made by the Town thereon and into the various funds established under this Bond Indenture are not general obligations of the Town but are limited obligations payable solely in accordance with the terms hereof from (a) payments or prepayments on the Series 2013 Bond Obligations including, without limitation, in certain circumstances, from proceeds of insurance, condemnation awards and proceeds from sales made under threat of condemnation and proceeds from the exercise of remedies as provided in the Master Indenture, (b) payments or prepayments made under the Loan Agreement (except for payments included in Unassigned Rights), and (c) moneys and investments held by the Bond Trustee under this Bond Indenture.

**Section 402. Debt Service Fund**. The Town hereby establishes with the Bond Trustee and directs the Bond Trustee to maintain so long as any of the Bonds are Outstanding a separate Fund to be known as the "Debt Service Fund - Town of North Manchester, Indiana Economic Development Refunding Revenue Bonds (Peabody Retirement Community Project) Series 2013" (the "**Debt Service Fund**").  All payments upon the Series 2013 Bond Obligations pledged hereunder, all transfers to the Bond Trustee by the Master Trustee pursuant to the provisions of Section 427(b)(iii) and 427(b)(viii) of the Master Indenture (including transfers of Excess Cash for the payment of the principal of and interest on the Series 2013B Bonds), all payments under the Loan Agreement, and all transfers from the Rebate Fund, when received by the Bond Trustee, shall be deposited into the Debt Service Fund and shall be held therein until disbursed as herein provided.  Pursuant to the assignment and pledge of payments upon the Series 2013A Obligation and the Series 2013B Obligation set forth in the granting clauses contained herein, the Town will direct the Corporation to make payments upon the Series 2013A Obligation and the Series 2013B Obligation pledged hereunder directly to the Bond Trustee when and as the same become due and payable.

**Section 403. Interest Fund**.

(a) The Town hereby establishes with the Bond Trustee and hereby directs the Bond Trustee to maintain so long as any of the Bonds are Outstanding a separate Fund to be known as the "Interest Fund - Town of North Manchester, Indiana Economic Development Refunding Revenue Bonds (Peabody Retirement Community Project) Series 2013" (the "**Interest Fund**").  The Town also hereby establishes with the Bond Trustee and hereby directs the Bond Trustee to maintain two (2) separate and segregated Accounts within the Interest Fund to be known as "2013A Interest Fund Account – Town of North Manchester, Indiana Economic Development Refunding Revenue Bonds (Peabody Retirement Community Project) Series 2013" (the "**2013A Interest Fund Account**") and "2013B Interest Fund Account – Town of North Manchester, Indiana Economic Development Refunding Revenue Bonds (Peabody Retirement Community Project) Series 2013" (the "**2013B Interest Fund Account**" and, together with the 2013A Interest Fund Account, the "**Interest Fund Accounts**").

(b) On or before the tenth $(10^{th})$ day of each month prior to January 2014, the Bond Trustee shall transfer from the Debt Service Fund to the 2013A Interest Fund Account an amount equal to (1) the lesser of (i) one-_____ (__) of the interest payable on the Series 2013A Bonds on January 1, 2014, or (ii) taking into account all amounts in the 2013A Interest Fund Account available to pay interest on the Series 2013A Bonds, such lesser sum as shall be required to pay the interest payable on the Series 2013A Bonds on January 1, 2014, plus (2) the amount of any remaining deficiency in the amounts available for any such required transfer in a prior month.  If the tenth $(10^{th})$ day of any month is not a Business Day, the deposit herein required to be made shall be made on the next succeeding Business Day.

(c) On or before the tenth $(10^{th})$ day of each month commencing January 2014, the Bond Trustee shall transfer from the Debt Service Fund to the 2013A Interest Fund Account an amount equal to (1) the lesser of (i) one-sixth $(1/6^{th})$ of the interest payable on the Series 2013A Bonds on the immediately succeeding Interest Payment Date for the Series 2013A Bonds, or (ii) taking into account all amounts in the 2013A Interest Fund Account available to pay interest on the Series 2013A Bonds, such lesser sum as shall be required to pay the interest payable on the Series 2013A Bonds on such Interest Payment Date, plus (2) the amount of any remaining deficiency in the amounts available for any such required [transfer] in a prior month. If the tenth $(10^{th})$ day of any month is not a Business Day, the deposit herein required to be made shall be made on the next succeeding Business Day.

<div align="center">

IV-1

</div>

(d) Moneys on deposit in the 2013A Interest Fund Account, other than income thereon that is required to be transferred to other funds created under this Bond Indenture or the Rebate Fund, shall only be used to pay interest on the Series 2013A Bonds or the interest portion of the purchase price of Series 2013A Bonds purchased in the open market pursuant to the provisions of Section 404(d) hereof.

(e) On or before the tenth (10th) day of each month prior to January 2014, the Bond Trustee shall transfer from the Debt Service Fund to the 2013B Interest Fund Account an amount equal to the least of (i) (1) one-____ (___) of the interest payable on the Series 2013B Bonds on January 1, 2014, plus (2) the amount of any remaining deficiency in the amounts available for any such required transfer in any prior month, (ii) taking into account all amounts in the 2013B Interest Fund Account available to pay interest on the Series 2013B Bonds, such lesser sum as shall be required to pay the interest payable on the Series 2013B Bonds on January 1, 2014 or (iii) Excess Cash available for such transfer.  If the tenth (10th) day of any month is not a Business Day, the deposit herein required to be made shall be made on the next succeeding Business Day.

(f) On or before the tenth (10th) day of each month commencing January 2014, the Bond Trustee shall transfer from the Debt Service Fund to the 2013B Interest Fund Account an amount equal to the least of (i) (1) one-sixth ($1/6^{th}$) of the interest payable on the Series 2013B Bonds on the immediately succeeding Interest Payment Date for the Series 2013B Bonds, plus (2) the amount of any remaining deficiency in the amounts available for any such required transfer on any prior date occurring after the most recent scheduled Interest Payment Date, (ii) taking into account all amounts in the 2013B Interest Fund Account available to pay interest on the Series 2013B Bonds, such lesser sum as shall be required or available to pay the interest payable on the Series 2013B Bonds on such Interest Payment Date, or (iii) Excess Cash available for such transfer.  If the tenth (10th) day of any month is not a Business Day, the deposit herein required to be made shall be made on the next succeeding Business Day.

(g) Moneys on deposit in the 2013B Interest Fund Account, other than income thereon that is required to be transferred to other funds created under this Bond Indenture or the Rebate Fund, shall, except as provided in subsection (i) below, only be used to pay interest on the Series 2013B Bonds or the interest portion of the purchase price of Series 2013B Bonds purchased in the open market pursuant to the provisions of Section 404(d) hereof.

(h) In connection with any partial redemption or defeasance prior to Maturity of the Bonds, the Bond Trustee may, at the request of the Corporation, use any amounts on deposit in (i) the 2013A Interest Fund Account, in excess of the amount needed to pay the interest on the Series 2013A Bonds remaining Outstanding on the first Interest Payment Date therefor occurring on or after the date of such redemption or defeasance, to pay the principal of and interest on the Series 2013A Bonds to be redeemed or defeased and (ii) the 2013B Interest Fund Account, in an amount not exceeding the percentage of the amount on deposit therein at the time of such application equal to the percentage obtained by dividing the principal amount of the Series 2013B Bonds to be redeemed or defeased by the aggregate principal amount of the Series 2013B Bonds Outstanding immediately prior to such application, to pay interest on the Series 2013B Bonds to be redeemed or defeased.

(i) To the extent the funds in the 2013A Interest Fund Account are at any time insufficient to pay interest due on the Series 2013A Bonds, the Trustee shall transfer funds from the Series 2013B Interest Fund Account in an amount sufficient to make such payment before paying any interest due on the Series 2013B Bonds.

(j) In connection with any exercise by the Corporation of its right to Early Redemption, the Bond Trustee shall (i) apply any amounts on deposit in the 2013A Interest Fund Account to the payment of accrued interest on the Series 2013A Bonds on the Early Redemption Date and (ii) transfer any amounts on deposit in the 2013B Interest Fund Account to the 2013B Optional Redemption Account for application to payment of amounts due on the Series 2013B Bonds on the Early Redemption Date.

### Section 404. Bond Sinking Fund.

(a) The Town hereby establishes with the Bond Trustee and directs the Bond Trustee to maintain so long as any of the Bonds is Outstanding a separate Fund to be known as the "Bond Sinking Fund - Town of North Manchester, Indiana Economic Development Refunding Revenue Bonds (Peabody Retirement Community Project) Series 2013" (the "**Bond Sinking Fund**").  The Town also hereby establishes with the Bond Trustee and hereby directs the Bond Trustee to maintain two (2) separate and segregated Accounts within the Bond Sinking Fund to be

IV-2

known as "2013A Bond Sinking Fund Account – Town of North Manchester, Indiana Economic Development Refunding Revenue Bonds (Peabody Retirement Community Project) Series 2013" (the "**2013A Bond Sinking Fund Account**") and "2013B Bond Sinking Fund Account – Town of North Manchester, Indiana Economic Development Refunding Revenue Bonds (Peabody Retirement Community Project) Series 2013" (the "**2013B Bond Sinking Fund Account**" and, together with the 2013A Bond Sinking Fund Account, the "**Bond Sinking Fund Accounts**").

(b) On or before the tenth (10th) day of each month commencing with the month in which the second-year anniversary of the Closing Date occurs (if the Closing Date is the 10th day of a month or earlier in the month) or with the month following the month in which the second-year anniversary of the Closing Date occurs (if the Closing Date is the 11th day of a month or later in the month), after making any transfer required by Section 403 hereof, the Bond Trustee shall transfer from the Debt Service Fund to the 2013A Bond Sinking Fund Account an amount equal to the lesser of (i) one-twelfth (1/12th) of the principal, if any, payable with respect to the Series 2013A Bonds on the immediately succeeding July 1 by Maturity or mandatory bond sinking fund redemption pursuant to Section 502 hereof or (ii) taking into account all amounts in the 2013A Bond Sinking Fund Account available to pay principal of the Series 2013A Bonds, such lesser sum as shall be required to pay the principal payable with respect to the Series 2013A Bonds on the immediately succeeding July 1 by Maturity or mandatory bond sinking fund redemption pursuant to Section 502 hereof. If the tenth (10th) day of any month is not a Business Day, the deposit herein required to be made shall be made on the immediately succeeding Business Day.

(c) On or before the tenth (10th) day of each month, commencing on July 10, 2045, after making any transfer required by Section 403 hereof, the Bond Trustee shall transfer from the Debt Service Fund to the 2013B Bond Sinking Fund Account an amount equal to the lesser of (i) one-twelfth (1/12th) of the principal, if any, payable with respect to the Series 2013B Bonds at Maturity on the immediately succeeding July 1 or (ii) taking into account all amounts in the Debt Service Reserve Fund available to pay the principal of the Series 2013B Bonds, such lesser sum as shall be required to pay the principal payable at Maturity with respect to the Series 2013B Bonds on the immediately succeeding July 1. If the tenth (10th) day of any month is not a Business Day, the deposit herein required to be made shall be made on the immediately succeeding Business Day.

(d) Moneys on deposit in the Bond Sinking Fund Accounts, other than income earned thereon that is to be transferred to other funds created hereunder or to the Rebate Fund, shall be applied by the Bond Trustee to pay principal of the Bonds as it becomes due and to redeem the Bonds in accordance with the Bond Sinking Fund schedule provided in Section 502 hereof. The Bond Trustee may, to the extent available for purchase, at the request of the Corporation, purchase for cancellation Series 2013 Bonds in the open market at prices not exceeding the principal amount thereof being purchased plus accrued interest, with such interest portion of the purchase price to be paid from the applicable Interest Fund Account and the principal portion of such purchase price to be paid from the applicable Series 2013 Bond Sinking Fund Account and upon cancellation of any such purchased Series 2013A Bonds the principal amount thereof shall be credited to the next Bond Sinking Fund payment otherwise due hereunder with respect to the Series 2013A Bonds.

(e) In connection with any partial redemption or defeasance prior to Maturity of the Bonds of any series, the Bond Trustee may, at the request of the Corporation, use any amounts on deposit in the 2013A Bond Sinking Fund Account and the 2013B Bond Sinking Account of the Bond Sinking Fund Account in excess of the amount needed to pay principal of the applicable series of Bonds remaining Outstanding on the first principal or mandatory sinking fund payment date occurring on or after the date of such redemption or defeasance to pay the principal of, and interest on, the Bonds to be redeemed or defeased.

(f) To the extent the funds in the 2013A Bond Sinking Fund Account are at any time insufficient to pay the next due principal of the Series 2013A Bonds, the Trustee shall transfer funds from the Series 2013B Bond Sinking Fund Account in an amount sufficient to make such payment before paying any principal of the Series 2013B Bonds.

(g) In connection with any exercise by the Corporation of its right to Early Redemption, the Bond Trustee shall transfer apply any amounts on deposit in (i) the 2013A Bond Sinking Fund Account and (ii) the 2013B Bond Sinking Fund Account to the 2013A Optional Redemption Account and 2013B Optional Redemption Account, respectively, for application, together with all other funds held by Bond Trustee and/or the Master Trustee, to the payment of the Early Redemption Amount on the Series 2013A Bonds and Series 2013B Bonds, respectively.

**Section 405. Optional Redemption Fund**.

(a) The Town hereby establishes with the Bond Trustee and hereby directs the Bond Trustee to maintain so long as any of the Bonds is Outstanding a separate Fund to be known as the "Optional Redemption Fund - Town of North Manchester, Indiana Economic Development Refunding Revenue Bonds (Peabody Retirement Community Project) Series 2013" (the "*Optional Redemption Fund*"). The Town also hereby establishes with the Bond Trustee and hereby directs the Bond Trustee to maintain two (2) separate and segregated Accounts within the Optional Redemption Fund to be known as the "2013A Optional Redemption Account – Town of North Manchester, Indiana Economic Development Refunding Revenue Bonds (Peabody Retirement Community Project) Series 2013" (the "*2013A Optional Redemption Account*") and the "2013B Optional Redemption Account – Town of North Manchester, Indiana Economic Development Refunding Revenue Bonds (Peabody Retirement Community Project) Series 2013" (the "*2013B Optional Redemption Account*"). In connection with an exercise of a redemption of the Series 2013 Bonds on the Early Redemption Date, on the Early Redemption Deposit Date (established pursuant to notice from the Corporation as required under Section 501(f)) any monies held by the Bond Trustee in any other Fund shall be credited to the Early Redemption Amount, and all monies held by the Bond Trustee (other than monies retained in the 2013A Interest Fund Account pursuant to Section 403(j) for direct application to pay accrued interest on the Series 2013A Bonds) shall be transferred to the Optional Redemption Fund and applied in accordance with the terms hereof, together with (i) the amounts applied to pay interest pursuant to Section 403(j), (ii) amounts transferred by the Master Trustee on the Early Redemption Deposit Date from funds available for such transfer under the Master Indenture and credited to the Early Redemption Amount and (iii) additional funds equaling the Early Redemption Amount Balance provided by the Corporation on the Early Redemption Deposit Date for deposit to the Optional Redemption Fund, to (1) redeem the Series 2013A Bonds at a redemption price equal to 100% of the principal amount thereof plus accrued interest to the applicable redemption date and (2) redeem the Series 2013B Bonds at a redemption price equal to (A) the Early Redemption Amount minus (B) the redemption price of the Series 2013A Bonds including accrued interest thereon as provided in clause (i).

(b) In the event of (i) prepayment by or on behalf of the Corporation or any other Member of amounts payable on the Series 2013 Bond Obligations pledged under this Bond Indenture, including prepayment with condemnation, insurance, or sale under threat of condemnation proceeds, or (ii) deposit with the Bond Trustee by the Corporation or the Town of moneys from any other source for redeeming Bonds or purchasing Bonds for cancellation, except as otherwise provided in this Bond Indenture and subject to the requirements of Section 501(d), such moneys shall be deposited into the applicable Optional Redemption Account or Accounts. Funds received by the Bond Trustee for the prepayment of Series 2013A Bonds and Series 2013B Bonds shall be deposited into the 2013A Optional Redemption Account or the 2013B Optional Redemption Account, as applicable. Moneys on deposit in the Optional Redemption Fund shall be used first to make up any deficiencies existing in the Interest Fund, the Bond Sinking Fund, and the Debt Service Reserve Fund (in the order listed) and second for the redemption of Bonds in accordance with the provisions of Article V hereof.

**Section 406. Debt Service Reserve Fund**.

(a) The Town hereby establishes with the Bond Trustee and hereby directs the Bond Trustee to maintain so long as any of the Bonds is Outstanding a separate Fund to be known as the "Debt Service Reserve Fund - Town of North Manchester, Indiana Economic Development Refunding Revenue Bonds (Peabody Retirement Community Project) Series 2013" (the "*Debt Service Reserve Fund*"). Until the first date as of which the Value of the moneys and investments in the Debt Service Reserve Fund shall equal the Debt Service Reserve Fund Requirement (the "*First Fill Date*"), and thereafter, to the extent that the Value of the moneys and investments in the Debt Service Reserve Fund shall be less than the Debt Service Reserve Fund Requirement due to the amount initially funded to the Debt Service Reserve Fund, a change in Debt Service Reserve Fund Requirement or a draw on the Debt Service Reserve Fund, funds transferred to the Bond Trustee by the Master Trustee pursuant to

the provisions of Section 427(b)(vi) of the Master Indenture shall be deposited into the Debt Service Reserve Fund in an amount equal to the lesser of (i) the amount of such available funds or (ii) the amount required to fund the Debt Service Reserve Fund to the Debt Service Reserve Fund Requirement.  Amounts on deposit in the Debt Service Reserve Fund shall be administered by the Bond Trustee as described in this Section 406.  Subject to the provisions of Article VII hereof, until no Series 2013A Bonds remain Outstanding, moneys on deposit in the Debt Service Reserve Fund shall be used only to make up any deficiencies in the 2013A Interest Fund Account and the 2013A Bond Sinking Fund Account (in that order) and shall not be used to pay the Series 2013B Bonds, provided however, that in the event of Early Redemption, such moneys shall be transferred to the Optional Redemption Fund and used, together with all other funds held by Bond Trustee and/or held by the Master Trustee and transferred to the Bond Trustee, to satisfy the Early Redemption Amount.

(b) Moneys on deposit in the Debt Service Reserve Fund shall be invested in Permitted Investments.  The Value of Permitted Investments in the Debt Service Reserve Fund shall be determined by the Bond Trustee on each Interest Payment Date (collectively, the "*Valuation Dates*" and each, a "*Valuation Date*").

(c) After the First Fill Date, to the extent that the Value of the moneys and investments in the Debt Service Reserve Fund shall have been less than the Debt Service Reserve Fund Requirement as of the immediately preceding Valuation Date as a result of a decline in the Value of the investments therein (for purposes of this subsection, an "*Investment Deficiency*"), funds transferred to the Bond Trustee by the Master Trustee pursuant to the provisions of Section 427(b)(vi) of the Master Indenture shall be deposited into the Debt Service Reserve Fund in an amount equal to the lesser of (i) the amount of such available funds or (ii) the Investment Deficiency minus any amounts deposited into the Debt Service Reserve Fund pursuant to the provisions of this subsection (c) after such immediately preceding Valuation Date.

(d) Subject to Section 407(c) hereof, if the Value of the moneys and investments in the Debt Service Reserve Fund is greater than the Debt Service Reserve Fund Requirement as of any Valuation Date, such excess shall be deposited in the Gross Revenue Fund established under Section 427 of the Master Indenture and shall be distributed in accordance with the Distribution Waterfall set forth in said Section 427 of the Master Indenture.

(e) If, after no Series 2013A Bonds remain Outstanding, the balance of the Debt Service Reserve Fund, together with all other amounts available to pay the principal of, and interest on, the Series 2013B Bonds at Maturity or earlier redemption of all outstanding Series 2013B Bonds (the "*Remaining Series 2013B Debt Service*") shall, at any time, be sufficient to pay the Remaining Series 2013B Debt Service, any moneys in the Debt Service Reserve Fund may, at the written direction of the Corporation, be transferred to the Interest Fund and/or the 2013B Bond Sinking Fund Account and/or the Optional Redemption Fund in such respective amounts as shall cause the amounts therein to be sufficient to the pay the Remaining Series 2013B Debt Service.

### Section 407. Investment of Funds.

(a) Upon verbal direction to be promptly followed by a Written Request of the Corporation filed with the Bond Trustee, moneys in the Debt Service Fund, the Interest Fund, the Bond Sinking Fund, the Debt Service Reserve Fund, and the Optional Redemption Fund shall be invested in Permitted Investments.  Investment income on such Funds shall be transferred monthly by the Bond Trustee in accordance with the provisions of this Section 407.  All such investments shall be made so as to mature, or be available without loss or penalty, on or prior to the date or dates that moneys therefrom are anticipated to be required, and moneys on deposit in the Debt Service Reserve Fund may be invested in investments that mature, or be available without loss or penalty, no later than two (2) years after the making thereof.  The Bond Trustee, when authorized by the Corporation, may trade with itself in the purchase and sale of securities for such investment; provided, however, that in no case shall any investment be otherwise than in accordance with the investment limitations contained herein and in the Tax Agreement.  The Bond Trustee shall not be liable or responsible for any loss resulting from any such investments.

(b) The investment earnings on funds on deposit in the Interest Fund shall be retained in the respective Accounts established therein.

(c) Except as provided in subsection (b) above, all income in excess of the requirements (in the case of the Debt Service Reserve Fund, the Interest Fund, and the Bond Sinking Fund, the amounts expected to be used to

make required debt service payments within thirteen (13) months of the date of deposit) of the funds specified in subsection (a) of this Section derived from the investment of moneys on deposit in any such funds shall be deposited in the following funds, in the order listed:

(i)   the Debt Service Reserve Fund, if the amount on deposit therein is less than the Debt Service Reserve Fund Requirement; and

(ii)  the Bond Sinking Fund to the extent of the amount required to be deposited therein to make the next required principal payment on the Bonds occurring within thirteen (13) months of the date of deposit; and

(iii) the Interest Fund to the extent of the estimated amount required to be deposited therein to make any interest payment on the Bonds occurring within thirteen (13) months of the date of deposit; and

(iv)  the balance, if any, to the Optional Redemption Fund, for application first to the optional redemption of Series 2013A Bonds and, if no Series 2013A Bonds are Outstanding, to the optional redemption of Series 2013B Bonds.

(d) Any costs of making any investment of moneys in a Fund or Account, including investment management fees, shall be charged to that Fund or Account.

(e) The Bond Trustee shall be entitled to presume that any investments made at the direction of the Corporation will not cause the Bonds to be "arbitrage bonds," and that such investments, if Permitted Investments, are permitted by applicable law.  The Bond Trustee shall not be liable or responsible for any calculation or determination that may be required in connection with or for the purpose of complying with Section 148 of the Code including, without limitation, the calculation of amounts required to be paid to the United States under the provisions of Section 148 of the Code, and shall be entitled to rely on the directions or absence of directions of the Corporation and any rebate analyst.

**Section 408. Trust Funds**. All moneys received by the Bond Trustee under the provisions of this Bond Indenture shall, except as provided in Section 409 hereof, be trust funds under the terms hereof for the benefit of all Outstanding Bonds (except as otherwise provided) and shall not be subject to lien or attachment of any creditor of the Town, the Corporation, or any other Member.  Such moneys shall be held in trust and applied in accordance with the provisions of this Bond Indenture.

**Section 409. Excluded Fund; Transfers to Rebate Fund**. The foregoing provisions of this Article IV notwithstanding, (a) the Rebate Fund shall not be considered a part of the Trust Estate created by this Bond Indenture and (b) the Bond Trustee shall, at the direction of the Corporation, transfer moneys on deposit in any of the trust funds established under this Article IV to the Rebate Fund in accordance with the provisions of the Tax Agreement.

*          *          *

IV-6

Case 3350069-RJM-12    Doc 2464-11    Filed 07/31/13    Pg 34 of 84

<div align="center">

**ARTICLE V**

**REDEMPTION OF BONDS**

</div>

**Section 501. Optional Redemption Dates and Prices**.

(a) Provided that no uncured Event of Default with respect to the Series 2013 Bond Obligations shall exist as of such optional redemption, the Bonds shall be callable for optional redemption prior to Maturity, in whole, in the event the Corporation shall exercise its option to prepay all of the Series 2013 Bond Obligations by the three-year anniversary of the Closing Date (the date of such three year anniversary, the "***Early Redemption Deadline***"). In the event the Corporation shall exercise its right of Early Redemption and the Early Redemption Amount shall have been paid, (i) the Series 2013A Bonds shall be redeemed at a price of 100% of the principal amount thereof, plus accrued but unpaid interest thereon through the applicable redemption notice date and (ii) each Series 2013B Bond shall be redeemed in full, including principal and accrued interest to the redemption date, at a price equal to its pro rata portion of the Early Redemption Amount minus the amount applied towards the Series 2013A Bonds, and thereafter no Series 2013 Bonds shall remain outstanding.

(b) From and after the Early Redemption Deadline through and including the 10-year anniversary of the Closing Date, the Bonds shall be callable for optional redemption, in whole, at any time prior to Maturity, at a price of 103% of the then-applicable principal amount thereof, plus accrued and unpaid interest to the date of redemption.

(c) Commencing from and after the 10-year anniversary of the Closing Date through Maturity, the Bonds shall be callable for optional redemption at any time prior to Maturity, in whole or in part, at a price of 100% of the then applicable principal amount thereof, plus accrued and unpaid interest to the date of redemption.

(d) Excess Cash deposited in the 2013B Optional Redemption Account, proceeds of the sale of Excess Land (as defined in the Master Indenture) transferred to the 2013 Optional Redemption Fund pursuant to Section 452 of the Master Indenture or proceeds from the LB Claim transferred to the 2013B Optional Redemption Account pursuant to Section 301 shall be applied on the first practicable date to the optional redemption of Series 2013B Bonds on a pro rata basis, and, if no Series 2013B Bonds remain Outstanding, transferred to the 2013A Optional Redemption Account and applied on the first practicable date to the optional redemption of the Series 2013A Bonds, by lot or in such other random manner as the Bond Trustee shall deem appropriate.

(e) Any partial redemption of Series 2013A Bonds shall be credited to future mandatory sinking fund redemptions in inverse chronological order. In the case of a redemption from sources other than Excess Cash deposited in the 2013B Optional Redemption Account, proceeds of the sale of Excess Land transferred to the 2013B Optional Redemption Account pursuant to Section 452 of the Master Indenture or proceeds from the LB Claim transferred to the 2013B Optional Redemption Account pursuant to Section 301, the Bonds shall be redeemed first from the Series 2013A Bonds, and if no Series 2013A Bonds remain Outstanding, then from the Series 2013B Bonds, and if less than all of the Series 2013A Bonds or less than all of the Series 2013B Bonds are being redeemed, by lot or in such other random manner as the Bond Trustee may deem appropriate for each applicable series of Bonds based on the outstanding principal thereof, subject to the limitation that any redemption of a Series 2013 Bond pursuant to the provisions of this Section shall be in a multiple of one dollar.

(f) Bonds may be called for redemption by the Bond Trustee pursuant to this Section 501 upon receipt by the Bond Trustee at least forty-five (45) days prior to the redemption date (or such shorter period as shall be acceptable to the Bond Trustee in its sole discretion) of a Written Request of the Corporation authorizing the application of funds for such redemption, provided that (i) no such request shall be required for a redemption pursuant to subsection (d) hereof and (ii) in the case of an Early Redemption, the Corporation shall, in lieu of such Written Request at least 45 days prior to the redemption date, provide notice to the Bond Trustee by telephone communication at least fourteen (14) days prior to the Early Redemption Deposit Date specifying the Early Redemption Deposit Date and directing the Bond Trustee to give notice pursuant to Section 504 hereof that the Series 2013 Bonds shall be optionally redeemed on the specified Early Redemption Deposit Date, and shall confirm such telephone notice on the same day such telephone notice is given by email notice to the Bond Trustee and by

<div align="center">V-1</div>

mailing a copy of such notice by first class mail, postage prepaid to the Bond Trustee. Any such Written Request or notice shall specify the amount of Bonds to be called for redemption.

(g)  In lieu of redeeming Series 2013A Bonds or Series 2013B Bonds, as applicable, pursuant to this Section 501, the Bond Trustee may, at the request of the Corporation, use such funds otherwise available hereunder for redemption of Bonds to purchase Series 2013A Bonds or Series 2013B Bonds, as applicable, in the open market at a price not exceeding the redemption price then applicable hereunder and delivering such purchased Bonds to the Trustee for cancellation.

(h) Notwithstanding the foregoing provisions of this Section, no redemption of less than all of the Bonds will be made unless the aggregate principal amount of Bonds to be redeemed is One Thousand Five Hundred Dollars ($1,500) or more.

### Section 502. Bond Sinking Fund Deposits - Mandatory Sinking Fund Redemptions.

(a) The Series 2013A Bonds shall be subject to mandatory redemption in the principal amounts and on the dates set forth below:

#### Series 2013A Bond Sinking Fund Account

| July 1 of the Year | Principal Amount | July 1 of the Year | Principal Amount |
|---|---|---|---|
| 20__ * | $ | 20__ | $ |
| 20__ * | | 20__ | |
| 20__ * | | 20__ | |
| 20__ * | | 20__ | |
| 20__ * | | 20__ | |
| 20____ | | 20__ | |
| 20__ | | 20__ | |
| 20__ | | 20__ | |
| 20__ | | 20__ * | |
| 20__ | | 20__ | |
| 20__ | | 20__ | |
| 20__ | | 20__ | |
| 20__ | | 20__ | |
| 20__ * | | 20__ * | |

* Maturity

(b) The deposits required pursuant to this Section 502 shall be reduced (i) by the amount of Series 2013A Bonds acquired and delivered in accordance with Section 404 hereof in satisfaction of such Bond Sinking Fund requirements and (ii) in connection with a partial redemption of Series 2013A Bonds other than by mandatory Bond Sinking Fund redemption.

(c) Moneys on deposit in the 2013A Bond Sinking Fund Account on July 1 of each of the years 20__ through 20__ shall be applied to the payment at Maturity or redemption of the specified principal amount of the Series 2013A Bonds by lot or in such other random manner as the Bond Trustee may deem appropriate, upon the notice and in the manner provided in this Article V, at a redemption price equal to 100% of the principal amount thereof plus accrued interest to the redemption date.

(d) The Series 2013B Bonds are not subject to mandatory Bond Sinking Fund redemption prior to Maturity. Amounts on deposit in the Series 2013B Account of the Bond Sinking Fund shall be applied to pay the Series 2013B Bonds at Maturity.

**Section 503. Mandatory Redemption Upon the Occurrence of a Determination of Taxability**. The Bonds shall be subject to mandatory redemption by the Town in whole and not in part upon the occurrence of a Determination of Taxability within one hundred fifty (150) days after the occurrence of such Determination of Taxability at a redemption price equal to 108 percent (108%) of the principal amount thereof, in the case of the Series 2013A Bonds, and 103 percent (103%) of the principal amount thereof, in the case of the Series 2013B Bonds, plus interest accrued thereon to the redemption date.

**Section 504. Notice of Redemption**.

(a) Notice of the call for any redemption pursuant to Section 501, 502, or 503 hereof shall state the following:  (i) the name of the bond issue, (ii) the CUSIP number and, if applicable, bond certificate number of the Bonds to be redeemed, (iii) the original dated date of the bond issue, (iv) the interest rate and Maturity of the Bonds to be redeemed, (v) the date of the redemption notice, (vi) the redemption date, (vii) the redemption price, and (viii) the address and telephone number of the designated corporate trust office of the Bond Trustee.  The redemption notice shall be given by mailing a copy of such notice of redemption by first class mail, postage prepaid, not less than thirty (30) nor more than sixty (60) days prior to the redemption date, or, in the case of a redemption upon a Determination of Taxability or upon an Early Redemption, not less than ten (10) days prior to the redemption date, to the Owners of the Bonds to be redeemed to the address shown on the Bond Register; provided, however, that failure to give such notice by mailing or a defect in the notice or the mailing as to any Bond shall not affect the validity of any proceedings for redemption as to any other Bond for which notice is properly given.

(b) Except for a redemption pursuant to Section 502 or 503, prior to the date that the redemption notice is mailed as aforesaid, funds shall be placed with the Bond Trustee by or on behalf of the Corporation to pay such Bonds and interest accrued thereon to the redemption date and the premium, if any.  Upon deposit with the Bond Trustee on or prior to the applicable redemption date of funds sufficient to pay the applicable redemption price, the Bonds, or portions thereof, so called for redemption shall not bear interest after the applicable redemption date, and shall not be deemed to be Outstanding under the provisions hereof.  The Bond Trustee shall redeem or purchase, in the manner provided in this Article V, such an aggregate principal amount of Bonds at the principal amount thereof plus interest accrued to the redemption date, and premium, if any, as will exhaust as nearly as practicable the funds placed on deposit with the Bond Trustee.  At the direction of the Corporation, such funds may be invested in Government Obligations until needed for such redemption.  If any Owner of Five Hundred Thousand Dollars ($500,000) or more in aggregate principal amount and/or original principal amount of Bonds to be redeemed on a single day delivers such Bonds for redemption on or prior to such redemption date, payment of such redemption price for such Bonds shall be made, if such Owner so elects, by wire transfer of funds to such wire transfer address within the continental United States as such Owner shall have furnished to the Bond Trustee in writing and upon compliance with the reasonable requirements of the Bond Trustee.  Each redemption payment shall indicate the dollar amount of each CUSIP identification number being redeemed.

*          *          *

V-3

Case 3:56096-RJM-19 Doc 18-3 Filed 03/03/14 13:36:26 Pg 37 of 84

<center>ARTICLE VI</center>

<center>GENERAL COVENANTS AND REPRESENTATIONS</center>

**Section 601. Payment of Principal, Premium, if any, and Interest.** Subject to the limited source of payment hereinafter referred to, the Town covenants that it will promptly pay the principal of, and premium, if any, and interest on, every Bond issued under this Bond Indenture at the place, on the dates, and in the manner provided herein and in said Bond according to the true intent and meaning thereof. The principal of, and premium, if any, and interest on, the Bonds are payable solely from (a) payments or prepayments by the Corporation upon the Series 2013 Bond Obligations and otherwise as provided herein and in the Series 2013 Bond Obligations and the Loan Agreement, which Series 2013 Bond Obligations and payments thereon are hereby specifically assigned and pledged to the payment of the Bonds in the manner and to the extent herein specified, (b) payments or prepayments under the Loan Agreement (other than Unassigned Rights), (c) moneys and investments held by the Bond Trustee under, and to the extent provided in, this Bond Indenture, and (d) in certain circumstances, proceeds from insurance, condemnation awards, and proceeds from sales made under threat of condemnation, and nothing in the Bonds or in this Bond Indenture shall be considered as assigning or pledging any other funds or assets of the Town (except the moneys, the Series 2013 Bond Obligations, and the Loan Agreement pledged under this Bond Indenture).

**Section 602. Performance of Covenants; Legal Authorization.** The Town covenants that it will faithfully perform on its part at all times any and all covenants, undertakings, stipulations, and provisions contained in this Bond Indenture, in any and every Bond executed, authenticated, and delivered hereunder and in all of its proceedings pertaining thereto; provided, however, that except for the matters set forth in any documents hereof relating to payment of the Bonds, the Town shall not be obligated to take any action or execute any instrument pursuant to any provision hereof until it shall have been requested to do so by the Corporation or by the Bond Trustee, or shall have received the instrument to be executed and at the option of the Town shall have received from the party requesting such action or execution assurance satisfactory to the Town that the Town shall be reimbursed for its reasonable expenses, including legal counsel fees, incurred or to be incurred in connection with taking such action or executing such instrument. The Town represents that it is duly authorized under the Constitution and the laws of the State, including particularly the Act and the Bond Ordinance to issue the Bonds authorized hereby and to execute this Bond Indenture, to grant the security interest herein provided, to assign and pledge the Loan Agreement and the Series 2013 Bond Obligations pledged hereunder (except as otherwise provided herein), and to assign and pledge the amounts hereby assigned and pledged in the manner and to the extent herein set forth, that all action on its part for the issuance of the Bonds and the execution and delivery of this Bond Indenture has been duly and effectively taken, and that the Bonds in the hands of the Owners thereof are and will be valid and enforceable obligations of the Town according to the terms thereof and hereof. Anything contained in this Bond Indenture to the contrary notwithstanding, it is hereby understood that none of the covenants of the Town contained in this Bond Indenture are intended to create a general or primary obligation of the Town.

**Section 603. Ownership; Instruments of Further Assurance.** The Town represents that it lawfully owns the Series 2013 Bond Obligations and that the pledge and assignment thereof and the assignment of its interest in the Loan Agreement (other than the Unassigned Rights) to the Bond Trustee hereby made are valid and lawful. The Town covenants that it will defend its title to the Series 2013 Bond Obligations and its interest in the Loan Agreement and the assignment thereof to the Bond Trustee, for the benefit of the Owners of the Bonds, against the claims and demands of all Persons whomsoever. The Town covenants that it will do, execute, acknowledge, and deliver or cause to be done, executed, acknowledged, and delivered, such indentures supplemental hereto and such further acts, instruments, and transfers as the Bond Trustee may reasonably require for the better assuring, transferring, conveying, pledging, assigning, and confirming unto the Bond Trustee the Series 2013 Bond Obligations, the Loan Agreement, and all payments thereon and thereunder pledged hereby to the payment of the principal of, and premium, if any, and interest on, the Bonds.

**Section 604. Recording and Filing.**

(a) The Town will execute such financing statements naming the Bond Trustee as assignee and pledgee of the Trust Estate assigned and pledged under this Bond Indenture for the payment of the principal of, and premium, if any, and interest on, the Bonds and as otherwise provided herein. The Corporation shall file, or cause to be filed,

<center>VI-1</center>

and shall deliver, or cause to be delivered to the Bond Trustee evidence of the filing of, Uniform Commercial Code financing statements with respect to the security interest granted by the Town to the Bond Trustee pursuant to this Bond Indenture (the "*Original Financing Statements*").  The Corporation shall file and record or cause to be filed and recorded such necessary continuation statements or supplements thereto and other instruments from time to time as may be required pursuant to the provisions of the Uniform Commercial Code (assuming the application of the Uniform Commercial Code) or other similar law to fully preserve and protect the security interest of the Bond Trustee described by the Original Financing Statements.  The Town, at the expense of the Corporation, shall execute and cause to be executed any and all further instruments as shall be reasonably required by the Bond Trustee to confirm or preserve the effectiveness of the Original Financing Statements until the principal of, and premium, if any, and interest on, the Bonds issued hereunder shall have been paid or provision for their payment shall be made as herein provided.  Notwithstanding the foregoing, the Corporation hereby authorizes the Bond Trustee, and appoints the Bond Trustee as its attorney-in-fact, to file in such office or offices as the Bond Trustee shall deem necessary or desirable such continuation statements and amendments thereof or supplements thereto, and such other documents as the Bond Trustee may from time to time require to continue the effectiveness of the Original Financing Statements until the principal of, and premium, if any, and interest on, the Bonds issued hereunder shall have been paid or provision for their payment shall be made as herein provided.

(b)  The Town represents that the assignment and pledge of the Trust Estate to the Bond Trustee complies with all laws applicable to such transfer, and that any filings or notices required under such laws to make such assignment and pledge valid, effective and perfected have occurred.

### Section 605. Required Reporting to the Town.

(a) The Bond Trustee shall keep, or cause to be kept, proper books of records and accounts in which complete and accurate entries shall be made of all Funds and Accounts established by or pursuant to this Bond Indenture, which shall at all reasonable times be subject to the inspection by the Town or the Owners or Beneficial Owners (or a designated representative thereof) of not less than ten percent (10%) in aggregate principal amount of the Bonds then Outstanding.

(b) Not later than thirty (30) days after the last day of each Bond Year, the Bond Trustee shall prepare and file with the Town a statement setting forth, with respect to such Bond Year, (i) amounts withdrawn from and deposited in each Fund and Account relating to the Bonds hereunder, (ii) the balance on deposit in each such Fund or Account relating to the Bonds at the end of such Bond Year, (iii) a brief description of all obligations held as investments in each such Fund or Account relating to the Bonds, (iv) the amount applied to the redemption of the Bonds, a description of the Bonds or portions of Bonds so redeemed, and an accounting of the Bonds of each Maturity Outstanding, and (v) any other information that the Town may reasonably request or that the Bond Trustee may from time to time deem appropriate.

### Section 606. Bond Register.

(a) The Bond Registrar will keep on file at its office the Bond Register, indicating the names and addresses of the Owners of the Bonds and the serial numbers of such Bonds held by each of such Owners. At reasonable times and under reasonable regulations established by the Bond Registrar, the Bond Register may be inspected and copied by the Corporation, any member of the Obligated Group, or the Town.

(b) Notwithstanding any other provision of this Bond Indenture, the Bond Trustee may, whenever a direction or consent of the Holders, Bondholders, or Owners is referenced herein, accept the written direction or consent of a person certifying in writing to the Bond Trustee's satisfaction that such person is at the time such instruction is delivered the Beneficial Owner of a specified principal amount of Bonds of a specified series and Maturity as though such direction or consent were delivered by the Holder, Bondholder, or Owner the principal amount of such Bonds specified in such certification, and shall be fully protected in relying on such certification and direction or consent.

**Section 607. Rights Under the Loan Agreement and the Series 2013 Bond Obligations; Bond Trustee as Owner of the Series 2013 Bond Obligations**.

(a) The Town agrees that the Bond Trustee in its own name or in the name of the Town may enforce all rights of the Town (other than the Unassigned Rights) and all obligations of the Corporation under and pursuant to the Loan Agreement (other than obligations pertaining to the Unassigned Rights) for and on behalf of the Bondholders, whether or not an Event of Default has occurred.

(b) The Bond Trustee shall be considered the Owner and Holder of the Series 2013 Bond Obligations.  The Bond Trustee shall exercise its rights as the Holder of the Series 2013A Obligation in accordance with the instructions of a Majority of the Series 2013A Bondholders and its rights as the Holder of the Series 2013B Obligation in accordance with the instructions of a Majority of the Series 2013B Bondholders, provided that, the Bond Trustee shall not consent to any reduction in the principal amount of the Series 2013 Bond Obligations, the interest payable thereon, or the timing of payments thereon unless the terms of the Series 2013 Bonds have been amended correspondingly with the consent of each Bondholder required to consent thereto.  For avoidance of doubt, the payment in full of the Series 2013B Bonds in an amount less than 100% of the principal amount thereof plus accrued interest upon an Early Redemption pursuant to the terms hereof shall not require any Bondholder consent.

**Section 608. Designation of Additional Paying Agents**. The Town may, in its discretion, cause the necessary arrangements to be made through the Bond Trustee and to be thereafter continued for the designation of an alternate Paying Agent, if any, and for the making available of funds hereunder for the payment of such of the Bonds as shall be presented when due at the Office of the Bond Trustee, or its successor in trust hereunder, or at the designated corporate trust office of said alternate Paying Agents.

**Section 609. Arbitrage; Compliance with Tax Agreement**. The Town and the Corporation covenant and agree that they will not take any action or fail to take any action with respect to the investment of the proceeds of the Bonds or with respect to the payments derived from the Series 2013 Bond Obligations or from the Loan Agreement or any other moneys regardless of source or where held that may, notwithstanding compliance with the other provisions of this Bond Indenture, the Loan Agreement, and the Tax Agreement, result in constituting the Bonds "arbitrage bonds" within the meaning of such term as used in Section 148 of the Code.  The Town and the Corporation further covenant and agree that they will comply with and take all actions required by the Tax Agreement.

**Section 610. Prohibited Activities**. Subject to the limitations on its liability as stated herein and to the extent permitted by law, the Town covenants and agrees that it has not knowingly engaged and will not knowingly engage in any activities and that it has not knowingly taken and will not knowingly take any action that might result in any interest on the Bonds becoming includable in the gross income of the Owners thereof for purposes of federal income taxation.

*                   *                   *

### ARTICLE VII

### EVENTS OF DEFAULT; REMEDIES

**Section 701. Events of Default**. Each of the following events is hereby declared an "*Event of Default*":

(a) payment of any installment of interest on any of the Bonds shall not be made when the same shall become due and payable, provided that interest on the Series 2013B Bonds shall not be due and payable on any scheduled Interest Payment Date prior to Maturity to the extent on the applicable Interest Payment Date amounts on deposit in the 2013B Interest Fund Account are insufficient to pay such interest, and that any such unpaid interest shall accrete and be added to the principal amount of the applicable Series 2013B Bonds on such Interest Payment Date; or

(b) payment of the principal of, or redemption price, of any of the Bonds shall not be made when the same shall become due and payable, either at Maturity, by proceedings for redemption or otherwise; or

(c) an "Event of Default" as set forth in Section 9.1 of the Loan Agreement or in Section 502(a) of the Master Indenture shall occur and be continuing, or the Master Trustee shall declare any Obligation immediately due and payable; or

(d) the failure by the Corporation to perform its covenant in Section 8.10 of the Loan Agreement relating to the discharge, vacation, bonding, or stay of any order, writ, or warrant of attachment, garnishment, execution, replevin, or similar process filed against any part of the Funds or Accounts held by the Bond Trustee hereunder, such failure being an "Event of Default" specified in Section 9.1(a)(ix) of the Loan Agreement;

(e) the Town shall for any reason be rendered incapable of fulfilling its obligations hereunder; or

(f) an order or decree shall be entered, appointing a receiver, receivers, custodian, or custodians for any of the revenues of the Town, or approving a petition filed against the Town seeking reorganization of the Town under the federal bankruptcy laws or any other similar law or statute of the United States of America or any state thereof, or if any such order or decree, having been entered without the consent or acquiescence of the Town, shall not be vacated, discharged, or stayed on appeal within sixty (60) days after the entry thereof; or

(g) any proceeding shall be instituted, with the consent or acquiescence of the Town, or any plan shall be entered into by the Town, for the purpose of effecting a composition between the Town and its creditors or for the purpose of adjusting the claims of such creditors pursuant to any federal or state statute now or hereafter enacted, if the claims of such creditors are under any circumstances payable from any part or all of the Trust Estate; or

(h) the Town (i) shall file a petition in bankruptcy or under Title 11 of the United States Code, as amended, (ii) shall make an assignment for the benefit of its creditors, (iii) shall consent to the appointment of a receiver, custodian, or trustee for itself or for the whole or any part of the Trust Estate, or (iv) shall generally not pay its debts as such debts become due; or

(i) (x) the Town shall be adjudged insolvent by a court of competent jurisdiction, (y) on a petition in bankruptcy filed against the Town, the Town shall be adjudged as bankrupt, or (z) an order, judgment, or decree shall be entered by any court of competent jurisdiction appointing, without the consent of the Town, a receiver, custodian, or trustee of the Town or of the whole or any part of its property and any of the aforesaid adjudications, orders, judgments, or decrees shall not be vacated or set aside or stayed within sixty (60) days from the date of entry thereof; or

(j) the Town shall file a petition or answer seeking reorganization or any arrangement under the federal bankruptcy laws or any other applicable law or statute of the United States of America or any state thereof; or

VII-1

(k) under the provisions of any other law for the relief or aid of debtors, any court of competent jurisdiction shall assume custody or control of the Town or of the whole or any substantial part of its property, and such custody or control shall not be terminated within sixty (60) days from the date of assumption of such custody or control; or

(l) the Town shall fail to make due and punctual performance of any other of the covenants, conditions, agreements, or provisions contained in the Bonds, in this Bond Indenture, or in any indenture supplemental hereto to be performed on the part of the Town, and such failure shall continue for the period of thirty (30) days after written notice specifying such failure and requiring the same to be remedied shall have been given to the Town and the Corporation by the Bond Trustee at the written request of the Majority of the Applicable Bondholders; provided, that, if such failure cannot with due diligence and dispatch be wholly cured within thirty (30) days, but can be wholly cured, the failure of the Town to remedy such failure within such thirty (30) day period shall not constitute an Event of Default if the Town shall immediately upon receipt of such notice commence with due diligence and dispatch the curing of such failure and, having so commenced the curing of such failure, shall thereafter prosecute and complete the same with due diligence and dispatch within such additional period as the Bond Trustee at the written request of the Majority of the Applicable Bondholders may grant in writing; or

(m) the Town or the Corporation shall fail in the performance of any covenant, condition, agreement, or provision of the Tax Agreement, and such failure shall continue for a period of thirty (30) days after written notice specifying such failure and requiring the same to be remedied shall have been given to the Town or the Corporation, as the case may be, by a Majority of the Applicable Bondholders; provided, that, if such failure cannot with due diligence and dispatch be wholly cured within thirty (30) days, but can be wholly cured, the failure of the Town or the Corporation to remedy such failure within such thirty (30) day period shall not constitute an Event of Default if the Town or the Corporation shall immediately upon receipt of such notice commence with due diligence and dispatch the curing of such failure and, having so commenced the curing of such failure, shall thereafter prosecute and complete the same with due diligence and dispatch within such additional period as the Bond Trustee at the written request of the Majority of the Applicable Bondholders may grant in writing.

**Section 702. Acceleration**. Upon the happening of any Event of Default the Bond Trustee may, and upon the written request of a Majority of the Applicable Bondholders, the Bond Trustee shall, by notice in writing delivered to the Town, declare the entire principal of the Bonds then Outstanding and the interest accrued thereon, immediately due and payable, and the entire principal and interest shall thereupon become and be immediately due and payable, subject, however, to the provisions of Section 710 hereof with respect to waivers of Events of Default.

**Section 703. Remedies; Rights of Bondholders**.

(a) Upon the occurrence of any Event of Default, the Bond Trustee may pursue any available remedy including a suit at law or in equity to enforce the payment of the principal of, and premium, if any, and interest on, the Bonds Outstanding.

(b) If an Event of Default shall have occurred, and if it shall have been requested so to do by a Majority of the Applicable Bondholders and shall have been indemnified as provided in Section 801 hereof, the Bond Trustee shall be obligated to exercise such one or more of the rights and powers conferred by this Section as the Bond Trustee shall be directed to exercise or shall deem expedient in the interests of the Owners of the Bonds, including without limitation exercising any of its rights under the Loan Agreement or as the Holder of the Series 2013 Bond Obligations; provided, however, that the Bond Trustee shall have the right to decline to comply with any such request if the Bond Trustee shall be advised by counsel (who may be its own counsel) that the action so requested may not lawfully be taken or the Bond Trustee in good faith shall determine that such action would be unjustly prejudicial to the Owners of the Bonds not parties to such request.

(c) No remedy by the terms of this Bond Indenture conferred upon or reserved to the Bond Trustee (or to the Owners of the Bonds) is intended to be exclusive of any other remedy, but each and every such remedy shall be cumulative and shall be in addition to any other remedy given to the Bond Trustee or to the Owners of the Bonds hereunder now or hereafter existing at law or in equity or by statute.

VII-2

(d) No delay or omission to exercise any right or power accruing upon the occurrence of any Event of Default or Default Condition shall impair any such right or power or shall be construed to be a waiver of any such Event of Default or Default Condition, or acquiescence therein; and every such right and power may be exercised from time to time and as often as may be deemed expedient.

(e) No waiver of any Event of Default or Default Condition, whether by the Bond Trustee or by the Owners of the Bonds, shall extend to or shall affect any subsequent Event of Default or Default Condition or shall impair any rights or remedies consequent thereon.

**Section 704. Direction of Proceedings by Bondholders**. A Majority of the Applicable Bondholders shall have the right, at any time, by an instrument or instruments in writing executed and delivered to the Bond Trustee, to direct the method and place of conducting all proceedings to be taken in connection with the enforcement of the terms and conditions of this Bond Indenture, including enforcement of the rights of the Town under the Loan Agreement or for the appointment of a receiver or any other proceedings hereunder; provided, that such direction shall be in accordance with the provisions of law and of this Bond Indenture.

**Section 705. Appointment of Receivers**. Upon the occurrence of an Event of Default, and upon the filing of a suit or other commencement of judicial proceedings to enforce the rights of the Bond Trustee and the Owners of Bonds under this Bond Indenture, the Bond Trustee shall be entitled, as a matter of right, to the appointment of a receiver or receivers of the properties pledged hereunder and of the revenues, issues, payments, and profits thereof, pending such proceedings, with such powers as the court making such appointment shall confer.

**Section 706. Application of Moneys**.

(a) All moneys received by the Bond Trustee, by any receiver, or by any Bondholder pursuant to any right given or action taken under the provisions of this Article shall, together with all moneys in the Funds maintained by the Bond Trustee hereunder, after payment of the costs and expenses of the proceedings resulting in the collection of such moneys and of the fees of, and the expenses, liabilities, and advances incurred or made by, the Bond Trustee, including, but not limited to, the reasonable fees and expenses of its counsel, be deposited in the Debt Service Fund and shall be applied as follows:

(i) Unless the principal of all the Bonds shall have become or shall have been declared due and payable, all such moneys shall be applied:

FIRST: To the payment of amounts, if any, payable to the United States of America pursuant to the Tax Agreement;

SECOND: To the payment to the Persons entitled thereto of all installments of interest then due on the Series 2013A Bonds, in the order of the maturity of the installments of such interest, together with interest on overdue interest at the applicable interest rate on the Bonds to the extent permitted by law, and, if the amount available shall not be sufficient to pay in full any particular installment and the interest thereon, then to the payment ratably, according to the amounts due on such installment and the interest thereon, to the Persons entitled thereto without any discrimination or privilege;

THIRD: To the payment to the Persons entitled thereto of the unpaid principal of any of the Series 2013A Bonds that shall have become due (other than Series 2013A Bonds called for redemption for the payment of which moneys are held pursuant to the provisions of this Bond Indenture), in the order of their due dates, and, if the amount available shall not be sufficient to pay in full Series 2013A Bonds due on any particular date, then to the payment ratably, according to the amount of principal due on such date, to the Persons entitled thereto, without any discrimination or privilege;

FOURTH: To the payment to the Persons entitled thereto of the unpaid principal of any of the Series 2013B Bonds that shall have become due (other than Series 2013B Bonds called for redemption for the payment of which moneys are held pursuant to the provisions of this Bond Indenture), and, if the amount available shall not be sufficient to pay in full Series 2013B Bonds due

VII-3

on any particular date, then to the payment ratably, according to the amount of principal due on such date, to the Persons entitled thereto, without any discrimination or privilege;

(ii)    If the principal of all the Bonds shall have become due or shall have been declared due and payable, all such moneys shall be applied:

FIRST: To the payment of amounts, if any, payable to the United States of America pursuant to the Tax Agreement;

SECOND: To the payment of the principal of and interest then due and unpaid upon the Series 2013A Bonds, together with interest on overdue interest at the applicable interest rate on the Bonds to the extent permitted by law, without preference or priority of principal or interest over the other, or of any installment of interest over any other installment of interest, or of any Series 2013A Bond over any other Series 2013A Bond, ratably, according to the amounts due respectively for principal and interest, to the Persons entitled thereto without any discrimination or privilege; and

THIRD: To the payment of the principal of and interest then due and unpaid upon the Series 2013B Bonds, without preference or priority of any Series 2013B Bond over any other Series 2013B Bond, ratably, according to the amounts due respectively for principal and interest, to the Persons entitled thereto without any discrimination or privilege;

(iii) If the principal of all the Bonds shall have been declared due and payable, and if such declaration shall thereafter have been rescinded and annulled under the provisions of this Article, then, subject to the provisions of paragraph (ii) of this subsection in the event that the principal of all the Bonds shall later become due or be declared due and payable, the moneys shall be applied in accordance with the provisions of paragraph (i) of this subsection.

(b) Interest shall continue to accrue, as applicable, on principal of the Bonds that has become due by acceleration or otherwise, until such principal shall be paid.

(c) Whenever moneys are to be applied by the Bond Trustee pursuant to the provisions of this Section, such moneys shall be applied by it at such times, and from time to time, as the Bond Trustee shall determine, having due regard for the amount of such moneys available for application and the likelihood of additional moneys becoming available for such application in the future.  Whenever the Bond Trustee shall apply such moneys, it shall fix the date (which shall be an Interest Payment Date unless it shall deem another date more suitable, or, with respect to payments of Defaulted Interest, shall be such date as is required by the last paragraph of Section 202 hereof) upon which such application is to be made and upon such date interest on the amounts of principal to be paid on such date shall cease to accrue.  The Bond Trustee shall give notice of the deposit with it of any such moneys and of the fixing of any such date and of the Special Record Date in accordance with Section 202(e) hereof at least ten (10) days prior to the Special Record Date.  The Bond Trustee shall not be required to make payment to the Owner of any unpaid Bond until such Bond shall be presented to the Bond Trustee for appropriate endorsement or for cancellation if fully paid.

(d) Whenever all Bonds and interest thereon have been paid under the provisions of this Section 706 and all expenses and charges of the Bond Trustee have been paid, including, but not limited to, the reasonable fees and expenses of its counsel, any balance remaining shall be paid to the Persons, if any, entitled to receive the same; and if no other Person shall be entitled thereto, then the balance, if any, shall be paid to the Corporation.

**Section 707. Remedies Vested in Bond Trustee**. All rights of action, including the right to file proof of claims under this Bond Indenture or under any of the Bonds, may be enforced by the Bond Trustee without the possession of any of the Bonds or the production thereof in any trial or other proceedings relating thereto and any such suit or proceeding instituted by the Bond Trustee shall be brought in its name as Bond Trustee without the necessity of joining as plaintiffs or defendants any Owners of the Bonds, and any recovery of judgment shall be for the equal benefit of the Owners of the Outstanding Bonds.

**Section 708. Rights and Remedies of Bondholders**. No Owner of any Bond shall have any right to institute any suit, action, or proceedings in equity or at law for the enforcement of this Bond Indenture or for the execution of any trust hereof or for the appointment of a receiver or any other remedy hereunder, unless a Default Condition shall have become an Event of Default and a Majority of the Applicable Bondholders shall have made written request to the Bond Trustee and shall have offered it reasonable opportunity either to proceed to exercise the powers hereinbefore granted or to institute such action, suit, or proceeding in its own name, and unless they also have offered to the Bond Trustee indemnity as provided in Section 801 hereof, and unless the Bond Trustee shall thereafter fail or refuse to exercise the power hereinbefore granted, or to institute such action, suit, or proceeding in its own name; and such notification, request, and offer of indemnity are hereby declared in every case at the option of the Bond Trustee to be conditions precedent to the execution of the powers and trusts of this Bond Indenture and to any action or cause of action for the enforcement of this Bond Indenture, or for the appointment of a receiver or for any other remedy hereunder; it being understood and intended that no one or more Owners of the Bonds shall have any right in any manner whatsoever to affect, disturb, or prejudice the lien of this Bond Indenture by any action or to enforce any right hereunder except in the manner herein provided, and that all proceedings at law or in equity shall be instituted, had, and maintained in the manner herein provided and for the equal benefit of the Owners of all Bonds Outstanding, provided, however, that no principal of and interest on the Series 2013B Bonds shall be paid unless and until all principal and interest then due on the Series 2013A Bonds has been paid. Nothing in this Bond Indenture contained shall, however, affect or impair the right of any Bondholder to enforce the payment of the principal of and interest on any Bond at and after the Maturity thereof, or the obligation of the Town to pay the principal of and interest on each of the Bonds issued hereunder to the respective Owners thereof at the time and place, from the source and in the manner in said Bonds expressed, provided, however, that no principal of and interest on the Series 2013B Bonds shall be paid unless and until all principal and interest then due on the Series 2013A Bonds has been paid.

**Section 709. Termination of Proceedings**. In case the Bond Trustee shall have proceeded to enforce any right under this Bond Indenture by the appointment of a receiver, or otherwise, and such proceedings shall have been discontinued or abandoned for any reason, or shall have been determined adversely to the Bond Trustee, then and in every case the Town and the Bond Trustee shall, subject to any determination in such proceeding, be restored to their former positions and rights hereunder with respect to the property pledged and assigned hereunder, and all rights, remedies and powers of the Bond Trustee shall continue as if no such proceedings had been taken.

**Section 710. Waiver of Events of Default**.

(a) The Bond Trustee may, in its discretion, waive any Event of Default and its consequences and rescind any declaration of maturity of principal, and shall do so upon written request of a Majority of the Applicable Bondholders.

(b) The foregoing notwithstanding, in no event shall there be waived (i) any failure to pay the principal of any Outstanding Bonds when due whether at Maturity or by mandatory redemption through the Bond Sinking Fund or (ii) any failure to pay when due of the interest on any such Bonds, unless prior to such waiver or rescission all arrears of interest, with interest thereon (to the extent permitted by law) at the rate borne by the Bonds in respect of which such Event of Default shall have occurred and all arrears of payments of principal when due other than as a result of an acceleration of the Bonds and all fees and expenses of the Bond Trustee and any Paying Agent in connection with such Event of Default shall have been paid or provided for, including, but not limited to, the reasonable fees of their counsel.

(c) In case of any such waiver or rescission or in case any proceeding taken by the Bond Trustee on account of any such Event of Default shall have been discontinued or abandoned or determined adversely, then and in every such case the Town, the Bond Trustee, and the Bondholders shall, subject to any determination in such proceeding, be restored to their former positions and rights hereunder respectively, but no such waiver or rescission shall extend to any subsequent or other Event of Default, or impair any right consequent thereon.

**Section 711. Corporation's Right of Possession and Use of Its Property**. So long as the Corporation is in full compliance with the terms and provisions of the Loan Agreement and the Master Indenture, the Corporation shall be suffered and permitted to possess, use, and enjoy its Property and appurtenances thereto free of claims of the Town and the Bond Trustee.

**Section 712. Waiver of Redemption; Effect of Sale of the Corporation's Property**. The Town, to the extent permitted by law, shall not claim any rights under any stay, valuation, exemption, or extension law, and hereby waives any right of redemption that it may have in respect of the Property of the Corporation.

**Section 713. Notice of Event of Default; Endorsement of the Series 2013 Bond Obligations**. Upon the occurrence of an Event of Default of which the Bond Trustee has actual knowledge or is required to take notice or be deemed to have notice under Section 801(g) hereof, the Bond Trustee shall promptly give written notice thereof to the Town, the Master Trustee, and the Corporation setting forth the nature of such Event of Default.  Upon the occurrence of an Event of Default and in the event the Town shall be requested by the Bond Trustee to endorse any of the Series 2013 Bond Obligations, as permitted under the Indiana Uniform Commercial Code, such endorsement may, in the discretion of the Town, be without recourse.

<div align="center">*          *          *</div>

Case 3550096-RDM-12    Doc 3-2 Rd-1 No/Ex-03 CO3-08-31-13 13:27:23    Pg 40 of 84

## ARTICLE VIII

### THE BOND TRUSTEE

**Section 801. Acceptance of the Trusts.** The Bond Trustee accepts and agrees to execute the trusts imposed upon it by this Bond Indenture, but only upon the terms and conditions set forth herein. The Bond Trustee, prior to the occurrence of an Event of Default and after the curing of all Events of Default that may have occurred, undertakes to perform such duties and only such duties as are specifically set forth in this Bond Indenture, and no implied covenants or obligations should be read into this Bond Indenture against the Bond Trustee. If any Event of Default shall have occurred and be continuing, the Bond Trustee shall exercise such of the rights and powers vested in it by this Bond Indenture and shall use the same degree of care as a prudent Person would exercise or use in the circumstances in the conduct of such prudent Person's own affairs. The Bond Trustee agrees to perform such trusts only upon and subject to the following expressed terms and conditions:

(a) The Bond Trustee may execute any of the trusts or powers hereof and perform any of its duties by or through attorneys, agents, or receivers and shall not be responsible for the misconduct or negligence of the same if appointed with due care, and shall be entitled to advice of counsel concerning all matters of trusts hereof and duties hereunder, and may in all cases pay such reasonable compensation (which shall be expenses reimbursable to the Bond Trustee pursuant to Section 6.9 of the Loan Agreement) to any attorney, agent, receiver, or employee retained or employed by it in connection herewith. The Bond Trustee may act upon the opinion or advice of an attorney, surveyor, engineer, accountant, or other expert or contractor if selected by it with due care or, if selected or retained by the Town, approved by the Bond Trustee in the exercise of such care. The Bond Trustee shall not be responsible for any loss or damage resulting from any action or nonaction based on its good faith reliance upon such opinion or advice.

(b) The Bond Trustee shall not be responsible for any recital herein, or in the Bonds (except with respect to the certificate of the Bond Trustee endorsed on the Bonds), or for the investment of moneys as herein provided (except that no investment shall be made except in accordance with Section 407 hereof), or for the recording or rerecording, filing or re-filing of this Bond Indenture, or any supplement or amendment thereto, or the filing of financing statements, or for the validity of the execution by the Town of this Bond Indenture, or of any supplemental indentures or instruments of further assurance, or for the sufficiency of the security for the Bonds issued hereunder or intended to be secured hereby, or for the value or title of the property herein conveyed or otherwise as to the maintenance of the security hereof. The Bond Trustee may (but shall be under no duty to) require of the Town and the Corporation full information and advice as to the performance of the covenants, conditions, and agreements in the Loan Agreement. Except as otherwise provided in Section 703 hereof, the Bond Trustee shall have no obligation to perform any of the duties of the Town under the Loan Agreement.

(c) The Bond Trustee shall not be accountable for the use or application by the Town or the Corporation of any of the Bonds or the proceeds thereof or for the use or application of any money paid over by the Bond Trustee in accordance with the provisions of this Bond Indenture or for the use and application of money received by any Paying Agent (except when the Bond Trustee acts as Paying Agent). The Bond Trustee may become the Owner of Bonds secured hereby with the same rights it would have if not Bond Trustee.

(d) The Bond Trustee shall be protected in acting upon any notice, order, requisition, request, consent, certificate, order, opinion (including an opinion of Independent Counsel), affidavit, letter, telegram, or other paper or document in good faith deemed by it to be genuine and correct and to have been signed or sent by the proper person or persons. The Bond Trustee shall be protected in relying upon any telephonic or other electronic communication deemed by it in good faith to be genuine and correct and to be from the proper person or persons whenever this Bond Indenture permits such telephonic or other electronic communication. Any action taken by the Bond Trustee pursuant to this Bond Indenture upon the request or authority or consent of any person who at the time of making such request or giving such authority or consent is the Owner of any Bond, shall be conclusive and binding upon all future Owners of the same Bond and upon Bonds issued in exchange therefor or in place thereof.

(e) As to the existence or non-existence of any fact or as to the sufficiency or validity of any instrument, paper or proceedings, the Bond Trustee shall be entitled to rely upon a certificate signed on behalf of the Town by the President or the Clerk-Treasurer or on behalf of the Corporation by an authorized agent of the Governing Body as sufficient evidence of the facts therein contained and prior to the occurrence of a Default Condition or an Event of Default of which the Bond Trustee has been notified as provided in subsection (g) of this Section, or of which by said subsection it is deemed to have notice, shall also be at liberty to accept a similar certificate to the effect that any particular dealing, transaction, or action is necessary or expedient, but may at its discretion secure such further evidence deemed necessary or advisable, but shall in no case be bound to secure the same.  The Bond Trustee may accept a certificate of the President or the Clerk-Treasurer of the Town to the effect that an ordinance or resolution in the form therein set forth has been adopted by the Town as conclusive evidence that such ordinance or resolution, as the case may be, has been duly adopted, and is in full force and effect.

(f)  The permissive right of the Bond Trustee to do things enumerated in this Bond Indenture shall not be construed as a duty and the Bond Trustee shall not be answerable for other than its negligence or willful misconduct. The Bond Trustee shall be fully protected, and shall have no liability to any Bondholder or any other party, if it refrains from acting without prior direction from a Majority of the Applicable Bondholders or a Majority of the Bondholders on any matter under this Bond Indenture involving a permissive or discretionary act by the Bond Trustee that does not specify that a direction from a specified group of Bondholders is required.

(g)  The Bond Trustee shall not be required to take notice or be deemed to have notice of any Event of Default or Default Condition hereunder (except non-payment of any principal (including mandatory sinking fund redemption), or interest when due on the Bonds) or non-payment of any payments required to be made by under Section 403(b) or (c), Section 404(b) or (c) hereof, unless the Bond Trustee shall be specifically notified in writing of such Event of Default or Default Condition by the Town or by a Majority of the Applicable Bondholders and all notices or other instruments required by this Bond Indenture to be delivered to the Bond Trustee must, in order to be effective, be delivered at the Office of the Bond Trustee, and in the absence of such notice so delivered the Bond Trustee may conclusively assume there is no Event of Default or Default Condition except as aforesaid.

(h) The Bond Trustee shall not be personally liable for any debts contracted or for injury to persons or damages to personal property, or for salaries or nonfulfillment of contracts relating to any period in which it may be in possession of or managing any Property.

(i)  At any and all reasonable times, the Bond Trustee, and its duly authorized agents, attorneys, experts, engineers, accountants, and representatives, shall have the right fully to inspect any and all of the property pledged hereunder, including all books, papers, and records of the Town or the Corporation pertaining to the property pledged hereunder and the Bonds, and to take such memoranda from and in regard thereto as may be desired.

(j)  The Bond Trustee shall not be required to give any bond or surety in respect of the execution of the said trusts and powers or otherwise in respect of the premises.

(k) Notwithstanding anything elsewhere in this Bond Indenture contained, the Bond Trustee shall have the right, but shall not be required, to demand, in respect of the authentication of any Bonds, the withdrawal of any cash, the release of any Property, or any action whatsoever within the purview of this Bond Indenture, any showings, certificates, opinions, appraisals, or other information, or corporate action or evidence thereof, in addition to that by the terms hereof required as a condition of such action by the Bond Trustee deemed necessary or desirable for the purpose of establishing the right of the Town or the Corporation to the authentication of any Bonds, the withdrawal of any cash, the release of any Property, or the taking of any other action by the Bond Trustee.

(l)  Before taking any action under this Bond Indenture relating to an Event of Default or a Default Condition or in connection with its duties under this Bond Indenture, other than making payments of principal of and interest on the Bonds as they become due or causing an acceleration of the Bonds when required by this Bond Indenture, the Bond Trustee may require that a satisfactory indemnity bond or other satisfactory indemnity be furnished for the reimbursement of all expenses to which it may be put and to protect it against all liability, including, but not limited to, any liability arising directly or indirectly under any federal, state, or local statute,

rule, law, or ordinance related to the protection of the environment or hazardous substances, except liability that is adjudicated to have resulted from its negligence or willful misconduct in connection with any action so taken.

(m) All moneys received by the Bond Trustee or any Paying Agent shall, until used or applied or invested as provided in this Bond Indenture or in the Tax Agreement, be held in trust for the purposes for which they were received but need not be segregated from other funds except to the extent required by law or by this Bond Indenture or the Tax Agreement.  Neither the Bond Trustee nor any Paying Agent shall be under any liability for interest on any moneys received hereunder except as may be otherwise agreed upon in writing.

(n) In the event the Bond Trustee shall receive inconsistent or conflicting requests and indemnity from two or more groups of Owners of Bonds, each representing less than a Majority of the Applicable Bondholders, or, with respect to action required to be taken upon request by a Majority of the Series 2013A Bondholders, representing less than a Majority of the Series 2013A Bondholders, or, with respect to action required to be taken upon request by a Majority of the Series 2013B Bondholders, representing less than a Majority of the Series 2013B Bondholders, pursuant to the provisions of this Bond Indenture, the Bond Trustee, in its sole discretion, may determine what action, if any, shall be taken including, without limitation, disregarding one or both requests.

(o) The Bond Trustee's immunities and protections from liability and its right to indemnification in connection with the performance of its duties under this Bond Indenture shall extend to the Bond Trustee's officers, directors, agents, attorneys, and employees. Such immunities and protections and right to indemnification, together with the Bond Trustee's right to compensation, shall survive the Bond Trustee's resignation or removal, the defeasance or discharge of this Bond Indenture, and final payment of the Obligations.

(p) Except for information provided by the Bond Trustee concerning the Bond Trustee, the Bond Trustee shall have no responsibility for any information in any offering memorandum or other disclosure material distributed with respect to the Bonds, and the Bond Trustee shall have no responsibility for compliance with any state or federal securities laws in connection with the Bonds.

(q) The Bond Trustee shall have no obligation to monitor or confirm (i) the quality of the Trust Estate; or (ii) the legal sufficiency of any liens, and the perfection thereof, granted or purported to be granted to the Bond Trustee pursuant to this Bond Indenture.

(r) Whenever there is a reference in this Bond Indenture to an act, document, or other matter being satisfactory to the Bond Trustee, acceptable to the Bond Trustee, not objected to by the Bond Trustee, consented to by the Bond Trustee, or otherwise subject to discretionary approval or non-approval by the Bond Trustee, the Bond Trustee may, but shall not be obligated to, refrain from exercising such discretion unless directed to exercise such discretion by a Majority of the Applicable Holders, and, if so directed, shall exercise such discretion in accordance with the direction of a Majority of the Applicable Holders.

### Section 802. Fees, Charges, and Expenses of the Bond Trustee, the Bond Registrar, and the Town.

(a) The Bond Trustee, Bond Registrar, and the Town shall be entitled to payment and reimbursement for reasonable fees for their respective services rendered hereunder and all advances, counsel fees and other expenses reasonably made or incurred by the Bond Trustee, the Bond Registrar, and the Town in connection with such services and in connection with entering into this Bond Indenture, including any such fees and expenses incurred in connection with action taken hereunder.

(b) The Town shall require the Corporation, pursuant to the Loan Agreement, to indemnify and hold harmless the Bond Trustee against any liabilities that the Bond Trustee may incur in the exercise and performance of its powers and duties hereunder and under any other agreement referred to herein that are not due to the Bond Trustee's negligence or willful misconduct, and for any reasonable fees and expenses of the Bond Trustee.  The rights of the Bond Trustee under this Section 802 shall survive the payment in full of the Bonds and the discharge of this Bond Indenture.

(c) When the Bond Trustee incurs expenses or renders services after an Event of Default specified in Section 701 occurs, the reasonable expenses and the compensation for services (including the reasonable fees and expenses of its agents and counsel) are intended to constitute expenses of administration under applicable bankruptcy law.

(d) The Bond Trustee shall have a first lien and right of setoff against all funds held hereunder (other than the Rebate Fund) with respect to its fees for services rendered hereunder and all advances, counsel fees, and other expenses reasonably made or incurred by the Bond Trustee.

**Section 803. Notice to the Town and the Bondholders if an Event of Default Occurs**. If an Event of Default occurs, the Bond Trustee shall give written notice thereof by first class mail or an overnight delivery service, postage prepaid, to the Town and to the Owners of all Bonds then Outstanding as shown on the Bond Register.

**Section 804. Intervention by Bond Trustee**. In any judicial proceeding to which the Town is a party and that in the opinion of the Bond Trustee and its counsel has a substantial bearing on the interests of the Owners of the Bonds, the Bond Trustee may intervene on behalf of the Bondholders and, subject to the provisions of Section 801(l) hereof, shall do so if requested in writing by a Majority of the Applicable Bondholders. The rights and obligations of the Bond Trustee under this Section are subject to the approval of a court of competent jurisdiction.

**Section 805. Successor Bond Trustee**. Any corporation or association into which the Bond Trustee may be converted or merged, or with which it may be consolidated, or to which it may sell or transfer its corporate trust business and assets as a whole or substantially as a whole, or any corporation or association resulting from any such conversion, sale, merger, consolidation, or transfer to which it is a party, provided such corporation or association is otherwise eligible under Section 806 hereof, shall be and become the successor Bond Trustee hereunder and vested with all of the title to the whole property or trust estate and all the trusts, powers, discretions, immunities, privileges, and all other matters as was its predecessor, without the execution or filing of any instrument or any further act, deed or conveyance on the part of any of the parties hereto, anything herein to the contrary notwithstanding.

**Section 806. Bond Trustee Required; Eligibility**. There shall at all times be a Bond Trustee hereunder that shall be a commercial bank or trust company organized and in good standing under the laws of the United States of America, any state thereof, or the District of Columbia, authorized to exercise corporate trust powers, subject to supervision or examination by federal or state authorities, and having a reported combined capital and surplus of not less than Fifty Million Dollars ($50,000,000). If at any time the Bond Trustee shall cease to be eligible in accordance with the provisions of this Section, it shall resign immediately in the manner provided in Section 807 hereof. No resignation or removal of the Bond Trustee and no appointment of a successor Bond Trustee shall become effective until the successor Bond Trustee shall have accepted its appointment under Section 811 hereof. If a successor Bond Trustee shall not have accepted its appointment under Section 811 hereof within forty-five (45) days of a notice of resignation or removal of the current Bond Trustee, the Bond Trustee may apply to a court of competent jurisdiction to appoint a successor Bond Trustee to act until such time, if any, as a successor shall have so accepted its appointment. All costs, fees and expenses related to such application to any court shall be paid by the Corporation.

**Section 807. Resignation by the Bond Trustee**. The Bond Trustee and any successor Bond Trustee may at any time resign from the trusts hereby created by executing any instrument in writing resigning such trusts and specifying the date when such resignation shall take effect, and filing the same with the Town and the Corporation not less than forty-five (45) days before the date specified in such instrument when such resignation shall take effect, and by giving notice to such resignation to each Owner of Bonds then Outstanding by first class mail, postage prepaid, not less than twenty (20) days prior to such resignation date.

**Section 808. Removal of the Bond Trustee**. The Bond Trustee may be removed at any time by an instrument or concurrent instruments in writing delivered to the Bond Trustee and the Town and signed by a Majority of the Applicable Bondholders. So long as no Event of Default or Default Condition shall have occurred and be continuing under this Bond Indenture or the Loan Agreement, the Bond Trustee may be removed at any time by an instrument in writing signed by the Town, upon the written request of the Corporation, and delivered to the Bond Trustee. The foregoing notwithstanding, the Bond Trustee may not be removed by the Town unless written

VIII-4

notice of the delivery of such instrument or instruments signed by the Town is mailed to the Owners of all Bonds Outstanding, which notice indicates the Bond Trustee will be removed and replaced by the successor trustee named in such notice, such removal and replacement to become effective upon the later of the acceptance of the appointment by the successor Bond Trustee, or the sixtieth (60th) day immediately succeeding the date of such notice, unless the Owners of ten percent (10%) or more in aggregate principal amount of such Bonds then Outstanding shall object in writing to such removal and replacement.  Such notice shall be mailed by first class mail postage prepaid to the Owners of all such Bonds then Outstanding at the address of such Owners then shown on the Bond Register.

     **Section 809. Appointment of Successor Bond Trustee by the Bondholders; Temporary Bond Trustee**.  In the event that the Bond Trustee shall give notice of resignation or be removed, or be dissolved, or shall be in the course of dissolution or liquidation, or otherwise become incapable of acting hereunder, or in case it shall be taken under the control of any public office or offices, or of a receiver appointed by a court, a successor may with the written consent of the Corporation (to the extent that no "Event of Default" shall have occurred and be continuing under the Loan Agreement and no Default Condition has occurred under the Loan Agreement), be appointed by a Majority of the Applicable Bondholders, by an instrument or concurrent instruments in writing signed by such Bondholders, or by their duly authorized attorneys in fact, a copy of which shall be delivered personally or sent by first class mail, postage prepaid, to the Town, the retiring Bond Trustee, the successor Bond Trustee and the Corporation.  Pending such appointment by the Bondholders, the Town may, with the consent of the Corporation (to the extent that no "Event of Default" shall have occurred and be continuing under the Loan Agreement), appoint a temporary successor Bond Trustee by an instrument in writing signed by an authorized officer of the Town, a copy of which shall be delivered personally or sent by first class mail, postage prepaid, to the retiring Bond Trustee, the successor Bond Trustee, and the Corporation.

     **Section 810. Judicial Appointment of Successor Trustee**.  In case at any time the Bond Trustee shall resign or receive notice of removal and no appointment of a successor Bond Trustee shall be made pursuant to the foregoing provisions of this Article VIII prior to the date specified in the notice of resignation as the date when such resignation is to take effect, the resigning Bond Trustee may forthwith apply to a court of competent jurisdiction for the appointment of a successor Bond Trustee.  If no appointment of a successor Bond Trustee shall be made pursuant to the foregoing provisions of this Article VIII within six (6) calendar months after a vacancy shall have occurred in the office of Bond Trustee, any Owner of Bonds may apply to any court of competent jurisdiction to appoint a successor Bond Trustee.  Such court may thereupon, after such notice, if any, as it may deem proper and prescribe, appoint a successor Bond Trustee.

     **Section 811. Concerning Any Successor Bond Trustees**.

     (a)  Every successor Bond Trustee appointed hereunder shall execute, acknowledge, and deliver to its predecessor and also to the Town an instrument in writing accepting such appointment hereunder, and thereupon such successor, without any further act, deed, or conveyance, shall become fully vested with all the estates, properties, rights, powers, trusts, duties, and obligations of its predecessor; but such predecessor shall, nevertheless, on the Written Request of the Town, or of its successor, execute and deliver an instrument transferring to such successor Bond Trustee all the estates, properties, rights, powers, and trusts of such predecessor hereunder; and every predecessor Bond Trustee shall deliver all securities and moneys held by it as Bond Trustee hereunder to its successor. Should any instrument in writing from the Town be required by any successor Bond Trustee for more fully and certainly vesting in such successor the estate, rights, powers, and duties hereby vested or intended to be vested in the predecessor, any and all such instruments in writing shall, on request, be executed, acknowledged, and delivered by the Town.  The resignation of any Bond Trustee and the instrument or instruments removing any Bond Trustee and appointing a successor hereunder, together with all other instruments provided for in this Article shall be filed and/or recorded by the successor Bond Trustee in each recording office, if any, where this Bond Indenture shall have been filed and/or recorded.

     (b)  Notice of the appointment of any successor Bond Trustee hereunder shall be given by such successor Bond Trustee to each Rating Agency at such time maintaining a rating on the Bonds pursuant to Section 1404 hereof.

**Section 812. Bond Trustee Protected in Relying Upon Resolution, Etc**. The ordinances, resolutions, opinions, certificates, and other instruments provided for in this Bond Indenture may be accepted by the Bond Trustee as conclusive evidence of the facts and conclusions stated therein and shall be full warrant, protection, and authority to the Bond Trustee for the release of property and the withdrawal of cash hereunder.

**Section 813. Successor Bond Trustee as Bond Trustee of Funds, Paying Agent, and Bond Registrar**. In the event of a change in the Office of the Bond Trustee, the predecessor Bond Trustee that has resigned or been removed shall cease to be Bond Trustee of the Debt Service Fund, the Interest Fund, the Bond Sinking Fund, the Optional Redemption Fund, the Debt Service Reserve Fund, and any other trust funds provided hereunder and shall cease to be the Bond Registrar and Paying Agent for the principal of, and premium, if any, and interest on, the Bonds, and the successor Bond Trustee shall become such Bond Trustee, Bond Registrar, and Paying Agent unless a separate Paying Agent or Agents are appointed by the Town in connection with the appointment of any successor Bond Trustee.

**Section 814. Paying Agents; Appointment and Acceptance of Duties; Removal**.

(a) The Bond Trustee is hereby designated and agrees to act as Paying Agent and as Bond Registrar for and in respect of the Bonds.

(b) The Town may appoint one or more additional Paying Agents for the Bonds. Any such Paying Agent shall be a commercial bank or trust company organized under the laws of the United States of America or one of the states thereof. Each Paying Agent other than the Bond Trustee shall signify its acceptance of the duties and obligations imposed upon it by this Bond Indenture by executing and delivering to the Town and the Bond Trustee a written acceptance thereof. The Town may remove any Paying Agent other than the Bond Trustee and any successors thereto, and appoint a successor or successors thereto; provided that any such Paying Agent designated by the Town shall continue to be a Paying Agent of the Town for the purpose of paying the principal of, and premium, if any, and interest on, the Bonds until the designation of a successor as such Paying Agent. Each Paying Agent is hereby authorized to pay or redeem Bonds when duly presented to it for payment or redemption, which Bonds shall thereafter be delivered to the Bond Trustee for cancellation.

**Section 815. Trust Estate May Be Vested in Separate or Co-Trustee**.

(a) It is the intent of the Town and the Bond Trustee that this Bond Indenture not violate the law of any jurisdiction (including particularly the State) denying or restricting the right of banking corporations or associations to transact business as Bond Trustee in that jurisdiction. It is recognized that in case of litigation under this Bond Indenture or the Loan Agreement, and in particular in case of the enforcement of any of them upon the occurrence of an Event of Default, or in case the Bond Trustee deems that by reason of any present or future law of any jurisdiction it may not exercise any of the powers, rights, or remedies granted to it under this Bond Indenture or to hold title to the Trust Estate or take any other action that may be desirable or necessary in connection therewith, it may be necessary for the Bond Trustee to appoint an additional individual or institution as a separate or co-Bond Trustee. The following provisions of this Section are adapted to these ends.

(b) In the event that the Bond Trustee appoints an additional individual or institution as a separate or co-Bond Trustee, (i) each and every remedy, power, right, claim, demand, cause of action, immunity, estate, title, interest, and lien expressed or intended by this Bond Indenture to be exercised by or vested in or conveyed to the Bond Trustee with respect thereto is exercisable by and vests in the separate or co-Bond Trustee, but only to the extent necessary to enable the separate or co-Bond Trustee to exercise those powers, rights, and remedies that it is directed to exercise by the Bond Trustee or by a Majority of the Applicable Bondholders, and (ii) every covenant and obligation necessary to the exercise thereof by the separate or co-Bond Trustee runs to and is enforceable by either of them.

(c) Should any deed, conveyance, or instrument in writing from the Town be required by the separate Bond Trustee or co-Bond Trustee so appointed by the Bond Trustee for more fully and certainly vesting in and confirming to him, her, or it those properties, rights, powers, trusts, duties, and obligations, any and all deeds, conveyances, and instruments in writing will, on request, be executed, acknowledged, and delivered by the Town. In case any separate Bond Trustee, co-Bond Trustee, or successor to either dies, becomes incapable of acting,

resigns, or is removed, all the estates, properties, rights, powers, trusts, duties, and obligations of the separate Bond Trustee or co-Bond Trustee, so far as permitted by law, vests in and may be exercised by the Bond Trustee until the appointment of a new Bond Trustee or successor to the separate Bond Trustee or co-Bond Trustee.

        **Section 816. Representations, Warranties, and Covenants of the Bond Trustee**. All federal, state and local governmental, public, and regulatory authority approvals, consents, notices, authorizations, registrations, licenses, exemptions, and filings that are required to have been obtained or made by the Bond Trustee with respect to the authorization, execution, delivery, and performance by, or the enforcement against or by, the Bond Trustee of this Bond Indenture have been obtained and are in full force and effect and all conditions of such approvals, consents, notices, authorizations, registrations, licenses, exemptions, and filings have been fully complied with. The Bond Trustee has a combined capital and surplus of at least Fifty Million Dollars ($50,000,000).

<p align="center">*        *        *</p>

<div align="center">

**ARTICLE IX**

**SUPPLEMENTAL BOND INDENTURES**

</div>

**Section 901. Supplemental Indentures Not Requiring Consent of the Bondholders**. Subject to the limitations set forth in Section 902(a) hereof with respect to this Section 901, the Town and the Bond Trustee may, without the consent of, but with prior written notice to, the Bondholders, enter into an indenture or indentures supplemental to this Bond Indenture for any one or more of the following purposes:

(a) to cure any ambiguity or formal defect or omission in this Bond Indenture;

(b) to grant to or confer upon the Bond Trustee for the benefit of the Bondholders any additional rights, remedies, powers, or authority that may lawfully be granted to or conferred upon the Bondholders and the Bond Trustee, or either of them;

(c) to assign and pledge under, or to subject to, this Bond Indenture additional revenues, properties, or collateral;

(d) to evidence the appointment of a separate bond trustee or the succession of a new bond trustee hereunder in accordance with the provisions hereof;

(e) to modify, amend, or supplement this Bond Indenture or any indenture supplemental hereto in such manner as to permit any required qualification of this Bond Indenture under the Trust Indenture Act of 1939, as then amended, or any similar federal statute hereafter in effect or to permit the qualification of the Bonds for sale under the securities laws of any state of the United States of America;

(f) to provide for the refunding or advance refunding of the Bonds, including the right to establish and administer an escrow fund and to take related action in connection therewith in accordance with the provisions of Article XI hereof;

(g) to modify, amend, or supplement this Bond Indenture or any indenture supplemental hereto in such manner as to permit certificated Bonds in accordance with the provisions hereof;

(h) to modify, amend, or supplement this Bond Indenture or any indenture supplemental hereto in such manner as to permit continued compliance with the Tax Agreement in manner that does not materially adversely affect the rights or interests of any Bondholder; and

(i) to modify, amend, or supplement the provisions hereof in any other way that the Bond Trustee has determined does not materially adversely affect the rights or interests of any Bondholder.

**Section 902. Supplemental Indentures Requiring Consent of the Bondholders**.

(a) In addition to supplemental indentures described in Section 901 hereof and subject to the terms and provisions contained in this Section, and not otherwise, a Majority of the Series 2013A Bondholders and a Majority of the Series 2013B Bondholders shall, or, in case only one series of Bonds Outstanding is affected thereby, the Owners of not less than a majority in aggregate principal amount of the Bonds of the series so affected that are Outstanding at the time of such execution, have the right, from time to time, anything contained in this Bond Indenture to the contrary notwithstanding, to consent to and approve the execution by the Town and the Bond Trustee of such other indenture or indentures supplemental hereto as shall be deemed necessary and desirable for the purpose of modifying, altering, amending, adding to, or rescinding, in any particular, any of the terms or provisions contained in this Bond Indenture or any supplemental indenture; provided, however, that nothing in this Section or in Section 901 contained shall permit, or be construed as permitting, (i) an extension of the Maturity or reduction in the principal amount, or reduction in the rate or extension of the time of paying of interest on, or change in the payment date or reduction in the amount payable on the redemption of, any Bonds, without the consent of the Owners of such Bonds, (ii) a reduction in the amount or extension of the time of any payment required to be made to or from the Interest Fund or the Bond Sinking Fund provided herein, without the consent of the Owners of all the

<div align="center">IX-1</div>

Bonds affected thereby, (iii) a reduction in the aggregate principal amount of Bonds the Owners of which are required to consent to any such supplemental indenture, without the consent of the Owners of all the Bonds affected by such reduction, or (iv) the modification of the rights, duties, or immunities of the Bond Trustee, without the written consent of the Bond Trustee.

(b) If at any time the Town shall request the Bond Trustee to enter into any such supplemental indenture for any of the purposes of this Section, the Bond Trustee shall, upon being satisfactorily indemnified with respect to expenses, cause notice of the proposed execution of such supplemental indenture to be mailed by first class mail or an overnight delivery service, postage prepaid, to the Owners of the Bonds at their addresses as the same shall appear on the Bond Register. Such notice shall briefly set forth the nature of the proposed supplemental indenture and shall state that copies thereof are on file at the Office of the Bond Trustee for inspection by all Bondholders. The Bond Trustee shall not, however, be subject to any liability to any Bondholder by reason of its failure to mail such notice, and any such failure shall not affect the validity of such supplemental indenture when consented to and approved as provided in this Section. If Bondholders required under Section 902(a) hereof shall have consented to and approved the execution thereof as herein provided, no Owner of any Bond shall have any right to object to any of the terms and provisions contained therein, or the operation thereof, or in any manner to question the propriety of the execution thereof, or to enjoin or restrain the Bond Trustee or the Town from executing the same or from taking any action pursuant to the provisions thereof. Upon the execution of any such supplemental indenture as in this Section permitted and provided, this Bond Indenture shall be and be deemed to be modified and amended in accordance therewith.

### Section 903. Consent of the Corporation.

(a) Anything herein to the contrary notwithstanding, so long as no "Event of Default" or "Default Condition" has occurred under the Loan Agreement, a supplemental indenture under this Article IX that adversely affects the rights of the Corporation under the Loan Agreement shall not become effective unless and until the Corporation shall have consented in writing to the execution and delivery of such supplemental indenture. In this regard, the Bond Trustee shall cause notice of the proposed execution and delivery of any such supplemental indenture to which the Corporation have not already consented, together with a copy of the proposed supplemental indenture and a written consent form to be signed by the Corporation, to be sent by first class mail or an overnight delivery service, postage prepaid, to the Corporation at least thirty (30) days prior to the proposed date of execution and delivery of any such supplemental indenture.

(b) Anything herein to the contrary notwithstanding, so long as no "Event of Default" or "Default Condition" has occurred under the Master Indenture, a supplemental indenture under this Article IX that adversely affects the rights of the Corporation under the Master Indenture shall not become effective unless and until the Corporation shall have consented in writing to the execution and delivery of such supplemental indenture.

### Section 904. Opinion of Bond Counsel. The Bond Trustee shall not be obligated to execute any supplemental indenture authorized by this Article if such supplemental indenture, in the judgment of the Bond Trustee, adversely affects the rights, duties, liabilities, protections, indemnities, or immunities of the Bond Trustee set forth herein. In executing any such supplemental indenture, the Bond Trustee shall be entitled to receive, and shall be fully protected in relying upon an Opinion of Bond Counsel to the effect that such supplemental indenture is authorized by this Bond Indenture and will not adversely affect the validity or enforceability of the Bonds or any exemption from federal income taxation to which the interest on the Bonds would otherwise be entitled.

<p style="text-align:center">*      *      *</p>

Case 3550096-RUW-19    Doc 220-3    Filed 07/30/13    Entered 07/31/13 13:20:26    Pg 39 of 84

### ARTICLE X

### AMENDMENTS TO THE LOAN AGREEMENT

**Section 1001. Amendments to Loan Agreement Not Requiring Consent of the Bondholders.** Subject to the terms and provisions of Section 1003 of this Bond Indenture, the Town and the Corporation may, with the prior written consent of the Bond Trustee and with prior written notice of such amendment to the Bondholders, amend or modify the Loan Agreement, or any provision thereof, or may consent to the amendment or modification thereof, for any one or more of the following purposes: (a) to cure any ambiguity or formal defect in the Loan Agreement; (b) to grant to or confer upon the Town or Bond Trustee, for the benefit of the Bond Owners, any additional rights, remedies, powers, or authorities that lawfully may be granted to or conferred upon the Town or the Bond Trustee; (c) to amend or modify the Loan Agreement, or any part thereof, in any manner specifically required or permitted by the terms thereof, including, without limitation, as may be necessary to maintain the exclusion from gross income for purposes of federal income taxation of the interest on the Bonds; (d) to modify, amend, or supplement the Loan Agreement, or any part thereof, or any supplement thereto, in such manner as the Bond Trustee and Corporation deem necessary in order to comply with any statute, regulation, judicial decision, or other law relating to secondary market disclosure requirements with respect to tax-exempt obligations of the type that includes the Bonds; (e) to provide that Bonds may be secured by additional security not otherwise provided for herein or in the Loan Agreement; (f) to provide for the appointment of a successor securities depository; (g) to provide for the availability of certificated Bonds; (h) to provide for changes in the components of the Project, to the extent permitted by this Bond Indenture and the Loan Agreement; and (i) to make any other change that does not, in the opinion of the Bond Trustee, have a material adverse effect upon the interests of the Bondholders. In addition, subject to the terms and provisions contained in Section 1003 hereof, the Bond Trustee may grant such waivers of compliance by the Corporation with the provisions of the Loan Agreement as to which the Bond Trustee may deem necessary or desirable to effectuate the purposes of the intent of the Loan Agreement and that, in the opinion of the Bond Trustee, do not have a material adverse effect upon the interests of the Bondholders, provided that the Bond Trustee shall file with the Town any and all such waivers granted by the Bond Trustee within three (3) business days thereof.

**Section 1002. Amendments to Loan Agreement Requiring Consent of the Bondholders.** Except for the amendments, changes, or modifications as provided in Section 1001 hereof, neither the Town nor the Bond Trustee shall consent to any other amendment, change, or modification of the Loan Agreement without the written approval or consent, of a Majority of the Series 2013A Bondholders and a Majority of the Series 2013B Bondholders, or, in case only one series of Bonds Outstanding is affected thereby, the Owners of not less than a majority in aggregate principal amount of the Bonds of the series so affected that are Outstanding hereunder at the time of execution of any such amendment, change, or modification; provided, however, that if such amendment, change, or modification will, by its terms, not take effect so long as any Bonds of a specified series remain Outstanding, the consent of the Owners of such Bonds shall not be required; and provided further, however, that no such amendment, change, or modification shall affect the obligation of the Corporation to make payments on the Series 2013A Bond Obligations or Series 2013B Bond Obligations as they become due and payable without the written approval or consent of all Bondholders affected thereby. If at any time the Town and the Corporation shall request the consent of the Bond Trustee to any such proposed amendment, change, or modification of the Loan Agreement, the Bond Trustee shall cause notice of such proposed amendment, change, or modification to be given in the same manner as provided by Section 902 hereof with respect to supplemental indentures. Such notice shall briefly set forth the nature of such proposed amendment, change, or modification and shall state that copies of the instrument embodying the same are on file at the Office of the Bond Trustee for inspection by all Bondholders. The Bond Trustee shall not, however, be subject to any liability to any Bondholder by reason of its failure to give such notice, and any such failure shall not affect the validity of such amendment, change, or modification when consented to and approved as provided in this Section. If the Bondholders required hereunder shall have consented to and approved the execution thereof as herein provided, no Owner of any Bond shall have any right to object to any of the terms and provisions contained therein, or the operation thereof, or in any manner to question the propriety of the execution thereof, or to enjoin or restrain the Bond Trustee or the Town from executing the same or from taking any action pursuant to the provisions thereof.

**Section 1003. No Amendment May Alter the Series 2013 Bond Obligations.** Under no circumstances shall any amendment to the Loan Agreement alter the Series 2013 Bond Obligations pledged hereunder or regarding the payments of principal thereof, or premium, if any, or interest thereon, without the consent of the Owners of all the Bonds Outstanding affected thereby.

**Section 1004. Opinion of Bond Counsel.** The Bond Trustee shall not be obligated to execute any amendment to the Loan Agreement authorized by this Article if such amendment, in the judgment of the Bond Trustee, adversely affects the rights, duties, liabilities, protections, indemnities, or immunities of the Bond Trustee set forth herein. In executing any amendment to the Loan Agreement, the Bond Trustee shall be entitled to receive, and shall be fully protected in relying upon an Opinion of Bond Counsel to the effect that such amendment is authorized by this Bond Indenture and will not adversely affect the validity or enforceability of the Bonds or any exemption from federal income taxation to which the interest on the Bonds would otherwise be entitled.

<center>*          *          *</center>

<div align="center">

**ARTICLE XI**

**SATISFACTION OF THIS BOND INDENTURE**

</div>

**Section 1101. Defeasance.**

(a) If the Town shall pay or provide for the payment of the entire indebtedness on all Bonds Outstanding (including, for the purposes of this Section 1101, any Bonds held by any Member of the Obligated Group) in any one or more of the following ways:

    (i)   by paying or causing to be paid the principal of (including redemption premium, if any) and interest on all Bonds Outstanding, as and when the same become due and payable;

    (ii)   by depositing with the Bond Trustee, in trust, at or before Maturity, moneys in an amount sufficient to pay or redeem (when redeemable) all Bonds Outstanding (including the payment of premium, if any, and interest payable on such Bonds to Maturity or redemption date thereof), provided that such moneys, if invested, shall be invested in noncallable Government Obligations in an amount, without consideration of any income or increment to accrue thereon, sufficient to pay or redeem (when redeemable) and discharge the indebtedness on all Bonds Outstanding at or before their respective Maturity, it being understood that the investment income on such Government Obligations may be used for any other purpose under the Act;

    (iii)   by delivering to the Bond Trustee, for cancellation by it, all Bonds Outstanding; or

    (iv)   by depositing with the Bond Trustee, in trust, noncallable Government Obligations in such amount as will, together with the income or increment to accrue thereon, without consideration of any reinvestment thereof, and any uninvested cash, be fully sufficient to pay or redeem (when redeemable) and discharge all the Bonds Outstanding (including the payment of premium, if any, and interest payable on such Bonds to Maturity or redemption date thereof), at or before their respective Maturity, all as confirmed by a verification report from a certified public accountant or other consultant acceptable to the Bond Trustee upon which the Bond Trustee may rely;

and if the Town shall also pay or cause to be paid all other sums payable hereunder by the Town, then and in that case, this Bond Indenture and the estate and rights granted hereunder shall cease, determine, and become null and void, and thereupon the Bond Trustee shall, upon Written Request of the Town, and upon receipt by the Bond Trustee of an Officer's Certificate and an opinion of Independent Counsel addressed to the Bond Trustee, each stating that in the opinion of the signers all conditions precedent to the satisfaction and discharge of this Bond Indenture have been complied with, upon which the Bond Trustee may rely, forthwith execute proper instruments acknowledging satisfaction of and discharging this Bond Indenture and the lien hereof.

(b) If provision is made for payment of Bonds pursuant to this Section and any such Bonds will not be fully paid with the cash and proceeds of Government Obligations within ninety (90) days after such deposit, as a further condition of such Bonds ceasing to be Outstanding hereunder and of the discharge of this Bond Indenture, the Corporation shall obtain and deliver to the Bond Trustee a rating of the applicable Bonds from a Rating Agency, based on the cash and Government Obligations deposited with the Bond Trustee hereunder, which rating shall be the highest rating then available from the applicable Rating Agency for bonds defeased with cash and/or Government Obligations.

(c) The satisfaction and discharge of this Bond Indenture shall be without prejudice to the rights of the Bond Trustee to charge and be reimbursed by the Town and the Corporation for any fees and expenditures that it may thereafter incur in connection herewith.

(d) All moneys, funds, securities, or other property remaining on deposit in the Debt Service Fund, the Interest Fund, the Bond Sinking Fund, the Optional Redemption Fund, the Debt Service Reserve Fund, or in any other Fund or investment under this Bond Indenture (other than said Government Obligations or other moneys

<div align="center">XI-3</div>

deposited in trust as above provided) shall, upon the full satisfaction of this Bond Indenture, forthwith be transferred, paid over and distributed to the Town and the Corporation, as their respective interests may appear.

(e) The Town or the Corporation may at any time surrender to the Bond Trustee for cancellation by it any Bonds previously authenticated and delivered, that the Town or the Corporation may have acquired in any manner whatsoever, and such Bonds, upon such surrender and cancellation, shall be deemed to be paid and retired.

**Section 1102. Liability of Authority Not Discharged**. Upon the deposit with the Bond Trustee, in trust, at or before Maturity, of money or noncallable Government Obligations in the necessary amount to pay or redeem all Outstanding Bonds (whether upon or prior to Maturity or the redemption date of such Bonds) and compliance with the other payment requirements of Section 1101 hereof, provided that if such Bonds are to be redeemed prior to the Maturity thereof, notice of such redemption shall have been given as in Article V herein provided, or provisions satisfactory to the Bond Trustee shall have been made for the giving of such notice, and subject to the provisions of Section 1104 hereof, this Bond Indenture may be discharged in accordance with the provisions hereof, but the liability of the Town in respect of the Bonds shall continue, provided that the Owners thereof shall thereafter be entitled to payment only out of the moneys or the Government Obligations deposited with the Bond Trustee as aforesaid.

**Section 1103. Provision for Payment of a Particular Series of Bonds or any Portion Thereof**.

(a) If the Town shall pay or provide for the payment of the entire indebtedness on all Bonds (including for purposes of this Section 1103 Bonds held by any Member of the Obligated Group) of a particular series or any portion of a particular series, in one or more of the following ways:

(i)   by paying or causing to be paid the principal of (including redemption premium, if any) and interest on all Bonds of such series Outstanding or any such portion thereof as and when the same shall become due and payable;

(ii)   by depositing with the Bond Trustee, in trust, at or before Maturity, moneys in an amount sufficient to pay or redeem (when redeemable) all of such portion of the Bonds (including the payment of premium, if any, and interest payable on all Bonds of such series Outstanding or any such portion thereof to the Maturity or redemption date thereof), provided that such moneys, if invested, shall be invested in noncallable Government Obligations in an amount, without consideration of any income or increment to accrue thereon, sufficient to pay or redeem (when redeemable) and discharge the indebtedness on all Bonds of such series Outstanding or any such portion thereof at or before their respective Maturity; it being understood that the investment income on such Government Obligations may be used for any other purpose under the Act;

(iii)   by delivering to the Bond Trustee, for cancellation by it, all Bonds of such series Outstanding or any such portion thereof; or

(iv)   by depositing with the Bond Trustee, in trust, noncallable Government Obligations in such amount as the Bond Trustee shall determine, which may be in reliance on a verification report from a certified public accountant or other consultant acceptable to the Bond Trustee, will, together with the income or increment to accrue thereon without consideration of any reinvestment thereof, and any uninvested cash, be fully sufficient to pay or redeem (when redeemable) and discharge the indebtedness on all Bonds of such series Outstanding (including the payment of premium, if any, and interest payable on such Bonds to Maturity or redemption thereof) or any such portion thereof at or before their respective Maturity;

and if the Town shall also pay or cause to be paid all other sums payable hereunder by the Town with respect to all Bonds of such series outstanding or any such portion thereof, and, if such Bonds of such Series or any such portion thereof are to be redeemed prior to the Maturity thereof, notice of such redemption shall have been given as in Article V hereof provided or provisions satisfactory to the Bond Trustee shall have been made for the giving of such notice, such Bonds shall cease to be entitled to any lien, benefit, or security hereunder. The liability of the Town in respect of such Bonds shall continue, but the Owners thereof shall thereafter be entitled to payment (to the

exclusion of all other Bondholders) only out of the moneys or Government Obligations deposited with the Bond Trustee as aforesaid.

(b) If provision is made for payment of Bonds pursuant to this Section and any such Bonds will not be fully paid with the cash and proceeds of Government Obligations within ninety (90) days after such deposit, as a further condition of such Bonds ceasing to be Outstanding hereunder and of the discharge of this Bond Indenture, the Corporation shall obtain and deliver to the Bond Trustee a rating of the applicable Bonds from a Rating Agency, based on the cash and Government Obligations deposited with the Bond Trustee hereunder, which rating shall be the highest rating then available from the applicable Rating Agency for bonds defeased with cash and/or Government Obligations.

**Section 1104. When Refunding is Not Permitted**. None of the Bonds Outstanding may be refunded as aforesaid nor may this Bond Indenture be discharged if under any circumstances such refunding or discharge would result in the loss of any exemption for purposes of federal income taxation to which interest on the Bonds would otherwise be entitled.  As a condition precedent to the advance refunding of any Bonds Outstanding, the Bond Trustee shall receive an Opinion of Bond Counsel to the effect that such advance refunding will not result in the loss of any exemption for purposes of federal income taxation to which the interest on such Bonds would otherwise be entitled, notwithstanding the satisfaction and discharge of this Bond Indenture.

*                *                *

## ARTICLE XII

### MANNER OF EVIDENCING OWNERSHIP OF BONDS; BONDS HELD BY CORPORATION

**Section 1201. Proof of Ownership**.

(a) Any request, direction, consent, or other instrument provided by this Bond Indenture to be signed and executed by the Bondholders may be in any number of concurrent writings of similar tenor and may be signed or executed by such Bondholders in person or by agent appointed in writing.  Proof of the execution of any such request, direction, or other instrument or of the writing appointing any such agent and of the ownership of Bonds, if made in the following manner, shall be sufficient for any of the purposes of this Bond Indenture and shall be conclusive in favor of the Bond Trustee and the Town, with regard to any action taken by them, or either of them, under such request or other instrument, namely:

(i)   the fact and date of the execution by any person of any such writing may be proved by the certificate of any officer in any jurisdiction who by law has power to take acknowledgments in such jurisdiction, that the person signing such writing acknowledged before him the execution thereof, or by the affidavit of a witness of such execution; and

(ii)  the ownership of Bonds and the amounts and registration numbers of such Bonds and the date of owning the same shall be proved by the Bond Register.

(b) Any action taken or suffered by the Bond Trustee pursuant to any provision of this Bond Indenture, upon the request or with the assent of any Person who at the time is the Owner of any Bond or Bonds, shall be conclusive and binding upon all future Owners of the same Bond or Bonds.

<p style="text-align:center">*              *              *</p>

## ARTICLE XIII

### RESERVED

\*         \*         \*

## ARTICLE XIV

### MISCELLANEOUS

**Section 1401. Limitation of Rights**. With the exception of rights herein expressly conferred, nothing expressed or mentioned in or to be implied from this Bond Indenture or the Bonds is intended or shall be construed to give to any Person other than the parties hereto and the Owners and Beneficial Owners of the Bonds, any legal or equitable right, remedy, or claim under or in respect to this Bond Indenture or any covenants, conditions, and provisions herein contained; this Bond Indenture and all of the covenants, conditions, and provisions hereof being intended to be and being for the sole and exclusive benefit of the parties hereto and the Owners of the Bonds as herein provided.

**Section 1402. Unclaimed Moneys**. Any moneys deposited with the Bond Trustee by or on behalf of the Town in accordance with the terms and covenants of this Bond Indenture in order to redeem or pay any Bond in accordance with the provisions hereof and remaining unclaimed by the Owners of the Bond for four (4) years after the final Maturity of all Bonds issued hereunder or the redemption date of all the Bonds shall, if no Event of Default shall have occurred hereunder and if no "Event of Default" shall have occurred under the Loan Agreement, be repaid by the Bond Trustee to the Corporation; and thereafter the Owners of the Bonds shall be entitled to look only to the Town for payment thereof provided that the Town shall be obligated to make such payment only to the extent it obtains funds therefor from the Corporation pursuant to Section 6.11 of the Loan Agreement. The Bond Trustee, before being required to make any such repayment, shall, at the expense of the Town, mail to the Owners of the Bonds, at the address that last appears on the Bond Register, a notice to the effect that said moneys have not been so applied and that after the date named in said notice any unclaimed balance of said moneys then remaining shall be paid to the Corporation. Such moneys may be invested in accordance with Section 407 hereof if the Corporation makes arrangements satisfactory to the Bond Trustee to indemnify the Bond Trustee for any costs that it may incur due to the unavailability of moneys due to such investment and to compensate the Bond Trustee for its reasonable cost of investing such funds. Investment income on any such unclaimed moneys received by the Bond Trustee shall be deposited as provided in Section 407 hereof until the final Maturity or redemption date of the Bonds. Any such income generated after such date shall be deemed to be unclaimed moneys of the type referred to in the first sentence of this Section and shall be disposed of in accordance with such sentence. The Town hereby covenants and agrees to indemnify and save the Bond Trustee harmless from any and all loss, costs, liability, and expense suffered or incurred by the Bond Trustee by reason of having returned any such moneys to the Town as herein provided.

**Section 1403. Severability**.

(a) If any provision of this Bond Indenture shall be held or deemed to be or shall, in fact, be inoperative or unenforceable as applied in any particular case in any jurisdiction or jurisdictions or in all jurisdictions, or in all cases because it conflicts with any other provision or provisions or any constitution or statute or rule of public policy, or for any other reason, such circumstances shall not have the effect of rendering the provision in question inoperative or unenforceable in any other case or circumstance, or of rendering any other provision or provisions herein contained invalid, inoperative, or unenforceable to any extent whatever.

(b) The invalidity of any one or more phrases, sentences, clauses, or Sections in this Bond Indenture contained shall not affect the remaining portions of this Bond Indenture or any part thereof.

**Section 1404. Notices**.

(a) Unless otherwise specifically provided herein, any notice, request, complaint, demand, communication, or other paper shall be sufficiently given and shall be deemed given when the same are: (i) deposited in the United States mail and sent by first class mail, postage prepaid, or (ii) delivered, in each case to the parties at the addresses set forth below or at such other address as a party may designate by notice to the other parties:

To the Town:                    Town of North Manchester, Indiana
                                103 East Main Street
                                North Manchester, Indiana 46962
                                Attention: Clerk-Treasurer
                                Telephone: (260) 982-9800
                                Facsimile: (260) 982-7428

To the Corporation:             The Estelle Peabody Memorial
                                Home of The Synod
                                of Lincoln Trails Presbyterian Church (U.S.A.)
                                400 West Seventh Street
                                North Manchester, Indiana 46962
                                Attention: President of Board of Trustees

With a copy to                  The Estelle Peabody Memorial Home of The Synod
                                of Lincoln Trails Presbyterian Church (U.S.A.)
                                400 West Seventh Street
                                North Manchester, Indiana 46962
                                Attention: Executive Director
                                Telephone: (260) 982-8616

To the Bond Trustee:            _____
                                _____
                                _____
                                Attention: Corporate Trust Services
                                Telephone: (___) ___-____
                                Facsimile: (___) ___-____

(b) The Bond Trustee shall give Immediate Notice to each Owner of Bonds of any change in the addresses of the Bond Trustee.

**Section 1405. Bond Trustee as Paying Agent and Registrar**. The Bond Trustee is hereby designated and agrees to act as Paying Agent and bond registrar for and in respect to the Bonds.

**Section 1406. Counterparts**. This Bond Indenture may be simultaneously executed in several counterparts, each of which shall be an original and all of which shall constitute but one and the same instrument.

**Section 1407. Applicable Law**. This Bond Indenture shall be governed by and construed in accordance with the laws of the State of Indiana (excluding the principles thereof governing conflicts of law).

**Section 1408. Provisions for Payment of Expenses**. The Town shall not be obligated to execute any documents or take any other action under or pursuant to this Bond Indenture, the Loan Agreement the Series 2013 Bond Obligations, or any other document in connection with the Bonds unless and until provision for the payment of expenses of the Town, including legal counsel fees, shall have been made.  Provisions for expenses shall be deemed to have been made upon arrangements reasonably satisfactory to the Town for the provision of expenses being agreed upon by the Town and the party requesting such execution.

**Section 1409. Immunity of Officers, Employees, and Members of the Town and the Town Council**. No recourse shall be had for the payment of the principal of, or premium, if any, or interest on, any of the Bonds or for any claim based thereon or upon any obligation, covenant, or agreement contained in this Bond Indenture or the Loan Agreement against any past, present, or future member, officer, agent, attorney, or employee of the Town or the Town Council, or any incorporator, member, officer, employee, director or trustee of any successor corporation, as such, either directly or through the Town, the Town Council, or any successor corporation, under any rule of law or equity, statute, or constitution or by the enforcement of any assessment or penalty or otherwise, and all such liability of any such incorporator, member, officer, employee, director, agent, attorney, or trustee as such is hereby

XIV-3

Case 13-00096-RLM-11    Doc dc 2    Filed 00/51/13    EOD 08/31/13 19:36:26    Pg 64 of 84

expressly waived and released as a condition of and consideration for the execution of this Bond Indenture or the Loan Agreement and the issuance of the Bonds.

**Section 1410. Payments Due on Non-Business Days.** If a payment date hereunder is not a Business Day, then payment may be made on the next Business Day, and no interest shall accrue for the intervening period.

[The remainder of this page is intentionally left blank.]

**IN WITNESS WHEREOF**, the **TOWN OF NORTH MANCHESTER, INDIANA** has caused these presents to be signed in its name and on its behalf by its Town Council President and attested by its Clerk-Treasurer, and to evidence its acceptance of the trusts hereby created, _____ has caused these presents to be signed in its name and on its behalf by one of its duly authorized officers, all as of the day and year first above written.

**TOWN OF NORTH MANCHESTER, INDIANA**

By _____

Christopher Garber, President

ATTEST:

_____
Carrie J. Mugford, Clerk-Treasurer

[The remainder of this page is intentionally left blank.]

_____, as Bond Trustee

By: _____

Case 3:50 ev-06 Rev 19   Doc 1362a ev 06 evid 6 23 ev 31 13 19 32 23   Pg 67 of 84

EXHIBIT "A"

FORM OF SERIES 2013A BOND

TOWN OF NORTH MANCHESTER, INDIANA

ECONOMIC DEVELOPMENT REFUNDING REVENUE BOND

(PEABODY RETIREMENT COMMUNITY PROJECT)

SERIES 2013A

No. R-_____                                                                $

| Interest Rate | Maturity Date | Dated Date | CUSIP Number |
|---|---|---|---|
| 5.13% prior to _____, 2014; 6.05% thereafter | | _____, 2013 | _____ |

PRINCIPAL AMOUNT:                          DOLLARS

REGISTERED OWNER:                          CEDE & CO.
                                 Tax Identification Number 13-2555119

Certain words not defined herein shall have the meanings assigned to them in the Bond Trust Indenture (the "***Bond Indenture***") dated as of _____ 1, 2013, between the Town and _____, as bond trustee (in such capacity, the "***Bond Trustee***").

The **TOWN OF NORTH MANCHESTER, INDIANA** (the "***Town***"), a municipal corporation organized and existing under the laws of the State of Indiana (the "***State***"), **FOR VALUE RECEIVED**, hereby promises to pay in lawful money of the United States of America to the Registered Owner specified above or registered assigns, on the Maturity Date specified above, unless this Bond shall have previously been called for redemption and payment of the redemption price made or provided for, but solely from amounts available under the Bond Indenture, the payments on the Series 2013A Obligation (hereinafter defined) and amounts payable under the Loan Agreement (hereinafter defined), which payments are pledged and assigned for the payment hereof pursuant to the Bond Indenture and not otherwise, upon surrender hereof, the Principal Amount specified above and to pay interest (computed on the basis of a 360-day year of twelve 30-day months) on such Principal Amount, payable solely from amounts available under the Bond Indenture, said Series 2013A Obligation payments and amounts payable under the Loan Agreement, from the date of this Bond or from the most recent Interest Payment Date (as defined below) to which interest has been paid at the interest rate per annum set forth above on January 1 and July 1 of each year (an "***Interest Payment Date***") commencing January 1, 2014, until payment of such principal amount or provision therefor shall have been made upon redemption or at Maturity; provided that such interest rate shall increase to the Gross-Up Rate (as defined in the Bond Indenture) commencing 150 days after the occurrence of a Determination of Taxability (as defined in the Bond Indenture).  The principal of this Bond is payable upon presentment at the designated or principal corporate trust office (the "***Office of the Bond Trustee***") of the Bond Trustee in _____, or of any alternate Paying Agent (as defined in the Bond Indenture), if any, named in the Bonds (hereinafter defined) or to the registered owner (each, an "***Owner***" and collectively, the "***Owners***") of Five Hundred Thousand Dollars ($500,000) or more in aggregate principal amount and/or original principal amount of Bonds who so elects by wire transfer of immediately available funds sent on the principal payment date in accordance with the provisions of the Bond Indenture.

**THIS BOND IS NOT A GENERAL OBLIGATION OF THE TOWN.  THIS BOND IS A LIMITED OBLIGATION OF THE TOWN, THE PRINCIPAL AND REDEMPTION PRICE OF, AND THE PREMIUM IF ANY, AND INTEREST ON, WHICH WILL BE PAYABLE SOLELY FROM THE REVENUES AND INCOME DERIVED FROM THE LOAN AGREEMENT AND THE SERIES 2013A**

**OBLIGATION, ALL AS DESCRIBED IN AND SUBJECT TO THE LIMITATIONS SET FORTH IN THE BOND INDENTURE FOR THE EQUAL AND RATABLE BENEFIT OF THE OWNERS, FROM TIME TO TIME, OF THE BONDS. THIS BOND AND THE REDEMPTION PRICE HEREOF, AND THE INTEREST HEREON DO NOT AND SHALL NEVER CONSTITUTE A GENERAL OBLGIATION OR INDEBTEDNESS OF THE TOWN, THE STATE OR ANY POLITICAL SUBDIVISION THEREOF WITHIN THE MEANING OF ANY CONSTITUTIONAL PROVISION OR STATUTORY LIMITATION AND DO NOT AND SHALL NEVER CONSTITUTE OR GIVE RISE TO A PECUNIARY LIABILITY OF THE TOWN, THE STATE OR ANY POLITICAL SUBDIVISION THEREOF, OR A CHARGE AGAINST THE GENERAL CREDIT OF THE TOWN, THE STATE OR ANY POLITICAL SUBDIVISION THEREOF. THE BONDS DO NOT GRANT THE OWNERS ANY RIGHT TO HAVE THE TOWN, THE STATE OR ANY POLITICAL SUBDIVISION THEREOF LEVY ANY TAXES OR APPROPRIATE ANY FUNDS FOR THE PAYMENT OF THE PRINCIPAL AND REDEMPTION PRICE, IF ANY, AND INTEREST ON THE BONDS. NEITHER THE MEMBERS OF THE TOWN COUNCIL NOR ANY PERSON EXECUTING THE BONDS SHALL BE LIABLE PERSONALLY ON THE BONDS BY REASON OF THE ISSUANCE THEREOF.**

Except as otherwise provided in the Bond Indenture with respect to Defaulted Interest, payment of interest hereon will be made to the Owner hereof as shown on the registration books of the Town (the "*Bond Register*") at the close of business on the fifteenth day of the month (whether or not a Business Day) immediately preceding an Interest Payment Date (the "*Record Date*") and will be paid (i) by check or draft mailed on the Interest Payment Date to such Owner at such person's address as it appears on the Bond Register or at such other address as may be furnished in writing by such Owner to the Bond Trustee prior to the applicable Record Date or (ii) to the Owner of Five Hundred Thousand Dollars ($500,000) or more in aggregate principal amount and/or original principal amount of Bonds who so elects by wire transfer of immediately available funds sent on the Interest Payment Date in accordance with the provisions of the Bond Indenture.

The Town previously issued three series of revenue bonds consisting of $41,900,000 in principal amount of its Town of North Manchester, Indiana Revenue Bonds (Peabody Retirement Community Project) Series 2002A (the "*Series 2002A Bonds*"), $3,500,000 in principal amount of its Town of North Manchester, Indiana Revenue Bonds (Peabody Retirement Community Project) Series 2002B-1 Extendable Rate Adjustable Securities[SM] (EXTRAS[SM]) (the "*Series 2002B-1 Bonds*") and $1,500,000 in principal amount of its Town of North Manchester, Indiana Revenue Bonds (Peabody Retirement Community Project) Series 2002B-2 Extendable Rate Adjustable Securities[SM] (EXTRAS[SM]) (the "*Series 2002B-2 Bonds*", collectively with the Series 2002B-1 Bonds, the "*Series 2002B Bonds*") under and pursuant to that certain Bond Indenture (the "*Series 2002 Bond Indenture*") dated as of August 15, 2002, between the Town and Wells Fargo Bank, N.A., successor to Wells Fargo Bank Indiana, NA, as bond trustee (the "*Series 2002 Bond Trustee*") for the purpose of providing funds to lend to The Estelle Peabody Memorial Home of the Synod of Lincoln Trails of the Presbyterian Church (U.S.A.), an Indiana nonprofit corporation (the "*Corporation*"), for the purpose of (i) financing a portion of the costs of the construction and equipping of 73 assisted living units and 48 Alzheimer/dementia units, renovation of various common areas, demolition of a portion of the then existing residential living facilities, and construction and equipping of a 144-bed replacement nursing facility (collectively, the "*Project*"), (ii) funding a debt service reserve fund; (iii) paying a portion of the interest on the Series 2002A Bonds and the Series 2002B Bonds (collectively, the "*Series 2002 Bonds*"); and (iv) pay certain expenses incurred in connection with the issuance of the Series 2002 Bonds.

This Series 2013A Bond is one of an authorized series of Series 2013A Bonds issued under the Bond Indenture in the principal amount of $23,400,000 (the "*Series 2013A Bonds*"). Simultaneously with the issuance of the Series 2013A Bonds, the Town is also issuing under the Bond Indenture $20,150,000 in original principal amount of its Subordinate Economic Development Refunding Revenue Bonds (Peabody Retirement Community Project) Series 2013B (the "*Series 2013B Bonds*"). The Series 2013A Bonds and the Series 2013B Bonds (collectively, the "*Bonds*") are being issued for the purpose of exchanging the same for all of the outstanding Series 2002 Bonds and, after such exchange, the Series 2002 Bonds will no longer be outstanding under the Series 2002 Bond Indenture (the "*Bond Exchange*"). The Bond Exchange is being undertaken in accordance with the Order of the Bankruptcy Court issued on _____, 2013, in respect of the Corporation's Bankruptcy Plan.

A-2

The Town issued the Bonds to the Corporation to accomplish the foregoing Bond Exchange in connection with the Corporation's delivery of the Loan Agreement (the "***Loan Agreement***") dated as of _____ 1, 2013, between the Town and the Corporation. The terms of the Loan Agreement require payments by the Corporation that, together with other moneys available therefor, will be sufficient to provide for the payment of the principal of, and interest on, the Bonds. The Series 2013A Bonds are secured by the Corporation's Series 2013A Note (the "***Series 2013A Obligation***") in the principal amount of $23,400,000 pursuant to an Amended and Restated Master Trust Indenture (the "***Master Indenture***") dated as of _____ 1, 2013, among the Corporation, as the initial Member of an obligated group (the "***Obligated Group***"), and _____, as Master Trustee (in such capacity, the "***Master Trustee***"). The Series 2013B Bonds are secured by the Corporation's Subordinate Series 2013B Note (the "***Series 2013B Obligation***" and, together with the Series 2013A Obligation, the "***Series 2013 Bond Obligations***") in the initial principal amount of $20,150,000 pursuant to the Master Indenture.

The Series 2013A Bonds are all issued under and equally and ratably secured by and entitled to the security of the Bond Indenture pursuant to which Bond Indenture the Series 2013 Bond Obligations are pledged and assigned and all the right, title, and interest of the Town in and to the Loan Agreement (excluding Unassigned Rights, as defined in the Bond Indenture) are assigned by the Town to the Bond Trustee as security for the Bonds. In addition, all or any portion of the Bonds may be advance refunded through a deposit in escrow for the benefit of such Bonds of cash and/or noncallable Government Obligations (as defined in the Bond Indenture). Pursuant to the terms and conditions contained in the Master Indenture, Members of the Obligated Group may also incur Additional Indebtedness and issue Obligations (as such terms are defined in the Master Indenture) that will not be pledged under the Bond Indenture, but which may be equally and ratably secured with the Series 2013 Bond Obligations, in the case of an Obligation, or that may be entitled to Liens upon the Property of the Obligated Group (as such terms are defined in the Master Indenture) or other security in addition to any Liens or other security that secures all Obligations, in either case. Reference is made to the Bond Indenture, to all indentures supplemental thereto, to the Master Indenture, to all indentures supplemental thereto, to the Loan Agreement, to all amendments thereto, for the provisions, among others, with respect to the nature and extent of the security, the rights, duties, and obligations of the Town, the Bond Trustee, and the Master Trustee, the rights of the Owners of the Series 2013A Bonds, the issuance of Obligations and the terms on which such Obligations are or may be issued and secured, and to all provisions of which the Owner by the acceptance of this Series 2013A Bond assents.

This Series 2013A Bond is registered on the Bond Register and may be transferred by the Owner hereof at the written request of such Owner in person or by such person's attorney duly authorized in writing at the Office of the Bond Trustee, but only in the manner, subject to the limitations and upon payment of the charges provided in the Bond Indenture and upon surrender and cancellation of this Series 2013A Bond. Upon such transfer a new registered Series 2013A Bond or Series 2013A Bonds without coupons of the same Maturity, of Authorized Denominations (hereinafter defined), for the same aggregate principal amount will be issued to the transferee in exchange therefor. The Town, the Bond Trustee and any paying agent may deem and treat the person in whose name this Series 2013A Bond is registered as the absolute owner hereof for the purpose of receiving payment of, or on account of, the principal and interest due hereon and for all other purposes and neither the Town, the Bond Trustee nor any paying agent will be affected by any notice to the contrary. The Bond Trustee will not be required to register the transfer or exchange of any registered Series 2013A Bond during the period of fifteen (15) days immediately preceding any Interest Payment Date with respect to such Series 2013A Bond, nor to transfer or exchange any Series 2013A Bond after the mailing of notice calling such Series 2013A Bond for redemption has been made, nor during a period of fifteen (15) days immediately preceding the mailing of notice of redemption of any Series 2013A Bonds of the same Maturity.

The Series 2013A Bonds are initially issuable only as registered Bonds without coupons in denominations of Two Thousand Five Hundred Dollars ($2,500) or any amount in excess thereof rounded to the nearest dollar. Subject to the limitations and upon payment of the charges provided in the Bond Indenture, Series 2013A Bonds in Authorized Denominations may be exchanged for a like aggregate principal amount of registered Series 2013A Bonds of other Authorized Denominations.

The Series 2013A Bonds shall be callable for optional redemption prior to Maturity, in whole, in the event the Corporation shall exercise its option to prepay all of the Bonds by the date that is three (3) years from the date of issuance of the Series 2013 Bonds (_____, [2016]) [insert three-year anniversary of Closing Date] (such redemption, an "***Early Redemption***" and such last date on which any such redemption occurs, the "***Early***

*Redemption Deadline*"). In the event the Corporation shall exercise its right of Early Redemption, the Series 2013A Bonds shall be redeemed in the amount of 100% of the principal amount thereof, plus accrued but unpaid interest through the applicable redemption notice date, from an aggregate payment by or on behalf of the Corporation, including amounts on deposit with the Bond Trustee and the Master Trustee as specified in the Bond Indenture and the Master Indenture, of a sum of Twenty Seven Million and no/100 Dollars ($27,000,000.00) plus accrued but unpaid interest on the Series 2013A Bonds through the applicable Early Redemption Deposit Date (as defined in the Bond Indenture), with the balance of such payment by the Corporation applied to the redemption in full of the Series 2013B Bonds.

Following the Early Redemption Deadline, the Series 2013A Bonds are callable for optional redemption prior to Maturity at any time, in whole, at a redemption price of (i) one hundred three percent (103%) of the principal amount thereof, if redeemed on or before _____, 2024, and (ii) one hundred percent (100%) of the principal amount thereof, if redeemed after _____, 2024, plus, in each case, accrued and unpaid interest thereon to the redemption date.

Notwithstanding the provisions of the two immediately preceding paragraphs, no redemption of less than all of the Series 2013A Bonds will permitted unless, the aggregate principal amount of Bonds to be redeemed is at least One Thousand Five Hundred Dollars ($1,500).

In lieu of redeeming Series 2013A Bonds, the Bond Trustee may, at the request of the Corporation, use such funds otherwise available under the Bond Indenture for redemption of Series 2013A Bonds to purchase Series 2013A Bonds in the open market at a price not exceeding the redemption price then applicable.

**The Series 2013A Bonds are subject to mandatory redemption by the Town in whole and not in part upon the occurrence of a Determination of Taxability (as defined in the Bond Indenture) within one hundred fifty (150) days after the occurrence of such Determination of Taxability at a redemption price equal to 108 percent (108%) of the principal amount thereof, plus interest accrued thereon to the redemption date.**

The Series 2013A Bonds are subject to mandatory sinking fund redemption in the principal amounts and on the dates set forth below, at a redemption price of 100 percent (100%) of the principal amount thereof, plus interest accrued thereon to the redemption date.

| July 1 of the Year | Principal Amount | July 1 of the Year | Principal Amount |
|---|---|---|---|
| 20__ * | $ | 20__ | $ |
| 20__ * | | 20__ | |
| 20__ * | | 20__ | |
| 20__ * | | 20__ | |
| 20__ * | | 20__ | |
| 20____ | | 20__ | |
| 20__ | | 20__ | |
| 20__ | | 20__ | |
| 20__ | | 20__ * | |
| 20__ | | 20__ | |
| 20__ | | 20__ | |
| 20__ | | 20__ | |
| 20__ | | 20__ | |
| 20__ * | | 20__ * | |

\* Maturity

If less than all of the Series 2013A Bonds is to be redeemed, such Series 2013A Bonds will be selected by lot or randomly selected utilizing such other method as may be designated by the Bond Trustee. In the case of any optional or extraordinary redemption or any purchase and cancellation of the Series 2013A Bonds, the Town will

A-4

receive credit against its required Bond Sinking Fund deposits with respect to such Series 2013A Bonds of such Maturity as provided in the Bond Indenture.

In the event any of the Series 2013A Bonds are called for redemption as aforesaid, notice thereof identifying the Series 2013A Bonds to be redeemed will be given by mailing a copy of the redemption notice by first class mail, postage prepaid, not more than sixty (60) nor less than thirty (30) days, or in the case of an Early Redemption or a redemption upon a Determination of Taxability, not less than ten (10) days, prior to the redemption date to the Owner of each Series 2013A Bond to be redeemed at the address shown on the Bond Register; provided, however, that failure to give such notice by mailing, or any defect in such notice or mailing as to any Series 2013A Bond, will not affect the validity of any proceedings for redemption as to any Series 2013A Bond as to which notice has been properly given. All Series 2013A Bonds so called for redemption will cease to bear interest on the specified redemption date, provided that notice of redemption has been given and funds for their redemption are on deposit with the Bond Trustee, and will no longer be deemed to be Outstanding under the provisions of the Bond Indenture.

The Series 2013A Bonds are also subject to defeasance of the Bond Indenture by depositing with the Bond Trustee noncallable Government Obligations (as defined in the Bond Indenture) in such amount, together with income or increment to accrue thereon, but without consideration of any reinvestment thereof, and any uninvested cash, sufficient to pay or redeem (when redeemable) and discharge the indebtedness on all Series 2013A Bonds Outstanding under the Bond Indenture at or before their Maturity. The Series 2013A Bonds are also subject to defeasance of the Bond Indenture by depositing with the Bond Trustee moneys in an amount sufficient to pay or redeem (when redeemable) and discharge the indebtedness on all Series 2013A Bonds Outstanding under the Bond Indenture at or before their Maturity, provided that such moneys, if invested, will be invested in noncallable Government Obligations in an amount, without consideration of any income or increment to accrue thereon, sufficient to pay or redeem (when redeemable) and discharge the indebtedness on all Series 2013A Bonds Outstanding at or before their Maturity; it being understood that the investment income on such moneys may be used for any other purpose under the Act. Upon such payment or provision therefor, for the remainder of the Bonds, and for the Series 2013B Bonds, together with all other payments required under the Bond Indenture, the Bond Indenture may be discharged by the Bond Trustee in accordance with the provisions thereof, but the Town will remain the obligor on all Series 2013A Bonds although the Owners thereof and the Owner hereof will be entitled to payment solely out of such cash and/or funds received from such Government Obligations deposited with the Bond Trustee.

The Town may also pay or provide for the payment of any portion of the Series 2013A Bonds by (i) depositing with the Bond Trustee noncallable Government Obligations in an amount, together with the income or increment to accrue thereon, but without consideration of any reinvestment thereof, and any uninvested cash, sufficient to pay or redeem (when redeemable) and discharge the indebtedness on any such portion of the Series 2013A Bonds at or before their respective Maturity; or (ii) depositing with the Bond Trustee moneys in an amount, without consideration of any income or increment to accrue thereon, sufficient to pay or redeem (when redeemable) and discharge the indebtedness on any portion of the Series 2013A Bonds at or before their respective Maturity, provided that such moneys, if invested, will be invested in noncallable Government Obligations in an amount, without consideration of any income or increment to accrue thereon, sufficient to pay or redeem (when redeemable) and discharge the indebtedness on any such portion of the Series 2013A Bonds at or before their respective Maturity; it being understood that the investment income on such Government Obligations may be used for any other purchase under the Act (as defined in the Bond Indenture). Upon such deposit, such Bonds of such series or any such portion thereof will cease to be entitled to any lien, benefit, or security under the Bond Indenture. The Town will remain the obligor on such portion of the Series 2013A Bonds but the Owners thereof will be entitled to payment (to the exclusion of all other Bondholders) solely out of funds received from such Government Obligations and/or cash deposited with the Bond Trustee. The foregoing notwithstanding, none of the Series 2013A Bonds may be refunded nor may the Bond Indenture be discharged if under any circumstances such refunding would result in the loss of any exemption for the purposes of federal income taxation to which interest on the Series 2013A Bonds would otherwise be entitled. The Bond Indenture requires that the Bond Trustee receive an opinion of nationally recognized municipal bond counsel (which bond counsel and opinion, including without limitation the scope, form, substance and other aspects thereof are acceptable to the Bond Trustee and which opinion may be based upon a ruling or rulings of the Internal Revenue Service), to the effect that such refunding

would not result in the loss of any exemption for the purposes of federal income taxation to which interest on such Series 2013A Bonds would otherwise be entitled.

The Bond Indenture provides for a Debt Service Reserve Fund to be maintained for the benefit of the Series 2013A Bonds. The initial balance of the Debt Service Reserve Fund will be less than the Debt Service Reserve Fund Requirement (as defined in the Bond Indenture). Additional moneys available for such purpose in accordance with the Master Indenture and the Bond Indenture will be deposited into the Debt Service Reserve Fund from time to time after the Series 2013A Bonds are issued from the Gross Revenues (as defined in the Bond Indenture) to increase the Value of the moneys and investments therein to an amount equal to the Debt Service Reserve Fund Requirement. From and after the first date as of which the Value of the moneys and investments in the Debt Service Reserve Fund equals the Debt Service Reserve Fund Requirement, moneys in the Debt Service Reserve Fund will be maintained in an amount equal to the Debt Service Reserve Fund Requirement in the manner and to the extent deposits to the credit of the Debt Service Reserve Fund are made from transfers to the Bond Trustee by the Master Trustee pursuant to the provisions of the Master Indenture.

In connection with any partial redemption or defeasance prior to Maturity of the Bonds entitled to the benefits and security of the Debt Service Reserve Fund, the Bond Trustee may, at the request of the Corporation, use any amounts on deposit therein in excess of the Debt Service Reserve Fund Requirement after such redemption to pay the principal of or the principal portion of the redemption price of said Bonds to be redeemed or defeased.

The Owner of this Series 2013A Bond will have no right to enforce the provisions of the Bond Indenture or to institute action to enforce the covenants therein, or to take any action with respect to any event of default under the Bond Indenture, or to institute, appear in or defend any suit or other proceedings with respect thereto, except as provided in the Bond Indenture. In certain events, on the conditions, in the manner and with the effect set forth in the Bond Indenture, the principal of all the Bonds (including this Series 2013A Bond) issued under the Bond Indenture and then Outstanding may become or may be declared due and payable before the stated Maturity thereof, together with interest accrued thereon. Modifications or alterations of the Bond Indenture, or of any supplements thereto, may be made only to the extent and in the circumstances permitted by the Bond Indenture.

It is hereby certified that all conditions, acts, and things required to exist, happen and be performed under the Act and under the Bond Indenture precedent to and in connection with the issuance of this Series 2013A Bond exist, have happened, and have been performed, and that the issuance, authentication, and delivery of this Series 2013A Bond have been duly authorized by duly adopted resolutions of the Town.

No recourse will be had for the payment of the principal of, or premium or interest on, any of the Bonds or for any claim based thereon or upon any obligation, covenant, or agreement in the Bond Indenture contained, against any past, present or future officer, director, member, employee, attorney, or agent of the Town or the Town Council of the Town (the "*Town Council*"), or any incorporator, officer, director, member, trustee, employee, attorney, or agent of any successor corporation or body politic, as such, either directly or through the Town, the Town Council, or any successor corporation or body politic, under any rule of law or equity, statute, or constitution or by the enforcement of any assessment or penalty or otherwise, and all such liability of any such incorporators, officers, directors, trustees, members, employees, attorneys, or agents, as such, is hereby expressly waived and released as a condition of and consideration for the execution of the Bond Indenture and the issuance of the Bonds.

This Bond will not be valid or become obligatory for any purpose or be entitled to any security or benefit under the Bond Indenture until the certificate of authentication hereon will have been duly executed by the Bond Trustee.

[The remainder of this page is intentionally left blank.]

A-6

IN WITNESS WHEREOF, as provided by the Act, the TOWN OF NORTH MANCHESTER, INDIANA has caused this Series 2013A Bond to be executed in its name and on its behalf by the manual or facsimile signatures of the President of the Town Council and the Clerk-Treasurer of the Town, and its seal to be hereunto affixed or printed, all as of the dated date specified above.

TOWN OF NORTH MANCHESTER, INDIANA

[SEAL]

By: _____
        President of Town Council

Attest:

_____
Clerk-Treasurer

[FORM OF BOND TRUSTEE'S CERTIFICATE OF AUTHENTICATION]

BOND TRUSTEE'S CERTIFICATE OF AUTHENTICATION

This Bond is one of the Series 2013A Bonds described in the within-mentioned Bond Indenture.

_____, as Bond Trustee

By _____
     Authorized Signatory

A-7

[FORM OF ASSIGNMENT OF BOND]

ASSIGNMENT

The following abbreviations, when used in the inscription on this bond or in the Assignment below, shall be construed as though they were written out in full according to applicable laws or regulations:

| TEN COM | - | as tenants in common |
| TEN ENT | - | as tenants by the entireties |
| JT TEN | - | as joint tenants with right of survivorship and not as tenants in common and not as community property |

UNIF TRANS
MIN ACT        - _____ Custodian _____
                              (Custodian)                                                    (Minor)
                     under Uniform Transfer to Minors Act _____
                                                                                                (State)

Additional abbreviations may be used although not in the above list.

FOR VALUE RECEIVED, the undersigned, _____ , hereby sells, assigns, and transfers unto _____ (Tax Identification or Social Security No. _____) the within bond and all rights thereunder and hereby irrevocably constitutes and appoints _____ attorney to transfer the within bond on the books kept for registration thereof, with full power of substitution in the premises.

Dated:_____

_____
Signature

NOTICE: The signature to this Assignment must correspond with the name of the registered owner as it appears upon the face of the within bond in every particular without alteration or enlargement or any change whatsoever.

_____
Signature Guaranteed

NOTICE: The signature to this Assignment must be guaranteed by an institution that is a participant in the Securities Transfer Agent Medallion Program ("STAMP") or similar program.

_____
(PLEASE INSERT SOCIAL SECURITY OR
OTHER IDENTIFYING NUMBER OF ASSIGNEE)

**EXHIBIT "B"**

**FORM OF SERIES 2013B BOND**

**TOWN OF NORTH MANCHESTER, INDIANA**

**SUBORDINATE ECONOMIC DEVELOPMENT REFUNDING REVENUE BOND**

**(PEABODY RETIREMENT COMMUNITY PROJECT)**

**SERIES 2013B**

No. R-____                                                                                          Initial Principal

Amount $

| Interest Rate | Maturity Date | Dated Date | CUSIP Number |
|:---:|:---:|:---:|:---:|
| 1.00% | July 1, 20__ | _____, 2013 | _____ |

**INITIAL PRINCIPAL AMOUNT:**                    DOLLARS

**REGISTERED OWNER:**                               CEDE & CO.
                                                    Tax Identification Number 13-2555119

      Certain words not defined herein shall have the meanings assigned to them in the Bond Trust Indenture (the "**Bond Indenture**") dated as of _____ 1, 2013, between the Town and _____, as bond trustee (in such capacity, the "**Bond Trustee**").

      The **TOWN OF NORTH MANCHESTER, INDIANA** (the "**Town**"), a municipal corporation organized and existing under the laws of the State of Indiana (the "**State**"), **FOR VALUE RECEIVED**, hereby promises to pay in lawful money of the United States of America to the Registered Owner specified above or registered assigns, on the Maturity Date specified above, unless this Bond shall be redeemable and shall have previously been called for redemption and payment of the redemption price made or provided for, but solely from amounts available under the Bond Indenture, the payments on the Series 2013B Obligation (hereinafter defined) and amounts payable under the Loan Agreement (hereinafter defined), which payments are pledged and assigned for the payment hereof pursuant to the Bond Indenture and not otherwise, upon surrender hereof, the Principal Amount specified herein and to pay interest (computed on the basis of a 360-day year of twelve 30-day months) on such Principal Amount, payable solely from amounts available therefor under the Bond Indenture, said Series 2013B Obligation payments and amounts payable under the Loan Agreement, from the date of this Bond or from the most recent Interest Payment Date (as defined below) to which interest has been paid at the interest rate per annum set forth above on January 1 and July 1 of each year (an "**Interest Payment Date**") commencing January 1, 2014, until payment of such principal amount or provision therefor shall have been made upon redemption or at Maturity; provided that such interest rate shall increase to the Gross-Up Rate (as defined in the Bond Indenture) commencing 150 days after the occurrence of a Determination of Taxability (as defined in the Bond Indenture).  To the extent so provided under the Bond Indenture, in the event amounts available therefor under the Bond Indenture are insufficient to pay the interest otherwise due on any Interest Payment Date, the amount of such unpaid interest shall accrete and be added to the principal amount hereof.  The Bond Trustee shall cause any such increased principal amount to be reflected on Schedule A hereto; provided that the Bond Trustee's failure to do so shall not affect such increase in the principal amount hereof.  The principal of this Bond is payable upon presentment at the designated or principal corporate trust office (the "**Office of the Bond Trustee**") of the Bond Trustee in _____, or of any alternate Paying Agent (as defined in the Bond Indenture), if any, named in the Bonds (hereinafter defined) or to the registered owner (each, an "**Owner**" and collectively, the "**Owners**") of Five Hundred Thousand Dollars ($500,000) or more in aggregate principal amount and/or original principal amount of Bonds who so elects by wire transfer of

B-1

immediately available funds sent on the principal payment date in accordance with the provisions of the Bond Indenture.

TO THE EXTENT INTEREST IS NOT PAID ON THIS SERIES 2013B BOND ON AN INTEREST PAYMENT DATE, SUCH UNPAID INTEREST SHALL THEREAFTER ACCRETE TO AND BE TREATED AS PRINCIPAL ON THIS SERIES 2013B BOND AND SHALL BEAR INTEREST AT THE INTEREST RATE ON THIS SERIES 2013B BOND. IT IS NOT AN EVENT OF DEFAULT UNDER THE BOND INDENTURE IF INTEREST DUE ON THE SERIES 2013B BOND IS NOT PAID ON AN INTEREST PAYMENT DATE IF EXCESS CASH IS NOT AVAILABLE FOR SUCH PAYMENT. NOTWITHSTANDING ANY PROVISION OF THIS SERIES 2013B BOND TO THE CONTRARY, ANY REFERENCE TO PRINCIPAL OF THIS SERIES 2013B BOND SHALL INCLUDE ANY UNPAID INTEREST ON SUCH SERIES 2013B BOND WHICH HAS ACCRETED TO AND SHALL BE TREATED AS PRINCIPAL THEREON.

THIS BOND IS NOT A GENERAL OBLIGATION OF THE TOWN. THIS BOND IS A LIMITED OBLIGATION OF THE TOWN, THE PRINCIPAL AND REDEMPTION PRICE OF, AND THE PREMIUM IF ANY, AND INTEREST ON, WHICH WILL BE PAYABLE SOLELY FROM THE REVENUES AND INCOME DERIVED FROM THE LOAN AGREEMENT AND THE SERIES 2013B OBLIGATION, ALL AS DESCRIBED IN AND SUBJECT TO THE LIMITATIONS SET FORTH IN THE BOND INDENTURE FOR THE EQUAL AND RATABLE BENEFIT OF THE OWNERS, FROM TIME TO TIME, OF THE BONDS. THIS BOND AND THE REDEMPTION PRICE HEREOF, AND THE INTEREST HEREON DO NOT AND SHALL NEVER CONSTITUTE A GENERAL OBLGIATION OR INDEBTEDNESS OF THE TOWN, THE STATE OR ANY POLITICAL SUBDIVISION THEREOF WITHIN THE MEANING OF ANY CONSTITUTIONAL PROVISION OR STATUTORY LIMITATION AND DO NOT AND SHALL NEVER CONSTITUTE OR GIVE RISE TO A PECUNIARY LIABILITY OF THE TOWN, THE STATE OR ANY POLITICAL SUBDIVISION THEREOF, OR A CHARGE AGAINST THE GENERAL CREDIT OF THE TOWN, THE STATE OR ANY POLITICAL SUBDIVISION THEREOF. THE BONDS DO NOT GRANT THE OWNERS ANY RIGHT TO HAVE THE TOWN, THE STATE OR ANY POLITICAL SUBDIVISION THEREOF LEVY ANY TAXES OR APPROPRIATE ANY FUNDS FOR THE PAYMENT OF THE PRINCIPAL AND REDEMPTION PRICE, IF ANY, AND INTEREST ON THE BONDS. NEITHER THE MEMBERS OF THE TOWN COUNCIL NOR ANY PERSON EXECUTING THE BONDS SHALL BE LIABLE PERSONALLY ON THE BONDS BY REASON OF THE ISSUANCE THEREOF.

Except as otherwise provided in the Bond Indenture with respect to Defaulted Interest, payment of interest hereon will be made to the Owner hereof as shown on the registration books of the Town (the "*Bond Register*") at the close of business on the fifteenth day of the month (whether or not a Business Day) immediately preceding an Interest Payment Date (the "*Record Date*") and will be paid (i) by check or draft mailed on the Interest Payment Date to such Owner at such person's address as it appears on the Bond Register or at such other address as may be furnished in writing by such Owner to the Bond Trustee prior to the applicable Record Date or (ii) to the Owner of Five Hundred Thousand Dollars ($500,000) or more in aggregate principal amount and/or original principal amount of Bonds who so elects by wire transfer of immediately available funds sent on the Interest Payment Date in accordance with the provisions of the Bond Indenture.

The Town previously issued three series of revenue bonds consisting of $41,900,000 in principal amount of its Town of North Manchester, Indiana Revenue Bonds (Peabody Retirement Community Project) Series 2002A (the "*Series 2002A Bonds*"), $3,500,000 in principal amount of its Town of North Manchester, Indiana Revenue Bonds (Peabody Retirement Community Project) Series 2002B-1 Extendable Rate Adjustable Securities[SM] (EXTRAS[SM]) (the "*Series 2002B-1 Bonds*") and $1,500,000 in principal amount of its Town of North Manchester, Indiana Revenue Bonds (Peabody Retirement Community Project) Series 2002B-2 Extendable Rate Adjustable Securities[SM] (EXTRAS[SM]) (the "*Series 2002B-2 Bonds*", collectively with the Series 2002B-1 Bonds, the "*Series 2002B Bonds*") under and pursuant to that certain Bond Indenture (the "*Series 2002 Bond Indenture*") dated as of August 15, 2002, between the Town and Wells Fargo Bank, N.A., successor to Wells Fargo Bank Indiana, NA, as bond trustee (the "*Series 2002 Bond Trustee*") for the purpose of providing funds to lend to The Estelle Peabody Memorial Home of the Synod of Lincoln Trails of the Presbyterian Church (U.S.A.), an Indiana nonprofit corporation (the "*Corporation*"), for the purpose of (i) financing a portion of the costs of the construction and

equipping of 73 assisted living units and 48 Alzheimer/dementia units, renovation of various common areas, demolition of a portion of the then existing residential living facilities, and construction and equipping of a 144-bed replacement nursing facility (collectively, the "*Project*"), (ii) funding a debt service reserve fund; (iii) paying a portion of the interest on the Series 2002A Bonds and the Series 2002B Bonds (collectively, the "*Series 2002 Bonds*"); and (iv) pay certain expenses incurred in connection with the issuance of the Series 2002 Bonds.

This Bond is one of an authorized series of Bonds issued under the Bond Indenture in the original principal amount of $20,150,000 (the "*Series 2013B Bonds*"). Simultaneously with the issuance of the Series 2013B Bonds, the Town is also issuing under the Bond Indenture $23,400,000 in original principal amount of its Economic Development Refunding Revenue Bonds (Peabody Retirement Community Project) Series 2013A (the "*Series 2013A Bonds*"). The Series 2013A Bonds and the Series 2013B Bonds (collectively, the "*Bonds*") are being issued for the purpose of exchanging the same for all of the outstanding Series 2002 Bonds and, after such exchange, the Series 2002 Bonds will no longer be outstanding under the Series 2002 Bond Indenture (the "*Bond Exchange*"). The Bond Exchange is being undertaken in accordance with the Order of the Bankruptcy Court issued on _____, 2013, in respect of the Corporation's Bankruptcy Plan.

THE SERIES 2013B BONDS ARE SUBORDINATE TO THE SERIES 2013A BONDS AS PROVIDED IN THE BOND INDENTURE.

The Town issued the Bonds to the Corporation to accomplish the foregoing Bond Exchange in connection with the Corporation's delivery of the Loan Agreement (the "*Loan Agreement*") dated as of _____ 1, 2013, between the Town and the Corporation. The terms of the Loan Agreement require payments by the Corporation that, together with other moneys available therefor, will be sufficient to provide for the payment of the principal of, and interest on, the Bonds. The Series 2013A Bonds are secured by the Corporation's Series 2013A Note (the "*Series 2013A Obligation*") in the principal amount of $23,400,000 pursuant to an Amended and Restated Master Trust Indenture (the "*Master Indenture*") dated as of _____ 1, 2013, among the Corporation, as the initial Member of an obligated group (the "*Obligated Group*"), and _____, as Master Trustee (in such capacity, the "*Master Trustee*"). The Series 2013B Bonds are secured by the Corporation's Subordinate Series 2013B Note (the "*Series 2013B Obligation*" and; together with the Series 2013A Obligation, the "*Series 2013 Bond Obligations*") in the initial principal amount of $20,150,000 pursuant to the Master Indenture.

The Series 2013B Bonds are all issued under and equally and ratably secured by and entitled to the security of the Bond Indenture pursuant to which Bond Indenture the Series 2013 Bond Obligations are pledged and assigned and all the right, title, and interest of the Town in and to the Loan Agreement (excluding Unassigned Rights, as defined in the Bond Indenture) are assigned by the Town to the Bond Trustee as security for the Bonds. In addition, all or any portion of the Bonds may be advance refunded through a deposit in escrow for the benefit of such Bonds of cash and/or noncallable Government Obligations (as defined in the Bond Indenture). Pursuant to the terms and conditions contained in the Master Indenture, Members of the Obligated Group may also incur Additional Indebtedness and issue Obligations (as such terms are defined in the Master Indenture) that will not be pledged under the Bond Indenture, but which may be equally and ratably secured with the Series 2013 Bond Obligations, in the case of an Obligation, or that may be entitled to Liens upon the Property of the Obligated Group (as such terms are defined in the Master Indenture) or other security in addition to any Liens or other security that secures all Obligations, in either case. Reference is made to the Bond Indenture, to all indentures supplemental thereto, to the Master Indenture, to all indentures supplemental thereto, to the Loan Agreement, to all amendments thereto, for the provisions, among others, with respect to the nature and extent of the security, the rights, duties, and obligations of the Town, the Bond Trustee, and the Master Trustee, the rights of the Owners of the Series 2013B Bonds, the issuance of Obligations and the terms on which such Obligations are or may be issued and secured, and to all provisions of which the Owner by the acceptance of this Series 2013B Bond assents.

This Series 2013B Bond is registered on the Bond Register and may be transferred by the Owner hereof at the written request of such Owner in person or by such person's attorney duly authorized in writing at the Office of the Bond Trustee, but only in the manner, subject to the limitations and upon payment of the charges provided in the Bond Indenture and upon surrender and cancellation of this Series 2013B Bond. Upon such transfer a new registered Series 2013B Bond or Bonds without coupons of the same Maturity, of Authorized Denominations (hereinafter defined), for the same aggregate principal amount will be issued to the transferee in exchange therefor. The Town, the Bond Trustee and any paying agent may deem and treat the person in whose

name this Series 2013B Bond is registered as the absolute owner hereof for the purpose of receiving payment of, or on account of, the principal and interest due hereon and for all other purposes and neither the Town, the Bond Trustee nor any paying agent will be affected by any notice to the contrary. The Bond Trustee will not be required to register the transfer or exchange of any registered Series 2013B Bond during the period of fifteen (15) days immediately preceding any Interest Payment Date with respect to such Series 2013B Bond, nor to transfer or exchange any Series 2013B Bond after the mailing of notice calling such Series 2013B Bond for redemption has been made, nor during a period of fifteen (15) days immediately preceding the mailing of notice of redemption of any Series 2013B Bonds of the same Maturity.

The Series 2013B Bonds are initially issuable only as registered Bonds without coupons in denominations of Two Thousand Dollars ($2,000) or any amount in excess thereof rounded to the nearest dollar. Subject to the limitations and upon payment of the charges provided in the Bond Indenture, Series 2013B Bonds in Authorized Denominations may be exchanged for a like aggregate principal amount of registered Series 2013B Bonds of other Authorized Denominations of the same Maturity.

The Series 2013B Bonds shall be callable for optional redemption prior to Maturity, in whole, in the event the Corporation shall exercise its option to prepay all of the Bonds by the date that is three (3) years from the date of issuance of the Series 2013 Bonds (_____, [2016]) [insert three-year anniversary of Closing Date] (such redemption, an "*Early Redemption*" and such last date on which any such redemption occurs, the "*Early Redemption Deadline*"). In the event the Corporation shall exercise its right of Early Redemption, the Series 2013B Bonds shall be redeemed in full by the payment on a ratable basis to the holders of the Series 2013B Bonds of an aggregate principal amount (the "*Series 2013B Early Redemption Amount*") equal to (i) Twenty Seven Million and no/100 Dollars ($27,000,000.00) plus accrued but unpaid interest on the Series 2013A Bonds through the applicable Early Redemption Deposit Date (as defined in the Bond Indenture), **minus** (ii) the amount required to redeem in full on the Early Redemption Date the Series 2013A Bonds at a redemption price equal to 100% of the principal amount of the Series 2013A Bonds plus accrued but unpaid interest thereon through the applicable redemption date. **EXERCISE BY THE CORPORATION OF ITS RIGHT OF EARLY REDEMPTION WOULD RESULT IN THE EXTINGUISHMENT OF THE SERIES 2013B BONDS AND ALL CLAIMS FOR PAYMENT THEREON IN EXCHANGE FOR THE RECEIPT BY HOLDERS OF THE SERIES 2013B BONDS OF AN AMOUNT SUBSTANTIALLY LESS THAN THE PRINCIPAL AMOUNT THEREOF AND ANY ACCRETED OR ACCRUED INTEREST THEREON.**

Following the Early Redemption Deadline, the Series 2013B Bonds are callable for optional redemption prior to Maturity at any time, in whole, at a redemption price of (i) one hundred three percent (103%) of the principal amount thereof, if redeemed on or before _____, 2024, and (ii) one hundred percent (100%) of the principal amount thereof, if redeemed after _____, 2024, plus in each case accrued and unpaid interest thereon to the redemption date.

In lieu of redeeming Series 2013B Bonds, the Bond Trustee may, at the request of the Corporation, use such funds otherwise available under the Bond Indenture for redemption of Series 2013B Bonds to purchase Series 2013B Bonds in the open market at a price not exceeding the redemption price then applicable.

**The Series 2013B Bonds are subject to mandatory redemption by the Town in whole and not in part upon the occurrence of a Determination of Taxability (as defined in the Bond Indenture) within one hundred fifty (150) days after the occurrence of such Determination of Taxability at a redemption price equal to one hundred three percent (103%) of the principal amount thereof, plus interest accrued thereon to the redemption date.**

Excess Cash (as defined in the Bond Indenture) deposited in the 2013B Optional Redemption Account, proceeds of the sale of Excess Land (as defined in the Master Indenture) transferred to the 2013B Optional Redemption Account pursuant to the Master Indenture or proceeds from the LB Claim (as defined in the Bond Indenture) transferred to the 2013B Optional Redemption Account pursuant to the Bond Indenture shall be applied on the first practicable date to the optional redemption of Series 2013B Bonds in accordance with the Bond Indenture.

No optional redemption of less than all of the Series 2013B Bonds at the time Outstanding other than in accordance with the Bond Indenture, will be made unless the total amount of funds available to and to be used for such partial redemption is equal to or greater than One Thousand Five Hundred Dollars ($1,500) and is an Authorized Denomination.  If less than all of a single Maturity of Series 2013B Bonds is to be redeemed, such Bonds will be selected by lot or randomly selected utilizing such other method as may be designated by the Bond Trustee.  In the case of any optional or extraordinary redemption or any purchase and cancellation of the Series 2013B Bonds, the Town will receive credit against its required Bond Sinking Fund deposits with respect to such Series 2013B Bonds of such Maturity.

In the event any of the Series 2013B Bonds are called for redemption as aforesaid, notice thereof identifying the Series 2013B Bonds to be redeemed will be given by mailing a copy of the redemption notice by first class mail, postage prepaid, not more than sixty (60) nor less than thirty (30) days, or in the case of an Early Redemption or a redemption upon a Determination of Taxability, not less than ten (10) days, prior to the redemption date to the Owner of each Series 2013B Bond to be redeemed at the address shown on the Bond Register; provided, however, that failure to give such notice by mailing, or any defect in such notice or mailing as to any Series 2013B Bond, will not affect the validity of any proceedings for redemption as to any Series 2013B Bond as to which notice has been properly given.  All Series 2013B Bonds so called for redemption will cease to bear interest on the specified redemption date, provided that notice of redemption has been given and funds for their redemption are on deposit with the Bond Trustee, and will no longer be protected by the Bond Indenture and will not be deemed to be Outstanding under the provisions of the Bond Indenture.

The Series 2013B Bonds are also subject to defeasance of the Bond Indenture by depositing with the Bond Trustee noncallable Government Obligations (as defined in the Bond Indenture) in such amount, together with income or increment to accrue thereon, but without consideration of any reinvestment thereof, and any uninvested cash, sufficient to pay or redeem (when redeemable) and discharge the indebtedness on all Series 2013B Bonds Outstanding under the Bond Indenture at or before their Maturity.  The Series 2013B Bonds are also subject to advance defeasance of the Bond Indenture by depositing with the Bond Trustee moneys in an amount sufficient to pay or redeem (when redeemable) and discharge the indebtedness on all Series 2013B Bonds Outstanding under the Bond Indenture at or before their Maturity, provided that such moneys, if invested, will be invested in noncallable Government Obligations in an amount, without consideration of any income or increment to accrue thereon, sufficient to pay or redeem (when redeemable) and discharge the indebtedness on all Series 2013B Bonds Outstanding at or before their Maturity; it being understood that the investment income on such moneys may be used for any other purpose under the Act (as defined in the Bond Indenture).  Upon such payment or provision therefor, for the remainder of the Bonds, and for the Series 2013B Bonds, together with all other payments required under the Bond Indenture, the Bond Indenture may be discharged by the Bond Trustee in accordance with the provisions thereof, but the Town will remain the obligor on all Series 2013B Bonds although the Owners thereof and the Owner hereof will be entitled to payment solely out of such cash and/or funds received from such Government Obligations deposited with the Bond Trustee.

The Town may also pay or provide for the payment of any portion of the Series 2013B Bonds by (i) depositing with the Bond Trustee noncallable Government Obligations in an amount, together with the income or increment to accrue thereon, but without consideration of any reinvestment thereof, and any uninvested cash, sufficient to pay or redeem (when redeemable) and discharge the indebtedness on any such portion of the Series 2013B Bonds at or before their Maturity; or (ii) depositing with the Bond Trustee moneys in an amount, without consideration of any income or increment to accrue thereon, sufficient to pay or redeem (when redeemable) and discharge the indebtedness on any portion of the Series 2013B Bonds at or before their respective Maturity, provided that such moneys, if invested, will be invested in noncallable Government Obligations in an amount, without consideration of any income or increment to accrue thereon, sufficient to pay or redeem (when redeemable) and discharge the indebtedness on any such portion of the Series 2013B Bonds at or before their respective Maturity; it being understood that the investment income on such Government Obligations may be used for any other purchase under the Act (as defined in the Bond Indenture).  Upon such deposit, such Bonds of such series or any such portion thereof will cease to be entitled to any lien, benefit, or security under the Bond Indenture.  The Town will remain the obligor on such portion of the Series 2013B Bonds but the Owners thereof will be entitled to payment (to the exclusion of all other Bondholders) solely out of funds received from such Government Obligations and/or cash deposited with the Bond Trustee.  The foregoing notwithstanding, none of the Series 2013B Bonds may be refunded nor may the Bond Indenture be discharged if under any circumstances such

refunding would result in the loss of any exemption for the purposes of federal income taxation to which interest on the Series 2013B Bonds would otherwise be entitled. The Bond Indenture requires that the Bond Trustee receive an opinion of nationally recognized municipal bond counsel (which bond counsel and opinion, including without limitation the scope, form, substance and other aspects thereof are acceptable to the Bond Trustee and which opinion may be based upon a ruling or rulings of the Internal Revenue Service), to the effect that such refunding would not result in the loss of any exemption for the purposes of federal income taxation to which interest on such Series 2013B Bonds would otherwise be entitled.

The Owner of this Series 2013B Bond will have no right to enforce the provisions of the Bond Indenture or to institute action to enforce the covenants therein, or to take any action with respect to any event of default under the Bond Indenture, or to institute, appear in or defend any suit or other proceedings with respect thereto, except as provided in the Bond Indenture. In certain events, on the conditions, in the manner and with the effect set forth in the Bond Indenture, the principal of all the Bonds (including this Series 2013B Bond) issued under the Bond Indenture and then Outstanding may become or may be declared due and payable before the stated Maturity thereof, together with interest accrued thereon. Modifications or alterations of the Bond Indenture, or of any supplements thereto, may be made only to the extent and in the circumstances permitted by the Bond Indenture.

It is hereby certified that all conditions, acts, and things required to exist, happen and be performed under the Act and under the Bond Indenture precedent to and in connection with the issuance of this Series 2013B Bond exist, have happened, and have been performed, and that the issuance, authentication, and delivery of this Series 2013B Bond have been duly authorized by duly adopted resolutions of the Town.

No recourse will be had for the payment of the principal of, or premium or interest on, any of the Bonds or for any claim based thereon or upon any obligation, covenant, or agreement in the Bond Indenture contained, against any past, present or future officer, director, member, employee, attorney, or agent of the Town or the Town Council of the Town (the "**Town Council**"), or any incorporator, officer, director, member, trustee, employee, attorney, or agent of any successor corporation or body politic, as such, either directly or through the Town, the Town Council, or any successor corporation or body politic, under any rule of law or equity, statute, or constitution or by the enforcement of any assessment or penalty or otherwise, and all such liability of any such incorporators, officers, directors, trustees, members, employees, attorneys, or agents, as such, is hereby expressly waived and released as a condition of and consideration for the execution of the Bond Indenture and the issuance of the Bonds.

This Bond will not be valid or become obligatory for any purpose or be entitled to any security or benefit under the Bond Indenture until the certificate of authentication hereon will have been duly executed by the Bond Trustee.

[The remainder of this page is intentionally left blank.]

B-6

**IN WITNESS WHEREOF**, as provided by the Act, the **TOWN OF NORTH MANCHESTER, INDIANA** has caused this Series 2013B Bond to be executed in its name and on its behalf by the manual or facsimile signature of the President of the Town Council and the Clerk-Treasurer of the Town, and its seal to be hereunto affixed or printed, all as of the dated date specified above.

<div style="text-align:center">

**TOWN OF NORTH MANCHESTER, INDIANA**

</div>

[**SEAL**]

By: _____
      President of Town Council

Attest:

_____
Clerk-Treasurer

<div style="text-align:center">

[**FORM OF BOND TRUSTEE'S CERTIFICATE OF AUTHENTICATION**]

**BOND TRUSTEE'S CERTIFICATE OF AUTHENTICATION**

</div>

This Bond is one of the Series 2013B Bonds described in the within-mentioned Bond Indenture.

_____, as Bond Trustee

By _____
    Authorized Signatory

<div style="text-align:center">

B-7

</div>

**[FORM OF ASSIGNMENT OF BOND]**

**ASSIGNMENT**

The following abbreviations, when used in the inscription on this bond or in the Assignment below, shall be construed as though they were written out in full according to applicable laws or regulations:

| | | |
|---|---|---|
| **TEN COM** | - | as tenants in common |
| **TEN ENT** | - | as tenants by the entireties |
| **JT TEN** | - | as joint tenants with right of survivorship and not as tenants in common and not as community property |

**UNIF TRANS
MIN ACT** - _____ Custodian _____
(Custodian)                                               (Minor)
under Uniform Transfer to Minors Act _____
(State)

Additional abbreviations may be used although not in the above list.

**FOR VALUE RECEIVED**, the undersigned, _____ , hereby sells, assigns, and transfers unto _____ (Tax Identification or Social Security No. _____) the within bond and all rights thereunder and hereby irrevocably constitutes and appoints _____ attorney to transfer the within bond on the books kept for registration thereof, with full power of substitution in the premises.

Dated:_____

_____
Signature

**NOTICE:** The signature to this Assignment must correspond with the name of the registered owner as it appears upon the face of the within bond in every particular without alteration or enlargement or any change whatsoever.

_____
Signature Guaranteed

**NOTICE:** The signature to this Assignment must be guaranteed by an institution that is a participant in the Securities Transfer Agent Medallion Program ("STAMP") or similar program.

_____
**(PLEASE INSERT SOCIAL SECURITY OR
OTHER IDENTIFYING NUMBER OF ASSIGNEE)**

SCHEDULE A

AGGREGATE PRINCIPAL AMOUNT OF SERIES 2013B BONDS

| Date of Accretion of Interest | Amount of increase in Principal Amount | Principal Amount of Series 2013B Bonds prior to such increase (taking into account any prior redemptions) | Principal Amount of Series 2013B Bonds after such increase | Signature of authorized officer of Trustee or Custodian |
|---|---|---|---|---|

Case 15-50099-RLM-11   Doc 48-2   Filed 10/21/15   EOD 10/31/13 13:27:26   Pg 34 of 34

**LOAN AGREEMENT**

---

**by and between**

---

**THE ESTELLE PEABODY MEMORIAL HOME OF THE SYNOD
OF LINCOLN TRAILS OF THE PRESBYTERIAN CHURCH (U.S.A.)**

a n d

**TOWN OF NORTH MANCHESTER, INDIANA**

---

relating to the

**$23,400,000
Town of North Manchester, Indiana
Economic Development Refunding Revenue Bonds
(Peabody Retirement Community Project)
Series 2013A**

a n d

**$20,150,000
Town of North Manchester, Indiana
Subordinate Economic Development Refunding Revenue Bonds
(Peabody Retirement Community Project)
Series 2013B**

---

**THE RIGHTS OF THE TOWN OF NORTH MANCHESTER, INDIANA HEREUNDER
HAVE BEEN ASSIGNED TO WELLS FARGO BANK, N.A., AS BOND TRUSTEE UNDER
A BOND TRUST INDENTURE DATED AS OF _____ 1, 2013, FROM THE
TOWN OF NORTH MANCHESTER, INDIANA.**

---

**DATED AS OF _____ 1, 2013**

---

TABLE OF CONTENTS

**Page**

Parties ..................................................................................................................................1

ARTICLE I
DEFINITIONS

Section 1.1    Definitions .................................................................................................I - 1

ARTICLE II
REPRESENTATIONS

Section 2.1    Representations by Town.............................................................................. II - 1
Section 2.2    Representations and Warranties by the Corporation.................................... II - 1

ARTICLE III
LICENSES AND PERMITS

Section 3.1    Permits ...................................................................................................... III - 1

ARTICLE IV
INVESTMENT OF FUNDS

Section 4.1    Investment of Funds; Arbitrage; Tax Agreement ..................................... IV - 1

ARTICLE V
ISSUANCE OF BONDS OF THE TOWN

Section 5.1    Payment of Bonds....................................................................................... V - 1
Section 5.2    Right of Bond Trustee to Enforce the Loan Agreement and the Series 2013 Bond
              Obligations ...............................................................................................  V - 1

ARTICLE VI
OBLIGATION PAYMENTS; FUND DEPOSITS; PREPAYMENTS AND OTHER PAYMENTS

Section 6.1    Payment of Principal, Premium, if any, and Interest .............................. VI - 1
Section 6.2    Payments in Respect of the Series 2013 Bond Obligations and the Loan Agreement ........... VI - 1
Section 6.3    Credits on the Series 2013 Bond Obligations ......................................... VI - 2
Section 6.4    Prepayment Generally................................................................................ VI - 2
Section 6.5    Prepayment from Net Proceeds of Insurance, Condemnation, or Sale ................... VI - 2
Section 6.6    Optional Prepayment of the Series 2013 Bond Obligations.................... VI - 2
Section 6.7    Notice of Prepayment ............................................................................... VI - 3
Section 6.8    Effect of Partial Prepayment; Amortization Schedules............................ VI - 3
Section 6.9    Additional Payments.................................................................................. VI - 3
Section 6.10   Obligation to Prepay Loan and Redeem Bonds upon a Determination of Taxability............. VI - 3
Section 6.11   Assignment and Pledge of Authority's Rights; Obligations of Corporation Unconditional .. VI - 3
Section 6.12   The Corporation's Obligations Unconditional........................................ VI - 4
Section 6.13   Exchange of Bonds ................................................................................... VI - 4

## ARTICLE VII

### COVENANTS RELATING TO THE USE AND OPERATION OF THE BOND FINANCED PROPERTY

Section 7.1    Use of the Facilities ................................................................................................ VII - 1
Section 7.2    Rates and Charges .................................................................................................. VII - 1
Section 7.3    No Warranty by Town ............................................................................................ VII - 1
Section 7.4    Compliance with Laws .......................................................................................... VII - 2

## ARTICLE VIII

### PARTICULAR COVENANTS OF THE CORPORATION

Section 8.1    Maintenance of Corporate Existence and Status .................................................... VIII - 1
Section 8.2    Consent to Assignment of Loan Agreement Rights and the Series 2013 Bond
               Obligations to the Bond Trustee ........................................................................... VIII - 2
Section 8.3    Maintenance; Recording ........................................................................................ VIII - 2
Section 8.4    Financial Statements, Etc. ..................................................................................... VIII - 2
Section 8.5    Indemnity ............................................................................................................... VIII - 2
Section 8.6    Licensure ............................................................................................................... VIII - 4
Section 8.7    Transfer of Assets .................................................................................................. VIII - 4
Section 8.8    Notice Regarding Bankruptcy Petitions, Event of Default or Potential Default .... VIII - 4
Section 8.9    Maintenance of Status as Member of the Obligated Group ................................... VIII - 4
Section 8.10   Discharge of Orders, Etc. ...................................................................................... VIII - 4
Section 8.11   Annual Certificate ................................................................................................. VIII - 5
Section 8.12   Maintenance and Repair; Insurance ...................................................................... VIII - 5

## ARTICLE IX

### EVENTS OF DEFAULT AND REMEDIES THEREFOR

Section 9.1    Events of Default ................................................................................................... IX - 1
Section 9.2    Application of Proceeds from Exercise of Remedies ............................................. IX - 3
Section 9.3    Remedies Cumulative; Delay or Omission Not a Waiver ...................................... IX - 3
Section 9.4    Waiver of Extension, Appraisement, Stay, Laws ................................................... IX - 3
Section 9.5    Remedies Subject to Provisions of Law ................................................................ IX - 3
Section 9.6    Default by the Town - Limited Liability ................................................................ IX - 3

## ARTICLE X

### SUPPLEMENTS AND AMENDMENTS TO THIS LOAN AGREEMENT

Section 10.1   Supplements and Amendments to this Loan Agreement ......................................... X - 1

## ARTICLE XI

### DEFEASANCE

Section 11.1   Defeasance ............................................................................................................. XI - 1

## ARTICLE XII

### MISCELLANEOUS PROVISIONS

Section 12.1   Payment of Expenses of Issuance of Bonds .......................................................... XII - 1
Section 12.2   Loan Agreement for Benefit of Parties Hereto ..................................................... XII - 1
Section 12.3   Severability ........................................................................................................... XII - 1

Section 12.4    Notices ........................................................................................................ XII - 1
Section 12.5    Successors and Assigns ............................................................................... XII - 2
Section 12.6    Counterparts ............................................................................................... XII - 2
Section 12.7    Governing Law ........................................................................................... XII – 2
Section 12.8    Limited Recourse to the Town .................................................................... XII - 2
Section 12.9    Term of this Loan Agreement .................................................................... XII – 2
Section 12.10   Bond Indenture Provisions ......................................................................... XII - 2

EXECUTION BY THE TOWN ............................................................................................... XII - 3
EXECUTION BY THE CORPORATION .................................................................................. XII - 4

EXHIBIT "A" THE PROJECT .............................................................................................. A - 1

## LOAN AGREEMENT

This **LOAN AGREEMENT** (the "*Loan Agreement*") dated as of _____ 1, 2013, is between **THE ESTELLE PEABODY MEMORIAL HOME OF THE SYNOD OF LINCOLN TRAILS OF THE PRESBYTERIAN CHURCH (U.S.A.)** (the "*Corporation*"), an Indiana nonprofit corporation, and the **TOWN OF NORTH MANCHESTER, INDIANA** (the "*Town*"), a municipal corporation organized and existing under the laws of the State of Indiana (the "*State*").

### W I T N E S S E T H :

**WHEREAS**, the Town is authorized and empowered pursuant to Indiana Code §§ 36-7-11.9 and 12 and Indiana Code § 5-1-5, as now in effect and as from time to time hereafter amended and supplemented (collectively, the "Act"), to issue and sell revenue bonds for the purpose of making loans of the proceeds of such revenue bonds for the financing, reimbursing or refinancing of all or any part of the cost of economic development facilities (as defined in the Act); and

**WHEREAS**, the Town previously issued three series of revenue bonds consisting of $41,900,000 in principal amount of its Town of North Manchester, Indiana Revenue Bonds (Peabody Retirement Community Project) Series 2002A (the "*Series 2002A Bonds*"), $3,500,000 in principal amount of its Town of North Manchester, Indiana Revenue Bonds (Peabody Retirement Community Project) Series 2002B-1 Extendable Rate Adjustable Securities[SM] (EXTRAS[SM]) (the "*Series 2002B-1 Bonds*") and $1,500,000 in principal amount of its Town of North Manchester, Indiana Revenue Bonds (Peabody Retirement Community Project) Series 2002B-2 Extendable Rate Adjustable Securities[SM] (EXTRAS[SM]) (the "*Series 2002B-2 Bonds*", collectively with the Series 2002B-1 Bonds, the "*Series 2002B Bonds*") under and pursuant to that certain Bond Trust Indenture dated as of August 15, 2002, between the Town and Wells Fargo Bank, N.A., successor to Wells Fargo Bank Indiana, NA, as bond trustee (the "*Series 2002 Bond Trustee*") for the purpose of providing funds to (i) pay a portion of the costs of the construction and equipping of 73 assisted living units and 48 Alzheimer/dementia units, renovation of various common areas, demolition of a portion of the then existing residential living facilities, and construction and equipping of a 144-bed replacement nursing facility (collectively, the "*Project*') on behalf of the Corporation, (ii) fund a debt service reserve fund; (iii) pay a portion of the interest on the Series 2002A Bonds and the Series 2002B Bonds (collectively, the "*Series 2002 Bonds*"); and (iv) pay certain expenses incurred in connection with the issuance of the Series 2002 Bonds; and

**WHEREAS**, the proceeds of the Series 2002 Bonds were loaned by the Town to the Corporation pursuant to that certain Loan Agreement dated as of August 15, 2002, between the Town and the Corporation (the "*Series 2002 Loan Agreement*"); and

**WHEREAS**, in order to provide security for the repayment of the Series 2002 Bonds, the Corporation issued to the Town its Series 2002A Note (the "*Series 2002A Obligation*") in the principal amount of $41,900,000, its Series 2002B-1 Note (the "*Series 2002B-1 Obligation*") in the original principal amount of $3,500,000 and its Series 2002B-2 Note (the "*Series 2002B-2 Obligation*", collectively with the Series 2002B-1 Obligation, the "*Series 2002B Obligation*") in the original principal amount of $1,500,000, each issued under and pursuant to a Master Trust Indenture, dated as of August 15, 2002, between the Corporation, as the initial member of an obligated group (the "*Obligated Group*"), and Wells Fargo Bank, N.A., as master trustee, as supplemented and amended by a Supplemental Indenture Number 2002A and Supplemental Indenture Number 2002B, each dated as of August 15, 2002 (as supplemented and amended, the "*Original Master Indenture*"), and the proceeds of the Series 2002 Bonds were loaned to the Corporation in order to provide the Corporation with a portion of the funds necessary, *inter alia*, to (i) pay or reimburse the Corporation for the payment of certain costs of the construction and equipping of the Project; (ii) fund a debt service reserve fund; (iii) pay a portion of the interest on the Series 2002 Bonds and (iv) pay certain expenses incurred in connection with the issuance of the Series 2002 Bonds, all as permitted by the Act; and

**WHEREAS**, the Corporation has requested that the Town issue: $23,400,000 Economic Development Refunding Revenue Bonds (Peabody Retirement Community Project) Series 2013A (the "*Series 2013A Bonds*") and $20,150,000 Subordinate Economic Development Refunding Revenue Bonds (Peabody Retirement Community Project) Series 2013B (the "*Series 2013B Bonds*" and, together with the Series 2013A Bonds, the "*Bonds*") and

exchange the Bonds for all of the Series 2002 Bonds which are outstanding in accordance with the Bond Exchange (as defined in the Master Indenture (as hereinafter defined); and

WHEREAS, in order to secure the repayment of the Series 2013A Bonds and the Series 2013B Bonds, the Corporation will issue to the Town its Series 2013A Note in the principal amount of $23,400,000 (the "*Series 2013A Obligation*") and its Subordinate Series 2013B Note in the principal amount of $20,150,000 (the "*Series 2013B Obligation*" and, together with the Series 2013A Obligation, the "*Series 2013 Bond Obligations*"), respectively, all pursuant to an Amended and Restated Master Trust Indenture (the "*Master Indenture*") dated as of _____ 1, 2013, between the Corporation, as the initial Member of the Obligated Group, and Wells Fargo Bank, N.A., as Master Trustee (in such capacity, the "*Master Trustee*") amending and restating the Original Master Indenture; and

WHEREAS, the Bonds will be issued by the Town in consideration of the Corporation's execution and delivery of this Loan Agreement; and

WHEREAS, pursuant to the Bond Trust Indenture (the "*Bond Indenture*") of even date herewith between the Town and Wells Fargo Bank, N.A., as bond trustee, the Town will pledge and assign the Series 2013 Bond Obligations and assign its rights under this Loan Agreement (excluding Unassigned Rights) as security for the Bonds; and

WHEREAS, the Bonds will be payable out of the payments to be made by the Corporation on the Series 2013 Bond Obligations and other payments provided for in the Master Indenture and in this Loan Agreement,

NOW THEREFORE, in consideration of the premises, the respective representations and agreements contained herein, the acceptance of the Series 2013 Bond Obligations by the Town to evidence said loan to the Corporation and for other good and valuable consideration, the receipt whereof is hereby acknowledged, and in order to secure the payment of the principal of, and premium, if any, and interest on, the Series 2013 Bond Obligations and the performance of all the covenants of the Corporation contained herein, the parties hereto agree as follows:

IN THE PERFORMANCE OF THE AGREEMENTS OF THE TOWN HEREIN CONTAINED, ANY OBLIGATION IT MAY HEREBY INCUR FOR THE PAYMENT OF MONEY SHALL NOT CONSTITUTE A GENERAL OBLIGATION OF THE TOWN BUT SHALL BE PAYABLE SOLELY OUT OF THE REVENUES, RECEIPTS, AND OTHER PAYMENTS DERIVED FROM THIS LOAN AGREEMENT, THE BOND INDENTURE, AND THE SALE OF THE BONDS, INSURANCE PROCEEDS, FORECLOSURE PROCEEDS, PROCEEDS FROM RELEASED PROPERTY, AND CONDEMNATION AWARDS AS HEREIN PROVIDED, AND THE BONDS AND THE INTEREST THEREON SHALL NOT CONSTITUTE A GENERAL OBLIGATION OR INDEBTEDNESS OF THE TOWN, THE STATE OR ANY POLITICAL SUBDIVISION THEREOF WITHIN THE MEANING OF ANY STATE CONSTITUTIONAL PROVISION OR STATUTORY LIMITATION WHATSOEVER AND SHALL NOT CONSTITUTE OR GIVE RISE TO ANY PECUNIARY LIABILITY OF THE TOWN, THE STATE OR ANY POLITICAL SUBDIVISION THEREOF OR A CHARGE AGAINST THE GENERAL CREDIT OF THE TOWN, THE STATE OR ANY POLITICAL SUBDIVISION THEREOF OR THE TAXING POWERS OF THE TOWN, THE STATE OR ANY POLITICAL SUBDIVISION THEREOF.

Reference is hereby made to the Bond Indenture and to the Master Indenture, for definitions of various terms used herein.

*               *               *

Case 35-06009-RLM-11    Doc deb 2 Filed 10/51/13    EOD 08/31/13 19:26:26    Pg 7 of 130

### ARTICLE I

### DEFINITIONS

**Section 1.1. Definitions.** (a) The terms used in this Loan Agreement, unless the context requires otherwise, shall have the same meanings as set forth in the Master Indenture and in the Bond Indenture.  All accounting terms not otherwise defined in the Master Indenture, the Bond Indenture, or herein shall have the meanings assigned to them in accordance with generally accepted accounting principles.

(b) All references in this instrument to designated "Articles," "Sections," and other subdivisions are to the designated Articles, Sections, and other subdivisions of this instrument as originally executed. The words "herein," "hereof," and "hereunder" and other words of similar import refer to this Loan Agreement as a whole and not to any particular Article, Section, or other subdivision unless the context indicates otherwise.

<div align="center">*   *   *</div>

## ARTICLE II
### REPRESENTATIONS

**Section 2.1. Representations by Town**. The Town represents and warrants that:

(a)   The Town is a municipal corporation duly organized and validly existing as such under the Act and the laws of the State, and is authorized to enter into the transactions contemplated by this Loan Agreement and to carry out its obligations hereunder, and has been duly authorized to execute and deliver this Loan Agreement.

(b)   It is the Town's understanding, based upon certain representations of the Corporation, that the issuance and delivery of the Bonds is to provide for the refunding of the Series 2002 Bonds through the exchange of the Series 2013 Bonds for the Series 2002 Bonds.

(c)   For the purposes described in Subsection 2.1(b) above, the Town has authorized its Series 2013A Bonds in the aggregate principal amount of $23,400,000 and its Series 2013B Bonds in the initial principal amount of $20,150,000, to be issued upon the terms set forth in the Bond Indenture, under the provisions of which the Town's interest in this Loan Agreement and the payments of principal, interest, and other revenues hereunder (other than Unassigned Rights), and under the Series 2013 Bond Obligations is pledged and assigned to the Bond Trustee as security for the payment of the principal of, and premium, if any, and interest on, the Bonds.  The Town covenants that it has not pledged or assigned and will not pledge or assign its interest in this Loan Agreement, or the revenues and receipts derived pursuant to this Loan Agreement, excepting the Unassigned Rights, other than to the Bond Trustee to secure the Bonds.

(d)   Neither the Town's execution of this Loan Agreement, its consummation of the transaction contemplated on its part thereby, nor the Town's fulfillment or compliance with the terms and conditions thereof conflicts with or results in a breach of the terms, conditions, or provisions of any material restriction, agreement, or instrument to which the Town is a party, or by which it or any of its property is bound, or constitutes a default or an event of default under any of the foregoing.

**Section 2.2. Representations and Warranties by the Corporation**. The Corporation makes the following representations and warranties as the basis for its covenants herein:

(a)   The Corporation is a nonprofit corporation duly incorporated under the laws of the State, is in good standing and duly authorized and existing and has full power under all the laws of the State and all other applicable provision of law and its Articles of Incorporation and Bylaws to conduct its business in the State and to create, issue, enter into, execute, and deliver the Master Indenture, the Series 2013 Bond Obligations, the Tax Agreement, the Mortgages, the Security Agreements, the Continuing Disclosure Agreement, the Management Services Agreement and this Loan Agreement (collectively, the "***Corporation Agreements***") and to authorize the distribution and use of the Disclosure Statement.

(b)   The Project has been completed.  The Project was comprised of the construction and equipping of facilities for use by the Corporation as assisted living units, Alzheimer/dementia units and nursing facilities, and related facilities and the Corporation, all as more particularly described in the Series 2002 Loan Agreement and the Original Master Indenture, and has been operated by the Corporation for such purposes since its date of completion. The Corporation will continue to operate the Project for such purposes until the expiration or earlier termination of this Loan Agreement.  No portion of the Bond Financed Property includes any property that was used, is used or is to be used primarily for sectarian instruction or study or as a place for devotional activities or religious worship or any property that was used, is used or to be used primarily in connection with any part of the program of a school or department of divinity for any religious denomination.  The Project has been and will be, until the expiration or earlier termination of this Loan Agreement, operated as "economic development facilities" within the meaning of the Act for the purpose of promoting job opportunities and diversification of economic development as provided in the Act.

(c)   The execution and delivery of the Corporation Agreements on the Corporation's part have been duly authorized by all necessary corporate action, and neither the Corporation's execution and delivery of the Corporation Agreements, the Corporation's consummation of the transactions contemplated on its part thereby, nor the

Corporation's fulfillment of or compliance with the terms and conditions thereof, conflicts with or results in a material breach of the Articles of Incorporation or Bylaws of the Corporation or any material agreement or instrument to which the Corporation is now a party or by which it is bound (except for any such breaches for which the Corporation has obtained a waiver or a consent), or constitutes a material default (or would constitute a material default with due notice or the passage of time or both) under any of the foregoing (except for any such defaults for which the Corporation has obtained a waiver or consent).

(d)   No litigation, proceedings, or investigations are pending for which service of process or written notice has been received or, to the knowledge of the Corporation, threatened against the Corporation seeking to restrain, enjoin, or in any way limit the approval or issuance and delivery of the Corporation Agreements or that would in any manner challenge or adversely affect the corporate existence or powers of the Corporation to enter into and carry out the transactions described in or contemplated by or the execution, delivery, validity or performance by the Corporation of the Corporation Agreements.  In addition, except as described in the Disclosure Statement, no litigation, proceedings or investigations are pending or, to the knowledge of the Corporation, threatened in writing against the Corporation, except litigation, proceedings, or investigations involving claims for which the probable ultimate recoveries and the estimated costs and expenses of defense, in the opinion of management of the Corporation (i) will be entirely within the applicable insurance policy limits (subject to applicable deductibles) or are not in excess of the total of the available assets held under applicable self-insurance programs or (ii) will not have a material adverse effect on the operations or condition, financial or otherwise, of the Corporation.

(e)   The Corporation is, and since the initial date of issuance of the Series 2002 Bonds has been, a Tax-Exempt Organization and the Corporation has not declared and has not been determined to have any "unrelated business taxable income" as defined in Section 512 of the Code, in an amount that could have a material adverse effect on the Corporation's status as a Tax-Exempt Organization, or that, if such income were subject to federal income taxation, would have a material adverse effect on the condition, financial or otherwise of the Corporation.

(f)   The audited financial statements of the Corporation for the years ended December 31, 2011 prepared and certified by Crowe Horwath LLP, independent certified public accountants, and included in the Disclosure Statement, correctly and fairly present the financial condition of the Corporation as of said dates, and the results of the operations of the Corporation for each of such periods, respectively, all in accordance with generally accepted accounting principles consistently applied except as stated in the notes thereto, and there has been no material adverse change in the condition, financial or otherwise, of the Corporation since December 31, 2011, from that set forth in the information so utilized except as disclosed in the Disclosure Statement.

(g)   Neither this Loan Agreement, the Tax Agreement, nor any other written statement furnished by the Corporation to the Town (including the descriptions and information contained in the Disclosure Statement) relating to (i) the Corporation or the Project, (ii) the operations and financial and other affairs of the Corporation and its Affiliates, (iii) the application by the Corporation of the proceeds to be received by it from the loan of the proceeds of sale of the Bonds, or (iv) the participation by the Corporation in the transactions contemplated herein and in the Disclosure Statement, contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements contained therein or herein not misleading.  There is no fact that the Corporation has not disclosed to the Town in writing that materially adversely affects or, so far as the Corporation can now foresee, will materially adversely affect the financial condition of the Corporation, the status of the Corporation as a Tax-Exempt Organization, the ability of the Corporation to own and operate the Project, or the Corporation's ability to make payments on the Series 2013 Bond Obligations and under this Loan Agreement when and as the same become due and payable.

(h)   Compliance by the Corporation with the provisions of the Corporation Agreements will not involve, to the extent applicable, any prohibited transaction within the meaning of the Employee Retirement Income Security Act of 1974, as amended (herein sometimes referred to as "*ERISA*"), or Section 4975 of the Code.  No "employee pension benefit plans," that are subject to Title IV of ERISA (herein sometimes referred to as "*Plans*"), maintained by the Corporation, nor any trust created thereunder, have incurred any "accumulated funding deficiency" as defined in Section 302 of ERISA, to the extent applicable and the present value of all benefits vested under all Plans, if any, did not exceed, as of the last annual valuation date, the value of the assets of the Plans allocable to such vested benefits.

(i)    The Corporation has all necessary licenses and permits to occupy and operate its existing facilities.

(j)    The representations and certifications contained in the Tax Agreement are true and correct, and are incorporated by reference herein.

<div align="center">

*                    *                    *

</div>

Case 23-00976-KCM-11    Doc 90-8    Filed 07/31/23    ECF 10/31/23 13:20:20    Pg 11 of
130

### Article III

### LICENSES AND PERMITS

**Section 3.1. Permits**. Upon request, the Corporation shall deliver to the Bond Trustee copies of all licenses and permits to operate the existing Facilities of the Corporation.

<center>*          *          *</center>

Case 13-00976-RAM    Doc 90-3    Filed 08/29/14    Page 130 of 230

## ARTICLE IV

### INVESTMENT OF FUNDS

**Section 4.1. Investment of Funds; Arbitrage; Tax Agreement.** The Corporation covenants and agrees that moneys on deposit in any Funds under the Bond Indenture (excluding the Rebate Fund) shall at all times be invested by the Bond Trustee in Permitted Investments and that the Corporation will take all actions necessary, including without limitation providing the Obligated Group Agent with all necessary information, to assure that such moneys are continuously invested in accordance with the provisions of the Bond Indenture and the Tax Agreement. The Corporation further covenants and agrees that it will not take any action or fail to take any action, including without limitation any action with respect to the investment of the proceeds of any Bonds (regardless of the source or whether or not held under the Bond Indenture), with respect to any other moneys or securities deposited with the Bond Trustee pursuant to the Bond Indenture, with respect to the payments derived from the Series 2013 Bond Obligations pledged under the Bond Indenture or from the Master Indenture or the Loan Agreement, with respect to the purchase of other Town obligations or with respect to any actions or payments required under the Tax Agreement that may result in constituting the Bonds "arbitrage bonds" within the meaning of such term as used in Section 148 of the Code. The Corporation covenants that neither it nor any related person, as defined in Sections 144(a)(3) and 147(a) of the Code, shall, pursuant to an arrangement, formal or informal, purchase obligations of the Town in an amount related to the amount of the Series 2013 Bond Obligations delivered in connection with the transaction contemplated hereby.

<div align="center">*      *      *</div>

## ARTICLE V

### ISSUANCE OF BONDS OF THE TOWN

**Section 5.1. Payment of Bonds**. The Corporation agrees that the principal of, the redemption premiums, if any, and the interest on the Bonds shall be payable in accordance with the provisions of the Bond Indenture and this Loan Agreement and that this Loan Agreement and the payments to be made hereunder and hereon (excluding Unassigned Rights) and the Series 2013 Bond Obligations shall be assigned and pledged to the Bond trustee to secure the payment of the Bonds.  The foregoing notwithstanding, the Corporation agrees that the moneys and securities, if any, on deposit in the Rebate Fund are not part of the Trust Estate and are not available to make payments of principal, and interest on the Bonds.

**Section 5.2. Right of Bond Trustee to Enforce the Loan Agreement and the Series 2013 Bond Obligations**. The Corporation agrees that the Series 2013 Bond Obligations, this Loan Agreement, and all of the rights, interests, powers, privileges, and benefits accruing to or vested in the Town under the Series 2013 Bond Obligations and this Loan Agreement (except Unassigned Rights), may be protected and enforced in conformity with the Bond Indenture and may be thereby assigned by the Town to the Bond Trustee as additional security for the Bonds and may be exercised, protected, and enforced for or on behalf of the Bondholders in conformity with the provisions of this Loan Agreement, the Master Indenture, and the Bond Indenture.

<div align="center">*            *            *</div>

## ARTICLE VI

### OBLIGATION PAYMENTS; FUND DEPOSITS; PREPAYMENTS AND OTHER PAYMENTS

**Section 6.1. Payment of Principal, Premium, if any, and Interest**. The Corporation shall duly and punctually pay the principal, redemption price, and premium, if any, and interest on, the Series 2013 Bond Obligations at the dates and the places and in the manner mentioned in the Series 2013 Bond Obligations and this Loan Agreement, according to the true intent and meaning thereof and hereof. Notwithstanding any schedule of payments upon the Series 2013 Bond Obligations, the Corporation agrees to make payments upon the Series 2013 Bond Obligations and be liable therefor at such times and in such amounts (including principal, redemption price, interest, and premium, if any) so as to provide for payment of the principal, redemption price, interest and premium, if any, on the Bonds Outstanding under the Bond Indenture when due whether upon a scheduled Interest Payment Date, at maturity, or by mandatory or optional redemption, acceleration, tender, or otherwise upon the Bonds.  The Corporation also agrees to make any payments as required under the Tax Agreement.

**Section 6.2. Payments in Respect of the Series 2013 Bond Obligations and the Loan Agreement**. The Corporation covenants and agrees to make the following payments in respect of the Series 2013 Bond Obligations directly to the Bond Trustee for deposit, as the case may be, into the appropriate fund established by the Bond Indenture, on the following dates:

(a) *Interest*:  Commencing (i) on the first day of _____, 2013, and continuing thereafter on the same day of each month through _____, 2014, an amount equal to $100,000 as interest on the Series 2013A Bonds, (ii) on the first day of _____, 2014 and continuing on the same day of each month thereafter through _____, 2015, an amount equal to $117,957 as interest on the Series 2013A Bonds, (iii) on the first day of each month thereafter, an amount equal to one-sixth (1/6) of the amount payable as interest on the Series 2013A Bonds on the immediately succeeding Interest Payment Date, (iv) on the first day of _____, 2013 through the first day of January, 2014, one-___ of the amount payable as interest on the Series 2013B Bonds on the next Interest Payment Date, and (v) on the first day of each month thereafter, an amount equal to (A) one-sixth of the amount payable as interest on the Series 2013B Bonds on the immediately succeeding Interest Payment Date, times the number of months elapsed since the immediately preceding Interest Payment Date, minus (B) the balance on deposit in the 2013B Interest Fund Account; provided, however, that the Corporation may be entitled to certain credits on such payments as permitted under Section 6.3 hereof and that as provided in the Master Indenture and the Bond Indenture, to the extent on the applicable monthly payment date and Interest Payment Date the Obligated Group shall have complied with all requirements thereunder relating to the transfer of Excess Cash and any other amounts to the Debt Service Fund under the Bond Indenture and the amounts on deposit in the 2013B Interest Fund Account are insufficient to pay such interest, the unavailable amount shall not be due and payable with respect to the Series 2013B Bonds on the applicable monthly payment date or Interest Payment Date and the amount of any such unpaid interest on the applicable Interest Payment Date shall accrete and be added to the principal amount of the Series 2013B Bonds on such applicable Interest Payment Date.

(b) *Principal*: (i)  On or before the first day of each month commencing the date that is two (2) years from the Closing Date and continuing thereafter, an annual amount equal to not less than one-twelfth (1/12th) of the amount of principal becoming due on the Series 2013A Bonds on the immediately succeeding _____ 1, by Maturity or mandatory Bond Sinking Fund redemption; provided, however, that the Corporation may be entitled to certain credits on such payments as permitted under Section 6.3 hereof; (ii) on or before the first day of each month commencing on the date that is twelve months prior to Maturity of the Series 2013B Bonds, and continuing thereafter, an amount equal to not less than one-twelfth (1/12) of the amount of principal becoming due on the Series 2013B Bonds on the immediately succeeding _____ 1, by Maturity; provided, however, that the Corporation may be entitled to certain credits on such payments as permitted under Section 6.3 hereof; and (iii) payments from Excess Cash as provided in Section 427(b)(viii) of the Master Indenture.

(c) *Debt Service Reserve Fund*:  The Corporation shall cause payments to be made to the Debt Service Reserve Fund as provided in Section 427(b)(vi) of the Master Indenture, both before and after the First Fill Date as defined herein.  If at any time after the First Fill Date the amount on deposit in the Debt Service Reserve Fund is less than one hundred percent (100%) of the Debt Service Reserve Fund Requirement as a result of the Debt Service Reserve Fund's having been drawn upon, the Bond Trustee shall notify the Corporation of such transfer and the Corporation agrees to restore or cause to be restored the amount on deposit in the Debt Service Reserve Fund to an

amount equal to the Debt Service Reserve Fund Requirement in the manner and to the extent provided in Section 427 of the Master Indenture by deposits to the credit of the Debt Service Reserve Fund from transfers to the Bond Trustee by the Master Trustee pursuant to the provisions of Section 427(b)(vi) of the Master Indenture.

**Section 6.3. Credits on the Series 2013 Bond Obligations.** Notwithstanding any provision contained in this Loan Agreement or in the Bond Indenture to the contrary, in addition to any credits on the Series 2013 Bond Obligations resulting from the payment or prepayment thereof from other sources:

(a)  any moneys deposited or credited by the Bond Trustee or the Corporation in the Interest Fund shall be credited against the obligation of the Corporation to pay interest on the Series 2013 Bond Obligations as the same become due;

(b)  any moneys deposited or credited by the Bond Trustee or the Corporation in the Bond Sinking Fund shall be credited against the obligation of the Corporation to pay the principal of the Series 2013 Bond Obligations as the same become due and in the order of maturity to the same extent as payments are applied upon the Bonds through the Bond Sinking Fund;

(c)  any moneys deposited or credited by the Bond Trustee or the Corporation in the Debt Service Reserve Fund shall be credited against the obligation of the Corporation to make the payments described in Section 6.2(c) hereof;

(d)  the principal amount of Bonds of any Series, subseries, maturity, and interest rate purchased by any Member of the Obligated Group and delivered to the Bond Trustee, or purchased by the Bond Trustee and cancelled, shall be credited against the obligation of the Corporation to pay the principal of the Series 2013 Bond Obligations in the manner specified in the Bond Indenture; and

(e)  the amount of any moneys transferred by the Bond Trustee from the Debt Service Reserve Fund and deposited in the Interest Fund or the Bond Sinking Fund shall be credited against the obligation of the Corporation to pay principal of and interest on, the Series 2013 Bond Obligations pledged under the Bond Indenture as the same become due, but the availability of such moneys in the Debt Service Reserve Fund shall not affect the Corporation's obligation to make the monthly payments described in Section 6.2(a) and Section 6.2(b) hereof.

**Section 6.4. Prepayment Generally.** The Corporation shall be permitted or required to prepay the Series 2013 Bond Obligations to the extent and in the manner provided in the Bond Indenture, the Master Indenture, and such Obligations.  If such prepayment is made in compliance with the terms of the Master Indenture, the Town agrees to accept prepayment of the Series 2013 Bond Obligations to the extent required to provide for a permitted or required prepayment of the Bonds.

**Section 6.5. Prepayment from Net Proceeds of Insurance, Condemnation, or Sale.** The Corporation shall have the right or obligation to have the Series 2013 Bond Obligations prepaid from the Net Proceeds of insurance, condemnation, or sale under threat of condemnation by giving the Town direction to apply such Net Proceeds in a notice given pursuant to Section 411 or Section 412 of the Master Indenture.  In such event the Town shall apply all or that portion of such Net Proceeds to be so applied promptly to the prepayment of the Series 2013 Bond Obligations, without premium, plus accrued and unpaid interest thereon to the date of prepayment.

**Section 6.6. Optional Prepayment of the Series 2013 Bond Obligations.** In addition to any prepayment of the Series 2013 Bond Obligations made pursuant to Section 6.5 hereof, the Corporation may, at its option and subject to the limitations of the Bond Indenture, and shall when required by the Bond Indenture, prepay or provide for the prepayment of any of the Series 2013 Bond Obligations in whole or, if so provided, in part in order to effect a redemption of Bonds pursuant to Section 501 of the Bond Indenture (but if in part, in Authorized Denominations).  Such prepayments shall be made by paying or providing for the payment to the Bond Trustee an amount sufficient to redeem (when redeemable) all or a part of the Bonds, as the case may be, at the redemption prices specified therefor in the Bond Indenture.  Any prepayment pursuant to this Section 6.6 shall include accrued interest and premium, if any, required for redemption of such Bonds as shall be redeemed by such prepayment.

**Section 6.7. Notice of Prepayment**. The Corporation shall give the Town and the Bond Trustee not less than forty-five (45) days' prior written notice of any prepayment of any of the Series 2013 Bond Obligations, which notice shall designate the date of prepayment and the amount thereof and direct the redemption of the Bonds in amounts corresponding to the prepayment, provided that no such notice shall be required for a redemption from Excess Cash as provided in Section 405(c) and (d) of the Bond Indenture or for mandatory bond sinking fund redemption payments. Such notice may be withdrawn by the Corporation prior to delivery of the Town's Written Request to the Bond Trustee pursuant to Section 501 of the Bond Indenture. Such notice may be contained in any notice of election given pursuant to Section 411 or Section 412 of the Master Indenture. The Corporation shall not be required to give notice to the Town of any prepayments of the Series 2013 Bond Obligations to be made pursuant to Section 6.5 hereof.

**Section 6.8. Effect of Partial Prepayment; Amortization Schedules**. Upon any partial prepayment of any of the Series 2013 Bond Obligations, each installment of principal that shall thereafter be payable on any of the Series 2013 Bond Obligations, as applicable, shall be reduced in a manner consistent with the reduction in the amount of principal payable on the Bonds to which such installment of principal corresponds. In addition, upon each such prepayment, each installment of interest that shall thereafter be payable on the Series 2013 Obligations shall be reduced, taking into account the interest rate or rates on the Series 2013 Bonds remaining Outstanding after the redemption of the Series 2013 Bonds from the proceeds of such partial prepayment and after the purchase and delivery and cancellation of the Series 2013 Bonds described in Section 6.3(c) hereof so that the interest remaining payable on the Series 2013 Obligations shall be sufficient to pay the interest on such Outstanding Series 2013 Bonds when due.

**Section 6.9. Additional Payments**. (a) The Corporation shall pay the reasonable fees of the Town's Counsel prior to or contemporaneously with the issuance of the Bonds.

(b) The Corporation shall also pay the following within thirty (30) days after receipt of a bill therefor:

(i)  The reasonable fees and expenses of the Town in connection with and as provided in this Loan Agreement and the Bonds, such fees and expenses to be paid directly to the Town or as otherwise directed in writing by the Town;

(ii)  (A) The fees and expenses of the Bond Trustee and the Master Trustee and all other fiduciaries and agents serving under the Bond Indenture or Master Indenture (including reasonable attorneys' fees and expenses and any expenses in connection with any redemption of the Bonds), and (B) all fees and expenses, including reasonable attorneys' fees and expenses, of the Bond Trustee for any extraordinary services rendered by it under the Bond Indenture. All such fees and expenses are to be paid directly to the Bond Trustee or the Master Trustee or other fiduciary or agent for its own account as and when such fees and expenses become due and payable; and

(iii)  All other reasonable fees and expenses incurred in connection with the issuance of the Bonds.

**Section 6.10. Obligation to Prepay Loan and Redeem Bonds upon a Determination of Taxability**. Should there occur a Determination of Taxability, the Corporation shall be required to make prepayments of the loan governed hereby in such manner and amount as will enable the Town to redeem all of the Bonds then Outstanding, as provided in Section 503 of the Bond Indenture and agrees to pay to the Bond Trustee in connection therewith one hundred eight percent (108%) of the principal amount of all Series 2013A Bonds then Outstanding and one hundred three percent (103%) of the principal amount of all Series 2013B Bonds then Outstanding, plus interest accrued thereon to the date of redemption.

**Section 6.11. Assignment and Pledge of Town's Rights; Obligations of Corporation Unconditional**. As security for the payment of the Bonds, the Town will assign and pledge to the Bond Trustee all right, title, and interest of the Town in and to this Loan Agreement and the Series 2013 Bond Obligations, including the right to receive payments hereunder and thereunder (except its Unassigned Rights, including without limitation, the right to receive payment of expenses, fees, and indemnification and the rights to make determinations and receive notices as herein provided), and hereby directs the Corporation to make said payments directly to the Bond Trustee. The Corporation herewith assents to such assignment and pledge and shall make payments directly to the Bond Trustee without defense or set-off by reason of any dispute between the Corporation and the Town or Bond Trustee, and hereby agrees that its obligation to make payments hereunder and to perform its other agreements contained herein are absolute and unconditional. Until

the principal of and interest on the Bonds shall have been fully paid or provision for the payment of the Bonds made in accordance with the Bond Indenture, the Corporation (a) shall not suspend or discontinue any payments provided for in this Loan Agreement, (b) shall perform all its other duties and responsibilities called for by this Loan Agreement, and (c) shall not terminate this Loan Agreement for any cause including any acts or circumstances that may constitute failure of consideration, destruction of, or damage to the Bond Financed Property, commercial frustration of purpose, any change in the laws of the United States or of the State or any political subdivision of either, or any failure of the Town to perform any of its agreements, whether express or implied, or any duty, liability, or obligation arising from or connected with this Loan Agreement.

**Section 6.12. The Corporation's Obligations Unconditional**. The Town and the Corporation agree that the Corporation shall bear all risk of damage or destruction in whole or in part to its Property or any part thereof including without limitation any loss, complete or partial, or interruption in the use, occupancy, or operation of such Property, or any manner or thing that for any reason interferes with, prevents, or renders burdensome, the use or occupancy of such Property or the compliance by the Corporation with any of the terms of this Loan Agreement. In furtherance of the foregoing, but without limiting any of the other provisions of this Loan Agreement, the Corporation agrees that its obligations to pay the principal of, and premium, if any, and interest on, the Series 2013 Bond Obligations, to pay the other sums herein provided for and to perform and observe its other agreements contained herein shall be absolute and unconditional and that the Corporation shall not be entitled to any abatement or diminution thereof nor to any termination of this Loan Agreement for any reason whatsoever.

**Section 6.13. Exchange of Bonds**. In the event the Act shall be determined to be unconstitutional under the laws of the State or under the laws of the United States of America, and as a result thereof, the Bonds are declared to be invalid and unenforceable, and if as a result thereof the obligation of the Corporation to make payments on the Series 2013 Bond Obligations pledged under the Bond Indenture shall be determined to be unenforceable, then the Corporation agrees that it will issue its own bonds (the interest on which may not be exempt from federal income tax) in exchange for the Bonds, in the same principal amount, having the same rate or rates of interest, maturity, redemption provisions, and prepayment provisions as are then applicable to the Bonds being exchanged.  The bonds to be issued by the Corporation shall be issued under an indenture having substantially the same terms and provisions as the Bond Indenture, this Loan Agreement, and the Master Indenture, and such bonds of the Corporation shall be issued thereunder in exchange for the Bonds surrendered by the Owners thereof.  Notice of any such exchange shall be given as provided for redemption of the Bonds under the Bond Indenture and the expenses of such exchange, including the printing of the bonds and other reasonable expenses in connection therewith, shall be borne by the Corporation.

*          *          *

## ARTICLE VII

### COVENANTS RELATING TO THE USE AND OPERATION OF THE BOND FINANCED PROPERTY

**Section 7.1. Use of the Facilities**. (a) The Corporation has used since it has been completed and will use the Project primarily as and for a continuing care retirement community and related activities and only in furtherance of the lawful corporate purposes of the Corporation and agrees to operate all its Property on a nondiscriminatory basis.

(b) The Corporation agrees that it has not, since its completion, and will not permit any of the Bond Financed Property to be used, (i) by any Person in an "unrelated trade or business" (as defined in Section 513(a) of the Code) of the Corporation (without regard to whether such activity results in unrelated trade or business income subject to taxation under Section 512(a) of the Code), or (ii) by any Person who is not a Tax-Exempt Organization, in either case in such manner or to such extent as would result in the loss of tax exemption of interest on the Bonds otherwise afforded under Section 103(a) of the Code.

(c) The Corporation further agrees that it has not, since its completion, and will not use or permit to be used any of the Bond Financed Property: (i) primarily for sectarian instruction or study or as a place of devotional activities or religious worship or as a facility used primarily in connection with any part of the program of a school or department of divinity for any religious denomination or the training of ministers, priests, nuns, rabbis, or other similar persons in the field of religion or (ii) in a manner that is prohibited by the Establishment of Religion Clause of the First Amendment to the Constitution of the United States of America and the decisions of the United States Supreme Court interpreting the same or by any comparable provisions of the Constitution of the State of Indiana and decisions of the Supreme Court of the State interpreting the same.

(d) The Corporation agrees that during the term of this Loan Agreement the Town, the Bond Trustee, and their duly authorized agents shall have the right, but shall be under no duty or obligation to exercise this right, during regular business hours, with reasonable notice, to enter upon the premises and examine and inspect the Project, subject to such limitations, restrictions, and requirements as the Corporation may reasonably prescribe.

**Section 7.2. Rates and Charges**. The Corporation covenants and agrees to operate its existing Facilities primarily as revenue producing continuing care retirement community or as facilities related thereto or for any other lawful purpose or activity, and to operate all of its Property on a nondiscriminatory basis, to charge such fees and rates for its Facilities and services, and to exercise such skill and diligence as to provide income from such Property together with other available funds sufficient to pay promptly all expenses of operation, maintenance, and repair of such Property, all amounts owing on the Series 2013 Bond Obligations and to pay all other payments required to be made by the Corporation hereunder and under the Master Indenture to the extent permitted by law. The Corporation further covenants and agrees that it will, from time to time as often as necessary, to the extent permitted by law, revise its rates, fees, and charges in such manner as may be necessary or proper to comply with the provisions of this Section. This Section shall not be construed to prohibit the Corporation from serving indigent patients to the extent required for it to continue its qualification as a Tax-Exempt Organization or from serving any other class or classes of patients without charge or at reduced rates so long as such service does not prevent the Corporation from satisfying the other requirements of this Section.

**Section 7.3. No Warranty by Town**. THE CORPORATION RECOGNIZES THAT NEITHER THE TOWN NOR THE TOWN COUNCIL HAS MADE AN INSPECTION OF THE PROJECT OR OF ANY FIXTURE OR OTHER ITEM CONSTITUTING A PORTION THEREOF, AND THE TOWN MAKES NO WARRANTY OR REPRESENTATION, EXPRESS OR IMPLIED OR OTHERWISE, WITH RESPECT TO THE SAME OR THE LOCATION, USE, DESCRIPTION, DESIGN, MERCHANTABILITY, CONDITION, WORKMANSHIP, OR FITNESS, SUITABILITY OR USE FOR ANY PARTICULAR PURPOSE, CONDITION, OR DURABILITY THEREOF. THE CORPORATION FURTHER RECOGNIZES THAT THE TOWN HAS NO TITLE OR INTEREST TO ANY PART OF THE BOND FINANCED PROPERTY AND THAT THE TOWN MAKES NO REPRESENTATIONS OR WARRANTIES OF ANY KIND AS TO THE CORPORATION'S TITLE THERETO OR OWNERSHIP THEREOF OR OTHERWISE, IT BEING AGREED THAT ALL RISKS INCIDENT THERETO ARE TO BE BORNE BY THE CORPORATION. IN THE EVENT OF ANY DEFECT OR DEFICIENCY OF ANY NATURE IN THE BOND FINANCED PROPERTY OR ANY FIXTURE OR OTHER ITEM CONSTITUTING A

PORTION THEREOF, WHETHER PATENT OR LATENT, THE TOWN SHALL HAVE NO RESPONSIBILITY OR LIABILITY WITH RESPECT THERETO. THE PROVISIONS OF THIS SECTION 7.3 HAVE BEEN NEGOTIATED AND ARE INTENDED TO BE A COMPLETE EXCLUSION AND NEGATION OF ANY WARRANTIES OR REPRESENTATIONS BY THE TOWN, EXPRESS OR IMPLIED, WITH RESPECT TO THE PROJECT OR ANY FIXTURE OR OTHER ITEM CONSTITUTING A PORTION THEREOF, WHETHER ARISING PURSUANT TO THE UNIFORM COMMERCIAL CODE OF THE STATE OF INDIANA OR ANOTHER LAW NOW OR HEREAFTER IN EFFECT OR OTHERWISE.

**Section 7.4. Compliance with Laws.** The Corporation shall, through the term of this Loan Agreement and at no expense to the Town, promptly comply or cause compliance with all applicable laws, ordinances, orders, rules, regulations, and requirements of duly constituted public authorities that may be applicable to the Project or to the repair and alteration thereof, or to the use or manner of use of the Project, including, but not limited to, the Americans with Disabilities Act, all federal, State, and local environmental, health, and safety laws, rules, regulations, and orders applicable to or pertaining to the Project, and the Federal Worker Adjustment and Retraining Notification Act, to the extent applicable to the Corporation or the Project.

<p style="text-align:center">*          *          *</p>

Case 15-00976-RLM-11    Doc 90-8    Filed 09/18/15    EOD 09/18/15 16:20:25    Pg 20 of 73

## ARTICLE VIII

### PARTICULAR COVENANTS OF THE CORPORATION

**Section 8.1. Maintenance of Corporate Existence and Status.** (a) Notwithstanding the provisions of Section 414 of the Master Indenture, unless the Corporation complies with the following provisions of this Section 8.1, the Corporation agrees that as long as any Bonds are Outstanding it will maintain its existence; will not dissolve, liquidate, or otherwise dispose of all or substantially all of its assets; and will not consolidate or merge into another corporation or permit one or more other corporations to consolidate with or merge into it.  Any dissolution, liquidation, disposition, consolidation, or merger shall be subject to the following conditions:

(i)    the Corporation shall provide a certificate to the Town and the Bond Trustee, in form and substance satisfactory to such parties, to the effect that no Event of Default nor any event or condition that, upon the giving of notice or the passage of time, or both, would constitute an Event of Default (a "*Default Condition*") exists hereunder or under the Bond Indenture and that no Event of Default or Default Condition will be caused by the dissolution, liquidation, disposition, consolidation, or merger;

(ii)   the entity surviving the dissolution, liquidation, disposition, consolidation, or merger shall assume in writing and without condition or qualification the obligations of the Corporation under the Corporation Documents;

(iii)  the Corporation or the entity surviving the dissolution, liquidation, disposition, consolidation, or merger, within ten (10) days after execution thereof, shall furnish to the Town and the Bond Trustee a true and complete copy of the instrument of dissolution, liquidation, disposition, consolidation, or merger;

(iv)   neither the validity nor the enforceability of the Bonds or the Bond Indenture shall be adversely affected by the dissolution, liquidation, disposition, consolidation, or merger;

(v)    the dissolution, liquidation, disposition, consolidation, or merger shall not adversely affect any exemption from federal income taxation to which interest on the Bonds would otherwise be entitled;

(vi)   evidence that no rating on the Bonds, if the Bonds are then rated, shall be reduced or withdrawn as a result of the dissolution, liquidation, disposition, consolidation, or merger;

(vii)  the Project shall continue to be as described herein;

(viii) any successor to the Corporation shall be qualified to do business in the State and shall continue to be qualified to do business in the State throughout the term hereof; and

(ix)   (A) neither the validity or enforceability of the Corporation Documents shall be adversely affected by the dissolution, liquidation, disposition, consolidation, or merger and (B) the provisions of the Act, the Bond Indenture, and the Corporation Documents shall be complied with concerning the dissolution, liquidation, disposition, consolidation, or merger.

(b)  As of the effective date of the dissolution, liquidation, disposition, consolidation, or merger, the Corporation (at its cost) shall furnish to the Town and Bond Trustee (i) an opinion of Bond Counsel, in form and substance satisfactory to such parties, as to items (a)(iv) and (v) above, and (ii) an opinion of Independent Counsel, in form and substance satisfactory such parties, as to the legal, valid and binding nature of items (a)(iii) and (ix) above.

(c)  The Corporation further agrees that it will not act or fail to act in any other manner that would adversely affect any exemption from federal income taxation of the interest earned by the Owners of the Bonds to which such Bonds would otherwise be entitled.

**Section 8.2. Consent to Assignment of the Loan Agreement Rights and the Series 2013 Bond Obligations to the Bond Trustee**. The Corporation agrees that this Loan Agreement and the Series 2013 Bond Obligations, and the payments to be made thereunder and thereon (excluding Unassigned Rights) shall be assigned and pledged to secure the payment of the Bonds and all of the rights, interests, powers, privileges, and benefits accruing to or vested in the Town thereunder may be protected and enforced in conformity with the Bond Indenture and may be assigned by the Town to the Bond Trustee as additional security for the Bonds, other than Unassigned Rights.

**Section 8.3. Maintenance; Recording**. (a) The Corporation shall, at its own expense, take all necessary action to maintain and preserve the liens and security interest of the Loan Agreement and the Master Indenture so long as any principal, premium, if any, or interest on the Bonds shall remain unpaid.

(b)  The Corporation shall, forthwith after the execution and delivery of the Loan Agreement and the Master Indenture and thereafter from time to time, cause the Loan Agreement and the Master Indenture, including any amendments thereof and supplements thereto, and any financing statements in respect thereof to be filed, registered and recorded in such manner and in such places as may be required by law in order to publish notice of (i) and fully to perfect and protect the lien and security interest thereof upon and the title of the Corporation to the Project, and (ii) the lien and security interest therein granted to the Bond Trustee and the Owners of the Bonds to the rights, if any, of the Town assigned under the Loan Agreement and the Master Indenture, and from time to time will perform or cause to be performed any other act as provided by law and will execute or cause to be executed any and all continuation statements and further instruments necessary for such publication, perfection (if applicable), and protection.  Except to the extent it is exempt therefrom, the Corporation will pay or cause to be paid all filing, registration, and recording fees incident to such filing, registration, and recording, and all expenses incident to the preparation, execution, and acknowledgment of such instruments of further assurance, and all federal or State fees and other similar fees, duties, imposts, assessments, and charges arising out of or in connection with the execution and delivery of the Loan Agreement and the Master Indenture and such instruments of further assurance.

(c)  The Town shall have no responsibility for the preparation, filing, or recording of any instrument, document or financing statement or for the maintenance of any security interest intended to be perfected thereby.  The Town will execute such instruments provided to it by the Corporation as may be reasonably necessary in connection with such filing or recording.

(d)  Notwithstanding the foregoing, the Bond Trustee may, but without any obligation to do so, in its discretion, file in such office or offices as the Bond Trustee deems necessary or desirable such financing and continuation statements and amendments thereof or supplements thereto, and such other documents as the Bond Trustee may from time to time require to perfect (if applicable), preserve, and protect the security interest of the Bond Trustee in the Trust Estate.  The Corporation hereby authorizes and appoints the Bond Trustee as its attorney-in-fact to make any such filing.

**Section 8.4. Financial Statements, Etc**. The Corporation covenants that it will keep proper books of records and accounts in which full, true and correct entries will be made of all dealings or transactions of, or in relation to, the business and affairs of the Corporation in accordance with generally accepted principles of accounting consistently applied (except as stated in the notes thereto), and will furnish the materials and notices required to be delivered to the Master Trustee under Section 414 of the Master Indenture to the Town, to the Bond Trustee and to any requesting Owner or Owners of $500,000 or more in aggregate principal amount of the outstanding Bonds; provided, however, that the Corporation shall deliver only the items set forth in Section 415(b)(v) and (vi) of the Master Indenture to the Town unless the Town requests receipt of any other items required to be delivered pursuant to Section 415 of the Master Indenture.

**Section 8.5. Indemnity**. (a) The Corporation shall pay, and shall protect, indemnify, and save the Town, the Town Council, and Bond Trustee and its respective past, present and future members, officers, directors, employees, agents, attorneys, successors, assigns and any other person, if any, who "controls" the Town, the Town Council, or Bond Trustee, as the case may be, as that term is defined in Section 15 of the Securities Act of 1933, as amended (the Town, the Bond Trustee and the other listed persons, collectively referred to as the "***Indemnified Persons***") harmless from and against any and all liabilities, losses, damages, taxes, penalties, costs and expenses (including attorneys' fees and expenses of the Town and Bond Trustee), causes of action, suits, proceedings, claims, demands, tax reviews,

investigations, and judgments of whatsoever kind and nature (including, but not limited to, those arising or resulting from any injury to or death of any person or damage to property) arising from or in any manner directly or indirectly growing out of or connected with the following:

(i)    the use, financing, non-use, condition, or occupancy of the Bond Financed Property, any repairs, construction, alterations, renovation, relocation, remodeling, and equipping thereof or thereto or the condition of any such Bond Financed Property including adjoining sidewalks, streets, or alleys and any equipment or facilities at any time located on or connected with such Bond Financed Property or used in connection therewith, but that are not the result of the gross negligence of the Town or Bond Trustee;

(ii)    a violation of any agreement, warranty, covenant, or condition of this Loan Agreement or any other agreement executed in connection with this Loan Agreement;

(iii)    a violation of any contract, agreement, or restriction by the Corporation relating to the Project;

(iv)    a violation of any law, ordinance, rules, regulation, or court order affecting the Project or the ownership, occupancy, or use thereof or the Bonds or use of the proceeds thereof;

(v)    any statement or information concerning the Corporation, any of its officers and members, its operations, or financial condition generally or the Bond Financed Property, contained in the Disclosure Statement or supplement or amendment thereto furnished to the Town or the purchaser of any Bonds, that is untrue or incorrect in any material respect, and any omission from the Disclosure Statement or any statement or information that should be contained therein for the purpose for which the same is to be used or that is necessary to make the statements therein concerning the Corporation, any of its officers and members and the Bond Financed Property not misleading in any material respect, provided that the Disclosure Statement or such supplement or amendment has been approved by the Corporation; and

(vi)    the acceptance or administration of the Bond Indenture, including without limitation the enforcement of any remedies under the Bond Indenture and related documents.

(b) In case any claim shall be made or any action shall be brought against one or more of the Indemnified Persons in respect of which indemnity can be sought against the Corporation pursuant to any of the preceding paragraphs, the Indemnified Party seeking indemnity shall promptly notify the Corporation, in writing, and the Corporation shall promptly assume the defense thereof, including the employment of counsel chosen by the Corporation and approved by the Town or the Town Council (in the case of a claim involving the Town) or the Bond Trustee (in the case of a claim involving the Bond Trustee), or both (provided, that such approval by the Town or Bond Trustee shall not be unreasonably withheld), the payment of all expenses and the right to negotiate and consent to settlement. No claim against the Town or the Bond Trustee shall be settled without the consent of the Town or the Bond Trustee, as applicable. If any Indemnified Person is advised in a written opinion of counsel that there may be legal defenses available to such Indemnified Person that are adverse to or in conflict with those available to the Corporation or that the defense of such Indemnified Person should be handled by separate counsel, the Corporation shall not have the right to assume the defense of such Indemnified Person, but the Corporation shall be responsible for the reasonable fees and expenses of counsel retained by such Indemnified Person in assuming its own defense, and provided also that, if the Corporation shall have failed to assume the defense of such action or to retain counsel reasonably satisfactory to the Town, the Town Council, or the Bond Trustee, as applicable, within a reasonable time after notice of the commencement of such action, the reasonable fees and expenses of counsel retained by the Indemnified Person shall be paid by the Corporation. Notwithstanding the foregoing, any one or more of the Indemnified Persons shall have the right to employ separate counsel with respect to any such claim or in any such action and to participate in the defense thereof, but the fees and expenses of such counsel shall be paid by such Indemnified Person unless the employment of such counsel has been specifically authorized by the Corporation or unless the provisions of the immediately preceding sentence are applicable. The Corporation shall not be liable for any settlement of any such action affected without the consent of the Corporation, but if settled with the consent of the Corporation or if there be a final judgment for the plaintiff in any such action with or without consent, the Corporation agrees to indemnify and hold harmless the Indemnified Person from and against any loss, liability, or expense by reason of such settlement or judgment.

(c)  The Corporation shall also indemnify the Town, the Town Council, the Bond Trustee, and such Indemnified Persons for all reasonable costs and expenses, including reasonable counsel fees, incurred in: (i) enforcing any obligation of the Corporation under this Loan Agreement or any related agreement, (ii) taking any action requested by the Corporation, (iii) taking any action required by this Loan Agreement or any related agreement, or (iv) taking any action considered necessary by the Town or the Bond Trustee and that is authorized by this Loan Agreement or any related agreement.

(d)  If the Town is to take any action under this Loan Agreement or any other instrument executed in connection herewith for the benefit of the Corporation, it will do so if and only if (i) the Town is a necessary party to any such action or proceeding, and (ii) the Town has received specific written direction from the Corporation, as required hereunder or under any other instrument executed in connection herewith, as to the action to be taken by the Town.

(e)  All amounts payable to the Town under this Section 8.5 shall be deemed to be fees and expenses payable to the Town for the purposes of the provisions hereof and of the Bond Indenture dealing with assignment of the Town's rights hereunder.  The Town and its members, officers, agents, attorneys, employees, successors, and assigns shall not be liable to the Corporation for any reason.

(f)  Any provision of this Loan Agreement or any other instrument or document executed and delivered in connection therewith to the contrary notwithstanding, the Town retains the right to (i) enforce any applicable federal or State law or regulation or resolution of the Town, and (ii) enforce any rights accorded to the Town by federal or State law or regulation of the Town, and nothing in this Agreement shall be construed as an express or implied waiver thereof.

**Section 8.6. Licensure**. The Corporation warrants that its Facilities have all material State and local licenses required for the operation thereof.  The Corporation will obtain and maintain or cause to be obtained and maintained all such licenses required for the operation of its Facilities and the Project and shall use its best efforts to obtain and maintain or cause to be obtained and maintained such licensure, so long as it is in the best interests of the Corporation and the Bondholders, as determined by the governing body of the Corporation.

**Section 8.7. Transfer of Assets**. The Corporation covenants and agrees that it will not sell, lease, or otherwise dispose, of any Property except as permitted by Section 418 of the Master Indenture.  The provisions of the Master Indenture notwithstanding, the Corporation covenants and agrees it will not sell, lease, or otherwise dispose, (including without limitation any involuntary disposition), directly or indirectly in whole or in part, any portion of the Bond Financed Property unless the conditions set forth in Section 3.06 of the Tax Agreement are satisfied.

**Section 8.8. Notice Regarding Bankruptcy Petitions, Event of Default or Potential Default**. The Corporation agrees to notify the Bond Trustee and the Town in writing prior to any filing by it of a petition in bankruptcy and to notify the Bond Trustee and the Town immediately by telephone and in writing as soon as reasonably practicable when it obtains knowledge that a petition in bankruptcy has been filed against the Corporation or any other Member or of the occurrence of an Event of Default or a Default Condition or of any other development, financial or otherwise, that is expected to materially adversely affect the ability of the Corporation to perform its obligations hereunder.

**Section 8.9. Maintenance of Status as Member of the Obligated Group**. Except as may be permitted under Section 212 of the Master Indenture, the Corporation covenants and agrees that as long as any Bonds remain Outstanding under the Bond Indenture, it will remain a Member of the Obligated Group and control the other Members of the Obligated Group.

**Section 8.10. Discharge of Orders, Etc**. The Corporation covenants to cause any order, writ, or warrant of attachment, garnishment, execution, replevin, or similar process filed against any part of the Funds or Accounts held by the Bond Trustee under the Bond Indenture or the Master Indenture to be discharged, vacated, bonded, or stayed within ninety (90) days after such filing (which ninety (90) day period shall be extended for so long as the Corporation is contesting such process in good faith), but, notwithstanding the foregoing, in any event not later than five (5) days

prior to any proposed execution or enforcement with respect to such filing or any transfer of moneys or investments pursuant to such filing.

**Section 8.11. Annual Certificate**. For each year that the Loan Agreement remains in effect, the Corporation will furnish to the Town and the Bond Trustee on or before January 31 of each succeeding year, a certificate of the Corporation, signed by authorized officer, stating that (i) the Corporation has made a review of its activities during the preceding calendar year for the purpose of determining whether or not the Corporation has complied with all of the terms, provisions, and conditions of this Loan Agreement, (ii) the Corporation has kept, observed, performed, and fulfilled each and every covenant, provision, and condition of this Loan Agreement on its part to be performed, and (iii) the Corporation is not in default in the performance or observance of any of the covenants, provisions or conditions hereof, or if the Corporation shall be in default, such certificate shall specify all such defaults and the nature thereof.

**Section 8.12. Maintenance and Repair; Insurance**. The Corporation shall maintain the Facilities in a safe and sound operating condition, making from time to time, all needed material repairs thereto, and shall maintain reasonable amounts of insurance coverage with respect to the Facilities and shall pay all costs of such maintenance, repair, and insurance as required by Sections 406 and 407 of the Master Indenture.

<p style="text-align:center">*   *   *</p>

Case 13-01076-RLM-11 Doc 60-3 Filed 08/31/15 EOD 08/31/15 13:20:26 Pg 29 of
230

## ARTICLE IX

### EVENTS OF DEFAULT AND REMEDIES THEREFOR

**Section 9.1. Events of Default.** (a) The occurrence and continuance of any of the following events shall constitute an "*Event of Default*" hereunder:

(i) failure of the Corporation to pay any installment of principal of, or premium or interest on any of the Series 2013 Bond Obligations or any other payment required by Sections 6.1 or 6.2 hereof when the same shall become due and payable (subject, in the case of interest on the Series 2013B Obligation, to the provisions of Section 6.2(a)), whether upon a scheduled monthly payment date, upon a scheduled Interest Payment Date, at maturity, upon any date fixed for prepayment or by acceleration, or otherwise; or

(ii) failure by the Corporation to perform or comply with any of the covenants, conditions, or provisions hereof or of the Tax Agreement and failure to remedy such failure within thirty (30) days after notice thereof from the Bond Trustee to the Corporation; provided, however, that if failure to comply or perform with such covenants, conditions, or provisions cannot be remedied within thirty (30) days, but can be remedied, no Event of Default shall be deemed to have occurred or to exist if the Bond Trustee, at the direction of a Majority of the Applicable Bondholders, shall consent to an additional cure period for the remediation of such failure and the Corporation diligently pursues such corrective action and complies with or performs such covenants, conditions, or provisions within such additional cure period; or

(iii) any representation or warranty made by the Corporation herein or in any statement or certificate furnished to the Town or the Bond Trustee or the purchaser of any Bonds in connection with the delivery of Bonds or furnished by the Corporation pursuant hereto including, without limitation, statements in the Disclosure Statement, proves untrue in any material respect as of the date of the issuance or making thereof and shall not be made good within sixty (60) days after notice thereof to the Corporation by the Bond Trustee; or

(iv) any "Event of Default" shall occur under the Master Indenture; or

(v) the Corporation shall admit insolvency or bankruptcy or its inability to pay its debts as they mature, or shall generally not pay its debts as such debts become due, or shall make an assignment for the benefit of creditors or apply for or consents to the appointment of a trustee, custodian, or receiver for the Corporation or for the major part of its Property; or

(vi) a trustee, custodian, or receiver shall be appointed for the Corporation or for the major part of its Property and shall not be discharged within sixty (60) days after such appointment; or

(vii) bankruptcy, reorganization, arrangement, insolvency, or liquidation proceedings, proceedings under Title 11 of the United States Code, as amended, or other proceedings for relief under any bankruptcy law or similar law for the relief of debtors shall be instituted by or against the Corporation (other than bankruptcy proceedings instituted by the Corporation against third parties), and if instituted against the Corporation shall be allowed against the Corporation, shall be consented to, or shall not be dismissed, stayed, or otherwise nullified within sixty (60) days after such institution; or

(viii) payment of any installment of principal of, or premium or interest on, any Bond shall not be made when the same shall become due and payable under the provisions of the Bond Indenture;

(ix) the Corporation shall fail to comply with or perform its obligations pursuant to Section 8.10 hereof; or

(x) a transfer shall occur from the Debt Service Reserve Fund due to the Corporation's failure to pay any installment of principal of, or premium, or interest on any of the Series 2013 Bond Obligations as required by Section 6.1 or 6.2 hereof when the same shall become due and payable,

and as a result of such transfer the amount on deposit in the Debt Service Reserve Fund shall be less than the Debt Service Reserve Fund Requirement.

(b)         Whenever any Event of Default shall have occurred and be continuing hereunder:

**(i)    Acceleration of Loan Payments; Waiver of Event of Default and Rescission of Acceleration**. The Bond Trustee (as the assignee and pledgee of the Town) may, and shall upon direction of a Majority of the Applicable Bondholders, by written notice to the Corporation, declare the entire amount of the loan made hereunder due and payable and upon such declaration such loan, in the amount of the outstanding principal of the Bonds, shall thereupon become immediately due and payable on such accelerated payment date, anything in the Series 2013 Bond Obligations or in this Loan Agreement to the contrary notwithstanding.  This provision, however, is subject to the condition that if, at any time after such payments shall have been so declared and become due and payable, all arrears of interest, if any, and principal payable under this Loan Agreement (other than principal due solely as a consequence of such acceleration) and the expenses of the Town and the Bond Trustee shall be paid by the Corporation, and every other Event of Default or Default Condition shall be cured, or be secured, to the satisfaction of the Bond Trustee, or provision deemed by the Bond Trustee to be adequate shall be made therefor, then and in every such case, the Bond Trustee, if so directed by a Majority of the Applicable Bondholders, by written notice to the Corporation, shall waive the Event of Default by reason of which such payments shall have been so declared and become due and payable and or shall rescind and annul such declaration and its consequences; provided, however, that there shall not be waived any Event of Default arising out of the failure to pay the principal payable on the Bonds when due whether by mandatory or optional redemption or at the date of maturity specified therein; and provided further that no such waiver, rescission, or annulment shall extend to or affect any subsequent Event of Default or impair any right consequent thereon.

**(ii)    Acceleration of Obligation; Waiver of Event of Default and Rescission of Acceleration**. The Bond Trustee (as the assignee and pledgee of the Town) may, and shall upon direction of a Majority of the Applicable Bondholders**,** by written notice to the Master Trustee and the Corporation, request that the Master Trustee declare the principal of the Series 2013 Bond Obligations (if not then due and payable) to be due and payable immediately.  This provision, however, is subject to the condition that if, at any time after the principal of the Series 2013 Bond Obligations shall have been so declared and become due and payable, all arrears of principal and interest, if any, upon the Series 2013 Bond Obligations (other than principal due solely as a consequence of such acceleration) and the expenses of the Town and the Bond Trustee shall be paid by the Corporation, and every other Event of Default or Default Condition shall be cured, or be secured, to the satisfaction of the Bond Trustee, or provision deemed by the Bond Trustee to be adequate shall be made therefor, then and in every such case, the Bond Trustee, if so directed by a Majority of the Applicable Bondholders, by written notice to the Master Trustee and the Corporation, shall waive the Event of Default by reason of which the Series 2013 Bond Obligations shall have been so declared and become due and payable and/or shall rescind and annul such declaration and its consequences; provided, however, that there shall not be waived any Event of Default arising out of the failure to pay the principal payable on the Bonds when due whether by mandatory or optional redemption or at the date of maturity specified therein; and provided further that no such waiver, rescission, or annulment shall extend to or affect any subsequent Event of Default or impair any right consequent thereon.

(ii) **Right to Bring Suit, Etc**. The Bond Trustee (as the assignee and pledgee of the Town), personally or by attorney, may, and shall upon direction of a Majority of the Applicable Bondholders, proceed to protect and enforce its rights by pursuing any available remedy including any remedy, or the exercise of any right, available to it as the holder of an Obligation under the Master Indenture (or as the assignee and pledgee of the holder of an Obligation under the Master Indenture) and/or a suit or suits in equity or at law, whether for damages or for the specific performance of any obligation, covenant, or agreement contained in the Series 2013 Bond Obligations, in this Loan Agreement, or in the Master Indenture, or in aid of the execution of any power herein granted, or for the enforcement of any other appropriate legal or equitable remedy, as shall be deemed most effectual to collect the payments then due and thereafter to become due on the Series 2013 Bond Obligations, to enforce performance and observance of any obligation, agreement, or covenant of the Corporation hereunder, under the Series 2013 Bond Obligations, or under the Master Indenture, or to protect and enforce any of the Bond Trustee's rights or duties hereunder or thereunder.

**Section 9.2. Application of Proceeds from Exercise of Remedies**. The proceeds or avails resulting from the exercise of any such remedies, together with any other sums that then may be held by the Town under this Loan Agreement, whether under the provisions of this Article or otherwise, and that are available for such application shall be applied as provided in the Bond Indenture.

**Section 9.3. Remedies Cumulative; Delay or Omission Not a Waiver**. No remedy herein conferred upon or reserved to the Town or the Bond Trustee is intended to be exclusive of any other available remedy or remedies, but each and every such remedy shall be cumulative and shall be in addition to every other remedy given under this Loan Agreement and the Bond Indenture, now or hereafter existing, at law or in equity or by statute. No delay or omission to exercise any right or power and accruing upon any Event of Default hereunder shall impair any such right or power or shall be construed to be a waiver thereof, but any such right and power may be exercised from time to time and as often as may be deemed expedient.

**Section 9.4. Waiver of Extension, Appraisement, Stay, Laws**. To the extent permitted by law, the Corporation agrees that it will not during the continuance of any Event of Default hereunder insist upon or plead, or in any manner whatsoever claim or take any benefit or advantage of, any stay or extension law wherever enacted, now or at any time hereafter in force, that may affect the covenants and terms of performance of this Loan Agreement; nor claim, take, or insist upon any benefit or advantage of any law now or hereafter in force providing for the valuation or appraisement of any of the Corporation's Property prior to any sale or sales thereof that may be made pursuant to any provision herein contained, or pursuant to the decree, judgment, or order of any court of competent jurisdiction; nor after any such sale or sales, claim or exercise any right under any statute heretofore or hereafter enacted by the United States of America or by any state or territory, or otherwise, to redeem the Property so sold or any part thereof; and the Corporation hereby expressly waives all benefits or advantage of any such law or laws and covenants not to hinder, delay, or impede the execution of any power herein granted or delegated to the Town, but to suffer and permit the execution of every power as though no such law or laws had been made or enacted.

**Section 9.5. Remedies Subject to Provisions of Law**. All rights, remedies and powers provided by this Article may be exercised only to the extent that the exercise thereof does not violate any applicable provision of law in the premises, and all the provisions of this Article are intended to be subject to all applicable mandatory provisions of law that may be controlling in the premises and to be limited to the extent necessary so that they will not render this Loan Agreement invalid or unenforceable under the provisions of any applicable law.

**Section 9.6. Default by the Town - Limited Liability**. Notwithstanding any provision or obligation to the contrary set forth herein, no provision of this Loan Agreement shall be construed so as to give rise to a pecuniary liability of the Town or to give rise to a charge upon the general credit of the Town, the liability of the Town hereunder being limited to its interest in this Loan Agreement and the Series 2013 Bond Obligations, and all other related documents and collateral and the lien of any judgment shall be restricted thereto. In the performance of the agreements of the Town herein contained, any obligation it may incur for the payment of money shall not be a debt of the Town, nor shall the Town be liable on any obligation so incurred. The Town does not assume general liability for the repayment of the Bonds or for the costs, fees, penalties, taxes, interest, commissions, charges, insurance, or any other payments recited herein, and shall be obligated to pay the same only out of the amounts payable by the Corporation hereunder. The Town shall not be required to do any act whatsoever or exercise any diligence whatsoever to mitigate the damages to the Corporation if an Event of Default shall occur hereunder.

*                *                *

Case 13-00076-RCM    Doc 90-8    Filed 07/31/13    Entered 07/31/13 18:20:26    Pg 295 of
530

## ARTICLE X

### SUPPLEMENTS AND AMENDMENTS TO THIS LOAN AGREEMENT

**Section 10.1. Supplements and Amendments to this Loan Agreement.** Subject to the terms, conditions, and provisions of Article X of the Bond Indenture, the Corporation and the Town, with the consent of the Bond Trustee, may from time to time enter into supplements and amendments to this Loan Agreement.  An executed copy of any of the foregoing amendments, changes, or modification shall be filed with the Bond Trustee.  The Bond Trustee may grant such waivers of compliance by the Corporation with provisions of this Loan Agreement as to which the Bond Trustee may deem necessary or desirable to effectuate the purposes or intent hereof and that, in the opinion of the Bond Trustee, do not have a material adverse effect upon the interests of the Bondholders, provided that the Bond Trustee shall file with the Town any and all such waivers granted by the Bond Trustee within three (3) business days thereof.

<div align="center">*       *       *</div>

## ARTICLE XI

### DEFEASANCE

**Section 11.1. Defeasance.** (a) If the Corporation shall pay and discharge or provide, in a manner satisfactory to the Town, for the payment and discharge of the whole amount of the principal of, and premium, if any, and interest on, the Series 2013 Bond Obligations and shall pay or cause to be paid all other sums payable hereunder and under the Bond Indenture, or shall make arrangements satisfactory to the Town for such payment and discharge, then and in that case all property, rights, and interest hereby conveyed or assigned or pledged shall revert to the Corporation, and the estate, right, title, and interest of the Town therein shall thereupon cease, terminate, and become void; and this Loan Agreement and the covenants of the Corporation contained herein, subject to the provisions of Section 12.9 hereof,, shall be discharged, and the Town in such case on demand of the Corporation and at its cost and expense, shall execute and deliver to the Corporation a proper instrument or proper instruments acknowledging the satisfaction and termination of this Loan Agreement and shall convey, assign, and transfer or cause to be conveyed, assigned, or transferred, and shall deliver or cause to be delivered to the Corporation, all Property, including money, then held by the Town other than moneys deposited with the Bond Trustee for the payment of the principal of, or premium, if any, or interest on, the Series 2013 Bond Obligations, together with such Series 2013 Bond Obligations marked paid or cancelled.

(b) The Corporation agrees to pay all costs of the Town, its advisors, and counsel in connection with any advance refunding of the Bonds, including, without limitation the cost of having a bond rating reassigned to any Bonds that are to be advance refunded, if such rating is requested by the Corporation. The Corporation also agrees that prior to advance refunding the Bonds it will make available to any Rating Agency that is maintaining a rating on the Bonds to be refunded such information as any such Rating Agency may require to reassign a bond rating to any Bonds that are to be advance refunded.

<center>*       *       *</center>

## ARTICLE XII

### MISCELLANEOUS PROVISIONS

**Section 12.1. Payment of Expenses of Issuance of Bonds**. The Corporation agrees to be liable and pay for any commitment and other financing costs, recording expenses, trustee's acceptance fees, escrow and title insurance costs, legal fees, printing expenses, and other fees and fair and customary expenses incurred or to be incurred by or on behalf of the Town in connection with or as an incident to the issuance and sale of the Bonds.

**Section 12.2. Loan Agreement for Benefit of Parties Hereto**. Nothing in this Loan Agreement, express or implied, is intended or shall be construed to confer upon, or to give to, any person other than the parties hereto, the Owners of the Series 2013 Bond Obligations, and the holders of the Bonds, any right, remedy, or claim under or by reason of this Loan Agreement or any covenant, condition, or stipulation hereof; and the covenants, stipulations, and agreements in this Loan Agreement contained are and shall be for the sole and exclusive benefit of the parties hereto, their successors and assigns, and the Owners of the Series 2013 Bond Obligations.

**Section 12.3. Severability**. In case any one or more of the provisions contained in this Loan Agreement or in the Series 2013 Bond Obligations shall be invalid, illegal, or unenforceable in any respect, the validity, legality, and enforceability of the remaining provisions contained herein and therein shall not in any way be affected or impaired thereby.

**Section 12.4. Notices**. Unless otherwise specifically provided herein, any notice, request, complaint, demand, communication, or other paper shall be sufficiently given and shall be deemed given when the same is: (i) deposited in the United States mail and sent by first class mail, postage prepaid, or (ii) delivered, in each case to the parties at the addresses set forth below or at such other address as a party may designate by notice to the other parties:

| | |
|---|---|
| To the Town: | Town of North Manchester, Indiana<br>103 East Main Street<br>North Manchester, Indiana 46962<br>Attention: Clerk-Treasurer<br>Telephone: (260) 982-9800<br>Facsimile: (260) 982-7428 |
| To the Corporation: | The Estelle Peabody Memorial Home of the Synod of Lincoln Trails of the Presbyterian Church (U.S.A.)<br>400 West Seventh Street<br>North Manchester, Indiana 46962<br>Attention: President<br>Telephone: (260) ___-_____<br>Facsimile: (260) ___-_____ |
| To the Bond Trustee: | Wells Fargo Bank, N.A.<br>_____<br>_____<br>Attention: Corporate Trust Services<br>Telephone: (___)<br>___-____ Facsimile: (___)<br>___-____ |
| To the Master Trustee: | Wells Fargo Bank, N.A.<br>_____<br>_____<br>Attention: Corporate Trust Services<br>Telephone: (___)<br>___-____ Facsimile: (___)<br>___-____ |

**Section 12.5. Successors and Assigns.** Whenever in this Loan Agreement any of the parties hereto is named or referred to, the successors and assigns of such party shall be deemed to be included and all the covenants, promises, and agreements in this Loan Agreement contained by or on behalf of the Corporation, or by or on behalf of the Town, shall bind and inure to the benefit of their respective successors and assigns, whether so expressed or not.

**Section 12.6. Counterparts.** This Loan Agreement is being executed in any number of counterparts, each of which is an original and all of which are identical. Each counterpart of this Loan Agreement is to be deemed an original hereof and all counterparts collectively are to be deemed but one instrument.

**Section 12.7. Governing Law.** This Loan Agreement shall be governed exclusively by and construed in accordance with the internal laws of the State of Indiana (excluding the principles thereof governing conflicts of law).

**Section 12.8. Limited Recourse to the Town.** The obligations of the Town with respect to the Bonds and under this Loan Agreement are special, limited obligations of the Town, payable solely out of the revenues and income derived under this Loan Agreement and the Series 2013 Bond Obligations and as otherwise provided under this Loan Agreement and the Bond Indenture. The obligations of the Town hereunder shall not be deemed to constitute an indebtedness or an obligation of the Town, the State, or any political subdivision thereof within the purview of any constitutional limitation or statutory provision, or a charge against the credit or general taxing powers of any of them. Neither the Town nor any member, director, officer, employee, attorney, or agent of the Town nor any person executing the Bonds shall be liable personally for the Bonds or be subject to any personal liability or accountability by reason of the issuance of the Bonds. No recourse shall be had for the payment of the principal of, or premium, if any, or interest on, any of the Bonds or for any claim based thereon or upon any obligation, covenant, or agreement contained in the Bond Indenture, this Loan Agreement or the Disclosure Statement against any past, present, or future member, officer, agent, attorney, or employee of the Town or the Town Council, or any incorporator, member, officer, employee, director or trustee of any successor corporation, as such, either directly or through the Town or any successor corporation, under any rule of law or equity, statute or constitution or by the enforcement of any assessment or penalty or otherwise, and all such liability of any such incorporator, member, officer, employee, director, attorney, agent, or trustee as such is hereby expressly waived and released as a condition of and consideration for the execution of the Bond Indenture and this Loan Agreement and the issuance of the Bonds.

**Section 12.9. Term of this Loan Agreement.** This Loan Agreement shall be in full force and effect from the date hereof, and shall continue in effect until the payment in full of all principal of, premium, if any, and interest on the Bonds, or provision for the payment thereof shall have been made pursuant to Article XI of the Bond Indenture; all fees, charges, indemnities, and expenses of the Town, the Bond Trustee, and the Bond Registrar have been fully paid or provision made for such payment (the payment of which fees, charges, indemnities, and expenses shall be evidenced by a written certification of the Corporation that it has fully paid or provided for all such fees, charges, indemnities, and expenses); and all other amounts due hereunder and under the obligations pledged under the Bond Indenture have been duly paid or provision made for such payment. All representations, certifications, and covenants by the Corporation as to the indemnification of various parties and the payment of fees and expenses of the Town as described in Section 8.5 hereof, and all matters affecting the tax-exempt status of the Bonds shall survive the termination of this Loan Agreement and the resignation or removal of the Bond Trustee.

**Section 12.10. Bond Indenture Provisions.** The Bond Indenture provisions concerning the Bonds and other matters therein are an integral part of the terms and conditions of the loan made by the Town to the Corporation pursuant to this Loan Agreement and the execution of this Loan Agreement shall constitute conclusive evidence of approval of the Bond Indenture by the Corporation to the extent it relates to the Corporation. Additionally, the Corporation agrees that, whenever the Bond Indenture by its terms imposes a duty or obligation upon the Corporation, such duty or obligation shall be binding upon the Corporation to the same extent as if the Corporation were an express party to the Bond Indenture, and the Corporation hereby agrees to carry out and perform all of its obligations under the Indenture as fully as if the Corporation were a party to the Bond Indenture.

[The remainder of this page is intentionally left blank.]

IN WITNESS WHEREOF, the Town and the Corporation have caused this Loan Agreement to be executed in their respective corporate names, all as of the date first above written.

<div align="right">

**TOWN OF NORTH MANCHESTER, INDIANA**

By: _____
    Christopher Garber, President of Town Council

</div>

ATTEST:

_____
Carrie J. Mugford, Clerk-Treasurer

[The remainder of this page is intentionally left blank.]

**THE ESTELLE PEABODY MEMORIAL HOME OF THE SYNOD
OF LINCOLN TRAILS OF THE PRESBYTERIAN CHURCH (U.S.A.)**

By: _____

_____, President

ATTEST:

_____

_____, Vice-President

**EXHIBIT "A"**

**THE PROJECT**

      Economic development facilities of the Corporation, including the construction and equipping of 73 assisted living units and 48 Alzheimer/dementia units, renovation of various common areas, demolition of a portion of the existing residential living facilities, and construction and equipping of a 144-bed replacement nursing facility.

2375422v2

A-1

08-13555-mg   Doc 46200   Filed 08/29/14   Entered 08/29/14 14:34:43   Main Document
Pg 303 of 409

**AMENDED AND RESTATED MORTGAGE, SECURITY AGREEMENT
AND FIXTURE FINANCING STATEMENT
(Wabash County)**

between

**THE ESTELLE PEABODY MEMORIAL HOME OF THE SYNOD OF LINCOLN
TRAILS OF THE PRESBYTERIAN CHURCH (U.S.A.)**

as Mortgagor

and

_____

as Master Trustee

Dated as of _____, 2013

(THIS AMENDED AND RESTATED MORTGAGE, SECURITY AGREEMENT AND
FIXTURE FINANCING STATEMENT CONTAINS AFTER-ACQUIRED PROPERTY
PROVISIONS, CREATES SECURITY INTERESTS IN PERSONAL PROPERTY AND
FIXTURES, CONSTITUTES AN ASSIGNMENT OF THE INTERESTS OF MORTGAGOR,
AS LESSOR, IN LEASES WITH RESPECT TO THE MORTGAGED PROPERTY, IS A
FIXTURE FINANCING STATEMENT WITHIN THE MEANING OF THE UNIFORM
COMMERCIAL CODE)

**Prior Recorded Document Reference:**
**Vol 551 Page 335 Recorded August 29, 2002 in Wabash County, IN (Mortgage, Security
Agreement and Fixture Financing Statement (Wabash County))**

# TABLE OF CONTENTS

**ARTICLE 1**  DEFINITIONS, EXHIBIT AND RULES OF INTERPRETATION ........................ 1

Section 1.1.  Definitions ............................................................................................ 1

Section 1.2.  Exhibits ................................................................................................ 3

Section 1.3.  Rules of Interpretation ......................................................................... 3

**ARTICLE II**  MORTGAGE AND SECURITY INTEREST ........................................ 5

Section 2.1.  Mortgage and Security Interest ........................................................... 5

Section 2.2.  Payments and Performances Secured ................................................... 6

Section 2.3.  Remedies Upon Event of Default ........................................................ 7

Section 2.4.  Surrender of Possession After Sale ..................................................... 8

Section 2.5.  Right of Entry ...................................................................................... 8

Section 2.6.  Assignment of and Security Interest in Leases and Rents .................. 8

Section 2.7.  Receiver .............................................................................................. 9

Section 2.8.  Application of Money to Indebtedness ............................................. 10

Section 2.9.  Termination of Proceedings ............................................................. 10

Section 2.10. Rights of Senior Obligations ........................................................... 10

Section 2.11. Waiver ............................................................................................. 10

Section 2.12. Attorneys' Fees ............................................................................... 10

Section 2.13. Financing Statement ........................................................................ 11

Section 2.14. Construction Mortgage .................................................................... 12

Section 2.15. Waiver of Purchase Money Mortgage ............................................. 12

Section 2.16. Title Evidence and Insurance Policies ............................................. 12

Secured 2.17. Security Agreement ......................................................................... 12

**ARTICLE III**  REPRESENTATIONS, COVENANTS, PERMITTED ENCUMBRANCES ......... 14

Section 3.1.  Warranty of Title .............................................................................. 14

Section 3.2.  Performance of and Authority for Covenants ................................... 14

Section 3.3.  Liens and Encumbrances .................................................................. 14

Section 3.4.  Permitted Contests ........................................................................... 15

Section 3.5.  Building and Equipment Covenants ................................................. 15

Section 3.6.  Powers of the Master Trustee ........................................................... 16

**ARTICLE IV**  RELEASE OF MORTGAGED PROPERTY, EASEMENTS, TIE-IN WALLS, REMOVAL OF FACILITY, ADDITION OF IMPROVEMENTS TO LIEN OF MORTGAGE ....17

Section 4.1.  Intentionally Omitted ....................................................................... 17

Section 4.2.  Grant of Easements, Licenses, Etc. .................................................. 17

Section 4.3.  Tie-In Walls ...................................................................................... 17

Section 4.4.  Removal of Fixtures and Equipment ................................................ 18

i

**Section 4.5.** **Addition of Improvements and Equipment to Lien of Mortgage** ................................ 19

**Section 4.6.** **Release of Mortgage** ................................ 19

**ARTICLE V** **MISCELLANEOUS** ................................ 20

**Section 5.1.** **Right of Inspection** ................................ 20

**Section 5.2.** **Advances** ................................ 20

**Section 5.3.** **Recording** ................................ 20

**Section 5.4.** **Opinion of Counsel or Title Endorsement to Recording** ................................ 20

**Section 5.5.** **Binding Effect** ................................ 20

**Section 5.6.** **Amendments** ................................ 21

**Section 5.7.** **Use of Facility** ................................ 21

**Section 5.8.** **Severability** ................................ 21

**Section 5.9.** **Notices** ................................ 21

**Section 5.10.** **Execution Counterparts** ................................ 22

**Section 5.11.** **Indiana Law** ................................ 22

**Section 5.12.** **Senior Mortgage** ................................ 22

**EXHIBIT A** **LEGAL DESCRIPTION** ................................ A-1

**EXHIBIT B** **PERMITTED ENCUMBRANCES** ................................ B-1

AMENDED AND RESTATED MORTGAGE, SECURITY AGREEMENT
AND FIXTURE FINANCING STATEMENT

**THIS AMENDED AND RESTATED MORTGAGE, SECURITY AGREEMENT AND FIXTURE FINANCING STATEMENT**, dated as of _____, 2013 (this "Mortgage"), between **THE ESTELLE PEABODY MEMORIAL HOME OF THE SYNOD OF LINCOLN TRAILS OF THE PRESBYTERIAN CHURCH (U.S.A.)**, an Indiana nonprofit corporation, (the "Mortgagor"), and _____, a banking corporation duly established and validly existing under and by virtue of the laws of the United States of America, successor to Wells Fargo Bank Indiana NA, as master trustee under the Master Trust Indenture hereinafter referred to (the "Master Trustee"), as mortgagee, which, together with the Junior Mortgage, Security Agreement and Fixture Financing Statement, dated as of _____, 2013, between the Mortgage and the Master Trustee, amends and restates in its entirety that certain MORTGAGE, SECURITY AGREEMENT AND FIXTURE FINANCING STATEMENT, dated as of August 15, 2002, between the Mortgagor and the Master Trustee, and recorded with the Recorder of Wabash County, Indiana, on August 29, 2002 in **Volume 551, Page 335**;

PRELIMINARY STATEMENT

Pursuant to a certain Amended and Restated Master Trust Indenture dated as of _____, 2013 (together with all amendments thereof and supplements thereto, the "Master Indenture"), between the Members (as defined in the Master Indenture) and the Master Trustee, the Members may issue notes secured thereby from time to time.  The Mortgagor wishes to mortgage and grant a security interest in the property described herein to the Master Trustee to secure the payment of the Senior Obligations, as defined below, issued under the Master Indenture.

NOW, THEREFORE, in consideration of the agreements contained in the Master Indenture and this Mortgage, the Mortgagor agrees as follows:

# ARTICLE 1

## DEFINITIONS, EXHIBIT AND RULES OF INTERPRETATION

**Section 1.1.    Definitions.**    The terms used in this Mortgage, unless the context clearly requires otherwise, shall have the same meanings as set forth in the Master Indenture.   In addition, terms defined in the recitals hereto and the following terms shall for all purposes of this Mortgage have the meanings herein specified, unless the context clearly otherwise requires:

"Building" shall mean the buildings, structures and site improvements and all other facilities and improvements forming a part of the Facility, and not constituting Fixtures or Equipment, and all other buildings, structures and improvements now or hereafter located on the Land, as they may at any time exist.

"Equipment" shall mean any and all items of furniture, machinery, equipment or other personal property located on the Land or in the Building, and all additions thereto and substitutions therefor including the proceeds therefrom, less any machinery, furniture, equipment or other personal property as may be taken by exercise of the power of eminent domain or as may be released from the lien of this Mortgage pursuant to Section 4.4 hereof, as such times may at any time exist.

"Event of Default" shall mean any event defined as such in Section 502 of the Master Indenture.

"Facility" shall mean the Land, the Building, the Fixtures and the Equipment, as such may at any time exist.

"Fixtures" shall mean any and all items or fixtures now owned or hereafter acquired by any Mortgagor and now or hereafter attached to or installed within or used in connection with the Land, including, but not limited to, any and all heating, plumbing and lighting apparatus, elevators and motors, engines and machinery, electrical equipment, incinerator apparatus, ventilating, air-conditioning and air cooling apparatus, water and gas apparatus, pipes, water heaters, mirrors, mantels, partitions, cleaning, intercom and sprinkler systems, fire extinguishing apparatus and equipment, water tanks, water softeners, carpets, carpeting, store windows and doors, window screens, screen doors, storm sash, window shades or blinds, awnings, locks, fences, trees, shrubs and all other non-consumable personal property of every kind and nature whatsoever permanently affixed to the Land or improvements thereon, including all extensions, additions, improvements, betterments, renewals and replacements of any of the foregoing, all of which are hereby declared and shall be deemed to be fixtures and an accession to the freehold and a part of the realty, as they may at any time exist, exclusive of items of Fixtures released from the lien hereof pursuant to the provisions of Section 4.4 hereof.

"Governmental Issuer" shall mean any state of the United States of America or any municipal corporation or other political subdivision formed under the laws thereof or any body

1

corporate and politic or any constituted authority or any agency or instrumentality of any of the foregoing empowered to issue obligations on behalf thereof.

"Land" shall mean the real estate and interest in real estate and other rights, licenses and permits with respect to real estate located in the County of Wabash, State of Indiana, which is described in Exhibit A attached hereto as the "Land", together with all rights in and to said real estate lying in streets, alleys and roads adjoining said real estate and all water rights, mineral rights, ditch rights, easements, rights of way, the reversion or reversions, remainder or remainders in and to said real estate, and all tenements, hereditaments, appurtenances, rights, privileges and immunities thereto belonging or appertaining whether now owned or hereafter acquired, however evidenced, used or enjoyed with said real estate, but exclusive of any real estate released from the lien hereof pursuant to provisions hereof.

"Leases" shall mean any and all leases, subleases, licenses, concessions or other occupancy agreements or agreement for guarantee of payments in lieu of Rents between any Mortgagor, as lessor, sublessor, licensor or grantor, and Lessees, as lessee, sublessee, licensee or grantee, with respect to the Facility, including any amendment or supplement thereto; excluding, however, any Residency Agreements.

"Lessee" shall mean a Person subleasing or occupying all or some portion of the Facility or guaranteeing payments in lieu of Rents from any Mortgagor pursuant to a Lease and any successor or assign of such Person.

"Master Indenture" shall mean the Amended and Restated Master Trust Indenture, dated as of _____, 2013, between the Mortgagor and the Master Trustee, which amends and restates the Original Master Indenture.

"Mortgage" shall mean this Amended and Restated Mortgage, Security Agreement and Fixture Financing Statement, as it may be supplemented or amended in accordance with the provisions hereof and of the Master Indenture.

"Mortgaged Property" shall mean the property set forth in Section 2.1 hereof.

"Mortgagor" shall mean The Estelle Peabody Memorial Home of the Synod of Lincoln Trails of The Presbyterian Church (U.S.A.), an Indiana nonprofit corporation, or its permitted successors and assigns under the Master Indenture.

"Mortgagor Certificate or Request" shall mean a written certificate, consent, order of request signed by a Mortgagor Representative and delivered to the Master Trustee, as assignee of this Mortgage.

"Mortgage Representative" shall mean a person designated to act on behalf of any Mortgagor as evidenced by a written certificate furnished to the Master Trustee containing the specimen signature of such person and signed for such Mortgagor by its Chief Executive Officer.

2

"Original Master Indenture" shall mean the Master Trust Indenture, dated as of August 15, 2002, between the Mortgagor and the Master Trustee, as supplemented and amended by the Series 2002A Supplemental Master Indenture and the Series 2002B Supplemental Master Indenture.

"Permitted Encumbrances" shall mean the Permitted Encumbrances as defined in Section 101 of the Master Indenture and those additional items listed in <u>Exhibit B</u> attached hereto and made a part hereof.

"Rents" shall mean any rents, income, profits or proceeds from any Leases, license, concession or other arrangement entered into with respect to the Mortgaged Property.

"Registered Land Surveyor" shall mean a Person engaged in the profession of surveying land and licensed in the State of Indiana, whether or not employed by, or in any way affiliated with, the Related Issuer or any Mortgagor.

"Residency Agreement" means any agreement between the Mortgagor and a resident of the Facility to occupy a unit in the Facility.

"Senior Obligations" shall have the meaning ascribed to it in the Master Indenture, which includes the Series 2013A Note.

"Series 2013A Note" shall mean The Estelle Peabody Memorial Home of the Synod of Lincoln Trails of the Presbyterian Church (U.S.A.) Series 2013A Note dated as of the date hereof in the aggregate principal amount of $23,400,000, with maturity dates of _____, issued pursuant to the Master Indenture.

"Uniform Commercial Code ("UCC")" shall mean the Uniform Commercial Code as enacted and from time to time amended in the State of Indiana, except that when "Uniform Commercial Code" or "UCC" is prefixed by the name of another state of the United States, it shall mean the Uniform Commercial Code as enacted and from time to time amended in that state.

**Section 1.2.** **Exhibits.** Attached to and by reference made a part of this Mortgage is the following:

<u>Exhibit A</u>:    Legal description of the Land.

<u>Exhibit B</u>:    Permitted Encumbrances.

**Section 1.3.** **Rules of Interpretation.**

(1)    This Mortgage shall be interpreted in accordance with and governed by the laws of the State of Indiana without giving effect to the conflicts-of-laws principles thereof.

3

2343395v5

(2)     The words "herein," "hereof" and "hereunder" and words of similar import, without reference to any particular article, section or subdivision, refer to this Mortgage as a whole rather than to any particular article, section or subdivision hereof.

(3)     References in this instrument to any particular article, section or subdivision hereof are to the designated article, section or subdivision of this instrument as originally executed.

(4)     The Table of Contents and titles of articles and sections herein are for convenience only and are not part of this Mortgage.

(5)     Unless the context hereof clearly requires otherwise, the singular shall include the plural and vice versa and the masculine shall include the feminine and vice versa.

(6)     Unless the context hereof clearly requires otherwise, "or" is not intended to be exclusive, but is intended to permit one or more or all of the alternative conjoined.

*(End of Article I)*

## ARTICLE II

## MORTGAGE AND SECURITY INTEREST

**Section 2.1.** **Mortgage and Security Interest.** Excepting only the Land and Fixtures, any and all assets, rights, title and interest of the Mortgagor included or otherwise identified in this Section are collectively defined as the "Personal Property." Capitalized words and phrases used in this instrument and not otherwise defined herein shall have the respective meanings assigned to such terms in either: (i) Article 9 of the Uniform Commercial Code as in force in Indiana at the time any financing statement or amendment thereto is filed by Master Trustee, or (ii) Article 9 as in force at any relevant time in Indiana, and the meaning to be ascribed thereto with respect to any particular item of property shall be that under the more encompassing of such definitions. The Mortgagor, in consideration of the Senior Obligations and the other good and lawful consideration, the receipt and sufficiency of which are hereby acknowledged from the Related Issuer, and to secure, and as security for, the payment of the Senior Obligations and the payment, performance and observance by the Mortgagor of all of the other covenants, agreements, representations, warranties and conditions herein or in the Master Indenture contained, by these presents does hereby irrevocably mortgage and warrant to the Master Trustee, its successors or its assigns forever, the following properties (all herein after referred to as the "Mortgaged Property"), and also does hereby grant to the Master Trustee, its successors or its assigns, forever, a security interest in all of such properties constituting goods, fixtures and other items of intangible personal property.

(a) The real estate and interests in real estate described as the "Land" in Exhibit A attached hereto and made a part hereof, situated in the County of Wabash, in the State of Indiana;

(b) All buildings, structures, additions, improvements and fixtures now or hereafter located on the Land, including all right, title and interest of such Mortgagor in and to all building materials and supplies and plants of every kind and nature whatsoever on said premises or in any building now or hereinafter located thereon, together with all rights in and to land lying in streets, alleys and roads adjoining the real estate and all water rights, mineral rights, ditch rights, easements, rights of way, the reversion or reversions, remainder or remainders in and to said real estate, and all tenements, hereditaments, appurtenances, rights, privileges and immunities thereunto belonging or appertaining whether now owned or hereafter acquired, however evidenced, used or enjoyed with said Land;

(c) All rights, interests and privileges of the Mortgagor in and to the Facility including, but not limited to, all Leases with respect to and Rents, revenues and income derived by the Mortgagor from the Facility, as more fully provided in Section 2.6 hereof;

(d) Any and all claims made or insurance proceeds paid for the damage of or destruction to all or any part of the Facility under the policies of insurance required by Section 407 of the Master Indenture, and any and all awards or compensation made by any governmental or other lawful authority for the taking or damaging by eminent

5

domain of the whole or any party of the Facility, including any awards for a temporary taking, change of grade of streets, or taking of access;

(e) All rights, title and interest of the Mortgagor in and to any and all tangible personal property, all Inventory, including, without limitation, raw materials, work-in-process and finished goods, all Goods, including, without limitation, embedded software, Equipment, vehicles, furniture and Fixtures, and all Software and computer programs;

(f) All right, title and interest hereinafter acquired in or to any of the property, real or personal, described above, hereby also releasing, relinquishing and waiving all exemptions in or to said property, vested or inchoate; and

(g) All proceeds from any property described in the foregoing paragraphs of this Section 2.1, and any and all other property of every name and nature from time to time hereafter by delivery or by writing of any kind conveyed, pledged, assigned or transferred, as and for additional security hereunder by the Mortgagor or by anyone in its behalf or with its written consent to the Master Trustee, which is hereby authorized to receive any and all such property at any and all times to hold and apply the same subject to the terms hereof;

TO HAVE AND TO HOLD, all and singular, the Mortgaged Property and the rights, privileges and appurtenances hereby conveyed and assigned, or agreed or intended so to be, to the Master Trustee and its successors and to them and their assigns forever, acting on behalf and for the equal and pro rata benefit and security of each and every Holder of Senior Obligations issued and to be issued under the Master Indenture, without preference, priority or distinction as to the participation in the lien, benefit and protection hereof of one Senior Obligation over or from the others for any reason whatsoever, except as in the Master Indenture otherwise expressly provided, so that each and all of such Senior Obligations shall be equally secured hereby with the same effect as if the same had all been made, issued and negotiated simultaneously with the delivery hereof and were expressed to mature on one and the same date;

SUBJECT, NEVERTHELESS, to Permitted Encumbrances;

AND IT IS HEREBY COVENANTED, DECLARED AND AGREED by and between the parties hereto that the Mortgaged Property is to be held and applied, subject to the further covenants, agreements and conditions set forth in the Master Indenture herein.

**Section 2.2.** **Payments and Performances Secured.** This Mortgage shall cover and secure:

(A) Payment of (1) the principal of _____ and 00/100 Dollars ($_____) and redemption premium, if any, and interest on the Series 2013A Note, and (2) all other Senior Obligations issued under the Master Indenture;

(B) To the extent relating to the Senior Obligations, payment of all other sums, with interest thereon at the rate specified herein or in the Master Indenture, becoming due

2343395v5

and payable under the provisions hereof or of the Master Indenture, to the Master Trustee;

(C)    To the extent relating to the Senior Obligations, performance of each covenant, agreement or condition of the Mortgagor set forth in the Master Indenture, or any indebtedness or document relating thereto;

(D)    To the extent relating to the Senior Obligations, performance of each covenant, agreement or condition of the Mortgagor contained herein, including without limitation any obligation to repay any advances pursuant to Section 5.2 hereof; and

(E)    To the extent relating to the Senior Obligations, payment of any present or future demands of any kind or nature which the Master Trustee may have against the Mortgagor under or pursuant to the Master Indenture, any Obligation or this Mortgage, whether absolute or contingent, whether due or not, whether otherwise secured or not, or whether existing at the time of the execution of this Mortgage, or arising thereafter;

provided that the total amount of all future advances contemplated and to be subject to the protection of this Mortgage is limited to Fifty Million Dollars ($50,000,000) plus all accrued and accruing interest and other amounts owing, as stated herein.

**Section 2.3.    Remedies Upon Event of Default.**  If one or more Events of Default shall have occurred and be continuing, the Master Trustee shall be entitled to exercise any or all of the remedies set forth or provided in the Master Indenture, including, but not limited to, petitioning a court of competent jurisdiction for the appointment of a receiver to take possession of and manage and operate the Mortgaged Property for the benefit of the Holders of the Senior Obligations then Outstanding, and including, but not limited to, declaring all outstanding Senior Obligations under the Master Indenture immediately due and payable without notice.

Without limitation as to the foregoing, upon any Event of Default, the Master Trustee shall have the right to proceed to protect and enforce its rights by a suit or suits in equity or at law, either for the specific performance of any covenant or agreement contained herein or in the Master Indenture or in aid of the execution of any power herein or therein granted, or the foreclosure of this Mortgage as a mortgage, or for the enforcement of any other appropriate legal or equitable remedy.

In the case of any sale of the Mortgaged Property pursuant to any judgment or decree of any court or otherwise in connection with the enforcement of any of the terms of this Mortgage, the Master Trustee or the Holder of any of the Senior Obligations then Outstanding (whether or not then in default) may become the purchaser and, for the purpose of making settlement for or payment of the purchase price, shall be entitled to turn in and use the indebtedness evidenced by the Master Indenture or the Senior Obligations and any claims for interest matured and unpaid thereon, together with additions to the mortgage debt, if any, accrued in order that there may be credited thereon the sums payable out of the net proceeds of such sale to the Holder of such Senior Obligations and claims for interest and additions to the mortgaged debt, if any, as his ratable share of such net proceeds; and thereupon such purchaser shall be credited on account of

7

such purchase price with the portion of net proceeds that shall be credited on account of such purchase price with the portion of such net proceeds that shall be applicable to the payment of, and shall have been credited upon, the Senior Obligations and claims for interest and additions to the mortgage debt so used.

Each and every power or remedy herein specifically given shall be in addition to every other power or remedy, existing or implied, given or now or hereafter existing at law or in equity, and each and every power and remedy herein specifically given or otherwise so existing may be exercised from time to time and as often and in such order as may be deemed expedient by the Master Trustee and the exercise or the beginning of the exercise of one power or remedy shall not be deemed a waiver of the right to exercise at the same time or thereafter any other power or remedy.  No delay or omission of the Master Trustee in the exercise of any right or power accruing hereunder shall impair any such right or power or be construed to be a waiver of any default or acquiescence therein.

**Section 2.4.    Surrender of Possession After Sale.**  The Mortgagor agrees to surrender possession of the Mortgaged Property to the purchaser at the foreclosure sale on demand, in the event that possession has not previously been delivered by the Mortgagor.

**Section 2.5.    Right of Entry.**  If the Master Trustee exercises one of the remedies provided for in Section 2.3 hereof, pursuant to a foreclosure of this Mortgage, the Master Trustee may then or at any time thereafter take complete and peaceful possession of the Facility or any portion thereof, with or without process of law, and may remove all persons therefrom, and the Mortgagor covenants in any such event peacefully and quietly to yield up and surrender the Facility or such portion thereof to the Master Trustee.

**Section 2.6.    Assignment of and Security Interest in Leases and Rents.**  The Mortgagor will perform and discharge its obligations, covenants and agreements under any and all Leases and will enforce and secure the performance of each and every covenant, obligation and agreement of each Lessee thereunder without cost or expense to the Master Trustee.  The Mortgagor will promptly notify the Master Trustee of any monetary default under any of the Leases which is not cured within ten (10) days following written notice by the Mortgagor to the Lessee, and the Mortgagor will, upon written request of the Master Trustee, exercise, in a prompt and diligent manner and at its own expense, the remedies available to it under the Leases then in default and prescribed by the Master Trustee in its request, including, without limitation and if available and requested by the Master Trustee, instituting a proceeding for eviction, or to collect delinquent rent or enforce other covenants or obligations of the Lessees under the Leases.

Each Lessee shall agree to subordinate its Lease to the lien of this Mortgage and attorn to the Master Trustee.  The Mortgagor agrees not to enter into any Lease unless the Lessee thereunder agrees to subordinate such Lease to the lien of this Mortgage and attorn to the Master Trustee.

The Master Trustee shall not be obligated to collect or attempt to collect any Rents which are not in fact paid to it; further, it shall not be obligated to perform or discharge, nor does it

hereby undertake to perform or discharge, any obligation, duty or liability under the Leases, or under or by reason of their assignment.

As additional security for the performance of the Mortgagor's obligations, the Mortgagor does hereby grant, transfer and assign to the Master Trustee all of its right, title and interest in and to all existing and future Leases and all extensions, modifications and renewals, if any, thereof, and any guarantees of the Lessee's obligations under any of the Leases. The Mortgagor does further hereby grant, transfer and assign to the Master Trustee all of the Rents now or hereafter accruing or owing from the Leases or otherwise as a result of any use, possession or occupancy of the Facility or any part thereof.

This assignment shall constitute an actual and present assignment of the Rents and Leases; provided that so long as no Event of Default hereunder has occurred and is subsisting, any Mortgagor shall be entitled to collect, but not more than thirty (30) days before due and payable, all of the Rents, and to retain, use and enjoy the same unless and until an Event of Default occurs hereunder. Upon the occurrence of an Event of Default hereunder, and upon written notice of the Master Trustee, all Rents payable under the Leases by the Lessees to any Mortgagor shall be payable directly to the Master Trustee. Any Mortgagor's obligations to make loan repayments under Section 401 of the Master Indenture or other payments under the Master Indenture shall be satisfied to the extent and in the amount of the Rents applied thereto in accordance with this Section 2.6.

The Lessees under each of the Leases are hereby irrevocably authorized and directed to recognize the claims of the Master Trustee hereunder without investigating the reason for any action taken by the Master Trustee, or the validity or the amount of indebtedness owing to the Master Trustee, or the existence of any default under this Mortgage, the Master Indenture or the application of the Rents to be made by the Master Trustee. The Mortgagor hereby irrevocably directs and authorizes each of the Lessees upon an Event of Default hereunder or under the Master Indenture and notification thereof by the Master Trustee to pay to the Master Trustee such sums due under its Lease as will satisfy the obligations of the Mortgagor hereunder and under the Master Indenture. To the extent that such sums are paid to the Master Trustee, the Mortgagor agrees that the Lessee shall have no further liability to the Mortgagor for the same. The sole signature of the Master Trustee shall be sufficient for the exercise of any rights hereunder, and the sole receipt of the Master Trustee of any sums received shall be a full discharge and release therefor to any such Lessee.

**Section 2.7.   Receiver.** Upon the happening of any Event of Default and during its continuance, or upon the commencement of any proceedings to foreclose this Mortgage or to enforce the specific performance hereof or in aid thereof or upon the commencement of any other proceeding to enforce any right of the Master Trustee hereunder, the Master Trustee shall be entitled, if it shall so elect and without regard to waste, adequacy of security, or solvency of any Mortgagor, forthwith, either before or after declaring all or a portion of the indebtedness secured hereby to be due and payable, to petition a court of competent jurisdiction for the appointment of a receiver or receivers pursuant to Indiana law.

2343395v5

Upon the happening of any of the events set forth in the preceding paragraph or during any period of redemption after a foreclosure sale and before the appointment of a receiver as hereinbefore provided, the Master Trustee shall have the right to collect the Rents to the extent and apply the same in the manner provided by Section 2.6 hereof. This assignment shall be binding upon the occupants of the Facility from the date of service of a copy of a notice of default in the terms and conditions of this Mortgage upon the occupants of the Facility. For the purpose aforesaid, the Master Trustee may enter and take possession of the Facility and manage and operate the same and take any action which, in the judgment of the Master Trustee, is necessary or proper to conserve the value of the Facility. The Master Trustee may also take possession of, and for these purposes use, any and all of the Equipment.

The expenses (including any receiver's fees, reasonable attorneys' fees, costs and agent's compensation) incurred pursuant to the powers herein contained shall be deemed to be immediately due and payable by the Mortgagor to the Master Trustee and shall be secured hereby. The Master Trustee shall not be liable to account to the Mortgagor for any action taken pursuant hereof other than to account for any Rents actually received by the Master Trustee.

**Section 2.8. Application of Money to Indebtedness.** The purchase money proceeds and avails of any sale of the Mortgaged Property or any part thereof, and the proceeds and avails of any other remedy hereunder, including proceeds realized under the assignment in Section 2.6 hereof, after payment of the costs and expenses (including reasonable attorneys' fees) of obtaining said proceeds, shall be apportioned and applied to the indebtedness secured hereby in accordance with the provisions of the Master Indenture.

**Section 2.9. Termination of Proceedings.** In case the Master Trustee shall have proceeded to enforce any right under this Mortgage by foreclosure, sale, entry or otherwise, and such proceedings shall have been discontinued or abandoned for any reason or shall have been determined adversely, then and in every such case the Mortgagor and the Master Trustee shall be restored, subject to any determination in such proceedings, to their former positions and rights hereunder with respect to the property subject to the lien hereof.

**Section 2.10. Rights of Holders of Senior Obligations.** If an Event of Default has occurred and is continuing, the Holders of outstanding Senior Obligations shall have, with regard to all rights, powers and remedies granted to the Master Trustee by, and any and all proceedings instituted under, this Article II, all of the rights granted to such Holders under Sections 505 and 509 of the Master Indenture.

**Section 2.11. Waiver.** The Mortgagor hereby waives, to the extent it lawfully may, all rights to have the Mortgaged Property marshaled upon any foreclosure hereof and agrees that any court having jurisdiction to foreclose this Mortgage may order the sale of the Mortgaged Property or any portion thereof as an entirety.

**Section 2.12. Attorneys' Fees.** In the event an Event of Default should occur and the Master Trustee should employ attorneys or incur other expenses for the foreclosure of this Mortgage or the enforcement or performance of any obligation of the Mortgagor hereunder, the Mortgagor will, on demand of the Master Trustee and receipt of an accounting therefor, pay to

10

the Master Trustee the reasonable fees of such attorneys and such other expenses so incurred, to the extent then permitted by Indiana law.

**Section 2.13.  Financing Statement.**  This instrument shall be deemed to be a financing statement filed as a fixture filing within the meaning of the UCC, and for such purpose the following information is being furnished:

| | | |
|---|---|---|
| (a) | Name and Address of Debtor | The Estelle Peabody Memorial Home of the Synod of Lincoln Trails of the Presbyterian Church (U.S.A.) c/o Peabody Retirement Home 400 West 7th Street North Manchester, IN  46962 |
| | Taxpayer Identification Number and County of Residence of Debtor | Taxpayer Identification No. The Estelle Peabody Memorial Home of the Synod of Lincoln Trails of the Presbyterian Church (U.S.A.) 35-0883511 |
| (b) | Record owner of real estate: | The Estelle Peabody Memorial Home of the Synod of Lincoln Trails of the Presbyterian Church (U.S.A.) c/o Peabody Retirement Home 400 West 7th Street North Manchester, IN  46962 |
| (c) | Name and Address Of Secured Party | _____ Master Trustee _____ _____ |
| (d) | Description of types (or Items) of property covered by this Financing Statement: | See definition of "Fixtures" in Section 1.1 hereof |
| (e) | Description of real estate to which collateral is attached or upon which it is located: | See Exhibit A hereto |

Some or all of the above-described collateral is or is to become fixtures upon the real estate described in Exhibit A hereto, and this Financing Statement is to be filed for record in the real estate records of Wabash County, Indiana.

11

The Mortgagor hereby authorizes any financing statements or amendments thereof or continuation statements thereto that the Master Trustee may require to perfect a security interest in said items or types of property. The Mortgagor shall pay all costs of filing such instruments.

**Section 2.14.  Construction Mortgage.**  Intentionally omitted.

**Section 2.15.  Waiver of Purchase Money Mortgage.**  The Mortgagor and the Master Trustee hereby acknowledge and agree that this Mortgage shall not be deemed or interpreted to be a "purchase money" mortgage under Indiana Code Section 32-29-1-4.

**Section 2.16.  Title Evidence and Insurance Policies.**  Each title insurance policy, all other evidences of title and all insurance policies placed or deposited with the Master Trustee (including proceeds from such policies) shall be deemed an incident to the title to the Mortgaged Property and upon foreclosure shall pass to the purchaser and the same are hereby pledged as additional security for the payment of the indebtedness secured hereby.

**Secured 2.17.  Security Agreement.**  The Mortgagor and the Master Trustee agree that this Mortgage shall constitute a "security agreement" within the meaning of the UCC with respect to any Personal Property and Fixtures included as part of the Mortgaged Property and all replacements thereof, substitutions therefor, additions thereto and the proceeds thereof (any and/or all of the Personal Property and Fixtures and the replacements thereof, substitutions therefor, additions thereto and the proceeds thereof may be referred to as the "Collateral"), and that a security interest in and to the Collateral is hereby granted to the Master Trustee, and the Collateral and all of the Mortgagor's right, title and interest therein are hereby assigned to the Master Trustee, all to secure payment of the indebtedness described in Section 2.2 hereof.  All of the provisions contained in this Mortgage pertain and apply to the Collateral as fully and to the same extent as to any other property comprising the Mortgaged Property, and the following provisions of this Section 2.17 shall not limit the applicability of any other provisions of this Mortgage but shall be in addition thereto:

> (a)  The Mortgagor (being the "debtor" as that term is used in the Code) is and will be the true and lawful owner of the Collateral, subject to no liens, charges or encumbrances other than the Permitted Encumbrances.

> (b)  The Collateral is to be used by the Mortgagor and its tenants solely for business purposes.

> (c)  The Collateral may be affixed to the Land but will not be affixed to any other real estate.

> (d)  The Mortgagor will at its own cost and expense, upon demand, furnish to the Master Trustee such information and authorizes such financing statements and other documents in form satisfactory to the Master Trustee and will do all such acts as the Master Trustee may at any time or from time to time request or as may be necessary or appropriate to establish and maintain a perfected security interest in the Collateral as security for the indebtedness described in Section 2.2 hereof,

12

subject to no other liens or encumbrances, other than the Permitted Encumbrances. The Mortgagor will pay the cost of filing or recording such financing statements or other documents, and this instrument, in all public offices wherever filing or recording is deemed by the Master Trustee to be desirable.

(e)     Upon any default under any of the indebtedness described in Section 2.2 hereof, the Master Trustee shall have the remedies of a secured party under the UCC and the Master Trustee shall be entitled to hold, maintain, preserve and prepare the Collateral for sale, until disposed of, or may propose to retain the Collateral subject to the Mortgagor's right of redemption in satisfaction of the Mortgagor's obligations, as provided in the UCC. The Master Trustee will give the Mortgagor at least twenty (20) days' notice of the time and place of any public sale of the Collateral or of the time after which any private sale or any other intended disposition thereof is made. The requirements of reasonable notice shall be met if such notice is mailed, by certified United States mail or equivalent, postage prepaid, to the address of the Mortgagor hereinafter set forth at least twenty (20) days before the time of the sale or disposition. The Master Trustee may buy at any public sale. The Master Trustee may buy at private sale if the Collateral is of a type customarily sold in a recognized market or is of a type which is the subject of widely distributed standard price quotations. Any such sale may be held in conjunction with any foreclosure sale of the Land. If the Master Trustee so elects, the Land and the Collateral may be sold as one lot. The Master Trustee may sell the Collateral without giving any warranties as to the Collateral and may specifically disclaim any warranties of title or the like, which shall not adversely affect the commercial reasonableness of such sale. The net proceeds realized upon any such disposition, after deduction for the expenses of the retaking, holding, preparing for sale, selling and the reasonable attorney's fees and legal expenses incurred by the Master Trustee, shall be applied against the indebtedness described in Section 2.2 hereof in such order or manner as the Master Trustee shall select. The Master Trustee will account to the Mortgagor for any surplus on such disposition.

(f)     The terms and provisions contained in this Section 2.17 shall, unless the context otherwise requires, have the meanings and be construed as provided in the UCC.

(g)     This Mortgage is intended to be a financing statement within the purview of Section 9.1-502 and 9.1-515 of the UCC with respect to the Collateral and the goods described herein, which goods are or may become fixtures relating to the Land. The addresses of the Mortgagor (Debtor) and the Master Trustee (Secured Party) are hereinafter set forth. This Mortgage is to be filed for record with the Recorder of Deeds of the County where the Land is located. The Mortgagor is the record owner of the Land.

*(End of Article II)*

2343395v5

# ARTICLE III

## REPRESENTATIONS, COVENANTS, PERMITTED ENCUMBRANCES

**Section 3.1.  Warranty of Title.**  The Mortgagor represents, warrants, covenants and agrees that The Estelle Peabody Memorial Home of the Synod of Lincoln Trails of the Presbyterian Church (U.S.A.) is the lawful owner of good and merchantable fee simple title to the Facility and is the lawful lessor under all Leases, and that it has good right and lawful authority to grant, convey, warrant and defend such good and merchantable title to the Mortgaged Property (subject to Permitted Encumbrances) and such good right and lawful authority to grant a lien and security interest in the same to the Master Trustee and any Related Issuer.

The Mortgagor further covenants and agrees that it will do, execute, acknowledge and deliver, or cause to be done, executed, acknowledged and delivered, such instruments supplemental hereto and such further acts, instruments and transfers as the Master Trustee may reasonably require for the better assuring, transferring, pledging, assigning and confirming unto the Master Trustee all and singular the property herein described and the revenues assigned and pledged hereby to the payment of the principal of and premium, if any, and interest on the Senior Obligations and to secure the other obligations secured hereby.

The Mortgagor further represents, warrants and covenants that the Mortgaged Property (i) is not property covered by, or requiring disclosure under, the Indiana Responsible Property Transfer Law, Indiana Code 13-25-3-1 *et seq.*; (ii) has not been used as a landfill or dump; and (iii) does not include any underground storage tanks or toxic or hazardous waste or materials.

**Section 3.2.  Performance of and Authority for Covenants.**  The Mortgagor covenants that it will faithfully perform at all times any and all covenants, undertakings, stipulations and provisions contained in this Mortgage, that it is duly authorized and has the power and has taken all necessary and proper action to authorize the execution of this Mortgage, to convey and to grant a security interest in the property described and secured herein and to assign and pledge the Rents and Leases in the manner and to the extent herein set forth, and that all necessary action on its part for the execution and delivery of this Mortgage has been duly and effectively taken.  The Mortgagor covenants that it will faithfully perform at all times any and all covenants, obligations and agreements on its part to be performed under the Master Indenture.

**Section 3.3.  Liens and Encumbrances.**  The Mortgagor represents and warrants that, as of the date of execution of this Mortgage, there exists no lien, charge or encumbrance (other than Permitted Encumbrances) on the Mortgaged Property.  Except as otherwise permitted by the provisions of this Mortgage, no Mortgagor will create or suffer to be created any lien, encumbrance or charge upon the Mortgaged Property (other than Permitted Encumbrances) and, subject to the provisions of Section 3.4 hereof relating to permitted contests, the Mortgagor will satisfy or cause to be discharged, or will make adequate provision to satisfy and discharge, all lawful claims and demands for labor, materials, supplies or other items which, if not satisfied, might by law become a lien upon the Mortgaged Property; provided that liens for labor or materials arising by operation of statutory law shall not be within the purview of this Section 3.3

14

2343395v5

if, when such liens shall be perfected, the Mortgagor shall cause them to be promptly discharged. If any such liens shall be filed or asserted against the Mortgaged Property by reason of work, labor, services or materials supplied or claimed to have been supplied, the Mortgagor shall, subject to the provisions of Section 3.4 hereof relating to permitted contests, forthwith cause the same to be discharged of record, or effectively prevent the enforcement and collection thereof against the Mortgaged Property or other payments to be made hereunder or under the Master Indenture by contest, payment, deposit, bond, order of court or otherwise. Nothing contained in this Section 3.3 shall be construed as modifying or affecting the rights of any Mortgagor granted in Section 3.4 hereof.

**Section 3.4. Permitted Contests.** No Mortgagor shall be required to pay any tax, charge, assessment or imposition referred to in Section 406(d) of the Master Indenture, nor to remove any lien, charge or encumbrance required to be removed under Section 3.3 hereof, so long as such Mortgagor shall contest, in good faith and at its own cost and expense, the amount or validity thereof, in an appropriate manner or by appropriate proceedings which shall operate during the pendency thereof to prevent the collection of or other realization upon the tax, charge, assessment, imposition, lien or encumbrance so contested and to further prevent the sale, forfeiture or loss of the Mortgaged Property or any part thereof to satisfy the same; provided that no such contest shall subject any Related Issuer or the Master Trustee to the risk of any liability; and provided, further, that, if the amount of such tax, charge, assessment, imposition, lien or encumbrance exceeds Twenty-five Thousand Dollars ($25,000), such Mortgagor shall maintain a reserve or surety bond therefor in the amount of such excess. Each such contest shall be promptly prosecuted to final conclusion (subject to the right of such Mortgagor to settle any such contest), and in any event such Mortgagor will save the Master Trustee harmless against all losses, judgments, decrees and costs (including reasonable attorneys' fees and expenses in connection therewith) and will, promptly after the final determination of such contest or settlement thereof, pay and discharge the amounts which shall be levied, assessed or imposed or determined to be payable therein, together with all penalties, fines, interest, costs and expenses thereon or in connection therewith. The Mortgagor shall give the Master Trustee prompt written notice of any such contest.

If the Master Trustee shall notify any Mortgagor that, in an Opinion of Counsel, by nonpayment of any of the foregoing items the lien of this Mortgage as to any substantial part of the Mortgaged Property will be materially endangered or any substantial part thereof will be subject to imminent loss or forfeiture or the obligations of such Mortgagor under this Mortgage shall be materially impaired, then such Mortgagor shall promptly pay all such unpaid items and cause them to be satisfied and discharged.

**Section 3.5. Building and Equipment Covenants.** The Mortgagor warrants, represents and covenants as follows:

(a) Except for Permitted Encumbrances, the Mortgagor is and will be the sole owner of the Building, Collateral and the items of Equipment, whether now owned or hereafter acquired, free from any adverse liens, security interests, encumbrances of adverse claims thereon of any kind, except Permitted Encumbrances. The Mortgagor will notify the Master Trustee of, and will defend the Building, Collateral and the items of

15

2343395v5

Equipment against, all claims and demands (except Permitted Encumbrances) of all persons at any time claiming the same or any interest therein, except as otherwise permitted herein.

(b)     The Mortgagor will not lease, sell, convey or in any manner transfer the Collateral, the Building, or the items of Equipment except as permitted by Sections 4.1 or 4.4 hereof.

(c)     The Building, Collateral and items of Equipment will be kept on or at the Land and the Mortgagor will not remove the Building or any items of Equipment from the Land, except as herein or in the Master Indenture permitted or provided.

**Section 3.6.**   **Powers of the Master Trustee.**   Without affecting the liability of any Person, including the Obligated Group, for the payment of any indebtedness secured hereby or the lien of this Mortgage on the remainder of the Mortgaged Property for the full amount of any indebtedness unpaid, the Master Trustee may from time to time, without notice and without regard to the consideration, if any, paid thereof, and notwithstanding the existence at the time of any inferior liens thereof: (a) release any Person liable for the payment of any of the indebtedness; (b) extend the time or otherwise alter the terms of payment of any of the indebtedness; (c) alter, substitute or release any property securing the indebtedness; (d) accept any additional security or resort to any security in such order as the Master Trustee may determine; (e) consent to the making of any map or plat of the Facility; (f) join in granting any easement or creating any restrictions thereon; or (g) join in any subordination or other agreement affecting this Mortgage or the lien or charge hereof.

The Master Trustee shall not be required, prior to exercising its rights against any Person or at any other time, by reason of any demand or otherwise, to commence proceedings against any Person liable under this Mortgage or under any indebtedness secured thereby.

Nothing herein shall authorize or be deemed to authorize the Master Trustee to exercise any right or power contrary to the provisions and limitations of the Master Indenture, and the Master Trustee shall be subject thereto with respect to all rights and powers hereunder.  It is understood and agreed that the Master Trustee is acting hereunder for and on behalf of the owners from time to time of the Senior Obligations under and subject to the terms and provisions of the Master Indenture.

*(End of Article III)*

# ARTICLE IV

## RELEASE OF MORTGAGED PROPERTY, EASEMENTS,
## TIE-IN WALLS, REMOVAL OF FACILITY,
## ADDITION OF IMPROVEMENTS TO LIEN OF MORTGAGE

**Section 4.1.  Intentionally Omitted.**

**Section 4.2.  Grant of Easements, Licenses, Etc.**  Mortgagor may at any time or times grant to itself or others easements, licenses, rights-of-way and other rights or privileges in the nature of easements with respect to the Facility, free from the lien of this Mortgage or Mortgagor may release existing easements, licenses, rights-of-way and other rights or privileges with or without consideration, and the Master Trustee will execute and deliver any instrument necessary or appropriate to confirm and grant or release any such easement, license, right-of-way or privilege; provided, however, that prior to any such grant or release, there shall have been supplied to the Master Trustee a Mortgagor Certificate to the effect:

> (a)      that such grant or release is not detrimental to the proper operation of the Facility;

> (b)      that such grant or release will not impair the operating unity or the efficiency of the Facility, or materially or adversely affect the character thereof; and

> (c)      that such grant or release will not, unless Mortgagor has obtained approval thereof from the appropriate governmental jurisdiction, result in a Nonconforming Use which would then be applicable to the Mortgagor's right, title and interest and the Master Trustee's security interest in the Mortgaged Property as burdened by the granting of such rights or privileges, and/or otherwise materially and adversely affect the value of the Land.

**Section 4.3.  Tie-In Walls.**  Mortgagor may, at its own expense:

> (a)      connect or "tie-in" walls (including use of existing walls for the support of future adjacent buildings) and utilities of the Facility to other structures erected on the Land or on real property adjacent to or near the Land or partly on such adjacent real property and partly on the Land; or

> (b)      in connection with the expansion or improvement of any building on the Land, tear down any wall of such building and build an addition to such building (either on the Land or on real property adjacent thereto or partly on such adjacent real property and partly on the Land);

provided, however, that prior to any such expansion, addition, improvement, tearing down or connection with the "tie-in" walls or utilities of the Facility, the Master Trustee shall have approved the same in writing based on a certificate or opinion of an Independent Architect that the same will not, unless Mortgagor has obtained approval thereof from the appropriate

17

governmental jurisdiction, result in the use becoming a "legal nonconforming use" under any statutes, ordinances, zoning, and or building codes (including but not limited to setback requirements and density standards) which apply to the Mortgaged Property immediately following such contemplated changes, or otherwise impair the operating unity or the efficiency of the Facility, or materially or adversely affect the character thereof and will not materially and adversely affect the value of the Land, and based on an Opinion of Counsel stating that all party-wall agreements, easements, cross-easements or other instruments relating to such expansion, addition, improvement, tearing down or connection with the "tie-in" walls or utilities of the Facility which are necessary or desirable to define the relative rights of the owners and encumbrances of the same therein, and to fully preserve the security hereof, have been duly executed, delivered and recorded, to which Opinion of Counsel copies of all such instruments shall be attached.  The Master Trustee shall release from the lien of this Mortgage any interest in the Land for the Facility, or join in any such party-wall agreements, easements, cross-easements or other agreements, to the extent necessary to effect the purpose of this Section 4.3.

**Section 4.4.  Removal of Fixtures and Equipment.**  Mortgagor will not remove or permit the removal of any items of Fixtures or Equipment from the Land except in accordance with the provision of this Section 4.4:

(1)    In any instance where any Mortgagor in its sound discretion determines that any item of Fixtures or Equipment has become inadequate, obsolete, worn out, unsuitable, undesirable or unnecessary for the operation of a Facility, such Mortgagor may, at its expense, remove and dispose of it and substitute and install other items of fixtures, furniture, machinery, equipment or other personal property, not necessarily having the same function, provided that such removal and substitution shall not impair the operating utility of the Facility.  All substituted items shall be installed free of all liens and encumbrances, other than Permitted Encumbrances, and shall become a part of the Facility as Fixtures or Equipment.  The Mortgagor will cooperate with the Master Trustee and will pay all costs, including counsel's fees, incurred in subjecting to the lien of this Mortgage all items so substituted, and the Master Trustee will cooperate with the Mortgagor in securing, if necessary, release of the property for which the substitution is made and in providing such bills of sale or other documents as may be required to facilitate the removal and substitution.  In the event the market value of the substituted items is less than the market value of the Fixtures or Equipment disposed of as reasonably determined by such Mortgagor, except as provided in Subsection (3) hereof, the Mortgagor shall pay to the Master Trustee an amount equal to the difference.

(2)    Upon removal of items of Fixtures or Equipment of the type described in Subsection (1) above, and provided the operating utility and unity of the Facility, are not impaired, the Mortgagor may decide not to make any substitution and installation of other items of furniture, machinery, equipment or other personal property, provided, and subject to the provisions of Subsection (3), (i) that in the case of the sale of any such Fixtures or Equipment, the Mortgagor shall pay to the Master Trustee an amount equal to the entire sale proceeds, (ii) that in the case of trade-in of any such Equipment for items not to be utilized as part of the facility, the Mortgagor shall pay to the Master Trustee an amount equal to the credit received by it in the trade-in, and (iii) that in the case of any

18

other disposition of such Equipment, the Mortgagor shall pay to the Master Trustee an amount equal to the market value of the property as reasonably determined by the Mortgagor. The Master Trustee will cooperate with Mortgagor in securing a release of the property to be removed and in providing such bills of sale or other documents as may be required to facilitate the removal and disposition.

(3)    The Mortgagor shall promptly report to the Master Trustee by Mortgagor Certificate the removal of any Fixtures or Equipment pursuant to Subsections (1) and (2) above, and amounts required to be accounted for by the Mortgagor, if any, shall promptly be paid to the Master Trustee, after any substitution, sale, trade-in or other dispositions; provided that no certificate need be given or payment made more often than once in any Fiscal year unless the aggregate book value of items of equipment removed and not previously reported in such Fiscal Year (other than in the ordinary course of business of the Mortgagor) shall be at least one Hundred Thousand Dollars ($100,000). The Mortgagor Certificate submitted shall specify the items of Fixtures and Equipment removed, the items of property substituted therefor, if any, and the amount, if any, required to be paid to the Master Trustee pursuant to the provisions of this Section 4.4.

Any funds paid to the Master Trustee pursuant to this Section 4.4 shall be remitted by the Master Trustee to the Related Bond Trustees on a pro rata basis for deposit in the sinking fund established under the Related Bond Indentures.

**Section 4.5.  Addition of Improvements and Equipment to Lien of Mortgage**.  All buildings, structures or improvements which may be acquired or constructed by Mortgagor subsequent to the date hereof and which are located on the Land, all property of every kind or nature added to or installed in any building, structure or improvement located on the Land, and all substitute or replacement items of Equipment acquired by any Mortgagor after the date hereof shall, immediately upon the acquisition thereof by such Mortgagor, and without any further conveyance or assignment, become subject to the mortgage lien and security interest of this Mortgage. Nevertheless, the Mortgagor, in accordance with the provisions of Section 3.1 hereof, will do, execute, acknowledge and deliver all and every such further acts, conveyances and assurances as the Master Trustee shall require for accomplishing the purposes of this Section 4.5.

**Section 4.6.  Release of Mortgage**.  Subject to the terms and conditions of the Master Indenture, the Mortgagor shall have the right to obtain a release of this Mortgage with respect to all of the Mortgaged Property in the event that the conditions for releasing the Mortgagor under Section 405 of the Master Indenture have been satisfied.

*(End of Article IV)*

19

2343395v5

# ARTICLE V

# MISCELLANEOUS

**Section 5.1.  Right of Inspection.**  At all reasonable times, upon prior written request (or, in an emergency, without any prior written request), the Master Trustee and its duly authorized agents, attorneys, experts, engineers, accountants and representatives may, and upon the direction of the Holders of at least twenty-five percent (25%) in aggregate principal amount of all Senior Obligations then Outstanding shall, inspect fully any and all of the Mortgaged Property herein conveyed, including all books, papers and records of any Mortgagor pertaining to the Mortgaged Property, and take such memoranda from and in regard thereto as may be desired, subject to any privacy restrictions under federal or state law regarding medical records, all at the expense of such Mortgagor; provided, however, that, if any such inspection occurs while no Event at Default has occurred and is continuing and includes any review or audit of any Mortgagor's books, papers or records by any independent accountant, such inspection shall be at the expense of the person making such inspection and not at the expense of the Mortgagor.

**Section 5.2.  Advances.**  If the Mortgagor shall fail to make all repairs, pay all liens, taxes, assessments and other charges required hereby, or maintain all insurance required hereunder, the Master Trustee may, but shall not be obligated to, take such action as may be necessary to cure such failure, including advancement of money, and the Mortgagor shall be obligated to repay all such advances on demand, with interest at an annual rate equal to ten percent (10%) per annum, or at such higher annual rate as the Mortgagor may consent to in writing, from the date of each such advance.

**Section 5.3.  Recording.**  The Master Trustee, at the expense of the Mortgagor, will cause this Mortgage and all supplements hereto and any other instruments of further assurances, to be promptly recorded, filed and registered, and at all times to be recorded, filed and registered, in such manner and in such places as may be required by law to preserve and protect fully the rights of the Master Trustee hereunder as to all of the Mortgaged Property.

**Section 5.4.  Opinion of Counsel or Title Endorsement to Recording.**  The Mortgagor will furnish to the Master Trustee, promptly after the execution and delivery of each supplemental instrument of further assurance (exclusive of UCC continuation statements), either (i) an Opinion of Counsel stating that, in the opinion of such counsel, this Mortgage, or such supplemental instrument of further assurance, has been properly recorded, filed or registered, or had been received for record, filing or registration in each requisite jurisdiction, so as to make effective the lien intended to be created by this Mortgage, and reciting the details of such actions, including the date or dates of such recordation, filing or registration or receipt for record, filing or registration, or state that in the opinion of such counsel, no such action is necessary to make such lien effective, or (ii) an endorsement to the tile insurance policy insuring the enforceability and priority of the lien of this Mortgage, insuring the effectiveness of the lien intended to be created hereby in light of such supplemental instrument.

**Section 5.5.  Binding Effect.**  All terms, covenants, conditions and agreements of the Mortgagor contained herein or set forth in the Master Indenture shall be binding upon the

20

Mortgagor, its heirs, representatives, successors and assigns, and every covenant, condition and agreement herein contained or set forth in the Master Indenture in favor of the Master Trustee, shall apply to and inure to the benefit of the Master Trustee, its successors or assigns.  This Mortgage is expressly made subject to all terms, conditions, covenants and agreements set forth in the Master Indenture.

**Section 5.6.  Amendments.**  Except as provided in Article IV hereof and in the Master Indenture, this Mortgage may be amended only in accordance with the provisions of Article IX of the Master Indenture.

**Section 5.7.  Use of Facility.**  It is recognized by the parties hereto that unless and until an Event of Default shall have occurred under Section 6.1 of the Master Indenture and the Master Trustee shall have exercised one of its remedies under Section 2.3 hereof, the Mortgagor shall have the unencumbered right to the use of the Facility in the ordinary course of its business, subject only to the covenants, conditions and agreements contained in the Master Indenture and the assignment of Rents contained in Section 2.6 hereof.

**Section 5.8.  Severability.**  In the event any provision of this Mortgage shall be held invalid, illegal, or unenforceable by any court of competent jurisdiction, such holding shall not invalidate or render unenforceable any other provision hereof, and the remaining provisions shall not in any way be affected or impaired thereby.

**Section 5.9.  Notices.**  All notices, certificate or other communications hereunder shall be sufficiently given and shall be deemed given two (2) days after the date when mailed by certified mail, postage prepaid, with proper address as indicated below.  The Issuer, the Mortgagor and the Master Trustee may, by written notice given by each to the others, designate any other address or addresses to which notices, certificates or other communications to them shall be sent when required as contemplated by this Mortgage.  Until otherwise provided by the respective parties, all notices, certificates and communications to each of them shall be addressed as follows:

|                          |                                                         |
|--------------------------|---------------------------------------------------------|
| To the Master Trustee:   | _____                                   |
|                          | _____                                   |
|                          | _____                                   |
|                          | Attn: Corporate Trust Department                        |
|                          |                                                         |
| To the Mortgagor:        | The Estelle Peabody Memorial Home of the Synod of       |
|                          | Lincoln Trails of the Presbyterian Church (U.S.A.)      |
|                          | c/o Peabody Retirement Home                             |
|                          | 400 W. 7th Street                                       |
|                          | North Manchester, IN  46962                             |
|                          |                                                         |
| To the Related           | Town of North Manchester                                |
| Bond Issuer:             | Town Hall                                               |
|                          | 103 East Main Street                                    |
|                          | North Manchester, Indiana  46962-1899                   |

21

**Section 5.10.**    **Execution Counterparts.**    This Mortgage may be simultaneously executed in several counterparts, each of which shall be an original and all of which shall constitute but one and the same instrument.

**Section 5.11.**    **Indiana Law.**    This Mortgage is made within the State of Indiana pursuant to the Act, and the parties intend that the Act and any other applicable Indiana law (other than the conflicts-of-laws principles thereof) govern this Mortgage, and all rights and indebtedness secured hereby.    The provisions of this Mortgage pertaining or relating to any security interest in personal property are intended to be governed in all respects by the UCC except to the extent that the UCC requires application of other law.

**Section 5.12.**    **Senior Mortgage**.    This Mortgage, any liens granted hereunder and payment of the Senior Obligations are all senior in all respects, including, in payment and priority, to the Junior Obligations (as defined in the Master Indenture), as more particularly provided for in the Master Indenture.

*(End of Article V)*

2343395v5

IN WITNESS WHEREOF, THE ESTELLE PEABODY MEMORIAL HOME OF THE SYNOD LINCOLN TRIALS OF THE PRESBYTERIAN CHURCH (U.S.A.), have caused these presents to be signed in their name and behalf by their duly authorized representative or representatives, and, to evidence their acceptance of the mortgage, lien and security interests created hereby and the other terms set forth herein, all as of the day and year first written above.

THE ESTELLE PEABODY MEMORIAL HOME
OF THE SYNOD OF LINCOLN TRAILS OF THE
PRESBYTERIAN CHURCH (U.S.A.)


By: _____
_____, President


Attest:

_____

_____, Vice President


*(Signature Page to Amended and Restated Mortgage, Security Agreement
and Fixture Financing Statement)*

23

STATE OF INDIANA      )
                            ) SS:

COUNTY OF WABASH    )

On this ____ day of _____, 2013, before me, the undersigned, a Notary

Public for the State of Indiana, personally appeared _____ and _____, known

to me to be the President and Vice President, respectively, of The Estelle Peabody Memorial

Home of the Synod of Lincoln Trails of the Presbyterian Church (U.S.A.), an Indiana nonprofit

corporation, who acknowledged to me that such corporation did execute the foregoing

instrument.

                                        _____

                                        Signature

                                        _____

                                        Printed                          Notary Public

My Commission Expires:                   My County of Residence:

_____         _____

*(Notary Page to Amended and Restated Mortgage, Security Agreement and Fixture Financing Statement)*

This instrument prepared by Dennis H. Otten, Bose McKinney & Evans LLP, 111 Monument Circle, Suite 2700, Indianapolis, Indiana 46204

I affirm under penalties for perjury that I have taken reasonable care to redact each Social Security Number in this document, unless required by law. *Dennis H. Otten*

2343395v5

**EXHIBIT A**

**LEGAL DESCRIPTION**

Part of the West Half of the Southwest Quarter of Section 32, Township 30 North, Range 7 East, being more particularly described as follows:

Beginning at the northwest corner of said Southwest Quarter, marked by an iron rebar stake; thence North 88 degrees 42 minutes 20 seconds East, along the north line of said Southwest Quarter, 1289.13 feet, to a masonry nail with a washer stamped LS80040428; thence South 00 degrees 02 minutes 49 seconds West, along the westerly right of way line of Maple Street, 1318.19 feet to a masonry nail with a washer stamped LS80040428; thence South 89 degrees 38 minutes 31 seconds West, along the northerly line of Sixth Street, 380.34 feet to an iron rebar stake with a plastic cap stamped LS80040428; thence South 00 degrees 02 minutes 24 seconds West, along the westerly line of Buffalo Street, 25.00 feet to an iron rebar stake with a plastic cap stamped LS80040428; thence South 89 degrees 38 minutes 31 seconds West, along the northerly line of August C. Mills Addition, 445.45 feet to an iron rebar stake with a plastic cap stamped LS80040428; thence North 00 degrees 00 minutes 00 seconds East, 547.65 feet to a chiseled "x"; thence South 88 degrees 42 minutes 20 seconds West, 462.50 feet to the west line of said Southwest Quarter; thence North 00 degrees 00 minutes 00 seconds East, along said west line, 782.02 feet to the POINT OF BEGINNING.

Containing 33.43 acres, more or less.

and

The following described real estate situated in Wabash County, State of Indiana:
Part of the Fractional Northwest Quarter and part of the Northeast Quarter of Section Number 31, Township 30 North, Range 7 East, Wabash County, Indiana, being more particularly described as follows:
Commencing at the southwest corner of said Fractional Northwest Quarter, marked by a section corner monument; thence North 89 degrees 40 minutes 51 seconds East, assumed bearing, along the south line of said Fractional Northwest Quarter, 55.92 feet; thence North 00 degrees 28 minutes 03 seconds East, 50.00 feet to the POINT OF BEGINNING and an iron iron rebar stake situated on the easterly right of way line of Indiana State Road Number 13; thence northerly, along said right of way line and a curve to the left having a radius of 114631.56 feet, an arc length of 225.00 feet and subtended by a chord bearing North 00 degrees 23 minutes 56 seconds East, 225.00 feet to an iron rebar stake; thence South 89 degrees 39 minutes 26 seconds East, 50.00 feet to an iron rebar stake;

A-1

thence North 00 degrees 19 minutes 49 seconds East, 50.00 feet to an iron rebar stake; thence North 89 degrees 39 minutes 26 seconds West, 50,00 feet to an iron rebar stake on the easterly right of way line of Indiana State Road Number 13; thence northerly, along said right of way line and a curve having a radius of 114631.56 feet, an arc length of 170.98 feet and subtended by a chord bearing North 00 degrees 16 minutes 30 seconds East, 170.98 feet to the centerline of Clear Creek; thence South 88 degrees 55 minutes 04 seconds East along said centerline, 134.42 feet; thence South 78 degrees 13 minutes 04 seconds East, along said centerline, 23.68 feet; thence South 78 degrees 19 minutes 47 seconds East, along said centerline, 188.16 feet; thence North 71 degrees 18 minutes 54 seconds East, along said centerline, 98.85 feet; thence North 44 degrees 02 minutes 11 seconds East, along said centerline, 111.11 feet; thence North 12 degrees 16 minutes 23 seconds West, along said centerline, 154.89 feet; thence North 22 degrees 30 minutes 22 seconds East, along said centerline, 85.82 feet; thence North 06 degrees 40 minutes 08 seconds East, along said centerline, 135.79 feet; thence North 15 degrees 27 minutes 48 seconds West, along said centerline, 141.80 feet; thence North 05 degrees 29 minutes 31 seconds East, along said centerline, 488.16 feet; thence North 19 degrees 39 minutes 45 seconds West, along said centerline, 88.69 feet; thence North 05 degrees 18 minutes 17 seconds East, along said centerline, 73.33 feet; thence North 66 degrees 44 minutes 22 seconds East, along said centerline, 370.56 feet; thence North 89 degrees 31 minutes 36 seconds East, along said centerline, 44.13 feet; thence North 48 degrees 02 minutes 28 seconds East, along said centerline, 94.07 feet; thence North 69 degrees 03 minutes 01 seconds East, along said centerline, 317.11 feet thence North 74 degrees 16 minutes 42 seconds East, along said centerline, 146.36 feet; thence North 67 degrees 05 minutes 27 seconds East, along said centerline, 113.55 feet; thence North 74 degrees 21 minutes 14 seconds East, along said centerline, 262.21 feet; thence North 42 degrees 03 minutes 46 seconds East, along said centerline, 78.73 feet to the westerly right of way line of Conrail Railroad; thence southeasterly, along said right of way line and a non-tangent curve to the right having a radius of 5680.15 feet, an arc length of 193.39 feet and subtended by a chord bearing South 30 degrees 36 minutes 04 seconds East, 193.38 feet to the point of tangency; thence South 28 degrees 27 minutes 57 seconds East, along said right of way line, 2285.87 feet to an iron rebar stake; thence South 89 degrees 40 minutes 51 seconds West, parallel with the south line of said Northeast Quarter and Fractional Northwest Quarter, 3006.34 feet to the POINT OF BEGINNING.

Containing 92.43 acres, more or less.

# EXHIBIT B

## PERMITTED ENCUMBRANCES

# JUNIOR MORTGAGE, SECURITY AGREEMENT
# AND FIXTURE FINANCING STATEMENT
## (Wabash County)

between

# THE ESTELLE PEABODY MEMORIAL HOME OF THE SYNOD OF LINCOLN
# TRAILS OF THE PRESBYTERIAN CHURCH (U.S.A.)

as Mortgagor

and

_____

as Master Trustee

Dated as of _____, 2013

(THIS JUNIOR MORTGAGE, SECURITY AGREEMENT AND FIXTURE FINANCING STATEMENT CONTAINS AFTER-ACQUIRED PROPERTY PROVISIONS, CREATES SECURITY INTERESTS IN PERSONAL PROPERTY AND FIXTURES, CONSTITUTES AN ASSIGNMENT OF THE INTERESTS OF MORTGAGOR, AS LESSOR, IN LEASES WITH RESPECT TO THE MORTGAGED PROPERTY, IS A FIXTURE FINANCING STATEMENT WITHIN THE MEANING OF THE UNIFORM COMMERCIAL CODE)

# TABLE OF CONTENTS

**ARTICLE 1**    **DEFINITIONS, EXHIBIT AND RULES OF INTERPRETATION** ........................ 1

   **Section 1.1.**   **Definitions.** ............................................................................................. 1

   **Section 1.2.**   **Exhibits** ................................................................................................ 3

   **Rules of Interpretation** ................................................................................................ 3

**ARTICLE II**    **MORTGAGE AND SECURITY INTEREST** ....................................... 5

   **Section 2.1.**   **Mortgage and Security Interest** ..................................................... 5

   **Section 2.2.**   **Payments and Performances Secured** ............................................ 6

   **Section 2.3.**   **Remedies Upon Event of Default** ................................................... 7

   **Section 2.4.**   **Surrender of Possession After Sale** ................................................ 8

   **Section 2.5.**   **Right of Entry** ................................................................................. 8

   **Section 2.6.**   **Assignment of and Security Interest in Leases and Rents** .......... 8

   **Section 2.7.**   **Receiver** ........................................................................................... 9

   **Section 2.8.**   **Application of Money to Indebtedness** ........................................ 10

   **Section 2.9.**   **Termination of Proceedings** ......................................................... 10

   **Section 2.10.**  **Rights of Junior Obligations** ........................................................ 10

   **Section 2.11.**  **Waiver** ............................................................................................ 10

   **Section 2.12.**  **Attorneys' Fees** ............................................................................. 11

   **Section 2.13.**  **Financing Statement** ..................................................................... 11

   **Section 2.14.**  **Construction Mortgage** ................................................................ 12

   **Section 2.15.**  **Waiver of Purchase Money Mortgage** .......................................... 12

   **Section 2.16.**  **Title Evidence and Insurance Policies** .......................................... 12

   **Secured 2.17.**  **Security Agreement** ...................................................................... 12

**ARTICLE III**    **REPRESENTATIONS, COVENANTS, PERMITTED ENCUMBRANCES** ......... 15

   **Section 3.1.**   **Warranty of Title** .......................................................................... 15

   **Section 3.2.**   **Performance of and Authority for Covenants** ............................. 15

   **Section 3.3.**   **Liens and Encumbrances** .............................................................. 15

   **Section 3.4.**   **Permitted Contests** ....................................................................... 16

   **Section 3.5.**   **Building and Equipment Covenants** ............................................ 16

   **Section 3.6.**   **Powers of the Master Trustee** ...................................................... 17

**ARTICLE IV**    **RELEASE OF MORTGAGED PROPERTY, EASEMENTS, TIE-IN WALLS, REMOVAL OF FACILITY, ADDITION OF IMPROVEMENTS TO LIEN OF MORTGAGE** .... 18

   **Section 4.1.**   **Intentionally Omitted** ................................................................... 18

   **Section 4.2.**   **Grant of Easements, Licenses, Etc.** .............................................. 18

   **Section 4.3.**   **Tie-In Walls** .................................................................................. 18

   **Section 4.4.**   **Removal of Fixtures and Equipment** ............................................ 19

**Section 4.5.** **Addition of Improvements and Equipment to Lien of Mortgage** ............................ 20

**Section 4.6.** **Release of Mortgage** ................................................................................ 20

**ARTICLE V**     **MISCELLANEOUS** .................................................................................. 21

**Section 5.1.** **Right of Inspection** .................................................................................. 21

**Section 5.2.** **Advances** .................................................................................................. 21

**Section 5.3.** **Recording** ................................................................................................ 21

**Section 5.4.** **Opinion of Counsel or Title Endorsement to Recording** ...................... 21

**Section 5.5.** **Binding Effect** .......................................................................................... 21

**Section 5.6.** **Amendments** ............................................................................................ 22

**Section 5.7.** **Use of Facility** .......................................................................................... 22

**Section 5.8.** **Severability** .............................................................................................. 22

**Section 5.9.** **Notices** ..................................................................................................... 22

**Section 5.10.** **Execution Counterparts** ........................................................................ 23

**Section 5.11.** **Indiana Law** ............................................................................................ 23

**Section 5.12.** **Junior Mortgage** ..................................................................................... 23

**EXHIBIT A**     **LEGAL DESCRIPTION** ........................................................................ A-1

**EXHIBIT B**     **PERMITTED ENCUMBRANCES** ......................................................... B-1

JUNIOR MORTGAGE, SECURITY AGREEMENT
AND FIXTURE FINANCING STATEMENT

**THIS JUNIOR MORTGAGE, SECURITY AGREEMENT AND FIXTURE FINANCING STATEMENT**, dated as of _____, 2013 (this "Mortgage"), between **THE ESTELLE PEABODY MEMORIAL HOME OF THE SYNOD OF LINCOLN TRAILS OF THE PRESBYTERIAN CHURCH (U.S.A.)**, an Indiana nonprofit corporation, (the "Mortgagor"), and _____, a banking corporation duly established and validly existing under and by virtue of the laws of the United States of America, successor to Wells Fargo Bank Indiana NA, as master trustee under the Master Trust Indenture hereinafter referred to (the "Master Trustee"), as mortgagee, which, together with the Amended and Restated Mortgage, Security Agreement and Fixture Financing Statement, dated as of _____, 2013, between the Mortgagor and the Master Trustee, amends and restates in its entirety that certain MORTGAGE, SECURITY AGREEMENT AND FIXTURE FINANCING STATEMENT, dated as of August 15, 2002, between the Mortgagor and the Master Trustee, and recorded with the Recorder of Wabash County, Indiana, on August 29, 2002 in **Volume 551, Page 335**;

PRELIMINARY STATEMENT

Pursuant to a certain Amended and Restated Master Trust Indenture dated as of _____, 2013 (together with all amendments thereof and supplements thereto, the "Master Indenture"), between the Members (as defined in the Master Indenture) and the Master Trustee, the Members may issue notes secured thereby from time to time. The Mortgagor wishes to mortgage and grant a security interest in the property described herein to the Master Trustee to secure the payment of the Subordinate Obligations, as defined below, issued under the Master Indenture.

NOW, THEREFORE, in consideration of the agreements contained in the Master Indenture and this Mortgage, the Mortgagor agrees as follows:

# ARTICLE 1

## DEFINITIONS, EXHIBIT AND RULES OF INTERPRETATION

**Section 1.1.**    **Definitions.**    The terms used in this Mortgage, unless the context clearly requires otherwise, shall have the same meanings as set forth in the Master Indenture.    In addition, terms defined in the recitals hereto and the following terms shall for all purposes of this Mortgage have the meanings herein specified, unless the context clearly otherwise requires:

"Building" shall mean the buildings, structures and site improvements and all other facilities and improvements forming a part of the Facility, and not constituting Fixtures or Equipment, and all other buildings, structures and improvements now or hereafter located on the Land, as they may at any time exist.

"Equipment" shall mean any and all items of furniture, machinery, equipment or other personal property located on the Land or in the Building, and all additions thereto and substitutions therefor including the proceeds therefrom, less any machinery, furniture, equipment or other personal property as may be taken by exercise of the power of eminent domain or as may be released from the lien of this Mortgage pursuant to Section 4.4 hereof, as such times may at any time exist.

"Event of Default" shall mean any event defined as such in Section 502 of the Master Indenture.

"Facility" shall mean the Land, the Building, the Fixtures and the Equipment, as such may at any time exist.

"Fixtures" shall mean any and all items or fixtures now owned or hereafter acquired by any Mortgagor and now or hereafter attached to or installed within or used in connection with the Land, including, but not limited to, any and all heating, plumbing and lighting apparatus, elevators and motors, engines and machinery, electrical equipment, incinerator apparatus, ventilating, air-conditioning and air cooling apparatus, water and gas apparatus, pipes, water heaters, mirrors, mantels, partitions, cleaning, intercom and sprinkler systems, fire extinguishing apparatus and equipment, water tanks, water softeners, carpets, carpeting, store windows and doors, window screens, screen doors, storm sash, window shades or blinds, awnings, locks, fences, trees, shrubs and all other non-consumable personal property of every kind and nature whatsoever permanently affixed to the Land or improvements thereon, including all extensions, additions, improvements, betterments, renewals and replacements of any of the foregoing, all of which are hereby declared and shall be deemed to be fixtures and an accession to the freehold and a part of the realty, as they may at any time exist, exclusive of items of Fixtures released from the lien hereof pursuant to the provisions of Section 4.4 hereof.

"Governmental Issuer" shall mean any state of the United States of America or any municipal corporation or other political subdivision formed under the laws thereof or any body

1

corporate and politic or any constituted authority or any agency or instrumentality of any of the foregoing empowered to issue obligations on behalf thereof.

"Land" shall mean the real estate and interest in real estate and other rights, licenses and permits with respect to real estate located in the County of Wabash, State of Indiana, which is described in Exhibit A attached hereto as the "Land", together with all rights in and to said real estate lying in streets, alleys and roads adjoining said real estate and all water rights, mineral rights, ditch rights, easements, rights of way, the reversion or reversions, remainder or remainders in and to said real estate, and all tenements, hereditaments, appurtenances, rights, privileges and immunities thereto belonging or appertaining whether now owned or hereafter acquired, however evidenced, used or enjoyed with said real estate, but exclusive of any real estate released from the lien hereof pursuant to provisions hereof.

"Leases" shall mean any and all leases, subleases, licenses, concessions or other occupancy agreements or agreement for guarantee of payments in lieu of Rents between any Mortgagor, as lessor, sublessor, licensor or grantor, and Lessees, as lessee, sublessee, licensee or grantee, with respect to the Facility, including any amendment or supplement thereto; excluding, however, any Residency Agreements.

"Lessee" shall mean a Person subleasing or occupying all or some portion of the Facility or guaranteeing payments in lieu of Rents from any Mortgagor pursuant to a Lease and any successor or assign of such Person.

"Master Indenture" shall mean the Amended and Restated Master Trust Indenture, dated as of _____, 2013, between the Mortgagor and the Master Trustee, which amends and restates the Original Master Indenture.

"Mortgage" shall mean this Junior Mortgage, Security Agreement and Fixture Financing Statement, as it may be supplemented or amended in accordance with the provisions hereof and of the Master Indenture.

"Mortgaged Property" shall mean the property set forth in Section 2.1 hereof.

"Mortgagor" shall mean The Estelle Peabody Memorial Home of the Synod of Lincoln Trails of The Presbyterian Church (U.S.A.), an Indiana nonprofit corporation, or its permitted successors and assigns under the Master Indenture.

"Mortgagor Certificate or Request" shall mean a written certificate, consent, order of request signed by a Mortgagor Representative and delivered to the Master Trustee, as assignee of this Mortgage.

"Mortgage Representative" shall mean a person designated to act on behalf of any Mortgagor as evidenced by a written certificate furnished to the Master Trustee containing the specimen signature of such person and signed for such Mortgagor by its Chief Executive Officer.

2374523v2

"Original Master Indenture" shall mean the Master Trust Indenture, dated as of August 15, 2002, between the Mortgagor and the Master Trustee, as supplemented and amended by the Series 2002A Supplemental Master Indenture and the Series 2002B Supplemental Master Indenture.

"Permitted Encumbrances" shall mean the Permitted Encumbrances as defined in Section 101 of the Master Indenture and those additional items listed in <u>Exhibit B</u> attached hereto and made a part hereof.

"Rents" shall mean any rents, income, profits or proceeds from any Leases, license, concession or other arrangement entered into with respect to the Mortgaged Property.

"Registered Land Surveyor" shall mean a Person engaged in the profession of surveying land and licensed in the State of Indiana, whether or not employed by, or in any way affiliated with, the Related Issuer or any Mortgagor.

"Residency Agreement" means any agreement between the Mortgagor and a resident of the Facility to occupy a unit in the Facility.

"Series 2013B Note" shall mean The Estelle Peabody Memorial Home of the Synod of Lincoln Trails of the Presbyterian Church (U.S.A.) Series 2013B Note dated as of the date hereof in the aggregate original principal amount of $23,400,000, with maturity dates of _____, issued pursuant to the Master Indenture.

"Subordinate Obligations" shall have the meaning ascribed to it in the Master Indenture, which includes the Series 2013B Note.

"Uniform Commercial Code ("UCC")" shall mean the Uniform Commercial Code as enacted and from time to time amended in the State of Indiana, except that when "Uniform Commercial Code" or "UCC" is prefixed by the name of another state of the United States, it shall mean the Uniform Commercial Code as enacted and from time to time amended in that state.

**Section 1.2.   Exhibits.**   Attached to and by reference made a part of this Mortgage is the following:

Exhibit A:      Legal description of the Land.

Exhibit B:      Permitted Encumbrances.

**Section 1.3.   Rules of Interpretation.**

(1)      This Mortgage shall be interpreted in accordance with and governed by the laws of the State of Indiana without giving effect to the conflicts-of-laws principles thereof.

3

(2)     The words "herein," "hereof" and "hereunder" and words of similar import, without reference to any particular article, section or subdivision, refer to this Mortgage as a whole rather than to any particular article, section or subdivision hereof.

(3)     References in this instrument to any particular article, section or subdivision hereof are to the designated article, section or subdivision of this instrument as originally executed.

(4)     The Table of Contents and titles of articles and sections herein are for convenience only and are not part of this Mortgage.

(5)     Unless the context hereof clearly requires otherwise, the singular shall include the plural and vice versa and the masculine shall include the feminine and vice versa.

(6)     Unless the context hereof clearly requires otherwise, "or" is not intended to be exclusive, but is intended to permit one or more or all of the alternative conjoined.

*(End of Article I)*

2374523v2

## ARTICLE II

## MORTGAGE AND SECURITY INTEREST

**Section 2.1.**    **Mortgage and Security Interest.**  Excepting only the Land and Fixtures, any and all assets, rights, title and interest of the Mortgagor included or otherwise identified in this Section are collectively defined as the "Personal Property."  Capitalized words and phrases used in this instrument and not otherwise defined herein shall have the respective meanings assigned to such terms in either: (i) Article 9 of the Uniform Commercial Code as in force in Indiana at the time any financing statement or amendment thereto is filed by Master Trustee, or (ii) Article 9 as in force at any relevant time in Indiana, and the meaning to be ascribed thereto with respect to any particular item of property shall be that under the more encompassing of such definitions.  The Mortgagor, in consideration of the Subordinate Obligations and the other good and lawful consideration, the receipt and sufficiency of which are hereby acknowledged from the Related Issuer, and to secure, and as security for, the payment of the Subordinate Obligations and the payment, performance and observance by the Mortgagor of all of the other covenants, agreements, representations, warranties and conditions herein or in the Master Indenture contained, by these presents does hereby irrevocably mortgage and warrant to the Master Trustee, its successors or its assigns forever, the following properties (all herein after referred to as the "Mortgaged Property"), and also does hereby grant to the Master Trustee, its successors or its assigns, forever, a security interest in all of such properties constituting goods, fixtures and other items of intangible personal property.

(a)    The real estate and interests in real estate described as the "Land" in Exhibit A attached hereto and made a part hereof, situated in the County of Wabash, in the State of Indiana;

(b)    All buildings, structures, additions, improvements and fixtures now or hereafter located on the Land, including all right, title and interest of such Mortgagor in and to all building materials and supplies and plants of every kind and nature whatsoever on said premises or in any building now or hereinafter located thereon, together with all rights in and to land lying in streets, alleys and roads adjoining the real estate and all water rights, mineral rights, ditch rights, easements, rights of way, the reversion or reversions, remainder or remainders in and to said real estate, and all tenements, hereditaments, appurtenances, rights, privileges and immunities thereunto belonging or appertaining whether now owned or hereafter acquired, however evidenced, used or enjoyed with said Land;

(c)    All rights, interests and privileges of the Mortgagor in and to the Facility including, but not limited to, all Leases with respect to and Rents, revenues and income derived by the Mortgagor from the Facility, as more fully provided in Section 2.6 hereof;

(d)    Any and all claims made or insurance proceeds paid for the damage of or destruction to all or any part of the Facility under the policies of insurance required by Section 407 of the Master Indenture, and any and all awards or compensation made by any governmental or other lawful authority for the taking or damaging by eminent

2374523v2

domain of the whole or any party of the Facility, including any awards for a temporary taking, change of grade of streets, or taking of access;

(e)    All rights, title and interest of the Mortgagor in and to any and all tangible personal property, all Inventory, including, without limitation, raw materials, work-in-process and finished goods, all Goods, including, without limitation, embedded software, Equipment, vehicles, furniture and Fixtures, and all Software and computer programs;

(f)    All right, title and interest hereinafter acquired in or to any of the property, real or personal, described above, hereby also releasing, relinquishing and waiving all exemptions in or to said property, vested or inchoate; and

(g)    All proceeds from any property described in the foregoing paragraphs of this Section 2.1, and any and all other property of every name and nature from time to time hereafter by delivery or by writing of any kind conveyed, pledged, assigned or transferred, as and for additional security hereunder by the Mortgagor or by anyone in its behalf or with its written consent to the Master Trustee, which is hereby authorized to receive any and all such property at any and all times to hold and apply the same subject to the terms hereof;

TO HAVE AND TO HOLD, all and singular, the Mortgaged Property and the rights, privileges and appurtenances hereby conveyed and assigned, or agreed or intended so to be, to the Master Trustee and its successors and to them and their assigns forever, acting on behalf and for the equal and pro rata benefit and security of each and every Holder of Subordinate Obligations issued and to be issued under the Master Indenture, without preference, priority or distinction as to the participation in the lien, benefit and protection hereof of one Subordinate Obligation over or from the others for any reason whatsoever, except as in the Master Indenture otherwise expressly provided, so that each and all of such Subordinate Obligations shall be equally secured hereby with the same effect as if the same had all been made, issued and negotiated simultaneously with the delivery hereof and were expressed to mature on one and the same date;

SUBJECT, NEVERTHELESS, to Permitted Encumbrances;

AND IT IS HEREBY COVENANTED, DECLARED AND AGREED by and between the parties hereto that the Mortgaged Property is to be held and applied, subject to the further covenants, agreements and conditions set forth in the Master Indenture herein.

**Section 2.2.    Payments and Performances Secured.**  This Mortgage shall cover and secure:

(A)    Payment of (1) the principal of _____ and 00/100 Dollars ($_____) and redemption premium, if any, and interest on the Series 2013B Note, and (2) all other Subordinate Obligations issued under the Master Indenture;

6

(B)    To the extent relating to the Subordinate Obligations, payment of all other sums, with interest thereon at the rate specified herein or in the Master Indenture, becoming due and payable under the provisions hereof or of the Master Indenture, to the Master Trustee;

(C)    To the extent relating to the Subordinate Obligations, performance of each covenant, agreement or condition of the Mortgagor set forth in the Master Indenture, or any indebtedness or document relating thereto;

(D)    To the extent relating to the Subordinate Obligations, performance of each covenant, agreement or condition of the Mortgagor contained herein, including without limitation any obligation to repay any advances pursuant to Section 5.2 hereof; and

(E)    To the extent relating to the Subordinate Obligations, payment of any present or future demands of any kind or nature which the Master Trustee may have against the Mortgagor under or pursuant to the Master Indenture, any Obligation or this Mortgage, whether absolute or contingent, whether due or not, whether otherwise secured or not, or whether existing at the time of the execution of this Mortgage, or arising thereafter;

provided that the total amount of all future advances contemplated and to be subject to the protection of this Mortgage is limited to Fifty Million Dollars ($50,000,000) plus all accrued and accruing interest and other amounts owing, as stated herein.

**Section 2.3.    Remedies Upon Event of Default.**  If one or more Events of Default shall have occurred and be continuing, the Master Trustee shall be entitled to exercise any or all of the remedies set forth or provided in the Master Indenture, including, but not limited to, petitioning a court of competent jurisdiction for the appointment of a receiver to take possession of and manage and operate the Mortgaged Property for the benefit of the Holders of the Subordinate Obligations then Outstanding, and including, but not limited to, declaring all outstanding Subordinate Obligations under the Master Indenture immediately due and payable without notice.

Without limitation as to the foregoing, upon any Event of Default, the Master Trustee shall have the right to proceed to protect and enforce its rights by a suit or suits in equity or at law, either for the specific performance of any covenant or agreement contained herein or in the Master Indenture or in aid of the execution of any power herein or therein granted, or the foreclosure of this Mortgage as a mortgage, or for the enforcement of any other appropriate legal or equitable remedy.

In the case of any sale of the Mortgaged Property pursuant to any judgment or decree of any court or otherwise in connection with the enforcement of any of the terms of this Mortgage, the Master Trustee or the Holder of any of the Subordinate Obligations then Outstanding (whether or not then in default) may become the purchaser and, for the purpose of making settlement for or payment of the purchase price, shall be entitled to turn in and use the indebtedness evidenced by the Master Indenture or the Subordinate Obligations and any claims

7

for interest matured and unpaid thereon, together with additions to the mortgage debt, if any, accrued in order that there may be credited thereon the sums payable out of the net proceeds of such sale to the Holder of such Subordinate Obligations and claims for interest and additions to the mortgaged debt, if any, as his ratable share of such net proceeds; and thereupon such purchaser shall be credited on account of such purchase price with the portion of net proceeds that shall be credited on account of such purchase price with the portion of such net proceeds that shall be applicable to the payment of, and shall have been credited upon, the Subordinate Obligations and claims for interest and additions to the mortgage debt so used.

Each and every power or remedy herein specifically given shall be in addition to every other power or remedy, existing or implied, given or now or hereafter existing at law or in equity, and each and every power and remedy herein specifically given or otherwise so existing may be exercised from time to time and as often and in such order as may be deemed expedient by the Master Trustee and the exercise or the beginning of the exercise of one power or remedy shall not be deemed a waiver of the right to exercise at the same time or thereafter any other power or remedy. No delay or omission of the Master Trustee in the exercise of any right or power accruing hereunder shall impair any such right or power or be construed to be a waiver of any default or acquiescence therein.

**Section 2.4.    Surrender of Possession After Sale.**  The Mortgagor agrees to surrender possession of the Mortgaged Property to the purchaser at the foreclosure sale on demand, in the event that possession has not previously been delivered by the Mortgagor.

**Section 2.5.    Right of Entry.**   If the Master Trustee exercises one of the remedies provided for in Section 2.3 hereof, pursuant to a foreclosure of this Mortgage, the Master Trustee may then or at any time thereafter take complete and peaceful possession of the Facility or any portion thereof, with or without process of law, and may remove all persons therefrom, and the Mortgagor covenants in any such event peacefully and quietly to yield up and surrender the Facility or such portion thereof to the Master Trustee.

**Section 2.6.    Assignment of and Security Interest in Leases and Rents.**   The Mortgagor will perform and discharge its obligations, covenants and agreements under any and all Leases and will enforce and secure the performance of each and every covenant, obligation and agreement of each Lessee thereunder without cost or expense to the Master Trustee. The Mortgagor will promptly notify the Master Trustee of any monetary default under any of the Leases which is not cured within ten (10) days following written notice by the Mortgagor to the Lessee, and the Mortgagor will, upon written request of the Master Trustee, exercise, in a prompt and diligent manner and at its own expense, the remedies available to it under the Leases then in default and prescribed by the Master Trustee in its request, including, without limitation and if available and requested by the Master Trustee, instituting a proceeding for eviction, or to collect delinquent rent or enforce other covenants or obligations of the Lessees under the Leases.

Each Lessee shall agree to subordinate its Lease to the lien of this Mortgage and attorn to the Master Trustee. The Mortgagor agrees not to enter into any Lease unless the Lessee thereunder agrees to subordinate such Lease to the lien of this Mortgage and attorn to the Master Trustee.

8

2374523v2

The Master Trustee shall not be obligated to collect or attempt to collect any Rents which are not in fact paid to it; further, it shall not be obligated to perform or discharge, nor does it hereby undertake to perform or discharge, any obligation, duty or liability under the Leases, or under or by reason of their assignment.

As additional security for the performance of the Mortgagor's obligations, the Mortgagor does hereby grant, transfer and assign to the Master Trustee all of its right, title and interest in and to all existing and future Leases and all extensions, modifications and renewals, if any, thereof, and any guarantees of the Lessee's obligations under any of the Leases. The Mortgagor does further hereby grant, transfer and assign to the Master Trustee all of the Rents now or hereafter accruing or owing from the Leases or otherwise as a result of any use, possession or occupancy of the Facility or any part thereof.

This assignment shall constitute an actual and present assignment of the Rents and Leases; provided that so long as no Event of Default hereunder has occurred and is subsisting, any Mortgagor shall be entitled to collect, but not more than thirty (30) days before due and payable, all of the Rents, and to retain, use and enjoy the same unless and until an Event of Default occurs hereunder. Upon the occurrence of an Event of Default hereunder, and upon written notice of the Master Trustee, all Rents payable under the Leases by the Lessees to any Mortgagor shall be payable directly to the Master Trustee. Any Mortgagor's obligations to make loan repayments under Section 401 of the Master Indenture or other payments under the Master Indenture shall be satisfied to the extent and in the amount of the Rents applied thereto in accordance with this Section 2.6.

The Lessees under each of the Leases are hereby irrevocably authorized and directed to recognize the claims of the Master Trustee hereunder without investigating the reason for any action taken by the Master Trustee, or the validity or the amount of indebtedness owing to the Master Trustee, or the existence of any default under this Mortgage, the Master Indenture or the application of the Rents to be made by the Master Trustee. The Mortgagor hereby irrevocably directs and authorizes each of the Lessees upon an Event of Default hereunder or under the Master Indenture and notification thereof by the Master Trustee to pay to the Master Trustee such sums due under its Lease as will satisfy the obligations of the Mortgagor hereunder and under the Master Indenture. To the extent that such sums are paid to the Master Trustee, the Mortgagor agrees that the Lessee shall have no further liability to the Mortgagor for the same. The sole signature of the Master Trustee shall be sufficient for the exercise of any rights hereunder, and the sole receipt of the Master Trustee of any sums received shall be a full discharge and release therefor to any such Lessee.

**Section 2.7.   Receiver.**   Upon the happening of any Event of Default and during its continuance, or upon the commencement of any proceedings to foreclose this Mortgage or to enforce the specific performance hereof or in aid thereof or upon the commencement of any other proceeding to enforce any right of the Master Trustee hereunder, the Master Trustee shall be entitled, if it shall so elect and without regard to waste, adequacy of security, or solvency of any Mortgagor, forthwith, either before or after declaring all or a portion of the indebtedness

9

secured hereby to be due and payable, to petition a court of competent jurisdiction for the appointment of a receiver or receivers pursuant to Indiana law.

Upon the happening of any of the events set forth in the preceding paragraph or during any period of redemption after a foreclosure sale and before the appointment of a receiver as hereinbefore provided, the Master Trustee shall have the right to collect the Rents to the extent and apply the same in the manner provided by Section 2.6 hereof. This assignment shall be binding upon the occupants of the Facility from the date of service of a copy of a notice of default in the terms and conditions of this Mortgage upon the occupants of the Facility. For the purpose aforesaid, the Master Trustee may enter and take possession of the Facility and manage and operate the same and take any action which, in the judgment of the Master Trustee, is necessary or proper to conserve the value of the Facility. The Master Trustee may also take possession of, and for these purposes use, any and all of the Equipment.

The expenses (including any receiver's fees, reasonable attorneys' fees, costs and agent's compensation) incurred pursuant to the powers herein contained shall be deemed to be immediately due and payable by the Mortgagor to the Master Trustee and shall be secured hereby. The Master Trustee shall not be liable to account to the Mortgagor for any action taken pursuant hereof other than to account for any Rents actually received by the Master Trustee.

**Section 2.8. Application of Money to Indebtedness.** The purchase money proceeds and avails of any sale of the Mortgaged Property or any part thereof, and the proceeds and avails of any other remedy hereunder, including proceeds realized under the assignment in Section 2.6 hereof, after payment of the costs and expenses (including reasonable attorneys' fees) of obtaining said proceeds, shall be apportioned and applied to the indebtedness secured hereby in accordance with the provisions of the Master Indenture.

**Section 2.9. Termination of Proceedings.** In case the Master Trustee shall have proceeded to enforce any right under this Mortgage by foreclosure, sale, entry or otherwise, and such proceedings shall have been discontinued or abandoned for any reason or shall have been determined adversely, then and in every such case the Mortgagor and the Master Trustee shall be restored, subject to any determination in such proceedings, to their former positions and rights hereunder with respect to the property subject to the lien hereof.

**Section 2.10. Rights of Holders of Subordinate Obligations.** If an Event of Default has occurred and is continuing, the Holders of outstanding Subordinate Obligations shall have, with regard to all rights, powers and remedies granted to the Master Trustee by, and any and all proceedings instituted under, this Article II, all of the rights granted to such Holders under Sections 505 and 509 of the Master Indenture.

**Section 2.11. Waiver.** The Mortgagor hereby waives, to the extent it lawfully may, all rights to have the Mortgaged Property marshaled upon any foreclosure hereof and agrees that any court having jurisdiction to foreclose this Mortgage may order the sale of the Mortgaged Property or any portion thereof as an entirety.

10

Case 13-00976-JMC-11 Doc 60-3 of 3 Filed 06/28/13 EOD 06/28/13 13:20:26 Pg 82 of
130

**Section 2.12.** **Attorneys' Fees.** In the event an Event of Default should occur and the Master Trustee should employ attorneys or incur other expenses for the foreclosure of this Mortgage or the enforcement or performance of any obligation of the Mortgagor hereunder, the Mortgagor will, on demand of the Master Trustee and receipt of an accounting therefor, pay to the Master Trustee the reasonable fees of such attorneys and such other expenses so incurred, to the extent then permitted by Indiana law.

**Section 2.13.** **Financing Statement.** This instrument shall be deemed to be a financing statement filed as a fixture filing within the meaning of the UCC, and for such purpose the following information is being furnished:

| | | |
|---|---|---|
| (a) | Name and Address of Debtor | The Estelle Peabody Memorial Home of the Synod of Lincoln Trails of the Presbyterian Church (U.S.A.)<br>c/o Peabody Retirement Home<br>400 West 7th Street<br>North Manchester, IN 46962 |
| | Taxpayer Identification Number and County of Residence of Debtor | Taxpayer Identification No. The Estelle Peabody Memorial Home of the Synod of Lincoln Trails of the Presbyterian Church (U.S.A.)<br>35-0883511 |
| (b) | Record owner of real estate: | The Estelle Peabody Memorial Home of the Synod of Lincoln Trails of the Presbyterian Church (U.S.A.)<br>c/o Peabody Retirement Home<br>400 West 7th Street<br>North Manchester, IN 46962 |
| (c) | Name and Address Of Secured Party | _____<br>Master Trustee<br>_____<br>_____ |
| (d) | Description of types (or Items) of property covered by this Financing Statement: | See definition of "Fixtures" in Section 1.1 hereof |
| (e) | Description of real estate to which collateral is attached or upon which it is located: | See Exhibit A hereto |

11

Some or all of the above-described collateral is or is to become fixtures upon the real estate described in <u>Exhibit A</u> hereto, and this Financing Statement is to be filed for record in the real estate records of Wabash County, Indiana.

The Mortgagor hereby authorizes any financing statements or amendments thereof or continuation statements thereto that the Master Trustee may require to perfect a security interest in said items or types of property. The Mortgagor shall pay all costs of filing such instruments.

**Section 2.14.  Construction Mortgage.**  Intentionally omitted.

**Section 2.15.  Waiver of Purchase Money Mortgage.**  The Mortgagor and the Master Trustee hereby acknowledge and agree that this Mortgage shall not be deemed or interpreted to be a "purchase money" mortgage under Indiana Code Section 32-29-1-4.

**Section 2.16.  Title Evidence and Insurance Policies.**  Each title insurance policy, all other evidences of title and all insurance policies placed or deposited with the Master Trustee (including proceeds from such policies) shall be deemed an incident to the title to the Mortgaged Property and upon foreclosure shall pass to the purchaser and the same are hereby pledged as additional security for the payment of the indebtedness secured hereby.

**Secured 2.17.  Security Agreement.**  The Mortgagor and the Master Trustee agree that this Mortgage shall constitute a "security agreement" within the meaning of the UCC with respect to any Personal Property and Fixtures included as part of the Mortgaged Property and all replacements thereof, substitutions therefor, additions thereto and the proceeds thereof (any and/or all of the Personal Property and Fixtures and the replacements thereof, substitutions therefor, additions thereto and the proceeds thereof may be referred to as the "Collateral"), and that a security interest in and to the Collateral is hereby granted to the Master Trustee, and the Collateral and all of the Mortgagor's right, title and interest therein are hereby assigned to the Master Trustee, all to secure payment of the indebtedness described in Section 2.2 hereof.  All of the provisions contained in this Mortgage pertain and apply to the Collateral as fully and to the same extent as to any other property comprising the Mortgaged Property, and the following provisions of this Section 2.17 shall not limit the applicability of any other provisions of this Mortgage but shall be in addition thereto:

(a)     The Mortgagor (being the "debtor" as that term is used in the Code) is and will be the true and lawful owner of the Collateral, subject to no liens, charges or encumbrances other than the Permitted Encumbrances.

(b)     The Collateral is to be used by the Mortgagor and its tenants solely for business purposes.

(c)     The Collateral may be affixed to the Land but will not be affixed to any other real estate.

(d)     The Mortgagor will at its own cost and expense, upon demand, furnish to the Master Trustee such information and authorizes such financing statements and

12

other documents in form satisfactory to the Master Trustee and will do all such acts as the Master Trustee may at any time or from time to time request or as may be necessary or appropriate to establish and maintain a perfected security interest in the Collateral as security for the indebtedness described in Section 2.2 hereof, subject to no other liens or encumbrances, other than the Permitted Encumbrances. The Mortgagor will pay the cost of filing or recording such financing statements or other documents, and this instrument, in all public offices wherever filing or recording is deemed by the Master Trustee to be desirable.

(e)     Upon any default under any of the indebtedness described in Section 2.2 hereof, the Master Trustee shall have the remedies of a secured party under the UCC and the Master Trustee shall be entitled to hold, maintain, preserve and prepare the Collateral for sale, until disposed of, or may propose to retain the Collateral subject to the Mortgagor's right of redemption in satisfaction of the Mortgagor's obligations, as provided in the UCC. The Master Trustee will give the Mortgagor at least twenty (20) days' notice of the time and place of any public sale of the Collateral or of the time after which any private sale or any other intended disposition thereof is made. The requirements of reasonable notice shall be met if such notice is mailed, by certified United States mail or equivalent, postage prepaid, to the address of the Mortgagor hereinafter set forth at least twenty (20) days before the time of the sale or disposition. The Master Trustee may buy at any public sale. The Master Trustee may buy at private sale if the Collateral is of a type customarily sold in a recognized market or is of a type which is the subject of widely distributed standard price quotations. Any such sale may be held in conjunction with any foreclosure sale of the Land. If the Master Trustee so elects, the Land and the Collateral may be sold as one lot. The Master Trustee may sell the Collateral without giving any warranties as to the Collateral and may specifically disclaim any warranties of title or the like, which shall not adversely affect the commercial reasonableness of such sale. The net proceeds realized upon any such disposition, after deduction for the expenses of the retaking, holding, preparing for sale, selling and the reasonable attorney's fees and legal expenses incurred by the Master Trustee, shall be applied against the indebtedness described in Section 2.2 hereof in such order or manner as the Master Trustee shall select. The Master Trustee will account to the Mortgagor for any surplus on such disposition.

(f)     The terms and provisions contained in this Section 2.17 shall, unless the context otherwise requires, have the meanings and be construed as provided in the UCC.

(g)     This Mortgage is intended to be a financing statement within the purview of Section 9.1-502 and 9.1-515 of the UCC with respect to the Collateral and the goods described herein, which goods are or may become fixtures relating to the Land. The addresses of the Mortgagor (Debtor) and the Master Trustee (Secured Party) are hereinafter set forth. This Mortgage is to be filed for record with the

Recorder of Deeds of the County where the Land is located.  The Mortgagor is the record owner of the Land.

*(End of Article II)*

2374523v2

**ARTICLE III**

**REPRESENTATIONS, COVENANTS, PERMITTED ENCUMBRANCES**

**Section 3.1.   Warranty of Title.**  The Mortgagor represents, warrants, covenants and agrees that The Estelle Peabody Memorial Home of the Synod of Lincoln Trails of the Presbyterian Church (U.S.A.) is the lawful owner of good and merchantable fee simple title to the Facility and is the lawful lessor under all Leases, and that it has good right and lawful authority to grant, convey, warrant and defend such good and merchantable title to the Mortgaged Property (subject to Permitted Encumbrances) and such good right and lawful authority to grant a lien and security interest in the same to the Master Trustee and any Related Issuer.

The Mortgagor further covenants and agrees that it will do, execute, acknowledge and deliver, or cause to be done, executed, acknowledged and delivered, such instruments supplemental hereto and such further acts, instruments and transfers as the Master Trustee may reasonably require for the better assuring, transferring, pledging, assigning and confirming unto the Master Trustee all and singular the property herein described and the revenues assigned and pledged hereby to the payment of the principal of and premium, if any, and interest on the Subordinate Obligations and to secure the other obligations secured hereby.

The Mortgagor further represents, warrants and covenants that the Mortgaged Property (i) is not property covered by, or requiring disclosure under, the Indiana Responsible Property Transfer Law, Indiana Code 13-25-3-1 *et seq.*; (ii) has not been used as a landfill or dump; and (iii) does not include any underground storage tanks or toxic or hazardous waste or materials.

**Section 3.2.   Performance of and Authority for Covenants.**  The Mortgagor covenants that it will faithfully perform at all times any and all covenants, undertakings, stipulations and provisions contained in this Mortgage, that it is duly authorized and has the power and has taken all necessary and proper action to authorize the execution of this Mortgage, to convey and to grant a security interest in the property described and secured herein and to assign and pledge the Rents and Leases in the manner and to the extent herein set forth, and that all necessary action on its part for the execution and delivery of this Mortgage has been duly and effectively taken.  The Mortgagor covenants that it will faithfully perform at all times any and all covenants, obligations and agreements on its part to be performed under the Master Indenture.

**Section 3.3.   Liens and Encumbrances.**  The Mortgagor represents and warrants that, as of the date of execution of this Mortgage, there exists no lien, charge or encumbrance (other than Permitted Encumbrances) on the Mortgaged Property.  Except as otherwise permitted by the provisions of this Mortgage, no Mortgagor will create or suffer to be created any lien, encumbrance or charge upon the Mortgaged Property (other than Permitted Encumbrances) and, subject to the provisions of Section 3.4 hereof relating to permitted contests, the Mortgagor will satisfy or cause to be discharged, or will make adequate provision to satisfy and discharge, all lawful claims and demands for labor, materials, supplies or other items which, if not satisfied, might by law become a lien upon the Mortgaged Property; provided that liens for labor or materials arising by operation of statutory law shall not be within the purview of this Section 3.3

15

2374523v2

if, when such liens shall be perfected, the Mortgagor shall cause them to be promptly discharged. If any such liens shall be filed or asserted against the Mortgaged Property by reason of work, labor, services or materials supplied or claimed to have been supplied, the Mortgagor shall, subject to the provisions of Section 3.4 hereof relating to permitted contests, forthwith cause the same to be discharged of record, or effectively prevent the enforcement and collection thereof against the Mortgaged Property or other payments to be made hereunder or under the Master Indenture by contest, payment, deposit, bond, order of court or otherwise. Nothing contained in this Section 3.3 shall be construed as modifying or affecting the rights of any Mortgagor granted in Section 3.4 hereof.

**Section 3.4.    Permitted Contests.**    No Mortgagor shall be required to pay any tax, charge, assessment or imposition referred to in Section 406(d) of the Master Indenture, nor to remove any lien, charge or encumbrance required to be removed under Section 3.3 hereof, so long as such Mortgagor shall contest, in good faith and at its own cost and expense, the amount or validity thereof, in an appropriate manner or by appropriate proceedings which shall operate during the pendency thereof to prevent the collection of or other realization upon the tax, charge, assessment, imposition, lien or encumbrance so contested and to further prevent the sale, forfeiture or loss of the Mortgaged Property or any part thereof to satisfy the same; provided that no such contest shall subject any Related Issuer or the Master Trustee to the risk of any liability; and provided, further, that, if the amount of such tax, charge, assessment, imposition, lien or encumbrance exceeds Twenty-five Thousand Dollars ($25,000), such Mortgagor shall maintain a reserve or surety bond therefor in the amount of such excess.  Each such contest shall be promptly prosecuted to final conclusion (subject to the right of such Mortgagor to settle any such contest), and in any event such Mortgagor will save the Master Trustee harmless against all losses, judgments, decrees and costs (including reasonable attorneys' fees and expenses in connection therewith) and will, promptly after the final determination of such contest or settlement thereof, pay and discharge the amounts which shall be levied, assessed or imposed or determined to be payable therein, together with all penalties, fines, interest, costs and expenses thereon or in connection therewith. The Mortgagor shall give the Master Trustee prompt written notice of any such contest.

If the Master Trustee shall notify any Mortgagor that, in an Opinion of Counsel, by nonpayment of any of the foregoing items the lien of this Mortgage as to any substantial part of the Mortgaged Property will be materially endangered or any substantial part thereof will be subject to imminent loss or forfeiture or the obligations of such Mortgagor under this Mortgage shall be materially impaired, then such Mortgagor shall promptly pay all such unpaid items and cause them to be satisfied and discharged.

**Section 3.5.  Building and Equipment Covenants.**  The Mortgagor warrants, represents and covenants as follows:

(a)    Except for Permitted Encumbrances, the Mortgagor is and will be the sole owner of the Building, Collateral and the items of Equipment, whether now owned or hereafter acquired, free from any adverse liens, security interests, encumbrances of adverse claims thereon of any kind, except Permitted Encumbrances. The Mortgagor will notify the Master Trustee of, and will defend the Building, Collateral and the items of

16

Equipment against, all claims and demands (except Permitted Encumbrances) of all persons at any time claiming the same or any interest therein, except as otherwise permitted herein.

(b)     The Mortgagor will not lease, sell, convey or in any manner transfer the Collateral, the Building, or the items of Equipment except as permitted by Sections 4.1 or 4.4 hereof.

(c)     The Building, Collateral and items of Equipment will be kept on or at the Land and the Mortgagor will not remove the Building or any items of Equipment from the Land, except as herein or in the Master Indenture permitted or provided.

**Section 3.6.   Powers of the Master Trustee.**  Without affecting the liability of any Person, including the Obligated Group, for the payment of any indebtedness secured hereby or the lien of this Mortgage on the remainder of the Mortgaged Property for the full amount of any indebtedness unpaid, the Master Trustee may from time to time, without notice and without regard to the consideration, if any, paid thereof, and notwithstanding the existence at the time of any inferior liens thereof: (a) release any Person liable for the payment of any of the indebtedness; (b) extend the time or otherwise alter the terms of payment of any of the indebtedness; (c) alter, substitute or release any property securing the indebtedness; (d) accept any additional security or resort to any security in such order as the Master Trustee may determine; (e) consent to the making of any map or plat of the Facility; (f) join in granting any easement or creating any restrictions thereon; or (g) join in any subordination or other agreement affecting this Mortgage or the lien or charge hereof.

The Master Trustee shall not be required, prior to exercising its rights against any Person or at any other time, by reason of any demand or otherwise, to commence proceedings against any Person liable under this Mortgage or under any indebtedness secured thereby.

Nothing herein shall authorize or be deemed to authorize the Master Trustee to exercise any right or power contrary to the provisions and limitations of the Master Indenture, and the Master Trustee shall be subject thereto with respect to all rights and powers hereunder.  It is understood and agreed that the Master Trustee is acting hereunder for and on behalf of the owners from time to time of the Subordinate Obligations under and subject to the terms and provisions of the Master Indenture.

*(End of Article III)*

2374523v2

# ARTICLE IV

## RELEASE OF MORTGAGED PROPERTY, EASEMENTS,
## TIE-IN WALLS, REMOVAL OF FACILITY,
## ADDITION OF IMPROVEMENTS TO LIEN OF MORTGAGE

**Section 4.1.   Intentionally Omitted.**

**Section 4.2.   Grant of Easements, Licenses, Etc.**   Mortgagor may at any time or times grant to itself or others easements, licenses, rights-of-way and other rights or privileges in the nature of easements with respect to the Facility, free from the lien of this Mortgage or Mortgagor may release existing easements, licenses, rights-of-way and other rights or privileges with or without consideration, and the Master Trustee will execute and deliver any instrument necessary or appropriate to confirm and grant or release any such easement, license, right-of-way or privilege; provided, however, that prior to any such grant or release, there shall have been supplied to the Master Trustee a Mortgagor Certificate to the effect:

(a)   that such grant or release is not detrimental to the proper operation of the Facility;

(b)   that such grant or release will not impair the operating unity or the efficiency of the Facility, or materially or adversely affect the character thereof; and

(c)   that such grant or release will not, unless Mortgagor has obtained approval thereof from the appropriate governmental jurisdiction, result in a Nonconforming Use which would then be applicable to the Mortgagor's right, title and interest and the Master Trustee's security interest in the Mortgaged Property as burdened by the granting of such rights or privileges, and/or otherwise materially and adversely affect the value of the Land.

**Section 4.3.   Tie-In Walls.**   Mortgagor may, at its own expense:

(a)   connect or "tie-in" walls (including use of existing walls for the support of future adjacent buildings) and utilities of the Facility to other structures erected on the Land or on real property adjacent to or near the Land or partly on such adjacent real property and partly on the Land; or

(b)   in connection with the expansion or improvement of any building on the Land, tear down any wall of such building and build an addition to such building (either on the Land or on real property adjacent thereto or partly on such adjacent real property and partly on the Land);

provided, however, that prior to any such expansion, addition, improvement, tearing down or connection with the "tie-in" walls or utilities of the Facility, the Master Trustee shall have approved the same in writing based on a certificate or opinion of an Independent Architect that the same will not, unless Mortgagor has obtained approval thereof from the appropriate

18

2374523v2

governmental jurisdiction, result in the use becoming a "legal nonconforming use" under any statutes, ordinances, zoning, and or building codes (including but not limited to setback requirements and density standards) which apply to the Mortgaged Property immediately following such contemplated changes, or otherwise impair the operating unity or the efficiency of the Facility, or materially or adversely affect the character thereof and will not materially and adversely affect the value of the Land, and based on an Opinion of Counsel stating that all party-wall agreements, easements, cross-easements or other instruments relating to such expansion, addition, improvement, tearing down or connection with the "tie-in" walls or utilities of the Facility which are necessary or desirable to define the relative rights of the owners and encumbrances of the same therein, and to fully preserve the security hereof, have been duly executed, delivered and recorded, to which Opinion of Counsel copies of all such instruments shall be attached.  The Master Trustee shall release from the lien of this Mortgage any interest in the Land for the Facility, or join in any such party-wall agreements, easements, cross-easements or other agreements, to the extent necessary to effect the purpose of this Section 4.3.

**Section 4.4.**   **Removal of Fixtures and Equipment.**   Mortgagor will not remove or permit the removal of any items of Fixtures or Equipment from the Land except in accordance with the provision of this Section 4.4:

(1)    In any instance where any Mortgagor in its sound discretion determines that any item of Fixtures or Equipment has become inadequate, obsolete, worn out, unsuitable, undesirable or unnecessary for the operation of a Facility, such Mortgagor may, at its expense, remove and dispose of it and substitute and install other items of fixtures, furniture, machinery, equipment or other personal property, not necessarily having the same function, provided that such removal and substitution shall not impair the operating utility of the Facility.  All substituted items shall be installed free of all liens and encumbrances, other than Permitted Encumbrances, and shall become a part of the Facility as Fixtures or Equipment.  The Mortgagor will cooperate with the Master Trustee and will pay all costs, including counsel's fees, incurred in subjecting to the lien of this Mortgage all items so substituted, and the Master Trustee will cooperate with the Mortgagor in securing, if necessary, release of the property for which the substitution is made and in providing such bills of sale or other documents as may be required to facilitate the removal and substitution.  In the event the market value of the substituted items is less than the market value of the Fixtures or Equipment disposed of as reasonably determined by such Mortgagor, except as provided in Subsection (3) hereof, the Mortgagor shall pay to the Master Trustee an amount equal to the difference.

(2)    Upon removal of items of Fixtures or Equipment of the type described in Subsection (1) above, and provided the operating utility and unity of the Facility, are not impaired, the Mortgagor may decide not to make any substitution and installation of other items of furniture, machinery, equipment or other personal property, provided, and subject to the provisions of Subsection (3), (i) that in the case of the sale of any such Fixtures or Equipment, the Mortgagor shall pay to the Master Trustee an amount equal to the entire sale proceeds, (ii) that in the case of trade-in of any such Equipment for items not to be utilized as part of the facility, the Mortgagor shall pay to the Master Trustee an amount equal to the credit received by it in the trade-in, and (iii) that in the case of any

19

other disposition of such Equipment, the Mortgagor shall pay to the Master Trustee an amount equal to the market value of the property as reasonably determined by the Mortgagor.  The Master Trustee will cooperate with Mortgagor in securing a release of the property to be removed and in providing such bills of sale or other documents as may be required to facilitate the removal and disposition.

(3)     The Mortgagor shall promptly report to the Master Trustee by Mortgagor Certificate the removal of any Fixtures or Equipment pursuant to Subsections (1) and (2) above, and amounts required to be accounted for by the Mortgagor, if any, shall promptly be paid to the Master Trustee, after any substitution, sale, trade-in or other dispositions; provided that no certificate need be given or payment made more often than once in any Fiscal year unless the aggregate book value of items of equipment removed and not previously reported in such Fiscal Year (other than in the ordinary course of business of the Mortgagor) shall be at least one Hundred Thousand Dollars ($100,000).  The Mortgagor Certificate submitted shall specify the items of Fixtures and Equipment removed, the items of property substituted therefor, if any, and the amount, if any, required to be paid to the Master Trustee pursuant to the provisions of this Section 4.4.

Any funds paid to the Master Trustee pursuant to this Section 4.4 shall be remitted by the Master Trustee to the Related Bond Trustees on a pro rata basis for deposit in the sinking fund established under the Related Bond Indentures.

**Section 4.5.   Addition of Improvements and Equipment to Lien of Mortgage**.  All buildings, structures or improvements which may be acquired or constructed by Mortgagor subsequent to the date hereof and which are located on the Land, all property of every kind or nature added to or installed in any building, structure or improvement located on the Land, and all substitute or replacement items of Equipment acquired by any Mortgagor after the date hereof shall, immediately upon the acquisition thereof by such Mortgagor, and without any further conveyance or assignment, become subject to the mortgage lien and security interest of this Mortgage.  Nevertheless, the Mortgagor, in accordance with the provisions of Section 3.1 hereof, will do, execute, acknowledge and deliver all and every such further acts, conveyances and assurances as the Master Trustee shall require for accomplishing the purposes of this Section 4.5.

**Section 4.6.   Release of Mortgage**.  Subject to the terms and conditions of the Master Indenture, the Mortgagor shall have the right to obtain a release of this Mortgage with respect to all of the Mortgaged Property in the event that the conditions for releasing the Mortgagor under Section 405 of the Master Indenture have been satisfied.

*(End of Article IV)*

20

Case 13-00676-JMC-7    Doc 462-00    Filed 08/29/14    EOD 08/29/14 14:34:20    Pg 92 of
130

# ARTICLE V

# MISCELLANEOUS

**Section 5.1.   Right of Inspection.**  At all reasonable times, upon prior written request (or, in an emergency, without any prior written request), the Master Trustee and its duly authorized agents, attorneys, experts, engineers, accountants and representatives may, and upon the direction of the Holders of at least twenty-five percent (25%) in aggregate principal amount of all Subordinate Obligations then Outstanding shall, inspect fully any and all of the Mortgaged Property herein conveyed, including all books, papers and records of any Mortgagor pertaining to the Mortgaged Property, and take such memoranda from and in regard thereto as may be desired, subject to any privacy restrictions under federal or state law regarding medical records, all at the expense of such Mortgagor; provided, however, that, if any such inspection occurs while no Event at Default has occurred and is continuing and includes any review or audit of any Mortgagor's books, papers or records by any independent accountant, such inspection shall be at the expense of the person making such inspection and not at the expense of the Mortgagor.

**Section 5.2.   Advances.**  If the Mortgagor shall fail to make all repairs, pay all liens, taxes, assessments and other charges required hereby, or maintain all insurance required hereunder, the Master Trustee may, but shall not be obligated to, take such action as may be necessary to cure such failure, including advancement of money, and the Mortgagor shall be obligated to repay all such advances on demand, with interest at an annual rate equal to ten percent (10%) per annum, or at such higher annual rate as the Mortgagor may consent to in writing, from the date of each such advance.

**Section 5.3.   Recording.**  The Master Trustee, at the expense of the Mortgagor, will cause this Mortgage and all supplements hereto and any other instruments of further assurances, to be promptly recorded, filed and registered, and at all times to be recorded, filed and registered, in such manner and in such places as may be required by law to preserve and protect fully the rights of the Master Trustee hereunder as to all of the Mortgaged Property.

**Section 5.4.   Opinion of Counsel or Title Endorsement to Recording.**  The Mortgagor will furnish to the Master Trustee, promptly after the execution and delivery of each supplemental instrument of further assurance (exclusive of UCC continuation statements), either (i) an Opinion of Counsel stating that, in the opinion of such counsel, this Mortgage, or such supplemental instrument of further assurance, has been properly recorded, filed or registered, or had been received for record, filing or registration in each requisite jurisdiction, so as to make effective the lien intended to be created by this Mortgage, and reciting the details of such actions, including the date or dates of such recordation, filing or registration or receipt for record, filing or registration, or state that in the opinion of such counsel, no such action is necessary to make such lien effective, or (ii) an endorsement to the tile insurance policy insuring the enforceability and priority of the lien of this Mortgage, insuring the effectiveness of the lien intended to be created hereby in light of such supplemental instrument.

**Section 5.5.   Binding Effect.**  All terms, covenants, conditions and agreements of the Mortgagor contained herein or set forth in the Master Indenture shall be binding upon the

21

Mortgagor, its heirs, representatives, successors and assigns, and every covenant, condition and agreement herein contained or set forth in the Master Indenture in favor of the Master Trustee, shall apply to and inure to the benefit of the Master Trustee, its successors or assigns. This Mortgage is expressly made subject to all terms, conditions, covenants and agreements set forth in the Master Indenture.

**Section 5.6.  Amendments.**  Except as provided in Article IV hereof and in the Master Indenture, this Mortgage may be amended only in accordance with the provisions of Article IX of the Master Indenture.

**Section 5.7.  Use of Facility.**  It is recognized by the parties hereto that unless and until an Event of Default shall have occurred under Section 6.1 of the Master Indenture and the Master Trustee shall have exercised one of its remedies under Section 2.3 hereof, the Mortgagor shall have the unencumbered right to the use of the Facility in the ordinary course of its business, subject only to the covenants, conditions and agreements contained in the Master Indenture and the assignment of Rents contained in Section 2.6 hereof.

**Section 5.8.  Severability.**  In the event any provision of this Mortgage shall be held invalid, illegal, or unenforceable by any court of competent jurisdiction, such holding shall not invalidate or render unenforceable any other provision hereof, and the remaining provisions shall not in any way be affected or impaired thereby.

**Section 5.9.  Notices.**  All notices, certificate or other communications hereunder shall be sufficiently given and shall be deemed given two (2) days after the date when mailed by certified mail, postage prepaid, with proper address as indicated below.  The Issuer, the Mortgagor and the Master Trustee may, by written notice given by each to the others, designate any other address or addresses to which notices, certificates or other communications to them shall be sent when required as contemplated by this Mortgage.  Until otherwise provided by the respective parties, all notices, certificates and communications to each of them shall be addressed as follows:

|                        |                                                              |
|------------------------|--------------------------------------------------------------|
| To the Master Trustee: | _____                                       |
|                        | _____                                       |
|                        | _____                                       |
|                        | Attn: Corporate Trust Department                             |
|                        |                                                              |
| To the Mortgagor:      | The Estelle Peabody Memorial Home of the Synod of            |
|                        | Lincoln Trails of the Presbyterian Church (U.S.A.)           |
|                        | c/o Peabody Retirement Home                                  |
|                        | 400 W. 7th Street                                            |
|                        | North Manchester, IN  46962                                  |
|                        |                                                              |
| To the Related         | Town of North Manchester                                     |
| Bond Issuer:           | Town Hall                                                    |
|                        | 103 East Main Street                                         |
|                        | North Manchester, Indiana  46962-1899                        |

22

Case 13-00076-FJS    Doc 00-03    Filed 00/00    Entered 00/00/14:34:20:26    Pg 94 of

  **Section 5.10.** **Execution Counterparts.** This Mortgage may be simultaneously executed in several counterparts, each of which shall be an original and all of which shall constitute but one and the same instrument.

  **Section 5.11.** **Indiana Law.** This Mortgage is made within the State of Indiana pursuant to the Act, and the parties intend that the Act and any other applicable Indiana law (other than the conflicts-of-laws principles thereof) govern this Mortgage, and all rights and indebtedness secured hereby.  The provisions of this Mortgage pertaining or relating to any security interest in personal property are intended to be governed in all respects by the UCC except to the extent that the UCC requires application of other law.

  **Section 5.12.** **Junior Mortgage**.  This Mortgage, any liens granted hereunder and payment of the Subordinate Obligations are all subject and subordinate in all respects, including, in payment and priority, to the Senior Obligations (as defined in the Master Indenture), as more particularly provided for in the Master Indenture.

<p align="center">*(End of Article V)*</p>

2374523v2

IN WITNESS WHEREOF, THE ESTELLE PEABODY MEMORIAL HOME OF THE SYNOD LINCOLN TRIALS OF THE PRESBYTERIAN CHURCH (U.S.A.), have caused these presents to be signed in their name and behalf by their duly authorized representative or representatives, and, to evidence their acceptance of the mortgage, lien and security interests created hereby and the other terms set forth herein, all as of the day and year first written above.

THE ESTELLE PEABODY MEMORIAL HOME
OF THE SYNOD OF LINCOLN TRAILS OF THE
PRESBYTERIAN CHURCH (U.S.A.)


By: _____
_____, President


Attest:
_____
_____, Vice President

*(Signature Page to Junior Mortgage, Security Agreement
and Fixture Financing Statement)*

STATE OF INDIANA          )
                          ) SS:
COUNTY OF WABASH          )


On this ____ day of _____, 2013, before me, the undersigned, a Notary

Public for the State of Indiana, personally appeared _____ and _____, known

to me to be the President and Vice President, respectively, of The Estelle Peabody Memorial

Home of the Synod of Lincoln Trails of the Presbyterian Church (U.S.A.), an Indiana nonprofit

corporation, who acknowledged to me that such corporation did execute the foregoing

instrument.


_____
Signature

_____
Printed                                    Notary Public


My Commission Expires:          My County of Residence:

_____          _____


*(Notary Page to Junior Mortgage, Security Agreement and Fixture Financing Statement)*


This instrument prepared by Dennis H. Otten, Bose McKinney & Evans LLP, 111 Monument
Circle, Suite 2700, Indianapolis, Indiana  46204

I affirm under penalties for perjury that I have taken reasonable care to redact each Social
Security Number in this document, unless required by law.  *Dennis H. Otten*

2374523v2

**EXHIBIT A**

**LEGAL DESCRIPTION**

Part of the West Half of the Southwest Quarter of Section 32, Township 30 North, Range 7 East, being more particularly described as follows:

Beginning at the northwest corner of said Southwest Quarter, marked by an iron rebar stake; thence North 88 degrees 42 minutes 20 seconds East, along the north line of said Southwest Quarter, 1289.13 feet, to a masonry nail with a washer stamped LS80040428; thence South 00 degrees 02 minutes 49 seconds West, along the westerly right of way line of Maple Street, 1318.19 feet to a masonry nail with a washer stamped LS80040428; thence South 89 degrees 38 minutes 31 seconds West, along the northerly line of Sixth Street, 380.34 feet to an iron rebar stake with a plastic cap stamped LS80040428; thence South 00 degrees 02 minutes 24 seconds West, along the westerly line of Buffalo Street, 25.00 feet to an iron rebar stake with a plastic cap stamped LS80040428; thence South 89 degrees 38 minutes 31 seconds West, along the northerly line of August C. Mills Addition, 445.45 feet to an iron rebar stake with a plastic cap stamped LS80040428; thence North 00 degrees 00 minutes 00 seconds East, 547.65 feet to a chiseled "x"; thence South 88 degrees 42 minutes 20 seconds West, 462.50 feet to the west line of said Southwest Quarter; thence North 00 degrees 00 minutes 00 seconds East, along said west line, 782.02 feet to the POINT OF BEGINNING.

Containing 33.43 acres, more or less.

and

The following described real estate situated in Wabash County, State of Indiana:
Part of the Fractional Northwest Quarter and part of the Northeast Quarter of Section Number 31, Township 30 North, Range 7 East, Wabash County, Indiana, being more particularly described as follows:
Commencing at the southwest corner of said Fractional Northwest Quarter, marked by a section corner monument; thence North 89 degrees 40 minutes 51 seconds East, assumed bearing, along the south line of said Fractional Northwest Quarter, 55.92 feet; thence North 00 degrees 28 minutes 03 seconds East, 50.00 feet to the POINT OF BEGINNING and an iron iron rebar stake situated on the easterly right of way line of Indiana State Road Number 13; thence northerly, along said right of way line and a curve to the left having a radius of 114631.56 feet, an arc length of 225.00 feet and subtended by a chord bearing North 00 degrees 23 minutes 56 seconds East, 225.00 feet to an iron rebar stake; thence South 89 degrees 39 minutes 26 seconds East, 50.00 feet to an iron rebar stake;

A-1

thence North 00 degrees 19 minutes 49 seconds East, 50.00 feet to an iron rebar stake; thence North 89 degrees 39 minutes 26 seconds West, 50,00 feet to an iron rebar stake on the easterly right of way line of Indiana State Road Number 13; thence northerly, along said right of way line and a curve having a radius of 114631.56 feet, an arc length of 170.98 feet and subtended by a chord bearing North 00 degrees 16 minutes 30 seconds East, 170.98 feet to the centerline of Clear Creek; thence South 88 degrees 55 minutes 04 seconds East along said centerline, 134.42 feet; thence South 78 degrees 13 minutes 04 seconds East, along said centerline, 23.68 feet; thence South 78 degrees 19 minutes 47 seconds East, along said centerline, 188.16 feet; thence North 71 degrees 18 minutes 54 seconds East, along said centerline, 98.85 feet; thence North 44 degrees 02 minutes 11 seconds East, along said centerline, 111.11 feet; thence North 12 degrees 16 minutes 23 seconds West, along said centerline, 154.89 feet; thence North 22 degrees 30 minutes 22 seconds East, along said centerline, 85.82 feet; thence North 06 degrees 40 minutes 08 seconds East, along said centerline, 135.79 feet; thence North 15 degrees 27 minutes 48 seconds West, along said centerline, 141.80 feet; thence North 05 degrees 29 minutes 31 seconds East, along said centerline, 488.16 feet; thence North 19 degrees 39 minutes 45 seconds West, along said centerline, 88.69 feet; thence North 05 degrees 18 minutes 17 seconds East, along said centerline, 73.33 feet; thence North 66 degrees 44 minutes 22 seconds East, along said centerline, 370.56 feet; thence North 89 degrees 31 minutes 36 seconds East, along said centerline, 44.13 feet; thence North 48 degrees 02 minutes 28 seconds East, along said centerline, 94.07 feet; thence North 69 degrees 03 minutes 01 seconds East, along said centerline, 317.11 feet thence North 74 degrees 16 minutes 42 seconds East, along said centerline, 146.36 feet; thence North 67 degrees 05 minutes 27 seconds East, along said centerline, 113.55 feet; thence North 74 degrees 21 minutes 14 seconds East, along said centerline, 262.21 feet; thence North 42 degrees 03 minutes 46 seconds East, along said centerline, 78.73 feet to the westerly right of way line of Conrail Railroad; thence southeasterly, along said right of way line and a non-tangent curve to the right having a radius of 5680.15 feet, an arc length of 193.39 feet and subtended by a chord bearing South 30 degrees 36 minutes 04 seconds East, 193.38 feet to the point of tangency; thence South 28 degrees 27 minutes 57 seconds East, along said right of way line, 2285.87 feet to an iron rebar stake; thence South 89 degrees 40 minutes 51 seconds West, parallel with the south line of said Northeast Quarter and Fractional Northwest Quarter, 3006.34 feet to the POINT OF BEGINNING.

Containing 92.43 acres, more or less.

# EXHIBIT B

# PERMITTED ENCUMBRANCES

08-13555-smg   Doc 46200   Filed 08/29/14   Entered 08/29/14 14:34:43   Main Document
Pg 367 of 409

# SENIOR SECURITY AGREEMENT

THIS SECURITY AGREEMENT ("Security Agreement"), dated and made effective as of
_____, 2013 is entered into by **THE ESTELLE PEABODY MEMORIAL HOME
OF THE SYNOD OF LINCOLN TRAILS OF THE PRESBYTERIAN CHURCH (U.S.A.),**
an Indiana nonprofit corporation ("Borrower"), whose address is 400 West 7th Street, North
Manchester, Indiana 46962, in favor of **WELLS FARGO BANK, N.A.,** a banking corporation
duly established and validly existing under and by virtue of the laws of the United States of
America, successor to Wells Fargo Bank Indiana NA, as master trustee under the Master
Indenture hereinafter referred to (together with its successors and assigns "Master Trustee").

NOW, THEREFORE, in consideration of the financial accommodations which may be
made from time to time by the Master Trustee to the Borrower, Master Trustee and Borrower
agree as follows:

1.     **Definitions.**   Certain terms used in this Security Agreement shall have the
definitions designated in this Section 1.  Such definitions shall be equally applicable to both the
singular and plural forms of the terms defined, and words of any gender shall include each other
gender where appropriate.  Unless defined herein, all capitalized terms shall have the meaning
set forth in the Uniform Commercial Code as enacted by Indiana.

"Collateral" shall mean all of the Borrower's property or rights in which a security
interest is granted hereunder.

"Default" shall mean an Event of Default as defined in the Master Indenture.

"Intellectual Property" shall mean all intellectual property of the Borrower, including,
without limitation, (a) all patents, patent applications, patent disclosures and inventions
(whether or not patentable and whether or not reduced to practice); (b) all trademarks,
service marks, trade dress, trade names, brand names, labels and corporate names and all
the goodwill and quality control standards associated therewith; (c) all registered and
unregistered statutory and common law copyrights; (d) all registrations, applications and
renewals for any of the foregoing; (e) all trade secrets, confidential information, ideas,
formulae, compositions, know-how, manufacturing and production processes and
techniques, research and development information, drawings, specifications, designs,
plans, improvements, proposals, technical and computer data, financial, business and
marketing plans, and customer and supplier lists and related information; (f) all other
proprietary rights (including, without limitation, all computer software and
documentation and all license agreements and sublicense agreements to and from third
parties relating to any of the foregoing); (g) all copies and tangible embodiments of the
foregoing in whatever form or medium; (h) all damages and payments for past, present
and future infringements of the foregoing; (i) all royalties and income due with respect to
the foregoing; and (j) the right to sue and recover for past, present and future
infringements of the foregoing.

"Master Indenture" shall mean the Amended and Restated Master Trust Indenture, dated
as of _____, 2013, between the Mortgagor and the Master Trustee.

Page 1 of 15

2373405_1

"Schedule of Accounts" shall have the meaning designated in Section 4(c) of this Security Agreement.

"Senior Obligations" shall have the meaning ascribed to it in the Master Indenture, which includes the Series 2013A Note.

"Series 2013A Note" shall mean The Estelle Peabody Memorial Home of the Synod of Lincoln Trails of the Presbyterian Church (U.S.A.) Series 2013A Note dated as of the date hereof in the aggregate principal amount of $23,400,000, with maturity dates of _____, issued pursuant to the Master Indenture.

"Uniform Commercial Code" shall mean the Uniform Commercial Code as enacted in the State of Indiana, as amended from time to time.

## 2.  Security Interest in Collateral

To secure the payment and performance of the Senior Obligations, the Borrower hereby grants and pledges to the Master Trustee a first lien and continuing security interest in the following Collateral:

(a)  All Accounts, Deposit Accounts, General Intangibles, Documents, Instruments, Investment Property, Chattel Paper and any other similar rights of the Borrower however created or evidenced, whether now existing or hereafter owned, acquired, created, used, or arising, specifically including, without limitation, invoices, contract and contract rights (including but not limited to any agreements, and any rights under any agreements, between the Borrower and a resident of the Borrower's facility to occupy a unit in or associated with such facility), claims (including but not limited to commercial tort claims), leases, licenses, license agreements, licensing fees, royalties, letters of credit rights, payment intangibles, binders or certificates of insurance, documents of title, securities (including all securities, security entitlements and securities accounts), security interests, goodwill, tax refunds, customer lists, franchises, franchise rights, drawings, designs, marketing rights, Intellectual Property, computer programs and software, artwork, databases and other like business property rights, all applications to acquire such rights, for which application may at any time be made by the Borrower, together with any and all books and records pertaining thereto and any right, title or interest in any Inventory which gave rise to an Account;

(b)  All Equipment, Goods and all other tangible personal property of the Borrower of every kind or nature, whether now owned or hereafter acquired, wherever located, specifically including, without limitation, all Goods, machinery, trucks, boats, barges, vehicles, trailers, forklifts, tools, dies, jigs, presses, appliances, implements, improvements, accessories, attachments, parts, components, partitions, systems, carpeting, draperies and apparatus;

(c)  All Inventory, whether now existing or hereafter acquired and wherever located, specifically including, without limitation, all merchandise, personal property, raw materials, work in process, finished Goods and other Goods held for sale or lease, materials and supplies of every nature usable or useful in connection with the production, manufacturing, packing, packaging, shipping, advertising, selling, leasing or furnishing of any of such Inventory and all

materials of the Borrower used or consumed or to be used or consumed in the Borrower's business, together with any and all books and records pertaining thereto;

(d)    All products and Proceeds of each of the foregoing.

(e)    All extensions, replacements, renewals, modifications, additions, improvements, accretions, accessions, annexations, tools, accessories, and parts now in, attached to or which may hereafter at any time be placed in or added to any Collateral, whether or not of like kind; and

(f)    All rights, remedies, claims and demands under or in connection with each of the foregoing.

Notwithstanding the foregoing provisions, none of the funds or accounts held by the Master Trustee under the Master Indenture securing the Senior Obligations shall be subject to the lien and security interest hereby granted in the Collateral.

**3.    Borrower's Representations and Warranties.**  To induce the Master Trustee to make certain financial accommodations, the Borrower represents and warrants to the Master Trustee that:

(a)    <u>Name of Borrower</u>.  The legal name of the Borrower is "THE ESTELLE PEABODY MEMORIAL HOME OF THE SYNOD OF LINCOLN TRAILS OF THE PRESBYTERIAN CHURCH (U.S.A.)."  Borrower is organized under the laws of the State of Indiana.  Set forth on <u>Schedule 1</u> hereto is a true, accurate and complete list of all previous legal names of the Borrower and all past and present assumed (or fictitious) names and tradenames of the Borrower.

(b)    <u>Historical Transfers</u>.  Except as set forth on <u>Schedule 1</u> hereto, the Borrower has not, within the past five (5) years, ever been conducted as a partnership or proprietorship, no other entity has merged into the Borrower or has been consolidated with the Borrower, and no person or entity has sold substantially all of its assets to the Borrower or sold assets to the Borrower outside the ordinary course of such person's or entity's business.

(c)    <u>Borrower's Title to Collateral</u>.  All Collateral is lawfully owned by the Borrower, free and clear of any prior security interest, pledge, sale, assignment, transfer, consignment arrangement or agreement or other encumbrance (other than liens described on the attached <u>Schedule 3</u>); the Borrower has the unencumbered right to pledge, sell, assign or transfer the Collateral subject to the permitted liens and to subject the Collateral to the security interest in favor of the Master Trustee herein; except for the liens identified on the attached <u>Schedule 3</u>, no financing statement covering all or any portion of the Collateral is on file in any public office other than in favor of the Master Trustee.   The security interest herein constitutes a legal and valid, first priority security interest in the Collateral.

(d)    <u>Accounts</u>.  Any Account subject to the security interest of the Master Trustee: (1) is a good and valid Account representing an undisputed, bona fide indebtedness incurred by the Account Debtor named therein, for Inventory held subject to delivery instructions or shipped or

delivered pursuant to a contract of sale; (2) is for services performed by the Borrower with or for said Account Debtor; (3) is free and clear from setoffs or counterclaims and is not subject to any lien other than the security interest granted hereunder; (4) is not subject to any agreement wherein the Account Debtor on any account may claim a deduction or discount except as shown on the list of such Account furnished the Master Trustee; (5) is owned by the Borrower and the Borrower shall have the right to subject such Accounts to the security interest of the Master Trustee; (6) will not be sold, assigned or transferred to any person other than the Master Trustee or in any other way encumbered and the Borrower will defend the same against any person claiming an interest in such Accounts adverse to the interest of the Master Trustee.

      (e)    <u>Intellectual Property</u>.  <u>Schedule 2</u> hereto contains a complete and accurate list as of the date hereof of all patented and registered Intellectual Property owned by the Borrower and of all pending applications for the registration of other Intellectual Property owned or filed by the Borrower.  <u>Schedule 2</u> also contains a complete and accurate list of all licenses and other rights granted by the Borrower to any third party with respect to the Intellectual Property and licenses and other rights granted by any third party to the Borrower.  Except for permitted liens and except as may be set forth in <u>Schedule 2</u>, (a) the Borrower owns and possesses all right, title and interest in and to, or has a valid and enforceable license to use, all of the Intellectual Property necessary for the operation of the Borrower's business as presently conducted or proposed to be conducted; (b) no claim by any third party contesting the validity, enforceability, use or ownership of any Intellectual Property has been made, is currently outstanding or, to the Borrower's knowledge, is threatened, and, to the Borrower's knowledge, there are no grounds for any such claim; (c) the Borrower has not received any notice of, nor is the Borrower aware of any facts which indicate the likelihood of, any material infringement or misappropriation by, or conflict with, any third party with respect to any Intellectual Property, nor has the Borrower received any claim of infringement or misappropriation of, or other conflict with, any intellectual property rights of any third party; (d) to the best of the Borrower's knowledge, the Borrower has not materially infringed, misappropriated or otherwise conflicted with any intellectual property rights of any third party, nor is Borrower aware of any material infringement, misappropriation or conflict which will occur as a result of the continued operation of the business of the Borrower as presently conducted or proposed to be conducted; and (e) the Borrower has made or will timely make all necessary filings and recordations (except user filings) and has paid or will pay all required fees and taxes to record and maintain its ownership in its Intellectual Property throughout the world to the extent necessary to conduct Borrower's business as currently being conducted.

      (f)    <u>Contracts and Leases</u>.  All leases of real or personal property and all contracts to which the Borrower is party are in full force and effect.  To the best of Borrower's knowledge, no person or entity is challenging or disputing the validity or enforceability of any such leases or contracts, and the Borrower is not in material default under any such leases or contracts.

      (g)    <u>Equipment and Inventory</u>.  <u>Schedule 4</u> is a true and correct list of all locations where Equipment and Inventory of the Borrower is located (except Inventory in transit) and all locations where Equipment and Inventory of the Borrower has been located in the four (4) months immediately preceding the date of this Agreement.  Borrower has not purchased any Equipment and Inventory in a transaction subject to the bulk transfer laws of any state or

otherwise outside the ordinary course of the Equipment and Inventory seller's business. If Equipment and Inventory is represented or covered by documents of title, the Borrower is the owner of the documents free of all encumbrances and security interests other than the Master Trustee's and warehousemen's charges, if any, not delinquent.

### 4. Agreements Concerning Accounts

(a)   <u>Location</u>.  Upon request by the Master Trustee, the Borrower will give the Master Trustee written notice of each office of the Borrower at which records of the Borrower relative to Accounts are kept.  Except where such notice is given, all records of the Borrower relative to Accounts are and will be kept at the chief executive offices of the Borrower.

(b)   <u>Returns and Repossessions</u>.  Prior to the occurrence of a Default, the Borrower may grant, in the ordinary course of business, to any Account Debtor, any rebate, refund or adjustment to which such Account Debtor may be lawfully entitled and may accept, in connection therewith, the return of Goods, the sale or lease of which shall have given rise to the obligation of the Account Debtor.  After the occurrence of a Default, no discount, credit or allowance shall be granted by the Borrower to any Account Debtor, and no return of Goods shall be accepted by the Borrower without the Master Trustee's prior written consent.

(c)   <u>Schedule of Accounts</u>.  Upon request by the Master Trustee, the Borrower will, from time to time, deliver to the Master Trustee a schedule identifying each Account ("Schedule of Accounts"), together with such schedules and certificates and reports relative to all or any of the Collateral and the items or amounts received by the Borrower in full or partial payment or otherwise, as Proceeds of any of the Collateral.  Each Schedule of Accounts or other schedule, certificate or report shall be executed by its duly authorized officer and shall be in the form specified by the Master Trustee.  Any Schedule of Accounts identifying any Account shall be accompanied, if the Master Trustee requests, (a) by a true and correct copy of the invoice evidencing such Account, (b) by evidence of shipment, delivery or performance, and (c) if such request shall be made after the occurrence of a Default by a duly executed assignment of such Account from the Borrower to the Master Trustee; provided, however, that the Borrower's failure to execute and deliver any such Schedule of Account and/or assignment shall not affect or limit the Master Trustee's security interest or other rights in and to Accounts, and provided, further, that a proper assignment of any Account wherein the United States Government is the Account Debtor may be requested by the Master Trustee at any time whether or not there shall have occurred a Default.

(d)   <u>Verification of Accounts</u>.  The Master Trustee and its officers, agents, and accountants, may examine, inspect or make abstracts from the Borrower's books and records, and verify returned and repossessed Goods, if any, and arrange for verification of Accounts, under reasonable procedures, directly with the Account Debtors and the Borrower shall furnish to the Master Trustee upon request additional Schedules of Accounts, together with all notes or other papers evidencing the same and any guaranty, securities or other information relating thereto, and shall do, make and deliver all such additional and further acts, things, deeds, assurances and instruments as the Master Trustee may reasonably require.

(e)    <u>After Default</u>.  After the occurrence of a Default and so long as such Default shall continue to exist, the Borrower:

    1.    agrees that the Master Trustee may notify any Account Debtor to make payment directly to the Master Trustee of any amounts due or to become due and enforce the collection of any Accounts by suit or otherwise and surrender, release or exchange all or any part thereof, or compromise or extend or renew for a period (whether or not longer than the original period) any indebtedness thereunder or evidenced thereby;

    2.    will note the security interest of the Master Trustee on all records relative to the Collateral including, without limitation, any invoice which evidences an Account;

    3.    will give notice of the Master Trustee's security interest in the Accounts or any other obligation owing to Borrower by each Account Debtor or any obligor with such notice requiring such Account Debtor or other obligor to pay the Account or other obligation directly to Master Trustee;

    4.    agrees that whenever the Borrower obtains possession (by return, repossession or otherwise) of any Goods, the sale or lease of which shall have given rise to any of the Collateral, it will (unless the Master Trustee shall otherwise consent in writing) segregate, label and hold such Goods as subject to the security interest of the Master Trustee hereunder, and will, at its own expense, dispose of such Goods in such manner as the Master Trustee may from time to time direct.

(f)    <u>Accounts Owed by the Federal Government</u>.  If any Account shall arise out of a contract with the United States of America, or any department, agency, subdivision, or instrumentality thereof, the Borrower shall promptly notify the Master Trustee thereof in writing and shall take all other action requested by the Master Trustee to protect the Master Trustee's security interest in such Account under the provisions of the Federal Assignment of Claims Act, as amended.

(g)    <u>Assignment of Security Interests</u>.  If, at any time the Borrower shall take and perfect a security interest in any property of an Account Debtor or any other person or entity to secure payment or performance of an Account, the Borrower shall promptly, upon the request of the Master Trustee, assign such security interest to the Master Trustee.

**5.    Agreements Concerning General Intangibles**

(a)    <u>Maintenance of Intellectual Property</u>.  Borrower shall have the duty to do any and all acts which are necessary to preserve and maintain all material rights in the Intellectual Property.

(b)    <u>Opposition Proceedings</u>.  Unless and until there shall have occurred and be continuing a Default, Borrower shall retain the legal and equitable title to the Intellectual Property and shall have the right to bring any opposition proceedings, cancellation proceedings or lawsuit in its own name to enforce, protect and use the Intellectual Property in the ordinary course of its business, but shall not be permitted, except with the prior written consent of the

Master Trustee, to sell, assign, transfer or otherwise encumber the Intellectual Property, other than licensings or other dispositions in the ordinary course of business or to resolve litigation or disputed claims brought or made by unrelated parties.

(c)   Verification of Intellectual Property.   The Master Trustee and its officers, agents, attorneys and accountants, may verify the Intellectual Property and all licenses and other agreements with respect thereto, under reasonable procedures, directly with licensees or by other methods, and the Borrower shall furnish to the Master Trustee upon request schedules of Intellectual Property and licenses, together with other information relating thereto, and shall do, make and deliver all such additional and further acts, things, deeds, assurances and instruments as the Master Trustee may reasonably require with respect to the Intellectual Property, including, without limitation, the licenses.   The Borrower shall promptly notify the Master Trustee if it knows that any material application or registration relating to Intellectual Property may become abandoned or dedicated to the public, or of any material adverse determination or development (including any claim) regarding the Intellectual Property or any material license with respect thereto, or regarding its right to register, keep and maintain the same, or if it knows that a material item of Intellectual Property is materially infringed or misappropriated by a third party, and, in any such event, unless (a) the Master Trustee or (b) the Borrower in the exercise of its reasonable business judgment after having considered the advice of reputable intellectual property counsel shall have determined that litigation is inappropriate or unadvisable, promptly sue for infringement or misappropriation.   The Master Trustee shall keep all information received pursuant to this paragraph confidential, except i) as disclosure of such information may be necessary to enforce any rights Master Trustee may have hereunder, ii) as otherwise may be required by local, state and federal laws and regulations, iii) as such information is requested by appropriate judicial or governmental proceedings, or iv) as such information is or becomes generally available to the public by means other than the acts or omissions of Master Trustee or its agents.

## 6.   Agreements Concerning Inventory

(a)   Locations.   Except where written notice is given to Master Trustee, all Inventory is and shall be kept at the locations set forth on Schedule 4 hereto.

(b)   Sales of Inventory.   The Borrower may, in the ordinary course of business, at its own expense, sell, lease or furnish under contracts of sale or service, any of the Inventory normally held by the Borrower for such purpose (a sale in the ordinary course of business does not include a transfer in total or partial satisfaction of a debt), and use and consume, in the ordinary course of business, any raw materials, work-in-process, finished goods or materials normally held by it for such purpose.

(c)   Condition of Inventory; Books and Records.   Borrower shall keep all Inventory in good order and in a commercially marketable condition and shall maintain full, accurate and complete books and records with respect to its Inventory at all times.

(d)   Warehousemen and Landlords.   Except for the warehousemen disclosed to the Master Trustee, Borrower shall not store any material portion of its Inventory with any bailee, warehouseman, or similar entity. The Borrower shall provide the Master Trustee with copies of

all agreements between the Borrower and any bailee, warehouseman, or similar entity and shall deliver to the Master Trustee a landlord's or warehouseman's lien waiver in a form acceptable to the Master Trustee, prior to entering into any material lease for warehouse storage or business facilities with any warehouseman other than those disclosed to the Master Trustee prior to the date hereof.

(e)     <u>Consigned Inventory</u>.   If at any time any of the Inventory is placed by the Borrower on consignment with any consignee, Borrower shall, prior to delivery of such consigned Inventory (a) provide the Master Trustee with all consignment agreements and other instruments and documentation to be used in connection with such consignment (all of which shall be in a form reasonably acceptable to the Master Trustee); (b) prepare, execute and file appropriate financing statements with respect to any consigned Inventory showing the consignee as Borrower, the Borrower as secured party, and the Master Trustee as assignees of the secured party; (c) prepare, execute and file appropriate financing statements with respect to any consigned Inventory showing the Borrower, as Borrower, and the Master Trustee, as secured parties; (d) conduct a search of all UCC filings made against the consignee in all jurisdictions in which Inventory to be consigned are to be located while on consignment, and furnish copies of such results to the Master Trustee; and (e) notify in writing all creditors of the consignee that are or may be holders of security interests in the Inventory to be consigned that the Borrower expects to deliver certain Inventory to the consignee.

### 7.     Agreements Concerning Equipment

(a)     <u>Locations</u>.   Except where written notice is given, the Equipment will be kept at or based at locations set forth on <u>Schedule 4</u> hereto.

(b)     <u>Titled Equipment</u>.   If Borrower now or hereafter has any vehicles, aircraft, watercraft, or other Equipment for which a certificate of title has been issued by a governmental authority, the Borrower shall, at the request of Master Trustee, immediately deliver to the Master Trustee, properly endorsed, each certificate of title or application for title or other evidence of ownership for each such item of Equipment, and the Borrower shall take all actions necessary to have the Master Trustee's security interest properly recorded on each such certificate of title and shall take all other steps reasonably necessary to perfect the Master Trustee's security interest in such Equipment.

(c)     <u>Transfers of Equipment</u>.   Borrower may from time to time substitute Equipment, provided that (a) the substituted Equipment is not subject to any lien or other encumbrance (except permitted liens) and has a fair market value at least equal to the fair market of the Equipment for which it is substituted; (b) the marketability and operating integrity of Borrower's Equipment after such substitution is not impaired; (c) the Equipment substituted for is no longer used or useful in the operation of Borrower's business and is sold in arm's length transaction in exchange for money or monies' worth at least equal to the fair market value of such Equipment substituted for; and (d) no Default has occurred and is continuing.

(d)     <u>Fixtures</u>.   The Borrower shall not permit any item of Equipment to become a fixture to real estate or an accession to any other property not subject to the Master Trustee's security interest herein without the prior written consent of the Master Trustee.   If any

Equipment is or will be attached to real estate in such a manner as to become a fixture, and such real estate is encumbered, the Borrower will obtain from the holder of such real estate encumbrance a written consent and subordination to the security interest hereby granted, or a written disclaimer of any interest in such Collateral, in a form reasonably acceptable to the Master Trustee.

## 8. General Provisions Concerning Collateral

(a)    <u>Preservation of Collateral</u>.  Borrower will keep the Collateral in good order and repair and will not waste or destroy the Collateral or any portion thereof.  Borrower will not use the Collateral in violation of any statute or ordinance or any policies of insurance thereon and the Master Trustee may examine and inspect such Collateral at any reasonable time or times wherever located.

(b)    <u>Further Assurances</u>.  The Borrower agrees to do such reasonable acts and things and deliver or cause to be delivered such other documents as the Master Trustee may deem necessary to establish and maintain a valid security interest in the Collateral (free of all other liens and claims) to secure the payment and performance of the Senior Obligations and to defend title to the Collateral against any person or entity claiming any interest therein adverse to the Master Trustee, including but not limited to execution of deposit account control agreements in form satisfactory to the Master Trustee.  The Borrower authorizes the Master Trustee, at the expense of the Borrower, to execute and file, without Borrower's signature thereon, a financing statement or statements on its behalf in those public offices deemed advisable or necessary by the Master Trustee or the Master Trustee to protect the security interests of the Master Trustee herein granted.  If permitted by law, the Borrower agrees that a carbon, photographic or other reproduction of this Security Agreement or of a financing statement may be filed as a financing statement.

(c)    <u>Insurance</u>.  The Borrower shall have and maintain at all times, with respect to Goods, Inventory and Equipment insurance coverage currently existing as represented by the proof of insurance provided by Borrower to Master Trustee, or obtain insurance coverage which is reasonably acceptable to Master Trustee.  Such insurance shall be payable to the Borrower and the Master Trustee, as their interests may appear.  The Master Trustee's interest shall be covered through a standard non-contributory lender's loss payable clause.  The insurance certificates evidencing the Borrower's compliance with the above shall be deposited with the Master Trustee, and in the event the Borrower fails to file and maintain such insurance, the Master Trustee may, at its option, purchase such insurance and the cost of such insurance shall become an obligation secured by these presents and all sums expended shall bear interest at the default rate of interest charged by the Master Trustee (as provided in the Master Indenture) at such time until paid.

(d)    <u>Collection of Collateral</u>.  The Borrower will, at its own expense, endeavor to collect, as and when due, all amounts due with respect to any Collateral including the taking of such action with respect to such collection as the Master Trustee may reasonably request or, in the absence of such request, as the Borrower may deem advisable.

(e) <u>Master Trustee May Defend Title</u>.  In the event the Borrower fails to pay any taxes, assessments, premiums, or fees, or fails to discharge any liens or claims against the Collateral required to be paid or discharged by the Borrower, or fails to purchase, maintain and file with the Master Trustee any insurance required by this Security Agreement, or if any such insurance is inappropriate to the situation, in the Master Trustee's reasonable discretion, the Master Trustee may, without demand or notice, pay any such taxes, assessments, premiums or fees, or pay, acquire, satisfy or discharge any liens or claims asserted against the Collateral (without any obligation to determine the validity thereof), or purchase any such insurance.  All sums so expended by the Master Trustee shall become an obligation secured by these presents and shall bear interest at the highest default rate of interest set forth in the Senior Obligations until paid.

(f) <u>Negotiable Collateral</u>.  If any Collateral, including Proceeds, consists of a letter of credit, advice of credit, Instrument, money, certificates of deposit, negotiable Documents, chattel paper or similar property, the Borrower shall, immediately upon receipt thereof and at the request of Master Trustee, endorse and assign such Collateral, and deliver actual physical possession thereof, to the Master Trustee.

(g) <u>Contracts</u>.  The Borrower shall remain liable to perform its obligations under any contracts included in the Collateral to the extent as though this Security Agreement had not been entered into, and the Master Trustee shall not have any obligation under any such contracts by reason of this Agreement.

(h) <u>Master Trustee's Right to Inspection</u>.  The Borrower shall at all reasonable times, allow the Master Trustee, its officers, attorneys and accountants, to examine, inspect or make abstracts from the Borrower's books and records and to verify Inventory both as to quantity and quality and to arrange for verification of Accounts under reasonable procedures directly with the Account Debtors or by other methods; shall furnish to the Master Trustee upon request additional statements of any Account, together with all notes or other papers evidencing the same and any guaranty, securities or other information relating thereto; and shall do, make, and deliver all such additional and further acts, things, deeds, assurances and instruments as the Master Trustee may require to further protect its interest in or rights to the Collateral.

(i) <u>Transfer of Collateral</u>.  Borrower shall not sell, lease, license, transfer or otherwise dispose of or encumber any interest in any Collateral except (i) sales of Inventory in the ordinary course of business; (ii) licensings and other dispositions of Intellectual Property in the ordinary course of business; and (iii) liens on the Collateral and other encumbrances that are permitted liens.

(j) <u>State of Formation</u>.  Borrower shall notify the Master Trustee in writing, such notice to be received by the Master Trustee at least thirty (30) days in advance, of any change in its state of formation.

(k) <u>Notice of Commercial Tort Claims</u>.  Borrower shall promptly notify the Master Trustee in writing of the existence of any commercial tort claims.

## 9.    Remedies

(a)    <u>Remedies Generally; Power of Sale</u>.  Upon the occurrence of any Default and at any time thereafter, the Master Trustee shall have all rights and remedies available at law or in equity including, without limitation, the rights and remedies of a secured party under the Uniform Commercial Code (regardless of whether the Code has been enacted in the jurisdiction where rights or remedies are asserted), including, without limitation, the right to take possession of the Collateral, and for that purpose the Master Trustee may, so far as the Borrower can give authority therefore, enter upon any premises on which the Collateral may be situated and remove the same therefrom.  The Master Trustee shall give to the Borrower at least ten (10) days' prior written notice of the time and place of any public sale of Collateral or of the time after which any private sale or any other intended disposition is to be made.  The Master Trustee may in its discretion transfer any securities or other property constituting Collateral into its own name or that of its nominee and receive the income thereon and hold the same as security for the Senior Obligations or apply it on principal or interest due on the Senior Obligations.  In the event that the Master Trustee takes possession of any Intellectual Property, the goodwill associated with any trademarks, tradenames, trade dress, and service marks of the Borrower shall be transferred to the Master Trustee.

(b)    <u>Deposits</u>.  Any and all Deposit Accounts, deposits or other sums at any time credited by or due from any Master Trustee to the Borrower shall at all times constitute security for any and all Senior Obligations, and such Master Trustee may apply or set off such deposits or other sums against Senior Obligations at any time in Default whether or not the Senior Obligations are then due or other Collateral is considered by the Master Trustee to be adequate.

(c)    <u>Waiver and Amendment</u>.  Except as otherwise expressly set forth herein, to the extent permitted by law, the Borrower waives demand, notice, protest, notice of acceptance of this Security Agreement, notice of loans made, credit extended, Collateral received or delivered or other action taken in reliance hereon and all other demands and notices of any description. With respect to both Senior Obligations and Collateral, the Borrower assents to any extension or postponement of the time of payment or any other indulgence, to any substitution, exchange, or release of Collateral, to the addition or release of any party primarily or secondarily liable, to the acceptance of partial payments thereon and the settlement, compromise or adjustment of any thereof, all in such manner and at such time or times as the Master Trustee may deem advisable. Except as otherwise provided by law, the Master Trustee shall not have any duty as to the collection or protection of the Collateral, or any income therefrom, or as to the preservation of rights against prior parties or as to the preservation of any rights pertaining thereto beyond the safe custody thereof.  The Master Trustee may exercise its rights with respect to Collateral without resorting to or regard to other Collateral or sources of reimbursement for any Senior Obligation.  Master Trustee shall not be deemed to have waived any of these rights upon or under the Senior Obligations or Collateral unless such waiver be in writing and signed by the Master Trustee.  No delay or omission on the part of the Master Trustee in exercising any right shall operate as a waiver of such right or any other right.  A waiver on any one occasion shall not be construed as a bar to the exercise of any right on any future occasion.  All rights and remedies of the Master Trustee as to the Senior Obligations or Collateral, whether evidenced hereby or by any other instrument or papers, shall be cumulative and may be exercised singly, successively or together.  The Master Trustee may, from time to time, without notice to the Borrower (a) retain

or obtain a security interest in any property of any other party, in addition to the Collateral, to secure any of the Senior Obligations; (b) retain or obtain the primary or secondary liability of any party, in addition to the Borrower with respect to any of the Senior Obligations; (c) extend or renew for any period (whether or not longer than the original period) or release or compromise any liability of any party or parties primarily or secondarily liable to the Master Trustee under the Senior Obligations; (d) release its security interest in any of the property securing any of the Senior Obligations and permit any substitution or exchange for any such property; and (e) resort to the Collateral for the payment of any of the Senior Obligations whether or not it shall have resorted to any other property or shall have proceeded against any party primarily or secondarily liable for any of the Senior Obligations. Master Trustee shall not, under any circumstances, or in any event whatsoever, have any liability for any error or omission or delay of any kind occurring in the liquidation of any Collateral, including the settlement or collection of any Account or for any damage resulting therefrom, absent a showing of negligence, bad faith or willful misconduct. This Security Agreement may be amended only by a writing duly signed by the Master Trustee and the Borrower.

(d)  <u>Expenses; Proceeds of Collateral</u>.  The Borrower shall pay to the Master Trustee on demand any and all reasonable out-of-pocket expenses, including reasonable attorneys' fees, incurred or paid by the Master Trustee in protecting or enforcing its rights upon or under the Senior Obligations or the Collateral or the existence, perfection or priority of the Master Trustee's security interest therein.  After deducting all of such expenses, the residue of any proceeds of collection or sale of the Collateral shall be applied to the payment of principal, interest, or fees on Senior Obligations in such order of preference as the Master Trustee may determine, proper allowance for interest on Senior Obligations not then due being made, and any excess shall be returned to the Borrower.

(e)  <u>Power of Attorney</u>.  The Borrower hereby irrevocably appoints the Master Trustee's designees from time to time its true and lawful attorneys-in-fact, with full power of substitution in the premises upon the occurrence of a Default and so long as such Default continues to exist (a) to demand, collect, receipt for, settle, compromise, adjust, sue for, foreclose or realize upon the Collateral in such manner as the Master Trustee may determine, whether or not the Collateral is then due; (b) to receive, open, and dispose of mail addressed to the Borrower; (c) to endorse notes, checks, drafts, money orders, Documents or other evidences of payment, shipment or storage or any form of Collateral on behalf of and in the name of the Borrower; (d) to sign and send on behalf of the Borrower any invoice or bill of lading relating to any Account, on drafts against customers, on schedules and assignments of Accounts, on notices of assignment, financing statements and other public records, on verifications of Accounts and on notices to customers; (e) to sign the Borrower's name to the proofs of claim against any Account Debtor on behalf of the Borrower; (f) to notify the post office authorities to change the address for delivery of the Borrower's mail to an address designated by the Master Trustee; (g) to endorse Borrower's names on all applications, documents, papers, certificates and instruments necessary or expedient for the Master Trustee to use the Intellectual Property, or necessary or expedient to grant or issue any exclusive or nonexclusive license under the Intellectual Property to anyone else, or necessary or expedient for the Master Trustee to assign, pledge, convey or otherwise transfer title in, or dispose of, the Intellectual Property to anyone else, for the purpose of recording, registering, filing or accomplishing any other formula with respect to the

Intellectual Property; and (h) to do all things reasonably necessary to carry out this Security Agreement. The Master Trustee will not be liable for any acts or omissions nor for any error of judgment or mistake of fact or law, absent negligence, bad faith or willful misconduct. This power, being coupled with an interest, is irrevocable until the Senior Obligations have been fully satisfied. Notwithstanding anything herein to the contrary, no attorney acting pursuant to this Section 9(e) shall have any authority to confess judgment on behalf of the Borrower.

(f)    <u>License</u>.  Borrower hereby grants to the Master Trustee a license to use, without charge, Borrower's Intellectual Property and other Collateral in completing production of, advertising for sale, or selling any Collateral after any Default, and all of the Borrower's rights under all licenses and franchise agreements shall, in such event, inure to the Master Trustee. In addition, the Borrower shall, upon request by Master Trustee, make available such personnel in Borrower's employ on the date of any Default as the Master Trustee may reasonably designate to permit the Master Trustee or the Master Trustee's designee to continue, directly or indirectly, to produce, advertise and sell the Collateral sold by the Borrower under any Intellectual Property or license. The license herein shall include the right of the Master Trustee to use, assign, license or sublicense any of the Borrower's Intellectual Property, including in such license reasonable access as to all media in which any of the licensed items may be recorded or stored; provided that the Master Trustee shall comply with all pre-existing quality control standards and trademark use requirements of the Borrower. No agreements hereafter entered into by the Borrower shall prohibit, restrict or impair the rights of the Master Trustee granted hereunder.

(g)    <u>Reinstatement</u>.  To the extent that the Borrower makes a payment or payments to the Master Trustee or the Master Trustee enforces its security interest and lien or exercises its right of setoff, and such payments or the Proceeds of such enforcement are set off or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside and/or required to be repaid to a trustee or receiver or any other party under any insolvency law, state or federal law, common law or equitable cause, then to the extent of such recovery, the Senior Obligations or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such enforcement or setoff had not occurred and shall be Senior Obligations secured by the Collateral. The Master Trustee may, at any time or times, pay, acquire, satisfy, or discharge any security interest, lien, encumbrance or claim asserted by any party against the Collateral; provided, however, that the Master Trustee shall take reasonable measures to notify the Borrower of its intention to pay any such claim but the failure to give such notice shall not invalidate any action taken by the Master Trustee. The Master Trustee shall not have any obligation to determine the validity thereof. All sums paid by the Master Trustee under the provisions of this paragraph and any existing or other charges relating thereto shall be repaid to Master Trustee by Borrower on demand, shall be deemed an advance under the Agreement and shall bear interest at the highest default rate set forth in the Bonds.

(h)    <u>No Marshaling</u>.  The Borrower, on its own behalf and on behalf of its successors and assigns, hereby expressly waives all rights, if any, to require a marshaling of assets by the Master Trustee or to require the Master Trustee's first resort to some or any portion of the Collateral before foreclosing upon, selling or otherwise realizing on any other portion thereof.

**10.    Senior Lien**

This Security Agreement, any liens granted hereunder and payment of the Senior Obligations are all senior in all respects, including, in payment and priority, to the Junior Obligations (as defined in the Master Indenture), as more particularly provided for in the Master Indenture.

**11.    Miscellaneous Provisions**

(a)    <u>Notices</u>.  All notices hereunder shall be at the addresses set forth in the Master Indenture.

(b)    <u>Governing Law</u>.    This Security Agreement and all rights and obligations hereunder, including matters of construction, validity and performance, shall be governed by the Uniform Commercial Code and other applicable laws of the State of Indiana, without regard to conflict of law principles.

(c)    <u>Severability</u>.  Whenever possible each provision of this Security Agreement shall be interpreted in such a manner as to be effective and valid under applicable law, but if any provision of this Security Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective only to the extent of such prohibition without invalidating the remainder of such provision or the remaining provisions of this Security Agreement.  The Borrower recognizes that the Master Trustee has relied on this Security Agreement in extending credit to the Borrower and agrees that such reliance by the Master Trustee shall be sufficient consideration for this Security Agreement.

(d)    <u>Binding on Successors</u>.  The rights, privileges and obligations of the Borrower and Master Trustee shall inure to the benefit of and be binding upon their respective successors and assigns.

(e)    <u>Consent to Jurisdiction, Venue</u>.  The parties agree that any action or proceeding relating in any way to this Agreement may be brought and enforced in the state courts located in Vanderburgh County, Indiana or Posey County, Indiana, and each irrevocably submits to the jurisdiction of such courts and waives any objection to the laying of venue in such courts or any claim that such courts are inconvenient forums.

(f)    **<u>JURY WAIVER.  THE PARTIES HEREBY WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM, WHETHER IN CONTRACT OR TORT, AT LAW OR IN EQUITY, ARISING OUT OF OR IN ANY WAY RELATED TO THIS AGREEMENT.  NO OFFICER OF THE MASTER TRUSTEE HAS AUTHORITY TO WAIVE, CONDITION, OR MODIFY THIS PROVISION</u>.**

IN WITNESS WHEREOF, the Borrower has caused this Security Agreement to be executed by its officer duly authorized as of the date first above written.

**THE ESTELLE PEABODY MEMORIAL
HOME OF THE SYNOD OF LINCOLN
TRAILS OF THE PRESBYTERIAN CHURCH
(U.S.A.)**


By:_____

_____ President

STATE OF INDIANA                        )
                                        ) SS:
COUNTY OF _____                   )

     Before me, the undersigned Notary Public in and for said County and State, came **THE ESTELLE PEABODY MEMORIAL HOME OF THE SYNOD OF LINCOLN TRAILS OF THE PRESBYTERIAN CHURCH (U.S.A.)**, by _____, its President, who, as such President, acknowledged the execution of the foregoing document for and on behalf of said company, and, after being duly sworn, stated that any and all representations therein are true.

     **WITNESS** my hand and notarial seal this _____ day of _____, 2013.

My county of residence is
_____ County,          _____
State of _____, and        NOTARY PUBLIC
My commission expires:
_____            _____
                                        PRINTED NAME

**Schedule 1**

Former Names, Assumed Names
<u>And Tradenames of Borrower</u>

None

<u>Prior Combinations</u>

None

Case 33-06976-RLM-11   Doc 60-3   Filed 09/14/33   EOD 09/14/33 13:20:23   Pg 1 of
180

**Schedule 2**


**Intellectual Property, Licenses**


1. <u>Trademark Registrations</u>.


2. <u>Trademark Applications</u>.


3. <u>Patents</u>:


4. <u>Patent Applications</u>:


5. <u>Registered Copyrights</u>.


6. <u>Trademark Licenses</u>.


7. <u>Technology Licenses</u>:

# Schedule 3

## Permitted Liens

Greater America Leasing Corporation  - security interest in following Collateral:

Various Koncia Minolta & Lexmark copiers, printers, scanners, and fax machines & Hasler mailing system and all products, proceeds and attachments.  See UCC Financing Statement No. 201100008553590 for additional information.

**Schedule 4**

**List of Locations of Collateral**

400 West 7th Street
North Manchester, Indiana 46962

# JUNIOR SECURITY AGREEMENT

THIS SECURITY AGREEMENT ("Security Agreement"), dated and made effective as of _____, 2013 is entered into by **THE ESTELLE PEABODY MEMORIAL HOME OF THE SYNOD OF LINCOLN TRAILS OF THE PRESBYTERIAN CHURCH (U.S.A.)**, an Indiana nonprofit corporation ("Borrower"), whose address is 400 West 7th Street, North Manchester, Indiana 46962, in favor of _____**,** a banking corporation duly established and validly existing under and by virtue of the laws of the United States of America, successor to Wells Fargo Bank Indiana NA, as master trustee under the Master Indenture hereinafter referred to (together with its successors and assigns "Master Trustee").

NOW, THEREFORE, in consideration of the financial accommodations which may be made from time to time by the Master Trustee to the Borrower, Master Trustee and Borrower agree as follows:

1.      **Definitions.**  Certain terms used in this Security Agreement shall have the definitions designated in this Section 1.  Such definitions shall be equally applicable to both the singular and plural forms of the terms defined, and words of any gender shall include each other gender where appropriate.  Unless defined herein, all capitalized terms shall have the meaning set forth in the Uniform Commercial Code as enacted by Indiana.

"Collateral" shall mean all of the Borrower's property or rights in which a security interest is granted hereunder.

"Default" shall mean an Event of Default as defined in the Master Indenture.

"Intellectual Property" shall mean all intellectual property of the Borrower, including, without limitation, (a) all patents, patent applications, patent disclosures and inventions (whether or not patentable and whether or not reduced to practice); (b) all trademarks, service marks, trade dress, trade names, brand names, labels and corporate names and all the goodwill and quality control standards associated therewith; (c) all registered and unregistered statutory and common law copyrights; (d) all registrations, applications and renewals for any of the foregoing; (e) all trade secrets, confidential information, ideas, formulae, compositions, know-how, manufacturing and production processes and techniques, research and development information, drawings, specifications, designs, plans, improvements, proposals, technical and computer data, financial, business and marketing plans, and customer and supplier lists and related information; (f) all other proprietary rights (including, without limitation, all computer software and documentation and all license agreements and sublicense agreements to and from third parties relating to any of the foregoing); (g) all copies and tangible embodiments of the foregoing in whatever form or medium; (h) all damages and payments for past, present and future infringements of the foregoing; (i) all royalties and income due with respect to the foregoing; and (j) the right to sue and recover for past, present and future infringements of the foregoing.

"Master Indenture" shall mean the Amended and Restated Master Trust Indenture, dated as of _____, 2013, between the Mortgagor and the Master Trustee.

2375001v2

"Schedule of Accounts" shall have the meaning designated in Section 4(c) of this Security Agreement.

"Junior Obligations" shall have the meaning ascribed to it in the Master Indenture, which includes the Series 2013B Note.

"Series 2013B Note" shall mean The Estelle Peabody Memorial Home of the Synod of Lincoln Trails of the Presbyterian Church (U.S.A.) Subordinate Series 2013B Note dated as of the date hereof in the aggregate original principal amount of $20,150,000, with a maturity date of _____, issued pursuant to the Master Indenture.

"Uniform Commercial Code" shall mean the Uniform Commercial Code as enacted in the State of Indiana, as amended from time to time.

## 2.    Security Interest in Collateral

To secure the payment and performance of the Junior Obligations, the Borrower hereby grants and pledges to the Master Trustee a first lien and continuing security interest in the following Collateral:

(a)    All Accounts, Deposit Accounts, General Intangibles, Documents, Instruments, Investment Property, Chattel Paper and any other similar rights of the Borrower however created or evidenced, whether now existing or hereafter owned, acquired, created, used, or arising, specifically including, without limitation, invoices, contract and contract rights (including but not limited to any agreements, and any rights under any agreements, between the Borrower and a resident of the Borrower's facility to occupy a unit in or associated with such facility), claims (including but not limited to commercial tort claims), leases, licenses, license agreements, licensing fees, royalties, letters of credit rights, payment intangibles, binders or certificates of insurance, documents of title, securities (including all securities, security entitlements and securities accounts), security interests, goodwill, tax refunds, customer lists, franchises, franchise rights, drawings, designs, marketing rights, Intellectual Property, computer programs and software, artwork, databases and other like business property rights, all applications to acquire such rights, for which application may at any time be made by the Borrower, together with any and all books and records pertaining thereto and any right, title or interest in any Inventory which gave rise to an Account;

(b)    All Equipment, Goods and all other tangible personal property of the Borrower of every kind or nature, whether now owned or hereafter acquired, wherever located, specifically including, without limitation, all Goods, machinery, trucks, boats, barges, vehicles, trailers, forklifts, tools, dies, jigs, presses, appliances, implements, improvements, accessories, attachments, parts, components, partitions, systems, carpeting, draperies and apparatus;

(c)    All Inventory, whether now existing or hereafter acquired and wherever located, specifically including, without limitation, all merchandise, personal property, raw materials, work in process, finished Goods and other Goods held for sale or lease, materials and supplies of every nature usable or useful in connection with the production, manufacturing, packing, packaging, shipping, advertising, selling, leasing or furnishing of any of such Inventory and all

materials of the Borrower used or consumed or to be used or consumed in the Borrower's business, together with any and all books and records pertaining thereto;

(d)        All products and Proceeds of each of the foregoing.

(e)        All extensions, replacements, renewals, modifications, additions, improvements, accretions, accessions, annexations, tools, accessories, and parts now in, attached to or which may hereafter at any time be placed in or added to any Collateral, whether or not of like kind; and

(f)        All rights, remedies, claims and demands under or in connection with each of the foregoing.

Notwithstanding the foregoing provisions, none of the funds or accounts held by the Master Trustee under the Master Indenture securing the Junior Obligations shall be subject to the lien and security interest hereby granted in the Collateral.

**3.        Borrower's Representations and Warranties.**  To induce the Master Trustee to make certain financial accommodations, the Borrower represents and warrants to the Master Trustee that:

(a)        <u>Name of Borrower</u>.  The legal name of the Borrower is "THE ESTELLE PEABODY MEMORIAL HOME OF THE SYNOD OF LINCOLN TRAILS OF THE PRESBYTERIAN CHURCH (U.S.A.)."  Borrower is organized under the laws of the State of Indiana.  Set forth on <u>Schedule 1</u> hereto is a true, accurate and complete list of all previous legal names of the Borrower and all past and present assumed (or fictitious) names and tradenames of the Borrower.

(b)        <u>Historical Transfers</u>.  Except as set forth on <u>Schedule 1</u> hereto, the Borrower has not, within the past five (5) years, ever been conducted as a partnership or proprietorship, no other entity has merged into the Borrower or has been consolidated with the Borrower, and no person or entity has sold substantially all of its assets to the Borrower or sold assets to the Borrower outside the ordinary course of such person's or entity's business.

(c)        <u>Borrower's Title to Collateral</u>.  All Collateral is lawfully owned by the Borrower, free and clear of any prior security interest, pledge, sale, assignment, transfer, consignment arrangement or agreement or other encumbrance (other than liens described on the attached <u>Schedule 3</u>); the Borrower has the unencumbered right to pledge, sell, assign or transfer the Collateral subject to the permitted liens and to subject the Collateral to the security interest in favor of the Master Trustee herein; except for the liens identified on the attached <u>Schedule 3</u>, no financing statement covering all or any portion of the Collateral is on file in any public office other than in favor of the Master Trustee.   The security interest herein constitutes a legal and valid, first priority security interest in the Collateral.

(d)        <u>Accounts.</u>  Any Account subject to the security interest of the Master Trustee: (1) is a good and valid Account representing an undisputed, bona fide indebtedness incurred by the Account Debtor named therein, for Inventory held subject to delivery instructions or shipped or

delivered pursuant to a contract of sale; (2) is for services performed by the Borrower with or for said Account Debtor; (3) is free and clear from setoffs or counterclaims and is not subject to any lien other than the security interest granted hereunder; (4) is not subject to any agreement wherein the Account Debtor on any account may claim a deduction or discount except as shown on the list of such Account furnished the Master Trustee; (5) is owned by the Borrower and the Borrower shall have the right to subject such Accounts to the security interest of the Master Trustee; (6) will not be sold, assigned or transferred to any person other than the Master Trustee or in any other way encumbered and the Borrower will defend the same against any person claiming an interest in such Accounts adverse to the interest of the Master Trustee.

(e)     Intellectual Property.  Schedule 2 hereto contains a complete and accurate list as of the date hereof of all patented and registered Intellectual Property owned by the Borrower and of all pending applications for the registration of other Intellectual Property owned or filed by the Borrower.  Schedule 2 also contains a complete and accurate list of all licenses and other rights granted by the Borrower to any third party with respect to the Intellectual Property and licenses and other rights granted by any third party to the Borrower.  Except for permitted liens and except as may be set forth in Schedule 2, (a) the Borrower owns and possesses all right, title and interest in and to, or has a valid and enforceable license to use, all of the Intellectual Property necessary for the operation of the Borrower's business as presently conducted or proposed to be conducted; (b) no claim by any third party contesting the validity, enforceability, use or ownership of any Intellectual Property has been made, is currently outstanding or, to the Borrower's knowledge, is threatened, and, to the Borrower's knowledge, there are no grounds for any such claim; (c) the Borrower has not received any notice of, nor is the Borrower aware of any facts which indicate the likelihood of, any material infringement or misappropriation by, or conflict with, any third party with respect to any Intellectual Property, nor has the Borrower received any claim of infringement or misappropriation of, or other conflict with, any intellectual property rights of any third party; (d) to the best of the Borrower's knowledge, the Borrower has not materially infringed, misappropriated or otherwise conflicted with any intellectual property rights of any third party, nor is Borrower aware of any material infringement, misappropriation or conflict which will occur as a result of the continued operation of the business of the Borrower as presently conducted or proposed to be conducted; and (e) the Borrower has made or will timely make all necessary filings and recordations (except user filings) and has paid or will pay all required fees and taxes to record and maintain its ownership in its Intellectual Property throughout the world to the extent necessary to conduct Borrower's business as currently being conducted.

(f)     Contracts and Leases.  All leases of real or personal property and all contracts to which the Borrower is party are in full force and effect.  To the best of Borrower's knowledge, no person or entity is challenging or disputing the validity or enforceability of any such leases or contracts, and the Borrower is not in material default under any such leases or contracts.

(g)     Equipment and Inventory.  Schedule 4 is a true and correct list of all locations where Equipment and Inventory of the Borrower is located (except Inventory in transit) and all locations where Equipment and Inventory of the Borrower has been located in the four (4) months immediately preceding the date of this Agreement.  Borrower has not purchased any Equipment and Inventory in a transaction subject to the bulk transfer laws of any state or

otherwise outside the ordinary course of the Equipment and Inventory seller's business.  If Equipment and Inventory is represented or covered by documents of title, the Borrower is the owner of the documents free of all encumbrances and security interests other than the Master Trustee's and warehousemen's charges, if any, not delinquent.

**4.      Agreements Concerning Accounts**

(a)      <u>Location</u>.  Upon request by the Master Trustee, the Borrower will give the Master Trustee written notice of each office of the Borrower at which records of the Borrower relative to Accounts are kept.  Except where such notice is given, all records of the Borrower relative to Accounts are and will be kept at the chief executive offices of the Borrower.

(b)      <u>Returns and Repossessions</u>.  Prior to the occurrence of a Default, the Borrower may grant, in the ordinary course of business, to any Account Debtor, any rebate, refund or adjustment to which such Account Debtor may be lawfully entitled and may accept, in connection therewith, the return of Goods, the sale or lease of which shall have given rise to the obligation of the Account Debtor.  After the occurrence of a Default, no discount, credit or allowance shall be granted by the Borrower to any Account Debtor, and no return of Goods shall be accepted by the Borrower without the Master Trustee's prior written consent.

(c)      <u>Schedule of Accounts</u>.  Upon request by the Master Trustee, the Borrower will, from time to time, deliver to the Master Trustee a schedule identifying each Account ("Schedule of Accounts"), together with such schedules and certificates and reports relative to all or any of the Collateral and the items or amounts received by the Borrower in full or partial payment or otherwise, as Proceeds of any of the Collateral.  Each Schedule of Accounts or other schedule, certificate or report shall be executed by its duly authorized officer and shall be in the form specified by the Master Trustee.  Any Schedule of Accounts identifying any Account shall be accompanied, if the Master Trustee requests, (a) by a true and correct copy of the invoice evidencing such Account, (b) by evidence of shipment, delivery or performance, and (c) if such request shall be made after the occurrence of a Default by a duly executed assignment of such Account from the Borrower to the Master Trustee; provided, however, that the Borrower's failure to execute and deliver any such Schedule of Account and/or assignment shall not affect or limit the Master Trustee's security interest or other rights in and to Accounts, and provided, further, that a proper assignment of any Account wherein the United States Government is the Account Debtor may be requested by the Master Trustee at any time whether or not there shall have occurred a Default.

(d)      <u>Verification of Accounts</u>.  The Master Trustee and its officers, agents, and accountants, may examine, inspect or make abstracts from the Borrower's books and records, and verify returned and repossessed Goods, if any, and arrange for verification of Accounts, under reasonable procedures, directly with the Account Debtors and the Borrower shall furnish to the Master Trustee upon request additional Schedules of Accounts, together with all notes or other papers evidencing the same and any guaranty, securities or other information relating thereto, and shall do, make and deliver all such additional and further acts, things, deeds, assurances and instruments as the Master Trustee may reasonably require.

     (e)    <u>After Default</u>.  After the occurrence of a Default and so long as such Default shall continue to exist, the Borrower:

        1.    agrees that the Master Trustee may notify any Account Debtor to make payment directly to the Master Trustee of any amounts due or to become due and enforce the collection of any Accounts by suit or otherwise and surrender, release or exchange all or any part thereof, or compromise or extend or renew for a period (whether or not longer than the original period) any indebtedness thereunder or evidenced thereby;

        2.    will note the security interest of the Master Trustee on all records relative to the Collateral including, without limitation, any invoice which evidences an Account;

        3.    will give notice of the Master Trustee's security interest in the Accounts or any other obligation owing to Borrower by each Account Debtor or any obligor with such notice requiring such Account Debtor or other obligor to pay the Account or other obligation directly to Master Trustee;

        4.    agrees that whenever the Borrower obtains possession (by return, repossession or otherwise) of any Goods, the sale or lease of which shall have given rise to any of the Collateral, it will (unless the Master Trustee shall otherwise consent in writing) segregate, label and hold such Goods as subject to the security interest of the Master Trustee hereunder, and will, at its own expense, dispose of such Goods in such manner as the Master Trustee may from time to time direct.

     (f)    <u>Accounts Owed by the Federal Government</u>.  If any Account shall arise out of a contract with the United States of America, or any department, agency, subdivision, or instrumentality thereof, the Borrower shall promptly notify the Master Trustee thereof in writing and shall take all other action requested by the Master Trustee to protect the Master Trustee's security interest in such Account under the provisions of the Federal Assignment of Claims Act, as amended.

     (g)    <u>Assignment of Security Interests</u>.  If, at any time the Borrower shall take and perfect a security interest in any property of an Account Debtor or any other person or entity to secure payment or performance of an Account, the Borrower shall promptly, upon the request of the Master Trustee, assign such security interest to the Master Trustee.

     **5.**    **Agreements Concerning General Intangibles**

     (a)    <u>Maintenance of Intellectual Property</u>.  Borrower shall have the duty to do any and all acts which are necessary to preserve and maintain all material rights in the Intellectual Property.

     (b)    <u>Opposition Proceedings</u>.  Unless and until there shall have occurred and be continuing a Default, Borrower shall retain the legal and equitable title to the Intellectual Property and shall have the right to bring any opposition proceedings, cancellation proceedings or lawsuit in its own name to enforce, protect and use the Intellectual Property in the ordinary course of its business, but shall not be permitted, except with the prior written consent of the

Master Trustee, to sell, assign, transfer or otherwise encumber the Intellectual Property, other than licensings or other dispositions in the ordinary course of business or to resolve litigation or disputed claims brought or made by unrelated parties.

(c)    Verification of Intellectual Property.  The Master Trustee and its officers, agents, attorneys and accountants, may verify the Intellectual Property and all licenses and other agreements with respect thereto, under reasonable procedures, directly with licensees or by other methods, and the Borrower shall furnish to the Master Trustee upon request schedules of Intellectual Property and licenses, together with other information relating thereto, and shall do, make and deliver all such additional and further acts, things, deeds, assurances and instruments as the Master Trustee may reasonably require with respect to the Intellectual Property, including, without limitation, the licenses.  The Borrower shall promptly notify the Master Trustee if it knows that any material application or registration relating to Intellectual Property may become abandoned or dedicated to the public, or of any material adverse determination or development (including any claim) regarding the Intellectual Property or any material license with respect thereto, or regarding its right to register, keep and maintain the same, or if it knows that a material item of Intellectual Property is materially infringed or misappropriated by a third party, and, in any such event, unless (a) the Master Trustee or (b) the Borrower in the exercise of its reasonable business judgment after having considered the advice of reputable intellectual property counsel shall have determined that litigation is inappropriate or unadvisable, promptly sue for infringement or misappropriation.  The Master Trustee shall keep all information received pursuant to this paragraph confidential, except i) as disclosure of such information may be necessary to enforce any rights Master Trustee may have hereunder, ii) as otherwise may be required by local, state and federal laws and regulations, iii) as such information is requested by appropriate judicial or governmental proceedings, or iv) as such information is or becomes generally available to the public by means other than the acts or omissions of Master Trustee or its agents.

**6.    Agreements Concerning Inventory**

(a)    Locations.  Except where written notice is given to Master Trustee, all Inventory is and shall be kept at the locations set forth on Schedule 4 hereto.

(b)    Sales of Inventory.  The Borrower may, in the ordinary course of business, at its own expense, sell, lease or furnish under contracts of sale or service, any of the Inventory normally held by the Borrower for such purpose (a sale in the ordinary course of business does not include a transfer in total or partial satisfaction of a debt), and use and consume, in the ordinary course of business, any raw materials, work-in-process, finished goods or materials normally held by it for such purpose.

(c)    Condition of Inventory; Books and Records.  Borrower shall keep all Inventory in good order and in a commercially marketable condition and shall maintain full, accurate and complete books and records with respect to its Inventory at all times.

(d)    Warehousemen and Landlords.  Except for the warehousemen disclosed to the Master Trustee, Borrower shall not store any material portion of its Inventory with any bailee, warehouseman, or similar entity. The Borrower shall provide the Master Trustee with copies of

all agreements between the Borrower and any bailee, warehouseman, or similar entity and shall deliver to the Master Trustee a landlord's or warehouseman's lien waiver in a form acceptable to the Master Trustee, prior to entering into any material lease for warehouse storage or business facilities with any warehouseman other than those disclosed to the Master Trustee prior to the date hereof.

(e)     Consigned Inventory.   If at any time any of the Inventory is placed by the Borrower on consignment with any consignee, Borrower shall, prior to delivery of such consigned Inventory (a) provide the Master Trustee with all consignment agreements and other instruments and documentation to be used in connection with such consignment (all of which shall be in a form reasonably acceptable to the Master Trustee); (b) prepare, execute and file appropriate financing statements with respect to any consigned Inventory showing the consignee as Borrower, the Borrower as secured party, and the Master Trustee as assignees of the secured party; (c) prepare, execute and file appropriate financing statements with respect to any consigned Inventory showing the Borrower, as Borrower, and the Master Trustee, as secured parties; (d) conduct a search of all UCC filings made against the consignee in all jurisdictions in which Inventory to be consigned are to be located while on consignment, and furnish copies of such results to the Master Trustee; and (e) notify in writing all creditors of the consignee that are or may be holders of security interests in the Inventory to be consigned that the Borrower expects to deliver certain Inventory to the consignee.

## 7.     Agreements Concerning Equipment

(a)     Locations.   Except where written notice is given, the Equipment will be kept at or based at locations set forth on Schedule 4 hereto.

(b)     Titled Equipment.   If Borrower now or hereafter has any vehicles, aircraft, watercraft, or other Equipment for which a certificate of title has been issued by a governmental authority, the Borrower shall, at the request of Master Trustee, immediately deliver to the Master Trustee, properly endorsed, each certificate of title or application for title or other evidence of ownership for each such item of Equipment, and the Borrower shall take all actions necessary to have the Master Trustee's security interest properly recorded on each such certificate of title and shall take all other steps reasonably necessary to perfect the Master Trustee's security interest in such Equipment.

(c)     Transfers of Equipment.   Borrower may from time to time substitute Equipment, provided that (a) the substituted Equipment is not subject to any lien or other encumbrance (except permitted liens) and has a fair market value at least equal to the fair market of the Equipment for which it is substituted; (b) the marketability and operating integrity of Borrower's Equipment after such substitution is not impaired; (c) the Equipment substituted for is no longer used or useful in the operation of Borrower's business and is sold in arm's length transaction in exchange for money or monies' worth at least equal to the fair market value of such Equipment substituted for; and (d) no Default has occurred and is continuing.

(d)     Fixtures.   The Borrower shall not permit any item of Equipment to become a fixture to real estate or an accession to any other property not subject to the Master Trustee's security interest herein without the prior written consent of the Master Trustee.   If any

Equipment is or will be attached to real estate in such a manner as to become a fixture, and such real estate is encumbered, the Borrower will obtain from the holder of such real estate encumbrance a written consent and subordination to the security interest hereby granted, or a written disclaimer of any interest in such Collateral, in a form reasonably acceptable to the Master Trustee.

### 8. General Provisions Concerning Collateral

(a)  <u>Preservation of Collateral</u>.  Borrower will keep the Collateral in good order and repair and will not waste or destroy the Collateral or any portion thereof.  Borrower will not use the Collateral in violation of any statute or ordinance or any policies of insurance thereon and the Master Trustee may examine and inspect such Collateral at any reasonable time or times wherever located.

(b)  <u>Further Assurances</u>.  The Borrower agrees to do such reasonable acts and things and deliver or cause to be delivered such other documents as the Master Trustee may deem necessary to establish and maintain a valid security interest in the Collateral (free of all other liens and claims) to secure the payment and performance of the Junior Obligations and to defend title to the Collateral against any person or entity claiming any interest therein adverse to the Master Trustee, including but not limited to execution of deposit account control agreements in form satisfactory to the Master Trustee.  The Borrower authorizes the Master Trustee, at the expense of the Borrower, to execute and file, without Borrower's signature thereon, a financing statement or statements on its behalf in those public offices deemed advisable or necessary by the Master Trustee or the Master Trustee to protect the security interests of the Master Trustee herein granted.  If permitted by law, the Borrower agrees that a carbon, photographic or other reproduction of this Security Agreement or of a financing statement may be filed as a financing statement.

(c)  <u>Insurance</u>.  The Borrower shall have and maintain at all times, with respect to Goods, Inventory and Equipment insurance coverage currently existing as represented by the proof of insurance provided by Borrower to Master Trustee, or obtain insurance coverage which is reasonably acceptable to Master Trustee.  Such insurance shall be payable to the Borrower and the Master Trustee, as their interests may appear.  The Master Trustee's interest shall be covered through a standard non-contributory lender's loss payable clause.  The insurance certificates evidencing the Borrower's compliance with the above shall be deposited with the Master Trustee, and in the event the Borrower fails to file and maintain such insurance, the Master Trustee may, at its option, purchase such insurance and the cost of such insurance shall become an obligation secured by these presents and all sums expended shall bear interest at the default rate of interest charged by the Master Trustee (as provided in the Master Indenture) at such time until paid.

(d)  <u>Collection of Collateral</u>.  The Borrower will, at its own expense, endeavor to collect, as and when due, all amounts due with respect to any Collateral including the taking of such action with respect to such collection as the Master Trustee may reasonably request or, in the absence of such request, as the Borrower may deem advisable.

(e)    <u>Master Trustee May Defend Title</u>.   In the event the Borrower fails to pay any taxes, assessments, premiums, or fees, or fails to discharge any liens or claims against the Collateral required to be paid or discharged by the Borrower, or fails to purchase, maintain and file with the Master Trustee any insurance required by this Security Agreement, or if any such insurance is inappropriate to the situation, in the Master Trustee's reasonable discretion, the Master Trustee may, without demand or notice, pay any such taxes, assessments, premiums or fees, or pay, acquire, satisfy or discharge any liens or claims asserted against the Collateral (without any obligation to determine the validity thereof), or purchase any such insurance.  All sums so expended by the Master Trustee shall become an obligation secured by these presents and shall bear interest at the highest default rate of interest set forth in the Junior Obligations until paid.

(f)    <u>Negotiable Collateral</u>.  If any Collateral, including Proceeds, consists of a letter of credit, advice of credit, Instrument, money, certificates of deposit, negotiable Documents, chattel paper or similar property, the Borrower shall, immediately upon receipt thereof and at the request of Master Trustee, endorse and assign such Collateral, and deliver actual physical possession thereof, to the Master Trustee.

(g)    <u>Contracts</u>.  The Borrower shall remain liable to perform its obligations under any contracts included in the Collateral to the extent as though this Security Agreement had not been entered into, and the Master Trustee shall not have any obligation under any such contracts by reason of this Agreement.

(h)    <u>Master Trustee's Right to Inspection</u>.  The Borrower shall at all reasonable times, allow the Master Trustee, its officers, attorneys and accountants, to examine, inspect or make abstracts from the Borrower's books and records and to verify Inventory both as to quantity and quality and to arrange for verification of Accounts under reasonable procedures directly with the Account Debtors or by other methods; shall furnish to the Master Trustee upon request additional statements of any Account, together with all notes or other papers evidencing the same and any guaranty, securities or other information relating thereto; and shall do, make, and deliver all such additional and further acts, things, deeds, assurances and instruments as the Master Trustee may require to further protect its interest in or rights to the Collateral.

(i)    <u>Transfer of Collateral</u>.   Borrower shall not sell, lease, license, transfer or otherwise dispose of or encumber any interest in any Collateral except (i) sales of Inventory in the ordinary course of business; (ii) licensings and other dispositions of Intellectual Property in the ordinary course of business; and (iii) liens on the Collateral and other encumbrances that are permitted liens.

(j)    <u>State of Formation</u>.  Borrower shall notify the Master Trustee in writing, such notice to be received by the Master Trustee at least thirty (30) days in advance, of any change in its state of formation.

(k)    <u>Notice of Commercial Tort Claims</u>.   Borrower shall promptly notify the Master Trustee in writing of the existence of any commercial tort claims.

## 9. Remedies

(a) <u>Remedies Generally; Power of Sale</u>.  Upon the occurrence of any Default and at any time thereafter, the Master Trustee shall have all rights and remedies available at law or in equity including, without limitation, the rights and remedies of a secured party under the Uniform Commercial Code (regardless of whether the Code has been enacted in the jurisdiction where rights or remedies are asserted), including, without limitation, the right to take possession of the Collateral, and for that purpose the Master Trustee may, so far as the Borrower can give authority therefore, enter upon any premises on which the Collateral may be situated and remove the same therefrom.  The Master Trustee shall give to the Borrower at least ten (10) days' prior written notice of the time and place of any public sale of Collateral or of the time after which any private sale or any other intended disposition is to be made.  The Master Trustee may in its discretion transfer any securities or other property constituting Collateral into its own name or that of its nominee and receive the income thereon and hold the same as security for the Junior Obligations or apply it on principal or interest due on the Junior Obligations.  In the event that the Master Trustee takes possession of any Intellectual Property, the goodwill associated with any trademarks, tradenames, trade dress, and service marks of the Borrower shall be transferred to the Master Trustee.

(b) <u>Deposits</u>.  Any and all Deposit Accounts, deposits or other sums at any time credited by or due from any Master Trustee to the Borrower shall at all times constitute security for any and all Junior Obligations, and such Master Trustee may apply or set off such deposits or other sums against Junior Obligations at any time in Default whether or not the Junior Obligations are then due or other Collateral is considered by the Master Trustee to be adequate.

(c) <u>Waiver and Amendment</u>.  Except as otherwise expressly set forth herein, to the extent permitted by law, the Borrower waives demand, notice, protest, notice of acceptance of this Security Agreement, notice of loans made, credit extended, Collateral received or delivered or other action taken in reliance hereon and all other demands and notices of any description.  With respect to both Junior Obligations and Collateral, the Borrower assents to any extension or postponement of the time of payment or any other indulgence, to any substitution, exchange, or release of Collateral, to the addition or release of any party primarily or secondarily liable, to the acceptance of partial payments thereon and the settlement, compromise or adjustment of any thereof, all in such manner and at such time or times as the Master Trustee may deem advisable.  Except as otherwise provided by law, the Master Trustee shall not have any duty as to the collection or protection of the Collateral, or any income therefrom, or as to the preservation of rights against prior parties or as to the preservation of any rights pertaining thereto beyond the safe custody thereof.  The Master Trustee may exercise its rights with respect to Collateral without resorting to or regard to other Collateral or sources of reimbursement for any Junior Obligation.  Master Trustee shall not be deemed to have waived any of these rights upon or under the Junior Obligations or Collateral unless such waiver be in writing and signed by the Master Trustee.  No delay or omission on the part of the Master Trustee in exercising any right shall operate as a waiver of such right or any other right.  A waiver on any one occasion shall not be construed as a bar to the exercise of any right on any future occasion.  All rights and remedies of the Master Trustee as to the Junior Obligations or Collateral, whether evidenced hereby or by any other instrument or papers, shall be cumulative and may be exercised singly, successively or together.  The Master Trustee may, from time to time, without notice to the Borrower (a) retain

or obtain a security interest in any property of any other party, in addition to the Collateral, to secure any of the Junior Obligations; (b) retain or obtain the primary or secondary liability of any party, in addition to the Borrower with respect to any of the Junior Obligations; (c) extend or renew for any period (whether or not longer than the original period) or release or compromise any liability of any party or parties primarily or secondarily liable to the Master Trustee under the Junior Obligations; (d) release its security interest in any of the property securing any of the Junior Obligations and permit any substitution or exchange for any such property; and (e) resort to the Collateral for the payment of any of the Junior Obligations whether or not it shall have resorted to any other property or shall have proceeded against any party primarily or secondarily liable for any of the Junior Obligations. Master Trustee shall not, under any circumstances, or in any event whatsoever, have any liability for any error or omission or delay of any kind occurring in the liquidation of any Collateral, including the settlement or collection of any Account or for any damage resulting therefrom, absent a showing of negligence, bad faith or willful misconduct. This Security Agreement may be amended only by a writing duly signed by the Master Trustee and the Borrower.

(d)     Expenses; Proceeds of Collateral.  The Borrower shall pay to the Master Trustee on demand any and all reasonable out-of-pocket expenses, including reasonable attorneys' fees, incurred or paid by the Master Trustee in protecting or enforcing its rights upon or under the Junior Obligations or the Collateral or the existence, perfection or priority of the Master Trustee's security interest therein.  After deducting all of such expenses, the residue of any proceeds of collection or sale of the Collateral shall be applied to the payment of principal, interest, or fees on Junior Obligations in such order of preference as the Master Trustee may determine, proper allowance for interest on Junior Obligations not then due being made, and any excess shall be returned to the Borrower.

(e)     Power of Attorney.  The Borrower hereby irrevocably appoints the Master Trustee's designees from time to time its true and lawful attorneys-in-fact, with full power of substitution in the premises upon the occurrence of a Default and so long as such Default continues to exist (a) to demand, collect, receipt for, settle, compromise, adjust, sue for, foreclose or realize upon the Collateral in such manner as the Master Trustee may determine, whether or not the Collateral is then due; (b) to receive, open, and dispose of mail addressed to the Borrower; (c) to endorse notes, checks, drafts, money orders, Documents or other evidences of payment, shipment or storage or any form of Collateral on behalf of and in the name of the Borrower; (d) to sign and send on behalf of the Borrower any invoice or bill of lading relating to any Account, on drafts against customers, on schedules and assignments of Accounts, on notices of assignment, financing statements and other public records, on verifications of Accounts and on notices to customers; (e) to sign the Borrower's name to the proofs of claim against any Account Debtor on behalf of the Borrower; (f) to notify the post office authorities to change the address for delivery of the Borrower's mail to an address designated by the Master Trustee; (g) to endorse Borrower's names on all applications, documents, papers, certificates and instruments necessary or expedient for the Master Trustee to use the Intellectual Property, or necessary or expedient to grant or issue any exclusive or nonexclusive license under the Intellectual Property to anyone else, or necessary or expedient for the Master Trustee to assign, pledge, convey or otherwise transfer title in, or dispose of, the Intellectual Property to anyone else, for the purpose of recording, registering, filing or accomplishing any other formula with respect to the

Intellectual Property; and (h) to do all things reasonably necessary to carry out this Security Agreement.  The Master Trustee will not be liable for any acts or omissions nor for any error of judgment or mistake of fact or law, absent negligence, bad faith or willful misconduct.  This power, being coupled with an interest, is irrevocable until the Junior Obligations have been fully satisfied.  Notwithstanding anything herein to the contrary, no attorney acting pursuant to this Section 9(e) shall have any authority to confess judgment on behalf of the Borrower.

(f)     License.  Borrower hereby grants to the Master Trustee a license to use, without charge, Borrower's Intellectual Property and other Collateral in completing production of, advertising for sale, or selling any Collateral after any Default, and all of the Borrower's rights under all licenses and franchise agreements shall, in such event, inure to the Master Trustee.  In addition, the Borrower shall, upon request by Master Trustee, make available such personnel in Borrower's employ on the date of any Default as the Master Trustee may reasonably designate to permit the Master Trustee or the Master Trustee's designee to continue, directly or indirectly, to produce, advertise and sell the Collateral sold by the Borrower under any Intellectual Property or license.  The license herein shall include the right of the Master Trustee to use, assign, license or sublicense any of the Borrower's Intellectual Property, including in such license reasonable access as to all media in which any of the licensed items may be recorded or stored; provided that the Master Trustee shall comply with all pre-existing quality control standards and trademark use requirements of the Borrower.  No agreements hereafter entered into by the Borrower shall prohibit, restrict or impair the rights of the Master Trustee granted hereunder.

(g)     Reinstatement.  To the extent that the Borrower makes a payment or payments to the Master Trustee or the Master Trustee enforces its security interest and lien or exercises its right of setoff, and such payments or the Proceeds of such enforcement are set off or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside and/or required to be repaid to a trustee or receiver or any other party under any insolvency law, state or federal law, common law or equitable cause, then to the extent of such recovery, the Junior Obligations or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such enforcement or setoff had not occurred and shall be Junior Obligations secured by the Collateral.  The Master Trustee may, at any time or times, pay, acquire, satisfy, or discharge any security interest, lien, encumbrance or claim asserted by any party against the Collateral; provided, however, that the Master Trustee shall take reasonable measures to notify the Borrower of its intention to pay any such claim but the failure to give such notice shall not invalidate any action taken by the Master Trustee.  The Master Trustee shall not have any obligation to determine the validity thereof.  All sums paid by the Master Trustee under the provisions of this paragraph and any existing or other charges relating thereto shall be repaid to Master Trustee by Borrower on demand, shall be deemed an advance under the Agreement and shall bear interest at the highest default rate set forth in the Bonds.

(h)     No Marshaling.  The Borrower, on its own behalf and on behalf of its successors and assigns, hereby expressly waives all rights, if any, to require a marshaling of assets by the Master Trustee or to require the Master Trustee's first resort to some or any portion of the Collateral before foreclosing upon, selling or otherwise realizing on any other portion thereof.

10.     **Junior Lien**

This Security Agreement, any liens granted hereunder and payment of the Junior Obligations are junior and subordinate in all respects, including, in payment and priority, to the Senior Obligations (as defined in the Master Indenture), as more particularly provided for in the Master Indenture.

11.     **Miscellaneous Provisions**

(a)     <u>Notices</u>.  All notices hereunder shall be at the addresses set forth in the Master Indenture.

(b)     <u>Governing Law</u>.   This Security Agreement and all rights and obligations hereunder, including matters of construction, validity and performance, shall be governed by the Uniform Commercial Code and other applicable laws of the State of Indiana, without regard to conflict of law principles.

(c)     <u>Severability</u>.  Whenever possible each provision of this Security Agreement shall be interpreted in such a manner as to be effective and valid under applicable law, but if any provision of this Security Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective only to the extent of such prohibition without invalidating the remainder of such provision or the remaining provisions of this Security Agreement.  The Borrower recognizes that the Master Trustee has relied on this Security Agreement in extending credit to the Borrower and agrees that such reliance by the Master Trustee shall be sufficient consideration for this Security Agreement.

(d)     <u>Binding on Successors</u>.  The rights, privileges and obligations of the Borrower and Master Trustee shall inure to the benefit of and be binding upon their respective successors and assigns.

(e)     <u>Consent to Jurisdiction, Venue</u>.  The parties agree that any action or proceeding relating in any way to this Agreement may be brought and enforced in the state courts located in Vanderburgh County, Indiana or Posey County, Indiana, and each irrevocably submits to the jurisdiction of such courts and waives any objection to the laying of venue in such courts or any claim that such courts are inconvenient forums.

(f)     **JURY WAIVER.  THE PARTIES HEREBY WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM, WHETHER IN CONTRACT OR TORT, AT LAW OR IN EQUITY, ARISING OUT OF OR IN ANY WAY RELATED TO THIS AGREEMENT.   NO OFFICER OF THE MASTER TRUSTEE HAS AUTHORITY TO WAIVE, CONDITION, OR MODIFY THIS PROVISION.**

IN WITNESS WHEREOF, the Borrower has caused this Security Agreement to be executed by its officer duly authorized as of the date first above written.

**THE ESTELLE PEABODY MEMORIAL**
**HOME OF THE SYNOD OF LINCOLN**
**TRAILS OF THE PRESBYTERIAN CHURCH**
**(U.S.A.)**


By:_____

_____ President

STATE OF INDIANA                           )
                                           ) SS:
COUNTY OF _____                      )

       Before me, the undersigned Notary Public in and for said County and State, came **THE ESTELLE PEABODY MEMORIAL HOME OF THE SYNOD OF LINCOLN TRAILS OF THE PRESBYTERIAN CHURCH (U.S.A.)**, by _____, its President, who, as such President, acknowledged the execution of the foregoing document for and on behalf of said company, and, after being duly sworn, stated that any and all representations therein are true.

       **WITNESS** my hand and notarial seal this _____ day of _____, 2013.

My county of residence is
_____ County,              _____
State of _____, and     NOTARY PUBLIC
My commission expires:
_____                _____
                                       PRINTED NAME

**Schedule 1**


Former Names, Assumed Names
<u>And Tradenames of Borrower</u>

None


<u>Prior Combinations</u>

None

**Schedule 2**


**Intellectual Property, Licenses**


1. <u>Trademark Registrations</u>.


2. <u>Trademark Applications</u>.


3. <u>Patents</u>:


4. <u>Patent Applications</u>:


5. <u>Registered Copyrights</u>.


6. <u>Trademark Licenses</u>.


7. <u>Technology Licenses</u>:

**Schedule 3**

**Permitted Liens**


Greater America Leasing Corporation  - security interest in following Collateral:

Various Koncia Minolta & Lexmark copiers, printers, scanners, and fax machines & Hasler mailing system and all products, proceeds and attachments.  See UCC Financing Statement No. 201100008553590 for additional information.

**Schedule 4**

**List of Locations of Collateral**

400 West 7th Street
North Manchester, Indiana 46962

**Schedule 6.1**

**Executory Contracts to be Rejected**

- NONE

# Schedule 6.2

## Leases and Contracts to be Assumed

| Party to Lease or Contract | Description of Contract | Cure Amount | Adequate Assurance of Future Payment |
|---|---|---|---|
| Paris Psychological Services, P.C.<br>11307 Notestine Road<br>Grabill, IN  46741 | Agreement for Psychological Services | $0.00 | $0.00 |
| National Institute For Fitness And Sport<br>250 University Blvd<br>Indianapolis, IN  46202 | Agreement for Services | $0.00 | $0.00 |
| Healthcare Therapy Services<br>5214 South East Street, Bld. D, Ste. 1<br>Indianapolis, IN  46227 | Agreement For Therapy Services | $0.00 | $0.00 |
| NeighborCare Of Indiana<br>3402 Congressional Parkway<br>Fort Wayne, IN  46808 | Consultant Pharmacist Agreement | $0.00 | $0.00 |
| Nutrition Services, Inc.<br>2035 Deer Trail<br>Warsaw, IN  46580 | Dietitian Services Contract | $0.00 | $0.00 |
| Maxim Staffing Solutions<br>220 West Colfax Place, Suite 510<br>South Bend, IN  46601 | Facility Staffing Agreement | $0.00 | $0.00 |
| PrimeSource Healthcare<br>2100 Lake Cook Road, Suite 1100<br>Buffalo Grove, IL  60089 | Health Care Service Affiliation Agreement | $0.00 | $0.00 |
| Hope Hospice, Inc.<br>1476 West 18th Street<br>Rochester, IN  46975 | Hospice and Nursing Home Service Agreement | $0.00 | $0.00 |
| Nowak Fire Systems, Inc.<br>302 West Superior Street<br>Fort Wayne, IN  46802 | Inspection and Service Agreement | $0.00 | $0.00 |
| Life Care Services, LLC<br>400 Loust Street, Suite 820<br>Des Moines, IA  50309 | Management Agreement<br>as amended and restated pursuant to Plan Section 5.6 | $0.00 | $0.00 |
| Cinergy MetroNet<br>203 East Main Street<br>North Manchester, IN  46962 | Master Service Agreement | $0.00 | $0.00 |

| | | | |
|---|---|---|---|
| Kosciusko Medical Group, LLC<br>2105 East Center Street<br>Warsaw, IN 46580 | Medical Director Services Agreement | $0.00 | $0.00 |
| Accelerated Care Plus Corp.<br>4850 Joule Street, Suite A-1<br>Reno, NV 89502 | Medical Instrument Operating Lease | $0.00 | $0.00 |
| NeighborCare Of Indiana<br>3402 Congressional Parkway<br>Fort Wayne, IN 46808 | Pharmacy Services Agreement | $0.00 | $0.00 |
| Residents #1 - #43<br>400 W. 7th St.<br>North Manchester, IN 46962<br><br>(Residents #1 - #43 as identified in Schedule G filed under seal) | Residency Contracts #1 - #43 | $0.00<br><br>($0.00 cure amount for each individual contract) | $0.00<br><br>($0.00 for each individual contract) |
| ATC Healthcare Services, Inc.<br>1983 Marcus Avenue, Suite E-122<br>Lake Success, NY 11042 | Service Agreement | $0.00 | $0.00 |