Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 08-13555-scc

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

5    In the Matter of:

6    LEHMAN BROTHERS HOLDING, INC. et al.

7    - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

8    Case No. 08-01420-scc

9    LEHMAN BROTHERS, INC.

10   - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

11

12                              United States Bankruptcy Court

13                              One Bowling Green

14                              New York, New York  10004

15                              August 12, 2014

16                              10:00 AM

17

18

19

20   B E F O R E:

21   HON. SHELLEY C. CHAPMAN

22   U.S. BANKRUPTCY JUDGE

23

24

25   ECRO:   UNKNOWN

Page 2

1   Conference for

2   [Adversary Proceeding No. 10-03542]; [Adversary Proceeding No.

3   10-03544]; [Adversary Proceeding No. 10-03545]; [Adversary

4   Proceeding No. 10-03809]; [Adversary Proceeding No. 10-03811]

5

6   HEARING re Doc # 24762, 24881 - Omnibus Application of

7   Individual Members of Official Committee of Unsecured Creditors

8   and Indenture Trustees Pursuant to Section 1129(a)(4), Or,

9   Alternatively, Sections 503(b)(3)(d) and 503(b)(4) of

10  Bankruptcy Code for Payment of Fees and  Reimbursement of

11  Expenses

12

13  HEARING re Doc #8408 – Trustee's Objection to the General

14  Creditor Proof of Claim of Connie & Curtis Gale (Claim No.

15  7000142)

16

17

18

19

20

21

22

23

24

25  Transcribed by:  Theresa Pullan

Page 3

1    A P P E A R A N C E S :

2

3    WEIL, GOTSHAL & MANGES LLP

4         Attorneys for Debtors

5         767 Fifth Avenue

6         New York, NY  10153

7    BY:   LEE JASON GOLDBERG, ESQ.

8

9    DIAMOND MCCARTHY, LLP

10        Attorneys for JA Hokkaido Shinren

11        Two Houston Center

12        909 Fannin, 15th Floor

13        Houston, Texas  77010

14   BY:   STEPHEN T. LODEN, ESQ.

15

16   WOLLMUTH MAHER & DEUTSCH LLP

17        Attorneys for LBSF

18        500 Fifth Avenue

19        New York, New York  10110

20   BY:   WILLIAM F. DAHILL, ESQ.

21

22

23

24

25

Page 4

1    COVINGTON & BURLING LLP

2            Attorneys for Wilmington Trust

3            The New York Times Building

4            620 Eighth Avenue

5            New York, NY  10018

6    BY:   DIANNE COFFINO, ESQ.

7

8    OFFICE OF THE UNITED STATES TRUSTEE

9            U.S. Federal Office Building

10           201 Varick Street, Room 1006

11           New York, NY  10014

12   BY:   ANDREA B. SCHWARTZ, ESQ.

13           SUSAN D. GOLDEN, ESQ.

14

15   HUGHES HUBBARD

16           Attorneys for SIPA Trustee

17           One Battery Park Plaza

18           New York, NY  10004

19   BY:   AMINA HASAN, ESQ.

20           JEFFREY S. MARGOLIN, ESQ.

21

22   MEISSNER & ASSOCIATES

23   BY:   STUART D. MEISSNER, ESQ.

24

25

Page 5

1                     P R O C E E D I N G S

2              THE CLERK:  Please have a seat.

3              THE COURT:  Good morning.  Some of you who are here

4    frequently may notice some new faces in the courtroom this

5    morning.  Our Court is hosting some distinguished visitors from

6    the United Arab Emirates who are here to observe our bankruptcy

7    system to form their own developing bankruptcy system and they

8    are most welcome and are particularly interested in attending a

9    hearing in one of the largest and most important bankruptcy

10   cases of all time.  So those are the faces that you see in the

11   courtroom today.  Okay, good morning.

12             MR. GOLDBERG:  Good morning, Your Honor, Lee Goldberg

13   of Weil Gotschal and Manges for Lehman Brothers Holdings, Inc.

14   and its affiliated chapter 11 estates.  Your Honor, we are here

15   for the Seventy-Sixth Omnibus and claims hearing.

16             We start this morning's calendar with a scheduling

17   conference for the five non-distributed actions.  These are the

18   derivatives related avoidance actions where the defendants are

19   the trustees and the SPD issuers, and the funds that are the

20   subject of the disputes remain in possession of the SPD issuers

21   themselves.

22             On May 15th Your Honor entered an order extending the

23   litigation stay for the non-distributed actions.  The May 15th

24   stay order contemplated that the chapter 11 estates would have

25   filed and served a proposed scheduling order governing the non-

Page 6

1   distributed actions by July 28th, 2014.  The chapter 11 estates

2   failed to file and serve the proposed scheduling order by that

3   date, so the chapter 11 estates conferred with the defendants

4   in the non-distributed actions regarding a revised timetable

5   for submitting the scheduling order.

6          Your Honor, today the plan administrator is seeking a

7   bridge order that briefly extends the litigation stay which is

8   scheduled to expire on August 14th and implements the agreed

9   timetable for submission of the proposed scheduling order.

10  Bank of New York Mellon and U.S. Bank, the trustees which

11  themselves are defendants in the non-distributed actions and

12  which also represent the SPD issuer defendants, have agreed to

13  the proposed bridge order.  Your Honor, I have a copy of the

14  proposed bridge order.

15          THE COURT:  Thank you.

16          MR. GOLDBERG:  Your Honor, according to the bridge

17  order, the plan administrator will file a proposed scheduling

18  order within 14 days of entry of the bridge order.  As the plan

19  administrator has previously described to Your Honor, the

20  proposed scheduling order for the non-distributed actions will

21  effectively mimic the scheduling order that Your Honor has

22  already entered for the distributed action -- that's adversary

23  proceeding 10-03547, except that for example there would be no

24  class certification issues.

25          Your Honor, after the plan administrator files a

Page 7

1    proposed scheduling order, the defendants in the non-

2    distributed actions will have 14 days to file written

3    objections to the proposed scheduling order.  The plan

4    administrator and the defendants will then have a certain

5    period of time to resolve any issues regarding the proposed

6    scheduling order.  If the parties are unable to agree on the

7    terms of a proposed scheduling order, then the dispute will be

8    set for a hearing before the Court.  In the interim, Your

9    Honor, the litigation stay with respect to the non-distributed

10   actions would be continued until entry of the scheduling order.

11          Your Honor, that concludes my presentation, if you

12   have any questions.

13          THE COURT:  All right.  Does anyone else wish to be

14   heard with respect to the proposed bridge order as described?

15   All right.  We'll enter that today.  Thank you very much.

16          MR. GOLDBERG:  Thank you, Your Honor.

17          Your Honor, the next matter on the calendar is a

18   scheduling conference for the Motion of JA Hokkaido in the

19   distributed action that I referred to, Adversary proceeding,

20   10-03547.  Mr. Dahill from Wollmuth Maher and Deutsch will

21   handle that.

22          THE COURT:  Okay, very good.  Thank you.

23          MR. GOLDBERG:  Thank you, Your Honor.

24          MR. DAHILL:  Good morning, Your Honor.

25          THE COURT:  Good morning.

Page 8

1          MR. DAHILL:  William Dahill from Wollmuth Maher and

2     Deutsch for LBSF in the distributed action litigation.

3          THE COURT:  All right.

4          MR. DAHILL:  As Your Honor knows --

5          THE COURT:  And who is here for JA Hokkaido?

6          MR. LODEN:  Good morning, Your Honor, Steve Loden of

7     Diamond McCarthy on behalf of the movants, JA Hokkaido.

8          THE COURT:  Okay.  There's an unfortunate amount of

9     correspondence and bickering going on over what are

10    fundamentally simple discovery issues.  So let's just try to be

11    as efficient as possible and resolve it.

12         MR. LODEN:  Absolutely.

13         THE COURT:  Based on my reading of everything that

14    you've submitted, the primary areas of contention include what

15    happens if you can't get the depositions scheduled in time and

16    under what circumstances and by what standard there would be an

17    extension of time.

18         MR. LODEN:  Correct.

19         THE COURT:  Which I really think is just a lot of

20    words around nothing.  But you can try to convince me that

21    there's a meaningful difference between the words that each of

22    you are urging; and secondly, the scope of the documents that

23    need to be produced.  So is there any further progress between

24    the two of you on the open issues?

25         MR. DAHILL:  Your Honor, if I might, there's one

Page 9

```
 1    other issue that I believe is also important and it comes out

 2    of the order of paragraph 7 which is the --

 3             THE COURT:  And that's the participating on the class

 4    --

 5             MR. DAHILL:  That's correct.  Or what happens at the

 6    end if there's not.  And I'm prepared to address any of those

 7    matters.

 8             THE COURT:  So why don't you start at the top, and

 9    should we talk about the deposition first?

10             MR. DAHILL:  Your Honor, we are prepared to, I mean

11    Mr. Logan attached to his papers the information about the

12    process for engaging.  We are prepared.  We will, we believe we

13    will meet the schedule, there are rooms available within the

14    timeframe proposed by counsel, there is plenty of time, if need

15    be, we will obtain local counsel to appear for us if there's

16    any Visa issues.

17             THE COURT:  Okay.

18             MR. DAHILL:  The only issue that we raise was rather

19    than having a standard, using a good cause standard if we're

20    unable to do that despite our efforts, I agree with you, I

21    don't, if we have the same understanding of what both language

22    -- I'm trying to --

23             THE COURT:  You're going to try your best to get it

24    done, and if for some reason that's beyond your control, you

25    can't get it done in that time, there's going to be an
```

1   extension.  I mean that's the way I would articulate it.

2           MR. DAHILL:  That's all we've asked for.

3           THE COURT:  Whether it's the words you used or it's

4   the words you used.

5           MR. DAHILL:  I don't think the wording is necessarily

6   as important as the clarifications that have been made on the

7   record today, which is why we pressed the issue.

8           MR. LODEN:  Thank you, Your Honor.

9           THE COURT:  Okay.

10          MR. LODEN:  We can deal next, still within the order

11  is the question of the participation within the class

12  certification process.  Your Honor, one way to look at this is

13  if there is a determination by JA Hokkaido that they don't want

14  to participate in the process of responding to discovery which

15  has already been served on all the known defendants and/or does

16  not want to participate in the briefing as a result of not

17  participating in discovery, they could be treated as any other

18  defendant who may not participate.  But the only point, the

19  problem that we've had with the language is that they at the

20  end of that process, if they don't succeed on that motion,

21  wanted to then I guess start all over again class cert as to

22  them.  And that's what's objectionable to us.

