WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ralph I. Miller
Jacqueline Marcus

Attorneys for Lehman Brothers Holdings Inc.,
in its capacity as Plan Administrator on behalf
of Lehman Brothers Special Financing Inc.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>LEHMAN BROTHERS HOLDINGS INC.,<br><br>               Debtor. | Chapter 11 Case<br>No. 08-13555 (SCC)<br><br>(Jointly Administered) |
| Lehman Brothers Holdings Inc., in its capacity<br>as Plan Administrator on behalf of Lehman<br>Brothers Special Financing Inc.,<br><br>               Plaintiff,<br><br>    v.<br><br>Mizuho International plc,<br><br>               Defendant. | Adv. Proc. No. 13-_____<br><br>**ADVERSARY PROCEEDING**<br>**COMPLAINT** |

1.      After terminating its swap agreements with Lehman Brothers Special Financing Inc. ("LBSF"), Defendant Mizuho International plc ("Mizuho") failed to calculate the amount LBSF was owed in good faith and refused to pay a properly calculated termination payment to LBSF as of the Early Termination Date in connection with a series of derivatives transactions (the "Swaps") entered into by the parties.  Further, Mizuho received and retained approximately $71 million in up-front premium payments which LBSF paid to Mizuho in connection with a series of credit arbitrage trades (the "Arbitrage Trades") even though LBSF had no opportunity to receive anything of value in return.  In total, Mizuho owes approximately $70 million, plus interest, to LBSF as set forth below.  Lehman Brothers Holdings Inc. ("LBHI"), in its capacity as Plan Administrator (in this capacity, the "Plan Administrator" or "Plaintiff") on behalf of LBSF, under the Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors (the "Plan"), alleges the following on knowledge as to LBSF's and LBHI's own acts and upon information and belief as to all other matters against Mizuho:

## PRELIMINARY STATEMENT

2.      Mizuho terminated the Swaps on September 15, 2008 and then, almost nine months later, sent LBSF a calculation statement (the "Calculation Statement") which was fundamentally flawed.  Mizuho also received and retained over $71 million which LBSF paid to it in connection with the Arbitrage Trades.  For the following three reasons, Mizuho owes LBSF a total payment of $70,463,545.

3.      First, Mizuho made critical errors in valuing three swaps, pursuant to which Mizuho sold LBSF credit protection on a collateralized debt obligation (or, "CDO") called Pyxis (the "Pyxis Trades").  Even though LBSF had no further obligation to pay "premiums" to

1

Mizuho under the Pyxis Trades, and Mizuho had no further obligation to make any payments to LBSF, Mizuho asserted in its Calculation Statement that LBSF owed Mizuho $30 million.

4.     Second, Mizuho still retains the over $71 million in up-front premium payments that LBSF paid to Mizuho over the life of the Arbitrage Trades despite the fact that the Arbitrage Trades were structured such that LBSF could not receive anything of value in return for the premiums it paid to Mizuho.  Accordingly, Mizuho has received a windfall in the amount of the premiums it received.  Because Mizuho received an unjust windfall while LBSF received nothing, Mizuho should return the $71,204,726 in premiums to LBSF.

5.     Finally, when calculating the early termination payment with respect to a series of credit default swaps and interest rate swaps and swaptions (or "options on swaps") (together, the "CDS and Rates Trades"), Mizuho failed to comply with its obligations under the Master Agreement in calculating the early termination payment *as of* the Early Termination Date. Instead, Mizuho valued the CDS and Rates Trades during the thirteen-day period *following* the Early Termination Date.  As a result, Mizuho's valuation for the CDS and Rates Trades set forth in the Calculation Statement is commercially unreasonable as a matter of law.

6.     Based on the above, Mizuho's valuation of the early termination payment set forth in the Calculation Statement was flawed, and Mizuho also owes LBSF over $71 million in respect of the premiums LBSF paid to Mizuho in connection with the Arbitrage Trades.  Based on the above, and as more fully set forth below, Mizuho should pay LBSF $70,463,545, an amount comprised of (a) $71,204,726 in respect of the Arbitrage Trade premiums, which Mizuho is required to refund; *plus* (b) $55,014,606 in respect of the early termination payment owed for the CDS and Rates Trades; *plus* (c) $264,784 in respect of Unpaid Amounts; *less* (c) $56,020,571 in respect of the cash collateral posted by Mizuho, which LBSF currently holds.

