WOLLMUTH MAHER & DEUTSCH LLP
500 Fifth Avenue
New York, New York 10110
Telephone: (212) 382-3300
Facsimile: (212) 382-0050
Paul R. DeFilippo
Adam M. Bialek
Jeffrey Coviello
Fletcher W. Strong

*Counsel for Plaintiff Lehman Brothers Derivative Products Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

———————————————————————————x

In re:                                                          :

LEHMAN BROTHERS HOLDINGS INC., *et al.*,     :

           Debtors.                                          :

———————————————————————————x

LEHMAN BROTHERS DERIVATIVE PRODUCTS INC. :

           Plaintiff,                                          :

− against −                                                   :

U.S. BANK TRUST NATIONAL ASSOCIATION,     :

           Trustee Defendant,                           :

− and −                                                        :

REPACKAGED AMERICAN GENERAL FLOATING   :
RATE TRUST CERTIFICATES, SERIES 2003-1 TRUST,
                                                :

           Issuer Defendant,                            :

− and −                                                        :

JACQUES MORET, INC. AND RALPH HARARY,      :

           Certificate Holder Defendants.         :

———————————————————————————x

Chapter 11

Case No. 08-13555 (SCC)

Adversary Proceeding
No. _____ (SCC)

**COMPLAINT**

TO THE HONORABLE SHELLY C. CHAPMAN
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Derivative Products Inc. ("LBDP" or "Plaintiff"),[1] through

Lehman Brothers Holdings Inc. ("LBHI"), the Plan Administrator under the Modified Third

Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors

(the "Plan"), by and through its undersigned counsel, brings this Complaint against U.S. Bank

Trust National Association ("U.S. Bank" or the "Trustee"), Repackaged American General

Floating Rate Trust Certificates, Series 2003-1 Trust ("Repack" or the "Trust"), and Jacques

Moret, Inc. and Ralph Harary (the "Certificate Holders") (the Trustee, Issuer, and Certificate

Holders are collectively referred to as the "Defendants"), and respectfully states:

## PRELIMINARY STATEMENT

1.      This action arises out of the improper forfeiture of LBDP's right to receive

substantial amounts pursuant to a swap termination payment right under a Swap Agreement

(defined below).  The provisions in the Swap Agreement – so-called "Walkaway Provisions" –

that worked this forfeiture *solely as a result of* LBHI's bankruptcy filing are unenforceable and

violate the *ipso facto* provisions of the Bankruptcy Code.  Moreover, because the distribution of

100% of the underlying collateral to the Certificate Holders was made five days *after* LBDP filed

its voluntary bankruptcy petition, such distribution violated the automatic stay imposed pursuant

to the Bankruptcy Code, and such collateral must be returned to the bankruptcy estate as a matter

of law.

2.      In July 2003, LBDP and Repack entered into an interest rate swap

governed by the Swap Agreement, whereby (i) Repack agreed to pay LBDP interest received on

---

[1] LBDP is a debtor in the above-captioned jointly administered chapter 11 case of LBHI and its affiliated debtors
(collectively with their non-debtor affiliates, "Lehman").  Capitalized terms not otherwise defined herein shall have
the meaning ascribed to them in the Master Agreement.

underlying securities (fixed rate corporate bonds) held by Repack, and (ii) in exchange, LBDP

agreed to make quarterly payments to Repack based on three-month LIBOR plus a 0.30 %

margin with respect to the outstanding notional amount of the swap.  The notional amount of

both the swap and the underlying securities comprising the Trust collateral was $15 million.

3.    LBHI's filing of a voluntary bankruptcy petition under Section 11 of the

Bankruptcy Code on September 15, 2008 constituted a "Trigger Event" which permitted the

Swap Agreement to be terminated ahead of schedule – *i.e.*, on an Early Termination Date.  Upon

the occurrence of such a "Trigger Event," LBDP was to determine whether LBDP or the Trust

was entitled to any termination payment based upon their respective "in the money" and "out of

the money" positions in the Swap Agreement as of the Early Termination Date.  *See* Schedule

Part 1(h)(2).  LBDP determined, in good faith, that it was decidedly "in the money" as of the

Early Termination Date and thus that LBDP was entitled to receive a termination payment of

millions of dollars.  On September 30, 2008, LBDP's termination payment calculation was

delivered to the Trust.  Thereafter, the "out of the money" party (*i.e.* the Trust) was scheduled to

pay the "in the money" party (*i.e.* LBDP) within ten days following the Early Termination Date.

*See* Schedule Part 1(h)(3).  However, LBDP never received *any* termination payment from the

Trust.

4.    Notwithstanding LBDP's right to an early termination payment, the

Trustee instead enforced certain Walkaway Provisions in the Transaction Agreements (defined

below) that purported to forfeit LBDP's right to receive *any* termination payment solely due to

LBHI's bankruptcy filing.  Thus, the Trustee caused an in-kind distribution of 100% of the Trust

collateral (corporate bonds) to the holders of Certificates issued by the Trust -- the Certificate

Holder Defendants.  Neither the Trustee nor the Certificate Holders made the required multi-

million dollar termination payment to LBDP from the Trust collateral or its proceeds.

