Page 1

1

2  UNITED STATES BANKRUPTCY COURT

3  SOUTHERN DISTRICT OF NEW YORK

4  Case Nos. 08-13555 (SCC); 08-01420(SCC)(SIPA)

5  - - - - - - - - - - - - - - - - - - - - - -x

6  In the Matters of:

7

8  LEHMAN BROTHERS HOLDINGS INC., et al.

9

10            Debtor.

11  - - - - - - - - - - - - - - - - - - - - - -x

12  LEHMAN BROTHERS INC.,

13

14            Debtor.

15  - - - - - - - - - - - - - - - - - - - - - -x

16            United States Bankruptcy Court

17            One Bowling Green

18            New York, New York

19

20            July 30, 2014

21            10:03 AM

22

23  B E F O R E:

24  HON. SHELLEY C. CHAPMAN

25  U.S. BANKRUPTCY JUDGE

Page 2

1

2   Motion Pursuant to Rule 9019 of the Federal Rules of Bankruptcy

3   Procedure and Section 105(a) of the Bankruptcy Code for

4   Approval of Partial Settlement Agreement Relating to SGS HY

5   Credit Fund I (Exum Ridge Cbo 2006-3) Swap Agreement and

6   Indenture [ECF No. 44723]

7

8   Motion Pursuant to Federal Rule of Bankruptcy Procedure 9019

9   for Entry of an Order Approving Settlement Agreements Between

10  the LBI Trustee and the Singapore Entities [LBI ECF No. 9358]

11

12  Motion Pursuant to Federal Rule of Bankruptcy Procedure 9019

13  for Entry of an Order Approving Settlement Agreement Between

14  the LBI Trustee and the Hong Kong Entities [LBI ECF No. 9363]

15

16  Trustee's Motion for an Order Pursuant to Sections 105(a),

17  502(a), 502(c) and 726 of the Bankruptcy Code and Bankruptcy

18  Rule 3009 (I) Capping the Maximum Allowable Amounts, and

19  Establishing an Interim Distribution Fund, for Unsecured

20  Claims, (II) Allowing Certain Unsecured Claims, (III)

21  Authorizing the Trustee to Make a First Interim Distribution to

22  Allowed Unsecured Creditors with a Record Date of July 15,

23  2014, and Related Relief [LBI ECF No. 9246]

24

25  Transcribed by:  Lisa Beck

Page 3

1    A P P E A R A N C E S :

2    WEIL GOTSHAL & MANGES LLP

3        Attorneys for Lehman Brothers Holdings Inc. and Its

4        Affiliates

5        767 Fifth Avenue

6        New York, NY 10153

7

8    BY:   JACQUELINE MARCUS, ESQ.

9        ERIC J. PETERMAN, ESQ.

10

11   HUGHES HUBBARD & REED LLP

12       Attorneys for James W. Giddens, Trustee for the SIPA

13       Liquidation of Lehman Brothers Inc.

14       One Battery Park Plaza

15       New York, NY 10004

16

17   BY:   JAMES B. KOBAK, JR., ESQ.

18       MICHAEL E. SALZMAN, ESQ.

19       MEGAN GRAGG, ESQ.

20       GREGORY C. FARRELL, ESQ.

21       DINA R. HOFFER, ESQ.

22

23

24

25

Page 4

```
 1    CHAPMAN AND CUTLER LLP

 2         Attorneys for U.S. Bank, N.A., as Trustee

 3         1270 Avenue of the Americas

 4         New York, NY 10020

 5

 6    BY:   CRAIG M. PRICE, ESQ.

 7

 8

 9    CHAPMAN AND CUTLER LLP

10         Attorneys for U.S. Bank, N.A., as Trustee

11         111 West Monroe Street

12         Chicago, IL 60603

13

14    BY:   FRANKLIN H. TOP, III, ESQ.

15

16

17    THOMPSON & KNIGHT LLP

18         Attorneys for Robert Chambers, Kyle Kettler and Matthew

19          Veghese

20         900 Third Avenue

21         20th Floor

22         New York, NY 10022

23

24    BY:   JENNIFER A. CHRISTIAN, ESQ.

25
```

Page 5

MILBANK, TWEED, HADLEY & MCCLOY LLP

  Attorneys for the Ad Hoc Group

  One Chase Manhattan Plaza

  New York, NY 10005


BY: GERARD UZZI, ESQ.



SCHLEMLEIN, GOETZ, FICK & SCRUGGS

  Attorneys for James Knipp

  66 South Hanford Street

  Seattle, WA 98134


BY: CHARLES A. LYMAN, ESQ.

  (TELEPHONICALLY)

1                    P R O C E E D I N G S

2              THE COURT:  All right?  I believe we're going to start

3    with LBHI.

4              MS. MARCUS:  Good morning, Your Honor.

5              THE COURT:  Good morning, Ms. Marcus.

6              MS. MARCUS:  Jacqueline Marcus, Weil, Gotshal & Manges

7    LLP, on behalf of Lehman Brothers Holdings Inc. as plan

8    administrator and its affiliated Chapter 11 estates.

9              We're here this morning, Your Honor, for the hearing

10   on the motion pursuant to Rule 9019 of the Federal Rules of

11   Bankruptcy Procedure and Section 105 of the Bankruptcy Code for

12   approval of partial settlement agreement regarding to SGS HY

13   Credit Fund (Exum Ridge Cbo 2006-3) swap agreement and

14   indenture.  And that's ECF number 44723.

15             With respect to the procedural context, we filed a

16   motion on June 16, 2014 and did not receive any objections

17   prior to the July 9th objection deadline.  As a result, rather

18   than proceeding with a hearing on this matter at the July 16th

19   omnibus hearing, we filed a certificate of no objection.  At

20   the Court's request, we appear today for a hearing on this

21   matter.

22             THE COURT:  My questions go not to the merits of the

23   settlement at all.  And those will be approved.  My question is

24   purely procedural.  And that is, it's denominated a partial

25   settlement agreement.  As far as I can tell, it does not

Page 7

1    contemplate dismissal of the adversary proceeding as to this

2    issuer.  So it's my understanding, based on reading the

3    papers -- specifically, I'm looking at paragraph 14 of the

4    motion -- the litigation involves this dispute that's being

5    settled and other similar disputes involving other issuers and

6    trustees.  So my questions are really procedural.  One, why the

7    adversary is not being dismissed as to this issuer.  And

8    secondly, my understanding is that this was filed in the main

9    case but not in the adversary.

10         MS. MARCUS:  Sure.

11         THE COURT:  So I hate to be --

12         MS. MARCUS:  That's fine.  That makes my life much

13    easier.

14         THE COURT:  -- ask about these technicalities but just

15    needed to know the answers to those questions.

16         MS. MARCUS:  Sure.  So the reason that it's described

17    as a partial settlement agreement is because under the

18    structure of the settlement, noteholders were provided with

19    notice and an opportunity effectively to opt out of the

20    settlement.  If any noteholder who received the notice provided

21    by the trustee didn't want the settlement then it would opt out

22    and funds would be placed into an escrow account for the

23    benefit, basically, of that noteholder.  If that noteholder

24    chose to litigate or there were some other settlements down the

25    road, those funds would be there.  And that's why it was not

Page 8

1    deemed a full settlement.

2              THE COURT:  Okay.

3              MS. MARCUS:  As it turns out, however, when we filed

4    the motion, of course, we didn't know if there would be any

5    objections.

6              THE COURT:  Right.

7              MS. MARCUS:  So it was denominated as a partial

8    settlement.  As it turned out, no noteholders --

9              THE COURT:  Okay.

10             MS. MARCUS:  -- have opted out and therefore it

11   actually is --

12             THE COURT:  Okay.

13             MS. MARCUS:  -- a settlement.  And the adversary

14   proceeding actually will be dismissed --

15             THE COURT:  Okay.

16             MS. MARCUS:  -- as to this issuer.

17             THE COURT:  Okay.

18             MS. MARCUS:  I think the way -- the settlement

19   agreement, I think, says that the -- when the escrowed funds

20   are distributed.

21             THE COURT:  Okay.

22             MS. MARCUS:  And the escrowed funds would be only for

23   objecting noteholders.

24             THE COURT:  Right.

25             MS. MARCUS:  So now, standing before you today, is a

Page 9

```
 1    complete settlement --

 2              THE COURT:  Okay.

 3              MS. MARCUS:  -- as to this issuer.

 4              THE COURT:  Okay.  And therefore, the adversary will

 5    be dismissed as to this issuer and that is an order that can be

 6    filed in the adversary.

 7              MS. MARCUS:  That is exactly right.  And just as to

 8    your other question as to why we filed in the main case instead

 9    of the adversary, one reason is that's how we've always done it

10    although that's not the most satisfying reason.  And if our

11    associate -- if an associate told me that, I might take issue

12    with that explanation.  But the other is that it provides

13    broader notice because in the main docket --

14              THE COURT:  Sure.

15              MS. MARCUS:  -- it's on the Epiq website.  Everybody

16    sees it.  And part of the effort of -- well, us and the

17    trustee, has been to provide as broad a notice as possible.

18              THE COURT:  Sure.  So I don't have an issue with that.

19    My issue is just with dotting the i's and crossing the t's in

20    the adversary because then if you just look at the adversary

21    docket, you don't see the disposition.  Right?  So you can file

22    it in both places and then all purposes are served.

23              MS. MARCUS:  And then the stipulation of dismissal

24    itself will be filed in the adversary docket.

25              THE COURT:  In the adversary.  Absolutely perfect.
```

1          MS. MARCUS:  If those are all your questions then --

2          THE COURT:  Those are all my questions.

3          MS. MARCUS:  -- then I'm done.

4          THE COURT:  So I will enter the appropriate orders.

5          MS. MARCUS:  Would you like us to revise the order to

6     strike "Partial"?

7          THE COURT:  That would be lovely.

8          MS. MARCUS:  Okay.

9          THE COURT:  All right?

10         MS. MARCUS:  So we'll do that and submit a revised

11    order.

