WEIL, GOTSHAL & MANGES LLP
Christopher J. Cox
201 Redwood Shores Parkway
Redwood Shores, CA 94065
Telephone:  (650) 802-3000
Facsimile:  (650) 802-3100

Jacqueline Marcus
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

Attorneys for Lehman Brothers Holdings Inc.,
in its capacity as Plan Administrator on behalf
of Lehman Brothers Special Financing Inc.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>LEHMAN BROTHERS HOLDINGS INC.,<br><br>                       Debtor. | Chapter 11 Case<br>No. 08-13555 (SCC)<br><br>(Jointly Administered) |
| Lehman Brothers Holdings Inc., in its capacity as Plan Administrator on behalf of Lehman Brothers Special Financing Inc.,<br><br>                       Plaintiff,<br><br>     v.<br><br>Buck Institute for Age Research, and Does 1-10,<br><br>                       Defendants. | Adv. Proc. No. _____<br><br>**ADVERSARY PROCEEDING**<br>**COMPLAINT** |

1.       After terminating its swap agreement with Plaintiff, Defendant Buck Institute for

Age Research ("Buck Institute") failed to calculate the amount Lehman Brothers Special

Financing Inc. ("LBSF") was owed in good faith and remitted a partial payment to LBSF of

$1,865,121.67.  Had Buck Institute properly calculated Loss, it would have paid LBSF an Early

Termination Payment of over $14 million as of the Early Termination Date.  Lehman Brothers

Holdings Inc. ("LBHI"), in its capacity as Plan Administrator (in this capacity, the "Plan

Administrator" or "Plaintiff") on behalf of LBSF, under the Modified Third Amended Joint

Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors (the "Plan"),

alleges the following on knowledge as to LBSF's and LBHI's own acts and upon information

and belief as to all other matters against Buck Institute and Does 1-10 ("Does 1-10" and together,

"Defendants"):

## PRELIMINARY STATEMENT

2.       Plaintiff brings this action to recover not less than $12.1 million due in 2008 when

Buck Institute terminated its interest rate swap (the "Transaction") with LBSF, plus contractual

interest.  When Buck Institute valued the Early Termination Payment[1] due to LBSF under the

Transaction, it ignored the provisions of the Schedule to the governing ISDA Master Agreement

which required Buck Institute to value the Transaction on the Early Termination Date under

"Second Method" and the "Market Quotation" measure or, if the Market Quotation process

failed, to determine its loss or gain resulting from the termination of the Transaction under the

"Loss" measure.  Under Market Quotation, Buck Institute as the Non-defaulting Party was

required to solicit quotations from Reference Market-makers (*i.e.*, "four leading dealers in the

relevant market") for replacement transactions "that would have the effect of preserving for

---

[1] Capitalized terms used but not defined herein shall have the meanings given them in the 1992 standard form (Local Currency-Single Jurisdiction) ISDA Master Agreement, dated as of December 8, 2003 (together with all schedules, annexes, and exhibits thereto, the "Master Agreement").

[Buck Institute] the economic equivalent of any payment or delivery . . . that would, but for the occurrence of the relevant Early Termination Date, have been required after that date." Master Agreement § 12 (definition of "Market Quotation" and "Reference Market-makers"). In other words, under Market Quotation, Buck Institute was required, as the Non-defaulting Party, to seek quotations from four leading dealers in the relevant market for the amount those dealers would pay, or receive, to step into the Defaulting Party's position in the trade. *Id.*

3.      Instead of soliciting bids from four leading dealers, Buck Institute solicited bids from *twenty-five* dealers. During the bid solicitation process, Buck Institute's financial advisor actively encouraged low bids in an effort to drive down the Early Termination Payment amount. Buck Institute, thus, failed to comply with the clear terms of the Master Agreement when implementing Market Quotation and tainted the process.

