Andrew J. Rossman
Ellison S. Ward
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7000

*Attorneys for Lehman Brothers Holdings Inc. and
Lehman Brothers Special Financing Inc.*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x

| | |
|---|---|
| In re: **LEHMAN BROTHERS HOLDINGS INC.**, *et al.*, | **Chapter 11**<br>**Case No. 08-13555 (SCC)** |
| **Debtors.** | |

------------------------------------------------------------x

| | |
|---|---|
| **Lehman Brothers Holdings Inc., in its capacity as Plan Administrator on behalf of Lehman Brothers Special Financing Inc.,** | |
| | Adv. Pro. No. _____ |
| **Plaintiffs,** | |
| v. | |
| **Raymond James Financial, Inc. and RJ Capital Services, Inc.,** | **ADVERSARY PROCEEDING**<br>**COMPLAINT** |
| **Defendants.** | |

------------------------------------------------------------x

Plaintiff Lehman Brothers Holdings Inc. ("LBHI"), in its capacity as Plan Administrator on behalf of Lehman Brothers Special Financing Inc. ("LBSF" or "Lehman") under the Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors (the "Plan") (in this capacity, "Plaintiff"), by and through its undersigned counsel, respectfully alleges as follows:

# PRELIMINARY STATEMENT[1]

1. When LBHI filed for bankruptcy on September 15, 2008, LBSF was party to an interest rate swap agreement with non-party Iowa Telecom. LBHI's bankruptcy filing on September 15 triggered an Event of Default under that agreement, which entitled Iowa Telecom to terminate the Swap.

2. Lehman was substantially "in the money" under the Swap at this time—the present value of the expected payments that Iowa Telecom would have made over the remaining life of the Swap, net of any interest payments owed by Lehman, was approximately $2.4 million as of September 26, 2008. Under the terms of the parties' agreement, upon terminating the Swap, Iowa Telecom was required to calculate and then pay this amount to Lehman.

3. Before exercising its right to terminate the Swap, Iowa Telecom reached out to Raymond James Financial, Inc., operating through its RJ Capital Services, Inc., division (together, "Raymond James" or "Defendants"), to inquire whether it would enter into a replacement transaction with Iowa Telecom. Raymond James jumped at the chance. More than simply pursuing an opportunity to execute a transaction at market levels, however, Raymond James took charge of the process for replacing the transaction in order to gain a much larger financial advantage that would leave Iowa Telecom unaffected—but would directly deprive Lehman of the value of the terminated interest rate swap.

4. Seizing the opportunity, Raymond James began acting as Iowa Telecom's advisor on termination and replacement of the Swap. Although Raymond James well understood the value of the transaction to Lehman, it persuaded Iowa Telecom to enter into a replacement

---

[1] Capitalized terms not defined in the Preliminary Statement shall have the meanings ascribed to them below.

transaction for which Raymond James would pay <u>nothing</u> to step into Lehman's shoes. Raymond James would realize the value of the trade, which had belonged to Lehman, as a windfall gain. Raymond James achieved this result, in essence, by persuading Iowa Telecom that, because Iowa Telecom would have to pass on any gain realized on the transaction to Lehman, there was no reason to demand a commercially reasonable payment from Raymond James.

5. In order to protect its windfall opportunity, Raymond James became deeply involved in the process of terminating and valuing the original Swap for Iowa Telecom. Raymond James helped Iowa Telecom to interpret its own ISDA Master agreement with Lehman; helped it to select an Early Termination date; helped it to calculate the Early Termination payment it submitted to Lehman; and even provided Iowa Telecom with templates for the documents that it ultimately submitted to Lehman in order to terminate the Swap and calculate the Early Termination payment. As a direct result of these actions by Raymond James, Iowa Telecom submitted a calculation statement and subsequent payment to Lehman that were unreasonable, in bad faith, and in violation of the terms of the Swap agreement. The value of the transaction, which should have been paid by Iowa Telecom to Lehman, instead went directly to Raymond James.

**PARTIES**

6. LBHI is a Delaware corporation with its former principal business address at 745 Seventh Avenue, New York, New York 10019, and its current principal business address at 1271 Avenue of the Americas, New York, New York 10020.

