Opposition Date:  October 14, 2014 at 11:59 p.m. (Prevailing Eastern Time)
Reply Date:  October 21, 2014 at 11:59 p.m. (Prevailing Eastern Time)

**JONES DAY**
Jayant W. Tambe
Laura W. Sawyer
222 East 41st Street
New York, New York 10017

*Attorneys for the Debtors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------------------x

| | | |
|---|---|---|
| **In re:** | : | **Chapter 11** |
| **LEHMAN BROTHERS HOLDINGS INC., et al.** | : | **Case No. 08-13555 (SCC)** |
| **Debtors.** | : | **(Jointly Administered)** |

--------------------------------------------------------------------x

## MEMORANDUM OF LAW IN SUPPORT OF LEHMAN'S MOTION FOR AN ORDER EXCLUDING THE TESTIMONY OF DANIEL CURRY AND JEFFREY HASTEROK

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................. 3

    I.      THE RESERVE FUND AGREEMENT ................................................ 3

    II.     DANIEL CURRY AND JEFFREY HASTEROK ................................. 4

ARGUMENT ...................................................................................................... 6

    I.      LEGAL STANDARD ........................................................................... 6

    II.     THE OPINIONS OF MESSRS. CURRY AND HASTEROK SHOULD
          NOT BE ADMITTED ........................................................................... 8

          A.     Messrs. Curry and Hasterok's Novel Approach To Value The RFA
                Is Not A Reliable Expert Opinion And Is Not Admissible ...................... 9

          B.     Messrs. Curry and Hasterok Rely Solely Upon Their *Ipse Dixit* To
                Support Their Opinions, Which Renders Them Inadmissible ................. 13

          C.     Messrs. Curry and Hasterok's Opinions Are Based Upon
                Speculative and Erroneous Assumptions, Rendering Their
                Conclusions Unreliable ......................................................................... 15

CONCLUSION ................................................................................................. 19

# TABLE OF AUTHORITIES

**Page**

CASES

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
　303 F.3d 256 (2d Cir. 2002)............................................................7, 15, 18

*Bank of N.Y. Mellon Trust Co. v. Solstice ABS CBO II, Ltd.*,
　910 F. Supp. 2d 629 (S.D.N.Y. 2012)..............................................13, 18

*Boucher v. United States Suzuki Motor Corp.*,
　73 F.3d 18 (2d Cir. 1996) ........................................................................18

*Bourjaily v. United States*,
　483 U.S. 171 (1987)..................................................................................6

*Carmichael v. City of New York*,
　No. 06-cv-1913, 2014 U.S. Dist. LEXIS 106563 (E.D.N.Y. Aug. 1, 2014) ......................8, 13

*Crowley v. Chait*,
　322 F. Supp. 2d 530 (D.N.J. 2004) ...................................................8, 13

*Daubert v. Merrell Dow Pharm., Inc.*,
　509 U.S. 579 (1993)..................................................................................6

*GE v. Joiner*,
　522 U.S. 136 (1997)................................................................................14

*In re Iridium Operating LLC*,
　373 B.R. 283 (Bankr. S.D.N.Y. 2007) (Peck, J.) ...................................6

*In re Med Diversified, Inc.*,
　334 B.R. 89 (Bankr. E.D.N.Y. 2005)......................................................6

*In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*,
　No. Civ. 1898, 2008 U.S. Dist. LEXIS 44216 (S.D.N.Y. June 5, 2008)......................8, 13, 15

*Kumho Tire Co. v. Carmichael*,
　526 U.S. 137 (1999).......................................................................... *passim*

*Lippe v. Bairnco Corp.*,
　99 F. App'x 274 (2d Cir. 2004) ...........................................................7, 13

*Nimely v. City of New York*,
   414 F.3d 381 (2d Cir. 2005)...........................................................................................7, 13

*Raskin v. Wyatt Co.*,
   125 F.3d 55 (2d Cir. 1997).................................................................................................18

*United States CFTC v. Moncada*,
   No. 12 Civ. 8791, 2014 U.S. Dist. LEXIS 88884 (S.D.N.Y. June 30, 2014).....................7, 13

*Zaremba v. GMC*,
   360 F. 3d 355 (2d Cir. 2004)...........................................................................................7, 13

**RULES**

Federal Rule of Evidence 702................................................................................................ *passim*

Lehman Brothers Holdings Inc. ("LBHI") and Lehman Brothers Special Financing Inc.

("LBSF" and collectively with LBHI, "Lehman"), by and through their undersigned counsel,

hereby move for the entry of an order, pursuant to Federal Rule of Evidence 702, excluding the

proposed expert testimony of Daniel Curry and Jeffrey Hasterok being proffered by the Tobacco

Settlement Authority of the State of Washington ("Washington TSA") from being considered in

connection with Proofs of Claim Nos. 37355 and 37356.

### INTRODUCTION

1.    The dispute between the parties revolves around the valuation of the Reserve

Fund Agreement ("RFA"), which was executed on November 5, 2002 and rejected on March 25,

2009.[1]

2.    In support of its Proofs of Claim, Washington TSA has presented expert reports

from Daniel Curry, Jeffrey Hasterok and Peter Shapiro.  All of the experts – both those

designated by Lehman and those designated by Washington TSA – agree that there is an

industry-standard methodology to value reserve fund agreements.