23          THE COURT:  Right.  And I agree with that.  I mean

24  you know we're going to proceed to resolve the jurisdictional

25  issue which I view is very important.  I don't know what the

Page 11

1    answer is, but it's a serious issue.  But in the meantime, you

2    know, the train is going to leave the station, there are dozens

3    of other parties on the train, and you can participate in that

4    or not.  But there's not going to be a do over if at the end of

5    the day, you know, the train has gotten three-quarters of the

6    way down the track and it's, there's a determination from the

7    Court that in fact there is jurisdiction, and as I sit here, of

8    course, I don't know the answer to that.  But there has to be a

9    balancing of burden versus efficiency, and I think the way that

10   that has to come out is that you can go along and your

11   interest, you can either actively protect your own interest or

12   you can in a sense rely on the other parties similarly

13   situated, you know, to advance the positions that the

14   defendants all want to advance.

15             MR. DAHILL:  Well if I may, Your Honor, attempt to

16   push back a little bit on that point.  We originally pushed for

17   a hearing on our motion for leave to file a motion to dismiss

18   back in June of last year, and withdrew that motion voluntarily

19   without prejudice before you actually took over this case, all

20   this happened, and attempted to work out amicably with Lehman

21   counsel some discovery and things like that to hopefully

22   resolve this issue without Court involvement at all.  We waited

23   months for that to occur and it never occurred.  So we re-filed

24   the motion again in March of this year and that re-filing was

25   prompted because Lehman was attempting again to sweep our

Page 12

```
1    client up with the hundreds of other defendants into ADR, into

2    class cert merits litigation before the personal jurisdiction

3    issues, which you characterized as important, and of course we

4    agree, had been resolved.  So we re-filed our motion and we

5    argued strenuously before you several months ago that before we

6    get into merits-based litigation, the jurisdictional issues

7    should be resolved.  They have not yet been resolved.  I'm now

8    hopeful that since we do have large agreement on the scheduling

9    order that they will be resolved soon.  But we're still in the

10   same position we were back in June of last year.

11           THE COURT:  Well let's be practical, okay, so let's

12   be practical.  When do you believe that you'll be prepared for

13   a hearing on the jurisdiction motion?

14           MR. DAHILL:  We could be prepared next week.

15           THE COURT:  Well.

16           MR. DAHILL:  The schedule which was proposed by Mr.

17   Loden asked for a schedule, a hearing in the beginning of

18   December I believe, I forget the date.  It's a date that was

19   proposed by JA Hokkaido.

20           THE COURT:  And is that driven by the time that it

21   takes to get the deposition?

22           MR. DAHILL:  Several things.  The deposition deadline

23   as proposed is October 31st.  I presume that counsel will want

24   documents before the deposition.  I would if I were in their

25   shoes.
```

1            THE COURT:  Why is the deposition deadline so far

2     away?

3            MR. DAHILL:  We can make it closer.

4            THE COURT:  Is it because of the logistical issues of

5     conducting the deposition in Japan?

6            MR. DAHILL:  There appears to be, Your Honor, based

7     on speaking with, there's services that you speak with, and

8     again Mr. Loden had a very helpful printout from the U.S.

9     Consulate in Japan.  It appears to be there's a minimum of six

10    weeks that would be required to get it going.  I think we're

11    talking, the day we're talking is roughly ten weeks, eight to

12    ten weeks out.  And as Mr. Loden suggested, we're probably

13    looking at getting, hopefully getting some additional documents

14    which then need to be translated based upon what we received

15    last time which were documents and a lot of them numerical

16    documents that are written in Japanese.  I mean it may well be

17    that there's a couple of weeks there that could be moved, but

18    it's not a big difference.

19            THE COURT:  Okay.  So there's no possibility, so the

20    deposition must take place in Japan?

21            MR. LODEN:  According to agreements between the

22    countries of the United States and Japan, the deposition has to

23    take place in Japan.  The U.S. Embassy in Tokyo, their website

24    says that Japan considers it an infringement upon their

25    judicial sovereignty for a Japanese citizen to be deposed

Page 14

1    anywhere other than the U.S. Embassy in Tokyo or Osaka for use

2    in U.S. based litigation.  It's pretty draconian.

3          THE COURT:  Even if the deponent agrees?

4          MR. LODEN:  That's my understanding.

5          MR. DAHILL:  That's the way it's written, Your Honor.

6    I will tell you similarly Mr. Loden and I had discussions, well

7    let's do this either telephonically or let's do this by video

8    conference.  And there's actually a firm rule that says you

9    cannot do it telephonically, and the ground rules for doing it

10   by video conference which we still I want to try, require them

11   having actually a counselor representative sitting in the room

12   with the deponent.  It is more difficult than we had

13   anticipated, I would say that.

14         MR. LODEN:  Absolutely.

15         MR. DAHILL:  Your Honor, there may be a way to short

16   circuit this whole process and especially the October 31st

17   deadline.  We did finally receive all of Lehman's formal

18   jurisdictional discovery requests on Friday.  We responded to

19   those requests yesterday, less than one business day.  The vast

20   majority of those requests we stated, you've already got the

21   documents, there are no further documents in our possession,

22   custody or control.  The only additional documents that might

23   be produced relate to the six general jurisdictional requests

24   for production which have been added to the mix, they weren't

25   part of the mix that started in November.  So depending on the

Page 15

1    Court's ruling on those six, it may be that they've got, if the

2    Court sustains our objections on those six, it may be that

3    Lehman has all the documents now that they need and the

4    deposition can happen much further than otherwise anticipated.

5    But again, I think that depends upon the Court's determination

6    on those six new requests for production.

7            I did receive apparently yesterday afternoon, Your

8    Honor, the responses to our requests.  Frankly haven't had a

9    chance to review them to have a meet and confer on all the

10   items, not the disputed items that counsel says, they've

11   represented that they've produced everything we need to revisit

12   that.  So I'll be happy to look at that.

13           As regards, and I don't know if this is a good segue

14   into the other documents.

15           THE COURT:  Yes.

16           MR. DAHILL:  The documents that are identified in my

17   letter, Your Honor, which are codified also in the formal

18   request, go to three basic topics -- contacts with the United

19   States, who JA Hokkaido is.  JA Hokkaido has presented itself

20   as you know so Liberian farmers who operate in a very narrow

21   area and frankly aren't aware of the bigger world.  But the

22   defendant here is an investment vehicle put together the

23   purpose of which is to invest as best we can tell from

24   documents already received internationally with strategies of

25   where, how they weigh their portfolio, what exposure they take

Page 16

1    in different countries.  And from our perspective in responding

2    to the papers that are right in the motion which has already

3    been made, which points out everything that JA Hokkaido is not,

4    all we're looking for is the opportunity to say what JA

5    Hokkaido is.

6            The third item that's covered goes to the application

7    jurisdictional basis of CPLR302A3 which one component of which

8    is participation in international commerce.  And to that end, I

9    will cite to the Court in response to the pleadings submitted

10   by Mr. Loden on Friday concerning the assertion that this only

11   applies to manufacturers of goods and widgets or selling

12   products.  There's a case, Local 875 v. Pollack 992 F.Supp, 545

13   (E.D.N.Y. 1998) case looking at CPLR302A3 and the defendant in

14   that case was a Swiss investment management firm, and they were

15   found to be covered by the statute because they engaged in

16   investing activities around the world.  So our view is that the

17   application, that that provision is a potentially

18   jurisdictional bases.  And again, some of the discovery we're

19   seeking in terms of what their portfolio is, where they, they

20   conduct investments goes directly to that item.  So we don't

21   call them the general investment, we call them either specific

22   U.S. contacts related to who JA Hokkaido is or to CPLR302A3.

23           THE COURT:  Okay.

24           MR. DAHILL:  Your Honor, if I may approach, can I

25   hand up a copy of the responses that we filed yesterday.  I

Page 17

1    think it's necessary in order for you to look at the actual

2    requests.

3              THE COURT:  I think I have them, but let's make sure.

4    Oh, no I don't have them.

5              MR. DAHILL:  No, I didn't think you did, these just

6    came across the wire yesterday.

7              THE COURT:  This is going to be very difficult to do.

8              MR. LODEN:  Well I just wanted to make a few points

9    and thought it might be helpful.  We're not going to go through

10   the document in depth.  But the requests at issue are numbers

11   18, 19, 21, 22, 31 and 33.

12             THE COURT:  All right.

13             MR. LODEN:  For example, 18 says, the nature,

14   documents sufficient to show the nature of all indirect

15   investments in the United States.  There's no definition for

16   what that means or how that ties to any allegations in the

17   complaint.  Similar with number 19.  Documents sufficient to

18   show all the derivative investments.  There's no explanation of

19   how derivative investments is different from indirect or what

20   it means or how it relates to anything in the complaint.

21   Similar to number 21.

22             THE COURT:  Well but they all, it's not that it

23   relates to anything in the complaint, it's the question of

24   whether or not JA Hokkaido has conducted business and/or made

25   investments connected to or in the United States in a way

```
 1   sufficient to establish personal jurisdiction.  So in the

 2   extreme example, there's embedded in some mutual fund

 3   investment they've made five shares of Apple stock.  Right?  So

 4   what you're basically saying is well surely we don't have to

 5   tell them everything like that because that wouldn't be

 6   sufficient to allow them to assert jurisdiction over us.

 7            MR. LODEN:  Well we're certainly saying that.  I

 8   don't know which request, is that a derivative investment,

 9   indirect or --

10            THE COURT:  Here, we're getting --

11            MR. DAHILL:  -- or any connection, which is number

12   21, any connection with the United States.

13            MR. LODEN:  Your Honor, these are requests that

14   counsel deals with all the time.  I mean some of the, the

15   nature of the requests are clear, they go to the context.  If

16   counsel is having now definitional problems, I'm obviously

17   happy to discuss those.  Those aren't new, they've been --

18            THE COURT:  Here's what we're going to do, here's

19   what we're going to do.  I've got a courtroom full of people

20   and this is in effect a discovery conference that is more

21   properly held off the record in chambers where we can go

22   through the requests one by one and arrive at an understanding.

23   So what I'm going to suggest to you is the following since

24   you're here, is that you avail yourself of my conference room,

25   let me conclude the rest of the hearing.  To the extent that
```

Page 19

1    you still have open issues, I will join you and we will get it

2    done.