2

7.      Accordingly, Mizuho should pay to LBSF $70,463,545, plus interest that continues to accrue until payment in full, which represents an industry-standard method of calculating Loss as of the Early Termination Date and takes into consideration the amounts LBSF paid to Mizuho in connection with the Arbitrage Trades.[1]

## THE PARTIES

8.      LBHI is a corporation organized and incorporated under the laws of the state of Delaware, with its current principal business address at 1271 Sixth Avenue, New York, New York 10020.  On December 6, 2011, the Court entered an order confirming the Plan.  The Plan became effective on March 6, 2012.  Pursuant to the Plan, LBHI, as Plan Administrator, is authorized to prosecute actions on behalf of the estate of LBSF.

9.      LBSF is a corporation organized and incorporated under the laws of the state of Delaware, with its current principal business address at 1271 Sixth Avenue, New York, New York 10020.

10.      Mizuho is a London based securities and investment bank, an arm of Mizuho Securities Co., Ltd., part of the Mizuho Financial Group, Inc., as well as a wholly owned subsidiary of Mizuho Securities UK Holdings Ltd.

## JURISDICTION AND VENUE

11.       On September 15, 2008, and periodically thereafter, LBHI and certain of its subsidiaries, including LBSF, commenced in this Court voluntary cases under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases").

12.      This adversary proceeding is filed pursuant to Rules 7001 and 7003 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), as well as sections 105(a), 541(c),

---

[1] Capitalized terms used but not defined herein shall have the meanings given them in the Master Agreement.

3

542(a), and 562 of the Bankruptcy Code, and the law of England and Wales, which governs the Master Agreement pursuant to Part 4(h) of the Schedule.

13.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334.

14.     The Court has personal jurisdiction over Defendant Mizuho.  Mizuho has consented to this Court's jurisdiction through filing two proofs of claim – Claim No. 14720 against LBHI and Claim No. 14721 against LBSF (collectively, the "Claims").

15.     This adversary proceeding constitutes a core proceeding under 28 U.S.C. § 157(b)(2).

16.     Pursuant to Rule 7008-1 of the Local Rules of Bankruptcy Procedure, Plaintiff states that it consents to the entry of a final judgment by this Court if it is determined that this Court, absent consent of the parties, cannot enter final orders or judgment consistent with Article III of the United States Constitution.

17.     Venue is proper in this Court under 28 U.S.C. § 1409(a) because the Chapter 11 Cases are pending in this district.

## BACKGROUND FACTS

### A.     The Master Agreement and the Swaps

18.     The Master Agreement provides the basic terms for the parties' contractual relationship.  The parties entered into the Master Agreement on January 9, 2007.  LBHI served as LBSF's Guarantor under the Master Agreement.

19.     In connection with the Master Agreement, LBSF and Mizuho entered into different types of Swaps over time.

#### 1.     The Pyxis Trades

20.     On March 29, 2007, LBSF and Mizuho entered into the Pyxis Trades, pursuant to which Mizuho sold LBSF credit protection on Pyxis referencing three different tranches of notes

4

issued by Pyxis under an indenture (the "Pyxis Indenture").  Due to the deterioration in the

collateral supporting the "Reference Obligations" underlying the notes issued pursuant to the

Pyxis Indenture – caused by the housing market and mortgage crisis – Mizuho was required to

pay LBSF the protection payments LBSF had bargained for under the "Implied Writedown

Amount" provision in the confirmations governing the Pyxis Trades (the "Pyxis Trades

Confirmations").