Accordingly, the Walkaway Provisions in the Transaction Agreements which were triggered

upon LBHI's bankruptcy filing and resulted in a forfeiture of LBDP's otherwise mandated multi-

million dollar termination payment constitute unenforceable *ipso facto* clauses.

5.    In addition, LBDP filed its voluntary petition for bankruptcy protection on

October 5, 2008, which was *five days before* the Trustee caused the in-kind distribution of the

Trust collateral to the Certificate Holders on October 10, 2008.  Consequently, the enforcement

of the Walkaway Provisions and subsequent distribution to the Certificate Holders of 100% of

the Trust collateral violated the automatic stay under Section 362 of the Bankruptcy Code.

6.    The Certificate Holders also received a substantial, unwarranted windfall

as a result of the Trustee's improper distribution of 100% of the Trust collateral to them, and

they have not returned the Trust collateral or paid LBDP its rightful termination payment.

Accordingly, equity and good conscience require that the Certificate Holders return the Trust

collateral or pay LBDP its multi-million dollar termination payment, plus interest.

7.    Further, LBDP asserts claims as a creditor of Repack to recover property

or the value thereof fraudulently conveyed from the Trust to the Certificate Holder Defendants.

## PARTIES

8.    Plaintiff Lehman Brothers Derivative Products Inc. is a Delaware

corporation with its principal business address at 1271 Sixth Avenue, New York, New York

10020.

9.    Defendant U.S. Bank Trust National Association is a national banking

association organized under the laws of the United States that does business throughout the

United States, with its principal business address in New York located at 100 Wall Street, New

York, New York 10005.

10.     Defendant Repackaged American General Floating Rate Trust Certificates, Series 2003-1 Trust, is a special purpose entity and trust formed under the laws of the State of New York pursuant to the Trust Agreement that was created for the purpose of entering into the Swap Agreement and issuing the Certificates to the Certificate Holders. Defendant U.S. Bank Trust National Association is the trustee of the Repackaged American General Floating Rate Trust Certificates, Series 2003-1 Trust, as well as the signatory to the Trust Agreement and Swap Agreement on behalf of the Trust.

11.     Defendant Jacques Moret, Inc. is a Delaware corporation with its principal place of business located at 1411 Broadway, 8th Floor, New York, New York 10018.

12.     Defendant Ralph Harary is an individual residing at 12 Lady Bess Drive, Deal, New Jersey 07723-1015.

## JURISDICTION AND VENUE

13.     This adversary proceeding is commenced pursuant to Rules 7001 and 7003 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

14.     The Court has subject-matter jurisdiction over this proceeding under 28 U.S.C. §§ 157, 1334, and 2201.  In addition, the parties have submitted to the exclusive jurisdiction of the courts of the State of New York and the United States District Court for the Southern District of New York under the applicable agreements.

15.     Further, this matter has a close nexus with the Plan, which became effective on March 6, 2012.  The Court has retained post-confirmation jurisdiction over this matter pursuant to section 14.1 of the Plan and paragraph 77 of the Order dated December 6, 2011 confirming the Plan.

16.     The Court has personal jurisdiction over the Defendants.

17.     Venue is proper under 28 U.S.C. §§ 157(a), 1408, and 1409.

4

18.    Pursuant to Bankruptcy Rule 7008, this adversary proceeding relates to the

chapter 11 case *In re Lehman Brothers Holdings Inc.*, pending in this Court as Case No. 08-

13555 (SCC).

## BACKGROUND

**A.    The Relevant Agreements and Transactions**

19.    As described more fully below, Repack is a special purpose entity that in

July 2003 (i) was formed by Lehman ABS Corporation ("LABS") and U.S. Bank for the purpose

of issuing $15 million worth of certificates to the Certificate Holders, and (ii) entered into an

interest rate swap with LBDP tied to payments made on the underlying collateral (corporate

bonds) held by the Trust.

**i.    The Trust Agreement**

20.    On July 2, 2003, LABS, as "Depositor," and U.S. Bank, as Trustee,

created the Repackaged American General Floating Rate Trust Certificates, Series 2003-1 Trust

by executing and delivering a Series Supplement (the "Series Supplement"), incorporating the

Standard Terms for Trust Agreements, dated as of January 16, 2001 (the "Standard Terms" and,

together with the Series Supplement, as amended and supplemented, the "Trust Agreement").

21.    The Trust Agreement required LABS to deposit into the Trust the

underlying Trust collateral consisting of: 7.5 % Notes due 2025 issued by American General

Corporation (the "Underlying Securities").

22.    Ultimately, the Underlying Securities with an aggregate principal amount

of $15,000,000 were deposited into the Trust.

23.    In turn, the Trust issued $15,000,000 face amount of Repackaged

American General Floating Rate Trust Certificates, Series 2003-1 (the "Certificates").  The

Certificates were then sold to the Certificate Holders who held the securities for their own benefit.