12         THE COURT:  Okay.

13         MS. MARCUS:  Great.

14         THE COURT:  Thank you very much.

15         THE COURT:  Thank you.

16         Okay.  Next we'll turn to the LBI agenda, please.

17         MR. KOBAK:  Good morning, Your Honor.  James Kobak,

18    Hughes Hubbard & Reed, for the SIPA trustee.

19         THE COURT:  Good morning.

20         MS. MARCUS:  Your Honor, on your calendar this morning

21    are three motions.  The first two will be presented by my

22    partner, Michael Salzman, and they involve settlements with

23    various affiliates and entities in Singapore and Hong Kong that

24    are accretive to the estate.  The last thing on our calendar is

25    a very significant motion to allow us to set reserves for

Page 11

1    unsecured claims and allow the trustee to commence interim

2    distributions of at least three billion dollars.  This really

3    marks a very, very major milestone in our liquidation.  It is

4    the result of a tremendous amount of work in analyzing,

5    resolving, negotiating, litigating, mediating, I think, between

6    12 and 13,000 claims totaling tens and tens of billions of

7    dollars.  That work continues even as I speak.  As a result of

8    that work and communications with claimants since the motion

9    was filed, there is not a single real opposition to this motion

10   and all the major creditor constituencies, as well as SIPC,

11   support it.

12          My associate, Megan Grad, has done an absolutely

13   wonderful job of leading our team on this effort.  So it seemed

14   to me it would be fitting for her to present this motion today.

15   And she'll be assisted by Mr. Farrell and Ms. Hoffer who are

16   members of her team.

17          THE COURT:  Very good.

18          MR. KOBAK:  Thank you.

19          THE COURT:  Thank you.  I think it would be best for

20   you to remain sitting.

21          MR. SALZMAN:  Thank you, Your Honor.  I appreciate

22   that.  Michael Salzman from Hughes Hubbard & Reed, attorney for

23   the SIPA trustee in Lehman Brothers Inc.

24          As Mr. Kobak said, we're here seeking approval of two

25   settlements with foreign Lehman affiliates.  I myself was last

Page 12

1    before Your Honor in connection with a settlement we reached

2    with Lehman Brothers Japan.  And now we've reached a settlement

3    with fiduciaries who represent interests of Lehman Brothers

4    affiliates in Singapore and Lehman Brother affiliates in Hong

5    Kong, two separate sets of fiduciaries, one geographically

6    based in Hong Kong, one in Singapore.

7           I'm happy to say that no opposition has been filed to

8    either one.  First -- the first motion up is the Singapore one.

9    That involved six agreements.  They were attached to our

10   motion.  As I said, there's six agreements but they're with the

11   same fiduciaries, just different entities -- legal entities in

12   Singapore.

13          This agreement was the product of international

14   cooperation between us and the Singapore fiduciaries and their

15   attorneys and accountants on both sides.  And it was a long

16   process of reconciliation of books and records by the

17   accountants and also thereafter arms-length negotiation of our

18   points that needed to be compromised.

19          Your Honor has the agreements themselves.  Let me just

20   summarize the key terms.  The trustee is receiving

21   approximately 300 million dollars in exchange -- deriving from

22   two accounts in Singapore that concerned exchange traded

23   derivatives.  The Singapore entities are receiving

24   approximately three million dollars as a general unsecured

25   claim or claims here.  And the trustee's recovery concerning

Page 13

1    the exchange traded derivatives is subject to the dispute with

2    Barclays that's being litigated now in the Second Circuit.  But

3    then -- so Barclays has become a party to this agreement and

4    it's agreeing that this money can be repatriated to the United

5    States on this basis, subject to their rights.  The trustee has

6    reserved for these Barclays contingency and so receiving this

7    money into the Lehman Brothers estate will be accretive to the

8    estate.

9          As set forth in our papers, we think this agreement --

10   set of agreements clearly is in the best of the estate.  The

11   Iridium factors are very easily met in this case.  And so, we

12   ask Your Honor to enter the proposed order with respect to the

13   Singapore settlement.

14         THE COURT:  All right.  Thank you very much.  Does

15   anyone else wish to be heard with respect to LBI's motion for

16   approval of the settlement between the LBI trustee and the

17   Singapore entities?

18         All right.  I quite agree that the settlement easily

19   satisfied the Iridium factors and is in the best interest of

20   the estate and I'm happy to approve it.

21         MR. SALZMAN:  Thank you, Your Honor.  With that, I'd

22   like to move next to the Hong Kong agreement.  It's a single

23   agreement but it does involve multiple entities on the Hong

24   Kong side who will have in common the same set of fiduciaries.

25         This agreement is subject to approval in Hong Kong as

Page 14

1   well as here.  As in the case of Singapore, I can say that we

2   had excellent cooperation between our side and the fiduciaries

3   in Hong Kong and their attorneys.  Barclays was also a party

4   there and other Lehman affiliates around the world also were

5   involved in proceedings in Hong Kong.  So we do appreciate

6   that.

7           There was a process of reconciliation and negotiation

8   that led to this agreement.  And to summarize the key terms,

9   the trustee will be receiving approximately 71 million dollars

10  as a trust claim in the Hong Kong proceedings.  The trustee is

11  receiving an unsecured claim for approximately 16 million

12  dollars.  The Hong Kong affiliates are receiving a general

13  unsecured claim for approximately 233 million dollars from us.

14  And the trustee's trust recovery in Hong Kong is likewise

15  subject to the Barclays litigation contingency but again has

16  been reserved for and is also accretive to our estate.

17          As our papers say, we think we again easily meet the

18  Iridium factors and this is in the best interest of the estate

19  to reach the settlement today and be able to proceed with that

20  settlement.  And so, we ask the Court to enter the proposed

21  order with respect to the Hong Kong settlement.

22          THE COURT:  All right.  Thank you.  Does anyone wish

23  to be heard with respect to the motion to approve the

24  settlement agreement between the LBI trustee and the Hong Kong

25  entities?

1           Okay.  I quite agree the settlement easily satisfies

2     the Iridium factors and clearly is in the best interest of the

3     estate.  And I'm happy to approve it.

4           MR. SALZMAN:  Thank you, Your Honor.

5           THE COURT:  Thank you very much.

6           MR. SALZMAN:  Thank you.

7           THE COURT:  All right.  So that brings us to the next

8     matter which is the motion to establish interim distribution

9     fund and related relief.

10          Good morning.

11          MS. GRAD:  Good morning, Your Honor.  Megan Grad of

12    Hughes Hubbard & Heed for the SIPA trustee.  I've been involved

13    in this case in different capacities since its commencement the

14    most recent of which has been overseeing the general day-to-day

15    administration of the general claim process.  So I'm both

16    personally and professionally gratified to be here before the

17    Court on this very significant motion that will allow us to

18    begin making distributions to unsecured creditors.

19          Specifically, we are asking the Court today for an

20    order capping the maximum allowable unsecured amounts for

21    (indiscernible) unresolved general creditor claims.  Allowing

22    certain unsecured general creditor claims, authorizing the

23    trustee to establish an interim distribution fund of three

24    billion or more for purposes of making an interim distribution

25    to allowed unsecured general creditors and reserving for

Page 16

1    remaining unresolved claims and, finally, authorizing the

2    trustee to make a first interim distribution from the LBI

3    general estate to allowed unsecured creditors with a record

4    date of July 15th.

5            As presented to the Court at the hearing in June on

6    the secured and priority claims reserve motion, the relief we

7    are seeking today is a necessary component of the trustee's

8    overall plan to begin distributions to unsecured general

9    creditors.

10           The first part of the plan was to cap claim amounts

11   and set reserves for secured and priority claims and to

12   authorize the trustee to make a distribution to allowed secured

13   and priority creditors.  That part of the plan was set in

14   motion last month with the Court's order.  As a result, more

15   than 240 million is in the process of being to fully satisfy

16   the allowed claims of secured and priority creditors, the

17   majority of which are former employees of LBI.

18           Now we're here at the second part of the plan.  To get

19   us to the point where we are today, with the Court's help over

20   the years and the advice and oversight of SIPC, the trustee has

21   made significant and historic achievements in the SIPA

22   liquidation and in administering the largest and most complex

23   general estate claims process of any broker-dealer failure.

24           When this liquidation began, it was far from certain

25   that a distribution to general unsecured claims would ever be

Page 17

1    possible.  That we're seeking authority and approval from the

2    Court today to take the necessary steps towards a distribution

3    to unsecured creditors is extraordinary.  The prospect of any

4    meaningful LBI general estate was a welcome development that

5    came about only after major settlements with LBI's affiliates,

6    in particular LBHI and LBIE, Lehman Brothers International

7    Europe, were achieved enabling the trustee to ensure hundred

8    percent distributions to allowed SIPA customer claims.  With

9    those settlements in principle reached towards the end of 2012

10   in keeping with the Securities Investor Protection Act, the

11   trustee began an assessment of general creditor claims.  And as

12   it became clear that customers would receive a hundred percent

13   on their claims with the settlements final, the trustee devoted

14   substantial resources to the general estate claims through the

15   deployment of a strategic plan of pursuing consensual

16   resolution of claims through settlements and voluntary

17   withdrawals, pursuing objections and ascertaining the validity

18   amount of allowed claims.

19          As the Court heard last month, there have been more

20   than 13,000 general creditor claims including reclassified

21   customer claims and administratively split claims asserted

22   against the estate in the amount of 127 billion.  Overall, the

23   trustee has resolved more than 12,000 claims by settlement,

24   withdrawal, order or otherwise.  To date, the trustee has filed

25   more than 250 omnibus objections to claims as well as many

Page 18

1    other individual objections.  There are currently almost 900

2    claims pending before the court and an initial approximately

3    700 outstanding claims remaining to be resolved.  Some of these

4    claims are currently being litigated and mediated and still

5    others will be litigated.

6         We're continuing to work on resolving remaining claims

7    every day and since we were before the Court last month on the

8    secured and priority reserves motion, we've continued to make

9    significant progress.  However, resolving disputed claims

10   inevitably will take time.

11        At the same time, as the Court heard last month, a

12   significant amount of cash is available for the general estate.

13   The LBI general estate currently has three billion dollars

14   available to make both an interim distribution and reserve an

15   appropriate to protect the interests and due process rights of

16   the holders of unresolved claims.  We believe that it is time

17   to begin distributing that money to creditors.