4.      Buck Institute received only two bids. When the Market Quotation process fails to generate at least three quotations from the four dealers, the Master Agreement requires the Non-defaulting Party to apply the Loss measure, under which Buck Institute was required to "reasonably determine[] in good faith . . . its total losses and costs (*or gain*, in which case expressed as a negative number) . . . ." *Id.* (emphasis added). Because it did not receive the minimum number of bids for valuation under Market Quotation, Buck Institute reverted to the Loss measure.

5.      LBSF was "in the money" under its Transaction with Buck Institute as of the Early Termination Date. The value of the Transaction as of the Early Termination Date was over $14 million in LBSF's favor. In other words, as of the Early Termination Date, the net present value of the expected payments which Buck Institute saved over the remaining term of the Transaction was approximately $14 million. Indeed, Buck Institute's financial advisor was

aware early in the bid solicitation process that the cost of termination on September 29, 2008, based on the mark-to-market valuation "is $14,140,959 at 2.876%."

6.      Despite recognizing the value of the Transaction, Buck Institute advised LBSF that the Settlement Amount it owed to LBSF as of the Early Termination Date was only $1,865,121.67, which was comprised of:  (a) $2,013,000.00 representing the alleged value of the terminated Transaction calculated using the Loss methodology; minus (b) expenses of $148,369.17; plus (c) $490.84 in accrued interest.  Buck Institute remitted a $1,865,121.67 payment (the "Partial Payment") to LBSF on October 16, 2008.  By failing to properly calculate its gain and turn over the full amount of that gain to LBSF, Buck Institute failed to comply with the clear terms of the Master Agreement when implementing Loss.

## THE PARTIES

7.      LBHI is a corporation organized and incorporated under the laws of the state of Delaware, with its current principal business address at 1271 Sixth Avenue, New York, New York 10020.  On December 6, 2011, the Court approved and entered an order confirming the Plan.  The Plan became effective on March 6, 2012.  Pursuant to the Plan, LBHI, as Plan Administrator, is authorized to prosecute actions on behalf of the estate of LBSF.

8.      LBSF is a corporation organized and incorporated under the laws of the state of Delaware, with its current principal business address at 1271 Sixth Avenue, New York, New York 10020.

9.      Buck Institute is a research facility located in Novato, California.

10.     Does 1-10 are unknown individuals, entities, and/or groups of individuals or entities who may have received distributions from Buck Institute.

## JURISDICTION AND VENUE

11.     On September 15, 2008, and periodically thereafter, LBHI and certain of its subsidiaries, including LBSF, commenced in this Court voluntary cases under Chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases").

12.     This adversary proceeding is filed pursuant to Rules 7001 and 7003 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), as well as sections 105(a), 541(c), and 542(b) of the Bankruptcy Code, and New York law, which governs the Master Agreement pursuant to Part 3(e) of the Schedule.

13.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334.

14.     The Court has personal jurisdiction over Defendant Buck Institute.

15.     This adversary proceeding constitutes a core proceeding under 28 U.S.C. § 157(b)(2).

16.     Pursuant to Rule 7008-1 of the Local Rules of Bankruptcy Procedure, Plaintiff states that it consents to the entry of a final judgment by this Court if it is determined that this Court, absent consent of the parties, cannot enter final orders or judgment consistent with Article III of the United States Constitution.

17.     Venue is proper in this Court under 28 U.S.C. § 1409(a) because the Chapter 11 Cases are pending in this district.

## BACKGROUND FACTS

### A.     The Master Agreement and the Transaction

18.     The Master Agreement provides the basic terms for the parties' contractual relationship.  The parties entered into an interest rate swap under the Master Agreement, the terms of which were set forth in the trade confirmation.

19.     Buck Institute originally entered into the Master Agreement and the Transaction with LBSF as a hedge against fluctuating interest rates.

20.     Under the Transaction, LBSF agreed to make monthly payments to Buck Institute at a floating interest rate tied to the One Month London Interbank Offered Rate in U.S. dollars (the "USD-LIBOR-BBA" rate) and Buck Institute agreed to make monthly payments to LBSF at a fixed rate of 4.99%, each based on an initial notional amount of $55,600,000 (which declined over the life of the Transaction).