3

7. LBSF is a Delaware corporation with its former principal business address at 745 Seventh Avenue, New York, New York 10019, and its current principal business address at 1271 Avenue of the Americas, New York, New York 10020.

8. On September 15, 2008 and October 3, 2008 LBHI and LBSF respectively, commenced with this Court voluntary cases under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases"). The Chapter 11 Cases have been consolidated and are being jointly administered pursuant to 1015(b) of the Bankruptcy Rules. On December 6, 2011, the Court entered an order confirming the Plan. The Plan became effective on March 6, 2012. Pursuant to the Plan, LBHI, as Plan Administrator, is authorized to prosecute actions on behalf of the estate of LBSF.

9. Defendant Raymond James Financial, Inc. is a Florida corporation with a current principal business address at 880 Carillon Parkway, St. Petersburg, Florida 33716. Upon information and belief, Raymond James Financial, Inc., holds itself out as doing business in New York, and regularly transacts business in New York through business offices located across the state and in New York County.

10. Defendant RJ Capital Services, Inc. is a Delaware corporation with a current principal business address at 880 Carillon Parkway, St. Petersburg, Florida 33716. RJ Capital Services, Inc. is a wholly-owned subsidiary of Defendant Raymond James Financial, Inc. Upon information and belief, it holds itself out as doing business in New York and regularly transacts business in New York through business offices located across the state and in New York County.

**JURISDICTION AND VENUE**

11.   Plaintiff brings this adversary proceeding pursuant to and under Rules 7001(1), (7), and 7003 of the Federal Rules of Bankruptcy Procedure, as well as Sections 105(a), 541, and 542 of title 11 of the United States Code (the "Bankruptcy Code"), and applicable provisions of state law.

12.   This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334 because this is a civil proceeding arising in or relating to the Chapter 11 Cases. Venue is proper in this Court under 28 U.S.C. § 1409(a).

13.   This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

14.   Plaintiff consents to entry of final orders by the bankruptcy judge.

**STATEMENT OF FACTS SUPPORTING RELIEF**

**A.   Lehman Enters Into An Interest Rate Swap With Iowa Telecom.**

15.   On August 26, 2005, LBSF entered into an interest rate swap (the "Swap") with non-party Iowa Telecommunications Services, Inc. ("Iowa Telecom"). Under the terms of the Swap, which was governed by a standard-form 1992 Multicurrency-Cross Border ISDA Master Agreement, dated December 22, 2005 (the "ISDA Master"), supplemented by a Trade Confirmation dated August 26, 2005, Lehman agreed to make quarterly payments to Iowa Telecom equal to the prevailing 3 month LIBOR rate on a notional amount of $175 million, in exchange for quarterly payments from Iowa Telecom equal to an interest rate of 4.115% on the same notional amount. In other words, Iowa Telecom paid Lehman a fixed interest rate, while Lehman paid Iowa Telecom a floating interest rate, which would change each payment period based on changes in the 3 month LIBOR rate. The Swap permitted Iowa Telecom to benefit if

5

actual interest rates were higher than anticipated and to lose if actual interest rates were lower than anticipated. The Swap had a scheduled termination date of November 23, 2011.

16. Between August 26, 2005 and September 15, 2008, both Iowa Telecom and Lehman fully performed all of their obligations under the Swap. As of September 12, 2008 future LIBOR rates were expected to be lower than those anticipated at the time the trade was entered into. This benefited Lehman. Consequently, the present value of the net future payments associated with the transaction was approximately $4.0 million in Lehman's favor on that date.

17. On September 15, 2008, LBHI filed a voluntary petition in this Court for relief under chapter 11 of the Bankruptcy Code. Because LBHI was a guarantor of LBSF's obligations under the ISDA Master, its bankruptcy triggered an "Event of Default" under the agreement, which entitled Iowa Telecom to terminate the Swap within twenty days of the event (an "<u>Early Termination</u>"). Upon terminating the Swap, Iowa Telecom was required to submit a calculation statement to Lehman, laying out the amount Iowa Telecom had calculated as the net payment that was due under the Early Termination provisions of the ISDA Master.