3.    Despite their recognition of the industry-standard methodology, Washington

TSA's proffered experts choose to value the RFA in manners that materially deviate from this

method.  In the case of Messrs. Curry and Hasterok, the industry-standard methodology is

purposefully discarded in favor of an *ad hoc* approach crafted only for this litigation.  Mr.

Shapiro, on the other hand, employs the basic framework of the industry-standard methodology,

but utilizes key assumptions that are markedly inconsistent with market practice.  The deviation

---

[1]    The RFA is dated November 5, 2002, by and among Washington TSA, as Issuer, U.S. Bank, as
Trustee, and LBSF, and was subsequently amended by the Amendment Agreement, dated March 26, 2003, among
Washington TSA, U.S. Bank, and LBSF.  It is attached as Ex. 1 to the Declaration of Laura W. Sawyer, dated
September 26, 2014, (hereinafter "Sawyer Decl.").

of Washington TSA's experts from market practice substantially skews their valuation of the RFA in Washington TSA's favor.

4.       Messrs. Curry and Hasterok are experienced financial professionals, who, notwithstanding their experience and expertise, proffer a novel approach to valuing the RFA. They admit, as they must, that they never used the approach found in their expert opinion during their nearly 45 years in finance.  Instead, the approach was constructed solely for purposes of Washington TSA's claim.  *See* Section IIA, below.  They deviate from the industry-standard methodology – and their expertise – in many ways, each of which independently provides grounds on which the opinions of Messrs. Curry and Hasterok should be excluded:

- They reject the industry-standard methodology for valuing reserve fund agreements.

- They reject the use of forward yield curves for valuing the RFA.

- They disregard key language of the RFA that requires the valuation of the RFA to be done "as if it were Lehman."

- They base their opinions on the speculative assumption that Washington TSA will only earn 0.65% on its Reserve Fund – no more and no less – for the next 23 years.[2]

- They reject the industry-standard method for discounting cash flows to present value and instead mistakenly use the same 0.65% as the discount rate to determine the Termination Amount of the RFA.

None of these approaches and assumptions are accepted in the market or have any basis in finance theory or practice.  It is black letter law that opinions presented that do not reflect industry standards are not admissible.

5.       Notwithstanding that Mr. Shapiro uses the industry-standard approach, Mr. Shapiro utilizes assumptions that are inconsistent with market practice which render his opinions inadmissible.  However, the Court recently ordered the production of additional

---

[2]       Capitalized terms not defined herein are ascribed the meaning provided in the RFA.

discovery relating to Mr. Shapiro's opinions and assumptions (including his work papers), which have not yet been produced, nor has Lehman had the opportunity to fully explore the bases of Mr. Shapiro's opinions in depositions.  Consequently, Lehman reserves its rights to move for the exclusion of Mr. Shapiro's opinions at a later date.

6.      In order for expert testimony to be admissible, experts must "use the same level of intellectual rigor that characterizes the practice of an expert in the relevant field" in the expert opinion.  *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).  Because Messrs. Curry and Hasterok have deviated from industry practice – which is where they obtained their purported expertise – their subsequent opinions are simply not admissible.  The opinions lack the rigor and reliability required of expert testimony and will not assist the Court in resolving the issues at the upcoming Claims Hearing and should not be admitted.

## BACKGROUND

### I.      THE RESERVE FUND AGREEMENT

7.      The RFA was a long-term investment contract under which LBSF delivered securities to Washington TSA that provided a guaranteed rate of return of 4.484% per annum (the "Guaranteed Rate") on approximately $45.5 million held in the Reserve Fund to secure payments of Bonds issued by Washington TSA, in consideration for Washington TSA's agreement to use the funds in the Reserve Fund to periodically purchase the securities from LBSF at fixed prices.  LBSF earned a profit in connection with the RFA insofar as it could acquire the securities for a price less than the price paid by Washington TSA.  LBHI guaranteed LBSF's performance under the RFA.

8.      The RFA provides that, in the event of a default by either Washington TSA or Lehman, a Termination Amount shall be calculated and paid.  *See* Ex. 1 to Sawyer Decl., RFA § 7.  Under Section 7.6 of the RFA, upon the occurrence of a Lehman Event of Default, Lehman

had the right to calculate the Termination Amount.  *Id.* at § 7.6.  Section 7.6(c) provided,

however, that:

> if Lehman fails to determine the Termination Amount within three
> Business Days of written notice from the Issuer or the Trustee of
> the occurrence of a Lehman Event of Default **then the Issuer shall
> make such determination as if it were Lehman** and the amount as
> so determined by the Issuer shall for purposes of this Section 7.6
> be deemed the Termination Amount.

Ex. 1 to Sawyer Decl., RFA, § 7.6(c) (emphasis added).

9.      The standard industry approach to value a reserve fund agreement is not in

dispute.  The standard industry approach essentially creates a hypothetical interest rate swap

where one payer (Lehman) would be deemed to pay fixed rate (the Guaranteed Rate of the RFA)

and the other payer (Washington TSA) would be deemed to pay floating rate (which would vary

depending on the anticipated rates for the securities to be delivered).  Using this methodology,

the cash flows associated with each of these payment legs is determined, using the Scheduled

Reserve Amount of the RFA as the notional amount.  For the fixed leg, the Guaranteed Rate of

the RFA is used.  To calculate the value of the floating leg, an implied forward yield curve for

the securities to be delivered must be used to determine the amount of future payments, based

upon market data as of the valuation date.  The valuation of the RFA is simply the difference in

the present values of these two sets of cash flows for the RFA.