3                MR. DAHILL:  Thank you.

4                THE COURT:  With respect to the issue of whether or

5    not there's going to be what I call a do over on the class

6    certification, there's not.  That's going to proceed, you can

7    participate to the extent that you wish to participate.  We can

8    continue to talk about expediting this motion.  Frankly I'm not

9    sure how much will have been gotten done by November or

10   December on the class certification front that it will be any

11   real prejudice.  And certainly to the extent that we can

12   expedite this matter, including for example, once you have all

13   the documents and I don't know if this runs afoul of Japan, of

14   Japanese law, which I certainly don't want to do, is whether or

15   not you could in lieu of a deposition propose some written

16   interrogatories.  So --

17               MR. LODEN:  We would be amenable, and in fact we've

18   offered that in the past.

19               THE COURT:  I mean I'm not, they have the right to

20   take a deposition, we have to do it consistent with local law,

21   I'm just throwing it out there as yet another, you know,

22   practical answer or suggestion to move it along more quickly.

23   But I'm not going to impose that on you.

24               MR. LODEN:  Thank you.

25               THE COURT:  All right.  So you know where my

Page 20

1    conference room is.

2            MR. DAHILL:  I do, Your Honor.  Also, I'm not sure

3    how [indiscernible] there were some letter requests.

4            THE COURT:  Those are not on the calendar for today,

5    and I'm not hearing them today.

6            MR. DAHILL:  Okay.  I would have only been here to

7    oppose them, so thank you, Your Honor.

8            THE COURT:  All right.  What's next please?

9            MR. GOLDBERG:  Your Honor, Lee Goldberg, Weil

10   Gotschal and Manges for Lehman Brothers Holdings, Inc. and its

11   affiliated chapter 11 estates.  Your Honor, the next matter on

12   the calendar is the omnibus application of individual members

13   of the official committee of unsecured creditors and indenture

14   trustees pursuant to section 1129(a)(4) or alternatively

15   sections 503(b)(3)(d) and 503(b)(4) of the Bankruptcy Code for

16   payments of fees and reimbursement of expenses.  Your Honor,

17   this is a status conference.

18           THE COURT:  Okay.

19           MR. GOLDBERG:  And I believe Ms. Coffino from

20   Covington Burling is going to handle it.

21           THE COURT:  All right.  I don't know if you folks

22   over here want to cede your places for the moment.

23           MR. GOLDBERG:  Your Honor, if I may ask to be excused

24   from the courtroom for the day.  Thank you.

25           THE COURT:  Yes, of course.

Page 21

1              MR. GOLDBERG:  Thank you.

2              THE COURT:  All right.  Good morning, Ms. Coffino,

3    how are you?

4              MS. COFFINO:  I'm fine.

5              THE COURT:  Good to see you.

6              MS. COFFINO:  Good to see you too.

7              THE COURT:  All right.  So, Ms. Schwartz, Ms. Golden,

8    how are you today?

9              MS. SCHWARTZ:  Good morning, Your Honor.  For the

10   record, Andrea Schwartz and Susan Golden for the United States

11   Trustee.

12             THE COURT:  Okay.  Now my understanding is that there

13   was a little activity and some correspondence yesterday.  I did

14   not review the correspondence, so you'll have to start from the

15   very beginning.  As far as I am aware, this is a scheduling

16   conference post-remand from Judge Sullivan reversing that

17   aspect of the plan that related to the entitlement of the

18   individual committee members to their fees.  So we're now back

19   for scheduling conference on a hearing on substantial

20   contribution.

21             MS. COFFINO:  Good morning, Your Honor, for the

22   record, Diane Coffino from Covington and Burling on behalf of

23   Wilmington Trust Company, Your Honor, which is the co-chair of

24   the creditors committee.

25             THE COURT:  Okay.  If you could speak up a bit, Ms.

Page 22

1   Coffino.

2          MS. COFFINO:  Sure.  We are here on remand.  Judge

3   Sullivan sent this case back to this Court for a factual

4   determination of whether the committee members have made a

5   substantial contribution and can get their fees awarded under

6   section 503(b)(3)(d).  Originally we were going to propose a

7   schedule that just put all the evidence in the declarations and

8   a supplemental memo.  But after one of our members spoke with

9   the U.S. Trustee's office and learned that they have a view

10  that there still is a threshold legal issue here as to whether

11  committee members can ever get a substantial contribution award

12  for committee service --

13         THE COURT:  Hold it.  Ms. Coffino is characterizing

14  her position.  You're going to have an opportunity to correct

15  her or --

16         MS. GOLDEN:  I appreciate that.  But for the record

17  Ms. Coffino is not the attorney or representing the law firm

18  that even spoke to the U.S. Trustee.

19         MS. COFFINO:  That's correct.  I said one of the

20  other members.

21         THE COURT:  She said that.  She said that.  Let's

22  everybody stay calm.  Okay?

23         MS. GOLDEN:  Sorry.

24         MS. COFFINO:  You didn't read our letter, but we are

25  proposing a column A, column B approach.  We think Judge

Page 23

1    Sullivan's decision forecloses this argument that he decided

2    that they in fact, committee members, in fact may get

3    substantial contribution awards so long as they can demonstrate

4    that they did extraordinary work over and above normal

5    committee duties.

6              THE COURT:  The usual substantial contribution

7    standard.

8              MS. COFFINO:  Standard.

9              THE COURT:  Okay.

10             MS. COFFINO:  But if Your Honor were to disagree with

11   us on the reading of that case and certainly the United States

12   Trustee's office can state their own position on that, we

13   thought if there was a threshold legal issue that needs to be

14   resolved, we ought to resolve it first before putting in any

15   declarations, so that we --

16             THE COURT:  Okay.  So there's that issue.

17             MS. COFFINO:  Right.

18             THE COURT:  But then there's also I need to hear from

19   you your vision -- it's an evidentiary hearing.  Correct?

20             MS. COFFINO:  That's correct.

21             THE COURT:  So I need to hear from you how you, what

22   you think that ought to look like.

23             MS. COFFINO:  Well we would precede that by putting

24   in declarations of the witnesses and supplemental memorandum,

25   the U.S. Trustee can respond to that and we thought we'd brief

Page 24

1    it up front and then meet with you again as to the framework of

2    an evidentiary hearing.

3             THE COURT:  So the declarations would be in lieu of

4    direct testimony at a trial?

5             MS. COFFINO:  Yes, they could be, they could be.

6    It's efficient that way, I know it gets done a lot in my other

7    cases.

8             THE COURT:  It does get done a lot.  I guess I

9    haven't given sufficient thought to how I'm going to be

10   thinking about the issues, and my hesitation with the

11   declarations, and we have to go back to threshold legal issue.

12   But just food for thought, my hesitation with the declaration

13   approach is that what I then get is a bunch of documents

14   written by lawyers, that's what I get, instead of testimony,

15   true testimony from a witness in their own words.  So I have to

16   balance the need for more from the horse's mouth testimony

17   versus a bunch of declarations that are going to be written by

18   lawyers.  So I have to think about that.

19            MS. COFFINO:  We'll do it any way you want, of

20   course.

21            THE COURT:  I'm sure you would say that.  But I need

22   to think about that.  So let's hold that thought for the

23   moment, and if you wouldn't mind, let me hear from Ms. Golden

24   or Ms. Schwartz on the issue of the threshold legal issue.

25            MS. GOLDEN:  Good morning, Your Honor.

Page 25

1           THE COURT:  Good morning.

2           MS. GOLDEN:  Again for the record, Susan Golden for

3    the U.S. Trustee.  Your Honor, first I'll discuss why the U.S.

4    Trustee believes that the matter really should be more fully

5    briefed, and then I'll discuss our difference of opinion and

6    what the threshold issue is.

7           THE COURT:  Well let's start simply.

8           MS. GOLDEN:  Okay.

9           THE COURT:  Do you believe that Judge Sullivan ruled

10   that the committee members as a matter of law are not precluded

11   from seeking 503(b) substantial contribution awards?

12          MS. GOLDEN:  I think there's a subtlety to that.  We

13   believe that committee members as sitting on the creditors

14   committee as committee members cannot seek a substantial

15   contribution award, members of the committee who independently

16   make a contribution to the case separate and apart from sitting

17   on the committee.  For example, I'll just give for

18   hypothetical, Wilmington Trust, Wilmington Trust sat on the

19   committee; we don't believe that Wilmington Trust by virtue of

20   sitting on the committee and working super hard on the

21   committee is allowed a substantial contribution claim.  If

22   Wilmington Trust did something separate and apart from sitting

23   on the committee as an individual creditor in the case, we view

24   that as a separate issue.  So --

25          THE COURT:  Well, let's read what Judge Sullivan had

1    to say.  Okay?

2              MS. GOLDEN:  Sure.

3              THE COURT:  At the end of the decision Judge Sullivan

4    said, accordingly, the Court holds that the Bankruptcy Code

5    does not necessarily exclude official committee members from

6    the benefits of 503(b) in all situations.  Although official

7    committee membership alone cannot be a sufficient condition for

8    reimbursement of professional expenses, it is not a

9    disqualification.  As such, to the extent the individual

10   members, which is defined, qualify under 503(b)(3)(d) by virtue

11   of having made a substantial contribution to the bankruptcy

12   case, they may have their professional fee expenses paid under

13   503(b)(4).  Nevertheless, the Court is no position to determine

14   whether the individual members made such a substantial

15   contribution and the Bankruptcy Court declined to reach this

16   issue when it first presented.  The Court therefore remands.

17             MS. GOLDEN:  Well --

18             THE COURT:  So I think it's pretty clear that Judge

19   Sullivan said, take your shot, demonstrate that you made a

20   substantial contribution and you can get your fees under

21   503(b)(4).  So I don't, I don't see a threshold legal issue.

22             MS. GOLDEN:  Well, the other aspect of the threshold

23   legal issue, and I think that this is a main thrust of our

24   disagreement in terms of the briefing, is that it is my

25   understanding that, on the application, would like to begin the

Page 27

1   briefing with the above and beyond or extraordinary

2   circumstances argument.  We believe, as I think Your Honor just

3   stated, that the threshold issue first is did they make a

4   substantial contribution.  And for that, they need to prove

5   under 503(b)(3) whether the services benefitted a creditor or

6   the estate itself or interested parties.

7          THE COURT:  I have to say, Ms. Golden, I usually can

8   follow every word you say, I do not know what you're trying to

9   tell me.

10         MS. GOLDEN:  Okay.

11         THE COURT:  I simply do not, I'm not seeing, I'm not

12  understanding the nuances.

13         MS. GOLDEN:  Okay.

14         THE COURT:  And let me just tell you where I am and

15  maybe you can move me from that point.

16         MS. GOLDEN:  Sure.

17         THE COURT:  I read this decision, I read it when it

18  came down, I read it, I've now read it four times, I read these

19  paragraphs again last night.  To me the only thing that's for

20  me to decide is the evidentiary factual issue, did they make a

21  substantial contribution as if --

22         MS. GOLDEN:  That is where we are.  Did they make a

23  substantial contribution.