21.    Accordingly, Mizuho paid LBSF approximately $30 million, representing the full

amount of credit protection LBSF had purchased from Mizuho in respect of the Pyxis Trades.  At

that point, LBSF had no further obligation to pay "premiums" to Mizuho, and Mizuho had no

further obligation to make any protection payments to LBSF.  Mizuho recognized on its books

that the Pyxis Trades were worth nothing.  As a result, the Pyxis Trades had zero value to both

Mizuho and LBSF by the time LBHI filed its Chapter 11 Case and on the Early Termination

Date.

22.    Another provision in the Pyxis Trades Confirmations, the "Writedown

Reimbursement," would have required LBSF to reimburse Mizuho a proportionate amount of

any previous protection payments Mizuho had made to LBSF if the Reference Obligations later

received principal or interest payments due to future adjustments (meaning if Pyxis made

payments to its noteholders pursuant to the Pyxis Indenture).  The actual purpose of the

Writedown Reimbursement is to correct for unforeseen reversals in the performance of the

underlying collateral.

23.    Plainly, events that occurred after the Early Termination Date have no impact on

the valuation of the Pyxis Trades or Mizuho's entitlement to a Writedown Reimbursement.

Reference to future events is invalid and irrelevant given the clear requirement to measure the

early termination payment *as of* the Early Termination Date. *See* Master Agreement § 6(d), 14; 11 U.S.C. § 562.

24.     In valuing the Pyxis Trades as of the Early Termination Date, under the terms of the Master Agreement, Mizuho should have – and could have – solicited market quotations from Reference Market Makers for amounts those dealers would pay to enter into replacement transactions. Master Agreement § 14. Had Mizuho done so, Mizuho would have attributed zero value to the Pyxis Trades as of the Early Termination Date because according to the market, and Mizuho's own books, the Pyxis Trades had a zero value as of that date.

25.     Alternatively, if Mizuho had defaulted to Loss (either because Market Quotation could not be determined or the Market Quotation measure would produce a "commercially unreasonable" result), Mizuho's total losses and costs (or gain) resulting from termination of the Pyxis Trades as of the Early Termination Date would also have been zero. *Id.* (definition of "Loss"). The value of the Pyxis Trades could not have been more than zero without appealing to future events which, here, were not foreseen by the market or Mizuho as of the Early Termination Date – the relevant date in calculating the early termination payment.

26.     Nonetheless, in its Calculation Statement dated June 3, 2009 setting forth the early termination payment for the Pyxis Trades, Mizuho mistakenly valued the Pyxis Trades as worth $30 million to Mizuho in consideration of the possibility of a Writedown Reimbursement based on events which occurred after the Early Termination Date, and which were not foreseen by the market or Mizuho as of the Early Termination Date. Specifically, Mizuho based its invalid valuation on Pyxis' application of an (unenforceable) provision in the Pyxis Indenture purporting to modify, or "flip", LBSF's right to receive payment under the Pyxis transaction (the

"<u>Priority Flip</u>"), which resulted in Pyxis making payments to its noteholders rather than to LBSF in early October 2008.

27.    Mizuho filed two proofs of claim primarily to recover the amounts Mizuho claims it is owed in connection with the Pyxis Trades – Claim No. 14720 against LBHI and 14721 against LBSF, each in the amount $34,128,918.  Given that Mizuho is not entitled to the Writedown Reimbursement in connection with the Pyxis Trades because LBSF had no liability as of the Early Termination Date to pay such amounts to Mizuho, these Claims should be disallowed.

### 2.    The Arbitrage Trades

28.    Starting in April 2006, Lehman Brothers International (Europe) ("<u>LBIE</u>") and Mizuho entered into the Arbitrage Trades which are memorialized under multiple confirmations and a May 15, 2007 letter (the "<u>Side Letter</u>," and together with the confirmations, the "<u>Arbitrage Confirmations</u>").  These trades were later novated to LBSF and continued through 2008.

29.    The Arbitrage Trades were structured as a combination of credit default swaps, and were executed in pairs, or "mirror" trades.  Each Arbitrage Trade consisted of the parties entering into (1) a credit default swap – or equivalent – on an index[2] and (2) a "single name" credit default swap – or equivalent – in the opposite direction on each of the component securities in that index.  On one side of the transaction, LBSF either bought or sold credit protection relating to a certain reference index or equivalent, and on the other side of the transaction, Mizuho acted as buyer or seller of credit protection with regard to individual securities that comprise the relevant reference index.