24.    Under the Trust Agreement, LBDP, as Swap Counterparty, was required to make payments to the Trust under the interest rate swap agreement described below, which payments were distributed to the Certificate Holders following receipt by the Trust. Conversely, the Trustee was required to pay LBDP any interest payments on the Underlying Securities received by the Trust.

ii.    **The Interest Rate Swap**

25.    Contemporaneously with the creation of the Trust Agreement, LBDP and Repack entered into an interest rate swap agreement (the "Swap Agreement").

26.    On July 2, 2003, the Trust entered into a Master Agreement (the "Master Agreement") consisting of (a) a 1992 multicurrency cross-border ISDA standard form master agreement dated as of July 2, 2003 (the "ISDA Standard Form"), by and between LBDP and the Trust, (b) a schedule to the ISDA Standard Form (the "Schedule"), and (c) swap confirmations entered into from time by and between LBDP and the Trust (the Trust Agreement and the Master Agreement shall hereinafter be referred to collectively as the "Transaction Agreements").

27.    LBDP and the Trust entered into a $10,000,000 interest rate swap by executing a confirmation, dated July 2, 2003 (the "Original Confirmation").

28.    On July 11, 2003, LBDP and the Trust executed a supplement to the Original Confirmation increasing the notional amount of the swap from $10,000,000 to $15,000,000 (the Original Confirmation as supplemented, the "Confirmation").

29.    Pursuant to the Swap Agreement, the Trust agreed to pay LBDP any interest received by the Trust on the Underlying Securities. In return, LBDP agreed to make

6

quarterly payments to the Trust based on three-month LIBOR plus a 0.30 % margin with respect

to the outstanding notional amount of the Swap Agreement.

30.     The Scheduled Termination Date of the Swap Agreement was July 15,

2025, which was also the maturity date of the Underlying Securities.

**B.    Early Termination Provisions in Swap Agreement Provided
        for Payment to Party "In the Money" as Termination Payment**

31.     Upon an early termination of the Swap Agreement, the party "out of the

money" would owe certain early termination payments to the party "in the money."

32.     The Master Agreement provided for the early termination of the swap

upon the occurrence of certain events, including the occurrence of an "Event of Default" or a

"Termination Event."

33.     Pursuant to the Schedule, certain Additional Termination Events,

including the bankruptcy filing of LBHI, were also added and each was also designated as a

"Trigger Event."  *See* Schedule Part 1(f)(3).

34.     The occurrence of a "Trigger Event" would require LBDP to designate an

Early Termination Date and to calculate, in good faith and in accordance with the applicable

formula, any termination payment to which either LBDP or the Trust may be entitled based upon

their respective "in the money" and "out of the money" position in the Swap Agreement as of the

Early Termination Date:

> **Market Quotation**.    For the purposes of determining the
> Settlement Amount pursuant to Section 6(e)(iv), the "Market
> Quotation" of a Terminated Transaction (which may be positive or
> negative) shall be the amount determined by Party A [LBDP],
> using Market Rates and Volatilities and by polling the Dealer
> Group as required, to be the mid-market value of the Transaction
> as of the close of business (New York time) on the Early
> Termination Date.    Party A [LBDP] shall perform such
> determinations in good faith in accordance with its usual operating

procedures and pursuant to industry standards.   For purposes of this definition, *if the Market Quotation of a Terminated Transaction represents an amount payable to Party A [LBDP], it shall be expressed as a negative number, and if the Market Quotation represents an amount payable to Party B [Repack], it shall be expressed as a positive number*.

Schedule Part 1(h)(2) (emphasis added).[2]

35.     LBDP was then required to notify the Trust of its calculation of the termination payment.  *See* Schedule Part 1(h)(2).

36.     Thereafter, the "out of the money" party was required to pay the "in the money" party within 10 days following the Early Termination Date.  *See* Schedule Part 1(h)(3).

## C.     Early Termination of the Swap Agreement and Calculation of LBDP's Termination Payment

37.     On September 15, 2008, LBHI filed a voluntary petition for bankruptcy protection under Chapter 11 of the Bankruptcy Code.

38.     Since LBHI's bankruptcy filing was a Trigger Event, LBDP designated September 23, 2008 as the Early Termination Date.

39.     Upon information and belief, on September 24, 2008, the Trustee delivered a "Notice of Default/SWAP Termination Event" to Standard & Poor's Rating Services, Moody's Investor Services, LABS, LBDP, Holders of the Trust Certificates, and Cede and Co. declaring that the bankruptcy petition filing by LBHI constituted both a "SWAP Termination Event" and an "Event of Default" under the Master Agreement.

40.     In accordance with Part 1(h)(2) of the Schedule, LBDP calculated the appropriate termination payment, in good faith, and determined that LBDP was entitled to a termination payment from the Trust under the Master Agreement for millions of dollars.

---

[2] For purposes of the Master Agreement, LBDP was "Party A" and Repack was "Party B."