18        However, to accomplish distributions to allowed

19   creditors, the trustee also must protect creditors with

20   disputed and unresolved claims.  Thus, the motion that we're

21   presenting today has two aims.  First, to get money out to

22   allowed unsecured creditors as soon as possible while also

23   protecting claimants who have disputed or unresolved claims.

24   Like the secured and priority reserves motion, this motion is

25   designed to provide the trustee and the creditors of the LBI

Page 19

1    estate with the certainty necessary to begin making

2    distributions.  It does this by establishing final capped

3    maximum amounts for remaining unresolved or disputed unsecured

4    claims and establishing and interim distribution fund for

5    purposes of reserving for remaining unresolved claims and

6    making a distribution to allowed creditors.

7          Second, the motion is designed to protect all

8    creditors' due process rights.  All outstanding general

9    creditor claimants were served with the motion and schedules

10   and have the opportunity to be heard by this Court about the

11   relief sought in the motion.  The trustee also permitted in the

12   motion to working cooperatively with claimants to address any

13   concerns and set up a call center for this very purpose.  With

14   respect to our communications with claimants, we had more than

15   a hundred from claimants into the call center.  In addition,

16   there were many other discussions with claimants outside the

17   call center including discussions right up to submission of our

18   revised schedules with the Court.

19         In most cases, our communications with claimants

20   involved answering questions.  In other cases, we made changes

21   to the schedules to the motion on the proposed order to address

22   their concerns.  Overall, there were only five responses to the

23   motion and four of them have been withdrawn.  Greg Farrell will

24   provide further detail on the responses in just a moment.  And

25   Dena Hoffer is here and prepared to provide an overview of

Page 20

1  changes we made to the revised schedules that we filed on July

2  28th.

3          There's not one single remaining objection to this

4  motion.  There is a reservation of rights which we believe is

5  not -- unnecessary in this context.  But there's no actual

6  objection from any of the thousands of creditors served with

7  and who will benefit from this motion.

8          The ad hoc group of creditors in the holding company

9  by far are the largest creditors representing some fifty

10  percent of our remaining claims, have filed papers in support.

11          Entering this order will benefit creditors.  It's

12  supported by SIPC; it's supported by major creditors of the

13  estate.  If Your Honor has any questions, I'm here to answer

14  them.  Otherwise, we respectfully request that the Court enter

15  the order.

16          THE COURT:  Well, let's take a moment to pause because

17  I think a number of the things that you said are worth

18  emphasizing.  I'm relatively new here.  But I think it's

19  important to note that this is indeed a very historic and

20  important moment in the case.  As you said, when you look back

21  five years, the notion that all customer claims will be paid,

22  the notion that all secured and priority claims would be paid,

23  the notion that there would ever be anything for unsecured

24  creditors was not something that I think many folks

25  contemplated.

Page 21

1          Now we're in a world in which discussions are taking

2    place at very high levels in Congress, the Federal Reserve,

3    other parts of the government about how to avoid another

4    Lehman.  And yet, when you look at the process that occurred

5    here under Judge Peck's watchful eye, and in the hands of

6    people like you, from my perspective at least, the result is

7    indeed extraordinary.  And I think it's important to note and I

8    think it's important for the general public to understand that

9    what this means is that ordinary creditors in fact are going to

10   be getting a distribution.  And that is indeed a Herculean

11   achievement for which I congratulate you and your team and your

12   colleagues and everyone indeed around the world who has helped

13   contribute to the result.

14          So I think it bears special emphasis that this is

15   indeed an extraordinary accomplishment and evidence of how

16   well, in fact, the system works.  Yes, it took five years.  But

17   given the magnitude of the claims and the magnitude of the many

18   complexities involved, I will say it only took five years.  And

19   the fact that you're standing here with their being no

20   objections to the relief requested is evidence of how clearly

21   it's been presented to the general creditor population so that

22   they understand that, in fact, their rights have been

23   protected.

24          So thank you.

25          MS. GRAD:  Thank you.

1          THE COURT:  Did you want to address specifically the

2     reservation of rights?  I think you alluded to it and I share

3     your observation that it's really not your main to the relief

4     that's being requested today.  And accordingly, I find that

5     there's no additional language that needs to be added to the

6     order to address that reservation of rights.

7          MS. GRAD:  I'd like my colleague, Greg Farrell, to

8     talk about it.  If you have any further questions about it --

9          THE COURT:  Well, I'm happy to--

10         MS. GRAD:  -- he's prepared --

11         THE COURT:  I'm happy to hear from him if he prepared

12    something to say.

13         MS. GRAD:  Thank you.

14         MR. FARRELL:  Good morning, Your Honor.  Gregory

15    Farrell from Hughes Hubbard & Reed for the SIPA trustee.  Given

16    what you just said, I'll just say that there were five

17    responses filed to the motion.  Four of them have now been

18    withdrawn.

19         THE COURT:  Right.

20         MR. FARRELL:  The remaining one is the reservation of

21    rights.  That's not a real opposition to the motion --

22         THE COURT:  Right.

23         MR. FARRELL:  -- or the relief requested therein.

24         THE COURT:  That's at docket 9440.  It's the

25    reservation of rights of Mssrs. Chambers, Verghese and Kettler,

Page 23

1    correct?

2            MR. FARRELL:  Correct, Your Honor.

3            THE COURT:  Okay.

4            MR. FARRELL:  We agree with what Your Honor just said

5    that the proposed addition that they requested to the proposed

6    order is not necessary or germane to the motion.  I guess I'll

7    leave it at that.  I understand their counsel is here.

8            THE COURT:  Right.  And their rights are in no way

9    adversely affected by the order and therefore that's yet

10   another reason why there's no language necessary to -- in

11   response to their reservation of rights.

12           MR. FARRELL:  We agree, Your Honor.

13           THE COURT:  All right.  Thank you very much.

14           MR. FARRELL:  Thank you, Your Honor.

15           THE COURT:  All right.  Would anyone else like to be

16   heard with respect to the motion?

17           All right.  I'm happy to grant it.

18           MR. KOBAK:  Thank you, Your Honor.

19           THE COURT:  All right?  There's nothing else, is

20   there?

21           MR. KOBAK:  No.  That concludes our calendar, Your

22   Honor.

23           THE COURT:  Okay.  We're going to take a short break.

24   And then I'll come back and then I have one more matter on the

25   10 o'clock calendar and that's ConnectEdu.  So if you would

Page 24

1    give me ten minutes, we'll turn to that next matter.  Thank

2    you.

3         (Recess until 2:03 p.m.)

4              THE COURT:  All right.  We are here today on the

5    motion of the 341 individual claimants to compel arbitration.

6              Good afternoon.  How are you?

7              UNIDENTIFIED SPEAKER:  Good afternoon, Your Honor.

8              THE COURT:  Would you like to start?

9              MR. LYMAN:  Good --

10             THE COURT:  Do I have someone on the phone?

11             MR. LYMAN:  Yes, you do, Your Honor.  This is Charlie

12   Lyman on behalf of Mr. James Knipp, who is joining in the

13   motion, but he's not part of the group at this point.

14             THE COURT:  All right.  Thank you, sir.

15             MR. SCAROLA:  Good afternoon, Your Honor.

16             THE COURT:  Good afternoon.

17             MR. SCAROLA:  Rick Scarola.  I'm one of the attorneys

18   at Scarola Malone & Zubatov.  My colleague, Alex Zubatov, is at

19   counsel table with me.

20             THE COURT:  All right.

21             MR. SCAROLA:  The motion is (indiscernible - :55),

22   and I try not to go over -- I assume Your Honor --

23             THE COURT:  Please.  I've read everything multiple

24   times.

25             MR. SCAROLA:  Okay.  I mean, in our view, it's as

Page 25

1   compelling a case for arbitration in the bankruptcy context as

2   there might be for the following reasons.  Core or not core,

3   there is still a presumption in favor of arbitration, and it's

4   the trustee's burden for the party opposing arbitration's

5   burden to overcome that presumption, and I don't think they

6   will overcome that presumption here, but cases discuss what the

7   salient factors are in a number of different ways.

8           I've thought about -- since you've -- I expect you've

9   read the papers -- to talk about the salient factors in terms

10  of four.  The first one is the obvious and the one pounded on

11  is the state law issues being the predominant issues and the

12  fact that even Section 501(a) refers to a contractual

13  subordination being something that's to be given effect (sic)

14  in accordance with applicable law here, the law in the state of

15  New York.

16          THE COURT:  But see, that's where there begin to be

17  internal inconsistencies.  Because you say that, but then, one

18  of the big points that you make is that this should be

19  arbitrated by FINRA in accordance with the Constitution and

20  rules of the New York Stock Exchange.  So that's different.

21          MR. SCAROLA:  Is the issue that what's culled (sic)

22  out in the agreement and was the New York Stock Exchange -- I

23  mean, in our view, the jurisdiction of the New York Stock

24  Exchange for arbitrations of this type has migrated to, through

25  the NASD and out to FINRA, as the relevant body.

1           THE COURT:  No, I understand that, but you're --

2           MR. SCAROLA:  If I'm wrong about that, it would go to

3     the relevant body.

4           THE COURT:  You're making a point about -- I think

5     you're making a point about expertise, and the notion that you

6     need a FINRA arbitrator because there are FINRA issues, that

7     these are issues that a FINRA arbitrator has unique expertise

8     in.  It's one of your arguments.

9           MR. SCAROLA:  It's one of them.  I think there are

10    two parts to that.  In general, arbitration versus remaining in

11    bankruptcy court in the face of an arbitration clause --

12          THE COURT:  Right.

13          MR. SCAROLA:  -- when looking at the factor, the

14    considerations of whether state law issues versus bankruptcy

15    issues predominate is simply whether it's FINRA or the AAA or

16    whoever might be called out as an arbitrator, it's that, as I

17    read the cases, is that the issues are not bankruptcy law-

18    specific.  If they were bankruptcy law issues to be applied in

19    considering what is the claim for subordination and our

20    defenses to it such as equitable subordination, which is not at

21    stake in these circumstances because this is purely an argument

22    over contractual subordination.