**B.      Buck Institute Terminates the Transaction**

21.     On September 15, 2008, LBHI commenced its Chapter 11 Case.  LBSF commenced its Chapter 11 Case on October 3, 2008.

22.     On September 23, 2008, Buck Institute sent LBSF a termination notice (the "Early Termination Notice"), stating that LBHI's Chapter 11 petition constituted an Event of Default under section 5(a)(vii) of the Master Agreement and designating "October 14, 2008 as the Early Termination Date with respect to all Transactions between you and us."

**C.      The Master Agreement Required Buck Institute to Use the "Second Method" and the "Market Quotation" Process to Determine the Transaction's Value**

23.     The Schedule to the Master Agreement provides that the payment owed upon early termination (the "Early Termination Payment") will be calculated based upon the "Second Method" or "full two-way payment" method, meaning that a payment would be made to the "in-the-money" party upon termination, regardless of whether it was the Defaulting Party.  *See* Master Agreement § 6(e)(i); Schedule § 1(g).  In other words, the party that is "in the money" on the Early Termination Date – here LBSF – has a right to an Early Termination Payment even if it is the Defaulting Party.  Thus, by selecting Second Method, the parties elected not to punish the Defaulting Party or deprive it of the benefits accrued under the Transaction.  Rather, the Master

Agreement was designed to preserve the benefit of the bargain upon Early Termination and put the parties in the same position as if there had been no termination.

24.     The Settlement Amount is defined in the Master Agreement as "the sum of . . . the Market Quotations (whether positive or negative) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation is determined" and the "Loss (whether positive or negative and without reference to any Unpaid Amounts) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation cannot be determined or would not . . . produce a commercially reasonable result."  Master Agreement § 12 (definition of "Settlement Amount").

25.     Accordingly, to arrive at the amount due, the Non-defaulting Party was required in the first instance to calculate the Early Termination Payment in accordance with the "Market Quotation" measure detailed in section 6 of the ISDA Master Agreement.  *See id*. at § 6(e)(i)(3). Under the Market Quotation measure, the determining party is instructed to seek Market Quotations from "Reference Market-makers" (specifically, "four leading dealers in the relevant market").  *Id*. at § 12 (definition of "Market Quotation" and "Reference Market-makers").  Each quotation is intended to reflect "an amount . . . that would have the effect of preserving for such party the economic equivalent of any payment or delivery . . . by the parties under Section 2(a)(1) . . . that would, but for the occurrence of the relevant Early Termination Date, have been required after that date."  *Id*.

26.     If four quotations are received, the party receiving the quotations is required to exclude the highest and lowest quotations, and average the remaining quotations.  *Id.*  If three quotations are received, the highest and lowest quotations are excluded and the middle quotation is used.  *Id.*  In the event that fewer than three market quotations are received (or if the result of

the Market Quotation process is not commercially reasonable), then the Master Agreement requires that the Loss measure be used to value the transaction.  *Id.*  "Loss" is defined in the Master Agreements in relevant part as:  "an amount that party reasonably determines in good faith to be its total losses and costs (*or gain*, in which case expressed as a negative number) in connection with this Agreement or . . . [the] Terminated Transactions . . . ."  *Id.* (emphasis added).

D.    **Buck Institute Improperly Conducts the Market Quotation Process and Then Defaults to Loss**

27.    Buck Institute did not comply with the unambiguous procedures set forth in the Master Agreement.  Buck Institute's financial advisor, Bond Logistix LLC ("Bond"), handled the bidding on Buck Institute's behalf.  Early in the Market Quotation process, Bond was aware that the cost of termination on September 29, 2008, based on the mark-to-market valuation "is $14,140,959 at 2.876%."  Also on September 29, 2008, Bond emailed a representative of The Bank of New York Mellon ("BNY") and explained that, although Buck Institute believed that the termination amount would have been $14.2 million, due to a rally during the day, Bond would not be surprised if the termination amount was actually "up in the $15mm neighborhood now."