18. The standard-form ISDA contract allows the parties to choose between several means of calculating the payment due upon an Early Termination. Iowa Telecom and Lehman had elected in 2005 that they would use the "<u>Loss</u>" method and the "<u>Second Method</u>" of calculating payments in the event of an Early Termination.

19. Under the Loss method, upon an Early Termination the parties were to exchange

> ...an amount [the non-defaulting] party <u>reasonably determines in good faith</u> to be its total losses and costs (<u>or gain, in which case expressed as a negative number</u>) in connection with this Agreement or that Terminated Transaction ... including any loss of bargain, cost of funding or, at the election of such party but without duplication, loss or cost incurred as a result of its terminating, liquidating,

6

> obtaining or reestablishing any hedge or related trading position (<u>or any gain resulting from any of them</u>).

(emphasis added).

20.  By selecting the Second Method, the parties agreed that payment due would equal the calculated Loss, no matter which direction the payment ran. (In contrast, under the "First Method," payment would only be made if the calculated Loss resulted in a payment owed to the non-defaulting party). Thus, by electing the Second Method, Iowa Telecom could make a claim against Lehman as to any loss it suffered as a result of Lehman's default and the Early Termination of the Swap, <u>but</u> was required to pay Lehman the amount of its gain, in the event that the Early Termination of the swap was a financial benefit to Iowa Telecom.

**B.    Raymond James Acts As Iowa Telecom's Advisor As It Seeks To Terminate And Replace The Swap.**

21.  Iowa Telecom reached out to nine different swap dealers in order to solicit a potential replacement transaction for the Swap: Barclays Capital, CoBank, GE Commercial Finance, CIBC World Markets, JPMorgan Chase & Company, National Rural Utilities Cooperative Finance Corporation, Raymond James, Wachovia, and Wells Fargo Financial Products.

22.  Most of these dealers expressed interest in entering into a replacement swap.

23.  This replacement transaction would have been an "off market" transaction, for which the dealers would have paid Iowa Telecom an upfront fee for the opportunity to step into Lehman's shoes as the receiver of a fixed rate of interest that was much higher than the then-prevailing fixed rate for an otherwise identical "at market" swap.

24.  Typically, when an interest rate swap is entered into, the fixed rate is set such that the present value of the fixed side of the swap is approximately equal to the present value of the

7

floating side of the swap. Once the fixed rate on the swap is set, the value of the swap will be directly affected by changes in expected future LIBOR rates and the swap will move in or out of the money. The swap market has developed standard and customary methods for determining expected future LIBOR rates. Additionally, the inputs necessary to perform the calculation are easily observable through a variety of market services on any given day (or at any given time of day).

25. In contrast, a trade may be done at a level other than the prevailing projected floating rate for a trade of similar maturity (or be "off market"). In this case, because the fixed rate of 4.115% was higher than the prevailing fixed rate for an otherwise identical swap, the replacement swap was "off market." In an off market trade, the party receiving the above market fixed rate (in this case, one of the dealers) generally makes a one-time, up-front payment to its counterparty (in this case, Iowa Telecom).

26. For example, the prevailing fixed rate on September 12, 2008—the last business day before LBHI filed for bankruptcy—was approximately 3.46%. To step into Lehman's shoes in a swap with identical terms as the Swap between Lehman and Iowa Telecom on that date, a party would have had to pay an upfront fee of approximately $4.0 million, an amount equal to the present value of the difference between the contractual fixed rate of 4.115% and the prevailing fixed rate of 3.46%. That amount was the value of that Swap to Lehman as of September 12, 2008.

27. This value was widely understood by Iowa Telecom and the dealers with which it discussed a replacement transaction; indeed, one of those dealers valued the Swap for Iowa

8

Telecom and confirmed that the Swap was worth approximately $4.0 million to Lehman as of September 12, 2008.[2]

28. However, rather than pursue actionable quotes from this field of dealers for this trade, Iowa Telecom quickly limited its dealings to only one dealer out of the nine. Raymond James was already a significant lender to Iowa Telecom, and thus had an established relationship with individuals at the company.