## II.    DANIEL CURRY AND JEFFREY HASTEROK

10.     Messrs. Curry and Hasterok submitted a consolidated expert report dated

December 16, 2013 (the "Curry/Hasterok Report") and a consolidated rebuttal report dated

March 24, 2014 (the "Curry/Hasterok Rebuttal").  Messrs. Curry and Hasterok also provided

deposition testimony on January 17, 2014 and January 16, 2014, respectively.  Messrs. Curry and

Hasterok opine that the Termination Amount owed to Washington TSA by Lehman is $37.5

million plus $553,080 in Section 7.7(b) damages,[3] for a total of $38,053,080.  Ex. 2 to Sawyer Decl., Curry/Hasterok Report at 2, 20.

11.    Messrs. Curry and Hasterok are financial industry professionals whose purported expertise derives solely from their experience.  Messrs. Curry and Hasterok both spent many years working in the finance industry and were colleagues at Morgan Stanley.  *See* Ex. 2 to Sawyer Decl., Curry/Hasterok Report at 24-25.  While at Morgan Stanley, one of Mr. Hasterok's primary responsibilities was to calculate termination values and new trade values for deals involving forward purchase agreements similar to the RFA.  *See* Ex. 3 to Sawyer Decl., Hasterok Tr. 28:15-21.  Mr. Curry spent his time at Morgan Stanley in a variety of positions involving municipal financing, which included managing risk of a portfolio of municipal bonds.  *See* Ex. 4 to Sawyer Decl., Curry Tr. 9:23-10:20.

12.    In reaching their expert opinions, Messrs. Curry and Hasterok have turned their backs on their experience.  They have rejected the industry-standard methodology and instead have purported to determine the Termination Amount in a manner that they freely admit they have never used in their combined nearly 45 years of experience in the financial industry.[4]  Ex. 3 to Sawyer Decl., Hasterok Tr. 91:19-92:10; Ex. 4 to Sawyer Decl., Curry Tr. 78:21-79:14.  As part of their novel approach, Messrs. Curry and Hasterok reject the use of forward yield curves for valuing a long-dated financial instrument and opine – with no justifiable or rational basis – that Washington TSA will only earn 0.65% on its Reserve Fund for the next 23 years.  To determine the Termination Amount, Messrs. Curry and Hasterok merely deduct 0.65% from the

---

[3]    The RFA also requires that Washington TSA be compensated for Lehman's failure to deliver Eligible Securities on December 1, 2008 through the valuation date, March 25, 2009.  *See* Ex. 1 to Sawyer Decl., RFA § 7.7(b).  Because Section 7.7(b) damages are not relevant to this motion, the calculation of these damages by Washington TSA's experts is not discussed in detail herein.

[4]    Messrs. Curry and Hasterok worked in tandem to develop the approach used in their Report.  *See* Ex. 4 to Sawyer Decl., Curry Tr. 144:25-145:20.

Guaranteed Rate of 4.484% for the remaining 23 years of the RFA and discount the result to

present value.  The justification Messrs. Curry and Hasterok give for this novel approach is

inconsistent with the plain language of the RFA that requires any valuation done by Washington

TSA to done "as if it were Lehman."  Ultimately, this approach, which is not based in any

industry expertise that Messrs. Curry and Hasterok may have, and which relies upon faulty and

speculative assumptions, is patently unreliable and not an admissible expert opinion.

## ARGUMENT

## I.    LEGAL STANDARD

13.    Federal Rule of Evidence 702 permits a court to admit expert evidence only if the

"knowledge, skill, experience, training, or education" qualifies the witness as an expert in the

relevant subject matter, ***and then*** only if

> (a) the expert's scientific, technical, or other specialized
> knowledge will help the trier of fact to understand the evidence or
> to determine a fact in issue;
> (b) the testimony is based upon sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods,
> ***and***
> (d) the witness has applied the principles and methods reliably to
> the facts of the case.

Fed. R. Evid. 702 (emphasis added).  The proponent of the evidence has the burden of

establishing by a preponderance of the evidence that the testimony is admissible.  *See Bourjaily v.*

*United States*, 483 U.S. 171, 175 (1987).

14.    Rule 702 "establishes a standard of evidentiary reliability" for expert testimony

that reflects the decision by the United States Supreme Court in *Daubert v. Merrell Dow Pharm.,*

*Inc.*, 509 U.S. 579, 590 (1993) and its progeny.[5]  Under this standard, "where such testimony's

---

[5]    Rule 702 and related *Daubert* principles are applied regularly in bankruptcy proceedings. *See, e.g., In re Iridium Operating LLC*, 373 B.R. 283 (Bankr. S.D.N.Y. 2007) (Peck, J.); *In re Med Diversified, Inc.*, 334 B.R. 89, 92 (Bankr. E.D.N.Y. 2005).

factual basis, data, principles, methods, or their application are called sufficiently into question, the trial judge must determine whether the testimony has a reliable basis in the knowledge and experience of the relevant discipline." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999) (alteration and citation omitted). "[I]t is critical that an expert's analysis be reliable *at every step*." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002) (emphasis added).