24         THE COURT:  Okay.  Then we have no dispute.

25         MS. GOLDEN:  Under -- did they make a substantial

Page 28

1   contribution under 503(b).

2           THE COURT:  There's no legal issue to brief.  So then

3   there will be an evidentiary hearing as to whether each of them

4   on an individual basis --

5           MS. GOLDEN:  Yes.

6           THE COURT: -- made a substantial contribution.

7   Right?  And to the extent that there's a nuance because they're

8   committee members as opposed to non-committee members, I

9   suppose there will be an opportunity for you to say that,

10  right, that there's a 50 page affidavit or there's five hours

11  of testimony, and I guess you want to be able to make the

12  argument that none of that was above and beyond the call of

13  duty of a committee member, and therefore it doesn't qualify as

14  a substantial contribution.

15          MS. GOLDEN:  Correct.

16          THE COURT:  Right?  So that's not a threshold legal

17  issue, that's whatever argument you're going to make after we

18  have the trial.  I can't re-rule on what Judge Sullivan ruled.

19          MS. GOLDEN:  Absolutely, of course.

20          THE COURT:  Right.  So if I find, however, I find on

21  the substantial contribution and folks want to appeal, I

22  imagine that the U.S. Trustee would then be able to appeal

23  Judge Sullivan's narrow ruling and take, and your office may

24  want to take the position that in fact serving on a committee

25  is a disqualification --

1            MS. GOLDEN:  That is correct.

2            THE COURT:  -- from getting substantial contribution.

3    But that's not for me to weigh in on.

4            MS. GOLDEN:  That is correct.  But, you know, I

5    agree, and we just want to make clear that what will be tried

6    is in the first instance whether each of the applicants I'll

7    call them, made a substantial contribution.

8            THE COURT:  Right.  But this is where we get into an

9    interesting philosophical issue with your office.

10           MS. GOLDEN:  You're not the first.

11           THE COURT:  Ms. Schwartz is dramatically rolling her

12   eyes, now shaking her head.

13           MS. GOLDEN:  Ms. Schwartz, I'm shocked.

14           THE COURT:  Pretending, feigning shock.

15           MS. GOLDEN:  Yes.

16           THE COURT:  And the interesting philosophical issue

17   is, and I, despite the fact that it seems like I do this not

18   infrequently, I'm not going to tell your office how to do its

19   job.  But one could make the observation that the U.S. Trustee

20   took a legal position on this issue and it prevailed, not

21   entirely, but partially, and we're back on a remand now.

22           MS. GOLDEN:  Correct.  We agree with that, yes.

23           THE COURT:  Right.  And now I should just do my job.

24           MS. GOLDEN:  We agree with that too.

25           THE COURT:  My job is to listen to all of them and to

Page 30

1     convince me that they made a substantial contribution.

2           MS. GOLDEN:  I agree with that as well.

3           THE COURT:  And I'm not sure, and I understand you

4     have standing as a party in interest to be heard in any issue

5     in the case, I'm not sure what the views of the U.S. Trustee

6     adds to that process.  I am the finder of fact, there's a legal

7     standard, I'm going to listen, I'm going to make a

8     determination.  So it's just unclear to me now that your office

9     has clarified the legal issue or obtained the clarification of

10    legal issue what more there is that I would really look to your

11    office to provide.  I'm the finder of fact, there's going to be

12    a trial just like there is on anything else, and basically to

13    me it almost boils down and you telling me that I'm going to

14    make a clear error because that would be the standard.  Right?

15    I think if I find that they, any of them have made a

16    substantial contribution and it goes up on appeal, that's a

17    factual finding.  And the standard on appeal is going to be

18    clear error.  So I think what you would be telling me now you

19    would be saying if you find that they made a substantial

20    contribution, basically you will committing clear error.  So

21    please, don't, this isn't personal.

22          MS. GOLDEN:  Oh, I know that.

23          THE COURT:  This is just, this is just me thinking

24    about what the hearing is going to look like and how I'm going

25    to think about what the U.S. Trustee will have to say.  I see

Page 31

1    Ms. Schwartz rising.  You know, my usual rule, I have a no

2    whack-a-mole rule, you know.

3            MS. SCHWARTZ:  Right.  However, Your Honor, I'm

4    handling the litigation aspect of this.  So if Your Honor would

5    permit me to answer Your Honor's question on what more has to

6    happen.

7            THE COURT:  Okay.

8            MS. GOLDEN:  That's fine.

9            MS. SCHWARTZ:  We'll split it up, Your Honor.

10            MS. GOLDEN:  We did split it up and Ms. Schwartz is

11    handling the discovery and litigation aspect of this, so I will

12    cede the podium to Ms. Schwartz for the moment.

13            THE COURT:  All right.  For those who may not have

14    understood the reference, the no whack-a-mole rule is that I

15    don't like to hear from multiple lawyers on behalf of one

16    party.  Okay.  So Ms. Schwartz or Ms. Golden, are we now, and

17    Ms. Coffino, are we in agreement that we're not going to have

18    briefing on a threshold legal issue?

19            MS. SCHWARTZ:  That is correct.

20            MS. COFFINO:  Yes.

21            THE COURT:  Okay, good.

22            MS. SCHWARTZ:  Your Honor, so now getting to the

23    point where Your Honor was asking the question what more is

24    there to have done.  And as part of those discussions, because

25    as you know, our office as are many parties, we try to talk

Page 32

1    about issues before we come before the Court to make as

2    efficient and smooth hearing as possible.  We spoke to Gene

3    Darcy (phonetic) who is an attorney for one of the individual

4    creditors who is not here today, and talked about some sort of

5    a schedule, that this was a scheduling conference.  And it's

6    our view, and we thought only fair to the applicants that they

7    have an opportunity to supplement any substantial contribution

8    claim that they've made.  If Your Honor may be aware, back in

9    the day when this, when the 1129(a)(4) claim was made, there

10   was in essence a very short section of that claim that said,

11   and if we don't get it under that, we get it under 503(b).  So

12   we thought it fair that the applicants have an opportunity to

13   supplement, replace, whatever they want to do as far as their

14   claim is.

15            THE COURT:  Okay.

16            MS. SCHWARTZ:  They gave us a schedule of timeframe

17   where they would have 120 days to file their claim.  We had

18   some, we don't care how much, we honestly don't care how much

19   time that they need and the Court is willing to give them so

20   long as we have the same amount of time.

21            THE COURT:  Sure.

22            MS. SCHWARTZ:  I will say, Your Honor, that of the

23   basic issue on a substantial contribution claim including for

24   example, that the services can't be duplicative, for example of

25   what committee counsel did or they can't be only for the

Page 33

1   interest of that individual creditor, but rather for the entire

2   creditor body.  Those are basic elements from Dana, Bayou

3   (phonetic), Granite Partners, back in the day.

4             THE COURT:  Right.

5             MS. SCHWARTZ:  We have that set up.  It may very well

6   be and we think we will want to take discovery with respect to

7   that.  And the reason is is Your Honor may be aware that the

8   committee had two sets, at least two sets of full time legal

9   counsel, they had the Milbank law firm and they had the Quinn

10  Emmanuel law firm.  The Milbank law firm directed approximately

11  and probably more than 400 attorneys to the work for the

12  committee.  That's not even including the Quinn Emmanuel people

13  which we suspect is over 200.  So there's a question as to

14  whether or not the work that the individual members claim that

15  they did over and above, extraordinary, etc. was in fact

16  duplicative of the work that was being done by the 400 Milbank

17  lawyers, etc.

18            Milbank's compensation in the case exceeds 235

19  million, there was lots and lots of fees that were paid for

20  this enormous amount of work.  So we're likely going to want to

21  take discovery of various parties to make a determination as to

22  that.  That doesn't go to whether Your Honor is going to make

23  the call on whether they in fact made a substantial

24  contribution.  You are the trier of fact.  But I think what

25  Your Honor said, and I think that we should maybe not make the

Page 34

1    decision on it at this moment as to whether or not the trial on

2    the 503(b) claims is in fact on paper.  It may be better, but

3    of course, we're not going to dictate how the claimants decide

4    to put their evidence in.  But it may be better to have to give

5    testimony.  That's going to be your call, Your Honor, we'll go

6    with whatever way Your Honor deems best.  But issues such as

7    duplication, self-interest and so forth --

8              THE COURT:  So let's stop there.  Okay.

9              MS. SCHWARTZ:  Yes.

10             THE COURT:  Because you just took it to, you know, we

11   just hit warp speed in terms of what I was thinking about in

12   terms of this.

13             MS. SCHWARTZ:  Okay.

14             THE COURT:  If what your office is thinking is that

15   there's going to be a comparison of the claims that are made

16   for substantial contribution against you know almost a half a

17   billion dollars of timesheets, that can't possibly be the way

18   this is going to go down.  I'm telling you right now there is

19   no way that I'm going to do that.  There is no way that I'm

20   going to do that.

21             MS. SCHWARTZ:  Well --

22             THE COURT:  So, and to go through, you know, three

23   years, four years, of timesheets for $400 million if you add

24   Milbank and Quinn Emmanuel to ferret out things that are

25   duplicative, I mean that's just a task that just doesn't make,

Page 35

1     it's just not, with all due respect to your office, I just

2     don't think it's a good idea.

3              MS. SCHWARTZ:  Well, let me say this, Your Honor.

4              THE COURT:  Or a wise use of resources.  I am

5     thinking of this much more in terms of a more global approach

6     with a more global explanation of on the one hand we have

7     hundreds of millions of dollars of fees incurred by hundreds

8     and hundreds of lawyers, what did you do that was above and

9     beyond what they did.  Maybe I'm being very simplistic about

10    it, but --

11             MS. GOLDEN:  Your Honor, I have to say that I

12    understand it could be a huge undertaking, it doesn't have to

13    be, we haven't fully scoped all of it out.  However, Your Honor

14    is going to have to make a finding that what these individual

15    creditors committees attorneys did was not duplicative of what

16    the other attorneys were doing.  That's part of a finding on a

17    503(b) claim.  We can't, and believe me, I'm going to be the

18    one doing the work on this side, I understand what you're

19    saying.

20             THE COURT:  Right.  But what I'm saying to you I

21    guess is, what I'm saying is that --

22             MS. SCHWARTZ:  But it can't be just a global thing,

23    that oh well here's the recovery we got.

24             THE COURT:  Right.  But nor can it be that we bring

25    in a truck to the back door with all the time sheets and we see

Page 36

1    a line on a time billing report from some time in 2011 and it

2    says work on plan issues and we say ah-ha, they were both

3    working on plan issues, and therefore that's duplicative.