---

[2] An "index" is a collection of corporate entities representing a particular market or a portion of the market.

30.    The Arbitrage Trades between LBSF and Mizuho were structured in a fashion which led to Mizuho obtaining an unjust windfall of over $71 million at LBSF's expense.  This is because the Arbitrage Trades were designed so that the cash flow and value of each index trade would always (no matter what date or time) be equal (but opposite) to the economic performance of the linked group of single name trades.

31.    Mizuho's own books and records reflect its recognition that the Arbitrage Trades had a zero value.  But, over the life of the Arbitrage Trades and prior to the Early Termination Date, LBSF paid – and Mizuho accepted – $71,204,726 in up front premiums.

### 3.    The CDS and Rates Trades

32.    The CDS and Rates Trades were comprised of several credit default swaps, and a series of interest rate swaps.  Pursuant to the credit default swaps, Mizuho sold LBSF credit protection on a portfolio of assets consisting of commercial and residential mortgage backed securities.  Pursuant to the interest rate swaps, one party periodically paid the other a fixed interest rate while the other paid a floating interest rate, which was based on an index.  At issue here are 64 outstanding transactions:  58 credit default swap transactions and 6 interest rate swaps.

33.    In the Master Agreement, the parties selected the Second Method and the Market Quotation measure to calculate any early termination payment for the CDS and Rates Trades. *See* Master Agreement at Schedule part 1(f).

34.    By choosing the Market Quotation measure, the parties agreed that the party determining the early termination payment would seek quotations from Reference Market-makers (*i.e.* four leading dealers in the relevant market) of the amounts those dealers would pay or charge to enter into replacement transactions "that would have the effect of preserving for [the Non-defaulting] party the economic equivalent of any payment . . . that would, but for the

8

occurrence of the relevant Early Termination Date, have been required after that date."  Master

Agreement § 14 (definitions of "Market Quotation" and "Reference Market-maker").

35.     If Market Quotation cannot be determined or the Market Quotation measure

would produce a "commercially unreasonable" result, the Non-defaulting party must revert to the

Loss measure to determine the Settlement Amount.  Master Agreement § 14 (definition of

"Settlement Amount").  Loss requires the Non-defaulting Party to "reasonably determine[] in

good faith . . . its total losses and costs (or gain)" resulting from the early termination.  *Id.*

(definition of "Loss").[3]  The Master Agreement also provides for interest to accrue on any unpaid

early termination payment.  *See id.* §§ 6(e)(1)(3), 6(d)(ii).

36.     Under both the Market Quotation and Loss measure, the Master Agreement also

plainly requires calculation of the Early Termination Payment "[***o***]***n or as soon as reasonably***

***practicable following*** the occurrence of an Early Termination Date[.]"  *Id.* §6(d) (emphasis

added); *see also id.* § 14 (requiring determination of "Loss ***as of*** the relevant Early Termination

Date, or, if that is not reasonably practicable, as of the earliest date thereafter as is reasonably

practicable."  *Id.* (emphasis added).  A statutory timing requirement also exists in 11 U.S.C. §

562 (requiring that damages measurements from swap terminations be valued "as of" the

termination date).

---

[3] Specifically, the Master Agreement defines Loss as:

> an amount that [the Non-defaulting Party] reasonably determines in good faith to be its total
> losses and costs (or gain, in which case expressed as a negative number) in connection with . . .
> th[e] [t]erminated Transaction . . including any loss of bargain, cost of funding, or, at the election
> of such party but without duplication, loss or cost **incurred** as a result of **its** terminating,
> liquidating, obtaining or reestablishing any hedge or related trading position (or any gain resulting
> from any of them).  Loss includes losses and costs (or ***gains***) in respect of any payment or
> delivery required to have been made . . . on or before the relevant [e]arly [t]ermination [d]ate and
> not **made** . . . A party may (but need not) determine its Loss by reference to quotations of relevant
> rates or prices from one or more leading dealers in the relevant markets.