41.     On September 30, 2008, LBDP then properly delivered its termination payment calculation to the Trust, as required by the Master Agreement.  Schedule Part 1(h)(2).

**D.     LBDP Filed for Chapter 11 Protection**

42.     On October 5, 2008, LBDP filed a voluntary petition for bankruptcy protection under Chapter 11 of the Bankruptcy Code.  LBDP's bankruptcy petition indicated that it was related to the bankruptcy filing of various other Lehman entities, including LBHI, which was listed as LBDP's "indirect parent."

**E.     The Trustee's Improper Distribution of 100% of the Swap Collateral to the Certificate Holders Pursuant to the Unenforceable Walkaway Provisions**

43.     Notwithstanding LBDP's entitlement to millions of dollars in a termination payment, the Trustee unilaterally determined that LBDP was not entitled to *any* termination payment because LBHI's bankruptcy filing was the basis for termination of the Master Agreement.  This determination was based upon unenforceable *ipso facto* provisions that worked a forfeiture of LBDP's contractual right to a termination payment solely as a result of LBHI's bankruptcy filing.

44.     Part 1(h)(5) of the Schedule provided that upon early termination due to a Trigger Event, which included the filing of a bankruptcy petition for LBHI, if the *Trust* was entitled to a termination payment under the applicable formula (yielding a "positive number"), LBDP was obligated to make the termination payment to the Trust, but if *LBDP* was entitled to a termination payment under the formula (yielding a "negative number"), then "no amount" was to be paid to LBDP:

> **Trigger Event**.   If an early Termination Date results from a Trigger Event, Party A [LBDP] shall determine the Settlement Amount of all Terminated Transactions on such date, and the amount payable will be equal to (A) the Settlement Amount in respect of the Terminated Transactions plus (B) the Termination

> Currency Equivalent of Unpaid Amounts owing to Party B [Repack] <u>minus</u> (C) the Termination Currency Equivalent of Unpaid Amounts owing to Party A [LBDP]. *If that amount is a positive number, Party A [LBDP] will pay it to Party B [Repack]; if it is a negative number, no amount will be paid by Party B [Repack] to Party A [LBDP].*

Schedule Part 1(h)(5) (emphasis added).

45.     In addition, Section 3(e)(iii) of the Confirmation provided that if the termination of the Swap was due to a Trigger Event, such as the bankruptcy filing of LBHI, then "no termination payment shall be payable" to LBDP:

> (iii) *No termination payment shall be payable by Party B [Repack] to Party A [LBDP] following the occurrence of a Special Termination Event.* [A] "Special Termination Event" is an Early Termination event caused by the occurrence of (A) an event specified in Section 5(a)(i) of the Master Agreement, (B) an event specified in Section 5(a)(vii) of the Master Agreement or (C) *a Trigger Event.*

Confirmation § 3(e)(iii) (emphasis added).

46.     Further, the Trust Agreement provided that if a "Special Termination Event" occurred, such as LBHI's bankruptcy filing, then the Certificate Holders would be entitled to receive their in-kind, pro rata share of the Underlying Securities in the Trust, plus any Early Termination Payment from LBDP.  Trust Agreement § 6(a).  Conversely, however, there was no provision for any Early Termination Payment to LBDP, even if LBDP was "in the money" at the time.  Trust Agreement § 6(a).

47.     In sum, Part 1(h)(5) of the Schedule, Section 3(e)(iii) of the Confirmation, and Section 6(a) of the Trust Agreement forfeited LBDP's contractual right to a termination payment if the termination was due to the bankruptcy filing of LBHI, which would be considered

both a "Trigger Event" under the Schedule and a "Special Termination Event" under the

Confirmation and Trust Agreement.[3]

48.    On or around October 10, 2008, the Trustee issued a "Notice of FULL

Redemption / Distribution in-Kind" of the Trust (the "Redemption Notice").  Without any

termination payment to LBDP, even though LBDP was in the money as of the Early Termination

Date, the Trustee's Redemption Notice announced the redemption of the Certificates through an

in-kind distribution of 100% of the outstanding Trust collateral to the Certificate Holders due to

LBHI's bankruptcy filing, which purportedly constituted both a "Trigger Event" and a "Special

Termination Event":

> On September 15, 2008, Lehman Brothers Holdings Inc. instituted
> a proceeding seeking a judgment of bankruptcy or insolvency.
> This is an Event of Default and a *Trigger Event* under the Swap.
> Pursuant to the Trust Agreement, a Trigger Event occurring and
> continuing under the Swap is a *Special Termination Event*.  On
> September 19, 2008 the Market Agent became subject to a
> liquidation proceeding by the Securities Investor Protection
> Corporation.  *Accordingly, the Trustee will redeem the Certificates
> on Friday, October 10, 2008 (the "Redemption Date") by
> distributing to each Certificateholder of record at the close of
> business on Thursday, October 9, 2008, its Pro-Rata Share of the
> Underlying Securities in-kind.*

Redemption Notice (emphasis added).

49.    On or around October 10, 2008, the Trustee distributed 100% of the Trust

collateral as of the Early Termination Date to the Certificate Holders, in-kind.