23          In a contractual setting, it's that the lack of a

24    bankruptcy law-specific issue controlling the specific question

25    --

1              THE COURT:  Well, but even --

2              MR. SCAROLA:  -- is a reason to enforce the

3      arbitration clause.

4              THE COURT:  Even then, one of the first issues that

5      you highlighted is -- and let me be clear.  This is not about

6      the merits.  I want to be clear about this.  We're not talking

7      about the merits, per se.  We're only talking about the merits

8      in the context of whether or not this should go to arbitration

9      or not, but you go into the merits.  So I have to follow you

10     into the merits.

11             And one of the issues that you highlight is big issue

12     -- whether or not this is an executory contract.

13             MR. SCAROLA:  Yes.

14             THE COURT:  Okay?  That's an issue that the

15     bankruptcy court uniquely, uniquely understands, uniquely

16     understands.

17             MR. SCAROLA:  But the case --

18             THE COURT:  Whether or not something is an executory

19     contract is a bankruptcy thing.  It's not a purely state court

20     thing.

21             MR. SCAROLA:  We didn't get into the case law on this

22     point, Your Honor, here, but the case law is to the effect

23     that, whether or not there are continuing duties such as to

24     make this an executory contract is, as we understand the case

25     law, an issue of state law, not an issue of bankruptcy

Page 28

1    jurisprudence, and that would argue for -- call it FINRA, or

2    call it AAA.  To me, arbitration with a small a of any sort,

3    under the prevailing factors and what's discussed in the cases,

4    that, on that particular issue, would argue for an arbitration

5    because it's a common law issue, not a bankruptcy law-specific

6    question as to whether or not this is, in fact, an executory

7    contract in the sense of whether or not there are continuing

8    duties.

9                I don't know if you want to go further into the

10   question of whether there are continuing duties, but, as we

11   read the cases, it is -- yes, bankruptcy courts, of course,

12   deal with executory contracts all the time.  Other courts deal

13   with executory contracts as well, and that particular question,

14   when it comes up in the bankruptcy context, of whether or not

15   any contract happens to be an executory contract is a matter of

16   the state law that governs that contract.

17               THE COURT:  But, I mean, you set up the conversation

18   by reference to the core versus non-core distinction, but you

19   virtually immediately then dismiss it because you -- I mean,

20   what you're saying is that, well, core, non-core, but that

21   really shouldn't be the test.  The test should really be

22   whether it's an issue that's purely a bankruptcy issue as

23   opposed to a state law issue, but that's not the test.  The

24   focus is core versus non-core.

25               MR. SCAROLA:  Your Honor, even if this is a core

1    matter -- and I think, if our papers weren't clear on this, let

2    me try to say it this way, because I think our position is a

3    little different from the way Your Honor has expressed it.

4              Even if it is a core matter -- and let's assume, for

5    the sake of argument, that it is -- the cases still say that

6    there's a presumption in favor of arbitration, and you still

7    have to look at the same factors that I am discussing.

8              THE COURT:  You have to look at whether or not

9    there's a conflict with fundamental principles of bankruptcy.

10             MR. SCAROLA:  And, to do that, I mean, in brief, I

11   think the -- I would identify four in a way different from the

12   way I framed them in our papers, but I think the way to frame

13   what the salient factors are here is the state law specific

14   issues we talked about a moment ago; second, whether this

15   particular dispute is central to this particular bankruptcy.

16             THE COURT:  You don't think that determining the

17   relative priority of similarly situated creditors is an

18   important issue that requires a consistent application and

19   decision as we enter the sixth year of this proceeding?

20             MR. SCAROLA:  It is important to every case.  It is

21   important to this case.  But is it central to this case

22   --

23             THE COURT:  No, but you see, that's what --

24             MR. SCAROLA:  -- in the way --

25             THE COURT:  What you've done is what you've said is

Page 30

1   well, but in every case, the Court has to determine relative

2   priorities.  This is not a case in which we're talking about

3   the liquidation by an arbitration of the amount of someone's

4   claim, a classic arbitration.

5           MR. SCAROLA:  I understand.

6           THE COURT:  Right?  This is an entire host of

7   claimants relying on a particular interpretation of a

8   subordination provision.

9           MR. SCAROLA:  I understand.  And that being the case,

10  the trustee hasn't cited in its papers and we're not aware of

11  any case that says the fact that it's a subordination issue

12  takes it out of the realm of being sent to arbitration where

13  there is a governing arbitration clause.

14          So, in my understanding of those cases, yes, it

15  affects the case as a whole.  Yes, it's important to the

16  bankruptcy, but, in terms of a quantitative analysis, the

17  papers that I've reviewed from the reserve's motion that was

18  heard this morning and the earlier reserve's motion indicate

19  some 20 to 27 billion in general unsecured creditors claims.

20          The amount of client claims that we're representing

21  here are, I expect, based on the back of the envelope, going to

22  be significantly less than one percent of the overall general

23  creditor claims.

24          THE COURT:  But that's not the test, either.  I mean,

25  you --

Page 31

1           MR. SCAROLA:  It is a part of the test, I think, in

2    terms of its centrality to the case as a whole.  I didn't mean

3    to cut Your Honor off, but I think that that is a factor.

4           To distinguish it from a case such as Best Products,

5    which was cited by the trustee, which talks -- it's not an

6    arbitration case, but it talks about subordination being the

7    core issue.  But, in Best Products, the subordination issue

8    there required -- I'm sorry.  The subordination issue involved

9    a settlement that required enforcement of the subordination

10   agreement in, I think, a Chapter 11 context to get everybody

11   onboard.  And, if that didn't happen, the whole thing was going

12   to blow up and not happen.

13          That's certainly central to that bankruptcy.  Our

14   claim, as important as it is to my group of clients, is not

15   central to this bankruptcy in anywhere near the same sense, and

16   I believe that what I just described in the Best Products case

17   is what --

18          THE COURT:  But then, you're suggesting that there's

19   some kind of a dollars test.  So, in other words, if it's only

20   going to affect one percent of the claims pool, you know, then

21   it's not central.  If it's going to affect five percent, it's

22   not central.  Oh, wait, it's getting up around ten percent.

23   Maybe that's a little more central.  That's not a principled

24   distinction.

25          MR. SCAROLA:  I'm arguing that it's part of a softer

Page 32

```
1    test.  I've never seen a case, say, that there is a hard

2    dollars test, and I don't think there is one, because it is, I

3    think, more qualitative than that.

4            If it were less than one percent, but it were in some

5    way like the facts -- and Best Products is the best I can come

6    up with as an analogy right now -- that it somehow was going to

7    impact the bankruptcy in other ways -- or I should say the

8    progress of the case to its conclusion, then the dollar amount

9    or the percentage amount, I think, wouldn't matter.

10           But here, this is an issue in a box, if you will.  I

11   mean, it's a contained issue.  It's either going to be a

12   determination that there is or is not subordination.  It's not

13   going to affect the progress of this case, which, as I

14   understand it, will go on another three to five years.  A

15   resolution in a bankruptcy is going to be faster, cheaper, more

16   efficient than under the federal rules.  It's not a comment on

17   this Court.  It's a comment on litigation, as I understand it,

18   under the federal bankruptcy rules (sic).

19           THE COURT:  Resolution in a bankruptcy or resolution

20   in arbitration?

21           MR. SCAROLA:  Resolution in a bankruptcy -- I'm

22   sorry.  I misspoke.

23           THE COURT:  You misspoke.

24           MR. SCAROLA:  The resolution in an arbitration.  I

25   apologize.
```

1           THE COURT:  Okay.  Well, let's talk about that,

2   because I don't think I agree with you on that, either.  If the

3   matter doesn't go to arbitration, then the trustee can file a

4   motion for summary judgment in ten days, and I'll hear it, and

5   we'll be done.

6           MR. SCAROLA:  I don't think that is the kind of

7   efficiency that the cases talk about.  That's not even an

8   argument that the trustee --

9           THE COURT:  Well, --

10          MR. SCAROLA:  -- has made.  The cases don't talk

11  about whether or not the case can be over because of a motion,

12  and I don't know that --

13          THE COURT:  One of your arguments --

14          MR. SCAROLA:  -- they can --

15          THE COURT:  -- is that it's going to be more

16  efficient to go to arbitration, and I'm suggesting to you that

17  that's not -- that the facts are not consistent with that, that

18  this is a matter of contract interpretation where there is

19  language that one might argue is plain on its face and that,

20  therefore, would be amenable to a summary disposition on a

21  summary judgment motion.  We're not there yet because we're

22  here first, and I have to decide whether or not send it to

23  arbitration or not.

24          But, to the extent that one of the factors is

25  efficiency, you make these arguments.  You say it's just

Page 34

1    indisputably going to be much quicker and much cheaper to go to

2    arbitration, and I don't agree with that.

3              MR. SCAROLA:  Your Honor, there is no party that's

4    standing before you in any case where there's potential for

5    arbitration where the same couldn't be said that Your Honor

6    could make the decision on a motion faster and more swiftly

7    than might be made in arbitration.  That would take every

8    arbitration -- unless this is going to be predetermined or

9    prejudged to be one that --

10             THE COURT:  I'm just --

11             MR. SCAROLA:  -- shouldn't go forward through

12   discovery.

13             THE COURT:  I'm just --

14             MR. SCAROLA:  Every arbitration has --

15             THE COURT:  I'm just asking -- I'm just responding to

16   your argument.  Your argument is it'll be faster and easier to

17   do it in arbitration, and I don't believe that that's true in

18   this case.

19             MR. SCAROLA:  And I guess I have, as my answer to

20   that, if I may, I don't believe it's within the permissible

21   factors for the Court to look into the possible motion that

22   could be made to decide I might well dismiss this case --

23             THE COURT:  Okay.  So --

24             MR. SCAROLA:  -- based upon any record, much less

25   this one.

1          THE COURT:  Now you're putting words in my mouth.  I

2    am merely responding to the fact that you make an argument

3    somewhere in these papers that it'll be much faster to go to

4    arbitration.  Am I mistaken?

5          MR. SCAROLA:  That is our argument, yes.

6          THE COURT:  Okay.  And I am responding to that

7    argument by saying that it ain't necessarily so.