28.    Bond sought to drive down artificially the payment that Buck Institute would owe to LBSF by seeking to influence the bids through negotiations with the Reference Market-makers.  Additionally, rather than soliciting bids from four leading dealers as required by the Master Agreement, Buck Institute solicited bids from *twenty-five* dealers.  Seeking bids from such a large number of dealers is not a standard industry practice and doing so drives down the number of competitive bids that are likely to be received in response to the solicitation.

29.     As Bond and Buck Institute anticipated, Buck Institute did not receive the three bids necessary for the Market Quotation process.  Buck Institute received only two bids:  (1) a bid from BNY for $7,000,000 and (2) a bid from Deutsche Bank ("DB") for $2,013,000.  Thus, the flawed Market Quotation process failed and Buck Institute was required to revert to Loss.

E.     **Buck Institute's Calculation Statement Is Not Reasonable or In Good Faith**

30.     LBSF received a Calculation Statement from Buck Institute pertaining to the Transaction (the "Calculation Statement") on October 17, 2008.  According to Buck Institute's Calculation Statement, the Settlement Amount due to LBSF was $1,865,121.67 under the Loss method.  Despite having obtained two quotations, in calculating Loss, Buck Institute utilized only the DB quotation, the lower of the two quotations.  Specifically, Buck Institute calculated its Settlement Amount as:  (a) $2,013,000.00 representing the alleged value of the terminated Transaction calculated using the Loss methodology with the DB quotation as a reference point; minus (b) expenses of $148,369.17; plus (c) $490.84 in accrued interest.

31.     Buck Institute's termination of the Transaction resulted in a gain to Buck Institute equal to the present value of the projected future payments it would have made to LBSF.  As of the Early Termination Date, based on the industry standard mid-market value of the Transaction, this value was approximately $14 million.  This amount represents an undisputed "gain" that should have been factored into Buck Institute's calculation of Loss and turned over to LBSF.

32.     Further, the sole quotation used by Buck Institute in calculating the purported Early Termination Payment included hypothetical costs that Buck Institute would incur only if it actually entered into a replacement transaction.  Buck Institute's inclusion of hypothetical costs in its Loss calculation is contrary to principles of New York contract law because neither party contemplated that it would incur charges not actually incurred in connection with the termination

of the Transaction.  Further, Buck Institute's improper bid solicitation process and unreasonable

Loss calculation violated the covenant of good faith and fair dealing.

33.     Buck Institute's Calculation Statement also included improper expenses totaling

$148,359.17 relating to its purported legal and advisory fees, almost 7.5% of the purported Early

Termination Payment that Buck Institute alleges was owed to LBSF.  These excessive fees

represent Buck Institute's effort to charge LBSF for Buck Institute's hiring of three law firms

and two financial advisors.  This is not commercially reasonable or in good faith and far exceeds

reasonable termination expenses for similar transactions.

**F.     <u>Buck Institute Owes Interest to LBSF</u>**

34.     Upon early termination, section 6(d) of the Master Agreement required Buck

Institute to calculate the termination amount promptly as of the Early Termination Date and pay

such amount.  Buck Institute has defaulted on its obligations under section 6(d) of the Master

Agreement.  Section 12 of the Master Agreement defines four Applicable Rates of interest (in

subsections (a)-(d)), which accrue on amounts owed.  *See* Master Agreement § 12.  Section 12 of

the Master Agreement provides that the "Termination Rate" applies to the amount owed up until

the date the amounts become payable and the "Default Rate" applies thereafter.  *Id.* at § 12.

Section 12 of the Master Agreement defines the "Default Rate" as equal to "a rate per annum

equal to the cost (without proof or evidence of any actual cost) to the relevant payee (as certified

by it) if it were to fund or of funding the relevant amounts plus 1% per annum."  Section 12 of

the Master Agreement defines the "Termination Rate" as "a rate per annum equal to the

arithmetic mean of the cost (without proof or evidence of any actual cost) to each party (as

certified by such party) if it were to fund or of funding such amounts."