29. Within days of Lehman's default, Raymond James began acting as Iowa Telecom's advisor on the Swap. Soon after stepping in as Iowa Telecom's adviser, Raymond James requested and received a copy of the ISDA Master governing the Swap. Apparently appreciating the full terms of Iowa Telecom's agreement with Lehman, Raymond James's Director of Fixed Income Derivatives Greg Sitrin reported to Iowa Telecom's CFO and Treasurer Craig Knock that "you have an Event of Default that can be designated at your convenience" and that the parties' election of the Loss method for calculating payments at Early Termination meant "you will be able to deduct any loss associated with creating a replacement swap—a very good thing."

30. Between about September 18 and September 26, Raymond James continued to act as Iowa Telecom's advisor with respect to the Swap, continuing to review the governing legal documents, providing legal and financial advice, providing updates on market swap levels, valuing the Swap and, ultimately (as will be described further below) assisting Iowa Telecom to terminate the Swap and submit its calculation statement to Lehman.

---

[2] The valuation estimate provided by this third party to Iowa Telecom and by Lehman to Iowa Telecom for September 12, 2008, differed by only $20,000. This is typical for valuation of simple interest rate swaps such as this one; these swaps are valued according to widely accepted market practices that do not generally yield major disputes as to the value of the swap on a given date.

C.  **Raymond James Enters Into A Replacement Swap With Iowa Telecom For Free, Earning A Windfall Gain At Lehman's Expense.**

31.     Having taken on the role of shepherding Iowa Telecom through the process of terminating the Swap, Raymond James also worked assiduously to become the replacement swap counterparty at an off market price.

32.     It appears that Raymond James quickly perceived an opportunity to take advantage of Lehman's bankruptcy status to realize a windfall gain on the replacement transaction that Lehman would be forced to absorb. It not only advised Iowa Telecom of this opportunity, but took advantage of it by entering into an off market replacement swap without making any upfront payment to Iowa Telecom for the beneficial payment stream it was contracting to receive.

        1.     *Raymond James Encourages Iowa Telecom To Offset The Replacement Trade Against Amounts Owed To Lehman.*

33.     As the parties were negotiating the replacement swap, Raymond James informed Iowa Telecom that 3 month LIBOR rates appeared to be increasing as they worked to put the replacement swap into place. But Sitrin, the Raymond James representative, told Iowa Telecom's CFO Knock that he shouldn't be concerned about a possible change in the pricing of the replacement swap. He noted that because, under the original terms of the Swap, Iowa Telecom would owe a substantial interest payment to Lehman on September 30, any "loss" that Iowa Telecom suffered in replacing the Swap—for example, if it replaced the Swap at a slightly higher fixed rate, therefore obligating it to make higher fixed rate payments over time—could be offset against the September 30 interest payment. He explained:

> Hypothetically and for example purposes, if you had a situation where the replacement swap is set at 4.20%, you would have a Loss of about $430,000. However, you owe Lehman $587,815 for the accrual due on 9/30. Your

10

settlement to Lehman would be approximately $158,000 (587,815 you owe them minus $430,000 they owe you). I calculated the breakeven rate at about 4.23% instead of the 4.115% you currently pay. So the "cushion" to higher rates is about 11.5 bps.

34. Iowa Telecom apparently agreed with this rationale. While Raymond James and Iowa Telecom initially discussed a replacement swap with a fixed rate of approximately 4.05%, Raymond James increased the fixed rate for the final transaction to 4.13%. Conveying this increase, Sitrin noted to Knock that "[f]rom a practical matter though, <u>this does not impact or cost you as it is absorbed by Lehman</u>" (emphasis added). Knock brushed it off, stating "I understand the increased spread, and frankly was ok with paying under 4.10% a few days ago, so <u>you could have had a larger spread. I just want out of this and not have to be in a collection spot to Lehman</u>" (emphasis added).

35. Recognizing that Iowa Telecom was eager to avoid dealings with a bankrupt entity, Raymond James seized the opportunity to enter into an advantageous, off-market transaction—without paying any upfront fee.