15.     To apply this standard, the "court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." *Id.*  When there is not "a sufficiently rigorous analytical connection between [an expert's] methodology and the expert's conclusions," *Nimely v. City of New York*, 414 F.3d 381, 396 (2d Cir. 2005), such that an expert's data or methodology "are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 *mandate* the exclusion of that unreliable opinion testimony." *Amorgianos*, 303 F.3d at 266 (emphasis added).

16.     Rule 702 requires that the Court determine that "the testimony is the product of reliable principles and methods."  For experts like those proffered by Washington TSA who have acquired their expertise through experience, the overarching test for reliability lies in determining whether the expert's testimony exhibits "in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co.*, 526 U.S. at 152.  *See also Nimely*, 414 F.3d at 399 (2d Cir. 2005) (same), *Lippe v. Bairnco Corp.*, 99 F. App'x 274, 278-279 (2d Cir. 2004) (same); *Zaremba v. GMC*, 360 F. 3d 355, 358 (2d Cir. 2004) (same); *U.S. CFTC v. Moncada*, No. 12 Civ. 8791, 2014 U.S. Dist. LEXIS 88884, at *4 (S.D.N.Y. June 30, 2014) (failure to use a "recognized methodology" is grounds for

exclusion); *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, No. Civ. 1898, 2008 U.S. Dist. LEXIS 44216, at *15 (S.D.N.Y. June 5, 2008) (an expert must use the same level of rigor in the courtroom as in practice); *Carmichael v. City of New York*, No. 06-cv-1913, 2014 U.S. Dist. LEXIS 106563, at *30-31 (E.D.N.Y. Aug. 1, 2014) (failure to use commonly accepted methodology weighs against admission); *Crowley v. Chait*, 322 F. Supp. 2d 530, 539 (D.N.J. 2004) (purported experts who testify on the basis of experience must show that their expert opinions are "rooted" in their experience).

17.    The Curry/Hasterok Report does not reflect the same level of intellectual rigor that professionals in the financial industry exhibit.  Further, the opinions of Messrs. Curry and Hasterok lack the "rigorous analytical connection" between methodology and conclusions that Federal Rule 702 and *Daubert* demand.  Washington TSA therefore cannot meet its burden of proving that their testimony is admissible.

## II.    THE OPINIONS OF MESSRS. CURRY AND HASTEROK SHOULD NOT BE ADMITTED

18.    For purposes of this Claims Hearing, Messrs. Curry and Hasterok have devised a new approach to valuing the RFA that rejects the industry-standard methodology.  Instead of valuing the fixed and floating cash flows of the RFA, with the assistance of forward yield curves, Messrs. Curry and Hasterok have determined to value the RFA by taking an assumed "Replacement Yield" that Washington TSA could expect to earn over the life of the RFA and deducting it from the Guaranteed Rate of the RFA.

19.    The approach employed by Messrs. Curry and Hasterok is so unreliable that it cannot be admitted and considered as expert opinion testimony.  As discussed in Section A below, Messrs. Curry and Hasterok – who are proffered as experts based upon their experience in the industry – must employ the same rigor in the courtroom that they would have in their

finance practice.  Their rejection of the industry-standard methodology in favor of an untested, novel approach cannot be admitted as expert opinion testimony.  However, even if the Court were to conclude that Messrs. Curry and Hasterok's approach were generally admissible, as discussed in Sections B and C below, they fail to plausibly explain a key step in their analysis, thereby creating a large analytical gap between method and conclusion, and they rely on a series of speculative and faulty assumptions.  Each of these shortcomings alone would suffice to render their opinions unreliable and inadmissible.

### A.    Messrs. Curry and Hasterok's Novel Approach To Value The RFA Is Not A Reliable Expert Opinion And Is Not Admissible

20.    As a fundamental matter, the rejection of the industry standard methodology calls into question the reliability and admissibility of Messrs. Curry and Hasterok's opinions.  In order for expert testimony to be admissible, the witness must employ "in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152.  Messrs. Curry and Hasterok freely admit that their novel approach proposed for purposes of this Claims Hearing is one that they have never used before in their professional lives.

21.    During his deposition, Mr. Hasterok was asked, "in all of your years at Morgan Stanley, you never used this type of methodology?"  Mr. Hasterok responded, "That's correct." Ex. 3 to Sawyer Decl., Hasterok Tr. 91:19-21.  Likewise, when Mr. Curry was asked, "Other than this report . . . have you ever employed the valuation methodology that is set forth in [the Curry/Hasterok Report] on any other transaction?" he confirmed that he did not because, "[i]t wasn't applicable to other transactions." Ex. 4 to Sawyer Decl., Curry Tr. 79:2-7.  Indeed, Washington TSA's other expert, Peter Shapiro, describes the industry-standard methodology, that is, the use of a hypothetical interest rate swap, as "**the appropriate**" methodology for

valuing a reserve fund agreement.  Ex. 5 to Sawyer Decl., Shapiro Report at 2 (emphasis added);

*see also* Ex. to Sawyer Decl. 7, Shapiro Tr. (Dec. 13, 2013) 121:8-16.