4              MS. SCHWARTZ:  We're not contemplating that, Your

5    Honor.

6              THE COURT:  Okay.

7              MS. SCHWARTZ:  However, the Court is going to have to

8    make a factual finding on the basic element of a 503(b) claim,

9    and in addition to that because these are individual members of

10   a creditors committee who in fact are charged with the tasks

11   that they did after Your Honor finds points, factors one, two,

12   three and four, you will then get to and they will argue, we

13   will argue, etc. whether or not they met that standard that

14   Judge Sullivan mentioned in his decision.  And so what we're

15   trying --

16             THE COURT:  I hear you.  I hear you, I mean I guess

17   we're just going to have to put our philosophical differences

18   aside because I still don't really understand what's going to

19   happen.  The bid and the ask here is they get more money, and

20   if they get more money the creditors get less money.  Right?

21             MS. SCHWARTZ:  Well they already got the money, we

22   haven't talked about yet them safeguarding that money.

23             THE COURT:  Okay.  Let's not make it more

24   complicated.

25             MS. SCHWARTZ:  Okay.

1           THE COURT:  Give me one moment while our visitors are

2    going to go visit with Judge Gropper.  Thank you so much.

3           UNIDENTIFIED:  Thanks, Judge.

4           THE COURT:  Enjoy the rest of your visit.

5           UNIDENTIFIED:  Thanks so much.  You'll be seeing more

6    of three of them for the week.

7           THE COURT:  Okay, very good.  Bye-bye.  Thank you.

8    It's hard enough to understand in English, let alone through an

9    interpreter.  So you know --

10          MS. SCHWARTZ:  May I make a suggestion here, Your

11   Honor?

12          THE COURT:  Yes.

13          MS. SCHWARTZ:  I mean as I said, it was our

14   understanding that this was going to be a scheduling

15   conference.  And I think that we should have some time to talk,

16   the parties talk together.

17          THE COURT:  Okay.

18          MS. SCHWARTZ:  Let us try to work out a schedule, let

19   us try to work out a scope of discovery, let us try to do that.

20          THE COURT:  That's a good suggestion.

21          MS. SCHWARTZ:  We have all reasonable people.  I mean

22   everybody has been living this issue for a long time, and I

23   think that that, and let us try to present that to Your Honor.

24   And if we can't do that, then we'll come to Court for help.

25          THE COURT:  But we now have clarity that there's not

Page 38

1    going to be any briefing on a threshold legal issue.

2              MS. SCHWARTZ:  Right.

3              THE COURT:  We're going to go right to the main

4    event.

5              MS. SCHWARTZ:  Right.

6              THE COURT:  Okay.  So then at least we accomplished

7    something today.

8              MS. SCHWARTZ:  Okay.

9              THE COURT:  All right.  So let me hear from Ms.

10   Coffino again.  Thank you Ms. Schwartz.  That was very helpful

11   for me to understand where you're coming from.

12             MS. SCHWARTZ:  Thank you.

13             MS. COFFINO:  I'd like to know more about the scope

14   of this discovery.  I don't think from the members perspective,

15   we don't see a need for massive discovery here and we share

16   your concern.  We don't want to be here in three years having a

17   trial, you know, in 2017.

18             THE COURT:  Well, but Ms. Schwartz just said that you

19   know the next thing is that you guys should talk and figure it

20   out.

21             MS. COFFINO:  Right.

22             THE COURT:  And if you can't agree you'll let me know

23   and you'll come back in on a more traditional, you know,

24   discovery conference, you'll have a meet and confer, etc.  I

25   think I'd like to think about, I think written submissions

Page 39

1   would be helpful, and what I would say to you is that you

2   should proceed assuming that at least in the first instance

3   there will be written direct submissions, but that I'm going to

4   reserve my right to ask in addition that there be live

5   testimony.  Certainly if somebody believes the right to cross-

6   examine a declarant, but I may also ask that there be

7   additional direct testimony in addition to what's written in

8   the declaration.  Okay.  So that way you --

9           MS. COFFINO:  Okay.  We don't, we have no objection

10   to proceeding to a meet and confer to flush out these issues.

11           THE COURT:  Okay.  So then why don't you do that and

12   then reach out to Ms. Lutkis and we'll put you back on the

13   calendar.  It doesn't have to be on a Lehman day, if you need

14   to come in for a discovery and a further scheduling conference,

15   we can see you individually.

16           MS. COFFINO:  Okay, thank you very much.

17           THE COURT:  And you know I like to see people in

18   person but it's a large group, so if we can help keep expenses

19   down by having some people phone in we can think about that

20   too.

21           MS. COFFINO:  Okay.

22           THE COURT:  Ms. Golden?

23           MS. GOLDEN:  Sure, Your Honor.  Just one thing.  The

24   U.S. Trustee doesn't have any objection to one of the firms,

25   obviously there are several firms here that are implicated.

Page 40

1          THE COURT:  Right.

2          MS. GOLDEN:  One firm taking the lead in terms of

3     speaking in Court in terms of the legal issues and whatnot.

4     And as Your Honor had said that each individual creditor has to

5     make their case before you, but we just want to let Your Honor

6     and all the parties here know that we do not have any issue

7     with Ms. Coffino or anyone, you know, taking the lead as one

8     attorney and all of them signing on to a legal brief as opposed

9     to Your Honor having to hear the same thing fifteen times.

10         THE COURT:  That would be delightful.  All right.

11    Very good.  This was very helpful and productive.  Thank you

12    all for coming in.  You may be all excused obviously.

13         MS. COFFINO:  Thank you.

14         THE COURT:  Ms. Schwartz?

15         MS. SCHWARTZ:  Yes, Your Honor.

16         THE COURT:  If I could impose on you to stop by my

17    chambers, you stepped up on a matter the other day involving a

18    pro se litigant.

19         MS. SCHWARTZ:  Right.

20         THE COURT:  And there was a subsequent development.

21         MS. SCHWARTZ:  Okay.

22         THE COURT:  And if you would stop by my chambers and

23    talk to Ms. Isen, I think there's something that your office

24    should be aware of.

25         MS. SCHWARTZ:  Thank you, Your Honor.

Page 41

1          THE COURT:  Okay.  Thank you.  Okay.  What's next?

2          MR. MARGOLIN:  Good morning, Your Honor, Jeffrey

3    Margolin, Hughes Hubbard and Reed for Mr. Giddons, the trustee

4    of Lehman Brothers Inc.  We have one matter on the LBI portion

5    of the calendar this morning that's going to be handled by my

6    colleague, Amina Hassan.

7          THE COURT:  Okay.

8          MS. HASSAN:  Good morning, Your Honor.

9          THE COURT:  Good morning.

10          MS. HASSAN: Amina Hassan from Hughes Hubbard and Reed

11    for the trustee.  I'm going to be addressing the one contested

12    matter at issue here, which is the trustee's objection to a

13    claim filed by Mr. and Mrs. Gale.  It's a general creditor

14    claim for approximately 2.5 million in alleged damages related

15    to one of the accounts that the Gales maintained at LBI from

16    2000 to 2008.

17          The trustee has briefed his position in the papers,

18    so I will just be hitting on some of what we consider to be the

19    key issues which underlie our positions, i.e., that this claim

20    should be expunged in its entirety and with prejudice.  What we

21    have here, Your Honor, is claimants who are basically seeking

22    or requesting the Court to go back in time and be able to redo

23    their investments and redo their decision not to bring this

24    claim earlier.  It is very unfortunate that they suffered

25    losses in their account.  However, their claims can just not be

Page 42

1   sustained.  The bulk of the claim is Steingard (phonetic) and

2   what remains all relates to creating that what was ratified by

3   the Gales over the years that they maintained their account at

4   LBI.

5           As Your Honor knows through the pleadings, the Gales

6   opened their account in 2000 with LBI.  The account is

7   primarily invested in technology stock, household names such as

8   AOL, Cisco, so on and so forth.  Unfortunately, the account

9   suffered losses soon thereafter.  I think it's significant to

10  know that approximately 85 to 90 percent of the total

11  diminution in value of the account actually happened between

12  June 2000 when the account was opened and July 2002, and the

13  two things notable about those losses.  One, as the court will

14  note, those losses coincide with the technology market crash.

15  And number two, all of those losses are prior to the statute of

16  limitations bar.

17          As we understand, the claimants filed their statement

18  of facts with FINRA in July of 2008.  They've alleged a number

19  of causes of action, but the maximum time limitation applicable

20  to any of them is six years which would mean that the cutoff

21  for limitations period is July 2002 or July 2nd, 2002.  And it

22  is our position that any of their losses or any claim related

23  to the period prior to that is Steingard and should be expunged

24  and disallowed for at least that reason.

25          Moving on --

1          THE COURT:  So the beginning account value, I'm

2    basing this off of some of the account statements, looks like

3    the beginning account value in June of 2000 was somewhere north

4    of two million two.

5          MS. HASSAN:  That's correct.

6          THE COURT:  And then the July 2002 beginning account

7    value is $657,000.

8          MS. HASSAN:  That sounds correct, Your Honor.

9          THE COURT:  And what is just for my own, remind me,

10   what's considered the turnover rate or the commission to equity

11   ratio above which its considered to be churning, do you know?

12         MS. HASSAN:  Yes, Your Honor, I believe it's a

13   turnover ratio which is generally used as a benchmark as a

14   turnover ratio of six.  But based on the expert analysis that

15   has been provided by claimants here, the average turnover is

16   actually half of that, and at no point during those eight years

17   does it actually get to six or over that.  And for that reason,

18   we believe that at least the churning allegation it can't even,

19   because it can't meet that benchmark, it cannot be sustained.

20         THE COURT:  So in a year, and this is really just for

21   my own understanding, so I'm looking at turnover and cost ratio

22   summary that's attached to the trustee's reply, and for example

23   --

24         MS. HASSAN:  Your Honor, do you mind telling me which

25   page you're on so I can look at the same thing?