*Id.* at § 14 (emphasis added).

37.    After terminating the CDS and Rates Trades, Mizuho failed to comply with the Master Agreement because Mizuho valued the early termination payment due with respect to the CDS and Rates Trades over the thirteen-day period *following* the Early Termination Date, as opposed to as of the Early Termination Date.

**B.    Mizuho Terminates the Swaps, Fails to Properly Calculate the Early Termination Payment, and Retains the Premiums**

38.    On September 15, 2008, LBHI filed its Chapter 11 Case.  LBSF filed its Chapter 11 Case on October 3, 2008.

39.    Immediately following the commencement of LBHI's Chapter 11 Case, on September 15, 2008, Mizuho elected to terminate all of its outstanding Swaps with LBSF.

40.    Although Mizuho was obligated to calculate the Early Termination Payment "on or as soon as reasonably practicable following the Early Termination Date[,]" (*see* Master Agreement § 6(d)(i)), Mizuho did not deliver its Calculation Statement to LBSF until June 3, 2009 – nearly nine months after Mizuho designated the Early Termination Date.  Mizuho also miscalculated the termination value of the Swaps and claimed LBSF owed Mizuho $34,128,918. This calculation mistakenly claimed a $30 million value in connection with the Pyxis Trades and improperly valued the CDS and Rates Trades.

41.    Mizuho's calculation is commercially unreasonable and contrary to law in two respects.

42.    First, Mizuho improperly valued the Pyxis Trades as worth $30 million to Mizuho in reliance on Pyxis' application of the unenforceable Priority Flip in the Pyxis Indenture (resulting in payments to Pyxis' noteholders instead of LBSF) – which occurred well after the Early Termination Date.  Any obligation by LBSF to pay a Writedown Reimbursement could not have arisen until *after* termination of LBSF's separate swaps with Pyxis (which occurred on

September 24, 2008, nine days after the Early Termination Date here), and the Pyxis trustee's subsequent decision to improperly distribute the Pyxis assets by applying the unenforceable Priority Flip.  Because Pyxis' application of the Priority Flip was not reasonably foreseen by Mizuho or other market participants on the Early Termination Date, Mizuho had no basis to claim an entitlement to a Writedown Reimbursement.

43.    Second, Mizuho failed to comply with its obligations under the Master Agreement in calculating the early termination payment because Mizuho valued the CDS and Rates Trades over the thirteen-day period *following* the Early Termination Date, as opposed to *as of* the Early Termination Date.  Mizuho calculated the early termination payment and the value of the CDS and Rates Trades under the Loss measure based on valuations obtained on dates ranging from September 16 through September 29, 2008.  Mizuho's flawed valuation procedure disregards the Master Agreement and the Bankruptcy Code, fails the test of commercial reasonableness, and is particularly egregious because Mizuho had the sole discretion to choose the Early Termination Date.

44.    There is no reason why it was not "reasonably practicable" for Mizuho to value the CDS and Rates Trades on the Early Termination Date.  Had Mizuho sought Market Quotations *as of* the Early Termination Date – as it was required to do – it would have arrived at a valuation much closer to the $55,014,606 calculated by LBSF using industry standard mark-to-market methodology.

45.    In addition, Mizuho is in possession of the $71,204,726 in up front premium payments LBSF paid to Mizuho in connection with the Arbitrage Trades.  Mizuho obtained an unjust windfall when it received and retained the over $71 million in up-front premium payments LBSF made to Mizuho.  Despite this fact, Mizuho kept the premiums, and continues to retain

such amounts.

## COUNT I

### Disallowance of Mizuho's Claims and Objection to Claims

46.    Plaintiff repeats, realleges, and incorporates by reference the allegations contained in paragraphs 1-45 of this Complaint as though fully set forth in this cause of action.