50.    Because the Walkaway Provisions became operative at the time of the

filing of the petition of LBHI, LBDP did not receive its multi-million dollar termination payment

that it otherwise would have received from the Trust.

---

[3] Part 1(h)(5) of the Schedule, Section 3(e)(iii) of the Confirmation, Section 6(a) of the Trust Agreement, and any related provision in any of the Transaction Agreements which preclude any termination payment to LBDP if triggered by the bankruptcy filing of LBHI shall collectively be referred to as the "Walkaway Provisions."

## COUNT I
### Against All Defendants
### (*Declaratory Judgment – Walkaway Provisions Are Unenforceable Ipso Facto Clauses*)

51.     LBDP repeats, realleges, and incorporates by reference the allegations

contained in all preceding paragraphs of this Complaint as though fully set forth in this cause of

action.

52.     At the time of the LBHI bankruptcy filing, the parties' respective

obligations under the Transaction Agreements were continuing and the performance of material

obligations under the Trust Agreement and the Swap Agreement remained outstanding on both

sides.

53.     Accordingly, the Trust Agreement and the Swap Agreement were

executory contracts and subject to the protections of Sections 365(e), 541(c)(1)(B) and 363(l) of

the Bankruptcy Code.

54.     The Walkaway Provisions that purport to terminate LBDP's right to a

termination payment as a result of LBHI's bankruptcy filing constitute unenforceable *ipso facto*

clauses that violate Sections 365(e)(1), 541(c)(1) and 363(l) of the Bankruptcy Code.

55.     The Bankruptcy Code protects debtors from being penalized for filing a

Chapter 11 case, notwithstanding any contractual provisions or applicable law that would have

that effect.  Section 365(e)(1) of the Bankruptcy Code provides that:

> [n]otwithstanding a provision in an executory contract . . .   an
> executory contract . . . of the debtor may not be terminated *or
> modified*, and any right or obligation under such contract or lease
> may not be terminated  *or modified*, at any time after the
> commencement of the case solely because of a provision in such
> contract . . . that is conditioned on . . . the commencement of a case
> under this title . . . .

11 U.S.C. § 365(e)(1) (emphasis added).

56.     Similarly, Section 541(c)(1) recognizes that a debtor's interest in property:

12

> becomes property of the estate . . . notwithstanding any provision
> in an agreement, transfer instrument, or applicable nonbankruptcy
> law . . . that is conditioned on . . . the commencement of a case
> under this title . . . and that effects or gives an option to effect a
> forfeiture, modification, or termination of the debtor's interest in
> property.

11 U.S.C. § 541(c)(1).

57.   Enforcement of the Walkaway Provisions also violated the *ipso facto*

prohibition of Section 363(l).  Section 363(l) provides, in relevant part, that the debtor:

> may use, sell, or lease property under section (b) or (c) of this
> section, or a plan under chapter 11, 12, or 13 of this title may
> provide for the use, sale, or lease of property, notwithstanding any
> provision in a contract, a lease, or applicable law that is
> conditioned on the insolvency or financial condition of the debtor,
> on the commencement of a case under this title concerning the
> debtor, or on the appointment of or the taking possession by a
> trustee in a case under this title or a custodian, and that effects, or
> give an option to effect, a forfeiture, modification, or termination
> of the debtor's interest in such property.

11 U.S.C. § 363(l).  As described above, Section 541(a)(1) broadly defines property of the estate

to include property in which the debtor did not have a possessory interest at the time the

bankruptcy proceedings commenced.

58.   Because the Walkaway Provisions (a) become operative after the

commencement of LBHI's bankruptcy case, (b) affect the priority of payment under the

Transaction Agreements solely because of "the commencement of a case" under the Bankruptcy

Code, and (c) deprive LBDP of its contractual termination payment, the provisions are

unenforceable *ipso facto* clauses.

59.   There is an actual controversy between the parties on this issue because

the Transaction Agreements on their face provide for the enforcement of the Walkaway

Provisions in violation of the Bankruptcy Code and Defendants have not agreed to waive or

disregard such Walkaway Provisions.

60.     Accordingly, pursuant to 28 U.S.C. § 2201 and Bankruptcy Rule 7001, LBDP requests that the Court enter a declaratory judgment that (a) the Walkaway Provisions are unenforceable *ipso facto* clauses pursuant to Sections 365(e)(1), 541(c)(1)(B) and 363(l) of the Bankruptcy Code, and (b) LBDP is entitled to its termination payment pursuant to the formula set forth in the Swap Agreement, plus interest.

**COUNT II**
**Against All Defendants**
(*Declaratory Judgment – Enforcement of Walkaway Provisions Violated the Automatic Stay*)

61.     LBDP repeats, realleges, and incorporates by reference the allegations contained in all preceding paragraphs of this Complaint as though fully set forth in this cause of action.