8          MR. SCAROLA:  It is possible that, if for other

9    reasons, Your Honor ruled that this case does not go to

10   arbitration, they could make a motion -- I don't think they

11   could make a sound motion.  It's too early.  It has to be a

12   summary judgment at this point -- motion at this point.

13   They've already relied on matter outside the record, and I

14   think the kinds of arguments that they've articulated on merits

15   --

16          THE COURT:  But --

17          MR. SCAROLA:  -- issues necessitate --

18          THE COURT:  What have they relied on that's outside

19   the record?

20          MR. SCAROLA:  Well, their affidavit has a stack of

21   papers outside the record, which I don't think they're

22   ultimately going to be relevant to what should be the issues on

23   the successorship point.

24          THE COURT:  So this is just a legal issue.  Again, we

25   might be talking about the merits, but I'm not considering the

1    merits today, only insofar as they relate to whether or not

2    this should go to arbitration.

3             MR. SCAROLA:  In this context, it's hard for me not

4    to say I don't see how a summary judgment motion on fact-

5    intensive questions could be resolved at this early stage

6    without there being discovery.  And, if Your Honor disagrees --

7             THE COURT:  But --

8             MR. SCAROLA:  -- in particular, I'd love an

9    opportunity to talk about that in relation to the particular

10   defenses we've raised.  As a matter of theory, yes, of course,

11   as a matter of theory, that decision could happen.  Could that

12   same decision happen in an arbitration just as swiftly?  I

13   don't think that's in this record.  I don't

14   know.  I mean, I'm not in a position to be --

15            THE COURT:  I'm merely responding to an argument that

16   you made.  You argued in your papers that it'd be faster to go

17   to arbitration.  The reason you made that is because you wanted

18   me to consider that in support of your position.  That's why I

19   raised it.  We can move on to another point.

20            MR. SCAROLA:  Well, I mean, if I just may, I don't

21   know that anybody could say on this record, and I don't know

22   the answer whether the same kind of motion, if it were viable,

23   couldn't be made in an arbitration context, and, if it could be

24   made, then that doesn't make it faster or less fast.  And, when

25   we've talked about the ability to get through an arbitration

Page 37

1    more efficiently and swiftly than a full litigation under the

2    federal rules of bankruptcy procedure and the federal rules of

3    civil procedure, that adverts to the general proposition the

4    extent to which discovery is broader, depositions are broader,

5    timelines are often broader under the two sets of federal rules

6    that would apply here.

7            And, in an arbitration, whether it's FINRA or whether

8    it's the AAA, whether it could ultimately be some other forum

9    that the parties could agree to, if you directed arbitration,

10   it is in all likelihood and in most, I think, practitioners'

11   view and most courts' view, a faster line from point a to the

12   end of the case than leaving aside the possibility of some

13   early motion for a resolution.  And I guess --

14           THE COURT:  So did you finish your presentation of

15   the factors that you think that --

16           MR. SCAROLA:  Well, you know, I --

17           THE COURT:  -- would inform my discretion to not

18   allow this to go to arbitration?

19           MR. SCAROLA:  I think the fourth that I would have

20   mentioned or would like to mention is the prospect of delay as

21   an issue.  Sending this to arbitration will not delay the

22   conclusion of this bankruptcy case.  It's a factor cited in

23   cases of this type frequently where the case is simply not as

24   large and closer to a resolution.

25           This case would be resolved in an arbitration far

Page 38

1    sooner than the bankruptcy as a whole would be concluded.  In

2    addition, in a bankruptcy, obviously, there are rounds of

3    appeal leaving aside the costs that adds another two, two-and-

4    a-half years, as I understand what the progress of two rounds

5    of appeal would be.

6            And, leaving aside the limited rights of appeal in a

7    bankruptcy -- in arbitration context, you simply don't have

8    that.  So, in terms of expedition and costs in that regard,

9    there is more certainly of a definitive result on a faster

10   track and, in fact, one more certain and swifter than many

11   round.

12           If all this were to be done by motions and rounds of

13   appeal, we would be at this much longer than if we had a

14   definitive decision in an arbitration.  And, in terms of

15   rounding out the factors, I think those are the salient factors

16   as we understand them.

17           THE COURT:  But isn't your description of the core,

18   non-core issue -- I think it falls a little short.  Because, as

19   I am reading your papers, one of the themes on the merits is

20   there's an agreement entered into in 1985 that, for whatever

21   reason, was never freshened up.  Right?  We're talking about a

22   1985 agreement --

23           MR. SCAROLA:  Yes.

24           THE COURT:  -- with an entity called Shearson.

25           MR. SCAROLA:  Yes.

1          THE COURT:  Right?  And the exercise that you want to

2   go through with an arbitrator is to demonstrate that, in some

3   places where it says Shearson, it just means Shearson, not its

4   successors, not this debtor, not LBI.  But, in other places, it

5   means LBI.  You want --

6          MR. SCAROLA:  No.

7          THE COURT:  -- a claim against LBI, but you don't

8   want a subordination LBI.  You just want --

9          MR. SCAROLA:  No, that is not our argument,

10  Your Honor.

11         THE COURT:  It absolutely is your argument.  In fact,

12  you say that, for the purposes of the obligations, you

13  distinguish between rights and obligations.

14         MR. SCAROLA:  That's because the contract does.

15         THE COURT:  Lehman doesn't get --

16         MR. SCAROLA:  We're not picking and choosing.  The

17  contract does.  And it's in that respect that I am disagreeing

18  with Your Honor's characterization of our argument.

19         THE COURT:  But embedded in that is the fact that you

20  are asking for a determination of whether or not LBI and

21  Shearson are the same -- LBI is a successor of Shearson,

22  correct?

23         MR. SCAROLA:  We are defending a claim to

24  subordination on the grounds the contract relied upon the

25  trustee advisably used the word --

1              THE COURT:  That's not my question.

2              MR. SCAROLA:  -- successor in some places.

3              THE COURT:  My question is --

4              MR. SCAROLA:  And that determination would, in fact,

5     be --

6              THE COURT:  Yes.

7              MR. SCAROLA:  -- that once Shearson --

8              THE COURT:  Yes.

9              MR. SCAROLA:  -- transmogrifies (sic), for lack of a

10    better word, into a successor as the case law understands what

11    a successor is --

12             THE COURT:  Right.

13             MR. SCAROLA:  -- the subordination provisions do not

14    apply --

15             THE COURT:  Okay.  But you're still not answering my

16    question.

17             MR. SCAROLA:  -- to this obligation.

18             THE COURT:  One of the things that you want me to

19    determine is whether Shearson and Lehman, for certain purposes

20    under this contract, are one in the same.

21             MR. SCAROLA:  In effect, that would be not for

22    purposes of this motion, but for purposes of our defense.

23             THE COURT:  Yes.

24             MR. SCAROLA:  That would be --

25             THE COURT:  Okay, right.

Page 41

1          MR. SCAROLA:  -- a characterization of one of the

2    issues.

3          THE COURT:  Right.  It's a pretty core issue,

4    determining who LBI is, who LBI was, who it's a successor of.

5    Nothing could be really more core for a bankruptcy court than

6    determining historically and as a matter of juridical contours

7    who the debtor is and who the debtor was, what its obligations

8    and rights are.  That's like the whole ball of wax.

9          MR. SCAROLA:  Your Honor, I don't think --

10          THE COURT:  That's what you are asking.  In footnote

11    ten in your papers, you, in fact, say that you want to go

12    through all the parts of the agreement and determine in which

13    places Shearson just means Shearson and in which places

14    Shearson means Lehman.  And that strikes me as being a pretty

15    big issue and one that one could argue a bankruptcy court and

16    not a FINRA arbitrator ought to decide.

17          MR. SCAROLA:  Your Honor, I do not think that that's

18    an issue that, as far as I'm aware, would affect any other part

19    of this bankruptcy case, because it has to do with something

20    unique as to what happened in 1985.  Now, I know that there are

21    in the records and in the record of this case four other

22    deferred compensation agreements relatively contemporaneous,

23    but I think I refer to that in the papers, with the one that's

24    at issue here.

25          In those agreements, the word successor was used

Page 42

1    advisedly there to describe what the entity is and where there

2    would be subordination down the road.  In our agreement, we

3    don't have to pick and choose, because it's a clear roadmap

4    that the word successor is not used to define the entity or the

5    debt where there would be subordination, but it is used in a

6    clear pattern advisedly in other places, some having to do with

7    clawbacks, some in the very final paragraph, which talks about

8    a successor will continue to owe this money.

9            And, in doing an analysis of that, those are state

10   law contract questions.  Is it central and core to this

11   bankruptcy?  I respectfully disagree that it is at this point

12   in the sense of who the debtor is.

13           There's no question as to who the debtor is, and, for

14   all material purposes, the kind of analysis that's necessary to

15   answer the question we posed in our second defense is

16   impertinent to anything else in this bankruptcy as far as it's,

17   at least, hit my radar.  It's possible that there is some

18   issue, but I don't believe that there is.

19           I think it's a one off, if you will, as far as the

20   rest of the bankruptcy case.  So is it any different from any

21   other state law contract interpretation question?  I don't

22   believe so.  I mean, let me just focus on that for a moment.

23           I believe it is a FINRA issue, because this was the

24   largest industry -- I mean, at the time, it was the New York

25   Stock Exchange arbitration.  This is the largest, I believe,

Page 43

1  deferred comp. plan, and it's going to be the last, because

2  this was being done and many companies were doing an agreement

3  -- I mean, a deferred comp. plan of this type in anticipation

4  of the rate and tax law changes that were about to come into

5  effect.

6          The numbers of people are obvious.  The dollars are

7  significant.  The people who were drafting the plan were -- and

8  the outside lawyers as well as the in-house people who were

9  working with this are senior officers.  As it happens, they're

10  also in the plan.

11          To some extent, it is --

12          THE COURT:  We're getting extremely far afield.  So -

13  -

14          MR. SCAROLA:  I am getting into the merits, but I

15  think it's part of the question that's posed here as whether or

16  not this is a fact-intensive one-off question or whether this

17  is something central to this particular bankruptcy case.