35.     Buck Institute designated October 14, 2008 as the Early Termination Date and the

effective date of its Calculation Statement is October 17, 2008.  Accordingly, the Termination

Rate applied from October 14, 2008 to October 17, 2008.  The Default Rate applies from

October 17, 2008 to the present, with interest continuing to accrue until LBSF receives payment

in full from Buck Institute.

**G.    The Failed Mediation**

36.    LBSF and Buck Institute engaged in settlement discussions without success.  Part

of those efforts included a mediation between the parties pursuant to this Court's Alternative

Dispute Resolution Procedures Order for Affirmative Claims of Debtors Under Derivatives

Contracts, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Sept. 17, 2009) [ECF No. 5207], which

occurred on March 1, 2011.

**COUNT I**

**Breach of the Master Agreement**

(*Against Defendant Buck Institute*)

37.    Plaintiff repeats, realleges, and incorporates by reference the allegations contained

in paragraphs 1-36 of this Complaint as though fully set forth in this cause of action.

38.    The Master Agreement is an enforceable contract, and LBSF has performed all of

its obligations in connection with the Master Agreement.  Further, any conditions precedent have

been performed, have occurred, or have been waived.

39.    On the Early Termination Date, LBSF was the party "in-the-money" and thus

entitled to receive a substantial Early Termination Payment from Buck Institute.

40.    Buck Institute breached the Master Agreement by failing to comply with the

express terms of the Master Agreement in employing the Market Quotation measure, failing to

turn over the full amount of its gain after reverting to the Loss measure, and otherwise failing to

follow reasonable, good faith, and commercially reasonable valuation practices.  As a result,

LBSF has been damaged in an amount to be proven at trial, but not less than $12.1 million,

representing the portion of Buck Institute's gain as of the Early Termination Date which it failed

to pay LBSF, plus interest which has accrued since the Early Termination Date and which will

continue to accrue at the Default Rate until final payment is made to LBSF.

## COUNT II

### Breach of the Master Agreement Based on Buck Institute's Breach of the Implied Covenant of Good Faith and Fair Dealing

(*Against Defendant Buck Institute*)

41.     Plaintiff repeats, realleges, and incorporates by reference the allegations contained

in paragraphs 1-40 of this Complaint as though fully set forth in this cause of action.

42.     On the Early Termination Date, LBSF was the party "in-the-money" and thus

entitled to receive a substantial Early Termination Payment from Buck Institute.

43.     Buck Institute manipulated the Market Quotation and Loss valuation processes to

retain a windfall.  Buck Institute knew that the Transaction was "in-the-money" to LBSF by

approximately $14 million.  However, Buck Institute retained a substantial gain when it remitted

the Partial Payment to LBSF and then acted as if it was relieved of its future payment obligations

under the Transaction.  By refusing to pay LBSF a properly calculated, commercially reasonable

termination payment, without including hypothetical costs, in accordance with the Loss measure

in the Master Agreement, Buck Institute violated the covenant of good faith and fair dealing

implicit in all contracts governed by New York law.

44.     As a result of this breach, LBSF has been damaged in an amount to be proven at

trial, but not less than $12.1 million, representing the portion of Buck Institute's gain as of the

Early Termination Date which Buck Institute failed to pay to LBSF, plus interest which has

accrued since the Early Termination Date and which will continue to accrue at the Default Rate

until full payment is made to LBSF.

## COUNT III

### Turnover of LBSF's Property Interest in the Properly Calculated Termination Payment Pursuant to Section 542(b) of the Bankruptcy Code

(*Against Defendant Buck Institute*)

45.      Plaintiff repeats, realleges, and incorporates by reference the allegations contained in paragraphs 1-44 of this Complaint as though fully set forth in this cause of action.

46.      Section 542(b) of the Bankruptcy Code provides that ". . . an entity that owes a debt that is property of the estate and that is matured, payable on demand, or payable on order, shall pay such debt to, or on the order of, the trustee, except to the extent that such debt may be offset under section 553 of this title against a claim against the debtor."  11 U.S.C. § 542(b).