    2. *Raymond James Enters Into The Replacement Transaction For Free, Realizing As A Windfall Gains That Belong To Lehman.*

36. Raymond James and Iowa Telecom reached agreement on a replacement trade on September 26, 2008. Most of the terms of the replacement trade were identical to the original Swap, including the notional amount, the scheduled termination date, and the frequency of payments. The fixed rate that Iowa Telecom agreed to pay was 4.13%, 0.015% higher than the rate paid on the original Swap.

37. Although, during the course of negotiations between Iowa Telecom and Raymond James, the 3 month LIBOR rates were increasing, the projected floating rates remained substantially lower than those anticipated at the time the transaction was entered into, and the

11

Swap thus remained "in the money" to the party stepping into Lehman's shoes. Specifically, as of September 26, when the replacement trade was agreed upon, the prevailing fixed rate for an otherwise identical swap was approximately 3.77%—well below the 4.115% rate that Iowa Telecom had been paying, and even further below the 4.13% rate it agreed to pay on the replacement trade. Because the value of the existing Swap on that date was (according to Lehman's figures) $2,406,127, the net present value of Iowa Telecom's higher future payments under the replacement swap should have been even greater than that amount.

38. Raymond James and Iowa Telecom were well aware of that value; on the same date they entered into a replacement trade, September 26, Raymond James provided Iowa Telecom with a valuation of the original Swap, noting that "the mid-market Lehman swap value including the amount owed on 9/30 [was] $2,360,000."

39. As described above, when an interest rate swap is entered into at an off market rate, the party receiving an above market rate makes an upfront payment equal to the present value of net future payments it will receive on the Swap, in order to compensate its counterparty for this benefit.

40. Raymond James knew very well that upfront payments of this nature were standard in the market; while assisting Iowa Telecom in valuing and terminating the existing Swap, Sitrin noticed with respect to the original Swap that "your fixed rate was well below market rates based on the trade date of the swap and market conditions around that time period," prompting him to ask, "[w]as there an existing swap that you converted into this swap <u>or an upfront payment you made to Lehman</u>, or something else unique ... ?" (emphasis added).

41. However, when the terms of the replacement swap between Raymond James were settled, <u>no upfront payment was included at all</u>. By depriving Iowa Telecom of the upfront fee it

12

should have been paid by Raymond James for a trade starting September 26—which both Raymond James and Iowa Telecom understood was in excess of $2.36 million—Raymond James instead received this highly beneficial transaction utterly for free. Because Iowa Telecom would have had to transfer any such fee to Lehman as a "gain" on the transaction, Raymond James's benefit came at no cost to Iowa Telecom.

### D.     Raymond James Assists Iowa Telecom To Submit A Commercially Unreasonable Payment to Lehman.

42.    At the same time that Raymond James and Iowa Telecom were negotiating a replacement swap that would allow Raymond James to obtain an extremely beneficial stream of payments at Lehman's direct expense, Raymond James was providing Iowa Telecom with tools and information needed to avoid making the payments to Lehman on the Swap that Lehman was rightfully owed under the ISDA Master.

43.    Indeed, Raymond James provided Iowa Telecom with the very documents it would use in order to terminate the transaction and submit a calculation statement to Lehman and advised it as to the best course of action for filing them:

> you get the Lehman notification ready for delivery, so that assuming we have final go-ahead, we are ready to move quickly on the termination. I am not sure when you planned to set the early termination date, but for obvious reasons, I would recommend we be in a position to move ahead as quickly after notification is delivered as allowed for under the ISDA. I believe you can set the termination date to be the same day that notice is delivered ... .

44.    Moreover, Raymond James appears to have conducted all of Iowa Telecom's valuation work, providing it with a series of interim calculations and a final calculation of the amounts owed to Lehman, which Iowa Telecom then used as the basis for its calculations submitted to Lehman.