22.    Furthermore, both Messrs. Curry and Hasterok admit that, if they had to value the

RFA outside of this proceeding, they would use different methods.  When asked about the

applicability of the methods he learned and employed at Morgan Stanley to the valuation of the

RFA, Mr. Hasterok responded, "[w]e didn't feel using that methodology—that exact same

methodology that I would have used if I was sitting in my seat at Morgan Stanley, was as

appropriate . . . ." Ex. 3 to Sawyer Decl., Hasterok Tr. 35:8-12.  Mr. Hasterok explained that

"We would not have used this method [employed in the Curry/Hasterok Report] when

calculating new RFAs or terminations of old RFAs." *Id.* at 91: 13-17.  Mr. Curry agreed that if

he were valuing the Termination Amount of the RFA as a trader he "wouldn't have valued it the

same way [as in the Curry/Hasterok Report]."  Ex. 4 to Sawyer Decl., Curry Tr. 147:15-16.

23.    In addition to rejecting the creation of a hypothetical interest rate swap to value

the RFA, Messrs. Curry and Hasterok also reject, in general, the use of forward yield curves in

any valuation approach.  The rejection of forward yield curves also flies in the face of industry

practice and valuation theory.  Messrs. Curry and Hasterok admit the fundamental role that

forward curves played in their finance careers for the valuation of financial instruments and

positions.[6]  Messrs. Curry and Hasterok are aware that forward rates are the industry standard

and that all market participants use them to price transactions on a daily basis.  *See generally* Ex.

3 to Sawyer Decl., Hasterok Tr. 196:8-18; Ex. 4 to Sawyer Decl., Curry Tr. 11:17 - 12:4.  Mr.

Hasterok confirmed that he "absolutely used swap – LIBOR swap curves, credit curves when

pricing new trades and the termination of old trades" while at Morgan Stanley.  Ex. 3 to Sawyer

---

[6]    Mr. Hasterok agreed that "if you are in a financial services environment as a trader or you are looking
to perform a fair price analysis of an interest rate derivative using an interest rate model . . . you better use forward
rates." Ex. 3 to Sawyer Decl., Hasterok Tr. 141:15 - 142:5.

Decl., Hasterok Tr. 28:9-25.  Mr. Curry likewise "would use forward curves to price hedges that

we would enter into to manage forward purchase agreements" like the RFA.  Ex. 4 to Sawyer

Decl., Curry Tr. 13:15-17.  *See also id.* at 9:23-10:25; 13:5-12.

24.     Notwithstanding the fundamental role of forward curves in the industry, Messrs.

Curry and Hasterok present two reasons for their rejection of forward curves.  First, Messrs.

Curry and Hasterok claim that "forward rates . . . are not generally accurate representatives of the

actual path the rates will actually follow over time."  Ex. 2 to Sawyer Decl., Curry/Hasterok

Expert Report at 14.  But this criticism rests on a faulty premise.  Forward rates are not designed

to predict future rates.  Rather, forward rates represent the market's consensus as to the price of

specific forward commitments.  Actual future rates can vary considerably from market forward

rates that were observed at previous times.

25.     Second, Messrs. Curry and Hasterok assert that it is inappropriate to use forward

curves because Washington TSA cannot transact at the levels seen on the forward curves.  *See*

Ex. 2 to Sawyer Decl., Curry/Hasterok Report at 14-15.  Washington TSA's ability to transact at

the levels seen in the forward curves as of March 25, 2009 (the valuation date) has absolutely no

relevance as to whether forward curves are market information that can support a valuation of

the RFA as of that date.  The RFA's value simply does not depend on whether or not

Washington TSA can currently transact.

26.     Ultimately, Messrs. Curry and Hasterok attempt to justify their deviation from the

industry-standard methodology and the use of forward curves, by arguing that Washington TSA

is not a financial institution, and, as such, should not be required to value the RFA as if it were a

financial institution.  *See* Ex. 8 to Sawyer Decl., Curry/Hasterok Rebuttal Report at 10; *see also*

Ex. 3 to Sawyer Decl., Hasterok Tr. 21:2-16, 103:18-104:4.  But valuation principles do not vary

based upon the role an institution plays in the financial market.

27.    More importantly, though, the express language of the RFA makes clear that the

purported justification for the novel Curry/Hasterok approach must be rejected.  Section 7.6(c) of

the RFA provides that if Washington TSA were to determine the Termination Amount, it must

do so "as if it were Lehman."  Ex. 1 to Sawyer Decl., RFA § 7.6(c).  In other words, if there is

any legitimacy to Messrs. Curry and Hasterok's position that dealers and counterparties value

reserve fund agreements differently (which there is not), Washington TSA must value the RFA

as if it were a dealer.  Mr. Hasterok confirmed that if he were to calculate the Termination

Amount from the point of view of a dealer, like Lehman, he would not use the methodology

found in the Curry/Hasterok Report, but would use the industry-standard methodology:

> Q:  . . . if you were calculating the estimated termination amount,
> not from the point of view of the client, but from the point of view
> of the dealer, you would use a different methodology?
>
> A:  Yes.
>
> Q:  You would use a forward curve methodology?
>
> A:  Yes.

Ex. 3 to Sawyer Decl., Hasterok Tr. 196:10-18.  Indeed, Mr. Hasterok explained that they

rejected the methodology they would have used at Morgan Stanley to value the RFA.  *Id.* at

35:8-12 ("We didn't feel using that methodology – the exact same methodology that I would

have used if I was sitting in my seat at Morgan Stanley, was as appropriate.").