Page 44

```
 1              THE COURT:   It's page 21, it's in a bracket, the

 2    numbers are in a bracket, I just happen to be turning to page

 3    21.  Do you see that one?

 4              MS. HASSAN:  Yes, I do.

 5              THE COURT:   Okay.  So for example, in 2006, the total

 6    purchases and the total sales are nearly identical.  Right?

 7    There are $2.9 million in purchases and $2.9 million in sales.

 8    And the portfolio turnover ratio is just four.

 9              MS. HASSAN:  Correct.

10              THE COURT:   So I don't -- so that's not considered

11    churning, in other words in a number, the entire account turned

12    over, that's not, under the legal standard of churning, that's

13    not churning?

14              MS. HASSAN:  That's right, Your Honor, because one,

15    it doesn't meet that particular benchmark and I also believe

16    it's not just a matter of the entire account or the activity in

17    the account, it's more, you know, whether specific, let's say

18    you're buying the same securities, you're selling the same

19    securities, that would be more symptomatic of churning I

20    believe than just the whole account, there being activity in

21    the account.

22              THE COURT:   I see.  Okay, I understand what you're

23    saying.  All right.  And, all right, is there anything else you

24    wanted to add before we hear from the counsel for the Gales?

25              MS. HASSAN:  I will just quickly add, so once we have
```

Page 45

1  the statute of limitations, a bulk of the claim basically set

2  aside under the statute of limitations from our point of view,

3  what's left is the six year period, 2002 to 2008, and we know

4  from the pleadings submitted by the claimants that they were

5  receiving monthly statements which told them exactly what was

6  happening in their accounts.  They were also on notice under

7  their agreement that they signed with LBI and under the

8  statements that they were receiving that if they have an

9  objection to make to any of the statements or to any of the

10  trades, they need to speak up and they need to put it in

11  writing within ten days.  But what we see is we didn't have any

12  of those objections during the six years.  In fact, Mr. and

13  Mrs. Gale chose to continue maintaining their account at LBI,

14  they continued depositing money, withdrawing money, and all

15  those actions signify ratification of consent to how their

16  account was being handled.

17          And for those reasons, Your Honor, I think between

18  the statute of limitations argument and the ratification

19  argument we believe that those two particularly are dispositive

20  of the claim in its entirety.

21          THE COURT:  All right.  Thank you.  Good morning.

22          MR. MEISSNER:  Good morning, Your Honor.

23          THE COURT:  Go ahead.

24          MR. MEISSNER:  Yes, I represent the Gales which

25  contrary to many of the parties that are before you, they're

Page 46

1    not the Bank of New York, they're not the Bank of America.

2              THE COURT:  I understand.

3              MR. MEISSNER:  They're not 133 employees of Lehman

4    Brothers, they're just two individuals.  I think the first

5    issue is what I would call in my experience as a prosecutor,

6    former prosecutor, a bait and switch that went on here.

7    Procedurally.

8              THE COURT:  Let me go right there.  I don't think

9    there was a procedural bait and switch, okay.  I think what

10   happened is for whatever reason on or around August 11th, you,

11   it occurred to you that one of the things that you might do

12   would be to move to lift the stay to compel arbitration.  And

13   the fact that you did not determine to do that before is not

14   the trustee's fault.  The trustee did not keep that thought out

15   of your mind.  So nothing that was said in the papers in that

16   regard is a bait and switch.  I mean that, you were never told

17   not to do that, you just didn't do it.

18             MR. MEISSNER:  Respectfully, Your Honor, the history

19   started with the filing of the notice of objection.

20             THE COURT:  Right.

21             MR. MEISSNER:  And I'm looking at it right here.  It

22   says the claim should be disallowed for the following reasons.

23   It's very simple, it's two pages.

24             THE COURT:  Right.

25             MR. MEISSNER:  And it made numerous references to the

Page 47

1   statement of claim which factually did not have the references

2   in it, it attached exhibits that they claim stood for things

3   that it didn't stand for, and I'm looking at it, it says the

4   claim should be disallowed for the following reasons --

5   ratification, lack of loss causation.

6           THE COURT:  Right.  And statute of limitations.

7           MR. MEISSNER:  And statute of limitations, period,

8   nothing about pleadings or anything else.

9           THE COURT:  But you're taking, you're turning the

10  world on its head.  Those are the three grounds, those are

11  still the three grounds.

12          MR. MEISSNER:  Well no, I'm looking at the reply

13  which attaches numerous exhibits that weren't attached to the

14  original objection.

15          THE COURT:  Okay, I don't need to look at --

16          MR. MEISSNER:  And the first very long argument is

17  the claim fails to correctly plead a cause of action, and it

18  goes on for several pages.  That was not addressed, we didn't

19  have a right to respond to that.

20          THE COURT:  But that has nothing to do with an

21  eleventh hour argument that after we've gone through all of

22  this that we're now going to stop in our tracks so that you can

23  make a motion to compel FINRA arbitration, it has nothing to do

24  with that.

25          MR. MEISSNER:  Their first argument was in an

Page 48

1    affidavit by the trustee was that we didn't even file a FINRA

2    arbitration.

3            THE COURT:  They made a mistake.

4            MR. MEISSNER:  Right.  So we responded based on the

5    paperwork that was provided, now they're making an issue that

6    hey we want you to comply with the pleading requirements in

7    federal court which obviously would not be part of what's

8    required in FINRA arbitration.  And now in response to that new

9    argument, new argument, we said fine, if you want us to deal,

10   make that argument --

11           THE COURT:  No, no, no.  That's not what they're --

12   you're twisting every bit of this.  They're not saying that

13   we're going to impose a FINRA pleading standard such as they

14   are on this proceeding.  We're now in a federal --

15           MR. MEISSNER:  Court.  Court pleading.

16           THE COURT:  Pardon?

17           MR. MEISSNER:  Opposing the court pleading, the

18   opposite.

19           THE COURT:  No, no, no.

20           MR. MEISSNER:  They're saying that we want to impose

21   the federal pleading requirements.

22           THE COURT:  That's right.  We're in a federal court,

23   and the Federal Rules of Civil Procedure apply.  So

24   accordingly, they have the right to say, look, all we know you

25   submitted a proof of claim, a proof of claim can be two

Page 49

1    sentences, right, and a debtor or a trustee can then say I

2    object to the claim because I don't know what the claimant is

3    talking about.  And then the court can say, you know, what,

4    you're right, claimant, you need to file a claim with more

5    precision.  In the Lehman case, we have this structure in which

6    we basically have kind of a 12(b)(6), this is kind of a

7    12(b)(6), it's a sufficiency hearing.  Okay.  So we have,

8    they've said on the merits, they have ratification, lack of

9    loss causation and statute of limitations.  And all that

10   they've said at the next round is, look, if you're not inclined

11   to dismiss it entirely out of hand, they at least, they, your

12   clients, at least ought to file a claim that complies with rule

13   9(b) because you are in some instances alleging things that

14   sound like fraud.  That's all.

15            MR. MEISSNER:  Right.  But their reply they attach

16   the actual contract that our client agreed --

17            THE COURT:  So what?

18            MR. MEISSNER:  -- and forced into arbitration.

19            THE COURT:  But you've known about that contract all

20   this time.

21            MR. MEISSNER:  We didn't have the contract.

22            THE COURT:  That's not their fault.  You have --

23            MR. MEISSNER:  No, it is their fault, it's their

24   contract filled out by them, given to them.  We don't have it.

25            THE COURT:  Your clients didn't have it?

Page 50

1            MR. MEISSNER:  No.

2            THE COURT:  I'm sorry --

3            MR. MEISSNER:  It's their own contract, they forced

4    the clients to sign and they keep.

5            THE COURT:  Oh no, no, no, no, we're not going to

6    play that game.  You have clients, you have clients who gave,

7    who now seek to enforce a contract.  This wasn't a secret

8    agreement that Lehman had.  Your client signed it.

9            MR. MEISSNER:  I understand that.  It's among --

10           THE COURT:  Your clients made a FINRA claim.

11           MR. MEISSNER:  Right, exactly.

12           THE COURT:  Right.  And now at the eleventh hour

13   you've decided, oh great, let's go to FINRA.  But --

14           MR. MEISSNER:  I don't think it's the eleventh hour,

15   but --

16           THE COURT:  It's the twelfth hour.

17           MR. MEISSNER:  Well --

18           THE COURT:  You know --

19           MR. MEISSNER:  The trustee incorrectly claimed that

20   we didn't even file a FINRA.

21           THE COURT:  They made a mistake.

22           MR. MEISSNER: We addressed that issue specifically --

23           THE COURT:  That's right.  Okay.  So now we have that

24   fact, there was a FINRA complaint that was filed in July of

25   2008.  Correct?  Right?

Page 51

1          MR. MEISSNER:  Right.

2          THE COURT:  No dispute about that.  Okay.  You only

3     get to go back six years.  You only get to go back to six

4     years?

5          MR. MEISSNER:  Go back to where?  Yeah, well I'll

6     address the substance of that if you'd like, I'd be happy to do

7     that.

8          THE COURT:  Under what possible scenario can you go

9     back more than six years?

10         MR. MEISSNER:  Well first of all, there's a

11    mischaracterization of the applicability of statute of

12    limitations.  If one took the time to read the actual statement

13    of claim, it's clear that our claim is not based on what they

14    are doing out of pocket damages, it's based on market damages,

15    and it was supported by Miley (phonetic) and other case law

16    marketed just to damages.  If you just read the complaint --

17         THE COURT:  No, no, no, no, no.  You are three steps

18    ahead.  The Gales gave their money to Lehman in the year 2000.

19    Right?

20         MR. MEISSNER:  Well first of all, the losses that we

21    claim, if you want to look at the market analysis provided, the

22    losses that we claim if you want to start at 2002 forward is

23    over $750,000.  That's the losses from 2002 forward.  That's --

24    secondly --

25         THE COURT:  Mr. Meissner, you're really, I don't know

Page 52

1    whether it's purposeful or not, but you're not sticking with me

2    here on the points that I'm making.  The Gales gave Lehman $2.2

3    million in the year 2000.

4            MR. MEISSNER:  Right.

5            THE COURT:  By July of 2002 which is six years back

6    from when the FINRA claim was filed, the account had dwindled

7    to $650,000.  During the period of time prior to that, the

8    Gales were entirely aware, indeed, and complained about what

9    was happening to the value of their investments.

10           MR. MEISSNER:  And they were misled by their broker

11   as detailed in the claim and therefore that raised an issue of

12   fraudulent concealment and equitable estoppel.

13           THE COURT:  There was no fraudulent concealment.

14   They had the account statements, they complained about what

15   happened, they had the ability at that time to do something

16   about it and they did not.

17           MR. MEISSNER:  Your Honor, if that was the case then

18   there would be no need for FINRA at all because every -- I've

19   been doing this for over a decade, every --

20           THE COURT:  Let me tell you something Mr. Meissner,

21   okay, my number one least favorite thing is when people tell me

22   how long they've been doing that, because that's their way of

23   telling me that I don't know what I'm doing.  So I've been

24   doing this for a really long time too.

25           MR. MEISSNER:  I don't claim to be a bankruptcy

Page 53

1    expert, I'm a FINRA arbitration attorney, I represent both --

2          THE COURT:  That's great, you're in a bankruptcy

3    court now.