47.    A proof of claim will not be deemed allowed if a party in interest objects thereto. 11 U.S.C. § 502(a).

48.    Plaintiff objects to Mizuho's Claims and seeks entry of a judgment against Mizuho disallowing its Claims pursuant to section 502(b) of the Bankruptcy Code.

49.    Mizuho's Claims should be disallowed and expunged on the basis that they provide no basis of liability as to LBSF.

50.    Indeed, Mizuho's Claims are for amounts which are primarily based on Mizuho's assertion that as of the Early Termination Date, the Pyxis Trades were worth $30 million to Mizuho based on the possibility of a Writedown Reimbursement.  However, LBSF's obligation to pay a Writedown Reimbursement could not have arisen until well after the Early Termination Date and, on the Early Termination Date the Pyxis Trades were valued at zero and neither LBSF nor Mizuho had any further obligations to make payments.

51.    Accordingly, Plaintiff has no liability to Mizuho, and LBSF does not owe any amounts to Mizuho.  As a result, Mizuho's Claims are not valid claims.

52.    Accordingly, pursuant to section 502(b) of the Bankruptcy Code and Bankruptcy Rule 3007, the Plan Administrator on behalf of LBSF requests that this Court disallow the Claims in their entirety.

53.    The Plan Administrator on behalf of LBSF hereby expressly reserves the right to further object to the Claims, or any other claim filed by Mizuho, on any other basis.

## COUNT II

### Turnover of LBSF's Property Interest in the Properly Calculated Termination Payment and the Arbitrage Trade Premiums Pursuant to Section 542(a) of the Bankruptcy Code

54.    Plaintiff repeats, realleges, and incorporates by reference the allegations contained in paragraphs 1-53 of this Complaint as though fully set forth in this cause of action.

55.    Section 542(a) of the Bankruptcy Code provides that ". . . an entity . . . in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 of this title . . . , shall deliver to the trustee, and account for, such property or the value of such property[.]"  11 U.S.C. § 542(a).

56.    As fully alleged above, Mizuho was obligated to pay LBSF a properly calculated early termination payment under the Master Agreement, plus interest, but failed to do so. Mizuho also improperly retained the approximately $71 million in premium payments LBSF paid to Mizuho in connection with the Arbitrage Trades, even though it is now clear that LBSF had no chance to receive anything of value in return.  Based on an industry-standard method of calculating Loss as of the Early Termination Date, and in consideration of the $71 million in premiums which LBSF paid to Mizuho, LBSF is entitled to a total principal payment of $70,463,545 from Mizuho.

57.    Here, Mizuho improperly has retained over $71 million in premium payments LBSF made to Mizuho in connection with the Arbitrage Trades.  Moreover, Mizuho made errors in calculating the early termination payment due LBSF.  Indeed, Mizuho should have valued the CDS and Rates Trades as of the Early Termination Date, rather than during the thirteen-day period following the Early Termination Date.  Mizuho also incorrectly calculated that LBSF owed Mizuho $30 million in respect of the Pyxis Trades.

58.    The amount of the properly calculated termination payment which Mizuho owed to LBSF in connection with the Swaps as of the Early Termination Date, and the amount of the premiums LBSF paid to Mizuho in connection with the Arbitrage Trades which Mizuho has improperly retained – in total, $70,463,545 – represents the total amount which Mizuho is required to return to LBSF in connection with the Swaps.  The total amount required to be returned to LBSF from Mizuho is property of LBSF's estate under section 541(a) of the Bankruptcy Code – "property that the trustee may use, sell, or lease."  *See* 11 U.S.C. § 542(a).

59.    Mizuho has failed to return to LBSF the $70,463,545 that it is improperly retaining, meaning that it is withholding property of the estate that LBSF could "use, sell or lease."

60.    Accordingly, pursuant to section 542(a) of the Bankruptcy Code, Plaintiff requests an order compelling and directing Mizuho to turn over to LBSF $70,463,545, plus prejudgment interest.

## COUNT III

### Unjust Enrichment Based on Mizuho's Improper Retention of the Premiums Paid in Connection with the Arbitrage Trades

61.    Plaintiff repeats, realleges, and incorporates by reference the allegations contained in paragraphs 1-60 of this Complaint as though fully set forth in this cause of action.