62.     Section 362(a) of the Bankruptcy Code provides, in relevant part, that the filing of a petition under Title 11 of the Bankruptcy Code "operates as a stay, applicable to all entities, of -- . . . (3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate . . . ." 11 U.S.C. § 362(a)(3).

63.     At the time LBDP commenced its voluntary bankruptcy case, LBDP's right to the termination payment under the Swap Agreement constituted a substantial asset of the estate. Any effort to control LBDP's termination payment, including any action to effect distribution of 100% of the underlying Trust collateral to the Certificate Holders, would be subject to, and in violation of, the automatic stay provided under Section 362(a) of the Bankruptcy Code. *See* 11 U.S.C. § 362(a)(3).

64.     Further, the Walkaway Provisions improperly seek to take property of LBDP because of the bankruptcy filing of LBHI. Property of a debtor becomes property of the estate, "notwithstanding any provision in an agreement . . . that is conditioned . . . on the

14

commencement of a case under this title . . . and that effects or gives an option to effect a

forfeiture, modification, or termination of the debtor's interest in property."  11 U.S.C. §

541(c)(1).

65.     Giving effect to the Walkaway Provisions would extinguish LBDP's right

to the termination payment, and thus cause LBDP to forfeit an interest in property because of

"the commencement of a case under this title."  Further, the transfer of LBDP's interest in the

Trust collateral, including LBDP's right to the termination payment to be satisfied from Trust

collateral proceeds, occurred five days after LBDP filed its voluntary bankruptcy petition.  This

violated the automatic stay provided under Section 362(a).

66.     There is an actual controversy between the parties on this issue because

the Transaction Agreements provide for the enforcement of the Walkaway Provisions in

violation of the Bankruptcy Code and Defendants have not agreed to waive or disregard such

Walkaway Provisions.

67.     Accordingly, pursuant to 28 U.S.C. § 2201 and Bankruptcy Rule 7001,

LBDP requests that this Court enter a declaratory judgment that all actions to enforce the

Walkaway Provisions constituted willful violations of the automatic stay under Section 362(a)(3)

of the Bankruptcy Code and are void *ab initio*.

<u>**COUNT III**</u>
**Against all Defendants**
(***Turnover under Section 542 (a) of the Bankruptcy Code of Estate Property***)

68.     LBDP repeats, realleges, and incorporates by reference the allegations

contained in all preceding paragraphs of this Complaint as though fully set forth in this cause of

action.

69.    Section 542(a) of the Bankruptcy Code provides that "an entity, . . . in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 of this title, . . . shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate." 11 U.S.C. § 542(a).

70.    If the void and unenforceable Walkaway Provisions had not been enforced in violation of the automatic stay, LBDP would have received its "in the money" termination payment in the ordinary course.    LBDP's interest in the termination payment prior to enforcement of the Walkaway Provisions constitutes property of the estate.

71.    Therefore, LBDP is entitled to turnover of the value of LBDP's termination payment – even if LBDP did not have possession of those funds on the dates on which LBDP or LBHI filed their respective petitions for bankruptcy – because LBDP was deprived of the use of those funds by enforcement of the Walkaway Provisions.

72.    Accordingly, pursuant to Section 542(a) of the Bankruptcy Code, LBDP requests an order compelling and directing Defendants to turn over the above-described property to LBDP as it constitutes property of the bankruptcy estate.

### COUNT IV
**Against all Defendants**
(***Turnover under Section 542 (b) of the Bankruptcy Code of Estate Property***)

73.    LBDP repeats, realleges, and incorporates by reference the allegations contained in all preceding paragraphs of this Complaint as though fully set forth in this cause of action.

74.    Section 542(b) of the Bankruptcy Code expressly provides that "an entity that owes a debt that is property of the estate and that is matured, payable on demand, or payable

on order, shall pay such debt to, or on the order of the trustee, except to the extent that such debt

may be offset under section 553 of this title against a claim against the debtor." 11 U.S.C. §

542(b).

75.    If the void and unenforceable Walkaway Provisions had not been enforced

in violation of the automatic stay, LBDP would have received its "in the money" termination

payment in the ordinary course.

76.    The amount owed to LBDP prior to enforcement of the Walkaway

Provisions constitutes a debt that has matured and is property of the estate pursuant to Section

541(a) of the Bankruptcy Code.  As a result of the operation of the Walkaway Provisions, certain

Defendants are in possession, custody or control of assets consisting of proceeds of the Debtors'

property in the amount of millions of dollars, which is of substantial value or benefit to the

Debtors' estate and is property belonging to the Debtors that may be used by them.

77.    Accordingly, pursuant to Section 542(b) of the Bankruptcy Code, LBDP

requests an order compelling and directing Defendants to turn over the above-described property

to LBDP as it constitutes property of the bankruptcy estate under Section 541(a) of the

Bankruptcy Code.

### COUNT V
**Against the Certificate Holders**
(*Unjust Enrichment*)

78.    LBDP repeats, realleges, and incorporates by reference the allegations

contained in all preceding paragraphs of this Complaint as though fully set forth in this cause of

action.