18          I have a group of clients, including the people who

19  proposed, argued for, sold to other members of the group, and

20  largely structured with counsel this plan.  Call it the magic

21  words of successorship are not in here where it ought to be.

22  Where it was in four other agreements that were done in the

23  same timeframe.

24          THE COURT:  We are now not just waiting in -- you're

25  now arguing the interpretation of the subordination clause.

Page 44

1          MR. SCAROLA:  I am.

2          THE COURT:  So I really don't want to do that today.

3          MR. SCAROLA:  I am, but I'm doing that for the sake

4   of saying you can't make a determination like that without the

5   full development of the factual record.

6          THE COURT:  Or --

7          MR. SCAROLA:  But, more than that, our clients

8   bargained for an industry arbitration of that issue.  An

9   industry arbitration meaning the arbitrating body that

10  regulated this entity.  I mean, it's common parlance associated

11  persons, broker/dealers.  These kinds of issues were

12  specifically called out for arbitration in 1985 about an issue

13  that, by its nature, wasn't going to come up for 20 or 50

14  years, that could be important, because this was expected to be

15  the significant part of people's retirement income down the

16  road.

17          When they bargained for arbitration, they did it in a

18  context where this agreement was being written to deal with the

19  net capital requirements, to deal with Shearson as it was then

20  understood, to deal with the subordination issue in a way that

21  other deferred comp. plans didn't.  So, when they said

22  arbitration of the subordination questions, there's special

23  reason to give credit to them, because the parties were saying

24  if there's a bankruptcy as well as similar scenarios -- if

25  there's a bankruptcy, what's subordinated and what's not ought

Page 45

1    to get decided in the context of what we understand to be the

2    arbitration overseen by the body that regulates all of us.

3            That was what was happening.  That's real.  That's in

4    the papers.

5            THE COURT:  No, but what you're saying --

6            MR. SCAROLA:  And it's on --

7            THE COURT:  But what you're saying is actually

8    inconsistent with that, because what you're saying is that when

9    Shearson ceased being Shearson, the subordination fell away.

10           MR. SCAROLA:  The subordination fell away, but --

11           THE COURT:  So that's entirely inconsistent with the

12   notion that, in 25 years later when there was -- 30 years later

13   when this was this bankruptcy proceeding, there was then going

14   to be an arbitration over subordination.  That's different from

15   what you just said.

16           MR. SCAROLA:  The reason it's not inconsistent is

17   because the obligation persists in the successor, according to

18   paragraph 11, which is on page 18, but the --

19           THE COURT:  Okay.  We are not only into the merits, -

20   -

21           MR. SCAROLA:  -- subordination provisions do not.

22           THE COURT:  -- but you've now given me an evidentiary

23   hearing.  So we're going to dial this way back to what the

24   issues are, and I'm going to ask the trustee to respond to your

25   arguments, and you can have some further time on reply.

1            All right?

2            MR. FITZPATRICK:  Good afternoon, Your Honor.

3            THE COURT:  Good afternoon.

4            MR. FITZPATRICK:  James Fitzpatrick, from Hughes

5    Hubbard, for the trustee.

6            THE COURT:  So why isn't Mr. Scarola right?

7            MR. FITZPATRICK:  Pardon me, Your Honor?

8            THE COURT:  Why isn't he right?

9            MR. FITZPATRICK:  Because there -- the case law's

10   clear.  There are two factors.  The first is whether it's core,

11   and the second is whether there is a conflict.

12           On the issue of whether it's core, I don't think it's

13   an issue of even if it's core, we can assume it's core.  I

14   think the Second Circuit law is clear that, not only is this --

15   is a subordination issue core, it's absolutely central.

16           In in re: Best Products, referring to Section 510 of

17   the code, which enforces subordination, and an additional,

18   though not referred to here, 726(a), which requires the trustee

19   to take account of subordination, in re: Best Products called

20   it fixing the order of priority of creditor claims against a

21   debtor is an integral and historic bankruptcy function.  And

22   the Second Circuit then also cited with approval of the

23   bankruptcy court stating, "It is hard to imagine an issue that

24   is more at the heart of the bankruptcy process than is this."

25           So I don't think it's an issue of assuming that it's

Page 47

1    core.  I think that, not only has it met the first prong, but

2    that prong weighs very heavily in favor of not arbitrating

3    these claims.

4            Moving on to conflict, I think that --

5            THE COURT:  Well, but what about the argument that,

6    you know, this is just, you know, a little, tiny piece of the

7    creditor pool and, therefore, it just won't matter?  I mean, in

8    other words, I think the argument that the way Mr. Scarola put

9    it in his papers, which is, of course, compelling on a human

10   level --

11           MR. FITZPATRICK:  Yes.

12           THE COURT:  Although I'm not so sure relevant on a

13   legal level -- is that this may be core to the debtors, but

14   there is nothing that could be more core to the folks who agree

15   --

16           MR. FITZPATRICK:  Yes.

17           THE COURT:  -- to take this deferred compensation.

18   So why isn't that compelling, that, you know, we're -- you

19   know, there's this giant LBI proceeding, and this is just this

20   little piece, and it won't move the dial, I think, was the

21   expression.

22           MR. FITZPATRICK:  Yes.

23           THE COURT:  And I think on the numbers, I mean, I

24   think that's true.  It's not going to move the dial.

25           MR. FITZPATRICK:  Yes.

Page 48

1          THE COURT:  Right?

2          MR. FITZPATRICK:  Yes, that's true, Your Honor, and

3     I'm not disputing for a second the importance of this issue to

4     the claims at all, of course, but that's not the test.  The

5     issue is whether is it a core bankruptcy function and a core

6     bankruptcy court function to determine the priority of the

7     claims.  And the case law is crystal clear that it's not just

8     core, but central, and there's just not a dollar value test to

9     it.  That's not the relevant factor to be applied.

10          And it's also -- I mean, the issue of -- the

11    importance of the issue to the claimants is not a reason for it

12    to be arbitrated, we submit.  I mean, it's an important issue,

13    but it's still important that it still be heard in the right

14    forum, and we'd say on an issue as core as this --

15          THE COURT:  Well, clearly, the determination -- I

16    mean, the elephant in the room is the assumption that an

17    arbitrator is going to rule in favor of the claimants and that

18    this Court is not going to rule in favor of the claimants.  I

19    think that's the elephant in the room.

20          I'm not saying anything that's surprising or

21    untoward.  A party always wants to go to the forum that thinks

22    it's going to be the most favorable.  I mean, I don't think

23    it's a question of whether this Court or some arbitrator will

24    better understand the issues.  And I didn't hear Mr. Scarola to

25    be making those arguments.  So -- right?

1          MR. FITZPATRICK:  I didn't hear him to make those

2     arguments, either.

3          THE COURT:  Yeah.  But, you know, in their view, they

4     bargained for a compensation package.  They agreed to take this

5     deferred compensation explicitly on the understanding that, if

6     and when push came to shove, they'd have a right to arbitrate.

7          MR. FITZPATRICK:  Well, there's two points on that,

8     Your Honor.  The first is it's not a question of whether the

9     arbitration clause on its terms would cover this.  If the

10    arbitration clause weren't applicable, we wouldn't be here.

11         THE COURT:  Uh-huh.

12         MR. FITZPATRICK:  All of the cases have arbitration

13    clauses that are applicable.

14         THE COURT:  Right.

15         MR. FITZPATRICK:  And then, the question becomes

16    whether, under the two-prong test, Your Honor should

17    nonetheless hear it, and we say that it should.  I do think, on

18    the issue of the arbitration clause itself, it's not just a

19    bankruptcy-related arbitration clause.  There are a lot of

20    different prongs that could have triggered it, many outside the

21    context of bankruptcy.

22         We're not talking about a situation where they -- at

23    least on the face of the document, it looks as though they were

24    bargaining only for a bankruptcy-related situation.  But, even

25    if they were, we would submit that's not the relevant test,

Page 50

1   because again, all of the cases have applicable arbitration

2   clauses.

3           And so, on the two prongs, Your Honor, first we'd say

4   the core prong clearly weighs in favor of no arbitration.  In

5   terms of the conflict, taking such a core issue of the

6   bankruptcy from the legal perspective and sending it to

7   arbitrators, specifically when the only issue going to the

8   arbitrators would be the question of whether or not these

9   claims are subordinated.  So we'd submit that just sending an

10  issue that's that central to bankruptcy law and bankruptcy

11  procedures to arbitrators is a conflict.

12          And if Your Honor had seen the papers in the cases,

13  the types of cases where courts in this circuit have not sent

14  things to arbitration include declaratory judgment actions

15  against insurance companies to bring money into the state, the

16  issue of whether a painting that was consigned to the debtor

17  was appropriately property of the estate.  We'd submit

18  certainly the issues here are every bit as much of a conflict

19  as any of the issues where Second Circuit courts have denied

20  arbitration.

21          And the one Second Circuit case, I believe, that the

22  claimants cite, the MBNA case, where arbitration did go

23  forward, we think is clearly distinguishable because there the

24  debtor had been discharged already.  So there really wasn't the

25  issue of the impact on the estate.

1           And the last thing I'd note, Your Honor, on --

2           THE COURT:  Well, I think Mr. Scarola --

3           MR. FITZPATRICK:  Yes.

4           THE COURT:  -- is kind of making the argument that

5   that's not dissimilar to here, because for a number of reasons.

6   One, the huge size of the pool and how this isn't going to move

7   the dial and the case is just going to be rolling on for

8   another three to five years anyway.  So I think -- not to put

9   words in Mr. Scarola's mouth, but I think that's why he thinks

10  that that is applicable.

11          MR. FITZPATRICK:  Understood, Your Honor.  And the

12  two points -- and again, I don't think the test is monetary.  I

13  think the test is whether it's a core bankruptcy issue or not.

14          And secondly, we do have certainly what we think and

15  what Judge Peck put in place and what Your Honor is continuing

16  to operate a very efficient claims procedure that we do think

17  can get through these quickly and efficiently.  Now, it is true

18  that, at the claimants' request, the subordination part of this

19  case is procedurally an adversary proceeding, and we did agree

20  to that.  But nonetheless, this will, once that issue is

21  determined, will again be part of the claim process, which we

22  think is an efficient process that will move forward quickly.