47.      As fully alleged above, Buck Institute was obligated to pay LBSF a properly calculated Early Termination Payment under the Master Agreement, plus interest.  The amount due to LBSF from Buck Institute as of October 14, 2008, the Early Termination Date, is property of LBSF's estate under section 541(a) of the Bankruptcy Code.

48.      The termination value of the Transaction on the Early Termination Date represents the payment Buck Institute owed to LBSF as of that date.  Buck Institute has failed to pay LBSF the full amount of the termination value of the Transaction on the Early Termination Date and continues to do so, making the Early Termination Payment a matured debt.

49.      Accordingly, pursuant to section 542(b) of the Bankruptcy Code, Plaintiff requests an order compelling and directing Buck Institute to turn over to LBSF the full value of the Transaction on the Early Termination Date, plus interest which has accrued since the Early Termination Date and which will continue to accrue at the Default Rate until final payment is made to LBSF.

## COUNT IV

### Unjust Enrichment

(*Against Defendant Buck Institute and Does 1-10*)

50.    Plaintiff repeats, realleges, and incorporates by reference the allegations contained
in paragraphs 1-49 of this Complaint as though fully set forth in this cause of action.

51.    As a result of Buck Institute's breach of its obligations to LBSF under the Master
Agreement and Buck Institute's failure to pay LBSF a termination payment representing the full
amount LBSF was "in-the-money" under the Transaction, Buck Institute and Does 1-10 obtained
an unjust windfall at the expense of LBSF.

52.    Buck Institute has been improperly and unjustly enriched at LBSF's expense as a
result of Buck Institute's actions.  To the extent Buck Institute distributed any of the funds to
Does 1-10, Does 1-10 have been improperly and unjustly enriched at LBSF's expense.  LBSF
received only $1,865,121.67, despite being the party "in-the-money" on a Transaction valued at
over $14 million as of the Early Termination Date, because of Buck Institute's bad faith
calculation under the Loss measure.  Equity and good conscience require that Buck Institute and
Does 1-10 return to LBSF not less than $12.1 million, plus prejudgment interest.

## COUNT V

### Declaratory Judgment that Buck Institute Violated the Automatic Stay and an Order Requiring Turnover of the Properly Calculated Early Termination Payment

(*Against Defendant Buck Institute*)

53.    Plaintiff repeats, realleges, and incorporates by reference the allegations contained
in paragraphs 1-52 of this Complaint as though fully set forth in this cause of action.

54.    Pursuant to section 362(a)(3) of the Bankruptcy Code, the filing of a voluntary
case under Chapter 11 of the Bankruptcy Code operates to stay "any act to obtain possession of

property of the estate or of property from the estate or to exercise control over property of the

estate" absent an order of the bankruptcy court granting relief from the stay.  11 U.S.C.

§ 362(a)(3).

55.    Under section 105(a) of the Bankruptcy Code, this Court may "issue any order,

process, or judgment that is necessary or appropriate to carry out the provisions of this title."

11 U.S.C. § 105(a).  Under this section, this Court may grant damages to punish violations of the

automatic stay.

56.    The full amount of the properly calculated Early Termination Payment constitutes

property of LBSF's estate and Buck Institute's retention of any such amount, therefore,

constitutes an impermissible "act to obtain possession of property of the estate or of property

from the estate or to exercise control over property of the estate."  11 U.S.C. § 362(a)(3).

Accordingly, Buck Institute's retention of not less than $12.1 million – representing the portion

of Buck Institute's gain as of the Early Termination Date which it failed to pay LBSF – also

constitutes an impermissible "act to obtain possession of property of the estate or of property

from the estate or to exercise control over property of the estate."  11 U.S.C. § 362(a)(3).

57.    Accordingly, LBSF is entitled to (1) a declaratory judgment that Buck Institute

acted in express violation of section 362 of the Bankruptcy Code; and (2) pursuant to

section 105(a) of the Bankruptcy Code, an award of monetary damages, in an amount to be

determined at trial and including (but not limited to) LBSF's actual damages, costs, and

attorneys' fees and expenses, on account of Buck Institute's knowing and willful violation of the

automatic stay.