13

45. Ultimately, Iowa Telecom followed Raymond James's advice to the letter, submitting the termination notice that it had provided once the replacement swap was agreed upon, on September 26, 2008, and submitting a calculation statement, using Raymond James's calculations, on September 30, 2008. That calculation statement netted the payment due to Lehman on September 30, 2008 under the now-terminated Swap of $587,816 against $75,847, which Raymond James calculated as Iowa Telecom's loss (because of the higher fixed rate of 4.13%) on the replacement swap. Iowa Telecom also subtracted its "reasonable out-of-pocket expenses representing external legal costs incurred by the Counterparty in an amount equal to $7,671.00," for a total calculated payment due to Lehman of $504,298. Iowa Telecom subsequently transferred this amount to Lehman.

46. The value to Lehman of the Swap with Iowa Telecom as of the Early Termination date, September 26, 2008, was $2,406,127. However, it received only $504,298 of this amount from Iowa Telecom. The remainder, $1,901,829, should have been realized as a gain by Iowa Telecom through its transaction with Raymond James, and paid to Lehman. Instead, it was realized as a windfall profit by Raymond James for entering into an advantageous swap, the costs of which it appropriated directly from Lehman.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

**(Unjust Enrichment)**

47. The Plaintiff realleges and incorporates by reference each and every allegation set forth above, as though fully set forth herein.

48. By entering into a replacement transaction with Iowa Telecom on September 26, 2008, following the termination of Iowa Telecom's Swap with LBSF, at an off market rate and

14

without making any upfront payment, Defendants received a valuable benefit belonging to Lehman in an amount equal the value of the replacement transaction on that date, and were enriched and benefitted thereby.

49. This enrichment was at Lehman's direct expense. The terms of Lehman's agreement with Iowa Telecom entitled Lehman to be paid any gain realized by Iowa Telecom upon termination of the Swap. Instead, Iowa Telecom transferred this gain to Raymond James, and Raymond James accepted it. Both parties fully knew and appreciated that Raymond James was being enriched and benefitted at Lehman's expense.

50. Iowa Telecom's transfer of this benefit was the result of Raymond James's concerted efforts to take advantage of an opportunity to profit from Lehman's bankruptcy. Although Raymond James understood Iowa Telecom's obligations under the ISDA Master, it collaborated with Iowa Telecom to ensure that Iowa Telecom made an unreasonable and bad faith payment to Lehman in violation of the terms of the ISDA Master by advising Iowa Telecom on the legal aspects of the termination; setting the terms of the replacement transaction; and conducting termination calculations on Iowa Telecom's behalf.

51. Thus, as a result of Raymond James's concerted efforts, which Raymond James targeted directly at Lehman by working with and advising Iowa Telecom to structure a replacement transaction and make an unreasonable and bad faith payment to Lehman, Raymond James was unjustly enriched, at Lehman's direct expense, in an amount to be proven at trial, but not less than $1,901,829 plus any applicable interest. Equity and good conscience require restitution of these funds to Lehman.

## SECOND CAUSE OF ACTION

### (Money Had And Received)

52. The Plaintiff realleges and incorporates by reference each and every allegation set forth above, as though fully set forth herein.

53. By entering into a replacement transaction with Iowa Telecom on September 26, 2008, following the termination of Iowa Telecom's Swap with LBSF, at an off-market rate and without making any upfront payment, Defendants received money belonging to Lehman in an amount equal to the value of the replacement transaction on that date, and were enriched and benefitted thereby.

54. Lehman was entitled to these funds. The terms of Lehman's agreement with Iowa Telecom entitled Lehman to be paid any gain realized by Iowa Telecom upon termination of the Swap. Instead, Iowa Telecom transferred this gain to Raymond James, and Raymond James accepted it. Both parties fully knew and appreciated that Raymond James was being enriched and benefitted at Lehman's expense.

55. Iowa Telecom's transfer was the result of Raymond James's concerted efforts to take advantage of an opportunity to profit off of Lehman's bankruptcy. Although Raymond James understood Iowa Telecom's obligations under the ISDA Master, it collaborated with Iowa Telecom to ensure that Iowa Telecom made an unreasonable and bad faith payment to Lehman in violation of the terms of the ISDA Master by advising Iowa Telecom on the legal aspects of the termination; setting the terms of the replacement transaction; and conducting termination calculations on Iowa Telecom's behalf.