28.    Messrs. Curry and Hasterok's disregard of the RFA's express requirement that

any valuation to be done by Washington TSA must be done "as if it were Lehman," combined

with their admission that if they had done the valuation from Lehman's perspective, they would

not have used the approach outlined in the Curry/Hasterok Report, warrants a complete rejection

of their opinions.  Any opinion that fails to consider the requirements of the RFA is simply of no probative value to the Court.  Where an expert fails "to consider necessary factors . . . the trial court has discretion to exclude his proffered testimony for lack of probative value." *Bank of N.Y. Mellon Trust Co. v. Solstice ABS CBO II, Ltd.,* 910 F. Supp. 2d 629, 640 (S.D.N.Y. 2012).

29.     To the extent there was any ambiguity as to whether Messrs. Curry and Hasterok have discarded the industry approach to valuing reserve fund agreements, including the use of forward curves, in the Curry/Hasterok Rebuttal Report, they confirm:  "we are well aware how FPAs (including the RFA) were priced . . . . ***We discarded this method*** . . . ."  Ex. 8 to Sawyer Decl., Curry/Hasterok Rebuttal Report, at 4-5 (emphasis added).  In its place, Messrs. Curry and Hasterok put forth an *ad hoc* approach created solely for the purpose of offering opinions in this case.  However, any opinions that flow from such a novel and untested approach must be rejected as inherently unreliable.  Messrs. Curry and Hasterok's abandonment of the techniques and expertise they may have acquired in their professional lives renders their resulting opinions inadmissible as they "failed to use the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, No. Civ. 1898, 2008 U.S. Dist. LEXIS 44216, at *15 (S.D.N.Y. June 5, 2008).  *See also Kumho Tire Co.*, 526 U.S. at 152; *Nimely*, 414 F.3d at 399; *Lippe v. Bairnco Corp.*, 99 F. App'x at 278-79; *Zaremba v. GMC*, 360 F. 3d at 358; *Moncada*, 2014 U.S. Dist. LEXIS 88884, at *4; *Carmichael*, 2014 U.S. Dist. LEXIS 106563 at *30-31; *Crowley*, 322 F. Supp. 2d at 539.

**B.     Messrs. Curry and Hasterok Rely Solely Upon Their *Ipse Dixit* To Support Their Opinions, Which Renders Them Inadmissible**

30.     Not only is the general methodological framework employed by Messrs. Curry and Hasterok unreliable, but it fails to articulate a key step.  Messrs. Curry and Hasterok do not adequately explain how they select the Termination Amount from the "Valuation Matrix" found

in their Expert Report.  Without this explanation, their opinion has a large logical gap and analytical gap requiring the Court to rely on their mere "say so," which is not permitted.  *See GE v. Joiner*, 522 U.S. 136, 146 (1997).

31.     After rejecting the industry standard methodology, Messrs. Curry and Hasterok purport to value the RFA by determining what interest rate Washington TSA will earn over the remaining life of the RFA (which they refer to as the "Replacement Yield") and then subtract that interest rate from the Guaranteed Rate of the RFA and then discount the resulting earnings to present value, using the Replacement Yield as the discount rate.  Ex. 2 to Sawyer Decl., Curry/Hasterok Report at 19.  In connection with this approach, Messrs. Curry and Hasterok have created a "Valuation Matrix" in which they present 40 different calculations of the Termination Amount, depending on the Replacement Yields assumed.  *Id*.

32.     Then, from the 40 values in the "Valuation Matrix," Messrs. Curry and Hasterok select one – based only on the conclusory assertion that projecting a flat and unchanging interest rate twenty-three years into the future somehow avoids problems of uncertainty  – and declare that to be the Termination Amount.[7]  *See* Ex. 2 to Sawyer Decl., Curry/Hasterok Report at 20. The method by which this selection of the "correct" Termination Amount from a myriad of choices is not adequately explained by Messrs. Curry and Hasterok.[8]  Such an unexplained leap renders their opinion inadmissible.  *See Joiner*, 522 US at 146 ("But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert.  A court may conclude that there is

---

[7]     The only logic that can be gleaned as to the selection of the Termination Amount is that it is coincidentally close to the Termination Amount determined by Washington TSA's expert, Peter Shapiro.  That alone, though, is no methodology that can be rigorously examined and tested.

[8]     Similarly, Messrs. Curry and Hasterok do not explain the methodology by which they reject the other 39 valuations found in their Valuation Matrix.

simply too great an analytical gap between the data and the opinion proffered."); *Amorgianos*,

303 F.3d at 267 ("To warrant admissibility, however, it is critical that an expert's analysis be

reliable at every step. . . . [A]ny step that renders the analysis unreliable under the *Daubert*

factors renders the expert's testimony inadmissible."); Fed. R. Evid 702 advisory committee's

note (2000 Amendments) (stating that an expert who is relying "solely . . . on experience . . .

must explain how that experience leads to the conclusion reached, why that experience is a

sufficient basis for the opinion, and how that experience is reliably applied to the facts.").

33.    Messrs. Curry and Hasterok's failure to provide a justifiable methodology for

their selection of the Termination Amount is grounds for exclusion of their opinions.  Their

assertion that a particular valuation from their Valuation Matrix is the correct Termination

Amount is purely *ipse dixit*.  Since Messrs. Curry and Hasterok do not explain the method by

which they reach their conclusions, their conclusions can be neither reconstructed nor tested.