4          MR. MEISSNER:  Both sides.

5          THE COURT:  Okay.  You're in a bankruptcy court in

6    which we apply statute of limitation.

7          MR. MEISSNER:  But we're dealing with a unique FINRA,

8    violation of FINRA rules and investments issues.  And as Your

9    Honor knows from the case law, the case law cited is going back

10   to the 80s and 90s because almost all cases go to FINRA

11   arbitration, so there's very little updated case law to apply,

12   that's why people apply to the SEC enforcement actions in FINRA

13   arbitration.  The --

14         THE COURT:  There's a motion before me now on a

15   sufficiency hearing under the procedures that have been in

16   place in this case for years.  The three basis for striking the

17   claim are ratification, lack of loss causation and the statute

18   of limitations.  There's nothing that you've said that

19   persuades me that the Gales are entitled to assert a claim

20   against this estate based on anything that occurred prior to

21   six years prior to the filing of the FINRA complaint.

22         MR. MEISSNER:  Well, Your Honor, the claim, and I

23   could if you want me to, cite the quote from the claim is

24   detailed with regard to representations made by the broker that

25   caused them to not be able to file their claim.  This is not,

Page 54

1    this is in essence a suitability case.  If people --

2            THE COURT:  What is it that the broker did, remember

3    now, we're talking about the statute of limitations, the way

4    that you extend the statute of limitations in general terms are

5    showing facts and circumstances that rendered you incapable of

6    knowing that you had a claim.  The Gales month after month got

7    their statements that showed the decline in their account which

8    if they were reading the newspaper, they would see that

9    everybody's accounts were declining.

10           MR. MEISSNER:  But that's not true, Your Honor.  The

11   entire claim shows that that's not what was happening.  In

12   fact, the base of the claim says that the --

13           THE COURT:  Are you denying that the Gales were aware

14   that their account went down from $2.2 million --

15           MR. MEISSNER:  No.  No.

16           THE COURT:  -- to $600,000?

17           MR. MEISSNER:  No, but --

18           THE COURT:  And they complained to Lehman, didn't

19   they?

20           MR. MEISSNER:  Yes, they complained about losses, but

21   as Your Honor knows, losses does not mean you have a claim.

22   And in fact it was only as a result of an analysis which

23   compared the standard deviation of the Standard and Poor's 500

24   compared to how the Gales were invested, for example.

25           THE COURT:  But there's no -- that's not the way a

Page 55

```
 1    statute of limitations works.  There was nothing that prevented

 2    them from taking action.

 3              MR. MEISSNER:  They didn't know they had a claim.  Of

 4    course, as Your Honor, the very assertion that the idea that --

 5              THE COURT:  Here's the difference.

 6              MR. MEISSNER:  -- the market in general was going

 7    down, so you don't have a claim.  And that's what was portrayed

 8    by the broker which was false, and if we give them the

 9    opportunity would be able to show that.  The reality is if the,

10    we gave the details of our damage analysis is a 60/40

11    diversity.  If the same money was invested 60 percent in

12    diversified equities and 40 percent bonds, they would have made

13    $700,000, not lost two and a half million.

14              THE COURT:  That's --

15              MR. MEISSNER:  That shows there wasn't a market-wide

16    collapse.

17              THE COURT:  They were aware, they got monthly

18    statements showing how their monies were being managed and they

19    elected not to do anything.

20              MR. MEISSNER:  But you're talking about ratification

21    defense, and if that applied, then there would be no ability to

22    have any suitability case anywhere because the essence of

23    suitability is that based on the person's lack of experience in

24    investing and otherwise, they rely on the broker.  The reality

25    is, everyone gets statements, unless you're dealing with a
```

1   [indiscernible] everyone gets statements.  So if everyone that

2   gets statements means that they can't file a suitability case -

3   -

4           THE COURT:  So in your world, in your world, there's

5   no statute of limitations ever until you for some reason you

6   think that those losses are really too severe, I think I'll go

7   out and hire an expert, and then when the expert tells you you

8   have a claim, that's when your claim kicks in.  That's like

9   saying that somebody gets in a car accident, they get hurt and

10  they wait ten years and some relative of theirs says, oh you

11  know you could have filed a claim because you got hurt in a car

12  accident.  That's not --

13          MR. MEISSNER:  No, I'm not saying that.

14          THE COURT:  The purpose of a statute of limitations

15  is that when you have, when you know what you know you then

16  have to act on it.

17          MR. MEISSNER:  I'm reading from page 8, McDonohue

18  explained, that is the broker, McDonohue explained that the

19  losses were simply reflective of the market conditions and that

20  he was investing the same investments that they were invested

21  in notably failing to distinguish between the clearly different

22  suitability requirements if such were in fact true.  He

23  sympathized with the Gales reassuring that he and his wife were

24  suffering from the same market and he stated that he almost had

25  lost his vacation home, and I can go on and on.  There are

Page 57

1    numerous representations in this statement of claim and no, the

2    answer is no, not everyone.  It depends on what if any

3    representations are made by that broker, what the relationship

4    is between the broker and the client and the background

5    experience of the clients.  That plays a role and every case is

6    different with respect to whether there is any ratification and

7    the trigger for statute of limitations.

8              Secondly, I have to say, as we've made clear over and

9    over again, our claim for damages is not what you're referring

10   to and what the trustee self-servingly referred to as out of

11   pocket losses, it's market adjusted damages.

12             THE COURT:  Believe it or not, I understand what

13   you're talking about.

14             MR. MEISSNER:  So then --

15             THE COURT:  And my point is that the starting point

16   which you don't agree with me is you're saying that we should

17   go back to the beginning and run an analysis of what the Gales

18   would have made had they been invested 60/40 or whatever you

19   say it should have been.

20             MR. MEISSNER:  Well I think Judge Ward in the

21   Meridian decision laid out the fact you know that this is the,

22   the facts here are the poster child of equitable estoppel and

23   fraudulent concealment.  The defendant should not benefit by

24   their broker continuously misleading the clients into thinking

25   that --

1       THE COURT:  So let me ask you this, let me ask you

2  this question.  If the broker engaged in this conduct, then why

3  is LBI responsible unless you can show that LBI was complicit.

4  The broker --

5       MR. MEISSNER:  Respondeat superior -- he's an agent

6  of --

7       THE COURT:  Under respondeat superior, the employer

8  is not responsible for the criminal conduct or the fraudulent

9  conduct of the employee unless they had knowledge or were

10  complicit.

11       MR. MEISSNER:  No, I think it's within the scope of

12  his employment, it's not criminal, we're not saying criminal.

13       THE COURT:  It is not within the scope of someone's

14  employment to churn or engage in fraudulent conduct.  That is

15  not within the scope of someone's employment.

16       MR. MEISSNER:  A broker who makes recommendations and

17  advises in this case took complete discretion of the account,

18  that's all within their purview of acting.  If the idea is that

19  if you know someone does something that they're not supposed to

20  and causes damages to someone, that their employer is never

21  responsible, I don't think that's the standard.  Obviously if

22  you went out and broke their car window, that's a different

23  story, but we're talking about a broker who was perceived,

24  giving the perception of doing what he's supposed to be doing

25  and working for Lehman Brothers, and in fact did not comply

Page 59

1   with numerous FINRA and SEC rules.  So it's right, it's

2   certainly right on target with 90 percent of the claims that I

3   file every day in FINRA, the broker does something, you know

4   you don't even name the broker, you name the company.  That's

5   who is responsible, and you know, I don't see arguments that

6   we're not responsible unless it's something that's like a

7   Madoff situation possibly, but that's not this.

8           THE COURT:  And there's, and you in your view the

9   plaintiff controls the running of the statute of limitations by

10  their decision when to retain an expert to explain to them that

11  the numbers that they saw on a piece of paper about which they

12  complained in fact give them a cause of action.

13          MR. MEISSNER:  It's not --

14          THE COURT:  That cannot be the law.

15          MR. MEISSNER: -- just the client and it's not you

16  know, heads I win, tails you lose, in other words if they

17  didn't complain, we cite, hey they never complained, and if

18  they do complain then they should have known and it's basically

19  you can't win.  The reality is they did complain and it's

20  detailed in the --

21          THE COURT:  They did complain.  They did complain.

22  They didn't get anything back, they complained, they didn't get

23  anything back.

24          MR. MEISSNER:  No, they didn't complain in asking for

25  money back, they complained and the broker pacified them and

Page 60

1   misled them and lied to them.

2           THE COURT:  At the time, in real time they complained

3   to Lehman Brothers about the losses in their account.

4           MR. MEISSNER:  And that was mishandled because that

5   was referred right back to the broker.

6           THE COURT:  And at that point in time they had the

7   ability to say just like we all do when we don't get a

8   satisfactory answer from customer service, I'm taking, I'm

9   ending my account, I'm moving, I'm suing you, and they elected

10  not to do that.

11          MR. MEISSNER:  Based on misrepresentations just like

12  in the fraudulent concealment and equitable estoppel referred

13  to in the Meridian case.  I mean the defendants should not

14  benefit by misleading the clients.  And it's not like this is

15  not detailed in the claim, it is detailed in the claim.

16          THE COURT:  Well let me hear from LBI again.  And

17  we're going to have to agree to disagree about the

18  responsibility of the broker for the fraudulent conduct of an

19  employee in the absence of showing that the employer had

20  knowledge or was otherwise complicit with the conduct of the

21  employee.

22          MR. MEISSNER:  Supposed to be supervised by this

23  supervisory --

24          THE COURT:  I understand, you know, I understand

25  about adequate supervision, I get all of that.  So what have

Page 61

1    you heard that persuades you that this claim ought to survive?

2              MS. HASSAN:  Nothing, You Honor.  We have --

3              THE COURT:  What about the fact that the broker

4    actively misled the Gales about that everything was honky dory

5    in their account.

6              MS. HASSAN:  With the misrepresentation, respectfully

7    let me point out Mr. Meissner talked about what the Gales are

8    not, but I think we also have to admit to the fact that they

9    are relatively sophisticated investors, we're talking about

10   Mrs. Gale who is a lawyer, a GC of a communications firm, we

11   know from the pleadings themselves that she had been investing

12   in the market since at least early 1990s.  So that's one.  And

13   regardless of that sophistication, one, I still don't follow

14   what the misrepresentation is.  What we know in the statement

15   of facts what we have is that the broker told Mr. and Mrs. Gale

16   that there are market wide losses.  Now I'm not sure whether

17   anyone can say that's a misrepresentation, but that's a

18   representation.