62.    Over the life of the Arbitrage Trades, LBSF paid to Mizuho over $71 million in up-front premium payments – which Mizuho accepted and has since retained.

63.    The Arbitrage Trades were structured such that LBSF could not receive any value in exchange for the premium payments, or at all in connection with the Arbitrage Trades.  Even Mizuho acknowledged that as of the Early Termination Date, the Arbitrage Trades had a zero value.

14

64.     As a result, Mizuho received over $71 million, while LBSF received nothing at all, and the premiums were paid to Mizuho in exchange for no consideration.  Mizuho, therefore, obtained an unjust windfall at the expense of LBSF.  This amount, which Mizuho has failed to pay to LBSF, has a definable financial value – $71,204,726.

65.     Mizuho has been improperly and unjustly enriched at LBSF's expense.  LBSF received nothing because of how the Arbitrage Trades were structured and because of Mizuho's retention of the premiums.  Equity and good conscience require that Mizuho return to LBSF at least $71 million, plus prejudgment interest.

## COUNT IV

### Money Had and Received Based on Mizuho's Improper Retention of the Premiums Paid in Connection with the Arbitrage Trades

66.     Plaintiff repeats, realleges, and incorporates by reference the allegations contained in paragraphs 1-65 of this Complaint as though fully set forth in this cause of action.

67.     Mizuho has been enriched at the expense of LBSF because Mizuho accepted and has retained over $71 million in premium payments which LBSF paid to Mizuho in connection with the Arbitrage Trades, but LBSF received nothing at all of value in return.

68.     The circumstances of the Arbitrage Trades and their early termination by Mizuho resulted in LBSF not obtaining any actual economic benefit (or value) from the Arbitrage Trades.  Thus, the $71 million that LBSF paid to Mizuho represents an unjustifiable windfall for Mizuho.

69.     Even Mizuho recognized that, as of the Early Termination Date and at all times, the Arbitrage Trades had a zero value.  Nonetheless, Mizuho retained the premiums LBSF paid to it.  LBSF received nothing in return for the premium payments it made to Mizuho, and because LBSF received nothing of value in return, LBSF had a substantial interest in the

$71,204,726 in premium payments it paid to Mizuho.  Equity and good conscience require Mizuho to return the premiums to LBSF.

70.    Mizuho has no right to retain amounts which LBSF paid to it because LBSF received nothing at all in return.  Mizuho has received a benefit from possessing and using the $71 million in premium payments since LBSF paid those amounts to Mizuho.  As such, Mizuho should be required to pay to LBSF the $71 million in premiums, plus prejudgment interest.

## COUNT V

### Equitable Rescission of the Agreement Underlying the Arbitrage Trades

71.    Plaintiff repeats, realleges, and incorporates by reference the allegations contained in paragraphs 1-70 of this Complaint as though fully set forth in this cause of action.

72.    Mizuho and LBSF entered into the Master Agreement, and then executed the Arbitrage Confirmations in connection with the Arbitrage Trades.

73.    When there is a failure of consideration, equitable rescission of the underlying contract is an appropriate remedy.

74.    Here, there was unquestionably a failure of consideration because LBSF paid $71,204,726 in premium payments to Mizuho but the trades were structured such that LBSF could never receive any consideration or other economic benefits in return.

75.    As a result, the $71 million in premiums that LBSF paid were transferred to Mizuho for no consideration.

76.    Because LBSF could never receive anything of value in connection with the Arbitrage Trades, and in fact did not receive anything of value in return for the premiums LBSF paid to Mizuho, equitable rescission is an appropriate remedy and Mizuho must return the $71,204,726 in premiums to LBSF, plus prejudgment interest.

16

## COUNT VI

### Violation of Section 562 of the Bankruptcy Code Based on Mizuho's Valuation of the CDS and Rates Trades

77.    Plaintiff repeats, realleges, and incorporates by reference the allegations contained in paragraphs 1-76 of this Complaint as though fully set forth in this cause of action.