79.    At the time LBHI filed its voluntary petition for bankruptcy protection,

LBDP was heavily "in-the-money" in the Swap Agreement.  The Trustee's determination to

enforce the Walkaway Provisions, however, and distribute the Trust collateral, wiped away

LBDP's "in-the-money" position and funneled all Trust collateral, including LBDP's interest

therein, to the Certificate Holders.

80.     The Certificate Holders thereby received a staggering windfall, including

LBDP's interest in the collateral, without providing any compensation to LBDP.

81.     LBDP's entire interest in the Trust collateral, including LBDP's right to

receive its termination payment from the Trust collateral, was transferred to the Certificate

Holders.  LBDP received nothing in return.

82.     The Certificate Holders have been improperly and unjustly enriched, at

LBDP's expense, as a result of such transfer.

83.     Equity and good conscience require that the Certificate Holders return the

portion of the Trust collateral that was due to LBDP in the form of the value of LBDP's

termination payment, plus interest.

## COUNT VI
### Against the Certificate Holders
(*Constructive Trust*)

84.     LBDP repeats, realleges, and incorporates by reference the allegations

contained in all preceding paragraphs of this Complaint as though fully set forth in this cause of

action.

85.     The Trustee has a confidential and/or fiduciary relationship with LBDP

with respect to LBDP's interest in the Trust collateral.  By entering into the Swap Agreement

and making payments thereunder, LBDP relied on the Trustee's implicit promise not to

improperly transfer collateral in which LBDP had an interest to third-parties.

18

86.     As a result of the improper distribution of 100% of the Trust collateral to the Certificate Holders, the Certificate Holders have been improperly and unjustly enriched at LBDP's expense.

87.     At the time of the distribution, the Certificate Holders were on notice that LBHI and LBDP filed for Chapter 11 bankruptcy and that transactions relating to the estates of LBHI, LBDP, and their affiliated debtors were subject to the Bankruptcy Code.  Accordingly, the Certificate Holders were not *bona fide* purchasers of the Trust collateral received in the distributions.

88.     Because of the unjust enrichment of the Certificate Holders, LBDP is entitled to the imposition of a constructive trust with respect to the Trust collateral transferred to the Certificate Holders.

## COUNT VII
### Against the Certificate Holders
(*Money Had and Received*)

89.     LBDP repeats, realleges, and incorporates by reference the allegations contained in all preceding paragraphs of this Complaint as though fully set forth in this cause of action.

90.     LBDP was substantially "in-the-money" on the swap at the time of the Swap Agreement's termination.  LBDP, therefore, had an interest in the Trust collateral distributed to the Certificate Holders in the amount of LBDP's contractual termination payment right.

91.     As a result of the improper distribution of the Trust collateral, the Certificate Holders received property that rightfully belonged to LBDP.

92.      Indeed, the distribution resulted in an enormous windfall to the Certificate Holders. LBDP received nothing in return.

93.      Equity and good conscience require that the Certificate Holders not be permitted to retain the portion of the Trust collateral that was due to LBDP in the form of the value of LBDP's termination payment, plus interest.

## COUNT VIII
### Against the Certificate Holders
(*Replevin*)

94.      LBDP repeats, realleges, and incorporates by reference the allegations contained in all preceding paragraphs of this Complaint as though fully set forth in this cause of action.

95.      Pursuant to the terms of Transaction Agreements, LBDP was granted an interest in the Trust collateral and the proceeds thereof. LBDP held such interest at the time of the Trust collateral transfer to the Certificate Holders.

96.      At the time of LBHI's filing of its voluntary petition for bankruptcy protection and the liquidation of the swap, LBDP was heavily "in-the-money" on the Swap Agreement.

97.      The Trustee's determination to enforce the Walkaway Provisions, however, and distribute 100% of the Trust collateral to the Certificate Holders, divested LBDP of substantial value arising from its "in-the-money" position.

98.      LBDP possesses and still retains an interest in the Trust collateral and the proceeds therefrom that is senior to any junior interest held by the Certificate Holders, and LBDP has the immediate right to possession of the Trust collateral.

99.     Upon information and belief, the Certificate Holders wrongfully retain possession of all of the Trust collateral and proceeds therefrom, subject to LBDP's valid and superior interest.

100.     As of the date of this Complaint, the Certificate Holders have failed to comply with LBDP's demand for immediate possession of the Trust collateral.

101.     Therefore, as the direct and proximate result of the foregoing, LBDP is entitled to an order of replevin directing the Certificate Holders to immediately tender the portion of the Trust collateral that was due to LBDP in the form of the value of LBDP's termination payment, plus interest.

**COUNT IX**
**Against all Defendants**
***(Fraudulent Conveyance – New York Debtor and Creditor Law §§ 273, 274, 278, and 279)***

102.     LBDP repeats, realleges, and incorporates by reference the allegations contained in all preceding paragraphs of this Complaint as though fully set forth in this cause of action.