23          And, unless you have --

24          THE COURT:  Okay.

25          MR. FITZPATRICK:  -- questions, Your Honor, that's

Page 52

1   all I have.

2           THE COURT:  Okay.  Thank you.

3           MR. FITZPATRICK:  Thank you, Your Honor.

4           THE COURT:  Mr. Scarola, anything more you'd like to

5   talk about?

6           MR. SCAROLA:  The standard Mr. Fitzpatrick talks

7   about, even in his papers, is the requirement that there be a

8   severe conflict.  I don't believe that he has articulated a

9   severe conflict that meets that test.

10           Talking about the Best Products case in which he

11   alluded to in his presentation, I spoke about, it's a wholly

12   different kind of context where that subordination issue, which

13   wasn't even exactly a subordination issue, was going to blow up

14   a Chapter 11 reorganization or not.  This is --

15           THE COURT:  I think the disconnect is looking at the

16   conflict in a kind of pure intellectual sense, right, the

17   importance of the bankruptcy court ordering the priorities

18   among creditors.  That's a biggy.  I mean, that's one of  the,

19   you know, top five things that the bankruptcy code imposes in a

20   bankruptcy process versus the way you're looking at it.  You're

21   looking at it much more in terms of the practical effect.

22           And what you're saying is that, even if it's a biggy,

23   even if it's a really big conceptual conflict, in this case, it

24   doesn't matter.  It's not going to change the outcome, impede

25   the progress, and that, therefore, the trustee in this case

1     shouldn't win the issue on is there a severe conflict, because

2     we're just a bunch of little folks in this big case.

3               I think that's where the two of you kind of are going

4     to have to agree to disagree.  I think that's it.  Doesn't that

5     sound right?

6               MR. SCAROLA:  Well, you'll tell us what you decide

7     the answer is, I think, but if I could take up what I think is

8     implicit in what Your Honor is saying?

9               THE COURT:  Sure.

10              MR. SCAROLA:  Is that, if it's subordination, it

11    ain't going to arbitration is somewhat implicit as a --

12              THE COURT:  Well, but let me --

13              MR. SCAROLA:  -- rule, because it's in what you

14    described as the top five.

15              THE COURT:  -- give you a different example.  Let me

16    give you a different example.  If, for example, the question

17    was liquidating the amount of a claim, right, under FINRA

18    arbitration, I don't think they could make that argument,

19    right?  But here the question is that the, you know, place of

20    the claims in the capital structure of the debtors amongst

21    thousands and thousands of other creditors, including thousands

22    and thousands of similarly situated, equally aggrieved former

23    employees who, you know, if I had a magic wand or a money

24    printing press, it would make my job a lot easier.

25              But one of the really difficult things about this

Page 54

1   case is hearing from all the employees who served for so many

2   years and are now coming up short.  So I want you to -- so

3   that's kind of the conflict that I have, to apply the law in an

4   appropriate way against the backdrop of fully understanding,

5   you know, what the stakes are, you know, for everybody, most

6   particularly, of course, the individuals.  So I don't want you

7   to think that I'm not focusing on that, because I have.

8           MR. SCAROLA:  I understand that, but if I may just

9   return to the point about --

10          THE COURT:  Sure.

11          MR. SCAROLA:  -- whether subordination, in general,

12  is so core a concept that is it the case that if subordination

13  is involved, and it's the order and priority of the claims,

14  would there never be then a situation where an arbitration

15  clause should be enforced?

16          THE COURT:  No, but that was my point is that I don't

17  have to decide all those other cases that maybe where it would

18  be appropriate.  Just yesterday, I issued a decision on a

19  subordination issue, issue of first impression under 510(b).

20  So I think last week or last month I issued another issue about

21  subordination.  I mean, it's the bread and butter of what this

22  Court has to do is the sorting of the claims among the

23  priorities.

24          So might there be one somewhere?  Sure, but that's

25  not what I have to decide.

1           MR. SCAROLA:  In deciding the case that you issued

2    the order on yesterday or the day before -- I'm lost in this

3    week at this point -- I mean, I read that decision, and what

4    you were construing was a novel issue under Section 510(b), as

5    I understand it.  That's a bankruptcy issue.  And, under the

6    prevailing test, that belongs here.  There wasn't even an issue

7    of arbitration, as I understand it, but that belongs here.

8           If you were to rule against this motion on the ground

9    that it involves subordination and that's so core and so

10   central that you have to keep it because it's subordination,

11   then, given how tangential to the rest of the case this is and

12   how unaffecting to the rest of the case this is, that will

13   serve as a precedent for the concept that, if it's

14   subordination, it ain't never going to arbitration.  You're not

15   going to have to make that ruling, because those cases aren't

16   in front of you.

17          THE COURT:  Ah, I don't -- yeah, I don't think -- you

18   know, lawyers can make whatever argument they decide to make,

19   but I don't think that that necessarily --

20          MR. SCAROLA:  There is no issue that we're going to

21   litigate when we get into the facts of what this agreement

22   says, why it says it, and how it got there, assuming it is

23   ambiguous -- I don't believe it could be construed on a motion

24   against us.  I think it could be construed for us.  We'll find

25   out if we stay here and have that kind of motion practice.

Page 56

1          I think in all likelihood that motion on the

2    successorship issue results in a determination that there needs

3    to be discovery, and that discovery includes classic state

4    court parole evidence, a whole big, long, deep inquiry into

5    something that happened 30 years ago where both sides get to

6    explain why this is written the way, seamlessly against

7    subordination, in our view, and different from all the

8    contemporaneous agreements done by the same people and the same

9    law firm.  That is the kind of morass that I don't think the

10   bankruptcy courts are intended to get into if there isn't

11   something about that dispute that's central to the bankruptcy.

12          THE COURT:  Really?

13          MR. SCAROLA:  If it is not central to the bankruptcy

14   -- I mean, obviously, I'm talking about the context of where

15   there's an arbitration involved.  You deal with those disputes

16   all the time, by their nature.

17          THE COURT:  Morasses of --

18          MR. SCAROLA:  Morasses of all sorts.

19          THE COURT:  All the time.

20          MR. SCAROLA:  But I meant -- and I think it's in

21   context clear I'm talking about where there's an arbitration

22   clause and where there is a forum that the parties selected to

23   parse that it should be parsed there, not because this Court is

24   not good enough.  That was one of the points you discussed, in

25   effect, with Mr. Fitzpatrick.  Not because we think we have a

Page 57

1    better chance of winning or losing.

2           Because by going to arbitration, we waive those two

3    rounds of appeal.  And all of these issues, if they're to be

4    decided on motion, get reviewed in two different places.

5           THE COURT:  Right.

6           MR. SCAROLA:  We come in here seeking arbitration

7    after significant deliberation not about which way Your Honor

8    is going to rule because we don't know, but about our own views

9    of expediency, what can be afforded, and what did the parties

10   bargain for.  And, if the parties bargained for that

11   determination, --

12          THE COURT:  Right, but --

13          MR. SCAROLA:  -- and it's not going to hurt the rest

14   of this case, --

15          THE COURT:  -- again, you know, it's always going to

16   be the case that, in this type of situation, there's an

17   arbitration clause and the question is whether to honor it or

18   not.  So saying that the parties bargained for it doesn't

19   really advance the ball.  There is an arbitration clause.

20          MR. SCAROLA:  Fair enough.  I agree.

21          THE COURT:  The trustee acknowledges that there is an

22   arbitration clause.  The reason we're here is to decide whether

23   or not bankruptcy should trump arbitration.  That's it, plain

24   and simple.

25          What I would like to do is take a little recess and

Page 58

1    try to give you a decision, but I'd like to come back at 3:00.

2    So would you mind waiting?

3            MR. SCAROLA:  No, of course not.

4            THE COURT:  All right.  All right.  We'll go back on

5    the record at 3:00.  Thank you.

6        (Recess at 2:48 p.m.)

7        (Reconvened at 3:01 p.m.)

8            THE COURT:  All right.  Please have a seat.

9            All right.  Thank you both for the presentations and

10   the materials.  Let me give you a decision.

11           The trustee filed six separate omnibus objections,

12   the 112th, the 113th, the 114th, the 138th, the 147th, and the

13   189th omnibus objection to general creditor claims seeking to

14   subordinate 437 general creditor claims asserted by 401 former

15   employees seeking deferred compensation pursuant to the

16   executive and select employees' plan, or the ESEP plan.

17           In 1985, each claimant signed an agreement with

18   Shearson Lehman Brothers, Inc. setting forth the terms of the

19   plan.  The trustee asserts that, pursuant to the express

20   subordination language set forth in paragraph nine of each

21   agreement, each claimant agreed that his or her benefits would

22   be subordinated to payment in full of LBI's unsubordinated

23   obligations.   Three hundred and forth-eight of the claimants

24   opposed, either formally or informally, the relevant omnibus

25   objection.

Page 59

1          After a hearing on the motion of the trustee with

2     opposition by a group of 341 claimants, referred to as the

3     claimants, represented by common counsel, the Court entered an

4     order dated April 1st, 2014 at ECF 8576 converting the omnibus

5     objections into a consolidated adversary proceeding and deeming

6     specific provisions of the omnibus objections sufficient in

7     lieu of an adversary complaint.  Pursuant to the same order,

8     the Court expunged the claims of the 53 claimants who did not

9     respond to the relevant omnibus objection.

10          The claimants filed their answer to the converted

11    complaint on April 29th, 2014.  The answer alleges as an

12    affirmative defense in paragraph 102 that, quote, "The

13    trustee's effort to seek subordination in this case are subject

14    to a requirement by the parties' contract that the issue

15    presented be resolved by mandatory arbitration," end quote.

16          On June 3rd, 2014, the Court entered an agreed case

17    management and scheduling order at ECF 9033 setting June 6th,

18    2014 as the deadline for the claimants to file a motion to

19    compel the arbitration of the issues in the adversary

20    proceeding.  The claimants timely filed the instant motion

21    seeking to, one, compel arbitration of the issues presented in

22    the adversary proceeding pursuant to the arbitration clause in

23    Section 5.1 of each agreement and, two, stay the adversary

24    proceeding pending the final outcome of the arbitration.