<u>**COUNT VI**</u>

<u>**Interest**</u>

(*Against Defendant Buck Institute and Does 1-10*)

58.    Plaintiff repeats, realleges, and incorporates by reference the allegations contained in paragraphs 1-57 of this Complaint as though fully set forth in this cause of action.

59.    Buck Institute not only owes LBSF an Early Termination Payment of not less than $12.1 million, but also interest thereon.

60.    By failing to properly value the Transaction and make the full payment due to LBSF, Buck Institute breached the Master Agreement and, therefore, must pay accrued interest on the amount it owes to LBSF, which interest continues to accrue until payment to LBSF in full.

61.    The Master Agreement explicitly provides that the Applicable Rate is the "Default Rate" on sums calculated pursuant to section 6(e) of the Master Agreement from the date the calculation statement is delivered.  Master Agreement § 12.  The "Termination Rate" applies to the amount owed prior to that date.  *Id.*  LBSF has certified its cost of funds as LIBOR plus 12.5%.

62.    Consequently, the interest owed on the portion of the Early Termination Payment still due to LBSF, not less than $12.1 million, began to accrue (i) at the Termination Rate from and including October 14, 2008, to but excluding October 17, 2008, and (ii) at the Default Rate from and including October 17, 2008 to the present, with interest continuing to accrue at the Default Rate until payment to LBSF in full.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that judgment be entered:

(1)     <u>Against Defendant Buck Institute as follows</u>:

A.      As to Counts I and II, awarding LBSF damages from Buck Institute in an amount to be determined at trial, but in all events, not less than $12.1 million, representing the portion of Buck Institute's gain which Buck Institute failed to pay to LBSF, plus interest which has accrued since the Early Termination Date and which will continue to accrue at the Default Rate until full payment is made to LBSF;

B.      As to Count III, an order compelling and directing Buck Institute to turn over the full amount of the properly-calculated Early Termination Payment to LBSF, which is the value of the Transaction on the Early Termination Date, plus interest which has accrued since the Early Termination Date and which will continue to accrue at the Default Rate until full payment is made to LBSF; and

C.      As to Count V, (1) a declaratory judgment that Buck Institute acted in express violation of section 362 of the Bankruptcy Code; and (2) pursuant to section 105(a) of the Bankruptcy Code, an award of monetary damages, in an amount to be determined at trial and including (but not limited to) LBSF's actual damages, costs, and attorneys' fees and expenses, on account of Buck Institute's knowing and willful violation of the automatic stay.

(2)     <u>Against Defendants Buck Institute and Does 1-10 as follows</u>:

D.      As to Count IV, awarding LBSF damages from Buck Institute and Does 1-10 in an amount to be determined at trial, but in all events, not less than $12.1 million, representing the portion of Buck Institute's gain which Buck Institute failed to pay to LBSF, plus interest which has accrued since the Early Termination Date and which will continue to accrue at the Default Rate until full payment is made to LBSF;

16

E.      Pre-judgment and post-judgment interest; and

F.      Such other and further relief, including interest, costs, and attorneys' fees, as the

Court deems just and proper.

Dated: September 16, 2014
       Redwood Shores, CA

                                    By:   */s/ Christopher J. Cox*                   
                                          Christopher J. Cox

                                          WEIL, GOTSHAL & MANGES LLP
                                          201 Redwood Shores Parkway
                                          Redwood Shores, CA 94065
                                          Telephone: (650) 802-3000
                                          Facsimile: (650) 802-3100

                                          Jacqueline Marcus
                                          WEIL, GOTSHAL & MANGES LLP
                                          767 Fifth Avenue
                                          New York, New York 10153
                                          Telephone: (212) 310-8000
                                          Facsimile: (212) 310-8007

                                          *Attorneys for Lehman Brothers Holdings Inc.,*
                                          *in its capacity as Plan Administrator on behalf*
                                          *of Lehman Brothers Special Financing Inc.*