56. Thus, as a result of Raymond James's concerted efforts, which Raymond James targeted directly at Lehman by working with and advising Iowa Telecom to structure a

16

replacement transaction and make an unreasonable and bad faith payment to Lehman, Raymond James received funds belonging to Lehman, in an amount to be proven at trial, but not less than $1,901,829 plus any applicable interest. Equity and good conscience require return of these funds to Lehman.

## THIRD CAUSE OF ACTION

### (Conspiracy To Induce Breach Of Contract)

57. The Plaintiff realleges and incorporates by reference each and every allegation set forth above, as though fully set forth herein.

58. Raymond James knew that Iowa Telecom and Lehman were parties to a valid contract, the ISDA Master, the terms of which governed termination and replacement of the Swap. Raymond James requested and reviewed the ISDA Master.

59. Although Raymond James understood Iowa Telecom's obligations under the ISDA Master, by advising Iowa Telecom on the legal aspects of the termination; setting the terms of the replacement transaction; and conducting termination calculations on Iowa Telecom's behalf, it induced Iowa Telecom to violate the ISDA Master by failing to properly calculate the payment owed to Lehman at Early Termination under the Loss Method. Under Raymond James's influence, Iowa Telecom submitted a calculation statement and subsequent payment to Lehman that was unreasonable, in bad faith, and did not reflect the full amount of its gain under the Loss measure.

60. As a result of this breach, Lehman was damaged in an amount to be proven at trial, but not less than $1,901,829 plus any applicable interest. Raymond James is jointly and severally liable for this breach.

17

# FOURTH CAUSE OF ACTION

### (Order Requiring Turnover Of Property Under Sections 105(a), 541 and 542 Of The Bankruptcy Code)

61. The Plaintiff realleges and incorporates by reference each and every allegation set forth above, as though fully set forth herein.

62. The value of the replacement transaction on the Early Termination date, September 26, 2008, is property in which LBSF had a legal and/or equitable interest, pursuant to the ISDA Master between LBSF and Iowa Telecom, as of the commencement of its bankruptcy case. The value of the replacement transaction is property of LBSF's estate under section 541(a)(1) of the Bankruptcy Code.

63. Raymond James is "in possession, custody, or control" of this property, which is of substantial value and benefit to LBSF's estate and which is property belonging to LBSF. Raymond James does not have a right to this property, by contract or otherwise, and Section 542 of the Bankruptcy Code requires that Raymond James turn over that property.

64. Accordingly, Lehman is entitled to an order, pursuant to section 105(a), 541(a)(1) and 542 of the Bankruptcy Code, (a) declaring that the value of the replacement transaction on the Early Termination Date constitutes property of LBSF's estate under section 541(a)(1) of the Bankruptcy Code and (b) compelling and directing Raymond James to turn over the value of the replacement transaction on the Early Termination date immediately for the benefit of LBSF's unsecured creditors pursuant to section 542 of the Bankruptcy Code. The amount of that value is to be proven at trial, but is not less than $1,901,829 plus any applicable interest.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Lehman Brothers Holdings Inc. in its capacity as Plan Administrator for Lehman Brothers Special Financing Inc. respectfully requests that this Court grant judgment:

(i) ordering restitution of funds belonging to Lehman Brothers Holdings Inc. and Lehman Brothers Special Financing Inc. in an amount not less than $1,901,829;

(ii) ordering turnover of property belonging to the estate of Lehman Brothers Special Financing Inc. in an amount not less than $1,901,829;

(iii) awarding Lehman Brothers Holdings Inc. and Lehman Brothers Special Financing Inc. damages in an amount not less than $1,901,829; and

(iv) awarding statutory interest, as well as costs and disbursements of this action and attorneys' fees; and

(v) awarding Lehman Brothers Holdings Inc. and Lehman Brothers Special Financing Inc., and their affiliates and subsidiaries, such other and further relief as this Court deems just and proper.

Dated:   New York, New York
September 25, 2014

By: /s/ Andrew J. Rossman
Andrew J. Rossman
Ellison S. Ward
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100
andrewrossman@quinnemaunel.com
ellisonward@quinnemaunel.com

*Attorneys for Lehman Brothers Holdings Inc. and Lehman Brothers Special Financing Inc.*