Because the Court "cannot assess the reliability of reasoning or methodology that is

unexplained," the "ultimate problem with [the experts'] opinion is not [their] conclusion but the

fact that [they] fail [. . . ] to identify any methodology." *In re Methyl Tertiary Butyl Ether Prods.*

*Liab. Litig.*, No. Civ. 1898, 2008 U.S. Dist. LEXIS 44216, at *13 (S.D.N.Y. June 5, 2008).

### C.    Messrs. Curry and Hasterok's Opinions Are Based Upon Speculative and Erroneous Assumptions, Rendering Their Conclusions Unreliable

34.    Even if the Court were to determine that the opinions of Messrs. Curry and

Hasterok were admissible notwithstanding the fundamental flaws discussed above, their opinions

rest on speculative and erroneous assumptions, which further render them inadmissible.  Again,

Messrs. Curry and Hasterok disregard market practice – which is the basis of their purported

expertise – in favor of untested assumptions.  Specifically, Messrs. Curry and Hasterok opine

that Washington TSA will be unable to earn more than 0.65% on the Reserve Fund through

2032, notwithstanding the fact that on March 25, 2009, the widely-available, industry-standard, interest rate curves were predicting that interest rates would rise over time, and reject the market-standard discount rate for determining the present value of future earnings.

35.    The Termination Amount selected by Messrs. Curry and Hasterok utilizes a Replacement Yield of 0.65%.  This Replacement Yield was determined by Messrs. Curry and Hasterok by averaging Washington TSA's actual earnings on the Reserve Fund from December 1, 2008 to March 25, 2009 and then taking that four-month average and extrapolating that Washington TSA will only earn that amount – no more and no less – for the remaining 23 years of the RFA.  Such an assumption is inconsistent with market information on the valuation date that believed interest rates would rise over time.  Again, Messrs. Curry and Hasterok reject industry standards and custom to base their opinions on an entirely speculative and untested assumption.

36.    Messrs. Curry and Hasterok recognize the problematic nature of the assumption they have made.  Neither of them has ever seen interest rates remain steady for more than a single day.  As Mr. Curry stated in his deposition, "I don't know that they [short-term rates] have been flat and unchanged for more than a day."  Ex. 4 to Sawyer Decl., Curry Tr. 81:5-7. Additionally, both Mr. Shapiro (Washington TSA's other expert witness) and Mr. Bob Cook (Washington TSA's finance director) confirm that they believe interest rates will rise over the next 23 years.  *See* Ex. 6 to Sawyer Decl., Shapiro Tr. (Mar. 5, 2014) 223:6-21 (stating that it is common sense to suppose that interest rates will rise); Ex. 9 to Sawyer Decl., Cook 30(b)(6) Tr. 117:18-23 (stating that TSA believed "interest rates were going to begin to rebound" in 2012). Indeed, Mr. Cook testified that the TSA rejected several alternative investments to replace the RFA because "we thought within six months, twelve months, that the interest rate environment

was going to begin to recover, so we didn't want to lock ourselves into an artificially low rate."

Ex. 9 to Sawyer Decl., Cook 30(b)(6) Tr. 92:11-14.

37.     Messrs. Curry and Hasterok also acknowledge the difficulty in taking historical

averages and projecting forward.  As they admit,

> Past performance is no guarantee of future results.  Future returns
> can (and probably will) vary from past returns. . . . In addition,
> historical average returns are very sensitive to the time period
> chosen.  For example, the average yield for the past year may be
> materially different than the average yield for the past three years.

*See* Ex. 2 to Sawyer Decl., Curry/Hasterok Report at 15.  As they note, the selection of the time

period sampled can dramatically impact the resulting assumption.[9]  As Mr. Hasterok testified in

his deposition, "depending on the date range, you are probably going to get very different

answers, and – but we did not do a thorough investigation of back-testing every possible range

and how that then fit to future results.  We did not do that."  Ex. 3 to Sawyer Decl., Hasterok Tr.

182:4-11.  As Mr. Hasterok confirmed, they did not do any analysis to justify their selection of

this four-month average to determine the Replacement Yield.[10]  *Id.* at 179:23-180-2 (Mr.

Hasterok testifying, "So did we do a specific analysis that says, 'Four months of data is the best

predictor of future results?' we did not do that analysis.").

38.     Messrs. Curry and Hasterok's assumption about future earnings by Washington

TSA is nothing more than sheer speculation.  The Second Circuit has found that the "[a]dmission

---

[9]     To highlight this difficulty, during the deposition of Mr. Hasterok and using the data provided by
Messrs. Curry and Hasterok, we looked at a seven-year average (as opposed to a four-month average).  Using the
seven-year average, the resulting "Replacement Yield" was 3%.  When a "Replacement Yield" of 3% was used in
the Curry/Hasterok approach, a Termination Amount of "about $10 million, give or take" was determined.  Ex. 3 to
Sawyer Decl., Hasterok Tr. 186:11-12.