19             THE COURT:  Well I think what Mr. Meissner is getting

20   at is the Gales through, and Mr. Meissner you can correct me if

21   I get this wrong, that the Gales thought they would have been

22   invested in a more diversified portfolio, 60/40 or what have

23   you that would have given them a buffer against the precipitous

24   decline in tech stocks.  That's not how they were invested.  So

25   but that gets us into a problematic cul-de-sac because to your

Page 62

1    point, the Gales could read the statements and see that they

2    were all in tech, that it wasn't 60 tech and 40 money bonds or

3    some other you know fixed or more secured investments.  So

4    that's kind of a problem.

5          MS. HASSAN:  The basic idea, Your Honor, basically is

6    they knew everything or they had everything, nothing changed

7    between February of 2008 when they decided to retain an expert

8    and [indiscernible] in 2002.  They still had the same account

9    statements which tell them exactly what is happening in their

10   account.  If they wanted to retain an expert at that point,

11   they could have done that, they could also have read the

12   account statements to see, you know, this is tech stock, this

13   is not bonds for instance.  And that's our point.  All LBI saw

14   for the six years --

15         THE COURT:  I mean this is not Madoff in the sense of

16   the statements were not made up, the statements actually

17   reflected what their investments were.  That's when the statute

18   of limitations truly would not run when you're given a piece of

19   paper that says here's your portfolio and Mr. Meissner, you

20   said a boiler room, I don't exactly know what that means, but

21   it's a fake, that's not really your account, there's no

22   allegation of that here.

23         MR. MEISSNER:  Right.

24         THE COURT:  Right?

25         MR. MEISSNER:  Correct.

Page 63

1          THE COURT:  Okay.  At least I got one right.

2          MS. HASSAN:  And we agree with the Court that you

3   know, with the statute of limitations, there is a due diligence

4   burden or requirement on the claimants as well.  They had all

5   the information, they didn't take action before the running of

6   the limitations period, and as far as we can see they didn't

7   take any action in the six years that followed.  And for those

8   reasons, the limitations and the ratification are the consent

9   to how the account has been handled by the remaining six years,

10  we don't see a reason why this claim should not be expunged.

11          THE COURT:  All right.  Here's what I'm going to say.

12          MR. MEISSNER:  If I could just make one more point.

13          THE COURT:  Sure.

14          MR. MEISSNER:  Your Honor, as Your Honor pointed out

15  in the questioning before I started, this account was not a buy

16  and hold account, this account was turned over five times, 500

17  times, that means you imagine what was going on in these

18  statements.  There was thousands of trades and to expect

19  someone who is not an expert or financial advisor to read

20  through that, and hey this is what's going on.

21          THE COURT:  No, no.  Okay.

22          MR. MEISSNER:  Even I, when I get a claim like this I

23  can't know whether there's a claim or not.

24          THE COURT:  I hear you.  But what I would say in

25  response to that, and I do, in my review of the account

Page 64

1   statements and the turnover rate --

2           MR. MEISSNER:  There are no account statements.

3           THE COURT:  No, the summaries of the turnover rates,

4   they were eye openers to me.  Now experts might tell me that

5   those are honky dory, but to me that looked like I don't expect

6   my entire, the amount of my entire portfolio to turn every

7   month, and the amount of the fees that were generated, and

8   particularly when I look at the period of time in which the

9   fees were generated, gives me a lot of pause.  So I agree with

10  you Mr. Meissner that if you get a stack of trades like this

11  you're not going to be able to figure out one from the other.

12  But you can do what I do every month which is I look at that

13  thing that says account value beginning of month and account

14  value at the end of the month.  And if the number goes up I'm

15  happy and if the number goes down I'm not happy.  Sometimes --

16          MR. MEISSNER:  But it doesn't give you a claim

17  necessarily.  It doesn't --

18          THE COURT:  But if the number, but if month after

19  month after month, 2.2 goes down to 2, goes down to 1.6, goes

20  down to 1.5, I'm on the phone and I'm doing something.  And --

21          MR. MEISSNER:  Yeah, they're on the phone and they

22  see NBC, the market is down  whatever, and obviously the gist

23  of what's going on here is they're saying the whole market went

24  down, and we're saying no, an analysis shows it did not.  And

25  in fact one thing that wasn't mentioned here at all was the

Page 65

1   fact they were not only invested, they were put on margin, so

2   that even gave fuel to the fire here, and by the way added to

3   the costs which is not talked about in the turnover, that

4   interest adds to cost.

5           THE COURT:  I'm going to sustain the trustee's

6   objection on the statute of limitations basis, but I'm going to

7   require but not sustain the other objections at this

8   preliminary stage, and afford the Gales the opportunity to re-

9   plead consistent with the federal rules.  So the statute of

10  limitations objection is sustained so no claim can be made on

11  matters that occurred before July of 2002 which is the six

12  years running backwards from the time that the FINRA claim was

13  made.

14          To the extent that there are damages that you want to

15  assert that aren't barred by the application of the statute of

16  limitations, you need to do that in a pleading.  If you also

17  then wish to make a motion to compel FINRA arbitration for what

18  remains of the claim you're free to do that as well.

19          What I would like to see happen here is that the

20  parties get together and talk.

21          MS. HASSAN:  Thank you, Your Honor.

22          THE COURT:  Mr. Meissner?

23          MR. MEISSNER:  Okay.  I've talked before but I'll be

24  happy to talk again.

25          THE COURT:  Well, I've given some new parameters to

Page 66

1   the claim, we have the new prospect of motion to compel FINRA

2   arbitration, I denied a motion to compel FINRA arbitration just

3   last week, every case is different, so the trustee ought to

4   think about that.

5           MR. MEISSNER:  That case seemed to be unique to the

6   bankruptcy court in seeking priority, I think.

7           THE COURT:  You could reasonably characterize my

8   ruling in that way, and that's why I'm suggesting that you

9   speak to Mr. Meissner given that he's expressed an interest to

10  make a motion to compel FINRA arbitration, and every case is

11  different.

12          MS. HASSAN:  I understand.

13          THE COURT:  But I came out today with the mindset of

14  being willing to be persuaded on the statute of limitations and

15  you strived mightily but I'm still where I am on the point, and

16  certainly the order will preserve that point for any appeal

17  that you may wish to take at the end of the day.

18          MR. MEISSNER:  Okay, thank you.

19          THE COURT:  Is that clear?  Is there any ambiguity in

20  next steps?  So I'll need an order sustaining the objection on

21  the statute of limitations ground denying it in all other

22  respects and affording the claimant the opportunity essentially

23  to re-plead, and we're behind the sufficiency stage at least at

24  this level and will have to see what happens next.

25          MR. MEISSNER:  If we were going to make a motion to -

Page 67

```
1    -
2              THE COURT:  You can do that any time you want, but
3    it's --
4              MR. MEISSNER:  That would before re-pleading.
5              THE COURT:  Not necessarily.  I mean I think it would
6    be helpful now that I've ruled on the statute of limitations
7    piece of having a clear statement of the claim and then you
8    would essentially be moving to compel arbitration on that
9    restatement of the claim.
10             MR. MEISSNER:  Okay.
11             MS. HASSAN:  Thank you, Your Honor.
12             THE COURT:  All right?
13             MR. MEISSNER:  Is there a date?
14             THE COURT:  Pardon me?
15             MR. MEISSNER:  There's no date?
16             THE COURT:  Well I'll give you a date if you want
17   one, but I don't want to impose on you, you folks can --
18             MR. MEISSNER:  That's fine.
19             THE COURT:  You can work together to come up with
20   some dates, and I would appreciate it if you would have some
21   conversations to try to figure out if there's a negotiated
22   settlement that you might come to.  All right?
23             MR. MEISSNER:  Okay.  Thank you.
24             THE COURT:  Okay.  Thank you very much.
25             MR. MEISSNER:  Thank you.
```

Page 68

1              THE COURT:  You folks are still here?  Haven't you

2    entirely agreed on everything?

3              MR. DAHILL:  I thought you might want to talk about

4    discovery.  Mr. Loden and I successfully addressed open issues,

5    so we've reached --

6              THE COURT:  Did you really?

7              MR. LODEN:  We got some [indiscernible]

8              MR. DAHILL:  We've reached compromise direction on

9    the discovery issues and we will submit a revised order

10   reflecting the first part of issues that we addressed

11   [indiscernible].  Thank you for your assistance.

12             THE COURT:  That's terrific.  I do personally know

13   the U.S. Ambassador to Japan, Mrs. Schlosberg, so

14             MR. LODEN:  Your Honor, we'll see if that will help

15   [indiscernible].

16             THE COURT:  In light of -- it's true.

17             MR. LODEN:  We're shooting for the 24th.

18             THE COURT:  Pardon me?

19             MR. LODEN:  We're shooting for the 24th of October

20   for the deposition in Tokyo.

21             THE COURT:  Okay.

22             MR. LODEN:  We're going to start the process..

23             THE COURT:  Okay.  In light of what's happening with

24   Argentina, I definitely don't want to start another

25   international incident.  But thank you very much for working it

Page 69

1    out.  That's delightful.  Have a good rest of the day.  Thank

2    you.

3         (Proceedings concluded at 11:34 AM)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 70

```
 1                            I N D E X

 2

 3                            RULINGS

 4    DESCRIPTION                                          PAGE

 5    Scheduling Conference for

 6    [Adversary Proceeding No. 10-03542]; [Adversary Proceeding No.

 7    10-03544]; [Adversary Proceeding No. 10-03545]; [Adversary

 8    Proceeding No. 10-03809]; [Adversary Proceeding No. 10-03811]

 9

10    HEARING re Doc # 24762, 24881 - Omnibus Application of

11    Individual Members of Official Committee of Unsecured Creditors

12    and Indenture Trustees Pursuant to Section 1129(a)(4), Or,

13    Alternatively, Sections 503(b)(3)(d) and 503(b)(4) of

14    Bankruptcy Code for Payment of Fees and  Reimbursement of

15    Expenses

16

17    HEARING re Doc #8408 – Trustee's Objection to the General

18    Creditor Proof of Claim of Connie & Curtis Gale (Claim No.

19    7000142)

20

21

22

23

24

25
```

Page 71

1                          CERTIFICATION

2              I, Theresa Pullan, certify that the foregoing is a

3    correct transcript from the official electronic sound recording

4    of the proceedings in the above-entitled matter.

5    Theresa        Digitally signed by Theresa Pullan
     Pullan         DN: cn=Theresa Pullan, o, ou,
                    email=digital1@veritext.com, c=US
                    Date: 2014.08.14 14:19:39 -04'00'

6    AAERT Certified Electronic Transcriber CET**00650

7    Theresa Pullan

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22    Veritext

23    330 Old Country Road

24    Suite 300

25    Mineola, NY  11501