78.    Section 562 of the Bankruptcy Code requires that a terminated swap be valued as of the Early Termination Date unless no commercially reasonable determinants of value are available on that date, and places a burden on the Non-defaulting Party – here, Mizuho – to show that commercially reasonable determinants of value were not available on that date.

79.    Mizuho, however, solicited Market Quotations and measured its Loss over the thirteen-day period following the Early Termination Date in valuing the CDS and Rates Trades. Further, nothing suggests that commercially reasonable determinants of value were unavailable on September 15, 2008, the Early Termination Date.  Therefore, Mizuho violated the express terms of section 562.

80.    LBSF has been damaged by Mizuho's violation in an amount to be proven at trial, but no less than $55,014,606, an amount representing the value of the CDS and Rates Trades on the Early Termination Date, plus interest.

## COUNT VII

### Breach of the Master Agreement Based on Mizuho's Valuation of the CDS and Rates Trades

81.    Plaintiff repeats, realleges, and incorporates by reference the allegations contained in paragraphs 1-80 of this Complaint as though fully set forth in this cause of action.

82.    The Master Agreement is an enforceable contract, and LBSF has performed all of its obligations in connection with the Master Agreement.  Further, any conditions precedent have been performed, have occurred, or have been waived.

17

83.     On the Early Termination Date, LBSF was entitled to receive a commercially reasonable termination payment from Mizuho.

84.     The Master Agreement required the non-defaulting party, here Mizuho, to calculate the early termination payment "**[o]n or as soon as reasonably practicable following** the occurrence of an Early Termination Date[.]"  Master Agreement §6(d) (emphasis added).

85.     In valuing the CDS and Rates Trades and calculating the early termination payment, Mizuho did not comply with this obligation.  In fact, Mizuho calculated the Early Termination Payment with respect to the CDS and Rates Trades over a thirteen day period *after* the Early Termination Date.

86.     By failing to comply with the express terms of the Master Agreement in calculating the early termination payment and otherwise failing to use reasonable valuation practices, Mizuho breached the Master Agreement.  As a result, LBSF has been damaged in an amount to be proven at trial, but no less $55,014,606, an amount representing the value of the CDS and Rates Trades on the Early Termination Date, plus interest.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that judgment be entered against Defendant Mizuho as follows:

A.     As to Count I, entry of a judgment against Mizuho disallowing its Claims pursuant to section 502(b) of the Bankruptcy Code;

B.     As to Count II, an order compelling and directing Mizuho to turn over $70,463,545, which represents the amount of the properly calculated early termination payment as of the Early Termination Date and accounts for the premium payments LBSF made to Mizuho in connection with the Arbitrage Trades, plus prejudgment interest which will continue to accrue until LBSF receives payment in full;

18

C.      As to Counts III and IV, awarding LBSF damages from Mizuho in an amount to be determined at trial, but in all events, at least $71 million, which represents the amount of the premium payments LBSF paid to Mizuho in connection with the Arbitrage Trades, and which Mizuho has retained, plus prejudgment interest which will continue to accrue until LBSF receives payment in full;

D.      As to Count V, an order rescinding the agreement underlying the Arbitrage Trades and requiring Mizuho to return to LBSF the $71 million in up-front premium payments LBSF paid to Mizuho in connection with Arbitrage Trades;

E.      As to Count VI and VII, awarding LBSF damages in an amount to be determined at trial, but in all events, at least $55,014,606, an amount representing the value of the CDS and Rates Trades on the Early Termination Date, plus prejudgment interest which will continue to accrue until LBSF receives payment in full;

F.      Pre-judgment and post-judgment interest; and

G.      Such other and further relief, including interest, costs, and attorneys' fees, as the Court deems just and proper.

Dated: September 15, 2014
New York, New York

By:   /s/  Ralph I. Miller
Ralph I. Miller
Jacqueline Marcus

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Attorneys for Lehman Brothers Special Financing Inc. in its capacity as Plan Administrator for Lehman Brothers Holdings Inc.*