103.     LBDP is a creditor of Repack.

104.     LBDP holds matured claims and/or unmatured claims against Repack.

105.     Upon the occurrence of a Special Termination Event under the Master Agreement, the Underlying Securities were transferred (by the Trustee on behalf of Repack) from the Certificate Account maintained by the Trustee (on behalf of Repack) pursuant to the Trust Agreement pro rata to each of the Certificate Holders ("the "Collateral Transfers").

106.     Each of these Collateral Transfers from the Trust was made without fair consideration.

21

107.    Further, at the time of the Collateral Transfers, the Trustee and/or the Certificate Holders knew or should have known that the Walkaway Provision triggered by the LBHI bankruptcy filing constituted unenforceable *ipso facto* clauses that violated Sections 365(e)(1), 541(c)(1) and 363(l) of the Bankruptcy Code.

108.    Repack was insolvent at the time of the Collateral Transfers or was rendered insolvent as a result of the Collateral Transfers.

109.    At the time Repack made the Collateral Transfers, Repack was engaged or was about to engage in a business or transaction for which the property remaining in its hands after the Collateral Transfers was an unreasonably small capital.

110.    As a result of the foregoing, LBDP is entitled (a) to have the Collateral Transfers set aside to the extent necessary to satisfy its claim; (b) to disregard the Collateral Transfers and attach or levy execution upon the property conveyed; and (c) to recover money damages for the entire amount of the Collateral Transfers.

## COUNT X
**Against All Defendants**
*(Declaratory Judgment – The Walkaway Provisions Operate as Unenforceable Penalties)*

111.    LBDP repeats, realleges, and incorporates by reference the allegations contained in all preceding paragraphs of this Complaint as though fully set forth in this cause of action.

112.    There is no rational relationship between the distribution to the Certificate Holders, on the one hand, and any damages they have suffered as a result of the Debtors' bankruptcy filings, on the other hand.  The contractual provisions which yield this result – the Walkaway Provisions – do not represent even a pretextual attempt to approximate actual damages.

113.    These provisions were intended solely to coerce performance.  Rather than fairly compensate for any resulting harm or loss, the Walkaway Provisions instead have produced what may fairly be described as a windfall for the Certificate Holders, and a punitive blow to the Debtors.

114.    Accordingly, the large transfer of value from LBDP to the Certificate Holders constitutes an unenforceable penalty.

115.    There is an actual controversy between the parties on these issues because: (i) the Transaction Documents contain the Walkaway Provisions; and (ii) Defendants have refused to acknowledge that these contractual provisions are unenforceable and pay LBDP what it is rightfully owed.

116.    Accordingly, pursuant to 28 U.S.C. § 2201 and Bankruptcy Rule 7001, LBDP requests that the Court enter a declaratory judgment that the Walkaway Provisions operate as unenforceable penalties.

## PRAYER FOR RELIEF

WHEREFORE, LBDP respectfully requests that the Court enter judgment in its favor, and against Defendants, as follows:

A.    Declaratory judgment that the Walkaway Provisions that were triggered upon LBHI's bankruptcy filing constitute unenforceable *ipso facto* clauses that violate 11 U.S.C. §§ 365(e)(1), 541(c)(1) and 363(l), and LBDP is entitled to its termination payment;

B.    Declaratory judgment that all actions to enforce the Walkaway Provisions constituted willful violations of the automatic stay under 11 U.S.C. § 362(a) and are void *ab initio*;

C.    Judgment that the Defendants account for and turn over the property of the estate now or formerly in their possession, custody or control or the value of such property under 11 U.S.C. § 542;

D.    Judgment that the Certificate Holders were unjustly enriched for their failure to return the portion of the Trust collateral that was due to LBDP in

23

accordance with equity and good conscience;

E.      Judgment imposing a constructive trust on the Trust collateral and proceeds therefrom;

F.      Judgment that the distribution of the Trust collateral to the Certificate Holders constituted a transfer of LBDP's interest in the property and that under principles of equity and good conscience, the Certificate Holders should not be permitted to retain the collateral;

G.      Judgment of replevin against the Certificate Holders for their failure to return the Trust collateral that rightfully belongs to LBDP;

H.      Judgment avoiding the distributions to the Defendants as fraudulent as to LBDP, and ordering the return of that portion of the distributions necessary to satisfy LBDP's claim against Repack;

I.      Declaratory judgment against the Defendants on the unenforceable penalty claim and ordering them to pay LBDP the value of LBDP's "in the money" position in the Swap Agreement;

J.      An award of damages in an amount to be determined at trial, plus interest; and

K.      Such other and further relief as the Court deems just and proper, including costs and attorneys' fees.

Dated:    New York, New York
          September 15, 2014

Respectfully submitted,

WOLLMUTH MAHER & DEUTSCH LLP

By:  /s/ Paul R. DeFilippo
        Paul R. DeFilippo
        Adam M. Bialek
        Jeffrey Coviello
        Fletcher W. Strong

500 Fifth Avenue
New York, New York 10110
Telephone: (212) 382-3300
Facsimile: (212) 382-0050

*Attorneys for Lehman Brothers Derivative Products Inc.*

24