25          Each of Mary Camilli-Bernat and James Knipp

Page 60

1    proceeding through counsel, and Johnathan H. Lang, proceeding

2    pro se, has joined in the motion.  In addition, on July 22nd,

3    2014, counsel to the claimants filed a second supplemental

4    notice of appearance stating that the claimants now comprise

5    344 individuals.

6           The trustee opposes the motion and submits that this

7    Court is the appropriate forum for this proceeding.  The

8    arbitration clause provides relevant part that, quote, "Any

9    controversy arising out of or relating to the subordination

10   provision of paragraph nine of each agreement shall be

11   submitted to and settled by arbitration pursuant to the

12   constitution and rules of the New York Stock Exchange and that

13   Shearson and employee shall be conclusively bound by such

14   arbitration."

15          The claimants argue that, one, there is a strong

16   presumption in favor of arbitration and, two, LBI will not be

17   prejudiced by enforcement of the agreements' express

18   arbitration clause.  The trustee counters that it is well

19   within the Court's discretion not to mandate arbitration based

20   on a clause like the one at issue, particularly where, as here,

21   the issue of claims subordination clearly is a core bankruptcy

22   issue and arbitration runs the risk of direct conflict with the

23   purposes of the bankruptcy code.

24          The Court agrees with the trustee and will deny the

25   motion.  The Federal Arbitration Act provides in pertinent part

1    that arbitration agreements, quote, "shall be valid,

2    irrevocable, and enforceable save upon such grounds as exist at

3    law or in equity for the revocation of any contract," 9 U.S.C.,

4    Section 2.  By this provision, the Federal Arbitration Act

5    establishes, quote, "A federal policy favoring arbitration,"

6    end quote, and requiring that federal courts rigorously enforce

7    agreements to arbitrate, Shearson American Express, Inc. v.

8    McMahon, 482 U.S. 220 at 226.

9         Like any statutory directive, however, this mandate

10   may be overridden by a contrary congressional command, Id.  The

11   relevant case law prescribes that, if Congress intended to make

12   an exception to the Federal Arbitration Act for a particular

13   claim, quote, "Such an intent will be deducible," end quote

14   from the text or legislative history of a particular statute

15   or, quote, "from an inherent conflict between arbitration and

16   the statute's underlying purpose," Id. at 226, 227.

17        The Second Circuit has recognized that it is within a

18   bankruptcy Court's discretion to decline to compel arbitration

19   when a conflict exists, quote, "between the bankruptcy code,

20   which favors centralization of disputes concerning a debtor's

21   estate and the FAA, which advocates a decentralized approach to

22   dispute resolution," in re: Crysen/Montenay Energy Co., 226 F.

23   3d 160 at 166, Second Circuit 2000 citing U.S. Lines v.

24   American Steamship Owners Mutual Protection and Indemnification

25   Association, Inc., in re: U.S. Lines, 197 F. 3d 631 at 640,

Page 62

1    641, Second Circuit 1999.

2            The inquiry then, quote, "with respect to the

3    exercise of that discretion, is, quote, 'whether any underlying

4    purpose of the bankruptcy code would be adversely affected by

5    enforcing the arbitration clause,'", Cibro Petroleum Products

6    v. City of Albany, in re: Winimo Realty Corporation, 270 B.R.

7    108 at 118, Southern District of New York 2001, quoting U.S.

8    Lines, 197 F. 3d at 640.

9            It is in engaging in this inquiry that the Second

10   Circuit has made a distinction between core and non-core

11   proceedings.  When a proceeding is core, the bankruptcy Court

12   then must analyze whether arbitration, quote, "would seriously

13   jeopardize the objectives of the bankruptcy code such that

14   there is an inherent conflict between arbitration and the

15   code," U.S. Lines 197 F. 3d at 640 to 41.

16           Generally, proceedings arising under Title 11 and

17   proceedings arising in a case under Title 11 are referred to as

18   core proceedings.  Whereas proceedings related to a case under

19   Title 11 are referred to as non-core proceedings.  See Bender

20   v. PriceWaterHouse and Company, LLP in re: Resorts

21   International, Inc. 372 F. 3d 154 at 162, Third Circuit 2004

22   citing Juan Collier (ph) on bankruptcy, paragraph 3.022 at 3-

23   35, 15th edition.

24           Bankruptcy core jurisdiction extends to all civil

25   proceedings arising under Title 11 or arising in a case under

Page 63

1    Title 11.  Joremi Enterprises v. Hershkowitz, in re: New 118th,

2    LLC, 396 B.R. 885 at 890, Southern District of New York

3    Bankruptcy 2008.  See also 28 U.S.C. Section 157(b)(1) stating

4    that, quote, "Bankruptcy judges may hear and determine all core

5    proceedings arising under Title 11 or arising in a case under

6    Title 11."

7            A core proceeding, as a general matter, is one that

8    invokes a substantive right under the bankruptcy code or could

9    only arise in the context of a bankruptcy case.  See New 118th,

10   396 B.R. at 890.  Put another way, a proceeding can be core,

11   quote, "by virtue of its nature if either, one, the type of

12   proceeding is unique to or uniquely affected by the bankruptcy

13   proceedings or, two, the proceedings directly affect a core

14   bankruptcy function," end quote, U.S. Lines 197 F. 3d at 637.

15           Core bankruptcy functions include fixing the order of

16   priority of creditor claims, centralizing all disputes in a

17   single forum, and preserving and equitably distributing the

18   estate's assets, Id. citing in re: Johns-Manville Corp., 827 F.

19   3d, 89 at 91, Second Circuit 1988; Kracken Investments, LLC v.

20   Jacobs, in re: Salander-O'Reilly Galleries, LLC, 475 B.R. 9 at

21   30 to 31, Southern District of New York 2012.

22           It is clear then that the dispute presently before

23   the Court where the claimants' claims fall in the priority

24   scheme of distributions to LBI's general creditors falls within

25   the Court's core function.  The Second Circuit also has held

Page 64

1    that disputes involving enforcement of a contractual

2    subordination agreement are core and, quote, "essential to the

3    administration of the estate," Resolution Trust Corp. v. Best

4    Products Company in re: Best Products, 68 F. 3d 26 at 31 to 32,

5    Second Circuit 1995.

6            Moreover, although the Court is reluctant to discuss

7    the merits of the claims at this early stage, it notes the

8    claimants have asserted that the subordination  language in the

9    agreements does not subordinate their claims to other claims

10   against LBI, but only to claims against Shearson.  Claimants

11   argue that Shearson's obligations under the agreements run to

12   its successors, but the subordination provision does not.

13           They submit that LBI is an entity distinct and

14   different from Shearson, which is defined in the agreements as

15   Shearson Lehman Brothers, Inc., motion paragraph four.

16   Certainly, there can be no question that the determination of

17   the definition of a debtor entity is a core function of the

18   bankruptcy Court that is overseeing the administration of the

19   debtor estate.

20           Arbitrating the subordination issue would jeopardize

21   the objectives of the bankruptcy code and conflict with the

22   integrity of the bankruptcy process in this case.  An outcome

23   contrary to the provisions of the bankruptcy code, which, by

24   their very nature, evidence Congress' intent to treat

25   differently-situated creditors differently, would disrupt the

Page 65

1    priority scheme that this Court is duty-bound to apply to all

2    creditors in this SIPA liquidation.

3            The arbitration clause provides that disputes arising

4    under the subordination provisions be arbitrated by FINRA.  As

5    the trustee argues, this arrangement made sense when LBI was an

6    entity operating under the rules of the New York Stock

7    Exchange, trustee's opposition at paragraph 16.

8            Upon examination, however, the provisions of the

9    agreement governing in the event of bankruptcy do not mention

10   the stock exchange and do not require interpretations of its

11   rules.  The stock exchange rules are irrelevant, and FINRA

12   arbitration simply is not appropriate.

13           Congress simply could not have intended to turn over

14   the determination of the relative priority of claims against

15   the estate and the equitable distribution of the estate's

16   assets in the largest SIPA liquidation in U.S. history of the

17   financial industry regulatory authority to be decided under the

18   rules of the New York Stock Exchange.  Accordingly, the motion

19   to compel is denied, and the trustee is directed to submit an

20   order consistent with this ruling.

21           And, if you would be so kind as to run the order by

22   Mr. Scarola before you submit it, I would be grateful.

23           All right?  And then, at an appropriate point, I'll

24   wait to hear from you folks to determine what's going to happen

25   next, what you would like to do next in terms of calendar and

Page 66

1    next steps, but I appreciate your coming in.  I appreciate

2    everyone's attention, and I wish you a good afternoon.  Thank

3    you.

4              UNIDENTIFIED SPEAKER:  Good afternoon, Your Honor.

5              MR. LYMAN:  Thank you, Your Honor.

6              THE COURT:  Thank you.

7              (Whereupon, these proceedings were concluded at 3:15

8    PM)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 67

1

2                            I N D E X

3

4                          R U L I N G S

5    DESCRIPTION                              PAGE      LINE

6    LBHI's motion to approve settlement        15        3

7    agreement between the LBI trustee and

8    Hong Kong entities granted

9    LBHI's motion for approval of partial      10        4

10   settlement agreement regarding to SGS HY

11   Credit Fund (Exum Ridge Cbo 2006-3)

12   swap agreement and indenture granted

13   LBI Trustee's motion to make first interim  23       16

14   Distribution to unsecured creditors granted

15   Motion to compel arbitration denied        60       24

16

17

18

19

20

21

22

23

24

25

Page 68

1

2                     C E R T I F I C A T I O N

3

4    I, Lisa Beck, certify that the foregoing transcript is a true

5    and accurate record of the proceedings.

6

7    **Lisa Beck**
     Digitally signed by Lisa Beck
     DN: cn=Lisa Beck, o, ou,
     email=digital1@veritext.com, c=US
     Date: 2014.09.04 15:20:38 -04'00'

8    _____

     Lisa Beck (CET**D 486)

9

     AAERT Certified Electronic Transcriber

10

11

     Veritext

12

     330 Old Country Road

13

     Suite 300

14

     Mineola, NY 11501

15

16

     Date:  July 31, 2014

17

18

19

20

21

22

23

24

25