[10]    The Curry/Hasterok Report asserts that the use of this actual historical yield is more reliable than the
use of average historical yields for other eligible securities:  "due to the variability of the average depending on the
time period chosen to calculate the average, use of [average historical yields] is inappropriate to determine a final
Termination Amount [sic]."  Ex. 2 to Sawyer Decl., Curry/Hasterok Report at 20.  But this conclusory statement
provides no substantive or statistical analysis to justify its conclusion.

of expert testimony based on speculative assumptions is an abuse of discretion." *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18 (2d Cir. 1996). Moreover, that expert testimony "should be excluded if it is speculative or conjectural . . ." *Id.* at 21. *See also Raskin v. Wyatt Co.*, 125 F.3d 55, 67 (2d Cir. 1997) (concluding that testimony should be excluded when one of a report's "central conclusions . . . is premised on an elementary statistical error"); *Bank of N.Y. Mellon Trust Co. v. Solstice ABS CBO II, Ltd.*, 910 F. Supp. 2d 629, 640 (S.D.N.Y. 2012) (Where the "analysis rests on faulty assumptions, the trial court has discretion to exclude [the expert's] proffered testimony for lack of probative value."). The unjustified projection of a fixed rate of 0.65% for 23 years is yet another "step that renders the analysis unreliable under the *Daubert* factors" and thus renders the Curry/Hasterok Report inadmissible. *Amorgianos*, 303 F.3d at 267.

39.     Messrs. Curry and Hasterok take the 0.65% "Replacement Yield" and use it for a second, unrelated (and improper) purpose. Specifically, they use 0.65% as the rate by which cash flows are discounted to present value. This discount rate is inconsistent with market practice, which uses the LIBOR curve for discounting. Washington TSA's other expert, Peter Shapiro, even recognizes the market practice of using the LIBOR curve. *See* Ex. 6 to Sawyer Decl., Shapiro Tr. (Mar. 5, 2014) at 118:20-21 ("The normal discounting curve that would be used is the LIBOR swap curve."). The use of an erroneous discount rate has a dramatic impact on the resulting valuation and Messrs. Curry and Hasterok's disregard of the industry standard once again renders their conclusions unreliable and inadmissible. *See Amorgianos*, 303 F.3d at 267; *Raskin*, 125 F.3d at 67.

## CONCLUSION

40.     Lehman respectfully requests that the Court (a) enter an order substantially in the form attached hereto as Exhibit A, granting the relief requested herein; and (b) grant such other and further relief to Lehman as the Court may deem proper.

Dated: September 26, 2014
       New York, New York

                                        Respectfully submitted,

                                        /s/ Laura W. Sawyer
                                        _____
                                        JONES DAY
                                        Jayant W. Tambe
                                        Laura W. Sawyer
                                        222 East 41st Street
                                        New York, New York  10017
                                        Telephone:   (212) 326-3685
                                        Facsimile:    (212) 755-7306

                                        *Attorneys for the Debtors*

# EXHIBIT A

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------ x

| | | |
|---|---|---|
| In re: | : | **Chapter 11** |
| **LEHMAN BROTHERS HOLDINGS INC., et al.** | : | **Case No. 08-13555 (SCC)** |
| Debtors. | : | **(Jointly Administered)** |

------------------------------------------------------------------ X

## ORDER EXCLUDING THE TESTIMONY OF
## <u>DANIEL CURRY AND JEFFREY HASTEROK</u>

This matter coming before the Court on Lehman's Motion for an Order Excluding the
Testimony of Daniel Curry and Jeffrey Hasterok; the Court having reviewed the Motion and
having considered the statements of counsel and testimony of the witnesses before the Court
during the Evidentiary Hearing on November 4, 5 and 6, 2014 (the "Hearing"); and the Court
having found that:

(a)     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and
1334;

(b)     This is a core proceeding pursuant to 28 U.S.C. § 157(b);

(c)     Notice of the Motion, supporting papers and statements of counsel and the
witnesses during the Hearing were sufficient under the circumstances; and

(d)     The Court having determined that the legal and factual bases set forth in the
Motion and at the Hearing establish just cause for the relief granted herein.

IT IS HEREBY ORDERED THAT:

(i)     The Motion is GRANTED.

(ii)     Any proffered expert testimony of Daniel Curry and Jeffrey Hasterok, including but not limited to, the Curry/Hasterok Expert Report, dated December 16, 2013; (attached to the Declaration of Laura W. Sawyer as Exhibit 2) and the Curry/Hasterok Expert Rebuttal Report, dated March 24, 2014; (attached to the Declaration of Laura W. Sawyer as Exhibit 8); and the testimony offered by Messrs. Curry and Hasterok at the Hearing, is hereby deemed inadmissible and is excluded from the record, pursuant to Federal Rule of Evidence 702.

(iii)    The Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation of this Order.

**SO ORDERED:**

Dated:   New York, New York
        _____, 2014

                                                  _____
                                                HONORABLE SHELLEY C. CHAPMAN
                                                UNITED STATES BANKRUPTCY JUDGE

## DECLARATION OF SERVICE

Laura W. Sawyer declares under penalty of perjury pursuant to 28 U.S.C. § 1746 that on

September 26, 2014, I caused a true and correct copy of the attached Memorandum of Law In

Support Of Lehman's Motion For An Order Excluding The Testimony Of Daniel Curry And

Jeffrey Hasterok to be served by first class mail and via the Southern District of New York

Bankruptcy Court's electronic case filing system upon the following counsel of record:

> Paul J. Lawrence
> Kymberly K. Evanson
> PACIFICA LAW GROUP LLP
> 1191 Second Avenue, Suite 2100
> Seattle, WA 98101
>
> Eric T. Moser
> Robert N. Michaelson
> RICH MICHAELSON MAGALIFF MOSER, LLP
> 340 Madison Avenue, 19th Floor
> New York, NY 10173

> /s/ Laura W. Sawyer
> Laura W. Sawyer